# EXHIBIT 1

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF TEXAS**
**HOUSTON DIVISION**

| | | |
|---|---|---|
| **OTIS LINDELL CHAPMAN AND** | § | |
| **KIM CHAPMAN** | § | |
|     **Plaintiffs,** | § | |
| | § | |
| **vs** | § | **CASE NO.** |
| | § | |
| **MONSANTO COMPANY** | § | |
|     **Defendants** | § | **JURY DEMANDED** |

---

## PLAINTIFFS' ORIGINAL COMPLAINT WITH JURY DEMAND

---

COME NOW Plaintiffs, Otis Lindell Chapman and Kim Chapman, by and through their undersigned counsel, and file their Complaint against Defendant Monsanto Company, and for causes of action show unto the Court as follows:

### INTRODUCTION

1.    In 1970, Defendant Monsanto Company, Inc. ("Monsanto") discovered the herbicidal properties of glyphosate and began marketing it in products in 1974 under the brand name Roundup®. Roundup® is a non-selective herbicide used to kill weeds that commonly compete with the growing of crops. In addition to the active ingredient glyphosate, Roundup® contains the surfactant Polyethoxylated tallow amine (POEA) and/or adjuvants and other so-called "inert" ingredients. In 2001, glyphosate was the most used pesticide active ingredient in American agriculture with 85-90 million pounds used annually. That number grew to 185 million pounds in 2007. As of 2013, glyphosate was the world's most widely used herbicide.

2.    Monsanto is a multinational agricultural biotechnology corporation based in St. Louis, Missouri, and incorporated in Delaware. It is the world's leading producer of glyphosate. As of 2009, Monsanto was the world's leading producer of seeds, accounting for 27% of the world

1

seed market.  The majority of these seeds are of the Roundup Ready® brand.  The stated advantage of Roundup Ready® crops is that they substantially improve a farmer's ability to control weeds, because glyphosate can be sprayed in the fields during the growing season without harming the crops.  In 2010, an estimated 70% of corn and cotton and 90% of soybean fields in the United States were Roundup Ready®.

3.      Monsanto's glyphosate products are registered in 130 countries and approved for use on over 100 different crops.  They are ubiquitous in the environment.  Numerous studies confirm that glyphosate is found in rivers, streams, and groundwater in agricultural areas where Roundup® is used.  It has been found in food, in the urine of agricultural workers, and even in the urine of urban dwellers who are not in direct contact with glyphosate.

4.      On March 20, 2015, the International Agency for Research on Cancer ("IARC"), an agency of the World Health Organization ("WHO"), issued an evaluation of several herbicides, including glyphosate.  That evaluation was based, in part, on studies of exposures to glyphosate in several countries around the world, and it traces the health implications from exposure to glyphosate since 2001.

5.      On July 29, 2015, IARC issued the formal monograph relating to glyphosate.  In that monograph, the IARC Working Group provides a thorough review of the numerous studies and data relating to glyphosate exposure in humans.

6.      The IARC Working Group classified glyphosate as a Group 2A herbicide, which means that it is *probably carcinogenic to humans*.  The IARC Working Group concluded that the cancers most associated with glyphosate exposure are non-Hodgkin lymphoma and other haematopoietic cancers, including lymphocytic lymphoma/chronic lymphocytic leukemia, B-cell lymphoma, and multiple myeloma.

2

7.      The IARC evaluation is significant.  It confirms what has been believed for years: that glyphosate is toxic to humans.

8.      Nevertheless, Monsanto, since it began selling Roundup®, has represented it as safe to humans and the environment.  Indeed, Monsanto has repeatedly proclaimed and continues to proclaim to the world, and particularly to United States consumers, that glyphosate-based herbicides, including Roundup®, create no unreasonable risks to human health or to the environment.

## JURISDICTION AND VENUE

9.      Federal diversity jurisdiction in this Court is proper under 28 U.S.C. § 1332 because Plaintiffs are citizens of Texas, a different state than the Defendant's place of incorporation (Delaware) and Defendant's headquarters (Missouri), and the aggregate amount in controversy exceeds $75,000, exclusive of interest and costs.

10.     This Court has personal jurisdiction over Monsanto because Monsanto transacts business in Texas and is a corporation doing business within Texas.  Monsanto knows or should have known that its Roundup® products are and were sold throughout the state of Texas, and, more specifically, caused Roundup® to be sold to Plaintiffs in Texas.

11.     In addition, Monsanto maintains sufficient contacts with the State of Texas such that this Court's exercise of personal jurisdiction over it does not offend traditional notions of fair play and substantial justice.

12.     Venue is proper within this District because the events giving rise to this action happened in or are closely related to this District.

## PARTIES

## PLAINTIFF OTIS LINDELL CHAPMAN

13.     Plaintiff Otis Lindell Chapman is a natural person, is a citizen of the State of Texas, and is a resident of Tomball, Texas.

14.     Mr. Chapman was exposed to Roundup® in or around Magnolia, Texas, from around 1995 through 2004.  He was diagnosed with Chronic Lymphocytic Leukemia in February 2003.

15.     Plaintiff Kim Chapman is a natural person, is a citizen of the State of Texas, is a resident of Tomball, Texas, and is the spouse of Plaintiff Otis Lindell Chapman.

## DEFENDANT MONSANTO COMPANY

16.     Defendant Monsanto Company is a corporation created under the laws of the State of Delaware with its headquarters and principal place of business in St. Louis, Missouri.

## FACTS

17.     At all times relevant to this complaint, Monsanto was the entity that discovered the herbicidal properties of glyphosate and the manufacturer of Roundup®, which contains the active ingredient glyphosate and the surfactant POEA, as well as adjuvants and other "inert" ingredients. Glyphosate is a broad spectrum, non-selective herbicide used in a wide variety of herbicidal products around the world.

18.     Plants treated with glyphosate translocate the systemic herbicide to their roots, shoot regions, and fruit, where it interferes with the plant's ability to form aromatic amino acids necessary for protein synthesis.  Treated plants generally die within two to three days.  Because plants absorb glyphosate, it cannot be completely removed by washing or peeling produce or by milling, baking, or brewing grains.

19.     For nearly 40 years, farms across the world have used Roundup® without knowing of the dangers its use poses.  That is because when Monsanto first introduced Roundup®, it touted

4

glyphosate as a technological breakthrough: it could kill almost every weed without causing harm either to people or to the environment.  Of course, history has shown that not to be true.  According to WHO, the main ingredient of Roundup® – glyphosate – is a probable cause of cancer.  Those most at risk are farm workers and other individuals with workplace exposure to Roundup®, such as garden center workers, nursery workers, and landscapers.  Agricultural workers are, once again, victims of corporate greed.  Monsanto assured the public that Roundup® was harmless.  In order to prove this, Monsanto has championed falsified data and has attacked legitimate studies that revealed Roundup®'s dangers.  Monsanto has led a prolonged campaign of misinformation to convince government agencies, farmers and the general population that Roundup® is safe.

### *The Discovery of Glyphosate and Development of Roundup®*

20.     The herbicidal properties of glyphosate were discovered in 1970 by Monsanto chemist John Franz.  The first glyphosate-based herbicide was introduced to the market in the mid-1970's under the brand name Roundup®.  From the outset, Monsanto marketed Roundup® as a "safe" general purpose herbicide for widespread commercial and consumer use.  It still markets Roundup® as safe today.

21.     In addition to the active ingredient glyphosate, Roundup® formulations also contain adjuvants and other chemicals such as the surfactant POEA, which are considered "inert" and therefore protected as "trade secrets" in manufacturing.  Growing evidence suggests that these adjuvants and additional components of Roundup® formulations are not, in fact, inert and are toxic in their own right.

### *Registration of Herbicides under Federal Law*

22.     The manufacture, formulation, and distribution of herbicides, such as Roundup®, are regulated under the Federal Insecticide, Fungicide, and Rodenticide Act ("FIFRA" or "Act"),

7 U.S.C. § 136 *et seq.* FIFRA requires that all pesticides be registered with the Environmental Protection Agency ("EPA" or "Agency") prior to their distribution, sale, or use, except as described by the Act. 7 U.S.C. § 136a(a).

23.     Because pesticides are toxic to plants, animals, and humans, at least to some degree, the EPA requires as part of the registration process, among other things, a variety of tests to evaluate the potential for exposure to pesticides, toxicity to people and other potential non-target organisms, and other adverse effects on the environment. Registration by the EPA, however, is not an assurance or finding of safety. The determination the Agency must make in registering or re-registering a product is not that the product is "safe," but rather that use of the product in accordance with its label directions "will not generally cause unreasonable adverse effects on the environment." 7 U.S.C. § 136a(c)(5)(D).

24.     FIFRA defines "unreasonable adverse effects on the environment" to mean "any unreasonable risk to man or the environment, taking into account the economic, social and environmental costs and benefits of the use of any pesticide." 7 U.S.C. § 136(bb). FIFRA thus requires EPA to make a risk/benefit analysis in determining whether a registration should be granted or a pesticide allowed to continue to be sold in commerce.

25.     The EPA and the State of Texas registered Roundup® for distribution, sale, and manufacture in the United States and the State of Texas.

26.     FIFRA generally requires that the registrant, Monsanto in the case of Roundup®, conducts the health and safety testing of pesticide products. The EPA has protocols governing the conduct of tests required for registration and the laboratory practices that must be followed in conducting these tests. The data produced by the registrant must be submitted to the EPA for review and evaluation. The government is not required, nor is it able, however, to perform the

product tests that are required of the manufacturer.

27.     The evaluation of each pesticide product distributed, sold, or manufactured is completed at the time the product in initially registered.  The data necessary for registration of a pesticide has changed over time.  The EPA is now in the process of re-evaluating all pesticide products through a congressionally mandated process called "re-registration."  7 U.S.C. § 136a-1. In order to reevaluate these pesticides, the EPA is demanding the completion of additional tests and the submission of data for the EPA's recent review and evaluation.

28.     In the case of glyphosate, and therefore Roundup®, the EPA had planned on releasing its preliminary risk assessment – in relation to the reregistration process – no later than July 2015.  The EPA completed its review of glyphosate in early 2015, but it delayed releasing the risk assessment pending further review in light of the WHO's health-related findings.

### *Scientific Fraud Underlying the Marketing and Sale of Glyphosate/Roundup®*

29.     Based on early studies showing that glyphosate could cause cancer in laboratory animals, the EPA originally classified glyphosate as *possibly carcinogenic to humans* (Group C) in 1985.  After pressure from Monsanto, including contrary studies it provided to the EPA, the EPA changed its classification to *evidence of non-carcinogenicity in humans* (Group E) in 1991. In so classifying glyphosate, however, the EPA made clear that the designation did not mean the chemical does not cause cancer: "It should be emphasized, however, that designation of an agent in Group E is based on the available evidence at the time of evaluation and should not be interpreted as a definitive conclusion that the agent will not be a carcinogen under any circumstances."

30.     On two occasions, the EPA found that the laboratories hired by Monsanto to test the toxicity of its Roundup® products for registration purposes committed fraud.

31.     In the first instance, Monsanto, in seeking initial registration of Roundup® by the EPA, hired Industrial Bio-Test laboratories ("IBT") to perform and evaluate pesticide toxicology studies relating to Roundup®.   IBT performed about 30 tests on glyphosate and glyphosate containing products, including nine of the 15 residue studies needed to register Roundup®.

32.     In 1976, the United States Food and Drug Administration ("FDA") performed an inspection of IBT that revealed discrepancies between the raw data and the final report relating to the toxicological impacts of glyphosate.   The EPA subsequently audited IBT; it too found the toxicology studies conducted for the Roundup® herbicide to be invalid.   An EPA reviewer stated, after finding "routine" falsification of data" at IBT, that it was "hard to believe the scientific integrity of the studies when they said they took specimens of the uterus from male rabbits."

33.     Three top executives of IBT were convicted of fraud in 1983.

34.     In the second incident of data falsification, Monsanto hired Craven Laboratories in 1991 to perform pesticide and herbicide studies, including for Roundup®.   In that same year, the owner of Craven Laboratories and three of its employees were indicted, and later convicted, of fraudulent laboratory practices in the testing of pesticides and herbicides.

35.     Despite the falsity of the tests that underlie its registration, within a few years of its launch, Monsanto was marketing Roundup® in 115 countries.

### The Importance of Roundup® to Monsanto's Market Dominance Profits

36.     The success of Roundup® was key to Monsanto's continued reputation and dominance in the marketplace.   Largely due to the success of Roundup® sales, Monsanto's agriculture division was out-performing its chemicals division's operating income, and that gap increased yearly.   But with its patent for glyphosate expiring in the United States in the year 2000, Monsanto needed a strategy to maintain its Roundup® market dominance and to ward off

impending competition.

37. In response, Monsanto began the development and sale of genetically engineered Roundup Ready® seeds in 1996. Since Roundup Ready® crops are resistant to glyphosate, farmers can spray Roundup® onto their fields during the growing season without harming the crop. This allowed Monsanto to expand its market for Roundup® even further; by 2000, Monsanto's biotechnology seeds were planted on more than 80 million acres worldwide and nearly 70% of American soybeans were planted from Roundup Ready® seeds. It also secured Monsanto's dominant share of the glyphosate/Roundup® market through a marketing strategy that coupled proprietary Roundup Ready® seeds with continued sales of its Roundup® herbicide.

38. Through a three-pronged strategy of increasing production, decreasing prices, and by coupling with Roundup Ready® seeds, Roundup® became Monsanto's most profitable product. In 2000, Roundup® accounted for almost $2.8 billion in sales, outselling other herbicides by a margin of five to one, and accounting for close to half of Monsanto's revenue. Today, glyphosate remains one of the world's largest herbicides by sales volume.

### _Monsanto has known for decades that it falsely advertises the safety of Roundup®_

39. In 1996, the New York Attorney General ("NYAG") filed a lawsuit against Monsanto based on its false and misleading advertising of Roundup® products. Specifically, the lawsuit challenged Monsanto's general representations that its spray-on glyphosate-based herbicides, including Roundup®, were **"safer than table salt"** and **"practically non-toxic"** to mammals, birds, and fish. Among the representations the NYAG found deceptive and misleading about the human and environmental safety of glyphosate and/or Roundup® are the following:

a)    "Remember that environmentally friendly Roundup herbicide is biodegradable. It won't build up in the soil so you can use Roundup with confidence along

9

customers' driveways, sidewalks and fences…"

b)     "And remember that Roundup is biodegradable and won't build up in the soil.  That will give you the environmental confidence you need to use Roundup everywhere you've got a weed, brush, edging or trimming problem."

c)     "Roundup biodegrades into naturally occurring elements."

d)     "Remember that versatile Roundup herbicide stays where you put it.  That means there's no washing or leaching to harm customers' shrubs or other desirable vegetation."

e)     "This non-residual herbicide will not wash or leach in the soil.  It … stays where you apply it."

f)     "You can apply Roundup with 'confidence because it will stay where you put it' it binds tightly to soil particles, preventing leaching.  Then, soon after application, soil microorganisms biodegrade Roundup into natural products."

g)     "Glyphosate is less toxic to rats than table sale following acute oral ingestion."

h)     "Glyphosate's safety margin is much greater than required.  It has over a 1,000-fold safety margin in food and over a 700-fold safety margin for workers who manufacture it or use it."

i)     "You can feel good about using herbicides by Monsanto.  They carry a toxicity category rating of 'practically non-toxic' as it pertains to mammals, birds and fish."

j)     "Roundup can be used where kids and pets will play and breaks down into natural material."  This ad depicts a person with his head in the ground and a pet dog standing in an area which has been treated with Roundup®.

10

40.     On November 19, 1996, Monsanto entered into an Assurance of Discontinuance with NYAG, in which Monsanto agreed, among other things, "to cease and desist from publishing or broadcasting any advertising [in New York] that represent, directly or by implication" that:

a)      its glyphosate containing pesticide products or any component thereof are safe, non-toxic, harmless or free from risk.

                    *          *          *

b)      its glyphosate containing pesticide products or any component thereof manufactured, formulated, distributed or sold by Monsanto are biodegradable.

                    *          *          *

c)      its glyphosate containing pesticide products or any component thereof stay where they are applied under all circumstances and will not move through the environment by any means.

                    *          *          *

d)      its glyphosate containing pesticide products or any component thereof are "good" for the environment or are "known for their environmental characteristics."

                    *          *          *

e)      glyphosate containing pesticide products or any component thereof are safer or less toxic than common consumer products other than herbicides;

f)      its glyphosate containing products or any component thereof might be classified as "practically non-toxic."

41.     Monsanto did not alter its advertising in the same manner in any state other than New York, and on information and belief it still has not done so as of today.

11

42.     In 2009, France's highest court ruled that Monsanto had not told the truth about the safety of Roundup®.  The French court affirmed an earlier judgment that Monsanto had falsely advertised its herbicide Roundup® as "biodegradable" and that it "left the soil clean."

*__Classification and Assessments of Glyphosate__*

43.     The IARC process for the classification of glyphosate followed IARC's stringent procedures for the evaluation of a chemical agent.  Over time, the IARC Monograph program has reviewed 980 agents.  Of those reviewed, it has determined 116 agents to be Group 1 (Known Human Carcinogens); 73 agents to be Group 2A (Probable Human Carcinogens); 287 agents to be Group 2B (Possible Human Carcinogens); 503 agents to be Group 3 (Not Classified); and one agent to be Probably Not Carcinogenic.

44.     The established procedure for IARC Monograph evaluations is described in the IARC Programme's Preamble.  Evaluations are performed by panels of international experts, selected on the basis of their expertise and the absence of actual or apparent conflicts of interest.

45.     One year before the Monograph meeting, the meeting is announced and there is a call both for data and for experts.  Eight months before the Monograph meeting, the Working Group membership is selected and the sections of the Monograph are developed by the Working Group members.  One month prior to the Monograph meeting, the call for data is closed and the various draft sections are distributed among Working Group members for review and comment. Finally, at the Monograph meeting, the Working Group finalizes review of all literature, evaluates the evidence in each category, and completes the overall evaluation.  Within two weeks after the Monograph meeting, the summary of the Working Group findings are published in *The Lance Oncology*, and within a year after the meeting, the finalized Monograph is published.

46.     In assessing an agent, the IARC Working Group reviews the following information: (a) human, experimental, and mechanistic data; (b) all pertinent epidemiological studies and cancer bioassays; and (c) representative mechanistic data.  The studies must by publicly available and have sufficient detail for meaningful review, and reviewers cannot be associated with the underlying study.

47.     In March 2015, IARC reassessed glyphosate.  The summary published in *The Lancet Oncology* reported that glyphosate is a Group 2A agent and probably carcinogenic in humans.

48.     On July 29, 2015, IARC issued its Monograph for glyphosate, Monograph Volume 112.  For Volume 112, a Working Group of 17 experts from 11 countries met at IARC from March 3-10, 2015 to assess the carcinogenicity of certain herbicides, including glyphosate.  The March meeting culminated a nearly one-year review and preparation by the IARC Secretariat and the Working Group, including a comprehensive review of the latest available scientific evidence. According to published procedures, the Working Group considered "reports that have been published or accepted for publication in the openly available scientific literature" as well as "data from governmental reports that are publicly available."

49.     The studies considered the following exposure groups: (1) occupational exposure of farmers and tree nursery workers in the United States, forestry workers in Canada and Finland and municipal weed-control workers in the United Kingdom; and (2) para-occupational exposure in farming families.

50.     Glyphosate was identified as the second most used household herbicide in the United States for weed control between 2001 and 2007 and the most heavily used herbicide in the world in 2012.

13

51.     Exposure pathways are identified as air (especially during spraying), water, and food.  Community exposure to glyphosate is widespread and found in soil, air, surface water, and groundwater, as well as in food.

52.     The assessment of the IARC Working Group identified several case control studies of occupational exposure in the United States, Canada, and Sweden.  These studies show a human health concern from agricultural and other work-related exposure to glyphosate.

53.     The IARC Working Group found an increased risk between exposure to glyphosate and NHL and several subtypes of NHL, and the increased risk persisted after adjustment for other pesticides.

54.     The IARC Working Group also found that glyphosate caused DNA and chromosomal damage in human cells.  One study in community residents reported increases in blood markers of chromosomal damage (micronuclei) after glyphosate formulations were sprayed.

55.     In male CD-1 mice, glyphosate induced a positive trend in the incidence of a rare tumor: renal tubule carcinoma.  A second study reported a positive trend for haemangiosarcoma in male mice.  Glyphosate increased pancreatic islet-cell adenoma in male rats in two studies.  A glyphosate formulation promoted skin tumors in an initiation promotion study in mice.

56.     The IARC Working Group also noted that glyphosate has been detected in the urine of agricultural workers, indicating absorption.   Soil microbes degrade glyphosate to aminomethylphosphoric acid (AMPA).  Blood AMPA detection after exposure suggests intestinal microbial metabolism in humans.

57.     The IARC Working Group further found that glyphosate and glyphosate formulations induced DNA and chromosomal damage in mammals, and in human and animal cells in utero.

14

58. The IARC Working Group also noted genotoxic, hormonal, and enzymatic effects in mammals exposed to glyphosate. Essentially, glyphosate inhibits the biosynthesis of aromatic amino acids, which leads to several metabolic disturbances, including the inhibition of protein and secondary product biosynthesis and general metabolic disruption.

59. The IARC Working Group also reviewed an Agricultural Health Study, consisting of a prospective cohort of 57,311 licensed pesticide applicators in Iowa and North Carolina. While this study differed from others in that it was based on a self-administered questionnaire, the results support an association between glyphosate exposure and multiple myeloma, hairy cell leukemia (HCL), and chronic lymphocytic leukemia (CLL), in addition to several other cancers.

### *Other Earlier Findings About Glyphosate's Dangers to Human Health*

60. The EPA has a technical fact sheet, as part of its Drinking Water and Health, National Primary Drinking Water Regulations publication, relating to glyphosate. This technical fact sheet predates IARC's March 20, 2015 evaluation. The fact sheet describes the release patterns for glyphosate as follows:

**Release Patterns**

Glyphosate is released to the environment in its use as an herbicide for controlling woody and herbaceous weeds on forestry, right-of-way, cropped and non-cropped sites. These sites may be around water and in wetlands. It may also be released to the environment during its manufacture, formulation, transport, storage, disposal and cleanup, and from spills. Since glyphosate is not a listed chemical in the Toxics Release Inventory, data on releases during its manufacture and handling are not available.

Occupational workers and home gardeners may be exposed to glyphosate by inhalation and dermal contact during spraying, mixing, and cleanup. They may also be exposed

15

by touching soil and plants to which glyphosate was applied. Occupational exposure may also occur during glyphosate's manufacture, transport storage, and disposal.

61.    In 1995, the Northwest Coalition for Alternatives to Pesticides reports that in California, the state with the most comprehensive program for reporting of pesticide caused illness, glyphosate was the third most commonly reported cause of pesticide illness among agricultural workers.

### The Toxicity of Other Ingredients in Roundup®

62.    In addition to the toxicity of the active ingredient, glyphosate, several studies support the hypothesis that the glyphosate-based formulation in Defendant's Roundup® products is more dangerous and toxic than glyphosate alone. Indeed, as early as 1991, available evidence demonstrated that glyphosate formulations were significantly more toxic than glyphosate alone.

63.    In 2002, a study by Julie Marc, entitled "Pesticide Roundup Provokes Cell Division Dysfunction at the Level of CDK1/Cyclin B Activation," revealed that Roundup® causes delays in the cell cycles of sea urchins but that the same concentrations of glyphosate alone were ineffective and did not alter cell cycles.

64.    A 2004 study by Marc and others, entitled "Glyphosate-based pesticides affect cell cycle regulation," demonstrated a molecular link between glyphosate-based products and cell cycle dysregulation. The researchers noted that "cell cycle dysregulation is a hallmark of tumor cells and human cancer. Failure in the cell cycle checkpoints leads genomic instability and subsequent development of cancer from the initial affected cell." Further, "[s]ince cell cycle disorders such as cancer result from dysfunction of a unique cell, it was of interest to evaluate the threshold dose of glyphosate affecting the cells."

65.     In 2005, a study by Francisco Peixoto, entitled "Comparative effects of the Roundup and glyphosate on mitochondrial oxidative phosphorylation," demonstrated that Roundup®'s effects on rat liver mitochondria are far more toxic than equal concentrations of glyphosate alone. The Peixoto study further suggested that the harmful effects of Roundup® on mitochondrial bioenergetics could not be exclusively attributed to glyphosate but could be the result of other chemicals, such as the surfactant POEA, or in the alternative, due to a potential synergic effect between glyphosate and other ingredients in the Roundup® formulation.

66.     In 2009, Nora Benachour and Gilles-Eric Seralini published a study examining the effects of Roundup® and glyphosate on human umbilical, embryonic, and placental cells.  The study tested dilution levels of Roundup® and glyphosate that were far below agricultural recommendations, corresponding with low levels of residue in food.  The researchers ultimately concluded that supposed "inert" ingredients, and possibly POEA, alter human cell permeability and amplify toxicity of glyphosate alone.  The researchers further suggested that assessments of glyphosate toxicity should account for the presence of adjuvants or additional chemicals used in the formulation of the complete pesticide.  The study confirmed that the adjuvants present in Roundup® are not, in fact, inert and that Roundup® is potentially far more toxic than its active ingredient glyphosate alone.

67.     The results of these studies were at all times available to Defendant.  Defendant thus knew or should have known that Roundup® is more toxic than glyphosate alone and that safety studies of Roundup®, Roundup®'s adjuvants and "inert" ingredients, and/or the surfactant POEA were necessary to protect Plaintiff from Roundup®.

68.     Despite its knowledge that Roundup® is considerably more dangerous than glyphosate alone, Defendant continued to promote Roundup® as safe.

### Recent Worldwide Bans on Roundup®/Glyphosate

69.     Several countries around the world have instituted bans on the sale of Roundup® and other glyphosate-containing herbicides, both before and since IARC first announced its assessment for glyphosate in march 2015, and more countries undoubtedly will follow suit as the dangers of the use of Roundup® become more widely known. The Netherlands issued a ban on all glyphosate-based herbicides in April 2014, including Roundup®, which took effect at the end of 2015.  In issuing the ban, the Dutch Parliament member who introduced the successful legislation stated: "Agricultural pesticides in user-friendly packaging are sold in abundance to private persons. In garden centers, Roundup® is promoted as harmless, but unsuspecting customers have no idea what the risks of this product are.  Especially children are sensitive to toxic substances and should therefore not be exposed to it."

70.     The Brazilian Public Prosecutor in the Federal District requested that the Brazilian Justice Department suspend the use of glyphosate.

71.     France banned the private sale of Roundup® and glyphosate following the IARC assessment for Glyphosate.

72.     Bermuda banned both the private and commercial sale of glyphosates, including Roundup®.  The Bermuda government explained its ban as follows: "Following a recent scientific study carried out by a leading cancer agency, the importation of weed spray 'Roundup' has been suspended."

73.     The Sri Lankan government banned the private and commercial use of glyphosate, particularly out of concern that glyphosate has been linked to fatal kidney disease in agricultural workers.

18

74. The government of Columbia announced its ban on using Roundup® and glyphosate to destroy illegal plantations of coca, the raw ingredient for cocaine, because of the WHO's finding that glyphosate is probably carcinogenic.

***Proposition 65 Listing***

75. On September 4, 2015, California's Office of Environmental Health Hazard Assessment ("OEHHA") published a notice of intent to include glyphosate on the state's list of known carcinogens under Proposition 65. California's Safe Drinking Water and Toxic Enforcement Act of 1986 (informally known as "Proposition 65"), requires the state to maintain and, at least, once a year, revise and republish a list of chemicals "known to the State of California to cause cancer or reproductive toxicity." The OEHHA determined that glyphosate met the criteria for the listing mechanism under the Labor Code following IARC's assessment of the chemical.

76. The listing process under the Labor Code is essentially automatic. The list of known carcinogens, at a minimum, must include substances identified by reference in Labor Code § 6382(b)(1). That section of the Labor Code identifies "[s]ubstances listed as human or animal carcinogens by the International Agency for Research on Cancer (IARC)." IARC's classification of glyphosate as a Group 2A chemical ("probably carcinogenic to humans") therefore triggered the listing.

77. A business that deploys a listed chemical in its products must provide "clear and reasonable warnings" to the public prior to exposure to the chemical. To be clear and reasonable, a warning must "(1) clearly communicate that the chemical is known to cause cancer, and/or birth defects or other reproductive harm; and (2) effectively reach the person before exposure." The law also prohibits the discharge of listed chemicals into drinking water.

78.     Monsanto disputed the listing decision and, in January 2016, filed a lawsuit against OEHHA and the agency's acting director, Lauren Zeise, in California state court, seeking declaratory and injunctive relief to prevent OEHHA from listing glyphosate.

79.     Monsanto alleged that OEHHA's exclusive reliance on the IARC decision signified that "OEHHA effectively elevated the determination of an ad hoc committee of an unelected, foreign body, which answers to no United States official (let alone any California state official), over the conclusions of its own scientific experts."  Monsanto further alleged that the Labor Code listing mechanism presented various constitutional violations because it "effectively empowers an unelected, undemocratic, unaccountable, and foreign body to make laws applicable in California." Among other things, Monsanto argued that Proposition 65's requirement to provide a "clear and reasonable warning" to consumers that the chemical is a known carcinogen would damage its reputation and violate its First Amendment rights.

### *EFSA Report on Glyphosate*

80.     On November 12, 2015, the European Food Safety Authority (EFSA), the European Union's primary agency for food safety, reported on its evaluation of the Renewal Assessment Report (RAR) on glyphosate.  The Rapporteur Member State assigned to glyphosate, the German Federal Institute for Risk Assessment (BfR), had produced the RAR as part of the renewal process for glyphosate in the EU.

81.     BfR sent its draft RAR to EFSA and the RAR underwent a peer review process by EFSA, other member states, and industry groups.  As part of the on-going peer review of Germany's reevaluation of glyphosate, EFSA had also received a second mandate from the European Commission to consider IARC's findings regarding the potential carcinogenicity of glyphosate and glyphosate-containing products.

82.     Based on a review of the RAR, which included data from industry submitted unpublished studies, EFSA sent its own report ("Conclusion") to the European Commission, finding that "glyphosate is unlikely to pose a carcinogenic hazard to humans and the evidence does not support classification with regard to its carcinogenic potential according to Regulation (EC) No 1272/2008." EFSA therefore disagreed with IARC: glyphosate was not genotoxic and did not present a carcinogenic threat to humans.

83.     In explaining why its results departed from IARC's conclusion, EFSA drew a distinction between the EU and IARC approaches to the study and classification of chemicals. Although IARC examined "both glyphosate – an active substance – and glyphosate-based formulations, grouping all formulations regardless of their composition," EFSA explained that it considered only glyphosate and that its assessment focuses on "each individual chemical, and each marketed mixture separately." IARC, on the other hand, "assesses generic agents, including groups of related chemicals, as well as occupational or environmental exposure, and cultural or behavioural practices." EFSA accorded greater weight to studies conducted with glyphosate alone than studies of formulated products.

84.     EFSA went further and noted:

[A]lthough some studies suggest that certain glyphosate-based formulations may be genotoxic (i.e. damaging to DNA), others that look solely at the active substance glyphosate do not show this effect. It is likely, therefore, that ***the genotoxic effects observed in some glyphosate-based formulations are related to the other constituents or "co-formulants"***. Similarly, certain glyphosate-based formulations display higher toxicity than that of the active ingredient, presumably because of the presence of co-formulants. In its assessment, ***EFSA proposes that the toxicity of each***

*pesticide formulation and in particular its genotoxic potential should be further considered and addressed by Member State authorities while they re-assess uses of glyphosate-based formulations in their own territories.* **(Emphasis added)**

85. Notwithstanding its conclusion, EFSA did set exposure levels for glyphosate. Specifically, EFSA proposed an acceptable daily intake (ADI) of 0.5 mg/kg of body weight per day; an acute reference dose (ARfD) of 0.5 mg/kg of body weight; and an acceptable operator exposure level (AOEL) of 0.1 mg/kg bw per day.

### *Leading Scientists Dispute EFSA's Conclusion*

86. On November 27, 2015, 96 independent academic and governmental scientists from around the world submitted an open letter to the EU health commissioner, Vytenis Andriukaitis. The scientists expressed their strong concerns and urged the commissioner to disregard the "flawed" EFSA report, arguing that "the BfR decision is not credible because it is not supported by the evidence and it was not reached in an open and transparent manner."

87. Signatories to the letter included Dr. Christopher J. Portier, Ph.D., and other renowned international experts in the field, some of whom were part of the IARC Working Group assigned to glyphosate.

88. In an exhaustive and careful examination, the scientists scrutinized EFSA's conclusions and outlined why the IARC Working Group decision was "by far the more credible":

The IARC WG decision was reached relying on open and transparent procedures by independent scientists who completed thorough conflict-of-interest statements and were not affiliated or financially supported in any way by the chemical manufacturing industry. It is fully referenced and depends entirely on reports published in the open, peer-reviewed biomedical literature. It is part of a long tradition of deeply researched

and highly credible reports on the carcinogenicity of hundreds of chemicals issued over the past four decades by IARC and used today by international agencies and regulatory bodies around the world as a basis for risk assessment, regulation and public health policy.

89.     With respect to human data, the scientists pointed out that EFSA agreed with IARC that there was "*limited evidence* of carcinogenicity" for non-Hodgkin lymphoma but EFSA nonetheless dismissed an association between glyphosate exposure and carcinogenicity.  IARC applies three levels of evidence in its analyses of human data, including sufficient evidence and limited evidence.  EFSA's ultimate conclusion that "there was no unequivocal evidence for a clear and strong association of NHL with glyphosate" was misleading because it was tantamount to IARC's highest level of evidence: "sufficient evidence," which means that a causal relationship has been established.  However, the scientists argued, "[l]egitimate public health concerns arise when 'causality is credible,' i.e., when there is *limited evidence*."

90.     Among its many other deficiencies, EFSA's conclusions regarding animal carcinogenicity data were "scientifically unacceptable," particularly in BfR's use of historical control data and in its trend analysis.  Indeed, BfR's analysis directly contradicted the Organisation for Economic Co-operation and Development ("OECD") testing guidelines while citing and purporting to follow those same guidelines.  For instance, the EFSA report dismisses observed trends in tumor incidence "because there are no individual treatment groups that are significantly different from controls and because the maximum observed response is reportedly within the range of the historical control data."  However, according to the scientists, concurrent controls are recommended over historical controls in all guidelines, scientific reports, and publications, and, if it is employed, historical control data "should be from studies in the same timeframe, for the same

exact animal strain, preferably from the same laboratory or the same supplier and preferably reviewed by the same pathologist." BfR's use of historical control data violated these precautions: "only a single study used the same mouse strain as the historical controls, but was reported more than 10 years after the historical control dataset was developed." Further deviating from sound scientific practices, the data used by the BfR came from studies in seven different laboratories. The scientists concluded:

> BfR reported seven positive mouse studies with three studies showing increases in renal tumors, two with positive findings for hemangiosarcomas, and two with positive findings for malignant lymphomas. BfR additionally reported two positive findings for tumors in rats. Eliminating the inappropriate use of historical data, the unequivocal conclusion is that these are not negative studies, but in fact document the carcinogenicity of glyphosate in laboratory animals.

91. The letter also critiqued the EFSA report's lack of transparency and the opacity surrounding the data cited in the report: "citations for almost all of the references, even those from the open scientific literature, have been redacted from the document" and "there are no authors or contributors listed for either document, a requirement for publication in virtually all scientific journals." Because BfR relied on unpublished, confidential industry provided studies, it is "impossible for any scientist not associated with BfR to review this conclusion with scientific confidence."

92. On March 3, 2016, the letter was published in the Journal of Epidemiology & Community Health.

### *Statement of Concern Regarding Glyphosate-Based Herbicides*

93. On February 17, 2016, a consensus statement published in the journal

Environmental Health, entitled "Concerns over use of glyphosate-based herbicides and risks associated with exposures: a consensus statement," assessed the safety of glyphosate-based herbicides (GBHs). The paper's "focus is on the unanticipated effects arising from the worldwide increase in use of GBHs, coupled with recent discoveries about the toxicity and human health risks stemming from use of GBHs." The researchers drew seven factual conclusions about GBHs:

1.    GBHs are the most heavily applied herbicide in the world and usage continues to rise;

2.    Worldwide, GBHs often contaminate drinking water sources, precipitation, and air, especially in agricultural regions;

3.    The half-life of glyphosate in water and soil is longer than previously recognized;

4.    Glyphosate and its metabolites are widely present in the global soybean supply;

5.    Human exposures to GBHs are rising;

6.    Glyphosate is now authoritatively classified as a probable human carcinogen; and

7.    Regulatory estimates of tolerable daily intakes for glyphosate in the United States and European Union are based on outdated science.

94.    The researchers noted that GBH use has increased approximately 100-fold since the 1970s. Furthermore, far from posing a limited hazard to vertebrates, as previously believed, two decades of evidence demonstrated that "several vertebrate pathways are likely targets of action, including hepatorenal damage, effects on nutrient balance through glyphosate chelating action and endocrine disruption."

95.    The paper attributed uncertainties in current assessments of glyphosate formulations to the fact that "[t]he full list of chemicals in most commercial GBHs is protected as 'commercial business information,' despite the universally accepted relevance of such information

25

to scientists hoping to conduct an accurate risk assessment of these herbicide formulations."
Further, the researchers argue, "[t]he distinction in regulatory review and decision processes
between 'active' and 'inert' ingredients has no toxicological justification, given increasing
evidence that several so-called 'inert' adjuvants are toxic in their own right."

96.     Among various implications, the researchers conclude that "existing toxicological
data and risk assessments are not sufficient to infer that GBHs, as currently used, are safe."
Further, "GBH-product formulations are more potent, or toxic, than glyphosate alone to a wide
array of non-target organisms including mammals, aquatic insects, and fish."  Accordingly, "risk
assessments of GBHs that are based on studies quantifying the impacts of glyphosate alone
underestimate both toxicity and exposure, and thus risk."   The paper concludes that this
"shortcoming has repeatedly led regulators to set inappropriately high exposure thresholds."

97.     The researchers also critique the current practice of regulators who largely rely on
"unpublished, non-peer reviewed data generated by the registrants" but ignore "published research
because it often uses standards and procedures to assess quality that are different from those
codified in regulatory agency data requirements, which largely focus on avoiding fraud."  In the
researchers' view, "[s]cientists independent of the registrants should conduct regulatory tests of
GBHs that include glyphosate alone, as well as GBH-product formulations."

98.     The researchers also call for greater inclusion of GBHs in government-led
toxicology testing programs:

> [A] fresh and independent examination of GBH toxicity should be undertaken, and . . .
> this re-examination be accompanied by systematic efforts by relevant agencies to
> monitor GBH levels in people and in the food supply, none of which are occurring
> today.   The U.S. National Toxicology Program should prioritize a thorough

26

toxicological assessment of the multiple pathways now identified as potentially vulnerable of GBHs.

99.     The researchers suggest that, in order to fill the gap created by an absence of government funds to support research on GBHs, regulators could adopt a system through which manufacturers fund the registration process and the necessary testing:

> "[W]e recommend that a system be put in place through which manufacturers of GBHs provide funds to the appropriate regulatory body as part or routine registration actions and fees.  Such funds should then be transferred to appropriate government research institutes, or to an agency experienced in the award of competitive grants.  In either case, funds would be made available to independent scientists to conduct the appropriate long-term (minimum 2 years) safety studies in recognized animal model systems.  A thorough and modern assessment of GBH toxicity will encompass potential endocrine disruption, impacts on the gut microbiome, carcinogenicity, and multigenerational effects looking at reproductive capability and frequency of birth defects."

### *FDA Announces Testing of Glyphosate Residue in Foods*

100.     On February 17, 2016, the U.S. Food and Drug Administration ("FDA") announced that, for the first time in its history, the agency planned to start testing certain foods for glyphosate residues.   FDA spokeswoman Lauren Sucher explained: "The agency is now considering assignments for Fiscal year 2016 to measure glyphosate in soybeans, corn, milk, and eggs, among other potential foods."

101.     In 2014, the U.S. Government Accountability Office (GAO) had severely rebuked the FDA for its failures to both monitor for pesticide residue, including that of glyphosate, and to disclose the limitations of its monitoring and testing efforts to the public.  The GAO had cited numerous undisclosed deficiencies in the FDA's process, specifically highlighting its omission of glyphosate testing.

102.     Indeed, in the past, both the FDA and the U.S. Department of Agriculture (USDA) had routinely excluded glyphosate from their testing for the residues of hundreds of other

pesticides, on the rationale that it was too expensive and unnecessary to protect public health.  Ms. Sucher, the FDA spokeswoman, however, now states that "the agency has developed 'streamlined methods' for testing for the weed killer."

103.    The FDA's move is significant as the agency possesses enforcement authority and can seek action if pesticide residues exceed enforcement guidelines.

### *European Union Vote on Glyphosate Renewal*

104.    The license for glyphosate in the European Union (EU) was set to expire on June 30, 2016.

105.    Without an extension of the license, Monsanto's Roundup® and other glyphosate-based herbicides faced a general phase out in EU markets.

106.    In the months leading up to the license expiration date, protracted meetings and votes among national experts from the 28 EU Member States failed to produce agreement on an extension.

107.    For instance, on March 4, 2016, *The Guardian* reported that France, the Netherlands, and Sweden did not support EFSA's assessment that glyphosate was harmless.  The paper quoted the Swedish environment minister, Åsa Romson, as stating: "We won't take risks with glyphosate and we don't think that the analysis done so far is good enough.  We will propose that no decision is taken until further analysis has been done and the Efsa scientists have been more transparent about their considerations."

108.    The Netherlands argued that relicensing should be placed on hold until after a separate evaluation of glyphosate's toxicity can be conducted.  Leading up to the vote, Italy joined the other EU states in opposing the license renewal, citing health concerns.

109.     On June 6, 2016, Member States voted but failed to reach a qualified majority in favor or against the re-authorization of glyphosate.

110.     On June 29, 2016, the EU Commission extended the European license for glyphosate for 18 months to allow the European Chemical Agency to rule on the safety of the chemical, which is expected by the end of 2017.

111.     On July 11, 2016, the EU voted in favor of a proposal to restrict the conditions of use of glyphosate in the EU, including a ban on common co-formulant POE-tallowamine (POEA) from all glyphosate-based herbicides, including Roundup®.

112.     These restrictions, which are non-binding on the EU states, are expected to apply until the European Chemicals Agency issues an opinion on the chemical's safety.

### *Plaintiff Otis Lindell Chapman's Exposure to Roundup®*

113.     Otis Lindell Chapman used Roundup® for at least 9 years on his property in Texas.

114.     Mr. Chapman frequently purchased Roundup® in its liquid form in Texas.

115.     In February 2003, doctors diagnosed Mr. Chapman with Chronic Lymphocytic Leukemia.

116.     Since his diagnosis, Mr. Chapman has been treated for the cancer.

117.     During the entire time in which Mr. Chapman was exposed to Roundup®, he did not know that exposure to Roundup® was injurious to his health or the health of others.

## TOLLING OF THE STATUTE OF LIMITATIONS
## DISCOVERY RULE TOLLING

118.     Within the time period of any applicable statutes of limitations, Plaintiffs could not have discovered, through the exercise of reasonable diligence, that exposure to Roundup® and glyphosate is injurious to human health.

119.    Plaintiffs did not discover, and did not know of facts that would cause a reasonable person to suspect, the risks associated with the use of and/or exposure to Roundup® and glyphosate; nor would a reasonable and diligent investigation by them have disclosed that Roundup® and glyphosate would cause Mr. Chapman's illness.

120.    For these reasons, all applicable statutes of limitations have been tolled by operation of the discovery rule with respect to Plaintiffs' claim.

**_Fraudulent Concealment Tolling_**

121.    All applicable statutes of limitations have also been tolled by Monsanto's knowing and active fraudulent concealment and denial of the facts alleged herein throughout the time period relevant to this action.

122.    Instead of disclosing critical safety information about Roundup® and glyphosate, Monsanto has consistently and falsely represented the safety of its Roundup® products.

**_Estoppel_**

123.    Monsanto was under a continuous duty to disclose to consumers, users and other person coming into contact with its products, including Plaintiffs, accurate safety information concerning its products and the risks associated with the use of and/or exposure to Roundup® and glyphosate.

124.    Instead, Monsanto knowingly, affirmatively, and actively concealed safety information concerning Roundup® and glyphosate and the serious risks associated with the use of and/or exposure to its products.

125.    Based on the foregoing, Monsanto is estopped from relying on any statutes of limitations in defense of this action.

## COUNT ONE
## STRICT LIABILITY
## (DESIGN DEFECT)

126.    Plaintiffs incorporate by reference all other paragraphs of this Complaint as if fully set forth herein, and further allege:

127.    Plaintiffs bring this strict liability claim against Defendant for defective design.

128.    At all times relevant to this litigation, Defendant engaged in the business of testing, developing, designing, manufacturing, marketing, selling, distributing, and promoting Roundup® products, which are defective and unreasonably dangerous to consumers, users and other persons coming into contact with them, including Plaintiffs, thereby placing Roundup® products into the stream of commerce.  These actions were under the ultimate control and supervision of Defendant.

129.    At all times relevant to this litigation, Defendant designed, researched, developed, formulated, manufactured, produced, tested, assembled, labeled, advertised, promoted, marketed, sold and distributed the Roundup® products used by Plaintiff Otis Lindell Chapman and/or to which Plaintiff Otis Lindell Chapman was exposed, as described above.

130.    At all times relevant to this litigation, Defendant's Roundup® products were manufactured, designed and labeled in an unsafe, defective, and inherently dangerous manner that was dangerous for use by or exposure to the public, and, in particular, Plaintiffs.

131.    At all times relevant to this litigation, Defendant's Roundup® products reached the intended consumers, handlers, and users or other persons coming into contact with these products in Illinois and throughout the United States, including Plaintiffs without substantial change in their condition as designed, manufactured, sold, distributed, labeled, and marketed by Defendants.

132.    Defendant's Roundup® products, as researched, tested, developed, designed, licensed, formulated, manufactured, packaged, labeled, distributed, sold, and marketed by

31

Defendant, were defective in design and formulation in that when they left the hands of the Defendant's manufacturers and/or suppliers, they were unreasonably dangerous because they were not as safe as an ordinary consumer would expect when used in an intended or reasonably foreseeable manner.

133.  Defendant's Roundup® products, as researched, tested, developed, designed, licensed, formulated, manufactured, packaged, labeled, distributed, sold, and marketed by Defendant, were defective in design and formulation in that when they left the hands of Defendants' manufacturers and/or suppliers, the foreseeable risks associated with these products' reasonably foreseeable uses exceeded the alleged benefits associated with their design and formulation.

134.  Therefore, at all times relevant to this litigation, Defendant's Roundup® products, as researched, tested, developed, designed, licensed, manufactured, packaged, labeled, distributed, sold and marketed by Defendant, were defective in design and formulation, in one or more of the following ways:

a)  When placed in the stream of commerce, Defendant's Roundup® products were defective in design and formulation, and, consequently, dangerous to an extent beyond that which an ordinary consumer would expect.

b)  When placed in the stream of commerce, Defendant's Roundup® products were unreasonably dangerous in that they were hazardous and posed a grave risk of cancer and other serious illnesses when used in a reasonably anticipated manner.

c)  When placed in the stream of commerce, Defendant's Roundup® products contained unreasonably dangerous design defects and were not reasonably safe when used in a reasonably anticipated or intended manner.

d)   Defendant did not sufficiently test, investigate, or study its Roundup® products and, specifically, the active ingredient glyphosate.

e)   Exposure to Roundup® and glyphosate-containing products presents a risk of harmful side effects that outweighs any potential utility stemming from the use of the herbicide.

f)   Defendant knew or should have known at the time of marketing its Roundup® products that exposure to Roundup® and specifically, its active ingredient glyphosate, could result in cancer and other severe illnesses and injuries.

g)   Defendant did not conduct adequate post-marketing surveillance of its Roundup® products.

h)   Defendant could have employed safer alternative designs and formulations.

135.   At all times relevant to this litigation, Plaintiff Otis Lindell Chapman used and/or was exposed to the use of Defendant's Roundup® products in an intended or reasonably foreseeable manner without knowledge of their dangerous characteristics.

136.   Plaintiffs could not have reasonably discovered the defects and risks associated with Roundup® or glyphosate-containing products before or at the time of exposure.

137.   The harm caused by Defendant's Roundup® products far outweighed their benefit, rendering Defendant's products dangerous to an extent beyond that which an ordinary consumer would contemplate.   Defendant's Roundup® products were and are more dangerous than alternative products and Defendant could have designed its Roundup® products to make them less dangerous.   Indeed, at the time that Defendant designed its Roundup® products, the state of the industry's scientific knowledge was such that a less risky design or formulation was attainable.

138. At the time Roundup® products left Defendant's control, there was a practical, technically feasible, and safer alternative design that would have prevented the harm without substantially impairing the reasonably anticipated or intended function of Defendant's Roundup® herbicides.

139. Defendant's defective design of Roundup® amounts to willful, wanton, and/or reckless conduct by Defendant.

140. Therefore, as a result of unreasonably dangerous condition of its Roundup® products, Defendant is strictly liable to Plaintiffs.

141. The defects in Defendant's Roundup® products were substantial and contributing factors in causing Plaintiff Otis Lindell Chapman's grave injuries, and, but for Defendant's misconduct and omissions, Plaintiff Otis Lindell Chapman would not have sustained his injuries.

142. As a direct and proximate result of Defendant placing its defective Roundup® products into the stream of commerce, Plaintiff Otis Lindell Chapman has suffered and continues to suffer grave injuries, and he has endured pain and discomfort, as well as economic hardship, including considerable financial expenses for medical care and treatment. Plaintiff Otis Lindell Chapman will continue to incur these expenses in the future.

WHEREFORE, Plaintiffs request that the Court enter judgment in Plaintiffs' favor for compensatory and punitive damages, together with interest, costs herein incurred, attorneys' fees, and all such other and further relief as this Court deems just and proper. Plaintiffs also demand a jury trial on the issues contained herein.

## COUNT TWO
## STRICT LIABILITY
## (FAILURE TO WARN)

143. Plaintiffs incorporate by reference all other paragraphs of this Complaint as if fully

set forth herein, and further allege:

144.    Plaintiffs bring this strict liability claim against Defendant for failure to warn.

145.    At all times relevant to this litigation, Defendant engaged in the business of testing, developing, designing, manufacturing, marketing, selling, distributing, and promoting Roundup® products, which are defective and unreasonably dangerous to consumers, including Plaintiffs, because they do not contain adequate warnings or instructions concerning the dangerous characteristics of Roundup® and specifically, the active ingredient glyphosate.  These actions were under the ultimate control and supervision of Defendant.

146.    Defendant researched, developed, designed, tested, manufactured, inspected, labeled, distributed, marketed, promoted, sold, and otherwise released into the stream of commerce its Roundup® products, and in the course of same, directly advertised or marketed the products to consumers and end users, including Plaintiffs, and Defendant therefore had a duty to warn of the risks associated with the reasonably foreseeable uses (and misuses) of Roundup® and glyphosate-containing products and a duty to instruct on the proper, safe use of these products.

147.    At all times relevant to this litigation, Defendant had a duty to properly test, develop, design, manufacture, inspect, package, label, market, promote, sell, distribute, maintain supply, provide proper warnings, and take such steps as necessary to ensure that its Roundup® products did not cause users and consumers to suffer from unreasonable and dangerous risks. Defendant had a continuing duty to instruct on the proper, safe use of these products.  Defendant, as manufacturer, seller, or distributor of chemical herbicides, is held to the knowledge of an expert in the field.

148.    At the time of manufacture, Defendant could have provided warnings or instructions regarding the full and complete risks of Roundup® and glyphosate-containing products

because it knew or should have known of the unreasonable risks of harm associated with the use of and/or exposure to these products.

149.    At all times relevant to this litigation, Defendant failed to investigate, study, test, or promote the safety of its Roundup® products.  Defendant also failed to minimize the dangers to users and consumer of its Roundup® products and to those who would foreseeably use or be harmed by Defendant's herbicides, including Plaintiffs.

150.    Despite the fact that Defendant knew or should have known that Roundup® products posed a grave risk of harm, it failed to warn of the dangerous risks associated with their use and exposure.  The dangerous propensities of its products and the carcinogenic characteristics of glyphosate, as described above, were known to Defendant, or scientifically knowable to Defendant through appropriate research and testing by known methods, at the time it distributed, supplied, or sold the product, and not known to end users and consumers, such as Plaintiffs.

151.    Defendant knew or should have known that its Roundup® and glyphosate-containing products created significant risks of serious bodily harm to consumers, as alleged herein, and Defendant failed to adequately warn consumers and reasonably foreseeable users of the risks of exposure to these products.  Defendant has wrongfully concealed information concerning the dangerous nature of Roundup® and its active ingredient glyphosate, and further made false and/or misleading statements concerning the safety of Roundup® and glyphosate.

152.    At all times relevant to this litigation, Defendant's Roundup® products reached the intended consumers, handlers, and users or other persons coming into contact with these products throughout the United States, including Plaintiffs, without substantial change in their condition as designed, manufactured, sold, distributed, labeled, and marketed by Defendant.

153.    At all times relevant to this litigation, Plaintiff Otis Lindell Chapman used and/or was exposed to the use of Defendant's Roundup® products in their intended or reasonably foreseeable manner without knowledge of their dangerous characteristics.

154.    Plaintiffs could not have reasonably discovered the defects and risks associated with Roundup® or glyphosate-containing products before or at the time of Plaintiff Otis Lindell Chapman's exposure.  Plaintiff Otis Lindell Chapman relied upon the skill, superior knowledge, and judgment of Defendant.

155.    Defendant knew or should have known that the minimal warnings disseminated with its Roundup® products were inadequate, but it failed to communicate adequate information on the dangers and safe use/exposure and failed to communicate warnings and instructions that were appropriate and adequate to render the products safe for their ordinary, intended, and reasonably foreseeable uses, including agricultural and horticultural applications.

156.    The information that Defendant did provide or communicate failed to contain relevant warnings, hazards, and precautions that would have enabled agricultural workers, horticultural workers and/or at-home users to utilize the products safely and with adequate protection.  Instead, Defendant disseminated information that was inaccurate, false, and misleading and which failed to communicate accurately or adequately the comparative severity, duration, and extent of the risk of injuries associated  with use of and/or exposure of Roundup® and glyphosate; continued to aggressively promote the efficacy of its products, even after it knew or should have known of the unreasonable risks from use or exposure; an concealed, downplayed, or otherwise suppressed, through aggressive marketing and promotion, any information or research about the risks and dangers of exposure to Roundup® and glyphosate.

157.    To this day, Defendant has failed to adequately and accurately warn of the true risks of Plaintiff Otis Lindell Chapman's injuries associated with the use of and exposure to Roundup® and its active ingredient glyphosate, a probable carcinogen.

158.    As a result of their inadequate warnings, Defendant's Roundup® products were defective and unreasonably dangerous when they left the possession and/or control of Defendant, were distributed by Defendant, and used by Plaintiff Otis Lindell Chapman.

159.    Defendant is liable to Plaintiffs for injuries caused by its failure, as described above, to provide adequate warnings or other clinically relevant information and data regarding the appropriate use of its Roundup® products and the risks associated with the use of or exposure to Roundup® and glyphosate.

160.    The defects in Defendant's Roundup® products were substantial and contributing factors in causing Plaintiff Otis Lindell Chapman's injuries, and, but for Defendant's misconduct and omissions, Plaintiff Otis Lindell Chapman would not have sustained his injuries.

161.    Had Defendant provided adequate warnings and instructions and properly disclosed and disseminated the risks associated with its Roundup® products, Plaintiff Otis Lindell Chapman could have avoided the risk of developing injuries as alleged herein and Plaintiff Otis Lindell Chapman could have obtained alternative herbicides.

162.    As a direct and proximate result of Defendant placing its defective Roundup® products into the stream of commerce, Plaintiff Otis Lindell Chapman has suffered and continues to suffer severe injuries, and has endured physical pain and discomfort, as well as economic hardship, including considerable financial expenses for medical care and treatment.  Plaintiff Otis Lindell Chapman will continue to incur these expenses in the future.

WHEREFORE, Plaintiffs request that the Court enter judgment in Plaintiffs' favor for compensatory and punitive damages, together with interest, costs herein incurred, attorney's fees, and all such other and further relief as this Court deems just and proper. Plaintiffs also demand a jury trial on the issues contained herein.

### COUNT THREE
### NEGLIGENCE

163. Plaintiffs incorporate by reference all other paragraphs of this Complaint as if fully set forth herein, and further allege:

164. Defendant, directly or indirectly, caused Roundup® products to be sold, distributed, packaged, labeled, marketed, and/or promoted.

165. Defendant, directly or indirectly, caused Roundup® products to be purchased and/or used by Plaintiff Otis Lindell Chapman.

166. At all times relevant to this litigation, Defendant had a duty to exercise reasonable care in the design, research, manufacture, marketing, advertisement, supply, promotion, packaging, sale, and distribution of its Roundup® products, including the duty to take all reasonable steps necessary to manufacture, promote, and/or sell a product that was not unreasonably dangerous to consumers, users, and other persons coming into contact with the product.

167. At all times relevant to this litigation, Defendant had a duty to exercise reasonable care in the marketing, advertising, and sale of its Roundup® products. Defendant's duty of care owed to consumers and the general public included providing accurate, true, and correct information concerning the risks of using Roundup® and appropriate, complete, and accurate warnings concerning the potential adverse effects of exposure to Roundup® and, in particular, its active ingredient glyphosate.

39

168.    At all times relevant to this litigation, Defendant knew or, in the exercise of reasonable care, should have known of the hazards and dangers of Roundup® and specifically, the carcinogenic properties of the chemical glyphosate.

169.    Accordingly, at all times relevant to this litigation, Defendant knew or, in the exercise of reasonable care, should have known that use of or exposure to its Roundup® products could cause Plaintiff Otis Lindell Chapman's injuries and thus created a dangerous and unreasonable risk of injury to the users of these products, including Plaintiff Otis Lindell Chapman.

170.    Defendant knew or, in the exercise of reasonable care, should have known that Roundup® is more toxic than glyphosate alone and that safety studies on Roundup®, Roundup®'s adjuvants and "inert" ingredients, and/or the surfactant POEA were necessary to protect Plaintiffs from Roundup®.

171.    Defendant knew or, in the exercise of reasonable care, should have known that tests limited to Roundup®'s active ingredient glyphosate were insufficient to prove the safety of Roundup®.

172.    Defendant also knew or, in the exercise of reasonable care, should have known that users and consumers of Roundup® were unaware of the risks and the magnitude of the risks associated with the use of and/or exposure to Roundup® and glyphosate-containing products.

173.    As such, Defendant breached its duty of reasonable care and failed to exercise ordinary care in the design, research, development, manufacture, testing, marketing, supply, promotion, advertisement, packaging, sale, and distribution of its Roundup® products, in that Defendant manufactured and produced defective herbicides containing the chemical glyphosate, knew or had reason to know of the defects inherent in its products, knew or had reason to know that a user's or consumer's exposure to the products created a significant risk of harm and

unreasonably dangerous side effects, and failed to prevent or adequately warn of these risks and injuries.

174.    Defendant failed to appropriately and adequately test Roundup®, Roundup®'s adjuvants and "inert" ingredients, and/or the surfactant POEA to protect Plaintiffs from Roundup®.

175.    Despite the ability and means to investigate, study, and test its products and to provide adequate warnings, Defendant has failed to do so.  Indeed, Defendant has wrongfully concealed information and has further made false and/or misleading statements concerning the safety and/or exposure to Roundup® and glyphosate.

176.    Defendant's negligence included:

a)    Manufacturing, producing, promoting, formulating, creating, developing, designing, selling, and/or distributing its Roundup® products without thorough and adequate pre- and post-market testing:

b)    Manufacturing, producing, promoting, formulating, creating, developing, designing, selling, and/or distributing Roundup® while negligently and/or intentionally concealing and failing to disclose the results of trials, tests, and studies of exposure to glyphosate, and, consequently, the risk of serious harm associated with human use of and exposure to Roundup®;

c)    Failing to undertake sufficient studies and conduct necessary tests to determine whether or not Roundup® products and glyphosate-containing products were safe for their intended use in agriculture, horticulture, and at-home use;

d)    Failing to undertake sufficient studies and conduct necessary tests to determine the safety of "inert" ingredients and/or adjuvants contained within Roundup®, and the propensity of these ingredients to render Roundup® toxic, increase the toxicity of

Roundup®, whether these ingredients are carcinogenic, magnify the carcinogenic properties of Roundup®, and whether or not "inert" ingredients and/or adjuvants were safe for use;

e)     Failing to use reasonable and prudent care in the design, research, manufacture, formulation, and development of Roundup® products so as to avoid the risk of serious harm associated with the prevalent use of Roundup®/glyphosate as an herbicide;

f)     Failing to design and manufacture Roundup® products so as to ensure they were at least as safe and effective as other herbicides on the market;

g)     Failing to provide adequate instructions, guidelines, and safety precautions to those persons who Defendant could reasonably foresee would use and/or be exposed to its Roundup® products;

h)     Failing to disclose to Plaintiffs, users, consumers, and the general public that the use of and exposure of Roundup® presented severe risks of cancer and other grave illnesses;

i)     Failing to warn Plaintiffs, users, consumers, and the general public that the product's risk of harm was unreasonable and that there were safer and effective alternative herbicides available to Plaintiffs and other users or consumers;

j)     Systemically suppressing or downplaying contrary evidence about the risks, incidence, and prevalence of the side effects of Roundup® and glyphosate-containing products;

k)     Representing that its Roundup® products were safe for their intended use when in fact, Defendant knew or should have known that the products were not safe for their

42

intended use;

l)  Declining to make or propose any changes to Roundup® products' labeling or other promotional materials that would alert the consumers and the general public of the risks of Roundup® and glyphosate;

m)  Advertising, marketing, and recommending the use of Roundup® products, while concealing and failing to disclose or warn of the dangers known by Defendant to be associated with or caused by the use of or exposure to Roundup® and glyphosate;

n)  Continuing to disseminate information to its consumers, which indicate or imply that Defendant's Roundup® products are not unsafe for use in the agricultural, horticultural industries, and/or home use; and

o)  Continuing the manufacture and sale of its products with the knowledge that the products were unreasonably unsafe and dangerous.

177.  Defendant knew and/or should have known that it was foreseeable that consumers and/or users, such as Plaintiffs, would suffer injuries as a result of Defendant's failure to exercise ordinary care in the manufacturing, marketing, labeling, distribution, and sale of Roundup®.

178.  Plaintiffs did not know the nature and extent of the injuries that could result from the intended use of and/or exposure to Roundup® or its active ingredient glyphosate.

179.  Defendant's negligence was the proximate cause of the injuries, harm, and economic losses that Plaintiff Otis Lindell Chapman suffered, and will continue to suffer, as described herein.

180.  Defendant's conduct, as described above, was reckless.  Defendant regularly risks the lives of consumers and users of its products, including Plaintiffs, with full knowledge of the dangers of its products.  Defendant has made conscious decisions not to redesign, re-label, warn,

or inform the unsuspecting public, including Plaintiffs.  Defendant's reckless conduct therefore warrants an award of punitive damages.

181.    As a proximate result of Defendant's wrongful acts and omissions in placing its defective Roundup® products into the stream of commerce without adequate warnings of the hazardous and carcinogenic nature of glyphosate, Plaintiff Otis Lindell Chapman has suffered and continues to suffer severe and permanent physical and emotional injuries.  Plaintiff Otis Lindell Chapman has endured pain and suffering, has suffered economic losses (including significant expenses for medical care and treatment) and will continue to incur these expenses in the future.

WHEREFORE, Plaintiffs request that the Court enter judgment in Plaintiffs' favor for compensatory and punitive damages, together with interest, costs herein incurred, attorneys' fees, and all such other and further relief as this Court deems just and proper.  Plaintiffs also demand a jury trial on the issues contained herein.

## COUNT FOUR
## BREACH OF EXPRESS WARRANTY

182.    Plaintiffs incorporate by reference all other paragraphs of this Complaint as if fully set forth herein, and further allege:

183.    At all times relevant to this litigation, Defendant engaged in the business of testing, developing, designing, manufacturing, marketing, selling, distributing, and promoting its Roundup® products, which are defective and unreasonably dangerous to consumers, including Plaintiffs, thereby placing Roundup® products into the stream of commerce.  These actions were under the ultimate control and supervision of Defendant.

184.    At all times relevant to this litigation, Defendant expressly represented and warranted to the purchasers of its Roundup® products, by and through statements made by Defendant in labels, publications, package inserts, and other written materials intended for

consumers and the general public, that its Roundup® products were safe to human health and the environment, effective, fit, and proper for their intended use. Defendant advertised, labeled, marketed, and promoted Roundup® products, representing the quality to consumers and the public in such a way as to induce their purchase or use, thereby making an express warranty that its Roundup® products would conform to the representations.

185.    These express representations include incomplete warnings and instructions that purport, but fail, to include the complete array of risks associated with use of and/or exposure to Roundup® and glyphosate. Defendant knew and/or should have known that the risks expressly included in Roundup® warnings and labels did not and do not accurately or adequately set forth the risks of developing the serious injuries complained of herein. Nevertheless, Defendant expressly represented that its Roundup® products were safe and effective, that they were safe and effective for use by individuals such as Plaintiffs, and/or that they were safe and effective as agricultural herbicides.

186.    The representations about Roundup®, as set forth herein, contained or constituted affirmations of fact or promises made by the seller to the buyer, which related to the goods and became part of the basis of the bargain, creating an express warranty that the goods would conform to the representations.

187.    Defendant placed its Roundup® products into the stream of commerce for sale and recommended their use to consumers and the public without adequately warning of the true risks of developing the injuries associated with the use of and exposure to Roundup® and its active ingredient glyphosate.

188.    Defendant breached these warranties because, among other things, its Roundup® products were defective, dangerous, unfit for use, did not contain label representing the true and

adequate nature of the risks associated with their use, and were not merchantable or safe for their intended, ordinary, and foreseeable use and purpose. Specifically, Defendant breached the warranties in the following ways:

    a)     Defendant represented through its labeling, advertising, and marketing materials that its Roundup® products were safe, and fraudulently withheld and concealed information about the risks of serious injury associated with use of and/or exposure to Roundup® and glyphosate by expressly limiting the risks associated with use and/or exposure within its warnings and labels; and

    b)     Defendant represented that its Roundup® products were safe for use an fraudulently concealed information that demonstrated that glyphosate, the active ingredient in Roundup®, had carcinogenic properties, and that its Roundup® products, therefore, were not safer than alternative available on the market.

189.     Defendant had sole access to material facts concerning the nature of the risks associated with its Roundup® products as expressly stated within its warnings and labels, and Defendant knew that consumers and users such as Plaintiffs could not have reasonably discovered that the risks expressly included in Roundup® warnings and labels were inadequate and inaccurate.

190.     Plaintiffs had no knowledge of the falsity or incompleteness of Defendant's statements and representations concerning Roundup®.

191.     Plaintiff Otis Lindell Chapman used and/or was exposed to the use of Roundup® as researched, developed, designed, tested, formulated, manufactured, inspected, labeled, distributed, packaged, marketed, promoted, sold, or otherwise released into the stream of commerce by Defendant.

192.    Had the warnings and labels for Roundup® products accurately and adequately set forth the true risks associated with the use of such products, including Plaintiff Otis Lindell Chapman's injuries, rather than expressly excluding such information and warranting that the products were safe for their intended use, Plaintiff Otis Lindell Chapman could have avoided the injuries complained of herein.

193.    As a direct and proximate result of Defendant's wrongful acts and omissions, Plaintiff Otis Lindell Chapman has suffered severe injuries.  Plaintiff Otis Lindell Chapman has endured pain and suffering, has suffered economic losses (including significant expenses for medical care and treatment), and will continue to incur these expenses in the future.

WHEREFORE, Plaintiffs request that the Court enter judgment in Plaintiffs' favor for compensatory and punitive damages, together with interest, costs herein incurred, attorneys' fees, and all such other and further relief as this Court deems just and proper.  Plaintiffs also demand a jury trial on the issues contained herein.

## COUNT FIVE
## BREACH OF IMPLIED WARRANTY
## OF MERCHANTABILITY

194.    Plaintiffs incorporate by reference all other paragraphs of this Complaint as if fully set forth herein, and further allege:

195.    At all times relevant to this litigation, Defendant engaged in the business of testing, developing, designing, formulating, manufacturing, marketing, selling, distributing, and promoting its Roundup® products, which are defective and unreasonably dangerous to users and consumers, including Plaintiffs, thereby placing Roundup® products into the stream of commerce.

196.    These actions were under the ultimate control and supervision of Defendant.

197.    Before the time that Plaintiff Otis Lindell Chapman was exposed to the use of the aforementioned Roundup® products, Defendant impliedly warranted to its consumers and users, including Plaintiffs, that its Roundup® products were of merchantable quality and safe and fit for the use for which they were intended; specifically, as horticultural herbicides.

198.    Defendant, however, failed to disclose that Roundup® has dangerous propensities when used as intended and that the use of and/or exposure to Roundup® and glyphosate-containing products carries an increased risk of developing severe injuries, including Plaintiff Otis Lindell Chapman's injuries.

199.    Upon information and belief, Plaintiffs reasonably relied upon the skill, superior knowledge and judgment of Defendant and upon its implied warranties that the Roundup® products were of merchantable quality and fit for their intended purpose or use.

200.    The Roundup® products were expected to reach and did in fact reach consumers and users, including Plaintiffs, without substantial change in the condition in which they were manufactured and sold by Defendant.

201.    At all times relevant to this litigation, Defendant was aware that consumers and users of its products, including Plaintiffs, would use Roundup® products as marketed by Defendant, which is to say that Plaintiffs were the foreseeable users of Roundup®.

202.    Defendant intended that its Roundup® products be used in the manner in which Plaintiff Otis Lindell Chapman in fact used them and Defendant impliedly warranted each product to be of merchantable quality, safe, and fit for this use, despite the fact that Roundup® was not adequately tested or researched.

203.    In reliance upon Defendant's implied warranty, Plaintiff Otis Lindell Chapman used Roundup® as instructed and labeled and in the foreseeable manner intended, recommended, promoted and marketed by Defendant.

204.    Plaintiffs could not have reasonably discovered or known of the risks of serious injury associated with Roundup® or glyphosate.

205.    Defendant breached its implied warranty to Plaintiffs in that its Roundup® products were not of merchantable quality, safe, or fit for their intended use, or adequately tested. Roundup® has dangerous propensities when used as intended and can cause serious injuries, including those injuries complained of herein.

206.    The harm caused by Defendant's Roundup® products far outweighed their benefit, rendering the products more dangerous than an ordinary consumer or user would expect and more dangerous than alternative products.

207.    As a direct and proximate result of Defendant's wrongful acts and omissions Plaintiff Otis Lindell Chapman has suffered severe and permanent physical and emotional injuries. Plaintiff Otis Lindell Chapman has endured pain and suffering, has suffered economic loss (including significant expenses for medical care and treatment) and will continue to incur these expenses in the future.

WHEREFORE, Plaintiffs request that the Court enter judgment in Plaintiffs' favor for compensatory and punitive damages, together with interest, costs herein incurred, attorneys' fees, and all such other and further relief as this Court deems just and proper. Plaintiffs also demand a jury trial on the issues contained herein.

**COUNT SIX**
**LOSS OF CONSORTIUM**

208.    Plaintiffs incorporate by reference all other paragraphs of this Complaint as if fully

set forth herein, and further allege:

209.    Plaintiff Kim Chapman, at all times relevant, was the lawful wife of Otis Lindell Chapman.

210.    As a direct, legal, and proximate result of the culpability and fault of Defendant, be such fault through strict liability, negligence or otherwise, Plaintiff Kim Chapman suffered the loss of support, services, love, companionship, affection, society, intimate relations, and other elements of consortium, all to her general damage in an amount in excess of the jurisdictional minimum of this Court.

211.    Plaintiffs demand judgment against Defendant for compensatory and punitive damages such as a jury may award, and such other relief as the Court deems just and proper in order to remedy Plaintiff Kim Chapman's loss of consortium.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs request that the Court enter judgment in Plaintiffs' favor and against Monsanto, awarding as follows:

A.    compensatory damages in an amount to be proven at trial;

B.    punitive damages;

C.    costs including reasonable attorneys' fees, court costs, and other litigation expenses; and

D.    any other relief the Court may deem just and proper.

Dated this 2nd day of December, 2019.

Respectfully Submitted,

_____

Robert L. Collins, Esq.

50

Texas Bar No.: 04618100
Federal ID No. 2421
ROBERT L. COLLINS & ASSOCIATES
P.O. Box 7726
Houston, Texas 77270-7726
Telephone:  (713) 467-8884
Facsimile:  (713) 467-8883
Email:  firm@robertcollinslaw.com

*Attorney for Plaintiffs Otis Lindell Chapman
and Kim Chapman*

JS 44 (Rev. 09/19)
Case 3:16-md-02741-VC Document 13749-1 Filed 09/21/21 Page 53 of 1541
Case 4:19-cv-04698-VC Document 1 Filed 12/02/19 in TXSD Page 1 of 2

# CIVIL COVER SHEET

The JS 44 civil cover sheet and the information contained herein neither replace nor supplement the filing and service of pleadings or other papers as required by law,  except as provided by local rules of court.  This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet.  *(SEE INSTRUCTIONS ON NEXT PAGE OF THIS FORM.)*

| I. (a)  PLAINTIFFS | DEFENDANTS |
|---|---|
| Otis Lindell Chapman and Kim Chapman | Monsanto Company |

| (b)  County of Residence of First Listed Plaintiff    Harris | County of Residence of First Listed Defendant    Out of District |
|---|---|
| *(EXCEPT IN U.S. PLAINTIFF CASES)* | *(IN U.S. PLAINTIFF CASES ONLY)* |
| | NOTE:   IN LAND CONDEMNATION CASES, USE THE LOCATION OF THE TRACT OF LAND INVOLVED. |

| (c)  Attorneys *(Firm Name, Address, and Telephone Number)* | Attorneys *(If Known)* |
|---|---|
| Robert L. Collins, Esq. - Robert L. Collins & Associates P.O. Box 7726, Houston, TX 77270 (713) 467-8884 | Martin C. Calhoun, Esq. - Hollingsworth LLP 1350 I Street NW, Washington, DC 20005 (202) 898-5867 |

## II.  BASIS OF JURISDICTION *(Place an "X" in One Box Only)*

☐ 1   U.S. Government
     Plaintiff

☐ 2   U.S. Government
     Defendant

☐ 3   Federal Question
     *(U.S. Government Not a Party)*

☒ 4   Diversity
     *(Indicate Citizenship of Parties in Item III)*

## III.  CITIZENSHIP OF PRINCIPAL PARTIES *(Place an "X" in One Box for Plaintiff*
*(For Diversity Cases Only)* and One Box for Defendant)*

| | PTF | DEF | | PTF | DEF |
|---|---|---|---|---|---|
| Citizen of This State | ☒ 1 | ☐ 1 | Incorporated *or* Principal Place of Business In This State | ☐ 4 | ☐ 4 |
| Citizen of Another State | ☐ 2 | ☐ 2 | Incorporated *and* Principal Place of Business In Another State | ☐ 5 | ☒ 5 |
| Citizen or Subject of a Foreign Country | ☐ 3 | ☐ 3 | Foreign Nation | ☐ 6 | ☐ 6 |

## IV.  NATURE OF SUIT *(Place an "X" in One Box Only)*

Click here for: Nature of Suit Code Descriptions.

| CONTRACT | TORTS | | FORFEITURE/PENALTY | BANKRUPTCY | OTHER STATUTES |
|---|---|---|---|---|---|
| ☐ 110 Insurance | **PERSONAL INJURY** | **PERSONAL INJURY** | ☐ 625 Drug Related Seizure of Property 21 USC 881 | ☐ 422 Appeal 28 USC 158 | ☐ 375 False Claims Act |
| ☐ 120 Marine | ☐ 310 Airplane | ☒ 365 Personal Injury - Product Liability | ☐ 690 Other | ☐ 423 Withdrawal 28 USC 157 | ☐ 376 Qui Tam (31 USC 3729(a)) |
| ☐ 130 Miller Act | ☐ 315 Airplane Product Liability | ☐ 367 Health Care/ Pharmaceutical Personal Injury Product Liability | | | ☐ 400 State Reapportionment |
| ☐ 140 Negotiable Instrument | ☐ 320 Assault, Libel & Slander | | | **PROPERTY RIGHTS** | ☐ 410 Antitrust |
| ☐ 150 Recovery of Overpayment & Enforcement of Judgment | ☐ 330 Federal Employers' Liability | | | ☐ 820 Copyrights | ☐ 430 Banks and Banking |
| ☐ 151 Medicare Act | ☐ 340 Marine | ☐ 368 Asbestos Personal Injury Product Liability | | ☐ 830 Patent | ☐ 450 Commerce |
| ☐ 152 Recovery of Defaulted Student Loans (Excludes Veterans) | ☐ 345 Marine Product Liability | **PERSONAL PROPERTY** | | ☐ 835 Patent - Abbreviated New Drug Application | ☐ 460 Deportation |
| | ☐ 350 Motor Vehicle | ☐ 370 Other Fraud | | ☐ 840 Trademark | ☐ 470 Racketeer Influenced and Corrupt Organizations |
| ☐ 153 Recovery of Overpayment of Veteran's Benefits | ☐ 355 Motor Vehicle Product Liability | ☐ 371 Truth in Lending | **LABOR** | **SOCIAL SECURITY** | ☐ 480 Consumer Credit (15 USC 1681 or 1692) |
| ☐ 160 Stockholders' Suits | ☐ 360 Other Personal Injury | ☐ 380 Other Personal Property Damage | ☐ 710 Fair Labor Standards Act | ☐ 861 HIA (1395ff) | ☐ 485 Telephone Consumer |
| ☐ 190 Other Contract | ☐ 362 Personal Injury - Medical Malpractice | ☐ 385 Property Damage Product Liability | ☐ 720 Labor/Management Relations | ☐ 862 Black Lung (923) | Protection Act |
| ☐ 195 Contract Product Liability | | | ☐ 740 Railway Labor Act | ☐ 863 DIWC/DIWW (405(g)) | ☐ 490 Cable/Sat TV |
| ☐ 196 Franchise | | | ☐ 751 Family and Medical Leave Act | ☐ 864 SSID Title XVI | ☐ 850 Securities/Commodities/ Exchange |
| | | | | ☐ 865 RSI (405(g)) | ☐ 890 Other Statutory Actions |
| **REAL PROPERTY** | **CIVIL RIGHTS** | **PRISONER PETITIONS** | ☐ 790 Other Labor Litigation | **FEDERAL TAX SUITS** | ☐ 891 Agricultural Acts |
| ☐ 210 Land Condemnation | ☐ 440 Other Civil Rights | **Habeas Corpus:** | ☐ 791 Employee Retirement Income Security Act | ☐ 870 Taxes (U.S. Plaintiff or Defendant) | ☐ 893 Environmental Matters |
| ☐ 220 Foreclosure | ☐ 441 Voting | ☐ 463 Alien Detainee | | ☐ 871 IRS—Third Party 26 USC 7609 | ☐ 895 Freedom of Information Act |
| ☐ 230 Rent Lease & Ejectment | ☐ 442 Employment | ☐ 510 Motions to Vacate Sentence | | | ☐ 896 Arbitration |
| ☐ 240 Torts to Land | ☐ 443 Housing/ Accommodations | ☐ 530 General | | | ☐ 899 Administrative Procedure Act/Review or Appeal of Agency Decision |
| ☐ 245 Tort Product Liability | ☐ 445 Amer. w/Disabilities - Employment | ☐ 535 Death Penalty | **IMMIGRATION** | | |
| ☐ 290 All Other Real Property | ☐ 446 Amer. w/Disabilities - Other | **Other:** | ☐ 462 Naturalization Application | | ☐ 950 Constitutionality of State Statutes |
| | ☐ 448 Education | ☐ 540 Mandamus & Other | ☐ 465 Other Immigration Actions | | |
| | | ☐ 550 Civil Rights | | | |
| | | ☐ 555 Prison Condition | | | |
| | | ☐ 560 Civil Detainee - Conditions of Confinement | | | |

## V.  ORIGIN *(Place an "X" in One Box Only)*

☒ 1   Original
     Proceeding

☐ 2   Removed from
     State Court

☐ 3   Remanded from
     Appellate Court

☐ 4   Reinstated or
     Reopened

☐ 5   Transferred from
     Another District
     *(specify)*

☐ 6   Multidistrict
     Litigation -
     Transfer

☐ 8   Multidistrict
     Litigation -
     Direct File

## VI.  CAUSE OF ACTION

Cite the U.S. Civil Statute under which you are filing *(Do not cite jurisdictional statutes unless diversity)*:
28.1332pl

Brief description of cause:
diversity, personal injury, product liability

| VII.  REQUESTED IN COMPLAINT: | ☐ CHECK IF THIS IS A CLASS ACTION UNDER RULE 23, F.R.Cv.P. | DEMAND $ 75,000.00 | CHECK YES only if demanded in complaint: JURY DEMAND:   ☒ Yes   ☐ No |
|---|---|---|---|

| VIII.  RELATED CASE(S) IF ANY | *(See instructions):* | JUDGE   Vince Chhabria | DOCKET NUMBER   MDL No. 2741 |
|---|---|---|---|

| DATE | SIGNATURE OF ATTORNEY OF RECORD |
|---|---|
| 12/02/2019 | /s/ Robert L. Collins |

**FOR OFFICE USE ONLY**

RECEIPT #_____   AMOUNT_____   APPLYING IFP_____   JUDGE_____   MAG. JUDGE_____

Case 3:16-md-02738-VC Document 1-1 Filed 09/21/21 Page 54 of 1541
Case 4:19-cv-04698 Document 1-1 Filed on 12/02/19 in TXSD Page 2 of 2

# INSTRUCTIONS FOR ATTORNEYS COMPLETING CIVIL COVER SHEET FORM JS 44

### Authority For Civil Cover Sheet

The JS 44 civil cover sheet and the information contained herein neither replaces nor supplements the filings and service of pleading or other papers as required by law, except as provided by local rules of court. This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet. Consequently, a civil cover sheet is submitted to the Clerk of Court for each civil complaint filed. The attorney filing a case should complete the form as follows:

**I.(a)  Plaintiffs-Defendants.** Enter names (last, first, middle initial) of plaintiff and defendant. If the plaintiff or defendant is a government agency, use only the full name or standard abbreviations. If the plaintiff or defendant is an official within a government agency, identify first the agency and then the official, giving both name and title.

**(b)  County of Residence.** For each civil case filed, except U.S. plaintiff cases, enter the name of the county where the first listed plaintiff resides at the time of filing. In U.S. plaintiff cases, enter the name of the county in which the first listed defendant resides at the time of filing. (NOTE: In land condemnation cases, the county of residence of the "defendant" is the location of the tract of land involved.)

**(c)  Attorneys.** Enter the firm name, address, telephone number, and attorney of record. If there are several attorneys, list them on an attachment, noting in this section "(see attachment)".

**II.  Jurisdiction.** The basis of jurisdiction is set forth under Rule 8(a), F.R.Cv.P., which requires that jurisdictions be shown in pleadings. Place an "X" in one of the boxes. If there is more than one basis of jurisdiction, precedence is given in the order shown below.
United States plaintiff. (1) Jurisdiction based on 28 U.S.C. 1345 and 1348. Suits by agencies and officers of the United States are included here.
United States defendant. (2) When the plaintiff is suing the United States, its officers or agencies, place an "X" in this box.
Federal question. (3) This refers to suits under 28 U.S.C. 1331, where jurisdiction arises under the Constitution of the United States, an amendment to the Constitution, an act of Congress or a treaty of the United States. In cases where the U.S. is a party, the U.S. plaintiff or defendant code takes precedence, and box 1 or 2 should be marked.
Diversity of citizenship. (4) This refers to suits under 28 U.S.C. 1332, where parties are citizens of different states. When Box 4 is checked, the citizenship of the different parties must be checked**.** (See Section III below**; NOTE: federal question actions take precedence over diversity cases.**)

**III.  Residence (citizenship) of Principal Parties.** This section of the JS 44 is to be completed if diversity of citizenship was indicated above. Mark this section for each principal party.

**IV.  Nature of Suit.** Place an "X" in the appropriate box. If there are multiple nature of suit codes associated with the case, pick the nature of suit code that is most applicable. Click here for: Nature of Suit Code Descriptions.

**V.  Origin.** Place an "X" in one of the seven boxes.
Original Proceedings. (1) Cases which originate in the United States district courts.
Removed from State Court. (2) Proceedings initiated in state courts may be removed to the district courts under Title 28 U.S.C., Section 1441.
Remanded from Appellate Court. (3) Check this box for cases remanded to the district court for further action. Use the date of remand as the filing date.
Reinstated or Reopened. (4) Check this box for cases reinstated or reopened in the district court. Use the reopening date as the filing date.
Transferred from Another District. (5) For cases transferred under Title 28 U.S.C. Section 1404(a). Do not use this for within district transfers or multidistrict litigation transfers.
Multidistrict Litigation – Transfer. (6) Check this box when a multidistrict case is transferred into the district under authority of Title 28 U.S.C. Section 1407.
Multidistrict Litigation – Direct File. (8) Check this box when a multidistrict case is filed in the same district as the Master MDL docket.
**PLEASE NOTE THAT THERE IS NOT AN ORIGIN CODE 7.** Origin Code 7 was used for historical records and is no longer relevant due to changes in statue.

**VI.  Cause of Action.** Report the civil statute directly related to the cause of action and give a brief description of the cause. **Do not cite jurisdictional statutes unless diversity.** Example: U.S. Civil Statute: 47 USC 553 Brief Description: Unauthorized reception of cable service

**VII.  Requested in Complaint.** Class Action. Place an "X" in this box if you are filing a class action under Rule 23, F.R.Cv.P.
Demand. In this space enter the actual dollar amount being demanded or indicate other demand, such as a preliminary injunction.
Jury Demand. Check the appropriate box to indicate whether or not a jury is being demanded.

**VIII.  Related Cases.** This section of the JS 44 is used to reference related pending cases, if any. If there are related pending cases, insert the docket numbers and the corresponding judge names for such cases.

**Date and Attorney Signature.** Date and sign the civil cover sheet.

AO 440 (Rev. 06/12)  Summons in a Civil Action

# UNITED STATES DISTRICT COURT

for the

_____ District of _____

|  |  |  |
|---|---|---|
|  | ) |  |
|  | ) |  |
|  | ) |  |
| _____ | ) |  |
| *Plaintiff(s)* | ) | Civil Action No. |
| v. | ) |  |
|  | ) |  |
|  | ) |  |
|  | ) |  |
| _____ | ) |  |
| *Defendant(s)* | ) |  |

## SUMMONS IN A CIVIL ACTION

To: *(Defendant's name and address)*

A lawsuit has been filed against you.

Within 21 days after service of this summons on you (not counting the day you received it) — or 60 days if you are the United States or a United States agency, or an officer or employee of the United States described in Fed. R. Civ. P. 12 (a)(2) or (3) — you must serve on the plaintiff an answer to the attached complaint or a motion under Rule 12 of the Federal Rules of Civil Procedure.  The answer or motion must be served on the plaintiff or plaintiff's attorney, whose name and address are:

If you fail to respond, judgment by default will be entered against you for the relief demanded in the complaint. You also must file your answer or motion with the court.

*CLERK OF COURT*

Date: _____          _____
                                                                                            *Signature of Clerk or Deputy Clerk*

AO 440 (Rev. 06/12)  Summons in a Civil Action (Page 2)

Civil Action No.

## PROOF OF SERVICE
### *(This section should not be filed with the court unless required by Fed. R. Civ. P. 4 (l))*

This summons for *(name of individual and title, if any)* _____

was received by me on *(date)* _____ .

❒ I personally served the summons on the individual at *(place)* _____
_____ on *(date)* _____ ; or

❒ I left the summons at the individual's residence or usual place of abode with *(name)* _____
_____ , a person of suitable age and discretion who resides there,

on *(date)* _____ , and mailed a copy to the individual's last known address; or

❒ I served the summons on *(name of individual)* _____ , who is

designated by law to accept service of process on behalf of *(name of organization)* _____
_____ on *(date)* _____ ; or

❒ I returned the summons unexecuted because _____ ; or

❒ Other *(specify):*
_____ .

My fees are $ _____ for travel and $ _____ for services, for a total of $ _____ .

I declare under penalty of perjury that this information is true.

Date: _____

_____
*Server's signature*

_____
*Printed name and title*

_____
*Server's address*

Additional information regarding attempted service, etc:

# EXHIBIT 2

# Glyphosate Issue Paper:
# Evaluation of Carcinogenic Potential

# EPA's Office of Pesticide Programs
# September 12, 2016



## Table of Contents

List of Acronyms ................................................................................................................ 7

List of Tables ..................................................................................................................... 10

1.0   Introduction.............................................................................................................. 12

1.1   Background .............................................................................................................. 12

1.2   Evaluation of Carcinogenic Potential...................................................................... 12

1.3   Overview of Draft "Framework for Incorporating Human Epidemiologic & Incident Data in Health Risk Assessment" ........................................................................... 13

1.4   Summary of the Exposure Profile in the United States ................................................ 15

1.5   Organization of this Document ............................................................................... 19

2.0   Systematic Review & Data Collection ...................................................................... 19

2.1   Data Collection: Methods & Sources ...................................................................... 20

2.1.1   Open Literature Search ........................................................................................ 20

2.1.2   Studies Submitted to the Agency ......................................................................... 21

2.2   Evaluation of Relevant Studies ............................................................................... 22

3.0   Data Evaluation of Epidemiology............................................................................. 22

3.1   Introduction.............................................................................................................. 22

3.2   Considerations for Study Quality Evaluation and Scope of Assessment.................... 23

3.2.1   Study Designs....................................................................................................... 24

3.2.1.1   Analytical Studies ............................................................................................ 25

3.2.1.2    Descriptive Studies ............................................................................ 27

3.2.2    Exposure Measures ............................................................................ 27

3.2.3    Outcome Measures ............................................................................ 28

3.2.4    Confounding ...................................................................................... 28

3.2.5    Statistical Analyses ........................................................................... 29

3.2.6    Risk of Bias ....................................................................................... 29

3.3    Review of Quality Results ............................................................... 30

3.3.1    "High" Quality Group ..................................................................... 30

3.3.2    "Moderate" Quality Group .............................................................. 31

3.3.3    "Low" Quality Group ...................................................................... 32

3.4    Assessment of Epidemiological Studies for Relevance to Analysis ............... 44

3.5    Summary of Relevant Epidemiological Studies .................................. 44

3.5.1    Solid Tumor Cancer Studies ............................................................ 45

3.5.2    Non-Solid Tumor Cancer Studies .................................................... 53

3.6    Discussion ......................................................................................... 63

4.0    Data Evaluation of Animal Carcinogenicity Studies ........................ 68

4.1    Introduction ...................................................................................... 69

4.2    Consideration of Study Quality for Animal Carcinogenicity Studies ......... 69

4.3    Assessment of Animal Carcinogenicity Studies ................................. 71

**4.4      Summary of Animal Carcinogenicity Studies** ................................................. **73**

**4.5      Rat Carcinogenicity Studies with Glyphosate** ............................................... **74**

**4.5.1   Burnett et al., 1979 (MRID 00105164)** ................................................... **74**

**4.5.2   Lankas, 1981 (MRID 00093879)** ........................................................... **74**

**4.5.3   Stout and Ruecker, 1990 (MRID 41643801)** ........................................ **75**

**4.5.4   Atkinson et al., 1993a (MRID 496317023)** ........................................... **79**

**4.5.5   Brammer, 2001 (MRID 49704601)** ....................................................... **79**

**4.5.6   Pavkov and Wyand 1987 (MRIDs 40214007, 41209905, 41209907)** ....... **80**

**4.5.7   Suresh, 1996 (MRID 49987401 )** .......................................................... **81**

**4.5.8   Enemoto, 1997 (MRID 50017103-50017105)** ......................................... **81**

**4.5.9   Wood et al., 2009a (MRID 49957404)** .................................................. **81**

**4.5.10    Summary of Rat Data** ...................................................................... **82**

**4.6      Mouse Carcinogenicity Studies with Glyphosate** ......................................... **85**

**4.6.1   Reyna and Gordon, 1973 (MRID 00061113)** ....................................... **85**

**4.6.2   Knezevich and Hogan, 1983 (MRID 00130406)** .................................... **85**

**4.6.3   Atkinson, 1993b (MRID 49631702)** ..................................................... **87**

**4.6.4   Wood et al., 2009b (MRID 49957402)** .................................................. **88**

**4.6.5   Sugimoto, 1997 (MRID 50017108 - 50017109)** ..................................... **89**

**4.6.6   Pavkov and Turnier, 1987 (MRIDs 40214006, 41209907)** ..................... **90**

**4.6.7    Summary of Mouse Data** ................................................................. **90**

**4.7    Absorption, Distribution, Metabolism, Excretion (ADME)** .......................... **94**

**4.8    Discussion** ......................................................................................... **95**

**5.0    Data Evaluation of Genetic Toxicity** ..................................................... **97**

**5.1    Introduction** ...................................................................................... **97**

**5.2    Scope of the Assessment Considerations for Study Quality Evaluation** ..................... **97**

**5.3    Tests for Gene Mutations for Glyphosate Technical** ................................... **99**

**5.3.1    Bacterial Mutagenicity Assays** .................................................. **99**

**5.3.2    *In vitro* Tests for Gene Mutations in Mammalian Cells** ........................... **103**

**5.4    *In vitro* Tests for Chromosomal Abnormalities** ........................................ **105**

**5.4.1    *In vitro* Mammalian Chromosomal Aberration Test** ................................ **105**

**5.4.2    *In vitro* Mammalian Micronucleus Test** ........................................... **106**

**5.5    *In Vivo* Genetic Toxicology Tests** ....................................................... **111**

**5.5.1    *In Vivo* Assays for Chromosomal Abnormalities** ..................................... **111**

**5.5.1.1    Mammalian Bone Marrow Chromosomal Aberration Assays** .......................... **111**

**5.5.1.2    Rodent Dominant Lethal Test** ................................................ **111**

**5.5.1.3    *In Vivo* Mammalian Erythrocyte Micronucleus Assays** .................................... **112**

**5.6    Additional Genotoxicity Assays Evaluating Primary DNA Damage** ...................... **119**

**5.7    Summary and Discussion** ................................................................. **126**

6.0     Data Integration & Weight-of-Evidence Analysis Across Multiple Lines of Evidence
        128

6.1     Background ................................................................................................ 128

6.2     Dose-Response and Temporal Concordance ............................................ 128

6.3     Strength, Consistency, and Specificity .................................................... 130

6.4     Biological Plausibility and Coherence...................................................... 131

6.5     Uncertainty ................................................................................................ 133

6.6     Evaluation of Cancer Classification per the 2005 EPA Guidelines for Carcinogen
        Risk Assessment ........................................................................................ 135

6.6.1   Introduction ............................................................................................... 135

6.6.2   Discussion of Evidence to Support Cancer Classification Descriptors ................ 137

6.7     Proposed Conclusions Regarding the Carcinogenic Potential of Glyphosate.......... 140

7.0     Collaborative Research Plan for Glyphosate and Glyphosate Formulations .......... 141

8.0     References .................................................................................................. 144

## List of Acronyms

ADME: Absorption, Distribution, Metabolism, and Excretion
AHS: Agricultural Health Study
AOP: Adverse Outcome Pathway
AMPA: Aminomethylphosphonic Acid
BrdU: Bromodeoxyuridine
CA: Chromosomal Aberration
CARC: Cancer Assessment Review Committee
CBPI: Cytokinesis Block Proliferation Index
CHL: Chinese Hamster Lung
CHO: Chinese Hamster Ovary
CPRC: Carcinogenicity Peer Review Committee
EFSA: European Food Safety Authority
EPSPS: 5-enolpyruvylshikimate-3-phosphate synthase
FAO: Food and Agriculture Organization
FIFRA: Federal Insecticide, Fungicide, and Rodenticide Act
FISH: Fluorescence in situ Hybridization
GC-MS: Gas Chromatography-Mass Spectrometry
HL: Hodgkin Lymphoma
HPLC: High-Performance Liquid Chromatography
HPRT: Hypoxanthine-Guanine Phosphoribosyl Transferase
IARC: International Agency for Research on Cancer
JMPR: Joint Meeting Pesticide Residues
MGUS: Monoclonal Gammopathy of Undetermined Significance
MN: Micronuclei
MOA: Mode of Action
MPCE: Micronucleated Polychromatic Erythrocytes
MRID: Master Record Identifier (a unique number assigned to each study submitted to EPA)
MTD: Maximum Tolerated Dose
NB: Nuclear Bud
NCR: National Research Council
NHL: Non-Hodgkin Lymphoma
NPB: Nucleoplasmic Bridges
NTP: National Toxicology Program
OCSPP: Office of Chemical Safety and Pollution Prevention
OECD: Organization for Economic Cooperation and Development
OPP: Office of Pesticides Program
PCE: Polychromatic Erythrocytes
PK: Pharmacokinetic
PPE: Personal Protective Equipment
PWG: Pathology Work Group
RED: Registration Eligibility Decision
ROS: Reactive Oxygen Species
SAP: Scientific Advisory Panel
SCE: Sister Chromatid Exchange

SCGE: Single Cell Gel Electrophoresis
TAC: Total Antioxidant Capacity
TK: Thymidine Kinase
UDS: Unscheduled DNA Synthesis
USGS: United States Geological Survey
UV: Ultraviolet
WHO: World Health Organization
XPRT: Xanthine-Guanine Phosphoribosyl Transferase

**List of Figures**

Figure 1.1.  Source to outcome pathway (adapted from NRC, 2007)

Figure 1.2.  Glyphosate agricultural usage (pounds applied annually) from 1987- 2014. Boxes indicate years when glyphosate-resistant crops were introduced.  Source: Proprietary Market Research Data (1987 – 2014)

Figure 1.3. Map of estimated agricultural use for glyphosate in 1994 from USGS

Figure 1.4. Map of estimated agricultural use for glyphosate in 2014 from USGS

Figure 3.1.  Study evaluation process for epidemiological studies

Figure 3.2.  Forest plot of effect estimates (denoted as ES for effect sizes) and associated 95% confidence intervals (CI) for non-Hodgkin lymphoma (NHL)

Figure 7.1.  Results of HepG2 exposures following 24 hour incubation using different glyphosate formulations

## List of Tables

Table 3.1 Study Quality Considerations

Table 3.2.  Summary of Study Design Elements Impacting Study Quality Assignment and Overall Ranking

Table 3.3. Summary of Findings: Solid Tumor Cancer Studies

Table 3.4.  Summary of Findings: Non-Solid Tumor Cancer Studies

Table 4.1.  Testicular Interstitial Cell Tumors in Male Sprague-Dawley Rats (Lankas, 1981) Cochran-Armitage Trend Test & Fisher's Exact Test Results

Table 4.2.  Pancreatic Islet Cell Tumors in Male Sprague-Dawley Rats (Stout and Ruecker, 1990) Cochran-Armitage Trend Test & Fisher's Exact Test Results

Table 4.3.  Historical Control Data — Pancreatic Islet Cell Adenomas in Male Sprague- Dawley Rats (MRID No. 41728701)

Table 4.4.  Hepatocellular Tumors in Male Sprague-Dawley Rats (Stout and Ruecker, 1990) Cochran-Armitage Trend Test & Fisher's Exact Test Results

Table 4.6.  Thyroid C-Cell Tumors in Male Sprague-Dawley Rats (Stout and Ruecker, 1990) Cochran-Armitage Trend Test & Fisher's Exact Test Results

Table 4.7.  Thyroid C-Cell Tumors in Female Sprague Dawley Rats Cochran-Armitage Trend Test & Fisher's Exact Test Results (Stout and Ruecker, 1990)

Table 4.8. Thyroid Non-Neoplastic Lesions (Stout and Ruecker, 1990)

Table 4.9.  Liver Adenomas in Male Wistar Rats (Brammer, 2001) Cochran-Armitage Trend Test and Fisher's Exact Test Results

Table 4.10.  Mammary Gland Tumor Incidences in Female Rats (Wood et al., 2009a) Fisher's Exact Test and Cochran-Armitage Trend Test Results

Table 4.11. Summary of Rat Carcinogenicity Studies

Table 4.12.  Kidney Tubular Cell Tumors in Male CD-1 Mice (Knezevich and Hogan, 1983) Cochran-Armitage Trend Test & Fisher's Exact Test Results

Table 4.13. Kidney Histopathological Alterations in Male CD-1 Mice (Knezevich and Hogan, 1983)

Table 4.14.  Hemangiosarcomas in Male CD-1 Mice (Atkinson, 1993b) Cochran-Armitage Trend Test and Fisher's Exact Test Results

Table 4.15.  Lung Tumors in Male CD-1 Mice (Wood et al., 2009b) Fisher's Exact Test and Cochran-Armitage Trend Test Results

Table 4.16.  Malignant Lymphomas in Male CD-1 Mice (Wood et al., 2009b) Fisher's Exact Test and Cochran-Armitage Trend Test Results

Table 4.17.  Hemangioma Incidences (Sugimoto, 1997) Fisher's Exact Test and Cochran-Armitage Trend Test Results

Table 4.18. Summary of Mouse Carcinogenicity Studies

Table 5.1.  *In vitro* Test for Gene Mutations in Bacteria: Glyphosate Technical

Table 5.2.  *In vitro* Mammalian Gene Mutation Assays: Glyphosate Technical

Table 5.3.  *In vitro* Tests for Chromosome Aberrations in Mammalian Cells- Glyphosate Technical

Table 5.4.  *In vitro* Tests for Micronuclei Induction in Mammalian Cells- Glyphosate Technical

Table 5.5.  *In Vivo* Tests for Chromosomal Aberrations in Mammals- Glyphosate Technical

Table 5.6.  In Vivo Tests for Micronuclei Induction in Mammals- Glyphosate Technical

Table 5.7 Assays for Detecting Primary DNA Damage- Glyphosate Technical

## 1.0 Introduction

## 1.1 Background

Glyphosate is a non-selective, phosphonomethyl amino acid herbicide registered to control weeds in various agricultural and non-agricultural settings.  The herbicide acts by inhibiting the 5-enolpyruvylshikimate-3-phosphate synthase (EPSPS) enzyme, which is not present in mammalian systems.  Glyphosate was initially registered in 1974.  Since then, several human health analyses have been completed for glyphosate.  In 1986, EPA issued the Glyphosate Registration Standard which updated the agency's toxicity database for this compound.  In 1993, EPA issued the registration eligibility decision (RED) that indicated that glyphosate was eligible for re-registration.

Currently, glyphosate is undergoing Registration Review[1], a program where all registered pesticides are reviewed at least every 15 years as mandated by the Federal Insecticide, Fungicide, and Rodenticide Act (FIFRA).  The initial docket opening for glyphosate occurred in 2009 with the publication of the human health scoping document and preliminary work plan[2].  As part of this process, the hazard and exposure of glyphosate are reevaluated to determine its potential risk to human and environmental health.  Risks are assessed using current practices and policies to ensure pesticide products can still be used safely.  Registration Review also allows the agency to incorporate new science.  For human health risk assessment, both non-cancer and cancer effects are evaluated for glyphosate and its metabolites, aminomethylphosphonic acid (AMPA) and *N*-acetyl-glyphosate; however, this document will focus on the cancer effects only.  EPA expects to complete its complete human health risk assessment in 2017 that will include an assessment of risk from anticipated exposures resulting from registered uses of glyphosate in residential and occupational settings.

## 1.2 Evaluation of Carcinogenic Potential

Since its registration, the carcinogenic potential of glyphosate has been evaluated by EPA several times.  In 1985, the initial peer review of glyphosate was conducted in accordance with the Proposed Guidelines for Carcinogen Risk Assessment.  The agency classified glyphosate as a Group C chemical (Possible Human Carcinogen), based on the presence of kidney tumors in male mice.  In 1986, the agency requested that the FIFRA Scientific Advisory Panel (SAP) evaluate the carcinogenic potential of glyphosate.  The panel determined that the data on renal tumors in male mice were equivocal (only an increase in adenomas was observed and the increase did not reach statistical significance).  As a result, the panel recommended a Group D chemical classification (Not Classifiable as to Human Carcinogenicity) for glyphosate and advised the agency to issue a data call-in notice for further studies in rats and/or mice to clarify the unresolved questions (FIFRA SAP Report, 1986)[3].

---

[1] Additional information on the Registration Review process can be found at: https://www.epa.gov/pesticide-reevaluation/registration-review-process

[2] Documents of the Registration Review can be found in the public docket at: EPA-HQ-OPP-2009-0361, accessible at www.regulations.gov.

[3] Review available at: http://www.epa.gov/pesticides/chem_search/cleared_reviews/csr_PC-103601_24-Feb-86_209.pdf

With the submission of two rat carcinogenicity studies following this data call-in, a second peer review was conducted in 1991 by the agency's Carcinogenicity Peer Review Committee (CPRC) to incorporate the new data.  In accordance with the agency's 1986 Draft Guidelines for Carcinogen Risk Assessment, the CPRC classified glyphosate as a Group E Chemical: "Evidence of Non-Carcinogenicity for Humans" based upon lack of evidence for carcinogenicity in mice and rats and the lack of concern for mutagenicity (TXR# 0008897).

Most recently, in September 2015, a third review was done by the Cancer Assessment Review Committee (CARC).  Relevant glyphosate data available to EPA at that time for glyphosate were reevaluated, including studies submitted by the registrant and studies published in the open literature.  The agency performed this evaluation in support of Registration Review in accordance with the 2005 Guidelines for Carcinogen Risk Assessment, classified glyphosate as "Not Likely to be Carcinogenic to Humans" (CARC, 2015; TXR #0057299).

Recently, several international agencies have evaluated the carcinogenic potential of glyphosate. In March 2015, the International Agency for Research on Cancer (IARC), a subdivision of the World Health Organization (WHO), determined that glyphosate was a probable carcinogen (group 2A) (IARC, 2015).  Later, in November 2015, the European Food Safety Authority (EFSA) determined that glyphosate was unlikely to pose a carcinogenic hazard to humans (EFSA, 2015).  In May 2016, the Joint Food and Agriculture Organization (FAO)/WHO Meeting on Pesticide Residues (JMPR), another subdivision of the WHO, concluded that glyphosate was unlikely to pose a carcinogenic risk to humans from exposure through the diet (JMPR, 2016). Some individual countries (e.g., France, Sweden) have been moving to ban glyphosate based on the IARC decision, while other countries (e.g., Japan, Canada) have continued to support their conclusion that glyphosate is unlikely to pose a carcinogenic risk to humans.

The recent peer review performed by CARC served as an initial analysis to update the data evaluation for glyphosate at that time.  Based on an evaluation of the studies included in the recent analyses by IARC, JMPR, and EFSA, the agency then became aware of additional relevant studies not available to EPA.  As a result, EPA also requested information from registrants about studies that existed, but had never been submitted to the agency.  The current evaluation incorporates these additional studies. In addition, the Agency conducted a systematic review of the open literature and toxicological databases for glyphosate by using a draft "Framework for Incorporating Human Epidemiologic & Incident Data in Health Risk Assessment".  As such, the current evaluation also provides a more thorough evaluation than the 2015 CARC review.

## 1.3    Overview of Draft "Framework for Incorporating Human Epidemiologic & Incident Data in Health Risk Assessment"

In 2010, OPP developed a draft "Framework for Incorporating Human Epidemiologic & Incident Data in Health Risk Assessment" which provides the foundation for evaluating multiple lines of scientific evidence in the context of understanding of the mode of action (MOA)/adverse outcome pathway (AOP) (U.S. EPA, 2010).  The draft framework, which includes two key components, problem formulation and use of the MOA/AOP pathway frameworks, was reviewed

favorably by the FIFRA SAP in 2010 (FIFRA SAP, 2010). Recently, EPA has applied this framework to the evaluation of atrazine and chlorpyrifos[4].

OPP's draft framework is consistent with updates to the World Health Organization/International Programme on Chemical Safety MOA/human relevance framework, which highlights the importance of problem formulation and the need to integrate information at different levels of biological organization (Meek *et al.*, 2014). Consistent with recommendations by the National Research Council (NRC) in its 2009 report on *Science and Decisions*, OPP's draft framework describes the importance of using problem formulation at the beginning of a complex scientific analysis. The problem formulation stage starts with planning dialogue with risk managers to identify goals for the analysis and possible risk management strategies. This initial dialogue provides the regulatory context for the scientific analysis and helps define the scope of such an analysis. The problem formulation stage also involves consideration of the available information regarding the pesticide use/usage, toxicological effects of concern, and exposure pathways and duration along with key gaps in data or scientific information. Specific to glyphosate, the scoping document prepared for Registration Review (J. Langsdale *et al.*, 2009) along with the review conducted by the CARC (CARC, 2015) represent the problem formulation analyses for the weight-of-evidence evaluation for carcinogenic potential. A summary of the US exposure profile is provided in Section 1.4 below to provide context for interpreting the various lines of evidence.

One of the key components of the agency's draft framework is the use of the MOA framework/AOP concept (Figure 1.1) as a tool for organizing and integrating information from different sources to inform the causal nature of links observed in both experimental and observational studies. Specifically, the modified Bradford Hill Criteria (Hill, 1965) are used to evaluate strength, consistency, dose response, temporal concordance and biological plausibility of multiple lines of evidence in a weight-of-evidence analysis.



**Figure 1.1. Source to outcome pathway (adapted from NRC, 2007).**

---

[4] Chlorpyrifos Revised Human Health Risk Assessment for Registration Review; 29-DEC-2014; D424485.
U.S. EPA 2010 SAP Background White Paper – Re-evaluation of Human Health Effects of Atrazine: Review of Experimental Animal and In Vitro Studies and Drinking Water Monitoring Frequency. EPA-HQ-OPP-2010-0125.
U.S. EPA 2011 SAP Issue Paper – Re-evaluation of Human Health Effects of Atrazine: Review of Cancer Epidemiology, Non-cancer Experimental Animal and In Vitro Studies and Drinking Water Monitoring Frequency. EPA-HQ-OPP-2011-0399.

## 1.4    Summary of the Exposure Profile in the United States

All pesticide products provide critical information about how to safely and legally handle and use pesticide products. Pesticide labels are legally enforceable and all carry the statement "it is a violation of Federal law to use this product in a manner inconsistent with its labeling." In other words, the label is law. As a result, a key function of the pesticide product label is to manage the potential risk from pesticides.

Labeled uses of glyphosate include over 100 terrestrial food crops as well as other non-agricultural sites, such as greenhouses, aquatic areas, and residential areas. It is also registered for use on glyphosate-resistant (transgenic) crop varieties such as corn, soybean, canola, cotton, sugar beets, and wheat. Registered tolerances in the United States include residues of the parent compound glyphosate and *N*-acetyl-glyphosate, a metabolite found in/on glyphosate-tolerant crops[5].

Dietary (food and water) exposures are anticipated from applications to crops. Since there are registered uses of glyphosate that may be used in residential settings, residential handlers may be exposed to glyphosate during applications. Exposures may also occur from entering non-occupational areas that have been previously treated with glyphosate. Occupational/commercial workers may be exposed to glyphosate while handling the pesticide prior to application (mixing and/or loading), during application, or when entering treated sites. The agency considers all of the anticipated exposure pathways as part of their evaluation for human health.

Oral exposure is considered the primary route of concern for glyphosate. Oral absorption has been shown to be relatively low for glyphosate (~30% of administered doses) with negligible accumulation in tissues and rapid excretion (primarily unchanged parent) via the urine. Due to its low vapor pressure, inhalation exposure to glyphosate is expected to be minimal. Dermal penetration has also been shown to be relatively low for human skin (<1%) indicating dermal exposure will only contribute slightly to a systemic biological dose. Furthermore, in route-specific inhalation and dermal toxicity studies, no adverse effects were observed. This all suggests that there is low potential for a sustainable biological dose following glyphosate exposure.

In residential/non-occupational settings, children 1-2 years old are considered the most highly exposed subpopulation with oral exposures from dietary (food and water) ingestion and incidental oral ingestion (e.g., hand-to-mouth activities) in treated areas. There is also potential for dermal exposures in previously treated areas. Using HED's standard exposure assessment methodologies which are based on peer-reviewed and validated exposure data and models[6], a high-end estimate of combined exposure for children 1-2 years old is 0.47 mg/kg/day (see Appendix E).

---

[5] All currently registered tolerances for residues of glyphosate can be found in the Code of Federal Regulations (40 CFR §180.364).
[6] Available: http://www2.epa.gov/pesticide-science-and-assessing-pesticide-risks/standard-operating-procedures-residential-pesticide

At the time of initial registration (1974), total use of glyphosate in the United States was approximately 1.4 million pounds (Benbrook, 2016). In 1995, total use of glyphosate increased to approximately 40 million pounds with agriculture accounting for 70% of use. With the introduction of transgenic crop varieties in the United States circa 1996, (such as soybean, cotton, and corn) use of glyphosate increased dramatically (Green and Owen, 2011), and in 2000 the total use of glyphosate in the United States was approximately 98.5 million pounds. By 2014, total annual use of glyphosate was approximately 280-290 million pounds (based on Benbrook, 2016 and industry proprietary data accessible to EPA) with agriculture accounting for 90% of use. Although glyphosate use has continuously increased up to 2012, the stabilization of glyphosate usage in recent years is due to the increase in a number of glyphosate-resistant weed species, starting with rigid ryegrass identified in California in 1998 and currently totaling 16 different weed species in the United States as of March 2016. Figure 1.2 below provides a visual representation of the increased agricultural use of glyphosate in the United States using proprietary market research data from 1987-2014.

The increased use of glyphosate may be partly attributed to an increase in the number of farmers using glyphosate; however, it is more likely that individuals already using glyphosate increased their use and subsequent exposure. With the introduction of transgenic crop varieties, glyphosate use shifted from pre-emergent to a combination of pre- and post-emergent applications. Additionally, application rates increased in some instances and more applications were allowed per year (2-3 times/year). Maps from the United States Geological Survey (USGS) displaying glyphosate use in the United States indicate that although use has drastically increased since 1994, areas treated with glyphosate for agricultural purposes appear to be approximately the same over time (Figures 1.3-1.4). The introduction of transgenic crops in some cases led to a shift in crops grown on individual farms, such that more acreage within the farm would be dedicated to growing the glyphosate-tolerant crops replacing other crops. In addition, during the 2000s there was also an increase in growing corn for ethanol production, which could also have resulted in increased acreage dedicated glyphosate-tolerant corn.



**Figure 1.2. Glyphosate agricultural usage (pounds applied annually) from 1987- 2014. Boxes indicate years when glyphosate-resistant crops were introduced. Source: Proprietary Market Research Data (1987 – 2014).**



**Figure 1.3. Map of estimated agricultural use for glyphosate in 1994 from USGS (http://water.usgs.gov/nawqa/pnsp/usage/maps/show_map.php?year=1994&map=GLYPHOSATE&hilo=H)**



**Figure 1.4. Map of estimated agricultural use for glyphosate in 2014 from USGS (http://water.usgs.gov/nawqa/pnsp/usage/maps/show_map.php?year=2014&map=GLYPHOSATE&hilo=H)**

The potential exposure to occupational handlers is dependent on the formulation, specific task (mixer, loader, and/or applicator), rate of application, and acreage treated.  Using HED's standard occupational exposure assessment methodologies which are based on peer-reviewed and validated exposure data and models[7], mixer/loaders result in the highest potential exposure estimates.  Assuming no personal protective equipment (PPE), exposure estimates for mixer/loaders range from 0.03-7 mg/kg/day using the maximum application rate for high acreage agricultural crops (6 lb ai/acre)[8].  For applicators, exposure would be lower with estimates ranging from 0.02-0.03 mg/kg/day using the same application rate and acreage.

The maximum potential exposures from currently registered uses of glyphosate in residential and occupational settings in the United States are used in the current evaluation to aid in the determination of whether findings in laboratory studies are relevant for human health risk assessment.  In Sections 4.0 and 5.0, descriptions are provided for animal carcinogenicity and genotoxicity studies, respectively.  Results from these studies, particularly those administering high doses, are put into context with the human exposure potential in the United States.

---

[7] Available: https://www.epa.gov/pesticide-science-and-assessing-pesticide-risks/occupational-pesticide-handler-exposure-data
[8] Based on use information provided by the Joint Glyphosate Task Force for the following end-use products: EPA Registration Nos.: 100-1182, 228-713, 524-343, 524-475, 524-537, 524-549, 524-579, 4787-23, and 62719-556.

## 1.5     Organization of this Document

In this analysis of the human carcinogenic potential of the active ingredient glyphosate, the agency has performed a comprehensive analysis of available data from submitted guideline studies and the open literature.  This includes epidemiological, animal carcinogenicity, and genotoxicity studies.  Consistent with the 2010 draft framework, the agency has evaluated these multiple lines of evidence and conducted a weight-of-evidence analysis.  Although there are studies available on glyphosate-based pesticide formulations, the agency is soliciting advice from the FIFRA SAP on this evaluation of human carcinogenic potential for the active ingredient glyphosate only at this time.  The remainder of this document is organized by the following:

- *Section 2.0 Systematic Review & Data Collection Methods* provides a description of methods used to compile all relevant studies used in the current evaluation.
- *Section 3.0 Data Evaluation of Epidemiology* describes the available epidemiological studies, evaluates relevant studies for study quality, and discusses reported effect estimates.
- *Section 4.0 Data Evaluation of Animal Carcinogenicity Studies* provides a description and evaluation of the available animal carcinogenicity studies for glyphosate.
- *Section 5.0 Data Evaluation of Genetic Toxicity* summarizes and discusses the various genotoxicity assays that have been tested with glyphosate.
- *Section 6.0 Data Integration & Weight of Evidence Analysis Across Multiple Lines of Evidence* integrates available data discussed in Sections 3.0-5.0 to consider concepts, such as strength, consistency, dose response, temporal concordance and biological plausibility in a weight-of-evidence analysis.  This section also provides discussion of the data in the context of cancer descriptors provided in the 2005 Guidelines for Carcinogen Risk Assessment.
- *Section 7.0 Collaborative Research Plan for Glyphosate and Glyphosate Formulations* provides a discussion of planned research that is intended to evaluate the role of glyphosate in product formulations and the differences in formulation toxicity.


## 2.0     Systematic Review & Data Collection

In recent years, the National Academy of Sciences National Research Council (NRC) has encouraged the agency to move towards systematic review processes to enhance the transparency of scientific literature reviews that support chemical-specific risk assessments to inform regulatory decision making (NRC, 2011).  The NRC defines systematic review as "a scientific investigation that focuses on a specific question and uses explicit, pre-specified scientific methods to identify, select, assess, and summarize the findings of similar but separate studies" (NRC, 2014).  Consistent with NRC's recommendations, EPA's Office of Chemical Safety and Pollution Prevention (OCSPP) is currently developing systematic review policies and procedures.  In short, OCSPP employs "fit for purpose" systematic reviews that rely on standard methods for *collecting, evaluating, and integrating* the scientific data supporting the agency's decisions.  The concept of fit for purpose implies that a particular activity or method is suitable for its intended use.  Inherent in this definition is the concept that one size does not fit all situations and thus flexibility is allowed.  However, it is notable that with flexibility comes the

importance of transparency of documented processes; including the importance of transparency and clarity in approaches to data collection, evaluation, and integration.  These are described throughout the document with data collection in Sections 2.1.1-2.1.2, evaluation in Sections 3-5, and integration in Section 6.

As a result, more recent evaluations are starting to reflect this progression in the agency's process.  Similar to the draft framework for incorporating human epidemiologic and incident data, systematic review begins with a problem formulation to determine the scope and purpose of the search.  Studies are considered based on their relevance to answer specific questions and those studies deemed relevant are then further considered for their usefulness in risk assessment.

The agency strives to use high-quality studies when evaluating the hazard potential of pesticidal chemicals and considers a broad set of data during this process.  This includes registrant generated studies required under FIFRA, as well as peer-reviewed scientific journals and other sources, such as other governments and academia.  A wide range of potential adverse effects are assessed using acute, subchronic, chronic, and route-specific studies; predominately from studies with laboratory animals, in addition to epidemiologic and human incident data.  All studies are thoroughly reviewed to ensure appropriate conduct and methodologies are utilized, and that sufficient data and details are provided.  In this way, hazards are identified and potential risks characterized to ensure that decisions are informed by the best science available.

## 2.1     Data Collection: Methods & Sources

Data were collected by searching the open literature (Section 2.1.1) and other publicly available sources (e.g., recent internal reviews, evaluations by other organizations) (Section 2.1.2).  Internal databases were also searched for submitted studies conducted according to Organization for Economic Cooperation and Development (OECD) test guidelines, OCSPP harmonized test guidelines, and other pesticide test guidelines (OPP guidelines) (Section 2.1.2).

It should be noted that glyphosate is primarily manufactured as various salts with cations, such as isopropylamine, ammonium, or sodium.  These salts are derivatives of the active substance glyphosate and increase the solubility of technical-grade glyphosate acid in water.  All of these forms were considered for the current evaluation.

### 2.1.1   Open Literature Search

As part of the evaluation of the human carcinogenic potential of glyphosate, the literature review described here uses concepts consistent with fit for purpose systematic review, such as detailed tracking of search terms and which literature have been included or excluded.  The primary goal of the literature search was to identify relevant and appropriate open literature studies that had the potential to inform the agency on the <u>human</u> carcinogenic potential of glyphosate.  Therefore, non-mammalian studies were not considered, and several terms were used in the search string in an attempt to exclude non-mammalian studies.

To obtain literature studies, OPP worked with EPA librarians to conduct searches in PubMed, Web of Science, and Science Direct.  A search was conducted on May 6, 2016 in PubMed and Web of Science using the following search string to yield 141 and 225 results, respectively:

> ((glyphosate OR "1071-83-6" OR roundup OR "N-(Phosphonomethyl)glycine") AND (aneuploid* OR chromosom* OR clastogenic* OR "DNA damag*" OR "DNA adduct*" OR genome* OR genotoxic* OR micronucle* OR cancer* OR carcinogen* OR oncogenic* OR mutagen* OR cytotoxic* OR tumor* OR tumour* OR malignanc* OR neoplasm* OR *oma)) NOT (fish* OR frog* OR tadpole* OR insect* OR eco* OR amphibian* OR reptil* OR invertebrate* OR fly OR flies OR aquatic OR bird* OR aqueous OR water OR yeast* OR worm* OR earthworm* OR bacteria* OR lichen OR resist* OR "herbicide resist")

Due to differences with using Science Direct, the search string was slightly changed.  This search was also conducted on May 6, 2016 and yielded 459 results:

> ((glyphosate OR "1071-83-6" OR roundup OR "N-(Phosphonomethyl)glycine") AND (aneuploid* OR chromosom* OR clastogenic* OR (DNA pre/2 (damag* OR adduct*)) OR genome* OR genotoxic* OR micronucle* OR cancer* OR carcinogen* OR oncogenic* OR mutagen* OR cytotoxic* OR tumor* OR tumour* OR malignanc* OR neoplasm* OR *oma)) AND NOT (eco* OR fish* OR frog* OR tadpole* OR invertebrate* OR bird* OR insect* OR fly OR flies OR amphibian* OR reptil* OR yeast* OR aquatic OR aqueous OR water OR worm* OR earthworm* OR bacteria* OR lichen OR resist* OR "herbicide resist")

After cross-referencing the results obtained from the three open literature searches for duplicates, a total of 735 individual articles were obtained (Appendix A) and one additional study (Alvarez-Moya et al., 2014) not identified in the search was added to this list for a total of 736 individual articles.  All of the studies were evaluated to determine if the study would be considered relevant to the issue of concern (i.e., human carcinogenic potential of glyphosate).  Many of the articles were not considered to be within the scope of the search or not considered relevant in general (658 articles).  Additionally, 27 articles were not appropriate due to the type of article (i.e., correspondence, abstract only, not available in English, retraction).  Of the 51relevant articles, 42 were used in the current evaluation (31 genotoxicity, 9 epidemiological, and 2 animal carcinogenicity).  Three articles also reported on the potential of glyphosate and its metabolites to be developed into therapeutic drugs for cancer treatment.  The remaining 6 articles evaluated effects on glyphosate or glyphosate formulations on cellular processes, mostly focusing on epidermal cells, and were not considered informative for the current evaluation.

## 2.1.2   Studies Submitted to the Agency

For all pesticides, there are toxicology data requirements that must be submitted to the agency for registration.  These studies, defined under the 40 CFR Part 158 Toxicology Data Requirements, provide information on a wide range of adverse health outcomes, routes of exposure, exposure durations, species, and lifestages.  They typically follow OECD, OCSPP, or OPP accepted protocols and guidelines, which ease comparisons across studies and chemicals.  The toxicological databases for glyphosate[9] were reviewed and all relevant animal, genotoxicity, and metabolism studies were collected for consideration.

---

[9] Glyphosate pesticide chemical (PC) codes: 103601, 103603, 103604, 103605, 103607, 103608, 103613, 128501, and 417300.

Several resources were used to ensure all relevant studies were included in the current evaluation.  The list of studies obtained from the toxicological database and the open literature search were cross-referenced with recent internal reviews (CARC, 2015; S. Recore *et al.*, 2014).  This list was also cross-referenced with review articles from the open literature [Chang and Delzell (2016), Greim et al. (2015), Kier and Kirkland (2013), Kier (2015), Mink *et al.* (2012), Schinasi and Leon (2014), and Williams *et al.* (2000)][10].  EPA requested studies from registrants that were not previously available to the EPA.  As a result, numerous studies were subsequently submitted to the agency.  Study reports for one animal carcinogenicity study and 17 genotoxicity studies, were not available to the agency and have been noted in the relevant sections below.  For these studies, data and study summaries provided in Greim et al. (2015) and Kier and Kirkland (2013) were relied upon for the current evaluation.

## 2.2    Evaluation of Relevant Studies

Studies submitted to the agency are evaluating based on OECD, OCSPP, or OPP test guideline requirements to determine whether studies are acceptable for use in risk assessment.  In the current evaluation, animal carcinogenicity, genotoxicity, and metabolism studies located in the internal databases with access to full study reports were evaluated in this manner.  Those classified as unacceptable were noted and subsequently excluded from the current evaluation.

In order to evaluate open literature studies, criteria described in the OPP guidance for considering and using open literature toxicity studies to support human health risk assessment was utilized (U.S. EPA, 2012).  This guidance assists OPP scientists in their judgement of the scientific quality of open literature publications.  More specifically, the document discusses how to screen open literature studies for journal articles/publications that are relevant to risk assessment, how to review potentially useful journal articles/publications and categorize them as to their usefulness in risk assessment, and how the studies may be used in the risk assessment.  As with submitted studies, those deemed unacceptable were noted and subsequently excluded from the current evaluation.

## 3.0    Data Evaluation of Epidemiology

## 3.1    Introduction

Epidemiological studies are valuable for risk assessment since they may provide direct evidence on whether human exposure to a chemical may cause cancer.  Studies of high quality and adequate statistical power are preferable and remove the need to account for extrapolation from animals to humans or extrapolation from high to low doses.  Epidemiological studies can also be integrated with experimental evidence when determining or clarifying the carcinogenic potential of a chemical for risk assessment.  The key considerations in evaluating epidemiologic studies are study design, exposure assessment, outcome assessment, confounding control, statistical analyses, and risk of other bias.

---

[10] All review articles, except Schinasi and Leon (2014), were funded and/or linked to Monsanto Co. or other registrants.

OPP routinely evaluates the available epidemiological literature.  As part of Registration Review of glyphosate, an evaluation was initially conducted in 2014 (S. Recore *et al.*, 2014) and subsequently another evaluation was performed in 2015 (CARC, 2015).  The 2015 evaluation began with the epidemiological studies previously identified in the 2014 evaluation and included three additional studies that were not included in the 2014 evaluation.  These studies were identified in review articles, included in the evaluation by IARC (2015), or were published since the 2014 OPP evaluation.  Both the 2014 and 2015 OPP evaluations considered the design and overall quality of the epidemiological studies; however, formal study quality evaluations and rankings were not conducted.  In the current review, all of the studies in the 2015 report, as well as additional epidemiological articles identified from a comprehensive search and cross-referencing with available resources as described under Section 2.0, were considered in the current evaluation, which totaled 58 epidemiological studies.  The following sections provide a description of how epidemiological studies were evaluated for study quality and subsequent overall rankings, a summary of relevant studies, and a discussion of the overall results.

## 3.2    Considerations for Study Quality Evaluation and Scope of Assessment

This section summarizes how specific study characteristics were factored into the determination of a study's overall quality category.  It should be noted that these study quality considerations are specific to the issue of concern (i.e., carcinogenic potential of glyphosate).  These considerations are considered 'fit-for-purpose' under this context and could differ in another regulatory or scientific context.  Although the basic concepts apply broadly, the study quality considerations are tailored specifically to studies investigating the association between glyphosate exposure and cancer outcomes.  As with all research studies, the design elements of an epidemiological study have potential impacts on study quality and relevance to the research question under investigation.  Each study was, therefore, judged to be of high, moderate, or low quality in each of the following six domains affecting study quality: study design, exposure assessment, outcome assessment, confounder control, statistical analysis, and susceptibility to bias (See Section 3.2.1 for general considerations under each domain).  A similar approach was recently used by OPP for the evaluation of epidemiological studies for organophosphate pesticides (A. Lowit *et al.,* 2015).

Primary literature and associated meta-analyses evaluating the association between glyphosate exposure and a cancer outcome were the focus of this analysis.  Reviews were only used to identify individual studies that should be considered for study evaluation.  Commentaries, correspondence, and letters to the editor without original data were excluded.  Of the relevant studies identified, studies with the most complete analyses utilizing the greatest number of cases and controls (e.g.*,* pooled case-control studies) were evaluated for ranking (see Appendix B for visual representation of these studies).  If studies did not collect exposure information on glyphosate from individual subjects, did not assess an outcome (e.g.*,* biomonitoring studies), and/or did not provide a quantitative measure of an association between glyphosate and a cancer outcome, then these studies were assigned a low quality ranking and were not further evaluated in detail (see Figure 3.1).  A similar process was used by JMPR for their identification of epidemiological studies for evaluating the carcinogenic potential of glyphosate and two other pesticides (JMPR, 2016).



**Figure 3.1.  Study evaluation process for epidemiological studies.**

### 3.2.1   Study Designs

In judging an individual study's contribution to the strength of evidence in the epidemiologic literature base, the following general hierarchy of observational study designs was considered (from most to least preferred):  prospective cohort study (including nested case-control studies), case-control study, and cross-sectional study.  It is important to note, however, that this hierarchy of study designs reflects the *potential* for the collection of high quality information (related to exposure, outcome, confounders, and effect modifiers) and *potential* for efficient and valid estimation of the true association.  Thus, in deliberating on quality, care has been taken to consider the circumstances and particulars of each individual study to consider whether the study was well conducted independent of the type of study design.

The study designs used in the epidemiological literature reviewed were analytical and descriptive studies.  Cohort and case-control study designs are analytical studies used to evaluate relative incidence of health and disease outcomes by exposure status.  Cross-sectional and ecological studies are generally considered descriptive or hypothesis-generating study designs; however, they can also be used to test hypotheses regarding prevalence of health outcomes and, under certain conditions, incidence as well.

| Table 3.1.  Epidemiological Study Quality Considerations[a]. | | | |
|---|---|---|---|
| **Parameter** | **High Score** | **Moderate Score** | **Low Score** |
| Study Design | Cohort | Case-control | Cross-sectional/Ecological |

| Table 3.1.  Epidemiological Study Quality Considerations[a]. | | | |
|---|---|---|---|
| **Parameter** | **High Score** | **Moderate Score** | **Low Score** |
| Exposure Assessment | Questionnaire and/or interview answered by subjects for chemical-specific exposure | Questionnaire and/or interview for chemical-specific exposure answered by subjects or proxy individuals | Low-quality questionnaire and/or interview; information collected for groups of chemicals rather than chemical-specific; no chemical-specific exposure information collected; ever/never use of pesticides in general evaluated |
| Outcome Assessment | State or National registries, physicians, and/or special surveillance programs with cases verified by histopathological evaluation for tumors; appropriate consideration of prevalent vs. incident cases; analysis by valid method specific for biomarkers | State or National registries, physicians, and/or special surveillance programs without histopathological verification for tumors; analysis by assays that are less specific for biomarkers of interest | No outcome evaluated; unclear/no consideration for whether prevalent or incident cases are appropriate; biomarker methods not validated |
| Confounder Control | Good control for important confounders related to cancer, standard confounders, and known confounders for glyphosate and cancer outcomes (e.g., exposure to multiple pesticides) through study design or analytic control with well measured co-exposures (i.e., cumulative exposure) | Moderately good control for confounders related to cancer; standard variables accounted for and; attempt to control for known confounders via a less efficient measure of co-exposure (e.g.,  ever/never use) | No adjustments for confounders |
| Statistical Analyses | Appropriate to study question and design, supported by relatively adequate sample size, maximal use of data, reported well | Acceptable methods, lower/questionable study power | Minimal attention to statistical analyses, sample size evidently low, comparison not performed or described clearly |
| Risk of (Other) Bias | Major sources of other potential biases not likely present, present but analyzed, unlikely to influence magnitude and direction of effect estimate, no/low potential of selection bias | Other sources of bias present, acknowledged but not addressed in study, may influence magnitude but not direction of estimate, evidence of potential selection bias with low impact on effect estimate | Major study biases present, unacknowledged or unaddressed in study, cannot exclude other explanation for study findings, evidence of selection bias with high potential to impact effect estimate |

[a] Overall study quality ranking based on comprehensive assessment across the parameters.

### 3.2.1.1 Analytical Studies

*(1) Cohort Study*

In a typical cohort study, such as the Agricultural Health Study (AHS), individuals are classified according to exposure status (i.e., presence, absence, or magnitude of exposure) and then followed over time to quantify and compare the development (i.e., incidence) of the health outcome of interest by exposure group.  Conceptually, the non-exposed comparison group in a cohort study provides an estimate of the incidence of the outcome among the exposed, had they, counter-to-fact, not been exposed.  Apart from chance variations, a valid cohort study comparing exposed individuals to non-exposed individuals provides an estimate of the relative risk (or rate) of the disease associated with exposure.  Ideally, the exposed and non-exposed groups are exchangeable, in the sense that switching the exposed to non-exposed, and non-exposed to exposed would yield the same measure of association (e.g., relative risk).  If this were the case then, apart from chance, a cohort study would yield a measure of association equivalent to that produced in a corresponding (intervention) study where exposure status was randomly assigned.

The chief advantage of the cohort study design is that it affords the investigator the opportunity to avoid and/or adjust for potential biases (i.e., selection bias, information bias, and confounding); however, these biases may also be avoided in other well-designed study designs, such as a case-control study.  Cohort studies also allow for discernment of the chronological relationship between exposure and outcome, and can be particularly efficient for studying uncommon exposures.  The primary disadvantage of the cohort study design is logistical inefficiency with respect to the necessary time, expense, and other resources needed to conduct them.  Cohort studies are particularly inefficient for evaluating associations with rare outcomes and diseases with long induction or latency periods.  Case-control studies that are nested within a cohort study (nested case-control studies) share the attributes of the cohort study and may be more efficient.  However, when follow-up throughout the study period is incomplete, the potential for selection bias is increased, especially if follow-up rates are related to exposure status.

Two sub-categories of cohort studies – prospective and retrospective – are often applied to distinguish between studies in which the health outcome has occurred (retrospective study), or has not occurred (prospective study) at the time the investigators initiate the study.  This distinction is important primarily as it pertains to the potential differences in the quality (e.g., completeness, accuracy, and precision) of information that can be ascertained by the investigators, and also as it relates to potential sources of bias.  Although not always true, the prospective study design is considered the preferable of the two, as investigators can potentially have more choices in determining how exposure, outcome, and covariate information is collected.  In a retrospective study conducted to evaluate the same hypothesis, by contrast, the investigators would have to rely on exposure information based on self-reporting or historical records.  Such reporting is subject to (human) errors in recall, however when such errors are uncorrelated with disease state, there can be a bias towards the null due to random exposure measurement error (information bias) and only when such errors are correlated with the disease state can there be bias away from the null.

### (2) Case-Control Study

In a typical case-control study, individuals are classified according to their outcome status (i.e., cases who have developed the outcome of interest, and controls who represent the population

from which the cases arise). The relative odds of exposure are then compared between cases and controls. The primary advantage of case-control studies is that they are logistically efficient relative to cohort studies, often being conducted at a fraction of the cost and in a fraction of the time as a corresponding cohort study. Case-control studies can be used to examine associations between multiple exposures and a given health outcome. They are particularly efficient for evaluating rare outcomes, but are inefficient for studying uncommon exposures. An important point to evaluate in each case-control study is the potential for selection bias, which arises if the exposure distribution among the control subjects is not representative of the exposure distribution among the population that gave rise to the cases. When participation rates between cases and controls are low or distinctly imbalanced, the potential for selection bias is increased, especially if participation rates are related to exposure status. Case-control studies that rely on self-reported exposure measures are also potentially susceptible to information bias which could result in bias towards the null or away from the null.

### 3.2.1.2 Descriptive Studies

Cross-sectional studies are used to evaluate associations between exposure and outcome prevalence in a population at a single point in (or period of) time. The primary advantage of a cross-sectional study is logistical efficiency. They are relatively quick and inexpensive to conduct, as a long period of follow-up is not required, and exposure and outcome assessments occur simultaneously. Cross-sectional studies have three primary *potential* disadvantages: 1) potential difficulty in discerning the temporal relationships (i.e., whether the exposure precedes the outcome); 2) estimating outcome prevalence rather than incidence of the outcome; and 3) the possible overrepresentation of cases of the outcome with long duration relative to the average in the population, and often with a better prognosis.

Ecological studies are used to evaluate associations between exposures and outcomes using population-level rather than individual-level data. The primary advantages of ecological studies are related to logistical efficiency, as they often rely on pre-existing data sources and require no individual-level exposure, outcome, or covariate assessments. The primary weakness of the ecologic study is the potential for confounding and resultant inappropriate extrapolation of associations observed on the aggregate-level to associations on an individual level. The discrepancy that associations observed at the population level are not observed at the individual level is referred to as the ecological fallacy. Semi-ecological studies are less susceptible to the ecological fallacy due to incorporation of individual-level data on outcomes and/or confounders. The quality of these studies depends on the ability of the group exposure data to represent individual exposure and the research question of interest.

### 3.2.2   Exposure Measures

As described in Section 3.2 and Figure 3.1, studies assigned a low quality ranking based on an initial evaluation were not further evaluated in detail. In all of the studies included in the analysis that were reviewed and ranked for study quality, exposure information was collected from subjects and/or proxy individuals via questionnaires and/or interviews. These exposure assessments typically include questions to determine the amount of direct pesticide use or to collect information on behaviors and conditions associated with pesticide use (e.g., occupation, tasks). This type of reporting likely misclassifies actual pesticide exposure. If conducted as part

of a prospective exposure assessment, these errors are likely to be non-differential with respect to the outcome(s) of interest.  In a retrospective assessment, the subject or proxy has knowledge of the outcome; therefore, these errors may be differential or non-differential.  Studies that exclusively used subjects rather than including proxy individuals were considered more reliable and given a higher weight given that the subjects would have a more accurate recollection of their own exposure.

### 3.2.3   Outcome Measures

All of the studies evaluated in detail, except one, utilized state or national cancer registries, physicians, and/or special surveillance programs to determine outcome status (i.e., subjects with or without a cancer of interest).  In several studies, the cases were also verified by histopathological evaluation.  Overall, outcome measures were relatively consistent across studies and these assessments are likely to have minimal errors.  The remaining study evaluated in detail (Koureas et al., 2014) assessed oxidative DNA damage rather than a type of cancer.  For this evaluation, the oxidation by-product 8-hydroxydeoxyguanosine (8-OHdG) was measured by enzyme immunoassay.  This type of assay generally exhibits low specificity.  More sensitive quantitative methods are available to analyze genomic DNA for 8-OHdG by high-performance liquid chromatography (HPLC) with electrochemical detection, gas chromatography-mass spectrometry (GC-MS), and HPLC tandem mass spectrometry.  Consideration of incident or prevalent cases should also be carried out.  By using only incident cases, there is greater confidence that exposures occurred prior to the development of the outcomes.  Inclusion of prevalent cases can lead to an over-representation of cases with a long course of disease.

### 3.2.4   Confounding

The degree to which confounders were controlled varied across studies.  Some studies adjusted for particular medical variables, while others did not.  Some standard variables, such as age, geographical location, and sex, were either adjusted for analytically or by matching in case-control studies.  Several studies collected information on potential confounders; however, not all of these variables were evaluated or results of the evaluation were not reported.  The direction and magnitude for confounders are, in general, difficult to determine because they are dependent upon the relationship of each confounding factor with glyphosate and the cancer under investigation.  Several studies considered the potential for confounding from co-exposure to other pesticides; however, only a few reported effect estimates between glyphosate exposure and cancer risk adjusted for the use of other pesticides.  Given most people in the epidemiological studies who use pesticides occupationally will be exposed to multiple pesticides and, in some instances, those other pesticides were observed to be risk factors for the same cancer, this is a particularly important concern to address in either the study design or in the statistical analyses.  Across numerous studies, co-exposures to other pesticides was found to be positively correlated with exposure to glyphosate and exposure to those other pesticides appear to increase the risk of some cancers.  As a result, the direction of confounding would be to inflate any true effect of glyphosate in the absence of statistical control.  This underlines the importance of controlling for co-exposures to other pesticides.

For NHL, other potential confounders, such as exposure to diesel exhaust fumes, solvents, ultraviolet radiation, livestock, and viruses, have been identified.  Some of these are more

plausible than others.  For example, occupational exposure to diesel exhaust fumes (e.g., McDuffie et al., 2002; Karunanayake et al. 2008; Baris et al. 2001; Maizlish et al. 1998) and solvents (Wang et al., 2009; Kato et al., 2005; Olsson and Brandt, 1988) are considered likely to increase the risk of NHL.  Agricultural workers are exposed to diesel fumes when using agricultural vehicles when applying pesticides, such as glyphosate, and when using heavy equipment during mixing, loading, and/or applying pesticides.  Agricultural workers are also exposed to solvents.  Solvents are often used in pesticide products to aid the delivery of the active ingredient and enhance efficacy.  Solvents are also used for cleaning and maintenance/repair of agricultural equipment used for mixing, loading, and/or applying pesticides.  With an association between exposure and outcome of interest, it is reasonable to consider diesel exhaust fumes and solvents as probable confounders; however, neither of these factors were accounted for in any of the studies evaluated in detail.  There is also evidence that ultraviolet (UV) radiation may increase the risk of NHL (Karipidis et al., 2007; Zhang et al., 2007).  As a result, there is a support that UV radiation is also a potential confounder given the extended amount of time agricultural workers spend outside performing activities, including those associated with pesticide use.  This was also not accounted for in any of the studies evaluated in detail.

### 3.2.5   Statistical Analyses

Statistical analyses that were appropriate to the study question and study design, supported by adequate sample size, maximized the use of available data, and were well characterized in the report were weighted most highly.  Acceptable statistical methods, questionable study power, and analytical choices that resulted in the loss of information were given moderate weight.  Reports with only minimal attention paid to the conduct and reporting of the statistical analyses were given the lowest weight.

### 3.2.6   Risk of Bias

The internal validity of the studies reviewed was judged by noting the design strategies and analytic methods used in each study to constrain or eliminate selection bias, information bias, and confounding.  Selection bias can occur when the sampling of the population by the investigator yields a study population that is not representative of the exposure and outcome distributions in the population sampled.  Put simply, selection bias occurs if selection of the study sample yields a different estimate of the measure of association than that which would have been obtained had the entire target population been evaluated.  Although there are numerous sources of selection bias, there are several mechanisms that may have induced selection bias in the studies reviewed: low participation rates of eligible individuals due to non-responsiveness or refusal (self-selection bias); loss to follow-up (i.e., failure to retain all study participants initially enrolled in the study); and, in a case-control study, control selection bias arising because the exposure distribution in the control sample does not represent the exposure distribution of the study base (i.e., the population that gave rise to the cases or more formally, the person-time experience of that population).

Information bias (also referred to as observation bias) arises when study participants are incorrectly categorized with respect to their exposure or outcome status, or when errors arise in the measurement of exposure or outcome, in the case of continuously distributed measures.

Epidemiologists often distinguish between two mechanisms or types of misclassification – those that are non-differential (or random) and those that are differential (non-random). Non-differential misclassification of exposure (or non-differential exposure measurement error) occurs when the probability or magnitude of error in the classification or measurement of exposure is independent of the outcome status of the study participants. Non-differential exposure measurement error typically results in a bias towards the null which may obscure any true effect of the exposure of interest. Similarly, non-differential misclassification of outcome (or outcome measurement error) occurs when the probability or magnitude of error in the assignment of outcome status or level is independent of exposure status. Non-differential outcome measurement error typically does not cause bias but does decrease the precision of effect estimates and therein inflates the width of confidence intervals. In contrast, differential exposure misclassification (or measurement error) occurs when the error in the exposure assignment is not independent of the outcome status. The mechanisms that cause non-differential misclassification in the currently reviewed literature include random errors in exposure recall from subjects or proxy respondents. The mechanisms that could induce differential misclassification include recall bias and interviewer/observer bias. Note that mismeasurement of confounders can result in residual confounding of the association of interest, even when adjustment for that confounder has been conducted in the analysis.

Studies in which major sources of potential biases were not likely to be present, studies in which potential sources of bias were present, but effectively addressed and analyzed to maximize the study validity, and studies in which sources of bias were unlikely to influence the magnitude and direction of the effect estimate were given more weight than studies where sources of bias may be present, but not addressed in the study.

## 3.3     Review of Quality Results

Each study was judged to be of high, moderate, or low quality in each of the six domains affecting study quality, as discussed above and in Table 3.1. The results of the quality assessment are presented separately for each group below. The quality rankings presented are specific to the current evaluation of the carcinogenic potential of glyphosate. As noted above and in Table 3.2, several studies were not included in the ranking evaluation because they did not represent the most complete analysis. Rather, the subjects were included in a larger analysis (e.g., pooled case-control study) to produce a greater number of cases and controls (see Appendix B for visual representation of these studies). For example, Cantor *et al.* (1992) was not individually evaluated for ranking because the data from this study were pooled with data from other studies in De Roos *et al.* (2003), which was included.

### 3.3.1   "High" Quality Group

Three studies were given a high quality ranking: De Roos *et al.* (2005), Eriksson *et al.* (2008), and Koutros *et al.* (2013).

De Roos *et al.* (2005) was the only cohort study available for ranking. This prospective cohort study evaluated associations between various pesticide exposures, including glyphosate, and cancer incidence for numerous solid and non-solid tumors in the AHS. The aim of the AHS is to evaluate the role of agricultural exposures in the development of cancer and other diseases in the

farming community.  AHS recruited 52,934 licensed private pesticide applicators along with 32,345 of their spouses between 1993 and 1997.  In the first two phases of the study, the cohort also included 4,916 commercial pesticide applicators from Iowa.  As a prospective analysis of the AHS cohort, information was obtained from exposed subjects at enrollment and no proxies were necessary.  Exposure was evaluated as ever/never use, cumulative lifetime exposure, and intensity-weighted cumulative exposure.  Due to the study design, the potential for many biases were reduced.  Additionally, the study adjusted and/or considered numerous factors, including use of other pesticides.  Study participants provided detailed pesticide exposure information prior to enrollment in the study and this information has been incorporated into the study evaluation by determining tertile cut points and calculating effect estimates by comparing to the lowest tertile.  Additional evaluations with quartiles and quintiles were performed for cancers with elevated effect estimates in the study and for NHL.

Eriksson *et al.* (2008) was a population-based case-control study that recruited a consecutive series of incident cases of NHL in several regions of Sweden from physicians treating lymphoma within specified health service areas.  Cases were verified pathologically and matched to randomly selected controls from the national population registry by age, sex and health service area.  Exposure information was collected from exposed individuals (i.e., no use of proxy respondents) using a comprehensive questionnaire including a total work history with in depth questions about exposures to pesticides, solvents, and other chemicals.  Interviewers were blinded to case/control status.  The study only reported minimal demographic information on subjects (age and sex) and a table with subject characteristics (e.g., smoking status, alcohol intake, physical activity, education) that could potentially be used to adjust effect estimates was not provided.  Glyphosate exposure was reported in 29 cases and 18 controls during the study period.  Multivariate analyses were adjusted for co-exposure to different agents, including MCPA, "2,4,5-Y and/or 2,4-D", mercurial seed dressing, arsenic, creosote, and tar.  An analysis for a potential exposure-response relationship was also conducted; however, it was not clear whether this analysis controlled for co-exposure to other pesticides based on the statistical methods description.  The number of cases and controls were also not reported for this analysis.

Koutros *et al.* (2013) was a nested case-control study within the AHS that evaluated the association between pesticide use and prostate cancer.  Exposure information was collected from exposed subjects (no proxies necessary) through the enrollment questionnaires, as well as in a follow-up questionnaire administered 5 years after enrollment.  This study evaluated the association between glyphosate and prostate cancer diagnoses from enrollment (1993-1997) through 2007 resulting in a longer follow-up time than many of the other case-control studies that utilized AHS subjects.  The study used lifetime cumulative exposure and intensity-weighted cumulative exposure metrics.  Analyses were also conducted using unlagged exposure and 15-year lagged exposure, which excluded the most recent 15 years of exposure for both exposure metrics.  Although the effect estimate reported for glyphosate in this study was not adjusted for co-exposure to other pesticides, additional analyses were not considered necessary since there was no association observed.

### 3.3.2  "Moderate" Quality Group

Twenty-one case-control studies were assigned a moderate quality rating (Table 3.2).  In general, these studies share many study design characteristics.  Exposure information was collected from subjects and/or proxy individuals, the outcome measurement(s) utilized state/national registries and surveillance programs, appropriate statistical analyses were performed, some covariates but maybe not all relevant covariates were evaluated and/or considered, and risks of bias were minimized to some extent.  Sample sizes varied across studies.  Case-control studies investigating solid tumors included study populations in the United States and Canada.  For non-solid tumors, study populations were located in the United States, Canada, Sweden, France, Germany, Italy, Ireland, Spain, and the Czech Republic.  Although several nested case-control studies shared most of the characteristics of the AHS cohort study, these studies were primarily given a moderate quality ranking since co-exposure to other pesticides was not accounted for in the analyses.

### 3.3.3   "Low" Quality Group

Seven case-control and 27 cross-sectional/ecological studies were assigned a low quality ranking.  All of these studies, except one case-control study (Cocco *et al.*, 2013) and one descriptive study (Koureas et al., 2014), were not subjected to a detailed evaluation because they did not report a quantitative measure of an association between glyphosate exposure and a cancer outcome, did not collect information on glyphosate exposure from all subjects, and/or did not evaluate risk to a cancer outcome (Appendix D).  In many instances, effect estimates were reported only for total pesticide exposure.  Additionally, exposure was assumed and glyphosate-specific exposure information was not collected.  In other studies, the aim of the study was to assess exposure methods for epidemiological studies and/or to evaluate the impact of exposure misclassification; therefore, there was no evaluation of a cancer outcome.

It should be noted that some of the studies assigned a low quality ranking in the current evaluation were included in the recent evaluation by IARC.  There were a number of descriptive studies that evaluated the genotoxicity in human populations; however, these studies did not meet the criteria for inclusion in the ranking as described in Section 3.2 and Figure 3.1.  In most instances, these studies reported effect estimates for total pesticide exposure and/or assumed glyphosate exposure without collecting glyphosate-specific exposure information.  For case-control studies, Cocco et al. (2013), Dennis et al. (2010) and Ruder et al. (2004) were included in the 2015 IARC evaluation, but were not considered informative in the current evaluation.

Detailed evaluations were not performed in the current evaluation for Dennis et al. (2010) and Ruder et al. (2004) because a quantitative measure of an association between glyphosate and a cancer outcome was not reported.  Cocco et al. (2013) received a detailed evaluation and was assigned a low quality ranking.  This case-control study, which evaluated lymphoma risk across six European countries, was not considered informative due to a combination of numerous limitations in the study.  The power of the study was low with only four cases and two controls exposed to glyphosate.  Control ascertainment was not consistent across countries, with a mix of hospital- and population-based controls used.  The overall participation rate for population-based controls was found to be much lower than the overall participation rates of the cases or hospital-based controls.  Lastly, the study was limited to ever/never use of glyphosate and did not control for confounders, in particular exposure to other pesticides.  Although this study was included in

the IARC evaluation, IARC also stated that the study had very limited power to assess the effects of glyphosate on risk of NHL.

The other study subjected to a detailed evaluation and assigned a low quality ranking was Koureas *et al*. (2014).  This cross-sectional study evaluated the association between glyphosate exposure and oxidative DNA damage in 80 Greek pesticide sprayers.  Although the study reported a non-statistically significant effect estimate for glyphosate, it is limited in its ability to contribute to the overall evaluation of the carcinogenic potential of glyphosate.  The effect estimate was not adjusted for any standard covariates or potential confounders, including co-exposure to other pesticides.  The power of the study was questionable.  There were 80 subjects, but the number exposed to glyphosate was not reported.  The outcome is measured using an immunoassay that is less specific for measuring the biomarker of interest than other available analytical methods.  Lastly, the study evaluates primary DNA damage, but does not measure the consequence of genetic damage.  An increase in oxidative DNA damage may lead to cell death or initiate DNA repair rather than lead to a mutation.

Due to the limitations in the studies assigned a low quality ranking, they do not provide reliable information to evaluate associations between glyphosate exposure and cancer outcomes. Therefore, the remaining sections of this document do not further discuss these studies except to note when a study is included in meta-analyses.

**Table 3.2.  Summary of Study Design Elements Impacting Study Quality Assignment and Overall Ranking.**

| Journal Article | Study Design | Exposure Assessment | Outcome Assessment | Confounder Control | Statistical Analyses | Risk of (Other) Bias | Overall Ranking |
|---|---|---|---|---|---|---|---|
| Alavanja *et al.* (2003) | This study was not included in the study quality ranking because the data were used in the updated analysis by Koutros *et al.* (2013). | | | | | | |
| Andreotti *et al.* (2009) | Nested Case-control | Questionnaire answered by subjects at study enrollment followed by take-home questionnaire; examined exposure for glyphosate as ever/never, and intensity-weighted cumulative exposure days; spouses either self-administered questionnaire (81%) or telephone interview (19%) | State cancer registries without histopathological verification; exclusion of subjects with prevalent cancer at enrollment; follow-up ~ 9 years | Adjusted for age, smoking, and diabetes for both exposure metrics as well as applicator type forever/never exposure metric

No adjustment for co-exposure to other pesticides or other potential confounders (e.g., solvents, diesel fumes, UV radiation) | Unconditional logistic regression to obtain OR and 95% CI | Exposure misclassification particularly for spouses, low response rate to take-home questionnaire (40%) but unclear if affected cases and controls differently, insufficient power for pesticide exposure interactions | Moderate |
| Band *et al.* (2011) | Population-based case-control

Males only | Self-administered questionnaire answered by subjects or proxies for deceased subjects requesting work history and demographic information; use of a job exposure matrix to estimate exposure to pesticides | Cancer registry with histopathological verification; excluded farmers that worked all outside of British Columbia; included prostate cancer cases prior to the PSA era | Adjustment for alcohol consumption, cigarette years, education level, pipe years, and respondent type. Marital status and ethnicity not significant

No adjustment for co-exposure to other pesticides or other potential confounders (e.g., solvents, diesel fumes, UV radiation) | Conditional logistic regression to obtain ORs and 95% CIs | Recall bias, use of proxy for deceased, exposure misclassification, participation rates cited from another study, use of cancer patients as controls (excluding lung and unknown cancer) | Moderate |
| Brown *et al.* (1990) | Pooled population-based case-control

Males only | In-person interviews using standardized questionnaire with subjects or proxies for deceased/incapacitated; supplementary questionnaire administered by telephone for Iowa subjects to obtain more | State cancer registry (Iowa) and special surveillance network including hospitals and pathology laboratories (Minnesota); cases ascertained retrospectively and prospectively (2 years after start of study); | Adjusted for vital status, age, state, ever used tobacco daily, close relative with lymphopoietic cancer, nonfarming job related to risk of leukemia in the study, exposure to substances related to risk in this study | Unconditional logistic models to obtain OR and 95% CI; questionable power (15 cases) | Recall bias; exposure misclassification, use of proxy respondents | Moderate |

**Table 3.2.  Summary of Study Design Elements Impacting Study Quality Assignment and Overall Ranking.**

| Journal Article | Study Design | Exposure Assessment | Outcome Assessment | Confounder Control | Statistical Analyses | Risk of (Other) Bias | Overall Ranking |
|---|---|---|---|---|---|---|---|
| | | detailed information from those indicating pesticide use | ~26% of cases deceased or too ill when identified and ~15% deceased or too ill at time of interview; histopathological verification by pathologists | (benzene, napthalene, hair dyes)<br><br>No adjustment for co-exposure to other pesticides or other potential confounders (e.g., solvents, diesel fumes, UV radiation) | | | |
| Brown *et al.* (1993) | Population-based case-control<br><br>Males only | In person interviews with standardized questionnaire to obtain detailed information on farm activities and use of pesticides from subjects or proxies | State cancer registry (Iowa) ascertained retrospectively and prospectively (2 years after start of study); ~26% of cases deceased or too ill when identified and ~15% deceased or too ill at time of interview; histopathological verification by pathologists | Adjusted for vital status and age; smoking and education evaluated and not found to be significant<br><br>No adjustment for co-exposure to other pesticides or other potential confounders (e.g., solvents, diesel fumes, UV radiation) | Logistic models to obtain OR and 95% CI; questionable power (11 cases) | Recall bias; exposure misclassification, use of proxy respondents | Moderate |
| Cantor *et al.* (1992) | This study was not included in the study quality ranking because the data were used in the pooled analysis conducted by De Roos *et al.* (2003). | | | | | | |
| Carreon *et al.* (2005) | This study was not included in the study quality ranking because the data were used in the pooled analysis conducted by Yiin *et al.* (2012). | | | | | | |
| Cocco *et al.* (2013) | European multi-center case-control<br><br>Hospital-based and population-based (mixed for 2 countries, only hospital-based for the rest) | Trained interviewers conducted in person interviews using structured questionnaire answered by subjects; those identified as agricultural worker on questionnaire given subsequent questions about pesticide use, crops, etc. | Surveillance centers, 20% of slides from each center reviewed by pathologist | Adjustment for age, sex, education, and center.<br><br>No adjustment for co-exposure to other pesticides or other potential confounders (e.g., solvents, diesel fumes, UV radiation) | Unconditional logistic regression to obtain ORs and 95% CIs; Low power (4 cases, 2 controls) | Recall bias, selection bias (low response rate for population-based controls and differed from cases), exposure misclassification, mix of hospital- and population-based controls, | Low |
| De Roos *et al.* (2003) | Population-based case-control<br><br>Males only<br><br>Pooled analysis of | Interviews with subjects or proxy for deceased subjects.  Different interview techniques across states.  One study collected information on | State cancer registries (one state chose a random sample, other states chose all cases), surveillance programs, and hospitals without | Adjustment for age, study site, and other pesticides.<br><br>First degree relative with haematopoietic | Logistic regression and hierarchical regression to obtain ORs and 95% CIs | Recall bias, exposure misclassification, , use of proxy for deceased, , varying quality of questionnaire/interview techniques across studies | Moderate |

**Table 3.2.  Summary of Study Design Elements Impacting Study Quality Assignment and Overall Ranking.**

| Journal Article | Study Design | Exposure Assessment | Outcome Assessment | Confounder Control | Statistical Analyses | Risk of (Other) Bias | Overall Ranking |
|---|---|---|---|---|---|---|---|
| | Cantor *et al.*, 1992; Hoar *et al.*, 1986; Zahm *et al.*, 1990 | pesticide use and then followed-up with questions on selected specific pesticides, another study had a direct question about a selected list of specific pesticides, and the last study used an open ended question without prompting for specific pesticides | histopathological verification | cancer, education, and smoking not found to be important confounders.

No adjustment for other potential confounders (e.g., solvents, diesel fumes, UV radiation) | | | |
| De Roos *et al.* (2005) | Prospective cohort (licensed pesticide applicators) | Questionnaire answered by subjects at enrollment and with subsequent take-home questionnaire; examined exposure as ever/never, cumulative lifetime days, and intensity-weighted cumulative exposure days | State cancer registries without histopathological verification; follow-up ~7 years | Adjustment for state of residence, age, education, smoking history, alcohol consumption, family history of cancer, use of other common pesticides

No adjustment for other potential confounders (e.g., solvents, diesel fumes, UV radiation) | Poisson regression to obtain RRs and 95% CIs | Major sources of potential biases unlikely, potential exposure misclassification due to any changes in exposure since enrollment, follow-up period may be limited | High |
| Engel *et al.* (2005) | Nested case-control

Females only | Take-home questionnaire from spouses of enrolled applicators used to obtain farm exposures, general health information, and reproductive health history; Information obtained from applicators used as measure of possible indirect exposure to spouses | State cancer registries identifying malignant breast cancer; ~5 years average follow-up time | Adjusted for age, race and state.

Evaluated BMI, age at menarche, parity, age at first birth, menopausal status, age at menopause, family history of breast cancer, physical activity, smoking, alcohol consumption, fruit and vegetable consumption and education but none | Poisson regression to obtain RRs and 95% CIs | Exposure misclassification, exposure to other pesticides (however no association observed), lack of information on length of marriage could result in overestimating exposure based on husband | Moderate |

**Table 3.2.  Summary of Study Design Elements Impacting Study Quality Assignment and Overall Ranking.**

| Journal Article | Study Design | Exposure Assessment | Outcome Assessment | Confounder Control | Statistical Analyses | Risk of (Other) Bias | Overall Ranking |
|---|---|---|---|---|---|---|---|
| | | | | found to be significant<br><br>No adjustment for co-exposure to other pesticides or other potential confounders (e.g., solvents, diesel fumes, UV radiation) | | | |
| Eriksson *et al.* (2008) | Population-based case-control | Questionnaire answered by subjects; follow-up by phone if incomplete answers; excluded exposures that occurred during the same calendar year and year before diagnosis (cases) or enrollment (controls); minimal demographic information reported | Physicians treating lymphoma within specified health service areas and verified by pathologists | Adjustment for age, sex, year of diagnosis/enrollment, as well as exposure to other pesticides in multivariate analyses. Not stated what adjustments were made for other pesticides in latency analyses.<br><br>No adjustment other potential confounders (e.g., solvents, diesel fumes, UV radiation) | Unconditional logistic regression and multivariate analyses to obtain ORs and 95% CIs; not clear how multivariate was performed; questionable power (29 cases, 18 controls); also included analysis of ≤10 vs. >10 years exposure | Recall bias, exposure misclassification, lack of subject demographics/ characteristics (e.g., smoking, alcohol consumption, race, etc) | High |
| Flower *et al.* (2004) | Nested case-control | Questionnaire answered by applicators at enrollment; spouses enrolled through a questionnaire brought home by applicator; females (applicators and spouses) were asked to complete a questionnaire on female and family health that collected information on children born during or after 1975 | State cancer registry to identify childhood cancer cases (diagnosed from birth through 19 yrs of age) for children of parents enrolled; hybrid prospective/retrospective ascertainment; excluded female applicators | Child's age at parent's enrollment was included in model; parental age at child's birth, child's sex, child's birth weight, history of parental smoking, paternal history of cancer, and maternal history of miscarriage were evaluated but not found to be significant and not included in model<br><br>No adjustment for co- | Logistic regression to obtain OR and 95% CI; calculated standardized incidence ratios to compare observed number of childhood cancer cases identified to the expected number; low/questionable power (6 parental cases, 13 maternal cases) | Exposure misclassification, lack of timing data to determine if exposure occurred prior to conception or during pregnancy, exposure to other pesticides (however no association observed and lack of power for adjustment) | Moderate |

**Table 3.2.  Summary of Study Design Elements Impacting Study Quality Assignment and Overall Ranking.**

| Journal Article | Study Design | Exposure Assessment | Outcome Assessment | Confounder Control | Statistical Analyses | Risk of (Other) Bias | Overall Ranking |
|---|---|---|---|---|---|---|---|
| | | | | exposure to other pesticides or other potential confounders (e.g., solvents, diesel fumes, UV radiation) | | | |
| Hardell and Eriksson (1999) | This study was not included in the study quality ranking because the data were used in the pooled analysis conducted by Hardell *et al.* (2002). | | | | | | |
| Hardell *et al.* (2002) | Population-based case-control<br><br>Males only<br><br>Pooled analysis of Hardell and Eriksson 1999 and Nordstrom *et al.*, 1998 | Questionnaire answered by subjects or proxy for deceased subjects to obtain complete working history and exposure to different chemicals; follow-up with interview for clarification | Registries with histopathological verification | Adjustment for age, vital status, and county (by matching). Exposure to other pesticides in multivariate analysis.<br><br>No adjustment for other potential confounders (e.g., solvents, diesel fumes, UV radiation) | Conditional logistic regression to obtain OR and 95% CI (univariate and multivariate analyses). Questionable power (8 cases/8 controls) | Recall bias, exposure misclassification, use of proxy for deceased | Moderate |
| Hohenadel *et al.* (2011) | This study was not included in the study quality ranking because a more complete analysis was conducted by McDuffie *et al.* (2001). | | | | | | |
| Kachuri *et al.* (2013) | Population-based case-control<br><br>Males only | Questionnaire answered by subjects or proxies; pesticide use collected via detailed telephone interview on all participants with 10+ hours of pesticide use during lifetime and 15% random sample of those who did not; exposure based on lifetime exposure to glyphosate | Cancer registries or hospitals in 6 Canadian provinces with histopathological verification for 36.55% of samples | Adjustment for age, province, selected medical conditions, family history of cancer, use of proxy respondent, smoking status<br><br>No adjustment for co-exposure to other pesticides or other potential confounders (e.g., solvents, diesel fumes, UV radiation) | Unconditional logistic regression to obtain OR and 95% CI; trends examined using multiple logistic regression | Recall bias, exposure misclassification, control selection based on three different sources depending on province of residence, low participation rates among controls, use of proxy respondents | Moderate |
| Karunanayake *et al.* (2012) | Population-based case-control<br><br>Males only | Questionnaire answered by subjects; pesticide use collected via detailed telephone interview on all participants with 10+ hours of pesticide use during lifetime and 15% | Cancer registries or hospital in 6 Canadian provinces with histopathological verification for 49% of samples; difficulty recruiting control | Adjusted for age, province of residence, and significant medical history variables<br><br>No adjustment for co- | Conditional logistic regression to obtain OR and 95% CI | Recall bias, exposure misclassification, control selection based on three different sources depending on province of residence, low participation rates among | Moderate |

**Table 3.2. Summary of Study Design Elements Impacting Study Quality Assignment and Overall Ranking.**

| Journal Article | Study Design | Exposure Assessment | Outcome Assessment | Confounder Control | Statistical Analyses | Risk of (Other) Bias | Overall Ranking |
|---|---|---|---|---|---|---|---|
| | | random sample of those who did not; exposure based on lifetime exposure to glyphosate | participants for older age groups | exposure to other pesticides or other potential confounders (e.g., solvents, diesel fumes, UV radiation) | | controls, unable to evaluate Epstein-barr virus exposure | |
| Koureas *et al.* (2014) | Cross-sectional | Questionnaire answered by pesticide sprayers | Genomic DNA extracted from peripheral blood samples and oxidation by-product 8-hydroxydeoxyguanosine (8-OHdG) was determined by enzyme immunoassay; more specific methods (HPLC, GC-MS) are available for measurement | No adjustments.  In univariate, occupational exposure, sex and alcohol consumption were statistically significant while DAP concentrations and smoking were not. | For univariate, chi-square test used to obtain RR and 95% CI; 8-OHdG levels transformed into binary variables (categorized as high and low using the 75th percentile cut-off); unknown number of exposed and unexposed cases (questionable power possible given total number of subjects is only 80) | Recall bias, did not control for risk factors identified as statistically significant for univariate analysis, does not measure the consequence of genetic damage | Low |
| Koutros *et al.* (2013) | Nested case-control<br><br>Males only | Questionnaire answered by subjects at study enrollment; examined exposure as cumulative lifetime days and intensity-weighted cumulative exposure days | State cancer registries with histopathological verification; total and aggressive prostate cancers evaluated | Adjustment for age, state, race, smoking, fruit servings, family history of prostate cancer, and leisure time physical activity in the winter.<br><br>No adjustment for co-exposure to other pesticides or other potential confounders (e.g., solvents, diesel fumes, UV radiation) | Poisson regression to obtain RRs and 95% CIs; also included unlagged vs. lagged analysis | Exposure misclassification | High |
| Landgren *et al.* (2009) | Nested case-control[a]<br><br>Males only | Questionnaire answered by subjects at enrollment in AHS cohort and subsequent take-home questionnaire to collect | Venous blood collected from antecubital vein and analyzed for MGUS; same method as used for controls group in | Adjusted for age and education level<br><br>Association with other pesticides examined | Logistic regression models to obtain OR and 95% CI comparing to population-based | Exposure misclassification, control group not from geographical area (used control group with | Moderate |

| Table 3.2.  Summary of Study Design Elements Impacting Study Quality Assignment and Overall Ranking. | | | | | | | |
|---|---|---|---|---|---|---|---|
| **Journal Article** | **Study Design** | **Exposure Assessment** | **Outcome Assessment** | **Confounder Control** | **Statistical Analyses** | **Risk of (Other) Bias** | **Overall Ranking** |
| | | information on 50 pesticides; occupational expoures, medical histories, and lifestyle factors updated with 5-year follow-up interview; subjects with prior history of lymphoproliferative malignancy excluded | Minnesota | and not found to be significant so no adjustment performed<br><br>No adjustment for other potential confounders (e.g., solvents, diesel fumes, UV radiation) | screening study in Olmsted County, Minnesota; questionable power (27 cases; 11 controls) | similar demographics from Minnesota) | |
| Lee *et al.* (2004a) | This study was not included in the study quality ranking because the data were used in the pooled analysis conducted by De Roos *et al.* (2003). | | | | | | |
| Lee *et al.* (2004b) | Population-based case-control<br><br>White males and females only | Subjects or proxies were interviewed by telephone; those living/working on a farm asked for detailed history of pesticide use and farming information | State cancer registry or review of discharge diagnosis and pathology records at 14 hospitals; only newly diagnosed cases with confirmed adenocarcinoma of stomach or esophagus retained; controls randomly selected from a prior study conducted in geographical area | Adjusted for age and sex; evaluated BMI, smoking, alcohol consumption, educational level, family history of stomach or esophageal cancer, respondent type, dietary intake of particular vitamins and minerals, protein, and carbohydrates (included in model if changed value of OR by more than 10%)<br><br>No adjustment for co-exposure to other pesticides or other potential confounders (e.g., solvents, diesel fumes, UV radiation) | Unconditional logistic regression to obtain OR and 95% CI; questionable power (12 cases for stomach; 12 cases for esophagus) | Recall bias, exposure misclassification, use of proxy respondents, control selection | Moderate |
| Lee *et al.* (2005) | Population-based case-control | Questionnaire and/or interview with subject or proxy individuals to collect information on use of specific pesticides; telephone follow-up for unclear responses | Referral by hospitals or through state cancer registries with histopathological verification; controls selected from a previous study | Adjusted for age and respondent type; evaluated history of head injury, marital status, education level, alcohol consumption, medical history of diabetes mellitus, | Unconditional logistic regression to obtain OR and 95% CI | Recall bias, exposure misclassification, large number of proxy respondents, control selection (historical control group from another cancer evaluation, differences in | Moderate |

**Table 3.2.  Summary of Study Design Elements Impacting Study Quality Assignment and Overall Ranking.**

| Journal Article | Study Design | Exposure Assessment | Outcome Assessment | Confounder Control | Statistical Analyses | Risk of (Other) Bias | Overall Ranking |
|---|---|---|---|---|---|---|---|
| | | | | dietary intake of α- and β-carotene, and dietary fiber (included in model if changed value of OR by more than 10%)<br><br>No adjustment for co-exposure to other pesticides or other potential confounders (e.g., solvents, diesel fumes, UV radiation) | | exposure time period evaluated, needed to add younger controls, exposure information collected for different time periods for cases vs. controls) | |
| Lee *et al.* (2007) | Nested case-control | Questionnaire answered by subjects at enrollment in AHS cohort and subsequent take-home questionnaire to collect information on 50 pesticides | State cancer registries without histopathological verification; follow-up ~ 7 years | Adjustment for age, smoking, state, total days of pesticide application<br><br>No adjustment for co-exposure to other pesticides or other potential confounders (e.g., solvents, diesel fumes, UV radiation) | Unconditional multivariate logistic regression to obtain OR and 95% CI | Exposure misclassification, limited data on dietary factors, NSAID drug use and family cancer history | Moderate |
| McDuffie *et al.*, 2001 | Population based case-control<br><br>Males only | Questionnaire answered by subjects; pesticide use collected via detailed telephone interview on all participants with 10+ hours of pesticide use during lifetime and 15% random sample of those who did not; exposure based on lifetime exposure to glyphosate | Cancer registries or hospital in 6 Canadian provinces with histopathological verification for 84% of samples; ascertainment of cases stopped in each province once target numbers were reached | Adjustment for age, province, and significant medical variables (including history of cancer in study participants and family history).<br><br>No adjustment for co-exposure to other pesticides or other potential confounders (e.g., solvents, diesel fumes, UV radiation) | Conditional logistic regression to obtain OR and 95% CI | Recall bias, exposure misclassification, control selection based on three different sources depending on province of residence, relatively low participation rates | Moderate |
| Nordstrom *et al.*, 1998 | This study was not included in the study quality ranking because the data were used in the pooled analysis conducted by Hardell *et al.* (2002). | | | | | | |
| Orsi *et al.*, 2009 | Hospital-based case-control | Data collection in 2 stages: 1) self- | Hospital catchment area with histopathological/ | Adjustment for age, center, and | Unconditional logistic regression | Recall bias, exposure misclassification, | Moderate |

**Table 3.2. Summary of Study Design Elements Impacting Study Quality Assignment and Overall Ranking.**

| Journal Article | Study Design | Exposure Assessment | Outcome Assessment | Confounder Control | Statistical Analyses | Risk of (Other) Bias | Overall Ranking |
|---|---|---|---|---|---|---|---|
| | Males only (occupationally exposed) | administered questionnaire on socioeconomic characteristics, family medical history, and lifelong residential and occupational histories and more specific information for each job held for at least 6 months, and 2) face-to-face interview with trained staff (blinded) using standardized questionnaire | cytological verification  Controls were hospital based with no prior history of lymphoid neoplasms, excluding patients with cancer or a disease directly related to occupation, smoking or alcohol abuse (but history of any of these did not prevent selection as a control) | socioeconomic category. Education and housing not found to impact results. Flu immunization, previous history of mononucleosis, skin type, smoking, and drinking did not change results. Evaluated particular crops and animal husbandry as well.  No adjustment for co-exposure to other pesticides or other potential confounders (e.g., solvents, diesel fumes, UV radiation) | to obtain OR and 95% CI. Questionable power (12 cases/24 controls) | hospital-based controls | |
| Pahwa *et al.* (2011)  Males only | Population-based case-control  Males only | Questionnaire answered by subjects; pesticide use collected via detailed telephone interview on all participants with 10+ hours of pesticide use during lifetime and 15% random sample of those who did not; exposure based on lifetime exposure to glyphosate | Cancer registries or hospitals in 6 Canadian provinces with histopathological verification for 30% of samples | Adjustment for age group, province of residence, and statistically significant medical history variables  No adjustment for co-exposure to other pesticides or other potential confounders (e.g., solvents, diesel fumes, UV radiation) | Conditional logistic regression to obtain OR and 95% CI; trends examined using multiple logistic regression | Recall bias, exposure misclassification, control selection based on three different sources depending on province of residence, low participation rates among controls | Moderate |
| Pahwa *et al.* (2012)  Males only | Population-based case-control  Males only | Questionnaire answered by subjects; pesticide use collected via detailed telephone interview on all participants with 10+ hours of pesticide use during lifetime and 15% random sample of those | Cancer registries or hospitals in 6 Canadian provinces with histopathological verification for 36.5% of samples | Adjustment for age group, province of residence, and statistically significant medical history variables  No adjustment for co- | Conditional logistic regression to obtain OR and 95% CI; trends examined using multiple logistic regression | Recall bias, exposure misclassification, control selection based on three different sources depending on province of residence, low participation rates among controls | Moderate |

**Table 3.2.  Summary of Study Design Elements Impacting Study Quality Assignment and Overall Ranking.**

| Journal Article | Study Design | Exposure Assessment | Outcome Assessment | Confounder Control | Statistical Analyses | Risk of (Other) Bias | Overall Ranking |
|---|---|---|---|---|---|---|---|
| | | who did not; exposure based on lifetime exposure to glyphosate | | exposure to other pesticides or other potential confounders (e.g., solvents, diesel fumes, UV radiation) | | | |
| Yiin *et al.* (2012) | Population-based case-control<br><br>Pooled analysis of men with women analyzed in Carreon *et al.* (2005) | Questionnaire and/or interview for chemical-specific exposure answered by subjects or proxy individuals | Cases referred by physicians or through state cancer registries with histopathological verification; controls matched within state, but not county of residence | Adjustment for age, education, sex, and , sex, and farm pesticide exposure (yes/no)<br><br>No adjustment for other potential confounders (e.g., solvents, diesel fumes, UV radiation) | Unconditional logistic regression to obtain ORs and 95% CIs | Acknowledge other sources of bias.  Recall bias, exposure misclassification, control selection (low number of deceased controls obtained) | Moderate |

[a] Mixed methods used in the Landgren et al (2009) study, with cross-sectional study design used to calculate prevalence rates comparing the AHS to a reference population MN.
Pesticide risk estimates (including glyphosate) calculated using nested case-control approach, comparing AHS exposed/unexposed (ever/never) study participants.

### 3.4     Assessment of Epidemiological Studies for Relevance to Analysis

Using the criteria summarized in Section 3.2, a total of 58 individual literature studies were identified in the literature review and were judged as high, moderate, or low quality.  Overall, 3 studies, 21 studies, and 34 studies were assigned high, moderate, or low rankings, respectively. All of the high and moderate quality studies were considered relevant to the current evaluation.

The majority of the studies were case-control studies evaluating a wide-range of cancers in the United States and Canada.  There were several case-control studies from Canada that utilized the same study population (Kachuri *et al.*, 2013; Karunanayake *et al.*, 2012; McDuffie *et al.*, 2001; Pahwa *et al.,* 2011; Pahwa *et al.*, 2012).  In a similar fashion, numerous studies in the United States were nested case-control studies, where the AHS cohort served as the source population for selecting cases and controls (Andreotti *et al*., 2009; Engel *et al*., 2005; Flower *et al*., 2004; Koutros *et al.*, 2013; Landgren *et al*., 2009; Lee *et al*., 2007).  In these studies, a subset of the AHS cohort were selected based on their outcome status for a particular cancer and exposure information was used from the AHS enrollment questionnaire and/or during follow-up interviews.  Nested case-control studies allow for testing of hypotheses not anticipated when the cohort was initially assembled.  In the AHS prospective cohort study (De Roos *et al.*, 2005), exposure and demographic information were also obtained from the questionnaires at enrollment; however, subjects were enrolled prior to developing cancer outcomes of interest. Subjects were then followed from enrollment to a subsequent time point to determine if subjects developed cancer outcomes of interest.  As such, all available subjects in the cohort are included in the evaluation of whether there was an association between a risk factor (e.g., glyphosate exposure) and outcome.

The moderate studies included a varying degree of control for confounding and biases across studies.  As moderate studies, they encompass a combination of strengths and limitations.  In particular, important factors that impacted the quality assessment for these studies included whether there was control for known confounders, identification of control selection issues, study power issues, and length of follow-up.  As noted previously, most people in these epidemiological studies used pesticides occupationally and were exposed to multiple pesticides over their working lifetime.  Therefore, exposure to other pesticides is a particularly important factor to control for and studies that made this adjustment were given more weight than those that did not.  Similarly, control selection issues were noted in a few studies and were given less weighting than those without control selection issues.  The issues ranged from concerns using hospital-based controls, using different population sources to ascertain controls within the same study, and appropriateness of using controls ascertained for another research question. Numerous studies had limited power due to small sample size, which results in large confidence intervals and reduces the reliability of the results to demonstrate a true association.  Studies demonstrating low or questionable power were therefore given less weighting.  Lastly, the length of follow-up time varied across studies.

### 3.5     Summary of Relevant Epidemiological Studies

A summary of the relevant studies evaluating the association between glyphosate exposure and cancer are discussed below.  Results of the studies reporting data on glyphosate exposure and

solid tumors (non-lymphohematopoietic) at various anatomical sites are presented in Table 3.3. Results of the studies reporting data on glyphosate exposure and non-solid tumors (lymphohematopoietic) are presented in Table 3.4.  For study details, see Table 3.2 above and Appendix C.

### 3.5.1   Solid Tumor Cancer Studies

#### *(1) Cancer at Multiple Sites from the AHS Cohort*

De Roos *et al*., (2005) evaluated associations between glyphosate exposure and cancer incidence of all cancers combined in the AHS cohort study and did not find an association [ever/never use relative risk ratio (RR) =1.0 with 95% confidence interval (CI) of 0.90–1.2) when adjusting for age, demographic and lifestyle factors, and exposure to other pesticides].  In addition, De Roos *et al*., 2005 evaluated cancer at specific anatomical sites.  Along with several nested case-control studies, no statistical evidence of an association with glyphosate was observed at any specific anatomical site (Table 3.3).  Specifically, AHS researchers reported no evidence of an association between glyphosate use and cancers of the oral cavity (De Roos *et al*., 2005), colon (De Roos *et al*., 2005; Lee *et al*., 2007), rectum (De Roos *et al*., 2005; Lee *et al*., 2007), lung (De Roos *et al*., 2005), kidney (De Roos *et al*., 2005), bladder (De Roos *et al*., 2005), pancreas (De Roos *et al*., 2005; Andreotti *et al*., 2009), breast (Engel *et al*., 2005), prostate (De Roos et al., 2005; Koutros *et al*., 2013) or melanoma (De Roos *et al*., 2005).  The adjusted RR or odds ratio (OR) and 95% CI for these studies are provided in Table 3.3.

#### *(2) Prostate Cancer*

In a Canadian population-based study (Band *et al.*, 2011), researchers reported non-statistically significant elevated odds of prostate cancer in relation to glyphosate use (OR=1.36; 95% CI=0.83–2.25).  There was no adjustment made for exposure to other pesticides.  This study included prostate cancer cases from 1983-1990, prior to the prostate-specific antigen (PSA) era. Consequently, the study included more advanced tumors before diagnosis.  The AHS related studies (De Roos et al., 2005; Koutros *et al*., 2013), reflect PSA-era cases (i.e., cases which are typically identified at an earlier stage in the progression of the disease) and also did not identify an association with prostate cancer.

#### *(3) Brain (Glioma) Cancer*

Lee *et al*. (2005) investigated the association between brain cancer with farming and agricultural pesticide use.  Matching for age, sex, vital status, and region, study authors reported a non-significant elevated odds of glioma (OR=1.5; 95% CI=0.7–3.1) in relation to glyphosate use by male farmers; however, the results were significantly different between those who self-reported pesticide use (OR=0.4; 95% CI=0.1–1.6), and for those for whom a proxy respondent was used (OR=3.1; 95% CI=1.2–8.2), indicating recall bias was a potential factor in this study. Furthermore, there was no adjustment for co-exposure to other pesticides and issues noted with control selection.

A population-based case-control study evaluated the risk of brain cancer, specifically, glioma risk, among men and women participating in the Upper Midwest Health Study (Yiin *et al*.,

2012).  Using a quantitative measure of pesticide exposure (in contrast to an ever-use metric), Yiin *et al.* (2012) observed no statistical evidence of an association with glyphosate with effect estimates roughly equal to the null value following adjustment for age, education, sex, and use of other pesticides (home and garden use: OR=0.98; 95% CI=0.67–1.43; non-farm jobs: OR=0.83; 95% CI=0.39–1.73).

### *(4) Stomach and Esophageal Cancer*

In a population-based case-control study in eastern Nebraska, Lee *et al.* (2004b) investigated pesticide use and stomach and esophageal adenocarcinomas.  There was no association observed between glyphosate exposure and either stomach cancer (OR=0.8; 95% CI=0.4–1.5) or esophageal cancer (OR=0.7; 95% CI=0.3–1.4) after adjustment for age and sex.  No adjustment was made for exposure to other pesticides.

### *(5) Soft Tissue Sarcoma*

A Canadian case-control study (Pahwa *et al.*, 2011) examined exposure to pesticides and soft tissue sarcoma and found no relation with the use of glyphosate after adjustment for age, province of residence, and medical history variables (OR=0.90; 95% CI= 0.58–1.40); however, control selection issues were noted, including low response rate and selection from three different sources depending on the province of residence.

### *(6) Total Childhood Cancer*

Flower *et al.* (2004), a nested case-control study in the AHS cohort, examined the relation between parental pesticide use and all pediatric cancers reported to state registries among children of AHS participants and did not observe a significant association with maternal use exposure to glyphosate (OR=0.61; 95% CI= 0.32–1.16) or paternal (prenatal) exposure to glyphosate (OR=0.84; 95% CI= 0.35–2.54).  The models adjusted for the child's age at the time of parents' enrollment.  There was no adjustment for exposure to other pesticides.

**Table 3.3. Summary of Findings: Solid Tumor Cancer Studies**

| Study | Study Design | Study Location | Exposure Metric | Adjusted Effect Estimate: RR or OR (95% CI)[a] | Covariate Adjustments in Analyses |
|---|---|---|---|---|---|
| *All Cancers Combined* | | | | | |
| De Roos *et al.* (2005) | Prospective Cohort | USA: Iowa and North Carolina | Ever/never | 1.0 (0.9-1.2) | Age, demographic and lifestyle factors, and other pesticides[b] |
| | | | Cumulative Exposure Days (by tertile cut points): 1-20 21-56 57-2,678 | 1.0 1.0 (0.9-1.1) 1.0 (0.9-1.1) | Age, demographic and lifestyle factors, and other pesticides[b] |
| | | | Intensity-Weighted Cumulative Exposure Days (by tertile cut points): 0.1-79.5 79.6-337.1 337.2-18,241 | 1.0 0.9 (0.8-1.0) 0.9 (0.8-1.1) | Age, demographic and lifestyle factors, and other pesticides[b] |
| *Lung* | | | | | |
| De Roos *et al.* (2005) | Prospective Cohort | USA: Iowa and North Carolina | Ever/never | 0.9 (0.6-1.3) | Age, demographic and lifestyle factors, and other pesticides[b] |
| | | | Cumulative Exposure Days (by tertile cut points): 1-20 21-56 57-2,678 | 1.0 0.9 (0.5-1.5) 0.7 (0.4-1.2) | Age, demographic and lifestyle factors, and other pesticides[b] |
| | | | Intensity-Weighted Cumulative Exposure Days (by tertile cut points): 0.1-79.5 79.6-337.1 337.2-18,241 | 1.0 1.1 (0.7-1.9) 0.6 (0.3-1.0) | Age, demographic and lifestyle factors, and other pesticides[b] |
| *Oral Cavity* | | | | | |
| De Roos *et al.* (2005) | Prospective Cohort | USA: Iowa and North Carolina | Ever/never | 1.0 (0.5-1.8) | Age, demographic and lifestyle factors, and other pesticides[b] |
| | | | Cumulative Exposure Days (by tertile cut points): 1-20 21-56 57-2,678 | 1.0 0.8 (0.4-1.7) 0.8 (0.4-1.7) | Age, demographic and lifestyle factors, and other pesticides[b] |
| | | | Intensity-Weighted Cumulative Exposure Days (by tertile cut points): 0.1-79.5 | 1.0 1.1 (0.5-2.5) | Age, demographic and lifestyle factors, and other pesticides[b] |

| Table 3.3. Summary of Findings: Solid Tumor Cancer Studies | | | | | |
|---|---|---|---|---|---|
| **Study** | **Study Design** | **Study Location** | **Exposure Metric** | **Adjusted Effect Estimate: RR or OR (95% CI)[a]** | **Covariate Adjustments in Analyses** |
| | | | 79.6-337.1 | 1.0 (0.5-2.3) | |
| | | | 337.2-18,241 | | |
| *Kidney* | | | | | |
| De Roos *et al.* (2005) | Prospective Cohort | USA: Iowa and North Carolina | Ever/never | 1.6 (0.7-3.8) | Age, demographic and lifestyle factors, and other pesticides[b] |
| | | | Cumulative Exposure Days (by tertile cut points): 1-20 21-56 57-2,678 | 1.0 0.6 (0.3-1.4) 0.7 (0.3-1.6) | Age, demographic and lifestyle factors, and other pesticides[b] |
| | | | Intensity-Weighted Cumulative Exposure Days (by tertile cut points): 0.1-79.5 79.6-337.1 337.2-18,241 | 1.0 0.3 (0.1-0.7) 0.5 (0.2-1.0) | Age, demographic and lifestyle factors, and other pesticides[b] |
| *Bladder* | | | | | |
| De Roos *et al.* (2005) | Prospective Cohort | USA: Iowa and North Carolina | Ever/never | 1.5 (0.7-3.2) | Age, demographic and lifestyle factors, and other pesticides[b] |
| | | | Cumulative Exposure Days (by tertile cut points): 1-20 21-56 57-2,678 | 1.0 1.0 (0.5-1.9) 1.2 (0.6-2.2) | Age, demographic and lifestyle factors, and other pesticides[b] |
| | | | Intensity-Weighted Cumulative Exposure Days (by tertile cut points): 0.1-79.5 79.6-337.1 337.2-18,241 | 1.0 0.5 (0.2-1.3) 0.8 (0.3-1.8) | Age, demographic and lifestyle factors, and other pesticides[b] |
| *Melanoma* | | | | | |
| De Roos *et al.* (2005) | Prospective Cohort | USA: Iowa and North Carolina | Ever/never | 1.6 (0.8-3.0) | Age, demographic and lifestyle factors, and other pesticides[b] |
| | | | Cumulative Exposure Days (by tertile cut points): 1-20 21-56 57-2,678 | 1.0 1.2 (0.7-2.3) 0.9 (0.5-1.8) | Age, demographic and lifestyle factors, and other pesticides[b] |
| | | | Intensity-Weighted Cumulative Exposure Days | | Age, demographic and lifestyle factors, and other pesticides[b] |

| Table 3.3. Summary of Findings: Solid Tumor Cancer Studies | | | | | |
|---|---|---|---|---|---|
| **Study** | **Study Design** | **Study Location** | **Exposure Metric** | **Adjusted Effect Estimate: RR or OR (95% CI)[a]** | **Covariate Adjustments in Analyses** |
| | | | (by tertile cut points): 0.1-79.5 79.6-337.1 337.2-18,241 | 1.0 0.6 (0.3-1.1) 0.7 (0.3-1.2) | |
| | | | *Colon* | | |
| De Roos *et al.* (2005) | Prospective Cohort | USA: Iowa and North Carolina | Ever/never | 1.4 (0.8-2.2) | Age, demographic and lifestyle factors, and other pesticides[b] |
| | | | Cumulative Exposure Days (by tertile cut points): 1-20 21-56 57-2,678 | 1.0 1.4 (0.9-2.4) 0.9 (0.4-1.7) | Age, demographic and lifestyle factors, and other pesticides[b] |
| | | | Intensity-Weighted Cumulative Exposure Days (by tertile cut points): 0.1-79.5 79.6-337.1 337.2-18,241 | 1.0 0.8 (0.5-1.5) 1.4 (0.8-2.5) | Age, demographic and lifestyle factors, and other pesticides[b] |
| Lee *et al.* (2007) | Nested Case-Control | USA: Iowa and North Carolina | Ever/never | 1.0 (0.7-1.5) | Age, smoking, state, total days of pesticide application |
| | | | *Rectum* | | |
| De Roos *et al.* (2005) | Prospective Cohort | USA: Iowa and North Carolina | Ever/never | 1.3 (0.7-2.3) | Age, demographic and lifestyle factors, and other pesticides[b] |
| | | | Cumulative Exposure Days (by tertile cut points): 1-20 21-56 57-2,678 | 1.0 1.3 (0.7-2.5) 1.1 (0.6-2.3) | Age, demographic and lifestyle factors, and other pesticides[b] |
| | | | Intensity-Weighted Cumulative Exposure Days (by tertile cut points): 0.1-79.5 79.6-337.1 337.2-18,241 | 1.0 1.0 (0.5-2.0) 0.9 (0.5-1.9) | Age, demographic and lifestyle factors, and other pesticides[b] |
| Lee *et al.* (2007) | Nested Case-Control | USA: Iowa and North Carolina | Ever/never | 1.6 (0.9-2.9) | Age, smoking, state, total days of pesticide application |
| | | | *Colorectal* | | |
| Lee *et al.* (2007) | Nested Case-Control | USA: Iowa and North Carolina | Ever/never | 1.2 (0.9-1.6) | Age, smoking, state, total days of pesticide application |
| | | | *Pancreas* | | |

**Table 3.3. Summary of Findings: Solid Tumor Cancer Studies**

| Study | Study Design | Study Location | Exposure Metric | Adjusted Effect Estimate: RR or OR (95% CI)[a] | Covariate Adjustments in Analyses |
|---|---|---|---|---|---|
| De Roos *et al.* (2005) | Prospective Cohort | USA: Iowa and North Carolina | Ever/never | 0.7 (0.3-2.0) | Age, demographic and lifestyle factors, and other pesticides[b] |
| | | | Cumulative Exposure Days (by tertile cut points): 1-20 21-56 57-2,678 | 1.0 1.6 (0.6-4.1) 1.3 (0.5-3.6) | Age, demographic and lifestyle factors, and other pesticides[b] |
| | | | Intensity-Weighted Cumulative Exposure Days (by tertile cut points): 0.1-79.5 79.6-337.1 337.2-18,241 | 1.0 2.5 (1.0-6.3) 0.5 (0.1-1.9) | Age, demographic and lifestyle factors, and other pesticides[b] |
| Andreotti *et al.* (2009) | Nested Case-Control | USA: Iowa and North Carolina | Ever/never | 1.1 (0.6-1.7) | Age group, cigarette smoking, diabetes, and applicator type |
| | | | Intensity-Weighted Exposure Days (by control median): ≤184 ≥185 | 1.4 (0.9-3.8) 0.5 (0.2-1.3) | Age group, cigarette smoking, and diabetes |
| | | | *Prostate* | | |
| De Roos *et al.* (2005) | Prospective Cohort | USA: Iowa and North Carolina | Ever/never | 1.1 (0.9-1.3) | Age, demographic and lifestyle factors, and other pesticides[b] |
| | | | Cumulative Exposure Days (by tertile cut points): 1-20 21-56 57-2,678 | 1.0 0.9 (0.7-1.1) 1.1 (0.9-1.3) | Age, demographic and lifestyle factors, and other pesticides[b] |
| | | | Intensity-Weighted Cumulative Exposure Days (by tertile cut points): 0.1-79.5 79.6-337.1 337.2-18,241 | 1.0 1.0 (0.8-1.2) 1.1 (0.9-1.3) | Age, demographic and lifestyle factors, and other pesticides[b] |
| Koutros *et al.* (2013)[c] | Nested Case-Control | USA: Iowa and North Carolina | Intensity-Weighted Cumulative Exposure Days (by quartile): Q1 Q2 Q3 Q4 | Total prostate cancer: 0.91 (0.79-1.06) 0.96 (0.83-1.12) 1.01 (0.87-1.17) 0.99 (0.86-1.15) | Age, state, race, smoking, fruit servings, family history of prostate cancer, and leisure time physical activity in the winter |

**Table 3.3. Summary of Findings: Solid Tumor Cancer Studies**

| Study | Study Design | Study Location | Exposure Metric | Adjusted Effect Estimate: RR or OR (95% CI)[a] | Covariate Adjustments in Analyses |
|---|---|---|---|---|---|
| | | | Intensity-Weighted Cumulative Exposure Days (by quartile): Q1 Q2 Q3 Q4 | Aggressive prostate cancer: 0.93 (0.74-1.16) 0.91 (0.73-1.13) 1.01 (0.82-1.25) 0.94 (0.75-1.18) | Age, state, race, smoking, fruit servings, family history of prostate cancer, and leisure time physical activity in the winter |
| Band *et al.* (2011) | Case-Control | Canada: British Columbia | Ever/never | 1.36 (0.83-2.25) | Alcohol consumption, cigarette years, education level, pipe years, and respondent type |
| *Esophagus* | | | | | |
| Lee *et al.* (2004b) | Case-Control | USA: Nebraska | Ever/never | 0.7 (0.3-1.4) | Age and sex |
| *Stomach* | | | | | |
| Lee *et al.* (2004b) | Case-Control | USA: Nebraska | Ever/never | 0.8 (0.4-1.5) | Age and sex |
| *Breast* | | | | | |
| Engel *et al.* (2005) | Nested Case-Control | USA: Iowa and North Carolina | Ever/never | Wives who apply pesticides: 0.9 (0.7-1.1) Wives who never used pesticides: 1.3 (0.8-1.9) | Age, race, and state of residence |
| *Soft Tissue Sarcoma* | | | | | |
| Pahwa *et al.* (2011) | Case-Control | Canada | Ever/never | 0.90 (0.58-1.40) | Age group, province of residence, and statistically significant medical history variables |
| *Brain (glioma)* | | | | | |
| Lee *et al.* (2005) | Case-Control | USA: Nebraska | Ever/never | Overall: 1.5 (0.7-3.1) Self-reported: 0.4 (0.1-1.6) Proxy respondents: 3.1 (1.2-8.2) | Age for overall analysis; age and respondent type for other analyses |
| Yiin *et al.* (2012) | Case-Control | USA: Iowa, Michigan, Minnesota, and Wisconsin | Ever/never | House/garden use: 0.98 (0.67-1.43) Non-farm jobs: 0.83 (0.39-1.73) | Age, education, sex, and use of other pesticides |
| *Total Childhood* | | | | | |

| Table 3.3. Summary of Findings: Solid Tumor Cancer Studies | | | | | |
|---|---|---|---|---|---|
| **Study** | **Study Design** | **Study Location** | **Exposure Metric** | **Adjusted Effect Estimate: RR or OR (95% CI)[a]** | **Covariate Adjustments in Analyses** |
| Flower *et al.* (2004) | Nested Case-Control | USA: Iowa and North Carolina | Ever/never | Maternal use: 0.61 (0.32-1.16)<br><br>Paternal use: 0.84 (0.35-2.34) | Child's age at enrollment |

[a] Some studies report multiple quantitative risk measurements.  This table reports the most highly adjusted quantitative measurements.
[b] De Roos *et al.* (2005) excluded subjects missing covariate data for demographic and lifestyle factors and exposure to other pesticides; therefore, the number of subjects included in each analysis varies.
[c] Effect estimates for glyphosate reported in the supplemental web material for Koutros *et al.* (2013).

### 3.5.2   Non-Solid Tumor Cancer Studies

*(1) Leukemia*

De Roos *et al*. (2005) reported no association between leukemia and glyphosate-exposed (ever/never used) pesticide applicators in the AHS cohort.  For applicators with the full data set (54,315), the RR was 1.1 (95% CI=0.6–2.4) with only adjustment for age.  In the fully adjusted model, the RR was similar (RR=1.0; 95% CI=0.5–1.9).  The number of participants included in the adjusted analysis was lower (n=40,716) due to the exclusion of subjects with missing covariate data.  Effect estimates using cumulative lifetime exposure and intensity-weighted cumulative exposure were also found to be non-statistically significant and did not demonstrate a trend with increasing exposure.

In a population-based case-control study in Iowa and Minnesota, Brown *et al.* (1990) did not observe an association with the ever-use of glyphosate (OR=0.9; 95% CI=0.5–1.6).  A limitation in the study was the low number of cases exposed to glyphosate (n=15).  Adjustments were made for several covariates, including vital status, age, tobacco use, family history of lymphopoietic cancer, high risk occupations, and high risk exposures; however, no adjustment was made for exposure to other pesticides.

Chang and Delzell (2016) conducted a meta-analysis exploring glyphosate exposure and leukemia using 3 studies (De Roos *et al*., 2005; Brown *et al*., 1990; and Kaufman *et al.,* 2009).  $I^2$ values were reported, which represented the percentage of the total variance explained by study heterogeneity and measure inconsistency in results.  Larger $I^2$ values indicate greater inconsistency.  A meta-risk ratio of 1.0 (95% CI=0.6-1.5) was obtained with an $I^2$ value of 0.0%, indicating consistency across the data sets.  It should be noted that this analysis included data from Kaufman *et al.* (2009), which is not considered in the current evaluation because it was assigned a low quality ranking because a quantitative measure of an association between glyphosate and a cancer outcome was not reported for that study.

*(2) Multiple Myeloma*

In a follow-up analysis of the study population from Iowa and Minnesota used in Brown *et al.* (1990), Brown *et al.* (1993) investigated whether pesticide use was related to multiple myeloma.  Among men in Iowa, the authors observed a non-statistically significant elevated association with glyphosate use (OR=1.7; 95% CI=0.8–3.6; 11 exposed cases); however, no adjustment was made for exposure to other pesticides.  The authors cautioned that while the study may lend support to the role of pesticides in general, the study limitations preclude use of the evidence as a definitive finding for any one compound.

De Roos *et al*. (2005) reported a suggestive association between multiple myeloma and glyphosate-exposed pesticide applicators based on 32 multiple myeloma cases observed in the AHS cohort.  For applicators with the full data set, the RR was 1.1 (95% CI=0.5–2.4) with only adjustment for age.  In the fully adjusted model excluding subjects with missing covariate data, there was a non-statistically significant elevated risk following adjustment for age, demographic and lifestyle factors, and exposure to other pesticides (RR=2.6; 95% CI=0.7–9.4).  The authors

postulated that the increased myeloma risk could be due to bias resulting from a selection of subjects in adjusted analyses that differed from subjects included in unadjusted analyses or may be due to a confounder or effect modifier that is prevalent among the subgroup and has not been accounted for in the analyses. When exposure data were also stratified by tertiles with the lowest tertile of exposure as the referent category, trend analyses were not statistically significant. Non-statistically significant elevated RRs of 1.9 (95% CI: 0.6-6.3) and 2.1 (95% CI: 0.6-7.0) were estimated for the highest tertile of both cumulative and intensity-weighted exposure days, respectively. The study authors did note that small sample size precluded precise estimation (n=19 for adjusted analyses). When using never exposed as the referent category, the trend analysis was again non-statistically significant, but the RRs ranged from 2.3 (95% CI: 0.6-8.9) to 4.4 (95% CI: 1.0-20.2) from the lowest tertile to the highest tertile, respectively. When stratified by quartiles, a statistically significant trend is achieved and the RR increased to 6.6 (95% CI: 1.4-30.6); however, the authors noted that the cases were sparsely distributed for these analyses.

Sorahan (2015)[11] re-analyzed the AHS data reported by De Roos *et al.* (2005) to examine the reason for the disparate findings in relation to the use of a full data set versus the restricted data set. Using Poisson regression, risk ratios were calculated without excluding subjects with missing covariate data. When adjusted for age and sex, the RR for ever-use of glyphosate was 1.12 (95% CI of 0.5–2.49). Additional adjustment for lifestyle factors and use of other pesticides did not have a large impact (RR=1.24; 95% CI=0.52–2.94). The authors concluded that the disparate findings in De Roos *et al.* (2005) could be attributed to the use of a restricted dataset that was unrepresentative.

Landgren *et al.* (2009), within the AHS study population, also investigated the association between pesticide use and prevalence of monoclonal gammopathy of undetermined significance (MGUS). MGUS is considered a pre-clinical marker of multiple myeloma progression. The authors did not observe an association with glyphosate use and MGUS using subjects from the AHS cohort (OR=0.50; 95% CI=0.20–1.0). No adjustment was made for exposure to other pesticides.

In a population-based case-control study (Pahwa *et al.*, 2012) among men in six Canadian provinces, a non-statistically significant elevated odds of multiple myeloma was reported in relation to glyphosate use (OR=1.22; 95% CI = 0.77–1.93), based upon 32 glyphosate exposed multiple myeloma cases and 133 controls. There was no adjustment for exposure to other pesticides. Kachuri *et al.* (2013), using the same Canadian study population, further explored multiple myeloma in relation to days per year that glyphosate was used. Adjustment for exposure to other pesticides was also not performed in this study. For ever-use, there was a slight non-statistically significant increased odds ratio (OR=1.19; 95% CI=0.76–1.87). For light users (>0 and ≤2 days/year), there was no association (OR=0.72; 95% CI = 0.39–1.32; 15 exposed cases); whereas, for heavy users (>2 days/ year), there was a non-statistically significant increased odds ratio (OR=2.04; 95% CI=0.98–4.23; 12 exposed cases). Similar results were obtained when proxy respondents were excluded from the analysis. The low number of cases and controls exposed to glyphosate, particularly when exposed subjects were divided into light and heavy users, was a limitation of the study. It would be expected that effect estimates would be reduced if adjustment for co-exposure to other pesticides had been performed.

[11] Funded by Monsanto

In a hospital-based case-control study conducted by Orsi *et al*. (2009) in France, 56 multiple myleoma cases and 313 age- and sex-matched controls were identified.  A non-statistically significant elevated risk was observed (OR=2.4; 95% CI=0.8–7.3; 5 exposed cases and 18 exposed controls).  The wide CI range can primarily be attributed to the low number of exposed cases indicating the analysis is underpowered.  Additionally, the study did not adjust for exposure to multiple pesticides.

Chang and Delzell (2016) conducted a meta-analysis exploring glyphosate exposure and multiple myeloma using data from the 6 studies described above (Brown *et al.*, 1993; De Roos *et al*., 2005; Sorahan, 2015; Pahwa *et al*., 2012; Kachuri *et al*., 2013; Orsi *et al*., 2009).  Meta-risk ratios were obtained using data from each of the 4 independent study populations, such that if a study population was already represented in the analysis by one study, then the same population analyzed by another study would not be included (e.g., Sorahan, 2015 and De Roos *et al.*, 2005 could not be used simultaneously in a meta-analysis).  The combined meta-risk ratio based on data from prioritized studies (Brown *et al.*, 1993; Kachuri *et al.*, 2013; Orsi *et al.*, 2009; and Sorahan, 2015) was 1.4 (95% CI=1.0-1.9) using random-effects and fixed-effects models and the $I^2$ value = 0.0% indicating consistency across data sets.  There was relatively no impact on the meta-risk ratio and associated 95% CI when secondary analyses were conducted using alternative estimates for a study population (e.g., substituting the data from Sorahan, 2015 for De Roos *et al.,* 2005).

### *(3) Hodgkin Lymphoma*

In a Canadian case-control study, Karunanayake *et al.,* (2012) evaluated Hodgkin lymphoma (HL) and observed no association with glyphosate exposure following adjustment for age, province of residence, and medical history variables (OR=0.99; 95% CI=0.62-1.56; 38 cases).  No adjustment was made for exposure to other pesticides.

In a hospital-based case-control study conducted by Orsi *et al*. (2009) in France, authors identified 87 HL cases and 265 age-and sex-matched controls.  There was a non-statistically significant elevated odds ratio observed (OR=1.7; 95% CI=0.6–5.0; 6 exposed cases and 15 exposed controls).  The wide CI range can primarily be attributed to the low number of exposed cases indicating the analysis is underpowered.  Also, as noted earlier, this study did not adjust for exposure to multiple pesticides.

Chang and Delzell (2016) conducted a meta-analysis exploring glyphosate exposure and HL using data from both of these studies.  A meta-risk ratio of 1.1 (95% CI=0.7-1.6) was obtained with a $I^2$ value of 0.0%, indicating consistency across the data sets.

### *(4) Non-Hodgkin Lymphoma*

NHL has about 60 subtypes classified by the WHO, which may have etiological differences (Morton *et al.*, 2014).  There are analyses available for particular subtypes of NHL; however, these are particularly limited by the small sample sizes.  As a result, this evaluation only presents results for total NHL.

There were six studies available that investigated the association between glyphosate exposure and NHL, which was the most for any type of cancer.  As discussed in Section 3.4, these studies encompass a combination of strengths and limitations.  These studies are therefore discussed in more detail in this section as compared to discussions of other cancer types in order to highlight the strengths and identify the limitations for each study.

De Roos *et al*. (2005) was the only prospective cohort study available; therefore, subjects were enrolled prior to developing cancer outcomes.  Disease status was determined through state cancer registries.  Exposure information was obtained from a large number of licensed pesticide applicators and no proxies were used.  Exposure was evaluated as ever/never use, cumulative lifetime exposure, and intensity-weighted cumulative exposure.  Due to the study design, the potential for many biases were reduced.  Additionally, the study adjusted and/or considered numerous factors, including use of other pesticides.  Median follow-up time was approximately 7 years and a longer follow-up would increase the ability of the study to detect subjects developing cancer outcomes; however, as discussed in Section 3.3.1, study participants provided exposure information prior to enrollment and this information was incorporated into the cumulative lifetime and intensity-weighted cumulative exposure metrics.  As a result, the amount of time exposed was longer than just the follow-up time since enrollment.  For applicators with the full data set, the RR for ever/never use was 1.2 (95% CI=0.7–1.9; 92 cases) with only adjustment for age.  In the fully adjusted model excluding subjects with missing covariate data, the RR was similar following adjustment for age, demographic and lifestyle factors, and exposure to other pesticides (RR=1.1; 95% CI=0.7-1.9).  Effect estimates obtained using cumulative lifetime exposure and intensity-weighted cumulative exposure were below 1 (RR = 0.6-0.9 when comparing to the lowest tertile).

De Roos *et al.* (2003) used pooled data from three case-controls studies evaluating NHL in white males from Nebraska, Kansas, and in Iowa and Minnesota (Cantor *et al.*, 1992; Hoar *et al.*, 1986; Zahm *et al.,* 1990; Appendix B).  Exposure information was obtained from exposed individuals or their next of kin (i.e., proxy respondents) if the subjects were dead or incapacitated; however, techniques varied across the three studies.  There is potential for selection bias due to exclusion of observations with missing covariate data, but only if the lack of the covariate data was associated with glyphosate exposure.  The effect estimates for the association between glyphosate exposure and NHL was significant (OR=2.1; 95% CI=1.1–4.0) in the logistic regression analyses controlling for co-exposure to other pesticides.  However, utilizing alternative hierarchical regression techniques to adjust for co-exposure to other pesticide exposures, the odds ratio was still elevated, but the increase was not statistically significant (OR=1.6; 95% CI=0.90–2.8).

Eriksson *et al.* (2008) is a Swedish case-control study that used detailed exposure information from exposed individuals (i.e.*,* no use of proxy respondents), but only minimal demographic information was provided on subjects (age and sex) and a table with subject characteristics (e.g., smoking status, alcohol intake, physical activity, education) was not provided.  Cases were identified through physicians and verified histopathologically.  Glyphosate exposure, which was reported in 29 cases and 18 controls between 1999 and 2003, produced a statistically significant increased OR in the univariate analysis (OR=2.02; 95% CI=1.10–3.71); however, in the

multivariate analysis adjustments were conducted for co-exposure to different agents including MCPA, "2,4,5-Y and/or 2,4-D", mercurial seed dressing, arsenic, creosote, and tar and the OR reduced to 1.51 (95% CI=0.77–2.94) and was not statistically significant.  Additional analyses were conducted to investigate the impact of various exposure times.  When exposure was for more than 10 cumulative days (the median number of days among exposed controls), the OR was 2.36 (95% CI=1.04–5.37; 17 exposed cases) and for exposure less than 10 cumulative days, the OR was 1.69 (95% CI=0.7–4.07; 12 exposed cases).  By dividing the exposed cases and controls using this exposure metric, wider CIs were observed indicating reduced power from the smaller sample sizes.  Additionally, these analyses did not account for co-exposure to other pesticides.  Similarly, wider CIs were also observed when exposed cases and controls were divided by a longer exposure metric.  ORs of 1.11 (95% CI=0.24-5.08) and 2.26 (95% CI=1.16-4.40) were obtained for 1-10 years and >10 years, respectively.  It was not clear whether this analysis controlled for co-exposure to other pesticides based on the statistical methods description and the subjects for each exposure group were not reported.  This finding, while limited to a single study, suggests that cohort studies without sufficient follow-up time or other case-control studies which did not stratify by time since first exposure may be less sensitive in detecting risk.

Hardell *et al.* (2002) used pooled data from two case-control studies in Sweden (Hardell and Eriksson, 1999; Nordstrom *et al.*, 1998; Appendix B) that examined hairy cell leukemia, a subtype of NHL, and NHL (not including hairy cell leukemia).  Exposure information was collected from individuals or proxy respondents based on a working history with specific questions on exposures to different chemicals.  Cases were identified from regional cancer registries and verified histopathologically.  In the univariate analysis, risk of NHL associated with glyphosate exposure was found to be significantly increased (OR=3.04; 95% CI=1.08–8.52), but when study site, vital status, and co-exposure to other pesticides were considered in the multivariate analysis, the OR noticeably attenuated and was found to be non-statistically significant (OR=1.85; 95% CI=0.55–6.20).  The wide range of the CI suggests that the analysis is underpowered (only 8 glyphosate-exposed cases and 8 glyphosate-controls).

McDuffie *et al.* (2001) is a multicenter population-based study among men of six Canadian provinces.  This case-control study utilized a well-conducted exposure assessment and cases were ascertained from cancer registries or hospitals in six provinces with histopathological verification for 84% of the samples.  There are concerns with control selection.  There was low control participation (48%) and different sources were used for selecting controls depending on the province of residence.  Effect estimates were obtained using a considerable number of exposed cases and controls (51 cases and 133 controls); however, the study did not assess co-exposure to other pesticides.  There was a non-statistically significant increased risk of NHL from glyphosate exposure when adjusting for age and province (OR=1.26; 95% CI=0.87–1.80) and when adjusting for age, province and medical variables (OR=1.20; 95% CI=0.83–1.74).  Medical variables found to be statistically significant included history of measles, mumps, previous cancer, skin-prick allergy tests, allergy desensitization shots, and a positive family history of cancer in a first-degree relative.  It would be expected that effect estimates would attenuate if control for co-exposure to other pesticides had been performed.  Additional analyses were conducted to investigate differences in exposure time.  When exposure was for more than 2 days/year, the OR was 2.12 (95% CI=1.20-3.73; 23 exposed cases and 36 exposed controls) compared to unexposed subjects and for exposure more than 0 and ≤ 2 days/year, the OR was

1.00 (95% CI=0.63–1.57; 28 exposed cases and 97 exposed controls) compared to unexposed subjects.

Orsi *et al.* (2009) is a French hospital-based case-control study that obtained exposure information from subjects (no proxies used) using a detailed questionnaire with lifelong residential and occupational histories followed by a discussion with a trained interviewer who was blinded to case status. No issues regarding exposure or outcome assessment were identified; however, there is potential for selection bias given the study utilized hospital-based controls. The study evaluated several potential confounders; however, it did not assess co-exposure to other pesticides. There was no association observed between NHL and glyphosate use (OR=1.0; 95% CI=0.5-2.2; 12 exposed cases and 24 exposed controls). The low number of cases and controls exposed to glyphosate and lack of adjustment for exposure to multiple pesticides were limitations of the study.

Schinasi and Leon (2014) conducted a meta-analysis exploring occupational glyphosate exposure and NHL using data from six of the above mentioned studies (McDuffie *et al.*, 2001; Hardell *et al.*, 2002; De Roos *et al.*, 2003; De Roos *et al.*, 2005; Eriksson *et al.*, 2008; and Orsi *et al.*, 2009). Since the authors identified a variety of sources of heterogeneity between publications, they decided a priori to calculate meta-risk ratio estimates and 95% CIs using random effect models, allowing between study heterogeneity to contribute to the variance. $I^2$ values were reported as a measure of inconsistency in results. For glyphosate, the meta-risk ratio was 1.5 with a 95% CI of 1.1–2.0 and the $I^2$ value was 32.7% indicating relatively low levels of heterogeneity among these studies. This study combined multiple smaller studies that on their own were very limited in statistical power.

The 2015 IARC evaluation noted that fully adjusted effect estimates in two of the Swedish studies (Hardell *et al.*, 2002 and Eriksson *et al.*, 2008) were not used in the analysis conducted by Schinasi and Leon (2014). Consequently, the IARC Working Group conducted a reexamination of the results of these studies (IARC 2015). For an association between glyphosate exposure and NHL, the IARC estimated a meta-risk ratio of 1.3 (95% CI=1.03–1.65, $I^2$ =0%; p=0.589 for heterogeneity).

Chang and Delzell (2016) conducted their own meta-analysis exploring glyphosate exposure and NHL using six independent studies (De Roos *et al.,* 2003; De Roos *et al.,* 2005; Eriksson *et al.,* 2008; Hardell *et al.,* 2002; McDuffie *et al.,* 2001; and Orsi *et al.,* 2009). A meta-risk ratio of 1.3 (95% CI=1.0-1.6) was obtained with an $I^2$ value of 0.0%. In a secondary analysis, the De Roos *et al.* (2003) OR using hierarchical regression was replaced by the logistic regression OR. This change had no impact on the meta-risk ratio and associated confidence interval (meta-risk ratio=1.3; 95% CI=1.0-1.6). In another secondary analysis, the OR from McDuffie *et al.* (2001) was replaced by the OR from Hohenadel *et al.* (2011), which evaluated the same study population (minus four previously misclassified NHL cases). This analysis also yielded similar results (meta-risk ratio=1.3; 95% CI=1.0-1.7). A final analysis was performed with the replacements for both secondary analyses [i.e., logistic regression OR from De Roos *et al.* (2003) and OR from Hohenadel *et al.* (2011)]. The results were relatively the same as the other meta-analyses (meta-risk ratio=1.4; 95% CI=1.0-1.8). Chang and Delzell (2016) also tested for publication bias using Egger's linear regression approach to evaluating funnel plot asymmetry,

and found no significant asymmetry indicating little evidence of publication bias; however, given the small sample size (n=6), this analysis would lack power and the results are not considered meaningful.

**Table 3.4.  Summary of Findings: Non-Solid Tumor Cancer Studies.**

| Study | Study Design | Study Location | Exposure Metric | Adjusted Effec Estimate: RR or OR (95% CI)[a] | Covariate Adjustments in Analyses |
|---|---|---|---|---|---|
| *Leukemia* | | | | | |
| De Roos *et al.* (2005) | Prospective Cohort | USA: Iowa and North Carolina | Ever/never | 1.0 (0.5-1.9) | Age, demographic and lifestyle factors, and other pesticides[b] |
| | | | Cumulative Exposure Days (by tertile cut points): 1-20 21-56 57-2,678 | 1.0 1.9 (0.8-4.5) 1.0 (0.4-2.9) | Age, demographic and lifestyle factors, and other pesticides[b] |
| | | | Intensity-Weighted Cumulative Exposure Days (by tertile cut points): 0.1-79.5 79.6-337.1 337.2-18,241 | 1.0 1.9 (0.8-4.7) 0.7 (0.2-2.1) | Age, demographic and lifestyle factors, and other pesticides[b] |
| Brown *et al.* (1990) | Case-Control | USA: Iowa and Minnesota | Ever/never | 0.9 (0.5-1.6) | Vital status, age, tobacco use, family history of lymphopoietic cancer, high occupations, and high risk exposures |
| *Multiple Myeloma* | | | | | |
| De Roos *et al.* (2005) | Prospective Cohort | USA: Iowa and North Carolina | Ever/never | 2.6 (0.7-9.4) | Age, demographic and lifestyle factors, and other pesticides[b] |
| | | | Cumulative Exposure Days (by tertile cut points): 1-20 21-56 57-2,678 | 1.0 1.1 (0.4-3.5) 1.9 (0.6-6.3) | Age, demographic and lifestyle factors, and other pesticides[b] |
| | | | Intensity-Weighted Cumulative Exposure Days (by tertile cut points): 0.1-79.5 79.6-337.1 337.2-18,241 | 1.0 1.2 (0.4-3.8) 2.1 (0.6-7.0) | Age, demographic and lifestyle factors, and other pesticides[b] |
| Brown *et al.* (1993) | Case-Control | USA: Iowa | Ever/never | 1.7 (0.8-3.6) | Age and vital status |
| Kachuri *et al.* (2013) | Case-Control | Canada | Ever/never | 1.19 (0.76-1.87) | Age, province of residence, smoking status, selected medical conditions, family history of cancer, and use of a proxy respondent |
| | | | Days per year of use: 0 to ≤2 days/year >2 days/year | 0.72 (0.39-1.32) 2.04 (0.98-4.23) | Age, province of residence, smoking status, selected medical conditions, family history of cancer, and use of a proxy respondent |
| Pahwa *et al.* (2012) | Case-Control | Canada | Ever/never | 1.22 (0.77-1.93) | Age group, province of residence, and statistically significant medical history variables |

**Table 3.4.  Summary of Findings: Non-Solid Tumor Cancer Studies.**

| Study | Study Design | Study Location | Exposure Metric | Adjusted Effec Estimate: RR or OR (95% CI)[a] | Covariate Adjustments in Analyses |
|---|---|---|---|---|---|
| Orsi *et al.* (2009) | Case-Control | France | Ever/never | 2.4 (0.8-7.3) | Age, centre, and socioeconomic category |
| *Monoclonal Gammopathy of Undetermined Significance (MGUS)* | | | | | |
| Landgren *et al.* (2009) | Nested Case-Control | USA: Iowa and North Carolina | Ever/never | 0.5 (0.2-1.0) | Age and education |
| *Hodgkin Lymphoma (HL)* | | | | | |
| Karunanayake *et al.* (2012) | Case-Control | Canada | Ever/never | 0.99 (0.62-1.56) | Age group, province of residence, and statistically significant medical history variables |
| Orsi *et al.* (2009) | Case-Control | France | Ever/never | 1.7 (0.6-5.0) | Age, centre, and socioeconomic category |
| *Non-Hodgkin Lymphoma (NHL)* | | | | | |
| De Roos *et al.* (2005) | Prospective Cohort | USA: Iowa and North Carolina | Ever/never | 1.1 (0.7-1.9) | Age, demographic and lifestyle factors, and other pesticides[b] |
| | | | Cumulative Exposure Days (by tertile cut points): 1-20 21-56 57-2,678 | 1.0 0.7 (0.4-1.4) 0.9 (0.5-1.6) | Age, demographic and lifestyle factors, and other pesticides[b] |
| | | | Intensity-Weighted Cumulative Exposure Days (by tertile cut points): 0.1-79.5 79.6-337.1 337.2-18,241 | 1.0 0.6 (0.3-1.1) 0.8 (0.5-1.4) | Age, demographic and lifestyle factors, and other pesticides[b] |
| De Roos *et al.* (2003) | Case-Control | USA: Iowa, Nebraska, Minnesota, and Kansas | Ever/never | 1.6 (0.9-2.8) | Age, study site, and use of other pesticides |
| Eriksson *et al.* (2008) | Case-Control | Sweden | Ever/never | Multivariate: 1.51 (0.77-2.94) | Age, sex, year of diagnosis or enrollment, and exposure to other pesticides |
| | | | Days per year of use: ≤ 10 days >10 days | 1.69 (0.70-4.07) 2.36 (1.04-5.37) | Age, sex, and year of diagnosis or enrollment |
| | | | Years of use: 1-10 years >10 years | 1.11 (0.24-5.08) 2.26 (1.16-4.40) | Unknown |
| Hardell *et al.* (2002) | Case-Control | Sweden | Ever/never | Multivariate: 1.85 (0.55-6.20) | Study, study area, vital status, and exposure to other pesticides |
| McDuffie *et al.* (2001) | Case-Control | Canada | Ever/never | 1.20 (0.83-1.74) | Age, province of residence, and statistically significant medical variables |
| | | | Days per year of use: >0 and ≤ 2 days | 1.00 (0.63-1.57) | Age and province of residence |

| Table 3.4.  Summary of Findings: Non-Solid Tumor Cancer Studies. | | | | | |
|---|---|---|---|---|---|
| **Study** | **Study Design** | **Study Location** | **Exposure Metric** | **Adjusted Effec Estimate: RR or OR (95% CI)[a]** | **Covariate Adjustments in Analyses** |
| | | | >2 days | 2.12 (1.20 -3.73) | |
| Orsi *et al.* (2009) | Case-Control | France | Ever/never | 1.0 (0.5-2.2) | Age, centre, and socioeconomic category |

[a] Some studies report multiple quantitative risk measurements.  This table reports the most highly adjusted quantitative measurements.

[b] De Roos *et al.* (2005) excluded subjects missing covariate data for demographic and lifestyle factors and exposure to other pesticides; therefore, the number of subjects included in each analysis varies.

### 3.6    Discussion

A total of 24 epidemiological studies from the open literature were identified as appropriate for detailed evaluation.  Of these, 23 studies were considered informative with regard to the carcinogenic potential of glyphosate.  There was no evidence of an association between glyphosate exposure and solid tumors.  There was also no evidence of an association between glyphosate exposure and leukemia, or HL.  This conclusion is consistent with those recently conducted by IARC, EFSA, and JMPR who also concluded there is no evidence of an association for these tumors at this time.  The data should be considered limited though with only one or two studies available for almost all of the cancer types investigated.  Additionally, with the increased use of glyphosate following the introduction of glyphosate-tolerant crops in 1996, there is a need for more recent studies since a large number of studies were conducted prior to 1996.  As described in Section 1.1, the use pattern changed following the introduction of transgenic crops, which may impact overall effect estimates.  The remainder of this discussion focuses on multiple myeloma and NHL.  Study elements for the available studies and their potential to impact effect estimates are examined; however, the discussion is applicable in most cases to all of the epidemiological studies used in this evaluation.

*Multiple Myeloma*

Five studies were available evaluating the association between glyphosate exposure and risk of multiple myeloma (Brown et al., 1993; De Roos et al., 2005; Kachuri et al., 2013; Orsi et al., 2009; Pahwa et al., 2012).  The effect estimates for ever/never use ranged from 1.19 to 2.6 although none were found to be statistically significant.  Only one study (De Roos et al., 2005) controlled for co-exposures to other pesticides; therefore, potential confounding was not addressed in the other studies.  There was an indication of a possible exposure-response relationship; however, this was the only study that evaluated the exposure-response relationship for multiple myeloma.  Furthermore, reanalysis of the full dataset by Sorahan (2015) raised concerns about whether the restricted dataset used for these analyses was representative of the whole cohort.  There was a single study of MGUS, a precursor to multiple myeloma, which showed decreased risk with exposure to glyphosate; however, the study did not control for exposure to other pesticides.  Overall, the available epidemiologic evidence for an association between glyphosate and risk of multiple myeloma is inadequate to assess the carcinogenic potential at this time due to the potential for confounding in three of the four studies, the limited observation of a possible exposure-response relationship in a single study, and concerns whether restricted datasets were representative of the whole cohort.

*NHL*

Six studies were available evaluating the association between glyphosate exposure and risk of NHL.  Effect estimates for ever/never use ranged from 1.0-1.85 in adjusted analyses with none reaching statistical significance (Figure 3.2).  Two of these studies did not adjust for co-exposures to other pesticides (McDuffie et al., 2001; Orsi et al., 2009).  Many of the evaluated studies had limited power due to small sample sizes, which resulted in large confidence intervals and reduced the reliability of the results to demonstrate a true association.  Meta-analyses were performed by IARC (2015) and Chang and Delzell (2016) using these results for the ever/never

use metric. Both analyses reported similar meta-risk ratios ranging from 1.3-1.5, depending on the effect estimates and studies included in the analyses. All meta-analysis estimates reported were non-statistically significant except the meta-risk ratio reported by IARC (2015), which was borderline significant with the lower limit of the 95% CI at 1.03. It should also be noted that publication bias may play a role in this evaluation given there is a tendency to only publish positive results and potential concerns regarding glyphosate have only been raised in recent years.

With respect to meta-analyses, caution should be taken when interpreting results. Meta-analyses are a systematic way to combine data from several studies to estimate a summary effect. Analyses were performed with 6 studies, which many would consider small for performing meta-analyses. Rarely will meta-analyses synthesize data from studies with identical study designs and methods. In the meta-analyses performed by IARC (2015) and Chang and Delzell (2016), inclusion was primarily based on whether a study addressed the broader question regarding the association between glyphosate exposure and risk of NHL. For meaningful results, careful consideration of whether studies are similar and should be combined in the analysis. Furthermore, the bias and confounding issues inherent for each individual study are carried over into the meta-analyses. Across the NHL studies, study characteristics varied, such as overall study design (i.e., cohort and case-control), source population, proxy respondent use, covariate adjustments, and confounding control. Even if these differences are not detected statistically, the meta-analysis estimate should be considered in the context of the data that are used to generate it.



**Figure 3.2. Forest plot of effect estimates (denoted as ES for effect sizes) and associated 95% confidence intervals (CI) for Non-Hodgkin lymphoma (NHL).**

Using cumulative lifetime and intensity-weighted cumulative exposure metrics, all effect estimates were less than 1 (OR = 0.6-0.9 when comparing to the lowest tertile) in the AHS cohort study (De Roos *et al.*, 2005).  Two case-control studies (Eriksson et al., 2008; McDuffie et al., 2001) evaluated the association of glyphosate exposure and NHL stratifying exposure by days per year of use.  These studies obtained effect estimates greater than 1, which conflicted with the results in the prospective cohort study; however, these estimates from the case-control studies do not appear to be adjusted for co-exposures to other pesticides.  As mentioned previously (and will be discussed further below), there was clearly strong potential for confounding from exposure to other pesticides.  In each instance where a study controlled for co-exposure to other pesticides, the adjusted effect estimate decreased in magnitude, including other analyses performed in one of these case-control studies.  Consequently, lack of adjustment for co-exposure to other pesticides in these analyses could partially explain the conflicting results between the cohort and case-control studies.

The possible effect of confounding factors, which are related to both the exposure of interest and the risk of disease, may make it difficult to interpret the results.  Control for confounding varied considerably across studies (Table 3.2).  Studies primarily adjusted for standard variables, such as age, gender, and residency location.  Co-exposure to other pesticides was considered for several of the NHL studies for ever/never use (De Roos *et al.*, 2003; De Roos *et al.*, 2005; Eriksson *et al.,* 2008; Hardell *et al.*, 2002); however, analyses of exposure-response and latency effects did not appear to control for these co-exposures.

There is clearly a strong potential for confounding by co-exposures to other pesticides since many are highly correlated and have been reported to be risk factors for NHL.  In the studies that did report a quantitative measure adjusted for the use of other pesticides, the risk was always found to be closer to the null than the risk calculated prior to this adjustment.  For examples, Eriksson et al. (2008) reported unadjusted and adjusted effect estimates of 2.02 (95% CI: 1.10-3.71) and 1.51 (95% CI:0.77-2.94), respectively.  Comparing the magnitude of those effect sizes on the natural log scale, the unadjusted effect was $\beta=0.70$ (95% CI: 0.10, 1.31) while the adjusted effect was $\beta=0.41$ (95% CI: -0.26, 1.08), suggesting a difference compatible with a degree of confounding by those herbicide co-exposures which appeared to have inflated the unadjusted effect upwards by 70% on the natural log scale (or by 46% on the OR scale).  This demonstrates the profound effect this adjustment has on effect estimates and the concern for residual confounding by other pesticides that cause NHL themselves.  As discussed in Section 3.2.4, other potential confounders have also been identified.  With an association between glyphosate exposure and the outcome of interest, occupational exposure to diesel exhaust fumes, solvents, and UV radiation are highly likely confounders in the NHL studies; however, none of these studies accounted for these potential confounders.

Recall bias and missing data are also limitations in most of the studies.  In epidemiologic studies, the quality of the exposure assessment is a major concern since the validity of the evaluations depends in large part on the ability to correctly quantify and classify an individual's exposure.  Variation in the quality of exposure assessment, study design and methods, as well as available information concerning potential confounding variables could also explain discrepancies in study findings.  During their lifetime, farmers are typically exposed to multiple pesticides and often

several may be used together posing a challenge for identifying specific risk factors.  Moreover, there is no direct information on pesticide exposure or absorbed dose because analyses are based on self-reported pesticide use.  The studies included in this epidemiology assessment relied primarily on questionnaires and interviews to describe participants' past and/or current exposure to glyphosate.  Since the questionnaires are commonly used to account for exposure and capture self-reporting, the results can be subject to misclassification and recall bias.

Furthermore, the use of proxy respondents has the potential to increase recall bias and thus may increase exposure misclassification, especially for proxy respondents not directly involved in farming operations that may be more prone to inaccurate responses than directly interviewed subjects.  In some of the NHL studies, the study participants were interviewed directly to assess exposure (De Roos *et al.*, 2005; Eriksson *et al.*, 2008; McDuffie *et al.*, 2001; Orsi *et al.*, 2009), making proxy respondent use a non-issue for these studies.  In other studies, however, study participants or proxy respondents were interviewed to assess exposure (Hardell *et al.*, 2002, De Roos *et al.*, 2003).  De Roos *et al.* (2003) did not find type of respondent to be statistically significant, but Hardell et al. (2002) did not conduct analyses to evaluate the impact of proxy use In non-NHL studies, proxy analyses were conducted in a small subset (Kachuri *et al.*, 2013; Lee *et al.*, 2004b; Lee *et al.*, 2005; Yiin *et al.*, 2012) and differences in effect estimates were often observed.  In a few studies, respondent type was used as an adjustment variable when calculating effect estimates (Band *et al.*, 2011; Kachuri *et al.*, 2013; Lee *et al.*, 2005).  As with all study design elements of case-control studies, one concern is whether or not the use of proxy respondents had a differential impact on the cases and controls included in the study because any differential impact may result in differential exposure misclassification.  When use of proxy respondents was comparable for cases and controls in the full study population, it could be assumed that there is less concern for potential recall bias from the use of proxy respondents.  In Hardell *et al.*, (2002), the percentage of cases and controls with proxy respondents was not fully reported for cases and controls though and this adds a potential source of uncertainty for the study.  Moreover, when proxy respondents were used in a study, the percentages were usually reported only for the full study population and were not reported for the specific cases and controls exposed to glyphosate.  This lack of information makes it difficult to assess the degree to which recall bias may have occurred due to the use of proxy respondents.

The highest risk measures were reported in studies with subjects developing NHL during a period of relatively low use of glyphosate.  For example, Hardell *et al.* (2002) and De Roos *et al.* (2003) acquired cases from 1987-1990 and 1979-1986, respectively.  These studies reported the largest adjusted ORs for glyphosate exposure and NHL (1.6 and 1.85); however, these studies investigated subjects prior to the introduction of genetically engineered glyphosate-tolerant crops.  As discussed in Section 1.4, glyphosate use dramatically increased following the introduction of genetically engineered glyphosate-tolerant crops in 1996.  Prevalence alone would not be expected to result in a corresponding increase in outcomes associated with glyphosate; however, the use pattern changed following the introduction of transgenic crops, such that in addition to new users, individuals already using glyphosate would have a corresponding increase in glyphosate exposure.  As a result, if a true association exists between glyphosate exposure and NHL, then a corresponding increase in effect estimates would also be expected during this time.  The currently available studies do not display this trend.  In more recent years, including the AHS prospective cohort study (De Roos *et al.*, 2005), reported

adjusted risk measures were lower (1.0-1.51).  Furthermore, if a true association exists, it would also be expected that the higher effect estimates would be reported in countries where individuals are more exposed to glyphosate, such as the United States and Canada, as compared to countries that exhibit less use[12].  Once again, the expected trend was not observed, such that effect estimates for studies conducted in Sweden (Eriksson *et al.*, 2008; Hardell et al., 2002), where glyphosate-tolerant crops are sparsely grown, were similar or higher than those reported in the United States (De Roos *et al.,* 2003; De Roos *et al.,* 2005) and Canada (McDuffie *et al.,* 2001).  These counterintuitive results highlight the need for additional studies to determine the true association between glyphosate exposure and NHL, as well as further elucidate the exposure-response relationship.

Some have argued that the follow-up period (median = 7 years) in De Roos et al. (2005) is not sufficiently long to account for the latency of NHL (Portier et al., 2016); however, the latency period for NHL following environmental exposures is relatively unknown and estimates have ranged from 1-25 years (Fontana et al., 1998; Kato et al., 2005; Weisenburger, 1992).  Eriksson et al., 2008) evaluated the impact of time since first exposure.  This study found an increased effect estimate for subjects with more than 10 years of glyphosate exposure prior to diagnosis of NHL.  This finding suggests a potential for a longer latency for NHL than the follow-up period in De Roos et al. (2005); however, this analysis did not appear to account for co-exposures to other pesticides and the number of subjects in the analysis were not reported.  It should be noted that the follow-up time in De Roos et al. (2005) does not represent the amount of time subjects have been exposed.  In this study, prior pesticide exposure was provided at time of enrollment and used to evaluate subjects that contribute person-time from enrollment until the point of diagnosis, death, movement from the catchment area, or loss to follow-up.  As such, estimated exposure for each subject did not continue to accrue during follow-up.  Additionally, subjects were not checked against state registries for inclusion in the cohort.  Rather, cancer analyses were restricted to those who are cancer-free at the time of enrollment to remove any issues related to treatment that might impact subsequent cancer risk.  At the time of enrollment, the average and median times of exposure 7.5 years and 8 years, respectively, with a standard deviation of 5.3[13].  These values were calculated using the midpoint of exposure categories provided in the questionnaire; therefore, these values represent a range of subject exposure time.  Given the majority of the subjects were at least 40 years old at the time of analysis and the recognition that these workers generally start in their profession at a much earlier age and stay in that profession over their lifetime, time of exposure for many of these subjects would be greater than the average and median times.  All of this information indicates that subjects within the cohort have ample amount of time for the outcome of interest to develop and be detected during the study.  Furthermore, NHL has about 60 subtypes classified by the WHO, which may have etiological differences (Morton *et al.*, 2014).  In this evaluation, the analysis of effect estimates was restricted to total NHL due to the small sample sizes in the few instances where NHL subtypes were analyzed.  There are concerns with grouping the subtypes together despite etiological differences and the latency period for each NHL subtype may vary due to these etiological differences.  Given the latency analysis was limited to Eriksson et al. (2008) and lack of NHL latency understanding in general, further analyses are needed to determine the true

---

[12] Components in glyphosate formulations in the United States and abroad are similar according to personal communication with Monsanto.
[13] Information provided by email from NIEHS.

latency time of NHL and NHL subtypes.  The next update to the AHS cohort study with a longer follow-up would also aid in alleviating any concerns regarding the ability of De Roos et al. (2005) to detect subjects developing NHL.

There are conflicting views on how to interpret the overall results for NHL.  Some believe that the data are indicative of a potential association between glyphosate exposure and risk of NHL.  This is primarily based on reported effect estimates across studies and the associated meta-analyses greater than 1 despite lack of statistical significance.  Additionally, the analysis conducted by Eriksson et al. (2008) observed a slightly statistically significant increase for those with more than 10 years of exposure prior to diagnosis.  There were also two case-control studies that investigated the association of glyphosate exposure and NHL by stratifying exposure by days per year of use that reported effect estimates greater than 1 for groups with the highest exposure.

Conversely, others have viewed the effect estimates as relatively small in magnitude and observed associations could be explained by chance and/or bias.  All of the effect estimates for ever/never use were non-statistically significant.  Sample sizes were small or questionable in some of the studies.  Half of the studies reported effect estimates approximately equal to 1, while the other half of the studies reported effect estimates clustered from 1.5-1.85, with the largest effect estimate having the widest confidence interval indicating the estimate was less reliable.  As such, the higher effect estimates were contradicted by the results from studies at least equal quality.  Meta-analyses were based on studies with varying study characteristics.  Given the limitations and concerns discussed above for the studies included in this evaluation, chance and/or bias cannot be excluded as an explanation for the relatively small increase observed in the meta-risk ratios.  Meanwhile, analyses performed by De Roos et al. (2005) reported effect estimates less than 1 for cumulative lifetime exposure and intensity-weighted cumulative exposure and these extensive analyses did not detect any exposure-response relationship, which conflicts with the two case-control studies that indicate potential for an exposure-response relationship comparing two groups stratified by days per year of use.  Although increased effect estimates were observed in one case-control study (Eriksson et al., 2008) for subjects exposed more than 10 years prior to diagnosis and in two case-control studies (McDuffie et al., 2001; Eriksson et al., 2008) that stratified exposure by days per year of use, none of these analyses appeared to adjust for exposures to other pesticides, which has been found to be particularly important for these analyses and would attenuate these estimates towards the null.  Furthermore, none of the studies in this evaluation of glyphosate exposure and risk of NHL accounted for other potential confounders, such as diesel exhaust fumes, solvents, and UV radiation.  These adjustments would also be expected to reduce effect estimates towards the null.

Based on the weight-of-evidence, the agency cannot exclude chance and/or bias as an explanation for observed associations in the database.  Due to study limitations and contradictory results across studies of at least equal quality, a conclusion regarding the association between glyphosate exposure and risk of NHL cannot be determined based on the available data.  The agency will continue to monitor the literature for studies and any updates to the AHS will be considered when available.

## 4.0    Data Evaluation of Animal Carcinogenicity Studies

## 4.1        Introduction

Cancer bioassays in animals have historically been the primary studies available to evaluate cancer hazard in humans, since until recently epidemiological evidence was limited.  The results of these bioassays, as well as results from screening assays for genotoxicity, are considered in a weight-of-evidence approach to determine the potential of a chemical to induce cancer in humans.  Carcinogenicity studies in two rodent species are required for the registration of food use pesticides or when the use of a pesticide is likely to result in repeated human exposure over a considerable portion of the human lifespan (40 CFR Part 158.500).  Rodent carcinogenicity studies identified from the data collection phase of the systematic review were evaluated for study quality and acceptable studies were evaluated in the context of the 2005 EPA Guidelines for Carcinogen Risk Assessment as described in Sections 4.2 and 4.3 below, respectively.

## 4.2        Consideration of Study Quality for Animal Carcinogenicity Studies

The agency has published test guidelines on how to conduct carcinogenicity studies (OCSPP 870.4200) and combined chronic/carcinogenicity studies (OCSPP 870.4300) in rodents which have been harmonized with OECD guidelines (Test Nos. 451 and 453).  Test substances are typically administered in animal carcinogenicity studies by the oral route for food use pesticides. The studies are generally conducted in mice and rats with exposure durations of 18-24 months for mice and 24 months for rats, which represent exposures of the majority of the expected lifespan in these animals.  Guideline carcinogenicity studies are designed to test three or more doses in both sexes (with at least 50 animals/sex/dose) with adequate dose spacing to characterize tumor dose-response relationships.  Key considerations when evaluating carcinogenicity studies for cancer hazard assessment include identification of target organs of carcinogenicity, increased incidence of tumors or proportion of malignant neoplasms, and reduction in the time to appearance of tumors relative to the concurrent control group (OECD TG 451).

There are a number of criteria the agency uses when evaluating the technical adequacy of animal carcinogenicity studies.  A primary criterion is the determination of the adequacy of dosing.  The 2005 EPA Guidelines for Carcinogen Risk Assessment recommends that the highest dose level selected should elicit signs of toxicity without substantially altering the normal life span due to effects other than tumors; or without inducing inappropriate toxicokinetics (e.g., overwhelming absorption or detoxification mechanisms); however, the high dose need not exceed 1,000 mg/kg/day (i.e., limit dose) (OCSPP 870.4200; OCSPP 870.4300).  Additional criteria to judge the technical adequacy and acceptability of animal carcinogenicity studies are provided in the test guidelines as well as other published sources (NTP, 1984; OSTP, 1985; Chhabra et al., 1990).  As stated in the 2005 EPA Guidelines for Carcinogen Risk Assessment, studies that are judged to be wholly inadequate in protocol, conduct or results, should be discarded from analysis.  Studies the agency consider acceptable are further evaluated for potential tumor effects.

Following study quality evaluation, a total of 9 chronic/carcinogenicity studies in the rat and 6 carcinogenicity studies in the mouse were considered acceptable for use in the current evaluation for the active ingredient glyphosate and were subsequently evaluated in the context of the 2005 EPA Guidelines for Carcinogen Risk Assessment as described in Section 4.3.  A number of studies were judged to be inadequate in protocol, conduct or reporting and were not considered in the analysis of glyphosate.  These studies and the justification for not including them in the analysis are listed below:

1.  A two-year chronic oral toxicity study in Albino rats by Reyna (1974)[14].  The study was considered inadequate to assess carcinogenicity due to insufficient reporting on the histopathology findings in the control and treatment groups. Approximately 70 animals were unaccounted for across the study.

2.  A two-year drinking water study in Wistar rats with a formulated product (13.6% ammonium salt) by Chruscielska et al., (2000).  In addition to deficiencies including inadequate reporting of water consumption and body weight data, this study was conducted with a glyphosate formulated product and not the active ingredient glyphosate, which is the focus of this review. Glyphosate formulations contain various components other than glyphosate and it has been hypothesized these components are more toxic than glyphosate alone.  The agency is collaborating with NTP to systematically investigate the mechanism(s) of toxicity for glyphosate and glyphosate formulations. This project is discussed in more detail in Section 7.0 of this document.

3.  An initiation-promotion study (George et al., 2010) in male Swiss mice that tested a commercial formulation of glyphosate (41%) on the skin.  Study deficiencies included small number (20) of animals, tested only males, and lack of histopathological examination.

4.  A carcinogenicity study in Swiss albino mice (Kumar, 2001)[15].  This study was not included due to the presence of a viral infection within the colony, which confounded the interpretation of the study findings. Malignant lymphomas were reported in this study in all dose groups.  However, lymphomas are one of the most common types of spontaneous neoplastic lesions in aging mice (Brayton et al., 2012).  Murine leukemia viruses (MuLVs) are also a common cause of lymphoma in many different strains of mice (Ward, 2006). For example, Tadesse-Heath et al. (2000) reported 50% lymphoma (mostly B-cell origin) incidence in a colony of Swiss mice infected with MuLVs.  Although the lymphoma incidences in Kumar (2001) were within or near normal background variation, it is not clear whether or not the viral infection may have contributed to the lymphoma incidence reported or the lower survival seen at the high dose in this study.

---

[14] MRID 00062507.
[15] MRID 49987403. In Greim et al. (2015), the same study is cited as Feinchemie Schwebda (2001).

5.   A two year feeding study in Sprague-Dawley rats (Excel, 1997) was not included. The agency does not have access to this study to perform an independent assessment of its conduct and; however, Greim et al. (2015) stated that the study "is considered unreliable for carcinogenicity evaluation" and there were "several deviations from the OECD Test Guideline 453".

## 4.3       Assessment of Animal Carcinogenicity Studies

The agency considers many factors when interpreting the results of carcinogenicity studies. The 2005 EPA Guidelines for Carcinogen Risk Assessment are intended as a guidance only and does not provide a checklist for determining whether tumor findings are related to treatment. These guidelines emphasize the importance of weighing multiple lines of evidence in reaching conclusions regarding human carcinogenic potential of chemicals.  Evaluation of observed tumor findings takes into consideration both biological and statistical significance.  There are several factors in the 2005 EPA Guidelines for Carcinogen Risk Assessment used in the weight-of-evidence evaluation of individual studies.  For this evaluation, the interpretation of the evidence related to tumor findings is described below.  The agency is soliciting comment from the SAP regarding several of these factors as they relate to the interpretation of studies as part of Charge Question #3.

### *Dose Selection*
Doses should be selected based on relevant toxicological information.  Caution is taken in administering an excessively high dose that would confound the interpretation of the results to humans.  As mentioned above, the 2005 EPA Guidelines for Carcinogen Risk Assessment recommends that the highest dose level selected should elicit signs of toxicity without substantially altering the normal life span due to effects other than tumors; or without inducing inappropriate toxicokinetics (e.g., overwhelming absorption or detoxification mechanisms); however, the high dose is not recommended to exceed 1,000 mg/kg/day (OCSPP 870.4200; OCSPP 870.4300).  Doses should provide relevant dose-response data for evaluating human hazard for human health risk assessment.  In the case of glyphosate, the low (oral) systemic toxicity and limited pharmacokinetic (PK) data for this chemical make it difficult to define a maximum tolerated dose (MTD) for the cancer bioassays.  A large number of the carcinogenicity studies conducted with glyphosate approach or exceed the limit dose.  The 2005 EPA Guidelines for Carcinogen Risk Assessment state that "weighing of the evidence includes addressing not only the likelihood of human carcinogenic effects of the agent but also the conditions under which such effects may be expressed".  As such, the agency puts less weight on observations of tumors that occur near or above the limit dose.

### *Statistical analyses to evaluate dose response and tumor incidences*
The main aim of statistical evaluation is to determine  whether exposure to the test agent is associated with an increase in tumor development, rather than due to chance alone. Statistical analyses should be performed on each tumor type separately.  The  incidence of benign and malignant lesions of the same cell type, usually within a single tissue or organ, are considered

separately, but may be combined when scientifically defensible (McConnell *et al*., 1986). Trend tests and pairwise comparison tests are the recommended tests for determining whether chance, rather than a treatment-related effect, is a plausible explanation for an apparent increase in tumor incidence. The 2005 Guidelines for Carcinogen Risk Assessment states that

"A trend test such as the Cochran-Armitage test (Snedecor and Cochran, 1967) asks whether the results in all dose groups together increase as dose increases. A pairwise comparison test such as the Fisher exact test (Fisher, 1950) asks whether an incidence in one dose group is increased over that of the control group. By convention, for both tests a statically significant comparison one for which *p* is less than 0.05 that the increased incidence is due to chance. Significance in either kind of test is sufficient to reject the hypothesis that chance accounts for the result."

In the current evaluation, the Cochran-Armitage Test for Trend (Snedecor and Cochran, 1967; one-sided) was used. For pairwise comparisons, the Fisher Exact Test (Fisher, 1950; one-sided) was used in the current evaluation to determine if incidences observed in treated groups were different from concurrent controls. Furthermore, the 2005 EPA Guidelines for Carcinogen Risk Assessment state that "considerations of multiple comparisons should also be taken into account". Multiple comparison methods control the familywise error rate, such that the probability of Type I error (incorrect rejection of the null hypothesis or "false positive") for the pairwise comparisons in the family does not exceed the alpha level. In the current evaluation, a Sidak correction method was used to adjust for multiple comparisons.

Forthe current evaluation, statistical significance observed in either test is judged in the context of all of the available evidence. Statistically significant responses may or may not be biologically significant and vice versa (Hsu and Stedeford, 2010; EPA, 2005). If a trend was found to be statistically significant, a closer examination of the tumor incidence was taken to determine whether the data demonstrate a monotonic dose-response where an increase in tumor incidence is expected with corresponding increase in dose. Therefore, statistically significant results with fluctuating tumor incidence across doses are not weighed as heavily as those displaying a monotonic dose-response. If a pair-wise comparison was found to be statistically significant, a closer examination of the tumor incidence and other lines of evidence was taken to determine whether the response was biologically significant. Factors considered in determining the biological relevance of a response are discussed below.

Given that statistical evaluations were performed at different times for each study, all statistical analyses were reanalyzed for the purposes of this evaluation to ensure consistent methods were applied (TXR# 0057494).

### Historical Control Data

As indicated in the 2005 EPA Guidelines for Carcinogen Risk Assessment (Section 2.2.2.1.3), the standard for determining statistical significance of tumor incidence comes from a comparison of tumors in dosed animals with those in concurrent control animals. Additional insight into the statistical and/or biological significance of a response can come from the consideration of

historical control data (Tarone, 1982; Haseman, 1995; EPA, 2005). Historical control data can add to the analysis, particularly by enabling identification of uncommon tumor types or high spontaneous incidence of a tumor in a given animal strain. Generally speaking, statistically significant increases in tumors should not be discounted simply because incidence rates in the treated groups are within the range of historical controls or because incidence rates in the concurrent controls are somewhat lower than average.

Historical control data are also useful to determine if concurrent control tumor incidences are consistent with previously reported tumor rates (Haseman, 1995). Given the large number of age-related tumor outcomes in long-term rodent bioassays, and thus the large number of potential statistical tests run, caution is taken when interpreting results that have marginal statistical significance or in which incidence rates in concurrent controls are unusually low in comparison with historical controls since there may be an artificial inflation of the differences between concurrent controls and treated groups. Consequently, in the current evaluation, unusually low incidence in concurrent controls was noted when applicable and considered as part of the weight-of-evidence for the tumor findings. Identification of common or uncommon situations prompts further thought about the meaning of the response in the current study in context with other observations in animal studies and with other evidence about the carcinogenic potential of the agent.

### Evidence of supporting preneoplastic lesions or related non-neoplastic lesions

Carcinogenicity rodent studies are designed to examine the production of tumors as well as preneoplastic lesions and other indications of chronic toxicity that may provide evidence of treatment-related effects and insights into the way the test agent produces tumors (EPA, 2005). As such, the presence or lack of supporting preneoplastic or other related non-neoplastic changes were noted in the current evaluation of each study and considered in the weight-of-evidence.

### Additional Considerations

Other observations can strengthen or lessen the significance of tumor findings in carcinogenicity studies. Such factors include: uncommon tumor types; tumors at multiple sites; tumors in multiple species, strains, or both sexes; progression of lesions from preneoplastic to benign to malignant; reduced latency of neoplastic lesions (i.e., time to tumor); presence of metastases; unusual magnitude of tumor response; and proportion of malignant tumors (EPA, 2005). The agency considers all of the above factors when determining the significance of tumor findings in animal carcinogenicity studies.

## 4.4    Summary of Animal Carcinogenicity Studies

A total of 9 chronic toxicity/carcinogenicity studies in the rat and 6 carcinogenicity studies in the mouse were considered acceptable and evaluated in the weight-of-evidence analysis for glyphosate. This includes all of the studies that were part of the 2015 CARC evaluation plus an additional 5 studies identified from the systematic review. In the 2015 CARC evaluation, for some of the studies considered, the CARC relied on summary data that was provided in the supplement to the Greim et al. (2015) review article. Due to the ongoing data collection effort and the acquiring of studies not previously submitted, the agency no longer needs to rely on the

Greim et al. (2015) review article for the study data generated in relevant studies, allowing for a more complete and independent analysis.  It should be noted that studies have been cited differently in this evaluation as compared to Greim et al. (2015) so these alternative citations have been noted for applicable studies.

The carcinogenicity studies conducted in the rat and mouse that were considered for the analysis are discussed in Sections 4.5 and 4.6, respectively.  In these sections, short study summaries are presented which include information on the study design (including test material, strain of animal used, and doses and route of administration) as well as study findings including effects on survival, general toxicity observed, relevant non-neoplastic lesions, and the incidence and characterization of any tumor findings.  The characterization of the tumor response(s) is based on the considerations previously discussed in Section 4.3 for interpreting the significance of tumor findings in animal carcinogenicity studies.  The rat and mouse carcinogenicity studies are all summarized in Table 4.11 and Table 4.18, respectively.

## 4.5    Rat Carcinogenicity Studies with Glyphosate

### 4.5.1    Burnett et al., 1979 (MRID 00105164)

In a two-year chronic/carcinogenicity oral study, glyphosate (as an aqueous monosodium salt solution) was administered to groups of 90 albino rats/sex/dose at doses of 0, 3, 10, or 30 mg/kg/day (M/F) for 24 months through oral intubation (gavage).

A higher mortality rate was noted in the control group in comparison to the treated groups after 12 and 24 months of testing.  No histopathological alterations were observed.  There were no treatment-related increases in tumor incidences in the study; however, the highest dose tested in this study was 30 mg/kg/day, which was not considered a maximum tolerable dose to assess the carcinogenic potential of glyphosate.

### 4.5.2    Lankas, 1981 (MRID 00093879)[16]

In a chronic toxicity/carcinogenicity study, groups of Sprague-Dawley rats (50/sex/dose) were fed diets containing glyphosate (98.7% pure) at dietary doses of 0, 3/3, 10/11, and 31/34 mg/kg/day (M/F).

There were no treatment-related effects on survival at any dose level.  As in Burnett (1979), the highest dose tested of approximately 32 mg/kg/day was not considered a maximum tolerable dose to assess the carcinogenic potential of glyphosate.  Consequently, a second study (Stout and Ruecker, 1990) was conducted at higher doses, which is summarized in the Section 4.5.3.

| Table 4.1.  Testicular Interstitial Cell Tumors in Male Sprague-Dawley Rats (Lankas, 1981) Cochran-Armitage Trend Test & Fisher's Exact Test Results | | | | |
|---|---|---|---|---|
| | 0 mg/kg/day | 3.05 mg/kg/day | 10.3 mg/kg/day | 31.49 mg/kg/day |

---

[16] In Greim et al. (2015), the same study is cited as Monsanto (1981).

**Table 4.1.  Testicular Interstitial Cell Tumors in Male Sprague-Dawley Rats (Lankas, 1981) Cochran-Armitage Trend Test & Fisher's Exact Test Results**

| Incidence | 0/50 | 3/47 | 1/49 | 6/44 |
|---|---|---|---|---|
| (%) | (0) | (6) | (2) | (12) |
| Raw p-value = | 0.009** | 0.121 | 0.500 | 0.013* |
| Sidak p-value = | -- | 0.321 | 0.875 | 0.039* |

Note: Trend test results denoted as <u>control</u>; * denotes significance at p=0.05; ** denotes significance at p=0.001.

A statistically significant trend was reported for the testicular interstitial tumors; however, closer examination of the tumor incidence indicates that the data do not demonstrate a monotonic dose response with greater incidence observed at the low-dose as compared at the mid-dose.  The incidence at the high dose was found to be statistically significant as compared to the concurrent controls.  The observed incidence of interstitial cell tumors in concurrent controls (0%) appears to be unusualy low for this tumor type as compared to historical controls provided in the study report for this tumor type (mean = 4.5%; range = 3.4%-6.7%) resulting in an artificial difference at the high dose.  Furthermore, the observed incidence of interstitial cell tumors in the glyphosate-treated groups were within the normal biological variation for this tumor type in this strain of rat.  There was an absence of pre-neoplastic or related non-neoplastic lesions (e.g., interstitial cell hyperplasia).  As a result, the statistically significant results do not appear to be biologically significant and are not supported by any histopathological observations.  Based on the weight-of-evidence for this study, the agency does not consider the increases in interstitial cell tumors in the testes to be treatment-related.

### 4.5.3   Stout and Ruecker, 1990 (MRID 41643801)[17]

In a chronic toxicity/carcinogenicity study, groups of Sprague-Dawley rats (60/sex/dose) were fed diets containing glyphosate (96.5%, pure) at dietary doses of 0, 89/113, 362/457 or 940/1183 mg/kg/day M/F for 24 months.  The highest dose tested in this study approaches or exceeds the highest dose recommended in the test guidelines on how to conduct carcinogenicity studies (OCSPP 870.4200 and OCSPP 870.4300).  Tumor findings at these high doses are given less weight.

There was no significant increase in mortality.  The most frequently seen tumors were pancreatic cell adenomas, hepatocellular adenomas, and thyroid C-cell adenomas in males.  A discussion of each tumor type by organ is presented below:

1. <u>Pancreas</u>: Tumor incidences of pancreatic islet cell tumors in male rats and corresponding historical control values are presented in Tables 4.2 and 4.3, respectively.  The incidence of pancreatic islet cell tumors lacked monotonic dose-responses and trend analyses were not statistically significant.  Statistical significance was observed with raw (unadjusted) p-values for the incidence of adenomas at the low-dose (89 mg/kg/day) and high-dose (940 mg/kg/day) when comparing to concurrent controls; however, none of the incidences were statistically significant with an adjustment for multiple comparisons (p=0.052 at the low-dose and p=0.120 at the high-dose).  The statistical significance of

---

[17] In Greim et al. (2015), the same study is cited as Monsanto (1990).

the pairwise comparisons with the concurrent control group may have been due to the unusually low incidences in the controls and not to an actual treatment-related response. The mean incidence of pancreatic islet cell adenomas in historical control data provided for laboratory (Monsanto Environmental Health Laboratory; MRID No. 41728701) was 5.3% and ranged from 1.8% to 8.3% indicating the concurrent control incidence for this tumor type was at the lower bound of the range. Carcinomas were only observed in the control group and the combined analyses did not yield any statistically significant pairwise comparisons. There were no supporting preneoplastic or other related non-neoplastic changes observed and no evidence of progression from adenomas to carcinomas. Based on a weight-of-evidence for this study, the agency does not consider these increases in pancreatic islet cell tumors to be treatment-related.

**Table 4.2. Pancreatic Islet Cell Tumors in Male Sprague-Dawley Rats (Stout and Ruecker, 1990) Cochran-Armitage Trend Test & Fisher's Exact Test Results.**

| Tumor Type | 0 mg/kg/day | 89 mg/kg/day | 362 mg/kg/day | 940 mg/kg/day |
|---|---|---|---|---|
| Adenoma Incidence (%) Raw p-value = Sidak p-value = | 1/43[a] (2) 0.176 -- | 8/45 (18) 0.018* 0.052 | 5/49 (10) 0.135 0.352 | 7/48[b] (15) 0.042* 0.120 |
| Carcinoma Incidence (%) Raw p-value = Sidak p-value = | 1/43[c] (2) -[d] -- | 0/45 (0) 1.000 1.000 | 0/49 (0) 1.000 1.000 | 0/48 (0) 1.000 1.000 |
| Combined Incidence (%) Raw p-value = Sidak p-value = | 2/43 (2) 0.242 -- | 8/45 (18) 0.052 0.149 | 5/49 (10) 0.275 0.619 | 7/48 (15) 0.108 0.289 |

Note: Trend test results denoted at control; * denotes significance at p=0.05.
a. Number of tumor-bearing animals/Number of animals examined, excluding those that died or were sacrificed prior to study week 55.
b. First adenoma in the study was observed at week 81 in the 940 mg/kg/day group.
c. First carcinoma in the study was observed at week 105 in the controls.
d. Trend p-value not reported since tumor incidence decreased with increasing dose.

Historical control data on the incidence of pancreatic islet cell adenomas in male Sprague-Dawley rats in 2-year studies (1983–1989) conducted at the testing facility (Monsanto Environmental Health Laboratory; MRID No. 41728701) are presented below in Table 4.3.

**Table 4.3. Historical Control Data — Pancreatic Islet Cell Adenomas in Male Sprague- Dawley Rats (MRID No. 41728701).**

| Study No. | 1 | 2 | 3 | 4 | 5 | 6 | 7 | Mean |
|---|---|---|---|---|---|---|---|---|
| Study Year | 07/83 | 02/85 | 10/85 | 6/85 | 9/88 | 1/89 | 3/89 | - |
| Tumor Incidence | 2/68 | 5/59 | 4/69 | 1/57 | 5/60 | 3/60 | 3/59 | - |
| Percentage (%) | 2.9% | 8.5% | 5.8% | 1.8% | 8.3% | 5.0% | 5.1% | 5.3% |

2. <u>Liver</u>: Tumor incidences of liver tumors in male rats are presented in Tables 4.4.  There
was a statistically significant dose trend for liver adenomas only.  Closer examination of
the incidence indicates a relatively flat response at the low- and mid-dose with only an
increase observed at the high-dose (940 mg/kg/day); however, the incidence of liver
adenomas at the high-dose was not statistically significant when compared to the
concurrent controls.  Carcinomas and combined adenomas/carcinomas lacked statistical
significance in trend and pairwise comparisons (Table 4.4).  Except for a single animal at
the mid-dose late in the study (89 weeks), no hyperplasia, preneoplastic foci or other non-
neoplastic lesions were observed.  Furthermore, there was no evidence of progression
from adenomas to carcinomas.  Given the lack of both statistical significance and
corroborative lesions to support the tumor finding, the agency does not consider these
increases in liver tumors to be treatment-related.

| Table 4.4.  Hepatocellular Tumors in Male Sprague-Dawley Rats (Stout and Ruecker, 1990) Cochran-Armitage Trend Test & Fisher's Exact Test Results | | | | |
|---|---|---|---|---|
| Tumor Type | 0 mg/kg/day | 89 mg/kg/day | 362 mg/kg/day | 940 mg/kg/day |
| Adenoma Incidence (%) Raw p-value = Sidak p-value = | 2/44[a] (5) 0.022* -- | 2/45 (4) 0.700 0.973 | 3/49 (6) 0.551 0.910 | 7/48[b] (15) 0.101 0.274 |
| Carcinoma Incidence (%) Raw p-value = Sidak p-value = | 3/44 (7) _[d] - | 2/45 (4) 0.827 0.995 | 1/49 (2) 0.954 1.000 | 2/48[c] (4) 0.845 0.996 |
| Combined Incidence (%) Raw p-value = Sidak p-value = | 5/44 (11) 0.078 -- | 4/45 (9) 0.769 0.988 | 4/49 (8) 0.808 0.993 | 9/48 (19) 0.245 0.569 |

Note: Trend test results denoted at <u>control</u>; * denotes significance at p=0.05.
a. Number of tumor-bearing animals/Number of animals examined, excluding those that died or were
   sacrificed prior to study week 55.
b. First adenoma in the study was observed at week 88 in the 940 mg/kg/day group.
c. First carcinoma in the study was observed at week 85 in the 940 mg/kg/day group.
d. Trend p-value not reported since tumor incidence decreased with increasing dose.

3. <u>Thyroid</u>: Tumor incidences of thyroid tumors in male and female rats are presented in
Tables 4.6 and 4.7, respectively.  For males, no statistically significant trends were
observed for adenomas, carcinomas, or combined adenomas/carcinomas.  For females, a
statistically significant trend was observed for adenomas and combined
adenomas/carcinomas with no statistical significance in pairwise analyses.  Therefore,
although there may be an indication of a dose-response in females, the increases observed
in the glyphosate treated groups were not considered to be different than those observed
in the concurrent controls.  Non-neoplastic lesions (thyroid C-cell hyperplasia) were

observed; however, there was a lack of a monotonic dose-response for these histopathological findings and no dose-related increase in severity to support tumor findings (Table 4.8). There was also no evidence of progression from adenomas to carcinomas. Based on a weight-of-evidence for this study, the agency does not consider these increases in thyroid tumors to be treatment-related.

**Table 4.6.  Thyroid C-Cell Tumors in Male Sprague-Dawley Rats (Stout and Ruecker, 1990)**
**Cochran-Armitage Trend Test & Fisher's Exact Test Results**

| Tumor Type | 0 mg/kg/day | 89 mg/kg/day | 362 mg/kg/day | 940 mg/kg/day |
|---|---|---|---|---|
| Adenoma | | | | |
| Incidence | 2/54[a, b] | 4/55 | 8/58 | 7/58 |
| (%) | (4) | (7) | (14) | (12) |
| Raw p-value = | 0.079 | 0.348 | 0.060 | 0.099 |
| Sidak p-value = | -- | 0.723 | 0.168 | 0.269 |
| Carcinoma | | | | |
| Incidence | 0/54 | 2/55[c] | 0/58 | 1/58 |
| (%) | (0) | (4) | (0) | (4) |
| Raw p-value = | 0.457 | 0.252 | 1.000 | 0.518 |
| Sidak p-value = | -- | 0.441 | 1.000 | 0.768 |
| Combined | | | | |
| Incidence | 2/54 | 6/55 | 8/58 | 8/58 |
| (%) | (4) | (11) | (14) | (14) |
| Raw p-value = | 0.087 | 0.141 | 0.060 | 0.060 |
| Sidak p-value = | -- | 0.367 | 0.168 | 0.168 |

Note: Trend test results denoted at <u>control</u>.
a.  Number of tumor-bearing animals/Number of animals examined, excluding those that died or were sacrificed prior to study week 55.
b. First adenoma in the study was observed at week 54 in the controls.
c. First carcinoma in the study was observed at week 93 in the 89 mg/kg/day group.

**Table 4.7.  Thyroid C-Cell Tumors in Female Sprague Dawley Rats**
**Cochran-Armitage Trend Test & Fisher's Exact Test Results (Stout and Ruecker, 1990).**

| Tumor Type | 0 mg/kg/day | 113 mg/kg/day | 457 mg/kg/day | 1183 mg/kg/day |
|---|---|---|---|---|
| Adenoma | | | | |
| Incidence | 2/57[a] | 2/60 | 6/59[b] | 6/55 |
| (%) | (4) | (7) | (10) | (11) |
| Raw p-value = | 0.040* | 0.710 | 0.147 | 0.124 |
| Sidak p-value = | -- | 0.976 | 0.380 | 0.328 |
| Carcinoma | | | | |
| Incidence | 0/57 | 0/60 | 1/59[c] | 0/55 |
| (%) | (0) | (0) | (2) | (0) |
| Raw p-value = | 0.494 | 1.000 | 0.509 | 1.000 |
| Sidak p-value = | -- | 1.000 | 0.509 | 1.000 |
| Adenoma/Carcinoma | | | | |
| Incidence | 2/57 | 2/60 | 7/59 | 6/55 |
| (%) | (4) | (3) | (12) | (11) |
| Raw p-value = | 0.042* | 0.710 | 0.090 | 0.124 |
| Sidak p-value = | -- | 0.976 | 0.246 | 0.328 |

Note: Trend test results denoted at <u>control</u>; * denotes significant at p=0.05.
a. Number of tumor-bearing animals/Number of animals examined, excluding those that died or were sacrificed prior to study week 55.

b. First adenoma in the study was observed at week 72 in the controls.
c. First carcinoma in the study was observed at week 93 in the 457 mg/kg/day group.

| Table 4.8. Thyroid Non-Neoplastic Lesions (Stout and Ruecker, 1990) | | | | |
|---|---|---|---|---|
| **Males** | | | | |
| Dose | 0 mg/kg/day | 89 mg/kg/day | 362 mg/kg/day | 940 mg/kg/day |
| Total Incidences of thyroid C-cell hyperplasia and severity scores | 5/60 (8%) <br><br> Diffuse (moderate) – 1 <br> Multi-focal (minimal) – 3 <br> Focal (mild) – 1 | 1/60 (2%) <br><br> Focal (mild) – 1 | 6/60 (10%) <br><br> Focal (minimal) – 4 <br> Multi-focal (minimal) – 1 <br> Multi-Focal (mild) – 1 | 5/60 (8%) <br><br> Focal (minimal) – 2 <br> Focal (mild) – 1 <br> Multi-focal (mild) – 1 <br> Multi-focal (moderate) – 1 |
| **Females** | | | | |
|  | 0 mg/kg/day | 113 mg/kg/day | 457 mg/kg/day | 1183 mg/kg/day |
| Thyroid C-cell hyperplasia and severity scores | 10/60 (17%) <br><br> Diffuse (moderate) – 1 <br> Focal (mild) – 1 <br> Focal (minimal) – 1 <br> Focal (mild) – 1 <br> Focal (moderate) – 1 <br> Multi-focal (minimal) – 3 <br> Multi-focal (moderate) – 1 <br> Diffuse (moderate) – 1 | 5/60 (8%) <br><br> Focal (mild) – 3 <br> Focal (minimal) – 1 <br> Multi-focal (minimal) – 1 | 9/60 (15%) <br><br> Focal (minimal) – 4 <br> Multi-focal (minimal) – 2 <br> Multi-focal (mild) – 3 | 5/60 (8%) <br><br> Focal (mild) – 1 <br> Focal (minimal) – 1 <br> Multi-focal (mild) – 2 <br> Diffuse (moderate) – 1 |

*Data taken from pages 1071-2114 of the study report.

### 4.5.4   Atkinson et al., 1993a (MRID 496317023)[18]

In a combined chronic toxicity/carcinogenicity study, glyphosate (98.9% pure) was administered to 50 Sprague-Dawley rats/sex/dose in the diet at doses of 0, 11/12, 112/109, 320/347, and 1147/1134 mg/kg/day for 104 weeks (M/F) for 104 weeks.  An additional 35 rats/sex/dose were included for 1-year interim sacrifice.

No adverse effects on survival were seen in either sex across the doses tested.  There were no changes in histopathological findings observed.  There were no treatment-related increases in tumor incidences in the study.

### 4.5.5   Brammer, 2001 (MRID 49704601)[19]

In a combined chronic toxicity/carcinogenicity study, glyphosate acid (97.6% pure) was administered to groups of Wistar rats in the diet.  Groups of 52 rats/sex received diets containing doses of 0, 121/145, 361/437 or 1214/1498 mg/kg/day for 24 months, in males/females, respectively.  The highest dose tested in this study exceeds the highest dose recommended in the

---

[18] Note: In Greim et al. (2015), the same study is cited as Cheminova (1993a).
[19] Note: In Greim et al. (2015), the same study is cited as Syngenta (2001).

test guidelines on how to conduct carcinogenicity studies (OCSPP 870.4200 and OCSPP 870.4300).

A statistically significant higher survival (p=0.02) was observed in males at the highest dose tested at the end of 104 weeks relative to concurrent controls, and  a statistically significant trend for improved survival was observed in treated males (p=0.03). The inter-current (early) deaths were 37/52, 36/52, 35/52, and 26/52 for the control, low-, mid-, and high-dose groups, respectively. The terminal deaths were 16/52, 17/52, 18/52, and 26/52 for the control, low-, mid- and high-dose groups, respectively. There were no treatment-related non-neoplastic lesions in any organs of either sex at any dose level tested.  As shown in Table 4.9, a statistically significant trend in the incidences of liver adenomas was observed in male rats; however, a monotonic dose-response was not observed upon closer examination of the incidence data. Tumor incidences appear to fluctuate with increases observed at the low- and high-dose and no tumors observed in the control and mid-dose.  Statistical significance with raw (unadjusted) p-values was observed for the tumor incidence at the high-dose (1214 mg/kg/day) when compared to concurrent controls; however, it was not statistically significant with an adjustment for multiple comparisons (p= 0.056).  Tumor findings at these high doses are given less weight. The improved survival in the high-dose group may help explain a modestly higher incidence of an age-related background tumor like liver adenomas and this corresponds with the lack of associated lesions.  Given that the tumor findings did not reflect a monotonic dose response and the high dose tumors were not statistically significant with an adjustment for multiple comparisons, the agency does not consider these increases in liver adenomas to be treatment-related.

| Table 4.9.  Liver Adenomas in Male Wistar Rats (Brammer, 2001) Cochran-Armitage Trend Test and Fisher's Exact Test Results. | | | | |
|---|---|---|---|---|
| | 0 mg/kg/day | 121 mg/kg/day | 361 mg/kg/day | 1214 mg/kg/day |
| Adenoma Incidence | 0/52[a] | 2/52 | 0/52 | 5/52 |
| (%) | (0) | (4) | (0) | (10) |
| Raw p-value = | 0.008** | 0.248 | 1.000 | 0.028* |
| Sidak p-value = | -- | 0.434 | 1.000 | 0.056 |

Note: Trend test results denoted at <u>control</u>; * denotes significance at p=0.05; ** denotes significance at p=0.01
a. Number of tumor-bearing animals/Number of animals examined.

### 4.5.6   Pavkov and Wyand 1987 (MRIDs 40214007, 41209905, 41209907)

Glyphosate trimesium salt (sulfosate, 56.2% pure) was tested in a 2-year chronic feeding/carcinogenicity study in male and female Sprague-Dawley (Crl:CD[SD]BR) rats.  Sixty animals/sex were tested in control group 1 (basal diet, no vehicle), 80/sex were tested in control group 2 (basal diet plus propylene g1ycol at 1% w/w vehicle) and in the low and mid-dose groups, and 90/sex were tested in the high dose group.  The following dose levels were tested: 0, 4.2/5.4, 21.2/27 or 41.8/55.7 mg/kg/day in males and females respectively.

Treatment had no effect on survival.  There were no changes in histopathological findings observed.  There were no treatment-related increases in tumor incidences in the study.

### 4.5.7    Suresh, 1996 (MRID 49987401 )[20]

In a combined chronic toxicity/carcinogenicity study, glyphosate (96.0-96.8% pure) was administered to groups of Wistar rats in the diet.  Groups of 50 rats/sex/group received diets containing 0, 6.3/8.6, 59.4/88.5, and 595.2/886 mg/kg/day glyphosate for 24 months in males and females respectively.  The highest dose tested in females in this study approaches the highest dose recommended in the test guidelines on how to conduct carcinogenicity studies (OCSPP 870.4200 and OCSPP 870.4300).

No adverse effects on survival were observed in either sex across the doses tested.  There were no changes in histopathological findings observed.  There were no treatment-related increases in tumor incidence observed in the study.

### 4.5.8    Enemoto, 1997 (MRID 50017103-50017105)[21]

In a combined chronic toxicity and carcinogenicity study, groups of 50 Sprague-Dawley rats/sex/group received daily dietary doses of 0, 104/115, 354/393 and 1127/1247 mg/kg bw/day glyphosate for males and females, respectively.  In addition, 10 rats/sex/group were included for interim sacrifices at 26, 52, and 78 weeks.  The highest dose tested in this study exceeds the highest dose recommended in the test guidelines on how to conduct carcinogenicity studies (OCSPP 870.4200 and OCSPP 870.4300).

There were no changes in mortality at any of the doses tested.  There were no changes in histopathological findings observed.  There were no treatment-related increases in tumor incidence observed in the study.

### 4.5.9    Wood et al., 2009a (MRID 49957404)[22]

In a combined chronic toxicity/carcinogenicity study, glyphosate (95.7% pure) was administered to groups of Wistar rats in the diet. Groups of 51 rats/sex/group received diets containing 0, 95.0, 316.9, and 1229.7 mg/kg/day glyphosate for males and female, respectively.  The highest dose tested in this study exceeds the highest dose recommended in the test guidelines on how to conduct carcinogenicity studies (OCSPP 870.4200 and OCSPP 870.4300).

No adverse effects on survival were seen in either sex across the doses tested.  There were no treatment-related preneoplastic or related non-neoplastic lesions in either sex at any dose level.

In female rats, mammary gland tumors were noted.  Tumor incidences for mammary gland adenomas, adenocarcinomas, and combined adenomas/adenocarcinomas in female mice are presented in Table 4.10.  Statistically significant trends were observed for the adenocarcinoma and combined analyses.  Tumor incidence for adenocarcinomas was not statistically significant

---

[20] Note: In Greim et al. (2015), the same study is cited as Feinchemie Schwebda (1996).

[21] Note: In Greim et al. (2015), the same study is cited as Arysta Life Sciences (1997b).

[22] Note: In Greim et al. (2015), the same study is cited as NuFarm (2009b).

in pairwise comparisons as compared to concurrent controls. Marginal statistical significance was observed with the raw (unadjusted) p-value for combined mammary gland tumors at the high-dose (1229.7 mg/kg/day) when comparing to concurrent controls; however, with an adjustment for multiple comparisons, the increased incidence at the high-dose was not statistically significant (p=0.132). There was also no evidence of progression from adenomas to carcinomas. Based on a weight-of-evidence for this study, the agency does not consider these increases in mammary gland tumors in female rats to be treatment-related.

| Table 4.10. Mammary Gland Tumor Incidences in Female Rats (Wood et al., 2009a) Fisher's Exact Test and Cochran-Armitage Trend Test Results | | | | |
|---|---|---|---|---|
| Tumor Type | 0 mg/kg/day | 95.0 mg/kg/day | 316.9 mg/kg/day | 1229.7 mg/kg/day |
| Adenoma Incidence (%) Raw p-value = Sidak p-value = | 0/51 (0) 0.062 -- | 0/51 (0) 1.000 1.000 | 0/51 (0) 1.000 1.000 | 2/51 (4) 0.248 0.248 |
| Adenocarcinoma Incidence (%) Raw p-value = Sidak p-value = | 2/51 (4) 0.042* -- | 3/51 (6) 0.500 0.875 | 1/51 (2) 0.879 0.998 | 6/51 (12) 0.135 0.352 |
| Combined Incidence (%) Raw p-value = Sidak p-value = | 2/51 (4) 0.007** -- | 3/51 (6) 0.500 0.875 | 1/51 (2) 0.879 0.998 | 8/51 (16) 0.046* 0.132 |

Note: Trend test results denoted at <u>control</u>; * denotes significance at p=0.05; ** denotes significant at p=0.01.

### 4.5.10    Summary of Rat Data

In 5 of the 9 rat studies conducted with glyphosate, no tumors were identified for detailed evaluation. Of the remaining 4 rat studies, a statistically significant trend was observed for tumor incidences in the testes, pancreas, liver, thyroid, or mammary gland; however, the agency determined that these tumor findings are not considered to be related to treatment. Although a statistically significant trend was obtained, closer examination of the incidence data across doses did not demonstrate a monotonic dose response in several instances. Some of the tumor incidences at the highest dose tested (approaching or exceeding 1,000 mg/kg/day for almost all studies) were statistically significant from concurrent controls using raw (unadjusted) p-values; however, none of the pairwise comparisons were found to be statistically significant following adjustment for multiple comparisons, except the testicular tumors seen in a single study. Furthermore, these high-dose tumors were given less weight. There was no evidence of corroborating pre-neoplastic or related non-neoplastic lesions or evidence of tumor progression (progression from pre-neoplastic to malignancy) to support biological significance of tumor findings. In a limited number of cases, the agency considered historical control data to inform the relevance of a tumor increase when incidence rates in the concurrent controls were unusually low.

| Table 4.11. Summary of Rat Carcinogenicity Studies | | | |
|---|---|---|---|
| **Study** | **Dose Range** | **Pre-Neoplastic or Related Non-Neoplastic Lesions** | **Tumors Incidences, Statistical Significance, and Related Comments** |
| **Burnett et al. (1979)**<br><br>Albino rats | 0, 3, 10 or 30 mg/kg/day for 24 months [M/F] | None observed | There were no treatment-related increases in tumor incidences. |
| **Lankas (1981)**<br><br>Sprague-Dawley rats | 98.7% Technical in diet<br>0, 3/3, 10/11, and 31/34 mg/kg/day [M/F] | None observed | Statistically significant trend observed for testicular interstitial cell tumors; however, did not observe monotonic dose-response with higher incidence at low-dose than mid-dose.  Incidences were 0/50 in controls, 3/47 at low-dose, 1/49 at mid-dose, and 6/44 at high-dose.  Increased incidence at high-dose statistically significant, but unusually low control incidence (based on historical control data in study report) inflated increase at high-dose. |
| **Stout and Ruecker (1990)**<br><br>Sprague-Dawley rats | 96.5% Technical in diet<br>0, 89/113, 362/457 and 940/1183 mg/kg/day [M/F] for 24 months | None observed | Pancreatic tumors lacked statistically significant trend.  Tumor incidence for pancreatic adenomas in males were 1/43 in controls, 8/45 at the low-dose, 5/49 at the mid-dose, and 7/48 at the high-dose.  Concurrent control incidence for this tumor type was at the lower bound of the historical control range. No statistically significant pairwise comparisons, including the highest dose tested which is approaching/exceeding 1,000 mg/kg/day.<br><br>Statistically significant trend for liver adenomas in males with only an increase at high-dose.  Incidences were 2/44 in controls, 2/45 at the low-dose, 3/49 at the mid-dose, and 7/48 at the high-dose. No statistically significant pairwise comparisons, including the highest dose tested which is approaching/exceeding 1,000 mg/kg/day.<br><br> No statistically significant trend for thyroid C-cell tumors in males.  For females, statistically significant trend for adenomas and combined adenomas/carcinomas.  Incidences for adenomas were 2/57 in controls, 2/60 at the low-dose, 6/59 at the mid-dose, and 6/55 at the high-dose.  Similar incidences were seen for combined except the mid-dose was 7/59.  No statistically significant pairwise comparisons, including the highest dose tested which is approaching/exceeding 1,000 mg/kg/day. |
| Atkinson et al. (1993a)<br><br>Sprague-Dawley rats | 98.9% Technical in diet<br>0, 11/12, 112/109, 320/347, and 1147/1134 mg/kg/day for 104 weeks (M/F) | None observed | There were no treatment-related increases in tumor incidences, including the highest dose tested which exceeded 1,000 mg/kg/day. |

| Table 4.11. Summary of Rat Carcinogenicity Studies | | | |
|---|---|---|---|
| **Study** | **Dose Range** | **Pre-Neoplastic or Related Non-Neoplastic Lesions** | **Tumors Incidences, Statistical Significance, and Related Comments** |
| **Brammer. (2001)**<br><br>Wistar rats | 97.6% Technical in diet<br>0, 121/145, 361/437 and 1214/1498 mg/kg/day [M/F] | None observed | Statistically significant trend in liver adenomas in males.  Incidences were 0/52 in controls, 2/52 at the low-dose, 0/52 at the mid-dose, and 5/52 at the high-dose.  No statistically significant pairwise comparisons when adjusting for multiple comparisons, including the highest dose tested which exceeded 1,000 mg/kg/day. |
| **Pavkov and Wyand (1987)**<br><br>Sprague-Dawley rats | 56.2% Technical (Trimesium salt; Sulfosate)<br>0, 4.2/5.4, 21.2/27 and 41.8/55.7 mg/kg/day [M/F] | None observed | There were no treatment-related increases in tumor incidences. |
| **Suresh (1996)**<br><br>Wistar rats | 96.0-96.8% Technical in diet<br>0, 6.3/8.6, 59.4/88.5, and 595.2/886 mg/kg/day [M/F] | None observed | There were no treatment-related increases in tumor incidences, including the highest dose tested which exceeded 1,000 mg/kg/day. |
| **Enemoto (1997)**<br><br>Sprague-Dawley rats | 94.61-97.56% Technical in diet<br>0, 104/115, 354/393 and 1127/1247 mg/kg/day [M/F] | None observed | There were no treatment-related increases in tumor incidences, including the highest dose tested which exceeded 1,000 mg/kg/day. |
| **Wood et al. (2009a)**<br><br>Wistar rats | 95.7% Technical in diet<br>0, 86/105, 285/349 or 1077/1382 mg/kg/day [M/F] | None observed | Statistically significant trends were observed for the mammary gland adenocarcinoma and combined adenoma/adenocarcinoma analyses.  Incidences for adenocarcinomas were 2/51 in controls, 3/51 at the low-dose, 1/51 at the mid-dose, and 6/51 at the high-dose.  Similar incidences observed for combined adenoma/adenocarcinomas except incidence at high-dose was 8/51.  No statistically significant pairwise comparisons when adjusting for multiple comparisons, including the highest dose tested which exceed 1,000 mg/kg/day. |

### 4.6     Mouse Carcinogenicity Studies with Glyphosate

#### 4.6.1     Reyna and Gordon, 1973 (MRID 00061113)

In an 18-month carcinogenicity study, groups of 50 Swiss white mice/sex/dose were fed glyphosate at dietary levels of approximately 17 mg/kg/day and 50 mg/kg/day.  There was no effect on survival at any of the doses tested.  There were no changes in histopathological findings observed.  There were no treatment-related increases in tumor incidence observed in the study.  Although only ten mice/sex/dose were examined for histopathological changes, there were no statistically significant increases in tumors observed in the study; therefore, this deficiency would not impact the overall conclusion regarding tumor findings.

#### 4.6.2     Knezevich and Hogan, 1983 (MRID 00130406)[23]

Groups of 50 male and female CD-1 mice received glyphosate (99.78%, pure) at dietary doses of 0, 161/195, 835/968, 4945/6069 mg/kg/day for males and females, respectively for 24 months.  The highest dose tested in this study far exceeds the highest dose recommended in the test guidelines on how to conduct carcinogenicity studies (OCSPP 870.4200 and OCSPP 870.4300).  Furthermore, the mid-dose tested in this study was approaching 1,000 mg/kg/day.  Tumor findings at these high doses are given less weight.

No effect on survival was observed.  There were no corroborating lesions to support any tumor findings in this study.

A low incidence of renal tubule adenomas, which are considered rare, were noted in males.  The incidences of renal tubule adenomas following initial evaluation of the study were reported as follows: 0/49 in the controls; 0/49 at the low-dose; 1/50 at the mid-dose; and 3/50 at the high dose (TXR No. 0004370).  In 1985, the registrant directed a re-evaluation of the original renal sections by a consulting pathologist.  This re-evaluation identified a small renal tubule adenoma in one control male mouse, which was not diagnosed as such in the original pathology report.  In 1986, at the request of the agency, additional renal sections (3 sections/kidney/mouse spaced at 150 micron intervals) were evaluated in all control and all glyphosate-treated male mice in order to determine if additional tumors were present.  The additional pathological and statistical evaluations concluded that the renal tumors in male mice were not compound-related.

Subsequently, the agency requested a Pathology Work Group (PWG) evaluate the kidney sections.  The PWG examined all sections of the kidney, including the additional renal sections, and were blinded to treatment group.  The renal tubular-cell lesions diagnosed by the PWG are presented below in Table 4.12 with results from statistical analyses.  The PWG noted that because differentiation between tubular-cell adenoma and tubular-cell carcinoma is not always clearly apparent and because both lesions are derived from the same cell type, it is appropriate to combine the incidences from these two tumor types for purposes of evaluation and statistical

---

[23] Note: In Greim et al. (2015), the same study is cited as Monsanto (1983).

analysis. The PWG unanimously concluded that these lesions are not compound-related based on the following considerations: 1) renal tubular cell tumors are spontaneous lesions for which there is a paucity of historical control data for this mouse stock; 2) there was no statistical significance in a pairwise comparison of treated groups with the concurrent controls and there was no evidence of a statistically significant linear trend; 3) multiple renal tumors were not found in any animal; and 4) compound-related nephrotoxic lesions, including pre-neoplastic changes, were not present in male mice in this study (TXR No. 0005590).

| Table 4.12. Kidney Tubular Cell Tumors in Male CD-1 Mice (Knezevich and Hogan, 1983) Cochran-Armitage Trend Test & Fisher's Exact Test Results. | | | | |
|---|---|---|---|---|
| Tumor Type | 0 mg/kg/day | 161 mg/kg/day | 835 mg/kg/day | 4945 mg/kg/day |
| Adenoma<br>Incidence<br>(%)<br>Raw p-value =<br>Sidak p-value = | 1/49<br>(2)<br>0.4422<br>-- | 0/49<br>(0)<br>1.000<br>1.000 | 0/50<br>(0)<br>1.000<br>1.000 | 1/50<br>(2)<br>0.758<br>0.986 |
| Carcinoma<br>Incidence<br>(%)<br>Raw p-value =<br>Sidak p-value = | 0/49<br>(0)<br>0.063<br>-- | 0/49<br>(0)<br>1.000<br>1.000 | 1/50<br>(2)<br>0.505<br>0.755 | 2/50<br>(4)<br>0.253<br>0.441 |
| Combined<br>Incidence<br>(%)<br>Raw p-value =<br>Sidak p-value = | 1/49<br>(2)<br>0.065<br>-- | 0/49<br>(0)<br>1.000<br>1.000 | 1/50<br>(2)<br>0.758<br>0.986 | 3/50<br>(6)<br>0.316<br>0.680 |

Note: Trend test results denoted at <u>control</u>.

Histopathological examinations noted chronic interstitial nephritis and tubular epithelial changes (basophilia and hypertrophy) in the kidneys of male rats in the study (Table 4.13). The increased incidence of chronic interstitial nephritis in males lacked a dose-response. The incidence in controls of bilateral interstitial nephritis was higher than low-dose group and approximately the same as the mid-dose group. Unilateral chronic interstitial nephritis was only seen in 1 animal in the low- and high-dose groups. Furthermore, chronic interstitial nephritis is not considered to be a precursor lesion for tubular neoplasms. A monotonic dose-response was not observed for the epithelial basophilia and hypertrophy, such that the incidence fluctuated with dose and the lowest incidence was observed at the highest dose tested. There was no increase in supporting preneoplastic or related non-neoplastic renal tubular lesions (e.g., tubular epithelial necrosis/regeneration, hyperplasia) observed in male mice.

| Table 4.13. Kidney Histopathological Alterations in Male CD-1 Mice (Knezevich and Hogan, 1983) | | | | |
|---|---|---|---|---|
| Males | | | | |
| Dose | 0 mg/kg/day | 161 mg/kg/day | 835 mg/kg/day | 4945 mg/kg/day |
| Bilateral Chronic<br>Interstitial Nephritis | 5/49<br>(10%) | 1/49<br>(2%) | 7/50<br>(14%) | 11/50<br>(22%) |

| Unilateral Chronic Interstitial Nephritis | 0/49 (0%) | 1/49 (2%) | 0/49 (0%) | 1/50 (2%) |
| Proximal Tubule Epithelial Basophilia and Hypertrophy | 15/49 (31%) | 10/49 (20%) | 15/50 (30%) | 7/50 (14%) |

*Data taken from page 305 and 306, and the study pathology report; incidences were moderate diffuse

Based on the weight-of-evidence for this study, the agency concurs with the PWG conclusion, following a thorough examination of all kidney sections, that the renal tubular neoplasms are not treatment-related with a lack of statistical significance in the trend and pairwise tests. Although there was an increase in chronic interstitial nephritis at the highest dose tested, this finding is not considered relevant to the tubular neoplasms.

### 4.6.3   Atkinson, 1993b (MRID 49631702)[24]

In a carcinogenicity study, glyphosate (>97% pure) was administered to groups of 50 CD-1 mice/sex/dose in the diet for 104 weeks at doses of 0, 98/102, 297/298, 988/1000 mg/kg/day for males and females, respectively. No interim sacrifices were performed.
There was no effect on survival in the study. There were no preneoplastic lesions or related non-neoplastic lesions observed. As shown in Table 4.14, hemangiosarcomas were found in 4/45 (9%) of high-dose male mice (1000 mg/kg/day) compared to none in the concurrent controls or other treated groups. Hemangiosarcomas are commonly observed in mice (generally more common in males for CD-1 strain) as both spontaneous and treatment-related tumors arising from endothelial cells. As vascular tumors, they can occur at different sites, with liver and spleen tending to be the most common sites in mice. In the high-dose mice with hemangiosarcomas, one had the tumors present in the liver and spleen, one had the tumor present in the liver only, one had the tumors present in the liver, spleen, and prostate, and one had the tumor present in the spleen only. A statistically significant trend was observed (p=0.00296). Closer examination of the incidence indicates a relatively flat response at the low- and mid-dose with only an increase observed at the high-dose; however, the incidence of hemangiosarcomas at the high-dose was not statistically significant when compared to the concurrent controls. Based on a weight-of-evidence for this study, the agency does not consider these increases in hemangiosarcomas in male mice to be treatment-related.

| Table 4.14.  Hemangiosarcomas in Male CD-1 Mice (Atkinson, 1993b) Cochran-Armitage Trend Test and Fisher's Exact Test Results. | | | | |
|---|---|---|---|---|
| Dose (mg/kg/day) | 0 | 100 | 300 | 1000 |
| Hemangiosarcoma Incidence (%) Raw p-value = Sidak p-value = | 0/47[a] (0) 0.003** -- | 0/46 (0) 1.000 1.000 | 0/50 (0) 1.000 1.000 | 4/45 (9) 0.053 0.053 |

Note: Trend test results denoted at <u>control</u>; * denotes significance at p=0.05; ** denotes significance at p=0.01
   a= Number of tumor bearing animals/Number of animals examined, excluding those that died before week 52.

---

[24] Note: In Greim et al. (2015), the same study is cited as Cheminova (1993b).

### 4.6.4   Wood et al., 2009b (MRID 49957402)[25]

In a feeding study conducted in 2009, CD-1 mice (50/sex/dose) received glyphosate (95.7%) for 80 weeks at dietary dose levels of 0, 71.4/97.9, 234.2/299.5, or 810/1081.2 mg/kg/day for males and females, respectively.  The highest dose tested in this study approaches or exceeds the highest dose recommended in the test guidelines on how to conduct carcinogenicity studies (OCSPP 870.4200 and OCSPP 870.4300).

There was no effect on survival in the study.  In male mice at the high dose, there were increases in the incidences of lung adenocarcinomas and malignant lymphomas.  A discussion of each tumor type is presented below:

1. Lung:  Tumor incidence for lung adenomas, adenocarcinomas, and combined adenomas/adenocarcinomas are presented in Table 4.15.  A statistically significant trend was only noted for the adenocarcinomas.  Closer examination of the tumor incidence indicates the dose-response was relatively flat at the low- and mid-dose with only an increase observed at the high-dose; however, the incidence of lung adenocarcinomas at the high-dose (810 mg/kg/day) was not statistically significant when compared to the concurrent controls.  There were no treatment-related preneoplastic or related non-neoplastic lesions observed.  There was also no evidence of progression from adenomas to carcinomas.  Based on a weight-of-evidence for this study, the agency does not consider these increases in lung tumors to be treatment-related.

2. Malignant lymphoma: Tumor incidence for malignant lymphoma are also presented in Table 4.16.  A statistically significant trend was observed and the incidence at the high-dose (810 mg/kg/day) was statistically significantly elevated as compared to concurrent controls with the raw (unadjusted) p-value; however, with an adjustment for multiple comparisons, the increased incidence at the high-dose was not statistically significant (p= 0.082).  Historical control data were also considered to better understand the significance of the reported increased incidence of lymphoma.  Historical control data from the same laboratory and same supplier are preferred; however, this data were not available for consideration with the study report.  The 2005 EPA Guidelines for Carcinogen Risk Assessment does not prohibit the use of historical control data from other sources; however, it does state it should be used with caution.  For this strain of mouse, the mean incidence for untreated animals is approximately 4.5% (range: 1.5%-21.7%) based on historical control data from Charles River (59 studies performed from 1987-2000; Giknis and Clifford, 2005) and Huntingdon Laboratories (20 studies from 1990-2002; Son and Gopinath, 2004).  Although the data are not from the performing laboratory, it does indicate that the incidence in concurrent controls in this study was low, which can contribute to the pairwise significance observed at the highest dose tested with the raw (unadjusted) p-value.  Based on a weight-of-evidence for this study, the agency does not consider the increase in malignant lymphoma to be treatment-related.

---

[25] Note: In Greim et al. (2015), the same study is cited as NuFarm (2009a).

**Table 4.15.  Lung Tumors in Male CD-1 Mice (Wood et al., 2009b)**
**Fisher's Exact Test and Cochran-Armitage Trend Test Results.**

| Dose (mg/kg/day) | 0 | 71.4 | 234.2 | 810 |
|---|---|---|---|---|
| Lung Adenoma Incidence | 9/51 | 7/51 | 9/51 | 4/51 |
| (%) | (18) | (14) | (18) | (8) |
| Raw p-value = | -[b] | 0.793 | 0.602 | 0.964 |
| Sidak p-value = | - | 0.991 | 0.937 | 1.000 |
| Lung Adenocarcinoma | 5/51[a] | 5/51 | 7/51 | 11/51 |
| (%) | (10) | (10) | (14) | (22) |
| Raw p-value = | 0.028* | 0.630 | 0.380 | 0.086 |
| Sidak p-value = | -- | 0.949 | 0.762 | 0.237 |
| Lung Combined Incidence | 14/51 | 12/51 | 16/51 | 15/51 |
| (%) | (27) | (24) | (31) | (29) |
| Raw p-value = | 0.336 | 0.752 | 0.414 | 0.500 |
| Sidak p-value = | -- | 0.985 | 0.799 | 0.875 |

Note: Trend test results denoted at <u>control</u>; * denotes significance at p=0.05;** denotes significance at p=0.01
a= Number of tumor bearing animals/Number of animals examined.
b = Trend p-value not reported since tumor incidence decreased with increasing dose.

**Table 4.16.  Malignant Lymphomas in Male CD-1 Mice (Wood et al., 2009b)**
**Fisher's Exact Test and Cochran-Armitage Trend Test Results.**

| Dose (mg/kg/day) | 0 | 71.4 | 234.2 | 810 |
|---|---|---|---|---|
| Malignant Lymphoma Incidence | 0/51 | 1/51 | 2/51 | 5/51 |
| (%) | (0) | (2) | (4) | (10) |
| Raw p-value = | 0.007** | 0.500 | 0.248 | 0.028* |
| Sidak p-value = | -- | 0.875 | 0.574 | 0.082 |

Note: Trend test results denoted at <u>control</u>; * denotes significance at p=0.05;** denotes significance at p=0.01
a= Number of tumor bearing animals/Number of animals examined.

### 4.6.5   Sugimoto, 1997 (MRID 50017108 - 50017109)[26]

In a carcinogenicity study, glyphosate (purity 97.56 and 94.61%; two lots) was administered to groups of 50 male and 50 female Specific-Pathogen-Free (SPF) ICR (Crj: CD-1) mice/dose in the diet at dose levels of 0, 165/153.2, 838.1/786.8, or 4348/4116 mg/kg/day for males and females, respectively, for 18 months.  The highest dose tested in this study far exceeds the highest dose recommended in the test guidelines on how to conduct carcinogenicity studies (OCSPP 870.4200 and OCSPP 870.4300).  Furthermore, the mid-dose tested in this study was approaching 1,000 mg/kg/day.  Tumor findings at these high doses are given less weight.

There were no treatment-related effects on mortality or survival.  There were no changes in histopathological findings observed.

---

[26]Note:  In Greim et al. (2015), the same study is cited as Arysta Life Sciences (1997b)

Hemangiomas in female mice were found to occur at different sites. The tumor incidences are presented in Table 4.17. A statistically significant trend was observed. Tumor incidence at the high-dose, which was approximately 4 times the recommended high-dose in test guidelines (4116 mg/kg/day), was statistically significant with the raw (unadjusted) p-value as compared to concurrent controls; however, with an adjustment for multiple comparisons, the high dose tumors were not statistically significant (p=0.055). Based on a weight-of-evidence for this study, the agency does not consider these increases in hemangiomas in female rats to be treatment-related.

| Table 4.17. Hemangioma Incidences (Sugimoto, 1997) Fisher's Exact Test and Cochran-Armitage Trend Test Results | | | | |
|---|---|---|---|---|
| Tumor Type | 0 mg/kg/day | 153.2 mg/kg/day | 786.8 mg/kg/day | 4116 mg/kg/day |
| Hemangioma Incidence (%) | 0/50 (0) | 0/50 (0) | 2/50 (4) | 5/50 (10) |
| Raw p-value = | 0.002** | 1.000 | 0.247 | 0.028* |
| Sidak p-value = | -- | 1.000 | 0.434 | 0.055 |

Note: Trend test results denoted at <u>control</u>; * denotes significance at p=0.05; ** denotes significance at p=0.01.

### 4.6.6   Pavkov and Turnier, 1987 (MRIDs 40214006, 41209907)

Glyphosate trimesium salt (sulfosate, 56.2% pure) was tested in a 2-year chronic feeding/carcinogenicity study in male and female CD-1 mice. Sixty animals/sex were tested in control group 1 (basal diet, no vehicle), 80/sex were tested in control group 2 (basal diet plus propylene glycol at 1% w/w vehicle) and in the low- and mid-dose groups, and 90/sex were tested in the high-dose group. The following dose levels were tested: 0, 11.7/16, 118/159, and 991/1341 mg/kg/day for males and females, respectively.

No adverse effects on survival were seen in either sex across the doses tested. There were no changes in histopathological findings observed. There were no treatment-related increases in tumor incidence observed in the study.

### 4.6.7   Summary of Mouse Data

No tumors were identified for detailed evaluation in 2 of the 6 mouse carcinogenicity studies. In the remaining 4 mouse studies, 3 observed a statistically significant trend in tumor incidences in the hemangiosarcomas, lung adenomas, malignant lymphomas or hemangiomas; however, the agency determined that none of the tumors observed in the mouse are treatment related. Although a statistically significant trend was obtained, closer examination of the incidence data across doses did not demonstrate a monotonic dose response in several instances. Some of the tumor incidences at the highest dose tested (approaching or exceeding 1,000 mg/kg/day for almost all studies) were statistically significant from concurrent controls using raw (unadjusted) p-values; however, none of the pairwise comparisons were found to be statistically significant following adjustment for multiple comparisons. Furthermore, these high-dose tumors were given less weight. There was no evidence of corroborating pre-neoplastic or related non-neoplastic lesions or evidence of tumor progression (progression from pre-neoplastic to malignancy) to support

biological significance of tumor findings.  In a limited number of cases, the agency considered historical control data to inform the relevance of a tumor increase when incidence rates in the concurrent controls were unusually low.

| Table 4.18. Summary of Mouse Carcinogenicity Studies | | | |
|---|---|---|---|
| **Study** | **Dose Range** | **Pre-Neoplastic or Related Non-Neoplastic Lesions** | **Tumors Incidences, Statistical Significance, and Related Comments** |
| **Reyna and Gordon  (1973)**<br><br>Swiss white mice | 0, 17 or 50 mg/kg/day for 18 months | None observed | There were no treatment-related increases in tumor incidence. |
| **Knezevich and Hogan (1983)**<br><br>CD-1 mice | 99.78% Technical in diet<br>0, 161/195, 835/968, 4945/6069 mg/kg/day for [M/F] for 24 months. | Chronic interstitial nephritis lacked dose-response and not considered relevant to renal tumors.  Tubular epithelial changes in kidney were approximately the same in controls, low- and mid-doses and then decreased at high-dose. | The incidences of renal tubule adenomas were: 1/49 (2%) in the controls; 0/49 at the low-dose; 1/50 at the mid-dose; and 3/50 (6%) at the high dose.  No statistical significance in trend or pairwise comparisons, including the mid- and high-doses which approached or exceeded 1,000 mg/kg/day. |
| **Atkinson et al. (1993b).**<br><br>CD-1 mice | 97.5 - 100.2% Technical in diet<br>0, 98/102, 297/298, 988/1000 mg/kg/day for 104 weeks (M/F) | None observed | Statistically significant trend for hemangiosarcomas that were only observed in 4/45 (9%) high-dose male mice.  Increased incidence was not statistically significant from the concurrent controls at all doses, including the highest dose tested which is approximately 1,000 mg/kg/day. |
| **Wood et al. (2009b)**<br><br>CD-1 mice | 95.7% Technical in diet<br>0, 71.4/97.9, 234.2/299.5, or 810/1081.2 mg/kg/day [M/F] for 80 weeks | None observed | Statistically significant trend for lung adenocarcinomas with incidences of 5/51 in controls, 5/51 at the low-dose, 7/51 at the mid-dose, and 11/51 at the high-dose.  No statistical significance in pairwise comparisons.<br><br>Statistically significant trend for malignant lymphoma with incidences of 0/51 in controls, 1/51 at the low-dose, 2/51 at the mid-dose, and 5/51 at the high-dose.  Incidence in concurrent controls for this tumor type was low.  No statistically significant pairwise results with multiple comparison adjustment, including the highest dose tested which was approaching 1,000 mg/kg/day. |
| **Sugimoto (1997)**<br><br>CD-1 mice | 94.61 – 97.56% Technical in diet<br>0, 165/153.2, 838.1/786.8, or 4348/4116 mg/kg/day [M/F] for 18 months | None observed | Statistically significant trend for hemangiomas female mice with incidences of 0/50 in controls, 0/50 at the low-dose, 2/50 at the mid-dose, and 5/50 at the high-dose.  No statistically significant pairwise results with multiple comparison adjustment, including the mid- and high-doses which approached or exceeded 1,000 mg/kg/day. |

**Table 4.18. Summary of Mouse Carcinogenicity Studies**

| Study | Dose Range | Pre-Neoplastic or Related Non-Neoplastic Lesions | Tumors Incidences, Statistical Significance, and Related Comments |
|---|---|---|---|
| **Pavkov and Turnier (1987)**<br><br>CD-1 mice | 56.2% Technical (Trimesium salt; Sulfosate) 0, 11.7/16, 118/159, and 991/1341 mg/kg/day [M/F] for 24 months. | None observed | There were no treatment-related increases in tumor incidence, including the highest dose tested which approached/exceeded 1,000 mg/kg/day. |

### 4.7 Absorption, Distribution, Metabolism, Excretion (ADME)

The 2005 EPA Guidelines for Carcinogen Risk Assessment also permit analysis of other key data that may provide valuable insights into the likelihood of human cancer risk from exposure to a chemical, such as information regarding the absorption, distribution, metabolism, and excretion (ADME) of a test chemical.  EPA's Harmonized Test Guidelines for pesticides include a series of studies for characterizing a chemical's metabolism and pharmacokinetics.  As described in the test guideline (OCSPP 870.7485), testing of the disposition of a test substance is designed to obtain adequate information on its: absorption, distribution, biotransformation (metabolism), and excretion, which can all collectively aid in understanding the chemical's mechanism of toxicity.  Basic pharmacokinetic/toxicokinetic parameters determined from these studies can also provide information on the potential for accumulation of the test substance in tissues and/or organs and the potential for induction of biotransformation as a result of exposure to the test substance.  These data can be used to assess the adequacy and relevance of the extrapolation of animal toxicity data (particularly chronic toxicity and/or carcinogenicity data) to estimate human risk.

Oral exposure is considered the primary route of concern for glyphosate. The maximum absorption from the GI tract for glyphosate was estimated to be ~30% with one study showing up to 40% based upon radiolabel detected in the urine.  In general, the amounts of glyphosate detected in tissues were negligible indicating low tissue retention following dosing.  Parent glyphosate is the principal form excreted in urine and feces.  The primary route of excretion following oral administration of glyphosate is the feces, as verified by the intravenous dosing and bile cannulation experiments.  Within the dose ranges tested, elimination was essentially complete by 24 hours indicating that glyphosate does not bioaccumulate.

Multiple studies examined the pharmacokinetics of a single dose of radiolabeled glyphosate ranging from 5.6 – 400 mg/kg.  Across these studies, time to reach peak plasma concentrations ($T_{max}$) appeared to increase with increasing dose; however, the reported range of $T_{max}$ (1-5.5 hours) suggests only a slight shift in absorption kinetics occurs despite large increases in dose. In the one study that tested two doses (NTP, 1992), data graphically show that peak blood levels were only roughly 3-fold with a 10-fold increase between the two doses.  Reported area under the curve (AUC) values indicated conflicting results regarding whether linear or non-linear absorption kinetics was occurring at higher doses.

In general, EPA and OECD guideline ADME studies are designed for a different purpose and do not provide the information needed to adequately determine whether linear kinetics is still occurring at high doses of glyphosate.  These studies are often limited to one or two doses and do not include time course data.  A well-conducted pharmacokinetic study testing multiple doses is needed to conclusively make this determination.

### 4.8    Discussion

Glyphosate has been extensively tested in rodents to evaluate its carcinogenic potential.  A total of 15 rodent carcinogenicity studies were considered to be adequate for this analysis.   Nine studies were conducted in the rat and 6 studies were conducted in the mouse.  When a potential tumor signal was identified in a study, the agency considered several factors.  Consistent with the EPA's 2005 Guidelines for Carcinogen Risk Assessment, the agency evaluated the tumor responses for both statistical and biological significance by considering factors such as historical control data; rarity of tumor types; tumors at multiple sites; tumors in multiple species, strains, or both sexes; progression of lesions from preneoplastic to benign to malignant; reduced latency of neoplastic lesions (i.e., time to tumor); presence of metastases; unusual magnitude of tumor response; proportion of malignant tumors; and dose-related increases.  When these factors were considered together, the agency made a determination of whether or not the observed tumor was related to treatment with glyphosate.  A weight of the evidence approach was used to determine the carcinogenic potential of glyphosate in rodents.

In 5 of the 9 rat studies conducted with glyphosate, no tumors were identified for detailed evaluation.  Of the remaining 4 rat studies, a statistically significant trend was observed for tumor incidences in the testes, pancreas, liver, thyroid, or mammary gland; however, the agency determined that these tumor findings are not considered to be related to treatment, as described in Section 4.5, due to lack of pairwise statistical significance, lack of a monotonic dose response, absence of preneoplastic or non-neoplastic lesions, no evidence of tumor progression, and/or historical control information (in limited instances).  Lastly, tumors seen in individual rat studies were not reproduced in other studies, including those conducted in the same animal species and strain at similar or higher doses.

In 2 of the 6 mouse studies, no tumors were identified for detailed evaluation.   In the remaining 4 mouse studies, 3 observed a statistically significant trend in tumor incidences in the hemangiosarcomas, lung adenomas, malignant lymphomas or hemangiomas; however, the agency determined that none of the tumors observed in the mouse are treatment related, as described in Section 4.6, due to lack of pairwise statistical significance, lack of a monotonic dose response, absence of preneoplastic or non-neoplastic lesions, no evidence of tumor progression, and/or historical control information (in limited instances). Lastly, tumors seen in individual mouse studies were not reproduced in other studies, including those conducted in the same animal species and strain at similar or higher doses.

In addition to the lines of evidence considered when determining if a tumor was treatment-related within in a study, the agency also looked across all of the relevant studies to determine if the tumor findings were reproducible in other studies conducted in the same species and strain. Increased incidence of testicular, pancreatic, thyroid and mammary gland tumors were seen in only one study and were not reproduced in the other four studies for that strain at similar or higher doses.  An increased incidence of hepatocellular adenomas were seen in one study with Sprague-Dawley rats and one study with Wistar rats, but this tumor type was not significantly

increased in the other six studies tested in these rat strains at similar or higher doses.  In the mice, an increase in the incidence of renal tumors, hemangiosarcomas, lung adenomas, malignant lymphoma and hemangiomas were reported only in a single study and findings were not seen in the four other studies conducted in CD-1 mice at similar or higher doses.

When looking across the studies at doses where potential tumor signals were identified, doses below 500 mg/kg/day consistently showed no increased incidence of tumors with the single exception of the testicular tumors in SD rats (Lankas, 1981), where an increase in incidence was seen at approximately 31.5 mg/kg/day.  However, as discussed in Section 4.5.2, the testicular tumor data do not show a monotonic dose response, the concurrent controls appear to be unusually low for this tumor, there were no  pre-neoplastic or related non-neoplastic lesions, and this tumor type was not seen in other studies at doses up to 35-fold higher in the same strain of rat.   As a result, the increased incidence in testicular tumors was not considered treatment-related based on the weight-of-evidence for the study.  Even if the tumor findings observed above 500 mg/kg/day were considered indicative of treatment-related effects, the 2005 EPA Guidelines for Carcinogen Risk Assessment state that the "weighing of the evidence includes addressing not only the likelihood of human carcinogenic effects of the agent but also the conditions under which such effects may be expressed".  As such, the high doses (~1,000 mg/kg/day or greater) where these tumor findings were observed were considered in the context of potential exposure to glyphosate in residential and occupational settings.  As previously discussed in Section 1.4, oral exposure is the primary route of concern for glyphosate.  In residential/non-occupational settings, children 1-2 years old are considered the most highly exposed subpopulation with an estimate of potential combined exposure of 0.47 mg/kg/day.  The estimated maximum potential exposure for occupational workers is 7 mg/kg/day.  The estimate of exposure children and occupational workers is at least 2,000-fold and 140-fold lower, respectively, than the doses (~1000 mg/kg/day) where increases in tumor incidences were typically observed in the rodent studies.  Based on these exposure estimates, the high dose tumor findings are not considered relevant for human health risk assessment.

Based on the weight-of-evidence, the agency has determined that any tumor findings observed in the rat and mouse carcinogenicity studies for glyphosate are not considered treatment-related. Tumor findings observed at the highest doses tested were also not reproduced in studies in the same animal strain at similar or higher doses.  Furthermore, even if the high-dose tumors were considered treatment-related, these findings are not considered relevant for human health risk assessment based on the use pattern and potential exposures for glyphosate.

## 5.0    Data Evaluation of Genetic Toxicity

### 5.1    Introduction

Genotoxicity is a broad term for any damage to the genetic material, whether the damage is transient or permanent.  Transient damage refers to unintended modifications to the structure of DNA, which may or may not undergo successful repair.  Permanent damage refers to heritable changes in the DNA sequence, known as mutations.  Types of mutations include: 1) changes in single base pairs, partial, single or multiple genes, or chromosomes, 2) breaks in chromosomes that result in transmissible deletion, duplication or rearrangement of chromosome segments, and 3) mitotic recombination (OECD, 2015).  In somatic cells, DNA-reactive chemicals can cause cancer if the mutations occur within regulatory genes that control cell growth, cell division and differentiation, such as proto-oncogenes, tumor suppressor genes and/or DNA damage response genes (OECD, 2015).  Additionally, DNA damage may signal the cell to undergo apoptosis (cell death) rather than cell division and, therefore, the damage is not "fixed" as a mutation and is not passed along to daughter cells.

Evaluation of genotoxicity data entails a weight-of-evidence approach that includes consideration of the various types of genetic damage that can occur. Since no single genotoxicity assay evaluates the many types of genetic alterations that can be induced by a chemical, one must employ a battery of genotoxicity tests to adequately cover all the genetic endpoints important for regulatory decisions.  EPA, like other regulatory agencies, considers genotoxicity information as part of the weight of evidence when assessing the potential of a chemical to induce cancer in humans. Under FIFRA, OPP requires genotoxicity tests of the technical grade active ingredient for the registration of both food and non-food use pesticides.  The current genotoxicity test battery (40 CFR Part 158.500) for pesticide registration consists of:

> 1) Bacterial reverse mutation test (typically conducted in bacteria strains *Salmonella typhimurium* and *Escherichia coli*),
> 2) *in vitro* mammalian (forward) gene mutation *and in vitro* mammalian chromosomal aberration test, and
> 3) *in vivo* test for micronucleus induction (mammalian erythrocyte micronucleus test) *or in vivo* chromosomal aberration test (mammalian bone marrow chromosomal aberration test).

In cases where equivocal or inconsistent results are obtained for the same endpoint in different test systems, additional testing may be required.  Test Guidelines on how to conduct the genotoxicity tests have been published by the agency and have been harmonized with the Organization for Economic Cooperation and Development (OECD, 2015; Cimino 2006).  These guidelines identify specific test species, genetic endpoints, test conditions, exposure durations as well information on how to report data and interpret the results.  The test guidelines provide a level of consistency and predictability for regulatory compliance and regulatory decision making.

### 5.2    Scope of the Assessment Considerations for Study Quality Evaluation

Previous genotoxicity assessments conducted as part of the CARC reviews for glyphosate in 1991 and 2015, considered only studies conducted with glyphosate technical and included only studies that provided adequate characterization of the test material (*i.e.* purity information provided).  In the current analysis, a fit-for-purpose systematic review process was conducted to identify relevant genotoxicity data from regulatory studies and published literature from open sources (published and unpublished) for both glyphosate technical and glyphosate-based formulations. Studies conducted with glyphosate formulations that were identified and considered relevant for genotoxicity evaluation are summarized in table form in Appendix F.  As described in Section 7.0 of this document, glyphosate formulations are hypothesized to be more toxic than glyphosate alone.  The agency is collaborating with NTP to systematically investigate the mechanism(s) of toxicity for glyphosate and glyphosate formulations.  However the focus of this section is the genotoxic potential of glyphosate technical.

As described previously in Section 2.1.3, the list of studies identified in this process were also cross-referenced with genotoxicity review articles for glyphosate from the open literature [Kier and Kirkland (2013), and Williams *et al.* (2000)], as well as recent international evaluations of glyphosate (IARC 2015, EFSA 2015, JMPR 2016).  The current analysis also includes studies conducted by other registrants that were not previously available to the agency. Sixteen studies for glyphosate technical that were included in Kier and Kirkland (2013) were not available to the agency; therefore, data and study summaries provided in the review articles were relied upon in the current review and are identified in the data tables with a footnote. The Kier and Kirkland (2013) article serves as the original publication for these studies and provided relevant information on study design and conditions as well as summary data.  The data set includes *in vitro* and *in vivo* studies conducted in mammalian systems, with the exception of standard bacterial test strains, which have a long history of detecting chemicals that are mutagenic in humans. Studies conducted in non-mammalian species (e.g. worms, fish, reptiles, plants), were excluded because they were considered to be not relevant for informing genotoxic risk in humans.

When evaluating the quality of the published and unpublished data for inclusion in the analysis, the agency considered the reporting quality (how well a study was reported), the study design and how well the study was conducted.  Critical elements in study design and interpretation for genotoxicity tests are described in the various EPA and OECD test guidelines.  Elements such as test conditions (e.g. solubility, pH, osmolarity, and cytotoxicity) and study design (e.g. number of test organisms, doses selected, use of positive and negative controls; blinded evaluation) were used to evaluate the quality of published and non-published studies.  In cases where inappropriate testing conditions or study design clearly had an impact on the outcome the study, the study was excluded from the analysis.  For example, early studies by Majeska (1982) were excluded from the analysis since it was clearly demonstrated that altered pH by the test chemical can result in false positive responses in several of *in vitro* genotoxicity tests (Majeska, 1985d,e,f).   In other cases, particularly with the published literature studies, where test conditions and/or study design differed from what is generally considered as acceptable following in the EPA or OECD guidelines, the differences are noted, but the studies were not excluded from analysis unless the condition made the study unreliable.  Summaries of relevant genotoxicity studies can be found in TXR# 0057499.  Studies that were excluded from the analysis are listed in Appendix G.

The studies evaluating the genetic toxicity of the active ingredient glyphosate are presented in the following sections according to the type of genetic endpoints evaluated: mutations, chromosomal aberrations and other assays evaluating DNA damage. *In vitro* and *in vivo* assays are discussed separately according to the genetic endpoint. For the purpose of this analysis, glyphosate and its salts are considered together when evaluating the genotoxic potential of the active ingredient glyphosate.

## 5.3    Tests for Gene Mutations for Glyphosate Technical

### 5.3.1    Bacterial Mutagenicity Assays

Bacteria have traditionally been employed as a primary test organism for the detection of chemical mutagens. The bacterial reverse mutation assay is routinely performed in the test strains of *Salmonella typhimurium* and *Escherichia coli*. These test strains are mutant strains that are deficient for the synthesis of an essential amino acid. The assay detects mutations that revert the test strains back to wild type for amino acid synthesis and the revertants are identified by their ability to grow in culture medium deficient of the specific amino acid(s). This mutagenicity test identifies point mutations, which includes base substitutions and deletions and insertions of up to a few base pairs (OECD 471). The tests are typically conducted in the presence and absence of an exogenous source of metabolic activation (e.g., S9 microsomal fraction of activated liver homogenates) to identify potential mutagenic metabolites.

Glyphosate has been extensively evaluated for its potential to induce mutations in bacteria. Most of the studies considered consist of the full battery of bacterial strains (*i.e.* the recommend strains in EPA and OECD Test Guidelines) and were evaluated at appropriate test concentrations (up to cytotoxic or assay limit concentrations).

EPA identified 27 studies that tested glyphosate technical in bacterial mutagenicity assays by means of the standard plate incorporation method or the pre-incubation modification of the standard assay. Glyphosate was negative in the presence and absence of metabolic activation in all the studies. The results of the bacterial reversion mutation assays evaluating glyphosate technical are presented in Table 5.1

**Table 5.1.** *In vitro* **Test for Gene Mutations in Bacteria: Glyphosate Technical.**

| Test/Endpoint | Test System | Concentrations | Purity | Results | Reference | Comments |
|---|---|---|---|---|---|---|
| Bacterial Reverse Mutation | *S. typhimurium* TA1535, TA1537, TA98 and TA100 and WP *uvrA* ± S9 | 156-5000 µg/plate | 95.68% | Negative ± S9 | Akanuma (1995) [MRID 50017102] | |
| Bacterial Reverse Mutation | *S. typhimurium* TA535, TA1537, TA98 and TA100 and *E. coli* WP2P and WP2P *uvrA* ± S9 | 100-5000 µg/plate in DMSO | 95.6% glyphosate acid | Negative ± S9 | Callander (1996) [MRID 44320617] | |
| Bacterial Reverse Mutation | *S. typhimurium* TA 1535, TA1537, TA98 and TA100 and *E. coli* WP2P and WP2P *uvrA* ± S9 | 100-5000 µg/plate in water | 60% potassium glyphosate salt | Negative ± S9 | Callander (1999)[1] | |
| Bacterial Reverse Mutation | *S. typhimurium* TA97a, TA98, TA100 and TA102, ± S9 | 25-2000 µg in aqueous solution | Not provided | Negative ± S9 | Chruscielska *et al.* (2000) | |
| Bacterial Reverse Mutation | *S. typhimurium* TA98, TA100, TA1535, TA1537 ± S9 | 10-1000 µg/plate | 98.4% | Negative ± S9 | Flowers and Kier (1978) [MRID 00078620] | |
| Bacterial Reverse Mutation | *S. typhimurium* TA98, TA100, TA102, TA1535, TA1537 ± S9 | 31.6-3160 µg/plate | 98.8% | Negative ± S9 | Flügge (2009a)[1] | |
| Bacterial Reverse Mutation | *S. typhimurium* TA98, TA100, TA102, TA1535, TA1537 ± S9 | 31.6-3160 µg/plate | 96.4% technical | Negative ± S9 | Flügge (2010b)[1] | |
| Bacterial Reverse Mutation | *S. typhimurium* TA1535, TA1537, TA98 and TA100 | 310-5000 µg/plate (+S9); 160-2500 µg/plate (−S9) | 98.6% | Negative ± S9 | Jensen (1991a) [MRID 49961502] | |
| Bacterial Reverse Mutation | *S. typhimurium* TA98, TA100, TA102, TA1535, TA1537 ± S9 | 1-1000 µg/plate | 98.05% | Negative ± S9 | Miyaji (2008)[1] | |
| Bacterial Reverse Mutation | *S. typhimurium* TA98, TA100, TA1535, TA1537, TA1538 ± S9 | 5000 µg/plate | Not reported | Negative ± S9 | Moriya et al. (1983) | |
| Bacterial Reverse Mutation | *S. typhimurium* TA1535, TA97, TA98 and TA100 ± S9 | 33-10,000 µg/plate | 99% | Negative ± S9 | NTP (1992) | Hamster and rat S9 |

**Table 5.1.  *In vitro* Test for Gene Mutations in Bacteria: Glyphosate Technical.**

| Test/Endpoint | Test System | Concentrations | Purity | Results | Reference | Comments |
|---|---|---|---|---|---|---|
| Bacterial Reverse Mutation | *S. typhimurium* TA98, TA100, TA1535 and TA97a ± S9 | 1-5000 µg/plate | 61.27 % Glyphosate isopropyl-amine salt | Negative ± S9 | Ranzani (2000)[1] | |
| Bacterial Reverse Mutation | *S. typhimurium* TA98, TA100, TA102, TA1535, TA1537 ± S9 | 648-5000 µg/plate | 98.01% | Negative ± S9 | Ribeiro do Val (2007) [MRID 50000903] | |
| Bacterial Reverse Mutation | *S. typhimurium* TA98, TA100, TA1535, TA1537 and *E. Coli* WP2 *uvrA* ± S9 | 31.6-5000 µg/plate | 96.0% technical | Negative ± S9 | Schreib (2010)[1] | |
| Bacterial Reverse Mutation | *S. typhimurium* TA1535, TA1537, TA1538, TA98, TA100 and *E. coli* WP2 *hcr* ± S9 | 10-5000 µg/plate | 98.4% | Negative ± S9 | Shirasu *et al*. (1978) [MRID 00078619] | Published in Li & Long, 1988 |
| Bacterial Reverse Mutation | *S. typhimurium* TA98, TA100, TA1535, TA1537 and *E. coli* WP *uvrA* ± S9 | 3-5000 µg/plate (plate-incorporation), 33-5000 µg/plate (pre-incubation test) | 95.1% | Negative ± S9 | Sokolowski (2007a) [MRID 49957406] | |
| Bacterial Reverse Mutation | *S. typhimurium* TA98, TA100, TA1535, TA1537 and *E. coli* WP *uvrA* ± S9 | 3-5000 µg/plate (plate–incorporation) 33 – 5000 µg/plate (pre-incubation test) | 97.7% | Negative ± S9 | Sokolowski (2007b) [MRID 49957407] | |
| Bacterial Reverse Mutation | *S. typhimurium* TA98, TA100, TA1535, TA1537 and *E. coli* WP *uvrA* ± S9 | 3-5000 µg/plate (plate–incorporation) 33-5000 µg/plate (pre-incubation test) | 95.0% | Negative ± S9 | Sokolowski (2007c) [MRID 49957408] | |
| Bacterial Reverse Mutation | *S. typhimurium* TA98, TA100, TA1535, TA1537 and *E. coli* WP *uvrA* ± S9 | 3-5000 µg/plate | 96.66% technical | Negative ± S9 | Sokolowski (2009a)[1] | |
| Bacterial Reverse Mutation | *S. typhimurium* TA98, TA100, TA1535, TA1537 and *E. coli* WP2 *uvrA* pKM 101 and WP2 pKM 101 ± S9 | 3-5000 µg/plate | 96.3% glyphosate acid | Negative ± S9 | Sokolowski (2009b) [MRID 49961801] | |
| Bacterial Reverse Mutation | *S. typhimurium* TA98, TA100, TA1535, TA1537 and *E. coli* WP *uvrA* ± S9 | 3-5000 µg/plate | 97.16 % | Negative ± S9 | Sokolowski (2010) [MRID 50000902] | |

**Table 5.1.  *In vitro* Test for Gene Mutations in Bacteria: Glyphosate Technical.**

| Test/Endpoint | Test System | Concentrations | Purity | Results | Reference | Comments |
|---|---|---|---|---|---|---|
| Bacterial Reverse Mutation | *S. typhimurium* TA98, TA100, TA1535, TA1537, TA1538 ± S9 | 1-1000 µg/plate | 96.0% | Negative ± S9 | Suresh (1993a)[1] | |
| Bacterial Reverse Mutation | *S. typhimurium* TA98, TA100, TA1535, TA1537 and *E. coli* WP *uvrA* ± S9 | 0-5000 µg/plate | 95.3% | Negative ± S9 | Thompson (1996) [MRID 49957409] | |
| Bacterial Reverse Mutation | *S. typhimurium* TA98, TA100, TA102, TA1535, TA1537 ± S9 | 31.6-5000 µg/plate | 98.2% | Negative ± S9 | Wallner (2010)[1] | |
| Bacterial Reverse Mutation | *S. typhimurium*  TA98 and TA100 ± S9 | 25 µg/plate | Not reported | Negative ± S9 | Wilderman and Nazar (1982) | Rat S9 and plant cell-free homogenates were used for  metabolic activation |
| Bacterial Reverse Mutation | *S. typhimurium*  TA1535, TA1537, TA1538, TA98 and TA100 ± S9 | 0.12-10 mg/plate –S9 0.56-15 mg/plate +S9 | 90% glyphosate trimesium salt | Negative ± S9 | Majeska et al. (1982a) [MRID 00126612] | |
| Bacterial Reverse Mutation | *S. typhimurium*  TA1535, TA1537, TA98 and TA100 ± S9 | 0.005-50 µL/mL | 55.6% glyphosate trimesium salt | Negative ± S9 | Majeska (1985a) [MRID 00155527] | |

[1] Study was cited in Kier and Kirkland (2013).  Supplementary information about the study was provided online including test guideline, test material purity, control chemicals and summary data tables.

### 5.3.2   *In vitro* Tests for Gene Mutations in Mammalian Cells

*In vitro* gene mutation studies in mammalian cells are conducted in cell lines with reporter genes for forward mutations.  The most common reporter genes are the endogenous thymidine kinase (TK) gene, endogenous hypoxanthine-guanine phosphoribosyl transferase (HPRT) gene and the xanthine-guanine phosphoribosyl transferase transgene (XPRT).  Mutations that occur within these reporter genes result in mutant cells that are resistant to the cytotoxic effect of the pyrimidine analogue trifluorothymidine (for TK) or the purine analogue 6-thioguanine (for HPRT and XPRT) (OPPTS 870.5330).  Suitable cell lines for this assay include L5178Y mouse lymphoma cells, Chinese hamster ovary (CHO) cells, hamster AS52 and V79 lung fibroblasts and human TK6 lymphoblastoid cells.  Similar to other *in vitro* assays, chemicals are tested both in the presence and absence of S9 metabolic activation.

A total of four studies were conducted for (forward) mutations in mammalian cells (Table 5.3).  Three studies were conducted with a high purity concentration of glyphosate technical ($\geq$95.6%) and the remaining study was performed with glyphosate trimesium salt.   In four of the assays, mouse lymphoma L5178Y TK$^{+/-}$ cells were the target organism and one was conducted in CHO cells with the HPRT endpoint.  Glyphosate technical and the glyphosate trimesium salt were negative in the mouse lymphoma cell assays (Jensen, 1991b; Clay, 1996; Majesak, 1985b) when tested up to the current guideline limit concentration and glyphosate was negative in CHO/HPRT cells when tested up to cytotoxic concentrations (Li, 1983a).

**Table 5.2.  *In vitro* Mammalian Gene Mutation Assays: Glyphosate Technical.**

| Test/Endpoint | Test System | Concentrations/ Conditions | Test Material Purity | Results | Reference | Comments |
|---|---|---|---|---|---|---|
| Gene Mutations in Mammalian Cells | Mouse lymphoma L5178Y TK$^{+/-}$ cells ± S9 | 296-1000 µg/mL | 95.6% | Negative | Clay (1996)[1] | Relative survival was 90% (-S9) and 57% (+S9) at top concentration |
| Gene Mutations in Mammalian Cells | Mouse lymphoma L5178Y TK$^{+/-}$ cells ± S9 | 520–4200 µg/mL (+S9); 610–5000 µg/mL (-S9) | 98.6% | Negative | Jensen (1991b) [MRID 49961504] | Reported no significant reduction in cloning efficiency at any concentration. |
| Gene Mutations in Mammalian Cells | Chinese hamster ovary (CHO) cells, HPRT locus ± S9 | 500–25000 µg/mL (+S9); 500-22500 µg/mL (-S9) | 98.7% | Negative | Li (1983a); [MRID 00132681] | Tested S9 from 1-10% Cytotoxic at 22.5 mg/mL (-S9, and with 1,2 and 10% S9) and at 17.5 mg/ml (10% S9) |
| Gene Mutations in Mammalian Cells | Mouse lymphoma L5178Y TK$^{+/-}$ cells ± S9 | 1-5 µl/mL | 55.6% *Glyphosate trimesium salt* | Negative | Majeska (1985b) [MRID 00155530] | Negative with pH adjusted |

[1] Study was cited in Kier and Kirkland (2013).  Supplementary information about the study was provided online including test guideline, test material purity, control chemicals and summary data tables.

## 5.4    *In vitro* Tests for Chromosomal Abnormalities

Cytogenetic assays are tests that can detect chemicals that cause structural chromosomal damage (clastogenicity) or affect the segregation of chromosomes during cell division and alter chromosome number (aneuploidy).  Generally, there are two types of *in vitro* cytogenetic assays that identify chemicals inducing chromosomal abnormalities: chromosomal aberration assays and micronucleus assays. Although chromosomal damage observed in these assays are not considered heritable mutations, chemicals that can induce these types of chromosomal damage can also induce transmissible mutations to daughter cells indicating their role in cancer (Yauk *et al.*, 2015; OECD 2015). In addition, assays such as (fluorescence *in situ* hybridization (FISH)) can provide additional mechanistic information on the formation of chromosomal abnormalities. It is important to note that factors such as cytotoxicity, solubility of the test substance, changes in pH or osmolality play a significant role in the outcome of the assay.  Like other *in vitro* assays, compounds are generally tested in the presence or absence of S9 metabolic activation to determine if metabolism affects the genotoxic activity of the parent compound and to determine if potential genotoxic metabolites are formed.

### 5.4.1    *In vitro* Mammalian Chromosomal Aberration Test

Chromosomal aberration assays detect both structural chromosomal and numerical aberrations. Structural chromosomal aberrations are of two types: chromatid and chromosome and include breaks, deletions and rearrangements (OPPTS 870.5375, OECD 2015).  Numerical chromosomal aberrations generally results from the loss of an entire chromosome mostly due to damage in the spindle fiber resulting in aneuploidy. The types of cells that are most commonly used in chromosomal aberration assays include established cell lines such as Chinese hamster lung (CHL) and CHO cells or primary cell cultures such as human or other mammalian peripheral blood lymphocytes.  In this assay, cells are typically sampled at a time equivalent to the length of approximately 1.5 cell cycles from the start of treatment.  Prior to harvesting, cells are treated with Colcemid® or colchicine to arrest cells at the first metaphase stage of the cell cycle following the beginning of exposure to the test article.  Once harvested, the cells are stained and metaphase cells are evaluated microscopically for various types of chromosome aberrations. (OECD TG 473). Data should be presented in a way that indicates the percentage of affected cells in the population of cells scored (e.g., % cells with aberrations or # aberrant cells/100 cells). Gaps should not be included in the analysis; they are scored but gaps alone in the absence of any additional chromosomal aberrations (e.g., a fragment or a ring chromosome) are not sufficient to define a cell as aberrant.

Glyphosate technical was evaluated in eight chromosomal aberrations tests to determine its potential to induce clastogenic effects *in vitro*. The findings are presented in Table 5.3.  Six of the eight studies were negative.  The two positive studies were both from the same laboratory where, Lioi *et al*. reported an increase in chromosomal aberrations at glyphosate concentrations of 8.5μM and above in bovine lymphocytes (Lioi et al., 1998b) and at all concentrations of glyphosate tested (7-170 μM) in human lymphocytes (Lioi et al., 1998a) following a 72-hour exposure period.  No chromosomal aberrations were observed as a result of exposure to glyphosate in one study using CHO cells (Majeska, 1985c) and in two studies with CHL cells

(Matsumoto, 1995; and Wright, 1996).  Sivikova and Dianovsky (2006) reported no statistically significant increases in chromosomal aberrations in bovine lymphocytes treated with glyphosate (62% pure) at concentrations up 1120 μM following 24-hour exposure. (Sivikova and Dianovsky, 2006).  In studies conducted with human lymphocytes treated with glyphosate (≥95%) for 24-96 hours at concentrations, no increase in chromosomal aberrations were seen at concentrations as high as 6000 μM (Fox, 1998; and Manas *et al*., 2009).

### 5.4.2   *In vitro* Mammalian Micronucleus Test

The *in vitro* micronucleus test can detect the induction of micronuclei in the cytoplasm of cells in the interphase stage of the cell cycle.  Micronuclei form from acentric chromosome fragments (i.e., chromosome fragments lacking a centromere) or when whole chromosomes are unable to migrate to the cellular poles during anaphase prior to cell division. (OECD 487).  Thus, the micronucleus assay can detect both structural and numerical chromosomal changes. It should be noted, however, that additional work is required to distinguish whether induced micronuclei have arisen from a clastogenic versus an aneugenic mechanism, *e.g.*, staining micronuclei to detect the presence of kinetochore proteins.  The assay is typically performed with cell lines or primary cell cultures of human or rodent origin.  The assay can be conducted with the addition of cytochalasin B which inhibits cytokinesis resulting in the formation of binucleated cells.  The presence of binucleated cells, indicates that cells have undergone one round of mitosis, a necessary prerequisite for micronucleus formation.

Six studies evaluated glyphosate technical for its potential to induce micronuclei *in vitro* (Table 5.4). Four of the six studies were positive and the remaining two studies were equivocal. In a study by Koller *et al*. (2012), TR146 cells (derived from a human neck metastasis of buccal epithelial origin) were treated for 20 minutes with up to 20 mg/L (~0.12 mM) glyphosate (95%), the authors reported a statistically significant increase in binucleated cells with micronuclei at 15 (~0.09 mM) and 20 (~0.12 mM) mg/L, and also indicated significant apoptosis and necrosis at 20 mg/L.  The short exposure period in this study was unusually short (20 minutes) and was conducted in a tumor cell line that had not been well characterized in regards to its degree of chromosomal instability and DNA damage and repair capacity.  In another study, Roustan *et al*. (2014) reported positive findings +S9 only in CHO cells treated with glyphosate (unknown purity) at 10- 100 μg/mL with little evidence of a dose response over that concentration range.

Two other studies evaluated glyphosate technical in human lymphocytes (Mladinic *et al*., 2009a, 2009b).  These studies used an exposure protocol that is different from the OECD recommendations for the *in vitro* micronucleus assay.  OECD recommends that whole blood or isolated lymphocytes are cultured in the presence of a mitogen (e.g. phytohemagglutinin; PHA) prior to exposure of a test chemical in order to detect micronuclei formed via an aneugenic mechanism.  However, in these two studies, blood cells were exposed to glyphosate for 4 hours, washed, and then treated with PHA to stimulate cell division. Both studies reported a statistically significant increase in micronucleated cells at 580 μg/mL (~3.4 mM), but not at lower concentrations, following 4-hour exposures in the presence of S9.  The frequency of micronucleated cells (+S9) ranged from 11.3 to 28.7 in one study (Mladinic *et al*., 2009a) and 33.3 to 65.2 in the other study (Mladinic *et al*., 2009b) over the 1000-fold concentration range. No statistically significant increases in micronucleated cells were seen in either study in the absence of S9 activation.  When cells were evaluated with vital stains, cells treated with 580

µg/mL showed a significant (p<0.05) increase in the percentage of cells undergoing apoptosis and necrosis compared to the negative controls.

Piesova et al. (2004, 2005) conducted two *in vitro* micronucleus studies using glyphosate technical (62%) up to 560 uM in bovine lymphocytes.  In the 2004 study, bovine lymphocytes from two donors were treated for 24 or 48 hours without S9 metabolic activation, and for 2 hours (with and without S9 activation) or 48 hours (-S9) in the 2005 study.  Both studies yielded similar results following 48-hour exposure to glyphosate.  In both cases, the authors reported a weak induction of micronuclei in one donor at 280 µM and at 560 µM in the second donor.  The induction was approximately 2-fold (p < 0.05), but with no clear dose response. No effects on micronuclei induction were seen at the 2- or 24-hour time points; however, with these early time points it is unlikely that one cell division has occurred during or after treatment. .

**Table 5.3.** *In vitro* Tests for Chromosome Aberrations in Mammalian Cells- Glyphosate Technical

| Test/Endpoint | Test System | Concentrations/ Conditions | Test Material Purity | Results | Reference | Comments |
|---|---|---|---|---|---|---|
| *In vitro* Chromosomal Aberration | Chinese hamster ovary (CHO) cells | 4-10 µl/mL, ± S9 | 55.6% *Glyphosate trimesium salt* | Negative | Majeska (1985c) [MRID 00155530] | pH adjusted (7.4-7.6) |
| *In vitro* Chromosomal Aberration | Chinese Hamster lung (CHL) cells | ±S9: 0, 250, 500, 1000 and 2000 µg/mL; 24 and 48 h treatment - S9; 6 h treatment  ±S9 harvest 24 h | 95.68% | Negative | Matsumoto (1995) [MRID 50017106] | Decline in pH noted at 500 and 1000 µg/mL. |
| *In vitro* Chromosomal Aberration | Chinese hamster lung (CHL) cells | -S9: 24 & 48-hr exposure: 0-1250 µg/mL; +S9: 0-1250 µg/mL | 95.3% | Negative | Wright (1996) [MRID 49957410] | Excessive decrease in pH >1250 µg/mL |
| *In vitro* Chromosomal Aberration | Bovine lymphocytes | -S9 only: 0, 7, 85 and 170 µM; 72 h exposure | ≥98% | Positive (all concs.) | Lioi *et al*. (1998b) | |
| *In vitro* Chromosomal Aberration | Bovine lymphocytes | ±S9: 0, 28, 56, 140, 280, 560 and 1120 µM; 24 h exposure | 62.0% | Negative | Sivikova and Dianovsky (2006) | Decreased MI and PI at ≥ 560 µM |
| *In vitro* Chromosomal Aberration | Human lymphocytes | ±S9: 100-1250 µg/mL cultures analyzed; 68 & 92 h | 95.6% | Negative | Fox (1998) [MRID 49961803] | Excessive decrease in pH >1250 µg/mL |
| *In vitro* Chromosomal Aberration | Human lymphocytes | -S9 only: 0, 5.0, 8.5, 17.0 and 51.1 µM; 72 h exposure | ≥98% | Positive ≥ 8.5 µM | Lioi *et al*.  (1998a) | No significant ↓ in MI observed. |
| *In vitro* Chromosomal Aberration | Human lymphocytes | -S9: 0, 200, 1200 and 6000 µM; 48 h exposure | 96.0% | Negative | Manas *et al*. (2009) | No toxicity observed up to 6000 µM |

[1] Study was cited in Kier and Kirkland (2013).  Supplementary information about the study was provided online including test guideline, test material purity, control chemicals and summary data tables.

CA= chromosomal aberrations, MI= mitotic index, PI= proliferation index.

**Table 5.4.  *In vitro* Tests for Micronuclei Induction in Mammalian Cells- Glyphosate Technical**

| Test/Endpoint | Test System | Concentrations/ Conditions | Test Material Purity | Results | Reference | Comments |
|---|---|---|---|---|---|---|
| *In vitro* Cytokinesis Block Micronucleus Assay (with FISH analysis) | TR146 cells (human-derived buccal carcinoma cell line) | 10, 15 and 20 mg/L; 20 minute exposure. | 95% | Positive<br><br>Statistically significant (p<0.05) increase in MN at 15 and 20 mg/L. | Koller *et al.* (2012) | Apoptosis and necrosis reported at 20 mg/L<br><br>Also reported ↑ in NB and NPB |
| *In vitro* Cytokinesis Block Micronucleus Test | CHO-K1 cells | 5 - 100 µg/mL, ±S9 | Not stated | Negative –S9 Positive +S9 at 10-100 µg/mL | Roustan et al., (2014) | No clear dose response |
| *In vitro* Cytokinesis Block Micronucleus Test | Bovine lymphocytes (2 donors) | 0, 28, 56, 140, 280 and 560 µM 24 & 48 h exposure | 62% | 24 h: Negative<br><br>48 h: Equivocal<br><br>↑ MN at  280 µM only (donor A) ↑ MN at  560  µM only (donor B) | Piesova, 2004 | No dose-response No significant decrease in CBPI observed. |
| *In vitro* Cytokinesis Block Micronucleus Test | Bovine lymphocytes (2 donors) | 0, 28, 56, 140, 280 and 560 µM; 2 h (±S9) and 48 h (-S9) exposure | 62% | 2 h: Negative<br><br>48 h: Equivocal<br><br>↑ MN at  280 µM only (donor A) and at  560  µM only (donor B) | Piesova, 2005 | No dose-response; No significant decrease in CBPI observed. Metabolic activation had no effect on MN formation after 2 h exposure. |

**Table 5.4.** *In vitro* Tests for Micronuclei Induction in Mammalian Cells- Glyphosate Technical

| Test/Endpoint | Test System | Concentrations/ Conditions | Test Material Purity | Results | Reference | Comments |
|---|---|---|---|---|---|---|
| *In vitro* Cytokinesis Block Micronucleus Assay (with FISH analysis) | Human lymphocytes (treated with cytochalasin B) | 4h treatment ±S9; 0.5, 2.91, 3.50, 92.8 and 580 µg/mL; harvested 72 h | 98.0% | Negative –S9<br><br>Positive +S9, ↑ MN at 580 µg/mL, but not at 0.5-92.8 µg/mL<br><br>Also observed ↑ in NB at 580 µg/mL (±S9); ↑ NPB at 580 µg/mL (+S9) | Mladinic *et al.* (2009a) | Cells were exposed to glyphosate and washed prior to treatment with PHA. Authors did not report being blind to treatment. |
| *In vitro* Cytokinesis Block Micronucleus Assay (with FISH analysis) | Human lymphocytes (treated with cytochalasin B) | 4h treatment ±S9; 0.5, 2.91, 3.50, 92.8 and 580 µg/mL | 98% | Negative –S9<br><br>Positive +S9 ↑ MN at 580 µg/mL, but not at 0.5 -92.8 µg/mL<br><br>↑ apoptosis and necrosis at 580 µg/mL (-S9); ↑ apoptosis at ≥ 2.91 µg/mL and necrosis at 580 µg/mL (+S9)<br><br>↑ in NB at 580 µg/mL (±S9) and NPB at 580 µg/mL (+S9) | Mladinic *et al.* (2009b) | Cells were exposed to glyphosate and washed prior to treatment with PHA. Authors did not report being blind to treatment.<br><br>. |

CBPI= cytokinesis block proliferation index, FISH= fluorescent in situ hybridization; MN= micronuclei; NB= nuclear buds; NPB= nucleoplasmic bridges.

### 5.5    *In Vivo* Genetic Toxicology Tests

#### 5.5.1    *In Vivo* Assays for Chromosomal Abnormalities

##### 5.5.1.1        Mammalian Bone Marrow Chromosomal Aberration Assays

The *in vivo* mammalian bone marrow chromosomal assay detects the ability of a chemical to cause structural chromosomal damage in cells in the bone marrow.  The assay is typically conducted in rodents (mouse or rat) and detects both chromosome-type and chromatid-type aberrations.  Chromatid-type aberrations are expressed when a single chromatid break occurs and/or a reunion between chromatids, and chromosome-type aberrations result from damage expressed in both sister chromatids (OPPTS 870.5385).  In this test, animals are exposed (typically via oral route or intraperitoneal injection) and sacrificed at sequential intervals.  Prior to sacrifice, animals are treated with a spindle inhibitor such as colchicine or Colcemid® to arrest cells at metaphase. Chromosome preparations from the bone marrow are stained and scored for chromosomal aberrations. (OPPTS 870.5385). Generally, the optimal time to detect chromosomal aberrations in the bone marrow is 24 hours after treatment.

Three *in vivo* mammalian bone marrow chromosomal assays were conducted with glyphosate technical for regulatory purposes and all were negative (Table 5.8).  In the first study, Sprague Dawley rats were administered glyphosate (98%) at 0 or 1000 mg/kg and the bone marrow was sampled at 6, 12 or 24 hours after dosing.  No significant increase in bone marrow chromosomal aberrations were observed (Li, 1983b).  In the second study, Swiss albino mice were treated twice by oral gavage (24 hours apart) with 0 or 5000 mg/kg glyphosate technical (96.8%) resulting in no significant increase in bone marrow chromosomal aberrations (Suresh, 1994). In a third study conducted with glyphosate trimesium salt, no increase in chromosomal aberrations were seen in the bone marrow of rats treated by oral gavage with up to 188 mg/kg (Majeska, 1982c).

##### 5.5.1.2        Rodent Dominant Lethal Test

Dominant lethal mutations cause embryonic or fetal death.  The induction of a dominant lethal mutation after exposure to a chemical indicates that the test chemical has affected the germinal tissue (sperm at some point in development, from stem cell to spermatocyte).  Dominant lethal effects are considered to result from chromosomal damage (structural or numerical), but may also reflect gene mutations or systemic toxicity (OPPTS 870.5450, OECD 2016).  In this test, male rodents are treated with the test material and mated with (untreated) virgin females.  The females animals are sacrificed at an appropriate time and the uteri are examined to determine the number of implants, and live and dead embryos.  Two dominant lethal studies were identified. One study was conducted in the rat (Suresh, 1992) where male rats were dosed by oral gavage with glyphosate up to 5000 mg/kg.  The other study (Rodney, 1980) was conducted in male mice treated with up to 2000 mg/kg glyphosate (98.7%) by oral gavage.  No significant increase in dominant lethal mutations were observed in either study (Table 5.5).

### 5.5.1.3        *In Vivo* Mammalian Erythrocyte Micronucleus Assays

The mammalian micronucleus test is the most commonly conducted *in vivo* test to detect clastogenic or aneugenic chemicals.  The test identifies chemicals that induce micronuclei in proerythrocytes (progenitor cells) by assessing micronucleus frequency in immature erythrocytes (polychromatic erythrocytes, PCEs) sampled from the bone marrow or from the peripheral blood (reticulocytes).  This test is typically conducted in mice or rats.  When bone marrow erythroblasts develop into erythrocytes, the main nucleus is extruded following the final cell division (erythrocytes are the only mammalian cell that does not contain a nucleus). Any micronuclei formed after the final cell division may remain in the cytoplasm following extrusion of the main nucleus.  The visualization of micronuclei is facilitated by the lack of a nucleus in these cells (OPPTS 870.5395, OECD 474).  Micronuclei can originate from acentric chromosomes, lagging chromosome fragments, or whole chromosomes; thus, micronuclei are biomarkers of both altered chromosome structure or chromosome number. The assay is based on an increase in the frequency of micronucleated erythrocytes in treated animals, in either peripheral blood samples or bone marrow samples (OPPTS 870.5395).  Additional mechanistic information on the formation of chromosomal abnormalities can be obtained from the incorporation of centromeric and telomeric fluorescent probes (FISH) assay.  .  According to EPA test guidelines, a single dose of the test substance may be used in this test if the dose is the maximum tolerated dose (MTD), a dose that produces some indication of bone marrow cytotoxicity (e.g., a reduction in the proportion of immature erythrocytes (PCEs) to total erythrocytes by >50%) or a maximum limit dose of 5000 mg/kg.  The routes of administration for this test are typically oral or intraperitoneal injection and generally involve a single administration.

Glyphosate technical has been extensively evaluated for micronuclei induction in *in vivo* studies. Fourteen studies were conducted for regulatory purposes, four were identified from the open literature, and one study was conducted by the U.S. National Toxicology Program (NTP).  This included nine studies with administration of glyphosate by the intraperitoneal (i.p.) route and 10 studies by the oral route.  The findings are presented in Table 5.10.  Of the nine i.p. studies, seven (Costa, 2008; Chruscielska *et al.*, 2000; Durward, 2006; Gava, 2000; Marques, 1999; Rank *et al.*, 1993 and Zaccaria, 1996) were negative.  These studies tested doses as high as 2016 mg/kg (single and double administration) with sampling times at 24 and 48 hours post-dose. Two positive findings were reported when glyphosate technical was administered by i.p. Bolognesi *et al.* (1997) reported a significant increase in micronuclei in the bone marrow of male Swiss CD mice 24 hours after i.p. treatment with 300 mg/kg glyphosate technical (99.9%).  The dose in this study was administered as ½ dose (150 mg/kg) injections 24 hours apart to 3 male mice.  Manas *et al.* (2009) evaluated glyphosate technical (96%) in BALB/c male and female mice (5/sex/dose) administered 50, 100 or 200 mg/kg by two i.p. injections, 24 hours apart.  The results showed a significant increase in micronucleated erythrocytes at 200 mg/kg, but not at 50 or 100 mg/kg.  It should be noted that doses that resulted in the positive responses in these two studies were above the reported i.p. LD50 value (130 mg/kg) for glyphosate in mice (NTP 1992).

Glyphosate technical was also evaluated in nine micronucleus assays with administration by the oral route in mice and one in the rat. Eight of the nine oral studies in the mouse were negative for micronuclei induction. The single positive response was seen in female mice treated with two 5000 mg/kg (limit dose) doses, 24 hours apart with bone marrow sampling at 24 hours post-dose (Suresh, 1993b). No increase was observed at lower doses (50 and 500 mg/kg) in females or at any dose in males. The eight negative oral studies in mice included single dose administrations of 5000 mg/kg and bone marrow analysis at 24, 48, and/or 72 hours (Jensen, 1991c; Fox and Mackay, 1996) and one or two administrations of glyphosate technical with top doses between 30 and 2000 mg/kg (Honarvar, 2005; Honarvar, 2008; Jones, 1999; and Zoriki-Hosmi, 2007). It should be noted that evaluations at 48 and 72 hours post dose may be too late to detect chemically-induced micronucleated PCEs in the bone marrow as these cells may have already migrated into the peripheral blood. No significant increase in micronucleated erythrocytes were seen in male or female mice following 13-weeks of dietary (feed) administration of glyphosate technical at doses up to 3393 mg/kg/day (NTP, 1992). In the single study that evaluated micronuclei induction in rats, glyphosate technical did not induce significant induce micronuclei in CD1 rats treated by oral gavage at doses up to 2000 mg/kg (Flügge, 2009b). When glyphosate trimesium salt was evaluated, no increase in micronuclei induction was seen in mice treated orally up to 1100 and 800 mg/kg in males and females, respectively (Majeska, 1987).

**Table 5.5.  *In Vivo* Tests for Chromosomal Aberrations in Mammals- Glyphosate Technical.**

| Test/Endpoint | Test System | Route of Administration | Doses | Test Material Purity | Results | Reference | Comments |
|---|---|---|---|---|---|---|---|
| Bone Marrow Chromosomal Aberration Test | Sprague Dawley rats (males and females) | Intraperitoneal injection; sampled at 6, 12 and 24 h after treatment | 0, 1000 mg/kg (6/sex/dose/sampling time) | 98% | Negative | Li  (1983b) [MRID 00132683] | No toxicity observed. A separate study using $^{14}C$-glyphosate showed that glyphosate reaches BM 0.5 h after dosing with ½ life elimination at 7.6 h. Peak BM value was 400 ppm, corresponding to 2000 ppm plasma value. |
| Bone Marrow Chromosomal Aberration Test | Sprague Dawley rats (males and females) Vehicle: distilled water | Oral gavage, sampling after 6, 12, 24, 48 h and 5 d | 0, 21, 63 and 188 mg/kg | 58.5% *Glyphosate trimesium salt* | Negative | Majeska (1982c) [MRID 00132176] | |
| Bone Marrow Chromosomal Aberration Test | Swiss Albino mice (males and females) Vehicle: peanut oil | Oral gavage (2 treatments, 24 h apart); sampling after 24 h (last treatment) | 0, 5000 mg/kg (5/sex/dose) | 96.8% | Negative | Suresh (1994) [MRID 49987408] | Significant (p<0.05) decrease in bw of females at high dose. |
| Rodent Dominant Lethal Test | CD-1 mice Each dosed male mated with 2 females/week for 8 weeks | Oral gavage | 0, 200, 800, and 2000 mg/kg | 98.7% | Negative | Rodwell (1980) [MRID 00046364] | |
| Rodent Dominant Lethal Test | Wistar rat Each dosed male mated with 1 female/week for 10 weeks | Oral gavage | 0, 200, 100 and 5000 mg/kg | 96.8% | Negative | Suresh (1992) [MRID 49987404] | |

**Table 5.6. In Vivo Tests for Micronuclei Induction in Mammals- Glyphosate Technical.**

| Test/Endpoint | Test System | Route of Administration | Doses | Test Material Purity | Results | Reference | Comments |
|---|---|---|---|---|---|---|---|
| Bone Marrow Micronucleus Test | Swiss CD1 mice (males only) | Intraperitoneal injection; 2 injections of half the dosage of 300 mg/kg 24 h apart; sampling at 6 and 24 h | 0, 300 mg/kg (3/dose) | 99.9% | Positive<br><br>Stat significant increase in MN at 24 h | Bolognesi *et al.* (1997) | Material and methods indicate 3 animals/dose; however, Table 1 of article indicates 4 animals were evaluated. |
| Bone Marrow Micronucleus Test | Balb C mice (males and females) Vehicle: Saline | Intraperitoneal Injection (two injections, 24 h apart); sampling after 24 h (last treatment) | 0, 50, 100, and 200 mg/kg (5/sex/dose) | 96% | Positive<br><br>↑MN at 200 mg/kg, but not at 50 or 100 mg/kg | Manas *et al.* (2009) | No significant signs of toxicity observed. |
| Bone Marrow Micronucleus Test | C3H mice (males only) Vehicle: water | Intraperitoneal Injection (single treatment); sampling after 24, 48 and 72 h | 0, 300 mg/kg | Not reported | Negative | Chruscielska *et al.* (2000) | |
| Bone Marrow Micronucleus Test | Swiss Albino mice (males and females) Vehicle: corn oil | Intraperitoneal Injection (2 treatments, 24 h apart); sampling after 24 h (last treatment) | 0, 15.62, 31.25, and 62.5 mg/kg (5/sex/dose) | 980 g/kg Glyphosate technical | Negative# | Costa (2008)[1] | OECD guideline 474<br><br>#Was not tested up to limit dose and did not demonstrate that compound was tested up to toxic dose. No mention of BM toxicity or clinical signs. |

**Table 5.6.  In Vivo Tests for Micronuclei Induction in Mammals- Glyphosate Technical.**

| Test/Endpoint | Test System | Route of Administration | Doses | Test Material Purity | Results | Reference | Comments |
|---|---|---|---|---|---|---|---|
| Bone Marrow Micronucleus Test | Crl:CD-1TM(ICR) BR mice (males only[1]) Vehicle: PBS | Intraperitoneal Injection (single treatment); sampling after 24 and 48 h (high dose only) | 0, 150, 300 and 600 mg/kg (7/dose) | 95.7% | Negative | Durward (2006) [MRID 49957411] | Clinical signs reported at ≥ 150 mg/kg. Significant ↓ in %PCEs reported at 24 h in 600 mg/kg group. ↑in MN PCEs observed at 600 mg/kg (1.9± 0.7 vs. 1.0 ± 1.2 control; p<0.05), at 24 h, but not 48 h, within historical control range. |
| Bone Marrow Micronucleus Test | Swiss Albino mice (males and females) Vehicle: water | Intraperitoneal Injection (2 treatments, 24 h apart); sampling after 24 h (last treatment) | 0, 1008, 2016, and 3024 mg/kg 5/sex/dose | 612.7 g/kg (glyphosate technical Nufarm) | Negative | Gava (2000)[1] | LD50 was 4032 mg/kg Mortality observed in 1 animal at high dose (only 4 m/f scored for MPCEs). No effect on PCE/NCE. |
| Bone Marrow Micronucleus Test | Swiss Albino mice (males and females) Vehicle: water | Intraperitoneal Injection (2 treatments, 24 h apart); sampling after 24 h (last treatment) | 0, 187.5, 375 and 562.5 mg/kg 5/sex/dose | 954.9 g/kg (glyphosate technical Nufarm) | Negative | Marques (1999) [MRID 49957412] | LD50 was 750 mg/kg No significant signs of toxicity observed in main study |
| Bone Marrow Micronucleus Test | NMRI-Bom mice | Intraperitoneal Injection (single treatment); sampling after 24 h (all doses) and 48 h (150 and 200 mg/kg) | 0, 150, and 200 mg/kg (5/sex/dose) | glyphosate isopropyla mine (purity not specified) | Negative | Rank *et al.* (1993) | |

**Table 5.6.  In Vivo Tests for Micronuclei Induction in Mammals- Glyphosate Technical.**

| Test/Endpoint | Test System | Route of Administration | Doses | Test Material Purity | Results | Reference | Comments |
|---|---|---|---|---|---|---|---|
| Bone Marrow Micronucleus Test | Swiss albino mice (males and females) | Intraperitoneal Injection (2 treatments, 24 h apart); sampling after 24 h (last treatment) | 0, 68, 137, and 206 mg/kg ( | 360 g/L | Negative | Zaccaria (1996) [MRID 49961501] | Doses selected were reported as corresponding to 25, 50 and 75% $LD_{50}$ |
| Bone Marrow Micronucleus Test | CD-1 mice (males and females) Vehicle: saline | Oral gavage (single treatment); sampling after 24 and 48 h | 0, 5000 mg/kg 5/sex/dose | 95.6% | Negative | Fox and Mackay (1996) [MRID 44320619] | No significant signs of toxicity observed |
| Bone Marrow Micronucleus Test | NMRI mice (males and females) Vehicle: PEG 400 | Oral gavage (single treatment); sampling after 24 and 48 h (high dose only) | 0, 500, 1000, and 2000 mg/kg 5 sex/dose | 97.73% | Negative | Honarvar (2005)[1] | OECD guideline 474 No significant signs of toxicity observed |
| Bone Marrow Micronucleus Test | NMRI mice (males only) Vehicle: 0.5% carboxymethylcellulose | Oral gavage (single treatment); sampling after 24 and 48 h (high dose only) | 0, 500, 1000, and 2000 mg/kg (5/dose) | 99.1% | Negative | Honarvar (2008) [MRID 49961802] | No significant signs of toxicity observed |
| Bone Marrow Micronucleus Test | NMRI mice (males and females) Vehicle: 0.5% carboxymethylcellulose | Oral gavage (single treatment); sampling after 24, 48 and 72h | 0, 5000 mg/kg; 5/sex/dose | 98.6% | Negative | Jensen (1991c) [MRID 49961503] | No significant signs of toxicity observed |
| Bone Marrow Micronucleus Test | CD-1 mice (males only[1]) Vehicle: water | Oral gavage single treatment); sampling after 24 and 48 h | 0, 2000 mg/kg 5/dose | 59.3% potassium glyphosate salt | Negative | Jones (1999)[1] | OECD guideline 474 No significant signs of toxicity observed |
| Bone Marrow Micronucleus Test | Swiss albino mice; (males and females) | Oral gavage (2 treatments, 24 h apart); sampling | 0, 50, 500, 5000 mg/kg 5/sex/dose | 96.8% glyphosate acid | Positive in females at 5000 | Suresh (1993b) [MRID 49987407] | No significant signs of toxicity observed |

**Table 5.6.  In Vivo Tests for Micronuclei Induction in Mammals- Glyphosate Technical.**

| Test/Endpoint | Test System | Route of Administration | Doses | Test Material Purity | Results | Reference | Comments |
|---|---|---|---|---|---|---|---|
|  | Vehicle: peanut oil | after 24 h (last treatment) |  | mg/kg only. Negative in males at all doses |  |  |  |
| Bone Marrow Micronucleus Test | Swiss mice (males only) Vehicle: corn oil | Oral gavage (2 treatments, 24 h apart); sampling after 24 h (last treatment) | 0, 8, 15 and 30 mg/kg (6/dose) | 980.1 g/kg | Negative | Zoriki Hosomi (2007) [MRID 50000901] | OECD guideline 474 No significant signs of toxicity observed |
| Bone Marrow Micronucleus Test | CD-1 mice (males and females) Vehicle:  distilled water | Oral gavage , Sampling 24, 48 and 72 h after treatment | Males: 0, 700, 900 and 1100 mg/kg Females: 0, 400, 600 and 800 mg/kg | 55.3% *Glyphosate trimesium salt* | Negative | Majeska (1987) [MRID 40214004] |  |
| Bone Marrow Micronucleus Test | B6CF3 Mice (males and females) | Oral (dietary). MN assay conducted following 13 week feed study. | 0, 205/213, 410/421, 811/844, 1678/1690 and 3393/3393 mg/kg (m/f) (10/sex/dose) | 99% | Negative | NTP (1992) |  |
| Bone Marrow Micronucleus Test | CD Rats (males and females) Vehicle: 0.8% hydroxypropylmethyl cellulose | Oral gavage (single treatment); sampling after 24 and 48 h (high dose only) | 0, 500, 1000, and 2000 mg/kg (5/sex/dose) | 98.8% | Negative | Flügge (2009b)[1] | OECD guideline 474 No significant signs of toxicity observed |

[1] Study was cited in Kier and Kirkland (2013).  Supplementary information about the study was provided online including test guideline followed, test material purity, control chemicals and summary data tables.
[2] Only males tested; report indicated that there were no difference between sexes seen in range finding study.
CA= chromosomal aberrations, MPCE= micronucleated polychromatic erythrocytes, NCE= normochromatic erythrocytes, PCE=polychromatic erythrocytes.

## 5.6     Additional Genotoxicity Assays Evaluating Primary DNA Damage

There are a number of genotoxicity assays that evaluate primary DNA damage, but do not measure the consequence of the genetic damage (*i.e.,* mutation or chromosomal damage).  As discussed in the Guidance Document on Revisions to OECD Genetic Toxicology Test Guidelines (OECD 2015), the endpoints measured in primary DNA damage tests such as DNA adducts, comet assay, or unscheduled DNA synthesis may lead to cell death or may initiate DNA repair, rather than a mutation.  These types of assays can, however, provide mechanistic information when interpreting positive findings in other genotoxicity tests or when determining whether a chemical is acting through a mutagenic mode of action.  Additionally, indirect mechanisms of DNA damage such as oxidative DNA damage can be detected by these test systems.  Oxidative damage results from oxidative stress, which occurs when there is a disturbance in the balance between the production of reactive oxygen species (ROS) and antioxidant defense systems.  Normal cellular metabolism is a source of endogenous reactive oxygen species that accounts for background levels of oxidative damage in normal cells.   Some types of oxidative damage are repairable while others lead to serious consequences in the cell. (Cooke et al, 2003).  The various assays evaluating primary DNA damage in glyphosate technical are presented in Table 5.7  Details of the findings are discussed below.

Glyphosate technical is not electrophilic and is not considered to be DNA-reactive.  In a study to evaluate the potential for glyphosate to directly interact with DNA, Peluso et al. (1998) reported that glyphosate technical did not form DNA adducts in mice when tested up to 270 mg/kg via i.p. Bolognesi et al. (1997) reported an increase in the oxidative damage biomarker 8-hydroxdeoxyguanosine (8-OHdG) in the liver 24 h after i.p. injection of 300 mg/kg in mice. No increase in 8-OHdG was seen in the kidney with glyphosate technical.  The dose in this study was high (300 mg/kg) for an i.p. injection and within the i.p. $LD_{50}$ range (134- 545 mg/kg) that has been reported elsewhere (WHO, 1994).

The comet assay, also known as single cell gel electrophoresis (SCGE), is a sensitive and rapid method to detect DNA strand breaks in individual cells. In this assay, individual cells are embedded in agarose.  The cells are then lysed (which digests the cellular and nuclear membranes) and the DNA is allowed to unwind under alkaline or neutral conditions.  During electrophoresis, chromatin (which is in a supercoiled state) that has undergone steric relaxation due to DNA damage migrates away from the nucleoid (nucleus) toward the anode, yielding images that resemble a comet.  The intensity of the comet tail relative to the comet head reflects the amount of DNA breakage (Tice et al., 2000; Collins et al., 2008).  The comet assay can detect single and double strand breaks resulting from direct interactions with DNA, alkali labile sites, or transient DNA breaks resulting during DNA excision repair. These types of strand breaks may be, (a) repaired with no persistent effect, (b) be lethal to the cell or (c) be fixed as a mutation (OECD TG 489).  DNA strand breaks in the comet assay can be measured by endpoints such as percent tail DNA (also referred to as % tail intensity), tail length, and tail moment. However, % tail DNA is the recommended metric for evaluating and interpreting results using this assay (OECD TG 489).

The five studies that evaluated glyphosate technical using the comet assay are summarized in Table 5.12. Two of the studies were conducted using tumor cell lines. Koller et al. (2012) reported positive comet effects (increased tail intensity) in a human buccal carcinoma cell line (TR146) following a 20-minute treatment with ≥ 20 mg/L (~0.118 mM) glyphosate. Although no evidence of cytotoxicity was reported in this study, the authors did report an increase in apoptosis and necrosis at the same concentrations (≥ 20 mg/L) when the same cell line was tested for *in vitro* micronuclei induction (discussed previously). In a study using Hep-2 cells (presumably a HeLa cell derivative), Manas et al. (2009) reported a statistically significant increase in mean tail length, and tail intensity at all concentrations (3.0-7.5 mM) tested. In a comet study conducted on human lymphocytes, Alvarez-Moya et al. (2014) reported significant increases in tail length only (but not % tail DNA) following treatment with glyphosate concentrations of 0.7-700 µM. Mladinic et al. (2009a) evaluated DNA damage in non-dividing human lymphocytes (±S9) following treatment from 0.5 to 580 µg/mL using the standard alkaline comet method and a modified comet method that detects DNA damage due to oxidative damage (human 8-hydroxyguanidine DNA-glycosylase, hOGG1 comet method). In this study, the authors reported statistically significant increases in tail intensity at 3.5 µg/mL and higher in the absence of S9, with significance only at 580 µg/mL (~3.4 mM) in the presence of S9 using the alkaline method. This concentration also resulted in increased apoptosis and necrosis as well as an increase in plasma total antioxidant capacity (TAC) and changes in plasma lipid peroxidation (thiobarbituric reactive substances, TBARs); however, only a dose-related increase in tail length (not % tail DNA) was observed at 580 µg/mL (+S9) using the hOGG1 method. When the Manas et al. (2013) evaluated blood and liver cells following a 14 day drinking water study in mice treated with 40 and 400 mg/kg/day glyphosate, significant increases in tail intensity, tail length and tail moment were reported were observed at both doses in both tissues (except for DNA tail intensity in liver at 40 mg/kg); however, there were no substantial effects on oxidative stress measurements suggesting that DNA damage reported may not be due to oxidative damage.

The Unscheduled DNA Synthesis (UDS) test with mammalian liver cells *in vitro* identifies substances that induce DNA repair after excision and removal of a segment of damaged DNA. The test is typically conducted in liver cells, which have relatively few cells in the S-phase of the cell cycle. The assay measures the incorporation of radiolabeled nucleotide [3H]-thymidine into DNA during the repair process in non-S phase cells. (OPPTS 870.5555). Substances that produce either a statistically significant dose-related increase or statistically significant and reproducible increase in 3H-TdR incorporation in at least one test point are considered to be positive in this test. A UDS study that evaluated glyphosate technical in rat primary hepatocytes was negative (Williams, 1978). Glyphosate technical was also negative in a DNA repair test conducted in bacteria (Rec-A test) (Shirasu, 1978).

In an alkaline elution assay, which detects single strand DNA breaks, Bolognesi et al. (1997) reported an increase in single strand breaks (i.e. increased DNA elution rate) in the liver and kidney 4 hours after a single i.p. injection of 300 mg/kg. The elution rate returned to control

levels at 24 hours. Glyphosate technical was also negative in a DNA repair test conducted in *Bacillus subtilis* H17 (rec$^+$) and M45 (rec$^-$) bacterial Rec-A test (Shirasu, 1978).

Finally, the sister chromatid exchange (SCE) test is an assay that can measure the consequence of primary DNA damage. The mechanism(s) of action for chemical induction of SCE is unclear. The SCE assay detects the exchange of DNA between two sister chromatid arms within a single chromosome. The assay can be performed *in vitro* or *in vivo*. Following exposure, cells/animals are treated with bromodeoxyuridine (BrdU) to allow for the differentiation of the two sister chromatids (harlequin staining) and prior to harvest are treated with a spindle inhibitor to accumulate cells in metaphase. The chromosome preparations are then stained and analyzed for SCEs (OPPTS 870.5900, 870.5915). The SCE studies that evaluated glyphosate technical are also presented in Table 12. Positive SCE findings were reported in all four studies; two evaluating bovine lymphocytes (Lioi, 1988b, Sivikova and Dianovksy, 2006) and two studies evaluating human lymphocytes (Lioi, 1988a; Bolognesi et al., 1997). In all four studies the induction did not demonstrate a clear dose response.

Additionally, although it is recognized that mechanisms other than genotoxicity may be involved in cell transformation, glyphosate trimesium salt was evaluated in the Balb/3T cell transformation assay (an *in vitro* tumor formation assay) and was negative up to 5.0 mg/ml (Majeska, 1982b).

**Table 5.7 Assays for Detecting Primary DNA Damage- Glyphosate Technical.**

| Test/Endpoint | Test System | Route of Administration | Doses/ Concentrations | Test Material Purity | Results | Reference | Comments |
|---|---|---|---|---|---|---|---|
| DNA Adducts $^{32}$P-postlabeling | Swiss CD1 mice (males and females) Liver and kidney evaluated | Intraperitoneal injection; 24 h exposure | 0, 130 and 270 mg/kg | Not reported | Negative | Peluso *et al.* (1998) | |
| DNA oxidative damage: 8-OHdG formation | Swiss CD-1 mice (males) liver and kidney evaluated | Intraperitoneal injection (single dose); sampling 4 and 24 h after injection | 0, 300 mg/kg (3/dose) | 99.9% | Kidney: negative<br><br>Liver: positive (24 h) | Bolognesi *et al.* (1997) | |
| Single-cell gel electrophoresis (SCGE) assays- Comet assay | TR146 cells (human-derived buccal epithelial cell line). | NA (*in vitro*) | -S9: 10-2000 mg/L; 20 minute exposure. | 95% | Positive<br><br>Increased DNA migration at >20 mg/L | Koller *et al.* (2012) | Also measured multiple cellular integrity parameters to assess cytotoxicity.  No clear evidence of cytotoxicity seen except for increase in enzyme activity (indicative of membrane damage) in LDHe (extracellular lactate dehydrogenase) assay at >80 mg/L.<br>No mention of monitoring pH |
| Single-cell gel electrophoresis (SCGE) assays- Comet assay | Hep-2 cells | NA (*in vitro*) | 0, 3, 4.5, 6, 7.5, 9, 12 and 15 mM | 96% | Positive<br><br>Stat. significant increase in mean tail length, and tail intensity at all concs. | Manas *et al.* (2009) | The authors did not report a source for the Hep-2 cells.  The agency presumes that this is a HeLa derived cervical carcinoma cell line. |

**Table 5.7 Assays for Detecting Primary DNA Damage- Glyphosate Technical.**

| Test/Endpoint | Test System | Route of Administration | Doses/ Concentrations | Test Material Purity | Results | Reference | Comments |
|---|---|---|---|---|---|---|---|
| Single-cell gel electrophoresis (SCGE) assays- Comet assay | Human lymphocytes | NA (*in vitro*) | 0, 0.7, 7, 70, 700 μM | 96% | Positive at all doses (increase in tail length only) | Alvarez-Moya *et al.*, (2014) | Issues were identified with this study resulting in a low quality ranking. These include: 1) blood was washed with PBS and then held at 4º C for an indeterminate amount of time before exposure to glyphosate.  (2) Cells were treated for 20 hours at room temperature. (3) The same amount of damage was reported across 2 orders of magnitude concentration. |
| Single-cell gel electrophoresis (SCGE) assays- Comet assay | Human lymphocytes; ±S9 Alkaline and hOOG1 Comet assays performed | NA (*in vitro*) | 0, 0.5, 2.91, 3.5, 92.8 and 580 μg/mL | 98% | Positive ±S9 | Mladinic *et al.* (2009a) | The alkaline comet assay -S9: ↑ in mean tail length at 580 μg/mL and ↑ in tail intensity at ≥ 3.5 μg/mL).  +S9: ↑ DNA tail length at ≥3.5 μg/mL. Tail intensity ↑ only at 580 μg/mL<br><br>hOOG1 comet assay: -S9 no effect on tail length, ↑tail intensity only at 3.50 μg/mL +S9: ↑ tail length at 580 μg/mL, no effect on tail intensity compared to controls at any conc. |

**Table 5.7 Assays for Detecting Primary DNA Damage- Glyphosate Technical.**

| Test/Endpoint | Test System | Route of Administration | Doses/ Concentrations | Test Material Purity | Results | Reference | Comments |
|---|---|---|---|---|---|---|---|
| Single-cell gel electrophoresis (SCGE) assays- Comet assay with oxidative stress measures | Balb/C mice; evaluated blood and liver | Drinking water (14 days) | 0, 40, and 400 mg/kg | 96% | Positive  Blood and liver at both doses | Manas et al. (2013) | Only minor effects seen on oxidative stress measurements (TBARs, SOD, CAT) |
| Sister Chromatid Exchange (SCE) | Bovine lymphocytes (3 donors) | NA (*in vitro*) | -S9:  0, 17, 85 and 170 µM; 72 h exposure | ≥98% | Positive Significant (p>0.05) increase in SC/cell at all concentrations | Lioi (1998b) | 1.8-, 2.1-, 1.6-fold increases, respectively |
| Sister Chromatid Exchange (SCE) | Human lymphocytes | NA (*in vitro*) | -S9: 0, 5, 8.5, 17 and 51 µM; 72 h exposure | ≥98% | Positive Significant (p>0.05) increase in SCE/cell at ≥ 8.5 µM | Lioi (1998a) | 1.9-, 2.8-, and 2.6-fold increase at 8.5, 17 and 51 µM, respectively |
| Sister Chromatid Exchange (SCE) | Human lymphocytes | NA (*in vitro*) | -S9: 0, 0.33, 1,3 and 6 mg/mL; 72 h exposure | 99.9% | Positive | Bolognesi *et al.* (1997) | Very limited information was provided on the methods used in this paper.  Authors report a dose –dependent increase in SCE frequency; however, no statistical analysis for dose response was reported.  Data presented graphically with no error bars. |
| Sister Chromatid Exchange (SCE) | Human lymphocytes | NA (*in vitro*) | 28, 56, 140, 280, 560 and 1120 µM;  24 h exposure ±S9 | 62% | Positive | Sivikova and Dianovsky (2006) | The increases in SCEs observed did not show a clear concentration related increase across a 40-fold increase in the concentrations tested |

**Table 5.7 Assays for Detecting Primary DNA Damage- Glyphosate Technical.**

| Test/Endpoint | Test System | Route of Administration | Doses/ Concentrations | Test Material Purity | Results | Reference | Comments |
|---|---|---|---|---|---|---|---|
| Alkaline elution assay- DNA single strand breaks | Swiss CD-1 mice (males) liver and kidney evaluated | Intraperitoneal injection (single dose); sampling 8 and 24 h after injection | 0, 300 mg/kg (3/dose) | 99.9% | Positive (Increased elution rate) at 4 hours in liver and kidney  At 24 h, elution rate returned to control levels | Bolognesi *et al.* (1997) | Return to control values may indicate DNA repair or reflect rapid elimination of compound |
| DNA Repair Test (Rec-A test) | *B. subtilis* H17 (rec+) and M45 (rec-) | NA (*in vitro*) | 20-2000 µg/disk | 98.4% | Negative | Shirasu (1978) [MRID 00078619] | |
| Unscheduled DNA synthesis (DNA repair) | F-344 rat primary hepatocytes | NA (*in vitro*) | 0, 0.0125, 0.0625, 0.125, 0.6.5, 1.25, 12.5, 125 µg/mL | 98% | Negative | Li and Long (1988) | |
| Cell Transformation Assay | BALB/3T cells | NA (*in vitro*) | 0.313-5.0 mg/mL | 90% *Glyphosate trimesium salt* | Negative | Majeska (1982b) [MRID 00126616] | |

h- hour; CAT= catalase, G6PD= glucose 6-phosphate dehydrogenase, NA= not applicable, hOOG1 = TBARs= thiobarbituric acid reactive substances, SOD= superoxide dismutase

## 5.7      Summary and Discussion

The genotoxic potential of glyphosate has been extensively investigated using a variety of test systems and genetic endpoints.  This assessment focuses only on test systems that the agency considered relevant for assessing genotoxic risks in humans.  The totality of the genetic toxicology information was evaluated using a weight of evidence approach to determine the genotoxic potential of glyphosate.  This involves the integration of *in vitro* and *in vivo* results as well as an overall evaluation of the quality, consistency, reproducibility, magnitude of response, dose-response relationship and relevance of the findings. In the weight of evidence analysis, studies evaluating endpoints that measured gene mutations and chromosomal aberrations (i.e. permanent DNA damage) were given more weight than endpoints reflecting DNA events that may be transient or reversible such as primary DNA damage (*e.g.,* comet assays).  *In vivo* studies in mammals were given the greatest weight and more weight was given to doses and routes of administration that were considered relevant for evaluating genotoxic risk based on human exposure to glyphosate.  Also, since the molecular mechanisms underlying the observation of SCEs are unclear and thus, the consequences of increased frequencies of SCEs are unclear, the data from this test were given low weight in the overall analysis.  A summary of the various lines of evidence of considered in the weight of evidence evaluation for the genotoxic potential of the active ingredient glyphosate is presented below.

### Evidence of primary DNA damage

Glyphosate technical is not considered to be electrophilic and did not induce DNA adducts in the liver or kidney at an i.p. dose of 270 mg/kg.  However, evidence of DNA strand breaks were reported in a number mammalian cell studies using the comet assay.  Additionally, transient increases in alkali labile sites in the liver and kidney of mice and an induction of 8-OHdG in DNA were seen in the livers of mice following i.p. injections with 300 mg/kg glyphosate.  These effects were seen at high doses at the i.p. route in mice ($LD_{50}$ for mouse =130 mg/kg; NTP, 1992).  However, due to technical limitations identified in a number of these studies (e.g. use of cancer cell lines that have not been well-characterized, atypical exposure protocols and no indication of blind to treatment), caution should be exercised in interpreting the results.

### *In vitro* mutations

Glyphosate technical was negative in all 39 studies for mutagenicity in bacteria.  In the four studies that tested for gene mutations in mammalian cells *in vitro,* no increase in mutations were observed.

### *In vitro* chromosomal alterations

Mixed results were observed in studies evaluating *in vitro* chromosomal alterations with glyphosate treatment.  Three SCE studies reported positive findings (Lioi, 1998a, b; Bolognesi *et al.*, 1997) bovine and human lymphocytes.  As stated previously, low weight is given to SCE results in the overall analysis given the uncertainty regarding the consequence of increases in the frequencies of SCEs. The SCE responses were weak and not concentration dependent.  Eight of the 10 studies measuring *in vitro* chromosomal aberrations were negative.  The two positive

findings were reported by Lioi et al., one study was conducted with bovine lymphocytes and the other with human lymphocytes.  The authors reported positive findings in these studies at concentrations much lower than four other studies that reported negative results using the same cell types.   Additionally, in both studies, Lioi et al. used an atypical exposure protocol of 72 hours which is very long for analyzing one round of mitosis.  Furthermore, in both studies, nearly the same level effect for aberration frequency and percent of cells with aberrations were observed for the same concentrations of glyphosate and the two other chemicals tested in those experiments.

Four of the six studies evaluating micronuclei induction *in vitro* were positive and two showed equivocal results.  Three of the positive responses required S9 activation, two conducted with human lymphocytes and one conducted with CHO cells.  The remaining positive micronucleus study was conducted using a TR146 cells which is a tumor cell line derived from human buccal mucosa.  The authors state that this cell line had not been previously used for genotoxicity testing.  It is difficult to interpret any genotoxicity findings conducted in a tumor cell line that has not been well-characterized regarding its DNA damage response and repair capacity, and its degree of chromosomal instability.

Glyphosate was negative in all three L5178Y mouse lymphoma cell studies which may detect chromosomal damage in addition to mutations.

Mammalian *in vivo* chromosomal alterations

All three *in vivo* mammalian studies evaluating chromosomal aberrations with glyphosate technical were negative. Two studies were conducted in rats (i.p. and oral) and one was conducted in mice (oral).  In addition glyphosate was also negative in a rodent dominant lethal test.  Glyphosate was negative in 15 of the 19 bone marrow micronucleus studies evaluated. In two of the positive studies, glyphosate technical was administered by i.p. injection.  In these studies, the authors reported positive findings at doses of 200-300 mg/kg.  Based on the available ADME data for glyphosate, assuming 30% oral absorption, an oral dose of ~700-1000 mg/kg would be needed to achieve a dose of 200-300 mg/kg in the blood.  Seven other i.p. studies in mice reported no increase in micronuclei induction at doses up to 3000 mg/kg.  The remaining positive finding was reported in an oral gavage study in mice where an approximately 2-fold increase in micronuclei were reported in females only at a dose of 5000 mg/kg, which is considerably higher than the current guideline recommended limit dose of 2000 mg/kg.  The effect was not seen in the 7 other oral gavage studies in mice when glyphosate was tested at similar doses.  In addition, glyphosate was negative for micronuclei induction following a 13 week dietary study with a dose up to approximately 3000 mg/kg/day.  A negative finding was also reported in the only study that evaluated *in vivo* micronuclei induction in the rat using doses up to 2000 mg/kg.

In a meta-analytic review of micronuclei frequency across mammalian and non-mammalian species (primarily fish, amphibians, reptiles and plants), Ghisi et al. (2016), not surprisingly, reported that different responses were observed when comparing mammalian results to phylogenetically distant non-mammalian species for micronuclei induction.  Their analyses included most, but not all, of the mammalian studies that the agency evaluated and determined to

be negative for micronuclei induction. The authors reported a statistically significant increase in micronuclei by the i.p. route across the studies in the data set they considered; however, when glyphosate was administered by the oral route (which is the most physiologically relevant route for human exposure to glyphosate), no significant difference was observed.

Conclusion for Glyphosate

The overall weight of evidence indicates that there is no convincing evidence that glyphosate induces mutations *in vivo* via the oral route. When administered by i.p. injection, the micronucleus studies were predominantly negative. In the two cases where an increase in micronuclei were reported via this route, the effects occurred above the reported i.p. LD50 for mice and were not observed in other i.p. injection studies at similar or higher doses. While there is limited evidence genotoxic for effects in some *in vitro* experiments, i*n vivo* effects were given more weight than *in vitro* effects particularly when the same genetic endpoint was measured, which is consistent with current OECD guidance. The only positive findings reported *in vivo* were seen at relatively high doses that are not relevant for human health risk assessment.


**6.0    Data Integration & Weight-of-Evidence Analysis Across Multiple Lines of Evidence**

**6.1    Background**

In 2010, OPP developed a draft "Framework for Incorporating Human Epidemiologic & Incident Data in Health Risk Assessment" which provides the foundation for evaluating multiple lines of scientific evidence (U.S. EPA, 2010). OPP's draft framework is consistent with updates to the World Health Organization/International Programme on Chemical Safety MOA/human relevance framework, which highlights the importance of problem formulation and the need to integrate information at different levels of biological organization (Meek et al, 2014).

One of the key components of the agency's draft framework is the use of modified Bradford Hill Criteria (Hill, 1965) like those described in the 2005 Guidelines for Carcinogen Risk Assessment. These criteria are used to evaluate the experimental support considers such concepts as strength, consistency, dose response, temporal concordance and biological plausibility in a weight-of-evidence analysis.

**6.2    Dose-Response and Temporal Concordance**

Given the lack of consistent positive findings particularly at doses < 1000 mg/kg/day across the lines of evidence, lack of mechanistic understanding, and lack of biological activity in mammalian systems to the parent compound glyphosate, there are few data to assess key events in the biological pathway and any associated  temporal or dose concordance. Temporal concordance can be assessed using the experimental animal studies and epidemiological studies that evaluated exposure prior to outcomes. Similarly, dose concordance can be assessed using findings of apical outcomes in experimental animal studies, as well as epidemiological studies that utilize exposure metrics that are stratified by the number of exposure days.

A prospective cohort study is designed to collect exposure information prior to the development of cancer.  As such, exposure is known to occur before the outcome.  In De Roos *et al.* (2005), a prospective cohort study, no association was observed between glyphosate exposure and numerous cancer subtypes in the AHS cohort.  Although the median follow-up time following recruitment into the cohort was approximately 7 years, it does not represent the amount of time subjects were exposed.  Study participants provided pesticide exposure information prior to enrollment in the study and this information was used to evaluate has cumulative lifetime days of exposure and intensity-weighted cumulative days of exposure.  An updated analysis of the AHS cohort is anticipated with a longer follow-up period, which includes the time period after the introduction of glyphosate-tolerant crops and the subsequent substantial increase in glyphosate use.  The updated AHS cohort analysis will further elucidate the impact of increased glyphosate use due to glyphosate-tolerant crops.  In De Roos *et al.* (2005), effect estimates did not increase across categories of increasing exposure for almost all cancer types, including NHL, in the prospective cohort study.

Two case-control studies evaluating the risk of NHL (Eriksson *et al.*, 2008 and McDuffie *et al.*, 2001) observed increased effect estimates in the highest exposure categories analyzed.  Eriksson *et al.* (2008) found a greater effect estimate for subjects with >10 days (based on the median days of exposure among controls) and >10 years of exposure (for latency analysis) when compared to subjects with ≤10 days and 1-10 years of exposure, respectively; however, this analysis did not appear to adjust for co-exposures to other pesticides.  By dividing the total number of exposed cases and controls using these exposure metrics, wider confidence intervals were observed indicating reduced power from smaller sample sizes.  This may indicate that a longer follow-up time is needed to detect the risk for NHL; however, given the latency analysis of NHL was limited to Eriksson et al. (2008) and lack of NHL latency understanding in general, further studies are needed to determine the true latency of NHL.  McDuffie *et al.* (2001), stratifying based on the average number of days per year of exposure, observed similar effect estimates in the lower exposure category (>0 and ≤2 days/year) while a greater effect estimate was observed in the highest exposure category (>2 days/year).  The results from these two case-control studies conflict with the results observed in the cohort study (De Roos *et al.*, 2005), where no dose-response was seen across three exposure categories (stratified by tertiles; however, the case-control studies did not adjust for co-exposure to other pesticides.  It is also difficult to make conclusions regarding dose-response with only two exposure categories used for the analyses by Eriksson et al. (2008) and McDuffie et al. (2001).  It should also be noted that these analyses combine all NHL subtypes, which may have etiological differences (Morton *et al.*, 2014).  Although some studies did provide effect estimates for subtypes, as stated in Section 3.5.2, these were not considered in the current evaluation due to the limited sample sizes.  At this time, there are no data available to evaluate dose-response for NHL subtypes.

Furthermore, as discussed in Section 3.6, a dose-response relationship was not observed following the dramatic increase in glyphosate use due to the introduction of genetically engineered glyphosate-tolerant crops in 1996.  Due to the change in use pattern, if a true association exists between glyphosate exposure and NHL, this large increase in use would be expected to result in a corresponding increase in risk of NHL associated with glyphosate exposure; therefore, higher effect estimates would be expected in more recent years.  This trend was not observed though.  For example, some of the highest adjusted risk measures for NHL

were reported for study years prior to 1996.  Furthermore, it would also be expected that higher effect estimates would be reported in countries with higher use of glyphosate and/or that use glyphosate-tolerant crops, such as the United States and Canada, as compared to countries that exhibit less use.  Once again, this trend was not observed with NHL studies, such that effect estimates for studies conducted in Sweden (Eriksson et al., 2008; Hardell *et al*., 2002) were similar or higher than those reported in the United States (De Roos *et al.,* 2003; De Roos *et al.,* 2005) and Canada (McDuffie *et al.,* 2001).

With respect to animal carcinogenicity studies, key events in a MOA/AOP are evaluated to confirm that they precede tumor appearance.  This temporal concordance evaluation cannot be conducted for glyphosate since a MOA/AOP has not been established.  In general, the tumor incidences lacked a monotonic dose-response.  It should be noted, however, that no preneoplastic or related non-neoplastic lesions were reported in any of the animal carcinogenicity studies to support any observed tumors.  Furthermore, genotoxicity assays did not support a direct mutagenic MOA.  While there is limited evidence of genotoxic in some *in vitro* endpoints, multiple *in vivo* do not support a genotoxic risk at relevant human exposure levels.

## 6.3     Strength, Consistency, and Specificity

A large database is available for evaluating the carcinogenicity potential of glyphosate.  Across animal carcinogenicity and genotoxicity studies, results were consistent.  For epidemiological studies, only one or two studies were available for almost all cancers investigated.  The largest number of studies was available investigating NHL; however, there were conflicting results across studies.

In epidemiological studies, there was no evidence of an association between glyphosate exposure and solid tumors, leukemia, and HL.  This conclusion is consistent with those recently conducted by IARC, EFSA, and JMPR.  The available data for multiple myeloma are not considered adequate to assess carcinogenic potential at this time.

At this time, a conclusion regarding the association between glyphosate exposure and risk of NHL cannot be supported based on the available data due to conflicting results.  Chance and/or bias cannot be excluded as an explanation for observed associations.  The magnitude of adjusted risk estimates for never/ever use were relatively small ranging from 1.0 (no association) to 1.85 in adjusted analyses, with the widest confidence interval observed for the highest effect estimate indicating the estimate is less reliable.  All of the estimates were not statistically significant with half of the effect estimates approximately equal to 1, while the other half of the effect estimates ranged from 1.5-1.85.  As a result, studies of at least equal quality provided conflicting results. There were various limitations identified in Section 3.6 for these studies that could impact calculated effect estimates and explain the weak responses observed in these studies.  Meta-risk ratios using these studies were also of small magnitude ranging from 1.3-1.5.  As discussed in Section 3.6, meta-analyses should be interpreted with caution and are susceptible to the same limitations identified for individual studies.

Although none of the effect estimates were below 1 using the never/ever exposure metric, risk estimates were all below 1 (0.6-0.9) when using cumulative lifetime and intensity-weighted

cumulative exposure metrics in the prospective cohort study (De Roos et al., 2005).  As discussed in Section 6.2, two case-control studies that investigated an exposure-response relationship conflicted with the extensive analyses conducted by De Roos et al. (2005).  This may be due to differences in confounding control, differences associated with study design, limitations from small sample sizes, and/or, as some may suggest, a potentially short follow-up time in the cohort.  It should also be noted that publication bias may play a role in this evaluation given there is a tendency to only publish positive results and potential concerns regarding glyphosate have only been raised in recent years.

A total of 15 (9 rat and 6 mouse) animal carcinogenicity studies with glyphosate, glyphosate acid, or glyphosate salts were analyzed for the current evaluation.  Although increases in tumor incidences were observed in some studies, none were considered treatment-related based on weight-of-evidence evaluations.  In 7 of these studies, no tumors were identified for detailed evaluation.  In the remaining studies, tumor incidences were not increased at doses <500 mg/kg/day, except for the testicular tumors observed in one study.  The high dose tumors, as well as the testicular tumors, were not reproduced in other studies, including those testing the same animal strain with similar or higher dosing.  Additionally, the tumors typically lacked a monotonic dose response, pairwise significance, and/or corroborating preneoplastic lesions.

Over 80 genotoxicity studies with the active ingredient glyphosate were analyzed for the current evaluation.  The overall weight-of-evidence indicates that there is no convincing evidence that glyphosate is genotoxic *in vivo* via the oral route.  When administered via i.p. injection the studies were predominantly negative.  In the two cases where an increase in micronuclei were reported via this route, the effects were not observed in other i.p. injection studies at similar or higher doses.  Technical glyphosate was negative in all gene mutation studies.  There was limited evidence of positive findings in studies evaluating primary DNA damage; however, as discussed in Section 5.6, the endpoints measured in these assays are less specific in regards to detecting permanent DNA changes (mutations) and can be attributed to other factors, such as cytotoxicity or cell culture conditions.  Although some positive findings were reported for chromosomal alterations *in vitro*, these findings were limited to a few studies and are not supported by the *in vivo* studies that are the most relevant for human risk assessment.

Overall, there is remarkable consistency in the database for glyphosate across multiple lines of evidence.  For NHL, observed associations in epidemiological studies were non-statistically significant and were of relatively small magnitude.  Chance and/or bias cannot be excluded as an explanation for the observed associations.  For all other cancer types, there were no associations found; however, only one or two studies were available for evaluation of most cancer types.  Across species, strain, and laboratory, tumor incidence was not increased at doses <500 mg/kg/day, except the testicular tumors which were only seen in one study.  Observed tumors were not reproduced in other studies, including those conducted using the same strain at similar or higher doses.  The genotoxicity studies demonstrate that glyphosate is not directly mutagenic or genotoxic *in vivo*.

## 6.4     Biological Plausibility and Coherence

The Guidelines for Carcinogen Risk Assessment (U.S. EPA, 2005) include the following guidance regarding the criteria of biological plausibility and coherence:

> "*evaluation of the biological plausibility of the associations observed in epidemiologic studies reflects consideration of both exposure-related factors and toxicological evidence relevant to identification of potential modes of action (MOAs). Similarly, consideration of the coherence of health effects associations reported in the epidemiologic literature reflects broad consideration of information pertaining to the nature of the biological markers evaluated in toxicologic and epidemiologic studies. [p.39].*"

The genotoxicity studies demonstrate that glyphosate is not directly mutagenic or genotoxic *in vivo*. The available data regarding non-cancer endpoints also do not provide any support for a carcinogenic process for glyphosate, and have shown glyphosate has relatively low toxicity. Laboratory animals generally display non-specific effects (e.g., clinical signs, reduced body weight) following glyphosate exposure at relatively high-doses, and no preneoplastic or related non-neoplastic lesions were observed to corroborate any of the observed tumors in the carcinogenicity studies. As discussed in Section 4.2, metabolism studies demonstrate low oral absorption and rapid excretion of glyphosate. The data are not sufficient to determine whether linear kinetics is occurring at high doses where tumors were observed. In the carcinogenicity test guideline (OCSPP 870.4200) and the 2005 Guidelines for Carcinogen Risk Assessment, inappropriate toxicokinetics (e.g., overwhelming absorption or detoxification mechanisms) should be avoided. A study evaluating the toxicokinetic profile of glyphosate using multiple doses is needed to further investigate the pharmacokinetic properties between low- and high-dose levels.

Although many of the studies included in this document focus on the potential for glyphosate to cause a cancer outcome, the agency is also aware of a limited number of studies in the open literature that have shown glyphosate and its metabolite, AMPA, can inhibit proliferation and promote apoptosis in cancer cells indicating the compounds have potential to be developed into therapeutic drugs for cancer treatment (Li *et al*, 2013; Parajuli *et al.*, 2015; Parajuli *et al.*, 2016). It is unknown if this is due to lack of additional studies that have investigated these compounds for cancer treatment or if this may be due to publication bias. The bias towards only publishing positive and/or novel results can hamper the ability to evaluate whether there are plausible biological mechanisms for observed outcomes and/or sufficient information to support a cause-and-effect interpretation of an association. Overall, this further supports the need for mechanistic data to elucidate the true mammalian MOA/AOP for glyphosate. There is a distinct lack of mechanistic understanding for the toxicity of glyphosate in mammals and the plant MOA is not relevant for mammalian systems.

As noted previously, tumor incidence in animal carcinogenicity studies was typically only increased at the highest doses tested (≥1000 mg/kg/day). It is very unlikely for people to be exposed to such large doses of glyphosate via the oral route. Glyphosate is registered for pre- and post-emergence application to a variety of fruit, vegetable, and field crops, as well as desiccant applications to several commodities. The highest dietary exposure value for any population subgroup in an unrefined chronic dietary analysis would be 0.23 mg/kg/day for children (1-2 years old). Since glyphosate also has residential uses, including application to turf,

there is also the potential for children at this age to be exposed via incidental oral exposures (e.g., hand to mouth, object to mouth and soil ingestion) from playing on treated lawns. The highest exposure for the incidental oral and dermal exposures would be 0.16 mg/kg/day (from hand-to-mouth behaviors for children) and 0.08 mg/kg/day, respectively. Combining exposures from the dietary and residential exposures for children would, therefore, result in an aggregate exposure of 0.47 mg/kg/day. These calculations use a number of assumptions that have been extensively peer-reviewed[27] and yet the potential oral exposure of glyphosate for the most highly exposed residential population subgroup is more than 2,000 times lower than the highest doses tested in the animal carcinogenicity studies (see Appendix E for more details regarding these calculations). The maximum potential exposure calculated for occupational handlers would be 7 mg/kg/day, which is still significantly lower than the highest doses tested in the animal carcinogenicity studies. As a result, even though tumors were observed in animal carcinogenicity studies, the possibility of being exposed to these excessive dietary doses over time is considered implausible based on the currently registered use pattern and not relevant to human health risk assessment.

## 6.5    Uncertainty

When evaluating a database, it is also important to assess the uncertainties associated with the available data. When uncertainty is high there is less confidence in the exposure and effect estimates and, therefore, informs the reliability of results. Understanding the sources of uncertainty within a database can help characterize observed results and aid in developing new research with reduced uncertainty.

In some instances, the agency did not have access to all of the data underlying the studies analyzed for the current evaluation. This includes all of the epidemiological studies, 17 genotoxicity studies, and 1 animal carcinogenicity study. For these studies, the agency had to rely upon information the study authors reported. Without the raw data, statistical analyses could not be replicated or recalculated. On the other hand, studies that include full reports with detailed methodology, analytically measured doses, and individual animal data may provide a higher level of confidence. It also allows the agency to perform its own evaluation of the data using current practices and policies.

Several uncertainties have already been identified throughout this document. There are numerous metabolism studies available for glyphosate; however, the data are not sufficient to determine whether linear kinetics is occurring at high doses where tumors were observed in animal carcinogenicity studies. In the carcinogenicity test guideline (OCSPP 870.4200) and the 2005 Guidelines for Carcinogen Risk Assessment, inappropriate toxicokinetics (e.g., overwhelming absorption or detoxification mechanisms) should be avoided. A study evaluating the toxicokinetic profile of glyphosate using multiple doses is needed to further investigate the pharmacokinetic properties between low- and high-dose levels.

---

[27] Using the 2012 Standard Operating Procedures for Residential Exposure Assessment. Available: http://www2.epa.gov/pesticide-science-and-assessing-pesticide-risks/standard-operating-procedures-residential-pesticide

With respect to the epidemiological data, the database is limited for each investigated cancer with only one or two studies available. Although six studies were used in the evaluation of NHL, the results were constrained by the limitations of the individual studies, such as small sample size/limited power, missing data, and control selection issues. The quality of the exposure assessment is a major concern since the validity of the overall study results depend in large part on the ability of the study to correctly quantify and classify a subject's exposure. There was no direct information on pesticide exposure or absorbed dose because the exposures were self-reported. All of the studies conducted exposure assessments through questionnaires and interviews that are susceptible to recall bias, which can result in exposure misclassification. The study with the highest ranking (De Roos *et al.*, 2005) did not find an association between glyphosate exposure and NHL; however, it has been noted that the median follow-up time for this study was ~7 years. A longer follow-up from the AHS cohort would be beneficial to better understand whether there is an association between glyphosate exposure and NHL. An update from the AHS cohort would also provide a more recent evaluation of glyphosate exposure and cancer outcomes. Many of the studies were conducted prior to the introduction of glyphosate-tolerant crops in 1996, which resulted in a dramatic increase of glyphosate use in subsequent use. More recent studies will help further elucidate the association between glyphosate exposure and cancer outcomes during this period of time.

Another consideration is that farmers and other applicators apply formulations, not the active ingredient alone. It is possible that different formulations were used across and/or within the different epidemiological studies. Formulations are end-use products that are sold as a mixture of registered pesticidal active ingredients, such as glyphosate, and additional substances that increase the effectiveness of a pesticidal product, which are often referred to as "inert ingredients." For example, inert ingredients may act as a solvent to allow a pesticide active ingredient to penetrate a plant's outer surface, may facilitate and accentuate the dispersion of the product, or may extend the pesticide product's shelf-life[28]. Inert ingredients and the proportion of these inert ingredients vary across formulations. It has been hypothesized that glyphosate formulations may be more toxic than glyphosate alone. Glyphosate has been studied in a multitude of studies and there are studies that have been conducted on numerous formulations that contain glyphosate; however, there are relatively few research projects that have attempted to systematically compare glyphosate and the formulations in the same experimental design. Furthermore, there are even less instances of studies comparing toxicity across formulations. This is one aspect of the uncertainty in the database that the agency has been working to address by developing a strategic research plan in collaboration with NTP (see Section 7.0).

It is recognized that these uncertainties exist for the current database; however, the available data are adequate for evaluating the carcinogenic potential of glyphosate and determine the cancer classification using the 2005 Guidelines for Carcinogen Risk Assessment. As discussed in Section 6.3, there are a large number of studies available and the database is remarkably consistent across these studies.

---

[28] https://www.epa.gov/pesticide-registration/inert-ingredients-overview-and-guidance

**6.6     Evaluation of Cancer Classification per the 2005 EPA Guidelines for Carcinogen Risk Assessment**

**6.6.1   Introduction**

In the 2005 Guidelines for Carcinogen Risk Assessment, five classification descriptors are provided:
- Carcinogenic to Humans
- Likely to be Carcinogenic to Humans
- Suggestive Evidence of Carcinogenic Potential
- Inadequate Information to Assess Carcinogenic Potential
- Not Likely to be Carcinogenic to Humans

Descriptors are assigned using all available data from the multiple lines of evidence.  The following text has been excerpted/summarized from the guidelines regarding these descriptors:

> Choosing a descriptor is a matter of judgment and cannot be reduced to a formula.  Each descriptor may be applicable to a wide variety of potential data sets and weights of evidence.  The weight-of-evidence, including the selected descriptor, is presented as a narrative laying out the complexity of information that is essential to understanding the hazard and its dependence on the quality, quantity, and type(s) of data available.  The descriptors and narratives are intended to permit sufficient flexibility to accommodate new scientific understanding and new testing methods.  The descriptors represent points along a continuum of evidence; consequently, there are gradations and borderline cases that are clarified by the full weight-of-evidence narrative.  Rather than focusing simply on the descriptor, the entire range of information included in the weight-of-evidence narrative should be considered.

The weight-of-evidence presented in Sections 6.2-6.5 and based on the available epidemiological, animal carcinogenicity, and genotoxicity data for glyphosate was considered for each classification descriptor.  For each descriptor, the guidelines provide examples and/or conditions for when the descriptor may be appropriate and the weight-of-evidence for glyphosate is assessed to determine which descriptor is supported by the available data.  As stated in the 2005 EPA Guidelines for Carcinogen Risk Assessment, "the entire range of information included in the weight-of-evidence should be considered".  Based on all of the available data, the weight-of-evidence clearly do not support the descriptors "carcinogenic to humans" and "likely to be carcinogenic to humans" at this time.  According to the 2005 Cancer Guidelines, "carcinogenic to humans" is appropriate "when there is convincing epidemiologic evidence of a causal association between human exposure and cancer."  Similarly, "likely to be carcinogenic to humans" descriptor is appropriate "when the weight of the evidence is adequate to demonstrate carcinogenic potential to humans but does not reach the weight of evidence for the descriptor."

In epidemiological studies, there was no evidence of an association between glyphosate exposure and solid tumors, leukemia, or HL.  The available data for multiple myeloma are not considered adequate to assess carcinogenic potential and a conclusion regarding the association between

glyphosate exposure and risk of NHL cannot be determined based on the available data due to conflicting results and various limitations identified in studies investigating NHL.  In 7 of the 15 animal carcinogenicity studies, no tumors were identified for detailed evaluation.  In the remaining 8 studies, tumor incidences were not increased at doses <500 mg/kg/day, except for testicular tumors.  The tumors observed at doses at or exceeding 1,000 mg/kg/day are not considered relevant to human health risk assessment.  Tumor findings were not reproduced in studies in the same animal strain at similar or higher doses.  Furthermore, the tumors often lacked a monotonic dose response, pairwise significance, and/or corroborating preneoplastic lesions.  The mammalian MOA/AOP is unknown for glyphosate and precursor events are unknown; however, the genotoxicity data were highly reproducible and consistent with a clear demonstration that glyphosate does not have a mutagenic MOA.

The descriptor "inadequate information to assess carcinogenic potential" is used when available data are judged inadequate for applying one of the other descriptors.  Given the extensive size of the glyphosate database, which includes a multitude of well-designed and well-conducted studies, this classification descriptor is not supported.  The epidemiological data at this time are limited and study results appear to be inconsistent for some cancer types.  However, it is important to note that epidemiological studies are not available for most pesticides.  Similarly, for most pesticides, generally, only two animal bioassays are available.  EPA routinely evaluates human cancer potential using the small, more typical datasets.  As such, for glyphosate, given the significant amount of information across multiple lines of evidence, the agency believes the database is sufficient to designate a cancer classification descriptor for glyphosate and that "inadequate information to assess carcinogenic potential" is not appropriate.

The remaining two cancer classification descriptors (*"Suggestive Evidence of Carcinogenic Potential"* and *"Not Likely to Be Carcinogenic to Humans"*) from the 2005 EPA Guidelines for Carcinogen Risk Assessment are described in detail below.  Subsequently, these descriptors are discussed in the context of whether the available evidence do or do not support them.

*"Suggestive Evidence of Carcinogenic Potential"*

This descriptor is appropriate when a concern for potential carcinogenic effects in humans is raised, but the data are judged not sufficient for a stronger conclusion.  It covers a spectrum of evidence associated with varying levels of concern for carcinogenicity.  Depending on the extent of the database, additional studies may or may not provide further insights.

Some examples of when this descriptor may be appropriate include the following:

- If a small, and possibly not statistically significant, increase in tumor incidence observed in a single animal or human study that does not reach the weight-of-evidence for the descriptor of "likely to be carcinogenic to humans."  The study generally would not be contradicted by other studies of equal quality in the same population group or experimental system;
- If there is evidence of a positive response in a study whose power, design, or conduct limits the ability to draw a confident conclusion (but does not make the study fatally flawed), but where the carcinogenic potential is strengthened by other lines of evidence;

- If there is a small increase in a tumor with a high background rate in that sex and strain, when there is some but insufficient evidence that the observed tumors may be due to intrinsic factors that cause background tumors and not due to the agent being assessed (when there is a high background rate of a specific tumor in animals of a particular sex and strain, then there may be biological factors operating independently of the agent being assessed that could be responsible for the development of the tumors). In this case, the reasons for determining that the tumors are not due to the agent are explained; or
- If there is a statistically significant increase at one dose only, but no significant response at the other doses and no overall trend.

*"Not Likely to Be Carcinogenic to Humans"*

This descriptor is appropriate when the available data are considered robust for deciding that there is no basis for human hazard concern. In some instances, there can be positive results in experimental animals when there is strong, consistent evidence that each MOA in experimental animals does not operate in humans. In other cases, there can be convincing evidence in both humans and animals that the agent is not carcinogenic.

This descriptor would be appropriate if any of the following was observed:

- Animal evidence demonstrates lack of carcinogenic effects in both sexes in well-designed and well-conducted studies in at least two appropriate animal species in the absence of other animal or human data suggesting a potential for cancer effects, or
- Convincing and extensive experimental evidence showing that the only carcinogenic effects observed in animals are not relevant to humans, or
- Convincing evidence that carcinogenic effects are not likely by a particular exposure route, or
- Convincing evidence that carcinogenic effects are not likely below a defined dose range.

## 6.6.2   Discussion of Evidence to Support Cancer Classification Descriptors

As stated above, the available data and weight-of-evidence clearly do not support the descriptors "carcinogenic to humans", "likely to be carcinogenic to humans", or "inadequate information to assess carcinogenic potential". The following discusses the remaining cancer classification descriptors and how the evidence does or does not support the descriptors.

It could be argued that the "suggestive evidence of carcinogenic potential" descriptor would be appropriate. The evidence to support this includes:

- Non-statistically significant effect estimates greater than the null were reported for NHL across studies and meta-analyses based on ever/never use ranged from 1.3-1.5.
- There was limited evidence of a possible exposure-response relationship between glyphosate exposure and NHL.

- In several animal carcinogenicity studies, a statistically significant trend was observed. In some instances, tumor incidences at the highest dose tested were statistically significant as compared to concurrent controls using raw (unadjusted) p-values.
- Positive responses were observed in a limited number of genotoxicity assays evaluating chromosomal and primary DNA damage.

However, according to the 2005 EPA Guidelines for Carcinogen Risk Assessment, in order for the above evidence to support the "suggestive evidence of carcinogenic potential" descriptor, "the study generally would not be contradicted by other studies of equal quality in the same population group or experimental system". Furthermore, the guidelines state that "rather than focusing simply on the descriptor, the entire range of information included in the weight-of-evidence narrative should be considered". For the epidemiological studies evaluating NHL, half of the studies reported effect estimates for ever/never use ranging from 1.5-1.85, with the widest confidence interval observed for the highest effect estimate indicating the effect estimate is less reliable. In the other half of the studies, which were of equal or higher quality, the reported effect estimates were approximately equal to the null. All of the effect estimates were non-statistically significant. There were conflicting results in exposure-response assessments investigating glyphosate exposure and the risk of NHL. Although two-case control studies (McDuffie et al., 2001; Eriksson et al., 2008) reported elevated effect estimates when analyzing for exposure-response relationships across two exposure categories, extensive analyses in a study of equal or higher quality (De Roos et al., 2005) for cumulative lifetime exposure and intensity-weighted cumulative exposure contradicted these results reporting effect estimates less than null (ranging from 0.6-0.9) when analyzing across tertiles. Furthermore, the two-case control studies did not account for co-exposure to other pesticides, which would be expected to cause inflated effect estimates. Various limitations that could impact the calculated effect estimate were identified for these studies and discussed in Section 3.6. The effect estimates greater than the null were not strengthened by other lines of evidence, as described in Sections 6.2-6.5.

In 7 (5 rat and 2 mouse) of the 15 animal carcinogenicity studies conducted with glyphosate, no tumors were identified for detailed evaluation. Of the remaining 8 studies, 7 observed a statistically significant trend for a particular tumor type; however, the agency determined that these tumors findings are not considered to be related to treatment. Although a statistically significant trend was obtained, closer examination of the incidence data across doses did not demonstrate a monotonic dose responses in several instances. Although the incidence at the highest dose tested (approaching or exceeding 1,000 mg/kg/day for almost all studies) for some of these tumors were statistically significant from concurrent controls using raw (unadjusted) p-values, none of the pairwise comparisons were found to be statistically significant following adjustment for multiple comparisons, except the testicular tumors that were seen in a single study. Furthermore, these high-dose tumors were given less weight. There was no evidence of corroborating pre-neoplastic or related non-neoplastic lesions and tumors showed no evidence of tumor progression to support the biological significance of tumor findings. In a limited number of cases, the agency also considered historical control data to inform the relevance of tumor findings when incidence rates in the concurrent controls were unusually low. Lastly, tumors seen in individual studies were not reproduced in studies of equal quality, including studies in the same animal species and strain at similar or higher doses.

Although positive responses were observed in a limited number of genotoxicity assays evaluating chromosomal and primary DNA damage, the overall weight-of-evidence indicates that there is no convincing evidence that glyphosate induces mutations *in vivo* via the oral route. When administered via i.p. injection the studies were predominantly negative.  In the two cases where an increase in micronuclei were reported via this route of administration, the results were contradicted by numerous other studies at similar or higher doses using the same assays and route of administration.  Technical glyphosate was negative in all gene mutation studies.  There was limited evidence of positive findings in studies evaluating primary DNA damage; however, the endpoints measured in these assays are less specific in regards to detecting permanent DNA changes (mutations) and can be attributed to other factors, such as cytotoxicity or cell culture conditions.  Although some positive findings were reported for chromosomal alterations *in vitro*, these findings were limited to a few studies and are not supported by the *in vivo* studies that are the most relevant for human risk assessment.

In summary, considering the entire range of information for the weight-of-evidence, the evidence outlined above to potentially support the "suggestive evidence of carcinogenic potential" descriptor are contradicted by other studies of equal or higher quality and, therefore, the data do not support this cancer classification descriptor.

For the "not likely to be carcinogenic to humans" descriptor, one of the considerations is whether there is "convincing evidence that carcinogenic effects are not likely below a defined dose range".  In the case of glyphosate, effects are not likely below 500 mg/kg/day based on oral studies. Tumor incidences were not increased in animal carcinogenicity at doses <500 mg/kg/day, except for the testicular tumors observed in a single study that were not considered treatment-related.  In genotoxicity studies, assays with oral administration were negative except for one instance where an extremely high dose (5,000 mg/kg/day) was administered.

The 2005 EPA Guidelines for Carcinogen Risk Assessment also state that "weighing of the evidence includes addressing not only the likelihood of human carcinogenic effects of the agent but also the conditions under which such effects may be expressed".  Increased tumor incidence was typically observed at doses of 1,000 mg/kg/day or greater.  Additionally, the only *in vivo* positive assays seen in the genotoxicity studies were administered via i.p. injection at doses of 200 mg/kg/day and 300 mg/kg/day or orally at 5,000 mg/kg/day.  These high doses are not considered relevant to human health risk assessment based on the currently registered use pattern for glyphosate.  Maximum potential glyphosate exposure in residential and occupational settings have been estimated at 0.47 mg/kg/day and 7 mg/kg/day, respectively, which are well-below the doses necessary to elicit the effects seen in these animal carcinogenicity and genotoxicity studies.  Additionally, non-linear kinetics may also be occurring at the high doses.  The carcinogenicity test guidelines (OCSPP 870.4200 and OCSPP 870.4300) and the 2005 Guidelines for Carcinogen Risk Assessment state that inappropriate toxicokinetics (e.g., overwhelming absorption or detoxification mechanisms) should be avoided.  A well-conducted pharmacokinetic study evaluating the toxicokinetic profile of glyphosate is needed to further investigate the toxicokinetic properties between high and low dose levels to ensure that inappropriate toxicokinetics is avoided.

Overall, there is not strong support for the "suggestive evidence of carcinogenic potential" cancer classification descriptor based on the weight-of-evidence, which includes the fact that even small, non-statistically significant changes observed in animal carcinogenicity and epidemiological studies were contradicted by studies of equal or higher quality. The strongest support is for "not likely to be carcinogenic to humans" at the doses relevant to human health risk assessment for glyphosate.

## 6.7   Proposed Conclusions Regarding the Carcinogenic Potential of Glyphosate

Glyphosate is a non-selective, phosphonomethyl amino acid herbicide registered to control weeds in various agricultural and non-agricultural settings. Labeled uses of glyphosate include over 100 terrestrial food crops as well as other non-agricultural sites, such as greenhouses, aquatic areas, and residential areas. Following the introduction of glyphosate-resistant crops in 1996, glyphosate use increased dramatically; however, glyphosate use has stabilized in recent years due to the increasing number of glyphosate-resistant weed species.

Since its registration in 1974, numerous human and environmental health analyses have been completed for glyphosate, which consider all anticipated exposure pathways. Glyphosate is currently undergoing Registration Review. As part of this process, the hazard and exposure of glyphosate are reevaluated to determine its potential risk to human and environmental health using current practices and policies. The human carcinogenic potential of glyphosate has been evaluated by the agency several times. As part of the current evaluation for Registration Review, the agency has performed a comprehensive analysis of available data from submitted guideline studies and the open literature. This includes epidemiological, animal carcinogenicity, and genotoxicity studies.

An extensive database exists for evaluating the carcinogenic potential of glyphosate, including 23 epidemiological studies, 15 animal carcinogenicity studies, and nearly 90 genotoxicity studies for the active ingredient glyphosate. These studies were evaluated for quality and results were analyzed across studies within each line of evidence. The modified Bradford Hill criteria were then used to evaluate multiple lines of evidence using such concepts as strength, consistency, dose response, temporal concordance and biological plausibility. The available data at this time do no support a carcinogenic process for glyphosate. Overall, animal carcinogenicity and genotoxicity studies were remarkably consistent and did not demonstrate a clear association between glyphosate exposure and outcomes of interest related to carcinogenic potential. In epidemiological studies, there was no evidence of an association between glyphosate exposure and numerous cancer outcomes; however, due to conflicting results and various limitations identified in studies investigating NHL, a conclusion regarding the association between glyphosate exposure and risk of NHL cannot be determined based on the available data. Increases in tumor incidence were not considered treatment-related in any of the animal carcinogenicity studies. In 7 of these studies, no tumors were identified for detailed evaluation. In the remaining studies, tumor incidences were not increased at doses <500 mg/kg/day, except for the testicular tumors observed in a single study. Increased tumor incidences at or exceeding the limit dose ($\geq$1000 mg/kg/day) are not considered relevant to human health. Furthermore, data from epidemiological and animal carcinogenicity studies do not reliably demonstrate expected dose-response relationships.

For cancer descriptors, the available data and weight-of-evidence clearly do not support the descriptors "carcinogenic to humans", "likely to be carcinogenic to humans", or "inadequate information to assess carcinogenic potential".  For the "suggestive evidence of carcinogenic potential" descriptor, considerations could be looked at in isolation; however, following a thorough integrative weight-of-evidence evaluation of the available data, the database would not support this cancer descriptor.  The strongest support is for "not likely to be carcinogenic to humans" at doses relevant to human health risk assessment.

This analysis integrating multiple lines of evidence highlights the need for mechanistic studies to elucidate the MOA/AOP of glyphosate, as well as additional epidemiology studies and updates from the AHS cohort study to further investigate the carcinogenic potential of glyphosate in humans.  This evaluation focused on studies on the active ingredient glyphosate; however, additional research could also be performed to determine whether formulation components, such as surfactants, influence the toxicity of glyphosate formulations.  The agency has been working on plans to initiate research given these identified data gaps and these plans are described in Section 7.0.

The agency is soliciting advice from the FIFRA SAP on the evaluation and interpretation of the available data for each line of evidence for the active ingredient glyphosate and the weight-of-evidence analysis, as well as how the available data inform cancer classification descriptors according to the agency's 2005 Guidelines for Carcinogen Risk Assessment.

## 7.0    Collaborative Research Plan for Glyphosate and Glyphosate Formulations

As previously mentioned, some have believed that glyphosate formulations may be more toxic than glyphosate alone.  Glyphosate has been studied in a multitude of studies and there are studies that have been conducted on numerous formulations that contain glyphosate; however, there are relatively few research projects that have attempted to directly compare glyphosate and the formulations in the same experimental design.  Furthermore, there are even less instances of studies comparing toxicity across formulations.

The agency has been collaborating with the NTP Division of the National Institute of Environmental Health Sciences to develop a research plan intended to evaluate the role of glyphosate in product formulations and the differences in formulation toxicity.  Four objectives were identified that laid out how research by NTP might contribute to these research questions: 1) compare the toxicity of glyphosate vs. formulations, as well as compare formulations vs. formulations, 2) provide publicly available toxicology data on cancer-related endpoints, 3) provide publicly available toxicology data on non-cancer endpoints, and 4) investigate the mechanisms of how glyphosate and formulations cause toxic effects.

As part of the first objective, NTP will investigate the differential biological activity of glyphosate, glyphosate formulations, and the individual components of formulations.  .  The NTP Laboratory Branch generated preliminary data by exposing human hepatoma cells (HepG2) to five different glyphosate products bought off the shelf.  The endpoint in the assay was cell viability, measured by ATP levels.  The data, presented in Figure 7.1, demonstrate at-a-glance

that formulations are not equally toxic and that the toxicity is not being driven by the amount of glyphosate in the formulations, at least for the endpoint of cell viability. This observation highlights how informative the data generated from this research can be to the overall research questions.



**Figure 7.1. Results of HepG2 exposures following 24 hour incubation using different glyphosate formulations.**

For the second objective, NTP will contribute to the publicly available knowledge-base describing the biological effects of glyphosate and formulations by conducting guideline studies addressing genotoxicity and studies that evaluate the oxidative stress potential. In order to organize publicly available data on glyphosate and formulations, IARC used 10 key characteristics of carcinogens as a way to help inform their conclusion (Smith *et al.*, 2016). Their review concluded that data were only available for two of these characteristics (genotoxicity and oxidative stress) and little to no information on the remaining characteristics was available. However, when members of a NTP workgroup looked at the available data included in the IARC review, the group did not agree with IARC that the data provided strong or clear evidence for either genotoxicity or induction of oxidative stress given protocol deficiencies that could produce questionable results.

Currently, the publicly available information regarding non-cancer endpoints for glyphosate and glyphosate formulations is limited. To begin to address the third objective, NTP will conduct a screening level analysis of the literature using text mining software, for studies regarding non-cancer endpoints resulting from glyphosate exposure. The resulting scoping report will describe the evidence base for health outcomes investigated in connection to glyphosate, as well as help identify data gaps.

As discussed in Section 6.0, there is a need for mechanistic studies to elucidate the MOA/AOP of glyphosate. Although there are data suggesting glyphosate may be genotoxic or cause oxidative stress, there is little mechanistic information to support these observations. For the last objective, NTP will use *in vitro* screening assays to gain mechanistic information on the effects

of glyphosate and different formulations for a variety of endpoints and allow for direct comparisons among them.  The screening approach will also allow for the identification of test substances that would be good candidates for further *in vivo* testing.  Since *in vivo* findings in genetic toxicology testing are generally considered as having a greater relevance to humans than *in vitro* findings, it is valuable to confirm the results seen at the cellular level at the whole animal level.

## 8.0   References

Alvarez-Moya et al. (2014) "Comparison of the in vivo and in vitro genotoxicity of glyphosate isopropylamine salt in three different organisms". *Genetics and Molecular Biology*, 37, 1, 105-110

Akanuma, M. (1995).  HR-001: Reverse Mutation Test. Kodaira Laboratories. The Institute of Environmental Toxicology, Tokyo, Japan.  Laboratory Project ID: IET 94-0142.
April 3, 1995.  MRID 50017102. Unpublished.

Andreotti, G., Freeman, L.E., Hou, L., Coble, J., Rusiecki, J., Hoppin, J.A., Silverman, D.T., and Alavanja, M.C. (2009). Agricultural pesticide use and pancreatic cancer risk in the Agricultural Health Study Cohort. International journal of cancer *124*, 2495-2500.

Atkinson, C., Strutt, A., Henderson, W., *et al.* (1993a). 104-Week Chronic Feeding/ Oncogenicity study in rats with 52-week interim kill. MRID No. 49631701. Unpublished

Atkinson, C., Martin, T., Hudson, P., and Robb, D. (1993b). Glyphosate: 104 week dietary carcinogenicity study in mice. Inveresk Research International, Tranent, EH33 2NE, Scotland. IRI Project No. 438618. April 7, 1993. MRID 49631702. Unpublished.

Band, P.R., Abanto, Z., Bert, J., Lang, B., Fang, R., Gallagher, R.P., and Le, N.D. (2011). Prostate cancer risk and exposure to pesticides in British Columbia farmers. The Prostate *71*, 168-183.

Baris, D, Garrity, TJ, Telles, JL, Heineman, EF, Olshan, A, Hoar Zahm, S. 2001. American Journal of Industrial Medicine. 39: 463-476.

Benbrook. (2016). Trends in glyphosate herbicide use in the United States and globally. Environmental Sciences Europe. 28(3).

Bolognesi, C., Bonatti, S., Degan, P., Gallerani, E., Peluso, M., Rabboni, R., Roggieri, P., and Abbondandolo, A. (1997). Genotoxic activity of glyphosate and its technical formulation roundup. Journal of Agricultural and Food Chemistry *45*, 1957-1962.

Brammer. (2001). Glyphosate Acid: Two Year Dietary Toxicity and Oncogenicity Study in Wistar Rats. Central Toxicology Laboratory, Alderley Park Macclesfield, Cheshire, UK: Syngenta. MRID 49704601. Unpublished.

Brown, L.M., Blair, A., Gibson, R., Everett, G.D., Cantor, K.P., Schuman, L.M., Burmeister, L.F., Vanlier, S.F., and Dick, F. (1990). Pesticide Exposures and Other Agricultural Risk Factors for Leukemia among Men in Iowa and Minnesota. Cancer Research *50*, 6585-6591.

Brown, L.M., Burmeister, L.F., Everett, G.D., and Blair, A. (1993). Pesticide Exposures and Multiple Myeloma in Iowa Men. Cancer Causes Control *4*, 153-156.

Brayton et al., 2012.  Pathology of aging mice and GEM background strains and experimental design. Vet Path. 49 (1): 85-105.

Burnett, P., Borders, J.; Kush, J. (1979) Report to Monsanto Company: Two Year Chronic Oral Toxicity Study with CP- 76100 in Albino Rats: IBT No. 8560-08924. (Unpublished study received Jun 24, 1982 under 524-308; prepared by Industrial Bio-Test Laboratories, Inc., submitted by Monsanto Co., Washington, DC; CDL:247746-A; 247745; 247747; 247748; 247749; 247750; 247751; 247752)

Collander R.D. (1996).  Glyphosate Acid:  An Evaluation of Mutagenic Potential Using *S. typhimurium* and *E. coli*.  Central Toxicology Laboratory, Cheshire, UK. Laboratory Project ID: CTL/P/4874 Study No. YV3611. February 16, 1996.  MRID 44320617. Unpublished.

Cantor, K.P., Blair, A., Brown, L.M., Burmeister, L.F., and Everett, G. (1993). Pesticides and Other Agricultural Risk Factors for Non-Hodgkin's Lymphoma among Men in Iowa and Minnesota. Cancer Research *53*, 2421-2421.

Carreón, T., Butler, M.A., Ruder, A.M., Waters, M.A., Davis-King, K.E., Calvert, G.M., Schulte, P.A., Connally, B., Ward, E.M., Sanderson, W.T.*, et al.* (2005). Gliomas and Farm Pesticide Exposure in Women: The Upper Midwest Health Study. Environmental Health Perspectives *113*, 546-551.

Cimino, M.C. (2006).  Comparative overview of current international strategies and guidelines for genetic toxicology testing for regulatory purposes. Environmental and Molecular Mutagenesis 47 (9): 362-390.

Chang, E.T., and Delzell, E. (2016). Systematic review and meta-analysis of glyphosate exposure and risk of lymphohematopoietic cancers. Journal of environmental science and health Part B, Pesticides, food contaminants, and agricultural wastes *51*, 402-434.

Chhabra et al. (1990). An over view of prechronic and chronic toxicity/carcinogenicity experimental study designs and criteria used by the National Toxicology Program. Environ Health Perspect. 86: 313-321.

Chruscielska et al. (2000).  Glyphosate: evaluation of chronic activity and possible far-reaching effects. Part 1. Studies on chronic toxicity. Pestycydy (Warsaw). 3-4: 11-20.

Collins, A.R., Oscoz, A.A., Brunborg, G., Gaivão, I., Giovannelli, L., Kruszewski, M., C.C., Stetina, R. (2008). The Comet assay:  topical issues.  Mutagenesis 23 (3): 143-151.

Cocco, P., Satta, G., Dubois, S., Pili, C., Pilleri, M., Zucca, M., t Mannetje, A.M., Becker, N., Benavente, Y., de Sanjose, S.*, et al.* (2013). Lymphoma risk and occupational exposure to pesticides: results of the Epilymph study. Occupational and environmental medicine *70*, 91-98.

Cooke et al., (2003).  Oxidative DNA damage:  mechanisms, mutation, and disease.  FASEB J. 17 (10): 1195-214.

Chruscielska, K. et al. 2000.  Glyphosate Evaluation of chronic activity and possible far-reaching effects.  Part 2.  Studies on mutagenic activity.  Pestycydy, 2000, (3-4), 21-25.  Published.

Dennis, L.K., Lynch, C.F., Sandler, D.P., and Alavanja, M.C. (2010). Pesticide use and cutaneous melanoma in pesticide applicators in the agricultural heath study. Environ Health Perspect *118*, 812-817.

De Roos, A.J., Zahm, S.H., Cantor, K.P., Weisenburger, D.D., Holmes, F.F., Burmeister, L.F., and Blair, A. (2003). Integrative assessment of multiple pesticides as risk factors for non-Hodgkin's lymphoma among men. Occupational and environmental medicine *60*. 1-9.

De Roos, A. J., et al. (2005). "Cancer incidence among glyphosate-exposed pesticide applicators in the Agricultural Health Study." Environ Health Perspect 113(1): 49-54.

Durward, R. (2006).  Technical Glyphosate: Micronucleus Test in the Mouse. Safepharm Laboratories Limited, Shardlow Business Park, Shardlow, Derbyshire DE72 2GD, UK, Study No. 2060/014. February 8, 2006. MRID 49957411. Unpublished.

Engel, L.S., Hill, D.A., Hoppin, J.A., Lubin, J.H., Lynch, C.F., Pierce, J., Samanic, C., Sandler, D.P., Blair, A., and Alavanja, M.C. (2005). Pesticide use and breast cancer risk among farmers' wives in the agricultural health study. Am J Epidemiol *161*, 121-135.

Enemoto, K. (1997), HR-001: 24-Month Oral Chronic Toxicity and Oncogenicity Study in Rats, Vol. 1. The Institute of Environmental Toxicology, Kodaira-shi, Tokyo, Japan, Arysta Life Sciences, Study No.:IET 94-0150.  MRID 50017104, 50017105, 5001703. Unpublished.

Eriksson, M., Hardell, L., Carlberg, M., and Akerman, M. (2008). Pesticide exposure as risk factor for non-Hodgkin lymphoma including histopathological subgroup analysis. International journal of cancer *123*, 1657-1663.

Excel (1997). Combined chronic toxicity/carcinogenicity study of glyphosate technical in Sprague Dawley rats. Pune, India: Indian Institute of Toxicology.

Fisher, RA. (1950) Statistical methods for research workers. Edinburgh, Scotland: Oliver and Boyd.

Flower, K.B., Hoppin, J.A., Lynch, C.F., Blair, A., Knott, C., Shore, D.L., and Sandler, D.P. (2004). Cancer Risk and Parental Pesticide Application in Children of Agricultural Health Study Participants. Environmental Health Perspectives *112*, 631-635.

Flowers, L.J., and Kier, L.D., Hannah, L.H. (1978) Final Report on Salmonella Mutagenicity Assay of Glyphosate: Test No. LF-78-161. MRID 00078620.  Unpublished.

Fontana et al (1998). Incidence rates of lymphomas and environmental measurements of phenoxy herbicides: ecological analysis and case-control study. Archives of Environmental Health: An International Journal. 53: 384-387.

Fox, V. (1998). Glyphosate acid:  In vitro cytogenetic assay in human lymphocytes. Central Toxicology Laboratory, Cheshire, UK.  Report CTL/P/6050.  October 29, 1998.  MRID 49961803. Unpublished

Fox and Mackay (1996).  Glyphosate acid:  Mouse bone marrow micronucleus test.  Central Toxicology Laboratory, Cheshire, UK. March 21, 1996. MRID 44320619. Unpublished.

Green and Owen, (2011).  Herbicide-resistant crops:  utilities and limitations for herbicide-resisitant week management. J. Agric Food Chem. 59 (11): 5819-29.

Greim, H., et al. (2015). "Evaluation of carcinogenic potential of the herbicide glyphosate, drawing on tumor incidence data from fourteen chronic/carcinogenicity rodent studies." Crit Rev Toxicol 45(3): 185-208.

George, J., et al. (2010). "Studies on glyphosate-induced carcinogenicity in mouse skin: a proteomic approach." J Proteomics 73(5): 951-964.

Ghisi, N.d.C., de Oliveira, E.C., and Prioli, A.J. (2016). Does exposure to glyphosate lead to an increase in the micronuclei frequency? A systematic and meta-analytic review. Chemosphere *145*, 42-54.

Giknis, M. L. A., and Clifford, C. B. (2005). Spontaneous Neoplastic Lesions in the Crl:CD1 (ICR) Mouse in Control Groups from 18 Month to 2 Year Studies. Charles River. http://www.criver.com/files/pdfs/rms/cd1/rm_rm_r_lesions_crlcd_1_icr_mouse.aspx

Hardell, L., Eriksson, M., and Nordstrom, M. (2002). Exposure to pesticides as risk factor for non-Hodgkin's lymphoma and hairy cell leukemia: Pooled analysis of two Swedish case-control studies. Leukemia & Lymphoma *43*, 1043-1049.

Hardell, L., and Eriksson, M. (1999). A case-control study of non-Hodgkin lymphoma and exposure to pesticides. Cancer *85*, 1353-1360.

Haseman, JK. (1995) Data analysis: Statistical analysis and use of historical control data. Regul Toxicol Pharmacol 21:52–59.

Hill AB (1965). The Environment and Disease: Association or Causation? Proc R Soc Med. May 1965; 58(5): 295–300.

Hoar *et al.* (1986). Agricultural herbicide use and risk of lymphoma and soft-tissue sarcoma. JAMA. 256:1141-1147.

Hohenadel, K., Harris, S.A., McLaughlin, J.R., Spinelli, J.J., Pahwa, P., Dosman, J.A., Demers, P.A., and Blair, A. (2011). Exposure to multiple pesticides and risk of non-Hodgkin lymphoma in men from six Canadian provinces. International journal of environmental research and public health *8*, 2320-2330.

Hornarvar, N. (2008).  Technical Glyphosate: Micronucleus Test of the Mouse. RCC, Cytotest

Cell Research GmBH (RCC-CCR0, In den Leppsteinswiesen 19, 64380 Rossdorf, Germany, Study No. 1158500. June 9, 2008. MRID 49961802. Unpublished.

Hsu and Stedeford (2010). Cancer Risk Assessment: Chemical Carcinogenesis, Hazard Evaluation, and Risk Quantification. John Wiley & Sons.

Jensen, J.C., 1991a**.** Mutagenicity test:  Ames Salmonella Assay with Glyphosate, Batch 206-JaK-25-1.  Scantox A/S, Lemvig, Denmark.  Laboratory No. 12323.  October 9, 1991.  MRID 49961502.  Unpublished.

Jensen, J.C. (1991b).  Mutagenicity test:  In vitro mammalian cell gene mutation test with glyphosate, batch 206-JaK-25-1. Scantox A/S, Lemvig, Denmark.  Laboratory No. 12325. October 9, 1991.  MRID 49961504.  Unpublished.

Jensen, JC (1991c).  Mutagenicity test:  Micronucleus test with Glyphosate, batch 206-JAK-25-1.  Scantox A/S, Lemvig, Denmark. Report number 12324. December 9, 1991.  MRID 49961503.

Kachuri, L., Demers, P.A., Blair, A., Spinelli, J.J., Pahwa, M., McLaughlin, J.R., Pahwa, P., Dosman, J.A., and Harris, S.A. (2013). Multiple pesticide exposures and the risk of multiple myeloma in Canadian men. International journal of cancer *133*, 1846-1858.

Karipidis et al. 2007. Occupational exposure to ionizing and non-ionizing radiation and risk of non-Hodgkin lymphoma. Int Arch Occup Environ Health. 80: 663-670.
Karunanayake, CP, McDuffie, HH, Dosman, JA, Spinelli, JJ, Pahwa, P. 2008. Occupational exposures and non-Hodgkin's lymphoma: Canadian case-control study. Environmental Health. 7:44.

Karunanayake, C.P., Spinelli, J.J., McLaughlin, J.R., Dosman, J.A., Pahwa, P., and McDuffie, H.H. (2012). Hodgkin lymphoma and pesticides exposure in men: a Canadian case-control study. Journal of agromedicine *17*, 30-39.

Kaufman, D.W., Anderson, T.E., and Issaragrisil, S. (2009). Risk factors for leukemia in Thailand. Annals of hematology *88*, 1079-1088.

Kato et al. (2005). Personal and occupational exposure to organic solvents and risk of non-Hodgkin's lymphoma (NHL) in women (United States). Cancer Causes & Control. 16:1215-1224.

Kier, L. D. (2015). "Review of genotoxicity biomonitoring studies of glyphosate-based formulations." Crit Rev Toxicol 45(3): 209-218.

Kier and Kirkland (2013). Review of genotoxicity studies of glyphosate and glyphosate-based formulations. Critical Reviews in Toxicology. 43: 283-315.

Knezevich, A.L and Hogan, G. K. (1983). A chronic feeding study of glyphosate in mice. Unpublished report prepared by Bio/Dynamic Inc., dated July 21, 1983. Report No. 77-2011.

EPA Accession No. 251007 – 251009, and 251014.  EPA Accession no. 251007-09, 251014. Unpublished.

Koller, V.J., Furhacker, M., Nersesyan, A., Misik, M., Eisenbauer, M., and Knasmueller, S. (2012). Cytotoxic and DNA-damaging properties of glyphosate and Roundup in human-derived buccal epithelial cells. Archives of toxicology *86*, 805-813.

Koureas, M., Tsezou, A., Tsakalof, A., Orfanidou, T., and Hadjichristodoulou, C. (2014). Increased levels of oxidative DNA damage in pesticide sprayers in Thessaly Region (Greece). Implications of pesticide exposure. The Science of the total environment *496*, 358-364.

Koutros, S., Beane Freeman, L.E., Lubin, J.H., Heltshe, S.L., Andreotti, G., Barry, K.H., DellaValle, C.T., Hoppin, J.A., Sandler, D.P., Lynch, C.F*., et al.* (2013). Risk of total and aggressive prostate cancer and pesticide use in the Agricultural Health Study. Am J Epidemiol *177*, 59-74.

Kumar, D.P.S. (2001), Carcinogenicity Study with Glyphosate Technical in Swiss Albino Mice, Toxicology Department Rallis Research Centre, Rallis India Limited.  Study No. TOXI: 1559.CARCI-M.  MRID 49987403. Unpublished.

Landgren, O., Kyle, R.A., Hoppin, J.A., Beane Freeman, L.E., Cerhan, J.R., Katzmann, J.A., Rajkumar, S.V., and Alavanja, M.C. (2009). Pesticide exposure and risk of monoclonal gammopathy of undetermined significance in the Agricultural Health Study. Blood *113*, 6386-6391.

J. Langsdale *et al.* (2009). Glyphosate. Human Health Assessment Scoping Document in Support of Registration Review. June 3, 2009. D362745.
Lankas, G, P. (1981) A Lifetime Study of Glyphosate in Rats. Report No. 77-2062 prepared by Bio Dynamics, Inc. EPA Accession. No. 247617 – 247621. December 23, 1981.  MRID 00093879.  Unpublished.

Lee, W.J., Cantor, K.P., Berzofsky, J.A., Zahm, S.H., and Blair, A. (2004a). Non-Hodgkin's lymphoma among asthmatics exposed to pesticides. International journal of cancer *111*, 298-302.

Lee, W.J., Lijinsky, W., Heineman, E.F., Markin, R.S., Weisenburger, D.D., and Ward, M.H. (2004b). Agricultural pesticide use and adenocarcinomas of the stomach and oesophagus. Occupational and environmental medicine *61*, 743-749.

Lee, W.J., Colt, J.S., Heineman, E.F., McComb, R., Weisenburger, D.D., Lijinsky, W., and Ward, M.H. (2005). Agricultural pesticide use and risk of glioma in Nebraska, United States. Occupational and environmental medicine *62*, 786-792.

Lee, W.J., Sandler, D.P., Blair, A., Samanic, C., Cross, A.J., and Alavanja, M.C. (2007). Pesticide use and colorectal cancer risk in the Agricultural Health Study. International journal of cancer *121*, 339-346.

Li, A.P. (1983a). CHO/HGPRT gene mutation assay with glyphosate.  Environmental Heath Lab, St. Louis, MO.  Study Number T830044. October 20, 1983.  MRID 00132681. Unpublished.

Li, A.P. (1983b).  In vivo bone marrow cytogenetic study of glyphosate in Sprague Dawley rats. Environmental Health Laboratory, St. Louis, MO.  October 20, 1983.  MRID 00132683. Unpublished.

Li, A. P. and T. J. Long (1988). An evaluation of the genotoxic potential of glyphosate.  Fundam Appl Toxicol 10(3): 537-546.

Lioi M.B., et al. (1998a).  Genotoxicity and oxidative stress induced by pesticide exposure in bovine lymphocyte cultures in vitro.  Mutation Research- Fundamental and Molecular Mechanisms of Mutagenesis.  403 (1-2), 13-20.

Lioi M.B., et al. (1998b).  Cytogenetic Damage and Induction of Pro-Oxidant State in Human Lymphocytes Exposed In Vitro to Gliphosate, Vinclozolin, Atrazine, and DPX-E9636. Environmental and Molecular Mutagenesis 32: 39-46.

Lioi, M.B., Scarfi, M.R., Santoro, A., Barbieri, R., Zeni, O., Salvemini, F., Di Berardino, D., and Ursini, M.V. (1998a). Cytogenetic damage and induction of pro-oxidant state in human lymphocytes exposed in vitro to gliphosate, vinclozolin, atrazine, and DPX-EP636. Environmental and Molecular Mutagenesis *32*, 39-46.

Lioi, M.B., Scarfi, M.R., Santoro, A., Barbieri, R., Zeni, O., Di Berardino, D., and Ursini, M.V. (1998b). Genotoxicity and oxidative stress induced by pesticide exposure in bovine lymphocyte cultures in vitro. Mutation Research-Fundamental and Molecular Mechanisms of Mutagenesis *403*, 13-20.

Lowit *et al.* (2015). Literature Review on Neurodevelopmental Effects & FQPA Safety Factor Determination for the Organophosphate Pesticides. September 15, 2015. D331251.

Maizlish, N, Beaumont, J, Singleton, J. 1998. Mortality among California highway workers. American Journal of Industrial Medicine. 13: 363-379.

Majeska, J.; Zameck, R.; Matheson, D. (1982a) SC-0224 (Lot No. 7269- 10): Mutagenicity Evaluation in Salmonella typhimurium: Report No. T-10847. MRID 00126612.  Unpublished.

Majeska, J. (1982b) Morphological transformation of Balb/3T3 cells. Report No. T-10884. MRID 00126616. Unpublished.

Majeska, J. (1982c) Mutagenicity evaluation of bone marrow cytogenetic analysis in rats. Report No. T10884. MRID 00132176. Unpublished.

Majeska, J. (1985a) Mutagenicity Evaluation in Salmonella typhimurium: SC-0224: Report No. T-12660. MRID 00155527.  Unpublished.

Majeska, J. (1985b) Mutagenicity Evaluation in Mouse Lymphoma Multiple Endpoint Test Forward Mutation Assay: SC-0224: Report No. T-12661. MRID 00155528.  Unpublished.

Majeska, J. (1985c) Mutagenicity Evaluation in Chinese Hamster Ovary Cytogenetic Assay: SC-0224: Report No. T-12663. MRID 00155530.  Unpublished.

Majeska, J (1987).  Mutagenic evaluation in bone marrow micronucleus.  Environmental Health Center, Farmington, CT.  Study Report No. T12689/SC-0024.  April 23, 1987.  MRID 40214004. Unpublished.

Mañas, F., Peralta, L., Raviolo, J., Ovando, H.G., Weyers, A., Ugnia, L., Cid, M.G., Larripa, I., and Gorla, N. (2009). Genotoxicity of glyphosate assessed by the comet assay and cytogenetic tests. Environmental toxicology and pharmacology *28*, 37-41.

Mañas, F., Peralta, L., Ugnia, L., Weyers, A., García Ovando, H., and Gorla, N. (2013). Oxidative stress and comet assay in tissues of mice administered glyphosate and ampa in drinking water for 14 days. BAG Journal of basic and applied genetics *24*, 67-75.

Marques, M.F.C. (1999).  A Micronucleus Study in Mice for Glifosate Tecnico Nufarm. Bioagri Laboratarios Ltda.  Study No: RF-G12.79/99.  December 27, 1999. MRID 49957412. Unpublished.

Matsumoto (1995).  HR-001:  In vitro cytogenetics test.  The Institute of Environmental Toxicology, Tokyo, Japan.  Laboratory Project ID: IET 94-0143.  May 29, 1995.  MRID 50017106. Unpublished.

McConnell, EE; Solleveld, HA; Swenberg, JA; et al. (1986) Guidelines for combining neoplasms for evaluation of rodent carcinogenesis studies. J Natl Cancer Inst 76:283–289.

McDuffie, H.H., Pahwa, P., McLaughlin, J.R., Spinelli, J.J., Fincham, S., Dosman, J.A., Robson, D., Skinnider, L.F., and Choi, N.W. (2001). Non-Hodgkin's lymphoma and specific pesticide exposures in men: Cross-Canada study of pesticides and health. Cancer Epidemiol Biomarkers Prev *10*, 1155-1163.

McDuffie, HH, Pahwa, P, McLaughlin, JR, Fincham, S, Robson, D, Dosman, JA, Hu, J. 2002. Canadian male farm residents, pesticide safety handling practices, exposure to animals and non-Hodgkin's lymphoma (NHL). American Journal of Industrial Medicine. 42: 54-61.

Meek ME, Boobis A, Cote I, Dellarco V, Fotakis G, Munn S, Seed J, Vickers C.  2014. New developments in the evolution and application of the WHO/IPCS framework on mode of action/species concordance analysis.  *J Appl Toxicol.* 2014 Jan;34(1):1-18.

Mink, P. J., et al. (2012). "Epidemiologic studies of glyphosate and cancer: a review." Regul Toxicol Pharmacol 63(3): 440-452.

Mladinic, M., Berend, S., Vrdoljak, A.L., Kopjar, N., Radic, B., and Zeljezic, D. (2009a). Evaluation of genome damage and its relation to oxidative stress induced by glyphosate in human lymphocytes in vitro. Environmental and molecular mutagenesis *50*, 800-807.

Mladinic, M., Perkovic, P., and Zeljezic, D. (2009b). Characterization of chromatin instabilities induced by glyphosate, terbuthylazine and carbofuran using cytome FISH assay. Toxicology letters *189*, 130-137.

Moriya, M. et al. 1983.  Further mutagenicity studies on pesticides in bacterial reverse assay systems.  Mutation Research, 116 (1983), 185-216.

Morton *et al.* (2014). Etiologic heterogeneity among non-Hodgkin lymphoma subtypes: the interlymp non-Hodgkin lymphoma subtypes project. J Natl Cancer Inst Monogr 48: 130-144.

Nordstrom, M., Hardell, L., Magnuson, A., Hagberg, H., and Rask-Andersen, A. (1998). Occupational exposures, animal exposure and smoking as risk factors for hairy cell leukaemia evaluated in a case-control study. Br J Cancer *77*, 2048-2052.

NTP (1992). NTP technical report on the toxicity studies of Glyphosate (CAS No. 1071-83-6) Administered In Dosed Feed To F344/N Rats And B6C3F1 Mice. Toxic Rep Ser 16: 1-d3.

OECD (2015).  Guidance Document on Revisions to OECD Genetic Toxicology Test Guidelines. August 31, 2015.

Olsson and Brandt (1988). Risk of non-Hodgkin's lymphoma among men occupationally exposed to organic solvents. Scandinavian Journal of Work, Environment, & Health. 14:246-251.

Orsi, L., Delabre, L., Monnereau, A., Delval, P., Berthou, C., Fenaux, P., Marit, G., Soubeyran, P., Huguet, F., Milpied, N.*, et al.* (2009). Occupational exposure to pesticides and lymphoid neoplasms among men: results of a French case-control study. Occupational and environmental medicine *66*, 291-298.

Pahwa, P., Karunanayake, C.P., Dosman, J.A., Spinelli, J.J., McLaughlin, J.R., and Cross-Canada, G. (2011). Soft-tissue sarcoma and pesticides exposure in men: results of a Canadian case-control study. Journal of occupational and environmental medicine / American College of Occupational and Environmental Medicine *53*, 1279-1286.

Pahwa, P., Karunanayake, C.P., Dosman, J.A., Spinelli, J.J., McDuffie, H.H., and McLaughlin, J.R. (2012). Multiple myeloma and exposure to pesticides: a Canadian case-control study. Journal of agromedicine *17*, 40-50.

Parajuli, K. R., et al. (2015). "Aminomethylphosphonic acid and methoxyacetic acid induce apoptosis in prostate cancer cells." Int J Mol Sci 16(5): 11750-11765.

Parajuli, K. R., et al. (2016). "Aminomethylphosphonic acid inhibits growth and metastasis of human prostate cancer in an orthotopic xenograft mouse model." Oncotarget 7(9): 10616-10626.

Pavkov, K.Ll, Turnier, J.C. (1987) Two-Year Chronic Toxicity and Oncogenecity Dietary Study with SC-0224 in Mice.  Stauffer Chemical Company.  MRID 40214006.  Unpublished.

Pavkov, K.Ll, Wyand, S. (1987) Two-Year Chronic Toxicity and Oncogenecity Dietary Study with SC-0224 in Rats.  Stauffer Chemical Company.  MRID 40214006.  Unpublished.

Peluso M. et al. (1998).  32P-Postlabeling detection of DNA adducts in mice treated with herbicide Roundup.  Environ and Mol Mutagen 31:55-59.

Piesova, E. (2004). The influence of different treatment length on the induction of micronuclei in bovine lymphocytes after exposure to glyphosate. Folia Veterinaria *48*, 130-134.

Piesova, E. (2005). The effect of glyphosate on the frequency of micronuclei in bovine lymphocytes in vitro. Acta Veterinaria-Beograd *55*, 101-109.

Portier, C.J., Armstrong, B.K., Baguley, B.C., Baur, X., Belyaev, I., Belle, R., Belpoggi, F., Biggeri, A., Bosland, M.C., Bruzzi, P.*, et al.* (2016). Differences in the carcinogenic evaluation of glyphosate between the International Agency for Research on Cancer (IARC) and the European Food Safety Authority (EFSA). Journal of epidemiology and community health.

Rank, J., et al. (1993). "Genotoxicity testing of the herbicide Roundup and its active ingredient glyphosate isopropylamine using the mouse bone marrow micronucleus test, Salmonella mutagenicity test, and Allium anaphase-telophase test." Mutat Res 300(1): 29-36.

Recore *et al.* (2014). Glyphosate: Tier II incident report. February 6, 2014. D417808.

Reyna, M.S. Gordon, D.E. (1973) 18-Month Carcinogenic Study with CP67573 in Swiss White Mice: IBT No. B569. (Unpublished study, including sponsor's validation report dated Feb 1, 1978, received Jun 21, 1978 under 524-308; prepared by Industrial Bio-Test Laboratories, Inc., submitted by Monsanto Co., Washington, D.C.; CDL:234136-G). MRID 00061113. Unpublished.

Reyna, M.S. Richter, W.R. Gordon, D.E. (1974) Two- Year Chronic Oral Toxicity Study with CP67573 in Albino Rats: IBT No. B564. MRID 00062507.  Unpublished.

Ribeiro do Val, R. (2007).  Bacterial reverse mutation test (Ames test) for Glifosato Technico Helm.  TECAM Tecnologia Ambiental Ltda., Sao Paulo, Brasil.  Study Number 3393/2007-2.0AM, Report Number RL3393/2007-2.0 AM-B, December 13, 2007.  MRID 50000903. Unpublished.

Rodney, DE (1980). Dominant lethal study in mice.  International Research and Development Corp. May 23, 1980.  MRID 0004634

Roustan, A., et al. (2014). "Genotoxicity of mixtures of glyphosate and atrazine and their environmental transformation products before and after photoactivation." Chemosphere 108: 93-100.

Ruder, A.M., Waters, M.A., Butler, M.A., Carreon, T., Calvert, G.M., Davis-King, K.E., Schulte, P.A., Sanderson, W.T., Ward, E.M., Connally, L.B., *et al.* (2004). Gliomas and farm pesticide exposure in men: the upper midwest health study. Archives of environmental health *59*, 650-657.

Schinasi, L., and Leon, M.E. (2014). Non-Hodgkin lymphoma and occupational exposure to agricultural pesticide chemical groups and active ingredients: a systematic review and meta-analysis. International journal of environmental research and public health *11*, 4449-4527.

Shirasu, Y.; Moriya, M.; Ohta, T. (1978) Microbial Mutagenicity Testing on CP67573 (Glyphosate). Apr 25, 1979 under 524-308; prepared by Institute of Environ- mental Toxicology, Japan, submitted by Monsanto Co., Washington, D.C.; CDL:238233-A. MRID 00078619. Unpublished.

Sivikova, K. and J. Dianovsky (2006). "Cytogenetic effect of technical glyphosate on cultivated bovine peripheral lymphocytes." Int J Hyg Environ Health 209(1): 15-20.

Smith *et al.*, (2016). Key characteristics of carcinogens as a basis for organizing data on mechanisms of carcinogenesis. Environmental Health Perspectives. 124: 713.

Snedecor, GW; Cochran, WG. (1967) Statistical methods, 6th ed. Ames, Iowa: Iowa State University Press.

Sokolowski, A. (2007a). *Salmonella typhimurium* and *Escherichia coli* Reverse Mutation Assay with Glyphosate Technical (NUP-05068). RCC Cytotest Cell Research GmbH, Rossdorf, Germany. Study Number 1061401. March, 16, 2007. MRID 49957406. Unpublished.

Sokolowski, A. (2007b). *Salmonella typhimurium* and *Escherichia coli* Reverse Mutation Assay with Glyphosate Technical (NUP-05070). RCC Cytotest Cell Research GmbH, Rossdorf, Germany. Study Number 1061402. March, 16, 2007. MRID 49957407. Unpublished.

Sokolowski, A. (2007c). *Salmonella typhimurium* and *Escherichia coli* Reverse Mutation Assay with Glyphosate Technical (NUP-05067). RCC Cytotest Cell Research GmbH, Rossdorf, Germany. Study Number 1061403. March, 16, 2007. MRID 49957408. Unpublished.

Sokolowski, A. (2009b). Glyphosate technical- Salmonella Typhimurium and Escherichia Coli reverse mutation assay. Cytotest Cell Research GmbH (Harlan CCR), Rossdorf, German. Study and Report Number 1264500. December 18, 2009. MRID 49961801. Unpublished.

Sokolowski, A. (2010). *Salmonella typhimurium* and *Escherichia coli* Reverse Mutation Assay with Glyphosate TC spiked with glyphosine. RCC Cytotest Cell Research GmbH, Rossdorf, Germany. Study Number 1332300. April 7, 2010. MRID 500000902. Unpublished.

Sorahan, T. (2015). "Multiple Myeloma and Glyphosate Use: A Re-Analysis of US Agricultural Health Study (AHS) Data." Int J Environ Res Public Health 12(2): 1548-1559.
Stout, L. D. and Ruecker, P.A. (1990). Chronic Study of Glyphosate Administered in Feed to Albino Rats. MRID No. 41643801; Historical Controls. MRID 41728700. Unpublished.

Sugimoto, K. (1997), HR-001: 18-Month Oral Oncogenicity Study in Mice, Vol. 1 and 2. The Institute of Environmental Toxicology, 2-772, Suzuki-cho, Kodaira-shi, Tokyo, 187, Japan, Study No.:IET 94-0151.  MRID 50017108, 50017109. Unpublished.

Suresh, T.P. (1993b). Mutagenicity-Micronucleus Test In Swiss Albino Mice. Rallis India Limited.  Study No: TOXI: 889-MUT.MN.  May 6, 1993. MRID 49987407. Unpublished.

Suresh, T.P. (1994).  Genetic Toxicology- In vivo mammalian bone marrow cytogenetic test-Chromosomal analysis.  Rallis Agrochemical Research Station, Bangalore, India.  January 1, 1994.  MRID 49987408.  Unpublished.

Suresh, T.P. (1996) Combined Chronic Toxicity and Carcinogenicity Study with Glyphosate Technical in Wistar Rats.  Toxicology Department Rallis Research Centre, Rallis India Limited, TOXI-1559, 002/1-GPT-CARCI-M.  MRID 49987401. Unpublished.

Taddesse-Heath, L.; Chattopadhyay, S.K.; Dillehay, D.; L.; Lander, M.R.; Nagashfar, Z.; Morse III, H.C.; Hartley, J.W. (2000): Lymphomas and high-level expression of murine leukemia viruses in CFW mice Journal of Virology 74:6832-6837

Tarone, RE. (1982).  The use of historical control information in testing for a trend in proportions. Biometrics 38:215–220.

Thompson, P.W. (1996).  Technical Glyphosate: Reverse Mutation Assay "Ames Test"Using *Salmonella typhimurium* and *Escherichia coli.*  Safepharm Laboratories Limited, Derby, UK.  Study Number 434/014.  February 20, 1996.  MRID 49957409. Unpublished.

Wang et al. (2009). Occupational exposure to solvents and risk of non-Hodgkin lymphoma in Connecticut women. American Journal of Epidemiology. 169:176-185.

Ward, J. M. (2006).  Lymphomas and leukemias in mice.  Experimental and Toxicologic Pathology, 57 (5-6): 377-381.

Weisenburger, D.D. (1992). Pathological Classsification of Non-Hodgkin's Lymphoma for Epidemiological Studies. Cancer Research *52*, 5456S-5462S.

Wilderman, A.G. and Nazar, R.N. (1982).  Significance of plant metabolism in the mutagenicity and toxicity of pesticides.  Canadian Journal of Genetics and Cytology 24(4): 437-449.

Williams, G. M., et al. (2000). "Safety Evaluation and Risk Assessment of the Herbicide Roundup and Its Active Ingredient, Glyphosate, for Humans." Regulatory Toxicology and Pharmacology 31(2): 117-165.

Wood, E., Dunster, J., Watson, P., and Brooks, P. (2009a) Glyphosate Technical:  Dietary Combined Chronic Toxicity/Carcinogenicity Study in the Rat.  Harlan Laboratories Limited,

Shardlow Business Park, Shardlow, Derbyshire DE72 2GD, UK.  Study No. 2060-012.  April, 23, 2009.  MRID 49957404. Unpublished.

Wood, E., Dunster, J., Watson, P., and Brooks, P. (2009b) Glyphosate Technical:  Dietary Carcinogenicity Study in the Mouse.  Harlan Laboratories Limited, Shardlow Business Park, Shardlow, Derbyshire DE72 2GD, UK.  Study No. 2060-011.  April, 22, 2009.  MRID 49957402. Unpublished.

Wright, N.P. (1996).  Technical Glyphosate:  Chromosomal aberration test in CHL cells in vitro. Safepharm Laboratories Limited, Derby, UK.  Study Number 434/015. March 13, 1996, MRID 49957410. Unpublished.

Yauk *et al.*, (2015).  Approaches to identifying germ cell mutagens:  Report of the 2013 IWGT workshop on germ cell assays.  Mutat Res Genet Toxicol Environ Mutagen, 783: 36-54.

Yiin, J.H., Ruder, A.M., Stewart, P.A., Waters, M.A., Carreon, T., Butler, M.A., Calvert, G.M., Davis-King, K.E., Schulte, P.A., Mandel, J.S.*, et al.* (2012). The upper midwest health study: a case-control study of pesticide applicators and risk of glioma. Environ Health *11*, 13.

Zaccaria, C.B. (1996). A micronucleus study in mice for the product Glyphosate. BioAgri. Study No: G.1.2 – 06/96.  November 18, 1996. MRID 49961501. Unpublished.

Zahm *et al* (1990). A case-control study of non-Hodgkin's lymphoma and the herbicide 2,4-dichlorophenoxyacetic acid (2,4-D) in Eastern Nebraska. Epidemiology. 1:349-356.

Zhang et al. (2007). Ultraviolet radiation exposure and risk of non-Hodgkin's lymphoma. American Journal of Epidemiology. 165: 1255-1264.

Zoriki-Hosmi, (2007).  Hosomi, R. (2007) Mammalian Erythrocyte Micronucleus Test for Glifosato Tecnico Helm. Project Number: RL/3393/2007/3/0MN/B.  MRID 50000901. Unpublished.

## Appendix A. Journal articles obtained from open literature search

| | |
|---|---|
| Abstract Only | Cebollero, L. R., et al. (2011). "Glyphosate based herbicides toxicity, a new approach." Toxicology Letters 205, Supplement: S233. |
| Abstract Only | Monroy, C. M., et al. (2004). "In vitro evaluation of glyphosate-induced DNA damage in fibrosarcoma cells HT1080 and Chinese hamster ovary (CHO) cells." Environ Mol Mutagen 44(3): 216-216. |
| Abstract Only | Ramos-Morales, P., et al. (2008). "Combined use of multiple biomarkers to evaluate the genotoxic activity of the herbicide Glyphosate." Environ Mol Mutagen 49(7): 577-577. |
| Abstract Only/Full article already identified | Sorahan, T. (2015). "Multiple Myeloma and Glyphosate Use: A Re-Analysis of US Agricultural Health Study (AHS) Data." Int J Environ Res Public Health 12(2): 1548-1559. |
| Article not in English | Kwiatkowska, M., et al. (2013). "GLYPHOSATE AND ITS FORMULATIONS - TOXICITY, OCCUPATIONAL AND ENVIRONMENTAL EXPOSURE." Med Pr 64(5): 717-729. |
| Article not in English | Lawson, R. and E. Estrade-Chapellaz (1999). "Intoxication volontaire par le glufosinate (Basta®)." Annales Françaises d'Anesthésie et de Réanimation 18(9): 1025-1026. |
| Article not in English | Mañas, F., et al. (2009). "Aberraciones cromosómicas en trabajadores rurales de la Provincia de Córdoba expuestos a plaguicidas." BAG. Journal of basic and applied genetics 20(1): 0-0. |
| Article not in English | Martinez, A., et al. (2007). "[Cytotoxicity of the herbicide glyphosate in human peripheral blood mononuclear cells]." Biomedica 27(4): 594-604. |
| Article not in English | Monroy, C. M., et al. (2005). "[Cytotoxicity and genotoxicity of human cells exposed in vitro to glyphosate]." Biomedica 25(3): 335-345. |
| Article not in English | Pieniazek, D., et al. (2003). "[Glyphosate--a non-toxic pesticide?]." Med Pr 54(6): 579-583. |
| Article not in English | Saratovskikh, E. A., et al. (2007). "Genotoxicity of the pestiside in Ames test and the possibility to formate the complexeses with DNA." Ekologicheskaya genetika V(3): 46-54. |
| Article not in English | В статье представлены результаты генотоксико логических, аллергологических и иммунологических исследований, проведенных в рамках медико-биологической оценки безопасности генно-инженерно-моди-фицированной кукурузы линии MON 88017, устойчивой к глифосату и жуку Diabrotica spp. Анализ данных, полученных при изучении уровня повреждений ДНК и уровня хромосомных аберраций, тяжести активного анафилактического шока и интенсивности гуморального иммунного ответа, состояния гуморального и клеточного звеньев иммунитета, не выявил какого-либо генотоксического, аллергенного, иммуномодулирующего и сенсибилизирующего действия ГМ-кукурузы линии MON 88017 по сравнению с ее традиционным аналогом. |
| Cancer treatment | Parajuli, K. R., et al. (2015). "Aminomethylphosphonic acid and methoxyacetic acid induce apoptosis in prostate cancer cells." Int J Mol Sci 16(5): 11750-11765. |
| Cancer treatment | Li, Q., et al. (2013). "Glyphosate and AMPA inhibit cancer cell growth through inhibiting intracellular glycine synthesis." Drug Des Devel Ther 7: 635-643. |
| Cancer treatment | Parajuli, K. R., et al. (2016). "Aminomethylphosphonic acid inhibits growth and metastasis of human prostate cancer in an orthotopic xenograft mouse model." Oncotarget 7(9): 10616-10626. |
| Correspondence article | Belle, R., et al. (2012). "LETTER TO THE EDITOR: TOXICITY OF ROUNDUP AND GLYPHOSATE." Journal of Toxicology and Environmental Health-Part B-Critical Reviews 15(4): 233-235. |
| Correspondence article | Carrasco, A. E. (2011). "Reply to the Letter to the Editor Regarding Our Article (Paganelli et al., 2010)." Chem Res Toxicol 24(5): 610-613. |
| Correspondence article | de Souza, L. and L. Macedo Oda (2013). "Letter to the editor." Food and Chemical Toxicology 53: 440. |
| Correspondence article | de Vendomois, J. S., et al. (2010). "Debate on GMOs Health Risks after Statistical Findings in Regulatory Tests." Int J Biol Sci 6(6): 590-598. |
| Correspondence article | Farmer, D. R., et al. (2005). "Glyphosate results revisited." Environ Health Perspect 113(6): A365-A366. |
| Correspondence article | Grunewald, W. and J. Bury (2013). "Comment on "Long term toxicity of a Roundup herbicide and a Roundup-tolerant genetically modified maize" by Seralini et al." Food and Chemical Toxicology 53: 447-448. |
| Correspondence article | Huang, K. and W. Xu (2013). "Reply to letter to the editor." Food and Chemical Toxicology 59: 811-812. |
| Correspondence article | Korsaeth, A., et al. (2015). "Comments on the recently published study: "Compositional differences in soybeans on the market: Glyphosate accumulates in Roundup Ready GM soybeans", by T. Bøhn, M. |

| | Cuhra, T. Traavik, M. Sanden, J. Fagan and R. Primicerio (Food Chemistry 2014, 153: 207–215)." Food Chemistry 172: 921-923. |
|---|---|
| Correspondence article | Ollivier, L. (2013). "A Comment on "Séralini, G.-E., et al., Long term toxicity of a Roundup herbicide and a Roundup-tolerant genetically modified maize. Food Chem. Toxicol. (2012)," http://dx.doi.org/10.1016/j.fct.2012.08.005." Food and Chemical Toxicology 53: 458. |
| Correspondence article | Portier, C. J., et al. (2016). "Differences in the carcinogenic evaluation of glyphosate between the International Agency for Research on Cancer (IARC) and the European Food Safety Authority (EFSA)." J Epidemiol Community Health. |
| Correspondence article | Roberfroid, M. (2014). "Letter to the editor." Food and Chemical Toxicology 66: 385. |
| Correspondence article | Sanders, D., et al. (2013). "Comment on "Long term toxicity of a Roundup herbicide and a Roundup-tolerant genetically modified maize" by Seralini et al." Food and Chemical Toxicology 53: 450-453. |
| Correspondence article | Schorsch, F. (2013). "Serious inadequacies regarding the pathology data presented in the paper by Séralini et al. (2012)." Food and Chemical Toxicology 53: 465-466. |
| Correspondence article | Wallace Hayes, A. (2014). "Editor in Chief of Food and Chemical Toxicology answers questions on retraction." Food and Chemical Toxicology 65: 394-395. |
| Effects on cellular processes | Benachour, N. and G.-E. Seralini (2009). "Glyphosate Formulations Induce Apoptosis and Necrosis in Human Umbilical, Embryonic, and Placental Cells." Chem Res Toxicol 22(1): 97-105. |
| Effects on cellular processes | Chaufan, G., et al. (2014). "Glyphosate commercial formulation causes cytotoxicity, oxidative effects, and apoptosis on human cells: differences with its active ingredient." Int J Toxicol 33(1): 29-38. |
| Effects on cellular processes | Coalova, I., et al. (2014). "Influence of the spray adjuvant on the toxicity effects of a glyphosate formulation." Toxicology in Vitro 28(7): 1306-1311. |
| Effects on cellular processes | George, J., et al. (2010). "Studies on glyphosate-induced carcinogenicity in mouse skin: a proteomic approach." J Proteomics 73(5): 951-964. |
| Effects on cellular processes | George, J. and Y. Shukla (2013). "Emptying of Intracellular Calcium Pool and Oxidative Stress Imbalance Are Associated with the Glyphosate-Induced Proliferation in Human Skin Keratinocytes HaCaT Cells." ISRN Dermatol 2013: 825180. |
| Effects on cellular processes | Heu, C., et al. (2012). "A step further toward glyphosate-induced epidermal cell death: Involvement of mitochondrial and oxidative mechanisms." Environmental Toxicology and Pharmacology 34(2): 144-153. |
| Not Relevant to current fit for purpose review | (1934). "The 1933 meeting of the American society of orthodontists at Oklahoma City." International Journal of Orthodontia and Dentistry for Children 20(1): 102-105. |
| Not Relevant to current fit for purpose review | (1938). "Supplementary report of region III: Reports of state chairmen." The Journal of Pediatrics 12(<HT>6</HT>): 846-850. |
| Not Relevant to current fit for purpose review | (1939). "Meeting of the Executive Board of the American Academy of Pediatrics." The Journal of Pediatrics 15(2): 294-315. |
| Not Relevant to current fit for purpose review | (1939). "Proceedings Meeting of the Executive Board of the American Academy of Pediatrics." The Journal of Pediatrics 14(2): 251-254. |
| Not Relevant to current fit for purpose review | (1967). "AORN Proceedings." AORN Journal 5(1): 82-91. |
| Not Relevant to current fit for purpose review | (1969). "AORN Proceedings." AORN Journal 9(5): 89-96. |
| Not Relevant to current fit for purpose review | (1969). "Nurse Recruitment Program—Stage I Winners." AORN Journal 10(<HT>6</HT>): 71-76. |
| Not Relevant to current fit for purpose review | (1970). "2036. Excretion of heliotrine in urine and bile: Jago, Marjorie, V., Lanigan, G. W., Bingley, J. B., Piercy, D. W. T., Whittem, J. H.&amp; Titchen, D. A. (1969). Excretion of the pyrrolizidine alkaloid heliotrine in the urine and bile of sheep. J. Path. 98, 115." Food and Cosmetics Toxicology 8(5): 607-608. |
| Not Relevant to current fit for purpose review | (1970). "2037. A round-up of fungal toxins: Krogh, P. (1969). The pathology of mycotoxicoses. J. stored Prod. Res. 5, 259." Food and Cosmetics Toxicology 8(5): 608. |
| Not Relevant to current fit for purpose review | (1972). "News and comment." American Journal of Orthodontics 62(3): 319-334. |
| Not Relevant to current fit for purpose review | (1976). "NHI proposals: a wide spectrum." AORN Journal 23(5): 814-818. |
| Not Relevant to current fit for purpose review | (1977). "The SR periodicals miscellany." Serials Review 3(2): 11-19. |

| Not Relevant to current fit for purpose review | (1980). "Appendix F — administrative procedures, facilities and standardization of testing." Survey of Ophthalmology 24, Supplement: 594-597. |
|---|---|
| Not Relevant to current fit for purpose review | (1981). "Calendar." Annals of Emergency Medicine 10(3): 5-6. |
| Not Relevant to current fit for purpose review | (1981). "Reviews of Books." The Lancet 317(8232): 1239-1240. |
| Not Relevant to current fit for purpose review | (1982). "Reviews of Books." The Lancet 320(8307): 1076-1078. |
| Not Relevant to current fit for purpose review | (1983). "Product news." Journal of Molecular Graphics 1(3): 89-91. |
| Not Relevant to current fit for purpose review | (1984). "24–27 October 1984 International meeting on artificial intelligence: Marseilles, France." Computer Compacts 2(3–4): 121-122. |
| Not Relevant to current fit for purpose review | (1985). "Newsview." Journal of Allergy and Clinical Immunology 76(2, Part 1): A36-A41. |
| Not Relevant to current fit for purpose review | (1990). "Regional direct marketing clubs/associations support DM education at local colleges/universities." Journal of Direct Marketing 4(1): 46-52. |
| Not Relevant to current fit for purpose review | (1990). "Subject index." Toxicology 61(3): 313-316. |
| Not Relevant to current fit for purpose review | (1990). "Volume contents." Toxicology 61(3): 319-320. |
| Not Relevant to current fit for purpose review | (1991). "4971677 Fluorescence detection type electrophoresis apparatus: Hideki Kambara, Yoshiko Katayama, Tetsuo Nishikawa, Hachiouji, Japan assigned to Hitachi Ltd." Biotechnology Advances 9(1): 89. |
| Not Relevant to current fit for purpose review | (1991). "4971903 Pyrophosphate-based method and apparatus for sequencing nucleic acids: Edward Hyman." Biotechnology Advances 9(1): 89. |
| Not Relevant to current fit for purpose review | (1991). "4971908 Glyphosate-tolerant 5-enolpyruvyl 3-phosphoshikimate synthase: Ganesh M Kishore, Dilip Shah assigned to Monsanto Company." Biotechnology Advances 9(1): 89. |
| Not Relevant to current fit for purpose review | (1991). "Author Index." Journal of Chromatography A 540: 479-482. |
| Not Relevant to current fit for purpose review | (1991). "Challenge to US computer fraud &amp; abuse act." Computer Fraud & Security Bulletin 1991(3): 5-6. |
| Not Relevant to current fit for purpose review | (1991). "Chemical index for volumes 16–17." Fundamental and Applied Toxicology 17(4): 848-850. |
| Not Relevant to current fit for purpose review | (1991). "Court case round-ups." Computer Fraud & Security Bulletin 1991(3): 5. |
| Not Relevant to current fit for purpose review | (1991). "FAT attacker!" Computer Fraud & Security Bulletin 1991(3): 5. |
| Not Relevant to current fit for purpose review | (1991). "FIGO news." International Journal of Gynecology & Obstetrics 35(3): 265-267. |
| Not Relevant to current fit for purpose review | (1991). "Local direct marketing clubs/associations support undergraduate/graduate level DM education." Journal of Direct Marketing 5(3): 61-65. |
| Not Relevant to current fit for purpose review | (1991). "Manipulation of molluscan haemocytes in vitro: ∗S.E. Fryer. Department of Zoology, Oregon State University, Corvallis OR 97331, USA." Developmental & Comparative Immunology 15, Supplement 1: S73. |
| Not Relevant to current fit for purpose review | (1991). "Preparation of monoclonal antibodies against hemolymph of the kuruma shrimp Penaeus japonicus (Crustacea: Decapoda): J. Rodriguez, V. Boulo, E. Bachère and E. Mialhe. IFREMER, Unité Pathol. Immunol. Génét. Mol., BP 133, 17390 La Tremblade, France." Developmental & Comparative Immunology 15, Supplement 1: S73. |
| Not Relevant to current fit for purpose review | (1991). "Round-up report from college/university direct marketing centers." Journal of Direct Marketing 5(2): 59-64. |
| Not Relevant to current fit for purpose review | (1992). "Forthcoming papers." Soil Biology and Biochemistry 24(1): 79. |
| Not Relevant to current fit for purpose review | (1992). "Subject index volume 85 (1992)." Plant Science 85(2): 235-237. |

| Not Relevant to current fit for purpose review | (1993). "Media watch." Physiotherapy 79(7): 496-498. |
|---|---|
| Not Relevant to current fit for purpose review | (1993). "Meetings and Notices." Journal of Equine Veterinary Science 13(9): 481-536. |
| Not Relevant to current fit for purpose review | (1993). "Meetings and notices." Journal of Equine Veterinary Science 13(8): 432-476. |
| Not Relevant to current fit for purpose review | (1993). "ROUND-UP Publications." Reproductive Health Matters 1(1): 109-110. |
| Not Relevant to current fit for purpose review | (1994). "Media Watch." Physiotherapy 80(11): 793-795. |
| Not Relevant to current fit for purpose review | (1994). "ROUND-UP Research." Reproductive Health Matters 2(4): 121-122. |
| Not Relevant to current fit for purpose review | (1994). "ROUND-UP Service Delivery." Reproductive Health Matters 2(3): 125-128. |
| Not Relevant to current fit for purpose review | (1995). "ROUND-UP Law and Policy." Reproductive Health Matters 3(<HT>6</HT>): 164-166. |
| Not Relevant to current fit for purpose review | (1995). "ROUND-UP Publications." Reproductive Health Matters 3(5): 146-151. |
| Not Relevant to current fit for purpose review | (1995). "ROUND-UP Service Delivery." Reproductive Health Matters 3(<HT>6</HT>): 167-169. |
| Not Relevant to current fit for purpose review | (1996). "5410871 Emission control device and method: Masters Ben F; Self James M Gastonia, NC, United States Assigned to Unlimited Technologies Inc." Environment International 22(2): XVI-XVII. |
| Not Relevant to current fit for purpose review | (1996). "5411697 Method for processing contaminated plastic waste: McGraw Peter S; Drake John; Hane Thomas H Severna Park, MD, United States Assigned to The United States of America as represented by the Secretary of the Navy." Environment International 22(2): XVII. |
| Not Relevant to current fit for purpose review | (1996). "5411944 Glyphosate-sulfuric acid adduct herbicides and use: Young Donald C Fullerton, CA, United States Assigned to Union Oil Company of California." Environment International 22(2): XVII. |
| Not Relevant to current fit for purpose review | (1996). "5412544 Method of illuminating and providing emergency egress guidance for hazardous areas: Derrick Donald E; Harris Hollis A; Marion Robert H; Tower William A; Towle L Christophe Hanover, NH, United States Assigned to Loctite Luminescent Systems Inc; The MTL Instruments Group." Environment International 22(2): XVII. |
| Not Relevant to current fit for purpose review | (1996). "Animal breeding and infertility: M.J. Meredith (Editor), Blackwell Science, Oxford, 1995, 508 pp., £60.00, ISBN 0-632-04038-6." Animal Reproduction Science 44(2): 135-136. |
| Not Relevant to current fit for purpose review | (1996). "Preliminary program of the ninety-sixth annual session, May 11–15,1996." American Journal of Orthodontics and Dentofacial Orthopedics 109(2): 196-214. |
| Not Relevant to current fit for purpose review | (1996). "Roundup of Federal Regulations on Food and Nutrition Issues." Journal of the American Dietetic Association 96(7): 654. |
| Not Relevant to current fit for purpose review | (1996). "ROUND-UP Research." Reproductive Health Matters 4(8): 149-153. |
| Not Relevant to current fit for purpose review | (1997). "ROUND-UP Conferences." Reproductive Health Matters 5(10): 180. |
| Not Relevant to current fit for purpose review | (1997). "ROUND-UP Research." Reproductive Health Matters 5(10): 162-167. |
| Not Relevant to current fit for purpose review | (1998). "E. coli antiserum." Journal of Equine Veterinary Science 18(8): 507. |
| Not Relevant to current fit for purpose review | (1998). "EIA in wild horses." Journal of Equine Veterinary Science 18(8): 507. |
| Not Relevant to current fit for purpose review | (1998). "Exercise-induced endotoxemia." Journal of Equine Veterinary Science 18(8): 506-507. |
| Not Relevant to current fit for purpose review | (1998). "Flamel Technologies sur les starting-blocks." Biofutur 1998(176): 41. |
| Not Relevant to current fit for purpose review | (1998). "Legislative roundup: protection of human subjects key issue for Congress." J Natl Cancer Inst 90(2): 97-98. |
| Not Relevant to current fit for purpose review | (1998). "ROUND-UP Conferences." Reproductive Health Matters <HT>6</HT>(12): 186. |

| Not Relevant to current fit for purpose review | (1999). "Research poster summaries from the ENA 1999 Annual Meeting." Journal of Emergency Nursing 25(<HT>6</HT>): 446-456. |
|---|---|
| Not Relevant to current fit for purpose review | (1999). "ROUND-UP Publications." Reproductive Health Matters 7(14): 196-201. |
| Not Relevant to current fit for purpose review | (2000). "Genome roundup." Nat Biotechnol 18(1): 9. |
| Not Relevant to current fit for purpose review | (2000). "ROUND-UP Law and Policy." Reproductive Health Matters 8(15): 171-174. |
| Not Relevant to current fit for purpose review | (2000). "ROUND-UP Research." Reproductive Health Matters 8(16): 190-192. |
| Not Relevant to current fit for purpose review | (2000). "Trauma news today." International Journal of Trauma Nursing <HT>6</HT>(3): 105-108. |
| Not Relevant to current fit for purpose review | (2001). "ROUND-UP Research." Reproductive Health Matters 9(18): 196-198. |
| Not Relevant to current fit for purpose review | (2002). "ROUND-UP Research." Reproductive Health Matters 10(19): 209-210. |
| Not Relevant to current fit for purpose review | (2003). "New Web site lights childhood obesity with fun." Journal of the American Dietetic Association 103(<HT>6</HT>): 671-672. |
| Not Relevant to current fit for purpose review | (2003). "ROUND-UP Law and Policy." Reproductive Health Matters 11(22): 199-203. |
| Not Relevant to current fit for purpose review | (2003). "ROUND-UP Research." Reproductive Health Matters 11(21): 201-204. |
| Not Relevant to current fit for purpose review | (2004). "Contemporary issues in women's health." International Journal of Gynecology & Obstetrics 87(2): 111-113. |
| Not Relevant to current fit for purpose review | (2004). "Contents page, CD logo." The Journal of Men's Health & Gender 1(4): 283-284. |
| Not Relevant to current fit for purpose review | (2004). "Editorial Board." European Journal of Oncology Nursing 8(4): i. |
| Not Relevant to current fit for purpose review | (2004). "Editorial Board." European Journal of Oncology Nursing 8(3): i. |
| Not Relevant to current fit for purpose review | (2004). "Editorial Board." European Journal of Oncology Nursing 8, Supplement 1: i. |
| Not Relevant to current fit for purpose review | (2004). "Editorial Board." European Journal of Oncology Nursing 8, Supplement 2: i. |
| Not Relevant to current fit for purpose review | (2004). "Research round-up." Complementary Therapies in Nursing and Midwifery 10(4): 262-263. |
| Not Relevant to current fit for purpose review | (2004). "ROUND-UP Condoms." Reproductive Health Matters 12(23): 176-177. |
| Not Relevant to current fit for purpose review | (2004). "ROUND-UP Publications." Reproductive Health Matters 12(24): 231-236. |
| Not Relevant to current fit for purpose review | (2004). "ROUND-UP Service Delivery." Reproductive Health Matters 12(23): 191-200. |
| Not Relevant to current fit for purpose review | (2004). "Volume Contents Index." The Journal of Men's Health & Gender 1(4): 413-415. |
| Not Relevant to current fit for purpose review | (2004). "WebWatch." The Journal of Men's Health & Gender 1(2–3): 240. |
| Not Relevant to current fit for purpose review | (2004). "You've Been Had! How the Media and Environmentalists Turned America into a Nation of Hypochondriacs: Melvin A. Benarde. Rutgers University Press, 2002. xiv + 308 pp. $28.00. ISBN 0-8135-3050-4." Chemical Health and Safety 11(2): 39-40. |
| Not Relevant to current fit for purpose review | (2005). "Contents page, CD logo." The Journal of Men's Health & Gender 2(4): 387. |
| Not Relevant to current fit for purpose review | (2005). "Contents page, CD logo." The Journal of Men's Health & Gender 2(2): 159-160. |
| Not Relevant to current fit for purpose review | (2005). "Editorial Board." European Journal of Oncology Nursing 9(4): i. |

| Not Relevant to current fit for purpose review | (2005). "Editorial Board." European Journal of Oncology Nursing 9(3): i. |
|---|---|
| Not Relevant to current fit for purpose review | (2005). "Editorial Board." European Journal of Oncology Nursing 9(2): i. |
| Not Relevant to current fit for purpose review | (2005). "Editorial Board." European Journal of Oncology Nursing 9(1): i. |
| Not Relevant to current fit for purpose review | (2005). "JournalWatch." The Journal of Men's Health & Gender 2(3): 353-356. |
| Not Relevant to current fit for purpose review | (2005). "News Round-up." The Journal of Men's Health & Gender 2(3): 360-363. |
| Not Relevant to current fit for purpose review | (2005). "News Round-up." The Journal of Men's Health & Gender 2(1): 116-118. |
| Not Relevant to current fit for purpose review | (2005). "News Round-up for jmhg vol 2 no 4 (Dec 2005)." The Journal of Men's Health & Gender 2(4): 444. |
| Not Relevant to current fit for purpose review | (2005). "Research round-up : a brief summary of research publications in CAM." Complementary Therapies in Clinical Practice 11(2): 139-141. |
| Not Relevant to current fit for purpose review | (2006). "ACFAOM newsletter." The Foot 16(4): 226-227. |
| Not Relevant to current fit for purpose review | (2006). "Aims &amp; Scope/Editorial board." The Journal of Men's Health & Gender 3(1): iii. |
| Not Relevant to current fit for purpose review | (2006). "Contents page, CD logo." The Journal of Men's Health & Gender 3(2): 119-120. |
| Not Relevant to current fit for purpose review | (2006). "Contents page, CD logo." The Journal of Men's Health & Gender 3(4): 315-316. |
| Not Relevant to current fit for purpose review | (2006). "Editorial Board." European Journal of Oncology Nursing 10(5): i. |
| Not Relevant to current fit for purpose review | (2006). "Editorial Board." European Journal of Oncology Nursing 10(4): i. |
| Not Relevant to current fit for purpose review | (2006). "Editorial Board." European Journal of Oncology Nursing 10(3): i. |
| Not Relevant to current fit for purpose review | (2006). "Editorial Board." European Journal of Oncology Nursing 10(2): i. |
| Not Relevant to current fit for purpose review | (2006). "Editorial Board." European Journal of Oncology Nursing 10(1): i. |
| Not Relevant to current fit for purpose review | (2006). "Editorial Board/Publication/Advertising info." Progress in Biophysics and Molecular Biology 92(1): CO2. |
| Not Relevant to current fit for purpose review | (2006). "News Round-up." The Journal of Men's Health & Gender 3(1): 93-96. |
| Not Relevant to current fit for purpose review | (2006). "News Round-up for jmhg vol 3 no 3 (September 2006)." The Journal of Men's Health & Gender 3(3): 304-306. |
| Not Relevant to current fit for purpose review | (2006). "Research." Reproductive Health Matters 14(28): 210-218. |
| Not Relevant to current fit for purpose review | (2006). "Research problems." Discrete Applied Mathematics 154(3): 604-607. |
| Not Relevant to current fit for purpose review | (2006). "Table of Contents." The American Journal of Emergency Medicine 24(4): A3-A4. |
| Not Relevant to current fit for purpose review | (2006). "Volume Contents Index: Volume 3." The Journal of Men's Health & Gender 3(4): 427-431. |
| Not Relevant to current fit for purpose review | (2006). "WebWatch for jmhg vol 3 no 1 (issue 9)." The Journal of Men's Health & Gender 3(1): 88. |
| Not Relevant to current fit for purpose review | (2007). "Art exhibit powered by geothermal energy." Renewable Energy Focus 8(<HT>6</HT>): 14. |
| Not Relevant to current fit for purpose review | (2007). "Contents." The Journal of Men's Health & Gender 4(2): 113-114. |

| Not Relevant to current fit for purpose review | (2007). "Contents page." The Journal of Men's Health & Gender 4(1): 1-2. |
|---|---|
| Not Relevant to current fit for purpose review | (2007). "Editorial Board." European Journal of Oncology Nursing 11, Supplement 2: ii. |
| Not Relevant to current fit for purpose review | (2007). "Editorial Board." European Journal of Oncology Nursing 11(5): i. |
| Not Relevant to current fit for purpose review | (2007). "Editorial Board." European Journal of Oncology Nursing 11(4): i. |
| Not Relevant to current fit for purpose review | (2007). "Editorial Board." European Journal of Oncology Nursing 11(3): i. |
| Not Relevant to current fit for purpose review | (2007). "Editorial Board." European Journal of Oncology Nursing 11(2): i. |
| Not Relevant to current fit for purpose review | (2007). "Editorial Board." European Journal of Oncology Nursing 11(1): i. |
| Not Relevant to current fit for purpose review | (2007). "In brief." Renewable Energy Focus 8(<HT>6</HT>): 18-19. |
| Not Relevant to current fit for purpose review | (2007). "North America." Renewable Energy Focus 8(5): 6. |
| Not Relevant to current fit for purpose review | (2007). "US could "eliminate CO2 emissions without nuclear power"." Renewable Energy Focus 8(5): 18. |
| Not Relevant to current fit for purpose review | (2008). "Editorial Board." European Journal of Oncology Nursing 12(5): i. |
| Not Relevant to current fit for purpose review | (2008). "Editorial Board." European Journal of Oncology Nursing 12(1): i. |
| Not Relevant to current fit for purpose review | (2008). "Editorial Board." European Journal of Oncology Nursing 12(4): i. |
| Not Relevant to current fit for purpose review | (2008). "Editorial Board." European Journal of Oncology Nursing 12(3): i. |
| Not Relevant to current fit for purpose review | (2008). "Editorial Board." European Journal of Oncology Nursing 12(2): i. |
| Not Relevant to current fit for purpose review | (2008). "In Brief." Renewable Energy Focus 9(3): 16. |
| Not Relevant to current fit for purpose review | (2008). "In brief – projects." Renewable Energy Focus 9(<HT>6</HT>): 15. |
| Not Relevant to current fit for purpose review | (2008). "Swiss FiT on slippery slope?" Renewable Energy Focus 9(5): 12. |
| Not Relevant to current fit for purpose review | (2008). "US wind heavyweights unite over PTC." Renewable Energy Focus 9(3): 17. |
| Not Relevant to current fit for purpose review | (2008). "Wärtsilä BioPower plant to use brewery spent grain." Renewable Energy Focus 9(2): 12. |
| Not Relevant to current fit for purpose review | (2009). "Acknowledgements." European Journal of Agronomy 31(3): iv. |
| Not Relevant to current fit for purpose review | (2009). "Carbon Trust calls for switch to biomass heating." Renewable Energy Focus 10(2): 15. |
| Not Relevant to current fit for purpose review | (2009). "Editorial Board." European Journal of Oncology Nursing 13(4): i. |
| Not Relevant to current fit for purpose review | (2009). "Editorial Board." European Journal of Oncology Nursing 13(3): i. |
| Not Relevant to current fit for purpose review | (2009). "Editorial Board." European Journal of Oncology Nursing 13(2): i. |
| Not Relevant to current fit for purpose review | (2009). "Editorial Board." European Journal of Oncology Nursing 13(1): i. |
| Not Relevant to current fit for purpose review | (2009). "EU renewables in short." Renewable Energy Focus 9(7): 14. |

| | |
|---|---|
| Not Relevant to current fit for purpose review | (2009). "Pickens scraps "mega" wind plans." Renewable Energy Focus 10(5): 18. |
| Not Relevant to current fit for purpose review | (2009). "Policy still needed for solar growth." Renewable Energy Focus 10(<HT>6</HT>): 16. |
| Not Relevant to current fit for purpose review | (2009). "Shell withdraws from wind and solar — focuses on biofuels." Renewable Energy Focus 10(3): 19. |
| Not Relevant to current fit for purpose review | (2010). "Communications orales du 27e congrès de la SFE." Annales d'Endocrinologie 71(5): 340-353. |
| Not Relevant to current fit for purpose review | (2010). "Ten GW US wind in 2009." Renewable Energy Focus 11(1): 13. |
| Not Relevant to current fit for purpose review | (2010). "UK introduces feed-in tariffs." Renewable Energy Focus 11(1): 8. |
| Not Relevant to current fit for purpose review | (2011). "€51 billion offshore wind market." Renewable Energy Focus 12(<HT>6</HT>): 12. |
| Not Relevant to current fit for purpose review | (2011). "December, 2010." The Lancet Neurology 10(3): 209. |
| Not Relevant to current fit for purpose review | (2011). "Directions &amp; Connections." Journal of the American Medical Directors Association 12(8): A14-A15. |
| Not Relevant to current fit for purpose review | (2011). "Directions &amp; Connections." Journal of the American Medical Directors Association 12(7): A14-A15. |
| Not Relevant to current fit for purpose review | (2011). "Directions &amp; Connections." Journal of the American Medical Directors Association 12(9): A10-A11. |
| Not Relevant to current fit for purpose review | (2011). "Editorial Board." Spectrochimica Acta Part A: Molecular and Biomolecular Spectroscopy 78(5): CO2. |
| Not Relevant to current fit for purpose review | (2011). "EU: huge renewables growth if projections met." Renewable Energy Focus 12(<HT>6</HT>): 10. |
| Not Relevant to current fit for purpose review | (2011). "Table of Contents." Regulatory Toxicology and Pharmacology 61(2): iii. |
| Not Relevant to current fit for purpose review | (2011). "Table of Contents." The American Journal of Emergency Medicine 29(4): A5-A7. |
| Not Relevant to current fit for purpose review | (2012). "Contents." The American Journal of Medicine 125(8): A5-A7. |
| Not Relevant to current fit for purpose review | (2012). "Directions &amp; Connections." Journal of the American Medical Directors Association 13(1): A10-A11. |
| Not Relevant to current fit for purpose review | (2012). "Directions &amp; Connections." Journal of the American Medical Directors Association 13(2): A14-A15. |
| Not Relevant to current fit for purpose review | (2012). "Impact sanitaire de la pollution environnementale et solutions pour la dépollution cellulaire." La Revue d'Homéopathie 3(3): 115-117. |
| Not Relevant to current fit for purpose review | (2012). "Revue de presse." La Revue d'Homéopathie 3(4): 159-160. |
| Not Relevant to current fit for purpose review | (2013). "December, 2012." The Lancet Neurology 12(3): 230. |
| Not Relevant to current fit for purpose review | (2015). "60 Seconds." New Scientist 225(3014): 7. |
| Not Relevant to current fit for purpose review | (2015). "60 Seconds." New Scientist 226(3022): 7. |
| Not Relevant to current fit for purpose review | (2015). "GLYPHOSATE UNLIKELY TO CAUSE CANCER, EU AGENCY FINDS." Chemical & Engineering News 93(45): 26-26. |
| Not Relevant to current fit for purpose review | (2016). "EDITORIAL BOARD." NeuroToxicology 52: IFC. |
| Not Relevant to current fit for purpose review | Abdullahi, A. E. (2002). "Cynodon dactylon control with tillage and glyphosate." Crop Protection 21(10): 1093-1100. |
| Not Relevant to current fit for purpose review | Acar, A., et al. (2015). "The Investigation of Genotoxic, Physiological and Anatomical Effects of Paraquat Herbicide on Allium cepa L." Cytologia 80(3): 343-351. |

| | |
|---|---|
| Not Relevant to current fit for purpose review | Acquavella, J., et al. (1999). "A case-control study of non-Hodgkin lymphoma and exposure to pesticides." Cancer 86(4): 729-731. |
| Not Relevant to current fit for purpose review | Aicher, R. H. (1999). "Vicarious Liability." Aesthetic Surgery Journal 19(4): 341. |
| Not Relevant to current fit for purpose review | Akaza, H. (2007). "Report from the 1st Japanese Urological Association-Japanese Society of Medical Oncology joint conference, 2006: 'A step towards better collaboration between urologists and medical oncologists'." Int J Urol 14(5): 375-383. |
| Not Relevant to current fit for purpose review | Akert, K. (1959). "Morphologue und physiologie des nervensystems: Paul Glees Georg Thieme, Verlag, Stuttgart, 1957, 445 pp. $13.50." Electroencephalography and Clinical Neurophysiology 11(1): 191-192. |
| Not Relevant to current fit for purpose review | Albrecht, B., et al. (1991). "In vivo utilization of N-(phosphonomethyl)-anilines and related substances by Pseudomonas spec. GS." J Basic Microbiol 31(6): 403-411. |
| Not Relevant to current fit for purpose review | Altenhoff, A. M. and C. Dessimoz (2009). "Phylogenetic and functional assessment of orthologs inference projects and methods." PLoS Comput Biol 5(1): e1000262. |
| Not Relevant to current fit for purpose review | Amaro, P. (2012). "O mancozebe é um óptimo exemplo da diversidade de classificação toxicológica dos pesticidas em Portugal." Revista de Ciências Agrárias 35(2): 118-125. |
| Not Relevant to current fit for purpose review | Andersson, K.-E. (2011). "This Month in Investigative Urology." The Journal of Urology 185(4): 1176. |
| Not Relevant to current fit for purpose review | Angelini, C. (2012). "Neuromuscular diseases: advances in therapy and diagnosis." The Lancet Neurology 11(1): 15-17. |
| Not Relevant to current fit for purpose review | Anklam, E. (1999). "The validation of methods based on polymerase chain reaction for the detection of genetically modified organisms in food." Analytica Chimica Acta 393(1–3): 177-179. |
| Not Relevant to current fit for purpose review | Antonini, A. (2012). "Movement disorders: towards new therapies in Parkinson's disease." The Lancet Neurology 11(1): 7-8. |
| Not Relevant to current fit for purpose review | Arjo, G., et al. (2013). "Plurality of opinion, scientific discourse and pseudoscience: an in depth analysis of the Seralini et al. study claiming that Roundup (TM) Ready corn or the herbicide Roundup (TM) cause cancer in rats." Transgenic Res 22(2): 255-267. |
| Not Relevant to current fit for purpose review | Astudillo, O. (2012). "Clinical trials: round-up." The Lancet Oncology 13(10): 976. |
| Not Relevant to current fit for purpose review | Atkinson, S. (2003). "Product developments in biotechnology and medical applications." Membrane Technology 2003(2): 10-11. |
| Not Relevant to current fit for purpose review | Avella, P., et al. (2007). "Metric inequalities and the Network Loading Problem." Discrete Optimization 4(1): 103-114. |
| Not Relevant to current fit for purpose review | Axelrad, J. C., et al. (2002). "Enhanced in vitro toxicity of the herbicide glyphosate to neuroblastoma cells chronically pre-treated with the organophosphate pesticide diazinon." Toxicology 178(1): 62-63. |
| Not Relevant to current fit for purpose review | Axelrad, J. C., et al. (2003). "The effects of acute pesticide exposure on neuroblastoma cells chronically exposed to diazinon." Toxicology 185(1–2): 67-78. |
| Not Relevant to current fit for purpose review | Azevedo, L., et al. (2010). "In Vivo Antimutagenic Properties of Transgenic and Conventional Soybeans." J Med Food 13(6): 1402-1408. |
| Not Relevant to current fit for purpose review | Bababunmi, E. A., et al. (1979). "The uncoupling effect of N-(phosphonomethyl)glycine on isolated rat liver mitochondria." Biochemical Pharmacology 28(<HT>6</HT>): 925-927. |
| Not Relevant to current fit for purpose review | Badr, A., et al. (2013). "Cytophysiological impacts of Metosulam herbicide on Vicia faba plants." Acta Physiologiae Plantarum 35(6): 1933-1941. |
| Not Relevant to current fit for purpose review | Barker, W. F. (1995). "The Western Vascular Society: Its first ten years." Journal of Vascular Surgery 22(4): 505-506. |
| Not Relevant to current fit for purpose review | Baron, R., et al. (2012). "Chronic pain: genes, plasticity, and phenotypes." The Lancet Neurology 11(1): 19-21. |
| Not Relevant to current fit for purpose review | Bar-Or, A. (2016). "Multiple sclerosis and related disorders: evolving pathophysiologic insights." The Lancet Neurology 15(1): 9-11. |
| Not Relevant to current fit for purpose review | Bartelink, H., et al. (1993). "Foreword." Radiotherapy and Oncology 29(2): xi-xii. |
| Not Relevant to current fit for purpose review | Bates, J. A. (2004). "Use of narrative interviewing in everyday information behavior research." Library & Information Science Research 26(1): 15-28. |
| Not Relevant to current fit for purpose review | Begna, S. H., et al. (2001). "Morphology and yield response to weed pressure by corn hybrids differing in canopy architecture." European Journal of Agronomy 14(4): 293-302. |

| Not Relevant to current fit for purpose review | Benachour, N., et al. (2007). "Time- and dose-dependent effects of roundup on human embryonic and placental cells." Arch Environ Contam Toxicol 53(1): 126-133. |
| --- | --- |
| Not Relevant to current fit for purpose review | Ben-Menachem, E. (2016). "Epilepsy in 2015: the year of collaborations for big data." The Lancet Neurology 15(1): 6-7. |
| Not Relevant to current fit for purpose review | Berdal, K. G. and A. Holst-Jensen (2001). "Roundup Ready (R) soybean event-specific real-time quantitative PCR assay and estimation of the practical detection and quantification limits in GMO analyses." European Food Research and Technology 213(6): 432-438. |
| Not Relevant to current fit for purpose review | Berer, M. (1996). "Men." Reproductive Health Matters 4(7): 7-10. |
| Not Relevant to current fit for purpose review | Berkovic, S. F. (2010). "Epilepsy: insights into causes and treatment dilemmas." The Lancet Neurology 9(1): 9-11. |
| Not Relevant to current fit for purpose review | Bermel, R. A. and J. A. Cohen (2011). "Multiple sclerosis: advances in understanding pathogenesis and emergence of oral treatment options." The Lancet Neurology 10(1): 4-5. |
| Not Relevant to current fit for purpose review | Bertheussen, K., et al. (1997). "A new sensitive cell culture test for tee assessment of pesticide toxicity." Journal of Environmental Science and Health Part B-Pesticides Food Contaminants and Agricultural Wastes 32(2): 195-211. |
| Not Relevant to current fit for purpose review | Bertucci, A., et al. (2015). "Detection of unamplified genomic DNA by a PNA-based microstructured optical fiber (MOF) Bragg-grating optofluidic system." Biosens Bioelectron 63: 248-254. |
| Not Relevant to current fit for purpose review | Bf (1995). "Let's Get Things Moving: Overcoming constipation." Physiotherapy 81(5): 301. |
| Not Relevant to current fit for purpose review | Bjerrum-Bohr, J. J., et al. (2012). "Hydrodynamics of a quark droplet." Nuclear Physics A 882: 90-106. |
| Not Relevant to current fit for purpose review | Blumann, W. and D. Fauth (1993). "Expensive NM standards round-up: Network Management Standards: OSI, SNMP and CMOL Protocols by Ulyses Black. Published by McGraw Hill, 1992, £38.95, 336 pp." Computer Communications 16(7): 449. |
| Not Relevant to current fit for purpose review | Bogler, O. and R. Sawaya (2008). "Foreword." Current Problems in Cancer 32(3): 95-96. |
| Not Relevant to current fit for purpose review | Bonn, D. (2005). "Web round-up: rare-tumour information." The Lancet Oncology <HT>6</HT>(3): 144. |
| Not Relevant to current fit for purpose review | Botha, G. M. and C. D. Viljoen (2009). "South Africa: A case study for voluntary GM labelling." Food Chemistry 112(4): 1060-1064. |
| Not Relevant to current fit for purpose review | Bournat, P. (1997). "Les techniques de transgénèse végétale." Biofutur 1997(172): 3-7. |
| Not Relevant to current fit for purpose review | Boutet, I., et al. (2004). "Molecular identification and expression of two non-P450 enzymes, monoamine oxidase A and flavin-containing monooxygenase 2, involved in phase I of xenobiotic biotransformation in the Pacific oyster, Crassostrea gigas." Biochim Biophys Acta 1679(1): 29-36. |
| Not Relevant to current fit for purpose review | Bowersox, T. W., et al. (1990). "Coppicing success of young Eucalyptus saligna in Hawaii." Biomass 23(2): 137-148. |
| Not Relevant to current fit for purpose review | Bowman, W. C. (1983). "Drugs and anesthesia—Pharmacology for anesthesiologists." Trends in Pharmacological Sciences 4: 358-359. |
| Not Relevant to current fit for purpose review | Brandenberger, L. P., et al. (2005). "Preemergence weed control in direct-seeded watermelon." Weed Technology 19(3): 706-712. |
| Not Relevant to current fit for purpose review | Breaden, A. (1991). "Victoria ASCCN." Confederation of Australian Critical Care Nurses Journal 4(3): 6. |
| Not Relevant to current fit for purpose review | Briscoe, M. and C. P. Wynne (1988). "State Round-Up Tasmanian Branch of A.S.C.C.N." CNSA Journal 1(1): 3-7. |
| Not Relevant to current fit for purpose review | Burkhart, C. G. (1981). "Looking at eyelid lesions--a clinical roundup." Geriatrics 36(8): 91-95. |
| Not Relevant to current fit for purpose review | Burr, T. J., et al. (1995). "SURVIVAL AND TUMORIGENICITY OF AGROBACTERIUM-VITIS IN LIVING AND DECAYING GRAPE ROOTS AND CANES IN SOIL." Plant Disease 79(7): 677-682. |
| Not Relevant to current fit for purpose review | Bushby, K. (2011). "Neuromuscular diseases: milestones in development of treatments." The Lancet Neurology 10(1): 11-13. |
| Not Relevant to current fit for purpose review | Butler, T. J., et al. (2002). "Broomsedge (Andropogon virginicus) response to herbicides and burning." Weed Technology 16(1): 18-22. |

| | |
|---|---|
| Not Relevant to current fit for purpose review | Cai, Z., et al. (2012). "3.102 PERINATAL LPS EXPOSURE INCREASES THE RISK FOR DOPAMINERGIC DISORDERS IN ADULT LIFE." Parkinsonism & Related Disorders 18, Supplement 2: S190. |
| Not Relevant to current fit for purpose review | Caloni, F., et al. (2015). "In vitro effects of glyphosate on cell proliferation and steroid production by bovine granulosa cells." Toxicology Letters 238(2, Supplement): S290. |
| Not Relevant to current fit for purpose review | Campbell, M. H. and A. R. Gilmour (1979). "EFFECT OF TIME AND RATE OF APPLICATION OF HERBICIDES ON SERRATED TUSSOCK (NASSELLA-TRICHOTOMA) AND IMPROVED PASTURE SPECIES .1. GLYPHOSATE AND 2,2-DPA." Australian Journal of Experimental Agriculture 19(99): 472-475. |
| Not Relevant to current fit for purpose review | Cao, G., et al. (2013). "Draft genome sequence of pseudomonas strain p818, isolated from glyphosate-polluted soil." Genome Announc 1(6). |
| Not Relevant to current fit for purpose review | Casorri, L., et al. (2010). "Testing Round-up Ready soybean along processing chain by traditional and innovative methods." Journal of Biotechnology 150, Supplement: 536. |
| Not Relevant to current fit for purpose review | Castillo, M., et al. (2014). "Seedbed Preparation Techniques and Weed Control Strategies for Strip-Planting Rhizoma Peanut into Warm-Season Grass Pastures." Crop Science 54(4): 1868-1875. |
| Not Relevant to current fit for purpose review | Cavusoglu, K., et al. (2011). "Protective effect of Ginkgo biloba L. leaf extract against glyphosate toxicity in Swiss albino mice." J Med Food 14(10): 1263-1272. |
| Not Relevant to current fit for purpose review | Cebeci, O. and H. Budak (2009). "Global Expression Patterns of Three Festuca Species Exposed to Different Doses of Glyphosate Using the Affymetrix GeneChip Wheat Genome Array." Comp Funct Genomics: 505701. |
| Not Relevant to current fit for purpose review | Chang, H. S., et al. (2001). "Allergenicity test of genetically modified soybean in Sprague-Dawley rats." Archives of Pharmacal Research 24(3): 256-261. |
| Not Relevant to current fit for purpose review | Chang, J.-S., et al. (1999). "Transformation of rat fibroblasts by phospholipase C-γ1 overexpression is accompanied by tyrosine dephosphorylation of paxillin." FEBS Letters 460(1): 161-165. |
| Not Relevant to current fit for purpose review | Charles, A. (2011). "Headache: new genes, new mechanisms, and new therapies." The Lancet Neurology 10(1): 13-14. |
| Not Relevant to current fit for purpose review | Charlton, C. G. and G. V. Muthian (2012). "3.101 PRENATAL SENSITIZATION AND POSTNATAL PRECIPITATION IN A MODEL OF PARKINSONISM." Parkinsonism & Related Disorders 18, Supplement 2: S189-S190. |
| Not Relevant to current fit for purpose review | Chee, P. P. and J. L. Slightom (1991). "TRANSFER AND EXPRESSION OF CUCUMBER MOSAIC-VIRUS COAT PROTEIN GENE IN THE GENOME OF CUCUMIS-SATIVUS." Journal of the American Society for Horticultural Science 116(6): 1098-1102. |
| Not Relevant to current fit for purpose review | Chen, L., et al. (2009). "Modeling Multi-typed Structurally Viewed Chemicals with the UMLS Refined Semantic Network." Journal of the American Medical Informatics Association 16(1): 116-131. |
| Not Relevant to current fit for purpose review | Chiò, A. and G. Lauria (2016). "Degenerative neuromuscular diseases: crucial gene and cell machinery discoveries." The Lancet Neurology 15(1): 12-13. |
| Not Relevant to current fit for purpose review | Chorfa, A., et al. (2013). "Specific Pesticide-Dependent Increases in alpha-Synuclein Levels in Human Neuroblastoma (SH-SY5Y) and Melanoma (SK-MEL-2) Cell Lines." Toxicological Sciences 133(2): 289-297. |
| Not Relevant to current fit for purpose review | Cichosz, G. and S. K. Wiackowski (2012). "[Genetically modified food--great unknown]." Pol Merkur Lekarski 33(194): 59-63. |
| Not Relevant to current fit for purpose review | Cooke, R. M. (1997). "Protein NMR extends into new fields of structural biology." Current Opinion in Chemical Biology 1(3): 359-364. |
| Not Relevant to current fit for purpose review | Cornish-Bowden, A. and M. L. Cardenas (2003). "Metabolic analysis in drug design." Comptes Rendus Biologies 326(5): 509-515. |
| Not Relevant to current fit for purpose review | Costa, M. d. D. L. d., et al. (2003). "Alterações de neuroimagem no parkinsonismo: estudo de cinco casos." Arquivos De Neuro-Psiquiatria 61(2B): 381-386. |
| Not Relevant to current fit for purpose review | Costello, J. (2015). "Research roundup." Int J Palliat Nurs 21(8): 410-411. |
| Not Relevant to current fit for purpose review | Coyle, J. (2003). "A Practical Guide to Intensity – Modulated Radiation Therapy." Clinical Oncology 15(8): 507. |
| Not Relevant to current fit for purpose review | Croft, S. M., et al. (1974). "Inhibition of chloroplast ribosome formation by N,N-bis(phosphonomethyl)glycine." Biochimica et Biophysica Acta (BBA) - Nucleic Acids and Protein Synthesis 335(2): 211-217. |

| Not Relevant to current fit for purpose review | Cross, J. R. (1995). "Modern Chinese Acupuncture - A review of acupuncture techniques as prasetised in China today." Physiotherapy 81(5): 302. |
|---|---|
| Not Relevant to current fit for purpose review | Cui, J., et al. (2011). "Detecting biological network organization and functional gene orthologs." Bioinformatics 27(20): 2919-2920. |
| Not Relevant to current fit for purpose review | Culbreth, M. E., et al. (2012). "Comparison of chemical-induced changes in proliferation and apoptosis in human and mouse neuroprogenitor cells." NeuroToxicology 33(6): 1499-1510. |
| Not Relevant to current fit for purpose review | Cundiff, J. S., et al. (1997). "A linear programming approach for designing a herbaceous biomass delivery system." Bioresource Technology 59(1): 47-55. |
| Not Relevant to current fit for purpose review | da Costa, M. D. L., et al. (2003). "Neuroimaging abnormalities in parkinsonism: study of five cases." Arquivos De Neuro-Psiquiatria 61(2B): 381-386. |
| Not Relevant to current fit for purpose review | D'Amico, D. B. (1978). "Critics prompt plans to revise health planning guidelines." AORN Journal 27(4): 702-706. |
| Not Relevant to current fit for purpose review | Dan, B. and P. Baxter (2014). "Paediatric neurology: a year of DNA technology." The Lancet Neurology 13(1): 16-18. |
| Not Relevant to current fit for purpose review | Dan, Y. H., et al. (2006). "MicroTom-a high-throughput model transformation system for functional genomics." Plant Cell Rep 25(5): 432-441. |
| Not Relevant to current fit for purpose review | Daniel, R. K., et al. (1986). "Tissue transplants in primates for upper extremity reconstruction: A preliminary report." The Journal of Hand Surgery 11(1): 1-8. |
| Not Relevant to current fit for purpose review | Das, M., et al. (2010). "A composite transcriptional signature differentiates responses towards closely related herbicides in Arabidopsis thaliana and Brassica napus." Plant Mol Biol 72(4-5): 545-556. |
| Not Relevant to current fit for purpose review | Das, M., et al. (2010). "A composite transcriptional signature differentiates responses towards closely related herbicides in Arabidopsis thaliana and Brassica napus." Plant Mol Biol 72(4-5): 545-556. |
| Not Relevant to current fit for purpose review | Datta, R. and H. Daniell (1996). "Transformation of the tobacco chloroplast genome with the arcA gene to confer glyphosate tolerance." Plant Physiol 111(2): 790-790. |
| Not Relevant to current fit for purpose review | Davis, W. M. and I. W. Waters (1999). "A new-drug roundup." Rn 62(4): 54-60; quiz 62. |
| Not Relevant to current fit for purpose review | De Marco, A., et al. (1992). "Importance of the type of soil for the induction of micronuclei and the growth of primary roots of Vicia faba treated with the herbicides atrazine, glyphosate and maleic hydrazide." Mutat Res 279(1): 9-13. |
| Not Relevant to current fit for purpose review | DeAngelis, L. M. (2010). "Neuro-oncology: new hope for patients with gliomas." The Lancet Neurology 9(1): 17-18. |
| Not Relevant to current fit for purpose review | Defarge, N., et al. (2016). "Co-Formulants in Glyphosate-Based Herbicides Disrupt Aromatase Activity in Human Cells below Toxic Levels." Int J Environ Res Public Health 13(3). |
| Not Relevant to current fit for purpose review | Dehghan, R., et al. (2015). "Optimization of overlapping activities in the design phase of construction projects." Automation in Construction 59: 81-95. |
| Not Relevant to current fit for purpose review | DeLuca, T. F., et al. (2006). "Roundup: a multi-genome repository of orthologs and evolutionary distances." Bioinformatics 22(16): 2044-2046. |
| Not Relevant to current fit for purpose review | Demarco, A., et al. (1995). "INFLUENCE OF SOIL CHARACTERISTICS ON THE CLASTOGENIC ACTIVITY OF MALEIC HYDRAZIDE IN ROOT-TIPS OF VICIA-FABA." Mutation Research-Genetic Toxicology 344(1-2): 5-12. |
| Not Relevant to current fit for purpose review | Demarco, A., et al. (1992). "IMPORTANCE OF THE TYPE OF SOIL FOR THE INDUCTION OF MICRONUCLEI AND THE GROWTH OF PRIMARY ROOTS OF VICIA-FABA TREATED WITH THE HERBICIDES ATRAZINE, GLYPHOSATE AND MALEIC HYDRAZIDE." Mutat Res 279(1): 9-13. |
| Not Relevant to current fit for purpose review | Demeke, T. and I. Ratnayaka (2008). "Multiplex qualitative PCR assay for identification of genetically modified canola events and real-time event-specific PCR assay for quantification of the GT73 canola event." Food Control 19(9): 893-897. |
| Not Relevant to current fit for purpose review | Deming, D. (1989). "Application of bottom-hole temperature corrections in geothermal studies." Geothermics 18(5–<HT>6</HT>): 775-786. |
| Not Relevant to current fit for purpose review | Desimone, C., et al. (1992). "GENOTOXIC EFFECT INDUCED BY HERBICIDES ATRAZINE GLYPHOSATE IN PLANTS OF VICIA-FABA GROWN IN DIFFERENT SOILS." Science of the Total Environment 123: 233-240. |
| Not Relevant to current fit for purpose review | Diener, H.-C. (2004). "Important advances in headache." The Lancet Neurology 3(1): 12. |

| | |
|---|---|
| Not Relevant to current fit for purpose review | Dong Kyu Kim, M. D., et al. (2015). "The Factors Associated with the Hypotension Development in Acute Glyphosate-surfactant Herbicide Poisoning." Journal of The Korean Society of Emergency Medicine 26(3): 248-255. |
| Not Relevant to current fit for purpose review | Donnan, G. A. (2004). "Stroke: prediction, prevention, and outcome." The Lancet Neurology 3(1): 9. |
| Not Relevant to current fit for purpose review | Dragutinovich, S. (1987). "Stimulus intensity reducers: Are they sensation seekers, extraverts, and strong nervous types?" Personality and Individual Differences 8(5): 693-704. |
| Not Relevant to current fit for purpose review | Druwe, I., et al. (2015). "Sensitivity of neuroprogenitor cells to chemical-induced apoptosis using a multiplexed assay suitable for high-throughput screening." Toxicology 333: 14-24. |
| Not Relevant to current fit for purpose review | Duncan, K., et al. (1984). "The complete amino acid sequence of Escherichia coli 5-enolpyruvylshikimate 3-phosphate synthase." FEBS Letters 170(1): 59-63. |
| Not Relevant to current fit for purpose review | Dunn, S. V. (1999). "Recognising our limits: the murky shores where science meets values and beliefs." Australian Critical Care 12(4): 130. |
| Not Relevant to current fit for purpose review | Ehlert, A., et al. (2008). "Development of a modular system for detection of genetically modified organisms in food based on ligation-dependent probe amplification." European Food Research and Technology 227(3): 805-812. |
| Not Relevant to current fit for purpose review | Elgorashi, E. E., et al. (2004). "Isolation of captan from Cyrtanthus suaveolens: the effect of pesticides on the quality and safety of traditional medicine." South African Journal of Botany 70(4): 512-514. |
| Not Relevant to current fit for purpose review | Elie-Caille, C., et al. (2010). "Morphological damages of a glyphosate-treated human keratinocyte cell line revealed by a micro- to nanoscale microscopic investigation." Cell Biol Toxicol 26(4): 331-339. |
| Not Relevant to current fit for purpose review | Endo, M. and S. Toki (2013). "Creation of herbicide-tolerant crops by gene targeting." Journal of Pesticide Science 38(1-2): 49-59. |
| Not Relevant to current fit for purpose review | Engel, K.-H., et al. (2006). "Quantification of DNA from genetically modified organisms in composite and processed foods." Trends in Food Science & Technology 17(9): 490-497. |
| Not Relevant to current fit for purpose review | Erickson, B. (2015). "GLYPHOSATE LINKED TO CANCER." Chemical & Engineering News 93(13): 5-5. |
| Not Relevant to current fit for purpose review | Ewald, M., et al. (2014). "From surface to intracellular non-invasive nanoscale study of living cells impairments." Nanotechnology 25(29). |
| Not Relevant to current fit for purpose review | Farrington, J. W. (1979). "Newsletters." Serials Review 5(2): 55-57. |
| Not Relevant to current fit for purpose review | Favata, A., et al. (2014). "A nonlinear theory of prestressed elastic stick-and-spring structures." International Journal of Engineering Science 80: 4-20. |
| Not Relevant to current fit for purpose review | Feng, Z., et al. (2005). "The influence of GFP-actin expression on the adhesion dynamics of HepG2 cells on a model extracellular matrix." Biomaterials 26(26): 5348-5358. |
| Not Relevant to current fit for purpose review | Feriotto, G., et al. (2002). "Biosensor technology and surface plasmon resonance for real-time detection of genetically modified Roundup Ready soybean gene sequences." J Agric Food Chem 50(5): 955-962. |
| Not Relevant to current fit for purpose review | Ferrara, G., et al. (2000). "Evaluation of antimutagenic and desmutagenic effects of humic and fulvic acids on root tips of Vicia faba." Environmental Toxicology 15(5): 513-517. |
| Not Relevant to current fit for purpose review | Ferrari, M. D. (2013). "Headache: the changing migraine brain." The Lancet Neurology 12(1): 6-8. |
| Not Relevant to current fit for purpose review | Fiers, T. (2004). "Lab-on-a-Chip. Miniaturised systems for (bio)chemical analysis and synthesis: (E. Oosterbroek, A. van den Berg) Elsevier. ISBN 0-444 51100-8." Clinica Chimica Acta 343(1–2): 245. |
| Not Relevant to current fit for purpose review | Figenschau, Y., et al. (1997). "A sensitive serum-free colorimetric assay for the detection of cytotoxic effects of pesticides." Journal of Environmental Science and Health Part B-Pesticides Food Contaminants and Agricultural Wastes 32(2): 177-194. |
| Not Relevant to current fit for purpose review | Fischer, G., et al. (2016). "Superficial Temporal Artery to Middle Cerebral Artery Bypass via a Minimized Approach: Operative Nuances and Problem-Solving Aspects." World Neurosurgery 88: 97-103. |
| Not Relevant to current fit for purpose review | Flóra, T. and Z. Simon (1982). "Thermische zersetzung des wirkstoffes von herbizid glyphosat." Thermochimica Acta 59(2): 125-132. |
| Not Relevant to current fit for purpose review | Forgacs, A. L., et al. (2012). "BLTK1 murine Leydig cells: a novel steroidogenic model for evaluating the effects of reproductive and developmental toxicants." Toxicol Sci 127(2): 391-402. |
| Not Relevant to current fit for purpose review | Forsyth, R. (2005). "Paediatrics: genetic insights and long-term follow-up." The Lancet Neurology 4(1): 8. |

| | |
|---|---|
| Not Relevant to current fit for purpose review | Fox, R. J. and R. A. Rudick (2004). "Multiple sclerosis: disease markers accelerate progress." The Lancet Neurology 3(1): 10. |
| Not Relevant to current fit for purpose review | Fox, S. (1999). "European Roundup - Positive news for Marimastat - British Biotech's drug shows promise against nonoperable gastric cancer." Genetic Engineering News 19(16): 20-+. |
| Not Relevant to current fit for purpose review | Fox, S. (2000). "European roundup - Genome research initiative launches in European union - Networking, training and mobility to be focus of integrated projects." Genetic Engineering News 20(21): 41-+. |
| Not Relevant to current fit for purpose review | Francisco Rossi, L., et al. (2016). "Chaetophractus villosus as a sentinel organism: Baseline values of mitotic index, chromosome aberrations and sister chromatid exchanges." Mutation Research-Genetic Toxicology and Environmental Mutagenesis 796: 40-45. |
| Not Relevant to current fit for purpose review | Fu, G. M., et al. (2016). "Optimization of liquid-state fermentation conditions for the glyphosate-degradation enzyme production of strain Aspergillus oryzae by ultraviolet mutagenesis." Prep Biochem Biotechnol. |
| Not Relevant to current fit for purpose review | Garry, V. F., et al. (2002). "Birth defects, season of conception, and sex of children born to pesticide applicators living in the Red River Valley of Minnesota, USA." Environ Health Perspect 110: 441-449. |
| Not Relevant to current fit for purpose review | Gasnier, C., et al. (2010). "Dig1 protects against cell death provoked by glyphosate-based herbicides in human liver cell lines." J Occup Med Toxicol 5: 29. |
| Not Relevant to current fit for purpose review | Gasnier, C., et al. (2009). "Glyphosate-based herbicides are toxic and endocrine disruptors in human cell lines." Toxicology 262(3): 184-191. |
| Not Relevant to current fit for purpose review | Gatty, A. (1990). "South Australian branch ASCCN." Confederation of Australian Critical Care Nurses Journal 3(3): 10. |
| Not Relevant to current fit for purpose review | Gayen, D., et al. (2013). "Comparative analysis of nutritional compositions of transgenic high iron rice with its non-transgenic counterpart." Food Chemistry 138(2-3): 835-840. |
| Not Relevant to current fit for purpose review | Giakoumaki, E., et al. (2003). "Combination of amplification and post-amplification strategies to improve optical DNA sensing." Biosensors and Bioelectronics 19(4): 337-344. |
| Not Relevant to current fit for purpose review | Giuffrida, M. C., et al. (2015). "Isothermal circular-strand-displacement polymerization of DNA and microRNA in digital microfluidic devices." Anal Bioanal Chem 407(6): 1533-1543. |
| Not Relevant to current fit for purpose review | Goldstein, C. and R. Chervin (2016). "Waking up to sleep research in 2015." The Lancet Neurology 15(1): 15-17. |
| Not Relevant to current fit for purpose review | Gonzalez, F. R. and A. M. Nardillo (1997). "Retention in multistep programmed-temperature gas chromatography and flow control Linear head pressure programs." Journal of Chromatography A 757(1–2): 109-118. |
| Not Relevant to current fit for purpose review | Gonzalez, N. V., et al. (2011). "A combination of the cytokinesis-block micronucleus cytome assay and centromeric identification for evaluation of the genotoxicity of dicamba." Toxicology Letters 207(3): 204-212. |
| Not Relevant to current fit for purpose review | Graus, F. and J. Dalmau (2012). "CNS autoimmunity: new findings and pending issues." The Lancet Neurology 11(1): 17-19. |
| Not Relevant to current fit for purpose review | Graus, F. and A. Tortosa (2006). "Neuro-oncology: setting new standards of management." The Lancet Neurology 5(1): 8-9. |
| Not Relevant to current fit for purpose review | Gregg, J. (1995). "Discipline, control, and the school mathematics tradition." Teaching and Teacher Education 11(<HT>6</HT>): 579-593. |
| Not Relevant to current fit for purpose review | Gress, S., et al. (2015). "Cardiotoxic Electrophysiological Effects of the Herbicide Roundup((R)) in Rat and Rabbit Ventricular Myocardium In Vitro." Cardiovasc Toxicol 15(4): 324-335. |
| Not Relevant to current fit for purpose review | Grosicka-Maciag, E., et al. (2012). "Dithiocarbamate fungicide zineb induces oxidative stress and apoptosis in Chinese hamster lung fibroblasts." Pesticide Biochemistry and Physiology 102(1): 95-101. |
| Not Relevant to current fit for purpose review | Gubbiga, N. G., et al. (1996). "Root/rhizome exudation of nicosulfuron from treated johnsongrass (Sorghum halepense) and possible implications for corn (Zea mays)." Weed Science 44(3): 455-460. |
| Not Relevant to current fit for purpose review | Guchi, T., et al. (2008). "Development of event-specific quantitation method for GA21 maize, which is a GM event without CaMV35S promoter." Journal of the Food Hygienic Society of Japan 49(1): 16-22. |
| Not Relevant to current fit for purpose review | Guo, B., et al. (2015). "Co-expression of G2-EPSPS and glyphosate acetyltransferase GAT genes conferring high tolerance to glyphosate in soybean." Front Plant Sci 6: 847. |
| Not Relevant to current fit for purpose review | Guyton, K. Z., et al. (2015). "Carcinogenicity of tetrachlorvinphos, parathion, malathion, diazinon, and glyphosate." Lancet Oncology 16(5): 490-491. |
| Not Relevant to current fit for purpose review | Hammond, B., et al. (2004). "Results of a 13 week safety assurance study with rats fed grain from glyphosate tolerant corn." Food Chem Toxicol 42(6): 1003-1014. |

| Not Relevant to current fit for purpose review | Hanberry, B. B., et al. (2013). "Small Mammal Responses to Intensively Established Pine Plantations in Coastal Plain Mississippi." Southern Journal of Applied Forestry 37(1): 53-58. |
|---|---|
| Not Relevant to current fit for purpose review | Haritou, M., et al. (2000). "Agents facilitating the electric field-induced fusion of intact rabbit erythrocytes." Bioelectrochemistry 52(2): 229-238. |
| Not Relevant to current fit for purpose review | Harkin, D. G., et al. (2000). "A novel approach to studying the migratory morphology of embryonic mesenchymal cells." Biology of the Cell 92(7): 537-543. |
| Not Relevant to current fit for purpose review | Harlow, S. D. and O. M. R. Campbell (2000). "Menstrual dysfunction: A missed opportunity for improving reproductive health in developing countries." Reproductive Health Matters 8(15): 142-147. |
| Not Relevant to current fit for purpose review | Hassannayebi, E. and S. H. Zegordi "Variable and adaptive neighbourhood search algorithms for rail rapid transit timetabling problem." Computers & Operations Research. |
| Not Relevant to current fit for purpose review | Hatamie, S., et al. (2015). "Curcumin-reduced graphene oxide sheets and their effects on human breast cancer cells." Mater Sci Eng C Mater Biol Appl 55: 482-489. |
| Not Relevant to current fit for purpose review | Haupt, S. E. (2006). "A quadratic empirical model formulation for dynamical systems using a genetic algorithm." Computers & Mathematics with Applications 51(3–4): 431-440. |
| Not Relevant to current fit for purpose review | Healy, C., et al. (2008). "Results of a 13-week safety assurance study with rats fed grain from corn rootworm-protected, glyphosate-tolerant MON 88017 corn." Food and Chemical Toxicology 46(7): 2517-2524. |
| Not Relevant to current fit for purpose review | Heck, G. R., et al. (2005). "Development and characterization of a CP4 EPSPS-Based, glyphosate-tolerant corn event." Crop Science 45(1): 329-339. |
| Not Relevant to current fit for purpose review | Henderson, N., et al. (2016). "PCR-Based Detection and Quantification of a Transgenic Glyphosate-Tolerant Canola Using a Novel Reference Gene System." Food Analytical Methods 9(2): 353-361. |
| Not Relevant to current fit for purpose review | Héraux, F. M. G., et al. (2005). "Combining Trichoderma virens-inoculated compost and a rye cover crop for weed control in transplanted vegetables." Biological Control 34(1): 21-26. |
| Not Relevant to current fit for purpose review | Hernández, A. F., et al. (2006). "Influence of exposure to pesticides on serum components and enzyme activities of cytotoxicity among intensive agriculture farmers." Environmental Research 102(1): 70-76. |
| Not Relevant to current fit for purpose review | Herrmann, K. M. and L. M. Weaver (1999). "The shikimate pathway." Annual Review of Plant Physiology and Plant Molecular Biology 50: 473-503. |
| Not Relevant to current fit for purpose review | Heu, C., et al. (2012). "Glyphosate-induced stiffening of HaCaT keratinocytes, a Peak Force Tapping study on living cells." J Struct Biol 178(1): 1-7. |
| Not Relevant to current fit for purpose review | Hill, H. F. (1962). "Nakajima's Glaucoma Operation." American Journal of Ophthalmology 53(2): 391-392. |
| Not Relevant to current fit for purpose review | Hohzaki, R. (2006). "Search allocation game." European Journal of Operational Research 172(1): 101-119. |
| Not Relevant to current fit for purpose review | Hokanson, R., et al. (2007). "Alteration of estrogen-regulated gene expression in human cells induced by the agricultural and horticultural herbicide glyphosate." Hum Exp Toxicol 26(9): 747-752. |
| Not Relevant to current fit for purpose review | Hothorn, L. A. and R. Oberdoerfer (2006). "Statistical analysis used in the nutritional assessment of novel food using the proof of safety." Regulatory Toxicology and Pharmacology 44(2): 125-135. |
| Not Relevant to current fit for purpose review | Hour, B. T., et al. (2012). "Herbicide Roundup Intoxication: Successful Treatment with Continuous Renal Replacement Therapy." The American Journal of Medicine 125(8): e1-e2. |
| Not Relevant to current fit for purpose review | Hsu, M.-H., et al. (2007). "2-(3-Fluorophenyl)-6-methoxyl-4-oxo-1,4-dihydroquinoline-3-carboxylic acid (YJC-1) induces mitotic phase arrest in A549 cells." European Journal of Pharmacology 559(1): 14-20. |
| Not Relevant to current fit for purpose review | Hu, B.-b., et al. (2014). "Energy efficiency of massive MIMO wireless communication systems with antenna selection." The Journal of China Universities of Posts and Telecommunications 21(<HT>6</HT>): 1-8. |
| Not Relevant to current fit for purpose review | Hu, T., et al. (2011). "Isolation and characterization of a rice glutathione S-transferase gene promoter regulated by herbicides and hormones." Plant Cell Rep 30(4): 539-549. |
| Not Relevant to current fit for purpose review | Huang, C. C., et al. (2004). "Development and application of a nested polymerase chain reaction method for the detection of genetically modified soybean in Chinese traditional fermented soy food-sufu." Journal of Food and Drug Analysis 12(3): 266-272. |
| Not Relevant to current fit for purpose review | Huang, J. L., et al. (2016). "Enhancement of the genotoxicity of benzo[a]pyrene by arecoline through suppression of DNA repair in HEp-2 cells." Toxicology in Vitro 33: 80-87. |
| Not Relevant to current fit for purpose review | Huang, Y.-T., et al. (2014). "The depletion of securin enhances butein-induced apoptosis and tumor inhibition in human colorectal cancer." Chemico-Biological Interactions 220: 41-50. |

| Not Relevant to current fit for purpose review | Hübner, P., et al. (1999). "Quantitative competitive PCR for the detection of genetically modified organisms in food." Food Control 10(<HT>6</HT>): 353-358. |
|---|---|
| Not Relevant to current fit for purpose review | Hubner, P., et al. (2001). "Validation of PCR methods for quantitation of genetically modified plants in food." J AOAC Int 84(6): 1855-1864. |
| Not Relevant to current fit for purpose review | Huisman, W., et al. (1997). "Costs of supply chains of Miscanthus giganteus." Industrial Crops and Products <HT>6</HT>(3–4): 353-366. |
| Not Relevant to current fit for purpose review | Hultberg, M. (2007). "Cysteine turnover in human cell lines is influenced by glyphosate." Environmental Toxicology and Pharmacology 24(1): 19-22. |
| Not Relevant to current fit for purpose review | Huynh, Q. K., et al. (1988). "Site-directed mutagenesis of Petunia hybrida 5-enolpyruvylshikimate-3-phosphate synthase: Lys-23 is essential for substrate binding." J Biol Chem 263(24): 11636-11639. |
| Not Relevant to current fit for purpose review | Jackson, E. (1933). "Progressive Ophthalmology." American Journal of Ophthalmology 16(2): 154-155. |
| Not Relevant to current fit for purpose review | Jacobelli, J., et al. (2004). "New views of the immunological synapse: variations in assembly and function." Current Opinion in Immunology 16(3): 345-352. |
| Not Relevant to current fit for purpose review | Jank, B. and A. Haslberger (2000). "Recombinant DNA insertion into plant retrotransposons." Trends in Biotechnology 18(8): 326-327. |
| Not Relevant to current fit for purpose review | Jankovic, J. (2008). "Parkinson's disease and movement disorders: moving forward." The Lancet Neurology 7(1): 9-11. |
| Not Relevant to current fit for purpose review | Jennings, J. C., et al. (2003). "Determining whether transgenic and endogenous plant DNA and transgenic protein are detectable in muscle from swine fed Roundup Ready soybean meal." J Anim Sci 81(6): 1447-1455. |
| Not Relevant to current fit for purpose review | Jiang, L. X., et al. (2013). "Glyphosate effects on the gene expression of the apical bud in soybean (Glycine max)." Biochem Biophys Res Commun 437(4): 544-549. |
| Not Relevant to current fit for purpose review | Johnson, K. A. (2013). "A century of enzyme kinetic analysis, 1913 to 2013." FEBS Letters 587(17): 2753-2766. |
| Not Relevant to current fit for purpose review | Jones, W. E. (1986). "Genetic recreation of wild horses." Journal of Equine Veterinary Science <HT>6</HT>(5): 246-249. |
| Not Relevant to current fit for purpose review | Kang, M., et al. (1993). "Interactive partitioning criteria set method for multiple objective linear programming." Computers & Operations Research 20(4): 435-446. |
| Not Relevant to current fit for purpose review | Kang, S. (2014). "Research round-up." The Lancet Psychiatry 1(7): 502. |
| Not Relevant to current fit for purpose review | Kang, S. (2014). "Research round-up." The Lancet Psychiatry 1(4): 261. |
| Not Relevant to current fit for purpose review | Kang, S. (2015). "Research round-up." The Lancet Psychiatry 2(1): 17. |
| Not Relevant to current fit for purpose review | Kang, S. (2016). "Research round-up." The Lancet Psychiatry 3(4): 323. |
| Not Relevant to current fit for purpose review | Kang, Y., et al. (2011). "Knockout and pullout recombineering for naturally transformable Burkholderia thailandensis and Burkholderia pseudomallei." Nature Protocols 6(8): 1085-1104. |
| Not Relevant to current fit for purpose review | Keenan, R. J., et al. (2005). "DNA shuffling as a tool for protein crystallization." Proc Natl Acad Sci U S A 102(25): 8887-8892. |
| Not Relevant to current fit for purpose review | Kelly, D. (2003). "Research Round-up." European Journal of Oncology Nursing 7(3): 210-212. |
| Not Relevant to current fit for purpose review | Kiernan, M. C. (2014). "ALS and neuromuscular disease: in search of the Holy Grail." The Lancet Neurology 13(1): 13-14. |
| Not Relevant to current fit for purpose review | Kim, H. J., et al. (2007). "Engineering and characterization of the isolated C-terminal domain of 5-enolpyruvylshikimate-3-phosphate (EPSP) synthase." Journal of Microbiology and Biotechnology 17(8): 1385-1389. |
| Not Relevant to current fit for purpose review | Kim, I., et al. (2012). "Cloud computing for comparative genomics with windows azure platform." Evol Bioinform Online 8: 527-534. |
| Not Relevant to current fit for purpose review | Kim, J.-H., et al. (2015). "Detection of eight genetically modified canola events using two event-specific pentaplex PCR systems." Food Control 51: 183-189. |
| Not Relevant to current fit for purpose review | Kim, J.-H., et al. (2015). "A simplified and accurate detection of the genetically modified wheat MON71800 with one calibrator plasmid." Food Chemistry 176: 1-6. |

| Not Relevant to current fit for purpose review | Kim, Y. H., et al. (2013). "Mixtures of glyphosate and surfactant TN20 accelerate cell death via mitochondrial damage-induced apoptosis and necrosis." Toxicol In Vitro 27(1): 191-197. |
|---|---|
| Not Relevant to current fit for purpose review | Kim, Y. H., et al. (2014). "Heart rate–corrected QT interval predicts mortality in glyphosate-surfactant herbicide–poisoned patients." The American Journal of Emergency Medicine 32(3): 203-207. |
| Not Relevant to current fit for purpose review | Kira, J.-i. (2008). "MS: prevention of neural damage by early intervention." The Lancet Neurology 7(1): 3-5. |
| Not Relevant to current fit for purpose review | Kirkham, F. (2004). "Paediatric neurology: genes and the environment." The Lancet Neurology 3(1): 18. |
| Not Relevant to current fit for purpose review | Klein, E. T. (1977). "J. Lyndon Carman (1905–1977)." American Journal of Orthodontics 72(2): 213-214. |
| Not Relevant to current fit for purpose review | Knopper, L. D. and D. R. S. Lean (2004). "Carcinogenic and genotoxic potential of turf pesticides commonly used on golf courses." Journal of Toxicology and Environmental Health-Part B-Critical Reviews 7(4): 267-279. |
| Not Relevant to current fit for purpose review | Kohn, P. M., et al. (1987). "Relationships between psychometric and experimental measures of arousability." Personality and Individual Differences 8(2): 225-231. |
| Not Relevant to current fit for purpose review | Kordowska, J., et al. (2006). "Phosphorylated l-caldesmon is involved in disassembly of actin stress fibers and postmitotic spreading." Experimental Cell Research 312(2): 95-110. |
| Not Relevant to current fit for purpose review | Kovalic, D., et al. (2012). "The Use of Next Generation Sequencing and Junction Sequence Analysis Bioinformatics to Achieve Molecular Characterization of Crops Improved Through Modern Biotechnology." Plant Genome 5(3): 149-163. |
| Not Relevant to current fit for purpose review | Kresge, K. J. (2005). "Women and HIV. Women's research roundup." Beta 17(4): 30-33. |
| Not Relevant to current fit for purpose review | Kristensen, T. (2004). "Lethal pictures." Network Security 2004(10): 19-20. |
| Not Relevant to current fit for purpose review | Kristensen, T. (2004). "Microsoft leaves Win2000, XPSP1 users in lurch." Network Security 2004(11): 16-17. |
| Not Relevant to current fit for purpose review | Kristensen, T. (2005). "More holes than a phishing net." Network Security 2005(1): 18-19. |
| Not Relevant to current fit for purpose review | Kudtarkar, P., et al. (2010). "Cost-effective cloud computing: a case study using the comparative genomics tool, roundup." Evol Bioinform Online 6: 197-203. |
| Not Relevant to current fit for purpose review | Kulesa, P. M., et al. (2008). "Neural crest invasion is a spatially-ordered progression into the head with higher cell proliferation at the migratory front as revealed by the photoactivatable protein, KikGR." Developmental Biology 316(2): 275-287. |
| Not Relevant to current fit for purpose review | Kuramochi, Y., et al. (2006). "Neuregulin activates erbB2-dependent src/FAK signaling and cytoskeletal remodeling in isolated adult rat cardiac myocytes." Journal of Molecular and Cellular Cardiology 41(2): 228-235. |
| Not Relevant to current fit for purpose review | Kuribara, H., et al. (2002). "Novel reference molecules for quantitation of genetically modified maize and soybean." J AOAC Int 85(5): 1077-1089. |
| Not Relevant to current fit for purpose review | Kutateladze, T., et al. (2007). "Detection of biotechnological crops in Georgia." Journal of Biotechnology 131(2, Supplement): S37-S38. |
| Not Relevant to current fit for purpose review | Kwon, K., et al. (2012). "3.103 PREDICTION AND CHARACTERIZATION OF ARABIDOPSIS THALIANA HOMOLOGS OF PARKINSON DISEASE-ASSOCIATED GENES BASED ON SEQUENCE SIMILARITIES AND MOLECULAR MODELING." Parkinsonism & Related Disorders 18, Supplement 2: S190. |
| Not Relevant to current fit for purpose review | La Mura, M., et al. (2011). "Application of QUIZ for GM quantification in food." Food Chemistry 125(4): 1340-1344. |
| Not Relevant to current fit for purpose review | Lam, S. H. F., et al. "Use of Intravenous Fat Emulsion in the Emergency Department for the Critically Ill Poisoned Patient." The Journal of Emergency Medicine. |
| Not Relevant to current fit for purpose review | Lamb, G. C., et al. (2000). "Prolonging the MGA-prostaglandin F2α interval from 17 to 19 days in an estrus synchronization system for heifers." Theriogenology 53(3): 691-698. |
| Not Relevant to current fit for purpose review | Larkin, M. (2001). "Websites in brief." The Lancet 358(9284): 850. |
| Not Relevant to current fit for purpose review | Larkin, M. (2003). "Technology and Public Health." The Lancet Infectious Diseases 3(5): 314-315. |

| Not Relevant to current fit for purpose review | Larkin, M. (2004). "Sites accelerate global response to HIV." The Lancet Infectious Diseases 4(7): 472-473. |
|---|---|
| Not Relevant to current fit for purpose review | Larsen, R. J. and D. W. Baggs (1986). "Some psychophysical and personality correlates of the Strelau temperament inventory." Personality and Individual Differences 7(4): 561-565. |
| Not Relevant to current fit for purpose review | Larsen, R. J. and M. A. Zarate (1991). "Extending reducer/augmenter theory into the emotion domain: The role of affect in regulating stimulation level." Personality and Individual Differences 12(7): 713-723. |
| Not Relevant to current fit for purpose review | Lee, A. H. (2008). "A pilot intervention for pregnant women in Sichuan, China on passive smoking." Patient Education and Counseling 71(3): 396-401. |
| Not Relevant to current fit for purpose review | Lee, C.-H., et al. (2008). "The early prognostic factors of glyphosate-surfactant intoxication." The American Journal of Emergency Medicine 26(3): 275-281. |
| Not Relevant to current fit for purpose review | Lee, D., et al. (2010). "Quantitation using informative zeros (QUIZ): Application for GMO detection and quantification without recourse to certified reference material." Food Chemistry 118(4): 974-978. |
| Not Relevant to current fit for purpose review | Lee, E.-J., et al. (2004). "G2/M cell cycle arrest and induction of apoptosis by a stilbenoid, 3,4,5-trimethoxy-4'-bromo-cis-stilbene, in human lung cancer cells." Life Sciences 75(23): 2829-2839. |
| Not Relevant to current fit for purpose review | Lee, H. J., et al. (2010). "Cloning and Characterization of a 5-Enolpyruvyl Shikimate 3-Phosphate Synthase (EPSPS) Gene from Korean Lawn Grass (Zoysia japonica)." Korean Journal of Horticultural Science & Technology 28(4): 648-655. |
| Not Relevant to current fit for purpose review | Lee, S. R., et al. (2007). "Neuroprotective effects of kobophenol A against the withdrawal of tropic support, nitrosative stress, and mitochondrial damage in SH-SY5Y neuroblastoma cells." Bioorganic & Medicinal Chemistry Letters 17(7): 1879-1882. |
| Not Relevant to current fit for purpose review | Lees, K. R. (2009). "Stroke: success for extending acute treatment." The Lancet Neurology 8(1): 2-4. |
| Not Relevant to current fit for purpose review | Lerat, S., et al. (2005). "Real-time polymerase chain reaction quantification of the transgenes for roundup ready corn and roundup ready soybean in soil samples." J Agric Food Chem 53(5): 1337-1342. |
| Not Relevant to current fit for purpose review | Leva, A. (2015). "Computing systems and the network as a control education arena." IFAC-PapersOnLine 48(29): 265-276. |
| Not Relevant to current fit for purpose review | Levy, M. L. (2006). "What's in this issue." Primary Care Respiratory Journal 15(<HT>6</HT>): 321-322. |
| Not Relevant to current fit for purpose review | Li, G., et al. (2015). "A genetic algorithm-based decomposition approach to solve an integrated equipment-workforce-service planning problem." Omega 50: 1-17. |
| Not Relevant to current fit for purpose review | Li, H., et al. (2014). "Chaetoglobosins from Chaetomium globosum, an endophytic fungus in Ginkgo biloba, and their phytotoxic and cytotoxic activities." J Agric Food Chem 62(17): 3734-3741. |
| Not Relevant to current fit for purpose review | Li, L., et al. (2015). "A transcriptomic analysis for identifying the unintended effects of introducing a heterologous glyphosate-tolerant EPSP synthase into Escherichia coli." Molecular Biosystems 11(3): 852-858. |
| Not Relevant to current fit for purpose review | Li, R. and R. S. El-Mallakh (2000). "A novel evidence of different mechanisms of lithium and valproate neuroprotective action on human SY5Y neuroblastoma cells: caspase-3 dependency." Neuroscience Letters 294(3): 147-150. |
| Not Relevant to current fit for purpose review | Lian, Y., et al. (2016). "Direct and simultaneous quantification of ATP, ADP and AMP by 1H and 31P Nuclear Magnetic Resonance spectroscopy." Talanta 150: 485-492. |
| Not Relevant to current fit for purpose review | Liang, J., et al. (2009). "The Role of Seminal Vesicle Motion in Target Margin Assessment for Online Image-Guided Radiotherapy for Prostate Cancer." International Journal of Radiation Oncology*Biology*Physics 73(3): 935-943. |
| Not Relevant to current fit for purpose review | Liberatore, M., et al. (2010). "Forensic investigation of peer-to-peer file sharing networks." Digital Investigation 7, Supplement: S95-S103. |
| Not Relevant to current fit for purpose review | Lin, N. and V. F. Garry (2000). "In vitro studies of cellular and molecular developmental toxicity of adjuvants, herbicides, and fungicides commonly used in Red River Valley, Minnesota." J Toxicol Environ Health A 60(6): 423-439. |
| Not Relevant to current fit for purpose review | Lin, Y.-C., et al. (2011). "744 ZOLEDRONIC ACID INDUCES AUTOPHAGIC CELL DEATH IN HUMAN PROSTATE CANCER CELLS." The Journal of Urology 185(4, Supplement): e298-e299. |
| Not Relevant to current fit for purpose review | Lin, Y.-K., et al. (2013). "Multiple-objective heuristics for scheduling unrelated parallel machines." European Journal of Operational Research 227(2): 239-253. |
| Not Relevant to current fit for purpose review | Lipton, R. B. and M. E. Bigal (2005). "Headache: triumphs in translational research." The Lancet Neurology 4(1): 11-12. |

| Not Relevant to current fit for purpose review | Liu, M. (2008). "Stroke: encouragement and disappointment in clinical trials." The Lancet Neurology 7(1): 5-7. |
|---|---|
| Not Relevant to current fit for purpose review | Liu, S., et al. (2003). "A prospective study of the association between APOE genotype and the risk of myocardial infarction among apparently healthy men." Atherosclerosis 166(2): 323-329. |
| Not Relevant to current fit for purpose review | Lluis, M., et al. (2008). "Severe acute poisoning due to a glufosinate containing preparation without mitochondrial involvement." Hum Exp Toxicol 27(6): 519-524. |
| Not Relevant to current fit for purpose review | Lodge, G. M., et al. (1994). "EFFECTS OF GLYPHOSATE, FLUPROPANATE AND 2,2-DPA ON HYPARRHENIA-HIRTA (L) STAPF (COOLATAI GRASS)." Australian Journal of Experimental Agriculture 34(4): 479-485. |
| Not Relevant to current fit for purpose review | Lombardo, M. and G. Lombardo (2010). "Wave aberration of human eyes and new descriptors of image optical quality and visual performance." Journal of Cataract & Refractive Surgery 36(2): 313-331. |
| Not Relevant to current fit for purpose review | Loredano, P., et al. (2010). "CASCAT: The Power of The Combined Protein Engineering Approach: Evolution of A Glycine Oxidase for A Novel Mechanism of Glyphosate Tolerance." Journal of Biotechnology 150: S122-S123. |
| Not Relevant to current fit for purpose review | Lucentini, J. (2008). "Technology roundup." Scientist: 76-82. |
| Not Relevant to current fit for purpose review | Machado, A. F. L., et al. (2008). "Anatomical characterization of the leaf, stem and rhizome of Digitaria insularis." Planta Daninha 26(1): 1-8. |
| Not Relevant to current fit for purpose review | Mahmood, A. (2009). "Renewables in Asia – a roundup." Renewable Energy Focus 9(7): 19. |
| Not Relevant to current fit for purpose review | Main, C. L., et al. (2004). "Sulfentrazone persistence in southern soils: Bioavailable concentration and effect on a rotational cotton crop." Weed Technology 18(2): 346-352. |
| Not Relevant to current fit for purpose review | Makowski, M., et al. (2009). "Oestrogen receptor alpha polymorphisms in women with breast cancer and their clinical significance." Przeglad Menopauzalny 8(1): 40-44. |
| Not Relevant to current fit for purpose review | Malatesta, M., et al. (2008). "Hepatoma tissue culture (HTC) cells as a model for investigating the effects of low concentrations of herbicide on cell structure and function." Toxicol In Vitro 22(8): 1853-1860. |
| Not Relevant to current fit for purpose review | Malecot, M., et al. (2013). "Specific proteomic response of Unio pictorum mussel to a mixture of glyphosate and microcystin-LR." J Proteome Res 12(11): 5281-5292. |
| Not Relevant to current fit for purpose review | Malhotra, R. C., et al. (2010). "Glyphosate–surfactant herbicide-induced reversible encephalopathy." Journal of Clinical Neuroscience 17(11): 1472-1473. |
| Not Relevant to current fit for purpose review | Mariana, A., et al. (2009). "The impact of simultaneous intoxication with agrochemicals on the antioxidant defense system in rat." Pesticide Biochemistry and Physiology 94(2-3): 93-99. |
| Not Relevant to current fit for purpose review | Marques, M. R., et al. (2007). "The inhibition of 5-enolpyruvylshikimate-3-phosphate synthase as a model for development of novel antimicrobials." Current Drug Targets 8(3): 445-457. |
| Not Relevant to current fit for purpose review | Marrelli, M., et al. (2013). "A comparative study of phytochemical composition of genetically and non-genetically modified soybean (Glycine max L.) and evaluation of antitumor activity." Nat Prod Res 27(6): 574-578. |
| Not Relevant to current fit for purpose review | Marriott, G. and J. W. Walker (1999). "Caged peptides and proteins: new probes to study polypeptide function in complex biological systems." Trends in Plant Science 4(8): 330-334. |
| Not Relevant to current fit for purpose review | Mastaglia, F. L. (2005). "Neuromuscular disorders: molecular and therapeutic insights." The Lancet Neurology 4(1): 6-7. |
| Not Relevant to current fit for purpose review | Mavunganidze, Z., et al. (2014). "The impact of tillage system and herbicides on weed density, diversity and yield of cotton (Gossipium hirsutum L.) and maize (Zea mays L.) under the smallholder sector." Crop Protection 58: 25-32. |
| Not Relevant to current fit for purpose review | Mayeux, R. and P. S. G. Hyslop (2008). "Alzheimer's disease: advances in trafficking." The Lancet Neurology 7(1): 2-3. |
| Not Relevant to current fit for purpose review | McAlister, B. G. and J. van Staden (1995). "Effect of artificially induced stress conditions on the growth of the medicinal plant Hypoxis hemerocallidea." South African Journal of Botany 61(2): 85-89. |
| Not Relevant to current fit for purpose review | McClenaghan, J. S. (1994). "The 1993 newspaper science reporter: Contributing, creative, and responsible." The Social Science Journal 31(4): 467-477. |
| Not Relevant to current fit for purpose review | McDowell, L. M., et al. (2004). "Rotational-echo double-resonance NMR-restrained model of the ternary complex of 5-enolpyruvylshikimate-3-phosphate synthase." J Biomol NMR 28(1): 11-29. |
| Not Relevant to current fit for purpose review | McKeone, D. H. (1973). "Liquid crystals for display applications." Optics & Laser Technology 5(1): 39-40. |

| Not Relevant to current fit for purpose review | Meacham, M. (1976). "Development of school libraries around the world." International Library Review 8(4): 453-459. |
| --- | --- |
| Not Relevant to current fit for purpose review | Merlis, J. K. (1959). "Fundamentals of clinical neurophysiology: Paul O. Chatfield Charles C. Thomas, Springfield, Illinois, 1957, 392 pp. $8.50." Electroencephalography and Clinical Neurophysiology 11(1): 192. |
| Not Relevant to current fit for purpose review | Mesnage, R., et al. (2013). "Ethoxylated adjuvants of glyphosate-based herbicides are active principles of human cell toxicity." Toxicology 313(2-3): 122-128. |
| Not Relevant to current fit for purpose review | Milán, M. and S. M. Cohen (1999). "Notch Signaling Is Not Sufficient to Define the Affinity Boundary between Dorsal and Ventral Compartments." Molecular Cell 4(<HT>6</HT>): 1073-1078. |
| Not Relevant to current fit for purpose review | Miller, J. W., et al. (1991). "Phthalocyanine Photodynamic Therapy of Experimental Iris Neovascularization." Ophthalmology 98(11): 1711-1719. |
| Not Relevant to current fit for purpose review | Miller, S. P. and D. M. Ferriero (2013). "Paediatric neurology: improved care of the developing brain." The Lancet Neurology 12(1): 16-18. |
| Not Relevant to current fit for purpose review | Milligan, A. L., et al. (2003). "A field assessment of the role of selective herbicides in the restoration of British moorland dominated by Molinia." Biological Conservation 109(3): 369-379. |
| Not Relevant to current fit for purpose review | Mink, P. J., et al. (2011). "Epidemiologic studies of glyphosate and non-cancer health outcomes: a review." Regul Toxicol Pharmacol 61(2): 172-184. |
| Not Relevant to current fit for purpose review | Minshull, J., et al. (2005). "Predicting enzyme function from protein sequence." Current Opinion in Chemical Biology 9(2): 202-209. |
| Not Relevant to current fit for purpose review | Mo, Q. and X. Zhuang (2012). "Matrix splitting with symmetry and dyadic framelet filter banks over algebraic number fields." Linear Algebra and its Applications 437(10): 2650-2679. |
| Not Relevant to current fit for purpose review | Monsen, E. R. (1998). "ADA'S Nutrition Campaigns Link Dietitians and the Public's Health." Journal of the American Dietetic Association 98(7): 746. |
| Not Relevant to current fit for purpose review | Monsen, E. R. (1998). "Dietetics Professionals Fight Obesity." Journal of the American Dietetic Association 98(10): 1098. |
| Not Relevant to current fit for purpose review | Monsen, E. R. (1999). "The Past Dietetics Century and the Future Dietetics Century." Journal of the American Dietetic Association 99(12): 1498. |
| Not Relevant to current fit for purpose review | Monsen, E. R. (1999). "What's Fresh in this Month's Journal?" Journal of the American Dietetic Association 99(3): 274. |
| Not Relevant to current fit for purpose review | Moreano, F., et al. (2006). "Ligation-dependent probe amplification for the simultaneous event-specific detection and relative quantification of DNA from two genetically modified organisms." European Food Research and Technology 222(5-6): 479-485. |
| Not Relevant to current fit for purpose review | Morgensztern, D. and R. Govindan (2010). "Best of the month: a roundup of articles published in recent months." J Thorac Oncol 5(8): 1305-1307. |
| Not Relevant to current fit for purpose review | Morgensztern, D. and R. Govindan (2011). "A Roundup of Recently Published Articles Relevant to Thoracic Oncology." Journal of Thoracic Oncology <HT>6</HT>(7): 1295-1297. |
| Not Relevant to current fit for purpose review | Morgensztern, D. and R. Govindan (2011). "A roundup of recently published articles relevant to thoracic oncology." J Thorac Oncol 6(7): 1295-1297. |
| Not Relevant to current fit for purpose review | Morris, R. T., et al. (2011). "RiceRBP: A database of experimentally identified RNA-binding proteins in Oryza sativa L." Plant Science 180(2): 204-211. |
| Not Relevant to current fit for purpose review | Muntoni, F. and J. H. Cross (2015). "Paediatric neurology: from molecular mechanisms to targeted treatments." The Lancet Neurology 14(1): 16-18. |
| Not Relevant to current fit for purpose review | Myllynen, P. and K. Vähäkangas (2013). "Placental transfer and metabolism: An overview of the experimental models utilizing human placental tissue." Toxicology in Vitro 27(1): 507-512. |
| Not Relevant to current fit for purpose review | Nam, H.-J., et al. (2008). "The ERK-RSK1 activation by growth factors at G2 phase delays cell cycle progression and reduces mitotic aberrations." Cellular Signalling 20(7): 1349-1358. |
| Not Relevant to current fit for purpose review | Naydenova, E., et al. (2007). "Synthesis, cytotoxicity and clastogenicity of novel alpha-aminophosphonic acids." Amino Acids 33(4): 695-702. |
| Not Relevant to current fit for purpose review | Naydenova, E. D., et al. (2008). "Novel N-(phosphonomethyl) glycine derivatives: Design, characterization and biological activity." Eur J Med Chem 43(6): 1199-1205. |
| Not Relevant to current fit for purpose review | Neumann, G., et al. (2011). "Assessment of the genetic stability of GMOs with a detailed examination of MON810 using Scorpion probes." European Food Research and Technology 233(1): 19-30. |
| Not Relevant to current fit for purpose review | Newton, F. H. (1962). "Appraising New Techniques." American Journal of Ophthalmology 53(2): 392. |

| | |
|---|---|
| Not Relevant to current fit for purpose review | Norrving, B. (2006). "Stroke: the catch-up of underinvestigated topics." The Lancet Neurology 5(1): 10-11. |
| Not Relevant to current fit for purpose review | Novis, P. M., et al. (2009). "Identification and Characterization of Freshwater Algae from a Pollution Gradient Using rbcL Sequencing and Toxicity Testing." Arch Environ Contam Toxicol 57(3): 504-514. |
| Not Relevant to current fit for purpose review | Ocaña, K. A. C. S., et al. (2013). "Designing a parallel cloud based comparative genomics workflow to improve phylogenetic analyses." Future Generation Computer Systems 29(8): 2205-2219. |
| Not Relevant to current fit for purpose review | Oeding, L. and G. Ottaviani (2013). "Eigenvectors of tensors and algorithms for Waring decomposition." Journal of Symbolic Computation 54: 9-35. |
| Not Relevant to current fit for purpose review | Oguchi, T., et al. (2008). "Development of event-specific quantitation method for GA21 maize, which is a gm event without CaMV35S promoter." Shokuhin Eiseigaku Zasshi 49(1): 16-22. |
| Not Relevant to current fit for purpose review | Okamoto, T. (2015). "SecondDEP: Resilient Computing that Prevents Shellcode Execution in Cyber-Attacks." Procedia Computer Science 60: 691-699. |
| Not Relevant to current fit for purpose review | Olanow, C. W. (2006). "Movement disorders: a step in the right direction." The Lancet Neurology 5(1): 3-5. |
| Not Relevant to current fit for purpose review | Omrani, D. (1993). "Doesn't quite live up to expectations: Enterprise-Wide Computing: How to Implement and Manage LANs by Thomas W. Madron. Published by John Wiley, 1991, £25.95, 372 pp." Computer Communications 16(7): 449-450. |
| Not Relevant to current fit for purpose review | Onori, R., et al. (2013). "Traceability of genetically modified Roundup Ready soybean: A case study on sampling and analytical uncertainty along processing chain." Food Control 24(2): 494-501. |
| Not Relevant to current fit for purpose review | O'Rourke, K. (2004). "Genome roundup." J Am Vet Med Assoc 224(4): 491-492. |
| Not Relevant to current fit for purpose review | Ortiz, S., et al. (2006). "Acute cytotoxicity in mammal cells exposed in vitro to a glyphosate-based formulation." Environ Mol Mutagen 47(6): 473-473. |
| Not Relevant to current fit for purpose review | Park, S., et al. (2015). "The effects of nonyl phenoxypolyethoxyl ethanol on cell damage pathway gene expression in SK-N-SH cells." Korean Journal of Internal Medicine 30(6): 873-883. |
| Not Relevant to current fit for purpose review | Pasqualone, A., et al. (2007). "Detection of soft wheat in semolina and durum wheat bread by analysis of DNA microsatellites." J Agric Food Chem 55(9): 3312-3318. |
| Not Relevant to current fit for purpose review | Patterson, P. (1980). "Nurses hold own in federal battle for education funds." AORN Journal 32(1): 116-118. |
| Not Relevant to current fit for purpose review | Patton, M. L. and R. F. Grove (1992). "Statolith hair movements and the regulation of tonic gravity reflexes in the lobster, Homarus americanus." Comparative Biochemistry and Physiology Part A: Physiology 101(2): 259-268. |
| Not Relevant to current fit for purpose review | Perisse, P., et al. (2011). "Seed and seedling morphology of Dicliptera squarrosa Nees (Acanthaceae) as a character identification source, and its relationship with survival structures." Phyton-International Journal of Experimental Botany 80: 73-78. |
| Not Relevant to current fit for purpose review | Perret, R. (2012). "Wanted dead or alive? Western genre items in the 21st century United States library." Library Collections, Acquisitions, and Technical Services 36(1–2): 39-52. |
| Not Relevant to current fit for purpose review | Perumal, L., et al. (2016). "Analysis of thin plates with holes by using exact geometrical representation within XFEM." Journal of Advanced Research 7(3): 445-452. |
| Not Relevant to current fit for purpose review | Pervaiz, S. (2013). "Conference roundup MAC 2011." Mitochondrion 13(3): 153-154. |
| Not Relevant to current fit for purpose review | Petersen, R. C. (2010). "Alzheimer's disease: progress in prediction." The Lancet Neurology 9(1): 4-5. |
| Not Relevant to current fit for purpose review | Pöltl, D., et al. (2012). "3.104 CELL-DEATH PATHWAYS DOWNSTREAM OF MITOCHONDRIA IN HUMAN DOPAMINERGIC NEURON DEGENERATION." Parkinsonism & Related Disorders 18, Supplement 2: S190. |
| Not Relevant to current fit for purpose review | Posch, K. C. and R. Posch (1990). "Approaching encryption at ISDN speed using partial parallel modulus multiplication." Microprocessing and Microprogramming 29(3): 177-184. |
| Not Relevant to current fit for purpose review | Potrebic, O., et al. (2009). "Acute glyphosate-surfactant poisoning with neurological sequels and fatal outcome." Vojnosanitetski Pregled 66(9): 758-762. |
| Not Relevant to current fit for purpose review | Powell, S. L. (2000). "Herbal Supplements: What Works, What Doesn't. 1999. From National Health Video, Inc. 12021 Wilshire Blvd., Suite 550, Los Angeles, CA 90025, 1-800-543-6803, videotape, 15 minutes, $89.00." Journal of Nutrition Education 32(5): 292-293. |
| Not Relevant to current fit for purpose review | Printz, C. (2013). "A roundup of news and information from our community." Clin Transl Sci 6(2): 83-84. |

| | |
|---|---|
| Not Relevant to current fit for purpose review | Printz, C. (2014). "In news: a roundup of news and information from our community." Clin Transl Sci 7(4): 287-288. |
| Not Relevant to current fit for purpose review | Printz, C. (2015). "In news: a roundup of news and information from our community." Clin Transl Sci 8(1): 1-2. |
| Not Relevant to current fit for purpose review | Qin, F., et al. (2012). "Composition of Transgenic Soybean Seeds with Higher gamma-Linolenic Acid Content Is Equivalent to That of Conventional Control." J Agric Food Chem 60(9): 2200-2204. |
| Not Relevant to current fit for purpose review | Radenski, A. and L. Ehwerhemuepha (2014). "Speeding-up codon analysis on the cloud with local MapReduce aggregation." Information Sciences 263: 175-185. |
| Not Relevant to current fit for purpose review | Radtke, P. J., et al. (2010). "An evaluation of overhead laser scanning to estimate herbage removals in pasture quadrats." Agricultural and Forest Meteorology 150(12): 1523-1528. |
| Not Relevant to current fit for purpose review | Rao, C. D., et al. (2015). "An enzyme-linked immuno focus assay for rapid detection and enumeration, and a newborn mouse model for human non-polio enteroviruses associated with acute diarrhea." Journal of Virological Methods 224: 47-52. |
| Not Relevant to current fit for purpose review | Rappold, P., et al. (2012). "3.106 PARAQUAT NEUROTOXICITY IS MEDIATED BY THE DOPAMINE TRANSPORTER AND ORGANIC CATION TRANSPORTER-3." Parkinsonism & Related Disorders 18, Supplement 2: S190-S191. |
| Not Relevant to current fit for purpose review | Rau, F. J. (1995). "Video review roundup." Adolescent and Pediatric Gynecology 8(3): 165. |
| Not Relevant to current fit for purpose review | Rau, F. J. (1997). "Comprehensive Review of Colposcopy 1996." Journal of Pediatric and Adolescent Gynecology 10(1): 49. |
| Not Relevant to current fit for purpose review | Rau, F. J. and K. M. Mulchahey (1997). "Milner-Fenwick Video Counseling Library: Colposcopy and Treatment of Dysplasia." Journal of Pediatric and Adolescent Gynecology 10(2): 103-104. |
| Not Relevant to current fit for purpose review | Rau, F. J. and E. E. Yordan (1996). "Sexual Assault: The Collection of Evidence for Forensic Analysis." Journal of Pediatric and Adolescent Gynecology 9(3): 169. |
| Not Relevant to current fit for purpose review | Reeve, J. C. (1995). "Core Textbook of Respiratory Care Practice." Physiotherapy 81(5): 301. |
| Not Relevant to current fit for purpose review | Reis, L. F., et al. (2006). "GMOs: building the future on the basis of past experience." An Acad Bras Cienc 78(4): 667-686. |
| Not Relevant to current fit for purpose review | Richard, S., et al. (2005). "Differential effects of glyphosate and roundup on human placental cells and aromatase." Environ Health Perspect 113(6): 716-720. |
| Not Relevant to current fit for purpose review | Richter, L. (1979). "Summary and guideline to the status reports." Euromicro Newsletter 5(3): 111-112. |
| Not Relevant to current fit for purpose review | Ring, M. (2007). "Driven Out by Hitler, a Dental Historian Enriches America: The Story of Curt Proskauer." Alpha Omegan 100(1): 25-29. |
| Not Relevant to current fit for purpose review | Robinson, D. J. (1995). "Study Package." Physiotherapy 81(5): 302. |
| Not Relevant to current fit for purpose review | Rogoli, R. P., et al. (2008). "Resposta de plantas de beterraba (Beta vulgaris) e de cenoura (Daucus carota) à deriva simulada de glyphosate e clomazone." Planta Daninha 26(2): 451-456. |
| Not Relevant to current fit for purpose review | Rosculete, E., et al. (2015). "Detection and quantification of genetically modified soybean in food and feed traded in the Romanian market." Journal of Biotechnology 208, Supplement: S73. |
| Not Relevant to current fit for purpose review | Roskelley, C. D., et al. (1995). "A hierarchy of ECM-mediated signalling regulates tissue-specific gene expression." Current Opinion in Cell Biology 7(5): 736-747. |
| Not Relevant to current fit for purpose review | Rouquié, D., et al. (2010). "Investigation of endogenous soybean food allergens by using a 2-dimensional gel electrophoresis approach." Regulatory Toxicology and Pharmacology 58(3, Supplement): S47-S53. |
| Not Relevant to current fit for purpose review | Ryd, W. and B. Hagmar (1977). "In vitro Effects of Cytochalasin B on TA3 Tumor Cells." Beiträge zur Pathologie 161(2): 131-141. |
| Not Relevant to current fit for purpose review | Sakamoto, Y., et al. (2008). "A 104-week feeding study of genetically modified soybeans in F344 rats." Journal of the Food Hygienic Society of Japan 49(4): 272-282. |
| Not Relevant to current fit for purpose review | Sakr, J., et al. (2014). "First comprehensive GMOs testing in Lebanon: Screening, identification and quantification of GM soybean imports." Food Control 36(1): 146-152. |
| Not Relevant to current fit for purpose review | Sanfilippo, J. S. (1998). ""Get A Life"-My Old Kentucky Home." Journal of Pediatric and Adolescent Gynecology 11(1): 1. |
| Not Relevant to current fit for purpose review | Sarraj, A. and J. C. Grotta (2014). "Stroke: new horizons in treatment." The Lancet Neurology 13(1): 2-3. |

| | |
|---|---|
| Not Relevant to current fit for purpose review | Sauer, N. J., et al. (2016). "Oligonucleotide-mediated genome editing provides precision and function to engineered nucleases and antibiotics in plants." Plant Physiol. |
| Not Relevant to current fit for purpose review | Sbruzzi, F. A., et al. (2013). "Transgenic and conventional Brazilian soybeans don't cause or prevent preneoplastic colon lesions or oxidative stress in a 90-day in vivo study." Revista De Nutricao-Brazilian Journal of Nutrition 26(4): 443-453. |
| Not Relevant to current fit for purpose review | Schapira, A. H. V. (2010). "Movement disorders: advances in cause and treatment." The Lancet Neurology 9(1): 6-7. |
| Not Relevant to current fit for purpose review | Scherlen, A. (2008). "Local to Global: The Importance of State-Level Journals to Library Literature." Serials Review 34(2): 129-136. |
| Not Relevant to current fit for purpose review | Schoenen, J. and G. Coppola (2010). "Headache: spreading from molecules to patients." The Lancet Neurology 9(1): 11-12. |
| Not Relevant to current fit for purpose review | Scotter, E. L. and C. E. Shaw (2013). "Neuromuscular disease: new insights and avenues for therapy." The Lancet Neurology 12(1): 13-15. |
| Not Relevant to current fit for purpose review | Selvapandiyan, A., et al. (1996). "Evidence for the shikimate-3-phosphate interacting site in the N-terminal domain of 5-enolpyruvyl shikimate-3-phosphate synthase of Bacillus subtilis." Biochemistry and Molecular Biology International 40(3): 603-610. |
| Not Relevant to current fit for purpose review | Selvapandiyan, A. and R. K. Bhatnagar (1994). "CLONING OF GENES ENCODING FOR C-P LYASE FROM PSEUDOMONAS ISOLATES PG2982 AND GLC11 - IDENTIFICATION OF A CRYPTIC ALLELE ON THE CHROMOSOME OF PSEUDOMONAS-AERUGINOSA." Current Microbiology 29(5): 255-261. |
| Not Relevant to current fit for purpose review | Selvapandiyan, A., et al. (1995). "Point mutation of a conserved arginine (104) to lysine introduces hypersensitivity to inhibition by glyphosate in the 5-enolpyruvylshikimate-3-phosphate synthase of Bacillus subtilis." FEBS Lett 374(2): 253-256. |
| Not Relevant to current fit for purpose review | Shi, G., et al. (2011). "MultiMSOAR 2.0: an accurate tool to identify ortholog groups among multiple genomes." PLoS One 6(6): e20892. |
| Not Relevant to current fit for purpose review | Shields, R. and K. Pollock (1974). "The adhesion of BHK and PyBHK cells to the substratum." Cell 3(1): 31-38. |
| Not Relevant to current fit for purpose review | Shuttleworth, W. A. and J. N. Evans (1994). "Site-directed mutagenesis and NMR studies of histidine-385 mutants of 5-enolpyruvylshikimate-3-phosphate synthase." Biochemistry 33(23): 7062-7068. |
| Not Relevant to current fit for purpose review | Shuttleworth, W. A. and J. N. Evans (1996). "The H385N mutant of 5-enolpyruvylshikimate-3-phosphate synthase: kinetics, fluorescence, and nuclear magnetic resonance studies." Arch Biochem Biophys 334(1): 37-42. |
| Not Relevant to current fit for purpose review | Shuttleworth, W. A. and J. N. S. Evans (1994). "SITE-DIRECTED MUTAGENESIS AND NMR-STUDIES OF HISTIDINE-385 MUTANTS OF 5-ENOLPYRUVYLSHIKIMATE-3-PHOSPHATE SYNTHASE." Biochemistry 33(23): 7062-7068. |
| Not Relevant to current fit for purpose review | Shuttleworth, W. A. and J. N. S. Evans (1996). "The H385N Mutant of 5-Enolpyruvylshikimate-3-phosphate Synthase: Kinetics, Fluorescence, and Nuclear Magnetic Resonance Studies." Archives of Biochemistry and Biophysics 334(1): 37-42. |
| Not Relevant to current fit for purpose review | Shuttleworth, W. A., et al. (1992). "Over-production of 5-enolpyruvylshikimate-3-phosphate synthase in Escherichia coli: use of the T7 promoter." Protein Eng 5(5): 461-466. |
| Not Relevant to current fit for purpose review | Shuttleworth, W. A., et al. (1999). "Site-directed mutagenesis of putative active site residues of 5-enolpyruvylshikimate-3-phosphate synthase." Biochemistry 38(1): 296-302. |
| Not Relevant to current fit for purpose review | Sienkiewicz, Z. (2007). "Rapporteur report: Roundup, discussion and recommendations." Progress in Biophysics and Molecular Biology 93(1-3): 414-420. |
| Not Relevant to current fit for purpose review | Sikorski, J. A. and K. J. Gruys (1997). "Understanding Glyphosate's molecular mode of action with EPSP synthase: Evidence favoring an allosteric inhibitor model." Accounts of Chemical Research 30(1): 2-8. |
| Not Relevant to current fit for purpose review | Simonetti, E., et al. (2015). "An Interlaboratory Comparative Study on the Quantitative Determination of Glyphosate at Low Levels in Wheat Flour." J AOAC Int 98(6): 1760-1768. |
| Not Relevant to current fit for purpose review | Singh, N. and A. Srivastava (2014). "Biomonitoring of Genotoxic Effect of Glyphosate and Pendimethalin in Vigna mungo Populations." Cytologia 79(2): 173-180. |
| Not Relevant to current fit for purpose review | Singh, S. K. and S. Kumar (2011). "Novel adaptive color space transform and application to image compression." Signal Processing: Image Communication 26(10): 662-672. |
| Not Relevant to current fit for purpose review | Sinha, R. P., et al. (2003). "Wavelength-dependent induction of a mycosporine-like amino acid in a rice-field cyanobacterium, Nostoc commune: role of inhibitors and salt stress." Photochemical & Photobiological Sciences 2(2): 171-176. |

| | |
|---|---|
| Not Relevant to current fit for purpose review | Sliseris, J., et al. (2013). "Optimal Design of GFRP-Plywood Variable Stiffness Plate." Procedia Engineering 57: 1060-1069. |
| Not Relevant to current fit for purpose review | Smith, S. O. (1993). "Magic angle spinning NMR methods for internuclear distance measurements." Current Opinion in Structural Biology 3(5): 755-759. |
| Not Relevant to current fit for purpose review | Smitt, P. S. (2004). "Neuro-oncology: diagnosis in the spotlight." The Lancet Neurology 3(1): 14. |
| Not Relevant to current fit for purpose review | Somasiri, A., et al. (2000). "Phosphatidylinositol 3-Kinase is required for adherens junction-dependent mammary epithelial cell spheroid formation." Differentiation 66(2–3): 116-125. |
| Not Relevant to current fit for purpose review | Sorensen, P. S. (2005). "Multiple sclerosis: pathophysiology revisited." The Lancet Neurology 4(1): 9-10. |
| Not Relevant to current fit for purpose review | Spaeth, S. C. and T. R. Sinclair (1983). "Variation in nitrogen accumulation and distribution among soybean cultivars." Field Crops Research 7: 1-12. |
| Not Relevant to current fit for purpose review | Spector, L. S. (1990). "Not-so-open skies." Space Policy <HT>6</HT>(1): 9-18. |
| Not Relevant to current fit for purpose review | Sperling, R. A. and K. A. Johnson (2012). "Dementia: new criteria but no new treatments." The Lancet Neurology 11(1): 4-5. |
| Not Relevant to current fit for purpose review | Sroka, J., et al. (2002). "Phenotype modulation in non-adherent and adherent sublines of Walker carcinosarcoma cells: the role of cell-substratum contacts and microtubules in controlling cell shape, locomotion and cytoskeletal structure." The International Journal of Biochemistry & Cell Biology 34(7): 882-899. |
| Not Relevant to current fit for purpose review | Stanton, T. L., et al. (1990). "The Effects of Wet on Growing Heifer Brewers Grain Performance." The Professional Animal Scientist <HT>6</HT>(2): 31-34. |
| Not Relevant to current fit for purpose review | Stauffer, M. E., et al. (2001). "Shikimate-3-phosphate binds to the isolated N-terminal domain of 5-enolpyruvylshikimate-3-phosphate synthase." Biochemistry 40(13): 3951-3957. |
| Not Relevant to current fit for purpose review | Stobiecka, M., et al. (2007). "Piezoelectric sensor for determination of genetically modified soybean roundup ready((R)) in samples not amplified by PCR." Sensors 7(8): 1462-1479. |
| Not Relevant to current fit for purpose review | Stoessl, A. J. (2011). "Movement disorders: new insights into Parkinson's disease." The Lancet Neurology 10(1): 5-7. |
| Not Relevant to current fit for purpose review | Stovner, L. J. (2008). "Headache: new concepts, models, and treatments." The Lancet Neurology 7(1): 11-12. |
| Not Relevant to current fit for purpose review | Struyker-Boudier, H. A. J. (1983). "Clinical hypertension and hypotension." Trends in Pharmacological Sciences 4: 359. |
| Not Relevant to current fit for purpose review | Subramanian, J., et al. (2012). "A roundup of articles published in recent months." J Thorac Oncol 7(3): 626-628. |
| Not Relevant to current fit for purpose review | Sutou, S. and H. Shindo (1975). "Concanavalin a induces endoreduplication in cultured mammalian cells." Biochemical and Biophysical Research Communications 67(1): 79-84. |
| Not Relevant to current fit for purpose review | Suzuki, N., et al. (1996). "Purification and characterization of a cytosolic isozyme of 3-Deoxy-D-arabino-heptulosonate 7-phosphate synthase from cultured carrot cells." Journal of Plant Physiology 149(1–2): 19-22. |
| Not Relevant to current fit for purpose review | Swaney, S. (1995). "Spasmodic Torticollis." Physiotherapy 81(5): 301. |
| Not Relevant to current fit for purpose review | Tai, A., et al. (2008). "Estimate of Radiobiologic Parameters From Clinical Data for Biologically Based Treatment Planning for Liver Irradiation." International Journal of Radiation Oncology*Biology*Physics 70(3): 900-907. |
| Not Relevant to current fit for purpose review | Tai, H.-K., et al. (2011). "A one-time inducible transposon for terminating selectable markers in transgenic plants." Botanical Studies 52(4): 375-381. |
| Not Relevant to current fit for purpose review | Takabatake, R., et al. (2010). "Development and evaluation of event-specific quantitative pcr method for genetically modified soybean MON89788." Journal of Biotechnology 150, Supplement: 482-483. |
| Not Relevant to current fit for purpose review | Talbot, K. (2007). "Neuromuscular disorders: therapeutic advances." The Lancet Neurology <HT>6</HT>(1): 18-19. |
| Not Relevant to current fit for purpose review | Tan, A. and G. D. Badhwar (1997). "Detecting the dynamical state of the atmosphere from the orbital decay of the ODERACS spheres." Journal of Atmospheric and Solar-Terrestrial Physics 59(4): 431-437. |
| Not Relevant to current fit for purpose review | Tan, J. H., et al. (2013). "An interactive lung field segmentation scheme with automated capability." Digital Signal Processing 23(3): 1022-1031. |

| | |
|---|---|
| Not Relevant to current fit for purpose review | Tan, S., et al. (2006). "Herbicidal inhibitors of amino acid biosynthesis and herbicide-tolerant crops." Amino Acids 30(2): 195-204. |
| Not Relevant to current fit for purpose review | Tardieu, M. (2010). "Paediatric neurology: brain development at an interface between genetics, the environment, and the immune system." The Lancet Neurology 9(1): 13-14. |
| Not Relevant to current fit for purpose review | Taverniers, I., et al. (2004). "Cloned plasmid DNA fragments as calibrators for controlling GMOs: different real-time duplex quantitative PCR methods." Anal Bioanal Chem 378(5): 1198-1207. |
| Not Relevant to current fit for purpose review | Thakur, K. T., et al. (2015). "CNS infections in 2014: guns, germs, and will." The Lancet Neurology 14(1): 20-22. |
| Not Relevant to current fit for purpose review | Thongprakaisang, S., et al. (2013). "Glyphosate induces human breast cancer cells growth via estrogen receptors." Food Chem Toxicol 59: 129-136. |
| Not Relevant to current fit for purpose review | Tong, X. H., et al. (2009). "Physiological and molecular mechanisms of glyphosate tolerance in an in vitro selected cotton mutant." Pesticide Biochemistry and Physiology 94(2-3): 100-106. |
| Not Relevant to current fit for purpose review | Tonkin, J. (1991). "South Australia CACCN." Confederation of Australian Critical Care Nurses Journal 4(3): 6. |
| Not Relevant to current fit for purpose review | Toyota, A., et al. (2006). "Quantification of genetically modified soybeans using a combination of a capillary-type real-time PCR system and a plasmid reference standard." Biosci Biotechnol Biochem 70(4): 821-827. |
| Not Relevant to current fit for purpose review | Trojano, M. and C. Tortorella (2015). "MS and related disorders: looking for markers of phenotypes." The Lancet Neurology 14(1): 11-13. |
| Not Relevant to current fit for purpose review | Trusler, C. S., et al. (2007). "Italian ryegrass (Lolium multiflorum) management options in winter wheat in Oklahoma." Weed Technology 21(1): 151-158. |
| Not Relevant to current fit for purpose review | Truta, E., et al. (2011). "Evaluation of Roundup-induced toxicity on genetic material and on length growth of barley seedlings." Acta Biol Hung 62(3): 290-301. |
| Not Relevant to current fit for purpose review | Turk, J. V. and D. L. Snedeker (1986). "Intro public relations texts: A round-up review." Public Relations Review 12(4): 48-55. |
| Not Relevant to current fit for purpose review | Tyshko, N. V., et al. (2008). "Medical and biological safety assessment of genetically modified maize event MON 88017. Report 2. Genotoxicologic, immunologic and allergologic examinations." Voprosy pitaniya 77(5): 13-17. |
| Not Relevant to current fit for purpose review | Ugarte, R. (2014). "Interaction between glyphosate and mitochondrial succinate dehydrogenase." Computational and Theoretical Chemistry 1043: 54-63. |
| Not Relevant to current fit for purpose review | Underwood, M. (1991). "Western Australia ASCCN." Confederation of Australian Critical Care Nurses Journal 4(3): 6. |
| Not Relevant to current fit for purpose review | Uppal, R. K. and M. J. Gooding (2013). "Gibberellin-responsive and -insensitive dwarfing alleles on wheat performance in contrasting tillage systems." Field Crops Research 141: 55-62. |
| Not Relevant to current fit for purpose review | Urda, A., et al. (2012). "Final voluntary assessment for Traumatology and Orthopaedic Surgery medical residents: A report on the results and a look at the future." Revista Española de Cirugía Ortopédica y Traumatología (English Edition) 56(3): 188-196. |
| Not Relevant to current fit for purpose review | Valencia, E., et al. (1999). "Yield and botanical composition of rhizoma peanut-grass swards treated with herbicides." Agronomy Journal 91(6): 956-961. |
| Not Relevant to current fit for purpose review | Van Caneghem, T. (2002). "EARNINGS MANAGEMENT INDUCED BY COGNITIVE REFERENCE POINTS." The British Accounting Review 34(2): 167-178. |
| Not Relevant to current fit for purpose review | van Duijn, G., et al. (1999). "Detection methods for genetically modified crops." Food Control 10(6): 375-378. |
| Not Relevant to current fit for purpose review | van Haselen, R. and R. Jütte (2013). "The placebo effect and its ramifications for clinical practice and research. Villa La Collina at Lake Como, Italy, 4–6 May 2012." Complementary Therapies in Medicine 21(2): 85-93. |
| Not Relevant to current fit for purpose review | Van Kampen, J. and J. D. Hundleby (1994). "An investigation of the associations between augmenting-reducing, reactivity, sensation seeking and body image." Personality and Individual Differences 16(3): 373-377. |
| Not Relevant to current fit for purpose review | Van Loon, A. J. (1991). "Glaciotectonic landforms and structures: J.S. Aber, D.G. Croot and M.M. Fenton. Kluwer Academic Publishers Group, Dordrecht, 1989, ix + 200 pp., Dfl.155.-, US$79.-, £49.-, ISBN 0-7923-0100-5 (hardcover)." Sedimentary Geology 75(1–2): 164-165. |
| Not Relevant to current fit for purpose review | Venancio, V. P., et al. (2012). "Conventional (MG-BR46 Conquista) and Transgenic (BRS Valiosa RR) Soybeans Have No Mutagenic Effects and May Protect Against Induced-DNA Damage In Vivo." Nutrition and Cancer-an International Journal 64(5): 725-731. |

| | |
|---|---|
| Not Relevant to current fit for purpose review | Vyn, T. J., et al. (2002). "Corn response to potassium placement in conservation tillage." Soil and Tillage Research 67(2): 159-169. |
| Not Relevant to current fit for purpose review | Walker, D. C., et al. (2004). "The epitheliome: agent-based modelling of the social behaviour of cells." Biosystems 76(1–3): 89-100. |
| Not Relevant to current fit for purpose review | Wallace, K., et al. (2015). "A multiplexed assay for determination of neurotoxicant effects on spontaneous network activity and viability from microelectrode arrays." NeuroToxicology 49: 79-85. |
| Not Relevant to current fit for purpose review | Wander, J. G. N. and H. J. Bouwmeester (1998). "Effects of nitrogen fertilization on dill (Anethum graveolens L.) seed and carvone production." Industrial Crops and Products 7(2–3): 211-216. |
| Not Relevant to current fit for purpose review | Wang, F., et al. (2008). "The microtubule plus end-binding protein EB1 is involved in Sertoli cell plasticity in testicular seminiferous tubules." Experimental Cell Research 314(1): 213-226. |
| Not Relevant to current fit for purpose review | Wang, G., et al. (2006). "Methyl protodioscin induces G2/M cell cycle arrest and apoptosis in HepG2 liver cancer cells." Cancer Letters 241(1): 102-109. |
| Not Relevant to current fit for purpose review | Wang, G., et al. (2012). "Damage to DNA caused by UV-B radiation in the desert cyanobacterium Scytonema javanicum and the effects of exogenous chemicals on the process." Chemosphere 88(4): 413-417. |
| Not Relevant to current fit for purpose review | Wang, G., et al. (2012). "3.105 GLYPHOSATE INDUCED CELL DEATH THROUGH APOPTOTIC AND AUTOPHAGIC MECHANISMS." Parkinsonism & Related Disorders 18, Supplement 2: S190. |
| Not Relevant to current fit for purpose review | Wang, M., et al. (2015). "Gene editing by co-transformation of TALEN and chimeric RNA/DNA oligonucleotides on the rice OsEPSPS gene and the inheritance of mutations." PLoS One 10(4): e0122755. |
| Not Relevant to current fit for purpose review | Wang, S.-A., et al. (2009). "Heat Shock Protein 90 Is Important for Sp1 Stability during Mitosis." Journal of Molecular Biology 387(5): 1106-1119. |
| Not Relevant to current fit for purpose review | Wang, X., et al. (2005). "Effects of Phe-to-Trp mutation and fluorotryptophan incorporation on the solution structure of cardiac troponin C, and analysis of its suitability as a potential probe for in situ NMR studies." Protein Science 14(9): 2447-2460. |
| Not Relevant to current fit for purpose review | Wang, X., et al. (2011). "Construction of a reference plasmid molecule containing eight targets for the detection of genetically modified crops." Appl Microbiol Biotechnol 90(2): 721-731. |
| Not Relevant to current fit for purpose review | Weng, H., et al. (2005). "Novel reference gene, High-mobility-group protein I/Y, used in qualitative and real-time quantitative polymerase chain reaction detection of transgenic rapeseed cultivars." J AOAC Int 88(2): 577-584. |
| Not Relevant to current fit for purpose review | White, A. K. and W. W. Metcalf (2004). "Two C-P lyase Operons in Pseudomonas stutzeri and their roles in the oxidation of phosphonates, phosphite, and hypophosphite." Journal of Bacteriology 186(14): 4730-4739. |
| Not Relevant to current fit for purpose review | Willenborg, C. J. and E. N. Johnson (2013). "Influence of seeding date and seeding rate on cow cockle, a new medicinal and industrial crop." Industrial Crops and Products 49: 554-560. |
| Not Relevant to current fit for purpose review | Williams, M. J., et al. (2002). "No-till establishment of rhizoma peanut." Agronomy Journal 94(6): 1350-1354. |
| Not Relevant to current fit for purpose review | Williamson, P. R., et al. (2016). "CNS infections in 2015: emerging catastrophic infections and new insights into neuroimmunological host damage." The Lancet Neurology 15(1): 17-19. |
| Not Relevant to current fit for purpose review | Wilson, R. (1970). "AORN RECRUITMENT PROGRAM ROUND-UP." AORN Journal 11(1): 66-68. |
| Not Relevant to current fit for purpose review | Wiznitzer, M. (2006). "Paediatric neurology: clinical advances with low technology." The Lancet Neurology 5(1): 14-15. |
| Not Relevant to current fit for purpose review | Wong, P. K. Y., et al. (1973). "Rapid, selective procedure for isolation of spontaneous temperature-sensitive mutants of Moloney leukemia virus." Virology 51(2): 424-431. |
| Not Relevant to current fit for purpose review | Wood, E. J. (1985). "From cells to atoms: an illustrated introduction to molecular biology: by A. R. Rees and M. J. E. Sternberg, Blackwell, 1984. £6.80 (viii + 94 pages) ISBN 0 632 00888 1." Trends in Biochemical Sciences 10(5): 214-215. |
| Not Relevant to current fit for purpose review | Wood, E. J. (1985). "Lecture notes on biochemistry: by J. K. Candish, Blackwell, 1984. £9.80 (vi + 290 pages) ISBN 0 632 01253 6." Trends in Biochemical Sciences 10(5): 214-215. |
| Not Relevant to current fit for purpose review | Wurz, A., et al. (1999). "Quantitative analysis of genetically modified organisms (GMO) in processed food by PCR-based methods." Food Control 10(<HT>6</HT>): 385-389. |
| Not Relevant to current fit for purpose review | Xia, J., et al. (2015). "Retraction of a study on genetically modified corn: Expert investigations should speak louder during controversies over safety." Bioscience Trends 9(2): 134-137. |

| | |
|---|---|
| Not Relevant to current fit for purpose review | Xu, J., et al. (2002). "Cloning of genomic DNA of rice 5-enolpyruvylshikimate 3-phosphate synthase gene and chromosomal localization of the gene." Sci China C Life Sci 45(3): 251-259. |
| Not Relevant to current fit for purpose review | Xu, J. W., et al. (2002). "Isolation of rice EPSP synthase cDNA and its sequence - Analysis and copy number determination." Acta Botanica Sinica 44(2): 188-192. |
| Not Relevant to current fit for purpose review | Xu, W. T., et al. (2011). "Establishment and evaluation of event-specific qualitative and quantitative PCR method for genetically modified soybean DP-356043-5." European Food Research and Technology 233(4): 685-695. |
| Not Relevant to current fit for purpose review | Yan, H.-Q., et al. (2011). "Novel AroA from Pseudomonas putida Confers Tobacco Plant with High Tolerance to Glyphosate." PLoS One 6(5). |
| Not Relevant to current fit for purpose review | Yan, L. T., et al. (2005). "Screening and construct-specific detection methods of transgenic Huafan No 1 tomato by conventional and real-time PCR." Journal of the Science of Food and Agriculture 85(13): 2159-2166. |
| Not Relevant to current fit for purpose review | Yang, R., et al. (2007). "Event-specific qualitative and quantitative PCR detection of roundup ready event GT73 based on the 3'-integration junction." Plant Cell Rep 26(10): 1821-1831. |
| Not Relevant to current fit for purpose review | Yang, Z. and X. Dong (2015). "Earnings roundup in private and public bank holding companies." Advances in Accounting 31(1): 96-99. |
| Not Relevant to current fit for purpose review | Yao, P., et al. (2015). "Improvement of glycine oxidase by DNA shuffling, and site-saturation mutagenesis of F247 residue." Int J Biol Macromol 79: 965-970. |
| Not Relevant to current fit for purpose review | Yılmaz, R., et al. "Verification of GMO analytical methods: DNA isolation and quantitative detection methods for Roundup Ready soy flour." New Biotechnology 29, Supplement: S196-S197. |
| Not Relevant to current fit for purpose review | You, Y., et al. (2012). "Effect of intravenous fat emulsion therapy on glyphosate-surfactant–induced cardiovascular collapse." The American Journal of Emergency Medicine 30(9): 2097.e2091-2097.e2092. |
| Not Relevant to current fit for purpose review | Yousef, M. I., et al. (1996). "A sensitive sperm-motility test for the assessment of cytotoxic effect of pesticides." Journal of Environmental Science and Health Part B-Pesticides Food Contaminants and Agricultural Wastes 31(1): 99-115. |
| Not Relevant to current fit for purpose review | Zanis, D. A., et al. (1997). "A comparison of three methods of measuring the type and quantity of services provided during substance abuse treatment." Drug and Alcohol Dependence 49(1): 25-32. |
| Not Relevant to current fit for purpose review | Zanoli, L. M., et al. (2013). "Peptide nucleic acid molecular beacons for the detection of PCR amplicons in droplet-based microfluidic devices." Anal Bioanal Chem 405(2-3): 615-624. |
| Not Relevant to current fit for purpose review | Zawahir, S., et al. (2009). "Acute intentional self-poisoning with a herbicide product containing fenoxaprop-P-ethyl, ethoxysulfuron, and isoxadifen ethyl: a prospective observational study." Clinical Toxicology 47(8): 792-797. |
| Not Relevant to current fit for purpose review | Zhan, T., et al. (2013). "Improving Glyphosate Oxidation Activity of Glycine Oxidase from Bacillus cereus by Directed Evolution." PLoS One 8(11). |
| Not Relevant to current fit for purpose review | Zhang, H., et al. (2008). "Development of one novel multiple-target plasmid for duplex quantitative PCR analysis of roundup ready soybean." Journal of Biotechnology 136, Supplement: S250. |
| Not Relevant to current fit for purpose review | Zhang, J., et al. (1998). "A transformation technique from RGB signals to the Munsell system for color analysis of tobacco leaves." Computers and Electronics in Agriculture 19(2): 155-166. |
| Not Relevant to current fit for purpose review | Zhang, M., et al. (2007). "Detection of Roundup Ready soy in highly processed products by triplex nested PCR." Food Control 18(10): 1277-1281. |
| Not Relevant to current fit for purpose review | Zhang, Q., et al. (2014). "Characterization of cytochalasins from the endophytic Xylaria sp. and their biological functions." J Agric Food Chem 62(45): 10962-10969. |
| Not Relevant to current fit for purpose review | Zheng, Q. and D. C. Chang (1991). "High-efficiency gene transfection by in situ electroporation of cultured cells." Biochimica et Biophysica Acta (BBA) - Gene Structure and Expression 1088(1): 104-110. |
| Not Relevant to current fit for purpose review | Zhou, H., et al. (1995). "Glyphosate-tolerant CP4 and GOX genes as a selectable marker in wheat transformation." Plant Cell Rep 15(3-4): 159-163. |
| Not Relevant to current fit for purpose review | Zhu, X., et al. (2012). "A high-throughput fluorescence resonance energy transfer (FRET)-based endothelial cell apoptosis assay and its application for screening vascular disrupting agents." Biochemical and Biophysical Research Communications 418(4): 641-646. |
| Not Relevant to current fit for purpose review | Ziegelberger, G., et al. (2006). "International commission on non-ionizing radiation protection." Progress in Biophysics and Molecular Biology 92(1): 1-3. |
| Not Relevant to current fit for purpose review | Zulet, A., et al. (2015). "Fermentation and alternative oxidase contribute to the action of amino acid biosynthesis-inhibiting herbicides." J Plant Physiol 175: 102-112. |

| Not Relevant to current fit for purpose review | 정원중, et al. (2006). "Prognostic Predictors of Outcome for Poisoning by Glyphosate-containing Herbicides, Based on Initial Findings." Journal of The Korean Society of Emergency Medicine 17(6): 630-636. |
|---|---|
| Not Relevant to current fit for purpose review | Boyle, W. S. and J. O. Evans (1974). "EFFECTS OF GLYPHOSATE AND ETHEPHON ON MEIOTIC CHROMOSOMES OF SECALE-CEREALE L." Journal of Heredity 65(4): 250-250. |
| Not Relevant to current fit for purpose review | Sherwood, M. M. and W. C. Davison (1957). "Correspondence." The Journal of Pediatrics 51(4): 486-487. |
| Not Relevant to current fit for purpose review | Belle, R., et al. (2007). "[Sea urchin embryo, DNA-damaged cell cycle checkpoint and the mechanisms initiating cancer development]." J Soc Biol 201(3): 317-327. |
| Not Relevant to current fit for purpose review | Gehin, A., et al. (2005). "Vitamins C and E reverse effect of herbicide-induced toxicity on human epidermal cells HaCaT: a biochemometric approach." Int J Pharm 288(2): 219-226. |
| Not Relevant to current fit for purpose review | Gehin, A., et al. (2006). "Glyphosate-induced antioxidant imbalance in HaCaT: The protective effect of vitamins C and E." Environmental Toxicology and Pharmacology 22(1): 27-34. |
| Not Relevant to current fit for purpose review | Lueken, A., et al. (2004). "Synergistic DNA damage by oxidative stress (induced by H2O2) and nongenotoxic environmental chemicals in human fibroblasts." Toxicol Lett 147(1): 35-43. |
| Not Relevant to current fit for purpose review | Baurand, P. E., et al. (2015). "Genotoxicity assessment of pesticides on terrestrial snail embryos by analysis of random amplified polymorphic DNA profiles." J Hazard Mater 298: 320-327. |
| Not Relevant to current fit for purpose review | Guilherme, S., et al. (2009). "Tissue specific DNA damage in the European eel (Anguilla anguilla) following a short-term exposure to a glyphosate-based herbicide." Toxicology Letters 189: S212-S212. |
| Not Relevant to current fit for purpose review | Marc, J., et al. (2004). "Glyphosate-based pesticides affect cell cycle regulation." Biol Cell 96(3): 245-249. |
| Not Relevant to current fit for purpose review | Marc, J., et al. (2003). "Embryonic cell cycle for risk assessment of pesticides at the molecular level." Environmental Chemistry Letters 1(1): 8-12. |
| Not Relevant to current fit for purpose review | Nwani, C. D., et al. (2014). "Induction of micronuclei and nuclear lesions in Channa punctatus following exposure to carbosulfan, glyphosate and atrazine." Drug Chem Toxicol 37(4): 370-377. |
| Not Relevant to current fit for purpose review | Owczarek, M., et al. (1999). "Evaluation of toxic and genotoxic activity of some pesticides in a soil-plant system." Human and Environmental Exposure to Xenobiotics: 755-762. |
| Not Relevant to current fit for purpose review | Perez-Iglesias, J. M., et al. (2016). "Effects of glyphosate on hepatic tissue evaluating melanomacrophages and erythrocytes responses in neotropical anuran Leptodactylus latinasus." Environ Sci Pollut Res Int. |
| Not Relevant to current fit for purpose review | Poletta, G. L., et al. (2009). "Genotoxicity of the herbicide formulation Roundup (glyphosate) in broad-snouted caiman (Caiman latirostris) evidenced by the Comet assay and the Micronucleus test." Mutat Res 672(2): 95-102. |
| Not Relevant to current fit for purpose review | Siddiqui, S., et al. (2012). "Glyphosate, alachor and maleic hydrazide have genotoxic effect on Trigonella foenum-graecum L." Bull Environ Contam Toxicol 88(5): 659-665. |
| Not Relevant to current fit for purpose review | Song, H.-Y., et al. (2012). "Cellular Toxicity of Surfactants Used as Herbicide Additives." J Korean Med Sci 27(1): 3-9. |
| Not Relevant to current fit for purpose review | Unver, T., et al. (2010). "Genome-wide profiling and analysis of Festuca arundinacea miRNAs and transcriptomes in response to foliar glyphosate application." Mol Genet Genomics 283(4): 397-413. |
| Relevant- Cancer Epi | Acquavella, J. F., et al. (2006). "Exposure misclassification in studies of agricultural pesticides - Insights from biomonitoring." Epidemiology 17(1): 69-74. |
| Relevant- Cancer Epi | Acquavella, J. F., et al. (2005). "Implications for epidemiologic research on variation by pesticide in studies of farmers and their families." Scandinavian Journal of Work Environment & Health 31: 105-109. |
| Relevant- Cancer Epi | Baker, B. A., et al. (2005). "Farm Family Exposure Study: methods and recruitment practices for a biomonitoring study of pesticide exposure." Journal of Exposure Analysis and Environmental Epidemiology 15(6): 491-499. |
| Relevant- Cancer Epi | Chang, E. T. and E. Delzell (2016). "Systematic review and meta-analysis of glyphosate exposure and risk of lymphohematopoietic cancers." J Environ Sci Health B 51(6): 402-434. |
| Relevant- Cancer Epi | De Roos, A. J., et al. (2005). "Cancer incidence among glyphosate-exposed pesticide applicators in the Agricultural Health Study." Environ Health Perspect 113(1): 49-54. |
| Relevant- Cancer Epi | Firth, H. M., et al. (2007). "Chemical exposure among NZ farmers." International Journal of Environmental Health Research 17(1): 33-43. |

| Relevant- Cancer Epi | Lash, T. L. (2007). "Bias analysis applied to Agricultural Health Study publications to estimate non-random sources of uncertainty." J Occup Med Toxicol 2: 15. |
|---|---|
| Relevant- Cancer Epi | Mink, P. J., et al. (2012). "Epidemiologic studies of glyphosate and cancer: a review." Regul Toxicol Pharmacol 63(3): 440-452. |
| Relevant- Cancer Epi | Sorahan, T. (2012). "Multiple myeloma and glyphosate use: A re-analysis of US Agricultural Health Study data." Toxicology Letters 211, Supplement: S169. |
| Relevant- Carcinogenicity | Greim, H., et al. (2015). "Evaluation of carcinogenic potential of the herbicide glyphosate, drawing on tumor incidence data from fourteen chronic/carcinogenicity rodent studies." Crit Rev Toxicol 45(3): 185-208. |
| Relevant- Carcinogenicity | Williams, G. M., et al. (2000). "Safety Evaluation and Risk Assessment of the Herbicide Roundup and Its Active Ingredient, Glyphosate, for Humans." Regulatory Toxicology and Pharmacology 31(2): 117-165. |
| Relevant- Genotoxicity | Alvarez-Moya et al. (2014) "Comparison of the in vivo and in vitro genotoxicity of glyphosate isopropylamine salt in three different organisms". *Genetics and Molecular Biology*, 37, 1, 105-110 |
| Relevant- Genotoxicity | Chan, P. and J. Mahler (1992). "NTP technical report on the toxicity studies of Glyphosate (CAS No. 1071-83-6) Administered In Dosed Feed To F344/N Rats And B6C3F1 Mice." Toxic Rep Ser 16: 1-d3. |
| Relevant- Genotoxicity | Bakry, F. A., et al. (2015). "Glyphosate herbicide induces genotoxic effect and physiological disturbances in Bulinus truncatus snails." Pestic Biochem Physiol 123: 24-30. |
| Relevant- Genotoxicity | Bolognesi, C., et al. (1997). "Genotoxic activity of glyphosate and its technical formulation roundup." J Agric Food Chem 45(5): 1957-1962. |
| Relevant- Genotoxicity | Bolognesi, C., et al. (2009). "Biomonitoring of genotoxic risk in agricultural workers from five colombian regions: association to occupational exposure to glyphosate." J Toxicol Environ Health A 72(15-16): 986-997. |
| Relevant- Genotoxicity | Da Silva, F. R., et al. (2014). "Genotoxic assessment in tobacco farmers at different crop times." Science of the Total Environment 490: 334-341. |
| Relevant- Genotoxicity | Dimitrov, B. D., et al. (2006). "Comparative genotoxicity of the herbicides Roundup, Stomp and Reglone in plant and mammalian test systems." Mutagenesis 21(6): 375-382. |
| Relevant- Genotoxicity | El-Shenawy, N. S. (2009). "Oxidative stress responses of rats exposed to Roundup and its active ingredient glyphosate." Environ Toxicol Pharmacol 28(3): 379-385. |
| Relevant- Genotoxicity | Fortes, C., et al. (2016). "Occupational Exposure to Pesticides With Occupational Sun Exposure Increases the Risk for Cutaneous Melanoma." J Occup Environ Med 58(4): 370-375. |
| Relevant- Genotoxicity | Ghisi Nde, C., et al. (2016). "Does exposure to glyphosate lead to an increase in the micronuclei frequency? A systematic and meta-analytic review." Chemosphere 145: 42-54. |
| Relevant- Genotoxicity | Heydens, W. F., et al. (2008). "Genotoxic potential of glyphosate formulations: mode-of-action investigations." J Agric Food Chem 56(4): 1517-1523. |
| Relevant- Genotoxicity | Kale, P. G., et al. (1995). "MUTAGENICITY TESTING OF 9 HERBICIDES AND PESTICIDES CURRENTLY USED IN AGRICULTURE." Environ Mol Mutagen 25(2): 148-153. |
| Relevant- Genotoxicity | Kier, L. D. (2015). "Review of genotoxicity biomonitoring studies of glyphosate-based formulations." Crit Rev Toxicol 45(3): 209-218. |
| Relevant- Genotoxicity | Koller, V. J., et al. (2012). "Cytotoxic and DNA-damaging properties of glyphosate and Roundup in human-derived buccal epithelial cells." Arch Toxicol 86(5): 805-813. |
| Relevant- Genotoxicity | Li, A. P. and T. J. Long (1988). "An evaluation of the genotoxic potential of glyphosate." Fundam Appl Toxicol 10(3): 537-546. |
| Relevant- Genotoxicity | Lioi, M. B., et al. (1998). "Genotoxicity and oxidative stress induced by pesticide exposure in bovine lymphocyte cultures in vitro." Mutat Res 403(1-2): 13-20. |
| Relevant- Genotoxicity | Manas, F., et al. (2009). "Genotoxicity of AMPA, the environmental metabolite of glyphosate, assessed by the Comet assay and cytogenetic tests." Ecotoxicol Environ Saf 72(3): 834-837. |
| Relevant- Genotoxicity | Manas, F., et al. (2009). "Genotoxicity of glyphosate assessed by the comet assay and cytogenetic tests." Environmental Toxicology and Pharmacology 28(1): 37-41. |
| Relevant- Genotoxicity | Mandel, J. S., et al. (2005). "Biomonitoring for farm families in the farm family exposure study." Scandinavian Journal of Work Environment & Health 31: 98-104. |
| Relevant- Genotoxicity | Mladinic, M., et al. (2009). "Evaluation of genome damage and its relation to oxidative stress induced by glyphosate in human lymphocytes in vitro." Environ Mol Mutagen 50(9): 800-807. |
| Relevant- Genotoxicity | Mladinic, M. and D. Zeljezic (2008). "Assessment of oxidative DNA damage by glyphosate applying hOGG1 modified comet and micronucleus assay." Toxicology Letters 180: S170-S171. |

| | |
|---|---|
| Relevant- Genotoxicity | Paz-y-Mino, C., et al. (2011). "Baseline determination in social, health, and genetic areas in communities affected by glyphosate aerial spraying on the northeastern Ecuadorian border." Rev Environ Health 26(1): 45-51. |
| Relevant- Genotoxicity | Paz-y-Mino, C., et al. (2007). "Evaluation of DNA damage in an Ecuadorian population exposed to glyphosate." Genetics and Molecular Biology 30(2): 456-460. |
| Relevant- Genotoxicity | Peluso, M., et al. (1998). "32P-postlabeling detection of DNA adducts in mice treated with the herbicide Roundup." Environ Mol Mutagen 31(1): 55-59. |
| Relevant- Genotoxicity | Piesova, E. (2005). "The effect of glyphosate on the frequency of micronuclei in bovine lymphocytes in vitro." Acta Veterinaria-Beograd 55(2-3): 101-109. |
| Relevant- Genotoxicity | Prasad, S., et al. (2009). "Clastogenic effects of glyphosate in bone marrow cells of swiss albino mice." J Toxicol 2009: 308985. |
| Relevant- Genotoxicity | Rank, J., et al. (1993). "Genotoxicity testing of the herbicide Roundup and its active ingredient glyphosate isopropylamine using the mouse bone marrow micronucleus test, Salmonella mutagenicity test, and Allium anaphase-telophase test." Mutat Res 300(1): 29-36. |
| Relevant- Genotoxicity | Roustan, A., et al. (2014). "Genotoxicity of mixtures of glyphosate and atrazine and their environmental transformation products before and after photoactivation." Chemosphere 108: 93-100. |
| Relevant- Genotoxicity | Silva Kahl, V. F., et al. (2016). "Telomere measurement in individuals occupationally exposed to pesticide mixtures in tobacco fields." Environ Mol Mutagen 57(1): 74-84. |
| Relevant- Genotoxicity | Sivikova, K. and J. Dianovsky (2006). "Cytogenetic effect of technical glyphosate on cultivated bovine peripheral lymphocytes." Int J Hyg Environ Health 209(1): 15-20. |
| Relevant- Genotoxicity | Vigfusson, N. V. and E. R. Vyse (1980). "The effect of the pesticides, Dexon, Captan and Roundup, on sister-chromatid exchanges in human lymphocytes in vitro." Mutat Res 79(1): 53-57. |
| Retracted Article | Séralini, G.-E., et al. (2014). "Retraction notice to "Long term toxicity of a Roundup herbicide and a Roundup-tolerant genetically modified maize" [Food Chem. Toxicol. 50 (2012) 4221–4231]." Food and Chemical Toxicology 63: 244. |

**Appendix B**



**Figure B.1.  Visual representation of studies included in De Roos *et al.* (2003).**



**Figure B.2.  Visual representation of studies included in Hardell *et al.* (2002).**



**Figure B.3.  Visual representation of the association between McDuffie *et al.* (2001) and the follow-up analysis by Hohenadal *et al.* (2011).**



**Figure B.4.  Visual representation of the association between Carreon** *et al.* **(2005), which investigated gliomas in women only, and Yiin** *et al.* **(2012), which investigated both sexes.**

# Appendix C

**Table B.1.  Design Characteristics of Epidemiological Studies Evaluated for Study Quality.**

| Study | Location | Study Years | Case Population | Control Population | Total Number of Subjects | Number of Glyphosate Exposed Cases | Proxy Use |
|---|---|---|---|---|---|---|---|
| Alavanja *et al.* (2003) | USA: Iowa and North Carolina | Enrollment (1993-1997) through 2001 | Males enrolled in AHS; licensed private and commercial applicators | Males enrolled in AHS; licensed private and commercial applicators | 566 cases 54,766 controls | not reported | No |
| Andreotti *et al.* (2009) | USA: Iowa and North Carolina | Enrollment (1993-1997) through 2004 | Participants enrolled in AHS; licensed private and commercial applicators and spouses | Participants enrolled in AHS; licensed private and commercial applicators and spouses | 93 cases (64 applicators, 29 spouses) 82,503 controls (52,721 applicators, 29,782 spouses) | 55 cases 48,461 controls | No |
| Band *et al.* (2011) | Canada: British Columbia | 1983-1990 | Male residents in British Columbia identified as cancer patients in British Columbia Cancer Registry (excluding farmers that worked all outside British Columbia) | Male residents in British Columbia identified as cancer patients in British Columbia Cancer Registry (excluding farmers that worked all outside British Columbia) with other cancer sites excluding lung cancer and cancers of unknown primary site | 1,153 cases 3,999 controls | 25 cases 60 controls | Yes (included in adjustment) |
| Brown *et al.* (1990) | USA: Iowa and Minnesota | Iowa: 1981-1983; Minnesota: 1980-1982 Initial interview 1981-1984 and supplemental interviews (Iowa only) in 1987 | White males (30 years or older) residing in Iowa or Minnesota diagnosed with leukemia | White males without lymphatic or hematopoietic cancer selected by random digit dialing (< age 65), Medicare records (age > 65) and state death certificate files (deceased controls) - frequency matched for 5-year age group, vital status, and state of residence | Initial: 578 cases; 1245 controls Supplemental: 92 cases; 211 controls | 15 cases 49 controls | Yes (not evaluated) |
| Brown *et al.* (1993) | USA: Iowa | Iowa: 1981-1983; Interview 1981-1984 | White males (30 years or older) residing in Iowa diagnosed with multiple myeloma | White males without lymphatic or hematopoietic cancer selected by random digit dialing (< age 65), Medicare records (age > | 173 cases 650 controls | 11 cases 40 controls | Yes (not evaluated) |

**Table B.1.  Design Characteristics of Epidemiological Studies Evaluated for Study Quality.**

| Study | Location | Study Years | Case Population | Control Population | Total Number of Subjects | Number of Glyphosate Exposed Cases | Proxy Use |
|---|---|---|---|---|---|---|---|
| | | | | 65) and state death certificate files (deceased controls) - frequency matched for 5-year age group, vital status, and state of residence | | | |
| Cocco *et al.* (2013) | Czech Republic, France, Germany, Italy, Ireland, and Spain | 1998-2004 | Adult patients first diagnosed with lymphoma residing in the referral area of the participating centers | Controls from Germany and Italy were randomly selected by sampling from the general population, matched to cases on sex, 5-year age-group, and residence area.  The rest of the centers used matched hospital controls, with eligibility criteria limited to diagnoses other than cancer, infectious diseases, and immunodeficient diseases | 2,348 cases 2,462 controls | 4 cases 2 controls | No |
| De Roos *et al.* (2003) | USA: Nebraska, Iowa, Minnesota, and Kansas | Nebraska: 1983-1986 Iowa: 1981-1983 Minnesota: 1980-1982 Kansas: 1979-1981 | White males diagnosed with NHL in one of the 4 states (21 years or older in Nebraska and Kansas; 30 years or older in Iowa and Minnesota) | Males living in same geographic area obtained by random digit dialing, Medicare records and state mortality files - frequency matched for race, sex, age, and vital status | 870 cases 2,569 controls | 36 cases 61 controls | Yes (not significant in covariate analysis) |
| De Roos *et al.* (2005) | USA: Iowa and North Carolina | Enrollment (1993-1997) through 2001 | Participants enrolled in AHS; licensed private and commercial applicators and spouses | Participants enrolled in AHS; licensed private and commercial applicators and spouses | 54,315 subjects included in this analysis | All cancers – 358 cases Lung – 26 cases Oral cavity – 10 cases Colon – 15 cases Rectum – 14 cases Pancreas – 7  cases Kidney – 9 cases Bladder – 17 cases Prostate – 145 cases Melanoma – 14 cases All lymphohematopoietic cancers – 36 cases NHL – 17 cases Leukemia – 9 cases | No |

**Table B.1. Design Characteristics of Epidemiological Studies Evaluated for Study Quality.**

| Study | Location | Study Years | Case Population | Control Population | Total Number of Subjects | Number of Glyphosate Exposed Cases | Proxy Use |
|---|---|---|---|---|---|---|---|
| | | | | | | Multiple myeloma – 6 cases (13,280 subjects not exposed to glyphosate used for comparison population) | |
| Engel *et al.* (2005) | USA: Iowa and North Carolina | Enrollment (1993-1997) through 2000 | Wives of applicators enrolled in AHS study with no history of breast cancer | Wives of applicators enrolled in AHS study with no history of breast cancer | 309 cases 30,145 controls | 82 cases; 10,016 controls | No |
| Eriksson *et al.* (2008) | Sweden | 1999-2002 | Patients (18-74 years of age) residing in Sweden and diagnosed with NHL | Swedish residents randomly selected living in same health service regions as cases - frequency matched for age (in 10 years) and sex | 910 cases 1,016 controls | 29 cases 18 controls | No |
| Flower *et al.* (2004) | USA: Iowa | 1993-1997 | Children (born after 1975) of participants enrolled in AHS study who were diagnosed with childhood cancer up to 19 years of age | Children (born after 1975) of participants enrolled in AHS study not diagnosed with childhood cancer up to 19 years of age | 50 cases out of 17,357 total study population | Maternal use: 13 cases of 6075 total exposed  Paternal use: 6 cases of 3231 total exposed | No |
| Hardell *et al.* (2002) | Sweden | NHL: 1987-1990 HCL: 1987-1992 | NHL: Male residents of one of four northern or three middle counties in Sweden age 25 years and older diagnosed with NHL; identified from regional cancer registries HCL: Living male residents of Sweden age 25 years and older diagnosed with HCl; identified from the Swedish Cancer Registry | NHL: Two male controls for each case matched by age, year of death if deceased, and county HCL: Four male controls for each case matched by age and county | 515 cases 1,141 controls | 8 cases 8 controls | Yes (not evaluated) |
| Kachuri *et al.* (2013) | Canada: Alberta, British Columbia, Manitoba, Ontario, | 1991–1994 | Men aged ≥ 19 years (≥ 30 years in analysis) - pulled from hospital records in Quebec, | Men aged ≥ 19 years (30 years in analysis) - pulled from provincial health insurance records in | 342 cases 1,357 controls | 32 cases 121 controls | Yes (included in adjustment) |

**Table B.1.  Design Characteristics of Epidemiological Studies Evaluated for Study Quality.**

| Study | Location | Study Years | Case Population | Control Population | Total Number of Subjects | Number of Glyphosate Exposed Cases | Proxy Use |
|---|---|---|---|---|---|---|---|
| | Quebec, and Saskatchewan | | cancer registries in all other provinces | Alberta, Saskatchewan, Manitoba, and Quebec; computerized telephone listings in Ontario; voter lists in British Columbia | | | |
| Karunanayake *et al.* (2012) | Canada: Alberta, British Columbia, Manitoba, Ontario, Quebec, and Saskatchewan | 1991–1994 | Men aged ≥ 19 years - pulled from hospital records in Quebec, cancer registries in all other provinces | Men aged ≥ 19 years - pulled from provincial health insurance records in Alberta, Saskatchewan, Manitoba, and Quebec; computerized telephone listings in Ontario; voter lists in British Columbia | 316 cases 1,506 controls | 38 cases 133 controls | No |
| Koureas *et al.* (2014) | Greece | 2010 | Inhabitants of the city of Larissa; Eligibility criteria for pesticide sprayers were 1) to personally apply pesticides systematically, and 2) to have recently applied pesticides (no longer than 7 days between last application and sampling). | The rural residents group were occupied in administrative services, public order services, health services, education or trade. Inclusion criteria for this group: absence of any involvement in agricultural activities either as a primary or secondary occupation by participant or any member of household. Also recruited urban residents (mainly blood donors) from the city of Larissa. | 80 pesticide sprayers, 85 rural residents, and 121 individuals | Not reported | No |
| Koutros *et al.* (2013) | USA: Iowa and North Carolina | Enrollment (1993-1997) through 2007 | Males enrolled in AHS; licensed private and commercial applicators | Males enrolled in AHS; licensed private and commercial applicators | 1,962 incident cases (including 919 aggressive prostate cancers) among 54,412 applicators | 1464 cases 42,420 controls | No |
| Landgren *et al.* (2009) | USA: Iowa and North Carolina | Exposure information: enrollment (1993-1997) and 5-year follow-up interview | Males enrolled in AHS; licensed private and commercial applicators | Males enrolled in AHS; licensed private and commercial applicators | 678 participants | 27 cases out of 570 total exposed | No |

**Table B.1.  Design Characteristics of Epidemiological Studies Evaluated for Study Quality.**

| Study | Location | Study Years | Case Population | Control Population | Total Number of Subjects | Number of Glyphosate Exposed Cases | Proxy Use |
|---|---|---|---|---|---|---|---|
| | | Blood samples: 2006-2007 (Iowa) and 2008 (North Carolina) | | | | | |
| Lee *et al.* (2004b) | USA: Nebraska | 1988-1993 | White residents of 1 of 66 Nebraska counties age 21 years or older with a newly confirmed case of adenocarcinoma of the stomach or Cases identified from the Nebraska Cancer Registry (1988–1990) or from discharge diagnosis and pathology records from 14 Nebraska hospitals (1991–1993) | Frequency matched by age and sex to the combined distribution of glioma, stomach, and esophageal cancer cases from a control group from a previous study (1986–1987) that selected controls from the general population by random digit dialing for those under 65 years, Health Care Financing Administration Medicare files for those over 65 years, mortality records for deceased and matched by race, sex, vital status (or year of death if deceased) | Stomach: 170 cases  Esophagus: 137 cases  502 Controls | 12 cases 46 controls | Yes (analysis showed differences) |
| Lee *et al.* (2005) | USA: Nebraska | 1988-1993 | White residents of 1 of 66 Nebraska counties age 21 years or older with confirmed adult glioma. Cases identified from Nebraska Cancer Registry or from participating hospitals in Lincoln and Omaha, Nebraska | Frequency matched by age, sex, and vital status to the combined distribution of glioma, stomach, and esophageal cancer cases from a control group from a previous study (1986–1987) that selected controls from the general population by random digit dialing for those under 65 years, Medicare files for those over 65 years, mortality records for deceased and matched by race, sex, vital status (or year of death if deceased), and 5-year age groups to the overall case distribution. Additional | 251 glioma cases 498 controls | 17 cases 32 controls | Yes (analysis showed differences, included in adjustment) |

**Table B.1.  Design Characteristics of Epidemiological Studies Evaluated for Study Quality.**

| Study | Location | Study Years | Case Population | Control Population | Total Number of Subjects | Number of Glyphosate Exposed Cases | Proxy Use |
|---|---|---|---|---|---|---|---|
| | | | | younger controls were brought into the study through random digit dialing and from death certificates | | | |
| Lee *et al.* (2007) | USA: Iowa and North Carolina | 1993-97; follow-up to 2002 | Agricultural Health Study participants: private and commercial applicators licensed in Iowa or North Carolina with no history of colorectal cancer at enrollment. Followed through 2002 for incident colorectal cancer | Agricultural Health Study participants: private and commercial applicators licensed in Iowa or North Carolina with no history of colorectal cancer at enrollment. Followed through 2002 for incident colorectal cancer | 56,813 licensed pesticide applicators

305 incident colorectal cancer cases (212 colon, 93 rectum)

56,508 controls | Colon - 151 cases; 49 controls

Rectum - 74 cases; 18 controls

Colorectal - 225 cases; 67 controls | No |
| McDuffie *et al.* (2001) | Canada: Alberta, British Columbia, Manitoba, Ontario, Quebec, and Saskatchewan | 1991-1994 | Male residents of six Canadian provinces age 19 years and older diagnosed with STS, HD, NHL, or MM; this study only evaluated those with NHL. Cases were identified from Canadian Cancer Registries; in Quebec, hospital ascertainment was used | Random control subject selection using Health Insurance records, computerized telephone listings, and voters' lists; males 19 years and older from same six Canadian provinces as cases matched by age (within 2 years) | 517 cases
1506 controls | Univariate analysis: 51 cases; 133 controls (multivariate analysis also conducted - glyphosate exposed numbers not reported) | No |
| Orsi *et al.* (2009) | France | 2000-2004 | Men aged 20–75 years living in the catchment areas of the main hospitals in Brest, Caen, Nantes, Lille, Toulouse, and Bordeaux, with no history of immunosuppression or taking immunosuppressant drugs.  Cases ascertained from hospital records. | Patients from the same hospital catchment area as the cases.  Patients were hospitalized for orthopedic or rheumatological conditions (89.3%), gastrointestinal or genitourinary tract diseases (4.8%), cardiovascular diseases (1.1%), skin and subcutaneous tissue disease (1.8%), and infections (3.0%), excluding patients admitted for cancer or a disease directly related to | 491 cases
456 controls | NHL: 12 cases 24 controls

HL: 6 cases 15 controls

Lymphoproliferative syndromes: 4 cases 18 controls

Multiple myeloma: 5 cases;18 controls

Lymphoid neoplasms: 27 cases; 24 controls | No |

**Table B.1. Design Characteristics of Epidemiological Studies Evaluated for Study Quality.**

| Study | Location | Study Years | Case Population | Control Population | Total Number of Subjects | Number of Glyphosate Exposed Cases | Proxy Use |
|---|---|---|---|---|---|---|---|
| | | | | occupation, smoking, or alcohol abuse | | | |
| Pahwa et al. (2011) | Canada (Alberta, British Columbia, Manitoba, Ontario, Quebec, and Saskatchewan) | 1991-1994 | Men aged ≥ 19 years - pulled from hospital records in Quebec, cancer registries in all other provinces | Men aged ≥ 19 years - pulled from provincial health insurance records in Alberta, Saskatchewan, Manitoba, and Quebec; computerized telephone listings in Ontario; voter lists in British Columbia | 342 cases 1,506 age/resident matched controls | 32 cases 133 controls | No |
| Pahwa et al. (2012) | Canada (Alberta, British Columbia, Manitoba, Ontario, Quebec, and Saskatchewan) | 1991-1994 | Men aged ≥ 19 years - pulled from hospital records in Quebec, cancer registries in all other provinces | Men aged ≥ 19 years - pulled from provincial health insurance records in Alberta, Saskatchewan, Manitoba, and Quebec; computerized telephone listings in Ontario; voter lists in British Columbia | 342 cases 1506 age/resident matched controls | 32 cases 133 controls | No |
| Yiin et al. (2012) | USA: Upper Midwest Health Study (Iowa, Michigan, Minnesota and Wisconsin) | 1995-1997 | Age 18–80 (at ascertainment or diagnosis in 1995 through January 1997) residing in counties where the largest population center had fewer than 250,000 residents.  Referral by physicians or through state cancer registries with cases verified by histological evaluation. | Controls age 18–64 randomly selected from state driver's license/nondriver ID records, and those age 65–80 were selected from Health Care Financing Administration's (HCFA) Medicare data within 10-year age group strata, with the proportion/stratum determined by the age distribution of glioma cases in that state from 1992 to 1994. Controls were frequency-matched within a state but not by county of residence.  Selected even if they had a self-reported history of cancer other than glioma. | 798 glioma cases; 1,175 controls | 12 cases 19 controls | Yes (analysis showed no differences) |

**Appendix D. List of studies assigned a low quality ranking and not evaluated in detail**

As described in Section 3.2, if studies did not collect exposure information on glyphosate from all subjects, did not assess an outcome (e.g., biomonitoring studies), and/or did not provide a quantitative measure of an association between glyphosate and a cancer outcome, then these studies were assigned a low quality ranking and were not further evaluated in detail.  These studies included the following 32 studies:

Acquavella *et al.* 2006; Andre *et al.*, 2007; Baker *et al.* 2005; Benedetti *et al.*, 2013; Bolognesi *et al.*, 2002; Bolognesi *et al.*, 2004; Bolognesi *et al.* 2009; Bortoli *et al.*, 2009; Costa *et al.*, 2006; Da Silva *et al.* 2014; Dennis *et al.* 2010; Firth *et al.* 2007; Gomez-Arroyo *et al.*, 2013; Gregio D'Arce *et al.*, 2000; El-Zaemey *et al.*, 2013; Fortes *et al.*, 2016; Fritschi *et al.*, 2005; Hernandez *et al.,* 2006; Kaufman *et al.* 2009; Khayat *et al.*, 2013; Lebailly *et al.,* 2003; Mandel *et al.* 2005; Martinez-Valenzuela *et al.*, 2009; Monge *et al.*, 2007; Pastor *et al.*, 2003; Paz-y Mino *et al.,* 2007; Paz-y Mino *et al.* 2011; Ruder *et al.* 2004; Shaham *et al.*, 2001; Silva Kahl *et al.* 2016; Simoniello *et al.*, 2008; Vlastos *et al.,* 2006.

**Appendix E**

*Chronic Dietary Exposure*

The agency uses Dietary Exposure Evaluation Model- Food Consumption Intake Database (DEEM-FCID; version 3.16), which incorporates consumption data from United States Department of Agriculture (USDA) National Health and Nutrition Examination Survey, What We Eat in America (NHANES/WWEIA; 2003-2008) to calculate potential chronic dietary exposures.  In an unrefined chronic dietary analysis, several conservative assumptions are used to generate high end estimates of potential exposure.  These assumptions include tolerance-level residues for all registered commodities, 100% crop treated, and drinking water values from a direct application to water scenario, as well as DEEM default processing factors.  For glyphosate, the highest exposure value for any population subgroup in an unrefined chronic dietary analysis would be 0.23 mg/kg/day for children 1-2 years old (Table E.1; DEEM inputs and results attached below).

| Table E.1. Chronic dietary exposure estimates | |
|---|---|
| **Population Subgroup** | **Exposure (mg/kg/day)** |
| General U.S. Population | 0.091515 |
| All Infants (< 1 year old) | 0.142826 |
| **Children 1-2 years old** | **0.230816** |
| Children 3-5 years old | 0.214117 |
| Children 6-12 years old | 0.149269 |
| Youth 13-19 years old | 0.089636 |
| Adults 20-49 years old | 0.076396 |
| Adults 50-99 years old | 0.062987 |
| Females 13-49 years old | 0.071057 |

*Post-application Incidental Oral and Dermal Exposure*

Glyphosate has residential uses, including application to turf, which would result in the highest potential post-application exposures; therefore, there is potential for children to be exposed via incidental oral and dermal routes from playing on treated lawns.  For this assessment, the agency evaluates exposures from hand-to-mouth behavior, object-to-mouth behavior, incidental soil ingestion, and dermal contact using the 2012 Standard Operating Procedures for Residential Pesticide Exposure Assessment[29].  Incidental oral exposures from hand-to-mouth, object-to-mouth, and incidental soil ingestion are considered inter-related and, therefore, not combined. To calculate high end estimates of exposures, the following is assumed according to the 2012 SOP to be health-protective:  1) maximum label rates are applied to the turf, 2) exposures are assumed to occur every day to the residue values on the day of application (i.e., no dissipation), and 3) individuals engage in post-application activities for the maximum amount of time represented by data for children spending time outdoors and not specifically engaged in activities

---

[29] Available: http://www2.epa.gov/pesticide-science-and-assessing-pesticide-risks/standard-operating-procedures-residential-pesticide

on turf, when in actuality children do not spend all of their outdoor time on turf.  The highest exposure from incidental oral scenarios using the maximum application rate for turf applications would be 0.16 mg/kg/day from hand-to-mouth behaviors by children (1 to <2 years old).  Dermal post-application to children 1 to <2 years old would be 0.08 mg/kg/day.

| Table E.2.  Post-application Exposure Estimates for Application of Glyphosate to Turf[1]. | | |
|---|---|---|
| **Lifestage** | **Post-application Exposure Scenario** | | **Exposure (mg/kg/day)** |
| Children 1 to <2 year old | Turf – sprays | Hand-to-Mouth | 0.16 |
| | | Object-to-Mouth | 0.005 |
| | | Incidental Soil Ingestion | 0.0003 |
| | | Dermal (high contact activities) | 0.08 |

[1]  Based on Roundup® Weed & Grass Super Concentrate, EPA Reg. No. 71995-25.

DEEM-FCID™ Chronic Residue File.

```
Filename: C:\Users\tbloem\Documents\work\glyphosate\registration review\417300C.R08
Chemical: Glyphosate
RfD(Chronic): 1 mg/kg bw/day  NOEL(Chronic): 100 mg/kg bw/day
RfD(Acute): 0 mg/kg bw/day  NOEL(Acute):  0 mg/kg bw/day
Date created/last modified: 06-09-2016/10:37:44     Program ver. 3.16, 03-08-d
Comment: THIS R98 FILE WAS GENERATED USING THE CONVERT TO R98 UTILITY VERSION 1.1.2.
-------------------------------------------------------------------------------
   EPA    Crop                                Def Res   Adj.Factors   Comment
   Code    Grp  Commodity Name                 (ppm)     #1     #2
---------- ---- ----------------------------- ---------- ------ ------  -------
0101050000 1AB  Beet, garden, roots            0.200000  1.000  1.000  P 7F20
           Full comment: P 7F2016
0101050001 1AB  Beet, garden, roots-babyfood   0.200000  1.000  1.000  P 7F20
           Full comment: P 7F2016
0101052000 1A   Beet, sugar                   10.000000  1.000  1.000  P 7F04
           Full comment: P 7F04886
0101052001 1A   Beet, sugar-babyfood          10.000000  1.000  1.000  P 7F04
           Full comment: P 7F04886
0101053000 1A   Beet, sugar, molasses         10.000000  1.000  1.000  P 7F04
           Full comment: P 7F04886
0101053001 1A   Beet, sugar, molasses-babyfood 10.000000  1.000  1.000  P 7F04
           Full comment: P 7F04886
0101067000 1AB  Burdock                        0.200000  1.000  1.000
0101078000 1AB  Carrot                         5.000000  1.000  1.000  P 8E36
           Full comment: P 8E3676   7F2016
0101078001 1AB  Carrot-babyfood                5.000000  1.000  1.000  P 8E36
           Full comment: P 8E3676   7F2016
0101079000 1AB  Carrot, juice                  5.000000  1.000  1.000  P 8E36
           Full comment: P 8E3676   7F2016
0101084000 1AB  Celeriac                       0.200000  1.000  1.000
0101100000 1AB  Chicory, roots                 0.200000  1.000  1.000
0101168000 1AB  Ginseng, dried                 0.200000  1.000  1.000  P 7F20
           Full comment: P 7F2016
0101190000 1AB  Horseradish                    0.200000  1.000  1.000  P 8E36
           Full comment: P 8E3676
0101250000 1AB  Parsley, turnip rooted         0.200000  1.000  1.000
```

```
0101251000 1AB  Parsnip                          0.200000  1.000  1.000  P 7F20
           Full comment: P 7F2016
0101251001 1AB  Parsnip-babyfood                 0.200000  1.000  1.000  P 7F20
           Full comment: P 7F2016
0101314000 1AB  Radish, roots                    0.200000  1.000  1.000  P 7F20
           Full comment: P 7F2016
0101316000 1AB  Radish, Oriental, roots          0.200000  1.000  1.000  P 7F20
           Full comment: P 7F2016
0101327000 1AB  Rutabaga                         0.200000  1.000  1.000
0101331000 1AB  Salsify, roots                   0.200000  1.000  1.000
0101388000 1AB  Turnip, roots                    0.200000  1.000  1.000  P 7F20
           Full comment: P 7F2016
0103015000 1CD  Arrowroot, flour                 0.200000  1.000  1.000
0103015001 1CD  Arrowroot, flour-babyfood        0.200000  1.000  1.000
0103017000 1CD  Artichoke, Jerusalem             0.200000  1.000  1.000  P 7F20
           Full comment: P 7F2016
0103082000 1CD  Cassava                          0.200000  1.000  1.000  P 7F20
           Full comment: P 7F2016
0103082001 1CD  Cassava-babyfood                 0.200000  1.000  1.000  P 7F20
           Full comment: P 7F2016
0103139000 1CD  Dasheen, corm                    0.200000  1.000  1.000  P 7F20
           Full comment: P 7F2016
0103166000 1CD  Ginger                           0.200000  1.000  1.000  P 7F20
           Full comment: P 7F2016
0103166001 1CD  Ginger-babyfood                  0.200000  1.000  1.000
0103167000 1CD  Ginger, dried                    0.200000  1.000  1.000  P 7F20
           Full comment: P 7F2016
0103296000 1C   Potato, chips                    0.200000  1.000  1.000  P 7F20
           Full comment: P 7F2016
0103297000 1C   Potato, dry (granules/ flakes)   0.200000  6.500  1.000
0103297001 1C   Potato, dry (granules/ flakes)-b 0.200000  6.500  1.000
0103298000 1C   Potato, flour                    0.200000  6.500  1.000  P 7F20
           Full comment: P 7F2016
0103298001 1C   Potato, flour-babyfood           0.200000  6.500  1.000  P 7F20
           Full comment: P 7F2016
0103299000 1C   Potato, tuber, w/peel            0.200000  1.000  1.000  P 7F20
           Full comment: P 7F2016
0103299001 1C   Potato, tuber, w/peel-babyfood   0.200000  1.000  1.000
0103300000 1C   Potato, tuber, w/o peel          0.200000  1.000  1.000  P 7F20
           Full comment: P 7F2016
0103300001 1C   Potato, tuber, w/o peel-babyfood 0.200000  1.000  1.000  P 7F20
           Full comment: P 7F2016
0103366000 1CD  Sweet potato                     3.000000  1.000  1.000  P 7F20
           Full comment: P 7F2016
0103366001 1CD  Sweet potato-babyfood            3.000000  1.000  1.000  P 7F20
           Full comment: P 7F2016
0103371000 1CD  Tanier, corm                     0.200000  1.000  1.000
0103387000 1CD  Turmeric                         0.200000  1.000  1.000  P 7F20
           Full comment: P 7F2016
0103406000 1CD  Yam, true                        0.200000  1.000  1.000  P 7F20
           Full comment: P 7F2016
0103407000 1CD  Yam bean                         0.200000  1.000  1.000  P 7F20
           Full comment: P 7F2016
0200051000 2    Beet, garden, tops               0.200000  1.000  1.000  P 8E21
           Full comment: P 8E2122
0200101000 2    Chicory, tops                    0.200000  1.000  1.000  P 7F20
           Full comment: P 7F2016 & 8E2122
0200140000 2    Dasheen, leaves                  0.200000  1.000  1.000  P 8E21
           Full comment: P 8E2122
0200315000 2    Radish, tops                     0.200000  1.000  1.000
0200317000 2    Radish, Oriental, tops           0.200000  1.000  1.000
0200332000 2    Salsify, tops                    0.200000  1.000  1.000
0301165000 3A   Garlic, bulb                     0.200000  1.000  1.000  P 8E36
```

```
                           Full comment: P 8E3676
0301165001 3A   Garlic, bulb-babyfood          0.200000   1.000   1.000   P 8E36
                 Full comment: P 8E3676
0301237000 3A   Onion, bulb                     0.200000   1.000   1.000   P 8E36
                 Full comment: P 8E3676
0301237001 3A   Onion, bulb-babyfood            0.200000   1.000   1.000   P 8E36
                 Full comment: P 8E3676
0301238000 3A   Onion, bulb, dried              0.200000   9.000   1.000   P 8E36
                 Full comment: P 8E3676
0301238001 3A   Onion, bulb, dried-babyfood     0.200000   9.000   1.000   P 8E36
                 Full comment: P 8E3676
0301338000 3A   Shallot, bulb                   0.200000   1.000   1.000
0302103000 3B   Chive, fresh leaves             0.200000   1.000   1.000   P 9E60
                 Full comment: P 9E6003
0302198000 3B   Leek                            0.200000   1.000   1.000   P 8E36
                 Full comment: P 8E3676
0302239000 3B   Onion, green                    0.200000   1.000   1.000   P 8E36
                 Full comment: P 8E3676
0302338500 3B   Shallot, fresh leaves           0.200000   1.000   1.000
0401005000 4A   Amaranth, leafy                 0.200000   1.000   1.000
0401018000 4A   Arugula                         0.200000   1.000   1.000   P 8E21
                 Full comment: P 8E2122
0401104000 4A   Chrysanthemum, garland          0.200000   1.000   1.000
0401133000 4A   Cress, garden                   0.200000   1.000   1.000
0401134000 4A   Cress, upland                   0.200000   1.000   1.000
0401138000 4A   Dandelion, leaves               0.200000   1.000   1.000   P 8E21
                 Full comment: P 8E2122
0401150000 4A   Endive                          0.200000   1.000   1.000   P 7F20
                 Full comment: P 7F2016 & 8E2122
0401204000 4A   Lettuce, head                   0.200000   1.000   1.000   P 8E21
                 Full comment: P 8E2122
0401205000 4A   Lettuce, leaf                   0.200000   1.000   1.000   P 8E21
                 Full comment: P 8E2122
0401248000 4A   Parsley, leaves                 0.200000   1.000   1.000   P 8E21
                 Full comment: P 8E2122
0401313000 4A   Radicchio                       0.200000   1.000   1.000   P 8E21
                 Full comment: P 8E2122
0401355000 4A   Spinach                         0.200000   1.000   1.000   P 8E21
                 Full comment: P 8E2122
0401355001 4A   Spinach-babyfood                0.200000   1.000   1.000   P 8E21
                 Full comment: P 8E2122
0402076000 4B   Cardoon                         0.200000   1.000   1.000
0402085000 4B   Celery                          0.200000   1.000   1.000   P 8E21
                 Full comment: P 8E2122
0402085001 4B   Celery-babyfood                 0.200000   1.000   1.000   P 8E21
                 Full comment: P 8E2122
0402086000 4B   Celery, juice                   0.200000   1.000   1.000   P 8E21
                 Full comment: P 8E2122
0402087000 4B   Celtuce                         0.500000   1.000   1.000
0402152000 4B   Fennel, Florence                0.500000   1.000   1.000
0402322000 4B   Rhubarb                         0.200000   1.000   1.000   P 8E21
                 Full comment: P 8E2122
0402367000 4B   Swiss chard                     0.200000   1.000   1.000   P 8E21
                 Full comment: P 8E2122
0501061000 5A   Broccoli                        0.200000   1.000   1.000   P 8E21
                 Full comment: P 8E2122
0501061001 5A   Broccoli-babyfood               0.200000   1.000   1.000   P 8E21
                 Full comment: P 8E2122
0501062000 5A   Broccoli, Chinese               0.200000   1.000   1.000   P 8E21
                 Full comment: P 8E2122
0501064000 5A   Brussels sprouts                0.200000   1.000   1.000   P 8E21
                 Full comment: P 8E2122
0501069000 5A   Cabbage                         0.200000   1.000   1.000   P 8E21
```

```
                    Full comment: P 8E2122
0501071000 5A    Cabbage, Chinese, napa         0.200000  1.000  1.000  P 8E21
                    Full comment: P 8E2122
0501072000 5A    Cabbage, Chinese, mustard      0.200000  1.000  1.000  P 8E21
                    Full comment: P 8E2122
0501083000 5A    Cauliflower                    0.200000  1.000  1.000  P 8E21
                    Full comment: P 8E2122
0501196000 5A    Kohlrabi                       0.500000  1.000  1.000
0502063000 5B    Broccoli raab                  0.200000  1.000  1.000
0502070000 5B    Cabbage, Chinese, bok choy     0.200000  1.000  1.000  P 8E21
                    Full comment: P 8E2122
0502117000 5B    Collards                       0.200000  1.000  1.000  P 8E21
                    Full comment: P 8E2122
0502194000 5B    Kale                           0.200000  1.000  1.000  P 8E21
                    Full comment: P 8E2122
0502229000 5B    Mustard greens                 0.200000  1.000  1.000  P 8E21
                    Full comment: P 8E2122
0502318000 5B    Rape greens                    0.200000  1.000  1.000
0502389000 5B    Turnip, greens                 0.200000  1.000  1.000  P 8E21
                    Full comment: P 8E2122
0600347000 6     Soybean, seed                  20.000000 1.000  1.000  P 5F15
                    Full comment: P 5F1536
0600349000 6     Soybean, soy milk              20.000000 1.000  1.000  P 5F15
                    Full comment: P 5F1536
0600349001 6     Soybean, soy milk-babyfood or in 20.000000 1.000 1.000
0600350000 6     Soybean, oil                   20.000000 1.000  1.000  P 5F15
                    Full comment: P 5F1536
0600350001 6     Soybean, oil-babyfood          20.000000 1.000  1.000  P 5F15
                    Full comment: P 5F1536
0601043000 6A    Bean, snap, succulent          5.000000  1.000  1.000  P 2E41
                    Full comment: P 2E4118
0601043001 6A    Bean, snap, succulent-babyfood 5.000000  1.000  1.000  P 2E41
                    Full comment: P 2E4118
0601257000 6A    Pea, edible podded, succulent  5.000000  1.000  1.000  P 2E41
                    Full comment: P 2E4118
0601349500 6AB   Soybean, vegetable             5.000000  1.000  1.000
0602031000 6B    Bean, broad, succulent         5.000000  1.000  1.000
0602033000 6B    Bean, cowpea, succulent        5.000000  1.000  1.000  P 2E41
                    Full comment: P 2E4118
0602037000 6B    Bean, lima, succulent          5.000000  1.000  1.000  P 2E41
                    Full comment: P 2E4118
0602255000 6B    Pea, succulent                 5.000000  1.000  1.000  P 2E41
                    Full comment: P 2E4118
0602255001 6B    Pea, succulent-babyfood        5.000000  1.000  1.000  P 2E41
                    Full comment: P 2E4118
0602259000 6B    Pea, pigeon, succulent         5.000000  1.000  1.000  P 2E41
                    Full comment: P 2E4118
0603030000 6C    Bean, black, seed              5.000000  1.000  1.000  P 2E41
                    Full comment: P 2E4118
0603032000 6C    Bean, broad, seed              5.000000  1.000  1.000  P 2E41
                    Full comment: P 2E4118
0603034000 6C    Bean, cowpea, seed             5.000000  1.000  1.000  P 2E41
                    Full comment: P 2E4118
0603035000 6C    Bean,  great northern, seed    5.000000  1.000  1.000  P 2E41
                    Full comment: P 2E4118
0603036000 6C    Bean, kidney, seed             5.000000  1.000  1.000  P 2E41
                    Full comment: P 2E4118
0603038000 6C    Bean, lima, seed               5.000000  1.000  1.000  P 2E41
                    Full comment: P 2E4118
0603039000 6C    Bean, mung, seed               5.000000  1.000  1.000  P 2E41
                    Full comment: P 2E4118
0603040000 6C    Bean, navy, seed               5.000000  1.000  1.000  P 2E41
                    Full comment: P 2E4118
```

```
0603041000 6C    Bean, pink, seed              5.000000   1.000  1.000  P 2E41
            Full comment: P 2E4118
0603042000 6C    Bean, pinto, seed             5.000000   1.000  1.000  P 2E41
            Full comment: P 2E4118
0603098000 6C    Chickpea, seed                8.000000   1.000  1.000  P 2E41
            Full comment: P 2E4118
0603098001 6C    Chickpea, seed-babyfood       8.000000   1.000  1.000  P 2E41
            Full comment: P 2E4118
0603099000 6C    Chickpea, flour               8.000000   1.000  1.000
0603182000 6C    Guar, seed                    8.000000   1.000  1.000  P 2E41
            Full comment: P 2E4118
0603182001 6C    Guar, seed-babyfood           8.000000   1.000  1.000
0603203000 6C    Lentil, seed                  8.000000   1.000  1.000  P 2E41
            Full comment: P 2E4118
0603256000 6C    Pea, dry                      8.000000   1.000  1.000  P 2E41
            Full comment: P 2E4118
0603256001 6C    Pea, dry-babyfood             8.000000   1.000  1.000  P 2E41
            Full comment: P 2E4118
0603258000 6C    Pea, pigeon, seed             8.000000   1.000  1.000
0603348000 6C    Soybean, flour               20.000000   1.000  1.000  P 5F15
            Full comment: P 5F1536
0603348001 6C    Soybean, flour-babyfood      20.000000   1.000  1.000  P 5F15
            Full comment: P 5F1536
0801374000 8A    Tomatillo                     0.100000   1.000  1.000
0801375000 8A    Tomato                        0.100000   1.000  1.000
0801375001 8A    Tomato-babyfood               0.100000   1.000  1.000
0801376000 8A    Tomato, paste                 0.100000   5.400  1.000
0801376001 8A    Tomato, paste-babyfood        0.100000   5.400  1.000
0801377000 8A    Tomato, puree                 0.100000   3.300  1.000
0801377001 8A    Tomato, puree-babyfood        0.100000   3.300  1.000
0801378000 8A    Tomato, dried                 0.100000  14.300  1.000
0801378001 8A    Tomato, dried-babyfood        0.100000  14.300  1.000
0801379000 8A    Tomato, juice                 0.100000   1.500  1.000
0801380000 8A    Tomato, Tree                  0.100000   1.000  1.000
0802148000 8BC   Eggplant                      0.100000   1.000  1.000
0802234000 8BC   Okra                          0.500000   1.000  1.000  P 9E60
            Full comment: P 9E6003
0802270000 8B    Pepper, bell                  0.100000   1.000  1.000
0802270001 8B    Pepper, bell-babyfood         0.100000   1.000  1.000
0802271000 8B    Pepper, bell, dried           0.100000   1.000  1.000
0802271001 8B    Pepper, bell, dried-babyfood  0.100000   1.000  1.000
0802272000 8BC   Pepper, nonbell               0.100000   1.000  1.000
0802272001 8BC   Pepper, nonbell-babyfood      0.100000   1.000  1.000
0802273000 8BC   Pepper, nonbell, dried        0.100000   1.000  1.000
0901075000 9A    Cantaloupe                    0.500000   1.000  1.000  P 3E28
            Full comment: P 3E2845
0901187000 9A    Honeydew melon                0.500000   1.000  1.000  P 3E28
            Full comment: P 3E2845
0901399000 9A    Watermelon                    0.500000   1.000  1.000  P 3E28
            Full comment: P 3E2845
0901400000 9A    Watermelon, juice             0.500000   1.000  1.000
0902021000 9B    Balsam pear                   0.500000   1.000  1.000
0902088000 9B    Chayote, fruit                0.500000   1.000  1.000
0902102000 9B    Chinese waxgourd              0.500000   1.000  1.000
0902135000 9B    Cucumber                      0.500000   1.000  1.000  P 3E28
            Full comment: P 3E2845
0902308000 9B    Pumpkin                       0.500000   1.000  1.000  P 3E28
            Full comment: P 3E2845
0902309000 9B    Pumpkin, seed                 0.500000   1.000  1.000
0902356000 9B    Squash, summer                0.500000   1.000  1.000  P 3E28
            Full comment: P 3E2845
0902356001 9B    Squash, summer-babyfood       0.500000   1.000  1.000  P 3E28
            Full comment: P 3E2845
```

Page **202** of **227**

```
0902357000 9B   Squash, winter              0.500000   1.000  1.000  P 3E28
            Full comment: P 3E2845
0902357001 9B   Squash, winter-babyfood     0.500000   1.000  1.000  P 3E28
            Full comment: P 3E2845
1001106000 10A  Citron                      0.500000   1.000  1.000  P 4F43
            Full comment: P 4F4338
1001107000 10A  Citrus hybrids              0.500000   1.000  1.000
1001108000 10A  Citrus, oil                 0.500000   1.000  1.000
1001240000 10A  Orange                      0.500000   1.000  1.000  P 4F43
            Full comment: P 4F4338
1001241000 10A  Orange, juice               0.500000   1.800  1.000  P 4F43
            Full comment: P 4F4338
1001241001 10A  Orange, juice-babyfood      0.500000   1.800  1.000  P 4F43
            Full comment: P 4F4338
1001242000 10A  Orange, peel                0.500000   1.000  1.000  P 4F43
            Full comment: P 4F4338
1001369000 10A  Tangerine                   0.500000   1.000  1.000  P 4F43
            Full comment: P 4F4338
1001370000 10A  Tangerine, juice            0.500000   2.300  1.000  P 4F43
            Full comment: P 4F4338
1002197000 10B  Kumquat                     0.500000   1.000  1.000
1002199000 10B  Lemon                       0.500000   1.000  1.000  P 4F43
            Full comment: P 4F4338
1002200000 10B  Lemon, juice                0.500000   2.000  1.000  P 4F43
            Full comment: P 4F4338
1002200001 10B  Lemon, juice-babyfood       0.500000   2.000  1.000  P 4F43
            Full comment: P 4F4338
1002201000 10B  Lemon, peel                 0.500000   1.000  1.000  P 4F43
            Full comment: P 4F4338
1002206000 10B  Lime                        0.500000   1.000  1.000  P 4F43
            Full comment: P 4F4338
1002207000 10B  Lime, juice                 0.500000   2.000  1.000  P 4F43
            Full comment: P 4F4338
1002207001 10B  Lime, juice-babyfood        0.500000   2.000  1.000  P 4F43
            Full comment: P 4F4338
1003180000 10C  Grapefruit                  0.500000   1.000  1.000  P 4F43
            Full comment: P 4F4338
1003181000 10C  Grapefruit, juice           0.500000   2.100  1.000  P 4F43
            Full comment: P 4F4338
1003307000 10C  Pummelo                     0.500000   1.000  1.000
1100007000 11   Apple, fruit with peel      0.200000   1.000  1.000  P 6F18
            Full comment: P 6F1861
1100008000 11   Apple, peeled fruit         0.200000   1.000  1.000  P 6F18
            Full comment: P 6F1861
1100008001 11   Apple, peeled fruit-babyfood 0.200000  1.000  1.000  P 6F18
            Full comment: P 6F1861
1100009000 11   Apple, dried                0.200000   8.000  1.000  P 6F18
            Full comment: P 6F1861
1100009001 11   Apple, dried-babyfood       0.200000   8.000  1.000  P 6F18
            Full comment: P 6F1861
1100010000 11   Apple, juice                0.200000   1.300  1.000  P 6F18
            Full comment: P 6F1861
1100010001 11   Apple, juice-babyfood       0.200000   1.300  1.000  P 6F18
            Full comment: P 6F1861
1100011000 11   Apple, sauce                0.200000   1.000  1.000  P 6F18
            Full comment: P 6F1861
1100011001 11   Apple, sauce-babyfood       0.200000   1.000  1.000  P 6F18
            Full comment: P 6F1861
1100129000 11   Crabapple                   0.200000   1.000  1.000
1100173500 11   Goji berry                  0.100000   1.000  1.000
1100210000 11   Loquat                      0.200000   1.000  1.000
1100266000 11   Pear                        0.200000   1.000  1.000  P 6F18
            Full comment: P 6F1861
```

```
1100266001 11   Pear-babyfood                    0.200000   1.000  1.000  P 6F18
            Full comment: P 6F1861
1100267000 11   Pear, dried                      0.200000   6.250  1.000  P 6F18
            Full comment: P 6F1861
1100268000 11   Pear, juice                      0.200000   1.000  1.000  P 6F18
            Full comment: P 6F1861
1100268001 11   Pear, juice-babyfood             0.200000   1.000  1.000  P 6F18
            Full comment: P 6F1861
1100310000 11   Quince                           0.200000   1.000  1.000
1201090000 12A  Cherry                           0.200000   1.000  1.000  P 2600
            Full comment: P 260044
1201090001 12A  Cherry-babyfood                  0.200000   1.000  1.000  P 2600
            Full comment: P 260044
1201091000 12A  Cherry, juice                    0.200000   1.500  1.000  P 2600
            Full comment: P 260044
1201091001 12A  Cherry, juice-babyfood           0.200000   1.500  1.000  P 2600
            Full comment: P 260044
1202012000 12B  Apricot                          0.200000   1.000  1.000  P 2600
            Full comment: P 260044
1202012001 12B  Apricot-babyfood                 0.200000   1.000  1.000  P 2600
            Full comment: P 260044
1202013000 12B  Apricot, dried                   0.200000   6.000  1.000  P 2600
            Full comment: P 260044
1202014000 12B  Apricot, juice                   0.200000   1.000  1.000  P 2600
            Full comment: P 260044
1202014001 12B  Apricot, juice-babyfood          0.200000   1.000  1.000  P 2600
            Full comment: P 260044
1202230000 12B  Nectarine                        0.200000   1.000  1.000  P 2600
            Full comment: P 260044
1202260000 12B  Peach                            0.200000   1.000  1.000  P 2600
            Full comment: P 260044
1202260001 12B  Peach-babyfood                   0.200000   1.000  1.000  P 2600
            Full comment: P 260044
1202261000 12B  Peach, dried                     0.200000   7.000  1.000  P 2600
            Full comment: P 260044
1202261001 12B  Peach, dried-babyfood            0.200000   7.000  1.000
1202262000 12B  Peach, juice                     0.200000   1.000  1.000  P 2600
            Full comment: P 260044
1202262001 12B  Peach, juice-babyfood            0.200000   1.000  1.000  P 2600
            Full comment: P 260044
1203285000 12C  Plum                             0.200000   1.000  1.000  P 2600
            Full comment: P 260044
1203285001 12C  Plum-babyfood                    0.200000   1.000  1.000  P 2600
            Full comment: P 260044
1203286000 12C  Plum, prune, fresh               0.200000   1.000  1.000  P 2600
            Full comment: P 260044
1203286001 12C  Plum, prune, fresh-babyfood      0.200000   1.000  1.000  P 2600
            Full comment: P 260044
1203287000 12C  Plum, prune, dried               0.200000   5.000  1.000  P 2600
            Full comment: P 260044
1203287001 12C  Plum, prune, dried-babyfood      0.200000   5.000  1.000
1203288000 12C  Plum, prune, juice               0.200000   1.400  1.000  P 2600
            Full comment: P 260044
1203288001 12C  Plum, prune, juice-babyfood      0.200000   1.400  1.000  P 2600
            Full comment: P 260044
1301055000 13A  Blackberry                       0.200000   1.000  1.000  P 3E29
            Full comment: P 3E2930
1301056000 13A  Blackberry, juice                0.200000   1.000  1.000  P 3E29
            Full comment: P 3E2930
1301056001 13A  Blackberry, juice-babyfood       0.200000   1.000  1.000  P 3E29
            Full comment: P 3E2930
1301058000 13A  Boysenberry                      0.200000   1.000  1.000  P 3E29
            Full comment: P 3E2930
```

```
1301208000 13A  Loganberry                   0.200000  1.000  1.000
1301320000 13A  Raspberry                    0.200000  1.000  1.000  P 3E29
           Full comment: P 3E2930
1301320001 13A  Raspberry-babyfood           0.200000  1.000  1.000  P 3E29
           Full comment: P 3E2930
1301321000 13A  Raspberry, juice             0.200000  1.000  1.000  P 3E29
           Full comment: P 3E2930
1301321001 13A  Raspberry, juice-babyfood    0.200000  1.000  1.000  P 3E29
           Full comment: P 3E2930
1302057000 13B  Blueberry                    0.200000  1.000  1.000  P 3E29
           Full comment: P 3E2930
1302057001 13B  Blueberry-babyfood           0.200000  1.000  1.000  P 3E29
           Full comment: P 3E2930
1302136000 13B  Currant                      0.200000  1.000  1.000  P 3E29
           Full comment: P 3E2930
1302137000 13B  Currant, dried               0.200000  1.000  1.000  P 3E29
           Full comment: P 3E2930
1302149000 13B  Elderberry                   0.200000  1.000  1.000
1302174000 13B  Gooseberry                   0.200000  1.000  1.000
1302191000 13B  Huckleberry                  0.200000  1.000  1.000  P 3E29
           Full comment: P 3E2930
1303227000 13C  Mulberry                     0.200000  1.000  1.000
1304175000 13D  Grape                        0.200000  1.000  1.000  P 5F15
           Full comment: P 5F1560
1304176000 13D  Grape, juice                 0.200000  1.200  1.000  P 5F15
           Full comment: P 5F1560
1304176001 13D  Grape, juice-babyfood        0.200000  1.200  1.000  P 5F15
           Full comment: P 5F1560
1304179000 13D  Grape, wine and sherry       0.200000  1.000  1.000  P 3E29
           Full comment: P 3E2930
1304195000 13D  Kiwifruit, fuzzy             0.200000  1.000  1.000  P 3E29
           Full comment: P 3E2929
1307130000 13G  Cranberry                    0.200000  1.000  1.000  P 0E24
           Full comment: P 0E2421
1307130001 13G  Cranberry-babyfood           0.200000  1.000  1.000  P 0E24
           Full comment: P 0E2421
1307131000 13G  Cranberry, dried             0.200000  1.000  1.000  P 0E24
           Full comment: P 0E2421
1307132000 13G  Cranberry, juice             0.200000  1.100  1.000  P 0E24
           Full comment: P 0E2421
1307132001 13G  Cranberry, juice-babyfood    0.200000  1.100  1.000  P 0E24
           Full comment: P 0E2421
1307359000 13G  Strawberry                   0.200000  1.000  1.000  P 3E29
           Full comment: P 3E2930
1307359001 13G  Strawberry-babyfood          0.200000  1.000  1.000  P 3E29
           Full comment: P 3E2930
1307360000 13G  Strawberry, juice            0.200000  1.000  1.000  P 3E29
           Full comment: P 3E2930
1307360001 13G  Strawberry, juice-babyfood   0.200000  1.000  1.000  P 3E29
           Full comment: P 3E2930
1400003000 14   Almond                       1.000000  1.000  1.000  P 7F18
           Full comment: P 7F1893
1400003001 14   Almond-babyfood              1.000000  1.000  1.000
1400004000 14   Almond, oil                  1.000000  1.000  1.000  P 7F18
           Full comment: P 7F1893
1400004001 14   Almond, oil-babyfood         1.000000  1.000  1.000
1400059000 14   Brazil nut                   1.000000  1.000  1.000  P 7F18
           Full comment: P 7F1893
1400068000 14   Butternut                    1.000000  1.000  1.000
1400081000 14   Cashew                       1.000000  1.000  1.000  P 7F18
           Full comment: P 7F1893
1400092000 14   Chestnut                     1.000000  1.000  1.000  P 7F18
           Full comment: P 7F1893
```

Page **205** of **227**

```
1400155000 14   Hazelnut                      1.000000   1.000   1.000   P 7F18
             Full comment: P 7F1893
1400156000 14   Hazelnut, oil                 1.000000   1.000   1.000
1400185000 14   Hickory nut                   1.000000   1.000   1.000
1400213000 14   Macadamia nut                 1.000000   1.000   1.000   P 7F18
             Full comment: P 7F1893
1400269000 14   Pecan                         1.000000   1.000   1.000   P 7F18
             Full comment: P 7F1893
1400278000 14   Pine nut                      1.000000   1.000   1.000   P 9E60
             Full comment: P 9E6003
1400282000 14   Pistachio                     1.000000   1.000   1.000   P 9E60
             Full comment: P 9E6003
1400391000 14   Walnut                        1.000000   1.000   1.000   P 7F18
             Full comment: P 7F1893
1500025000 15   Barley, pearled barley       30.000000   1.000   1.000   P 2E41
             Full comment: P 2E4118
1500025001 15   Barley, pearled barley-babyfood  30.000000   1.000   1.000   P 2E41
             Full comment: P 2E4118
1500026000 15   Barley, flour                30.000000   1.000   1.000   P 2E41
             Full comment: P 2E4118
1500026001 15   Barley, flour-babyfood       30.000000   1.000   1.000   P 2E41
             Full comment: P 2E4118
1500027000 15   Barley, bran                 30.000000   1.000   1.000   P 2E41
             Full comment: P 2E4118
1500065000 15   Buckwheat                    30.000000   1.000   1.000   P 8E21
             Full comment: P 8E2122
1500066000 15   Buckwheat, flour             30.000000   1.000   1.000
1500120000 15   Corn, field, flour            5.000000   1.000   1.000   P 8F36
             Full comment: P 8F3673
1500120001 15   Corn, field, flour-babyfood   5.000000   1.000   1.000   P 8F36
             Full comment: P 8F3673
1500121000 15   Corn, field, meal             5.000000   1.000   1.000   P 8F36
             Full comment: P 8F3673
1500121001 15   Corn, field, meal-babyfood    5.000000   1.000   1.000
1500122000 15   Corn, field, bran             5.000000   1.000   1.000   P 8F36
             Full comment: P 8F3673
1500123000 15   Corn, field, starch           5.000000   1.000   1.000   P 8F36
             Full comment: P 8F3673
1500123001 15   Corn, field, starch-babyfood  5.000000   1.000   1.000   P 8F36
             Full comment: P 8F3673
1500124000 15   Corn, field, syrup            5.000000   1.500   1.000   P 8F36
             Full comment: P 8F3673
1500124001 15   Corn, field, syrup-babyfood   5.000000   1.500   1.000   P 8F36
             Full comment: P 8F3673
1500125000 15   Corn, field, oil              5.000000   1.000   1.000   P 8F36
             Full comment: P 8F3673
1500125001 15   Corn, field, oil-babyfood     5.000000   1.000   1.000   P 8F36
             Full comment: P 8F3673
1500126000 15   Corn, pop                     0.100000   1.000   1.000   P 8E21
             Full comment: P 8E2122
1500127000 15   Corn, sweet                   3.500000   1.000   1.000   P 8E21
             Full comment: P 8E2122
1500127001 15   Corn, sweet-babyfood          3.500000   1.000   1.000   P 8E21
             Full comment: P 8E2122
1500226000 15   Millet, grain                30.000000   1.000   1.000   P 8E21
             Full comment: P 8E2122
1500231000 15   Oat, bran                    30.000000   1.000   1.000   P 6E46
             Full comment: P 6E4645
1500232000 15   Oat, flour                   30.000000   1.000   1.000   P 6E46
             Full comment: P 6E4645
1500232001 15   Oat, flour-babyfood          30.000000   1.000   1.000   P 6E46
             Full comment: P 6E4645
1500233000 15   Oat, groats/rolled oats      30.000000   1.000   1.000   P 6E46
```

```
                 Full comment: P 6E4645
1500233001 15    Oat, groats/rolled oats-babyfood  30.000000  1.000  1.000  P 6E46
                 Full comment: P 6E4645
1500323000 15    Rice, white                        0.100000  1.000  1.000
1500323001 15    Rice, white-babyfood               0.100000  1.000  1.000
1500324000 15    Rice, brown                        0.100000  1.000  1.000
1500324001 15    Rice, brown-babyfood               0.100000  1.000  1.000
1500325000 15    Rice, flour                        0.100000  1.000  1.000
1500325001 15    Rice, flour-babyfood               0.100000  1.000  1.000
1500326000 15    Rice, bran                         0.100000  1.000  1.000
1500326001 15    Rice, bran-babyfood                0.100000  1.000  1.000
1500328000 15    Rye, grain                        30.000000  1.000  1.000  P 8E21
                 Full comment: P 8E2122
1500329000 15    Rye, flour                        30.000000  1.000  1.000
1500344000 15    Sorghum, grain                    30.000000  1.000  1.000
1500345000 15    Sorghum, syrup                    30.000000  1.000  1.000
1500381000 15    Triticale, flour                  30.000000  1.000  1.000
1500381001 15    Triticale, flour-babyfood         30.000000  1.000  1.000
1500401000 15    Wheat, grain                      30.000000  1.000  1.000  P 8E21
                 Full comment: P 8E2122
1500401001 15    Wheat, grain-babyfood             30.000000  1.000  1.000  P 8E21
                 Full comment: P 8E2122
1500402000 15    Wheat, flour                      30.000000  1.000  1.000
1500402001 15    Wheat, flour-babyfood             30.000000  1.000  1.000
1500403000 15    Wheat, germ                       30.000000  1.000  1.000  P 8E21
                 Full comment: P 8E2122
1500404000 15    Wheat, bran                       30.000000  1.000  1.000  P 8E21
                 Full comment: P 8E2122
1500405000 15    Wild rice                          0.100000  1.000  1.000  P 8E21
                 Full comment: P 8E2122
1800002000 18    Alfalfa, seed                      0.500000  1.000  1.000
1901028000 19A   Basil, fresh leaves                0.200000  1.000  1.000  P 9E60
                 Full comment: P 9E6003
1901028001 19A   Basil, fresh leaves-babyfood       0.200000  1.000  1.000
1901029000 19A   Basil, dried leaves                0.200000  1.000  1.000  P 9E60
                 Full comment: P 9E6003
1901029001 19A   Basil, dried leaves-babyfood       0.200000  1.000  1.000  P 9E60
                 Full comment: P 9E6003
1901102500 19A   Chive, dried leaves                0.200000  1.000  1.000
1901118000 19A   Cilantro, leaves                   0.200000  1.000  1.000  P 9E60
                 Full comment: P 9E6003
1901118001 19A   Cilantro, leaves-babyfood          0.200000  1.000  1.000
1901144000 19A   Dillweed                           0.200000  1.000  1.000  P 9E60
                 Full comment: P 9E6003
1901184000 19A   Herbs, other                       0.200000  1.000  1.000
1901184001 19A   Herbs, other-babyfood              0.200000  1.000  1.000
1901202000 19A   Lemongrass                         0.200000  1.000  1.000
1901220000 19A   Marjoram                           0.200000  1.000  1.000  P 9E60
                 Full comment: P 9E6003
1901220001 19A   Marjoram-babyfood                  0.200000  1.000  1.000  P 9E60
                 Full comment: P 9E6003
1901249000 19A   Parsley, dried leaves              0.200000  1.000  1.000  P 8E21
                 Full comment: P 8E2122
1901249001 19A   Parsley, dried leaves-babyfood     0.200000  1.000  1.000  P 8E21
                 Full comment: P 8E2122
1901334000 19A   Savory                             0.200000  1.000  1.000  P 9E60
                 Full comment: P 9E6003
1902105000 19B   Cinnamon                           7.000000  1.000  1.000  P 9E60
                 Full comment: P 9E6003
1902105001 19B   Cinnamon-babyfood                  7.000000  1.000  1.000  P 9E60
                 Full comment: P 9E6003
1902119000 19B   Coriander, seed                    7.000000  1.000  1.000  P 9E60
                 Full comment: P 9E6003
```

Page **207** of **227**

```
1902119001 19B  Coriander, seed-babyfood          7.000000  1.000  1.000
1902143000 19B  Dill, seed                        7.000000  1.000  1.000  P 9E60
              Full comment: P 9E6003
1902274000 19B  Pepper, black and white           7.000000  1.000  1.000  P 9E60
              Full comment: P 9E6003
1902274001 19B  Pepper, black and white-babyfood  7.000000  1.000  1.000  P 9E60
              Full comment: P 9E6003
1902354000 19B  Spices, other                     7.000000  1.000  1.000
1902354001 19B  Spices, other-babyfood            7.000000  1.000  1.000
2001163000 20A  Flax seed, oil                   40.000000  1.000  1.000  00ND00
              Full comment: 00ND0025 (S18)
2001319000 20A  Rapeseed, oil                    20.000000  1.000  1.000  P 2E41
              Full comment: P 2E4118
2001319001 20A  Rapeseed, oil-babyfood           20.000000  1.000  1.000  P 2E41
              Full comment: P 2E4118
2001336000 20A  Sesame, seed                     40.000000  1.000  1.000  P 9E60
              Full comment: P 9E6003
2001336001 20A  Sesame, seed-babyfood            40.000000  1.000  1.000
2001337000 20A  Sesame, oil                      40.000000  1.000  1.000  P 9E60
              Full comment: P 9E6003
2001337001 20A  Sesame, oil-babyfood             40.000000  1.000  1.000
2002330000 20B  Safflower, oil                   40.000000  1.000  1.000  P 9E60
              Full comment: P 9E6003
2002330001 20B  Safflower, oil-babyfood          40.000000  1.000  1.000  P 9E60
              Full comment: P 9E6003
2002364000 20B  Sunflower, seed                  40.000000  1.000  1.000  P 6F34
              Full comment: P 6F3408
2002365000 20B  Sunflower, oil                   40.000000  1.000  1.000  P 6F34
              Full comment: P 6F3408
2002365001 20B  Sunflower, oil-babyfood          40.000000  1.000  1.000  P 6F34
              Full comment: P 6F3408
2003114001 20C  Coconut, oil-babyfood             0.100000  1.000  1.000  P 2F26
              Full comment: P 2F2680
2003128000 20C  Cottonseed, oil                  40.000000  1.000  1.000
2003128001 20C  Cottonseed, oil-babyfood         40.000000  1.000  1.000
3100046000 31   Beef, meat byproducts             5.000000  1.000  1.000
3100046001 31   Beef, meat byproducts-babyfood    5.000000  1.000  1.000
3100048000 31   Beef, kidney                      5.000000  1.000  1.000  P 4F43
              Full comment: P 4F4312
3100049000 31   Beef, liver                       5.000000  1.000  1.000  P OF23
              Full comment: P OF2329
3100049001 31   Beef, liver-babyfood              5.000000  1.000  1.000  P OF23
              Full comment: P OF2329
3200170000 32   Goat, meat byproducts             5.000000  1.000  1.000
3200172000 32   Goat, kidney                      5.000000  1.000  1.000
3200173000 32   Goat, liver                       5.000000  1.000  1.000
3400291000 34   Pork, skin                        5.000000  1.000  1.000
3400292000 34   Pork, meat byproducts             5.000000  1.000  1.000
3400292001 34   Pork, meat byproducts-babyfood    5.000000  1.000  1.000
3400294000 34   Pork, kidney                      5.000000  1.000  1.000
3400295000 34   Pork, liver                       5.000000  1.000  1.000  P OF23
              Full comment: P OF2329
3500340000 35   Sheep, meat byproducts            5.000000  1.000  1.000
3500342000 35   Sheep, kidney                     5.000000  1.000  1.000
3500343000 35   Sheep, liver                      5.000000  1.000  1.000
4000093000 40   Chicken, meat                     0.100000  1.000  1.000  P 9F50
              Full comment: P 9F5096
4000093001 40   Chicken, meat-babyfood            0.100000  1.000  1.000  P 9F50
              Full comment: P 9F5096
4000094000 40   Chicken, liver                    1.000000  1.000  1.000  P 9F50
              Full comment: P 9F5096
4000095000 40   Chicken, meat byproducts          1.000000  1.000  1.000  P 9F50
              Full comment: P 9F5096
```

Page **208** of **227**

```
4000095001 40   Chicken, meat byproducts-babyfoo   1.000000   1.000   1.000   P 9F50
              Full comment: P 9F5096
4000097000 40   Chicken, skin                      1.000000   1.000   1.000
4000097001 40   Chicken, skin-babyfood             1.000000   1.000   1.000
5000382000 50   Turkey, meat                       0.100000   1.000   1.000   P 0F23
              Full comment: P 0F2329
5000382001 50   Turkey, meat-babyfood              0.100000   1.000   1.000   P 0F23
              Full comment: P 0F2329
5000383000 50   Turkey, liver                      1.000000   1.000   1.000
5000383001 50   Turkey, liver-babyfood             1.000000   1.000   1.000
5000384000 50   Turkey, meat byproducts            1.000000   1.000   1.000   P 0F23
              Full comment: P 0F2329
5000384001 50   Turkey, meat byproducts-babyfood   1.000000   1.000   1.000   P 0F23
              Full comment: P 0F2329
5000386000 50   Turkey, skin                       1.000000   1.000   1.000
5000386001 50   Turkey, skin-babyfood              1.000000   1.000   1.000
6000301000 60   Poultry, other, meat               0.100000   1.000   1.000   P 9E60
              Full comment: P 9E6003
6000302000 60   Poultry, other, liver              1.000000   1.000   1.000
6000303000 60   Poultry, other, meat byproducts    1.000000   1.000   1.000
6000305000 60   Poultry, other, skin               1.000000   1.000   1.000
7000145000 70   Egg, whole                         0.050000   1.000   1.000   P   9F5
              Full comment: P  9F5096
7000145001 70   Egg, whole-babyfood                0.050000   1.000   1.000   P   9F5
              Full comment: P  9F5096
7000146000 70   Egg, white                         0.050000   1.000   1.000   P   9F5
              Full comment: P  9F5096
7000146001 70   Egg, white (solids)-babyfood       0.050000   1.000   1.000
7000147000 70   Egg, yolk                          0.050000   1.000   1.000   P   9F5
              Full comment: P  9F5096
7000147001 70   Egg, yolk-babyfood                 0.050000   1.000   1.000   P   9F5
              Full comment: P  9F5096
8000157000 80   Fish-freshwater finfish            0.250000   1.000   1.000   P 9F21
              Full comment: P 9F2163
8000158000 80   Fish-freshwater finfish, farm ra   0.250000   1.000   1.000   P 9F21
              Full comment: P 9F2163
8000159000 80   Fish-saltwater finfish, tuna       0.250000   1.000   1.000   P 9F21
              Full comment: P 9F2163
8000160000 80   Fish-saltwater finfish, other      0.250000   1.000   1.000   P 9F21
              Full comment: P 9F2163
8000161000 80   Fish-shellfish, crustacean         3.000000   1.000   1.000   P 3F29
              Full comment: P 3F2956
8000162000 80   Fish-shellfish, mollusc            3.000000   1.000   1.000   P 3F29
              Full comment: P 3F2956
8601000000 86A  Water, direct, all sources         0.159000   1.000   1.000
8602000000 86B  Water, indirect, all sources       0.159000   1.000   1.000
9500000500 O    Acai berry                         0.200000   1.000   1.000
9500001000 O    Acerola                            0.200000   1.000   1.000
9500001500 O    Agave                              0.500000   1.000   1.000
9500016000 O    Artichoke, globe                   0.200000   1.000   1.000   P 9E60
              Full comment: P 9E6003
9500019000 O    Asparagus                          0.500000   1.000   1.000   P 8E36
              Full comment: P 8E3648
9500019500 O    Atemoya                            0.200000   1.000   1.000
9500020000 O    Avocado                            0.200000   1.000   1.000   P 8F20
              Full comment: P 8F2021
9500022000 O    Bamboo, shoots                     0.500000   1.000   1.000   P 9E60
              Full comment: P 9E6003
9500023000 O    Banana                             0.200000   1.000   1.000   P 9F22
              Full comment: P 9F2223
9500023001 O    Banana-babyfood                    0.200000   1.000   1.000   P 9F22
              Full comment: P 9F2223
9500024000 O    Banana, dried                      0.200000   3.900   1.000   P 9F22
```

Page **209** of **227**

```
                    Full comment: P 9F2223
9500024001 O    Banana, dried-babyfood        0.200000  3.900  1.000  P 9F22
                    Full comment: P 9F2223
9500060000 O    Breadfruit                    0.200000  1.000  1.000  P 9E37
                    Full comment: P 9E3754
9500073000 O    Cactus                        0.500000  1.000  1.000
9500074000 O    Canistel                      0.200000  1.000  1.000
9500077000 O    Carob                         0.200000  1.000  1.000
9500089000 O    Cherimoya                     0.200000  1.000  1.000
9500109000 O    Cocoa bean, chocolate         0.200000  1.000  1.000  P 0E38
                    Full comment: P 0E3857
9500110000 O    Cocoa bean, powder            0.200000  1.000  1.000  P 0E38
                    Full comment: P 0E3857
9500111000 O    Coconut, meat                 0.100000  1.000  1.000  P 2F26
                    Full comment: P 2F2680
9500111001 O    Coconut, meat-babyfood        0.100000  1.000  1.000  P 2F26
                    Full comment: P 2F2680
9500112000 O    Coconut, dried                0.100000  2.100  1.000  P 2F26
                    Full comment: P 2F2680
9500113000 O    Coconut, milk                 0.100000  1.000  1.000  P 2F26
                    Full comment: P 2F2680
9500114000 O    Coconut, oil                  0.100000  1.000  1.000  P 2F26
                    Full comment: P 2F2680
9500115000 O    Coffee, roasted bean          1.000000  1.000  1.000  P 6E18
                    Full comment: P 6E1809
9500116000 O    Coffee, instant               1.000000  1.000  1.000  P 6E18
                    Full comment: P 6E1809
9500141000 O    Date                          0.200000  1.000  1.000  P 9E37
                    Full comment: P 9E3754
9500151000 O    Feijoa                        0.200000  1.000  1.000
9500153000 O    Fig                           0.200000  1.000  1.000  P 3E29
                    Full comment: P 3E2929
9500154000 O    Fig, dried                    0.200000  1.000  1.000  P 3E29
                    Full comment: P 3E2929
9500177000 O    Grape, leaves                 0.200000  1.000  1.000
9500178000 O    Grape, raisin                 0.200000  4.300  1.000  P 5F15
                    Full comment: P 5F1560
9500183000 O    Guava                         0.200000  1.000  1.000  P 1E24
                    Full comment: P 1E2443
9500183001 O    Guava-babyfood                0.200000  1.000  1.000
9500188000 O    Hop                           7.000000  1.000  1.000
9500193000 O    Jackfruit                     0.200000  1.000  1.000
9500209000 O    Longan                        0.200000  1.000  1.000
9500211000 O    Lychee                        0.200000  1.000  1.000
9500212000 O    Lychee, dried                 0.200000  1.850  1.000
9500214000 O    Mamey apple                   0.200000  1.000  1.000
9500215000 O    Mango                         0.200000  1.000  1.000  P 1E24
                    Full comment: P 1E2490
9500215001 O    Mango-babyfood                0.200000  1.000  1.000  P 1E24
                    Full comment: P 1E2490
9500216000 O    Mango, dried                  0.200000  1.000  1.000  P 1E24
                    Full comment: P 1E2490
9500217000 O    Mango, juice                  0.200000  1.000  1.000  P 1E24
                    Full comment: P 1E2490
9500217001 O    Mango, juice-babyfood         0.200000  1.000  1.000  P 1E24
                    Full comment: P 1E2490
9500235000 O    Olive                         0.200000  1.000  1.000  P 3E29
                    Full comment: P 3E2929
9500236000 O    Olive, oil                    0.200000  1.000  1.000  P 3E29
                    Full comment: P 3E2929
9500243000 O    Palm heart, leaves            0.500000  1.000  1.000  P 9E60
                    Full comment: P 9E6003
9500244000 O    Palm, oil                     0.100000  1.000  1.000  P 6H51
```

```
                      Full comment: P 6H5115
9500244001 O    Palm, oil-babyfood            0.100000   1.000   1.000   P 6H51
                      Full comment: P 6H5115
9500245000 O    Papaya                        0.200000   1.000   1.000   P 1E24
                      Full comment: P 1E2443
9500245001 O    Papaya-babyfood               0.200000   1.000   1.000
9500246000 O    Papaya, dried                 0.200000   1.800   1.000   P 1E24
                      Full comment: P 1E2443
9500247000 O    Papaya, juice                 0.200000   1.500   1.000   P 1E24
                      Full comment: P 1E2443
9500252000 O    Passionfruit                  0.200000   1.000   1.000   P 9E37
                      Full comment: P 9E3715
9500252001 O    Passionfruit-babyfood         0.200000   1.000   1.000
9500253000 O    Passionfruit, juice           0.200000   1.000   1.000   P 9E37
                      Full comment: P 9E3715
9500253001 O    Passionfruit, juice-babyfood  0.200000   1.000   1.000
9500254000 O    Pawpaw                        0.200000   1.000   1.000
9500263000 O    Peanut                        0.100000   1.000   1.000   P 0F23
                      Full comment: P 0F2329
9500264000 O    Peanut, butter                0.100000   1.890   1.000
9500265000 O    Peanut, oil                   0.100000   1.000   1.000   P 0F23
                      Full comment: P 0F2329
9500275000 O    Peppermint                  200.000000   1.000   1.000
9500276000 O    Peppermint, oil             200.000000   1.000   1.000
9500277000 O    Persimmon                     0.200000   1.000   1.000   P 9E37
                      Full comment: P 9E3754
9500279000 O    Pineapple                     0.200000   1.000   1.000   P 2F26
                      Full comment: P 2F2634
9500279001 O    Pineapple-babyfood            0.200000   1.000   1.000   P 2F26
                      Full comment: P 2F2634
9500280000 O    Pineapple, dried              0.200000   5.000   1.000   P 2F26
                      Full comment: P 2F2634
9500281000 O    Pineapple, juice              0.200000   1.700   1.000   P 2F26
                      Full comment: P 2F2634
9500281001 O    Pineapple, juice-babyfood     0.200000   1.700   1.000   P 2F26
                      Full comment: P 2F2634
9500283000 O    Plantain                      0.200000   1.000   1.000   P 9F22
                      Full comment: P 9F2223
9500284000 O    Plantain, dried               0.200000   3.900   1.000   P 9F22
                      Full comment: P 9F2223
9500289000 O    Pomegranate                   0.200000   1.000   1.000   P 1E39
                      Full comment: P 1E3978
9500311000 O    Quinoa, grain                 5.000000   1.000   1.000
9500333000 O    Sapote, Mamey                 0.200000   1.000   1.000
9500346000 O    Soursop                       0.200000   1.000   1.000
9500351000 O    Spanish lime                  0.200000   1.000   1.000
9500352000 O    Spearmint                   200.000000   1.000   1.000
9500353000 O    Spearmint, oil              200.000000   1.000   1.000
9500358000 O    Starfruit                     0.200000   1.000   1.000   P 6E34
                      Full comment: P 6E3424
9500361000 O    Sugar apple                   0.200000   1.000   1.000
9500362000 O    Sugarcane, sugar              2.000000   1.000   1.000
9500362001 O    Sugarcane, sugar-babyfood     2.000000   1.000   1.000
9500363000 O    Sugarcane, molasses          30.000000   1.000   1.000   P 9H51
                      Full comment: P 9H5196
9500363001 O    Sugarcane, molasses-babyfood 30.000000   1.000   1.000   P 9H51
                      Full comment: P 9H5196
9500368000 O    Tamarind                      0.200000   1.000   1.000
9500372000 O    Tea, dried                    1.000000   1.000   1.000   P 1H53
                      Full comment: P 1H5310 & 8H5568
9500373000 O    Tea, instant                  7.000000   1.000   1.000   P 1H53
                      Full comment: P 1H5310 & 8H5568
9500373500 O    Teff, flour                   5.000000   1.000   1.000
```

```
9500398000 O    Watercress                      0.200000  1.000  1.000  P 9E60
            Full comment: P 9E6003
```

## Attachment 2:      DEEM-FCID™ Chronic Exposure Estimates.

```
US EPA                                                   Ver. 3.16, 03-08-d
DEEM-FCID Chronic analysis for GLYPHOSATE               NHANES 2003-2008 2-day
Residue file name: C:\Users\tbloem\Documents\work\glyphosate\registration
review\417300C.R08
                                          Adjustment factor #2 NOT used.
Analysis Date 06-09-2016/10:40:23    Residue file dated: 06-09-2016/10:37:44
COMMENT 1: THIS R98 FILE WAS GENERATED USING THE CONVERT TO R98 UTILITY VERSION 1.1.2.
=============================================================================
                   Total exposure by population subgroup
-----------------------------------------------------------------------------

                                       Total Exposure
                                       ---------------
              Population                    mg/kg
              Subgroup                  body wt/day
-------------------------------------   -------------
Total US Population                        0.091530
Hispanic                                   0.094838
Non-Hisp-White                             0.091452
Non-Hisp-Black                             0.086606
Non-Hisp-Other                             0.095659
Nursing Infants                            0.072309
Non-Nursing Infants                        0.174388
Female 13+ PREG                            0.076716
Children 1-6                               0.218895
Children 7-12                              0.139417
Male 13-19                                 0.097324
Female 13-19/NP                            0.082295
Male 20+                                   0.077524
Female 20+/NP                              0.064402
Seniors 55+                                0.061294
All Infants                                0.142873
Female 13-50                               0.070729
Children 1-2                               0.230916
Children 3-5                               0.214174
Children 6-12                              0.149290
Youth 13-19                                0.089645
Adults 20-49                               0.076405
Adults 50-99                               0.062993
Female 13-49                               0.071066
```

-----------------------------------------------------------------------------

Note: The reference dose (RfD) and percent of RfD have been removed from this file because these are based on non-cancer endpoints and non-cancer endpoints are not the focus of this SAP.

**Appendix F**

*Genotoxicity Studies with Glyphosate Based Formulations*

While the focus of this analysis to determine the genotoxic potential of glyphosate, the agency has identified numerous studies conducted with glyphosate-based formulations that contain various concentrations of the glyphosate as well as other components of the end use products and are presented in Tables F.1-F.5.

**Table F.1.  *In vitro* Test for Gene Mutations in Bacteria: Glyphosate Formulations.**

| Test/Endpoint | Test System | Concentrations | Test Material/ Concentration | Results | Reference | Comments |
|---|---|---|---|---|---|---|
| Bacterial Reverse Mutation | *S. typhimurium* TA1535, TA1537, TA1538, TA98 and TA100; *E. coli* WP2 *uvrA* pKM101 ± S9 | 1.6-5000 µg/plate ± S9 (plate incorporation) | ICIA 0224 57.6% in water | Negative ± S9 | Callander (1988) | |
| Bacterial Reverse Mutation | *S. typhimurium* TA98, TA100, TA1535, TA1537; *E. coli* WP2P and *uvrA* ± S9 | 100-5000 µg/plate ±S9 plate incorporation & pre-incubation protocols | TMSC (tri-methyl-sulfonium chloride) 95% purity | Negative ± S9 | Callander (1993) | |
| Bacterial Reverse Mutation | *S. typhimurium* TA98, TA100, TA102, TA1535, and TA1537 ± S9 | 26, 43, 72, 120, 200 µg/plate | Glyphosate liquid formulation (480 g/L isopropylamine salt) | Negative ± S9 | Camolesi (2009)[1] | |
| Bacterial Reverse Mutation | *S. typhimurium* TA98, TA100, TA102, TA1535, and TA1537 ± S9 | 26, 43, 72, 120, 200 µg/plate | MON 77280 equivalent of glyphosate acid: 495 g/L | Negative ± S9 | Camolesi (2010) | |
| Bacterial Reverse Mutation | *S. typhimurium* TA98, TA100, TA102, TA1535, and TA1537 ± S9 | 0.2-2000 µg/plate | MON 76190 53.2% glyphosate | Negative ± S9 | Catoyra (2009)[1] | |
| Bacterial Reverse Mutation | *S. typhimurium* TA97a, TA98, TA100 and TA102± S9 | 2 µg/plate (toxic) | Perzocyd 10 SL formulation | Negative ± S9 | Chruscielska *et al.* (2000) | |
| Bacterial Reverse Mutation | *S. typhimurium* TA98, TA100, TA102, TA1535, and TA1537 ± S9 | 0.03-3.0 µL/plate | MON 8080 (87.6%) | Negative ± S9 | Flowers (1981) | |
| Bacterial Reverse Mutation | *S. typhimurium* TA98, TA100, TA102, TA1535, and TA1537 ± S9 | 3.16-1000 µg/plate | TROP M (Glyphosate 480); 35.84% purity based on acid, 48.46% pure based on IPA salt | Negative ± S9 | Flügge (2010a)[1] | |
| Bacterial Reverse Mutation | *S. typhimurium* TA98, TA100, TA102, TA1535, and TA1537 ± S9 | 0.316-100 | Glyphosate 757 g/kg granular formulation (76.1% | Negative ± S9 | Flügge (2010d)[1] | |

**Table F.1.  *In vitro* Test for Gene Mutations in Bacteria: Glyphosate Formulations.**

| Test/Endpoint | Test System | Concentrations | Test Material/ Concentration | Results | Reference | Comments |
|---|---|---|---|---|---|---|
| | | | monoammonium glyphosate salt) | | | |
| Bacterial Reverse Mutation | *S. typhimurium* TA97a, TA98, TA100, and TA1535 ± S9 | 1-5000 µg/plate | Roundup WG 784 g/kg ammonium salt equivalent | Negative ± S9 | Gava (1998) | |
| Bacterial Reverse Mutation | *S. typhimurium* TA98, TA100, TA1535, TA1537± S9 | 50-5000 µg/plate | Rodeo® (containing IPA salt and water only); 40% glyphosate (acid equivalent) | Negative ± S9 | Kier *et al.*, (1992) | |
| Bacterial Reverse Mutation | *S. typhimurium* TA98, TA100, TA1535, TA1537 ± S9 | 5-500 µg/plate (-S9)/ 15-1500 µg/plate (+S9) | MON 2139 (Roundup®) 31% Glyphosate (acid equivalent) | Negative ± S9 | Kier *et al.*, (1992) | Cytotoxic at top concentrations |
| Bacterial Reverse Mutation | *S. typhimurium* TA98, TA100, TA1535, TA1537 ± S9 | 5-500 µg/plate (-S9)/ 15-1500 µg/plate (+S9) | MON 14445 (Direct®); 75% Glyphosate (acid equivalent) | Negative ± S9 | Kier *et al.*, (1992) | Cytotoxic at the top concentrations, occasionally at lower concentrations |
| Bacterial Reverse Mutation | *S. typhimurium* TA98, TA100, TA1535, TA1537 ± S9 | 0.2-2000 µg/plate | MON 79672 (Roundup Ultramax); 74.7% monoammonium glyphosate salt; 68.2% glyphosate | Negative ± S9 | Lope (2008)[1] | |
| Bacterial Reverse Mutation | *S. typhimurium* TA1535, TA1537, TA1538, TA98 and TA100 ± S9 | 0.617-50 µL/plate ± S9 | SC-0224, 19.2% purity | Negative ± S9 | Majeska (1982) | |
| Bacterial Reverse Mutation | *S. typhimurium* TA98, TA100, TA1535, TA1537 and *E. coli* WP2 *uvrA* ± S9 | TA strains: 10 - 5000 µg/plate (+S9); 3.33-3330 µg/plate (-S9); E. coli: 33.3-5000 µg/plate (+/- S9) | MON 78239 36.6% glyphosate (44.9% potassium salt of glyphosate) | Negative | Mecchi (2003a) | Increase in revertants seen in TA98 and TA1535 -S9 on first trial, not conc-dep; however no increase in revertants seen in repeat in those strains; overall negative. |

**Table F.1. *In vitro* Test for Gene Mutations in Bacteria: Glyphosate Formulations.**

| Test/Endpoint | Test System | Concentrations | Test Material/ Concentration | Results | Reference | Comments |
|---|---|---|---|---|---|---|
| Bacterial Reverse Mutation | *S. typhimurium* TA98, TA100, TA1535, TA1537 and *E. coli* WP2 *uvrA* ± S9 | TA strains: 3.33-3330 µg/plate (+S9); 1.0-1000 µg/plate (-S9); E. coli: 33.3-5000 µg/plate (+/- S9) | MON 78634 65.2% w/w glyphosate (71.8% w/w as monoammonium salt of glyphosate) | Negative | Mecchi (2003b) | |
| Bacterial Reverse Mutation | *S. typhimurium* TA 98, TA100, TA1535, TA1537 and *E. coli* WP2 *uvrA* ± S9 | 10 - 5000 µg/plate (+/-S9) | MON 79864 38.7% glyphosate acid (wt %) | Negative | Mecchi (2008a) | Inhibited growth seen at ≥2000 -S9 |
| Bacterial Reverse Mutation | *S. typhimurium* TA 98, TA100, TA1535, TA1537 and *E. coli* WP2 *uvrA* ± S9 | 33.3-5000 µg/plate | MON 76313 30.9% glyphosate acid | Negative | Mecchi (2008b) | |
| Bacterial Reverse Mutation | *S. typhimurium* TA 98, TA100, TA1535, TA1537 and *E. coli* WP2 *uvrA* ± S9 | 10-5000 µg/plate (+/-S9) | MON 76171 31.1% glyphosate | Negative | Mecchi (2008c)[1] | |
| Bacterial Reverse Mutation | *S. typhimurium* TA 98, TA100, TA1535, TA1537 and *E. coli* WP2 *uvrA* ± S9 | 10-5000 µg/plate (+/-S9) | MON 79991 71.6% glyphosate acid | Negative | Mecchi (2009a) | |
| Bacterial Reverse Mutation | *S. typhimurium* TA 98, TA100, TA1535, TA1537 and *E. coli* WP2 *uvrA* ± S9 | 10-5000 µg/plate (+/-S9) | MON 76138 38.5% glyphosate | Negative | Mecchi (2009b)[1] | |
| Bacterial Reverse Mutation | *S. typhimurium* TA97a, TA98, TA100, and TA1535 ± S9 | 1-5000 µg/plate | MON 77280 646.4 g/L salt equivalent | Negative | Perina (1998) | |

**Table F.1.  *In vitro* Test for Gene Mutations in Bacteria: Glyphosate Formulations.**

| Test/Endpoint | Test System | Concentrations | Test Material/ Concentration | Results | Reference | Comments |
|---|---|---|---|---|---|---|
| Bacterial Reverse Mutation | *S. typhimurium* TA98 and TA100 ± S9 | 0-1440 µg/plate (calculated as glyphosate IPA salt) | Roundup, 480 g/L glyphosate isopropylamine salt | Negative – S9, Equivocal +S9 | Rank *et al.* (1993) | Stat significant increase at 360 µg/plate for TA98 (-S9) and 720 µg/plate for TA100 (+S9).  Not significant at higher concentrations and were not replicated. Effects occurred at close to toxic levels. |
| Bacterial Reverse Mutation | *S. typhimurium*  TA98, TA100, TA102, TA1535, and TA1537 ± S9 | 500-5000 µg/plate; | 495 g/L glyphosate isopropylamine salt; 371.0 g/L (equivalent of glyphosate acid) | Negative ± S9 | Silvino (2011) | |
| Bacterial Reverse Mutation | *S. typhimurium*  TA98, TA100, TA102, TA1535, and TA1537 ± S9 | 1.5-5000 µg/plate | MON 8709 495 g/L glyphosate isopropylamine salt; 371.0 g/L (equivalent of glyphosate acid) | Negative ± S9 | Silvino (2011) | |
| Bacterial Reverse Mutation | *S. typhimurium*  TA98, TA100, TA102, TA1535, and TA1537 ± S9 | 15-5000 µg/plate | MON 76313 468 g/L glyphosate isopropylamine salt (351 g/L glyphosate acid equivalent) | Negative ± S9 | Silvino (2012) | Cytotoxic at 5000 µg/plate for some strains |
| Bacterial Reverse Mutation | *S. typhimurium* TA97a, TA98, TA100 and TA1535 ± S9 | 1-5000 µg/plate | Glifos formulation (glyphosate isopropylammoni um salt , Berol 907 and water) | Negative ± S9 | Vargas (1996) | Cytotoxic at the two upper concentrations |

**Table F.1.  *In vitro* Test for Gene Mutations in Bacteria: Glyphosate Formulations.**

| Test/Endpoint | Test System | Concentrations | Test Material/ Concentration | Results | Reference | Comments |
|---|---|---|---|---|---|---|
| Bacterial Reverse Mutation | *S. typhimurium*  TA98, TA100, TA102, TA1535, TA1537± S9 | 3.16-316 µg/plate | FSG 3090-H1 360 g/L | Negative ± S9 | Uhde (2004)[1] | |
| Bacterial Reverse Mutation | *S. typhimurium* TA98, TA100 ± S9 | 0.01-100 µg/plate | 64% (glyphosate Isopropylammonium salt) | Negative ± S9 | Wang *et al.* (1993) | |
| Bacterial Reverse Mutation | *S. typhimurium* TA98, TA100, TA1535, TA1537 and *E. coli* WP2 *uvrA* ± S9 | All strains: 33.3-5000 µg/plate (+S9); 10-3330 µg/plate (-S9) | MON 78910 30.3% glyphosate acid | Negative ± S9 | Xu (2006) | Cytotoxic ≥1000 µg/plate (-S9) |

[1] Study was cited in Kier and Kirkland (2013).  Supplementary information about the study was provided online including test guideline, test material purity, control chemicals and summary data tables.

**Table F.2.  *In Vitro* Tests for Chromosome Damage in Mammalian Cells- Glyphosate Formulations**

| Test/Endpoint | Test System | Concentrations | Test Material/ Concentration | Results | Reference | Comments |
|---|---|---|---|---|---|---|
| *In vitro* **Chromosomal Aberration using fluorescent in situ hybridization (FISH)** | Bovine lymphocytes (from two 6-8 month old calves) -whole chromosome (1) painting probe | 28-1120 µM<br><br>24 h exposure | 62% Isopropylamine salt of glyphosate (38% inert ingredients) | Negative. | Holeckova (2006) | Small but significant increase in polyploidy seen at 56µM No positive control reported. |
| *In vitro* **Cytokinesis Block Micronucleus Assay (with FISH analysis)** | TR146 cells (human-derived buccal epithelial cell line) | 0, 10, 15 and 20 mg/L; 20 minute exposure. | Roundup Ultra Max (450 g/l glyphosate acid) | Positive<br><br>Increase in MN at all test concentrations | Koller *et al.* (2012) | No apoptosis observed at any conc.<br><br>Necrosis reported at 20 mg/L.<br><br>Increase in NB and NPB seen at all concentrations |

MI= mitotic index. FISH= fluorescent in situ hybridization, MN= micronuclei; NB= nuclear buds; NPB= nucleoplasmic bridges.

**Table F.3. *In Vivo* Tests for Chromosomal Aberrations in Mammals- Glyphosate Formulations.**

| Test/Endpoint | Test System | Route of Administration | Doses | Test Material Purity | Results | Reference | Comments |
|---|---|---|---|---|---|---|---|
| Bone Marrow Chromosomal Aberration | Swiss albino mice (males only) Vehicle: DMSO | Intraperitoneal injection; sampling 24, 48 and 72 h | 0, 25 and 50 mg/kg (5/dose) | Roundup (>41% isopropylamine glyphosate) | Positive Increase in MN at all time points at both doses | Prasad *et al.* (2009) | Significant decrease in mitotic index seen at all doses and time points |
| Bone Marrow Chromosomal Aberration | C57BL mice (males only) Vehicle: water | Oral administration; sampling 6, 24, 48, 72, 96 and 120 h | 0.05, 0.01, 0.5 and 1.0% (8/dose) | Roundup | Negative | Dimitrov *et al.* (2006) | |
| Bone Marrow Chromosomal Aberration | New Zealand white rabbits (males only) Vehicle: | Drinking water for 60 days | 0, 750 ppm (5/dose) | Roundup | Positive | Helal and Moussa (2005) | |

BM= bone marrow, SC= spermatocyte.

**Table F.4.** *In Vivo* Tests for Micronuclei Induction in Mammals- Glyphosate Formulations.

| Test/Endpoint | Test System | Route of Administration | Doses | Test Material Purity | Results | Reference | Comments |
|---|---|---|---|---|---|---|---|
| **Bone Marrow Micronucleus Test** | Swiss CD1 mice (males only) | Intraperitoneal injection; 2 injections of half the dosage of 135 mg/kg 24 h apart; sampling at 6 and 24 h | 0, 450 mg/kg roundup, equiv. to 135 kg glyphosate (3/dose) | Roundup, 30.4% glyphosate | Positive | Bolognesi *et al.* (1997) | Stat significant increase in MN at 6 and 24 h |
| **Bone Marrow Micronucleus Test** | C3H mice (males only) Vehicle: water | Intraperitoneal Injection (single treatment); sampling after 24, 48 and 72 h | 0, 90 mg/kg | Not reported | Negative | Chruscielska *et al.* (2000) | |
| **Bone Marrow Micronucleus Test** | Swiss mice (males and females) Vehicle: water | Intraperitoneal Injection (2 treatments, 24 h apart); sampling after 24 h (last treatment) | 0, 50, 100 and 200 mg/kg | 480g/L Isopropyla mine salt of glyphosate | Negative | Grisolia (2002) | |
| **Bone Marrow Micronucleus Test** | CD-1 mice (males and females) | Intraperitoneal injection; sampling 24, 48 and 72 h | 0, 140, 280, and 555 mg/kg | Roundup (31% glyphosate salt) | Negative | Kier (1992) | Some deaths observed at high dose (HD), ↓PCE/NCE ratio at HD at 48 h in males. |
| **Bone Marrow Micronucleus Test** | Swiss albino mice (males and females) | Intraperitoneal Injection (2 treatments, 24 h apart); sampling after 24 h (last treatment) | 0, 212.5, 425 and 637.5 mg/kg | MON 77280 646.4 g/L glyphosate salt equivalent | Negative | Monma (1998) | Doses tested corresponded to 25%, 50% and 75% LD50 |

**Table F.4.  *In Vivo* Tests for Micronuclei Induction in Mammals- Glyphosate Formulations.**

| Test/Endpoint | Test System | Route of Administration | Doses | Test Material Purity | Results | Reference | Comments |
|---|---|---|---|---|---|---|---|
| **Bone Marrow Micronucleus Test** | NMRI-Bom mice | Intraperitoneal Injection (single treatment); sampling after 24 h | 0, 133 and 200 mg/kg (4/sex/dose) | Roundup, 480 g glyphosate isopropyla mine salt per liter | Negative | Rank *et al.* (1993) | BM toxicity indicated by %PCE decreased at 200 mg/kg |
| **Bone Marrow Micronucleus Test** | Swiss albino mice (males only[2]) Vehicle: water | Oral gavage (two treatments, 24 h apart); sampled at 18 and 24 h after last dose | 0, 2000 mg/kg | MON 8709494.7 g/L salt of isopropyla mine (371.0 glyphosate acid) | Negative | Claro (2011) | OECD 474 Guideline No significant signs of toxicity observed in main study. |
| **Bone Marrow Micronucleus Test** | C57BL mice (males only) Vehicle: water | Oral administration; sampling 6, 24, 48, 72, 96 and 120 h | 0.05, 0.01, 0.5 and 1.0% (1%=1080 mg/kg) (8/dose) | Roundup | Negative | Dimitrov *et al.* (2006) | Toxicity seen in 1.0% dose group |
| **Bone Marrow Micronucleus Test** | Crl:CD-1(ICR) BR mice (males only[2]) Vehicle: water | Oral gavage (single treatment); sampling after 24 and 48 h (high dose only) | 0, 500, 1000, and 2000 (mg/kg) (5/dose) | MON 78239 (36.6% glyphosate) | Negative | Erexson (2003a) | EPA Guideline (84-2) No significant signs of toxicity observed in main study. |
| **Bone Marrow Micronucleus Test** | Crl:CD-1(ICR) BR mice (males only[2]) Vehicle: water | Oral gavage (single treatment); sampling after 24 and 48 h (high dose only) | 0, 500, 1000, and 2000 (mg/kg) (5/dose) | MON 78634 (65.2% glyphosate) | Negative | Erexson (2003b) | EPA Guideline (84-2) No significant signs of toxicity observed in main study. |
| **Bone Marrow Micronucleus Test** | Crl:CD-1(ICR) BR mice (males only[2]) Vehicle: water | Oral gavage (single treatment); sampling after 24 and 48 h (high dose only) | 0, 500, 1000, and 2000 (mg/kg) (5/dose) | MON 78910 (30.3% glyphosate) | Negative | Erexson (2006) | EPA Guideline (84-2) No significant signs of toxicity observed in main study. |

**Table F.4.** *In Vivo* **Tests for Micronuclei Induction in Mammals- Glyphosate Formulations.**

| Test/Endpoint | Test System | Route of Administration | Doses | Test Material Purity | Results | Reference | Comments |
|---|---|---|---|---|---|---|---|
| **Bone Marrow Micronucleus Test** | NMRI mice (males and females) Vehicle: 0.8% hydroxypropylmethyl cellulose | Oral gavage (single treatment); sampling after 24 and 48 h (high dose only) | 0, 500, 1000, and 2000 mg/kg (5/sex/dose) | TROP M (Glyphosate 480); 358.4 g/L glyphosate acid; 483.6 g/L IPA salt | Negative | Flügge (2010c)[1] | OECD Guideline 474 No significant signs of toxicity observed in main study. |
| **Bone Marrow Micronucleus Test** | Swiss mice (males only[2]) Vehicle: water | Oral gavage (2 treatments, 24 h apart); sampling after 24 h (last treatment) | 0, 2000 mg/kg (6/dose) | A17035A 289.7 g/L glyphosate | Negative | Negro Silva (2009)[1] | OECD Guideline 474 No significant signs of toxicity observed in main study. |
| **Bone Marrow Micronucleus Test** | Swiss mice (males only[2]) Vehicle: water | Oral gavage (2 treatments, 24 h apart); sampling after 24 h (last treatment) | 0, 2000 mg/kg (6/dose) | Glyphosate SL (499.35 g/L glyphosate) | Negative | Negro Silva (2011)[1] | OECD Guideline 474 No significant signs of toxicity observed in main study |
| **Bone Marrow Micronucleus Test** | Hsd:CD-1(ICR) mice (males only[2]) Vehicle: water | Oral gavage (single treatment); sampling after 24 and 48 h (high dose only) | 0, 500, 1000, and 2000 (mg/kg) (5/dose) | MON 79864 (38.7% glyphosate) | Negative # | Xu (2008a) | EPA Guideline (84-2) /OECD 474 No significant signs of toxicity observed in main study. |
| **Bone Marrow Micronucleus Test** | CD-1(ICR)BR mice (males only[2]) Vehicle: water | Oral gavage (single treatment); sampling after 24 and 48 h (high dose only) | 0, 500, 1000, and 2000 (mg/kg) (5/dose) | MON 76171 (31.1% glyphosate) | Negative | Xu (2008b) | EPA Guideline (84-2) /OECD 474 No significant signs of toxicity observed in main study. |
| **Bone Marrow Micronucleus Test** | CD-1(ICR)BR mice (males only[2]) Vehicle: water | Oral gavage (single treatment); sampling after 24 and 48 h (high dose only) | 0, 500, 1000, and 2000 (mg/kg) (5/dose) | MON 79991 (71.6% glyphosate) | Negative | Xu (2009a) | EPA Guideline (84-2) /OECD 474 No significant signs of toxicity observed in main study. |

**Table F.4.  *In Vivo* Tests for Micronuclei Induction in Mammals- Glyphosate Formulations.**

| Test/Endpoint | Test System | Route of Administration | Doses | Test Material Purity | Results | Reference | Comments |
|---|---|---|---|---|---|---|---|
| **Bone Marrow Micronucleus Test** | CD-1(ICR)BR mice (males only[2]) Vehicle: water | Oral gavage (single treatment); sampling after 24 and 48 h (high dose only) | 0, 500, 1000, and 2000 (mg/kg) (5/dose) | MON 76138 (38.5% glyphosate) | Negative | Xu (2009b)[1] | EPA Guideline (84-2) /OECD 474 No significant signs of toxicity observed in main study. |
| **Bone Marrow Micronucleus Test** | Hsd:CD-1(ICR)BR mice (males only[2]) Vehicle: water | Oral gavage (single treatment); sampling after 24 and 48 h (high dose only) | 0, 500, 1000, and 2000 (mg/kg) (5/dose) | MON 76313 (30.9% glyphosate) | Negative | Xu (2009c)[1] | EPA Guideline (84-2) /OECD 474 No significant signs of toxicity observed in main study. |
| **Bone Marrow Micronucleus Test** | CD rats (males and females) Vehicle: 0.8% hydroxypropylmethyl cellulose | Oral gavage (single treatment); sampling after 24 and 48 h (high dose only) | 0, 500, 1000, and 2000 mg/kg (5/sex/dose) | 757 g/kg granular formulation (69.1% glyphosate acid) | Negative | Flügge (2010e)[1] | OECD Guideline 474 No significant signs of toxicity observed in main study |

[1] Study was cited in Kier and Kirkland (2013).  Supplementary information about the study was provided online including test guideline, test material purity, control chemicals and summary data tables.

[2] Only males tested; report indicated that there were no difference between sexes seen in range finding study.

BM= bone marrow, CA= chromosomal aberrations, MN= micronucleated erythrocytes, NCE= normochromatic erythrocytes, PCE=polychromatic erythrocytes.

**Table F.5.  Other Assays for Detecting DNA Damage- Glyphosate Formulations.**

| Test/Endpoint | Test System | Route of Administration | Doses/ Concentrations | Test Material/ Concentration | Results | Reference | Comments |
|---|---|---|---|---|---|---|---|
| **Bacterial SOS Chromotest** | *Escherichia coli* PQ37 strain | NA (*in vitro*) | 0.25μg/sample | Roundup BIO formulation; | Positive | Raipulis *et al.* (2009) | |
| **DNA Adducts $^{32}$P-postlabeling** | Swiss CD1 mice (males and females) Liver and kidney evaluated | Intraperitoneal injection | 0, 400, 500 and 600 mg/kg, corresponding to 122, 152 and 182 mg/kg glyphosate salt | Roundup (30.4% isopropylammonium salt of glyphosate) | Positive (liver and kidney) | Peluso *et al.* (1998) | |
| **DNA oxidative damage: 8-OHdG formation** | Swiss CD-1 mice (males) liver and kidney evaluated | Intraperitoneal injection (single dose); sampling 4 and 24 h after injection | 900 mg/kg corresponding to 270 mg/kg glyphosate (3/dose) | 900 mg/kg corresponding to 270 mg/kg glyphosate | Kidney: positive at 8 and 24  h

Liver: negative | Bolognesi *et al.* (1997) | |
| **Single-cell gel electrophoresis (SCGE) assays- COMET assay** | TR146 cells (human-derived buccal epithelial cell line). Alkaline conditions | NA (*in vitro*) | | Roundup Ultra Max (450 g/l glyphosate acid) | Induced DNA migration at >20 mg/L | Koller *et al.* (2012) | Also measured multiple cellular integrity parameters to assess cytotoxicity. Formulation was more toxic than technical. Significant increase in LDHe at all concentrations tested. Cytotoxic ≥ 60 mg/L |
| **Sister Chromatid Exchange (SCE)** | Bovine lymphocytes | NA (*in vitro*) | 28 - 1112 μM;; ±S9;  sampling at 24 and 48 h | 62% Isopropylamine salt of glyphosate | Positive | Sivikova & Dianovsky (2006) | |

**Table F.5.  Other Assays for Detecting DNA Damage- Glyphosate Formulations.**

| Test/Endpoint | Test System | Route of Administration | Doses/ Concentrations | Test Material/ Concentration | Results | Reference | Comments |
|---|---|---|---|---|---|---|---|
| **Sister Chromatid Exchange (SCE)** | Human lymphocytes (2 donors) | NA (*in vitro*) | 250, 2500 and 25000 µg/mL | Roundup; Isopropylamine salt of glyphosate (purity not stated) | Stat. significant increase (p<0.001) at 250 µg/mL in both donors, and in one donor at 2500 µg/mL | Vigfusson and Vyse (1980) | No growth seen at highest concentration (25 mg/mL) |
| **Sister Chromatid Exchange (SCE)** | Human lymphocytes | NA (*in vitro*) | -S9: 0, 0.1 and 0.33 mg/mL; 72 h exposure | Roundup, 30.4% glyphosate | Positive | Bolognesi *et al.* (1997) | Stat significant increase in SCE/cell at ≥ 0.1 mg/mL |
| **Alkaline elution assay- DNA single strand breaks** | Swiss CD-1 mice (males) liver and kidney evaluated | Intraperitoneal injection (single dose); sampling 4 and 24 h after injection | 900 mg/kg corresponding to 270 mg/kg glyphosate (3/dose) | 900 mg/kg corresponding to 270 mg/kg glyphosate | Positive (Increased elution rate) at 4 hours in liver and kidney<br><br>At 24 h, returned to control levels | Bolognesi *et al.* (1997) | Return to control values at 24 h may indicate DNA repair or reflect rapid elimination of compound |

h= hour, NA= not applicable, SCE= sister chromatid exchange, LDHe= extracellular lactate dehydrogenase

**Appendix G**

The following studies were considered during the systematic review, but were excluded from the analysis.

Amer S.M. et al (2006).  In vitro and in vivo evaluation of the genotoxicity of the herbicide glyphosate in mice.  Bulletin of the National Research Centre (Cairo) 31 (5): 427-446.

Aboukila, R.S. et al. (2014). Cytogenetic Study on the Effect of Bentazon and Glyphosate Herbicide on Mice.  Alexandria Journal of Veterinary Sciences, 41: 95-101.

Majeska (1982d) MRID 00126616

Majeska (1982e) MRID 00126614

Majeska (1982f) MRID 00126615

# EXHIBIT 3

Electronically Filed - City of St. Louis - November 22, 2019 - 03:42 PM



**Backgrounder**
**History of Monsanto's Glyphosate Herbicides**
June 2005

The original Roundup® herbicide[1], containing the active ingredient glyphosate, was introduced in 1974.  Today, Roundup® WeatherMax, Roundup® UltraMAX , and other glyphosate agricultural herbicides produced by Monsanto are among the world's most widely used herbicides.  Monsanto's glyphosate products are registered in more than 130 countries and are approved for weed control in more than100 crops.  No other herbicide active ingredient compares in terms of number of approved uses.

Roundup® WeatherMAX and other Roundup brand agricultural products are broad-spectrum, non-selective herbicides, which are active on most species of green plants.  In addition to glyphosate, the formulations typically include water and a surfactant system.  The surfactant system enables the products to adhere to the surface of leaves so the active ingredient can penetrate.  When the products are applied to green leaves or stems, the active ingredient moves throughout the plant so the entire plant dies.  A few days after treatment, the plant wilts and yellows.  Then, as the plant tissue deteriorates, the plant turns brown.  At the same time, the roots or rhizomes are deteriorating so the plant cannot regenerate.

Glyphosate binds tightly to most types of soil so it is not available for uptake by roots of nearby plants.  It works by disrupting a plant enzyme involved in the production of amino acids that are essential to plant growth.  The enzyme, EPSP synthase, is not present in humans or animals, contributing to the low risk to human health from the use of glyphosate according to label directions.

In addition to agricultural uses, herbicides containing glyphosate are used to control weeds in utility rights-of-way, on roadsides, along railways or in places around the home such as sidewalks and gardens.    Some products for the residential market may include additional active ingredients at a much lower concentration than glyphosate.  These products are used when a faster response is desired in the targeted weeds, or when extended weed control is desired. Herbicides containing glyphosate are also used by wildlife organizations to protect and restore wildlife habitats threatened by invasive, non-native vegetation.  For example, a Monsanto glyphosate herbicide was selected to control invasive weeds in the unique Galapagos Islands ecosystem.

Another glyphosate herbicide, AquaMaster™, is approved for weed control in aquatic environments, including ponds and reservoirs, waterfowl sanctuaries and recreational waterways.  Only a few herbicides have toxicological and environmental characteristics that allow them to be directly applied to aquatic vegetation.  The AquaMaster™ formulation (under a previous brand name) was selected to rid the Florida Everglades of invasive weeds.

Conservation groups have chosen glyphosate formulations because of their effectiveness against most weeds and the fact that glyphosate has very low toxicity to wildlife.  Because of its multiple uses, glyphosate has been the subject of hundreds of health, safety and environmental

---

[1] "The original Roundup herbicide" refers to the Roundup agricultural herbicide (also known as MON 2139), which contained the active ingredient glyphosate (as the isopropylamine salt), water and a surfactant  (polyoxyethylene-alkylamine or POEA).

Electronically Filed - City of St. Louis - November 22, 2019 - 03:42 PM

studies.  Regulatory agencies around the world have concluded that glyphosate herbicides pose no unreasonable risks to human health and the environment when used according to label directions.

Glyphosate holds an elite position among honored technologies.  John Franz, the Monsanto scientist who first identified the herbicidal activity of glyphosate, received the National Medal of Technology, the highest honor for technical achievement, in 1987, at which time the original Roundup® agricultural herbicide was recognized for its impact "upon the production of agricultural food and fiber as well as agricultural practices throughout the world."  Very few agricultural technologies have won the nation's technology award.  In 1996, Monsanto received the Presidential Award for Sustainable Development.  The White House recognized Monsanto for "pioneering sustainable technologies," which included the development of such products as the original Roundup herbicide.  Also in 1996, Monsanto received the Presidential Green Chemistry Challenge Award for environmentally responsible systems used in the manufacture of glyphosate herbicides.

In addition, Farm Chemicals magazine, in its September 1994 100th anniversary edition, called the original Roundup® herbicide one of the "Top 10 Products That Changed the Face of Agriculture."  That designation was based in large measure on the fact that Roundup agricultural herbicides enable and encourage the practice of conservation tillage.  Their broad-spectrum effectiveness allows farmers to control weeds with minimal tillage.  This conserves valuable topsoil, reduces runoff into streams and reduces trips across farm fields, conserving time and fuel.

When Roundup WeatherMAX™ is used over the top of Roundup Ready® crops according to label directions, most common weed species are controlled without harm to  the growing crop.  In most cases, farmers are able to replace multiple herbicide products with Roundup WeatherMAX™, reducing the overall amount of herbicide that is used.  And in many cases, only one herbicide application is required, conserving fuel by reducing trips across the field.

All pesticides sold or distributed in the United States must be registered by the Environmental Protection Agency (EPA), based on scientific studies showing that they can be used without posing unreasonable risks to people or the environment.  Because of advances in scientific knowledge, the law requires that pesticides that were first registered years ago be reregistered periodically to ensure that they meet the current standards.  Glyphosate was re-registered in September 1993 after EPA reviewed new studies and concluded that the use of glyphosate-based herbicides in accordance with label directions would "not pose unreasonable risks or adverse effects to humans or the environment."

-oOo-

# EXHIBIT 4

United States
Environmental Protection
Agency

Office of Prevention, Pesticides
And Toxic Substances
(7508W)

EPA-738-R-93-014
September 1993

# ♻EPA Reregistration Eligibility Decision (RED)

# Glyphosate




**Recycled/Recyclable**
Printed with Soy/Canola ink on paper that
contains at least 50% recycled fiber



**UNITED STATES ENVIRONMENTAL PROTECTION AGENCY**
**WASHINGTON, D.C. 20460**

FEB 1 6 1994

OFFICE OF
PREVENTION, PESTICIDES AND
TOXIC SUBSTANCES

**CERTIFIED MAIL**

Dear Registrant:

I am pleased to announce that the Environmental Protection
Agency (the "Agency") has completed its reregistration eligibility
decision on the pesticide active ingredient glyphosate.

Enclosed is a **Reregistration Eligibility Decision (RED)**
**Document** for the pesticide active ingredients isopropylamine salt
of glyphosate and sodium salt of glyphosate, hereafter referred to
as glyphosate. The RED is the Agency's evaluation of the
glyphosate data base, its conclusions regarding human and
environmental risks associated with the current product uses, and
its decisions and conditions under which uses and products will be
eligible for rereregistration. Also enclosed is the **EPA RED facts**
and the **Pesticide Reregistration Handbook** which provides
instructions to registrants on how to respond to any labeling and
data requirements specified in the RED and how to reregister
products.

The RED identifies outstanding product specific data
requirements for end-use products and manufacturing-use products.
These requirements are listed on the **Requirements Status and**
**Registrant's Response Form**, which, along with the **Data Call-In**
**Response Form** listing all of your company's products subject to the
RED, is included as an Attachment. Instructions for completing
both forms are contained in the RED package. All product specific
data must be submitted and found acceptable by the Agency before a
product can be reregistered.

Generic data requirements usually will have been fulfilled
prior to making a reregistration eligibility decision. However,
there may be some instances where additional generic data are
required. If generic data requirements need to be fulfilled, all
registrants must complete the appropriate **Data Call-In Response**
**Form** and **Requirements Status and Registrant's Response Form**. These
forms are in the appendices to the RED.



**Recycled/Recyclable**
Printed with Soy/Canola Ink on paper that
contains at least 50% recycled fiber



The RED identifies any specific labeling requirements such as restricted use classification, groundwater hazard statements, endangered species precautions, etc., necessary for reregistration based on a review of the generic data for the active ingredient. In addition, in order to be reregistered, all product labeling must be in compliance with format and content labeling as described in 40 CFR §156.10 and all labeling changes imposed by Pesticide Regulation (PR) Notices, and any label changes imposed by this RED.

The Pesticide Reregistration Handbook contains detailed instructions for compliance with the RED and must be followed carefully. There are several key points to remember in preparing your response to the RED:

<u>Within 90 Days of Your Receipt of this Letter</u>

1.   For **each** product which is subject to this RED, **you must complete, sign and submit the data call-in (DCI) response forms attached to the RED** [Appendix F, Attachments B and D, has forms for product specific data]. Follow the instructions in Attachments B and D for completing those forms and submit the forms to the appropriate address specified in the Data Call-Ins. **Note that the DCI forms are to be sent to the Special Review and Reregistration Division (use the mailing distribution code RED-SRRD-0178 for your generic response).**

2.   **No time extensions will be granted for submitting the 90-day responses.** If the Agency does not receive a response for a product, it may issue a Notice of Intent to Suspend (NOIS) for that product.

3.   **Any requests for data waivers or time extensions to the 8-month deadline must be submitted as part of your 90-day response.** Such requests will generally not be considered if submitted later than the 90-day response.

<u>Within 8 Months of the Date of this Letter</u>

1.   For **each product, you must submit a completed Application for Reregistration (EPA Form 8570-1), five copies of the label and labeling** revised as specified by the RED and in accordance with current requirements, <u>**two**</u> **completed copies of the Confidential Statement of Formula (CSF) (EPA Form 8570-4), a completed Certification with Respect to Citation of Data (EPA Form 8570-31), and data or references to data** (see item 2 below).

2.   You must **submit or cite the required product specific data** as part of your commit-ment for reregistration. For most products, you will probably be citing data which have already been submitted to the Agency. In these cases, you must **submit a list of the studies and the corresponding EPA identifier numbers (i.e., ACCESSION or MRID numbers).** Before citing these studies, you must **make sure that they meet the**



**Agency's current acceptance criteria** (Appendix F, Attachment E).  Be sure to follow data formatting requirements in P.R. Notice 86-5.  Failure to adequately comply with the data requirements specified in this RED may result in the Notice of Intent to Suspend your product.

3.    The labeling and CSF which you submit for **each** product must comply **with P.R. Notice 91-2** (Appendix D).  That Notice requires that the amount of active ingredient declared in the ingredient statement must be stated as the **nominal concentration** rather than the lower certified limit.  You have two options for submitting a CSF:  (1) accept the standard certified limits (see 40 CFR §158.175) or (2) provide certified limits that are supported by the analysis of five batches.  If you choose the second option, you must submit or cite the data for the five batches along with a certification statement as described in 40 CFR §158.175(e).

4.    Send your Application for Registration to the **Registration Division Product Manager who is assigned to the product, PM #25 Robert Taylor.**  Use the correct address shown on page 6 of the enclosed Product Reregistration Handbook (Appendix E). Note that the mailing distribution code for your response is RED-RD-PM25.

    Questions on **product specific data requirements and labeling** (for both End-use and Manufacturing-use products) should be directed to the Special Review and Registration Division Planning and Reregistration Review Manager for glyphosate, Frank Rubis at (703) 308-8184. Questions on the generic data requirements should be directed to Eric Feris, the Chemical Review Manager in the Special Review and Reregistration Division at (703) 308-8048 (call via the Virginia Relay:  1-800-828-1140).

    The Agency is prepared to meet with any registrants who have questions about responding to the glyphosate RED.  **If you wish to meet with the Agency, you must contact Eric Feris within two weeks of your receipt of the RED.**  The Agency intends to have one combined meeting with interested registrants.  If there are any requests for such a meeting, the Agency will notify all registrants who requested a meeting of the date, location and time.  Requests for a meeting will not extend the 90-day or 8-month response deadlines.

                            Sincerely yours,

                            Daniel Barolo, Director
                            Special Review and
                                Reregistration Division

Enclosures

United States     Prevention, Pesticides     EPA-738-F-93-011
Environmental Protection     And Toxic Substances     September 1993
Agency     (7508W)

# ❧EPA R.E.D. FACTS

# Glyphosate

**Pesticide Reregistration**

All pesticides sold or distributed in the United States must be registered by EPA, based on scientific studies showing that they can be used without posing unreasonable risks to people or the environment. Because of advances in scientific knowledge, the law requires that pesticides which were first registered years ago be reregistered to ensure that they meet today's more stringent standards.

In evaluating pesticides for reregistration, EPA obtains and reviews a complete set of studies from pesticide producers, describing the human health and environmental effects of each pesticide. The Agency imposes any regulatory controls that are needed to effectively manage each pesticide's risks. EPA then reregisters pesticides that can be used without posing unreasonable risks to human health or the environment.

When a pesticide is eligible for reregistration, EPA announces this and explains why in a Reregistration Eligibility Decision (RED) document. This fact sheet summarizes the information in the RED document for glyphosate.

**Use Profile**

Glyphosate is a non-selective herbicide registered for use on many food and non-food field crops as well as non-crop areas where total vegetation control is desired. When applied at lower rates, glyphosate also is a plant growth regulator.

Glyphosate is among the most widely used pesticides by volume. It ranked eleventh among conventional pesticides used in the U.S. during 1990-91. In recent years, approximately 13 to 20 million acres were treated with 18.7 million pounds of glyphosate annually. The largest use sites include hay/pasture, soybeans and field corn.

Three salts of glyphosate are used as active ingredients in registered pesticide products. Two of these active ingredients, plus technical grade glyphosate, are contained in the 56 products that are subject to this RED.

The isopropylamine salt, an active ingredient in 53 registered products, is used as a herbicide to control broadleaf weeds and grasses in many food and non-food crops and a variety of other sites including ornamentals, lawns and turf, residential areas, greenhouses, forest plantings and industrial rights-of-way. It is formulated as a liquid, solid or pellet/tablet, and is applied using ground or aerial equipment.



The sodium salt of glyphosate, an active ingredient in two registered pesticide products, is used as a plant growth regulator for peanuts and sugarcane, to modify plant growth and hasten the ripening of fruit. It is applied as a ground spray to peanut fields and as an aerial spray to sugarcane. Preharvest intervals are established for both crops.

The monoammonium salt of glyphosate is an active ingredient in an additional seven herbicide/growth regulator products. This form of glyphosate was initially registered after November 1984, so it is not subject to reregistration or included in this RED. However, in reassessing the existing glyphosate tolerances (maximum residue limits in or on food and feed), EPA included those for the monoammonium salt.

## Regulatory History

EPA issued a Registration Standard for glyphosate in June 1986 (NTIS PB87-103214). The Registration Standard required additional phytotoxicity, environmental fate, toxicology, product chemistry and residue chemistry studies. All of the data required have been submitted and reviewed, or were waived.

## Human Health Assessment

### Toxicity

Glyphosate is of relatively low oral and dermal acute toxicity. It has been placed in Toxicity Category III for these effects (Toxicity Category I indicates the highest degree of acute toxicity, and Category IV the lowest). The acute inhalation toxicity study was waived because glyphosate is non-volatile and because adequate inhalation studies with end-use products exist showing low toxicity.

A subchronic feeding study using rats showed blood and pancreatic effects. A similar study with mice showed reduced body weight gains in both sexes at the highest dose levels. A dermal study with rabbits showed slight reddening and swelling of the skin, decreased food consumption in males and decreased enzyme production, at the highest dose levels.

Several chronic toxicity/carcinogenicity studies using rats, mice and beagle dogs resulted in no effects based on the parameters examined, or resulted in findings that glyphosate was not carcinogenic in the study. In June 1991, EPA classified glyphosate as a Group E oncogen--one that shows evidence of non-carcinogenicity for humans--based on the lack of convincing evidence of carcinogenicity in adequate studies.

In developmental toxicity studies using pregnant rats and rabbits, glyphosate caused treatment-related effects in the high dose groups including diarrhea, decreased body weight gain, nasal discharge and death.

One reproductive toxicity study using rats showed kidney effects in the high dose male pups; another study showed digestive effects and decreased body weight gain. Glyphosate does not cause mutations.



In one metabolism study with rats, most of the glyphosate administered (97.5 percent) was excreted in urine and feces as the parent compound; less than one percent of the absorbed dose remained in tissues and organs, primarily in bone tissue. Aminomethyl phosphonic acid (AMPA) was the only metabolite excreted. A second study using rats showed that very little glyphosate reaches bone marrow, that it is rapidly eliminated from bone marrow, and that it is even more rapidly eliminated from plasma.

## Dietary Exposure

The nature of glyphosate residue in plants and animals is adequately understood. Studies with a variety of plants indicate that uptake of glyphosate or AMPA from soil is limited. The material which is taken up is readily translocated throughout the plant and into its fruit. In animals, most glyphosate is eliminated in urine and feces. Enforcement methods are available to detect residues of glyphosate and AMPA in or on plant commodities, in water and in animal commodities.

85 tolerances have been established for residues of glyphosate and its metabolite, AMPA, in or on a wide variety of crops and crop groups, as well as in many processed foods, animal feed and animal tissues (please see 40 CFR 180.364, 40 CFR 185.3500 and 40 CFR 186.3500). EPA has reassessed the existing and proposed tolerances for glyphosate. Though some adjustments will be needed, no major changes in existing tolerances are required. EPA also has compared the U.S. tolerances with international Codex maximum residue limits (MRLs), and is recommending certain adjustments to achieve greater compatibility.

EPA conducted a dietary risk assessment for glyphosate based on a worst-case risk scenario, that is, assuming that 100 percent of all possible commodities/acreage were treated, and assuming that tolerance-level residues remained in/on all treated commodities. The Agency concluded that the chronic dietary risk posed by glyphosate food uses is minimal.

A reference dose (RfD), or estimate of daily exposure that would not cause adverse effects throughout a lifetime, of 2 mg/kg/day has been proposed for glyphosate, based on the developmental toxicity studies described above.

## Occupational and Residential Exposure

Occupational and residential exposure to glyphosate can be expected based on its currently registered uses. However, due to glyphosate's low acute toxicity and the absence of other toxicological concerns (especially carcinogenicity), occupational and residential exposure data are not required for reregistration.

Some glyphosate end-use products are in Toxicity Categories I or II for primary eye irritation or skin irritation. In California, glyphosate ranks high among pesticides causing illness or injury to workers, who report numerous incidents of eye and skin irritation from splashes during mixing

3



and loading.  EPA is not adding any personal protective equipment (PPE) requirements at this time, but any existing PPE label requirements must be retained.

The Worker Protection Standard (WPS) for Agricultural Pesticides (please see 40 CFR 156 and 170) established an interim restricted entry interval (REI) of 12 hours for glyphosate.  The Agency has decided to retain this REI as a prudent measure to mitigate risks to workers.  During the REI, workers may reenter areas treated with glyphosate only in the few, narrow exceptions allowed in the WPS.  The REI applies only to glyphosate uses within the scope of the WPS, so homeowner and commercial uses are not included.

### Human Risk Assessment

EPA's worst case risk assessment of glyphosate's many registered food uses concludes that human dietary exposure and risk are minimal. Existing and proposed tolerances have been reassessed, and no significant changes are needed to protect the public.

Exposure to workers and other applicators generally is not expected to pose undue risks, due to glyphosate's low acute toxicity.  However, splashes during mixing and loading of some products can cause injury, primarily eye and skin irritation.  EPA is continuing to recommend PPE, including protective eye wear, for workers using end-use products that are in Toxicity Categories I or II for eye and skin irritation.  To mitigate potential risks associated with reentering treated agricultural areas, EPA is retaining the 12 hour REI set by the WPS.

## Environmental Assessment

### Environmental Fate

Glyphosate adsorbs strongly to soil and is not expected to move vertically below the six inch soil layer; residues are expected to be immobile in soil.  Glyphosate is readily degraded by soil microbes to AMPA, which is degraded to carbon dioxide.  Glyphosate and AMPA are not likely to move to ground water due to their strong adsorptive characteristics.  However, glyphosate does have the potential to contaminate surface waters due to its aquatic use patterns and through erosion, as it adsorbs to soil particles suspended in runoff.  If glyphosate reached surface water, it would not be broken down readily by water or sunlight.

### Ecological Effects

Glyphosate is no more than slightly toxic to birds and is practically non-toxic to fish, aquatic invertebrates and honeybees.  Due to the presence of a toxic inert ingredient, some glyphosate end-use products must be labeled, "Toxic to fish," if they may be applied directly to aquatic environments.  Product labeling does not preclude off-target movement of

4

glyphosate by drift. EPA therefore is requiring three additional terrestrial plant studies to assess potential risks to nontarget plants.

EPA does not expect that most endangered terrestrial or aquatic organisms will be affected by the registered uses of glyphosate. However. many endangered plants as well as the Houston toad (due to its habitat) may be at risk. EPA is deferring any use modifications or labeling amendments until it has published the Endangered Species Protection Plan and has given registrants guidance regarding endangered species precautionary labeling.

### Ecological Effects Risk Assessment

Based on current data, EPA has determined that the effects of glyphosate on birds, mammals, fish and invertebrates are minimal. Under certain use conditions, glyphosate may cause adverse effects to nontarget aquatic plants. Additional data are needed to fully evaluate the effects of glyphosate on nontarget terrestrial plants. Risk reduction measures will be developed if needed, once the data from these studies are submitted and evaluated.

## Additional Data Required

EPA is requiring three generic studies (Tier II Vegetative Vigor, Droplet Size Spectrum, and Drift Field Evaluation) which are not part of the target data base and do not affect the reregistration eligibility of glyphosate. The Agency also is requiring product-specific data including product chemistry and acute toxicity studies, as well as revised Confidential Statements of Formula and revised labeling.

## Product Labeling Changes Required

All end-use glyphosate products must comply with EPA's current pesticide product labeling requirements. In addition:

● **Protection of Aquatic Organisms**

<u>Non-Aquatic Uses</u> - End-use products that are not registered for aquatic uses must bear the following label statement:

> *Do not apply directly to water, to areas where surface water is present or to intertidal areas below the mean high water mark. Do not contaminate water when disposing of equipment washwaters and rinsate.*

<u>Aquatic Uses</u> - End-use products registered for aquatic uses must bear the following label statement:

> *Do not contaminate water when disposing of equipment washwaters and rinsate. Treatment of aquatic weeds can result in oxygen loss from decomposition for dead plants. This loss can cause fish kills.*



- **Worker Protection Standard (WPS) Requirements**

    Any product whose labeling permits use in the production of an agricultural plant on any farm, forest, nursery or greenhouse must comply with the labeling requirements of:

    - PR Notice 93-7, "Labeling Revisions Required by the Worker Protection Standard (WPS)," and

    - PR Notice 93-11, "Supplemental Guidance for PR Notice 93-7."

Unless specifically directed in the RED, all statements required by these two PR Notices must appear on product labeling exactly as instructed in the Notices. Labels must be revised by April 21, 1994, for products distributed or sold by the primary registrant or supplementally registered distributors, and by October 23, 1995, for products distributed or sold by anyone.

- **Personal Protective Equipment (PPE)**

    No new PPE requirements must be added to glyphosate labels. However, any existing PPE requirements on labels must be retained.

- **Entry Restrictions**

    Products Not Primarily Intended for Home Use:

    ○ Uses Within the Scope of the WPS - A 12-hour restricted entry interval (REI) is required for all products with uses within the scope of the WPS, except products intended primarily for home use. The PPE for early entry should be that required for applicators of glyphosate, except any applicator requirement for an apron or respirator is waived. This REI and PPE should be inserted into the standardized statements required by PR Notice 93-7.

        - Sole Active Ingredient End-Use Products - Labels must be revised to adopt the entry restrictions set forth in this section. Any conflicting entry restrictions on current labeling must be removed.

        - Multiple Active Ingredient Products - Registrants must compare the entry restrictions set forth in this section to those on their current labeling and retain the more protective. A specific time period in hours or days is considered more protective than "until sprays have dried" or "dusts have settled."

    ○ Uses Not Within the Scope of the WPS - No new entry restrictions must be added. However, any entry restrictions on current product labeling with these uses must be retained.

    Products Primarily Intended for Home Use:

    ○ No new entry restrictions must be added. However, any entry restrictions on current product labeling must be retained.

6

**Regulatory
Conclusion**

The use of currently registered pesticide products containing the isopropylamine and sodium salts of glyphosate in accordance with the labeling specified in this RED will not pose unreasonable risks or adverse effects to humans or the environment. Therefore, all uses of these products are eligible for reregistration.

These glyphosate products will be reregistered once the required product-specific data, revised Confidential Statements of Formula and revised labeling are received and accepted by EPA.

Products which contain active ingredients in addition to glyphosate will not be reregistered until all their other active ingredients also are eligible for reregistration.

**For More
Information**

EPA is requesting public comments on the Reregistration Eligibility Decision (RED) document for glyphosate during a 60-day time period, as announced in a Notice of Availability published in the Federal Register. To obtain a copy of the RED document or to submit written comments, please contact the Pesticide Docket, Public Response and Program Resources Branch, Field Operations Division (7506C), Office of Pesticide Programs (OPP), US EPA, Washington, DC 20460, telephone 703-305-5805.

Following the comment period, the glyphosate RED document will be available from the National Technical Information Service (NTIS), 5285 Port Royal Road, Springfield, VA 22161, telephone 703-487-4650.

For more information about EPA's pesticide reregistration program, the glyphosate RED, or reregistration of individual products containing glyphosate, please contact the Special Review and Reregistration Division (7508W), OPP, US EPA, Washington, DC 20460, telephone 703-308-8000.

For information about the health effects of pesticides, or for assistance in recognizing and managing pesticide poisoning symptoms, please contact the National Pesticides Telecommunications Network (NPTN). Call toll-free 1-800-858-7378, between 8:00 am and 6:00 pm Central Time, Monday through Friday.

# REREGISTRATION ELIGIBILITY DECISION DOCUMENT

## GLYPHOSATE

**LIST A**
**CASE 0178**

**US Environmental Protection Agency**
**Office of Pesticide Programs**
**Special Review and Reregsitration Division**

# GLYPHOSATE REREGISTRATION ELIGIBILITY TEAM

**Office of Pesticide Programs:**

Special Review and Reregistration Division
*Eric Feris* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . Reregistration Branch

Health Effects Division
*Jane Smith* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . Chemical Coordination Branch
*Krystyna Locke* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . Toxicology Branch I
*Jeff Evans* . . . . . . . . . . . . . . . . . . . . . . . . . Occupational and Residential Exposure Branch
*Randolph Perfetti* . . . . . . . . . . . . . . . . . . . . . . . . Chemistry Branch - Reregistration Support

Biological and Economic Analysis Division
*James G. Saulmon* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . Biological Analysis Branch
*Eric Maurer* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . Economic Analysis Branch

Environmental Fate and Effects Division
*Candace Brassard* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . Ecological Effects Branch
*Kevin Poff* . . . . . . . . . . . . . . . . . . . . . . . . . . . . Environmental Fate and Groundwater Branch
*Bernice Slutsky* . . . . . . . . . . . . . . . . . . . . . . . . . . Science Analysis and Coordination Staff

Registration Division
*Mark Perry* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . Registration Support Branch
*Karen P. Hicks* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . Fungicide-Herbicide Branch

Policy and Special Projects Staff
*Jean Frane* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . Food Safety & Regulation Tracking Section

**Office of General Counsel:**

Pesticides and Toxic Substances Division
*Debra Burton* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . Pesticides Branch

**Office of Compliance Monitoring:**

Policy and Grants Division
*Beverly Updike* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . FIFRA Policy & Analysis Branch

# TABLE OF CONTENTS

**GLOSSARY OF TERMS AND ABBREVIATIONS** . . . . . . . . . . . . . . . . . . . . . . . . . vi

**EXECUTIVE SUMMARY** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . viii

**I.    INTRODUCTION** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

**II.   CASE OVERVIEW** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

    **A.   Chemical Overview** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

    **B.   Use Profile** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

    **C.   Estimated Usage of Pesticide** . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

    **D.   Data Requirements** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

    **E.   Regulatory History** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

**III.  SCIENCE ASSESSMENT** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

    **A.   Product Chemistry** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

    **B.   Human Health Assessment** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

        1.   Toxicology Assessment . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

            a.   Acute Toxicity . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

            b.   Subchronic Toxicity . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

            c.   Chronic Toxicity . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

            d.   Carcinogenicity . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

            e.   Developmental Toxicity . . . . . . . . . . . . . . . . . . . . . . . . . 15

f.      Reproductive Toxicity . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  16

g.      Mutagenicity . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  17

h.      Metabolism . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  17

i.      Neurotoxicity . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  18

j.      Other Toxicological Endpoints . . . . . . . . . . . . . . . . . . . . . . . . . . .  19

k.      Reference Dose . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  19

2.      Exposure Assessment . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  20

a.      Dietary Exposure . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  20

b.      Occupational and Residential . . . . . . . . . . . . . . . . . . . . . . . . . . . .  21

3.      Risk Assessment . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  23

a.      Dietary . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  23

b.      Occupational and Residential . . . . . . . . . . . . . . . . . . . . . . . . . . . .  24

c.      Dietary Exposure References . . . . . . . . . . . . . . . . . . . . . . . . . . . .  24

C.      **Environmental Assessment** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  30

1.      Environmental Fate . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  30

a.      Environmental Fate and Transport . . . . . . . . . . . . . . . . . . . . . . . .  30

b.      Environmental Fate and Groundwater Assessment . . . . . . . . . .  37

2.      Ecological Effects . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  37

a.      Ecological Hazard . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  37

b.      Ecological Effects Risk Assessment . . . . . . . . . . . . . . . . . . . . . . .  53

IV.   **RISK MANAGEMENT AND REREGISTRATION DECISION** . . . . . . . .  57

**A.**    **Determination of Eligibility** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 57

      1.    Eligibility Decision . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 57

      2.    Eligible and Ineligible Uses . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 58

**B.**    **Regulatory Position** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 58

      1.    Tolerance Re-assessment . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 58

      2.    Labeling Rationale . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 70

      3.    Endangered Species Statement . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 70

**V.**    **ACTIONS REQUIRED BY REGISTRANTS** . . . . . . . . . . . . . . . . . . . . . . . . . . . 70

**A.**    **Manufacturing-Use Products** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 70

      1.    Additional Generic Data Requirements . . . . . . . . . . . . . . . . . . . . . . . . . . 70

      2.    Labeling Requirements for Manufacturing-Use Products . . . . . . . . . . . 71

**B.**    **End-Use Products** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 71

      1.    Additional Product-Specific Data Requirements . . . . . . . . . . . . . . . . . . 71

      2.    Labeling Requirements for End-Use Products . . . . . . . . . . . . . . . . . . . . 72

          a.    Nonaquatic . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 72

          b.    Aquatic . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 72

**C.**    **Existing Stocks** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 74

**VI.**    **APPENDICES** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 74

**Appendix A -**    Use Patterns Subject to Reregistration

**Appendix B -**    Table of the Generic Data Requirements and Studies Used to Make the Reregistration Decision

**Appendix C** -    Citations Considered to be Part of the Data Base Supporting the Reregistration of Glyphosate

**Appendix D** -    List of Available Related Documents

**Appendix E** -    Pesticide Reregistration Handbook

**Appendix F** -    Generic and Product-Specific Data Call-In

- **!** Attachment 1 -    Chemical Status Sheet
- **!** Attachment 2 -    Generic Data Call-In and Product Specific Data Call-In Response Forms with Instructions
- **!** Attachment 3 -    Generic Data Call-In and Product Specific Data Call-In Requirements Status and Registrants' Response Forms with Instructions
- **!** Attachment 4 -    EPA Grouping of End Use Products for Meeting Acute Toxicology Data Requirements.
- **!** Attachment 5 -    EPA Acceptance Criteria
- **!** Attachment 6 -    List of all Registrant(s) sent this Data Call-In
- **!** Attachment 7 -    Cost Share/Data Compensation Forms

# GLOSSARY OF TERMS AND ABBREVIATIONS

a.i.        Active Ingredient

CAS         Chemical Abstracts Service

CFR         Code of Federal Regulations

CSF         Confidential Statement of Formula

EEC         Estimated Environmental Concentration.  The estimated pesticide concentration in an environment, such as a terrestrial ecosystem.

EP          End-Use Product

EPA         U.S. Environmental Protection Agency

FIFRA       Federal Insecticide, Fungicide, and Rodenticide Act

FFDCA       Federal Food, Drug, and Cosmetic Act

FR          Federal Register

HDT         Highest Dose Tested

$LC_{50}$        Median Lethal Concentration.  A statistically derived concentration of a substance that can be expected to cause death in 50% of test animals.  It is usually expressed as the weight of substance per weight or volume of water or feed, e.g., mg/l or ppm.

$LD_{50}$        Median Lethal Dose.  A statistically derived single dose that can be expected to cause death in 50% of the test animals when administered by the route indicated (oral or  dermal).  It is expressed as a weight of substance per unit weight of animal, e.g., mg/kg.

$LD_{lo}$        Lethal Dose-low.  Lowest Dose at which lethality occurs

LEL         Lowest Effect Level

| MATC | Maximum Allowable Toxicant Concentration:  A range at which the pesticide causes no effect (NOEL) and the lowest dose at which an effect was observed (LOEL). |
|---|---|
| MP | Manufacturing-Use Product |
| MPI | Maximum Permissible Intake |
| MRID | Master Record Identification (number).  EPA's system of recording and tracking studies submitted. |
| N/A | Not Applicable |
| NPDES | National Pollutant Discharge Elimination System |
| NOEL | No Observed Effect Level |
| OPP | Office of Pesticide Programs |
| PADI | Provisional Acceptable Daily Intake |
| ppm | Parts Per Million |
| REI | Restricted Entry Interval |
| RfD | Reference Dose |
| RS | Registration Standard |
| TD | Toxic Dose. The dose at which a substance produces a toxic effect. |
| TC | Toxic Concentration. The dose at which a substance produces a toxic effect. |
| TMRC | Theoretical Maximum Residue Contribution. |
| WPS | Worker Protection Standard |

## EXECUTIVE SUMMARY

This document addresses the reregistration eligibility of the pesticide glyphosate. There are 63 glyphosate-containing products registered for use in the United States.  The isopropylamine salt of glyphosate, the active ingredient in 53 of these registrations, is used as a herbicide to control a number of broadleaf weeds and grasses.  The principal food use sites include corn, wheat, sorghum, citrus and stone fruits, potatoes and onions, asparagus, coffee, peanuts, and pineapples.  There are also a number of non-food use sites including ornamental, turf, forestry, and industrial rights-of-way.  Two registrations contain the sodium salt of glyphosate and are used in sugarcane-fields.  In addition there are seven herbicide/plant regulation products containing the monoammonium salt of glyphosate which were registered subsequent to the development of List A and are not a subject of this RED. Except where explicitly noted otherwise, the term "glyphosate," when used in this document, refers to either the technical acid or the isoproplyamine and sodium salts of glyphosate. However, the monoammonium salt is included in the tolerance expression.  Available data have been sufficient to allow re-assessment of existing tolerances, which includes the monoammonium salt of glyphosate.

In June 1986, the Agency issued the document "Registration Standard for Pesticide Products Containing Glyphosate as the Active Ingredient" (NTIS #PB87-103214).  The Registration Standard required scientific studies in the areas of phytotoxicity, environmental fate, toxicology, product chemistry, and residue chemistry.  With the exception of a few waived studies, all of the data required have been submitted.  After completing its review for reregistration, the Agency now concludes that the data base on glyphosate is substantially complete.

Based on the results of its reregistration review, EPA has concluded that all registered uses of glyphosate are eligible for reregistration.  The Agency has classified glyphosate as a Group E carcinogen (signifies evidence of non-carcinogenicity in humans).  A Reference Dose of 2 mg/kg/day has been recommended.  This proposal is based on a maternal NOEL of 175 mg/kg/day from a rabbit developmental toxicity study and an uncertainty factor of 100. The dietary risk assessment is based on a worst-case scenario, assuming treatment of 100% of acreage and highest legal residue values which likely result in an overestimation of exposure and risk.  Even with these values, however, dietary exposure is expected to be minimal.  There are 85 tolerances established for various crops and crop groups as well as Federal Food, Drug, and Cosmetic Act §409 tolerances for processed food and animal feed and animal tolerances.  A re-assessment of tolerances is included in this document and there are no major changes in the previously-established tolerances.  Studies show that glyphosate is no more than slightly toxic to birds and is practically non-toxic to fish and honeybees. However, a toxic inert in glyphosate end use products necessitates the labelling of some

products "toxic to fish" since some glyphosate products are applied directly to aquatic environments.

The Agency does have concerns regarding the potential hazard to endangered plant species and the Houston toad.  However, the Agency is not requiring any modification of use or label changes in this document.  A Federal Register Notice on the Endangered Species Protection Plan and subsequent guidance to registrants will impose appropriate exposure mitigation measures for areas where endangered plant species and the Houston toad may be encountered.  In addition, there have been a number of reported incidents of spray drift damage to non-target crops.  Spray drift studies are required as is a Tier II Vegetative Vigor study.  These studies are not part of the target data base for reregistration of glyphosate.

Before reregistering each product, the Agency is requiring that product specific data in the areas of product chemistry and acute toxicology, revised Confidential Statements of Formula, and revised labeling be submitted within eight (8) months of the issuance of this document.  In an effort to reduce the time, resources, and number of animals needed to fulfill the acute toxicology data requirements for glyphosate-containing end use products, the Agency has "batched" products considered to be similar with respect to acute toxicity testing requirements.  After reviewing these data and the revised labels, the Agency will determine whether to re-register a product based on whether or not that product meets the requirements in Section 3(c)(5) of FIFRA.  End use products containing glyphosate in combination with other active ingredients will not be re-registered until the Reregistration Eligibility Decisions for all active ingredients contained in that product are issued and all the active ingredients contained in the product are also eligible for reregistration.  However, product specific data for these products are being called in at this time.

# I.   INTRODUCTION

In 1988, the Federal Insecticide, Fungicide, and Rodenticide Act (FIFRA) was amended to accelerate the reregistration of products with active ingredients registered prior to November 1, 1984.  The amended Act provides a schedule for the reregistration process to be completed in nine years.  There are five phases to the reregistration process. The first four phases of the process focus on identification of data requirements to support the reregistration of an active ingredient and the generation and submission of data to fulfill the requirements.  The fifth phase is a review by the U.S. Environmental Protection Agency (referred to as "the Agency") of all data submitted to support reregistration.

FIFRA Section 4(g)(2)(A) states that in Phase 5 "the Administrator shall determine whether pesticides containing such active ingredient are eligible for registration" before calling in data on products and either re-registering products or taking "other appropriate regulatory action."  Thus, reregistration involves a thorough review of the scientific data base underlying a pesticide's registration.  The purpose of the Agency's review is to reassess the potential hazards arising from the currently registered uses of the pesticide; to determine the need for additional data on health and environmental effects; and to determine whether the pesticide meets the "no unreasonable adverse effects" criterion of FIFRA.

This document presents the Agency's decision regarding the reregistration eligibility of the registered uses of the isopropylamine salt and the sodium salt formulations of glyphosate.  Except where explicitly noted otherwise, the term "glyphosate," when used in this document, refers to either the technical acid or the isoproplyamine and sodium salts of glyphosate but does not cover the monoammonium salt products since the compound was not included in the Federal Register publication of List A.  The document consists of six sections.  Section I is the introduction.  Section II describes glyphosate, its uses, data requirements and regulatory history.   Section III discusses the human health and environmental assessment based on the data available to the Agency.   Section IV presents the reregistration decision for glyphosate.  Section V discusses the reregistration requirements for glyphosate.  Finally, Section VI is the Appendices which support this Reregistration Eligibility Document.  Additional details concerning the Agency's review of applicable data are available on request.[1]

---

[1] EPA's reviews of data on the set of registered uses considered for EPA's analysis may be obtained from the OPP P Field Operations Division (H7506C), Office of Pesticide Programs, EPA, Washington, DC 20460.

## II.    CASE OVERVIEW

### A.    Chemical Overview

The following active ingredient(s) are covered by this Reregistration Eligibility Document:

Common Name:            glyphosate

Chemical Name:          N-phosphonomethyl glycine

CAS Registry Number:    38641-94-0

OPP Chemical Codes:     103601 (isopropylamine salt)
                        103603 (sodium salt)

Empirical Formula:      $C_3H_8NO_5P$

Trade Names:            Roundup, Rodeo, Shackle

Basic Manufacturer: Monsanto Company
                        800 N. Lindbergh Blvd.
                        St. Louis, MO  63167

### B.    Use Profile

The following is information on the current registered uses with an overview of use sites and application methods.  A detailed table of the uses of glyphosate is  given in Appendix A.

Chemical:               glyphosate, isopropylamine salt (103601)

Type of Chemical:       herbicide

Mechanism of Action:    not known at this time, but it appears to inhibit the aromatic amino acid biosynthesis pathway and may inhibit or repress chlorismate mutase and/or prephenate hydratase.

2

Use groups and sites:

AQUATIC FOOD CROP:
agricultural drainage systems, irrigation systems, lakes/ponds/reservoirs (with human or wildlife use), streams/rivers/channeled water.

AQUATIC NON-FOOD INDUSTRIAL:
aquatic areas/water, drainage systems, sewage systems.

AQUATIC NON-FOOD OUTDOOR:
aquatic areas/water

FORESTRY:
conifer release, forest plantings (reforestation programs), forest trees (all or unspecified).

GREENHOUSE FOOD CROP:
greenhouses-in use.

INDOOR NON-FOOD:
greenhouse-empty.

OUTDOOR RESIDENTIAL:
household/domestic dwellings outdoor premises.

TERRESTIAL FEED CROP:
alfalfa, barley, beans, buckwheat, corn, grass forage/fodder/hay, lentils, millet (proso), nongrass forage/fodder/straw/hay, oats, pastures, rye, sorghum, wheat.

TERRESTRIAL FOOD CROP:
acerola (West Indies Cherry), apricot, artichoke (Jerusalem), asparagus, atemoya, avocado, banana, beech nut, beets, blackberry, blueberry, boysenberry, brazil nut, breadfruit (breadnut), broccoli, brussels sprouts, butternut, cabbage, cabbage (Chinese), carambola (jalea), carrot (including tops), cashew, cauliflower, celery, chard (swiss), cherimoya, cherry, chestnut, chicory, cocoa, coffee, collards, cranberry, cress (water), cucumber, currant, date, dewberry, eggfruit tree (canistel), eggplant, elderberry, endive (escarole), fig, filbert (hazelnut), garlic, gooseberry, gourds, groundcherry (strawberry tomato/tomatillo), guava, hickory nut, horseradish, huckleberry, jaboticaba, jackfruit, kale, kitembilla (ceylon gooseberry), kiwi fruit, kohlrabi, leek, lettuce, litchi nut, loganberry, longan, loquat, macadamia nut

3

(bushnut), mamey (mammee apple), mango, marmaladebox (genipapo), mayhaw (hawthorn), melons, melons (cantaloupe), melons (honeydew), melons (mango), melons (musk), melons (water), melons winter (casaba/crenshaw/honeydew/persian),  mustard, nectarine, okra, olive, onion, papaya, parsley, passion fruit, peach, pear, pecan, pepper, persimmon, pistachio, plantain, plum, pomegranate, prune, pumpkin, quince, radish, raspberry (black, red), rhubarb, rutabaga, sapodilla, sapota (white), soursop, spinach, squash (summer), squash (winter), sugar apple (custard apple), sweet potato, tamarind, taro, tea, walnut (English/black), yam.

TERRESTRIAL FOOD + FEED CROP:
agricultural fallow/idleland, almond, apple, barley, beans, beets (unspecified), buckwheat, calamondin, citron (citrus), citrus hybrids other than tangelo, corn (unspecified), corn (field), cotton (unspecified), grapefruit, grapes, kumquat, lemon, lentils, lime, millet proso (broomcorn), mustard, oats, orange, parsnip, peanuts (unspecified), peas (unspecified), pineapple, potato (white/irish), pummelo (shaddock), rape, rice, rice (wild), rye, sorghum, soybeans (unspecified), sugar beet, sugarcane, tangelo, tangerines, tomato, triticale, turnip, wheat.

TERRESTRIAL + GREENHOUSE NON-FOOD CROP:
ornamental and/or shade trees, ornamental woody shrubs and vines.

TERRESTRIAL NON-FOOD CROP:
agricultural fallow/idleland, agricultural rights-of-way/fencerows/hedgerows, agricultural uncultivated areas, airports/landing fields, christmas tree plantations, golf course turf, industrial areas (outdoor), nonagricultural outdoor buildings/structures, nonagricultural rights-of-way/fencerows/hedgerows, nonagricultural uncultivated areas/soils, ornamental and/or shade trees, ornamental lawns and turf, ornamental woody shubs and vines, paths/patios, paved areas (private roads/sidewalks), recreational areas, urban areas.

TERRESTRIAL NON-FOOD+OUTDOOR RESIDENTIAL:
ornamental and/or shade trees, ornamental herbaceous plants, ornamental lawns and turf, ornamental woody shubs and vines.

Pests:                              many broadleaf and grass weeds

Formulation types registered:

SINGLE ACTIVE INGREDIENT:
Form Not Identified/Liquid
        53.50 % glyphosate, isopropylamine salt
        41.00 % glyphosate, isopropylamine salt
Form Not Identified/Solid
        76.00 % glyphosate, isopropylamine salt
Liquid-Ready to Use
        19.70 % glyphosate, isopropylamine salt
        18.30 % glyphosate, isopropylamine salt
        15.80 % glyphosate, isopropylamine salt
         1.00 % glyphosate, isopropylamine salt
         0.96 % glyphosate, isopropylamine salt
         0.50 % glyphosate, isopropylamine salt
Manufacturing Use
        94.00 % glyphosate, isopropylamine salt
Pelleted/Tableted
        83.50 % glyphosate, isopropylamine salt
        60.00 % glyphosate, isopropylamine salt
Pressurized Liquid
         0.96 % glyphosate, isopropylamine salt
         0.75 % glyphosate, isopropylamine salt
Soluble Concentrate/Liquid
        62.00 % glyphosate, isopropylamine salt
        53.80 % glyphosate, isopropylamine salt
        41.50 % glyphosate, isopropylamine salt
        41.00 % glyphosate, isopropylamine salt
        28.60 % glyphosate, isopropylamine salt
        25.10 % glyphosate, isopropylamine salt
        18.00 % glyphosate, isopropylamine salt
        10.00 % glyphosate, isopropylamine salt
         8.20 % glyphosate, isopropylamine salt
         7.00 % glyphosate, isopropylamine salt
         5.00 % glyphosate, isopropylamine salt
Soluble Concentrate/Solid
        93.96 % glyphosate, isopropylamine salt

MULTIPLE ACTIVE INGREDIENT:
Liquid-Ready to Use
     12.40 % glyphosate, isopropylamine salt + 1 other A.I.
     7.70 % glyphosate, isopropylamine salt + 1 other A.I.
     0.50 % glyphosate, isopropylamine salt + 1 other A.I.
     0.25 % glyphosate, isopropylamine salt + 1 other A.I.
Soluble Concentrate/Liquid
     16.50 % glyphosate, isopropylamine salt + 1 other A.I.
     14.80 % glyphosate, isopropylamine salt + 1 other A.I.
     13.30 % glyphosate, isopropylamine salt + 1 other A.I.
     12.90 % glyphosate, isopropylamine salt + 1 other A.I.

Methods and rates of application (Given in maximum active (acid equivalent (ae)) rates, except as otherwise noted):

Broadcast or spray; for example as needed:

Form Not Identified/Liquid - rates were not specified in Appendix A dated 8/12/93;

Form Not Identified/Solid - rates were not specified in Appendix A dated 8/12/93;

Liquid-Ready to Use - applied at rate of 3.08 lb ae/A;

Pelleted/Tableted - applied as a spot treatment, for example from a hand held sprayer;

Pressurized Liquid - applied as a spot treatment, for example from an aerosol can;

Soluble Concentrate/Liquid - applied at rate of 7.5 lb ae/A;

Soluble Concentrate/Solid - applied at rates of 0.09 gal ae/A;

Chemical:                  glyphosate, sodium salt (103603)

Type of Chemical:        plant regulator

Mechanism of Action:     modifies plant growth; hastens fruit ripening

Use Groups and Sites:

TERRESTRIAL FOOD + FEED CROP:
peanuts (unspecified); sugarcane

Formulation Types Registered:

SINGLE ACTIVE INGREDIENT:
soluble concentrate/solid
        75.0% glyphosate, sodium salt

Methods and Rates of Application:

soluble concentrate/solid - applied as ground spray at peanut bloom stage at 0.0375 lb a.i./A in 10 gal water;

soluble concentrate/solid - applied as aerial spray at sugarcane ratoon stage at 0.525 lb a.i./A in 5 gal water.

Use Limitations:
sugarcane - 21 days preharvest interval; peanuts - 84 days preharvest interval. Do not apply this product through any type of irrigation system.

## C.    Estimated Usage of Pesticide

This section summarizes the best estimates available for the pesticide uses of glyphosate. These estimates are derived from a variety of published and proprietary sources available to the Agency. The data, reported on an aggregate and site (crop) basis, reflect annual fluctuations in use patterns as well as the variability in using data from various information sources.

The table below summarizes glyphosate useage by site.

| Glyphosate Usage | | |
|---|---|---|
| **Site** | **Multiple Acres Treated (x1000)** | **Pounds AI (x1000)** |
| non-ag areas | unknown | 3000-7000 |
| almonds | 350-390 | 500-550 |

7

| | | |
|---|---|---|
| apples | 75-275 | 65-200 |
| barley | 550-600 | 275-325 |
| cherries | 15-95 | 20-125 |
| corn, field | 1,300-1,700 | 1,100-1,200 |
| cotton | 300-1,000 | 225-375 |
| hay/pasture | 3,000-3,500 | 1,500-1,700 |
| dry edible beans/peas | 50 | 20 |
| grapefruit | 70-140 | 183-375 |
| grapes | 45-550 | 25-265 |
| lemons | 5-75 | 10-70 |
| other ag sites | 3,000-3,500 | 1,000-1,500 |
| oranges | 300-600 | 650-1,300 |
| peaches | 10-150 | 10-110 |
| peanuts | 10-30 | 5-10 |
| pears | 15-50 | 15-65 |
| pecans | 5-300 | 5-150 |
| plums/prunes | 5-80 | 5-40 |
| rice | 30-55 | 25-30 |
| sorghum | 450-550 | 100-150 |
| soybeans | 2,600-4,800 | 2,200-2,400 |
| spring wheat | 200-225 | 50-60 |
| sugarcane | 10-70 | 5-35 |
| potatoes | 20-40 | 25-30 |
| sunflowers | 60-70 | 25-40 |
| sweet corn | 10-30 | 5-15 |
| tomatoes | 30-40 | 15-30 |
| green beans/peas | 20-40 | 5-20 |
| walnuts | 150-175 | 100-125 |
| winter wheat | 350-1,150 | 250-450 |

| TOTAL | 12,985-20,280 | 11,398-18,745 |
|---|---|---|

In a typical year between 1989 and 1991, approximately 13-20 million acre treatments were made with 18.7 million pounds active ingredient. Hay/pasture (20%), soybeans (20%), field corn (9%), and other agricultural areas (20%) comprise 71% of the total acreage treated with glyphosate. Non-agricultural areas (33%), soybeans (15%), hay/pasture (11%), and corn (8%) comprise 67% of the total pounds of active ingredient applied.

**D.    Data Requirements**

Data required in the June 1986 Registration Standard for glyphosate include studies on product chemistry, ecological effects, environmental fate, toxicology, and residue chemistry. These data were required to support the uses listed in the Registration Standard. Appendix B includes all data requirements identified by the Agency for currently registered uses needed to support reregistration.

**E.    Regulatory History**

Glyphosate is registered in the United States for use as a herbicide. The June 1986 Registration Standard evaluated the studies currently on file at the Agency and required submission of further data. This Reregistration Eligibility Document reflects an assessment of all data which were submitted in response to the Registration Standard.

# III.   SCIENCE ASSESSMENT

**A.    Product Chemistry**



MOLECULAR STRUCTURE OF GLYPHOSATE

9

Empirical Formula:   $C_3H_8NO_5P$
Molecular Weight:   169.07
CAS Registry No.:   38641-94-0
Shaughnessy No.:   103601 (isopropylamine salt, IPA)
                             103603 (sodium salt)

The glyphosate (N-phosphonomethyl glycine) salts are nonselective herbicides and plant growth regulators.  The technical isopropylamine salt (IPA) is a white crystalline solid with a melting point of 200EC and a bulk density of 1.74 lb/ft³.  It is 1% soluble in water at 25EC and insoluble in ethanol, acetone, or benzene.  The technical sodium salt is a white crystalline solid which decomposes at 140EC with a bulk density of 30 lb/ft³.

## B.   Human Health Assessment

1.   Toxicology Assessment

The toxicological data base on glyphosate is adequate and will support reregistration eligibility.

a.   Acute Toxicity

The table below summarizes the toxicity results and categories for technical grade glyphosate.  The acute inhalation study was waived by the Agency since glyphosate technical is a nonvolatile solid and adequate inhalation studies were conducted on the end-use product formulations.

| Acute Toxicity | | |
|---|---|---|
| **Test** | **Result** | **Category** |
| Acute Oral (rat) (1) | > 4320 mg/kg | III |
| Acute Dermal (rabbit)(1) | > 2 g/kg | III |
| Acute Inhalation (1) | Not Required | N/A |
| 1 - MRID 00067039 | | |

The following table is derived from MPs considered toxicologically similar to glyphosate technical.

10

| Acute Toxicity | | |
|---|---|---|
| **Test** | **Result** | **Category** |
| Eye Irritation (1) | mild irritation, clears in 7 days | III |
| Dermal Irritation (2) | slight irritation | IV |
| Skin Sensitization (3) | negative | N/A |
| 1 - MRID 41400603<br>2 - MRID 41400604<br>3 - MRIDs 00137137, 00137138, 00137139, 00137140 | | |

Other studies submitted to the Agency give similar results. They are acceptable for reregistration (MRIDs 41400601, and 41400602)

b.      Subchronic Toxicity

In a 90-day feeding study Sprague-Dawley rats were fed diets containing 0, 1000, 5000 or 20000 ppm of glyphosate for three months.  These doses were equivalent to 0, 63, 317 and 1267 mg/kg/day, respectively (males) and 0, 84, 404 and 1623 mg/kg/day, respectively (females).   The following findings were regarded as possibly treatment-related:  (1) increased serum phosphorus and potassium in all treated groups, males and females;  (2) increased serum glucose in the mid-dose and high-dose males;  (3) increased blood urea nitrogen (BUN) and serum alkaline phosphatase in the high-dose males;  and (4) occurrence of pancreatic lesions in the high-dose males (pancreas was not examined in the low-dose and mid-dose groups).  Based on these findings, the systemic NOEL is < 1000 ppm (not determined definitively) for both sexes.  (MRIDs 40559401, and 00093879)

In a second 90-day feeding study CD-1 mice were fed diets containing 0, 250, 500 or 2500 mg/kg/day of glyphosate for three months.  Body weight gains of the high-dose males and females were about 24% and 18% lower, respectively, than those of the controls.  Body weight gains of the low-dose and mid-dose groups were comparable to those of the controls.  Based on the reduced

body weight gains in both sexes, the NOEL for systemic toxicity is 500 mg/kg and the LOEL is 2500 mg/kg.  (MRID 00036803)

In a 21-day dermal study glyphosate was applied to the skin of New Zealand white rabbits using 10 rabbits/sex/dose (5 with intact and 5 with abraded skin).  The levels of glyphosate tested were 10, 1000 or 5000 mg/kg/day.  The rabbits were exposed for three consecutive weeks, 6 hours/day, 5 days/week.  Treatment-related effects observed only in the high dose groups included:  (1) very slight erythema and edema in intact and abraded skin of both sexes; (2) decreased food consumption in males;  and (3) decreased serum lactic dehydrogenase in both sexes.  Based on these effects, the NOEL for males and females is 1000 mg/kg/day and the LOEL is 5000 mg/kg/day.  (MRID 00098460)

The required 90-day feeding study in dogs is satisfied by the one-year dog feeding study.  (MRID 00153374)

c.    Chronic Toxicity

A chronic feeding/carcinogenicity study was conducted using male and female Sprague-Dawley rats which were fed diets containing 0, 30, 100 or 300 ppm of glyphosate for 26 months. These levels were equivalent to 0, 3, 10 and 31 mg of glyphosate/kg/day, respectively, for the males and 0, 3, 11 and 34 mg of glyphosate/kg/day, respectively, for the females.  There were no effects based on any of the parameters examined (toxic signs, mortality, body weights, food consumption, hematology, clinical chemistry, urinalysis, organ weights and organ/tissue pathology). Therefore, the NOEL for systemic toxicity is $ 300 ppm (HDT; males: 31 mg/kg/day and females: 34 mg/kg/day).  (MRID 00093879)

A second chronic feeding/carcinogenicity study was conducted using male and female Sprague-Dawley rats which were fed diets containing 0, 2000, 8000 or 20000 ppm of glyphosate for 2 years.  These levels were equivalent to 0, 89, 362 or 940 mg/kg/day, respectively, for the males and 0, 113, 457 or 1183 mg/kg/day, respectively, for the females.  Treatment-related effects observed only in the high-dose group included: (1) In the females: decreased body weight gains; and (2) In the males:  increased incidence of cataracts and lens abnormalities, decreased urinary

pH, increased absolute liver weight and increased liver weight/brain weight ratio (relative liver weight).  No significant systemic effects were observed in the low-dose and mid-dose male and female groups.  Therefore, the NOEL for systemic toxicity is 8000 ppm (males: 362 mg/kg/day and females: 457 mg/kg/day) and the LOEL is 20000 ppm (HDT; males: 940 mg/kg/day and females: 1183 mg/kg/day).  (MRID 41643801)

A chronic study was conducted using male and female beagle dogs which were given glyphosate in gelatin capsules containing 0, 20, 100 or 500 mg/kg/day for one year.  There were no effects based on all parameters examined, in all groups.  Therefore, the NOEL for systemic toxicity is $ 500 mg/kg/day, for both sexes.  (MRID 00153374)

d.      Carcinogenicity

A chronic feeding/carcinogenicity study was conducted using Sprague-Dawley rats which were fed diets containing glyphosate (males: 0, 3, 10 or 31 mg/kg/day and females: 0, 3, 11 or 34 mg/kg/day) for 26 months.  The following findings were observed in the high-dose groups when compared with the concurrent controls: (1) increased incidence of thyroid C-cell carcinomas in females; and (2) increased incidence of interstitial cell (Leydig cell) testicular tumors.  However, the Agency concluded that these neoplasms were not treatment-related and glyphosate was not considered to be carcinogenic in this study because the incidence of thyroid carcinomas was not statistically significant and the incidence of testicular tumors was within the historical incidence.  The Agency also concluded that this study was not conducted at high enough dose levels for an adequate negative carcinogenicity.  (MRID 00093879)

A chronic feeding/carcinogenicity study was conducted using Sprague-Dawley rats fed diets containing glyphosate (males: 0, 89, 362 or 940 mg/kg/day and females: 0, 113, 457 or 1183 mg/kg/day) for 2 years.  The study showed a slightly increased incidence of (1) pancreatic islet cells adenomas in the low-dose and high-dose males; (2) hepatocellular (liver) adenomas in the low-dose and high-dose males; and (3) thyroid C-cells adenomas in the mid-dose and high-dose males and females.  The Agency concluded that these

adenomas were not treatment-related and glyphosate was not considered to be carcinogenic in this study. With respect to pancreatic islet cells adenomas, there was no statistically significant positive dose-related trend in their occurrence; there was no progression to carcinomas; and the incidence of pancreatic hyperplasia (non-neoplastic lesion) was not dose-related. With respect to hepatocellular adenomas, the increased incidence of these neoplasms was not statistically significant in comparison with the controls; the incidence was within the historical control range; there was no progression to carcinomas; and the incidence of hyperplasia was not compound-related. With respect to thyroid C-cell adenomas, there was no statistically significant dose-related trend in their occurrence; the increased incidence was not statistically significant; there was no progression to carcinomas; and there was no significant dose-related increase in severity or incidence of hyperplasia in either sex. (MRID 41643801)

A carcinogenicity study in mice was conducted with CD-1 mice fed diets containing 0, 150, 750 or 4500 mg/kg/day of glyphosate for 18 months. No effects were observed in the low-dose and mid-dose groups. The following findings were observed in the high-dose group: (1) decreased body weight gain in males and females; (2) increased incidence of hepatocellular hypertrophy, hepatocellular necrosis and interstitial nephritis in males; (3) increased incidence of proximal tubule epithelial basophilia and hypertrophy in females; and (4) slightly increased incidence of renal tubular adenomas, a rare tumor, in males. Based on these effects, the systemic NOEL and LOEL were 750 mg/kg/day and 4500 mg/kg/day, respectively. The Agency concluded that the occurrence of these adenomas was spontaneous rather than compound-induced because the incidence of renal tubular adenomas in males was not statistically significant when compared with the concurrent controls. An independent group of pathologists and biometricians also conducted extensive evaluations of these adenomas and reached the same conclusion. Therefore, glyphosate was not considered to be carcinogenic in this study. (MRIDs 00130406, and 00150564)

On June 26, 1991, the Agency classified glyphosate in Group E (evidence of non-carcinogenicity for humans), based on a lack of convincing evidence of carcinogenicity in adequate studies with two animal species, rat and mouse.

e.     Developmental Toxicity

A developmental toxicity study was conducted with pregnant Charles River COBS CD rats which were administered 0, 300, 1000 or 3500 mg/kg/day of glyphosate by gavage during gestation days 6 through 19.  Treatment-related effects observed only in the high-dose dams included:  (1) diarrhea; (2) decreased mean body weight gain; (3) breathing rattles; (4) inactivity; (5) red matter around the nose and mouth, and on forelimbs and dorsal head; (6) decreases in total implantations/dam and inviable fetuses/dam; and (7) deaths (6/25 or 24% of the group).  Treatment-related developmental effects observed only in the high-dose group included:  (1) increased number of litters and fetuses with unossified sternebrae; and (2) decreased mean fetal body weights.  Therefore, the NOEL and LOEL for maternal toxicity are 1000 mg/kg/day and 3500 mg/kg/day, respectively.  The NOEL and LOEL for developmental toxicity are 1000 mg/kg/day and 3500 mg/kg/day, respectively.  (MRID 00046362)

In a second study, pregnant Dutch Belted rabbits were administered 0, 75, 175 or 350 mg/kg/day of glyphosate by gavage during gestation days 6 through 27.  Treatment-related findings were observed only in the high-dose group and included: (1) diarrhea; (2) nasal discharge; and (3) death (10/16 or 62.5% of does died by gestation day 21).  Developmental toxicity was not observed at any dose tested.  Therefore, the NOEL and LOEL for maternal toxicity are 175 mg/kg/day and 350 mg/kg/day, respectively.  The NOEL for developmental toxicity is $ 175 mg/kg/day.  Due to high maternal mortality at the 350 mg/kg/day dose level, too few litters (only 6) were available to assess adequately developmental toxicity at that level.  (MRID 00046363)

f.     Reproductive Toxicity

A reproduction study was conducted with male and female Sprague-Dawley rats which were administered 0, 3, 10 or 30 mg/kg/day of glyphosate continuously in the diet for three successive generations.  The only effect observed was an increased incidence of focal tubular dilation of the kidney (both unilateral and bilateral combined) in the high-dose male $F_{3b}$ pups. Therefore, the NOEL for systemic and reproductive toxicity is $ 30 mg/kg/day (HDT).  The

NOEL and LOEL for developmental toxicity are 10 mg/kg/day and 30 mg/kg/day, respectively.  (MRID 00105995)

Another reproduction study was conducted with Sprague-Dawley rats which were administered 0, 100, 500 or 1500 mg/kg/day of glyphosate continuously in the diet for two successive generations.  Treatment-related effects observed only in the high-dose group included:  (1) soft stools, very frequent, in the $F_o$ and $F_1$ males and females; (2) decreased food consumption and body weight gain of the $F_o$ and $F_1$ males and females during the growth (premating) period; and (3) decreased body weight gain of the $F_{1a}$, $F_{2a}$ and $F_{2b}$ male and female pups during the second and third weeks of lactation.  Focal tubular dilation of the kidneys, observed in the previous study (00105995), was not observed at any dose level in this study.  Based on the above findings, the systemic NOEL and LOEL are 10000 ppm (500 mg/kg/day) and 30000 ppm (1500 mg/kg/day), respectively.  The reproductive NOEL is 30000 ppm (1500 mg/kg/day; HDT); and the developmental NOEL and LOEL are 10000 ppm (500 mg/kg/day) and 30000 ppm (1500 mg/kg/day), respectively.  (MRID 41621501)

Since the focal tubular dilation of the kidneys was not observed at the 1500 mg/kg/day level (HDT) in the 2-generation rat reproduction study but was observed at the 30 mg/kg/day level (HDT) in the 3-generation rat reproduction study (00105995), the Agency concluded that the latter was a spurious rather than glyphosate-related effect.

g.      Mutagenicity

A Gene mutation assay in an Ames Test was conducted using glyphosate, both with and without metabolic activation. The strains of *Salmonella typhimurium* used were TA98, TA100, TA1535 and TA1537.  No increases in reverse mutations were observed at any concentration.  (MRID 00078620)

A gene mutation assay in mammalian cells was conducted using glyphosate in the Chinese hamster ovary (CHO) cells/hypoxanthine - guanine -phosphoribosyl transferase (HGPRT) assay, with and without metabolic activation.  No mutagenic response was observed either with or without metabolic activation up to the limit of cytotoxicity (10 mg/Ml).  (MRID 00132681)

A Structural Chromosomal Aberration Assay was conducted using a single dose of glyphosate administered intraperitoneally (i.p.) to male and female Sprague-Dawley rats.  The dose used was 1 g/kg of body weight and the bone marrow cells were examined for clastogenic (chromosome-damaging) effect.  No significant clastogenic effects were observed.  (MRID 00132683)

In a fourth study, glyphosate was tested in two assays:  the rec-assay using *B. subtilis* H17 (rec⁺) and M45 (rec⁻); and the reverse mutation assays using *E. coli* WP2 hcr and *Salmonella typhimurium* strains TA98, TA100, TA1535, TA1537 and TA1538, with and without metabolic activation.  No increases in mutations were observed in either study.  (MRID 00078619)

h.      Metabolism

Two metabolism studies with rats are available.  In the first study, single or repeated doses of radiolabeled $^{14}$C-glyphosate were administered orally to male and female Sprague-Dawley rats. Following a single oral dose of $^{14}$C-glyphosate, 30 to 36% of the dose was absorbed and less than 0.27% of the dose was eliminated as $CO_2$. Ninety-seven point five percent of the administered dose was excreted in the urine and feces as the parent compound, glyphosate.  Amino methyl phosphonic acid (AMPA) was the only metabolite found in urine (0.2-0.3% of the administered dose) and feces (0.2-0.4% of the administered dose).  Less than 1.0% of the

absorbed dose remained in tissues and organs, primarily in bone tissue.  Repeated dosing at 10 mg/kg did not significantly change the metabolism, distribution or excretion of glyphosate.  (MRIDs 40767101, and 40767102)

In a second study, male and female Sprague-Dawley rats received single intraperitoneal injections of radiolabeled $^{14}$C-glyphosate.  The dose level of glyphosate used for male and female rats was 1150 mg/kg.  Blood samples were collected 0.25, 0.50, 1, 2, 4, 6 and 10 hours after injection.  Femoral bone marrow samples were collected from one third of the male and female rats sacrificed at 0.5, 4, or 10 hours after injection.  Thirty minutes after injection of glyphosate, the concentration of radioactivity in the bone marrow of male and female rats was equivalent to 0.0044% and 0.0072%, respectively, of the administered dose.   Assuming first order kinetics, the decrease in radioactivity in bone marrow occurred with a half-life of 7.6 and 4.2 hours for males and females, respectively.  Similarly, the half-lives of the radioactivity in plasma were approximately 1 hour for both sexes.  These findings indicate that very little glyphosate reaches bone marrow, that it is rapidly eliminated from bone marrow and that it is even more rapidly eliminated from plasma.  (MRID 00132685)

i.      Neurotoxicity

The acute and 90-day neurotoxicity screening battery in the rat (guidelines 81-8-SS, 82-7) is not being required since there was no evidence of neurotoxicity seen in any of the existing studies at very high doses and this chemical lacks a leaving group;  therefore, it would not seem likely to inhibit esterases (the presumptive neurotoxic mechanism of concern for all organophosphates).

j.      Other Toxicological Endpoints

A dermal penetration study (guideline 85-2) with technical grade glyphosate is not being required because there are no toxicological endpoints to indicate this study is necessary.

Domestic Animal Safety Studies (86-1) are not being required for the use patterns of glyphosate (a plant growth regulator and herbicide).

Technical grade glyphosate contains N-nitrosoglyphosate (NNG) as a contaminant.  Carcinogenicity testing of nitroso contaminants is normally required only in those cases in which the level of nitroso compounds exceeds 1.0 ppm.  Analyses showed that greater than 92% of the individual technical glyphosate samples contained less than 1.0 ppm NNG.  The Agency concluded that the NNG content of glyphosate was not toxicologically significant.

k.      Reference Dose

On August 27, 1992, the Agency's Office of Pesticide Programs Reference Dose (RfD) Peer Review Committee recommended that the RfD for glyphosate be established at 2 mg/kg/day.  This value was based on the maternal NOEL of 175 mg/kg/day from the rabbit developmental toxicity study (00046363) and an uncertainty factor (UF) of 100.  This RfD has not yet been confirmed by the Agency RfD Work Group.

In September of 1986, the Joint Food and Agricultural Organization of the United Nations (FAO)/World Health Organization (WHO) on Pesticides Residues [JMPR] proposed an Allowable Daily Intake (ADI) of 0.3 mg/kg body weight for glyphosate *per se*. The ADI was based on a 26-month feeding study in the rat yielding a NOEL of > 31 mg/kg body weight per day and and uncertainty factor of 100.  The Agency places more importance on the developmental rabbit study since no effect was observed in the 26-month study whereas maternal mortality was observed in the developmental rabbit study in the high dose group.   JMPR

19

acknowledged that there is no effect at the highest dose tested in the 26-month rat study.

2.    Exposure Assessment

a.    Dietary Exposure

The qualitative nature of the residue in plants is adequately understood.  Studies with a variety of plants including corn, cotton, soybeans, and wheat indicate that the uptake of glyphosate or its metabolite, aminomethyl phosphonic acid (AMPA), from soil is limited. The material which is taken up is readily translocated. Foliarly applied glyphosate is readily absorbed and translocated throughout the trees or vines to the fruit of apples, coffee, dwarf citrus (calamondin), pears and grapes.  Metabolism via N-methylation yields N-methylated glycines and phosphonic acids.  For the most part, the ratio of glyphosate to AMPA is 9 to 1 but can approach 1 to 1 in a few cases (e.g., soybeans and carrots).  Much of the residue data for crops reflects a detectable residue of parent (0.05 - 0.15 ppm) along with residues below the level of detection (<0.05 ppm) of AMPA.  The terminal residue to be regulated in plants is glyphosate *per se*.

The qualitative nature of the residue in animals is adequately understood.  Studies with lactating goats and laying hens fed a mixture of glyphosate and AMPA indicate that the primary route of elimination was by excretion (urine and feces).  These results are consistent with metabolism studies in rats, rabbits, and cows.  The terminal residues in eggs, milk, and animal tissues are glyphosate and its metabolite AMPA;  there was no evidence of further metabolism.  The terminal residue to be regulated in livestock is glyphosate *per se*.

An adequate enforcement method is available for analysis of residues of glyphosate and its metabolite AMPA in or on plant commodities and in water.  This method utilizes GLC (Method I of PAM Vol. II; limit of detection is 0.05 ppm).  For enforcement of tolerances in animal commodities, an HPLC method with fluorescence detection is available;  the reported limits of detection are 0.01 ppm for glyphosate and 0.012 ppm for AMPA.

The available storage stability data indicate that residues of glyphosate and its metabolite AMPA are stable under frozen storage conditions (-20EC):  in or on plant commodities for a period of 1 year, in animal commodities for 2 years, and in water for 1 year.  No additional storage stability data are needed.

All data requirements for magnitude of the residue in plants have been evaluated and deemed adequate.  Additional potato processing data are being generated.  All data requirements for magnitude of the residue in plants as a result of irrigation with glyphosate-treated water have also been submitted and are adequate to support registered use and applicable tolerances.  No additional data are required for magnitude of the residue in animals, potable water, and fish.  A list of residue chemistry study references is provided on page 24.

b.    Occupational and Residential

Occupational and residential exposure can be expected based on the currently registered uses of products containing glyphosate.  However, due to the low toxicity (acute category III) of glyphosate and the lack of other toxicological concerns (i.e carcinogenicity) occupational and residential exposure data are not required.   Glyphosate is a non-selective herbicide applied to terrestrial food and non-food crops, turf, greenhouse crops, and non-crop areas where total vegetation control is desired.  Glyphosate, when applied at lower rates, is also a plant growth regulator.

Although glyphosate meets the Agency's exposure criteria for post-application/reentry and/or mixer/loader/applicator exposure monitoring data, glyphosate does not meet the Agency's toxicity criteria for these data requirements.  Acute oral and dermal toxicity data for the technical material are in Toxicity Category III and IV.  In addition, glyphosate is poorly absorbed dermally.   The acute inhalation toxicity study for the technical material was waived because glyphosate is non-volatile and because there were adequate inhalation studies with end-use products showing low toxicity.  Therefore, occupational and residential exposure data are not required to support the reregistration of glyphosate.  (For these

21

same reasons, these data were not required in the 1986 Registration Standard.)

The following information is product-specific related, but is presented here for informational purposes. Some glyphosate end-use products are in Toxicity Category I and II based on primary eye irritation or dermal irritation. In California, where physicians are required to report pesticide poisonings, glyphosate was ranked third out of the 25 leading causes of illnesses or injury due to pesticides used between 1980 and 1984. These mixer/loader/applicator reported incidents consisted of eye and skin irritation. In reports issued by California since then (1987 and 1988), glyphosate continued to be a leading cause of illnesses or injuries (primarily eye and skin irritation). In the 1986 Registration Standard, the Agency recommended personal protective equipment, including protective eyewear for mixer/loader/applicators using end-use products that could cause eye or skin irritation. At that time, it was determined that mixer/loaders were at risk of eye or skin injury from splashes during mixing and loading. The Agency did not require personal protective equipment for users of "homeowner" products (containing up to 10% glyphosate) because of the low concentration of glyphosate and because the products are "ready-to-use", requiring no mixing; therefore, the potential for eye or dermal exposure is minimized.

The Agency, at this time, is not adding any additional personal protective equipment requirements to the labels of end-use products; however, any existing personal protective equipment on those labels must be retained.

The Worker Protection Standard (WPS) for Agricultural Pesticides -- 40 CFR Parts 156 and 170 -- established an interim restricted entry interval (REI) of 12 hours for glyphosate because the acute toxicity categories of glyphosate for acute dermal toxicity, skin irritation potential, and eye irritation potential are Toxicity Category III or IV. The Agency has determined that the 12-hour REI for all WPS sites should be retained as a prudent measure to mitigate risk to workers entering treated areas after application. Furthermore, given the known irritation-effects concerns for glyphosate, the Agency considers the additional protections offered by the requirements in the WPS essential to its decision that a 12-hour REI for this chemical will offer sufficient risk mitigation to workers.

Therefore, during the REI the Agency will allow workers to enter areas treated with glyphosate during the REI only in the few narrow exceptions allowed in the WPS.

The Agency has determined that, at this time, the entry restrictions discussed in this section need not apply to uses of glyphosate ouside the scope of the Worker Protection Standard for Agricultural Chemicals, including out-of-scope commercial uses and homeowner uses. The predicted frequency, duration, and degree of exposure due to post-application as the result of such uses should not warrant the risk mitigation measures being required for persons engaged in the production of agricultural plants for commercial or research purposes.

3.   Risk Assessment

   a.   Dietary

The chronic dietary risk analysis used tolerance level residues and assumed all acreage, of the crops considered, was treated with glyphosate to estimate the Theoretical Maximum Residue Contribution (TMRC) for the overall U.S. population and 22 population subgroups. These exposures (TMRCs) were then compared to the RfD for glyphosate to estimate chronic dietary risk.

The calculated TMRC for the overall U.S. population from food uses of glyphosate is 0.025 mg/kg bwt/day, which represents 1.2% of the RfD. The subgroup most highly exposed, non-nursing infants less than one year old, has a TMRC of 0.058 mg/kg bwt/day, or 2.9% of the RfD. Over one third of the dietary exposure and risk from glyphosate is due to the proposed tolerances on wheat.

This analysis was meant to be a "worst case" scenario of risk. The inclusion of recommended tolerances for reregistration as well as tolerances recommended for revocation; the use of the highest existing, pending, or recommended residue value for each commodity; and the assumptions of tolerance level residues and treatment of 100 percent of the crops for every commodity considered result in an overestimation of exposure and risk values for glyphosate (though there is some underestimation due to the lack of consumption information for some of the commodities to which

glyphosate is expected to be applied).  Nonetheless, given the risk values arrived at by this analysis, EPA concludes that the chronic dietary risk posed by this pesticide on these food uses is minimal.

b.    Occupational and Residential

As discussed above in the occupational exposure assessment, exposure to humans from proper application of glyphosate to terrestrial food and non-food crops as well as greenhouses, turf, and non-crop areas can result in injury (primarily eye and skin irritation) from splashes during mixing and loading.  The Agency continues to recommend protective clothing (including protective eye wear) for mixer/loader/applicators using end-use products that may be in toxicity category I or II for primary eye and dermal irritation.

c.    Dietary Exposure References

This table references the residue data used to support the reregistration of glyphosate and includes the commodities eligible for reregistration.

| Guideline/Commodity | References[1] |
|---|---|
| §171-4 (a):  Plant Metabolism | 00038771, 00039141, 00051983, 00065753, 00108097, 00108129, 00108133, 00108140, 00108151, 00111945 |
| §171-4 (b):  Animal Metabolism | 00094971, 00108098, 00108099, 00108100, 00108101, 00108116, 00108099, 00108200, 40541301-40541304 |
| §171-4 (c) and (d):  Residue Analytical Methods | 00028853, 00036222, 00036223, 00036231, 00037688, 00038770, 00038979, 00044423, 00051982, 00053002, 00053005, 00060108, 00061559, 00063714, 00065751, 00065752, 00067425, 00076805, 00078823, 00078824, 00108133, 00108144, 00108149, 00108151, 00108175, 00108176, 00108186, 00108231, 00111945, 00111949, 00122715, 00159419, 00164729, 40502601, 40541304 |
| §171-4 (e):  Storage Stability | 00039142, 00040083, 00051980, 00053002, 00061553, 00061555, 00108129, 00108132, 40502605, 40532004, 41940701 |

24

| Guideline/Commodity | References[1] |
| --- | --- |

§171-4 (k) (l):  Magnitude of the Residue in Plants

Root and Tuber Vegetables Group

| | |
| --- | --- |
| - Artichokes, Jerusalem | N/A |
| - Beets, garden | 00108159 |
| - Carrots | 00108159 |
| - Chicory | N/A |
| - Horseradish | N/A |
| - Parsnips | N/A |
| - Potatoes | 00108151, 41947001 |
| - Radish | 00108159 |
| - Rutabagas | N/A |
| - Salsify | N/A |
| - Sugar beets | 00039381, 00108151 |
| - Sweet potato | 00108151 |
| - Turnips | 40835201 |

Leaves of Root and Tuber
  Vegetables Group

| | |
| --- | --- |
| - Beets, greens | N/A |
| - Chicory leaves | N/A |
| - Sugar beet tops | 00039381, 00108151 |
| - Turnip tops | 40835201 |

Bulb Vegetables Group

| | |
| --- | --- |
| - Garlic | N/A |
| - Onions (green and dry bulb) | 40783101 |

Leafy Vegetables (except Brassica)
  Group

| | |
| --- | --- |
| - Celery | N/A |
| - Lettuce (head and leaf) | 00108159 |
| - Spinach | N/A |

| Guideline/Commodity | References[1] |
|---|---|
| Brassica Leafy Vegetables Group | |
| - Broccoli | 40802801, 40802801 |
| - Cabbage | 00108159 |
| - Cauliflower | N/A |
| - Kale | N/A |
| - Mustard greens | 40802801, 40802801 |
| Legume Vegetables (Succulent/Dried) Group | |
| - Beans (succulent and dried) | 00108159 |
| - Lentils | 00108159 |
| - Peas (succulent and dried) | 00108159 |
| - Soybeans | 00015759, 00015760, 00015761, 00015762, 00015763, 00015764, 00015765, 00015766, 00015767, 00024503, 00033954, 00038908, 00040084, 00061555, 00108153, 00108203 |
| (processed commodities) | 00061555, 00108153, 00156793 |
| Foliage of Legume Vegetables (Succulent/Dried) Group | |
| - Bean vines and hay | 00108159 |
| - Lentil forage and hay | 00108159 |
| - Pea vines and straw | |
| - Soybean forage and hay | 00015759, 00015760, 00015761, 00015762, 00015763, 00015764, 00015765, 00015766, 00015767, 00033954, 00038908, 00040084, 00061555, 00108153, 00108203 |
| Fruiting Vegetables Group | |
| Cucurbit Vegetables Group | |
| Citrus Fruits Group | 00039142 |
| (processed commodities) | 40159401 |
| Pome Fruits Group | 00108129 |
| Stone Fruits Group | 00111949 |

| Guideline/Commodity | References[1] |
|---|---|
| - Plums (fresh prunes) | 00111949 |
| | |
| Small Fruits and Berries Group | |
| - Blackberries | |
| - Blueberries | |
| - Cranberries | 00053002 |
| - Grapes | 00038770, 00108132 |
| (processed commodities) | 40785303 |
| - Raspberries | |
| | |
| Tree Nuts Group | 00111945 |
| - Almond hulls | 00111945 |
| | |
| Cereal Grains Group | |
| - Barley | 00038908, 00040087, 00044422, 00108203 |
| (processed commodities) | N/A |
| - Corn (field and fresh) | 00023336, 00023512, 00037687, 00038908, 00040085, 00048284, 00108203, 40502602 |
| (processed commodities) | 40502604, 41478101 |
| - Oats | 00038908, 00040087, 00044422, 00108203 |
| (processed commodities) | N/A |
| - Rice | 00038908, 00040087, 00044422 |
| (processed commodities) | N/A |
| - Rye | N/A |
| (processed commodities) | N/A |
| - Sorghum | 00038908, 00040087, 00044422, 00108203, 00109271, 40502601 |
| (processed commodities) | 40502603 |
| - Wheat | 00038908, 00040086, 00044426, 00108203, 00122715, 41484301 |
| (processed commodities) | 00150835 |
| Forage, Fodder, and Straw of Cereal   Grains Group | |
| - Barley forage, hay, and straw | 00038908, 00040087, 00044422, 00108203 |

| Guideline/Commodity | References[1] |
|---|---|
| - Corn forage and fodder | 00023336, 00023512, 00037687, 00038908, 00040085, 00048284, 00108203, 40502602 |
| - Oat forage, hay, and straw | 00038908, 00040087, 00044422, 00108203 |
| - Rice straw | 00038908, 00040087, 00044422 |
| - Rye forage and straw | N/A |
| - Sorghum forage and fodder | 00038908, 00040087, 00044422, 00108203, 00109271, 40502601 |
| - Wheat forage and straw | 00038908, 00040086, 00044426, 00108203, 00122715 |
| <u>Grass Forage, Fodder, and Hay Group</u> | 00076805, 00108147 |
| <u>Non-grass Animal Feeds (forage, fodder, straw, and hay) Group</u> | 00076805, 00108147 |
| - Alfalfa seed | 40541304 |
| <u>Miscellaneous Commodities</u> | |
| - Acerola | |
| - Atemoya | |
| - Asparagus | 00108144, 40642401 |
| - Avocados | 00108149 |
| - Bananas | 00108175 |
| - Breadfruit | 40149401 |
| - Canistel | 40149401 |
| - Carambola | |
| - Cherimoya | |
| - Cocoa beans | |
| - Coconut | |
| - Coffee beans | 00051980, 00051981 |
| - Cotton | 00060103, 00061553, 00108176, 00108153, 00108203 |
| (processed commodities) | 00061553, 00108176, 00108153 |
| - Dates | 40149401 |
| - Figs | |
| - Genip | |
| - Guavas | 00059050 |
| - Jaboticaba | 40149401 |
| - Jackfruit | 40149401 |

28

| Guideline/Commodity | References[1] |
|---|---|
| - Kiwi fruit | |
| - Litchi Nut (Lychee) | |
| - Longan | |
| - Mamey Sapote (Mammee Apple) | |
| - Mangoes | 40580401 |
| - Okra | N/A |
| - Olives | 00108175, 42398401 |
| (processed commodities) | 00108175, 42398401 |
| - Palm oil | |
| - Papayas | 00063713 |
| - Passion Fruit | |
| - Peanuts | 00144341, 00028852 |
| (processed commodities) | 00144341, 00028852 |
| - Persimmons | 40149401 |
| - Pineapple | N/A |
| - Pistachio | 00111945 |
| - Sapodilla | |
| - Sapote (black and white) | 40149401 |
| - Soursop | 40149401 |
| - Sugar apple | |
| - Sugarcane | 00108140 |
| (processed commodities) | 00108168 |
| - Tamarind | 40149401 |
| - Tea | 00078823, 00078824 |
| - Watercress | N/A |
| §171-4 (h):  Magnitude of the Residue in Plants Resulting from the Use of Irrigation Water | 00039381, 40541305 |
| §171-4 (j):  Magnitude of the Residue  in Meat, Milk, Poultry, and Eggs | 00108115, 40532001-03 |
| §171-4 (g):  Magnitude of the Residue in Fish | 00036229, 00076491, 00154311, 00155120 |

| Guideline/Commodity | References[1] |
|---|---|
| §171-4 (f):  Nature and Magnitude the Residue in Drinking and Irrigation Water | 00039377, 00039381, 00077227, 00077228, 00077229, 00077230, 00077231, 00077232, 00077233, 00077234, 00077235, 00077236, 00077237, 00077238, 00077301, 00108173, |
| §171-4 (i):  Magnitude of the Residue in Food Handling Establishment | |
| §171-5:  Reduction of Residues | |

1 N/A means not available by MRID number.  Those guidelines/commodities which do not list a MRID reference number, additional reference information can be provided from Table A in the Product and Residue Chemistry Chapters by R.B. Perfetti, Chemistry Branch Reregistration Support (CBRS# 10665) in the Health Effects Division dated 10/27/92 through FOI.

## C.     Environmental Assessment

1.     Environmental Fate

a.     Environmental Fate and Transport

(1)     Hydrolysis

Glyphosate is stable at pH 3, 6, 9 at 5 and 35EC. (Accession 00108192)

(2)     Photodegradation in Water

Glyphosate is stable to photodegradation in pH 5, 7, and 9 buffered solutions under natural sunlight.  (MRID 41689101)

(3)     Photodegradation on Soil

Glyphosate is stable to photodegradation on soil. (MRID 41335101)

(4)     Aerobic Soil Metabolism

Data indicate half-life values of 1.85 and 2.06 days in Kickapoo sandy loam and Dupo silt loam respectively. Aminomethyl phosphonic acid (AMPA) was the major degradate.  (MRID 42372501)

(5)     Anaerobic Aquatic Metabolism

Glyphosate has a half-life of 8.1 days in anaerobic (flooded plus nitrogen atmosphere) silty clay loam sediment. AMPA was the major degradate.  (MRID 42372502)

(6)     Aerobic Aquatic Metabolism

Glyphosate has a half-life of 7 days in flooded silty clay loam sediment that was incubated in the dark at $24.6 \pm 0.57$ C for 30 days.  AMPA was the major degradate.  (MRID 42372503)

(7)     Leaching/Adsorption/Desorption

$K_d$ values of 62, 90, 70, 22, and 175 were reported for Drummer silty clay loam, Ray silt, Spinks sandy loam, Lintonia sandy loam, and Cattail Swamp sediment respectively.  After (aged) leaching 7 soils with 20" of water, the recovered radioactivity in the soils was 93-100% of the applied material.  (Accessions 00108192, 00076493, 00108140)

(8)     Terrestrial Field Dissipation

The Agency has received an interim report on a terrestrial field dissipation study in progress by Monsanto Company.  (MRID 42607501)

This report contains data from eight different field sites.  Some of the data from the individual field sites are deficient; however, the Agency may use the data from the eight field sites together to satisfy the terrestrial field dissipation 164-1 data requirement.

31

The interim report results from the first 12 months of bareground field dissipation trials from eight sites show that the median half-life ($DT_{50}$) for glyphosate applied at maximum annual use rates (7.95 lb a.e./acre, 10.7 lb a.i./acre) was 13.9 days with a range of 2.6 (Texas) to 140.6 (Iowa) days. Acceptable aerobic soil, aerobic aquatic and anaerobic aquatic metabolism studies demonstrate that under those conditions at 25EC in the laboratory glyphosate degrades rapidly with half-lives of approximately 2, 7 and 8 days respectively. The reported half-lives ($DT_{50}$) from the field studies conducted in the coldest climates, ie. Minnesota, New York and Iowa, were the longest at 28.7, 127.8, and 140.6 days respectively indicating that glyphosate residues in the field are somewhat more persistent in cooler climates as opposed to milder ones (Georgia, California, Arizona, Ohio, and Texas).

Glyphosate (as well as AMPA) was shown to remain predominantly in the 0-6 inch soil layer throughout the duration of the study at all field sites. Iowa was the individual test site to have average glyphosate residues, at all sampling times, greater than 0.01 ppm in the 6-12 inch depth. There were a number of detections from 0.01 to 0.09 ppm in the 6-12 inch layer in Minnesota, New York and Texas, and glyphosate was detected at generally <0.05 ppm at the other 5 field sites (6-12 inch depth).

Glyphosate was detected at three different sites below 12 inches. In California, at 0 DAT, average glyphosate residues were 0.21 ppm and 0.10 ppm in the 12-18 and 18-24 inch soil horizons respectively. Soil core contamination was attributed to these detections since movement of residues to this depth on the first day of sampling is unlikely. In Arizona at 21 DAT the average glyphosate residues were 0.06, in the 18-24 inch soil layer. There were no glyphosate residues in the 6-12 or 12-18 inch soil layer in Arizona on 21 DAT and in subsequent samples below 12 inches which may indicate a problem with sampling technique. In Iowa at 190 DAT the average glyphosate residues were 0.05 ppm in the 12-18 inch soil layer. Since there were no glyphosate residues detected in the 6-12 inch soil layer at 190 DAT, and

the lack of a significant amount of rainfall between sampling intervals in combination with the amount of time between sampling intervals and the high adsorptive characteristics of glyphosate give an indication that there may have been a problem with sampling technique.

AMPA was also shown to remain predominantly in the 0-6 inch soil layer. AMPA was found at every test site on Day 0 samples indicating the rapid degradation of parent glyphosate. The AMPA levels generally reached a maximum between day 14 and day 30. Where the field half-lives were longer (Iowa, Minnesota, New York), the maximum average AMPA levels occurred between 62 and 95 DAT. The maximum average AMPA levels found in the 0-6 inch soil layer were 0.6 ppm and occurred in Ohio and Georgia at 21 DAT and 61 DAT respectively. The AMPA levels at those sites had decreased to 0.12 and 0.44 ppm at 12 months after treatment.

In all samples but three, AMPA residue levels were <0.05 ppm in the 6-12 inch soil layer. In New York at 14 and 30 DAT average residues were detected at 0.06 ppm. In Iowa at the 92 DAT sample average AMPA residues were 0.08 ppm. Iowa and New York also exhibited 50% dissipation times of 140.6 and 127.8 days respectively.

AMPA levels were detected at 0.06 ppm in the 18-24 inch soil layer on 21 DAT in Arizona and 0.04 and 0.03 ppm in the 12-18 inch soil layer at 90 and 180 DAT respectively in New York.

A final report on the terrestrial field dissipation study showed the median half-life ($DT_{50}$) (of eight sites) of AMPA was 240 days with a range of 119 (Ohio) to 958 (California) days. The half-lives for the dissipation of AMPA for seven of the eight test sites were:

| | | |
|---|---|---|
| ! | Arizona | 142 days |
| ! | California | 958 days |
| ! | Georgia | 896 days |
| ! | Minnesota | 302 days |

> ! New York 240 days
> ! Ohio 119 days
> ! Texas 131 days

Iowa was not calculated because recharging of AMPA residues was greater than degradation. AMPA was shown to remain predominantly in the 0-6 inch soil layer throughout the duration of the study at all eight field sites. AMPA was detected three times (at a concentration greater than 0.05 ppm) at depths greater than 12 inches. The three detections were attributed to contamination during sampling rather than vertical mobility.

(9)     Aquatic Field Dissipation

Glyphosate dissipated from water (irrigation source) with a calculated half-life of 7.5 days and 120 days from the sediment of the farm pond in Missouri. (MRID 40881601)

In Michigan, Georgia and Oregon pond and stream water, the maximum glyphosate concentrations were measured immediately posttreatment and dissipated rapidly. Glyphosate accumulated in the pond sediment, and to a lesser extent in the stream sediments; glyphosate was present in pond sediment at $1 ppm in Michigan and Oregon at approximately 1 year posttreatment. (MRID 41552801)

(10)    Forestry Dissipation

When aerially applied at 3.75 lb/A to forested sites in Michigan, Oregon, and Georgia, glyphosate averaged 652-1273 ppm in tree foliage immediately posttreatment. It then declined rapidly with half-lives of <1 day at the Michigan and Georgia sites and <14 days at the Oregon site.

The forestry dissipation study results demonstrate that when used under normal silviculture practices according to label directions, the maximum combined glyphosate and AMPA residue level in soil is less than 5 ppm. Glyphosate and AMPA residues in soil dissipate with time. The average half-life for the dissipation of glyphosate was 100 days, and

ranged from 35 to 158 days.  The average half-life for the dissipation of AMPA was 118 days, and ranged from 71 days to 165 days.  (MRID 41552801)

(11)   Accumulation in Confined Rotational Crops

Glyphosate residues (expressed as fresh weight) accumulated in lettuce, carrots, and barley planted 30, 119, and 364 days after sandy loam soil was treated with glyphosate at 3.71 lb ai/A.  Accumulation decreased as the length of the rotation increased.  In crops planted at 30 days, posttreatment, [$^{14}$C]residues at harvest were 0.097 ppm in lettuce, 0.051 and 0.037 ppm in carrot tops and roots, respectively, and 0.188 and 0.175 ppm in barley grain and straw, respectively.  In immature lettuce harvested at 40 and 60 days postplanting, [$^{14}$C]residues were 0.108 and 0.048 ppm, respectively.  In crops planted at 119 days posttreatment, [$^{14}$C]residues at harvest were 0.037 ppm in lettuce, 0.028 and 0.017 ppm in carrot tops and roots, respectively, and 0.078 and 0.056 ppm in barley grain and straw, respectively.  In immature lettuce harvested at 28 and 48 days postplanting, [$^{14}$C]residues were 0.059 and 0.055 ppm, respectively.   In crops planted at 364 days posttreatment, [$^{14}$C]residues at harvest were 0.028 ppm in lettuce, 0.018 and 0.0096 ppm in carrot tops and roots, respectively, and 0.047 and 0.061 ppm in barley grain and straw, respectively.  In immature lettuce harvested at 35 and 61 days postplanting, [$^{14}$C]residues were 0.057 and 0.043 ppm, respectively; in barley forage harvested at 48 days postplanting, [$^{14}$C]residues were 0.056 ppm.   (MRID 41543201 and 41543202)

(12)   Accumulation in Irrigated Crops

Alfalfa, corn (grain and forage), grass (fescue or sudan) and lettuce were irrigated five to eight times during the 1987 growing season with glyphosate treated water containing a maximum of 21.3 ppm (on treatment day then fell to 0.46 ppm by 1 day after treatment) of glyphosate.  Residues in the sediment beneath the treated water reached a maximum of 3.5 ppm at 14 days after treatment.  Residues

35

of glyphosate in the sprinkler water at the pond site were the highest 7 days after treatment at 0.12 ppm.  One lettuce sample from the Missouri location (the pond site) at 29 days after treatment (of water source) and 5 irrigation events was found to contain 0.06 ppm glyphosate.  (MRID 40541305)

(13)   Bioaccumulation in Fish

Maximum bioconcentration factors were 0.38X for edible tissues, 0.63X for nonedible tissues, and 0.52X for whole fish.  (MRID 41228301)

(14)    Laboratory and Field Volatility

The requirement of these studies was waived based on the low vapor pressure of glyphosate.

b.    Environmental Fate and Groundwater Assessment

In general, the available field and laboratory data indicate glyphosate adsorbs strongly to soil and would not be expected to move vertically below the 6 inch soil layer.  Based on unaged batch equilibrium studies glyphosate and glyphosate residues are expected to be immobile with $Kd_{(ads)}$ values ranging from 62 to 175. The mechanism of adsorption is unclear; however, it is speculated that it may be associated with vacant phosphate sorption sites or high levels of metallic soil cations.  The data indicate that chemical and photochemical decomposition is not a significant pathway of degradation of glyphosate in soil and water.  However, glyphosate is readily degraded by soil microbes to aminomethyl phosphonic acid (AMPA), which is degraded to $CO_2$, although at a slower rate than parent glyphosate.  Even though glyphosate is highly water soluble it appears that parent glyphosate and AMPA have a low potential to move to ground-water due to their strong adsorptive characteristics demonstrated in the laboratory and field studies. However, glyphosate does have the potential to contaminate surface waters due to its aquatic use patterns and erosion via transport of residues adsorbed to soil particles suspended in runoff water.   If glyphosate were to reach surface water it would be resistant to hydrolysis and aqueous photolysis.

Based on the low vapor pressure of glyphosate, volatilization from soils will not be an important dissipation mechanism.  The low octanol/water coefficient suggests that glyphosate will have a low tendency to accumulate in fish.

2.    Ecological Effects

a.    Ecological Hazard

(1)     Effects to Nontarget Birds

To establish the toxicity of glyphosate to birds, tests were required using the technical grade material.

(a)     Avian Single-Dose Oral LD$_{50}$ - Technical

| Acute Oral Toxicity Findings | | | |
|---|---|---|---|
| **Species** | **% AI** | **LD$_{50}$ (95% CL)** | **Conclusions** |
| Bobwhite quail | 83% | > 2000 mg/kg | practically non-toxic to upland game birds |

**One avian single-dose oral study on either a waterfowl species (preferably mallard duck) or an upland species (preferably bobwhite quail) was required. These data indicate that technical glyphosate is practically non-toxic to an upland bird species on an acute oral basis. The guideline requirement for an avian acute oral study is fulfilled. (Study ID 234395)**

(b)     Avian Dietary - Technical

| Avian Subacute Dietary Toxicity Findings | | | |
|---|---|---|---|
| **Species** | **% AI** | **Reproductive Impairment** | **Conclusions** |
| Mallard duck | 98.5% Tech | > 4640 ppm | no more than slightly toxic to upland game birds and waterfowl |
| Bobwhite quail | 98.% Tech | > 4640 ppm | |

**Two subacute dietary studies, one study on a species of waterfowl (preferably mallard duck) and one on an upland game bird species (preferably a bobwhite quail), were required. These data indicate that the technical glyphosate is no more than slightly toxic to birds on a dietary basis. The guideline requirement is fulfilled for both studies. (Study IDs 94171 and 00086492)**

*GLYPHOSATE RED*

*September 1993*

(c)      Avian Reproduction

| Avian Reproduction Findings | | | |
|---|---|---|---|
| **Species** | **% AI** | **Reproductive Impairment** | **Conclusions** |
| Mallard duck | 83% Tech | No effects up to 1000 ppm | not expected to cause reproductive impairment |
| Mallard duck | 90.4% Tech | No effects up to 30 ppm | |
| Bobwhite quail | 83% Tech | No effects up to 1000 ppm | |

**An avian reproduction test was required to support registration of the end-use products of glyphosate since the following guideline criteria have been exceeded. The labeling for several use patterns contains directions for use under which birds may be subject to repeated exposure to glyphosate. The labeling allows repeat application for certain uses, such as alfalfa, barley, oats, apples, cherries, and oranges. These data indicate that technical glyphosate is not expected to cause reproductive impairment. The guideline requirements for an avian reproduction study on both upland game bird and waterfowl are fulfilled. (Study IDs 235924, 00036328, and 235924)**

(d)      Summary of Findings

Glyphosate is practically non-toxic to bobwhite quail on the basis of acute oral toxicity. An $LD_{50}$ greater than 2000 mg/kg was determined for bobwhite quail given a single oral dose of technical glyphosate. Studies indicate that the 8-day dietary $LC_{50}$ of the chemical is greater than 4000 ppm for both mallard ducks and bobwhite quail. These data indicate that the chemical is slightly toxic to birds. Avian reproduction studies indicate reproductive impairment would not be expected at a dietary level of up to 1000 ppm. The available acute toxicity data do not indicate a requirement of precautionary labeling for birds on products containing glyphosate.

39

(2)    Effects on Non-Target Fish

(a)    Acute Toxicity to Freshwater Fish

| Acute Toxicity to Freshwater Fish Findings | | | |
|---|---|---|---|
| **Species** | **% AI** | **48-hr LC$_{50}$ (95%CL)** | **Conclusions** |
| Bluegill sunfish | 96.5% | > 24 mg/l | ranges in toxicity from slightly non-toxic to practically non-toxic to both cold water and warm water fish |
| Fathead Minnow | 87.3% | 84.9 mg/l (72.9-99.3) | |
| Bluegill sunfish | 83% | 120 mg/l (111-130) | |
| Rainbow Trout | 83% | 86 mg/l (70-106) | |
| Rainbow Trout | 96.7% | 140 mg/l (120-170) | |
| Fathead minnow | 96.7% | 97 mg/l (79-120) | |
| Channel catfish | 96.7% | 130 mg/l (110-160) | |
| Bluegill sunfish | 96.7% | 140 mg/l (110-160) | |

**The minimum data required for establishing the acute toxicity of glyphosate to freshwater fish are the results of two 96-hour studies with the technical grade product. One study was to be performed on a cold water fish species (preferably rainbow trout) and one study was to be performed using a warm water species (preferably bluegill sunfish). The results of these eight studies indicate that technical glyphosate is slightly to practically nontoxic to both cold water and warm water fish. The guidelines requirement for acute toxicity testing of the technical on freshwater fish is fulfilled. (Study IDs 00108112, 00108171, 234395, 097661, and 249160)**

(b)     Chronic Toxicity to Freshwater Fish

| Chronic Toxicity to Freshwater Fish Findings | | | |
|---|---|---|---|
| **Species** | **% AI** | **Results** | **Conclusions** |
| Fathead Minnow | 87.3% tech | MATC > 25.7 mg/l | no effects at or below this level |

**Due to the aquatic use of the chemical, its presence in water is likely to be continuous or recurrent regardless of toxicity; therefore, chronic testing was required. This fish full life cycle study satisfies the generic guideline requirement for chronic freshwater fish testing. (Study ID 00108171)**

| Acute Toxicity to Freshwater Fish Findings from Studies using Formulated Products | | | |
|---|---|---|---|
| **Species** | **% AI (IPA salt)** | **96-hr LC$_{50}$ (95% CL)** | **Conclusions** |
| Bluegill sunfish | 41.8% | 5.8 mg/l (4.4-8.3) | ranges in toxicity from moderately toxic to practically non-toxic to both warmwater and coldwater fish |
| Rainbow Trout | 41.8% | 8.2 mg/l (6.4-9.0) | |
| Channel catfish | 41.36% | 16 mg/l (9.4-26) | |
| Rainbow Trout | 41.36 | 11 mg/l (8.7-14) | |
| Bluegill sunfish | 41.36% | 14 mg/l (8.7-24) | |
| Fathead Minnow | 41.36% | 9.4 mg/l (5.6-16) | |
| Rainbow Trout | 62.4% | >1000 mg/l | |
| Bluegill sunfish | 62.4% | >1000 mg/l | |
| Rainbow Trout | *41.2% + 15.3 "AA" surfactant | 120 mg/l (56-180) | |

| Acute Toxicity to Freshwater Fish<br>Findings from Studies using Formulated Products | | |
|---|---|---|
| Rainbow Trout | *40.7% + 15% "W" surfactant | 150 mg/l (100-320) |
| Bluegill sunfish | *40.7% + 15% "W" surfactant | >100 mg/l |
| Bluegill sunfish | *41.2% + 15.3% "AA" surfactant | >180 mg/l |
| Rainbow Trout | 7.03% + 0.5% "X-77" | 240 mg/l (180-320 mg/l) |
| Bluegill sunfish | 7.03% + 0.5% "X-77" | 830 mg/l (620-1600) |
| Rainbow Trout | 51% | 8.3 mg/l (7.0-9.9) |
| Fathead minnows | 41% | 2.3 mg/l (1.9-2.8) |
| Rainbow Trout | 41% | 9.0 mg/l (7.5-11) |
| Bluegill sunfish | 41% | 4.3 mg/l (3.4-5.5) |
| Channel catfish | 41% | 13 mg/l (11-16) |
| Bluegill sunfish | 41% | 5 mg/l (3.8-6.6) |
| Rainbow Trout | 41% | 1.3 mg/l (1.1-16) |

**Testing of an end-use product is required if the pesticide will be introduced directly into an aquatic environment when used as directed by the label. Drainage systems would be included in such a category. Therefore, formulated product testing was required. According to the surfactant selected, the formulated product toxicity ranges from moderately toxic to practically non-toxic. (Study ID 249159, 00070894,**

00070895, 00070897, 00070896, 00078661, 00078662, 00078658, 00078655, 00078656, 00078659, 00078664, 00078665, 249160)

| Surfactant Test Findings | | | |
|---|---|---|---|
| Species | % AI | 96-hour LC$_{50}$ (95% CL) | Conclusions |
| Fathead minnow | MONO818 Tech 100% | 1.0 mg/l (1.2-1.7) | ranges in toxicity from highly toxic to slightly toxic to warmwater and coldwater fish |
| Rainbow trout | MONO818 Tech 100% | 2.0 mg/l (1.5-2.7) | |
| Rainbow Trout | MONO818 | 0.65 mg/l (.54-.78) | |
| Channel Catfish | MONO818 Tech 100% | 13 mg/l (10-17) | |
| Bluegill sunfish | MONO818 Tech 100% | 3.0 (2.5-3.7) | |
| Bluegill sunfish | MONO818 Tech 100% | 1 mg/l (.72-1.4) | |

**Testing of the surfactant may be required under unusual circumstances. When inerts are likely to be toxic, testing can be required. These data indicate that MONO818 ranges from moderately toxic to very highly toxic to both cold and warm water fish after 96 hour exposure. (Study ID 249160)**

(c)     Summary of Findings

Three tests on warm water species, one bluegill and two with fathead minnow, produced the 96-hour LC$_{50}$s of 120 ppm, 84.9 ppm, and 97 ppm, respectively (McAllister and Forbis 1978, ID #234395; EG & G Bionomics 1975, ID #00108171 and Folmar, Sanders, and Julin 1979, ID #249160). Two rainbow trout 96-hour LC$_{50}$s provided values of 86 ppm and 140 ppm. Based on these tests, technical glyphosate ranges from slightly to practically non-toxic to freshwater fish species.

Surfactant testing was performed with both cold water and warm water fish. In this case, the initial formulation demonstrated an application rate much

lower than technical glyphosate. The $LC_{50}$ for rainbow trout was 1.3 mg/l or moderately toxic. The surfactant (MON0818) when tested alone produced an $LC_{50}$ value of 0.65 mg/l for rainbow trout indicating a highly toxic category (Folmar et al. 1979, ID #249160). In contrast, the formulation of 41.2 percent isopropylamine salt and 15.3 percent "AA" surfactant provided a rainbow trout $LC_{50}$ of 120 mg/l, indicating a practically non-toxic compound (Thompson and Griffen 1980, ID #00078658). Bluegill are in the same category of toxicity with an even higher $LC_{50}$ of greater than 180 mg/l (Thompson and Griffen 1980, ID #00078659). The bluegill and rainbow trout were similar in sensitivity to the formulation containing the "W" surfactant with $LC_{50}$ values of 150 and >100 mg/l, respectively. Also, neither rainbow trout ($LC_{50}$ 240 mg/l) nor bluegill ($LC_{50}$ 830 mg/l) were very sensitive to the x-77(.5) surfactant and glyphosate(7.03%).

The surfactant MON0818 has been tested separately, producing an $LC_{50}$ of 13 mg/l on *Chironomous* indicating it is a slightly toxic material. For fish, the catfish appears to be the most tolerant with an $LC_{50}$ value of 13 mg/l, and rainbow trout the most sensitive with an $LC_{50}$ value of 0.65 mg/l. Based upon available data products containing MONO8l8 must include the statement, "This pesticide is toxic to fish."

44

(3)     Effects on Aquatic Invertebrates

(a)     Acute Toxicity to Freshwater Invertebrates

| Acute Toxicity to Freshwater Invertebrates Findings | | | |
|---|---|---|---|
| **Species** | **% AI** | **48-hr LC$_{50}$ (ppm)** | **Conclusions** |
| *Daphnia magna* | 83% tech | 780 | ranges in toxicity from slightly toxic to practically non-toxic to freshwater invertebrates |
| *Chironomus plumosus* | 96.7% tech | 55 (31-97) | |

**The minimum data requirement to establish the acute toxicity of glyphosate to freshwater invertebrates is a 48-hour acute study using the technical material.  Test organisms should be first instar *Daphnia magna* or early instar amphipods, stone flies or mayflies.  The results of these studies indicate that technical glyphosate is slightly toxic to *Chironomus plumosus* and is practically non toxic to *Daphnia magna*.  The guideline requirement for acute testing on a freshwater invertebrate has been fulfilled. (Study ID 00108172, and 249160)**

(b)     Chronic Toxicity to Freshwater Invertebrates

| Chronic Toxicity to Freshwater Invertebrates Findings | | | |
|---|---|---|---|
| **Species** | **% AI** | **Results** | **Conclusions** |
| *Daphnia magna* | 99.7% tech | MATC > 50 -< 96 mg/L | caused reduced reproductive capacity |

**Due to the aquatic use of the chemical its presence in water is likely to be continuous or recurrent regardless of toxicity; therefore, chronic testing was required.  This study satisfies the guideline requirement for chronic freshwater invertebrate testing.  (Study ID 249160)**

| Acute Toxicity to Freshwater Invertebrates Findings from Studies using Formulated Products | | | |
|---|---|---|---|
| **Species** | **% AI (IPA salt)** | **48-hr LC$_{50}$ (ppm)** | **Conclusions** |
| *Daphnia magna* | 62.4% | 869 (703-1019) | ranges in toxicity from moderately toxic to practically non-toxic to freshwater invertebrates |

| Acute Toxicity to Freshwater Invertebrates Findings from Studies using Formulated Products | | |
|---|---|---|
| *Daphnia magna* | 7.03% + X-77 surfactant @0.5% | >1000 |
| *Daphnia magna* | 41.2% + "AA" surfactant @ 15.3% | 310 (250-400) |
| *Daphnia magna* | 40.7% MON2139 + 15% "W" surfactant | 72 (62-83) |
| *Daphnia magna* | 41% | 3 (2.6-3.4) |
| *Gammarus pseudolimnaeus* | 41% | 62 (40-98) |
| *Chironomus plumosus* | 41% | 18 (9.4-32) |
| *Daphnia pulex* | 51% MON 2139 | 242(224-261.5) |
| *Daphnia magna* | 41.36% | 5.3 (4.4-6.3) |
| *Gammarus pseudolimnaeus* | 41.83% | 41.9 (30.7-62) |
| | | **Other results** |
| *Ephemerella walkeri* | 41% | Mayfly nymphs avoided glyphosate at concentrations of 10 mg/L but not at 1.0 mg/l. |

| Acute Toxicity to Freshwater Invertebrates Findings from Studies using Formulated Products | | | |
|---|---|---|---|
| *Chironomus plumosus* | 41% | Significant increases in stream drift of midge larvae was observed after the 2.0 mg/l, but not at the 0.02 or 0.2 mg/l level. | |

**Testing of an end-use product is required if the pesticide will be introduced directly into an aquatic environment when used as directed by the label. Drainage systems (wet and dry) would be included in such a category. Therefore, formulated product testing was required. According to the surfactant selected, the formulated product toxicity ranges from moderately toxic to practically non-toxic. (Study ID 00078663, 00078666, 00078660, 00078657, 249160, 00108109, 00070893, and 249159)**

| Surfactant Test Findings | | | |
|---|---|---|---|
| **Species** | **% AI** | **48-hr LC$_{50}$ (95%CL)** | **Conclusions** |
| *Daphnia magna* | 100% MONO818 surfactant | 13 mg/L (7.1-24) | slightly toxic to freshwater invertebrates |

**Testing of the surfactant may be required under unusual circumstances. One test on the surfactant was received and determined as acceptable for use in a risk assessment. (Study ID 249160)**

    (d)     Summary of Findings

       A 48-hour LC$_{50}$ of 780 ppm (mg/l) was found for *Daphnia magna* exposed to technical glyphosate (McAllister and Forbis 1978, ID #00108172). The results of this study indicate that the chemical is practically non-toxic to aquatic invertebrates.

       In addition to these acute studies, a fish life-cycle study indicates technical glyphosate has a

47

MATC greater than 25.7 ppm. No effect was observed at the highest level tested. A *Daphnia magna* life cycle study with an MATC of >50 - <96 ppm reported reduced reproductive capacity, the most sensitive parameter.

The available acute toxicity data indicate that precautionary labeling for freshwater intervertebrates is not required for products containing glyphosate.

In order to determine the effect of the three surfactants ("W", "AA", and "X-77") on invertebrates, additional *Daphnia* studies were conducted. The 7.03 percent isopropylamine salt of glyphosate with a surfactant at 0.5 percent identified as X-77 resulted in an $LC_{50}$ of greater than 1000 mg/l or practically non-toxic category for *Daphnia*. The second combination was 41.2 percent isopropylamine and 15.3 percent of a surfactant identified as "AA." This $LC_{50}$ was 310 ppm which would indicate it is practically non-toxic to *Daphnia*. The third combination consisted of 40.7 percent isopropylamine and 15 percent of a surfactant identified as "W." The resultant $LC_{50}$ of 72 ppm reveals that this material is slightly toxic to *Daphnia*.

A glyphosate formulation was tested several times with different invertebrates. The $LC_{50}$ values ranged from 3 mg/l for *Daphnia* to 62 mg/l for *Gammarus* indicating a moderately toxic material for *Daphnia* and no more than slightly toxic for *Gammarus*.

(4)     Effects on Marine/Estuarine Organisms

(a)    Acute Toxicity

Acute toxicity testing for estuarine and marine organisms on technical glyphosate is required.  The guidelines require estuarine and marine studies when exposure of such waters is likely.  Crops, such as cotton, corn, sugarcane, turf, citrus, berries, forestry, sorghum, watermelon, etc. would allow this type of exposure to occur.

Acute toxicity testing for estuarine and marine organisms on formulated glyphosate may be required when exposure to estuarine and marine water is expected.  The use in drainage systems (wet or dry) would allow this type of exposure.   Minimum requirements are results from testing the technical on one estuarine fish (96 hrs $LC_{50}$) and either a 48 hrs oyster larvae study or a 96 hrs shell deposition study. Again, since there is such an extensive data set for this chemical, the Agency can determine that glyphosate demonstrates low toxicity to fish and oyster species, and therefore is waiving the marine fish and oyster acute toxicity studies on the formulated product.

| Acute Toxicity to Estuarine and Marine Organisms Findings | | | |
|---|---|---|---|
| **Species** | **% AI** | **Results** | **Conclusions** |
| Grass shrimp | 96.7% tech | $LC_{50}$ 281 ppm (207-381) | ranges in toxicity from slightly to practically non-toxic to marine organisms |
| Fiddler crab | 96.7% tech | $LC_{50}$ 934 ppm (555-1570) | |
| Atlantic oyster | 96.7% tech | $TL_{50}$ > 10 mg/L for 48 hours | |

These data on marine/estuarine species are acceptable for use in a risk assessment.  These data indicate that technical glyphosate is practically non-toxic to grass shrimp, fiddler crab, and slightly toxic to the Atlantic oyster.  Acute toxicity testing on an estuarine fish species is normally required.  However, since there is such an extensive data set for this chemical, the Agency can determine that glyphosate

**demonstrates low toxicity to fish species, and therefore is waiving the marine fish acute toxicity study. (Study ID 00108110, and 00108111)**

       (b)    Summary of Findings

A series of studies were performed on marine/ estuarine species. A 96-hour $LC_{50}$ of 281 ppm was determined for grass shrimp (*Palaemonetas vulgaris*). In a study on fiddler crabs (*Uca pugilator*), it was determined that the 96-hour $LC_{50}$ is 934 ppm glyphosate. Both of these studies indicate technical glyphosate is practically non-toxic to grass shrimp and fiddler crabs. An embryo-larvae 48-hour $TL_{50}$ for Atlantic oyster greater than 10 ppm indicating glyphosate is slightly toxic.

      (5)    Effects on Non-Target Insects

       (a)    Acute Toxicity Testing

| Acute Toxicity to Honeybees Data | | | |
|---|---|---|---|
| **Species** | **AI %** | **Results** | **Conclusions** |
| Honeybee acute oral | tech*CP67573 | oral $LD_{50} >$ 100μg/bee | practically non-toxic to honeybees on an acute oral and acute contact basis |
| Honeybee acute oral | 36 % MON2139 | oral $LD_{50} >$ 100μg/bee | |
| Honeybee acute contact | tech*CP67573 | contact $LD_{50} >$ 100μg/bee | |
| Honeybee acute contact | 36 % MON2139 | contact $LD_{50} >$ 100μg/bee | |
| * - The percentage of active ingredient used was not reported. | | | |

**The guidelines require acute toxicity testing to honeybees on the technical when a herbicide is registered as a general use herbicide. Given the multitude of use patterns for which this chemical is registered, acute honeybee toxicity studies are required. Based on these data, glyphosate (CP67573) is considered practically nontoxic on the basis of acute contact toxicity, as well as on acute oral toxicity. These data satisfy guideline requirements for nontarget insect studies when glyphosate is used as a general use herbicide. (Fiche No. 00026489)**

(b)      Summary of Findings

Four studies were conducted, two on technical glyphosate and two on the formulation MON2139, consisting of 36 % active ingredient. Results from the honeybee acute oral toxicity study indicates both technical and formulated glyphosate are practically nontoxic to the honey bee with $LD_{50}$ values greater than 100 μg/bee. Results from the honeybee acute contact toxicity study indicates both technical and formulated glyphosate are practically nontoxic to the honey bee with $LD_{50}$ values greater than 100 μg/bee.

(6)      Effects to Non-Target Plants

When a herbicide is applied as a terrestrial nonfood use, aquatic nonfood use, or as a forestry use, Tier I nontarget phytotoxicity studies are required in order to evaluate the effects of the herbicide on nontarget plants.

(a)      Phytotoxicity Testing

| Effects on Non-Target Plant Findings | | |
|---|---|---|
| **Species** | **%AI** | **Results** |
| *Selenastrum capricornutum* | 96.6 | 4 day $EC_{50}$ = 12.5 mg/l |
| *Navicula pelliculosa* | 96.6 | 4 Day $EC_{50}$ = 39.9 mg/l |
| *Skeletonema costatum* | 96.6 | 4 day $EC_{50}$ = 0.85 mg/l |
| *Anabaena flos-aquae* | 96.6 | 4 day $EC_{50}$ = 11.7 mg/l |
| *Lemna gibba* | 96.6 | 7 day $EC_{50}$ = 21.5 mg/l |

**Based on the results of the preceding studies, the data indicates that the 4 day $EC_{50}$ ranged from 0.85 mg/l to 39.9 mg/l for four aquatic plant species, and a 7 day $EC_{50}$ of 21.5 mg/l for one aquatic species. Based**

on the data submitted, the requirements for Tier I and Tier II Aquatic Plant Growth Studies (122-2 and 123-2) have been fulfilled.

A seed germination/seedling emergence study was conducted (MRID 40159301) on isopropylamine salt of glyphosate CP-70139 (Tech) 50% acid basis. The results indicate that CP-70139 applied at a rate up to 10.0 lb ai/A resulted in <25 % effect on the spectrum of monocots and dicots tested. Based on the results of this study, Tier I data requirements for seed germination/seedling emergence guideline reference 122-1 have been satisfied. (MRIDs 40236901, 40236902, 40236903, 40236934, and 40236905)

(b)     Summary of Findings

Based on the results of the aquatic plant growth studies which were conducted on 5 species, the data indicates that the 4 day $EC_{50}$ ranged from 0.85 mg/l to 39.9 mg/l for four aquatic plant species, and a 7 day $EC_{50}$ of 21.5 mg/l for one aquatic species.

A seed germination/seedling emergence study was conducted on isopropylamine salt of glyphosate CP-70139 (Tech) 50% acid basis. The results indicate that CP-70139 applied at a rate up to 10.0 lb ai/A resulted in <25 % effect on the spectrum of monocots and dicots tested.

Based on the use patterns, the method of application, and the chemical properties of glyphosate, additional studies are required to evaluate the effects on nontarget plants. The recommended labels do not preclude off-target movement of glyphosate by drift. Nor do they address the potential off-target movement via terrestrial plants as well as aquatic plants. Therefore, the Agency is requiring terrestrial plant test data to assess potential risk to nontarget plants. The data required are the Tier II Vegetative Vigor Guideline Reference No. 123-1. In addition, droplet size spectrum (201-1) and drift field evaluation (202-1) data are required.

These three guideline studies, Vegetative Vigor, Droplet Size Spectrum, and Drift Field Evaluation are not considered part of the target data base for reregistration. These data do not affect the

reregistration eligibility of glyphosate.  If, upon review of the data from these studies, modification in use practices and/or precautionary measures are necessary, the Agency will require all registrants to make label changes as appropriate.

b.    Ecological Effects Risk Assessment

Based on the current data, it has been determined that effects to birds, mammals, fish and invertebrates are minimal. Under certain use conditions, glyphosate is expected to cause adverse effects to nontarget aquatic plants.  Additional data are needed in order to fully evaluate the effects of glyphosate on nontarget terrestrial plants. This includes results from vegetative vigor testing (123-1), droplet size spectrum (201-1). In addition, the drift field evaluation (202-1) study must be submitted and reviewed. Risk reduction measures cannot be recommended until data are submitted and evaluated.

(1)    Non-Endangered Species

(a)    Terrestrial Species

The acute oral $LD_{50}$ found for bobwhite quail dosed with technical glyphosate is greater than 3851 mg/kg. This indicates that the chemical is practically non-toxic to an upland game species.  On a dietary basis, the available data indicate that, at most, technical glyphosate is slightly toxic to both mallards and bobwhite ($LC_{50} > 4640$). The articles of Hoerger and Kenaga (1972) and Kenaga (1973) were consulted in order to estimate the maximum concentration of glyphosate which may occur at the highest application rate for such sites as, cotton and corn. The following chart addresses the major vegetation categories upon which fauna are expected to feed.

| Feed Category Concentrations (ppm) @ 5.0625 lbs ai/A | |
|---|---|
| Short grass | 1215 |

| Long grass | 557 |
|---|---|
| Leafy crops | 632 |
| Forage; small insects | 294 |
| Pods; large insects | 61 |
| Fruit | 35 |

Comparing these residues to the dietary data for both bobwhite and mallards ($LC_{50} > 4640$; 1/5th the $LC_{50} > 928$), higher use rates may produce potentially toxic residues on short grass only (assuming the $LC_{50}$ is just over $> 4640$). Wildlife ingesting significant amounts of insects, pods and/or fruits should not be affected by single applications.

Directions for some of the use patterns do indicate that applications can be repeated. Multiple treatments could potentially increase residues on dietary items within an extended time period. Also, the available information suggest that glyphosate is relatively persistent. The half-life in soil is as high as 90.2 days. However, avian reproduction studies demonstrated no adverse effects at the highest level tested, 1000 parts per million. Similarly, 90-day dietary studies with dogs and rats indicate no significant abnormalities when the maximum level tested is 2000 parts per million. Based on this, minimal risk is expected.

(b)     Aquatic Species

Aquatic organisms do not appear to be sensitive to technical glyphosate.  The most sensitive aquatic invertebrate tested is *Chironomus plumosus* with a 48-hr $LC_{50}$ of 55 ppm which is very near to the lower limit of the *Daphnia* chronic MATC of 50 mg/l. The most sensitive fish species are fathead minnow and rainbow trout which have 96-hour $LC_{50}$s of 84.9 and 86 mg/l.  Chronic testing for the technical with fathead minnow provided an MATC of > 25.7 mg/l. Based on the toxicity and the various EEC's the Agency has determined technical glyphosate should not cause acute or chronic adverse effects to aquatic environments.  Therefore, minimal risk is expected to aquatic organisms from the technical glyphosate.

(c)     Terrestrial Plants and Aquatic Macrophytes

A seed germination/seedling emergence study was conducted on isopropylamine salt of glyphosate CP-70139 (Tech) 50% acid basis.   The results indicate that CP-70139 applied at a rate up to 10.0 lb ai/A resulted in <25 % effect on the spectrum of monocots and dicots tested. Considering the use patterns that are terrestrial food crop and non-food crop the above EEC's were considered for evaluating the effects to nontarget plants. The highest exposure of 0.404 lb a.i. (from aerial application, mist blower and sprinkler irrigation) is well below the 10.0 lb a.i./A rate which resulted in < 25 % effect on the monocots and dicots tested.  Therefore, it has been determined that the use of glyphosate is not expected to cause adverse effects on seed germination/seedling emergence with the various registered use patterns. (MRID 40159301)

No vegetative vigor (123-1) plant studies have been conducted.  Based on the use patterns, the method of application and the chemical properties of

glyphosate, additional studies are required to evaluate these effects on nontarget terrestrial plants. The recommended labeling precautions do not preclude off-target movement of glyphosate by drift. To assess potential risk to terrestrial plants the Agency is requiring additional terrestrial plant test data, including results from vegetative vigor testing, droplet size spectrum testing and drift field evaluation. These data are not part of the target data base for reregistration.  Risk reduction measures cannot be recommended until data are submitted and evaluated. If, upon review of the data from these studies, modification in use practices and/or precautionary measures are necessary, the Agency will require all registrants to make label changes as appropriate.

The aquatic EEC from direct application of 3.72 ppm was used to estimate exposure.  Based on the results of the aquatic macrophyte toxicity data, the 4 day $EC_{50}$ was reported to be as low as 0.85 ppm indicating that there may be adverse effects to nontarget aquatic plant species.

(2)   Endangered Species

Based on the toxicity data and the estimated exposure, it is not expected that endangered terrestrial or aquatic organisms will be affected from the use of glyphosate on the registered uses since the EEC's are well below the endangered species criteria (birds= $1/10 \ LC_{50}$, aquatic organisms= $1/20 \ LC_{50}$).  However, many endangered plants may be at risk from the use of glyphosate on the registered use patterns.   In addition, as discussed in the 1986 Glyphosate Registration Standard, it was determined that based on habitat, the Houston Toad may be at risk from the use of glyphosate on alfalfa.

# IV.   RISK MANAGEMENT AND REREGISTRATION DECISION

## A.   Determination of Eligibility

Section 4(g)(2)(A) of FIFRA calls for the Agency to determine, after submission of relevant data concerning an active ingredient, whether products containing the active ingredients are eligible for reregistration. The Agency has previously identified and required the submission of the generic (i.e. active ingredient specific) data required to support reregistration of products containing glyphosate active ingredients. The Agency has completed its review of these generic data, and has determined that the data are sufficient to support reregistration of all products containing the isopropylamine and sodium salts of glyphosate. Appendix B identifies the generic data requirements that the Agency reviewed as part of its determination of reregistration eligibility of glyphosate, and lists the submitted studies that the Agency found acceptable.

The data identified in Appendix B were sufficient to allow the Agency to assess the registered uses of glyphosate and to determine that glyphosate can be used without resulting in unreasonable adverse effects to man and the environment. The Agency therefore finds that all products containing glyphosate as the active ingredients are eligible for reregistration. The reregistration of particular products is addressed in Section V of this document.

The Agency made its reregistration eligibility determination based upon the target data base required for reregistration, the current guidelines for conducting acceptable studies to generate such data and the data identified in Appendix B. Although the Agency has found that all uses of glyphosate (isopropylamine and sodium salt formulations) are eligible for reregistration, it should be understood that the Agency may take appropriate regulatory action, and/or require the submission of additional data to support the registration of products containing glyphosate, if new information comes to the Agency's attention or if the data requirements for registration (or the guidelines for generating such data) change.

1.      Eligibility Decision

Based on the reviews of the generic data for the active ingredient glyphosate, the Agency has sufficient information on the health effects of glyphosate and on its potential for causing adverse effects in fish and wildlife and the environment. The Agency concludes that products containing glyphosate for all uses are eligible for reregistration.

The Agency has determined that glyphosate products, labeled and used as specified in this Reregistration Eligibility Document, will not pose unreasonable risks or adverse effects to humans or the environment.

2.      Eligible and Ineligible Uses

The Agency has determined that all uses of glyphosate are eligible for reregistration.

**B.      Regulatory Position**

The following is a summary of the regulatory positions and rationales for glyphosate.  Where labeling revisions are imposed, specific language is set forth in Section V of this document.

1.      Tolerance Re-assessment

The Agency has determined that aminomethyl phosphonic acid (AMPA), the metabolite of glyphosate, no longer needs to be regulated and therefore this compound will be dropped from the tolerance expression. Also, although the monoammonium salt of glyphosate is not subject to reregistration, the available data are to allow re-assessment of existing tolerances for residues resulting from the application of the monoammonium salt of glyphosate.

Tolerances Listed Under 40 CFR §180.364(a):

The tolerances listed in 40 CFR §180.364(a) are for the combined residues of glyphosate and its metabolite AMPA resulting from application of the isopropylamine salt of glyphosate and/or the monoammonium salt of glyphosate.

Sufficient data are available to ascertain the adequacy of the established tolerances listed in 40 CFR §180.364(a) for:  acerola; alfalfa, forage, seed, and hay; almonds, hulls; artichokes, Jerusalem; asparagus; atemoya; avocados; Bahiagrass; bananas; beets, garden, roots; Bermudagrass; bluegrass; Brassica leafy vegetables group; bromegrass; bulb vegetables group; carambola; carrots; cereal grains group; citrus fruits group; coffee beans, green; clover; cotton forage; cotton hay; cottonseed; cranberries; cucurbit vegetables group; fescue; figs; foliage of legume vegetables group; fruiting vegetables group; grapes; grass forage, fodder, and hay group; guavas; horseradish; kiwifruit; leafy vegetables group; leaves of the root and tuber vegetables group; legume vegetables group; longan fruit; lychee; mangoes; non-grass animal feeds group, forage and hay; orchardgrass; papayas; parsnips; passion fruit; peanuts; peanuts,

vines; pineapple; pistachio; pome fruits group; radishes; rutabagas; ryegrass; sapodilla; sapote; small fruits and berries group; soybeans; soybean, forage; stone fruits group; sugar apple; sugar beets; sweet potatoes; timothy; tree nuts group; turnip roots; wheatgrass; and yams. Certain commodity definitions of the above tolerances are not in accordance with the definitions listed in Table II of Subdivision O; see the tolerance re-assessment table on page 63 for modifications in commodity definitions.

The established crop group tolerances for the now-obsolete "seed and pod vegetables" (0.2 ppm) and "seed and pod vegetables, forage and hay" (0.2 ppm) are inappropriate and are to be replaced with "legume vegetables group (except soybeans)" and "legume vegetables group, foliage of (except soybean forage and hay)," respectively. Soybeans must be excluded from the crop group tolerances because the use pattern for soybeans is different from other legume vegetables, and the established tolerance for soybeans and soybean forage and hay differ by a factor >5x from other legume vegetables. To achieve compatibility with Codex MRLs for selected commodities, the following actions must be taken (see the table on page 68): (i) increase U.S. tolerance for legume vegetables group (except soybeans) from 0.2 ppm to 5 ppm; and (ii) increase U.S. tolerance for soybean hay from 15 ppm to 20 ppm.

The individual tolerances for cranberries (0.2 ppm) and grapes (0.2 ppm) should be revoked since these fruits are covered by the crop group tolerance (0.2 ppm) for small fruits and berries. The tolerance for cotton hay is to be revoked since this is not a raw agricultural commodity of cotton.

Tolerances for wheat, grain and wheat, straw at 4 and 85 ppm, respectively, have been proposed (PP0F3865/FAP2H5635). When these tolerances have been established, the tolerances for the cereal grains group and the cereal grains group, forage, fodder, and straw should be modified to "cereal grains group (except wheat)" and "cereal grains group, forage, fodder, and straw (except wheat straw)", respectively. To achieve compatibility with the Codex MRL for wheat grain, the U.S. tolerance should be established at 5 ppm (see the table on page 68).

The existing and conflicting tolerances for alfalfa (200 ppm), alfalfa fresh and hay (0.2 ppm), clover (200 ppm), and forage legumes (except soybeans and peanuts; 0.4 ppm) should be deleted. Concomitant with the deletion of these tolerances, a tolerance of 100 ppm for residues in or on the non-grass animal feeds group, forage and hay, is to be established. The available data from alfalfa, lespedeza, and trefoil will support this crop group tolerance.

The established tolerances for "forage grasses" (0.2 ppm), "grasses, forage" (0.2 ppm), Bahiagrass (200 ppm), Bermudagrass (200 ppm), bluegrass (200 ppm), bromegrass (200 ppm), fescue (200 ppm), orchardgrass (200 ppm), ryegrass (200 ppm), timothy (200 ppm), and wheatgrass (200 ppm) is to be deleted. Concomitant with the deletion of these tolerances, a tolerance for residues in on or on the grass forage, fodder, and hay group is to be established at 100 ppm. The available data indicate that following registered use, residues in or on the grass forage, fodder, and hay group will not exceed 100 ppm.

Individual tolerances exist for residues in or on salsify and the following tropical/subtropical crops: breadfruit; canistel; cherimoya; cocoa beans; coconut; dates; genip; jaboticaba; jackfruit; persimmons; sapote (black and white); soursop; and tamarind. There are currently no registered uses of glyphosate on these crop sites. These tolerances will be revoked.

A tolerance of 200 ppm has recently been established for residues in or on soybean straw (FR 42701, 9/16/92). However, this tolerance is to be revoked since this is not a raw agricultural commodity of soybeans. The tolerance for soybeans, hay should be raised to cover this desiccant use.

The expression negligible residues (N) should be deleted. For a complete listing of appropriate commodity definition changes and recommendations, see the table on page 63.

Tolerances Listed Under 40 CFR §180.364(b):

The tolerances listed in 40 CFR §180.364(b) are for the combined residues of glyphosate and its metabolite AMPA resulting from application of the glyphosate isopropylamine salt and/or glyphosate monoammonium salt for herbicidal and plant growth regulator purposes and/or the sodium sesqui salt for plant regulator purposes.

Sufficient data are available to ascertain the adequacy of the established tolerances listed in 40 CFR §180.364(b) for: liver and kidney of cattle, goats, hogs, horses, poultry, and sheep; peanuts; peanuts, hay; peanuts, hulls; sugarcane; fish; and shellfish. See the table on page 63 for modifications in commodity definitions.

Tolerances Listed Under 40 CFR §180.364(c):

The tolerances listed in 40 CFR §180.364(c) are for the combined residues of glyphosate and its metabolite AMPA resulting from the use of irrigation water containing residues of 0.5 ppm following applications on or around aquatic sites, and are established at 0.1 ppm. The Agency's Office of Water has established a maximum contaminant level (MCL) of 0.7 ppm for glyphosate *per se* in drinking water (FR Notice: Vol. 57, No. 138, page 31776, dated July 17, 1992).

Sufficient data are available to ascertain the established tolerances listed in 40 CFR §180.364(c) for the crop groupings Brassica leafy vegetables group; bulb vegetables group; cereal grains group; citrus fruits group; cucurbit vegetables group; foliage of legume vegetables group; forage, fodder, and straw of the cereal grains group; fruiting vegetables group; grass forage, fodder and hay group; leafy vegetables group; leaves of the root and tuber vegetables group; legume vegetables group; non-grass animal feeds group, forage and hay; pome fruits group; root and tuber vegetables group; stone fruits group; tree nuts group; and the individual commodities avocados, cottonseed, and hops. See the table on page 63 for modifications in commodity definitions.

Tolerances Listed Under 40 CFR §185.3500:

The tolerances listed in 40 CFR §185.3500(1) are for the combined residues of glyphosate and its metabolite AMPA resulting from the

application of the glyphosate for herbicidal purposes and/or the sodium sesqui salt for plant regulator purposes.

Sufficient data are available to ascertain the adequacy of the established food additive tolerances listed in 40 CFR §185.3500(1) for sugarcane, molasses.  See the table on page 63 for modifications in commodity definitions.

The tolerances listed in 40 CFR §185.3500(2) are for the combined residues of glyphosate and its metabolite AMPA resulting from the application of the isopropylamine salt of glyphosate for herbicidal purposes.

Sufficient data are available to ascertain the adequacy of the established food additive tolerances listed in 40 CFR §185.3500(2) for olives (imported), palm oil, dried tea and instant tea.  See the table on page 63 for modifications in commodity definitions.

A 12-ppm food additive tolerance for wheat milling fractions (except flour) has been proposed (FAP2H5635).  To achieve compatibility with the Codex MRL for wheat bran, unprocessed, the U.S. tolerance should be established at 40 ppm (see the table on page 68).

Tolerances Listed Under 40 CFR §186.3500:

The tolerances listed in 40 CFR §186.3500(a) are for the combined residues of glyphosate and its metabolite AMPA.

Sufficient data are available to ascertain the adequacy of the established feed additive tolerances listed in 40 CFR §186.3500(a) for dried citrus pulp and soybean hulls.  See the table on page 63 for modifications in commodity definitions.

A tolerance has recently been established at 1.0 ppm for the combined residues of glyphosate and AMPA in citrus, molasses (FR 42701, 9/16/92).

Existing tolerances of glyphosate are currently established in the Title 40 of the Code of Federal Regulations, §180.364.  The reassessment of the established tolerances is set forth in the Tolerance Reassessment Table as follows.

*GLYPHOSATE RED*

*September 1993*

| Commodity | Current Tolerance [1] (ppm) | Tolerance [2] Reassessment (ppm) | Comment/*Correct Commodity Definition* |
|---|---|---|---|
| **Tolerances listed under 180.364(a):** | | | |
| Acerola | 0.2 | | |
| Alfalfa<br>Alfalfa, fresh and hay<br>Clover<br>Forage legumes (except soybeans and peanuts) | 200.0<br>0.2<br>200.0<br>0.4 | Revoke and establish at 100 | *Non-grass animal feeds group, forage and hay* |
| Almond hulls | 1 | | *Almonds, hulls* |
| Artichokes, Jerusalem | 0.2 | | |
| Asparagus | 0.5 | | |
| Atemoya | 0.2 | | |
| Avocados | 0.2 | | |
| Bahiagrass<br>Bermudagrass<br>Bluegrass<br>Bromegrass<br>Fescue<br>Forage grasses<br>Grasses, forage<br>Orchardgrass<br>Ryegrass<br>Timothy<br>Wheatgrass | 200.0<br>200.0<br>200.0<br>200.0<br>200.0<br>0.2<br>0.2<br>200.0<br>200.0<br>200.0<br>200.0 | Revoke and establish at 100 | *Grass forage, fodder, and hay group* |
| Bananas | 0.2 | | |
| Beets | 0.2 | | *Beets, garden, roots* |
| Beets, sugar | 0.2 | | *Sugar beets* |
| Breadfruit | 0.2 | Revoke | No registered uses |
| Canistel | 0.2 | Revoke | No registered uses |
| Carambola | 0.2 | | |
| Carrots | 0.2 | | |
| Cherimoya | 0.2 | Revoke | No registered uses |
| Chicory | 0.2 | | *Chicory, roots* |
| Citrus fruits | 0.2 | | *Citrus fruits group* |
| Cocoa beans | 0.2 | Revoke | No registered uses |
| Coconut | 0.1 | Revoke | No registered uses |
| Coffee beans | 1 | | *Coffee beans, green* |
| Cotton, forage | 15 | | |

63

*GLYPHOSATE RED*
*September 1993*

| Commodity | Current Tolerance [1] (ppm) | Tolerance [2] Reassessment (ppm) | Comment/*Correct Commodity Definition* |
|---|---|---|---|
| Cotton, hay | 15 | Revoke | Not in Table II, Subdivision O, PAG |
| Cottonseed | 15 | | |
| Cranberries | 0.2 | Revoke | Covered under small fruits and berries group |
| Dates | 0.2 | Revoke | No registered uses |
| Figs | 0.2 | | |
| Forage grasses<br>Grasses, forage | 0.2<br>0.2 | 0.2 | *Forage, fodder, and straw of cereal grains group (except wheat straw)* |
| Fruits, small and berries | 0.2 | | *Small fruits and berries group* |
| Genip | 0.2 | Revoke | No registered uses |
| Grain crops | 0.1 | | *Cereal grains group (except wheat)* |
| Grapes | 0.2 | Revoke | Covered under small fruits and berries group |
| Guavas | 0.2 | | |
| Horseradish | 0.2 | | |
| Jaboticaba | 0.2 | Revoke | No registered uses |
| Jackfruit | 0.2 | Revoke | No registered uses |
| Kiwifruit | 0.2 | 0.1 | see Codex Harmonization Table |
| Leafy vegetables | 0.2 | | *Leafy vegetables (except Brassica) group* <u>and</u> *Leaves of root and tuber vegetables group* |
| Longan | 0.2 | | *Longan fruit* |
| Lychee | 0.2 | | |
| Mamy sapote | 0.2 | | *Sapote* |
| Mangoes | 0.2 | | |
| Nuts | 0.2 | | *Tree nuts group* |
| Olives | 0.2 | | |
| Papayas | 0.2 | | |
| Parsnips | 0.2 | | *Parsnips, roots* |
| Passion fruit | 0.2 | | |
| Peanut, forage | 0.5 | | *Peanuts, vines* |
| Persimmons | 0.2 | Revoke | No registered uses |

64

*GLYPHOSATE RED*
*September 1993*

| Commodity | Current Tolerance [1] (ppm) | Tolerance [2] Reassessment (ppm) | Comment/*Correct Commodity Definition* |
|---|---|---|---|
| Pineapple | 0.1 | | *Pineapples* |
| Pistachio nuts | 0.2 | | *Pistachios* |
| Pome fruits | 0.2 | | *Pome fruits group* |
| Potatoes | 0.2 | | |
| Radishes | 0.2 | | *Radishes, root* |
| Rutabagas | 0.2 | | *Rutabagas, root* |
| Salsify | 0.2 | Revoke | No registered uses |
| Sapodilla | 0.2 | | |
| Sapote, black | 0.2 | Revoke | No registered uses |
| Sapote, white | 0.2 | Revoke | No registered uses |
| Seed and pod vegetables | 0.2 | 5 | see Codex harmonization Table; *Legume vegetables group (except soybeans)* |
| Seed and pod vegetables, forage | 0.2 | 0.2 | *Foliage of legume vegetables group (except soybean forage and hay)* |
| Seed and pod vegetables, hay | 0.2 | | |
| Soursop | 0.2 | Revoke | No registered uses |
| Soybeans | 20 | | |
| Soybeans, forage | 15 | | |
| Soybeans, hay | 15 | 200 | Raised to cover desiccant use. |
| Soybeans, straw | 200 | Revoke | Not in Table II, Subdivision O, PAG |
| Stone fruit | 0.2 | | *Stone fruits group* |
| Sugar apple | 0.2 | | |
| Sweet potatoes | 0.2 | | |
| Tamarind | 0.2 | Revoke | No registered uses |
| Turnips | 0.2 | | *Turnips, roots* |
| Vegetables, bulb | 0.2 | | *Bulb vegetables group* |
| Vegetables, cucurbit | 0.5 | | *Cucurbit vegetables group* |
| Vegetables, fruiting (except cucurbits) group | 0.1 | | *Fruiting vegetables group* |
| Vegetables, leafy, Brassica (cole) | 0.2 | | *Brassica leafy vegetables group* |
| Yams | 0.2 | | |
| Wheat, grain | N/A | 5.0 | see Codex harmonization Table |
| Wheat, straw | N/A | 85 (proposed) | |

65

| Commodity | Current Tolerance [1] (ppm) | Tolerance [2] Reassessment (ppm) | Comment/*Correct Commodity Definition* |
|---|---|---|---|
| **Tolerances listed under 40 CFR §180.364(b):** | | | |
| Cattle, kidney | 0.5 | 2.0 | see Codex harmonization Table |
| Cattle, liver | 0.5 | 2.0 | see Codex harmonization Table |
| Fish | 0.25 | | |
| Goats, kidney | 0.5 | | |
| Goats, liver | 0.5 | | |
| Hogs, kidney | 0.5 | 1.0 | see Codex harmonization Table |
| Hogs, liver | 0.5 | 1.0 | see Codex harmonization Table |
| Horses, kidney | 0.5 | | |
| Horses, liver | 0.5 | | |
| Peanuts | 0.1 | | |
| Peanut, hay | 0.5 | | *Peanuts, hay* |
| Peanut, hulls | 0.5 | | *Peanuts, hulls* |
| Poultry, kidney | 0.5 | | |
| Poultry, liver | 0.5 | | |
| Sheep, kidney | 0.5 | | |
| Sheep, liver | 0.5 | | |
| Shellfish | 3.0 | | |
| Sugarcane | 2.0 | | |
| **Tolerances listed under 40 CFR 180.364(c):** | | | |
| Avocados | 0.1 | | |
| Citrus | 0.1 | | *Citrus fruits group* |
| Cottonseed | 0.1 | | |
| Cucurbits | 0.1 | | *Cucurbit vegetables group* |
| Forage grasses | 0.1 | | *Grass forage, fodder, and hay group* |
| Forage legumes | 0.1 | | *Non-grass animal feeds group, forage and hay* |
| Fruiting vegetables | 0.1 | | *Fruiting vegetables group* |
| Grain crops | 0.1 | | *Cereal grains group* <u>and</u> *Forage, fodder, and straw of cereal grains group* |
| Hops | 0.1 | | |

66

*GLYPHOSATE RED*
*September 1993*

| Commodity | Current Tolerance [1] (ppm) | Tolerance [2] Reassessment (ppm) | Comment/*Correct Commodity Definition* |
|---|---|---|---|
| Leafy vegetables | 0.1 | | *Leafy vegetables (except Brassica) group* <u>and</u> *Brassica (cole) leafy vegetables group* |
| Nuts | 0.1 | | *Tree nuts group* |
| Pome fruits | 0.1 | | *Pome fruits group* |
| Root crop vegetables | 0.1 | | *Root and tuber vegetables group* <u>and</u> *Leaves of root and tuber vegetables group* <u>and</u> *Bulb vegetables group* |
| Seed and pod vegetables | 0.1 | | *Legume vegetables group* <u>and</u> *Foliage of legume vegetables group* |
| Stone fruit | 0.1 | | *Stone fruits group* |
| **Tolerances listed under 40 CFR §185.3500(a)(1):** | | | |
| Molasses, sugarcane | 30.0 | | *Sugarcane, molasses* |
| **Tolerances listed under 40 CFR §185.3500(a)(2):** | | | |
| Oil, palm | 0.1 | | *Palm oil, refined* |
| Olives, imported | 0.1 | | |
| Tea, dried | 1.0 | | |
| Tea, instant | 7.0 | Revoke | Not in Table II, Subdivision O, PAG |
| Wheat milling fractions (except flour) | N/A | 40 | see Codex harmonization Table |
| **Tolerances listed under 40 CFR §186.3500(a):** | | | |
| Citrus, pulp, dried | 1.0 | | |
| Citrus molasses | 1.0 | | *Citrus, molasses* |
| Soybean hulls | 100 | | *Soybeans, hulls* |

1  Tolerances are for the combined residues of glyphosate and its metabolite AMPA.
2  Tolerances are now for glyphosate *per se*.

67

CODEX HARMONIZATION TABLE

Several maximum residue limits (MRLs) for glyphosate have been established by Codex in various commodities. The Codex MRLs (currently expressed in terms of glyphosate *per se*) and applicable U.S. tolerances (expressed in terms of the combined residues of glyphosate and its metabolite AMPA) are listed in the table below. The Agency has determined that AMPA no longer needs to be regulated and therefore will be deleted from the tolerance expression. Based on this determination, the expression of the U.S. tolerances and the Codex MRLs will be harmonized, and both will now be expressed in terms of glyphosate *per se*.

Codex MRLs and applicable U.S. tolerances. Recommendations for compatibility are based on conclusions following reassessments of U.S. tolerances (see Tolerance Reassessment Table, above).

| Commodity | MRL (Step) (mg/kg) | U.S. Tolerance (ppm) | Recommendation |
|---|---|---|---|
| Barley | 20  (CXL) | 0.1 (Cereal grains group, except wheat) | |
| Beans (dry) | 2  (CXL) | 0.2 (Legume vegetables group, except soybeans) | |
| Cattle meat | 0.1 (CXL) | | |
| Cattle milk | 0.1 (CXL) | | |
| Cattle, edible offal | 2  (CXL) | 0.5 (Cattle, liver & kidney) | increase U.S. tolerances |
| Cottonseed | 0.5 (CXL) | 15 | |
| Eggs | 0.1 (CXL) | | |
| Hay or fodder (dry) of grasses | 50  (CXL) | 100 (Grass forage, fodder, and hay group) | |
| Kiwifruit | 0.1 (CXL) | 0.2 | decrease U.S. tolerance |
| Maize | 0.1 (CXL) | 0.1 | |
| Oats | 20  (CXL) | 0.1 (Cereal grains group, except wheat) | |
| Peas (dry) | 5  (CXL) | 0.2 (Legume vegetables group, except soybeans) | increase U.S. tolerance |
| Pig meat | 0.1 (CXL) | | |
| Pig, edible offal | 1  (CXL) | 0.5 (Hogs, liver & kidney) | increase U.S. tolerances |
| Poultry meat | 0.1 (CXL) | | |
| Rape seed | 10  (CXL) | | |
| Rice | 0.1 (CXL) | 0.1 (Cereal grains group, except wheat) | |

| Commodity | MRL (Step) (mg/kg) | U.S. Tolerance (ppm) | Recommendation |
|---|---|---|---|
| Sorghum | 0.1 (CXL) | 0.1 (Cereal grains group, except wheat) | |
| Soya bean fodder | 20   (Step 8) | 15 (Soybeans, hay) | |
| Soya bean forage (green) | 5   (Step 8) | 15 (Soybeans, forage) | |
| Soya bean (dry) | 5   (Step 8) | 20 (Soybeans) | |
| Soya bean (immature seeds) | 0.2 (CXL) | | |
| Straw and fodder (dry) of cereal grains | 100   (CXL) | 0.2 (Forage, fodder, and straw of cereal grains group, except wheat straw) | |
| Sweet corn (corn-on-the-cob) | 0.1 (CXL) | 0.1 (Cereal grains group, except wheat) | |
| Wheat | 5   (CXL) | 4 (proposed) | increase U.S. tolerance proposal |
| Wheat bran, unprocessed | 40   (Step 6) | 12 (proposed) | increase U.S. tolerance proposal |
| Wheat flour | 0.5 (Step 8) | | |
| Wheat whole meal | 5   (Step 8) | 12 (proposed) | |

The following conclusions can be made regarding efforts to harmonize the U.S. tolerances with the Codex MRLs:

Ë    Compatibility between the U.S. tolerances and permanent Codex MRLs exists in or on:  corn (field and sweet); rice; and sorghum.

Ë    The levels of U.S. tolerances should be increased, toxicological and DRES considerations permitting, to achieve compatibility with the Codex MRLs in or on the following commodities:  (i) liver and kidney of cattle (from 0.5 to 2.0 ppm); (ii) liver and kidney of hogs (from 0.5 to 1.0 ppm); and (iii) legume vegetables group (except soybeans) (from 0.2 to 5 ppm);

Ë    The level of the U.S. tolerance should be decreased to achieve compatibility with the Codex MRLs in or on kiwifruit (from 0.2 to 0.1 ppm).

Ë    The U.S. tolerances in or on the following commodities were based on registered use patterns in the U.S. and cannot be lowered to achieve compatibility with the Codex MRLs:  (i) grass forage, fodder, and hay group; (ii) soybeans; and (iii) soybeans, forage.

Ë    Wheat grain and wheat bran tolerances of 4 and 12 ppm, respectively, have been proposed.  To achieve compatibility with Codex, these tolerance levels should be increased, toxicological and DRES considerations permitting, to 5 and 40 ppm, respectively.

Ë    Wide differences (>5x) exist between the U.S. tolerances and permanent Codex MRLs in or on the following commodities:  barley; beans (dry); soybeans, hay; cottonseed; oats; forage, fodder, and straw of cereal grains.  The decision to harmonize residue levels in or on these commodities cannot be made at this time.

Ë    No questions of compatibility exist with respect to commodities where:  (i) no Codex MRLs have been established, but U.S. tolerances exist; and (ii) Codex MRLs have been established, but U.S. tolerances do not exist.

2.    Labeling Rationale

While studies show that glyphosate is no more than slightly toxic to birds and is practically non-toxic to fish and honeybees, a toxic inert in glyphosate end use products necessitates the labelling of some products "toxic to fish" since some glyphosate products are applied directly to aquatic environments.

3.    Endangered Species Statement

The Agency does have concerns regarding exposure of endangered plant species to glyphosate.  In the June 1986 Registration Standard, the Agency discussed consultations with the US Fish and Wildlife Service (FWS) on hazards to crops, rangeland, silvicultural sites, and the Houston toad which may result from the use of glyphosate. Because a jeopardy opinion resulted from these consultations, the agency imposed endangered species labeling requirements in the Registration Standard to mitigate the risk to endangered species.  Since that time, additional plant species have been added to the list of endangered species.  At the present time, EPA is working with the FWS and other federal and state agencies to develop a program to avoid jeopardizing the continued existence of all listed species by the use of pesticides.  When the Endangered Species Protection Program is implemented and subsequent guidance is given, endangered species labeling amendments may be required on affected end-use products.  Labeling statements for end use products will likely refer users to county specific bulletins specifying detailed limitations on use to protect endangered species.

# V.   ACTIONS REQUIRED BY REGISTRANTS

This section specifies the data requirements and responses necessary for the reregistration of both manufacturing-use and end-use products.

## A. Manufacturing-Use Products

1.    Additional Generic Data Requirements

The generic data base supporting the reregistration of glyphosate for the above eligible uses has been reviewed and determined to be substantially complete. The Agency will be calling in data on processed potatoes in a separate DCI. However, the following additional generic data are required at this time. These additional generic data are not part of the target data base for glyphosate and do not affect the reregistration eligibility of glyphosate. (See Appendices for the Generic Data Call-In Notice.)

| Name of Study | Guideline Number |
|---------------|------------------|
| Tier II Vegetative Vigor | 123-1 |
| Droplet Size Spectrum | 201-1 |
| Drift Field Evaluation | 202-1 |

2.    Labeling Requirements for Manufacturing-Use Products

Effluent Discharge Labeling Statement

All manufacturing-use or end-use products that may be contained in an effluent discharged to the waters of the United States or municipal sewer systems must bear the following revised effluent discharge labeling statement.

"Do not discharge effluent containing this product into lakes, streams, ponds, estuaries, oceans or other waters unless in accordance with the requirements of a National Pollutant Discharge Elimination System (NPDES) permit and the permitting authority has been notified in writing prior to discharge. Do not discharge effluent containing this product to sewer systems without previously notifying the local sewage treatment plant authority. For guidance contact your State Water Board or Regional Office of the EPA."

All affected products distributed or sold by registrants and distributors (supplemental registrants) must bear the above labeling by October 1, 1995. All products distributed or sold by persons other than registrants or supplemental registrants after October 1, 1997 must bear the correct labeling. Refer to PR Notice 93-10 or 40 CFR 152.46(a)(1) for additional information.

B.    **End-Use Products**

1.    Additional Product-Specific Data Requirements

Section 4(g)(2)B) of FIFRA calls for the Agency to obtain any needed product-specific data regarding the pesticide  after a determination of eligibility has been

71

made.  The product specific data requirements are listed in Appendix G, the Product Specific Data Call-In Notice.

Registrants must review previous data submissions to ensure that they meet current EPA acceptance criteria (Appendix F; Attachment E) and if not, commit to conduct new studies.  If a registrant believes that previously submitted data meet current testing standards, then study MRID numbers should be cited according to the instructions in the Requirement Status and Registrants Response Form provided for each product.

2.   Labeling Requirements for End-Use Products

The labels and labeling of all products must comply with EPA's current regulations and requirements as specified in 40 CFR §156.10 and other applicable documents.  Please follow the instructions in the Pesticide Reregistration Handbook with respect to labels and labeling.  Furthermore, the following additional labeling must be present on glyphosate end-use product labels.

a.   Nonaquatic

"Do not apply directly to water, to areas where surface water is present or to intertidal areas below the mean high water mark.  Do not contaminate water when disposing of equipment washwaters and rinsate."

b.   Aquatic

"Do not contaminate water when disposing of equipment washwaters and rinsate.   Treatment of aquatic weeds can result in oxygen loss from decomposition for dead plants.  This loss can cause fish kills."

c.   Worker Protection Standard

Compliance

Any product whose labeling reasonably permits use in the commercial or research production of an agricultural plant on any farm, forest, nursery, or greenhouse must comply with the labeling requirements of PR Notice 93-7, "Labeling Revisions Required by the Worker Protection Standard (WPS), and PR Notice 93-11, "Supplemental Guidance for PR Notice 93-7," which reflect the requirements of EPA's labeling regulations for worker protection statements (40 CFR part 156, subpart K).  These labeling revisions are necessary to implement the Worker Protection Standard for Agricultural Pesticides (40 CFR Part 170) and must be completed in accordance with, and within the deadlines

specified in, PR Notices 93-7 and 93-11.  Unless otherwise specifically directed in this RED, all statements required by PR Notices 93-7 and 93-11 are to be on the product labeling exactly as instructed in those notices.

After April 21, 1994, except as otherwise provided in PR Notices 93-7 and 93-11, all products within the scope of those notices must bear WPS PR-Notice-complying labeling when they are distributed or sold by the primary registrant or any supplementally registered distributor.

After October 23, 1995, except as otherwise provided in PR Notices 93-7 and 93-11, all products within the scope of those notices must bear WPS PR-Notice-complying labeling when they are distributed or sold by any person.

Personal Protective Equipment

Do not add any additional personal protective equipment requirements to the labels of glyphosate end-use products,   however, any existing personal protective equipment on those labels must be retained.

Entry Restrictions

**Products not Primarily Intended for Home Use**

**Uses Within the Scope of the WPS:**  A 12-hour restricted entry interval (REI) is required for all uses within the scope of the WPS (see PR Notice 93-7) on all end-use products, except those intended primarily for home use (see tests in PR Notice 93-7 and 93-11).  This REI should be inserted into the standardized REI statement required by PR Notice 93-7. The personal protective equipment for early entry should be the PPE required for applicators of glyphosate, except any applicator requirement for an apron or respirator is waived.  This PPE should be inserted into the standardized early entry PPE statement required by PR Notice 93-7."

**Sole-active-ingredient** end-use products that contain glyphosate must be revised to adopt the entry restrictions set forth in this section.  Any conflicting entry restrictions on their current labeling must be removed.
**Multiple-active-ingredient** end-use products that contain glyphosate must compare the entry restrictions set forth in this section to the entry restrictions on their current labeling and retain the more protective.  A specific time-period in hours or days is considered more protective than "sprays have dried" or "dusts have settled."

73

**Uses Not Within the Scope of the WPS**: Do not add any additional entry restrictions for uses not within the scope of the WPS, however, any entry restrictions on the current product labeling for those uses must be retained.

**Products Primarily Intended for Home Use:**  For products primarily intended for home use (see tests in PR Notice 93-7 and 93-11), do not add any additional entry restrictions for such products, however, any entry restrictions on the current product labeling must be retained.

## C.    Existing Stocks

Registrants may generally distribute and sell products bearing old labels/labeling for 26 months from the date of the issuance of this RED.  Persons other than the registrant may generally distribute or sell such products for 50 months from the date of the issuance of this RED.  However, existing stocks time frames will be established case-by-case, depending on the number of products involved, the number of label changes, and other factors.  Refer to "Existing Stocks of Pesticide Products; State of Policy"; <u>Federal Register</u>, Volume 56, No. 123, June 26, 1991.

The Agency has determined that registrants may distribute and sell glyphosate products bearing old labels/labeling for 26 months from the date of issuance of this RED.  Persons other than registrants may distribute or sell such products for 50 months from the date of issuance of this RED.

# VI.  APPENDICES

74

1. **Bolded** references were reviewed on 4/26/90.  Unbolded references were reviewed in the Residue Chemistry Science Chapter of the Reregistration Standard dated 7/15/85.  Otherwise, references were reviewed as noted.

# Appendix A

## Use Patterns Subject to Reregistration

Appendix A is approximately 200 pages long and is not being
included in the mailing of the RED.  Instead, a summary of
eligible sites and use groups is provided.  Interested parties
may order a copy of the full Appendix A per the instructions in
Appendix D.

Date: 05 JUL 1995
Page: 1

103601 - Glyphosate, isopropylamine salt

LUIS
General Chemical Report
Site and Use Groups

| Site............................................ | Use Group............................ | Use Group Category Desc.. |
|---|---|---|
| ACEROLA (WEST INDIES CHERRY) | TERRESTRIAL FOOD CROP | Food/Feed Uses |
| AGRICULTURAL DRAINAGE SYSTEMS | AQUATIC FOOD CROP | Food/Feed Uses |
| AGRICULTURAL FALLOW/IDLELAND | TERRESTRIAL FOOD+FEED CROP | Food/Feed Uses |
| ALFALFA | TERRESTRIAL FEED CROP | Food/Feed Uses |
| ALMOND | TERRESTRIAL FOOD+FEED CROP | Food/Feed Uses |
| APPLE | TERRESTRIAL FOOD+FEED CROP | Food/Feed Uses |
| APRICOT | TERRESTRIAL FOOD CROP | Food/Feed Uses |
| ARTICHOKE, JERUSALEM | TERRESTRIAL FOOD CROP | Food/Feed Uses |
| ASPARAGUS | TERRESTRIAL FOOD CROP | Food/Feed Uses |
| ATEMOYA | TERRESTRIAL FOOD CROP | Food/Feed Uses |
| AVOCADO | TERRESTRIAL FOOD CROP | Food/Feed Uses |
| BANANA | TERRESTRIAL FOOD CROP | Food/Feed Uses |
| BARLEY | TERRESTRIAL FEED CROP | Food/Feed Uses |
| BARLEY | TERRESTRIAL FOOD+FEED CROP | Food/Feed Uses |
| BEANS | TERRESTRIAL FEED CROP | Food/Feed Uses |
| BEANS | TERRESTRIAL FOOD+FEED CROP | Food/Feed Uses |
| BEECH NUT | TERRESTRIAL FOOD CROP | Food/Feed Uses |
| BEETS | TERRESTRIAL FOOD CROP | Food/Feed Uses |
| BEETS (UNSPECIFIED) | TERRESTRIAL FOOD+FEED CROP | Food/Feed Uses |

103601 - Glyphosate, isopropylamine salt

USDA
General Chemical Report
Site and Use Groups

| Site.................. | Use Group.................................. | Use Group Category Desc.. |
|---|---|---|
| BLACKBERRY | TERRESTRIAL FOOD CROP | Food/Feed Uses |
| BLUEBERRY | TERRESTRIAL FOOD CROP | Food/Feed Uses |
| BOYSENBERRY | TERRESTRIAL FOOD CROP | Food/Feed Uses |
| BRAZIL NUT | TERRESTRIAL FOOD CROP | Food/Feed Uses |
| BREADFRUIT (BREADNUT) | TERRESTRIAL FOOD CROP | Food/Feed Uses |
| BROCCOLI | TERRESTRIAL FOOD CROP | Food/Feed Uses |
| BRUSSELS SPROUTS | TERRESTRIAL FOOD CROP | Food/Feed Uses |
| BUCKWHEAT | TERRESTRIAL FEED CROP | Food/Feed Uses |
| BUCKWHEAT | TERRESTRIAL FOOD+FEED CROP | Food/Feed Uses |
| BUTTERNUT | TERRESTRIAL FOOD CROP | Food/Feed Uses |
| CABBAGE | TERRESTRIAL FOOD CROP | Food/Feed Uses |
| CABBAGE, CHINESE | TERRESTRIAL FOOD CROP | Food/Feed Uses |
| CALAMONDIN | TERRESTRIAL FOOD+FEED CROP | Food/Feed Uses |
| CARAMBOLA (JALEA) | TERRESTRIAL FOOD CROP | Food/Feed Uses |
| CARROT (INCLUDING TOPS) | TERRESTRIAL FOOD CROP | Food/Feed Uses |
| CASHEW | TERRESTRIAL FOOD CROP | Food/Feed Uses |
| CAULIFLOWER | TERRESTRIAL FOOD CROP | Food/Feed Uses |
| CELERY | TERRESTRIAL FOOD CROP | Food/Feed Uses |

103601 - Glyphosate, isopropylamine salt

**LUIS**
**General Chemical Report**
**Site and Use Groups**

| Site | Use Group | Use Group Category Desc. |
|------|-----------|--------------------------|
| CHARD, SWISS | TERRESTRIAL FOOD CROP | Food/Feed Uses |
| CHERIMOYA | TERRESTRIAL FOOD CROP | Food/Feed Uses |
| CHERRY | TERRESTRIAL FOOD CROP | Food/Feed Uses |
| CHESTNUT | TERRESTRIAL FOOD CROP | Food/Feed Uses |
| CHICORY | TERRESTRIAL FOOD CROP | Food/Feed Uses |
| CITRON (CITRUS) | TERRESTRIAL FOOD+FEED CROP | Food/Feed Uses |
| CITRUS HYBRIDS OTHER THAN TANGELO | TERRESTRIAL FOOD+FEED CROP | Food/Feed Uses |
| COCOA | TERRESTRIAL FOOD CROP | Food/Feed Uses |
| COFFEE | TERRESTRIAL FOOD CROP | Food/Feed Uses |
| COLLARDS | TERRESTRIAL FOOD CROP | Food/Feed Uses |
| CORN | TERRESTRIAL FEED CROP | Food/Feed Uses |
| CORN (UNSPECIFIED) | TERRESTRIAL FOOD+FEED CROP | Food/Feed Uses |
| CORN, FIELD | TERRESTRIAL FOOD+FEED CROP | Food/Feed Uses |
| COTTON (UNSPECIFIED) | TERRESTRIAL FOOD+FEED CROP | Food/Feed Uses |
| CRANBERRY | TERRESTRIAL FOOD CROP | Food/Feed Uses |
| CRESS, WATER | TERRESTRIAL FOOD CROP | Food/Feed Uses |
| CUCUMBER | TERRESTRIAL FOOD CROP | Food/Feed Uses |
| CURRANT | TERRESTRIAL FOOD CROP | Food/Feed Uses |
| DATE | TERRESTRIAL FOOD CROP | Food/Feed Uses |

103101 - Glyphosate, Isopropylamine salt

Date: 05 JUL 1993
Page: 4

**IPMS**
General Chemical Report
Site and Use Groups

| Site.................................. Use Group.............................. Use Group Category Desc.. |
|---|

| Site | Use Group | Use Group Category Desc. |
|---|---|---|
| DEWBERRY | TERRESTRIAL FOOD CROP | Food/Feed Uses |
| EGGFRUIT TREE (CANISTEL) | TERRESTRIAL FOOD CROP | Food/Feed Uses |
| EGGPLANT | TERRESTRIAL FOOD CROP | Food/Feed Uses |
| ELDERBERRY | TERRESTRIAL FOOD CROP | Food/Feed Uses |
| ENDIVE (ESCAROLE) | TERRESTRIAL FOOD CROP | Food/Feed Uses |
| FIG | TERRESTRIAL FOOD CROP | Food/Feed Uses |
| FILBERT (HAZELNUT) | TERRESTRIAL FOOD CROP | Food/Feed Uses |
| GARLIC | TERRESTRIAL FOOD CROP | Food/Feed Uses |
| GOOSEBERRY | TERRESTRIAL FOOD CROP | Food/Feed Uses |
| GOURDS | TERRESTRIAL FOOD CROP | Food/Feed Uses |
| GRAPEFRUIT | TERRESTRIAL FOOD+FEED CROP | Food/Feed Uses |
| GRAPES | TERRESTRIAL FOOD+FEED CROP | Food/Feed Uses |
| GRASS FORAGE/FODDER/HAY | TERRESTRIAL FEED CROP | Food/Feed Uses |
| GREENHOUSE-IN USE | GREENHOUSE FOOD CROP | Food/Feed Uses |
| GROUNDCHERRY (STRAWBERRY TOMATO/TOMATILLO) | TERRESTRIAL FOOD CROP | Food/Feed Uses |
| GUAVA | TERRESTRIAL FOOD CROP | Food/Feed Uses |
| HICKORY NUT | TERRESTRIAL FOOD CROP | Food/Feed Uses |
| HORSERADISH | TERRESTRIAL FOOD CROP | Food/Feed Uses |

103601 - Glyphosate, Isopropylamine salt

LUIS
General Chemical Report
Site and Use Groups

| Site................................. | Use Group............................ | Use Group Category Desc.. |
|---|---|---|
| HUCKLEBERRY | TERRESTRIAL FOOD CROP | Food/Feed Uses |
| IRRIGATION SYSTEMS | AQUATIC FOOD CROP | Food/Feed Uses |
| JABOTICABA | TERRESTRIAL FOOD CROP | Food/Feed Uses |
| JACKFRUIT | TERRESTRIAL FOOD CROP | Food/Feed Uses |
| KALE | TERRESTRIAL FOOD CROP | Food/Feed Uses |
| KITEMBILLA (CEYLON GOOSEBERRY) | TERRESTRIAL FOOD CROP | Food/Feed Uses |
| KIWI FRUIT | TERRESTRIAL FOOD CROP | Food/Feed Uses |
| KOHLRABI | TERRESTRIAL FOOD CROP | Food/Feed Uses |
| KUMQUAT | TERRESTRIAL F/OOD+FEED CROP | Food/Feed Uses |
| LAKES/PONDS/RESERVOIRS (WITH HUMAN OR WILDLIFE USE) | AQUATIC FOOD CROP | Food/Feed Uses |
| LEEK | TERRESTRIAL FOOD CROP | Food/Feed Uses |
| LEMON | TERRESTRIAL FOOD+FEED CROP | Food/Feed Uses |
| LENTILS | TERRESTRIAL FEED CROP | Food/Feed Uses |
| LENTILS | TERRESTRIAL FOOD+FEED CROP | Food/Feed Uses |
| LETTUCE | TERRESTRIAL FOOD CROP | Food/Feed Uses |
| LIME | TERRESTRIAL FOOD+FEED CROP | Food/Feed Uses |
| LITCHI NUT | TERRESTRIAL FOOD CROP | Food/Feed Uses |
| LOGANBERRY | TERRESTRIAL FOOD CROP | Food/Feed Uses |
| LONGAN | TERRESTRIAL FOOD CROP | Food/Feed Uses |

103601 - Glyphosate, isopropylamine salt

LUIS
General Chemical Report
Site and Use Groups

| Site................ | Use Group............................... | Use Group Category Desc.. |
|---|---|---|
| LOQUAT | TERRESTRIAL FOOD CROP | Food/Feed Uses |
| MACADAMIA NUT (BUSHNUT) | TERRESTRIAL FOOD CROP | Food/Feed Uses |
| MAMEY (MAMMEE APPLE) | TERRESTRIAL FOOD CROP | Food/Feed Uses |
| MANGO | TERRESTRIAL FOOD CROP | Food/Feed Uses |
| MARMALADEBOX (GENIPAPO) | TERRESTRIAL FOOD CROP | Food/Feed Uses |
| MAYHAW (HAWTHORN) | TERRESTRIAL FOOD CROP | Food/Feed Uses |
| MELONS | TERRESTRIAL FOOD CROP | Food/Feed Uses |
| MELONS, CANTALOUPE | TERRESTRIAL FOOD CROP | Food/Feed Uses |
| MELONS, HONEYDEW | TERRESTRIAL FOOD CROP | Food/Feed Uses |
| MELONS, MANGO | TERRESTRIAL FOOD CROP | Food/Feed Uses |
| MELONS, MUSK | TERRESTRIAL FOOD CROP | Food/Feed Uses |
| MELONS, WATER | TERRESTRIAL FOOD CROP | Food/Feed Uses |
| MELONS, WINTER (CASABA/CRENSHAW/HONEYDEW/PERSIAN) | TERRESTRIAL FOOD CROP | Food/Feed Uses |
| MILLET (PROSO) | TERRESTRIAL FEED CROP | Food/Feed Uses |
| MILLET, PROSO (BROOMCORN) | TERRESTRIAL FOOD+FEED CROP | Food/Feed Uses |
| MUSTARD | TERRESTRIAL FOOD CROP | Food/Feed Uses |
| MUSTARD | TERRESTRIAL FOOD+FEED CROP | Food/Feed Uses |
| NECTARINE | TERRESTRIAL FOOD CROP | Food/Feed Uses |

10901 - Glyphosate, Isopropylamine salt

**LEVE**
**General Chemical Report**
**Site and Use Groups**

| Site | Use Group | Use Group Category Desc. |
|------|-----------|--------------------------|
| NONGRASS FORAGE/FODDER/STRAW/HAY | TERRESTRIAL FEED CROP | Food/Feed Uses |
| OATS | TERRESTRIAL FEED CROP | Food/Feed Uses |
| OATS | TERRESTRIAL FOOD+FEED CROP | Food/Feed Uses |
| OKRA | TERRESTRIAL FOOD CROP | Food/Feed Uses |
| OLIVE | TERRESTRIAL FOOD CROP | Food/Feed Uses |
| ONION | TERRESTRIAL FOOD CROP | Food/Feed Uses |
| ORANGE | TERRESTRIAL FOOD+FEED CROP | Food/Feed Uses |
| PAPAYA | TERRESTRIAL FOOD CROP | Food/Feed Uses |
| PARSLEY | TERRESTRIAL FOOD CROP | Food/Feed Uses |
| PARSNIP | TERRESTRIAL FOOD+FEED CROP | Food/Feed Uses |
| PASSION FRUIT | TERRESTRIAL FOOD CROP | Food/Feed Uses |
| PASTURES | TERRESTRIAL FEED CROP | Food/Feed Uses |
| PEACH | TERRESTRIAL FOOD CROP | Food/Feed Uses |
| PEANUTS (UNSPECIFIED) | TERRESTRIAL FOOD+FEED CROP | Food/Feed Uses |
| PEAR | TERRESTRIAL FOOD CROP | Food/Feed Uses |
| PEAS (UNSPECIFIED) | TERRESTRIAL FOOD+FEED CROP | Food/Feed Uses |
| PECAN | TERRESTRIAL FOOD CROP | Food/Feed Uses |
| PEPPER | TERRESTRIAL FOOD CROP | Food/Feed Uses |
| PERSIMMON | TERRESTRIAL FOOD CROP | Food/Feed Uses |

103601 - Glyphosate, Isopropylamine salt

**LUIS**
**General Chemical Report**
**Site and Use Groups**

| Site | Use Group | Use Group Category Desc. |
|------|-----------|--------------------------|
| PINEAPPLE | TERRESTRIAL FOOD+FEED CROP | Food/Feed Uses |
| PISTACHIO | TERRESTRIAL FOOD CROP | Food/Feed Uses |
| PLANTAIN | TERRESTRIAL FOOD CROP | Food/Feed Uses |
| PLUM | TERRESTRIAL FOOD CROP | Food/Feed Uses |
| POMEGRANATE | TERRESTRIAL FOOD CROP | Food/Feed Uses |
| POTATO, WHITE/IRISH | TERRESTRIAL FOOD+FEED CROP | Food/Feed Uses |
| PRUNE | TERRESTRIAL FOOD CROP | Food/Feed Uses |
| PUMMELO (SHADDOCK) | TERRESTRIAL FOOD+FEED CROP | Food/Feed Uses |
| PUMPKIN | TERRESTRIAL FOOD CROP | Food/Feed Uses |
| QUINCE | TERRESTRIAL FOOD CROP | Food/Feed Uses |
| QUINCE | TERRESTRIAL FOOD CROP | Food/Feed Uses |
| RADISH | TERRESTRIAL FOOD+FEED CROP | Food/Feed Uses |
| RASPBERRY (BLACK, RED) | TERRESTRIAL FOOD CROP | Food/Feed Uses |
| RHUBARB | TERRESTRIAL FOOD CROP | Food/Feed Uses |
| RICE | TERRESTRIAL FOOD+FEED CROP | Food/Feed Uses |
| RICE, WILD | TERRESTRIAL FOOD+FEED CROP | Food/Feed Uses |
| RUTABAGA | TERRESTRIAL FOOD CROP | Food/Feed Uses |
| RYE | TERRESTRIAL FEED CROP | Food/Feed Uses |

103601 - Glyphosate, Isopropylamine salt

DATE
General Chemical Report
Site and Use Groups

| Site | Use Group | Use Group Category Desc.. |
|------|-----------|---------------------------|
| RYE | TERRESTRIAL FOOD+FEED CROP | Food/Feed Uses |
| SAPODILLA | TERRESTRIAL FOOD CROP | Food/Feed Uses |
| SAPOTA, WHITE | TERRESTRIAL FOOD CROP | Food/Feed Uses |
| SITE NOT SPECIFIED | USE GROUP FOR SITE 00000 | Food/Feed Uses |
| SORGHUM | TERRESTRIAL FEED CROP | Food/Feed Uses |
| SORGHUM | TERRESTRIAL FOOD+FEED CROP | Food/Feed Uses |
| SOURSOP | TERRESTRIAL FOOD CROP | Food/Feed Uses |
| SOYBEANS (UNSPECIFIED) | TERRESTRIAL FOOD+FEED CROP | Food/Feed Uses |
| SPINACH | TERRESTRIAL FOOD CROP | Food/Feed Uses |
| SQUASH (SUMMER) | TERRESTRIAL FOOD CROP | Food/Feed Uses |
| SQUASH (WINTER) | TERRESTRIAL FOOD CROP | Food/Feed Uses |
| STREAMS/RIVERS/CHANNELED WATER | AQUATIC FOOD CROP | Food/Feed Uses |
| SUGAR APPLE (CUSTARD APPLE) | TERRESTRIAL FOOD CROP | Food/Feed Uses |
| SUGAR BEET | TERRESTRIAL FOOD+FEED CROP | Food/Feed Uses |
| SUGARCANE | TERRESTRIAL FOOD+FEED CROP | Food/Feed Uses |
| SWEET POTATO | TERRESTRIAL FOOD CROP | Food/Feed Uses |
| TAMARIND | TERRESTRIAL FOOD CROP | Food/Feed Uses |
| TANGELO | TERRESTRIAL FOOD+FEED CROP | Food/Feed Uses |
| TANGERINES | TERRESTRIAL FOOD+FEED CROP | Food/Feed Uses |

103601 - Glyphosate, isopropylamine salt

Date: 05 JUL 1993
Page: 10

L016
General Chemical Report
Site and Use Groups

| Site.................... | Use Group.................... | Use Group Category Desc.. |
|---|---|---|
| TARO | TERRESTRIAL FOOD CROP | Food/Feed Uses |
| TEA | TERRESTRIAL FOOD CROP | Food/Feed Uses |
| TOMATO | TERRESTRIAL FOOD+FEED CROP | Food/Feed Uses |
| TRITICALE | TERRESTRIAL FOOD+FEED CROP | Food/Feed Uses |
| TURNIP | TERRESTRIAL FOOD+FEED CROP | Food/Feed Uses |
| WALNUT (ENGLISH/BLACK) | TERRESTRIAL FOOD CROP | Food/Feed Uses |
| WHEAT | TERRESTRIAL FEED CROP | Food/Feed Uses |
| WHEAT | TERRESTRIAL FOOD+FEED CROP | Food/Feed Uses |
| YAM | TERRESTRIAL FOOD CROP | Food/Feed Uses |
| AGRICULTURAL FALLOW/IDLELAND | TERRESTRIAL NON-FOOD CROP | Non-Food/Non-Feed Uses |
| AGRICULTURAL RIGHTS-OF-WAY//FENCEROWS/HEDGEROWS | TERRESTRIAL NON-FOOD CROP | Non-Food/Non-Feed Uses |
| AGRICULTURAL UNCULTIVATED AREAS | TERRESTRIAL NON-FOOD CROP | Non-Food/Non-Feed Uses |
| AIRPORTS/LANDING FIELDS | TERRESTRIAL NON-FOOD CROP | Non-Food/Non-Feed Uses |
| AQUATIC AREAS/WATER | AQUATIC NON-FOOD INDUSTRIAL | Non-Food/Non-Feed Uses |
| AQUATIC AREAS/WATER | AQUATIC NON-FOOD OUTDOOR | Non-Food/Non-Feed Uses |
| CHRISTMAS TREE PLANTATIONS | TERRESTRIAL NON-FOOD CROP | Non-Food/Non-Feed Uses |
| CONIFER RELEASE | FORESTRY | Non-Food/Non-Feed Uses |
| DRAINAGE SYSTEMS | AQUATIC NON-FOOD INDUSTRIAL | Non-Food/Non-Feed Uses |

103601 - Glyphosate, isopropylamine salt

Date: 05 JUL 1991
Page: 11

**LUIS**
**General Chemical Report**
**Site and Use Groups**

| Site.................................... | Use Group.............................. | Use Group Category Desc.. |
|---|---|---|
| FOREST PLANTINGS (REFORESTATION PROGRAMS) | FORESTRY | Non-Food/Non-Feed Uses |
| FOREST TREES (ALL OR UNSPECIFIED) | FORESTRY | Non-Food/Non-Feed Uses |
| GOLF COURSE TURF | TERRESTRIAL NON-FOOD CROP | Non-Food/Non-Feed Uses |
| GREENHOUSE-EMPTY | INDOOR NON-FOOD | Non-Food/Non-Feed Uses |
| HOUSEHOLD/DOMESTIC DWELLINGS OUTDOOR PREMISES | OUTDOOR RESIDENTIAL | Non-Food/Non-Feed Uses |
| INDUSTRIAL AREAS (OUTDOOR) | TERRESTRIAL NON-FOOD CROP | Non-Food/Non-Feed Uses |
| NONAGRICULTURAL OUTDOOR BUILDINGS/STRUCTURES | TERRESTRIAL NON-FOOD CROP | Non-Food/Non-Feed Uses |
| NONAGRICULTURAL RIGHTS-OF-WAY/FENCEROWS/HEDGEROWS | TERRESTRIAL NON-FOOD CROP | Non-Food/Non-Feed Uses |
| NONAGRICULTURAL UNCULTIVATED AREAS/SOILS | TERRESTRIAL NON-FOOD CROP | Non-Food/Non-Feed Uses |
| ORNAMENTAL AND/OR SHADE TREES | TERRESTRIAL NON-FOOD CROP | Non-Food/Non-Feed Uses |
| ORNAMENTAL AND/OR SHADE TREES | TERRESTRIAL NON-FOOD-OUTDOOR RESIDE | Non-Food/Non-Feed Uses |
| ORNAMENTAL AND/OR SHADE TREES | TERRESTRIAL-GREENHOUSE NON-FOOD CRO | Non-Food/Non-Feed Uses |
| ORNAMENTAL HERBACEOUS PLANTS | TERRESTRIAL NON-FOOD-OUTDOOR RESIDE | Non-Food/Non-Feed Uses |
| ORNAMENTAL LAWNS AND TURF | TERRESTRIAL NON-FOOD CROP | Non-Food/Non-Feed Uses |
| ORNAMENTAL LAWNS AND TURF | TERRESTRIAL NON-FOOD-OUTDOOR RESIDE | Non-Food/Non-Feed Uses |
| ORNAMENTAL WOODY SHRUBS AND VINES | TERRESTRIAL NON-FOOD CROP | Non-Food/Non-Feed Uses |
| ORNAMENTAL WOODY SHRUBS AND VINES | TERRESTRIAL NON-FOOD-OUTDOOR RESIDE | Non-Food/Non-Feed Uses |
| ORNAMENTAL WOODY SHRUBS AND VINES | TERRESTRIAL-GREENHOUSE NON-FOOD CRO | Non-Food/Non-Feed Uses |
| PATHS/PATIOS | TERRESTRIAL NON-FOOD CROP | Non-Food/Non-Feed Uses |

103601 - Glyphosate, isopropylamine salt

**LUIS**
**General Chemical Report**
**Site and Use Groups**

Site................................................. Use Group................................................. Use Group Category Desc..

| Site | Use Group | Use Group Category Desc. |
|------|-----------|--------------------------|
| PAVED AREAS (PRIVATE ROADS/SIDEWALKS) | TERRESTRIAL NON-FOOD CROP | Non-Food/Non-Feed Uses |
| RECREATIONAL AREAS | TERRESTRIAL NON-FOOD CROP | Non-Food/Non-Feed Uses |
| SEWAGE SYSTEMS | AQUATIC NON-FOOD INDUSTRIAL | Non-Food/Non-Feed Uses |
| SITE NOT SPECIFIED | USE GROUP FOR SITE 00000 | Non-Food/Non-Feed Uses |
| URBAN AREAS | TERRESTRIAL NON-FOOD CROP | Non-Food/Non-Feed Uses |

103603 - glyphosate, sodium salt

Date: 14 MAY 1992
Page: 1

LUIS
General Chemical Report
Site and Use Groups

(DYNAMAC REF 2XT)

| Site............................................. | Use Group....................................... | Use Group Category Desc.. |
|---|---|---|
| PEANUTS (UNSPECIFIED) | TERRESTRIAL FOOD+FEED CROP | Food/Feed Uses |
| SUGARCANE | TERRESTRIAL FOOD+FEED CROP | Food/Feed Uses |

# Appendix B

Table of Generic Data Requirements and
Studies Used to Make the Reregistration Decision

# GUIDE TO APPENDIX B

Appendix B contains listings of data requirements which support the reregistration for the pesticide glyphosate covered by this Reregistration Eligibility Document.  It contains generic data requirements that apply to glyphosate in all products, including data requirements for which a "typical formulation" is the test substance.

The data table is organized in the following format:

1.   Data Requirement (Column 1).  The data requirements are listed in the order in which they appear in 40 CFR, Part 158.  The reference numbers accompanying each test refer to the test protocols set in the Pesticide Assessment Guidelines, which are available from the National Technical Information Service, 5285 Port Royal Road, Springfield, VA  22161  (703) 487 - 4650.

2.   Use Pattern (Column 2).  This column indicates the use patterns for which the data requirements apply.  The following letter designations are used for the given use patterns:

         A    Terrestrial food
         B    Terrestrial feed
         C    Terrestrial non-food
         D    Aquatic food
         E    Aquatic non-food outdoor
         F    Aquatic non-food industrial
         G    Aquatic non-food residential
         H    Greenhouse food
         I    Greenhouse non-food
         J    Forestry
         K    Residential
         L    Indoor food
         M    Indoor non-food
         N    Indoor medical
         O    Indoor residential

3.   Bibliographic citation (Column 3).  If the Agency has acceptable data in its files, this column lists the identifying number of each study.  This normally is the Master Record Identification (MRID) number, but may be a "GS" number if no MRID number has been assigned.  Refer to the Bibliography appendix for a complete citation of the

study.

## Data Supporting Guideline Requirements for the Reregistration of Glyphosate

| REQUIREMENT | | USE PATTERN | CITATION(S) |
|---|---|---|---|

### PRODUCT CHEMISTRY

| | | | |
|---|---|---|---|
| 61-2A | Start. Mat. & Mnfg. Process | all | 00161333 |
| 61-2B | Formation of Impurities | all | 00161333 |
| 62-1 | Preliminary Analysis | all | 40405401, 00161333 |
| 63-2 | Color | all | 00161333 |
| 63-3 | Physical State | all | 00161333 |
| 63-4 | Odor | all | 00161333 |
| 63-5 | Melting Point | all | 00161333 |
| 63-6 | Boiling Point | all | 00161333 |
| 63-7 | Density | all | 00161333 |
| 63-8 | Solubility | all | 00161333 |
| 63-9 | Vapor Pressure | all | 41096101, 00161333 |
| 63-10 | Dissociation Constant | all | 00161333 |
| 63-11 | Octanol/Water Partition | all | 00161333 |
| 63-12 | pH | all | 00161333 |
| 63-13 | Stability | all | 00161333, 40559301 |
| 63-17 | Storage stability | A C | 41573601, 00039142, 00061553, 00040083, 00061555, 00051980, 00108129, 00053002, 00108102 |

## Data Supporting Guideline Requirements for the Reregistration of Glyphosate

| REQUIREMENT | | USE PATTERN | CITATION(S) |
|---|---|---|---|
| **ECOLOGICAL EFFECTS** | | | |
| 71-1A | **Acute Avian Oral - Quail/Duck** | A B C D F G H | 00108204 |
| 71-2A | **Avian Dietary - Quail** | A B C D F G H | 00108107 |
| 71-2B | **Avian Dietary - Duck** | A B C D F G H | 00076492 |
| 71-3 | **Wild Mammal Toxicity** | A B C D F G H | 00076492 |
| 71-4A | **Avian Reproduction - Quail** | A B C D G | 00108207 |
| 71-4B | **Avian Reproduction - Duck** | A B C D G | 00036328, 00111953 |
| 72-1A | **Fish Toxicity Bluegill** | A B C D F G H | 00136339, GS-0178025 |
| 72-1B | **Fish Toxicity Bluegill - TEP** | A B C D G | 15296, 152599, 152601, 152767 |
| 72-1C | **Fish Toxicity Rainbow Trout** | A B C D F G H | 00108112, 00108205 |
| 72-1D | **Fish Toxicity Rainbow Trout - TEP** | A B C D G | 00070895, 00078661, 00070897, 00078662, 00078655, 00078664, 00078656, 00078665, 00078658, 00108205, 00078659, 00124760, GS0178025, 5298, 152766, 152903, 155477 |
| 72-2A | **Invertebrate Toxicity** | A B C D F G H | 00108172 |
| 72-2B | **Invertebrate Toxicity - TEP** | A B C D G | 00070893, 00078666, 00078657, 00124762, 00078660, GS0178025, 0078663, 152597, 152600, 152602, 152768 |
| 72-3B | **Estuarine/Marine Toxicity - Mollusk** | A B C D | 00108110 |

## Data Supporting Guideline Requirements for the Reregistration of Glyphosate

| REQUIREMENT | | USE PATTERN | CITATION(S) |
|---|---|---|---|
| 72-3C | **Estuarine/Marine Toxicity - Shrimp** | A B C D | 00108111 |
| 72-4B | **Life Cycle Invertebrate** | A B C D G H | 00124763 |
| 72-5 | **Life Cycle Fish** | A B C D G H | 00108171 |
| 122-1A | **Seed Germination/Seedling Emergence** | B D G | 40159301 |
| 122-2 | **Aquatic Plant Growth** | B D G | 40236901, 40236902, 40236903, 40236904, 40236905 |
| 123-2 | **Aquatic Plant Growth** | B D G | 40236901, 40236902, 40236903, 40236904, 40236905 |
| 141-1 | **Honey Bee Acute Contact** | A B G H | 00026489 |

## TOXICOLOGY

| | | | |
|---|---|---|---|
| 81-1 | **Acute Oral Toxicity - Rat** | A B C D F G H | 00067039, 41400601 |
| 81-2 | **Acute Dermal Toxicity - Rabbit/Rat** | A B C D F G H | 00067039, 41400602 |
| 81-4 | **Primary Eye Irritation - Rabbit** | | 41400603, 41400604 |
| 81-6 | **Dermal Sensitization - Guinea Pig** | | 00137137, 00137138, 00137139, 00137140 |
| 82-1A | **90-Day Feeding - Rodent** | | 00036803, 40559401 |
| 82-2 | **21-Day Dermal - Rabbit/Rat** | A B C D F G H | 00098460 |
| 83-1A | **Chronic Feeding Toxicity - Rodent** | A C D F H | 00098460, 00093879 |

## Data Supporting Guideline Requirements for the Reregistration of Glyphosate

| REQUIREMENT | | USE PATTERN | CITATION(S) |
|---|---|---|---|
| 83-1B | Chronic Feeding Toxicity - Non-Rodent | A C D F H | 00162912, 41728701, 00153374 |
| 83-2A | Oncogenicity - Rat | A C D F H | 41728701, 41643801, 00093879 |
| 83-2B | Oncogenicity - Mouse | A C D F H | 00130406, 00150564 |
| 83-3A | Developmental Toxicity - Rat | A B C D F G H | 00046362 |
| 83-3B | Developmental Toxicity - Rabbit | A B C D F G H | 00046363 |
| 83-4 | 2-Generation Reproduction - Rat | A C D H | 00081674, 00105995, 41621501 |
| 84-2A | Gene Mutation (Ames Test) | A B C D F G H | 00078620, 00132683 |
| 84-2B | Structural Chromosomal Aberration | A B C D F G H | 00046364, 00132681, 00132685 |
| 84-4 | Other Genotoxic Effects | A B C D F G H | 00078619, 00132686, 00132685 |
| 85-1 | General Metabolism | A C D F G H | 40767101, 40767102 |

## ENVIRONMENTAL FATE

| | | | |
|---|---|---|---|
| 161-1 | Hydrolysis | A B C D F G H | 00108192 |
| 161-2 | Photodegradation - Water | A B C D G | 41689101 |
| 161-3 | Photodegradation - Soil | A G | 41335101 |
| 162-1 | Aerobic Soil Metabolism | A B F G H | 42372501 |
| 162-3 | Anaerobic Aquatic Metabolism | C D | 42372502 |
| 162-4 | Aerobic Aquatic Metabolism | C D | 42372503 |
| 163-1 | Leaching/Adsorption/ Desorption | A B C D | 00108192 |

## Data Supporting Guideline Requirements for the Reregistration of Glyphosate

| REQUIREMENT | USE PATTERN | CITATION(S) |
|---|---|---|
| **164-1** | **Terrestrial Field Dissipation** | A B H | 42765001 |
| **164-2** | **Aquatic Field Dissipation** | C D | 42383201 |
| **164-3** | **Forest Field Dissipation** | G | 41552801 |
| **165-1** | **Confined Rotational Crop** | A C | 42372504, 41543201, 41543202 |
| **165-3** | **Accumulation - Irrigated Crops** | C D | 42372505, 40541305 |
| **165-4** | **Bioaccumulation in Fish** | A B C D G | 41228301 |

**RESIDUE CHEMISTRY REFERENCES ARE CONTAINED IN THE BODY OF THE RED UNDER SECTION III, B**

# Appendix C

Citations Considered to be Part of the Data Base
Supporting the Reregistration of Glyphosate

# GUIDE TO APPENDIX C

1.  **CONTENTS OF BIBLIOGRAPHY.**  This bibliography contains citations of all studies considered relevant by EPA in arriving at the positions and conclusions stated elsewhere in the Reregistration Eligibility Document.  Primary sources for studies in this bibliography have been the body of data submitted to EPA and its predecessor agencies in support of past regulatory decisions.  Selections from other sources including published literature, in those instances where they have been considered, are included.

2.  **UNITS OF ENTRY.**  The unit of entry in this bibliography is called a "study".  In the case of published materials, this corresponds closely to an article.  In the case of unpublished materials submitted to the Agency, the Agency has sought to identify documents at a level parallel to the published article from within the typically larger volumes in which they were submitted.  The resulting "studies" generally have a distinct title (or at least a single subject), can stand alone for purposes of review and can be described with a conventional bibliographic citation.  The Agency has also attempted to unite basic documents and commentaries upon them,  treating them as a single study.

3.  **IDENTIFICATION OF ENTRIES.**  The entries in this bibliography are sorted  numerically by Master Record Identifier, or "MRID Number".  This number is unique to the citation, and should be uses whenever a specific reference is required.  It is not related to the six-digit "Accession Number" which has been used to identify volumes of submitted studies (see paragraph 4(d)(4) below for further explanation).  In a few cases, entries added to the bibliography late in the review may be preceded by a nine character temporary identifying number is also to be used whenever specific reference is needed.

4.  **FORM OF ENTRY.**  In addition to the Master Record Identifier (MRID), each entry consists of a citation containing standard elements followed, in the case of material submitted to EPA, by a description of the earliest known submission.  Bibliographic conventions used reflect the standard of the American National Standards Institute (ANSI), expanded to provide for certain special needs.

C-1

a.   **Author.**  Whenever the author could confidently be
identified, the Agency has chosen to show a personal
author.  When no individual was identified, the Agency has
shown a identifiable laboratory or testing facility as the
author.  When no author or laboratory could be identified,
the Agency has shown the first submitter as the author.

b.   **Document Date.**  The date of the study is taken directly
from the document.  When the date is followed by a
question mark, the bibliographer has deduced the date from
the evidence contained in the document.  When the date
appears as (19??), the Agency was unable to determine or
estimate the date of the document.

c.   **Title.**  In some cases, it has been necessary for the
Agency bibliographers to create or enhance a document
title.  Any such editorial insertions are contained
between square brackets.

d.   **Trailing Parentheses.**  For studies submitted to the Agency
in the past, the trailing parentheses include (in addition
to any self-explanatory text) the following elements
describing the earliest known submission:

(1)  <u>Submission Date</u>.  The date of the earliest known
submission appears immediately following the word
"received".

(2)  <u>Administrative Number</u>.  The next element immediately
following the word "under" is the registration
number, experimental use permit number, petition
number, or other administrative number associated
with the earliest known submission.

(3)  <u>Submitter</u>.  The third element is the submitter.  When
authorship is de-faulted to the submitter, this
element is omitted.

(4)  <u>Volume Identification (Accession Numbers)</u>.  The final
element in the trailing parentheses identifies the
EPA accession number of the volume in which the
original submission of the study appears.  The six-
digit accession number follows the symbol "CDL",
which stands for "Company Data Library".  This
accession number is in turn followed by an alphabetic

C-2

suffix which shows the relative position of the study
within the volume.

00015759   Kahrs, R.A.; Cheung, M.W. (1979) Tank Mixes of Metolachlor (
plus Linuron or Metribuzin plus Glyphosate--Soybeans; Tank M
of Metolachlor (8E) plus Linuron or Metribuzin plus Paraquat
Soybeans: No and Minimum Tillage Applications: Report No. AB
79029. Summary of studies 237821-B through 237821-Q. (Unpub-
lished study received Mar 16, 1979 under 100-583; submitted
Ciba-Geigy Corp., Greensboro, N.C.; CDL:237821-A)

00015760   Kincaid, L. (1979) Metolachlor + Glyphosate + Linuron; Dual
Roundup 4E + Lorox 50W: AG-A No. 4763 I,II. (Unpublished stu
including letter dated May 23, 1978 from J.D. Riggleman to R
ert A. Kahrs, received Mar 16, 1979 under 100-583; prepared
cooperation with E.I. du Pont de Nemours & Co., Inc. and ADC
Laboratories, submitted by Ciba-Geigy Corp., Greensboro, N.C
CDL:237821-B)

00015761   Schnappinger, M.G. (1979) Metolachlor + Glyphosate + Linuron
Dual 8E + Roundup 4E + Lorox 50W: AG-A No. 4886 I,II.
(Unpublished study including letter dated May 23, 1978 from
Riggleman to Robert A. Kahrs, received Mar 16, 1979 under
100-583; prepared in cooperation with E.I. du Pont de Nemour
Co., Inc. and ADC Laboratories, submitted by Ciba-Geigy Corp
Greensboro, N.C.: CDL:237821-C)

00015762   Searcy, V.; Herman, D. (1979) Metolachlor + Glyphosate +
Linuron; Dual 8E + Roundup 4E + Lorox 50W: AG-A No. 4893 I,I
(Unpublished study including letter dated May 23, 1978 from
Riggleman to Robert A. Kahrs, received Mar 16, 1979 under
100-583; prepared in cooperation with E.I. du Pont de Nemour
Co., Inc. and ADC Laboratories, submitted by Ciba-Geigy Corp
Greensboro, N.C.; CDL:237821-D)

00015763   Rose, W.; Worsham, D. (1979) Metolachlor + Glyphosate + Linu
Dual 8E + Roundup 4E + Lorox 50W: AG-A No. 4956 I,II A. (Unp
lished study including letter dated May 23, 1978 from J.D. R
gleman to Robert A. Kahrs, received Mar 16, 1979 under 100-5
prepared in cooperation with Rocky Mount Experiment Station,
Laboratories and E.I. du Pont de Nemours & Co., Inc., submit
by Ciba-Geigy Corp., Greensboro, N.C.; CDL:237821-E)

00015764   Kincaid, L. (1979) Metolachlor (Dual(R) 8E); Glyphosate (Rou
4E); Metribuzin (Sencor 50W): AG-A No. 4765 I,II. (Unpublish
study including letter dated May 23, 1978 from J.D. Rigglema
Robert A. Kahrs, received Mar 16, 1979 under 100-583; prepar

C-4

in cooperation with ADC Laboratories and E.I. du Pont de Nem
& Co., Inc., submitted by Ciba-Geigy Corp., Greensboro, N.C.
CDL:237821-F)

00015765  Schnappinger, M.G. (1978) Metolachlor (Dual 8E); Glyphosate
(Roundup 4E); Metribuzin (Sencor 50W): AG-A No. 4887 I,II.
(Unpublished study including letter dated May 23, 1978 from
Riggleman to Robert Kahrs, received Mar 16, 1979 under 100-5
prepared in cooperation with ADC Laboratories and E.I. du Po
de Nemours Co., Inc., submitted by Ciba-Geigy Corp., Greensb
N.C.; CDL:237821-G)

00015766  Searcy, S.; Herman, D. (1979) Metolachlor (Dual 8E); Glyphos
(Roundup 4E); Metribuzin (Sencor 50W): AG-A No. 4895 I,II.
(Unpublished study including letter dated May 23, 1978 from
Riggleman to Robert A. Kahrs, received Mar 16, 1979 under 10
583; prepared in cooperation with ADC Laboratories and E.I.
Pont de Nemours Co., Inc., submitted by Ciba-Geigy Corp.,
Greensboro, N.C.; CDL:237821-H)

00015767  Rose, W.; Worsham, D. (1979) Metolachlor (Dual 8E); Glyphosa
(Roundup 4E); Metribuzin (Sencor 50W): AG-A No. 4958 I,II A.
(Unpublished study including letter dated May 23, 1978 from
Riggleman to Robert A. Kahrs, received Mar 16, 1979 under 10
583; prepared in cooperation with ADC Laboratories and E.I.
Pont de Nemours & Co., Inc., submitted by Ciba-Geigy Corp.,
Greensboro, N.C.; CDL:237821-I)

00023336  Monsanto Company (1974) Residues of Glyphosate, Atrazine and
Simazine in or on Field Corn Grain, Sweet Corn and Corn Fora
and Fodder following a Tank Mix, Pre-emergent, Minimum Till
Application of Roundup, Atrazine and Simazine. (Unpublished
study received Dec 19, 1977 under 524-308; CDL:232518-B)

00023512  Houseworth, L.D.; Schnappinger, H.G.; Slagowski, J.L.; et al
(1979) Tank Mixes of Metolachlor (6E, 8E) plus Simazine and/
Atrazine plus Paraquat or Glyphosate--Corn: Summary of Resid
Data: Report No. ABR-79105. (Unpublished study received Dec
1979 under 100-583; prepared in cooperation with Chevron Che
ical Co. and others, submitted by Ciba-Geigy Corp., Greensbo
N.C.; CDL:241647-A)

00024503  Monsanto Company (1974) Summary of Residue Data. (Unpublishe
study received Jan 16, 1978 under 524-285; CDL:232680-B)

C-5

00027235   Monsanto Company (1979) Analytical Residue Method for
           N-Phosphonomethylglycine (Glyphosate) and Aminomethylphospho
           acid in Sugarcane, Bagasse, Raw Sugar and Molasses. (Unpubli
           study received Dec 28, 1979 under 524-332; CDL:099157-B)

00028852   Monsanto Company (1976) Glyphosate Residues in Peanuts follo
           Preemergent Treatment with Roundup Herbicide. (Unpublished s
           received Feb 22, 1980 under 524-308; CDL:099306-A)

00028853   Monsanto Company (19??) Analytical Residue Method for
           N-(Phosphonomethyl) glycine, Aminomethylphosphonic acid and
           N-Nitroso-N(phosphonomethyl) glycine in Peanuts. (Unpublishe
           study received Feb 22, 1980 under 524-308; CDL:099306-B)

00033954   Monsanto Company (1973) Summary and Conclusion: Residue Data
           (Unpublished study received Dec 30, 1975 under 524-308; CDL:
           224062-A)

00036222   Monsanto Company (1974) Analytical Residue Method for
           N-Phosphonomethyl glycine and Aminomethylphosphonic acid in
           and Water. Method B dated Nov 21, 1974. (Unpublished study
           received Sep 25, 1975 under 6G1679; CDL:095356-A)

00036223   Monsanto Company (1974) Analytical Residue Method for
           N-Phosphonomethyl glycine and Aminomethylphosphonic acid in
           Forage and Grain. Method B dated Mar 1, 1974. (Unpublished s
           received Sep 25, 1975 under 6G1679; CDL:095356-B)

00036229   Kramer, R.M.; Beasley, R.K.; Steinmetz, J.R.; et al. (1975)
           Interim Report on CP 67573, Residue and Metabolism. Part 28:
           Determination of Residues of Glyphosate and Its Metabolite i
           Fish: Agricultural Research Report No. 378. (pp. 1-13 only;
           unpublished study received Sep 25, 1975 under 6G1679; submit
           by Monsanto Co., Washington, D.C.; CDL:095356-I)

00036231   Monsanto Company (1975) Analytical Residue Method for
           N-Phosphonomethylglycine and Aminomethylphosphonic acid in F
           Tissue. Method dated Sep 2, 1975. (Unpublished study receive
           Sep 25, 1975 under 6G1679; CDL:095356-K)

00036328   Fink, R. (1975) Final Report: One Generation Reproduction
           Study--Mallard Duck: Project No. 139-101. (Unpublished study
           received Sep 26, 1975 under 6G1679; prepared by Truslow Farm
           Inc., submitted by Monsanto Co., Washington, D.C.; CDL:09648

C-6

00037687   Monsanto Company (1976) Residues of Glyphosate, Alachlor and
           Cyanazine in or on Field Corn Forage, Fodder, and Grain
           following a Tank Mix, Pre-emergent, Minimum Till Application
           Roundup, Lasso and Blades. (Unpublished study received Apr 1
           1979 under 524-285; CDL:238167-B)

00037688   Monsanto Company (1979) Analytical Residue Method for
           N-Phosphonomethyl Glycine, Aminomethylphosphonic acid and
           N-Nitrosoglyphosate in Field Corn Forage, Fodder and Grain.
           Method dated Jan 22, 1979. (Unpublished study received Apr 1
           1979 under 524-285; CDL:238167-C)

00038770   Cowell, J.E.; Taylor, A.L.; Stranz, J.L.; et al. (1974) Fina
           Report on CP 67563, Residue and Metabolism: Part 21:
           Determination of CP 67573 and CP 50435 Residues in Grapes:
           Agricultural Research Report No. 337. Includes undated metho
           entitled: Roundup and metabolite residue analytical method.
           (Unpublished study received Oct 4, 1974 under 5fl560; submit
           by Monsanto Co., Washington, D.C.; CDL:094261-A)

00038771   Rueppel, M.L.; Suba, L.A.; Moran, S.J.; et al. (1974) Final
           Report on CP 67573, Residue and Metabolism: Part 20: The
           Metabolism of CP 67573 in Grape Plants: Agricultural Researc
           Report No. 335. (Unpublished study received Oct 4, 1974 unde
           5F1560; submitted by Monsanto Co., Washington, D.C.;
           CDL:094261-B)

00038908   Beasley, R.K.; Daniels, R.J.; Lauer, R.; et al. (1974) Final
           Report on CP 67573, Residue and Metabolism--Part 17:
           Determination of Crop Residues in Corn, Wheat, Soybeans, Sma
           Grains, Soil and Water: Agricultural Research Report No. 325
           (Unpublished study received Jan 31, 1977 under 524-308;
           submitted by Monsanto Co., Washington, D.C.; CDL:095787-B)

00038979   Cowell, J.E.; Taylor, A.L.; Stranz, J.L.; et al. (1974) Roun
           and Metabolite Residue Analytical Method. (Unpublished study
           ceived 1974 under 5G1561; submitted by Monsanto Co., Washing
           D.C.; CDL:094264-B)

00039141   Sutherland, M.L.; Marvel, J.T.; Banduhn, M.C.; et al. (1975)
           Summary of Metabolism Studies of Glyphosate in Citrus Plants
           (Unpublished study received Jan 26, 1976 under 524-308;
           submitted by Monsanto Co., Washington, D.C.; CDL:094958-B)

00039142   Beasley, R.K.; Kramer, R.M.; Carstarphen, B.A.; et al. (1975

C-7

Summary of Glyphosate (Roundup) Residue Studies in Citrus Fr
and Processed Fractions. (Unpublished study received Jan 26,
1976 under 6G1734; submitted by Monsanto Co., Washington, D.
CDL:095065-A)

00039377   Conkin, R.A.; Hannah, L.H.; Stewart, E.R. (1975) Residue Dat
for Roundup on Rice and in Fish. (Unpublished study received
26, 1975 under 6H5106; submitted by Monsanto Co., Washington
D.C.; CDL:094900-C)

00039381   Kramer, R.M.; Arras, D.D.; Beasley, R.K.; et al. (1975) Fina
Report on CP 67573 Residue and Metabolism: Agricultural Rese
Report No. 372. (Unpublished study received Sep 25, 1975 und
6G1679; prepared in cooperation with Washington State Univ.
others, submitted by Monsanto Co., Washington, D.C.; CDL:
095355-A)

00040083   Monsanto Company (1975) Storage Stability of Field Residue
Samples and Glyphosate-14C Treated Crops. (Unpublished study
received Aug 13, 1975 under 5F1536; CDL:094866-A)

00040084   Monsanto Company (1975) Glyphosate Residues in Soybeans. (Un
lished study received Aug 13, 1975 under 5F1536; CDL:094866-

00040085   Monsanto Company (1975) Glyphosate Residues in Corn. (Unpub-
lished study received Aug 13, 1975 under 5F1536; CDL:094866-

00040086   Monsanto Company (1975) Glyphosate Residues in Wheat Grain.
(Unpublished study received Aug 13, 1975 under 5F1536; CDL:
094866-D)

00040087   Monsanto Company (1975) Glyphosate Residues in Small Grains.
(Unpublished study received Aug 13, 1975 under 5F1536; CDL:
094866-E)

00044422   Monsanto Company (19??) Summary and Conclusions: Roundup on
Barley, Buckwheat, Oats, Rice, Rye and Sorghums. (Unpublishe
study received on unknown date under 5G1523; CDL:094036-B)

00044423   Monsanto Company (1974) Analytical Residue Method for
N-Phosphonomethyl glycine and Aminomethylphosphonic acid in
Forage and Grain. Method dated Mar 1, 1974. (Unpublished stu
received on unknown date under SG1523; CDL:094036-C)

00044426   Monsanto Company (1973) Roundup Metabolite in Various Grains

C-8

(Unpublished study received on unknown date under 5G1523, CD 094155-F)

00046362  Rodwell, D.E.; Tasker, E.J.; Blair, A.M.; et al. (1980) Teratology Study in Rats: IRDC No. 401-054.  (Unpublished st including IRDC no. 999-021; received May 23, 1980 under 524- prepared by International Research and Development Corp., submitted by Monsanto Co., Washington, D.C.; CDL:242516-A)

00046363  Rodwell, D.E.; Tasker, E.J.; Blair, M.; et al. (1980) Terato Study in Rabbits: IRDC No. 401-056. (Unpublished study recei May 23, 1980 under 524-308; prepared by International Resear and Development Corp., submitted by Monsanto Co., Washington D.C.; CDL:242516-B)

00048284  Monsanto Company (1973) Residue Data. (Compilation; unpublis study received on unknown date under 524-EX-21; CDL:223373-E

00051980  Monsanto Company (1975) Residue Results. (Unpublished study ceived Jun 3, 1976 under 524-308; CDL:096177-D)

00051982  Monsanto Company (1976) Analytical Residue Method for N-Phosphonomethylglycine and Aminomethylphosphonic acid in G Coffee Beans. Method dated May 1, 1976. (Unpublished study received Jun 3, 1976 under 524-308; CDL:096177-F)

00051983  Malik, J.M.; Curtis, T.S.; Marvel, J.T. (1975) Final Report CP67573, Residue and Metabolism; Part 24: The Metabolism of 67573 in Coffee Plants: Agricultural Research Report No. 344 (Unpublished study received Jun 3, 1976 under 524-308; submi by Monsanto Co.xx Washington, D.C.; CDL:096177-I)

00053005  Beasley, R.K.; Steinmetz, J.R.; Taylor, A.L.; et al. (1977) lytical Residue Method for N-Phosphonomethyl glycine and Ami methylphosphonic acid in Forage Legumes and Grasses: Report MSL-0061. Method dated Jun 28, 1977. (Unpublished study rece Sep 16, 1980 under 524-308; submitted by Monsanto Co., Washington, D.C.; CDL:099625-B)

00059050  Interregional Research Project Number 4 (1978) Summary of Glyphosate Residues in Guava. (Unpublished study received No 19, 1980 under 1E2443; CDL:099739-A)

00060103  Baszis, S.R.; Cowell, J.; Lottman, M.; et al. (1980) Glyphos Residues in Cotton following Topical Treatment with Roundup

C-9

Herbicide: Report No. MSL-1283. Final rept. Includes method
dated Aug 12, 1980 entitled: Analytical residue method for N
(Phosphonomethyl)glycine, Aminomethylphosphonic acid and N-N
troso-N-(Phosphonomethyl)glycine in forages and grains. (Unp
lished study received Nov 12, 1980 under 524-EX-54; submitte
Monsanto Co., Washington, D.C.; CDL:099720-A)

00061555   Monsanto Company (1974) Residue Results. (Unpublished study
ceived on unknown date under 524-EX-24; CDL:095345-J)

00061559   Monsanto Company (19??) Analytical Residue Method for
N-Phosphonomethyl glycine (Glyphosate) and Aminomethylphosph
acid in Sugarcane, Sugarcane Leaves, Bagasse, Sugar and
Molasses, Irrigation Water and Soil. (Unpublished study rece
Mar 11, 1976 under 524-308; CDL:095141-E)

00063713   Monsanto Company (1979) Summary of Glyphosate Residues in
Papaya. (Unpublished study received Nov 20, 1980 under 524-3
CDL: 099751-A)

00063714   Monsanto Company (1979) Analytical Residue Method for
N-Phosphonomethylglycine and Aminomethylphosphonic acid in
Papaya: Project No. 5064. (Unpublished study received Nov 20
1980 under 524308; CDL:099751-B)

00065751   Monsanto Company (1966?) Analytical Residue Method for
N-(Phosphonomethyl)-glycine, Aminomethylphosphonic Acid and
N-Nitroso-N(phosphonomethyl)-glycine in Forages, Grains, Soi
and Water. Undated method 1. (Unpublished study received May
1977 under 524-308; CDL:229787-C)

00065752   Monsanto Company (1966?) Analytical Residue Method for
N-(Phosphonomethyl)-glycine, Aminomethylphosphonic Acid and
Nitroso-N(phosphonomethyl)-glycine in Forages, Grains and Wa
Undated method 2. (Unpublished study received May 12, 1977 u
524308; CDL:229787-D)

00065753   Frazier, H.W.; Rueppel, M.L. (1976) Crop Metabolism Studies
N(Phosphonomethyl)-glycine: N-Nitrosoglyphosate: Report No.
Interim rept. (Unpublished study received May 12, 1977 under
524-308; submitted by Monsanto Co., Washington, D.C.; CDL:
229787-E)

00067039   Birch, M.D. (1970) Toxicological Investigation of CP 67573-3
Project No. Y-70-90. (Unpublished study received Jan 30, 197

C-10

under 524-308; prepared by Younger Laboratories, Inc., submi
by Monsanto Co., Washington, D.C.; CDL:008460-C)

00067425   Monsanto Company (1980) Residues of Glyphosate and Other
           Herbicides in Wheat following Chemical Fallow Applications o
           Roundup Tank Mix Combinations. Includes method dated Jul 1,
           and undated methods entitled: 2,4-D in wheat forage, straw a
           grain; Dicamba in wheat forage, straw and grain; Residues of
           alachlor in wheat grain, forage and straw; Atrazine in wheat
           forage, straw and grain; Cyanazine in wheat forage, straw an
           grain; Metribuzin and metabolites in wheat forage, straw and
           grain. (Unpublished study, including published data, receive
           Dec 29, 1980 under 524-308; CDL:243990-A; 2t3991)

00070893   LeBlanc, G.A.; Surprenant, D.C.; Sleight, B.H., III (1980) A
           Toxicity of Roundup to the Water Flea (Daphnia magna): Repor
           #BW-80-4-636; Monsanto Study No. BN-80-079. (Unpublished stu
           including letter dated Feb 21, 1980 from R. Oleson to Robert
           Foster, received Apr 2, 1981 under 524-308; prepared by EG &
           Bionomics, submitted by Monsanto Co., Washington, D.C.;
           CDL:244749-B)

00070895   LeBlanc, G.A.; Surprenant, D.C.; Sleight, B.H., III (1980) A
           Toxicity of Roundup to Rainbow Trout (Salmo gairdneri): Repo
           #BW-80-4-635; Monsanto Study No. BN-80-074. (Unpublished stu
           received Apr 4, 1981 under 524-308; prepared by EG & G,
           Bionomics, submitted by Monsanto Co., Washington, D.C.; CDL:
           244749-D)

00070897   LeBlanc, G.A.; Surprenant, D.C.; Sleight, B.H., III (1980) A
           Toxicity of Roundup to Bluegill (Lepomis macrochirus): Repor
           #BW-80-4-634; Monsanto Study No. BN-80-075. (Unpublished stu
           received Apr 2, 1981 under 524-308; prepared by EG & G,
           Bionomics, submitted by Monsanto Co., Washington, D.C.; CDL:
           244749-F)

00076491   Sleight, B.H., III (1973) Research Report Submitted to Monsa
           Company: Exposure of Fish to 14C-Roundup: Accumulation,
           Distribution, and Elimination of 14C-Residues. (Unpublished
           study received Nov 9, 1973 under 524-308; prepared by Bionom
           Inc., submitted by Monsanto Co., Washington, D.C.; CDL:12064

00076492   Fink, R. (1973) Final Report: Eight-day Dietary LC50--Bobwhi
           Quail: Project No. 241-106. (Unpublished study received Nov
           1973 under 524-308; prepared by Environmental Sciences Corp.

submitted by Monsanto Co., Washington, D.C.; CDL:120640-D)

00076805   Baszis, S.R.; Serdy, F.S.; Dubelman, S. (1980) Glyphosate
Residues in Pasture Grasses, Legumes and Alfalfa following
Postemergent Spot Treatment with Roundup Herbicide: Report N
MSL-1140. Includes method dated Jul 1, 1979. (Unpublished
st received May 11, 1981 under 524-308; submitted by Monsanto C
Washington, D.C.; CDL:070083-A)

00077227   Branch, D.K.; Stout, L.D.; Folk, R.M. (1981) Acute Dermal
Toxicity of Mon 2139 NF-80-W to Rabbits: EHL 800295.
(Unpublished study received Jul 1, 1981 under 524-308; submi
by Monsanto Co., Washington, D.C.; CDL:070170-G)

00077228   Branch, D.K.; Stout, L.D.; Folk, R.M. (1981) Primary Eye Irr
tion of MON 2139 NF-80-W to Rabbits: EHL 800297. (Unpublishe
study received Jul 1, 1981 under 524-308; submitted by Monsa
Co., Washington, D.C.; CDL:070170-H)

00077229   Branch, D.K.; Stout, L.D.; Folk, R.M. (1981) Primary Skin Ir
tation of MON 2139 NF-80-W to Rabbits: EHL 800296. (Unpublis
study received Jul 1, 1981 under 524-308; submitted by Monsa
Co., Washington, D.C.; CDL:07D170-I)

00077230   Branch, D.K.; Stout, L.D.; Folk, R.M. (1981) Acute Oral Toxi
of MON 2139 NF-80-AA to Rats: EHL 800290. (Unpublished study
received Jul 1, 1981 under 524-308; submitted by Monsanto Co
Washington, D.C.; CDL:070170-J)

00077231   Branch, D.K.; Stout, L.D.; Folk, R.M. (1981) Acute Dermal
Toxicity of MON 2139 NF-80-AA to Rabbits: EHL 800291.
(Unpublished study received Jul 1, 1981 under 524-308; submi
by Monsanto Co., Washington, D.C.; CDL:070170-K)

00077232   Branch, D.K.; Stout, L.D.; Folk, R.M. (1981) Primary Eye Irr
tion of MON 2139 NF-80-AA to Rabbits: EHL 800293. (Unpublish
study received Jul 1, 1981 under 524-308; submitted by Monsa
Co., Washington, D.C.; CDL:070170-L)

00077233   Branch, D.K.; Stout, L.D.; Folk, R.M. (1981) Primary Skin Ir
tation of MON 2139 NF-80-AA to Rabbits: EHL 800292. (Unpubli
study received Jul 1, 1981 under 524-308; submitted by Monsa
Co., Washington D.C.; CDL:070170-M)

00077234   Branch, D.K.; Stout, L.D.; Folk, R.M. (1981) Acute Oral Toxi

of Mon 0139 to Rats: EHL 800257. ( Unpublished study receive
Jul 1, 1981 under 524-308; submitted by Monsanto Co., Wash-
ington, D.C.; CDL:070170-N)

00077235   Branch, D.K.; Stout, L.D.; Folk, R.M. (1981) Acute Dermal
Toxicity of MON 0139 to Rabbits: EHL 800258. (Unpublished st
received Jul 1, 1981 under 524-308; submitted by Monsanto Co
Washington, D.C.; CDL:070170-0)

00077236   Branch, D.K.; Stout, L.D.; Folk, R.M. (1981) Primary Eye Irr
tion of MON 0139 to Rabbits: EHL 800260. (Unpublished study
received Jul 1, 1981 under 524-308; submitted by Monsanto Co
Washington, D.C.; CDL:070170-P)

00077237   Branch, D.K.; Stout, L.D.; Folk, R.M. (1981) Primary Skin Ir
tation of MON 0139 to Rabbits: EHL 800259. (Unpublished stud
received Jul 1, 1981 under 524-308; submitted by Monsanto Co
Washington, D.C.; CDL:070170-Q)

00077238   Dubelman, S.; Steinmetz, J.R. (1981) Glyphosate Residues in
Water following Application of Roundup Herbicide to Flowing
ies of Water: MSL-1486. Final rept. Includes method dated Se
1980. unpublished study received Jul 1, 1981 under 524-308;
prepared in cooperation with Analytical Biochemistry Labs,
submitted by Monsanto Co., Washington D.C.; CDL:070170-R)

00077301   Monsanto Company (1975) Residue Results. (Compilation;
unpublished study, including published data, received Mar 11
1976 under 524-308; CDL:095141-A)

00078619   Shirasu, Y.; Moriya, M.; Ohta, T. (1978) Microbial Mutagenic
Testing on CP67573 (Glyphosate). (Unpublished study received
25, 1979 under 524-308; prepared by Institute of Environment
Toxicology, Japan, submitted by Monsanto Co., Washington, D.
CDL:238233-A)

00078620   Kier, L.D.; Flowers, L.J.; Hannah, L.H. (1978) Final Report
Salmonella Mutagenicity Assay of Glyphosate: Test No. LF-78-
(Unpublished study received Apr 25, 1979 under 524-308; sub-
mitted by Monsanto Co., Washington, D.C.; CDL:238233-B)

00078655   Thompson, C.M.; Griffen, J.; Boudreau, P. (1980) Acute Toxic
of MON 2139 NF-80W (AB-80-363) to Rainbow Trout (Salmo gaird
ri): Static Acute Bioassay Report #26316. (Unpublished study
received Jul 1, 1981 under 524-308; prepared by Analytical B

C-13

Chemistry Laboratories, Inc., submitted by Monsanto Co., Washington, D.C.; CDL:070171-B)

00078656 Thompson, C.M.; Griffen, J.; (1980) Acute Toxicity of MON 21 NF80W (AB-80-364) to Bluegill Sunfish (Lepomis macrochirus): Static Acute Bioassay Report #26315. (Unpublished study rece Jul 1, 1981 under 524-308; prepared by Analytical Bio Chemis Laboratories, Inc., submitted by Monsanto Co., Washington, D CDL:070171-C)

00078657 Forbis, A.D.; Boudreau, P. (1980) Acute Toxicity of MON 2139-NF-80W (AB-80-365) to Daphnia magna: Static Acute Bioas Report #26317. (Unpublished study received Jul 1, 1981 under 524-308; prepared by Analytical Bio Chemistry Laboratories, Inc., submitted by Monsanto Co., Washington, D.C.; CDL:07017

00078658 Thompson, C.M.; Griffen, J.; Forbis, A.D. (1980) Acute Toxic of MON 2139 NF-80-AA (AB-80-367) to Rainbow Trout (Salmo gai neri): Static Acute Bioassay Report #26319. (Unpublished stu received Jul 1, 1981 under 524-308; prepared by Analytical B Chemistry Laboratories, Inc., submitted by Monsanto Co., Washington, D.C.; CDL:070171-E)

00078659 Thompson, C.M.; Griffen, J. (1980) Acute Toxicity of MON 2139-NF80AA (AB-80-368) to Bluegill Sunfish (Lepomis macrochirus): Static Acute Bioassay Report #26318. (Unpublis study received Jul 1, 1981 under 524-308; prepared by Analyt Bio Chemistry Laboratories, Inc., submitted by Monsanto Co., Washington, D.C.; CDL:070171-F)

00078660 Boudreau, P.; Forbis, A.D. (1980) The Acute Toxicity of MON NF-80-AA (AB-80-369) to Daphnia magna: Static Acute Bioassay Report #26320. (Unpublished study received Jul 1, 1981 under 524-308; prepared by Analytical Bio Chemistry Laboratories, Inc., submitted by Monsanto Co., Washington, D.C.; CDL:07017

00078661 Thompson, C.M.; Griffen, J. (1981) Acute Toxicity of MON 013 (Lot LURT 12011) (AB-81-072) to Rainbow Trout (Salmo gairdne Static Acute Bioassay Report #27202. (Unpublished study rece Jul 1, 1981 under 524-308; prepared by Analytical Bio Chemis Laboratories, Inc., submitted by Monsanto Co., Washington, D CDL:070171-H)

00078662 Griffen, J.; Thompson, C.M. (1981) Acute Toxicity of MON 013 (Lot LURT 12011) (AB-81-073) to Bluegill Sunfish (Lepomis ma

chirus): Static Acute Bioassay Report #27201. (Unpublished s
received Jul 1, 1981 under 524-308; prepared by Analytical B
Chemistry Laboratories, Inc., submitted by Monsanto Co.,
Washington, D.C.; CDL:070171-I)

00078663   Forbis, A.D.; Boudreau, P. (1981) Acute Toxicity of MON 0139
(Lot LURT 12011) (AB-81-074) to Daphnia magna: Static Acute
assay Report #27203. ( Unpublished study received Jul 1, 198
under 524-308; prepared by Analytical Bio Chemistry Laborato
ries, Inc., submitted by Monsanto Co., Washington, D.C.; CDL
070171-J)

00078664   Thompson, C.M.; Griffen, J. (1980) Acute Toxicity of
MON-0139-X-77 (AB-80-262) to Rainbow Trout (Salmo gairdneri)
Static Acute Bioassay Report #26020. ( Unpublished study
received Jul 1, 1981 under 524-308; prepared by Analytical B
Chemistry Laboratories, Inc., submitted by Monsanto Co.,
Washington, D.C.; CDL: 070171-K)

00078665   Thompson, C.M.; Griffen, J. (1980) Acute Toxicity of
MON-0139-X-77 (AB-80-263) to Bluegill Sunfish (Lepomis
macrochirus): Static Acute Bioassay Report #26019. (Unpublis
study received Jul 1, 1981 under 524-308; prepared by Analyt
Bio Chemistry Laboratories, Inc., submitted by Monsanto Co.,
Washington, D.C.; CDL:070171-L)

00078666   Forbis, A.D.; Boudreau, P. (1980) Acute Toxicity of
MON-0139-X-77 (AB-80-264) to Daphnia magna: Static Acute
Bioassay Report #26021. (Unpublished study received Jul 1, 1
under 524-308; prepared by Analytical Bio Chemistry
Laboratories, Inc., submitted by Monsanto Co., Washington, D
CDL:070171-M)

00078823   Monsanto Company (1978) Glyphosate Residues in Tea Leaves
following Postemergent Directed Treatment with Roundup
Herbicide: MSL-0908. (Unpublished study received Jun 17, 198
under 524- 308; CDL:245567-A)

00078824   Monsanto Company (1980) Glyphosate Residues in Brewed and
Instant Tea following Postemergent Directed Treatment in Tea
Plantations with Roundup Herbicide: MSL-1582. (Unpublished s
received Jun 17, 1981 under 524-308; CDL:245567-B)

00081674   Schroeder, R.E.; Hogan, G.K. (1981) A Three-Generation
Reproduction Study with Glyphosate in Rats: Project No. 77-2

C-15

(Unpublished study received Sep 22, 1981 under 524-308; prep by Bio/dynamics, Inc., submitted by Monsanto Co., Washington D.C.; CDL:245909-A)

00093879 Lankas, G.R.; Hogan, G.K. (1981) A Lifetime Feeding Study of Glyphosate (Roundup Technical) in Rats: Project No. 772062. (Unpublished study received Jan 20, 1982 under 524-308; prep by Bio/dynamics, Inc., submitted by Monsanto Co., Washington D.C.; CDL:246617-A; 246618; 246619; 246620; 246621)

00094971 Grabiak, M.C.; Malik, J.M.; Purdum, xx.R. (1981) A Reinvestigation of the Static Exposure of Channel Catfish to 14C-Labeled Glyphosate, N-(Phosphonomethyl) Glycine: Report MSL-2056. (Unpublished study, including final bioconcentrati report no. 27497, received Mar 2, 1982 under 524-308; submit by Monsanto Co., Washington, D.C.; CDL:246876-A)

00098460 Johnson, D.E.; Nair, K.P.C.; Riley, J.H.; et al. (1982) 21-d Dermal Toxicity Study in Rabbits: 401-168; Monsanto No. IR-8 195. (Unpublished study received Apr 12, 1982 under 524-308; prepared by International Research and Development Corp., su mitted by Monsanto Co., Washington, D.C.; CDL:247228-A)

00105995 Street, R. (1982) Letter sent to R. Taylor dated Jul 6, 1982 Roundup herbicide: Addendum to pathology report for a three-generation reproduction study in rats with glyphosate. (Unpu lished study received Jul 7, 1982 under 524-308; submitted b Monsanto Co., Washington, DC; CDL:247793-A)

00108097 Rueppel, M.; Suba, L.; Conoyer, M.; et al. (1973) Final Repo on CP 67573, Residue and Metabolism: Part 10: The Metabolism CP 67573 in Soybeans, Cotton, Wheat, and Corn: Agricultural Research Report No. 304. (Unpublished study received Nov 12, 1973 under 4G1444; submitted by Monsanto Commercial Products Co., St. Louis, MO; CDL:093849-B)

00108098 Colvin, L.; Miller, J.; Marvel J. (1973) Final Report on CP 67573 Residue and Metabolism: Part 8: The Gross Metabolism o ... (CP 67573-14C) in the Laboratory Rat following a Single Dose: Agricultural Research Report No. 297. (Unpublished stu received Nov 12, 1973 under 4G1444; submitted by Monsanto Commercial Products Co., St. Louis, MO; CDL:093849-C)

00108099 Colvin, L.; Miller, J.; Marvel, J. (1973) Final Report on CP 67573 Residue and Metabolism: Part 9: The Gross Distribution

... CP 67573-14C in the Rabbit: Agricultural Research Report 298. (Unpublished study received Nov 12, 1973 under 4G1444; mitted by Monsanto Commercial Products Co., St. Louis, MO; C 093849-D)

00108100   Colvin, L.; Moran, S.; Miller, J.; et al. (1973) Final Repor CP 67573 Residue and Metabolism: Part 11: The Metabolism of CP 50435-14C in the Laboratory Rat: Agricultural Research Re No. 303. (Unpublished study received Nov 12, 1973 under 4G14 submitted by Monsanto Commercial Products Co., St. Louis, MO CDL:093849-E)

00108101   Moran, S.; Colvin, L.; Rueppel, M.; et al. (1973) Final Repo on CP 67573 Residue and Metabolism: Part 12: The Isolation a Identification of the Metabolites of CP 67573-14C Excreted b the Laboratory Rat: Agricultural Research Report No. 306. (U published study received Nov 12, 1973 under 4G1444; submitte Monsanto Commercial Products Co., St. Louis, MO; CDL: 093849

00108107   Fink, R. (1973) Final Report: Eight-day Dietary LC50--Mallar Ducks: Technical CP67573: Project No. 241-107. (Unpublished study received Jul 12, 1974 under 5F1536; prepared by Enviro mental Sciences Corp., submitted by Monsanto Co., Washington DC; CDL:094171-I)

00108110   Bentley, R. (1973) Acute Toxicity of Roundup (Technical) to Atlantic Oyster (Crassostrea virginica). (Unpublished study received Jul 12, 1974 under 5F1536; prepared by Bionomics, I submitted by Monsanto Co., Washington, DC; CDL:094171-L)

00108111   Bentley, R. (1973) Acute Toxicity of Roundup (Technical) to Grass Shrimp (Palaemonetas vulgaris) and Fiddler Crab (Uca pagilator). (Unpublished study received Jul 12, 1974 under 5F1536; prepared by Bionomics, Inc., submitted by Monsanto, Washington, DC; CDL:094171-M)

00108112   Morrill, L. (1973) Acute Toxicity of Roundup to Bluegill (Lepomis macrochirus). (Unpublished study received Jul 12, under 5F536; prepared by Bionomics, Inc., submitted by Monsa Co., Washington, DC; CDL:  094171-N)

00108115   Lauer, R.; Cowell, J.; Stranz, J.; et al. (1974) Final Repor CP 67573, Residue and Metabolism: Part 18: Determination of idues in Meat, Milk and Eggs: Agricultural Research Report N 326. (Unpublished study-received Jul 12, 1974 under 5F1536;

C-17

submitted by Monsanto Co., St. Louis, MO; CDL:094180-A)

00108116 Colvin, L.; Miller, J.; Marvel, J. (1973) Final Report on CP
67573 Residue and Metabolism: Part 13: The Dynamics of
Accumulation and Depletion of Orally Ingested
N-Phosphonomethylglycine-14C: Agricultural Research Report N
309. (Unpublished study received Jul 12, 1974 under 5F1536;
submitted by Monsanto Co., St. Louis, MO; CDL:094180-C)

00108129 Monsanto Co. (1976) Residue Studies and Methods of Analysis
Use of Glyphosate in Pome Fruit Orchards. (Compilation;
unpublished study received Sep 7, 1976 under 524-308;
CDL:095269-C)

00108132 Cowell, J.; Lottman, C.; Cable, M.; et al. (1976) Determinat
of Roundup Herbicide Residues in Raisins: Report No. 440. Fi
rept. (Unpublished study received Jan 11, 1977 under 524-308
submitted by Monsanto Co., Washington, DC; CDL:095703-A)

00108133 Monsanto Co. (1976) Residue Studies in Green and Dry Alfalfa
Metabolism Studies in Pasture Crops: Glyphosate. (Compilatio
unpublished study received Jan 11, 1977 under 524-308;
CDL:095704-A)

00108140 Monsanto Co. (1975) Glyphosate Residue and Metabolism Studie
Sugarcane and Soils. (Compilation; unpublished study receive
Jul 1, 1976 under 6G1826; CDL:095972-B)

00108144 Monsanto Co. (1977) Study: Residue and Metabolism Analyses o
Roundup on Specific Foodstuffs. (Compilation; unpublished st
received Feb 14, 1978 under 524-EX-44; CDL:096821-A)

00108147 Monsanto Co. (1977) Residue and Metabolism: Roundup on Forag
Grasses, Legumes and Pasture Crops. (Unpublished study recei
May 9, 1978 under 524-308; CDL:097094-B)

00108149 Cowell, J.; Jordan, L.; Kramer, R.; et al. (1976) Glyphosate
Residues in Avocados following Post-directed Treatments with
Roundup Herbicide: Report No. 447. Final rept. (Unpublished
study received Nov 15, 1977 under 524-308; prepared in
cooperation with Univ. of California--Riverside, Dept. of Pl
Sciences, submitted by Monsanto Co., Washington, DC;
CDL:096631-A)

00108151 Monsanto Co. (1976) Residue, Uptake and Metabolism Studies:

C-18

Roundup. (Compilation; unpublished study received Dec 22, 19 under 524-EX-43; CDL:096684-A)

00108153   Monsanto Agricultural Products Co. (1975) Residues: Glyphosa on Soybeans & Cotton. (Compilation; unpublished study receiv Jun 21, 1977 under 7F1971; CDL:096191-A)

00108159   Monsanto Co. (1977) Residue and Metabolism Studies: Roundup. (Compilation; unpublished study received Oct 25, 1977 under 524-308; CDL:096398-A)

00108168   Monsanto Co. (1977) Residue Studies and Methods of Analysis the Use of Glyphosate as a Sugarcane Ripener. (Compilation; unpublished study received Aug 30, 1978 under 524-330; CDL: 097402-C)

00108171   EG & G, Bionomics (1975) Chronic Toxicity of Glyphosate to t Fathead Minnow (Pimephales promelas, Rafinesque). (Unpublish study received Dec 27, 1978 under 524-308; submitted by Mons Co., Washington, DC; CDL:097759-B)

00108172   McAllister, W.; Forbis, A. (1978) Acute Toxicity of Technica Glyphosate (AB-78-201) to Daphnia magna. (Unpublished study ceived Dec 27, 1978 under 524-308; prepared by Analytical Bi Chemistry Laboratories, Inc., submitted by Monsanto Co., Was ngton, DC; CDL:097759-C)

00108173   Monsanto Co. (1978) Residue Studies for Use of Roundup Herbi in Aquatic Situations. (Compilation; unpublished study recei Dec 27, 1978 under 524-308; CDL:097760-A; 097761; 097762)

00108174   Monsanto Co. (1975) Efficacy of Roundup on Corn and Other Gr (Compilation; unpublished study received Dec 3, 1975 under 5F1536; CDL:097859-A)

00108175   Monsanto Co. (1979) Residue Studies--Bananas; Olives: Roundu (Compilation; unpublished study received Jun 20, 1979 under 524-308; CDL:098332-A)

00108176   Monsanto Co. (1975) Residue Studies and Methods of Analysis Pre-emergent Use of Glyphosate in Cotton. (Compilation; un-published study received May 20, 1976 under 6F1798; CDL: 098511-A)

00108186   Monsanto Co. (1976) Residue Studies and Methods of Analysis

C-19

Use of Glyphosate in Pome Fruit Orchards. (Compilation; unpu
lished study received Sep 7, 1976 under 524-308; CDL:228995-

00108192   Brightwell, B.; Malik, J. (1978) Solubility, Volatility,
Adsorption and Partition Coefficients, Leaching and Aquatic
Metabolism of MON 0573 and MON 0101: Report No. MSL-0207. Fi
rept. (Unpublished study received Jun-12, 1978 under 524-308;
submitted by Monsanto Co., Washington, DC; CDL:234108-A)

00108200   Grapenthien, N.; Jenkins, D.; (1973) Report to ...: Milk and
Tissue Residue Study with ... CP 67573 in the Cow: IBT No.
632-03894. (Unpublished study received Jun 21, 1978 under
524-308; prepared by Industrial Bio-Test Laboratories, Inc.,
submitted by Monsanto Co., Washington, DC; CDL:234152-A)

00108203   Cowell, J.; Kramer, R.; Lottman, C.; et al. (1978) Residues
Crops following Spot Treatments with Roundup Herbicide: Repo
No. MSL-0282. Final rept. (Unpublished study received Jul 11
1978 under 524-308; submitted by Monsanto Co., Washington, D
CDL:234319-B)

00108204   Fink, R.; Beavers, J.; Brown, R. (1978) Final Report: Acute
LD50--Bobwhite Quail: Technical Glyphosate: Project No. 1391
(Unpublished study received Jul 14, 1978 under 524-308; prep
by Wildlife International, Ltd. and Washington College,
submitted by Monsanto Co., Washington, DC; CDL:234395-A)

00108205   McAllister, W.; Forbis, A. (1978) Acute Toxicity of Technica
Glyphosate to Bluegill Sunfish (Lepomis macrochirus): Static
Acute Bioassay Report. (Unpublished study received Jul 14, 1
under 524-308; prepared by Analytical Bio Chemistry Laborato
ries, Inc., submitted by Monsanto Co., Washington, DC; CDL:
234395-B)

00108207   Fink, R.; Beavers, J. (1978) Final Report: One-generation
Reproduction study--Bobwhite Quail: Glyphosate Technical:
Project No. 139-141. (Unpublished study received Nov 13, 197
under 524-308; prepared by Wildlife International, Ltd.,
submitted by Monsanto Co., Washington, DC; CDL:235924-B)

00108231   Conkin, R.; Serdy, F.; Street, R. (1979) A Short Residue Met
for Glyphosate, Active Ingredient in Roundup Herbicide: MSL0
(Unpublished study received Jul 30, 1979 under 524-308;
submitted by Monsanto Co., Washington, DC; CDL:238888-A)

C-20

00109271  Monsanto Co. (19??) Crop Residues and Tolerances. (Unpublish
          study received Apr 9, 1982 under KS 82/1 for Monsanto; CDL:
          247348-B)

00111945  Monsanto Co. (1976) Residue and Plant Metabolism Studies.
          (Compilation; unpublished study received Dec 8, 1976 under
          524-308; CDL:095633-A)

00111949  Danhaus, R.; Kramer, R. (1978) Glyphosate Residues in Stone
          Fruit following Postemergent Directed Treatments with Roundu
          Herbicide: Report No. MSL-0454. Final rept. (Unpublished stu
          received Nov 20, 1978 under 524-EX-47; prepared in cooperati
          with Analytical Development Corp., submitted by Monsanto Co.
          Washington, DC; CDL:097636-A)

00111953  Fink, R.; Beavers, J. (1978) Final Report: One-generation
          Reproduction Study--Mallard Duck: Glyphosate Technical: Proj
          No. 139-143. (Unpublished study received Nov 13, 1978 under
          524-308; prepared by Wildlife International Ltd., submitted
          Monsanto Co., Washington, DC; CDL:235924-A)

00122715  Steinmetz, J.; Cowell, J. (1982) Glyphosate Residues in Whea
          Grain following Ropewick Wiper Treatment with Roundup Herbic
          MSL-2569. (Unpublished study received Dec 17, 1982 under 524
          submitted by Monsanto Co., Washington, DC; CDL:071296-A)

00124760  Forbis, A.; Boudreau, P.; Cranor, xx. (1982) Dynamic 96-hour
          Acute Toxicity of Roundup (AB-82-33) to Bluegill Sunfish
          (Lepomis macrochirus): Dynamic Acute Bioassay Report #28746.
          (Unpublished study received Dec 27, 1982 under 524-308; prep
          by Analytical Bio-Chemistry Laboratories, Inc., submitted by
          Monsanto Co., Washington, DC; CDL:249159-A)

00124762  Forbis, A.; Boudreau, P.; Schofield, M. (1982) Dynamic 48-ho
          Acute Toxicity of Roundup (AB-82-035) to Gammarus pseudolim-
          naeus: Dynamic Acute Bioassay Report #28747. (Unpublished st
          received Dec 27, 1982 under 524-308; prepared by Analytical
          Bio-Chemistry Laboratories, Inc., submitted by Monsanto Co.,
          Washington, DC; CDL:249159-C)

00124763  McAllister, W.; McKee, M.; Schofield, M.; et al. (1982) Chro
          Toxicity of Glyphosate (AB-82-036) to Daphnia magna under Fl
          through Test Conditions: Chronic Toxicity Final Report ABC
          #28742. (Unpublished study received Dec 27, 1982 under 524-3
          prepared by Analytical Bio-Chemistry Laboratories, Inc., sub

C-21

mitted by Monsanto Co., Washington, DC; CDL:249160-A)

00130406  Knezevich, A.; Hogan, G. (1983) A Chronic Feeding Study of
          Glyphosate (Roundup Technical) in Mice: Project No. 77-2061:
          BDN-77420. Final rept. (Unpublished study received Aug 17, 1
          under 524-308; prepared by Bio/dynamics, Inc., submitted by
          santo Co., Washington, DC; CDL:251007-A; 251008; 251009; 251
          251011; 251012; 251013; 251014)

00132681  Li, A.; Kier, L.; Folk, R. (1983) CHO/HGPRT Gene Mutation As
          with Glyphosate: EHL Study No. ML-83-155. Final rept. (Un-
          published study received Nov 15, 1983 under 524-308; submitt
          by Monsanto Co., Washington, DC; CDL:251737-B)

00132683  Li, A.; Kier, L.; Folk, R. (1983) In vivo Bone Marrow
          Cytogenetics Study of Glyphosate in Sprague-Dawley Rats: Stu
          No. 830083. (Unpublished study received Nov 15, 1983 under
          524-308; submitted by Monsanto Co., Washington, DC;
          CDL:251737-D)

00132685  Ridley, W., Dietrich, M.; Folk, R.; et al. (1983) A Study of
          Plasma and Bone Marrow Levels of Glyphosate following Intrap
          toneal Administration in the Rat: Study No. 830109. (Unpubli
          study received Nov 15, 1983 under 524-308; submitted by Mons
          Co., Washington, DC; CDL:251737-F)

00132686  Williams, G.; Tong, C.; Dirks, R.; et al. (1983) The Hepatoc
          Primary Culture/DNA Repair Assay on Compound JJN-1020 Using
          Hepatocytes in Culture: NDItln vitro Facility Experimental N
          083183A; Sponsor Order No. AH-83-181. (Unpublished study
          received Nov 15, 1983 under 524-308; prepared by Naylor Dana
          Institute for Disease Prevention, submitted by Monsanto Co.,
          Washington, DC; CDL:251737-G)

GS0178-003   Suba, L. (1976) Metabolism of CP67573 in Representative
          Vegetables and Rotation Crops: Final Report No. 406.
      Unpublished study prepared by Monsanto Agricultural
Research Dept. 57 p.

GS0178-004   Brightwell, B. (1978) Bioaccumulation and Metabolism
          of Glyphosate in Channel Catfish (Ictalurus punctatus: Final Repo
          No. MSL-0381. Unpublished study prepared by Monsanto Agricultural
          Research Dept. 34 p.

GS0178-014   Lauer, R.; Cowell, J.; Briggs, L.; et al. (1974) Roundup

C-22

and Metabolite Residue Method Development for Animal Tissues
Products: Appendix C. Unpublished study prepared by Monsanto
p.

GS0178-017   Monsanto Co. (1976) Analytical Residue Method for
            N-nitnoso-N-phosphonomethyl Glycine in Water: Method D.
            Unpublished method. 7 p.

GS0178-018   Monsanto Co. (1978) Analytical Residue Method for
            N-nitrosoglyphosate in Water: Method 3. Unpublished Method.
            p.

GS0178-019   Storherr, R. (1980) Letter sent-to E. Zager dated Sept.
            19, 1980: Glyphosate HPLC Method trial on tomatoes and
            cottonseed. 3 p.

GS0178-020   Storherr, R. (1981) Letter sent to M. Nelson dated Jan
            19, 1981: Method trial on PP #OF2329, glyphosate in or on
            peanuts, by an HPLC procedure. 3 p.

GS0178-022   Zee, K. (1975) Memorandum to J. Cummings dated Nov 1,
            1975: PP #5F1536. Method tryout for glyphosate on soybeans.

GS0178-023   Zee, K. (1977) Memorandum to J. Cummings dated Feb 9,
            1977: PP #6F1733 and 6F1758. Method tryout for glyphosate in
            beef liver. 2 p.

GS0178-025   Folmar, L.; Sanders, H.; Julin, A. (1979) Toxicity of the
            herbicide glyphosate and several of its formulations to fish
            aquatic invertebrates. Arch. Environm. Contam. Toxicol.
            8:269-278.

GS0178-028   Monsanto Co. (1976) Information to Support
            Establishment of a Food Additive Tolerance for Glyphosate in
            Palm Oil: Special Report No. 424. Vol 1 of 1, Sections A-J.
            Unpublished study. 41 P.

Arkansas Cooperative Extension Service (1985) Recommended
            Chemicals for Weed and Brush Control, MP-A4, Arkansas.

Hill, E.F., Heath, R.G., Spann, J.W. and Williams, J.D.(1975)
            Lethal Dietary Toxicities of Environmental Pollutants  to Bi
            U.S.F.W.S.  Special Scientific .Report--Wildlife No. 191.

Hoerger and Kenaga (1972) Pesticide Residues on Plants.

    Correlation of Representative Data as a Basis for Estimation
    their Magnitude in the Environment.  <u>Environmental Quality</u>.
    Academic Press, N.Y.1:9-28.

Kenaga (1973) Factors to be considered in the Evaluation of
    Pesticides to Birds in their Environment. <u>Environmental
    Quality</u>, Academic Press, N.Y.<u>II</u>: 166-181.

Leonard, W.H. and Martin, J.H.  (1963) <u>Cereal Crops</u>, Part V.
    Rice, Sorghum, and Millets, page 635.

USDA, The biologic and economic assessment of 2,4,5-T,
    Cooperative Impact Assessment Technical Bulletin Number 1671

Wauchope (1978) The Pesticide Content of Surface Water Draining
    from Agricultural Fields - A Review, J. Environ.  Qual., Vol
    7.7, No. 4.

00067039 Birch, M.D. (1970) Toxicological Investigation of CP 67573-3
    Project No. Y-70-90.  (Unpublished study received Jan 30, 19
    under 524-308; prepared by Younger Laboratories, Inc., submi
    by Monsanto Co., Washington, D.C.; CDL:008460-C)

40159301 Bohn, J. (1987) An Evaluation of the Preemergence Herbicidal
    Activity of CP-70139:  Lab Project ID:  056337.  Unpublished
    study prepared by Monsanto Agricultural Co.  25 p.

40236901 Hughes, J. (1987) The Toxicity of Glyphosate Technical to
    Selenastrum capricornutum:  Lab Project ID:  1092-02-1100-1.
    Unpublished study prepared by Malcolm Pirnie, Inc.  23 p.

40236902 Hughes, J. (1987) The Toxicity of Glyphosate Technical to
    Navicula pelliculosa:  Lab Project ID:  1092-02-1100-2.
    Unpublished study prepared by Malcolm Pirnie, Inc.  23 p.

40236903 Hughes, J. (1987) The Toxicity of Glyphosate Technical to
    Skeletonema costatum:  Lab Project ID:  1092-02-1100-3.
    Unpublished study prepared by Malcolm Pirnie, Inc.  24 p.

40236904 Hughes, J. (1987) The Toxicity of Glyphosate Technical to
    Anabaena flosaquae:  Lab Project ID:  1092-02-1100-4.
    Unpublished study prepared by Malcolm Pirnie, Inc.  23 p.

40236905 Hughes, J. (1987) The Toxicity of Glyphosate Technical to Le
    gibba:  Lab Project ID:  1092-02-1100-5.  Unpublished study

prepared by Malcolm Pirnie, Inc.  22 p.

41400603  Blaszcak, D. (1988) Eye Irritation Study in Rabbits for
          Glyphosate Technical (Wetcake): Lab Project Number: 4888-88:
          Monsanto Reference No. BD-88-114.  Unpublished study prepare
          Bio/dynamics, Inc.  20 p.

41400604  Blaszcak, D. (1988) Primary Dermal Irritation Study in Rabbi
          for Glyphosate Technical (Wetcake): Lab Project Number: 4887
          Monsanto Reference No. BD-88-114.  Unpublished study prepare
          Bio/dynamics, Inc.  17 p.

ACCSN: 252142   A   MRID: 00137137
                B   MRID: 00137138
                C   MRID: 00137139
                D   MRID: 00137140

00137137  Auletta, C.; Daly, I.; Blaszcak, D.; et al. (1983) A Dermal
          Sensitization Study in Guinea Pigs: [Roundup Formulation]:
          Bio/dynamics Project No. 4234-83; Monsanto Reference No. BD-
          007.  (Unpublished study received Jan 5, 1984 under 524-308;
          prepared by Bio/dynamics, Inc., submitted by Monsanto Co.,
          Washington, DC; CDL:252142-A)

00137138  Auletta, C.; Daly, I.; Blaszcak, D.; et al. (1983) A Dermal
          Sensitization Study in Guinea Pigs: [Glyphosate]: Bio/dynami
          Project No. 4235-82; Monsanto Reference No. BD-83-008.
          (Unpublished study received Jan 5, 1984 under 524-308; prepa
          by Bio/dynamics, Inc., submitted by Monsanto Co., Washington
          DC; CDL:  252142-B)

00137139  Maibach, H. (1982) [Toxicity: 14C-glyphosate in Monkeys].
          (Unpublished study received Jan 5, 1984 under 524-308; prepa
          by Univ. of California--San Fransisco, School of Medicine,
          submitted by Monsanto Co., Washington, DC; CDL:252142-C)

00137140  Franz, T. (1983) Evaluation of the Percutaneous Absorption o
          Roundup Formulations in Man Using an in vitro Technique:
          Monsanto Study No. UW-81-346.  Final rept.  (Unpublished stu
          received Jan 5, 1984 under 524-308; prepared by Univ. of
          Washington, School of Medicine, submitted by Monsanto Co.,
          Washington, DC; CDL:252142-D)

40405401  Hirsch, R.; Augustin, D. (1987) Nitrosamine Analyses of Roun
          Herbicide, rodeo Herbicide, MON 0139 and Polado Technical:

C-25

Laboratory Project ID R. D. No. 835.  Unpublished study prep
by Monsanto Agricultural Company.  212 p.

41400601  Blaszcak, D. (1988) Acute Oral Toxicity Study in Rats for
Glyphosate Technical (Wetcake) ...: Lab Project Number: 4885
Monsanto Reference No. BD-88-114.  Unpublished study prepare
Bio/dynamics, Inc.  18 p.

41400602  Blaszcak, D. (1988) Acute Dermal Toxicity Study in Rabbits f
Glyphosate Technical (Wetcake): Lab Project Number: 4886-88:
Monsanto Reference No. BD-88-114.  Unpublished study prepare
Bio/dynamics, Inc.  17 p.

41573601  Herre, B.; Korndorfer, C.; Barclay, J. (1990) Product Chemis
Data to Support the Registration of the 62% Solution of the
Isopropylamine Salt of Glyphosate (MON-0139):  Storage Stabi
Study:  Lab Project Number:  MSL-6199:  1006.  Unpublished s
prepared by Monsanto Agricultural Co.  12 p.

40559401  Stout, L.; Johnson, C. (1987) 90-day Study of Glyphosate
Administered in Feed to Sprague/Dawley Rats: Proj. ID ML-86-
351/EHL 86128.  Unpublished study prepared by Monsanto
Agricultural Co. 267 p.

00093879  Lankas, G.R.; Hogan, G.K. (1981) A Lifetime Feeding Study of
Glyphosate (Roundup  Technical) in Rats: Project No. 77-2062
(Unpublished study received Jan 20, 1982 under 524-308; prep
by Bio/dynamics, Inc., submitted by Monsanto Co., Washington
D.C.; CDL:246617-A; 246618; 246619; 246620; 246621)

00036803  Street, R.W.; Conkin, R.A.; Edwards, G.A.; et al. (1980) A
Three-Month Feeding Study of Glyphosate in Mice: Special Rep
# MSL-1154.  (Unpublished study received Jul 2, 1980 under 5
308; submitted by Monsanto Co., Washington, D.C.; CDL:242799

00098460  Johnson, D.E.; Nair, K.P.C.; Riley, J.H.; et al. (1982) 21-d
Dermal Toxicity Study in Rabbits: 401-168; Monsanto No. IR-8
195.  (Unpublished study received Apr 12, 1982 under 524-308
prepared by International Research and Development Corp.,
submitted by Monsanto Co., Washington, D.C.; CDL:247228-A)

00153374  Reyna, M. (1985) Twelve Month Study of Glyphosate Administer
by Gelatin Capsule to Beagle Dogs: Project No. ML-83-137: St
No. 830116.  Unpublished study prepared by Monsanto Company
Environmental Health.  317 p.

00093879   Lankas, G.R.; Hogan, G.K. (1981) A Lifetime Feeding Study of
           Glyphosate (Roundup  Technical) in Rats: Project No. 77-2062
           (Unpublished study received Jan 20, 1982 under 524-308; prep
           by Bio/dynamics, Inc., submitted by Monsanto Co., Washington
           D.C.; CDL:246617-A; 246618; 246619; 246620; 246621)

41643801   Stout, L.; Ruecker, F. (1990) Chronic Study of Glyphosate
           Adminitered in Feed to Albino Rats: Lab Project Number: MSL-
           10495:  R.D. 1014.  Unpublished study prepared by Monsanto
           Agricultural Co.  2175 p.

00153374   Reyna, M. (1985) Twelve Month Study of Glyphosate Administer
           by Gelatin Capsule to Beagle Dogs: Project No. ML-83-137: St
           No. 830116.  Unpublished study prepared by Monsanto Company
           Environmental Health.  317 p.

00130406   Knezevich, A.; Hogan, G. (1983) A Chronic Feeding Study of
           Glyphosate (Roundup Technical) in Mice: Project No. 77-2061:
           BDN-77-420.  Final rept.  (Unpublished study received Aug 17
           1983 under 524-308; prepared by Bio/dynamics, Inc., submitte
           Monsanto Co., Washington, DC; CDL:251007-A; 251008; 251009;
           251010; 251011; 251012; 251013; 251014)

00150564   McConnel, R. (1985) A Chronic Feeding Study of Glyphosate
           (Roundup Technical in Mice): Pathology Report on Additional
           Kidney Sections: Addendum to Final Report Dated July 21, 198
           Project No. 77-2061A.  Unpublished study prepared by
           Bio/dynamics Inc. 59 p.

00046362   Rodwell, D.E.; Tasker, E.J.; Blair, A.M.; et al. (1980)
           Teratology Study in Rats: IRDC No. 401-054.  (Unpublished st
           including IRDC no. 999-021; received May 23, 1980 under 524-
           prepared by International Research and Development Corp.,
           submitted by Monsanto Co., Washington, D.C.; CDL:242516-A)

00046363   Rodwell, D.E.; Tasker, E.J.; Blair, M.; et al. (1980) Terato
           Study in Rabbits: IRDC No. 401-056.  (Unpublished study rece
           May 23, 1980 under 524-308; prepared by International Resear
           and Development Corp., submitted by Monsanto Co., Washington
           D.C.; CDL:242516-B) 00105995 Street, R. (1982) Letter sent t
           Taylor dated Jul 6, 1982:  Roundup herbicide: Addendum to
           pathology report for a three-generation reproduction study i
           rats with glyphosate.  (Unpublished study received Jul 7, 19
           under 524-308; submitted by Monsanto Co., Washington, DC;
           CDL:247793-A)

C-27

00105995   Street, R. (1982) Letter sent ot R. Taylor dated Jul 6, 1982
           Roundup Herbicide:  Addendum to pathology reprot for a three
           generation reproduction study in rates with glyphosate.
           (Unpublished study received Jul 7, 1982 under 524-308; submi
           by Monsanto Co., Washington, DC; CDL:247793-A)

41621501   Reyna, M. (1990) Two Generation Reproduction Feeding Study w
           Glysophate in Sprague-Dawley Rats: Lab Project No: MSL-10387
           Unpublished study prepared by Monsanto Agricultural Co.  115

00078620   Kier, L.D.; Flowers, L.J.; Hannah, L.H. (1978) Final Report
           Salmonella Mutagenicity Assay of Glyphosate: Test No. LF-78-
           (Unpublished study received Apr 25, 1979 under 524-308;
           submitted by Monsanto Co., Washington, D.C.; CDL:238233-B)

00132681   Li, A.; Kier, L.; Folk, R. (1983) CHO/HGPRT Gene Mutation As
           with Glyphosate: EHL Study No. ML-83-155.  Final rept.
           (Unpublished study received Nov 15, 1983 under 524-308;
           submitted by Monsanto Co., Washington, DC; CDL:251737-B)

00132683   Li, A.; Kier, L.; Folk, R. (1983) In vivo Bone Marrow
           Cytogenetics Study of Glyphosate in Sprague-Dawley Rats: Stu
           No. 830083.  (Unpublished study received Nov 15, 1983 under
           308; submitted by Monsanto Co., Washington, DC; CDL:251737-D

00078619   Shirasu, Y.; Moriya, M.; Ohta, T. (1978) Microbial Mutagenic
           Testing on CP67573 (Glyphosate).  (Unpublished study receive
           April 25, 1979 under 524-308; prepared by Institute of
           Environmental Toxicology, Japan, submitted by Monsanto Co.,
           Washington, D.C.; CDL:238233-A)

40767101   Ridley, W.; Mirly, K. (1988) The Metabolism of Glyphosate in
           Sprague Dawley Rats--Part I. Excretion and Tissue Distributi
           of Glyphosate and Its Metablites following Intravenous and O
           Administration: Laboratory Project No. 86139 (MSL-7215): R.D
           No. 877.  Unpublished study prepared by Monsanto Co.  587 p.

40767102   Howe, R.; Chott, R.; McClanahan, R. (1988) Metabolism of
           Glyphosate in Sprague-Dawley Rats. Part II. Identification,
           Characterization, and Quantitation of Glyphosate and Its
           Metabolites after Intravenous and Oral Administration:
           Laboratory Project No. MSL-7206: R.D. No. 877.  Unpublished
           study prepared by Monsanto Co.  155 p.

00132685   Ridley, W., Dietrich, M.; Folk, R.; et al. (1983) A Study of

Plasma and Bone Marrow Levels of Glyphosate following
Intraperitoneal Administration in the Rat: Study No. 830109.
(Unpublished study received Nov 15, 1983 under 524-308;
submitted by Monsanto Co., Washington, DC; CDL:251737-F)

Study No.: UW-81-346; Date: 8/30/83; No MRID or Accession No.)

"Pesticides Contaminated with N-nitroso Compounds, proposed policy 45
42854 (June 25, 1980)"

00152596   Thompson, C.; McAllister, W. (1983) Acute Toxicity of Liqua
           to Rainbow Trout (Salmo gairdneri): Report #30409.  Unpubli
           study prepared by Analytical Bio-Chemistry Laboratories, Inc
           51 p.

00152599   Kinter, D.; Forbis, A. (1983) Acute Toxicity of LI-700 to
           Rainbow Trout (Salmo gairdneri): Report No. 30412.  Unpubli
           study prepared by Analytical Bio-Chemistry Laboratories, Inc
           46 p.

00152601   Thompson, C.; McAllister, W. (1983) Acute Toxicity of Passag
           Rainbow Trout (Salmo gairdneri): Report No. 30412.  Unpubli
           study prepared by Analytical Bio-Chemistry Laboratories, Inc
           46 p.

00152767   Kinter, D.; Forbis, A. (1983) Acute Toxicity of [Inert
           Ingredient] to Rainbow Trout (Salmo gairdneri): Static Bioa
           Report No. 30415.  Unpublished Monsanto Study No. AB-83-120
           prepared by Analytical Bio-Chemistry Laboratories, Inc.  46

00152597   Burgess, D.; Forbis, A. (1983) Acute Toxicity of Liqua-Wet t
           Daphnia magna: Report No. 30410.  Unpublished study prepare
           Analytical Bio-Chemistry Laboratories, Inc.  35 p.

00152600   Burgess, D.; Forbis, A. (1983) Acute Toxicity of LI-700 to
           Daphnia magna: Report No. 30413.  Unpublished study prepare
           Analytical Bio-Chemistry Laboratories, Inc.  34 p.

00152602   Burgess, D.; Forbis, A. (1983) Acute Toxicity of Passage to
           Daphnia magna: Report No. 30413.  Unpublished study prepare
           Analytical Bio-Chemistry Laboratories, Inc.  34 p.

00152768   Burgess, D.; Forbis, A. (1983) Acute Toxicity of [Inert
           Ingredient] to Daphnia magna: Static Acute Bioassay Report
           30416.  Unpublished Monsanto Study No. AB-83-122 prepared by

Analytical Bio-Chemistry Laboratories, Inc.  36 p.

41335101  Shepler, K.; McGovern, P. (1989) Photodegradation of Carbon-
          Glyphosate in/on Soil by Natural Sunlight:  Lab Project Numb
          MSL-9271:  PTRL-153W.  Unpublished study prepared by
          Pharmacology and Toxicology Research Laboratory.  82 p.

42765001  Oppenhuizen, M. (1993) The Terrestrial Field Dissipation of
          Glyphosate:  Final Report:  Lab Project Number:  MSL-12651:
          63-R-1:  AL-91-121.  Unpublished study prepared by The
          Agricultural Group of the Monsanto Co. and Pan-Agricultural
          Labs, Inc.  1244 p.

40559301  Barclay, J.; Pike, R. (1987) Product Chemistry Data to Suppo
          the Registration of MON-8783 (FallowMaster):  Storage Stabil
          Study:  Laboratory Project ID MSL-6537, R. D. No. 819.
          Unpublished study prepared by Monsanto Agricultural Company.
          p.

00162912  Ruecker, F. (1986) Addendum to One-year Toxicology Study in
          with Glyphosate:  Special Report MSL-5927.  Unpublished adde
          prepared by Monsanto Agricultural Co.  6 p.

00046364  Rodwell, D. E.; Wrenn, J. M.; Blair, A. M.; et al. (1980)
          Dominant Lethal Study in Mice:  IRDC No. 401-064.  (Unpublis
          study received May 23, 1980 under 524-308; prepared by
          International Research and Development Corp., submitted by
          Monsanto Co., Washington, DC; CDL:  242516-C)

00161333  Hammon, J. (1986) Product Chemistry Data To Suppport the
          Continued Registration of Glyphosphate
          (N-phosphonomethylglycine): Report No. MSL-5066 (Revised):
          Project No. 7663.  Unpublished study prepared by Monsanto Co
          172 p.

41096101  Leiber, M. (1988) Vapor Pressure Determinations for Glyphosa
          and MON-7200/15100: Project No. MSL-7642; R.D. No. 924.
          Unpublished study prepared by Monsanto Agricultural Co.  59

00061553  Monsanto Company (1974) Residue Results.  (Unpublished study
          received on unknown date under 524-EX-24; CDL:095345-F)

00051980  Monsanto Company (1975) Residue Results.  (Unpublished study
          received Jun 3, 1976 under 524-308; CDL:096177-D)

C-30

00053002   Monsanto Company (1980) Summary: Glyphosate.  Includes undat
           method entitled: Analysis of Glyphosate in cranberries; unda
           method entitled: Glyphosate and metabolite; and undated meth
           entitled: Procedure for Glyphosate and Aminomethylphosphonic
           acid analysis of cranberries.  (Reports by various sources;
           unpublished study received Sep 18, 1980 under 524-308; CDL:
           099624-A)

00108102   Keckemet, O. (1975) The Results of Tests on the Amount of
           Residue Remaining, Including a Description of the Analytical
           Methods Used: Endothall.  (Unpublished study received Feb 1,
           1975 under 4G1449; submitted by Pennwalt Corp., Tacoma, WA;
           093861-A)

00136339   Thompson, C.; Mcallister, W. (1978) Acute Toxicity of Techni
           Glyphosate (AB-78-165) to Rainbow Trout (Salmo gairdneri).
           (Unpublished study received Dec 5, 1978 under 524-308; prepa
           by Analytical Bio Chemistry Laboratories, Inc., submitted by
           Monsanto Co., Washington, DC; CDL:097661-B)

00005298   Arthur, B.W.; Casida, J.E. (1958) Biological activity of sev
           O,O-Dialkyl alpha-acyloxyethyl phosphonates.  Agricultural a
           Food Chemistry 6(5):360-365.  (Report no. 1868; also an
           unpublished submission received Aug 18, 1966 under 7F0612;
           submitted by Chemagro Corp., Kansas City, Mo.; CDL:090796-W)

00152766   Forbis, A. (1983) Acute Toxicity of Inert Ingredient to Blue
           Sunfish (Lepomis macrochirus): Static Bioassay Report No. 30
           Unpublished Monsanto Study No.  AB-83-121 prepared by Analyt
           Bio-Chemistry Laboratories, Inc.  46 p.

00152903   Cohle, P.; McAllister, W. (1983) Acute Toxicity of Passage t
           Bluegill Sunfish (Lepomis macrochirus):  Report #30411.
           Unpublished study prepared by Analytical Bio-Chemistry
           Laboratories, Inc.  45 p.

00155477   Watkins, C.; Thayer, D.; Haller, W. (1985) Toxicity of adjuv
           to bluegill.  Bull. Environ. Contam. Toxicol. 34:138-142.

00026489   Fraser, W.D.; Jenkins, G. (1972) The Acute Contact and Oral
           Toxicities of CP67573 and Mon2139 to Worker Honey Bees.
           (Unpublished study received on unknown date under 4G1444;
           prepared by Huntingdon Research Centre, submitted by Monsant
           Co., Washington, D.C.; CDL:093848-R)

41728701 Stout, L.; Ruecker, F. (1990) Chronic Study of Glyphosate
         Administered in Feed to Albino Rats: Lab Project Number:
         MSL-10495: R.D. 1014. Unpublished study prepared by Monsan
         Agricultural Co. 42 p.

41689101 Castle, S.; Ruzo, L.; Kathryn, S. (1990) Degradation Study:
         Photodegradation of Carbon 14 Glyphosate in a Buffered Aqueo
         Solution at pH 5, 7 and 9 by Natural Sunlight: Lab Project
         Number: 233W-1: 233W: 1020. Unpublished study prepared by
         Pharmacology and Toxicology Research Laboratory, Inc. 105 p

42372501 Honegger, J. (1992) Addendum to MSL-10578 Aerobic Metabolism
         carbon 14 Glyphosate in Sandy Loam and Silt Loam Soils with
         Biometer Flask: Supplement to MRID 41742901: Unpublished st
         prepared by Monsanto Agricultural Comp. 10 p.

42372502 Honegger, J. (1992) Addendum to MSL-10577: Anaerobic Aquatic
         Metabolism of carbon 14 Glyphosate: Supplement to MRID 41723
         Unpublished study prepared by Monsanto Agricultural Comp. 1

42372503 Honegger, J. (1992) Addendum to MSL-10576: Aerobic Aquatic
         Metabolism of ócarbon 14ª Glyphosate: Supplement to MRID
         41723601: Unpublished study prepared by Monsanto Agricultur
         Comp. 6 p.

42383201 Goure, W. (1992) Aquatic Dissipation of Glyphosate and AMPA
         Water and Soil Sediment Following Application of Glyphosate
         Irrigated Crop and Forestry Uses: Addendum to
         MSL-8332/Supplement to RD 898. Unpublished study prepared b
         Monsanto Ag. Co. 36 p.

41552801 Honer, L. (1990) Dissipation of Glyphosate and
         Aminomethylphosphonic Acid in Forestry Sites: Lab Project
         Number: MSL-9940; 993. Unpublished study prepared by Monsan
         Agricultural Co. 555 p.

42372504 Honegger, J. (1992) Addendum to MSL-9811: Confined Rotationa
         Crop Study of Glyphosate. Part II: Quantitation,
         Charaterization, and Identification of Glyphosate and its
         Metabolites in Rotational Crops: Supplement to MRID 41543202
         Unpublished study prepared by Monsanto Agricultural Comp. 1

41543201 Nicholls, R. (1990) Confined Rotational Crop Study of Glypho
         Part I: In-Field Portion: Lab Project Number: EF-88-22.
         Unpublished study prepared by Pan-Agricultural Labs., Inc.

C-32

p.

41543202  McMullan, P.; Honegger,J.; Logusch, E. (1990) Confined
          Rotational Crop Study of Glyphosate Part II:  Quantitation,
          Characterization and Identification of Glyphosate and Its
          Metabolites in Rotational Crops: Lab Project Number: MSL-981
          Unpublished study prepared by Monsanto Agricultural Labs.  8

 42372505 Goure, W. (1992) Addendum to MSL-7633: Irrigated Crop Study.
          Determination of Glyphosate Residues in Crops, Irrigation Wa
          Sediment and Soil Following Treatment of Irrigation Source w
          Rodeo Herbicide: Supplement to MRID 40541305:  Unpublished s
          prepared by Monsanto Agricultural Comp.  22p.

40541305  Kunstman, J. (1988) Volume 5:  Irrigated Crops
          Study--Determination of Glyphosate Residues in Crops, Irriga
          Water, Sediment, and Soil following Treatment of Irrigation
          Source with Rodeo: Laboratory Project No. MSL-7633.  Unpubli
          study prepared by Monsanto Agricultural Co.  203 p.

41228301  Forbis, A. (1989) Uptake, Depuration and ioconcentration of
          Carbon 14-Glyphosate to Bluegill Sunfish (Lepomis macrochiru
          Project ID MSL-9304.  Unpublished study prepared by Analytic
          Biochemistry Laboratories, Inc.  425 p.

40541301 Bodden, R.; Patanella, J.; Feng, P. (1988) Volume 1:
     Metabolism Study of Synthetic ¢Carbon 13/Carbon
 14|--Labeled Glyphosate and Aminomethylphosphonic Acid in
Lactating Goats: Laboratory Project No. HLA 6103-113:
MSL-7458.  Unpublished study prepared by Monsanto Co. 129p.
40541302 Bodden, R.; Feng, P.; Patanella, J. (1988) Volume 2:
     Metabolism Study of Synthetic ¢Carbon 13/Carbon
 14|--Labeled Glyphosate and Aminomethylphosphonic Acid in
Laying Hens: Laboratory Project No.: HLA 6103-112:
MSL-7420.  Unpublished study prepared by Monsanto Co. 126p.
                                                 40541303
Pijanowski, P. (1988) Volume 3:  Validation of an Analytical
Method for the Determination of Glyphosate Residues in
Animal Tissues:  Laboratory Project No. MSL-7358.
Unpublished study prepared by Monsanto Co.  65 p.

40541304 Mueth, M. (1988) Volume 4:  Glyphosate Residues in Alfalfa
     Hay and Seed following Scattered Spot Treatment with
 Roundup Herbicide:  Laboratory Project No. MSL-7482.
Unpublished study prepared by Monsanto Co.  121 p.

C-33

00159419 Kuntsman, J. (1985) Validation of a New Residue Method for Analysis
         of Glyphosate and Aminomethylphosphonic Acid (AMPA) - A Round-
         robin Study: Report No. MSL-4268: Job/Project No. 7163.  Un-
         published study prepared by Monsanto Co. and others.  103 p.

00164729 Danhaus, R. (1986) Reanalysis of Water, Cotton, Soybeans, Pasture
         Grasses, Alfalfa and Other Legumes for Glyphosate and Amino-
         methylphosphonic Acid: MSL-4500.  Unpublished study prepared
         by Monsanto Co.  84 p.

40502601 Kunstman, J. (1987) Glyphosate Residues in Milo Grain and Fodder
         Following Preharvest Applications with Roundup Herbicide: MSL-
         6919.  Unpublished study prepared by Monsanto Co.  110 p.

00061553 Monsanto Company (1974) Residue Results.  (Unpublished study re-
         ceived on unknown date under 524-EX-24; CDL:095345-F)

 40502605 Mueth, M. (1988) Storage Stability of Glyphosate in Crops and Wa-
         ter - Status Report: 0066300.  Unpublished compilation prepared
         by Monsanto Co.  141 p.

40532004 Manning, M. (1988) Storage Stability Study of Glyphosate and AMPA
         in Swine Tissues, Dairy Cow Tissues and Milk, Laying Hen
         Tissues and Eggs: Laboratory Project ID MSL-7515.  Unpublished
         study prepared by Monsanto Company.  204 p.

41940701 Mueth, M. (1991) Storage Stability of Glyphosate Residues in Crop
         Commodities: Lab Project Number: MSL-10843: 1051.  Unpublished
         study prepared by Monsanto Agricultural Co.  193 p.

40785302 Mueth, M. (1988) Glyphosate Residues in Potatoes and Processed
         Fractions of Potatoes After Treatment with Roundup Herbicide:
         Project ID. MSL-7877.  301 p.

40835201 Baron, J. (1988) Glyphosate--Magnitude of Residue on Turnip:
         IR-4 Project 3204.  Unpublished study prepared by IR-4
         Northeast Analytical Lab.  82 p.

40783101 Baron, J. (1988) Glyphosate--Magnitude of Residue on Onions: IR-4
         Project 3205, 3206, 3207.  Unpublished study prepared by IR-4
         Northeast Analytical Lab.  97 p.

40802801 Baron, J. (1988) Glyphosate - Magnitude of Residue on Broccoli:
         Project ID. PR-3210.  Unpublished study prepared by IR-4
         Northeast Analytical Laboratory.  42 p.

00156793 Kunstman, J. (1983) Glyphosate Residues in Soybeans and Soybean

Fractions following Recirculating Sprayer and Preharvest Topical Treatments with Roundup Herbicide: Report No. MSL-3259: Project No. 7163.  Unpublished study prepared by Monsanto Co.  117 p.

40159401 Beasley, R. (1987) Determination of CP 67573 and CP 50435 Residues in Citrus Process Fractions: Additional Information in Response to the Guidance Document for Glyphosate Registration and Specifically the Previously Submitted Glyphosate Residue Chemistry Study for Citrus Fruits.  Unpublished study prepared by Monsanto Agricultural Co.  12 p.

00053002 Monsanto Company (1980) Summary: ¢Glyphosate|.  Includes undated method entitled: Analysis of Glyphosate in cranberries; undated method entitled: Glyphosate and metabolite; and undated method entitled: Procedure for Glyphosate and Aminomethylphosphonic acid analysis of cranberries.  (Reports by various sources; unpublished study received Sep 18, 1980 under 524-308; CDL: 099624-A)

40785303 Adams, S. (1988) Glyphosate Residues in Grapes and Grape Processing Commodities Following Directed Spray Treatment with Roundup Herbicide: Project ID. MSL-8027.  Unpublished study prepared by Monsanto Agricultural Co.  121 p.

40502602 Kunstman, J. (1987) Glyphosate Residues in Corn Grain and Fodder Following Preharvest Applications with Roundup Herbicide: MSL-6638.  Unpublished study prepared by Monsanto Co.  176 p.

40502604 Kunstman, J. (1987) Glyphosate Residues in Corn Grain Fractions Following Preharvest Applications to Corn with Roundup Herbicide: MSL-6917.  Unpublished study prepared by Monsanto Co.  195 p.

41478101 Kunda, U. S. (1990) Glyphosphate Residues in or on Corn Grits and Flour Following Preharvest Application of Roundup Herbicide to Corn: Lab Project Number: MSL-9797.  Unpublished study prepared by Monsanto Agricultural Co., in cooperation with Texas A&M Univ. Food Protein Research Center.  88 p.

40502601 Kunstman, J. (1987) Glyphosate Residues in Milo Grain and Fodder Following Preharvest Applications with Roundup Herbicide: MSL-6919.  Unpublished study prepared by Monsanto Co.  110 p.

40502603 Kuntsman, J. (1987) Glyphosate Residues in Milo Grain Fractions Following Preharvest Applications to Milo with Roundup Herbicide: MSL-7043.  Unpublished study prepared by Monsanto Co.

138 p.

41484301 Allin, J. (1989) Glyphosate Residues in Wheat Grain and Straw afte
Preharvest Treatment with Roundup Herbicide: R.D. No. 983.
Unpublished study prepared by Monsanto Agricultural Co.   436 p.

00150835 Monsanto Co. (1984) ÝGlyphosate Residues in Wheat Grain, Straw and
Milling/Fractionation Products following Ropewick Wiper Treat-
ment with Roundup Herbicide¨.  Unpublished compilation.  158 p.

00109271 Monsanto Co. (19??) Crop Residues and Tolerances.  (Unpublished
study received Apr 9, 1982 under KS 82/1 for Monsanto; CDL:
247348-B)

40502601 Kunstman, J. (1987) Glyphosate Residues in Milo Grain and Fodder
Following Preharvest Applications with Roundup Herbicide: MSL-
6919.  Unpublished study prepared by Monsanto Co.  110 p.

40541304 Mueth, M. (1988) Volume 4:  Glyphosate Residues in Alfalfa Hay and
Seed following Scattered Spot Treatment with Roundup Herbicide:
Laboratory Project No. MSL-7482.  Unpublished study prepared by
Monsanto Co.  121 p.

40642401 Baron, J. (1988) Glyphosate--Magnitude of Residue on Asparagus:
Laboratory Project ID: PR 3212.  Unpublished study prepared by
NY State Agricultural Experiment Station.  69 p.

40149401 Sheldon, A. (1986) Triphenyltin Hydroxide--Responses to Questions
in the EPA Letter September 24, 1986 (Jacoby to Sheldon).  Un-
published study prepared by M&T Chemicals Inc.  15 p.

00051981 Monsanto Company (1973) Master Summary Table of PPM Residues of
Glyphosate (CP67573) and Glyphosate Metabolite (CP50435) in
Green Coffee Bean Studies Using a Single Directed Post-emergent
Application.  (Unpublished study received Jun 3, 1976 under
524-308; CDL:096177-E)

40580401 Baron, J. (1988) Glyphosate--Magnitude of Residue on Mango: Projec
ID: IR-4 PR-3213.  Unpublished study prepared by IR-4 Northeast
Analytical Laboratory.  35 p.

42398401 Hontis, A. (1992) Residues of Glyphosate/AMPA in Olives and
Olive Oil Following Use of Sting SE--Spanish Field Trials
1990-1992: Lab Project Number: 1115: MLL-30297.  Unpublished
study prepared by Monsanto Agricultural Co.  73 p.

00144341 Steinmetz, J. (1984) Glyphosate Residues in Peanuts and Peanut
         Fractionation Products Following Postemergent Polyester/Acrylic
         Pipewick Treatments with Roundup Herbicide: Report No. MSL-3392
         Job/Project No. 7163.  Unpublished study prepared by Monsanto
         Co. in cooperation with ABC Laboratories, Inc. and Craven Labor-
         atories, Inc.  116 p.

40541305 Kunstman, J. (1988) Volume 5:  Irrigated Crops Study--Determination
         of Glyphosate Residues in Crops, Irrigation Water, Sediment, and
         Soil following Treatment of Irrigation Source with Rodeo: Labo-
         ratory Project No. MSL-7633.  Unpublished study prepared by Mon-
         santo Agricultural Co.  203 p.

40532001 Manning, M.; Wilson, G. (1987) Residue Determination of Glyphosate
         and AMPA in Laying Hen Tissues and Eggs Following a 28-Day
         Feeding Study: Laboratory Project ID MSL-6676.  Unpublished
         study prepared by Monsanto Company.  192 p.

40532002 Manning, M.; Wilson, G. (1987) Residue Determination of Glyphosate
         and AMPA in Swine Tissues Following a 28-Day Feeding Study:
         Laboratory Project ID MSL-6627.  Unpublished study prepared by
         Monsanto Company.  147 p.

40532003 Manning, M.; Wilson, G. (1987) Residue Determination of Glyphosate
         and AMPA in Dairy Cow Tissues and Milk Following a 28-Day
         Feeding Study: Laboratory Project ID MSL-6729.  Unpublished
         study prepared by Monsanto Company.  180 p.

00154311 Armstrong, T., Comp. (1985) Static Marine Mollusk (Rangia cuneata)
         Bioconcentration Study with Water-applied ÝCarbon-14¨-Glypho-
         sate and "Non-aged" Sandy Loam Soil Substrate, Part I and Part
         II: Special Report MSL-5159.  Unpublished compilation prepared
         by Monsanto Agricultural Products Co. in cooperation with
         Analytical Bio-Chemistry Labs.  293 p.

00155120 Armstrong, T., comp. (1985) Static Crayfish (Procambarus simulans
         Faxon) Bioconcentration Study with Water-applied ÝCarbon 14¨-
         Glyophosate and "Non-aged" Sandy Loam Soil Substrate, Part I and
         Part II.  Unpublished compilation prepared by Monsanto Co. 324p.

# Appendix D

## List of Available Related Documents

The following is a list of available documents related to glyphosate. Its purpose is to provide a path to more detailed information if it is required.  These accompanying documents are part of the Administrative Record for glyphosate and are included in the EPA's Office of Pesticide Programs Public Docket.

1.   Health and Environmental Effects Science Chapters

2.   Detailed Label Usage Information System (LUIS) Report

3.   Glyphosate RED Fact Sheet (included in this RED)

4.   PR Notice 91-2 (Included in this RED) Pertains to the Label Ingredient Statement

5.   Complete Appendix A which details the use patterns subject to reregistration

Federal publications on glyphosate are available and may be purchased from the National Technical Information Service (NTIS), 5285 Port Royal Road, Springfield, VA  22161.

1.   Pesticide Fact Sheet (No. EPA-738-F-93-011) for Glyphosate

2.   Registration Standard for Pesticide Products Containing Glyphosate as the Active Ingredient (The 1986 Registration Standard):  NTIS Stock No. PB87-103214

# Appendix E

## Pesticide Reregistration Handbook

# PESTICIDE REREGISTRATION HANDBOOK

## HOW TO RESPOND TO THE
## REREGISTRATION ELIGIBILITY DOCUMENT (RED)

**OFFICE OF PESTICIDE PROGRAMS**

**ENVIRONMENTAL PROTECTION AGENCY**

**OCTOBER 1991**

# PRODUCT REREGISTRATION HANDBOOK

## TABLE OF CONTENTS

I.   Introduction

   A.   Purpose and Content     1

   B.   Reregistration Eligibility Document     1

   C.   Reregistration Process     1

II.  Instructions for Responding

   A.   How and When to Respond     2

   B.   When No Response Is Needed     5

   B.   Where to Respond     6

III.  Submission of Data and Labels/Labeling

   A.   Generic Data     6

   B.   Product Specific Data     7

      1.   Product Chemistry     7

      2.   Acute Toxicity     8

      3.   Product Performance     9

   C.   Labels/Labeling     10

Appendix

   A.   Confidential Statement of Formula and Instructions

   B.   Label Contents

   C.   Sample Label Formats--General Use & Restricted Use

   D.   Label Regulations (40 CFR 156.10)

## PESTICIDE REREGISTRATION HANDBOOK

### I.   INTRODUCTION

#### A.   Purpose and Content of this Handbook

This Handbook provides instructions to registrants on how to respond to the Reregistration Eligibility Document (hereafter referred to as the "RED") and how to reregister products.

Section I is this introduction.

Section II contains step-by-step instructions which must be followed by registrants responding to the RED.

Section III provides additional instructions on the format, content and other aspects of generic data, product specific data and labels/labeling which may be required to be submitted.

Detailed instructions are in the Appendix.

#### B.   The Reregistration Eligibility Document (RED)

Under Section 4 of the Federal Insecticide, Fungicide and Rodenticide Act (FIFRA), as amended in 1988, EPA is required to reregister pesticides that were first registered before November 1, 1984.   The RED describes in detail the subject chemical, its uses and its regulatory history; describes EPA's decision concerning the eligibility of the uses of the chemical for reregistration; and explains the scientific and regulatory bases for this decision. EPA's reviews of the data by scientific discipline are available upon request.[1]   Appendices to the RED contain: (1) a Data Dall-In Notice which requires submission of generic and product specific data and which gives directions for responding, (2) a listing of existing studies that satisfy generic data requirements and (3) a bibliography of the generic studies EPA has reviewed.

#### C.   The Reregistration Process

Reregistration involves a thorough review of the scientific data base underlying a pesticide's registration.   The purpose of EPA's review is to reassess the potential hazards arising from the currently registered uses of the pesticide, to determine whether the data base is substantially complete or there is need for additional generic data, and to determine whether the pesticide is eligible for reregistration.   This decision is issued as the RED.

---

[1]   EPA's science reviews and information on the registered uses considered for EPA's analyses may be obtained from: EPA, Freedom of Information, 401 M St., S.W., Washington, D.C. 20460.

2

If the RED declares that some or all uses of the chemical are eligible for reregistration, affected registrants must first respond within 90 days of receipt to the data call-in portion of the RED. Within 8 months of receiving the RED, registrants must submit or cite any data and labels/labeling required for each product. EPA has until 14 months after the RED is issued (i.e., 6 months after the registrants' 8 month deadline) to review the submission for each product and decide whether to reregister it based on the following criteria:

--whether all of the product specific data and labels/labeling are acceptable,

--whether all of the uses on the label/labeling are eligible,

--whether all of the active ingredients in the product are eligible, and

--if no List 1 toxic inert ingredient is contained in the product (a List 1 inert is permitted only if all data for it have been submitted and EPA determines that the inert does not pose any unreasonable adverse effects in that product).

Products which meet all of these criteria will be reregistered. Products which do not meet all of these criteria, but which have acceptable product specific data and labeling, will be processed as amendments in order to implement label changes required by the RED.

## II.   INSTRUCTIONS FOR RESPONDING

### A.   How and When to Respond

This section provides directions for submitting timely and adequate responses necessary to reregister products containing the active ingredient covered by the RED. Registrants must follow these steps exactly to avoid suspension of their products. All products containing the active ingredient in the RED [i.e., manufacturing use products, end use products and special local need (SLN or Section 24c) registrations] are subject to the requirements of the RED. Figure 1 summarizes how and when to respond to the RED. A step-by-step explanation follows.

**Step 1.   Are Expedited Label Changes Required?**   In some instances, EPA may conclude that certain changes to product labels/labeling must be implemented rapidly. If the RED requires expedited label/labeling changes, registrants must submit the items below by the deadline specified in the RED. If expedited label changes are not required, go to Step 2.

a.   Application for Registration (EPA Form 8570-1). Complete



3

and sign the form.  In Section II, insert the phrase "Expedited Amendment in Response to the Reregistration Eligibility Document for (insert case name for chemical)."  Applications for expedited label changes will be processed as applications for amended registration.  Use only an original application form with a red identifier number in the upper right-hand corner.

b.  **Five (5) copies of revised draft label and labeling.** Refer to the RED for label/labeling changes and follow the instructions in Section III.C. and the Appendix of this Handbook for revising the label and labeling for each product.

**Step 2.  Are data required?**  If the RED requires generic or product specific data, you must follow the directions in the data call-in notice in the RED.  All registrants must respond for all products within 90 days of receipt; products for which an adequate response is not received on time will be subject to suspension. No time extensions will be given for responding within 90 days.

**Step 3.   Are Uses of a Pesticide Eligible for Reregistration?** If any uses of the active ingredient(s) covered by the RED are eligible for reregistration, follow these instructions.  If no uses are eligible, no further response may be needed (see page 5).

EPA's decision on the eligibility of each of the uses of the active ingredient(s) is presented in the RED.  If **any uses** of a chemical are eligible for reregistration, registrants for manufacturing-use products (MPs), end-use products (EPs) and special local needs registrations (SLNs), must submit the items below **for each product** within **8 months** of the date of issuance of the RED:

a.  Application for Reregistration (use EPA Form 8570-1). Complete and sign the form.  In Section II of that form, check the box "Other" and insert the phrase "Application for Reregistration." Use only an original application form with a red identifier number in the upper right-hand corner.

b.  **Five (5) copies of revised draft label and labeling.** Refer to the RED for labeling changes specific to the active ingredient, follow the instructions in Section III.C. of this Handbook and refer to the Appendix of this Handbook for guidance on current requirements for labels and labeling.  If there are ineligible uses on the label or labeling, you may delete such uses and avoid all requirements and consequences which may be associated with ineligible uses (e.g, generic data requirements, cancellation, suspension, etc.).  If you delete certain uses now and those uses become eligible for reregistration later, you must submit an amendment application to add those uses back to the label.



4

**FIGURE 1.   HOW AND WHEN TO RESPOND TO THE REREGISTRATION
ELIGIBILITY DOCUMENT (RED) FOR MANUFACTURING USE
PRODUCTS (MPs), END-USE PRODUCTS (EPs) and SPECIAL
LOCAL NEEDS REGISTRATIONS (SLNs).**

**STEP 1:**   A:e expedited label revisions required?

            **Yes**            **No**

        Submit application
        and labels on
        expedited schedule
        specified in RED.

**STEP 2:**   Are data required?

            **Yes**            **No**

        Submit forms within
        90 days for generic
        and product specific
        data.

**STEP 3:**   Are any of the uses on the label
            eligible for reregistration?

            **Yes**                          **No**

        Are any uses on the label
        <u>ineligible</u> for reregistration?

        **Yes**            **No**

        Do you wish to
        <u>delete</u> ineligible
        uses from label?

    **No**            **Yes**

For each MP & EP        For each MP & EP        No further response
& SLN (24c) submit     & SLN (24c) submit     necessary.  Await
application within     application within     the outcome of
8 months.  If          8 months.  If          EPA's review.
the submission         the submission
is acceptable,         is acceptable,
the label will be      the label will be
stamped accepted       stamped accepted
as an amendment.       and a notice of
<u>No</u> reregistration   reregistration
will be issued.        will be issued.



5

    c.    **Product Specific Data.**  You must follow the instructions in the Data Call-In Notice in the RED and in Section III of this Handbook.  Responses to the data call in are due within <u>90 days</u> of receipt of the RED and submission or citation of data is due within <u>8 months</u> of the issuance of the RED.

    d.    **Two (2) copies of the current Confidential Statement of Formula (EPA Form 8570-4, revised February 85).**  Two completed and signed CSF forms must be submitted for the basic formulation and for each alternate formulation.  If CSFs are not provided for the alternate formulas, they will not be reregistered and will no longer be acceptable.  The Appendix of this Handbook has specific instructions for completing the CSF form.

    e.    **Certification With Respect to Citation of Data (EPA Form 8570-31).**  This form must be completed, signed and submitted for each product to assure that the data compensation provisions of FIFRA are met.

B.   <u>When No Response is Needed</u>

    If no uses of a pesticide are eligible for reregistration, it is unlikely that you will be required to submit product specific data or labeling.  Uses of an active ingredient may be declared ineligible for reregistration for two possible reasons:

    --Available data indicate that one or more of the criteria for an in-depth special review have been met;

    --Additional generic data are required.

    In the first instance, if the active ingredient is placed into special review, reregistration activities associated with those uses of the chemical are stopped until EPA makes a final determination.  At that time, EPA will indicate which uses may be eligible for reregistration and which uses are to be cancelled.  If some or all of the previously ineligible uses become eligible for reregistration, EPA will start the reregistration process for products containing only eligible uses.

    In the second instance, based upon the review of studies for an active ingredient during reregistration, additional generic data (e.g., second- or third-tier studies) may be needed (see the RED).  In such cases, the chemical's uses will not be eligible for reregistration until the additional generic data have been submitted to and reviewed and found acceptable by EPA.  If the data are reviewed and found to be acceptable, EPA will indicate which uses will be eligible for reregistration and will initiate reregistration of products containing previously ineligible uses.  If the data are not submitted, products containing the active ingredient may be suspended.

6

C. Where to Respond

By U.S. Mail:

Document Processing Desk (insert distribution code)
Office of Pesticide Programs (H7504C)
Environmental Protection Agency
401 M Street, S.W.
Washington, D.C. 20460-0001

By express mail or by hand delivery:

Document Processing Desk (insert distribution code)
Office of Pesticide Programs (H7504C)
Room 266A, Crystal Mall 2
1921 Jefferson Davis Highway
Arlington, VA 22202

These mailing addresses and the following distribution codes must be used to assure the timely receipt and processing of your submissions. Not using them may significantly delay the handling of your submissions:

RED-SRRD-xxx (where xxx is the case code given on the front of the RED)--use this distribution code for all responses pertaining to or containing generic data. Such responses include the 90-day response forms for generic data or hard copies of generic data.

RED-RD-PMxx (where xx is the Product Manager team number)-- use this distribution code for all responses pertaining to or containing product specific data or labeling. Such responses would include expedited labeling amendments, 90-day responses to product specific data requirements, hard copies of product specific data and applications for reregistration.

III. SUBMISSION OF DATA AND LABELS/LABELING

This section provides additional instructions concerning responses required for generic data, product specific data and labels/labeling.

A. Generic Data

During EPA's evaluation of an active ingredient for reregistration, additional generic data requirements may be identified that registrants must fulfill. In some instances these data requirements would have to be satisfied before an active ingredient or some of its uses could be declared eligible for reregistration. In other cases, these new data requirements would not affect the eligibility of the active ingredient, but would be necessary to confirm EPA's assessment of that chemical.



7

Any new data requirements and how they affect reregistration eligibility of a chemical are discussed in the RED.  If new generic data requirements are imposed in a Data Dall-In Notice in the RED, registrants must respond as described in that Notice.  The RED also contains instructions for completing these forms, a citation of EPA's legal authority for requiring the new data, a listing of options available to registrants for satisfying the data requirements and the name of the contact person for inquiries.

B.  Product Specific Data

Product specific data may be required for the reregistration of each pesticide product in three areas--product chemistry, acute toxicity and efficacy.

1.  Product Chemistry

Following are instructions for submitting product-specific data and a discussion of EPA's policy on inert ingredients.

a.  Data

All data requirements for MPs, EPs and SLNs (24c's) are specified in the Data Call-In Notice in the RED.  In addition:

--If you cite data from another identical, registered product, you must identify the EPA registration number of that product.

--If the product-specific data submitted or cited do not pertain to an identical formulation to the product submitted for reregistration, then new product-specific data are required to be submitted by the deadline specified in the Data Call-In Notice. The only exception is for products which EPA "groups" together a being similar enough to depend on the same data.  Such groupings are discussed in the appendix to the RED (for acute toxicity purposes, for example), if it was feasible to do so.

b.  Inert Ingredients

EPA has implemented a strategy for regulating inert ingredients which affects the reregistration of pesticide products. This strategy, issued on April 22, 1987 (52 FR 13305-13309) and updated on November 22, 1989 (54 FR 48314-48316), adopted certain policies designed to reduce the potential for adverse effects from pesticide products containing intentionally added inert ingredients.  EPA divided the known inert ingredients into four categories:

--Inerts of toxicological concern (List 1) for which available data demonstrate toxic effects of concern (includes about 50 chemicals).

8

--Potentially toxic inerts (List 2) for which only limited data are available, but such data or the chemical structure suggest the potential for toxicity (includes about 60 chemicals).

--Inerts of unknown toxicity (List 3) for which no data or bases for suspecting toxic effects are available (includes up to 2,000 chemicals).

--Inerts of minimal concern (List 4) which are generally regarded as innocuous (includes about 290 chemicals).

When a RED is issued and any uses of an active ingredient are declared eligible for reregistration, all products containing that active ingredient will be subject to reregistration. EPA will, as part of the reregistration review, examine the inert ingredients of each product prior to reregistration to ensure that they do not present unreasonable risks. In reviewing the product chemistry data, EPA will identify List 1 inerts. EPA will continue to encourage registrants to eliminate any List 1 inerts present. Reregistration of products containing only List 2, 3 or 4 inerts will be unaffected by the inerts strategy.

Consistent with the strategy on inerts, a product containing a List 1 inert ingredient will <u>not</u> be reregistered until a full risk assessment of the product has been conducted, based on the data called in for that inert ingredient. However, the existing registration of a product containing a List 1 inert will remain valid as long as the product bears the required label warning and is in compliance with any outstanding DCI, or other activity under the inerts strategy.

Any product containing a List 2, 3 or 4 inert <u>may</u> be reregistered <u>if</u> it meets all other requirements for reregistration. As the inerts strategy is implemented and data for the List 2 and 3 inerts are reviewed, EPA may move these inerts to the other Lists. If an inert were moved to List 1, products containing that inert would become ineligible for reregistration. Inert ingredients must also meet normal registration and tolerance requirements, as applicable.

2.  <u>Acute Toxicity</u>

The data call-in notice in the RED specifies the acute toxicity data required for reregistration of each MP or EP. It indicates whether any of the standard tests have been waived and, if so, why.

If feasible, EPA will "batch" products that are similar with respect to their acute toxicity so that one set of tests can support reregistration of each baatch of products. This approach will impose the least amount of testing necessary to adequately support the registration and labeling for pesticide products. The



9

main benefits of this approach are to minimize the need for animal testing, reduce the expense to registrants to generate the tests and decrease the resources EPA must spend on reviewing data. Registrants may contact other registrants with products in the same "batch" to decide whether to provide or depend on one set of data; alternatively, registrants may choose to conduct their own studies.

3.   **Product Performance**

Consult the Data Call-In section of the RED to determine whether Product Performance data are required for your product.

Product performance (efficacy) data are generated in studies designed to document how candidate pesticide formulations perform as pest control agents. These data include tests run to determine whether a formulation is lethal to certain pest species, to document the effectiveness of the formulation in controlling pest species in actual use situations, and to determine whether certain claims beyond mere control of a pest (e.g., "six-month residual effect," "kills Warfarin resistant house mice," etc.) are justified.

EPA has standard protocols for certain efficacy tests. In general, standard methods have been developed for tests needed to substantiate claims that have been made frequently for pesticide products. As the scope of potential pesticidal claims is extremely broad, the Agency does not have standard methods for tests needed to substantiate many pesticide claims, especially those that are uncommon. The Product Performance Guidelines, Subdivision G, offer general guidance for developing protocols for efficacy testing. Proposed protocols should be submitted to EPA for review before tests are initiated.

a.   **Efficacy Data Submission Waiver Policy**

FIFRA gives the Administrator of EPA authority "to waive data requirements pertaining to efficacy" but does not require that efficacy data requirements be waived for any class of pesticide product registered under Section 3 of the Act. As a matter of policy, EPA does not require submission of efficacy data to support many types of pesticidal claims but does require submission of such data for certain types of claims. As noted in 40 CFR 158.640, this waiver applies to the submission of efficacy data rather than to the generation of efficacy data. EPA expects each registrant to "ensure through testing that his products are efficacious when used in accordance with commonly accepted pest control practices."

This general policy notwithstanding, EPA may, at any time, require a registrant to submit efficacy data to support any claim made for a product. EPA also may require that certain claims of effectiveness be established before a Section 3 registration is granted.

10

### b. Claims and Products for Which Efficacy Data Generally Are Required

Submission of efficacy data at reregistration typically is required for the following types of products:

1. products claimed to control microorganisms that pose potential threats to public health;

2. products claimed to control vertebrate pests that may directly or indirectly transmit diseases to humans;

3. potentially very hazardous products for which EPA determines that it is necessary to conduct a "risk-benefits" analysis;

4. products of types for which EPA has reasons (e.g., consumer complaints, unlikely claims, unusual use patterns, etc.) to question claims; and

### C. Labels and Labeling

To remain in compliance with FIFRA, the label and labeling of each product must be revised to meet the requirements for reregistration as described below. "Labeling" includes the container label and any written, printed or graphic matter that accompanies the pesticide in U.S. commerce at any time (such as technical bulletins, collateral labeling, etc.). Applications for new uses or labeling changes that do not pertain to reregistration must be filed separately from the application for reregistration described in Step 3 earlier. Changes to labeling which must be made for reregistration include, but are not limited to:

1. Labeling changes specified in the RED. Such changes may include statements on RESTRICTED USE, groundwater hazards, protective clothing/equipment, endangered species, environmental hazards, etc.

2. The format and content of labeling as described in 40 CFR 156.10. When further acute testing is needed, the currently accepted precautionary statements will usually be retained until testing is completed and the data are reviewed.

3. Labeling changes required by Pesticide Regulatory (PR) Notices, regulations, regulatory decisions and policies issued by EPA which are relevant to the pesticide. Your product's labeling must reflect any applicable requirements which are in effect at the time the RED is issued. Some existing notices are referred to in Section B. of the Appendix.



**APPENDIX**

A.   Confidential Statement of Formula and Instructions

B.   Instructions for Label Contents

C.   Sample Label Formats--General Use & Restricted Use

D.   Label Regulations (40 CFR 156.10)

Confidential Business Information: Does Not Contain National Security Information (E.O. 12065)

Form Approved. OMB No. 2070-0060. Approval expires 9-30-90

United States Environmental Protection Agency
Office of Pesticide Programs (TS-767)
Washington, DC 20460

**⊕EPA**

**Confidential Statement of Formula**

A. ☐ Basic Formulation
   ☐ Alternate Formulation

B.

Page ___ of ___

See Instructions on Back

1. Name and Address of Applicant/Registrant (Include ZIP Code)

2. Name and Address of Producer (Include ZIP Code)

3. Product Name

4. Registration No./File Symbol

5. EPA Product Mgr/Team No.

6. Country Where Formulated

7. Pounds/Gal or Bulk Density

8. pH

9. Flash Point/Flame Extension

| EPA USE ONLY | 10. Components in Formulation (List as actually introduced into the formulation. Give commonly accepted chemical name, trade name, and CAS number.) | 11. Supplier Name & Address | 12. EPA Reg. No. | 13. Each Component in Formulation a. Amount | | 14. Certified Limits % by Weight a. Upper Limit b. Lower Limit | 15. Purpose in Formulation |
|---|---|---|---|---|---|---|---|
| | | | | b. % by Weight | | | |
| | | | | | | | |
| | | | | | | | |
| | | | | | | | |
| | | | | | | | |
| | | | | | | | |
| | | | | | | | |
| | | | | | | | |
| | | | | | | | |

17. Total Weight    100%

16. Typed Name of Approving Official

18. Signature of Approving Official

19. Title

20. Phone No. (Include Area Code)

21. Date

EPA Form 8570-4 (Rev. 2-88) Previous editions are obsolete

## Instructions for Completing the Confidential Statement of Formula

The Confidential Statement of Formula (CSF) Form 8570-4 must be used. Two legible, signed copies of the form are required. Following are basic instructions:

a. All the blocks on the form must be filled in and answered completely.

b. If any block is not applicable, mark it N/A.

c. The CSF must be signed, dated and the telephone number of the responsible party must be provided.

d. All applicable information which is on the product-specific data submission must also be reported on the CSF.

e. All weights reported under item 7 must be in pounds per gallon for liquids and pounds per cubic feet for solids.

f. Flashpoint must be in degrees Fahrenheit and flame extension in inches.

g. For all active ingredients, the EPA Registration Numbers for the currently registered source products must be reported under column 12.

h. The Chemical Abstracts Service (CAS) Numbers for all actives and inerts and all common names for the trade names must be reported.

i. For the active ingredients, the percent purity of the source products must be reported under column 10 and must be exactly the same as on the source product's label.

j. All the weights in columns 13.a. and 13.b. must be in pounds, kilograms, or grams. In no case will volumes be accepted. Do not mix English and metric system units (i.e., pounds and kilograms).

k. All the items under column 13.b. must total 100 percent.

l. All items under columns 14.a. and 14.b. for the active ingredients must represent pure active form.

m. The upper and lower certified limits for all active and inert ingredients must follow the 40 CFR 158.175 instructions. An explanation must be provided if the proposed limits are different than standard certified limits.

n. When new CSFs are submitted and approved, all previously submitted CSFs become obsolete for that specific formulation.



## B.  INSTRUCTIONS FOR LABEL CONTENTS

40 CFR 156.10 and Pesticide Regulatory (P.R.) Notices require that specific labeling statements appear at certain locations on the label.  The sample label formats in Appendix C show where these statements are to be placed.

Item 1.  PRODUCT NAME - The name, brand or trademark is required to be located on the front panel, preferably centered in the upper part of the panel.  The name of a product will not be accepted if it is false or misleading.  [40 CFR 156.10(b)]

Item 2.  COMPANY NAME AND ADDRESS - The name and address of the producer, registrant or person for whom the product is produced are required on the label and should be located at the bottom of the front panel or at the end of the label text. [40 CFR 156.10(c)]

Item 3.  NET CONTENTS - A net contents statement is required on all labels or on the container of the pesticide.  The preferred location is the bottom of the front panel immediately above the company name and address, or at the end of the label text.  The net contents must be expressed in the largest suitable unit, e.g., "1 pound 10 ounces" rather than "26 ounces."  In addition to English units, net contents may be expressed in metric units.  [40 CFR 156.10(d)]

Item 4.  EPA REGISTRATION NUMBER - The registration number assigned to the pesticide product must appear on the label, preceded by the phrase "EPA Registration No.," or "EPA Reg. No."  The registration number must be set in type of a size and style similar to other print on that part of the label on which it appears and must run parallel to it.   The  registration  number  and  the  required identifying phrase must not appear in such a manner as to suggest or imply recommendation or endorsement of the product by the Agency.  [40 CFR 156.10(e)]

Item 5.  EPA ESTABLISHMENT NUMBER - The EPA establishment number, preceded by the phrase "EPA Est." is the final establishment at which the product was produced, and may appear in any suitable location on the label or immediate container.  It must also appear on the wrapper or outside container of the package if the EPA establishment number on the immediate container cannot be clearly read through such wrapper or container.  [40 CFR 156.10(f)]

Item 6A.  INGREDIENTS STATEMENT - An ingredients statement is normally required on the front panel.  The ingredients statement must contain the name and percentage by weight of each active ingredient and the total percentage by weight of all inert ingredients.  The preferred location is immediately below the product name.  The ingredients statement must run parallel with, and be clearly distinguished from, other text on the panel.  It must not be placed in the body of other text.  [40 CFR 156.10(g)]

Item 6B.  POUNDS PER GALLON STATEMENT - For liquid agricultural



formulations, the pounds per gallon of active ingredient must be indicated on the label. [40 CFR 156.10(h)(iv)]

Item 6C.   NAMES TO BE USED IN INGREDIENT STATEMENT - The acceptable common name, if there is one, shall be used, followed by the chemical name.   If no common name has been established, the chemical name alone shall be used.  Chemicals related to the active ingredient are allowed to be listed <u>only</u> if efficacy data supporting such claims are submitted or referenced.  If such data are provided, the related chemicals must be listed <u>separately</u> and not as a portion of the active ingredient.

Item 6D.   INERT INGREDIENTS RECLASSIFIED AS ACTIVE INGREDIENTS - If EPA has reclassified chemicals from inert ingredient status to active ingredient status, registrants of affected products must change the ingredient statement accordingly (See 52 FR 13307-8, April 22, 1987).   If such pesticides have food uses, tolerances must either be established for such uses, or an exemption from the requirement for tolerances must be obtained.

Item 6E.   NOMINAL CONCENTRATION - The amount of active ingredient declared in the ingredient statement must be the nominal concentration of the product as defined in 40 CFR 158.153(i) and described in P.R. Notice 91-2.

Item 7.   WARNINGS AND PRECAUTIONARY STATEMENTS - Front panel precautionary statements must be grouped together, preferably within a block outline.  The table below shows the minimum type size requirements for various size labels.

| Size of Label on Front Panel in Square Inches | Signal Word Minimum Type Size All Capitals | "Keep Out of Reach of Children" Minimum Type Size |
|---|---|---|
| 5 and under | 6 point | 6 point |
| above 5 to 10 | 10 point | 6 point |
| above 10 to 15 | 12 point | 8 point |
| above 15 to 30 | 14 point | 10 point |
| over 30 | 18 point | 12 point |

Item 7A.   CHILD HAZARD WARNING STATEMENT - The statement "Keep Out of Reach of Children" must be located on the front panel above the signal word except where contact with children during distribution or use is unlikely.  [40 CFR 156.10(h)(1)(ii)]

Item 7B.   SIGNAL WORD - The signal word (DANGER, WARNING, or CAUTION) is required on the front panel immediately below the child hazard warning statement.  [40 CFR 156.10(h)(1)(i)].



**Item 7C.   SKULL & CROSSBONES AND WORD "POISON"** – On products assigned a toxicity Category I on the basis of oral, dermal, or inhalation toxicity, the word "Poison" shall appear on the label in red on a background of distinctly contrasting color and the skull and crossbones shall appear in immediate proximity to the word POISON.  [40 CFR 156.10(h)(1)(i)].

**Item 7D.   STATEMENT OF PRACTICAL TREATMENT** – A statement of practical treatment (first aid or other) shall appear on the label of pesticide products in toxicity Categories I, II, and III.  [40 CFR 156.10(h)(1)(iii)]

**Item 7E.   REFERRAL STATEMENT** – The statement "see Side (or Back) Panel for Additional Precautionary Statements" is required on the front panel for all products, unless all required precautionary statements appear on the front panel.  [40 CFR 156.10(h)(1)(iii)].

**Item 8.   SIDE/BACK PANEL PRECAUTIONARY LABELING** – The precautionary statements listed below must appear together on the label under the heading "PRECAUTIONARY STATEMENTS."  The preferred location is at the top of the side or back panel preceding the directions for use, and it is preferred that these statements be surrounded by a block outline.   Each of the three hazard warning statements must be headed by the appropriate hazard title.  [40 CFR 156.10(h)(2)]

**Item 8A.   HAZARD TO HUMANS AND DOMESTIC ANIMALS** – Where a hazard exists to humans or domestic animals, precautionary statements are required indicating the particular hazard, the route(s) of exposure and the precautions to be taken to avoid accident, injury or damage.  [40 CFR 156.10(h)(2)(i)]

**Item 8B.   ENVIRONMENTAL HAZARD** – Where a hazard exists to non-target organisms excluding humans and domestic animals, precautionary statements are required stating the nature of the hazard and the appropriate precautions to avoid potential accident, injury, or damage.  [40 CFR 156.10(h)(2)(ii)]

**Item 8C.   PHYSICAL OR CHEMICAL HAZARD** – FLAMMABILITY Precautionary statements relating to flammability of a product are required to appear on the label if it meets the criteria in the PHYS/CHEM Labeling Appendix.  The requirement is based on the results of the flashpoint determinations and flame extension tests required to be submitted for all products.  These statements are to be located in the side/back panel precautionary statements section, preceded by the heading "Physical/Chemical Hazards."  Note that no signal word is used in conjunction with the flammability statements.

**Item 9A.   RESTRICTED USE CLASSIFICATION** – FIFRA sec. 3(d) requires that all pesticide formulations/uses be classified for either general or restricted use.  Products classified for restricted use may be limited to use by certified applicators or persons under their direct supervision (or may be subject to other restrictions that may be imposed by regulation).  If your product has been classified for restricted use, then these requirements apply:



1.   **All uses restricted.** The following statements must be placed in a black box at the top of the front panel of the label and labeling:

   a.   The statement "Restricted Use Pesticide" must appear at the top of the front panel of the label. The statement must be set in type of the same minimum size as required for human hazard signal word [see table in 40 CFR 156.10(h)(1)(iv)]. No statements of any kind may appear above this RUP statement.

   b.   The reason for the the restricted use classification must appear below the RUP statement. The RED will prescribe this statement.

   c.   A summary statement of the terms of restriction must appear directly below this reason statement on the front panel. If use is restricted to certified applicators, the following statement is required: "For retail sale to and use only by Certified Applicators or persons under their direct supervision and only for those uses covered by the Certified Applicator's Certification." The RED will specify what statement must be used.

2.   **Some but not all uses restricted.** If the RED states that some uses are classified for restricted use, and some are unclassified, several courses of action are available:

   a.   You may label the product for Restricted use. If you do so, you may include on the label uses that are unrestricted, but you may not distinguish them on the label as being unrestricted.

   b.   You may delete all restricted uses from your label and submit draft labeling bearing only unrestricted uses.

   c.   You may "split" your registration, i.e., register two separate products with identical formulations, one bearing only unrestricted uses, and the other bearing restricted uses. To do so, submit two applications for reregistration, each containing all forms and necessary labels. Both applications should be submitted simultaneously. Note that the products will be assigned separate registration numbers.

**Item 9B. MISUSE STATEMENT** - All products must bear the misuse statement, "It is a violation of Federal law to use this product in a manner inconsistent with its labeling." This statement appears at the beginning of the directions for use, directly beneath the heading of that section.

**Item 10A. REENTRY STATEMENT** - If a restricted entry interval (REI) has been established by the Agency, it must be included on the label. Additional worker protection statements may be required in



accordance with PR Notice 83-2, March 29, 1983.

Item 10B.  STORAGE AND DISPOSAL BLOCK - All labels are required to bear storage and disposal statements.  These statements are developed for specific containers, sizes, and chemical content. These instructions must be grouped and appear under the heading "Storage and Disposal" in the directions for use.  This heading must be set in the same type sizes as required for the child hazard warning.  Refer to P.R. Notices 83-3 and 84-1 to determine the storage and disposal instructions appropriate for your products.

Item 10C.  DIRECTIONS FOR USE - Directions for use must be stated in terms which can be easily read and understood by the average person likely to use or to supervise the use of the pesticide. When followed, directions must be adequate to protect the public from fraud and from personal injury and to prevent unreasonable adverse effects on the environment.  [40 CFR 156.10(i)(2)]

COLLATERAL LABELING

Bulletins, leaflets, circulars, brochures, data sheets, flyers, or other written or graphic printed matter which is referred to on the label or which is to accompany the product are termed collateral labeling.  Such labeling may not bear claims or representations that differ in substance from those accepted in connection with registration of the product.  Collateral labeling must be made part of the response to the RED and submitted for review.

LABEL FORMAT FOR UNCLASSIFIED PRODUCTS

# PRODUCT NAME

ACTIVE INGREDIENT: _____ %
INERT INGREDIENTS: _____ %
TOTAL: 100.00 %

THIS PRODUCT CONTAINS _____ LBS OF _____ PER GALLON

## KEEP OUT OF REACH OF CHILDREN

### CAUTION

STATEMENT OF PRACTICAL TREATMENT

IF SWALLOWED
IF INHALED
IF ON SKIN
IF IN EYES

SEE SIDE PANEL FOR ADDITIONAL PRECAUTIONARY STATEMENTS

MFG BY
TOWN, STATE
ESTABLISHMENT NO.
EPA REGISTRATION NO.
NET CONTENTS

STORAGE AND DISPOSAL
STORAGE
DISPOSAL

WARRANTY STATEMENT

CROP:
CROP:
CROP:
CROP:

PRECAUTIONARY STATEMENTS
HAZARDS TO HUMANS & DOMESTIC ANIMALS
CAUTION

ENVIRONMENTAL HAZARDS

PHYSICAL OR CHEMICAL HAZARDS

DIRECTIONS FOR USE
It is a violation of Federal law to use this product in a manner inconsistent with its labeling.

RE-ENTRY STATEMENT
(If Applicable)

CROP:
CROP:
CROP:

LABEL FORMAT FOR PRODUCTS CLASSIFIED FOR RESTRICTED USE

RESTRICTED USE PESTICIDE

Due to (insert reason*)

FOR RETAIL SALE TO AND USE ONLY BY CERTIFIED APPLICATORS OR PERSONS UNDER THEIR DIRECT SUPERVISION AND ONLY FOR THOSE USES COVERED BY THE CERTIFIED APPLICATOR'S CERTIFICATION

(*for example, "Due to high acute toxicity.")

PRODUCT NAME

ACTIVE INGREDIENT: _____ %
INERT INGREDIENTS: _____ %
TOTAL: 100.00 %

THIS PRODUCT CONTAINS ___ LBS OF ___ PER GALLON

KEEP OUT OF REACH OF CHILDREN

DANGER—POISON



STATEMENT OF PRACTICAL TREATMENT
IF SWALLOWED
IF INHALED
IF ON SKIN
IF IN EYES

SEE SIDE PANEL FOR ADDITIONAL PRECAUTIONARY STATEMENTS

MFG BY
TOWN, STATE
ESTABLISHMENT NO.
EPA REGISTRATION NO.

NET CONTENTS

PRECAUTIONARY STATEMENTS
HAZARDS TO HUMANS
& DOMESTIC ANIMALS
DANGER

ENVIRONMENTAL HAZARDS

PHYSICAL OR CHEMICAL HAZARDS

DIRECTIONS FOR USE
It is a violation of Federal law to use this product in a manner inconsistent with its labeling.

RE-ENTRY STATEMENT
(if Applicable)

STORAGE AND DISPOSAL
STORAGE
DISPOSAL

CROP:

CROP:

CROP:

CROP:

CROP:

WARRANTY STATEMENT

CROP:

submitter has asserted a confidential business information claim concerning the material).

(5) A copy of each document, proposal, or other item of written material concerning the Registration Standard provided by the Agency to any person or party outside of government (within 15 working days after the item is made available to such person or party).

(6) A copy of the Registration Standard;

(7) With respect to a Registration Standard for which the Agency has determined that a substantially complete chronic health and teratology data base exists, a copy of the FEDERAL REGISTER notice concerning availability of a proposed Registration Standard, and a copy of each comment received in response to that notice (within 10 working days after receipt by the Agency, or 15 working days if the submitter has asserted a confidential business information claim concerning the material).

(8) A copy of the FEDERAL REGISTER notice announcing the issuance of the Registration Standard (within 10 working days after the publication of the notice).

(c) *Index of the docket.* The Agency will establish and keep current an index to the docket for each Registration Standard. The index will include, but is not limited to:

(1) A list of each meeting between the Agency and any person or party outside of government, containing the date and subject of the meeting, the names of participants and the name of the person requesting the meeting.

(2) A list of each document in the docket by title, source or recipient(s), and the date the document was received or provided by the Agency.

(d) *Availability of docket and indices.* (1) The Agency will make available to the public for inspection and copying the docket and index for any Registration Standard.

(2) The Agency will establish and maintain a mailing list of persons who have specifically requested that they receive indices for Registration Standard dockets. On a quarterly basis, EPA will distribute the indices of new materials placed in the public docket to

these persons. Annually, EPA will require that persons on the list renew their requests for inclusion on the list.

(3) The Agency will issue annually in the FEDERAL REGISTER (in conjunction with the annual schedule notice specified in § 155.25) a notice announcing the availability of docket indices.

(4) Each FEDERAL REGISTER notice of availability of a Registration Standard will announce the availability of the docket index for that Standard.

**§ 155.34  Notice of availability.**

(a) The Agency will issue in the FEDERAL REGISTER a notice announcing the issuance and availability of Registration Standard which:

(1) Concerns a previously unregistered active ingredient; or

(2) Concerns a previously registered active ingredient, and the Registration Standard states that registrants will be required (under FIFRA section 3(c)(2)(B)) to submit chronic health (including, but not limited to, chronic feeding, oncogenicity and reproduction) or teratology studies.

(b) Interested persons may submit comments concerning any Registration Standard described by paragraph (a) of this section at any time.

(c) The Agency will issue in the FEDERAL REGISTER a notice announcing the availability of, and providing opportunity for comment on, each proposed Registration Standard which concerns a previously registered active ingredient for which the Agency has determined that a substantially complete chronic health and teratology data base exists. Following the comment period and issuance of the Registration Standard, the Agency will issue in the FEDERAL REGISTER a notice of availability of the Registration Standard.

# PART 156—LABELING REQUIREMENTS FOR PESTICIDES AND DEVICES

AUTHORITY: 7 U.S.C. 136-136y.

**§ 156.10  Labeling requirements.**

(a) *General—*(1) *Contents of the label.* Every pesticide products shall bear a label containing the information specified by the Act and the regu-

75



lations in this Part. The contents of a label must show clearly and prominently the following:

(i) The name, brand, or trademark under which the product is sold as prescribed in paragraph (b) of this section;

(ii) The name and address of the producer, registrant, or person for whom produced as prescribed in paragraph (c) of this section;

(iii) The net contents as prescribed in paragraph (d) of this section;

(iv) The product registration number as prescribed in paragraph (e) of this section;

(v) The producing establishment number as prescribed in paragraph (f) of this section;

(vi) An ingredient statement as prescribed in paragraph (g) of this section;

(vii) Warning or precautionary statements as prescribed in paragraph (h) of this section;

(viii) The directions for use as prescribed in paragraph (i) of this section; and

(ix) The use classification(s) as prescribed in paragraph (j) of this section.

(2) *Prominence and legibility.* (i) All words, statements, graphic representations, designs or other information required on the labeling by the Act or the regulations in this part must be clearly legible to a person with normal vision, and must be placed with such conspicuousness (as compared with other words, statements, designs, or graphic matter on the labeling) and expressed in such terms as to render it likely to be read and understood by the ordinary individual under customary conditions of purchase and use.

(ii) All required label text must:

(A) Be set in 6-point or larger type;

(B) Appear on a clear contrasting background; and

(C) Not be obscured or crowded.

(3) *Language to be used.* All required label or labeling text shall appear in the English language. However, the Agency may require or the applicant may propose additional text in other languages as is considered necessary to protect the public. When additional text in another language is necessary, all labeling requirements will be applied equally to both the English and other-language versions of the labeling.

(4) *Placement of Label*—(i) *General.* The label shall appear on or be securely attached to the immediate container of the pesticide product. For purposes of this Section, and the misbranding provisions of the Act, "securely attached" shall mean that a label can reasonably be expected to remain affixed during the foreseeable conditions and period of use. If the immediate container is enclosed within a wrapper or outside container through which the label cannot be clearly read, the label must also be securely attached to such outside wrapper or container, if it is a part of the package as customarily distributed or sold.

(ii) *Tank cars and other bulk containers*—(A) *Transportation.* While a pesticide product is in transit, the appropriate provisions of 49 CFR Parts 170–189, concerning the transportation of hazardous materials, and specifically those provisions concerning the labeling, marking and placarding of hazardous materials and the vehicles carrying them, define the basic Federal requirements. In addition, when any registered pesticide product is transported in a tank car, tank truck or other mobile or portable bulk container, a copy of the accepted label must be attached to the shipping papers, and left with the consignee at the time of delivery.

(B) *Storage.* When pesticide products are stored in bulk containers, whether mobile or stationary, which remain in the custody of the user, a copy of the label of labeling, including all appropriate directions for use, shall be securely attached to the container in the immediate vicinity of the discharge control valve.

(5) *False or misleading statements.* Pursuant to section 2(q)(1)(A) of the Act, a pesticide or a device declared subject to the Act pursuant to § 153.240, is misbranded if its labeling is false or misleading in any particular including both pesticidal and non-pesticidal claims. Examples of statements or representations in the labeling which constitute misbranding include:

(i) A false or misleading statement concerning the composition of the product;



(ii) A false or misleading statement concerning the effectiveness of the product as a pesticide or device;

(iii) A false or misleading statement about the value of the product for purposes other than as a pesticide or device;

(iv) A false or misleading comparison with other pesticides or devices;

(v) Any statement directly or indirectly implying that the pesticide or device is recommended or endorsed by any agency of the Federal Government;

(vi) The name of a pesticide which contains two or more principal active ingredients if the name suggests one or more but not all such principal active ingredients even though the names of the other ingredients are stated elsewhere in the labeling;

(vii) A true statement used in such a way as to give a false or misleading impression to the purchaser;

(viii) Label disclaimers which negate or detract from labeling statements required under the Act and these regulations;

(ix) Claims as to the safety of the pesticide or its ingredients, including statements such as "safe," "nonpoisonous," "noninjurious," "harmless" or "nontoxic to humans and pets" with or without such a qualifying phrase as "when used as directed"; and

(x) Non-numerical and/or comparative statements on the safety of the product, including but not limited to:

(A) "Contains all natural ingredients";

(B) "Among the least toxic chemicals known"

(C) "Pollution approved"

(6) *Final printed labeling.* (i) Except as provided in paragraph (a)(6)(ii) of this section, final printed labeling must be submitted and accepted prior to registration. However, final printed labeling need not be submitted until draft label texts have been provisionally accepted by the Agency.

(ii) Clearly legible reproductions or photo reductions will be accepted for unusual labels such as those silk-screened directly onto glass or metal containers or large bag or drum labels. Such reproductions must be of microfilm reproduction quality.

(b) *Name, brand, or trademark.* (1) The name, brand, or trademark under which the pesticide product is sold shall appear on the front panel of the label.

(2) No name, brand, or trademark may appear on the label which:

(i) Is false or misleading, or

(ii) Has not been approved by the Administrator through registration or supplemental registration as an additional name pursuant to § 152.132.

(c) Name and address of producer, registrant, or person for whom produced. An unqualified name and address given on the label shall be considered as the name and address of the producer. If the registrant's name appears on the label and the registrant is not the producer, or if the name of the person for whom the pesticide was produced appears on the label, it must be qualified by appropriate wording such as "Packed for * * *," "Distributed by * * *," or "Sold by * * *" to show that the name is not that of the producer.

(d) *Net weight or measure of contents.* (1) The net weight or measure of content shall be exclusive of wrappers or other materials and shall be the average content unless explicitly stated as a minimum quantity.

(2) If the pesticide is a liquid, the net content statement shall be in terms of liquid measure at 68° F (20°C) and shall be expressed in conventional American units of fluid ounces, pints, quarts, and gallons.

(3) If the pesticide is solid or semisolid, viscous or pressurized, or is a mixture of liquid and solid, the net content statement shall be in terms of weight expressed as avoirdupois pounds and ounces.

(4) In all cases, net content shall be stated in terms of the largest suitable units, i.e., "1 pound 10 ounces" rather than "26 ounces."

(5) In addition to the required units specified, net content may be expressed in metric units.

(6) Variation above minimum content or around an average is permissible only to the extent that it represents deviation unavoidable in good manufacturing practice. Variation below a stated minimum is not permitted. In no case shall the average con-



tent of the packages in a shipment fall below the stated average content.

(e) *Product registration number.* The registration number assigned to the pesticide product at the time of registration shall appear on the label, preceded by the phrase "EPA Registration No.," or the phrase "EPA Reg. No." The registration number shall be set in type of a size and style similar to other print on that part of the label on which it appears and shall run parallel to it. The registration number and the required identifying phrase shall not appear in such a manner as to suggest or imply recommendation or endorsement of the product by the Agency.

(f) *Producing establishments registration number.* The producing establishment registration number preceded by the phrase "EPA Est.", of the final establishment at which the product was produced may appear in any suitable location on the label or immediate container. It must appear on the wrapper or outside container of the package if the EPA establishment registration number on the immediate container cannot be clearly read through such wrapper or container.

(g) *Ingredient statement*—(1) *General.* The label of each pesticide product must bear a statement which contains the name and percentage by weight of each active ingredient, the total percentage by weight of all inert ingredients; and if the pesticide contains arsenic in any form, a statement of the percentages of total and water-soluble arsenic calculated as elemental arsenic. The active ingredients must be designated by the term "active ingredients" and the inert ingredients by the term "inert ingredients," or the singular forms of these terms when appropriate. Both terms shall be in the same type size, be aligned to the same margin and be equally prominent. The statement "Inert Ingredients, none" is not required for pesticides which contain 100 percent active ingredients. Unless the ingredient statement is a complete analysis of the pesticide, the term "analysis" shall not be used as a heading for the ingredient statement.

(2) *Position of ingredient statement.* (i) The ingredient statement is normally required on the front panel of

the label. If there is an outside container or wrapper through which the ingredient statement cannot be clearly read, the ingredient statement must also appear on such outside container or wrapper. If the size or form of the package makes it impracticable to place the ingredient statement on the front panel of the label, permission may be granted for the ingredient statement to appear elsewhere.

(ii) The text of the ingredient statement must run parallel with other text on the panel on which it appears, and must be clearly distinguishable from and must not be placed in the body of other text.

(3) *Names to be used in ingredient statement.* The name used for each ingredient shall be the accepted common name, if there is one, followed by the chemical name. The common name may be used alone only if it is well known. If no common name has been established, the chemical name alone shall be used. In no case will the use of a trademark or proprietary name be permitted unless such name has been accepted as a common name by the Administrator under the authority of section 25(c)(6).

(4) *Statements of percentages.* The percentages of ingredients shall be stated in terms of weight-to-weight. The sum of percentages of the active and the inert ingredients shall be 100. Percentages shall not be expressed by a range of values such as "22-25%." If the uses of the pesticide product are expressed as weight of active ingredient per unit area, a statement of the weight of active ingredient per unit volume of the pesticide formulation shall also appear in the ingredient statement.

(5) *Accuracy of stated percentages.* The percentages given shall be as precise as possible reflecting good manufacturing practice. If there may be unavoidable variation between manufacturing batches, the value stated for each active ingredient shall be the lowest percentage which may be present.

(6) *Deterioration.* Pesticides which change in chemical composition significantly must meet the following labeling requirements:



(i) In cases where it is determined that a pesticide formulation changes chemical composition significantly, the product must bear the following statement in a prominent position on the label: "Not for sale or use after [date]."

(ii) The product must meet all label claims up to the expiration time indicated on the label.

(7. *Inert ingredients.* The Administrator may require the name of any inert ingredient(s) to be listed in the ingredient statement if he determines that such ingredient(s) may pose a hazard to man or the environment.

(h) *Warnings and precautionary statements.* Required warnings and precautionary statements concerning the general areas of toxicological hazard including hazard to children, environmental hazard, and physical or chemical hazard fall into two groups: those required on the front panel of the labeling and those which may appear elsewhere. Specific requirements concerning content, placement, type size, and prominence are given below.

(1) *Required front panel statements.* With the exception of the child hazard warning statement, the text required on the front panel of the label is determined by the Toxicity Category of the pesticide. The category is assigned on the basis of the highest hazard shown by any of the indicators in the table below:

| Hazard indicators | Toxicity categories | | | |
|---|---|---|---|---|
| | I | II | III | IV |
| Oral LD₅₀ | Up to and including 50 mg/kg. | From 50 thru 500 mg/kg. | From 500 thru 5000 mg/kg. | Greater than 5000 mg/kg. |
| Inhalation LC₅₀ | Up to and including .2 mg/liter. | From .2 thru 2 mg/liter. | From 2. thru 20 mg/liter. | Greater than 20 mg/liter. |
| Dermal LD₅₀ | Up to and including 200 mg/kg. | From 200 thru 2000 | From 2,000 thru 20,000. | Greater than 20,000. |
| Eye effects | Corrosive; corneal opacity not reversible within 7 days. | Corneal opacity reversible within 7 days; irritation persisting for 7 days. | No corneal opacity; irritation reversible within 7 days. | No irritation. |
| Skin effects | Corrosive | Severe irritation at 72 hours. | Moderate irritation at 72 hours. | Mild or slight irritation at 72 hours. |

(i) *Human hazard signal word*—(A) *Toxicity Category I.* All pesticide products meeting the criteria of Toxicity Category I shall bear on the front panel the signal word "Danger." In addition if the product was assigned to Toxicity Category I on the basis of its oral, inhalation or dermal toxicity (as distinct from skin and eye local effects) the word "Poison" shall appear in red on a background of distinctly contrasting color and the skull and crossbones shall appear in immediate proximity to the word "poison."

(B) *Toxicity Category II.* All pesticide products meeting the criteria of Toxicity Category II shall bear on the front panel the signal word "Warning."

(C) *Toxicity Category III.* All pesticide products meeting the criteria of Toxicity Category III shall bear on the front panel the signal word "Caution."

(D) *Toxicity Category IV.* All pesticide products meeting the criteria of Toxicity Category IV shall bear on the front panel the signal word "Caution."

(E) *Use of signal words.* Use of any signal word(s) associated with a higher Toxicity Category is not permitted except when the Agency determines that such labeling is necessary to prevent unreasonable adverse effects on man or the environment. In no case shall more than one human hazard signal word appear on the front panel of a label.

(ii) *Child hazard warning.* Every pesticide product label shall bear on the front panel the statement "keep out of reach of children." Only in cases where the likelihood of contact with children during distribution, marketing, storage or use is demonstrated by the applicant to be extremely remote, or if the nature of the pesticide is such

**79**



that it is approved for use on infants or small children, may the Administrator waive this requirement.

(iii) *Statement of practical treatment*—(A) *Toxicity Category I.* A statement of practical treatment (first aid or other) shall appear on the front panel of the label of all pesticides falling into Toxicity Category I on the basis of oral, inhalation or dermal toxicity. The Agency may, however, permit reasonable variations in the placement of the statement of practical treatment is some reference such as "See statement of practical treatment on back panel" appears on the front panel near the word "Poison" and the skull and crossbones.

(B) *Other toxicity categories.* The statement of practical treatment is not required on the front panel except as described in paragraph (h)(1)(iii)(A) of this section. The applicant may, however, include such a front panel statement at his option. Statements of practical treatment are, however, required elsewhere on the label in accord with paragraph (h)(2) of this section if they do not appear on the front panel.

(iv) *Placement and prominence.* All the require front panel warning statements shall be grouped together on the label, and shall appear with sufficient prominence relative to other front panel text and graphic material to make them unlikely to be overlooked under customary conditions of purchase and use. The following table shows the minimum type size requirements for the front panel warning statements on various sizes of labels:

| Size of label front panel in square inches | Points | |
|---|---|---|
| | Required signal word, all capitals | "Keep out of reach of children" |
| 5 and under | 6 | 6 |
| Above 5 to 10 | 10 | 6 |
| Above 10 to 15 | 12 | 8 |
| Above 15 to 30 | 14 | 10 |
| Over 30 | 18 | 12 |

(2) *Other required warnings and precautionary statements.* The warnings and precautionary statements as required below shall appear together on the label under the general heading "Precautionary Statements" and under appropriate subheadings of "Hazard to Humans and Domestic Animals," "Environmental Hazard" and "Physical or Chemical Hazard."

(i) *Hazard to humans and domestic animals.* (A) Where a hazard exists to humans or domestic animals, precautionary statements are required indicating the particular hazard, the route(s) of exposure and the precautions to be taken to avoid accident, injury or damage. The precautionary paragraph shall be immediately preceded by the appropriate hazard signal word.

(B) The following table depicts typical precautionary statements. These statements must be modified or expanded to reflect specific hazards.

| Toxicity category | Precautionary statements by toxicity category | |
|---|---|---|
| | Oral, inhalation, or dermal toxicity | Skin and eye local effects |
| I | Fatal (poisonous) if swallowed [inhaled or absorbed through skin]. Do not breathe vapor [dust or spray mist]. Do not get in eyes, on skin, or on clothing [Front panel statement of practical treatment required.]. | Corrosive, causes eye and skin damage [or skin irritation]. Do not get in eyes, on skin, or on clothing. Wear goggles or face shield and rubber gloves when handling. Harmful or fatal if swallowed. [Appropriate first aid statement required.] |
| II | May be fatal if swallowed [inhaled or absorbed through the skin]. Do not breathe vapors [dust or spray mist]. Do not get in eyes, on skin, or on clothing. [Appropriate first aid statements required.]. | Causes eye [and skin] irritation. Do not get in eyes, on skin, or on clothing. Harmful if swallowed. [Appropriate first aid statement required.] |
| III | Harmful if swallowed [inhaled or absorbed through the skin]. Avoid breathing vapors [dust or spray mist]. Avoid contact with skin [eyes or clothing]. [Appropriate first aid statement required.]. | Avoid contact with skin, eyes or clothing. In case of contact immediately flush eyes or skin with plenty of water. Get medical attention if irritation persists. |
| IV | [No precautionary statements required.] | [No precautionary statements required.] |

(ii) *Environmental hazards.* Where a hazard exists to non target organisms excluding humans and domestic animals, precautionary statements are required stating the nature of the hazard and the appropriate precautions to avoid potential accident, injury or damage. Examples of the hazard statements and the circumstances under which they are required follow:

(A) If a pesticide intended for outdoor use contains an active ingredient with a mammalian acute oral LD₅₀ of 100 or less, the statement "This Pesticide is Toxic to Wildlife" is required.

(B) If a pesticide intended for outdoor use contains an active ingredient with a fish acute LC₅₀ of 1 ppm or less, the statement "This Pesticide is Toxic to Fish" is required.

(C) If a pesticide intended for outdoor use contains an active ingredient with an avian acute oral LD₅₀ of 100 mg/kg or less, or a subacute dietary LC₅₀ of 500 ppm or less, the statement "This Pesticide is Toxic to Wildlife" is required.

(D) If either accident history or field studies demonstrate that use of the pesticide may result in fatality to birds, fish or mammals, the statement "This pesticide is extremely toxic to wildlife (fish)" is required.

(E) For uses involving foliar application to agricultural crops, forests, or shade trees, or for mosquito abatement treatments, pesticides toxic to pollinating insects must bear appropriate label cautions. .

(F) For all outdoor uses other than aquatic applications the label must bear the caution "Keep out of lakes, ponds or streams. Do not contaminate water by cleaning of equipment or disposal of wastes."

(iii) *Physical or chemical hazards.* Warning statements on the flammability or explosive characteristics of the pesticide are required as follows:

| Flash point | Required text |
|---|---|
| **(A) PRESSURIZED CONTAINERS** | |
| Flash point at or below 20° F; if there is a flashback at any valve opening. | Extremely flammable. Contents under pressure. Keep away from fire, sparks, and heated surfaces. Do not puncture or incinerate container. Exposure to temperatures above 130° F may cause bursting. |
| Flash point above 20° F and not over 80° F or if the flame extension is more than 18 in long at a distance of 6 in from the flame. | Flammable. Contents under pressure. Keep away from heat, sparks, and open flame. Do not puncture or incinerate container. Exposure to temperatures above 130° F may cause bursting. |
| All other pressurized containers............. | Contents under pressure. Do not use or store near heat or open flame. Do not puncture or incinerate container. Exposure to temperatures above 130° F may cause bursting. |
| **(B) NONPRESSURIZED CONTAINERS** | |
| At or below 20° F............. | Extremely flammable. Keep away from fire, sparks, and heated surfaces. |
| Above 20° F and not over 80° F............. | Flammable. Keep away from heat and open flame. |
| Above 80° F and not over 150° F............. | Do not use or store near heat or open flame. |

(i) *Directions for Use*—(1) *General requirements*—(i) *Adequacy and clarity of directions.* Directions for use must be stated in terms which can be easily read and understood by the average person likely to use or to supervise the use of the pesticide. When followed, directions must be adequate to protect the public from fraud and from personal injury and to prevent unreasonable adverse effects on the environment.

(ii) *Placement of directions for use.* Directions may appear on any portion of the label provided that they are conspicuous enough to be easily read by the user of the pesticide product. Directions for use may appear on printed or graphic matter which accompanies the pesticide provided that:

(A) If required by the Agency, such printed or graphic matter is securely attached to each package of the pesticide, or placed within the outside wrapper or bag;



(B) The label bears a reference to the directions for use in accompanying leaflets or circulars, such as "See directions in the enclosed circular:" and

(C) The Administrator determines that it is not necessary for such directions to appear on the label.

(iii) *Exceptions to requirement for direction for use*—(A) Detailed directions for use may be omitted from labeling of pesticides which are intended for use only by manufacturers of products other than pesticide products in their regular manufacturing processes, provided that:

(1) The label clearly shows that the product is intended for use only in manufacturing processes and specifies the type(s) of products involved.

(2) Adequate information such as technical data sheets or bulletins, is available to the trade specifying the type of product involved and its proper use in manufacturing processes;

(3) The product will not come into the hands of the general public except after incorporation into finished products; and

(4) The Administrator determines that such directions are not necessary to prevent unreasonable adverse effects on man or the environment.

(B) Detailed directions for use may be omitted from the labeling of pesticide products for which sale is limited to physicians, veterinarians, or druggists, provided that:

(1) The label clearly states that the product is for use only by physicians or veterinarians;

(2) The Administrator determines that such directions are not necessary to prevent unreasonable adverse effects on man or the environment; and

(3) The product is also a drug and regulated under the provisions of the Federal Food, Drug and Cosmetic Act.

(C) Detailed directions for use may be omitted from the labeling of pesticide products which are intended for use only by formulators in preparing pesticides for sale to the public, provided that:

(1) There is information readily available to the formulators on the composition, toxicity, methods of use, applicable restrictions or limitations, and effectiveness of the product for pesticide purposes;

(2) The label clearly states that the product is intended for use only in manufacturing, formulating, mixing, or repacking for use as a pesticide and specifies the type(s) of pesticide products involved;

(3) The product as finally manufactured, formulated, mixed, or repackaged is registered; and

(4) The Administrator determines that such directions are not necessary to prevent unreasonable adverse effects on man or the environment.

(2) *Contents of Directions for Use.* The directions for use shall include the following, under the headings "Directions for Use":

(i) The statement of use classification as prescribed in paragraph (j) of this section immediately under the heading "Directions for Use."

(ii) Immediately below the statement of use classification, the statement "It is a violation of Federal law to use this product in a manner inconsistent with its labeling."

(iii) The site(s) of application, as for example the crops, animals, areas, or objects to be treated.

(iv) The target pest(s) associated with each site.

(v) The dosage rate associated with each site and pest.

(vi) The method of application, including instructions for dilution, if required, and type(s) of application apparatus or equipment required.

(vii) The frequency and timing of applications necessary to obtain effective results without causing unreasonable adverse effects on the environment.

(viii) Specific limitations on reentry to areas where the pesticide has been applied, meeting the requirements concerning reentry provided by 40 CFR Part 170.

(ix) Specific directions concerning the storage and disposal of the pesticide and its container, meeting the requirements of 40 CFR Part 165. These instructions shall be grouped and appear under the heading "Storage and Disposal." This heading must be set in type of the same minimum sizes as required for the child hazard warning. (See Table in § 162.10(h)(1)(iv))



(x) Any limitations or restrictions on use required to prevent unreasonable adverse effects, such as:

(A) Required intervals between application and harvest of food or feed crops.

(B) Rotational crop restrictions.

(C) Warnings as required against use on certain crops, animals, objects, or in or adjacent to certain areas.

(D) [Reserved]

(E) For restricted use pesticides, a statement that the pesticide may be applied under the direct supervision of a certified applicator who is not physically present at the site of application but nonetheless available to the person applying the pesticide, unless the Agency has determined that the pesticide may only be applied under the direct supervision of a certified applicator who is physically present.

(F) Other pertinent information which the Administrator determines to be necessary for the protection of man and the environment.

(j) *Statement of Use Classification.* By October 22, 1976, all pesticide products must bear on their labels a statement of use classification as described in paragraphs (j) (1) and (2) of this section. Any pesticide product for which some uses are classified for general use and others for restricted use shall be separately labeled according to the labeling standards set forth in this subsection, and shall be marketed as separate products with different registration numbers, one bearing directions only for general use(s) and the other bearing directions for restricted use(s) except that, if a product has both restricted use(s) and general use(s), both of these uses may appear on a product labeled for restricted use. Such products shall be subject to the provisions of paragraph (j)(2) of this section.

(1) *General Use Classification.* Pesticide products bearing directions for use(s) classified general shall be labeled with the exact words "General Classification" immediately below the heading "Directions for Use." And reference to the general classification that suggests or implies that the general utility of the pesticide extends beyond those purposes and uses contained in the Directions for Use will be considered a false or misleading statement under the statutory definitions of misbranding.

(2) *Restricted Use Classification.* Pesticide products bearing direction for use(s) classified restricted shall bear statements of restricted use classification on the front panel as described below:

(i) *Front panel statement of restricted use classification.* (A) At the top of the front panel of the label, set in type of the same minimum sizes as required for human hazard signal words (see table in paragraph (h)(1)(iv) of this section), and appearing with sufficient prominence relative to other text and graphic material on the front panel to make it unlikely to be overlooked under customary conditions of purchase and use, the statement "Restricted Use Pesticide" shall appear.

(B) Directly below this statement on the front panel, a summary statement of the terms of restriction imposed as a precondition to registration shall appear. If use is restricted to certified applicators, the following statement is required: "For retail sale to and use only by Certified Applicators or persons under their direct supervision and only for those uses covered by the Certified Applicator's certification." If, however, other regulatory restrictions are imposed, the Administrator will define the appropriate wording for the terms of restriction by regulation.

[40 FR 28268, July 3, 1975; 40 FR 32329, Aug. 1, 1975; 40 FR 36571, Aug. 21, 1975, as amended at 43 FR 5786, Feb. 9, 1978. Redesignated and amended at 53 FR 15991, 15999, May 4, 1988]



# Appendix F

## Generic and Product-Specific Data Call-In



# UNITED STATES ENVIRONMENTAL PROTECTION AGENCY

## WASHINGTON, D.C. 20460

OFFICE OF
PREVENTION, PESTICIDES
AND TOXIC SUBSTANCES

### GENERIC AND PRODUCT SPECIFIC DATA CALL-IN NOTICE

## FEB 1 6 1994

### CERTIFIED MAIL

Dear Sir or Madam:

This Notice requires you and other registrants of pesticide products containing the active ingredient identified in Attachment A of this Notice, the <u>Data Call-In Chemical Status Sheet</u>, to submit certain data as noted herein to the U.S. Environmental Protection Agency (EPA, the Agency). These data are necessary to maintain the continued registration of your product(s) containing this active ingredient. Within 90 days after you receive this Notice you must respond as set forth in Section III below. Your response must state:

1. How you will comply with the requirements set forth in this Notice and its Attachments 1 through 7; or

2. Why you believe you are exempt from the requirements listed in this Notice and in Attachment 3 (for both generic and product specific data), the <u>Requirements Status and Registrant's Response Form</u>, (see section III-B); or

3. Why you believe EPA should not require your submission of data in the manner specified by this Notice (see section III-D).

If you do not respond to this Notice, or if you do not satisfy EPA that you will comply with its requirements or should be exempt or excused from doing so, then the registration of your product(s) subject to this Notice will be subject to suspension. We have provided a list of all of your products subject to this Notice in Attachment 2. All products are listed on both the generic and product specific <u>Data Call-In Response Forms.</u> Also included is a list of all registrants who were sent this Notice (Attachment 6).

The authority for this Notice is section 3(c)(2)(B) of the Federal Insecticide, Fungicide and Rodenticide Act as amended (FIFRA), 7 U.S.C. section 136a(c)(2)(B). Collection of this



information is authorized under the Paperwork Reduction Act by OMB Approval No. 2070-0107 and 2070-0057 (expiration date 3-31-96).

This Notice is divided into six sections and seven Attachments. The Notice itself contains information and instructions applicable to all Data Call-In Notices. The Attachments contain specific chemical information and instructions. The six sections of the Notice are:

Section I     -    Why You are Receiving this Notice
Section II    -    Data Required by this Notice
Section III   -    Compliance with Requirements of this Notice
Section IV    -    Consequences of Failure to Comply with this Notice
Section V     -    Registrants' Obligation to Report Possible Unreasonable Adverse Effects
Section VI    -    Inquiries and Responses to this Notice

The Attachments to this Notice are:

1 -   <u>Data Call-In Chemical Status Sheet</u>
2 -   <u>Generic Data Call-In and Product Specific Data Call-In Response Forms</u> with Instructions
3 -   <u>Generic Data Call-In and Product Specific Data Call-In Requirements Status and Registrant's Response Forms</u> with Instructions
4 -   <u>EPA Grouping of End-Use Products for Meeting Acute Toxicology Data Requirements for Reregistration</u>
5 -   <u>EPA Acceptance Criteria</u>
6 -   <u>List of Registrants Receiving This Notice</u>
7 -   <u>Cost Share and Data Compensation Forms</u>

## SECTION I.  <u>WHY YOU ARE RECEIVING THIS NOTICE</u>

The Agency has reviewed existing data for this active ingredient(s) and reevaluated the data needed to support continued registration of the subject active ingredient(s). This reevaluation identified additional data necessary to assess the health and safety of the continued use of products containing this active ingredient(s). You have been sent this Notice because you have product(s) containing the subject active ingredients.

## SECTION II. <u>DATA REQUIRED BY THIS NOTICE</u>

II-A. <u>DATA REQUIRED</u>

The data required by this Notice are specified in the <u>Requirements Status and Registrant's Response Forms</u>: Attachment 3



(for both generic and product specific data requirements). Depending on the results of the studies required in this Notice, additional studies/testing may be required.

II-B. <u>SCHEDULE FOR SUBMISSION OF DATA</u>

You are required to submit the data or otherwise satisfy the data requirements specified in the <u>Requirements Status and Registrant's Response Forms</u> (Attachment 3) within the timeframes provided.

II-C. <u>TESTING PROTOCOL</u>

All studies required under this Notice must be conducted in accordance with test standards outlined in the Pesticide Assessment Guidelines for those studies for which guidelines have been established.

These EPA Guidelines are available from the National Technical Information Service (NTIS), Attn: Order Desk, 5285 Port Royal Road, Springfield, Va 22161 (Telephone number: 703-487-4650).

Protocols approved by the Organization for Economic Cooperation and Development (OECD) are also acceptable if the OECD recommended test standards conform to those specified in the Pesticide Data Requirements regulation (40 CFR § 158.70). When using the OECD protocols, they should be modified as appropriate so that the data generated by the study will satisfy the requirements of 40 CFR § 158. Normally, the Agency will not extend deadlines for complying with data requirements when the studies were not conducted in accordance with acceptable standards. The OECD protocols are available from OECD, 2001 L Street, N.W., Washington, D.C. 20036 (Telephone number 202-785-6323; Fax telephone number 202-785-0350).

All new studies and proposed protocols submitted in response to this Data Call-In Notice must be in accordance with Good Laboratory Practices [40 CFR Part 160].

II-D.      <u>REGISTRANTS RECEIVING PREVIOUS SECTION 3(c)(2)(B) NOTICES ISSUED BY THE AGENCY</u>

Unless otherwise noted herein, <u>this Data Call-In does not in any way supersede or change the requirements of any previous Data Call-In(s)</u>, or any other agreements entered into with the Agency pertaining to such prior Notice. Registrants must comply with the requirements of all Notices to avoid issuance of a Notice of Intent to Suspend their affected products.

3



**SECTION III. <u>COMPLIANCE WITH REQUIREMENTS OF THIS NOTICE</u>**

You must use the correct forms and instructions when completing your response to this Notice. The type of Data Call-In you must comply with (Generic or Product Specific) is specified in item number 3 on the four Data Call-In forms (Attachments 2 and 3).

**III-A. <u>SCHEDULE FOR RESPONDING TO THE AGENCY</u>**

The appropriate responses initially required by this Notice for generic and product specific data must be submitted to the Agency within 90 days after your receipt of this Notice. Failure to adequately respond to this Notice within 90 days of your receipt will be a basis for issuing a Notice of Intent to Suspend (NOIS) affecting your products. This and other bases for issuance of NOIS due to failure to comply with this Notice are presented in Section IV-A and IV-B.

**III-B. <u>OPTIONS FOR RESPONDING TO THE AGENCY</u>**

1. <u>Generic Data Requirements</u>

The options for responding to this Notice for generic data requirements are: (a) voluntary cancellation, (b) delete use(s), (c) claim generic data exemption, (d) agree to satisfy the generic data requirements imposed by this Notice or (e) request a data waiver(s).

A discussion of how to respond if you choose the Voluntary Cancellation option, the Delete Use(s) option or the Generic Data Exemption option is presented below. A discussion of the various options available for satisfying the generic data requirements of this Notice is contained in Section III-C. A discussion of options relating to requests for data waivers is contained in Section III-D.

Two forms apply to generic data requirements, one or both of which must be used in responding to the Agency, depending upon your response. These two forms are the <u>Data-Call-In Response Form</u>, and the <u>Requirements Status and Registrant's Response Form</u>, (contained in Attachments 2 and 3, respectively).

The <u>Data Call-In Response Forms</u> must be submitted as part of every response to this Notice. The <u>Requirements Status and Registrant's Response Forms</u> also must be submitted if you do not qualify for a Generic Data Exemption or are not requesting voluntary cancellation of your registration(s). Please note that the company's authorized representative is required to sign the first page of both <u>Data Call-In Response Forms</u> and the <u>Requirements Status and Registrant's Response Forms</u> (if this form

4



is required) and initial any subsequent pages. The forms contain separate detailed instructions on the response options. Do not alter the printed material. If you have questions or need assistance in preparing your response, call or write the contact person(s) identified in Attachment 1.

    a.   <u>Voluntary Cancellation</u> -

You may avoid the requirements of this Notice by requesting voluntary cancellation of your product(s) containing the active ingredient that is the subject of this Notice. If you wish to voluntarily cancel your product, you must submit completed Generic and Product Specific <u>Data Call-In Response Forms</u> (Attachment 2), indicating your election of this option. Voluntary cancellation is item number 5 on both <u>Data Call-In Response Form(s)</u>. If you choose this option, these are the only forms that you are required to complete.

If you chose to voluntarily cancel your product, further sale and distribution of your product after the effective date of cancellation must be in accordance with the Existing Stocks provisions of this Notice, which are contained in Section IV-C.

    b.   <u>Use Deletion</u> -

You may avoid the requirements of this Notice by eliminating the uses of your product to which the requirements apply. If you wish to amend your registration to delete uses, you must submit the <u>Requirements Status and Registrant's Response Form</u> (Attachment 3), a completed application for amendment, a copy of your proposed amended labeling, and all other information required for processing the application. Use deletion is option number 7 under item 9 in the instructions for the <u>Requirements Status and Registrant's Response Forms</u>. You must also complete a <u>Data Call-In Response Form</u> by signing the certification, item number 8. Application forms for amending registrations may be obtained from the Registration Support Branch, Registration Division, Office of Pesticide Programs, EPA, by calling (703) 308-8358.

If you choose to delete the use(s) subject to this Notice or uses subject to specific data requirements, further sale, distribution, or use of your product after one year from the due date of your 90 day response, is allowed only if the product bears an amended label.

    c.   <u>Generic Data Exemption</u> -

Under section 3(c)(2)(D) of FIFRA, an applicant for registration of a product is exempt from the requirement to submit or cite generic data concerning an active ingredient if the active ingredient in the product is derived exclusively from



purchased, registered pesticide products containing the active ingredient. EPA has concluded, as an exercise of its discretion, that it normally will not suspend the registration of a product which would qualify and continue to qualify for the generic data exemption in section 3(c)(2)(D) of FIFRA. To qualify, <u>all</u> of the following requirements must be met:

(i).  The active ingredient in your registered product must be present <u>solely</u> because of incorporation of another registered product which contains the subject active ingredient and is purchased from a source not connected with you;

(ii).  Every registrant who is the ultimate source of the active ingredient in your product subject to this DCI must be in compliance with the requirements of this Notice and must remain in compliance; and

(iii).  You must have provided to EPA an accurate and current "Confidential Statement of Formula" for each of your products to which this Notice applies.

To apply for the Generic Data Exemption you must submit a completed <u>Data Call-In Response Form</u>, Attachment 2 and all supporting documentation. The Generic Data Exemption is item number 6a on the <u>Data Call-In Response Form</u>. If you claim a generic data exemption you are not required to complete the <u>Requirements Status and Registrant's Response Form</u>. Generic Data Exemption cannot be selected as an option for responding to product specific data requirements.

If you are granted a Generic Data Exemption, you rely on the efforts of other persons to provide the Agency with the required data. If the registrant(s) who have committed to generate and submit the required data fail to take appropriate steps to meet requirements or are no longer in compliance with this Data Call-In Notice, the Agency will consider that both they and you are not compliance and will normally initiate proceedings to suspend the registrations of both your and their product(s), unless you commit to submit and do submit the required data within the specified time. In such cases the Agency generally will not grant a time extension for submitting the data.

d.    <u>Satisfying the Generic Data Requirements of this Notice</u>

There are various options available to satisfy the generic data requirements of this Notice. These options are discussed in Section III-C.1. of this Notice and comprise options 1 through 6 of item 9 in the instructions for the <u>Requirements Status and Registrant's Response Form</u> and item 6b on the <u>Data Call-In Response Form</u>.  If you choose item 6b (agree to satisfy the

6



generic data requirements), you must submit the <u>Data Call-In Response Form</u> and the <u>Requirements Status and Registrant's Response Form</u> as well as any other information/data pertaining to the option chosen to address the data requirement. Your response must be on the forms marked "GENERIC" in item number 3.

  **e.** <u>Request for Generic Data Waivers</u>.

  Waivers for generic data are discussed in Section III-D.1. of this Notice and are covered by options 8 and 9 of item 9 in the instructions for the <u>Requirements Status and Registrant's Response Form</u>. If you choose one of these options, you must submit both forms as well as any other information/data pertaining to the option chosen to address the data requirement.

  **2.** <u>Product Specific Data Requirements</u>

  The options for responding to this Notice for product specific data are: (a) voluntary cancellation, (b) agree to satisfy the product specific data requirements imposed by this Notice or (c) request a data waiver(s).

  A discussion of how to respond if you choose the Voluntary Cancellation option is presented below. A discussion of the various options available for satisfying the product specific data requirements of this Notice is contained in Section III-C.2. A discussion of options relating to requests for data waivers is contained in Section III-D.2.

  Two forms apply to the product specific data requirements one or both of which must be used in responding to the Agency, depending upon your response. These forms are the <u>Data-Call-In Response Form</u>, and the <u>Requirements Status and Registrant's Response Form</u>, for product specific data (contained in Attachments 2 and 3, respectively). The <u>Data Call-In Response Form</u> must be submitted as part of every response to this Notice. In addition, one copy of the <u>Requirements Status and Registrant's Response Form</u> also must be submitted for each product listed on the <u>Data Call-In Response Form</u> unless the voluntary cancellation option is selected. Please note that the company's authorized representative is required to sign the first page of the <u>Data Call-In Response Form</u> and <u>Requirements Status and Registrant's Response Form</u> (if this form is required) and initial any subsequent pages. The forms contain separate detailed instructions on the response options. Do not alter the printed material. If you have questions or need assistance in preparing your response, call or write the contact person(s) identified in Attachment 1.

  **a.** <u>Voluntary Cancellation</u>

<div align="center">7</div>



You may avoid the requirements of this Notice by requesting voluntary cancellation of your product(s) containing the active ingredient that is the subject of this Notice. If you wish to voluntarily cancel your product, you must submit a completed <u>Data Call-In Response Form</u>, indicating your election of this option. Voluntary cancellation is item number 5 on both the <u>Generic and Product Specific Data Call-In Response Forms</u>. If you choose this option, you must complete both Data Call-In response forms. These are the only forms that you are required to complete.

If you choose to voluntarily cancel your product, further sale and distribution of your product after the effective date of cancellation must be in accordance with the Existing Stocks provisions of this Notice which are contained in Section IV-C.

    **b.**   <u>Satisfying the Product Specific Data Requirements of this Notice</u>.

There are various options available to satisfy the product specific data requirements of this Notice. These options are discussed in Section III-C.2. of this Notice and comprise options 1 through 6 of item 9 in the instructions for the product specific <u>Requirements Status and Registrant's Response Form</u> and item numbers 7a and 7b (agree to satisfy the product specific data requirements for an MUP or EUP as applicable) on the product specific <u>Data Call-In Response Form</u>. Note that the options available for addressing product specific data requirements differ slightly from those options for fulfilling generic data requirements. Deletion of a use(s) and the low volume/minor use option are not valid options for fulfilling product specific data requirements. It is important to ensure that you are using the correct forms and instructions when completing your response to the Reregistration Eligibility Decision document.

    **c.**   <u>Request for Product Specific Data Waivers</u>.

Waivers for product specific data are discussed in Section III-D.2. of this Notice and are covered by option 7 of item 9 in the instructions for the <u>Requirements Status and Registrant's Response Form</u>. If you choose this option, you must submit the <u>Data Call-In Response Form</u> and the <u>Requirements Status and Registrant's Response Form</u> as well as any other information/data pertaining to the option chosen to address the data requirement. Your response must be on the forms marked "PRODUCT SPECIFIC" in item number 3.

**III-C** <u>SATISFYING THE DATA REQUIREMENTS OF THIS NOTICE</u>



1.   <u>Generic Data</u>

If you acknowledge on the Generic <u>Data Call-In Response Form</u> that you agree to satisfy the generic data requirements (i.e. you select item number 6b), then you must select one of the six options on the Generic <u>Requirements Status and Registrant's Response Form</u> related to data production for each data requirement. Your option selection should be entered under item number 9, "Registrant Response." The six options related to data production are the first six options discussed under item 9 in the instructions for completing the Requirements Status and Registrant's Response Form. These six options are listed immediately below with information in parentheses to guide you to additional instructions provided in this Section. The options are:

(1)   I will generate and submit data within the specified timeframe (Developing Data)
(2)   I have entered into an agreement with one or more registrants to develop data jointly (Cost Sharing)

(3)   I have made offers to cost-share (Offers to Cost Share)
(4)   I am submitting an existing study that has not been submitted previously to the Agency by anyone (Submitting an Existing Study)
(5)   I am submitting or citing data to upgrade a study classified by EPA as partially acceptable and upgradeable (Upgrading a Study)
(6)   I am citing an existing study that EPA has classified as acceptable or an existing study that has been submitted but not reviewed by the Agency (Citing an Existing Study)

<u>Option 1. Developing Data</u>

If you choose to develop the required data it must be in conformance with Agency deadlines and with other Agency requirements as referenced herein and in the attachments. All data generated and submitted must comply with the Good Laboratory Practice (GLP) rule (40 CFR Part 160), be conducted according to the Pesticide Assessment Guidelines (PAG) and be in conformance with the requirements of PR Notice 86-5. In addition, certain studies require Agency approval of test protocols in advance of study initiation. Those studies for which a protocol must be submitted have been identified in the <u>Requirements Status and Registrant's Response Form</u> and/or footnotes to the form. If you wish to use a protocol which differs from the options discussed in Section II-C of this Notice, you must submit a detailed description of the proposed protocol and your reason for wishing to use it. The Agency may choose to reject a protocol not specified in Section II-C. If the Agency rejects your protocol you will be notified in writing, however, you should be aware



that rejection of a proposed protocol will not be a basis for extending the deadline for submission of data.

A progress report must be submitted for each study within 90 days from the date you are required to commit to generate or undertake some other means to address that study requirement, such as making an offer to cost share or agreeing to share in the cost of developing that study.  This 90-day progress report must include the date the study was or will be initiated and, for studies to be started within 12 months of commitment, the name and address of the laboratory(ies) or individuals who are or will be conducting the study.

In addition, if the time frame for submission of a final report is more than 1 year, interim reports must be submitted at 12 month intervals from the date you are required to commit to generate or otherwise address the requirement for the study. In addition to the other information specified in the preceding paragraph, at a minimum, a brief description of current activity on and the status of the study must be included as well as a full description of any problems encountered since the last progress report.

The time frames in the <u>Requirements Status and Registrant's Response Form</u> are the time frames that the Agency is allowing for the submission of completed study reports or protocols. The noted deadlines run from the date of the receipt of this Notice by the registrant. If the data are not submitted by the deadline, each registrant is subject to receipt of a Notice of Intent to Suspend the affected registration(s).

If you cannot submit the data/reports to the Agency in the time required by this Notice and intend to seek additional time to meet the requirements(s), you must submit a request to the Agency which includes: (1) a detailed description of the expected difficulty and (2) a proposed schedule including alternative dates for meeting such requirements on a step-by-step basis. You must explain any technical or laboratory difficulties and provide documentation from the laboratory performing the testing. While EPA is considering your request, the original deadline remains. The Agency will respond to your request in writing. If EPA does not grant your request, the original deadline remains. Normally, extensions can be requested only in cases of extraordinary testing problems beyond the expectation or control of the registrant. Extensions will not be given in submitting the 90-day responses. Extensions will not be considered if the request for extension is not made in a timely fashion; in no event shall an extension request be considered if it is submitted at or after the lapse of the subject deadline.

<u>Option 2. Agreement to Share in Cost to Develop Data</u>

10



If you choose to enter into an agreement to share in the cost of producing the required data but will not be submitting the data yourself, you must provide the name of the registrant who will be submitting the data. You must also provide EPA with documentary evidence that an agreement has been formed. Such evidence may be your letter offering to join in an agreement and the other registrant's acceptance of your offer, or a written statement by the parties that an agreement exists. The agreement to produce the data need not specify all of the terms of the final arrangement between the parties or the mechanism to resolve the terms. Section 3(c)(2)(B) provides that if the parties cannot resolve the terms of the agreement they may resolve their differences through binding arbitration.

### Option 3. Offer to Share in the Cost of Data Development

If you have made an offer to pay in an attempt to enter into an agreement or amend an existing agreement to meet the requirements of this Notice and have been unsuccessful, you may request EPA (by selecting this option) to exercise its discretion not to suspend your registration(s), although you do not comply with the data submission requirements of this Notice. EPA has determined that as a general policy, absent other relevant considerations, it will not suspend the registration of a product

of a registrant who has in good faith sought and continues to seek to enter into a joint data development/cost sharing program, but the other registrant(s) developing the data has refused to accept the offer. To qualify for this option, you must submit documentation to the Agency proving that you have made an offer to another registrant (who has an obligation to submit data) to share in the burden of developing that data. You must also submit to the Agency a completed EPA Form 8570-32, Certification of Offer to Cost Share in the Development of Data, Attachment 7. In addition, you must demonstrate that the other registrant to whom the offer was made has not accepted your offer to enter into a cost-sharing agreement by including a copy of your offer and proof of the other registrant's receipt of that offer (such as a certified mail receipt). Your offer must, in addition to anything else, offer to share in the burden of producing the data upon terms to be agreed to or, failing agreement, to be bound by binding arbitration as provided by FIFRA section 3(c)(2)(B)(iii) and must not qualify this offer. The other registrant must also inform EPA of its election of an option to develop and submit the data required by this Notice by submitting a <u>Data Call-In Response Form</u> and a <u>Requirements Status and Registrant's Response Form</u> committing to develop and submit the data required by this Notice.

In order for you to avoid suspension under this option, you may not withdraw your offer to share in the burden of developing the data. In addition, the other registrant must fulfill its

11



commitment to develop and submit the data as required by this Notice. If the other registrant fails to develop the data or for some other reason is subject to suspension, your registration as well as that of the other registrant normally will be subject to initiation of suspension proceedings, unless you commit to submit, and do submit, the required data in the specified time frame. In such cases, the Agency generally will not grant a time extension for submitting the data.

## Option 4. Submitting an Existing Study

If you choose to submit an existing study in response to this Notice, you must determine that the study satisfies the requirements imposed by this Notice. You may only submit a study that has not been previously submitted to the Agency or previously cited by anyone. Existing studies are studies which predate issuance of this Notice. Do not use this option if you are submitting data to upgrade a study. (See Option 5).

You should be aware that if the Agency determines that the study is not acceptable, the Agency will require you to comply with this Notice, normally without an extension of the required date of submission. The Agency may determine at any time that a study is not valid and needs to be repeated.

To meet the requirements of the DCI Notice for submitting an existing study, <u>all of the following three criteria must be clearly Met</u>:

a.  You must certify at the time that the existing study is submitted that the raw data and specimens from the study are available for audit and review and you must identify where they are available. This must be done in accordance with the requirements of the Good Laboratory Practice (GLP) regulation, 40 CFR Part 160. As stated in 40 CFR 160.3 "`[r]aw data' means any laboratory worksheets, records, memoranda, notes, or exact copies thereof, that are the result of original observations and activities of a study and are necessary for the reconstruction and evaluation of the report of that study. In the event that exact transcripts of raw data have been prepared (e.g., tapes which have been transcribed verbatim, dated, and verified accurate by signature), the exact copy or exact transcript may be substituted for the original source as raw data. 'Raw data' may include photographs, microfilm or microfiche copies, computer printouts, magnetic media, including dictated observations, and recorded data from automated instruments." The term "specimens", according to 40 CFR

12



160.3, means "any material derived from a test system for examination or analysis."

b.  Health and safety studies completed after May 1984 also must also contain all GLP-required quality assurance and quality control information, pursuant to the requirements of 40 CFR Part 160. Registrants also must certify at the time of submitting the existing study that such GLP information is available for post May 1984 studies by including an appropriate statement on or attached to the study signed by an authorized official or representative of the registrant.

c.  You must certify that each study fulfills the acceptance criteria for the Guideline relevant to the study provided in the FIFRA Accelerated Reregistration Phase 3 Technical Guidance and that the study has been conducted according to the Pesticide Assessment Guidelines (PAG) or meets the purpose of the PAG (both available from NTIS). A study not conducted according to the PAG may be submitted to the Agency for consideration if the registrant believes that the study clearly meets the purpose of the PAG. The registrant is referred to 40 CFR 158.70 which states the Agency's policy regarding acceptable protocols. If you wish to submit the study, you must, in addition to certifying that the purposes of the PAG are met by the study, clearly articulate the rationale why you believe the study meets the purpose of the PAG, including copies of any supporting information or data. It has been the Agency's experience that studies completed prior to January 1970 rarely satisfied the purpose of the PAG and that necessary raw data usually are not available for such studies.

If you submit an existing study, you must certify that the study meets all requirements of the criteria outlined above.

If EPA has previously reviewed a protocol for a study you are submitting, you must identify any action taken by the Agency on the protocol and must indicate, as part of your certification, the manner in which all Agency comments, concerns, or issues were addressed in the final protocol and study.

If you know of a study pertaining to any requirement in this Notice which does not meet the criteria outlined above but does contain factual information regarding unreasonable adverse effects, you must notify the Agency of such a study. If such study is in the Agency's files, you need only cite it along with the notification. If not in the Agency's files, you must submit a summary and copies as required by PR Notice 86-5.

13



## Option 5. Upgrading a Study

If a study has been classified as partially acceptable and·
upgradeable, you may submit data to upgrade that study. The
Agency will review the data submitted and determine if the
requirement is satisfied. If the Agency decides the requirement
is not satisfied, you may still be required to submit new data
normally without any time extension. Deficient, but upgradeable
studies will normally be classified as supplemental. However, it
is important to note that not all studies classified as
supplemental are upgradeable. If you have questions regarding the
classification of a study or whether a study may be upgraded,
call or write the contact person listed in Attachment 1. If you
submit data to upgrade an existing study you must satisfy or
supply information to correct <u>all</u> deficiencies in the study
identified by EPA. You must provide a clearly articulated
rationale of how the deficiencies have been remedied or corrected
and why the study should be rated as acceptable to EPA. Your
submission must also specify the MRID number(s) of the study
which you are attempting to upgrade and must be in conformance
with PR Notice 86-5.

Do not submit additional data for the purpose of upgrading a
study classified as unacceptable and determined by the Agency as
not capable of being upgraded.

This option also should be used to cite data that has been
previously submitted to upgrade a study, but has not yet been
reviewed by the Agency. You must provide the MRID number of the
data submission as well as the MRID number of the study being
upgraded.

The criteria for submitting an existing study, as specified
in Option 4 above, apply to all data submissions intended to
upgrade studies. Additionally, your submission of data intended

to upgrade studies must be accompanied by a certification that
you comply with each of those criteria, as well as a
certification regarding protocol compliance with Agency
requirements.

## Option 6. Citing Existing Studies

If you choose to cite a study that has been previously
submitted to EPA, that study must have been previously classified
by EPA as acceptable, or it must be a study which has not yet
been reviewed by the Agency. Acceptable toxicology studies
generally will have been classified as "core-guideline" or "core-
minimum."  For ecological effects studies, the classification
generally would be a rating of "core." For all other disciplines
the classification would be "acceptable." With respect to any
studies for which you wish to select this option, you must

14



provide the MRID number of the study you are citing and, if the study has been reviewed by the Agency, you must provide the Agency's classification of the study.

If you are citing a study of which you are not the original data submitter, you must submit a completed copy of EPA Form 8570-31, <u>Certification with Respect to Data Compensation Requirements</u>.

2. <u>Product Specific Data</u>

If you acknowledge on the product specific <u>Data Call-In Response Form</u> that you agree to satisfy the product specific data requirements (i.e. you select option 7a or 7b), then you must select one of the six options on the <u>Requirements Status and Registrant's Response Form</u> related to data production for each data requirement. Your option selection should be entered under item number 9, "Registrant Response." The six options related to data production are the first six options discussed under item 9 in the instructions for completing the <u>Requirements Status and Registrant's Response Form</u>. These six options are listed immediately below with information in parentheses to guide registrants to additional instructions provided in this Section. The options are:

(1) I will generate and submit data within the specified time-frame (Developing Data)
(2) I have entered into an agreement with one or more registrants to develop data jointly (Cost Sharing)
(3) I have made offers to cost-share (Offers to Cost Share)
(4) I am submitting an existing study that has not been submitted previously to the Agency by anyone (Submitting an Existing Study)

(5) I am submitting or citing data to upgrade a study classified by EPA as partially acceptable and upgradeable (Upgrading a Study)

(6) I am citing an existing study that EPA has classified as acceptable or an existing study that has been submitted but not reviewed by the Agency (Citing an Existing Study)

<u>Option 1. Developing Data</u> -- The requirements for developing product specific data are the same as those described for generic data (see Section III.C.1, Option 1) except that normally no protocols or progress reports are required.

<u>Option 2. Agree to Share in Cost to Develop Data</u> -- If you enter into an agreement to cost share, the same requirements apply to product specific data as to generic data (see Section III.C.1, Option 2). However, registrants may <u>only</u> choose this option for

15



acute toxicity data and certain efficacy data <u>and</u> only if EPA has indicated in the attached data tables that your product and at least one other product are similar for purposes of depending on the same data. If this is the case, data may be generated for just one of the products in the group. The <u>registration number</u> of the product for which data <u>will</u> be submitted <u>must</u> be noted in the agreement to cost share by the registrant selecting this option.

<u>Option 3. Offer to Share in the Cost of Data Development</u> --The same requirements for generic data (Section III.C.I., Option 3) apply to this option. This option only applies to acute toxicity and certain efficacy data as described in option 2 above.

<u>Option 4. Submitting an Existing Study</u> -- The same requirements described for generic data (see Section III.C.1., Option 4) apply to this option for product specific data.

<u>Option 5. Upgrading a Study</u> -- The same requirements described for generic data (see Section III.C.1., Option 5) apply to this option for product specific data.

<u>Option 6. Citing Existing Studies</u> -- The same requirements described for generic data (see Section III.C.1., Option 6) apply to this option for product specific data.

Registrants who select one of the above 6 options must meet all of the requirements described in the instructions for completing the <u>Data Call-In Response</u> Form and the <u>Requirements Status and Registrant's Response</u> Form, and in the generic data requirements section (III.C.1.), as appropriate.

III-D  <u>REQUESTS FOR DATA WAIVERS</u>

    1.   <u>Generic Data</u>

There are two types of data waiver responses to this Notice. The first is a request for a low volume/minor use waiver and the second is a waiver request based on your belief that the data requirement(s) are not appropriate for your product.

    a.   <u>Low Volume/Minor Use Waiver</u>

Option 8 under item 9 on the <u>Requirements Status and Registrant's Response Form</u>. Section 3(c)(2)(A) of FIFRA requires EPA to consider the appropriateness of requiring data for low volume, minor use pesticides. In implementing



this provision, EPA considers low volume pesticides to be only those active ingredients whose total production volume for all pesticide registrants is small. In determining whether to grant a low volume, minor use waiver, the Agency will consider the extent, pattern and volume of use, the economic incentive to conduct the testing, the importance of the pesticide, and the exposure and risk from use of the pesticide. If an active ingredient is used for both high volume and low volume uses, a low volume exemption will not be approved. If all uses of an active ingredient are low volume and the combined volumes for all uses are also low, then an exemption may be granted, depending on review of other information outlined below. An exemption will not be granted if any registrant of the active ingredient elects to conduct the testing. Any registrant receiving a low volume minor use waiver must remain within the sales figures in their forecast supporting the waiver request in order to remain qualified for such waiver. If granted a waiver, a registrant will be required, as a condition of the waiver, to submit annual sales reports. The Agency will respond to requests for waivers in writing.

To apply for a low volume, minor use waiver, you must submit the following information, as applicable to your product(s), as part of your 90-day response to this Notice:

(i). Total company sales (pounds and dollars) of all registered product(s) containing the active ingredient. If applicable to the active ingredient, include foreign sales for those products that are not registered in this country but are applied to sugar (cane or beet), coffee, bananas, cocoa, and other such crops. Present the above information by year for each of the past five years.

(ii) Provide an estimate of the sales (pounds and dollars) of the active ingredient for each major use site. Present the above information by year for each of the past five years.

(iii) Total direct production cost of product(s) containing the active ingredient by year for the past five years. Include information on raw material cost, direct labor cost, advertising, sales and marketing, and any other significant costs listed separately.

(iv) Total indirect production cost (e.g. plant overhead, amortized plant and equipment) charged to product(s) containing the active ingredient by year for the past five years. Exclude all non-recurring costs that were directly related to the active ingredient, such as costs of initial registration and any data development.

17



(v)   A list of each data requirement for which you seek a waiver. Indicate the type of waiver sought and the estimated cost to you (listed separately for each data requirement and associated test) of conducting the testing needed to fulfill each of these data requirements.

(vi)   A list of each data requirement for which you are not seeking any waiver and the estimated cost to you (listed separately for each data requirement and associated test) of conducting the testing needed to fulfill each of these data requirements.

(vii)   For each of the next ten years, a year-by-year forecast of company sales (pounds and dollars) of the active ingredient, direct production costs of product(s) containing the active ingredient (following the parameters in item 2 above), indirect production costs of product(s) containing the active ingredient (following the parameters in item 3 above), and costs of data development pertaining to the active ingredient.

(viii)   A description of the importance and unique benefits of the active ingredient to users. Discuss the use patterns and the effectiveness of the active ingredient relative to registered alternative chemicals and non-chemical control strategies. Focus on benefits unique to the active ingredient, providing information that is as quantitative as possible. If you do not have quantitative data upon which to base your estimates, then present the reasoning used to derive your estimates. To assist the Agency in determining the degree of importance of the active ingredient in terms of its benefits, you should provide information on any of the following factors, as applicable to your product(s): (a) documentation of the usefulness of the active ingredient in Integrated Pest Management, (b) description of the beneficial impacts on the environment of use of the active ingredient, as opposed to its registered alternatives, (c) information on the breakdown of the active ingredient after use and on its persistence in the environment, and (d) description of its usefulness against a pest(s) of public health significance.

Failure to submit sufficient information for the Agency to make a determination regarding a request for a low volume/minor use waiver will result in denial of the request for a waiver.

b.   <u>Request for Waiver of Data</u>

Option 9, under Item 9, on the <u>Requirements Status and Registrant's Response Form</u>. This option may be used if you believe that a particular data requirement should not apply because the requirement is inappropriate. You must submit a



rationale explaining why you believe the data requirements should not apply. You also must submit the current label(s) of your product(s) and, if a current copy of your Confidential Statement of Formula is not already on file you must submit a current copy.

You will be informed of the Agency's decision in writing. If the Agency determines that the data requirements of this Notice are not appropriate to your product(s), you will not be required to supply the data pursuant to section 3(c)(2)(B). <u>If EPA determines that the data are required for your product(s), you must choose a method of meeting the requirements of this Notice within the time frame provided by this Notice.</u> Within 30 days of your receipt of the Agency's written decision, you must submit a revised <u>Requirements</u> <u>Status and Registrant's Response Form</u> indicating the option chosen.

## 2. <u>Product Specific Data</u>

If you request a waiver for product specific data because you believe it is inappropriate, you must attach a complete justification for the request including technical reasons, data and references to relevant EPA regulations, guidelines or policies. (Note: any supplemental data must be submitted in the format required by PR Notice 86-5). This will be the <u>only</u> opportunity to state the reasons or provide information in support of your request. If the Agency approves your waiver request, you will not be required to supply the data pursuant to section 3(c)(2)(B) of FIFRA. If the Agency denies your waiver request, you must choose an option for meeting the data requirements of this Notice within 30 days of the receipt of the Agency's decision.  You must indicate and submit the option chosen on the product specific <u>Requirements Status and Registrant's Response Form</u>. Product specific data requirements for product chemistry, acute toxicity and efficacy (where appropriate) are required for all products and the Agency would grant a waiver only under extraordinary circumstances. You should also be aware that submitting a waiver request will <u>not</u> automatically extend the due date for the study in question. Waiver requests submitted without adequate supporting rationale will be denied and the original due date will remain in force.

## SECTION IV.      <u>CONSEQUENCES OF FAILURE TO COMPLY WITH THIS NOTICE</u>

IV-A <u>NOTICE OF INTENT TO SUSPEND</u>

The Agency may issue a Notice of Intent to Suspend products subject to this Notice due to failure by a registrant to comply with the requirements of this Data Call-In Notice, pursuant to



FIFRA section 3(c)(2)(B). Events which may be the basis for issuance of a Notice of Intent to Suspend include, but are not limited to, the following:

1. Failure to respond as required by this Notice within 90 days of your receipt of this Notice.

2. Failure to submit on the required schedule an acceptable proposed or final protocol when such is required to be submitted to the Agency for review.

3. Failure to submit on the required schedule an adequate progress report on a study as required by this Notice.

4. Failure to submit on the required schedule acceptable data as required by this Notice.

5. Failure to take a required action or submit adequate information pertaining to any option chosen to address the data requirements (e.g., any required action or information pertaining to submission or citation of existing studies or offers, arrangements, or arbitration on the sharing of costs or the formation of Task Forces, failure to comply with the terms of an agreement or arbitration concerning joint data development or failure to comply with any terms of a data waiver).

6. Failure to submit supportable certifications as to the conditions of submitted studies, as required by Section III-C of this Notice.

7. Withdrawal of an offer to share in the cost of developing required data.

8. Failure of the registrant to whom you have tendered an offer to share in the cost of developing data and provided proof of the registrant's receipt of such offer or failure of a registrant on whom you rely for a generic data exemption either to:

i. Inform EPA of intent to develop and submit the data required by this Notice on a Data Call-In Response Form and a <u>Requirements Status and Registrant's Response Form.</u>

ii. Fulfill the commitment to develop and submit the data as required by this Notice; or

iii. Otherwise take appropriate steps to meet the requirements stated in this Notice,



unless you commit to submit and do submit the required data in the specified time frame.

9.   Failure to take any required or appropriate steps, not mentioned above, at any time following the issuance of this Notice.

## IV-B.   BASIS FOR DETERMINATION THAT SUBMITTED STUDY IS UNACCEPTABLE

The Agency may determine that a study (even if submitted within the required time) is unacceptable and constitutes a basis for issuance of a Notice of Intent to Suspend. The grounds for suspension include, but are not limited to, failure to meet any of the following:

1)   EPA requirements specified in the Data Call-In Notice or other documents incorporated by reference (including, as applicable, EPA Pesticide Assessment Guidelines, Data Reporting Guidelines, and GeneTox Health Effects Test Guidelines) regarding the design, conduct, and reporting of required studies. Such requirements include, but are not limited to, those relating to test material, test procedures, selection of species, number of animals, sex and distribution of animals, dose and effect levels to be tested or attained, duration of test, and, as applicable, Good Laboratory Practices.

2)   EPA requirements regarding the submission of protocols, including the incorporation of any changes required by the Agency following review.

3)   EPA requirements regarding the reporting of data, including the manner of reporting, the completeness of results, and the adequacy of any required supporting (or raw) data, including, but not limited to, requirements referenced or included in this Notice or contained in PR 86-5. All studies must be submitted in the form of a final report; a preliminary report will not be considered to fulfill the submission requirement.

## IV-C   EXISTING STOCKS OF SUSPENDED OR CANCELLED PRODUCTS

EPA has statutory authority to permit continued sale, distribution and use of existing stocks of a pesticide product which has been suspended or cancelled if doing so would be consistent with the purposes of the Act.

The Agency has determined that such disposition by registrants of existing stocks for a suspended registration when



a section 3(c)(2)(B) data request is outstanding generally would not be consistent with the Act's purposes. Accordingly, the Agency anticipates granting registrants permission to sell, distribute, or use existing stocks of suspended product(s) only in exceptional circumstances. If you believe such disposition of existing stocks of your product(s) which may be suspended for failure to comply with this Notice should be permitted, you have the burden of clearly demonstrating to EPA that granting such permission would be consistent with the Act. You also must explain why an "existing stocks" provision is necessary, including a statement of the quantity of existing stocks and your estimate of the time required for their sale, distribution, and use. Unless you meet this burden, the Agency will not consider any request pertaining to the continued sale, distribution, or use of your existing stocks after suspension.

If you request a voluntary cancellation of your product(s) as a response to this Notice and your product is in full compliance with all Agency requirements, you will have, under most circumstances, one year from the date your 90 day response to this Notice is due, to sell, distribute, or use existing stocks. Normally, the Agency will allow persons other than the registrant such as independent distributors, retailers and end users to sell, distribute or use such existing stocks until the stocks are exhausted. Any sale, distribution or use of stocks of voluntarily cancelled products containing an active ingredient for which the Agency has particular risk concerns will be determined on a case-by-case basis.

Requests for voluntary cancellation received <u>after</u> the 90 day response period required by this Notice will not result in the agency granting any additional time to sell, distribute, or use existing stocks beyond a year from the date the 90 day response was due, <u>unless</u> you demonstrate to the Agency that you are in full compliance with all Agency requirements, including the requirements of this Notice. For example, if you decide to voluntarily cancel your registration six months before a 3-year study is scheduled to be submitted, all progress reports and other information necessary to establish that you have been conducting the study in an acceptable and good faith manner must have been submitted to the Agency, before EPA will consider granting an existing stocks provision.

**SECTION V.      REGISTRANTS' OBLIGATION TO REPORT POSSIBLE UNREASONABLE ADVERSE EFFECTS**

Registrants are reminded that FIFRA section 6(a)(2) states that if at any time after a pesticide is registered a registrant has additional factual information regarding unreasonable adverse effects on the environment by the pesticide, the registrant shall submit the information to the Agency. Registrants must notify the



Agency of any factual information they have, from whatever source, including but not limited to interim or preliminary results of studies, regarding unreasonable adverse effects on man or the environment. This requirement continues as long as the products are registered by the Agency.

**SECTION VI.    INQUIRIES AND RESPONSES TO THIS NOTICE**

If you have any questions regarding the requirements and procedures established by this Notice, call the contact person(s) listed in Attachment 1, the Data Call-In Chemical Status Sheet.

All responses to this Notice must include completed Data Call-In Response Forms (Attachment 2)and completed Requirements Status and Registrant's Response Forms (Attachment 3), for both (generic and product specific data) and any other documents required by this Notice, and should be submitted to the contact person(s) identified in Attachment 1.  If the voluntary cancellation or generic data exemption option is chosen, only the Generic and Product Specific Data Call-In Response Forms need be submitted.

The Office of Compliance Monitoring (OCM) of the Office of Prevention, Pesticides and Toxic Substances (OPPTS), EPA, will be monitoring the data being generated in response to this Notice.

Sincerely yours,

Daniel M. Barolo, Director
Special Review and
Reregistration Division

Attachments

The Attachments to this Notice are:

1 -  Data Call-In Chemical Status Sheet
2 -  Generic Data Call-In and Product Specific Data
Call-In Response Forms with Instructions
3 -  Generic Data Call-In and Product Specific Data
Call-In Requirements Status and Registrant's
Response Forms with Instructions
4 -  EPA Grouping of End-Use Products for Meeting Acute
Toxicology Data Requirements for Reregistration
5 -  EPA Acceptance Criteria
6 -  List of Registrants Receiving This Notice
7 -  Cost Share and Data Compensation Forms



# Attachment 1

## Chemical Status Sheet

GLYPHOSATE:   DATA CALL-IN CHEMICAL STATUS SHEET

### DATA REQUIRED BY THIS NOTICE

The additional data requirements needed to complete the data base for glyphosate are contained in <u>Generic DCI and Product Specific DCI Requirements Status and Registrant's Response</u> forms (Attachment 3).

### INQUIRIES AND RESPONSES TO THIS NOTICE

If you have any questions regarding the generic data base for glyphosate, please contact Eric Feris, the Review Manager for this chemical through the Virginia Relay (1-800-828-1140) at (703) 308-8048.

If you have any questions regarding the product specific data requirements and procedures established by this Notice, please contact Frank Rubis at (703) 308-8184.

All responses to this Notice should be submitted to:

Eric Feris
Special Review and Reregistration Division (7508W)
Office of Pesticide Programs
U.S. Environmental Protection Agency
Washington, D.C.  20460

RE:  Glyphosate



# Attachment 2

## Generic DCI and Product Specific DCI Response Forms with Instructions

Instructions For Completing
The
"Data Call-In Response Forms"
For The Generic And Product Specific Data Call-In

## INTRODUCTION

These instructions apply to the Generic and Product Specific "Data Call-In Response Forms" and are to be used by registrants to respond to generic and product specific Data Call-Ins as part of EPA's Reregistration Program under the Federal Insecticide Fungicide and Rodenticide Act. **The type of data call-in (generic or product specific) is indicated in item number 3 ("Date and Type of DCI") on each form.** BOTH "Data Call-In Response" forms must be completed.

Although the form is the same for both generic and product specific data, instructions for completing these forms are different. Please read these instructions carefully before filling out the forms.

EPA has developed these forms individually for each registrant, and has preprinted these forms with a number of items. <u>DO NOT</u> use these forms for any other active ingredient.

Items 1 through 4 have been preprinted on the form. Items 5 through 7 must be completed by the registrant as appropriate. Items 8 through 11 must be completed by the registrant before submitting a response to the Agency.

Public reporting burden for this collection of information is estimated to average 15 minutes per response, including time for reviewing instructions, searching existing data sources, gathering and maintaining the data needed, and completing and reviewing the collection of information. Send comments regarding the burden estimate or any other aspect of this collection of information, including suggesting for reducing this burden, to Chief, Information Policy Branch, PM-223, U.S. Environmental Protection Agency, 401 M St., S.W., Washington, D.C. 20460; and to the Office of Management and Budget, Paperwork Reduction Project 2070-0107, Washington, D.C. 20503.



INSTRUCTIONS FOR COMPLETING THE DATA CALL-IN RESPONSE FORMS
Generic and Product Specific Data Call-In

Item 1.    **ON BOTH FORMS:**  This item identifies your company name,
number and address.

Item 2.    **ON BOTH FORMS:**  This item identifies the case number,
case name, EPA chemical number and chemical name.

Item 3.    **ON BOTH FORMS:**  This item identifies the type of Data
Call-In.  The date of issuance is date stamped.

Item 4.    **ON BOTH FORMS:**  This item identifies the EPA product
registrations relevant to the data call-in.  Please
note that you are also responsible for informing the
Agency of your response regarding any product that you
believe may be covered by this Data Call-In but that is
not listed by the Agency in Item 4. You must bring any
such apparent omission to the Agency's attention within
the period required for submission of this response
form.

Item 5.    **ON BOTH FORMS:**  Check this item for each product
registration you wish to cancel voluntarily. If a
registration number is listed for a product for which
you previously requested voluntary cancellation,
indicate in Item 5 the date of that request. Since this
Data Call-In requires both generic and product specific
data, you must complete item 5 on both Data Call-In
response forms.  You do not need to complete any item
on the Requirements Status and Registrant's Response
Forms.

Item 6a.   **ON THE GENERIC DATA FORM:** Check this Item if the Data
Call-In is for generic data as indicated in Item 3 and
you are eligible for a Generic Data Exemption for the
chemical listed in Item 2 and used in the subject
product.  By electing this exemption, you agree to the
terms and conditions of a Generic Data Exemption as
explained in the Data Call-In Notice.

If you are eligible for or claim a Generic Data
Exemption, enter the EPA registration Number of each
registered source of that active ingredient that you
use in your product.

Typically, if you purchase an EPA-registered product
from one or more other producers (who, with respect to
the incorporated product, are in compliance with this
and any other outstanding Data Call-In Notice), and



<u>INSTRUCTIONS FOR COMPLETING THE DATA CALL-IN RESPONSE FORMS</u>
<u>Generic and Product Specific Data Call-In</u>

incorporate that product into all your products, you may complete this item for all products listed on this form. If, however, you produce the active ingredient yourself, or use any unregistered product (regardless of the fact that some of your sources are registered), you may not claim a Generic Data Exemption and you may not select this item.

**Item 6b.**  **ON THE GENERIC DATA FORM:**  Check this Item if the Data Call-In is for generic data as indicated in Item 3 and if you are agreeing to satisfy the generic data requirements of this Data Call-In. Attach the <u>Requirements Status and Registrant's Response Form</u> that indicates how you will satisfy those requirements.

NOTE:  **Item 6a and 6b are not applicable for Product Specific Data.**

**Item 7a.**  **ON THE PRODUCT SPECIFIC DATA FORM:**  For each manufacturing use product (MUP) for which you wish to maintain registration, you must agree to satisfy the data requirements by responding "yes."

**Item 7b.**  For each end use product (EUP) for which you wish to maintain registration, you must agree to satisfy the data requirements by responding "yes."

FOR BOTH MUP and EUP products

You should also respond "yes" to this item (7a for MUP's and 7b for EUP's) if your product is identical to another product and you qualify for a data exemption. You must provide the EPA registration numbers of your source(s); do not complete the Requirements Status and Registrant's Response form.  Examples of such products include repackaged products and Special Local Needs (Section 24c) products which are identical to federally registered products.

If you are requesting a data waiver, answer "yes" here; in addition, on the "Requirements Status and Registrant's Response" form under Item 9, you must respond with option 7 (Waiver Request) for each study for which you are requesting a waiver.

NOTE:  **Item 7a and 7b are not applicable for Generic Data.**



<u>INSTRUCTIONS FOR COMPLETING THE DATA CALL-IN RESPONSE FORMS</u>
<u>Generic and Product Specific Data Call-In</u>

Item 8.   **ON BOTH FORMS:**  This certification statement must be signed by an authorized representative of your company and the person signing must include his/her title. Additional pages used in your response must be initialled and dated in the space provided for the certification.

Item 9.   **ON BOTH FORMS:**  Enter the date of signature.

Item 10.  **ON BOTH FORMS:**  Enter the name of the person EPA should contact with questions regarding your response.

Item 11.  **ON BOTH FORMS:**  Enter the phone number of your company contact.

Note:   You may provide additional information that does not fit on this form in a signed letter that accompanies your response.  For example, you may wish to report that your product has already been transferred to another company or that you have already voluntarily cancelled this product. For these cases, please supply all relevant details so that EPA can ensure that its records are correct.



**United States Environmental Protection Agency**
Washington, D. C. 20460

**DATA CALL-IN RESPONSE**

Form Approved

OMB No. 2070-0107
2070-0057

Approval Expires 03-31-94

INSTRUCTIONS: Please type or print in ink. Please read carefully the attached instructions and supply the information requested on this form. Use additional sheet(s) if necessary.

| 1. Company name and Address | 2. Case # and Name | 3. Date and Type of DCI |
|---|---|---|
| SAMPLE COMPANY<br>1234 MAIN STREET<br>ANYWHERE, USA 54321 | 0178  Glyphosate | GENERIC<br><br>FEB 1 6 1994 |

| 4. EPA Product Registration | 5. I wish to cancel this product registration voluntarily. | 6. Generic Data | | 7. Product Specific Data | |
|---|---|---|---|---|---|
| | | 6a. I am claiming a Generic Data Exemption because I obtain the active ingredient from the source EPA registration number listed below. | 6b. I agree to satisfy Generic Data requirements as indicated on the attached form entitled "Requirements Status and Registrant's Response." | 7a. My product is a MUP and I agree to satisfy the MUP requirements on the attached form entitled "Requirements Status and Registrant's Response." | 7b. My product is an EUP and I agree to satisfy the EUP requirements on the attached form entitled "Requirements Status and Registrant's Response." |
| | | N.A. | N.A. | N.A. | |

8. Certification
I certify that the statements made on this form and all attachments are true, accurate, and complete.
I acknowledge that any knowingly false or misleading statement may be punishable by fine, imprisonment or both under applicable law.

Signature and Title of Company's Authorized Representative _____

| 9. Date |
|---|
| |

| 10. Name of Company Contact | 11. Phone Number |
|---|---|
| | |



**Form Approved**

OMB No. 2070-0107
2070-0057

Approval Expires 03-31-94

# United States Environmental Protection Agency
## Washington, D. C. 20460
## DATA CALL-IN RESPONSE

INSTRUCTIONS: Please type or print in ink.  Please read carefully the attached instructions and supply the information requested on this form.
Use additional sheet(s) if necessary.

| 1. Company name and Address | 2. Case # and Name | 3. Date and Type of DCI |
|---|---|---|
| SAMPLE COMPANY<br>1234 MAIN STREET<br>ANYWHERE, USA  54321 | 0178  Glyphosate | PRODUCT SPECIFIC<br><br>FEB 1 6 1994 |

| 4. EPA Product Registration | 5. I wish to cancel this product registration voluntarily. | 6. Generic Data | | 7. Product Specific Data | |
|---|---|---|---|---|---|
| | | 6a. I am claiming a Generic Data Exemption because I obtain the active ingredient from the source EPA registration number listed below. | 6b. I agree to satisfy Generic Data requirements as indicated on the attached form entitled "Requirements Status and Registrant's Response." | 7a. My product is a MUP and I agree to satisfy the MUP requirements on the attached form entitled "Requirements Status and Registrant's Response." | 7b. My product is an EUP and I agree to satisfy the EUP requirements on the attached form entitled "Requirements Status and Registrant's Response." |
| | | N.A. | N.A. | N.A. | |

8. Certification

I certify that the statements made on this form and all attachments are true, accurate, and complete.
I acknowledge that any knowingly false or misleading statement may be punishable by fine, imprisonment
or both under applicable law.

| Signature and Title of Company's Authorized Representative | | 9. Date |
|---|---|---|
| 10. Name of Company Contact | | 11. Phone Number |

# Attachment 3

## Generic DCI and Product Specific DCI Requirements Status and Registrants' Response Forms with Instructions

Instructions For Completing
The
"Requirements Status and Registrant's Response Forms"
For The Generic and Product Specific Data Call-In

### INTRODUCTION

These instructions apply to the Generic and Product Specific
"Requirements Status and Registrant's Response Forms" and are to
be used by registrants to respond to generic and product specific
Data Call-In's as part of EPA's reregistration program under the
Federal Insecticide Fungicide and Rodenticide Act. **The type of
Data Call-In (generic or product specific) is indicated in item
number 3 ("Date and Type of DCI") on each form.** Both
"Requirements Status and Registrant's Response" forms must be
completed.

Although the <u>form</u> is the same for both product specific and
generic data, <u>instructions</u> for completing the forms differ
slightly. Specifically, options for satisfying product specific
data requirements do not include (1) deletion of uses or (2)
request for a low volume/minor use waiver. Please read these
instructions carefully before filling out the forms.

EPA has developed these forms individually for each
registrant, and has preprinted these forms with a number of
items. <u>DO NOT</u> use these forms for any other active ingredient.

Items 1 through 8 have been preprinted on the form. Item 9
must be completed by the registrant as appropriate. Items 10
through 13 must be completed by the registrant before submitting
a response to the Agency.

Public reporting burden for this collection of information
is estimated to average 30 minutes per response, including time
for reviewing instructions, searching existing data sources,
gathering and maintaining the data needed, and completing and
reviewing the collection of information. Send comments regarding
the burden estimate or any other aspect of this collection of
information, including suggesting for reducing this burden, to
Chief, Information Policy Branch, PM-223, U.S. Environmental
Protection Agency, 401 M St., S.W., Washington, D.C. 20460; and
to the Office of Management and Budget, Paperwork Reduction
Project 2070-0107, Washington, D.C. 20503.



INSTRUCTIONS FOR COMPLETING THE "REQUIREMENTS STATUS AND
REGISTRANT'S RESPONSE FORMS"
Generic and Product Specific Data Call-In

Item 1.    **ON BOTH FORMS:**  This item identifies your company name,
number and address.

Item 2.    **ON THE GENERIC DATA FORM:**  This item identifies the
case number, case name, EPA chemical number and
chemical name.

**ON THE PRODUCT SPECIFIC DATA FORM:**  This item
identifies the  case number, case name, and the EPA
Registration Number of the product for which the Agency
is requesting product specific data.

Item 3.    **ON THE GENERIC DATA FORM:**  This item identifies the
type of Data Call-In.  The date of issuance is date
stamped.

**ON THE PRODUCT SPECIFIC DATA FORM:**  This item
identifies the type of Data Call-In.  The date of
issuance is also date stamped.  Note the unique
identifier number (ID#) assigned by the Agency.  This
ID number must be used in the transmittal document for
any data submissions in response to this Data Call-In
Notice.

Item 4.    **ON BOTH FORMS:**  This item identifies the guideline
reference number of studies required.  These
guidelines, in addition to the requirements specified
in the Data Call-In Notice, govern the conduct of the
required studies.  Note that series 61 and 62 in
product chemistry are now listed under 40 CFR 158.155
through 158.180, Subpart c.

Item 5.    **ON BOTH FORMS:**  This item identifies the study title
associated with the guideline reference number and
whether protocols and 1, 2, or 3-year progress reports
are required to be submitted in connection with the
study.  As noted in Section III of the Data Call-In
Notice, 90-day progress reports are required for all
studies.

If an asterisk appears in Item 5, EPA has attached
information relevant to this guideline reference number
to the Requirements Status and Registrant's Response
Form.



<u>INSTRUCTIONS FOR COMPLETING THE "REQUIREMENTS STATUS AND
REGISTRANT'S RESPONSE FORMS"</u>
<u>Generic and Product Specific Data Call-In</u>

Item 6.   **ON BOTH FORMS:**  This item identifies the code
associated with the use pattern of the pesticide.   In
the case of efficacy data (product specific
requirement), the required study only pertains to
products which have the use sites and/or pests
indicated.  A brief description of each code follows:

A     Terrestrial food
B     Terrestrial feed
C     Terrestrial non-food
D     Aquatic food
E     Aquatic non-food outdoor
F     Aquatic non-food industrial
G     Aquatic non-food residential
H     Greenhouse food
I     Greenhouse non-food crop
J     Forestry
K     Residential
L     Indoor food
M     Indoor non-food
N     Indoor medical
O     Indoor residential

Item 7.   **ON BOTH FORMS:**  This item identifies the code assigned
to the substance that must be used for testing. A brief
description of each code follows:

EUP           End-Use Product
MP            Manufacturing-Use Product
MP/TGAI       Manufacturing-Use Product and Technical
                 Grade Active Ingredient
PAI           Pure Active Ingredient
PAI/M         Pure Active Ingredient and Metabolites
PAI/PAIRA     Pure Active Indredient or Pute Active
                 Ingredient Radiolabelled
PAIRA         Pure Active Ingredient Radiolabelled
PAIRA/M       Pure Active Ingredient Radiolabelled
                 and  Metabolites
PAIRA/PM      Pure Active Ingredient Radiolabelled
                 and Plant Metabolites
TEP           Typical End-Use Product
TEP ___%      Typical End-Use Product, Percent
                 Active Ingredient Specified
TEP/MET       Typical End-Use Product and Metabolites
TEP/PAI/M     Typical End-Use Product or Pure Active
                 Ingredient and Metabolites



<u>INSTRUCTIONS FOR COMPLETING THE "REQUIREMENTS STATUS AND
REGISTRANT'S RESPONSE FORMS"</u>
<u>Generic and Product Specific Data Call-In</u>

| | |
|---|---|
| TGAI | Technical Grade Active Ingredient |
| TGAI/PAI | Technical Grade Active Ingredient or Pure Active Ingredient |
| TGAI/PAIRA | Technical Grade Active Ingredient or Pure Active Ingredient Radiolabelled |
| TGAI/TEP | Technical Grade Active Ingredient or Typical End-Use Product |
| MET | Metabolites |
| IMP | Impurities |
| DEGR | Degradates |
| * | See: guideline comment |

Item 8.    This item completed by the Agency identifies the time
frame allowed for submission of the study or protocol
identified in item 5.

**ON THE GENERIC DATA FORM:**  The time frame runs from the
date of your receipt of the Data Call-In notice.

**ON THE PRODUCT SPECIFIC DATA FORM:**  The due date for
submission of product specific studies begins from the
date stamped on the letter transmitting the
Reregistration Eligibility Decision document, and not
from the date of receipt.  However, your response to
the Data Call-In itself is due 90 days from the date of
receipt.

Item 9.    **ON BOTH FORMS:**  Enter the appropriate Response Code or
Codes to show how you intend to comply with each data
requirement. Brief descriptions of each code follow.
The Data Call-In Notice contains a fuller description
of each of these options.

Option 1. **ON BOTH FORMS:**  (<u>Developing Data</u>) I will conduct a
new study and submit it within the time frames
specified in item 8 above. By indicating that I
have chosen this option, I certify that I will
comply with all the requirements pertaining to the
conditions for submittal of this study as outlined
.in the Data Call-In Notice and that I will provide
the protocols and progress reports required in
item 5 above.

Option 2. **ON BOTH FORMS:**  (<u>Agreement to Cost Share</u>) I have
entered into an agreement with one or more
registrants to develop data jointly. By indicating



<u>INSTRUCTIONS FOR COMPLETING THE "REQUIREMENTS STATUS AND
REGISTRANT'S RESPONSE FORMS"</u>
<u>Generic and Product Specific Data Call-In</u>

that I have chosen this option, I certify that I
will comply with all the requirements pertaining
to sharing in the cost of developing data as
outlined in the Data Call-In Notice.

**However, for Product Specific Data,** I
understand that this option is available for acute
toxicity or certain efficacy data **ONLY** if the
Agency indicates in an attachment to this notice
that my product is similar enough to another
product to qualify for this option. I certify that
another party in the agreement is committing to
submit or provide the required data; if the
required study is not submitted on time, my
product may be subject to suspension.

Option 3. **ON BOTH FORMS:**   (<u>Offer to Cost Share</u>) I have made
an offer to enter into an agreement with one or
more registrants to develop data jointly.  I am
also submitting a completed "Certification of
offer to Cost Share in the Development of Data"
form.  I am submitting evidence that I have made
an offer to another registrant (who has an
obligation to submit data) to share in the cost of
that data.  I am including a copy of my offer and
proof of the other registrant's receipt of that
offer.  I am identifying the party which is
committing to submit or provide the required data;
if the required study is not submitted on time, my
product may be subject to suspension. I understand
that other terms under Option 3 in the Data
Call-In Notice apply as well.

**However, for Product Specific Data,**  I
understand that this option is available only for
acute toxicity or certain efficacy data and only
if the Agency indicates in an attachment to this
Data Call-In Notice that my product is similar
enough to another product to qualify for this
option.

Option 4. **ON BOTH FORMS:**  (<u>Submitting Existing Data</u>)  I will
submit an existing study by the specified due date
that has never before been submitted to EPA.  By
indicating that I have chosen this option, I
certify that this study meets all the requirements
pertaining to the conditions for submittal of



INSTRUCTIONS FOR COMPLETING THE "REQUIREMENTS STATUS AND
REGISTRANT'S RESPONSE FORMS"
Generic and Product Specific Data Call-In

existing data outlined in the Data Call-In Notice
and I have attached the needed supporting
information along with this response.

Option 5. **ON BOTH FORMS:** (Upgrading a Study)  I will submit
by the specified due date, or will cite data to

upgrade a study that EPA has classified as
partially acceptable and potentially upgradeable.
By indicating that I have chosen this option, I
certify that I have met all the requirements
pertaining to the conditions for submitting or
citing existing data to upgrade a study described
in the Data Call-In Notice. I am indicating on
attached correspondence the Master Record
Identification Number (MRID) that EPA has assigned
to the data that I am citing as well as the MRID
of the study I am attempting to upgrade.

Option 6. **ON BOTH FORMS:** (Citing a Study)  I am citing an
existing study that has been previously classified
by EPA as acceptable, core, core minimum, or a
study that has not yet been reviewed by the
Agency. If reviewed, I am providing the Agency's
classification of the study.

**However, for Product Specific Data,**  I am
citing another registrant's study.  I understand
that this option is available **ONLY** for acute
toxicity or certain efficacy data and **ONLY** if the
cited study was conducted on my product, an
identical product or a product which the Agency
has "grouped" with one or more other products for
purposes of depending on the same data. I may also
choose this option if I am citing my own data. In
either case, I will provide the MRID or Accession
number (s).  If I cite another registrant's data,
I will submit a completed "Certification With
Respect To Data Compensation Requirements" form.

**FOR THE GENERIC DATA FORM ONLY:  The following three options
(Numbers 7, 8, and 9) are responses that apply only to the
"Requirements Status and Registrant's Response Form" for
generic data.**

Option 7. (Deleting Uses)  I am attaching an application for
amendment to my registration deleting the uses for
which the data are required.



<u>INSTRUCTIONS FOR COMPLETING THE "REQUIREMENTS STATUS AND
REGISTRANT'S RESPONSE FORMS"</u>
<u>Generic and Product Specific Data Call-In</u>

Option 8.  (<u>Low Volume/Minor Use Waiver Request</u>) I have read
the statements concerning low volume-minor use
data waivers in the Data Call-In Notice and I
request a low-volume minor use waiver of the data
requirement. I am attaching a detailed
justification to support this waiver request
including, among other things, all information
required to support the request. I understand
that, unless modified by the Agency in writing,
the data requirement as stated in the Notice
governs.

Option 9.  (<u>Request for Waiver of Data</u>) I have read the
statements concerning data waivers other than low-
volume minor-use data waivers in the Data Call-In
Notice and I request a waiver of the data
requirement. I am attaching a rationale explaining
why I believe the data requirements do not apply.
I am also submitting a copy of my current labels.
(You must also submit a copy of your Confidential
Statement of Formula if not already on file with
EPA). I understand that, unless modified by the
Agency in writing, the data requirement as stated
in the Notice governs.

**FOR PRODUCT SPECIFIC DATA:  The following option (number 7)
is a response that applies to the "Requirements Status and
Registrant's Response Form" for product specific data.**

Option 7.  (<u>Waiver Request</u>)  I request a waiver for this
study because it is inappropriate for my product.
I am attaching a complete justification for this
request, including technical reasons, data and
references to relevant EPA regulations, guidelines
or policies. [Note: any supplemental data must be
submitted in the format required by P.R. Notice
86-5]. I understand that this is my only
opportunity to state the reasons or provide
information in support of my request. If the
Agency approves my waiver request, I will not be
required to supply the data pursuant to Section
3(c)(2)(B) of FIFRA. If the Agency denies my
waiver request, I must choose a method of
meetingthe data requirements of this Notice by the
due date stated by this Notice. In this case, I
must, within 30 days-of my receipt of the Agency's
written decision, submit a revised "Requirements
Status" form specifying the option chosen. I also



<u>INSTRUCTIONS FOR COMPLETING THE "REQUIREMENTS STATUS AND
REGISTRANT'S RESPONSE FORMS"</u>
<u>Generic and Product Specific Data Call-In</u>

> understand that the deadline for submission of
> data as specified by the original Data Call-In
> notice will not change.

**Item 10.** **ON BOTH FORMS:** This item must be signed by an
authorized representative of your
company. The person signing must include
his/her title, and must initial and date
all other pages of this form.

**Item 11.** **ON BOTH FORMS:** Enter the date of signature.

**Item 12.** **ON BOTH FORMS:** Enter the name of the person EPA should
contact with questions regarding your
response.

**Item 13.** **ON BOTH FORMS:** Enter the phone number of your company
contact.

<u>NOTE:</u>    You may provide additional information that does not
fit on this form in a signed letter that accompanies
this your response. For example, you may wish to report
that your product has already been transferred to
another company or that you have already voluntarily
cancelled this product. For these cases, please supply
all relevant details so that the Agency can ensure that
its records are correct.



Form Approved
OMB No. 2070-0107
2070-0057
Approval Expires 03-31-92

# United States Environmental Protection Agency
## Washington, D.C. 20460
### REQUIREMENTS STATUS AND REGISTRANT'S RESPONSE

INSTRUCTIONS: Please type or print in ink.  Please read carefully the attached instructions and supply the information requested on this form. Use additional sheet(s) if necessary

| 1. Company name and Address | 2. Case # and Name | 3. Date and Type of DCI |
|---|---|---|
| | 0178  Glyphosate | GENERIC |
| | Chemical # and Name  103601 | |
| | isopropylamine glyphosate | FEB 1 6 1994 |

| 4. Guideline Requirement Number | 5. Study Title | Progress Reports | | | 6. Use Pattern | 7. Test Substance | 8. Time Frame | 9. Registrant Response |
|---|---|---|---|---|---|---|---|---|
| | | 1 | 2 | 3 | | | | |
| 123-1(b) | Vegetative vigor | Y | | | ABCDEFJK | TGAI | 12 mos. | |
| 201-1 | Droplet size spectrum | | | | ABCDEJ | TEP | 12 mos. | |
| 202-1 | Drift field evaluation | | | | ABCDEJ | TEP | 24 mos. | |

10. Certification

I certify that the statements made on this form and all attachments are true, accurate, and complete.
I acknowledge that any knowingly false or misleading statement may be punishable by fine, imprisonment or both under applicable law.

Signature and Title of Company's Authorized Representative

| 12. Name of Company Contact | 11. Date |
|---|---|
| | 13. Phone Number |



Form Approved
OMB No. 2070-0107
2070-0057
Approval Expires 03-31-94

# United States Environmental Protection Agency
## Washington, D. C. 20460
### REQUIREMENTS STATUS AND REGISTRANT'S RESPONSE

INSTRUCTIONS: Please type or print in ink. Please read carefully the attached instructions and supply the information requested on this form. Use additional sheet(s) if necessary.

**1. Company name and Address**
SAMPLE COMPANY
1234 MAIN STREET
ANYWHERE, USA 54321

**2. Case # and Name**
0178  Glyphosate

EPA Reg. No. 70-269

**3. Date and Type of DCI**
PRODUCT SPECIFIC
ID# 70-RD-3263
FEB 16 1994

| 4. Guideline Requirement Number | 5. Study Title | Progress Reports 1 | 2 | 3 | 6. Use Pattern | 7. Test Substance | 8. Time Frame | 9. Registrant's Response |
|---|---|---|---|---|---|---|---|---|
| | **Prod Chem - Regular Chemical** | | | | | | | |
| 61-1 | Product Identity & composition (1) | | | | | | | |
| 61-2(a) | Descriptn starting materials; (1,2) products & formulatn process | | | | ABCDEFGHIJKLMNO | MP/EP | 8 mos. | |
| | | | | | ABCDEFGHIJKLMNO | MP/EP and TGAI | 8 mos. | |
| 61-2(b) | Discussion of formation of (1,3) impurities | | | | ABCDEFGHIJKLMNO | MP/EP and TGAI | 8 mos. | |
| 62-1 | Preliminary analysis (1,4) | | | | ABCDEFGHIJKLMNO | MP/EP and TGAI | 8 mos. | |
| 62-2 | Certification of limits (1,5) | | | | ABCDEFGHIJKLMNO | MP/EP | 8 mos. | |
| 62-3 | Analytical method (1) | | | | ABCDEFGHIJKLMNO | MP/EP | 8 mos. | |
| 63-3 | Physical state | | | | ABCDEFGHIJKLMNO | MP/EP and TGAI | 8 mos. | |
| 63-5 | Melting point | | | | ABCDEFGHIJKLMNO | TGAI | 8 mos. | |
| 63-6 | Boiling point | | | | ABCDEFGHIJKLMNO | TGAI | 8 mos. | |
| 63-7 | Density (6) | | | | ABCDEFGHIJKLMNO | MP/EP and TGAI | 8 mos. | |
| 63-8 | Solubility (7) | | | | ABCDEFGHIJKLMNO | TGAI/PAI | 8 mos. | |
| 63-9 | Vapor pressure | | | | ABCDEFGHIJKLMNO | TGAI/PAI | 8 mos. | |

**10. Certification**

I certify that the statements made on this form and all attachments are true, accurate, and complete. I acknowledge that any knowingly false or misleading statement may be punishable by fine, imprisonment or both under applicable law.

Signature and Title of Company's Authorized Representative _____

**11. Date**

**12. Name of Company Contact**

**13. Phone Number**



# United States Environmental Protection Agency
## Washington, D. C. 20460
### REQUIREMENTS STATUS AND REGISTRANT'S RESPONSE

Form Approved

OMB No. 2070-0107
2070-0057

Approval Expires 03-31-96

INSTRUCTIONS: Please type or print in ink.  Please read carefully the attached instructions and supply the information requested on this form.
Use additional sheet(s) if necessary.

| | | |
|---|---|---|
| **1. Company name and Address**<br>SAMPLE COMPANY<br>1234 MAIN STREET<br>ANYWHERE, USA  54321 | **2. Case # and Name**<br>0178  Glyphosate<br><br>EPA Reg. No.  70-269 | **3. Date and Type of DCI**<br>PRODUCT SPECIFIC<br>ID# 70-RD-3263<br>FEB 1 6 1994 |

| 4. Guideline Requirement Number | 5. Study Title | | Progress Reports | | | 6. Use Pattern | 7. Test Substance | 8. Time Frame | 9. Registrant Response |
|---|---|---|---|---|---|---|---|---|---|
| | | | 1 | 2 | 3 | | | | |
| 63-10 | Dissociation constant | (8) | | | | ABCDEFGHIJKLMNO | TGAI/PAI | 8 mos. | |
| 63-11 | Octanol/water partition coefficient | | | | | ABCDEFGHIJKLMNO | PAI | 8 mos. | |
| 63-12 | pH | (9) | | | | ABCDEFGHIJKLMNO | MP/EP and TGAI | 8 mos. | |
| 63-13 | Stability | | | | | ABCDEFGHIJKLMNO | MP/EP | 8 mos. | |
| 63-14 | Oxidizing or reducing action | (10) | | | | ABCDEFGHIJKLMNO | MP/EP | 8 mos. | |
| 63-15 | Flammability | (11) | | | | ABCDEFGHIJKLMNO | MP/EP | 8 mos. | |
| 63-16 | Explodability | (12) | | | | ABCDEFGHIJKLMNO | MP/EP | 8 mos. | |
| 63-17 | Storage stability | | | | | ABCDEFGHIJKLMNO | MP/EP | 8 mos. | |
| 63-18 | Viscosity | (13) | | | | ABCDEFGHIJKLMNO | MP/EP | 8 mos. | |
| 63-19 | Miscibility | (14) | | | | ABCDEFGHIJKLMNO | MP/EP | 8 mos. | |
| 63-20 | Corrosion characteristics | | | | | ABCDEFGHIJKLMNO | MP/EP | 8 mos. | |
| 63-21 | Dielectric breakdown voltage | (15) | | | | ABCDEFGHIJKLMNO | MP/EP | 8 mos. | |
| | **Acute Toxic - Regular Chemical** | | | | | | | | |
| 81-1 | Acute oral toxicity-rat | (1,36,37) | | | | ABCDEFGHIJKLMNO | MP/EP and TGAI | 8 mos. | |
| 81-2 | Acute dermal toxicity-rabbit/rat | (1,2,37) | | | | ABCDEFGHIJKLMNO | MP/EP and TGAI | 8 mos. | |
| 81-3 | Acute inhalation toxicity-rat | (3) | | | | ABCDEFGHIJKLMNO | MP/EP and TGAI | 8 mos. | |
| 81-4 | Primary eye irritation-rabbit | (2) | | | | ABCDEFGHIJKLMNO | MP/EP | 8 mos. | |
| 81-5 | Primary dermal irritation | (1,2) | | | | ABCDEFGHIJKLMNO | MP/EP | 8 mos. | |

Initial to indicate certification as to information on this page
(full text of certification is on page one).

Date

# United States Environmental Protection Agency
## Washington, D. C. 20460
## REQUIREMENTS STATUS AND REGISTRANT'S RESPONSE

Form Approved
OMB No. 2070-0107
       2070-0057
Approval Expires 03-31-95

INSTRUCTIONS: Please type or print in ink. Please read carefully the attached instructions and supply the information requested on this form. Use additional sheet(s) if necessary.

| 1. Company name and Address | 2. Case # and Name | 3. Date and Type of DCI |
|---|---|---|
| SAMPLE COMPANY<br>1234 MAIN STREET<br>ANYWHERE, USA 54321 | 0178 Glyphosate<br><br>EPA Reg. No. 70-269 | PRODUCT SPECIFIC<br>ID# 70-RD-3263<br><br>FEB 1 6 1994 |

| 4. Guideline Requirement Number | 5. Study Title | Progress Reports | | | 6. Use Pattern | 7. Test Substance | 8. Time Frame | 9. Registrant's Response |
|---|---|---|---|---|---|---|---|---|
| | | 1 | 2 | 3 | | | | |
| 81-6 | Dermal sensitization (4) | | | | ABCDEFGHIJKLMNO | MP/EP | 8 mos. | |

Initial to indicate certification as to information on this page (full text of certification is on page one).

Date

United States Environmental Protection Agency
Washington, D. C. 20460

## FOOTNOTES AND KEY DEFINATIONS FOR GUIDELINE REQUIREMENTS

### Case # and Name:  0178   Glyphosate

Key: MP = manufacturing-use product; EP = end-use product; provided formulators purchase their active ingredient(s) from a registered source, they need not submit or cite data pertaining to the purchased product.[NOTE: If a product is a 100 percent repackage of another registered product that is purchased, and any use for the product does not differ from those of the purchased and registered source, users are not subject to any data requirements identified in the tables.]; TEP = typical end-use product; TGAI = technical grade of the active ingredient; PAI = "pure" active ingredient; PAIRA = "pure" active ingredient, radiolabeled.

Use Categories Key:

| | | |
|---|---|---|
| A - Terrestrial food crop | B - Terrestrial food feed crop | C - Terrestrial nonfood crop | D - Aquatic food crop | E - Aquatic nonfood outdoor |
| F - Aquatic nonfood Industrial | G - Aquatic nonfood residential | H - Greenhouse food crop | I - Greenhouse nonfood crop | J - Forestry |
| K - Residential outdoor | L - Indoor nonfood | M - Indoor nonfood | N - Indoor Medical | O - Indoor residential |

**Footnotes:**  [The following notes are referenced in column two (5. Study Title) of the REQUIREMENTS STATUS AND REGISTRANT'S RESPONSE form.]

### Prod Chem - Regular Chemical

1   Requirements pertaining to product identity, composition, analysis, and certification of ingredients are detailed further in the following sections:  *158.155 for product identity and composition (61-1);  *158.160, 158.162, and 158.165 for description of starting materials and manufacturing process (61-2);  *158.167 for discussion of formation of impurities (61-3);  *158.170 for preliminary analysis (62-1);  *158.175 for certification of limits (62-2); and  *158.180 for enforcement analytical methods (62-3).

2   A schematic diagram and/or brief description of the production process will suffice if the pesticide is not already under full scale production and an experimental use permit is being sought.

3   If the pesticide is not already under full scale production and an experimental use permit is sought, a discussion of unintentional ingredients shall be submitted to the extent this information is available.

4   To support registration of an MP or EP, whether produced by an integrated system or not, the technical grade of Active Ingredient must be analyzed.  If the technical grade of Active Ingredient cannot be isolated, a statement of composition of the practical equivalent of the technical grade of Active Ingredient must be submitted. Data on EPs or MPs will be required on a case-by-case basis.

5   Certified limits are not required for inert ingredients in products proposed for experimental use.

6   Required if technical chemical is solid at room temperature.

7   Required if technical chemical is liquid at room temperature.

8   Required if technical chemical is organic and non-polar.

9   Required if test substances are dispersible with water.

10   Required if product contains an oxidizing or reducing agent.

11   Required if product contains combustible liquids.

12   Required if product is potentially explosive.

13   Required if product is a liquid.

14   Required if product is an emulsifiable liquid and is to be diluted with petroleum solvents.

15   Required if end-use product is liquid and is to be used around electrical equipment.

### Acute Toxic - Regular Chemical

1   Not required if test material is a gas or highly volatile.

2   Not required if test material is corrosive to skin or has pH less than 2 or greater than 11.5; such a product will be classified as Toxicity Category I on the basis of potential eye and dermal irritation effects.

United States Environmental Protection Agency
Washington, D. C. 20460

FOOTNOTES AND KEY DEFINATIONS FOR GUIDELINE REQUIREMENTS

Case # and Name:  0178   Glyphosate

## Footnotes (cont.):

3  Required if the product consists of, or under conditions of use will result in, an inhalable material (e. g., gas, volatile substances, or aerosol/particulate).

4  Required unless repeated dermal exposure does not occur under conditions of use.

36  Special testing (acute, subchronic, and/or chronic) is required for organophospates, and may be required for other cholinesterase inhibitors and other pesticides which have demonstrated a potential to adversely affect the visual system.  Registrants should consult with the agency for development of protocols and methodology prior to initiation of studies.

37  Testing of the EP dilution is required if it can be reasonably anticipated that the results of such testing may meet the criteria for restriction to use by certified applicators specified in 40 CFR 152.170(b) or the criteria for initiation of special review specified in 40 CFR 154.7 (a)(1).

# Attachment 4

## EPA Grouping of End Use Products for meeting Acute Toxicology Data Requirements

**EPA'S BATCHING OF GLYPHOSATE PRODUCTS FOR MEETING ACUTE TOXICITY DATA REQUIREMENTS FOR REREGISTRATION**

In an effort to reduce the time, resources and number of animals needed to fulfill the acute toxicity data requirements for reregistration of products containing the active ingredient glyphosate, the Agency has batched products which can be considered similar for purposes of acute toxicity. Factors considered in the sorting process include each product's active and inert ingredients (identity, percent composition and biological activity), type of formulation (e.g., emulsifiable concentrate, aerosol, wettable powder, granular, etc.), and labeling (e.g., signal word, use classification, precautionary labeling, etc.).  Note that the Agency is not describing batched products as "substantially similar" since some products within a batch may not be considered chemically similar or have identical use patterns.

Batching has been accomplished using the readily available information described above, and frequently acute toxicity data on individual products has been found to be incomplete. Notwithstanding the batching process, the Agency reserves the right to require, at any time, acute toxicity data for an individual product should the need arise.

Registrants of products within a batch may choose to cooperatively generate, submit or cite a single battery of six acute toxicological studies to represent all the products within that batch. It is the registrants' option to participate in the process with all other registrants, only some of the other registrants, or only their own products within a batch, or to generate all the required acute toxicological studies for each of their own products.  If a registrant chooses to generate the data for a batch, he/she must use one of the products within the batch as the test material.  If a registrant chooses to rely upon previously submitted acute toxicity data, he/she may do so provided that the data base is complete and valid by today's standards (see acceptance criteria attached), the formulation tested is considered by EPA to be similar for acute toxicity, and the formulation has not been significantly altered since submission and acceptance of the acute toxicity data. Regardless of whether new data is generated or existing data is referenced, registrants must clearly identify the test material by EPA Registration Number.

In deciding how to meet the product specific data requirements, registrants must follow the directions given in the Data Call-In Notice and its attachments appended to the RED. The DCI Notice contains two response forms which are to be completed and submitted to the Agency within 90 days of receipt.  The first form, "Data Call-In Response," asks whether the registrant will meet the data requirements for each product.  The second form, "Requirements Status and Registrant's Response," lists the



product specific data required for each product, including the standard six acute toxicity tests. A registrant who wishes to participate in a batch must decide whether he/she will provide the data or depend on someone else to do so. If a registrant supplies the data to support a batch of products, he/she must select one of the following options: Developing Data (Option 1), Submitting an Existing Study (Option 4), Upgrading an Existing Study (Option 5) or Citing an Existing Study (Option 6). If a registrant depends on another's data, he/she must choose among: Cost Sharing (Option 2), Offers to Cost Share (Option 3) or Citing an Existing Study (Option 6). If a registrant does not want to participate in a batch, the choices are Options 1, 4, 5 or 6. However, a registrant should know that choosing not to participate in a batch does not preclude other registrants in the batch from citing his/her studies and offering to cost share (Option 3) those studies.

Fifty-six products were found which contain glyphosate as the active ingredient. The products have been placed into five batches and a "no batch" category in accordance with the active and inert ingredients, type of formulation and current labeling. Table 1 identifies the products in each batch. Table 2 lists the twenty-seven products which have been placed in the "no batch" category.

The Agency requires that products in batch four include separate primary eye irritation studies for each product within these batches. The remaining acute toxicity requirements for the products in batch four may be satisfied by one of the procedures described above.



Table 1

| Batch | EPA Reg. No. | % Glyphosate | Formulation Type |
|-------|--------------|--------------|------------------|
| 1 | 70-269 | 0.96 | Liq |
| | 239-2467 | 0.5 | Liq |
| | 524-330 | 0.96 | Liq |
| | 7401-304 | 0.5 | Liq |
| | 7401-307 | 0.5 | Liq |
| | 7401-357 | 1.0 | Liq |
| | 7401-400 | 1.0 | Liq |
| | 7401-401 | 0.5 | Liq |
| | 7401-402 | 0.5 | Liq |
| | 7401-403 | 0.5 | Liq |
| | 10370-282 | 0.96 | Liq |
| | 10583-14 | 0.96 | Liq |
| | 46515-5 | 0.96 | Liq |
| | 56644-64 | 0.96 | Liq |
| 2 | 19713-320 | 0.96 | Aerosol |
| | 46515-7 | 0.96 | Aerosol |
| 3 | 70-284 | 5.0 | Liq |
| | 7401-306 | 5.0 | Liq |
| | 7401-404 | 5.0 | Liq |
| | 34911-25 | 5.0 | Liq |
| | 46515-3 | 5.0 | Liq |
| | 56644-48 | 5.0 | Liq |
| 4 | 524-339 | 41.0 | Liq |
| | 524-454 | 41.0 | Liq |
| 5 | 524-318 | 53.5 | Liq |
| | 524-343 | 53.8 | Liq |
| | 524-350 | 53.8 | Liq |
| | 19713-364 | 53.8 | Liq |



Table II lists products that were either considered not to be similar or the Agency lacked sufficient information for decision making and were not placed in any batch. Registrants of these products are responsible for meeting the acute toxicity data requirements separately for each product.

Table 2 (No batch)

| EPA Reg. No. | % Glyphosate and other actives | Formulation Type |
|---|---|---|
| 239-2469 | Glyphosate 5.0 | Liq |
| 239-2509 | Glyphosate 0.5, Acifluorfen 0.12 | Liq |
| 239-2516 | Glyphosate 0.25, Oxyfluorfen 0.25 | Liq |
| 239-2596 | Glyphosate 0.75 | Aerosol |
| 524-308 | Glyphosate 41.0 | Liq |
| 524-326 | Glyphosate 41.5 | Liq |
| 524-332 | Glyphosate 75.0 | Solid |
| 524-333 | Glyphosate 62.0 | Liq |
| 524-341 | Glyphosate 14.8, Alachlor 27.6 | Liq |
| 524-370 | Glyphosate 18.0 | Liq |
| 524-376 | Glyphosate 13.3, 2,4-D 11.1 | Liq |
| 524-382 | Glyphosate 28.6 | Liq |
| 524-390 | Glyphosate 16.5, Dicamba 7.0 | Liq |
| 524-420 | Glyphosate 96.3 | Solid |
| 524-421 | Glyphosate 76.0 | Solid |
| 524-435 | Glyphosate 83.5 | Capsular |
| 524-439 | Glyphosate 7.7, Oxadiazon 14.9 | Liq |
| 524-440 | Glyphosate 25.1 | Liq |
| 524-445 | Glyphosate 41.0 | Liq |
| 524-449 | Glyphosate 12.4, Oryzalin 11.8 | Liq |
| 524-450 | Glyphosate 15.8 | Liq |
| 524-451 | Glyphosate 0.96 | Liq |
| 524-452 | Glyphosate 60.0 | Solid |
| 524-432 | Glyphosate 18.3 | Liq |
| 7401-405 | Glyphosate 10.0 | Liq |
| 935-48 | Glyphosate 12.9, 2,4-D 20.6 | Liq |
| 10370-283 | Glyphosate 10.0 | Liq |
| 10583-15 | Glyphosate 8.2 | Liq |

# Attachment 5

### EPA Acceptance Criteria

## SUBDIVISION D

| Guideline | Study Title |
|-----------|-------------|
| Series 61 | Product Identity and Composition |
| Series 62 | Analysis and Certification of Product Ingredients |
| Series 63 | Physical and Chemical Characteristics |



**61 Product Identity and Composition**

ACCEPTANCE CRITERIA

Does your study meet the following acceptance criteria?

1. ____ Name of technical material tested (include product name and trade name, if appropriate).

2. ____ Name, nominal concentration, and certified limits (upper and lower) for each active ingredient and each intentionally-added inert ingredient.

3. ____ Name and upper certified limit for each impurity or each group of impurities present at $\geq$ 0.1% by weight and for certain toxicologically significant impurities (e.g., dioxins, nitrosamines) present at <0.1%.

4. ____ Purpose of each active ingredient and each intentionally-added inert.

5. ____ Chemical name from Chemical Abstracts index of Nomenclature and Chemical Abstracts Service (CAS) Registry Number for each active ingredient and, if available, for each intentionally-added inert.

6. ____ Molecular, structural, and empirical formulas, molecular weight or weight range, and any company assigned experimental or internal code numbers for each active ingredient.

7. ____ Description of each beginning material in the manufacturing process.
   ____ EPA Registration Number if registered; for other beginning materials,          the          following:

   ____ Name and address of manufacturer or supplier.
   ____ Brand name, trade name or commercial designation.
   ____ Technical specifications or data sheets by which manufacturer or supplier describes composition, properties or toxicity.

8. ____ Description of manufacturing process.
   ____ Statement of whether batch or continuous process.
   ____ Relative amounts of beginning materials and order in which they are added.
   ____ Description of equipment.
   ____ Description of physical conditions (temperature, pressure, humidity) controlled in each step and the parameters that are maintained.
   ____ Statement of whether process involves intended chemical reactions.
   ____ Flow chart with chemical equations for each intended chemical reaction.
   ____ Duration of each step of process.
   ____ Description of purification procedures.
   ____ Description of measures taken to assure quality of final product.

9. ____ Discussion of formation of impurities based on established chemical theory addressing (1) each impurity which may be present at $\geq$ 0.1% or was found at $\geq$ 0.1% by product analyses and (2) certain toxicologically significant impurities (see #3).



**62 Analysis and Certification of Product Ingredients**

## ACCEPTANCE CRITERIA

The following criteria apply to the technical grade of the active ingredient being reregistered. Use a table to present the information in items 6, 7, and 8.

Does your study meet the following acceptance criteria?

1. ____ Five or more representative samples (batches in case of batch process) analyzed for each active ingredient and all impurities present at $\geq$ 0.1%.

2. ____ Degree of accountability or closure $\geq$ ca 98%.

3. ____ Analyses conducted for certain trace toxic impurities at lower than 0.1% (examples, nitrosamines in the case of products containing dinitroanilines or containing secondary or tertiary amines/alkanolamines plus nitrites; polyhalogenated dibenzodioxins and dibenzofurans). [Note that in the case of nitrosamines both fresh and stored samples must be analyzed.].

4. ____ Complete and detailed description of each step in analytical method used to analyze above samples.

5. ____ Statement of precision and accuracy of analytical method used to analyze above samples.

6. ____ Identities and quantities (including mean and standard deviation) provided for each analyzed ingredient.

7. ____ Upper and lower certified limits proposed for each active ingredient and intentionally added inert along with explanation of how the limits were determined.

8. ____ Upper certified limit proposed for each impurity present at $\geq$ 0.1% and for certain toxicologically significant impurities at <0.1% along with explanation of how limit determined.

9. ____ Analytical methods to verify certified limits of each active ingredient and impurities (latter not required if exempt from requirement of tolerance or if generally recognized as safe by FDA) are fully described.

10. ____ Analytical methods (as discussed in #9) to verify certified limits validated as to their precision and accuracy.



## 63 Physical and Chemical Characteristics

### ACCEPTANCE CRITERIA

The following criteria apply to the technical grade of the active ingredient being reregistered.

Does your study meet the following acceptance criteria?

63-2 Color

____ Verbal description of coloration (or lack of it)
____ Any intentional coloration also reported in terms of Munsell color system

63-3 Physical State

____ Verbal description of physical state provided using terms such as "solid, granular, volatile liquid"
____ Based on visual inspection at about 20-25° C

63-4 Odor

____ Verbal description of odor (or lack of it) using terms such as "garlic-like, characteristic of aromatic compounds"
____ Observed at room temperature

63-5 Melting Point

____ Reported in °C
____ Any observed decomposition reported

63-6 Boiling Point

____ Reported in °C
____ Pressure under which B.P. measured reported
____ Any observed decomposition reported

63-7 Density, Bulk Density, Specific Gravity

____ Measured at about 20-25° C
____ Density of technical grade active ingredient reported in g/ml <u>or</u> the specific gravity of liquids reported with reference to water at 20° C. [Note: <u>Bulk</u> density of registered products may be reported in lbs/$ft^3$ or lbs/gallon.]

63-8 Solubility

____ Determined in distilled water and representative polar and non-polar solvents, including those used in formulations and analytical methods for the pesticide
____ Measured at about 20-25° C
____ Reported in g/100 ml (other units like ppm acceptable if sparingly soluble)

63-9 Vapor Pressure

____ Measured at 25° C (or calculated by extrapolation from measurements made at higher temperature if pressure too low to measure at 25° C)
____ Experimental procedure described
____ Reported in mm Hg (torr) or other conventional units

63-10 Dissociation Constant

____ Experimental method described
____ Temperature of measurement specified (preferably about 20-25°C)



63-11 Octanol/water Partition Coefficient
    \_\_\_\_    Measured at about 20-25° C
    \_\_\_\_    Experimentally determined and description of procedure provided (preferred method-45 Fed. Register 77350)
    \_\_\_\_    Data supporting reported value provided

63-12 pH
    \_\_\_\_    Measured at about 20-25° C
    \_\_\_\_    Measured following dilution or dispersion in distilled water

63-13 Stability
    \_\_\_\_    Sensitivity to metal ions and metal determined
    \_\_\_\_    Stability at normal and elevated temperatures
    \_\_\_\_    Sensitivity to sunlight determined



## SUBDIVISION F

| Guideline | Study Title |
|---|---|
| 81-1 | Acute Oral Toxicity in the Rat |
| 81-2 | Acute Dermal Toxicity in the Rat, Rabbit or Guinea Pig |
| 81-3 | Acute Inhalation Toxicity in the Rat |
| 81-4 | Primary Eye Irritation in the Rabbit |
| 81-5 | Primary Dermal Irritation Study |
| 81-6 | Dermal Sensitization in the Guinea Pig |

## 81-1 Acute Oral Toxicity in the Rat

### ACCEPTANCE CRITERIA

Does your study meet the following acceptance criteria?

1.____ Identify material tested (technical, end-use product, etc).
2.____ At least 5 young adult rats/sex/group.
3.____ Dosing, single oral may be administered over 24 hrs.
4.*___ Vehicle control if other than water.
5.____ Doses tested, sufficient to determine a toxicity category or a limit dose (5000 mg/kg).
6.____ Individual observations at least once a day.
7.____ Observation period to last at least 14 days, or until all test animals appear normal whichever is longer.
8.____ Individual daily observations.
9.____ Individual body weights.
10.____ Gross necropsy on all animals.

Criteria marked with an * are supplemental and may not be required for every study.



**81-2  Acute Dermal toxicity in the Rat, Rabbit or Guinea Pig**

### ACCEPTANCE CRITERIA

Does your study meet the following acceptance criteria?

1. _____ Identify material tested (technical, end-use product, etc).
2. _____ At least 5 animals/sex/group.
3. *_____ Rats 200-300 gm, rabbits 2.0-3.0 kg or guinea pigs 350-450 gm.
4. _____ Dosing, single dermal.
5. _____ Dosing duration at least 24 hours.
6. *_____ Vehicle control, only if toxicity of vehicle is unknown.
7. _____ Doses tested, sufficient to determine a toxicity category or a limit dose (2000 mg/kg).
8. _____ Application site clipped or shaved at least 24 hours before dosing.
9. _____ Application site at least 10% of body surface area.
10. _____ Application site covered with a porous nonirritating cover to retain test material and to prevent ingestion.
11. _____ Individual observations at least once a day.
12. _____ Observation period to last at least 14 days.
13. _____ Individual body weights.
14. _____ Gross necropsy on all animals.

Criteria marked with an * are supplemental and may not be required for every study.



## 81-3 Acute Inhalation Toxicity in the Rat

### ACCEPTANCE CRITERIA

Does your study meet the following acceptance criteria?

1. ____ Identify material tested (technical, end-use product, etc).
2. ____ Product is a gas, a solid which may produce a significant vapor hazard based on toxicity and expected use or contains particles of inhalable size for man (aerodynamic diameter 15 $\mu$m or less).
3. ____ At least 5 young adult rats/sex/group.
4. ____ Dosing, at least 4 hours by inhalation.
5. ____ Chamber air flow dynamic, at least 10 air changes/hour, at least 19% oxygen content.
6. ____ Chamber temperature, 22° C ($\pm$2°), relative humidity 40-60%.
7. ____ Monitor rate of air flow.
8. ____ Monitor actual concentrations of test material in breathing zone.
9. ____ Monitor aerodynamic particle size for aerosols.
10. ___ Doses tested, sufficient to determine a toxicity category or a limit dose (5 mg/L actual concentration of respirable substance).
11. ___ Individual observations at least once a day.
12. ___ Observation period to last at least 14 days.
13. ___ Individual body weights.
14. ___ Gross necropsy on all animals.



### 81-4  Primary Eye Irritation in the Rabbit

## ACCEPTANCE CRITERIA

Does your study meet the following acceptance criteria?

1.____  Identify material tested (technical, end-use product, etc).
2.____  Study not required if material is corrosive, causes severe
        dermal irritation or has a pH of $\leq 2$ or $\geq 11.5$.
3.____  6 adult rabbits.
4.____  Dosing, instillation into the conjunctival sac of one eye
        per animal.
5.____  Dose, 0.1 ml if a liquid; 0.1 ml or not more than 100 mg if a solid, paste or particulate substance.
6.____  Solid or granular test material ground to a fine dust.
7.____  Eyes not washed for at least 24 hours.
8.____  Eyes examined and graded for irritation before dosing and
        at 1, 24, 48 and 72 hr, then daily until eyes are normal
        or 21 days (whichever is shorter).
9.*____  Individual daily observations.

Criteria marked with an * are supplemental and may not be required for every study.



## 81-5 Primary Dermal Irritation Study

### ACCEPTANCE CRITERIA

Does your study meet the following acceptance criteria?

1. ____ Identify material tested (technical, end-use product, etc).
2. ____ Study not required if material is corrosive or has a pH of $\leq 2$ or $\geq 11.5$.
3. ____ 6 adult animals.
4. ____ Dosing, single dermal.
5. ____ Dosing duration 4 hours.
6. ____ Application site shaved or clipped at least 24 hours prior to dosing.
7. ____ Application site approximately 6 cm².
8. ____ Application site covered with a gauze patch held in place with nonirritating tape.
9. ____ Material removed, washed with water, without trauma to application site.
10. ___ Application site examined and graded for irritation at 1, 24, 48 and 72 hr, then daily until normal or 14 days (whichever is shorter).
11. * ___ Individual daily observations.

Criteria marked with an * are supplemental and may not be required for every study.



## 81-6  Dermal Sensitization in the Guinea Pig

### ACCEPTANCE CRITERIA

Does your study meet the following acceptance criteria?

1. ___ Identify material tested (technical, end-use product, etc).
2. ___ Study not required if material is corrosive or has a
pH of $\leq 2$ or $\geq 11.5$.
3. ___ One of the following methods is utilized:
_____ Freund's complete adjuvant test
_____ Guinea pig maximization test
_____ Split adjuvant technique
_____ Buehler test
_____ Open epicutaneous test
_____ Mauer optimization test
_____ Footpad technique in guinea pig.
4. ___ Complete description of test.
5. *__ Reference for test.
6. ___ Test followed essentially as described in reference document.
7. ___ Positive control included (may provide historical data conducted within the last 6 months).

Criteria marked with an * are supplemental and may not be required for every study.



# Attachment 6

**List of all Registrants sent this DCI**

## List of All Registrants Sent This Data Call-In Notice

Case # and Name
0178  Glyphosate
Chemical # and Name
103601  Isopropylamine glyphosate ( N-(phosphonomethyl)gly

| Company Number | Company Name | Additional Name | Address | City & State | Zip |
|---|---|---|---|---|---|
| 000070 | WILBUR-ELLIS COMPANY | | BOX 16458 | FRESNO CA | 93755 |
| 000239 | CHEVRON CHEMICAL CO | ORTHO CONSUMER PRODUCTS DIVISION | 940 HENSLEY ST | RICHMOND CA | 94804 |
| 000524 | MONSANTO CO | AGENT FOR: MONSANTO AGRICULTURAL C | 700 14TH ST, N.W. SUITE 1100 | WASHINGTON DC | 20005 |
| 000935 | OCCIDENTAL CHEMICAL CORPORATION | | DEVELOPMENT CENTER, V-81 BOX 344 | NIAGARA FALLS NY | 14302 |
| 007401 | VOLUNTARY PURCHASING GROUP, INC. | | P. O. BOX 460 | BONHAM TX | 75418 |
| 010370 | ROUSSEL UCLAF CORP | | 95 CHESTNUT RIDGE RD | MONTVALE NJ | 07645 |
| 010583 | LUNDAL ASSOCIATES INC | | 7493 E TIMBERLANE COURT. | SCOTTSDALE AZ | 85258 |
| 019713 | DREXEL CHEMICAL CO | | BOX 9306 | MEMPHIS TN | 38109 |
| 034911 | HI-YIELD CHEMICAL COMPANY | | BOX 460 | BONHAM TX | 75418 |
| 046515 | CELEX CORPORATION | | 377 AMELIA ST. | PLYMOUTH MI | 48170 |
| 056644 | SECURITY PRODUCTS COMPANY OF DELAW | | BOX 59084 | MINNEAPOLIS MN | 55459 |
| 066459 | KAUAI TARO GROWERS ASSOCIATION | | BOX 427 | HANALEI HI | 96714 |

# Attachment 7

### Cost Share/Data Compensation Forms



| United States Environmental Protection Agency<br>Washington, DC 20460<br>**CERTIFICATION WITH RESPECT TO**<br>**DATA COMPENSATION REQUIREMENTS** | Form Approved<br>OMB No. 2070-0107<br>2070-0057<br>Approval Expires 3-31-9 |
|---|---|

Public reporting burden for this collection of information is estimated to average 15 minutes per response, including time for reviewing instructions, searching existing data sources, gathering and maintaining the data needed, and completing and reviewing the collection of information. Send comments regarding the burden estimate or any other aspect of this collection of information, including suggestions for reducing this burden, to Chief, Information Policy Branch, PM-223, U.S. Environmental Protection Agency, 401 M St., S.W., Washington, DC 20460; and to the Office of Management and Budget, Paperwork Reduction Project (2070-0106), Washington, DC 20503.

**Please fill in blanks below.**

| Company Name | Company Number |
|---|---|
| Chemical Name | EPA Chemical Number |

I Certify that:

1. For each study cited in support of registration or reregistration under the Federal Insecticide, Fungicide and Rodenticide Act (FIFRA) that is an exclusive use study, I am the original data submitter, or I have obtained the written permission of the original data submitter to cite that study.

2. That for each study cited in support of registration or reregistration under FIFRA that is NOT an exclusive use study, I am the original data submitter, or I have obtained the written permission of the original data submitter, or I have notified in writing the company(ies) that submitted data I have cited and have offered to: (a) Pay compensation for those data in accordance with sections 3(c)(1)(D) and 3(c)(2)(D) of FIFRA; and (b) Commence negotiation to determine which data are subject to the compensation requirement of FIFRA and the amount of compensation due, if any. The companies I have notified are: (check one)

   [ ] All companies on the data submitters' list for the active ingredient listed on this form (Cite-All Method or Cite-All Option under the Selective Method). (Also sign the General Offer to Pay below.)

   [ ] The companies who have submitted the studies listed on the back of this form or attached sheets, or indicated on the attached "Requirements Status and Registrants' Response Form."

3. That I have previously complied with section 3(c)(1)(D) of FIFRA for the studies I have cited in support of registration or reregistration under FIFRA.

| Signature | Date |
|---|---|
| Name and Title (Please Type or Print) | |

**GENERAL OFFER TO PAY:** I hereby offer and agree to pay compensation to other persons, with regard to the registration or reregistration of my products, to the extent required by FIFRA sections 3(c)(1)(D) and 3(c)(2)(D).

| Signature | Date |
|---|---|
| Name and Title (Please Type or Print) | |

EPA Form 8570-31 (4-90)



**United States Environmental Protection Agency**
**Washington, DC 20460**
## CERTIFICATION OF OFFER TO COST
## SHARE IN THE DEVELOPMENT OF DATA

Form Approved

OMB No, 2070-0107
                2070-0057
Approval Expires  3-31-96

Public reporting burden for this collection of information is estimated to average 15 minutes per response, including time for reviewing instructions, searching existing data sources, gathering and maintaining the data needed, and completing and reviewing the collection of information. Send comments regarding the burden estimate or any other aspect of this collection of information, including suggestions for reducing this burden, to Chief, Information Policy Branch, PM-223, U.S. Environmental Protection Agency, 401 M St., S.W., Washington, DC 20460; and to the Office of Management and Budget, Paperwork Reduction Project (2070-0106), Washington, DC 20503.

**Please fill in blanks below.**

| Company Name | Company Number |
|---|---|
| Chemical Name | EPA Chemical Number |

**I Certify that:**

My company is willing to develp and submit the data required by EPA under the authority of the Federal Insecticide, Fungicide and Rodenticide Act (FIFRA), if necessary. However, my company would prefer to enter into an agreement with one or more registrants to develop jointly or share in the cost of developing data.

My firm has offered in writing to enter into such an agreement. That offer was irrevocable and included an offer to be bound by arbitration decision under section 3(c)(2)(B)(iii) of FIFRA if final agreement on all terms could not be reached otherwise. This offer was made to the following firm(s) on the following date(s):

| Name of Firm(s) | Date of Offer |
|---|---|
| | |

**Certification:**

I certify that I am duly authorized to represent the company name above, and that the statements that I have made on this form and all attachments therein are true, accurate, and complete. I acknowledge that any knowingly false or misleading statement may be punishable by fine or imprisonment or both under applicable law.

| Signature of Company's Authorized Representative | Date |
|---|---|
| Name and Title (Please Type or Print) | |

EPA Form 8570-32 (5-91)          Replaces EPA Form 8580-6, which is obsolete



# EXHIBIT 5

Docket Number EPA-HQ-OPP-2009-0361
www.regulations.gov



# Glyphosate

# Interim Registration Review Decision
# Case Number 0178

# January 2020

Approved by: _____

Elissa Reaves, Ph.D.
Acting Director
Pesticide Re-evaluation Division

Date:  ____1-22-2020____

Docket Number EPA-HQ-OPP-2009-0361
www.regulations.gov

# Table of Contents

I.    INTRODUCTION ................................................................................................. 3

   A.    Updates Since the Proposed Interim Registration Review Decision was Issued............ 4

   B.    Summary of Public Comments on the Proposed Interim Decision and Agency Responses................................................................................................................ 5

II.    USE AND USAGE ............................................................................................... 8

III.    SCIENTIFIC ASSESSMENTS ............................................................................ 9

   A.    Human Health Risks ...................................................................................... 9

      1.    Human Incidents and Epidemiological Analysis............................................ 10

      2.    Tolerances........................................................................................... 10

      3.    Human Health Data Needs ....................................................................... 12

   B.    Ecological Risks ......................................................................................... 12

      1.    Ecological and Environmental Fate Data Needs ........................................... 13

   C.    Benefits Assessment.................................................................................... 13

IV.    INTERIM REGISTRATION REVIEW DECISION.............................................. 15

   A.    Risk Mitigation and Regulatory Rationale..................................................... 15

      1.    Spray Drift Management ......................................................................... 15

      2.    Herbicide Resistance Management ............................................................ 17

      3.    Non-target Organism Advisory ................................................................ 17

      4.    Label Consistency Measures .................................................................... 18

   B.    Tolerance Actions ....................................................................................... 19

   C.    Interim Registration Review Decision ........................................................... 20

   D.    Data Requirements ...................................................................................... 20

V.    NEXT STEPS AND TIMELINE .......................................................................... 20

   A.    Interim Registration Review Decision ........................................................... 20

   B.    Implementation of Mitigation Measures ........................................................ 21

   Appendix A: Summary of Required Actions for Glyphosate................................... 22

   Appendix B:  Required Labeling Changes for Glyphosate Products ....................... 23

   Appendix C:  Maximum Application Rates for Glyphosate Ground and Aerial Application.. 28

   Appendix D: Endangered Species Assessment...................................................... 33

   Appendix E: Endocrine Disruptor Screening Program............................................ 35

Docket Number EPA-HQ-OPP-2009-0361
www.regulations.gov

# I.   INTRODUCTION

This document is the Environmental Protection Agency's (the EPA or the agency) *Interim Registration Review Decision* (ID) for glyphosate acid (PC Code 417300) and its various salt forms (PC Codes 103601, 103604, 103605, 103607, 103608, and 103613; case 0178), and is being issued pursuant to 40 CFR § 155.56 and 155.58. A registration review decision is the agency's determination whether a pesticide continues to meet, or does not meet, the standard for registration in the Federal Insecticide, Fungicide, and Rodenticide Act (FIFRA). The agency may issue, when it determines it to be appropriate, an Interim Registration Review Decision before completing registration review. Among other things, the Interim Registration Review Decision may require new risk mitigation measures, impose interim risk mitigation measures, identify data or information required to complete the review, and include schedules for submitting the required data, conducting the new risk assessment and completing the registration review case. Additional information on glyphosate can be found in the EPA's public docket (EPA-HQ-OPP-2009-0361) at www.regulations.gov.

FIFRA, as amended by the Food Quality Protection Act (FQPA) of 1996, mandates the continuous review of existing pesticides. All pesticides distributed or sold in the United States must be registered by the EPA based on scientific data showing that they will not cause unreasonable risks to human health or to the environment when used as directed on product labeling. The registration review program is intended to make sure that, as the ability to assess and reduce risk evolves and as policies and practices change, all registered pesticides continue to meet the statutory standard of no unreasonable adverse effects. Changes in science, public policy, and pesticide use practices will occur over time. Through the registration review program, the agency periodically re-evaluates pesticides to make sure that as these changes occur, products in the marketplace can continue to be used safely. Information on this program is provided at http://www2.epa.gov/pesticide-reevaluation. In 2006, the agency implemented the registration review program pursuant to FIFRA § 3(g) and will review each registered pesticide every 15 years to determine whether it continues to meet the FIFRA standard for registration.

The EPA is issuing an ID for glyphosate so that it can (1) move forward with aspects of the registration review case that are complete and (2) implement interim risk mitigation (see Appendices A and B). The agency is currently working with the U.S. Fish and Wildlife Service and the National Marine Fisheries Service (collectively referred to as, the Services) to develop methodologies for conducting national threatened and endangered (listed) species assessments for pesticides in accordance with the Endangered Species Act (ESA) § 7. Therefore, although the EPA has not yet fully evaluated risks to federally-listed species, the agency will complete its listed species assessment and any necessary consultation with the Services for glyphosate prior to completing the glyphosate registration review. Likewise, the agency will complete endocrine screening for glyphosate, pursuant to the Federal Food, Drug, and Cosmetic Act (FFDCA) § 408(p), before completing registration review. See Appendices D and E, respectively, for additional information on the listed species assessment and the endocrine screening for the glyphosate registration review.

In addition, in September 2018, the Environmental Working Group (EWG) along with several other stakeholders, collectively referred to as EWG et al. hereafter, petitioned the agency to

3

Docket Number EPA-HQ-OPP-2009-0361
www.regulations.gov

reduce the glyphosate tolerance in oats to 0.1 parts per million (ppm) and to require labels for registered glyphosate products to explicitly prohibit the use of glyphosate as a preharvest desiccant. The agency is in the process of reviewing comments submitted on the 2018 EWG et al. petition and responding to the EWG et al. petition; to the extent the issues in the petition impact the registration review case, EPA will incorporate its responses to the petition into its final registration review decision for glyphosate. To view the EWG et al. petition and related documents, visit docket ID: EPA-HQ-OPP-2019-0066 at regulations.gov.

The glyphosate registration review case covers glyphosate acid (PC code 417300) and the following salt forms with active pesticide registrations: isopropylamine salt (PC code 103601), ammonium salt (PC code 103604), ethanol amine salt (PC code 103605), diammonium salt (PC code 103607), dimethyl ammonium salt (PC code 103608), and the potassium salt (PC code 103613). Glyphosate is a non-selective, systemic herbicide with products registered for use in a wide array of both agricultural and non-agricultural settings. Agricultural uses include stone and pome fruits, citrus fruits, berries, nuts, vegetables, cereal grains, and other field crops. Non-agricultural uses include residential spot treatments, aquatic areas, forests, rights-of-way, recreational turf, ornamentals, non-food tree crops, and Conservation Reserve Program land. Glyphosate products are also registered for use on the glyphosate-resistant crops, including alfalfa, corn, soybean, cotton, canola, and sugar beets. The first pesticide product containing glyphosate was registered in 1974; a Reregistration Eligibility Decision (RED) for glyphosate was completed in 1993. Since then, the EPA has reviewed the risk assessments for glyphosate to determine if updates were necessary when new uses were added to glyphosate labels.

This document describes any changes since the Proposed Interim Registration Review Decision (PID), includes a summary of public comments on the PID, and includes the agency's interim registration review decision and the agency's rationale. See the PID for a summary of glyphosate's registration review timeline, use and usage information describing how and why glyphosate is used, the EPA's risk and benefits assessments, and a discussion of risk characterization. The PID also describes the mitigation measures that were proposed to address risks of concern and the regulatory rationale for the EPA's proposed interim registration review decision.

## A.  Updates Since the Proposed Interim Registration Review Decision was Issued

In April 2019, the EPA published the PID for glyphosate. Since that time, the agency has reviewed public comments and has made changes to the spray drift management labeling and rotational crop timing language that was proposed in the PID. The changes for spray drift management labeling are as follows: changes in droplet size restrictions, the removal of advisory spray drift statements for airblast applications, and the incorporation of updated swath displacement language for aerial applications. In addition, the agency has updated the language regarding rotational crop timing to provide clearer directions for use. For more information on the changes made to the mitigation proposed in the PID, please refer to Section IV.A. and Appendix A. There have been no additional updates to what was proposed in the PID, nor any updates to the draft risk assessments (DRAs). This document thus finalizes the agency's draft supporting documents *Glyphosate Draft Human Health Risk Assessment for Registration Review* and *Registration Review—Preliminary Ecological Risk Assessment for Glyphosate and Its Salts*,

4

Docket Number EPA-HQ-OPP-2009-0361
www.regulations.gov

which are available in the public docket. Along with the ID, the following documents are also posted to the glyphosate docket:

- *Response from the Pesticide Re-evaluation Division to Comments on the Glyphosate Proposed Interim Decision*, dated January 16, 2019
- *Glyphosate: Response to Comments on the Proposed Interim Decision Regarding the Human Health Risk Assessment*, dated January 13, 2019

### B. Summary of Public Comments on the Proposed Interim Decision and Agency Responses

During the 60-day public comment period for the PID, which opened on May 6, 2019, the agency received comments requesting an extension of the public comment period from the original deadline of July 5, 2019. The agency extended the comment period for 60 days, which then closed on September 3, 2019. During the 120-day comment period, the agency received roughly 283,300 comments. Over 12,000 unique submissions were received from various stakeholders, including glyphosate registrants, grower groups, non-governmental organizations, pesticide industry groups, states, the U.S. Department of Agriculture and members of the general public. Most comments came from mass mailer campaigns, and approximately 120 unique substantive comments were received from various stakeholders.

Along with the ID, the agency is posting the following documents that address comments received on the PID: *Response from the Pesticide Re-evaluation Division to Comments on the Glyphosate Proposed Interim Decision* and *Glyphosate: Response to Comments on the Proposed Interim Decision Regarding the Human Health Risk Assessment*. Most of the comments received on the PID are substantively the same as comments received during previous glyphosate comment periods on the agency's risk assessments. The *Glyphosate: Response to Comments on the Proposed Interim Decision Regarding the Human Health Risk Assessment* responds to comments that have not been addressed previously via the December 2016 FIFRA Scientific Advisory Panel (SAP) meeting to discuss the carcinogenic potential of glyphosate[1] or in previous registration review documents for glyphosate. These comments did not result in changes to the agency's risk assessments.

EPA's *Response from the Pesticide Re-evaluation Division to Comments on the Glyphosate Proposed Interim Decision* document combined comments by topic instead of responding to individual stakeholders and directs the public to responses previously provided in EPA documents. Comments specific to the glyphosate mitigation, comments of a broader regulatory nature, and the agency's responses to those comments are summarized below, and some resulted in changes to the mitigation proposed in the PID.

For more detailed responses to comments relating to the human health risk assessment, and EPA's cancer evaluation for glyphosate, see the *Glyphosate: Response to Comments on the Human Health Draft Risk Assessment* and *Glyphosate: Response to Comments on the Proposed Interim Decision Regarding the Human Health Risk Assessment*. For more detailed responses to

---

[1] Materials from the December 13-16, 2016 FIFRA SAP are posted in docket EPA-HQ-OPP-2016-0385. The final report, the transcript, charge questions, and other materials are also available online:
https://www.epa.gov/sap/meeting-materials-december-13-16-2016-scientific-advisory-panel

Docket Number EPA-HQ-OPP-2009-0361
www.regulations.gov

comments relating to the ecological risk assessment, see the *Response to Public Comments on the Preliminary Ecological Risk Assessment for Glyphosate*. For detailed responses to comments on the use/usage of glyphosate and the benefits, see the *Glyphosate: Response to Comments, Usage, and Benefits (PC Codes: 103601, 103604, 103605, 103607, 103613, 417300)*. All response to comments documents are available in the public docket for glyphosate (EPA-HQ-OPP-2009-0361) and published online[2]. The agency thanks all commenters for their comments and has considered them in developing this ID.

## Comments Regarding the Environmental Working Group (EWG) Petition

**Comment:** On September 27, 2018, the agency received a petition from the Environmental Working Group, Ben & Jerry's Homemade, Inc., Happy Family Organics, MegaFood, MOM's Organic Market, National Co+op Grocers, Nature's Path Foods Inc., One Degree Organic Foods USA, Inc., and Stonyfield Farms, Inc (EWG et al.). The petitioners requested that the agency reduce the tolerance of the pesticide glyphosate in or on oats from 30 ppm to 0.1 ppm and modify labels to explicitly prohibit preharvest use on oats. The petitioners asserted that the current tolerance level for oats is not protective enough when assessing people's dietary exposure to glyphosate in oats and the potential carcinogenicity of glyphosate. Numerous members of the general public commented in support of the EWG et al. petition. Various stakeholders and numerous farmers commented in opposition of the petition. EWG et al. also provided comments on the PID that were similar in nature to the issues raised in the petition.

**EPA Response:** In accordance with FFDCA section 408(d)(3), EPA published EWG et al.'s petition for a 30-day public comment period on May 6, 2019; the public comment period closed on June 5, 2019. The full petition is posted in docket EPA-HQ-OPP-2019-0066 at www.regulations.gov. The agency is still reviewing the 103,447 comments that were received on the petition. This Interim Decision reflects the conclusions of EPA's most recent risk assessments and does not address the claims raised in the petition, or constitute EPA's response to the petition. The agency anticipates issuing the response to the petition in 2020.

## Comments Regarding the Human Health Risk Assessment

**Comment:** The agency received comments regarding the human health risk assessment from a wide array of stakeholders. Topics included concerns with the cancer assessment, toxicological studies, protection of children, and detections of glyphosate. Additionally, open literature studies were also identified for the agency's consideration.

**EPA Response:** Comments received regarding the human health risk assessment for glyphosate have been previously addressed in the *Glyphosate: Response to Comments on the Human Health Draft Risk Assessment* (EPA-HQ-OPP-2009-0361-2343). Many of the open literature studies were previously identified and considered by the agency as part of two open literature searches. The remaining studies identified during the public comment period were primarily journal articles published since these searches were conducted. None of the open literature

---

[2] https://www.epa.gov/ingredients-used-pesticide-products/proposed-interim-registration-review-decision-and-responses-0

Docket Number EPA-HQ-OPP-2009-0361
www.regulations.gov

studies identified for the agency's consideration were found to have an impact on the glyphosate hazard characterization, cancer assessment, or human health risk assessment. The agency will continue to monitor the open literature for studies that use scientifically sound and appropriate methodology and relevant routes of exposure that have the potential to impact the risk evaluation of glyphosate. For more information, please see the *Glyphosate: Response to Comments on the Proposed Interim Decision Regarding the Human Health Risk Assessment*, which is available on the public docket.

## Comments Regarding Spray Drift Management

**Comment:** Several stakeholders, including USDA and NAAA, provided comments on the proposed droplet size requirement of "fine or coarser," suggesting that a larger droplet size may be more appropriate for glyphosate products where glyphosate is the only active ingredient. The commenters expressed concern that using a fine droplet size might increase the risk of drift while providing no improvement on efficacy, due to the fact that glyphosate is a systemic herbicide that needs less coverage than contact pesticides. Commenters also noted that glyphosate is often tank-mixed with other pesticides and that fine droplet size may be appropriate in those cases to allow greater flexibility for tank mixing.

**EPA Response:** The agency is requiring label changes to reduce off-target spray drift and establish a baseline level of protection against spray drift that is consistent across all products containing glyphosate. The agency's goal is to manage off-target spray drift from application of glyphosate while continuing to preserve glyphosate's utility for growers and allow growers continued flexibility when making applications. Since glyphosate is a systemic herbicide, the agency agrees that "medium" or coarser droplet size is appropriate when glyphosate is sprayed as the sole active ingredient, or when tank-mixed with other systemic herbicides. Since glyphosate is a compound that is frequently tank-mixed with other pesticides (*e.g.* when used with an insecticide in a burndown treatment), the agency agrees that a "fine" droplet size is appropriate when tank-mixing with a pesticide product that requires a fine droplet size. The agency is revising the droplet size labeling based on the comments received. Refer to Section IV.A.1. and Appendix B of this Interim Decision for additional information on the required droplet size language.

**Comment:** Commenters noted that it is not appropriate to require enforceable spray drift management language for airblast applications, given that herbicides are not applied via airblast to orchards and vineyards.

**EPA Response:** The agency agrees that airblast application is not an approved application method for glyphosate and has removed this language from the required labeling in Appendix B.

## Comments Regarding Rotational Crop Timing

**Comment:** The Joint Glyphosate Task Force (JGTF), consisting of 26 member companies, commented on the proposed labeling changes for rotational crop timing, suggesting language that provides clearer directions for use.

Docket Number EPA-HQ-OPP-2009-0361
www.regulations.gov

**EPA Response:** The agency thanks the JGTF for their comment. The agency has reviewed the suggested language and agrees that the language is more informative and clarifies the directions for use regarding rotational crop timing. Updated label clarification language for rotational crop timing has been included in Appendix B.

### Comments Regarding the JGTF "Glyphosate Master Reference Label"

**Comment:** The JGTF submitted to the agency a document titled "Glyphosate Master Reference Label," which is intended to be used by registrants to aid in the creation and review of product labels containing glyphosate. The "Glyphosate Master Reference Label" intends to define key elements of a glyphosate end-use product label, including precautionary and other label statements, approved crop and non-crop uses, maximum application rates, methods of application, and application restrictions for specific uses.

**EPA Response:** The agency appreciates the registrant collaboration in identifying currently registered uses of glyphosate in the JGTF's "Glyphosate Master Reference Label". The task force developed this tool as a reference for registrants. While the JGTF's "Glyphosate Master Reference Label" may be used by registrants to aid in label submission, EPA emphasizes that the existing EPA process for reviewing labels as part of registration review still applies.

## II.   USE AND USAGE

Glyphosate is a broad-spectrum, systemic glycine herbicide which inhibits the enzyme 5-enolypyruvylshikimate-3-phosphate (EPSP) synthase in plants and inhibits aromatic amino acid synthesis. It is the only herbicide in the Weed Science Society of America's (WSSA) group 9 class and it has a unique mode of action. Glyphosate products are registered as ready-to-use solution, water-dispersible granules, soluble concentrate, emulsifiable concentrate, flowable concentrate, water soluble packaging, pressurized liquid, pellets/tablets, and tree injection shells. It can be applied as a pre-emergent, post-emergent, or as a pre-harvest application to the crop to treat a variety of emerged grass and broadleaf weeds. In a few crops (*e.g.* sugarcane), glyphosate is used as a plant growth regulator.

Glyphosate products are registered for use in a wide array of both agricultural and non-agricultural settings. Agricultural uses include stone and pome fruits, citrus fruits, berries, nuts, vegetables, legumes, cereal grains, and other field crops. Glyphosate products are also registered for use on the following glyphosate-resistant (transgenic) crops: corn, soybean, cotton, canola, sugar beets, and alfalfa. Registered non-agricultural uses include: tree injections, residential spot treatments, aquatic areas, forests, rights-of-way, recreational turf, ornamentals, non-food tree crops, and Conservation Reserve Program land.

Application methods vary for glyphosate and include aircraft, various ground equipment, and various handheld equipment. Application types include: aerial spray, ground boom spray, strip treatment, band treatment, broadcast spray, spot treatment, stump treatment, tree injection, and wipe-on/wiper treatments. The maximum single application rate on labels is up to 8 pounds acid equivalent per acre (lb ae/A) (acid equivalents or ae are used to assess the different acid and salt forms of glyphosate) for the following uses: pastures, non-food tree crops, forestry, aquatic

Docket Number EPA-HQ-OPP-2009-0361
www.regulations.gov

areas, and non-crop. However, for agricultural row crop uses, maximum single application rates are 1.55 lb ae/A for aerial applications and 3.75 lb ae/A for ground applications. Maximum annual application rates are generally 6 to 8 lbs ae/A, except for residential spot treatments.

The EPA completed a usage analysis for glyphosate by analyzing agricultural market research data from 2012 to 2016. Approximately 281 million pounds of glyphosate was applied to 298 million acres annually in agricultural settings, on average. Most glyphosate was applied to soybean (117.4 million lbs applied annually), corn (94.9 million lbs applied annually), and cotton (20 million lbs applied annually). Many citrus fruits (*e.g.*, grapefruit, oranges, lemons), field crops (*e.g.*, soybean, corn, cotton), and tree nuts (*e.g.*, almonds, walnuts, pistachios) have the highest percentage of their acres treated with glyphosate.

Approximately 24 million pounds of glyphosate are applied to non-agricultural sites annually, on average. The majority of non-agricultural use is in the homeowner market (5 million lbs applied annually), turf (4.9 million lbs applied annually), forestry (3.6 million lbs applied annually), and roadways (3.3 million lbs applied annually).

## III.   SCIENTIFIC ASSESSMENTS

### A.  Human Health Risks

A summary of the agency's human health risk assessment was presented in the glyphosate PID. The agency used the most current science policies and risk assessment methodologies to prepare a risk assessment in support of the registration review of glyphosate. The EPA thoroughly assessed risks to humans from exposure to glyphosate from all registered uses and all routes of exposure and did not identify any risks of concern.

Both non-cancer and cancer effects were evaluated for glyphosate and its metabolites, aminomethyl phosphonic acid (AMPA) and N-acetyl-glyphosate. The human health risk assessment for glyphosate and supporting documents, including the agency's revised issue paper on the carcinogenic potential of glyphosate, are published in the public registration review docket for glyphosate (EPA-HQ-OPP-2009-0361) at www.regulations.gov. The deliberations of the glyphosate FIFRA SAP meeting on the carcinogenic potential of glyphosate, including the agenda, meeting notes, SAP recommendations, the EPA's presentation to the FIFRA SAP, and other supporting documents are published in the glyphosate FIFRA SAP docket (EPA-HQ-OPP-2016-0385) at www.regulations.gov.

The agency concluded that there are no dietary risks of concern for any segment of the population, even with the most conservative assumptions applied in its assessments (*e.g.*, tolerance-level residues, direct application to water, and 100% crop treated).  The agency also concluded that there are no residential, non-occupational bystander, aggregate, or occupational risks of concern.

The EPA has not made a common mechanism of toxicity to humans finding as to glyphosate and any other substance and it does not appear to produce a toxic metabolite produced by other substances. Therefore, it was not appropriate for EPA to assess cumulative risks.

Docket Number EPA-HQ-OPP-2009-0361
www.regulations.gov

For additional details on the human health assessment for glyphosate, see the *Glyphosate Draft Human Health Risk Assessment for Registration Review*, which is available in the public docket.

### 1. Human Incidents and Epidemiological Analysis

The EPA conducted human health incident reviews for glyphosate in February 2014 and in October 2018. Thousands of glyphosate incidents were reported but most reported incidents were minor in severity. The high number of reported incidents across the databases is likely a result of glyphosate being among the most widely-used pesticides in the United States by volume. Health effects reported in the incident databases included dermal, ocular, and respiratory symptoms and effects were generally mild and resolved rapidly. While the agency recently received information regarding litigation related to glyphosate human health incident claims, submitted under the FIFRA 6(a)2 adverse event reporting requirement, the agency does not comment on private litigation. EPA has thoroughly evaluated potential human health risk associated with exposure to glyphosate and determined that there are no risks to human health from the current registered uses of glyphosate and that glyphosate is not likely to be carcinogenic to humans. The agency will continue to monitor incident information and additional analyses will be conducted if ongoing human incident monitoring indicates a concern.

The medical-case literature was reviewed, and most accidental ingestion of glyphosate formulations result in mild symptoms. Intentional ingestions caused moderate to severe symptoms and involved multiple organ systems.

The epidemiological literature was also reviewed but most studies were hypothesis-generating in nature. The EPA found there was insufficient evidence to conclude that glyphosate plays a role in any human diseases. Since the last EPA review of the epidemiological literature, two studies regarding the association between glyphosate exposure and non-Hodgkin's Lymphoma (NHL) were identified for detailed review by the agency; however, these studies did not impact the agency's assessment. For more information, refer to *Glyphosate: Response to Comments on the Proposed Interim Decision Regarding the Human Health Risk Assessment*, which is available on the public docket.

For more information on reported human incidents, see the *Glyphosate: Tier II Incident Report*, available in the in the public docket for glyphosate.

### 2. Tolerances

Tolerances are established for residues of glyphosate in/on numerous plant commodities in 40 CFR § 180.364. Glyphosate tolerances range from 0.2 to 400 ppm. The EPA evaluated the glyphosate residue chemistry database to determine if the established tolerances conform to current practices and to determine whether updates were necessary for current crop group/subgroup definitions. The EPA intends to establish new tolerances for various vegetable and fruit groups and subgroups, as listed in Table 1. Upon establishment of these new crop group tolerances, EPA intends to remove the following individual tolerances, since they will no longer be needed: acerola; aloe vera; ambarella; asparagus; atemoya; avocado; bamboo, shoots; banana; biriba; breadfruit; cactus, fruit; cactus, pads; canistel; cherimoya; custard apple; date, dried fruit;

Docket Number EPA-HQ-OPP-2009-0361
www.regulations.gov

durian; feijoa; fig; fruit, stone, group 12; guava; ilama; imbe; imbu; jaboticaba; jackfruit; longan; lychee; mamey apple; mango; mangosteen; marmaladebox; noni; nut, tree, group 14; olive; palm heart; papaya; papaya, mountain; passionfruit; pawpaw; persimmon; pineapple; pistachio; pomegranate; pulasan; rambutan; rose apple; sapodilla; sapote, black; sapote, mamey; sapote, white; soursop; Spanish lime; star apple; starfruit; sugar apple; Surinam cherry; tamarind; vegetable, leafy, brassica, group 5; vegetable, leafy, except brassica, group 4; watercress, upland; and wax jambu. Additionally, EPA is requiring eliminating trailing zeros listed in tolerances consistent with agency policy.

| Table 1. Required Changes to the Tolerance Levels or Commodity Definitions for Glyphosate. | | | | |
|---|---|---|---|---|
| **Current** | | **Required Change** | | **Comment** |
| **Commodity** | **Tolerance (ppm)** | **Commodity** | **Tolerance (ppm)** | |
| Soybean, forage | 100.0 | Soybean, forage | 100 | Correct number of significant figures to be consistent with EPA policy |
| Soybean, hay | 200.0 | Soybean, hay | 200 | |
| Soybean, hulls | 120.0 | Soybean, hulls | 120 | |
| Soybean, seed | 20.0 | Soybean, seed | 20 | |
| Fruit, stone, group 12 | 0.2 | Fruit, stone, group 12-12 | 0.2 | Update to the current crop group definitions; coconut was excluded from the tree nut crop group tolerances as the residues were not within 5x (coconut tolerance at 0.1 ppm) |
| Nut, tree, group 14 | 1.0 | Nut, tree, group 14-12 (except coconut) | 1.0 | |
| Vegetable, leafy, except brassica, group 4 | 0.2 | Vegetable, leafy, group 4-16 | 0.2 | Update to the current crop group definitions |
| Vegetable, leafy, brassica, group 5 | 0.2 | Vegetable, *Brassica*, head and stem, group 5-16 | 0.2 | |
| Several | 0.2-0.5-- | Vegetable, stalk and stem, subgroup 22A | 0.5 | |
| | 0.2 | Vegetable, leaf petiole, subgroup 22B | 0.2 | |
| | 0.2 | Fruit, tropical and subtropical, edible peel, group 23 | 0.2 | |
| | 0.2 | Fruit, tropical and subtropical, small fruit, inedible peel, group 24A | 0.2 | |
| | 0.2 | Fruit, tropical and subtropical, medium to large fruit, smooth, inedible peel, group 24B | 0.2 | |
| | 0.2 | Fruit, tropical and subtropical, large fruit, rough or hairy, inedible peel, group 24C | 0.2 | |
| | 0.2 | Fruit, tropical and subtropical, vine, inedible peel, group 24E | 0.2 | |

In accordance with FFDCA, the agency will be conducting rulemaking to implement any tolerance changes identified for glyphosate.

As noted in the PID, the agency received a September 27, 2018 petition from the Environmental Working Group et al., requesting that the agency reduce the tolerance of the pesticide glyphosate in or on oats and modify labels to explicitly prohibit preharvest use on oats. The agency issued a Federal Register Notice of Filing for public comment in a separate docket, EPA-HQ-OPP-2019-0066. This Interim Decision reflects the conclusions of EPA's most recent risk assessments and

Docket Number EPA-HQ-OPP-2009-0361
www.regulations.gov

does not address the claims raised in the petition or provide EPA's response to the petition. The agency anticipates issuing the response to the petition in 2020.

### 3. Human Health Data Needs

No additional human health data needs have been identified for the glyphosate registration review beyond the human health data required as part of the registration review DCI, which has been satisfied.

### B. Ecological Risks

A summary of the agency's ecological risk assessment was presented in the PID. The agency used the most current science policies and risk assessment methodologies to prepare a risk assessment in support of the registration review of glyphosate.

The agency did not identify potential risks of concern for fish, aquatic invertebrates, or aquatic-phase amphibians.  Low or limited potential risks of concern were identified for mammals and birds.  Consistent with its mode of action as an herbicide, potential risks to non-target terrestrial and aquatic plants were primarily from spray drift and the resulting distances from the edge of the field to below toxicity threshold were heavily dependent on the application rate used.  Given its importance as a critical food resource for the monarch butterfly, the agency also completed a spray drift analysis for common milkweed, with those results being similar to distances calculated for other terrestrial plants tested in ecotoxicity tests (*i.e.*, cucumber).

Based on an adult honey bee acute contact and oral toxicity tests, the likelihood of acute adverse effects to adult bees is considered low at application rates up to 5.7 lb a.e./A; however, it is uncertain if effects would occur at higher application rates (i.e., up to 8 lb a.e./A).  In a colony-level study, no adverse effects (acute or sublethal) were reported based on exposure to residues from an application at a rate of 1.92 lb ae/A. However, the full suite of Tier I toxicity studies are unavailable to fully assess potential risk to bees at the individual and/or colony level.

The agency believes that additional data may be necessary to fully evaluate risks to bees. Although the agency did not identify the need for these additional data to evaluate potential effects to bees when initially scoping the registration review for glyphosate, the Problem Formulation and registration review generic data call-in (GDCI) for glyphosate were both issued prior to publication of the June 2014 harmonized *Guidance for Assessing Pesticide Risks to Bees*[3]. This 2014 guidance lists additional laboratory-based studies of individual bees and based on the results of those studies, possible colony-level studies, that were not included in the glyphosate registration review GDCI. Therefore, the agency is currently determining whether additional bee toxicity and exposure data are needed for glyphosate. If the agency determines that additional data are necessary to help make a final registration review decision for glyphosate, then EPA will issue a GDCI to obtain these data. The pollinator studies that could be required for glyphosate are listed in Table 2.

---

[3] http://www2.epa.gov/sites/production/files/201406/documents/pollinator_risk_assessment_guidance_06_19_14.pdf

Docket Number EPA-HQ-OPP-2009-0361
www.regulations.gov

Table 2: Potential Pollinator Data Requirements

| Guideline # | Study |
|---|---|
| Tier 1 | |
| 850.3020 | Acute contact toxicity study with adult honey bees |
| 850.3030 | Honey bee toxicity of residues on foliage |
| Non-Guideline (OECD 213) | Honey bee adult acute oral toxicity |
| Non-Guideline (OECD 237) | Honey bee larvae acute oral toxicity |
| Non-Guideline (OECD 245) | Honey bee adult chronic oral toxicity |
| Non-Guideline OECD 239) | Honey bee larvae chronic oral toxicity |
| Tier 2[†] | |
| Non-Guideline | Field trial of residues in pollen and nectar |
| Non-Guideline (OECD 75) | Semi-field testing for pollinators |
| Tier 3[†] | |
| 850.3040 | Full-Field testing for pollinators |

[†] The need for higher tier tests for pollinators will be determined based upon the results of lower tiered tests and/or other lines of evidence and the need for a refined pollinator risk assessment.

The EPA is currently working with its federal partners and other stakeholders to implement an interim approach for assessing potential risk to listed species and their designated critical habitats. Once the scientific methods necessary to complete risk assessments for listed species and their designated critical habitats are finalized, the agency will complete its endangered species assessment for glyphosate. The draft biological evaluation for glyphosate is anticipated in 2020.

The agency conducted a review of ecological incidents and determined the majority of the glyphosate incidents are for terrestrial plants. Most plant incidents involved spray drift onto adjacent agricultural crops and grass. Fewer incidents were reported for terrestrial and aquatic wildlife.

For additional details on the ecological assessment for glyphosate, see the *Registration Review— Preliminary Ecological Risk Assessment for Glyphosate and Its Salts*, which is available in the public docket.

### 1. Ecological and Environmental Fate Data Needs

The ecological effects data required as part of the glyphosate registration review DCI were received and found to be adequate for risk assessment. The agency will issue a DCI for additional pollinator data as part of a separate action if it determines that additional pollinator data are necessary to help make a final registration review decision for glyphosate.

### C. Benefits Assessment

Glyphosate is the most commonly used agricultural herbicide in the United States. It is a broad-spectrum herbicide that provides postemergence control of broadleaf, sedge, and grass weeds with minimal residual toxicity to crops or non-target vegetation. Glyphosate is a unique herbicide as it is the only herbicide classified as a Group 9 herbicide by the WSSA, which acts by inhibiting the enzyme EDSP synthase in plants and inhibiting aromatic amino acid synthesis.

13

Docket Number EPA-HQ-OPP-2009-0361
www.regulations.gov

Glyphosate is a relatively inexpensive herbicide to apply in agricultural situations, with the cost of applications to most crops ranging $1 to $13 per acre.

Glyphosate products are registered for use in agriculture, including horticulture, viticulture, and silviculture, as well as non-agricultural sites including commercial, industrial, and residential areas. Current glyphosate-resistant field crops are soybean, corn, cotton, canola, alfalfa, and sugar beet. Many of these crops, such as corn, cotton, soybean, and sugar beet, have exceptionally high percentages of their acreage treated with glyphosate (approximately 90 percent of acres treated in each crop). Genetically-engineered (transgenic) glyphosate-resistant (GR) varieties of these crops can be sprayed over-the-top with minimal or no crop phytotoxicity, and glyphosate may also be used as a pre-plant burndown in many of these crops. On average, 84 percent of glyphosate applied in agricultural settings, in terms of pounds, is applied to soybeans, corn, or cotton per year.

Glyphosate is also beneficial as part of weed control programs in orchards and specialty crops. Glyphosate use is prevalent in orchards and vineyards, and most acres of crops such as tree nuts, citrus, and grapes are treated with glyphosate. Glyphosate is the most versatile herbicide in orchard floor management because it may be used for under tree weed control, chemical wiping, chemical mowing, and spot treatment. Since glyphosate controls a broad spectrum of weeds and does not have residual soil activity, it can be used to control emerged weeds prior to planting high value crops such as fruits and vegetables, for which growers sometimes have limited weed control options.

Glyphosate is also important for noxious and invasive weed control in aquatic systems, pastures/rangelands, public lands, forestry, and rights-of-way. Invasive weeds controlled by glyphosate include cattails and water hyacinth, which can impede water flow and irrigation. Improper weed management can cause water to stagnate, providing a breeding habitat for mosquitos. Therefore, effective weed control is important for controlling mosquito-borne diseases. Glyphosate is also important for habitat restoration efforts. It is used to control invasive annual, perennial, and woody plants in riparian habitats and rangeland. Glyphosate use in rights-of-way helps keep roadways and railroad tracks safe by protecting the stability of the surface, maintaining visibility for operators, and allowing for the distribution of goods, services, and utilities (gas and electric). Glyphosate is the most frequently used active ingredient used to control invasive species in the United States.

Glyphosate is a versatile active ingredient and can be applied with many different types of application equipment depending on the needs of the user. In addition to the broadcast spray applications, it can be applied via application methods such as cut stump treatment, stem/tree injection, wick applications, spot treatment, and as a directed spray.

For more information on the benefits of glyphosate, see the *Glyphosate: Response to Comments, Usage, and Benefits*. In addition, the USDA provided non-agricultural usage information as a 2018 comment in the glyphosate public docket (EPA-HQ-OPP-2009-0361-1618), which furthered the agency's understanding of the benefits of glyphosate to this sector.

14

Docket Number EPA-HQ-OPP-2009-0361
www.regulations.gov

# IV.   INTERIM REGISTRATION REVIEW DECISION

### A.  Risk Mitigation and Regulatory Rationale

The EPA did not identify any human health risks from exposure to glyphosate. The agency identified potential ecological risk to mammals and birds, but these risks are expected to be limited to the application area or areas near the application area. The EPA also identified potential risk to terrestrial and aquatic plants from off-site spray drift, consistent with glyphosate's use as an herbicide.

Glyphosate is a versatile herbicide that provides a broad spectrum of weed control across numerous agricultural and non-agricultural sites. Glyphosate is generally inexpensive in agricultural settings. Glyphosate is important in the management of invasive/noxious weeds and is a critical tool for habitat restoration efforts for rangeland and pastures. It is used for weed management for rights-of-way, forestry, industrial settings, residential areas, and aquatic environments.

The EPA concludes that the benefits outweigh the potential ecological risks when glyphosate is used according to label directions. To reduce off-site spray drift to non-target organisms, the agency is requiring spray drift management labeling. Since the PID was issued and in response to comments, the agency has made changes to the spray drift management language relating to droplet size, updated the swath displacement language based on current EPA policy, and removed the proposed advisory spray drift language for application via airblast, as airblast is not an application method used for glyphosate. In addition, EPA has adjusted the required language for rotational crop timing information based on the comments received. All required mitigation measures are detailed in Appendices A and B.

### 1.  Spray Drift Management

The agency is requiring label changes to reduce off-target spray drift and establish a baseline level of protection against spray drift that is consistent across all glyphosate products. Reducing spray drift will reduce the extent of environmental exposure and risk to non-target plants and animals. Although the agency is not making a complete endangered species finding at this time, these label changes are expected to reduce the extent of exposure and may reduce risk to listed species whose range and/or critical habitat co-occur with the use of glyphosate.

The agency is requiring the following spray drift mitigation language to be included on all glyphosate product labels for products applied by liquid spray application. The required spray drift language is intended to be mandatory, enforceable statements and supersede any existing language already on product labels (either advisory or mandatory) covering the same topics. The agency is providing recommendations which allow glyphosate registrants to standardize all advisory language on glyphosate product labels. Registrants must ensure that any existing advisory language left on labels does not contradict or modify the new mandatory spray drift statements required in this ID once added to the labels.

- Applicators must not spray during temperature inversions.

15

- For aerial applications, do not apply when wind speeds exceed 15 mph at the application site. If the wind speed is greater than 10 mph, the boom length must be 65% or less of the wingspan for fixed wing aircraft and 75% or less of the rotor blade diameter for helicopters. Otherwise, the boom length must be 75% or less of the wingspan for fixed-wing aircraft and 90% or less of the rotor diameter for helicopters.
- For aerial applicators, if the windspeed is 10 miles per hour or less, applicators must use ½ swath displacement upwind at the downwind edge of the field. When the windspeed is between 11-15 miles per hour, applicators must use ¾ swath displacement upwind at the downwind edge of the field.
- For aerial applications, the release height must be no higher than 10 feet from the top of the ground or crop canopy, unless a greater application height is required for pilot safety.
- For ground boom applications, apply with the release height no more than 4 feet above the ground or crop canopy.
- For ground and/or aerial applications, select nozzle and pressure that deliver Medium or coarser droplets as indicated in nozzle manufacturer's catalogues and in accordance with American Society of Agricultural & Biological Engineers Standard 572.1 (ASABE S572.1), unless tank-mixing with a pesticide product that requires use of a finer droplet size (ASABE S572.1). If a finer droplet size is used, applicators are required to use a Fine or coarser droplet size (ASABE S572.1).

The agency's goal is to manage off-target spray drift from applications of glyphosate while continuing to preserve glyphosate's utility for growers and allow growers continued flexibility when making applications. The agency assessed the potential impact on growers of the required spray drift management restrictions and has determined that these measures are not expected to substantially reduce the benefits of glyphosate to users. Prohibiting glyphosate applications during temperature inversions may impact the usability of glyphosate products by reducing the amount of time users have to apply glyphosate, but growers can switch to other products if they encounter temperature inversions.

For the PID, the EPA considered the impact of requiring "fine" or coarser droplets (*i.e.*, requiring growers to deliver droplets no smaller than "fine") on glyphosate labels and determined that such a requirement was not likely to affect the efficacy of glyphosate when used alone since it is a systemic herbicide. The agency is now requiring "medium" or coarser droplet size where glyphosate is the sole active ingredient being applied in order to further reduce drift. Efficacy is anticipated to be unaffected based on comments received from the public. Glyphosate is a compound that is frequently tank-mixed with other herbicides. Given that the language provides flexibility with droplet size for tank-mixed partners, the EPA does not expect there would be concerns for tank mixing with other herbicides. However, since glyphosate can be applied as a burndown treatment, insecticides may be included in the tank mix. Insecticides are generally considered to provide better efficacy with smaller droplets, therefore EPA is allowing "fine" droplets for use in tank mixes with active ingredients that require "fine" or coarser droplets. The EPA is uncertain if requiring "fine" droplets will impact the efficacy of insecticides tank-mixed with glyphosate because some insecticides could be more effective at droplet sizes smaller than "fine" (such as "very fine" or "extremely fine"). If reduced efficacy occurred, the agency would expect growers to respond by increasing the application rates (if allowed by the label), increasing

16

Docket Number EPA-HQ-OPP-2009-0361
www.regulations.gov

the number of applications, increasing the application rates of tank-mix partners, making additional applications, or switching to a different active ingredient.

In addition to including the spray drift restrictions on glyphosate labels, all references to volumetric mean diameter (VMD) information for spray droplets are required to be removed from all glyphosate labels where such information currently appears. The new language above, which cites ASABE S572.1, eliminates the need for VMD information.

## 2. Herbicide Resistance Management

On August 24, 2017, the EPA finalized a Pesticide Registration Notice (PRN or Notice) on herbicide resistance management.[4] Consistent with the Notice, the EPA is requiring the implementation of herbicide resistance measures for existing chemicals during registration review, and for new chemicals and new uses at the time of registration. In registration review, herbicide resistance elements will be included in every herbicide PID and ID.

The development and spread of herbicide-resistant weeds in agriculture is a widespread problem that has the potential to fundamentally change production practices in U.S. agriculture. While herbicide-resistant weeds have been known since the 1950s, the number of species and their geographical extent has been increasing rapidly. Currently there are over 250 weed species worldwide with confirmed herbicide resistance. In the United States, there are over 155 weed species with confirmed resistance to one or more herbicides.

Management of herbicide-resistant weeds, both in controlling established herbicide-resistant weeds and in slowing or preventing the development of new herbicide-resistant weeds, is a complex problem without a simple solution. Coordinated efforts of growers, agricultural extension, academic researcher, scientific societies, pesticide registrants, and state and federal agencies are required to address this problem.

The EPA is requiring measures for the pesticide registrants to provide growers and users with detailed information and recommendations to slow the development and spread of herbicide resistant weeds. This is part of a more holistic, proactive approach recommended by crop consultants, commodity organizations, professional/scientific societies, researchers, and the registrants themselves.

## 3. Non-target Organism Advisory

The protection of pollinators and other non-target organisms is a priority for the agency. While the agency did not identify risks to individual bees from glyphosate applications at rates below 5.7 lb ae/A, risks to terrestrial invertebrates at higher application rates are uncertain. In addition, glyphosate may impact non-target plants via spray drift and impact nectar sources and habitat for pollinators and other non-target organisms. EPA is requiring a non-target organism advisory to alert users of potential impact to non-target organisms: "This product is toxic to plants and may adversely impact the forage and habitat of non-target organisms, including pollinators, in areas

---

[4] PRN 2017-2, "Guidance for Herbicide Resistance Management Labeling, Education, Training, and Stewardship"

Docket Number EPA-HQ-OPP-2009-0361
www.regulations.gov

adjacent to the treated site. Protect the forage and habitat of non-target organisms by following label directions intended to minimize spray drift."

### 4.   Label Consistency Measures

There are currently 557 Section 3 registrations and 37 Section 24(c) registrations for glyphosate. Label directions for glyphosate vary significantly from label to label, and newer stamped labels in general have more comprehensive instructions than older labels. The EPA is requiring all glyphosate labels to be updated to modern standards. The specific components of the label that require updates are as follows: the maximum application parameters, the environmental hazards statement for aquatic use, and clarification on rotational crop timing. In addition, the agency is providing guidance to glyphosate registrants on acceptable marketing statements.

*Maximum Application Parameters*

In 2013, at the agency's request and in preparation for risk assessment, the Joint Glyphosate Task Force, a consortium of glyphosate registrants, created a *Use Summary Matrix*, which was intended to summarize all use sites being supported as part of registration review and outline important application parameters such as maximum single and yearly application rates. EPA's risk assessments for glyphosate were based on maximum application parameters as described in the *Use Summary Matrix*. The maximum application rates on glyphosate labels must be consistent with the maximum application rates that were assessed by the agency and supported by the Joint Glyphosate Task Force. These maximum application parameters are described in Appendix C of this document.

Many older glyphosate labels do not define any maximum application parameters. EPA is requiring that maximum application parameters be clearly defined on all glyphosate labels and must not exceed the maximum application parameters as described in Appendix C. It is not EPA's intention to change the current application rates on glyphosate labels, but the agency is requiring defined rate limits in order to establish better consistency and clarity on labels. Appendix C lists the maximum application parameters by use site for both aerial and ground application.

*Statements for Aquatic Uses*

The EPA is requiring updated environmental hazards statements for aquatic use products to be consistent with modern standards and to be in line with newer pesticide labels. The glyphosate Reregistration Eligibility Decision (RED) issued in 1993 specified that glyphosate labels formulated for aquatic use have language intended to warn users of potential fish suffocation from aquatic applications. The EPA is requiring updates to the existing language to be consistent with current labeling guidance (see the EPA's Label Review Manual, and Table 4 below).

An additional statement under "directions for use" for aquatic use labels is required to instruct users to apply in strips to help avoid oxygen depletion when emerged weed infestations cover the total surface area of an impounded water body (see Table 4 below).

Docket Number EPA-HQ-OPP-2009-0361
www.regulations.gov

**Table 4. Statements Required for Glyphosate for Aquatic Use**

| Product Type | Statement |
|---|---|
| Environmental hazards: for labels with terrestrial uses only | "Do not apply directly to water, to areas where surface water is present or to intertidal areas below the mean high-water mark. Do not contaminate water when cleaning equipment or disposing of equipment wash waters and rinsate." |
| Environmental hazards: for labels with aquatic uses only | "Killing aquatic weeds can result in depletion or loss of oxygen in the water due to decomposition of dead plant material. This oxygen loss can cause fish suffocation. Consult with your State agency with primary responsibility for regulating pesticides before applying to public waters to determine if a permit is required. Do not contaminate water when cleaning equipment or disposing of equipment wash waters and rinsate." |
| Environmental hazards: for labels with both aquatic and terrestrial uses | "Killing aquatic weeds can result in depletion or loss of oxygen in the water due to decomposition of dead plant material. This oxygen loss can cause fish suffocation. Consult with your State agency with primary responsibility for regulating pesticides before applying to public waters to determine if a permit is required. For terrestrial uses, do not apply directly to water, to areas where surface water is present or to intertidal areas below the mean high-water mark [*Optional text, if applicable*: except when applying this product by air over the forest canopy]. Do not contaminate water when cleaning equipment or disposing of equipment wash waters and rinsate." |
| Directions for use for aquatic uses | "When emerged weed infestations cover the total surface area of an impounded waterbody, apply this product to the emerged vegetation in strips to help avoid oxygen depletion in the water due to decaying vegetation. Oxygen depletion in the water can result in increased fish mortality." |

*Clarification on Rotational Crop Timing*

Many glyphosate labels lack instructions for crop rotation. The EPA is requiring the clarification that treated fields may be rotated to a labeled crop at any time. For fields being rotated to a non-labeled crop, any glyphosate application must be made a minimum of 30 days prior to planting. EPA is updating the language that was proposed in the PID to further clarify the instructions on rotational crop timing based on public comments received.

*Label Claims*

During meetings with the agency in 2018, the Joint Glyphosate Task Force proposed to clarify on existing labels a statement about how glyphosate works. The following statement is being required: "Glyphosate works by targeting an enzyme that is essential for plant growth." The revision is consistent with the requirements of 40 CFR § 156.10(a)(5). Registrants may use alternate claims, as long as alternate claims meet labeling requirements. Registrants can refer to 40 CFR § 156.10(a)(5) for requirements regarding label claims prior to submitting updated labels for registration review.

## B. Tolerance Actions

The EPA is requiring the following revisions for glyphosate tolerances: adjusting the number of significant figures, establishing new tolerances for various vegetable and fruit groups/subgroups, and deleting certain older tolerances which are no longer needed due to the new tolerance

Docket Number EPA-HQ-OPP-2009-0361
www.regulations.gov

groupings. Refer to Section III.A.3 of this document for the required tolerance changes. The agency will use its FFDCA rulemaking authority to make the needed changes to the tolerances. The agency intends to address the tolerance revisions requested by the EWG et al. petitioners in its response to their petition and has not addressed them in this document.

### C.  Interim Registration Review Decision

In accordance with 40 CFR § 155.56 and 155.58, the agency is issuing this Interim Registration Review Decision. Except for the EDSP, ESA, and resolution of the EWG et al. petition, the agency has made the following Interim Registration Review Decision: (1) no additional data are required at this time; and (2) changes to the affected registrations and their labeling are needed, as described in Section IV. A. and Appendices B and C. This document finalizes the agency's draft supporting documents: *Glyphosate Draft Human Health Risk Assessment for Registration Review*, and *Registration Review—Preliminary Ecological Risk Assessment for Glyphosate and Its Salts.*

In this interim registration review decision, the EPA is making no human health or environmental safety findings associated with the EDSP screening of glyphosate, nor is it making a complete endangered species finding. This interim registration review decision does not address the specific claims raised in the EWG et al. petition, nor does it constitute EPA's response to the petition. Although the agency is not making a complete endangered species finding at this time, the mitigation described in this document is expected to reduce the extent of environmental exposure and may reduce risk to listed species whose range and/or critical habitat co-occur with the use of glyphosate. The agency's final registration review decision for glyphosate will be dependent upon the result of the agency's ESA assessment and any needed section 7 consultation with the Services, an EDSP FFDCA section 408(p) determination, and after a resolution of the EWG et al. petition.

### D.  Data Requirements

No additional data are required for this registration review at this time. The EPA will consider requiring the glyphosate registrants to submit pollinator data as a separate action.

## V.    NEXT STEPS AND TIMELINE

### A.  Interim Registration Review Decision

A Federal Register Notice will announce the availability of this Interim Registration Review Decision for glyphosate. A final decision on the glyphosate registration review case will occur after: (1) an EDSP FFDCA §408(p) determination, (2) an endangered species determination under the ESA and any needed §7 consultation with the Services, and (3) a resolution of the EWG et al. petition. This document finalizes the agency's draft supporting documents: *Glyphosate Draft Human Health Risk Assessment for Registration Review*, and *Registration Review—Preliminary Ecological Risk Assessment for Glyphosate and Its Salts.*

Docket Number EPA-HQ-OPP-2009-0361
www.regulations.gov

### B.  Implementation of Mitigation Measures

Given the anticipated timeframe for the agency's response to the EWG et al. petition in 2020, labels should not be submitted at this time. Once the agency completes its response to the petition, it will issue letters to glyphosate registrants requesting label submission to incorporate the glyphosate required interim risk mitigation (see Appendices A, B, and C), which will be posted to the docket. Revised labels and requests for amendment of registrations will be required for submission to the agency for review within 60 days following the issuance of letters.

Docket Number EPA-HQ-OPP-2009-0361
www.regulations.gov

## Appendix A: Summary of Required Actions for Glyphosate

Registration Review Case#: 0178
PC Codes: 103601, 103604, 103605, 103607, 103608, 103613, 417300
Chemical Type: herbicide
Chemical Family: glycine derivative
Mode of Action: targets the 5-enolpyruvyl-3-shikimate phosphate synthase enzyme

| Affected Population(s) | Source of Exposure | Route of Exposure | Duration of Exposure | Potential Risk(s) of Concern | Required Actions | Comment |
|---|---|---|---|---|---|---|
| Terrestrial and aquatic plants | Spray drift | Foliar absorption | Acute Chronic | Survival, biomass | Require enforceable spray drift management language; updated environmental hazards language | |
| Birds | Residues on food items (via deposition or spray drift) | Dietary | Acute Chronic | Growth | Require enforceable spray drift management language | Risks are likely limited to the field and areas near the application field. |
| Mammals | Residues on food items (via deposition or spray drift) | Dietary | Acute Chronic | Growth and reproduction | Require enforceable spray drift management language | Risks to are likely limited to the field and areas near the application field. |
| Terrestrial invertebrates | Residues on nectar sources (via deposition or spray drift) | Dietary | Acute Chronic | Effects on nectar sources of terrestrial invertebrates | Non-target organism environmental hazards language | Risks to bees are uncertain at application rates higher than 1.9 lb ae/A. The agency may require additional pollinator data to fully assess risk to terrestrial invertebrates. |

Docket Number EPA-HQ-OPP-2009-0361
www.regulations.gov

## Appendix B:  Required Labeling Changes for Glyphosate Products

| Description | Required Label Language for Glyphosate Products | | | | Placement on Label |
|---|---|---|---|---|---|
| | **End Use Products** | | | | |
| **Mechanism of Action Group Number** | **Note to registrant:**<br>• Include the name of the **ACTIVE INGREDIENT** in the first column<br>• Include the word "**GROUP**" in the second column<br>• Include the **MODE/MECHANISM OF ACTION CODE** in the third column (for herbicides this is the Mechanism of Action, for fungicides this is the FRAC Code, and for insecticides this is the Primary Site of Action)<br>• Include the type of pesticide (*i.e.*, **HERBICIDE** or **FUNGICIDE** or **INSECTICIDE**) in the fourth column. | | | | Front Panel, upper right quadrant.<br>All text should be black, bold face and all caps on a white background, except the mode of action code, which should be white, bold face and all caps on a black background; all text and columns should be surrounded by a black rectangle. |
| | **Glyphosate** | **GROUP** | **9** | **HERBICIDE** | |
| **Non-target Organism Advisory** | "NON-TARGET ORGANISM ADVISORY: This product is toxic to plants and may adversely impact the forage and habitat of non-target organisms, including pollinators, in areas adjacent to the treated site.  Protect the forage and habitat of non-target organisms by following label directions intended to minimize spray drift." | | | | Environmental Hazards |
| **Environmental Hazards Statement for Aquatic Use** | *For labels without aquatic uses:* "Do not apply directly to water, to areas where surface water is present or to intertidal areas below the mean high-water mark. Do not contaminate water when cleaning equipment or disposing of equipment wash waters and rinsate."<br><br>*For labels with aquatic uses only:* "Killing aquatic weeds can result in depletion or loss of oxygen in the water due to decomposition of dead plant material. This oxygen loss can cause fish suffocation. Consult with your State agency with primary responsibility for regulating pesticides before applying to public waters to determine if a permit is required. Do not contaminate water when cleaning equipment or disposing of equipment wash waters and rinsate."<br><br>*For labels with both aquatic and terrestrial uses:* "Killing aquatic weeds can result in depletion or loss of oxygen in the water due to decomposition of dead plant material. This oxygen loss can cause fish suffocation. Consult with your | | | | Environmental Hazards |

Docket Number EPA-HQ-OPP-2009-0361
www.regulations.gov

| Description | Required Label Language for Glyphosate Products | Placement on Label |
|---|---|---|
| | State agency with primary responsibility for regulating pesticides before applying to public waters to determine if a permit is required. For terrestrial uses, do not apply directly to water, to areas where surface water is present or to intertidal areas below the mean high-water mark [*Optional text, if applicable*: except when applying this product by air over the forest canopy]. Do not contaminate water when cleaning equipment or disposing of equipment wash waters and rinsate." | |
| **Aquatic Use Statement** | "When emerged weed infestations cover the total surface area of an impounded waterbody, apply this product to the emerged vegetation in strips to help avoid oxygen depletion in the water due to decaying vegetation. Oxygen depletion in the water can result in increased fish mortality." | Directions for Use |
| **HERBICIDE RESISTANCE MANAGEMENT:** Weed Resistance Management | Include resistance management label language for herbicides from PRN 2017-1 and PRN 2017-2 (https://www.epa.gov/pesticide-registration/pesticide-registration-notices-year) | Directions for Use, prior to directions for specific crops under the heading "WEED RESISTANCE-MANAGEMENT" |
| **Additional Required Labelling Action** (Applies to all products delivered via liquid spray applications) | Remove information about volumetric mean diameter from all labels where such information currently appears. | Directions for Use |
| **Rotational crop information** | "This product may be applied during fallow intervals preceding planting, prior to planting or transplanting, at-planting, or preemergence to annual and perennial crops listed on this label, except where specifically limited. For any crop not listed on this label, application must be made a minimum of 30 days prior to planting." | Directions for Use |
| **Label claims** | "Glyphosate works by targeting an enzyme that is essential for plant growth." [Alternate claims, if used, must meet labeling requirements. Refer to 40 CFR § 156.10(a)(5) for requirements regarding label claims.] | Product Information |
| **Clarification of application rates** | Ground and aerial applications rates on the labels must not exceed the maximum application parameters as noted in Appendix C of this document, which were maximum application parameters assessed by the EPA. Application rates may only be clarified for uses that are currently approved on labels. | Directions for Use |

Docket Number EPA-HQ-OPP-2009-0361
www.regulations.gov

| Description | Required Label Language for Glyphosate Products | Placement on Label |
|---|---|---|
| **Spray Drift Management Application Restrictions** for all products that are delivered via liquid spray applications and allow aerial application | **"MANDATORY SPRAY DRIFT**<br>**Aerial Applications**:<br>• Do not release spray at a height greater than 10 ft above the ground or vegetative canopy, unless a greater application height is necessary for pilot safety.<br>• Applicators are required to use a Medium or coarser droplet size (ASABE S572.1) unless tank-mixing with a pesticide product that requires use of a finer droplet size. If a finer droplet size is used, applicators are required to use a Fine or coarser droplet size (ASABE S572.1).<br>• If the windspeed is 10 miles per hour or less, applicators must use ½ swath displacement upwind at the downwind edge of the field. When the windspeed is 11-15 miles per hour, applicators must use ¾ swath displacement upwind at the downwind edge of the field.<br>• Do not apply when wind speeds exceed 15 mph at the application site. If the windspeed is greater than 10 mph, the boom length must be 65% or less of the wingspan for fixed wing aircraft and 75% or less of the rotor diameter for helicopters. Otherwise, the boom length must be 75% or less of the wingspan for fixed-wing aircraft and 90% or less of the rotor diameter for helicopters.<br>• Do not apply during temperature inversions." | Directions for Use, in a box titled "Mandatory Spray Drift" under the heading "Aerial Applications" |
| **Spray Drift Management Application Restrictions** for products that are delivered via liquid spray applications and allow ground boom applications | **"MANDATORY SPRAY DRIFT**<br>**Ground Boom Applications:**<br>• User must only apply with the release height recommended by the manufacturer, but no more than 4 feet above the ground or crop canopy.<br>• Applicators are required to use a Medium or coarser droplet size (ASABE S572.1) unless tank-mixing with a pesticide product that requires use of a finer droplet size. If a finer droplet size is used, applicators are required to use a Fine or coarser droplet size (ASABE S572.1).<br>• Do not apply when wind speeds exceed 15 miles per hour at the application site.<br>• Do not apply during temperature inversions." | Directions for Use, in a box titled "Mandatory Spray Drift" under the heading "Ground Boom Applications" |
| **Spray Drift Management Application Restrictions** for products that are delivered via liquid spray applications and allow boomless ground sprayer applications | **"MANDATORY SPRAY DRIFT**<br>**Boomless Ground Applications:**<br>• Applicators are required to use a Medium or coarser droplet size (ASABE S572.1) unless tank-mixing with a pesticide product that requires use of a finer droplet size. If a finer droplet size is used, applicators are required to use a Fine or coarser droplet size (ASABE S572.1).<br>• Do not apply when wind speeds exceed 15 miles per hour at the application site.<br>• Do not apply during temperature inversions." | Directions for Use, in a box titled "Mandatory Spray Drift" under the heading "Boomless Applications" |

Docket Number EPA-HQ-OPP-2009-0361
www.regulations.gov

| Description | Required Label Language for Glyphosate Products | Placement on Label |
|---|---|---|
| **Advisory Spray Drift Management Language** for all products delivered via liquid spray application | **"SPRAY DRIFT ADVISORIES**<br>THE APPLICATOR IS RESPONSIBLE FOR AVOIDING OFF-SITE SPRAY DRIFT.<br>BE AWARE OF NEARBY NON-TARGET SITES AND ENVIRONMENTAL CONDITIONS.<br><br>**IMPORTANCE OF DROPLET SIZE**<br>An effective way to reduce spray drift is to apply large droplets. Use the largest droplets that provide target pest control. While applying larger droplets will reduce spray drift, the potential for drift will be greater if applications are made improperly or under unfavorable environmental conditions.<br><br>**Controlling Droplet Size – Ground Boom** *(note to registrants: remove if ground boom is prohibited on product labels)*<br>• Volume - Increasing the spray volume so that larger droplets are produced will reduce spray drift. Use the highest practical spray volume for the application.  If a greater spray volume is needed, consider using a nozzle with a higher flow rate.<br>• Pressure - Use the lowest spray pressure recommended for the nozzle to produce the target spray volume and droplet size.<br>• Spray Nozzle - Use a spray nozzle that is designed for the intended application. Consider using nozzles designed to reduce drift.<br><br>**Controlling Droplet Size – Aircraft** *(note to registrants: remove if aerial application is prohibited on product labels)*<br>• Adjust Nozzles - Follow nozzle manufacturers' recommendations for setting up nozzles.  Generally, to reduce fine droplets, nozzles should be oriented parallel with the airflow in flight.<br><br>**BOOM HEIGHT – Ground Boom** *(note to registrants: remove if ground boom is prohibited on product labels)*<br>For ground equipment, the boom should remain level with the crop and have minimal bounce.<br><br>**RELEASE HEIGHT** - **Aircraft** *(note to registrants: remove if aerial application is prohibited on product labels)*<br>Higher release heights increase the potential for spray drift.<br><br>**SHIELDED SPRAYERS**<br>Shielding the boom or individual nozzles can reduce spray drift.  Consider using shielded sprayers.  Verify that the shields are not interfering with the uniform deposition of the spray on the target area.<br><br>**TEMPERATURE AND HUMIDITY**<br>When making applications in hot and dry conditions, use larger droplets to reduce effects of evaporation.<br><br>**TEMPERATURE INVERSIONS** | Directions for Use, just below the Spray Drift box, under the heading "Spray Drift Advisories" |

26

Docket Number EPA-HQ-OPP-2009-0361
www.regulations.gov

| Description | Required Label Language for Glyphosate Products | Placement on Label |
|---|---|---|
| | Drift potential is high during a temperature inversion. Temperature inversions restrict vertical air mixing, which can cause small droplets to remain suspended in a concentrated cloud.  This cloud can move in unpredictable directions due to the light variable winds common during inversions.  Temperature inversions are characterized by increasing temperatures with altitude and are common on nights with limited cloud cover and light to no wind. They can begin to form in late afternoon/early evening and often continue into the morning.  Their presence can be indicated by ground fog.  If fog is not present, inversions can also be identified by the movement of smoke from a ground source or an aircraft smoke generator.  Smoke that layers and moves laterally in a concentrated cloud (under low wind conditions) indicates an inversion, while smoke that moves upward and rapidly dissipates indicates good vertical air mixing.<br><br>**WIND**<br>Drift potential generally increases with wind speed.  AVOID APPLICATIONS DURING GUSTY WIND CONDITIONS.<br>Applicators need to be familiar with local wind patterns and terrain that could affect spray drift." | |
| **Advisory Spray Drift Management Language** for products that are delivered via liquid spray applications and allow boomless ground sprayer applications | **"SPRAY DRIFT ADVISORIES**<br>**Boomless Ground Applications:**<br>• Setting nozzles at the lowest effective height will help to reduce the potential for spray drift." | Directions for Use, just below the Spray Drift box, under the heading "Spray Drift Advisories" |
| **Advisory Spray Drift Management Language** for all products that allow liquid applications with handheld technologies | **"SPRAY DRIFT ADVISORIES**<br>**Handheld Technology Applications:**<br>• Take precautions to minimize spray drift." | Directions for Use, just below the Spray Drift box, under the heading "Spray Drift Advisories" |

Docket Number EPA-HQ-OPP-2009-0361
www.regulations.gov

## Appendix C:  Maximum Application Rates for Glyphosate Ground and Aerial Application[5]

| Crop Group | Ground Maximum Single Application Rate (lb a.e./A) | Aerial Maximum single application rate (lb a.e./A) | Maximum Annual Application Rate (lb a.e./A) |
|---|---|---|---|
| Round-up Ready 2 Yield Soybeans | 3.75 | 1.55 | 6 |
| Root Tuber Vegetables: arracacha, arrowroot, carrot, chinese artichoke, Jerusalem artichoke, beet (garden), burdock, canna, cassava (bitter and sweet), celeriac, chayote (root), chervil (turnip-rooted), chicory, chufa, dasheen (taro), galangal, ginger, ginseng, horseradish, leren, kava (turn-rooted), parsley (turnip-rooted), parsnip, potato, radish, rutabaga, oriental radish, salsify, skirret, sweet potato, tanier, turmeric, turnip, wasabi, yacon, yam bean, true yam | 3.75 | 1.55 | 6 |
| Rangelands | 0.38 | 0.38 | 2.25 |
| Pome Fruits: including apple, crabapple, loquat, mayhaw, pear, oriental pear, quince | 3.75 | 1.55 | 8 |
| Pastures | 8 | 8 | 8 |
| Oilseed Crops: borage, buffalo gourd, calendula, canola, castor oil plant, chinese tallow tree, crambe, cuphea, echium, euphorbia, evening primrose, flax (seed), gold of pleasure, hare's ear mustard, jojoba, lesquerella, meadow foam, milkweed, mustard (seed), niger (seed), oil radish, poppy seed, rapeseed, rose hip, safflower, sesame, stokes aster, sunflower, sweet rocket, tallow wood, tea oil plant, veronia. | 3.75 | 1.55 | 6 |
| Non-Food Tree Crops: pine, poplar, eucalyptus, christmas trees, other non-food tree crops | 8 | 8 | 8 |
| Miscellaneous Tree Food Crops: cactus (fruit and pads), palm (heart, leaves, oil) | 3.75 | 1.55 | 8 |
| Miscellaneous Crops: aloe vera, bamboo shoots, globe artichoke, okra, peanut (ground nut), strawberry, sugar beet, asparagus, pineapple | 3.75 | 1.55 | 6 |
| Legume Vegetables: Succulent varieties of Bean (Lupinus: includes grain lupin, sweet lupin, white lupin, white sweet lupin); Bean (Phaseolus: includes field bean, kidney bean, lima bean, navy bean, pinto bean, runner bean, snap bean, tepary bean, wax bean); Bean (Vigna: includes adzuki bean, asparagus bean, blackeyed pea, catjang, Chinese longbean, cowpea, crowder pea, moth bean, mung bean, rice bean, southern pea, urd bean, yardlong bean); Broad bean (fava); Chickpea (garbanzo); Guar; Jackbean; Lablab bean; Lentil; Pea (Pisum: includes dwarf pea, edible-podded pea, English pea, field pea, garden pea, green pea, snowpea, sugar snap pea); Pigeon pea; Soybean (immature seed); Sword bean. Dry varieties of Bean (Lupinus: includes grain lupin, sweet lupin, white lupin, white sweet lupin); Bean (Phaseolus: includes field bean, kidney bean, lima bean, navy bean, pinto bean, runner bean, snap bean, | 3.75 | 1.55 | 6 |

---

[5] It is not EPA's intention to change the current application rates on glyphosate labels, but the agency is requiring defined rate limits on labels in order to establish better consistency and clarity on labels.

28

Docket Number EPA-HQ-OPP-2009-0361
www.regulations.gov

| Crop Group | Ground Maximum Single Application Rate (lb a.e./A) | Aerial Maximum single application rate (lb a.e./A) | Maximum Annual Application Rate (lb a.e./A) |
|---|---|---|---|
| tepary bean, wax bean); Bean (Vigna: includes adzuki bean, asparagus bean, blackeyed pea, catjang, Chinese longbean, cowpea, crowder pea, moth bean, mung bean, rice bean, southern pea, urd bean, yardlong bean); Broad bean (fava); Chickpea (garbanzo); Guar; Jackbean; Lablab bean; Soybean (immature seed); Sword bean<br>Dry varieties of Lentil; Pea (Pisum: includes dwarf pea, edible-podded pea, English pea, garden pea, green pea, snowpea, sugar snap pea); Pigeon pea | | | |
| Leafy Vegetables: Amaranth (Chinese spinach); Arugula (roquette); Beet greens; Cardoon; Celery; Chinese celery; Celtuce; Chaya; Chervil; Edible-leaved chrysanthemum; Garland chrysanthemum; Corn salad; Cress (garden and upland); Dandelion; Dock (sorrel); Dokudami; Endive (escarole); Florence fennel; Gow kee; Lettuce (head and leaf); Orach, Parsley; Purslane (garden and winter); Radicchio (red chicory); Rhubarb; Spinach; New Zealand spinach; Vine spinach; Swiss chard; Watercress (upland); Water spinach | 3.75 | 1.55 | 6 |
| Herbs and Spices: Allspice, Angelica, Star anise, Annatto (seed), Balm, Basil, Corage, Burnet, camomile, Caper buds, Caraway, Black caraway, Cardamom, Cassia bark, Cassia buds, Catnip, Celery seed, Chervil (dried), Chive, Chinese chive, Cilantro (leaf), Cilantro (seed), Cinnamon, Clary, Clove buds, Coriander leaf (cilantro or Chinese parsley), Coriander seed (cilantro), Costmary, Cumin, Curry (leaf), Dill (dillweed), Dill (seed), Epazote, Fennel seed (common and Florence), Fenugreek, White ginger flower, Grains of paradise, Horehound, Hyssop, Juniper berry, Lavender, Lemongrass, Lovage (leaf and seed), Mace, Marigold, Marjoram (including oregano), Mexican oregano, Mioga flower, Mustard (seed), Nasturtium, Nutmeg, Parsley (dried), Pennyroyal, Pepper (black and white), Pepper leaves, Peppermint, Perilla, Poppy (seed), Rosemary, Rue, Saffron, Sage, Savory (summer and winter), Spearmint, Stevia levaes, Sweet bay, Tansy, Tarragon, Thyme, Vanilla, Wintergreen, Woodruff, Wormwood | 3.75 | 1.55 | 6 |
| Grass/Turfgrass/Sod Production | 3.75 | 1.55 | 6 |
| Grain Sorghum | 3.75 | 1.55 | 6 |
| Fruiting Vegetables: Eggplant; Groundcherry (Physalis spp); Pepino; Pepper (includes bell pepper, chili pepper, cooking pepper, pimento, sweet pepper); Tomatillo; Tomato | 3.75 | 1.55 | 6 |
| Forestry | 8 | 8 | 8 |
| Fallow | 3.75 | 1.55 | 6 |
| Cucurbits Vegetables/Fruit: Chayote (fruit); Chinese waxgourd (Chinese preserving melon); Citron melon; Cucumber; Gherkin; Edible gourd (includes hyotan, cucuzza, hechima, Chinese okra); Melons (all); Momordica spp (includes balsam apple, balsam pear, bittermelon, Chinese cucumber); Muskmelon (includes cantaloupe, casaba, crenshaw melon, golden pershaw melon, honeydew melon, honey ball melon, mango melon, Persian melon, pineapple melon, Santa Claus melon, snake melon); Pumpkin; Summer squash | 3.75 | 1.55 | 6 |

Docket Number EPA-HQ-OPP-2009-0361
www.regulations.gov

| Crop Group | Ground Maximum Single Application Rate (lb a.e./A) | Aerial Maximum single application rate (lb a.e./A) | Maximum Annual Application Rate (lb a.e./A) |
|---|---|---|---|
| (includes crookneck squash, scallop squash, straightneck squash, vegetable marrow, zucchini); Winter squash (includes butternut squash, calabaza, hubbard squash, acorn squash, spaghetti squash); Watermelon | | | |
| Cotton | 3.75 | 1.55 | 6 |
| Corn (Field, Seed, Silage, Popcorn) | 3.75 | 1.55 | 6 |
| Conservation Reserve Program | 3.75 | 1.55 | 6 |
| Citrus Fruit Crop: All cultivars, varieties and/or hybrids of Calamondin; Chironja; Citron; Citrus hybrids; Grapefruit (including Japanese summer); Kumquat; Lemon; Lime (including Australian desert lime, Australian finger lime, Australian round lime, Brown river finger lime, Mount white, New Guinea wild, Russell river, sweet, and Tahiti); Mandarin (including Mediterranean and Satsuma); Orange (all); Pummelo; Tangelo; Tangerine (Mandarin); Tangor; Uniq Fruit (ugli) | 3.75 | 1.55 | 8 |
| Cereal and Grain Crop: barley, buckwheat, millet, oats, rye, quinoa, teff, teosinte, triticale, wild rice, rice, feed barley, wheat | 3.75 | 1.55 | 6 |
| Bulb Vegetables: All cultivars, varieties and/or hybrids of Chive (fresh leaves, including Chinese chive); Daylily (bulb); Elegans hosta; Fritillaria (bulb and leaves); Garlic (bulb, including great-headed and serpent garlic); Kurrant, Leek (including lady's and wild leek); Lily (bulb); Onion (including Beltsville bunching, bulb, Chinese bulb, fresh, green, macrostem, pearl, potato bulb, tree tops and Welsh onion tops); Shallot (bulb and fresh leaves) | 3.75 | 1.55 | 6 |
| Brassica Vegetable: Broccoli; Chinese broccoli (gai lon); Broccoli raab (rapini); Brussels sprouts; Cabbage; Chinese cabbage (bok choy); Chinese cabbage (napa); Chinese mustard cabbage (gai choy); Cauliflower; Cavalo broccoli; Collards; Kale; Kohlrabi; Mizuna; Mustard greens; Mustard spinach; Rape greens | 3.75 | 1.55 | 6 |
| Round-up Ready Flex Cotton | 3.75 | 1.55 | 6 |
| Round-up Ready Cotton | 3.75 | 1.55 | 6 |
| Round-up Ready Corn (GA-21) | 3.75 | 1.55 | 6 |
| Round-up Ready Corn 2 (NK603) | 3.75 | 1.55 | 6 |
| Round-up Ready Alfalfa | 1.55 | 1.55 | 6 |
| Round-up Ready Sugarbeets | 3.75 | 1.55 | 6 |
| Tropical/Subtropical Trees/Fruits: Ambarella; Atemoya; Avocado; Banana; Barbados cherry (acerola); Biriba; Blimbe; Breadfruit; Cacao (cocoa) bean; Canistel; Carambola (starfruit); Cherimoya; Coffee; Custard apple; Dates; Durian; Feijoa; Figs; Governor's plum; Guava; Ilama; Imbe; Imbu; Jaboticaba; Jackfruit; Longan; Lychee; Mamey apple; Mango; Mangosteen; Marmaladebox (genip); Mountain papaya; Noni | 3.75 | 1.55 | 8 |

30

Docket Number EPA-HQ-OPP-2009-0361
www.regulations.gov

| Crop Group | Ground Maximum Single Application Rate (lb a.e./A) | Aerial Maximum single application rate (lb a.e./A) | Maximum Annual Application Rate (lb a.e./A) |
|---|---|---|---|
| (Indian mulberry); Papaya; Pawpaw; Plantain; Persimmon; Pomegranate; Pulasan; Rambuttan; Rose apple; Sapodilla; Sapote (black, mamey, white); Spanish lime; Soursop; Star apple; Sugar apple; Surinam cherry; Tamarind; Tea; Ti (roots and leaves); Wax jambu | | | |
| Tree Nut Crops: Cultivars, varieties, and/or hybrids of African nut-tree; Almond; Beechnut; Brazil nut; Brazilian pine; Bunya; Burr oak; Butternut; Cajou nut; Candlenut; Cashew; Chestnut; Chinquapin; Coconut; Coquito nut; Dika nut; Ginkgo; Guiana chestnut; Hazelnut (Filbert); Heartnut; Hickory nut; Japanese horse-chestnut; Macadamia nut; Mongongo nut; Monkey-pot; Monkey puzzle nut; Okari nut; Pachira nut; Peach palm nut; Pecan; Pequi; Pili nut; Pine nut; Pistachio; Sapucaia nut; Tropical almond; Walnut (black, English); Yellowhorn | 3.75 | 1.55 | 8 |
| Sweet Corn | 3.75 | 1.55 | 6 |
| Sugar Cane | 3.75 | 2.25 | 6 |
| Stone Fruit: All cultivars, varieties and/or hybrids of Apricot; Cherry (sweet and tart); Nectarine; Olive; Peach; Plum/Prune (all types); Plumcot | 3.75 | 1.55 | 8 |
| Round-Up Ready Canola (Winter Varieties) | 1.55 | 1.55 | 6 |
| Soybeans | 3.75 | 1.55 | 6 |
| Sweet Corn with Round-Up Ready 2 Technology | 3.75 | 1.55 | 6 |
| Round-Up Ready Canola (Spring Varieties) | 1.55 | 1.55 | 6 |
| Vine Crops: grapes (raisin, table, wine), hops, passion fruit, kiwi | 3.75 | 1.55 | 8 |

31

Docket Number EPA-HQ-OPP-2009-0361
www.regulations.gov

| Crop Group | Ground Maximum Single Application Rate (lb a.e./A) | Aerial Maximum single application rate (lb a.e./A) | Maximum Annual Application Rate (lb a.e./A) |
|---|---|---|---|
| Non-Crop: Airports, airfields, apartment complexes, commercial sites, ditch banks, driveways, ramps, alleys, lanes, paths, trails, sidewalks, walkways, access roads, farm roads, highways (including aprons, medians, guardrails, and rights-of-way), paved areas and prior to paving, dry ditches, dry canals, fences and fencerows, golf courses, greenhouses, industrial sites, landscape areas, lumber yards, manufacturing sites, municipal sites, natural areas, office complexes, ornamentals, parks, campgrounds, sports areas, tennis courts, parking areas, cemeteries, petroleum or other tank farms and pumping installations, refineries, around telephone and communications equipment, public areas, drive-in theaters, railroads (including ballasts, shoulders, crossings and spot treatments), recreation areas, residential areas, rights-of-way, roadsides, firebreaks, schools, shadehouses, sports complexes, storage areas, substations, construction and pre-construction sites, turfgrass areas, around ornamental gardens, around ornamental trees and shrubs, power and utility sites, around commercial or industrial outbuildings, warehouse areas, bare ground, gravel yards, mulched areas, beaches, habitat restoration and management areas, uncropped farmstead areas, uncultivated non-agricultural areas, vacant lots, wastelands, shelter belts, and wildlife management areas. Natural Woodlands, including Wildlife and Habitat Management Areas, Wildlife Openings, Natural Areas (such as Wildlands and Wildlife Refuge), Campgrounds, Parks and Recreational Areas in Natural Forests, and Reforestation Treatments in Natural Forests | 8 | 8 | 8 |
| Aquatic | 8 | 8 | 8 |
| Alfalfa, Clover, and Other Forage Legumes, including: kudzu, lespedeza, lupin, sainfoin, trefoil, velvet bean, vetch, kenaf, leucaena | 3.75 | 1.55 | 6 |
| Berry and Small Fruit Crops: All cultivars, varieties and/or hybrids of Amur River grape; Aronia berry; Bayberry; Bearberry; Bilberry; Blackberry (including Andean blackberry, arctic blackberry, bingleberry, black satin berry, boysenberry, brombeere, California blackberry, Chesterberry, Cherokee blackberry, Cheyenne blackberry, common blackberry, coryberry, darrowberry, dewberry, Dirksen thornless berry, evergreen blackberry, Himalayaberry, hullberry, lavacaberry, loganberry, lowberry, Lucretiaberry, mammoth blackberry, marionberry, mora, mures deronce, nectarberry, Northern dewberry, olallieberry, Oregon evergreen berry, phenomenalberry, rangeberry, ravenberry, rossberry, Shawnee blackberry, Southern dewberry, tayberry, youngberry, zarzamora); Blueberry (highbush and lowbush); Buffaloberry; Che; Chilean guava; Chokecherry; Cloudberry; Cranberry (including highbush); Currant (black, Buffalo, red, native); Elderberry; European barberry; Gooseberry; Grape; Honeysuckle (edible); Huckleberry; Jostaberry; Juneberry (Saskatoon berry); Kiwifruit (fuzzy and hardy); Ligonberry; Maypop; Mountain pepper berries; Mulberry; Muntries; Partridgeberry; Phalsa; Pincherry; Raspberry (black, red and wild); Riberry; Salal; Schisandra berry; Sea buckthorn; Serviceberry | 3.75 | 1.55 | 8 |

32

Docket Number EPA-HQ-OPP-2009-0361
www.regulations.gov

**Appendix D: Endangered Species Assessment**

This Appendix provides general background about the Agency's assessment of risks from pesticides to endangered and threatened (listed) species under the Endangered Species Act. Additional background specific to glyphosate appears at the conclusion of this Appendix.

In 2013, the EPA, along with the Fish and Wildlife Service (FWS), the National Marine Fisheries Service (NMFS), and the United States Department of Agriculture (USDA) released a summary of their joint Interim Approaches for assessing risks to endangered and threatened (listed) species from pesticides[6]. These Interim Approaches were developed jointly by the agencies in response to the National Academy of Sciences' (NAS) recommendations that discussed specific scientific and technical issues related to the development of pesticide risk assessments conducted on federally threatened and endangered species.

Since that time, EPA has conducted biological evaluations (BEs) on three pilot chemicals representing the first nationwide pesticide consultations. These initial consultations were pilots and were envisioned to be the start of an iterative process. The agencies are continuing to work to improve the consultation process. For example, advancements to the initial pilot interim methods have been proposed based on experience conducting the first three pilot BEs. Public input on those proposed revisions is currently being considered.

Also, a provision in the December 2018 Farm Bill included the establishment of a FIFRA Interagency Working Group to provide recommendations for improving the consultation process required under section 7 of the Endangered Species Act for pesticide registration and Registration Review and to increase opportunities for stakeholder input. This group includes representation from EPA, NMFS, FWS, USDA, and the Council on Environmental Quality (CEQ). Given this new law and that the first nationwide pesticide consultations were envisioned as pilots, the agencies are continuing to work collaboratively as consistent with the congressional intent of this new statutory provision. EPA has been tasked with a lead role on this group, and EPA hosted the first Principals Working Group meeting on June 6, 2019.

Given that the agencies are continuing to develop and work toward implementation of approaches to assess the potential risks of pesticides to listed species and their designated critical habitat, the ecological risk assessment supporting this ID for glyphosate does not contain a complete ESA analysis that includes effects determinations for specific listed species or designated critical habitat. Although the EPA has not yet completed effects determinations for specific species or habitats, for this ID, the EPA's evaluation assumed, for all taxa of non-target wildlife and plants, that listed species and designated critical habitats may be present in the vicinity of the application of glyphosate. This will allow the EPA to focus its future evaluations on the types of species where the potential for effects exists once the scientific methods being developed by the agencies have been fully vetted. Once that occurs, these methods will be applied to subsequent analyses for glyphosate as part of completing this registration review.

---

[6] https://www.epa.gov/endangered-species/draft-revised-method-national-level-endangered-species-risk-assessment-process

Docket Number EPA-HQ-OPP-2009-0361
www.regulations.gov

Glyphosate is one of the chemicals in stipulated partial settlement agreement in the case of
Center for Biological Diversity et al., v. United States Environmental Protection Agency et al.,
No. 3:11 cv 0293 (N.D. Cal.).  Among other provisions, this agreement sets an August 14, 2021,
deadline for EPA to complete nationwide ESA section 7(a)(2) effects determination for
glyphosate and, as appropriate, request initiation of any ESA section 7(a)(2) consultations with
the Services that EPA may determine to be necessary as a result of those effects determinations.

Docket Number EPA-HQ-OPP-2009-0361
www.regulations.gov

**Appendix E: Endocrine Disruptor Screening Program**

As required by FIFRA and FFDCA, the EPA reviews numerous studies to assess potential adverse outcomes from exposure to chemicals. Collectively, these studies include acute, sub-chronic and chronic toxicity, including assessments of carcinogenicity, neurotoxicity, developmental, reproductive, and general or systemic toxicity. These studies include endpoints which may be susceptible to endocrine influence, including effects on endocrine target organ histopathology, organ weights, estrus cyclicity, sexual maturation, fertility, pregnancy rates, reproductive loss, and sex ratios in offspring. For ecological hazard assessments, the EPA evaluates acute tests and chronic studies that assess growth, developmental and reproductive effects in different taxonomic groups. As part of its most recent registration decision for glyphosate, the EPA reviewed these data and selected the most sensitive endpoints for relevant risk assessment scenarios from the existing hazard database. However, as required by FFDCA § 408(p), glyphosate is subject to the endocrine screening part of the Endocrine Disruptor Screening Program (EDSP).

The EPA has developed the EDSP to determine whether certain substances (including pesticide active and other ingredients) may have an effect in humans or wildlife similar to an effect produced by a "naturally occurring estrogen, or other such endocrine effects as the Administrator may designate." The EDSP employs a two-tiered approach to making the statutorily required determinations. Tier 1 consists of a battery of 11 screening assays to identify the potential of a chemical substance to interact with the estrogen, androgen, or thyroid (E, A, or T) hormonal systems. Chemicals that go through Tier 1 screening and are found to have the potential to interact with E, A, or T hormonal systems will proceed to the next stage of the EDSP where the EPA will determine which, if any, of the Tier 2 tests are necessary based on the available data. Tier 2 testing is designed to identify any adverse endocrine-related effects caused by the substance, and establish a dose-response relationship between the dose and the E, A, or T effect.

Under FFDCA § 408(p), the agency must screen all pesticide chemicals. Between October 2009 and February 2010, the EPA issued test orders/data call-ins for the first group of 67 chemicals, which contains 58 pesticide active ingredients and 9 inert ingredients. The agency has reviewed all of the assay data received for the List 1 chemicals and the conclusions of those reviews are available in the chemical-specific public dockets. Glyphosate is on List 1 and the review conclusions are available in the glyphosate public docket (see EPA-HQ-OPP-2009-0361). A second list of chemicals identified for EDSP screening was published on June 14, 2013,[7] and includes some pesticides scheduled for Registration Review and chemicals found in water. Neither of these lists should be construed as a list of known or likely endocrine disruptors. For further information on the status of the EDSP, the policies and procedures, the lists of chemicals, future lists, the test guidelines and the Tier 1 screening battery, please visit the EPA website.[8]

---

[7] See http://www.regulations.gov/#!documentDetail;D=EPA-HQ-OPPT-2009-0477-0074 for the final second list of chemicals.
[8] https://www.epa.gov/endocrine-disruption

Docket Number EPA-HQ-OPP-2009-0361
www.regulations.gov

In this ID, the EPA is making no human health or environmental safety findings associated with the EDSP screening of glyphosate. Before completing this registration review, the agency will make an EDSP FFDCA § 408(p) determination.

# EXHIBIT 6



UNITED STATES ENVIRONMENTAL PROTECTION AGENCY
WASHINGTON, D.C.  20460

OFFICE OF
PREVENTION, PESTICIDES AND
TOXIC SUBSTANCES

*1-25-11*

Dawn Fee-White
Monsanto Company
1300 I (Eye) Street, NW
Suite 450 East
Washington, DC  20005

Subject:  EPA Reg. No. 524-517 / Ranger Pro Herbicide Label Amendment

The labeling referred to above, submitted in connection with registration under the Federal
Insecticide, Fungicide, and Rodenticide Act, as amended, is acceptable.

A stamped copy of the label is enclosed for your records.  If you have any questions please call
Erik Kraft at 703-308-9358 or email at Kraft.Erik@epa.gov.

Sincerely,

James A. Tompkins
Product Manager 25
Herbicide Branch
Registration Division (7505P)

21225H4-1/53



Ranger PRO is a complete broad-spectrum postemergence
professional herbicide for non-crop, industrial,
Turf and ornamental weed control.

## Complete Directions for Use



~~The complete broad-spectrum postemergence professional~~
~~herbicide for industrial, turf and ornamental weed control.~~



EPA Reg. No. 524-517                    2009-1

**AVOID CONTACT OF HERBICIDE WITH FOLIAGE, STEMS,**
**EXPOSED NON-WOODY ROOTS OR FRUIT OF CROPS,**
**DESIRABLE PLANTS AND TREES, BECAUSE SEVERE INJURY**
**OR DESTRUCTION IS LIKELY TO RESULT.**

ACCEPTED

1-25-10

Under the Federal Insecticide,
Fungicide, and Rodenticide Act,
as amended, for the pesticide
registered under
EPA Reg. No. 524-517



000524-00517.20090317.amend.pdf

## MASTER LABEL FOR EPA REG. NO. 524-517
### Registered Brand Names

Base Brand Name:
RangerPRO Herbicide

Table of Contents for Master Label

| I | Main Label for Industrial, Turf, & Ornamental Uses | Page 2 |
|---|---|---|
| II | Supplemental Labeling for Industrial, Turf, & Ornamental Uses | Page 34 |

**See each label part for more detailed table of contents**

All AG Crop uses and crop use supplemental labels previously on this registration have been removed. Ag non-crop uses are incorporated.

000524-00517.20090317.amend.pdf

---

I. MAIN LABEL FOR INDUSTRIAL, TURF, ORNAMENTAL USES

---

[INSERT PRODUCT LOGO]



Ranger PRO herbicide is a complete broad-spectrum postemergence professional herbicide for industrial, turf and ornamental weed control.

---

*Optional alternate statement:* Ranger PRO herbicide is a complete broad-spectrum postemergence professional herbicide for forestry site preparation and utility rights-of-way weed control.

---

**Complete Directions for Use**

EPA Reg. No. 524-517

AVOID CONTACT OF HERBICIDE WITH FOLIAGE, STEMS, EXPOSED NON-WOODY ROOTS OR FRUIT OF CROPS, DESIRABLE PLANTS AND TREES, BECAUSE SEVERE INJURY OR DESTRUCTION IS LIKELY TO RESULT.

Read the entire label before using this product.

Use only according to label instructions.

Not all products listed in this label are registered for use in California. Check the registration status of each product in California before using.

Read the "LIMIT OF WARRANTY AND LIABILITY" statement at the end of the label before buying or using. If terms are not acceptable, return at once unopened.

THIS IS AN END-USE PRODUCT. MONSANTO (THIS COMPANY) DOES NOT INTEND AND HAS NOT REGISTERED IT FOR REFORMULATION. SEE INDIVIDUAL CONTAINER LABEL FOR REPACKAGING LIMITATIONS.

---

[*Container label text for* Refillable Container Label Statement]

THIS IS AN END-USE PRODUCT. MONSANTO (THIS COMPANY) DOES NOT INTEND AND HAS NOT REGISTERED IT FOR REFORMULATION. IT IS INTENDED THAT REPACKAGING BE ONLY IN ACCORDANCE WITH A MONSANTO (VALID) REPACKAGING OR TOLL REPACKAGING AGREEMENT.

[*Container label text for* Non-Refillable Container Label Statement]

THIS IS AN END-USE PRODUCT. MONSANTO (THIS COMPANY) DOES NOT INTEND AND HAS NOT REGISTERED IT FOR REFORMULATION OR REPACKAGING

---

**CONTENTS**

| | | |
|---|---|---|
| 1 | 1.0 | **INGREDIENTS** |
| 2 | 2.0 | **IMPORTANT PHONE NUMBERS** |
| 3 | 3.0 | **PRECAUTIONARY STATEMENTS** |
| | 3.1 | Hazards to Humans and Domestic Animals |

I. MAIN LABEL FOR INDUSTRIAL, TURF, AND ORNAMENTAL USES

|      | 3.2  | Environmental Hazards |
|      | 3.3  | Physical or Chemical Hazards |
| 4    | 4.0  | **STORAGE AND DISPOSAL** |
| 5    | 5.0  | **PRODUCT INFORMATION** |
|      | 5.1  | Weed Resistance Management |
|      | 5.2  | Management for Glyphosate Resistant Weed Biotypes |
| 6    | 6.0  | **MIXING** |
|      | 6.1  | Mixing with Water |
|      | 6.2  | Tank Mixtures |
|      | 6.3  | Tank Mixing Procedure |
|      | 6.4  | Mixing Percent Solutions |
|      | [*Optional Section:* Surfactants] |  |
|      | 6.5  | Colorants or Dyes |
|      | 6.6  | Drift Control Additives |
| 7    | 7.0  | **APPLICATION EQUIPMENT AND TECHNIQUES** |
|      | 7.1  | Aerial Equipment |
|      | 7.2  | Ground Broadcast Equipment |
|      | 7.3  | Backpack or High-Volume Equipment |
|      | 7.4  | Selective Equipment |
|      | 7.5  | Injection Systems |
|      | 7.6  | CDA Equipment |
| 8    | 8.0  | **SITE AND USE INSTRUCTIONS** |
|      | 8.1  | Cut Stump |
|      | 8.2  | Forestry Site Preparation |
|      | 8.3  | Non-Crop Areas and Industrial Sites |
|      | 8.4  | Habitat Management |
|      | 8.5  | Hollow Stem Injection |
|      | 8.6  | Injection and Frill (Woody Brush and Trees) |
|      | 8.7  | Ornamentals, Plant Nurseries, and Christmas Trees |
|      | 8.8  | Pasture Grasses, Forage Legumes |
|      | 8.9  | Rangelands |
|      | 8.9  | Parks, Recreational and Residential Areas |
|      | 8.10 | Railroads |
|      | 8.11 | Roadsides |
|      | 8.12 | Utility Sites |
| 9    | 9.0  | **WEEDS CONTROLLED** |
|      | 9.1  | Annual Weeds |
|      | 9.2  | Perennial Weeds |
|      | 9.3  | Woody Brush and Trees |
| 10   | 10.0 | **LIMIT OF WARRANTY AND LIABILITY** |

**1.0 INGREDIENTS**

ACTIVE INGREDIENT:

*Glyphosate, N-(phosphonomethyl)glycine, in the form of its isopropylamine salt...............................41.0%

OTHER INGREDIENTS (including surfactant): .................................................................................... 59.0%

100.0%

*Contains 480 grams per liter or 4 pounds per U.S. gallon of the active ingredient glyphosate, in the form of its isopropylamine salt. Equivalent to 356 grams per liter or 3 pounds per U.S. gallon of the acid, glyphosate.

This product is protected by U.S. Patent Nos. 5,683,958; 5,703,015; 6,063,733; 6,121,199; 6,121,200. No license granted under any non-U.S. patent(s).

**2.0 IMPORTANT PHONE NUMBERS**

I. MAIN LABEL FOR INDUSTRIAL, TURF, AND ORNAMENTAL USES

1. FOR PRODUCT INFORMATION OR ASSISTANCE IN USING THIS PRODUCT, CALL TOLL-FREE,

1-800-332-3111.

2. IN CASE OF AN EMERGENCY INVOLVING THIS PRODUCT, OR FOR MEDICAL ASSISTANCE, CALL COLLECT, DAY OR NIGHT,

(314)-694-4000.

### 3.0 PRECAUTIONARY STATEMENTS

### 3.1 Hazards to Humans and Domestic Animals

Keep out of reach of children.

# CAUTION!

CAUSES EYE IRRITATION.

Avoid contact with eyes or clothing.

| **FIRST AID:** | Call a poison control center or doctor for treatment advice. |
|---|---|
| **IF IN EYES** | • Hold eye open and rinse slowly and gently with water for 15 - 20 minutes.<br><br>• Remove contact lenses if present after the first 5 minutes then continue rinsing eye. |
| | |

- Have the product container or label with you when calling a poison control center or doctor, or going for treatment.
- You may also contact **(314) 694-4000,** collect day or night, for emergency medical treatment information.
- This product is identified as **[INSERT BRAND NAME], EPA Registration No. 524-517**.

DOMESTIC ANIMALS: This product is considered to be relatively nontoxic to dogs and other domestic animals; however, ingestion of this product or large amounts of freshly sprayed vegetation may result in temporary gastrointestinal irritation (vomiting, diarrhea, colic, etc.). If such symptoms are observed, provide the animal with plenty of fluids to prevent dehydration. Call a veterinarian if symptoms persist for more than 24 hours.

**Personal Protective Equipment (PPE)**

**Applicators and other handlers must wear:** long-sleeved shirt and long pants, shoes plus socks. Follow manufacturer's instructions for cleaning/maintaining Personal Protective Equipment. If there are no such instructions for washables, use detergent and hot water. Keep and wash PPE separately from other laundry.

Discard clothing and other absorbent materials that have been drenched or heavily contaminated with this product's concentrate. Do not reuse them.

When handlers use closed systems, enclosed cabs or aircraft in a manner that meets the requirements listed in Worker Protection Standard (WPS) for agricultural pesticides [40 CFR 170.240 (d) (4-6)], the handler PPE requirements may be reduced or modified as specified in the WPS.

| **User Safety Recommendations:** |
|---|
| Users should: |
| • Wash hands before eating, drinking, chewing gum, using tobacco or using the toilet. |

I. MAIN LABEL FOR INDUSTRIAL, TURF, AND ORNAMENTAL USES

| • Remove clothing immediately if pesticide gets inside. Then wash thoroughly and put on clean clothing. |
| --- |

**3.2 Environmental Hazards**

Do not apply directly to water, to areas where surface water is present or to intertidal areas below the mean high water mark. Do not contaminate water when cleaning equipment or disposing of equipment washwaters.

**3.3 Physical or Chemical Hazards**

Mix, store and apply spray solutions of this product using only stainless steel, fiberglass, plastic or plastic-lined steel containers.

DO NOT MIX, STORE OR APPLY THIS PRODUCT OR SPRAY SOLUTIONS OF THIS PRODUCT IN GALVANIZED STEEL OR UNLINED STEEL (EXCEPT STAINLESS STEEL) CONTAINERS OR SPRAY TANKS. This product or spray solutions of this product react with such containers and tanks to produce hydrogen gas which may form a highly combustible gas mixture. This gas mixture could flash or explode, causing serious personal injury, if ignited by open flame, spark, welder's torch, lighted cigarette or other ignition source.

## DIRECTIONS FOR USE

It is a violation of Federal law to use this product in any manner inconsistent with its labeling. This product can only be used in accordance with the Directions for Use on this label or in separately published Monsanto *[insert company name]* Supplemental Labeling or Fact Sheets. Supplemental labeling can be found on the Internet at www.cdms.net or www.greenbook.net websites or obtained by contacting your Authorized Monsanto *[insert company name]* Retailer or Monsanto Company *[insert company name]* Representative.

Do not apply this product in a way that will contact workers or other persons, either directly or through drift. Only protected handlers may be in the area during application. For any requirements specific to your State or Tribe, consult the agency responsible for pesticide regulations.

| Agricultural Use Requirements |
| --- |
| Use this product only in accordance with its labeling and with the Worker Protection Standard, 40 CFR Part 170. This Standard contains requirements for the protection of agricultural workers on farms, forests, nurseries, and greenhouses, and handlers of agricultural pesticides. It contains requirements for training, decontamination, notification and emergency assistance. It also contains specific instructions and exceptions pertaining to the statements on this label about Personal Protective Equipment (PPE) and restricted entry interval. The requirements in this box only apply to uses of this product that are covered by the Worker Protection Standard. |
| Do not enter or allow worker entry into treated areas during the restricted entry interval (REI) of 4 hours. |
| PPE required for early entry to treated areas that is permitted under the Worker Protection Standard and that involves contact with anything that has been treated, such as plants, soil or water, is: coveralls, chemical resistant gloves greater than 14 mils in thickness composed of materials such as butyl rubber, natural rubber, neoprene rubber, or nitrile rubber, shoes plus socks. |

| Non-Agricultural Use Requirements |
| --- |
| The requirements in this box apply to uses of this product that are NOT within the scope of the Worker Protection Standard (40 CFR Part 170) for agricultural pesticides. The WPS applies when this product is used to produce agricultural plants on farms, forests, nurseries or greenhouses. |
| Keep people and pets off treated areas until spray solution has dried to prevent transfer of this product onto desirable vegetation. |

**4.0 STORAGE AND DISPOSAL**

*[FOR RIGID PLASTIC 2.5 GAL CONTAINERS OR OTHERS </= 5 GAL]*

I. MAIN LABEL FOR INDUSTRIAL, TURF, AND ORNAMENTAL USES

Proper pesticide storage and disposal are essential to protect against exposure to people and the environment due to leaks and spills, excess product or waste, and vandalism. Do not allow this product to contaminate water, foodstuffs, feed or seed by storage or disposal.

**PESTICIDE STORAGE:** Store pesticides away from food, pet food, feed, seed, fertilizers, and veterinary supplies. Keep container closed to prevent spills and contamination. *[Alternate language]* Do not contaminate water, foodstuffs, feed or seed by storage or disposal. Keep container closed to prevent spills and contamination.

**PESTICIDE DISPOSAL:** To avoid wastes, use all material in this container, including rinsate, by application in accordance with label directions. If wastes cannot be avoided, offer remaining product to a waste disposal facility or pesticide disposal program. Such programs are often run by state or local governments or by industry. All disposal must be in accordance with applicable Federal, State and local procedures

**CONTAINER DISPOSAL:**

Nonrefillable container. Do not reuse this container to hold materials other than pesticides or dilute pesticides (rinsate). After emptying and cleaning, it may be allowable to temporarily hold rinsate or other pesticide-related materials in this container. Contact your state regulatory agency to determine allowable practices in your state. *[Alternate language]* CONTAINER DISPOSAL: Nonrefillable container. Do not reuse or refill this container.

**CONTAINER HANDLING:** Triple rinse or pressure rinse container (or equivalent) promptly after emptying.

Triple rinse as follows: Empty the remaining contents into application equipment or a mix tank and drain for 10 seconds after the flow begins to drip. Fill the container 1/4 full with water and recap. Shake for 10 seconds. Pour rinsate into application equipment or a mix tank or store rinsate for later use or disposal. Drain for 10 seconds after the flow begins to drip. Repeat this procedure two more times.

Pressure rinse as follows: Empty the remaining contents into application equipment or a mix tank and continue to drain for 10 seconds after the flow begins to drip. Hold container upside down over application equipment or mix tank or collect rinsate for later use or disposal. Insert pressure rinsing nozzle in the side of the container, and rinse at about 40 PSI for at least 30 seconds. Drain for 10 seconds after the flow begins to drip.

Once cleaned, some (*optional: agricultural*) plastic pesticide containers can be taken to a container collection site or picked up for recycling. To find the nearest site, contact your chemical dealer or Monsanto at 1-800-768-6387. If recycling is not available, puncture and dispose of in a sanitary landfill. *[Alternate disposal statement:* Offer container for recycling, if available, or puncture and dispose of in a sanitary landfill.]

*[FOR RIGID PLASTIC 30 GAL CONTAINERS OR OTHERS > 5 GAL]*

Proper pesticide storage and disposal are essential to protect against exposure to people and the environment due to leaks and spills, excess product or waste, and vandalism. Do not allow this product to contaminate water, foodstuffs, feed or seed by storage or disposal.

**PESTICIDE STORAGE:** Store pesticides away from food, pet food, feed, seed, fertilizers, and veterinary supplies. Keep container closed to prevent spills and contamination. *[Alternate language]* Do not contaminate water, foodstuffs, feed or seed by storage or disposal. Keep container closed to prevent spills and contamination.

**PESTICIDE DISPOSAL:** To avoid wastes, use all material in this container, including rinsate, by application in accordance with label directions. If wastes cannot be avoided, offer remaining product to a waste disposal facility or pesticide disposal program. Such programs are often run by state or local governments or by industry. All disposal must be in accordance with applicable Federal, State and local procedures

**CONTAINER DISPOSAL:** Nonrefillable container. Do not reuse or refill this container. *[Alternate language]* Nonrefillable container. Do not reuse this container to hold materials other

I. MAIN LABEL FOR INDUSTRIAL, TURF, AND ORNAMENTAL USES

than pesticides or dilute pesticides (rinsate). After emptying and cleaning, it may be allowable to temporarily hold rinsate or other pesticide-related materials in this container. Contact your state regulatory agency to determine allowable practices in your state.

**CONTAINER HANDLING:** Triple rinse or pressure rinse container (or equivalent) promptly after emptying.

Triple rinse as follows: Empty the remaining contents into application equipment or a mix tank. Fill the container 1/4 full with water. Replace and tighten closures. Tip container on its side and roll it back and forth, ensuring at least one revolution, for 30 seconds. Stand the container on its end and tip it back and forth several times. Turn the container over onto its other end tip it back and forth several times. Empty the rinsate into application equipment or a mix tank or store rinsate for later use or disposal. Repeat this procedure two more times.

Pressure rinse as follows: Empty the remaining contents into application equipment or a mix tank and continue to drain for 10 seconds after the flow begins to drip. Hold container upside down over application equipment or mix tank or collect rinsate for later use or disposal. Insert pressure rinsing nozzle in the side of the container, and rinse at about 40 PSI for at least 30 seconds. Drain for 10 seconds after the flow begins to drip.

Once cleaned, some (*optional: agricultural*) plastic pesticide containers can be taken to a container collection site or picked up for recycling. To find the nearest site, contact your chemical dealer or Monsanto at 1-800-768-6387. If recycling is not available, puncture and dispose of in a sanitary landfill. [*Alternate disposal statement:* Offer container for recycling, if available, or puncture and dispose of in a sanitary landfill.]

[*Optional Container Label Text*] Return container to Monsanto for recycling. Contact 1-800-768-6387.

[*Container label language for transport vehicles as defined in 40 CFR §156.3*]

Proper pesticide storage and disposal are essential to protect against exposure to people and the environment due to leaks and spills, excess product or waste, and vandalism. Do not allow this product to contaminate water, foodstuffs, feed or seed by storage or disposal.

**PESTICIDE STORAGE:** Store pesticides away from food, pet food, feed, seed, fertilizers, and veterinary supplies. Keep container closed to prevent spills and contamination.

**PESTICIDE DISPOSAL:** To avoid wastes, empty as much product from this transport vehicle as possible for repackaging or use in accordance with label directions. If wastes cannot be avoided, offer remaining product to a waste disposal facility or pesticide disposal program. Such programs are often run by state or local governments or by industry.

**CONTAINER DISPOSAL:** Emptied container retains vapor and product residue. Observe all precautions stated on this label until the container is cleaned, reconditioned or destroyed.

**CONTAINER HANDLING:** Prior to refilling, inspect carefully for damage such as cracks, punctures, abrasions, and worn-out threads and closures. Clean thoroughly before reuse for transportation of a material of different composition or before retiring this transport vehicle from service.

## 5.0 PRODUCT INFORMATION

**Product Description:** This product is a postemergence, systemic herbicide with no residual soil activity. It gives broad-spectrum control of many annual weeds, perennial weeds, woody brush and trees. It is formulated as a water-soluble liquid containing surfactant and no additional surfactant is needed or recommended. It may be applied through standard equipment after dilution and mixing with water or other carriers according to label instructions.

*Optional alternate statement: It is formulated as a water-soluble liquid containing **[X.X percent]** surfactant and no additional surfactant is needed or recommended.*

I. MAIN LABEL FOR INDUSTRIAL, TURF, AND ORNAMENTAL USES

**Time to Symptoms:** This product moves through the plant from the point of foliage contact to and into the root system. Visible effects are a gradual wilting and yellowing of the plant which advances to complete browning of above-ground growth and deterioration of underground plant parts. Effects are visible on most annual weeds within 2 to 4 days, but on most perennial weeds may not occur for 7 days or more. Extremely cool or cloudy weather following treatment may slow activity of this product and delay development of visual symptoms.

**Stage of Weeds:** Annual weeds are easiest to control when they are small. Best control of most perennial weeds is obtained when treatment is made at late growth stages approaching maturity. See the "WEEDS CONTROLLED" sections of this label for specific weed rates.

Always use the higher product application rate in the range when weed growth is heavy or dense, or when weeds are growing in an undisturbed (non-cultivated) area. Reduced weed control may result from treating weeds with disease or insect damage, weeds heavily covered with dust, or weeds under poor growing conditions.

**Mode of Action in Plants:** The active ingredient in this product inhibits an enzyme found only in plants and microorganisms that is essential to formation of specific amino acids.

**Cultural Considerations:** Reduced control may result when applications are made to annual or perennial weeds that have been mowed, grazed or cut, and have not been allowed to regrow to the recommended stage for treatment.

**Rainfastness:** Heavy rainfall soon after application may wash this product off of the foliage and a repeat application may be required for adequate control.

**Spray Coverage:** For best results, ensure spray coverage is uniform and complete. Do not spray foliage to the point of run-off.

**No Soil Activity:** Weeds must be emerged at the time of application to be controlled by this product. Weeds germinating from seed after application will not be controlled. Unemerged plants arising from unattached underground rhizomes or rootstocks of perennials will not be affected by the herbicide and will continue to grow.

**Maximum Application Rates:** The maximum application or use rates stated throughout this label are given in units of volume (fluid ounces or quarts) of this product per acre. However, the maximum allowed application rates apply to this product combined with the use of any and all other herbicides containing the active ingredient glyphosate, whether applied separately or as tank mixtures, on a basis of total pounds of glyphosate (acid equivalents) per acre. If more than one glyphosate-containing product is applied to the same site within the same year, you must ensure that the total use of glyphosate (pounds acid equivalents) does not exceed the maximum allowed. The combined total of all treatments must not exceed 10.6 quarts of this product (10.6 pounds of glyphosate acid) per acre per year. See the "INGREDIENTS" section of this label for necessary product information.

**ATTENTION**

AVOID CONTACT OF HERBICIDE WITH FOLIAGE, STEMS, EXPOSED NON-WOODY ROOTS OR FRUIT OF CROPS, DESIRABLE PLANTS AND TREES, BECAUSE SEVERE INJURY OR DESTRUCTION MAY RESULT.

AVOID DRIFT. EXTREME CARE MUST BE USED WHEN APPLYING THIS PRODUCT TO PREVENT INJURY TO DESIRABLE PLANTS AND CROPS.

Do not allow the herbicide solution to mist, drip, drift or splash onto desirable vegetation since minute quantities of this product can cause severe damage or destruction to the crop, plants or other areas on which treatment was not intended. The likelihood of injury occurring from the use of this product increases when winds are gusty, as wind velocity increases, when wind direction is constantly changing or when there are other meteorological conditions that favor spray drift. When spraying, avoid combinations of pressure and nozzle type that will result in splatter or fine particles (mist) that are likely to drift. AVOID APPLYING AT EXCESSIVE SPEED OR PRESSURE.

I. MAIN LABEL FOR INDUSTRIAL, TURF, AND ORNAMENTAL USES

**NOTE:** Use of this product in any manner not consistent with this label may result in injury to persons, animals or crops, or other unintended consequences.

### 5.1 Weed Resistance Management

| GROUP | 9 | HERBICIDE |
|-------|---|-----------|



Glyphosate, the active ingredient in this product, is a Group 9 herbicide based on the mode of action classification system of the Weed Science Society of America. Any weed population may contain plants naturally resistant to Group 9 herbicides. Weed species resistant to Group 9 herbicides may be effectively managed utilizing another herbicide from a different Group or using other cultural or mechanical practices.

To minimize the occurrence of glyphosate-resistant biotypes observe the following good weed management practices:

- Scout your application site before and after herbicides applications.
- Control weeds early when they are relatively small.
- Incorporate other herbicides and cultural or mechanical practices as part of your weed control system where appropriate.
- Utilize the label rate for the most difficult weed in the site. Avoid tank-mixtures with other herbicides that reduce this product's efficacy (through antagonism) or tank mixtures which encourage rates of this product below the labeled amounts.
- Control weed escapes and prevent weeds from setting seeds.
- Clean equipment before moving from site to site to minimize spread of weed seed.
- Use new commercial seed as free of weed seed as possible.
- Report any incidence of repeated non-performance of this product on a particular weed to your Monsanto*[insert company name]* representative, local retailer, or county extension agent.

### 5.2 Management for Glyphosate Resistant Weed Biotypes

**NOTE:** Appropriate testing is critical in order to confirm weed resistance to glyphosate. Contact your Monsanto *[inert company name]* representative to determine if resistance has been confirmed to any particular weed biotype in your area. Control instructions for biotypes confirmed as resistant to glyphosate are made available on separately published supplemental labeling or Fact Sheets for this product and may be obtained from your local retailer or Monsanto *[insert company name]* representative.

Since the occurrence of new glyphosate resistant weeds cannot be determined until after product use and scientific confirmation, Monsanto Company *[insert company name]* is not responsible for any losses that may result from the failure of this product to control glyphosate-resistant weed biotypes.

The following good weed management practices are encouraged to reduce the spread of confirmed glyphosate resistant biotypes:

- If a naturally occurring resistant biotype is present at your site, this product may be tank-mixed or applied sequentially with an appropriately labeled herbicide with a different mode of action to achieve control.
- Cultural and mechanical control practices may also be used as appropriate.
- Scout treated sites after herbicide applications and control escapes of resistant biotypes before they set seed.
- Thoroughly clean equipment before leaving sites known to contain resistant biotypes.

### 6.0 MIXING

Mix, store and apply spray solutions of this product using only clean stainless steel, aluminum, fiberglass, plastic or plastic-lined steel containers.

I. MAIN LABEL FOR INDUSTRIAL, TURF, AND ORNAMENTAL USES

DO NOT MIX, STORE OR APPLY THIS PRODUCT OR SPRAY SOLUTIONS OF THIS PRODUCT IN GALVANIZED STEEL OR UNLINED STEEL (EXCEPT STAINLESS STEEL) CONTAINERS OR SPRAY TANKS.

Use caution to avoid siphoning back into the carrier source. Use approved anti-back-siphoning devices where required by state or local regulations.

Clean sprayer parts immediately after using this product by thoroughly flushing with water.

**NOTE:** REDUCED RESULTS MAY OCCUR IF WATER CONTAINING SOIL IS USED, VISIBLY MUDDY WATER OR WATER FROM PONDS AND DITCHES THAT IS NOT CLEAR.

### 6.1 Mixing with Water

This product mixes readily with water. Mix spray solutions of this product as follows: Fill the mixing or spray tank with the required amount of clean water. Add the labeled amount of this product near the end of the filling process and mix gently (well).  During mixing and application, foaming of the spray solution may occur. To prevent or minimize foam, avoid the use of mechanical agitators, terminate by-pass and return lines at the bottom of the tank and, if needed, use an approved anti-foam or defoaming agent.

### 6.2 Tank Mixtures

This product does not provide residual weed control. This product may be tank-mixed with other herbicides to provide residual weed control, a broader weed control spectrum or an alternate mode of action.  Always read and follow label directions for all products in the tank mixture. Use according to the most restrictive precautionary statements for each product in the mixture. Any labeled rate of this product may be used in a tank mix.

When this label describes a tank mixture with a generic active ingredient such as diuron, 2,4-D or dicamba, the user is responsible for ensuring the mixture product label allows the specific application.

Buyer and all users are responsible for all loss or damage in connection with the use or handling of mixtures of this product with herbicides or other materials that are not expressly listed in this label. Mixing this product with herbicides or other materials not identified on this label may result in reduced performance.

### 6.3 Tank Mixing Procedure

When tank mixing, read and carefully observe label directions, cautionary statements and all information on the labels of all products used. Add the tank-mix product to the tank as directed by the label. Maintain agitation and add the labeled amount of this product.

Maintain good agitation at all times until the contents of the tank are sprayed. If the spray mixture is allowed to settle, thorough agitation may be required to resuspend the mixture before spraying is resumed.

Keep by-pass line on or near the bottom of the tank to minimize foaming. Screen size in nozzle or line strainers should be no finer than 50-mesh.

Always predetermine the compatibility of labeled tank mixtures of this product with water carrier by mixing small proportional quantities in advance. Ensure that the specific tank mixture product is registered for application at the desired site.

Refer to the "Tank Mixtures" section for additional precautions.

### 6.4 Mixing Percent Solutions

Prepare the desired volume of spray solution by mixing the amount of this product in water as shown in the following table:

**Spray Solution**

Amount of **[INSERT BRAND NAME]**

I. MAIN LABEL FOR INDUSTRIAL, TURF, AND ORNAMENTAL USES

| Desired Volume | 1/2% | 1% | 1-1/2% | 2% | 5% | 10% |
|---|---|---|---|---|---|---|
| 1 gal | 2/3 oz | 1-1/3 oz | 2 oz | 2-2/3 oz | 6-1/2 oz | 13 oz |
| 25 gal | 1 pt | 1 qt | 1-1/2 qt | 2 qt | 5 qt | 10 qt |
| 100 gal | 2 qt | 1 gal | 1-1/2 gal | 2 gal | 5 gal | 10 gal |

2 tablespoons = 1 fluid ounce

For use in backpack, knapsack or pump-up sprayers, it is suggested that the labeled amount of this product be mixed with water in a larger container. Fill sprayer with the mixed solution.

---

**Optional Section:**

**Surfactants**

Nonionic surfactants which are labeled for use with herbicides may be used. Do not reduce rates of this product when adding surfactant. When adding additional surfactant, use 0.5 percent surfactant concentration (2 quarts per 100 gallons of spray solution) when using surfactants which contain at least 70 percent active ingredient or a 1 percent surfactant concentration (4 quarts per 100 gallons of spray solution) for those surfactants containing less than 70 percent active ingredient. Read and carefully observe surfactant cautionary statements and other information appearing on the surfactant label.

---

### 6.5 Colorants or Dyes

Approved colorants or marking dyes may be added to this product. Colorants or dyes used in spray solutions of this product may reduce performance, especially at lower rates or dilution. Use colorants or dyes according to the manufacturer's instructions.

### 6.6 Drift Control Additives

Drift reduction additives may be used with all equipment types, except wiper applicators, and sponge bars.  When a drift reduction additive is used, read and carefully observe precautionary statements and all other information appearing on the additive label.  The use of drift reduction additives can affect spray coverage which may result in reduced performance.

### 7.0 APPLICATION EQUIPMENT AND TECHNIQUES

Do not apply this product through any type of irrigation system.

APPLY THESE SPRAY SOLUTIONS IN PROPERLY MAINTAINED AND CALIBRATED EQUIPMENT CAPABLE OF DELIVERING DESIRED VOLUMES.

### SPRAY DRIFT MANAGEMENT

AVOID DRIFT. EXTREME CARE MUST BE USED WHEN APPLYING THIS PRODUCT TO PREVENT INJURY TO DESIRABLE VEGETATION.

Do not allow the herbicide solution to mist, drip, drift or splash onto desirable vegetation since minute quantities of this product can cause severe damage or destruction to the crop, plants or other areas on which treatment was not intended.

Avoiding spray drift at the application site is the responsibility of the applicator. The interaction of many equipment- and weather-related factors determine the potential for spray drift. The applicator and/or the grower is responsible for considering all these factors when making decisions.

### 7.1 Aerial Equipment

DO NOT APPLY THIS PRODUCT USING AERIAL SPRAY EQUIPMENT EXCEPT UNDER CONDITIONS AS SPECIFIED WITHIN THIS LABEL.

FOR AERIAL APPLICATION IN CALIFORNIA, REFER TO THE FEDERAL SUPPLEMENTAL LABEL FOR AERIAL APPLICATIONS IN THAT STATE FOR SPECIFIC INSTRUCTIONS, RESTRICTIONS AND REQUIREMENTS.

I. MAIN LABEL FOR INDUSTRIAL, TURF, AND ORNAMENTAL USES

TO PREVENT INJURY TO ADJACENT DESIRABLE VEGETATION, APPROPRIATE BUFFER ZONES MUST BE MAINTAINED.

Avoid direct application to any body of water.

Use the labeled rates of this herbicide in 3 to 25 gallons of water per acre.

Coarse sprays are less likely to drift; therefore, do not use nozzles or nozzle configurations that dispense spray as fine spray droplets. Do not angle nozzles forward into the air stream and do not increase spray volume by increasing nozzle pressure. Drift control additives may be used. When a drift control additive is used, read and carefully observe the cautionary statements and all other information appearing on the additive label.

Ensure uniform application — To avoid streaked, uneven or overlapped application, use appropriate marking devices.

**Aircraft Maintenance**

PROLONGED EXPOSURE OF THIS PRODUCT TO UNCOATED STEEL SURFACES MAY RESULT IN CORROSION AND POSSIBLE FAILURE OF THE PART. The maintenance of an organic coating (paint) which meets aerospace specification MIL-C-38413 may prevent corrosion. To prevent corrosion of exposed parts, thoroughly wash aircraft after each day of spraying to remove residues of this product accumulated during spraying or from spills. Landing gear is most susceptible.

## AERIAL SPRAY DRIFT MANAGEMENT

The following drift management requirements must be followed to avoid off-target drift movement from aerial applications to agricultural field crops.

1. The distance of the outermost nozzles on the boom must not exceed 3/4 the length of the wingspan or rotor.

2. Nozzles must always point backward parallel with the air stream and never be pointed downwards more than 45 degrees. Where states have more stringent regulations, they should be observed.

**Importance of droplet size**

The most effective way to reduce drift potential is to apply large droplets. The best drift management strategy is to apply the largest droplets that provide sufficient coverage and control. Applying larger droplets reduces drift potential, but will not prevent drift if applications are made improperly, or under unfavorable environmental conditions (see the **Wind, Temperature and Humidity**, and **Temperature Inversion** sections of this label).

**Controlling droplet size**

- **Volume:** Use high flow-rate nozzles to apply the highest practical spray volume. Nozzles with the higher rated flows produce larger droplets.

- **Pressure:** Use the lower spray pressures labeled for the nozzle. Higher pressure reduces droplet size and does not improve canopy penetration. When higher flow-rates are needed, use higher flow-rate nozzles instead of increasing pressure.

- **Number of nozzles:** Use the minimum number of nozzles that provide uniform coverage.

- **Nozzle orientation:** Orienting nozzles so that the spray is released backwards, parallel to the air stream, will produce larger droplets than other orientations. Significant deflection from the horizontal will reduce droplet size and increase drift potential.

- **Nozzle type:** Use a nozzle type that is designed for the intended application. With most nozzle types, narrower spray angles produce larger droplets. Consider using low-drift nozzles. Solid stream nozzles oriented straight back produce larger droplets than other nozzle types.

- **Boom Length:** For some use patterns, reducing the effective boom length to less than 3/4 of the wingspan or rotor length may further reduce drift without reducing swath width.

I. MAIN LABEL FOR INDUSTRIAL, TURF, AND ORNAMENTAL USES

- **Application Height:** Applications must not be made at a height greater than 10 feet above the top of the largest plants unless a greater height is required for aircraft safety. Making applications at the lowest height that is safe reduces the exposure of the droplets to evaporation and wind.

### Swath Adjustment

When applications are made with a crosswind, the swath will be displaced downwind. Therefore, on the up and downwind edges of the field, the applicator must compensate for this displacement by adjusting the path of the aircraft upwind. Swath adjustment distance increases with increasing drift potential (higher wind, smaller droplets, etc.).

### Wind

Drift potential is lowest between wind speeds of 2 to 10 miles per hour. However, many factors, including droplet size and equipment type determine drift potential at any given speed. Application must be avoided below 2 miles per hour due to variable wind direction and high inversion potential. **NOTE:** Local terrain can influence wind patterns. Every applicator must be familiar with local wind patterns and how they affect drift.

### Temperature and Humidity

When making applications in low relative humidity, set up equipment to produce larger droplets to compensate for evaporation. Droplet evaporation is most severe when conditions are both hot and dry.

### Temperature Inversions

Applications must not occur during a temperature inversion because drift potential is high. Temperature inversions restrict vertical air mixing, which causes small suspended droplets to remain in a concentrated cloud. This cloud can move in unpredictable directions due to the light variable winds common during inversions. Temperature inversions are characterized by increasing temperatures with altitude and are common on nights with limited cloud cover and light to no wind. They begin to form as the sun sets and often continue into the morning. Their presence can be indicated by ground fog; however, if fog is not present, inversions can also be identified by the movement of smoke from a ground source or an aircraft smoke generator. Smoke that layers and moves laterally in a concentrated cloud (under low wind conditions) indicates an inversion, while smoke that moves upward and rapidly dissipates indicates good vertical air mixing.

### Sensitive Areas

This product must only be applied when the potential for drift to adjacent sensitive areas (e.g., residential areas, bodies of water, known habitat for threatened or endangered species, non-target crops) is minimal (e.g., when wind is blowing away from the sensitive areas).

### 7.2 Ground Broadcast Equipment

Apply the labeled rates of this product in 3 to 40 gallons of water per acre as a broadcast spray unless otherwise specified in this label or in separate supplemental labeling or fact sheets published by Monsanto [*this company*]. *(Optional statement: Use the labeled rates of this product in 10 to 60 gallons of water per acre as a broadcast spray unless otherwise specified in this label or in separate supplemental labeling or Fact Sheets published by Monsanto [this company])* As density of weeds increases, increase spray volume within the labeled range to ensure complete coverage. Carefully select proper nozzles to avoid spraying a fine mist. For best results with ground application equipment, use flat-fan nozzles. Check for even distribution of spray droplets.

### 7.3 Backpack or High-Volume Equipment

Apply to foliage of vegetation to be controlled. For applications made on a spray-to-wet basis, ensure spray coverage is uniform and complete. Do not spray to the point of runoff. Use coarse sprays only.

Refer to the "Annual Weeds" instructions of "WEEDS CONTROLLED" section for specific rates and restrictions **7.4 Selective Equipment**

## I. MAIN LABEL FOR INDUSTRIAL, TURF, AND ORNAMENTAL USES

This product may be diluted with water and applied through recirculating spray systems, shielded applicators, hooded sprayers, wiper applicators or sponge bars, to listed weeds growing in any site specified on this label.

AVOID CONTACT OF HERBICIDE WITH DESIRABLE VEGETATION. Contact of this product with desirable vegetation may result in unwanted plant damage or destruction.**Recirculating Spray**

A recirculating spray system directs the spray solution onto weeds growing above desirable vegetation, while spray solution not intercepted by weeds is collected and returned to the spray tank for reuse.

Adjust application equipment used above desired vegetation to the lowest spray stream or wiper contact point is at least 2 inches above the desirable vegetation. Droplets, mist, foam or splatter of the herbicide solution settling on desirable vegetation is likely to result in discoloration, stunting or destruction.

Better results may be obtained when more of the weed is exposed to the herbicide solution. Weeds not contacted by the herbicide solution will not be affected. This may occur in dense clumps, severe infestations or when the height of the weeds varies so that not all weeds are contacted. In these instances, repeat treatment may be necessary.

### Shielded and Hooded Applicators

A shielded or hooded applicator directs the herbicide solution onto weeds, while shielding desirable vegetation from the herbicide. Use nozzles that provide uniform coverage within the treated area. Keep shields on these sprayers adjusted to protect desirable vegetation. EXTREME CARE MUST BE EXERCISED TO AVOID CONTACT OF HERBICIDE WITH DESIRABLE VEGETATION.

### Wiper Applicators and Sponge Bars

A wiper or sponge applicator applies the herbicide solution onto weeds by rubbing the weed with an absorbent material containing the herbicide solution. Equipment must be designed, maintained and operated to prevent the herbicide solution from contacting desirable vegetation. Operate this equipment at ground speeds no greater than 5 miles per hour. Performance may be improved by reducing speed in areas of heavy weed infestations to ensure adequate wiper saturation. Better results may be obtained if 2 applications are made in opposite directions.

Avoid leakage or dripping onto desirable vegetation. Adjust height of applicator to ensure adequate contact with weeds. Keep wiping surfaces clean. Be aware that, on sloping ground, the herbicide solution may migrate, causing dripping on the lower end and drying of the wicks on the upper end of a wiper applicator.

Do not use wiper equipment when weeds are wet.

Mix only the amount of solution to be used during a 1-day period, as reduced product performance may result from the use of solutions held in storage. Clean wiper parts immediately after using this product by thoroughly flushing with water.

**For Rope or Sponge Wick Applicators:** Solutions ranging from 33 to 75 percent of this product in water may be used.

**For Panel Applicators and pressure-feed systems:** Solutions ranging from 33 to 100 percent of this product in water may be used.

When applied as directed, this product CONTROLS the following weeds:

| Corn, volunteer | Sicklepod |
|---|---|
| Panicum, Texas | Spanishneedles |
| Rye, common | Starbur, bristly |
| Shattercane | |

When applied as directed, this product SUPPRESSES the following weeds:

I. MAIN LABEL FOR INDUSTRIAL, TURF, AND ORNAMENTAL USES

| Beggarweed, Florida | Ragweed, common |
|---|---|
| Bermudagrass | Ragweed, giant |
| Dogbane, hemp | Smutgrass |
| Dogfennel | Sunflower |
| Guineagrass | Thistle, Canada |
| Johnsongrass | Thistle, musk |
| Milkweed | Vaseygrass |
| Nightshade, silverleaf | Velvetleaf |
| Pigweed, redroot | |

### 7.5 Injection Systems

This product may be used in aerial or ground injection spray systems. It may be used as a liquid concentrate or diluted prior to injecting into the spray stream. Do not mix this product with the undiluted concentrate of other products when using injection systems unless specifically directed.

### 7.6 CDA Equipment

The rate of this product applied per acre by controlled droplet application (CDA) equipment must not be less than the amount directed in this label when applied by conventional broadcast equipment. For vehicle-mounted CDA equipment, apply 2 to 15 gallons of water per acre.

CDA equipment produces a spray pattern that is not easily visible. Extreme care must be exercised to avoid spray or drift contacting the foliage or any other tissue of desirable vegetation, as damage or destruction is likely to result.

### 8.0 SITE AND USE INSTRUCTIONS

Detailed instructions follow alphabetically, by site.

Unless otherwise specified on this label or in separate supplemental labeling or fact sheets published by Monsanto [this company], applications may be made to control any weeds listed in the annual, perennial and woody brush tables. Also refer to the "SELECTIVE EQUIPMENT" section.

### 8.1 Cut Stump

Cut stump treatments may be made on any site listed on this label. This product will control many types of woody brush and tree species. Apply this product using suitable equipment to ensure coverage of the entire cambium. Cut trees or resprouts close to the soil surface. Apply a 50- to 100-percent solution of this product to the freshly-cut surface **immediately after** cutting. Delays in application may result in reduced performance. For best results, make applications during periods of active growth and full leaf expansion.

DO NOT MAKE CUT STUMP APPLICATIONS WHEN THE ROOTS OF DESIRABLE WOODY BRUSH OR TREES MAY BE GRAFTED TO THE ROOTS OF THE CUT STUMP. Some sprouts, stems, or trees may share the same root system. Adjacent trees having a similar age, height and spacing may signal shared roots. Whether grafted or shared, injury is likely to occur to non-treated stems/trees when one or more trees sharing common roots are treated.

### 8.2 Forestry Site Preparation

This product is labeled for the control or partial control of woody brush, trees and herbaceous weeds in forestry sites. This product is also labeled for use in preparing or establishing wildlife openings within these sites and maintaining logging roads.

This product is labeled for use in site preparation prior to planting any tree species, including Christmas trees, eucalyptus, hybrid tree cultivars and silvicultural nursery sites.

I. MAIN LABEL FOR INDUSTRIAL, TURF, AND ORNAMENTAL USES

Use higher rates of this product within the labeled range for control or partial control of woody brush, trees and hard-to-control perennial herbaceous weeds. For best results, apply to actively growing woody brush and trees after full leaf expansion and before fall color and leaf drop. Increase rates within the labeled range for control of perennial herbaceous weeds any time after emergence and before seedheads, flowers or berries appear.

Use the lower rates of this product within the labeled range for control of annual herbaceous weeds and actively growing perennial herbaceous weeds after seedheads, flowers or berries appear. Apply to the foliage of actively growing annual herbaceous weeds any time after emergence.

This product has no herbicidal or residual activity in the soil. Where repeat applications are necessary, do not exceed 10.6 quarts of this product per acre per year.

TANK MIXTURES: Tank mixtures of this product may be used to increase the spectrum of vegetation controlled. When tank mixing, read and carefully observe the label claims, cautionary statements and all information on the labels of all products used. Use according to the most restrictive precautionary statements for each product in the mixture.

**NOTE**: For forestry site preparation, make sure the tank-mix product is approved for use prior to planting the desired species. Observe planting interval restrictions.

Any labeled rate of this product may be used in a tank mix with the following products for forestry site preparation.

| Arsenal Applicators Concentrate | Escort |
|---|---|
| Chopper | Garlon 3A |
| Chopper GEN2 | Garlon 4 |
| | Oust XP |

For control of herbaceous weeds, use the lower labeled tank mixture rates. For control of dense stands or tough-to-control woody brush and trees, use the higher labeled tank mixture rates.

**Do not apply this product as an over-the-top broadcast spray for forestry conifer or hardwood release unless otherwise directed on this label or in separately published Monsanto *[insert company name]* supplemental labeling or fact sheets,**

### 8.3 Non-Crop Areas and Industrial Sites

This product may be used in non-crop areas, airports, apartment complexes, commercial sites, ditch banks, driveways, dry ditches, dry canals, fencerows, forestry sites, golf courses, greenhouses, industrial sites, landscape areas, lumber yards, manufacturing sites, municipal sites, natural areas, office complexes, ornamentals, parks, parking areas, petroleum tank farms and pumping installations, railroads, recreational areas, residential areas, rights-of-way, roadsides, schools, shadehouses, sports complexes, storage areas, substations, turfgrass areas, utility sites, warehouse areas, other public areas, and wildlife management sites.

This product may also be used in non-food crop sites, Christmas tree farms, plant nurseries, sod or turf seed farms.

Unless otherwise specified, applications may be made to control any weeds listed in the WEEDS CONTROLLED section of this label.

### Weed Control, Trim-and-Edge, Bare Ground

This product may be used in non-crop and non-food crop areas. It may be applied with any application equipment described in this label. This product may be used to trim-and-edge around objects in non-crop sites, for spot treatment of unwanted vegetation and to eliminate unwanted weeds growing in established shrub beds or ornamental plantings. This product may be used prior to planting an area to ornamentals, flowers, turfgrass (sod or seed), or prior to laying asphalt or beginning construction projects.

Repeated applications of this product may be used, as weeds emerge, to maintain bare ground.

I. MAIN LABEL FOR INDUSTRIAL, TURF, AND ORNAMENTAL USES

TANK MIXTURES: This product may be tank mixed with the following products provided that the specific product is labeled for application at the use site. Refer to the individual product labels for approved sites and application rates.

| | |
|---|---|
| Arsenal | Plateau |
| Clarity | Princep DF |
| Barricade 65WG | Princep Liquid |
| Diuron | Ronstar 50WSP |
| Endurance | Sahara |
| Escort | simazine |
| Garlon 3A | Surflan |
| Garlon 4 | Telar |
| Karmex | Vanquish |
| Krovar I DF | 2,4-D |
| | |
| Oust XP | |
| Pendulum  3.3 EC | |
| Pendulum WDG | |

This product plus dicamba tank mixtures may not be applied by air in California.

When applied as a tank mixture for bare ground, this product provides control of the emerged annual weeds and control or partial control of emerged perennial weeds, woody brush and trees.

For control or partial control of the following perennial weeds, apply 1 to 2 quarts of this product plus 2 to 8 ounces of Oust XP per acre.

| | |
|---|---|
| Bahiagrass | Fescue, tall |
| Bermudagrass | Johnsongrass |
| Broomsedge | Poorjoe |
| Dallisgrass | Quackgrass |
| Dock, curly | Vaseygrass |
| Dogfennel | Vervain, blue |

**Chemical Mowing - Perennials**

This product will suppress perennial grasses listed in this section to serve as a substitute for mowing. Use 8 fluid ounces of this product per acre when treating tall fescue, fine fescue, orchardgrass, quackgrass or reed canarygrass covers. Use 6 fluid ounces of this product per acre when treating Kentucky bluegrass. Apply treatments in 10 to 40 gallons of spray solution per acre.

Use only in areas where some temporary injury or discoloration of perennial grasses can be tolerated.

**Chemical Mowing - Annuals**

For growth suppression of some annual grasses, annual ryegrass, wild barley and wild oats growing in coarse turf on roadsides or other industrial areas, apply 4 to 5 fluid ounces of this product in 10 to 40 gallons of spray solution per acre. Make applications when annual grasses are actively growing and before the seedheads are in the boot stage of development. Treatments may cause injury to the desired grasses.

***Bromus* Species and Medusahead in Pastures and Rangelands**

***Bromus* species.** This product may be used to treat downy brome (*Bromus tectorum*), Japanese brome (*Bromus japonicus*), soft chess (*Bromus mollis*) and cheatgrass (*Bromus secalinus*) found in industrial, rangeland and pasture sites. Apply 8 to 16 fluid ounces of this product per acre on a broadcast basis.

For best results, coincide treatment with early seedhead emergence of the most mature plants. Delaying the application until this growth stage will maximize the emergence of other weedy grass flushes. Make

I. MAIN LABEL FOR INDUSTRIAL, TURF, AND ORNAMENTAL USES

applications to the same site each year until seed banks are depleted and the desirable perennial grasses can become reestablished on the site.

**Medusahead.** To treat medusahead, apply 16 fluid ounces of this product per acre as soon as plants are actively growing, and prior to the 4-leaf stage. Applications may be made in the fall or spring.

Applications to brome and medusahead may be made using ground or aerial equipment. Aerial applications for these uses may be made using fixed wing or helicopter equipment. For aerial applications, apply in 2 to 10 gallons of water per acre. For applications using ground equipment, apply in 10 to 20 gallons of water per acre. When applied as directed in this label, there are no grazing restrictions.

**Dormant Turfgrass**

This product may be used to control or suppress many winter annual weeds and tall fescue for effective release of dormant bermudagrass and bahiagrass turf. Treat only when turf is dormant and prior to spring green-up.

Apply 8 to 64 fluid ounces of this product per acre. Apply the labeled rates in 10 to 40 gallons of water per acre. Use only in areas where bermudagrass or bahiagrass are desirable ground covers and where some temporary injury or discoloration can be tolerated.

Treatments in excess of 16 fluid ounces per acre may result in injury or delayed green-up in highly maintained areas, golf courses and lawns. DO NOT apply tank mixtures of this product plus Oust XP in highly maintained turfgrass areas. For further uses, refer to the "RAILROADS" section of this label, which gives rates for dormant bermudagrass treatment and the "ROADSIDES" section of this label, which gives rates for dormant bermudagrass and bahiagrass treatments.

**Actively Growing Bermudagrass**

This product may be used to control or partially control many annual and perennial weeds for effective release of actively growing bermudagrass. DO NOT apply more than 16 fluid ounces of this product per acre in highly maintained turfgrass areas. DO NOT apply tank mixtures of this product plus Oust XP in highly maintained turfgrass areas. For further uses, refer to the "ROADSIDES" section of this label, which gives rates for actively growing bermudagrass treatments. Use only in areas where some temporary injury or discoloration can be tolerated.

**Turfgrass Renovation, Seed, or Sod Production**

This product controls most existing vegetation prior to renovating turfgrass areas or establishing turfgrass grown for seed or sod. For maximum control of existing vegetation, delay planting or sodding to determine if any regrowth from escaped underground plant parts occurs. Where repeat treatments are necessary, sufficient regrowth must be attained prior to application. For warm-season grasses like bermudagrass, summer or fall applications provide the best control. Where existing vegetation is growing under mowed turfgrass management, apply this product after omitting at least one regular mowing to allow sufficient growth for good interception of the spray.

Do not disturb soil or underground plant parts before treatment. Delay tillage or renovation techniques such as vertical mowing, coring or slicing for 7 days after application to allow translocation into underground plant parts.

Desirable turfgrasses may be planted following the above procedures.

Hand-held equipment may be used for spot treatment of unwanted vegetation growing in existing turfgrass. Broadcast or hand-held equipment may be used to control sod remnants or other unwanted vegetation after sod is harvested.

If application rates total 3 quarts per acre or less, no waiting period between treatment and feeding or livestock grazing is required. If the rate is greater than 3 quarts per acre, remove domestic livestock before application and wait 8 weeks after application before grazing or harvesting.

**8.4 Habitat Management**

**Habitat Restoration and Management**

I. MAIN LABEL FOR INDUSTRIAL, TURF, AND ORNAMENTAL USES

This product may be used to control exotic and other undesirable vegetation in habitat management and natural areas, including rangeland and wildlife refuges. Applications can be made to allow recovery of native plant species, prior to planting desirable native species, and for similar broad-spectrum vegetation control requirements. Spot treatments can be made to selectively remove unwanted plants for habitat management and enhancement.

### Wildlife Food Plots

This product may be used as a site preparation treatment prior to planting wildlife food plots. Any wildlife food species may be planted after applying this product, or native species may be allowed to repopulate the area. If tillage is needed to prepare a seedbed, wait 7 days after application before tillage to allow translocation into underground plant parts.

### 8.5 Hollow Stem Injection

**Castorbean (Ricinus communis)**

Inject 5 ml per plant of this product into the lower portion of the main stem.

**Hemlock, Poison (Conium maculatum)**

Inject one leaf cane per plant 10 to 12 inches above root crown with 6 ml of a 5% v/v solution of this product.

**Hogweed, Giant (Heracleum mantegazzianum)**

Inject one leaf cane per plant 12 inches above root crown with 6 ml of a 5% v/v solution of this product.

**Horsetail, Field (Equisetum arvense)**

Inject one segment above the root crown with 0.6 ml per stem of this product. Use a small syringe that calibrates to this rate.

**Knotweed, Bohemian (Polygonum bohemicum), Giant (Polygonum sachalinense), Japanese (Polygonum cuspidatum)**

Inject 6 ml per stem of this product between second and third internode.

**Reed, Giant (Arundo donax)**

Inject 8 ml per stem of this product between the second and third internode.

**Thistle, Canada (Cirsium arvense)**

Cut 8 to 9 of the tallest plants at bud stage in a clump with clippers. Use a cavity needle that is pushed into the stem center and then slowly removed as 0.6 ml per stem of this product is injected into the stem.

NOTE: Based on the maximum annual use rate of glyphosate for these non-crop sites, the combined total for all treatments must not exceed 10.6 quarts of this product per acre. At 6 ml per stem, 10.6 quarts treats approximately 1700 stems.

### 8.6 Injection and Frill (Woody Brush and Trees)

This product may be used to control or partially control woody brush and trees by injection or frill applications. Apply this product using suitable equipment that must penetrate into the living tissue. Apply the equivalent of 1/25 fluid ounce (1 ml) of this product for each 2 to 3 inches of trunk diameter at breast height (DBH). This is best achieved by applying a 50 to 100 percent concentration of this product either to a continuous frill around the tree or as cuts evenly spaced around the tree below all branches. As tree diameter increases in size, better results are achieved by applying diluted material to a continuous frill or more closely spaced cuttings. Avoid application techniques that allow runoff to occur from frilled or cut areas in species that exude sap freely. In these species, make the frill or cut at an oblique angle to produce a cupping effect and use a 100 percent concentration of this product. For best results, make application during periods of active growth and after full leaf expansion.

### 8.7 Ornamentals, Plant Nurseries, and Christmas Trees

I. MAIN LABEL FOR INDUSTRIAL, TURF, AND ORNAMENTAL USES

**Post-Directed, Trim-and-Edge**

This product may be used prior to the planting of and as a post-directed spray around established woody ornamental species, arborvitae, azalea, boxwood, crabapple, eucalyptus, euonymus, fir, Douglas fir, jojoba, hollies, lilac, magnolia, maple, oak, poplar, privet, pine, spruce and yew, growing in plant nurseries, on Christmas tree farms, or on other non-food tree production sites. This product may also be used to trim and edge around trees, buildings, sidewalks and roads, potted plants and other objects in a nursery setting.

Desirable plants may be protected from the spray solution by using shields or coverings made of cardboard or other impermeable material. THIS PRODUCT IS NOT LABELED FOR USE AS AN OVER-THE-TOP BROADCAST SPRAY IN ORNAMENTALS AND CHRISTMAS TREES. Care must be exercised to avoid contact of spray, drift or mist with foliage or bark of established ornamental species.

**Site Preparation**

This product may be used prior to planting any ornamental, nursery or Christmas tree species.

**Wiper Applications**

This product may be used through wick or other suitable wiper applicators to control or partially control undesirable vegetation around established eucalyptus or poplar trees. See the "SELECTIVE EQUIPMENT" section of this label for further information about the proper use of wiper applicators.

**Greenhouse/Shadehouse**

This product may be used to control weeds growing in and around greenhouses and shadehouses. Desirable vegetation must not be present during application and air circulation fans must be turned off.

## 8.8 PASTURE GRASSES, FORAGE LEGUMES

**Alfalfa, Clover, and Other Forage Legumes**

This product may be used on Alfalfa, Clover, Kenaf, Kudzu, Lespedeza, Leucaena, Lupin, Sainfoin, Trefoil, Velvet bean, and Vetch (all types). This product can be applied preplant, preemergence, at-planting, or for renovation.

This produce may also be used as a spot treatment (Alfalfa and Clover Only), over-the-top wiper applications (Alfalfa and Clover Only), or preharvest (Alfalfa Only).

**Preplant, Preemergence, At-Planting**

This product may be applied before, during or after planting crops listed in this section. Applications must be made prior to emergence of the crop.

If a single application is made at rates of 2 quarts per acre or less, no waiting period between treatment and feeding or grazing is required. If applications rates greater than 2 quarts per acre are made, remove domestic livestock before application and wait 8 weeks after application before grazing or harvesting.

**Renovation**

This product may be applied as a broadcast spray to renovate existing stands of alfalfa, clover, and other labeled forage legumes.

Remove domestic livestock before application. If application rates of 2 quarts per acre or less are used wait 36 hours after application before grazing or harvesting. If application rates greater than 2 quarts per acre are used, wait 8 weeks between applications and grazing or harvesting.

**Spot Treatment, Over-the-Top Wiper Applications (Alfalfa and Clover Only)**

This product may be applied as a spot treatment in alfalfa or clover. This product may be applied with wiper applicators to control or suppress the weeds listed below. Applications may be made in the same area at 30-day intervals.

I. MAIN LABEL FOR INDUSTRIAL, TURF, AND ORNAMENTAL USES

For spot treatment and wiper applications, apply in areas where the movement of domestic livestock can be controlled. Treat no more than 10 percent of the total field area at one time. Remove domestic livestock before application and wait 14 days after application before grazing livestock or harvesting.

When applied as directed, this product CONTROLS the following weeds:

Corn, volunteer

Pancium, Texas

Rye, common

Shattercane

Sicklepod

Spanishneedles

Starbur, bristly

When applied as directed, this product SUPRESSES the following weeds:

Beggarweed, Florida

Bermudagrass

Dogbane, hemp

Dogfennel

Guineagrass

Johnsongrass

Milkweed

Nightshade, silverleaf

Pigweed, redroot

Ragweed, common

Ragweed, giant

Smutgrass

Sunflower

Thistle, Canada

Thistle, musk

Vaseygrass

Velvetleaf

**Preharvest (Alfalfa Only)**

This product may be used in declining alfalfa stands or any stand of alfalfa where crop destruction is acceptable. This application will severely injure or destroy the stand of alfalfa. This product will control annual and perennial weeds, including quackgrass, when applied prior to the harvest of alfalfa. The treated crop and weeds can be harvested and fed to livestock after 36 hours. Allow a minimum of 36 hours between application and harvest. Applications may be made at any time of the year. Make only one application to an existing stand of alfalfa per year. For control of quackgrass, apply in the spring, late summer or fall when quackgrass is actively growing. Treatments for quackgrass must be followed by deep tillage for complete control.

Do not apply more than 2 quarts of this product per acre as a preharvest treatment. Preharvest application to alfalfa grown for seed may result in a reduction in germination or crop vigor.

I. MAIN LABEL FOR INDUSTRIAL, TURF, AND ORNAMENTAL USES

### 8.9 Rangelands

This product can be applied postemergence and will control or suppress many annual weeds growing in perennial cool and warm-season grass rangelands.

Preventing viable seed production is key to the successful control and invasion of annual grassy weeds in rangelands. Follow-up applications in sequential years should eliminate most of the viable seeds.

Delay grazing of treated areas to encourage growth of desirable perennials. Allowing desirable perennials to flower and reseed in the treated area will encourage successful transition.

Do not use ammonium sulfate when spraying rangeland grasses with this product. Do not apply more than 3 quarts per acre per year.

Apply 12 to 16 fluid ounces of this product per acre to control or suppress many weeds, including downy brome, cheatgrass, cereal rye and jointed goatgrass in rangelands. Apply when most mature brome plants are in early flower and before the plants, including seedheads, turn color. Allowing for secondary weed flushes to occur in the spring following rain events further depletes the seed reserve and encourages perennial grass conversion on weedy sites. Make Fall applications where spring moisture is limited and fall germination allows for good weed growth.

For medusahead, apply 16 fluid ounces of this product per acre at the 3-leaf stage. Delaying applications beyond this stage will result in reduced or unacceptable control. Fire may be useful in eliminating the thatch layer produced by slow decaying culms prior to application. Allow new growth to occur before spraying after a burn. Repeat applications in subsequent years may be necessary to eliminate the seedbank before reestablishing desirable perennial grasses in medusahead-dominated rangelands.

Slight discoloration of the desirable grasses may occur, but they will regreen and regrow under moist soil conditions as effects of this product wear off.

### 8.10 Parks, Recreational and Residential Areas

This product may be used in parks, recreational and residential areas. It may be applied with any application equipment described in this label. This product may be used to trim-and-edge around trees, fences, and paths, around buildings, sidewalks, and other objects in these areas. This product may be used for spot treatment of unwanted vegetation. This product may be used to eliminate unwanted weeds growing in established shrub beds or ornamental plantings. This product may be used prior to planting an area to ornamentals, flowers, turfgrass (sod or seed), or prior to laying asphalt or beginning construction projects.

All of the instructions in the "**Non-Crop Areas and Industrial Sites**" section apply to park and recreational areas.

### 8.11 Railroads

All of the instructions in the "**Non-Crop Areas and Industrial Sites**" section apply to railroads.

### Bare Ground, Ballast and Shoulders, Crossings, and Spot Treatment

This product may be used to maintain bare ground on railroad ballast and shoulders. Repeat applications of this product may be used, as weeds emerge, to maintain bare ground. This product may be used to control tall-growing weeds to improve line-of-sight at railroad crossings and reduce the need for mowing along rights-of-way. For crossing applications, up to 80 gallons of spray solution per acre may be used.

This product may be tank mixed with the following products provided that the specific product is registered for ballast, shoulder, spot, bare ground and crossing treatments:

| | |
|---|---|
| Arsenal | Krovar I DF |
| Clarity | Oust XP |
| Diuron | Sahara |
| Escort | Spike |
| Garlon 3A | Telar |
| Garlon 4 | Vanquish |

I. MAIN LABEL FOR INDUSTRIAL, TURF, AND ORNAMENTAL USES

| Hyvar X | 2,4-D |
|---------|-------|

**Brush Control**

This product may be used to control woody brush and trees on railroad rights-of-way. Apply 4 to 10 quarts of this product per acre as a broadcast spray, using boom-type or boomless nozzles. Up to 80 gallons of spray solution per acre may be used. Apply a 3/4 to 2-percent solution of this product when using high-volume spray-to-wet applications. Apply a 5- to 10-percent solution of this product when using low volume directed sprays for spot treatment. This product may be mixed with the following products for enhanced control of woody brush and trees:

| Arsenal | Garlon 4 |
|---------|----------|
| Escort | Tordon K |
| Garlon 3A | |

**Bermudagrass Release**

This product may be used to control or partially control many annual and perennial weeds for effective release of actively growing bermudagrass. Apply 1 to 3 pints of this product in up to 80 gallons of spray solution per acre. Use the lower rate when treating annual weeds below 6 inches in height (or runner length). Use the higher rate as weeds increase in size or as they approach flower or seedhead formation. These rates will also provide partial control of the following perennial species:

| Bahiagrass | Johnsongrass |
|------------|--------------|
| Bluestem, silver | Trumpetcreeper |
| Fescue, tall | Vaseygrass |

This product may be tank-mixed with Oust XP. If tank-mixed, use no more than 1 to 3 pints of this product with 1 to 2 ounces of Oust XP per acre. Use the lower rates of each product to control annual weeds less than 6 inches in height (or runner length) that are listed in this label and the Oust XP label. Use the higher rates as annual weeds increase in size and approach the flower or seedhead stages. These rates will also provide partial control of the following perennial weeds:

| Bahiagrass | Fescue, tall |
|------------|--------------|
| Blackberry | Johnsongrass |
| Bluestem, silver | Poorjoe |
| Broomsedge | Raspberry |
| Dallisgrass | Trumpetcreeper |
| Dewberry | Vaseygrass |
| Dock, curly | Vervain, blue |
| Dogfennel | |

Use only on well-established bermudagrass. Bermudagrass injury may result from the treatment, but regrowth will occur under moist conditions. Do not make repeat applications in the same season since severe injury may occur.

**8.12 Roadsides**

All of the instructions in the "**Non-Crop Areas and Industrial Sites**" section apply to roadsides.

**Shoulder Treatments**

This product may be used on road shoulders. It may be applied with boom sprayers, shielded boom sprayers, high-volume off-center nozzles, hand-held equipment, and similar equipment.

**Guardrails and Other Obstacles to Mowing**

This product may be used to control weeds growing under guardrails and around signposts and other objects along the roadside.

**Spot Treatment**

This product may be used as a spot treatment to control unwanted vegetation growing along roadsides.

I. MAIN LABEL FOR INDUSTRIAL, TURF, AND ORNAMENTAL USES

**Tank Mixtures**

This product may be tank-mixed with the following products for shoulder, guardrail, spot and bare ground treatments provided that the specific product is registered for use on such sites. Read and carefully observe label directions, cautionary statements and all information on the labels of all products used.:

| Clarity | Princep DF |
| Diuron | Princep Liquid |
| Endurance | Ronstar 50WSP |
| Escort | Sahara |
| Krovar I DF | simazine |
| Oust XP | Surflan |
| Outrider | Telar |
| Pendulum 3.3 EC | Vanquish |
| Pendulum WDG | 2,4-D |

See the "Tank Mixture" section of this label for tank mixing instructions.

**Release of Bermudagrass or Bahiagrass**

**Dormant Applications**

This product may be used to control or partially control many winter annual weeds and tall fescue for effective release of dormant bermudagrass or bahiagrass. Treat only when turf is dormant and prior to spring green-up. This product may also be tank-mixed with Outrider or Oust XP for residual control. Tank mixtures of this product with Oust XP may delay green-up.

For best results on winter annuals, treat when plants are in an early growth stage (below 6 inches in height) after most have germinated. For best results on tall fescue, treat when fescue is at or beyond the 4- to 6-leaf stage.

Apply 8 to 64 fluid ounces of this product in a tank mixture with 3/4 to 1-1/3 ounces Outrider herbicide per acre. Read and follow all label directions for Outrider herbicide.

Apply 8 to 64 fluid ounces of this product per acre alone or in a tank mixture with 1/4 to 1 ounce per acre of Oust XP. Apply the labeled rates in 10 to 40 gallons of water per acre. Use only in areas where bermudagrass or bahiagrass are desirable ground covers and where some temporary injury or discoloration can be tolerated. To avoid delays in green-up and minimize injury, add no more than 1 ounce of Oust XP per acre on bermudagrass and no more than 1/2 ounce of Oust XP per acre on bahiagrass and avoid treatments when these grasses are in a semi-dormant condition.

**Actively Growing Bermudagrass**

This product may be used to control or partially control many annual and perennial weeds for effective release of actively growing bermudagrass. Apply 1 to 3 pints of this product in 10 to 40 gallons of spray solution per acre. Use the lower rate when treating annual weeds below 6 inches in height (or runner length). Use the higher rate as weeds increase in size or as they approach flower or seedhead formation. These rates will also provide partial control of the following perennial species:

| Bahiagrass | Johnsongrass |
| Bluestem, silver | Trumpetcreeper |
| Fescue, tall | Vaseygrass |

This product may be tank mixed with Outrider for control or partial control of Johnsongrass and other weeds listed in the Outrider label. Use 8 to 32 fluid ounces of this product with 3/4 to 1 1/3 ounces of Outrider. Use the higher rates of both products for control of perennial weeds or annual weeds greater than 6 inches in height.

This product may be tank mixed with Oust XP. If tank-mixed, use no more than 1 to 2 pints of this product with 1 to 2 ounces of Oust XP per acre. Use the lower rates of each product to control annual weeds less than 6 inches in height (or runner length) that are listed in this label and the Oust XP label. Use the higher

I. MAIN LABEL FOR INDUSTRIAL, TURF, AND ORNAMENTAL USES

rates as annual weeds increase in size and approach the flower or seedhead stages. These rates will also provide partial control of the following perennial weeds:

| | |
|---|---|
| Bahiagrass | Fescue, tall |
| Bluestem, silver | Johnsongrass |
| Broomsedge | Poorjoe |
| Dallisgrass | Trumpetcreeper |
| Dock, curly | Vaseygrass |
| Dogfennel | Vervain, blue |

Use only on well-established bermudagrass. Bermudagrass injury may result from the treatment, but regrowth will occur under moist conditions. Repeat applications of the tank mix in the same season causes severe injury.

**Actively Growing Bahiagrass**

For suppression of vegetative growth and seedhead inhibition of bahiagrass for approximately 45 days, apply 6 fluid ounces of this product in 10 to 40 gallons of water per acre. Apply 1 to 2 weeks after full green-up or after mowing to a uniform height of 3 to 4 inches. This application must be made prior to seedhead emergence.

For suppression up to 120 days, apply 4 fluid ounces of this product per acre, followed by an application of 2 to 4 fluid ounces per acre about 45 days later. Make no more than 2 applications per year.

This product may be used for control or partial control of Johnsongrass and other weeds listed on the Outrider label in actively growing bahiagrass. Apply 1-1/2 to 4-3/4 ounces of this product with 0.75 to 1.33 ounces of Outrider per acre. Use the higher rates for control of perennial weeds or annual weeds greater than 6 inches in height. Use only on well established bahiagrass.

A tank mixture of this product plus Oust XP may be used. Apply 6 fluid ounces of this product plus 1/4 ounce of Oust XP per acre 1 to 2 weeks following an initial spring mowing. Make only one application per year.

**8.13 Utility Sites**

This product is labeled for use along electrical power, pipeline and telephone rights-of-way, and in other sites associated with these rights-of-way, substations, roadsides, railroads or similar rights-of-way that run in conjunction with utilities.

This product may be used in utility sites and substations for bare ground, trim-and-edge, spot treatment of unwanted vegetation and to eliminate unwanted weeds growing in established shrub beds or ornamental plantings. This product may be used prior to planting a utility site to ornamentals, flowers, turfgrass (sod or seed), or beginning construction projects.

Repeated applications of this product may be used, as weeds emerge, to maintain bare ground.

This product is also labeled for use in preparing or establishing wildlife openings within these sites, maintaining access roads and for side trimming along utility rights-of-way.

**Tank Mixtures**

Tank mixtures of this product may be used to increase the spectrum of control for herbaceous weeds, woody brush and trees provided that the specific product is registered for application to the desired site. When tank mixing, read and carefully observe the label claims, cautionary statements and all information on the labels of all products used. Use according to the most restrictive precautionary statements for each product in the mixture. Any labeled rate of this product may be used in a tank mix.

For control of herbaceous weeds, use the lower labeled tank mixture rates. For control of dense stands or tough-to-control woody brush and trees, use the higher labeled rates.

I. MAIN LABEL FOR INDUSTRIAL, TURF, AND ORNAMENTAL USES

TANK MIXTURES: This product may be tank mixed with the following products for use in utility sites, provided that the specific product used is labeled for use on these sites. Refer to the individual product labels for approved sites and application rates.

| | |
|---|---|
| Arsenal | atrazine [1] |
| Barricade 65WG | dicamba [1] |
| diuron [1] | Endurance |
| Escort | Escort XP |
| Garlon 3A [2] | Garlon 4 [3] |
| Krenite | Krovar I DF |
| Oust | Oust XP |
| Outrider | pendimethalin [1] |
| Plateau | |
| Ronstar 50WP | Sahara |
| simazine [1] | Surflan AS |
| Surflan WDG | Telar DF |
| Transline | Vanquish |
| Velpar DF | Velpar L |
| 2,4-D [1] | |

[1] Tank mixtures with product containing this generic active ingredient may be made provided the specific product is labeled for application at the use site.

[2] Ensure that Garlon 3A is thoroughly mixed with water according to label directions before adding this product. Have spray mixture agitating at the time this product is added to avoid spray incompatibility problems.

[3] For side trimming treatments, use this product alone or in a tank mixture with Garlon 4.

### Bare Ground and Trim-and-Edge

This product may be used in utility sites and substations for bare ground, trim-and-edge around objects, spot treatment of unwanted vegetation and to eliminate unwanted weeds growing in established shrub beds or ornamental plantings. This product may be used prior to planting a utility site to ornamentals, flowers, turfgrass (sod or seed), or beginning construction projects.

Repeated applications of this product may be used, as weeds emerge, to maintain bare ground.

This product may be tank mixed with the following products. Refer to these products' labels for approved non-crop sites and application rates.

| | |
|---|---|
| Arsenal | Plateau™ |
| Banvel | Princep™DF |
| Barricade™ 65WG | Princep™ Liquid |
| Diuron | Ronstar™ 50WP |
| Endurance™ | Sahara™ |
| Escort | simazine |
| Garlon 3A | Surflan™ |

### 9.0 WEEDS CONTROLLED

Always use the higher rate of this product per acre within the labeled range when weed growth is heavy or dense or weeds are growing in an undisturbed (noncultivated) area.

I. MAIN LABEL FOR INDUSTRIAL, TURF, AND ORNAMENTAL USES

Reduced results may occur when treating weeds heavily covered with dust. For weeds that have been mowed, grazed or cut, allow regrowth to occur prior to treatment.

For low-volume directed spray applications, use a 5- to 10-percent solution of this product for control or partial control of annual weeds, perennial weeds, or woody brush and trees. Spray coverage must be uniform with at least 50 percent of the foliage contacted. Coverage of the top one-half of the plant is important for best results. To ensure adequate spray coverage, spray both sides of large or tall woody brush and trees, when foliage is thick and dense, or where there are multiple resprouts.

Refer to the following label sections for labeled rates for the control of annual and perennial weeds and woody brush and trees. For difficult to control perennial weeds and woody brush and trees, where plants are growing under stressed conditions, or where infestations are dense, this product may be used at 5 to 10 quarts per acre for enhanced results.

### 9.1 Annual Weeds

Use 1 quart per acre if weeds are less than 6 inches in height or runner length and 1.5 quarts to 4 quarts per acre if weeds are over 6 inches in height or runner length or when weeds are growing under stressed conditions.

For spray-to-wet applications, apply a 1/2-percent solution of this product to weeds less than 6 inches in height or runner length. Apply prior to seedhead formation in grass or bud formation in broadleaf weeds. For annual weeds over 6 inches tall, or for smaller weeds growing under stressed conditions, use a 1- to 2-percent solution. Use the higher rate for tough-to-control species or for weeds over 24 inches tall.

### WEED SPECIES

| |
|---|
| Anoda, spurred |
| Barley* |
| Barley, little * |
| Barnyardgrass* |
| Bassia, fivehook |
| Bittercress* |
| Bluegrass, annual* |
| Bluegrass, bulbous* |
| Brome, downy* |
| Brome, Japanese* |
| Buttercup* |
| Castorbean |
| Cheatgrass* |
| Cheeseweed *(Malva parviflora)* |
| Chervil* |
| Chickweed* |
| Cocklebur* |
| Copperleaf, hophornbeam |
| Copperleaf, Virginia |
| Coreopsis, plains/tickseed * |
| Corn* |
| Crabgrass* |
| Cupgrass, woolly * |
| Dwarfdandelion* |
| Eclipta* |
| Falsedandelion* |
| Falseflax, smallseed* |
| Fiddleneck |
| Filaree |
| Fleabane, annual* |
| Fleabane, hairy *(Conyza bonariensis)** |

## I. MAIN LABEL FOR INDUSTRIAL, TURF, AND ORNAMENTAL USES

| |
|---|
| Fleabane, rough* |
| Foxtail* |
| Foxtail, Carolina * |
| Geranium, Carolina |
| Goatgrass, jointed* |
| Goosegrass |
| Groundsel, common* |
| Henbit |
| Horseweed/Marestail (*Conyza canadensis*) |
| Itchgrass* |
| Johnsongrass, seedling |
| Junglerice |
| Knotweed |
| Kochia |
| Lamb's-quarters* |
| Lettuce, prickly * |
| Mannagrass, eastern * |
| Mayweed |
| Medusahead* |
| Morningglory (*Ipomoea spp*) |
| Mustard, blue* |
| Mustard, tansy* |
| Mustard, tumble* |
| Mustard, wild* |
| Nightshade, black * |
| Oats |
| Pancium browntop * |
| Pancium, fall * |
| Pancium, Texas * |
| Pennycress, field * |
| Pepperweed, Virginia * |
| Pigweed* |
| Puncturevine |
| Purslane, common |
| Pusley, Florida |
| Ragweed, common* |
| Ragweed, giant |
| Rice, red |
| Rocket, London * |
| Rocket, yellow |
| Rye* |
| Ryegrass* |
| Sandbur, field* |
| Sesbania, hemp |
| Shattercane* |
| Shepherd's-purse* |
| Sicklepod |
| Signalgrass, broadleaf* |
| Smartweed, ladysthumb* |
| Smartweed, Pennsylvania* |
| Sorghum, grain (milo)* |
| Sowthistle, annual |
| Spanishneedles |

I. MAIN LABEL FOR INDUSTRIAL, TURF, AND ORNAMENTAL USES

| |
|---|
| Speedwell, corn * |
| Speedwell, purslane* |
| Sprangletop* |
| Spurge, annual |
| Spurge, prostrate* |
| Spurge, spotted* |
| Spurry, umbrella* |
| Starthistle, yellow |
| Stinkgrass* |
| Sunflower* |
| Teaweed/Prickly sida |
| Thistle, Russian |
| Velvetleaf |
| Wheat* |
| Wild oats* |
| Witchgrass* |

*When using field broadcast equipment (aerial applications or boom sprayers using flat-fan nozzles) these species will be controlled or partially controlled using 1 pint of this product per acre. Applications must be made using 3 to 10 gallons of carrier volume per acre. Use nozzles that ensure thorough coverage of foliage and treat when weeds are in an early growth stage.

**9.2 Perennial Weeds**

Best results are obtained when perennial weeds are treated after they reach the reproductive stage of growth (seedhead initiation in grasses and bud formation in broadleaves). For non-flowering plants, best results are obtained when the plants reach a mature stage of growth. In many situations, treatments are required prior to these growth stages. Under these conditions, use the higher application rate within the labeled range.

Use a 2-percent solution on tough-to-control perennials like bermudagrass, dock, field bindweed, hemp dogbane, milkweed and Canada thistle.

Ensure thorough coverage when using spray-to-wet treatments using hand-held equipment. When using hand-held equipment for low-volume directed spot treatments, apply a 5- to 10-percent solution of this product.

Allow 7 or more days after application before tillage.

| Weed Species | Rate (QT/A) | Hand-Held % Solution |
|---|---|---|
| Alfalfa* | 1 | 2 |
| Alligatorweed* | 4 | 1.5 |
| Anise (fennel) | 2-4 | 1-2 |
| Artichoke, Jerusalem | 3-5 | 2 |
| Bahiagrass | 3-5 | 2 |
| Beachgrass, European (*Ammophila arenaria*) | -- | 5 |
| Bentgrass* | 1.5 | 2 |
| Bermudagrass | 5 | 2 |
| Bermudagrass, water (knotgrass) | 1.5 | 2 |
| Bindweed, field | 4-5 | 2 |
| Bluegrass, Kentucky | 2 | 2 |
| Blueweed, Texas | 4-5 | 2 |
| Brackenfern | 3-4 | 1-1.5 |
| Bromegrass, smooth | 2 | 2 |
| Bursage, woolly-leaf | -- | 2 |
| Canarygrass, reed | 2-3 | 2 |
| Cattail | 3-5 | 2 |

I. MAIN LABEL FOR INDUSTRIAL, TURF, AND ORNAMENTAL USES

| | | |
|---|---|---|
| Clover; red, white | 3-5 | 2 |
| Cogongrass | 3-5 | 2 |
| Dallisgrass | 3-5 | 2 |
| Dandelion | 3-5 | 2 |
| Dock, curly | 3-5 | 2 |
| Dogbane, hemp | 4 | 2 |
| Fescue (except tall) | 3-5 | 2 |
| Fescue, tall | 1-3 | 2 |
| Guineagrass | 3 | 1 |
| Hemlock, poison | 2-4 | 1-2 |
| Horsenettle | 3-5 | 2 |
| Horseradish | 4 | 2 |
| Iceplant | 2 | 1.5-2 |
| Ivy, German | 2-4 | 1-2 |
| Johnsongrass | 2-3 | 1 |
| Kikuyugrass | 2-3 | 2 |
| Knapweed | 4 | 2 |
| Lantana | -- | 1-1.25 |
| Lespedeza | 3-5 | 2 |
| Milkweed, common | 3 | 2 |
| Muhly, wirestem | 2 | 2 |
| Mullein, common | 3-5 | 2 |
| Napiergrass | 3-5 | 2 |
| Nightshade, silverleaf | 2 | 2 |
| Nutsedge; purple, yellow | 3 | 1-2 |
| Orchardgrass | 2 | 2 |
| Pampasgrass | 3-5 | 1.5-2 |
| Paragrass | 3-5 | 2 |
| Pepperweed, perennial | 4 | 2 |
| Phragmites* | 3-5 | 1-2 |
| Quackgrass | 2-3 | 2 |
| Redvine* | 2 | 2 |
| Reed, giant | 4-5 | 2 |
| Ryegrass, perennial | 2-3 | 1 |
| Smartweed, swamp | 3-5 | 2 |
| Spurge, leafy* | -- | 2 |
| Sweet potato, wild* | -- | 2 |
| Thistle, artichoke | 2-3 | 1-2 |
| Thistle, Canada | 2-3 | 2 |
| Timothy | 2-3 | 2 |
| Torpedograss* | 4-5 | 2 |
| Trumpetcreeper* | 2-3 | 2 |
| Vaseygrass | 3-5 | 2 |
| Velvetgrass | 3-5 | 2 |
| Wheatgrass, western | 2-3 | 2 |

*Partial control

**9.3 Woody Brush and Trees**

Apply this product after full leaf expansion, unless otherwise directed in this label or separate supplemental label or Fact Sheet published by Monsanto *[this company]* . Use the higher rate for larger plants and/or dense areas of growth. On vines, use the higher rate for plants that have reached the woody stage of growth. Best results are obtained when application is made in late summer or fall after fruit formation.

I. MAIN LABEL FOR INDUSTRIAL, TURF, AND ORNAMENTAL USES

In arid areas, best results are obtained when applications are made in the spring to early summer when brush species are at high moisture content and are flowering.

Ensure thorough coverage when using spray-to-wet treatments using hand-held equipment. When using hand-held equipment for low-volume directed-spray spot treatments, apply a 5- to 10-percent solution of this product.

Symptoms may not appear prior to frost or senescence with fall treatments.

Allow 7 or more days after application before tillage, mowing or removal. Repeat treatments may be necessary to control plants regenerating from underground parts or seed. Some autumn colors on undesirable deciduous species are acceptable provided no major leaf drop has occurred. Reduced performance may result if fall treatments are made following a frost.

| Weed Species | Broadcast Rate (QT/A) | Hand-Held Spray-to-Wet % Solution |
|---|---|---|
| Alder | 3-4 | 1-1.5 |
| Ash* | 2-5 | 1-2 |
| Aspen, quaking | 2-3 | 1-1.5 |
| Bearclover (Bearmat)* | 2-5 | 1-2 |
| Beech* | 2-5 | 1-2 |
| Birch | 2 | 1 |
| Blackberry | 3-4 | 1-1.5 |
| Blackgum* | 2-5 | 1-2 |
| Bracken | 2-5 | 1-2 |
| Broom; French, Scotch | 2-5 | 1.5-2 |
| Buckwheat, California* | 2-4 | 1-2 |
| Cascara* | 2-5 | 1-2 |
| Catsclaw* | -- | 1-1.5 |
| Ceanothus* | 2-5 | 1-2 |
| Chamise* | 2-5 | 1 |
| Cherry; bitter, black, pin | 2-3 | 1-1.5 |
| Coyotebrush | 3-4 | 1.5-2 |
| Creeper, Virginia | 2-5 | 1-2 |
| Deerweed | 2-5 | 1 |
| Dogwood* | 2-5 | 1-2 |
| Elderberry | 2 | 1 |
| Elm* | 2-5 | 1-2 |
| Eucalyptus | -- | 2 |
| Flower, monkey flower* | 2-4 | 1-2 |
| Gorse* | 2-5 | 1-2 |
| Hasardia* | 2-4 | 1-2 |
| Hawthorn | 2-3 | 1-1.5 |
| Hazel | 2 | 1 |
| Hickory* | 2-5 | 1-2 |
| Honeysuckle | 3-4 | 1-1.5 |
| Hornbeam,  American* | 2-5 | 1-2 |
| Ivy, poison | 4-5 | 2 |
| Kudzu | 4 | 2 |
| Locust, black* | 2-4 | 1-2 |
| Madrone resprouts* | -- | 2 |
| Manzanita* | 2-5 | 1-2 |
| Maple, red* | 2-4 | 1-1.5 |
| Maple, sugar | -- | 1-1.5 |
| Maple, vine * | 2-5 | 1-2 |

I. MAIN LABEL FOR INDUSTRIAL, TURF, AND ORNAMENTAL USES

| Oak; black, white* | 2-4 | 1-2 |
|---|---|---|
| Oak, post | 3-4 | 1-1.5 |
| Oak; northern pin | 2-4 | 1-1.5 |
| Oak, poison | 4-5 | 2 |
| Oak, scrub* | 2-4 | 1-1.5 |
| Oak, southern red | 2-3 | 1-1.5 |
| Olive, Russian * | 2-5 | 1-2 |
| Peppertree, Brazilian (Florida holly)* | 2-5 | 1-2 |
| Persimmon* | 2-5 | 1-2 |
| Pine | 2-5 | 1-2 |
| Poplar, yellow* | 2-5 | 1-2 |
| Redbud, eastern | 2-5 | 1-2 |
| Rose, multiflora | 2 | 1 |
| Sage, black | 2-4 | 1 |
| Sage, white* | 2-4 | 1-2 |
| Sage brush, California | 2-4 | 1 |
| Salmonberry | 2 | 1 |
| Saltcedar* | 2-5 | 1-2 |
| Sassafras* | 2-5 | 1-2 |
| Sourwood* | 2-5 | 1-2 |
| Sumac; laurel, poison, smooth, sugarbush, winged * | 2-4 | 1-2 |
| Sweetgum | 2-3 | 1-1.5 |
| Swordfern* | 2-5 | 1-2 |
| Tallowtree, Chinese | -- | 1 |
| Tanoak resprouts* | -- | 2 |
| Thimbleberry | 2 | 1 |
| Tobacco, tree* | 2-4 | 1-2 |
| Toyon* | - | 2 |
| Trumpetcreeper | 2-3 | 1-1.5 |
| Waxmyrtle, southern* | 2-5 | 1-2 |
| Willow | 3 | 1 |
| Yerba Santa, California* | - | 2 |

*Partial control

**10.0 LIMIT OF WARRANTY AND LIABILITY**

*Monsanto* Company *[This company]* warrants that this product conforms to the chemical description on the label and is reasonably fit for the purposes set forth in the Complete Directions for Use label booklet ("Directions") when used in accordance with those Directions under the conditions described therein. TO THE EXTENT CONSISTENT WITH APPLICABLE LAW, NO OTHER EXPRESS WARRANTY OR IMPLIED WARRANTY OF FITNESS FOR PARTICULAR PURPOSE OR MERCHANTABILITY IS MADE. This warranty is also subject to the conditions and limitations stated herein.

Buyer and all users shall promptly notify this Company of any claims whether based in contract, negligence, strict liability, other tort or otherwise.

To the extent consistent with applicable law, buyer and all users are responsible for all loss or damage from use or handling which results from conditions beyond the control of this Company, including, but not limited to, incompatibility with products other than those set forth in the Directions, application to or contact with desirable vegetation, unusual weather, weather conditions which are outside the range considered normal at the application site and for the time period when the product is applied, as well as weather conditions which are outside the application ranges set forth in the Directions, application in any manner not explicitly set forth in the Directions, moisture conditions outside the moisture range specified in the Directions, or the presence of products other than those set forth in the Directions in or on the soil, crop or treated vegetation.

I. MAIN LABEL FOR INDUSTRIAL, TURF, AND ORNAMENTAL USES

This Company does not warrant any product reformulated or repackaged from this product except in accordance with this Company's stewardship requirements and with express written permission from this Company.

TO THE EXTENT CONSISTENT WITH APPLICABLE LAW, THE EXCLUSIVE REMEDY OF THE USER OR BUYER, AND THE LIMIT OF THE LIABILITY OF THIS COMPANY OR ANY OTHER SELLER FOR ANY AND ALL LOSSES, INJURIES OR DAMAGES RESULTING FROM THE USE OR HANDLING OF THIS PRODUCT (INCLUDING CLAIMS BASED IN CONTRACT, NEGLIGENCE, STRICT LIABILITY, OTHER TORT OR OTHERWISE) SHALL BE THE PURCHASE PRICE PAID BY THE USER OR BUYER FOR THE QUANTITY OF THIS PRODUCT INVOLVED, OR, AT THE ELECTION OF THIS COMPANY OR ANY OTHER SELLER, THE REPLACEMENT OF SUCH QUANTITY, OR, IF NOT ACQUIRED BY PURCHASE, REPLACEMENT OF SUCH QUANTITY. IN NO EVENT SHALL THIS COMPANY OR ANY OTHER SELLER BE LIABLE FOR ANY INCIDENTAL, CONSEQUENTIAL OR SPECIAL DAMAGES.

Upon opening and using this product, buyer and all users are deemed to have accepted the terms of this LIMIT OF WARRANTY AND LIABILITY which may not be varied by any verbal or written agreement. If terms are not acceptable, return at once unopened.

[INSERT BRAND NAME], Outrider, Monsanto and Vine symbol are trademarks of Monsanto Technology LLC. All other trademarks are the property of their respective owners.

This product is protected by U.S. Patent Nos. 5,683,958; 5,703,015; 6,063,733; 6,121,199; 6,121,200. No license granted under any non-U.S. patent(s).

EPA Reg. No. 524-517

---

In case of an emergency involving this product,

or for medical assistance,

Call Collect, day or night, (314) 694-4000.

---

©[DATE]  MONSANTO COMPANY *[INSERT COMPANY NAME]*

Packed For: *[Produced (Manufactured) for:]*

*[Insert company name & mailing address]*

Monsanto Company

800 N. Lindbergh Blvd.

ST. LOUIS, MISSOURI, 63167 U.S.A.

000524-00517.20090317.amend.pdf

| | II. SUPPLEMENTAL LABELING FOR INDUSTRIAL, TURF, & ORNAMENTAL USES |
|---|---|

Table of Contents: Industrial, Turf, and Ornamental Supplemental labeling

| | Name | EPA APPROVAL |
|---|---|---|
| A | FOR USE FOR SELECTIVE WEED CONTROL ON **[INSERT BRAND NAME]** TOLERANT PURE GOLD® TALL FESCUE AND AURORA GOLD® FINE FESCUE SELECTIONS. | Nov 20, 2002 |
| B | **[INSERT BRAND NAME]** HERBICIDE AND TANK MIXTURES FOR NON-CROP AREAS, INCLUDING RAILROAD RIGHTS-OF-WAY, SUBSTATIONS, AIRPORTS, INDUSTRIAL PLANTS, ROADSIDES, STORAGE AREAS AND SIMILAR SITES | Nov 20, 2002 |
| C | AERIAL APPLICATIONS IN CALIFORNIA | Amended this submission |
| D | FOR USE IN CITRUS CROPS IN FLORIDA | June 19, 2008 |

000524-00517.20090317.amend.pdf

## SUPPLEMENTAL LABELING

READ THE ENTIRE LABEL FOR **[INSERT BRAND NAME]** BEFORE PROCEEDING WITH THE USE DIRECTIONS CONTAINED IN THIS SUPPLEMENTAL LABELING.

When using **[INSERT BRAND NAME]** as permitted according to this supplemental labeling, read and follow all applicable directions, restrictions, and precautions on the label booklet provided with the pesticide container and on this supplemental labeling. This supplemental labeling must be in the possession of the user at the time of pesticide application.

### [INSERT BRAND NAME HERE]

Herbicide

[INSERT SUPPLEMENTAL TITLE HERE]

EPA Reg. No. 524-517

Keep out of reach of children.

### CAUTION!

In case of an emergency involving this product, Call Collect, day or night, 314-694-4000.

---

**[INSERT BRAND NAME]** is a trademark of Monsanto Technology LLC *[insert Company name]*.

---

### DIRECTIONS FOR USE

---

It is a violation of Federal law to use this product in any manner inconsistent with its labeling.

This labeling must be in the possession of the user at the time of herbicide application.

AVOID CONTACT OF HERBICIDE WITH FOLIAGE, STEMS, EXPOSED NON-WOODY ROOTS OR FRUIT OF CROPS, DESIRABLE PLANTS AND TREES, BECAUSE SEVERE INJURY OR DESTRUCTION MAY RESULT.

See "PRODUCT INFORMATION" and "MIXING" sections of the label booklet for **[INSERT BRAND NAME]** for essential product performance information.

---

### [INSERT SPECIFIC DIRECTIONS FOR USE HERE]

---

**Read the "Limit of Warranty and Liability" in the label booklet for [INSERT BRAND NAME] before using. These terms apply to this supplemental labeling and if these terms are not acceptable, return the product unopened at once.**

---

© [DATE] MONSANTO COMPANY

800 N. Lindbergh Blvd.

ST. LOUIS, MISSOURI 63167

*[Insert company name and mailing address]*

000524-00517.20091214.amend.pdf

---

**A. FOR USE FOR SELECTIVE WEED CONTROL ON [INSERT BRAND NAME]** TOLERANT PURE GOLD® TALL FESCUE AND AURORA GOLD® FINE FESCUE SELECTIONS.

---

**[INSERT BRAND NAME] Tolerant Tall Fescue Selections For Seed Production**

Use this product on **[INSERT BRAND NAME]** tolerant tall and fine fescue grown for seed production only.

This product may be applied at rates of 4 to16 fluid ounces per acre as a postemergence spray on **[INSERT BRAND NAME]** tolerant tall fescue selections. See the label booklet for application instructions, rates, weeds controlled and proper growth stage of weeds.

When applied postemergence, this product will control or suppress the following weeds: annual bluegrass mustards, downy brome, cheatgrass, chickweed, pennycress, fleabane, shepherd's-purse, sowthistle, wild oat, dandelion, quackgrass, and Canada thistle. See the **[INSERT BRAND NAME]** label booklet for a complete list of weeds controlled or suppressed.

**NOTE:** The labeled rate for this use will limit the level of control of certain species of weeds.

**NOTE:** Some crop discoloration and yellowing may occur at higher rates of application with **INSERT BRAND NAME** tolerant tall and fine fescue selections. Reduction in stand of these selections may occur under stress conditions.

**Timing Of Applications**

Applications can be made 6 weeks after germination and to established crops after growth resumes in the Fall until onset of dormancy and in the Spring after dormancy break until 60 days prior to harvest.

Avoid spraying during or within two weeks after periods when air temperatures fall below 25°F.

Remove domestic livestock from the seed production field prior to application. Wait 60 days after making this application before grazing or harvesting the treated area.

**NOTE:** Only two applications per crop growth cycle may be made to any one site. If two applications are required, only one Fall and one Spring application may be made during one 12 month cycle.

---

**B. [INSERT BRAND NAME]** HERBICIDE AND TANK MIXTURES FOR NON-CROP AREAS, INCLUDING RAILROAD RIGHTS-OF-WAY, SUBSTATIONS, AIRPORTS, INDUSTRIAL PLANTS, ROADSIDES, STORAGE AREAS AND SIMILAR SITES

---

Do not allow spray mixtures of this herbicide to mist, drip, drift or splash onto desirable vegetation since injury or destruction may occur. Do not apply when wind or other conditions favor drift.

See the "WEEDS CONTROLLED" section of the **[INSERT BRAND NAME]** label booklet for application rates. For difficult to control species, where dense stands occur, or where conditions for control are not ideal, 5 to 10 quarts per acre of this product may be used for improved results.

---

TANK MIXTURES

---

This product provides control of the emerged weeds listed in the label booklet. When applied as a tank mixture, the following herbicides will provide preemergence and/or postemergence control of the weeds listed in the individual product labels.

000524-00517.20091214.amend.pdf

The following list of products may be tank mixed with this product provided that the specific product is registered for application to the desired site. Any labeled rate of this product may be used in a tank mixture with these products.

Tank-mix Product

| Arsenal™ * | |
|---|---|
| Banvel | |
| 2,4-D | |
| Garlon™ 3A | |
| Garlon 4 | |
| Diuron | |
| Diuron + 2,4-D | |
| Diuron + Garlon 3A | |
| Diuron + Garlon 4 | |
| Hyvar™ X | |
| Hyvar X + 2,4-D | |
| Hyvar X + Garlon 3A | |
| Hyvar X + Garlon 4 | |
| Krovar™ I DF | |
| Krovar I DF + 2,4-D | |
| Krovar I DF + Garlon 3A | |
| Krovar I DF + Garlon 4 | |
| Oust XP™ | |
| Oust XP + 2,4-D | |
| Oust XP + Garlon 3A | |
| Oust XP + Garlon 4 | |
| Spike™ 80W | |
| Spike 80W + 2,4-D | |
| Spike 80W + Garlon 3A | |
| Spike 80W + Garlon 4 | |

* Arsenal is not approved for use in the state of California.

Refer to the individual product labels for specific non-crop sites, rates, carrier volumes and precautionary statements.

Read and carefully observe the label claims, cautionary statements, labeled use rates and all other information on the labels of all products used in these tank mixtures. Use according to the most restrictive label directions for each product in the mixture.

Maintain good agitation at all times during the mixing process. Ensure that the tank-mix products are well mixed with the spray solution before adding this product.

Mix only the quantity of spray solution that can be used during the same day. Tank mixtures allowed to stand overnight may result in reduced weed control.

Maintain good agitation at all times until the contents of the tank are sprayed. If the spray mixture is allowed to settle, thorough agitation is required to resuspend the mixture before spraying is resumed.

When used in combination as recommended by Monsanto Company *[this company]*, the liability of Monsanto *[this company]* shall in no manner extend to any damage, loss or injury not solely and directly caused by the inclusion of the Monsanto *[this]* product in such combination use.

000524-00517.20091214.amend.pdf

---

## C. LIMITATIONS ON AERIAL APPLICATION IN CALIFORNIA ONLY, INCLUDING FRESNO COUNTY, CALIFORNIA

### DIRECTIONS FOR USE

All labeled treatments may be made by aerial equipment where appropriate, provided that the applicator complies with the precautions and restrictions specified on this supplemental labeling and in the product label booklet. Refer to Aerial Equipment in the "APPLICATION EQUIPMENT AND TECHNIQUES" section of the product label for additional information. Refer to the individual use site section of the product label, or to other supplemental labeling or technical fact sheets published separately for this product by Monsanto *[insert company name]*, for specific use instructions.

AVOID DRIFT—DO NOT APPLY WHEN WINDS ARE GUSTY OR UNDER ANY OTHER CONDITION WHICH FAVORS DRIFT. DRIFT MAY CAUSE DAMAGE TO ANY VEGETATION CONTACTED TO WHICH TREATMENT IS NOT INTENDED. TO PREVENT INJURY TO ADJACENT DESIRABLE VEGETATION, APPROPRIATE BUFFER ZONES MUST BE MAINTAINED.

Use the following guidelines when aerial applications are made near crops or desirable perennial vegetation after bud break and before total leaf drop, and/or near other desirable vegetation or annual crops.

1. Do not apply within 100 feet of all desirable vegetation or crop(s).

2. If wind up to 5 miles per hour is blowing toward desirable vegetation or crop(s), do not apply within 500 feet of the desirable vegetation or crop(s).

3. Winds blowing from 5 to 10 miles per hour toward desirable vegetation or crop(s) may require buffer zones in excess of 500 feet.

4. Do not apply when winds are in excess of 10 miles per hour or when inversion conditions exist.

When applied as directed under the conditions described, this product controls annual and perennial weeds listed in the label booklet.

When tank-mixing this product with 2,4-D, only 2,4-D amine formulations may be used for aerial application in California. Tank mixtures with 2,4-D amine formulations may be applied by air in California for fallow and reduced tillage systems, and for alfalfa and pasture renovation applications only.

This product, when tank-mixed with dicamba, may not be applied by air in California.

### ADDITIONAL INFORMATION FOR FRESNO COUNTY, CALIFORNIA

The following information applies only from February 15 through March 31 within the following boundaries of Fresno County, California:

| | |
|---|---|
| North: | Fresno County line |
| South: | Fresno County line |
| East: | State Highway 99 |
| West: | Fresno County line |

Always read and follow the label directions and precautionary statements for all products used in the aerial application.

---

000524-00517.20091214.amend.pdf

Observe the following directions to minimize off-site movement during aerial application of this product. Minimization of off-site movement is the responsibility of the grower, Pest Control Advisor and aerial applicator.

**Written Recommendations**

A written recommendation MUST be submitted by or on behalf of the applicator to the Fresno County Agricultural Commissioner 24 hours prior to the application. This written recommendation MUST state the proximity of surrounding crops, and that conditions of each manufacturer's product label and this label have been satisfied.

**Aerial Applicator Training and Equipment**

Aerial application of this product is limited to pilots who have successfully completed a Fresno County Agricultural Commissioner and California Department of Pesticide Regulation approved training program for aerial application of herbicides. All aircraft must be inspected, critiqued in flight and certified at a Fresno County Agricultural Commissioner approved fly-in. Test and calibrate spray equipment at intervals sufficient to insure that proper rates of herbicides and adjuvants are being applied during commercial use. Applicator must document such calibrations and testing. Demonstration of performance at Fresno County Agricultural Commissioner approved fly-ins constitutes such documentation, or other written records showing calculations and measurements of flight and spray parameters acceptable to the Fresno County Agricultural Commissioner.

**Applications at Night—**Do not apply this product by air earlier than 30 minutes prior to sunrise and/or later than 30 minutes after sunset without prior permission from the Fresno County Agricultural Commissioner.

To report known or suspected misuse of this product, call 1-800-332-3111.

For additional information on the proper aerial application of this product, call 916-784-1718.

000524-00517.20091214.amend.pdf

## D. FOR USE IN CITRUS CROPS

### DIRECTIONS FOR USE

**LABELED CROPS:** Calamondin, Chironja, Citron, Citrus Hybrids, Grapefruit, Kumquat, Lemon, Lime, Mandarin (tangerine), Orange (all), Pummelo, Satsuma Mandarin, Tangelo (ugli), Tangor

**TYPES OF APPLICATION:** Preplant (Site Preparation) Broadcast Spray, Middles (between rows), Strips (within rows), Shielded Sprayer, Hooded Sprayer, Wiper Applicator, Directed Spray, Spot Treatment

**USE INSTRUCTIONS:** Applications may be made with boom equipment, CDA equipment, shielded sprayer, hand-held and high-volume wand, lance, orchard gun or with wiper applicator equipment, except as directed.  Apply this product according to the rates listed in the "ANNUAL WEEDS" and "PERENNIAL WEEDS" sections of the Complete Directions for Use booklet for [Insert Brand Name] herbicide.  Use the higher rate in the labeled range when weeds are stressed, growing in dense populations or greater than 12 inches tall.  Repeat applications may be made up to a maximum of 10.6 quarts of product per acre per year.

For burndown or control of the weeds listed below, apply the labeled rate of this product in 3 to 30 gallons of water per acre. Where weed foliage is dense, use 10 to 30 gallons of water per acre.

For goatweed, apply 2 to 3 quarts of this product per acre in 20 to 30 gallons of water per acre when plants are actively growing. Use 2 quarts per acre when plants are less than 8 inches tall and 3 quarts per acre when plants are greater than 8 inches tall. If goatweed is greater than 8 inches tall, the addition of Krovar I or Karmex may improve weed control.

**Perennial Weeds:**

S = Suppression           B = Burndown
PC = Partial Control       C = Control

| WEED SPECIES | [Insert Brand Name] Herbicide RATE PER ACRE | | | |
|---|---|---|---|---|
| | 1 QT | 2 QT | 3 QT | 5 QT |
| Bermudagrass | B | — | PC | C |
| Guineagrass | | | | |
|   Florida Ridge | B | C | C | C |
|   Florida Flatwoods | — | B | C | C |
| Paragrass | B | C | C | C |
| Torpedograss | S | — | PC | C |

Refer to the individual product labels for listing of specific crops, rates, geographic restrictions and precautionary statements.

**Middles (between rows)**

**USE INSTRUCTIONS:** This product will control or suppress annual and perennial weeds, and ground covers growing in the middles (between rows of trees).  If weeds are under drought stress, irrigate prior to application. Reduced weed control may result if weeds have been recently mowed at the time of application.

000524-00517.20091214.amend.pdf

TANK MIXTURES: A tank mixture of this product plus Goal 2XL may be applied for annual weed control in-between rows (middles) of citrus trees, especially when weeds are stressed or growing in dense populations. Application of 16 to 32 fluid ounces of this product, plus 3 to 12 fluid ounces of Goal 2XL, per acre will control annual weeds with a maximum height of 6 inches, including crabgrass, common groundsel, junglerice, common lambsquarters, redroot pigweed, London rocket, common ryegrass, shepherd's-purse, annual sowthistle, filaree (suppression), horseweed/marestail (*Conyza canadensis)*, stinging nettle and common purslane (suppression). This tank mixture will also control common cheeseweed (malva) or hairy fleabane (*Conyza bonariensis)* with a maximum height or diameter of 3 inches. Read and follow label directions for all products in the tank mixture.

**Strips (in rows)**

USE INSTRUCTIONS: For applications in strips (within rows of trees), only selective equipment (directed sprays, hooded sprayers, shielded applicators, or wipers) should be used, and then only where there is sufficient clearance, in order to minimize the potential for overspray or drift of this product onto the crop.

TANK MIXTURES: This product may be applied within rows of trees in tank mixtures with the following products:

| Devrinol 50-DF, Direx 4L, Goal 2XL, Karmex DF, pendimethalin, Princep Caliber 90, Simazine 4L, Sim-Trol 4L, Solicam DF, Surflan AS, |
| --- |

Refer to the tank mixture product label for restrictions and precautions; use according to the most restrictive precautionary statements for each product in the tank mixture.

PRECAUTIONS, RESTRICTIONS: Use extreme care to avoid contact of this herbicide solution, spray, drift or mist with foliage or bark of trunk, branches, suckers, fruit or other parts of trees. Avoid applications when recent pruning wounds or other mechanical injury has occurred. Contact of this product with other than matured brown bark can result in serious crop damage or destruction. Only shielded or directed sprayers may be used where there is the potential for crop contact, and then only where there is sufficient clearance. See additional use instructions and precautions in the "**Application Equipment And Techniques**" section of the directions for use booklet for [Insert Brand Name].

Allow a minimum of 1 day between last application and harvest in citrus crops. Allow a minimum of 3 days between application and transplanting trees.

For citron groves, apply as a directed spray only.

000524-00517.20091214.amend.pdf

Revisions this submission for 000524-00517.20091214.amend.pdf

Removal of alternate brand names
Support of Ranger PRO as base brand name
Changes requested by EPA October 29, 2009 approval to remove general.
Change/delete uses of recommend and other advisory statements as requested on other recent EPA approvals resulting in slight re-wording of some sentences.



**UNITED STATES ENVIRONMENTAL PROTECTION AGENCY**
**WASHINGTON, D.C.  20460**

OFFICE OF
PREVENTION, PESTICIDES

TOXIC SUBSTANCES

AND

JUL 1 - 2009

Ms. Dawn Fee-White
Monsanto Company
1300 I Street, NW—Suite 450 East
Washington. DC 20005

Dear Ms. Fee-White:

Subject: Roundup ProMax Herbicide (Revise Master Label)
      EPA Registration No. 524-579
      Application Dated May 13, 2009

The labeling referred to above, submitted in connection with registration under the Federal Insecticide, Fungicide and Rodenticide Act as amended is acceptable provided you make the following changes before you release the product for shipment.

1. On page 2, revise the fourth paragraph to read "Not all products **listed** on this label are registered for use in California."

2. On page 3 and 17, revise the Heading for Section 8.0 to read "Site and Use **Instructions**".

3. On page 10, under Cultural Considerations, revised the section by replacing the word "recommended" with the word "specified".

4. On page 12, under Tank Mixing, revise the first sentence of the second paragraph to read "When this label **lists** a tank mixture with a generic active ingredient…"

5. On page 13, under Colorants and Dyes, revise the last sentence to read "Use colorants or dyes according to the manufacturer's **directions.**

6. On page 27, under Utility Sites, revise the first sentence of the fourth paragraph to read "This product **also may be used** in preparing or establishing wildlife openings within these sites."

7. On page 43, Supplemental B, revise the first note to read "The **labeled** rate for this use will limit the level of control of certain species of weeds."

2/49

Page 2
EPA Registration No. 524-579

Submit one copy of final printed labeling incorporating the above changes before you release the product for shipment. Amended labeling will supersede all previously approved ones. A stamped copy of labeling is enclosed for your records.

Sincerely,

*Vickie K Walters for*

James A. Tompkins
Product Manager 25
Herbicide Branch
Registration Division (7505P)



3/49

## MASTER LABEL FOR EPA REG. NO. 524-579

**Registered Brand Names:**

***Roundup PROMAX Herbicide***

### Table of Contents for Master Label

| | | |
|---|---|---|
| I. | **Label for Industrial, Turf and Ornamental Uses** | **3 - 38** |
| II. | **Supplemental Labeling** | **39 – 48** |



# [INSERT BRAND NAME]
Herbicide

The complete broad-spectrum postemergence professional herbicide for non-crop, industrial, turf and ornamental weed control.

## Complete Directions for Use

EPA Reg. No. 524-579

AVOID CONTACT OF HERBICIDE WITH FOLIAGE, STEMS, EXPOSED NON-WOODY ROOTS OR FRUIT OF CROPS, DESIRABLE PLANTS AND TREES, BECAUSE SEVERE INJURY OR DESTRUCTION IS LIKELY TO RESULT.

Read the entire label before using this product.

Use only according to label instructions.

Not all products recommended on this label are registered for use in California. Check the registration status of each product in California before using.

Read the **LIMIT OF WARRANTY AND LIABILITY** statement at the end of the label before buying or using. If terms are not acceptable, return at once unopened.

THIS IS AN END-USE PRODUCT. MONSANTO DOES NOT INTEND AND HAS NOT REGISTERED IT FOR REFORMULATION. SEE INDIVIDUAL CONTAINER LABEL FOR REPACKAGING LIMITATIONS.

---

Refillable Container Label Statement

THIS IS AN END-USE PRODUCT. MONSANTO DOES NOT INTEND AND HAS NOT REGISTERED IT FOR REFORMULATION. REPACKAGING OF THIS PRODUCT FOR DISTRIBUTION OR SALE MAY BE CONDUCTED ONLY UNDER THE TERMS OF A WRITTEN CONTRACT WITH MONSANTO .

Non-Refillable Container Label Statement:

THIS IS AN END-USE PRODUCT. MONSANTO DOES NOT INTEND AND HAS NOT REGISTERED IT FOR REFORMULATION OR REPACKAGING

---

## CONTENTS

## PRODUCT INFORMATION

1    1.0    **INGREDIENTS**

2    2.0    **IMPORTANT PHONE NUMBERS**

3    3.0    **PRECAUTIONARY STATEMENTS**
         3.1    Hazards to Humans and Domestic Animals
         3.2    Environmental Hazards
         3.3    Physical or Chemical Hazards

## DIRECTIONS FOR USE

4    4.0    **STORAGE AND DISPOSAL**

5    5.0    **GENERAL INFORMATION**

5.1    Weed Resistance Management
5.2    Management Recommendations for Glyphosate-Resistant Weed Biotypes

6    6.0    **MIXING**
6.1    Mixing with Water
6.2    Tank Mixing
6.3    Tank Mixing Procedure
6.4    Mixing for Hand-Held Sprayers
6.5    Colorants or Dyes

7    7.0    **APPLICATION EQUIPMENT AND TECHNIQUES**
7.1    Aerial Equipment
7.2    Ground Broadcast Equipment
7.3    Hand-Held or Backpack Equipment
7.4    Selective Equipment
7.5    Injection Systems
7.6    CDA Equipment

8    8.0    **SITE AND USE RECOMMENDATIONS**
8.1    Cut Stump
8.2    Forestry Site Preparation
8.3    General Areas and Industrial Sites
8.4    Turfgrass
8.5    Habitat Management
8.6    Hollow-Stem Injection
8.7    Injection and Frill (Woody Brush and Trees)
8.8    Non-Food Tree, Shrub or Vine Production Sites
8.9    Parks, Recreational and Residential Areas
8.10   Railroads
8.11   Roadsides
8.12   Rangelands
8.13   Utility Sites
8.14   Grass Seed or Sod Production
8.15   Pastures

9    9.0    **WEEDS CONTROLLED**
9.1    Annual Weeds
9.2    Perennial Weeds
9.3    Woody Brush and Trees

10    10.0   **LIMIT OF WARRANTY AND LIABILITY**

**PRODUCT INFORMATION**

**1.0 INGREDIENTS**

ACTIVE INGREDIENT:
*Glyphosate, N-(phosphonomethyl)glycine, in the form of its potassium salt......................................48.7%
OTHER INGREDIENTS: ...................................................................................................... 51.3%
100.0%

*Contains 660 grams per liter or 5.5 pounds per U.S. gallon of the active ingredient glyphosate, in the form of its potassium salt. Equivalent to 540 grams per liter or 4.5 pounds per U.S. gallon of the acid, glyphosate.

This product is protected by U.S. Patent No's. 5,668,085 and 6,365,551. Other patents pending. No license granted under any non-U.S. patent(s).

## 2.0 IMPORTANT PHONE NUMBERS

FOR PRODUCT INFORMATION OR ASSISTANCE IN USING THIS PRODUCT, CALL TOLL-FREE,
1-800-332-3111.

IN CASE OF AN EMERGENCY INVOLVING THIS PRODUCT, OR FOR MEDICAL ASSISTANCE, CALL COLLECT, DAY OR NIGHT,

(314)-694-4000.

**ACCEPTED**
with **COMMENTS**
In EPA Letter Dated:
JUL 1 – 2009

Under the Federal Insecticide, Fungicide, and Rodenticide Act, as amended, for the pesticide registered under EPA Reg. No.
524-579

## 3.0 PRECAUTIONARY STATEMENTS

### 3.1 Hazards to Humans and Domestic Animals

Keep out of reach of children.

# CAUTION!

CAUSES MODERATE EYE IRRITATION
Avoid contact with eyes or clothing. Avoid breathing vapor or spray mist.

| FIRST AID: Call a poison control center or doctor for treatment advice. | |
|---|---|
| IF IN EYES | • Hold eye open and rinse slowly and gently with water for 15 to 20 minutes.<br>• Remove contact lenses if present after the first 5 minutes then continue rinsing eye. |
| | |
| • Have the product container or label with you when calling a poison control center or doctor, or going for treatment.<br>• You may also contact **(314) 694-4000,** collect day or night, for emergency medical treatment information.<br>• This product is identified as **[INSERT BRAND NAME], EPA Registration No. 524-579**. | |

DOMESTIC ANIMALS: This product is considered to be relatively nontoxic to dogs and other domestic animals; however, ingestion of this product or large amounts of freshly sprayed vegetation may result in temporary gastrointestinal irritation (vomiting, diarrhea, colic, etc.). If such symptoms are observed, provide the animal with plenty of fluids to prevent dehydration. Call a veterinarian if symptoms persist for more than 24 hours.

**Personal Protective Equipment (PPE)**

**Applicators and other handlers must wear:** long-sleeved shirt and long pants, shoes plus socks.

Follow manufacturer's instructions for cleaning/maintaining PPE. If there are no such instructions for washables, use detergent and hot water. Keep and wash PPE separately from other laundry.

When handlers use closed systems, enclosed cabs, or aircraft in a manner that meets the requirements listed in Worker Protection Standard (WPS) for agricultural pesticides [40 CFR 170.240 (d) (4-6)], the handler PPE requirements may be reduced or modified as specified in the WPS.

---

**User Safety Recommendations:**

Users should:

• Wash hands before eating, drinking, chewing gum, using tobacco, or using the toilet.
• Remove clothing immediately if pesticide gets inside. Then wash thoroughly and put on clean clothing.

---

### 3.2 Environmental Hazards

Do not apply directly to water, to areas where surface water is present or to intertidal areas below the mean high water mark. Do not contaminate water when cleaning equipment or disposing of equipment washwaters.

### 3.3 Physical or Chemical Hazards

Spray solutions of this product can be mixed, stored and applied using only stainless steel, fiberglass, plastic or plastic-lined steel containers.

DO NOT MIX, STORE OR APPLY THIS PRODUCT OR SPRAY SOLUTIONS OF THIS PRODUCT IN GALVANIZED STEEL OR UNLINED STEEL (EXCEPT STAINLESS STEEL) CONTAINERS OR SPRAY TANKS. This product or spray solutions of this product react with such containers and tanks to produce hydrogen gas which may form a highly combustible gas mixture. This gas mixture could flash or explode, causing serious personal injury, if ignited by open flame, spark, welder's torch, lighted cigarette or other ignition source.

---

## DIRECTIONS FOR USE

It is a violation of Federal law to use this product in any manner inconsistent with its labeling. This product can only be used in accordance with the Directions for Use on this label or in separately published Monsanto supplemental labeling. Supplemental labeling can be found on the Internet at www.agrian.com, www.cdms.net or www.greenbook.net, or obtained from your Authorized Monsanto Retailer or Monsanto Company Representative.

---

**The following paragraph is reserved and will only appear on final printed labeling for products under this registration if and when required by EPA:**

ENDANGERED SPECIES PROTECTION REQUIREMENTS: This product may have effects on federally listed threatened or endangered species or their critical habitat in some locations. When using this product, you must follow the measures contained in the Endangered Species Protection Bulletin for the county or parish in which you are applying the pesticide. To determine whether your county or parish has a Bulletin, and to obtain that Bulletin, consult *http://www.epa.gov/espp/,*or call 1-800-447-3813 no more than 6 months before using this product. Applicators must use Bulletins that are in effect in the month in which the pesticide will be applied. New Bulletins will generally be available from the above sources 6 months prior to their effective dates.

---

Do not apply this product in a way that will contact workers or other persons, either directly or through drift. Only protected handlers may be in the area during application. For any requirements specific to your State or Tribe, consult the agency responsible for pesticide regulations.

---

Agricultural Use Requirements

---

Use this product only in accordance with its labeling and with the Worker Protection Standard, 40 CFR Part 170. This Standard contains requirements for the protection of agricultural workers on farms, forests, nurseries, and greenhouses, and handlers of agricultural pesticides. It contains requirements for training, decontamination, notification, and emergency assistance. It also contains specific instructions and exceptions pertaining to the statements on this label about personal protective equipment (PPE) and restricted-entry interval. The requirements in this box only apply to uses of this product that are covered by the Worker Protection Standard.

Do not enter or allow worker entry into treated areas during the restricted-entry interval (REI) of 4 hours.

PPE required for early entry to treated areas that is permitted under the Worker Protection Standard and that involves contact with anything that has been treated, such as plants, soil, or water, is: coveralls, shoes plus socks and chemical-resistant gloves made of any waterproof material.

---

Non-Agricultural Use Requirements

The requirements in this box apply to uses of this product that are NOT within the scope of the Worker Protection Standard for agricultural pesticides (40 CFR Part 170). The WPS applies when this product is used to produce agricultural plants on farms, forests, nurseries or greenhouses.

Keep people and pets off treated areas until spray solution has dried.

---

## 4.0 STORAGE AND DISPOSAL

Proper pesticide storage and disposal are essential to protect against exposure to people and the environment due to leaks and spills, excess product or waste, and vandalism. Do not allow this product to contaminate water, foodstuffs, feed or seed by storage and disposal.

**PESTICIDE STORAGE:** Store pesticides away from food, pet food, feed, seed, fertilizers, and veterinary supplies. Keep container closed to prevent spills and contamination.

**PESTICIDE DISPOSAL:** To avoid wastes, use all material in this container, including rinsate, by application according to label directions. If wastes cannot be avoided, offer remaining product to a waste disposal facility or pesticide disposal program. Such programs are often run by state or local governments or by industry. All disposal must be in accordance with applicable federal, state and local regulations and procedures.

[*Alternate PESTICIDE DISPOSAL statement for transport vehicles only:* To avoid wastes, empty as much product from this transport vehicle as possible for repackaging or use in accordance with label directions. If wastes cannot be avoided, offer remaining product or rinsate to a waste disposal facility or pesticide disposal program. All disposal must be in accordance with applicable federal, state and local regulations and procedures.]

## CONTAINER HANDLING AND DISPOSAL:

See container label for container handling and disposal instructions and for refilling limitations.

---

[*CONTAINER HANDLING AND DISPOSAL STATEMENT AND REFILLING LIMITATION FOR NONREFILLABLE RIGID CONTAINERS OF LESS THAN 1-GALLON CAPACITY*]

Nonrefillable container. Do not reuse or refill this container.

[*Alternate container statement:* Nonrefillable container. Do not reuse this container to hold materials other than pesticides or dilute pesticides (rinsate). After emptying and cleaning, it may be allowable to

---

temporarily hold rinsate or other pesticide-related materials in the container.   Contact your state regulatory agency to determine allowable practices in your state.]

Triple rinse this container promptly after emptying.

Triple rinse as follows:  Empty the remaining contents into application equipment or a mix tank and drain for 10 seconds after the flow begins to drip.  Fill the container ¼ full with water and recap.  Shake for 10 seconds.  Pour rinsate into application equipment or a mix tank or store rinsate for later use or disposal.  Drain for 10 seconds after the flow begins to drip.  Repeat this procedure two more times.

Then offer this container for recycling, if available.  If recycling is not available, dispose of in accordance with federal, state and local regulations and procedures, which may include puncturing the properly rinsed container and disposing in a sanitary landfill.

[*Alternate container disposal statement:* Once properly rinsed, some plastic pesticide containers can be taken to a container collection site or picked up for recycling.  To find the nearest site, contact your chemical dealer or Monsanto at 1-800-ROUNDUP (1-800-768-6387). If recycling is not available, dispose of in accordance with federal, state and local regulations and procedures, which may include puncturing the properly rinsed container and disposing in a sanitary landfill.]

[*CONTAINER HANDLING AND DISPOSAL STATEMENT AND REFILLING LIMITATION FOR NONREFILLABLE RIGID PLASTIC 2.5-GALLON CONTAINERS AND OTHER CONTAINERS OF GREATER THAN 1-GALLON BUT EQUAL TO OR LESS THAN 5-GALLON CAPACITY*]

Nonrefillable container. Do not reuse this container to hold materials other than pesticides or dilute pesticides (rinsate).  After emptying and cleaning, it may be allowable to temporarily hold rinsate or other pesticide-related materials in the container.  Contact your state regulatory agency to determine allowable practices in your state.

[*Alternate container statement:* Nonrefillable container. Do not reuse or refill this container.]

Triple rinse or pressure rinse (or equivalent) this container promptly after emptying.

Triple rinse as follows:  Empty the remaining contents into application equipment or a mix tank and drain for 10 seconds after the flow begins to drip.  Fill the container ¼ full with water and recap.  Shake for 10 seconds.  Pour rinsate into application equipment or a mix tank or store rinsate for later use or disposal.  Drain for 10 seconds after the flow begins to drip.  Repeat this procedure two more times.

Pressure rinse as follows:  Empty the remaining contents into application equipment or a mix tank and continue to drain for 10 seconds after the flow begins to drip.  Hold container upside down over application equipment or mix tank or collect rinsate for later use or disposal.  Insert pressure rinsing nozzle in the side of the container, and rinse at about 40 PSI for at least 30 seconds.  Drain for 10 seconds after the flow begins to drip.

Once properly rinsed, some plastic pesticide containers can be taken to a container collection site or picked up for recycling.  To find the nearest site, contact your chemical dealer or Monsanto at 1-800-ROUNDUP (1-800-768-6387).  If recycling is not available, dispose of in accordance with federal, state and local regulations and procedures, which may include puncturing the properly rinsed container and disposing in a sanitary landfill.

---

[*Alternate container disposal statement:* Then offer this container for recycling, if available.  If recycling is not available, dispose of in accordance with federal, state and local regulations and procedures, which may include puncturing the properly rinsed container and disposing in a sanitary landfill.]



*[CONTAINER HANDLING AND DISPOSAL STATEMENT AND REFILLING LIMITATION FOR NONREFILLABLE RIGID PLASTIC 30-GALLON CONTAINERS AND OTHER CONTAINERS OF GREATER THAN 5-GALLON CAPACITY]*

Nonrefillable container.  Do not reuse or refill this container.

[*Alternate container statement:* Nonrefillable container. Do not reuse this container to hold materials other than pesticides or dilute pesticides (rinsate).  After emptying and cleaning, it may be allowable to temporarily hold rinsate or other pesticide-related materials in the container.  Contact your state regulatory agency to determine allowable practices in your state.]

Triple rinse or pressure rinse (or equivalent) this container promptly after emptying.

Triple rinse as follows: Empty the remaining contents into application equipment or a mix tank.  Fill the container ¼ full with water.  Replace and tighten closures.  Tip container on its side and roll it back and forth, ensuring at least one revolution, for 30 seconds.  Stand the container on its end and tip it back and forth several times.  Turn the container over onto its other end tip it back and forth several times.  Empty the rinsate into application equipment or a mix tank or store rinsate for later use or disposal.  Repeat this procedure two more times.

Pressure rinse as follows: Empty the remaining contents into application equipment or a mix tank and continue to drain for 10 seconds after the flow begins to drip.  Hold container upside down over application equipment or mix tank or collect rinsate for later use or disposal.  Insert pressure rinsing nozzle in the side of the container, and rinse at about 40 PSI for at least 30 seconds.  Drain for 10 seconds after the flow begins to drip.

Once properly rinsed, some plastic pesticide containers can be taken to a container collection site or picked up for recycling.  To find the nearest site, contact your chemical dealer or Monsanto at 1-800-ROUNDUP (1-800-768-6387).  If recycling is not available, dispose of in accordance with federal, state and local regulations and procedures, which may include puncturing the properly rinsed container and disposing in a sanitary landfill.

[*Alternate container disposal statement:* Then offer this container for recycling, if available.  If recycling is not available, dispose of in accordance with federal, state and local regulations and procedures, which may include puncturing the properly rinsed container and disposing in a sanitary landfill.]

[*Optional container label statement:* Return Properly Rinsed Container to Monsanto for Recycling Contact: 1-800-ROUNDUP (1-800-768-6387)]

*[CONTAINER HANDLING AND DISPOSAL STATEMENT AND REFILLING LIMITATION FOR ALL REFILLABLE CONTAINERS, EXCEPT TRANSPORT CONTAINERS]*

Refillable container.  Refill this container with pesticide only.  Do not reuse this container for any other purpose.

Cleaning this container before refilling is the responsibility of the refiller. Cleaning this container before final disposal is the responsibility of the person disposing of the container.

To clean this container before final disposal, empty the remaining contents from this container into application equipment or a mix tank.  Fill the container about 10 percent full with water.  Agitate vigorously or recirculate water with the pump for 2 minutes.  Pour or pump rinsate into application equipment or rinsate collection system.  Repeat this rinsing procedure two more times.  Then offer this container for

recycling, if available.   To obtain information about recycling refillable containers, contact Monsanto Company at 1-800-ROUNDUP (1-800-768-6387).

[*Optional container label statement:* Return Properly Rinsed Container to Monsanto for Recycling, Contact 1-800-ROUNDUP (1-800-768-6387)]

## 5.0 GENERAL INFORMATION

**Product Description:** This product is a postemergence, systemic herbicide with no soil residual activity. It gives broad-spectrum control of many annual weeds, perennial weeds, woody brush and trees. It is formulated as a water-soluble liquid containing surfactant and no additional surfactant is needed or recommended.

**Time to Symptoms:** This product moves through the plant from the point of foliage contact to and into the root system. Visible effects are a gradual wilting and yellowing of the plant, which advances to complete browning of aboveground growth and deterioration of underground plant parts. Effects are visible on most annual weeds within 2 to 4 days, but on most perennial weeds, effects may not be visible for 7 or more days. Extremely cool or cloudy weather following treatment may slow activity of this product and delay development of visual symptoms.

**Stage of Weeds:** Annual weeds are easiest to control when they are small. Best control of most perennial weeds is obtained when treatment is made at late growth stages approaching maturity.

**Mode of Action in Plants:** The active ingredient in this product inhibits an enzyme found only in plants and microorganisms that is essential to the formation of specific amino acids.

**Cultural Considerations:** Reduced control may result when applications are made to annual or perennial weeds that have been mowed, grazed or cut, and have not been allowed to regrow to the recommended stage for treatment.

**Rainfastness:** Heavy rainfall soon after application may wash this product off of the foliage and a repeat application may be required for adequate weed control.

**No Soil Activity:** Weeds must be emerged at the time of application to be controlled by this product. Weeds germinating from seed after application will not be controlled. Plants arising from unattached underground rhizomes or rootstocks of perennials that have not yet emerged at the time of application will not be affected by this herbicide and will continue to grow.

**Maximum Application Rates:** The maximum application or use rates stated throughout this label are given in units of volume (fluid ounces or quarts) of this product per acre. However, the maximum allowed application rates apply to this product combined with the use of any and all other herbicides containing the active ingredient glyphosate, whether applied separately or as tank mixtures, on a basis of total pounds of glyphosate (acid equivalents) per acre. If more than one glyphosate-containing product is applied to the same site within the same year, you must ensure that the total use of glyphosate (pounds acid equivalents) does not exceed the maximum allowed. The combined total of all treatments must not exceed 7 quarts of this product (8 pounds of glyphosate acid) per acre per year. See the **INGREDIENTS** section of this label for necessary product information.

### ATTENTION

AVOID CONTACT OF HERBICIDE WITH FOLIAGE, STEMS, EXPOSED NON-WOODY ROOTS OR FRUIT OF CROPS, DESIRABLE PLANTS AND TREES, BECAUSE SEVERE INJURY OR DESTRUCTION MAY RESULT.

AVOID DRIFT. EXTREME CARE MUST BE USED WHEN APPLYING THIS PRODUCT TO PREVENT INJURY TO DESIRABLE PLANTS AND CROPS.

Do not allow the herbicide solution to mist, drip, drift or splash onto desirable vegetation since minute quantities of this product can cause severe damage or destruction to the crop, plants or other areas on which treatment was not intended. The likelihood of injury occurring from the use of this product increases when winds are gusty, as wind velocity increases, when wind direction is constantly changing or when there are other meteorological conditions that favor spray drift. When spraying, avoid combinations of pressure and nozzle type that will result in splatter or fine particles (mist) that are likely to drift. AVOID APPLYING AT EXCESSIVE SPEED OR PRESSURE.

**NOTE:** Use of this product in any manner not consistent with this label may result in injury to persons, animals or crops, or have other unintended consequences.

### 5.1 Weed Resistance Management



| GROUP | 9 | HERBICIDE |
|-------|---|-----------|

Glyphosate, the active ingredient in this product, is a Group 9 herbicide based on the mode of action classification system of the Weed Science Society of America. Any weed population may contain plants naturally resistant to Group 9 herbicides. Weed species resistant to Group 9 herbicides may be effectively managed utilizing another herbicide from a different Group or using other cultural or mechanical practices.

To minimize the occurrence of glyphosate-resistant biotypes observe the following general weed management recommendations:

- Scout your application site before and after herbicides applications.
- Control weeds early when they are relatively small.
- Incorporate other herbicides and cultural or mechanical practices as part of your weed control system where appropriate.
- Utilize the labeled rate for the most difficult weed in the site. Avoid tank-mixtures with other herbicides that reduce this product's efficacy (through antagonism) or tank mixture recommendations which encourage rates of this product below the labeled rate.
- Control weed escapes and prevent weeds from setting seeds.
- Clean equipment before moving from site to site to minimize spread of weed seed.
- Use new commercial seed as free of weed seed as possible.
- Report any incidence of repeated non-performance of this product on a particular weed to your Monsanto representative, local retailer, or county extension agent.

### 5.2 Management Recommendations for Glyphosate-Resistant Weed Biotypes

**NOTE**: Appropriate testing is critical in order to confirm weed resistance to glyphosate. Call 1-800-ROUNDUP (1-800-768-6387) or contact your Monsanto representative to determine if resistance in any particular weed biotype has been confirmed in your area, or visit on the Internet www.weedresistancemanagement.com or www.weedscience.org.

Directions for the control of biotypes confirmed to be resistant to glyphosate are made available on separately published supplemental labeling or Fact Sheets for this product and may be obtained from your local retailer or Monsanto representative.

Since the occurrence of new glyphosate-resistant weeds cannot be determined until after product use and scientific confirmation, Monsanto Company is not responsible for any losses that may result from the failure of this product to control glyphosate-resistant weed biotypes.

The following good weed management practices are recommended to reduce the spread of confirmed glyphosate-resistant biotypes:

- If a naturally occurring resistant biotype is present at your site, this product may be tank-mixed or applied sequentially with an appropriately labeled herbicide with a different mode of action to achieve control.

---

- Cultural and mechanical control practices may also be used as appropriate.
- Scout treated sites after herbicide applications and control escapes, including resistant biotypes, before they set seed.
- Thoroughly clean equipment before leaving sites known to contain resistant biotypes.

## 6.0 MIXING

Spray solutions of this product can be mixed, stored and applied using only clean stainless steel, fiberglass, plastic or plastic-lined steel containers. Clean sprayer parts immediately after using this product by thoroughly flushing with water.

Use caution to avoid siphoning back into the carrier source. Use approved anti-back-siphoning devices where required by State or local regulations.

### 6.1 Mixing with Water

**NOTE:** PRODUCT PERFORMANCE MAY BE SIGNIFICANTLY REDUCED IF WATER CONTAINING SOIL SEDIMENT IS USED AS CARRIER. DO NOT MIX THIS PRODUCT WITH WATER FROM PONDS AND DITCHES THAT IS VISIBLY MUDDY OR MURKY.

This product mixes readily with water. Mix spray solutions of this product as follows: Begin filling the mixing tank or spray tank with clean water. Add the proper amount of this product near the end of the filling process and mix gently. During mixing and application, foaming of the spray solution may occur. To prevent or minimize foaming, mix gently, terminate by-pass and return lines at the bottom of the tank and, if necessary, use an anti-foam or defoaming agent.

### 6.2 Tank Mixing

This product does not provide residual weed control. This product may be tank-mixed with other herbicides to provide residual weed control, a broader weed control spectrum or an alternate mode of action. Read and carefully observe the cautionary statements and all other information appearing on the labels of all herbicides used. Use according to the most restrictive precautionary statements for each product in the mixture.

When this label recommends a tank mixture with a generic active ingredient such as diuron, atrazine, 2,4-D, dicamba, diuron or pendimethalin the user is responsible for ensuring that the specific application being made is included on the label of the specific product being used in the tank mixture. Refer to all individual product labels, supplemental labeling and fact sheets for all products in the tank mixture, and observe all precautions and limitations on the label, including application timing restrictions, soil restrictions and use according to the most restrictive precautionary statements for each product in the tank mixture.

Always predetermine the compatibility of all tank-mix products together in the carrier by mixing small proportional quantities in advance.

Buyer and all users are responsible for all loss or damage in connection with the use or handling of mixtures of this product with herbicides or other materials that are not expressed in this label. Mixing this product with herbicides or other materials not on this label may result in reduced performance.

### 6.3 Tank-Mixing Procedure

When tank mixing, read and carefully observe label directions, cautionary statements and all information on the labels of all products used. Add the tank-mix product to the tank as directed by the label. Maintain agitation and add the specified amount of this product.

Maintain good agitation at all times until the contents of the tank are sprayed. If the spray mixture is allowed to settle, thorough agitation may be required to resuspend the mixture before spraying is resumed.

Keep by-pass line on or near the bottom of the tank to minimize foaming. Screen size in nozzle or line strainers should be no finer than 50-mesh.

Always predetermine the compatibility of labeled tank mixtures of this product with water carrier by mixing small proportional quantities in advance. Ensure that the specific tank mixture product is registered for application at the desired site.

Refer to the **Tank Mixing** and **GENERAL INFORMATION** sections for additional precautions.

**6.4 Mixing for Hand-Held Sprayers**

Prepare the desired spray volume by mixing the amount of this product indicated in the following table in water:

<u>Spray Solution</u>

Amount of **[INSERT BRAND NAME]**

| Desired Volume | 0.4% | 0.7% | 1.0% | 1.5% | 4% | 7% |
|---|---|---|---|---|---|---|
| 1 gal | 0.5 oz | 1 oz | 1.3 oz | 2 oz | 5 oz | 9 oz |
| 25 gal | 0.8 pt | 0.7 qt | 1 qt | 1.5 qt | 4 qt | 7 qt |
| 100 gal | 1.6 qt | 2.8 qt | 1 gal | 1.5 gal | 4 gal | 7 gal |

2 tablespoons = 1 fluid ounce

For use in backpack, knapsack or pump-up sprayers, add the appropriate amount of this product, mixed with water in a larger container and then filling sprayer with the mixed solution.

**6.5 Colorants or Dyes**

Colorants or marking dyes may be added to spray solutions of this product; however, they can reduce product performance, especially at lower rates or dilution. Use colorants or dyes according to the manufacturer's recommendations.

**7.0 APPLICATION EQUIPMENT AND TECHNIQUES**

Do not apply this product through any type of irrigation system.

APPLY SPRAY SOLUTIONS IN PROPERLY MAINTAINED AND CALIBRATED EQUIPMENT CAPABLE OF DELIVERING DESIRED VOLUMES.

**7.1 Aerial Equipment**

DO NOT APPLY THIS PRODUCT USING AERIAL SPRAY EQUIPMENT EXCEPT UNDER CONDITIONS AS SPECIFIED WITHIN THIS LABEL.

FOR AERIAL APPLICATION IN CALIFORNIA, REFER TO THE FEDERAL SUPPLEMENTAL LABEL FOR AERIAL APPLICATIONS IN THAT STATE FOR SPECIFIC INSTRUCTIONS, RESTRICTIONS AND REQUIREMENTS.

AVOID DRIFT. DO NOT APPLY WHEN WINDS ARE GUSTY OR UNDER ANY OTHER CONDITION WHICH FAVORS DRIFT. DRIFT MAY CAUSE DAMAGE TO ANY VEGETATION CONTACTED TO WHICH TREATMENT IS NOT INTENDED. TO PREVENT INJURY TO ADJACENT DESIRABLE VEGETATION, APPROPRIATE BUFFER ZONES MUST BE MAINTAINED.

Avoid direct application to any body of water.

Use the labeled rates of this herbicide in 3 to 25 gallons of water per acre unless otherwise specified on this label, or in separate supplemental labeling or fact sheets published by Monsanto for this product.

Coarse sprays are less likely to drift; therefore, do not use nozzles or nozzle configurations that dispense spray as fine spray droplets. Do not angle nozzles forward into the airstream and do not increase spray

volume by increasing nozzle pressure. Drift control additives may be used. When a drift control additive is used, read and carefully observe the cautionary statements and all other information appearing on the additive label.

Ensure uniform application.   To avoid streaked, uneven or overlapped application, use appropriate marking devices.

**Aircraft Maintenance**; Thoroughly wash aircraft, especially landing gear, after each day of spraying to remove resides of this product accumulated during spraying or from spills. PROLONGED EXPOSURE OF THIS PRODUCT TO UNCOATED STEEL SURFACES MAY RESULT IN CORROSION AND POSSIBLE FAILURE OF THE PART. LANDING GEAR IS MOST SUSCEPTIBLE. Maintaining an organic coating (paint) that meets aerospace specification MIL-C-38413 may prevent corrosion.

## SPRAY DRIFT MANAGEMENT

AVOID DRIFT. EXTREME CARE MUST BE USED WHEN APPLYING THIS PRODUCT TO PREVENT INJURY TO DESIRABLE PLANTS AND CROPS.

Do not allow the herbicide solution to mist, drip, drift or splash onto desirable vegetation since minute quantities of this product can cause severe damage or destruction to the crop, plants or other areas on which treatment was not intended.

Avoiding spray drift at the application site is the responsibility of the applicator. The interaction of many equipment- and weather-related factors determines the potential for spray drift. The applicator and the grower are responsible for considering all these factors when making decisions.

## AERIAL SPRAY DRIFT MANAGEMENT

The following drift management requirements must be followed to avoid off-target drift movement from aerial application.
1.  The distance of the outermost nozzles on the boom must not exceed 3/4 the length of the wingspan or rotor.
2.  Nozzles must always point backward, parallel with the air stream and never be pointed downwards more than 45 degrees. Where states have more stringent regulations, they should be observed.

**Importance of Droplet Size**

The most effective way to reduce drift potential is to apply large droplets. The best drift management strategy is to apply the largest droplets that provide sufficient coverage and control. Applying larger droplets reduces drift potential, but will not prevent drift if applications are made improperly, or under unfavorable environmental conditions (see the **"Wind"**, **"Temperature and Humidity"**, and **"Temperature Inversions"** sections of this label).

**Controlling Droplet Size**
*   **Volume:** Use high flow rate nozzles to apply the highest practical spray volume. Nozzles with the higher rated flows produce larger droplets.
*   **Pressure:** Use the lower spray pressures recommended for the nozzle. Higher pressure reduces droplet size and does not improve canopy penetration. When higher flow rates are needed, use higher flow rate nozzles instead of increasing pressure.
*   **Number of nozzles:** Use the minimum number of nozzles that provide uniform coverage.
*   **Nozzle orientation:** Orienting nozzles so that the spray is released backwards, parallel to the air stream, will produce larger droplets than other orientations. Significant deflection from the horizontal will reduce droplet size and increase drift potential.
*   **Nozzle type:** Use a nozzle type that is designed for the intended application. With most nozzle types, narrower spray angles produce larger droplets. Consider using low-drift nozzles. Solid stream nozzles oriented straight back produce larger droplets than other nozzle types.

- **Boom length:** For some use patterns, reducing the effective boom length to less than 3/4 of the wingspan or rotor length may further reduce drift without reducing swath width.
- **Application height:** Applications should not be made at a height greater than 10 feet above the top of the largest plants unless a greater height is required for aircraft safety. Making applications at the lowest height that is safe reduces the exposure of the droplets to evaporation and wind.

**Swath Adjustment**

When applications are made with a crosswind, the swath will be displaced downwind. Therefore, on the up and downwind edges of the field, the applicator must compensate for this displacement by adjusting the path of the aircraft upwind. Swath adjustment distance should increase, with increasing drift potential (higher wind speed, smaller droplets, etc.).

**Wind**

Drift potential is lowest between wind speeds of 2 to 10 miles per hour. However, many factors, including droplet size and equipment type determine drift potential at any given speed. Application should be avoided below 2 miles per hour due to variable wind direction and high inversion potential. **NOTE:** Local terrain can influence wind patterns. Every applicator should be familiar with local wind patterns and how they affect drift.

**Temperature and Humidity**

When making applications in low relative humidity, setup equipment to produce larger droplets to compensate for evaporation. Droplet evaporation is most severe when conditions are both hot and dry.

**Temperature Inversions**

Applications should not be made during a temperature inversion because drift potential is high. Temperature inversions restrict vertical air mixing, which causes small, suspended droplets to remain in a concentrated cloud. This cloud can move in unpredictable directions due to the light variable winds common during inversions. Temperature inversions are characterized by increasing temperatures with altitude and are common on nights with limited cloud cover and light to no wind. They begin to form as the sun sets and often continue into the morning. Their presence can be indicated by ground fog; however, if fog is not present, the movement of smoke from a ground source or an aircraft smoke generator can also identify temperature inversions. Smoke that layers and moves laterally in a concentrated cloud (under low wind conditions) indicates an inversion, while smoke that moves upward and rapidly dissipates indicates good vertical air mixing.

**Sensitive Areas**

Apply this product when the potential for drift to adjacent sensitive areas (e.g., residential areas, bodies of water, known habitat for threatened or endangered species, non-target crops) is minimal (e.g., when wind is blowing away from the sensitive areas).

**7.2 Ground Broadcast Equipment**

Apply the labeled rates of this product in 3 to 40 gallons of water per acre as a broadcast spray unless otherwise specified on this label, or in separate supplemental labeling or fact sheets published by Monsanto for this product. As density of weeds increases, spray volume should be increased within the specified range to ensure complete coverage. Carefully select proper nozzles to avoid spraying a fine mist. For best results with ground application equipment, use flat-fan nozzles. Check spray pattern for uniform distribution of spray droplets.

**7.3 Hand-Held or Backpack Equipment**

Apply to foliage of vegetation to be controlled. For applications made on a spray-to-wet basis, spray coverage should be uniform and complete. Do not spray to the point of runoff. Use coarse sprays only.

For low-volume directed spray applications, spray coverage should be uniform with at least 50 percent of the foliage contacted. Coverage of the top one-half of the plant is important for best results. To ensure

adequate spray coverage, spray both sides of large or tall woody brush and trees, when foliage is thick and dense, or where there are multiple sprouts.

## 7.4 Selective Equipment

This product may be diluted in water and applied through shielded applicators, hooded sprayers, wiper applicators or sponge bars to weeds listed on this label growing in any non-crop site specified on this label.

AVOID CONTACT OF HERBICIDE WITH DESIRABLE VEGETATION, AS SERIOUS INJURY OR DEATH OF THE DESIRABLE VEGETATION IS LIKELY TO OCCUR.

Application equipment used above desired vegetation should be adjusted so that the lowest spray stream or wiper contact point is at least 2 inches above the desirable vegetation. Droplets, mist, foam or splatter of the herbicide solution settling on desirable vegetation is likely to result in discoloration, stunting or destruction.

Better results may be obtained when more of the weed is exposed to the herbicide solution. Weeds not contacted by the herbicide solution will not be affected. This may occur in dense clumps, severe infestations or when the height of the weeds varies so that not all weeds are contacted. In these instances, repeat treatment may be necessary.

### Shielded and Hooded Applicators

A shielded or hooded applicator directs the herbicide solution onto weeds, while shielding desirable vegetation from the herbicide Use nozzles that provide uniform coverage within the treated area. Keep shields on these sprayers adjusted to protect desirable vegetation. EXTREME CARE MUST BE EXERCISED TO AVOID CONTACT OF HERBICIDE WITH DESIRABLE VEGETATION.

### Wiper Applicators

Wiper applicators are devices that physically wipe the appropriate amounts of this product directly onto the weed. Equipment must be designed, maintained and operated to prevent the herbicide solution from contacting desirable vegetation.

Application equipment used over the top of desirable vegetation should be adjusted so that the wiper contact point is at least 2 inches above the desirable vegetation. Better results may be obtained when more of the weed is exposed to the herbicide solution. Weeds should be a minimum of 6 inches above the desirable vegetation. Adjust the height of the applicator to ensure adequate contact with weeds. Weeds not contacted by the herbicide solution will not be affected. Poor contact may occur when weeds are growing in dense clumps, in severe weed infestations or when weed height varies dramatically. In these instances, repeat treatments may be necessary.

Operate this equipment at ground speeds no greater than 5 miles per hour. Performance may be improved by reducing speed in areas of heavy weed infestations to provide adequate wiper saturation with the herbicide solution. Better results may be obtained when two applications are made in opposite directions.

Droplets, mist, foam or splatter of the herbicide solution settling onto desirable vegetation may result in discoloration, stunting or destruction. Avoid leakage or dripping onto desirable vegetation. Keep wiping surfaces clean. Be aware that on sloping ground the herbicide solution may migrate, causing dripping on the lower end and drying of the wicks on the upper end of the wiper applicator.

Do not use wiper applicators when weeds are wet.

Mix only the amount of this product to be used during a 1-day period, as reduced product performance may result from the use of solutions held in storage. Clean wiper parts immediately after using this product by thoroughly flushing with water.

**For Rope or Sponge Wick Applicators**—Solutions ranging from 25 to 70 percent of this product in water may be used.

**For Panel Applicators and pressure-feed systems**—Solutions ranging from 25 to 100 percent of this product in water may be used.

When applied as directed, this product CONTROLS the following weeds:

| | |
|---|---|
| Corn, volunteer | Sicklepod |
| Panicum, Texas | Spanishneedles |
| Rye, common | Starbur, bristly |
| Shattercane | |

When applied as directed, this product SUPPRESSES the following weeds:

| | |
|---|---|
| Beggarweed, Florida | Ragweed, common |
| Bermudagrass | Ragweed, giant |
| Dogbane, hemp | Smutgrass |
| Dogfennel | Sunflower |
| Guineagrass | Thistle, Canada |
| Johnsongrass | Thistle, musk |
| Milkweed | Vaseygrass |
| Nightshade, silverleaf | Velvetleaf |
| Pigweed, redroot | |

## 7.5 Injection Systems

This product may be used in aerial or ground injection spray systems. It may be used as a liquid concentrate or diluted prior to injecting into the spray stream. Do not mix this product with the undiluted concentrate of other products when using injection systems unless specifically instructed in this label.

## 7.6 CDA Equipment

The rate of this product applied per acre by controlled droplet application (CDA) equipment must not be less than the amount directed in this label when applied by conventional broadcast equipment. For vehicle-mounted CDA equipment, apply 2 to 15 gallons of water per acre.

CDA equipment produces a spray pattern that is not easily visible. Extreme care must be exercised to avoid spray or drift contacting the foliage or any other green tissue of desirable vegetation, as damage or destruction is likely to result.

## 8.0 SITE AND USE RECOMMENDATIONS

This product may be used in non-crop areas such as airports, apartment complexes, commercial sites, ditch banks, driveways, dry ditches, dry canals, fencerows, golf courses, greenhouses, industrial sites, landscape areas, lumber yards, manufacturing sites, municipal sites, natural areas, office complexes, ornamentals, parks, parking areas, pastures, petroleum tank farms and pumping installations, public areas, railroads, rangeland, recreation areas, residential areas, rights-of-way, roadsides, schools, shadehouses, sports complexes, storage areas, substations, turfgrass areas, utility sites, warehouse areas and wildlife management areas.

This product may also be used in non-food crop sites such as Christmas tree farms, plant nurseries, sod or turf seed farms.

Unless otherwise specified, applications may be made to control any weeds listed in the **WEEDS CONTROLLED** section of this label.

## 8.1 Cut Stump

Cut stump treatments may be made on any site listed on this label. This product will control many types of woody brush and tree species, some of which are listed below. Apply this product using suitable equipment to ensure coverage of the entire cambium. Cut trees or resprouts close to the soil surface. Apply a 50- to 100- percent solution of this product to the freshly cut surface **immediately after** cutting. Delays in application may result in reduced performance. For best results, applications should be made during periods of active growth and full leaf expansion.

| | |
|---|---|
| Alder | Reed, giant |
| Eucalyptus | Saltcedar |
| Madrone | Sweetgum |
| Oak | Tan oak |
| Pepper, Brazilian | Willow |
| Pine, Austrian | |

DO NOT MAKE CUT STUMP APPLICATIONS WHEN THE ROOTS OF DESIRABLE WOODY BRUSH OR TREES MAY BE GRAFTED TO THE ROOTS OF THE CUT STUMP. Some sprouts, stems, or trees may share the same root system. Adjacent trees having a similar age, height and spacing may signal shared roots. Whether grafted or shared, injury is likely to occur to non-treated stems/trees when one or more trees sharing common roots are treated.

**8.2 Forestry Site Preparation**

This product is labeled for the control or partial control of woody brush, trees and herbaceous weeds in forestry. This product is also labeled for use in preparing or establishing wildlife openings within these sites and maintaining logging roads.

Use this product for site preparation prior to planting any tree species, including Christmas trees, eucalyptus, hybrid tree cultivars and silvicultural nursery sites.

Use the higher rates of this product within the specified range for control or partial control of woody brush, trees and hard-to-control perennial herbaceous weeds. For best results, apply to actively growing woody brush and trees after full leaf expansion and before fall color and leaf drop. Increase rates within the specified range for control of perennial herbaceous weeds any time after emergence and before seedheads, flowers or berries appear.

Use the lower rates of this product within the specified range for control of annual herbaceous weeds and actively growing perennial herbaceous weeds after seedheads, flowers or berries appear. Apply to the foliage of actively growing annual herbaceous weeds any time after emergence.

TANK MIXTURES: Tank mixtures of this product may be used to increase the spectrum of vegetation controlled. When tank mixing, read and carefully observe the label claims, cautionary statements and all information on the labels of all products used. Use according to the most restrictive precautionary statements for each product in the mixture.

**NOTE**: For forestry site preparation, make sure the tank-mix product is approved for use prior to planting the desired species. Observe planting interval restrictions.

Any labeled rate of this product may be used in a tank mix with the following products for forestry site preparation.

Arsenal Applicators Concentrate

Chopper

Escort or Escort XP

Garlon 3A

Garlon 4

Landmark XP

Oust XP

Westar

For control of herbaceous weeds, use the lower labeled tank mixture rates. For control of dense stands or tough-to-control woody brush and trees, use the higher labeled rates.

Do not apply this product as an over-the-top broadcast spray for forestry conifer or hardwood release unless otherwise specified on this label, or in separate supplemental labeling or fact sheets published by Monsanto for this product.

## 8.3 General Areas and Industrial Sites

**General Weed Control, Trim-and-Edge, Bare Ground**

This product may be used in general non-crop and non-food crop areas. It may be applied with any application equipment described in this label. This product may be used to trim-and-edge around objects in these sites, for spot treatment of unwanted vegetation and to eliminate unwanted weeds growing in established shrub beds or ornamental plantings. This product may be used prior to planting an area to ornamentals, flowers, turfgrass (sod or seed), or prior to laying asphalt or beginning construction projects.

Repeated applications of this product may be used, as weeds emerge, to maintain bare ground.

TANK MIXTURES: This product may be tank mixed with the following products, provided that the specific product is labeled for application at the use site. Refer to the individual product labels for approved sites and application rates.

| | | |
|---|---|---|
| Arsenal | atrazine [1] | Certainty |
| Barricade 65WG | Crossbow L | dicamba [1] |
| diuron [1] | Endurance | Escort or Escort XP |
| Gallery 75DF | Garlon 3A | Garlon 4 |
| Goal 2XL | Karmex DF | Krovar I DF |
| Landmark II MP | Landmark MP | Landmark XP |
| Milestone | | Oust XP |
| Outrider® | Pendulum 3.3 EC | Pendulum WDG |
| pendimethalin [1] | Plateau | Poast |
| Princep DF | Princep 4L | Ronstar 50WP |
| Sahara | simazine [1] | Surflan AS |
| Surflan WDG | Telar | Transline |
| Vanquish | Velpar DF | Velpar L |
| 2,4-D [1] | | |

[1] Tank mixtures with products containing this single active ingredient may be made provided the specific product is labeled for application at the use site.

This product plus dicamba tank mixtures may not be applied by air in California.

When applied as a tank mixture for bare ground, this product provides control of the emerged annual weeds and control or partial control of emerged perennial weeds, woody brush and trees.

For control or partial control of the following perennial weeds, apply 22 to 44 fluid ounces of this product plus 2 to 4 ounces of Oust XP per acre.

| | |
|---|---|
| Bahiagrass | Johnsongrass |
| Bermudagrass | Poorjoe |



| | |
|---|---|
| Broomsedge | Quackgrass |
| Dallisgrass | Vaseygrass |
| Dock, curly | Vervain, blue |
| Dogfennel | |
| Fescue, tall | |

**Chemical Mowing - Perennials**

This product will suppress perennial grasses listed in this section to serve as a substitute for mowing. Use 5 fluid ounces of this product per acre when treating tall fescue, fine fescue, orchardgrass, quackgrass or reed canarygrass covers. Use 4 fluid ounces of this product per acre when treating Kentucky bluegrass. Apply treatments in 10 to 40 gallons of spray solution per acre.

Use only in areas where some temporary injury or discoloration of perennial grasses can be tolerated.

**Chemical Mowing – Annuals**

For growth suppression of some annual grasses, such as annual ryegrass, wild barley and wild oats growing in coarse turf on roadsides or other industrial areas, apply 3 to 4 fluid ounces of this product in 10 to 40 gallons of spray solution per acre. Applications should be made when annual grasses are actively growing and before the seedheads are in the boot stage of development. Treatments may cause injury to the desired grasses.

**8.4 Turfgrass**

**Dormant Turfgrass**

This product may be used to control or suppress many winter annual weeds and tall fescue for effective release of dormant bermudagrass and bahiagrass turf. Treat only when turf is dormant and prior to spring green-up.

Apply 5 to 44 fluid ounces of this product in 10 to 40 gallons of water per acre. Use only in areas where bermudagrass or bahiagrass are desirable ground covers and where some temporary injury or discoloration can be tolerated.

Treatments in excess of 11 fluid ounces per acre may result in injury or delayed green-up in highly maintained areas, such as golf courses and lawns. DO NOT apply tank mixtures of this product plus Oust XP in highly maintained turfgrass areas.

**Actively Growing Bermudagrass**

This product may be used to control or partially control many annual and perennial weeds for effective release of actively growing bermudagrass. DO NOT apply more than 11 fluid ounces of this product per acre in highly maintained turfgrass areas. DO NOT apply tank mixtures of this product plus Oust XP in highly maintained turfgrass areas. Use only in areas where some temporary injury or discoloration can be tolerated.

**Turfgrass Renovation, Seed or Sod Production**

This product controls most existing vegetation prior to renovating turfgrass areas or establishing turfgrass grown for seed or sod. For maximum control of existing vegetation, delay planting or sodding to determine if any regrowth from escaped underground plant parts occurs. Where repeat treatments are necessary, sufficient regrowth must be attained prior to application. For warm-season grasses such as bermudagrass, summer or fall applications provide the best control. Where existing vegetation is growing under mowed turfgrass management, apply this product after omitting at least one regular mowing to allow sufficient growth for good interception of the spray.

Desirable turfgrasses may be planted following the above procedures.

Hand-held equipment may be used for spot treatment of unwanted vegetation growing in existing turfgrass. Broadcast or hand-held equipment may be used to control sod remnants or other unwanted vegetation after sod is harvested.

PRECAUTIONS, RESTRICTIONS: Do not disturb soil or underground plant parts before treatment. Tillage or renovation techniques such as vertical mowing, coring or slicing should be delayed for 7 days after application to allow translocation into underground plant parts. If application rates total 2 quarts per acre or less, no waiting period between treatment and feeding or livestock grazing is required. If the rate is greater than 2 quarts per acre, remove livestock before application and wait 8 weeks after application before grazing or harvesting.

### 8.5  Habitat Management

### Habitat Restoration and Management

This product may be used to control exotic and other undesirable vegetation in habitat management and natural areas, including rangeland and wildlife refuges. Applications can be made to allow recovery of native plant species, prior to planting desirable native species, and for similar broad-spectrum vegetation control requirements. Spot treatments can be made to selectively remove unwanted plants for habitat management and enhancement.

### Wildlife Food Plots

This product may be used as a site preparation treatment prior to planting wildlife food plots. Any wildlife food species may be planted after applying this product, or native species may be allowed to repopulate the area. If tillage is needed to prepare a seedbed, wait 7 days after application before tillage to allow translocation into underground plant parts.

### 8.6 Hollow Stem Injection

This product may be applied through hand-held injection devices that deliver recommended amounts of this product into targeted hollow-stem plants growing in any site specified on this label.

For control of the following hollow-stem plants, follow the use instructions below:

**Castorbean,** *Ricinus communis*
Inject 4 ml per plant of this product into the lower portion of the main stem.

**Hemlock, Poison,** *Conium maculatum*
Inject one leaf cane per plant 10 to 12 inches above the root crown with 5 ml of a 5% v/v solution of this product.

**Hogweed, Giant,** *Hercleum mantegazzianum*
Inject one leaf cane per plant 12 inches above the root crown with 5 ml of a 5% v/v solution of this product.

**Horsetail, Field,** *Equisetum arvense*
Inject one segment above the root crown with 0.5 ml per stem of this product. Use a small syringe that calibrates to this rate.

**Knotweed, Bohemian,** *Polygonum bohemicum*
Inject 5 ml per stem of this product between the second and third internode.

**Knotweed, Giant,** *Polygonum sachalinense*
Inject 5 ml per stem of this product between second and third internode.

**Knotweed, Japanese,** *Polygonum cuspidatum*
Inject 5 ml per stem of this product between second and third internode.

**Reed, Giant** *Arundo donax*
Inject 6 ml per stem of this product between second and third internode.

**Thistle, Canada,** *Circisum arvense*

Cut 8 to 9 of the tallest plants at bud stage in a clump with clippers. Use a cavity needle that is pushed into the stem center and then slowly removed as 0.5 ml per stem of this product is injected into the stem.

**Note**: The combined total for all treatments must not exceed 7 quarts of this product per acre. At 5 ml per stem, 7 quarts should treat approximately 1300 stems per acre.

## 8.7  Injection and Frill (Woody Brush and Trees)

This product may be used to control woody brush and trees by injection or frill applications. Apply this product using suitable equipment that must penetrate into the living tissue. Apply the equivalent of 1 ml of this product per each 2 to 3 inches of trunk diameter at breast height (DBH). This is best achieved by applying a 50- to 100-percent concentration of this product either to a continuous frill around the tree or as cuts evenly spaced around the tree below all branches. As tree diameter increases in size, better results are achieved by applying diluted material to a continuous frill or more closely spaced cuttings. Avoid application techniques that allow run-off to occur from frilled or cut areas in species that exude sap freely. In species such as this, make the frill or cuts at an oblique angle to produce a cupping effect and use a 100-percent concentration of this product. For best results, application should be made during periods of active growth and after full leaf expansion. This product will control many species, some of which are listed below:

| Control | Partial Control |
|---------|-----------------|
| Oak | Black gum |
| Poplar | Dogwood |
| Sweetgum | Hickory |
| Sycamore | Maple, red |

## 8.8  Non-Food Tree, Shrub, or Vine Production Sites

This product may be used for general weed control prior to the planting of and around established ornamentals, or any woody tree, shrub or vine species, including arborvitae, azalea, boxwood, crabapple, eucalyptus, euonymus, fir, Douglas fir, jojoba, hollies, lilac, magnolia, maple, oak, poplar, privet, pine, spruce and yew, growing in plant nurseries, on Christmas tree farms, or on other non-food tree production sites.

UNLESS OTHERWISE DIRECTED, THIS PRODUCT IS NOT RECOMMENDED FOR USE AS AN OVER-THE-TOP BROADCAST SPRAY IN ORNAMENTALS AND CHRISTMAS TREES. Care must be taken to avoid contact of spray, drift or mist with foliage or bark of desirable ornamental species.

This product may also be used to control weeds growing in and around greenhouses and shadehouses. Desirable vegetation must not be present during application and air circulation fans must be turned off until after the application has dried.

TYPES OF APPLICATION:  Site Preparation, Post-directed, Trim-and-edge, Wiper Application

**Site Preparation**

This product may be used prior to planting any tree, shrub or vine, including Christmas tree species, in a nursery or production setting.

**Post-Directed, Trim-and-Edge**

This product may be used as a post-directed spray around established woody ornamental species, or to trim and edge around trees, buildings, sidewalks, roads, potted plants and other objects in a production setting.

Desirable plants may be protected from the spray solution by using shields or coverings made of cardboard or other impermeable material.

**Wiper Application**

This product may be used through wick or other suitable wiper applicators to control or partially control undesirable vegetation around established trees, shrubs or vines. See the **SELECTIVE EQUIPMENT** section of this label for further information about the proper use of wiper applicators.

**8.9 Parks, Recreational and Residential Areas**

All of the instructions in the **General Areas and Industrial Sites** section may be made in park and recreational areas.

This product may be used in parks, recreational and residential areas. It may be applied with any application equipment described in this label. This product may be used to trim-and-edge around trees, fences, paths, around buildings, sidewalks and other objects in these areas. This product may be used for spot treatment of unwanted vegetation. This product may be used to eliminate unwanted weeds growing in established shrub beds or ornamental plantings. This product may be used prior to planting an area to ornamentals, flowers, turfgrass (sod or seed), or prior to laying asphalt or beginning construction projects.

**8.10 Railroads**

All of the instructions in the **General Areas and Industrial Sites** section may be made to railroads.

**Bare ground, Ballast and Shoulders, Crossings, Spot Treatment**

This product may be used to maintain bare ground on railroad ballast and shoulders. Repeat applications of this product may be used, as weeds emerge, to maintain bare ground. This product may be used to control tall-growing weeds to improve line-of-sight at railroad crossings and reduce the need for mowing along rights-of-way. For crossing applications, up to 80 gallons of spray solution per acre may be used.

TANK MIXTURES: This product may be tank mixed with the following products for ballast, shoulder, spot, bare ground and crossing treatments provided the specific product used is labeled for use on these sites. Refer to the individual product labels for approved sites and application rates:

| | |
|---|---|
| Arsenal | atrazine [1] |
| dicamba [1] | diuron [1] |
| Escort | Escort XP |
| Garlon 3A | Garlon 4 |
| Hyvar X | Hyvar X-L |
| Krovar I DF | |
| Oust XP | Outrider |
| Sahara DG | simazine [1] |
| Spike 80DF | Telar DF |
| Transline | Vanquish |
| Velpar DF | Velpar L |
| 2,4-D [1] | |

[1] Tank mixtures with products containing this single generic active ingredient may be made provided the specific product is labeled for application at the use site.

**Brush Control**

This product may be used to control woody brush and trees on railroad rights-of-way. Apply 2.5 to 7 quarts of this product per acre as a broadcast spray, using boom-type or boomless nozzles. Up to 80 gallons of spray solution per acre may be used. Apply a 0.7- to 1.5-percent solution of this product when using high-volume spray-to-wet applications. Apply a 4- to 7-percent solution of this product when using low volume directed sprays for spot treatment.

TANK MIXTURES: This product may be mixed with the following products for ballast, shoulder, spot, bare ground and crossing treatments as well as for enhanced control of woody brush and trees, provided the specific product used is labeled for use on these sites. Refer to the individual product labels for approved sites and application rates:

| | |
|---|---|
| Arsenal | atrazine [1] |
| dicamba [1] | diuron [1] |
| Escort | Escort XP |
| Garlon 3A | Garlon 4 |
| Hyvar X | Hyvar X-L |
| Sahara DG | simazine [1] |
| Spike 80 DF | Vanquish |
| Transline | Velpar L |
| Velpar DF | 2,4-D [1] |

[1] Tank mixtures with products containing this single generic active ingredient may be made provided the specific product is labeled for application at the use site.

**Bermudagrass Release**

This product may be used to control or partially control many annual and perennial weeds for effective release of actively growing bermudagrass. Apply 11 to 32 fluid ounces of this product in up to 80 gallons of spray solution per acre. Use the lower rate when treating annual weeds below 6 inches in height (or runner length). Use the higher rate as weeds increase in size or as they approach flower or seedhead formation. These rates will also provide partial control of the following perennial species:

| | |
|---|---|
| Bahiagrass | Johnsongrass |
| Bluestem, silver | Trumpetcreeper |
| Fescue, tall | Vaseygrass |

This product may be tank-mixed with Oust XP. If tank-mixed, use no more than 11 to 32 fluid ounces of this product with 1 to 2 ounces of Oust XP per acre. Use the lower rates of each product to control annual weeds less than 6 inches in height (or runner length) that are listed in this label and the Oust XP label. Use the higher rates as annual weeds increase in size and approach the flower or seedhead stages. These rates will also provide partial control of the following perennial weeds:

| | |
|---|---|
| Bahiagrass | Fescue, tall |
| Blackberry | Johnsongrass |
| Bluestem, silver | Poorjoe |
| Broomsedge | Raspberry |
| Dallisgrass | Trumpetcreeper |
| Dewberry | Vaseygrass |
| Dock, curly | Vervain, blue |
| Dogfennel | |

Use only on well-established bermudagrass. Bermudagrass injury may result from the treatment, but regrowth will occur under moist conditions. Repeat applications in the same season are not recommended, since severe injury may occur.

**8.11 Roadsides**

All of the applications in the **General Areas and Industrial Sites** section may be made on roadsides.

**Shoulder Treatments**

---

This product may be used on road shoulders. It may be applied with boom sprayers, shielded boom sprayers, high-volume off-center nozzles, hand-held equipment, and similar equipment.

**Guardrails and Other Obstacles to Mowing**

This product may be used to control weeds growing under guardrails and around signposts and other objects along the roadside.

**Spot Treatment**

This product may be used as a spot treatment to control unwanted vegetation growing along roadsides.

TANK MIXTURES: This product may be tank-mixed with the following products, for shoulder, guardrail, spot and bare ground treatments provided that the specific product used is labeled for use on these sites. Refer to the individual product labels for approved sites and application rates:

| | |
|---|---|
| atrazine [1] | Oust XP |
| Clarity | Outrider |
| Crossbow L | Pendulum 3.3 EC |
| dicamba [1] | Pendulum WDG |
| diuron [1] | Plateau |
| Endurance | Princep DF |
| Escort | Princep 4L |
| Escort XP | Ronstar 50WP |
| Gallery 75 DF | Sahara |
| Krovar I DF | simazine [1] |
| Landmark II MP | Surflan |
| Landmark MP | Telar |
| Landmark XP | Vanquish |
| | 2,4-D [1] |

[1] Tank mixtures with products containing this single generic active ingredient may be made provided the specific product is labeled for application at the use site.

**Release of Bermudagrass or Bahiagrass**

**Dormant Applications**

This product may be used to control or partially control many winter annual weeds and tall fescue for effective release of dormant bermudagrass or bahiagrass. Treat only when turf is dormant and prior to spring green-up. This product may also be tank-mixed with Outrider, or Oust XP for residual control. Tank mixtures of this product with Oust XP may delay green-up.

For best results on winter annuals, treat when plants are in an early growth stage (below 6 inches in height) after most have germinated. For best results on tall fescue, treat when fescue is at or beyond the 4- to 6-leaf stage.

Apply 5 to 44 fluid ounces of this product in a tank mix with 0.75 to 1.33 ounces of Outrider herbicide per acre. Read and follow all label directions for Outrider herbicide.

Apply 6 to 44 fluid ounces of this product per acre alone or in a tank mixture with 0.25 to 1 ounce per acre of Oust XP. Apply the labeled rates in 10 to 40 gallons of water per acre. Use only in areas where bermudagrass or bahiagrass are desirable ground covers and where some temporary injury or discoloration can be tolerated. To avoid delays in green-up and minimize injury, add no more than 1 ounce of Oust XP per acre on bermudagrass and no more than 0.5 ounce of Oust XP per acre on bahiagrass and avoid treatments when these grasses are in a semi-dormant condition.

**Actively Growing Bermudagrass**

This product may be used to control or partially control many annual and perennial weeds for effective release of actively growing bermudagrass. Apply 11 to 32 fluid ounces of this product in 10 to 40 gallons of spray solution per acre. Use the lower rate when treating annual weeds below 6 inches in height (or runner length). Use the higher rate as weeds increase in size or as they approach flower or seedhead formation. These rates will also provide partial control of the following perennial species:

| | |
|---|---|
| Bahiagrass | Johnsongrass |
| Bluestem, silver | Trumpetcreeper |
| Fescue, tall | Vaseygrass |

This product may be tank-mixed with Outrider herbicide for control or partial control of Johnsongrass and other weeds listed on the Outrider label. Use 5 to 22 fluid ounces of this product with 0.75 to 1.33 ounces of Outrider per acre. Use the higher rates of both products for control of perennial weeds or annual weeds greater than 6 inches in height.

This product may be tank-mixed with Oust XP. If tank-mixed, use no more than 11 to 22 fluid ounces of this product with 1 to 2 ounces of Oust XP per acre. Use the lower rates of each product to control annual weeds less than 6 inches in height (or runner length) that are listed in this label and the Oust XP label. Use the higher rates as annual weeds increase in size and approach the flower or seedhead stages. These rates will also provide partial control of the following perennial weeds:

| | |
|---|---|
| Bahiagrass | Fescue, tall |
| Bluestem, silver | Johnsongrass |
| Broomsedge | Poorjoe |
| Dallisgrass | Trumpetcreeper |
| Dock, curly | Vaseygrass |
| Dogfennel | Vervain, blue |

Use only on well-established bermudagrass. Bermudagrass injury may result from the treatment, but regrowth will occur under moist conditions. Repeat applications of the tank mix in the same season are not recommended, since severe injury may occur.

**Actively Growing Bahiagrass**

For suppression of vegetative growth and seedhead inhibition of bahiagrass for approximately 45 days, apply 4 fluid ounces of this product in 10 to 40 gallons of water per acre. Apply 1 to 2 weeks after full green-up or after mowing to a uniform height of 3 to 4 inches. This application must be made prior to seedhead emergence.

For suppression up to 120 days, apply 3 fluid ounces of this product per acre, followed by an application of 1.5 to 3 fluid ounces per acre about 45 days later. Make no more than 2 applications per year.

This product may be used for control or partial control of Johnsongrass and other weeds listed on the Outrider herbicide label. Apply 4 fluid ounces of this product with 0.75 to 2.0 ounces of Outrider per acre. Use the higher rates for control of perennial weeds and annual weeds greater than 6 inches in height. Use only on well established bahiagrass.

A tank mixture of this product plus Oust XP may be used. Apply 4 fluid ounces of this product plus 0.25 ounce of Oust XP per acre 1 to 2 weeks following an initial spring mowing. Make only one application per year.

**8.12 Rangelands**

This product will control or suppress many annual weeds growing in perennial cool- and warm-season grass rangelands, pastures, and industrial sites. Preventing weed seed production is critical to the successful control of annual grassy weeds invading these perennial grass sites. Follow-up applications in sequential years should eliminate most of the viable seeds. Grazing of treated areas should be delayed to



encourage growth of desirable perennials. Allowing desirable perennials to flower and reseed in the treated area will encourage successful transition.

**Bromus:** This product may be used to control or suppress downy brome (*Bromus tectorum*), Japanese brome (*Bromus japonicus*), soft chess (*Bromus mollis*), cheatgrass *(Bromus secalinus)*, cereal rye and jointed goatgrass found in rangelands pastures and industrial sites. Apply 5 to 11 fluid ounces of this product per acre on a broadcast basis.

For best results, treatment should coincide with early seedhead emergence of the most mature plants. Delaying the application until this growth stage will maximize the emergence of other weedy grass flushes. Applications should be made to the same site each year until seed banks are depleted and the desirable perennial grasses can become reestablished on the site.

**Medusahead:** To control or suppress medusahead, apply 11 fluid ounces of this product per acre at the 3-leaf stage when plants are actively growing. Delaying applications beyond this stage will result in reduced or unacceptable control. Repeat applications in subsequent years may be necessary to eliminate the seedbank before reestablishing desirable perennial grasses. Applications may be made in the fall or spring.

Applications may be made using ground or aerial equipment. Aerial applications for these uses may be made using fixed wing or helicopter equipment. For aerial applications, apply in 2 to 10 gallons of water per acre. For applications using ground equipment, apply in 10 to 20 gallons of water per acre.

### Spot Treatment, Wiper Application

This product may be applied in rangeland, pastures or industrial sites as a spot treatment, or over the top of desirable grasses using wiper applicators to control tall weeds. Applications may be repeated in the same area at 30-day intervals.

For spot treatments or wiper application methods using rates of 2 quarts of this product per acre or less, the entire site or any portion of it may be treated. When spot treatments or wiper applications are made using rates above 2 quarts of this product per acre, no more than 10 percent of the total site may be treated at any one time. To achieve maximum performance, remove domestic livestock before application and wait 7 days after application before grazing livestock or harvesting for feed.

### 8.13 Utility Sites

Use this product along electrical power, pipeline and telephone rights-of-way, and in other sites associated with these rights-of-way, such as substations, roadsides, railroads or similar rights-of-way that run in conjunction with utilities.

Use this product in utility sites and substations for bare ground, trim-and-edge around objects, spot treatment of unwanted vegetation and to eliminate unwanted weeds growing in established shrub beds or ornamental plantings. This product may be used prior to planting a utility site to ornamentals, flowers, turfgrass (sod or seed), or beginning construction projects.

Repeated applications of this product may be used, as weeds emerge, to maintain bare ground.

This product is also recommended for use in preparing or establishing wildlife openings within these sites, maintaining access roads and for side trimming along utility rights-of-way.
TANK MIXTURES: This product may be tank mixed with the following products for use in utility sites, provided that the specific product used is labeled for use on these sites.   Refer to the individual product labels for approved sites and application rates.

For control of herbaceous weeds, use the lower tank mixture rates. For control of dense stands or tough-to-control woody brush and trees, use the higher tank mixture rates.

| | |
|---|---|
| Arsenal | atrazine [1] |
| Barricade 65WG | dicamba [1] |

| | |
|---|---|
| diuron [1] | Endurance |
| Escort | Escort XP |
| Garlon 3A [2] | Garlon 4 [3] |
| Krenite | Krovar I DF |
| | Oust XP |
| Outrider | pendimethalin [1] |
| Plateau | |
| Ronstar 50WP | Sahara |
| simazine [1] | Surflan AS |
| Surflan WDG | Telar DF |
| Transline | Vanquish |
| Velpar DF | Velpar L |
| 2,4-D [1] | |

[1] Tank mixtures with product containing this generic active ingredient may be made provided the specific product is labeled for application at the use site.

[2] Ensure that Garlon 3A is thoroughly mixed with water according to label directions before adding this product. Have spray mixture agitating at the time this product is added to avoid spray incompatibility problems.

[3] For side trimming treatments, this product can be used alone or in a tank mixture with Garlon 4.

### 8.14  Grass Seed or Sod Production

Use this product in grass seed and sod production for preplant, at-planting, preemergence, removal of established stands, renovation, site preparation, shielded spraying, wiper application, spot treatment, and creating rows in annual ryegrass.

**Preplant, At-Planting, Preemergence, Removal of Established Stands, Renovation, Site Preparation**

This product controls most existing vegetation for purposes of renovating turf or forage grass seed areas or for establishing turfgrass grown for sod. It may also be used to destroy remaining undesired grass vegetation when production fields are converted to alternate species or crops. Make applications before, during, or after planting, or for renovation purposes. Applications must be made prior to crop emergence in order to avoid crop injury. For maximum control of existing vegetation, delay planting to determine if any regrowth from escaped underground plant parts occurs. Where existing vegetation is growing under mowed turfgrass management, apply this product after omitting at least one regular mowing to allow sufficient growth for good interception of the herbicide spray. Where repeat treatments are necessary, sufficient regrowth must be attained prior to application. For warm-season grasses, such as bermudagrass, summer or fall applications provide best control. Broadcast equipment may be used to control sod remnants or other unwanted vegetation after sod is harvested. Application rates up to 3.3 quarts per acre may be used to totally remove established stands of tough to kill grass species.

Do not disturb soil or underground plant parts before treatment. Tillage or renovation techniques such as vertical mowing, coring or slicing should be delayed for 7 days after application to allow proper translocation into underground plant parts. If application rates total 2 quarts per acre or less, no waiting period between treatment and feeding or livestock grazing is required. If the rate is greater than 2 quarts per acre, remove domestic livestock before application and wait 8 weeks after application before grazing or harvesting.

**Shielded Sprayers**

Apply 22 to 64 fluid ounces of this product in 10 to 20 gallons of water per acre to control weeds between grass seed rows. Uniform planting in straight rows aids in shielded sprayer applications. Best results are obtained when the grass seed plants are small enough to easily pass by the protective shields.

Contact of this product in any manner with desirable vegetation may result in discoloration, stunting or destruction. Such damage shall be the sole responsibility of the applicator.

### Wiper Application

This product may be applied over the top of desirable grasses using wiper applicators for the control of tall weeds.

Contact of this product in any manner with desirable vegetation may result in discoloration, stunting or destruction. Such damage shall be the sole responsibility of the applicator.

### Spot Treatment

Apply a 1-percent solution of this product using hand-held spray equipment to control weeds within established vegetation prior to heading of grasses grown for seed. Hand-held equipment may be used to control sod remnants or other unwanted vegetation after sod is harvested.

The grass sprayed in the treated area will be killed. Take care not to spray or allow spray to drift outside the target area in order to avoid unwanted grass injury or destruction.

### Creating Rows in Annual Ryegrass

Apply 11 to 22 fluid ounces of this product per acre. Best results are obtained when applications are made before the ryegrass reaches 6 inches in height. Use the higher rate within the labeled range when ryegrass is greater than 6 inches in height.

Set nozzle heights to allow the establishment of the desired row spacing.  Use of low-pressure nozzles, or drop nozzles designed to target the application over a narrow band are recommended.

Take care not to spray or allow spray to drift outside target area in order to avoid unwanted grass destruction.

**Grower assumes all responsibility for losses resulting from misapplication of this product.**

### 8.15 Pastures

This product may be applied to any pasture grass (other than food crops in the *Gramineae* family), including bahiagrass, bermudagrass, bluegrass, brome, fescue, guineagrass, kikuyugrass, orchardgrass, pangola grass, ryegrass, timothy, and wheatgrass.  Application can be made as a spot treatment, wiper application, preplant, preemergence, pasture renovation, or postemergent broadcast.

### Preplant, Preemergence, Pasture Renovation

This product may be applied for weed control prior to planting or emergence of forage grasses. This product may also be applied to control perennial pasture species listed on this label prior to replanting.

If application rates total 2 quarts per acre or less, no waiting period between treatment and feeding or livestock grazing is required. If the rate is greater than 2 quarts per acre, remove domestic livestock before application and wait 8 weeks after application before grazing or harvesting.

### Spot Treatment, Wiper Application

This product may be applied in pastures as a spot treatment, or over the top of desirable grasses using wiper applicators to control tall weeds. Applications may be repeated in the same area at 30-day intervals.

For spot treatments or wiper application methods using rates of 2 quarts of this product per acre or less, the entire field or any portion of it may be treated. When spot treatments or wiper applications are made using rates above 2 quarts of this product per acre, no more than 10 percent of the total pasture may be

---

treated at any one time. To achieve maximum performance, remove domestic livestock before application and wait 7 days after application before grazing livestock or harvesting for feed.

**Postemergent Weed Control (Broadcast Treatments)**

This product may be applied to pastures to suppress competitive growth and seed production of annual weeds and undesirable vegetation in pastures. For selective applications with broadcast spray equipment, apply 8 to 11 fluid ounces of this product per acre in early spring before desirable perennial grasses break dormancy and initiate green growth. Late fall applications can be made after desirable perennial grasses have reached dormancy.

Some stunting of perennial grasses will occur if broadcast applications are made when plants are not dormant. Use of higher application rates will cause stand reductions. No waiting period is required between application and grazing or harvesting for feed. Do not apply more than 2 quarts of this product per acre per year onto pasture grasses except for renovation uses as described previously in this section.

## 9.0  WEEDS CONTROLLED

Always use the higher rate of this product per acre within the specified range when weed growth is heavy or dense or weeds are growing in an undisturbed (noncultivated) area.

Reduced results may occur when treating weeds heavily covered with dust. For weeds that have been mowed, grazed or cut, allow regrowth to occur prior to treatment.

Refer to the following label sections for rates to control annual and perennial weeds and woody brush and trees. For difficult to control perennial weeds and woody brush and trees, where plants are growing under stressed conditions, or where infestations are dense, this product may be used at 4 to 7 quarts per acre for enhanced results.

### 9.1  Annual Weeds

Use 22 fluid ounces of this product per acre if weeds are less than 6 inches in height or runner length and 1.0 to 2.7 quarts of this product per acre if weeds are over 6 inches in height or runner length or when weeds are growing under stressed conditions. Use the higher rate for tough-to-control species regardless of the weed size at application. Treat tough-to-control weeds early when they are relatively small. This product may be tank mixed provided the tank-mix product is labeled for application at the target site. Refer to the individual tank mix product labels for approved sites and application rates.

For spray-to-wet applications, apply a 0.4-percent solution of this product to weeds less than 6 inches in height or runner length. For annual weeds over 6 inches tall, or for smaller weeds growing under stressed conditions, use a 0.7- to 1.5-percent solution. Use the higher rate for tough-to-control species or for weeds over 24 inches tall. Apply prior to seedhead formation in grass or bud formation in broadleaf weeds.

For low volume directed spray applications, use a 4- to 7-percent solution of this product. Spray coverage should be uniform with at least 50 percent of the foliage contacted. Coverage of the top one half of the plant is important for best results. To ensure adequate spray coverage, spray both sides of large or tall weeds when foliage is thick and dense or where there are multiple sprouts.

**Weed Species**

Anoda, spurred
Barley
Barnyardgrass
Bassia, fivehook
Bittercress
Black nightshade
Bluegrass, annual
Bluegrass, bulbous
Brome, downy
Brome, Japanese

Browntop panicum
Buttercup
Carolina foxtail
Carolina geranium
Castorbean
Cheatgrass
Cheeseweed (*Malva parviflora*)
Chervil
Chickweed
Cocklebur
Copperleaf, hophornbeam
Corn
Corn speedwell
Crabgrass
Dwarfdandelion
Eastern mannagrass
Eclipta
Fall panicum
Falsedandelion
Falseflax, smallseed
Fiddleneck
Field pennycress
Filaree
Fleabane, annual
Fleabane, hairy (*Conyza bonariensis*)
Fleabane, rough
Florida pusley
Foxtail
Goatgrass, jointed
Goosegrass
Grain sorghum (milo)
Groundsel, common
Hemp sesbania
Henbit
Horseweed/Marestail (*Conyza canadensis*)
Itchgrass
Johnsongrass, seedling
Junglerice
Knotweed
Kochia
Lamb's-quarters
Little barley
London rocket
Mayweed
Medusahead
Morningglory (*Ipomoea spp*)
Mustard, blue
Mustard, tansy
Mustard, tumble
Mustard, wild
Oats
Pigweed
Plains/Tickseed coreopsis
Prickly lettuce

Puncturevine
Purslane, common
Ragweed, common
Ragweed, giant
Red rice
Russian thistle
Rye
Ryegrass
Sandbur, field
Shattercane
Shepherd's-purse
Sicklepod
Signalgrass, broadleaf
Smartweed, ladysthumb
Smartweed, Pennsylvania
Sowthistle, annual
Spanishneedles
Speedwell, purslane
Sprangletop
Spurge, annual
Spurge, prostrate
Spurge, spotted
Spurry, umbrella
Starthistle, yellow
Stinkgrass
Sunflower
Teaweed/Prickly sida
Texas panicum
Velvetleaf
Virginia copperleaf
Virginia pepperweed
Wheat
Wild oats
Witchgrass
Woolly cupgrass
Yellow rocket

## 9.2 Perennial Weeds

Best results are obtained when perennial weeds are treated after they reach the reproductive stage of growth (seedhead initiation in grasses and bud formation in broadleaves). For non-flowering plants, best results are obtained when the plants reach a mature stage of growth. In many situations, treatments are required prior to these growth stages. Under these conditions, use the higher application rate within the specified range.

Ensure thorough coverage when using spray-to-wet treatments with hand-held equipment. For best results, use a 1.5-percent solution on harder-to-control perennials such as bermudagrass, dock, field bindweed, hemp dogbane, milkweed and Canada thistle.

For low volume directed spray applications, use a 4- to 7-percent solution of this product. Spray coverage should be uniform with at least 50 percent of the foliage contacted. Coverage of the top one half of the plant is important for best results. To ensure adequate spray coverage, spray both sides of large or tall weeds when foliage is thick and dense or where there are multiple sprouts.

Allow 7 or more days after application before tillage.

| Weed Species | Rate (QT/A) | Hand-Held % Solution |
|---|---|---|
| Alfalfa* | 1 - 1.5 | 1.5 |
| Alligatorweed* | 3 | 1 |
| Anise (fennel) | 1.3 - 2.7 | 1 - 1.5 |
| Bahiagrass | 2 - 3.3 | 1.5 |
| Beachgrass, European (*Ammophila arenaria*) | -- | 3.5 |
| Bentgrass* | 1 | 1.5 |
| Bermudagrass | 3.3 | 1.5 |
| Bermudagrass, water (knotgrass) | 1 | 1.5 |
| Bindweed, field | 2.7 - 3.3 | 1.5 |
| Bluegrass, Kentucky | 1.5 | 1.5 |
| Blueweed, Texas | 2.7 - 3.3 | 1.5 |
| Brackenfern | 2 - 3 | 1 |
| Bromegrass, smooth | 1.5 | 1.5 |
| Bursage, woolly-leaf | -- | 1.5 |
| Canarygrass, reed | 1.5 - 2 | 1.5 |
| Cattail | 2 - 3.3 | 1.5 |
| Clover; red, white | 2 - 3.3 | 1.5 |
| Cogongrass | 2 - 3.3 | 1.5 |
| Dallisgrass | 2 - 3.3 | 1.5 |
| Dandelion | 2 - 3.3 | 1.5 |
| Dock, curly | 2 - 3.3 | 1.5 |
| Dogbane, hemp | 2.5 | 1.5 |
| Fescue (except tall) | 3 | 1.5 |
| Fescue, tall | 2 | 1.5 |
| German ivy | 1.3 - 2.7 | 1 - 1.5 |
| Guineagrass | 2 | 1 |
| Horsenettle | 2 - 3.3 | 1.5 |
| Horseradish | 3 | 1.5 |
| Iceplant | 1.3 | 1.5 - 2 |
| Jerusalem artichoke | 2 - 3.3 | 1.5 |
| Johnsongrass | 1.3 - 2 | 1 |
| Kikuyugrass | 1.5 - 2 | 1.5 |
| Knapweed | 3 | 1.5 |
| Lantana | -- | 1 |
| Lespedeza | 2 - 3.3 | 1.5 |
| Milkweed, common | 2 | 1.5 |
| Muhly, wirestem | 1.5 | 1.5 |
| Mullein, common | 2 - 3.3 | 1.5 |
| Napiergrass | 2 - 3.3 | 1.5 |
| Nightshade, silverleaf | 1.5 | 1.5 |
| Nutsedge; purple, yellow | 2 | 1 - 1.5 |
| Orchardgrass | 1.5 | 1.5 |
| Pampasgrass | 2 - 3.3 | 1 - 1.5 |
| Paragrass | 2 - 3.3 | 1.5 |

| | | |
|---|---|---|
| Pepperweed, perennial | 2.7 | 1.5 |
| Phragmites* | 2 - 3.3 | 1 - 1.5 |
| Poison hemlock | 1.3 - 2.7 | 1 - 1.5 |
| Pokeweed, common | 1 | 1.5 |
| Quackgrass | 1.3 - 2 | 1.5 |
| Redvine* | 1.5 | 1.5 |
| Reed, giant | 2.7 - 3.3 | 1.5 |
| Ryegrass, perennial | 1.5 - 2 | 1 |
| Smartweed, swamp | 2 - 3.3 | 1.5 |
| Sowthistle, perennial | 1.5 - 2 | 1.5 |
| Spurge, leafy* | -- | 1.5 |
| Starthistle, yellow | 1.5 | 1.5 |
| Sweet potato, wild* | -- | 1.5 |
| Thistle, artichoke | 1.3 - 2 | 1 - 1.5 |
| Thistle, Canada | 1.5 - 2 | 1.5 |
| Timothy | 1.5 - 2 | 1.5 |
| Torpedograss* | 2.7 - 3.3 | 1.5 |
| Trumpetcreeper* | 1.5 - 2 | 1.5 |
| Vaseygrass | 2 - 3.3 | 1.5 |
| Velvetgrass | 2 - 3.3 | 1.5 |
| Wheatgrass, western | 1.5 - 2 | 1.5 |

* Partial control

### 9.3  Woody Brush and Trees

Apply this product after full leaf expansion, unless otherwise directed on this label, or in separate supplemental labeling or Fact Sheets published by Monsanto Company for this product. Use the higher rate for larger plants and/or dense areas of growth. On vines, use the higher rate for plants that have reached the woody stage of growth. Best results are obtained when application is made in late summer or fall after fruit formation.

In arid areas, best results are obtained when applications are made in the spring to early summer when brush species are at high moisture content and are flowering.

For best results when using hand-held equipment, use a 1.5-percent solution on harder-to-control woody brush and trees.

For low volume directed-spray applications, apply a 4- to 7-percent solution of this product. Spray coverage should be uniform with at least 50-percent of the foliage contacted. Coverage of the top one-half of the plant is important for best results. To ensure adequate spray coverage, spray both sides of large or tall woody brush and trees, when foliage is thick and dense, or where there are multiple spouts.

Symptoms may not appear prior to frost or senescence with fall treatments.

Allow 7 or more days after application before tillage, mowing or removal. Repeat treatments may be necessary to control plants regenerating from underground parts or seed. Some autumn colors on undesirable deciduous species are acceptable provided no major leaf drop has occurred. Reduced performance may result if fall treatments are made following a frost.

| Weed Species | Broadcast Rate (QT/A) | Hand-Held Spray-to-Wet % Solution |
|---|---|---|
| Alder | 2 - 3 | 1 |

| | | |
|---|---|---|
| Ash* | 1.5 - 3.3 | 1 - 1.5 |
| Aspen, quaking | 1.5 - 2 | 1 |
| Bearclover (Bearmat)* | 1.5 - 3.3 | 1 - 1.5 |
| Beech* | 1.5 - 3.3 | 1 - 1.5 |
| Birch | 1.5 - 2 | 1 |
| Blackberry | 2 - 3 | 1 |
| Blackgum | 1.5 - 3.3 | 1 - 1.5 |
| Bracken | 1.5 - 3.3 | 1 - 1.5 |
| Broom; French, Scotch | 1.3 - 3.3 | 1 - 1.5 |
| Buckwheat, California* | 1.3 - 2.5 | 1 - 1.5 |
| Cascara* | 1.5 - 3.3 | 1 - 1.5 |
| Catsclaw* | -- | 1 |
| Ceanothus* | 1.5 - 3.3 | 1 - 1.5 |
| Chamise* | 1.3 - 3.3 | 1 |
| Cherry; bitter, black, pin | 1.5 - 2 | 1 |
| Coyote brush | 2 - 2.7 | 1 - 1.5 |
| Deerweed | 1.3 - 3.3 | 1 |
| Dogwood* | 1.5 - 3.3 | 1 - 1.5 |
| Elderberry | 1.5 - 2 | 1 |
| Elm* | 1.5 - 3.3 | 1 - 1.5 |
| Eucalyptus | -- | 1.5 |
| Gorse* | 1.5 - 3.3 | 1 - 1.5 |
| Hasardia* | 1.3 - 2.5 | 1 - 1.5 |
| Hawthorn | 1.5 - 2 | 1 |
| Hazel | 1.5 - 2 | 1 |
| Hickory* | 1.5 - 3.3 | 1 - 1.5 |
| Honeysuckle | 2 - 3 | 1 |
| Hornbeam, American* | 1.5 - 3.3 | 1 - 1.5 |
| Kudzu | 2.5 - 3 | 1.5 |
| Locust, black* | 1.5 - 2.5 | 1 - 1.5 |
| Madrone resprouts* | -- | 1.5 |
| Manzanita* | 1.5 - 3.3 | 1 - 1.5 |
| Maple, red | 1.5 - 3 | 1 |
| Maple, sugar | -- | 1 |
| Monkey flower* | 1.3 - 2.7 | 1 - 1.5 |
| Oak; black, white* | 1.5 - 3 | 1 - 1.5 |
| Oak, post | 2 - 3 | 1 |
| Oak; northern, pin | 1.3 - 2.7 | 1 |
| Oak, Scrub* | 1.3 - 2.7 | 1 |
| Oak; southern red | 1.5 - 2 | 1 |
| Peppertree, Brazilian (Florida holly)* | 1.3 - 3.3 | 1 - 1.5 |
| Persimmon* | 1.5 - 3.3 | 1 - 1.5 |
| Pine | 1.5 - 3.3 | 1 - 1.5 |
| Poison ivy | 2.5 - 3.3 | 1.5 |
| Poison oak | 2.5 - 3.3 | 1.5 |
| Poplar, yellow* | 1.5 - 3.3 | 1 - 1.5 |

| | | |
|---|---|---|
| Redbud, eastern | 1.5 - 3.3 | 1 - 1.5 |
| Rose, multiflora | 1.5 | 1 |
| Russian olive* | 1.5 - 3.3 | 1 - 1.5 |
| Sage, black | 1.3 - 2.7 | 1 |
| Sage, white* | 1.5 - 2.7 | 1 - 1.5 |
| Sage brush, California | 1.3 - 2.7 | 1 |
| Salmonberry | 1.5 - 2 | 1 |
| Saltcedar* | 1.5 - 3.3 | 1 - 1.5 |
| Sassafras* | 1.5 - 3.3 | 1 - 1.5 |
| Sourwood* | 1.5 - 3.3 | 1 - 1.5 |
| Sumac; laurel, poison, smooth, sugarbush, winged* | 1.5 - 3 | 1 - 1.5 |
| Sweetgum | 1.5 - 2 | 1 |
| Swordfern* | 1.5 - 3.3 | 1 - 1.5 |
| Tallowtree, Chinese | -- | 1 |
| Tan oak resprouts* | -- | 1.5 |
| Thimbleberry | 1.5 | 1 |
| Tobacco, tree* | 1.5 - 2.5 | 1 - 1.5 |
| Toyon* | -- | 1.5 |
| Trumpetcreeper | 1.5 - 2 | 1 |
| Vine maple* | 1.5 - 3.3 | 1 - 1.5 |
| Virginia creeper | 1.5 - 3.3 | 1 - 1.5 |
| Waxmyrtle, southern* | 1.5 - 3.3 | 1 - 1.5 |
| Willow | 2 - 3 | 1 |
| Yerbasenta* | -- | 1.5 |

\* Partial control

## 10.0  LIMIT OF WARRANTY AND LIABILITY

Monsanto Company warrants that this product conforms to the chemical description on the label and is reasonably fit for the purposes set forth in the Complete Directions for Use label booklet ("Directions") when used in accordance with those Directions under the conditions described therein. TO THE EXTENT CONSISTENT WITH APPLICABLE LAW, NO OTHER EXPRESS WARRANTY OR IMPLIED WARRANTY OF FITNESS FOR PARTICULAR PURPOSE OR MERCHANTABILITY IS MADE. This warranty is also subject to the conditions and limitations stated herein.

To the extent consistent with applicable law, buyer and all users shall promptly notify this Company of any claims whether based in contract, negligence, strict liability, other tort or otherwise.

To the fullest extent permitted by law, buyer and all users are responsible for all loss or damage from use or handling which results from conditions beyond the control of this Company to the extent consistent with applicable law, including, but not limited to, incompatibility with products other than those set forth in the Directions, application to or contact with desirable vegetation, failure of this product to control weed biotypes which develop resistance to glyphosate, unusual weather, weather conditions which are outside the range considered normal at the application site and for the time period when the product is applied, as well as weather conditions which are outside the application ranges set forth in the Directions, application in any manner not explicitly set forth in the Directions, moisture conditions outside the moisture range specified in the Directions, or the presence of products other than those set forth in the Directions in or on the soil, crop or treated vegetation.

This Company does not warrant any product reformulated or repackaged from this product except in accordance with this Company's stewardship requirements and with express written permission from this Company.

TO THE EXTENT CONSISTENT WITH APPLICABLE LAW, THE EXCLUSIVE REMEDY OF THE USER OR BUYER, AND THE LIMIT OF THE LIABILITY OF THIS COMPANY OR ANY OTHER SELLER FOR ANY AND ALL LOSSES, INJURIES OR DAMAGES RESULTING FROM THE USE OR HANDLING OF THIS PRODUCT (INCLUDING CLAIMS BASED IN CONTRACT, NEGLIGENCE, STRICT LIABILITY, OTHER TORT OR OTHERWISE) SHALL BE THE PURCHASE PRICE PAID BY THE USER OR BUYER FOR THE QUANTITY OF THIS PRODUCT INVOLVED, OR, AT THE ELECTION OF THIS COMPANY OR ANY OTHER SELLER, THE REPLACEMENT OF SUCH QUANTITY, OR, IF NOT ACQUIRED BY PURCHASE, REPLACEMENT OF SUCH QUANTITY. TO THE EXTENT CONSISTENT WITH APPLICABLE LAW, IN NO EVENT SHALL THIS COMPANY OR ANY OTHER SELLER BE LIABLE FOR ANY INCIDENTAL, CONSEQUENTIAL OR SPECIAL DAMAGES.

Upon opening and using this product, buyer and all users are deemed to have accepted the terms of this LIMIT OF WARRANTY AND LIABILITY which may not be varied by any verbal or written agreement. If terms are not acceptable, return at once unopened.

**[INSERT BRAND NAME]**, Outrider, Monsanto and Vine symbol are trademarks of Monsanto Technology LLC.

All other trademarks are the property of their respective owners.

This product is protected by U.S. Patent No's. 5,668,085 and 6,365,441. Other patents pending. No license granted under any non-U.S. patent(s).

EPA Reg. No. 524-579

---

In case of an emergency involving this product, or for medical assistance,
Call Collect, day or night, (314) 694-4000.

---

© [DATE]
Packed For:
MONSANTO COMPANY
800 N. Lindbergh Blvd.
ST. LOUIS, MISSOURI, 63167 USA

40/49

**APPENDIX 1 – Consolidated List of Label Claims**

Rainfast in 15 Minutes

Rainfast in 30 Minutes

Rainfast in 45 Minutes

Rainfast in 60 Minutes

Rainproof in 15 Minutes

Rainproof in 30 Minutes

Rainproof in 45 Minutes

Rainproof in 60 Minutes

15-Minute Rainfastness

30-Minute Rainfastness

45-Minute Rainfastness

60-Minute Rainfastness

First New Formula in over 30 years

First New Formula in 33 years

Treats 50% more area

50% more concentrated

Brand Advantage

Performance Guarantee

Performance Guaranteed

Guaranteed Performance

Faster Symptoms

Faster physical symptoms

Faster results

Faster control of weeds

3 Times Faster

4 Times Faster

5 Times Faster

3 Times More to the Root

4 Times More to the Root

5 Times More to the Root

See Results 3x Faster

See Results 4x Faster

See Results 5x Faster

Works 3x Faster

Works 4x Faster

---

Works 5x Faster
More Consistent performance
NEW

42/49

## IV. SUPPLEMENTAL LABELING FOR INDUSTRIAL, TURF, & ORNAMENTAL USES

Table of Contents: Industrial, Turf, and Ornamental Supplemental labeling

|   | Name | 1st Approval Date |
|---|------|-------------------|
|   | TEMPLATE FOR SUPPLEMENTAL LABELS AND STANDARD LANGUAGE | 20 June 2007 |
| A | FOR USE FOR SELECTIVE WEED CONTROL ON **[INSERT BRAND NAME]** TOLERANT PURE GOLD® TALL FESCUE AND AURORA GOLD® FINE FESCUE SELECTIONS. | 20 June 2007 |
|   |   |   |
| B | AERIAL APPLICATIONS IN CALIFORNIA | 20 June 2007 |
| C | TANK MIXES FOR IMPROVED CONTROL OF BENTGRASS (Agrostis spp.) | 20 June 2007 |
| D | TANK MIXTURES FOR TOUGH TO CONTROL WEEDS | 11/1/07 |
| E | ALTERNATE INGREDIENT STATEMENT | 11/1/07 |

# SUPPLEMENTAL LABELING

READ THE ENTIRE LABEL FOR **[INSERT BRAND NAME]** BEFORE PROCEEDING WITH THE USE DIRECTIONS CONTAINED IN THIS SUPPLEMENTAL LABELING.

When using **[INSERT BRAND NAME]** as permitted according to this supplemental labeling, read and follow all applicable directions, restrictions, and precautions on the label booklet provided with the pesticide container and on this supplemental labeling. This supplemental labeling must be in the possession of the user at the time of pesticide application.

## [INSERT BRAND NAME]
Herbicide

EPA Reg. No. 524-579

Keep out of reach of children.
# CAUTION!

In case of an emergency involving this product, Call Collect, day or night, 314-694-4000.

---

**[INSERT BRAND NAME]** is a registered trademark of Monsanto Technology LLC.

---

## DIRECTIONS FOR USE

---

It is a violation of Federal law to use this product in any manner inconsistent with its labeling.

This labeling must be in the possession of the user at the time of herbicide application.

AVOID CONTACT OF HERBICIDE WITH FOLIAGE, STEMS, EXPOSED NON-WOODY ROOTS OR FRUIT OF CROPS, DESIRABLE PLANTS AND TREES, BECAUSE SEVERE INJURY OR DESTRUCTION MAY RESULT.

See "GENERAL INFORMATION" and "MIXING" sections of the label booklet for **[INSERT BRAND NAME]** for essential product performance information.

---

**[INSERT SPECIFIC DIRECTIONS FOR USE FROM FOLLOWING SECTIONS HERE]**

---

**Read the "Limit of Warranty and Liability" in the label booklet for [INSERT BRAND NAME] before using. These terms apply to this supplemental labeling and if these terms are not acceptable, return the product unopened at once.**

---

© [DATE] MONSANTO COMPANY
ST. LOUIS, MISSOURI 63167 USA

## A. LIMITATIONS ON AERIAL APPLICATION IN CALIFORNIA ONLY, INCLUDING FRESNO COUNTY, CALIFORNIA

### DIRECTIONS FOR USE

All labeled treatments may be made by aerial equipment where appropriate, provided that the applicator complies with the precautions and restrictions specified on this supplemental labeling and in the product label booklet. Refer to Aerial Equipment in the "APPLICATION EQUIPMENT AND TECHNIIQUES" section of the product label for additional information.  Refer to the individual use site section of the product label, or to other supplemental labeling or technical fact sheets published separately for this product by Monsanto, for specific use instructions.

AVOID DRIFT—DO NOT APPLY WHEN WINDS ARE GUSTY OR UNDER ANY OTHER CONDITION WHICH FAVORS DRIFT. DRIFT MAY CAUSE DAMAGE TO ANY VEGETATION CONTACTED TO WHICH TREATMENT IS NOT INTENDED. TO PREVENT INJURY TO ADJACENT DESIRABLE VEGETATION, APPROPRIATE BUFFER ZONES MUST BE MAINTAINED.

Use the following guidelines when aerial applications are made near crops or desirable perennial vegetation after bud break and before total leaf drop, and/or near other desirable vegetation or annual crops.

1.  Do not apply within 100 feet of all desirable vegetation or crop(s).

2.  If wind up to 5 miles per hour is blowing toward desirable vegetation or crop(s), do not apply within 500 feet of the desirable vegetation or crop(s).

3.  Winds blowing from 5 to 10 miles per hour toward desirable vegetation or crop(s) may require buffer zones in excess of 500 feet.

4.  Do not apply when winds are in excess of 10 miles per hour or when inversion conditions exist.

When applied as directed, under the conditions described, this product controls annual and perennial weeds listed in the label booklet.

When tank-mixing this product with 2,4-D, only 2,4-D amine formulations may be used for aerial application in California. Tank mixtures with 2,4-D amine formulations may be applied by air in California for fallow and reduced tillage systems, and for alfalfa and pasture renovation applications only.

This product, when tank-mixed with dicamba, may not be applied by air in California.

### ADDITIONAL INFORMATION FOR FRESNO COUNTY, CALIFORNIA

The following information applies only from February 15 through March 31 within the following boundaries of Fresno County, California:

| | | |
|---|---|---|
| North: | Fresno County line |
| South: | Fresno County line |
| East: | State Highway 99 |
| West: | Fresno County line |

Always read and follow the label directions and precautionary statements for all products used in the aerial application.

Observe the following directions to minimize off-site movement during aerial application of this product. Minimization of off-site movement is the responsibility of the grower, Pest Control Advisor and aerial applicator.

**Written Recommendations**

A written recommendation MUST be submitted by or on behalf of the applicator to the Fresno County Agricultural Commissioner 24 hours prior to the application. This written recommendation MUST state the proximity of surrounding crops, and that conditions of each manufacturer's product label and this label have been satisfied.

**Aerial Applicator Training and Equipment**

Aerial application of this product is limited to pilots who have successfully completed a Fresno County Agricultural Commissioner and California Department of Pesticide Regulation approved training program for aerial application of herbicides. All aircraft must be inspected, critiqued in flight and certified at a Fresno County Agricultural Commissioner approved fly-in. Test and calibrate spray equipment at intervals sufficient to insure that proper rates of herbicides and adjuvants are being applied during commercial use. Applicator must document such calibrations and testing. Demonstration of performance at Fresno County Agricultural Commissioner approved fly-ins constitutes such documentation, or other written records showing calculations and measurements of flight and spray parameters acceptable to the Fresno County Agricultural Commissioner.

**Applications at Night—**Do not apply this product by air earlier than 30 minutes prior to sunrise and/or later than 30 minutes after sunset without prior permission from the Fresno County Agricultural Commissioner.

To report known or suspected misuse of this product, call 1-800-332-3111.

For additional information on the proper aerial application of this product, call 916-784-1718.

---

### B. FOR USE FOR SELECTIVE WEED CONTROL ON [INSERT BRAND NAME] TOLERANT PURE GOLD® TALL FESCUE AND AURORA GOLD® FINE FESCUE SELECTIONS

### DIRECTIONS FOR USE

**[INSERT BRAND NAME] Tolerant Tall Fescue Selections For Seed Production**

Use this product on **[INSERT BRAND NAME]** tolerant tall and fine fescue grown for seed production only.

This product may be applied at rates of 2.5 to 9 fluid ounces per acre as a postemergence spray on **[INSERT BRAND NAME]** tolerant tall fescue selections. See the label booklet for application instructions, rate recommendations, weeds controlled and proper growth stage of weeds.

When applied postemergence, this product will control or suppress the following weeds: annual bluegrass mustards, downy brome, cheatgrass, chickweed, pennycress, fleabane, shepherd's-purse, sowthistle, wild oat, dandelion, quackgrass, and Canada thistle. See the **[INSERT BRAND NAME]** label booklet for a complete list of weeds controlled or suppressed.

**NOTE:** The recommended rate for this use will limit the level of control of certain species of weeds.

**NOTE:** Some crop discoloration and yellowing may occur at higher rates of application with **INSERT BRAND NAME]** tolerant tall and fine fescue selections. Reduction in stand of these selections may occur under stress conditions.

**Timing Of Applications**

Applications can be made 6 weeks after germination and to established crops after growth resumes in the Fall until onset of dormancy and in the Spring after dormancy break until 60 days prior to harvest.

Avoid spraying during or within two weeks after periods when air temperatures fall below 25°F.

---



Remove domestic livestock from the seed production field prior to application. Wait 60 days after making this application before grazing or harvesting the treated area.

**NOTE:** Only two applications per crop growth cycle may be made to any one site. If two applications are required, only one Fall and one Spring application may be made during one 12 month cycle.

---

## C. TANK MIXTURES FOR IMPROVED CONTROL OF BENTGRASS *(Agrostis spp.)*

### DIRECTIONS FOR USE

**[INSERT BRAND NAME]** herbicide may be tank mixed with the products listed below for improved control of bentgrass *(Agrostis* spp.). When tank mixing, read and carefully observe label directions, cautionary statements and all information on the labels of each product used. Refer to each individual product label for approved use sites.

| | |
|---|---|
| ENVOY® | FUSILADE® II |
| FUSION® | VANTAGE® |

Dry ammonium sulfate, at 1 to 2 percent by weight, may be added to the spray solution for the above applications. The equivalent rate of ammonium sulfate in a liquid formulation may also be used. Ensure that ammonium sulfate is completely dissolved in the spray tank before adding herbicides. Thoroughly rinse the spray system with clean water after use to reduce corrosion.

**Broadcast Treatment**
- Apply 1.6 to 2.2 quarts per acre of this product plus 34 fluid ounces per acre of **Envoy** in 20 to 40 gallons per acre of spray solution.
- Apply 1.6 to 2.2 quarts per acre of this product plus 24 fluid ounces per acre of **Fusilade II** in 20 to 40 gallons per acre of spray solution.
- Apply 1.6 to 2.2 quarts per acre of this product plus 60 fluid ounces per acre of **Vantage** in 20 to 40 gallons per acre of spray solution.
- Apply 1.6 to 2.2 quarts per acre of this product plus 9 fluid ounces per acre of **Fusion** in 20 to 40 gallons per acre of spray solution.

Re-treatment may be needed in the event of incomplete control.

**Spot Treatment**
- Mix 1.5 fluid ounces of this product with 1.3 fluid ounces of **Envoy** in one gallon of water and spray-to-wet.
- Mix 1.5 fluid ounces of this product with 0.75 fluid ounces of **Fusilade II** in one gallon of water and spray-to-wet.
- Mix 1.5 fluid ounces of this product with 3 fluid ounces of **Vantage** in one gallon of water and spray-to-wet.
- Mix 1.5 fluid ounces of this product with 0.25 fluid ounces of **Fusion** in one gallon of water and spray-to-wet.

**ATTENTION:** AVOID DRIFT. EXTREME CARE MUST BE USED WHEN APPLYING THIS PRODUCT TO PREVENT INJURY TO DESIRABLE PLANTS AND CROPS.

| D.  TANK MIXTURES FOR TOUGH TO CONTROL WEEDS |
| --- |

[INSERT INTO SUPPLEMENTAL LABEL TEMPLATE AS INDICATED]

DIRECTIONS FOR USE

Use in areas such as airports, apartment complexes, Christmas tree farms, commercial sites, ditch banks, dry ditches, dry canals, fencerows, golf courses, greenhouses, industrial sties, landscape areas, lumber yards, manufacturing sites, municipal sites, natural areas, office complexes, ornamentals, parks, parking areas, pastures, petroleum tank farms and pumping installations, plant nurseries, public areas, railroads, rangeland, recreational areas, residential areas, rights-of-way, roadsides, schools, sod or turf seed farms, sports complexes, storage areas, substations, turfgrass areas, utility sites, warehouse areas, and wildlife management areas.

See "GENERAL INFORMATION" and "MIXING" sections of the label booklet for [INSERT BRAND NAME] for essential product performance information.

Do not allow spray mixtures of this herbicide to mist, drip, drift or splash onto desirable vegetation since injury or destruction may occur. Do not apply when wind or other conditions favor drift.

See the "WEEDS CONTROLLED" section of the [INSERT BRAND NAME] label booklet for specific rates. For tough to control species, where dense stands occur, or where conditions for control are not ideal, 4 to 7 quarts per acre of this product can be used for improved results.

TANK MIXTURES

This product provides control of the emerged weeds listed in the label booklet. When applied as a tank mixture, the following herbicides will provide preemergence and/or postemergence control of the weeds listed in the individual product labels.

The following list of products may be tank mixed with this product, provided that the specific product is registered for application to the target site. Any labeled rate of this product may be used in a tank mixture with these products. Refer to these product labels for approved sites and application rates.

| | |
| --- | --- |
| 2,4-D[1] | Krovar I DF |
| Arsenal | Landmark II MP |
| atrazine[1] | Landmark MP |
| Barricade 65WG | Landmark XP |
| Crossbow L | Milestone |
| dicamba[1] | |
| diuron[1] | Oust XP |
| Endurance | Outrider |
| Escort | Overdrive |
| Escort XP | pendimethalin[1] |
| Gallery 75 DF | Plateau |
| Garlon 3A | Plateau DG |
| Garlon 4 | Poast |
| Goal 2XL | Quicksilver |
| Hyvar X | Ronstar 50 WSP |
| Hyvar X-L | Sahara DG |
| Krenite | simazine[1] |



Spike 80DF  
Surflan AS  
Surflan WDG  
Telar DF  

Transline  
Velpar DF  
Velpar L  

[1] Tank mixtures with products containing this generic active ingredient may be made provided the specific product is registered for this use.

Refer to the individual product labels for specific sites, rates, carrier volumes and precautionary statements.

Read and carefully observe the label claims, cautionary statements, use rates and all other information on the labels of all products used in these tank mixtures. Use according to the most restrictive precautionary statements for each product in the mixture.

Maintain good agitation at all times during the mixing process. Ensure that the tank-mix products are well mixed with the spray solution before adding this product.

Mix only the quantity of spray solution that can be used during the same day. Tank mixtures allowed to stand overnight may result in reduced weed control.

Maintain good agitation at all times until the contents of the tank are sprayed. If the spray mixture is allowed to settle, thorough agitation is required to resuspend the mixture before spraying is resumed.

When used in combination as directed by Monsanto Company, the liability of Monsanto shall in no manner extend to any damage, loss or injury not solely and directly caused by the inclusion of the Monsanto product in such combination use.

Outrider is a trademark of Monsanto Technology LLC. All other trademarks are the property of their respective owners.

---

| E.  ALTERNATE INGREDIENT STATEMENT |
|---|

[INSERT INTO SUPPLEMENTAL LABEL TEMPLATE AS INDICATED]

INGREDIENTS:

ACTIVE INGREDIENT:  
*Glyphosate, N-(phosphonomethyl)glycine, in the form of its potassium salt.................. 48.7%  
OTHER INGREDIENTS (including 8.8% surfactant):................................................. 51.3%  
                                                                                      100.0%

*Contains 660 grams per liter or 5.5 pounds per U.S. gallon of the active ingredient glyphosate, in the form of its potassium salt. Equivalent to 540 grams per liter or 4.5 pounds per U.S. gallon of the acid, glyphosate.

Product Description: This product is a postemergence, systemic herbicide with no soil residual activity. It gives broad-spectrum control of many annual weeds, perennial weeds, woody brush and trees. It is formulated as a water-soluble liquid containing 8.8 percent surfactant and no additional surfactant is needed or recommended.

---

49/49

LIST OF CHANGES THIS SUBMISSION

- Update Storage and Disposal Section for compliance with the Container Containment Rule and PR Notice 2007-4.
- Incorporate hollow stem injection supplemental label approved November 1, 2007
- General updates for clarification and consistency with previously approved glyphosate product labels
- Deleted references to Oust to only reference Oust XP as Oust is no longer marketed



**UNITED STATES ENVIRONMENTAL PROTECTION AGENCY**
**WASHINGTON, D.C.  20460**

OFFICE OF
PREVENTION, PESTICIDES

**AND**

TOXIC SUBSTANCES

JUL  1 - 2009

Ms. Dawn Fee-White
Monsanto Company,
1300 I (Eye) Street, N.W., Suite 450 East
Washington, DC 2005

Dear Ms. Fee-White:

Subject: Roundup Pro Max Herbicide (Foliar and Broadcast Treatment of Japanese
       Knotweed and Oriental Bittersweet)
       EPA Registration No. 524-579
       Application Dated April 2, 2009


The labeling referred to above, submitted in connection with registration under the Federal
Insecticide, Fungicide, and Rodenticide Act as amended is acceptable. A stamped copy of
labeling is enclosed for your records.

Sincerely,

*Zichie Kahllas for*
James A. Tompkins
Product Manager 25
Herbicide Branch
Registration Division (7505P)

# SUPPLEMENTAL LABELING

READ THE ENTIRE LABEL FOR **ROUNDUP PROMAX™ HERBICIDE** BEFORE PROCEEDING WITH THE USE DIRECTIONS CONTAINED IN THIS SUPPLEMENTAL LABELING.

When using Roundup PROMAX Herbicide as permitted according to this supplemental labeling, read and follow all applicable directions, restrictions, and precautions on the label booklet provided with the pesticide container and on this supplemental labeling. This supplemental labeling must be in the possession of the user at the time of pesticide application.

# ROUNDUP PROMAX™ HERBICIDE LOGO

## For Foliar and Broadcast Treatment of Japanese Knotweed & Oriental Bittersweet

EPA Reg. No. 524-579

Roundup PROMAX is a trademark of Monsanto Technology LLC.

Keep out of reach of children.

# CAUTION!

ACCEPTED

JUL 1 – 2009

Under the Federal Insecticide, Fungicide, and Rodenticide Act, as amended for the pesticide registered under
EPA Reg. No. 524-579

In case of an emergency involving this product,
Call Collect, day or night, (314) 694-4000.

## DIRECTIONS FOR USE

It is a violation of Federal law to use this product in any manner inconsistent with its labeling.

This label must be in the possession of the user at the time of the herbicide application.

AVOID CONTACT OF HERBICIDE WITH FOLIAGE, STEMS, EXPOSED NON-WOODY ROOTS OR FRUIT OF CROPS, DESIRABLE PLANTS AND TREES, BECAUSE SEVERE INJURY OR DESTRUCTION MAY RESULT.

See the "GENERAL INFORMATION", "MIXING AND APPLICATION INSTRUCTIONS" and "AQUATIC AND OTHER NON-CROP SITES" sections of the label booklet for Roundup PROMAX herbicide for essential product performance information.  See the "WEEDS CONTROLLED" section of the label booklet for Roundup PROMAX herbicide for optimum stage of treatment of weed for best results.

### JAPANESE KNOTWEED

For control of Japanese knotweed (*Polygonum cuspidatum*), this product may be applied as a 2.0% v/v spray-to-wet solution. Ensure thorough coverage when using spray-to-wet treatments using hand-held equipment.

For broadcast applications, apply 3.25 quarts of this product in 3 to 40 gallons per acre as a broadcast treatment.

Late summer or fall application is ideal, while leaves are still green and after fruit formation.

## ORIENTAL BITTERSWEET

For control of Oriental bittersweet (*Celastrus orbiculatus*), this product may be applied as a 1.5% v/v spray-to-wet solution. Ensure thorough coverage when using spray-to-wet treatments using hand-held equipment.

For broadcast applications, apply 2 quarts of this product in 3 to 40 gallons per acre as a broadcast treatment.

Late summer or fall application is ideal, while leaves are still green and after fruit formation.

## WARRANTY AND LIABILITY

When used in combination as recommended by Monsanto Company, the liability of Monsanto shall in no manner extend to any damage, loss or injury not directly caused by the inclusion of the Monsanto product in such combination use.

Read the "LIMIT OF WARRANTY AND LIABILITY" in the label booklet for Roundup PROMAX herbicide before buying or using this product. Those terms apply to this supplemental labeling and if those terms are not acceptable, return the product unopened at once.

© 2009 MONSANTO COMPANY
800 N. Lindbergh Blvd.
St. Louis, Missouri, 63167 U.S.A.

[Print Plate]      [Approval date]



**UNITED STATES ENVIRONMENTAL PROTECTION AGENCY**
**WASHINGTON, DC  20460**

OFFICE OF CHEMICAL SAFETY
AND POLLUTION PREVENTION

March 10, 2016

Ona E. Maune
Federal Regulatory Affairs Manager
Monsanto Company
1300 I Street NW Suite 450 East
Washington, DC 20005


Subject:        Label Amendment – Label Format Changes
                    Product Name: RD 1687 Herbicide
                    EPA Registration Number: 71995-51
                    Application Date: 12/18/2014
                    Decision Number: 499010


Dear Ms. Maune:

The amended label referred to above, submitted in connection with registration under the Federal Insecticide, Fungicide and Rodenticide Act, as amended, is acceptable. This approval does not affect any conditions that were previously imposed on this registration. You continue to be subject to existing conditions on your registration and any deadlines connected with them.

A stamped copy of your labeling is enclosed for your records. This labeling supersedes all previously accepted labeling. You must submit one copy of the final printed labeling before you release the product for shipment with the new labeling. In accordance with 40 CFR 152.130(c), you may distribute or sell this product under the previously approved labeling for 18 months from the date of this letter. After 18 months, you may only distribute or sell this product if it bears this new revised labeling or subsequently approved labeling. "To distribute or sell" is defined under FIFRA section 2(gg) and its implementing regulation at 40 CFR 152.3.

Should you wish to add/retain a reference to the company's website on your label, then please be aware that the website becomes labeling under the Federal Insecticide Fungicide and Rodenticide Act and is subject to review by the Agency. If the website is false or misleading, the product would be misbranded and unlawful to sell or distribute under FIFRA section 12(a)(1)(E). 40 CFR 156.10(a)(5) list examples of statements EPA may consider false or misleading. In addition, regardless of whether a website is referenced on your product's label, claims made on the website may not substantially differ from those claims approved through the registration process. Therefore, should the Agency find or if it is brought to our attention that a website contains false or misleading statements or claims substantially differing from the EPA approved registration, the website will be referred to the EPA's Office of Enforcement and Compliance.

Page 2 of 2
EPA Reg. No. 71995-51
Decision No. 499010

Your release for shipment of the product constitutes acceptance of these conditions. If these conditions are not complied with, the registration will be subject to cancellation in accordance with FIFRA section 6. If you have any questions, please contact Sarah Meadows by phone at 703-347-0505, or via email at meadows.sarah@epa.gov.

Sincerely,

Reuben Baris, Product Manager 25
Herbicide Branch
Registration Division (7505P)
Office of Pesticide Programs

Enclosure

## MASTER LABEL FOR EPA REG. NO. 71995-51

Primary Brand Name:

**RD 1687 Herbicide**

Alternate Brand Names:

**Roundup® Ready-To-Use Max Control 365**
**Roundup® Ready-To-Use 365 Weed & Grass Killer Plus Weed Preventer**

---

*Editorial Notes:*
*Bold, italicized text is information for the reader and is not part of the label.*
Bracketed text [ ] is optional text and a 'place holder' for graphics.
Text separated by a backslash '/' denotes 'and/or' options.
Note: Duration references of 1 Year= 12 Months= 52 Weeks= 365 Days can be used throughout the label.
*Refer to APPENDIX 1 for Consolidated List of Label Claims; APPENDIX 2 for Packaging Related Claims; and APPENDIX 3 for Packaging Related Instructions.*

---

[Insert Brand Name and Logo]

[Insert Claims from Appendix 1 or 2] [Insert Graphics]

**ACTIVE INGREDIENTS:**
Glyphosate, isopropylamine salt[†] .................................................................. 1.00%
Imazapic, ammonium salt[††]…………………………………………………………… 0.08%
Diquat dibromide ......................................................................................... 0.04%
**OTHER INGREDIENTS** ........................................................................... 98.88%
**TOTAL** .................................................................................................. **100.00%**

[†]Contains 0.06 lb. glyphosate acid equivalent and [††] 0.006 lb. imazapic acid equivalent per US gallon.

Keep Out of Reach of Children

# CAUTION

See [back/ side] [panel/ booklet/ label] for additional precautionary statements.
*Alternative Text:* [See container label for [complete] use directions and additional precautionary statements.]

NET [Insert Net contents FL OZ or GAL, see Appendix 2] [Insert Metric Conversion]
*Net contents of final printed labeling based on various commercial sizes to be marketed*

[Insert 2D code/ PPN code/ LB code]



**ACCEPTED**
03/10/2016
Under the Federal Insecticide, Fungicide and Rodenticide Act as amended, for the pesticide registered under
EPA Reg. No. 71995-51

*Optional Instructions for Booklet*
OPEN/ ABRA
Open Booklet for Assembly and Use Instructions
Open booklet for details
Press to Reseal
Resealable Label for Directions & Precautions

---

*Optional text for Pump '**N Go® 2 Sprayer*** [Insert Logo/ Graphics]

[The FAST and EASY Way to Kill and Prevent Weeds for up to 12 Months!] [Insert Claims from Appendix 1 or 2]
- [[The] Pump 'N Go® 2 sprayer provides up to [10/ insert length of spray time] minutes of continuous spray!]
- [Extendable wand provides greater accuracy without bending over.]

[Connect/ Extend/ Pump [insert# of time]/ Spray/ Store/ Depressurize/ Retighten to Store] [Insert Graphics for each step]

---

[**DID YOU KNOW?**]
[People and pets may enter treated area after spray has dried]
[Insert Claims from Appendix 1 or 2]
[Insert Graphics]

[**Use this product in areas where control of vegetation is desired for up to** [**1 year/ 12 months/ 365 days**]. **It is not for use on lawns, on or around fruits, vegetables, flowers, trees, shrubs or other plants, or over the root zones of desirable vegetation.**]

**IMPORTANT!** To prevent new weeds and grasses from growing, YOU MUST SPRAY THE ENTIRE AREA you want to control, NOT JUST the emerged weeds.

*Optional Roundup® Graphics Wheel with the following Where To Use, What To Know and How To Use components*

**WHERE TO USE** [Insert Graphics]
[[Yellow color/ insert color] represents area to be sprayed to receive up to [1 year/ 12 month] weed-free control.]
[[NOTE:] Product goes on clear and will not stain. [Insert color] [highlight/ color] shown for illustration purposes only.]
- [Driveway [&/ and] Sidewalk Cracks]
- [Patios [&/ and] Paths]
- [Along Fences [&/ and/ Curbs]]
- [Gravel Areas]

**WHAT TO KNOW** [Insert Graphics]
- [Rainproof in 30 Minutes]
- [Visible Results in 12 Hours]
- [Covers Up To [insert value from Appendix 2] sq ft]
- [Plant [12 months/ 1 Year] After Application[*] [[*] (see booklet for details)]

**HOW TO USE** [Insert Graphics] *Select applicable packaging type below*

---

***Battery Operated Sprayer Containers*** [Insert Graphics]
Connect Hose
Extend [Wand/ Insert Applicator Name]
[Add /Cone/ Dome/ Guard/ Shield]
Twist Nozzle [and/ &] Spray [Weeds]

***Pump 'N Go® 2 Sprayer Containers*** [Insert Graphics]
[Connect Hose & Extend Wand]
[Pump & Spray [Weeds]]

***Quick Connect Sprayers*** [Insert Graphics]
Pull Tubing Out
Insert Into Cap [(until it clicks)]
[Flip Cap Up/ Flip Up Spout/ [Turn/ Twist] [Spout/ Knob] to ON/ Pull Spout Up]
Adjust Spray Nozzle
[&/ Spray/ Weeds]

***Refill Containers*** [Insert Graphics]
Pour Refill Into [Empty/ Insert Packaging Type] Container
[or] [Connect/ Reuse/ Transfer] [Insert Applicator Name/ Wand] [on/ to/ this] [Container/ Bottle]
[Do NOT Add Water [Picture of Droplet]]

***Trigger Sprayers*** [Insert Graphics]
Adjust Nozzle
Spray Weeds [You Want To Kill]

---

[**DO NOT USE:**
In areas that will be planted or seeded within 1 year [(*see booklet for details)]]

***Anti-theft device statement:*** [This bottle [may] contain[s] an anti-theft device[, either inside or on the back of the bottle]. [It does not affect product performance.]]

©[Insert Year] [MONSANTO COMPANY] [Insert Company Name]
[Produced/ Manufactured/ Distributed] [for/ by]] [Monsanto Company
Lawn & Garden Products] [Insert Company Name]
[P.O. Box 418 Marysville, OH 43041] [Insert Address]
[www.roundup.com]

EPA Reg. No. 71995-51
EPA Est. 239-IA-3[I], 239-MS-001[M] [Insert Additional Establishments]
Superscript is first letter of lot number

[Made in/ Manufactured in/ Produced in/ Assembled in/ Product of] [USA/ [Insert Country]] [with [insert# %] or more US parts/ with over [insert# %] US parts/ with foreign and domestic parts]]

[Insert 2D code/ PPN code/ LB code] [Insert UPC Barcode/ Proof of Purchase]

[Insert LOT number or LOT number will be printed directly on the container]

*Inside Back Booklet Label:*

*Pump 'N Go® 2 Sprayer Container Only: Insert 'HOW TO ASSEMBLE AND USE INSTRUCTIONS' from Appendix 3*

*Optional Section:*
**PRODUCT FACTS**

[**WHAT IT DOES**]

[**KILLS** [**AND**/ **&**] **PREVENTS ALL TYPES** OF [TOUGH] WEEDS [AND/ &] GRASSES] [including [Insert from Weed List] [for up to 1 year]

[[Kills/ Controls] common weeds [and/ &] grasses [brush] [including/ such as] *Alternative Text:* [[Common] Weeds [grasses/ [&/ and]/ brush] controlled [include:]] [Bermudagrass, Black Medic, Buckhorn Plantain, Buttercup, Common Purslane, Curly Dock, Crabgrass, Dandelion, Kentucky Bluegrass, Lambsquarters, Morning Glory, Perennial Ryegrass, Spotted Spurge, Fescue, White Clover, and Yellow Nutsedge [Insert from Weed List] [and other broadleaf [and/ &] grassy weeds [brush]]].

[Insert Graphic of grassy, broadleaf and woody weeds]

[[Container] [covers/ treats] up to [insert X value from Appendix 2] sq ft.

[Insert Claims from Appendix 1 or 2]

[This product is intended for use in areas where control of vegetation is desired for up to 1 year. It is not for use on lawns, on or around fruits, vegetables, flowers, trees, shrubs or other plants, or over the root zones of desirable vegetation.]


**HOW IT WORKS** [Insert Graphics]
**IMPORTANT: To prevent new weeds and grasses from growing, YOU MUST SPRAY THE ENTIRE AREA you want to [control/ keep free of weeds], NOT JUST the [emerged/ existing] weeds.**

[**Insert Brand Name/ This Product**] [**Dual Action**/ **Formula**] **Works** [**2**/ **Two**] **Ways:**
1.  [[Glyphosate/ Insert Brand Name/ This product] [is absorbed by the weed's leaves/ enters plants through the foliage]. It moves through the weed to the root, stopping the production of an essential enzyme found in plants [, but not in humans or animals].]
    [Both glyphosate and diquat cause weeds to begin to yellow and wilt within [12] hours, with complete kill in 1 to 2 weeks.]
    [Weeds die, roots and all – so they don't grow back.]

2.  [Imazapic [prevents new weeds from growing for up to 1 year by creating an invisible barrier in the soil.]
    *Alternate text:* [Imazapic [creates/ provides] an invisible barrier in the soil that prevents growth of [new] [weeds/ seeds/ and grasses] [from/ sprouting/ germinating/ appearing/ growing] for up to 1 year.]


**DIRECTIONS FOR USE**

It is a violation of Federal law to use this product in a manner inconsistent with its labeling. Always read and follow label directions.

**WHERE TO USE** [Insert Graphics]
[Apply/ spray] [Insert brand name/ this product] to BOTH existing weeds **and** [weed-prone] areas where weeds have not yet appeared. [Treated areas stay/ Keeps treated areas] weed free for up to 1 year.
*Alternate text:* [Apply only where you want to kill existing weeds AND prevent future weed growth for up to 1 year, such as:]
- On cracks and crevices in [driveways/ sidewalks/ and/ walkways]
- Patios and paths
- [Along fences/ fence lines] [foundations/ and/ curbs]
- [Gravel areas /gravel pathways/ [RV and boat] parking areas/ decorative rock]
- [Along retaining walls and landscape borders]
- [On [walkways/ driveways/ gravel pathways/ [RV and boat] parking areas/ under decks/ and/ [brick/ paver] patios/ paths]]

[**NOTE:**] In heavy clay soils, plant growth may be prevented for more than one year. In areas of heavy rainfall, applications every 6-8 months may be necessary. To avoid damage to desirable plants, DO NOT apply over their root systems. For shrubs and trees, DO NOT apply closer than twice the distance from the trunk to the drip line as roots may be within this area. [Insert Graphic showing tree drip line]

**WHERE NOT TO USE** [Insert Graphics]

- DO NOT SPRAY plants or grasses you like – they will die.
- DO NOT USE in areas that will be planted or seeded within 1 year.
- DO NOT SPRAY landscaped areas around young plants or in areas next to any desirable plants or grasses.
- DO NOT USE over the root zone of desirable trees or shrubs.
- DO NOT USE on steep slopes as movement on soil surface may damage desirable plants down the slope.
- DO NOT SPRAY next to a fence if desirable plants and grasses are growing on the other side.
- DO NOT USE in lawns or for lawn renovation as this product prevents desirable grasses from growing too.
- DO NOT USE for vegetable garden preparation or in and around fruits and vegetables.

**NOTE:** For weed control in these areas use an EPA registered product approved for the use sites listed above; such as [Insert Brand Name for EPA# 71995-33] [or] [Insert Brand Name for EPA# 71995-25].

---

*For Quick Connect, Battery Operated Sprayers and Refill Containers Only:*
*HOW TO ASSEMBLE AND USE INSTRUCTIONS*
*[Insert Applicator Name or Packaging Type/ Directions] [Insert Instructions & Graphics from Appendix 3]*

*For Ready-To-Use Refill Containers Only*
[**REFILL DIRECTIONS**]
[This product can be used as a refill in [2/ two) ways:] [1.] Use this product to refill the empty [Insert Brand Name for EPA# 71995-51] container by pouring product carefully and directly into the container. DO NOT add water. [2.] [Insert Applicator Name] can be reused with this [refill] [bottle/ container]. Follow the instructions below to disconnect the [Insert Applicator Name/ wand] from the [empty] [bottle/ container] and reconnect to the cap on this [bottle/ container].]

**HOW TO APPLY** [Insert Graphics] *Select applicable packaging type below*

*Pump 'N Go® 2 and Battery Operated Sprayers*

- Follow illustrations and/or instructions in the How to Assemble and Use Instructions section to prime the sprayer.
- Spray the existing weeds AND the entire surrounding weed-prone area you want to keep [weed free/ free of weeds] for up to 1 year. Spray the area until **thoroughly wet**.
  *Alternate Text:* [To keep areas weed free for up to 1 year, spray the [entire/ desired/ weed-prone] area until **thoroughly wet**.]
  *Alternate Text:* [Spray [existing/ emerged] weeds and the entire surrounding [weed-prone] area where weeds or grasses you want to kill normally appear until **thoroughly wet**. Spray only the areas you want keep free of weeds for up to1 year].
- When applying [this product] to [targeted/ weed-prone/ treatment] areas, shield desirable plants from drift with a sheet of cardboard or plastic.] If desirable plants are accidentally sprayed, rinse off immediately with water [or cut off the treated area].

*Quick Connect Sprayers and Trigger Sprayers*

- Adjust [sprayer] nozzle to the desired spray setting [(Spray or Stream)].
- Spray the existing weeds AND the entire surrounding weed-prone area you want to keep [weed free/ free of weeds] for up to 1 year. Spray the area until **thoroughly wet**.
  *Alternate Text:* [To keep areas weed free for up to 1 year, spray the [entire/ desired/ weed-prone] area until **thoroughly wet**.]
  *Alternate Text:* [Spray [existing/ emerged] weeds and the entire surrounding [weed-prone] area where weeds or grasses you want to kill normally appear until **thoroughly wet**. Spray only the areas you want keep free of weeds for up to1 year].
- When applying [this product] to [targeted/ weed-prone/ treatment] areas, shield desirable plants from drift with a sheet of cardboard or plastic.] If desirable plants are accidentally sprayed, rinse off immediately with water [or cut off the treated area].

**WHEN TO APPLY** [Insert Graphics]

- For best results, apply during warm, sunny weather above 60° F [to accelerate systemic movement from foliage to roots].
- [Apply/ Spray] when air is calm to prevent drift to desirable plants.
- RAINPROOF [Protection]: Rain or watering 30 minutes after application will NOT wash away effectiveness.
  ***Alternative Text:*** [Insert Brand Name] is Rainproof in 30 minutes.]
- [Weeds yellow and wilt within 12 hours with complete kill in 1 to 2 weeks.]

**APPLICATION RESTRICTIONS:** Do not apply this product in a way that will contact any person or pet, either directly or through drift. Only persons applying this product may be in the area during application.

---

**User Safety Recommendations:**
- Clothing and protective equipment exposed to this product should be washed in detergent and hot water. Such items should be kept and washed separate from other laundry.
- Users should wash hands before eating, drinking, chewing gum, using tobacco, or using the toilet.
- Users should remove clothing immediately if product gets inside; then wash thoroughly and put on clean clothing.

---

**Entry Restrictions:** People and pets must not touch treated plants or enter treated areas until after spray has dried.

**WHEN TO REPLANT** [Insert Graphics]

All ornamental bedding plants [(annuals and perennials)], trees, shrubs, sod and seed [(flowers and grasses)] can be planted **1 year after** application.

***Optional Section:***
**HOW TO REFILL**

***For Ready-To-Use Containers with Applicators Intended to be Reused/ Refilled***

- This container and sprayer can be reused.
- To refill this empty container, pour product carefully and directly from the [Insert Brand Name for EPA# 71995-51] container designated as the ready-to-use refill container. DO NOT add water.
- Use [Insert brand name for EPA# 71995-49] to refill the container. [Insert Applicable Container Size Instructions from List below]

***24 fl oz Trigger Sprayer:***
Add 1.125 fl oz (7 Tsp) of [Insert brand name for EPA# 71995-49] to this empty container and then fill with water slowly to avoid foaming.

***64 fl oz:***
Add 3 fl oz (6 Tbs) of [Insert brand name for EPA# 71995-49] to this empty container and then fill with water slowly to avoid foaming.

***1 Gallon:***
Add 6 fl oz (12 Tbs) of [Insert brand name for EPA# 71995-49] to this empty container and then fill with water slowly to avoid foaming.

***1.33 Gallon:***
Add [the pre-measured bottle] [8 fl oz (16 Tbs)] of [Insert brand name for EPA# 71995-49] to this empty container and then fill with water slowly to avoid foaming.

***1.5 Gallon:***
Add 9 fl oz (18 Tbs) of [Insert brand name for EPA# 71995-49] to this empty container and then fill with water slowly to avoid foaming.

***For Battery Operated Sprayers with Wand containers***
- The [Insert Applicator Name/ wand] can be reused with the [Insert Brand Name for EPA# 71995-51] refill [bottle/ container]. Read and follow instructions in REFILL DIRECTIONS section to reuse the [Insert Applicator Name/ wand/ applicator].

*Optional Section: Battery Operated Sprayer ONLY Select Any of the Options Below*
**HOW TO CLEAN:**

- [Battery operated [wand/ Insert Applicator Name] may be used with other Roundup brand products, it will replace any sprayer fitted with a quick-connect cap.]
  ***Alternative Text:*** [Before using the [wand/ Insert Applicator Name] with other Roundup brand products, clean the sprayer thoroughly.]
- [Disconnect sprayer unit from the [quick-connect/ bottle] cap.]
- [Place ONLY the end of the hose into a bucket of water and spray continuously for 30 seconds onto [bare soil or gravel/ treated area].]
  ***Alternative Text:*** [Rinse sprayer and sprayer parts including the [hose/ cone/ dome/ guard/ shield] with water 3 times. Spray rinse water on [bare soil or gravel/ treated area]. Discard empty sprayer bottle as instructed in DISPOSAL section.]
  ***Alternative Text:*** [Rinse sprayer with water 3 times and then spray [clean] water through sprayer for 30 seconds.] [Spray rinse water on [bare soil or gravel/ treated area].
- [Connect [wand/ Insert Applicator Name] to any Roundup brand product with a quick-connect cap.]
- [Failure to properly clean sprayer before using with other Roundup brand products may cause damage to your plants.]

---

*Optional Section: Select from the list below*
**KILLS AND PREVENTS ALL TYPES OF [TOUGH] WEEDS AND GRASSES** [Insert Graphics]

Kills and prevents [insert from the list below] [and other broadleaf/ [and/ &] grassy weeds] [for up to 1 year].

***Alternative Text:*** [Controls [common] weeds and grasses [brush] [including]/ [Common] Weeds [grasses/ [&/ and]/ brush] controlled [include:]] [Bermudagrass, Black Medic, Buckhorn Plantain, Buttercup, Common Purslane, Curly Dock, Crabgrass, Dandelion, Kentucky Bluegrass, Lambsquarters, Morning Glory, Perennial Ryegrass, Spotted Spurge, Fescue, White Clover, and Yellow Nutsedge [insert from the list below] [and other broadleaf [and/ &] grassy weeds [brush]]].

**Annual Weed Control** *Alternative Text:* [Annuals/ **Annual Weeds**/ [&/and]/ **Grasses**] [(Continued)]

| | | | |
|---|---|---|---|
| Annual Ryegrass | Diffuse Lovegrass | Kochia | Sowthistle (annual) |
| Barnyardgrass | Dog Fennel | Lambsquarters | Spotted Spurge |
| Bittercress | Evening Primrose | Little Bitter Cress | Sprangletop |
| Black Medic | Fall Panicum | London Rocket | Stinkgrass |
| Black Nightshade | Fiddleneck | Maiden Cane | Sunflower |
| Bluegrass (annual) | Field Pennycress | Mallow | Swinecress |
| Blue Mustard | Field Sandbur | Mayweed | Tansy Mustard |
| Blue Toadflax | Filaree | Morning Glory (annual) | Tansy Ragwort |
| Brassbuttons | Florida Pusley | Pennsylvania Smartweed | Teaweed |
| Bromegrass | Garden Spurge | Prickly Lettuce | Texas Panicum |
| Buckwheat | Giant Foxtail | Prostrate Spurge | Tumble Mustard |
| Bur Clover | Giant Ragweed | Puncture Vine | Velvetleaf |
| Burcucumber | Goosegrass | Purslane | Virginia Pepperweed |
| Buttercup | Green Foxtail | Purslane Speedwell | Wild Buckwheat |
| Carolina Geranium | Hairy Nightshade | Redroot Pigweed | Wild Mustard |
| Cheat | Hemp Sesbania | Russian Thistle | Wild Oats |
| Chickweed (Common) | Henbit | Sandspur | Wild Proso Millet |
| Chickweed (Mouseear) | Horseweed/ Marestail | Shattercane | Witchgrass |
| Cocklebur | Itchgrass | Shepherd's-purse | Wooly Cupgrass |
| Common Groundsel | Jimsonweed | Sicklepod | Yellow Foxtail |
| Crabgrass | Junglerice | Smooth Cat's Ear | Yellow Rocket |
| Creeping Beggarweed | Knotweed | Smooth Pigweed | |

**[Tough]** **Perennial Weed Control** *Alternative Text:* [**Perennials**/ **Perennial Weeds**/ **Grasses**/ [**&/and**]/ **Tough**/ **Brush**] [(Continued)]

| | | | |
|---|---|---|---|
| Alder | Dallisgrass | Maple | Smooth Bromegrass |
| Artichoke Thistle | Dandelion | Milkweed | Sourwood |
| Ash | Dewberry | Nimblewill | Sowthistle (perennial) |
| Aspen (quaking) | Dogwood | Nutsedge | Spurred Anoda |
| Bahiagrass | Dollarweed | Oak | St. Augustinegrass |
| Bamboo | Elderberry | Oldenlandia | Sumac |
| Bermudagrass | Elm | Orchardgrass | Swamp Smartweed |
| Blackberry | Eucalyptus | Oxalis | Sweetgum |
| Blackgum | False Dandelion | Pampasgrass | Tan Oak |
| Black Locust | Fennel | Pennywort | Thimbleberry |
| Bluegrass (Kentucky) | Fescue species | Perennial Ryegrass | Timothy |
| Bluegum Eucalyptus | Field Bindweed | Persimmon | Torpedograss |
| Brackenfern | Giant Reed | Pine | Tree Tobacco |
| Broadleaf Plantain | Guineagrass | Poison Hemlock | Trumpetcreeper |
| Broom (French, Scotch) | Hawthorn | Poison Ivy | Vaseygrass |
| Buckhorn Plantain | Hazel | Poison Oak | Virginia Creeper |
| Canada Thistle | Hemp Dogbane | Poison Sumac | White Clover |
| Cattail | Honeysuckle | Poplar | Whitetop |
| Ceanothus | Horsenettle | Primrose | Wild Barley |
| Chamise | Horseradish | Purple Nutsedge | Wild Blackberry |
| Cherry | Iceplant | Quackgrass | Wild Oats |
| Cogongrass | Johnsongrass | Raspberry | Wild Rose (multiflora) |
| Common Mullein | Kikuyugrass | Ragweed (Common) | Wild Sweet Potato |
| Common Pokeweed | Knapweed | Red Clover | Wild Violet |
| Corn Speedwell | Kudzu | Redvine | Willow |
| Coyote Brush | Lantana | Reed Canarygrass | Wirestem Muhly |
| Creeping Bentgrass | Leafy Spurge | Sage | Yellow ~~Nutgrass~~ Nutsedge |
| Creeping Charlie | Locust | Salmonberry | Yellow Poplar |
| Crowfootgrass | Lovegrass | Saltcedar | Yellow Starthistle |
| Curly Dock | Madrone | Sassafras | Zoysia |

[**NOTE**:  Heavy lawn grass or well established difficult to control weeds, such as Bermudagrass, Nimblewill, Dandelion, or Canada Thistle may require a repeat application.]

**STORAGE AND DISPOSAL** *Select applicable packaging type below:*

*Battery Operated Sprayer Containers:*

**PESTICIDE STORAGE:** Flip spout down. *Alternative Text:* [Close [Insert Color] spout on cap/ [Turn/ Twist] [spout/ knob] on cap to OFF/ Push spout down]. **NO NEED TO DISCONNECT SPRAYER HOSE FROM CAP.** Close nozzle on trigger sprayer. [Engage trigger lock.] [Retract and] Flip the [wand/ Insert Applicator Name] closed and place back in side [carrier/ clip/ holder]. Store product in original container in a safe place away from direct sunlight. Keep from freezing. If frozen, allow to thaw and shake well before using.

*Non-Sprayer (Refill) Containers:*

**PESTICIDE STORAGE:** Store product in original container in a safe place away from direct sunlight. Keep from freezing. If frozen, allow to thaw and shake well before using.

*Pump 'N Go® 2 Sprayer Containers:*

**PESTICIDE STORAGE:** Push the [Insert Color/ yellow] button and retract the wand until the [Insert Color/ yellow] button snaps back into the original STORAGE POSITION. Place wand back onto [the top of] the bottle [in the integrated holster] with nozzle [facing down/ tip extended through the eyelet opening]. Push pump handle all the way down and turn pump handle and cap counter-clockwise to relieve pressure, then retighten to store. Store product in original container in a safe place away from direct sunlight. Keep from freezing. If frozen, allow to thaw and shake well before using.

*Quick Connect Sprayer Containers:*

**PESTICIDE STORAGE:** Flip spout down. *Alternative Text:* [Close [Insert Color] spout on cap/ [Turn/ Twist] [spout/ knob] on cap to OFF/ Push spout down]. **NO NEED TO DISCONNECT TRIGGER SPRAYER.** Close nozzle on trigger sprayer. Snap sprayer back in place. *Alternative Text:* [Place sprayer back in side [carrier/ clip/ holder]. Store product in original container in a safe place away from direct sunlight. Keep from freezing. If frozen, allow to thaw and shake well before using.

*Trigger Sprayer Containers:*

**PESTICIDE STORAGE:** Rotate nozzle to closed position. Store product in original container in a safe place away from direct sunlight. Keep from freezing. If frozen, allow to thaw and shake well before using.

*For Containers <u>with</u> Refill Instructions:*

**PESTICIDE DISPOSAL AND CONTAINER HANDLING:** Nonrefillable container. Do not reuse or refill this container unless the directions for use allow a different concentrated or ready-to-use product to be diluted in or poured directly into the container. Reuse or refill this container according to the directions contained in the [HOW TO REFILL] section.

*For Containers <u>without</u> Refill Instructions:*

**PESTICIDE DISPOSAL AND CONTAINER HANDLING:** Nonrefillable container. Do not reuse or refill this container. [Insert Applicator Name/ Comfort Wand/ Sure Shot Wand] can be reused with [this] [Insert Brand Name for EPA# 71995-51] [refill] [bottle/ container]. [Follow instructions in the REFILL DIRECTIONS section when reusing the [Insert Applicator Name/ wand].

*ALL Packaging Types:*

**If Empty:** Place in trash or offer for recycling, if available. **If Partly Filled:** Call your local solid waste agency [or Insert Telephone Number] for disposal instructions. Never place unused product down any indoor or outdoor drain.

**PRECAUTORY STATEMENTS** [Insert Graphics]

**HAZARDS TO HUMANS & DOMESTIC ANIMALS**

**KEEP OUT OF REACH OF CHILDREN**

CAUTION: Causes moderate eye irritation. Avoid contact with eyes or clothing. Wash thoroughly with soap and water after handling.

[Re-entry icon]

People and pets must not touch treated plants or enter treated areas until after spray has dried.

| **FIRST AID** | | |
|---|---|---|
| **IF IN EYES** | • | Hold eye open and rinse slowly and gently with water for 15-20 minutes. |
| | • | Remove contact lenses, if present, after first 5 minutes, then continue rinsing eyes. |
| | • | Call a poison control center [Insert Telephone Number] or doctor for treatment advice. |
| **EMERGENCY MEDICAL INFORMATION** | | |
| • Have the product container or label with you when calling a poison control center or doctor, or going for treatment. | | |
| • You may contact [Insert Telephone Number] for emergency medical treatment information. | | |
| • This product is identified as [**Insert Brand Name**], **EPA Reg. No. 71995-51**. | | |

**ENVIRONMENTAL HAZARDS:**

To protect the environment, do not allow pesticide to enter or run off into storm drains, drainage ditches, gutters or surface waters.  Applying this product in calm weather when rain is not predicted for the next 24 hours will help to ensure that wind or rain does not blow or wash pesticide off the treatment area. Diquat is toxic to aquatic invertebrates. Do not apply directly to water. Imazapic demonstrates the properties and characteristics associated with chemicals detected in ground water. The use of this product in areas where soil is permeable, particularly where the water table is shallow, may result in groundwater contamination.

**NOTICE:**  To the extent consistent with applicable law, buyer assumes all responsibility for safety and use not in accordance with directions.

[Guaranteed Satisfaction.*]

*Optional Section*
***CONSUMER GUARANTEE**

If for any reason you are not satisfied after using this product, simply send us original proof of purchase and we will [replace the product or] refund the purchase price.

***Optional Section***
**ROUNDUP BRAND FAMILY OF PRODUCTS**

Visit the Roundup website, [www.roundup.com], to learn more about the Roundup brand family of products for the best solutions to your toughest weed problems.

***Alternative Text:*** [**Roundup® Lawn & Garden products have the best solutions to your toughest weed problems**.] [**Visit the Roundup website, [**www.roundup.com**], to learn more about the Roundup brand family of products.**]]

[Insert Graphic- Roundup Product Family Photo]

• [Roundup Extended Control Weed & Grass Killer products] [– kill & prevent weeds for up to 4 months]
• [Roundup Max Control 365 products] [– kill & prevent weeds for up to [1 year/ 12 months]]
• [Roundup Ready-To-Use Weed & Grass Killer III/ Insert Brand Name for EPA# 71995-33] [– no mixing, no mess]
• [Insert Brand Name for EPA# 71995-33] [– kill weeds, protect desirable plants.]
• [Roundup Poison Ivy Plus Tough Brush Killer products] [– kill tough, brushy, hard-to-control weeds]
• [Roundup Wild Blackberry Plus Vine & Brush Killer products] [– kill tough brush & vines]
• [Insert Brand Name for EPA# 71995-29] [– [fast visible results]
• [Insert Brand Name for EPA# 71995-25] [– best Roundup brand concentrate value]
• [Insert Brand Name for EPA# 71995-60] [– targets hard to spray weeds]

***Optional Spanish Translations:***

[Insert generic logo and brand name in English & Spanish]

[Insert Label Language in Spanish as Applicable]

***Base Label Information:***

[Insert generic logo and brand name in English & Spanish]

***Insert applicable instruction along side of base label:***
[Resealable Label for Directions & Precautions / Etiqueta resellable de instrucciones y avisos de precaución.]
***Alternative Text:*** [Open Booklet for Assembly and Use Instructions / Abra la etiqueta para las instrucciones para ensamblar y para usar.]

---

**PRECAUTIONARY STATEMENTS**

---

**HAZARDS TO HUMANS & DOMESTIC ANIMALS**

**KEEP OUT OF REACH OF CHILDREN**

**CAUTION:** Causes moderate eye irritation. Avoid contact with eyes or clothing. Wash thoroughly with soap and water after handling.

[Re-entry icon]

People and pets must not touch treated plants or enter treated areas until after spray has dried.

| FIRST AID | |
|---|---|
| **IF IN EYES** | • Hold eye open and rinse slowly and gently with water for 15-20 minutes. |
| | • Remove contact lenses, if present, after first 5 minutes, then continue rinsing eyes. |
| | • Call a poison control center [Insert Telephone Number] or doctor for treatment advice. |
| **EMERGENCY MEDICAL INFORMATION** | |
| • Have the product container or label with you when calling a poison control center or doctor, or going for treatment. | |
| • You may contact [Insert Telephone Number] for emergency medical treatment information. | |
| • This product is identified as [**Insert Brand Name**], **EPA Reg. No. 71995-51**. | |

**ENVIRONMENTAL HAZARDS:**

To protect the environment, do not allow pesticide to enter or run off into storm drains, drainage ditches, gutters or surface waters. Applying this product in calm weather when rain is not predicted for the next 24 hours will help to ensure that wind or rain does not blow or wash pesticide off the treatment area. Diquat is toxic to aquatic invertebrates. Do not apply directly to water. Imazapic demonstrates the properties and characteristics associated with chemicals detected in ground water. The use of this product in areas where soil is permeable, particularly where the water table is shallow, may result in groundwater contamination.

***Insert Applicable Storage and Disposal Statements from Section above per Packaging Type***

[Insert phone & computer icons]
Questions, Comments or Information
1-800-246-7219         www.roundup.com
Preguntas, Comentarios o Información

©[Insert Year] [MONSANTO COMPANY] [Insert Company Name]
[Produced/ Manufactured/ Distributed] [for/ by]] [Monsanto Company
Lawn & Garden Products] [Insert Company Name]
[P.O. Box 418 Marysville, OH 43041] [Insert Address]

EPA Reg. No. 71995-51
EPA Est. 239-IA-3[I], 239-MS-001[M] [Insert Additional Establishments]
Superscript is first letter of lot number

[Made in/ Manufactured in/ Produced in/ Assembled in/ Product of] [USA/ [Insert Country] [with [insert# %] or more US parts/ with over [insert# %] US parts/ with foreign and domestic parts]]

***Anti-theft device statement:*** [This [bottle/ package] [may] contain[s] an anti-theft device [, either inside or on the back of the [bottle/ package]]. [It does not affect product performance.]]

[Insert Relevant Trademark Disclosure Statement(s)]

[Insert Relevant Patent Information Statement(s)] [For a list of patents, if any, covering this product or its use, please go to [insert patent website/ www.monsantotechnology.com/lawnandgarden].]

[Insert 2D Code/ PPN code/ Insert LB code] [UPC Code/ Proof of Purchase]

**APPENDIX 1:  Consolidated List of Label Claims**

- ***Product guarantee statement for use throughout*** [Guaranteed Satisfaction/ Consumer Guarantee] If for any reason you are not satisfied after using this product, simply send us the original proof of purchase and we will [replace the product or] refund the purchase price.
- 2 in 1 [kills and prevents]
- Absorbed into both broadleaf and grassy weeds
- Absorbs on contact, starts working immediately
- Absorbed through the leaves, it goes all the way to the root for total kill [on weeds you directly spray]
- Apply [one time/ once] to kill and prevent [for up to/ 1 year/ 365/ 12 months]
- Before [Insert Graphic of live weed] / After [Insert Graphic of dead weed]
- Begins absorbing on contact
- Begins to work in [Insert value between 1 and 24] hours
- Begins working in hours
- Binds to soil and prevents weeds where applied
- Blocks weed[s] [growth]/ [for up to/ 1 year/ 12 months]
- [Can be used [on/ along]/ For use [on/ along]] [cracks/ and/ crevices/ in] [driveways/ sidewalks/ walkways/ driveway cracks/ sidewalk cracks/ brick/ paver/ patios/ paths/ gravel [areas/ paths/ driveways]/ decorative rock/ fences/ foundations/ curbs/ retaining walls/ landscape borders/ [RV and boat] parking [areas/ lots]/ under decks]
- Completely kills even the toughest weeds and grasses
- *CONSUMER GUARANTEE: If for any reason you are not satisfied after using this product, simply send us original proof of purchase and we will [replace the product or] refund the purchase price.
- Consumer Guarantee* [see/ open] booklet for details.] ***qualify guarantee***
- Controls tough weeds longer than other Roundup brand products [*longer than Roundup® Ready-To-Use Extended Control Weed & Grass Killer Plus Weed Preventer II]
- Dead Weeds Guaranteed* [or Your Money Back] ***qualify guarantee***
- Delivers maximum performance: Kills tough weeds and grasses to the root, prevents new weeds and grasses for up to 1 year; visible results in 12 hours; rain-proof protection in 30 minutes
- Do NOT add water
- [Driveways/ Patios/ Sidewalks] Stay[s] clear [of weeds] for up to [1/ a] year
- Dual [2-way] Action [kills and prevents]
- Dual [2-way] Action:  Kills existing weeds [roots and all] and prevents new weeds from appearing for up to [1 year/ 12 months/ 52 weeks/ 365 days]
- Even if it rains – [Roundup brands/ Insert Brand Name] won't lose effectiveness
- Exclusive [Roundup brand/ Insert brand name] formula
- Exclusive formula won't be washed away by rain or watering 30 minutes after treatment.
- Extended weed control
- FastAct® [II] [Technology] [– Results in 12 Hours!]
- Fast acting [formula]
- Fast-acting for visible results in 12 hours
- For [outdoor] residential use [only]
- For use on driveways, patios, sidewalks & gravel [areas/ paths]
- Goodbye weeds
- Got Tough Weeds – Get [Insert brand name/ Roundup Max Control 365/ products]
- Great value – covers up to [Insert Value from Appendix 2 table] sq ft
- Guaranteed effective: Kills weeds and grasses, roots and all, with just one application
- Guaranteed* [results/ satisfaction] [[see/ open] booklet for details.] ***qualify guarantee***
- Guaranteed* results [with one application] ***qualify guarantee***
- Hard on weeds, easy on you
- Ideal for killing and preventing unwanted weeds and grasses. Use along fences, retaining walls; in cracks of walks, driveways and patios.
- It's your year!™
- Keeps driveways, walkways, patios and weed-free for up to [1 year/ 12 months/ 52 weeks/ 365 days]
- Keeps weeds from growing [for up to [1 year/ 12 months]
- Kills all [annual and perennial] weeds, grasses and other unwanted plants

- **Kill and prevent unwanted weeds** and grasses. Use along fences, retaining walls; in cracks of walks, drives and patios
- Kills and prevents for up to [1 year/ 12 months/ 52 weeks/ 365 days]
- Kills existing tough weeds [& grasses] [to the root/ roots and all]
- Kills even the toughest weeds
- Kills over 200 [different/ types/ species/ kinds/ of] of weeds[*] [*/(as listed)/ as listed/ below/ on the [product] label]
- Kills [to] the root[s] so [treated] weeds don't come back
- Kills the root[s] [so weeds don't come back] [first time, every time] [guaranteed] ***qualify guarantee***
- Kills [to] the roots [Guaranteed[!/*]] ***qualify guarantee***
- Kills [the toughest/ weeds and grasses] to the root so [weeds/ they] don't come back
- Kills the roots of [both] broadleaf and grassy weeds
- Kills the weed you see and the root you don't
- Kills the weeds [& grasses] you see [roots & all] and prevents [new] [weeds/ seeds] [from/ sprouting/ germinating/ appearing] for up to 1 year
- Kills unwanted weeds [and grasses]
- Kills vegetation [weeds/ and grasses] for up to [1 year /12 months/ 52 weeks/ 365 days]
- Kills weeds [and grasses] [clear/ down to the root] [1-2 weeks] [roots and all]
- Kills weeds [and unwanted grasses] – roots and all
- Kills weeds clear down to the root, 1st time, every time so weeds don't come back – guaranteed ***qualify guarantee***
- Kills weeds dead
- Kills weeds and grasses in – Patios – Driveways – Walkways – Gravel Areas
- Kills weeds, roots and all
- Kills what you directly spray
- Long lasting weed & grass control
- Longest lasting Roundup brand formula
- Multipurpose grass and broadleaf weed control
- [Next day/ this weekend] results:  Begins killing on contact, visible results in 12 hours
- No more hand pulling
- No Root, No Weed, No Problem®
- Non-staining [formula]
- Not for sale or sales into the state of New York
- Not registered for sale or use in New York
- [One application] Kills [existing] weeds [& grasses] [roots & all] and prevents [new] [weeds/ seeds] [from sprouting/ germinating/ appearing/ growing] for up to [1 year/ 12 months/ 365 days]
- One [application/ spray] kills weeds and grasses, roots and all [maximum effectiveness]
- One [application/ spray] kills weeds [to the root] and prevents [new] weeds for up to [1 year/ 12 months/ 365 days]
- [One/ 1] [step/ stop] [weed] protection [for up to/ 1 year/ 12 months/ 365 days/ 52 weeks]
- Outdoor use only [Insert Graphic]
- [Patented] FastAct® [II] Technology
- Powerful protection against weeds [for up to/ 1 year/ 12 months/ 52 weeks/ 365 days]
- Product goes on clear and [dries clear/ stays clear/ will not stain]
- Prevents [growth/ re-growth/ new growth] for up to [1 year/ 12 months/ 365 days/ 52 weeks]
- [Protects against/ Prevents] [new] weeds [for up to/ 1 year/ 12 months/ 52 weeks/ 365 days]
- Protects [against weeds] [up to/ 3[X]/ 300%] longer* [than current brand/ than original]* *than Roundup Extended Control Ready-To-Use Weed & Grass Killer Plus Weed Preventer II
- Proven performance: Roundup brands work the first time, every time – and have for [more than/ 30/ insert # years] years
- Provides maximum control: Kills existing weeds to the root so they don't come back
- Provides extended [up to 1 year/ 12 months] control of weeds in driveways, walkways and patios
- [Provides] [visible] results in 12 hours
- [RainFast/ RAINPROOF/ Rainproof Protection:] in 30 minutes [for control that won't wash away]
- [Roundup brand's/ Our] longest lasting formula
- [Roundup Max Control 365 products/ Roundup brand/ Insert Brand Name] can be used on patios, walkways, driveways, gravel areas and along fences

- [Roundup Max Control 365 products/ Insert Brand Name] create[s] an invisible [weed] [shield/ barrier] for up to [1 year/ 12 months/ 365 days/ 52 weeks]
- [Roundup Max Control 365 products/ Insert Brand Name] [is/ are] [Relentless in the fight against weeds [for up to/ 1 year/ 12 months/ 52 weeks/ 365 days]
- [Roundup Max Control 365 products/ Roundup brand[s]/ Insert Brand Name] [is/ are] tougher than the toughest weed
- [Roundup Max Control 365 products/ Roundup brand's] [are the/ most] [advanced/ powerful] formula [[to protect against/ to prevent] weeds] [for up to/ 1 year/ 12 months/ 52 weeks/ 365 days]
- Roundup's exclusive formula won't be washed away by rain or watering 30 minutes after treatment
- Roundup's exclusive [patented] [FastAct®] [II] [technology] formula kills to the root so weeds don't come back
- Same great formula!
- Satisfaction guaranteed* [or/ we will gladly refund purchase price/ your money back with proof of purchase] *qualify guarantee*
- So long weeds
- Spray today, dead tomorrow
- [Spray weeds/ Use] on [brick/ paver] patios, paths, sidewalks, sidewalk cracks, walkways and driveways
- Spray the [weed/ leaves] to kill the root
- Starts to kill [in hours/ the same day/ overnight]
- Starts working [immediately/ in Insert # hours/ overnight]
- Systemic [weed/ and grass] killer for spot treatment of undesirable vegetation
- The fast & easy way to kill and prevent weeds for up to [1 year/ 12 months/ 52 weeks/ 365 days]
- Tough formula [kills to the roots]
- Tougher than the toughest weeds
- Unlike hand pulling, Roundup kills all the way to the roots
- Up to [1 year/ 12 months/ 52 weeks/ 365 days] without weeds
- Use along fences, on paths, patios, sidewalks, driveways, and on brick or gravel areas
- Use on [driveways/ sidewalks/ patios/ brick walks/ gravel paths/ fence lines] to prevent [weed growth/ weeds from growing] [for up to/ 1 year/ 12 months/ 365 days/ 52 weeks]
- Visible effects are gradual wilting and yellowing advancing to complete browning and root destruction
- Visible Results in 12 Hours!
- Visible results in 12 hours, weed free for up to [1 year/ 12 months/ 52 weeks/ 365 days]
- Weed Barrier [protection/ technology]
- [Weeds won't grow for] up to [1 year/ 12 months/ 52 weeks/ 365 days] [without weeds]
- Weed Preventer
- Works first time, every time [guaranteed] *qualify guarantee*
- Works on [Insert or Select from Weed List]
- [Year long/ 12 month/ 52 week/ 365 day] weed control

**Promotional Offering Options**

- [Insert value]% Free [More] [than X] ***qualify***
- [Insert value]% More in Each Bottle
- [Insert value]% More Value size [than X] ***qualify***
- [Insert #] [Concentrate] Bottle[s] [Included/ Attached]
- [Insert #] [Concentrate] Refill[s] [Included/ Attached]
- [Insert #] Pre-Measured [Concentrate] [Refill/ Bottle[s]] [Included/ Attached]
- [Insert #] Refill[s] [Included/ Attached]
- [Insert Dollar Amount] Rebate
- A [Insert Dollar Amount] Value
- Bonus [Size/ Pack/ Pak]
- BONUS SIZE [Insert Value]% MORE! ***qualify***
- Bundle Pack
- Can be used in [Insert Packaging Type/ Container/ Sprayer]
- Can be used to REFILL [Insert Packaging Type/ Container/ Sprayer]
- Club [Pack/ Pak/ Size]
- Combo [Pack/ Pak/ Size]
- [CONE/ DOME/ GUARD/ SHIELD] INCLUDED!
- Easy Mix Refill System
- Free Concentrate
- FREE [CONE/ DOME/ GUARD/ SHIELD]
- Free [Insert Description] with this purchase of [Insert Brand Name] [Insert Container Size]
- FREE REFILL [with purchase [of Insert Brand Name]]
- FREE [Insert Brand Name] a [Insert Dollar Amount] [VALUE]
- Free [Insert Container Size] [Insert Brand Name] [Concentrate/ Refill] [Included/ Attached/ Inside/ With Purchase/ Coupon]
- FREE [Insert Brand Name] SAMPLE [Included/ Attached/ Inside/ With Purchase]
- FREE SAMPLE
- Great Value
- Larger size [covers up to [Insert value from Appendix 2] sq ft]
- NEW! ***Use only if new package or formulation***
- NOT FOR INDIVIDUAL SALE
- NOW! ***Use only if new package or formulation***
- [Part of] [Easy Mix] Refill [System]
- [Pre-Measured] [Concentrate] [Bottle/ Refill] makes [up to] 1.33 Gallons/ Insert Product Size]
- Ready-To-Use
- Refill [Included]
- Refill Size
- Refill System
- [Insert Packaging Type/ Sprayer] Refill
- SAMPLE NOT FOR SALE
- Save up to $[Insert Value] on [your] next purchase
- TWIN [PACK/ PAK]
- Value [Pack/ Pak]
- VALUE [SIZE/ SIZED]

**APPENDIX 2:  Packaging Related Claims**

**Calculation of Spray Coverage**

- ***To determine how many square feet can be treated, divide the number of fluid ounces by 128 and multiply by 300 (X= Net contents (fl oz) ÷ 128 x 300 sq ft)***

| NET CONTENT SKU Size | Spray Coverage |
|---|---|
| 24 FL OZ  [(1 PT 8 FL OZ/ 1.5 PT)] | • Treats up to 56 sq ft |
| 30 FL OZ  [(1 PT 14 FL OZ/ 1.875 PT)] | • Treats up to 70 sq ft |
| 64 FL OZ [(½ GAL/ 2 QT)] | • Treats up to 150 sq ft |
| 1 GALLON [(128 FL OZ)] | • Treats up to 300 sq ft |
| 1.1  GALLON [(141 FL OZ)] | • Treats up to 330 sq ft |
| 1.25 GALLON [(160 FL OZ)] | • Treats up to 375 sq ft |
| 1.33 GALLON [(170 FL OZ)] | • Treats up to 400 sq ft |
| 1.5 GALLON [(192 FL OZ)] | • Treats up to 450 sq ft |

**Other Packaging Related Claims**

| General: |
|---|

- Accurate
- Accurately targets [what/ the weeds] you want to [spray/ kill]
- Accurately targets [precisely/ exactly] [what/ the weeds] you want to [spray/ kill]
- Adjustable [spray/ sprayer] nozzle for maximum control
- Adjustable spray pattern for maximum control
- [Applicator/ Application] [Device/ System]!
- [Insert Brand Name of Batteries] Batteries included
- Battery Operated
- Be smarter than you weeds
- Change the way you spray
- Convenient
- No Mix[ing], No Mess
- No Mixing [necessary] [No measuring]
- [Easy/ Convenient] To Use
- Easy to store
- EASY-TO-USE [Insert Applicator Name]
- Easy to use [convenient/ handy/ useful]
- Fast and easy [application/ way to spray]
- Give your hands a break
- Great for large or small [jobs/ areas]
- Ideal for large or small [jobs/ areas]
- Handy
- It's always ready to spray
- No leaks or mess
- [Precise/ Precision] control – [sprays/ targets/ only what you want]
- [Precise /Precision] control for maximum accuracy
- Pre-mixed, pre-measured, easy-to-use
- Power Up with Duracell® [Batteries]
- Powered by Duracell® [Batteries]
- Quick [&/ and] easy to use
- Recycle symbol [Insert Graphic]
- Redesigned [Insert Applicator Name/ Sprayer]
- Refillable [Container]

- Requires no mixing
- [Save/ Saves] time and energy
- Targeted spray
- Targets weeds [in tight/ hard to reach/ places]
- The easy way to kill [and prevent] weeds [for up to/ 12 months/ 1 year]
- The easy way to spray
- The fast and easy way to kill [and prevent] weeds [for up to/ 12 months/ 1year]
- The fast way to spray
- You're always ready to spray

**Pump 'N Go® 2 Sprayer:**

- [33%/ Insert Value %] More than 1 gallon size
- Consistent spray for maximum accuracy
- Continuous, adjustable spray
- Convenient [extendable wand]
- Cover more ground faster
- Easy to use tank sprayer
- Extendable wand provides greater accuracy without bending over
- Long[er] spray time with less pumping
- No [constant] pumping
- No [More] Hand Fatigue
- No constant trigger [squeezing/ pulling]
- No more pumping, no more pulling, just spray
- No more squeeze, squeeze, squeeze
- No more tired [aching] hands
- One pump [= /equals] [Insert #] trigger sprays
- One pump delivers [Insert #] trigger sprays
- [Insert Applicator Name] [Provides] Up to [Insert #] minutes of continuous spray
- Quickly covers large areas
- Reusable [Pump 'N Go 2] [sprayer/ container]
- [Up to] [10/ insert #] [minutes of] Continuous spray

**Refill Container:**

- Don't Forget Your Refill
- Just [connect/ plug in] [Insert Applicator Name/ Comfort Wand/ Sure Shot Wand] and it's ready to spray
- Pour refill [directly] into [Insert Packaging Type] [container/ sprayer]
- [Ready-To-Use] Refill [Available]
- [Refills/ Recharges/ Reloads/ Renews] [Insert Applicator Name/ Comfort Wand/ Sure Shot Wand/ Pump 'N Go 2] [sprayer]
- Reuse with [Insert Applicator Name/ Comfort Wand/ Sure Shot Wand]
- The fast and easy way to refill your [Insert Packaging Type] [container/ sprayer]
- There is no mixing and no measuring, you just [pour/ connect] and go
- Works with [Insert Applicator Name/ Comfort Wand/ Sure Shot Wand]

**Battery Operated Sprayer with Wand**

- [33%/ Insert Value %] More than 1 gallon size
- Comfort Wand® [with extended reach/ [with continuous spray]
- Consistent spray for maximum accuracy
- Continuous Spray [Wand]
- Continuous spray wand [with extended reach]
- Continuous, adjustable spray
- Easy reach extendable spray wand
- Easy to use tank sprayer
- Extended Reach [Wand]

- Extendable spray wand – less bending
- Extendable [Insert Applicator Name] spray wand
- No [constant] pumping
- No constant trigger [squeezing/ pulling]
- No [More] Hand Fatigue
- No more pumping, no more pulling, just spray
- No more squeeze, squeeze, squeeze
- No more tired [aching] hands
- No more trigger sprayer
- [One-Touch] [Precision] Wand
- Power Sprayer [for large areas]
- Quickly covers large areas
- Reusable [Comfort Wand] [One-Touch Wand] [Insert Applicator Name]
- The powerful way to spray

---

**Battery Operated Sprayer with Extendable Wand:**

- [Adds control so] [the spray] [only] goes where you want it to go
- Apply faster with the [extended wand/ Insert Applicator Name]
- [Avoid accidental spray to [surrounding/ nearby] [flowers/ and/ vegetables/ desirable plants]
- [Bending [down/ over] to kill weeds is [a thing of the past/ in the past/ no longer needed]
- [Cone/ Dome/ Guard/ Shield] attaches to the bottle [stores easily] [when not in use]
- [Cone/ Dome/ Guard/ Shield] helps protect [nearby/ desirable plants/ flowers] [from spray/ drift/ damage] [even in windy conditions]
- [Cone/ Dome/ Guard/ Shield] keeps the spray contained so wind won't carry it to [desirable plants/ flowers and shrubs]
- [Cone/ Dome/ Guard/ Shield] helps protect [nearby plants/ desirable plants] [from splashing/ from spray]
- Continuous Spray
- Customize the [wand/ Insert Applicator Name] length [for personal comfort]
- Direct application reduces unintended damage to nearby plants [from the wind] [due to accidental spray]
- Easily get[s] into [deep,] hard-to-reach areas
- Extend
- Extended [Reach/ Continuous Spray] Sure Shot™ Wand [with extended reach/ with continuous spray]
- Extended [Reach/ Continuous Spray] Wand [with extended reach/ with continuous spray]
- [Extended/ Extendable] wand puts more distance between you and the spray
- Extends 2 feet [for more targeted control] [so no more/ bending over/ aching back]
- Focus the spray [where you need it most/ where you want it to go]
- Ideal for [use/ targeting] weeds in hard to reach places
- Ideal for [use/ targeting] weeds on driveways, sidewalks and patios
- [Helps] [Contain/ Isolate/ Target] [the product/ spray]
- [Helps] Keep[s] the spray on the weed
- Helps protect desirable [plants/ vegetation/ flowers/ shrubs/ vegetables]
- [Insert Applicator name] gives you an easy way to kill weeds
- [Just/ Simply] spray the leaves to kill the [weed to the] root
- Helps protects desirable plants [such as flowers and shrubs]
- [Lightweight/ and/ durable] applicator
- [Now it's] [[Protective] [cone/ dome/ guard/ shield] makes it] Easier to kill weeds in more places
- Pinpoint the weeds [you want] to kill
- [Precisely] [Target[s]] [hard to reach/ weeds/ places] [the weeds you want to kill]
- [Precision/ Precise/ Adjustable] sprayer
- [Protective] [cone/ dome/ guard/ shield] helps [focus/ target] the spray on the weed[s]
- [Protective] [cone/ dome/ guard/ shield] [at the end of the wand] fits over the weed [(like an umbrella)] [so the spray is contained/ to help contain the spray]
- [Protective] [cone/ dome/ guard/ shield] fits over weeds to help contain spray [even in windy conditions]
- Reach[es] into [tight/ hard to reach] places [weeds like to grow]
- Reach

- Removable [protective] [cone/ dome/ guard/ shield]
- Reusable [Sure Shot Wand] [Insert Applicator Name]
- [Sprayer provides the best way to] Focus the spray on the leaves [where it does the most [good/ damage]]
- Sure Shot™ [Extended/ Reach/ Continuous Spray] Wand [with extended reach/ with continuous spray]
- Target[s] hard to reach [weeds/ places]
- Targets the weed under the shield
- [Use in and around] [Ideal for targeting weeds in] [fences/ driveways/ sidewalks/ patios/ and/ hard to reach places]
- Use without [the/ protective] [cone/ dome/ guard/ shield] on [patios/ walkways/ driveways/ and/ gravel/ areas]
- [Wand/ Insert Applicator Name] extends [to the top of the weeds for direct application] [2 feet] [letting you more precisely [pinpoint/ focus on] [the weeds you want to kill]
- [Wand/ Insert Applicator Name] [extends 2 feet] [to] Reduce[s] [back] bending [and the] [continuous spray wand helps reduces hand fatigue] [putting more distance between you and the spray]
- [Wand/ Insert Applicator Name] [provides the best way to] Focus the spray on the leaves [to kill to the root]
- [Wand/ Insert Applicator Name] [provides] precision control to [maximize every spray/ get the most [effect] from every spray]

**APPENDIX 3:  Packaging Related Instructions**

---

**QUICK CONNECT SPRAYER** [Insert Graphics]

1.  Remove sprayer.  Pull cord/tubing <u>ALL THE WAY OUT</u>.
2.  Insert [Insert Color] plug into [spout/ knob/ opening] on cap [until it clicks].
3.  Flip up spout. ***Alternative Text:*** [Flip up [Insert Color] spout until fully upright/ [Turn/ Twist] [spout/ knob] to ON/ Pull spout up.]  [Open/ Adjust] nozzle [at end of sprayer] to the desired spray setting [(spray or stream)].

---

**PUMP 'N GO® 2 SPRAYER** [Insert Graphics]

***Instructions for Printing on the Wand and Handle:***

***Wand:*** STORAGE POSITION Push button and pull nozzle end. Extend to spray position. [Insert Arrow Graphic] SPRAY POSITION

***Handle:*** [Insert Arrow Graphic] RELEASE PRESSURE AFTER USE Push handle to cap & turn.  RETIGHTEN.

**1. CUT** [Insert Graphics]
Carefully cut the [Insert #/ two] [Insert Color/ white] zip ties securing the hose and pump handle with scissors. Use caution not to cut the [Insert Color/ white] hose.

**2. CONNECT** [Insert Graphics]
Unwind hose. Firmly push the connector at the end of the hose onto the spout on the pump, until it locks into place.

**3. EXTEND WAND** [Insert Graphics]
Lift sprayer wand off bottle. Push [Insert Color/ yellow] button while pulling out on the wand nozzle tip. Fully extend wand until [Insert Color/ yellow] button snaps into SPRAY POSITION. **NOTE**: [Insert Color/ white] trigger will not function until wand is fully extended and [Insert Color/ yellow] button is visible in the SPRAY POSITION.

**4. PUMP** [Insert Graphics]
Make sure handle is screwed on **tightly** or the bottle will not pressurize. Pump container [Insert Number of Pumps to Prime X-X] times to pressurize bottle.  A full bottle requires fewer pumps than an empty bottle. Pumping to the higher range will provide longer spray duration. After pumping, push pump down and turn handle clockwise to lock into carrying position. **NOTE**: This bottle is designed to expand under pressure and cannot be over-pressurized.

**5. SPRAY** [Insert Graphics]
Aim wand. Spray by pushing down [Insert Color/ white] trigger with thumb.  Adjust spray pattern by rotating [Insert Color/ white] nozzle tip up to one-half rotation. Spray weeds [and grasses] until **thoroughly wet**.

**6. STORE** [Insert Graphics]
When finished spraying, push the [Insert Color/ yellow] button and [retract/ push] the wand until the [Insert Color/ yellow] button snaps back into the original STORAGE POSITION. Place wand back onto [the top of] the bottle [in the integrated holster] with nozzle [facing down/ tip extended through the eyelet opening].

**7. DEPRESSURIZE** [Insert Graphics]
Push pump handle all the way down and turn pump handle and cap counter-clockwise to relieve pressure, then retighten to store.

---

**REFILL CONTAINER** [Insert Graphics]

How to attach [Insert Applicator Name/ wand] to [Insert Brand Name for 71995-51] [Refill] [Bottle/ Container]:
Removing [Insert Applicator Name] from original empty [bottle/ container]:
1.  Remove the [Insert Applicator Name/ wand] by pulling the [Insert Color] plug from the [Insert Color] [spout/ opening/ knob] on cap.
2.  At the bottom of the side [clip/ carrier/ holder] press the middle tab up and slide the [clip/ carrier/ holder] upwards to remove it from the empty [bottle/ container].
Adding [Insert Applicator Name] to [Insert Brand name for 71995-51] [Refill] [bottle]:
3.  Slide the side [clip/ carrier/ holder] downward on the knob located [on the] [right-hand] side of the refill [bottle/ container].
4.  [Insert [Insert Color] plug at end of hose into [Insert Color] [spout/ knob/ opening] on cap [<u>until it clicks</u>].]

---

**BATTERY OPERATED SPRAYER WITH WAND** [Insert Graphics]

---

***Wand Safety Sticker or Printed on the Handle:*** Always lock after use ***Alternative Text:*** [Always lock sprayer when opening and closing] [Insert Icons]

[Insert Illustration or Photo]

**1. Remove** [Insert Graphics- Unsnap holder/ Twist left/ Pull]
- Remove [wand/ Insert Applicator Name] [from] [side/ carrier/ holder/ clip/ bottle].
- Remove protective strip from battery compartment to activate batteries.
- [Pull connector by slightly twisting from [side/ carrier/ holder/ clip/ bottle] and unwrap hose completely.]

**2. Connect** [Insert Graphics]
- Insert [Insert Color] plug at end of hose into [Insert Color] [spout/ knob/ opening] on cap [until it clicks]. Flip up spout. ***Alternative Text:*** [Flip up [Insert Color] spout until fully upright/ [Turn/ Twist] [spout/ knob] to ON/ Pull spout up.]  [Spout must remain up while spraying.]

**3. Extend** [Insert Graphics]
- Flip open [wand/ Insert Applicator Name] until it clicks and locks into position.

**4. [Twist Nozzle and] Spray** [Insert Graphics]
- Slide trigger lock on [wand/ Insert Applicator Name] handle to the unlocked position.
- Twist nozzle [at end of sprayer] to desired spray pattern.
- Point [Insert Applicator Name] nozzle away from body and hold [Insert Color] trigger for continuous spray.

**Important Use Information**: Do not submerge in water. When storing sprayer for long periods, remove batteries.

---

**BATTERY OPERATED SPRAYER WITH EXTENDABLE WAND** [Insert Graphics]

---

***Wand Safety Sticker or Printed on the Handle:*** Always lock after use ***Alternative Text:*** [Always lock sprayer when opening and closing] [Insert Icons]

[Insert Illustration or Photo]

**1. Remove** [Insert Graphics- Unsnap holder/ Twist left/ Pull]
- Remove [wand/ Insert Applicator Name] [from] [side/ carrier/ holder/ clip/ bottle].
- Remove protective strip from battery compartment to activate batteries.
- [Pull connector by slightly twisting from [side/ carrier/ holder/ clip/ bottle] and unwrap hose completely.]

**2. Connect** [Insert Graphics]
- Insert [Insert Color] plug at end of hose into [Insert Color] [spout/ knob/ opening] on cap [until it clicks]. Flip up spout. ***Alternative Text:*** [Flip up [Insert Color] spout until fully upright/ [Turn/ Twist] [spout/ knob] to ON/ Pull spout up.]  [Spout must remain up while spraying.]
- [Remove [protective] [cone/ dome/ guard/ shield] [from side clip/ from bottle] and attach over nozzle [for targeted application].

**3. Extend** [Insert Graphics]
- Flip open [wand/ Insert Applicator Name] until it clicks and locks into position.
- [Extend [wand/ fully]].

**4. [Twist Nozzle and] Spray** [Insert Graphics]
- Slide trigger lock on [wand/ Insert Applicator Name] handle to the unlocked position.
- Twist nozzle [at end of sprayer] to desired spray pattern.
- [Place the [cone/ dome/ guard/ shield] [on the ground] over weeds or grasses you want to kill.] [Use the [cone/ dome/ guard/ shield] to cover the weeds or grasses you want to kill.]
- Point [Insert Applicator Name] nozzle away from body and hold [Insert Color] trigger for continuous spray.
- [[Cone/ Dome/ Guard/ Shield] can be removed when applying product to [areas such as] [driveways/ walkways/ patios/ and/ gravel].

**Important Use Information**: Do not submerge in water. When storing sprayer for long periods, remove batteries.

---

***BATTERY REPLACEMENT SECTION- BATTERY OPERATED SPRAYER WITH WANDS ONLY***
[Insert Graphics]

---

**To replace batteries**: Open battery compartment at bottom of [wand/ Insert Applicator Name] with a small screwdriver [Insert Illustration]. Remove used batteries and replace with [Insert #/ four] new [AA/ alkaline] batteries [in correct position as marked inside battery compartment] [or per illustration].

Securely close battery compartment door and screw closed firmly. Always use a complete set of the same type when replacing batteries. Best performance is achieved with alkaline batteries. Never mix alkaline, carbon-zinc or rechargeable batteries. Dispose of used batteries according to manufacturer's instructions or in household trash.

---

*Optional Section for Battery Operated Sprayer Only:*
**IMPORTANT SPRAYER INFORMATION**

- Read and follow all directions before use.
- [Insert Applicator Name] is to be used only with Roundup brand products with a quick-connect cap. [Insert Applicator Name] may not be compatible with other products.
- Do not drop or throw sprayer.
- Do not [submerge/ immerse] sprayer in water. Never place sprayer in dishwasher.
- Do not use soap or other cleaning agents to clean sprayer.  If necessary, clean outer sprayer surface only with damp towel.
- Insert batteries in their correct (+/-) position.  Remove batteries for winter storage or when storing product for long periods of time.
- Always use a complete set of new alkaline batteries.  Never mix alkaline, carbon-zinc, or rechargeable batteries.
- Always follow the manufacturer's instructions for battery disposal and use.
- Purge [Insert Applicator Name] of liquid for winter storage or place [wand/ Insert Applicator Name] in a heated storage area.

---

*Optional Section:*

***TROUBLESHOOTING SECTION FOR BATTERY OPERATED SPRAYER***

---

***[Troubleshooting Section for [Battery Powered/ Comfort Wand/ One-Touch Wand/ Extendable Wand/ Sure Shot Wand/ Insert Applicator Name] Directions]***

Troubleshooting Tips:

Problem: Sprayer does not [spray/ function].
  Possible Cause: Batteries not installed properly.
  Solution: See instructions for correct battery placement.

Problem: Sprayer makes a straining noise. [Sprayer runs but no product comes out].
  Possible Cause: Nozzle is turned Off.
  Solution: Twist nozzle to desired spray pattern.

  Possible Cause: [Insert Color] plug at end of hose is not [flipped up/ open].
  Solution: Insert [Insert Color] plug at end of hose into [Insert Color] [spout/ knob/ opening] on cap [until it clicks] and [flip up spout/ flip up [Insert Color] spout until fully upright/ [turn/ twist] [spout/ knob] to ON/ pull spout up.]

  Possible Cause: Sprayer is not primed.
  Solution: Press and hold button on sprayer for about [10/ 15/ 20/ 30] seconds to prime the sprayer.

Problem: Spray pattern is weak [or uneven]. [Product flow is uneven or dribbles out of nozzle].
  Possible Cause: Weak batteries.
  Solution: Install a fresh set of alkaline batteries.

  Possible Cause: [Insert Color] plug at end of hose is not [in the fully upright position/ in the ON position].
  Solution: Insert [Insert Color] plug at end of hose into [Insert Color] [spout/ knob/ opening] on cap [until it clicks]. [Attach coupler to the cap] and [flip up spout/ flip up [Insert Color] spout until fully upright/ [turn/ twist] [spout/ knob] to ON/ pull spout up.]

  Possible Cause: Sprayer nozzle not fully open.
  Solution: [Turn/ Twist] nozzle to desired spray pattern.

---



**UNITED STATES ENVIRONMENTAL PROTECTION AGENCY**
**WASHINGTON, DC  20460**

OFFICE OF CHEMICAL SAFETY
AND POLLUTION PREVENTION

October 18, 2016

Mr. Stephen Adams
Regulatory Affairs Manager
Monsanto Company
700 Chesterfield Parkway North
Chesterfield, MO 63017

Subject:      Label Amendment – Reformatting Label and Incorporation of Supplemental
              Labeling into Section 3 Master Label
              Product Name: Roundup Custom Herbicide
              EPA Registration Number: 524-343
              Application Date: March 11, 2015
              Label Resubmitted: October 17, 2016
              Decision Number: 502399

Dear Mr. Adams:

The amended label referred to above, submitted in connection with registration under the Federal
Insecticide, Fungicide and Rodenticide Act, as amended, is acceptable. This approval does not
affect any conditions that were previously imposed on this registration. You continue to be
subject to existing conditions on your registration and any deadlines connected with them.

A stamped copy of your labeling is enclosed for your records. This labeling supersedes all
previously accepted labeling. You must submit one copy of the final printed labeling before you
release the product for shipment with the new labeling. In accordance with 40 CFR 152.130(c),
you may distribute or sell this product under the previously approved labeling for 18 months
from the date of this letter. After 18 months, you may only distribute or sell this product if it
bears this new revised labeling or subsequently approved labeling. "To distribute or sell" is
defined under FIFRA section 2(gg) and its implementing regulation at 40 CFR 152.3.

Should you wish to add/retain a reference to the company's website on your label, then please be
aware that the website becomes labeling under the Federal Insecticide Fungicide and Rodenticide
Act and is subject to review by the Agency. If the website is false or misleading, the product
would be misbranded and unlawful to sell or distribute under FIFRA section 12(a)(1)(E). 40
CFR 156.10(a)(5) list examples of statements EPA may consider false or misleading. In addition,
regardless of whether a website is referenced on your product's label, claims made on the
website may not substantially differ from those claims approved through the registration process.
Therefore, should the Agency find or if it is brought to our attention that a website contains false
or misleading statements or claims substantially differing from the EPA approved registration,
the website will be referred to the EPA's Office of Enforcement and Compliance.

*Continued on Page 2 of 2*

Page 2 of 2
EPA Reg. No. 524-343
Decision No. 502399

Your release for shipment of the product constitutes acceptance of these conditions. If these conditions are not complied with, the registration will be subject to cancellation in accordance with FIFRA section 6. If you have any questions, please contact Beth Benbow by phone at 703-347-8072, or via email at Benbow.bethany@epa.gov.


Sincerely,

Reuben Baris, Product Manager 25
Herbicide Branch
Registration Division (7505P)
Office of Pesticide Programs


Enclosure

# MASTER LABEL FOR EPA REG. NO. 524-343

Primary Brand Name:

## Roundup Custom® Herbicide

Alternate Brand Names:

## AquaMaster® Herbicide
## Roundup® AquaMaster Herbicide
## Roundup Custom® for Aquatic & Terrestrial Use

## Master Label Table of Contents

| I.   | Container Labels                                            | 2 – 31    |
|------|------------------------------------------------------------|-----------|
| II.  | Directions for Use with Food and Feed Crops                | 32 – 120  |
| III. | Directions for Use for on Aquatic and Other Terrestrial Sites | 121 – 170 |

**See each label section for more detailed table of contents**

```
A C C E P T E D
10/18/2016
Under the Federal Insecticide, Fungicide
and Rodenticide Act as amended, for the
pesticide registered under
EPA Reg. No.
            524-343
```

| I.   CONTAINER LABELS |
|---|

## 1.0   CONTAINER LABELS WITH SEPARATE DIRECTIONS FOR USE BOOKLET

[*Pesticide containers that have the complete directions for use booklet attached separately as labeling to and detachable from the container, require a label that is securely attached to the pesticide container.*]

### 1.1   Complete Label Text for Container Label with Separate Directions for Use Booklet

[*The following represents the complete label text that can appear as a single or dual (front and back) container label, with separate, detachable complete directions for use labeling (booklet).  This container label may also appear as a multi-page label (see the following section for minimum base label content).*]

[*FRONT PANEL*]

# [INSERT BRAND NAME] [*Logo optional*]

| GROUP | 9 | HERBICIDE |
|---|---|---|

[*Optional marketing claims and/or logos on this Master Label may be added to the Front Panel*]

A broad-spectrum postemergence herbicide for weed control in many agricultural systems

[*Alternative product statement:* Selective broad-spectrum weed control in Roundup Ready® crops]

[*Alternative product statement:* Non-selective, broad-spectrum weed control for many agricultural systems and farmsteads]

[*Alternative product statement for products that also contain aquatic, industrial, turf, ornamental, select crop and other terrestrial uses:*  A broad-spectrum postemergence herbicide for aquatic and industrial, turf, ornamental, forestry, roadside, utility rights-of-way, [*Optional text, if applicable:* select crop,] and other listed terrestrial weed control.  (For a complete list of aquatic and terrestrial uses, see the Directions for Use section in the attached labeling booklet.)]

[*Optional statement for limited-geography product distribution:* This product is not registered in all states.] [*Optional text:* See inside attached labeling booklet for more details.]

[*Additional optional statements for limited-geography product distribution:* For control of annual and perennial weeds in [*list states and county-level information, as appropriate, where product is registered and distributed*]. [*Optional text:* *County Distribution:*] [*Optional text:* see inside attached labeling booklet for details.] [*Optional text:* In [*list states*] this product is distributed in the counties listed below:] [*list counties by state*]

AVOID CONTACT OF THIS HERBICIDE WITH FOLIAGE, [*Optional text:* GREEN] STEMS, EXPOSED NON-WOODY ROOTS OR FRUIT OF CROPS, DESIRABLE PLANTS AND TREES, [*Optional text, if applicable:* EXCEPT AS DIRECTED FOR USE ON ROUNDUP READY® CROPS,] AS SEVERE PLANT INJURY OR DESTRUCTION COULD RESULT.

ACTIVE INGREDIENT:
\*Glyphosate, N-(phosphonomethyl) glycine, in the form of its isopropylamine salt...........................  53.8%
OTHER INGREDIENTS: ..............................................................................................................  46.2%
100.0%

\*Contains 648 grams of the active ingredient glyphosate, in the form of its isopropylamine salt, per liter or 5.4 pounds per U.S. gallon, which is equivalent to 480 grams of the acid, glyphosate, per liter or 4.0 pounds per U.S. gallon (39.9% by weight).

I.  CONTAINER LABELS

[*Optional label text that will be updated at the time of printing, if necessary:* This product is protected by U.S. Patent No.'s [*List appropriate patents*].]

[*Optional label text, if applicable:*  Other Patents Pending.]

[*Optional label text, if applicable:*  No license granted under any non-U.S. patent(s).]

[*Option to insert reference to a Monsanto Patent Website:*  For a list of patents, if any, covering this product or its use, please go to www.monsantotechnology.com.]

EPA Reg. No. 524-343

EPA Est. [*Insert appropriate EPA establishment number:* 524-IA-1; 524-LA-1; *or* Other*; or blank space*]

[*Alternative EPA establishment text:* EPA Est. (L) 524-LA-1 or (M) 524-IA-1 Lot number prefix (L) or (M) indicate appropriate establishment number.]  [*This lot number relationship with the establishment number can be expanded or changed to include additional or add new producing sites as appropriate.*]

Keep out of reach of children

# CAUTION

[*Optional label statement, if applicable for front-and-back container label:*  See back panel for additional] [*Optional text, as applicable:* Precautions [and] First Aid]

[*Optional label statement, if applicable for multi-page container label:* See inside for additional] [*Optional text, as applicable:* Precautions [and] First Aid]

See attached labeling booklet for Complete Directions for Use [*Optional text:* in English and Spanish].

[*Alternative label statement:* See inside for Complete Directions for Use] [*Optional text:* in English and Spanish].

Read the entire label before using this product.

Use only according to label directions.

Read the "LIMIT OF WARRANTY AND LIABILITY" statement [*Optional text, if statement not included on the container label:* at the end of the attached labeling booklet] before buying or using.  If terms are not acceptable, return at once unopened.

[*Optional container label statement:* THIS IS AN END-USE PRODUCT. MONSANTO COMPANY DOES NOT INTEND AND HAS NOT REGISTERED IT FOR REFORMULATION. REPACKAGING OF THIS PRODUCT FOR DISTRIBUTION OR SALE MAY BE CONDUCTED ONLY UNDER THE TERMS OF A WRITTEN CONTRACT WITH MONSANTO COMPANY.]

[*Optional alternative container label statement:* THIS IS AN END-USE PRODUCT. MONSANTO COMPANY DOES NOT INTEND AND HAS NOT REGISTERED IT FOR REFORMULATION OR REPACKAGING.]

NET [*insert appropriate value*] GAL [*or other appropriate unit of measure*] [*Alternative text:* NET CONTENTS]

Packed for:
MONSANTO COMPANY
800 N. LINDBERGH BLVD.
ST. LOUIS, MISSOURI 63167 USA

[*Optional text:* Open Here]

I. CONTAINER LABELS

[*ADDITIONAL CONTENT THAT MAY APPEAR ON ANY PANEL OR INSIDE MULTI-PAGE LABEL*]

## PRECAUTIONARY STATEMENTS

### Hazards to Humans and Domestic Animals

Keep out of reach of children

# CAUTION

DOMESTIC ANIMALS: This product is considered to be relatively nontoxic to dogs and other domestic animals; however, ingestion of this product or large amounts of freshly sprayed vegetation could result in temporary gastrointestinal irritation (vomiting, diarrhea, colic, etc.). If such symptoms are observed, provide the animal with plenty of fluids to prevent dehydration. Call a veterinarian if symptoms persist for more than 24 hours.

### Personal Protective Equipment (PPE)

**Applicators and other handlers must wear:** long-sleeved shirt and long pants, socks and shoes.

Follow manufacturer's instructions for cleaning/maintaining PPE (Personal Protective Equipment). If there are no instructions for washables, use detergent and hot water. Keep and wash PPE separately from other laundry.

---

**User Safety Recommendations**

Users should:

• Wash hands before eating, drinking, chewing gum, using tobacco, or using the toilet.
• Remove clothing immediately if pesticide gets inside. Then wash thoroughly and put on clean clothing.

---

### Environmental Hazards

[*For labels without aquatic uses:*  Do not apply directly to water, to areas where surface water is present or to intertidal areas below the mean high-water mark. Do not contaminate water when cleaning equipment or disposing of equipment wash waters and rinsate.]

[*Alternative text for labels with aquatic uses only:*  Killing aquatic weeds can result in depletion or loss of oxygen in the water due to decomposition of dead plant material.  This oxygen loss can cause fish suffocation.  Consult with your State agency with primary responsibility for regulating pesticides before applying to public waters to determine if a permit is required.  Do not contaminate water when cleaning equipment or disposing of equipment wash waters and rinsate.]

[*Alternative text for labels with both aquatic and terrestrial uses:*  Killing aquatic weeds can result in depletion or loss of oxygen in the water due to decomposition of dead plant material.  This oxygen loss can cause fish suffocation.  Consult with your State agency with primary responsibility for regulating pesticides before applying to public waters to determine if a permit is required.  For terrestrial uses, do not apply directly to water, to areas where surface water is present or to intertidal areas below the mean high-water mark [*Optional text, if applicable*: , except when applying this product by air over the forest canopy]. Do not contaminate water when cleaning equipment or disposing of equipment wash waters and rinsate.]

### Physical or Chemical Hazards

Spray solutions of this product may be mixed, stored and applied using stainless steel, fiberglass, plastic or plastic-lined steel containers.

I. CONTAINER LABELS

DO NOT MIX, STORE OR APPLY THIS PRODUCT OR SPRAY SOLUTIONS OF THIS PRODUCT IN GALVANIZED STEEL OR UNLINED STEEL (EXCEPT STAINLESS STEEL) CONTAINERS OR SPRAY TANKS. This product or spray solutions of this product react with such containers and tanks to produce hydrogen gas, which can form a highly combustible gas mixture. This gas mixture could flash or explode if ignited by open flame, spark, welder's torch, lighted cigarette or other ignition source and cause serious personal injury.

---

## DIRECTIONS FOR USE

It is a violation of Federal law to use this product in any manner inconsistent with its labeling.  Do not apply this product in a way that will contact workers or other persons, either directly or through drift. Only protected handlers may be in the area during application. For any requirements specific to your State or Tribe, consult the agency responsible for pesticide regulation.

### Agricultural Use Requirements

Use this product only in accordance with its labeling and with the Worker Protection Standard, 40 CFR Part 170.  Refer to supplemental labeling under "AGRICULTURAL USE REQUIREMENTS" in the DIRECTIONS FOR USE section for information about this standard.

[*The following Non-Agricultural Use Requirements are not required to be on the container label, but must appear in the Complete Directions for Use booklet.*]

### Non-Agricultural Use Requirements

The requirements in this box apply to uses of this product that are NOT within the scope of the Worker Protection Standard for agricultural pesticides (40 CFR Part 170). The WPS applies when this product is used to produce agricultural plants on farms, forests, nurseries or greenhouses.

Keep people and pets off treated areas until spray solution has dried.

See attached labeling booklet for complete Agricultural and Non-Agricultural Use Requirements of the Worker Protection Standard and Directions for Use [*Optional text:* in English and Spanish].

### STORAGE AND DISPOSAL

Proper pesticide storage and disposal are essential to protect against exposure to people and the environment due to leaks and spills, excess product or waste, and vandalism.  Do not allow this product to contaminate water, foodstuffs, feed or seed by storage or disposal.

**PESTICIDE STORAGE:** STORE ABOVE 5°F (-15°C) TO KEEP PRODUCT FROM CRYSTALLIZING. Crystals will settle to the bottom.  If allowed to crystallize, warm to 68°F (20°C) to redissolve and roll or shake container, or recirculate contents of larger containers, to mix well before using. Store pesticides away from food, pet food, feed, seed, fertilizers and veterinary supplies.  Keep container closed to prevent spills and contamination.

**PESTICIDE DISPOSAL:**  To avoid wastes, use all material in this container, including rinsate, by application according to label directions.  If wastes cannot be avoided, offer remaining product to a waste disposal facility or pesticide disposal program. Such programs are often run by state or local governments or by industry.  All disposal must be in accordance with applicable federal, state and local regulations and procedures.

**CONTAINER HANDLING AND DISPOSAL:** [*Insert appropriate Container Handling and Disposal Statement and Refilling Limitation from the following options*]

I. CONTAINER LABELS

[*CONTAINER HANDLING AND DISPOSAL STATEMENT AND REFILLING LIMITATION FOR NONREFILLABLE RIGID CONTAINERS OF LESS THAN 1-GALLON CAPACITY*]

Nonrefillable container.  Do not reuse or refill this container.

[*Alternative container statement:* Nonrefillable container. Do not reuse this container to hold materials other than pesticides or dilute pesticides (rinsate).  After emptying and cleaning, it may be allowable to temporarily hold rinsate or other pesticide-related materials in this container. Contact your state regulatory agency to determine allowable practices in your state.]

Triple rinse this container promptly after emptying.

Triple rinse as follows:  Empty the remaining contents into application equipment or mix-tank and continue to drain for 10 seconds after the flow begins to drip.  Fill the container ¼ full with water and recap.  Shake for 10 seconds.  Pour rinsate into application equipment or mix-tank, or store rinsate for later use or disposal.  Continue to drain for 10 seconds after the flow begins to drip.  Repeat this procedure two more times.

Once properly rinsed, some plastic [*Optional text:* agricultural] pesticide containers can be taken to a container collection site or picked up for recycling. [*Alternative container disposal statement:* Then offer the container for recycling, if available.]

[*Optional container disposal statement:* To find the nearest collection site, contact your chemical dealer or Monsanto Company at 1-800-768-6387] [*Alternative telephone numbers:* 1-800-ROUNDUP (1-800-768-6387)].

If recycling is not available, dispose of in accordance with federal, state and local regulations and procedures, which may include puncturing the properly rinsed container and disposing in a sanitary landfill.

---

[*CONTAINER HANDLING AND DISPOSAL STATEMENT AND REFILLING LIMITATION FOR NONREFILLABLE RIGID PLASTIC 2.5-GALLON CONTAINER AND OTHER NONREFILLABLE CONTAINERS OF GREATER THAN 1-GALLON, BUT EQUAL TO OR LESS THAN 5-GALLON CAPACITY*]

Nonrefillable container. Do not reuse this container to hold materials other than pesticides or dilute pesticides (rinsate).  After emptying and cleaning, it may be allowable to temporarily hold rinsate or other pesticide-related materials in this container.  Contact your state regulatory agency to determine allowable practices in your state.

[*Alternative container statement:* Nonrefillable container. Do not reuse or refill this container.]

Triple rinse or pressure rinse (or equivalent) this container promptly after emptying.

Triple rinse as follows:  Empty the remaining contents into application equipment or mix-tank and continue to drain for 10 seconds after the flow begins to drip.  Fill the container ¼ full with water and recap.  Shake for 10 seconds.  Pour rinsate into application equipment or mix-tank, or store rinsate for later use or disposal.  Continue to drain for 10 seconds after the flow begins to drip.  Repeat this procedure two more times.

Pressure rinse as follows:  Empty the remaining contents into application equipment or mix-tank and continue to drain for 10 seconds after the flow begins to drip. Place container so that it can drain directly into application equipment or mix-tank while rinsing, or collect rinsate for later use or disposal. Insert pressure rinsing nozzle into the side of the container and rinse at about 40 PSI for at least 30 seconds. Continue to drain for 10 seconds after the flow begins to drip.

I. CONTAINER LABELS

Once properly rinsed, some plastic [*Optional text:* agricultural] pesticide containers can be taken to a container collection site or picked up for recycling.  [*Alternative container disposal statement:* Then offer the container for recycling, if available.]

[*Optional container disposal statement:* To find the nearest collection site, contact your chemical dealer or Monsanto Company at 1-800-768-6387] [*Alternative telephone numbers:* 1-800-ROUNDUP (1-800-768-6387)].

If recycling is not available, dispose of in accordance with federal, state and local regulations and procedures, which may include puncturing the properly rinsed container and disposing in a sanitary landfill.

---

[*CONTAINER HANDLING AND DISPOSAL STATEMENT AND REFILLING LIMITATION FOR NONREFILLABLE RIGID PLASTIC 30-GALLON CONTAINER AND OTHER NONREFILLABLE CONTAINERS OF GREATER THAN 5-GALLON CAPACITY*]

Nonrefillable container.  Do not reuse or refill this container.

[*Alternative container statement:* Nonrefillable container. Do not reuse this container to hold materials other than pesticides or dilute pesticides (rinsate).  After emptying and cleaning, it may be allowable to temporarily hold rinsate or other pesticide-related materials in this container.  Contact your state regulatory agency to determine allowable practices in your state.]

Triple rinse or pressure rinse (or equivalent) this container promptly after emptying.

[*Optional label text:* For containers not equipped with pumping systems,] Triple rinse as follows: Empty the remaining contents into application equipment or mix-tank.  Fill the container ¼ full with water.  Replace and tighten closures.  Tip the container on its side and roll it back and forth for 30 seconds, ensuring at least one complete revolution.  Stand the container on its end and tip it back and forth several times.  Turn the container over onto its other end and tip it back and forth several times.  Empty the rinsate into application equipment or mix-tank, or store rinsate for later use or disposal.  Repeat this procedure two more times.

[*Alternative or additional triple rinsing instructions for large containers equipped with pumping systems:* [*Optional label text:* For large containers equipped with pumping systems,] Triple rinse as follows: Empty the remaining contents into application equipment or mix-tank.  Fill the container about 10 percent full with water.  Agitate vigorously or recirculate water with the pump for 2 minutes.  Pour or pump rinsate into application equipment or rinsate collection system.  Repeat this rinsing procedure two more times. Repeat this procedure two more times.]

Pressure rinse as follows: Empty the remaining contents into application equipment or mix-tank and continue to drain for 10 seconds after the flow begins to drip. Place container so that it can drain directly into application equipment or mix-tank while rinsing, or collect rinsate for later use or disposal.  Insert pressure rinsing nozzle into the side of the container and rinse at about 40 PSI for at least 30 seconds. Continue to drain for 10 seconds after the flow begins to drip.

Once properly rinsed, some plastic [*Optional text:* agricultural] pesticide containers can be taken to a container collection site or picked up for recycling. [*Alternative container disposal statement:* Then offer the container for recycling, if available.]

[*Optional container disposal statement:* Some container manufacturers offer container recycling. See additional information regarding manufacturer recycling programs attached to this container, if available. If no recycling information is available on this container, contact your chemical dealer or Monsanto Company at 1-800-768-6387 [*Alternative telephone numbers:* 1-800-ROUNDUP (1-800-768-6387)] to find the nearest recycling location.]

I. CONTAINER LABELS

[*Optional container disposal statement:* To find the nearest collection site, contact your chemical dealer or Monsanto Company at 1-800-768-6387] [*Alternative telephone numbers:* 1-800-ROUNDUP (1-800-768-6387)].

If recycling is not available, dispose of in accordance with federal, state and local regulations and procedures, which may include puncturing the properly rinsed container and disposing in a sanitary landfill.

[*Optional container disposal statement:* Return Properly Rinsed Container to Monsanto for Recycling – Call 1-800-768-6387] [*Alternative telephone numbers:* 1-800-ROUNDUP (1-800-768-6387)]

[*Optional additional container disposal statement:* IBC EMPTY? – FREE CALL – 1-888-SCHUETZ (1-888-724-8389) www.schuetz.net/ticket; Schuetz ticket service]

[*Optional additional container disposal statement:* FREE IBC PICKUP] [For continental USA and Canada only]

[*Optional additional container disposal statement:* RETURNnet SYSTEM – To return empty IBC's Email or Call – www.returnnetsystem.com – 1-888-758-SHIP – United States and Canada (1-888-758-7447 – IBCNA – Clarkston, Michigan – USA]

---

[*CONTAINER HANDLING AND DISPOSAL STATEMENT AND REFILLING LIMITATION FOR ALL REFILLABLE CONTAINERS, EXCEPT TRANSPORT VEHICLES*]

Refillable container.  Refill this container with pesticide only.  Do not reuse this container for any other purpose.

Cleaning this container before refilling is the responsibility of the refiller. Cleaning this container before final disposal is the responsibility of the person disposing of the container.

To clean this container before final disposal, empty the remaining contents from the container into application equipment or mix-tank.  Fill the container about 10 percent full with water.  Agitate vigorously or recirculate water with the pump for 2 minutes.  Pour or pump rinsate into application equipment or rinsate collection system.  Repeat this rinsing procedure two more times.

[*Optional container disposal statement:* Then offer the container for recycling, if available.]

[*Optional container disposal statement:* Some container manufacturers offer container recycling. See additional information regarding manufacturer recycling programs attached to this container, if available. If no recycling information is available on this container, contact your chemical dealer or Monsanto Company at 1-800-768-6387 [*Alternative telephone numbers:* 1-800-ROUNDUP (1-800-768-6387)] to find the nearest recycling location.]

[*Optional additional container disposal statement:* IBC EMPTY? – FREE CALL – 1-888-SCHUETZ (1-888-724-8389) www.schuetz.net/ticket; Schuetz ticket service]

[*Optional additional container disposal statement:* FREE IBC PICKUP] [For continental USA and Canada only]

[*Optional additional container disposal statement:* RETURNnet SYSTEM – To return empty IBC's Email or Call – www.returnnetsystem.com – 1-888-758-SHIP – United States and Canada (1-888-758-7447 – IBCNA – Clarkston, Michigan – USA]

[*Optional container disposal statement:* To obtain information about recycling refillable containers, contact Monsanto Company at 1-800-768-6387] [*Alternative telephone numbers:* 1-800-ROUNDUP (1-800-768-6387)].

I. CONTAINER LABELS

---

[*Optional container disposal statement:* Return Properly Rinsed Container to Monsanto for Recycling – Call 1-800-768-6387]  [*Alternative telephone numbers:* 1-800-ROUNDUP (1-800-768-6387)]

[*Optional additional container label statements for the CUBE refillable packaging system only:*
CUBE Monsanto Refillable Delivery System
FEATURES INCLUDE:
• Automatic Venting
• Heavy duty one-way 2-inch camloc ball valve with protective shield door
• Complete coated steel protective enclosure
• Durable 4-way plastic pallet
Lift door to access one-way valve]

---

[*Optional label text:*  For product information or assistance using this product call toll-free 1-800-332-3111]

[Amplify, Bullet, Certainty, Degree, Degree Xtra, Harness, INTRRO, Lariat, Micro-Tech, Monsanto and Vine Design, Outrider, Roundup, Roundup Custom and Design, [*ALTERNATE BRAND NAME and DESIGN*], Roundup Original, Roundup Ready, Roundup Ready 2 Technology, Roundup Ready 2 Yield, Roundup Ready PLUS and Design, Rowel, TripleFLEX, TRUEBLUE ADVANTAGE PROVEN RELIABLE SUPPORTED and Design, TruFlex and Warrant] are [registered] trademarks of Monsanto Technology LLC.  All other trademarks are the property of their respective owners.]

[*Insert LOT number or LOT number will be printed directly on the container*]

©[*Year*]

[*Insert date*]

[*Insert print plate number and barcode(s), as applicable*]

[*Optional text that can be placed on the area of the base label where the directions-for-use booklet is attached and can only be seen if the booklet is removed:*  COMPLETE DIRECTIONS FOR USE HAVE BEEN REMOVED]

## 2.0    EXTENDED CONTENT LABELS

[*Extended content labels (ECL) have the complete directions for use attached as additional pages directly to a base label that is securely attached to the pesticide container.*]

### 2.1    Base Label for Extended Content Labels

[*The following text represents the MINIMUM information that must be on the label that is securely attached to the primary pesticide container.  Additional label information from the complete directions for use sections and the extended label contents included in this Master Label may be added to this base label as space allows.*]

# [INSERT BRAND NAME] [*Logo optional*]

| GROUP | 9 | HERBICIDE |
|-------|---|-----------|

[*Optional marketing claims and/or logos in this Master Label may be added to the Base Label, if space allows*]

---

ACTIVE INGREDIENT:
*Glyphosate, N-(phosphonomethyl) glycine, in the form of its isopropylamine salt...........................  53.8%
OTHER INGREDIENTS: ..............................................................................................................  46.2%

---

I.  CONTAINER LABELS

100.0%

*Contains 648 grams of the active ingredient glyphosate, in the form of its isopropylamine salt, per liter or 5.4 pounds per U.S. gallon, which is equivalent to 480 grams of the acid, glyphosate, per liter or 4.0 pounds per U.S. gallon (39.9% by weight).

---

**PRECAUTIONARY STATEMENTS**

Hazards to Humans and Domestic Animals

Keep out of reach of children

# CAUTION

[*Optional base label text, if space allows:* DOMESTIC ANIMALS: This product is considered to be relatively nontoxic to dogs and other domestic animals; however, ingestion of this product or large amounts of freshly sprayed vegetation could result in temporary gastrointestinal irritation (vomiting, diarrhea, colic, etc.). If such symptoms are observed, provide the animal with plenty of fluids to prevent dehydration. Call a veterinarian if symptoms persist for more than 24 hours.]

**Personal Protective Equipment (PPE)**

**Applicators and other handlers must wear:** long-sleeved shirt and long pants, socks and shoes.

[*Optional base label text, as applicable:* See attached labeling for additional] [*Optional text, as applicable:* Precautions, First Aid [and] information on Personal Protective Equipment].

---

**DIRECTIONS FOR USE**

It is a violation of Federal law to use this product in any manner inconsistent with its labeling.  Do not apply this product in a way that will contact workers or other persons, either directly or through drift. Only protected handlers may be in the area during application. For any requirements specific to your State or Tribe, consult the agency responsible for pesticide regulation.

**Agricultural Use Requirements**

Use this product only in accordance with its labeling and with the Worker Protection Standard, 40 CFR Part 170. Refer to supplemental labeling under "AGRICULTURAL USE REQUIREMENTS" in the DIRECTIONS FOR USE section for information about this standard.

See Complete Directions for Use attached to this label for complete [*Optional text, as applicable*: Agricultural and Non-Agricultural Use Requirements of the Worker Protection Standard, Directions for Use and Limit of Warranty and Liability] [*Optional label text, if applicable:* in English and Spanish].

[*Alternative label statement:* See attached label booklet for complete] [*Optional label text, as applicable*: Agricultural and Non-Agricultural Use Requirements of the Worker Protection Standard, Directions for Use and Limit of Warranty and Liability] [*Optional label text, if applicable:* in English and Spanish].

**STORAGE AND DISPOSAL**

Proper pesticide storage and disposal are essential to protect against exposure to people and the environment due to leaks and spills, excess product or waste, and vandalism.  Do not allow this product to contaminate water, foodstuffs, feed or seed by storage or disposal.

**PESTICIDE STORAGE:** STORE ABOVE 5°F (-15°C) TO KEEP PRODUCT FROM CRYSTALLIZING. Crystals will settle to the bottom.  If allowed to crystallize, warm to 68°F (20°C) to redissolve and roll or

I. CONTAINER LABELS

shake container, or recirculate contents of larger containers, to mix well before using. Store pesticides away from food, pet food, feed, seed, fertilizers and veterinary supplies.  Keep container closed to prevent spills and contamination.

**PESTICIDE DISPOSAL:**  To avoid wastes, use all material in this container, including rinsate, by application according to label directions.  If wastes cannot be avoided, offer remaining product to a waste disposal facility or pesticide disposal program. Such programs are often run by state or local governments or by industry.  All disposal must be in accordance with applicable federal, state and local regulations and procedures.

**CONTAINER HANDLING AND DISPOSAL:** [*Insert appropriate Container Handling and Disposal Statement and Refilling Limitation from the following options*]

---

[*CONTAINER HANDLING AND DISPOSAL STATEMENT AND REFILLING LIMITATION FOR NONREFILLABLE RIGID CONTAINERS OF LESS THAN 1-GALLON CAPACITY*]

Nonrefillable container.  Do not reuse or refill this container.

[*Alternative container statement:* Nonrefillable container. Do not reuse this container to hold materials other than pesticides or dilute pesticides (rinsate). After emptying and cleaning, it may be allowable to temporarily hold rinsate or other pesticide-related materials in this container. Contact your state regulatory agency to determine allowable practices in your state.]

Triple rinse this container promptly after emptying.

Triple rinse as follows:  Empty the remaining contents into application equipment or mix-tank and continue to drain for 10 seconds after the flow begins to drip.  Fill the container ¼ full with water and recap.  Shake for 10 seconds.  Pour rinsate into application equipment or mix-tank, or store rinsate for later use or disposal.  Continue to drain for 10 seconds after the flow begins to drip.  Repeat this procedure two more times.

Once properly rinsed, some plastic [*Optional text:* agricultural] pesticide containers can be taken to a container collection site or picked up for recycling. [*Alternative container disposal statement:* Then offer the container for recycling, if available.]

[*Optional container disposal statement:* To find the nearest collection site, contact your chemical dealer or Monsanto Company at 1-800-768-6387] [*Alternative telephone numbers:* 1-800-ROUNDUP (1-800-768-6387)].

If recycling is not available, dispose of in accordance with federal, state and local regulations and procedures, which may include puncturing the properly rinsed container and disposing in a sanitary landfill.

---

[*CONTAINER HANDLING AND DISPOSAL STATEMENT AND REFILLING LIMITATION FOR NONREFILLABLE RIGID PLASTIC 2.5-GALLON CONTAINER AND OTHER NONREFILLABLE CONTAINERS OF GREATER THAN 1-GALLON, BUT EQUAL TO OR LESS THAN 5-GALLON CAPACITY*]

Nonrefillable container. Do not reuse this container to hold materials other than pesticides or dilute pesticides (rinsate).  After emptying and cleaning, it may be allowable to temporarily hold rinsate or other pesticide-related materials in this container.  Contact your state regulatory agency to determine allowable practices in your state.

[*Alternative container statement:* Nonrefillable container. Do not reuse or refill this container.]

Triple rinse or pressure rinse (or equivalent) this container promptly after emptying.

---

I. CONTAINER LABELS

Triple rinse as follows:  Empty the remaining contents into application equipment or mix-tank and continue to drain for 10 seconds after the flow begins to drip.  Fill the container ¼ full with water and recap.  Shake for 10 seconds.  Pour rinsate into application equipment or mix-tank, or store rinsate for later use or disposal.  Continue to drain for 10 seconds after the flow begins to drip.  Repeat this procedure two more times.

Pressure rinse as follows:  Empty the remaining contents into application equipment or mix-tank and continue to drain for 10 seconds after the flow begins to drip. Place container so that it can drain directly into application equipment or mix-tank while rinsing, or collect rinsate for later use or disposal. Insert pressure rinsing nozzle into the side of the container and rinse at about 40 PSI for at least 30 seconds. Continue to drain for 10 seconds after the flow begins to drip.

Once properly rinsed, some plastic [*Optional text:* agricultural] pesticide containers can be taken to a container collection site or picked up for recycling.  [*Alternative container disposal statement:* Then offer the container for recycling, if available.]

[*Optional container disposal statement:* To find the nearest collection site, contact your chemical dealer or Monsanto Company at 1-800-768-6387] [*Alternative telephone numbers:* 1-800-ROUNDUP (1-800-768-6387)].

If recycling is not available, dispose of in accordance with federal, state and local regulations and procedures, which may include puncturing the properly rinsed container and disposing in a sanitary landfill.

---

[*CONTAINER HANDLING AND DISPOSAL STATEMENT AND REFILLING LIMITATION FOR NONREFILLABLE RIGID PLASTIC 30-GALLON CONTAINER AND OTHER NONREFILLABLE CONTAINERS OF GREATER THAN 5-GALLON CAPACITY*]

Nonrefillable container.  Do not reuse or refill this container.

[*Alternative container statement:* Nonrefillable container. Do not reuse this container to hold materials other than pesticides or dilute pesticides (rinsate).  After emptying and cleaning, it may be allowable to temporarily hold rinsate or other pesticide-related materials in this container. Contact your state regulatory agency to determine allowable practices in your state.]

Triple rinse or pressure rinse (or equivalent) this container promptly after emptying.

[*Optional label text:* For containers not equipped with pumping systems,] Triple rinse as follows: Empty the remaining contents into application equipment or mix-tank.  Fill the container ¼ full with water. Replace and tighten closures.  Tip the container on its side and roll it back and forth for 30 seconds, ensuring at least one complete revolution.  Stand the container on its end and tip it back and forth several times.  Turn the container over onto its other end and tip it back and forth several times.  Empty the rinsate into application equipment or mix-tank, or store rinsate for later use or disposal.  Repeat this procedure two more times.

[*Alternative or additional triple rinsing instructions for large containers equipped with pumping systems:* [*Optional label text:* For large containers equipped with pumping systems,] Triple rinse as follows: Empty the remaining contents into application equipment or mix-tank.  Fill the container about 10 percent full with water.  Agitate vigorously or recirculate water with the pump for 2 minutes.  Pour or pump rinsate into application equipment or rinsate collection system.  Repeat this rinsing procedure two more times. Repeat this procedure two more times.]

Pressure rinse as follows: Empty the remaining contents into application equipment or mix-tank and continue to drain for 10 seconds after the flow begins to drip. Place container so that it can drain directly into application equipment or mix-tank while rinsing, or collect rinsate for later use or disposal.  Insert

I. CONTAINER LABELS

pressure rinsing nozzle into the side of the container and rinse at about 40 PSI for at least 30 seconds. Continue to drain for 10 seconds after the flow begins to drip.

Once properly rinsed, some plastic [*Optional text:* agricultural] pesticide containers can be taken to a container collection site or picked up for recycling. [*Alternative container disposal statement:* Then offer the container for recycling, if available.]

[*Optional container disposal statement:* Some container manufacturers offer container recycling. See additional information regarding manufacturer recycling programs attached to this container, if available. If no recycling information is available on this container, contact your chemical dealer or Monsanto Company at 1-800-768-6387 [*Alternative telephone numbers:* 1-800-ROUNDUP (1-800-768-6387)] to find the nearest recycling location.]

[*Optional container disposal statement:* To find the nearest collection site, contact your chemical dealer or Monsanto Company at 1-800-768-6387] [*Alternative telephone numbers:* 1-800-ROUNDUP (1-800-768-6387)].

If recycling is not available, dispose of in accordance with federal, state and local regulations and procedures, which may include puncturing the properly rinsed container and disposing in a sanitary landfill.

[*Optional container disposal statement:* Return Properly Rinsed Container to Monsanto for Recycling – Call 1-800-768-6387] [*Alternative telephone numbers:* 1-800-ROUNDUP (1-800-768-6387)]

[*Optional additional container disposal statement:* IBC EMPTY? – FREE CALL – 1-888-SCHUETZ (1-888-724-8389) www.schuetz.net/ticket; Schuetz ticket service]

[*Optional additional container disposal statement:* FREE IBC PICKUP] [For continental USA and Canada only]

[*Optional additional container disposal statement:* RETURNnet SYSTEM – To return empty IBC's Email or Call – www.returnnetsystem.com – 1-888-758-SHIP – United States and Canada (1-888-758-7447 – IBCNA – Clarkston, Michigan – USA]

---

[*CONTAINER HANDLING AND DISPOSAL STATEMENT AND REFILLING LIMITATION FOR ALL REFILLABLE CONTAINERS, EXCEPT TRANSPORT VEHICLES*]

Refillable container.  Refill this container with pesticide only.  Do not reuse this container for any other purpose.

Cleaning this container before refilling is the responsibility of the refiller. Cleaning this container before final disposal is the responsibility of the person disposing of the container.

To clean this container before final disposal, empty the remaining contents from the container into application equipment or mix-tank.  Fill the container about 10 percent full with water.  Agitate vigorously or recirculate water with the pump for 2 minutes.  Pour or pump rinsate into application equipment or rinsate collection system.  Repeat this rinsing procedure two more times.

[*Optional container disposal statement:* Then offer the container for recycling, if available.]

[*Optional container disposal statement:* Some container manufacturers offer container recycling. See additional information regarding manufacturer recycling programs attached to this container, if available. If no recycling information is available on this container, contact your chemical dealer or Monsanto Company at 1-800-768-6387 [*Alternative telephone numbers:* 1-800-ROUNDUP (1-800-768-6387)] to find the nearest recycling location.]

[*Optional additional container disposal statement:* IBC EMPTY? – FREE CALL – 1-888-SCHUETZ (1-

I.  CONTAINER LABELS

888-724-8389) www.schuetz.net/ticket; Schuetz ticket service]

[*Optional additional container disposal statement:*  FREE IBC PICKUP] [For continental USA and Canada only]

[*Optional additional container disposal statement:*  RETURNnet SYSTEM – To return empty IBC's Email or Call – www.returnnetsystem.com – 1-888-758-SHIP – United States and Canada (1-888-758-7447 – IBCNA – Clarkston, Michigan – USA]

[*Optional container disposal statement:* To obtain information about recycling refillable containers, contact Monsanto Company at 1-800-768-6387] [*Alternative telephone numbers:* 1-800-ROUNDUP (1-800-768-6387)].

[*Optional container disposal statement:* Return Properly Rinsed Container to Monsanto for Recycling – Call 1-800-768-6387]  [*Alternative telephone numbers:* 1-800-ROUNDUP (1-800-768-6387)]

[*Optional additional container label statements for the CUBE refillable packaging system only:*
   CUBE Monsanto Refillable Delivery System
   FEATURES INCLUDE:
   • Automatic Venting
   • Heavy duty one-way 2-inch camloc ball valve with protective shield door
   • Complete coated steel protective enclosure
   • Durable 4-way plastic pallet

   Lift door to access one-way valve]

[*Optional label text:* For product information or assistance using this product call toll-free 1-800-332-3111]

EPA Reg. No. 524-343

EPA Est. [*Insert appropriate EPA establishment number:* 524-IA-1; 524-LA-1; *or* Other*; or blank space*]

[*Alternative EPA establishment text:* EPA Est. (L) 524-LA-1 or (M) 524-IA-1 Lot number prefix (L) or (M) indicate appropriate establishment number.]  [*This lot number relationship with the establishment number can be expanded or changed to include additional or add new producing sites as appropriate*]

NET [*insert appropriate value or leave blank line for refillable container*] GAL [*Alternative label text:* NET CONTENTS]

Packed For:
MONSANTO COMPANY
800 N. LINDBERGH BLVD.
ST. LOUIS, MISSOURI 63167 USA

©[Year]

[*Insert LOT number or LOT number will be printed directly on the container*]

[*Insert print plate number and barcodes as applicable*]

[*Optional text that will be hidden behind the attached Extended Content Label and only become visible if the ECL is removed:*  COMPLETE DIRECTIONS FOR USE HAVE BEEN REMOVED]

## 2.2     Extended Content

[*The following represents the complete labeling text that must appear on the additional pages attached to the container base label as an Extended Content Label with the complete directions for use.*]

[*FRONT PANEL*]

I.  CONTAINER LABELS

# [INSERT BRAND NAME] [*Logo optional*]

| GROUP | 9 | HERBICIDE |
|-------|---|-----------|

[*Optional marketing claims and/or logos on this Master Label may be added to the Front Panel*]

A broad-spectrum postemergence herbicide for weed control in many agricultural systems.

[*Alternative product statement:*  Selective broad-spectrum weed control in Roundup Ready® crops]

[*Alternative product statement:*   Non-selective, broad-spectrum weed control for many agricultural systems and farmsteads]

[*Alternative product statement for products that also contain aquatic, industrial, turf, ornamental, select crop and other terrestrial uses:* A broad-spectrum postemergence herbicide for aquatic and industrial, turf, ornamental, forestry, roadside, utility rights-of-way, [*Optional text, if applicable:* select crop,] and other listed terrestrial weed control.  (For a complete list of aquatic and terrestrial uses, see the Directions for Use section inside [*Alternative text:* of] this labeling.)]

[*Optional statement for limited-geography product distribution:* This product is not registered in all states.] [*Optional text:* See inside attached labeling for more details.]

[*Additional optional statements for limited-geography product distribution:* For control of annual and perennial weeds in] [*list states and county-level information, as appropriate, where product is registered and distributed*]. [*Optional text:* *County Distribution:*] [*Optional text:* see inside attached labeling for details.] [*Optional text:* In [*list states*] this product is distributed in the counties listed below:] [*list counties by state*]

AVOID CONTACT OF THIS HERBICIDE WITH FOLIAGE, [*Optional text:* GREEN] STEMS, EXPOSED NON-WOODY ROOTS OR FRUIT OF CROPS, DESIRABLE PLANTS AND TREES, [*Optional label text, if applicable:* EXCEPT AS DIRECTED FOR USE ON ROUNDUP READY® CROPS,] AS SEVERE PLANT INJURY OR DESTRUCTION COULD RESULT.

ACTIVE INGREDIENT:
*Glyphosate, N-(phosphonomethyl) glycine, in the form of its isopropylamine salt............................ 53.8%
OTHER INGREDIENTS: ................................................................................................................  46.2%
                                                                                                                                          100.0%

*Contains 648 grams of the active ingredient glyphosate, in the form of its isopropylamine salt, per liter or 5.4 pounds per U.S. gallon, which is equivalent to 480 grams of the acid, glyphosate, per liter or 4.0 pounds per U.S. gallon (39.9% by weight).

[*Optional label text that will be updated at the time of printing, if necessary:* This product is protected by U.S. Patent No.'s [*List appropriate patents*].]

[*Optional label text, if applicable:*  Other Patents Pending.]

[*Optional label text, if applicable:*  No license granted under any non-U.S. patent(s).]

[*Option to insert reference to a Monsanto Patent Website:*  For a list of patents, if any, covering this product or its use, please go to www.monsantotechnology.com.]

EPA Reg. No. 524-343

EPA Est. [*Insert appropriate EPA establishment number:* 524-IA-1; 524-LA-1; *or* Other; *or blank space*]

I.  CONTAINER LABELS

[*Alternative EPA establishment text:* EPA Est. (L) 524-LA-1 or (M) 524-IA-1 Lot number prefix (L) or (M) indicate appropriate establishment number.]  [*This lot number relationship with the establishment number can be expanded or changed to include additional or add new producing sites as appropriate*]

Keep out of reach of children

# CAUTION

[*Optional label statement, if applicable:* See inside for additional] [*Optional text, as applicable:* Precautions [and] First Aid].

See inside for Complete Directions for Use [*Optional text:* in English and Spanish].

[*Alternative label statement:* See attached labeling for Complete Directions for Use]  [*Optional text:* in English and Spanish].

Read the entire label before using this product.

Use only according to label directions.

Read the LIMIT OF WARRANTY AND LIABILITY statement [*Optional text, if statement not included on the container label:* at the end of the attached labeling] before buying or using.  If terms are not acceptable, return at once unopened.

[*Optional container label statement:* THIS IS AN END-USE PRODUCT. MONSANTO COMPANY DOES NOT INTEND AND HAS NOT REGISTERED IT FOR REFORMULATION OR REPACKAGING.]

NET [*insert appropriate value*] GAL [*or other appropriate unit of measure*] [*Alternative text:* NET CONTENTS]

Packed for:
MONSANTO COMPANY
800 N. LINDBERGH BLVD.
ST. LOUIS, MISSOURI 63167 USA

©[Year]

[*Insert date*]

[*Insert print plate number and barcode(s) as applicable*]

[*Optional text:* Open Here]

[*EXTENDED CONTENT*]

[*For Extended Content Label, insert Complete Directions for Use, beginning with the Table of Contents from Parts II and/or III of this Master Label, as appropriate*]

## 3.0    SECONDARY PACKAGING FOR SHIPPING AND SALE

[*This section defines labeling for secondary packaging of multiple units of this product that are themselves fully labeled for individual sale, but are distributed and can also be sold as a multi-pack unit.*]

### 3.1    Secondary Packaging for Two 2.5-Gallon Nonrefillable Containers

[*FRONT PANEL*]

## [INSERT BRAND NAME] [*Logo optional*]

| GROUP | 9 | HERBICIDE |
|-------|---|-----------|

## I. CONTAINER LABELS

[*Optional marketing claims and/or logos included on this Master Label may be added to this secondary packaging*]

A broad-spectrum postemergence herbicide for weed control in many agricultural systems

[*Alternative product statement:* Selective broad-spectrum weed control in Roundup Ready® crops]

[*Alternative product statement:* Non-selective, broad-spectrum weed control for many agricultural systems and farmsteads]

[*Alternative statement for products that also contain aquatic, industrial, turf, ornamental, select crop and other terrestrial uses:* A broad-spectrum postemergence herbicide for aquatic and industrial, turf, ornamental, forestry, roadside, utility rights-of-way, [*Optional text, if applicable:* select crop,] and other listed terrestrial weed control.  (For a complete list of aquatic and terrestrial uses, see the Directions for Use section of the attached labeling [*Optional text:* booklet] inside.)]

[*Optional statement for limited-geography product distribution:* This product is not registered in all states.] [*Optional text:* See labeling [*Optional text:* booklet] inside for more details.]

[*Additional optional statements for limited-geography product distribution:* For control of annual and perennial weeds in [*list states and county-level information as appropriate where product is registered and distributed*]. [*Optional text:* *County Distribution:] [*Optional text:* see labeling [*Optional text:* booklet] inside for details.] [*Optional text:* In [*list states*] this product is distributed in the counties listed below:] [*list counties by state*]

AVOID CONTACT OF THIS HERBICIDE WITH FOLIAGE, [*Optional text:* GREEN] STEMS, EXPOSED NON-WOODY ROOTS OR FRUIT OF CROPS, DESIRABLE PLANTS AND TREES, [*Optional label text, if applicable:* EXCEPT AS DIRECTED FOR USE ON ROUNDUP READY® CROPS,] AS SEVERE PLANT INJURY OR DESTRUCTION COULD RESULT.

ACTIVE INGREDIENT:

| | |
|---|---|
| *Glyphosate, N-(phosphonomethyl) glycine, in the form of its isopropylamine salt | 53.8% |
| OTHER INGREDIENTS: | 46.2% |
| | 100.0% |

*Contains 648 grams of the active ingredient glyphosate, in the form of its isopropylamine salt, per liter or 5.4 pounds per U.S. gallon, which is equivalent to 480 grams of the acid, glyphosate, per liter or 4.0 pounds per U.S. gallon (39.9% by weight).

[*Optional label text that will be updated at the time of printing, if necessary:* This product is protected by U.S. Patent No.'s [*List appropriate patents*].]

[*Optional label text, if applicable:* Other Patents Pending.]

[*Optional label text, if applicable:* No license granted under any non-U.S. patent(s).]

[*Option to insert reference to a Monsanto Patent Website:* For a list of patents, if any, covering this product or its use, please go to www.monsantotechnology.com.]

EPA Reg. No. 524-343

EPA Est. [*Insert appropriate pesticide establishment number:* 524-IA-1; 524-LA-1; *or* Other; or blank space]

[*Alternative EPA establishment text:* EPA Est. (L) 524-LA-1 or (M) 524-IA-1 Lot number prefix (L) or (M) indicate appropriate establishment number.]  [*This lot number relationship with the establishment number can be expanded or changed to include additional or add new producing sites as appropriate*]

I. CONTAINER LABELS

Keep out of reach of children

# CAUTION

[*Optional label text, if applicable:* See side panel for additional] [*Optional text, as applicable:* Precautions [and] First Aid].

See labeling booklet inside for Complete Directions for Use [*Optional text:* in English and Spanish].

[*Alternative label text:* See attached labeling inside for Complete Directions for Use [*Optional text:* in English and Spanish].

Read the entire label before using this product.

Use only according to label directions.

Read the LIMIT OF WARRANTY AND LIABILITY statement [*Optional text, if applicable:* on side panel] before buying or using.  If terms are not acceptable, return at once unopened.

[*Optional container label statement:* THIS IS AN END-USE PRODUCT. MONSANTO COMPANY DOES NOT INTEND AND HAS NOT REGISTERED IT FOR REFORMULATION OR REPACKAGING.]

Two 2.5 GAL Units

Packed for:
MONSANTO COMPANY
800 N. LINDBERGH BLVD.
ST. LOUIS, MISSOURI 63167 USA

©[Year]

[*Insert print plate number and barcode(s) as applicable*]

[*ADDITIONAL CONTENT*]

**PRECAUTIONARY STATEMENTS**

Hazards to Humans and Domestic Animals

Keep out of reach of children

# CAUTION

DOMESTIC ANIMALS: This product is considered to be relatively nontoxic to dogs and other domestic animals; however, ingestion of this product or large amounts of freshly sprayed vegetation could result in temporary gastrointestinal irritation (vomiting, diarrhea, colic, etc.). If such symptoms are observed, provide the animal with plenty of fluids to prevent dehydration. Call a veterinarian if symptoms persist for more than 24 hours.

**Personal Protective Equipment (PPE)**

**Applicators and other handlers must wear:** long-sleeved shirt and long pants, socks and shoes.

Follow manufacturer's instructions for cleaning/maintaining PPE (Personal Protective Equipment). If there are no instructions for washables, use detergent and hot water. Keep and wash PPE separately from other laundry.

**User Safety Recommendations**

I. CONTAINER LABELS

Users should:
• Wash hands before eating, drinking, chewing gum, using tobacco, or using the toilet.
• Remove clothing immediately if pesticide gets inside. Then wash thoroughly and put on clean clothing.

**Environmental Hazards**

[*For labels without aquatic uses:* Do not apply directly to water, to areas where surface water is present or to intertidal areas below the mean high-water mark. Do not contaminate water when cleaning equipment or disposing of equipment wash waters and rinsate.]

[*Alternative text for labels with aquatic uses only:* Killing aquatic weeds can result in depletion or loss of oxygen in the water due to decomposition of dead plant material. This oxygen loss can cause fish suffocation. Consult with your State agency with primary responsibility for regulating pesticides before applying to public waters to determine if a permit is required. Do not contaminate water when cleaning equipment or disposing of equipment wash waters and rinsate.]

[*Alternative text for labels with both aquatic and terrestrial uses:* Killing aquatic weeds can result in depletion or loss of oxygen in the water due to decomposition of dead plant material. This oxygen loss can cause fish suffocation. Consult with your State agency with primary responsibility for regulating pesticides before applying to public waters to determine if a permit is required. For terrestrial uses, do not apply directly to water, to areas where surface water is present or to intertidal areas below the mean high-water mark [*Optional text, if applicable*: , except when applying this product by air over the forest canopy]. Do not contaminate water when cleaning equipment or disposing of equipment wash waters and rinsate.]

**Physical or Chemical Hazards**

Spray solutions of this product may be mixed, stored and applied using stainless steel, fiberglass, plastic or plastic-lined steel containers.

DO NOT MIX, STORE OR APPLY THIS PRODUCT OR SPRAY SOLUTIONS OF THIS PRODUCT IN GALVANIZED STEEL OR UNLINED STEEL (EXCEPT STAINLESS STEEL) CONTAINERS OR SPRAY TANKS. This product or spray solutions of this product react with such containers and tanks to produce hydrogen gas, which can form a highly combustible gas mixture. This gas mixture could flash or explode if ignited by open flame, spark, welder's torch, lighted cigarette or other ignition source and cause serious personal injury.

## DIRECTIONS FOR USE

It is a violation of Federal law to use this product in any manner inconsistent with its labeling. This product may only be used in accordance with the Directions for Use on this label or in separately published supplemental labeling. Supplemental labeling can be obtained from your Authorized Monsanto Retailer or Monsanto Company Representative.

Do not apply this product in a way that will contact workers or other persons, either directly or through drift. Only protected handlers may be in the area during application. For any requirements specific to your State or Tribe, consult the agency responsible for pesticide regulation.

### Agricultural Use Requirements

Use this product in accordance with its labeling and with the Worker Protection Standard, 40 CFR Part 170. Refer to supplemental labeling under "AGRICULTURAL USE REQUIREMENTS" in the DIRECTIONS FOR USE section for information about this standard.

I. CONTAINER LABELS

---

**Non-Agricultural Use Requirements**

The requirements in this box apply to uses of this product that are NOT within the scope of the Worker Protection Standard for agricultural pesticides (40 CFR Part 170). The WPS applies when this product is used to produce agricultural plants on farms, forests, nurseries or greenhouses.

Keep people and pets off treated areas until spray solution has dried.

---

See labeling booklet inside for complete Agricultural and Non-Agricultural Use Requirements of the Worker Protection Standard and Directions for Use [*Optional label text:* in English and Spanish].

[*Alternative label statement:* See attached labeling inside for complete Agricultural and Non-Agricultural Use Requirements of the Worker Protection Standard and Directions for Use [*Optional text:* in English and Spanish].

---

**STORAGE AND DISPOSAL**

Proper pesticide storage and disposal are essential to protect against exposure to people and the environment due to leaks and spills, excess product or waste, and vandalism.  Do not allow this product to contaminate water, foodstuffs, feed or seed by storage or disposal.

**PESTICIDE STORAGE:** STORE ABOVE 5°F (-15°C) TO KEEP PRODUCT FROM CRYSTALLIZING. Crystals will settle to the bottom.  If allowed to crystallize, warm to 68°F (20°C) to redissolve and roll or shake container, or recirculate contents of larger containers, to mix well before using. Store pesticides away from food, pet food, feed, seed, fertilizers and veterinary supplies.  Keep container closed to prevent spills and contamination.

**PESTICIDE DISPOSAL:**  To avoid wastes, use all material in the container, including rinsate, by application according to label directions.  If wastes cannot be avoided, offer remaining product to a waste disposal facility or pesticide disposal program. Such programs are often run by state or local governments or by industry.  All disposal must be in accordance with applicable federal, state and local regulations and procedures.

**CONTAINER HANDLING AND DISPOSAL:**  [*NOTE: Container Handling and Disposal Statement must match exactly the statement that is on the 2.5-gallon container inside the packaging.*]

Nonrefillable container. Do not reuse the container to hold materials other than pesticides or dilute pesticides (rinsate).  After emptying and cleaning, it may be allowable to temporarily hold rinsate or other pesticide-related materials in the container.  Contact your state regulatory agency to determine allowable practices in your state.

[*Alternative container statement:* Nonrefillable container. Do not reuse or refill the container.]

Triple rinse or pressure rinse (or equivalent) the container promptly after emptying.

Triple rinse as follows:  Empty the remaining contents into application equipment or mix-tank and continue to drain for 10 seconds after the flow begins to drip.  Fill the container ¼ full with water and recap.  Shake for 10 seconds.  Pour rinsate into application equipment or mix-tank, or store rinsate for later use or disposal.  Continue to drain for 10 seconds after the flow begins to drip.  Repeat this procedure two more times.

Pressure rinse as follows:  Empty the remaining contents into application equipment or mix-tank and continue to drain for 10 seconds after the flow begins to drip.  Place container so that it can drain directly into application equipment or mix-tank while rinsing, or collect rinsate for later use or disposal.  Insert pressure rinsing nozzle into the side of the container and rinse at about 40 PSI for at least 30 seconds. Continue to drain for 10 seconds after the flow begins to drip.

---

I. CONTAINER LABELS

Once properly rinsed, some plastic [*Optional text:* agricultural] pesticide containers can be taken to a container collection site or picked up for recycling.  [*Alternative container disposal statement:* Then offer the container for recycling, if available.]

[*Optional container disposal statement:* To find the nearest collection site, contact your chemical dealer or Monsanto Company at 1-800-768-6387] [*Alternative telephone numbers:* 1-800-ROUNDUP (1-800-768-6387)].

If recycling is not available, dispose of in accordance with federal, state and local regulations and procedures, which may include puncturing the properly rinsed container and disposing in a sanitary landfill.

For product information or assistance using this product, call toll-free 1-800-332-3111.

**LIMIT OF WARRANTY AND LIABILITY**

Monsanto Company ("Company") warrants that this product conforms to the chemical description on the label.  TO THE EXTENT CONSISTENT WITH APPLICABLE LAW, NO OTHER EXPRESS WARRANTY OR IMPLIED WARRANTY OF FITNESS FOR PARTICULAR PURPOSE OR MERCHANTABILITY IS MADE. This warranty is also subject to the conditions and limitations stated herein.

Buyer and all users shall use this product only for the purposes of and in accordance with the Complete Directions for Use label ("Directions") and shall promptly notify this Company of any claims whether based in contract, negligence, strict liability, other tort or otherwise.

To the extent consistent with applicable law, buyer and all users are responsible for all loss, injuries or damage from use or handling which results from conditions beyond the control of this Company, including, but not limited to, incompatibility with products other than those set forth in the Directions, application to or contact with desirable vegetation, crop injury or failure of this product to control weed biotypes which develop resistance to glyphosate, unusual weather, weather conditions which are outside the range considered normal at the application site and for the time period when the product is applied, as well as weather conditions which are outside the application ranges set forth in the Directions, use and/or application in any manner not explicitly set forth in or inconsistent with the Directions, moisture conditions outside the moisture range specified in the Directions, or the presence of products other than those set forth in the Directions in or on the soil, crop or treated vegetation.

This Company does not warrant any product reformulated or repackaged from this product except in accordance with this Company's stewardship requirements and with express written permission from this Company.

[*Optional statement for agricultural-use products, if applicable:* For in-crop (over-the-top) uses on Roundup Ready crops, crop safety and weed control performance are not warranted by Monsanto when this product is used in conjunction with "brown bag" or "bin run" seed saved from previous year's production and replanted.]

TO THE EXTENT CONSISTENT WITH APPLICABLE LAW, THE EXCLUSIVE REMEDY OF THE USER OR BUYER, AND THE LIMIT OF THE LIABILITY OF THIS COMPANY OR ANY OTHER SELLER FOR ANY AND ALL LOSSES, INJURIES OR DAMAGES RESULTING FROM THE USE OR HANDLING OF THIS PRODUCT (INCLUDING CLAIMS BASED IN CONTRACT, NEGLIGENCE, STRICT LIABILITY, OTHER TORT OR OTHERWISE) SHALL BE THE PURCHASE PRICE PAID BY THE USER OR BUYER FOR THE QUANTITY OF THIS PRODUCT INVOLVED, OR, AT THE ELECTION OF THIS COMPANY OR ANY OTHER SELLER, THE REPLACEMENT OF SUCH QUANTITY, OR, IF NOT ACQUIRED BY PURCHASE, REPLACEMENT OF SUCH QUANTITY. TO THE EXTENT CONSISTENT WITH APPLICABLE LAW, IN NO EVENT SHALL THIS COMPANY OR ANY OTHER SELLER BE LIABLE FOR ANY INCIDENTAL, CONSEQUENTIAL OR SPECIAL DAMAGES.

I.  CONTAINER LABELS

Upon opening and using this product, buyer and all users are deemed to have accepted the terms of this LIMIT OF WARRANTY AND LIABILITY which may not be varied by any verbal or written agreement. If terms are not acceptable, return at once unopened.

[Amplify, Bullet, Certainty, Degree, Degree Xtra, Harness, INTRRO, Lariat, Micro-Tech, Monsanto and Vine Design, Outrider, Roundup, Roundup Custom and Design, [*ALTERNATE BRAND NAME and DESIGN*], Roundup Original, Roundup Ready, Roundup Ready 2 Technology, Roundup Ready 2 Yield, Roundup Ready PLUS and Design, Rowel, TripleFLEX, TRUEBLUE ADVANTAGE PROVEN RELIABLE SUPPORTED and Design, TruFlex and Warrant] are [registered] trademarks of Monsanto Technology LLC.  All other trademarks are the property of their respective owners.

[*Insert UN packaging certification, if applicable*]

[*Optional packaging text:* Pull at scored pullouts for easier opening]

[*Optional packaging text:* THIS SIDE UP]

### 4.0     NONREFILLABLE SMART-PAK CONTAINER

[*The Smart-Pak container is a composite packaging consisting of a lightweight plastic container inside a rigid cardboard packaging to give it needed support required during shipping and storage.  Monsanto does not store, transport or sell the plastic container once it is filled with product without the outer cardboard packaging, and specific language in the STORAGE AND DISPOSAL section and other places on the label inform retailers and end-users to not remove the inner plastic container until it has been emptied and properly rinsed.*]

### 4.1     Outermost Cardboard Packaging

[*FRONT PANEL*]

## [**INSERT BRAND NAME**] [*Logo optional*]

| GROUP | 9 | HERBICIDE |
|-------|---|-----------|

[*Optional marketing claims and/or logos included on this Master Label may be added to this secondary packaging*]

A broad-spectrum postemergence herbicide for weed control in many agricultural systems.

[*Alternative product statement:*  Selective broad-spectrum weed control in Roundup Ready® crops]

[*Alternative product statement:* Non-selective, broad-spectrum weed control for many agricultural systems and farmsteads]

[*Alternative product statement for products that also contain aquatic, industrial, turf, ornamental, select crop and other terrestrial uses:*  A broad-spectrum postemergence herbicide for aquatic and industrial, turf, ornamental, forestry, roadside, utility rights-of-way, [*Optional text, if applicable:* select crop,] and other listed terrestrial weed control.  (For a complete list of aquatic and terrestrial uses, see the Directions for Use section in the attached labeling [*Optional text:* booklet].)]

[*Optional statement for limited-geography product distribution:* This product is not registered in all states.] [*Optional text:* See attached labeling [*Optional text:* booklet] for more details.]

[*Additional optional statements for limited-geography product distribution:* For control of annual and perennial weeds in [*list states and or county-level information as appropriate where product is registered and distributed*]. [*Optional text:*\*County Level Distribution:*] see inside attached labeling [*Optional text:* booklet] for details.] [*Optional text:* In [*list states*] this product is distributed in the counties listed below:] [*list counties by state*]

I. CONTAINER LABELS

AVOID CONTACT OF THIS HERBICIDE WITH FOLIAGE, [*Optional text:* GREEN] STEMS, EXPOSED NON-WOODY ROOTS OR FRUIT OF CROPS, DESIRABLE PLANTS AND TREES, [*Optional text, if applicable:* EXCEPT AS DIRECTED FOR USE ON ROUNDUP READY® CROPS,] AS SEVERE PLANT INJURY OR DESTRUCTION COULD RESULT.

ACTIVE INGREDIENT:

\*Glyphosate, N-(phosphonomethyl) glycine, in the form of its isopropylamine salt............................ 53.8%

OTHER INGREDIENTS: ................................................................................................................ 46.2%

100.0%

\*Contains 648 grams of the active ingredient glyphosate, in the form of its isopropylamine salt, per liter or 5.4 pounds per U.S. gallon, which is equivalent to 480 grams of the acid, glyphosate, per liter or 4.0 pounds per U.S. gallon (39.9% by weight).

[*Optional label text that will be updated at the time of printing, if necessary:* This product is protected by U.S. Patent No.'s [*List appropriate patents*].]

[*Optional label text, if applicable:* Other Patents Pending.]

[*Optional label text, if applicable:* No license granted under any non-U.S. patent(s).]

[*Option to insert reference to a Monsanto Patent Website:* For a list of patents, if any, covering this product or its use, please go to www.monsantotechnology.com.]

EPA Reg. No. 524-343

EPA Est. [*Insert appropriate EPA establishment number:* 524-IA-1; 524-LA-1; *or* Other*; or blank space*]

[*Alternative EPA establishment text:* EPA Est. (L) 524-LA-1 or (M) 524-IA-1 Lot number prefix (L) or (M) indicate appropriate establishment number.]  [*This lot number relationship with the establishment number can be expanded or changed to include additional or add new producing sites as appropriate.*]

Keep out of reach of children

# CAUTION

[*Optional label text, if applicable:* See back [*Alternative text:* side] panel for additional] [*Optional text, as applicable:* Precautions [and] First Aid]

See labeling booklet inside for Complete Directions for Use [*Optional text:* in English and Spanish].

[*Alternative label text:* See attached labeling for Complete Directions for Use [*Optional text:* in English and Spanish].

Read the entire label before using this product.

Use only according to label directions.

Read the LIMIT OF WARRANTY AND LIABILITY statement [*Optional text, if applicable:* on side panel] before buying or using.  If terms are not acceptable, return at once unopened.

[*Optional container label statement:* THIS IS AN END-USE PRODUCT. MONSANTO COMPANY DOES NOT INTEND AND HAS NOT REGISTERED IT FOR REFORMULATION OR REPACKAGING.]

3 [*or other appropriate* measure] GALLONS [*Alternative text:* GAL]

[*ADDITIONAL CONTENT THAT MAY APPEAR ON ANY PANEL OF THE OUTER PACKAGING*]

I. CONTAINER LABELS

---

**PRECAUTIONARY STATEMENTS**

---

**Hazards to Humans and Domestic Animals**

Keep out of reach of children

# CAUTION

DOMESTIC ANIMALS: This product is considered to be relatively nontoxic to dogs and other domestic animals; however, ingestion of this product or large amounts of freshly sprayed vegetation could result in temporary gastrointestinal irritation (vomiting, diarrhea, colic, etc.). If such symptoms are observed, provide the animal with plenty of fluids to prevent dehydration. Call a veterinarian if symptoms persist for more than 24 hours.

---

**Personal Protective Equipment (PPE)**

**Applicators and other handlers must wear:** long-sleeved shirt and long pants, socks and shoes.

Follow manufacturer's instructions for cleaning/maintaining PPE (Personal Protective Equipment). If there are no instructions for washables, use detergent and hot water. Keep and wash PPE separately from other laundry.

---

**User Safety Recommendations**

Users should:

• Wash hands before eating, drinking, chewing gum, using tobacco, or using the toilet.
• Remove clothing immediately if pesticide gets inside. Then wash thoroughly and put on clean clothing.

---

**Environmental Hazards**

[*For labels without aquatic uses:*  Do not apply directly to water, to areas where surface water is present or to intertidal areas below the mean high-water mark. Do not contaminate water when cleaning equipment or disposing of equipment wash waters and rinsate.]

[*Alternative text for labels with aquatic uses only:*  Killing aquatic weeds can result in depletion or loss of oxygen in the water due to decomposition of dead plant material.  This oxygen loss can cause fish suffocation.  Consult with your State agency with primary responsibility for regulating pesticides before applying to public waters to determine if a permit is required.  Do not contaminate water when cleaning equipment or disposing of equipment wash waters and rinsate.]

[*Alternative text for labels with both aquatic and terrestrial uses:*  Killing aquatic weeds can result in depletion or loss of oxygen in the water due to decomposition of dead plant material.  This oxygen loss can cause fish suffocation.  Consult with your State agency with primary responsibility for regulating pesticides before applying to public waters to determine if a permit is required.  For terrestrial uses, do not apply directly to water, to areas where surface water is present or to intertidal areas below the mean high-water mark [*Optional text, if applicable*: , except when applying this product by air over the forest canopy]. Do not contaminate water when cleaning equipment or disposing of equipment wash waters and rinsate.]

---

**Physical or Chemical Hazards**

Spray solutions of this product may be mixed, stored and applied using stainless steel, fiberglass, plastic or plastic-lined steel containers.

I. CONTAINER LABELS

DO NOT MIX, STORE OR APPLY THIS PRODUCT OR SPRAY SOLUTIONS OF THIS PRODUCT IN GALVANIZED STEEL OR UNLINED STEEL (EXCEPT STAINLESS STEEL) CONTAINERS OR SPRAY TANKS. This product or spray solutions of this product react with such containers and tanks to produce hydrogen gas, which can form a highly combustible gas mixture. This gas mixture could flash or explode if ignited by open flame, spark, welder's torch, lighted cigarette or other ignition source and cause serious personal injury.

## DIRECTIONS FOR USE

It is a violation of Federal law to use this product in any manner inconsistent with its labeling.  This product may only be used in accordance with the Directions for Use on this label or in separately published supplemental labeling.

Do not apply this product in a way that will contact workers or other persons, either directly or through drift. Only protected handlers may be in the area during application. For any requirements specific to your State or Tribe, consult the agency responsible for pesticide regulation.

## Agricultural Use Requirements

Use this product in accordance with its labeling and with the Worker Protection Standard, 40 CFR Part 170. Refer to supplemental labeling under "AGRICULTURAL USE REQUIREMENTS" in the DIRECTIONS FOR USE section for information about this standard.

See [*Optional text:* attached] labeling [*Optional text, if applicable:* booklet inside] for complete Agricultural and Non-Agricultural Use Requirements of the Worker Protection Standard and Directions for Use. Read the entire label before using this product.

## STORAGE AND DISPOSAL

Proper pesticide storage and disposal are essential to protect against exposure to people and the environment due to leaks and spills, excess product or waste, and vandalism. Do not allow this product to contaminate water, foodstuffs, feed or seed by storage and disposal.

**PESTICIDE STORAGE:** STORE ABOVE 5°F (-15°C) TO KEEP PRODUCT FROM CRYSTALLIZING. Crystals will settle to the bottom.  If allowed to crystallize, warm to 68°F (20°C) to redissolve and shake container or recirculate contents of larger containers to mix well before using. Store pesticides away from food, pet food, feed, seed, fertilizers and veterinary supplies. Keep container closed to prevent spills and contamination.  Do not store this container unprotected from the weather, especially precipitation, for extended periods of time.  DO NOT REMOVE INNER PLASTIC CONTAINER FROM THE PACKAGE UNTIL IT HAS BEEN EMPTIED AND PROPERLY RINSED.

**PESTICIDE DISPOSAL:** To avoid wastes, use all material in this container, including rinsate, by application according to label directions.  If wastes cannot be avoided, offer remaining product to a waste disposal facility or pesticide disposal program. Such programs are often run by state or local governments or by industry.  All disposal must be in accordance with applicable federal, state and local regulations and procedures.

**CONTAINER HANDLING AND DISPOSAL:** Nonrefillable container.  Do not reuse or refill this container.

Triple rinse or pressure rinse (or equivalent) the inner plastic container promptly after emptying.

Triple rinse as follows:  Empty the remaining contents into application equipment or mix-tank and continue to drain for 10 seconds after the flow begins to drip.  Fill the inner plastic container ¼ full with water and recap.  Shake for 10 seconds.  Pour rinsate into application equipment or mix-tank, or store rinsate for later use or disposal.  Continue to drain for 10 seconds after the flow begins to drip.  Repeat this procedure two more times.

I.  CONTAINER LABELS

Pressure rinse as follows:  Empty the remaining contents into application equipment or mix-tank and continue to drain for 10 seconds after the flow begins to drip.  Place container so that it can drain directly into application equipment or mix-tank while rinsing, or collect rinsate for later use or disposal.  Insert pressure rinsing nozzle through the bottom of the container, ensuring that you puncture the inner plastic container, and rinse at about 40 PSI for at least 30 seconds.  Continue to drain for 10 seconds after the flow begins to drip.

After rinsing, open the outer cardboard packaging and remove the inner plastic container.

Once properly rinsed, some plastic [*Optional text:* agricultural] pesticide containers can be taken to a container collection site or picked up for recycling. Recycle the cardboard separately. [*Alternative container disposal statement:* Then offer the outer cardboard packaging and inner plastic container for recycling, if available.]

[*Optional container disposal statement:* To find the nearest collection site, contact your chemical dealer or Monsanto Company at 1-800-768-6387] [*Alternative telephone numbers:* 1-800-ROUNDUP (1-800-768-6387)].

If recycling is not available, dispose of each component in accordance with federal, state and local regulations and procedures, which may include puncturing the properly rinsed inner plastic container and disposing both the outer cardboard packaging and inner plastic container in a sanitary landfill.

[*Optional label text:* For product information or assistance using this product, call toll-free 1-800-332-3111.]

[Amplify, Bullet, Certainty, Degree, Degree Xtra, Harness, INTRRO, Lariat, Micro-Tech, Monsanto and Vine Design, Outrider, Roundup, Roundup Custom and Design, [*ALTERNATE BRAND NAME and DESIGN*], Roundup Original, Roundup Ready, Roundup Ready 2 Technology, Roundup Ready 2 Yield, Roundup Ready PLUS and Design, Rowel, TripleFLEX, TRUEBLUE ADVANTAGE PROVEN RELIABLE SUPPORTED and Design, TruFlex and Warrant] are [registered] trademarks of Monsanto Technology LLC.  All other trademarks are the property of their respective owners.

[*Top panel label statement:*]  DO NOT REMOVE THE INNER PLASTIC CONTAINER FROM THIS PACKAGE UNTIL IT HAS BEEN EMPTIED AND PROPERLY RINSED.

Packed for:
MONSANTO COMPANY
800 N. LINDBERGH BLVD.
ST. LOUIS, MISSOURI 63167 USA

©[Year]

[*Insert print plate number and barcode(s) as applicable*]

[*Insert LOT number or LOT number will be printed directly on the container*]

**4.2     Inner Plastic Container Label**

## [INSERT BRAND NAME] [*Logo optional*]

| GROUP | 9 | HERBICIDE |
|-------|---|-----------|

ACTIVE INGREDIENT:

*Glyphosate, N-(phosphonomethyl) glycine, in the form of its isopropylamine salt............................ 53.8%

OTHER INGREDIENTS: .................................................................................................................. 46.2%

100.0%

I. CONTAINER LABELS

*Contains 648 grams of the active ingredient glyphosate, in the form of its isopropylamine salt, per liter or 5.4 pounds per U.S. gallon, which is equivalent to 480 grams of the acid, glyphosate, per liter or 4.0 pounds per U.S. gallon (39.9% by weight).

Keep out of reach of children

# CAUTION

EPA Reg. No. 524-343

**UNLESS THIS PLASTIC CONTAINER IS EMPTY AND HAS BEEN PROPERLY RINSED FOR DISPOSAL, IT IS NOT TO BE REMOVED FROM ITS OUTER CARDBOARD PACKAGING. FOR MORE INFORMATION CALL 1-800-768-6387** [*Alternative telephone numbers:* **1-800-ROUNDUP (1-800-768-6387)**] **OR COLLECT AT 314-694-4000.**

**4.3     Optional Container Label Statements for the Smart-Pak Composite Packaging Only**

Protect this package from precipitation until emptied and properly rinsed.

Use the cap to cut the foil seal.

Invert cap over foil seal and rotate clockwise and counterclockwise to cut the foil seal. Remove foil seal.

Easy to Handle

Uses less plastic than ordinary [*Alternative text:* typical] jugs

Produces less plastic waste than ordinary [*Alternative text:* typical] jugs

Compact Design

Space Efficient

Stackable

Easy to Use

Easy to Pour

Easy to Recycle

**5.0     TRANSPORT VEHICLE LABEL (AS DEFINED AT 40 CFR § 156.3)**

<div align="center">

## [INSERT BRAND NAME] [*Logo optional*]

| GROUP | 9 | HERBICIDE |
|-------|---|-----------|

</div>

[*Optional marketing claims and/or logos included on this Master Label may be added to this label*]

A broad-spectrum postemergence herbicide for weed control in many agricultural systems.

[*Alternative product statement:* Selective broad-spectrum weed control in Roundup Ready® crops]

[*Alternative product statement:* Non-selective, broad-spectrum weed control for many agricultural systems and farmsteads]

[*Alternative product statement for products that also contain aquatic, industrial, turf, ornamental, select crop and other terrestrial uses:* A broad-spectrum postemergence herbicide for aquatic and industrial, turf, ornamental, forestry, roadside, utility rights-of-way, [*Optional text, if applicable:* select crop,] and other listed terrestrial weed control.]

[*Optional statement for limited-geography product distribution:* This product is not registered in all states.]

I. CONTAINER LABELS

FOR BULK PESTICIDE TRANSPORT ONLY

ACTIVE INGREDIENT:

*Glyphosate, N-(phosphonomethyl) glycine, in the form of its isopropylamine salt............................  53.8%

OTHER INGREDIENTS: .................................................................................................................  46.2%

100.0%

*Contains 648 grams of the active ingredient glyphosate, in the form of its isopropylamine salt, per liter or 5.4 pounds per U.S. gallon, which is equivalent to 480 grams of the acid, glyphosate, per liter or 4.0 pounds per U.S. gallon (39.9% by weight).

[*Optional label text that will be updated at the time of printing, if applicable:* This product is protected by U.S. Patent No.'s [*List appropriate patents*].]

[*Optional label text, if applicable:* Other Patents Pending.]

[*Optional label text, if applicable:* No license granted under any non-U.S. patent(s).]

[*Option to insert reference to a Monsanto Patent Website:* For a list of patents, if any, covering this product or its use, please go to www.monsantotechnology.com.]

EPA Reg. No. 524-343

EPA Est. [*Insert appropriate EPA establishment number:* 524-IA-1; 524-LA-1; *or* Other; *or blank space*]

[*Alternative EPA establishment text:* EPA Est. (L) 524-LA-1 or (M) 524-IA-1 Lot number prefix (L) or (M) indicate appropriate establishment number.] [*This lot number relationship with the establishment number can be expanded or changed to include additional or add new producing sites as appropriate*]

## PRECAUTIONARY STATEMENTS

### Hazards to Humans and Domestic Animals

Keep out of reach of children

# CAUTION

DOMESTIC ANIMALS: This product is considered to be relatively nontoxic to dogs and other domestic animals; however, ingestion of this product or large amounts of freshly sprayed vegetation could result in temporary gastrointestinal irritation (vomiting, diarrhea, colic, etc.). If such symptoms are observed, provide the animal with plenty of fluids to prevent dehydration. Call a veterinarian if symptoms persist for more than 24 hours.

### Personal Protective Equipment (PPE)

**Applicators and other handlers must wear:** long-sleeved shirt and long pants, socks and shoes.

Follow manufacturer's instructions for cleaning/maintaining PPE (Personal Protective Equipment). If there are no instructions for washables, use detergent and hot water. Keep and wash PPE separately from other laundry.

### User Safety Recommendations

Users should:

• Wash hands before eating, drinking, chewing gum, using tobacco, or using the toilet.
• Remove clothing immediately if pesticide gets inside. Then wash thoroughly and put on clean clothing.

I.  CONTAINER LABELS

---

**Environmental Hazards**

---

[*For labels without aquatic uses:* Do not apply directly to water, to areas where surface water is present or to intertidal areas below the mean high-water mark. Do not contaminate water when cleaning equipment or disposing of equipment wash waters and rinsate.]

[*Alternative text for labels with aquatic uses only:*  Killing aquatic weeds can result in depletion or loss of oxygen in the water due to decomposition of dead plant material.  This oxygen loss can cause fish suffocation.  Consult with your State agency with primary responsibility for regulating pesticides before applying to public waters to determine if a permit is required.  Do not contaminate water when cleaning equipment or disposing of equipment wash waters and rinsate.]

[*Alternative text for labels with both aquatic and terrestrial uses:*  Killing aquatic weeds can result in depletion or loss of oxygen in the water due to decomposition of dead plant material.  This oxygen loss can cause fish suffocation.  Consult with your State agency with primary responsibility for regulating pesticides before applying to public waters to determine if a permit is required.  For terrestrial uses, do not apply directly to water, to areas where surface water is present or to intertidal areas below the mean high-water mark [*Optional text, if applicable*: , except when applying this product by air over the forest canopy]. Do not contaminate water when cleaning equipment or disposing of equipment wash waters and rinsate.]

**Physical or Chemical Hazards**

---

Spray solutions of this product may be mixed, stored and applied using stainless steel, fiberglass, plastic or plastic-lined steel containers.

DO NOT MIX, STORE OR APPLY THIS PRODUCT OR SPRAY SOLUTIONS OF THIS PRODUCT IN GALVANIZED STEEL OR UNLINED STEEL (EXCEPT STAINLESS STEEL) CONTAINERS OR SPRAY TANKS. This product or spray solutions of this product react with such containers and tanks to produce hydrogen gas, which can form a highly combustible gas mixture. This gas mixture could flash or explode if ignited by open flame, spark, welder's torch, lighted cigarette or other ignition source and cause serious personal injury.

---

### DIRECTIONS FOR USE

It is a violation of Federal law to use this product in any manner inconsistent with its labeling.  Do not apply this product in a way that will contact workers or other persons, either directly or through drift. Only protected handlers may be in the area during application. For any requirements specific to your State or Tribe, consult the agency responsible for pesticide regulation.

---

#### Agricultural Use Requirements

Use this product only in accordance with its labeling and with the Worker Protection Standard, 40 CFR Part 170. This Standard contains requirements for the protection of agricultural workers on farms, forests, nurseries, and greenhouses, and handlers of agricultural pesticides. It contains requirements for training, decontamination, notification, and emergency assistance. It also contains specific instructions and exceptions pertaining to the statements on this label about personal protective equipment (PPE) and restricted entry interval. The requirements in this box only apply to uses of this product that are covered by the Worker Protection Standard.

Do not enter or allow worker entry into treated areas during the restricted-entry interval (REI) of 4 hours.

---

**Page 29 of 170**

I. CONTAINER LABELS

PPE required for early entry to treated areas that is permitted under the Worker Protection Standard and that involves contact with anything that has been treated, such as plants, soil, or water, is: coveralls, shoes plus socks, and chemical-resistant gloves made of any waterproof material.

### Non-Agricultural Use Requirements

The requirements in this box apply to uses of this product that are NOT within the scope of the Worker Protection Standard for agricultural pesticides (40 CFR Part 170). The WPS applies when this product is used to produce agricultural plants on farms, forests, nurseries or greenhouses.

Keep people and pets off treated areas until spray solution has dried.

FOR BULK PESTICIDE TRANSPORT ONLY

### STORAGE AND DISPOSAL

Proper pesticide storage and disposal are essential to protect against exposure to people and the environment due to leaks and spills, excess product or waste, and vandalism.  Do not allow this product to contaminate water, foodstuffs, feed or seed by storage or disposal.

**PESTICIDE STORAGE:** STORE ABOVE 5°F (-15°C) TO KEEP PRODUCT FROM CRYSTALLIZING. Crystals will settle to the bottom.  If allowed to crystallize, warm to 68°F (20°C) to redissolve and roll or shake container, or recirculate contents of larger containers, to mix well before using. Store pesticides away from food, pet food, feed, seed, fertilizers and veterinary supplies.  Keep container closed to prevent spills and contamination.

**PESTICIDE DISPOSAL:**  To avoid wastes, empty as much product from this transport vehicle as possible for repackaging or use in accordance with label directions.  If wastes cannot be avoided, offer remaining product or rinsate to a waste disposal facility or pesticide disposal program.  All disposal must be in accordance with applicable federal, state and local regulations and procedures.

**CONTAINER HANDLING AND DISPOSAL:** Emptied transport vehicle container retains vapor and product residue.  Observe all precautions stated on this label until the container is cleaned, reconditioned or destroyed.  Prior to refilling, inspect carefully for damage such as cracks, punctures, abrasions, and worn-out threads and closures.  Clean thoroughly before reuse for transportation of a material of different composition or before retiring this transport vehicle container from service.

**THIS LABEL FOR USE WITH TRANSPORT VEHICLES ONLY**

[Amplify, Bullet, Certainty, Degree, Degree Xtra, Harness, INTRRO, Lariat, Micro-Tech, Monsanto and Vine Design, Outrider, Roundup, Roundup Custom and Design, [*ALTERNATE BRAND NAME and DESIGN*], Roundup Original, Roundup Ready, Roundup Ready 2 Technology, Roundup Ready 2 Yield, Roundup Ready PLUS and Design, Rowel, TripleFLEX, TRUEBLUE ADVANTAGE PROVEN RELIABLE SUPPORTED and Design, TruFlex and Warrant] are [registered] trademarks of Monsanto Technology LLC.  All other trademarks are the property of their respective owners.

Packed for:
MONSANTO COMPANY
800 N. LINDBERGH BLVD.
ST. LOUIS, MISSOURI 63167 USA

©[Year]

NET [*Insert net contents or blank space*] GAL [*or other unit of measure, as appropriate*]
[*Alternative label statement:* NET CONTENTS:] [*Insert net contents or blank space*] GAL

I.  CONTAINER LABELS

[*Alternative label statement:* NET CONTENTS: <u>See Bill of Lading</u>]

LOT [*Insert Lot number or blank space*]
[*Alternative label statement:* LOT: <u>See Bill of Lading</u>]

[*Alternative label statement:* For Net Contents and Lot Number, see the Bill of Lading]

[*Insert print plate number and barcode(s) as applicable*]

---

## II.   DIRECTIONS FOR USE WITH FOOD AND FEED CROPS

---

### [**INSERT BRAND NAME**] [Logo]

Herbicide

Complete Directions for Use

| GROUP | 9 | HERBICIDE |
|-------|---|-----------|

EPA Reg. No. 524-343

A broad-spectrum postemergence herbicide for weed control in many agricultural systems.

[*Alternative product statement:*  Selective broad-spectrum weed control in Roundup Ready® crops]

[*Alternative product statement:* Non-selective, broad-spectrum weed control for many agricultural systems and farmsteads]

[*Optional statement for limited-geography product distribution:* This product is not registered in all states.]

[*Alternative or additional statements for limited-geography product distribution:* For control of annual and perennial weeds in [*list states and or county-level information, as appropriate, where product is registered and distributed*]. [*Optional text:* *County Distribution:*] [*Optional text:* see inside for details.] [*Optional text:* In [*list states*] this product is distributed in the counties listed below:] [*list counties by states*]

AVOID CONTACT OF THIS HERBICIDE WITH FOLIAGE, [*Optional text:* GREEN] STEMS, EXPOSED NON-WOODY ROOTS OR FRUIT OF CROPS, DESIRABLE PLANTS AND TREES, [*Optional text, if applicable:* EXCEPT AS DIRECTED FOR USE ON ROUNDUP READY® CROPS,] AS SEVERE PLANT INJURY OR DESTRUCTION COULD RESULT.

[*Optional label text:* TrueBlue Advantage – Proven – Reliable – Supported® (Logo)]

[*Optional label text:* Roundup® – Powerful Performance at a Practical Price]

[*Optional label text:* Roundup Ready PLUS™ – Weed Management Solutions (Logo)]

[*Optional label text:* Herbicide for Roundup Ready® Crops]

[*Optional label text:* A member of the Roundup® Family of [*Optional text:* Agricultural] Herbicides by Monsanto]

Not all products listed on this label are registered for use in California.  Check the registration status of each product in California before using.

Read the entire label before using this product.

Use only according to label directions.

It is a violation of Federal law to use this product in any manner inconsistent with its labeling.

Read the "LIMIT OF WARRANTY AND LIABILITY" statement at the end of this labeling before buying or using.  If terms are not acceptable, return at once unopened.

[*Optional text:* THIS IS AN END-USE PRODUCT. MONSANTO COMPANY DOES NOT INTEND AND HAS NOT REGISTERED IT FOR REFORMULATION.  SEE INDIVIDUAL CONTAINER LABEL FOR REPACKAGING LIMITATIONS.]

**CONTENTS**

**1       1.0     INGREDIENTS**

II. DIRECTIONS FOR USE WITH FOOD AND FEED CROPS

**2**  **2.0**  **IMPORTANT PHONE NUMBERS**

**3**  **3.0**  **PRECAUTIONARY STATEMENTS**
      3.1  Hazards to Humans and Domestic Animals
      3.2  Environmental Hazards
      3.3  Physical or Chemical Hazards

**4**  **4.0**  **STORAGE AND DISPOSAL**

**5**  **5.0**  **PRODUCT INFORMATION**

**6**  **6.0**  **WEED RESISTANCE MANAGEMENT**
      6.1  Weed Management Practices
      6.2  Management of Glyphosate-Resistant Biotypes

**7**  **7.0**  **MIXING**
      7.1  Mixing with Water
      7.2  Surfactant
      7.3  Tank Mixtures
      7.4  Tank-Mixing Procedure
      7.5  Mixing Spray Solution Concentrations
      7.6  Ammonium Sulfate
      7.7  Colorants and Dyes
      7.8  Drift Reduction Additives

**8**  **8.0**  **APPLICATION EQUIPMENT AND TECHNIQUES**
      8.1  Spray Drift Management
      8.2  Aerial Application Equipment
      8.3  Ground Application Equipment
      8.4  Handheld Sprayers
      8.5  Selective Application Equipment
      8.6  Injection Systems
      8.7  Controlled Droplet Applicator (CDA)

**9**  **9.0**  **ANNUAL AND PERENNIAL CROPS**
      9.1  Cereal and Grain Crops
      9.2  Corn
      9.3  Cotton
      9.4  Fallow Systems
      9.5  Grain Sorghum (Milo)
      9.6  Herbs and Spices
      9.7  Oilseed Crops
      9.8  Soybean
      9.9  Sugarcane
      9.10  Vegetable Crops
      9.11  Miscellaneous Crops

**10**  **10.0**  **TREE, VINE AND SHRUB CROPS**
      10.1  Berry and Small Fruit Crops
      10.2  Citrus Fruit Crops
      10.3  Pome Fruit Crops
      10.4  Stone Fruit Crops
      10.5  Tree Nut Crops

II. DIRECTIONS FOR USE WITH FOOD AND FEED CROPS

| | 10.6 | Tropical and Subtropical Trees and Fruit Crops |
| | 10.7 | Vine Crops |
| | 10.8 | Miscellaneous Tree Food Crops |
| | 10.9 | Non-Food Tree Crops |

**11      11.0    PASTURE GRASSES, FORAGE LEGUMES AND RANGELAND**
      11.1    Alfalfa, Clover and Other Forage Legumes
      11.2    Conservation Reserve program (CRP)
      11.3    Grass Seed and Sod Production
      11.4    Pastures
      11.5    Rangeland

**12      12.0    ROUNDUP READY CROPS**
      12.1    Roundup Ready Alfalfa
      12.2    Roundup Ready Canola (Spring Varieties)
      12.3    Roundup Ready Canola (Winter Varieties)
      12.4    TruFlex Roundup Ready Canola (Spring Varieties)
      12.5    Field Corn Hybrids with Roundup Ready 2 Technology
      12.6    Sweet Corn Hybrids with Roundup Ready 2 Technology
      12.7    Roundup Ready Cotton
      12.8    Roundup Ready Flex Cotton
      12.9    Roundup Ready Soybean
      12.10   Roundup Ready 2 Yield Soybean
      12.11   Roundup Ready Sugarbeet

**13      13.0    FARMSTEAD USE**
      13.1    Farmstead Weed Control, Trim-And-Edge
      13.2    Greenhouse/Shadehouse
      13.3    Chemical Mowing
      13.4    Cut Stump Application
      13.5    Habitat Management

**14      14.0    ANNUAL WEEDS RATE SECTION**
      14.1    Annual Weeds -- Tank Mixtures with 2,4-D, Dicamba, or Tordon 22K
      14.2    Annual Weeds – Handheld Sprayers
      14.3    Annual Weeds – Tank Mixtures for Fallow and Reduced Tillage Systems

**15      15.0    PERENNIAL WEEDS RATE SECTION**

**16      16.0    WOODY BRUSH, TREES AND VINES RATE SECTION**

**17      17.0    LIMIT OF WARRANTY AND LIABILITY**

**1.0      INGREDIENTS**

---

ACTIVE INGREDIENT:

*Glyphosate, N-(phosphonomethyl)glycine, in the form of its isopropylamine salt ............................. 53.8%

OTHER INGREDIENTS: ....................................................................................................................  46.2%

                                                           100.0%

*Contains 648 grams of the active ingredient glyphosate, in the form of its isopropylamine salt, per liter or 5.4 pounds per U.S. gallon, which is equivalent to 480 grams of the acid, glyphosate, per liter or 4.0 pounds per U.S. gallon (39.9% by weight).

---

II. DIRECTIONS FOR USE WITH FOOD AND FEED CROPS

[*Optional label text that will be updated at the time of printing, if applicable:* This product is protected by U.S. Patent No.'s [*List appropriate patents*].]

[*Optional label text, if applicable:* Other Patents Pending.]

[*Optional label text, if applicable:* No license granted under any non-U.S. patent(s).]

[*Option to insert reference to a Monsanto Patent Website:* For a list of patents, if any, covering this product or its use, please go to www.monsantotechnology.com.]

## 2.0   IMPORTANT PHONE NUMBERS

1.  FOR PRODUCT INFORMATION OR ASSISTANCE USING THIS PRODUCT, CALL TOLL-FREE,
                              (800) 332-3111

2.  IN CASE OF AN EMERGENCY INVOLVING THIS HERBICIDE PRODUCT, OR FOR MEDICAL ASSISTANCE, CALL COLLECT, DAY OR NIGHT,
                              (314) 694-4000

## 3.0   PRECAUTIONARY STATEMENTS

### 3.1   Hazards to Humans and Domestic Animals

Keep out of reach of children

# CAUTION

DOMESTIC ANIMALS: This product is considered to be relatively nontoxic to dogs and other domestic animals; however, ingestion of this product or large amounts of freshly sprayed vegetation could result in temporary gastrointestinal irritation (vomiting, diarrhea, colic, etc.). If such symptoms are observed, provide the animal with plenty of fluids to prevent dehydration. Call a veterinarian if symptoms persist for more than 24 hours.

**Personal Protective Equipment (PPE)**

**Applicators and other handlers must wear:** long-sleeved shirt and long pants, socks and shoes.

Follow manufacturer's instructions for cleaning/maintaining PPE (Personal Protective Equipment). If there are no instructions for washables, use detergent and hot water. Keep and wash PPE separately from other laundry.

**User Safety Recommendations:**

Users should:

• Wash hands before eating, drinking, chewing gum, using tobacco, or using the toilet.

• Remove clothing immediately if pesticide gets inside.  Then wash thoroughly and put on clean clothing.

### 3.2   Environmental Hazards

Do not apply directly to water, to areas where surface water is present or to intertidal areas below the mean high water mark. Do not contaminate water when cleaning equipment or disposing of equipment wash waters and rinsate.

### 3.3   Physical or Chemical Hazards

Spray solutions of this product may be mixed, stored and applied using stainless steel, fiberglass, plastic or plastic-lined steel containers.

II. DIRECTIONS FOR USE WITH FOOD AND FEED CROPS

DO NOT MIX, STORE OR APPLY THIS PRODUCT OR SPRAY SOLUTIONS OF THIS PRODUCT IN GALVANIZED STEEL OR UNLINED STEEL (EXCEPT STAINLESS STEEL) CONTAINERS OR SPRAY TANKS. This product or spray solutions of this product react with such containers and tanks to produce hydrogen gas, which can form a highly combustible gas mixture. This gas mixture could flash or explode if ignited by open flame, spark, welder's torch, lighted cigarette or other ignition source and cause serious personal injury.

---

## DIRECTIONS FOR USE

It is a violation of Federal law to use this product in any manner inconsistent with its labeling. This product may only be used in accordance with the Directions for Use on this label or on separately published supplemental labeling.  Supplemental labeling for this product can be obtained from your Authorized Monsanto Retailer or Monsanto Company Representative.

[*The following paragraph is reserved and will only appear on final printed labeling for products under this registration if and when required by EPA:*

ENDANGERED SPECIES PROTECTION REQUIREMENTS: This product may have effects on federally listed threatened or endangered species or their critical habitat in some locations. When using this product, you must follow the measures contained in the Endangered Species Protection Bulletin for the county or parish in which you are applying the pesticide. To determine whether your county or parish has a Bulletin, and to obtain that Bulletin, consult http://www.epa.gov/espp/,or call 1-800-447-3813 no more than 6 months before using this product. Applicators must use Bulletins that are in effect in the month in which the pesticide will be applied. New Bulletins will generally be available from the above sources 6 months prior to their effective dates.]

Do not apply this product in a way that will contact workers or other persons, either directly or through drift. Only protected handlers may be in the area during application.  For any requirements specific to your State or Tribe, consult the agency responsible for pesticide regulation.

## Agricultural Use Requirements

Use this product only in accordance with its labeling and with the Worker Protection Standard, 40 CFR Part 170. This Standard contains requirements for the protection of agricultural workers on farms, forests, nurseries, and greenhouses, and handlers of agricultural pesticides. It contains requirements for training, decontamination, notification, and emergency assistance. It also contains specific instructions and exceptions pertaining to the statements on this label about personal protective equipment (PPE) and restricted entry interval. The requirements in this box only apply to uses of this product that are covered by the Worker Protection Standard.

Do not enter or allow worker entry into treated areas during the restricted-entry interval (REI) of 4 hours.

PPE required for early entry to treated areas that is permitted under the Worker Protection Standard and that involves contact with anything that has been treated, such as plants, soil, or water, is: coveralls, shoes plus socks, and chemical-resistant gloves made of any waterproof material.

## Non-Agricultural Use Requirements

The requirements in this box apply to uses of this product that are NOT within the scope of the Worker Protection Standard for agricultural pesticides (40 CFR Part 170). The WPS applies when this product is used to produce agricultural plants on farms, forests, nurseries or greenhouses.

Keep people and pets off treated areas until spray solution has dried.

## 4.0    STORAGE AND DISPOSAL

II. DIRECTIONS FOR USE WITH FOOD AND FEED CROPS

Proper pesticide storage and disposal are essential to protect against exposure to people and the environment due to leaks and spills, excess product or waste, and vandalism. Do not allow this product to contaminate water, foodstuffs, feed or seed by storage and disposal.

**PESTICIDE STORAGE**: STORE ABOVE 5°F (-15°C) TO KEEP PRODUCT FROM CRYSTALLIZING. Crystals will settle to the bottom. If allowed to crystallize, warm to 68°F (20°C) to redissolve and roll or shake container or recirculate contents of larger containers to mix well before using. Store pesticides away from food, pet food, feed, seed, fertilizers, and veterinary supplies. Keep container closed to prevent spills and contamination. See individual container label for additional storage conditions, if any.

**PESTICIDE DISPOSAL**: To avoid wastes, use all material in the container, including rinsate, by application according to label directions. If wastes cannot be avoided, offer remaining product to a waste disposal facility or pesticide disposal program. Such programs are often run by state or local governments or by industry. All disposal must be in accordance with applicable federal, state and local regulations and procedures.

**CONTAINER HANDLING AND DISPOSAL**: [*Optional label text, if applicable:* See container label for container handling and disposal instructions and refilling limitations.] [*Alternative optional text for ECL label:* See base label attached to the container for container handling and disposal instructions and refilling limitations.]

---

[*CONTAINER HANDLING AND DISPOSAL STATEMENT AND REFILLING LIMITATION FOR NONREFILLABLE RIGID CONTAINERS OF LESS THAN 1-GALLON CAPACITY*]

Nonrefillable container. Do not reuse or refill the container.

[*Alternative container statement:* Nonrefillable container. Do not reuse the container to hold materials other than pesticides or dilute pesticides (rinsate). After emptying and cleaning, it may be allowable to temporarily hold rinsate or other pesticide-related materials in the container. Contact your state regulatory agency to determine allowable practices in your state.]

Triple rinse the container promptly after emptying.

Triple rinse as follows: Empty the remaining contents into application equipment or mix-tank and continue to drain for 10 seconds after the flow begins to drip. Fill the container ¼ full with water and recap. Shake for 10 seconds. Pour rinsate into application equipment or mix-tank, or store rinsate for later use or disposal. Continue to drain for 10 seconds after the flow begins to drip. Repeat this procedure two more times.

Once properly rinsed, some plastic [*Optional text:* agricultural] pesticide containers can be taken to a container collection site or picked up for recycling. [*Alternative container disposal statement:* Then offer the container for recycling, if available.]

[*Optional container disposal statement:* To find the nearest collection site, contact your chemical dealer or Monsanto Company at 1-800-768-6387] [*Alternative telephone numbers:* 1-800-ROUNDUP (1-800-768-6387)].

If recycling is not available, dispose of in accordance with federal, state and local regulations and procedures, which may include puncturing the properly rinsed container and disposing in a sanitary landfill.

---

[*CONTAINER HANDLING AND DISPOSAL STATEMENT AND REFILLING LIMITATION FOR NONREFILLABLE RIGID PLASTIC 2.5-GALLON CONTAINER AND OTHER NONREFILLABLE CONTAINERS OF GREATER THAN 1-GALLON, BUT EQUAL TO OR LESS THAN 5-GALLON CAPACITY*]

---

## II. DIRECTIONS FOR USE WITH FOOD AND FEED CROPS

Nonrefillable container. Do not reuse the container to hold materials other than pesticides or dilute pesticides (rinsate). After emptying and cleaning, it may be allowable to temporarily hold rinsate or other pesticide-related materials in the container. Contact your state regulatory agency to determine allowable practices in your state.

[*Alternative container statement:* Nonrefillable container. Do not reuse or refill the container.]

Triple rinse or pressure rinse (or equivalent) the container promptly after emptying.

Triple rinse as follows: Empty the remaining contents into application equipment or mix-tank and continue to drain for 10 seconds after the flow begins to drip. Fill the container ¼ full with water and recap. Shake for 10 seconds. Pour rinsate into application equipment or mix-tank, or store rinsate for later use or disposal. Continue to drain for 10 seconds after the flow begins to drip. Repeat this procedure two more times.

Pressure rinse as follows: Empty the remaining contents into application equipment or mix-tank and continue to drain for 10 seconds after the flow begins to drip. Place container so that it can drain directly into application equipment or mix-tank while rinsing, or collect rinsate for later use or disposal. Insert pressure rinsing nozzle into the side of the container and rinse at about 40 PSI for at least 30 seconds. Continue to drain for 10 seconds after the flow begins to drip.

Once properly rinsed, some plastic [*Optional text:* agricultural] pesticide containers can be taken to a container collection site or picked up for recycling. [*Alternative container disposal statement:* Then offer the container for recycling, if available.]

[*Optional container disposal statement:* To find the nearest collection site, contact your chemical dealer or Monsanto Company at 1-800-768-6387] [*Alternative telephone numbers:* 1-800-ROUNDUP (1-800-768-6387)].

If recycling is not available, dispose of in accordance with federal, state and local regulations and procedures, which may include puncturing the properly rinsed container and disposing in a sanitary landfill.

---

[*CONTAINER HANDLING AND DISPOSAL STATEMENT AND REFILLING LIMITATION FOR NONREFILLABLE RIGID PLASTIC 30-GALLON CONTAINER AND OTHER NONREFILLABLE CONTAINERS OF GREATER THAN 5-GALLON CAPACITY*]

Nonrefillable container. Do not reuse or refill the container.

[*Alternative container statement:* Nonrefillable container. Do not reuse the container to hold materials other than pesticides or dilute pesticides (rinsate). After emptying and cleaning, it may be allowable to temporarily hold rinsate or other pesticide-related materials in the container. Contact your state regulatory agency to determine allowable practices in your state.]

Triple rinse or pressure rinse (or equivalent) the container promptly after emptying.

[*Optional label text:* For containers not equipped with pumping systems,] Triple rinse as follows: Empty the remaining contents into application equipment or mix-tank. Fill the container ¼ full with water. Replace and tighten closures. Tip the container on its side and roll it back and forth for 30 seconds, ensuring at least one complete revolution. Stand the container on its end and tip it back and forth several times. Turn the container over onto its other end and tip it back and forth several times. Empty the rinsate into application equipment or mix-tank, or store rinsate for later use or disposal. Repeat this procedure two more times.

[*Alternative or additional triple rinsing instructions for large containers equipped with pumping systems:* [*Optional label text:* For large containers equipped with pumping systems,] Triple rinse as follows: Empty

II. DIRECTIONS FOR USE WITH FOOD AND FEED CROPS

the remaining contents into application equipment or mix-tank. Fill the container about 10 percent full with water. Agitate vigorously or recirculate water with the pump for 2 minutes. Pour or pump rinsate into application equipment or rinsate collection system. Repeat this rinsing procedure two more times. Repeat this procedure two more times.]

Pressure rinse as follows: Empty the remaining contents into application equipment or mix-tank and continue to drain for 10 seconds after the flow begins to drip. Place container so that it can drain directly into application equipment or mix–tank while rinsing, or collect rinsate for later use or disposal. Insert pressure rinsing nozzle into the side of the container and rinse at about 40 PSI for at least 30 seconds. Continue to drain for 10 seconds after the flow begins to drip.

Once properly rinsed, some plastic [*Optional text:* agricultural] pesticide containers can be taken to a container collection site or picked up for recycling. [*Alternative container disposal statement:* Then offer the container for recycling, if available.]

[*Optional container disposal statement:* Some container manufacturers offer container recycling. See additional information regarding manufacturer recycling programs attached to the container, if available. If no recycling information is available on the container, contact your chemical dealer or Monsanto Company at 1-800-768-6387 [*Alternative telephone numbers:* 1-800-ROUNDUP (1-800-768-6387)] to find the nearest recycling location].

[*Optional container disposal statement:* To find the nearest collection site, contact your chemical dealer or Monsanto Company at 1-800-768-6387] [*Alternative telephone numbers:* 1-800-ROUNDUP (1-800-768-6387)].

If recycling is not available, dispose of in accordance with federal, state and local regulations and procedures, which may include puncturing the properly rinsed container and disposing in a sanitary landfill.

[*Optional container disposal statement:* Return Properly Rinsed Container to Monsanto for Recycling – Call 1-800-768-6387] [*Alternative telephone numbers:* 1-800-ROUNDUP (1-800-768-6387)]

[*Optional additional container disposal statement:* IBC EMPTY? – FREE CALL – 1-888-SCHUETZ (1-888-724-8389) www.schuetz.net/ticket; Schuetz ticket service]

[*Optional additional container disposal statement:* FREE IBC PICKUP] [For continental USA and Canada only]

[*Optional additional container disposal statement:* RETURNnet SYSTEM – To return empty IBC's Email or Call – www.returnnetsystem.com – 1-888-758-SHIP – United States and Canada (1-888-758-7447 – IBCNA – Clarkston, Michigan – USA]

---

[*CONTAINER HANDLING AND DISPOSAL STATEMENT AND REFILLING LIMITATION FOR ALL REFILLABLE CONTAINERS, EXCEPT TRANSPORT VEHICLES*]

Refillable container. Refill the container with pesticide only. Do not reuse the container for any other purpose.

Cleaning the container before refilling is the responsibility of the refiller. Cleaning the container before final disposal is the responsibility of the person disposing of the container.

To clean the container before final disposal, empty the remaining contents from the container into application equipment or mix-tank. Fill the container about 10 percent full with water. Agitate vigorously or recirculate water with the pump for 2 minutes. Pour or pump rinsate into application equipment or rinsate collection system. Repeat this rinsing procedure two more times.

[*Optional container disposal statement:* Then offer the container for recycling, if available.]

II. DIRECTIONS FOR USE WITH FOOD AND FEED CROPS

---

[*Optional container disposal statement:* Some container manufacturers offer container recycling. See additional information regarding manufacturer recycling programs attached to this container, if available. If no recycling information is available on this container, contact your chemical dealer or Monsanto Company at 1-800-768-6387 [*Alternative telephone numbers:* 1-800-ROUNDUP (1-800-768-6387)] to find the nearest recycling location.]

[*Optional additional container disposal statement:* IBC EMPTY? – FREE CALL – 1-888-SCHUETZ (1-888-724-8389) www.schuetz.net/ticket; Schuetz ticket service]

[*Optional additional container disposal statement:* FREE IBC PICKUP] [For continental USA and Canada only]

[*Optional additional container disposal statement:* RETURNnet SYSTEM – To return empty IBC's Email or Call – www.returnnetsystem.com – 1-888-758-SHIP – United States and Canada (1-888-758-7447 – IBCNA – Clarkston, Michigan – USA]

[*Optional container disposal statement:* To obtain information about recycling refillable containers, contact Monsanto Company at 1-800-768-6387] [*Alternative telephone numbers:* 1-800-ROUNDUP (1-800-768-6387)].

[*Optional container disposal statement:* Return Properly Rinsed Container to Monsanto for Recycling – Call 1-800-768-6387] [*Alternative telephone numbers:* 1-800-ROUNDUP (1/800-768-6387)]

---

### 5.0    PRODUCT INFORMATION

**Product Description:** This product is a postemergence, systemic herbicide with no soil residual activity. It is generally non-selective and gives broad-spectrum control of many annual and perennial weeds, woody brush, trees and vines.  It is formulated as a water-soluble liquid that, unless otherwise directed, requires dilution with water or other carrier and the addition of a surfactant that is labeled for use with herbicides before application according to label directions using standard and specialized pesticide application equipment.

**Mechanism of Action:**  The active ingredient in this product inhibits an enzyme found only in plants and microorganisms that is essential to the formation of specific amino acids.

**No Soil Activity:**  This product binds tightly to soil particles and does not provide residual weed control. Weeds must be emerged at the time of application to be controlled by foliar application of this product. Weed seeds in the soil will not be affected by this product and will continue to germinate.  Unattached plant rhizomes and rootstocks beneath the soil surface will also not be affected by this product.

**Biological Degradation:**  Degradation of this product is primarily a biological process carried out by soil microbes.

**Stage of Weeds:**  Annual weeds are easiest to control when they are small.  Enhanced control of most perennial weeds is obtained when this product is applied at late growth stages approaching maturity. Refer to the "ANNUAL WEEDS RATE SECTION," "PERENNIAL WEEDS RATE SECTION" and "WOODY BRUSH, TREES AND VINES RATE SECTION" for more information on the control of specific weeds.

**Cultural Considerations:** Reduced weed control could result when this product is applied to annual or perennial weeds that have been mowed, grazed or cut, and have not been allowed to re-grow prior to application.  Always use a higher product application rate within the given range when weed growth is heavy or dense, or when weeds are growing in an undisturbed (non-cultivated) area.  Reduced weed control could also result when this product is applied to weeds that show signs of disease or insect damage, are covered with dust, or are surviving under poor growing conditions.

**Spray Coverage:** For enhanced results, spray coverage must be uniform and complete.  Do not spray foliage to the point of runoff.

II. DIRECTIONS FOR USE WITH FOOD AND FEED CROPS

**Rainfastness:**  Rainfall within 4 hours of application could wash this product off of the foliage and a second application might then be needed for acceptable weed control.  Refer to specific use sections of this label for additional information on minimum intervals required before re-application of this product.

**Time to Symptoms:** This product moves through the plant from the point of foliage contact to and into the root system. Visible effects are a gradual wilting and yellowing of the plant that advances to complete browning of aboveground growth and deterioration of underground plant parts.  Effects are visible on most annual weeds within 2 to 4 days, but on most perennial weeds, effects might not be visible for 7 or more days after application. Extremely cool or cloudy weather following application could slow activity of this product and delay development of visual symptoms.

**Maximum Application Rates:**  The maximum application or use rates stated throughout this label are given in units of volume (fluid ounces or quarts) of this product per acre.  However, the maximum allowable application rates apply to this product combined with the use of any and all other herbicides containing the active ingredient glyphosate, whether applied separately or in a tank mixture, on a basis of total pounds of glyphosate (acid equivalents) per acre. If more than one glyphosate-containing product is applied to the same site within the same year, you must ensure that the total use of glyphosate (pounds acid equivalents) does not exceed the maximum allowed. See the "INGREDIENTS" section of this label for necessary product information.

Unless otherwise specified on this label, the combined total application of this product on a site must not exceed 6 quarts (6 pounds of glyphosate acid) per acre per year.  For applications on non-crop sites, or on tree, vine, or shrub crop production sites, the combined total application of this product must not exceed 8 quarts (8 pounds of glyphosate acid) per acre per year.

**NOTE:** Use of this product in any manner not consistent with this label could result in injury to persons, animals or crops, or have other unintended consequences.

## 6.0   WEED RESISTANCE MANAGEMENT

| GROUP | 9 | HERBICIDE |
| --- | --- | --- |

Glyphosate, the active ingredient in this product, is a Group 9 herbicide based on the mechanism of action classification system of the Weed Science Society of America. Any weed population can contain plants that are naturally resistant to Group 9 herbicides.  Weeds resistant to Group 9 herbicides can be effectively managed by using another herbicide from a different Group (either alone or in a mixture according to label directions), by using other cultural or mechanical methods of weed control, or a combination of the two.  Consult your local company representative, state cooperative extension agent, professional consultant or other qualified authority to determine appropriate actions for controlling specific resistant weeds.

## 6.1   Weed Management Practices

Resistant populations arise when rare individual plants are uncontrolled by a normal dose of a given herbicide under normal environmental conditions. In the absence of other control measures, these individuals survive, produce seed, and eventually become the dominant biotype in the field through continuous selection.  The best means of reducing this selection is to use diverse weed control practices such as multiple herbicides with different mechanisms of action, and often in combination with various mechanical and cultural practices.

To minimize the occurrence of herbicide-resistant biotypes, including those resistant to glyphosate, implement the following weed management practice options that are practical to your situation.  These management practices are applicable to reduce the spread of confirmed resistant biotypes (managing existing resistant biotypes) and to reduce the potential for selecting for resistance in new species (proactive resistance management).

II. DIRECTIONS FOR USE WITH FOOD AND FEED CROPS

- Use a diversified approach toward weed management focused on preventing weed seed production and reducing the number of weed seeds in the soil.

- Plant crops into fields that are as weed-free as possible and then keep them as weed-free as possible.

- Plant crop seed that is as weed-free as possible.

- Scout fields routinely, before and after herbicide application.

- Use multiple herbicide mechanisms of action that are effective against the most troublesome weeds in your field and against those with known resistance.

- Apply herbicides at application rates listed on the label when weeds are within the size range indicated on the label.

- Emphasize cultural practices that suppress weeds by using crop competitiveness.

- Use mechanical and biological weed management practices, where appropriate.

- Prevent field-to-field and within-field movement of weed seed or vegetative propagules.

- Manage weed seed at harvest and after harvest to prevent a buildup of the weed seedbank.

## 6.2     Management of Glyphosate-Resistant Biotypes

Appropriate testing is needed to determine if a weed is resistant to glyphosate. Call 1-800-768-6387 [*Alternative telephone numbers:* 1-800-ROUNDUP (1-800-768-6387)] or contact your Monsanto Company representative to determine if resistance in any particular weed biotype has been confirmed in your area, or visit on the Internet at www.weedresistancemanagement.com or www.weedscience.org.

Glyphosate-resistant weeds can be controlled or managed by applying this product in combination with residual preemergence herbicides and/or other postemergence herbicides labeled for control of the targeted weed in the crop being grown. For more information, see the "ANNUAL WEEDS RATE SECTION" and "PERENNIAL WEEDS RATE SECTION" of this label.

Since the occurrence of resistant weeds is difficult to detect prior to use, Monsanto Company accepts no liability for any losses that result from the failure of this product to control resistant weeds.

## 7.0     MIXING

Spray solutions of this product may be mixed, stored and applied using clean stainless steel, fiberglass, plastic or plastic-lined steel containers.

DO NOT MIX, STORE OR APPLY THIS PRODUCT OR SPRAY SOLUTIONS OF THIS PRODUCT IN GALVANIZED STEEL OR UNLINED STEEL (EXCEPT STAINLESS STEEL) CONTAINERS OR SPRAY TANKS.

Eliminate any risk of siphoning the contents of the tank back into the carrier source while mixing. Use approved anti-back-siphoning devices where required by state or local regulations.

A 50-mesh nozzle screen or line strainer on the spray equipment is adequate.

Clean sprayer parts promptly after using this product by thoroughly flushing with water.

## 7.1     Mixing with Water

PERFORMANCE OF THIS PRODUCT CAN BE SIGNIFICANTLY REDUCED IF WATER CONTAINING SOIL SEDIMENT IS USED AS CARRIER.  DO NOT MIX THIS PRODUCT WITH WATER FROM PONDS OR DITCHES THAT IS VISIBLY MUDDY OR MURKY.

This product mixes readily with water. Mix spray solutions of this product as follows.  Begin filling the mixing tank or spray tank with clean water. Add the required amount of this product near the end of the

II. DIRECTIONS FOR USE WITH FOOD AND FEED CROPS

filling process and mix gently.  Foaming of the spray solution can occur during mixing. To prevent or minimize foaming, mix gently, terminate by-pass and return lines at the bottom of the tank and, if necessary, add an appropriate anti-foam or defoaming agent to the spray solution.

**7.2    Surfactant**

Unless otherwised directed, this product requires the addition of 2 or more quarts of a nonionic surfactant that is labeled for use with herbicides per 100 gallons of spray solution (0.5% or more by volume).  Unless otherwise directed, use a higher concentration of surfactant when any of the following conditions apply to the use of this product:

- Adding surfactants that contain less than 70 percent active ingredient
- Making a broadcast application using a high carrier volume or using handheld spray equipment
- Applying under adverse growing conditions or anytime weeds are under stress
- Applying as a tank-mix with other products
- Applying to hard-to-control weeds, woody brush, trees or vines

Read and follow all precautionary statements and directions for use on the surfactant label.

[*Optional label text, if applicable:* When applying this product [*Optional label text, if applicable:* preharvest to cotton or] [*Optional label text, if applicable:* postemergence (in–crop) over the top of Roundup Ready crops], do not exceed a surfactant concentration of 2 quarts per 100 gallons of spray solution.  Surfactant concentrations exceeding two quarts per 100 gallons of spray solution could result in crop injury and reduced yield.]

All reference throughout this label to concentration of surfactant in the spray solution is on a percentage-of-volume basis.  Refer to the table below to achieve the appropriate concentration of surfactant in the spray solution.

| Desired Volume of Spray Solution | Amount of Surfactant to Achieve Indicated Concentration in Spray Solution (percent by volume) | | | | | |
|---|---|---|---|---|---|---|
| | 0.5% | 0.75% | 1% | 1.5% | 4% | 8% |
| 1 gallon | 2/3 fl oz | 1 fl oz | 1.3 fl oz | 2 fl oz | 5 fl oz | 10 fl oz |
| 25 gallons | 16 fl oz | 24 fl oz | 1 qt | 1.5 qts | 4 qts | 2 gals |
| 100 gallons | 2 qts | 3 qts | 1 gal | 1.5 gals | 4 gals | 8 gals |

2 tablespoons = 1 fluid ounce (fl oz)

**7.3    Tank Mixtures**

This product does not provide residual weed control. This product may be tank-mixed with other herbicides to provide residual weed control in the soil, a broader weed control spectrum or an alternate mechanism of action.

Some tank-mix products have the potential to cause crop injury under certain conditions, at certain growth stages and/or under other circumstances.  Read the label of all products to be used in the tank mixture prior to use to determine the potential for crop injury.

Tank mixtures with other herbicides, insecticides, fungicides, micronutrients or foliar fertilizers could result in reduced weed control or crop injury. Monsanto Company has not tested all tank-mix product formulations for compatibility, antagonism or reduction in product performance.  To the extent consistent with applicable law, buyer and all users are responsible for any and all loss or damage in connection with

II. DIRECTIONS FOR USE WITH FOOD AND FEED CROPS

the use or handling of mixtures of this product with herbicides or other materials that are not expressly specified on this label, or on separate supplemental labeling or Fact Sheets published for this product.

When a tank-mix with a generic active ingredient, such as 2,4-D, atrazine, dicamba, diuron, pendimethalin or any other product or material, is listed on this label, the user is responsible for ensuring that the specific application being made is included on the label of the product being used in the mix.

Refer to all individual product labels, supplemental labeling and Fact Sheets for all products in the tank mixture, and observe all precautions and limitations on the label, including application timing restrictions, soil restrictions, minimum re-cropping intervals and any crop rotation restrictions. Use according to the most restrictive precautionary statements for each product in the tank mixture.

For enhanced results, apply tank mixtures with this product at a minimum spray volume rate of 10 gallons per acre.

### 7.4    Tank-Mixing Procedure

Always predetermine the compatibility of all tank-mix products together in the carrier by mixing small proportional quantities in advance.

Mix only the quantity of spray solution that will be applied that day.  Application of tank-mix solutions that are allowed to stand overnight could result in reduced weed control.

Pepare tank mixtures of this product as follows:

1. Place a 20- to 35-mesh screen or wetting basket over filling port of tank.

2. Through the screen, fill the spray tank one-half full with water and start gentle agitation.

3. If ammonium sulfate is to be used, add it slowly through the screen into the tank and continue adding water into the tank through the screen. If dry ammonium sulfate is being used, ensure that it is completely dissolved in the spray tank before adding other products.

4. If a wettable powder is used, prepare a slurry of it with water and add it SLOWLY through the screen into the tank while continuing gentle agitation.

5. If a flowable formulation is used, premix one part flowable with one part water and add the diluted mixture SLOWLY through the screen into the tank while continuing gentle agitation.

6. If an emulsifiable concentrate formulation is used, premix one part emulsifiable concentrate with two parts water and add the diluted mixture SLOWLY through the screen into the tank while continuing gentle agitation.

7. Continue filling the spray tank with water through the screen and add the required amount of this product near the end of the filling process.

8. Add nonionic surfactant to the spray tank before completing the filling process.

9. Add individual tank-mix components to the tank as follows: wettable powders; flowables; emulsifiable concentrates; drift reduction additives; water soluble liquids (this product); nonionic surfactants.

Maintain gentle agitation at all times until the contents of the tank are sprayed out. If the spray mixture is allowed to settle, agitate thoroughly to resuspend the mixture before resuming application.

Keep by-pass and return lines on or near the bottom of the tank to minimize foaming.

A 50-mesh nozzle screen or line strainer on the spray equipment is adequate.

### 7.5    Mixing Spray Solution Concentrations

All reference throughout this label to concentration of this product in a spray solution is on a percentage-of-volume basis.

## II. DIRECTIONS FOR USE WITH FOOD AND FEED CROPS

Prepare the desired volume of spray solution at a given concentration by mixing the amount of this product indicated in the following table with water.

| Desired Volume of Spray Solution | Amount of [INSERT BRAND NAME] to Achieve Indicated Concentration in Spray Solution (percent by volume) | | | | | |
|---|---|---|---|---|---|---|
| | 0.5% | 0.75% | 1% | 1.5% | 4% | 8% |
| 1 gallon | 2/3 fl oz | 1 fl oz | 1.3 fl oz | 2 fl oz | 5 fl oz | 10 fl oz |
| 25 gallon | 16 fl oz | 24 fl oz | 1 qt | 1.5 qts | 4 qts | 2 gals |
| 100 gallon | 2 qts | 3 qts | 1 gal | 1.5 gals | 4 gals | 8 gals |

2 tablespoons = 1 fluid ounce (fl oz)

For filling backpack and pump-up sprayers, consider mixing the appropriate amount of this product with water in a larger container and then filling the sprayer from the larger container.

### 7.6    Ammonium Sulfate

Unless otherwise directed, the addition of 1 to 2 percent dry ammonium sulfate by weight (8.5 to 17 pounds per 100 gallons of water), could increase the performance of this product on annual and perennial weeds, particularly under hard water conditions, drought conditions or when tank-mixed with certain residual herbicides.  An equivalent amount of a liquid formulation of ammonium sulfate may also be used. Ensure that dry ammonium sulfate is completely dissolved in the spray tank before adding herbicides. Thoroughly rinse the spray system with clean water promptly after use to reduce corrosion.

When using ammonium sulfate, apply this product at rates directed on this label; lower application rates will result in reduced performance.

### 7.7    Colorants and Dyes

Colorants and marking dyes may be added to spray solutions of this product; however, they can reduce the performance of this product.  Use colorants and dyes according to the manufacturer's directions.

### 7.8    Drift Reduction Additives

Drift reduction additives may be used with all equipment types, except wiper applicators, sponge bars and controlled droplet applicators (CDA).  When a drift reduction additive is used, read and follow all precautions, limitations and all other information on the product label.  Use of drift reduction additives can affect spray coverage, which could reduce the performance of this product.

### 8.0    APPLICATION EQUIPMENT AND TECHNIQUES

This product may be applied using the following equipment:

**Aerial Application Equipment**—fixed-wing and helicopter

**Ground Application Equipment**—boom or boomless systems, pull-type sprayers, floaters, pick-up sprayers, spray coupes and other ground broadcast application equipment

**Handheld Sprayers**—backpack sprayers, pump-up pressure sprayers, handguns, handwands, mistblowers*, lances and other handheld and motorized spray equipment used to direct the spray onto weed foliage

*This product is not registered in California or Arizona for use in mistblowers.

**Selective Application Equipment**—shielded and hooded sprayers, wiper applicator, sponge bar, spray bottle

II. DIRECTIONS FOR USE WITH FOOD AND FEED CROPS

**Injection Systems**—aerial or ground injection sprayers

**Controlled Droplet Applicator (CDA)**—handheld or boom-mounted applicators that produce a spray consisting of a narrow range of droplet sizes

APPLY THIS PRODUCT USING PROPERLY MAINTAINED AND CALIBRATED EQUIPMENT CAPABLE OF ACCURATELY DELIVERING DESIRED VOLUMES.

Do not apply this product through any type of irrigation system.

## 8.1    Spray Drift Management

AVOID CONTACT OF THIS HERBICIDE WITH FOLIAGE, [*Optional text:* GREEN] STEMS, EXPOSED NON-WOODY ROOTS OR FRUIT OF CROPS, DESIRABLE PLANTS AND TREES, [*Optional text, if applicable:* EXCEPT AS DIRECTED FOR USE ON ROUNDUP READY® CROPS,] AS SEVERE PLANT INJURY OR DESTRUCTION COULD RESULT.

Do not allow the herbicide solution to mist, drip, drift, or splash onto desirable vegetation, as even small quantities of this product can cause severe damage or destruction to the crop, plants or other vegetation on which application was not intended.

AVOID DRIFT.  USE EXTREME CARE TO PREVENT INJURY TO DESIRABLE PLANTS AND CROPS WHEN APPLYING THIS PRODUCT.

Avoiding spray drift at the application site is the responsibility of the applicator.  The interaction of many equipment- and weather-related factors determines the potential for spray drift.  The applicator and the grower are responsible for considering all these factors when making decisions regarding the application of this product.

The likelihood of injury occurring as the result of spray drift while applying this product increases when winds are gusty, as wind velocity increases, when wind direction is constantly changing or when there are other meteorological conditions that favor spray drift.  When spraying, avoid combinations of pressure and nozzle type that will result in splatter or generation of fine particles (mist) that are likely to drift.

TO PREVENT INJURY TO ADJACENT DESIRABLE VEGETATION, APPROPRIATE BUFFERS MUST BE MAINTAINED.

AVOID APPLYING THIS PRODUCT AT EXCESSIVE SPEED OR SPRAYER PRESSURE.

## 8.2    Aerial Application Equipment

Unless otherwise prohibited, all applications of this product described on this label may be made using aerial application equipment where appropriate, provided that the applicator complies with the precautions and restrictions specified on this label or on separate supplemental labeling published for this product.

DO NOT APPLY THIS PRODUCT USING AERIAL APPLICATION EQUIPMENT EXCEPT UNDER CONDITIONS SPECIFIED ON THIS LABEL OR ON SEPARATELY PUBLISHED SUPPLEMENTAL LABELING FOR THIS PRODUCT.

FOR SPECIFIC USE INSTRUCTIONS, RESTRICTIONS AND REQUIREMENTS RELATED TO THE AERIAL APPLICATION OF THIS PRODUCT IN ARKANSAS AND CALIFORNIA, OR SPECIFIC COUNTIES THEREIN, REFER TO THE LIMITATIONS ON AERIAL APPLICATION IN THAT STATE OR COUNTY PRESENTED IN THIS SECTION.

Unless otherwise directed, the maximum single application rate of this product is 48 fluid ounces per acre when using aerial application equipment.  Apply this product at the appropriate rate in 3 to 15 gallons of water per acre unless otherwise directed on this label or on separate supplemental labeling for this

II. DIRECTIONS FOR USE WITH FOOD AND FEED CROPS

product.  Refer to the individual use sections of this label for application rates, spray volumes and additional directions for use.

Drift control reduction additives may be used.

Ensure uniform application.  To avoid streaked, uneven or overlapped application, use appropriate marking devices.

**Aircraft Maintenance**

Thoroughly wash aircraft, especially landing gear, after each day of spraying to remove residues of this product accumulated during spraying or from spills. PROLONGED EXPOSURE OF THIS PRODUCT TO UNCOATED STEEL SURFACES COULD RESULT IN CORROSION AND POSSIBLE FAILURE OF THE PART. LANDING GEAR IS MOST SUSCEPTIBLE. The maintenance of an organic coating (paint) that meets aerospace specification MIL-C-38413 can help prevent corrosion.

<div align="center"><strong>AERIAL SPRAY DRIFT MANAGEMENT</strong></div>

The following drift management requirements must be followed to minimize off-target drift movement during aerial application.  [*Optional label text, if applicable:* These requirements do not apply to forestry applications.]

1.  The distance of the outermost nozzles on the boom must not exceed 3/4 the length of the wingspan or rotor.

2.  Nozzles must always point backwards, parallel with the air stream and never be pointed downwards more than 45 degrees.  Where states have more stringent regulations, they must be followed.

**Importance of Droplet Size**

The most effective way to reduce drift potential is to apply large droplets.  The best drift management strategy is to apply the largest droplets that provide sufficient coverage and control. Applying larger droplets reduces drift potential, but will not prevent drift if application is made improperly or under unfavorable environmental conditions, such as in windy, high temperature with low humidty, and/or inversion conditions as described below.

**Controlling Droplet Size**

- **Volume:**  Use high flow rate nozzles to apply the highest practical spray volume.  Nozzles with the higher rated flows produce larger droplets.

- **Pressure:**  Operate at a spray pressure towards the lower end of the range listed for the nozzle.  Higher pressure reduces droplet size and does not improve canopy penetration.  When higher flow rates are needed, use higher flow rate nozzles instead of increasing pressure.

- **Number of nozzles:**  Use the minimum number of nozzles that provides uniform coverage.

- **Nozzle orientation:**  Orienting nozzles so that the spray is released backwards, parallel to the air stream, will produce larger droplets than other orientations. Significant deflection from the horizontal will reduce droplet size and increase drift potential.

- **Nozzle type:**  Use a nozzle type that is designed for the intended application.  With most nozzle types, narrower spray angles produce larger droplets.  Consider using low-drift nozzles.  Solid stream nozzles oriented straight back produce larger droplets than other nozzle types.

- **Boom length:**  For some use patterns, reducing the effective boom length to less than 3/4 of the wingspan or rotor length can further reduce drift without reducing swath width.

II. DIRECTIONS FOR USE WITH FOOD AND FEED CROPS

- **Application height:** Application must be made at a height of 10 feet or less above the top of the largest plants, unless a greater height is required for aircraft safety. Making the application at the lowest height that is safe reduces the exposure of the droplets to evaporation and wind.

**Swath Adjustment**

When an application is made with a crosswind present, the swath will be displaced downwind. Therefore, on the upwind and downwind edges of the field, the applicator must compensate for this displacement by adjusting the path of the aircraft upwind. Increase the swath adjustment distance with increasing drift potential (higher wind, smaller droplets, etc.).

**Wind**

Drift potential is lowest at wind speeds of between 2 and 10 miles per hour. However, many factors, including droplet size and equipment type, determine drift potential at any given wind speed. Avoid application when wind speeds are below 2 miles per hour due to variable wind direction and high inversion potential. **NOTE:** Local terrain can influence wind patterns. Every applicator must be familiar with local wind patterns and how they affect drift.

**Temperature and Humidity**

When making an application in low relative humidity, set application equipment to produce larger droplets to compensate for evaporation. Droplet evaporation is most severe when conditions are both hot and dry.

**Temperature Inversion**

Do not apply this product during a temperature inversion as drift potential is high under these conditions. Temperature inversions restrict vertical air mixing, which causes small droplets to remain suspended in a concentrated cloud. This cloud can move in unpredictable directions due to the light variable winds common during inversions. Temperature inversions are characterized by increasing temperatures with altitude and are common on nights with limited cloud cover and light to no wind. They begin to form as the sun sets and often continue into the morning. Their presence can be indicated by ground fog; however, if fog is not present, inversions can also be identified by the movement of smoke from a ground source or an aircraft smoke generator. Smoke that layers and moves laterally in a concentrated cloud (under low wind conditions) indicates an inversion, while smoke that moves upward and rapidly dissipates indicates good vertical air mixing.

**Sensitive Areas**

Apply this product only when the potential for drift to adjacent sensitive areas (e.g., residential areas, bodies of water, known habitat for threatened or endangered species, non-target crops) is minimal (e.g., when wind is blowing away from the sensitive areas).

Avoid direct application to any body of water.

**State Specific Limitations on Aerial Application**

---

### LIMITATIONS ON AERIAL APPLICATION IN CALIFORNIA ONLY

---

DO NOT apply this product using aerial application equipment in residential areas.

AVOID DRIFT – DO NOT APPLY WHEN WINDS ARE GUSTY OR UNDER ANY OTHER CONDITION THAT FAVORS DRIFT. DRIFT OF THIS PRODUCT ONTO ANY VEGETATION TO WHICH APPLICATION WAS NOT INTENDED CAN CAUSE DAMAGE. TO PREVENT INJURY TO ADJACENT DESIRABLE VEGETATION, USE PROPER AERIAL APPLICATION EQUIPMENT FITTED WITH APPROPRIATE NOZZLES AND MAINTAIN ADEQUATE BUFFERS.

II. DIRECTIONS FOR USE WITH FOOD AND FEED CROPS

Follow the directions below when making an aerial application near non-target crops, desirable annual vegetation or desirable perennial vegetation after bud break and before total leaf drop.

1.  Do not apply this product within 100 feet of all desirable vegetation or non-target crops.

2.  If winds are blowing up to 5 miles per hour TOWARD desirable vegetation or non-target crops, do not apply this product within 500 feet of the desirable vegetation or crops.

3.  If winds are blowing between 5 and 10 miles per hour TOWARD desirable vegetation or non-target crops, a buffer zone greater than 500 feet might be needed to protect the desirable vegetation or crops.

4.  Do not apply this product using aerial application equipment when winds are blowing in excess of 10 miles per hour.

5.  Do not apply this product using aerial application equipment when inversion conditions exist.

When tank-mixing this product with 2,4-D, only 2,4-D amine formulations may be applied in California using aerial application equipment. Tank mixtures of this product with 2,4-D amine formulations may be applied by air in California on fallow fields and in reduced tillage systems, and for alfalfa and pasture renovation applications only.

This product, when tank-mixed with dicamba, may not be applied by air in California.

---

**ADDITIONAL LIMITATIONS ON AERIAL APPLICATION
IN FRESNO COUNTY, CALIFORNIA ONLY**

---

Always read and follow the label directions and precautionary statements for all products used in the aerial application.

The following information applies only from February 15 through March 31 within the following boundaries of Fresno County, California:

North:  Fresno County line

South:  Fresno County line

East:   State Highway 99

West:   Fresno County line

Observe the following directions to minimize off-site movement during aerial application of this product. Minimization of off-site movement is the responsibility of the grower, Pest Control Advisor and aerial applicator.

**Written Directions**

Written directions MUST be submitted by or on behalf of the applicator to the Fresno County Agricultural Commissioner 24 hours prior to the application. These written directions MUST state the proximity of surrounding crops and that conditions of each manufacturer's product label and this label have been satisfied.

**Aerial Applicator Training and Equipment**

Aerial application of this product is limited to pilots who have successfully completed a Fresno County Agricultural Commissioner and California Department of Pesticide Regulation approved training program for aerial application of herbicides. All aircraft must be inspected, critiqued in flight and certified at a Fresno County Agricultural Commissioner approved fly-in. Test and calibrate spray equipment at intervals sufficient to insure that proper rates of herbicides and adjuvants are being applied during commercial use. Applicator must document such calibrations and testing. Demonstration of performance at Fresno County Agricultural Commissioner approved fly-ins

II. DIRECTIONS FOR USE WITH FOOD AND FEED CROPS

constitutes such documentation, or other written records showing calculations and measurements of flight and spray parameters acceptable to the Fresno County Agricultural Commissioner.

**Application at Night** – Do not apply this product by air earlier than 30 minutes prior to sunrise or later than 30 minutes after sunset without prior permission from the Fresno County Agricultural Commissioner.

For additional information on the proper aerial application of this product in Fresno County, call (800) 332-3111.

---

### LIMITATIONS ON AERIAL APPLICATION IN ARKANSAS ONLY

---

AVOID DRIFT. DO NOT APPLY INTO STILL AIR WHERE THERE IS A TEMPERATURE INVERSION LOW ENOUGH FOR FINE SPRAY PARTICLES TO BECOME SUSPENDED AND MOVE OUTSIDE THE TARGET AREA WHEN THE INVERSION LAYER MOVES. DO NOT APPLY WHEN WINDS ARE GUSTY OR UNDER ANY OTHER CONDITION THAT FAVORS DRIFT. DRIFT IS LIKELY TO CAUSE DAMAGE TO ANY VEGETATION CONTACTED. TO PREVENT INJURY TO ADJACENT DESIRABLE VEGETATION, APPROPRIATE BUFFER ZONES MUST BE MAINTAINED.

Apply this product at the appropriate rate in 3 to 15 gallons of water per acre.

Use sufficient carrier volume and appropriate equipment set-up to form droplets large enough to avoid drift potential. Coarse droplets in the 300 to 500 (VMD) micron range have a lower drift potential.

Applications are typically to be made with the nozzle release point at 8 to 15 feet above the top of the target plants unless a greater height is required for aircraft safety.

The distance of the outermost nozzles on the boom must not exceed 75 percent of the length of the wingspan or rotor. In many cases, reducing this distance to 65 percent of the length of the wingspan or rotor will improve drift control without affecting the swath width.

Nozzles must always discharge backward parallel with the air stream and never discharge downwards more than 45 degrees on fixed wing aircraft or] forward of the prevailing airflow on rotary winged aircraft. Avoid the use of nozzles with wide-angle discharge.

Do not apply this product when winds are in excess of 10 miles per hour.

Do not apply when there is a low-level inversion where fine spray particles could be suspended in still air and move outside the target area when the inversion layer moves. These conditions can occur when wind speeds are less than 2 miles per hour.

Follow the directions below when an aerial application is made near non-target crops or other desirable vegetation:

1. Do not apply this product within 100 feet of non-target crops or any desirable vegetation.

2. If winds up to 5 miles per hour are blowing TOWARD non-target crops or desirable vegetation, do not apply this product within 500 feet upwind of the crop or desirable vegetation.

3. If winds between 5 and 10 miles per hour are blowing TOWARD non-target crops or desirable vegetation, a buffer zone in excess of 500 feet might be needed to protect the crop or desireable vegetation.

---

**8.3    Ground Application Equipment**

II. DIRECTIONS FOR USE WITH FOOD AND FEED CROPS

Apply this product at the appropriate rate as specified on this label in 3 to 40 gallons of water per acre when making a broadcast application using ground application equipment, unless otherwise directed on this label or on separate supplemental labeling or Fact Sheets published for this product.  As the weed density increases, increase the spray volume toward the upper end of this range to ensure complete coverage.  Use nozzles that will avoid generating a fine mist.  For enhanced results with ground application equipment, use flat-fan nozzles. Check spray pattern for uniform distribution of spray droplets.

## 8.4    Handheld Sprayers

When using a handheld sprayer, apply spray solutions of this product uniformly and completely to the foliage of target weeds using a coarse droplet spectrum and a spray-to-wet technique; do not spray to the point of runoff.  For the appropriate concentration of this product in the spray solution and timing of application to control specific weeds, woody brush, trees and vines, refer to the "ANNUAL WEEDS RATE SECTION," "PERENNIAL WEEDS RATE SECTION" and "WOODY BRUSH, TREES AND VINES RATE SECTION" of this label.

Spot treatment application of this product for weed control in a cropping system using a handheld sprayer may be made only when specifically directed on this label or on separate supplemental labeling for this product.  The crop sprayed with this product will be killed along with the weeds.  Take care not to spray or allow spray to drift outside the target area in order to avoid unwanted crop destruction.

## 8.5    Selective Application Equipment

Selective application equipment allows this product to be applied to weeds growing near the crop or other desirable vegetation without killing the desireable vegetation. Selective application equipment must be capable of preventing all contact of the herbicide solution with the crop or other desirable vegetation and operated without spray mist escape, leakage or dripping of the herbicide solution.

AVOID CONTACT OF THIS HERBICIDE WITH DESIRABLE VEGETATION.  Contact of this product with desirable vegetation could result in unwanted plant damage or destruction. To the extent consistent with applicable law, such damage shall be the sole responsibility of the applicator.

**Shielded and Hooded Sprayers**

A shielded sprayer directs the herbicide solution to the target weeds while protecting the crop or other desirable vegetation from coming into contact with the herbicide spray with an impervious material or shield. Use nozzles that provide uniform coverage within the application area.  Keep shields properly adjusted to protect desirable vegetation.

A hooded sprayer is a type of shielded sprayer where the spray pattern is fully enclosed, including the top, sides, front and back, thereby shielding the crop or other desirable vegetation from the spray solution.

This product may be diluted in water with an appropriate surfactant and applied using a shielded or hooded sprayer to weeds listed on this label growing on any non-crop site described on this label and in between rows of plants (row middles) in any cropping system listed on this label.

Properly adjust the hood to protect desirable vegetation.  Ensure that the hood is capable of completely enclosing the spray pattern.  If necessary when applying around crops grown on raised beds, extend the front and rear flaps of the hooded sprayer downward to reach the ground in deep furrows.

A hooded sprayer must be configured and operated in a manner that minimizes bouncing and avoids raising the hood up off the ground surface at any time.  If the hood is raised, spray particles can escape and come into contact with the crop, causing damage to or destruction of the crop or other desirable vegetation.  Avoid operating this equipment on rough or sloping terrain where the spray hood is likely to rise up off the ground surface.

II. DIRECTIONS FOR USE WITH FOOD AND FEED CROPS

Use hoods designed to minimize excessive dripping or runoff down the inside of the hood, such as a single, low pressure, low drift, flat-fan nozzle with an 80- to 95-degree spray angle positioned at the top center of the hood, with a spray volume of 20 to 30 gallons per acre.

The following procedures will help reduce the potential for crop injury when using a hooded sprayer:

- Operate the sprayer with the hood on the ground or skimming across the ground surface.

- Leave at least an 8-inch untreated strip over the drill row.  (For example, if the crop row width is 38 inches, use a sprayer hood with a maximum width of 30 inches.)

- Operate at a ground speed of no greater than 5 miles per hour to minimize bouncing of the hooded sprayer.

- Apply when wind speed is 10 miles per hour of less.

- Use low-drift nozzles that provide uniform coverage within the application area.

Injury to a crop or other desirable vegetation can occur when application is made to foliage of weeds that come into direct contact with the crop or desirable vegetation.  Do not apply this product when leaves of desirable vegetation are growing in direct contact with weeds.  Droplets, mist, foam or splatter of the herbicide solution settling onto desirable vegetation can result in discoloration, stunting or destruction.

**Wiper Applicator**

A wiper applicator is a device that physically wipes this product or solutions of this product directly onto the target weed or cut stump.  Any handheld device that is capable of physically wiping this product or solutions of this product directly onto the target weed or cut stump, such as a paint brush, may be used.

A mechanical wiper applicator, such as a rope wick or sponge bar that can be driven through a field over the top of a crop or other desirable vegetation to control weeds that are taller than the desirable vegetation, must be designed, maintained and operated to prevent the herbicide solution from contacting desirable vegetation.

Wiper applicators may be used over the top of food or feed crops ONLY if specifically permitted for use over that crop by this label or by separately published supplemental labeling for this product.

When using a mechanical wiper applicator, adjust the height of the applicator to ensure adequate contact with weeds and so that the wiper contact point is a minimum of 2 inches above the desirable vegetation. Enhanced results can be obtained when more of the weed is exposed to the herbicide solution and weeds are a minimum of 6 inches above the desirable vegetation.  Weeds that do not come into contact with the herbicide solution will not be affected. Poor contact can occur when weeds are growing in dense clumps, when operating in an area of severe weed infestation, or when weed height varies dramatically. In these situations, more than one application of this product might be necessary.

Operate wiper applicators at a ground speed of no greater than 5 miles per hour.  Performance in areas of heavy weed infestation can be improved by reducing speed, which will provide more time for re-saturation of the wiper with the herbicide solution and more contact time of the wiper with the weed. Enhanced results with a wiper applicator can be obtained when two applications are made traveling in opposite directions in the field.

Keep wiper surfaces clean.

Droplets, mist, foam or splatter of the herbicide solution settling onto desirable vegetation can result in discoloration, stunting or destruction. Avoid leakage or dripping onto desirable vegetation.  Be aware that on sloping ground the herbicide solution can migrate to one side, causing dripping on the lower end and drying of the wiper on the upper end of the applicator.

Do not apply this product using a wiper applicator when weeds are wet.

## II. DIRECTIONS FOR USE WITH FOOD AND FEED CROPS

Add a nonionic surfactant to a concentration of 10 percent by volume of the total applicator solution (one gallon of surfactant for every 10 gallons of solution) for use in a wiper applicator.  See the "MIXING" section of this label for more information on the use of surfactants.

**For Rope Wick and Sponge Bar Applicators**—use solutions ranging from 33 to 75 percent of this product in water

**For Panel Applicators**—use solutions ranging from 33 to 90 percent of this product in water.

Mix only the amount of this product that will be used during a 1-day period, as reduced product performance can result from the use of solutions held in storage.

Clean wiper parts promptly after using this product by thoroughly flushing with water.

### 8.5    Injection Systems

This product may be used in aerial or ground injection spray systems as a liquid concentrate or diluted prior to injecting into the spray stream.  Do not mix this concentrated product with the undiluted concentrate of other products for use in injection systems, unless otherwise directed.  A non-ionic surfactant concentration of 0.5% or more in the spray stream is required for use of this product in injection systems.

### 8.6    Controlled Droplet Applicator (CDA)

The amount of this product applied per acre using a controlled droplet applicator (CDA) must be no less than the rate specified on this label for application using conventional broadcast application equipment.

A controlled droplet applicator produces a spray pattern that is not easily visible. Use extreme care to avoid spray or drift from contacting the foliage or any other green tissue of desirable vegetation, as plant damage or destruction could result.

### 9.0    ANNUAL AND PERENNIAL CROPS

THIS SECTION PROVIDES DIRECTIONS FOR USE OF THIS PRODUCT THAT APPLY TO ALL CROPS LISTED IN THE FOLLOWING SECTIONS.  SEE THE INDIVIDUAL CROP SECTIONS FOR SPECIFIC USE INSTRUCTIONS, PREHARVEST INTERVALS, AND ADDITIONAL PRECAUTIONS AND RESTRICTIONS.

See the "ROUNDUP READY CROPS" section of this label, or separately published supplemental labeling for this product, for directions for use in Roundup Ready crops.

TYPES OF APPLICATION: Chemical Fallow; Preplant Fallow Beds; Preplant; At-Planting; Preemergence; Hooded Sprayer in Row Middles; Shielded Sprayer in Row Middles; Wiper Applicator in Row Middles; Post-Harvest

USE INSTRUCTIONS:  This product may be applied during fallow intervals preceding planting, prior to planting or transplanting, at-planting, or preemergence to annual and perennial crops listed on this label, except where specifically limited.  For any crop not listed on this label, application must be made a minimum of 30 days prior to planting.  Unless otherwise directed, apply this product according to the rates listed in the "ANNUAL WEEDS RATE SECTION," "PERENNIAL WEEDS RATE SECTION" and "WOODY BRUSH, TREES AND VINES RATE SECTION" of this label.  Application rates specified on this label for hard-to-control weeds, or those specified on separate supplemental labeling for this product, supersede the rates in the "ANNUAL WEEDS RATE SECTION," "PERENNIAL WEEDS RATE SECTION" and "WOODY BRUSH, TREES AND VINES RATE SECTION" of this label.  Additional information on hard-to-control weeds can be found on Fact Sheets published for this product.

## II. DIRECTIONS FOR USE WITH FOOD AND FEED CROPS

Application of this product may be repeated as needed up to a maximum of 6 quarts per acre per year. Refer to specific use sections of this label for additional information on minimum intervals required before re-application of this product.

Hooded sprayers and wiper applicators capable of preventing all contact of the herbicide solution with the crop may be used in mulched or unmulched row middles after crop establishment. Wiper applicators may be used over the top of crops to control tall weeds only when specifically directed in the individual crop sections that follow. Crop injury is possible with these methods of application. Refer to the "APPLICATION EQUIPMENT AND TECHNIQUES" section of this label for information regarding the potential for crop injury using selective application equipment.

Spot treatment application of this product for weed control in a cropping system may be made only when specifically directed in the individual crop sections that follow.

Unless otherwise prohibited, all applications of this product described in the sections that follow may be made using aerial application equipment where appropriate, provided that the applicator complies with the precautions and restrictions specified on this label and on all supplemental labeling published for this product. Refer to the "APPLICATION EQUIPMENT AND TECHNIQUES" section of this label for information on aerial application and procedures for avoiding spray drift that could cause injury to any vegetation not intended for application. Use of appropriate buffers will help prevent injury to adjacent vegetation.

TANK MIXTURES: This product may be tank-mixed with other herbicides to provide residual weed control, a broader weed control spectrum or an alternate mechanism of action. Always read and follow label directions for all products in the tank mixture. Use all products according to rates and timing specified on the label. Some tank-mix products have the potential to cause crop injury. Read the label for all products in the tank mixture prior to use to determine the potential for crop injury. Always predetermine the compatibility of tank-mix products together in the carrier by mixing small proportional quantities in advance. Mixing other products with this herbicide in the spray tank can cause incompatibility, antagonism, or a reduction in the efficacy of this product. Monsanto Company has not tested all product formulations for compatibility or performance in a tank-mix with this product. To the extent consistent with applicable law, buyer and all users are responsible for any and all loss or damage in connection with the use or handling of mixtures of this product with herbicides or other materials that are not specifically identified on this label or on separate supplemental labeling or Fact Sheets for this product. See the "MIXING" section of this label for more information on tank mixtures.

PRECAUTIONS: Avoid contact of this herbicide with foliage, green shoots or stems, bark, exposed roots (including those emerging from plastic mulch), or fruit of crops, as severe crop injury or destruction could result. Transplant seedlings coming into contact with weeds that are still wet with a spray solution of this product could result in significant crop injury. When making preemergence applications, application must be made before crop emergence to avoid severe crop injury. Broadcast application of this product at emergence will result in injury or death of emerged seedlings. Apply before seed germination in coarse sandy soils to further minimize the risk of crop injury. In crops where spot treatment is allowed, the crop sprayed with this product will be killed along with the weeds. Take care not to spray or allow spray to drift outside the target area in order to avoid unwanted crop destruction. See the "APPLICATION EQUIPMENT AND TECHNIQUES" section of this label for additional information.

Preharvest application on crops grown for seed could result in a reduction in germination or vigor. To the extent consistent with applicable law, buyer and all users are responsible for any and all loss or damage in connection with the preharvest use of this product on any crop grown for seed.

RESTRICTIONS: Observe the maximum application rates stated throughout this label. Maximum application rates apply to the use of this product combined with the use of any and all other herbicides containing glyphosate as the active ingredient, whether applied separately or as mixtures. Calculate the application rates (glyphosate acid equivalents) and ensure that the total use of this and other glyphosate-

II. DIRECTIONS FOR USE WITH FOOD AND FEED CROPS

containing products does not exceed the stated maximum rate.  See the "PRODUCT INFORMATION" section of this label for more information on Maximum Application Rates.

Unless otherwise directed on this label, application using selective equipment, including wiper applicators and hooded sprayers, must be made a minimum of 14 days prior to harvest. In crops where spot treatment is allowed, do not apply this product to more than 10 percent of the total field to be harvested, unless otherwise directed. Post-harvest and fallow application must be made a minimum of 30 days prior to the planting of any crop not listed on this label.

Do not harvest or feed vegetation from an area for 8 weeks following broadcast postemergence application, unless otherwise directed.

When applying this product as a tank mixture with one or more products, refer to each individual tank-mix product label for restrictions and apply the mixture in accordance with the most restrictive statements for each product in the tank.

### 9.1    Cereal and Grain Crops

LABELED CROPS: Barley; Buckwheat; Millet (pearl, proso); Oats; Rice; Rye; Quinoa; Teff; Teosinte; Triticale; Wheat (all types); Wild rice

TYPES OF APPLICATION: Those listed in Section 9.0, plus Red Rice Control Prior to Planting Rice; Spot Treatment (except rice); Control of Barnyardgrass in Rice Using Renovation Treatment (California only); Wiper Applicator (feed barley and wheat only); Preharvest (feed barley and wheat only)

**Preplant, At-Planting, Preemergence**

USE INSTRUCTIONS: This product may be applied before, during or after the planting of cereal crops, but prior to crop emergence.

**Red Rice Control Prior to Planting Rice**

USE INSTRUCTIONS: Flush fields prior to application to obtain uniform germination and stand of red rice and then apply 48 fluid ounces of this product in 5 to 10 gallons of water per acre when the majority of the red rice plants are at the 2-leaf stage and no more than 4 inches tall.  Red rice plants with less than 2 true leaves might only be partially controlled. Avoid spraying during conditions of low humidity, as reduced control of red rice could result.

RESTRICTIONS:  Do not apply this product to rice fields or levees when fields contain floodwater.  Do not flood fields for a minimum of 8 days following application.

**Spot Treatment (Except Rice)**

USE INSTRUCTIONS: This product may be applied as a spot treatment in cereal crops, except rice. Apply before heading in small grains.

RESTRICTIONS: Do not apply this product to more than 10 percent of the total field area to be harvested.

**Control of Barnyardgrass in Rice Using Renovation Treatment (California Only)**

THIS APPLICATION FOR USE IN CALIFORNIA ONLY

USE INSTRUCTIONS: This product may be applied as a renovation treatment in rice crops to control barnyardgrass (*Echinochola crus-galli*) infestations using ground broadcast application equipment or a handheld sprayer. Renovation is defined as an herbicide application that will result in crop and weed destruction in an entire field or contiguous area within a field.

RESTRICTIONS: Rice straw and stubble from the application area, including a 25-foot buffer zone on all sides, may not be used for animal bedding, grazing, or any other feed purpose. DO NOT make this application using aerial application equipment.

II. DIRECTIONS FOR USE WITH FOOD AND FEED CROPS

**Wiper Applicator (Feed Barley and Wheat Only)**

USE INSTRUCTIONS:  This product may be applied over the top of feed barley and wheat using a wiper applicator to control tall weeds.  To control common rye or cereal rye, apply after weeds have headed and achieved maximum growth.  See additional instructions on the use of wiper applicators in the "APPLICATION EQUIPMENT AND TECHNIQUES" section of this label.

RESTRICTIONS:  Allow a minimum of 35 days between application and harvest.  Do not use roller applicator.

**Preharvest (Feed Barley and Wheat Only)**

USE INSTRUCTIONS:  This product provides weed control when applied prior to harvest of feed barley or wheat.  For feed barley, apply after the hard-dough stage when grain moisture is 20 percent or less.  For wheat, apply after the hard-dough stage when grain moisture is 30 percent or less. Stubble may be grazed immediately after harvest.

Apply this product in 10 to 20 gallons of water per acre when using ground application equipment and in 3 to 10 gallons of water per acre when using aerial application equipment.

RESTRICTIONS: Do not apply more than 24 fluid ounces of this product per acre for preharvest application. Allow a minimum of 7 days between application and harvest or grazing.

**Post-Harvest**

USE INSTRUCTIONS: This product may be applied for weed conrol after harvest of cereal crops.  Higer rates might be needed to control large weeds that were growing in the field at the time of harvest. Tank mixtures with 2,4-D or dicamba may be used.  Ensure that the product used is labeled for weed control following harvest of cereal crops. Read and follow label directions for all products in the tank mixture.

RESTRICTIONS:  Allow a minimum of 7 days between application and harvest or feeding of vegetation within the application area.  Application must be made a minimum of 30 days prior to the planting of any crop not listed on this label.

**9.2    Corn**

TYPES OF CORN:  Field corn; Popcorn; Seed corn; Silage corn; Sweet corn

TYPES OF APPLICATION: Those listed in Section 9.0, plus Spot Treatment; Preharvest

For directions for use with field corn hybrids with Roundup Ready 2 Technology (including Roundup Ready corn 2 and field corn products displaying the Roundup Ready 2 Technology logo), or with sweet corn hybrids with Roundup Ready 2 Technology (including Roundup Ready Sweet Corn and sweet corn products displaying the Roundup Ready 2 Technology logo), see the "ROUNDUP READY CROPS" section of this label. [*Alternative text:* For directions for use with field corn hybrids with Roundup Ready 2 Technology (including Roundup Ready Corn 2 and field corn products displaying the Roundup Ready 2 Technology logo), or with Roundup Ready sweet corn, see the "ROUNDUP READY CROPS" section of this label.]

**Preplant, At-Planting, Preemergence**

USE INSTRUCTIONS: This product may be applied alone or in a tank-mix before, during or after planting corn, but prior to crop emergence.

TANK MIXTURES: This product may be tank-mixed with the following products.  Ensure that the product used is labeled for application prior to planting or the emergence of the type of corn crop being grown. Read and follow label directions for all products in the tank mixture.  Apply these tank mixtures in 10 to 20 gallons of water or 10 to 60 gallons of nitrogen solution, per acre.

II. DIRECTIONS FOR USE WITH FOOD AND FEED CROPS

---

2,4-D; acetochlor; atrazine; bicyclopyrone; carfentrazone-ethyl; clopyralid; dicamba; diflufenzopyr; dimethenamid; dimethenamid-p; flufenacet; flumetsulam; flumiclorac pentyl ester; isoxaflutole; linuron; mesotrione; metolachlor; s-metolachlor; metribuzin; pendimethalin; rimsulfuron; saflufenacil; simazine; thiencarbazone-methyl

AAtrex 4L; AAtrex Nine-O; Acuron; Acuron Flexi; Aim EC; Aim EW; Atrazine 4L; Atrazine 90 DF; Axiom DF; Balance Flexx; Banvel; Banvel 480; Bicep II MAGNUM; Bicep II MAGNUM FC; Bicep Lite II MAGNUM; Callisto; Cinch; Cinch ATZ; Cinch ATZ Lite; Clarity; Corvus; Degree Xtra; Distinct; Dual MAGNUM; Dual II MAGNUM; FulTime; FulTime NXT; Guardsman MAX; Harness; Harness Xtra; Harness Xtra 5.6L; Hornet WDG Broadleaf Blend; Keystone; Keystone LA; Keystone LA NXT; Keystone NXT; Leadoff; Linex 4L; Lorox DF; Marksman; Me-Too-Lachlor II; Outlook; Prowl 3.3 EC; Prowl H2O; Python WDG; Resicore; Resolve DF; Resolve Q; Resolve SG; Resource; Shark EW; Shark H2O; Sharpen Powered by Kixor; Simazine 4L Flowable; Simazine 90 DF; Simazine 90 WDG; Stalwart; Stalwart C; Stalwart Xtra; Stinger; Surpass EC; Surpass NXT; TopNotch; TripleFLEX II

---

For hard-to-control annual weeds, such as fall panicum, barnyardgrass, crabgrass, shattercane and broadleaf signalgrass up to 2 inches tall, and Pennsylvania smartweed up to 6 inches tall, apply 24 fluid ounces of this product per acre in these tank mixtures. For other annual weeds listed on this label, apply 18 to 24 fluid ounces of this product per acre when weeds are less than 6 inches tall, and 24 to 36 fluid ounces per acre when weeds are over 6 inches tall. When using a nitrogen solution as the carrier, higher application rates might be needed for acceptable weed control.

RESTRICTIONS: Application of 2,4-D or dicamba must be made a minimum of 7 days prior to planting corn.

In Southern states, do not mix this product in nitrogen solutions for application to hard-to-control grasses, such as barnyardgrass, fall panicum, broadleaf signalgrass, annual ryegrass and any perennial weeds. This area includes Illinois and Indiana south of Route 50, Alabama, Arkansas, Delaware, Florida, Georgia, Kentucky, Louisiana, Maryland, Mississippi, New Jersey, North Carolina, Oklahoma, South Carolina, Tennessee, Texas, Virginia and West Virginia.

**Hooded Sprayer**

USE INSTRUCTIONS: This product may be applied using a hooded sprayer for weed control in between rows of corn.  Only hooded sprayers that completely enclose the spray pattern may be used. See additional instructions for the use of hooded sprayers in the "APPLICATION EQUIPMENT AND TECHNIQUES" section of this label.

RESTRICTIONS: Corn must be at least 12 inches tall, measured without extending leaves. Do not apply more than 24 fluid ounces of this product per acre for each hooded sprayer application and no more than 72 fluid ounces per acre per year total.

**Spot Treatment**

USE INSTRUCTIONS: This product may be applied as a spot treatment prior to silking of corn.

RESTRICTIONS: Do not apply this product to more than 10 percent of the total field area to be harvested.

**Preharvest**

USE INSTRUCTIONS: Up to 72 fluid ounces of this product per acre may be applied using ground application equipment, or up to 48 fluid ounces per acre using aerial application equipment, when kernel fill is complete and the corn is physiologically mature (black layer formed) and grain moisture is 35 percent or less.

RESTRICTIONS: Allow a minimum of 7 days between application and harvest.

II. DIRECTIONS FOR USE WITH FOOD AND FEED CROPS

**Post-Harvest**

USE INSTRUCTIONS: This product may be applied for weed control after harvest of corn. Higher rates might be needed for control of large weeds that were growing in the field at the time of harvest. Tank mixtures with 2,4-D or dicamba may be used. Ensure that the product used is labeled for post-harvest application in corn. Read and follow label directions for all products in the tank mixture.

RESTRICTIONS: Allow a minimum of 7 days between application and harvest or feeding of vegetation within the application area. Application of this product must be made a minimum of 30 days prior to planting any crop not listed on this label.

**9.3    Cotton**

TYPES OF APPLICATION: Those listed in Section 9.0, plus Selective Equipment; Spot Treatment; Preharvest

For directions for use with Roundup Ready cotton and Roundup Ready Flex cotton, see the "ROUNDUP READY CROPS" section of this label.

**Preplant, At-Planting, Preemergence**

USE INSTRUCTIONS: This product may be applied before, during or after planting cotton, but prior to crop emergence.

TANK MIXTURES:  This product may be tank-mixed with 2,4-D or Clarity and applied prior to planting only.   This product may also be tank-mixed with the following products and applied prior to crop emergence. Ensure that the product used is labeled for application prior to planting or the emergence of cotton. Read and follow label directions for all products used in the tank mixture.   Apply these tank mixtures in 10 to 20 gallons of water per acre.

| |
|---|
| acetochlor; clomazone; diuron; flumioxazin; fluometuron; fomesafen; metolachlor; s-metolachlor; norflurazon; pendimethalin; prometyrn; pyrithiobac-sodium, saflufenacil |
| Caparol 4L; Command 3ME; Cotoran 4L; Cotton Pro; Dawn; Direx 4L; Dual MAGNUM; Dual II MAGNUM; Karmex DF; Prowl 3.3 EC; Prowl H2O; Reflex; Rowel; Sharpen Powered by Kixor; Stalwart; Staple LX; Valor SX; Warrant; Warrant Ultra |

**Selective Equipment**

USE INSTRUCTIONS: This product may be applied using a hooded or shielded sprayer, or over the top of cotton using a wiper applicator to control tall weeds.  See additional instructions on the use of this selective equipment in the "APPLICATION EQUIPMENT AND TECHNIQUES" section of this label.

RESTRICTIONS: Allow a minimum of 7 days between application and harvest.

**Spot Treatment**

USE INSTRUCTIONS: This product may be applied in cotton as a spot treatment prior to boll opening.

RESTRICTIONS: Do not apply this product to more than 10 percent of the total field area to be harvested.

**Preharvest**

USE INSTRUCTIONS: This product provides weed control and cotton re-growth inhibition when applied prior to harvest. For weed control, apply at rates given in the "ANNUAL WEEDS RATE SECTION" and "PERENNIAL WEEDS RATE SECTION" of this label.  For cotton re-growth inhibition, apply 18 to 48 fluid ounces of this product per acre.  Make preharvest application only after sufficient bolls have developed to produce the desired yield. Application made prior to this time could affect maximum yield potential.

II. DIRECTIONS FOR USE WITH FOOD AND FEED CROPS

TANK MIXTURES: This product may be tank-mixed with DEF 6, Dropp, Folex, Ginstar, or Prep to enhance cotton leaf-drop.  Read and follow label directions for all products used in the tank mixture.

PRECAUTIONS:  Do not exceed a surfactant concentration of 0.5% by volume (2 quarts per 100 gallons of spray solution) when making a preharvest application to cotton.  Surfactant concentration greater than 0.5% could result in crop injury and reduced yield.

RESTRICTIONS: Allow a minimum of 7 days between application and harvest.

### 9.4     Fallow Systems

This product may be applied during the fallow period prior to planting or emergence of any crop listed on this label.  Application must be made a minimum of 30 days prior to the planting of any crop not listed on this label.

TYPES OF APPLICATION: Chemical fallow; Preplant fallow beds; Aid-to-tillage

**Chemical Fallow**

USE INSTRUCTIONS: This product may be used as a substitute for tillage to control annual weeds in fallow fields. Broadcast or spot treatment application will also control or suppress many perennial weeds in fallow fields. Tank-mix this product with 2,4-D or dicamba for a broader weed control spectrum.  Aerial application of up to 48 fluid ounces of this product per acre may be made onto fallow fields where there is sufficient buffer to prevent injury due to drift onto adjacent crops.

PRECAUTIONS  Some crop injury could occur if dicamba is applied within 45 days of planting.

**Preplant Fallow Beds**

USE INSTRUCTIONS:  This product will control weeds listed in the "ANNUAL WEEDS RATE SECTION," "PERENNIAL WEEDS RATE SECTION" and "WOODY BRUSH, TREES AND VINES RATE SECTION" of this label prior to planting.

TANK MIXTURES: Apply 9 fluid ounces of this product per acre in a tank-mix with an appropriate rate of Goal 2XL to control the following weeds up to the maximum height or length indicated: 3 inches—common cheeseweed, chickweed, groundsel; 6 inches—London rocket, shepherd's-purse.

Apply 12 fluid ounces of this product per acre in a tank-mix with an appropriate rate of Goal 2XL to control the following weeds with the maximum height or length indicated: 6 inches—common cheeseweed, groundsel, marestail (*Conyza canadensis*), 12 inches—chickweed, London rocket, shepherd's-purse.

**Aid-to-Tillage**

USE INSTRUCTIONS: This product may be used in conjunction with tillage practices in fallow systems, or prior to the planting of crops listed on this label (preplant), to control downy brome, cheat, volunteer wheat, tansy mustard and foxtail. Apply 10 fluid ounces of this product in 3 to 10 gallons of water per acre before weeds are 6 inches in height. Application must be followed by conventional tillage no later than 15 days after application and before re-growth occurs. Allow a minimum of 1 day after application before tillage.

PRECAUTIONS: Tank mixtures with residual herbicides could result in reduced performance of this product.

### 9.5     Grain Sorghum (Milo)

TYPES OF APPLICATIONS: Those listed in Section 9.0, plus Spot treatment; Wiper Applicator; Preharvest

**Preplant, At-planting, Preemergence**

## II. DIRECTIONS FOR USE WITH FOOD AND FEED CROPS

USE INSTRUCTIONS: This product may be applied alone or in a tank mixture before, during or after planting grain sorghum, but prior to crop emergence.

TANK MIXTURES: This product may be tank-mixed with the following products.  Ensure that the product used is labeled for application prior to planting or emergence of grain sorghum.  Read and follow label directions for all products used in the tank mixture. Apply these tank mixtures in 10 to 20 gallons of water or 10 to 60 gallons of nitrogen solution, per acre.

---

acetochlor; atrazine; metolachlor; s-metolachlor; saflufenacil

Bicep II MAGNUM; Bicep II MAGNUM FC; Bicep Lite II MAGNUM; Degree Xtra; Dual MAGNUM; Dual II MAGNUM; Sharpen Powered by Kixor; Warrant

---

For hard-to-control annual weeds, such as fall panicum, barnyardgrass, crabgrass, shattercane and broadleaf signalgrass up to 2 inches tall, and Pennsylvania smartweed up to 6 inches tall, apply 24 fluid ounces of this product per acre in a tank mixture with one or more of the products listed here.

For control of other annual weeds listed on this label, apply 18 to 24 fluid ounces of this product per acre when weeds are less than 6 inches tall, and 24 to 36 fluid ounces per acre when weeds are over 6 inches tall.  When using a nitrogen solution as the carrier, the application rate might need to be increased to acheive acceptable weed control.

**Spot Treatment, Wiper Applicator**

USE INSTRUCTIONS: This product may be applied as a spot treatment in grain sorghum before heading. This product may also be applied over the top of grain sorghum using a wiper applicator to control or suppress tall weeds.  See additional instructions on the use of wiper applicators in the "APPLICATION EQUIPMENT AND TECHNIQUES" section of this label.

RESTRICTIONS:  For spot treatment, do not apply this product to more than 10 percent of the total field area to be harvested.  When applied using a wiper applicator, allow a minimum of 40 days between application and harvest. Do not use a roller applicator. Do not feed or graze grain sorghum fodder or ensile vegetation within the application area.

**Hooded Sprayer**

USE INSTRUCTIONS: This product may be applied using a hooded sprayer for weed control in between rows of grain sorghum.  Make application before grain sorghum sends tillers between the drill rows. If tillers are sprayed with this herbicide, the main plant could be damaged or destroyed. Contact of this product in any manner with any vegetation to which application is not intended could cause damage. Only hooded sprayers that completely enclose the spray pattern may be used. See additional instructions on the use of hooded sprayers in the "APPLICATION EQUIPMENT AND TECHNIQUES" section of this label.

RESTRICTIONS: Grain sorghum must be at least 12 inches tall, measured without extending leaves.  Do not graze or feed grain sorghum forage or fodder following application of this product using a hooded sprayer.  Do not apply more than 24 fluid ounces of this product per acre per hooded sprayer application and no more than 72 fluid ounces per acre per year total.

**Preharvest**

USE INSTRUCTIONS:  Up to 48 fluid ounces of this product per acre may be applied after sorghum grain has reached 30 percent moisture or less. As with other herbicides that cause sudden plant death, avoid preharvest application of this product on grain sorghum (milo) infected with charcoal rot as lodging can occur.

RESTRICTIONS: Allow a minimum of 7 days between application and harvest of grain sorghum. Preharvest application of this product on grain sorghum (milo) is not registered for use in California.

II. DIRECTIONS FOR USE WITH FOOD AND FEED CROPS

**Post-Harvest**

USE INSTRUCTIONS: This product may be applied for weed control after harvest of grain sorghum. Higher application rates might be needed to control large weeds that were growing in the field at the time of harvest. Tank mixtures with 2,4-D or dicamba may be used.  Ensure that the product used is labeled for post-harvest application in grain sorghum (milo). Read and follow label directions for all products in the tank mixture.

This product may be applied to grain sorghum stubble following harvest to control or suppress re-growth. Apply 24 fluid ounces of this product per acre for control or 20 fluid ounces per acre for suppression.

RESTRICTIONS: Allow a minimum of 7 days between application and harvest or feeding of vegetation within the application area.  Application must be made a minimum of 30 days prior to the planting of any crop not listed on this label.

**9.6    Herbs and Spices**

LABELED CROPS:  Allspice; Angelica; Star anise; Annatto (seed); Balm; Basil; Borage; Burnet; Camomile; Caper buds; Caraway; Black caraway; Cardamom; Cassia bark; Cassia buds; Catnip; Celery seed; Chervil (dried); Chive; Chinese chive; Cinnamon; Clary; Clove buds; Coriander leaf (cilantro or Chinese parsley); Coriander seed (cilantro); Costmary; Culantro (leaf); Culantro (seed); Cumin; Curry (leaf); Dill (dillweed); Dill (seed); Epazote; Fennel seed (common and Florence); Fenugreek; White ginger flower; Grains of paradise; Horehound; Hyssop; Juniper berry; Lavender; Lemongrass; Lovage (leaf and seed); Mace; Marigold; Marjoram (including oregano); Mexican oregano; Mioga flower; Mustard (seed); Nasturtium; Nutmeg; Parsley (dried); Pennyroyal; Pepper (black and white); Pepper leaves; Peppermint; Perilla; Poppy (seed); Rosemary; Rue; Saffron; Sage; Savory (summer and winter); Spearmint; Stevia leaves; Sweet bay; Tansy; Tarragon; Thyme; Vanilla; Wintergreen; Woodruff; Wormwood

TYPES OF APPLICATION: Those listed in Section 9.0, plus Spot Treatment (peppermint and spearmint only); Wiper Applicator (peppermint and spearmint only)

PRECAUTIONS:  This product could cause crop injury when applied prior to transplanting or direct-seeding crops into plastic mulch.  Remove residual product from the plastic prior to planting with a single 0.5-inch application of water, either by natural rainfall or by irrigation.  Ensure that the wash water flushes off the plastic mulch and does not enter the transplant holes.  Application made at crop emergence will result in injury or death of emerged seedlings.

**Spot Treatment, Wiper Applicator (Peppermint and Spearmint Only)**

USE INSTRUCTIONS:  This product may be applied as a spot treatment in peppermint and spearmint, or over the top of peppermint and spearmint using a wiper applicator to control tall weeds.  Application may be repeated on the same area at 30-day intervals.  See additional instructions on the use of wiper applicators in the "APPLICATION EQUIPMENT AND TECHNIQUES" section of this label.

RESTRICTIONS:  Allow a minimum of 7 days between application and harvest.  For spot treatment application, do not apply this product to more than 10 percent of the total field area to be harvested

**9.7    Oilseed Crops**

LABELED CROPS:   Borage; Buffalo gourd; Calendula; Canola; Castor oil plant; Chinese tallowtree; Crambe; Cuphea; Echium; Euphorbia; Evening primrose; Flax; Gold of pleasure; Hare's ear mustard; Jojoba; Lesquerella; Meadowfoam; Milkweed; Mustard; Niger seed; Oil radish; Poppy; Rape; Rose hip; Safflower; Sesame; Stokes aster; Sunflower; Sweet rocket; Tallowwood; Tea oil plant; Veronia

For directions for use with Roundup Ready canola and TruFlex™ Roundup Ready® canola, see the "ROUNDUP READY CROPS" section of this label.

TYPES OF APPLICATION: Those listed in Section 9.0, plus Preharvest (except buffalo gourd)

II. DIRECTIONS FOR USE WITH FOOD AND FEED CROPS

USE INSTRUCTIONS: Refer to the following table for maximum application rates of this product for use in safflower, sunflower and all other oilseed crops listed in this section, if a preharvest application is to be made.  If a preharvest application is NOT to be made, the maximum application rate of this product for all preemergence, selective equipment and post-harvest applications in any oilseed crop listed in this section is limited only by the maximum of 6 quarts per acre per year. If a preharvest application is intended to be made to any crop listed in this section, except buffalo gourd, the maximum combined total of all preemergence and selective equipment applications is limited as indicated in the following table.  See the "PRODUCT INFORMATION" section of this label for more information on Maximum Application Rates.

| Maximum Application Rates if a Preharvest Application is Made ||
|---|---|
| **Safflower** ||
| Combined total for all Preemergence and Selective Equipment applications | 72 fluid ounces per acre |
| Preharvest application | 72 fluid ounces per acre |
| **Sunflower** ||
| Combined total for all Preemergence and Selective Equipment applications | 24 fluid ounces per acre |
| Preharvest application | 24 fluid ounces per acre |
| **All Other Oilseed Crops Listed (Except Buffalo Gourd)** ||
| Combined total for all Preemergence and Selective Equipment applications | 48 fluid ounces per acre |
| Preharvest application | 36 fluid ounces per acre |

RESTRICTIONS:  Do not exceed a total application rate of 6 quarts of this product per acre per year. Preharvest application is not permitted on buffalo gourd.

**Preplant, At-Planting, Preemergence**

USE INSTRUCTIONS: This product may be applied before, during or after planting oilseed crops listed in this section, but must be applied prior to crop emergence.  Observe the maximum application rates listed at the beginning of this section.

TANK MIXTURES: For sunflower, a tank mixture with pendimethalin [*Alternative text*: Prowl herbicide] may be applied before, during or after planting in conventionally tilled soil, a cover crop, established sod or previous crop residue.

RESTRICTIONS:  See the use instructions at the beginning of this section for important information on maximum application rates for preemergence and selective equipment applications of this product.

**Selective Equipment**

USE INSTRUCTIONS: This product may be applied using a wiper applicator or shielded sprayer between crop rows once the crop is established.  Observe the maximum application rates listed at the beginning of this section.  See additional instructions on the use of wiper applicators and shielded sprayers in the "APPLICATION EQUIPMENT AND TECHNIQUES" section of this label.

**Preharvest (Except Buffalo Gourd)**

USE INSTRUCTIONS: This product provides weed control and serves as a harvest aid when applied to a physiologically mature oilseed crop listed in this section.  For safflower, up to 72 fluid ounces of this product may be applied per acre when seed has lost its opaque character, approximately 20 to 30 days after the end of flowering of the secondary branches.  For sunflower, up to 24 fluid ounces of this product per acre may be applied when the backsides of sunflower heads are yellow and bracts are turning brown

II. DIRECTIONS FOR USE WITH FOOD AND FEED CROPS

and seed moisture content is less than 35 percent.  For all other oilseed crops listed in this section (except buffalo gourd), up to 36 fluid ounces of this product per acre may be applied prior to harvest.

RESTRICTIONS: DO NOT MAKE A PREHARVEST APPLICATION if you have exceeded the maximum application rates for the combined total of all preemergence and selective equipment applications listed in the table at the beginning of this section.  Make only 1 preharvest application of this product and allow a minimum of 7 days between application and harvest or feeding to livestock.  Application must be made a minimum of 30 days prior to the planting of any crop not listed on this label.  Preharvest application is not allowed on buffalo gourd or on Roundup Ready® or TruFlex™ RoundupReady canola.

**Post-Harvest**

USE INSTRUCTIONS: This product may be applied for weed control after harvest of oilseed crops. Higher application rates might be needed for control of large weeds that were growing in the field at the time of harvest. Tank mixtures with 2,4-D or dicamba may be used.  Ensure that the product used is labeled for post-harvest application in the crop harvested.   Read and follow label directions for all products in the tank mixture.

RESTRICTIONS:  Do not exceed a total application rate of 6 quarts of this product per acre per year. Allow a minimum of 7 days between application of this product and harvest or feeding of vegetation within the application area.  Application must be made a minimum or 30 days prior to the planting of any crop not listed on this label.

**9.8    Soybean**

TYPES OF APPLICATION: Those listed in Section 9.0, plus Spot Treatment; Selective Equipment; Preharvest

For directions for use on Roundup Ready soybean and Roundup Ready 2 Yield soybean, see the "ROUNDUP READY CROPS" section of this label.

**Preplant, At-planting, Preemergence**

USE INSTRUCTIONS: This product may be applied alone or in a tank mixture before, during or after planting soybean, but prior to crop emergence.

TANK MIXTURES:  This product may be tank-mixed with 2,4-D, Banvel or Clarity and applied prior to planting only.  This product may also be tank-mixed with the following products and applied prior to crop emergence.  Ensure that the product used is labeled for application prior to planting or the emergence of soybean. Read and follow label directions for all products in the tank mixture.  Apply these tank mixtures in 10 to 20 gallons of water per acre.

---

acetochlor; carfentrazone-ethyl; chlorimuron ethyl; clethodim; clomazone; cloransulam-methyl; dimethenamid; dimethenamid-p; fenoxaprop-p-ethyl; fluazifop-p-butyl; flufenacet; flumetsulam; flumiclorac pentyl ester; flumioxazin; fluthiacet-methyl; fomesafen; imazaquin; imazethapyr; lactofen; linuron; metolachlor; s-metolachlor; metribuzin; pendimethalin; pyroxasulfone; quizalofop-p-ethyl; saflufenacil; sulfentrazone; tribenuron methyl; trifluralin

Aim EC; Aim EW; Assure II; Authority Assist; Authority Elite; Authority First DF; Authority MAXX; Authority MTZ DF; Authority XL; Axiom DF; Blanket 4F; Boundary 6.5 EC; Cadet, Canopy; Canopy Blend; Canopy EX; Classic; Cobra; Command 3ME; Dawn; Dual MAGNUM; Dual II MAGNUM; Fierce; Fierce XLT; FirstRate; Flexstar; Fusion; Linex 4L; Lorox DF; Me-Too-Lachlor; Optill Powered by Kixor; Outlook; Phoenix; Prowl 3.3 EC; Prowl H2O; Pursuit; Python WDG; Reflex; Resource; Rhythm; Rowel; Rowel FX; Select; Select 2 EC; Select Max Herbicide with Inside Technology; Sharpen Powered by Kixor; Spartan 4F; Treflan 4L; Treflan 4 EC; TriCor 4F; TriCor DF; Valor SX; Valor XLT; Warrant; Warrant Ultra; Zidua

---

II. DIRECTIONS FOR USE WITH FOOD AND FEED CROPS

For hard-to-control annual weeds, such as fall panicum, barnyardgrass, crabgrass, shattercane and broadleaf signalgrass up to 2 inches tall, and Pennsylvania smartweed up to 6 inches tall, apply 24 fluid ounces of this product per acre in a tank mixture with one of the products listed. For other annual weeds listed on this label, apply 18 to 24 fluid ounces of this product per acre when weeds are less than 6 inches tall, and 24 to 36 fluid ounces when weeds are over 6 inches tall.

**Spot Treatment**

USE INSTRUCTIONS: This product may be applied as a spot treatment prior to initial pod set in soybean.

RESTRICTIONS: Do not apply this product to more than 10 percent of the total field area to be harvested.

**Selective Equipment**

USE INSTRUCTIONS: This product may be applied in soybean using a shielded sprayer, hooded sprayer, wiper applicator or sponge bar.   See additional instructions on the use of selective equipment in the "APPLICATION EQUIPMENT AND TECHNIQUES" section of this label.

RESTRICTIONS: Allow a minimum of 7 days between application and harvest.

**Preharvest**

USE INSTRUCTIONS:  This product may be applied to soybean prior to harvest after pods have set and lost all green color.  Apply at rates given in the "ANNUAL WEEDS RATE SECTION" and "PERENNIAL WEEDS RATE SECTION" of this label.  Take care to avoid excessive seed shatter loss due to ground application equipment.

RESTRICTIONS: Do not apply more than 4 quarts of this product per acre for preharvest application using ground application equipment or more than 48 fluid ounces per acre using aerial application equipment.  Allow a minimum of 7 days between application and harvest of soybean. If the preharvest application rate is greater than 24 fluid ounces per acre, do not graze or harvest hay or fodder within the application area for livestock feed within 25 days of application. If the application rate is 24 fluid ounces per acre or less, the grazing restriction is reduced to 14 days after application.

**9.9    Sugarcane**

TYPES OF APPLICATION: Those listed in Section 9.0, plus Spot Treatment [*Alternative text:* Chemical Fallow; Preplant; At-Planting; Peemergence; Hooded Sprayer in Row Middles; Shielded Sprayer in Row Middles; Wiper Applicator in Row Middles; Spot Treatment; Plant Growth Regulator; Post-Harvest]

**Preplant, At-Planting, Preemergence**

USE INSTRUCTIONS: This product may be applied in or around sugarcane fields, or in fields prior to the emergence of plant cane.

RESTRICTIONS: Do not apply to vegetation in or around ditches, canals or ponds containing water to be used for irrigation [*Optional text, if this use included on label for aquatic use:*  unless the surfactant added to the spray solution is labeled for herbicide use and approved for aquatic application].

**Spot Treatment**

USE INSTRUCTIONS: This product may be applied as a spot treatment in sugarcane.  For control of volunteer or diseased sugarcane, apply a 1-percent solution of this product in water using a handheld sprayer and a spray-to-wet technique.  Enhanced results can be obtained on volunteer or diseased sugarcane when application is made when there are at least 7 new leaves.  Avoid contact of this herbicide with healthy sugarcane plants as severe damage or destruction could result.

RESTRICTIONS: Do not feed or graze treated sugarcane foliage within the application area.

**Hooded Sprayer**

II. DIRECTIONS FOR USE WITH FOOD AND FEED CROPS

USE INSTRUCTIONS: This product may be applied using a hooded sprayer for weed control in between rows of sugarcane.  See additional instructions on the use of hooded sprayers in the "APPLICATION EQUIPMENT AND TECHNIQUES" section of this label.

PRECAUTIONS: Do not allow weeds within the application area to come into contact with the crop.

**Fallow Treatment**

USE INSTRUCTIONS: This product may be used as a replacement for tillage in fields that are lying fallow between sugarcane crops. This product may also be used to remove the last stubble of ratoon cane by applying 3 to 3.75 quarts of this product in 10 to 40 gallons of water per acre to new growth having at least 7 new leaves.  Allow a minimum of 7 days after application before tillage. Aerial application of up to 72 fluid ounces per acre may be made onto fallow sites where there is sufficient buffer to prevent drift onto adjacent crops. Tank mixtures with 2,4-D or dicamba may be used.  Ensure that the product used is labeled for this application in sugarcane. Read and follow label directions for all products in the tank mixture.

### 9.9.1   Sugarcane Ripening [*Alternative title:* **Plant Growth Regulation**]

USE INSTRUCTIONS: This product may be used as a foliar-applied plant growth regulator to hasten ripening and extend the period of high sucrose level in both low- and high-tonnage sugarcane.  Most of the sucrose increase is concentrated in the top nodes of the cane stalk.   To maximize sugar recovery where topping is practiced at harvest, top at the base of the fourth leaf.  Consult your state sugarcane authority or local Monsanto Company representative regarding the degree of sucrose response that can be anticipated prior to application of this product.

As a result of leaf desiccation, improved trash burn can be expected.

Apply this product at the following rates and timing according to the State in which the sugarcane is grown.   Use a higher application rate within the given range when applying to sugarcane under adverse ripening conditions or to less responsive varieties.

**FLORIDA** – Apply 6 to 14 fluid ounces of this product per acre 3 to 5 weeks before harvest of LAST RATOON CANE ONLY.

**HAWAII** – Apply 10 to 24 fluid ounes of this product per acre 4 to 10 weeks before harvest.

**LOUISIANA** – Apply 4 to 14 fluid ounces of this product per acre 3 to 7 weeks before harvest of RATOON CANE ONLY.

**PUERTO RICO** – Apply 6 fluid ounces of this product per acre 3 to 5 weeks before harvest of RATOON CANE ONLY.

**TEXAS** – Apply 6 to 14 fluid ounces of this product per acre 3 to 5 weeks before harvest of RATOON CANE ONLY.

PRECAUTIONS:  Application of this product can initiate development of shooting eyes.  This product might not increase the sucrose content of sugarcane under conditions of good natural ripening. Within 2 to 3 weeks after application, this product could produce a slight yellowing to a pronounced browning and drying of leaves, and a shortening of upper internodes. Spindle death could occur.

Rainfall within 6 hours after application could reduce the effectiveness of this product.

Application to sugarcane grown for seed could result in a reduction in germination or vigor.  To the extent consistent with applicable law, buyer and all users are responsible for any and all loss or damage in connection with the preharvest use of this product on sugarcane grown for seed.

RESTRICTIONS:  Do not feed or graze sugarcane forage following application.  Do not plant subsequent crops within 30 days after application of this product other than the following: alfalfa or

II. DIRECTIONS FOR USE WITH FOOD AND FEED CROPS

other forage legumes, beans (all types), corn (all types), cotton, melons (all types), pasture grasses, peanuts, potatoes (Irish or sweet), sorghum (milo), soybean, squash (all types) or wheat.

Do not apply for enhanced ripening to any crops other than sugarcane. Use of this product in any manner not consistent with this label could result in injury to persons, animals or crops, or other unintended consequences.

**9.10    Vegetable Crops**

THIS SECTION PROVIDES DIRECTIONS FOR USE THAT APPLY TO ALL VEGETABLE CROPS LISTED IN THE FOLLOWING SECTIONS.  SEE THE INDIVIDUAL CROP SECTIONS FOR SPECIFIC DIRECTIONS FOR USE, PREHARVEST INTERVALS, PRECAUTIONS AND RESTRICTIONS.

TYPES OF APPLICATION: Chemical Fallow; Preplant Fallow Beds; Preplant; At-Planting; Preemergence; Prior to Transplanting Vegetables; Hooded Sprayer in Row-Middles; Shielded Sprayer in Row-Middles; Wiper Applicator in Row-Middles; Directed Application (non-bearing ginseng only); Wiper Applicator (carrot, rutabaga and sweet potato only); Post-harvest

PRECAUTIONS: This product could cause crop injury when applied prior to transplanting or direct-seeding crops into plastic mulch. Remove residual product from the plastic with a single 0.5-inch application of water, either by natural rainfall or by irrigation, prior to planting.  Ensure that the wash water flushes off the plastic mulch and does not enter the transplant holes.  Application of this product at crop emergence will result in injury or death to emerged seedlings.

Avoid contact of this herbicide with foliage, green shoots or stems, bark, exposed roots (including those emerging from the plastic mulch), or fruit of crops, as severe crop injury or destruction could result. Transplanted seedlings coming into contact with freshly sprayed weeds could result in significant crop injury.

Preemergence application must be made before crop emerges from the soil to avoid severe crop injury. Apply before seed germination in coarse sandy soils to further minimize the risk of crop injury. In crops with vines, make hooded sprayer, shielded spray, and wiper applications in row middles prior to vine development, otherwise severe crop injury or destruction could result.

RESTRICTIONS: Unless otherwise directed, application using selective equipment, including wiper applicators and hooded sprayers, must be made a minimum of 14 days prior to harvest. Post-harvest and fallow applications must be made a minimum of 30 days prior to the planting of any crop not listed on this label.  See additional use instructions in the "APPLICATION EQUIPMENT AND TECHNIQUES" section of this label.

**9.10.1    Brassica Vegetables**

LABELED CROPS: Broccoli; Chinese broccoli (gai lon); Broccoli raab (rapini); Brussels sprouts; Cabbage; Chinese cabbage (bok choy); Chinese cabbage (napa); Chinese mustard cabbage (gai choy); Cauliflower; Cavalo broccoli; Collards; Kale; Kohlrabi; Mizuna; Mustard greens; Mustard spinach; Rape greens

**9.10.2    Bulb Vegetables**

LABELED CROPS:  All cultivars, varieties and/or hybrids of Chive (including Chinese); Daylily; Elegans hosta; Fritillaria; Garlic (including great-headed, serpent); Kurrat; Leek (including lady's, wild); Onion (including Beltsville bunching, bulb, Chinese, fresh, green, macrostem, pearl, potato, tree, Welsh); Shallot

**9.10.3    Cucurbit Vegetables and Fruits**

LABELED CROPS: Chayote; Chinese waxgourd (Chinese preserving melon); Citron melon; Cucumber; Gherkin; Edible gourd (includes hyotan, cucuzza, hechima, Chinese okra); Melons (all);

II. DIRECTIONS FOR USE WITH FOOD AND FEED CROPS

*Momordica spp.* (includes balsam apple, balsam pear, bittermelon, Chinese cucumber); Muskmelon (includes cantaloupe, casaba, crenshaw melon, golden pershaw melon, honeydew melon, honey ball melon, mango melon, Persian melon, pineapple melon, Santa Claus melon, snake melon); Pumpkin; Summer squash (includes crookneck squash, scallop squash, straightneck squash, vegetable marrow, zucchini); Winter squash (includes butternut squash, calabaza, hubbard squash, acorn squash, spaghetti squash); Watermelon

RESTRICTIONS: For cantaloupe, casaba melon, crenshaw melon, cucumber, gherkin, gourds, honeydew melon, honey ball melon, mango melon, melons (all), muskmelon, Persian melon, pumpkin, squash (summer, winter), and watermelon, allow a minum of 3 days between application and planting.

### 9.10.4    Leafy Vegetables

LABELED CROPS:  Amaranth (Chinese spinach); Arugula (roquette); Beet greens; Cardoon; Celery; Chinese celery; Celtuce; Chaya; Chervil; Edible-leaved chrysanthemum; Garland chrysanthemum; Corn salad; Cress (garden, upland); Dandelion; Dock (sorrel); Dokudami; Endive (escarole); Florence fennel; Gow kee; Lettuce (head, leaf); Orach, Parsley; Purslane (garden and winter); Radicchio (red chicory); Rhubarb; Spinach; New Zealand spinach; Vine spinach; Swiss chard; Watercress (upland); Water spinach

RESTRICTIONS: For watercress, allow a minimum of 3 days between application and seeding, and do not apply this product during the period between seeding and emergence.

### 9.10.5    Fruiting Vegetables

LABELED CROPS:  All cultivars, varieties and/or hybrids of Eggplant (including African, pea, scarlet); Cocona; Garden huckleberry; Goji berry; Groundcherry (*Physalis* spp.); Martinynia, Naranjilla; Okra; Pepino; Pepper (includes bell pepper, chili pepper, cooking pepper, pimento, sweet pepper); Roselle; Sunberry; Tomatillo; Tomato

RESTRICTIONS: Allow a minimum of 3 days between application and planting.  For tomato and tomatillo, do not apply this product using a hooded or shielded sprayer in row middles because of the potential for crop injury.

### 9.10.6    Legume Vegetables (Succulent or Dried)

LABELED CROPS:  Bean (*Lupinus*: includes grain lupin, sweet lupin, white lupin, white sweet lupin); Bean (Phaseolus: includes field bean, kidney bean, lima bean, navy bean, pinto bean, runner bean, snap bean, tepary bean, wax bean); Bean (Vigna: includes adzuki bean, asparagus bean, blackeyed pea, catjang, Chinese longbean, cowpea, crowder pea, moth bean, mung bean, rice bean, southern pea, urd bean, yardlong bean); Broad bean (fava); Chickpea (garbanzo); Guar, Jackbean; Lablab bean; Lentil; Pea (Pisum: includes dwarf pea, edible-podded pea, English pea, field pea, garden pea, green pea, snowpea, sugar snap pea); Pigeon pea; Soybean (immature seed); Sword bean

TYPES OF APPLICATION: Those listed in Section 9.0, plus Spot Treatment (dry varieties only); Preharvest (dry varieties only)

**Spot Treatment (Dry Varieties Only)**

USE INSTRUCTIONS:  This product may be applied as a spot treatment to control troublesome weeds such as Canada thistle, quackgrass, mayweed (dog fennel) and milkweed in any dry legume variety listed in this section, except cowpeas of field (feed) peas. Apply up to 24 fluid ounces of this product per acre in dry beans, or up to 72 fluid ounces per acre in dry peas, lentils and chickpeas, in 10 to 20 gallons of water using ground application equipment, or apply a 2-percent solution in a handheld sprayer. For enhanced results, apply at or beyond the bud stage of growth.

II. DIRECTIONS FOR USE WITH FOOD AND FEED CROPS

RESTRICTIONS: Allow a minimum of 7 days between application and harvest. Only one spot treatment application may be made per year.  Do not combine spot treatment with a preharvest broadcast application on the same crop area. Allow a minimum of 30 days between application and the planting of any crop not listed on this label. Do not feed vines and hay from the application area to livestock.  Do not apply this product as a spot treatment in cowpeas or field (feed) peas, since these are considered to be grown only as livestock feed.

**Preharvest (Dry Varieties Only)**

USE INSTRUCTIONS:  This product may be applied over the top of any dry legume variety listed in this section prior to harvest, except cowpeas or field (feed) peas.  Apply up to 24 fluid ounces of this product per acre in dry beans, or up to 72 fluid ounces per acre in dry peas, lentils and chickpeas, in 3 to 20 gallons of water per acre at the hard dough stage of the legume seed (30 percent grain moisture or less).

RESTRICTIONS: Allow a minimum of 7 days between application and harvest.  Only one preharvest application may be made per year.  Do not combine a preharvest application with a spot treatment application on the same crop area. Allow a minimum of 30 days between application and the planting of any crop not listed on this label. Do not feed vines and hay from the application area to livestock. Do not make a preharvest application of this product in cowpeas or field (feed) peas, since these are considered to be grown only as livestock feed.

### 9.10.7    Root and Tuber Vegetables

LABELED CROPS:  Arracacha; Arrowroot; Chinese artichoke; Jerusalem artichoke; Beet (garden); Burdock; Canna; Carrot; Cassava (bitter and sweet); Celeriac; Chayote (root); Chervil (turnip-rooted); Chicory; Chufa; Dasheen (taro); Galangal; Ginger; Ginseng; Horseradish; Leren; Kava (turnip-rooted); Parsley (turnip-rooted); Parsnip; Potato; Radish; Oriental radish; Rutabaga; Salsify; Black salsify; Spanish salsify; Skirret; Sweet potato; Tanier; Turmeric; Turnip; Wasabi; Yacon; Yam bean; True yam

TYPES OF APPLICATION: Those listed in Section 9.0, plus Directed Application (non-bearing ginseng only); Wiper applicator (carrot, rutabaga, sweet potato only)

**Directed Application in Ginseng (Non-Bearing Only)**

USE INSTRUCTIONS: This product may be applied for weed control in established non-bearing ginseng using a boom sprayer, CDA, shielded sprayer, wiper applicator, handheld or backpack wand, lance, or orchard gun.  See additional use instructions in the "APPLICATION EQUIPMENT AND TECHNIQUES" section of this label.

PRECAUTIONS: Control the application so as to not allow any contact of this product with the ginseng plant.  Droplets, mist, foam or splatter of the herbicide solution settling onto desirable vegetation could result in discoloration, stunting or destruction.

RESTRICTIONS:  Application must be made a minimum of one year prior to ginseng harvest.

**Wiper Applicator (Carrot, Rutabaga and Sweet Potato Only)**

USE INSTRUCTIONS:  A 33-percent solution of this product by volume in water may be applied using a wiper applicator over the top of carrot, rutabaga and sweet potato for the control of tall weeds. Add a nonionic surfactant to the application solution at a concentration of 10 percent by volume (10 gallons of surfactant per 100 gallons of application solution).  See additional use instructions for wiper applicators in the "APPLICATION EQUIPMENT AND TECHNIQUES" section of this label.

RESTRICTIONS:  For carrot, a maximum of two wiper or sponge bar applications may be made a minimum of 60 days prior to harvest following the first application and 7 days prior to harvest following the second application or if only one wiper application is made over the top of the carrot crop.  For

II. DIRECTIONS FOR USE WITH FOOD AND FEED CROPS

rutabaga, allow a minimum of 14 days between application and harvest.  For sweet potato, a maximum of five wiper or sponge bar applications may be made with a minimum of 14 days between applications and a minimum of 7 days prior to harvest

## 9.11    Miscellaneous Crops

LABELED CROPS: Aloe vera; Asparagus; Bamboo shoots; Globe artichoke; Okra; Peanut; Pineapple; Sugarbeet

TYPES OF APPLICATION: Those listed in Section 9.0, plus Spot Treatment (asparagus)

For directions for use with Roundup Ready sugarbeet, see the "ROUNDUP READY CROPS" section of this label.

PRECAUTIONS:  Preemergence application must be made before the crop emerges from the soil to avoid severe crop injury. Apply before seed germination in coarse sandy soils to further minimize the risk of crop injury. In crops with vines, apply this product in row middles using a hooded sprayer, shielded sprayer or wiper applicator prior to vine development, otherwise severe crop injury or destruction could result.

### Spot Weed Control, Site Preparation

USE INSTRUCTIONS: This product may be applied for spot weed control and site preparation prior to planting or transplanting crops listed in this section.

PRECAUTIONS: This product could cause crop injury when applied prior to transplanting or direct-seeding crops into plastic mulch. Remove residues of this product from the plastic with a single 0.5-inch application of water, either by natural rainfall or irrigation, prior to planting.  Ensure that the wash water flushes off the plastic mulch and does not enter the transplant holes.

RESTRICTIONS: Allow a minimum of 21 days between residue removal and transplanting.  Do not apply this product within 7 days prior to the emergence of the first asparagus spears. Do not feed or graze pineapple forage from within the application area.

### Spot Treatment (Asparagus)

USE INSTRUCTIONS: This product may be applied immediately after cutting asparagus, but prior to the emergence of new spears.

RESTRICTIONS: Do not apply this product to more than 10 percent of the total field area to be harvested. Do not harvest asparagus within 5 days of a spot treatment application.

### Post-Harvest in Asparagus

USE INSTRUCTIONS: This product may be applied for weed control after the last harvest of asparagus and all spears have been removed. If spears are allowed to re-grow, delay application until ferns have developed and make the application as a directed or shielded spray in order to avoid contact of this product with ferns, stems or spears. See additional use instructions in the "APPLICATION EQUIPMENT AND TECHNIQUES" section of this label.

PRECAUTIONS: Direct contact of the spray with the asparagus could result in serious crop injury.

## 10.0    TREE, VINE AND SHRUB CROPS

THIS SECTION PROVIDES DIRECTIONS FOR USE THAT APPLY TO ALL TREE, VINE AND SHRUB CROPS LISTED IN THE FOLLOWING SECTIONS.  SEE THE INDIVIDUAL CROP SECTIONS FOR SPECIFIC DIRECTIONS FOR USE, PREHARVEST INTERVALS, PRECAUTIONS AND RESTRICTIONS.

## II. DIRECTIONS FOR USE WITH FOOD AND FEED CROPS

TYPES OF APPLICATION: Preplant (site preparation); Broadcast Spray, Selective Equipment (shielded sprayer, wiper applicator), Directed Spray and Spot Treatment in Middles (between rows of trees, vines or bushes) and Strips (within rows of trees, vines or bushes); Site Weed Control; Perennial Grass Suppression; Cut Stump Application

USE INSTRUCTIONS:  Unless specifically prohibited in the individual crop sections that follow, this product may be applied using a boom sprayer, controlled droplet applicator (CDA), shielded sprayer, wiper applicator, handheld or backpack sprayer, lance or orchard gun, in middles (between rows of trees, vines or bushes) and strips (within rows of trees, vines or bushes), for weed control or perennial grass suppression in established tree fruit and nut groves, orchards and vineyards.  It may also be used for site preparation prior to planting or transplanting these crops.

Apply 12 fluid ounces to 4 quarts of this product per acre as directed in the "ANNUAL WEEDS RATE SECTION" and "PERENNIAL WEEDS RATE SECTION" of this label. Use a higher application rate within a given range when weeds are stressed, growing in dense populations or greater than 12 inches tall. Application may be repeated as needed up to a maximum of 8 quarts of this product per acre per year. See the "PRODUCT INFORMATION" section of this label for more information on Maximum Application Rates.

PRECAUTIONS:  Use extreme care to avoid contact of this herbicide solution, spray, drift or mist with foliage or green bark of trunk, branches, suckers, fruit or other parts of desirable trees, canes and vines. Avoid application when recent pruning wounds or other mechanical injury have occurred. Contact of this product with other than matured brown bark could result in serious crop damage or destruction.  Only shielded or directed sprayers may be used in crops where potential for crop contact is high, and then only where there is sufficient clearance. For application in strips (within rows of trees), only selective equipment (directed sprayer, hooded sprayer, shielded sprayer or wiper applicator) may be used in order to minimize the potential for overspray or drift of this product onto the crop. For berry crops, hooded sprayers must be fully enclosed including top, sides, front and back.  Only wiper applicators or shielded sprayers capable of preventing all contact of this product with the crop may be used.  See additional use instructions and precautions in the "APPLICATION EQUIPMENT AND TECHNIQUES" section of this label.

RESTRICTIONS:  Allow a minimum of 3 days between application of this product and transplanting.

**Middles (between rows)**

USE INSTRUCTIONS: This product will control or suppress annual and perennial weeds and ground covers growing between rows of tree, vine and shrub crops listed on this label.  If weeds are under drought stress, irrigate prior to application. Reduced weed control could result if weeds have been recently mowed at the time of application.

TANK MIXTURES: A tank mixture of this product with Goal 2XL may be applied for annual weed control between rows (middles) of a variety of tree, vine and shrub crops when weeds are stressed or growing in dense populations. Application of 12 to 24 fluid ounces of this product per acre plus an appropriate rate of Goal 2XL will control annual weeds with a maximum height or length of 6 inches, including crabgrass, common groundsel, junglerice, common lambsquarters, redroot pigweed, London rocket, common ryegrass, shepherd's-purse, annual sowthistle, filaree (suppression), horseweed/marestail, stinging nettle and common purslane (suppression).   This tank-mix will also control common cheeseweed (malva) or hairy fleabane with a maximum height or length of 3 inches.

This product may also be applied to row middles in tank mixtures with the following products.

| 2,4-D; bromacil; clethodim; diuron; fluazifop-P-butyl; flumioxazin; glufosinate-ammonium; indaziflam; napropamide; norflurazon; oryzalin; oxyfluorfen; pendimethalin; penoxsulam; pyraflufen ethyl; rimsulfuron; saflufenacil; sethoxydim; simazine; thiazopyr |
| --- |

## II. DIRECTIONS FOR USE WITH FOOD AND FEED CROPS

Alion; Chateau Herbicide SW; Devrinol 2-XT; Devrinol 50-DF; Devrinol 50-DF Ornamental; Devrinol DF-XT; Devrinol DF-XT Ornamental; Direx 4L; Dri-Clean; Fusilade II Turf & Ornamental; Fusilade DX; Goal 2XL; GoalTender; Karmex DF; Matrix FNV; Matrix SG; Orchard Master Broadleaf; Orchard Master CA; Pindar GT; Poast; Poast Plus; Prowl 3.3 EC; Prowl H2O; Princep 4L; Princep Caliber 90; Princep Liquid; Rely 280; Select; Select 2 EC; Select Max Herbicide with Inside Technology; Simazine 4L; Simazine 4L Flowable; Simazine 90DF; Simazine 90 WDG; Sim-Trol 4L; Sim-Trol DF; Solicam DF; Surflan AS Agricultural; Surflan AS Specialty; Surflan Flex; Surflan Flex T&O; Surflan XL 2G; Treevix Powered by Kixor; Venue; Visor Broadcrop

Ensure that the product used is labeled for application within the crop being grown. Read and follow label directions for all products in the tank mixture.

### Strips (within rows)

TANK MIXTURES: This product may be applied within rows of tree, vine and shrub crops in tank mixtures with the following products.

2,4-D; bromacil; clethodim; diuron; fluazifop-P-butyl; flumioxazin; glufosinate-ammonium; indaziflam; napropamide; norflurazon; oryzalin; oxyfluorfen; pendimethalin; penoxsulam; pyraflufen ethyl; rimsulfuron; saflufenacil; sethoxydim; simazine; thiazopyr

Alion; Chateau Herbicide SW; Devrinol 2-XT; Devrinol 50-DF; Devrinol 50-DF Ornamental; Devrinol DF-XT; Devrinol DF-XT Ornamental; Direx 4L; Dri-Clean; Fusilade II Turf & Ornamental Fusilade DX; Goal 2XL; GoalTender; Karmex DF; Matrix FNV; Matrix SG; Orchard Master Broadleaf; Orchard Master CA; Pindar GT; Poast; Poast Plus; Prowl 3.3 EC; Prowl H2O; Princep 4L; Princep Caliber 90; Princep Liquid; Rely 280; Select; Select 2 EC; Select Max Herbicide with Inside Technology; Simazine 4L; Simazine 4L Flowable; Simazine 90DF; Simazine 90 WDG; Sim-Trol 4L; Sim-Trol DF; Solicam DF; Surflan AS Agricultural; Surflan AS Specialty; Surflan Flex; Surflan Flex T&O; Surflan XL 2G; Treevix Powered by Kixor; Venue; Visor Broadcrop

Ensure that the product used is labeled for application within the crop being grown. Read and follow label directions for all products in the tank mixture.

RESTRICTIONS:  Do not apply these tank mixtures in Puerto Rico.

### Perennial Grass Suppression

This product will suppress perennial grasses such as bahiagrass, bermudagrass, tall fescue, orchardgrass, Kentucky bluegrass and quackgrass that are grown as ground covers in tree, vine and shrub crops.

For suppression of tall fescue, fine fescue, orchardgrass and quackgrass, apply 6 fluid ounces of this product in 10 to 20 gallons of water per acre.

For suppression of Kentucky bluegrass covers, apply 4.5 fluid ounces of this product per acre.  Do not add ammonium sulfate to the spray mix.

For enhanced results, mow cool-season grass covers in the spring to even their height and then apply this product 3 to 4 days after mowing.

For suppression of vegetative growth and seedhead inhibition of bahiagrass for approximately 45 days, apply 4.5 fluid ounces of this product in 10 to 25 gallons of water per acre 1 to 2 weeks after full green-up or after mowing to a uniform height of 3 to 4 inches prior to seedhead emergence.  For suppression for up to 120 days, apply 3 fluid ounces of this product per acre, followed by an application of 1.5 to 3 fluid ounces per acre about 45 days later.  Make no more than two applications per year.

For burndown of bermudagrass, apply 24 to 48 fluid ounces of this product in 3 to 20 gallons of water per acre.  Make this application only if a reduction of the bermudagrass stand can be tolerated.  When

## II. DIRECTIONS FOR USE WITH FOOD AND FEED CROPS

burndown is required prior to harvest, make the application a minimum of 21 days prior to harvest to allow sufficient time for burndown to occur.

For suppression of bermudagrass, apply 4.5 to 12 fluid ounces of this product per acre east of the Rocky Mountains and 12 fluid ounces west of the Rocky Mountains in a total spray volume of 3 to 20 gallons per acre no sooner than 1 to 2 weeks after full green-up.  If the bermudagrass is mowed prior to application, maintain a minimum of 3 inches in height.  Sequential applications may be made when re-growth occurs and bermudagrass injury and stand reduction can be tolerated. East of the Rocky Mountains, apply 4.5 to 7.5 fluid ounces of this product per acre under shaded conditions or where a lesser degree of suppression is desired.

**Cut Stump Application**

Application of this product to a freshly cut tree stump may be made during site preparation or site renovation to control regrowth and re-sprouting of stumps of many tree species, some of which are listed below.

<u>Citrus Trees</u>: Calamondin, Chironja, Citron, Citrus hybrids, Grapefruit, Kumquat, Lemon, Lime, Mandarin (Tangerine), Orange (all), Pummelo, Tangelo, Tangor

<u>Fruit Trees</u>: Apple, Apricot, Cherry (sweet, sour), Crabapple, Loquat, Mayhaw, Nectarine, Olive, Peach, Pear, Plum/Prune (all), Quince

<u>Nut Trees</u>: Almond, Beechnut, Brazil nut, Butternut, Cashew, Chestnut, Chinquapin, Filbert (hazelnut), Hickory nut, Macadamia, Pecan, Pistachio, Walnut (black, English)

USE INSTRUCTIONS:  Cut the tree close to the soil surface and immediately apply a 50- to 100-percent (undiluted) solution of this product to the freshly cut surface using application equipment capable of covering the entire cambium. A delay in application could result in reduced performance. For enhanced results, cut the tree during period of active growth and full leaf expansion and apply this product.

PRECAUTIONS:  DO NOT MAKE A CUT STUMP APPLICATION WHEN THE ROOTS OF ADJACENT DESIRABLE TREES MIGHT BE GRAFTED TO THE ROOTS OF THE CUT STUMP, AS INJURY COULD OCCUR IN ADJACENT TREES. Some sprouts, stems or trees can share a common root system. Adjacent trees having a similar age, height and spacing could be an indicator of a shared root system. Whether grafted or shared, injury is likely to occur to adjacent stems or trees when this product is applied to one or more trees sharing a common root system.

### 10.1    Berry and Small Fruit Crops

LABELED CROPS: All cultivars, varieties and/or hybrids of Amur River grape; Aronia berry; Bayberry; Bearberry; Bilberry; Blackberry (including Andean blackberry, arctic blackberry, bingleberry, black satin berry, boysenberry, brombeere, California blackberry, Cherokee blackberry, chesterberry, Cheyenne blackberry, common blackberry, coryberry, darrowberry, dewberry, Dirksen thornless berry, evergreen blackberry, Himalayaberry, hullberry, lavacaberry, loganberry, lowberry, Lucretia berry, mammoth blackberry, marionberry, mora, mures de ronce, nectarberry, Northern dewberry, olallieberry, Oregon evergreen berry, phenomenalberry, rangeberry, ravenberry, rossberry, Shawnee blackberry, Southern dewberry, tayberry, youngberry, zarzamora); Blueberry (highbush, lowbush); Buffaloberry; Che; Chilean guava; Chokecherry; Cloudberry; Cranberry (including highbush); Currant (black, Buffalo, red, native); Elderberry; European barberry; Gooseberry; Grape; Honeysuckle (edible); Huckleberry; Jostaberry; Juneberry (Saskatoon berry); Kiwifruit (fuzzy, hardy); Ligonberry; Maypop; Mountain pepper berries; Mulberry; Muntries; Partridgeberry; Phalsa; Pincherry; Raspberry (black, red, wild); Riberry; Salal; Schisandra berry; Sea buckthorn; Serviceberry; Strawberry

TYPES OF APPLICATION: Those listed in Section 10.0

II. DIRECTIONS FOR USE WITH FOOD AND FEED CROPS

PRECAUTIONS: To avoid damage, spray solutions of this product must not be allowed to contact desirable vegetation, including green shoots, canes, or foliage.  In the northeast and Great Lakes regions, apply this product in grape vineyards prior to the end of the bloom stage in order to avoid crop injury, or apply using a shielded sprayer or wiper applicator.  USE THIS PRODUCT WITH EXTREME CARE AROUND RASPBERRY, AS SERIOUS CROP DAMAGE CAN OCCUR IF ANY PART OF THE VINE COMES INTO CONTACT WITH THIS PRODUCT.  To the extent consistent with applicable law, grower assumes all responsibility for crop losses resulting from misapplication of this product.

RESTRICTIONS:  Allow a minimum of 3 days between application of this product and transplanting. Allow a minimum of 30 days between application and harvest in cranberries or the planting of any crop not listed on this label. Allow a minimum of 14 days between application and harvest for all other berry and small fruit crops listed here.  Do not apply this product using selective equipment in kiwifruit.

**Spot Treatment**

USE INSTRUCTIONS:  Spot treatment application using a handheld sprayer or other appropriate application equipment listed in the "APPLICATION EQUIPMENT AND TECHNIQUES" section of this label may be used to control weeds in berry and small fruit crops listed in this section.

For control of weeds growing in dry ditches (interior and perimeter) of cranberry production areas, drop water level to remove standing water in ditches and apply a 0.75- to 1.5-percent solution of this product with a handheld sprayer to adequately wet the vegetation only; do not spray to the point of runoff.  To achieve maximum weed control in dry ditches, apply this product within 1 day after water drawdown to ensure application to actively growing weeds and allow a minimum of 2 days after application before reintroduction of water.

RESTRICTIONS:  Allow a minimum of 30 days between spot treatment application and harvest of cranberries.  Do not apply directly to water.  Use nozzles that produce medium- to large-sized droplets to minimize spray drift and avoid crop injury.

**Post-Harvest Application in Cranberry Production**

USE INSTRUCTIONS: This product may be applied for weed control after the harvest of berries and small fruit listed in this section.  In cranberry bogs, apply this product after cranberry vines are dormant (after they have turned red) using a handheld sprayer, wiper applicator or any other appropriate application equipment listed in the "APPLICATION EQUIPMENT AND TECHNIQUES" section of this label. With a handheld sprayer, apply a 0.5- to 0.75-percent solution of this product to adequately wet the vegetation only; do not spray to the point of runoff.  With a handheld boom sprayer, apply 1.5 to 3.75 quarts of this product per acre.

PRECAUTIONS:  Even though vines appear dormant, contact of this product with desirable vegetation could result in damage or severe plant injury. Cranberry plants that are directly sprayed could be killed.

RESTRICTIONS:  Apply this product only after cranberries have been harvested. Do not apply to more than 10 percent of the total bog.  Allow a minimum of 6 months between post-harvest application and the next harvest of cranberries.  Do not apply using aerial application equipment.  Do not apply directly to water.

**10.2    Citrus Fruit Crops**

LABELED CROPS:  All cultivars, varieties and/or hybrids of Calamondin; Chironja; Citron; Citrus Hybrids; Grapefruit (including Japanese summer); Kumquat; Lemon; Lime (including Australian desert lime, Australian finger lime, Australian round lime, Brown river finger lime, Mount white, New Guinea wild, Russell river, sweet, and Tahiti); Mandarin (including Mediterranean, Satsuma); Orange (all); Pummelo; Tangelo (ugli); Tangerine (Mandarin); Tangor; Uniq Fruit (ugli)

II. DIRECTIONS FOR USE WITH FOOD AND FEED CROPS

TYPES OF APPLICATION: Those listed in Section 10.0 [*Alternative text:* Preplant (site preparation); Broadcast Spray, Selective Equipment (shielded sprayer, wiper applicator), Directed Spray or Spot Treatment in Middles (between rows of trees) or Strips (within rows of trees); Perennial Grass Suppression; Cut Stump Application]

USE INSTRUCTIONS: The following use instructions pertain to application in Florida and Texas only.

For burndown or control of the weeds listed below, apply this product at the specified rate in 3 to 30 gallons of water per acre. Where weed foliage is dense, use 10 to 30 gallons of water per acre.

To control goatweed, apply 48 to 72 fluid ounces of this product in 20 to 30 gallons of water per acre when plants are actively growing. Apply 48 fluid ounces per acre when plants are less than 8 inches tall and 72 fluid ounces per acre when plants are greater than 8 inches tall. If goatweed is greater than 8 inches tall, the use of this product in a tank-mix with Krovar I or Karmex could improve weed control. Refer to the individual product labels for specific crops, rates, geographic restrictions and precautionary statements.

| Weed Species | Level of Perennial Weed Control at Various Application Rates (amount of this product per acre) | | | |
| --- | --- | --- | --- | --- |
| | 24 fl oz | 48 fl oz | 2.25 quarts | 3.75 quarts |
| Bermudagrass | B | – | PC | C |
| Guinea grass | | | | |
| *Texas and Florida Ridge* | B | C | C | C |
| *Florida Flatwoods* | – | B | C | C |
| Para grass | B | C | C | C |
| Torpedograss | S | – | PC | C |

S = Suppression, PC = Partial Control, B = Burndown, C = Control

RESTRICTIONS:  Allow a minimum of 1 day between application and harvest of citrus fruit crops.  For citron groves, apply as a directed spray only.

**10.3   Pome Fruit Crops**

LABELED CROPS: All cultivars, varieties and/or hybrids of Apple; Azarole; Crabapple, Loquat; Mayhaw; Medlar; Pear (including Asian pear); Quince (including Chinese and Japanese quince); Tejocote

TYPES OF APPLICATION: Those listed in Section 10.0

RESTRICTIONS:  Allow a minimum of 1 day between application and harvest of pome fruit.

**10.4   Stone Fruit Crops**

LABELED CROPS: Apricot; Cherry (sweet, tart); Nectarine; Olive; Peach; Plum/Prune (all types); Plumcot

TYPES OF APPLICATION: Those listed in Section 10.0

PRECAUTIONS:  Avoid application near trees with recent pruning wounds or other mechanical injury. Apply only near trees that have been planted in the orchard for a minimum of 2 years. ENSURE THAT NO PART OF A PEACH TREE IS CONTACTED WITH OVERSPRAY OR DRIFT OF THIS PRODUCT.

RESTRICTIONS:  Allow a minimum of 17 days between application and harvest of stone fruit.  In olive groves, apply as a directed spray only.  Remove suckers and low-hanging limbs a minimum of 10 days prior to application.

II. DIRECTIONS FOR USE WITH FOOD AND FEED CROPS

**10.5     Tree Nut Crops**

LABELED CROPS: Almond, Beechnut; Betelnut; Brazil nut; Butternut; Cashew; Chestnut; Chinquapin; Coconut; Filbert (hazelnut); Hickory nut; Macadamia; Pecan; Pine nut; Pistachio; Walnut (black, English)

TYPES OF APPLICATION: Those listed in Section 10.0

RESTRICTIONS:   Allow a minimum of 3 days between application and harvest of tree nuts, except coconut.   Allow a minimum of 14 days between application and harvest of coconut.

**10.6     Tropical and Subtropical Trees and Fruit Crops**

LABELED CROPS: Ambarella; Atemoya; Avocado; Banana; Barbados cherry (acerola); Biriba; Blimbe; Breadfruit; Cacao (cocoa) bean; Canistel; Carambola (starfruit); Cherimoya; Coffee; Custard apple; Dates; Durian; Feijoa; Figs; Governor's plum; Guava; Ilama; Imbe; Imbu; Jaboticaba; Jackfruit; Longan; Lychee; Mamey apple; Mango; Mangosteen; Marmaladebox (genip); Mountain papaya; Noni (Indian mulberry); Papaya; Pawpaw; Plantain; Persimmon; Pomegranate; Pulasan; Rambutan; Rose apple; Sapodilla; Sapote (black, mamey, white); Spanish lime; Soursop; Star apple; Sugar apple; Surinam cherry; Tamarind; Tea; Ti; Wax jambu

TYPES OF APPLICATION: Those listed in Section 10.0 and as a Bananacide (banana only)

RESTRICTIONS:  Allow a minimum of 1 day between application and harvest in banana, coffee, guava, papaya, and plantain crops.  Allow a minimum of 14 days between application and harvest for all other tropical or subtropical tree fruit listed here.  In coffee and banana, delay application a minimum of 3 months after transplanting to allow the new coffee or banana plant to become established.

**Bananacide (Banana Only)**

USE INSTRUCTIONS: This product may be used to destroy banana plants infected with the Banana Bunchy Top Virus, as well as non-infected banana plants, in order to establish a disease-free buffer around a plantation.  Remove all fruit from the plants within the area prior to treatment.  Inject 0.04 fluid ounce (1 milliliter) of this concentrated product (undiluted) for every 2 to 3 inches of pseudostem diameter of the banana plant to be controlled.  Make the injection at least one foot above the ground, except for very small plants, which can be injected vertically into the top.  Any subsequent re-growth must also be destroyed.  Mechanically destroy all plants and mats (or units) within a 4-foot radius around a treated mat.

For control of the Banana Bunchy Top Virus, it is critical that the grower follow a strict control program involving monitoring for diseased plants, spraying to control the aphid vector, and destruction of all infected mats (or units).  An infected plant might not show symptoms of the Banana Bunchy Top Virus for up to 125 days; therefore, it is critical that the entire mat (or unit) containing the diseased plant be destroyed immediately.

No surfactant is required to be added to this product when injecting into banana plants.

RESTRICTIONS: Do not apply more than 0.5 fluid ounce (15 milliliters) of this product per mat (or unit).  Do not harvest any fruit or plant material from treated mats (or units) following injection.  Do not allow livestock to consume treated plant material.  Following transplant of new banana plants into treated areas, allow plants to become established for a minimum of 3 months before applying this product for weed control.

**10.7     Vine Crops**

LABELED CROPS: Hops; Passion fruit

TYPES OF APPLICATIONS: Those listed in Section 10.0

USE INSTRUCTIONS: Apply this product for weed control only when green shoots, canes or foliage are not in the spray zone.

II. DIRECTIONS FOR USE WITH FOOD AND FEED CROPS

RESTRICTIONS:  Allow a minimum of 14 days between application and harvest of these vine crops.

### 10.8   Miscellaneous Tree Food Crops

LABELED CROPS: Cactus (all, including prickly pear, dragon fruit); Palm

TYPES OF APPLICATION: Those listed in Section 10.0

### 10.9   Non-Food Tree Crops

LABELED CROPS:  Pine; Poplar; Eucalyptus; Christmas Trees; all other non-food tree crops

TYPES OF APPLICATION: Those listed in Section 10.0

PRECAUTIONS: Avoid contact of spray, drift or mist of this product with foliage or green bark of established Christmas trees and other pine trees. Desirable plants can be protected from the spray solution by using shields or coverings of impermeable materials.

[*Optional label statement:* RESTRICTIONS: DO NOT apply this product as a broadcast application over the top of plantations or tree crops] [*Optional text:* , unless otherwise directed.].

### Site Preparation

USE INSTRUCTIONS: This product may be used for weed control prior to planting non-food tree crops.

PRECAUTIONS: Protect non-target plants from being sprayed with this product during site preparation application.

### Directed Spray, Spot Treatment, Wiper Applicator

USE INSTRUCTIONS: This product may be applied as a post-directed spray or spot treatment, or applied using a wiper applicator, around established Christmas trees, eucalyptus, poplar, and all other non-food tree crops.

## 11.0   PASTURE GRASSES, FORAGE LEGUMES AND RANGELAND

USE INSTRUCTIONS: Refer to the "ANNUAL WEEDS RATE SECTION" and "PERENNIAL WEEDS RATE SECTION" of this label for application rates of this product for specific weeds. When applied as directed, this product will control those annual and perennial grasses and broadleaf weeds listed. Application rates specified on this label for hard-to-control weeds, or those specified on separate supplemental labeling for this product, supersede rates listed in the "ANNUAL WEEDS RATE SECTION," "PERENNIAL WEEDS RATE SECTION" and "WOODY BRUSH, TREES AND VINES RATE SECTION" of this label.  Additional information on hard-to-control weeds can be found on Fact Sheets published for this product.

### 11.1   Alfalfa, Clover and Other Forage Legumes

LABELED CROPS:  Alfalfa; Clover; Kenaf; Kudzu; Lespedeza; Leucaena; Lupin; Sainfoin; Trefoil; Velvet bean; Vetch (all types)

TYPES OF APPLICATION: Preplant; At-Planting; Preemergence; Spot Treatment; Wiper Applicator; Preharvest (except kenaf and leucaena); Stand Removal

For directions for use with Roundup Ready alfalfa, see the "ROUNDUP READY CROPS" section of this label.

### Preplant, At-Planting, Preemergence

USE INSTRUCTIONS: This product may be applied before, during or after planting crops listed in this section, but prior to crop emergence.

RESTRICTIONS: Remove domestic livestock before application.

II. DIRECTIONS FOR USE WITH FOOD AND FEED CROPS

**Spot Treatment, Wiper Applicator**

USE INSTRUCTIONS: This product may be applied as a spot treatment or over the top of crops listed in this section using a wiper applicator. See additional instructions on the use of wiper applicators in the "APPLICATION EQUIPMENT AND TECHNIQUES" section of this label.  Application may be repeated in the same area at 30-day intervals.

RESTRICTIONS: For spot treatment and use with a wiper applicator, apply in areas where the movement of domestic livestock can be controlled. Remove domestic livestock before application and wait a minimum of 3 days after application before grazing livestock or harvesting.  Do not apply this product to more than 10 percent of the total field area at any one time.

**Weed Control in Dormant Alfalfa**

USE INSTRUCTIONS: This product will control or suppress many weeds, including quackgrass, downy brome and cheatgrass in dormant alfalfa. Apply 7 to 9 fluid ounces of this product per acre in the spring when alfalfa is dormant, after spring temperatures have warmed enough to encourage weed growth, but prior to initiation of trifoliate leaf expansion of the alfalfa crop. Application made after expansion of the first trifoliate leaf will cause growth reduction and reduced crop yield.

PRECAUTIONS:  Improper application of this product to alfalfa can cause crop injury.  Do not use this product on dormant alfalfa if a slight yield reduction in the first cutting cannot be tolerated.  Slight discoloration of the alfalfa crop could occur, but will re-green and resume growth under moist soil conditions as effects of this product wear off.

RESTRICTIONS: Do not add ammonium sulfate to spray solutions of this product for application to dormant alfalfa.  Do not make more than one application per year.  Allow a minimum of 36 hours after application before grazing livestock or harvesting.

**Preharvest (Except Kenaf and Leucaena), Stand Removal**

USE INSTRUCTIONS: This product may be applied as a broadcast application prior to harvest (except in kenaf and leucaena) in declining stands or in any stand where severe crop injury or destruction is acceptable, or to remove an established stand of any forage legume listed in this section.  Application may be made at any time of the year to control annual and perennial weeds, including quackgrass.  For control of quackgrass, apply in the spring, late-summer or fall when quackgrass is actively growing. Application for quackgrass control must be followed by deep tillage for complete control.  If the crop is to be harvested or grazed by livestock, apply up to 48 fluid ounces of this product per acre in alfalfa and up to 36 fluid ounces per acre in all other legumes listed in this section.  For complete removal of established stands of clover, it might be necessary to use a higher application rate, as listed in the "PERENNIAL WEEDS RATE SECTION" of this label.

PRECAUTIONS: This application can destroy an alfalfa stand and severely injure or destroy other legume crops listed, such as clover.  Preharvest application on alfalfa grown for seed could result in a reduction in germination or vigor.  To the extent consistent with applicable law, buyer and all users are responsible for any and all loss or damage in connection with the preharvest use of this product on alfalfa grown for seed.

RESTRICTIONS:  Make only one application to an existing crop stand per year.  Remove domestic livestock before application.  Foliage within the application area can be harvested and fed to livestock according to the application rates and intervals defined in the following table.  If applying at a rate greater than those listed here, do not harvest foliage for livestock feed or allow livestock to graze within the application area.

| Crop | Maximum Single Preharvest Application Rate | Minimum Interval Between Application and Harvest or |
|------|------|------|

II. DIRECTIONS FOR USE WITH FOOD AND FEED CROPS

|  | (per acre) | **Livestock Grazing** |
|---|---|---|
| Alfalfa | 48 fluid ounces | 36 hours |
| All other legumes listed | 36 fluid ounces | 3 days |

Crops listed on this label may be planted into the application area at any time; all other crops may be planted 30 days after application.

## 11.2    Conservation Reserve Program (CRP)

TYPES OF APPLICATION: Postemergence Weed Control in Dormant CRP Grasses; Wiper Applicator; Renovation (rotating out of CRP); Site Preparation

**Postemergence Weed Control in Dormant CRP Grasses, Wiper Applicator**

USE INSTRUCTIONS: Apply this product to suppress competitive growth and seed production of undesirable vegetation on CRP land. Application may be made using a wiper applicator to control tall weeds, or as a broadcast application or spot treatment to dormant CRP grasses. For selective weed control using broadcast application equipment, apply 9 to 12 fluid ounces of this product per acre in early-spring before desirable CRP grasses, such as crested and tall wheatgrass, break dormancy and initiate green growth. Late-fall application may be made after desirable perennial grasses have reached dormancy.

PRECAUTIONS: Some stunting of CRP perennial grasses will occur if broadcast application is made when plants are not dormant.

RESTRICTIONS: Do not apply more than 2.25 quarts of this product per acre per year onto CRP land. No waiting period is required between application and grazing or harvesting for feed.

**Renovation (Rotating out of CRP), Site Preparation**

USE INSTRUCTIONS: This product may be used to prepare CRP land for crop production.  Refer to federal, state or local use guides for CRP renovation information.

RESTRICTIONS: Crops listed on this label may be planted into the area at any time; all other crops may be planted 30 days after application.

## 11.3    Grass Seed and Sod Production

LABELED CROPS:  Any grass (*Gramineae* family) except Corn; Sorghum; Sugarcane and those listed in the "CEREAL AND GRAIN CROPS" section of this label

TYPES OF APPLICATION:  Preplant; At-Planting; Preemergence; Renovation; Removal of Established Stands; Site Preparation; Shielded Sprayer; Wiper Application; Spot Treatment; Creating Rows in Annual Ryegrass

**Preplant, At-Planting, Preemergence, Renovation, Removal of Established Stand, Site Preparation**

USE INSTRUCTIONS: This product controls most existing vegetation for purposes of renovating turf or forage grass seed production areas, or for establishing turfgrass grown for sod. This product may be used to destroy undesirable grass vegetation when production fields are converted to alternative species or crops. Do not disturb soil or underground plant parts before application and delay tillage or renovation techniques, including vertical mowing, coring and slicing, for a minimum of 7 days after application to allow for herbicide translocation into underground plant parts.

Apply before, during or after planting, or for renovation purposes. Where existing vegetation is growing under mowed turfgrass management, apply this product after omitting at least one regular mowing to allow sufficient growth for good interception of the herbicide spray.  For maximum control of existing vegetation, delay planting until determining if any re-growth of underground plant parts will occur.  Where

## II. DIRECTIONS FOR USE WITH FOOD AND FEED CROPS

repeat applications are necessary, sufficient re-growth must be attained prior to application.  For warm-season grasses, such as bermudagrass, summer or fall application provides enhanced control. Broadcast application of this product may be used to control sod remnants or other unwanted vegetation after sod is harvested.  Application rates of up to 3.75 quarts per acre may be used to totally remove an established stand of hard-to-kill grass species.

RESTRICTIONS: If application rate is 2.25 quarts of this product per acre or less, no waiting period between application and feeding or livestock grazing is required.  If the rate is greater than 2.25 quarts per acre, remove domestic livestock before application and wait 8 weeks after application before grazing or harvesting.  Crops listed on this label may be planted into the area at any time; all other crops may be planted 30 days after application.

**Shielded Sprayer**

USE INSTRUCTIONS:  Apply 24 to 72 fluid ounces of this product in 10 to 20 gallons of water per acre using a shielded sprayer to control weeds between grass seed rows.  Uniform planting in straight rows will aid shielded sprayer application.  Enhanced results can be obtained when the grass seed crop is small enough to easily pass by the protective shields.  See additional instructions on the use of shielded sprayers in the "APPLICATION EQUIPMENT AND TECHNIQUES" section of this label.

PRECAUTIONS: Contact of this product in any manner to any vegetation to which application is not intended could cause damage.

**Wiper Applicator**

USE INSTRUCTIONS: This product may be applied over the top of desirable grasses using a wiper applicator for the control of tall weeds.  See additional instructions on the use of wiper applicators in the "APPLICATION EQUIPMENT AND TECHNIQUES" section of this label.

PRECAUTIONS:  Droplets, mist, foam or splatter of the herbicide solution settling onto desirable vegetation could result in discoloration, stunting or destruction.

**Spot Treatment**

USE INSTRUCTIONS: Apply a 1-percent solution of this product using a handheld sprayer to control weeds within established vegetation prior to heading of grasses grown for seed or to control sod remnants or other unwanted vegetation after sod is harvested.

PRECAUTIONS: This product will kill the desirable grasses along with the weeds. Take care not to spray or allow spray to drift outside the target area in order to avoid unwanted crop destruction.

**Creating Rows in Annual Ryegrass**

USE INSTRUCTIONS: Use low-pressure nozzles or drop nozzles designed to target the application over a narrow band. Set nozzle height to establish the desired row spacing and apply 12 to 24 fluid ounces of this product per acre. Enhanced results can be obtained when application is made before ryegrass reaches 6 inches in height. Use the higher application rate within this range when ryegrass is greater than 6 inches in height.

PRECAUTIONS:  Take care not to spray or allow spray to drift outside target area in order to avoid unwanted crop destruction. To the extent consistent with applicable law, grower assumes all responsibility for crop losses resulting from misapplication of this product.

**11.4    Pastures**

LABELED CROPS: Bahiagrass; Bermudagrass; Bluegrass; Brome; Fescue; Guineagrass; Kikuyugrass; Orchardgrass; Pangola grass; Ryegrass; Timothy; Wheatgrass and any grass (*Gramineae* family) except Corn, Sorghum, Sugarcane and those listed in "CEREAL AND GRAIN CROPS" section of this label

II. DIRECTIONS FOR USE WITH FOOD AND FEED CROPS

TYPES OF APPLICATION: Preplant; Preemergence; Pasture Renovation; Spot Treatment; Wiper Applicator; Postemergence Weed Control (broadcast application)

**Preplant, Preemergence, Pasture Renovation**

USE INSTRUCTIONS: This product may be applied for weed control prior to planting or emergence of forage grasses.   This product may also be apllied to control perennial pasture species listed on this label prior to re-planting.

RESTRICTIONS:  If application rates total 2.25 quarts of this product per acre or less, no waiting period between application and feeding or livestock grazing is required.  If the rate is greater than 2.25 quarts per acre, remove domestic livestock before application and wait 8 weeks after application before grazing or harvesting. Crops listed on this label may be planted into the area at any time; all other crops may be planted 30 days after application.

**Spot Treatment, Wiper Applicator**

USE INSTRUCTIONS: This product may be applied in pastures as a spot treatment or over the top of desirable grasses using a wiper applicator to control tall weeds.  To achieve maximum performance, remove domestic livestock before application and wait a minimum of 7 days after application before grazing livestock or harvesting for feed.  See additional instructions on the use of wiper applicators in the "APPLICATION EQUIPMENT AND TECHNIQUES" section of this label.

RESTRICTIONS: For spot treatment or use with a wiper applicator at rates of 2.25 quarts per acre or less, this product may be applied over the entire pasture or any portion of it. At rates above 2.25 quarts per acre, this product may be applied over no more than 10 percent of the total pasture at any one time. Application may be repeated on the same area at 30-day intervals.

**Postemergence Weed Control (Broadcast Application)**

USE INSTRUCTIONS:  This product may be applied in pastures to suppress competitive growth and seed production of annual weeds and other undesirable vegetation. For selective weed control using broadcast application equipment, apply 9 to 12 fluid ounces of this product per acre in early-spring before desirable perennial grasses break dormancy and initiate green growth. Late fall application may be made after desirable perennial grasses have reached dormancy.

PRECAUTIONS:  Some stunting of perennial grasses will occur if broadcast application is made when plants are not dormant.  Higher application rates may be used for hard-to-control weeds; however, higher rates will cause stand reduction.

RESTRICTIONS: No waiting period is required between application and grazing or harvesting for feed. Do not apply more than 2.25 quarts of this product per acre per year onto pasture grasses, except for renovation use as described on this label.  If replanting is needed due to severe stand reduction, wait a minimum of 30 days after application before planting any crop not listed on this label.

**11.5    Rangeland**

TYPES OF APPLICATION:  Postemergence

USE INSTRUCTIONS:  This product will control or suppress many annual weeds growing in perennial cool- and warm-season grass rangeland.  Slight discoloration of the desirable grasses could occur, but will re-green and resume growing under moist soil conditions as effects of this product wear off.

Preventing seed production is critical to the control of invasive annual grassy weeds on rangeland. Follow-up applications in sequential years can be used to eliminate most of the viable seeds.  Delay grazing of the area after application of this product to allow desirable perennials to grow, flower and re-seed the area.

II. DIRECTIONS FOR USE WITH FOOD AND FEED CROPS

Apply 9 to 12 fluid ounces of this product per acre to control or suppress many weeds, including downy brome, cheatgrass, cereal rye and jointed goatgrass on rangeland.  Apply when most mature brome plants are in early-flower and before the plants, including seedheads, turn color.  Allowing for secondary weed flushes to occur after spring rains further depletes the seed reserve and encourages perennial grass conversion on weedy sites. Apply this product in the fall in areas where spring moisture is normally limited and fall germination allows for good weed growth amd weed seed depletion.

For control of medusahead, apply 12 fluid ounces of this product per acre at the 3-leaf stage. Delaying application beyond this stage will result in reduced or unacceptable control. Controlled burning prior to application can be useful in eliminating the thatch layer produced by slowly decaying culms. Allow new growth to occur before applying this product after a burn. Repeat applications in subsequent years are necessary to eliminate the seedbank before re-establishing desirable perennial grasses in medusahead-dominated rangeland.

RESTRICTIONS:  Do not apply more than 2.25 quarts of this product per acre per year on rangeland.  Do not add ammonium sulfate to the spray mixture when applying this product on rangeland grasses. No waiting period between application and feeding or livestock grazing is required.

## 12.0   ROUNDUP READY CROPS

ROUNDUP READY CROPS CONTAIN A PATENTED GENE THAT PROVIDES TOLERANCE TO GLYPHOSATE, THE ACTIVE INGREDIENT IN THIS PRODUCT.  THIS PRODUCT WILL CAUSE SEVERE CROP INJURY OR DESTRUCTION AND YIELD LOSS IF APPLIED TO CROPS THAT ARE NOT GLYPHOSATE TOLERANT.  AVOID CONTACT OF THIS PRODUCT WITH FOLIAGE, GREEN STEMS, OR FRUIT OF CROPS, OR ANY DESIRABLE PLANTS THAT DO NOT CONTAIN A GLYPHOSATE-TOLERANCE GENE, AS SEVERE PLANT INJURY OR DESTRUCTION WILL RESULT. Information on Roundup Ready crops can be obtained from your seed supplier or Monsanto Company representative. Roundup Ready crops must be purchased from an authorized licensed seed supplier.

The directions for use in the sections that follow, or those published separately on supplemental labeling for this product, include all applications of this product that may be made onto a specified Roundup Ready crop during the complete cropping season. DO NOT combine these directions for use with the directions for use with the same crops listed in the "ANNUAL AND PERENNIAL CROPS" and "PASTURE GRASSES, FORAGE LEGUMES AND RANGELAND" sections of this label, which are intended for use on crops that do not contain a glyphosate-tolerance gene.

**NOTE:** Roundup Ready seed and the method of selectively controlling weeds in a Roundup Ready crop are protected under several U.S. Patents, including 5,352,605 and 5,633,435.  [*This list will be updated at the time of printing, if necessary.*]  A license to use Roundup Ready seed must be obtained prior to planting. Monsanto Company retains ownership of the gene and process technologies, and the Purchaser of the seed receives the right to use the licensed genes and technologies subject to the limited use license conditions. Seed containing a Roundup Ready trait cannot be used for research and demonstration, reverse engineering or in connection with herbicide registration.  Progeny seed containing a Roundup Ready trait may not be saved for replanting or transferred to others for replanting.  Contact your Authorized Monsanto Retailer for information on obtaining a limited use license.

USE INSTRUCTIONS:  Refer to the "ANNUAL WEEDS RATE SECTION" and "PERENNIAL WEEDS RATE SECTION" of this label for application rates for specific weeds. When applied as directed, this product will control the annual and perennial grasses and broadleaf weeds listed. Observe the maximum application rates and crop stage timings specified for individual Roundup Ready crops in the sections that follow.

**Sprayer Preparation:** It is important that sprayer and mixing equipment be clean and free of pesticide residue before being used to apply this product over the top of Roundup Ready crops. Follow the cleaning procedures specified on the label of the product(s) previously used. THOROUGHLY CLEAN

II. DIRECTIONS FOR USE WITH FOOD AND FEED CROPS

THE SPRAY TANK AND ALL LINES AND FILTERS TO ELIMINATE POTENTIAL CONTAMINATION FROM OTHER HERBICIDES PRIOR TO MIXING AND APPLYING THIS PRODUCT.

**ATTENTION:** AVOID DRIFT. USE EXTREME CARE WHEN APPLYING THIS PRODUCT TO PREVENT INJURY TO DESIRABLE PLANTS AND CROPS THAT DO NOT CONTAIN A GLYPHOSATE-TOLERANCE GENE.

**Ground broadcast application** – Apply this product in 5 to 20 gallons of spray solution per acre, unless otherwise directed. Select proper nozzles and spray pressure settings to avoid spraying a fine mist. For enhanced results with ground application equipment, use flat-fan nozzles. Check for even distribution of spray droplets.

**Aerial application** – Unless otherwise prohibited, all applications of this product described in this section may be made using aerial application equipment, where appropriate, provided that the applicator complies with the precautions and restrictions specified on this label and on all supplemental labeling published separately for this product. Apply this product in 3 to 15 gallons of water per acre. See the "APPLICATION EQUIPMENT AND TECHNIQUES" section of this label for important information on aerial application and procedures for avoiding spray drift that could cause injury to any vegetation not intended for application. Use of appropriate buffer zones will help prevent injury to adjacent vegetation.

See the "MIXING" and "APPLICATION EQUIPMENT AND TECHNIQUES" sections of this label for additional directions and restrictions on the application of this product.

TANK MIXTURES: Tank mixtures of this product with other herbicides, insecticides, fungicides, micronutrients or foliar fertilizers could result in reduced weed control or crop injury when applied over the top of Roundup Ready crops.  Read the label of all products used in the tank mixture prior to use to determine the potential for crop injury.  Always read and follow label directions for all products in the tank mixture.  Use all products according to rates and timing specified on the product label.  Always predetermine the compatibility of tank-mix products together in the carrier by mixing small proportional quantities in advance.  Monsanto Company has not tested this product with all tank-mix product formulations for compatibility, antagonism or performance.  To the extent consistent with applicable law, buyer and all users are responsible for any and all loss or damage in connection with the use or handling of mixtures of this product with herbicides or other materials that are not specifically listed on this label or on separate supplemental labeling or Fact Sheets for this product.  See the "MIXING" section of this label for more information on tank mixtures.

The addition of certain surfactants to a spray solution of this product could result in some crop response including leaf speckling or leaf necrosis due to the surfactant.  Refer to the individual Roundup Ready crop sections that follow, or to separate supplemental labeling, for additional precautions or restrictions on the use of surfactants.  Refer to the "MIXING" section of this label for additional information on the use of surfactants with this product.

Ammonium sulfate may be added to spray solutions of this product for application to Roundup Ready crops.  Refer to the "MIXING" section of this label for instructions on the use of ammonium sulfate.

The following use directions are based on a clean start at planting by using a burndown application or tillage to control existing weeds before crop emergence.  In no-till and stale seedbed systems, apply this product as a preplant burndown application to control existing weeds prior to crop emergence.  Some weeds, such as black nightshade, broadleaf signalgrass, sicklepod, Texas panicum, sandbur, annual morning glory, woolly cupgrass, shattercane, wild proso millet, burcumber, and giant ragweed with multiple germination times or suppressed (stunted) weeds might require a second application of this product for complete control.   Make second application after some re-growth has occurred and a minimum of 10 days after a previous application of this product.

Application rates of this product specified on this label for hard-to-control weeds, or those specified on separate supplemental labeling for this product, supersede rates in the "ANNUAL WEEDS RATE

II. DIRECTIONS FOR USE WITH FOOD AND FEED CROPS

SECTION" and "PERENNIAL WEEDS RATE SECTION" of this label.  Additional information on hard-to-control weeds can be found on Fact Sheets published for this product.

RESTRICTIONS:  Observe the maximum application rates stated throughout this label.  Maximum application rates apply to the use of this product combined with the use of any and all other herbicides containing glyphosate, whether applied separately or as mixtures.  Calculate the application rates (glyphosate acid equivalents) and ensure that the total use of this and other glyphosate-containing products does not exceed the stated maximum rate.  See the "PRODUCT INFORMATION" section of this label for more information on Maximum Application Rates.  When applying this product as a tank mixture with one or more products, refer to each individual tank-mix product label for restrictions and apply the tank mixture in accordance with the most restrictive statements for each product in the tank.

## 12.1   Roundup Ready Alfalfa

TYPES OF APPLICATION: Preplant; At-planting; Preemergence; Postemergence (In-crop)

USE INSTRUCTIONS:  Refer to the following table for maximum application rates of this product.

| Maximum Application Rates | |
|---|---|
| Combined total per year for all applications, including Preplant during year of establishment | 6 quarts per acre |
| Preplant, At-planting and Preemergence single application | 50 fluid ounces per acre |
| Combined total per year for In-crop application on newly established and established stands | 4.6 quarts per acre |

See the "ROUNDUP READY CROPS" section of this label for information regarding the use of this product in Roundup Ready crops.  See the "PRODUCT INFORMATION" section of this label for more information on Maximum Application Rates.

**Preplant, At-Planting, Preemergence**

USE INSTRUCTIONS: This product may be applied before, during or after planting Roundup Ready alfalfa.

**Postemergence (In-crop)**

USE INSTRUCTIONS:  This product may be applied over the top of Roundup Ready alfalfa (in-crop) from emergence until 5 days prior to cutting. To maximize crop yield and quality potential of the forage and hay, apply this product after weeds have emerged, but before alfalfa growth or re-growth interferes with spray coverage of the target weeds.

Refer to the "ANNUAL WEEDS RATE SECTION" and "PERENNIAL WEEDS RATE SECTION" of this label for application rates for specific weeds. When applied as directed, this product will control the annual and perennial grasses and broadleaf weeds listed. This product will also suppress or control the parasitic weed dodder (*Cuscuta* spp.*)* in Roundup Ready alfalfa.  More than one application might be necessary for complete control.

PRECAUTIONS:  Freezing or near freezing conditions, or large temperature swings, within 5 days after application of this product to Roundup Ready alfalfa could result in a limited, temporary crop response.

**New Stand Establishment (Seeding Year)** – Due to the biology and breeding constraints of alfalfa, up to 10 percent of the seedlings will not contain a Roundup Ready gene and will not survive after the first application of this product.  To eliminate the undesirable effects of stand gaps created by this loss of plants, make a single application of at least 24 fluid ounces of this product per acre at or before the 4-trifoliate growth stage. Refer to the following table for application rates during stand establishment (seeding year).

II. DIRECTIONS FOR USE WITH FOOD AND FEED CROPS

| NEW STAND ESTABLISHMENT (Seeding Year) Application Rates | |
|---|---|
| **Prior to First Cutting** | |
| From emergence up to 4 trifoliate leaves | 24 to 48 fluid ounces per acre |
| From 5 trifoliate leaves up to 5 days before first cutting | Up to 48 fluid ounces per acre |
| **After First Cutting** | |
| In-crop application, per cutting, up to 5 days before cutting | Up to 48 fluid ounces per acre |

TANK MIXTURES: Up to 48 fluid ounces of this product per acre may be applied postemergence (in-crop) over the top of Roundup Ready alfalfa in the seeding year in a tank-mix with the following products after weeds have emerged, but before alfalfa growth or re-growth interferes with spray coverage of the target weeds. Ensure that the product used in the tank-mix is labeled for application postemergence (in-crop) to alfalfa.  Read and follow label directions for all products in the tank mixture.

clethodim; imazamox; imazethapyr; sethoxydim; quizalofop-p-ethyl

Assure II; Poast; Poast Plus; Pursuit; Raptor; Select 2 EC; Select Max Herbicide with Inside Technology

[*Optional statement:* Pursuit or Raptor applied to seedling alfalfa could result in a temporary reduction in growth.  Do not include crop oil concentrate or methylated seed oil in tank mixtures of this product with Pursuit or Raptor as unsatisfactory crop injury could result.]

**Established Stands (Non-seeding Year)** – Refer to the following table for directions and application rates for in-crop application to established stands of alfalfa (non-seeding year).

| ESTABLISHED STANDS (Non-seeding Year) Application Rates | |
|---|---|
| In-crop application, per cutting, up to 5 days before cutting | Up to 48 fluid ounces per acre |

TANK MIXTURES: This product may be applied postemergence (in-crop) over the top of established stands of Roundup Ready alfalfa in tank mixtures described below according to the growing condition of the crop. Ensure that the product used is labeled for application postemergence (in-crop) to alfalfa.  Read and follow label directions for all products in the tank mixture.

**Actively growing alfalfa**: For control of emerged annual grasses and broadleaf weeds when alfalfa is actively growing, this product may be applied at up to 48 fluid ounces per acre in a tank mixture with the following herbicides.

clethodim; imazamox; imazethapyr; sethoxydim; quizalofop-p-ethyl

Assure II; Poast; Poast Plus; Pursuit; Raptor; Select 2 EC; Select Max Herbicide with Inside Technology

[*Optional statement:* Do not include crop oil concentrate or methylated seed oil in tank mixtures of this product with Pursuit or Raptor as unsatisfactory crop injury could result.]

**Dormant alfalfa:** For control of emerged annual grasses and broadleaf weeds when alfalfa is dormant, this product may be applied at up to 48 fluid ounces per acre in a tank mixture with the following herbicides when daily temperatures remain above freezing.

imazamox; imazethapyr; metribuzin; pronamide; propyzamide

Kerb 50-W; Kerb SC; Pursuit; Raptor; TriCor 4F; TriCor DF

II. DIRECTIONS FOR USE WITH FOOD AND FEED CROPS

[*Optional statement*:  Do not include crop oil concentrate or methylated seed oil in tank mixtures of this product with Pursuit or Raptor as unsatisfactory crop injury could result.]

PRECAUTIONS: Where Roundup Ready alfalfa is grown with a companion or cover crop, or is over-seeded with a second species, in-crop (over-the-top) application of this product will eliminate the non-Roundup Ready (non-glyphosate-tolerant) species.

RESTRICTIONS: Do not exceed 48 fluid ounces per acre for any single in-crop application of this product. Sequential applications of this product must be a minimum of 7 days apart.  The combined total per year for all in-crop applications in both newly established (seeding year) and established stands (non-seeding year) must not exceed 4.6 quarts (148 fluid ounces) per acre.  Do not apply to frozen or snow covered ground.  Remove domestic livestock before application. Wait a minimum of 5 days after application before grazing, or cutting or feeding of forage and hay.

## 12.2   Roundup Ready Canola (Spring Varieties)

For directions for use of this product on TruFlex™ Roundup Ready® Canola, refer to that section of this label.  DO NOT combine these directions for use on Roundup Ready canola with the directions for use on TruFlex Roundup Ready canola.

Roundup Ready spring canola is defined as those Roundup Ready canola varieties that are seeded in the spring and harvested in the fall and do not enter a winter dormancy period.

TYPES OF APPLICATION:   Preplant; At-Planting; Preemergence; Postemergence (In-crop); Postemergence (In-crop) in Hybrid Seed Production Only

USE INSTRUCTIONS: Refer to the following table for the maximum application rates for this product with spring varieties of Roundup Ready canola.

| Maximum Application Rates | |
| --- | --- |
| Total for all Preplant, At-Planting, Preemergence applications | 48 fluid ounces per acre |
| Total for all In-crop applications from emergence to 6-leaf stage | 24 fluid ounces per acre |

See the "ROUNDUP READY CROPS" section of this label for information regarding the use of this product in Roundup Ready crops. See the "PRODUCT INFORMATION" section of this label for more information on Maximum Application Rates.

**Preplant, At-Planting, Preemergence**

USE INSTRUCTIONS: This product may be applied before, during or after planting Roundup Ready spring canola.

RESTRICTIONS: Maximum quantity of this product that may be applied for all preplant, at-planting and preemergence applications combined is 48 fluid ounces per acre per season.

**Postemergence (In-crop)**

USE INSTRUCTIONS: This product may be applied postemergence (in-crop) to spring varieties of Roundup Ready canola from emergence through the 6-leaf stage of development, unless otherwise directed.  Application made during bolting or flowering could result in crop injury and yield loss. To maximize yield potential, eliminate competing weeds early.

**Single Application** – Apply 12 to 18 fluid ounces of this product per acre no later than the 6-leaf stage for the control of annual weeds.  Avoid overlapping applications as this could result in temporary yellowing, delayed flowering, and/or growth reduction. Similar crop injury could result when more than 12 fluid ounces per acre is applied after the 4-leaf stage.

II. DIRECTIONS FOR USE WITH FOOD AND FEED CROPS

**Sequential Application** – Apply 12 fluid ounces of this product per acre to 1- to 3-leaf canola followed by a sequential application at a minimum interval of 10 days, but no later than the 6-leaf stage. Sequential application works best for control of early emerging annual and perennial weeds, such as Canada thistle and quackgrass, or whenever more than one application is needed for acceptable weed control.

RESTRICTIONS: No more than two in-crop (over-the-top) broadcast applications may be made from crop emergence through the 6-leaf stage of development and the total in-crop application must not exceed 24 fluid ounces of this product per acre.   Allow a minimum of 60 days between application and canola harvest.

**Postemergence (In-crop) in Hybrid Seed Production Only**

THIS POSTEMERGENCE APPLICATION IS FOR USE ONLY IN HYBRID CANOLA SEED PRODUCTION OF BOTH SPRING AND WINTER VARIETIES.  DO NOT MAKE THIS APPLICATION ON CANOLA GROWN FOR FOOD OR FEED.

This product may be applied at a rate of between 14 and 27 fluid ounces per acre from emergence until pollination is complete or near completion for the control of non-glyphosate-tolerant canola pollen parental line(s) in hybrid canola seed production fields containing both Roundup Ready canola line(s) and non-glyphosate tolerant line(s).  Sequential applications may be made for the control of non-glyphosate-tolerant pollen parental lines up to a maximum total application rate of 22 fluid ounces per acre.

RESTRICTIONS:  Allow a minimum of 5 days between sequential applications.  Maximum total application rate of this product for ALL postemergence (in-crop) applications in hybrid canola seed production fields, including application for weed control and control of non-glyphosate-tolerant canola, is 27 fluid ounces per acre.

### 12.3    Roundup Ready Canola (Winter Varieties)

For directions for use of this product on TruFlex Roundup Ready Canola, refer to that section of this label. DO NOT combine these directions for use on Roundup Ready canola with the directions for use on TruFlex Roundup Ready canola.

Roundup Ready winter canola is defined as those Roundup Ready canola varieties that are seeded in early-fall and harvested the following spring or summer.  Winter canola varieties are intended to enter a cold period dormancy in the winter.

TYPES OF APPLICATION: Preplant; At-Planting; Preemergence; Postemergence (In-crop)

USE INSTRUCTIONS:  Refer to the following table for the maximum application rates of this product with winter varieties of Roundup Ready canola.

| Maximum Application Rates | |
|---|---|
| Total for all Preplant, At-Planting, Preemergence applications | 48 fluid ounces per acre |
| Total for all In-crop applications from emergence to canopy closure or prior to bolting in the spring | 48 fluid ounces per acre |

See the "ROUNDUP READY CROPS" section of this label for information regarding the use of this product in Roundup Ready crops. See the "PRODUCT INFORMATION" section of this label for information on Maximum Application Rates.

**Preplant, At-Planting, Preemergence**

USE INSTRUCTIONS: This product may be applied before, during or after planting Roundup Ready winter canola.

**Postemergence (In-crop)**

II. DIRECTIONS FOR USE WITH FOOD AND FEED CROPS

USE INSTRUCTIONS:  This product may be applied to winter varieties of Roundup Ready canola from emergence to canopy closure in the fall and prior to bolting in the spring.  Application made during or after bolting could result in crop injury and yield loss. To maximize yield potential, eliminate competing weeds early.

Some weeds with multiple germination times, or suppressed (stunted) weeds, or weeds that have overwintered, might need a sequential application of this product for control. Make the second application after some re-growth has occurred and a minimum of 60 days after the initial application of this product.

**Single Application** – Apply 18 to 24 fluid ounces of this product per acre in the fall when weeds are small and actively growing.  Use a higher rate within this range when weed densities are high, when weeds have overwintered or when weeds become large and well established. Application of more than 18 fluid ounces per acre prior to the 6-leaf stage could result in reduced crop growth in the fall.  Avoid spray overlaps as this could result in temporary yellowing and/or growth reduction.

**Sequential Application** – Apply 12 to 24 fluid ounces of this product per acre to 2-leaf or larger canola in the fall, followed by a sequential application at the same rate and at a minimum interval of 60 days, but before bolting in the spring. Sequential application works best for control of early-emerging annual weeds and winter-emerging weeds, such as downy brome, jointed goatgrass and ryegrass, and for weeds that have overwintered.  This product will control or suppress most perennial weeds. For some perennial weeds, a sequential application might be needed to reduce competition with the crop.

RESTRICTIONS:  No more than two over-the-top broadcast applications may be made from crop emergence up to the onset of bolting and the total in-crop application must not exceed 48 fluid ounces of this product per acre.  Allow a minimum of 60 days between application and harvest of canola grain.  No waiting period is required between application and open grazing of livestock.

### 12.4    TruFlex Roundup Ready Canola (Spring Varieties)

TruFlex Roundup Ready spring canola is defined as those varieties of TruFlex Roundup Ready canola that are seeded in the spring and harvested in the fall and do not enter a period of winter dormancy.

**The directions for use provided in this section are specific to and may only be used with varieties designated as TruFlex Roundup Ready canola.**  Applications described on this label made over the top of canola that is not designated as TruFlex Roundup Ready canola could cause serious crop injury and reduced yields.  DO NOT combine these directions-for-use with those in the "Roundup Ready Canola" section of this label or with any other directions-for-use on canola on labeling for this or any other glyphosate-containing product.  Drift of this product from an application made to TruFlex Roundup Ready canola onto adjacent fields of Roundup Ready canola could cause extensive crop injury.

TYPES   OF   APPLICATION:  Preplant;  At-Planting;  Preemergence;  Postemergence  (In-crop); Postemergence (In-crop) in Hybrid Seed Production Only

USE INSTRUCTIONS: Refer to the following table for the maximum application rates of this product with spring varieties of TruFlex Roundup Ready canola.

| Maximum Application Rates | |
|---|---|
| Total for all Preplant, At-Planting, Preemergence applications | 3.75 quarts per acre |
| Total for all In-crop applications from emergence through harvest | 48 fluid ounces per acre |
| Total for all In-crop applications from emergence through the 6-leaf stage | 48 fluid ounces per acre |
| Total for all In-crop applications from the 6-leaf stage through first-flower | 24 fluid ounces per acre |

II. DIRECTIONS FOR USE WITH FOOD AND FEED CROPS

See the "ROUNDUP READY CROPS" section of this label for information regarding the use of this product in Roundup Ready crops. See the "PRODUCT INFORMATION" section of the label for more information on Maximum Application Rates.

**Preplant, At-Planting, Preemergence**

USE INSTRUCTIONS: Up to 3.75 quarts of this product may be applied before, during or after planting spring varieties of TruFlex Roundup Ready canola.

**Postemergence (In-crop)**

USE INSTRUCTIONS: This product may be applied postemergence (in-crop) to spring varieties of TruFlex Roundup Ready canola from emergence through the first-flower stage of development. To maximize yield potential, eliminate competing weeds early.

For control of Canada thistle and morning glory, apply 48 fluid ounces of this product per acre no later than the 6-leaf stage of canola development. For control of wild buckwheat over 2 inches in size, make sequential applications of 24 fluid ounces followed by 24 fluid ounces of this product per acre. For control of other annual weeds, apply up to 48 fluid ounces of this product per acre no later than the 6-leaf stage or up to 24 fluid ounces after the 6-leaf stage through first-flower.

RESTRICTIONS: No more than two in-crop (over-the-top) broadcast applications may be made from crop emergence through the first-flower stage of canola development and the total in-crop application must not exceed 48 fluid ounces of this product per acre. No more than 24 fluid ounces of this product may be applied in-crop after the 6-leaf stage.

**Postemergence (In-crop) in Hybrid Seed Production Only**

THIS POSTEMERGENCE APPLICATION IS FOR USE ONLY IN HYBRID CANOLA SEED PRODUCTION OF BOTH SPRING AND WINTER VARIETIES. DO NOT MAKE THIS APPLICATION ON CANOLA GROWN FOR FOOD OR FEED.

This product may be applied at a rate of between 14 and 27 fluid ounces per acre from emergence until pollination is complete or near completion for the control of non-glyphosate-tolerant canola pollen parental line(s) in hybrid canola seed production fields containing both a Roundup Ready canola line(s) and a non-glyphosate tolerant line(s). Sequential applications may be made for the control of non-glyphosate-tolerant pollen parental lines up to a maximum total application rate of 22 fluid ounces per acre.

RESTRICTIONS: Allow a minimum of 5 days between sequential applications. Maximum total application rate of this product for ALL postemergence (in-crop) applications in hybrid canola seed production fields, including application for weed control and control of non-glyphosate-tolerant canola, is 27 fluid ounces per acre.

**12.5    Field Corn Hybrids with Roundup Ready 2 Technology**

Field corn hybrids with Roundup Ready 2 Technology include Roundup Ready Corn 2 and field corn seed products displaying the Roundup Ready 2 Technology logo.

The directions for use in this section apply only to use on FIELD CORN hybrids with Roundup Ready 2 Technology. For directions for use on SWEET CORN hybrids that contain Roundup Ready 2 Technology, see the "Sweet Corn Hybrids with Roundup Ready 2 Technology" section of this label. [*Alternative text:* For directions for use on Roundup Ready Sweet Corn, see the "Roundup Ready Sweet Corn" section of this label.]

TYPES OF APPLICATION: Preplant; At-Planting; Preemergence; Postemergence (In-crop); Spot Treatment; Preharvest; Post-Harvest; Postemergence (In-crop) for Tassel Control in Roundup Hybridization Systems Only

## II. DIRECTIONS FOR USE WITH FOOD AND FEED CROPS

USE INSTRUCTIONS: Refer to the following table for maximum application rates of this product with field corn hybrids with Roundup Ready 2 Technology.

| Maximum Application Rates | |
|---|---|
| Combined total per year for all applications | 6 quarts per acre |
| Total for all Preplant, At-Planting, Preemergence applications | 3.75 quarts per acre |
| Maximum single In-crop application rate up to 48-inch corn | 36 fluid ounces per acre |
| Total for all In-crop applications from emergence through 48-inch corn | 72 fluid ounces per acre |
| Maximum Preharvest application rate after maximum kernel fill is complete and the crop is physiologically mature (black layer formation) until 7 days before harvest* | 24 fluid ounces per acre |

*See RESTRICTIONS for Preharvest application.

See the "ROUNDUP READY CROPS" section of this label for information regarding the use of this product in Roundup Ready crops. See the "PRODUCT INFORMATION" section of this label for information on Maximum Application Rates.

PRECAUTIONS:  The use of the in-crop (over-the-top) rates described in this section on other than field corn hybrids with Roundup Ready 2 Technology could cause crop injury and reduced yields.

**Preplant, At-Planting, Preemergence**

USE INSTRUCTIONS: This product may be applied alone or in a tank mixture before, during or after planting field corn hybrids with Roundup Ready 2 Technology.

TANK MIXTURES: This product may be tank-mixed with the following products.  Apply these tank mixtures in 10 to 20 gallons of water or 10 to 60 gallons of nitrogen solution per acre.  Ensure that the product used is labeled for application prior to emergence of field corn.  Read and follow label directions for all products in the tank mixture.

2,4-D; acetochlor; atrazine; bicyclopyrone; carfentrazone-ethyl; clopyralid; dicamba; diflufenzopyr; dimethenamid; dimethenamid-p; flufenacet; flumetsulam; flumiclorac pentyl ester; isoxaflutole; linuron; mesotrione; metolachlor; s-metolachlor; metribuzin; pendimethalin; rimsulfuron; saflufenacil; simazine; thiencarbazone-methyl

AAtrex 4L; AAtrex Nine-O; Acuron; Acuron Flexi; Aim EC; Aim EW; Atrazine 4L; Atrazine 90 DF; Axiom DF; Balance Flexx; Banvel; Balance 480; Bicep II MAGNUM; Bicep II MAGNUM FC; Bicep Lite II MAGNUM; Callisto; Cinch; Cinch ATZ; Cinch ATZ Lite; Clarity; Corvus; Degree Xtra; Distinct; Dual MAGNUM; Dual II MAGNUM; FulTime; FulTime NXT; Guardsman MAX; Harness; Harness Xtra; Harness Xtra 5.6L; Hornet WDG Broadleaf Blend; Keystone; Keystone LA; Keystone LA NXT; Keystone NXT; Leadoff; Linex 4L; Lorox DF; Marksman; Me-Too-Lachlor II; Outlook; Prowl 3.3 EC; Prowl H2O; Python WDG; Resicore; Resolve DF; Resolve Q; Resolve SG; Resource; Shark EW; Shark H2O; Sharpen Powered by Kixor; Simazine 4L Flowable; Simazine 90DF; Simazine 90 WDG; Stalwart; Stalwart C; Stalwart Xtra; Stinger; Surpass EC; Surpass NXT; TopNotch; TripleFLEX II

RESTRICTIONS: Maximum quantity of this product that may be applied for all preplant, at-planting and preemergence applications combined is 3.75 quarts per acre per season.  Application of 2,4-D or dicamba must be made a minimum of 7 days prior to planting corn.

**NOTE:** For maximum weed control, make a postemergence (in-crop) application of this product following application of a preemergence residual product listed above.

**Postemergence (in-crop)**

## II. DIRECTIONS FOR USE WITH FOOD AND FEED CROPS

USE INSTRUCTIONS: This product may be applied alone or in a tank-mix over the top of field corn hybrids with Roundup Ready 2 Technology from emergence through the V8 stage (8 leaves with collars), or until corn plant height reaches 30 inches (freestanding), whichever comes first, unless otherwise directed.  Use drop nozzles for optimum spray coverage and weed control when corn plant height is 24 to 30 inches.  When corn plants are 30 to 48 inches tall (freestanding), apply this product using **only** ground application equipment fitted with drop nozzles aligned to avoid spraying into the whorls of the corn plants.  Maximum single in-crop application rate of this product up to 48-inch field corn is 36 fluid ounces per acre.  Total in-crop application of this product from corn plant emergence through 48 inches in height must not exceed 72 fluid ounces per acre.

When applied as directed, this product will control annual grasses and broadleaf weeds listed on this label.  Many perennial grasses and broadleaf weeds will be controlled or suppressed with one or more applications of this product.   Make a postemergence application of 18 to 24 fluid ounces of this product per acre before weeds exceed 4 inches in height (before they become competitive with the crop).  Repeat this application before new flushes of weeds exceed 4 inches in height.

TANK MIXTURES: This product may be tank-mixed with the following products. Ensure that the product used is labeled for application postemergence (in-crop) to field corn. Read and follow label directions for all products in the tank mixture.

---

2,4-D; acetochlor; atrazine; bicyclopyrone; carfentrazone-ethyl; clopyralid; dicamba; diflufenzopyr; flumetsulam; flumiclorac pentyl ester; foramsulfuron; halosulfuron-methyl; iodosulfuron-methyl-sodium; isoxaflutole; mesotrione; nicosulfuron; rimsulfuron; tembotrione; thiencarbazone-methyl; thifensulfuron methyl; topramezone

Acuron; Acuron Flexi; Aim EC; Aim EW; Banvel; Banvel 480; Basis; Basis Blend; Callisto; Callisto Xtra; Capreno; Clarity; Corvus; Degree Xtra; Distinct; Harness; Harness Xtra; Harness Xtra 5.6L; Hornet WDG Broadleaf Blend; Impact; Laudis; Marksman; Resicore; Resolve C; Resolve DF; Resolve SG; Resource; Shark EW; Shark H2O; Status; TripleFLEX II; Warrant

---

RESTRICTIONS: Allow a minimum of 10 days between in-crop applications of this product. Allow a minimum of 50 days between application of this product and harvest of corn forage or grain.

**Preharvest**

USE INSTRUCTIONS:  Up to 24 fluid ounces of this product per acre may be applied for annual and perennial weed control prior to harvest when kernel fill is complete and the corn is physiologically mature (black layer formed) and grain moisture is 35 percent or less.

RESTRICTIONS:  A preharvest application may be made only if the combined total of previously applied over-the-top or drop nozzle applications does not exceed 48 fluid ounces of this product per acre.  Allow a minimum of 7 days between application and harvest or feeding of corn stover or grain.

**Post-Harvest**

USE INSTRUCTIONS: This product may be applied for weed control after crop harvest.  Higher rates might be needed for control of large weeds that were growing in the field at the time of harvest. Tank mixtures with 2,4-D or dicamba may be used.  Ensure that the product used is labeled for post-harvest application in field corn. Read and follow label directions for all products in the tank mixture.

RESTRICTIONS:   Allow a minimum of 7 days between application and harvest or the feeding of vegetation within the application area.  Application must be made a minimum of 30 days prior to the planting of any crop not listed on this label.

**Postemergence (In-crop) for Tassel Control in Roundup Hybridization Systems Only**

II. DIRECTIONS FOR USE WITH FOOD AND FEED CROPS

THIS APPLICATION IS FOR USE ONLY IN SEED PRODUCTION OF CORN HYBRIDS USING THE ROUNDUP HYBRIDIZATION SYSTEM (RHS).   DO NOT MAKE THIS APPLICATION ON CORN GROWN FOR FOOD OR FEED.

The RHS designation indicates that the corn contains Monsanto proprietary gene technology that allows for tassel-only susceptibility to this product.  Use of this product on corn hybrids or inbreds that are not designated as RHS or as corn containing Roundup Ready 2 Technology could result in severe crop injury and yield loss.

USE INSTRUCTIONS: This product may be applied at rates of between 12 and 36 fluid ounces per acre as an over-the-top broadcast application for tassel control in RHS-based seed corn production fields from the V8 stage until either the V13 stage or 100 GDU (Growing Degeree Units) before flowering.

RESTRICTIONS: Make no more than two applications of this product for tassel control.  The maximum total application rate of this product for tassel control is 72 fluid ounces.  The maximum combined total amount of this product that may be applied per year for both weed control and tassel control, is 6 quarts per acre.

**12.6    Sweet Corn Hybrids with Roundup Ready 2 Technology** [*Alternative heading:* **Roundup Ready Sweet Corn**]

[*Optional statement if using the title with Roundup Ready 2 Technology:* Sweet corn hybrids with Roundup Ready 2 Technology include Roundup Ready Sweet Corn and sweet corn seed products displaying the Roundup Ready 2 Technology logo.]

The directions for use in this section apply only to use on SWEET CORN hybrids with Roundup Ready 2 Technology [*Alternative text:* The directions for use in this section apply only to use on Roundup Ready Sweet Corn].  For directions for use on FIELD CORN hybrids that contain Roundup Ready 2 Technology, see the "Field Corn Hybrids with Roundup Ready 2 Technology" section of this label.

TYPES OF APPLICATION: Preplant; At-Planting; Preemergence; Postemergence (In-crop)

USE INSTRUCTIONS: Refer to the following table for maximum application rates of this product with sweet corn hybrids with Roundup Ready 2 Technology. [*Alternative text:* Refer to the following table for maximum application rates of this product with Roundup Ready sweet corn.]

| Maximum Application Rates | |
|---|---|
| Combined total per year for all applications | 6 quarts per acre |
| Total for all Preplant, At-Planting, Preemergence applications | 3.75 quarts per acre |
| Maximum single In-crop application rate up to 48-inch sweet corn | 48 fluid ounces per acre |
| Total for all In-crop applications from emergence through 48-inch sweet corn | 4.6 quarts per acre |

See the "ROUNDUP READY CROPS" section of this label for information regarding the use of this product in Roundup Ready crops. See the "PRODUCT INFORMATION" section of this label for more information on Maximum Application Rates.

PRECAUTIONS: The use of the in-crop (over-the-top) applications described in this section on other than sweet corn hybrids with Roundup Ready 2 Technology could cause crop injury and reduced yields. [*Alternative text:* The use of the in-crop (over-the-top) applications described in this section on other than Roundup Ready sweet corn could cause crop injury and reduced yields.]

**Preplant, At-Planting, Preemergence**

## II. DIRECTIONS FOR USE WITH FOOD AND FEED CROPS

USE INSTRUCTIONS: This product may be applied alone or in a tank mixture before, during or after planting sweet corn hybrids with Roundup Ready 2 Technology. [*Alternative text:* This product may be applied alone or in a tank mixture before, during or after planting Roundup Ready sweet corn.]

TANK MIXTURES: This product may be tank-mixed with the residual herbicide products listed below for maximum weed control. Ensure that the product used is labeled for application prior to emergence of sweet corn.  Read and follow label directions for all products in the tank mixture.   Apply these tank mixtures in 10 to 20 gallons of water or in 10 to 60 gallons of nitrogen solution per acre.

acetochlor; atrazine; carfentrazone-ethyl;  dimethenamid-p; metolachlor; s-metolachlor

AAtrex 4L; AAtrex Nine-O; Aim EC; Aim EW; Atrazine 4L; Atrazine 90 DF; Bicep II MAGNUM; Bicep II MAGNUM FC; Bicep Lite II MAGNUM; Cinch; Cinch ATZ; Degree Xtra; Dual MAGNUM; Dual II Magnum; FulTime; Guardsman MAX; Harness; Harness Xtra; Harness Xtra 5.6L; Keystone; Keystone LA; Keystone LA NXT;  Keystone NXT;  Me-Too-Lachlor II;  Outlook; TopNotch

RESTRICTIONS: Maximum quantity of this product that may be applied for all preplant, at-planting and preemergence applications combined is 3.75 quarts per acre per season.

**Postemergence (In-crop)**

USE INSTRUCTIONS:  Apply this product alone or in a tank mixture over the top of [*Optional text:* Roundup Ready] sweet corn [*Alternative text:* hybrids with Roundup Ready 2 Technology] from emergence through the V8 stage (8 leaves with collars), or until sweet corn plant height reaches 30 inches (freestanding), whichever comes first.  Use drop nozzles for optimum spray coverage and weed control when sweet corn plant height is 24 to 30 inches.  When sweet corn plants are 30 to 48 inches tall (freestanding), apply this product using **only** ground application equipment fitted with drop nozzles aligned to avoid spraying into the whorls of the sweet corn plants.  Avoid spraying if the crop has reached the reproductive stage.  Maximum single in-crop application rate of this product up to 48-inch sweet corn is 48 fluid ounces per acre.  Total in-crop application of this product from emergence through 48 inches in height must not exceed 4.6 quarts (148 fluid ounces) per acre per growing season.

When applied as directed, this product will control annual grasses and broadleaf weeds listed on this label. Many perennial grasses and broadleaf weeds will be controlled or suppressed with one or more applications of this product.  Apply 18 to 24 fluid ounces of this product per acre before weeds exceed 4 inches in height or before they become competitive with the crop. If new flushes of weeds occur, a sequential application of 18 to 24 fluid ounces per acre may be made before weeds exceed 4 inches in height.

TANK MIXTURES: This product may be tank-mixed with the following products.  Ensure that the product used is labeled for application postemergence (in-crop) to sweet corn. Read and follow label directions for all products in the tank mixture.

atrazine; carfentrazone-ethyl; foramsulfuron; tembotrione; topramezone

AAtrex 4L; AAtrex Nine-O; Aim EC; Aim EW; Atrazine 4L; Atrazine 90 DF; Callisto; Callisto Xtra; Impact; Laudis

RESTRICTIONS: Allow a minimum of 10 days between in-crop applications of this product. Do not apply atrazine in a tank-mix with this product when sweet corn plants are greater than 12 inches tall. Allow a minimum of 30 days between application of this product and harvest of sweet corn forage or grain.

**12.7    Roundup Ready Cotton**

TYPES OF APPLICATION: Preplant; At-Planting; Preemergence; Postemergence (In-crop); Selective Equipment (In-crop); Preharvest

## II. DIRECTIONS FOR USE WITH FOOD AND FEED CROPS

USE INSTRUCTIONS: Refer to the following table for maximum application rates of this product with Roundup Ready cotton.

| Maximum Application Rates | |
|---|---|
| Combined total per year for all applications | 6 quarts per acre |
| Total for all Preplant, At-Planting, Preemergence applications | 3.75 quarts per acre |
| Total for all In-crop applications from cracking to layby | 3 quarts per acre |
| Maximum Preharvest application rate | 48 fluid ounces per acre |
| Combined total for all In-crop applications from emergence through harvest | 4.5 quarts per acre |

See the "ROUNDUP READY CROPS" section of this label for information regarding the use of this product in Roundup Ready crops.  See the "PRODUCT INFORMATION" section of this label for more information on Maximum Application Rates.

**Preplant, At-Planting, Preemergence**

USE INSTRUCTIONS: This product may be applied before, during or after planting Roundup Ready cotton.

TANK MIXTURES: This product may be tank-mixed with 2,4-D or Clarity and applied prior to planting only.  This product may be tank-mixed with the following products and applied prior to crop emergence. Ensure that the product used is labeled for application prior to the emergence of cotton.  Read and follow label directions for all products in the tank mixture.

acetochlor; clomazone; diuron; flumioxazin; fluometuron; fomesafen; metolachlor; s-metolachlor; norflurazon; pendimethalin; prometyrn; pyrithiobac-sodium; saflufenacil

Caparol 4L; Command 3ME; Cotoran 4L; Cotton Pro; Dawn; Direx 4L; Dual MAGNUM; Dual II MAGNUM; Karmex DF; Prowl 3.3 EC; Prowl H2O; Reflex; Rowel; Sharpen Powered by Kixor; Stalwart; Staple LX; Valor SX; Warrant; Warrant Ultra

RESTRICTIONS: Maximum quantity of this product that may be applied for all preplant, at-planting and preemergence applications combined is 3.75 quarts per acre per season.

**Postemergence (In-crop)**

USE INSTRUCTIONS: This product may be applied over the top of Roundup Ready cotton (in-crop) at rates of up 24 fluid ounces per acre per application from cracking until the 4-leaf (node) stage of development (until the fifth true leaf reaches the size of a quarter).  NO MORE THAN TWO OVER-THE-TOP BROADCAST APPLICATIONS MAY BE MADE FROM CROP EMERGENCE THROUGH THE 4-LEAF (NODE) STAGE OF DEVELOPMENT.  SEQUENTIAL OVER-THE-TOP OR POST-DIRECTED APPLICATIONS OF THIS PRODUCT IN-CROP MUST BE A MINIMUM OF 10 DAYS APART AND COTTON MUST HAVE AT LEAST TWO NODES OF INCREMENTAL GROWTH BETWEEN APPLICATIONS. Over-the-top application made after the 4-leaf (node) stage of development could result in boll loss, delayed maturity and/or yield loss.

TANK MIXTURES:  This product may be tank-mixed with the following products and applied over the top of Roundup Ready cotton up to the 4-leaf stage.  Ensure that the product used is labeled for application postemergence (in-crop) to cotton. Read and follow label directions for all products in the tank mixture.

acetochlor; clethodim; fluazifop-P-butyl; fomesafen; metolachlor; s-metolachlor; monosodium acid methanearsonate; pyrithiobac-sodium; quizalofop-p-ethyl, sethoxydim; trifloxysulfuron-sodium

II. DIRECTIONS FOR USE WITH FOOD AND FEED CROPS

---

Assure II; Dual MAGNUM; Dual II MAGNUM; Envoke; Fusilade DX; MSMA 6 Plus; MSMA 6.6; Poast; Poast Plus; Reflex; Select; Select 2 EC; Select Max Herbicide with Inside Technology; Stalwart; Staple LX; Warrant; Warrant Ultra

---

[*Optional text:* Staple LX could cause leaf yellowing and/or leaf crinkling when applied postemergence (in-crop) to Roundup Ready cotton.]

[*Optional text:* [Dual MAGNUM, Dual II MAGNUM and Stalwart] applied over the top of Roundup Ready cotton could cause leaf injury in the form of necrotic spotting.]

**Salvage Treatment** – may be made after the 4-leaf stage of development and only when weeds threaten to cause the loss of the crop. Apply 24 fluid ounces of this product per acre either as an over-the-top application or as a post-directed application sprayed higher on the cotton plants and onto the weeds.

IN THE STATE OF ARIZONA ONLY, up to 36 fluid ounces of this product may be applied per acre either as an over-the-top application or a post-directed application for salvage treatment.

**NOTE:** SALVAGE TREATMENT WILL RESULT IN SIGNIFICANT BOLL LOSS, DELAYED MATURITY AND/OR YIELD LOSS. NO MORE THAN ONE SALVAGE TREATMENT MAY BE MADE PER GROWING SEASON.

RESTRICTIONS: Maximum quantity of this product that may be applied for all in-crop applications from cracking to layby combined is 3 quarts per acre per season. Allow a minimum of 7 days between application and harvest of cotton.

**Selective Equipment (In-crop)**

USE INSTRUCTIONS: This product may be applied using precision post-directed or hooded sprayers at rates of up to 24 fluid ounces per acre per application to Roundup Ready cotton through layby. At this crop stage, use post-directed application equipment to direct the spray towards the base of the cotton plants, avoiding contact of the herbicide spray with the leaves of the plant. To minimize contact, maintain a low spray pressure (less than 30 pounds per square inch) and place nozzles in a low position directing a horizontal spray pattern under the leaves of the cotton plant and onto the weeds in the row. For enhanced results, apply this product while weeds are small (less than 3 inches in height). See additional use instructions in the "APPLICATION EQUIPMENT AND TECHNIQUES" section of this label.

TANK MIXTURES: This product may be tank-mixed with the following products for in-crop application using precision post-directed or hooded sprayers. Ensure that the product used is labeled for application postemergence (in-crop) to cotton. Read and follow label directions for all products in the tank mixture.

---

acetochlor; carfentrazone-ethyl; diuron; flumioxazin; fluometuron; fomesafen; linuron; metolachlor; monosodium acid methanearsonate; pendimethalin; prometryn; pyrithiobac-sodium; trifloxysulfuron-sodium

Aim EC; Aim EW; Caparol 4L; Cotoran 4L; Direx 4L; Envoke; Layby-Pro; MSMA 6 Plus; MSMA 6.6; Prowl 3.3 EC; Prowl H2O; Rowel; Staple LX; Valor SX; Warrant; Warrant Ultra

---

[*Optional text:* Staple LX could cause leaf yellowing and/or leaf crinkling when applied postemergence (in-crop) to Roundup Ready cotton.]

RESTRICTIONS: Maximum quantity of this product that may be applied for all in-crop applications from cracking to layby combined is 2.75 quarts per acre per season. Allow a minimum of 7 days between application and harvest of cotton. NO MORE THAN TWO APPLICATIONS OF THIS PRODUCT MAY BE MADE FROM THE 5-LEAF STAGE THROUGH LAYBY. SEQUENTIAL OVER-THE-TOP OR POST-DIRECTED IN-CROP APPLICATIONS OF THIS PRODUCT MUST BE A MINIMUM OF 10 DAYS APART

II. DIRECTIONS FOR USE WITH FOOD AND FEED CROPS

AND COTTON MUST HAVE AT LEAST TWO NODES OF INCREMENTAL GROWTH BETWEEN APPLICATIONS.

**Preharvest**

USE INSTRUCTIONS:  Up to 48 fluid ounces of this product per acre may be applied for annual and perennial weed control prior to crop harvest after 20 percent boll crack.

**NOTE:** This product will not enhance the performance of harvest aids when applied to Roundup Ready cotton.

PRECAUTIONS: Do not apply this product for preharvest weed control to cotton grown for seed, as a reduction in germination or vigor could occur.  Buyer and all users are responsible for any and all loss or damage in connection with the preharvest use of this product on Roundup Ready cotton grown for seed.

DO NOT EXCEED A SURFACTANT CONCENTRATION 0.5% BY WEIGHT (2 QUARTS PER 100 GALLONS OF SPRAY SOLUTION WHEN MAKING A PREHARVEST APPLICATION TO ROUNDUP READY COTTON.  Surfactant concentrations exceeding 0.5% could result in crop injury and reduced yield.

RESTRICTIONS: Allow a minimum of 7 days between application and harvest of cotton.

**ATTENTION:**  USE OF THIS PRODUCT IN ACCORDANCE WITH LABEL DIRECTIONS IS EXPECTED TO RESULT IN NORMAL GROWTH OF ROUNDUP READY COTTON, HOWEVER, DUE TO THE SENSITIVITY OF COTTON FRUITING TO VARIOUS ENVIRONMENTAL CONDITIONS, AGRONOMIC PRACTICES AND OTHER FACTORS, IT IS IMPOSSIBLE TO ELIMINATE ALL RISKS ASSOCIATED WITH THIS PRODUCT, EVEN WHEN APPLICATIONS ARE MADE IN ACCORDANCE WITH THE LABEL DIRECTIONS.  IN SOME CASES, THESE FACTORS CAN RESULT IN BOLL LOSS, DELAYED MATURITY AND/OR YIELD LOSS.

**12.8    Roundup Ready Flex Cotton**

**The directions for use of this product provided in this section are specific to and may only be used with varieties designated as Roundup Ready *Flex* cotton**.  Applications described in this section made over the top of cotton other than Roundup Ready Flex cotton will cause crop injury and reduced yields.  DO NOT combine the directions for use in this section with those in the "Roundup Ready Cotton" section of this label, or with any other directions for use on Roundup Ready cotton or Roundup Ready Flex cotton on labeling for this or any other glyphosate-containing product.  Drift of this product from an application made to Roundup Ready Flex cotton onto adjacent fields of post 4-leaf (node) *Roundup Ready cotton* could cause extensive crop injury, including boll loss, delayed maturity and/or yield loss.

TYPES OF APPLICATION: Preplant; At-Planting; Preemergence; Postemergence (In-crop); Preharvest

USE INSTRUCTIONS: Refer to the following table for maximum application rates of this product with Roundup Ready Flex cotton.

| Maximum Application Rates ||
| --- | --- |
| Combined total per year for all applications | 6 quarts per acre |
| Total for all Preplant, At-Planting, Preemergence applications | 3.75 quarts per acre |
| Total for all In-crop applications from cracking to 60 percent open bolls | 4.5 quarts per acre |
| Total for all In-crop applications between layby and 60 percent open bolls | 48 fluid ounces per acre |
| Total for all in-crop applications from 60 percent open bolls to 7 days prior to harvest | 48 fluid ounces per acre |
| Total for all In-crop applications from emergence through harvest | 4.5 quarts per acre |

## II. DIRECTIONS FOR USE WITH FOOD AND FEED CROPS

See the "ROUNDUP READY CROPS" section of this label for information regarding the use of this product in Roundup Ready crops. See the "PRODUCT INFORMATION" section of this label for more information on Maximum Application Rates.

**Preplant, At-Planting, Preemergence**

USE INSTRUCTIONS:  This product may be applied before, during or after planting Roundup Ready Flex cotton.

TANK MIXTURES: This product may be tank-mixed with 2,4-D or Clarity and applied prior to planting only. This product may be tank-mixed with the following products and applied prior to crop emergence. Ensure that the product used is labeled for application prior to emergence of cotton. Read and follow label directions for all products in the tank mixture.

acetochlor; clomazone; diuron; flumioxan; fluometuron; fomesafen; metolachlor; s-metolachlor; norflurozon; pendimethalin; prometyrn; pyrithiobac-sodium; saflufenacil

Caparol 4L; Command 3ME; Cotoran 4L; Cotton Pro; Dawn; Direx 4L; Dual MAGNUM; Dual II MAGNUM; Karmex DF; Prowl 3.3 EC; Prowl H2O; Reflex; Rowel; Sharpen Powered by Kixor; Stalwart; Staple LX; Valor SX; Warrant; Warrant Ultra

RESTRICTIONS:  Maximum quantity of this product that may be applied for all preplant, at-planting and preemergence applications combined is 3.75 quarts per acre per season.

**Postemergence (In-crop)**

USE INSTRUCTIONS:  This product may be applied to control annual grasses and broadleaf weeds listed on this label in Roundup Ready Flex cotton.  To maximize yield potential, eliminate competing weeds early.  Many perennial weeds will be controlled or suppressed with one or more applications of this product.  Use an initial application rate of 24 fluid ounces per acre to control or suppress 1 to 3 inch tall annual grasses and broadleaf weeds. This product may be applied postemergence to Roundup Ready Flex cotton using ground application equipment at rates up to 36 fluid ounces per acre per application.  In addition to broadcast application, post-directed spray equipment may be used to achieve more thorough weed coverage.

IN THE STATES OF ARIZONA, NEW MEXICO AND TEXAS (WEST OF I-35) ONLY, up to 48 fluid ounces of this product per acre may be applied per postemergence application using ground application equipment.

TANK MIXTURES: This product may be tank-mixed with the following products and applied postemergence (in-crop) over the top of Roundup Ready Flex cotton.

acetochlor; clethodim; fluazifop-P-butyl; fomesafen; metolachlor; s-metolachlor; monosodium acid methanearsonate; pyrithiobac-sodium; quizalofop-p-ethyl; sethoxydim; trifloxysulfuron-sodium

Assure II; Dual MAGNUM; Dual II MAGNUM; Envoke; Fusilade DX; MSMA 6 Plus; MSMA 6.6; Poast; Poast Plus; Reflex; Select; Select 2 EC; Select Max Herbicide with Inside Technology; Stalwart; Staple LX; Warrant; Warrant Ultra

[*Optional text:* Staple LX could cause leaf yellowing and/or leaf crinkling when applied postemergence (in-crop) in Roundup Ready Flex cotton.]

[*Optional text:* [Dual MAGNUM, Dual II MAGNUM and Stalwart] applied over the top of Roundup Ready Flex cotton could cause leaf injury in the form of necrotic spotting.]

This product may be tank-mixed with the following products for in-crop application using precision post-directed or hooded sprayers.

II. DIRECTIONS FOR USE WITH FOOD AND FEED CROPS

acetochlor; carfentrazone-ethyl; diuron; flumioxazin; fluometuron; fomesafen; linuron; metolachlor; monosodium acid methanearsonate; pendimethalin; prometyrn; pyrithiobac-sodium; trifloxysulfuron-sodium

Aim EC; Aim EW; Caparol 4L; Cotoran 4L; Direx 4L; Envoke; Layby-Pro; MSMA 6 Plus; MSMA 6.6; Prowl 3.3 EC; Prowl H2O; Rowel; Staple LX; Valor SX; Warrant; Warrant Ultra

[*Optional text:* Staple LX could cause leaf yellowing and/or leaf crinkling when applied postemergence (in-crop) in Roundup Ready Flex cotton.]

Ensure that the product used is labeled for application postemergence (in-crop) to cotton. Read and follow label directions for all products in the tank mixture.

PRECAUTIONS: DO NOT EXCEED A SURFACTANT CONCENTRATION 0.5% BY WEIGHT (2 QUARTS PER 100 GALLONS OF SPRAY SOLUTION WHEN MAKING AN OVER-THE-TOP IN-CROP APPLICATION TO ROUNDUP READY FLEX COTTON. Surfactant concentrations exceeding 0.5% could result in crop injury and reduced yield.

RESTRICTIONS: The maximum single, in-crop application rate of this product to Roundup Ready Flex cotton using ground application equipment is 36 fluid ounces per acre, except in Arizona, New Mexico and west Texas (west of I-35 only), where up to 48 fluid ounces per acre may be applied in a single application using ground application equipment. **In-crop application rates above 24 fluid ounces per acre made alone or with the addition of other crop chemical products containing surfactant could cause a crop response including leaf speckling or leaf necrosis.** Do not exceed a maximum single, in-crop application rate of 24 fluid ounces of this product per acre when using aerial application equipment, except in Arizona, New Mexico and west Texas (west of I-35 only), where up to 36 fluid ounces may be applied as a single application using aerial application equipment. Between layby and 60 percent open bolls, the maximum combined total application rate of this product is 48 fluid ounces per acre. The combined total for all applications of this product made from crop emergence to 60 percent open bolls must not exceed 4.5 quarts per acre.

**Preharvest**

USE INSTRUCTIONS: Up to 48 fluid ounces of this product per acre may be applied to Roundup Ready Flex cotton for annual and perennial weed control prior to harvest after 60 percent boll crack.

**NOTE:** This product will not enhance the performance of harvest aids when applied to Roundup Ready Flex cotton.

PRECAUTIONS: DO NOT EXCEED A SURFACTANT CONCENTRATION 0.5% BY WEIGHT (2 QUARTS PER 100 GALLONS OF SPRAY SOLUTION WHEN MAKING A PREHARVEST APPLICATION TO ROUNDUP READY FLEX COTTON. Surfactant concentrations exceeding 0.5% could result in crop injury and reduced yield.

RESTRICTIONS: Allow a minimum of 7 days between application and harvest of Roundup Ready Flex cotton.

**ATTENTION:** USE OF THIS PRODUCT IN ACCORDANCE WITH LABEL DIRECTIONS IS EXPECTED TO RESULT IN NORMAL GROWTH OF ROUNDUP READY FLEX COTTON. HOWEVER, DUE TO THE SENSITIVITY OF COTTON FRUITING TO VARIOUS ENVIRONMENTAL CONDITIONS, AGRONOMIC PRACTICES AND OTHER FACTORS, IT IS IMPOSSIBLE TO ELIMINATE ALL RISKS ASSOCIATED WITH THIS PRODUCT, EVEN WHEN APPLICATIONS ARE MADE IN ACCORDANCE WITH THE LABEL DIRECTIONS. IN SOME CASES, THESE FACTORS CAN RESULT IN BOLL LOSS, DELAYED MATURITY AND/OR YIELD LOSS.

**12.9   Roundup Ready Soybean**

## II. DIRECTIONS FOR USE WITH FOOD AND FEED CROPS

TYPES OF APPLICATION: Preplant; At-planting; Preemergence; Postemergence (In-crop); Preharvest; Post-harvest

USE INSTRUCTIONS: Refer to the following table for maximum application rates of this product with Roundup Ready soybean.

| Maximum Application Rates | |
|---|---|
| Combined total per year for all applications | 6 quarts per acre |
| Total for all Preplant, At-Planting, Preemergence applications | 3.75 quarts per acre |
| Total for all In-crop applications from cracking through flowering (R2 stage soybean) | 72 fluid ounces per acre |
| Maximum preharvest application rate | 24 fluid ounces per acre |

See the "ROUNDUP READY CROPS" section of this label for information regarding the use of this product in Roundup Ready crops. See the "PRODUCT INFORMATION" section of this label for more information on Maximum Application Rates.

**Preplant, At-planting, Preemergence**

USE INSTRUCTIONS:  This product may be applied before, during or after planting Roundup Ready soybean.

TANK MIXTURES: This product may be tank-mixed with 2,4-D, Banvel or Clarity and applied prior to planting only.  This product may be tank-mixed with the following products and applied prior to crop emergence.  Ensure that the product used is labeled for application prior to emergence of soybean. Read and follow label directions for all products in the tank mixture.

acetochlor; carfentrazone-ethyl; chlorimuron ethyl; clethodim; clomazone; cloransulam-methyl; dimethenamid; dimethenamid-p; fenoxaprop-p-ethyl; fluazifop-p-butyl; flufenacet; flumetsulam; flumiclorac pentyl ester; flumioxazin; fomesafen; fluthiacet-methyl; imazaquin; imazethapyr; lactofen; linuron; metolachlor; s-metolachlor; metribuzin; pendimethalin; pyroxasulfone; quizalofop-p-ethyl; saflufenacil; sulfentrazone; tribenuron methyl; trifluralin

Aim EC; Aim EW; Assure II; Authority Assist; Authority Elite; Authority First DF; Authority MAXX; Authority MTZ DF; Authority XL; Axiom DF; Blanket 4F; Boundary 6.5 EC; Cadet; Canopy; Canopy Blend; Canopy EX; Classic; Cobra; Command 3ME; Dawn; Dual MAGNUM; Dual II MAGNUM; Fierce; Fierce XLT; FirstRate; Flexstar; Fusion; Linex 4L; Lorox DF; Me-Too-Lachlor; Optill Powered by Kixor; Outlook; Phoenix; Prowl 3.3 EC; Prowl H2O; Pursuit; Python WDG; Reflex; Resource; Rhythm; Rowel; Rowel FX; Select; Select 2 EC; Select Max Herbicide with Inside Technology; Sharpen Powered by Kixor; Spartan 4F; Treflan 4L; Treflan 4 EC; TriCor 4F; TriCor DF; Valor SX; Valor XLT; Warrant; Warrant Ultra; Zidua

RESTRICTIONS:  Maximum quantity of this product that may be applied for all preplant, at-planting and preemergence applications combined is 3.75 quarts per acre per season.

**Postemergence (In-crop)**

USE INSTRUCTIONS: This product may be used to control annual grasses and broadleaf weeds in Roundup Ready soybean from emergence (cracking) through flowering (R2 stage soybean).  R2 stage soybean ends when a pod 5 millimeters (3/16 inch) long appears at one of the four uppermost nodes on the main stem with a fully developed leaf (R3 stage). Refer to the "ANNUAL WEEDS RATE SECTION" of this label for application rates for specific annual weeds.  An initial application of 24 fluid ounces of this product per acre will control or suppress most 2- to 8-inch tall weeds, which are normally found approximately 2 to 5 weeks after planting. If the initial application is delayed and weeds are larger, apply

II. DIRECTIONS FOR USE WITH FOOD AND FEED CROPS

a higher rate of this product. This product may be applied up to 48 fluid ounces per acre as a single, in-crop application for control of annual weeds and where dense weed populations exist.

Application of 24 to 48 fluid ounces of this product per acre (single or multiple applications) will control or suppress perennial weeds, including bermudagrass, Canada thistle, common milkweed, field bindweed, hemp dogbane, horsenettle, marestail (horseweed), nutsedge, quackgrass, rhizome johnsongrass, redvine, trumpetcreeper, swamp smartweed and wirestem muhly. For best results, allow perennial weed species to achieve at least 6 inches of growth before applying this product.

Under adverse growing conditions, including drought, hail or wind damage, or a poor soybean stand that slows or delays canopy closure, a sequential application of this product might be necessary to control late flushes of weeds. IN THE SOUTHERN STATES, A SEQUENTIAL APPLICATION OF THIS PRODUCT WILL BE NEEDED TO CONTROL NEW FLUSHES OF WEEDS IN THE ROUNDUP READY SOYBEAN CROP. To control giant ragweed, apply 24 fluid ounces of this product per acre when the weed is 8 to 12 inches tall to increase control and possibly avoid the need for a sequential application.

TANK MIXTURES: This product may be tank-mixed with the following products and applied postemergence (in-crop) over the top of Roundup Ready soybean.  Ensure that the product used is labeled for application postemergence (in-crop) to soybean. Read and follow label directions for all products in the tank mixture.

acetochlor; acifluorfen; bentazon; chlorimuron ethyl; clethodim; cloransulam-methyl; fenoxaprop-p-ethyl; fluazifop-p-butyl; flumiclorac pentyl ester; fluthiacet-methyl; fomesafen; imazamox; imazethapyr; lactofen; pendimethalin; quizalofop P-ethyl; sethoxydim; thifensulfuron-methyl

Arrow 2EC; Assure II; Basagran; Basagran 5L; Cadet; Classic; Cobra; Dawn; Extreme; FirstRate; Flexstar; Fusilade DX; Fusion; Harmony SG; Phoenix; Poast; Poast Plus; Pursuit; Raptor; Reflex; Resource; Rhythm; Select; Select 2 EC; Select Max Herbicide with Inside Technology; Synchrony XP; Targa; Ultra Blazer; Warrant; Warrant Ultra

PRECAUTIONS: In some cases, these tank-mix products will cause visual soybean injury.

RESTRICTIONS: The combined total application of this product from crop emergence through harvest must not exceed 72 fluid ounces per acre. The maximum rate for any single in-crop application is 48 fluid ounces per acre. The maximum combined total amount of this product that may be applied during flowering (R2 stage soybean) is 48 fluid ounces per acre.

**Preharvest**

USE INSTRUCTIONS:  Apply up to 24 fluid ounces of this product per acre to Roundup Ready soybean for weed control prior to harvest after pods have set and lost all green color.  Take care to avoid excessive seed shatter loss due to ground application equipment.

RESTRICTIONS: Allow a minimum of 14 days between application and harvest of soybean grain or feeding of soybean grain, forage or hay.

**Post-Harvest**

USE INSTRUCTIONS: This product may be applied for weed control after harvest of Roundup Ready soybean.  Higher rates might be needed for control of large weeds that were growing in the field at the time of harvest. Tank mixtures with 2,4-D or dicamba may be used.  Ensure that the product used is labeled for weed control application after harvest of soybean. Read and follow label directions for all products in the tank mixture.

RESTRICTIONS:  Application must be made a minimum of 30 days prior to the planting of any crop not listed on this label.

**12.10   Roundup Ready 2 Yield Soybean**

## II. DIRECTIONS FOR USE WITH FOOD AND FEED CROPS

TYPES OF APPLICATION: Preplant; At-planting; Preemergence; Postemergence (In-crop); Preharvest; Post-harvest

USE INSTRUCTIONS: Refer to the following table for maximum application rates of this product with Roundup Ready 2 Yield soybean.

| Maximum Application Rates | |
|---|---|
| Combined total per year for all applications | 6 quarts per acre |
| Total for all Preplant, At-Planting, Preemergence applications | 3.75 quarts per acre |
| Total for all In-crop applications from cracking through flowering (R2 stage soybean) | 72 fluid ounces per acre |
| Maximum Preharvest application rate | 24 fluid ounces per acre |

See the "ROUNDUP READY CROPS" section of this label for information regarding the use of this product in Roundup Ready crops. See the "PRODUCT INFORMATION" section of this label for more information on Maximum Application Rates.

**Preplant, At-planting, Preemergence**

USE INSTRUCTIONS:  This product may be applied before, during or after planting Roundup Ready 2 Yield soybean.

TANK MIXTURES: This product may be tank-mixed with 2,4-D, Banvel or Clarity and applied prior to planting only.  This product may be tank-mixed with the following products and applied prior to crop emergence.  Ensure that the product used is labeled for application prior to emergence of soybean. Read and follow label directions for all products in the tank mixture.

acetochlor; carfentrazone-ethyl; chlorimuron ethyl; clethodim; clomazone; cloransulam-methyl; dimethenamid; dimethenamid-p; fenoxaprop-p-ethyl; fluazifop-p-butyl; flufenacet; flumetsulam; flumiclorac pentyl ester; flumioxazin; fluthiacet-methyl; fomesafen; imazaquin; imazethapyr; lactofen; linuron; metolachlor; s-metolachlor; metribuzin; pendimethalin; pyroxasulfone; quizalofop-p-ethyl; saflufenacil; sulfentrazone; tribenuron methyl; trifluralin

Aim EC; Aim EW; Assure II; Authority Assist; Authority Elite; Authority First DF; Authority MAXX; Authority MTZ DF; Authority XL; Axiom DF; Blanket 4F; Boundary 6.5 EC; Cadet; Canopy; Canopy Blend; Canopy EX; Classic; Cobra; Command 3ME; Dawn; Dual MAGNUM; Dual II MAGNUM; Fierce; Fierce XLT; FirstRate; Flexstar; Fusion; Linex 4L; Lorox DF; Me-Too-Lachlor; Optill Powered by Kixor; Outlook; Phoenix; Prowl 3.3 EC; Prowl H2O; Pursuit; Python WDG; Reflex; Resource; Rhythm; Rowel; Rowel FX; Select; Select 2 EC; Select Max Herbicide with Inside Technology; Sharpen Powered by Kixor; Spartan 4F; Treflan 4L; Treflan 4 EC; TriCor 4F; TriCor DF; Valor SX; Valor XLT; Warrant; Warrant Ultra; Zidua

RESTRICTIONS:  Maximum quantity of this product that may be applied for all preplant, at-planting and preemergence applications combined is 3.75 quarts per acre per season.

**Postemergence (In-crop)**

USE INSTRUCTIONS: This product may be used to control annual grasses and broadleaf weeds in Roundup Ready 2 Yield soybean from emergence (cracking) through flowering (R2 stage soybean).  R2 stage soybean ends when a pod 5 millimeters (3/16 inch) long appears at one of the four uppermost nodes on the main stem with a fully developed leaf (R3 stage). Refer to the "ANNUAL WEEDS RATE SECTION" of this label for application rates for specific annual weeds.  An initial application of 24 fluid ounces of this product per acre will control or suppress most 2- to 8-inch tall weeds, which are normally found approximately 2 to 5 weeks after planting. If the initial application is delayed and weeds are larger,

## II. DIRECTIONS FOR USE WITH FOOD AND FEED CROPS

apply a higher rate of this product. This product can be used up to 48 fluid ounces per acre as a single, in-crop application for control of annual weeds and where dense weed populations exist.

Application of 24 to 48 fluid ounces of this product per acre (single or multiple applications) will control or suppress perennial weeds, including bermudagrass, Canada thistle, common milkweed, field bindweed, hemp dogbane, horsenettle, marestail (horseweed), nutsedge, quackgrass, rhizome johnsongrass, redvine, trumpetcreeper, swamp smartweed and wirestem muhly. For enhanced results, allow perennial weed species to achieve at least 6 inches of growth before applying this product.

Under adverse growing conditions, including drought, hail or wind damage, or a poor soybean stand that slows or delays canopy closure, a sequential application of this product may be necessary to control late flushes of weeds. IN THE SOUTHERN STATES, A SEQUENTIAL APPLICATION OF THIS PRODUCT WILL BE NEEDED TO CONTROL NEW FLUSHES OF WEEDS IN THE ROUNDUP READY 2 YIELD SOYBEAN CROP. To control giant ragweed, apply 24 fluid ounces of this product per acre when the weed is 8 to 12 inches tall to increase control and possibly avoid the need for a sequential application.

TANK MIXTURES: This product may be tank-mixed with the following products and applied postemergence (in-crop) over the top of Roundup Ready 2 Yield soybean.  Ensure that the product used is labeled for application postemergence (in-crop) to soybean. Read and follow label directions for all products in the tank mixture.

---

acetochlor; acifluorfen; bentazon; chlorimuron ethyl; clethodim; cloransulam-methyl; fenoxaprop-p-ethyl; fluazifop-p-butyl; flumiclorac pentyl ester; fluthiacet-methyl; fomesafen; imazamox; imazethapyr; lactofen; pendimethalin; quizalofop P-ethyl; sethoxydim; thifensulfuron-methyl

Arrow 2EC; Assure II; Basagran; Basagran 5L; Cadet; Classic; Cobra; Dawn; Extreme; FirstRate; Flexstar; Fusilade DX; Fusion; Harmony SG; Phoenix; Poast; Poast Plus; Pursuit; Raptor; Reflex; Resource; Rhythm; Select; Select 2 EC; Select Max Herbicide with Inside Technology; Synchrony XP; Targa; Ultra Blazer; Warrant; Warrant Ultra

---

PRECAUTIONS: In some cases, these tank-mix products will cause visual soybean injury.

RESTRICTIONS: The combined total application of this product from crop emergence through harvest must not exceed 72 fluid ounces per acre. The maximum rate for any single in-crop application is 48 fluid ounces per acre. The maximum combined total amount of this product that may be applied during flowering (R2 stage soybean) is 48 fluid ounces per acre.

**Preharvest**

USE INSTRUCTIONS:  Up to 24 fluid ounces of this product per acre may be applied to Roundup Ready 2 Yield soybean for weed control prior to harvest after pods have set and lost all green color.  Take care to avoid excessive seed shatter loss due to ground application equipment.

RESTRICTIONS: Allow a minimum of 14 days between application and harvest of soybean grain or feeding of soybean grain, forage or hay.

**Post-Harvest**

USE INSTRUCTIONS: This product may be applied for weed control after harvest of Roundup Ready 2 Yield soybean.  Higher rates might be needed for control of large weeds that were growing in the field at the time of harvest. Tank mixtures with 2,4-D or dicamba may be used.  Ensure that the product used is labeled for weed control application after harvest of soybean. Read and follow label directions for all products in the tank mixture.

RESTRICTIONS:  Application of this product must be made a minimum of 30 days prior to the planting of any crop not listed on this label.

**12.11   Roundup Ready Sugarbeet**

## II. DIRECTIONS FOR USE WITH FOOD AND FEED CROPS

TYPES OF APPLICATION: Preplant; At-planting; Preemergence; Postemergence (In-crop)

USE INSTRUCTIONS:  Refer to the following table for maximum application rates of this product with Roundup Ready sugarbeet.

| Maximum Application Rates | |
|---|---|
| Combined total per year for all applications | 6 quarts per acre |
| Total for all Preplant, At-Planting, Preemergence applications | 3.75 quarts per acre |
| Maximum single application rate from emergence to 8-leaf stage | 36 fluid ounces per acre |
| Total for all applications made from emergence to 8-leaf stage | 64 fluid ounces per acre |
| Maximum single application rate between 8-leaf stage and canopy closure | 24 fluid ounces per acre |
| Total for all applications made between 8-leaf stage and canopy closure | 48 fluid ounces per acre |

See the "ROUNDUP READY CROPS" section of this label for information regarding the use of this product in Roundup Ready crops.  See the "PRODUCT INFORMATION" section of this label for more information on Maximum Application Rates.

**Preplant, At-Planting, Preemergence**

USE INSTRUCTIONS: This product may be applied before, during or after planting of Roundup Ready sugarbeet.

TANK MIXTURES: This product may be tank-mixed with the following products and applied prior to crop emergence.  Ensure that the product used is labeled for application prior to emergence of sugarbeet. Read and follow label directions for all products in the tank mixture.

ethofumesate

Norton SC

RESTRICTIONS: Maximum quantity of this product that may be applied for all preplant, at-planting and preemergence applications combined is 3.75 quarts per acre per season.

**Postemergence (In-crop)**

USE INSTRUCTIONS: This product may be applied over the top of Roundup Ready sugarbeet for control of annual grasses and broadleaf weeds from emergence to 30 days prior to harvest.  To maximize yield potential, eliminate competing weeds early.   Up to 4 applications of this product may be made with a minimum of 10 days between each application. This product will control or suppress most perennial weeds.  For some perennial weeds, more than one application might be needed to eliminate crop competition throughout the growing season. Refer to the "ANNUAL WEEDS RATE SECTION" and "PERENNIAL WEEDS RATE SECTION" of this label for application rates for specific weeds.

TANK MIXTURES: This product may be tank-mixed with the following products and applied postemergence (in-crop) over the top of Roundup Ready sugarbeet.  Ensure that the product used is labeled for application postemergence (in-crop) to sugarbeet. Read and follow label directions for all products in the tank mixture.

clethodim;   clopyralid;   desmedipham;   dimethenamid-p;   ethofumesate;   s-metolachlor; phenmedipham; quizalofop-p-ethyl; triflusulfuron-methyl

Assure II; Betamix; Betanex; Dual MAGNUM; Dual II MAGNUM; Norton SC; Outlook; Progress; Select; Select 2 EC; Select Max Herbicide with Inside Technology; Stinger; Upbeet; Warrant

II. DIRECTIONS FOR USE WITH FOOD AND FEED CROPS

[*Optional statement:* Betamix, Betanex, Norton SC and Progress can cause significant sugarbeet injury.  Refer to these product labels for crop injury precautions.]

RESTRICTIONS: The combined total application of this product from crop emergence through harvest must not exceed 112 fluid ounces per acre. The maximum rate for any single application from crop emergence until the 8-leaf stage is 36 fluid ounces per acre. The maximum rate for any single application between the 8-leaf stage and canopy closure is 24 fluid ounces per acre. Allow a minimum of 30 days between application and sugarbeet harvest.

## 13.0    FARMSTEAD USE

TYPES OF USES: Farmstead Weed Control; Trim-and-Edge; Greenhouse/Shadehouse; Chemical Mowing; Cut Stump Application; Habitat Management

USE INSTRUCTIONS: Refer to the "ANNUAL WEEDS RATE SECTION" and "PERENNIAL WEEDS RATE SECTION" of this label for application rates for specific weeds. When applied as directed, this product will control those annual and perennial grasses and broadleaf weeds.  Application rates of this product specified in the following sections, or on separate supplemental labeling or Fact Sheets published for this product, for hard-to-control weeds supersede rates in the "ANNUAL WEEDS RATE SECTION" and "PERENNIAL WEEDS RATE SECTION" of this label.

### 13.1    Farmstead Weed Control, Trim-And-Edge

USE INSTRUCTIONS: This product may be used to control annual and perennial weeds, woody brush, trees and vines found on any part of the farmstead, including around building foundations and equipment storage areas, along and in fences, in ditches and canals, along ditch banks, driveways, farm roads, farmyards, fencerows, parking areas, rangeland, rights-of-way, shelterbelts, storage areas and prior to planting landscape ornamentals.

TANK MIXTURES:  This product may be tank-mixed with the following products, provided that the product used is labeled for these sites and uses.  Refer to each individual product label for approved sites and application rates.  Read and follow label directions for all products in the tank mixture.

---

2,4-D;  bromacil;  chlorosulfuron;  dicamba;  diuron;  imazapic;  imazapyr;  metsulfuron-methyl; oryzalin; oxadiazon; pendimethalin; prodiamine; simazine; sulfometuron-methyl

Arsenal; Banvel; Banvel 480; Barricade 4L; Barricade 65WG; Clarity; Diuron 4L; Endurance; Escort XP; Karmex DF; Krovar I DF; Oust XP; Pendulum 3.3 EC; Pendulum 2G; Pendulum Aqua Cap; Plateau; Princep 4L; Princep Caliber 90; Princep Liquid; Ronstar 50 WSP; Ronstar Flo; Ronstar G; Sahara DG; Simazine 4L; Simazine 4L Flowable; Simazine 90DF;  Simazine 90 WDG;  Surflan AS Agricultural;Surflan AS Specialty; Surflan Flex; Surflan Flex T&O; Surflan XL 2G; Telar XP; Vanquish

---

For annual weeds, apply 24 fluid ounces of this product per acre when weeds are less than 6 inches tall, 36 fluid ounces per acre when weeds are 6 to 12 inches tall and 48 fluid ounces per acre when weeds are greater than 12 inches tall. For perennial weeds, apply 48 fluid ounces to 3.75 quarts per acre in a tank-mix with one of the products listed here. For application of tank mixtures using a backpack sprayer, handgun or other handheld applicator, see the "ANNUAL WEEDS RATE SECTION" and "PERENNIAL WEEDS RATE SECTION" of this label for the required concentration of this product in the mix.

### 13.2    Greenhouse/Shadehouse

USE INSTRUCTIONS: This product may be used to control weeds in and around greenhouses and shadehouses.

II. DIRECTIONS FOR USE WITH FOOD AND FEED CROPS

PRECAUTIONS:  Remove desirable vegetation before applying this product inside a greenhouse or shadehouse.

RESTRICTIONS:  Turn air circulation fans off before applying this product inside a greenhouse or shadehouse and until the application solution has dried.  Do not use inside residential greenhouses.

## 13.3    Chemical Mowing

USE INSTRUCTIONS: This product may be used to suppress growth of perennial grasses listed in this section along farm ditches and on any other part of the farmstead to serve as a substitute for mowing. Apply 4.5 fluid ounces of this product per acre to suppress Kentucky bluegrass, 6 fluid ounces to suppress tall fescue, fine fescue, orchardgrass, bahiagrass or quackgrass, 12 fluid ounces to suppress bermudagrass, or 48 fluid ounces to suppress torpedograss or para grass. Make all applications in 10 to 20 gallons of spray solution per acre.

PRECAUTIONS: Use only in areas where some temporary injury or discoloration of perennial grasses can be tolerated.

## 13.4    Cut Stump Application

TYPES OF USES: Treating brush and tree stumps on any terrestrial site

USE INSTRUCTIONS: This product may be used to control re-growth and re-sprouting of many species of woody brush and trees.  Cut the woody brush or tree close to the soil surface and immediately apply a 50- to 100-percent (undiluted) solution of this product to the freshly cut surface using application equipment capable of covering the entire cambium. A delay in application could result in reduced performance. For enhanced results, cut the woody brush or tree during period of active growth and full leaf expansion and apply this product.  Some of the species controlled by this method of application of this product are:

| | | | |
|---|---|---|---|
| Alder | Oak | Reed, giant | Tan oak |
| Eucalyptus | Pepper, Brazilian | Saltcedar | Willow |
| Madrone | Pine, Austrian | Sweetgum | |

PRECAUTIONS: Do not make a cut stump application when the roots of desirable woody brush or trees might be grafted to the roots of the cut stump.  Some sprouts, stems, or trees can share a common root system.  Adjacent trees having a similar age, height and spacing could be an indicator of a shared root system. Whether grafted or shared, injury is likely to occur to adjacent stems or trees when this product is applied to one or more trees sharing a common root system.

## 13.5    Habitat Management

TYPES OF USES: Habitat Restoration and Maintenance; Wildlife Food Plots

**Habitat Restoration and Maintenance**

USE INSTRUCTIONS: This product may be used to control exotic and other undesirable vegetation in habitat management areas. Application may be made to allow recovery of native plant species or prior to planting desirable native species, and for similar broad-spectrum vegetation control in habitat management areas. Spot treatment may be used to selectively remove unwanted plants for habitat maintenance and enhancement.

**Wildlife Food Plots**

USE INSTRUCTIONS: This product may be used to eliminate annual and perennial weeds prior to planting wildlife food plots. Any wildlife food species may be planted after applying this product or native species may be allowed to repopulate the area.  If tillage is needed to prepare a seedbed, wait a minimum of 7 days after application before tilling.

II. DIRECTIONS FOR USE WITH FOOD AND FEED CROPS

RESTRICTIONS: There are no rotational restrictions for planting any wildlife food species or for allowing native species to repopulate the area following application of this product.

## 14.0   ANNUAL WEEDS RATE SECTION

When water carrier volumes are between 16 and 40 gallons per acre for ground application, and between 6 and 15 gallons per acre for aerial application, and contain 0.5% or more of a non-ionic surfactant labeled for use with herbicides, the following use rates will control the annual weeds listed in the "ANNUAL WEEDS RATE TABLE" that follows.

- 24 fluid ounces per acre – grass and broadleaf annual weeds less than 6 inches in height or circumference, and vines less than 3 inches in length.

- 36 fluid ounces per acre – grass and broadleaf annual weeds 6 to 12 inches in height or circumference, and vines 3 to 6 inches in length.

- 48 fluid ounces per acre – grass and broadleaf annual weeds greater than 12 inches in height or circumference, and vines greater than 6 inches in length.

**WHEN WATER CARRIER VOLUMES ARE BETWEEN 3 AND 15 GALLONS PER ACRE FOR GROUND APPLICATION AND BETWEEN 3 AND 5 GALLONS PER ACRE FOR AERIAL APPLICATION, USE THE RATES SPECIFIED FOR INDIVIDUAL WEEDS INDICATED IN THE "ANNUAL WEEDS RATE TABLE."**

Apply to actively growing annual weeds. New leaf development indicates active growth.

Annual weeds are often easiest to control when they are small.  Control of older, mature (hardened) or otherwise hard-to-control annual weed species could require higher application rates than specified in this table, even if they meet the size requirements listed.  This product may be applied at rates of up to 48 fluid ounces per acre for hard-to-contol annual weeds and where dense weed populations exist.  Follow all precautions and restrictions, including maximum application rates and crop stage timings specified in the directions for use on specific crops, including Roundup Ready crops, and use sites listed on this label.

Maximum size refers to the maximum plant height, length of runners for vines, or circumference of rosette plants in inches.

Do not tank-mix this product with soil residual herbicides when applying at these rates, unless otherwise directed.

For control of annual weeds using a handheld controlled droplet applicator (CDA), apply a 20-percent solution of this product (25 to 26 fluid ounces of this product per gallon of spray solution) at a flow rate of 2 fluid ounces per minute and a walking speed of 1.5 miles per hour (1 quart per acre).  When using a vehicle-mounted CDA, apply the required amount of this product, as indicated in the following table, in 2 to 15 gallons of water per acre.

For weeds that have been mowed, grazed or cut, allow re-growth to occur prior to application of this product.

### ANNUAL WEEDS RATE TABLE

| Weed Species | Broadcast Application Rate (fluid ounces per acre) | | | | |
|---|---|---|---|---|---|
| | **12** | **18** | **24** | **30** | **36** |
| | Maximum Height/Length (inches) | | | | |
| Ammannia, purple | 3 | 6 | 12 | - | 18 |
| Annoda, spurred | - | 2 | 3 | 5 | 8 |
| Barley | 18 | 18+ | - | - | - |

II. DIRECTIONS FOR USE WITH FOOD AND FEED CROPS

| Weed Species | Broadcast Application Rate (fluid ounces per acre) | | | | |
|---|---|---|---|---|---|
| | 12 | 18 | 24 | 30 | 36 |
| | Maximum Height/Length (inches) | | | | |
| Barnyardgrass | - | 3 | 6 | 7 | 9 |
| Bassia, fivehook | - | - | 6 | - | - |
| Beggarweed, Florida | - | 5 | 8 | - | - |
| Bittercress | 12 | 20 | - | - | - |
| Bluegrass, annual | 10 | - | - | - | - |
| Bluegrass, bulbous | 6 | - | - | - | - |
| Brome, downy[1,2] | 6 | 12 | - | - | - |
| Brome, Japanese | 6 | 12 | 24 | - | - |
| Browntop panicum | 6 | 8 | 12 | - | 24 |
| Buckwheat, wild[3] | - | 1 | 2 | - | - |
| Burcucumber | - | 6 | 12 | - | 18 |
| Buttercup | 12 | 20 | - | - | - |
| Carolina geranium | - | - | 4 | - | 9 |
| Carpetweed | - | 6 | 12 | - | - |
| Cheat[2] | 6 | 20 | - | - | - |
| Chervil | 20 | - | - | - | - |
| Chickweed | - | 12 | 18 | - | - |
| Cocklebur | 12 | 18 | 24 | - | 36 |
| Copperleaf, hophornbeam | - | 2 | 4 | - | 6 |
| Copperleaf, Virginia | - | 2 | 4 | - | 6 |
| Coreopsis, plains | - | 6 | 12 | - | 18 |
| Corn, volunteer | 6 | 12 | 20 | - | - |
| Corn speedwell | 12 | - | - | - | - |
| Crabgrass | 3 | 6 | 12 | - | - |
| Crowfootgrass | - | - | 6 | - | 12 |
| Cutleaf evening primrose | - | - | 3 | - | 6 |
| Devilsclaw (unicorn plant) | - | 3 | 6 | - | - |
| Dwarf dandelion | 12 | - | - | - | - |
| Eastern mannagrass | 8 | 12 | - | - | - |
| Eclipta | - | 4 | 8 | 12 | - |
| Fall panicum | 4 | - | 6 | - | 12 |
| False dandelion | - | 20 | - | - | - |
| Falseflax, smallseed | 12 | - | - | - | - |
| Fiddleneck | - | 6 | 12 | - | - |
| Field pennycress | 6 | 12 | - | - | - |
| Filaree | - | - | 6 | - | 12 |
| Fleabane, annual | 6 | 20 | - | - | - |
| Fleabane, hairy* (*Conyza bonariensis*) | - | - | 6 | - | 10 |
| Fleabane, rough | 3 | 6 | 12 | - | - |

II. DIRECTIONS FOR USE WITH FOOD AND FEED CROPS

| Weed Species | Broadcast Application Rate (fluid ounces per acre) | | | | |
| | 12 | 18 | 24 | 30 | 36 |
| | Maximum Height/Length (inches) | | | | |
|---|---|---|---|---|---|
| Florida pusley | - | - | 4 | - | 6 |
| Foxtail, giant, bristly, yellow | 6 | 12 | 20 | - | - |
| Foxtail, Carolina | 10 | - | - | - | - |
| Foxtail, green | 12 | - | - | - | - |
| Goatgrass, jointed | 6 | 12 | - | - | - |
| Goosegrass* | - | 3 | 6 | - | 12 |
| Grain sorghum (milo) | 6 | 12 | 20 | - | - |
| Groundcherry | - | 3 | 6 | - | 9 |
| Groundsel; common, cressleaf | - | 6 | 10 | - | - |
| Hemp sesbania | - | 2 | 4 | 6 | 8 |
| Henbit | - | - | 6 | - | 12 |
| Horseweed/ Marestail* (*Conyza Canadensis*) | - | 6 | 12 | - | 18 |
| Itchgrass | 6 | 8 | 12 | - | 18 |
| Jimsonweed | - | - | 12 | - | 18 |
| Johnsongrass, seedling* | 6 | 12 | 18 | - | 24 |
| Junglerice* | - | 3 | 6 | 7 | 9 |
| Knotweed | - | - | 6 | - | 12 |
| Kochia*[4] | - | 3 to 6 | 12 | - | - |
| Lambsquarters | - | 6 | 12 | - | 20 |
| Little barley | 6 | 12 | - | - | - |
| London rocket | 6 | - | 24 | - | - |
| Mayweed | - | 2 | 6 | 12 | 18 |
| Morning glory, annual (*Ipomoea spp*) | - | - | 3 | - | 6 |
| Mustard; blue, tansy, tumble, wild | 6 | 12 | 18 | - | - |
| Nightshade; black, hairy | - | 4 | 6 | - | 12 |
| Oats | 3 | 6 | 18 | - | - |
| Pigweed, Palmer* | - | 12 | 18 | 24 | - |
| Pigweed species* | - | 12 | 18 | 24 | - |
| Prickly lettuce | - | 6 | 12 | - | - |
| Purslane | - | - | 3 | - | 6 |
| Ragweed; common,* giant* | - | 6 | 12 | - | 18 |
| Red rice | - | - | 4 | - | - |
| Rye, volunteer/cereal[2] | 6 | 18 | 18+ | - | - |
| Ryegrass species* | - | - | 6 | - | 12 |
| Sandbur, field | 6 | 12 | - | - | - |
| Sandbur, longspine | 6 | 12 | - | - | - |
| Shattercane | 6 | 12 | 20 | - | - |
| Shepherd's-purse | 6 | 12 | - | - | - |
| Sicklepod | - | 2 | 4 | - | 8 |

II. DIRECTIONS FOR USE WITH FOOD AND FEED CROPS

| Weed Species | Broadcast Application Rate (fluid ounces per acre) | | | | |
|---|---|---|---|---|---|
| | **12** | **18** | **24** | **30** | **36** |
| | Maximum Height/Length (inches) | | | | |
| Signalgrass, broadleaf | - | 3 | 6 | 7 | 9 |
| Smartweed, ladysthumb | - | - | 6 | - | 9 |
| Smartweed, Pennsylvania | - | - | 6 | - | 9 |
| Sowthistle, annual | - | - | 6 | - | 12 |
| Spanish needles | - | - | 6 | - | 12 |
| Speedwell, purslane | 12 | - | - | - | - |
| Sprangletop | 6 | 12 | 20 | - | - |
| Spurge; prostrate, spotted | - | 6 | 12 | - | - |
| Spurry, umbrella | 6 | - | - | - | - |
| Stinkgrass | - | 12 | - | - | - |
| Sunflower | 12 | 18 | - | - | - |
| Swinecress | - | 5 | 12 | - | - |
| Teaweed/ Prickly sida | - | 2 | 4 | - | 6 |
| Texas panicum | 6 | 8 | 12 | - | 24 |
| Thistle, Russian*[5] | - | 6 | 12 | - | - |
| Velvetleaf | - | - | 6 | - | 12 |
| Virginia pepperweed | - | 18 | - | - | - |
| Waterhemp* | - | - | 6 | - | 12 |
| Wheat[2] | 6 | 12 | 18 | - | - |
| Wheat (overwintered) | - | 6 | 12 | - | 18 |
| Wild oats | 3 | 6 | 18 | - | - |
| Wild proso millet | - | 6 | 12 | - | 18 |
| Witchgrass | - | 12 | - | - | - |
| Woolly cupgrass | - | 6 | 12 | - | - |
| Yellow rocket | - | 12 | 20 | - | - |

[1] For control of downy brome in no-till systems, apply 18 fluid ounces of this product per acre.

[2] Performance of this product can be enhanced if application is made before this weed reaches the boot stage of growth.

[3] Apply 18 fluid ounces of this product per acre to control wild buckwheat in the cotyledon to 2-leaf stage. Apply 24 fluid ounces per acre to control 2- to 4-leaf wild buckwheat. For enhanced control of wild buckwheat over 2 inches in size, make sequential applications of 24 fluid ounces followed by 24 fluid ounces of this product per acre.

[4] Do not apply when kochia is in the button stage.

[5] Control of Russian thistle can vary based on environmental conditions and spray coverage. If possible, apply this product in a tank mixture with 2,4-D, as described in the following section, to improve control.

* A glyphosate-resistant biotype has been confirmed.  For additional information, refer to the "WEED RESISTANCE MANAGEMENT" section of this label.  You can also visit via the Internet, www.weedscience.org or www.weedresistancemanagement.com, or contact your Monsanto Company representative.

II. DIRECTIONS FOR USE WITH FOOD AND FEED CROPS

### 14.1   Annual Weeds—Tank Mixtures with 2,4-D, Dicamba, or Tordon 22K

Enhanced control of certain hard-to-control weeds can be achieved by tank-mixing this product with dicamba, 2,4-D, or Tordon 22K. An appropriate rate of these other herbicides combined with the rate of this product specified in the "ANNUAL WEEDS RATE TABLE" will control the following weeds up to the maximum height or length indicated:  6 inches—prickly lettuce, marestail/horseweed, morning glory, kochia (in a tank-mix with dicamba only) wild buckwheat (in a tank-mix with Tordon 22K only); 12 inches—cocklebur, lambsquarters, pigweed, Russian thistle (in a tank-mix with 2,4-D only).

At application rates listed in the "ANNUAL WEEDS RATE SECTION," this product will control the following weeds up to a maximum height or length of 6 inches:  common ragweed, giant ragweed, Pennsylvania smartweed, and velvetleaf.  For enhanced control of these weeds, apply this product in a tank-mix with 2,4-D.

Ensure that the product used is labeled for application at the desired site.  Follow all precautions and limitations on the tank-mix product label, including any application timing restrictions, soil restrictions, minimum re-cropping intervals and/or crop rotation restrictions. Use according to the more restrictive label requirements.  Some crop injury could occur if dicamba or Tordon 22K is applied within 45 days of planting.

### 14.2   Annual Weeds—Handheld Sprayers

For control of weeds listed in the "ANNUAL WEEDS RATE TABLE," apply a 0.5-percent solution of this product to weeds less than 6 inches in height or runner length prior to seedhead formation in grasses or bud formation in broadleaf weeds. For control of annual weeds over 6 inches tall, or unless otherwise directed, use a 0.75-percent solution.

For enhanced results on hard-to-control perennials, such as bermudagrass, dock, field bindweed, hemp dogbane, milkweed and Canada thistle, apply a 1.5-percent solution of this product.

When using application methods that result in less than complete coverage, apply a 4-percent solution of this product for control of annual and perennial weeds, and a 4- to 8-percent solution for control of woody brush, trees and vines.

### 14.3   Annual Weeds—Tank Mixtures for Fallow and Reduced Tillage Systems

For use only in Colorado, Kansas, Nebraska, Oklahoma, Oregon, South Dakota, and Washington.  In Oregon and Washington, do not exceed 1 pound of atrazine per acre.

Application of 18 to 22 fluid ounces of this product per acre in a tank mixture with atrazine will provide enhanced control of the following weeds:  barnyardgrass (requires 22 fluid ounces of this product per acre for control), downy brome, green foxtail, lambsquarters, prickly lettuce, tansy mustard, pigweed, field sandbur, stinkgrass, Russian thistle, volunteer wheat and witchgrass.  For control of kochia, apply 16 to 20 fluid ounces of this product in a tank-mix with atrazine and dicamba.  Ensure that the atrazine and dicamba products are labeled for the intended use and application site.  Follow all precautions and limitations on the tank-mix product label, including any application timing restrictions, soil restrictions, minimum re-cropping intervals and/or crop rotation restrictions.

### 15.0   PERENNIAL WEEDS RATE SECTION

Apply this product to actively growing perennial weeds.  New leaf development indicates active growth. Enhanced results can be obtained when soil moisture is adequate for active weed growth.

If weeds have been recently mowed or tilled, do not apply this product until plants have resumed active growth and have reached the specified stage of growth or sufficient growth has been achieved to allow for good interception of the spray solution.  For enhanced control, do not mow, cut, till, burn or disturb vegetation in the application area for a minimum of 7 days after application.

## II. DIRECTIONS FOR USE WITH FOOD AND FEED CROPS

For control of perennial weeds using a handheld controlled droplet applicator (CDA), apply a 20- to 40-percent solution of this product (25 to 51 fluid ounces per gallon of applicator solution) at a flow rate of 2 fluid ounces per minute and a walking speed of 0.75 mile per hour (2 to 3 quarts per acre). When using a vehicle-mounted CDA, apply the appropriate amount of this product, as indicated in the following rate table, in 2 to 15 gallons of water per acre.

This product has no soil activity and does not control emergence of perennial weeds from seed and dormant underground roots, rhizomes or tubers present in the soil at the time of application. More than one application of this product might be necessary to control weeds regenerating from underground parts or seed, but must be made prior to crop emergence, except where in-crop application is allowed.

Application of this product in the fall must be made before a killing frost.

Unless otherwise directed, allow a minimum of 7 days after application before soil tillage.

### PERENNIAL WEEDS RATE TABLE

| Weed Species | Broadcast Rate (quarts/acre) | Water Volume (gallons/acre) | Handheld Sprayer Concentration (% solution) |
|---|---|---|---|
| **Alfalfa** | 0.75 – 1.5 | 3 – 10 | 1.5% |
| Apply after last hay cutting in the fall and alfalfa has re-grown to a height of 6 to 8 inches or more. Follow with deep tillage after a minimum of 7 days after application, but before soil freeze-up. | | | |
| **Alligatorweed** | 3 | 3 – 20 | 1.25% |
| For partial control, apply this product when most target plants are in bloom. More than one application will be needed to achieve control. | | | |
| **Anise (fennel)**[1] | – | – | 0.75 – 1.5% |
| **Bahiagrass** [2] | 2.25 – 3.75 | 3 – 20 | 1.5% |
| **Bentgrass** | 1.125 | 10 – 20 | 1.5% |
| For suppression in grass seed production areas using ground application equipment only. Ensure entire crown area has resumed growth prior to application in the fall. Ensure that bentgrass has at least 3 inches of growth before application. Avoid tillage prior to application. Tillage 7 to 10 days after application provides enhanced results. | | | |
| **Bermudagrass** | 2.25 – 3.75 | 3 – 20 | 1.5% |
| For control, apply 3.75 quarts of this product per acre when bermudagrass is actively growing and seedheads are present. More than one application might be necessary to achieve control. For partial control, apply 2.25 quarts per acre. | | | |
| **Bermudagrass, water (knotgrass)** | 0.75 – 1.125 | 5 – 10 | 1.5% |
| Apply 36 fluid ounces of this product in 5 to 10 gallons of water per acre when water bermudagrass is 12 to 18 inches in length. Allow a minimum of 7 days after application before tilling, flushing or flooding the field. | | | |
| For fall application, till fallow fields and apply 24 fluid ounces of this product in 5 to 10 gallons of water per acre prior to frost and when water bermudagrass is 12 to 18 inches in length. | | | |
| This product is not registered in the State of California for control of water bermudagrass. | | | |
| **Bindweed, field** | 0.45 – 3.75 | 3 – 20 | 1.5% |
| Do not apply this product when field bindweed is under drought stress, as good soil moisture is necessary for active plant growth and efficacy of this product. | | | |
| For control, apply 2.75 to 3.75 quarts of this product per acre west of the Mississippi River and 2.25 to 2.75 quarts east of the Mississippi River when bindweed is at or beyond full bloom. For enhanced results, apply in late-summer or fall. Fall application must be made before a killing frost. | | | |

II. DIRECTIONS FOR USE WITH FOOD AND FEED CROPS

| Weed Species | Broadcast Rate (quarts/acre) | Water Volume (gallons/acre) | Handheld Sprayer Concentration (% solution) |
|---|---|---|---|

Also for control, apply 48 fluid ounces of this product plus an appropriate rate of dicamba in 10 to 20 gallons of water per acre. Do not apply this mixture using aerial application equipment.

For suppression of field bindweed on irrigated agricultural land, apply 24 to 48 fluid ounces of this product plus an appropriate rate of 2,4-D in 10 to 20 gallons of water per acre using ground application equipment only.  Application may be made following harvest or on fallow ground in the fall when bindweed is actively growing and the majority of runners are 12 inches or more in length.  Irrigate at least once to promote active bindweed growth.

For suppression, apply 12 fluid ounces of this product plus a rate of 2,4-D that will provide suppression of field bindweed in 3 to 10 gallons of water per acre using ground application equipment, or in 3 to 5 gallons of water per acre using aerial application equipment. Application of this tank-mix using aerial equipment is only allowed on fallow fields and in reduced tillage systems. Delay application until maximum emergence has occurred and vines are 6 to 18 inches in length.

**In California only**, apply 24 fluid ounces to 3.75 quarts of this product per acre. Actual rate needed for suppression or control will vary within this range depending on local conditions. For suppression on irrigated land where annual tillage is performed, apply 24 fluid ounces of this product in 3 to 10 gallons of water per acre to bindweed that has reached a length of 12 inches or greater. Allow maximum weed emergence and runner growth before applying this product. Allow a minimum of 3 days after application before tillage.

| **Bluegrass, Kentucky** | 0.75 – 1.7 | 3 – 40 | 1.5% |
|---|---|---|---|

Apply 48 fluid ounces of this product in 10 to 40 gallons of water per acre when most plants have reached the boot to early seedhead stage of development. For partial control in pasture or hay crop renovation, apply 24 to 36 fluid ounces of this product in 3 to 10 gallons of water per acre to actively growing target plants when most have reached 4 to 12 inches in height.

| **Blueweed, Texas** | 2.25 – 3.75 | 3 – 40 | 1.5% |
|---|---|---|---|

Apply 3 to 3.75 quarts of this product per acre west of the Mississippi River or 2.25 to 3 quarts per acre east of the Mississippi River when plants are at or beyond full bloom.  For enhanced results, apply in late-summer or fall. Fall application must be made before a killing frost.

| **Brackenfern** | 2.25 – 3.3 | 3 – 40 | 1% |
|---|---|---|---|

Make application to fully expanded fronds that are at least 18 inches long.

| **Bromegrass, smooth** | 0.75 – 1.75 | 3 – 40 | 1.5% |
|---|---|---|---|

Apply 48 fluid ounces of this product in 10 to 40 gallons of water per acre when most plants have reached the boot to early-seedhead stage of development. For partial control in pasture or hay crop renovation, apply 24 to 36 fluid ounces of this product in 3 to 10 gallons of water per acre to actively growing bromegrass when it has reached a height of 4 to 12 inches.

| **Bursage, woolly-leaf** | – | 3 – 20 | 1.5% |
|---|---|---|---|

For control, apply 48 fluid ounces of this product plus 0.5 pound of dicamba per acre when plants are producing new active growth that has been initiated by moisture for at least 2 weeks and are at or beyond flowering. For partial control, apply 24 fluid ounces of this product per acre in a tank-mix with an appropriate rate of dicamba that will provide partial contro.

| **Canarygrass, reed**[2] | 1.7 – 2.25 | 3 – 40 | 1.5% |
|---|---|---|---|
| **Cattail**[2] | 2.25 – 3.75 | 3 – 40 | 1.5% |

| **Clover; red, white**[1] | 2.25 – 3.75 | 3 – 20 | 1.5% |
|---|---|---|---|

Also for control, apply 12 to 24 fluid ounces of this product in a tank-mix with an appropriate rate of 2,4-D in 3 to 10 gallons of water per acre.

II. DIRECTIONS FOR USE WITH FOOD AND FEED CROPS

| Weed Species | Broadcast Rate (quarts/acre) | Water Volume (gallons/acre) | Handheld Sprayer Concentration (% solution) |
|---|---|---|---|
| **Cogongrass** | 2.25 – 3.75 | 10 – 40 | 1.5% |
| Apply in late-summer or fall when cogongrass is at least 18 inches tall. Due to uneven stages of growth and the dense nature of this vegetation preventing good spray coverage, more than one application might be necessary to achieve control. | | | |
| **Dallisgrass**[2] | 2.25 – 3.75 | 3 – 20 | 1.5% |
| **Dandelion**[1] | 2.25 – 3.75 | 3 – 40 | 1.5% |
| Also for control, apply 12 fluid ounces of this product in a tank-mix with an appropriate rate of 2,4-D in 3 to 10 gallons of water per acre. | | | |
| **Dock, curly**[1] | 2.25 – 3.75 | 3 – 40 | 1.5% |
| Also for control, apply 12 to 24 fluid ounces of this product in a tank-mix with an appropriate rate of 2,4-D, in 3 to 10 gallons of water per acre. | | | |
| **Dogbane, hemp** | 3.5 | 3 – 40 | 1.5% |
| Apply when most target plants have reached the late-bud to flower stage of development. Allow weeds to re-grow to a mature stage prior to application of this product after crop harvest or mowing.  For enhanced results, apply in late-summer or fall.<br><br>For suppression, apply 12 fluid ounces of this product in a tank-mix with an appropriate rate of 2,4-D in 3 to 10 gallons of water per acre using ground application equipment, or in 3 to 5 gallons of water per acre using aerial application equipment.  Delay application until maximum emergence of dogbane has occurred. | | | |
| **Fescue (except tall)**[2] | 2.25 – 3.75 | 3 – 20 | 1.5% |
| **Fescue, tall** | 0.75 – 2.25 | 3 – 40 | 1.5% |
| Apply 2.25 quarts of this product per acre when most tall fescue has reached the boot to early-seedhead stage of development.<br><br>For fall application, apply 24 fluid ounces of this product in 3 to 10 gallons of water per acre when plants have 6 to 12 inches of new growth.  A sequential application of 12 fluid ounces of this product per acre will improve long-term control and will control seedlings germinating after fall application or in the following spring. | | | |
| **Guineagrass** | 1.5 – 2.25 | 3 – 40 | 0.75% |
| Apply when most target plants have reached the 7-leaf stage of growth. Ensure thorough coverage when using a handheld sprayer. In Texas and the ridge of Florida, apply 48 fluid ounces of this product per acre for control. In the flatwoods region of Florida, 2.25 quarts per acre is needed for control. | | | |
| **Horsenettle**[1] | 2.25 – 3.75 | 3 – 20 | 1.5% |
| **Horseradish** | 3 | 3 – 40 | 1.5% |
| Apply when most plants have reached the late-bud to flower stage of growth. For enhanced results, apply in late-summer or fall. | | | |
| **Iceplant**[1] | – | – | 1.5 - 2% |
| Thorough coverage of the target weed with this product will provide enhanced control. | | | |
| **Jerusalem artichoke**[1] | 2.25 – 3.75 | 3 – 20 | 1.5% |
| **Johnsongrass** | 0.4 – 2.25 | 3 – 40 | 1% |
| In annual cropping systems, apply 24 to 48 fluid onces of this product in 3 to 10 gallons of water per acre. Use 48 fluid ounces of this product when applying in 10 to 40 gallons of water per acre. On non-crop sites or in areas where annual tillage is not practiced (no-till), apply 48 to 72 fluid ounces of this | | | |

II. DIRECTIONS FOR USE WITH FOOD AND FEED CROPS

| Weed Species | Broadcast Rate (quarts/acre) | Water Volume (gallons/acre) | Handheld Sprayer Concentration (% solution) |
|---|---|---|---|

product in 10 to 40 gallons of water per acre.

For enhanced results, apply when most johnsongrass has reached the boot to head stage of development or in the fall prior to frost. Allow a minimum of 7 days after application before tillage.  Do not tank-mix with residual herbicides when applying 24 fluid ounces of this product per acre.

For burndown of johnsongrass, apply 12 fluid ounces of this product in 3 to 10 gallons of water per acre before plants reach a height of 12 inches and allow a minimum of 3 days after application before tillage.

For partial control or suppression, apply a 0.75-percent solution of this product as a spot treatment when johnsongrass is 12 to 18 inches tall. Ensure that coverage is uniform and complete.

| | | | |
|---|---|---|---|
| **Kikuyu grass** | 1.5 – 2.25 | 3 – 40 | 1.5% |

Apply when most kikuyu grass is at least 8 inches tall (3- or 4-leaf stage of growth).  Allow a minimum of 3 days after application before tillage.

| | | | |
|---|---|---|---|
| **Knapweed** | 3 | 3 – 40 | 1.5% |

Apply when most target plants have reached the late-bud to flower stage of growth. For enhanced results, apply in late-summer or fall.

| | | | |
|---|---|---|---|
| **Lantana** | – | – | 1% |

Apply at or beyond the bloom stage of growth.

| | | | |
|---|---|---|---|
| **Lespedeza**[1] | 2.25 – 3.75 | 3 – 20 | 1.5% |
| **Milkweed, common** | 2.25 | 3 – 40 | 1.5% |

Apply when most target plants have reached the late-bud to flower stage of growth.

| | | | |
|---|---|---|---|
| **Muhly, wirestem** | 0.75 – 1.75 | 3 – 40 | 1.5% |

Apply 24 fluid ounces of this product in 3 to 10 gallons of water per acre, or 48 fluid ounces when applying in 10 to 40 gallons of water per acre or whenever applying in pasture, sod, or non-crop areas, when wirestem muhly is at least 8 inches tall.  Do not till the soil between harvest and fall application, or in the fall or spring prior to spring application. Allow a minimum of 3 days after application before tillage.

| | | | |
|---|---|---|---|
| **Mullein, common**[1] | 2.25 – 3.75 | 3 – 20 | 1.5% |
| **Napiergrass**[2] | 2.25 – 3.75 | 3 – 20 | 1.5% |
| **Nightshade, silverleaf** | 1.5 | 3 – 10 | 1.5% |

For enahnced results, apply when at least 60 percent of the target plants have berries. Fall application must be made before a killing frost.

| | | | |
|---|---|---|---|
| **Nutsedge; purple, yellow** | 0.5 – 2.25 | 3 – 40 | 1 – 1.5% |

For control of nutsedge plants and immature nutlets, apply 2.25 quarts of this product per acre or a 1- to 1.5-percent solution when plants are in flower or when new nutlets can be found at rhizome tips. Nutlets that have not germinated will not be controlled and will need repeated applications of this product after germination for long-term control.

Sequential applications of 24 to 48 fluid ounces of this product in 3 to 10 gallons of water per acre when a majority of the nutsedge plants are in the 3- to 5-leaf stage (less than 6 inches tall) will also provide control.  Repeat this application as necessary when newly emerging plants reach the 3- to 5-leaf stage. Subsequent applications will be necessary for long-term control.

For partial control of existing nutsedge, apply 12 to 48 fluid ounces of this product in 3 to 40 gallons of water per acre when plants have 3 to 5 leaves and most are less than 6 inches tall. Repeat this application as needed to control newly emerging plants or re-growth of existing plants.

II. DIRECTIONS FOR USE WITH FOOD AND FEED CROPS

| Weed Species | Broadcast Rate (quarts/acre) | Water Volume (gallons/acre) | Handheld Sprayer Concentration (% solution) |
|---|---|---|---|
| **Orchardgrass** | 0.75 – 1.75 | 3 – 40 | 1.5% |

Apply 48 fluid ounces of this product in 10 to 40 gallons of water per acre when most plants have reached the boot to early-seedhead stage of development. For partial control in pasture or hay crop renovation, apply 24 to 36 fluid ounces of this product in 3 to 10 gallons of water per acre when orchardgrass is actively growing  and has reached 4 to 12 inches in height.

When going from orchardgrass sod to no-till corn, apply 24 to 36 fluid ounces of this product in 3 to 10 gallons of water per acre to orchardgrass that is a minimum of 12 inches tall for spring application and 6 inches tall for fall application. Allow a minimum of 3 days after application before planting.  A sequential application of atrazine will be necessary to achieve optimum results.

| | | | |
|---|---|---|---|
| **Pampas grass** | – | – | 1.5% |

Apply this product when pampasgrass is at or beyond the boot stage of growth. Thorough coverage will provide ehanced control.

| | | | |
|---|---|---|---|
| **Para grass**[2] | 2.25 – 3.75 | 3 – 20 | 1.5% |
| **Phragmites** | 2.25 – 3.75 | 10 – 40 | 1 – 1.5% |

For partial control and enhanced results, apply this product in late-summer or fall when plants are actively growing and in full bloom. Application before or after this stage could result in reduced control. Due to the dense nature of this vegetation (which can prevent good spray coverage) and uneven stages of growth, more than one application might be necessary to achieve control. Visual symptoms of control will be slow to develop.

| | | | |
|---|---|---|---|
| **Poison hemlock** | – | – | 1 – 1.5% |

Apply this product using a handheld sprayer with a spray-to-wet technique. Optimum results are obtained when thoroughly applied to target plants that are at the bud to full-bloom stage of growth.

| | | | |
|---|---|---|---|
| **Pokeweed, common** | 1.125 | 3 – 40 | 1.5% |

Apply to actively growing target plants up to 24 inches tall.

| | | | |
|---|---|---|---|
| **Quackgrass** | 0.75 – 2.25 | 3 – 40 | 1.5% |

In annual cropping systems or in pastures and sod fields to be cultivated with deep tillage, apply 24 fluid ounces of this product in 3 to 10 gallons of water per acre or 48 fluid ounces in 10 to 40 gallons of water per acre when quackgrass is 6 to 8 inches in height. Do not tank-mix with residual herbicides when using the 24-fluid-ounce rate. Do not till between harvest and fall application, or in the fall or spring prior to spring application. Allow a minimum of 3 days after application before tillage. In pastures or sod fields, use a moldboard plow for enhanced results.

In pastures, sod fields or non-crop areas where deep tillage will not follow application of this product, apply 48 to 68 fluid ounces in 10 to 40 gallons of water per acre when quackgrass is greater than 8 inches tall.

| | | | |
|---|---|---|---|
| **Redvine** | 0.5 – 1.75 | 5 – 10 | 1.5% |

For suppression, make two applications of 18 fluid ounces of this product 7 to 14 days apart, or a single application of 48 fluid ounces, in 5 to 10 gallons of water per acre in late-September or early-October, to plants that are at least 18 inches tall and have been growing 45 to 60 days since the last tillage operation. Apply a minimum of 1 week before a killing frost.

| | | | |
|---|---|---|---|
| **Reed, giant** | – | – | 1.5% |

Enhanced results can be obtained when application is made in late-summer or fall.

| | | | |
|---|---|---|---|
| **Ryegrass, perennial** | 0.75 – 2.25 | 3 – 40 | 0.75% |

In annual cropping systems, apply 24 to 44 fluid ounces of this product in 3 to 10 gallons of water per

II. DIRECTIONS FOR USE WITH FOOD AND FEED CROPS

| Weed Species | Broadcast Rate (quarts/acre) | Water Volume (gallons/acre) | Handheld Sprayer Concentration (% solution) |
|---|---|---|---|

acre, or 48 fluid ounces when applying in 10 to 40 gallons of water per acre.  On non-crop sites or in areas where annual tillage is not practiced (no-till), apply 48 to 72 fluid ounces of this product in 10 to 40 gallons of water per acre.

For enhanced results, apply when most ryegrass has reached the boot to head stage of growth or in the fall prior to frost. Do not tank-mix with residual herbicides when applying 24 fluid ounces of this product per acre.

| | | | |
|---|---|---|---|
| **Smartweed, swamp**[1] | 2.25 – 3.75 | 3 – 40 | 1.5% |

Also for control, apply 12 fluid ounces of this product in a tank-mix with an appropriate rate of 2,4-D in 3 to 10 gallons of water per acre in late-summer or fall.

| | | | |
|---|---|---|---|
| **Sowthistle, perennial** | 1.7 – 2.25 | 3 – 40 | 1.5% |

Apply when most plants are at or beyond the bud stage of growth. After harvest, mowing or tillage in late-summer or fall, allow a minimum of 4 weeks for initiation of active growth and rosette development prior to application of this product.  Fall application must be made before a killing frost. Allow a minimum of 3 days after application before tillage.

| | | | |
|---|---|---|---|
| **Spurge, leafy** | – | – | 1.5% |

For suppression, apply 12 fluid ounces of this product in a tank-mix with an appropriate rate of 2,4-D in 3 to 10 gallons of water per acre in late-summer or fall. If mowing has occurred, delay application until most target plants are 12 inches tall.

| | | | |
|---|---|---|---|
| **Starthistle, yellow** | 1.7 | 10 – 40 | 1.5% |

Enhanced results can be obtained when application is made during the rosette, bolting or early-flower stage.

| | | | |
|---|---|---|---|
| **Sweet potato, wild** | – | – | 1.5% |

For partial control, apply to plants that are at or beyond the bloom stage of growth. More than one application might be needed.

| | | | |
|---|---|---|---|
| **Thistle, artichoke** | – | – | 1.5% |

For partial control, apply when plants are at or beyond the bloom stage of growth. More than one application might be needed.

| | | | |
|---|---|---|---|
| **Thistle, Canada** | 1.7 – 2.25 | 3 – 40 | 1.5% |

Apply when most target plants are at or beyond the bud stage of development. After harvest, mowing or tillage in late-summer or fall, allow a minimum of 4 weeks for initiation of active growth and rosette development prior to application of this product. Fall application must be made before a killing frost.

For suppression in the spring, apply 24 fluid ounces of this product alone or 12 fluid ounces of this product in a tank-mix with an appropriate rate of 2,4-D in 3 to 10 gallons of water per acre when rosette is a minimum of 6 inches in diameter. Application may be made as long as leaves are still green and plants are actively growing.

Allow a minimum of 3 days after application before tillage.

| | | | |
|---|---|---|---|
| **Timothy**[2] | 1.7 – 2.25 | 3 – 40 | 1.5% |
| **Torpedograss** | 3 – 3.75 | 3 – 40 | 1.5% |

For partial control, apply when most target plants are at or beyond the seedhead stage of development. More than one application will be needed to achieve control. Fall application must be made before frost.

| | | | |
|---|---|---|---|
| **Trumpetcreeper** | 1.7 | 5 – 10 | 1.5% |

For partial control, apply in late-September or October when trumpetcreeper is a minimum of 18 inches

II. DIRECTIONS FOR USE WITH FOOD AND FEED CROPS

| Weed Species | Broadcast Rate (quarts/acre) | Water Volume (gallons/acre) | Handheld Sprayer Concentration (% minimum) |
|---|---|---|---|
| tall and has been growing 45 to 60 days since the last tillage operation. Make application a minimum of 1 week before a killing frost. | | | |
| Vaseygrass[2] | 2.25 – 3.75 | 3 – 20 | 1.5% |
| Velvetgrass[2] | 2.25 – 3.75 | 3 – 20 | 1.5% |
| Wheatgrass, western[2] | 1.7 – 2.25 | 3 – 40 | 1.5% |

[1]  Apply when most plants have reached the early-bud stage of development.
[2]  Apply when most plants have reached the early-heading stage of development.

## 16.0   WOODY BRUSH, TREES AND VINES RATE SECTION

Apply this product during full leaf expansion, unless otherwise directed.  Use a higher rate of application or spray solution concentration within a given range for larger plants or in areas of dense vegetative growth.  On vines, use a higher rate of application or spray solution concentration for plants that have reached the woody stage.  Enhanced results can be obtained when application is made in late-summer or fall after fruit formation.

In arid areas, enhanced results can be obtained when application is made in spring to early-summer when brush species are at high moisture content and flowering.

Unless otherwise directed, make broadcast applications in 3 to 40 gallons of water per acre. Ensure thorough coverage when using handheld sprayers. Herbicidal symptoms might not appear prior to frost or senescence following application in the fall.

Allow a minimum of 7 days after application before tillage, mowing or removal of vegetation in the application area.  Repeat applications might be necessary to control plants regenerating from underground parts or seed.  Some autumn color on undesirable deciduous species is acceptable when applying this product, provided no major leaf drop has occurred. Reduced performance could result if fall application is made after a frost.

### WOODY BRUSH, TREES AND VINES RATE TABLE

| Species | Broadcast Rate (quarts/acre) | Handheld Sprayer Concentration (% solution) |
|---|---|---|
| Alder | 2.25 – 3.3 | 1 – 1.5% |
| Ash[1] | 1.75 – 3.75 | 1 – 1.5% |
| Aspen, quaking | 1.75 – 2.25 | 1 – 1.5% |
| Bearmat (Bearclover)[1] | 1.75 – 2.25 | 1 – 1.5% |
| Beech[1] | 1.75 – 3.75 | 1 – 1.5% |
| Birch | 1.75 – 3.75 | 1% |
| Blackberry | 2.25 – 3.3 | 1 – 1.5%. |
| Apply after target plants have reached full leaf maturity. Ehanced results can be obtained when application is made in late-summer or fall.  Apply a 1-percent solution of this product after berries have set or dropped in late-fall.  After leaf drop and until a killing frost or as long as stems are green, apply 2.25 to 3 quarts of this product in 10 to 40 gallons of water per acre. | | |

II. DIRECTIONS FOR USE WITH FOOD AND FEED CROPS

| Species | Broadcast Rate (quarts/acre) | Handheld Sprayer Concentration (% solution) |
|---|---|---|
| **Blackgum** | 1.5 – 3.75 | 1 – 1.5% |
| **Bracken** | 1.5 – 3.75 | 1 – 1.5% |
| **Broom; French, Scotch** | – | 1.5% |
| **Buckwheat, California**[1,2] | – | 1 – 1.5% |
| **Cascara**[1] | 1.5 – 3.75 | 1 – 1.5% |
| **Catsclaw**[1] | – | 1 – 1.5% |
| **Ceanothus**[1] | 1.5 – 3.75 | 1 – 1.5% |
| **Chamise**[2] | – | 1% |
| **Cherry; bitter, black, pin** | 1.5 – 2.25 | 1 – 1.5% |
| **Coyote brush**<br>Apply when at least 50 percent of the new leaves are fully developed. | – | 1.5% |
| **Dogwood**[1] | 1.75 – 3.75 | 1 – 1.5% |
| **Elderberry** | 1.75 – 2.25 | 1% |
| **Elm**[1] | 1.75 – 3.75 | 1 – 1.5% |
| **Eucalyptus**<br>For control of eucalyptus re-sprouts, apply when re-sprouts are 6 to 12 feet tall. Ensure complete coverage. Application to drought-stressed eucalyptus plants will result in less than optimum results. | – | 1.5% |
| **Florida holly (Brazilian Peppertree)**[1] | 1.75 – 3.75 | 1 – 1.5% |
| **Gorse**[1] | 1.75 – 3.75 | 1 – 1.5% |
| **Hasardia**[1,2] | – | 1 – 1.5% |
| **Hawthorn** | 1.75 – 2.25 | 1 – 1.5% |
| **Hazel** | 1.75 – 2.25 | 1% |
| **Hickory**[1] | 1.75 – 3.75 | 1 – 1.5% |
| **Honeysuckle** | 1.75 – 3.3 | 1 – 1.5% |
| **Hornbeam, American**[1] | 1.75 – 3.75 | 1 – 1.5% |
| **Kudzu**<br>More than one application might be needed to achieve control. | 3.3 – 3.75 | 1.5% |
| **Locust, black**[1] | 1.75 – 3.3 | 1 – 1.5% |
| **Madrone re-sprouts**[1]<br>Apply to re-sprouts that are 3 to 6 feet tall. Enhanced results can be obtained with spring or early-summer application. | – | 1.5% |
| **Manzanita**[1] | 1.75 – 3.75 | 1 – 1.5% |
| **Maple, red**<br>Apply a 1.5-percent solution when at least 50 percent of the new leaves are fully developed. For partial control, apply 1.75 to 3.3 quarts of this product per acre. | 1.75 – 3.3 | 1 – 1.5% |
| **Maple, sugar**<br>Apply when at least 50 percent of the new leaves are fully developed. | – | 1 – 1.5% |
| **Monkey flower**[1,2] | – | 1 – 1.5% |

II. DIRECTIONS FOR USE WITH FOOD AND FEED CROPS

| Species | Broadcast Rate (quarts/acre) | Handheld Sprayer Concentration (% solution) |
|---|---|---|
| Oak; black, white[1] | 1.75 – 3.3 | 1 – 1.5% |
| Oak, post | 2.25 – 3.3 | 1 – 1.5% |
| Oak; northern<br>Apply when at least 50 percent of the new pin leaves are fully developed | – | 1 – 1.5% |
| Oak; southern red | 1.75 – 2.25 | 1 – 1.5% |
| Persimmon[1] | 1.75 – 3.75 | 1 – 1.5% |
| Pine | 1.75 – 3.75 | 1 – 1.5% |
| Poison ivy/Poison oak<br>More than one application might be needed to achieve control. Application in the fall must be made before leaves lose green color. | 3 – 3.75 | 1.5% |
| Poplar, yellow[1] | 1.75 – 3.75 | 1 – 1.5% |
| Redbud, eastern | 1.75 – 3.75 | 1 – 1.5% |
| Rose, multiflora<br>Make application prior to leaf deterioration by leaf-eating insects. | 1.75 | 1% |
| Russian olive[1] | 1.75 – 3.75 | 1 – 1.5% |
| Sage, black[2] | – | 1% |
| Sage, white[1] | 1.75 – 3.75 | 1 – 1.5% |
| Sage brush, California[2] | – | 1% |
| Salmonberry | 1.75 – 2.25 | 1% |
| Saltcedar | 1.75 – 3.75 | 1 – 1.5% |
| Sassafras[1] | 1.75 – 3.75 | 1 – 1.5% |
| Sourwood[1] | 1.75 – 3.75 | 1 – 1.5% |
| Sumac; poison, smooth, winged[1] | 1.75 – 3.3 | 1 – 1.5% |
| Sweetgum | 1.75 – 2.25 | 1 – 1.5% |
| Swordfern[1] | 1.75 – 3.75 | 1 – 1.5% |
| Tallowtree, Chinese[2] | – | 1% |
| Tan oak re-sprouts[1]<br>Apply to re-sprouts that are less than 6 feet tall. Enhanced results can be obtained following application in the fall. | – | 1.5% |
| Thimbleberry | 1.75 – 2.25 | 1% |
| Tobacco, tree[1] | – | 1 – 1.5% |
| Trumpetcreeper | 1.75 – 2.25 | 1 – 1.5% |
| Vine maple[1] | 1.75 – 3.75 | 1 – 1.5% |
| Virginia creeper | 1.75 – 3.75 | 1 – 1.5% |
| Waxmyrtle, southern[1] | 1.75 – 3.75 | 1 – 1.5% |
| Willow | 2.25 – 3.3 | 1% |

[1] Partial Control

II. DIRECTIONS FOR USE WITH FOOD AND FEED CROPS

[2] Thorough coverage of foliage is necessary for enhanced results.

## 18.0    LIMIT OF WARRANTY AND LIABILITY

Monsanto Company ("Company") warrants that this product conforms to the chemical description on the label TO THE EXTENT CONSISTENT WITH APPLICABLE LAW, NO OTHER EXPRESS WARRANTY OR IMPLIED WARRANTY OF FITNESS FOR PARTICULAR PURPOSE OR MERCHANTABILITY IS MADE. This warranty is also subject to the conditions and limitations stated herein.

Buyer and all users shall use this product only for the purposes of and in accordance with the Complete Directions for Use label ("Directions") and shall promptly notify this Company of any claims whether based in contract, negligence, strict liability, other tort or otherwise.

To the extent consistent with applicable law, buyer and all users are responsible for all loss, injuries or damage from use or handling which results from conditions beyond the control of this Company, including, but not limited to, incompatibility with products other than those set forth in the Directions, application to or contact with desirable vegetation, crop injury or failure of this product to control weed biotypes which develop resistance to glyphosate, unusual weather, weather conditions which are outside the range considered normal at the application site and for the time period when the product is applied, as well as weather conditions which are outside the application ranges set forth in the Directions, use and/or application in any manner not explicitly set forth in or inconsistent with the Directions, moisture conditions outside the moisture range specified in the Directions, or the presence of products other than those set forth in the Directions in or on the soil, crop or treated vegetation.

This Company does not warrant any product reformulated or repackaged from this product except in accordance with this Company's stewardship requirements and with express written permission from this Company.

[*Optional statement for agricultural-use products, if applicable:* For in-crop (over-the-top) uses on Roundup Ready crops, crop safety and weed control performance are not warranted by Monsanto when this product is used in conjunction with "brown bag" or "bin run" seed saved from previous year's production and replanted.]

TO THE EXTENT CONSISTENT WITH APPLICABLE LAW, THE EXCLUSIVE REMEDY OF THE USER OR BUYER, AND THE LIMIT OF THE LIABILITY OF THIS COMPANY OR ANY OTHER SELLER FOR ANY AND ALL LOSSES, INJURIES OR DAMAGES RESULTING FROM THE USE OR HANDLING OF THIS PRODUCT (INCLUDING CLAIMS BASED IN CONTRACT, NEGLIGENCE, STRICT LIABILITY, OTHER TORT OR OTHERWISE) SHALL BE THE PURCHASE PRICE PAID BY THE USER OR BUYER FOR THE QUANTITY OF THIS PRODUCT INVOLVED, OR, AT THE ELECTION OF THIS COMPANY OR ANY OTHER SELLER, THE REPLACEMENT OF SUCH QUANTITY, OR, IF NOT ACQUIRED BY PURCHASE, REPLACEMENT OF SUCH QUANTITY. TO THE EXTENT CONSISTENT WITH APPLICABLE LAW, IN NO EVENT SHALL THIS COMPANY OR ANY OTHER SELLER BE LIABLE FOR ANY INCIDENTAL, CONSEQUENTIAL OR SPECIAL DAMAGES.

Upon opening and using this product, buyer and all users are deemed to have accepted the terms of this LIMIT OF WARRANTY AND LIABILITY which may not be varied by any verbal or written agreement. If terms are not acceptable, return at once unopened.

[Amplify, Bullet, Certainty, Degree, Degree Xtra, Harness, INTRRO, Lariat, Lasso, Micro-Tech, Monsanto and Vine Design, Outrider, Roundup, Roundup Custom and Design, [*ALTERNATE BRAND NAME and DESIGN*], Roundup Original, Roundup Ready, Roundup Ready 2 Technology, Roundup Ready 2 Yield, Roundup Ready PLUS and Design, Rowel, TripleFLEX, TruFlex, TRUEBLUE ADVANTAGE PROVEN RELIABLE SUPPORTED and Design,  and Warrant] are [registered] trademarks of Monsanto Technology LLC.  All other trademarks are the property of their respective owners.

II. DIRECTIONS FOR USE WITH FOOD AND FEED CROPS

EPA Reg. No. 524-343

In case of an emergency involving this product, call collect, day or night, (314) 694-4000.

©[Year]

Packed for:

MONSANTO COMPANY
800 N. LINDBERGH BLVD.
ST. LOUIS, MISSOURI  63167 USA

[*Insert print plate number*]

---

## III.  DIRECTIONS FOR USE ON AQUATIC AND LISTED TERRESTRIAL SITES

### [**INSERT BRAND NAME**] [Logo]

**Complete Directions for Use**

| GROUP | 9 | HERBICIDE |
|-------|---|-----------|

EPA Reg. No. 524-343

A broad-spectrum postemergence herbicide for aquatic and industrial, turf, ornamental, forestry, roadside, utility rights-of-way, [*Optional text, if applicable:* select crop,] and other listed terrestrial weed control.

(For a complete list of aquatic and terrestrial use sites, see the Directions for Use section of this label.)

[*Optional statement for limited-geography product distribution:* This product is not registered in all states.]

[*Additional optional statements for limited-geography product distribution:* For control of annual and perennial weeds in [*list states and or county-level information, as appropriate, where product is registered and distributed*]. [*Optional text:* *County Distribution:*] [*Optional text:* see inside for details.] [*Optional text:* In [*list states*] this product is distributed in the counties listed below:] [*list counties by state*]

AVOID CONTACT OF THIS HERBICIDE WITH FOLIAGE, [*Optional text:* GREEN] STEMS, EXPOSED NON-WOODY ROOTS OR FRUIT OF CROPS, DESIRABLE PLANTS AND TREES, [*Optional text, if applicable:* EXCEPT AS DIRECTED FOR USE ON ROUNDUP READY® CROPS,] AS SEVERE PLANT INJURY OR DESTRUCTION COULD RESULT.

[*Optional label statement:* Roundup® – Powerful Performance at a Practical Price]

[*Optional label statement:* Roundup Ready PLUS™ – Weed Management Solutions (Logo)]

[*Optional label statement:* TrueBlue Advantage – Proven – Reliable – Supported® (Logo)]

[*Optional label statement:* A member of the Roundup® Family of Herbicides by Monsanto]

[*Optional label statement:* A member of the Roundup® Family of Agricultural Herbicides by Monsanto]

Read the entire label before using this product.

Use only according to label directions.

Not all products listed on this label are registered for use in California.  Check the registration status of each product in California before using.

Read the "LIMIT OF WARRANTY AND LIABILITY" statement at the end of this labeling before buying or using. If terms are not acceptable, return at once unopened.

THIS IS AN END-USE PRODUCT.  MONSANTO COMPANY DOES NOT INTEND AND HAS NOT REGISTERED IT FOR REFORMULATION. SEE INDIVIDUAL CONTAINER LABEL FOR REPACKAGING LIMITATIONS.

**CONTENTS**

1      1.0    INGREDIENTS

2      2.0    IMPORTANT PHONE NUMBERS

3      3.0    PRECAUTIONARY STATEMENTS
            3.1    Hazards to Humans and Domestic Animals

III. DIRECTIONS FOR USE ON AQUATIC AND LISTED TERRESTRIAL SITES

|       | 3.2  | Environmental Hazards |
|       | 3.3  | Physical or Chemical Hazards |
| **4** | **4.0** | **STORAGE AND DISPOSAL** |
| **5** | **5.0** | **PRODUCT INFORMATION** |
| **6** | **6.0** | **WEED RESISTANCE MANAGEMENT** |
|       | 6.1  | Weed Management Practices |
|       | 6.2  | Management of Glyphosate-Resistant Biotypes |
| **7** | **7.0** | **MIXING** |
|       | 7.1  | Mixing with Water |
|       | 7.2  | Surfactant |
|       | 7.3  | Tank Mixtures |
|       | 7.4  | Tank-Mixing Procedure |
|       | 7.5  | Mixing Spray Solution Concentrations |
|       | 7.6  | Ammonium Sulfate [*This section optional in final printed label*] |
|       | 7.7  | Colorants and Dyes |
|       | 7.8  | Drift Reduction Additives |
| **8** | **8.0** | **APPLICATION EQUIPMENT AND TECHNIQUES** |
|       | 8.1  | Spray Drift Management |
|       | 8.2  | Aerial Application Equipment |
|       | 8.3  | Ground Application Equipment |
|       | 8.4  | Handheld Sprayers |
|       | 8.5  | Selective Application Equipment |
|       | 8.6  | Injection Systems |
|       | 8.7  | Controlled Droplet Applicator (CDA) |
| **9** | **9.0** | **AQUATIC AND TERRESTRIAL USE SITES** |
|       | 9.1  | Aquatic Sites |
|       | 9.2  | Terrestrial Sites |
| **10** | **10.0** | **ADDITIONAL SITE MANAGEMENT INFORMATION** |
|       | 10.1 | Forestry, Hardwood and Christmas Tree Site Management |
|       | 10.2 | Native and Wildlife Habitat Management |
|       | 10.3 | Ornamental and Production Nursery Management |
|       | 10.4 | Commercial, Residential and Recreational Area Management |
|       | 10.5 | Pasture Management |
|       | 10.6 | Railroad Management |
|       | 10.7 | Rangeland Management |
|       | 10.8 | Roadside Management |
|       | 10.9 | Utility Management |
| **11** | **11.0** | **CROP USES** [*This section is optional; appropriate subsections added at time of printing*] |
| **12** | **12.0** | **WEEDS CONTROLLED** |
|       | 12.1 | Weed Control, Renovation and Chemical Mowing in Turf |
|       | 12.2 | Annual Weeds |
|       | 12.3 | Perennial Weeds |
|       | 12.4 | Woody Brush, Trees and Vines |
| **13** | **13.0** | **LIMIT OF WARRANTY AND LIABILITY** |
|       | **1.0** | **INGREDIENTS** |

III. DIRECTIONS FOR USE ON AQUATIC AND LISTED TERRESTRIAL SITES

---

ACTIVE INGREDIENT:
*Glyphosate, N-(phosphonomethyl)glycine, in the form of its isopropylamine salt ............................. 53.8%
OTHER INGREDIENTS: ................................................................................................................. 46.2%
                                                                                                                                       100.0%

*Contains 648 grams of the active ingredient glyphosate, in the form of its isopropylamine salt per liter, or 5.4 pounds per U.S. gallon, which is equivalent to 480 grams of the acid, glyphosate, per liter or 4.0 pounds per U.S. gallon (39.9% by weight).

---

[*Optional label text that will be updated at the time of printing, if applicable:* This product is protected by U.S. Patent No.'s [*List appropriate patents*].]

[*Optional label text, if applicable:* Other Patents Pending.]

[*Optional label text, if applicable:* No license granted under any non-U.S. patent(s).]

[*Option to insert reference to a Monsanto Patent Website:* For a list of patents, if any, covering this product or its use, please go to www.monsantotechnology.com.]

## 2.0    IMPORTANT PHONE NUMBERS

1.  FOR PRODUCT INFORMATION OR ASSISTANCE USING THIS PRODUCT, CALL TOLL-FREE,
                                     (800) 332-3111

2.  IN CASE OF AN EMERGENCY INVOLVING THIS PRODUCT OR FOR MEDICAL ASSISTANCE, CALL COLLECT, DAY OR NIGHT,
                                     (314) 694-4000

## 3.0    PRECAUTIONARY STATEMENTS

### 3.1    Hazards to Humans and Domestic Animals

Keep out of reach of children

# CAUTION

DOMESTIC ANIMALS: This product is considered to be relatively nontoxic to dogs and other domestic animals; however, ingestion of this product or large amounts of freshly sprayed vegetation could result in temporary gastrointestinal irritation (vomiting, diarrhea, colic, etc.). If such symptoms are observed, provide the animal with plenty of fluids to prevent dehydration. Call a veterinarian if symptoms persist for more than 24 hours.

---

**Personal Protective Equipment (PPE)**

**Applicators and other handlers must wear:** long-sleeved shirt and long pants, socks and shoes.

Follow manufacturer's instructions for cleaning/maintaining PPE (Personal Protective Equipment). If there are no instructions for washables, use detergent and hot water. Keep and wash PPE separately from other laundry.

---

**User Safety Recommendations:**

Users should:

• Wash hands before eating, drinking, chewing gum, using tobacco, or using the toilet.

• Remove clothing immediately if pesticide gets inside.  Then wash thoroughly and put on clean clothing.

---

III. DIRECTIONS FOR USE ON AQUATIC AND LISTED TERRESTRIAL SITES

### 3.2    Environmental Hazards

Killing aquatic weeds can result in depletion or loss of oxygen in the water due to decomposition of dead plant material.  This oxygen loss can cause fish suffocation.  Consult with your State agency with primary responsibility for regulating pesticides before applying to public waters to determine if a permit is required.  For terrestrial uses, do not apply directly to water, to areas where surface water is present or to intertidal areas below the mean high-water mark [*Optional text, if applicable*: , except if applying aerially over the forest canopy].   Do not contaminate water when cleaning equipment or disposing of equipment wash waters and rinsate.

[*Alternative text for labels with aquatic uses only:*  Killing aquatic weeds can result in depletion or loss of oxygen in the water due to decomposition of dead plant material.  This oxygen loss can cause fish suffocation.  Consult with your State agency with primary responsibility for regulating pesticides before applying to public waters to determine if a permit is required.  Do not contaminate water when cleaning equipment or disposing of equipment wash waters and rinsate.]

### 3.3    Physical or Chemical Hazards

Spray solutions of this product may be mixed, stored and applied using stainless steel, fiberglass, plastic or plastic-lined steel containers.

DO NOT MIX, STORE OR APPLY THIS PRODUCT OR SPRAY SOLUTIONS OF THIS PRODUCT IN GALVANIZED STEEL OR UNLINED STEEL (EXCEPT STAINLESS STEEL) CONTAINERS OR SPRAY TANKS. This product or spray solutions of this product react with such containers and tanks to produce hydrogen gas, which can form a highly combustible gas mixture. This gas mixture could flash or explode if ignited by open flame, spark, welder's torch, lighted cigarette or other ignition source and cause serious personal injury.

---

### DIRECTIONS FOR USE

It is a violation of Federal law to use this product in any manner inconsistent with its labeling. This product may only be used in accordance with the Directions for Use on this label or on separately published supplemental labeling. Supplemental labeling for this product can be obtained from your Authorized Monsanto Retailer or Monsanto Company Representative.

[*The following paragraph is reserved and will only appear on final printed labeling for products under this registration if and when required by EPA:*

ENDANGERED SPECIES PROTECTION REQUIREMENTS: This product may have effects on federally listed threatened or endangered species or their critical habitat in some locations. When using this product, you must follow the measures contained in the Endangered Species Protection Bulletin for the county or parish in which you are applying the pesticide. To determine whether your county or parish has a Bulletin, and to obtain that Bulletin, consult http://www.epa.gov/espp/,or call 1-800-447-3813 no more than 6 months before using this product. Applicators must use Bulletins that are in effect in the month in which the pesticide will be applied. New Bulletins will generally be available from the above sources 6 months prior to their effective dates.]

Do not apply this product in a way that will contact workers or other persons, either directly or through drift. Only protected handlers may be in the area during application.  For any requirements specific to your State or Tribe, consult the agency responsible for pesticide regulation.

### Agricultural Use Requirements

Use this product only in accordance with its labeling and with the Worker Protection Standard, 40 CFR Part 170. This Standard contains requirements for the protection of agricultural workers on farms, forests, nurseries, and greenhouses, and handlers of agricultural pesticides. It contains requirements for training,

III. DIRECTIONS FOR USE ON AQUATIC AND LISTED TERRESTRIAL SITES

decontamination, notification, and emergency assistance. It also contains specific instructions and exceptions pertaining to the statements on this label about personal protective equipment (PPE) and restricted entry interval. The requirements in this box only apply to uses of this product that are covered by the Worker Protection Standard.

Do not enter or allow worker entry into treated areas during the restricted entry interval (REI) of 4 hours.

PPE required for early entry to treated areas that is permitted under the Worker Protection Standard and that involves contact with anything that has been treated, such as plants, soil, or water, is: coveralls, shoes plus socks, and chemical-resistant gloves made of any waterproof material.

---

**Non-Agricultural Use Requirements**

The requirements in this box apply to uses of this product that are NOT within the scope of the Worker Protection Standard for agricultural pesticides (40 CFR Part 170). The WPS applies when this product is used to produce agricultural plants on farms, forests, nurseries or greenhouses.

Keep people and pets off treated areas until spray solution has dried.

---

## 4.0    STORAGE AND DISPOSAL

Proper pesticide storage and disposal are essential to protect against exposure to people and the environment due to leaks and spills, excess product or waste, and vandalism. Do not allow this product to contaminate water, foodstuffs, feed or seed by storage and disposal.

**PESTICIDE STORAGE:** STORE ABOVE 5°F (-15°C) TO KEEP PRODUCT FROM CRYSTALLIZING. Crystals will settle to the bottom.  If allowed to crystallize, warm to 68°F (20°C) to redissolve and roll or shake container or recirculate contents of larger containers to mix well before using. Store pesticides away from food, pet food, feed, seed, fertilizers, and veterinary supplies.  Keep container closed to prevent spills and contamination.  See individual container label for additional storage conditions, if any.

**PESTICIDE DISPOSAL:** To avoid wastes, use all material in the container, including rinsate, by application according to label directions.  If wastes cannot be avoided, offer remaining product to a waste disposal facility or pesticide disposal program. Such programs are often run by state or local governments or by industry.  All disposal must be in accordance with applicable federal, state and local regulations and procedures.

**CONTAINER HANDLING AND DISPOSAL:** [*Optional label text, if applicable:* See container label for container handling and disposal instructions and refilling limitations.]   [*Alternative optional text for ECL label:*  See base label attached to the container for container handling and disposal instructions and refilling limitations.]

---

[*CONTAINER HANDLING AND DISPOSAL STATEMENT AND REFILLING LIMITATION FOR NONREFILLABLE RIGID CONTAINERS OF LESS THAN 1-GALLON CAPACITY*]

Nonrefillable container.  Do not reuse or refill the container.

[*Alternative container statement:* Nonrefillable container.  Do not reuse the container to hold materials other than pesticides or dilute pesticides (rinsate).  After emptying and cleaning, it may be allowable to temporarily hold rinsate or other pesticide-related materials in the container. Contact your state regulatory agency to determine allowable practices in your state.]

Triple rinse the container promptly after emptying.

Triple rinse as follows:  Empty the remaining contents into application equipment or mix-tank and continue to drain for 10 seconds after the flow begins to drip.  Fill the container ¼ full with water and

---

III. DIRECTIONS FOR USE ON AQUATIC AND LISTED TERRESTRIAL SITES

recap. Shake for 10 seconds. Pour rinsate into application equipment or mix-tank, or store rinsate for later use or disposal. Continue to drain for 10 seconds after the flow begins to drip. Repeat this procedure two more times.

Once properly rinsed, some plastic [*Optional text:* agricultural] pesticide containers can be taken to a container collection site or picked up for recycling. [*Alternative container disposal statement:* Then offer the container for recycling, if available.]

[*Optional container disposal statement:* To find the nearest collection site, contact your chemical dealer or Monsanto Company at 1-800-768-6387] [*Alternative telephone numbers:* 1-800-ROUNDUP (1-800-768-6387)].

If recycling is not available, dispose of in accordance with federal, state and local regulations and procedures, which may include puncturing the properly rinsed container and disposing in a sanitary landfill.

---

[*CONTAINER HANDLING AND DISPOSAL STATEMENT AND REFILLING LIMITATION FOR NONREFILLABLE RIGID PLASTIC 2.5-GALLON CONTAINER AND OTHER NONREFILLABLE CONTAINERS OF GREATER THAN 1-GALLON, BUT EQUAL TO OR LESS THAN 5-GALLON CAPACITY*]

Nonrefillable container. Do not reuse the container to hold materials other than pesticides or dilute pesticides (rinsate). After emptying and cleaning, it may be allowable to temporarily hold rinsate or other pesticide-related materials in the container. Contact your state regulatory agency to determine allowable practices in your state.

[*Alternative container statement:* Nonrefillable container. Do not reuse or refill the container.]

Triple rinse or pressure rinse (or equivalent) the container promptly after emptying.

Triple rinse as follows: Empty the remaining contents into application equipment or mix-tank and continue to drain for 10 seconds after the flow begins to drip. Fill the container ¼ full with water and recap. Shake for 10 seconds. Pour rinsate into application equipment or mix-tank, or store rinsate for later use or disposal. Continue to drain for 10 seconds after the flow begins to drip. Repeat this procedure two more times.

Pressure rinse as follows: Empty the remaining contents into application equipment or mix-tank and continue to drain for 10 seconds after the flow begins to drip. Place container so that it can drain directly into application equipment or mix-tank while rinsing, or collect rinsate for later use or disposal. Insert pressure rinsing nozzle into the side of the container and rinse at about 40 PSI for at least 30 seconds. Continue to drain for 10 seconds after the flow begins to drip.

Once properly rinsed, some plastic [*Optional text:* agricultural] pesticide containers can be taken to a container collection site or picked up for recycling. [*Alternative container disposal statement:* Then offer this container for recycling, if available.]

[*Optional container disposal statement:* To find the nearest collection site, contact your chemical dealer or Monsanto Company at 1-800-768-6387] [*Alternative telephone numbers:* 1-800-ROUNDUP (1-800-768-6387)].

If recycling is not available, dispose of in accordance with federal, state and local regulations and procedures, which may include puncturing the properly rinsed container and disposing in a sanitary landfill.

---

III. DIRECTIONS FOR USE ON AQUATIC AND LISTED TERRESTRIAL SITES

[*CONTAINER HANDLING AND DISPOSAL STATEMENT AND REFILLING LIMITATION FOR NONREFILLABLE RIGID PLASTIC 30-GALLON CONTAINER AND OTHER NONREFILLABLE CONTAINERS OF GREATER THAN 5-GALLON CAPACITY*]

Nonrefillable container.  Do not reuse or refill the container.

[*Alternative container statement:* Nonrefillable container. Do not reuse the container to hold materials other than pesticides or dilute pesticides (rinsate).  After emptying and cleaning, it may be allowable to temporarily hold rinsate or other pesticide-related materials in the container. Contact your state regulatory agency to determine allowable practices in your state.]

Triple rinse or pressure rinse (or equivalent) the container promptly after emptying.

[*Optional label text:* For containers not equipped with pumping systems,] Triple rinse as follows: Empty the remaining contents into application equipment or mix-tank.  Fill the container ¼ full with water. Replace and tighten closures.  Tip the container on its side and roll it back and forth for 30 seconds, ensuring at least one complete revolution.  Stand the container on its end and tip it back and forth several times.  Turn the container over onto its other end and tip it back and forth several times.  Empty the rinsate into application equipment or mix-tank, or store rinsate for later use or disposal.  Repeat this procedure two more times.

[*Alternative or additional triple rinsing instructions for large containers equipped with pumping systems:* [*Optional label text:* For large containers equipped with pumping systems,] Triple rinse as follows: Empty the remaining contents into application equipment or mix-tank.  Fill the container about 10 percent full with water.  Agitate vigorously or recirculate water with the pump for 2 minutes.  Pour or pump rinsate into application equipment or rinsate collection system.  Repeat this rinsing procedure two more times. Repeat this procedure two more times.]

Pressure rinse as follows: Empty the remaining contents into application equipment or mix-tank and continue to drain for 10 seconds after the flow begins to drip. Place container so that it can drain directly into application equipment or mix-tank while rinsing, or collect rinsate for later use or disposal.  Insert pressure rinsing nozzle into the side of the container and rinse at about 40 PSI for at least 30 seconds. Continue to drain for 10 seconds after the flow begins to drip.

Once properly rinsed, some plastic [*Optional text:* agricultural] pesticide containers can be taken to a container collection site or picked up for recycling.  [*Alternative container disposal statement:* Then offer the container for recycling, if available.]

[*Optional container disposal statement:* Some container manufacturers offer container recycling. See additional information regarding manufacturer recycling programs attached to the container, if available. If no recycling information is available on the container, contact your chemical dealer or Monsanto Company at 1-800-768-6387 [*Alternative telephone numbers:* 1-800-ROUNDUP (1-800-768-6387)] to find the nearest recycling location.]

[*Optional container disposal statement:* To find the nearest collection site, contact your chemical dealer or Monsanto Company at 1-800-768-6387] [*Alternative telephone numbers:* 1-800-ROUNDUP (1-800-768-6387)]].

If recycling is not available, dispose of in accordance with federal, state and local regulations and procedures, which may include puncturing the properly rinsed container and disposing in a sanitary landfill.

[*Optional additional container disposal statement:* Return Properly Rinsed Container to Monsanto for Recycling – Call 1-800-768-6387 [*Alternative telephone numbers:* 1-800-ROUNDUP (1-800-768-6387)]]

[*Optional additional container disposal statement:*  IBC EMPTY? – FREE CALL – 1-888-SCHUETZ (1-888-724-8389) www.schuetz.net/ticket; Schuetz ticket service]

III. DIRECTIONS FOR USE ON AQUATIC AND LISTED TERRESTRIAL SITES

---

[*Optional additional container disposal statement:*  FREE IBC PICKUP] [For continental USA and Canada only]

[*Optional additional container disposal statement:*  RETURNnet SYSTEM – To return empty IBC's Email or Call – www.returnnetsystem.com – 1-888-758-SHIP – United States and Canada (1-888-758-7447 – IBCNA – Clarkston, Michigan – USA]

---

[*CONTAINER HANDLING AND DISPOSAL STATEMENT AND REFILLING LIMITATION FOR ALL REFILLABLE CONTAINERS, EXCEPT TRANSPORT VEHICLES*]

Refillable container.  Refill the container with pesticide only.  Do not reuse the container for any other purpose.

Cleaning the container before refilling is the responsibility of the refiller. Cleaning the container before final disposal is the responsibility of the person disposing of the container.

To clean the container before final disposal, empty the remaining contents from this container into application equipment or mix-tank.  Fill the container about 10 percent full with water.  Agitate vigorously or recirculate water with the pump for 2 minutes.  Pour or pump rinsate into application equipment or rinsate collection system.  Repeat this rinsing procedure two more times.

[*Optional container disposal statement:* Then offer this container for recycling, if available.]

[*Optional container disposal statement:* Some container manufacturers offer container recycling. See additional information regarding manufacturer recycling programs attached to this container, if available. If no recycling information is available on this container, contact your chemical dealer or Monsanto Company at 1-800-768-6387 [*Alternative telephone numbers:* 1-800-ROUNDUP (1-800-768-6387)] to find the nearest recycling location.]

[*Optional additional container disposal statement:*  IBC EMPTY? – FREE CALL – 1-888-SCHUETZ (1-888-724-8389) www.schuetz.net/ticket; Schuetz ticket service]

[*Optional additional container disposal statement:*  FREE IBC PICKUP] [For continental USA and Canada only]

[*Optional additional container disposal statements:*  RETURNnet SYSTEM – To return empty IBC's Email or Call – www.returnnetsystem.com – 1-888-758-SHIP – United States and Canada (1-888-758-7447 – IBCNA – Clarkston, Michigan – USA]

[*Optional container disposal statement:* To obtain information about recycling refillable containers, contact Monsanto Company at 1-800-768-6387 [*Alternative telephone numbers:* 1-800-ROUNDUP (1-800-768-6387)].]

[*Optional container disposal statement:* Return Properly Rinsed Container to Monsanto for Recycling – Call 1-800-768-6387 [*Alternative telephone numbers:* 1-800-ROUNDUP (1-800-768-6387)]]

---

## 5.0    PRODUCT INFORMATION

**Product Description:** This product is a postemergence, systemic herbicide that, when mixed in the spray tank with a surfactant that is approved for aquatic use, may be used for both aquatic and terrestrial weed control.  This product provides broad-spectrum control of many annual and perennial weeds, woody brush, trees and vines.  This product does not control submerged weeds or provide residual weed control in soil.  It is formulated as a water-soluble liquid that, unless otherwise directed, requires dilution with water or another carrier and the addition of a surfactant according to label directions and intended use site before application using standard and specialized pesticide application equipment.

III. DIRECTIONS FOR USE ON AQUATIC AND LISTED TERRESTRIAL SITES

**Mechansim of Action:** The active ingredient in this product inhibits an enzyme found only in plants and microorganisms that is essential to the formation of specific amino acids.

**No Soil Activity:** This product binds tightly to soil particles and does not provide residual weed control. Weeds must be emerged at the time of application to be controlled by foliar application of this product. Weed seeds in the soil will not be affected by this product and will continue to germinate. Unattached plant rhizomes and rootstocks beneath the soil surface will also not be affected by this product.

**Biological Degradation:** Degradation of this product is primarily a biological process carried out by soil microbes.

**Stage of Weeds:** Aquatic weeds must have foliage above the water surface in order to be controlled by this product.  On terrestrial sites, annual and perennial weeds are easiest to control when they are small. See the "WEEDS CONTROLLED" section of this label for more information on the control of specific weeds.

**Cultural Considerations:** Reduced weed control could result when this product is applied to annual or perennial weeds that have been mowed, grazed or cut, and have not been allowed to re-grow prior to application.  Always use the highest application rate of this product within the given range when weed growth is heavy or dense, or when weeds are growing in an undisturbed (non-cultivated) area. Reduced weed control could result when this product is applied to weeds that show signs of disease or insect damage, are covered with dust, or are surviving under poor growing conditions.

**Spray Coverage:** For enhanced results, spray coverage must be uniform and complete. Do not spray foliage to the point of runoff.

**Rainfastness:**  Rainfall or submersion of aquatic weeds by wave action within 4 hours of application could wash this product off of the foliage and a second application might be needed for acceptable weed control.  Refer to specific use sections of this label for additional information on minimum intervals required before re-application of this product.

**Time to Symptoms:** This product moves through the plant from the point of foliage contact to and into the root system. Visible effects are a gradual wilting and yellowing of the plant that advances to complete browning of aboveground growth and deterioration of underground plant parts.  Effects are visible on most annual weeds within 2 to 4 days, but on most perennial weeds, effects might not be visible for 7 or more days after application. Extremely cool or cloudy weather following application could slow activity of this product and delay development of visual symptoms.

**Maximum Application Rates:** The maximum application or use rates stated throughout this label are given in units of volume (fluid ounces or quarts) of this product per acre.  However, the maximum allowable application rates apply to this product combined with the use of any and all other herbicides containing the active ingredient glyphosate, whether applied separately or in a tank mixture, on a basis of total pounds of glyphosate (acid equivalents) per acre. If more than one glyphosate-containing product is applied to the same site within the same year, you must ensure that the total use of glyphosate (pounds acid equivalents) does not exceed the maximum allowed. See the "INGREDIENTS" section of this label for necessary product information.

Unless otherwise specified on this label, the combined total of all applications of this product on a site must not exceed 8 quarts (8 pounds of glyphosate acid) per acre per year.

**NOTE:** Use of this product in any manner not consistent with this label could result in injury to persons, animals, crops or other desirable vegetation, or have other unintended consequences.

**6.0    WEED RESISTANCE MANAGEMENT**

| GROUP | 9 | HERBICIDE |
|-------|---|-----------|

III. DIRECTIONS FOR USE ON AQUATIC AND LISTED TERRESTRIAL SITES

Glyphosate, the active ingredient in this product, is a Group 9 herbicide based on the mechanism of action classification system of the Weed Science Society of America. Any weed population can contain plants that are naturally resistant to Group 9 herbicides. Weeds resistant to Group 9 herbicides can be effectively managed by using another herbicide from a different Group (either alone or in a mixture according to label directions), by using other cultural or mechanical methods of weed control, or a combination of the two.  Consult your local company representative, state cooperative extension agent, professional consultant or other qualified authority to determine appropriate actions for controlling specific resistant weeds.

**6.1    Weed Management Practices**

Resistant populations arise when rare individual plants are uncontrolled by a normal dose of a given herbicide under normal environmental conditions. In the absence of other control measures these individuals survive, produce seed, and eventually become the dominant biotype in the field through continuous selection.  The best means of reducing this selection is to use diverse weed control practices such as multiple herbicides with different mechanisms of action, and often in combination with various mechanical and cultural practices.

To minimize the occurrence of herbicide-resistant biotypes, including those resistant to glyphosate, implement the following weed management practice options that are practical to your situation.  These management practices are applicable to reduce the spread of confirmed resistant biotypes (managing existing resistant biotypes) and to reduce the potential for selecting for resistance in new species (proactive resistance management).

- Use a diversified approach toward weed management focused on preventing weed seed production and reducing the number of weed seeds in the soil.

- Plant crops into fields that are as weed-free as possible and then keep them as weed-free as possible.

- Plant seed that is as weed-free as possible.

- Scout fields and application sites routinely, before and after herbicide application.

- Use multiple herbicide mechanisms of action that are effective against the most troublesome weeds at your application site and against those with known resistance.

- Apply herbicides at application rates listed on the label when weeds are within the size range indicated on the label.

- Emphasize cultural practices that suppress weeds by using crop competitiveness.

- Use mechanical and biological weed management practices, where appropriate.

- Prevent field-to-field and within-field movement of weed seed or vegetative propagules.

- Manage weed seed at harvest and after harvest to prevent a buildup of the weed seedbank.

**6.2    Management of Glyphosate-Resistant Biotypes**

Appropriate testing is needed to determine if a weed is resistant to glyphosate. Call 1-800-768-6387 [*Alternative telephone numbers:* 1-800-ROUNDUP (1-800-768-6387)] or contact your Monsanto Company representative to determine if resistance in any particular weed biotype has been confirmed in your area, or visit on the Internet at www.weedresistancemanagement.com or www.weedscience.org.

Glyphosate-resistant weeds can be controlled or managed by applying this product in combination with residual preemergence herbicides and/or other postemergence herbicides labeled for control of the targeted weed in the crop being grown or on the site of application. For more information, see the "WEEDS CONTROLLED" section of this label.

III. DIRECTIONS FOR USE ON AQUATIC AND LISTED TERRESTRIAL SITES

Since the occurrence of resistant weeds is difficult to detect prior to use, Monsanto Company accepts no liability for any losses that result from the failure of this product to control resistant weeds.

## 7.0    MIXING

Spray solutions of this product may be mixed, stored and applied using clean stainless steel, fiberglass, plastic or plastic-lined steel containers.

DO NOT MIX, STORE OR APPLY THIS PRODUCT OR SPRAY SOLUTIONS OF THIS PRODUCT IN GALVANIZED STEEL OR UNLINED STEEL (EXCEPT STAINLESS STEEL) CONTAINERS OR SPRAY TANKS.

Eliminate any risk of siphoning the contents of the tank back into the carrier source while mixing. Use approved anti-back-siphoning devices where required by state or local regulations.

A 50-mesh nozzle screen or line strainer on the spray equipment is adequate.

Clean sprayer parts promptly after using this product by thoroughly flushing with water.

### 7.1    Mixing with Water

PERFORMANCE OF THIS PRODUCT CAN BE SIGNIFICANTLY REDUCED IF WATER CONTAINING SOIL SEDIMENT IS USED AS CARRIER. DO NOT MIX THIS PRODUCT WITH WATER FROM PONDS OR DITCHES THAT IS VISIBLY MUDDY OR MURKY.

This product mixes readily with water. Mix spray solutions of this product as follows. Begin filling the mixing tank or spray tank with clean water. Add the required amount of this product near the end of the filling process and mix gently.    Foaming of the spray solution can occur during mixing. To prevent or minimize foaming, mix gently, terminate by-pass and return lines at the bottom of the tank and, if necessary, add an appropriate anti-foam or defoaming agent to the spray solution.

### 7.2    Surfactant

Unless otherwise directed, this product requires the addition of 2 or more quarts of a nonionic surfactant that is labeled for use with herbicides [*Optional label text, if applicable:* and approved for aquatic use] per 100 gallons of spray solution (0.5% or more by volume).   Unless otherwise directed, use a higher concentration of surfactant when any of the following conditions apply to the use of this product:

- Adding surfactants that contain less than 70 percent active ingredient
- Making a broadcast application using a high carrier volume or using handheld spray equipment
- Applying under adverse growing conditions or anytime weeds are under stress
- Applying as a tank-mix with other products
- Applying to hard-to-control weeds, woody brush, trees and vines

[*Optional label text to be used if surfactants that are not approved for aquatic use are allowed with this product:* **NOTE:** For direct application of spray solutions of this product on emerged aquatic weeds or for use in intertidal areas below the mean high-water mark, or in application areas where a buffer that will ensure no overspray of an adjacent body of water cannot be maintained, a surfactant that is also approved for aquatic use must be used.  For terrestrial applications, surfactant is also needed in the spray solution, but does not have to be approved for aquatic use.]

[*Optional label text to be used if surfactants that are not approved for aquatic use are allowed with this product:* RESTRICTION:  If a surfactant that is NOT approved for aquatic use is added to the spray solution, DO NOT apply directly to or over water or use in intertidal areas below the mean high-water mark.]

III. DIRECTIONS FOR USE ON AQUATIC AND LISTED TERRESTRIAL SITES

Check with your local State agency with primary responsibility for regulating pesticides for additional information about surfactants that are approved for aquatic use.

Read and follow all precautionary statements and directions for use on the surfactant label.

All reference throughout this label to concentration of surfactant in the spray solution is on a percentage-of-volume basis.  Refer to the table below to achieve the appropriate concentration of surfactant in the spray solution.

| Desired Volume of Spray Solution | Amount of Surfactant to Achieve Indicated Concentration in Spray Solution (percent by volume) | | | | | |
|---|---|---|---|---|---|---|
| | 0.5% | 0.75% | 1% | 1.5% | 4% | 8% |
| 1 gallon | 2/3 fl oz | 1 fl oz | 1.3 fl oz | 2 fl oz | 5 fl oz | 10 fl oz |
| 25 gallons | 16 fl oz | 24 fl oz | 1 qt | 1.5 qts | 4 qts | 2 gals |
| 100 gallons | 2 qts | 3 qts | 1 gal | 1.5 gals | 4 gals | 8 gals |

2 tablespoons = 1 fluid ounce (fl oz)

### 7.3    Tank Mixtures

This product does not provide residual weed control. This product may be tank-mixed with other herbicides to provide residual weed control in the soil, a broader weed control spectrum or an alternative mechanism of action.

NOT ALL TANK-MIX PRODUCTS LISTED ON THIS LABEL ARE APPROVED FOR USE ON AQUATIC SITES.  Refer to each individual label for all products in the tank mixture for approved use sites and application rates.

When a tank-mix with a generic active ingredient, such as 2,4-D or dicamba, or any other product or material, is listed on this label, the user is responsible for ensuring that the specific application being made and the use site is included on the label of the product used in the mix.

Monsanto Company has not tested all tank-mix product formulations for compatibility, antagonism or reduction in product performance.  Mixing this product with herbicides or other materials not specified on this label could result in reduced performance of this product.  To the extent consistent with applicable law, buyer and all users are responsible for any loss or damage in connection with the use or handling of mixtures of this product with herbicides or other materials that are not expressly specified on this label, or on separate supplemental labeling or Fact Sheets published for this product.

Refer to all individual product labels, supplemental labeling and Fact Sheets for all products in the tank mixture, and observe all precautions and limitations on the label, including any application timing restrictions, soil restrictions, minimum re-cropping intervals and/or crop rotation restrictions. Use according to the most restrictive precautionary statements for each product in the tank mixture.

This product may be applied at any rate listed on this label in a tank mixture with the following products to provide preemergence and/or improved postemergence control of weeds listed on the individual product labels.

---

2,4-D; atrazine; dicamba; bromacil; diuron; imazapyr; metsulfuron methyl; oryzalin; pendimethalin, prodiamine; simazine; sulfosulfuron; trichlopyr

Arsenal; Arsenal Herbicide Applicators Concentrate; Banvel; Banvel 480; Barricade 4L; Barricade 65WG; Certainty® Turf; Chopper Gen2; Crossbow; Endurance; Escort XP; Forestry Garlon 4 Specialty; Forestry Garlon XLT Specialty; Gallery SC; Gallery 75 Dry Flowable Specialty; Garlon

III. DIRECTIONS FOR USE ON AQUATIC AND LISTED TERRESTRIAL SITES

3A Specialty; Garlon 4 Specialty; Garlon 4 Ultra Specialty; Goal 2XL; GoalTender; Habitat; Hyvar X; Hyvar X-L; Karmex DF; Krenite S Brush Control Agent; Krovar I DF; Landmark; Landmark XP; Oust Extra; Oust XP; Outrider®; Plateau; Poast; Poast Plus; Ronstar 50 WSP; Ronstar Flo; Ronstar G; Sahara DG; Spike 20P Specialty; Spike 80 DF Specialty; Stalker; Surflan AS Specialty; Surflan Flex; Surflan Flex T&O; Surflan XL 2G; Surflan Pro; Telar XP; Tordon 101 Mixture Specialty; Tordon 22K Specialty; Tordon K Herbicide Specialty; Transline Specialty; Vanquish; Velpar DF CU; Velpar DF VU; Velpar L CU; Velpar L; Velpar L VU

When used in combination as described on this label and to the extent consistent with applicable law, the liability of Monsanto shall in no manner extend to any damage, loss or injury not solely and directly caused by the inclusion of the Monsanto product in such combination use.

**7.4    Tank-Mixing Procedure**

Always predetermine the compatibility of all tank-mix products in the carrier by mixing small proportional quantities in advance.

Add individual tank-mix components to the tank as follows: wettable powders; flowables; emulsifiable concentrates; drift reduction additives; water soluble liquids (this product); nonionic surfactants. Ensure that the tank-mix products are well mixed in the spray solution before adding this product.

Mix only the quantity of spray solution that will be applied that day.  Application of tank-mix solutions that are allowed to stand overnight could result in reduced weed control.

Maintain gentile agitation at all times until the contents of the tank are sprayed out. If the spray mixture is allowed to settle, agitate thoroughly to resuspend the mixture before resuming application.

Keep by-pass line on or near the bottom of the tank to minimize foaming.

A 50-mesh nozzle screen or line strainer on the spray equipment is adequate.

**7.5    Mixing Spray Solution Concentrations**

All reference throughout this label to concentration of this product in a spray solution is on a percentage-of-volume basis.

Prepare the desired volume of spray solution at a given concentration by mixing the amount of this product indicated in the following table with water.

| Desired Volume of Spray Solution | Amount of [INSERT BRAND NAME] to Achieve Indicated Concentration in Spray Solution (percent by volume) | | | | | |
|---|---|---|---|---|---|---|
| | 0.5% | 0.75% | 1% | 1.5% | 4% | 8% |
| 1 gallon | 2/3 fl oz | 1 fl oz | 1.3 fl oz | 2 fl oz | 5 fl oz | 10 fl oz |
| 25 gallons | 16 fl oz | 24 fl oz | 1 qt | 1.5 qts | 4 qts | 2 gals |
| 100 gallons | 2 qts | 3 qts | 1 gal | 1.5 gals | 4 gals | 8 gals |

2 tablespoons = 1 fluid ounce (fl oz)

For filling backpack and pump-up sprayers, consider mixing the appropriate amount of this product with water in a larger container and then filling the sprayer from the larger container.

**7.6    Ammonium Sulfate** [*This section optional in final printed label*]

Unless otherwise directed, the addition of 1 to 2 percent dry ammonium sulfate by weight (8.5 to 17 pounds per 100 gallons of water), could increase the performance of this product on annual and perennial weeds, particularly under hard water conditions, drought conditions or when tank-mixed with certain

III. DIRECTIONS FOR USE ON AQUATIC AND LISTED TERRESTRIAL SITES

residual herbicides.  An equivalent amount of a liquid formulation of ammonium sulfate may also be used. Ensure that dry ammonium sulfate is completely dissolved in the spray tank before adding herbicides. Thoroughly rinse the spray system with clean water promptly after use to reduce corrosion.

When using ammonium sulfate, apply this product at rates directed on this label; lower rates will result in reduced performance.

**7.7    Colorants and Dyes**

Colorants and marking dyes may be added to spray solutions of this product; however, they could reduce the performance of this product. Use colorants and dyes according to the manufacturer's directions.

**7.8    Drift Reduction Additives**

Drift reduction additives may be used with all application equipment types, except wiper applicators, sponge bars and controlled droplet applicators (CDA).  When a drift reduction additive is used, read and carefully follow all precautions, limitations and all other information appearing on the product label.  The use of drift reduction additives can affect spray coverage, which could result in reduced performance of this product.

**8.0    APPLICATION EQUIPMENT AND TECHNIQUES**

This product may be applied using the following equipment:

**Aerial Application Equipment**—fixed-wing and helicopter [*Alternative text:* helicopter only] [*Optional text:* (Aerial application allowed by helicopter only in] [*list states where aerial application is allowed by helicopter only, if applicable.*])

**Ground Application Equipment**—boom or boomless systems, pull-type sprayers, floaters, pick-up sprayers, spray coupes and other ground broadcast application equipment

**Handheld Sprayers**—backpack sprayers, pump-up pressure sprayers, handguns, handwands, mistblowers*, lances and other handheld and motorized spray equipment used to direct the spray onto weed foliage.

*This product is not registered in California or Arizona for use in mistblowers.

**Selective Application Equipment**—recirculating sprayer, shielded and hooded sprayers, wiper applicator, sponge bar, single or hollow stem injectors, tree injector, spray bottle

**Injection Systems**—aerial or ground injection sprayers

**Controlled Droplet Applicator (CDA)**—handheld or boom-mounted applicators that produce a spray consisting of a narrow range of droplet sizes

APPLY THIS PRODUCT USING PROPERLY MAINTAINED AND CALIBRATED EQUIPMENT CAPABLE OF ACCURATELY DELIVERING DESIRED VOLUMES.

Do not apply this product through any type of irrigation system.

**8.1    Spray Drift Management**

AVOID CONTACT OF THIS HERBICIDE WITH FOLIAGE, [*Optional text:* GREEN] STEMS, EXPOSED NON-WOODY ROOTS OR FRUIT OF CROPS, DESIRABLE PLANTS AND TREES, [*Optional text, if applicable:* EXCEPT AS DIRECTED FOR USE ON ROUNDUP READY® CROPS], AS SEVERE PLANT INJURY OR DESTRUCTION COULD RESULT.

Do not allow the herbicide solution to mist, drip, drift, or splash onto desirable vegetation, as even small quantities of this product can cause severe damage or destruction to the crop, plants or other vegetation on which application was not intended.

III. DIRECTIONS FOR USE ON AQUATIC AND LISTED TERRESTRIAL SITES

AVOID DRIFT.  USE EXTREME CARE TO PREVENT INJURY TO DESIRABLE PLANTS AND CROPS WHEN APPLYING THIS PRODUCT.

Avoiding spray drift at the application site is the responsibility of the applicator.  The interaction of many equipment- and weather-related factors determines the potential for spray drift.  The applicator and the grower are responsible for considering all these factors when making decisions regarding the application of this product.

The likelihood of injury occurring as the result of spray drift while applying this product increases when winds are gusty, as wind velocity increases, when wind direction is constantly changing or when there are other meteorological conditions that favor spray drift.  When spraying, avoid combinations of pressure and nozzle type that will result in splatter or generation of fine particles (mist) that are likely to drift.

TO PREVENT INJURY TO ADJACENT DESIRABLE VEGETATION, APPROPRIATE BUFFERS MUST BE MAINTAINED.

AVOID APPLYING THIS PRODUCT AT EXCESSIVE SPEED OR SPRAYER PRESSURE.

**8.2    Aerial Application Equipment**

Unless otherwise prohibited, all broadcast applications of this product described on this label may be made using aerial application equipment where appropriate, provided that the applicator complies with the precautions and restrictions specified on this label and on separate supplemental labeling published for this product.

DO NOT APPLY THIS PRODUCT USING AERIAL APPLICATION EQUIPMENT EXCEPT UNDER CONDITIONS SPECIFIED ON THIS LABEL OR ON SEPARATELY PUBLISHED SUPPLEMENTAL LABELING FOR THIS PRODUCT.

[*Optional voluntary label restriction*: Aerial application of this product may be made using helicopters only.]

[*Optional voluntary label restriction*: Aerial application of this product may be made using helicopters only in] [*list states where aerial application is permitted by helicopter only, if applicable*].

FOR SPECIFIC USE INSTRUCTIONS, RESTRICTIONS AND REQUIREMENTS RELATED TO THE AERIAL APPLICATION OF THIS PRODUCT IN CALIFORNIA OR SPECIFIC COUNTIES THEREIN, REFER TO THE LIMITATIONS ON AERIAL APPLICATION IN THAT STATE OR COUNTY PRESENTED IN THIS SECTION.

Apply this product at the rate specified on this label in 3 to 25 gallons of water per acre, unless otherwise directed.  Use a larger spray volume within this range where weeds, brush, trees and vines are dense or form multiple canopy layers.

Avoid direct application to any body of water.

Drift control reduction additives may be used.

Ensure uniform application. To avoid streaked, uneven or overlapped application, use appropriate marking devices.

**Aircraft Maintenance**

Thoroughly wash aircraft, especially landing gear, after each day of spraying to remove residues of this product accumulated during spraying or from spills. PROLONGED EXPOSURE OF THIS PRODUCT TO UNCOATED STEEL SURFACES COULD RESULT IN CORROSION AND POSSIBLE FAILURE OF THE PART. LANDING GEAR IS MOST SUSCEPTIBLE.  Maintaining an organic coating (paint) that meets aerospace specification MIL-C-38413 can help prevent corrosion.

**AERIAL SPRAY DRIFT MANAGEMENT**

## III. DIRECTIONS FOR USE ON AQUATIC AND LISTED TERRESTRIAL SITES

The following drift management requirements must be followed to minimize off-target drift movement during aerial application.  [*Optional label text, if applicable:* These requirements do not apply to forestry applications.]

1.  The distance of the outermost nozzles on the boom must not exceed ¾ the length of the [*Optional text, if application using fixed-wing aircraft allowed:*  wingspan or] rotor.

2.  Nozzles must always point backwards parallel with the air stream and never be pointed downwards more than 45 degrees.  Where states have more stringent regulations, they must be followed.

**Importance of Droplet Size**

The most effective way to reduce drift potential is to apply large droplets.  The best drift management strategy is to apply the largest droplets that provide sufficient coverage and control. Applying larger droplets reduces drift potential, but will not prevent drift if the application is made improperly or under unfavorable environmental conditions, such as in windy, high temperature with low humidty, and/or inversion conditions as described below.

**Controlling Droplet Size**

- **Volume:**  Use high flow rate nozzles to apply the highest practical spray volume.  Nozzles with the higher rated flows produce larger droplets.

- **Pressure:**  Operate at a spray pressure towards the lower end of the range listed for the nozzle.  Higher pressure reduces droplet size and does not improve canopy penetration.  When higher flow rates are needed, use higher flow rate nozzles instead of increasing pressure.

- **Number of nozzles:**  Use the minimum number of nozzles that provides uniform coverage.

- **Nozzle orientation:**  Orienting nozzles so that the spray is released backwards, parallel to the air stream, will produce larger droplets than other orientations.  Significant deflection from the horizontal will reduce droplet size and increase drift potential.

- **Nozzle type:**  Use a nozzle type that is designed for the intended application.  With most nozzle types, narrower spray angles produce larger droplets.  Consider using low-drift nozzles.  Solid stream nozzles oriented straight back produce larger droplets than other nozzle types.

- **Boom length:**  For some use patterns, reducing the effective boom length to less than ¾ of the [*Optional text, if application using fixed-wing aircraft allowed:* wingspan or] rotor length can further reduce drift without reducing swath width.

- **Application height:**  Application must be made at a height of 10 feet or less above the top of the tallest plants, unless a greater height is required for aircraft safety.  Making the application at the lowest height that is safe reduces the exposure of the droplets to evaporation and wind.

**Swath Adjustment**

When an application is made in the presence of a crosswind, the swath will be displaced downwind. Therefore, on the upwind and downwind edges of the field, the applicator must compensate for this displacement by adjusting the path of the aircraft upwind.  Increase the swath adjustment distance with increasing drift potential (higher wind, smaller droplets, etc.).

**Wind**

Drift potential is lowest at wind speeds of between 2 and 10 miles per hour. However, many factors, including droplet size and equipment type, determine drift potential at any given wind speed.  Avoid application when wind speeds are below 2 miles per hour due to variable wind direction and high inversion potential.  **NOTE:** Local terrain can influence wind patterns.  Every applicator must be familiar with local wind patterns and how they affect drift.

III. DIRECTIONS FOR USE ON AQUATIC AND LISTED TERRESTRIAL SITES

**Temperature and Humidity**

When making an application in low relative humidity, set application equipment to produce larger droplets to compensate for evaporation.  Droplet evaporation is most severe when conditions are both hot and dry.

**Temperature Inversions**

Do not apply this product during a temperature inversion as drift potential is high under these conditions. Temperature inversions restrict vertical air mixing, which causes small droplets to remain suspended in a concentrated cloud.  This cloud can move in unpredictable directions due to the light variable winds common during inversions.  Temperature inversions are characterized by increasing temperatures with altitude and are common on nights with limited cloud cover and light to no wind.  They begin to form as the sun sets and often continue into the morning.  Their presence can be indicated by ground fog; however, if fog is not present, inversions can also be identified by the movement of smoke from a ground source or an aircraft smoke generator.  Smoke that layers and moves laterally in a concentrated cloud (under low wind conditions) indicates an inversion, while smoke that moves upward and rapidly dissipates indicates good vertical air mixing.

**Sensitive Areas**

Apply this product only when the potential for drift to adjacent sensitive non-target areas (e.g., residential areas, known habitat for threatened or endangered species, non-target crops) is minimal (e.g., when wind is blowing away from a sensitive area).

**State Specific Limitations on Aerial Application**

---

### LIMITATIONS ON AERIAL APPLICATION IN CALIFORNIA ONLY

---

[*Optional voluntary restriction:* Aerial application of this product in California may be made by helicopter only.]

DO NOT apply this product using aerial application equipment in residential areas.

AVOID DRIFT – DO NOT APPLY WHEN WINDS ARE GUSTY OR UNDER ANY OTHER CONDITION THAT FAVORS DRIFT. DRIFT OF THIS PRODUCT ONTO ANY VEGETATION TO WHICH APPLICATION WAS NOT INTENDED CAN CAUSE DAMAGE. TO PREVENT INJURY TO ADJACENT DESIRABLE VEGETATION, USE PROPER AERIAL APPLICATION EQUIPMENT FITTED WITH APPROPRIATE NOZZLES AND MAINTAIN ADEQUATE BUFFERS.

Follow the directions below when making an aerial application near non-target crops, desirable annual vegetation, or desirable perennial vegetation after bud break and before total leaf drop.

1.  Do not apply this product within 100 feet of all desirable vegetation or non-target crops.

2.  If winds are blowing up to 5 miles per hour TOWARD desirable vegetation or non-target crops, do not apply this product within 500 feet of the desirable vegetation or crops.

3.  If winds are blowing between 5 and 10 miles per hour TOWARD desirable vegetation or non-target crops, a buffer zone greater than 500 feet might be needed to protect the desirable vegetation or crops.

4.  Do not apply this product using aerial application equipment when winds are blowing in excess of 10 miles per hour.

5.  Do not apply this product using aerial application equipment when inversion conditions exist.

When tank-mixing this product with 2,4-D, only 2,4-D amine formulations may be applied in California using aerial application equipment. Tank mixtures of this product with 2,4-D amine formulations may

III. DIRECTIONS FOR USE ON AQUATIC AND LISTED TERRESTRIAL SITES

be applied by air in California on fallow fields and in reduced tillage systems [*Optional text, if applicable:* and for alfalfa and pasture renovation applications] only.

This product, when tank-mixed with dicamba, may not be applied by air in California.

---

### ADDITIONAL LIMITATIONS ON AERIAL APPLICATION IN FRESNO COUNTY, CALIFORNIA ONLY

---

Always read and follow the label directions and precautionary statements for all products used in the aerial application.

The following information applies only from February 15 through March 31 within the following boundaries of Fresno County, California:

|       |                    |
|-------|--------------------|
| North: | Fresno County line |
| South: | Fresno County line |
| East:  | State Highway 99   |
| West:  | Fresno County line |

Observe the following directions to minimize off-site movement during aerial application of this product. Minimization of off-site movement is the responsibility of the grower, Pest Control Advisor and aerial applicator.

**Written Directions**

Written directions MUST be submitted by or on behalf of the applicator to the Fresno County Agricultural Commissioner 24 hours prior to the application. These written directions MUST state the proximity of surrounding crops and that conditions of each manufacturer's product label and this label have been satisfied.

**Aerial Applicator Training and Equipment**

Aerial application of this product is limited to pilots who have successfully completed a Fresno County Agricultural Commissioner and California Department of Pesticide Regulation approved training program for aerial application of herbicides. All aircraft must be inspected, critiqued in flight and certified at a Fresno County Agricultural Commissioner approved fly-in. Test and calibrate spray equipment at intervals sufficient to insure that proper rates of herbicides and adjuvants are being applied during commercial use. Applicator must document such calibrations and testing. Demonstration of performance at Fresno County Agricultural Commissioner approved fly-ins constitutes such documentation, or other written records showing calculations and measurements of flight and spray parameters acceptable to the Fresno County Agricultural Commissioner.

**Applications at Night** – Do not apply this product by air earlier than 30 minutes prior to sunrise and/or later than 30 minutes after sunset without prior permission from the Fresno County Agricultural Commissioner.

For additional information on the proper aerial application of this product in Fresno County, call (800) 332-3111.

---

### 8.3    Ground Application Equipment

Apply this product at the appropriate rate as specified on this label in 3 to 40 gallons [*Alternative volume:* 10 to 60 gallons] of water per acre when making a broadcast application using ground application equipment, unless otherwise directed on this label or on separate supplemental labeling or Fact Sheets published for this product.  As the weed density increases, increase the spray volume toward the upper

III. DIRECTIONS FOR USE ON AQUATIC AND LISTED TERRESTRIAL SITES

end of this range to ensure complete coverage. Use nozzles that will avoid generating a fine mist. For enhanced results with ground application equipment, use flat-fan nozzles. Check spray pattern for uniform distribution of spray droplets.

**8.4    Handheld Sprayers**

When using a handheld sprayer, apply spray solutions of this product uniformly and completely to the foliage of target weeds using a coarse droplet spectrum and a spray-to-wet technique; do not spray to the point of runoff.  For the appropriate concentration of this product in the spray solution and timing of application to control specific weeds, woody brush, trees and vines, refer to the "WEEDS CONTROLLED" section of this label.

For control of annual weeds, make application when weeds are small and prior to seedhead or bud formation.  For control of perennial weeds, woody brush, trees and vines, make application after flowering and before fall color and leaf drop.

When making a low-volume directed spray application to annual and perennial weeds, woody brush, trees and vines using a handheld sprayer, ensure that at least 50 to 75 percent of the foliage or the top one-half of each unwanted plant is sprayed.  If a straight stream nozzle is used, start the application at the top of the targeted plant and spray from top to bottom in a lateral zig-zag motion.  To ensure uniform and complete coverage, spray both sides of large or tall woody brush, trees and vines, or when foliage is thick and dense, or where there are multiple sprouts.  For enhanced results on woody brush, trees and vines, apply to actively growing vegetation after full leaf expansion and flowering, prior to fall color and leaf drop.

The following table summarizes various methods of foliar application using a backpack sprayer with a spray-to-wet or low-volume directed spray technique and high-volume sprayer application using handheld application equipment for control or partial control of herbaceous weeds, woody brush, trees and vines listed in the "WEEDS CONTROLLED" section of this label.

| Method of Application | Spray Solution Concentration | Spray Volume |
|---|---|---|
| Handgun or Backpack Sprayer | 0.5 to 1.5% by volume | Spray-to-wet technique |
| Low-Volume Directed Spray (Backpack) | 4 to 8% by volume | 15 to 25 gallons/acre |
| Modified High-Volume Spray | 1.5 to 3% by volume | 40 to 60 gallons/acre |

Low-volume directed spray application with a backpack sprayer works best when applying to weeds and brush less than 10 feet tall.  For taller weeds and brush, a high-volume handgun can be modified by reducing the nozzle size and spray pressure to produce a modified high-volume directed spray application.

**8.5    Selective Application Equipment**

Selective application equipment allows this product to be applied to weeds growing near a crop or other desireable vegetation without killing the desireable vegetation. Selective application equipment must be capable of preventing all contact of the herbicide solution with the desirable vegetation and operated without spray mist escape, leakage or dripping of the herbicide solution.

AVOID CONTACT OF THIS HERBICIDE WITH DESIRABLE VEGETATION.  Contact of this product with desirable vegetation could result in unwanted plant damage or destruction.  To the extent consistent with applicable law, such damage shall be the sole responsibility of the applicator.

This product may be diluted with water and applied using a recirculating sprayer, shielded sprayer, hooded sprayer, wiper applicator or sponge bar to weeds listed on this label growing in any aquatic or on any terrestrial non-food or non-feed crop site listed on this label, where feasible.  This product may also

III. DIRECTIONS FOR USE ON AQUATIC AND LISTED TERRESTRIAL SITES

be used with sprayers equipped with optical weed sensor technology.  Other selective equipment that may be used to deliver or apply this product are single and hollow stem injectors, tree injectors, wiper applicators for cut stem and cut stump applications, and spray or squirt bottles for cut stem, cut stump and frill applications to control large stem weeds, brush, trees and vines listed on this label.

**Recirculating Sprayer**

A recirculating sprayer directs the spray solution onto weeds growing above desirable vegetation, while spray solution that is not intercepted by weeds is collected and returned to the spray tank for reapplication.  A recirculating sprayer may be used to apply spray solutions of this product to weeds listed on this label in any aquatic or on any terrestrial non-crop site described on this label.

**Shielded and Hooded Sprayers**

A shielded sprayer directs the herbicide solution to the target weeds while protecting desirable vegetation from coming into contact with the herbicide spray with an impervious material or shield. Use nozzles that provide uniform coverage within the application area.  Keep shields properly adjusted to protect desirable vegetation.

A hooded sprayer is a type of shielded sprayer where the spray pattern is fully enclosed, including the top, sides, front and back, thereby shielding desirable vegetation from the spray solution.

This product may be diluted with water and, unless otherwise directed, mixed with a surfactant and applied using a shielded or hooded sprayer to weeds listed on this label growing in any aquatic or on any terrestrial non-crop site listed on this label, where feasible, and between rows of plants (row middles) in any cropping system listed on this label.

Properly adjust the hood to protect desirable vegetation.  Ensure that the hood is capable of completely enclosing the spray pattern.  If necessary when applying around crops grown on raised beds, extend the front and rear flaps of the hooded sprayer downward to reach the ground in deep furrows.

A hooded sprayer must be configured and operated in a manner that minimizes bouncing and avoids raising the hood up off the ground surface at any time.  If the hood is raised, spray particles can escape and come into contact with the crop or other desirable vegetation, causing damage to or destruction of the desirable vegetation.  Avoid operating this equipment on rough or sloping terrain where the spray hood is likely to rise up off the ground surface.

Use hoods designed to minimize excessive dripping or runoff down the inside of the hood, such as a single, low pressure, low drift, flat-fan nozzle with an 80- to 95-degree spray angle positioned at the top center of the hood, with a spray volume of 20 to 30 gallons per acre.

The following procedures will help reduce the potential for injury to desirable vegetation when using a hooded sprayer:

- Operate the sprayer with the hood on the ground or skimming across the ground surface.

- Leave at least an 8-inch untreated strip over the drill row.  (For example, if a crop row width is 38 inches, use a sprayer hood with a maximum width of 30 inches.)

- Operate at a ground speed no greater than 5 miles per hour to minimize bouncing of the hooded sprayer.

- Apply when wind speed is 10 miles per hour of less.

- Use low-drift nozzles that provide uniform coverage within the application area.

Injury to a crop or other desirable vegetation can occur when application is made to foliage of weeds that come into direct contact with the desirable vegetation.  Do not apply this product when leaves of desirable

III. DIRECTIONS FOR USE ON AQUATIC AND LISTED TERRESTRIAL SITES

vegetation are growing in direct contact with weeds. Droplets, mist, foam or splatter of the herbicide solution settling onto desirable vegetation can result in discoloration, stunting or destruction.

**Wiper Applicator**

A wiper applicator is a device that physically wipes this product or solutions of this product directly onto the weed or cut stump. Any handheld device that is capable of physically wiping this product or solutions of this product directly onto the target weed or stump, such as a paint brush, may be used.

A mechnical wiper applicator, such as a rope wick or sponge bar that can be driven through a field over the top of a crop or other desireable vegetation to control weeds that are taller than the desirable vegetation, must be designed, maintained and operated to prevent the herbicide solution from coming into contact with desirable vegetation.

Wiper applicators may be used over the top of food or feed crops ONLY if specifically permitted for use over that crop by this label or by separately published supplemental labeling for this product.

When using a mechanical wiper applicator, adjust the height of the applicator to ensure adequate contact with the weeds and so that the wiper contact point is at least 2 inches above the crop or desirable vegetation. Enhanced results can be obtained when more of the weed is exposed to the herbicide solution and weeds are a minimum of 6 inches above the desirable vegetation. Weeds that do not come into contact with the herbicide solution will not be affected. Poor contact can occur when weeds are growing in dense clumps, when operating in areas of severe weed infestation, or when weed height varies dramatically. In these situations, more than one application of this product might be necessary.

Operate wiper applicators at a ground speed of no greater than 5 miles per hour. Performance in areas of heavy weed infestation can be improved by reducing speed, which will provide more time for re-saturation of the wiper with the herbicide solution and more contact time of the wiper with the weed. Enhanced results with a wiper applicator can be obtained when two applications are made traveling in opposite directions in the field.

Keep wiper surfaces clean.

Droplets, mist, foam or splatter of the herbicide solution settling onto desirable vegetation can result in discoloration, stunting or destruction. Avoid leakage or dripping onto desirable vegetation. Be aware that on sloping ground the herbicide solution can migrate to one side, causing dripping on the lower end and drying of the wiper on the upper end of the applicator.

Do not apply this product using a wiper applicator when weeds are wet.

Add a nonionic surfactant to a concentration of 10 percent by volume of the total applicator solution (one gallon of surfactant for every 10 gallons of solution) for use in a wiper applicator. See the "MIXING" section of this label for more information on the use of surfactants.

**For Rope Wick and Sponge Bar Applicators** – apply solutions ranging from 33 to 75 percent of this product by volume in water.

**For Panel Applicators** – apply solutions ranging from 33 to 90 percent of this product by volume in water.

Mix only the amount of this product that will be used during a 1-day period, as reduced product performance can result from the use of solutions held in storage.

Clean wiper parts promptly after using this product by thoroughly flushing with water.

**Single and Hollow Stem Injectors**

Control of certain weeds listed in the "WEEDS CONTROLLED" section can be obtained by injecting this concentrated product or solutions of this product directly in or onto the target weed. Ensure that the

III. DIRECTIONS FOR USE ON AQUATIC AND LISTED TERRESTRIAL SITES

handheld injector being used for this application is capable of accurately delivering the volume specified on the label. When making stem injections, the combined total use of this product must not exceed 8 quarts per acre per year. At 5 milliliters of concentrated (undiluted) product per stem, 8 quarts will treat approximately 1500 stems per acre per year. The number of stems that can be treated per acre will vary depending on the injection volume and the concentration of this product in the application solution.

**8.6    Injection Systems**

This product may be used in aerial and ground injection spray systems as a liquid concentrate or diluted prior to injecting into the spray stream. Do not mix this concentrated product with the undiluted concentrate of other products when using injection systems, unless otherwise directed. A non-ionic surfactant concentration of 0.5% or more in the spray stream is required for use of this product in injection systems.

**8.7    Controlled Droplet Applicator (CDA)**

The amount of this product applied per acre using a controlled droplet applicator (CDA) must be no less than the rate specified on this label for application using conventional broadcast application equipment.

A controlled droplet applicator produces a spray pattern that is not easily visible. Use extreme care to avoid spray or drift from contacting the foliage or any other tissue of desirable vegetation, as plant damage or destruction could result.

**9.0    AQUATIC AND TERRESTRIAL USE SITES**

This product may be used according to the directions for use described on this label to control weeds, woody brush, trees and vines listed on this label growing in aquatic environments and on any terrestrial site described on this label.

**9.1    Aquatic Sites**

This product may be used to control emerged weeds, brush, trees and vines in all flowing, non-flowing or transient bodies of fresh and brackish surface water. These bodies of water include lakes, rivers, streams, ponds, estuaries, rice paddies, seeps, irrigation and drainage ditches, canals, reservoirs, wetlands and wastewater treatment facilities. This product may also be used to control weeds in intertidal areas below the mean high-water mark and on terrestrial sites where bodies of water may be present and a buffer that will ensure no overspray of the water cannot be maintained.

When applying spray solutions of this product in or near aquatic sites, a nonionic surfactant that is labeled for use with herbicides and approved for direct application to bodies of water must be used. See the "MIXING" section of this label for more information on the use of surfactants with this product.

Before using this product for aquatic weed control or for terrestrial weed control near aquatic sites, read the following information carefully.

- This product does not control plants that are completely submerged or have a majority of their foliage under water.

- There is no restriction on the use of water for irrigation, recreation or domestic purposes following direct application of this product to emerged aquatic plants.

- Consult your local State agency with primary responsibility for regulating pesticides, State fish and wildlife agency and/or water control authority before applying this product to vegetation growing in public waters to determine if a permit is required.

- Do not apply this product directly to water within 0.5 mile upstream of an active potable water intake in flowing water (i.e., river, stream, etc.) or within 0.5 mile of an active potable water intake in a standing body of water, such as a lake, pond or reservoir. To make aquatic applications around and

III. DIRECTIONS FOR USE ON AQUATIC AND LISTED TERRESTRIAL SITES

within 0.5 mile of active potable water intakes, the water intake must be turned off for a minimum period of 48 hours after the application.  The water intake may be turned on prior to 48 hours if the glyphosate level in the intake water is below 0.7 parts per million as determined by laboratory analysis.  These aquatic applications may be made ONLY in those cases where there are alternative water sources or holding ponds that would permit the turning off of an active potable water intake for a minimum period of 48 hours after the application.  This restriction does NOT apply to intermittent inadvertent overspray of water on terrestrial use sites.

- To achieve maximum weed control in dry ditches, apply this product within 1 day after water drawdown to ensure application to actively growing weeds and allow a minimum of 7 days after application before reintroduction of water

- Floating mats of vegetation could require more than one application of this product for control. Avoid washing this product off of foliage after application by boat backwash or rainfall within 4 hours of application. Wait a minimum of 24 hours before re-applying this product to the same vegetation.

- Application of this product to moving bodies of water must be made while traveling upstream to prevent concentration of this herbicide in the water.

- When making a bankside application, do not overlap more than 1 foot into open water.

- Do not apply this product to bodies of water where emerged weeds do not exist.

- If applying this product to more than 20 percent of the total area of a body of water, do not apply more than 3.75 quarts per acre in any single broadcast application.  If applying to less than 20 percent of the total area of a body of water, any rate listed on this label may be applied.  This single application rate restriction does not apply to stream crossings in utility rights-of-way.

- When emerged weed infestations cover the total surface area of an impounded waterbody, apply this product to the emerged vegetation in strips to help avoid oxygen depletion in the water due to decaying vegetation. Oxygen depletion in the water can result in increased fish mortality.

TANK MIXTURES:  This product may be applied in a tank mixture with one or more of the following products for enhanced control of aquatic weeds, woody brush, trees and vines in aquatic sites, provided that the product used is labeled for aquatic use.  Refer to the individual label of all products used in the tank mixture for approved uses and application rates.  Always read and follow label directions for each product in the mix.

| 2,4-D amine; imazapyr; flumioxazin; triclopyr |
| Clipper; Garlon 3A Specialty; Habitat |

## 9.2   TERRESTRIAL SITES

This product may be used according to the directions for use described on this label to control weeds, woody brush, trees and vines listed on this label on any terrestrial site described on this label.

This product may be used to control weeds, woody brush, trees and vines on maintained landscapes, on improved and unimproved land, on lawns and turf and around ornamentals on industrial, commercial and residential sites, including airports, apartment complexes, chaparrals, ditch banks, driveways, dry ditches, dry canals, farmsteads, fencerows, forestry sites, golf courses, greenhouses, lumber yards, manufacturing sites, municipal sites, natural areas, nurseries, office complexes, ornamental beds, parks, parking areas, pastures, petroleum tank farms, pumping installations, railroads, rangeland, recreational areas, residential areas, roadsides, schools, shadehouses, sod and turfgrass seed farms, sports complexes, storage areas, substations, utility rights-of-way, utility sites, warehouse areas, wildlife food plots and wildlife management areas.

III. DIRECTIONS FOR USE ON AQUATIC AND LISTED TERRESTRIAL SITES

This product may be used for non-selective control of unwanted vegetation on any site listed on this label for trim-and-edge application around objects, including around building foundations, equipment storage areas and trees, and along and in fences, and to eliminate unwanted weeds growing in and around established shrub beds and ornamental plantings. This product may also be used for complete elimination of vegetation from a terrestrial site prior to planting ornamentals, flowers, or turfgrass (sod or seed), and prior to land development, including prior to beginning construction projects or the laying of asphalt or other road material.  Application of this product may be repeated, as needed, to maintain bare ground, up to a total application of 8 quarts per acre per year.

This product may be used for establishment and maintenance of fuel breaks, for establishing fire perimeters and black lines, along fire roads and to facilitate prescribed burning practices on any site described on this label.

[*Optional label text:* This product may also be used for weed control or growth regulation on] [*Optional list of any terrestrial uses that are included on this Master Label, including, but not limited to:* Christmas tree farms, citrus orchards, fallow vegetable fields, farmsteads, production nurseries, sugarcane fields, sod farms and turfgrass seed farms.]

This product requires the addition of a nonionic surfactant to the spray solution labeled for herbicide application.  See the "MIXING" section of this label for more information on the use of surfactants with this product.

Unless otherwise directed, application of this product may be made according to the directions for use in the sections that follow on any of these sites using any method of application described on this label to control any weeds, woody brush, trees and vines listed in the "WEEDS CONTROLLED" section of this label. [*Alternative label text:*  Unless otherwise directed, application of this product may be made according to the directions for use in the sections that follow on any of these sites using any method of application described on this label to control any weeds, woody brush, trees and vines listed in the "ANNUAL WEEDS RATE SECTION," "PERENNIAL WEEDS RATE SECTION" and "WOODY BRUSH, TREES AND VINES RATE SECTION" of this label.]

## 10.0    ADDITIONAL SITE MANAGEMENT INFORMATION

The following sections contain additional use information specifically related to certain use sites.  Unless otherwise directed, any application of this product described in the "WEEDS CONTROLLED" section or any other section of this label may be made on the use sites described in the sections that follow, where applicable, using any method of application described on this label that is appropriate.

### 10.1    Forestry, Hardwood and Christmas Tree Site Management

This product may be used for control or partial control of woody brush, trees and herbaceous weeds on any tree site, including forestry settings, Christmas tree plantations, and silvicultural and production nursery sties, using any method of application listed on this label.  See the "WEEDS CONTROLLED" section of this label for application rates and specific use directions.

Unless otherwise directed, this product requires a nonionic surfactant that is labeled for the intended use on the site of application to be added to the spray mixture.  Use of this product without a surfactant will result in reduced performance.  See the "MIXING" section of this label for more information on the use of surfactants with this product.

**IMPORTANT:** SOME SURFACTANTS CAN CAUSE TREE INJURY WHEN DIRECTLY APPLIED TO SOME SPECIES.  READ AND FULLY UNDERSTAND ALL APPROVED USES, PRECAUTIONS AND LIMITATIONS OF THE SURFACTANT BEFORE USING.

**Weed Management, Site Preparation**

III. DIRECTIONS FOR USE ON AQUATIC AND LISTED TERRESTRIAL SITES

This product may be used to control or partially control undesirable woody brush, trees, vines and herbaceous weeds listed on this label for preparing sites prior to planting any tree species, including Christmas trees, eucalyptus trees and hybrid tree cultivars, and for controlling weeds around established trees, [*Optional text:* for the release of conifer and hardwood trees,] establishing wildlife openings and maintaining roads on any tree site.

TANK MIXTURES: This product may be applied in a tank-mix with the products listed in this section to increase the spectrum of vegetation controlled. Any application rate of this product listed on this label may be used in a tank-mix with the following products for tree site management, including site preparation, provided that the product is labeled for the use on the site of application and prior to planting the desired species. Refer to the individual label of all products used in the tank mixture for approved uses and application rates.  Read and follow all directions for use and precautions for each product used, including planting interval restrictions, if any.  Use this product according to the most restrictive precautionary statements of any product in the mix.

---

imazapyr; metsulfuron methyl; sulfometuron methyl; triclopyr

Arsenal; Arsenal Herbicide Applicators Concentrate; Chopper; Chopper GEN2; Escort XP; Forestry Garlon 4 Specialty; Forestry Garlon XRT Specialty; Garlon 3A Specialty; Garlon 4 Specialty; Garlon 4 Ultra Specialty; Landmark; Landmark XP; Oust Extra; Oust XP

---

For control of herbaceous weeds, apply these tank-mix products at the lower end of the application rate range specified on the product label.  For control or partial control of dense stands or for hard-to-control woody brush, trees and vines, apply these products at a rate or spray solution concentration towards the higher end of the given range.

**Conifer Release, Mid-Rotation Conifer Release, Hardwood Release, Timber Stand Improvement**

This product may be applied as a directed spray using a handheld sprayer or using any selective application equipment described on this label to control woody and herbaceous weeds and other undesirable understory vegetation below the tree crop canopy in conifer plantations, hardwood sites, Christmas tree plantations and silvicultural and ornamental nurseries to facilitate the release and growth of conifer and hardwood trees.

This product may also be applied using ground broadcast equipment or as a directed spray application for mid-rotation release under the canopy of pines, other conifers and hardwoods.

PRECAUTIONS:  Avoid contact of spray drift, mist or drips with foliage, green bark or non-woody surface roots of desirable plant species.  Use application techniques that prevent or minimize contact of this product with foliage of desired trees or other plants through direct contact or off-target spray movement.

[*Optional label text:* RESTRICTIONS:  Do not apply this product as an over-the-top broadcast spray for conifer or hardwood release, unless otherwise directed on this label or on separate supplemental labeling for this product.]

**Conifer Release – Broadcast Application** [*This section is optional in the final printed label*]

This product may be broadly applied over the top of conifer tree species listed in this section after formation of final conifer resting buds in the fall or prior to initial bud swelling in the spring for control, partial control or suppression of herbaceous weeds and hardwoods listed in the "WEEDS CONTROLLED" section of this label to facilitate the release of these tree species in a forestry, plantation or nursery setting.  Unless otherwise directed, make this application only where conifers have been established for a minimum of one growing season.

PRECAUTIONS:  Conifer injury can occur when this product is applied at rates higher than prescribed on this label, where spray applications overlap, if application is made when conifers are actively growing, or

III. DIRECTIONS FOR USE ON AQUATIC AND LISTED TERRESTRIAL SITES

when they are growing under stress from drought, flood, improper planting or insect, animal or disease damage.

Conifer Release Outside the Southeastern United States

For release of the following conifer species growing for a minimum of one growing season in most areas outside the southeastern United States, apply 24 to 48 fluid ounces of this product per acre as a broadcast application over the top of the conifer trees.

- Douglas fir
- Hemlock
- California redwood
- Fir species
- Pines*
- Spruce

*Includes all species <u>except</u> loblolly pine, longleaf pine, shortleaf pine or slash pine.*

Apply 24 to 40 fluid ounces of this product for release of Douglas fir, pine and spruce that have been established for only one growing season (except in California).

For release of spruce (*Picea* spp.) in Maine, Michigan, Minnesota, New Hampshire and Wisconsin, up to 2.25 quarts of this product may be applied after formation of final resting buds in the fall for control of woody brush and tree species.

PRECAUTIONS: Ensure that the conifers are well hardened off before application of this product. Some nonionic surfactants can cause tree injury when broadly applied over the top of hemlock and California redwood and in mixed conifer stands. Test the nonionic surfactant to be used for tree safety before using.

Conifer Release in the Southeastern United States

For release of the following conifer species established for more than one growing season in the southeastern United States, apply 36 to 60 fluid ounces of this product per acre in the fall as a broadcast application over the top of the trees. For release of these species after only one growing season, apply only 24 fluid ounces of this product per acre.

- Eastern white pine
- Longleaf pine
- Slash pine
- Loblolly pine
- Shortleaf pine
- Virginia pine

TANK MIXTURES: This product may be applied for conifer release in a tank-mix with the following products to provide a broader spectrum of postemergence weed control and for residual control of weeds listed on the label of those products. Only apply these tank mixtures over the top of conifer species that are approved for this use for all products in the mix. Refer to the individual product labels for approved uses and application rates. Read and follow all directions for use and precautions for each product used. Use this product according to the most restrictive precautionary statements of any product in the mixture.

atrazine; imazapyr; metsulfuron methyl; sulfometuron methyl

Arsenal; Arsenal Herbicide Applicators Concentrate; Oust Extra; Oust XP

For release of Douglas fir established for a minimum of one growing season prior to bud swell in early spring, apply 24 fluid ounces of this product in a tank-mix with an appropriate rate of atrazine. Do not add surfactant for this application.

For herbaceous release of loblolly pine, Virginia pine and longleaf pine in the spring and early summer, apply 12 to 18 fluid ounces of this product per acre in a tank-mix with an appropriate rate of Oust Extra or Oust XP.

**Late-Summer and Fall after Resting Bud Formation**

For release of jack pine, white pine and white spruce, apply 24 to 48 fluid ounces of this product per acre in a tank-mix with an appropriate rate of Oust Extra or Oust XP that will not harm these conifer species.

III. DIRECTIONS FOR USE ON AQUATIC AND LISTED TERRESTRIAL SITES

For release of Douglas fir, apply 24 to 36 fluid ounces of this product per acre in a tank-mix with an appropriate rate of Arsenal or Arsenal Herbicide Applicators Concentrate.

For release of balsam fir and red spruce, apply 48 fluid ounces of this product per acre in a tank-mix with an appropriate rate of Arsenal or Arsenal Herbicide Applicators Concentrate.

## 10.2    Native and Wildlife Habitat Management

This product may be used to control exotic and other undesirable vegetation in wildlife habitat and natural areas, including riparian and estuarine areas, rangeland, and wildlife refuges. Application may be made to allow recovery of native plant species or prior to planting desirable native species, and for similar broad-spectrum vegetation control. Spot treatment, cut stump, cut stem, stem injection, wiper applicator and all other methods of application listed on this label may be used to selectively remove unwanted plants for habitat management and enhancement.

This product may also be used to eliminate annual and perennial weeds prior to planting wildlife food plots. Any wildlife food species may be planted after applying this product or native species may be allowed to repopulate the area naturally. If tillage is needed to prepare a seedbed, wait a minimum of 7 days after application before tilling to allow translocation of this product into underground plant parts.

## 10.3    Ornamental and Production Nursery Management

All uses of this product described on this label may be used in a plant nursery setting using any method of application described.

This product may be used to clear an area of unwanted vegetation prior to planting any ornamental plant, tree, shrub or other plants.

This product may also be used to control weeds growing around established woody ornamental species, such as arborvitae, azalea, boxwood, crabapple, eucalyptus, euonymus, fir, Douglas fir, jojoba, hollies, lilac, magnolia, maple, oak, poplar, privet, pine, spruce and yew. This product may also be used to trim and edge around potted plants and other objects in a plant nursery.

PRECAUTIONS:   Protect desirable plants from the spray solution using shields or coverings made of waterproof material. Take care to avoid contact of spray, drift or mist with foliage, green stems or immature bark of established ornamental species.

**Greenhouse/Shadehouse**

This product may be used to control weeds growing in and around greenhouses and shadehouses.

RESTRICTIONS:   Desirable vegetation must not be present during application in a greenhouse.   Turn air circulation fans off before applying this product inside a greenhouse or shadehouse and leave them off until the application solution has dried.

## 10.4    Commercial, Residential and Recreational Area Management

All applications of this product described on this label may be used on commercial, residential and recreational areas, including parks, schools and athletic fields, using any method of application described on this label, including spot treatment of unwanted vegetation, trim-and-edge application around trees, fences, walking paths, buildings, sidewalks, nature trails and other objects in these areas, to eliminate unwanted weeds growing in established shrub and ornamental beds, for turf management and renovation, and to eliminate vegetation from a site prior to development, including prior to planting an area to ornamentals, flowers or turfgrass (sod or seed), or beginning construction projects.

## 10.5    Pasture Management

The use of this product in pastures includes use on bahiagrass, bermudagrass, bluegrass, brome, fescue, guineagrass, kikuyugrass, orchardgrass, pangola grass, ryegrass, Timothy, and wheatgrass.

III. DIRECTIONS FOR USE ON AQUATIC AND LISTED TERRESTRIAL SITES

**Preplant, Preemergence, Pasture Renovation**

This product may be applied prior to planting or emergence of forage or perennial grasses. Refer to the "WEEDS CONTROLLED" section of this label for application rates of this product for control of specific weeds.

RESTRICTIONS:  If the total application rate of this product is 2.25 quarts per acre or less, no waiting period between application and feeding or livestock grazing is required.  If the rate is greater than 2.25 quarts per acre, remove domestic livestock before application and wait a minimum of 8 weeks after application before grazing or harvesting.

**Spot Treatment, Wiper Applicator**

This product may be applied in pastures as a spot treatment or over the top of desirable grasses using a wiper applicator to control taller growing weeds.  For enhanced weed control, remove domestic livestock before application to allow for sufficient plant growth and wait a minimum of 7 days after application before grazing livestock or harvesting for feed.  See additional instructions on the use of wiper applicators in the "APPLICATION EQUIPMENT AND TECHNIQUES" section of this label.

RESTRICTIONS:  For spot treatment or use with a wiper applicator at rates of 2.25 quarts per acre or less, this product may be applied over the entire pasture or any portion of it.  At rates greater than 2.25 quarts per acre, this product may be applied over no more than 10 percent of the total pasture at any one time. Application may be repeated in the same area at 30-day intervals.

**Weed Suppression in Dormant Pastures**

This product may be applied in dormant pastures to suppress competitive growth and seed production of annual weeds and other undesirable vegetation.  Apply 9 to 12 fluid ounces of this product per acre using broadcast application equipment on pastures in late-fall after desirable perennial grasses have reached dormancy or in late-winter before desirable perennial grasses break dormancy and initiate green growth.

PRECAUTIONS:  Higher application rates may be used for hard-to-control weeds; however, higher rates can cause stand reduction.  Some stunting of perennial grasses can occur if broadcast application is made when they are not dormant.

RESTRICTIONS:  No waiting period is required between application and grazing or harvesting for feed.  Do not apply more than 2.25 quarts of this product per acre per year onto pasture grasses except for renovation.  If reseeding is needed due to severe stand reduction, no waiting period is required after application of this product before seeding the pasture grasses listed at the beginning of this section; for all other pasture grasses, wait a minimum of 30 days after application before seeding.

**10.6    Railroad Management**

All uses of this product described in the "WEEDS CONTROLLED" or any other section of this label may be used on railroad sites using any method of application described.

This product requires a nonionic surfactant that is labeled for the intended use on the site of application to be added to the spray mixture.  If application is to be made where aquatic sites might be directly sprayed or inadvertently oversprayed, the surfactant must be labeled for aquatic use.  Use of this product without a surfactant will result in reduced performance.  See the "MIXING" section of this label for more information on the use of surfactants with this product.

Application of this product along railroad rights-of-way may be made in up to 80 gallons of spray solution per acre.

**Bare Ground, Ballast and Shoulders, Crossings, Spot Treatment**

This product may be used to maintain bare ground on railroad ballast and shoulders and reduce the need for mowing and mechanical brush removal along railroad rights-of-way. Application of this product may be

III. DIRECTIONS FOR USE ON AQUATIC AND LISTED TERRESTRIAL SITES

repeated as weeds continue to emerge in order to maintain bare ground, up to a maximum total application rate of 8 quarts of this product per acre per year.

TANK MIXTURES: This product may be applied in a tank mixture with the following products for enhanced control of woody brush and trees for bare ground, ballast and shoulder, crossing and spot treatment applications, and other brush, tree and vine control on railroad sites, provided that the product used is labeled for these applications.  Not all tank-mix products listed are labeled for aquatic use.  Refer to the individual label of all products used in the tank mixture for approved uses and application rates.  Always read and follow label directions for each product in the mix.

---

2,4-D; atrazine; bromacil; chlorsulfuron; clopyralid; dicamba; diquat; diuron; hexazinone; imazapyr; metsulfuron methyl; pelargonic acid; simazine; sulfometuron methyl; sulfosulfuron; tebuthiuron; triclopyr

Arsenal; Arsenal Herbicide Applicators Concentrate; Chopper; Chopper Gen2; Escort XP; Forestry Garlon 4 Specialty; Forestry Garlon XRT Specialty; Garlon 3A Specialty; Garlon 4 Specialty; Garlon 4 Ultra Specialty; Habitat; Hyvar X; Hyvar X-L; Krovar I DF; Oust Extra; Oust XP; Outrider[®]; Princep 4L; Princep Caliber 90; Princep Liquid; Sahara DG; Scythe; Stalker; Spike 20P Specialty; Spike 80DF Specialty; Telar XP; Transline Specialty; Velpar DF CU; Velpar DF VU; Velpar L; Velpar L CU; Velpar L VU; Vastlan Specialty

---

**Brush, Tree and Vine Control**

This product may be used to control woody brush, trees and vines along railroad rights-of-way.  Apply 3 to 8 quarts of this product per acre in up to 80 gallons of spray solution containing 0.5% or more by volume of a nonionic surfactant as a broadcast application using either a boom or boomless sprayer.  Apply a 0.75- to 1.5-percent solution of this product when using high-volume application equipment with a spray-to-wet technique, or a 4- to 8-percent solution when using low-volume directed spray for spot treatment.

TANK MIXTURES: This product may be applied in a tank-mix with one or more of the following products for enhanced control of woody brush, trees and vines along railroad rights-of-way, provided that the product is labeled for use on these sites. Refer to the individual product label for approved sites and application rates.

---

chlorsulfuron; clopyralid; dicamba; fosamine; hexazinone; imazapyr; metsulfuron methyl; picloram; triclopyr

Arsenal; Arsenal Herbicide Applicator's Concentrate; Chopper; Chopper Gen2; Escort XP; Forestry Garlon 4 Specialty; Forestry Garlon XRT Specialty; Garlon 3A Specialty; Garlon 4 Specialty; Garlon 4 Ultra Specialty; Habitat; Krenite S Brush Control Agent; Stalker; Telar XP; Tordon 101 Mixture Specialty; Tordon 22K Specialty; Tordon K Herbicide Specialty; Transline Specialty; Vanquish; Velpar DF CU; Velpar DF VU; Velpar L; Velpar L CU; Velpar L VU; Vastlan Specialty

---

**Weed Control in Dormant and Actively Growing Bermudagrass**

This product may be used to control or partially control many annual and perennial weeds in dormant and actively growing bermudagrass along railroad rights-of-way.  See the "WEEDS CONTROLLED" section of this label for directions for use of this product for weed control in grasses.

**10.7    Rangeland Management**

This product will control or suppress many annual weeds growing on perennial cool- and warm-season grass rangeland.  Slight discoloration of the desirable grasses could occur, but will re-green and resume growing under moist soil conditions as effects of this product wear off.

III. DIRECTIONS FOR USE ON AQUATIC AND LISTED TERRESTRIAL SITES

Preventing seed production is critical to the control of invasive annual grassy weeds on rangeland. Yearly application of this product to eliminate invasive annual weeds before they produce seed will help eliminate viable weed seeds from the soil.  Delay grazing of the area after application of this product to allow desirable perennials to grow, flower and re-seed the area.

***Bromus* Control**:  A broadcast application of 9 to 12 fluid ounces of this product per acre will control or suppress downy brome (*Bromus tectorum*), Japanese brome (*Bromus japonicus*), soft chess (*Bromus mollis*), cheatgrass *(Bromus secalinus)*, cereal rye and jointed goatgrass on rangeland.  For enhanced results, apply this product when most brome plants are in early-flower and before the plants, including seedheads, turn color. Allow for secondary weed flushes to occur after spring rains to further deplete the seed reserve in the soil and encourage perennial grass conversion on weedy sites. Apply this product in the fall in areas where spring moisture is normally limited and fall germination allows for good weed growth and weed seed depletion.

***Medusahead* Control:**  To control or suppress medusahead, apply 12 fluid ounces of this product per acre at the 3-leaf stage. Delaying application beyond this stage will result in reduced or unacceptable control. Controlled burning prior to application of this product will eliminate the thatch layer produced by slowly decaying culms. Allow new weed growth to occur before applying this product after a burn.  Repeat this application annually to eliminate medusahead seeds in the soil and allow desirable perennial grasses to repopulate the area.

RESTRICTIONS:  Do not apply more than 2.25 quarts of this product per acre per year on rangeland.  Do not use ammonium sulfate when applying this product on rangeland grasses.  No waiting period between application of this product and feeding or livestock grazing is required.

## 10.8    Roadside Management

All uses of this product described on this label may be used for weed management along roadways, including weed control in dormant and active bermudagrass and bahiagrass, weed control along shoulders and under and around guardrails, signposts and other objects along the road, using any method of application described on this label.  If applying this product in areas where the spray solution could inadvertently overspray a body of surface water, a non-ionic surfactant approved for aquatic use must be used.  See the "MIXING" section of this label for more information on the use of surfactants with this product.

TANK MIXTURES: This product may be tank-mixed with the following products for shoulder, guardrail, spot treatment and maintaining bare ground applications, provided that the product used is labeled for use on these sites. Not all tank-mix products listed are labeled for aquatic use.  Refer to the individual product labels for approved uses and application rates.

---

2,4-D; atrazine; bromacil; chlorsulfuron; clopyralid; dicamba; diuron; fosamine; hexazinone; imazapic; imazapyr; metsulfuron methyl; oryzalin; oxadiazon; pendimethalin; picloram; prodiamine; simazine; sulfometuron; sulfosulfuron; triclopyr

---

AAtrex 4L; AAtrex Nine-O; Banvel; Barricade 65WG; Chopper; Chopper Gen2; Crossbow; Direx 4L; Escort XP; Endurance; Formula 40; Gallery 75 Dry Flowable Specialty; Gallery SC; Garlon 4; Garlon XRT; Hyvar X; Karmex DF; Krenite S Brush Control Agent; Krovar I DF; Landmark; Landmark XP; Oust Extra; Oust XP; Outrider[®]; Pendulum 3.3 EC; Pendulum AquaCap; Pendimax 3.3; Plateau; Poast; Poast Plus; Princep 4L; Ronstar 50 WSP; Ronstar Flo; Ronstar G; Sahara DG; Surflan AS Specialty; Surflan Flex; Surflan Flex T&O; Surflan Pro; Surflan XL 2G; Telar XP; Tordon K; Vanquish; Vastlan Specialty; Velpar DF CU; Velpar DF VU; Velpar L; Velpar L CU; Velpar L VU; Weedar 64

---

## 10.9    Utility Management

III. DIRECTIONS FOR USE ON AQUATIC AND LISTED TERRESTRIAL SITES

This product may be used along electrical power, pipeline and telephone rights-of-way, and on all sites associated with these utility rights-of-way, including substations, access roads and railroads, and along similar rights-of-way that run in conjunction with utilities, for spot treatment of unwanted vegetation, side-trimming, trim-and-edge application around objects, weed control prior to planting a utility site to ornamentals, flowers or turfgrass (sod or seed), turf management, to eliminate unwanted weeds growing in established shrub or ornamental beds, to prepare or establishing wildlife openings and for eliminating vegetation prior to beginning construction projects. Application of this product may be repeated as needed to maintain bare ground as weeds continue to emerge, up to a maximum application rate of 8 quarts per acre per year.

TANK MIXTURES: This product may be tank-mixed with the following products for use on utility sites, provided that the product is labeled for use on these sites. Not all tank-mix products listed are labeled for aquatic use. Refer to the individual product label for approved uses and application rates. For control of herbaceous weeds, use a lower application rate or spray solution concentration within the given ranges for these tank-mix products and increase the rate or concentration toward the higher end of the ranges for control of dense stands or hard-to-control woody brush, trees and vines.

2,4-D; atrazine; bromacil; chlorsulfuron; clopyralid; dicamba; diuron; fosamine; hexazinone; imazapic; imazapyr; metsulfuron methyl; oryzalin; pendimethalin; prodiamine; simazine; sulfometuron methyl; sulfosulfuron; triclopyr

AAtrex 4L; AAtrex Nine-O; Arsenal Herbicide Applicators Concentrate; Endurance; Escort XP; Forestry Garlon 4 Specialty; Forestry Garlon XLT Specialty; Garlon 3A Specialty; Garlon 4 Specialty; Garlon 4 Ultra Specialty; Hyvar XL; Krenite S Brush Control Agent; Krovar I DF; Oust Extra; Oust XP; Outrider®; Plateau; Sahara DG; Surflan AS Agricultural; Surflan AS Specialty; Surflan Flex; Surflan Flex T&O; Surflan XL 2G; Telar XP; Transline Specialty; Vanquish; Velpar DF CU; Velpar DF VU; Velpar L; Velpar L CU; Velpar L VU; Vastlan Specialty; Weedar 64

Ensure that the Garlon product is thoroughly mixed with water according to label directions before adding this product to the spray mixture. Maintain continuous agitation when adding this product in order to avoid tank-mix compatibility problems.

For enhanced results with side-trimming, apply this product in a tank-mix with one of the Garlon products listed above.

**11.0   CROP USES** [*This section is optional*]

[*Any crop use listed in the Directions for Use with Food Crops section of this Master Label may be included on this sub-label for aquatic and terrestrial use*]

**12.0   WEEDS CONTROLLED**

Read the entire label before proceeding to use this product.

Unless otherwised directed, this product requires the addition of a nonionic surfactant that is labeled for use with herbicides to the spray solution. See the "MIXING" section of this label for more information on the use of surfactants with this product.

Always use the higher application rate or spray solution concentration of this product within a given range when weed growth is heavy or dense, or when weeds are growing in an undisturbed (non-cultivated) area.

Poor weed control could be realized if application is made to weeds covered with dust. For weeds that have been mowed, grazed or cut, allow re-growth to occur prior to application of this product.

III. DIRECTIONS FOR USE ON AQUATIC AND LISTED TERRESTRIAL SITES

Refer to the sections that follow for application rates and timing of application for the control of annual and perennial weeds and woody brush, trees and vines.

**12.1    Weed Control, Renovation and Chemical Mowing in Turf**

The use of this product described in this section may be applied to turfgrass growing on any terrestrial site listed on this label.  Ensure that any tank-mix product applied with this product is labeled for the intended use and on the site of application.

**Weed Control in Dormant Bermudagrass and Bahiagrass**

This product may be used to control or suppress many winter annual weeds and tall fescue for effective release of dormant bermudagrass and bahiagrass prior to spring green-up in areas where these turfgrasses are desirable ground covers and some temporary injury or discoloration can be tolerated.

Apply 6 to 48 fluid ounces of this product in 10 to 40 gallons of water per acre when bermudagrass and bahiagrass are dormant and prior to spring green-up.

Application of more than 12 fluid ounces of this product per acre on highly maintained bermudagrass and bahiagrass turf, such as golf courses and lawns, could result in injury or delayed green-up in the spring.

For residual weed control in dormant bermudagrass and bahiagrass, this product may be tank-mixed with Outrider®, Oust Extra or Oust XP herbicides.  Apply 6 to 48 fluid ounces of this product in a tank-mix with an appropriate rate of Outrider, Oust Extra or Oust XP herbicide in 10 to 40 gallons of water per acre.  To avoid delays in green-up and minimize injury, apply no more than 1 ounce of Oust Extra or Oust XP herbicide per acre on bermudagrass and no more than 0.5 ounce on bahiagrass, and avoid application when these grasses are in a semi-dormant condition.

DO NOT apply this product in a tank-mix with Outrider, Oust Extra or Oust XP herbicides on highly maintained bermudagrass and bahiagrass turf, such as on golf courses and lawns.

**Weed Control in Actively Growing Bermudagrass**

This product may be used to control or partially control many annual and perennial weeds in actively growing bermudagrass.  Some bermudagrass injury could result from the application of this product, but the bermudagrass will recover under moist conditions once the effects of the product wear off. Use only on well-established bermudagrass where some temporary injury or discoloration can be tolerated.

Apply 12 to 36 fluid ounces of this product in 10 to 40 gallons of spray solution per acre. Use a lower application rate within this range when controlling annual weeds less than 4 inches tall (or runner length) and increase the rate towards the upper end of the range as weeds increase in size or as they approach flower or seedhead formation. At these application rates, this product will provide partial control of the following perennial weeds in actively growing bermudagrass:

- Bahiagrass
- Bluestem, silver
- Fescue, tall
- Johnsongrass
- Trumpetcreeper
- Vaseygrass

PRECAUTIONS:  Applying more than 12 fluid ounces of this product per acre on highly maintained bermudagrass, such as on golf courses and lawns, could cause unacceptable turf injury and discoloration.

For a broader weed control spectrum in actively growing bermudagrass, this product may be tank-mixed with Outrider, Oust Extra or Oust XP herbicides.  Apply these tank-mixtures only on well-established bermudagrass where some temporary injury or discoloration can be tolerated.  Make no more than one application of this product in these tank mixtures in the same season, otherwise the bermudagrass could be severely injured.

Apply 6 to 24 fluid ounces of this product per acre in a tank-mix with Outrider herbicide for control or partial control of Johnsongrass and other weeds listed on the Outrider herbicide label.  Use a higher

III. DIRECTIONS FOR USE ON AQUATIC AND LISTED TERRESTRIAL SITES

application rate of both products within the given ranges for control of annual or perennial weeds greater than 6 inches tall.

Apply 12 to 24 fluid ounces of this product per acre in a tank-mix with Oust Extra or Oust XP herbicide per acre for enhanced control of weeds listed on those labels. Use a lower application rate of each product within the given ranges to control annual weeds listed on the labels that are less than 4 inches tall (or runner length) and increase the rates toward the upper end of the ranges as annual weeds increase in size and approach the flower or seedhead stage. This tank-mix will provide partial control of the following perennial weeds in actively growing bermudagrass:

- Bahiagrass
- Bluestem, silver
- Broomsedge
- Dallisgrass
- Dock, curly
- Dogfennel
- Fescue, tall
- Johnsongrass
- Poorjoe
- Trumpetcreeper
- Vaseygrass
- Vervain, blue

PRECAUTIONS: Apply these tank mixtures only on well-established bermudagrass where some temporary injury or discoloration can be tolerated.  DO NOT apply this product in a tank mixture with Outrider or Oust herbicides on highly maintained bermudagrass, such as on golf courses and lawns.

**Weed Control in Actively Growing Bahiagrass**

For suppression of vegetative growth and seedhead inhibition of bahiagrass for approximately 45 days, apply 4 fluid ounces of this product in 10 to 40 gallons of water per acre 1 to 2 weeks after full green-up or after mowing to a uniform height of 3 to 4 inches prior to seedhead emergence.

For growth suppression of bahiagrass for up to 120 days, apply 3 fluid ounces of this product per acre, followed by an application of 2 to 3 fluid ounces per acre about 45 days later.  Make no more than two growth suppression applications per year.

For broad spectrum weed control in actively growing bahiagrass, this product may be tank-mixed with Outrider®, Oust Extra or Oust XP herbicides.

Apply 1.5 to 3.5 fluid ounces of this product per acre in a tank-mix with an appropriate rate of Outrider herbicide per acre to control perennial weeds or annual weeds greater than 4 inches in height.

Apply 4 fluid ounces of this product per acre in a tank-mix with an appropriate rate of Oust Extra or Oust XP herbicide 1 to 2 weeks following an initial spring mowing for enhanced control of weeds listed on the Oust herbicide label in actively growing bahiagrass. Make this application only once per year.

PRECAUTIONS:  Apply these tank mixtures only on well-established bahiagrass where some temporary injury or discoloration can be tolerated.

**Turf Renovation**

This product controls most existing vegetation prior to renovating turfgrass areas or establishing turfgrass grown for seed or sod.  For maximum control of existing vegetation, delay planting or sodding until after determining if any re-growth of underground plant parts will occur.  Where repeat applications are necessary, sufficient re-growth must be attained prior to re-application of this product.  Summer or fall application provides enhanced control of warm-season grasses, such as bermudagrass. For managed turfgrass, apply this product after omitting at least one regular mowing to allow sufficient growth for good interception of the spray solution.

This product has no residual soil activity and will not affect plants, seed or sod planted back into the area after application.

A handheld sprayer may be used for spot treatment of unwanted vegetation growing in existing turfgrass. Broadcast application or spot treatment using a handheld sprayer may be used to control sod remnants or other unwanted vegetation after sod is harvested.

III. DIRECTIONS FOR USE ON AQUATIC AND LISTED TERRESTRIAL SITES

PRECAUTIONS:  Do not disturb soil or underground plant parts before application of this product. Delay tillage and renovation techniques, such as vertical mowing, coring or slicing, a minimum of 7 days after application to allow translocation of this herbicide into underground plant parts.

RESTRICTIONS:  If application rates total 2.25 quarts of this product per acre or less, no waiting period between application and feeding or livestock grazing is required.  If the rate is greater than 2.25 quarts per acre, remove domestic livestock before application and wait 8 weeks after application before grazing or harvesting.

**Chemical Mowing**

This product may be used to suppress growth of perennial and annual grasses to serve as a substitute for mowing.

Perennial Grasses – apply 5 fluid ounces of this product per acre to suppress growth of Kentucky bluegrass, or 6 fluid ounces to suppress tall fescue, fine fescue, orchardgrass, quackgrass or reed canarygrass in 10 to 40 gallons of spray solution per acre after grasses have greened up to at least 75 percent green color in the spring, or 7 to 10 days after mowing when sufficient re-growth has occurred to provide a desirable height for growth regulation.  Use chemical mowing only in areas where some temporary injury or discoloration of perennial grasses can be tolerated.

Annual Grasses – apply 3 to 4 fluid ounces of this product in 10 to 40 gallons of spray solution per acre to suppress growth of some annual grasses, such as annual ryegrass, wild barley and wild oats when actively growing in coarse turf on roadsides or other industrial areas and before the seedheads are in the boot stage of development.  This application could injure the desired annual grasses.

PRECAUTIONS:  Use this product for chemical mowing only in areas where some temporary injury or discoloration of perennial and annual grasses can be tolerated.

**12.2   Annual Weeds**

Annual weeds are easiest to control when they are small and actively growing.  New leaf development indicates active growth.

To control or partially control the annual weeds listed in this section when they are less than 6 inches in height or runner length and actively growing, apply 24 fluid ounces of this product per acre.  If they are over 6 inches in height or runner length, or slowly growing under stressed conditions, increase the application rate to 1 to 4 quarts per acre, depending on weed height and the severity of the poor growing conditions.

For application using a handheld sprayer with a spray-to-wet technique, apply a 0.5-percent solution of this product to annual weeds less than 6 inches in height or runner length prior to seedhead formation in grasses or bud formation in broadleaf weeds. To control annual weeds over 6 inches tall, or even smaller weeds growing under stressed conditions, apply a 0.75- to 1.5-percent solution.  Apply the maximum concentration of this product within this range for hard-to-control weeds or to control weeds over 24 inches tall.

For control of annual weeds using a handheld controlled droplet applicator (CDA), apply a 15-percent solution of this product (19 to 20 fluid ounces of this product per gallon of spray solution) at a flow rate of 2 fluid ounces of spray solution per minute and a walking speed of 1.5 miles per hour (1 quart of spray solution per acre).  When using a vehicle-mounted CDA, apply the required amount of this product, as indicated in this section, in 2 to 15 gallons of water per acre.

For enhanced control, do not mow, cut, till, burn or disturb vegetation in the application area for a minimum of 3 days after application.

This product has no residual soil activity and does not control emergence of new annual weeds from seed.  Subsequent applications of this product will be needed to control weeds that continue to emerge.

III. DIRECTIONS FOR USE ON AQUATIC AND LISTED TERRESTRIAL SITES

**WEED SPECIES**

Anoda, spurred
Balsam apple[1]
Barley
Barley, little
Barnyardgrass
Bassia, fivehook
Bittercress
Bluegrass, annual
Bluegrass, bulbous
Brome, downy
Brome, Japanese
Broomsedge
Buttercup
Castor bean[2]
Cheatgrass
Cheeseweed (*Malva parviflora*)
Chervil
Chickweed
Cocklebur
Copperleaf, hophornbeam
Copperleaf, Virginia
Coreopsis, plains/tickseed
Corn
Crabgrass
Cupgrass, woolly
Dwarf dandelion
Eclipta
False dandelion
Falseflax, smallseed
Fiddleneck
Filaree
Fleabane, annual
Fleabane, hairy (*Conyza bonariensis*)
Fleabane, rough
Foxtail
Foxtail, Carolina
Geranium, Carolina
Goatgrass, jointed
Goosegrass
Groundsel, common
Henbit
Horseweed/Marestail (*Conyza canadensis*)
Itchgrass
Johnsongrass, seedling
Junglerice
Knotweed
Kochia
Lambsquarters
Lettuce, prickly

III. DIRECTIONS FOR USE ON AQUATIC AND LISTED TERRESTRIAL SITES

Mannagrass, eastern
Mayweed
Medusahead
Morning glory (*Ipomoea* spp)
Mustard, blue
Mustard, tansy
Mustard, tumble
Mustard, wild
Nightshade, black
Oats
Panicum, browntop
Panicum, fall
Panicum, Texas
Pennycress, field
Pepperweed, Virginia
Pigweed
Puncturevine
Purslane, common
Pusley, Florida
Ragweed, common
Ragweed, giant
Rice, red
Rocket, London
Rocket, yellow
Rye
Ryegrass
Sandbur, field
Sesbania, hemp
Shattercane
Shepherd's-purse
Sicklepod
Signalgrass, broadleaf
Smartweed, ladysthumb
Smartweed, Pennsylvania
Sorghum, grain (milo)
Sowthistle, annual
Spanish needles[3]
Speedwell, corn
Speedwell, purslane
Sprangletop
Spurge, annual
Spurge, prostrate
Spurge, spotted
Spurry, umbrella
Starthistle, yellow
Stinkgrass
Sunflower
Teaweed / Prickly sida
Thistle, Russian
Velvetleaf
Wheat

III. DIRECTIONS FOR USE ON AQUATIC AND LISTED TERRESTRIAL SITES

Wild oats
Witchgrass

[1] For control of balsam apple, apply this product using handheld equipment only.

[2] Control of castor bean can also be achieved by injecting 4 milliliters of this concentrated (undiluted) product per plant into the lower portion of the main stem.

[3] For control of Spanish needles, apply 48 fluid ounces of this product per acre.

## 12.3    Perennial Weeds

Enhanced control of perennial weeds can be obtained when this product is applied when target weeds are small and actively growing. New leaf development indicates active growth. If application of this product must be made to larger weeds or to weeds that are slowly growing under stressful conditions, apply at a rate or spray solution concentration towards the upper end of the specified range.

If weeds have been mowed or tilled, do not apply this product until plants have resumed active growth and have reached the specified stage of growth or sufficient growth has been achieved to allow for good interception of the spray solution.  For enhanced control, do not mow, cut, till, burn or disturb vegetation in the application area for a minimum of 7 days after application.

For control of perennial weeds listed on this label using backpack or handheld equipment and a low-volume application technique, apply a 4- to 8-percent solution of this product over the crown of the target plant to cover 50 percent of the upper plant foliage.

For control of perennial weeds using a handheld controlled droplet applicator (CDA), apply a 15- to 30-percent solution of this product (19 to 38 fluid ounces of this product per gallon of spray solution) at a flow rate of 2 fluid ounces of spray solution per minute and a walking speed of 0.75 mile per hour (2 to 4 quarts of spray solution per acre).  When using a vehicle-mounted CDA, apply the required amount of this product, as indicated in the following table, in 2 to 15 gallons of water per acre.

Application of this product in the fall must be made before a killing frost.

This product has no soil activity and does not control emergence of perennial weeds from seed and dormant underground roots, rhizomes or tubers present in the soil at the time of application. More than one application of this product will be necessary for continued control of weeds that emerge following application.

### PERENNIAL WEEDS RATE TABLE

| Weed Species | Broadcast Rate (quarts/acre) | Handheld Spray-to-Wet Concentration (% solution) |
|---|---|---|
| Alfalfa* | 0.7 | 1.5 |
| Alligatorweed* | 3 | 1.3 |
| Apply this product when most of the target plants are in bloom. More than one application will be needed to achieve control. | | |
| Anise (fennel) | 1.5 – 3 | 1 – 1.5 |
| Bahiagrass | 2.3 – 3.75 | 1.5 |
| Beachgrass, European | – | 3.5 |
| Apply a 3.5-percent solution of this product using a spray-to-wet technique or an 8-percent solution using a low-volume application technique. Enhanced results can be obtained when application is made onto target weeds that are actively growing at the boot through the full-heading stage of development. | | |

III. DIRECTIONS FOR USE ON AQUATIC AND LISTED TERRESTRIAL SITES

| Weed Species | Broadcast Rate (quarts/acre) | Handheld Spray-to-Wet Concentration (% solution) |
|---|---|---|

Make application prior to the loss of more than 50 percent of green leaf color in the fall.  Monitor application site and re-apply this product to any target weeds that were missed, if necessary, before re-seeding the area with desirable vegetation.

For selective control of European beachgrass, apply a 33.3-percent solution of this product containing 1 to 2.5 percent of a nonionic surfactant during period of active growth using a wiper applicator. Maximizing the amount of individual leaf tissue contacted by the wiper applicator or making a second pass in the opposite direction will improve control.  Avoid contact of the herbicide solution with desirable vegetation.

| Weed Species | Broadcast Rate (quarts/acre) | Handheld Spray-to-Wet Concentration (% solution) |
|---|---|---|
| **Bentgrass*** | 1 | 1.5 |
| **Bermudagrass** Make application when seedheads are present. | 4 | 1.5 |
| **Bermudagrass, water (knotgrass)** | 1 | 1.5 |
| **Bindweed, field** For control, apply 3 to 3.75 quarts of this product per acre as a broadcast application west of the Mississippi River and 2.3 to 3 quarts per acre east of the Mississippi River when bindweed is at or beyond full bloom.  For enhanced results, apply in late-summer or fall. | 2.3 – 3.75 | 1.5 |
| **Bittersweet, Oriental** For control of oriental bittersweet, apply this product as a broadcast spray in 30 to 40 gallons of spray solution containing 0.25 percent of a nonionic surfactant and 0.1 percent nonionic organosilicone per acre. Use a nonionic surfactant concentration of 0.5 to 2 percent by volume when using a handheld sprayer and a spray-to-wet application. For enhanced results, ensure complete coverage of the target plant with the spray solution. | 2.25 | 2 |
| **Bluegrass, Kentucky** Apply when most target plants have reached the boot to head stage of development. When application is made prior to the boot stage, reduced control can result. In the fall, make application before plants have turned brown. | 1.5 – 2.3 | 0.75 |
| **Blueweed, Texas** Apply 3 to 3.75 quarts of this product per acre west of the Mississippi River and 2.3 to 3 quarts per acre east of the Mississippi River when most target plants are at or beyond full bloom.  For enhanced results, apply in late-summer or fall. | 2.3 – 3.75 | 1.5 |
| **Brackenfern** Apply to fully expanded fronds that are at least 18 inches long. | 2.3 – 3 | 0.75 – 1 |
| **Bromegrass, smooth** Apply this product when most target plants have reached the boot to head stage of development. When application is made prior to the boot stage, reduced control can result. In the fall, make application before plants have turned brown. | 1.5 – 2.3 | 0.75 |
| **Bursage, woolly-leaf** | – | 1.5 |
| **Canarygrass, reed** Apply this product when most target plants have reached the boot to head stage of development. When application is made prior to the boot stage, reduced control can result. In the fall, make application before plants have turned brown. | 1.5 – 2.3 | 0.75 |
| **Cattail** Apply this product when target plants are actively growing and are at or beyond the early to full bloom | 2.3 – 3.75 | 0.75 |

III. DIRECTIONS FOR USE ON AQUATIC AND LISTED TERRESTRIAL SITES

| Weed Species | Broadcast Rate (quarts/acre) | Handheld Spray-to-Wet Concentration (% solution) |
|---|---|---|
| stage of development. Enhanced results are achieved when application is made during the summer or fall months. | | |
| **Clover; red, white** | 2.3 – 3.75 | 1.5 |
| **Cogongrass** | 2.3 – 3.75 | 1.5 |
| Apply this product in late-summer or fall when cogongrass is at least 18 inches tall and actively growing. Due to uneven stages of growth and the dense nature of cogongrass vegetation, more than one application might be necessary to achieve control. | | |
| **Cordgrass** | 2 – 8 | 5 – 8 |
| Prior to application of this product for control of cordgrass, survey the area to determine if shellfish beds exist within the application area.  If shellfish are intended to be harvested in the area, delay application of this product until after harvest or maintain a 50-foot buffer between the application area and commercial shellfish beds, or do not harvest shellfish for a minimum of 14 days following application of this product.  See restrictions below. | | |
| Ideal conditions for control of cordgrass are when target plants are free of silt and debris and actively growing, and good spray coverage is achievable.  The presence of debris or silt on the surface of cordgrass will reduce the performance of this product. To improve herbicide uptake, wash targeted plants prior to application and allow a minimum of 4 hours for plants to dry before applying this product. Where cordgrass has been cut or mowed prior to application, allow for sufficient re-growth before applying this product to ensure adequate interception and uptake of this product. Rainfall or immersion of the plant in tidewater within 4 hours after application could reduce the effectiveness of this product. | | |
| Apply 2 to 8 quarts of this product per acre using ground broadcast application or optical sensor equipment in 5 to 100 gallons of spray solution, or in 5 to 10 gallons of spray solution per acre when using aerial application equipment.  Apply a 5- to 8-percent solution of this product when using a handheld backpack sprayer or high-volume sprayer.  Make all applications of this product for the control of cordgrass in a spray solution containing 0.25% or more (1 or more quarts per 100 gallons of spray solution) of a nonionic surfactant or other adjuvant that is compatible with this product and labeled for use with herbicides and approved for use on aquatic sites. For enhanced results, ensure complete coverage of cordgrass clumps. | | |
| RESTRICTIONS:  If a minimum 50-foot buffer is maintained between the application area and commercial shellfish beds, there is no restriction on shellfish harvest.  If application is made within 50 feet of commercial shellfish beds, DO NOT harvest shellfish for a minimum of 14 days following application of this product. | | |
| **Cutgrass, giant\*** | 3 | 1 |
| More than one application of this product will be required to achieve control, especially where vegetation is partially submerged in water. Allow target weeds to re-grow to the 7- to 10-leaf stage before making next application. | | |
| **Dallisgrass** | 2.3 – 3.75 | 1.5 |
| **Dandelion** | 2.3 – 3.75 | 1.5 |
| **Dock, curly** | 2.3 – 3.75 | 1.5 |
| **Dogbane, hemp** | 3 | 1.5 |
| Apply this product when most target plants have reached the late-bud to flower stage of growth. For enhanced results, make application in late-summer or fall. | | |
| **Fescue** (except tall) | 2.3 – 3.75 | 1.5 |

III. DIRECTIONS FOR USE ON AQUATIC AND LISTED TERRESTRIAL SITES

| Weed Species | Broadcast Rate (quarts/acre) | Handheld Spray-to-Wet Concentration (% solution) |
|---|---|---|
| **Fescue, tall** | 2.3 | 1 |
| Apply this product when most target plants have reached the boot to head stage of growth. If applied prior to the boot stage, less than desirable control might be obtained. | | |
| **Guineagrass** | 2.3 | 0.75 |
| Apply this product when most target plants have at least reached the 7-leaf growth stage. | | |
| **Hemlock, poison** | 1.5 – 3 | 0.75 – 1.5 |
| Control can also be achieved by injecting 5 milliliters of a 5-percent solution of this product using a handheld injection device in one leaf cane per plant, 12 inches above the root crown.[1] No surfactant is required. | | |
| **Hogweed, giant** | – | – |
| Inject 5 milliliters of a 5-percent solution of this product into one leaf cane per plant, 12 inches above the root crown.[1] No surfactant is required. | | |
| **Horsenettle** | 2.3 – 3.75 | 1.5 |
| **Horseradish** | 3 | 1.5 |
| Apply this product when most target plants have reached the late-bud to flower stage of development. For enhanced results, apply in late-summer or fall. | | |
| **Horsetail, field** | – | – |
| Inject 0.5 milliliter of this product per stem directly into the plant stem, one segment above the root crown.[1] No surfactant is required. | | |
| **Iceplant** | 1.5 | 1.5 |
| **Iris, yellow flag** | – | – |
| Cut flower stems 8 to 9 inches above the root crown.  Push a cavity needle into the stem center and then slowly remove it as you inject 0.5 milliliter of this product using a handheld injector.[1] No surfactant is required. | | |
| **Ivy; cape, German** | 1.5 – 3 | 0.75 – 1.5 |
| **Jerusalem artichoke** | 2.3 – 3.75 | 1.5 |
| **Johnsongrass** | 1.5 – 2.3 | 0.75 |
| Apply this product when most target plants have reached the boot to head stage of development or before plants have turned brown in the fall. When applied prior to the boot stage, reduced control can result. | | |
| **Kikuyugrass** | 1.5 – 2.3 | 0.75 |
| **Knapweed** | 3 | 1.5 |
| Apply this product when most target plants have reached the late-bud to flower stage of growth. For enhanced results, apply in late-summer or fall. | | |
| **Knotweed; Bohemian, giant, Japanese** | 3 | 2 |
| Apply 3 quarts of this product per acre as a broadcast application in 3 to 40 gallons of spray solution with 0.5 to 1 percent by volume of a nonionic surfactant. For application using a backpack sprayer and a spray-to-wet technique, apply a 2-percent solution of this product containing 0.5 to 2 percent by volume of a nonionic surfactant. For enhanced control, do not disturb vegetation in the application area for a minimum of 7 days after application. | | |
| Control can also be achieved by cutting stems cleanly just below the 2nd or 3rd node above the ground and immediately apply 0.36 fluid ounce (10 milliliters) of a 50-percent solution of this product in water | | |

III. DIRECTIONS FOR USE ON AQUATIC AND LISTED TERRESTRIAL SITES

| Weed Species | Broadcast Rate (quarts/acre) | Handheld Spray-to-Wet Concentration (% solution) |
|---|---|---|
| into the "well" or remaining internode.  Ensure that the upper plant material that was removed is gathered and properly discarded to prevent new plants from propagating from sprouting buds.  Use of a bio-barrier, such as cardboard, plywood or plastic sheeting, will help guard against the spread of plant material.  The combined total application rate of this product must not exceed 8 quarts per acre.[1] | | |
| Control can also be achieved by injecting 5 milliliters of this product per stem into the second or third internode using a handheld injection device.[1]  No surfactant is required. | | |
| **Lantana** | – | 0.75 – 1 |
| Apply this product when most target plants are at or beyond the bloom stage of growth. Use the higher spray solution concentration on plants that have reached the woody stage of growth. | | |
| **Lespedeza** | 2.3 – 3.75 | 1.5 |
| **Loosestrife, purple** | 2 | 1 – 1.5 |
| Apply this product when most target plants are at or beyond the bloom stage of growth. Enhanced results can be achieved when application is made during summer or fall months. Fall application must be made before a killing frost. | | |
| **Lotus, American** | 2 | 0.75 |
| Apply this product when most target plants are at or beyond the bloom stage of growth. Enhanced results can be achieved when application is made during summer or fall months. Fall application must be made before a killing frost. More than one application of this product might be necessary to control re-growth of underground plant parts and seeds. | | |
| **Maidencane** | 3 | 0.75 |
| More than one application of this product will be needed for control, especially for vegetation partially submerged in water. Allow plants to re-grow to the 7- to10-leaf stage before making next application. | | |
| **Milkweed, common** | 2.3 | 1.5 |
| Apply this product when most target plants have reached the late-bud to flower stage of growth. | | |
| **Muhly, wirestem** | 1.5 – 2.3 | 0.75 |
| Make application when most target plants are at least 8 inches in height (3- to 4-leaf stage of development) and actively growing. | | |
| **Mullein, common** | 2.3 – 3.75 | 1.5 |
| **Napiergrass** | 2.3 – 3.75 | 1.5 |
| **Nightshade, silverleaf** | 2.3 – 3.75 | 1.5 |
| Apply 3 to 3.75 quarts of this product per acre as a broadcast application west of the Mississippi River and 2.3 to 3 quarts per acre east of the Mississippi River when most target plants are at or beyond full bloom. Enhanced results can be obtained when application is made in late-summer or fall after berries have formed. | | |
| **Nutsedge; purple, yellow** | 2.3 | 0.75 |
| Apply this product to control existing nutsedge plants and attached immature nutlets when target plants are in flower or when new nutlets can be found at rhizome tips. Nutlets that have not germinated will not be controlled and will require repeated application of this product for long-term control. | | |
| **Orchardgrass** | 1.5 – 2.3 | 0.75 |
| Make application when most target plants have reached the boot to head stage of development. When applied prior to the boot stage, less than desirable control could be obtained. In the fall, make application before plants have turned brown. | | |
| **Pampas grass** | 2.3 – 3.75 | 1.5 |

III. DIRECTIONS FOR USE ON AQUATIC AND LISTED TERRESTRIAL SITES

| Weed Species | Broadcast Rate (quarts/acre) | Handheld Spray-to-Wet Concentration (% solution) |
|---|---|---|
| **Para grass** | 3 | 0.75 |
| More than one application of this product will be needed to achieve complete control. Allow plants to re-grow to the 7- to10-leaf stage before making next application. | | |
| **Pepperweed, perennial** | 3 | 1.5 |
| **Phragmites*** | 2 – 3.75 | 0.75 – 1.5 |
| For partial control of phragmites in Florida and the counties of other states bordering the Gulf of Mexico, apply 3.75 quarts of this product per acre as a broadcast application or a 1.5-percent solution using a handheld sprayer. In other areas of the U.S., apply 2 to 3 quarts per acre as a broadcast application or, for partial control, apply a 0.75-percent solution using a handheld sprayer. For enhanced results, make application in late-summer or fall when plants are actively growing and in full bloom. Due to the dense nature of this vegetation (which can prevent good spray coverage) and uneven stages of growth, more than one application of this product might be necessary to achieve control. Visual symptoms of control will be slow to develop. | | |
| **Quackgrass** | 1.5 – 2.3 | 0.75 |
| Apply this product when most target plants are at least 8 inches in height (3- to 4-leaf stage of development) and actively growing. | | |
| **Redvine*** | 1.5 | 1.5 |
| **Reed; common, giant** | 3 – 3.75 | 1.5 |
| For enhanced results make application in late-summer or fall. | | |
| Control can also be achieved by injecting 5 milliliters of this concentrated product (undiluted) directly into the second or third internode using a handheld injection device.[1] No surfactant is required. | | |
| **Ryegrass, perennial** | 1.5 – 2.3 | 0.75 |
| Apply this product when most target plants have reached the boot to head stage of growth. When applied prior to the boot stage, reduced control can result. In the fall, make application before ryegrass turns brown. | | |
| **Salvinia, giant** | 3 – 3.75 | 2 |
| Apply a 2-percent solution of this product containing 0.5 to 2 percent by volume of a nonionic surfactant approved for aquatic use and containing at least 70 percent active ingredient using spray-to-wet technique. For broadcast application, apply 3 to 3.75 quarts of this product per acre in 3 to 40 gallons of spray solution containing 0.1 percent by volume nonionic organosilicone and 0.25 percent nonionic spreader sticker surfactant approved for aquatic use. | | |
| Allow a minimum of 3 days after application before disturbing vegetation in the application site. This product will not control plants that are completely submerged or have a majority of foliage under water. | | |
| **Smartweed, swamp** | 2.3 – 3.75 | 1.5 |
| **Spatterdock** | 3 | 0.75 |
| Make application when most target plants are in full bloom. For enhanced results, apply in the summer or fall. | | |
| **Spurge, leafy*** | – | 1.5 |
| **Starthistle, yellow** | – | 1.5 |
| **Sweetpotato, wild*** | – | 1.5 |
| Make application when most target plants are at or beyond the bloom stage of growth. More than one application will be needed to achieve control. | | |
| **Thistle, artichoke** | 1.5 – 2.3 | 2 |

III. DIRECTIONS FOR USE ON AQUATIC AND LISTED TERRESTRIAL SITES

| Weed Species | Broadcast Rate (quarts/acre) | Handheld Spray-to-Wet Concentration (% solution) |
|---|---|---|
| Make application when target plants are at or beyond the bud stage of growth. | | |
| **Thistle, Canada** | 1.5 – 2.3 | 1.5 |
| Make application when target plants are at or beyond the bud stage of growth. | | |
| Control can also be achieved by stem-injection. Cut 8 to 9 of tallest plants in a clump at bud stage. Push a cavity needle into the stem center and then slowly remove it as you inject 0.5 milliliter of this concentrated product into the stem.[1] No surfactant required. | | |
| **Timothy** | 1.5 – 2.3 | 1.5 |
| Make application when most target plants have reached the boot to head stage of development. If application is made prior to the boot stage, reduced control can result. In the fall, make application before plants turn brown. | | |
| **Torpedograss*** | 3 – 3.75 | 0.75 – 1.5 |
| Apply this product at a lower rate or spray solution concentration within the specified range when torpedograss is growing on terrestrial sites and at a higher rate or concentration within the range when partially submerged under water or growing as a floating mat. Additional applications of this proudct will be needed to maintain control. | | |
| **Trumpetcreeper*** | 1.5 – 2.3 | 1.5 |
| **Tules, common** | – | 1.5 |
| Make application to target plants at or beyond the seedhead stage of development. Visual symptoms will be slow to appear and might not appear for 3 or more weeks after application. | | |
| **Vaseygrass** | 2.3 – 3.75 | 1.5 |
| **Velvetgrass** | 2.3 – 3.75 | 1.5 |
| **Waterhyacinth** | 2.5 – 3 | 0.75 – 1 |
| Make application when target plants are at or beyond the early bloom stage of development. Visual symptoms might require 3 or more weeks after application to appear, with complete necrosis and decomposition not occurring until 60 to 90 days after application. Use a higher application rate within the given range when more rapid visual effects are desired. | | |
| **Waterlettuce** | – | 0.75 – 1 |
| Apply a 1-percent solution of this product in areas of heavy infestation. Enhanced results can be obtained when applied from mid-summer through winter. Application in the spring could require more than one application to achieve control. | | |
| **Waterprimrose** | – | 0.75 |
| Make application to target plants that are at or beyond the bloom stage of growth, but before fall color changes occur. Thorough coverage is necessary for enhanced control. | | |
| **Wheatgrass, western** | 1.5 – 2.3 | 0.75 |
| Make application when most target plants have reached the boot to head stage of development. Application made prior to the boot stage could result in reduced control. In the fall, make application before plants turn brown. | | |

* Partial control

[1] When using stem injection, the combined total use of this product must not exceed 8 quarts per acre per year. At 5 milliliters of concentrated (undiluted) product per stem, 8 quarts will treat approximately 1500 stems per acre per year. The number of stems that can be treated per acre will vary depending on the injection volume and the concentration of this product in the application solution.

III. DIRECTIONS FOR USE ON AQUATIC AND LISTED TERRESTRIAL SITES

**Other perennials listed on this label** – Apply 2.3 to 3.75 quarts of this product per acre as a broadcast application or a 0.75- to 1.5-percent solution using a handheld sprayer.

**12.4    Woody Brush, Trees and Vines**

Apply this product to brush and trees that are actively growing after full leaf expansion, unless otherwise directed.  Use a higher application rate within a given range for larger brush and trees and/or application in areas of dense vegetative growth. For control of vines, apply this product at a higher application rate or spray solution concentration within the given range when target plants have reached the woody stage of growth.

Enhanced control of woody brush and trees is obtained when application is made in late-summer or fall after fruit formation; however, in arid areas, enhanced control can be obtained when application is made in the spring to early-summer when brush and trees are at high moisture content and flowering.  Poor control can be expected when this product is applied to drought-stressed brush and trees.

Some autumn color on undesirable deciduous species is acceptable when applying this product to brush and trees in the fall, provided no major leaf drop has occurred.  Reduced performance of this product could result if fall application is made following a frost.  Symptoms might not appear prior to frost or senescence following fall application.

For enhanced results, allow 7 or more days after application before mowing, cutting, tilling, burning or removal of woody brush, trees and vines from the application site. Additional applications of this product will be needed to control brush and trees regenerating from underground parts or seed.

TANK MIXTURES:  This product may be applied at any rate stated on this label in a tank mixture with the following products to increase the spectrum of control of herbaceous weeds, woody brush, trees and vines. For control of herbaceous weeds, apply the tank-mix product at the lower end of the given application rate or spray solution concentration range.  For control of dense stands or tough-to-control woody brush, trees and vines, increase the application rate or spray solution concentration of the tank-mix product towards the higher end of the range.  Refer to the individual product labels for approved uses and application rates. Not all tank-mix products listed are labeled for aquatic use.

imazapyr; metsulfuron methyl; triclopyr

Arsenal; Arsenal Herbicide Applicators Concentrate; Escort XP; Forestry Garlon 4 Specialty; Forestry Garlon XRT Specialty; Garlon 3A Specialty; Garlon 4 Specialty; Garlon 4 Ultra Specialty; Vastlan Specialty

Ensure that the proper amount of the Garlon herbicide is thoroughly mixed with water in the spray tank before adding this product.

**Cut Stump Application**

This product may be used to control re-growth and re-sprouting of woody brush and trees on any site listed on this label.

Cut the woody brush or tree close to the soil or water surface and immediately apply a 50- to 100-percent (undiluted) solution of this product to the freshly-cut surface using an applicator capable of applying this product to the entire cambium. A delay in application could result in reduced performance. For enhanced results, cut the woody brush or tree during period of active growth and full leaf expansion and apply this product.  No surfactant is needed for cut stump application.

For control of the tree of heaven (*Ailanthus altissima*), cut the tree close to the soil surface and immediately apply a 50-percent solution of this product (16 fluid ounces per quart of solution) and 10 percent Arsenal herbicide (3 to 4 fluid ounces per quart of solution) in water to the freshly-cut surface.

III. DIRECTIONS FOR USE ON AQUATIC AND LISTED TERRESTRIAL SITES

DO NOT MAKE A CUT STUMP APPLICATION WHEN THE ROOTS OF DESIRABLE WOODY BRUSH OR TREES MAY BE GRAFTED TO THE ROOTS OF THE CUT STUMP, AS INJURY COULD OCCUR IN THE ADJACENT TREES. Some sprouts, stems, or trees can share a common root system.  Adjacent trees having a similar age, height and spacing could be an indicator of a shared root system. Whether grafted or shared, injury is likely to occur to adjacent stems or trees when this product is applied to one or more trees sharing common root system.

**Woody Brush and Tree Injection and Frill Application**

This product may be used to control woody brush and trees listed in this section by injection or frill application on any aquatic and terrestrial site listed on this label.

Inject or apply the equivalent of 1 milliliter (0.04 fluid once) of this product for every 2 to 3 inches of trunk diameter at breast height (DBH). If injecting this product into the woody brush or tree, use equipment capable of penetrating into the living plant tissue under the bark.  No surfactant is required for direct injection of this product into woody brush and trees.

For frill application, apply a 50- to 95-percent solution of this product in water, with 0.5% or more by volume of a nonionic surfactant, to either a continuous frill around the tree or to cuts evenly spaced around the tree below all branches. As tree diameter increases, enahnced results can be achieved by applying this product to a continuous frill or more closely spaced cuttings. Avoid application techniques that allow this product to run out of the frill or cut areas.  In species that freely exude sap, make the frill or cuts at an oblique angle to produce a cupping effect and apply a 95-percent solution of this product with a nonionic surfactant as described above. For enhanced results, make this application during period of active growth and after full leaf expansion.

**Modified High-Volume and Low-Volume Backpack Application**

For control and partial control of woody bush, trees and vines listed on this label when using a backpack sprayer or other handheld equipment and a directed low-volume foliar application technique, apply a 4- to 8-percent solution of this product containing 0.5 to 1 percent by volume of a nonionic surfactant evenly over the plant crown to cover 50 percent of the upper foliage of undesirable woody brush, trees and vines.

### WOODY BRUSH, TREES AND VINES RATE TABLE

| Species | Broadcast Rate (quarts/acre) | Handheld Spray-to-Wet Concentration (% solution) |
|---|---|---|
| Alder | 2.3 – 3 | 0.75 – 1.2 |
| Ash* | 1.5 – 3.75 | 0.75 – 1.5 |
| Aspen, quaking | 1.5 – 2.3 | 0.75 – 1.2 |
| Bearclover (Bearmat)* | 1.5 – 3.75 | 0.75 – 1.5 |
| Beech* | 1.5 – 3.75 | 0.75 – 1.5 |
| Birch | 1.5 | 0.75 |
| Blackberry | 2.3 – 3 | 0.75 – 1.2 |
| Blackgum | 1.5 – 3.75 | 0.75 – 1.5 |
| Bracken | 1.5 – 3.75 | 0.75 – 1.5 |
| Broom; French, Scotch | 1.5 – 3.75 | 1.2 – 1.5 |
| Buckwheat, California* | 1.5 – 3 | 0.75 – 1.5 |

III. DIRECTIONS FOR USE ON AQUATIC AND LISTED TERRESTRIAL SITES

| Species | Broadcast Rate (quarts/acre) | Handheld Spray-to-Wet Concentration (% solution) |
|---|---|---|
| Cascara* | 1.5 – 3.75 | 0.75 – 1.5 |
| Castor bean | 1.5 – 3.75 | 1.5 |
| Also for control, inject 4 milliliters of this concentrated (undiluted) product per plant directly into the lower portion of the main stem using a handheld injection device.[1]  No surfactant is required. | | |
| Catsclaw* | – | 1.2 – 1.5 |
| For partial control, apply this product when at least 50 percent of the new leaves are fully developed. | | |
| Ceanothus* | 1.5 – 3.75 | 0.75 – 1.5 |
| Chamise* | 1.5 – 3.75 | 0.75 |
| Cherry; bitter, black, pin | 1.5 – 3.75 | 1 – 1.5 |
| Cottonwood, eastern | 1.5 – 3.75 | 0.75 – 1.5 |
| Coyote brush | 2.3 – 3 | 1.2 – 1.5 |
| For control, apply this product when at least 50 percent of the new leaves are fully developed. | | |
| Cypress; swamp, bald | 1.5 – 3.75 | 0.75 – 1.5 |
| Deerweed | 1.5 – 3.75 | 0.75 – 1.5 |
| Dewberry | 2.3 – 3 | 0.75 – 1.2 |
| Dogwood* | 3 – 3.75 | 1 – 2 |
| Elderberry | 1.5 | 0.75 |
| Elm* | 1.5 – 3.75 | 0.75 – 1.5 |
| Eucalyptus, blue gum | – | 1.5 |
| For control of eucalyptus re-sprouts, apply this product using a handheld sprayer when re-sprouts are 6 to 12 feet tall. Ensure complete coverage. | | |
| Gallberry | 1.5 – 3.75 | 0.75 – 1.5 |
| Gorse* | 1.5 – 3.75 | 0.75 – 1.5 |
| Hackberry, western | 1.5 – 3.75 | 0.75 – 1.5 |
| Hasardia* | 1.5 – 3 | 0.75 – 1.5 |
| Hawthorn | 1.5 – 2.3 | 0.75 – 1.2 |
| Hazel | 1.5 | 0.75 |
| Hickory* | 3 – 3.75 | 1 – 2 |
| Honeysuckle | 2.3 – 3 | 0.75 – 1.2 |
| Hornbeam, American* | 1.5 – 3.75 | 0.75 – 1.5 |
| Huckleberry | 1.5 – 3.75 | 0.75 – 1.5 |
| Ivy, poison | 3 – 3.75 | 1.5 |
| Kudzu | 3 | 1.5 |
| Locust, black* | 1.5 – 3 | 0.75 – 1.5 |
| Madrone resprouts* | – | 1.5 |
| Magnolia, sweetbay | 1.5 – 3.75 | 0.75 – 1.5 |
| Manzanita* | 1.5 – 3.75 | 0.75 – 1.5 |

III. DIRECTIONS FOR USE ON AQUATIC AND LISTED TERRESTRIAL SITES

| Species | Broadcast Rate (quarts/acre) | Handheld Spray-to-Wet Concentration (% solution) |
|---|---|---|
| **Maple, red** | 1 – 3.75 | 0.75 – 1.2 |
| For control, apply a 0.75- to 1.2-percent solution of this product using a handheld sprayer when leaves are fully developed. For partial control, apply 1 to 3.75 quarts per acre as a broadcast application. | | |
| **Maple, sugar** | – | 0.75 – 1.2 |
| For control, apply this product using a handheld sprayer when at least 50 percent of the new leaves are fully developed. | | |
| **Maple, vine\*** | 1.5 – 3.75 | 0.75 – 1.5 |
| **Monkey flower\*** | 1.5 – 3 | 0.75 – 1.5 |
| **Oak; black, white\*** | 1.5 – 3 | 0.75 – 1.5 |
| **Oak; northern pin** | 1.5 – 3 | 0.75 – 1.2 |
| For control, apply this product when at least 50 percent of the new leaves are fully developed. | | |
| **Oak, poison** | 3 – 3.75 | 1.5 |
| Repeat applications might be required to maintain control. Application in the fall must be made before leaves lose green color. | | |
| **Oak, post** | 2.3 – 3 | 0.75 – 1.2 |
| **Oak, red** | – | 0.75 – 1.2 |
| For control, apply this product using a handheld sprayer when at least 50 percent of the new leaves are fully developed. | | |
| **Oak, scrub\*** | 1.5 – 3 | 0.75 – 1.5 |
| Oak, southern red | 1.5 – 3.75 | 1 – 1.5 |
| **Orange, Osage** | 1.5 – 3.75 | 0.75 – 1.5 |
| **Peppertree, Brazilian (Florida holly)\*** | 1.5 – 3.75 | 1.5 |
| **Persimmon\*** | 1.5 – 3.75 | 0.75 – 1.5 |
| **Pine** | 1.5 – 3.75 | 0.75 – 1.5 |
| **Poplar, yellow\*** | 1.5 – 3.75 | 0.75 – 1.5 |
| **Prunus** | 1.5 – 3.75 | 1 – 1.5 |
| **Raspberry** | 2.3 – 3 | 0.75 – 1.2 |
| **Redbud, eastern** | 1.5 - 3.75 | 0.75 - 1.5 |
| **Redcedar, eastern** | 1.5 – 3.75 | 0.75 – 1.5 |
| **Rose,  multiflora** | 1.5 | 0.75 |
| Make application prior to leaf deterioration by leaf-feeding insects. | | |
| **Russian olive\*** | 1.5 – 3.75 | 0.75 – 1.5 |
| **Sage, black** | 1.5 – 3 | 0.75 |
| **Sage, white\*** | 1.5 – 3 | 0.75 – 1.5 |
| **Sagebrush, California** | 1.5 – 3 | 0.75 |
| **Salmonberry** | 1.5 | 0.75 |
| **Saltbush** | – | 1 |
| **Saltcedar\*** | 3 – 3.75 | 1 – 2 |

III. DIRECTIONS FOR USE ON AQUATIC AND LISTED TERRESTRIAL SITES

| Species | Broadcast Rate (quarts/acre) | Handheld Spray-to-Wet Concentration (% solution) |
|---|---|---|
| For partial control, apply a 1- to 2-percent solution of this product using a handheld sprayer or 3 to 3.75 quarts per acre as a broadcast application. For control, apply a 1- to 1.5-percent solution of this product in a tank-mix with Arsenal herbicide or Arsenal Herbicide Applicators Concentrate using a handheld sprayer. For control using broadcast application, apply 1.5 quarts of this product per acre in a tank-mix with an appropriate rate of Arsenal herbicide or Arsenal Herbicide Applicators Concentrate to plants less than 6 feet tall. To control saltcedar greater than 6 feet tall using broadcast application, apply 3 quarts of this product per acre in a tank-mix with a higher rate of Arsenal herbicide or Arsenal Herbicide Applicators Concentrate. | | |
| Sassafras* | 1.5 – 3.75 | 0.75 – 1.5 |
| Sea Myrtle | – | 1 |
| Sourwood* | 1.5 – 3.75 | 0.75 – 1.5 |
| Sumac; laurel, poison, smooth, sugarbush, winged* | 1.5 – 3 | 0.75 – 1.5 |
| Sweetgum | 1.5 – 2.3 | 0.75 – 1.5 |
| Swordfern* | 1.5 – 3.75 | 0.75 – 1.5 |
| Tallowtree, Chinese | – | 0.75 |
| Tan oak re-sprouts* | – | 1.5 |
| Thimbleberry | 1.5 | 0.75 |
| Tobacco, tree* | 1.5 – 3 | 0.75 – 1.5 |
| Toyon* | – | 1.5 |
| Trumpetcreeper | 1.5 – 2.3 | 0.75 – 1.2 |
| Vine maple* | 1.5 – 3.75 | 0.75 – 1.5 |
| Virginia creeper | 1.5 – 3.75 | 0.75 – 1.5 |
| Waxmyrtle, southern* | 1.5 – 3.75 | 1.5 |
| Willow | 2.3 | 0.75 |
| Yerba Santa, California* | – | 1.5 |

 * Partial control

**Other woody brush and trees listed on this label** – For partial control, apply 1.5 to 3.75 quarts of this product per acre as a broadcast application or a 0.75- to 1.5-percent solution using a handheld sprayer and a spray-to-wet application technique.

## 13.0   LIMIT OF WARRANTY AND LIABILITY

Monsanto Company ("Company") warrants that this product conforms to the chemical description on the label. TO THE EXTENT CONSISTENT WITH APPLICABLE LAW, NO OTHER EXPRESS WARRANTY OR IMPLIED WARRANTY OF FITNESS FOR PARTICULAR PURPOSE OR MERCHANTABILITY IS MADE. This warranty is also subject to the conditions and limitations stated herein.

Buyer and all users shall use this product only for the purposes of and in accordance with the Complete Directions for Use label ("Directions") and shall promptly notify this Company of any claims whether based in contract, negligence, strict liability, other tort or otherwise.

III. DIRECTIONS FOR USE ON AQUATIC AND LISTED TERRESTRIAL SITES

To the extent consistent with applicable law, buyer and all users are responsible for all loss, injuries or damage from use or handling which results from conditions beyond the control of this Company, including, but not limited to, incompatibility with products other than those set forth in the Directions, application to or contact with desirable vegetation, crop injury or failure of this product to control weed biotypes which develop resistance to glyphosate, unusual weather, weather conditions which are outside the range considered normal at the application site and for the time period when the product is applied, as well as weather conditions which are outside the application ranges set forth in the Directions, use and/or application in any manner not explicitly set forth in or inconsistent with the Directions, moisture conditions outside the moisture range specified in the Directions, or the presence of products other than those set forth in the Directions in or on the soil, crop or treated vegetation.

This Company does not warrant any product reformulated or repackaged from this product except in accordance with this Company's stewardship requirements and with express written permission from this Company.

[*Optional statement for agricultural-use products, if applicable:* For in-crop (over-the-top) uses on Roundup Ready crops, crop safety and weed control performance are not warranted by Monsanto when this product is used in conjunction with "brown bag" or "bin run" seed saved from previous year's production and replanted.]

TO THE EXTENT CONSISTENT WITH APPLICABLE LAW, THE EXCLUSIVE REMEDY OF THE USER OR BUYER, AND THE LIMIT OF THE LIABILITY OF THIS COMPANY OR ANY OTHER SELLER FOR ANY AND ALL LOSSES, INJURIES OR DAMAGES RESULTING FROM THE USE OR HANDLING OF THIS PRODUCT (INCLUDING CLAIMS BASED IN CONTRACT, NEGLIGENCE, STRICT LIABILITY, OTHER TORT OR OTHERWISE) SHALL BE THE PURCHASE PRICE PAID BY THE USER OR BUYER FOR THE QUANTITY OF THIS PRODUCT INVOLVED, OR, AT THE ELECTION OF THIS COMPANY OR ANY OTHER SELLER, THE REPLACEMENT OF SUCH QUANTITY, OR, IF NOT ACQUIRED BY PURCHASE, REPLACEMENT OF SUCH QUANTITY. TO THE EXTENT CONSISTENT WITH APPLICABLE LAW, IN NO EVENT SHALL THIS COMPANY OR ANY OTHER SELLER BE LIABLE FOR ANY INCIDENTAL, CONSEQUENTIAL OR SPECIAL DAMAGES.

Upon opening and using this product, buyer and all users are deemed to have accepted the terms of this LIMIT OF WARRANTY AND LIABILITY which may not be varied by any verbal or written agreement. If terms are not acceptable, return at once unopened.

---

[Amplify, Bullet, Certainty, Degree, Degree Xtra, Harness, INTRRO, Lariat, Lasso, Micro-Tech, Monsanto and Vine Design, Outrider, Roundup, Roundup Custom and Design, [*ALTERNATE BRAND NAME and DESIGN*], Roundup Original, Roundup Ready, Roundup Ready 2 Technology, Roundup Ready 2 Yield, Roundup Ready PLUS and Design, Rowel, TripleFLEX, TRUEBLUE ADVANTAGE PROVEN RELIABLE SUPPORTED and Design, TruFlex and Warrant] are [registered] trademarks of Monsanto Technology LLC. All other trademarks are the property of their respective owners.

EPA Reg. No. 524-343

---

In case of an emergency involving this product, or for medical assistance,
call collect, day or night, (314) 694-4000.

---

©[Year]

Packed for:

MONSANTO COMPANY
800 N. LINDBERGH BLVD.
ST. LOUIS, MISSOURI, 63167 U.S.A.

III. DIRECTIONS FOR USE ON AQUATIC AND LISTED TERRESTRIAL SITES

[*Insert print plate number*]
[*Insert barcode*]



| U.S. ENVIRONMENTAL PROTECTION AGENCY<br>Office of Pesticide Programs<br>Registration Division (7505P)<br>1200 Pennsylvania Ave., N.W.<br>Washington, D.C. 20460 | EPA Reg. Number:<br><br>93236-4 | Date of Issuance:<br><br>2/22/18 |
|---|---|---|

NOTICE OF PESTICIDE:
  _X_ Registration
  ___ Reregistration
  (under FIFRA, as amended)

**Term of Issuance:**

Unconditional

**Name of Pesticide Product:**

ROUNDUP QUIKPRO
HERBICIDE

**Name and Address of Registrant (include ZIP Code):**

Stephen A. Adams
Seamless Control LLC
14111 Scottslawn Road
Maryville, OH 43041

**Note:** Changes in labeling differing in substance from that accepted in connection with this registration must be submitted to and accepted by the Registration Division prior to use of the label in commerce.  In any correspondence on this product always refer to the above EPA registration number.

On the basis of information furnished by the registrant, the above named pesticide is hereby registered under the Federal Insecticide, Fungicide and Rodenticide Act.

Registration is in no way to be construed as an endorsement or recommendation of this product by the Agency. In order to protect health and the environment, the Administrator, on his motion, may at any time suspend or cancel the registration of a pesticide in accordance with the Act. The acceptance of any name in connection with the registration of a product under this Act is not to be construed as giving the registrant a right to exclusive use of the name or to its use if it has been covered by others.

This product is unconditionally registered in accordance with FIFRA section 3(c)(5) provided that you:

1. Submit and/or cite all data required for registration/reregistration/registration review of your product when the Agency requires all registrants of similar products to submit such data.

2. Make the following label changes before you release the product for shipment:

   • Revise the EPA Registration Number to read, "EPA Reg. No. 93236-4."

3. Submit one copy of the revised final printed label for the record before you release the product for shipment.

| **Signature of Approving Official:** | **Date:** |
|---|---|
| *[signature]*<br><br>Reuben Baris, Product Manager 25<br>Herbicides Branch, Registration Division (7505P) | 2/22/18 |

EPA Form 8570-6

Registration Notice Unconditional v.20150320

Page 2 of 2
EPA Reg. No. 93236-4
Decision No. 534655


Should you wish to add/retain a reference to the company's website on your label, then please be aware that the website becomes labeling under the Federal Insecticide Fungicide and Rodenticide Act and is subject to review by the Agency. If the website is false or misleading, the product would be misbranded and unlawful to sell or distribute under FIFRA section 12(a)(1)(E). 40 CFR 156.10(a)(5) list examples of statements EPA may consider false or misleading. In addition, regardless of whether a website is referenced on your product's label, claims made on the website may not substantially differ from those claims approved through the registration process. Therefore, should the Agency find or if it is brought to our attention that a website contains false or misleading statements or claims substantially differing from the EPA approved registration, the website will be referred to the EPA's Office of Enforcement and Compliance.

If these conditions are not complied with, the registration will be subject to cancellation in accordance with FIFRA section 6. Your release for shipment of the product constitutes acceptance of these conditions. A stamped copy of the label is enclosed for your records. Please also note that the record for this product currently contains the following CSFs:

- Basic CSF dated 10/05/2017
- Alternate CSF A dated 10/05/2017
- Alternate CSF B dated 10/05/2017

If you have any questions, please contact Maggie Rudick by phone at 703-347-0257, or via email at rudick.maggie@epa.gov.


Enclosure

# MASTER LABEL FOR EPA REG. NO. 93236-4

Primary Brand Name:

## Roundup QuikPRO® Herbicide

Alternate Brand Name(s):
(none)

## Master Label Table of Contents

| I. | Container Labels | 2 - 25 |
|---|---|---|
| II. | Directions for Use on Industrial, Turf and Ornamental Sites | 26 - 44 |

**See Directions-for-Use section for a more detailed Table of Contents**

**ACCEPTED**

02/22/2018

Under the Federal Insecticide, Fungicide
and Rodenticide Act as amended, for the
pesticide registered under
EPA Reg. No. 93236-4

| I. CONTAINER LABELS |
| --- |

**1.0   FOIL PACKET CONTAINER BOXED WITH SEPARATE DIRECTIONS FOR USE BOOKLET**

[*Small quantities of this product are packaged in foil packets that are not labeled for individual sale and boxed in various quantities along with a directions for use booklet. These boxes of individually wrapped product are then packaged in a larger container for shipping and sale, or the larger container can be opened and the smaller boxes containing individually wrapped product sold individually. Point of sale display units for this product are also provided.*]

**1.1   Minimum Text for Foil Packet Container**

# [**INSERT BRAND NAME**] [Logo]

[*Optional marketing claims and/or logos on this Master Label may be added to the packet*]

A [*Alternative:* [**INSERT BRAND NAME**] is a] fast-acting non-selective [*Optional text:* professional] herbicide for use on industrial, turf and ornamental sites.]

[*Alternative product statement:* A [*Alternative:* [**INSERT BRAND NAME**] is a] fast-acting, non-selective [*Optional text:* professional] herbicide for use on non-crop areas and industrial sites.]

[*Alternative product statement:* A [*Alternative:* [**INSERT BRAND NAME**] is a] fast-acting, non-selective herbicide intended for use by industrial, turf and ornamental professionals.]

[*Alternative product statement:* A [*Alternative:* [**INSERT BRAND NAME**] is a] fast-acting [*Optional text:* professional] herbicide for non-selective weed control.]

(See the Complete Directions for Use for approved uses and sites.)

[*Optional text for 1.5-ounce packet:* Add one 1.5 oz. packet per one gallon of water] [*Optional starburst graphic*]

Read the complete product labeling for this product before using.

User must read and follow all directions.

---

ACTIVE INGREDIENTS:
Glyphosate, N-(phosphonomethyl)glycine, in the form of its ammonium salt.................................... 73.3%
Diquat dibromide [6,7-dihydrodipyrido (1,2-a;2',1'-c) pyrazinediium dibromide]................................ 2.9%
OTHER INGREDIENTS .................................................................................................................. 23.8%
100.0%

One pound of [**INSERT BRAND NAME**] contains 0.733 pound of the ammonium salt of glyphosate, which is equivalent to 0.666 pound of the acid, glyphosate (66.6%), and 0.029 pound of the dibromide salt of diquat.

---

[*Optional label text that will be updated at the time of printing, if necessary:* This product is protected by [O*ptional text:* one or more of the following] U.S. Patent No. 7,008,904.]

[*Optional label text, if applicable:* Other patents pending]

[*Optional label text, if applicable:* No license granted under any patent to use this product other than in accordance with this label.]

[*Optional label text, if applicable:* No license granted under any non-U.S. patent(s).]

---

Keep Out of Reach of Children

# CAUTION

[*Optional text, as applicable:* See complete product labeling for additional [*Optional text, as applicable:* Precautions, First Aid [and] information on Personal Protective Equipment].]

**DIRECTIONS FOR USE**

It is a violation of Federal law to use this product in any manner inconsistent with its labeling. See separate product labeling for Complete Directions for Use, Storage and Disposal, and other important information about this product.

Read the entire Directions for Use before using.

[*Optional text:* For product information or assistance using this product call [O*ptional text, if applicable:* toll-free] 1-800-332-3111 [*Or insert alternative telephone number, as appropriate*].]

[*Optional text:* In case of an emergency involving this product, call [*Optional text, as applicable:* collect,] day or night (314)-694-4000.]

EPA Reg. No. 93236-4

EPA Est. [*Insert appropriate EPA establishment number*]

[*Insert net contents, as appropriate:* NET [*insert appropriate value or leave blank line for refillable container*] OZ [*or other appropriate unit of measure*]] [*Alternative label text:* NET CONTENTS]

[*Optional text, if applicable:* [*INSERT BRAND NAME and Design* [and] TRUEBLUE ADVANTAGE PROVEN RELIABLE SUPPORT and Design] are [registered] trademarks of Seamless Control LLC.]

[*Optional text, if applicable:* Roundup QuikPRO and Design is a [registered] trademark of Monsanto Technology LLC and used under license.]

[*Optional text, if applicable:* All other trademarks are the property of their respective owners.]

[*Insert LOT number or LOT number will be printed directly on the packaging*]

[*Optional label text, if applicable:* Product of Brazil; Formulated in the U.S. with U.S. Ingredients]

© [YEAR]

Packed [*Alternative text:* Produced] [*Alternative text:* Manufactured] for:
SEAMLESS CONTROL LLC
14111 SCOTTSLAWN ROAD
MARYSVILLE, OH 43041

[*Optional label text:* FOR CHEMICAL SPILL, LEAK, FIRE, OR EXPOSURE, CALL CHEMTREC AT (800) 424-9300]

[*Optional text:* This [*Optional text:* multipack] unit is not labeled for individual sale]

[*Optional text:* [To Open] Cut Here] [*scissors illustrating opening instructions*]

[*Optional: Insert date*]

[*Insert print plate number and barcode(s) as applicable*]

## 1.1 Multiple Foil Packet Shipping and Display Containers

[*FRONT PANEL*]

# [INSERT BRAND NAME] [Logo]

| GLYPHOSATE | GROUP | 9 | HERBICIDE |
|---|---|---|---|
| DIQUAT | GROUP | 22 | HERBICIDE |

[*Optional marketing claims and/or logos on this Master Label may be added to the multi-foilpack shipping and display container*]

A [*Alternative:* **INSERT BRAND NAME**] is a] fast-acting non-selective [*Optional text:* professional] herbicide for use on industrial, turf and ornamental sites.]

[*Alternative product statement:* A [*Alternative:* **INSERT BRAND NAME**] is a] fast-acting, non-selective [*Optional text:* professional] herbicide for use on non-crop areas and industrial sites.]

[*Alternative product statement:* A [*Alternative:* **INSERT BRAND NAME**] is a] fast-acting, non-selective herbicide intended for use by industrial, turf and ornamental professionals.]

[*Alternative product statement:* A [*Alternative:* **INSERT BRAND NAME**] is a] fast-acting [*Optional text:* professional] herbicide for non-selective weed control.]

(See the Complete Directions for Use for approved uses and sites.)

[*Optional text:* Add [*Insert number of packets*] [*Insert net weight of product inside packet*] oz. packet per [*Insert volume of spray solution*] gallon of water] [*Optional starburst graphic*]

---

ACTIVE INGREDIENTS:
Glyphosate, N-(phosphonomethyl)glycine, in the form of its ammonium salt.................................... 73.3%
Diquat dibromide [6,7-dihydrodipyrido (1,2-a;2',1'-c) pyrazinediium dibromide]................................ 2.9%
OTHER INGREDIENTS ......................................................................................................  23.8%
100.0%

One pound of [**INSERT BRAND NAME**] contains 0.733 pound of the ammonium salt of glyphosate, which is equivalent to 0.666 pound of the acid, glyphosate (66.6%), and 0.029 pound of the dibromide salt of diquat.

---

Keep Out of Reach of Children

# CAUTION

[*Optional text, as applicable:*  See side [*Optional text, as applicable:* [and] back] panel[s] for additional] [*Optional text, as applicable:* Precautions, First Aid [and] information on Personal Protective Equipment].]

Complete Directions for Use for this product [*Optional text, if applicable:* in English and Spanish] inside [*Optional text:* each individual box].

Read the complete product labeling for this product before using.

Use only according to label directions.

[*Indicate package contents, as appropriate:*  NET [*Alternative text:* CONTAINS] [*Insert number of individual packets*] [*Optional text:* X] ([*Insert weight of product in individual packet*] OZ)

[*SIDE PANELS*]

AVOID CONTACT OF THIS HERBICIDE WITH FOLIAGE, [*Optional text:* GREEN] STEMS, EXPOSED NON-WOODY ROOTS, OR FRUIT OF CROPS, DESIRABLE PLANTS AND TREES, AS SEVERE PLANT INJURY OR DESTRUCTION COULD RESULT.

Read the "LIMIT OF WARRANTY AND LIABILITY" statement on the product labeling inside before buying or using. If terms are not acceptable, return at once unopened.

---

### PRECAUTIONARY STATEMENTS

---

Hazards to Humans and Domestic Animals

---

Keep out of reach of children

# CAUTION

Harmful if swallowed

Harmful if inhaled

Causes moderate eye irritation

Avoid breathing dust or spray mist

Avoid contact with eyes or clothing

Remove contaminated clothing and wash clothing before reuse.

Wash thoroughly with soap and water after handling.

| FIRST AID | |
|---|---|
| **IF SWALLOWED** | • Call a physician or Poison Control Center for treatment advice.<br>• Have person sip a glass of water, if able to swallow.<br>• Do not induce vomiting unless told to do so by a Poison Control Center or physician.<br>• Do not give anything by mouth to an unconscious person.<br>• Quick treatment is essential to counteract poisoning and should be initiated before signs and symptoms of injury appear. |
| **IF INHALED** | • Move person to fresh air.<br>• If person is not breathing, call 911 or an ambulance, then give artificial respiration, preferably mouth-to-mouth, if possible.<br>• Call a Poison Control Center or physician for further treatment advice. |
| **IF IN EYES** | • Hold eye open and rinse slowly and gently with water for 15 to 20 minutes.<br>• Remove contact lenses, if present, after the first 5 minutes, then continue rinsing eye.<br>• Call a Poison Control Center or physician for treatment advice. |

• Have the product container or labeling with you when calling a poison control center or physician, or going for treatment.
• You can also call [O*ptional text, if applicable:* toll-free] **(314) 694-4000** [*Or insert alternative telephone number, as appropriate*] [O*ptional text, if applicable*:, collect, day or night,] for emergency medical treatment information.
• This product is identified as [**INSERT BRAND NAME**], **EPA Registration No. 93236-4**.

DOMESTIC ANIMALS: Keep livestock and pets out of treated areas. Do not graze livestock on treated areas. This product is considered to be relatively nontoxic to dogs and other domestic animals; however, ingestion of this product or large amounts of freshly sprayed vegetation could result in temporary

gastrointestinal irritation (vomiting, diarrhea, colic, etc.). If such symptoms are observed, provide the animal with plenty of fluids to prevent dehydration. Call a veterinarian if symptoms persist for more than 24 hours.

**Personal Protective Equipment (PPE)**

Applicators and other handlers must wear:  long-sleeved shirt and long pants, protective footwear plus socks, and protective eyewear. Follow manufacturer's instructions for cleaning/maintaining Personal Protective Equipment (PPE). If there are no instructions for washables, use detergent and hot water. Keep and wash PPE separately from other laundry.

---

**User Safety Recommendations**

Users should:

- Wash hands thoroughly after handling and before eating, drinking, chewing gum, using tobacco, or using the toilet.
- Remove clothing/PPE immediately if pesticide gets inside.  Then wash throroughly and put on clean clothing.
- Remove PPE immediately after handling this product.  As soon as possible, wash thoroughly and change into clean clothing.

---

[*Optional text, as applicable:*  See product labeling inside [*Optional text:* each individual box] for additional] [*Optional text, as applicable:* Precautions, First Aid [and] information on Personal Protective Equipment].]

[*Optional text:* (Continued on back panel)]

[*Optional text:* (Continued from side panel)]

---

Environmental Hazards

---

This product is toxic to aquatic invertebrates.  Do not apply directly to water, to areas where surface water is present or to intertidal areas below the mean high water mark.  Do not contaminate water when cleaning equipment or disposing of equipment wash waters and rinsate.

---

Physical or Chemical Hazards

---

Spray solutions of this product may be mixed, stored and applied using stainless steel, fiberglass, plastic or plastic-lined steel containers.

DO NOT MIX, STORE OR APPLY THIS PRODUCT OR SPRAY SOLUTIONS OF THIS PRODUCT IN GALVANIZED STEEL OR UNLINED STEEL (EXCEPT STAINLESS STEEL) CONTAINERS OR SPRAY TANKS. This product or spray solutions of this product react with such containers and tanks to produce hydrogen gas, which can form a highly combustible gas mixture. This gas mixture could flash or explode if ignited by open flame, spark, welder's torch, lighted cigarette or other ignition source and cause serious personal injury.

---

**DIRECTIONS FOR USE**

---

It is a violation of Federal law to use this product in any manner inconsistent with its labeling.  Do not apply this product in a way that will contact workers or other persons, either directly or through drift. Only protected handlers may be in the area during application. For any requirements specific to your State or Tribe, consult the agency responsible for pesticide regulation.

**Entry Restrictions**:  Keep all unprotected persons out of operating areas or vicinity where there may be drift.  Keep people and pets off treated areas until spray solution has dried.

See additional labeling inside [*Optional text:* individual box] for Complete Directions for Use of this product [*Optional text:* in English and Spanish].

Read the entire Directions for Use before using.

User must read and follow all directions.

For product information or assistance using this product call [O*ptional text, if applicable:* toll-free] 1-800-332-3111 [*Or insert alternative telephone number, as appropriate*].

---

**STORAGE AND DISPOSAL**

Proper pesticide storage and disposal are essential to protect against exposure to people and the environment due to leaks and spills, excess product or waste, and vandalism. Do not allow this product to contaminate water, foodstuffs, feed or seed by storage or disposal.

**PESTICIDE STORAGE:** Store pesticides away from food, pet food, feed, seed, fertilizers, and veterinary supplies.  Keep container closed to prevent spills and contamination.

**PESTICIDE DISPOSAL:** To avoid wastes, use all material in the foil packet by application in accordance with label directions. If wastes cannot be avoided, offer remaining product to a waste disposal facility or pesticide disposal program. Such programs are often run by state or local governments or by industry. All disposal must be in accordance with applicable federal, state and local procedures.

**CONTAINER HANDLING AND DISPOSAL:**  Empty the contents of this packet into sprayer or mixing tank by tapping the sides while holding the open packet over the tank.  When empty, dispose of the foil packet in a sanitary landfill.

---

[*Optional text, if applicable:* [*INSERT BRAND NAME and Design* [and] TRUEBLUE ADVANTAGE PROVEN RELIABLE SUPPORT and Design] are [registered] trademarks of Seamless Control LLC.]

[*Optional text, if applicable:* Roundup QuikPRO and Design is a [registered] trademark of Monsanto Technology LLC and used under license.]

[*Optional text, if applicable:*  All other trademarks are the property of their respective owners.]

[*Insert LOT number or LOT number will be printed directly on the container*]

[*Optional label text, if applicable:* Product of Brazil; Formulated in the U.S. with U.S. Ingredients]

Packed [*Alternative text:* Produced] [*Alternative text:* Manufactured] for:
SEAMLESS CONTROL LLC
14111 SCOTTSLAWN ROAD
MARYSVILLE, OH 43041

© [YEAR]

EPA Reg. No. 93236-4

EPA Est. [*Insert appropriate EPA establishment number*]

[*Optional label text:* FOR CHEMICAL SPILL, LEAK, FIRE, OR EXPOSURE, CALL CHEMTREC AT (800) 424-9300]

[*Optional text:* STOP! DO NOT CUT HERE! SPECIAL DISPLAY TRAY ENCLOSED. OPEN FROM BOTTOM. SLIT TAPE AND LIFT OFF DISPLAY TRAY] [*Optional graphic illustration of opening instructions*]

[*Optional text:* THIS SIDE UP] [*Optional graphic of two arrows pointing upward*]

[*Optional: Insert date*]

[*Insert print plate number and barcode(s) as applicable*]

## 2.0   RIGID NONREFILLABLE  PLASTIC CONTAINERS WITH EXTENDED CONTENT LABEL OR SEPARATE DIRECTIONS FOR USE BOOKLET

[*Larger quantities of this product can be packaged in rigid nonrefillable plastic containers with an extended content label (ECL) containing the directions for use.  These plastic containers can be shipped in cardboard packaging.  Point of sale display units for this product are also provided.*]

### 2.1   Rigid Nonrefillable Plastic Container

[*FRONT PANEL*]

## [**INSERT BRAND NAME**] [Logo]

| GLYPHOSATE | GROUP | 9 | HERBICIDE |
|---|---|---|---|
| DIQUAT | GROUP | 22 | HERBICIDE |

[*Optional marketing claims and/or logos on this Master Label may be added to the Front Panel*]

A [*Alternative:* [**INSERT BRAND NAME**] is a] fast-acting non-selective [*Optional text:* professional] herbicide for use on industrial, turf and ornamental sites.]

[*Alternative product statement:* A [*Alternative:* [**INSERT BRAND NAME**] is a] fast-acting, non-selective [*Optional text:* professional] herbicide for use on non-crop areas and industrial sites.  ]

[*Alternative product statement:* A [*Alternative:* [**INSERT BRAND NAME**] is a] fast-acting, non-selective herbicide intended for use by industrial, turf and ornamental professionals.]

[*Alternative product statement:* A [*Alternative:* [**INSERT BRAND NAME**] is a] fast-acting [*Optional text:* professional] herbicide for non-selective weed control.]

(See the Complete Directions for Use for approved uses and sites.)

ACTIVE INGREDIENTS:
Glyphosate, N-(phosphonomethyl)glycine, in the form of its ammonium salt.....................................  73.3%
Diquat dibromide [6,7-dihydrodipyrido (1,2-a;2',1'-c) pyrazinediium dibromide]...............................  2.9%
OTHER INGREDIENTS .......................................................................................................  23.8%
                                                                                                                                                        100.0%

One pound of [**INSERT BRAND NAME**] contains 0.733 pound of the ammonium salt of glyphosate, which is equivalent to 0.666 pound of the acid, glyphosate (66.6%), and 0.029 pound of the dibromide salt of diquat.

Keep Out of Reach of Children

# CAUTION

[*Optional label text, if applicable:* See back panel for additional] [*Optional text, as applicable:* Precautions [and] First Aid].

See attached labeling on back [*Alternative text, if applicable:* separate product labeling] for Complete Directions for Use [*Optional text:* in English and Spanish]

User must read and follow all directions.

[*Insert net contents, as appropriate:* NET WT [*insert appropriate value*] LBS] [*or other appropriate unit of measure*]] [*Alternative label text:* NET CONTENTS]

[*Optional text, if applicable:* Container filled by weight, not volume]

[*Insert print plate number and barcode(s), as applicable*]

[*BACK PANEL*]

---

### PRECAUTIONARY STATEMENTS

---

Hazards to Humans and Domestic Animals

---

Keep out of reach of children

# CAUTION

[*Optional label text, if applicable:* See attached [*Alternative text, if applicable:* separate product] labeling for additional] [*Optional text, as applicable:* Precautions [and] First Aid].

Harmful if swallowed

Harmful if inhaled

Causes moderate eye irritation

Avoid breathing dust or spray mist

Avoid contact with eyes or clothing

Remove contaminated clothing and wash clothing before reuse.

Wash thoroughly with soap and water after handling.

| FIRST AID | |
|---|---|
| **IF SWALLOWED** | • Call a physician or Poison Control Center for treatment advice.<br>• Have person sip a glass of water, if able to swallow.<br>• Do not induce vomiting unless told to do so by a Poison Control Center or physician.<br>• Do not give anything by mouth to an unconscious person.<br>• Quick treatment is essential to counteract poisoning and should be initiated before signs and symptoms of injury appear. |
| **IF INHALED** | • Move person to fresh air.<br>• If person is not breathing, call 911 or an ambulance, then give artificial respiration, preferably mouth-to-mouth, if possible.<br>• Call a Poison Control Center or physician for further treatment advice. |
| **IF IN EYES** | • Hold eye open and rinse slowly and gently with water for 15 to 20 minutes. |

|  | • Remove contact lenses, if present, after the first 5 minutes, then continue rinsing eye. |
|  | • Call a Poison Control Center or physician for treatment advice. |

• Have the product container or labeling with you when calling a poison control center or physician, or going for treatment.

• You can also call [O*ptional text, if applicable:* toll-free] **(314) 694-4000** [*Or insert alternative telephone number, as appropriate*] [O*ptional text, if applicable:*, collect, day or night,] for emergency medical treatment information.

• This product is identified as [**INSERT BRAND NAME**], **EPA Registration No. 93236-4**.

---

**User Safety Recommendations**

Users should:

• Wash hands thoroughly after handling and before eating, drinking, chewing gum, using tobacco, or using the toilet.

• Remove clothing/PPE immediately if pesticide gets inside. Then wash thoroughly and put on clean clothing.

• Remove PPE immediately after handling this product. As soon as possible, wash thoroughly and change into clean clothing.

---

**Personal Protective Equipment (PPE)**

Applicators and other handlers must wear: long-sleeved shirt and long pants, protective footwear plus socks, and protective eyewear. Follow manufacturer's instructions for cleaning/maintaining Personal Protective Equipment (PPE). If there are no instructions for washables, use detergent and hot water. Keep and wash PPE separately from other laundry.

[O*ptional label text, if applicable:* See attached [*Alternative text, if applicable:* separate product] labeling for additional [O*ptional text, as applicable:* Precautions, First Aid [and] information on Personal Protective Equipment].

## DIRECTIONS FOR USE

It is a violation of Federal law to use this product in any manner inconsistent with its labeling. Do not apply this product in a way that will contact workers or other persons, either directly or through drift. Only protected handlers may be in the area during application. For any requirements specific to your State or Tribe, consult the agency responsible for pesticide regulation.

**Entry Restrictions**: Keep all unprotected persons out of operating areas or vicinity where there may be drift. Keep people and pets off treated areas until spray solution has dried.

See attached [*Alternative text, if applicable:* separate product] labeling for Complete Directions for Use of this product [O*ptional text:* in English and Spanish].

Read the entire Directions for Use before using.

User must read and follow all directions.

## STORAGE AND DISPOSAL

Proper pesticide storage and disposal are essential to protect against exposure to people and the environment due to leaks and spills, excess product or waste, and vandalism. Do not allow this product to contaminate water, foodstuffs, feed or seed by storage or disposal.

**PESTICIDE STORAGE:** Store pesticides away from food, pet food, feed, seed, fertilizers, and veterinary supplies.  Keep container closed to prevent spills and contamination.

**PESTICIDE DISPOSAL:** To avoid wastes, use all material in this container by application in accordance with label directions. If wastes cannot be avoided, offer remaining product to a waste disposal facility or pesticide disposal program. Such programs are often run by state or local governments or by industry. All disposal must be in accordance with applicable federal, state and local procedures.

**CONTAINER HANDLING AND DISPOSAL:** Nonrefillable container. Do not reuse or refill this container.

[*Alternative container statement:* Nonrefillable container. Do not reuse this container to hold materials other than pesticides or dilute pesticides (rinsate).  After emptying and cleaning, it may be allowable to temporarily hold rinsate or other pesticide-related materials in this container.  Contact your state regulatory agency to determine allowable practices in your state.]

Triple rinse or pressure rinse (or equivalent) this container promptly after emptying.

[*Optional text, if applicable:* See inside [*Alternative text, if applicable:* separate product labeling] for additional container rinsing directions.]

Triple rinse as follows:  Empty the remaining contents into application equipment or mix-tank and continue to drain for 10 seconds after the flow begins to drip.  Fill the container ¼ full with water and recap.  Shake for 10 seconds.  Pour rinsate into application equipment or mix-tank, or store rinsate for later use or disposal.  Continue to drain for 10 seconds after the flow begins to drip.  Repeat this procedure two more times.

Pressure rinse as follows:  Empty the remaining contents into application equipment or mix-tank and continue to drain for 10 seconds after the flow begins to drip. Place container so that it can drain directly into application equipment or mix-tank while rinsing, or collect rinsate for later use or disposal.  Insert pressure rinsing nozzle into the side of the container and rinse at about 40 PSI for at least 30 seconds. Continue to drain for 10 seconds after the flow begins to drip.

Once properly rinsed, some plastic pesticide containers can be taken to a container collection site or picked up for recycling.  [*Alternative container disposal statement:* Then offer the container for recycling, if available.]

[*Optional container disposal statement:* To find the nearest collection site, contact your chemical dealer [*Optional text:* or *INSERT COMPANY NAME* at *TELEPHONE NUMBER*] [*Optional text:* or call1-800-768-6387] [*Alternative telephone numbers:* 1-800-ROUNDUP (1-800-768-6387)].]

If recycling is not available, dispose of in accordance with federal, state and local regulations and procedures, which may include puncturing the properly rinsed container and disposing in a sanitary landfill.

[*Optional text:* [*INSERT BRAND NAME and Design*] is a [registered] trademark of Seamless Control LLC.]

[*Optional text:* Roundup Quik PRO and Design is a [registered] trademark of Monsanto Technology LLC and used under license.]

EPA Reg. No. 93236-4

EPA Est. [*Insert appropriate establishment number*]

Packed [*Alternative text:* Produced] [*Alternative text:* Manufactured] for:
SEAMLESS CONTROL LLC

14111 SCOTTSLAWN ROAD
MARYSVILLE, OH 43041 USA

©[YEAR]

[*Optional: Insert date*]

[*Insert print plate number*]

[*Insert barcodes*]

[*Optional text:* ATTACH COMPLETE DIRECTIONS FOR USE HERE]

[*Optional text that will be hidden behind the attached Extended Content Label and only become visible if the ECL is removed:*  COMPLETE DIRECTIONS FOR USE HAVE BEEN REMOVED]

[*Optional label text:* FOR CHEMICAL SPILL, LEAK, FIRE, OR EXPOSURE, CALL CHEMTREC AT (800) 424-9300]

**2.1    Extended Content Labeling**

[*The following represents the complete labeling text that must appear on the additional pages attached to the container base label as an Extended Content Label with complete directions for use.*]

[*FRONT PANEL*]

---

### PRECAUTIONARY STATEMENTS

Hazards to Humans and Domestic Animals

---

Keep out of reach of children

# CAUTION

[*Optional label text, if applicable:* See inside for additional] [*Optional text, as applicable:* Precautions [and] First Aid].]

Harmful if swallowed

Harmful if inhaled

Causes moderate eye irritation

Avoid breathing dust or spray mist

Avoid contact with eyes or clothing

Remove contaminated clothing and wash clothing before reuse.

Wash thoroughly with soap and water after handling.

| FIRST AID | |
|---|---|
| **IF SWALLOWED** | • Call a physician or Poison Control Center for treatment advice.<br>• Have person sip a glass of water, if able to swallow.<br>• Do not induce vomiting unless told to do so by a Poison Control Center or physician.<br>• Do not give anything by mouth to an unconscious person.<br>• Quick treatment is essential to counteract poisoning and should be initiated before signs and symptoms of injury appear. |

| IF INHALED | • Move person to fresh air. |
| | • If person is not breathing, call 911 or an ambulance, then give artificial respiration, preferably mouth-to-mouth, if possible. |
| | • Call a Poison Control Center or physician for further treatment advice. |
| IF IN EYES | • Hold eye open and rinse slowly and gently with water for 15 to 20 minutes. |
| | • Remove contact lenses, if present, after the first 5 minutes, then continue rinsing eye. |
| | • Call a Poison Control Center or physician for treatment advice. |

- Have the product container or labeling with you when calling a poison control center or physician, or going for treatment.
- You can also call [O*ptional text, if applicable:* toll-free] **(314) 694-4000** [*Or insert alternative telephone number, as appropriate*] [O*ptional text, if applicable:*, collect, day or night,] for emergency medical treatment information.
- This product is identified as [**INSERT BRAND NAME**], **EPA Registration No. 93236-4**.

---

**User Safety Recommendations**

Users should:

- Wash hands thoroughly after handling and before eating, drinking, chewing gum, using tobacco, or using the toilet.
- Remove clothing/PPE immediately if pesticide gets inside. Then wash thoroughly and put on clean clothing.
- Remove PPE immediately after handling this product.  As soon as possible, wash thoroughly and change into clean clothing.

---

**Personal Protective Equipment (PPE)**

Applicators and other handlers must wear:  long-sleeved shirt and long pants, protective footwear plus socks, and protective eyewear. Follow manufacturer's instructions for cleaning/maintaining Personal Protective Equipment (PPE). If there are no instructions for washables, use detergent and hot water. Keep and wash PPE separately from other laundry.

[*Optional label text, if applicable:*  See inside [*Alternative text, if applicable:* separate product labeling] for additional [*Optional text, as applicable:* Precautions, First Aid [and] information on Personal Protective Equipment].

---

### DIRECTIONS FOR USE

It is a violation of Federal law to use this product in any manner inconsistent with its labeling.  Do not apply this product in a way that will contact workers or other persons, either directly or through drift. Only protected handlers may be in the area during pesticide application. For any requirements specific to your State or Tribe, consult the agency responsible for pesticide regulation.

**Entry Restrictions**:  Keep all unprotected persons out of operating areas or vicinity where there may be drift.  Keep people and pets off treated areas until spray solution has dried.

See inside for Complete Directions for Use of this product [*Optional text:* in English and Spanish].

Read the entire Directions for Use before using.

User must read and follow all directions.

---

### STORAGE AND DISPOSAL

Proper pesticide storage and disposal are essential to protect against exposure to people and the environment due to leaks and spills, excess product or waste, and vandalism. Do not allow this product to contaminate water, foodstuffs, feed or seed by storage or disposal.

**PESTICIDE STORAGE:** Store pesticides away from food, pet food, feed, seed, fertilizers, and veterinary supplies.  Keep container closed to prevent spills and contamination.

**PESTICIDE DISPOSAL:** To avoid wastes, use all material in this container by application in accordance with label directions. If wastes cannot be avoided, offer remaining product to a waste disposal facility or pesticide disposal program. Such programs are often run by state or local governments or by industry. All disposal must be in accordance with applicable Federal, State and local procedures.

**CONTAINER HANDLING AND DISPOSAL:**  Nonrefillable container. Do not reuse or refill this container.

[*Alternative container statement:* Do not reuse this container to hold materials other than pesticides or dilute pesticides (rinsate).  After emptying and cleaning, it may be allowable to temporarily hold rinsate or other pesticide-related materials in this container.  Contact your state regulatory agency to determine allowable practices in your state.]

Triple rinse or pressure rinse (or equivalent) this container promptly after emptying.

[*Optional text, if applicable:* See inside [*Alternative text, if applicable:* attached labeling] [*Alternative text, if applicable:* separate product labeling] for additional container rinsing directions.]

Triple rinse as follows:  Empty the remaining contents into application equipment or mix-tank and continue to drain for 10 seconds after the flow begins to drip.  Fill the container ¼ full with water and recap.  Shake for 10 seconds.  Pour rinsate into application equipment or mix-tank, or store rinsate for later use or disposal.  Continue to drain for 10 seconds after the flow begins to drip.  Repeat this procedure two more times.

Pressure rinse as follows:  Empty the remaining contents into application equipment or mix-tank and continue to drain for 10 seconds after the flow begins to drip. Place container so that it can drain directly into application equipment or mix-tank while rinsing, or collect rinsate for later use or disposal.  Insert pressure rinsing nozzle into the side of the container and rinse at about 40 PSI for at least 30 seconds. Continue to drain for 10 seconds after the flow begins to drip.

Once properly rinsed, some plastic pesticide containers can be taken to a container collection site or picked up for recycling.  [*Alternative container disposal statement:* Then offer the container for recycling, if available.]

[*Optional container disposal statement:* To find the nearest collection site, contact your chemical dealer [*Optional text:* or *INSERT COMPANY NAME* at *TELEPHONE NUMBER*] [*Optional text:* or call1-800-768-6387] [*Alternative telephone numbers:* 1-800-ROUNDUP (1-800-768-6387)].]

If recycling is not available, dispose of in accordance with federal, state and local regulations and procedures, which may include puncturing the properly rinsed container and disposing in a sanitary landfill.

---

[*Optional text:* [*INSERT BRAND NAME and Design*] is a [registered] trademark of Seamless Control LLC.]

[*Optional text:* Roundup Quik PRO and Design is a [registered] trademark of Monsanto Technology LLC and used under license.]

EPA Reg. No. 93236-4

EPA Est. [*Insert appropriate establishment number*]

Packed [*Alternative text:* Produced] [*Alternative text:* Manufactured] for:
SEAMLESS CONTROL LLC
14111 SCOTTSLAWN ROAD
MARYSVILLE, OH 43041 USA

©[YEAR]

[*Optional: Insert date*]

[*Insert print plate number*]

[*Insert barcodes*]

[*Optional text:* Open Here]

[*EXTENDED CONTENT*]

[*Insert Complete Directions for Use from Part II of this Master Label.*]

**2.2     Secondary Packaging for Multiple Nonrefillable Plastic Containers**

[*This section defines labeling for secondary packaging of multiple units of this product that are themselves fully labeled for individual sale, but are distributed and can also be sold as a multi-pack unit.*]

[*FRONT PANEL*]

<div align="center">

# [INSERT BRAND NAME] [*Logo optional*]

</div>

| GLYPHOSATE | GROUP | 9 | HERBICIDE |
|:---:|:---:|:---:|:---:|
| DIQUAT | GROUP | 22 | HERBICIDE |

[*Optional marketing claims and/or logos included on this Master Label may be added to this secondary packaging*]

A [*Alternative:* [**INSERT BRAND NAME**] is a] fast-acting non-selective [*Optional text:* professional] herbicide for use on industrial, turf and ornamental sites.

[*Alternative product statement:* A [*Alternative:* **INSERT BRAND NAME**] is a] fast-acting, non-selective [*Optional text:* professional] herbicide for use on non-crop areas and industrial sites.]

[*Alternative product statement:* A [*Alternative:* **INSERT BRAND NAME**] is a] fast-acting, non-selective herbicide intended for use by industrial, turf and ornamental professionals.]

[*Alternative product statement:* A [*Alternative:* **INSERT BRAND NAME**] is a] fast-acting [*Optional text:* professional] herbicide for non-selective weed control.]

(See the Complete Directions for Use for approved uses and sites.)

[*Optional label text:* FOR CHEMICAL SPILL, LEAK, FIRE, OR EXPOSURE, CALL CHEMTREC AT (800) 424-9300]

[*Optional statement for limited-geography product distribution:* This product is not registered in all states.] [*Optional text:* See labeling [*Optional text:* booklet] inside for more details.]

[*Additional optional statements for limited-geography product distribution:* For control of annual and perennial weeds in [*list states and county-level information as appropriate where product is registered*

*and distributed*]. [*Optional text:* \*County Distribution:*] [*Optional text:* see labeling [*Optional text:* booklet] inside for details.] [*Optional text:* In [*list states*] this product is distributed [*Optional text:* only] in the counties listed below:] [*list counties by states*]

---

ACTIVE INGREDIENTS:
Glyphosate, N-(phosphonomethyl)glycine, in the form of its ammonium salt.................................... 73.3%
Diquat dibromide [6,7-dihydrodipyrido (1,2-a;2',1'-c) pyrazinediium dibromide]................................ 2.9%
OTHER INGREDIENTS ...................................................................................................... 23.8%
                                                                                                    100.0%

One pound of [**INSERT BRAND NAME**] contains 0.733 pound of the ammonium salt of glyphosate, which is equivalent to 0.666 pound of the acid, glyphosate (66.6%), and 0.029 pound of the dibromide salt of diquat.

---

[*Optional label text that will be updated at the time of printing, if necessary:* This product is protected by [*Optional text:* one or more of the following] U.S. Patent No. 7,008,904.]

[*Optional label text, if applicable:* Other patents pending]

[*Optional label text, if applicable:* No license granted under any patent to use this product other than in accordance with this label.]

[*Optional label text, if applicable:* No license granted under any non-U.S. patent(s).]

EPA Reg. No. 93236-4

EPA Est. [*Insert appropriate EPA establishment number*]

---

Keep Out of Reach of Children

# CAUTION

[*Optional label text, if applicable:* See side [*Alternative text:* back] panel[s] for additional] [*Optional text, as applicable:* Precautions [and] First Aid].]

See attached labeling [*Alternative text, if applicable:* separate product labeling] inside for Complete Directions for Use [*Optional text:* in English and Spanish]

Read the entire labeling before using this product.

 User must read and follow all directions.

AVOID CONTACT OF THIS HERBICIDE WITH FOLIAGE, [*Optional text:* GREEN] STEMS, EXPOSED NON-WOODY ROOTS, OR FRUIT OF CROPS, DESIRABLE PLANTS AND TREES, AS SEVERE PLANT INJURY OR DESTRUCTION COULD RESULT.

Read the LIMIT OF WARRANTY AND LIABILITY statement [*Optional text, if applicable:* on side panel] before buying or using.  If terms are not acceptable, return at once unopened.

[*Insert contents, as appropriate:* [*Optional label text:* CONTAINS] [*Insert value for number of individual units*] [*Insert appropriate value for net contents of each individual unit*] [LBS *or other appropriate unit of measure*] UNITS]

Packed [*Alternative text:* Produced] [*Alternative text:* Manufactured] for:
SEAMLESS CONTROL LLC
14111 SCOTTSLAWN ROAD
MARYSVILLE, OH 43041 USA

©[YEAR]

[*Optional: Insert date*]

[*Insert print plate number and barcode(s) as applicable*]

[*ADDITIONAL LABEL CONTENT*]

---

### PRECAUTIONARY STATEMENTS

Hazards to Humans and Domestic Animals

Keep out of reach of children

# CAUTION

Harmful if swallowed

Harmful if inhaled

Causes moderate eye irritation

Avoid breathing dust or spray mist

Avoid contact with eyes or clothing

Remove contaminated clothing and wash clothing before reuse.

Wash thoroughly with soap and water after handling.

| FIRST AID | |
|---|---|
| **IF SWALLOWED** | • Call a physician or Poison Control Center for treatment advice.<br>• Have person sip a glass of water, if able to swallow.<br>• Do not induce vomiting unless told to do so by a Poison Control Center or physician.<br>• Do not give anything by mouth to an unconscious person.<br>• Quick treatment is essential to counteract poisoning and should be initiated before signs and symptoms of injury appear. |
| **IF INHALED** | • Move person to fresh air.<br>• If person is not breathing, call 911 or an ambulance, then give artificial respiration, preferably mouth-to-mouth, if possible.<br>• Call a Poison Control Center or physician for further treatment advice. |
| **IF IN EYES** | • Hold eye open and rinse slowly and gently with water for 15 to 20 minutes.<br>• Remove contact lenses, if present, after the first 5 minutes, then continue rinsing eye.<br>• Call a Poison Control Center or physician for treatment advice. |

• Have the product container or labeling with you when calling a poison control center or physician, or going for treatment.

• You can also call [O*ptional text, if applicable:* toll-free] **(314) 694-4000** [*Or insert alternative telephone number, as appropriate*] [O*ptional text, if applicable:*, collect, day or night,] for emergency medical treatment information.

• This product is identified as [**INSERT BRAND NAME**], **EPA Registration No. 93236-4**.

DOMESTIC ANIMALS: Keep livestock and pets out of treated areas. Do not graze livestock on treated areas. This product is considered to be relatively nontoxic to dogs and other domestic animals; however, ingestion of this product or large amounts of freshly sprayed vegetation could result in temporary gastrointestinal irritation (vomiting, diarrhea, colic, etc.). If such symptoms are observed, provide the animal with plenty of fluids to prevent dehydration. Call a veterinarian if symptoms persist for more than 24 hours.

**Personal Protective Equipment (PPE)**

Applicators and other handlers must wear:  long-sleeved shirt and long pants, protective footwear plus socks, and protective eyewear. Follow manufacturer's instructions for cleaning/maintaining Personal Protective Equipment (PPE). If there are no instructions for washables, use detergent and hot water. Keep and wash PPE separately from other laundry.

---

**User Safety Recommendations**

Users should:

- Wash hands thoroughly after handling and before eating, drinking, chewing gum, using tobacco, or using the toilet.
- Remove clothing/PPE immediately if pesticide gets inside.  Then wash throroughly and put on clean clothing.
- Remove PPE immediately after handling this product.  As soon as possible, wash thoroughly and change into clean clothing.

---

[*Optional text, as applicable:*  See product labeling inside for additional [*Optional text, as applicable:* Precautions, First Aid [and] information on Personal Protective Equipment].]

[*Optional text:* (Continued on back panel)]

[*Optional text:* (Continued from side panel)]

---

Environmental Hazards

---

This product is toxic to aquatic invertebrates.  Do not apply directly to water, to areas where surface water is present or to intertidal areas below the mean high water mark.  Do not contaminate water when cleaning equipment or disposing of equipment wash waters and rinsate.

---

Physical or Chemical Hazards

---

Spray solutions of this product may be mixed, stored and applied using stainless steel, fiberglass, plastic or plastic-lined steel containers.

DO NOT MIX, STORE OR APPLY THIS PRODUCT OR SPRAY SOLUTIONS OF THIS PRODUCT IN GALVANIZED STEEL OR UNLINED STEEL (EXCEPT STAINLESS STEEL) CONTAINERS OR SPRAY TANKS. This product or spray solutions of this product react with such containers and tanks to produce hydrogen gas, which can form a highly combustible gas mixture. This gas mixture could flash or explode if ignited by open flame, spark, welder's torch, lighted cigarette or other ignition source and cause serious personal injury.

---

**DIRECTIONS FOR USE**

---

It is a violation of Federal law to use this product in any manner inconsistent with its labeling.  Do not apply this product in a way that will contact workers or other persons, either directly or through drift. Only protected handlers may be in the area during application. For any requirements specific to your State or Tribe, consult the agency responsible for pesticide regulation.

**Entry Restrictions**:  Keep all unprotected persons out of operating areas or vicinity where there may be drift.  Keep people and pets off treated areas until spray solution has dried.

See additional labeling inside [*Optional text:* individual box] for Complete Directions for Use of this product [*Optional text:* in English and Spanish].

Read the entire Directions for Use before using.

 User must read and follow all directions.

For product information or assistance using this product call [O*ptional text, if applicable:* toll-free] 1-800-332-3111 [*Or insert alternative telephone number, as appropriate*].

---

### STORAGE AND DISPOSAL

Proper pesticide storage and disposal are essential to protect against exposure to people and the environment due to leaks and spills, excess product or waste, and vandalism. Do not allow this product to contaminate water, foodstuffs, feed or seed by storage or disposal.

**PESTICIDE STORAGE:** Store pesticides away from food, pet food, feed, seed, fertilizers, and veterinary supplies.  Keep container closed to prevent spills and contamination.

**PESTICIDE DISPOSAL:** To avoid wastes, use all material in the foil packet by application in accordance with label directions. If wastes cannot be avoided, offer remaining product to a waste disposal facility or pesticide disposal program. Such programs are often run by state or local governments or by industry. All disposal must be in accordance with applicable federal, state and local procedures.

**CONTAINER HANDLING AND DISPOSAL:**  [*NOTE: Container Handling and Disposal Statement must match exactly the statement that is on the individual container inside the packaging.*]

Nonrefillable container. Do not reuse or refill this container.

[*Alternative container statement:* Do not reuse this container to hold materials other than pesticides or dilute pesticides (rinsate).  After emptying and cleaning, it may be allowable to temporarily hold rinsate or other pesticide-related materials in this container.  Contact your state regulatory agency to determine allowable practices in your state.]

Triple rinse or pressure rinse (or equivalent) this container promptly after emptying.

[*Optional text, if applicable:* See inside [*Alternative text, if applicable:* attached labeling] [*Alternative text, if applicable:* separate product labeling] for additional container rinsing directions.]

Triple rinse as follows:  Empty the remaining contents into application equipment or mix-tank and continue to drain for 10 seconds after the flow begins to drip.  Fill the container ¼ full with water and recap.  Shake for 10 seconds.  Pour rinsate into application equipment or mix-tank, or store rinsate for later use or disposal.  Continue to drain for 10 seconds after the flow begins to drip.  Repeat this procedure two more times.

Pressure rinse as follows:  Empty the remaining contents into application equipment or mix-tank and continue to drain for 10 seconds after the flow begins to drip. Place container so that it can drain directly into application equipment or mix-tank while rinsing, or collect rinsate for later use or disposal.  Insert pressure rinsing nozzle into the side of the container and rinse at about 40 PSI for at least 30 seconds. Continue to drain for 10 seconds after the flow begins to drip.

Once properly rinsed, some plastic pesticide containers can be taken to a container collection site or picked up for recycling.  [*Alternative container disposal statement:* Then offer the container for recycling, if available.]

[*Optional container disposal statement:* To find the nearest collection site, contact your chemical dealer [*Optional text:* or *INSERT COMPANY NAME* at *TELEPHONE NUMBER*] [*Optional text:* or call1-800-768-6387] [*Alternative telephone numbers:* 1-800-ROUNDUP (1-800-768-6387)].]

If recycling is not available, dispose of in accordance with federal, state and local regulations and procedures, which may include puncturing the properly rinsed container and disposing in a sanitary landfill.

**LIMIT OF WARRANTY AND LIABILITY**

Seamless Control LLC ("Company") warrants that this product conforms to the chemical description on the label.   TO THE EXTENT CONSISTENT WITH APPLICABLE LAW, NO OTHER EXPRESS WARRANTY OR IMPLIED WARRANTY OF FITNESS FOR PARTICULAR PURPOSE OR MERCHANTABILITY IS MADE.   This warranty is also subject to the conditions and limitations stated herein.

Buyer and all users shall use this product only for the purposes of and in accordance with the Complete Directions for Use label ("Directions") and shall promptly notify this Company of any claims whether based in contract, negligence, strict liability, other tort or otherwise.

To the extent consistent with applicable law, buyer and all users are responsible for all loss, injuries or damage from use or handling which results from conditions beyond the control of this Company, including, but not limited to, incompatibility with products other than those set forth in the Directions, application to or contact with desirable vegetation, crop injury or failure of this product to control weed biotypes which develop resistance to glyphosate, unusual weather, weather conditions which are outside the range considered normal at the application site and for the time period when the product is applied, as well as weather conditions which are outside the application ranges set forth in the Directions, use and/or application in any manner not explicitly set forth in or inconsistent with the Directions, moisture conditions outside the moisture range specified in the Directions, or the presence of products other than those set forth in the Directions in or on the soil, crop or treated vegetation.

This Company does not warrant any product reformulated or repackaged from this product except in accordance with this Company's stewardship requirements and with express written permission from this Company.

TO THE EXTENT CONSISTENT WITH APPLICABLE LAW, THE EXCLUSIVE REMEDY OF THE USER OR BUYER, AND THE LIMIT OF THE LIABILITY OF THIS COMPANY OR ANY OTHER SELLER FOR ANY AND ALL LOSSES, INJURIES OR DAMAGES RESULTING FROM THE USE OR HANDLING OF THIS PRODUCT (INCLUDING CLAIMS BASED IN CONTRACT, NEGLIGENCE, STRICT LIABILITY, OTHER TORT OR OTHERWISE) SHALL BE THE PURCHASE PRICE PAID BY THE USER OR BUYER FOR THE QUANTITY OF THIS PRODUCT INVOLVED, OR, AT THE ELECTION OF THIS COMPANY OR ANY OTHER SELLER, THE REPLACEMENT OF SUCH QUANTITY, OR, IF NOT ACQUIRED BY PURCHASE, REPLACEMENT OF SUCH QUANTITY. TO THE EXTENT CONSISTENT WITH APPLICABLE LAW, IN NO EVENT SHALL THIS COMPANY OR ANY OTHER SELLER BE LIABLE FOR ANY INCIDENTAL, CONSEQUENTIAL OR SPECIAL DAMAGES.

Upon opening and using this product, buyer and all users are deemed to have accepted the terms of this LIMIT OF WARRANTY AND LIABILITY which may not be varied by any verbal or written agreement. If terms are not acceptable, return at once unopened.

[*Optional text:* [*INSERT BRAND NAME and Design*] is a [registered] trademark of Seamless Control LLC.]

[*Optional text:* Roundup Quik PRO and Design is a [registered] trademark of Monsanto Technology LLC and used under license.]

[*Optional text, if applicable:*  All other trademarks are the property of their respective owners.]

[*Insert UN packaging certification, if applicable*]

[*Optional packaging text:* Pull at scored cutouts for easier opening]

[*Optional packaging text:* THIS SIDE UP] [*Optional graphic of two arrows pointing upward*]

[*Optional packaging text:* Liquid] [*Optional graphic of a liquid droplet*]

[*Optional packaging text:* To open, cut straps and carefully lift outer case straight up]

[*Optional packaging text:* Maximum [*Alternative text:* Max] stack limit [*Entire appropriate value*] high for storage. Do not stack quarter pallets separately]

**2.3    Measuring Device**

[*This section defines a measuring device that may be included with purchase of product in nonrefillable rigid plastic container. The device is calibrated based on bulk density of the product and estimated to be accurate to ± 10%.*]

Units of Dry Measure: 1.5 oz 3.0 oz 4.5 oz [*Other values may be added as needed*]

[*Optional text:* Measuring guide to be used with herbicide.]

[*Optional text:* Dispose of empty device when finished]

[*Optional text:* Volumetric accuracy ± 10%]

[*Optional text:* Weigh product when more accurate measurement is needed]

[*Optional text:* Do not tap excessively when measuring]

**3.0    OTHER NON-RIGID, NONREFILLABLE  CONTAINERS WITH EXTENDED CONTENT LABEL OR SEPARATE DIRECTIONS FOR USE BOOKLET**

[*Bulk quantities of this dry, granular product can be packaged in non-rigid, nonrefillable containers, such as lined and/or unlined bags (Super Sacks), with attached labeling containing complete directions for use.*]

**3.1    Other Non-Rigid, Nonrefillable Container Base Label**

## [INSERT BRAND NAME] [Logo]

| GLYPHOSATE | GROUP | 9 | HERBICIDE |
|---|---|---|---|
| DIQUAT | GROUP | 22 | HERBICIDE |

[*Optional marketing claims and/or logos on this Master Label may be added to the Front Panel*]

A [*Alternative:* [**INSERT BRAND NAME**] is a] fast-acting non-selective [*Optional text:* professional] herbicide for use on industrial, turf and ornamental sites.]

[*Alternative product statement:* A [*Alternative:* [**INSERT BRAND NAME**] is a] fast-acting, non-selective [*Optional text:* professional] herbicide for use on non-crop areas and industrial sites.  ]

[*Alternative product statement:* A [*Alternative:* [**INSERT BRAND NAME**] is a] fast-acting, non-selective herbicide intended for use by industrial, turf and ornamental professionals.]

[*Alternative product statement:* A [*Alternative:* [**INSERT BRAND NAME**] is a] fast-acting [*Optional text:* professional] herbicide for non-selective weed control.]

(See the Complete Directions for Use for approved uses and sites.)

[*Optional label text:* FOR CHEMICAL SPILL, LEAK, FIRE, OR EXPOSURE, CALL CHEMTREC AT (800) 424-9300]

[*Optional statement for limited-geography product distribution:* This product is not registered in all states.] [*Optional text:* See attached labeling for more details.]

[*Additional optional statements for limited-geography product distribution:* For control of annual and perennial weeds in [*list states and county-level information as appropriate where product is registered and distributed*]. [*Optional text:* *County Distribution:*] [*Optional text:* see labeling [*Optional text:* booklet] inside for details.] [*Optional text:* In [*list states*] this product is distributed [*Optional text:* only] in the counties listed below:] [*list counties by states*]

---

ACTIVE INGREDIENTS:
Glyphosate, N-(phosphonomethyl)glycine, in the form of its ammonium salt.................................... 73.3%
Diquat dibromide [6,7-dihydrodipyrido (1,2-a;2',1'-c) pyrazinediium dibromide]................................ 2.9%
OTHER INGREDIENTS ........................................................................................................... 23.8%
100.0%

One pound of [**INSERT BRAND NAME**] contains 0.733 pound of the ammonium salt of glyphosate, which is equivalent to 0.666 pound of the acid, glyphosate (66.6%), and 0.029 pound of the dibromide salt of diquat.

---

## PRECAUTIONARY STATEMENTS

---

### Hazards to Humans and Domestic Animals

---

Keep out of reach of children

# CAUTION

[*Optional label text, if applicable:* See attached [*Alternative text, if applicable:* separate product] labeling for additional] [*Optional text, as applicable:* Precautions [and] First Aid].

Harmful if swallowed

Harmful if inhaled

Causes moderate eye irritation

Avoid breathing dust or spray mist

Avoid contact with eyes or clothing

Remove contaminated clothing and wash clothing before reuse.

Wash thoroughly with soap and water after handling.

| FIRST AID | |
|---|---|
| **IF SWALLOWED** | • Call a physician or Poison Control Center for treatment advice. |
| | • Have person sip a glass of water, if able to swallow. |
| | • Do not induce vomiting unless told to do so by a Poison Control Center or physician. |
| | • Do not give anything by mouth to an unconscious person. |
| | • Quick treatment is essential to counteract poisoning and should be initiated before signs and symptoms of injury appear. |
| **IF INHALED** | • Move person to fresh air. |

| | • If person is not breathing, call 911 or an ambulance, then give artificial respiration, preferably mouth-to-mouth, if possible. |
| | • Call a Poison Control Center or physician for further treatment advice. |
| **IF IN EYES** | • Hold eye open and rinse slowly and gently with water for 15 to 20 minutes. |
| | • Remove contact lenses, if present, after the first 5 minutes, then continue rinsing eye. |
| | • Call a Poison Control Center or physician for treatment advice. |

• Have the product container or labeling with you when calling a poison control center or physician, or going for treatment.

• You can also call [O*ptional text, if applicable:* toll-free] **(314) 694-4000** [*Or insert alternative telephone number, as appropriate*] [O*ptional text, if applicable:*, collect, day or night,] for emergency medical treatment information.

• This product is identified as [**INSERT BRAND NAME**], **EPA Registration No. 93236-4**.

DOMESTIC ANIMALS: Keep livestock and pets out of treated areas.  Do not graze livestock on treated areas.  This product is considered to be relatively nontoxic to dogs and other domestic animals; however, ingestion of this product or large amounts of freshly sprayed vegetation may result in temporary gastrointestinal irritation (vomiting, diarrhea, colic, etc.).  If such symptoms are observed, provide the animal with plenty of fluids to prevent dehydration.  Call a veterinarian if symptoms persist for more than 24 hours.

**Personal Protective Equipment (PPE)**

Applicators and other handlers must wear:  long-sleeved shirt and long pants, protective footwear plus socks, and protective eyewear. Follow manufacturer's instructions for cleaning/maintaining Personal Protective Equipment (PPE). If there are no instructions for washables, use detergent and hot water. Keep and wash PPE separately from other laundry.

**User Safety Recommendations**

Users should:

• Wash hands thoroughly after handling and before eating, drinking, chewing gum, using tobacco, or using the toilet.

• Remove clothing/PPE immediately if pesticide gets inside. Then wash thoroughly and put on clean clothing.

• Remove PPE immediately after handling this product.  As soon as possible, wash thoroughly and change into clean clothing.

Environmental Hazards

This product is toxic to aquatic invertebrates.  Do not apply directly to water, to areas where surface water is present or to intertidal areas below the mean high water mark.  Do not contaminate water when cleaning equipment or disposing of equipment wash waters and rinsate.

Physical or Chemical Hazards

Spray solutions of this product may be mixed, stored and applied using stainless steel, fiberglass, plastic or plastic-lined steel containers.

DO NOT MIX, STORE OR APPLY THIS PRODUCT OR SPRAY SOLUTIONS OF THIS PRODUCT IN GALVANIZED STEEL OR UNLINED STEEL (EXCEPT STAINLESS STEEL) CONTAINERS OR SPRAY TANKS. This product or spray solutions of this product react with such containers and tanks to produce hydrogen gas, which can form a highly combustible gas mixture. This gas mixture could flash or explode if ignited by open flame, spark, welder's torch, lighted cigarette or other ignition source and cause serious personal injury.

## DIRECTIONS FOR USE

It is a violation of Federal law to use this product in any manner inconsistent with its labeling.  Do not apply this product in a way that will contact workers or other persons, either directly or through drift. Only protected handlers may be in the area during application. For any requirements specific to your State or Tribe, consult the agency responsible for pesticide regulation.

**Entry Restrictions**:  Keep all unprotected persons out of operating areas or vicinity where there may be drift.  Keep people and pets off treated areas until spray solution has dried.

See attached labeling for Complete Directions for Use of this product [*Optional text:* in English and Spanish].

Read the entire Directions for Use before using.

User must read and follow all directions.

---

## STORAGE AND DISPOSAL

Proper pesticide storage and disposal are essential to protect against exposure to people and the environment due to leaks and spills, excess product or waste, and vandalism. Do not allow this product to contaminate water, foodstuffs, feed or seed by storage or disposal.

**PESTICIDE STORAGE:** Store pesticides away from food, pet food, feed, seed, fertilizers, and veterinary supplies.  Keep container closed to prevent spills and contamination.

**PESTICIDE DISPOSAL:** To avoid wastes, use all material in this container by application in accordance with label directions. If wastes cannot be avoided, offer remaining product to a waste disposal facility or pesticide disposal program. Such programs are often run by state or local governments or by industry. All disposal must be in accordance with applicable federal, state and local procedures.

**CONTAINER HANDLING AND DISPOSAL:** Nonrefillable container. Do not reuse or refill this container.

Completely empty the contents of this bag by shaking and tapping the sides and bottom to loosen clinging material.  Then dispose of empty bag in accordance with applicable federal, state and local regulations and procedures, which may include disposing in a sanitary landfill.

---

[*Optional text:* [*INSERT BRAND NAME and Design*] is a [registered] trademark of Seamless Control LLC.]

[*Optional text:* Roundup Quik PRO and Design is a [registered] trademark of Monsanto Technology LLC and used under license.]

[*Optional label text that will be updated at the time of printing, if necessary:*  This product is protected by [O*ptional text:* one or more of the following] U.S. Patent No. 7,008,904.]

[*Optional label text, if applicable:*  Other patents pending]

[*Optional label text, if applicable:*  No license granted under any patent to use this product other than in accordance with this label.]

[*Optional label text, if applicable:*  No license granted under any non-U.S. patent(s).]

EPA Reg. No. 93236-4

EPA Est. [*Insert appropriate establishment number*]

Packed [*Alternative text:* Produced] [*Alternative text:* Manufactured] for:
SEAMLESS CONTROL LLC
14111 SCOTTSLAWN ROAD
MARYSVILLE, OH 43041 USA

©[YEAR]

[*Insert net contents, as appropriate:* NET WT [*insert appropriate value or leave blank line for entry*] LBS]
[*or other appropriate unit of measure*]] [*Alternative label text:* NET CONTENTS]

[*Optional text, if applicable:* Container filled by weight, not volume]

[*Insert print plate number and barcode(s), as applicable*]

[*Optional: Insert date*]

[*Optional text:* ATTACH COMPLETE DIRECTIONS FOR USE HERE]

[*Optional text that will be hidden behind the attached label and only become visible if removed:* COMPLETE DIRECTIONS FOR USE HAVE BEEN REMOVED]

[*Optional text:* THIS UNIT NOT FOR SALE OR DISTRIBUTION]

---

| II. | DIRECTIONS FOR USE ON INDUSTRIAL, TURF AND ORNAMENTAL SITES |
|---|---|

# [INSERT BRAND NAME] [*Logo*]

**Complete Directions for Use**

| GLYPHOSATE | GROUP | 9 | HERBICIDE |
|---|---|---|---|
| DIQUAT | GROUP | 22 | HERBICIDE |

EPA Reg. No. 93236-4

A [*Alternative:* [**INSERT BRAND NAME**] is a] fast-acting non-selective [*Optional text:* professional] herbicide for use on industrial, turf and ornamental sites.]

[*Alternative product statement:* A [*Alternative:* [**INSERT BRAND NAME**] is a] fast-acting, non-selective [*Optional text:* professional] herbicide for use on non-crop areas and industrial sites.  ]

[*Alternative product statement:* A [*Alternative:* [**INSERT BRAND NAME**] is a] fast-acting, non-selective herbicide intended for use by industrial, turf and ornamental professionals.]

[*Alternative product statement:* A [*Alternative:* [**INSERT BRAND NAME**] is a] fast-acting [*Optional text:* professional] herbicide for non-selective weed control.]

(See the Complete Directions for Use for approved uses and sites.)

[*Optional text for 1.5-ounce packet:* Add one 1.5 oz. packet per one gallon of water] [*Optional starburst graphic*]

[*List of additional optional marketing claims for this product:*

- [1 jug] Makes 72 gallons of spray solution
- 1 pouch makes 1 gallon of spray solution
- [*INSERT BRAND NAME*] for Quick Action
- [*Dead weed graphic*] [*Weed species name*] 2 hours [hrs.] after treatment, [*Weed species name*] 24 hours [hrs.] after treatment [*Times may vary depending on conditions]
- 30% lighter than liquid herbicides
- Convenient to Use! 1.5 ounce [oz] Packets
- [*INSERT BRAND NAME*] Dead weeds – Quick [*Alternative text:* Fast]!
- Dry [Granule] formulation
- Dry formulation is easy to handle, easy to clean up
- Dual language (English and Spanish) label
- Easy to use [*Optional text:* precision labeled] measuring device
- Premeasured, makes 1 gallon of spray solution
- Pull a Fast One on Weeds with [*INSERT BRAND NAME*]
- Quick [action] [measuring] [mixing] [results]
- Quick burndown and complete weed control, roots and all
- Quick uptake speeds weed-killing power right to the root where it cannot wash out
- Quick uptake makes [*INSERT BRAND* NAME] Rainfast in [just] 1-hour [one-hour] [*Clock showing 1 o'clock, illustrating 1 hour uptake*]
- Visible results in as little as 24 hours

- Water Soluble Granule
- Quality. Performance. Satisfaction.
- Complete control – roots and all]

[*Optional label text:* FOR CHEMICAL SPILL, LEAK, FIRE, OR EXPOSURE, CALL CHEMTREC AT (800) 424-9300]

[*Optional statement for limited-geography product distribution:* This product is not registered in all states.]

[*Additional optional statements for limited-geography product distribution:* For control of annual and perennial weeds in [*list states and or county-level information, as appropriate, where product is registered and distributed*]. [*Optional text:* *County Distribution:] [*Optional text:* see inside for details.] [*Optional text:* In [*list states*] this product is distributed in the counties listed below:] [*list counties by state*]

AVOID CONTACT OF THIS HERBICIDE WITH FOLIAGE, [*Optional text:* GREEN] STEMS, EXPOSED NON-WOODY ROOTS, OR FRUIT OF CROPS, DESIRABLE PLANTS AND TREES, AS SEVERE PLANT INJURY OR DESTRUCTION COULD RESULT.

Read the [*Alternative text:* this] entire labeling before using this product.

User must read and follow all directions.

Read the "LIMIT OF WARRANTY AND LIABILITY" statement at the end of this labeling before buying or using. If terms are not acceptable, return at once unopened.

**CONTENTS** [*Inclusion of this Table of Contents is optional in the final printed labeling*]

| 1 | 1.0 | **INGREDIENTS** |
|---|-----|-----------------|
| 2 | 2.0 | **IMPORTANT PHONE NUMBERS** |
| 3 | 3.0 | **PRECAUTIONARY STATEMENTS** |
|   | 3.1 | Hazards to Humans and Domestic Animals |
|   | 3.2 | Environmental Hazards |
|   | 3.3 | Physical or Chemical Hazards |
| 4 | 4.0 | **STORAGE AND DISPOSAL** |
| 5 | 5.0 | **PRODUCT INFORMATION** |
| 6 | 6.0 | **WEED RESISTANCE MANAGEMENT** |
|   | 6.1 | Weed Management Practices |
|   | 6.2 | Management of Herbicide-Resistant Weeds |
| 7 | 7.0 | **MIXING** |
|   | 7.1 | Mixing with Water |
|   | 7.2 | Tank Mixtures |
|   | 7.3 | Colorants and Dyes |
|   | 7.4 | Drift Reduction Additives |
| 8 | 8.0 | **APPLICATION EQUIPMENT AND TECHNIQUES** |
|   | 8.1 | Spray Drift Management |
|   | 8.2 | Ground Application Equipment |
|   | 8.3 | Handheld Sprayers |
|   | 8.4 | Controlled Droplet Applicator (CDA) |
| 9 | 9.0 | **TERRESTRIAL USE SITES** |
| 10 | 10.0 | **WEEDS CONTROLLED** |
|   | 10.1 | Turfgrass Weed Control and Renovation |
|   | 10.2 | Annual Weeds |

10.3      Perennial Weeds

10.4      Woody Brush, Trees and Vines

**11    11.0      LIMIT OF WARRANTY AND LIABILITY**

**1.0      INGREDIENTS**

ACTIVE INGREDIENTS:

Glyphosate, N-(phosphonomethyl)glycine, in the form of its ammonium salt.................................... 73.3%

Diquat dibromide [6,7-dihydrodipyrido (1,2-a:2',1'-c) pyrazinediium dibromide]................................ 2.9%

OTHER INGREDIENTS: ..................................................................................................................  23.8%

                                                             100.0%

One pound of [**INSERT BRAND NAME**] contains 0.733 pound of the ammonium salt of glyphosate, which is equivalent to 0.666 pound of the acid, glyphosate (66.6%) and 0.029 pound of the dibromide salt of diquat.

[*Optional label text that will be updated at the time of printing, if necessary:*  This product is protected by [O*ptional text:* one or more of the following] U.S. Patent No. 7,008,904.]

[*Optional label text, if applicable:*  Other patents pending]

[*Optional label text, if applicable:*  No license granted under any patent to use this product other than in accordance with this label.]

[*Optional label text, if applicable:*  No license granted under any non-U.S. patent(s).]

**2.0      IMPORTANT PHONE NUMBERS**

1.    FOR PRODUCT INFORMATION OR ASSISTANCE USING THIS PRODUCT, CALL  [*Optional text, if applicable:* TOLL-FREE, COLLECT, DAY OR NIGHT],

                (800) 332-3111 [*Or insert alternative telephone number, as appropriate*]

2.    IN CASE OF AN EMERGENCY INVOLVING THIS PRODUCT OR FOR MEDICAL ASSISTANCE, CALL [*Optional text, if applicable:* TOLL-FREE, COLLECT, DAY OR NIGHT],

                (314) 694-4000 [*Or insert alternative telephone number, as appropriate*]

**3.0      PRECAUTIONARY STATEMENTS**

**3.1      Hazards to Humans and Domestic Animals**

Keep out of reach of children

# CAUTION

Harmful if swallowed

Harmful if inhaled

Causes moderate eye irritation

Avoid breathing dust or spray mist

Avoid contact with eyes or clothing

Remove contaminated clothing and wash clothing before reuse

Wash thoroughly with soap and water after handling

| FIRST AID | |
|---|---|
| **IF SWALLOWED** | • Call a physician or Poison Control Center for treatment advice.<br>• Have person sip a glass of water if able to swallow.<br>• Do not induce vomiting unless told to do so by a Poison Control Center or physician.<br>• Do not give anything by mouth to an unconscious person.<br>• Quick treatment is essential to counteract poisoning and should be initiated before signs and symptoms of injury appear. |
| **IF INHALED** | • Move person to fresh air<br>• If person is not breathing, call 911 or an ambulance, then give artificial respiration, preferably by mouth-to-mouth, if possible.<br>• Call a Poison Control Center or physician for further treatment advice. |
| **IF IN EYES** | • Hold eye open and rinse slowly and gently with water for 15-20 minutes. Remove contact lenses, if present, after the first 5 minutes, then continue rinsing eye.<br>• Call a Poison Control Center or physician for treatment advice. |

• Have the product container or label with you when calling a poison control center or physician, or going for treatment.

• You can also call [O*ptional text, if applicable:* toll-free] **(314) 694-4000** [*Or insert alternative telephone number, as appropriate*] [O*ptional text, if applicable:*, collect, day or night,] for emergency medical treatment information.

• This product is identified as [**INSERT BRAND NAME**], **EPA Registration No. 93236-4**.

DOMESTIC ANIMALS: Keep livestock and pets out of treated areas.  Do not graze livestock on treated areas.  This product is considered to be relatively nontoxic to dogs and other domestic animals; however, ingestion of this product or large amounts of freshly sprayed vegetation may result in temporary gastrointestinal irritation (vomiting, diarrhea, colic, etc.).  If such symptoms are observed, provide the animal with plenty of fluids to prevent dehydration.  Call a veterinarian if symptoms persist for more than 24 hours.

**Personal Protective Equipment (PPE)**

Applicators and other handlers must wear:  long-sleeved shirt and long pants, protective footwear plus socks, and protective eyewear. Follow manufacturer's instructions for cleaning/maintaining Personal Protective Equipment (PPE). If there are no instructions for washables, use detergent and hot water. Keep and wash PPE separately from other laundry.

**User Safety Recommendations**

Users should:

• Wash hands thoroughly after handling and before eating, drinking, chewing gum, using tobacco, or using the toilet.

• Remove clothing/PPE immediately if pesticide gets inside.  Then wash throroughly and put on clean clothing.

• Remove PPE immediately after handling this product.  As soon as possible, wash thoroughly and change into clean clothing.

**3.2    Environmental Hazards**

This product is toxic to aquatic invertebrates.  Do not apply directly to water, to areas where surface water is present or to intertidal areas below the mean high water mark.  Do not contaminate water when cleaning equipment or disposing of equipment wash waters and rinsate.

### 3.3    Physical or Chemical Hazards

Spray solutions of this product may be mixed, stored and applied using stainless steel, fiberglass, plastic or plastic-lined steel containers.

DO NOT MIX, STORE OR APPLY THIS PRODUCT OR SPRAY SOLUTIONS OF THIS PRODUCT IN GALVANIZED STEEL OR UNLINED STEEL (EXCEPT STAINLESS STEEL) CONTAINERS OR SPRAY TANKS. This product or spray solutions of this product react with such containers and tanks to produce hydrogen gas, which can form a highly combustible gas mixture. This gas mixture could flash or explode if ignited by open flame, spark, welder's torch, lighted cigarette or other ignition source and cause serious personal injury.

---

## DIRECTIONS FOR USE

It is a violation of Federal law to use this product in any manner inconsistent with its labeling.  Do not apply this product in a way that will contact workers or other persons, either directly or through drift.  Only protected handlers may be in the area during application.  For any requirements specific to your State or Tribe, consult the agency responsible for pesticide regulation.

**Entry Restrictions:** Keep all unprotected persons out of operating areas or vicinity where there may be drift.  Keep people and pets off treated areas until spray solution has dried.

## 4.0    STORAGE AND DISPOSAL

Proper pesticide storage and disposal are essential to protect against exposure to people and the environment due to leaks and spills, excess product or waste, and vandalism. Do not allow this product to contaminate water, foodstuffs, feed or seed by storage or disposal.

**PESTICIDE STORAGE:**  Store pesticides away from food, pet food, feed, seed, fertilizers, and veterinary supplies.  Keep container closed to prevent spills and contamination.

**PESTICIDE DISPOSAL:**  To avoid wastes, use all material in the container, including rinsate, by application according to label directions.  If wastes cannot be avoided, offer remaining product to a waste disposal facility or pesticide disposal program. Such programs are often run by state or local governments or by industry. All disposal must be in accordance with applicable federal, state and local procedures.

**CONTAINER HANDLING AND DISPOSAL:**  [*Optional label text, if applicable:* See container label for container handling and disposal instructions [*Optional text, if applicable:* and refilling limitations].] [*Alternative optional label text for ECL label:*  See base label attached to this container for container handling and disposal instructions [*Optional text, if applicable:* and refilling limitations].]

---

[*CONTAINER HANDLING AND DISPOSAL STATEMENT FOR FOIL PACKET*]

Empty the contents of this packet into sprayer or mixing tank by tapping the sides while holding the open packet over the tank.  When empty, dispose of the foil packet in a sanitary landfill.

---

[*CONTAINER HANDLING AND DISPOSAL STATEMENT AND REFILLING LIMITATION FOR NONREFILLABLE RIGID PLASTIC CONTAINERS*]

Nonrefillable container.  Do not reuse or refill the container.

[*Alternative container statement:* Nonrefillable container. Do not reuse the container to hold materials other than pesticides or dilute pesticides (rinsate). After emptying and cleaning, it may be allowable to

temporarily hold rinsate or other pesticide-related materials in the container. Contact your state regulatory agency to determine allowable practices in your state.]

Triple rinse or pressure rinse (or equivalent) the container promptly after emptying.

Triple rinse as follows: Empty the remaining contents into application equipment or mix-tank. Fill the container ¼ full with water and recap. Shake for 10 seconds. Pour rinsate into application equipment or mix-tank or store rinsate for later use or disposal. Drain for 10 seconds after the flow begins to drip. Repeat this procedure two more times.

Pressure rinse as follows: Empty the remaining contents into application equipment or mix-tank. Place container so that it can drain directly into application equipment or mix-tank while rinsing, or collect rinsate for later use or disposal. Insert pressure rinsing nozzle into the side of the container and rinse at about 40 PSI for at least 30 seconds. Continue to drain for 10 seconds after the flow begins to drip.

Once properly rinsed, some plastic pesticide containers can be taken to a container collection site or picked up for recycling. [*Alternative container disposal statement:* Then offer the container for recycling, if available.]

[*Optional container disposal statement:* To find the nearest collection site, contact your chemical dealer [*Optional text:* or *INSERT COMPANY NAME* at *TELEPHONE NUMBER*] [*Optional text:* or call 1-800-768-6387] [*Alternative telephone numbers:* 1-800-ROUNDUP (1-800-768-6387)].]

If recycling is not available, dispose of in accordance with federal, state and local regulations and procedures, which may include puncturing the properly rinsed container and and disposing in a sanitary landfill.

---

[*CONTAINER HANDLING AND DISPOSAL STATEMENT AND REFILLING LIMITATION FOR NONREFILLABLE, NON-RIGID CONTAINERS, SUCH AS SUPER SACKS*]

**CONTAINER HANDLING AND DISPOSAL:**  Nonfillable container. Do not reuse or refill this container.

Completely empty the contents of this bag by shaking and tapping the sides and bottom to loosen clinging material.  Then dispose of empty bag in accordance with applicable federal, state and local regulations and procedures, which may include disposing in a sanitary landfill.

---

## 5.0    PRODUCT INFORMATION

**Product Description:** This product is a postemergence, systemic herbicide with no residual soil activity. It is non-selective and provides broad-spectrum control of many annual and perennial weeds, woody brush, trees and vines.  It is formulated as a water-soluble granule containing surfactant and no additional surfactant is needed. This product may be applied using standard and specialized pesticide application equipment after dissolution and thorough mixing with water according to label directions.

**Mechanism of Action:**  One of the active ingredients in this product inhibits an enzyme found only in plants and microorganisms that is essential to formation of specific amino acids.  A second active ingredient rapidly disrupts cell integrity of photosynthetically active tissues in the contacted foliage.

**No Soil Activity:** Weeds must be emerged at the time of application to be controlled by this product. Weeds germinating from seed after application will not be controlled.  Plants growing from unattached underground rhizomes or root stocks of perennials that have not yet emerged at the time of application will not be affected by the herbicide and will continue to grow.

**Cultural Considerations:** Reduced control could result when this product is applied to annual or perennial weeds that have been mowed, grazed, or cut, and have not been allowed to re-grow prior ro application.  Always use the highest application rate of this product within a given range when weed

growth is heavy or dense, or when weeds are growing in an undisturbed (non-cultivated) area. Reduced weed control could result when this product is applied to weeds that show signs of disease or insect damage, are covered with dust, or are surviving under poor growing conditions.

**Spray Coverage:**  For best results, spray coverage must be uniform and complete. Do not spray foliage to the point of runoff.

**Rainfastness:** Rainfall within 4 hours after application could wash this product off of the foliage and a second application might be needed to achieve acceptable weed control.  Refer to specific use sections of this label for additional information on minimum intervals required, if any, before re-application of this product.

**Time to Symptoms:** This product moves through the plant from the point of foliage contact to and into the root system. Visible effects are a quick yellowing of the foliage that advances to complete browning of above-ground growth and deterioration of underground plant parts.  Effects are visible on most annual weeds within 1 day and on most perennial weeds within 2 days after application.  Extremely cool or cloudy weather following application could slow activity of this product and delay development of visual symptoms.

**Maximum Application Rates:**  The maximum application or use rates stated throughout this label are given in units of weight (pounds) of this product per acre.  However, the maximum allowable application rates apply to this product combined with the use of any and all other herbicides containing the active ingredient glyphosate, whether applied separately or in a tank mixture, on a basis of total pounds of glyphosate (acid equivalents) per acre.  If more than one glyphosate-containing product is applied to the same site within the same year, you must ensure that the total use of glyphosate (pounds acid equivalents) does not exceed the maximum allowed.  See the "INGREDIENTS" section of this label for necessary product information.   Unless otherwise specified on this label, the combined total of all applications of this product on a site must not exceed 12.25 pounds (8 pounds of glyphosate acid) per acre per year.

## 6.0    WEED RESISTANCE MANAGEMENT

| GLYPHOSATE | GROUP | 9 | HERBICIDE |
|---|---|---|---|
| DIQUAT | GROUP | 22 | HERBICIDE |

Glyphosate, one of the active ingredients in this product, is a Group 9 herbicide and diquat, the other active ingredient in this product, is a Group 22 herbicide, based on the mechanism of action classification system of the Weed Science Society of America.  Any weed population can contain plants that are naturally resistant to Group 9 or Group 22 herbicides.  Weeds resistant to Group 9 and/or Group 22 herbicides can be effectively managed by using another herbicide from a different Group (either alone or in a mixture according to label directions), by using other cultural or mechanical methods of weed control, or a combination of the two.  Consult your local company representative, state cooperative extension agent, professional consultant or other qualified authority to determine appropriate actions for controlling specific resistant weeds or to report any incidence of repeated non-performance of this product on a particular weed.

Since the occurrence of resistant weeds is difficult to detect before use, Seamless Control LLC accepts no liability for any losses that result from the failure of this product to control resistant weeds.

### 6.1    Weed Management Practices

Resistant populations arise when rare individual plants are uncontrolled by a normal dose of a given herbicide under normal environmental conditions. In the absence of other control measures these individuals survive, produce seed, and eventually become the dominant biotype in the field through continuous selection.  The best means of reducing this selection is to use diverse weed control practices

such as multiple herbicides with different mechanisms of action that are each effective at controlling a specific weed species, and often in combination with various mechanical and cultural practices.

Suspected herbicide resistance can be identified by these factors:

- Failure to control a weed species normally controlled by the herbicide at the dose applied, especially when control is achieved on adjacent weeds

- A spreading patch of non-controlled plants of a particular species

- Surviving plants mixed with controlled individuals of the same species

To minimize the occurrence of herbicide-resistant biotypes, including those resistant to glyphosate and diquat, implement the following weed management practice options that are practical to your situation. These management practices are applicable to reduce the spread of suspected and confirmed resistant biotypes (managing existing resistant biotypes) and to reduce the potential for selecting for resistance in new species (proactive resistance management).

- Use a diversified approach toward weed management focused on preventing weed seed production and reducing the number of weed seeds in the soil.

- Plant seed that is as weed-free as possible.

- Scout fields and application sites routinely, before and after herbicide application.

- Use multiple herbicide mechanisms of action that are effective against the most troublesome weeds on your application site and against those with known resistance.

- Apply herbicides at application rates listed on the label when weeds are within the size range indicated on the label.

- Emphasize cultural practices that suppress weeds by using crop competiveness.

- Use mechanical and biological weed management practices, where appropriate.

- Prevent field-to-field and within-field movement of weed seed or vegetative propagules.

### 6.2     Management of Herbicide-Resistant Biotypes

Appropriate testing is needed to determine if a weed is resistant to a herbicide. Call 1-800-768-6387 [*Alternative telephone numbers:* 1-800-ROUNDUP (1-800-768-6387)] [*Optional alternative text: INSERT COMPANY NAME AND/OR TELEPHONE NUMBER*] [*Optional alternative text:* [or] contact your Seamless Control Representative] to report any incidence of non-performance of this product against a particular weed species or to determine if resistance in any particular weed biotype has been confirmed in your area [*Optional additional text:*, or visit on the Internet at www.weedresistancemanagement.com or www.weedscience.org].

### 7.0     MIXING

Spray solutions of this product may be mixed, stored and applied using clean stainless steel, fiberglass, plastic or plastic-lined steel containers.

DO NOT MIX, STORE OR APPLY THIS PRODUCT OR SPRAY SOLUTIONS OF THIS PRODUCT IN GALVANIZED STEEL OR UNLINED STEEL (EXCEPT STAINLESS STEEL) CONTAINERS OR SPRAY TANKS.

Eliminate any risk of siphoning the contents of the tank back into the carrier source while mixing.  Use approved anti-back-siphoning devices where required by State or local regulations.

Mix only the quantity of spray solution that will be applied that day.  Slower onset of visual effects could result from the application of spray solutions allowed to stand overnight.

A 50-mesh nozzle screen or line strainer on spray equipment is adequate.

Clean sprayer parts promptly after using this product by thoroughly flushing with water.

### 7.1    Mixing with Water

PERFORMANCE OF THIS PRODUCT CAN BE SIGNIFICANTLY REDUCED IF WATER CONTAINING SOIL SEDIMENT IS USED AS CARRIER.  DO NOT MIX THIS PRODUCT WITH WATER FROM PONDS OR DITCHES THAT IS VISIBLY MUDDY OR MURKY.

This product mixes readily with water.  Foaming of the spray solution can occur during mixing and application. To prevent or minimize foam, avoid the use of mechanical agitators, terminate by-pass and return lines at the bottom of the tank and, if necessary, add an appropriate anti-foam or defoaming agent to the spray solution.

Mix this product in water as follows:

1.   Place a 20 to 35-mesh screen or wetting basket over filling port of mixing tank.

2.   Through the screen, fill the tank one-half full with water and start gentle agitation.

3.   Add [INSERT BRAND NAME] directly into the tank using a circular motion while pouring.

4.   Continue filling the spray tank to the appropriate level with water.

If adding additional products to the spray mixture, add them after this product has been added and is completely dissolved.

### 7.2    Tank Mixtures

This product does not provide residual weed control in the soil. This product may be tank-mixed with other herbicides to provide residual weed control, a broader weed control spectrum or an alternate mechanism of action.

When a tank-mix with a generic active ingredient, such as 2,4-D or pendimethalin, or any other product or material, is listed on this label, the user is responsible for ensuring that the specific application being made and the use site are included on the label of the product used in the mix.

Refer to all individual product labels, supplemental labeling and Fact Sheets for all products in the tank mixture and observe all precautions and limitations on the label, including application timing and soil restrictions.  It is the pesticide user's responsibility to ensure that all products in the listed mixtures are registered for the intended use. Users must follow the most restrictive directions for use and precautionary statements of each product in the tank mixture.

Add tank-mix components to the tank after this product has been added and is completely dissolved.  Add individual components in the following order: wettable powders; flowables; emulsifiable concentrates; water soluble liquids.

When adding a wettable powder formulation to a tank-mix with this product, first make a slurry of it with water before SLOWLY adding it through the screen into the tank.  When adding a flowable formulation to the mix, premix one part of the product with one part water before SLOWLY adding it through the screen into the tank.  When adding an emulsifiable concentrate formulation, premix one part of the product with two parts water before SLOWLY adding it through the screen into the tank.

Always predetermine the compatibility of all tank-mix products together in the carrier by mixing small proportional quantities in advance.

Seamless Control has not tested all tank-mix product formulations for compatibility, antagonism or reduction in product performance.  Mixing this product with herbicides or other materials not specified on this label could result in reduced performance of this product.  To the extent consistent with applicable

law, buyer and all users are responsible for any and all loss or damage in connection with the use or handling of mixtures of this product with herbicides or other materials that are not expressly specified ion this label,.

This product may be applied in a tank mixture with the following products to provide preemergence and/or improved postemergence control of weeds listed on the individual product labels.

> [*Active ingredients and products to be added to the final printed labeling for tank-mixing may be selected from the following list:*
>
> 2,4-D; atrazine; dicamba; bromacil; diuron; imazapyr; metsulfuron methyl; oryzalin; pendimethalin, prodiamine; simazine; sulfosulfuron; trichlopyr
>
> Arsenal; Arsenal Herbicide Applicators Concentrate; Banvel; Banvel 480; Barricade 4L; Barricade 65WG; Certainty Turf; Chopper Gen2; Crossbow; Endurance; Escort XP; Forestry Garlon 4 Specialty; Forestry Garlon XLT Specialty; Gallery SC; Gallery 75 Dry Flowable Specialty; Garlon; 3A Specialty; Garlon 4 Specialty; Garlon 4 Ultra Specialty; Goal 2XL; GoalTender; Habitat; Hyvar X; Hyvar X-L; Karmex DF; Krenite S Brush Control Agent; Krovar I DF; Landmark; Landmark XP; Oust Extra; Oust XP; Outrider; Plateau; Poast; Poast Plus; Ronstar 50 WSP; Ronstar Flo; Ronstar G; Sahara DG; Spike 20P Specialty; Spike 80 DF Specialty; Stalker; Surflan AS Specialty; Surflan Flex; Surflan Flex T&O; Surflan XL 2G; Surflan Pro; Telar XP; Tordon 101 Mixture Specialty; Tordon 22K Specialty; Tordon K Herbicide Specialty; Transline Specialty; Vanquish; Velpar DF CU; Velpar DF VU; Velpar L CU; Velpar L; Velpar L VU]

To maintain bare ground, apply this product to control or partially control emerged annual and perennial weeds in a tank-mix with a product listed here that provides residual control of weed seeds that have not germinated at the time of application.

When used in combination as described on this label, and to the extent consistent with applicable law, the liability of Seamless Control LLC shall in no manner extend to any damage, loss or injury not solely and directly caused by the inclusion of the Seamless Control product in such combination use.

### 7.3   Colorants and Dyes

Colorants and marking dyes may be added to this product; however, they can reduce the performance of this product.  Certain blue dyes are not stable in a spray solution of this product.  Conduct a jar test first to determine if the desired blue dye is stable.  If stability of the dye is a problem, consider switching to an alternate color dye.  Use colorants and dyes according to the manufacturer's directions.

### 7.4   Drift Reduction Additives

Drift control additives may be used with all equipment types.  When a drift control additive is used, read and follow all directions for use, precautions, limitations and all other information appearing on the product label.  The use of drift reduction additives can affect spray coverage, which could result in reduced performance of this product.

### 8.0   APPLICATION EQUIPMENT AND TECHNIQUES

This product may be applied with the following equipment:

**Ground Application Equipment**—boom or boomless systems, pull-type sprayers, floaters, pick-up sprayers, spray coupes and other ground broadcast application equipment

**Handheld Sprayers**—backpack sprayers, pump-up pressure sprayers, handguns, handwands, and other handheld and motorized spray equipment used to direct the spray onto unwanted foliage

**Controlled Droplet Applicator (CDA)**—handheld or boom-mounted applicators that produce a spray pattern consisting of a narrow range of droplet sizes

APPLY THIS PRODUCT USING PROPERLY MAINTAINED AND CALIBRATED EQUIPMENT CAPABLE OF ACCURATELY DELIVERING DESIRED VOLUMES.

DO NOT apply this product using aerial application equipment.

DO NOT apply this product through any type of irrigation system.

## 8.1    Spray Drift Management

AVOID CONTACT OF THIS HERBICIDE WITH FOLIAGE, [*Optional text:* GREEN] STEMS, EXPOSED NON-WOODY ROOTS OR FRUIT OF CROPS, DESIRABLE PLANTS AND TREES, AS SEVERE PLANT INJURY OR DESTRUCTION COULD RESULT.

Do not allow the herbicide solution to mist, drip, drift or splash onto desirable vegetation, as even small quantities of this product can cause severe damage or destruction to vegetation on which application was not intended.

AVOID DRIFT. USE EXTREME CARE TO PREVENT INJURY TO DESIRABLE PLANTS WHEN APPLYING THIS PRODUCT.

Avoiding spray drift at the application site is the responsibility of the applicator.  The interaction of many equipment and weather-related factors determines the potential for spray drift.  The applicator is responsible for considering all these factors when making decisions regarding the applicaton of this product.

The likelihood of injury occurring as the result of spray drift while applying this product increases when winds are gusty, as wind velocity increases, when wind direction is constantly changing or when there are other meteorological conditions that favor spray drift.  When spraying, avoid combinations of pressure and nozzle type that will result in splatter or generation of fine particles (mist) that are likely to drift.

TO PREVENT INJURY TO ADJACENT DESIRABLE VEGETATION, APPROPRIATE BUFFERS MUST BE MAINTAINED.

AVOID APPLYING THIS PRODUCT AT EXCESSIVE SPEED OR SPRAYER PRESSURE.

## 8.2    Ground Application Equipment

Apply this product at an appropriate rate specified on this label in 10 to 80 gallons of water per acre when making a broadcast application using ground application equipment, unless otherwise specified on this label or on separate supplemental labeling or Fact Sheets published for this product.  As the weed density increases, increase the spray volume towards the upper end of this range to ensure complete coverage.  Use nozzles that will avoid generating a fine mist.  For best performance when using ground application equipment, use flat-fan nozzles.  Check spray pattern for uniform distribution of spray droplets.

## 8.3    Handheld Sprayers

When using a handheld sprayer, apply spray solutions of this product uniformly and completely to foliage of target weeds using a coarse spray droplet spectrum and a spray-to-wet technique; do not spray to the point of runoff.  For the appropriate concentration of this product in the spray solution and timing of application to control specific weeds, woody brush, trees and vines, refer to the "WEEDS CONTROLLED" section of this label.

For control of annual weeds, make application when weeds are small and prior to seedhead or bud formation.  For control of perennial weeds, woody brush, trees and vines, make application after flowering and before fall color and leaf drop.

When making a low-volume directed spray application to annual and perennial weeds, woody brush, trees and vines using a handheld sprayer, ensure that at least 50 to 75 percent of the foliage or the top one-half of each unwanted plant is sprayed.  If a straight stream nozzle is used, start the application at the top of the targeted plant and spray from top to bottom in a lateral zig-zag motion.  To ensure uniform and complete coverage, spray both sides of large or tall woody brush, trees and vines, or when foliage is thick and dense, or where there are multiple sprouts. For best performance of this product on woody brush, trees and vines, apply to actively growing vegetation after full leaf expansion and flowering, prior to fall color and leaf drop.

**8.4** **Controlled Droplet Applicator (CDA)** [*This section is optional in the final printed label*]

The amount of this product applied per acre by controlled droplet application (CDA) must be no less than the rate stated on this label for application using conventional broadcast application equipment.  For vehicle mounted CDA equipment, apply 3 to 15 gallons of water per acre.

For hand-held CDA units, apply a solution of 1.5 to 2.0 pounds of this product in one gallon of water at a flow rate of 2 fluid ounces per minute and a walking speed of 0.75 mile per hour.

A controlled droplet applicator produces a spray pattern that is not easily visible.  Use extreme care to avoid spray or drift from coming into contact with the foliage or any other green tissue of desirable vegetation, as plant damage or destruction could result.

**9.0** **TERRESTRIAL USE SITES**

This product may be used according to the directions described on this label to control annual and perennial weeds, woody brush, trees and vines listed on this label on any terrestrial site described on this label.

This product may be used to control weeds, woody brush, trees and vines on maintained landscapes, on improved and unimproved land, on lawns and turf and around ornamentals on industrial, commercial and residential sites, including [*Optional text, as applicable, select all uses that apply to final printed labeling:* airports, apartment complexes, ditch banks, driveways, dry ditches, dry canals, fencerows, golf courses, industrial sites, landscape areas, lumberyards, manufacturing sites, municipal sites, natural areas, office complexes, ornamental landscapes, parks, parking areas, recreational areas, residential areas, rights-of-way, roadsides, schools, sports complexes, storage areas, and warehouse areas].

This product may NOT be used for the production of agricultural plants on farms or in nurseries, greenhouses and forests, including any food or feed crop, timber, ornamental plants, trees or any other plants being grown for sale.  This product may NOT be used in conjuction with commercial seed production.

This product may be used for non-selective control of unwanted vegetation on any site described on this label for trim-and-edge application around objects including around building foundations, equipment storage areas and trees, and to eliminate unwanted vegetation growing in and around established shrub beds and ornamental plantings. This product may also be used for complete elimination of vegetation from a terrestrial site prior to planting ornamentals, flowers, turfgrass (sod or seed), and prior to land development, including prior to beginning construction projects or the laying of asphalt or other road material.  Application may be repeated, as needed, to maintain bare ground, up to a total application of 12.25 pounds of this product (8 pounds of glyphosate acid) per acre per year.

**10.0** **WEEDS CONTROLLED**

Always use the higher rate of this product per acre within a given range when weed growth is heavy or dense, or when weeds are growing in an undisturbed (noncultivated) area.

Poor weed control could be realized if application is made to weeds covered with dust. For weeds that have been mowed, grazed or cut, allow re-growth to occur prior to application of this product.

Refer to sections that follow for application rates and timing of application to control annual and perennial weeds, woody brush, trees and vines. For hard-to-control perennial weeds and where weed growth is heavy or dense, or when weeds are slowly growing under stressed conditions, this product may be applied at up to 12.25 pounds per acre for maximum weed control.

## 10.1    Turfgrass Weed Control and Renovation

The use of this product as described in this section may be applied to turfgrass growing on any terrestrial site described on this label using any method of application described.

DO NOT use this product on turf being grown for sale or other commercial use as sod, or for commercial seed production, or for research purposes.  Do not disturb soil or underground plant parts prior to application of this product.

Ensure that any tank-mix product applied with this product is labeled for the intended use and on the site of application.  Do not feed or allow grazing of vegetation from the treated area by livestock.

**Weed Control in Dormant Turfgrass and Bahiagrass**

This product may be used to control or suppress many winter annual weeds and tall fescue for effective release of dormant bermudagrass and bahiagrass prior to spring green-up in areas where bermudagrass or bahiagrass are desirable ground covers and where some temporary injury or discoloration can be tolerated.

Apply 5 to 16 ounces of this product in 10 to 80 gallons of water per acre when bermudagrass and bahiagrass are dormant and prior to spring green-up.

Application of more than 9 ounces of this product per acre on highly maintained bermudagrass and bahiagrass, such as golf courses and lawns, could result in injury or delayed green-up in the spring.

**Turf Renovation**

This product controls most existing vegetation prior to renovating turfgrass areas.  For maximum control of existing vegetation, delay planting or sodding until after determining if any re-growth from underground plant parts will occur.  Where repeat applications are necessary, sufficient re-growth must be attained prior to re-application of this product.  For managed turfgrass, apply this product after omitting at least one regular mowing to allow sufficient growth for good interception of the spray solution.

Delay tillage or renovation techniques, such as vertical mowing, coring or slicing for a minimum of 7 days after application to allow translocation of the herbicide into underground plant parts.

This product has no residual soil activity and will not affect plants, seed or sod planted back into the area after application.

## 10.2    Annual Weeds

Annual weeds are easiest to control with this product when they are small and actively growing.  New leaf development indicates active growth.

To control the annual weeds listed in this section using ground broadcast application equipment, apply 2.25 to 4.5 pounds of this product in 10 to 80 gallons of water per acre.  When applying at rates less than 4.5 pounds of this product per acre, the level of fast-acting symptomology could be less.

To control annual weeds using a handheld sprayer with a spray-to-wet technique, apply this product at a concentration of 1.2 ounces per gallon of spray solution.

Allow a minimum of 7 days after application before tillage.

**Annual Weed Species**

Anoda, spurred
Barley[1]
Barley, little[1]
Barnyardgrass[1]
Bassia, fivehook
Bittercress[1]
Bluegrass, annual*[1]
Bluegrass, bulbous[1]
Brome, downy[1]
Brome, Japanese[1]
Buttercup[1]
Castor bean
Cheatgrass[1]
Cheeseweed (*Malva parviflora*)
Chervil[1]
Chickweed[1]
Cocklebur[1]
Copperleaf, hophornbeam
Copperleaf, Virginia
Coreopsis, plains/tickseed [1]
Corn[1]
Crabgrass[1]
Cupgrass, woolly[1]
Dwarf dandelion[1]
Eclipta[1]
False dandelion[1]
False flax, smallseed[1]
Fiddleneck
Filaree
Fleabane, annual[1]
Fleabane, hairy*[1] (*Conyza bonariensis*)
Fleabane, rough[1]
Foxtail[1]
Foxtail, Carolina[1]
Geranium, Carolina
Goatgrass, jointed[1]
Goosegrass*
Groundsel, common[1]
Henbit
Horseweed/Marestail* (*Conyza canadensis*)
Itchgrass[1]
Johnsongrass, seedling*
Junglerice*
Knotweed
Kochia*
Lambsquarters[1]
Lettuce, prickly[1]
Mannagrass, eastern[1]
Mayweed
Medusahead[1]
Morning glory (*Ipomoea spp.*)

Mustard, blue[1]
Mustard, tansy[1]
Mustard, tumble[1]
Mustard, wild[1]
Nightshade, black[1]
Oats
Panicum, browntop[1]
Panicum, fall [1]
Panicum, Texas[1]
Pennycress, field[1]
Pepperweed, Virginia[1]
Pigweed*[1]
Purslane, common
Pusley, Florida
Ragweed, common*[1]
Ragweed, giant*
Rice, red
Rocket, London[1]
Rocket, yellow
Rye[1]
Ryegrass*[1]
Sandbur, field[1]
Sesbania, hemp
Shattercane[1]
Shepherd's-purse[1]
Sicklepod
Signalgrass, broadleaf[1]
Smartweed, ladysthumb[1]
Smartweed, Pennsylvania[1]
Sorghum, grain (milo) [1]
Sowthistle, annual
Spanish needles
Speedwell, corn[1]
Speedwell, purslane[1]
Sprangletop[1]
Spurge, annual
Spurge, prostrate[1]
Spurge, spotted[1]
Spurry, umbrella[1]
Starthistle, yellow
Stinkgrass[1]
Sunflower[1]
Teaweed / Prickly sida
Thistle, Russian*
Velvetleaf
Wheat[1]
Wild oats[1]
Witchgrass[1]

---

[1] These species will be controlled or partially controlled when this product is applied using ground broadcast application equipment equipped with flat-fan nozzles.

\* A glyphosate-resistant biotype has been confirmed.  For additional information, refer to the "WEED RESISTANCE MANAGEMENT" section of this label.  You can also visit on the Internet, www.weedscience.org or www.weedresistancemanagement.com, or contact your Seamless Control representative.

### 10.3   Perennial Weeds

More effective control of perennial weeds listed in this section can be obtained when this product is applied after target weeds have reached the reproductive stage of growth, which is indicated by seedhead initiation in grasses and bud formation in broadleaves.  For control of non-flowering plants, best results can be obtained when target plants have reached a mature stage of growth.  If application must be made prior to these growth stages or to weeds that are slowly growing under stressful conditions, apply this product at a rate toward the upper end of the specified range.

To control perennial weeds using ground broadcast application equipment, apply 4.5 to 9.0 pounds of this product in 10 to 80 gallons of water per acre.  At application rates of less than 9.0 pounds per acre, the level of fast-acting symptomology could be less.

To control perennial weeds using a handheld sprayer with a spray-to-wet technique, apply this product at a concentration of 1.5 ounces per gallon of spray solution.  When using a handheld sprayer with a low-volume directed application technique, apply at a concentration of 4.0 to 8.0 ounces of this product per gallon of spray solution.

Allow a minimum of 7 days after application before tillage.

**Perennial Weed Species**

Alfalfa[1]
Alligatorweed[1]
Anise (fennel)
Bahiagrass
Beachgrass, European (*Ammophila arenaria*)
Bentgrass[1]
Bermudagrass[1]
Bermudagrass, water (knotgrass)
Bindweed, field
Bluegrass, Kentucky
Blueweed, Texas
Bromegrass, smooth
Bursage, woolly-leaf
Canarygrass, reed
Cattail
Clover; red, white[1]
Cogongrass
Dallisgrass
Dandelion
Dock, curly
Dogbane, hemp
Fescue
Fescue, tall
Guinea grass
Hemlock, poison
Horsenettle
Horseradish

Iceplant
Ivy; German
Jerusalem artichoke
Johnsongrass
Kikuyu grass[1]
Knapweed
Lantana
Lespedeza
Milkweed, common
Muhly, wirestem
Mullein, common
Napiergrass
Nightshade, silverleaf
Nutsedge; purple, yellow
Orchardgrass
Pampas grass
Para grass
Pepperweed, perennial
Phragmites[1]
Quackgrass
Redvine[1]
Reed, giant
Ryegrass, perennial
Spurge, leafy[1]
Thistle, artichoke
Thistle, Canada
Timothy
Torpedograss[1]
Trumpetcreeper[1]
Vaseygrass
Velvetgrass
Wheatgrass, western

[1] Partial Control

**10.4    Woody Brush, Trees and Vines**

Maximum performance of this product on woody brush, trees and vines can be obtained when application is made when target plants are in the seedling stage of growth.  More than one application might be needed to control larger plants.

To control woody brush, tree and vine seedlings using ground broadcast application equipment, apply 9.0 pounds of this product in 10 to 80 gallons of water per acre.

To control woody brush, tree and vine seedlings using a handheld sprayer with a spray-to-wet technique, apply this product at a concentration of 1.5 ounces per gallon of spray solution.  When using a handheld sprayer with a low-volume directed application technique, apply at a concentration of 4.0 to 8.0 ounces of this product per gallon of spray solution.

Allow a minimum of 7 days after application before tillage.

**Woody Brush, Tree and Vine Species**

Alder

Ash[1]
Beech[1]
Birch
Blackberry
Blackgum
Cherry; bitter, black, pin
Dogwood[1]
Elderberry
Elm[1]
Honeysuckle
Locust, black[1]
Maple, red
Maple, sugar
Oak, black[1]
Oak, northern pin
Oak, post
Oak, red
Oak, scrub[1]
Oak, southern red
Oak, white[1]
Peppertree, Brazilian (Florida holly)[1]
Pine
Poison ivy[1]
Poison oak[1]
Poplar, yellow[1]
Redbud, eastern
Rose, multiflora
Saltcedar[1]
Sumac; laurel, poison, smooth, sugarbush, winged[1]
Sweetgum
Vine maple[1]
Virginia creeper
Waxmyrtle, southern[1]

---

[1] Partial control

## 11.0   LIMIT OF WARRANTY AND LIABILITY

Seamless Control LLC ("Company") warrants that this product conforms to the chemical description on the label.   TO THE EXTENT CONSISTENT WITH APPLICABLE LAW, NO OTHER EXPRESS WARRANTY OR IMPLIED WARRANTY OF FITNESS FOR PARTICULAR PURPOSE OR MERCHANTABILITY IS MADE.   This warranty is also subject to the conditions and limitations stated herein.

Buyer and all users shall use this product only for the purposes of and in accordance with the Complete Directions for Use label ("Directions") and shall promptly notify this Company of any claims whether based in contract, negligence, strict liability, other tort or otherwise.

To the extent consistent with applicable law, buyer and all users are responsible for all loss, injuries or damage from use or handling which results from conditions beyond the control of this Company, including, but not limited to, incompatibility with products other than those set forth in the Directions, application to or contact with desirable vegetation, crop injury or failure of this product to control weed biotypes which develop resistance to glyphosate, unusual weather, weather conditions which are outside the range considered normal at the application site and for the time period when the product is applied, as well as weather conditions which are outside the application ranges set forth in the Directions, use and/or

application in any manner not explicitly set forth in or inconsistent with the Directions, moisture conditions outside the moisture range specified in the Directions, or the presence of products other than those set forth in the Directions in or on the soil, crop or treated vegetation.

This Company does not warrant any product reformulated or repackaged from this product except in accordance with this Company's stewardship requirements and with express written permission from this Company.

TO THE EXTENT CONSISTENT WITH APPLICABLE LAW, THE EXCLUSIVE REMEDY OF THE USER OR BUYER, AND THE LIMIT OF THE LIABILITY OF THIS COMPANY OR ANY OTHER SELLER FOR ANY AND ALL LOSSES, INJURIES OR DAMAGES RESULTING FROM THE USE OR HANDLING OF THIS PRODUCT (INCLUDING CLAIMS BASED IN CONTRACT, NEGLIGENCE, STRICT LIABILITY, OTHER TORT OR OTHERWISE) SHALL BE THE PURCHASE PRICE PAID BY THE USER OR BUYER FOR THE QUANTITY OF THIS PRODUCT INVOLVED, OR, AT THE ELECTION OF THIS COMPANY OR ANY OTHER SELLER, THE REPLACEMENT OF SUCH QUANTITY, OR, IF NOT ACQUIRED BY PURCHASE, REPLACEMENT OF SUCH QUANTITY. TO THE EXTENT CONSISTENT WITH APPLICABLE LAW, IN NO EVENT SHALL THIS COMPANY OR ANY OTHER SELLER BE LIABLE FOR ANY INCIDENTAL, CONSEQUENTIAL OR SPECIAL DAMAGES.

Upon opening and using this product, buyer and all users are deemed to have accepted the terms of this LIMIT OF WARRANTY AND LIABILITY which may not be varied by any verbal or written agreement. If terms are not acceptable, return at once unopened.

[*Optional text, if applicable:* [*INSERT BRAND NAME and Design* [and] TRUEBLUE ADVANTAGE PROVEN RELIABLE SUPPORT and Design] are [registered] trademarks of Seamless Control LLC.]

[*Optional text, if applicable:* Roundup QuikPRO and Design is a [registered] trademark of Monsanto Technology LLC and used under license.]

[*Optional text, if applicable:* All other trademarks are the property of their respective owners.]

[*Optional text, if applicable:* Product of Brazil, formulated in the U.S. with U.S. Ingredients.]

In case of an emergency involving this product, or for medical assistance,
call [O*ptional text, if applicable:* toll-free, collect, day or night,] (314) 694-4000 [*Or insert alternative telephone number, as appropriate*].

Packed [*Alternative text:* Produced] [*Alternative text:* Manufactured] for:
SEAMLESS CONTROL LLC
14111 SCOTTSLAWN ROAD
MARYSVILLE, OH 43041

©[YEAR]

[*Insert print plate number*]

[*Insert barcode*]

# EXHIBIT 7

An official website of the United States government.

 United States
Environmental Protection
Agency

# About Pesticide Registration

## Related Information

**What is a pesticide?**

A pesticide is any substance or mixture of substances intended for

- Preventing, destroying, repelling or mitigating any pest.
- Use as a plant regulator, defoliant, or desiccant.
- Use as a nitrogen stabilizer

More information on types of pesticides.

Definition of pesticide in FIFRA

**Types of registrations under FIFRA**

Public involvement in pesticide registration

**On this page:**

- Pesticide registration process
- Federal pesticide laws
- Pesticide label
- Compliance and enforcement

# Pesticide Registration Process

The process of registering a pesticide is a scientific, legal, and administrative procedure through which we examine

- the ingredients of the pesticide;
- the particular site or crop where it is to be used;
- the amount, frequency, and timing of its use; and
- storage and disposal practices.

In evaluating a pesticide registration application, we assess a wide variety of potential human health and environmental effects associated with use of the product. The company that wants to produce the pesticide must provide data from studies that comply with our testing guidelines.

We develop risk assessments that evaluate the potential for

- Harm to humans, wildlife, fish, and plants, including endangered species and non-target organisms.
- Contamination of surface water or ground water from leaching, runoff, and spray drift.

Potential human risks range from short-term toxicity to long-term effects such as cancer and reproductive system disorders.

We also evaluate and approve the language that appears on each pesticide label to ensure the directions for use and safety measures are appropriate to any potential risk. Following label directions is required by law and is necessary to ensure safe use.

Companies submit an application for a registration action, such as to register a new pesticide active ingredient, new product for an existing pesticide, or adding a new use to an existing product.

The company's application typically includes:

- Service fee(s) required by the Pesticide Registration Improvement Act (PRIA).
- Forms describing the requested action.
- The identity and quantity of all chemicals in the product.
- Data on potential risks to human health and the environment, including about the potential for pesticide residues on food (if applicable).
- Proof that the product manufacturing process is reliable.
- Labeling, including directions for use, contents, and appropriate warnings.
- Evidence of meeting all legal and financial obligations.

We publish a notice of receipt in the Federal Register for each application for registration of a new product that contains a new pesticide active ingredient or that proposes a new use for an existing pesticide.

Applications are assigned to the appropriate pesticide division, where it is processed and tracked. A project manager is then assigned to:

- Complete a detailed review of the application
- Assign and coordinate the appropriate scientific review
- Implement priorities and timetable as set by PRIA
- Coordinate administrative action
- Communicate with applicant, otherwise known as the registrant, about the review

## The Evaluation Process

- We evaluate human health risks (including sensitive groups such as children and immune-suppressed individuals), by reviewing data on:
  - Aggregate risks–through food, water, and residential uses

Case 3:16-md-02741-VC   Document 13749-1   Filed 09/21/21   Page 957 of 1541

- - Cumulative risks–from different pesticides with the same effects
    - Occupational risks to those applying the product during their work
  - We evaluate environmental risks by reviewing data on:
    - Potential for ground water contamination
    - Risks to endangered and threatened species
    - Potential for endocrine-disruption effects
  - We implement risk assessment and peer review:
    - We review all the scientific data on the pesticide product and develop comprehensive risk assessments that examine the potential effects of the product or ingredient on the human population and environment.
    - The health and environmental risk assessments undergo a process of peer review by scientific experts.
  - We make risk management and regulatory decisions, where we:
    - Consider the results of the risk assessments and the peer review
    - Research alternative pesticides that are already registered
    - Review any measures needed to mitigate any identified risks
    - Discuss with the applicant if modifications to the product or labeling must be made to mitigate risk
    - Establish new food tolerances if needed, after publishing notices for comment in the Federal Register
    - Grant the registration if no changes are needed, or if necessary modifications are accepted by the applicant
    - Publish in the Federal Register a notice of issuance of the registration

# Federal Pesticide Laws

We regulate pesticides under broad authority granted in two major statutes, the Federal Insecticide, Fungicide, and Rodenticide Act and the Federal Food, Drug, and Cosmetic Act. These laws have been amended by the Food Quality Protection Act and the Pesticide Registration Improvement Act.

- **Federal Insecticide, Fungicide, and Rodenticide Act (FIFRA)** - Requires all pesticides sold or distributed in the United States (including imported pesticides) to be registered by EPA.
  - Registration is based on evaluation of scientific data and assessment of risks and benefits of a product's use.
  - Label directions control how products are used.
  - We can authorize limited use of unregistered pesticides or pesticides registered for other uses to address emergencies and special local needs.
  - We can suspend or cancel a product's registration.
  - Training is required for workers in pesticide-treated areas and certification and training for applicators of restricted use pesticides.

- **Federal Food, Drug and Cosmetic Act (FFDCA)** - Requires us to set pesticide tolerances for all pesticides used in or on food or in a manner that will result in a residue in or on food or animal feed. A tolerance is the maximum permissible level for pesticide residues allowed in or on human food and animal feed.
  - Includes strong provisions for protecting infants and children, as well as other sensitive subpopulations.
  - Provides for exemption from the requirement for a tolerance.

- Under the **Food Quality Protection Act, of 1996 (FQPA)**, which amended both FIFRA and FFDCA, we must find that a pesticide poses a "reasonable certainty of no harm" before it can be registered for use on food or feed. We must review each pesticide registration at least once every 15 years.
  - Several factors must be addressed before a tolerance can be established, including:
    - the aggregate, non-occupational exposure from the pesticide (exposure through diet and drinking water and from using pesticides in and around the home);
    - the cumulative effects from exposure to pesticides that have a common mechanism of toxicity, that is, two or more pesticide chemicals or other substances that cause a common toxic effect(s) by the same, or essentially the same, sequence of major biochemical events (i.e., interpreted as mode of action);
    - whether there is increased susceptibility to infants and children, or other sensitive subpopulations, from exposure to the pesticide; and
    - whether the pesticide produces an effect in humans similar to an effect produced by a naturally-occurring estrogen or produces other endocrine-disruption effects.

- The **Pesticide Registration Improvement Act of 2003 (PRIA)** (455 pp, 1.23 MB, About PDF) also amended FIFRA and FFDCA. PRIA was reauthorized by the Pesticide Registration Improvement Renewal Act of 2007 and the Pesticide Registration Improvement Extension Act of 2012. Under PRIA:
  - Companies must pay service fees according to the category of the registration action.
  - EPA must meet decision review time periods, which result in a more predictable evaluation process for companies.
  - Shorter decision review periods are provided for reduced-risk registration applications.

- The **Endangered Species Act** (ESA) requires federal agencies to ensure that any action they authorize, fund, or carry out, will not likely jeopardize the continued existence of any listed species, or destroy or adversely modify any critical habitat for those species. EPA is responsible for reviewing information and data to determine whether a pesticide product may be registered for a particular use. As part of that determination, we assess whether listed endangered or threatened species or their designated critical habitat may be affected by use of the product. All pesticide products that EPA determines "may affect" a listed species or its designated critical habitat may be subject to EPA's Endangered Species Protection Program.

Regulations implementing the pesticide statues are available at 40 CFR Part 150-189.

Read more about EPA laws.

Read more about EPA regulations.

# The Pesticide Label

Case 3:16-md-02741-VC Document 13749-1 Filed 09/21/21 Page 959 of 1541

We review pesticide product labels as part of the licensing/registration process and must approve all label language before a pesticide can be sold or distributed in the United States. The overall intent of the label is to provide clear directions for effective product performance while minimizing risks to human health and the environment. It is a violation of federal law to use a pesticide in a manner inconsistent with its labeling. The courts consider a label to be a legal document. In addition, following labeling instructions carefully and precisely is necessary to ensure safe and effective use.

- Guidance on developing product labels
  - Label Review Manual
  - Pesticide Registration (PR) Notices.
- Search for registered pesticide labels.

## Compliance and Enforcement

Anyone applying pesticides must comply with federal and state laws. In general, states have primary authority for compliance monitoring and enforcing against illegal pesticide use. Often, a state's department of agriculture has this responsibility, but it can be a state's environmental or other agency.

- EPA compliance information.
- EPA enforcement information.
- Find your state's lead pesticide agency.    EXIT

LAST UPDATED ON JANUARY 7, 2021

# EXHIBIT 8

EPA/630/P-03/001B
March 2005

# Guidelines for Carcinogen
# Risk Assessment

Risk Assessment Forum
U.S. Environmental Protection Agency
Washington, DC

**DISCLAIMER**

Mention of trade names or commercial products does not constitute endorsement or recommendation for use.

# CONTENTS

1. INTRODUCTION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1-1
   1.1. PURPOSE AND SCOPE OF THE GUIDELINES . . . . . . . . . . . . . . . . . . . . . . 1-1
   1.2. ORGANIZATION AND APPLICATION OF THE GUIDELINES . . . . . . . . . . 1-3
      1.2.1. Organization . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1-3
      1.2.2. Application . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1-5
   1.3. KEY FEATURES OF THE CANCER GUIDELINES . . . . . . . . . . . . . . . . . . . . 1-7
      1.3.1. Critical Analysis of Available Information as the Starting Point for
            Evaluation . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1-7
      1.3.2. Mode of Action . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1-10
      1.3.3. Weight of Evidence Narrative . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1-11
      1.3.4. Dose-response Assessment . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1-12
      1.3.5. Susceptible Populations and Lifestages . . . . . . . . . . . . . . . . . . . . . . . . 1-13
      1.3.6. Evaluating Risks from Childhood Exposures . . . . . . . . . . . . . . . . . . . . 1-15
      1.3.7. Emphasis on Characterization . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1-21

2. HAZARD ASSESSMENT . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2-1
   2.1. OVERVIEW OF HAZARD ASSESSMENT AND CHARACTERIZATION . . . 2-1
      2.1.1. Analyses of Data . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2-1
      2.1.2. Presentation of Results . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2-1
   2.2. ANALYSIS OF TUMOR DATA . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2-2
      2.2.1. Human Data . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2-3
          2.2.1.1. Assessment of evidence of carcinogenicity from human data . 2-4
          2.2.1.2. Types of studies . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2-5
          2.2.1.3. Exposure issues . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2-6
          2.2.1.4. Biological markers . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2-7
          2.2.1.5. Confounding actors . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2-8
          2.2.1.6. Statistical considerations. . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2-9
              2.2.1.6.1. Likelihood of observing an effect . . . . . . . . . . . . . . . 2-9
              2.2.1.6.2. Sampling and other bias issues . . . . . . . . . . . . . . . . 2-10
              2.2.1.6.3. Combining statistical evidence across studies . . . . 2-11
          2.2.1.7. Evidence for Causality . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2-11
      2.2.2. Animal Data . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2-15
          2.2.2.1. Long-term Carcinogenicity Studies . . . . . . . . . . . . . . . . . . . . . 2-15
              2.2.2.1.1. Dosing issues . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2-16
              2.2.2.1.2. Statistical considerations . . . . . . . . . . . . . . . . . . . . . 2-19
              2.2.2.1.3. Concurrent and historical controls . . . . . . . . . . . . . 2-20
              2.2.2.1.4. Assessment of evidence of carcinogenicity from long-
                    term animal studies . . . . . . . . . . . . . . . . . . . . . . . . . . 2-21
              2.2.2.1.5. Site concordance . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2-22
          2.2.2.2. Perinatal Carcinogenicity Studies . . . . . . . . . . . . . . . . . . . . . . 2-22
          2.2.2.3. Other Studies . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2-24
      2.2.3. Structural Analogue Data . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2-25
   2.3. ANALYSIS OF OTHER KEY DATA . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2-25

2.3.1. Physicochemical Properties  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2-25
2.3.2. Structure-Activity Relationships  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2-26
2.3.3. Comparative Metabolism and Toxicokinetics  . . . . . . . . . . . . . . . . . . . 2-27
2.3.4. Toxicological and Clinical Findings . . . . . . . . . . . . . . . . . . . . . . . . . . . 2-29
2.3.5. Events Relevant to Mode of Carcinogenic Action . . . . . . . . . . . . . . . . 2-30
        2.3.5.1. Direct DNA-Reactive Effects  . . . . . . . . . . . . . . . . . . . . . . . 2-31
        2.3.5.2. Indirect DNA Effects or Other Effects on Genes/Gene Expression
                . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2-32
        2.3.5.3. Precursor Events and Biomarker Information . . . . . . . . . . . 2-34
        2.3.5.4. Judging Data  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2-36
2.4.    MODE OF ACTION—GENERAL CONSIDERATIONS AND FRAMEWORK
        FOR ANALYSIS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2-36
2.4.1. General Considerations . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2-36
2.4.2. Evaluating a Hypothesized Mode of Action . . . . . . . . . . . . . . . . . . . . 2-40
        2.4.2.1. Peer Review . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2-40
        2.4.2.2. Use of the Framework  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2-40
2.4.3. Framework for Evaluating Each Hypothesized Carcinogenic Mode of
        Action . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2-41
        2.4.3.1. Description of the Hypothesized Mode of Action . . . . . . . . 2-43
        2.4.3.2. Discussion of the Experimental Support for the Hypothesized
                Mode of Action  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2-44
        2.4.3.3. Consideration of the Possibility of Other Modes of Action  . 2-46
        2.4.3.4. Conclusions About the Hypothesized Mode of Action . . . . . 2-47
2.4.4. Evolution with Experience . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2-49
2.5. WEIGHT OF EVIDENCE NARRATIVE . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2-49
2.6. HAZARD CHARACTERIZATION  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2-59

3. DOSE-RESPONSE ASSESSMENT  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3-1
3.1. ANALYSIS OF DOSE  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3-3
3.1.1. Standardizing Different Experimental Dosing Regimens  . . . . . . . . . . . 3-4
3.1.2. Toxicokinetic Data and Modeling  . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3-5
3.1.3. Cross-species Scaling Procedures . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3-6
        3.1.3.1. Oral Exposures . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3-6
        3.1.3.2. Inhalation Exposures  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3-8
3.1.4. Route Extrapolation . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3-9
3.2. ANALYSIS IN THE RANGE OF OBSERVATION . . . . . . . . . . . . . . . . . . . 3-11
3.2.1. Epidemiologic Studies  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3-11
3.2.2. Toxicodynamic ("Biologically Based") Modeling . . . . . . . . . . . . . . . 3-13
3.2.3. Empirical Modeling ("Curve Fitting") . . . . . . . . . . . . . . . . . . . . . . . . 3-14
3.2.4. Point of Departure (POD) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3-16
3.2.5. Characterizing the POD: The POD Narrative . . . . . . . . . . . . . . . . . . . 3-18
3.2.6. Relative Potency Factors  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3-20
3.3. EXTRAPOLATION TO LOWER DOSES . . . . . . . . . . . . . . . . . . . . . . . . . . 3-20
3.3.1. Choosing an Extrapolation Approach . . . . . . . . . . . . . . . . . . . . . . . . . 3-21
3.3.2. Extrapolation Using a Toxicodynamic Model . . . . . . . . . . . . . . . . . . . 3-21

3.3.3. Extrapolation Using a Low-dose Linear Model . . . . . . . . . . . . . . . . . 3-23
3.3.4. Nonlinear Extrapolation to Lower Doses . . . . . . . . . . . . . . . . . . . . . 3-23
3.3.5. Comparing and Combining Multiple Extrapolations . . . . . . . . . . . . . 3-24
3.4. EXTRAPOLATION TO DIFFERENT HUMAN EXPOSURE SCENARIOS
. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3-26
3.5. EXTRAPOLATION TO SUSCEPTIBLE POPULATIONS
AND LIFESTAGES . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3-29
3.6. UNCERTAINTY . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3-29
3.7. DOSE-RESPONSE CHARACTERIZATION . . . . . . . . . . . . . . . . . . . . . . . 3-32

4. EXPOSURE ASSESSMENT . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4-1
4.1. DEFINING THE ASSESSMENT QUESTIONS . . . . . . . . . . . . . . . . . . . . . . 4-1
4.2. SELECTING OR DEVELOPING THE CONCEPTUAL AND MATHEMATICAL
MODELS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4-3
4.3. COLLECTING DATA OR SELECTING AND EVALUATING AVAILABLE
DATA . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4-3
4.3.1. Adjusting Unit Risks for Highly Exposed Populations and Lifestages . 4-4
4.4. EXPOSURE CHARACTERIZATION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4-5

5. RISK CHARACTERIZATION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5-1
5.1. PURPOSE . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5-1
5.2. APPLICATION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5-4
5.3. PRESENTATION OF THE RISK CHARACTERIZATION SUMMARY . . . . . 5-5
5.4. CONTENT OF THE RISK CHARACTERIZATION SUMMARY . . . . . . . . . . 5-6

APPENDIX:  MAJOR DEFAULT OPTIONS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . A-1

APPENDIX B: EPA's GUIDANCE FOR DATA QUALITY ASSESSMENT . . . . . . . . . . . B-1

REFERENCES . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . R-1

## LIST OF FIGURES

Figure 1-1.  Flow chart for early-life risk assessment using mode of action framework . . . . 1-23
Figure 3-1.  Compatibility of Alternative Points of Departure with Observed and Modeled
Tumor Incidences . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3-35
Figure 3-2.  Crossing between 10% and 1% Dose-Response Curves for Bladder Carcinomas and
Liver Carcinomas Induced by 2-AAF . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3-35

# 1. INTRODUCTION

## 1.1. PURPOSE AND SCOPE OF THE GUIDELINES

These guidelines revise and replace the U.S. Environmental Protection Agency's (EPA's, or the Agency's) *Guidelines for Carcinogen Risk Assessment,* published in 51 FR 33992, September 24, 1986 (U.S. EPA, 1986a) and the 1999 interim final guidelines (U.S. EPA, 1999a; see U.S. EPA 2001b).  They provide EPA staff with guidance for developing and using risk assessments.  They also provide basic information to the public about the Agency's risk assessment methods.

These cancer guidelines are used with other risk assessment guidelines, such as the *Guidelines for Mutagenicity Risk Assessment* (U.S. EPA, 1986b) and the *Guidelines for Exposure Assessment* (U.S. EPA, 1992a). Consideration of other Agency guidance documents is also important in assessing cancer risks where procedures for evaluating specific target organ effects have been developed (e.g., assessment of thyroid follicular cell tumors, U.S. EPA, 1998a). All of EPA's guidelines should be consulted when conducting a risk assessment in order to ensure that information from studies on carcinogenesis and other health effects are considered together in the overall characterization of risk.  This is particularly true in the case in which a precursor effect for a tumor is also a precursor or endpoint of other health effects or when there is a concern for a particular susceptible life-stage for which the Agency has developed guidance, for example, *Guidelines for Developmental Toxicity Risk Assessment* (U.S. EPA, 1991a).  The developmental guidelines discuss hazards to children that may result from exposures during preconception and prenatal or postnatal development to sexual maturity.  Similar guidelines exist for reproductive toxicant risk assessments (U.S. EPA, 1996a) and for neurotoxicity risk assessment (U.S. EPA, 1998b). The overall characterization of risk is conducted within the context of broader policies and guidance such as Executive Order 13045, "Protection of Children From Environmental Health Risks and Safety Risks"( Executive Order 13045, 1997) which is the primary directive to federal agencies and departments to identify and assess environmental health risks and safety risks that may disproportionately affect children.

The cancer guidelines encourage both consistency in the procedures that support scientific components of Agency decision making and flexibility to allow incorporation of innovations and contemporaneous scientific concepts.  In balancing these goals, the Agency relies on established scientific peer review processes (U.S. EPA, 2000a; OMB 2004).  The cancer guidelines incorporate basic principles and science policies based on evaluation of the currently available information.  The Agency intends to revise these cancer guidelines when substantial changes are necessary.  As more information about carcinogenesis develops, the need may arise to make appropriate changes in risk assessment guidance. In the interim, the Agency intends to issue special reports, after appropriate peer review, to supplement and update guidance on single topics (e.g., U.S. EPA, 1991b).  One such guidance document, *Supplemental Guidance for Assessing Susceptibility from Early-Life Exposure to Carcinogens* ("Supplemental Guidance"), was developed in conjunction with these cancer guidelines (U.S. EPA., 2005).  Because both the methodology and the data in the Supplemental Guidance (see Section 1.3.6) are expected to evolve more rapidly than the issues addressed in these cancer guidelines, the two were developed as separate documents.  The Supplemental Guidance, however, as well as any other relevant (including subsequent) guidance documents, should be considered along with these cancer guidelines as risk assessments for carcinogens are generated. The use of supplemental guidance, such as the Supplemental Guidance for Assessing Cancer Susceptibility from Early-life Exposure to Carcinogens, has the advantage of allowing the Supplemental Guidance to be modified as more data become available.   Thus, the consideration of new, peer-reviewed scientific understanding and data in an assessment can always be consistent with the purposes of these cancer guidelines.

These cancer guidelines are intended as guidance only.  They do not establish any substantive "rules" under the Administrative Procedure Act or any other law and have no binding effect on EPA or any regulated entity, but instead represent a non-binding statement of policy. EPA believes that the cancer guidelines represent a sound and up-to-date approach to cancer risk assessment, and the cancer guidelines enhance the application of the best available science in EPA's risk assessments.  However, EPA cancer risk assessments may be conducted differently than envisioned in the cancer guidelines for many reasons, including (but not limited to) new

information, new scientific understanding, or new science policy judgment.  The science of risk assessment continues to develop rapidly, and specific components of the cancer guidelines may become outdated or may otherwise require modification in individual settings.  Use of the cancer guidelines in future risk assessments will be based on decisions by EPA that the approaches are suitable and appropriate in the context of those particular risk assessments.  These judgments will be tested through peer review, and risk assessments will be modified to use different approaches if appropriate.

### 1.2.  ORGANIZATION AND APPLICATION OF THE CANCER GUIDELINES

### 1.2.1.  Organization

Publications by the Office of Science and Technology (OSTP, 1985) and the National Research Council (NRC) (NRC, 1983, 1994) provide information and general principles about risk assessment.  Risk assessment uses available scientific information on the properties of an agent[1] and its effects in biological systems to provide an evaluation of the potential for harm as a consequence of environmental exposure.  The 1983 and 1994 NRC documents organize risk assessment information into four areas:  hazard identification, dose-response assessment, exposure assessment, and risk characterization.  This structure appears in these cancer guidelines, with additional emphasis placed on characterization of evidence and conclusions in each area of the assessment.  In particular, the cancer guidelines adopt the approach of the NRC's 1994 report in adding a dimension of characterization to the hazard identification step:  an evaluation of the conditions under which its expression is anticipated.  Risk assessment questions addressed in these cancer guidelines are as follows.

- For hazard—Can the identified agent present a carcinogenic hazard to humans and, if so, under what circumstances?

- For dose response—At what levels of exposure might effects occur?

---

[1] The term "agent" refers generally to any chemical substance, mixture, or physical or biological entity being assessed, unless otherwise noted (See Section 1.2.2 for a note on radiation.).

- For exposure—What are the conditions of human exposure?

- For risk—What is the character of the risk?  How well do data support conclusions about the nature and extent of the risk from various exposures?

The risk characterization process first summarizes findings on hazard, dose response, and exposure characterizations and then develops an integrative analysis of the whole risk case.  It ends in the writing of a technical risk characterization. Other documents, such as summaries for the risk managers and the public, reflecting the key points of the risk characterization are usually written.  A summary for managers is a presentation for those who may or may not be familiar with the scientific details of cancer assessment.  It also provides information for other interested readers.  The initial steps in the risk characterization process are to make building blocks in the form of characterizations of the assessments of hazard, dose response, and exposure.  The individual assessments and characterizations are then integrated to arrive at risk estimates for exposure scenarios of interest.  As part of the characterization process, explicit evaluations are made of the hazard and risk potential for susceptible lifestages, including children (U.S. EPA, 1995, 2000b).

The 1994 NRC document also explicitly called attention to the role of the risk assessment process in identifying scientific uncertainties that, if addressed, could serve to reduce their uncertainty in future iterations of the risk assessment.  NRC recommended that when the Agency "reports estimates of risk to decisions-makers and the public, it should present not only point estimates of risk, but also the sources and magnitudes of uncertainty associated with these estimates" (p. 15).  Thus, the identified uncertainties serve as a feedback loop to the research community and decisionmakers, specifying areas and types of information that would be particularly useful.

There are several reasons for individually characterizing the hazard, dose response, and exposure assessments.  One is that they are often done by different people than those who do the integrative analyses.  The second is that there is very often a lapse of time between the conduct of hazard and dose-response analyses and the conduct of exposure assessment and integrative

analysis.  Thus, it is important to capture characterizations of assessments as the assessments are done to avoid the need to go back and reconstruct them.  Finally, frequently a single hazard assessment is used by several programs for several different exposure scenarios.  There may be one or several documents involved.  "Integrative analysis" is a generic term; and many documents that have other titles may contain integrative analyses.  In the following sections, the elements of these characterizations are discussed.

### 1.2.2.  Application

The cancer guidelines apply within the framework of policies provided by applicable EPA statutes and do not alter such policies.

- The cancer guidelines cover the assessment of available data.  They do not imply that one kind of data or another is prerequisite for regulatory action concerning any agent.  It is important  that, when evaluating and considering the use of any data, EPA analysts incorporate  the basic standards of quality, as defined by the EPA Information Quality Guidelines (U.S. EPA, 2002a see Appendix B) and other Agency guidance on data quality such as the EPA Quality Manual for Environmental Programs (U.S. EPA, 2000e), as well as *OMB Guidelines for Ensuring and Maximizing the Quality, Utility, and Integrity of Information Disseminated by Federal Agencies* (OMB, 2002).  It is very important that all analyses consider the basic standards of quality, including objectivity, utility, and integrity.  A summary of the factors and considerations generally used by the Agency when evaluating and considering the use of scientific and technical information is contained in EPA's *A Summary of General Assessment Factors for Evaluating the Quality of Scientific and Technical Information* (U.S. EPA, 2003).

- Risk management applies directives in statutes, which may require consideration of potential risk or solely hazard or exposure potential, along with social, economic, technical, and other factors in decision making.  Risk assessments may be used to support

decisions, but in order to maintain their integrity as decision-making tools, they are not influenced by consideration of the social or economic consequences of regulatory action.

The assessment of risk from radiation sources is informed by the continuing examination of human data by the National Academy of Sciences/NRC in its series of numbered reports: "Biological Effects of Ionizing Radiation." Although some of the general principles of these cancer guidelines may also apply to radiation risk assessments, some of the details of their risk assessment procedures may not, as they are most focused on other kinds of agents. Therefore, these cancer guidelines are not intended to provide the primary source of, or guidance for, the Agency's evaluation of the carcinogenic risks of radiation.

Not every EPA assessment has the same scope or depth, a factor recognized by the National Academy of Sciences (NRC, 1996). For example, EPA's Information Quality Guidelines (U.S. EPA, 2002a, see Appendix B) discuss influential information that "will have or does have a clear and substantial impact ... on important public policies or private sector decisions ... that should adhere to a rigorous standard of quality." It is often difficult to know *a priori* how the results of a risk assessment are likely to be used by the Agency. Some risk assessments may be used by Agency economists and policy analysts, and the necessary information for such analyses, as discussed in detail later in this document, should be included when practicable (U.S. EPA, 2002a). On the other hand, Agency staff often conduct screening-level assessments for priority setting or separate assessments of hazard or exposure for ranking purposes or to decide whether to invest resources in collecting data for a full assessment. Moreover, a given assessment of hazard and dose response may be used with more than one exposure assessment that may be conducted separately and at different times as the need arises in studying environmental problems related to various exposure media. The cancer guidelines apply to these various situations in appropriate detail, given the scope and depth of the particular assessment. For example, a screening assessment may be based almost entirely on structure-activity relationships (SARs) and default options, when other data are not readily available. When more data and resources are readily available, assessments can use a critical analysis of all of the available data as the starting point of the risk assessment. Under these conditions, default

options would only be used to address uncertainties or the absence of critical data.  Default options are inferences based on general scientific knowledge of the phenomena in question and are also matters of policy concerning the appropriate way to bridge uncertainties that concern potential risk to human health.

These cancer guidelines do not suggest that all of the kinds of data covered here will need to be available or used for either assessment or decision making.  The level of detail of an assessment is a matter of Agency management discretion regarding applicable decision-making needs. The Agency generally presumes that key cancer information (e.g., assessments contained in the Agency's Integrated risk Information System) is "influential information" as defined by the EPA Information Quality Guidelines and "highly influential" as defined by OMB's Information Quality Bulletin for Peer Review (OMB 2004).

## 1.3.  KEY FEATURES OF THE CANCER GUIDELINES

### 1.3.1.  Critical Analysis of Available Information as the Starting Point for Evaluation

As an increasing understanding of carcinogenesis is becoming available, these cancer guidelines adopt a view of default options that is consistent with EPA's mission to protect human health while adhering to the tenets of sound science.  Rather than viewing default options as the starting point from which departures may be justified by new scientific information, these cancer guidelines view a critical analysis of all of the available information that is relevant to assessing the carcinogenic risk as the starting point from which a default option may be invoked if needed to address uncertainty or the absence of critical information.  Preference is given to using information that has been peer reviewed, e.g., reported in peer-reviewed scientific journals.  The primary goal of EPA actions is protection of human health; accordingly, as an Agency policy, risk assessment procedures, including default options that are used in the absence of scientific data to the contrary, should be health protective (U.S. EPA, 1999b).

Use of health protective risk assessment procedures as described in these cancer guidelines means that estimates, while uncertain, are more likely to overstate than understate hazard and/or risk.  NRC (1994) reaffirmed the use of default options as "a reasonable way to cope with uncertainty about the choice of appropriate models or theory" (p. 104).  NRC saw the

need to treat uncertainty in a predictable way that is "scientifically defensible, consistent with the agency's statutory mission, and responsive to the needs of decision-makers" (p. 86). The extent of health protection provided to the public ultimately depends upon what risk managers decide is the appropriate course of regulatory action. When risk assessments are performed using only one set of procedures, it may be difficult for risk managers to determine how much health protectiveness is built into a particular hazard determination or risk characterization. When there are alternative procedures having significant biological support, the Agency encourages assessments to be performed using these alternative procedures, if feasible, in order to shed light on the uncertainties in the assessment, recognizing that the Agency may decide to give greater weight to one set of procedures than another in a specific assessment or management decision.

Encouraging risk assessors to be receptive to new scientific information, NRC discussed the need for departures from default options when a "sufficient showing" is made. It called on EPA to articulate clearly its criteria for a departure so that decisions to depart from default options would be "scientifically credible and receive public acceptance" (p. 91). It was concerned that *ad hoc* departures would undercut the scientific credibility of a risk assessment. NRC envisioned that principles for choosing and departing from default options would balance several objectives, including "protecting the public health, ensuring scientific validity, minimizing serious errors in estimating risks, maximizing incentives for research, creating an orderly and predictable process, and fostering openness and trustworthiness" (p. 81).

Appendices N-1 and N-2 of NRC (1994) discussed two competing standards for choosing default options articulated by members of the committee. One suggested approach would evaluate a departure in terms of whether "it is scientifically plausible" and whether it "tends to protect public health in the face of scientific uncertainty" (p. 601). An alternative approach "emphasizes scientific plausibility with regard to the use of alternative models" (p. 631). Reaching no consensus on a single approach, NRC recognized that developing criteria for departures is an EPA policy matter.

The basis for invoking a default option depends on the circumstances. Generally, if a gap in basic understanding exists or if agent-specific information is missing, a default option may be used. If agent-specific information is present but critical analysis reveals inadequacies, a default

option may also be used.  If critical analysis of agent-specific information is consistent with one or more biologically based models as well as with the default option, the alternative models and the default option are both carried through the assessment and characterized for the risk manager. In this case, the default model not only fits the data, but also serves as a benchmark for comparison with other analyses.  This case also highlights the importance of extensive experimentation to support a conclusion about mode of action, including addressing the issue of whether alternative modes of action are also plausible.  Section 2.4 provides a framework for critical analysis of mode of action information to address the extent to which the available information supports the hypothesized mode of action, whether alternative modes of action are also plausible, and whether there is confidence that the same inferences can be extended to populations and lifestages that are not represented among the experimental data.

Generally, cancer risk decisions strive to be "scientifically defensible, consistent with the agency's statutory mission, and responsive to the needs of decision-makers" (NRC, 1994). Scientific defensibility would be evaluated through use of EPA's Science Advisory Board, EPA's Office of Pesticide Programs' Scientific Advisory Panel, or other independent expert peer review panels to determine whether a consensus among scientific experts exists.  Consistency with the Agency's statutory mission would consider whether the risk assessment overall supports EPA's mission to protect human health and safeguard the natural environment.  Responsiveness to the needs of decisionmakers would take into account pragmatic considerations such as the nature of the decision; the required depth of analysis; the utility, time, and cost of generating new scientific data; and the time, personnel, and resources allotted to the risk assessment.

With a multitude of types of data, analyses, and risk assessments, as well as the diversity of needs of decisionmakers, it is neither possible nor desirable to specify step-by-step criteria for decisions to invoke a default option.  A discussion of major default options appears in the Appendix.  Screening-level assessments may more readily use default parameters, even worst-case assumptions, that would not be appropriate in a full-scale assessment.  On the other hand, significant risk management decisions will often benefit from a more comprehensive assessment, including alternative risk models having significant biological support.  To the extent practicable, such assessments should provide central estimates of potential risks in conjunction with lower

and upper bounds (e.g., confidence limits) and a clear statement of the uncertainty associated with these estimates.

In the absence of sufficient data or understanding to develop of a robust, biologically based model, an appropriate policy choice is to have a single preferred curve-fitting model for each type of data set.  Many different curve-fitting models have been developed, and those that fit the observed data reasonably well may lead to several-fold differences in estimated risk at the lower end of the observed range.  In addition, goodness-of-fit to the experimental observations is not by itself an effective means of discriminating among models that adequately fit the data (OSTP, 1985).  To provide some measure of consistency across different carcinogen assessments, EPA uses a standard curve-fitting procedure for tumor incidence data.  Assessments that include a different approach should provide an adequate justification and compare their results with those from the standard procedure.  Application of models to data should be conducted in an open and transparent manner.

### 1.3.2.  Mode of Action

The use of mode of action[2] in the assessment of potential carcinogens is a main focus of these cancer guidelines.  This area of emphasis arose because of the significant scientific advances that have developed concerning the causes of cancer induction.  Elucidation of a mode of action for a particular cancer response in animals or humans is a data-rich determination. Significant information should be developed to ensure that a scientifically justifiable mode of action underlies the process leading to cancer at a given site.  In the absence of sufficiently, scientifically justifiable mode of action information, EPA generally takes public health-protective, default positions regarding the interpretation of toxicologic and epidemiologic data:

---

[2] The term *"mode of action"* is defined as a sequence of key events and processes, starting with interaction of an agent with a cell, proceeding through operational and anatomical changes, and resulting in cancer formation.  A *"key event"* is an empirically observable precursor step that is itself a necessary element of the mode of action or is a biologically based marker for such an element.  Mode of action is contrasted with "*mechanism of action*," which implies a more detailed understanding and description of events, often at the molecular level, than is meant by mode of action.  The toxicokinetic processes that lead to formation or distribution of the active agent to the target tissue are considered in estimating dose but are not part of the mode of action as the term is used here.  There are many examples of possible modes of carcinogenic action, such as mutagenicity, mitogenesis, inhibition of cell death, cytotoxicity with reparative cell proliferation, and immune suppression.

animal tumor findings are judged to be relevant to humans, and cancer risks are assumed to conform with low dose linearity.

Understanding of mode of action can be a key to identifying processes that may cause chemical exposures to differentially affect a particular population segment or lifestage. Some modes of action are anticipated to be mutagenic and are assessed with a linear approach. This is the mode of action of radiation and several other agents that are known carcinogens. Other modes of action may be modeled with either linear or nonlinear[3] approaches after a rigorous analysis of available data under the guidance provided in the framework for mode of action analysis (see Section 2.4.3).

### 1.3.3.  Weight of Evidence Narrative

The cancer guidelines emphasize the importance of weighing all of the evidence in reaching conclusions about the human carcinogenic potential of agents. This is accomplished in a single integrative step after assessing all of the individual lines of evidence, which is in contrast to the step-wise approach in the 1986 cancer guidelines. Evidence considered includes tumor findings, or lack thereof, in humans and laboratory animals; an agent's chemical and physical properties; its structure-activity relationships (SARs) as compared with other carcinogenic agents; and studies addressing potential carcinogenic processes and mode(s) of action, either *in vivo* or *in vitro*. Data from epidemiologic studies are generally preferred for characterizing human cancer hazard and risk. However, all of the information discussed above could provide valuable insights into the possible mode(s) of action and likelihood of human cancer hazard and risk. The cancer guidelines recognize the growing sophistication of research methods,

---

[3]The term "*nonlinear*" is used here in a narrower sense than its usual meaning in the field of mathematical modeling. In these cancer guidelines, the term "*nonlinear*" refers to threshold models (which show no response over a range of low doses that include zero) and some nonthreshold models (e.g., a quadractic model, which shows some response at all doses above zero). In these cancer guidelines, a nonlinear model is one whose slope is zero at (and perhaps above) a dose of zero. A *low-dose-linear* model is one whose slope is greater than zero at a dose of zero. A low-dose-linear model approximates a straight line only at very low doses; at higher doses near the observed data, a low-dose-linear model can display curvature. The term "*low-dose-linear*" is often abbreviated "linear," although a low-dose-linear model is not linear at all doses. Use of nonlinear approaches does not imply a biological threshold dose below which the response is zero. Estimating thresholds can be problematic; for example, a response that is not statistically significant can be consistent with a small risk that falls below an experiment's power of detection.

particularly in their ability to reveal the modes of action of carcinogenic agents at cellular and subcellular levels as well as toxicokinetic processes.

Weighing of the evidence includes addressing not only the likelihood of human carcinogenic effects of the agent but also the conditions under which such effects may be expressed, to the extent that these are revealed in the toxicological and other biologically important features of the agent.

The weight of evidence narrative to characterize hazard summarizes the results of the hazard assessment and provides a conclusion with regard to human carcinogenic potential. The narrative explains the kinds of evidence available and how they fit together in drawing conclusions, and it points out significant issues/strengths/limitations of the data and conclusions. Because the narrative also summarizes the mode of action information, it sets the stage for the discussion of the rationale underlying a recommended approach to dose-response assessment.

In order to provide some measure of clarity and consistency in an otherwise free-form, narrative characterization, standard descriptors are used as part of the hazard narrative to express the conclusion regarding the weight of evidence for carcinogenic hazard potential. There are five recommended standard hazard descriptors: "*Carcinogenic to Humans*," "*Likely to Be Carcinogenic to Humans*," "*Suggestive Evidence of Carcinogenic Potential*," "*Inadequate Information to Assess Carcinogenic Potential*," and "*Not Likely to Be Carcinogenic to Humans*." Each standard descriptor may be applicable to a wide variety of data sets and weights of evidence and is presented only in the context of a weight of evidence narrative. Furthermore, as described in Section 2.5 of these cancer guidelines, more than one conclusion may be reached for an agent.

### 1.3.4.  Dose-response Assessment

Dose-response assessment evaluates potential risks to humans at particular exposure levels. The approach to dose-response assessment for a particular agent is based on the conclusion reached as to its potential mode(s) of action for each tumor type. Because an agent may induce multiple tumor types, the dose-response assessment includes an analysis of all tumor types, followed by an overall synthesis that includes a characterization of the risk estimates across tumor types, the strength of the mode of action information of each tumor type, and the

anticipated relevance of each tumor type to humans, including susceptible populations and lifestages (e.g., childhood).

Dose-response assessment for each tumor type is performed in two steps: assessment of observed data to derive a point of departure (POD),[4] followed by extrapolation to lower exposures to the extent that is necessary.  Data from epidemiologic studies, of sufficient quality, are generally preferred for estimating risks.  When animal studies are the basis of the analysis, the estimation of a human-equivalent dose should utilize toxicokinetic data to inform cross-species dose scaling if appropriate and if adequate data are available.  Otherwise, default procedures should be applied.  For oral dose, based on current science, an appropriate default option is to scale daily applied doses experienced for a lifetime in proportion to body weight raised to the 3/4 power (U.S. EPA, 1992b).  For inhalation dose, based on current science, an appropriate default methodology estimates respiratory deposition of particles and gases and estimates internal doses of gases with different absorption characteristics.  When toxicokinetic modeling (see Section 3.1.2) is used without toxicodynamic modeling (see Section 3.2.2), the dose-response assessment develops and supports an approach for addressing toxicodynamic equivalence, perhaps by retaining some of the cross-species scaling factor (see Section 3.1.3).  Guidance is also provided for adjustment of dose from adults to children (see Section 4.3.1).

Response data on effects of the agent on carcinogenic processes are analyzed (nontumor data) in addition to data on tumor incidence.  If appropriate, the analyses of data on tumor incidence and on precursor effects may be used in combination.  To the extent the relationship between precursor effects and tumor incidence are known, precursor data may be used to estimate a dose-response function below the observable tumor data.  Study of the dose-response function for effects believed to be part of the carcinogenic process influenced by the agent may also assist in evaluating the relationship of exposure and response in the range of observation and at exposure levels below the range of observation.

---

[4] A "*point of departure*" (POD) marks the beginning of extrapolation to lower doses.  The POD is an estimated dose (usually expressed in human-equivalent terms) near the lower end of the observed range, without significant extrapolation to lower doses.

The first step of dose-response assessment is evaluation within the range of observation. Approaches to analysis of the range of observation of epidemiologic studies are determined by the type of study and how dose and response are measured in the study.  In the absence of adequate human data for dose-response analysis, animal data are generally used.  If there are sufficient quantitative data and adequate understanding of the carcinogenic process, a biologically based model may be developed to relate dose and response data on an agent-specific basis.  Otherwise, as a default procedure, a standard model can be used to curve-fit the data.

The POD for extrapolating the relationship to environmental exposure levels of interest, when the latter are outside the range of observed data, is generally the lower 95% confidence limit on the lowest dose level that can be supported for modeling by the data.  SAB (1997) suggested that, "it may be appropriate to emphasize lower statistical bounds in screening analyses and in activities designed to develop an appropriate human exposure value, since such activities require accounting for various types of uncertainties and a lower bound on the central estimate is a scientifically-based approach accounting for the uncertainty in the true value of the $ED_{10}$ [or central estimate]."  However, the consensus of the SAB (1997) was that, "both point estimates and statistical bounds can be useful in different circumstances, and recommended that the Agency routinely calculate and present the point estimate of the $ED_{10}$ [or central estimate] and the corresponding upper and lower 95% statistical bounds."  For example, it may be appropriate to emphasize the central estimate in activities that involve formal uncertainty analysis that are required by OMB Circular A-4 (OMB, 2003) as well as ranking agents as to their carcinogenic hazard.  Thus,  risk assessors should calculate, to the extent practicable, and present the central estimate and the corresponding upper and lower statistical bounds (such as confidence limits) to inform decisionmakers.

The second step of dose-response assessment is extrapolation to lower dose levels, if needed.  This extrapolation is based on extension of a biologically based model if supported by substantial data (see Section 3.3.2).  Otherwise, default approaches can be applied that are consistent with current understanding of mode(s) of action of the agent, including approaches that assume linearity or nonlinearity of the dose-response relationship, or both.  A default approach for linearity extends a straight line from the POD to zero dose/zero response (see

1-14

Section 3.3.3).  The linear approach is used when: (1) there is an absence of sufficient information on modes of action or (2) the mode of action information indicates that the dose-response curve at low dose is or is expected to be linear.  Where alternative approaches have significant biological support, and no scientific consensus favors a single approach, an assessment may present results using alternative approaches.  A nonlinear approach can be used to develop a reference dose or a reference concentration (see Section 3.3.4).

### 1.3.5.  Susceptible Populations and Lifestages

An important use of mode of action information is to identify susceptible populations and lifestages.  It is rare to have epidemiologic studies or animal bioassays conducted in susceptible individuals.  This information need can be filled by identifying the key events of the mode of action and then identifying risk factors, such as differences due to genetic polymorphisms, disease, altered organ function, lifestyle, and lifestage, that can augment these key events.  To do this, the information about the key precursor events is reviewed to identify particular populations or lifestages that can be particularly susceptible to their occurrence (see Section 2.4.3.4).  Any information suggesting quantitative differences between populations or lifestages is flagged for consideration in the dose-response assessment (see Section 3.5 and U.S. EPA 2002b).

### 1.3.6.  Evaluating Risks from Childhood Exposures

NRC (1994) recommended that "EPA should assess risks to infants and children whenever it appears that their risks might be greater than those of adults."  Executive Order 13045 (1997) requires that "each Federal Agency shall make it a high priority to identify and assess environmental health and safety risks that may disproportionately affect children, and shall ensure that their policies, programs, and standards address disproportionate risks that result from environmental health risks or safety risks."  In assessing risks to children, EPA considers both effects manifest during childhood and early-life exposures that can contribute to effects at any time later in life.

These cancer guidelines view childhood as a sequence of lifestages rather than viewing children as a subpopulation, the distinction being that a subpopulation refers to a portion of the

population, whereas a lifestage is inclusive of the entire population.  Exposures that are of concern extend from conception through adolescence and also include pre-conception exposures of both parents.  These cancer guidelines use the term "childhood" in this more inclusive sense.

Rarely are there studies that directly evaluate risks following early-life exposure.  Epidemiologic studies of early-life exposure to environmental agents are seldom available.  Standard animal bioassays generally begin dosing after the animals are several weeks old, when many organ systems are mature.  This could lead to an understatement of risk, because an accepted concept in the science of carcinogenesis is that young animals are usually more susceptible to the carcinogenic activity of a chemical than are mature animals (McConnell, 1992).

At this time, there is some evidence of higher cancer risks following early-life exposure.  For radiation carcinogenesis, data indicate that risks for several forms of cancer are highest following childhood exposure (NRC, 1990; Miller, 1995; U.S. EPA, 1999c).  These human results are supported by the few animal bioassays that include perinatal (prenatal or early postnatal) exposure.  Perinatal exposure to some agents can induce higher incidences of the tumors seen in standard bioassays; some examples include vinyl chloride (Maltoni et al., 1981), diethylnitrosamine (Peto et al., 1984), benzidine, DDT, dieldrin, and safrole (Vesselinovitch et al., 1979).  Moreover, perinatal exposure to some agents, including vinyl chloride (Maltoni et al., 1981) and saccharin (Cohen, 1995; Whysner and Williams, 1996), can induce different tumors that are not seen in standard bioassays.  Surveys comparing perinatal carcinogenesis bioassays with standard bioassays for a limited number of chemicals (McConnell, 1992; U.S. EPA, 1996b) have concluded that

- the same tumor sites are usually observed following either perinatal or adult exposure, and

- perinatal exposure in conjunction with adult exposure usually increases the incidence of tumors or reduces the latent period before tumors are observed.

1-16

The risk attributable to early-life exposure often appears modest compared with the risk from lifetime exposure, but it can be about 10-fold higher than the risk from an exposure of similar duration occurring later in life (Ginsberg, 2003).  Further research is warranted to investigate the extent to which these findings apply to specific agents, chemical classes, and modes of action or in general.

These empirical results are consistent with current understanding of the biological processes involved in carcinogenesis, which leads to a reasonable expectation that children can be more susceptible to many carcinogenic agents (Anderson et al., 2000; Birnbaum and Fenton, 2003; Ginsberg, 2003; Miller et al., 2002; Scheuplein et al., 2002).  Some aspects potentially leading to childhood susceptibility are listed below.

- Differences in the capacity to metabolize and clear chemicals can result in larger or smaller internal doses of the active agent(s).

- More frequent cell division during development can result in enhanced expression of mutations due to the reduced time available for repair of DNA lesions (Slikker et al., 2004).

- Some embryonic cells, such as brain cells, lack key DNA repair enzymes.

- More frequent cell division during development can result in clonal expansion of cells with mutations from prior unrepaired DNA damage (Slikker et al., 2004).

- Some components of the immune system are not fully functional during development (Holladay and Smialowicz, 2000; Holsapple et al., 2003).

- Hormonal systems operate at different levels during different lifestages.

1-17

- Induction of developmental abnormalities can result in a predisposition to carcinogenic effects later in life (Anderson et al., 2000; Birnbaum and Fenton, 2003; Fenton and Davis, 2002).

To evaluate risks from early-life exposure, these cancer guidelines emphasize the role of toxicokinetic information to estimate levels of the active agent in children and toxicodynamic information to identify whether any key events of the mode of action are of increased concern early in life.  Developmental toxicity studies can provide information on critical periods of exposure for particular targets of toxicity.

An approach to assessing risks from early-life exposure is presented in Figure 1-1.  In the hazard assessment, when there are mode of action data, the assessment considers whether these data have special relevance during childhood, considering the various aspects of development listed above.  Examples of such data include toxicokinetics that predict a sufficiently large internal dose in children or a mode of action where a key precursor event is more likely to occur during childhood.  There is no recommended default to settle the question of whether tumors arising through a mode of action are relevant during childhood; and adequate understanding the mode of action implies that there are sufficient data (on either the specific agent or the general mode of action) to form a confident conclusion about relevance during childhood (see Section 2.4.3.4).

In the dose-response assessment, the potential for susceptibility during childhood warrants explicit consideration in each assessment.  These cancer guidelines encourage developing separate risk estimates for children according to a tiered approach that considers what pertinent data are available (see Section 3.5).  Childhood may be a susceptible period; moreover, exposures during childhood generally are not equivalent to exposures at other times and may be treated differently from exposures occurring later in life (see Section 3.5).  In addition, adjustment of unit risk estimates may be warranted when used to estimate risks from childhood exposure (see Section 4.4).

At this time, several limitations preclude a full assessment of children's risk.  There are no generally used testing protocols to identify potential environmental causes of cancers that are

unique to children, including several forms of childhood cancer and cancers that develop from parental exposures, and cases where developmental exposure may alter susceptibility to carcinogen exposure in the adult (Birnbaum and Fenton, 2003).  Dose-response assessment is limited by an inability to observe how developmental exposure can modify incidence and latency and an inability to estimate the ultimate tumor response resulting from induced susceptibility to later carcinogen exposures.

To partially address the limitations identified above, EPA developed in conjunction with these cancer guidelines, *Supplemental Guidance for Assessing Susceptibility from Early-Life Exposure to Carcinogens* ("Supplemental Guidance").  The Supplemental Guidance addresses a number of issues pertaining to cancer risks associated with early-life exposures generally, but provides specific guidance on procedures for adjusting cancer potency estimates only for carcinogens acting through a mutagenic mode of action. This Supplemental Guidance recommends, for such chemicals when no chemical-specific data exist, a default approach using estimates from chronic studies (i.e., cancer slope factors) with appropriate modifications to address the potential for differential risk of early-lifestage exposure.

The Agency considered both the advantages and disadvantages to extending the recommended, age dependent adjustment factors for carcinogenic potency to carcinogenic agents for which the mode of action remains unknown.  EPA decided to recommend these factors only for carcinogens acting through a mutagenic mode of action based on a combination of analysis of available data and long-standing science policy positions which govern the Agency's overall approach to carcinogen risk assessment. In general, the Agency prefers to rely on analyses of data, rather than general defaults. When data are available for a sensitive lifestage, they would be used directly to evaluate risks for that chemical and that lifestage on a case-by-case basis. In the case of nonmutagenic carcinogens, when the mode of action is unknown, the data were judged by EPA to be too limited and the modes of action too diverse to use this as a category for which a general default adjustment factor approach can be applied. In this situation, a linear low-dose extrapolation methodology (without further adjustment) is recommended. It is the Agency's long-standing science policy position that use of the linear low-dose extrapolation approach

provides adequate public health conservatism in the absence of chemical-specific data indicating differential early-life sensitivity or when the mode of action is not mutagenic.

The Agency expects to produce additional supplemental guidance for other modes of action, as data from new research and toxicity testing indicate it is warranted. EPA intends to focus its research, and work collaboratively with its federal partners, to improve understanding of the implications of early life exposure to carcinogens.  Development of guidance for estrogenic agents and chemicals acting through other processes resulting in endocrine disruption and subsequent carcinogenesis, for example, might be a reasonable priority in light of the human experience with diethylstilbesterol and the existing early life animal studies.  It is worth noting that each mode of action for endocrine disruption will probably require separate analysis.

As the Agency examines additional carcinogenic agents, the age groupings may differ from those recommended for assessing cancer risks from early-life exposure to chemicals with a mutagenic mode of action.  Puberty and its associated biological changes, for example, involve many biological processes that could lead to changes in sensitivity to the effects of some carcinogens, depending on their mode of action.  The Agency is interested in identifying lifestages that may be particularly sensitive or refractory for carcinogenesis, and believes that the mode of action framework described in these cancer guidelines is an appropriate mechanism for elucidating these lifestages. For each additional mode of action evaluated, the various age groupings determined to be at differential risk may differ from those proposed in the Supplemental Guidance.  For example, the age groupings selected for the age-dependent adjustments for carcinogens acting through a mutagenic mode of action were initially selected based on the available data, i.e., for the laboratory animal age range representative of birth to < 2 years in humans.  More limited data and information on human biology were used to determine a science-informed policy regarding 2 to < 16 years.  Data were not available to refine the latter age group.  If more data become available regarding carcinogens with a mutagenic mode of action, consideration may be given to further refinement of these age groups.

1-20

### 1.3.7.  Emphasis on Characterization

The cancer guidelines emphasize the importance of a clear and useful characterization narrative that summarizes the analyses of hazard, dose-response, and exposure assessment. These characterizations summarize the assessments to explain the extent and weight of evidence, major points of interpretation and rationale for their selection, strengths and weaknesses of the evidence and the analysis, and discuss alternative conclusions and uncertainties that deserve serious consideration (U.S. EPA, 2000b).  They serve as starting materials for the overall risk characterization process that completes the risk assessment.

**Figure 1-1.  Flow chart for early-life risk assessment using mode of action framework.**



## 2.  HAZARD ASSESSMENT

## 2.1.  OVERVIEW OF HAZARD ASSESSMENT AND CHARACTERIZATION

### 2.1.1.  Analyses of Data

The purpose of hazard assessment is to review and evaluate data pertinent to two questions:  (1) whether an agent may pose a carcinogenic hazard to human beings, and (2) under what circumstances an identified hazard may be expressed (NRC, 1994).  Hazard assessment involves analyses of a variety of data that may range from observations of tumor responses to analysis of structure-activity relationships (SARs).  The purpose of the assessment is not simply to assemble these separate evaluations; its purpose is to construct a total analysis examining what the biological data reveal as a whole about carcinogenic effects and mode of action of the agent, and their implications for human hazard and dose-response evaluation.  Conclusions are drawn from weight-of-evidence evaluations based on the combined strength and coherence of inferences appropriately drawn from all of the available information.  To the extent that data permit, hazard assessment addresses the question of mode of action of an agent as both an initial step in identifying human hazard potential and as a component in considering appropriate approaches to dose-response assessment.

The topics in this chapter include analysis of tumor data, both human and animal, and analysis of other key information about properties and effects that relate to carcinogenic potential.  The chapter addresses how information can be used to evaluate potential modes of action.  It also provides guidance on performing a weight of evidence evaluation.

### 2.1.2.  Presentation of Results

Presentation of the results of hazard assessment should be informed by Agency guidance as discussed in Section 2.6.  The results are presented in a technical hazard characterization that serves as a support to later risk characterization.  It includes:

- •   a summary of the evaluations of hazard data,
- •   the rationales for its conclusions, and

- an explanation of the significant strengths or limitations of the conclusions.

Another presentation feature is the use of a weight of evidence narrative that includes both a conclusion about the weight of evidence of carcinogenic potential and a summary of the data on which the conclusion rests. This narrative is a brief summary that *in toto* replaces the alphanumerical classification system used in EPA's 1986 cancer guidelines (U.S. EPA, 1986a).

## 2.2. ANALYSIS OF TUMOR DATA

Evidence of carcinogenicity comes from finding tumor increases in humans or laboratory animals exposed to a given agent or from finding tumors following exposure to structural analogues to the compound under review. The significance of observed or anticipated tumor effects is evaluated in reference to all the other key data on the agent. This section contains guidance for analyzing human and animal studies to decide whether there is an association between exposure to an agent or a structural analogue and occurrence of tumors. Note that the use of the term "tumor" in these cancer guidelines is defined as malignant neoplasms or a combination of malignant and corresponding benign neoplasms.

Observation of only benign neoplasia may or may not have significance for evaluation under these cancer guidelines. Benign tumors that are not observed to progress to malignancy are assessed on a case-by-case basis. There is a range of possibilities for their overall significance. They may deserve attention because they are serious health problems even though they are not malignant; for instance, benign tumors may be a health risk because of their effect on the function of a target tissue such as the brain. They may be significant indicators of the need for further testing of an agent if they are observed in a short- term test protocol, or such an observation may add to the overall weight of evidence if the same agent causes malignancies in a long-term study. Knowledge of the mode of action associated with a benign tumor response may aid in the interpretation of other tumor responses associated with the same agent. In other cases, observation of a benign tumor response alone may have no significant health hazard implications when other sources of evidence show no suggestion of carcinogenicity.

### 2.2.1.  Human Data

Human data may come from epidemiologic studies or case reports.  (Clinical human studies, which involve intentional exposures to substances, may provide toxicokinetic data, but generally not data on carcinogenicity.)  The most common sources of human data for cancer risk assessment are epidemiologic investigations.  Epidemiology is the study of the distribution of disease in human populations and the factors that may influence that distribution.  The goals of cancer epidemiology are to identify distribution of cancer risk and determine the extent to which the risk can be attributed causally to specific exposures to exogenous or endogenous factors (see Centers for Disease Control and Prevention [CDC, 2004]).  Epidemiologic data are extremely valuable in risk assessment because they provide direct evidence on whether a substance is likely to produce cancer in humans, thereby avoiding issues such as:  species-to-species inference, extrapolation to exposures relevant to people, effects of concomitant exposures due to lifestyles.  Thus, epidemiologic studies typically evaluate agents under more relevant conditions.  When human data of high quality and adequate statistical power are available, they are generally preferable over animal data and should be given greater weight in hazard characterization and dose-response assessment, although both can be used.

Null results from epidemiologic studies alone generally do not prove the absence of carcinogenic effects because such results can arise either from an agent being truly not carcinogenic or from other factors such as:  inadequate statistical power, inadequate study design, imprecise estimates, or confounding factors.  Moreover, null results from a well-designed and well-conducted epidemiologic study that contains usable exposure data can help to define upper limits for the estimated dose of concern for human exposure in cases where the overall weight of the evidence indicates that the agent is potentially carcinogenic in humans.  Furthermore, data from a well designed and well conducted epidemiologic study that does not show positive results, in conjunction with compelling mechanistic information, can lend support to a conclusion that animal responses may not be predictive of a human cancer hazard.

Epidemiology can also complement experimental evidence in corroborating or clarifying the carcinogenic potential of the agent in question.  For example, epidemiologic studies that show elevated cancer risk for tumor sites corresponding to those at which laboratory animals

experience increased tumor incidence can strengthen the weight of evidence of human carcinogenicity.  Furthermore, biochemical or molecular epidemiology may help improve understanding of the mechanisms of human carcinogenesis.

### 2.2.1.1.  *Assessment of Evidence of Carcinogenicity from Human Data*

All studies that are considered to be of acceptable quality, whether yielding positive or null results, or even suggesting protective carcinogenic effects, should be considered in assessing the totality of the human evidence.  Conclusions about the overall evidence for carcinogenicity from available studies in humans should be summarized along with a discussion of uncertainties and gaps in knowledge.  Conclusions regarding the strength of the evidence for positive or negative associations observed, as well as evidence supporting judgments of causality, should be clearly described.  In assessing the human data within the overall weight of evidence, determination about the strength of the epidemiologic evidence should clearly identify the degree to which the observed associations may be explained by other factors, including bias or confounding.

Characteristics that are generally desirable in epidemiologic studies include (1) clear articulation of study objectives or hypothesis; (2) proper selection and characterization of comparison groups (exposed and unexposed groups or case and control groups); (3) adequate characterization of exposure; (4) sufficient length of follow-up for disease occurrence; (5) valid ascertainment of the causes of cancer morbidity and mortality; (6) proper consideration of bias and confounding factors; (7) adequate sample size to detect an effect; (8) clear, well-documented, and appropriate methodology for data collection and analysis; (9) adequate response rate and methodology for handling missing data; and (10) complete and clear documentation of results. No single criterion determines the overall adequacy of a study.  Practical and resource constraints may limit the ability to address all of these characteristics in a study.  The risk assessor is encouraged to consider how the limitations of the available studies might influence the conclusions.  While positive biases may be due, for example, to a healthy worker effect, it is also important to consider negative biases, for example, workers who may leave the workforce due to illness caused either by high exposures to the agent or to effects of confounders such as smoking.

The following discussions highlight the major factors included in an analysis of epidemiologic studies.

### 2.2.1.2. *Types of Studies*

The major types of cancer epidemiologic study designs used for examining environmental causes of cancer are analytical studies and descriptive studies.  Each study type has well-known strengths and weaknesses that affect interpretation of results, as summarized below (Lilienfeld and Lilienfeld, 1979; Mausner and Kramer, 1985; Kelsey et al., 1996;  Rothman and Greenland, 1998).

Analytical epidemiologic studies, which include case-control and cohort designs, are generally relied on for identifying a causal association between human exposure and adverse health effects.  In case-control studies, groups of individuals with (cases) and without (controls) a particular disease are identified and compared to determine differences in exposure.  In cohort studies, a group of "exposed" and "nonexposed" individuals are identified and studied over time to determine differences in disease occurrence.  Cohort studies can be performed either prospectively or retrospectively from historical records.  The type of study chosen may depend on the hypothesis to be evaluated.  For example, case-control studies may be more appropriate for rare cancers while cohort studies may be more appropriate for more commonly occurring cancers.

On the other hand, descriptive epidemiologic studies examine symptom or disease rates among populations in relation to personal characteristics such as age, gender, race, and temporal or environmental conditions.  Descriptive studies are most frequently used to generate hypotheses about exposure factors, but subsequent analytical designs are necessary to infer causality.  For example, cross-sectional designs might be used to compare the prevalence of cancer between areas near and far from a Superfund site.  However, in studies where exposure and disease information applies only to the current conditions, it is not possible to infer that the exposure actually *caused* the disease.  Therefore, these studies are used to identify patterns or trends in disease occurrence over time or in different geographical locations, but typical

limitations in the characterization of populations in these studies make it difficult to infer the causal agent or degree of exposure.

Case reports describe a particular effect in an individual or group of individuals who were exposed to a substance.  These reports are often anecdotal or highly selective in nature and generally are of limited use for hazard assessment.  Specifically, cancer causality can rarely be inferred from case reports alone.  Investigative follow-up may or may not accompany such reports.  For cancer, the most common types of case series are associated with occupational and childhood exposures.  Case reports can be particularly valuable for identifying unique features, such as an association with an uncommon tumor (e.g., inhalation of vinyl chloride and hepatic angiosarcoma in workers or ingestion of diethylstilbestrol by mothers and clear-cell carcinoma of the vagina in offspring).

### 2.2.1.3.  *Exposure Issues*.

For epidemiologic data to be useful in determining whether there is an association between health effects and exposure to an agent, there should be adequate characterization of exposure information.  In general, greater weight should be given to studies with more precise and specific exposure estimates.

Questions to address about exposure are:  What can one reliably conclude about the exposure parameters including (but not limited to) the level, duration, route, and frequency of exposure of individuals in one population as compared with another?  How sensitive are study results to uncertainties in these parameters?

Actual exposure measurements are not available for many retrospective studies.  Therefore, surrogates are often used to reconstruct exposure parameters.  These may involve attributing exposures to job classifications in a workplace or to broader occupational or geographic groupings.  Use of surrogates carries a potential for misclassification, i.e., individuals may be placed in an incorrect exposure group.  Misclassification generally leads to reduced ability of a study to detect differences between study and referent populations.

When either current or historical monitoring data are available, the exposure evaluation includes consideration of the error bounds of the monitoring and analytic methods and whether

the data are from routine or accidental exposures.  The potential for misclassification and for measurement errors is amenable to both qualitative and quantitative analysis.  These are essential analyses for judging a study's results, because exposure estimation is the most critical part of a retrospective study.

### 2.2.1.4.  *Biological Markers*.

Biological markers potentially offer excellent measures of exposure (Hulka and Margolin, 1992; Peto and Darby, 1994).  In some cases, molecular or cellular effects (e.g., DNA or protein adducts, mutation, chromosomal aberrations, levels of thyroid-stimulating hormone) can be measured in blood, body fluids, cells, and tissues to serve as biomarkers of exposure in humans and animals (Callemen et al., 1978; Birner et al., 1990).  As such, they can act as an internal surrogate measure of chemical dose, representing, as appropriate, either recent exposure (e.g., serum concentration) or accumulated exposure over some period (e.g., hemoglobin adducts).  Validated markers of exposure such as alkylated hemoglobin from exposure to ethylene oxide (Van Sittert et al., 1985) or urinary arsenic (Enterline et al., 1987) can improve estimates of dose over the relevant time periods for the markers.  Markers closely identified with effects promise to greatly increase the ability of studies to distinguish real effects from bias at low levels of relative risk between populations (Taylor et al., 1994; Biggs et al., 1993) and to resolve problems of confounding risk factors.  However, when using molecular or cellular effects as biomarkers of exposure, since many of these changes are often not specific to just one type of exposure, it is important to be aware that changes may be due to exposures unrelated to the exposure of interest and attention must be paid to controlling for potential confounders.

Biochemical or molecular epidemiologic studies may use biological markers of effect as indicators of disease or its precursors.  The application of techniques for measuring cellular and molecular alterations due to exposure to specific environmental agents may allow conclusions to be drawn about the mechanisms of carcinogenesis (see section 2.4 for more information on this topic).

**2.2.1.5. *Confounding Factors*.**

Control for potential confounding factors is an important consideration in the evaluation of the design and in the analysis of observational epidemiologic studies.  A confounder is a variable that is related to both the health outcome of concern (cancer) and exposure.  Common examples include age, socioeconomic status, smoking habits, and diet.  For instance, if older people are more likely to be exposed to a given contaminant as well as more likely to have cancer because of their age, age is considered a confounder.  Adjustment for potentially confounding factors (from a statistical as contrasted with an epidemiologic point of view) can occur either in the design of the study (e.g., individual or group matching on critical factors) or in the statistical analysis of the results (stratification or direct or indirect adjustment).  Direct adjustment in the statistical analysis may not be possible owing to the presentation of the data or because needed information was not collected during the study.  In this case, indirect comparisons may be possible.  For example, in the absence of data on smoking status among individuals in the study population, an examination of the possible contribution of cigarette smoking to increased lung cancer risk may be based on information from other sources, such as the American Cancer Society's longitudinal studies (Hammand, 1966; Garfinkel and Silverberg, 1991).  The effectiveness of adjustments contributes to the ability to draw inferences from a study.

Different studies involving exposure to an agent may have different confounding factors.  If consistent increases in cancer risk are observed across a collection of studies with different confounding factors, the inference that the agent under investigation was the etiologic factor is strengthened.

There may also be instances where the agent of interest is a risk factor in conjunction with another agent.  For instance, interaction as well as effect-measure modification are sometimes construed to be confounding, but they are different than confounding.  Interaction is described as a situation in which two or more risk factors modify the effect of each other with regard to the occurrence of a given effect.  This phenomenon is sometimes described as effect-measure modification or heterogeneity of effect (Szklo and Nieto, 2000).  Effect-measure modification refers to variation in the magnitude of measure exposure effect across levels of another variable (Rothman and Greenland, 1998).   The variable across which the effect measure varies and is

called an *effect modifier* (e.g., hepatitis virus B and aflatoxin in hepatic cancer). Interaction, on the other hand, means effect of the exposure on the outcome differs, depending on the presence of another variable (the effect modifier). When the effect of the exposure of interest is accentuated by another variable, it is said to be synergistic interaction. Synergistic interaction can be additive (e.g., hepatitis virus B and aflatoxin in hepatic cancer) or multiplicative (e.g., asbestos and smoking in lung cancer). If the effect of exposure is diminished or eliminated by another variable, it said to be antagonistic interaction (e.g., intake of vitamin E and lower occurrence of lung cancer).

### 2.2.1.6.  *Statistical Considerations*.

The analysis should apply appropriate statistical methods to ascertain whether the observed association between exposure and effects would be expected by chance. A description of the method or methods used should include the reasons for their selection. Statistical analyses of the bias, confounding, and interaction are part of addressing the significance of an association and the power of a study to detect an effect.

The analysis augments examination of the results for the whole population with exploration of the results for groups with comparatively greater exposure or time since first exposure. This may support identifying an association or establishing a dose-response trend. When studies show no association, such exploration may apply to determining an upper limit on potential human risk for consideration alongside results of animal tumor effects studies.

### 2.2.1.6.1.  *Likelihood of observing an effect*.  The power of a study – the likelihood of observing an effect if one exists – increases with sample size, i.e., the number of subjects studied from a population. (For example, a quadrupling of a background rate in the 1 per 10,000 range would require more subjects who have experienced greater or longer exposure or lengthier follow-up, than a doubling of a background rate in the 1 per 100 range.) If the size of the effect is expected to be very small at low doses, higher doses or longer durations of exposure may be needed to have an appreciable likelihood of observing an effect with a given sample size. Because of the often long latency period in cancer development, the likelihood of observing an effect also

depends on whether adequate time has elapsed since exposure began for effects to occur.  Since the design of the study and the choice of analysis, as well as the design level of certainty in the results and the magnitude of response in an unexposed population also affect the likelihood of observing an effect, it is important to carefully interpret the absence of an observed effect.  A unique feature that can be ascribed to the effects of a particular agent (such as a tumor type that is seen only rarely in the absence of the agent) can increase sensitivity by permitting separation of bias and confounding factors from real effects.  Similarly, a biomarker particular to the agent can permit these distinctions.  Statistical re-analyses of data, particularly an examination of different exposure indices, can give insight into potential exposure-response relationships.  These are all factors to explore in statistical analysis of the data.

**2.2.1.6.2.  *Sampling and other bias issues*.**  When comparing cases and controls or exposed and non-exposed populations, it would be preferable for the two populations to differ only in exposure to the agent in question.  Because this is seldom the case, it is important to identify sources of sampling and other potential biases inherent in a study design or data collection methods.

Bias is a systematic error.  In epidemiologic studies, bias can occur in the selection of cases and controls or exposed and non-exposed populations, as well as the follow up of the groups, or the classification of disease or exposure.  The size of the risks observed can be affected by noncomparability between populations of factors such as general health, diet, lifestyle, or geographic location; differences in the way case and control individuals recall past events; differences in data collection that result in unequal ascertainment of health effects in the populations; and unequal follow-up of individuals (Rothman and Greenland, 1998).  Other factors worth consideration can be inherent in the available cohorts, e.g., use of occupational studies (the healthy worker effect), absence of one sex, or limitations in sample size for one or more ethnicities.

The mere presence of biases does not invalidate a study, but should be reflected in the judgment of its strengths or weaknesses.  Acceptance of studies for assessment depends on identifying their sources of bias and the possible effects on study results.

**2.2.1.6.3.  *Combining statistical evidence across studies***.  Meta-analysis is a means of integrating the results of multiple studies of similar health effects and risk factors.  This technique is particularly useful when various studies yield varying degrees of risk or even conflicting associations (negative and positive).  It is intended to introduce consistency and comprehensiveness into what otherwise might be a more subjective review of the literature.  The value of such an analysis is dependent upon a systematic review of the literature that uses transparent criteria of inclusion and exclusion.  In interpreting such analyses, it is important to consider the effects of differences in study quality, as well as the effect of publication bias. Meta-analysis may not be advantageous in some circumstances. These include when the relationship between exposure and disease is obvious from the individual studies; when there are only a few studies of the key health outcomes; when there is insufficient information from available studies related to disease, risk estimate, or exposure classification to insure comparability; or when there are substantial confounding or other biases that cannot be adjusted for in the analysis (Blair et al., 1995; Greenland, 1987; Peto, 1992).

**2.2.1.7.  *Evidence for Causality***

Determining whether an observed association (risk) is causal rather than spurious involves consideration of a number of factors.  Sir Bradford Hill (Hill, 1965) developed a set of guidelines for evaluating epidemiologic associations that can be used in conjunction with the discussion of causality such as the 2004 Surgeon General's report on smoking (CDC, 2004) and in other documents (e.g., Rothman and Greenland 1998; IPCS, 1999)  .  The critical assessment of epidemiologic evidence is conceptually based upon consideration of salient aspects of the evidence of associations so as to reach fundamental judgments as to the likely causal significance of the observed associations. In so doing, it is appropriate to draw from those aspects initially presented in Hill's classic monograph (Hill, 1965) and widely used by the scientific community in conducting such evidence-based reviews. A number of these aspects are judged to be particularly salient in evaluating the body of evidence available in this review, including the aspects described by Hill as strength, experiment, consistency, plausibility, and coherence. Other aspects identified by Hill, including temporality and biological gradient, are also relevant and

considered here (e.g., in characterizing lag structures and concentration-response relationships), but are more directly addressed in the design and analyses of the individual epidemiologic studies included in this assessment. As discussed below, these salient aspects are interrelated and considered throughout the evaluation of the epidemiologic evidence generally reflected in the integrative synthesis of the mode of action framework.

The general evaluation of the strength of the epidemiological evidence reflects consideration not only of the magnitude of reported effects estimates and their statistical significance, but also of the precision of the effects estimates and the robustness of the effects associations. Consideration of the robustness of the associations takes into account a number of factors, including in particular the impact of alternative models and model specifications and potential confounding factors, as well issues related to the consequences of measurement error. Consideration of the consistency of the effects associations involves looking across the results of studies conducted by different investigators in different places and times.  Particular weight may be given, consistent with Hill's views, to the presence of  "similar results reached in quite different ways, e.g., prospectively and retrospectively" (Hill, 1965).  Looking beyond the epidemiological evidence, evaluation of the biological plausibility of the associations observed in epidemiologic studies reflects consideration of both exposure-related factors and toxicological evidence relevant to identification of potential modes of action (MOAs). Similarly, consideration of the coherence of health effects associations reported in the epidemiologic literature reflects broad consideration of information pertaining to the nature of the biological markers evaluated in toxicologic and epidemiologic studies.

In identifying these aspects as being particularly salient in this assessment, it is also important to recognize that no one aspect is either necessary or sufficient for drawing inferences of causality. As Hill (1965) emphasized:

"None of my nine viewpoints can bring indisputable evidence for or against the cause-and-effect hypothesis and none can be required as *a sine qua non*. What they can do,  with greater or less strength, is to help us to make up our minds on the fundamental question — is there any other way of explaining the set of facts

before us, is there any other answer equally, or more, likely than cause and effect?"

While these aspects frame considerations weighed in assessing the epidemiologic evidence, they do not lend themselves to being considered in terms of simple formulas or hard-and-fast rules of evidence leading to answers about causality (Hill, 1965). One, for example, cannot simply count up the numbers of studies reporting statistically significant results or statistically non-significant results for carcinogenesis and related MOAs and reach credible conclusions about the relative strength of the evidence and the likelihood of causality. Rather, these important considerations are taken into account throughout the assessment with a goal of producing an objective appraisal of the evidence (informed by peer and public comment and advice), which includes the weighing of alternative views on controversial issues. Thus, although these guidelines have become known as "causal criteria," it is important to note that they cannot be used as a strictly quantitative checklist. Rather, these "criteria" should be used to determine the strength of the evidence for concluding causality. In particular, the absence of one or more of the "criteria" does not automatically exclude a study from consideration (e.g., see discussion in CDC, 2004). The list below has been adapted from Hill's guidelines as an aid in judging causality.

*(a) Consistency of the observed association.* An inference of causality is strengthened when a pattern of elevated risks is observed across several independent studies. The reproducibility of findings constitutes one of the strongest arguments for causality. If there are discordant results among investigations, possible reasons such as differences in exposure, confounding factors, and the power of the study are considered.

*(b) Strength of the observed association.* The finding of large, precise risks increases confidence that the association is not likely due to chance, bias, or other factors. A modest risk, however, does not preclude a causal association and may reflect a lower level of exposure, an agent of lower potency, or a common disease with a high background level.

*(c) Specificity of the observed association.* As originally intended, this refers to increased inference of causality if one cause is associated with a single effect or disease (Hill, 1965). Based on our current understanding that many agents cause cancer at multiple sites, and

many cancers have multiple causes, this is now considered one of the weaker guidelines for causality.  Thus, although the presence of specificity may support causality, its absence does not exclude it.

(d) *Temporal relationship of the observed association.*  A causal interpretation is strengthened when exposure is known to precede development of the disease.  Because a latent period of up to 20 years or longer is often associated with cancer development in adults, the study should consider whether exposures occurred sufficiently long ago to produce an effect at the time the cancer is assessed.  This is among the strongest criteria for an inference of causality.

(e) *Biological gradient (exposure-response relationship).*  A clear exposure-response relationship (e.g., increasing effects associated with greater exposure) strongly suggests cause and effect, especially when such relationships are also observed for duration of exposure (e.g., increasing effects observed following longer exposure times).  There are many possible reasons that an epidemiologic study may fail to detect an exposure-response relationship.  For example, an analysis that included decreasing exposures due to improved technology that is combined with higher prior exposure in an initial analysis can require a segmented analysis to apportion exposure.  Other reasons for failure to detect a relationship may include a small range of exposures.  Thus, the absence of an exposure-response relationship does not exclude a causal relationship.

(f) *Biological plausibility.*  An inference of causality tends to be strengthened by consistency with data from experimental studies or other sources demonstrating plausible biological mechanisms.  A lack of mechanistic data, however, is not a reason to reject causality.

(g) *Coherence.*  An inference of causality may be strengthened by other lines of evidence that support a cause-and-effect interpretation of the association.  Information is considered from animal bioassays, toxicokinetic studies, and short-term studies.  The absence of other lines of evidence, however, is not a reason to reject causality.

(h) *Experimental evidence (from human populations).*  Experimental evidence is seldom available from human populations and exists only when conditions of human exposure have occurred to create a "natural experiment" at different levels of exposure.  Strong evidence

for causality can be provided when a change in exposure brings about a change in disease frequency, for example, the decrease in the risk of lung cancer that follows cessation of smoking.

*(i) Analogy.* SARs and information on the agent's structural analogues can provide insight into whether an association is causal. Similarly, information on mode of action for a chemical, as one of many structural analogues, can inform decisions regarding likely causality.

## 2.2.2. Animal Data

Various whole-animal test systems are currently used or are under development for evaluating potential carcinogenicity. Cancer studies involving chronic exposure for most of the lifespan of an animal are generally accepted for evaluation of tumor effects (Tomatis et al., 1989; Rall, 1991; Allen et al., 1988; but see Ames and Gold, 1990). Other studies of special design are useful for observing formation of preneoplastic lesions or tumors or investigating specific modes of action. Their applicability is determined on a case-by-case basis.

### 2.2.2.1. *Long-term Carcinogenicity Studies*

The objective of long-term carcinogenesis bioassays is to determine the potential carcinogenic hazard and dose-response relationships of the test agent. Carcinogenicity rodent studies are designed to examine the production of tumors as well as preneoplastic lesions and other indications of chronic toxicity that may provide evidence of treatment-related effects and insights into the way the test agent produces tumors. Current standardized carcinogenicity studies in rodents test at least 50 animals per sex per dose group in each of three treatment groups and in a concurrent control group, usually for 18 to 24 months, depending on the rodent species tested (OECD, 1981; U.S. EPA, 1998c). The high dose in long-term studies is generally selected to provide the maximum ability to detect treatment-related carcinogenic effects while not compromising the outcome of the study through excessive toxicity or inducing inappropriate toxicokinetics (e.g., overwhelming absorption or detoxification mechanisms). The purpose of two or more lower doses is to provide some information on the shape of the dose-response curve. Similar protocols have been and continue to be used by many laboratories worldwide.

All available studies of tumor effects in whole animals should be considered, at least preliminarily. The analysis should discard studies judged to be wholly inadequate in protocol, conduct, or results. Criteria for the technical adequacy of animal carcinogenicity studies have been published and should be used as guidance to judge the acceptability of individual studies (e.g., NTP, 1984; OSTP, 1985; Chhabra et al., 1990). As these criteria, in whole or in part, may be updated by the National Toxicology Program (NTP) and others, the analyst should consult the appropriate sources to determine both the current standards as well as those that were contemporaneous with the study. Care should be taken to include studies that provide some evidence bearing on carcinogenicity or that help interpret effects noted in other studies, even if these studies have some limitations of protocol or conduct. Such limited, but not wholly inadequate, studies can contribute as their deficiencies permit. The findings of long-term rodent bioassays should be interpreted in conjunction with results of prechronic studies along with toxicokinetic studies and other pertinent information, if available. Evaluation of tumor effects takes into consideration both biological and statistical significance of the findings (Haseman, 1984, 1985, 1990, 1995). The following sections highlight the major issues in the evaluation of long-term carcinogenicity studies.

**2.2.2.1.1.  *Dosing issues*.**  Among the many criteria for technical adequacy of animal carcinogenicity studies is the appropriateness of dose selection. The selection of doses for chronic bioassays is based on scientific judgments and sound toxicologic principles. Dose selection should be made on the basis of relevant toxicologic information from prechronic, mechanistic, and toxicokinetic and mechanistic studies. A scientific rationale for dose selection should be clearly articulated (e.g., NTP, 1984; ILSI, 1997). How well the dose selection is made is evaluated after the completion of the bioassay.

Interpretation of carcinogenicity study results is profoundly affected by study exposure conditions, especially by inappropriate dose selection. This is particularly important in studies that do not show positive results for carcinogenicity, because failure to use a sufficiently high dose reduces the sensitivity of the studies. A lack of tumorigenic responses at exposure levels that cause significant impairment of animal survival may also not be acceptable. In addition,

overt toxicity or qualitatively altered toxicokinetics due to excessively high doses may result in tumor effects that are secondary to the toxicity rather than directly attributable to the agent.

With regard to the appropriateness of the high dose, an adequate high dose would generally be one that produces some toxic effects without unduly affecting mortality from effects other than cancer or producing significant adverse effects on the nutrition and health of the test animals (OECD, 1981; NRC, 1993a). If the test agent does not appear to cause any specific target organ toxicity or perturbation of physiological function, an adequate high dose can be specified in terms of a percentage reduction of body weight gain over the lifespan of the animals. The high dose would generally be considered inadequate if neither toxicity nor change in weight gain is observed. On the other hand, significant increases in mortality from effects other than cancer generally indicate that an adequate high dose has been exceeded.

Other signs of treatment-related toxicity associated with an excessive high dose may include (a) significant reduction of body weight gain (e.g., greater than 10%), (b) significant increases in abnormal behavioral and clinical signs, (c) significant changes in hematology or clinical chemistry, (d) saturation of absorption and detoxification mechanisms, or (e) marked changes in organ weight, morphology, and histopathology. It should be noted that practical upper limits have been established to avoid the use of excessively high doses in long-term carcinogenicity studies of environmental chemicals (e.g., 5% of the test substance in the feed for dietary studies or 1 g/kg body weight for oral gavage studies [OECD, 1981]).

For dietary studies, weight gain reductions should be evaluated as to whether there is a palatability problem or an issue with food efficiency; certainly, the latter is a toxic manifestation. In the case of inhalation studies with respirable particles, evidence of impairment of normal clearance of particles from the lung should be considered along with other signs of toxicity to the respiratory airways to determine whether the high exposure concentration has been appropriately selected (U.S. EPA, 2001a). For dermal studies, evidence of skin irritation may indicate that an adequate high dose has been reached (U.S. EPA, 1989).

In order to obtain the most relevant information from a long-term carcinogenicity study, it is important to maximize exposure conditions to the test material. At the same time, caution is appropriate in using excessive high-dose levels that would confound the interpretation of study

results to humans.  The middle and lowest doses should be selected to characterize the shape of the dose-response curve as much as possible.  It is important that the doses be adequately spaced so that the study can provide relevant dose-response data for assessing human hazard and risk.  If the testing of potential carcinogenicity is being combined with an evaluation of noncancer chronic toxicity, the study should be designed to include one dose in addition to the control(s) that is not expected to elicit adverse effects.

There are several possible outcomes regarding the study interpretation of the significance and relevance of tumorigenic effects associated with exposure or dose levels below, at, or above an adequate high dose.  The general guidance is given here; for each case, the information at hand should be evaluated and a rationale should be given for the position taken.

- *Adequately high dose*.  If an adequately high dose has been used, tumor effects are judged positive or negative depending on the presence or absence of significant tumor incidence increases, respectively.

- *Excessively high dose*.  If toxicity or mortality is excessive at the high dose, interpretation depends on whether or not tumors are found.

    – Studies that show tumor effects only at excessive doses may be compromised and may or may not carry weight, depending on the interpretation in the context of other study results and other lines of evidence.  Results of such studies, however, are generally not considered suitable for dose-response extrapolation if it is determined that the mode(s) of action underlying the tumorigenic responses at high doses is not operative at lower doses.

    – Studies that show tumors at lower doses, even though the high dose is excessive and may be discounted, should be evaluated on their own merits.

2-18

–      If a study does not show an increase in tumor incidence at a toxic high dose and appropriately spaced lower doses are used without such toxicity or tumors, the study is generally judged as negative for carcinogenicity.

•      *Inadequately high dose*.  Studies of inadequate sensitivity where an adequately high dose has not been reached may be used to bound the dose range where carcinogenic effects might be expected.

**2.2.2.1.2.   *Statistical considerations***.  The main aim of statistical evaluation is to determine whether exposure to the test agent is associated with an increase of tumor development. Statistical analysis of a long-term study should be performed for each tumor type separately.  The incidence of benign and malignant lesions of the same cell type, usually within a single tissue or organ, are considered separately but may be combined when scientifically defensible (McConnell et al., 1986).

Trend tests and pairwise comparison tests are the recommended tests for determining whether chance, rather than a treatment-related effect, is a plausible explanation for an apparent increase in tumor incidence.  A trend test such as the Cochran-Armitage test (Snedecor and Cochran, 1967) asks whether the results in all dose groups together increase as dose increases.  A pairwise comparison test such as the Fisher exact test (Fisher, 1950) asks whether an incidence in one dose group is increased over that of the control group.  By convention, for both tests a statistically significant comparison is one for which $p$ is less than 0.05 that the increased incidence is due to chance.  Significance in either kind of test is sufficient to reject the hypothesis that chance accounts for the result.

A statistically significant response may or may not be biologically significant and vice versa.  The selection of a significance level is a policy choice based on a trade-off between the risks of false positives and false negatives.  A result with a significance level of greater or less than 5% (the most common significance level) is examined to see if the result confirms other scientific information.  When the assessment departs from a simple 5% level, this should be

highlighted in the risk characterization.  A two-tailed test or a one-tailed test can be used.  In either case a rationale is provided.

Statistical power can affect the likelihood that a statistically significant result could reasonably be expected.  This is especially important in studies or dose groups with small sample sizes or low dose rates.  Reporting the statistical power can be useful for comparing and reconciling positive and negative results from different studies.

Considerations of multiple comparisons should also be taken into account.  Haseman (1983) analyzed typical animal bioassays that tested both sexes of two species and concluded that, because of multiple comparisons, a single tumor increase for a species-sex-site combination that is statistically significant at the 1% level for common tumors or 5% for rare tumors corresponds to a 7–8% significance level for the study as a whole.  Therefore, animal bioassays presenting only one significant result that falls short of the 1% level for a common tumor should be treated with caution.

**2.2.2.1.3.  *Concurrent and historical controls*.**  The standard for determining statistical significance of tumor incidence comes from a comparison of tumors in dosed animals with those in concurrent control animals.  Additional insights about both statistical and biological significance can come from an examination of historical control data (Tarone, 1982; Haseman, 1995).  Historical control data can add to the analysis, particularly by enabling identification of uncommon tumor types or high spontaneous incidence of a tumor in a given animal strain. Identification of common or uncommon situations prompts further thought about the meaning of the response in the current study in context with other observations in animal studies and with other evidence about the carcinogenic potential of the agent.  These other sources of information may reinforce or weaken the significance given to the response in the hazard assessment. Caution should be exercised in simply looking at the ranges of historical responses, because the range ignores differences in survival of animals among studies and is related to the number of studies in the database.

In analyzing results for uncommon tumors in a treated group that are not statistically significant in comparison with concurrent controls, the analyst may be informed by the

experience of historical controls to conclude that the result is in fact unlikely to be due to chance. However, caution should be used in interpreting results.  In analyzing results for common tumors, a different set of considerations comes into play.  Generally speaking, statistically significant increases in tumors should not be discounted simply because incidence rates in the treated groups are within the range of historical controls or because incidence rates in the concurrent controls are somewhat lower than average.  Random assignment of animals to groups and proper statistical procedures provide assurance that statistically significant results are unlikely to be due to chance alone.  However, caution should be used in interpreting results that are barely statistically significant or in which incidence rates in concurrent controls are unusually low in comparison with historical controls.

In cases where there may be reason to discount the biological relevance to humans of increases in common animal tumors, such considerations should be weighed on their own merits and clearly distinguished from statistical concerns.

When historical control data are used, the discussion should address several issues that affect comparability of historical and concurrent control data, such as genetic drift in the laboratory strains, differences in pathology examination at different times and in different laboratories (e.g., in criteria for evaluating lesions; variations in the techniques for the preparation or reading of tissue samples among laboratories), and comparability of animals from different suppliers.  The most relevant historical data come from the same laboratory and the same supplier and are gathered within 2 or 3 years one way or the other of the study under review; other data should be used only with extreme caution.

**2.2.2.1.4.** *Assessment of evidence of carcinogenicity from long-term animal studies*.  In general, observation of tumors under different circumstances lends support to the significance of the findings for animal carcinogenicity.  Significance is generally increased by the observation of more of the factors listed below.  For a factor such as malignancy, the severity of the observed pathology can also affect the significance.  The following observations add significance to the tumor findings:

- uncommon tumor types;

- tumors at multiple sites;

- tumors by more than one route of administration;

- tumors in multiple species, strains, or both sexes;

- progression of lesions from preneoplastic to benign to malignant;

- reduced latency of neoplastic lesions;

- metastases;

- unusual magnitude of tumor response;

- proportion of malignant tumors; and

- dose-related increases.

In these cancer guidelines, tumors observed in animals are generally assumed to indicate that an agent may produce tumors in humans. Mode of action may help inform this assumption on a chemical-specific basis. Moreover, the absence of tumors in well-conducted, long-term animal studies in at least two species provides reasonable assurance that an agent may not be a carcinogenic concern for humans.

**2.2.2.1.5.  *Site concordance*.**  Site concordance of tumor effects between animals and humans should be considered in each case. Thus far, there is evidence that growth control mechanisms at the level of the cell are homologous among mammals, but there is no evidence that these mechanisms are site concordant. Moreover, agents observed to produce tumors in both humans and animals have produced tumors either at the same site (e.g., vinyl chloride) or different sites (e.g., benzene) (NRC, 1994). Hence, site concordance is not always assumed between animals and humans. On the other hand, certain modes of action with consequences for particular tissue sites (e.g., disruption of thyroid function) may lead to an anticipation of site concordance.

**2.2.2.2.  *Perinatal Carcinogenicity Studies***
The objective of perinatal carcinogenesis studies is to determine the carcinogenic potential and dose-response relationships of the test agent in the developing organism. Some

investigators have hypothesized that the age of initial exposure to a chemical carcinogen may influence the carcinogenic response (Vesselinovitch et al., 1979; Rice, 1979; McConnell, 1992). Current standardized long-term carcinogenesis bioassays generally begin dosing animals at 6–8 weeks of age and continue dosing for the lifespan of the animal (18–24 months). This protocol has been modified in some cases to investigate the potential of the test agent to induce transplacental carcinogenesis or to investigate the potential differences following perinatal and adult exposures, but currently there is not a standardized protocol for testing agents for carcinogenic effects following prenatal or early postnatal exposure.

Several cancer bioassay studies have compared adult and perinatal exposures (see McConnell, 1992; U.S. EPA, 1996b). A review of these studies reveals that perinatal exposure rarely identifies carcinogens that are not found in standard animal bioassays. Exposure that is perinatal can increase the incidence of a given type of tumor. The increase may reflect an increased length of exposure and a higher dose for the developing organism relative to the adult or an increase in susceptibility in some cases. Additionally, exposure that is perinatal through adulthood sometimes reduces the latency period for tumors to develop in the growing organism (U.S. EPA, 1996b). EPA evaluates the usefulness of perinatal studies on an agent-by-agent basis (e.g., U.S. EPA, 1997a, b).

Perinatal study data analysis generally follows the principles discussed above for evaluating other long-term carcinogenicity studies. When differences in responses between perinatal animals and adult animals suggest an increased susceptibility of perinatal or postnatal animals, such as the ones below, a separate evaluation of the response should be prepared:

- a difference in dose-response relationship,
- the presence of different tumor types,
- an earlier onset of tumors, or
- an increase in the incidence of tumors.

**2.2.2.3.  *Other Studies***

Intermediate-term and acute dosing studies often use protocols that screen for carcinogenic or preneoplastic effects, sometimes in a single tissue.  Some protocols involve the development of various proliferative lesions, such as foci of alteration in the liver (Goldsworthy et al., 1986).  Others use tumor endpoints, such as the induction of lung adenomas in the sensitive strain A mouse (Maronpot et al., 1986) or tumor induction in initiation-promotion studies using various organs such as the bladder, intestine, liver, lung, mammary gland, and thyroid (Ito et al., 1992).  In these tests, the selected tissue rather than the whole animal is, in a sense, the test system.  Important information concerning the steps in the carcinogenic process and mode of action can be obtained from "start/stop" experiments.  In these protocols, an agent is given for a period of time to induce particular lesions or effects and then stopped in order to evaluate the progression or reversibility of processes (Todd, 1986; Marsman and Popp, 1994).

Assays in genetically engineered rodents may provide insight into the chemical and gene interactions involved in carcinogenesis (Tennant et al., 1995).  These mechanistically based approaches involve activated oncogenes that are introduced (transgenic) or tumor suppressor genes that are deleted (knocked out).  If appropriate genes are selected, not only may these systems provide information on mechanisms, but the rodents typically show tumor development earlier than in the standard bioassay.  Transgenic mutagenesis assays also represent a mechanistic approach for assessing the mutagenic properties of agents as well as developing quantitative linkages between exposure, internal dose, and mutation related to tumor induction (Morrison and Ashby, 1994; Sisk et al., 1994; Hayward et al., 1995).

The support that these studies give to a determination of carcinogenicity rests on their contribution to the consistency of other evidence about an agent.  For instance, benzoyl peroxide has promoter activity on the skin, but the overall evidence may be less supportive (Kraus et al., 1995).  These studies also may contribute information about mode of action.  It is important to recognize the limitations of these experimental protocols, such as short duration, limited histology, lack of complete development of tumors, or experimental manipulation of the carcinogenic process, that may limit their contribution to the overall assessment.  Generally, their results are appropriate as aids in the interpretation of other toxicological evidence (e.g., rodent

chronic bioassays), especially regarding potential modes of action.  On the basis of currently available information, it is unlikely that any of these assays, which are conducted for 6 months with 15 animals per group, will replace all chronic bioassays for hazard identification (Spalding et al., 2000; Gulezian et al., 2000; ILSI, 2001).

### 2.2.3.  Structural Analogue Data

For some chemical classes, there is significant available information, largely from rodent bioassays, on the carcinogenicity of analogues.  Analogue effects are instructive in investigating carcinogenic potential of an agent as well as in identifying potential target organs, exposures associated with effects, and potential functional class effects or modes of action.  All appropriate studies should be included and analyzed, whether indicative of a positive effect or not.  Evaluation includes tests in various animal species, strains, and sexes; with different routes of administration; and at various doses, as data are available.  Confidence in conclusions is a function of how similar the analogues are to the agent under review in structure, metabolism, and biological activity.  It is important to consider this confidence to ensure a balanced position.

### 2.3.  ANALYSIS OF OTHER KEY DATA

The physical, chemical, and structural properties of an agent, as well as data on endpoints that are thought to be critical elements of the carcinogenic process, provide valuable insights into the likelihood of human cancer risk.  The following sections provide guidance for analyses of these data.

### 2.3.1.  Physicochemical Properties

Physicochemical properties affect an agent's absorption, tissue distribution (bioavailability), biotransformation, and degradation in the body and are important determinants of hazard potential (and dose-response analysis).  Properties that should be analyzed include, but are not limited to, molecular weight, size, and shape; valence state; physical state (gas, liquid, solid); water or lipid solubility, which can influence retention and tissue distribution; and potential for chemical degradation or stabilization in the body.

An agent's potential for chemical reaction with cellular components, particularly with DNA and proteins, is also important.  The agent's molecular size and shape, electrophilicity, and charge distribution are considered in order to decide whether they would facilitate such reactions.

## 2.3.2.  Structure-Activity Relationships (SARs)

SAR analyses and models can be used to predict molecular properties, surrogate biological endpoints, and carcinogenicity (see, e.g., Richard, 1998a, b; Richard and Williams, 2002; Contrera et al., 2003).  Overall, these analyses provide valuable initial information on agents, they may strengthen or weaken concern, and they are part of the weight of evidence.

Currently, SAR analysis is most useful for chemicals and metabolites that are believed to initiate carcinogenesis through covalent interaction with DNA (i.e., DNA-reactive, mutagenic, electrophilic, or proelectrophilic chemicals) (Ashby and Tennant, 1991).  For organic chemicals, the predictive capability of SAR analysis combined with other toxicity information has been demonstrated (Ashby and Tennant, 1994).  The following parameters are useful in comparing an agent to its structural analogues and congeners that produce tumors and affect related biological processes such as receptor binding and activation, mutagenicity, and general toxicity (Woo and Arcos, 1989):

- nature and reactivity of the electrophilic moiety or moieties present;

- potential to form electrophilic reactive intermediate(s) through chemical, photochemical, or metabolic activation;

- contribution of the carrier molecule to which the electrophilic moiety(ies) is attached;

- physicochemical properties (e.g., physical state, solubility, octanol/water partition coefficient, half-life in aqueous solution);

- structural and substructural features (e.g., electronic, stearic, molecular geometric);

- metabolic pattern (e.g., metabolic pathways and activation and detoxification ratio); and

- possible exposure route(s) of the agent.

Suitable SAR analysis of non-DNA-reactive chemicals and of DNA-reactive chemicals that do not appear to bind covalently to DNA should be based on knowledge or postulation of the probable mode(s) of action of closely related carcinogenic structural analogues (e.g., receptor mediated, cytotoxicity related).  Examination of the physicochemical and biochemical properties of the agent may then provide the rest of the information needed in order to make an assessment of the likelihood of the agent's activity by that mode of action.

### 2.3.3.  Comparative Metabolism and Toxicokinetics

Studies of the absorption, distribution, biotransformation, and excretion of agents permit comparisons among species to assist in determining the implications of animal responses for human hazard assessment, supporting identification of active metabolites, identifying changes in distribution and metabolic pathway or pathways over a dose range, and making comparisons among different routes of exposure.

If extensive data are available (e.g., blood/tissue partition coefficients and pertinent physiological parameters of the species of interest), physiologically based toxicokinetic models can be constructed to assist in a determination of tissue dosimetry, species-to-species extrapolation of dose, and route-to-route extrapolation (Conolly and Andersen, 1991; see Section 3.1.2).  If sufficient data are not available, it may be assumed as a default that toxicokinetic and metabolic processes are qualitatively comparable among species.  Discussion of appropriate procedures for quantitative, interspecies comparisons appears in Chapter 3.

The *qualitative* question of whether an agent is absorbed by a particular route of exposure is important for weight of evidence classification, discussed in Section 2.5.  Decisions about

whether route of exposure is a limiting factor on expression of any hazard, e.g., absorption does not occur by a specified route, are generally based on studies in which effects of the agent or its structural analogues have been observed by different routes, on physical-chemical properties, or on toxicokinetics studies.

Adequate metabolism and toxicokinetic data can be applied toward the following, as data permit. Confidence in conclusions is enhanced when *in vivo* data are available.

- *Identifying metabolites and reactive intermediates of metabolism and determining whether one or more of these intermediates is likely to be responsible for the observed effects*. Information on the reactive intermediates focuses on SAR analysis, analysis of potential modes of action, and estimation of internal dose in dose-response assessment (D'Souza et al., 1987; Krewski et al., 1987).

- *Identifying and comparing the relative activities of metabolic pathways in animals and in humans, and at different ages*. This analysis can provide insights for extrapolating results of animal studies to humans.

- *Describing anticipated distribution within the body and possibly identifying target organs*. Use of water solubility, molecular weight, and structure analysis can support qualitative inferences about anticipated distribution and excretion. In addition, describing whether the agent or metabolite of concern will be excreted rapidly or slowly or whether it will be stored in a particular tissue or tissues to be mobilized later can identify issues in comparing species and formulating dose-response assessment approaches.

- *Identifying changes in toxicokinetics and metabolic pathways with increases in dose*. These changes may result in important differences between high and low dose levels in disposition of the agent or generation of its active forms. These

2-28

studies play an important role in providing a rationale for dose selection in carcinogenicity studies.

- *Identifying and comparing metabolic process differences by age, sex, or other characteristic so that susceptible subpopulations can be recognized.* For example, metabolic capacity with respect to P450 enzymes in newborn children is extremely limited compared to that in adults, so that a carcinogenic metabolite formed through P450 activity will have limited effect in the young, whereas a carcinogenic agent deactivated through P450 activity will result in increased susceptibility of this lifestage (Cresteil, 1998). A variety of changes in toxicokinetics and physiology occur from the fetal stage to post-weaning to young child. Any of these changes may make a difference for risk (Renwick, 1998).

- *Determining bioavailability via different routes of exposure by analyzing uptake processes under various exposure conditions.* This analysis supports identification of hazards for untested routes. In addition, use of physicochemical data (e.g., octanol-water partition coefficient information) can support an inference about the likelihood of dermal absorption (Flynn, 1990).

Attempts should be made in all of these areas to clarify and describe as much as possible the variability to be expected because of differences in species, sex, age, and route of exposure. The analysis takes into account the presence of subpopulations of individuals who are particularly vulnerable to the effects of an agent because of toxicokinetic or metabolic differences (genetically or environmentally determined) (Bois et al., 1995) and is a special emphasis for assessment of risks to children.

### 2.3.4. Toxicological and Clinical Findings

Toxicological findings in experimental animals and clinical observations in humans are important resources for the cancer hazard assessment. Such findings provide information on

physiological effects and effects on enzymes, hormones, and other important macromolecules as well as on target organs for toxicity.  For example, given that the cancer process represents defects in processes such as terminal differentiation, growth control, and cell death, developmental studies of agents may provide an understanding of the activity of an agent that carries over to cancer assessment.  Toxicity studies in animals by different routes of administration support comparison of absorption and metabolism by those routes.  Data on human variability in standard clinical tests may also provide insight into the range of human susceptibility and the common mechanisms of agents that affect the tested parameters.

### 2.3.5.  Events Relevant to Mode of Carcinogenic Action

Knowledge of the biochemical and biological changes that precede tumor development (which include, but are not limited to, mutagenesis, increased cell proliferation, inhibition of programmed cell death, and receptor activation) may provide important insight for determining whether a cancer hazard exists and may help inform appropriate consideration of the dose-response relationship below the range of observable tumor response.  Because cancer can result from a series of genetic alterations in the genes that control cell growth, division, and differentiation (Vogelstein et al., 1988; Hanahan and Weinberg, 2000; Kinzler and Vogelstein, 2002), the ability of an agent to affect genotype (and hence gene products) or gene expression is of obvious importance in evaluating its influence on the carcinogenic process.  Initial and key questions to examine are:  Does the agent (or its metabolite) interact directly with DNA, leading to mutations that bring about changes in gene products or gene expression?  Does the agent bring about effects on gene expression via other nondirect DNA interaction processes?

Furthermore, carcinogenesis involves a complex series and interplay of events that alter the signals a cell receives from its extracellular environment, thereby promoting uncontrolled growth.  Many, but not all, mutagens are carcinogens, and some, but not all, agents that induce cell proliferation lead to tumor development.  Thus, understanding the range of key steps in the carcinogenic process upon which an agent might act is essential for evaluating its mode of action.  Determination of carcinogens that are operating by a mutagenic mode of action, for example, entails evaluation of *in vivo* or *in vitro* short-term testing results for genetic endpoints, metabolic

profiles, physicochemical properties, and structure-activity relationship (SAR) analyses in a weight-of-evidence approach (Dearfield et al., 1991; U.S. EPA, 1986b; Waters et al., 1999).  Key data for a mutagenic mode of action may be evidence that the carcinogen or a metabolite is DNA-reactive and/or has the ability to bind to DNA.  Also, mutagenic carcinogens usually produce positive effects in multiple test systems for different genetic endpoints, particularly gene mutations and structural chromosome aberrations, and in tests performed *in vivo* which generally are supported by positive tests *in vitro*.  Additionally, carcinogens may be identified as operating via a mutagenic mode of action if they have similar properties and SAR to mutagenic carcinogens.  Endpoints that provide insight into an agent's ability to alter gene products and gene expression, together with other features of an agent's potential mode of carcinogenic action, are discussed below.

### 2.3.5.1. *Direct DNA-Reactive Effects*

It is well known that many carcinogens are electrophiles that interact with DNA, resulting in DNA adducts and breakage (referred to in these cancer guidelines as direct DNA effects).  Usually during the process of DNA replication, these DNA lesions can be converted into and fixed as mutations and chromosomal alterations that then may initiate and otherwise contribute to the carcinogenic process (Shelby and Zeiger, 1990; Tinwell and Ashby, 1991; IARC, 1999).  Thus, studies of mutations and other genetic lesions continue to inform the assessment of potential human cancer hazard and in the understanding of an agent's mode of carcinogenic action.

EPA has published testing guidelines for detecting the ability of an agent to damage DNA and produce mutations and chromosomal alterations (as discussed in Dearfield et al., 1991).  Briefly, standard tests for gene mutations in bacteria and mammalian cells *in vitro* and *in vivo* and for structural chromosomal aberrations *in vitro* and *in vivo* are important examples of relevant methods.  New molecular approaches, such as mouse mutations and cancer transgenic models, are providing a means to examine mutation at tissue sites where the tumor response is observed (Heddle and Swiger, 1996; Tennant et al., 1999).  Additionally, continued improvements in fluorescent-based chromosome staining methods (fluorescent *in situ*

hybridization [FISH] ) will allow the detection of specific chromosomal abnormalities in relevant target tissues (Tucker and Preston, 1998).

Endpoints indicative of DNA damage but not measures of mutation *per se*, such as DNA adducts or strand breakage, may be detected in relevant target tissues and thus contribute to evaluating an agent's mutagenic potential.  Evidence of chemical-specific DNA adducts (e.g., reactions at oxygen sites in DNA bases or with ring nitrogens of guanine and adenine) provides information on a mutagen's ability to directly interact with DNA (La and Swenberg, 1996). Some planar molecules (e.g., 9-aminoacridine) intercalate between base pairs of DNA, which results in a physical distortion in DNA that may lead to mutations when DNA replicates.  As discussed below, some carcinogens do not interact directly with DNA, but they can produce increases in endogenous levels of DNA adducts (e.g., 8-hydroxyguanine) by indirect mechanisms.

### 2.3.5.2. *Indirect DNA Effects or Other Effects on Genes/Gene Expression*

Although some carcinogens may result in an elevation of mutations or cytogenetic anomalies, as detected in standard assays, they may do so by indirect mechanisms.  These effects may be brought about by chemical-cell interactions rather than by the chemical (or its metabolite) directly interacting with DNA.  An increase in mutations might be due to cytotoxic exposures causing regenerative proliferation or to mitogenic influences (Cohen and Ellwein, 1990). Increased cell division may elevate mutation by clonal expansion of initiated cells or by increasing the number of genetic errors by rapid cell division and reduced time for DNA repair. Some agents might result in an elevation of mutations by interfering with the enzymes involved in DNA repair and recombination (Barrett and Lee, 1992).  Damage to certain critical DNA repair genes or other genes (e.g., the p53 gene) may result in genomic instability, which predisposes cells to further genetic alterations and increases the probability of neoplastic progression (Harris and Hollstein, 1993; Levine et al., 1994; Rouse and Jackson, 2002). Likewise, DNA repair processes may be saturated at certain doses of a chemical, leading to an elevation of genetic alterations.

The initiation of programmed cell death (apoptosis) can potentially be blocked by an agent, thereby permitting replication of cells carrying genetic errors that would normally be removed from the proliferative pool.  At certain doses an agent may also generate reactive oxygen species that produce oxidative damage to DNA and other macromolecules (Chang et al. 1988; Kehrer, 1993; Clayson et al., 1994).  The role of cellular alterations that are attributable to oxidative damage in tumorigenesis (e.g., 8-hydroxyguanine) is currently unclear.

Several carcinogens have been shown to induce aneuploidy (the loss or gain of chromosomes) (Barrett, 1992; Gibson et al., 1995).  Aneuploidy can result in the loss of heterozygosity or genomic instability (Cavenee et al., 1986; Fearon and Vogelstein, 1990). Agents that cause aneuploidy typically interfere with the normal process of chromosome segregation by interacting with non-DNA targets such as the proteins needed for chromosome segregation and chromosome movement.  Whether this chromosome imbalance is the cause or the effect of tumorigenesis is not clear.  Thus, it is important to understand if the agent induces aneuploidy as a key early event in the carcinogenic process.

It is possible for an agent to alter gene expression by transcriptional, translational, or post-translational modifications.  For example, perturbation of DNA methylation patterns may cause effects that contribute to carcinogenesis (Jones, 1986; Holliday, 1987; Goodman and Counts, 1993; Chuang et al., 1996; Baylin and Bestor, 2002).  Overexpression of genes by DNA amplification has been observed in certain tumors (Vainio et al., 1992).  Mechanisms of altering gene expression may involve cellular reprogramming through hormonal or receptor-mediated mechanisms (Barrett, 1992; Ashby et al., 1994).

Both cell proliferation and programmed cell death can be part of the maintenance of homeostasis in many normal tissues, and alterations in the level or rate of either can be important elements of the carcinogenic process.  The balance between the two can directly affect the survival and growth of initiated cells as well as preneoplastic and tumor cell populations (i.e., increase in cell proliferation or decrease in cell death) (Moolgavkar, 1986; Cohen and Ellwein, 1990, 1991; Cohen et al., 1991; Bellamy et al., 1995).  Thus, measurements of these events can contribute to the weight of the evidence for cancer hazard prediction and to mode of action

understanding.  In studies of proliferative effects, distinctions should be made between mitogenesis and regenerative proliferation (Cohen and Ellwein, 1990, 1991; Cohen et al., 1991).

In applying information from studies on cell proliferation and apoptosis to risk assessment, it is important to identify the tissues and target cells involved, to measure effects in both normal and neoplastic tissue, to distinguish between apoptosis and necrosis, and to determine the dose that affects these processes.  Gap-junctional intercellular communication is believed to play a role in tissue and organ development and in the maintenance of a normal cellular phenotype within tissues.  A growing body of evidence suggests that chemical interference with gap-junctional intercellular communication is a contributing factor in tumor development (Swierenga and Yamasaki, 1992; Yamasaki, 1995).

### 2.3.5.3.  *Precursor Events and Biomarker Information*

Most testing schemes for mutagenicity and other short-term assays were designed for hazard identification purposes; thus, these assays are generally conducted using acute exposures. For data on "precursor steps" to be useful in informing the dose-response curve for tumor induction below the level of observation, it is often useful for data to come from *in vivo* studies and from studies where exposure is repeated or given over an extended period of time.  Although consistency of results across different assays and animal models provides a stronger basis for drawing conclusions, it is desirable to have data on the precursor event in the same target organ, sex, animal strain, and species as the tumor data.  In evaluating an agent's mode of action, it is usually not sufficient to determine that some event commences upon dosing.  It is important to understand whether it is a necessary event that plays a key role in the process that leads to tumor development versus an effect of the cancer process itself or simply an associated event.

Various endpoints can serve as biological markers of effects in biological systems or samples.  These may help identify doses at which elements of the carcinogenic process are operating; aid in interspecies extrapolations when data are available from both experimental animal and human cells; and under certain circumstances, provide insights into the possible shape of the dose-response curve below levels where tumor incidences are observed (e.g., Choy, 1993).

Genetic and other findings (such as changes in proto-oncogenes and tumor suppressor genes in preneoplastic and neoplastic tissue or, possibly, measures of endocrine disruption) can indicate the potential for disease and, as such, serve as biomarkers of effect.  They, too, can be used in different ways.

- The spectrum of genetic changes in proliferative lesions and tumors following chemical administration to experimental animals can be determined and compared with that in spontaneous tumors in control animals, in animals exposed to other agents of varying structural and functional activities, and in persons exposed to the agent under study.

- Biomarkers of effect and/or precursors may help to identify subpopulations of individuals who may be at an elevated risk for a certain cancer or exposure to a certain agent, e.g., cytochrome P450 2D6/debrisoquine sensitivity for lung cancer (Caporaso et al., 1989) or inherited colon cancer syndromes (Kinzler et al., 1991; Peltomäki et al., 1993).

- As with biomarkers of exposure, it may be justified in some cases to use biomarkers of effect and/or precursors for dose-response assessment or to provide insight into the potential shape of the dose-response curve at doses below those at which tumors are induced experimentally.

In applying biomarker data to cancer assessment an assessment should consider:
- analytical methodology,
- routes of exposure,
- exposure to mixtures,
- time after exposure,
- sensitivity and specificity of biomarkers, and
- dose-response relationships.

2-35

**2.3.5.4.** *Judging Data*

Criteria that are generally applicable for judging the adequacy of mechanistically based data include:

- mechanistic relevance of the data to carcinogenicity,
- number of studies of each endpoint,
- consistency of results in different test systems and different species,
- similar dose-response relationships for tumor and mode of action-related effects,
- conduct of the tests in accordance with generally accepted protocols, and
- degree of consensus and general acceptance among scientists regarding interpretation of the significance and specificity of the tests.

Although important information can be gained from *in vitro* test systems, a higher level of confidence is generally given to data that are derived from *in vivo* systems, particularly those results that show a site concordance with the tumor data.

It is important to remember that when judging and considering the use of any data, the basic standard of quality, as defined by the EPA Information Quality Guidelines, should be satisfied.

## 2.4.    MODE OF ACTION—GENERAL CONSIDERATIONS AND FRAMEWORK FOR ANALYSIS

### 2.4.1. General Considerations

The interaction between the biology of the organism and the chemical properties of the agent determine whether there is an adverse effect. Thus, mode of action analysis is based on physical, chemical, and biological information that helps to explain key events in an agent's influence on development of tumors. The entire range of information developed in the assessment is reviewed to arrive at a reasoned judgment. An agent may work by more than one mode of action, both at different sites and at the same tumor site. Thus the mode of action and human relevance cannot necessarily be generalized to other toxic endpoints or tissues or cell types without additional analyses (IPCS, 1999; Meek et al., 2003). At least some information

bearing on mode of action (e.g., SAR, screening tests for mutagenicity) is present for most agents undergoing assessment of carcinogenicity, even though certainty about exact molecular mechanisms may be rare.

Information for mode of action analysis generally includes tumor data in humans and animals and among structural analogues, as well as the other key data.  The more complete the data package and the generic knowledge about a given mode of action, the more confidence one has and the more one can rely on assessment of available data rather than reverting to default options to address the absence of information on mode of action.  Reasoned judgments are generally based on a data-rich source of chemical, chemical class, and tumor type-specific information.  Many times there will be conflicting data and gaps in the information base; it is important to carefully evaluate these uncertainties before reaching any conclusion.

In making decisions about potential modes of action and the relevance of animal tumor findings to humans (Ashby et al., 1990; Ashby and Tennant, 1991; Tennant, 1993; IPCS 1999; Sonich-Mullin et al., 2001; Meek et al., 2003), very often the results of chronic animal studies may give important clues.  Some of the important factors to review include:

- tumor types, for example, those responsive to endocrine influence or those produced by DNA-reactive carcinogens;

- number of studies and of tumor sites, sexes, and species affected or unaffected in those studies and if the data present a coherent story;

- similarity of metabolic activation and detoxification for a specific chemical between humans and tested species;

- influence of route of exposure on the spectrum of tumors and whether they occur at point of exposure or systemic sites;

- effect of high dose exposures on the target organ or systemic toxicity that may not reflect typical physiological conditions, for example, urinary chemical changes associated with stone formation, effects on immune surveillance;

- presence of proliferative lesions, for example, hepatic foci, or hyperplasia;

- effect of dose and time on the progression of lesions from preneoplastic to benign tumors, then to malignant;

- ratio of malignant to benign tumors as a function of dose and time;

- time of appearance of tumors after commencing exposure;

- development of tumors that invade locally or systemically, or lead to death;

- tumors at organ sites with high or low background historical incidence in laboratory animals;

- biomarkers in tumor cells, both induced and spontaneous, for example, DNA or protein adducts, mutation spectra, chromosome changes, oncogene activation; and/or

- shape of the dose-response curve in the range of tumor observation, for example, linear versus nonlinear.

Some of the myriad ways in which information from chronic animal studies influences mode of action judgments include, but are not limited to, the following:

- multisite and multispecies tumor effects that are often associated with mutagenic agents;

2-38

- tumors restricted to one sex or species suggesting an influence restricted to gender, strain, or species;

- late onset of tumors that are primarily benign,  are at sites with a high historical background incidence, or show reversal of lesions on cessation of exposure suggesting a growth-promoting mode of action;

- the possibility that an agent acting differently in different tissues; or

- the possibility that has more than one mode of action in a single tissue.

Simple knowledge of sites of tumor increase in rodent studies can give preliminary clues as to mode of action.  Experience at the National Toxicology Program (NTP) indicates that substances that are DNA reactive and that produce gene mutations may be unique in producing tumors in certain anatomical sites, whereas tumors at other sites may arise from both mutagenic or nonmutagenic influences (Ashby and Tennant, 1991; Huff et al., 1991).

The types of data and their influence on judgments regarding mode of action are expected to evolve, both as science advances and as the risk assessment community gains more experience with these analyses.  This section contains a framework for evaluating hypothesized mode(s) of action.  This framework has similarities to and differences with the concepts presented in other MOA frameworks (e.g., IPCS, 1999; Sonich-Mullin et al., 2001; Meek et al., 2003).  Differences are often due to the context of the use for the framework.  For example, the Meek et al. (2003) presents a stand-alone document for addressing mode of action issues; thus, it recommends that conclusions concerning MOA be rendered separately.  In these cancer guidelines, however, they are incorporated into the context of all of the data regarding weight of the evidence for carcinogenicity.

### 2.4.2. Evaluating an Hypothesized Mode of Action

#### 2.4.2.1. *Peer Review*

In reaching conclusions, the question of "general acceptance" of a mode of action should be tested as part of the independent peer review that EPA obtains for its assessment and conclusions. In some cases the mode of action may already have been established by development of a large body of research information and characterization of the phenomenon over time. In some cases there will have been development of an Agency policy (e.g., mode of action involving alpha-2u-globulin in the male rat [U.S. EPA, 1991b]) or a series of previous assessments in which both the mode of action and its applicability to particular cases has been explored. If so, the assessment and its peer review can focus on the evidence that a particular agent acts in this mode. The peer review should also evaluate the strengths and weaknesses of competing modes of action.

In other cases, the mode of action may not have previously been the subject of an Agency document. If so, the data to support both the mode of action and the associated activity of the agent should undergo EPA assessment and subsequent peer review.

#### 2.4.2.2. *Use of the Framework*

The framework supports a full analysis of mode of action information, but it can also be used as a screen to decide whether sufficient information is available to evaluate or whether the data gaps are too substantial to justify further analysis. Mode of action conclusions are used to address the question of human relevance of animal tumor responses, to address differences in anticipated response among humans, such as between children and adults or men and women; and as the basis of decisions about the anticipated shape of the dose-response relationship. Guidance on the latter appears in Section 3.

This framework is intended to provide an analytical approach for evaluating the mode of action. It is neither a checklist nor a list of required criteria. As the type and amount of information will depend on the mode of action postulated, scientific judgment is important to determine if the weight of evidence is sufficient.

### 2.4.3.  Framework for Evaluating Each Hypothesized Carcinogenic Mode of Action

This framework is intended to be an analytic tool for judging whether available data support a mode of carcinogenic action hypothesized for an agent.  It is based upon considerations for causality in epidemiologic investigations originally articulated by Hill (1965) but later modified by others and extended to experimental studies.  The original Hill criteria were applied to epidemiologic data, whereas this framework is applied to a much wider assortment of experimental data, so it retains the basic principles of Hill but is much modified in content.

The modified Hill criteria can be useful for organizing thinking about aspects of causation, and they are consistent with the scientific method of developing hypotheses and testing those hypotheses experimentally.  During analysis by EPA, and as guidance for peer review, a key question is whether the data to support a mode of action meet the standards generally applied in experimental biology regarding inference of causation.

All pertinent studies are reviewed in analyzing a mode of action, and an overall weighing of evidence is performed, laying out the strengths, weaknesses, and uncertainties of the case as well as potential alternative positions and rationales.  Identifying data gaps and research needs is also part of the assessment.

To evaluate whether an hypothesized mode of action is operative, an analysis starts with an outline of the scientific findings regarding the hypothesized key events leading to cancer, and then weighing information to determine whether there is a causal relationship between these events and cancer formation, i.e., that the effects are critical for induction of tumors.  It is not generally expected that the complete sequence will be known at the molecular level.  Instead, empirical observations made at different levels of biological organization—biochemical, cellular, physiological, tissue, organ, and system—are analyzed.

Several important points should be considered when working with the framework:

- The topics listed for analysis should *not* be regarded as a checklist of necessary "proofs."  The judgment of whether an hypothesized mode of action is supported by available data takes account of the analysis as a whole.

- The framework provides a structure for organizing the facts upon which conclusions as to mode of action rest. The purpose of using the framework is to make analysis transparent and to allow the reader to understand the facts and reasoning behind a conclusion.

- The framework does not dictate an answer. The weight of evidence that is sufficient to support a decision about a mode of action may be less or more, depending on the purpose of the analysis, for example, screening, research needs identification, or full risk assessment. To make the reasoning transparent, the purpose of the analysis should be made apparent to the reader.

- Toxicokinetic studies may contribute to mode of action analysis by contributing to identifying the active form(s) of an agent that is central to the mode of action. Apart from contributing in this way, toxicokinetics studies may reveal effects of saturation of metabolic processes. These may not be considered key events in a mode of action, but they are given separate consideration in assessing dose metrics and potential nonlinearity of the dose-response relationship.

- Generally, "sufficient" support is a matter of scientific judgment in the context of the requirements of the decisionmaker or in the context of science policy guidance regarding a certain mode of action.

- Even when an hypothesized mode of action is supported for a described response in a specific tissue, it may not explain other tumor responses observed, which should get separate consideration in hazard and dose-response assessment.

For each tumor site being evaluated, the mode of action analysis should begin with a description of the relevant data and key events that may be associated with an hypothesized mode of action and its sequence of key events (see Section 2.4.3.1). This can be followed by a

discussion of various aspects of the experimental support for hypothesized mode(s) of action in animals and humans (see Section 2.4.3.2).  The possibility of other modes of action also should be considered and discussed (see Section 2.4.3.3); if there is evidence for more than one mode of action, each should receive a separate analysis.  Conclusions about each hypothesized mode of action should address whether the mode of action is supported in animals and is relevant to humans and which populations or lifestages can be particularly susceptible (see Section 2.4.3.4).  In a risk assessment document, the analysis of an hypothesized mode of action can be presented before or with the characterization of an agent's potential hazard to humans.

### 2.4.3.1.  *Description of the Hypothesized Mode of Action*

*Summary description of the hypothesized mode of action.*  For each tumor site, the mode of action analysis begins with a description of the hypothesized mode of action and its sequence of key events.  If there is evidence for more than one mode of action, each receives a separate analysis.

*Identification of key events.*  In order to judge how well data support involvement of a key event in carcinogenic processes, the experimental definition of the event or events should be clear and reproducible.  To support an association, experiments should define and measure an event consistently.

- Can a list of events be identified that are key to the carcinogenic process?

- Are the events well defined?

Pertinent observations may include, but are not limited to, receptor-ligand changes, cytotoxicity, cell cycle effects, increased cell growth, organ weight differences, histological changes, hormone or other protein perturbations, or DNA and chromosome effects.

**2.4.3.2.   *Discussion of the Experimental Support for the Hypothesized Mode of Action***

The experimental support for the hypothesized mode of action should be discussed from several viewpoints patterned after the Hill criteria (see Section 2.2.1.7).  For illustration, the explanation of each topic includes typical questions to be addressed to the available empirical data and experimental observations anticipated to be pertinent.  The latter will vary from case to case.  For a particular mode of action, certain observations may be established as essential in practice or policy, for example, measures of thyroid hormone levels in supporting thyroid hormone elevation as a key event in carcinogenesis.

*Strength, consistency, specificity of association.*  A statistically significant association between events and a tumor response observed in well-conducted studies is generally supportive of causation.  Consistent observations in a number of such studies with differing experimental designs increase that support, because different designs may reduce unknown biases.  Studies showing "recovery," i.e, absence or reduction of carcinogenicity when the event is blocked or diminished, are particularly useful tests of the association.  Specificity of the association, without evidence of other modes of action, strengthens a causal conclusion.  A lack of strength, consistency, and specificity of association weakens the causal conclusions for a particular mode of action.

- What is the level of statistical and biological significance for each event and for cancer?

- Do independent studies and different experimental hypothesis-testing approaches produce the same associations?

- Does the agent produce effects other than those hypothesized?

- Is the key event associated with precursor lesions?

Pertinent observations include tumor response associated with events (site of action logically relates to event[s]), precursor lesions associated with events, initiation-promotion studies, and stop/recovery studies.

*Dose-response concordance.*  If a key event and tumor endpoints increase with dose such that the key events forecast the appearance of tumors at a later time or higher dose, a causal association can be strengthened.  Dose-response associations of the key event with other precursor events can add further strength.  Difficulty arises when an event is not causal but accompanies the process generally.  For example, if tumors and the hypothesized precursor both increase with dose, the two responses will be correlated regardless of whether a causal relationship exists.  This is similar to the issue of confounding in epidemiologic studies.  Dose-response studies coupled with mechanistic studies can assist in clarifying these relationships.

- What are the correlations among doses producing events and cancer?

Pertinent observations include, but are not limited to, 2-year bioassay observation of lesions correlated with observations of hormone changes and the same lesions in shorter term studies or in interim sacrifice.

*Temporal relationship.*  If an event is shown to be causally linked to tumorigenesis, it will precede tumor appearance.  An event may also be observed contemporaneously or after tumor appearance; these observations may add to the strength of association but not to the temporal association.

- What is the ordering of events that underlie the carcinogenic process?

- Is this ordering consistent among independent studies?

Pertinent observations include studies of varying duration observing the temporal sequence of events and development of tumors.

*Biological plausibility and coherence.*  It is important that the hypothesized mode of action and the events that are part of it be based on contemporaneous understanding of the biology of cancer to be accepted.  If the body of information under scrutiny is consistent with other examples (including structurally related agents) for which the hypothesized mode of action is accepted, the case is strengthened.  Because some modes of action can be anticipated to evoke effects other than cancer, the available toxicity database on noncancer effects, for example, reproductive effects of certain hormonal disturbances, can contribute to this evaluation.

- Is the mode of action consistent with what is known about carcinogenesis in general and for the case specifically?

- Are carcinogenic effects and events consistent across structural analogues?

- Is the database on the agent internally consistent in supporting the purported mode of action, including relevant noncancer toxicities?

Pertinent observations include the scientific basis for considering an hypothesized mode of action generally, given the contemporaneous state of knowledge of carcinogenic processes; previous examples of data sets showing the mode of action; data sets on analogues; and coherence of data in this case from cancer and noncancer toxicity studies.

### 2.4.3.3.  *Consideration of the Possibility of Other Modes of Action*

The possible involvement of more than one mode of action at the tumor site should be considered.  Pertinent observations that are not consistent with the hypothesized mode of action can suggest the possibility of other modes of action.  Some pertinent observations can be consistent with more than one mode of action.  Furthermore, different modes of action can operate in different dose ranges; for example, an agent can act predominantly through cytotoxicity at high doses and through mutagenicity at lower doses where cytotoxicity may not occur.

If there is evidence for more than one mode of action, each should receive a separate analysis. There may be an uneven level of experimental support for the different modes of action. Sometimes this can reflect disproportionate resources spent on investigating one particular mode of action and not the validity or relative importance of the other possible modes of action. Ultimately, however, the information on all of the modes of action should be integrated to better understand how and when each mode acts, and which mode(s) may be of interest for exposure levels relevant to human exposures of interest.

### 2.4.3.4. *Conclusions About the Hypothesized Mode of Action*

Conclusions about the hypothesized mode of action should address the issues listed below. For those agents for which the mode of action is considered useful for the risk assessment, the weight of the evidence concerning mode of action in animals as well as its relevance for humans would be incorporated into the weight of evidence narrative (Section 2.5).

*(a) Is the hypothesized mode of action sufficiently supported in the test animals?* Associations observed between key events and tumors may or may not support an inference of causation. The conclusion that the agent causes one or more key events that results in tumors is strengthened as more aspects of causation are satisfied and weakened as fewer are satisfied. Consistent results in different experiments that test the hypothesized mode of action build support for that mode of action. Replicating results in a similar experiment does not generally meaningfully strengthen the original evidence, and discordant results generally weaken that support. Experimental challenge to the hypothesized mode of action, where interrupting the sequence of key events suppresses the tumor response or enhancement of key events increases the tumor response, creates very strong support for the mode of action.

*(b) Is the hypothesized mode of action relevant to humans?* If an hypothesized mode of action is sufficiently supported in the test animals, the sequence of key precursor events should be reviewed to identify critical similarities and differences between the test animals and humans. The question of concordance can be complicated by cross-species differences in toxicokinetics or

toxicodynamics.  For example, the active agent can be formed through different metabolic pathways in animals and humans.  Any information suggesting quantitative differences between animals and humans is flagged for consideration in the dose-response assessment.  This includes the potential for different internal doses of the active agent or for differential occurrence of a key precursor event.

"Relevance" of a potential mode of action is considered in the context of characterization of hazard, not level of risk.  Anticipated levels of human exposure are not used to determine whether the hypothesized mode of action is relevant to humans.  Exposure information is integrated into the overall risk characterization.

The question of relevance considers all populations and lifestages.  It is possible that the conditions under which a mode of action operates exist primarily in a particular population or lifestage, for example, in those with a pre-existing hormonal imbalance.  Other populations or lifestages may not be analogous to the test animals, in which case the question of relevance would be decided by inference.

Special attention should be paid to whether tumors can arise from childhood exposure, considering various aspects of development during these lifestages.  Because the studies that support a mode of action are typically conducted in mature animals, conclusions about relevance during childhood generally rely on inference.  There is currently no standard Agency position regarding the issue of whether tumors arising through the hypothesized mode of action are relevant during childhood; understanding the mode of action implies that there are sufficient data (on either the specific agent or the general mode of action) to form a confident conclusion about relevance during childhood.

*(c) Which populations or lifestages can be particularly susceptible to the hypothesized mode of action?*  If an hypothesized mode of action is judged relevant to humans, information about the key precursor event(s) is reviewed to identify populations or lifestages that might reasonably expected to be particularly susceptible to their occurrence.  Although agent-specific data would provide the strongest indication of susceptibility, this review may also rely on general knowledge about the precursor events and characteristics of individuals susceptible to these

events.  Any information suggesting quantitative differences between populations or lifestages should be flagged for consideration in the dose-response assessment (see Section 3.5).  This includes the potential for a higher internal dose of the active agent or for an increased occurrence of a key precursor event.  Quantitative differences may result in separate risk estimates for susceptible populations or lifestages.

The possibility that childhood is a susceptible period for exposure should be explicitly addressed.  Generic understanding of the mode of action can be used to gauge childhood susceptibility, and this determination can be refined through analysis of agent-specific data.

### 2.4.4   Evolution with Experience

Several groups have proposed or incorporated mode of action into their risk assessments (see, e.g., U.S. EPA , 1991b; Sonich-Mullin et al., 2001; Meek et al., 2003).  As the frameworks and mandates under which these evaluations were produced differ, the specific procedures described in and conclusions drawn may also differ.  Nevertheless, the number of case studies from all venues remains limited.  More experience with differing modes of action are expected to highlight and illustrate the strengths and limitations of the general framework proposed in these cancer guidelines.  Moreover, additional toxicological techniques may expand or change scientific judgments regarding which information is useful for mode of action determinations.  As warranted, additional guidance may be proposed as experience is gained and/or as toxicological knowledge advances.

## 2.5.  WEIGHT OF EVIDENCE NARRATIVE

The *weight of evidence narrative* is a short summary (one to two pages) that explains an agent's human carcinogenic potential and the conditions that characterize its expression.  It should be sufficiently complete to be able to stand alone, highlighting the key issues and decisions that were the basis for the evaluation of the agent's potential hazard.  It should be sufficiently clear and transparent to be useful to risk managers and non-expert readers.  It may be useful to summarize all of the significant components and conclusions in the first paragraph of the narrative and to explain complex issues in more depth in the rest of the narrative.

2-49

The weight of the evidence should be presented as a narrative laying out the complexity of information that is essential to understanding the hazard and its dependence on the quality, quantity, and type(s) of data available, as well as the circumstances of exposure or the traits of an exposed population that may be required for expression of cancer.  For example, the narrative can clearly state to what extent the determination was based on data from human exposure, from animal experiments, from some combination of the two, or from other data.  Similarly, information on mode of action can specify to what extent the data are from *in vivo* or *in vitro* exposures or based on similarities to other chemicals.  The extent to which an agent's mode of action occurs only on reaching a minimum dose or a minimum duration should also be presented. A hazard might also be expressed disproportionately in individuals possessing a specific gene; such characterizations may follow from a better understanding of the human genome. Furthermore, route of exposure should be used to qualify a hazard if, for example, an agent is not absorbed by some routes.  Similarly, a hazard can be attributable to exposures during a susceptible lifestage on the basis of our understanding of human development.

The weight of evidence-of-evidence narrative should highlight:

- the quality and quantity of the data;

- all key decisions and the basis for these major decisions; and

- any data, analyses, or assumptions that are unusual for or new to EPA.

To capture this complexity, a weight of evidence narrative generally includes

- conclusions about human carcinogenic potential (choice of descriptor(s), described below),

- a summary of the key evidence supporting these conclusions (for each descriptor used), including information on the type(s) of data (human and/or animal, *in vivo* and/or *in vitro*) used to support the conclusion(s),

- available information on the epidemiologic or experimental conditions that characterize expression of carcinogenicity (e.g., if carcinogenicity is possible only by one exposure route or only above a certain human exposure level),

- a summary of potential modes of action and how they reinforce the conclusions,

- indications of any susceptible populations or lifestages, when available, and

- a summary of the key default options invoked when the available information is inconclusive.

To provide some measure of clarity and consistency in an otherwise free-form narrative, the weight of evidence descriptors are included in the first sentence of the narrative. Choosing a descriptor is a matter of judgment and cannot be reduced to a formula. Each descriptor may be applicable to a wide variety of potential data sets and weights of evidence. These descriptors and narratives are intended to permit sufficient flexibility to accommodate new scientific understanding and new testing methods as they are developed and accepted by the scientific community and the public. Descriptors represent points along a continuum of evidence; consequently, there are gradations and borderline cases that are clarified by the full narrative. Descriptors, as well as an introductory paragraph, are a short summary of the complete narrative that preserves the complexity that is an essential part of the hazard characterization. **Users of these cancer guidelines and of the risk assessments that result from the use of these cancer guidelines should consider the entire range of information included in the narrative rather than focusing simply on the descriptor.**

In borderline cases, the narrative explains the case for choosing one descriptor and discusses the arguments for considering but not choosing another.  For example, between "suggestive" and "likely" or between "suggestive" and "inadequate," the explanation clearly communicates the information needed to consider appropriately the agent's carcinogenic potential in subsequent decisions.

Multiple descriptors can be used for a single agent, for example, when carcinogenesis is dose- or route-dependent.  For example, if an agent causes point-of-contact tumors by one exposure route but adequate testing is negative by another route, then the agent could be described as likely to be carcinogenic by the first route but not likely to be carcinogenic by the second.  Another example is when the mode of action is sufficiently understood to conclude that a key event in tumor development would not occur below a certain dose range.  In this case, the agent could be described as likely to be carcinogenic above a certain dose range but not likely to be carcinogenic below that range.

Descriptors can be selected for an agent that has not been tested in a cancer bioassay if sufficient other information, e.g., toxicokinetic and mode of action information, is available to make a strong, convincing, and logical case through scientific inference.  For example, if an agent is one of a well-defined class of agents that are understood to operate through a common mode of action and if that agent has the same mode of action, then in the narrative the untested agent would have the same descriptor as the class.  Another example is when an untested agent's effects are understood to be caused by a human metabolite, in which case in the narrative the untested agent could have the same descriptor as the metabolite.  As new testing methods are developed and used, assessments may increasingly be based on inferences from toxicokinetic and mode of action information in the absence of tumor studies in animals or humans.

When a well-studied agent produces tumors only at a point of initial contact, the descriptor generally applies only to the exposure route producing tumors unless the mode of action is relevant to other routes.  The rationale for this conclusion would be explained in the narrative.

When tumors occur at a site other than the point of initial contact, the descriptor generally applies to all exposure routes that have not been adequately tested at sufficient doses.  An

2-52

exception occurs when there is convincing information, e.g., toxicokinetic data that absorption does not occur by another route.

When the response differs qualitatively as well as quantitatively with dose, this information should be part of the characterization of the hazard.  In some cases reaching a certain dose range can be a precondition for effects to occur, as when cancer is secondary to another toxic effect that appears only above a certain dose.  In other cases exposure duration can be a precondition for hazard if effects occur only after exposure is sustained for a certain duration. These considerations differ from the issues of relative absorption or potency at different dose levels because they may represent a discontinuity in a dose-response function.

When multiple bioassays are inconclusive, mode of action data are likely to hold the key to resolution of the more appropriate descriptor.  When bioassays are few, further bioassays to replicate a study's results or to investigate the potential for effects in another sex, strain, or species may be useful.

When there are few pertinent data, the descriptor makes a statement about the database, for example, "Inadequate Information to Assess Carcinogenic Potential," or a database that provides "Suggestive Evidence of Carcinogenic Potential."  With more information, the descriptor expresses a conclusion about the agent's carcinogenic potential to humans.  If the conclusion is positive, the agent could be described as "Likely to Be Carcinogenic to Humans" or, with strong evidence, "Carcinogenic to Humans."  If the conclusion is negative, the agent could be described as "Not Likely to Be Carcinogenic to Humans."

Although the term "likely" can have a probabilistic connotation in other contexts, its use as a weight of evidence descriptor does not correspond to a quantifiable probability of whether the chemical is carcinogenic.  This is because the data that support cancer assessments generally are not suitable for numerical calculations of the probability that an agent is a carcinogen.  Other health agencies have expressed a comparable weight of evidence using terms such as "Reasonably Anticipated to Be a Human Carcinogen" (NTP) or "Probably Carcinogenic to Humans" (International Agency for Research on Cancer).

The following descriptors can be used as an introduction to the weight of evidence narrative.  The examples presented in the discussion of the descriptors are illustrative.  The

2-53

examples are neither a checklist nor a limitation for the descriptor.  The complete weight of evidence narrative, rather than the descriptor alone, provides the conclusions and the basis for them.

### *"Carcinogenic to Humans"*

This descriptor indicates strong evidence of human carcinogenicity.  It covers different combinations of evidence.

- This descriptor is appropriate when there is convincing epidemiologic evidence of a causal association between human exposure and cancer.

- Exceptionally, this descriptor may be equally appropriate with a lesser weight of epidemiologic evidence that is strengthened by other lines of evidence.  It can be used when all of the following conditions are met: (a) there is strong evidence of an association between human exposure and either cancer or the key precursor events of the agent's mode of action but not enough for a causal association, and (b) there is extensive evidence of carcinogenicity in animals, and (c) the mode(s) of carcinogenic action and associated key precursor events have been identified in animals, and (d) there is strong evidence that the key precursor events that precede the cancer response in animals are anticipated to occur in humans and progress to tumors, based on available biological information.  In this case, the narrative includes a summary of both the experimental and epidemiologic information on mode of action and also an indication of the relative weight that each source of information carries, e.g., based on human information, based on limited human and extensive animal experiments.

### *"Likely to Be Carcinogenic to Humans"*

This descriptor is appropriate when the weight of the evidence is adequate to demonstrate carcinogenic potential to humans but does not reach the weight of evidence for the descriptor

"Carcinogenic to Humans."  Adequate evidence consistent with this descriptor covers a broad spectrum.  As stated previously, the use of the term "likely" as a weight of evidence descriptor does not correspond to a quantifiable probability.  The examples below are meant to represent the broad range of data combinations that are covered by this descriptor; they are illustrative and provide neither a checklist nor a limitation for the data that might support use of this descriptor. Moreover, additional information, e.g., on mode of action, might change the choice of descriptor for the illustrated examples.  Supporting data for this descriptor may include:

- an agent demonstrating a plausible (but not definitively causal) association between human exposure and cancer, in most cases with some supporting biological, experimental evidence, though not necessarily carcinogenicity data from animal experiments;

- an agent that has tested positive in animal experiments in more than one species, sex, strain, site, or exposure route, with or without evidence of carcinogenicity in humans;

- a positive tumor study that raises additional biological concerns beyond that of a statistically significant result, for example, a high degree of malignancy, or an early age at onset;

- a rare animal tumor response in a single experiment that is assumed to be relevant to humans; or

- a positive tumor study that is strengthened by other lines of evidence, for example, either plausible (but not definitively causal) association between human exposure and cancer or evidence that the agent or an important metabolite causes events generally known to be associated with tumor formation (such as DNA reactivity or effects on cell growth control) likely to be related to the tumor response in this case.

**"*Suggestive Evidence of Carcinogenic Potential*"**

This descriptor of the database is appropriate when the weight of evidence is suggestive of carcinogenicity; a concern for potential carcinogenic effects in humans is raised, but the data are judged not sufficient for a stronger conclusion. This descriptor covers a spectrum of evidence associated with varying levels of concern for carcinogenicity, ranging from a positive cancer result in the only study on an agent to a single positive cancer result in an extensive database that includes negative studies in other species. Depending on the extent of the database, additional studies may or may not provide further insights. Some examples include:

- a small, and possibly not statistically significant, increase in tumor incidence observed in a single animal or human study that does not reach the weight of evidence for the descriptor "Likely to Be Carcinogenic to Humans." The study generally would not be contradicted by other studies of equal quality in the same population group or experimental system (see discussions of *conflicting evidence* and *differing results*, below);

- a small increase in a tumor with a high background rate in that sex and strain, when there is some but insufficient evidence that the observed tumors may be due to intrinsic factors that cause background tumors and not due to the agent being assessed. (When there is a high background rate of a specific tumor in animals of a particular sex and strain, then there may be biological factors operating independently of the agent being assessed that could be responsible for the development of the observed tumors.) In this case, the reasons for determining that the tumors are not due to the agent are explained;

- evidence of a positive response in a study whose power, design, or conduct limits the ability to draw a confident conclusion (but does not make the study fatally

2-56

flawed), but where the carcinogenic potential is strengthened by other lines of evidence (such as structure-activity relationships); or

- a statistically significant increase at one dose only, but no significant response at the other doses and no overall trend.

### *"Inadequate Information to Assess Carcinogenic Potential"*

This descriptor of the database is appropriate when available data are judged inadequate for applying one of the other descriptors.  Additional studies generally would be expected to provide further insights.  Some examples include:

- little or no pertinent information;

- conflicting evidence, that is, some studies provide evidence of carcinogenicity but other studies of equal quality in the same sex and strain are negative.  *Differing results*, that is, positive results in some studies and negative results in one or more different experimental systems, do not constitute *conflicting evidence,* as the term is used here.  Depending on the overall weight of evidence, differing results can be considered either suggestive evidence or likely evidence; or

- negative results that are not sufficiently robust for the descriptor, "Not Likely to Be Carcinogenic to Humans."

### *"Not Likely to Be Carcinogenic to Humans"*

This descriptor is appropriate when the available data are considered robust for deciding that there is no basis for human hazard concern.  In some instances, there can be positive results in experimental animals when there is strong, consistent evidence that each mode of action in experimental animals does not operate in humans.  In other cases, there can be convincing

2-57

evidence in both humans and animals that the agent is not carcinogenic.  The judgment may be based on data such as:

- animal evidence that demonstrates lack of carcinogenic effect in both sexes in well-designed and well-conducted studies in at least two appropriate animal species (in the absence of other animal or human data suggesting a potential for cancer effects),

- convincing and extensive experimental evidence showing that the only carcinogenic effects observed in animals are not relevant to humans,

- convincing evidence that carcinogenic effects are not likely by a particular exposure route (see Section 2.3), or

- convincing evidence that carcinogenic effects are not likely below a defined dose range.

A descriptor of "not likely" applies only to the circumstances supported by the data.  For example, an agent may be "Not Likely to Be Carcinogenic" by one route but not necessarily by another.  In those cases that have positive animal experiment(s) but the results are judged to be not relevant to humans, the narrative discusses why the results are not relevant.

***Multiple Descriptors***

More than one descriptor can be used when an agent's effects differ by dose or exposure route.  For example, an agent may be "Carcinogenic to Humans" by one exposure route but "Not Likely to Be Carcinogenic" by a route by which it is not absorbed.  Also, an agent could be "Likely to Be Carcinogenic" above a specified dose but "Not Likely to Be Carcinogenic" below that dose because a key event in tumor formation does not occur below that dose.

## 2.6.  HAZARD CHARACTERIZATION

The *hazard characterization* contains the hazard information needed for a full risk characterization (U.S. EPA, 2000b).  It presents the results of the hazard assessment and explains how the weight of evidence conclusion was reached.  The hazard characterization summarizes, in plain language, conclusions about the agent's potential effects, whether they can be expected to depend qualitatively on the circumstances of exposure, and if anyone can be expected to be especially susceptible.  It discusses the extent to which these conclusions are supported by data or are the result of default options invoked because the data are inconclusive.  It explains how complex cases with differing results in different studies were resolved.  The hazard characterization highlights the major issues addressed in the hazard assessment and discusses alternative interpretations of the data and the degree to which they are supportable scientifically and are consistent with EPA guidelines.

When the conclusion is supported by mode of action information, the hazard characterization also provides a clear summary of the mode of action conclusions (see Section 2.4.3.4), including the completeness of the data, the strengths and limitations of the inferences made, the potential for other modes of action, and the implications of the mode of action for selecting viable approaches to the dose-response assessment.  The hazard characterization also discusses the extent to which mode of action information is available to address the potential for disproportionate risks in specific populations or lifestages or the potential for enhanced risks on the basis of interactions with other agents or stressors, if anticipated.

Topics that can be addressed in a hazard characterization include:

- summary of the results of the hazard assessment;

- identification of any likely susceptible populations and lifestages, especially attending to children, infants, and fetuses;

- conclusions about the agent's mode of action, and implications for selecting approaches to the dose-response assessment;

- identification of the available lines of evidence (e.g., animal bioassays, epidemiologic studies, toxicokinetic information, mode of action studies, and information about structural analogues or metabolites), highlighting data quality and coherence of results from different lines of evidence; and

- strengths and limitations of the hazard assessment, highlighting significant issues in interpreting the data, alternative interpretations that are considered equally plausible, critical data gaps, and default options invoked when the available information is inconclusive.

# 3. DOSE-RESPONSE ASSESSMENT

Dose-response assessment estimates potential risks to humans at exposure levels of interest.  Dose-response assessments are useful in many applications: estimating risk at different exposure levels, estimating the risk reduction for different decision options, estimating the risk remaining after an action is taken, providing the risk information needed for benefit-cost analyses of different decision options, comparing risks across different agents or health effects, and setting research priorities.  The purpose of the assessment should consider the quality of the data available, which will vary from case to case.

A dose-response analysis is generally developed from each study that reports quantitative data on dose and response.  Alternative measures of dose are available for analyzing human and animal studies (see Section 3.1).  A two-step approach distinguishes analysis of the dose-response data from inferences made about lower doses.  The first step is an analysis of dose and response in the range of observation of the experimental or epidemiologic studies (see Section 3.2).  Modeling is encouraged to incorporate a wide range of experimental data into the dose-response assessment (see Sections 3.1.2, 3.2.1, 3.2.2, 3.2.3).  The modeling yields a point of departure (POD) near the lower end of the observed range, without significant extrapolation to lower doses (see Sections 3.2.4, 3.2.5).  The second step is extrapolation to lower doses (see Section 3.3).  The extrapolation approach considers what is known about the agent's mode of action (see Section 3.3.1).  Both linear and nonlinear approaches are available (see Sections 3.3.3, 3.3.4).  When multiple estimates can be developed, the strengths and weaknesses of each are presented.  In some cases, they may be combined in a way that best represents human cancer risk (see Section 3.3.5).  Special consideration is given to describing dose-response differences attributable to different human exposure scenarios (see Section 3.4) and to susceptible populations and lifestages (see Section 3.5).  It is important to discuss significant uncertainties encountered in the analysis (see Section 3.6) and to characterize other important aspects of the dose-response assessment (see Section 3.7).

The scope, depth, and use of a dose-response assessment vary in different circumstances.  Although the quality of dose-response data is not necessarily related to the weight of evidence

descriptor, dose-response assessments are generally completed for agents considered "Carcinogenic to Humans" and "Likely to Be Carcinogenic to Humans."  When there is suggestive evidence, the Agency generally would not attempt a dose-response assessment, as the nature of the data generally would not support one; however, when the evidence includes a well-conducted study, quantitative analyses may be useful for some purposes, for example, providing a sense of the magnitude and uncertainty of potential risks, ranking potential hazards, or setting research priorities.  In each case, the rationale for the quantitative analysis is explained, considering the uncertainty in the data and the suggestive nature of the weight of evidence.  These analyses generally would not be considered Agency consensus estimates.  Dose-response assessments are generally not done when there is inadequate evidence, although calculating a bounding estimate from an epidemiologic or experimental study that does not show positive results can indicate the study's level of sensitivity and capacity to detect risk levels of concern.

Cancer is a collection of several diseases that develop through cell and tissue changes over time.  Dose-response assessment procedures based on tumor incidence have seldom taken into account the effects of key precursor events within the whole biological process due to lack of empirical data and understanding about these events.  In this discussion, response data include measures of key precursor events considered integral to the carcinogenic process in addition to tumor incidence.  These responses may include changes in DNA, chromosomes, or other key macromolecules; effects on growth signal transduction, including induction of hormonal changes; or physiological or toxic effects that include proliferative events diagnosed as precancerous but not pathology that is judged to be cancer.  Analysis of such responses may be done along with that of tumor incidence to enhance the tumor dose-response analysis.  If dose-response analysis of nontumor key events is more informative about the carcinogenic process for an agent, it can be used in lieu of, or in conjunction with, tumor incidence analysis for the overall dose-response assessment.

As understanding of mode of action improves and new types of data become available, dose-response assessment will continue to evolve.  These cancer guidelines encourage the development and application of new methods that improve dose-response assessment by reflecting new scientific understanding and new sources of information.

### 3.1.  ANALYSIS OF DOSE

For each effect observed, dose-response assessment should begin by determining an appropriate *dose metric*.  Several dose metrics have been used, e.g., delivered dose, body burden, and area under the curve, and others may be appropriate depending on the data and mode of action.

Selection of an appropriate dose metric considers what data are available and what is known about the agent's mode of action at the target site, and uncertainties involved in estimation and application of alternative metrics.  The dose metric specifies:

- the agent measured, preferably the active agent (administered agent or a metabolite);
- proximity to the target site (exposure concentration, potential dose, internal dose, or delivered dose,[5] reflecting increasing proximity); and

- the time component of the effective dose (cumulative dose, average dose, peak dose, or body burden).

Analyses can be based on estimates of animal dose metrics or human dose metrics.  The assessment should describe the approach used to select a dose metric and the reasons for this approach.  The final analysis, however, should determine a human equivalent dose metric.  This facilitates comparing results from different datasets and effects by using human equivalent dose/concentrations as common metrics.  When appropriate, it may be necessary to convert dose metrics across exposure routes.  When route-to-route extrapolations are made, the underlying data, algorithms, and assumptions are clearly described.

---

[5] *Exposure* is contact of an agent with the outer boundary of an organism.  *Exposure concentration* is the concentration of a chemical in its transport or carrier medium at the point of contact.  *Dose* is the amount of a substance available for interaction with metabolic processes or biologically significant receptors after crossing the outer boundary of an organism.  *Potential dose* is the amount ingested, inhaled, or applied to the skin.  *Applied dose* is the amount of a substance presented to an absorption barrier and available for absorption (although not necessarily having yet crossed the outer boundary of the organism).  *Absorbed dose* is the amount crossing a specific absorption barrier (e.g., the exchange boundaries of skin, lung, and digestive tract) through uptake processes.  *Internal dose* is a more general term, used without respect to specific absorption barriers or exchange boundaries.  *Delivered dose* is the amount of the chemical available for interaction by any particular organ or cell (U.S. EPA, 1992a).

Timing of exposure can also be important.  When there is a susceptible lifestage, doses during the susceptible period are not equivalent to doses at other times, and they would be analyzed separately.

### 3.1.1.  Standardizing Different Experimental Exposure Regimens

Complex exposure or dosing regimens are often present in experimental and epidemiologic studies.  The resulting internal dose depends on many variables, including concentration, duration, frequency of administration, and duration of recovery periods between administrations.  Internal dose also depends on variables that are intrinsic to the exposed individual, such as lifestage and rates of metabolism and clearance.  To facilitate comparing results from different study designs and to make inferences about human exposures, a summary estimate of the dose metric, whether the administered dose or inhalation exposure concentration or an internal metric, may be derived for a complex exposure regimen.

*Toxicokinetic modeling is the preferred approach* for estimating dose metrics from exposure.  Toxicokinetic models generally describe the relationship between exposure and measures of internal dose over time.  More complex models can reflect sources of intrinsic variation, such as polymorphisms in metabolism and clearance rates.  When a robust model is not available, or when the purpose of the assessment does not warrant developing a model, simpler approaches may be used.

*For chronic exposure studies*, the cumulative exposure or dose administered often is expressed as an average over the duration of the study, as one consistent dose metric.  This approach implies that a higher dose administered over a short duration is equivalent to a commensurately lower dose administered over a longer duration.  Uncertainty usually increases as the duration becomes shorter relative to the averaging duration or the intermittent doses become more intense than the averaged dose.  Moreover, doses during any specific susceptible or refractory period would not be equivalent to doses at other times.  For these reasons, cumulative exposure or potential dose may be replaced by a more appropriate dose metric when indicated by the data.

*For mode of action studies*, the dose metric should be calculated over a duration that reflects the time to occurrence of the key precursor effects.  Mode of action studies are often of limited duration, as the precursors can be observed after less-than-chronic exposures.  When the experimental exposure regimen is specified on a weekly basis (for example, 4 hours a day, 5 days a week), the daily exposure  may be averaged over the week, where appropriate.

Doses in studies at the cellular or molecular level can be difficult to relate to organ- or organism-level dose metrics.  Toxicokinetic modeling can sometimes be used to relate doses at the cellular or molecular level to doses or exposures at higher levels of organization.

### 3.1.2.  Toxicokinetic Data and Modeling

In the absence of chemical-specific data, physiologically based toxicokinetic modeling is potentially the most comprehensive way to account for biological processes that determine internal dose.  Physiologically based models commonly describe blood flow between physiological compartments and simulate the relationship between applied dose and internal dose.  Toxicokinetic models generally need data on absorption, distribution, metabolism, and elimination of the administered agent and its metabolites.

Additionally, in the case of inhalation exposures, models can explicitly characterize the geometry of the respiratory tract and the airflow through it, as well as the interaction of this airflow with the entrained particles or fibers and gases (Kimbell et al., 2001; Subramaniam et al., 2003).  Because of large interspecies differences in airway morphometry such models can be particularly useful in interspecies extrapolations. When employed, however, the potential for large inter-individual differences in airway morphometry, are considered to ensure that the models provide information representative of human populations.

Toxicokinetic models can improve dose-response assessment by revealing and describing nonlinear relationships between applied and internal dose.  Nonlinearity observed in a dose-response curve often can be attributed to toxicokinetics (Hoel et al., 1983; Gaylor et al., 1994), involving, for example, saturation or induction of enzymatic processes at high doses.  In some cases, toxicokinetic processes tend to become linear at sufficiently low doses (Hattis, 1990).

A discussion of confidence should accompany the presentation of model results and include consideration of model validation and sensitivity analysis, stressing the predictive performance of the model and whether the model is sufficient to support decision-making. Quantitative uncertainty analysis is important for evaluating the performance of a model, whether the model is based primarily on default assumptions or chemical-specific data. The uncertainty analysis covers questions of *model uncertainty* (e.g., Is the model based on the appropriate biology and how does that affect estimates of dose metrics?) and *parameter uncertainty* (e.g., Do the data support unbiased and stable estimates of the model parameters?). When a delivered dose measure is used in animal-to-human extrapolation, the assessment discusses the confidence of the target tissue and its toxicodynamics being the same in both species (see Section 3.6). Toxicokinetic modeling results may be presented alone as the preferred method of estimating human equivalent exposures or doses, or these results may be presented in parallel with default procedures (see Section 3.1.3), depending on the confidence in the modeling.

### 3.1.3.  Cross-species Scaling Procedures

Standard cross-species scaling procedures are available when the data are not sufficient to support a toxicokinetic model or when the purpose of the assessment does not warrant developing one. The aim is to define exposure levels for humans and animals that are expected to produce the same degree of effect (U.S. EPA, 1992b), taking into account differences in scale between test animals and humans, such as size and lifespan.

#### *3.1.3.1.  Oral Exposures*

For oral exposures, administered doses should be scaled from animals to humans on the basis of equivalence of $mg/kg^{3/4}$-d (milligrams of the agent normalized by the 3/4 power of body weight per day) (U.S. EPA, 1992b). The 3/4 power is consistent with current science, including empirical data that allow comparison of potencies in humans and animals, and it is also supported by analysis of the allometric variation of key physiological parameters across mammalian species. It is generally more appropriate at low doses, where sources of nonlinearity such as saturation of enzyme activity are less likely to occur. This scaling is intended as an

unbiased estimate rather than a conservative one.  Equating exposure concentrations in food or water is an alternative version of the same approach, because daily intakes of food or water are approximately proportional to the 3/4 power of body weight.

The aim of these cross-species scaling procedures is to estimate administered doses in animals and humans that result in equal lifetime risks.  It is useful to recognize two components of this equivalence:  *toxicokinetic equivalence*, which determines administered doses in animals and humans that yield equal tissue doses, and *toxicodynamic equivalence*, which determines tissue doses in animals and humans that yield equal lifetime risks (U.S. EPA, 1992b). Toxicokinetic modeling (see Section 3.1.2) addresses factors associated with toxicokinetic equivalence, and toxicodynamic modeling (see Section 3.2.2) addresses factors associated with toxicodynamic equivalence. When toxicokinetic modeling is used without toxicodynamic modeling, the dose-response assessment develops and supports an approach for addressing toxicodynamic equivalence, perhaps by retaining some of the cross-species scaling factor (e.g., using the square root of the cross-species scaling factor or using a factor of 3 to cover toxicodynamic differences between animals and humans, as is currently done in deriving inhalation reference concentrations [U.S. EPA, 1994]).

When assessing risks from childhood exposure, the $mg/kg^{3/4}$-d scaling factor does not use the child's body weight (U.S. EPA, 1992b).  This reflects several uncertainties in extrapolating risks to children:

- The data supporting the $mg/kg^{3/4}$-d scaling factor were derived for differences across species and may not apply as well to differently sized individuals of the same species or to different lifestages.

- In addition to metabolic differences, there are also important toxicodynamic differences; for example, children have faster rates of cell division than do adults, so scaling across different lifestages and species simultaneously may be particularly uncertain.

### 3.1.3.2.  *Inhalation Exposures*

For inhalation exposures experimental exposure concentrations are replaced with human equivalent concentrations calculated using EPA's methods for deriving inhalation reference concentrations (U.S. EPA, 1994), which give preference to the use of toxicokinetic modeling. When toxicokinetic models are unavailable, default dosimetry models are employed to extrapolate from experimental exposure concentrations to human equivalent concentrations. When toxicokinetic modeling or dosimetry modeling is used without toxicodynamic modeling, the dose-response assessment develops and supports an approach for addressing toxicodynamic equivalence.

The default dosimetry models typically involve the use of species-specific physiologic and anatomic factors relevant to the form of the agent (e.g., particle or gas) and categorized with regard to whether the response occurs either locally (i.e., within the respiratory tract) or remotely. For example, current default models (U.S. EPA, 1994) use parameters such as:

- inhalation rate and surface area of the affected part of the respiratory tract for gases eliciting the response locally,

- blood:gas partition coefficients for remote acting gases,

- fractional deposition with inhalation rate and surface area of the affected part of the respiratory tract for particles eliciting the response locally, and

- fractional deposition with inhalation rate and body weight for particles eliciting the response remotely.

The current default values for some parameters used in the default models (e.g., breathing rate and respiratory tract surface area) are based on data from adults (U.S. EPA, 1994).  The human respiratory system passes through several distinct stages of maturation and growth during the first several years of life and into adolescence (Pinkerton and Joad, 2000), during which

characteristics important to disposition of inhaled toxicants may vary.  Children and adults breathing the same concentration of an agent may receive different doses to the body or lungs (U.S. EPA, 2002b).  Consequently, it may be appropriate to evaluate the default models by considering physiologic and anatomic factors representative of early lifestages, for example through the substitution of child-specific parameters (U.S. EPA, 2002b).  Such evaluation uses the default model and dosimetric adjustment in use at the time of the assessment coupled with the best understanding of child-specific parameters at that time (e.g., drawn from the scientific literature).  This analysis is undertaken with caution: (1) because of the correlations between activity level, breathing rate, respiratory tract dimensions, and body weight and (2) to avoid the possibility of mismatching the type of agent (gas or particle) and its site of response (within the respiratory tract or remote from the respiratory tract) with the relevant dosimetry factors in use at the time of the assessment.  Analyses of children's inhalation dosimetry are also considered when using model structures beyond the default models (e.g., physiologically based toxicokinetic models).

When using dosimetry modeling, the comparison of human-equivalent concentrations for different lifestages (e.g., for an adult and a child) can indicate whether it is important to carry both concentrations forward in the dose-response assessment or whether a verbal characterization of any findings will suffice.

### 3.1.4.  Route Extrapolation

In certain situations, an assessment based on studies of one exposure route may be applied to another exposure route.  Route-to-route extrapolation has both qualitative and quantitative aspects.  For the qualitative aspect, the assessor should weigh the degree to which positive results by one exposure route support a judgment that similar results would be expected by another route.  In general, confidence in making such a judgment is strengthened when tumors are observed at a site distant from the portal of entry and when absorption is similar through both routes.  In the absence of contrary data, a qualitative default option can be used:  if the agent is absorbed through an exposure route to give an internal dose, it may be carcinogenic by that route.

When a qualitative extrapolation can be supported, quantitative extrapolation may still be problematic due to the absence of adequate data.  The differences in biological processes among routes of exposure (oral, inhalation, dermal) can be great because of, for example, first-pass effects and different results from different exposure patterns.  There is no generally applicable method for accounting for these differences in uptake processes in a quantitative route-to-route extrapolation of dose-response data in the absence of good data on the agent of interest.  Therefore, route-to-route extrapolation of dose data relies on a case-by-case analysis of available data.  When good data on the agent itself are limited, an extrapolation analysis can be based on expectations from physical and chemical properties of the agent, properties and route-specific data on structurally analogous compounds, or *in vitro* or *in vivo* uptake data on the agent.

Route-to-route uptake models may be applied if model parameters are suitable for the compound of interest.  Such models are currently considered interim methods; further model development and validation is awaiting the development of more extensive data.  For screening or hazard ranking, route-to-route extrapolation may be based on assumed quantitative comparability as a default, as long as it is reasonable to assume absorption by compared routes.  When route-to-route extrapolation is used, the assessor's degree of confidence in both the qualitative and quantitative extrapolation is discussed in the assessment and highlighted in the dose-response characterization.

Toxicokinetic modeling can be used to compare results of studies by different exposure routes.  Results can also be compared on the basis of internal dose for effects distant from the point of contact.

Route extrapolation can be used to understand how internal dose and subsequent effects depend on exposure route.  If testing by different exposure routes is available, the observation of similar or dissimilar internal doses can be important in determining whether and what conclusions can be made concerning the dose-response function(s) for different routes of exposure.

## 3.2.  ANALYSIS IN THE RANGE OF OBSERVATION

The principle underlying these cancer guidelines is to use approaches that include as much information as possible.  Quantitative information about key precursor events can be used to develop a toxicodynamic model.  Alternatively, such information can be fitted by empirical models to extend the dose-response analysis of tumor incidence to lower doses and response levels.  The analysis in the range of observation is used to establish a POD near the lower end of the observed range (see Section 3.3).

### 3.2.1.  Epidemiologic Studies

Ideally, epidemiologic data would be used to select the dose-response function for human exposures.  Because epidemiologic data are usually limited and many models may fit the data (Samet et al.,1998), other factors may influence model choice.  For epidemiologic studies, including those with grouped data, analysis by linear models in the range of observation is generally appropriate unless the fit is poor.  The relatively small exposure range observed in many epidemiologic studies, for example, makes it difficult to discern the shape of the exposure- or dose-response curve.  Exposure misclassification and errors in exposure estimation also obscure the shape of the dose-response curve.  When these errors are unsystematic or random, the result is frequently to bias the risk estimates toward zero.  When a linear model fits poorly, more flexible models that allow for low-dose linearity, for example, a linear-quadratic model or a Hill model (Murrell et al., 1998), are often considered next.

Analysis of epidemiologic studies depends on the type of study and quality of the data, particularly the availability of quantitative measures of exposure.  The objective is to develop a dose-response curve that estimates the incidence of cancer attributable to the dose (as estimated from the exposure) to the agent.  In some cases, e.g., tobacco smoke or occupational exposures, the data are in the range of the exposures of interest.  In other cases, as with data from animal experiments, information from the observable range is extrapolated to exposures of interest.

Analysis of effects raises additional issues:

- Many studies collect information from death certificates, which leads to estimates of mortality rather than incidence.  Because survival rates vary for different cancers, the analysis may be improved by adjusting mortality figures to reflect the relationship between incidence and mortality.

- Epidemiologic studies, by their nature, are limited in the extent to which they can control for effects due to exposures from other agents.  In some cases, the agent can have discernible interactive effects with another agent, making it possible to estimate the contribution of each agent as a risk factor for the effects of the other.  For example, competing risks in a study population can limit the observed occurrence of cancer, while additive effects may lead to an increase occurrence of cancer.  In the case of rates not already so adjusted, the analysis can be improved by correcting for competing or additive risks that are not similar in exposed and comparison groups.

- Comparison groups that are not free from exposure to the agent can bias the risk estimates toward zero.  The analysis can be improved by considering background exposures in the exposed and comparison groups.

- The latent period for most cancers implies that exposures immediately preceding the detection of a tumor would be less likely to have contributed to its development and, therefore, may count less in the analysis.  Study subjects who were first exposed near the end of the study may not have had adequate time since exposure for cancer to develop; therefore, analysis of their data may be similar to analysis of data for those who were not exposed.  However, for carcinogens that act on multiple stages of the carcinogenic process, especially the later stages, all periods of exposure. including recent exposures, may be important.

Some study designs can yield only a partial characterization of the overall hazard and therefore risk as, for example, in studies that: (1) investigate only one effect (typical of many

case-control studies), (2) include only one population segment (e.g., male workers or workers of one socioeconomic class), or (3) include only one lifestage (e.g., childhood leukemia following maternal exposure to contaminated drinking water).  To obtain a more complete characterization that includes risks of other cancers, estimates from these studies can be supplemented with estimates from other studies that investigated other cancers, population segments, or lifestages (see Section 3.5).

When several studies are available for dose-response analysis, *meta-analysis* can provide a systematic approach to weighing positive studies and those studies that do not show positive results, and calculating an overall risk estimate with greater precision.  Issues considered include the comparability of studies, heterogeneity across studies, and the potential for a single large study to dominate the analysis.  Confidence in a meta-analysis is increased when it considers study quality, including definition of the study population and comparison group, measurement of exposure, potential for exposure misclassification, adequacy of follow-up period, and analysis of confounders (see Section 2.2.1.3).

### 3.2.2.  Toxicodynamic ("Biologically Based") Modeling

Toxicodynamic modeling can be used when there are sufficient data to ascertain the mode of action (see Section 2.4) and quantitatively support model parameters that represent rates and other quantities associated with the key precursor events of the mode of action.  Toxicodynamic modeling is potentially the most comprehensive way to account for the biological processes involved in a response.  Such models seek to reflect the sequence of key precursor events that lead to cancer.  Toxicodynamic models can contribute to dose-response assessment by revealing and describing nonlinear relationships between internal dose and cancer response.  Such models may provide a useful approach for analysis in the range of observation, provided the purpose of the assessment justifies the effort involved.

*If a new model is developed for a specific agent*, extensive data on the agent are important for identifying the form of the model, estimating its parameters, and building confidence in its results.  Conformance to the observed tumor incidence data alone does not establish a model's validity, as a model can be designed with a sufficiently large number of parameters so as to fit

3-13

any given dataset. Peer review, including both an examination of the scientific basis supporting the model and an independent evaluation of the model's performance, is an essential part of evaluating the new model.

*If a standard model already exists for the agent's mode of action*, the model can be adapted for the agent by using agent-specific data to estimate the model's parameters. An example is the two-stage clonal expansion model developed by Moolgavkar and Knudson (1981) and Chen and Farland (1991). These models continue to be improved as more information becomes available.

It is possible for different models to provide equivalent fits to the observed data but to diverge substantially in their projections at lower doses. When model parameters are estimated from tumor incidence data, it is often the case that different combinations of parameter estimates can yield similar results in the observed range. For this reason, critical parameters (e.g., mutation rates and cell birth and death rates) are estimated from laboratory studies and not by curve-fitting to tumor incidence data (Portier, 1987). This approach reduces model uncertainty (see Section 3.6) and ensures that the model does not give answers that are biologically unrealistic. This approach also provides a robustness of results, where the results are not likely to change substantially if fitted to slightly different data.

Toxicodynamic modeling can provide insight into the relationship between tumors and key precursor events. For example, a model that includes cell proliferation can be used to explore the extent to which small increases in the cell proliferation rate can lead to large lifetime tumor incidences (Gaylor and Zheng, 1996). In this way, toxicodynamic modeling can be used to select and characterize an appropriate precursor response level (see Section 3.2.2, 3.2.5).

### 3.2.3. Empirical Modeling ("Curve Fitting")

When a toxicodynamic model is not available or when the purpose of the assessment does not warrant developing such a model, empirical modeling (sometimes called "curve fitting") should be used in the range of observation. A model can be fitted to data on either tumor incidence or a key precursor event. Goodness-of-fit to the experimental observations is not by itself an effective means of discriminating among models that adequately fit the data (OSTP,

1985).  Many different curve-fitting models have been developed, and those that fit the observed data reasonably well may lead to several-fold differences in estimated risk at the lower end of the observed range.  Another problem occurs when a multitude of alternatives are presented without sufficient context to make a reasoned judgment about the alternatives.  This form of model uncertainty reflects primarily the availability of different computer models and not biological information about the agent being assessed or about carcinogenesis in general.  In cases where curve-fitting models are used because the data are not adequate to support a toxicodynamic model, there generally would be no biological basis to choose among alternative curve-fitting models.  However, in situations where there are alternative models with significant biological support, the decisionmaker can be informed by the presentation of these alternatives along with their strengths and uncertainties.

Quantitative data on precursors can be used in conjunction with, or in lieu of, data on tumor incidence to extend the dose-response curve to lower doses.  Caution is used with rates of molecular events such as mutation or cell proliferation or signal transduction.  Such rates can be difficult to relate to cell or tissue changes overall.  The timing of observations of these phenomena, as well as the cell type involved, is linked to other precursor events to ensure that the measurement is truly a key event (Section 2.4).

*For incidence data* on either tumors or a precursor, an established empirical procedure is used to provide objectivity and consistency among assessments.  The procedure models incidence, corrected for background, as an increasing function of dose.  The models are sufficiently flexible in the observed range to fit linear and nonlinear datasets.  Additional judgments and perhaps alternative analyses are used when the procedure fails to yield reliable results.  For example, when a model's fit is poor, the highest dose is often omitted in cases where it is judged that the highest dose reflects competing toxicity that is more relevant at high doses than at lower doses.  Another example is when there are large differences in survival across dose groups; here, models that includes time-to-tumor or time-to-event information may be useful.

*For continuous data* on key precursor effects, empirical models can be chosen on the basis of the structure of the data.  The rationale for the choice of model, the alternatives

3-15

considered and rejected, and a discussion of model uncertainty are included in the dose-response characterization.

### 3.2.4. Point of Departure (POD)

For each tumor response, a POD from the observed data should be estimated to mark the beginning of extrapolation to lower doses. The POD is an estimated dose (expressed in human-equivalent terms) near the lower end of the observed range without significant extrapolation to lower doses.

The POD is used as the starting point for subsequent extrapolations and analyses. For linear extrapolation, the POD is used to calculate a *slope factor* (see Section 3.3.3), and for nonlinear extrapolation the POD is used in the calculation of a *reference dose* or *reference concentration* (see Section 3.3.4). In a risk characterization, the POD is part of the determination of a *margin of exposure* (see Section 5.4). With appropriate adjustments, it can also be used as the basis for *hazard rankings* that compare different agents or health effects.

The lowest POD is used that is adequately supported by the data. If the POD is above some data points, it can fail to reflect the shape of the dose-response curve at the lowest doses and can introduce bias into subsequent extrapolations (see Figure 3-1). On the other hand, if the POD is far below all observed data points, it can introduce model uncertainty and parameter uncertainty (see Section 3.6) that increase with the distance between the data and the POD. Use of a POD at the lowest level supported by the data seeks to balance these considerations. It uses information from the model(s) a small distance below the observed range rather than discarding this information and using extrapolation procedures in a range where the model(s) can provide some useful information. Statistical tests involving the ratio of the central estimate and its lower bound (i.e., $ED_{xx}/LED_{xx}$) can be useful for evaluating how well the data support a model's estimates at a particular response level. (Note that the ability to model at a particular response level is not the same as the study's ability to identify an increase at that response level as statistically significant.)

The POD for extrapolating the relationship to environmental exposure levels of interest, when the latter are outside the range of observed data, is generally the lower 95% confidence

limit on the lowest dose level that can be supported for modeling by the data.  SAB (1997) suggested that, "it may be appropriate to emphasize lower statistical bounds in screening analyses and in activities designed to develop an appropriate human exposure value, since such activities require accounting for various types of uncertainties and a lower bound on the central estimate is a scientifically-based approach accounting for the uncertainty in the true value of the $ED_{10}$ [or central estimate]."  However, the consensus of the SAB (1997) was that, "both point estimates and statistical bounds can be useful in different circumstances, and recommended that the Agency routinely calculate and present the point estimate of the $ED_{10}$ [or central estimate] and the corresponding upper and lower 95% statistical bounds."  For example, it may be appropriate to emphasize the central estimate in activities that involve formal uncertainty analysis that are required by OMB Circular A-4 (OMB, 2003) as well as ranking agents as to their carcinogenic hazard.  Thus,  risk assessors should calculate, to the extent practicable, and present the central estimate and the corresponding upper and lower statistical bounds (such as confidence limits) to inform decisionmakers.

*When tumor data are used*, a POD is obtained from the modeled tumor incidences. Conventional cancer bioassays, with approximately 50 animals per group, generally can support modeling down to an increased incidence of 1–10%; epidemiologic studies, with larger sample sizes, below 1%.  Various models commonly used for carcinogens yield similar estimates of the POD at response levels as low as 1% (Krewski and Van Ryzin, 1981; Gaylor et al., 1994). Consequently, response levels at or below 10% can often be used as the POD.  As a modeling convention, the lower bound on the doses associated with standard response levels of 1, 5, and 10% can be analyzed, presented, and considered.  For making comparisons at doses within the observed range, the $ED_{10}$ and $LED_{10}$ are also reported and can be used, with appropriate adjustments, in hazard rankings that compare different agents or health effects (U.S. EPA, 2002c).  A *no-observed-adverse-effect level* (NOAEL) generally is not used for assessing the potential for carcinogenic response when one or more models can be fitted to the data.

*When good quality precursor data are available and are clearly tied to the mode of action of the compound of interest*, models that include both tumors and their precursors may be advantageous for deriving a POD.  Such models can provide insight into quantitative

relationships between tumors and precursors (see Section 3.2.2), possibly suggesting the precursor response level that is associated with a particular tumor response level. The goal is to use precursor data to extend the observed range below what can be observed in tumor studies. EPA is continuing to examine this issue and anticipates that findings and conclusions may result in supplemental guidance to these cancer guidelines. If the precursor data are drawn from small samples or if the quantitative relationship between tumors and precursors is not well defined, then the tumor data will provide a more reliable POD. Precursor effects may or may not be biologically adverse in themselves; the intent is to consider not only tumors but also damage that can lead to subsequent tumor development by the agent. Analysis of continuous data may differ from discrete data; Murrell et al. (1998) discuss alternative approaches to deriving a POD from continuous data.

### 3.2.5. Characterizing the POD: The POD Narrative

As a single-point summary of a single dose-response curve, the POD alone does not convey all the critical information present in the data from which it is derived. To convey a measure of uncertainty, the POD should be presented as a central estimate with upper and lower bounds. A POD narrative summarizes other important features of the database and the POD that are important to account for in low-dose extrapolations or other analyses.

*(a) Nature of the response.* Is the POD based on tumors or a precursor? If on tumors, does the POD measure incidence or mortality? Is it a lifetime measure or was the study terminated early? The relationships between precursors and tumors, incidence and mortality, and lifetime and early-termination results vary from case to case. Modeling can provide quantitative insight into these relationships, for example, linking a change in a precursor response to a tumor incidence (see Section 3.2.2). This can aid in evaluating the significance of the response at the POD and adjusting different PODs to make them comparable.

*(b) Level of the response.* What level of response is associated with the POD, for example, 1% cancer risk, 10% cancer risk, or 10% change in a precursor measure?

*(c) Nature of the study population.*  Is the POD based on humans or animals?  How large is the effective sample size?  Is the study group representative of the general population, of healthy adult workers, or of a susceptible group?  Are both sexes represented?  Did exposure occur during a susceptible lifestage?

*(d) Slope of the dose-response curve at the POD.*  How does response change as dose is reduced below the POD?  A steep slope indicates that risk decreases rapidly as dose decreases.  On the other hand, a steep slope also indicates that errors in an exposure assessment can lead to large errors in estimating risk.  Both aspects of the slope are important.  The slope also indicates whether dose-response curves for different effects are likely to cross below the POD.  For example, in the $ED_{01}$ study where 2-acetylaminofluorene caused bladder carcinomas and liver carcinomas in mice (Littlefield et al., 1980), the dose-response curves for these tumors cross between 10% and 1% response (see Figure 3-2).  This crossing, which can be inferred from the slopes of the curves at a 10% response, shows how considering the slope can lead to better inferences about the predominant effects expected at lower doses.  Mode of action data can also be useful; quantitative information about key precursor events can be used to describe how risk decreases as dose decreases below the POD.

*(e) Relationship of the POD with other cancers.*  How does the POD for this cancer relate to PODs for other cancers observed in the database?  For example, a POD based on male workers would not reflect the implications of mammary tumors in female rats or mice.

*(f) Extent of the overall cancer database.*  Have potential cancer responses been adequately studied (e.g., were all tissues examined), or is the database limited to particular effects, population segments, or lifestages?  Do the mode of action data suggest a potential for cancers not observed in the database (e.g., disruption of particular endocrine pathways leading to related cancers)?

### 3.2.6.  Relative Potency Factors

*Relative potency factors* (of which toxicity equivalence factors are a special case) can be used for a well-defined class of agents that operate through a common mode of action for the same toxic endpoint.  A complete dose-response assessment is conducted for one well-studied member of the class that serves as the *index chemical* for the class.  The other members of the class are tied to the index chemical by relative potency factors that are based on characteristics such as relative toxicological outcomes, relative metabolic rates, relative absorption rates, quantitative SARs, or receptor binding characteristics (U.S. EPA, 2000c).  Examples of this approach are the *toxicity equivalence factors* for dioxin-like compounds and the relative potency factors for some carcinogenic polycyclic aromatic hydrocarbons.  Whenever practicable, toxicity equivalence factors should be validated and accompanied by quantitative uncertainty analysis.

### 3.3.  EXTRAPOLATION TO LOWER DOSES

The purpose of low-dose extrapolation is to provide as much information as possible about risk in the range of doses below the observed data.  The most versatile forms of low-dose extrapolation are dose-response models that characterize risk as a probability over a range of environmental exposure levels.  These risk probabilities allow estimates of the risk reduction under different decision options and estimates of the risk remaining after an action is taken and provide the risk information needed for benefit-cost analyses of different decision options.

When a dose-response model is not developed for lower doses, another form of low-dose extrapolation is a safety assessment that characterizes the safety of one lower dose, with no explicit characterization of risks above or below that dose.  Although this type of extrapolation may be adequate for evaluation of some decision options, it may not be adequate for other purposes (e.g., benefit-cost analyses) that require a quantitative characterization of risks across a range of doses.  At this time, safety assessment is the default approach for tumors that arise through a nonlinear mode of action; however, EPA continues to explore methods for quantifying dose-response relationships over a range of environmental exposure levels for tumors that arise through a nonlinear mode of action (U.S. EPA, 2002c).  EPA program offices that need this more

3-20

explicit dose-response information may develop and apply methods that are informed by the methods described in these cancer guidelines.

### 3.3.1.  Choosing an Extrapolation Approach

The approach for extrapolation below the observed data considers the understanding of the agent's mode of action at each tumor site (see Section 2.4).  Mode of action information can suggest the likely shape of the dose-response curve at lower doses.  The extent of inter-individual variation is also considered, with greater variation spreading the response over a wider range of doses.

*Linear extrapolation* should be used when there are MOA data to indicate that the dose-response curve is expected to have a linear component below the POD.  Agents that are generally considered to be linear in this region include:

- agents that are DNA-reactive and have direct mutagenic activity, or

- agents for which human exposures or body burdens are high and near doses associated with key precursor events in the carcinogenic process, so that background exposures to this and other agents operating through a common mode of action are in the increasing, approximately linear, portion of the dose-response curve.

When the weight of evidence evaluation of all available data are insufficient to establish the mode of action for a tumor site and when scientifically plausible based on the available data, linear extrapolation is used as a default approach, because linear extrapolation generally is considered to be a health-protective approach.  Nonlinear approaches generally should not be used in cases where the mode of action has not been ascertained.  Where alternative approaches with significant biological support are available for the same tumor response and no scientific consensus favors a single approach, an assessment may present results based on more than one approach.

A *nonlinear approach* should be selected when there are sufficient data to ascertain the mode of action and conclude that it is not linear at low doses <u>and</u> the agent does not demonstrate mutagenic or other activity consistent with linearity at low doses. Special attention is important when the data support a nonlinear mode of action but there is also a suggestion of mutagenicity. Depending on the strength of the suggestion of mutagenicity, the assessment may justify a conclusion that mutagenicity is not operative at low doses and focus on a nonlinear approach, or alternatively, the assessment may use both linear and nonlinear approaches.

*Both linear and nonlinear approaches* may be used when there are multiple modes of action. If there are multiple tumor sites, one with a linear and another with a nonlinear mode of action, then the corresponding approach is used at each site. If there are multiple modes of action at a single tumor site, one linear and another nonlinear, then both approaches are used to decouple and consider the respective contributions of each mode of action in different dose ranges. For example, an agent can act predominantly through cytotoxicity at high doses and through mutagenicity at lower doses where cytotoxicity does not occur. Modeling to a low response level can be useful for estimating the response at doses where the high-dose mode of action would be less important.

### 3.3.2.  Extrapolation Using a Toxicodynamic Model

The preferred approach is to develop a toxicodynamic model of the agent's mode of action and use that model for extrapolation to lower doses (see Section 3.2.2). The extent of extrapolation is governed by an analysis of *model uncertainty*, where alternative models that fit similarly in the observed range can diverge below that range (see Section 3.6). Substantial divergence is likely when model parameters are estimated from tumor incidence data, so that different combinations of parameter estimates yield similar fits in the observed range but have different implications at lower doses. An analysis of model uncertainty can be used to determine the range where extrapolation using the toxicodynamic model is supported and where further extrapolation would be based on either a linear or a nonlinear default, as appropriate (see Sections 3.3.3, 3.3.4).

### 3.3.3.  Extrapolation Using a Low-dose, Linear Model

Linear extrapolation should be used in two distinct circumstances: (1) when there are data to indicate that the dose-response curve has a linear component below the POD, or (2) as a default for a tumor site where the mode of action is not established (see Section 3.3.1).  For linear extrapolation, a line should be drawn from the POD to the origin, corrected for background.  This implies a proportional (linear) relationship between risk and dose at low doses.  (Note that the dose-response curve generally is not linear at higher doses.)

The slope of this line, known as the *slope factor*, is an upper-bound estimate of risk per increment of dose that can be used to estimate risk probabilities for different exposure levels.  The slope factor is equal to $0.01/LED_{01}$ if the $LED_{01}$ is used as the POD.

*Unit risk* estimates express the slope in terms of $\mu g/L$ drinking water or $\mu g/m^3$ or ppm air.  In general, the drinking water unit risk is derived by converting a slope factor from units of mg/kg-d to units of $\mu g/L$, whereas an inhalation unit risk is developed directly from a dose-response analysis using equivalent human concentrations already expressed in units of $\mu g/m^3$.  Unit risk estimates often assume a standard intake rate (L/day drinking water or $m^3$/day air) and body weight (kg), which may need to be reconciled with the exposure factors for the population of interest in an exposure assessment (see Section 4.4).  Alternatively, when the slope factor for inhalation is in units of ppm, it may sometimes be termed the inhalation unit risk.  Although unit risks have not been calculated in the past for dermal exposures, both exposures that are absorbed into the systemic circulation and those that remain in contact with the skin are also important.

*Risk-specific doses* are derived from the slope factor or unit risk to estimate the dose associated with a specific risk level, for example, a one-in-a-million increased lifetime risk.

### 3.3.4.  Nonlinear Extrapolation to Lower Doses

A nonlinear extrapolation method can be used for cases with sufficient data to ascertain the mode of action and to conclude that it is not linear at low doses but with not enough data to support a toxicodynamic model that may be either nonlinear or linear at low doses.  Nonlinear extrapolation having a significant biological support may be presented in addition to a linear approach when the available data and a weight of evidence evaluation support a nonlinear

approach, but the data are not strong enough to ascertain the mode of action applying the Agency's mode of action framework.  If the mode of action and other information can support chemical-specific modeling at low doses, it is preferable to default procedures.

For cases where the tumors arise through a nonlinear mode of action, an oral *reference dose* or an inhalation *reference concentration*, or both, should be developed in accordance with EPA's established practice for developing such values, taking into consideration the factors summarized in the characterization of the POD (see Section 3.2.5).  This approach expands the past focus of such reference values (previously reserved for effects other than cancer) to include carcinogenic effects determined to have a nonlinear mode of action.  As with other health effects of concern, it is important to put cancer in perspective with the overall health impact of an exposure by comparing reference value calculations for cancer with those for other health effects.

For effects other than cancer, reference values have been described as being based on the assumption of biological thresholds.  The Agency's more current guidelines for these effects (U.S. EPA, 1996a, 1998b), however, do not use this assumption, citing the difficulty of empirically distinguishing a true threshold from a dose-response curve that is nonlinear at low doses.

Economic and policy analysts need to know how the probability of cancer varies at exposures above the reference value and whether, and to what extent, there are health benefits from reducing exposures below the reference value.  The risk assessment community is working to develop better methods to provide more useful information to economic and policy analysts.

### 3.3.5.  Comparing and Combining Multiple Extrapolations

*When multiple estimates can be developed*, all datasets should be considered and a judgment made about how best to represent the human cancer risk.  Some options for presenting results include:

- adding risk estimates derived from different tumor sites (NRC, 1994),

- combining data from different datasets in a joint analysis (Putzrath and Ginevan, 1991; Stiteler et al., 1993; Vater et al., 1993),

- combining responses that operate through a common mode of action,

- representing the overall response in each experiment by counting animals with any tumor showing a statistically significant increase,

- presenting a range of results from multiple datasets (in this case, the dose-response assessment includes guidance on how to choose an appropriate value from the range),

- choosing a single dataset if it can be justified as most representative of the overall response in humans, or

- a combination of these options.

*Cross-comparison of estimates from human and animal studies* can provide a valuable risk perspective.

- Calculating an animal-derived slope factor and using it to estimate the risk expected in a human study can provide information with which to evaluate the human study design, for example, adequacy of exposure level and sample size.

- Calculating an upper-bound slope factor from a human study that does not show positive results but that has good exposure information, and comparing it to an animal-derived slope factor can indicate whether the animal and humans studies are consistent.

### 3.4.  EXTRAPOLATION TO DIFFERENT HUMAN EXPOSURE SCENARIOS

As described in the previous cancer guidelines, special problems arise when the human exposure situation of concern suggests exposure regimens, e.g., route and dosing schedule, that are substantially different from those used in the relevant animal studies.  Unless there is evidence to the contrary in a particular case, the cumulative dose received over a lifetime, expressed as average daily exposure prorated over a lifetime, is recommended as an appropriate measure of exposure to a carcinogen.  That is, the assumption is made that a high dose of a carcinogen received over a short period of time is equivalent to a corresponding low dose spread over a lifetime.  This approach becomes more problematical as the exposures in question become more intense but less frequent, especially when there is evidence that the agent has shown dose-rate effects (U.S. EPA 1986a).

Accordingly, *for lifetime human exposure scenarios* that involve intermittent or varying levels of exposure, the prevailing practice has been to assess exposure by calculating a *lifetime average daily exposure or dose* (U.S. EPA, 1992a).

*For less-than-lifetime human exposure scenarios*, too, the lifetime average daily exposure or dose has often been used.  The use of these lifetime average exposure metrics was adopted with low-dose linear cancer assessments in mind.  The lifetime averaging implies that less-than-lifetime exposure is associated with a linearly proportional reduction of the lifetime risk, regardless of when exposures occur.  Such averaging may be problematic in some situations.  This can be illustrated using both the multistage model and the two-stage clonal expansion model that predict that short-duration risks are not necessarily proportional to exposure duration and can depend on the nature of the carcinogen and the timing of exposure (Goddard et al., 1995; Murdoch et al., 1992).  These examples indicate some circumstances in which use of a lifetime average daily dose (LADD) would underestimate cancer risk by two- to fivefold, and others in which it might overestimate risk (Murdoch et al., 1992).  Thus, averaging over the duration of a lifestage or a critical window of exposure may be appropriate.  As methodological research focuses on new approaches for estimating risks from less-than-lifetime exposures, methods and defaults can be expected to change.

This highlights the importance for each dose-response assessment to critically evaluate all information pertaining to less-than-lifetime exposure.  For example, detailed stop-exposure studies can provide information about the relationship between exposure duration, precursor effects, potential for reversibility, and tumor development.  Toxicokinetic modeling can investigate differences in internal dose between short-term and long-term exposure or between intermittent and constant exposure.  Persistence in the body can be useful in explaining long-term effects resulting from shorter-term exposures.

*For nonlinear cancer analyses*, it may be appropriate to assess exposure by calculating a *daily dose* that is averaged over the exposure duration for the study (see Section 3.1.1).  For example, when the analysis is based on precursor effects that result from less than a lifetime exposure, that exposure period may be used.  This reflects an expectation that the precursor effects on which the analysis is based can result from less-than-lifetime exposure, bringing consistency to the methods used for dose-response assessment and exposure assessment in such cases.  The dose-response assessment can provide a recommendation to exposure assessors about the averaging time that is appropriate to the mode of action and to the exposure duration of the scenario.

## 3.5.  EXTRAPOLATION TO SUSCEPTIBLE POPULATIONS AND LIFESTAGES

The dose-response assessment strives to derive separate estimates for susceptible populations and lifestages so that these risks can be explicitly characterized.  For a susceptible population, higher risks can be expected from exposures anytime during life, but this applies to only a portion of the general population (e.g., those bearing a particular genetic susceptibility).  In contrast, for a susceptible lifestage, higher risks can be expected from exposures during only a portion of a lifetime, but everyone in the population may pass through those lifestages.  Effects of exposures during a susceptible period are not equivalent to effects of exposures at other times; consequently, it is useful to estimate the risk attributable to exposures during each period.

Depending on the data available, a tiered approach should be used to address susceptible populations and lifestages.

- When there is an epidemiologic study or an animal bioassay that reports quantitative results for susceptible individuals, the data should be analyzed to provide a separate risk estimate for those who are susceptible.  If susceptibility pertains to a lifestage, it is useful to characterize the portion of the lifetime risk that can be attributed to the susceptible lifestage.

- When there are data on some risk-related parameters that allow comparison of the general population and susceptible individuals, the data should be analyzed with an eye toward adjusting the general population estimate for susceptible individuals. This analysis can range from toxicokinetic modeling that uses parameter values representative of susceptible individuals to more simply adjusting a general population estimate to reflect differences in important rate-governing parameters. Care is taken to not make parameter adjustments in isolation, as the appropriate adjustment can depend on the interactions of several parameters; for example, the ratio of metabolic activation and clearance rates can be more appropriate than the activation rate alone (U.S. EPA, 1992b).

- In the absence of such agent-specific data, there is some general information to indicate that childhood can be a susceptible lifestage for exposure to some carcinogens (U.S. EPA, 2005); this warrants explicit consideration in each assessment.  The potential for susceptibility from early-life exposure is expected to vary among specific agents and chemical classes.  In addition, the concern that the dose-averaging generally used for assessing less-than-lifetime exposure is more likely to understate than overstate risk (see Section 3.4) contributes to the suggestion that alternative approaches be considered for assessing risks from less-than-lifetime exposure that occurs during childhood.  Accompanying these cancer guidelines is the Supplemental Guidance that the Agency will use to assess risks from early-life exposure to potential carcinogens (U.S. EPA, 2005).  The Supplemental Guidance may be updated to reflect new data and new understanding that may become available in the future.

## 3.6.  UNCERTAINTY

The NRC (1983, 1994, 1996, 2002) has repeatedly advised that proper characterization of uncertainty is essential in risk assessment.  An assessment that omits or underestimates uncertainty can leave decisionmakers with a false sense of confidence in estimates of risk.  On the other hand, a high level of uncertainty does not imply that a risk assessment or a risk management action should be delayed (NRC, 2002).  Uncertainty in dose-response assessment can be classified as either *model uncertainty* or *parameter uncertainty*.  A related concept, *human variation*, is discussed below.  Assessments should discuss the significant uncertainties encountered in the analysis, distinguishing, if possible, between model uncertainty, parameter uncertainty, and human variation.  Origins of these uncertainties can span a range, from a single causal thread supported by sparse data, to abundant information that presents multiple possible conclusions or that does not coalesce.  As described in Section 2.6 and in Section 5.1, all contributing features should be noted.

*Model uncertainty* refers to a lack of knowledge needed to determine which is the correct scientific theory on which to base a model.  In risk assessment, model uncertainty is reflected in alternative choices for model structure, dose metrics, and extrapolation approaches.  Other sources of model uncertainty concern whether surrogate data are appropriate, for example, using data on adults to make inferences about children.  The full extent of model uncertainty usually cannot be quantified; a partial characterization can be obtained by comparing the results of alternative models.  Model uncertainty is expressed through comparison of separate analyses from each model, coupled with a subjective probability statement, where feasible and appropriate, of the likelihood that each model might be correct  (NRC, 1994).

Some aspects of model uncertainty that should be addressed in an assessment include the use of animal models as a surrogate for humans, the influence of cross-species differences in metabolism and physiology, the use of effects observed at high doses as an indicator of the potential for effects at lower doses, the effect of using linear or nonlinear extrapolation to estimate risks, the use of using small samples and subgroups to make inferences about entire human populations or subpopulations with differential susceptibilities, and the use of

experimental exposure regimens to make inferences about different human exposure scenarios (NRC, 2002).

Toxicokinetic and toxicodynamic models are generally premised on *site concordance* across species, modeling, for example, the relationship between administered dose and liver tissue concentrations to predict increased incidences of liver cancer.  This relationship, which can be observed in animals, is typically only inferred for humans.  There are, however, numerous examples of an agent causing different cancers in different species.  The assessment should discuss the relevant data that bear on this form of model uncertainty.

*Parameter uncertainty* refers to a lack of knowledge about the values of a model's parameters.  This leads to a distribution of values for each parameter.  Common sources of parameter uncertainty include random measurement errors, systematic measurement errors, use of surrogate data instead of direct measurements, misclassification of exposure status, random sampling errors, and use of an unrepresentative sample.  Most types of parameter uncertainty can be quantified by statistical analysis.

*Human variation* refers to person-to-person differences in biological susceptibility or in exposure.  Although both human variation and uncertainty can be characterized as ranges or distributions, they are fundamentally different concepts.  Uncertainty can be reduced by further research that supports a model or improves a parameter estimate, but human variation is a reality that can be better characterized, but not reduced, by further research.  Fields other than risk assessment use "variation" or "variability" to mean dispersion about a central value, including measurement errors and other random errors that risk assessors address as uncertainty.

*Probabilistic risk assessment*, informed by expert judgment, has been used in exposure assessment to estimate human variation and uncertainty in lifetime average daily exposure concentration or dose.  Probabilistic methods can be used in this exposure assessment application because the pertinent variables (for example, concentration, intake rate, exposure duration, and body weight) have been identified, their distributions can be observed, and the formula for combining the variables to estimate the lifetime average daily dose is well defined (see U.S. EPA, 1992a).  Similarly, probabilistic methods can be applied in dose-response assessment when there is an understanding of the important parameters and their relationships, such as

3-30

identification of the key determinants of human variation (for example, metabolic polymorphisms, hormone levels, and cell replication rates), observation of the distributions of these variables, and valid models for combining these variables.  With appropriate data and expert judgment, formal approaches to probabilistic risk assessment can be applied to provide insight into the overall extent and dominant sources of human variation and uncertainty.  In doing this, it is important to note that analyses that omit or underestimate some principal sources of variation or uncertainty could provide a misleadingly narrow description of the true extent of variation and uncertainty and give decisionmakers a false sense of confidence in estimates of risk.  Specification of joint probability distributions is appropriate when variables are not independent of each other.   In each case, the assessment should carefully consider the questions of uncertainty and human variation and discuss the extent to which there are data to address them.

Probabilistic risk assessment has also been used in dose-response assessment to determine and distinguish the degree of uncertainty and variability in toxicokinetic and toxicodynamic modeling.  Although this field is less advanced that probabilistic exposure assessment, progress is being made and these cancer guidelines are flexible enough to accommodate continuing advances in these approaches.

*Advances in uncertainty analysis* are expected as the field develops.  The cancer guidelines are intended to be flexible enough to incorporate additional approaches for characterizing uncertainty that have less commonly been used by regulatory agencies.  In all scientific and engineering fields, data and research limitations often limit the application of established methods. A dearth of data is a particular problem when quantifying the *probability distribution* of model outputs. In many of these scientific and engineering disciplines, researchers have used rigorous expert elicitation methods to overcome the lack of peer-reviewed methods and data. Although expert elicitation has not been widely used in environmental risk assessment, several studies have applied this methodology as a tool for understanding quantitative risk.  For example, expert elicitation has been used in chemical risk assessment and its associated uncertainty (e.g., Richmond, 1981; Renn, 1999; Florig et al., 2001; Morgan et al., 2001; Willis et al., 2004), components of risk assessment such as hazard assessment and dose-response

3-31

evaluation (e.g., Hawkins and Graham 1988; Jelovsek et al., 1990; Evans et al., 1994; IEc, 2004; U.S. EPA 2004) and exposure assessment (e.g., Whitfield and Wallsten, 1989; Hawkins and Evans, 1989; Winkler et al., 1995; Stiber et al., 1999; Walker et al., 2001, 2003; Van Der Fels-Klerx et al., 2002), and for evaluating other types of risks (e.g., North and Merkhofer, 1976; Fos and McLin, 1990). These cancer guidelines are flexible enough to accommodate the use of expert elicitation to characterize cancer risks, as a complement to the methods presented in the cancer guidelines. According to NRC (NRC, 2002), the rigorous use of expert elicitation for the analyses of risks is considered to be quality science.

## 3.7. DOSE-RESPONSE CHARACTERIZATION

A *dose-response characterization* extracts the dose-response information needed in a full risk characterization (U.S. EPA, 2000b), including:

- presentation of the recommended estimates (slope factors, reference doses, reference concentrations) and alternatives with significant biological support,

- a summary of the data supporting these estimates,

- a summary and explanation of the modeling approaches used,

- a description of any special features such as the development and consolidation of multiple estimates as detailed in Section 3.3.5,

- the POD narrative (see Section 3.2.5),

- a summary of the key defaults invoked,

- identification of susceptible populations or lifestages and quantification of their differential susceptibility, and

3-32

- a discussion of the strengths and limitations of the dose-response assessment, highlighting significant issues in developing risk estimates, alternative approaches considered equally plausible, and how these issues were resolved.

*All estimates should be accompanied by the weight of evidence descriptor and its narrative* (see Section 2.5) to convey a sense of the qualitative uncertainty about whether the agent may or may not be carcinogenic.

Slope factors generally represent an upper bound on the average risk in a population or the risk for a randomly selected individual but not the risk for a highly susceptible individual or group. Some individuals face a higher risk and some face a lower risk. The use of upper bounds generally is considered to be a health-protective approach for covering the risk to susceptible individuals, although the calculation of upper bounds is not based on susceptibility data. Similarly, exposure during some lifestages can contribute more or less to the total lifetime risk than do similar exposures at other times. The dose-response assessment characterizes, to the extent possible, the extent of these variations.

Depending on the supporting data and modeling approach, a slope factor can have a mix of traits that tend to either estimate, overestimate, or underestimate risk.

*Some examples of traits that tend to overestimate risk include the following.*

- The slope factor is derived from data on a highly susceptible animal strain.

- Linear extrapolation is used as a default and extends over several orders of magnitude.

- The largest of several slope factors is chosen.

*Some examples of traits that tend to underestimate risk include the following.*

- Several tumor types were observed, but the slope factor is based on a subset of them.

- The study design does not include exposure during a susceptible lifestage, for example, perinatal exposure.

- The study population is of less-than-average susceptibility, for example, healthy adult workers.

- There is random exposure misclassification or random exposure measurement error in the study from which the slope factor is derived.

*Some examples of traits that inherently neither overestimate nor underestimate risk include the following.*

- The slope factor is derived from data in humans or in an animal strain that responds like humans.

- Linear extrapolation is appropriate for the agent's mode of action.

- Environmental exposures are close to the observed data.

- Several slope factors for the same tumor are averaged or a slope factor is derived from pooled data from several studies.

- The slope factor is derived from the only suitable study.

3-34



Figure 3-1.  Compatibility of alternative points of departure with observed and modeled tumor incidences



Figure 3-2.  Crossing--between 10% and 1%--of dose-response curves for bladder carcinomas and liver carcinomas induced by 2-AAF

# 4.  EXPOSURE ASSESSMENT

Exposure assessment is the determination (qualitative and quantitative) of the magnitude, frequency, and duration of exposure and internal dose (U.S. EPA, 1992a).  This section provides a brief overview of exposure assessment principles, with an emphasis on issues related to carcinogenic risk assessment.  The information presented here should be used in conjunction with other guidance documents, including *Guidelines for Exposure Assessment* (U.S. EPA, 1992a),  *Science Policy Council Handbook: Risk Characterization* (U.S. EPA, 2000b), *Exposure Factors Handbook* (U.S. EPA, 1997c), the 1997 *Policy for Use of Probabilistic Analysis in Risk Assessments* (U.S. EPA, 1997d), and the 1997 *Guiding Principles for Monte Carlo Analysis* (U.S. EPA, 1997e).  In addition, program-specific guidelines for exposure assessment should be consulted.

Exposure assessment generally consists of four major steps: defining the assessment questions, selecting or developing the conceptual and mathematical models, collecting data or selecting and evaluating available data, and exposure characterization.  Each of these steps is briefly described below.

## 4.1.  DEFINING THE ASSESSMENT QUESTIONS

In providing a clear and unambiguous statement of the purpose and scope of the exposure assessment (U.S. EPA, 1997e), consider the following.

- The management objectives of the assessment will determine whether deterministic screening level analyses are adequate or whether full probabilistic exposure characterization is needed.

- Identify and include all important sources (e.g., pesticide applications), pathways (e.g., food or water), and routes (e.g., ingestion, inhalation, and dermal) of exposure in the assessment.  If a particular source, pathway, or route is omitted, a clear and transparent explanation should be provided.

- Separate analyses should be conducted for each definable subgroup within the population of interest. In particular, subpopulations or lifestages that are believed to be highly exposed or susceptible to a particular health effect should be studied. These include people with certain diseases or genetic susceptibilities and others whose behavior or physiology may lead to higher exposure or susceptibility. Consider the following examples:

  — Physiological differences between men and women (e.g., body weight and inhalation rate) may lead to important differences in exposures. See, for example, the discussion in *Exposure Factors Handbook* (U.S. EPA, 1997c, Appendix 1A).

  — Pregnant and lactating women may have exposures that differ from the general population (e.g., slightly higher water consumption) (U.S. EPA, 1997c). Further, exposure to pregnant women may result in exposure to the developing fetus (NRC, 1993b).

  — Children consume more food per body weight than do adults while consuming fewer types of foods, i.e., have a more limited diet (ILSI, 1992; NRC, 1993b; U.S. EPA, 1997c). In addition, children engage in crawling and mouthing (i.e., putting hands and objects in the mouth) behaviors, which can increase their exposures.

  — The elderly and disabled may have important differences in their exposures due to a more sedentary lifestyle (U.S. EPA, 1997c). In addition, the health status of this group may affect their susceptibility to the detrimental effects of exposure.

For further guidance, see *Guidelines for Exposure Assessment* (U.S. EPA, 1992a, § 3).

4-2

## 4.2.  SELECTING OR DEVELOPING THE CONCEPTUAL AND MATHEMATICAL MODELS

Carcinogen risk assessment models have generally been based on the premise that risk is proportional to cumulative lifetime dose.  For lifetime human exposure scenarios, therefore, the exposure metric used for carcinogenic risk assessment has been the lifetime average daily dose (LADD) or, in the case of inhalation exposure, the lifetime average exposure concentration. These metrics are typically used in conjunction with the corresponding slope factor to calculate individual excess cancer risk.  The LADD is typically an estimate of the daily intake of a carcinogenic agent throughout the entire life of an individual, while the lifetime average exposure concentration is the corresponding estimate of average exposure concentration for the carcinogenic agent over the entire life of an individual.  Depending on the objectives of the assessment, the LADD or lifetime average exposure concentration may be calculated deterministically (using point estimates for each factor to derive a point estimate of the exposure) or stochastically (using probability distributions to represent each factor and such techniques as Monte Carlo analysis to derive a distribution of the LADD) (U.S. EPA, 1997e).  Stochastic analyses may help to identify certain population segments or lifestages that are highly exposed and may need to be assessed as a special subgroup.  For further guidance, see *Guidelines for Exposure Assessment* (U.S. EPA, 1992a, § 5.3.5.2 ).  As methodological research focuses on new approaches for estimating risks from less-than-lifetime exposures, methods and defaults can be expected to change.

There may be cases where the mode of action indicates that dose rates are important in the carcinogenic process.  In these cases, short-term, less-than-lifetime exposure estimates may be more appropriate than the LADD for risk assessment.  This may be the case when a nonlinear dose-response approach is used (see Section 3.3.4).

## 4.3.  COLLECTING DATA OR SELECTING AND EVALUATING AVAILABLE DATA

After the assessment questions have been defined and the conceptual and mathematical models have been developed, it is important to compile and evaluate existing data or, if necessary, to collect new data.  Depending on the exposure scenario under consideration, data on

a wide variety of exposure factors may be needed.  EPA's *Exposure Factors Handbook* (U.S. EPA, 1997c) contains a large compilation of exposure data, with some analysis and recommendations.  Some of these data are organized by age groups to assist with assessing such subgroups as children.  See, for example, *Exposure Factors Handbook* (U.S. EPA, 1997c, Volume 1, Chapter 3).  When using these existing data, it is important to evaluate the quality of the data and the extent to which the data are representative of the population under consideration. EPA's (U.S. EPA, 2000d) and OMB's (OMB 2002) guidance on information quality, as well as program-specific guidances can provide further assistance for evaluating existing data.

When existing data fail to provide an adequate surrogate for the needs of a particular assessment, it is important to collect new data.  Such data collection efforts should be guided by the references listed above (e.g., *Guidance for Data Quality Assessment* and program-specific guidance).  Once again, subpopulations or lifestages of concern are an important consideration in any data collection effort.

### 4.3.1.  Adjusting Unit Risks for Highly Exposed Populations and Lifestages

Unit risk estimates that have been developed in the dose-response assessment often assumed standard adult intake rates.  When an exposure assessment focuses on a population or lifestage with differential exposure, good exposure assessment practice would replace the standard intake rates with values representative of the exposed population.  Small changes in exposure assessments can be approximated by using linearly proportional adjustments of exposure parameters, but a more accurate integrative analysis may require an analysis stratified by exposure duration (see Section 5.1) .

> *For example*, to adjust the drinking water unit risk for an active
> population that drinks 4 L/day (instead of 2 L/day), multiply the unit
> risk by 2.

Because children drink more water relative to their body weight than do adults (U.S. EPA, 2002d), adjustments to unit risk estimates are warranted whenever they are applied in an assessment of childhood exposure.

> *For example*, to adjust the drinking water unit risk for a 9-kg infant who drinks 1 L/day (instead of a 70-kg adult who drinks 2 L/day), multiply the unit risk by [(1 L/day) / (9 kg)] / [(2 L/day) / (70 kg)] = 3.9.

Inhalation dosimetry is employed to derive the human equivalent exposure concentrations on which inhalation unit risks, and reference concentrations, are based (U.S. EPA, 1994). As described previously (see Sections 3.1.2, 3.1.3), different dosimetry methods may be employed depending on the availability of relevant data and chemical-specific characteristics of the pollutant. Consideration of lifestage-particular physiological characteristics in the dosimetry analysis may result in a refinement to the human equivalent concentration (HEC) to insure relevance in risk assessment across lifestages, or might conceivably conclude with multiple HECs, and corresponding inhalation unit risk values (e.g., separate for childhood and adulthood).

The dose-response assessment discusses the key sources of uncertainty in estimating dosimetry, including any related to lifestage. Review of this discussion and of the dosimetric analysis performed in deriving the HEC and resultant unit risk will assist in the appropriate application of inhalation unit risk values to exposure across lifestages.

## 4.4.  EXPOSURE CHARACTERIZATION

The exposure characterization is a technical characterization that presents the assessment results and supports the risk characterization. It provides a statement of the purpose, scope, and approach used in the assessment, identifying the exposure scenarios and population subgroups covered. It provides estimates of the magnitude, frequency, duration, and distribution of exposures among members of the exposed population as the data permit. It identifies and compares the contribution of different sources, pathways, and routes of exposure. In particular, a

qualitative discussion of the strengths and limitations (uncertainties) of the data and models are presented.

The discussion of uncertainties is a critical component of the exposure characterization. Uncertainties can arise out of problems with the conceptual and mathematical models. Uncertainties can also arise from poor data quality and data that are not quite representative of the population or scenario of interest. Consider the following examples of uncertainties.

- National data (i.e., data collected to represent the entire U.S. population) may not be representative of exposures occurring within a regional or local population.

- Use of short-term data to infer chronic, lifetime exposures should be done with caution. Use of short-term data to estimate long-term exposures has the tendency to underestimate the number of people exposed while overestimating the exposure levels experienced by those in the upper end (i.e., above the 90th percentile) of the exposure distribution. For further guidance, refer to *Guidelines for Exposure Assessment* (U.S. EPA, 1992a, § 5.3.1).

- Children's behavior, including their more limited diet, may lead to relatively high but intermittent exposures. This pattern of exposure, "one that gradually declines over the developmental period and which remains relatively constant thereafter" is not accounted for in the LADD model (ILSI, 1992). Further, the physiological characteristics of children may lead to important differences in exposure. Some of these differences can be accounted for in the LADD model. For further guidance, see *Guidelines for Exposure Assessment* (U.S. EPA, 1992a, § 5.3.5.2).

Overall, the exposure characterization should provide a full description of the sources, pathways, and routes of exposure. The characterization also should include a full description of the populations assessed. In particular, highly exposed or susceptible subpopulation or lifestage should be discussed. For further guidance on the exposure characterization, consult *Guidelines*

*for Exposure Assessment* (U.S. EPA, 1992a), the *Policy and Guidance for Risk Characterization* (U.S. EPA, 2000b,1995) and EPA's *Rule Writer's Guide to Executive Order 13045* (especially Attachment C: Technical Support for Risk Assessors—Suggestions for Characterizing Risks to Children [U.S. EPA, 1998d]).

# 5.  RISK CHARACTERIZATION

## 5.1.  PURPOSE

EPA has developed general guidance on risk characterization for use in its risk assessment activities.  The core of EPA's risk characterization policy (U.S. EPA, 2000b, 1995) includes the following.

> Each risk assessment prepared in support of decision making at EPA should include a risk characterization that follows the principles and reflects the values outlined in this policy.  A risk characterization should be prepared in a manner that is clear, transparent, reasonable, and consistent with other risk characterizations of similar scope prepared across programs in the Agency. Further, discussion of risk in all EPA reports, presentations, decision packages, and other documents should be substantively consistent with the risk characterization.  The nature of the risk characterization will depend upon the information available, the regulatory application of the risk information, and the resources (including time) available.  In all cases, however, the assessment should identify and discuss all the major issues associated with determining the nature and extent of the risk and provide commentary on any constraints limiting fuller exposition.

Risk characterization should be carried out in accordance with the EPA (U.S. EPA, 2002a) and OMB (2002) information quality guidelines.  EPA's risk characterization handbook (U.S. EPA, 2000b) provides detailed guidance to Agency staff.  The discussion below does not attempt to duplicate this material, but it summarizes its applicability to carcinogen risk assessment.

The risk characterization includes a summary for the risk manager in a nontechnical discussion that minimizes the use of technical terms.  It is an appraisal of the science that informs the risk manager in public health decisions, as do other decision-making analyses of economic,

social, or technology issues.  It also serves the needs of other interested readers.  The summary is an information resource for preparing risk communication information, but being somewhat more technical than desired for communication with the general public, is not itself the usual vehicle for communication with every audience.

The risk characterization also brings together the assessments of hazard, dose response, and exposure to make risk estimates for the exposure scenarios of interest.  This analysis that follows the summary is generally much more extensive.  It typically will identify exposure scenarios of interest in decision making and present risk analyses associated with them.  Some of the analyses may concern scenarios in several media; others may examine, for example, only drinking water risks.  As these cancer guidelines allow different hazard characterizations and different potencies for specified conditions, e.g., exposure level, route of exposure, or lifestage, some of the integrative analyses may need to be stratified to accommodate the appropriate combinations of parameters across relevant exposure durations.

In constructing high end estimates of risk, the assessor should bear in mind that the high-end risk is a plausible estimate of the risk for those persons at the upper end of the risk distribution (U.S. EPA, 1992a). The intent of this approach is to convey an estimate of risk in the upper range of the distribution, but to avoid estimates that are beyond the true distribution. Overly conservative assumptions, when combined, can lead to unrealistic estimates of risk. This means that when constructing estimates from a series of factors (e.g., emissions, exposure, and unit risk estimates) not all factors should be set to values that maximize exposure, dose, or effect, since this will almost always lead to an estimate that is above the 99th-percentile confidence level and may be of limited use to decisionmakers. This is particularly problematic when using unbounded lognormal factor distributions.

While it is an appropriate aim to assure protection of health and the environment in the face of scientific uncertainty, common sense, reasonable applications of assumptions and policy, and transparency are essential to avoid unrealistically high estimates.  It is also important to inform risk managers of the final distribution of risk estimates (U.S. EPA, 2000b; 1995). Otherwise, risk management decisions may be made on varying levels of conservatism, leading

to misplaced risk priorities and potentially higher overall risks.  (Nichols and Zeckhauser,1986; Zeckhauser and Viscusi,1990).

The risk characterization presents an integrated and balanced picture of the analysis of the hazard, dose-response, and exposure.  The risk analyst should provide summaries of the evidence and results and describe the quality of available data and the degree of confidence to be placed in the risk estimates.  Important features include the constraints of available data and the state of knowledge, significant scientific issues, and significant science and science policy choices that were made when alternative interpretations of data exist (U.S. EPA, 1995, 2000b ).  Choices made about using data or default options in the assessment are explicitly discussed in the course of analysis, and if a choice is a significant issue, it is highlighted in the summary.  In situations where there are alternative approaches for a risk assessment that have significant biological support, the decisionmaker can be informed by the presentation of these alternatives along with their strengths and uncertainties.

## 5.2.  APPLICATION

Risk characterization is a necessary part of generating any Agency report on risk, whether the report is preliminary — to support allocation of resources toward further study — or comprehensive — to support regulatory decisions.  In the former case, the detail and sophistication of the characterization are appropriately small in scale; in the latter case, appropriately extensive.  Even if a document covers only parts of a risk assessment (hazard and dose-response analyses, for instance), the results of these are characterized.

Risk assessment is an iterative process that grows in depth and scope in stages from screening for priority making to preliminary estimation to fuller examination in support of complex regulatory decision making.  Default options may be used at any stage, but they are predominant at screening stages and are used less as more data are gathered and incorporated at later stages. Various provisions in EPA-administered statutes require decisions based on differing findings for which differing degrees of analysis are appropriate.  There are close to 30 provisions within the major statutes that require decisions based on risk, hazard, or exposure assessment. For example, Agency review of pre-manufacture notices under Section 5 of the Toxic Substances

5-3

Control Act relies on screening analyses, whereas requirements for industry testing under Section 4 of that Act rely on preliminary analyses of risk or simply of exposure.  In comparison, air quality criteria under the Clean Air Act rest on a rich data collection and are required by statute to undergo periodic reassessment.  There are provisions that require ranking of hazards of numerous pollutants — which may be addressed through a screening level of analysis — and other provisions for which a full assessment of risk is more appropriate.

Given this range in the scope and depth of analyses, not all risk characterizations can or should be equal in coverage or depth.  The risk assessor should carefully decide which issues in a particular assessment are important to present, choosing those that are noteworthy in their impact on results.  For example, health effect assessments typically rely on animal data because human data are rarely available.  The objective of characterization of the use of animal data is not to recount generic issues about interpreting and using animal data; Agency guidance documents cover these issues.  Rather, the objective is to highlight any significant issues that arose within the particular assessment being characterized and inform the reader about significant uncertainties that affect conclusions.

## 5.3.  PRESENTATION OF THE RISK CHARACTERIZATION SUMMARY

The presentation is a nontechnical discussion of important conclusions, issues, and uncertainties that uses the hazard, dose response, exposure, and integrative analyses for technical support.  The primary technical supports within the risk assessment are the hazard characterization, dose-response characterization, and exposure characterization described in these cancer guidelines.  The risk characterization is derived from these.  The presentation should fulfill the aims outlined in the purpose section above.

## 5.4.  CONTENT OF THE RISK CHARACTERIZATION SUMMARY

Specific guidance on hazard, dose-response, and exposure characterization appears in previous sections.  Overall, the risk characterization routinely includes the following, capturing the important items covered in hazard, dose response, and exposure characterization:

- primary conclusions about hazard, dose response, and exposure, including alternatives with significant biological support;

- nature of key supporting information and analytic methods;

- risk estimates and their attendant uncertainties, including key uses of default options when data are missing or uncertain.

    — With linear extrapolations, risk below the POD is typically approximated by multiplying the slope factor by an estimate of exposure, i.e., Risk = Slope Factor x Exposure.  For exposure levels above the POD, the dose-response model is used instead of this approximation.

    — With nonlinear extrapolations, the method of risk assessment depends on the procedure used.  If a nonlinear dose-response function has been determined, it can be used with the expected exposure to estimate a risk. If an RfD or RfC was calculated, the hazard can be expressed as a *hazard quotient* (HQ), defined as the ratio of an exposure estimate over the reference dose (RfD) or reference concentration (RfC), i.e., HQ = Exposure / (RfD or RfC).  From the hazard quotient, it can generally be inferred whether the nonlinear mode of action is relevant at the environmental exposure level in question;

- statement of the extent of extrapolation of risk estimates from observed data to exposure levels of interest and its implications for certainty or uncertainty in quantifying risk.  The extent of extrapolation can be expressed as a *margin of exposure* (MOE), defined as the ratio of the POD over an exposure estimate (MOE = POD / Exposure);

.

- significant strengths and limitations of the data and analyses, including any major peer review issues;

- appropriate comparison with similar EPA risk analyses or common risks with which people may be familiar; and

- comparison with all appropriate assessments of the same problem by others.

It is often difficult to know *a priori* when or how different results of a cancer risk assessment are likely to be used by Agency economists, policy analysts, and decisionmakers, so it is important that the resulting characterizations include the necessary information for these analyses to the extent practicable.  OMB and EPA guidelines for benefit-cost analysis require expected or central estimates of risk and information on the uncertainty of the estimate when it is possible or practicable.  The extent of the uncertainty information needed for analysis depends, in part, on the scale of the policy being considered, with formal quantitative analysis of uncertainty being required in some cases.[6]  OMB Circular A-4 (OMB, 2003) emphasizes that agencies "should try to provide some estimate of the probability distribution of regulatory benefits and costs."  These OMB guidelines note, "Whenever it is possible to characterize quantitatively the probability distribution, some estimates of expected value ... must be provided in addition to ranges, variances, specified low-end and high-end percentile estimates, and other characteristics of the distribution."  The risk characterization should therefore include, where practicable, expected or central estimates of risk, as well as upper and lower bounds, e.g., confidence limits, based on the POD, if not a full characterization of uncertainty of the risk.  As discussed in EPA's *Guidelines for Ensuring and Maximizing the Quality, Objectivity, Utility, and Integrity of Information Disseminated by the Environmental Protection Agency* (Appendix B), statutory mandates, such as the Safe Drinking Water Act, the Food Quality Protection Act, and the Clean

---

6       Specifically, OMB guidelines state: "For rules that exceed the $1 billion annual [economic effects] threshold, a formal quantitative analysis of uncertainty is required.  For rules with annual benefits and/or costs in the range from 100 million to $1 billion, you should seek to use more rigorous approaches with higher consequence rules" (OMB, 2003, page 158)

Air Act, call for the Agency to generate specific kinds of risk information, and thus these updated cancer assessment guidelines should be read in conjunction with the Agency's statutory mandates regarding risk assessment.

## APPENDIX A:  MAJOR DEFAULT OPTIONS

This discussion covers the major default options commonly employed when data are missing or sufficiently uncertain in a cancer risk assessment, as adopted in these cancer guidelines.  These options are predominantly inferences that help use the data observed under empirical conditions in order to estimate events and outcomes under environmental conditions. Several inferential issues arise when effects seen in a subpopulation of humans or animals are used to infer potential effects in the population of environmentally exposed humans.  Several more inferential issues arise in extrapolating the exposure-effect relationship observed empirically to lower-exposure environmental conditions.  The following issues cover the major default areas.

- Is the presence or absence of effects observed in a human population predictive of effects in another exposed human population?

- Is the presence or absence of effects observed in an animal population predictive of effects in exposed humans?

- How do metabolic pathways relate across species and among different age groups and between sexes in humans?

- How do toxicokinetic processes relate across species and among different age groups and between sexes in humans?

- What is the relationship between the observed dose-response relationship to the relationship at lower doses?

A-1

***Is the Presence or Absence of Effects Observed in a Human Population Predictive of Effects in Another Exposed Human Population?***

*When cancer effects in exposed humans are attributed to exposure to an agent, the default option is that the resulting data are predictive of cancer in any other exposed human population.* Most studies investigating cancer outcomes in humans from exposure to agents are often studies of occupationally exposed humans. By sex, age, and general health, workers may not be representative of the general population exposed environmentally to the same agents. In such studies there is no opportunity to observe subpopulations who are likely to be under represented, such as fetuses, infants and children, women, or people in poor health, who may respond differently from healthy workers. Therefore, it is understood that this option could still underestimate the response of certain human subpopulations (NRC, 1993b, 1994).

*When cancer effects are not found in an exposed human population, this information by itself is not generally sufficient to conclude that the agent poses no carcinogenic hazard to this or other populations of potentially exposed humans, including susceptible subpopulations or lifestages.* This is because epidemiologic studies often have low power to detect and attribute responses and typically evaluate cancer potential in a restricted population (e.g., by age, healthy workers). The topic of susceptibility and variation is addressed further in the discussion below of quantitative default options about dose-response relationships. Well-conducted studies that fail to detect a statistically significant positive association, however, may have value and should be judged on their merits, including population size, duration of the study, the quality of the exposure characterization and measures of outcome, and the magnitude and duration of the exposure.

There is not yet enough knowledge to form a basis for any generally applicable qualitative or quantitative inference to compensate for the gap in knowledge concerning other populations. In these cancer guidelines, this problem is left to analysis in individual cases, to be attended to with further general guidance as future research and information allow. When information on a susceptible subpopulation or lifestage exists, it will be used. For example, an agent such as diethylstilbestrol (DES) causes a rare form of vaginal cancer (clear-cell adenocarcinoma) (Herbst

et al., 1971) in about 1 per 1000 of adult women whose mothers were exposed during pregnancy (Hatch et al., 1998).

***Is the Presence or Absence of Effects Observed in an Animal Population Predictive of Effects in Exposed Humans?*** *The default option is that positive effects in animal cancer studies indicate that the agent under study can have carcinogenic potential in humans.* Thus, if no adequate human or mode of action data are present, positive effects in animal cancer studies are a basis for assessing the carcinogenic hazard to humans. This option is a public health-protective policy, and it is both appropriate and necessary, given that we do not test for carcinogenicity in humans. The option is supported by the fact that nearly all of the agents known to cause cancer in humans are carcinogenic in animals in tests that have adequate protocols (IARC, 1994; Tomatis et al., 1989; Huff, 1994). Moreover, almost one-third of human carcinogens were identified subsequent to animal testing (Huff, 1993). Further support is provided by research on the molecular biology of cancer processes, which has shown that the mechanisms of control of cell growth and differentiation are remarkably homologous among species and highly conserved in evolution. Nevertheless, the same research tools that have enabled recognition of the nature and commonality of cancer processes at the molecular level also have the power to reveal differences and instances in which animal responses are not relevant to humans (Lijinsky, 1993; U.S. EPA, 1991b). Under these cancer guidelines, available mode of action information is studied for its implications in both hazard and dose-response assessment and its ability to obviate default options.

There may be instances in which the use of an animal model would identify a hazard in animals that is not truly a hazard in humans (e.g., the alpha-2u-globulin association with renal neoplasia in male rats [U.S. EPA, 1991b]). The extent to which animal studies may yield false positive indications for humans is a matter of scientific debate. To demonstrate that a response in animals is not relevant to any human situation, adequate data to assess the relevancy issue are important.

*In general, while effects seen at the highest dose tested are assumed to be appropriate for assessment, it is necessary that the experimental conditions be scrutinized.* Animal studies

A-3

are conducted at high doses in order to provide statistical power, the highest dose being one that is minimally toxic (maximum tolerated dose or MTD).  Consequently, the question often arises of whether a carcinogenic effect at the highest dose may be a consequence of cell killing with compensatory cell replication or of general physiological disruption rather than inherent carcinogenicity of the tested agent.  There is little doubt that this may happen in some cases, but skepticism exists among some scientists that it is a pervasive problem (Ames and Gold, 1990; Melnick et al., 1993; Barrett, 1993).  If adequate data demonstrate that the effects are solely the result of excessive toxicity rather than carcinogenicity of the tested agent *per se*, then the effects may be regarded as not appropriate to include in assessment of the potential for human carcinogenicity of the agent.  This is a matter of expert judgment, with consideration given to all of the data available about the agent, including effects in other toxicity studies, structure-activity relationships, and effects on growth control and differentiation.

*When cancer effects are not found in well-conducted animal cancer studies in two or more appropriate species and other information does not support the carcinogenic potential of the agent, these data provide a basis for concluding that the agent is not likely to possess human carcinogenic potential, in the absence of human data to the contrary.*  This default option about lack of cancer effects has limitations.  It is recognized that animal studies (and epidemiologic studies as well) have very low power to detect cancer effects.  Detection of a 10% tumor incidence is generally the limit of power with standard protocols for animal studies (with the exception of rare tumors that are virtually markers for a particular agent, e.g., angiosarcoma caused by vinyl chloride).  In some situations, the tested animal species may not be predictive of effects in humans; for example, arsenic shows only minimal or no effect in animals, whereas it is clearly positive in humans.  Therefore, it is important to consider other information as well; absence of mutagenic activity or absence of carcinogenic activity among structural analogues can increase the confidence that negative results in animal studies indicate a lack of human hazard.

Another limitation is that standard animal study protocols are not yet available for effectively studying perinatal effects. The potential for effects on the very young generally should be considered separately.  Under existing Agency policy (U.S. EPA, 1997a, b), perinatal studies

A-4

accomplished by modification of existing adult bioassay protocols are important in special circumstances.

*Target organ concordance is not a prerequisite for evaluating the implications of animal study results for humans.* Target organs of carcinogenesis for agents that cause cancer in both animals and humans are most often concordant at one or more sites (Tomatis et al., 1989; Huff, 1994). However, concordance by site is not uniform. The mechanisms of control of cell growth and differentiation are concordant among species, but there are marked differences among species in the way control is managed in various tissues. For example, in humans, mutations of the tumor suppressor genes p53 and retinoblastoma are frequently observed genetic changes in tumors. These tumor-suppressor genes are also observed to be operating in some rodent tissues, but other growth control mechanisms predominate in other rodent tissues. Thus, an animal response may be due to changes in a control that are relevant to humans but appear in animals in a different way.

However, it is appropriate under these cancer guidelines to consider the influences of route of exposure, metabolism, and, particularly, some modes of action that may either support or not support target organ concordance between animals and humans. When data allow, these influences are considered in deciding whether agent-, species-, or organ-specific situations are appropriate to use in preference to this default assumption (NRC, 1994). In contrast, use of toxicokinetic modeling inherently assumes site concordance, as these models are used to estimate delivered dose to a particular tissue or organ in humans on the basis of the same tissue or organ from animal data.

*The default is to include benign tumors observed in animal studies in the assessment of animal tumor incidence, if such tumors have the capacity to progress to the malignancies with which they are associated.* This default is consistent with the approach of the National Toxicology Program and the International Agency for Research on Cancer and is more protective of public health than not including benign tumors in the assessment; benign and malignant tumors are treated as representative of related responses to the test agent (McConnell et al., 1986), which is scientifically appropriate. Nonetheless, in assessing findings from animal studies, a greater proportion of malignancy is weighed more heavily than is a response with a

greater proportion of benign tumors.  Greater frequency of malignancy of a particular tumor type in comparison with other tumor responses observed in an animal study is also a factor to be considered in selecting the response to be used in dose-response assessment.

*Benign tumors that are not observed to progress to malignancy are assessed on a case-by-case basis.*  There is a range of possibilities for the overall significance of benign tumors. They may deserve attention because they are serious health problems even though they are not malignant; for instance, benign tumors may be a health risk because of their effect on the function of a target tissue, such as the brain.  They may be significant indicators of the need for further testing of an agent if they are observed in a short-term test protocol, or such an observation may add to the overall weight of evidence if the same agent causes malignancies in a long-term study.  Knowledge of the mode of action associated with a benign tumor response may aid in the interpretation of other tumor responses associated with the same agent.

### How Do Metabolic Pathways Relate Across Species and Among Different Age Groups and Between Sexes in Humans?

*The default option is that there is a similarity of the basic pathways of metabolism and the occurrence of metabolites in tissues in regard to the species-to-species extrapolation of cancer hazard and risk.*  If comparative metabolism studies were to show no similarity between the tested species and humans and a metabolite(s) was the active form, there would be less support for an inference that the animal response(s) relates to humans.  In other cases, parameters of metabolism may vary quantitatively between species; this becomes a factor in deciding on an appropriate human-equivalent dose based on animal studies, optimally in the context of a toxicokinetic model.  Although the basic pathways are assumed to be the same among humans, the presence of polymorphisms in the general population and factors such as the maturation of the pathways in infants should be considered.  The active form of an agent may be present to differing degrees, or it may be completely absent, which may result in greater or lesser risk for subpopulations.

A-6

***How Do Toxicokinetic Processes Relate Across Species and Among Different Age Groups and
Between Sexes in Humans?***

A major issue is how to estimate human-equivalent doses in extrapolating from animal
studies.  *As a default for oral exposure, a human equivalent dose for adults is estimated from
data on another species by an adjustment of animal applied oral dose by a scaling factor based
on body weight to the 3/4 power.  The same factor is used for children because it is slightly more
protective than using children's body weight (see Section 3.1.3).*  This adjustment factor is used
because it represents scaling of metabolic rate across animals of different size.  Because the
factor adjusts for a parameter that can be improved on and brought into more sophisticated
toxicokinetic modeling when such data become available, they are usually preferable to the
default option.

*For inhalation exposure, a human equivalent dose for adults is estimated by default
methodologies that provide estimates of lung deposition and internal dose* (U.S. EPA, 1994).
The methodologies can be refined to more sophisticated forms with data on toxicokinetic and
metabolic parameters of the specific agent.  This default option, like the one for oral exposure, is
selected in part because it lays a foundation for incorporating better data.  The use of information
to improve dose estimation from applied to internal to delivered dose is encouraged, including
use of toxicokinetic modeling instead of any default, where data are available.

There are important differences between infants, adults, and older adults in the processes
of absorption, distribution, and elimination; for example, infants tend to absorb metals through
the gut more rapidly and more efficiently than do older children or adults (Calabrese, 1986).
Renal elimination is also not as efficient in infants.  Although these processes reach adult
competency at about the time of weaning, they may have important implications, particularly
when the dose-response relationship for an agent is considered to be nonlinear and there is an
exposure scenario disproportionately affecting infants, because in these cases the magnitude of
dose is more pertinent than the usual approach in linear extrapolation of averaging dose across a
lifetime. Efficiency of intestinal absorption in older adults tends to be generally less overall for
most chemicals.  Another notable difference is that, post-weaning (about 1 year), children have a

higher metabolic rate than do adults (Renwick, 1998), and they may toxify or detoxify agents at a correspondingly higher rate.

For a route-to-route exposure extrapolation, *the default option is that an agent that causes internal tumors by one route of exposure will be carcinogenic by another route if it is absorbed by the second route to give an internal dose.* This is a qualitative option and is considered to be public-health protective. The rationale is that for internal tumors an internal dose is significant no matter what the route of exposure. Additionally, the metabolism of the agent will be qualitatively the same for an internal dose. The issue of quantitative extrapolation of the dose-response relationship from one route to another is addressed case by case. Quantitative extrapolation is complicated by considerations such as first-pass metabolism.

### What Is the Correlation of the Observed Dose-Response Relationship to the Relationship at Lower Doses?

If sufficient data are available, a biologically based model for both the observed range and extrapolation below that range may be used. Although no standard biologically based models are in existence, an agent-specific model may be developed if extensive data exist in a particular case and the purpose of the assessment justifies the investment of the resources needed. *The default procedure for the observed range of data when a biologically based model is not used is to use a curve-fitting model for incidence data.*

In the absence of data supporting a biologically based model for extrapolation outside of the observed range, the choice of approach is based on the view of mode of action of the agent arrived at in the hazard assessment. If more than one approach (e.g., both a nonlinear and linear approach) are supported by the data, they should be used and presented to the decisionmaker.

*A linear extrapolation approach is used when the mode of action information is supportive of linearity or mode of action is not understood.* The linear approach is used when a view of the mode of action indicates a linear response, for example, when a conclusion is made that an agent directly causes alterations in DNA, a kind of interaction that not only theoretically requires one reaction but also is likely to be additive to ongoing, spontaneous gene mutation. Other kinds of activity may have linear implications, for example, linear rate-limiting steps

A-8

would also support a linear procedure.  The linear approach is to draw a straight line between a point of departure from observed data, generally as a default, an LED chosen to be representative of the lower end of the observed range, and the origin (zero incremental dose, zero incremental response).  This approach is generally considered to be public-health protective.

The linear default is thought to generally provide an upper-bound calculation of potential risk at low doses, for example, a 1/100,000 to 1/1,000,000 risk.  This upper bound is thought to be public-health protective at low doses for the range of human variation, considering the typical Agency target range for risk management of 1/1,000,000 to 1/10,000, although it may not completely be so (Bois et al., 1995) if  pre-existing disease or genetic constitution place a percentage of the population at greater risk from exposure to carcinogens.  The question of what may be the actual variation in human susceptibility is one that was discussed in general in the NRC (1994) report, as well as the NRC report on pesticides in children and infants (NRC, 1993b).  NRC has recommended research on the question, and EPA and other agencies are conducting such research.  Given the current state of knowledge, EPA will assume that the linear default procedure adequately accounts for human variation unless there is case-specific information for a given agent or mode of action that indicates a particularly susceptible subpopulation or lifestage, in which case the special information will be used.

*When adequate data on mode of action provide sufficient evidence to support a nonlinear mode of action for the general population and/or any subpopulations of concern, a different approach — a reference dose/reference concentration that assumes that nonlinearity – is used.*  The POD is again generally an BMDL when incidence data are modeled.  A sufficient basis to support this nonlinear procedure is likely to include data on responses that are key events integral to the carcinogenic process.  This means that the POD may be based on these precursor response data, for example, hormone levels or mitogenic effects rather than tumor incidence data.

*When the mode of action information indicates that the dose-response function may be adequately described by both a linear and a nonlinear approach, then the results of both the linear and the nonlinear analyses are presented.*  An assessment may use both linear and nonlinear approaches if different responses are thought to result from different modes of action or a response appears to be very different at high and low doses due to influence of separate

A-9

modes of action.  The results may be needed for assessment of combined risk from agents that have common modes of action.

*Absent data to the contrary, the default assumption is that the cumulative dose received over a lifetime, expressed as a lifetime average daily dose or lifetime average daily exposure, is an appropriate measure of dose or exposure.*  This assumes that a high dose of such an agent received over a shorter period of time is equivalent to a low dose spread over a lifetime.  This is thought to be a relatively public-health-protective option and has some empirical support (Monro, 1992).  A counter example, i.e., effects of short-term, high exposure levels that result in subsequent cancer development, is treatment of cancer patients with certain chemotherapeutic agents.  When sufficient information is available to support a different approach, it can be used.  For example, short-term exposure estimates (several days to several months) may be more appropriate than the lifetime average daily dose.  In these cases, both agent concentration and duration are likely to be important, because such effects may be reversible at cessation of very short-term exposures.

**APPENDIX B: EPA's GUIDANCE FOR DATA QUALITY ASSESSMENT**

U.S. EPA (U.S. Environmental Protection Agency). (2000d) Guidance for data quality assessment: practical methods for data analysis. Office of Environmental Information, Washington, DC. EPA/600/R-96/084. Available from: http://www.epa.gov/quality/qs-docs/g9-final.pdf.

# REFERENCES

Allen, BC; Crump, KS; Shipp, AM. (1988) Correlation between carcinogenic potency of chemicals in animals and humans. Risk Anal 8:531–544.

Ames, BN; Gold, LS. (1990) Too many rodent carcinogens: mitogenesis increases mutagenesis. Science 249:970–971.

Anderson, LM; Diwan, BA; Fear, NT; et al. (2000) Critical windows of exposure for children's health: cancer in human epidemiological studies and neoplasms in experimental animal models. Environ Health Perspect 108(Suppl 3):573-594

Ashby, J; Tennant, RW. (1991) Definitive relationships among chemical structure, carcinogenicity and mutagenicity for 301 chemicals tested by the U.S. NTP. Mutat Res 257:229–306.

Ashby, J; Tennant, RW. (1994) Prediction of rodent carcinogenicity for 44 chemicals: results. Mutagenesis 9:7–15.

Ashby, J; Doerrer, NG; Flamm, FG; et al. (1990) A scheme for classifying carcinogens. Regul Toxicol Pharmacol 12:270–295.

Ashby, J; Brady, A; Elcombe, CR; et al. (1994) Mechanistically based human hazard assessment of peroxisome proliferator-induced hepatocarcinogenesis. Hum Exper Toxicol 13:1–117.

Barrett, JC. (1992) Mechanisms of action of known human carcinogens. In: Mechanisms of carcinogenesis in risk identification. IARC Sci Pubs No. 116, 115–134. International Agency for Research on Cancer, Lyon, France.

Barrett, JC. (1993) Mechanisms of multistep carcinogenesis and carcinogen risk assessment. Environ Health Perspect 100:9-20.

Barrett, JC; Lee, TC. (1992) Mechanisms of arsenic-induced gene amplification.  In: Kellems, RE, ed. Gene amplification in mammalian cells: a comprehensive guide. New York: Marcel Dekker.

Baylin, S; Bestor, TH. (2002) Altered methylation patterns in cancer cell genomes: causes or consequence?  Cancer Cell 1:299–305.

Bellamy, CO; Malcomson, RD; Harrison, DJ; et al. (1995) Cell death in health and disease: the biology and regulation of apoptosis. Seminars in Cancer Biology, Apoptosis in Oncogenesis and Chemotherapy 6:3–16.

Biggs, PJ; Warren, W; Venitt, S; et al. (1993) Does a genotoxic carcinogen contribute to human breast cancer? The value of mutational spectra in unraveling the etiology of cancer. Mutagenesis 8:275–283.

Birnbaum, LS; Fenton, SE. (2003) Cancer and developmental exposure to endocrine disruptors. Environ Health Perspect 111:389-394.

Birner, G; Albrecht, W; Neumann, HG. (1990) Biomonitoring of aromatic amines. III: hemoglobin binding and benzidine and some benzidine congeners. Arch Toxicol 64(2):97–102.

Blair, A; Burg, J; Foran, J; et al. (1995) Guidelines for application of meta-analysis in environmental epidemiology. Regul Toxicol Pharmacol 22:189–197.

Bois, FY; Krowech, G; Zeise, L. (1995) Modeling human interindividual variability in metabolism and risk: the example of 4-aminobiphenyl. Risk Anal 15:205–213.

Calabrese, EJ. (1986) Age and susceptibility to toxic substances. New York: Winter-Interscience Publication, John Wiley and Sons, Inc.

Callemen, CJ; Ehrenberg, L; Jansson, B; et al. (1978) Monitoring and risk assessment by means of alkyl groups in hemoglobin in persons occupationally exposed to ethylene oxide. J Environ Pathol Toxicol 2:427–442.

Caporaso, N; Hayes, RB; Dosemeci, M; et al. (1989) Lung cancer risk, occupational exposure, and the debrisoquine metabolic phenotype. Cancer Res 49:3675–3679.

Cavenee, WK; Koufos, A; Hansen, MF. (1986) Recessive mutant genes predisposing to human cancer.  Mutat Res 168:3–14.

CDC (Centers for Disease Control and Prevention).  (2004)  The health consequences of smoking: a report of the surgeon general. Dept. of Health and Human Services, Washington, D.C. Available from:  http://www.cdc.gov/tobacco/sgr/sgr_2004/index.htm.

Chang, CC; Jone, C; Trosko, JE; et al. (1988) Effect of cholesterol epoxides on the inhibition of intercellular communication and on mutation induction in Chinese hamster V79 cells.  Mutat Res 206:471–478.

Chuang, LS; Ng, HH; Chia, JN; Li, BF. (1996) Characterisation of independent DNA and multiple Zn-binding domains at the N terminus of human DNA-(cytosine-5) methyltransferase: modulating the property of a DNA-binding domain by contiguous Zn-binding motifs.  J Mol Biol 257(5):935- 48.

Chen, C; Farland, W. (1991) Incorporating cell proliferation in quantitative cancer risk assessment: approaches, issues, and uncertainties. In: Butterworth, B., Slaga, T., Farland, W., et

al., eds. Chemical induced cell proliferation: implications for risk assessment. New York: Wiley-Liss, pp. 481–499.

Chhabra, RE; Huff, JE; Schwetz, BS; Selkirk, J. (1990) An overview of prechronic and chronic toxicity/carcinogenicity experimental study designs and criteria used by the National Toxicology Program.  Environ. Health Perspect. 86:313-321.

Choy, WN. (1993) A review of the dose-response induction of DNA adducts by aflatoxin $B_2$ and its implications to quantitative cancer-risk assessment. Mutat Res 296:181–198.

Clayson, DB; Mehta, R; Iverson, F. (1994) Oxidative DNA damage—the effects of certain genotoxic and operationally non-genotoxic carcinogens. Mutat Res 317:25–42.

Cohen, SM. (1995)  Role of urinary physiology and chemistry in bladder carcinogenesis. Fd Chem Toxicol 33:715–30.

Cohen, SW; Ellwein, LB. (1990) Cell proliferation in carcinogenesis. Science 249:1007–1011.

Cohen, SM; Ellwein, LB. (1991) Genetic errors, cell proliferation and carcinogenesis. Cancer Res 51:6493–6505.

Cohen, SM; Purtilo, DT; Ellwein, LB. (1991) Pivotal role of increased cell proliferation in human carcinogenesis. Mod Pathol 4:371–375.

Conolly, RB; Andersen, ME. (1991) Biologically based pharmacodynamic models: tools for toxicological research and risk assessment. Ann Rev Pharmacol Toxicol 31:503–523.

Contrera, JF; Matthews, EJ; Benz, RD. (2003) Predicting the carcinogenic potential of pharmaceuticals in rodents using molecular structural similarity and E-state indices. Regul. Toxicol. Pharmacol. 38:243–259.

Cresteil, T. (1998)  Onset of xenobiotic metabolism in children: toxicological implications.  Food Addit Contam 15, Supplement 45–51.

Dearfield, K. L.; Auletta, A. E.; Cimino, M. C., et al. (1991) Considerations in the U.S. Environmental Protection Agency's testing approach for mutagenicity. Mutat. Res. 258:259-283.

D'Souza, RW; Francis, WR; Bruce, RD; et al. (1987) Physiologically based pharmacokinetic model for ethylene chloride and its application in risk assessment. In: Pharmacokinetics in risk assessment: drinking water and health. Vol. 8. Washington, DC: National Academy Press.

Enterline, PE; Henderson, VL; Marsh, GM. (1987) Exposure to arsenic. Amer J Epidemiol 125:929–938.

Evans, JS; Gray, GM; Sielken, RL Jr; Smith, AE; Valdez-Flores, C; Graham, JD. (1994 ) Use of probabilistic expert judgment in uncertainty analysis of carcinogenic potency. Regul Toxicol Pharmacol. 2:15-36.

Executive Order 13045 (1997) Protection of children from environmental health risks and safety risks, issued April 21, 1997.

Fearon, E; Vogelstein, B. (1990) A genetic model for colorectal tumorigenesis. Cell 61:959–967.

Fenton, SE; Davis, CC. (2002) Atrazine exposure in utero increases dimethylbenz a anthracene-induced mammary tumor incidence in long evans offspring.  Toxicol Sci 66(1-2):185. "The Toxicologist, Abstracts of the 41st Annual Meeting of the Society of Toxicology." (Abstract 903) Fisher, RA. (1950) Statistical methods for research workers. Edinburgh, Scotland: Oliver and Boyd.

Florig, HK; Morgan, MG; Morgan, KM; Jenni, KE; Fischhoff, B; Fischbeck, PS; DeKay, ML. (2001) A deliberative method for ranking risks (I): Overview and test bed development. Risk Anal. 21:913-21.

Flynn, GL. (1990) Physicochemical determinants of skin absorption. In: Gerrity, TR, Henry, CJ, eds. Principles of route to route extrapolation for risk assessment. New York: Elsevier Science; pp. 93–127.

Fos, PJ; McLin, CL. (1990) The risk of falling in the elderly: a subjective approach. Med Decis Making 10:195-200.

Garfinkel, L; Silverberg, E. (1991) Lung cancer and smoking trends in the United States over the past 25 years. Cancer 41:137–145.

Gaylor, DW; Zheng, Q. (1996) Risk assessment of nongenotoxic carcinogens based on cell proliferation/death rates in rodents. Risk Anal 16(2):221–225.

Gaylor, DW; Kodell, RL; Chen, JJ; et al. (1994) Point estimates of cancer risk at low doses. Risk Anal 14(5):843–850.

Gibson, DP; Aardema, MJ; Kerckaert, GA; et al. (1995) Detection of aneuploidy-inducing carcinogens in the Syrian hamster embryo (SHE) cell transformation assay. Mutat Res 343:7–24.

Ginsberg, GL. (2003) Assessing cancer risks from short-term exposures in children. Risk Anal 23(1):19-34.

Goddard, MJ; Murdoch, DJ; Krewski, D. (1995). Temporal aspects of risk characterization. Inhal Toxicol 7:1005–1018.

Goldsworthy, TL; Hanigan, MH; Pitot, HC. (1986) Models of hepatocarcinogenesis in the rat–contrasts and comparisons. CRC Crit Rev Toxicol 17:61–89.

Goodman, JI; Counts, JL. (1993) Hypomethylation of DNA: A possible nongenotoxic mechanism underlying the role of cell proliferation in carcinogenesis. Environ Health Perspect 101 Supp. 5:169–172.

Greenland, S. (1987) Quantitative methods in the review of epidemiologic literature. Epidemiol Rev 9:1–29.

Gulezian, D; Jacobson-Kram, D; McCullough, CB; et al. (2000) Use of transgenic animals for carcinogenicity testing: considerations and implications for risk assessment. Toxicol Pathol 28:482–499.

Hammand, EC. (1966) Smoking in relation to the death rates of one million men and women. In: Haenxzel, W, ed. Epidemiological approaches to the study of cancer and other chronic diseases. National Cancer Institute Monograph No. 19. Washington, DC.

Hanahan, D; Weinberg, RA. (2000) The hallmarks of cancer. Cell 100:57–70.

Harris, CC; Hollstein, M. (1993) Clinical implications of the p53 tumor suppressor gene. N Engl J Med 329:1318–1327.

Haseman, JK. (1983) Issues: a reexamination of false-positive rates for carcinogenesis studies. Fundam Appl Toxicol 3:334–339.

Haseman, JK. (1984) Statistical issues in the design, analysis and interpretation of animal carcinogenicity studies. Environ Health Perspect 58:385–392.

Haseman, JK. (1985) Issues in carcinogenicity testing: dose selection. Fundam Appl Toxicol 5:66–78.

Haseman, JK. (1990) Use of statistical decision rules for evaluating laboratory animal carcinogenicity studies. Fundam Appl Toxicol 14:637–648.

Haseman, JK. (1995) Data analysis: Statistical analysis and use of historical control data. Regul Toxicol Pharmacol 21:52–59.

Hatch, EE; Palmer, JR; Titus-Ernstoff, L; Noller, KL et al. (1998) Cancer risk in women exposed to diethylstilbestrol in utero. JAMA 280:630-634.

Hattis, D. (1990) Pharmacokinetic principles for dose-rate extrapolation of carcinogenic risk from genetically active agents. Risk Anal 10:303–316.

Hawkins, NC; Evans, JS. (1989) Subjective estimation of toluene exposures: a calibration study of industrial hygienists, Applied Industrial Hygiene, 4:61-68.

Hawkins, NC; Graham, JD. (1988 ) Expert scientific judgment and cancer risk assessment: a pilot study of pharmacokinetic data, Risk Anal. 8:615-25.

Hayward, JJ; Shane, BS; Tindall, KR; et al. (1995) Differential in vivo mutagenicity of the carcinogen-noncarcinogen pair 2,4- and 2,6-diaminotoluene. Carcinogenesis 10:2429–2433.

Heddle, JA; Swiger, RR. (1996) Risk estimation from somatic mutation assays.  Mutat Res 365(1-3):107-17.

Herbst, AL, Ulfelder, H, Poskanzer, DC. (1971) Adenocarcinoma of the vagina: association of maternal stilbestrol therapy with tumor appearance in young women. N Engl J Med 284:878-881.

Hill, AB.  (1965)  The environment and disease: association or causation? Proc R Soc Med 58:295–300.

Hoel, DG; Kaplan, NL; Anderson, MW. (1983) Implication of nonlinear kinetics on risk estimation in carcinogenesis. Science 219:1032–1037.

Holliday, R. (1987) DNA methylation and epigenetic defects in carcinogenesis.  Mutat Res 181:215–217.

Holladay SD, Smialowicz RJ. 2000. Development of the murine and human immune system: differential effects of immunotoxicants depend on time of exposure. Environ Health Perspect 108 Suppl 3:463-473.

Holsapple MP, West LJ, Landreth KS. 2003. Species comparison of anatomical and functional immune system development. Birth Defects Res B Dev Reprod Toxicol 68(4):321-334.

Huff, JE. (1993) Chemicals and cancer in humans: first evidence in experimental animals. Environ Health Perspect 100:201-210.

Huff, JE. (1994) Chemicals causally associated with cancers in humans and laboratory animals. A perfect concordance. In: Carcinogenesis. Waalkes, MP, Ward, JM, eds., New York: Raven Press; pp. 25-37.

Huff J, Cirvello J, Haseman J, Bucher J (1991) Chemicals associated with site-specific neoplasia in 1394 long-term carcinogenesis experiments in laboratory rodents. Environ Health Perspect 93:247-70. Erratum in: Environ Health Perspect 1991 Nov;95:213.

Hulka, BS; Margolin, BH. (1992) Methodological issues in epidemiologic studies using biological markers. Am J Epidemiol 135:122–129.

IARC (International Agency for Research on Cancer). (1994) IARC monographs on the evaluation of carcinogenic risks to humans. Vol. 60. Some industrial chemicals. Lyon, France: IARC; pp. 13-33.

IARC. (International Agency for Research on Cancer) (1999) The use of short- and medium-term tests for carcinogens and data on genetic effects in carcinogenic hazard evaluation. Lyon, France.

IEc (Industrial Economics, Incorporated). 2004. "An Expert Judgment Study of the Concentration-Response Relationship Between PM2.5 Exposure and Mortality," Available at: www.epa.gov/ttn/ecas/benefits.html.

ILSI (International Life Sciences Institute). (1992) Similarities and differences between children and adults; implications for risk assessment. Washington, DC: ILSI Press.

ILSI (International Life Sciences Institute). (1997) Principles for the selection of doses in chronic rodent bioassays. Foran, JA, ed. Washington, DC: ILSI Press.

ILSI (International Life Sciences Institute). (2001) Proceedings of workshop on the evaluation of alternative methods for carcinogenesis testing. Toxicol Pathol 29:1–351.

IPCS (International Programme on Chemical Safety). (1999) IPCS workshop on developing a conceptual framework for cancer risk assessment, February 16-18, 1999, Lyon, France. IPCS/99.6. World Health Organization, Geneva.

Ito, N; Shirai, T; Hasegawa, R. (1992) Medium-term bioassays for carcinogens. In: Vainio, H, Magee, PN, McGregor, DB, et al., eds. Mechanisms of carcinogenesis in risk identifications. International Agency for Research on Cancer, Lyon, France; pp. 353–388.

Jelovsek ,FR; Mattison, DR; Young, JF. (1990) Eliciting principles of hazard identification from experts. Teratology 42:521-533.

Jones, PA. (1986) DNA methylation and cancer. Cancer Res 46:461–466.

Kehrer, JP. (1993) Free radicals as mediators of tissue injury and disease. Crit Rev Toxicol 23:21–48.

Kelsey, JL; Whittemore, AS; Evans, AS; Thompson, WD. (1996) Methods in observational epidemiology. New York: Oxford University Press.

Kimbell, JS; Subramaniam, RP; Gross, EA; Schlosser, PM; Morgan, KT. (2001) Dosimetry modeling of inhaled formaldehyde: comparisons of local flux predictions in the rat, monkey and human nasal passages. Toxicol Sci 64(1):100-110.

Kinzler, KW; Vogelstein, B. (2002) Colorectal tumors. In: Vogelstein, B; Kinzler, KW, eds. The genetic basis of human cancer. New York: McGraw-Hill.

Kinzler, KW; Nilbert, MC; Su, L-K; et al. (1991) Identification of FAP locus genes from chromosome 5q21. Science 253:661–665.

Kraus, AL; Munro, IC; Orr, JC; et al. (1995) Benzoyl peroxide: an integrated human safety assessment for carcinogenicity. Regul Toxicol Pharmacol 21:87–107.

Krewski, D; Van Ryzin, J. (1981) Dose response models for quantal response toxicity data. In: Csorgo; Dawson;  Rao; et al., eds. Statistics and related topics. Amsterdam: North-Holland, pp. 201–231.

Krewski, D; Murdoch, DJ; Withey, JR. (1987) The application of pharmacokinetic data in carcinogenic risk assessment. In: Pharmacokinetics in risk assessment: drinking water and health. Vol. 8. Washington, DC: National Academy Press; pp. 441–468.

La, DK; Swenberg, JA. (1996) DNA adducts: biological markers of exposure and potential applications to risk assessment.  Mutat Res 365(1-3):129- 46.

Levine, AJ; Perry, ME; Chang, A; et al. (1994) The 1993 Walter Hubert lecture: the role of the p53 tumor-suppressor gene in tumorigenesis. Br J Cancer 69:409–416.

Lijinsky, W. (1993) Species differences in carcinogenesis. In Vivo 7:65-72.

Lilienfeld, AM; Lilienfeld, D. (1979) Foundations of epidemiology, 2nd ed. New York: Oxford University Press.

Littlefield, NA; Farmer, JH; Gaylor, DW. (1980) ED01 study. J Environ Pathol Toxicol 3:17.

Maltoni, C; Lefemine, G; Ciliberti, A; et al. (1981) Carcinogenicity bioassay of vinyl chloride monomer: a model of risk assessment on an experimental basis. Environ Health Perspect 41:3–29.

Maronpot, RR; Shimkin, MB; Witschi, HP; et al. (1986) Strain A mouse pulmonary tumor test results for chemicals previously tested in National Cancer Institute carcinogenicity test. J Natl Cancer Inst 76:1101–1112.

Marsman, DS; Popp, JA. (1994) Biological potential of basophilic hepatocellular foci and hepatic adenoma induced by the peroxisome proliferator, Wy-14,643. Carcinogenesis 15:111–117.

Mausner, JS; Kramer, S. (1985) Epidemiology, 2nd ed. Philadelphia: W.B. Saunders.

McConnell, EE. (1992) Comparative response in carcinogenesis bioassay as a function of age at first exposure. In: Guzelian, P; Henry, CJ; Olin, SS, eds. Similarities and difference between children and adults: implications for risk assessment. Washington, DC: ILSI Press; pp. 66-78.

McConnell, EE; Solleveld, HA; Swenberg, JA; et al. (1986) Guidelines for combining neoplasms for evaluation of rodent carcinogenesis studies. J Natl Cancer Inst 76:283–289.

Meek, ME; Bucher, JR; Chohen, SM; Dellarco, V; Hill, RN; Lehman-McKeeman, LD; Longfellow, DG; Pastoor, T; Seed, J.; and Patton, DE. (2003) A framework for humand relevance analysis of information on carcinogenic modes of action.  Crit Rev Toxicol 33:591-653.

Melnick, RL, Huff, JE, Barrett, JC, Maronpot, RR, Lucier, G, Portier, CJ. (1993) Cell proliferation and chemical carcinogenesis: A symposium overview. Mol Carcinog 7:135-138.

Miller, RW. (1995) Special susceptibility of the child to certain radiation-induced cancers. Environ Health Perspect 103(suppl 6):41–44.

Miller, MD; Marty, MA; Arcus, A; et al. (2002) Differences between children and adults: implications for risk assessment at California EPA.  Int J Toxicol 21:403-418.

Monro, A. (1992) What is an appropriate measure of exposure when testing drugs for carcinogenicity in rodents? Toxicol Appl Pharmacol 112:171-181.

Moolgavkar, SH. (1986) Carcinogenesis Modelin: From Molecular Biology to Epidemiology. Am Rev Public Health 7:151-169.

Moolgavkar, SH; Knudson, AG. (1981) Mutation and cancer: a model for human carcinogenesis. J Natl Cancer Inst 66:1037–1052.

Morgan, KM; DeKay, ML; Fischbeck, PS; Morgan, MG; Fischhoff, B; Florig, HK. (2001) A deliberative method for ranking risks (II): Evaluation of validity and agreement among risk managers. Risk Anal. 21:923-37.

Morrison, V; Ashby, J. (1994) A preliminary evaluation of the performance of the muta[TM] mouse (lacZ) and Big Blue[TM] (lacI) transgenic mouse mutation assays. Mutagenesis 9:367–375.

Murdoch, DJ; Krewski, D; Wargo, J. (1992) Cancer risk assessment with intermittent exposure. Risk Anal 12(4):569–577.

Murrell, JA; Portier, CJ; Morris, RW. (1998) Characterizing dose-response I: critical assessment of the benchmark dose concept. Risk Anal 18(1):13–25.

NRC (National Research Council). (1983) Risk assessment in the federal government: managing the process. Committee on the Institutional Means for Assessment of Risks to Public Health, Commission on Life Sciences, NRC. Washington, DC: National Academy Press.

NRC (National Research Council). (1990) Health effects of exposure to low levels of ionizing radiation (BEIR V). Washington, DC: National Academy Press.

NRC (National Research Council). (1993a) Issues in risk assessment. Committee on Risk Assessment Methodology. Washington, DC: National Academy Press.

NRC (National Research Council). (1993b) Pesticides in the diets of infants and children. Washington, DC: National Academy Press.

NRC (National Research Council). (1994) Science and judgment in risk assessment. Washington, DC: National Academy Press.

NRC (National Research Council). (1996) Understanding risk: informing decisions in a democratic society. Washington, DC: National Academy Press.

NRC (National Research Council). (2002) Estimating the public health benefits of proposed air pollution regulations. Washington, DC: National Academy Press.

NTP (National Toxicology Program). (1984) Report of the ad hoc panel on chemical carcinogenesis testing and evaluation of the National Toxicology Program, Board of Scientific Counselors. Washington, DC: U.S. Government Printing Office. 1984-421-132:4726.

Nichols, AL; Zeckhauser,RJ. (1986). The dangers of caution:  Conservatism in the assessment and the mismanagement of risk. In:  Smith, VK, ed., Advances in Applied Micro-Economics: Risk, Uncertainty, and the Valuation of Benefits and Costs, Vol. 4, Greenwich, Conn.: JAI Press, pp. 55-82.

North, DW ; Merkhofer, MW. (1976). A methodology for analyzing emission control strategies. Comput Oper Res 3:187-207.

OECD (Organization for Economic Cooperation and Development). (1981) Guidelines for testing of chemicals. Carcinogenicity studies. No. 451. Paris, France.

OMB (Office of Management and Budget). (2002) Guidelines for ensuring and maximizing the quality, objectivity, utility, and integrity of information disseminated by federal agencies. Federal Register 67(36):8451-8460. Available from: http://www.epa.gov/oei/qualityguidelines/fr22fe02-117.htm.

OMB (Office of Management and Budget).  (2003) Circular A-4:  Regulatory Analysis. September 17.  Available from:  http://www.whitehouse.gov/omb/circulars/a004/a-4.pdf

OMB (Office of Management and Budget).  (2004) Revised information quality bulletin for peer review. April 15. Available from: http://www.whitehouse.gov/omb/inforeg/peer_review041404.pdf.

OSTP (Office of Science and Technology Policy). (1985) Chemical carcinogens: review of the science and its associated principles. Federal Register 50:10372-10442.

Peltomäki, P; Aaltonen, LA; Sisonen, P; et al. (1993) Genetic mapping of a locus predisposing human colorectal cancer. Science 260:810–812.

Peto, J. (1992) Meta-analysis of epidemiological studies of carcinogenesis. In: Mechanisms of carcinogenesis in risk assessment. IARC Sci. Pubs. No. 116, Lyon, France; pp. 571–577.

Peto, J; Darby, S. (1994) Radon risk reassessed. Nature 368:97–98.

Peto, R; Gray, R; Brantom, P; et al. (1984) Nitrosamine carcinogenesis in 5120 rodents: chronic administration of sixteen different concentrations of NDEA, NDMA, NPYR and NPIP in the water of 4440 inbred rats, with parallel studies on NDEA alone of the effect of age of starting (3,6, or 20 weeks) and of species (rats, mice or hamsters).  IARC Sci Publ 57:627–665.

Pinkerton, KE; Joad, J. (2000) The mammalian respiratory system and critical windows of exposure for children's health. Environ Health Perspect 108(suppl):457–462.

Portier, C. (1987) Statistical properties of a two-stage model of carcinogenesis. Environ Health Perspect 76:125–131.

Putzrath, RM; Ginevan, ME (1991) Meta-analysis: Methods for combining data to improve quantitative risk assessment.  Regul Toxicol Pharmacol 14:178-188

Rall, DP. (1991) Carcinogens and human health: part 2. Science 251:10–11.

Renn, O. (1999) Model for an analytic-deliberative process in risk management. Environ Sci Technol 33:3049-3055.

Renwick, AG. (1998)  Toxicokinetics in infants and children in relation to the ADI and TDI. Food Addit Contam 15, Suppl 17–35.

Rice, JM. (1979) Problems and perspective in perinatal carcinogenesis: a summary of the conference. NCI Monogr 51:271-278.

Richard, AM. (1998a) Structure-based methods for predicting mutagenicity and carcinogenicity: are we there yet? Mutat Res 400:493-507.

Richard, AM, (1998b) Commercial toxicology prediction systems: A regulatory perspective. Toxicol. Lett. 102-103:611-616.

Richard, AM; Williams, CR.  (2002) Distributed structure-searchable toxicity (DSSTox) public database network: a proposal: Mutat. Res. 499:27-52.

Richmond, HM. (1981). A framework for assessment of health risks associated with national ambient air quality standards.  Environ Prof 3:225-234.

Rothman, KJ; Greenland, S. (1998) Modern Epidemiology.  Philadelphia: Lippincott Williams and Wilkins Publishers.

Rouse, J; Jackson, SP. (2002) Interfaces between the detection, signaling, and repair of DNA damage. Science 297:547–551.

Samet, JM; Schnatter, R; Gibb, H. (1998) Invited Commentary: Epidemiology and risk assessment.  Am J Epidemiol 148:929-936.

Scheuplein, R; Charnley, G; Dourson, M. (2002) Differential sensitivity of children and adults to chemical toxicity. I: biological basis.  Regul Toxicol Pharmacol 35:429-447.

SAB (Science Advisory Board). (1997) An SAB report: guidelines for cancer risk assessment. Washington DC: U.S. Environmental Protection Agency, September. EPA-SAB-EHC-97-010. Available from:  http://www.epa.gov/sab/pdf/ehc9710.pdf.

Shelby, MD; Zeiger, E. (1990) Activity of human carcinogens in the *Salmonella* and rodent bone-marrow cytogenetics tests. Mutat Res 234:257–261.

Silberstein, GB. (2001) Tumour-stromal interactions: role of the stroma in mammary development.  Breast Cancer Res 3:218-223.

Slikker W, 3rd, Mei N, Chen T. 2004. N-ethyl-N-nitrosourea (ENU) increased brain mutations in prenatal and neonatal mice but not in the adults. Toxicol Sci 81(1):112-120. Sisk, SC; Pluta, LJ; Bond, JA; et al. (1994) Molecular analysis of lacI mutants from bone marrow of B6C3F1 transgenic mice following inhalation exposure to 1,3-butadiene. Carcinogenesis 15(3):471–477.

Snedecor, GW; Cochran, WG. (1967) Statistical methods, 6th ed. Ames, Iowa: Iowa State University Press.

Sonich-Mullin, C; Fielder, R; Wiltse, J; Baetcke, K; Dempsey. K; Fenner-Crisp, P; Grant, D; Hartley, M; Knaap, A; Kroese, D; Mangelsdorf, I; Meek, E; Rice, JM; and Yones, M. (2001) IPCS conceptual framework for evaluating a mode of action for chemical carcinogenesis.  Regul Toxicol Phamacol 34:146-152.

Spalding, JW; French, JE; Stasiewicz, S; Furedi-Machacek, M; Conner, F; Tice, RR; Tennant, RW. (2000) Responses of transgenic mouse lines p53(+/-) and Tg.AC to agents tested in conventional carcinogenicity bioassays. Toxicol Sci 53(2)213-223.

Stiber, NA; Pantazidou, M; Small, MJ. (1999) Expert system methodology for evaluating reductive dechlorination at TCE sites. Environ Sci Technol 33:3012-3020.

Stiteler, WH; Knauf, LA; Hertzberg, RC; et al. (1993) A statistical test of compatibility of data sets to a common dose-response model. Regul Toxicol Pharmacol 18:392–402.

Subramaniam, RP; Asgharian, B; Freijer, JI; Miller, FJ; Anjilvel, S. (2003) Analysis of differences in particle deposition in the human lung. Inhal Toxicol 15:1-21.

Swierenga, SHH; Yamasaki, H. (1992) Performance of tests for cell transformation and gap junction intercellular communication for detecting nongenotoxic carcinogenic activity. In: Mechanisms of carcinogenesis in risk identification. IARC Sci. Pubs. No. 116, Lyon, France; pp. 165–193.

Szklo, M; Nieto, FJ. (2000): Epidemiology Beyond the Basics. Gaithersburg, MD: Aspen Publishers, Inc.

Tarone, RE. (1982) The use of historical control information in testing for a trend in proportions. Biometrics 38:215–220.

Taylor, JH; Watson, MA; Devereux, TR; et al. (1994) p53 mutation hotspot in radon-associated lung cancer. Lancet 343:86–87.

Tennant, RW. (1993) Stratification of rodent carcinogenicity bioassay results to reflect relative human hazard. Mutat Res 286:111–118.

Tennant, RW; French, JE; Spalding, JW. (1995) Identifying chemical carcinogens and assessing potential risk in short-term bioassays using transgenic mouse models. Environ Health Perspect 103:942–950.

Tennant, RW; Stasiewicz, S; Mennear, J; et al. (1999) Genetically altered mouse models for identifying carcinogens. In: McGregor, DB; Rice, JM; Venitt, S, eds. The use of short- and medium-term tests for carcinogens and data on genetic effects in carcinogenic hazard evaluation. Lyon, France: International Agency for Research on Cancer.

Tinwell, H; Ashby, J. (1991) Activity of the human carcinogen MeCCNU in the mouse bone marrow mironucleus test. Environ Molec Mutagen 17:152–154.

Todd, GC. (1986) Induction of reversibility of thyroid proliferative changes in rats given an antithyroid compound. Vet Pathol 23:110–117.

Tomatis, L; Aitio, A; Wilbourn, J; et al. (1989) Human carcinogens so far identified. Jpn J Cancer Res 80:795–807.

Tucker, JD; Preston, RJ. (1996) Chromosome aberrations, micronuclei, aneuploidy, sister chromatid exchanges, and cancer risk assessment. Mutat Res 365(1-3):147-59. Review.

U.S. EPA (U.S. Environmental Protection Agency). (1986a) Guidelines for carcinogen risk assessment. Federal Register 51(185):33992–34003. Available from: http://www.epa.gov/ncea/raf/.

U.S. EPA (U.S. Environmental Protection Agency). (1986b) Guidelines for mutagenicity risk assessment. Federal Register 51(185):34006-34012. Available from: http://cfpub.epa.gov/ncea/raf/recorddisplay.cfm?deid=23160.

U.S. EPA (U.S. Environmental Protection Agency). (1989) Summary of the second workshop carcinogenesis bioassay with the dermal route. May 18-19, 1988, Research Triangle Park, NC. EPA/560/6-89/003. Available from NTIS, Springfield, VA 22161.

U.S. EPA (U.S. Environmental Protection Agency). (1991a) Guidelines for developmental toxicity risk assessment. Federal Register 56(234):63798-63826. Available from: http://cfpub.epa.gov/ncea/raf/recorddisplay.cfm?deid=23162.

U.S. EPA (U.S. Environmental Protection Agency). (1991b) Alpha-2u-globulin: association with chemically induced renal toxicity and neoplasia in the male rat. Risk Assessment Forum, Washington, DC. EPA/625/3-91/019F.

U.S. EPA (U.S. Environmental Protection Agency). (1992a) Guidelines for exposure assessment. Federal Register 57(104):22888-22938. Available from: http://cfpub.epa.gov/ncea/raf/recorddisplay.cfm?deid=15263.

U.S. EPA (U.S. Environmental Protection Agency). (1992b) Draft report: a cross-species scaling factor for carcinogen risk assessment based on equivalence of mg/kg$^{3/4}$/day. Federal Register 57(109):24152-24173.

U.S. EPA (U.S. Environmental Protection Agency). (1994) Methods for derivation of inhalation reference concentrations and application of inhalation dosimetry. Office of Health and Environmental Assessment, Environmental Criteria and Assessment Office, Research Triangle Park, NC. EPA/600/8-90/066F.

U.S. EPA (U.S. Environmental Protection Agency). (1995) Policy for risk characterization. Memorandum of Carol M. Browner, Administrator, March 21, 1995, Washington, DC. Available from: http://www.epa.gov/osp/spc/2riskchr.htm.

U.S. EPA (U.S. Environmental Protection Agency). (1996a) Guidelines for reproductive toxicity risk assessment. Federal Register 61(212):56274-56322. Available from: http://cfpub.epa.gov/ncea/raf/recordisplay.cfm?deid=2838.

U.S. EPA (U.S. Environmental Protection Agency). (1996b) Comparison of the effects of chemicals with combined perinatal and adult exposure vs. Adult only exposure in carcinogenesis studies.  Office of Pesticide Programs. Washington, DC.

U.S. EPA (U.S. Environmental Protection Agency). (1997a) A proposed OPP policy on determining the need for perinatal carcinogenicity testing on a pesticide.  Office of Pesticide Programs. Washington, DC.

U.S. EPA (U.S. Environmental Protection Agency). (1997b) A set of scientific issues being considered by the Agency in connection with the criteria for requiring in-utero cancer studies. Office of Pesticide Programs.  FIFRA Scientific Advisory Panel.  September 1997 meeting report. Available from: http://www.epa.gov/pesticides/SAP/archive/september/finalsep.htm.

U.S. EPA (U.S. Environmental Protection Agency). (1997c) Exposure factors handbook. National Center for Environmental Assessment, Washington, DC. EPA/600/P-95/002F. Available from: http://cfpub.epa.gov/ncea/cfm/recordisplay.cfm?deid=12464.

U.S. EPA (U.S. Environmental Protection Agency). (1997d) Policy for use of probabilistic analysis in risk assessment. Memorandum of Fred Hansen, Deputy Administrator, May 15, 1997. Available from: http://www.epa.gov/osp/spc/probpol.htm.

U.S. EPA (U.S. Environmental Protection Agency). (1997e) Guiding principles for Monte Carlo analysis. Risk Assessment Forum, Washington, DC. EPA/630/R-97/001. Available from: http://cfpub.epa.gov/ncea/raf/recordisplay.cfm?deid=29596.

U.S. EPA (U.S. Environmental Protection Agency). (1998a) Assessment of thyroid follicular cell tumors.  Risk Assessment Forum, Washington, DC. EPA/630/R-97/002. Available from: http://cfpub.epa.gov/ncea/raf/recordisplay.cfm?deid=13102.

U.S. EPA (U.S. Environmental Protection Agency). (1998b) Guidelines for neurotoxicity risk assessment. Federal Register 63(93):26926-26954. Available from: http://cfpub.epa.gov/ncea/raf/recordisplay.cfm?deid=12479.

U.S. EPA (U.S. Environmental Protection Agency). (1998c) Health effects test guidelines: OPPTS 870.4300 combined chronic toxicity/carcinogenicity. Office of Prevention, Pesticides and Toxic Substances, Washington, DC. EPA/712/C-98/212. Available from: http://www.epa.gov/opptsfrs/OPPTS_Harmonized/870_Health_Effects_Test_Guidelines/Series/

U.S. EPA (U.S. Environmental Protection Agency). (1998d) EPA's rule writer's guide to Executive Order 13045. Available from: http://yosemite.epa.gov/ochp/ochpweb.nsf/content/whatwe_regulate.htm

U.S. EPA (U.S. Environmental Protection Agency). (1999a) Guidelines for carcinogen risk assessment (review draft). Risk Assessment Forum, Washington, DC. NCEA-F-0644. Available from: http://www.epa.gov/ncea/raf/cancer.htm.

U.S. EPA (U.S. Environmental Protection Agency). (1999b) Review of revised sections of the proposed guidelines for carcinogen risk assessment. Science Advisory Board, Washington, DC. EPA/SAB/EC-99/015. Available from: http://www.epa.gov/ncea/raf/cancer.htm.

U.S. EPA (U.S. Environmental Protection Agency). (1999c) Cancer risk coefficients for environmental exposure to radionuclides: federal guidance report no. 13. Office of Air and Radiation. EPA/402/R-99/001. Available from: http://www.epa.gov/radiation/federal.

U.S. EPA (U.S. Environmental Protection Agency). (2000a) Science Policy Council handbook: peer review.  Office of Research and Development, Office of Science Policy, Washington, DC. EPA/100/B-98/001. Available from: http://www.epa.gov/osp/spc/prhandbk.pdf.

U.S. EPA (U.S. Environmental Protection Agency). (2000b) U.S. EPA. Science Policy Council handbook: risk characterization. EPA Science Policy Council, Washington, DC. EPA/100/B-00/002. Available from: http://www.epa.gov/osp/spc/rchandbk.pdf

U.S. EPA (U.S. Environmental Protection Agency). (2000c) Supplementary guidance for conducting health risk assessments of chemical mixtures. Risk Assessment Forum, Washington, DC. EPA/630/R-00/002. Available from: http://cfpub.epa.gov/ncea/raf/recordisplay.cfm?deid=20533.

U.S. EPA (U.S. Environmental Protection Agency). (2000d) Guidance for data quality assessment: practical methods for data analysis. Office of Environmental Information, Washington, DC. EPA/600/R-96/084. Available from: http://www.epa.gov/quality/qs-docs/g9-final.pdf.

U.S. EPA (U.S. Environmental Protection Agency). (2000e) EPA quality manual for environmental programs 5360 A1.  Available from: http://www.epa.gov/quality/qs-docs/5360.pdf.

U.S. EPA (U.S. Environmental Protection Agency). (2001a) Health effects test guidelines. Combined chronic toxicity/carcinogenicty testing of respirable fibrous particles. OPPTS 870.8355. Available from: http://www.epa.gov/opptsfrs/home/guidelin.htm.

U.S. EPA (U.S. Environmental Protection Agency). (2001b) Notice of opportunity to provide additional information and comment. Fed Reg 66:59593-59594.  Available from: http://cfpub.epa.gov/ncea/raf/recordisplay.cfm?deid=55868.

U.S. EPA (U.S. Environmental Protection Agency). (2002a) Guidelines for ensuring and maximizing the quality, objectivity, utility and integrity for information disseminated by the Environmental Protection Agency. Office of Environmental Information, Washington, DC. EPA/260/R-02/008. Available from: http://www.epa.gov/oei/qualityguidelines/index.html.

U.S. EPA (U.S. Environmental Protection Agency). (2002b) A review of the reference dose and reference concentration process . Risk Assessment Forum, Washington, DC. EPA/630/P-02/002F. Available from:  http://cfpub.epa.gov/ncea/raf/recordisplay.cfm?deid=55365.

U.S. EPA (U.S. Environmental Protection Agency). (2002c) Workshop on the benefits of reductions in exposure to hazardous air pollutants: developing best estimates of dose-response functions. Science Advisory Board, Washington, DC. EPA/SAB-EC/WKSHP/02/001. Available from: http://www.epa.gov/science1/fiscal02.htm.

U.S. EPA (U.S. Environmental Protection Agency). (2002d) Child-specific exposure factors handbook (interim report). EPA/600/P-00/002B. Office of Research and Development, National Center for Environmental Assessment, Washington, DC, 448 pp. Available from: http://cfpub.epa.gov/ncea/cfm/recordisplay.cfm?deid=55145.

U.S. EPA (U.S. Environmental Protection Agency). (2003) A summary of general assessment factors for evaluating the quality of scientific and technical information. Science Policy Council, Washington, DC. EPA 100/B-03/001.  Available from: http://www.epa.gov/osa/spc/htm/assess2.pdf.

U.S. EPA (U.S. Environmental Protection Agency). (2004).  Final Regulatory Analysis: Control of Emissions from Nonroad Diesel Engines.  Prepared by U.S. EPA, Office of Transportation and Air Quality, Washington, DC, May; EPA report no.  EPA420-R-04-007.  See chapter 9 and Appendix B.  Available from:  http://www.epa.gov/nonroad-diesel/2004fr.htm#ria

U.S. EPA (U.S. Environmental Protection Agency). (2005) Supplemental guidance for assessing cancer susceptibility from early-life exposure to carcinogens. Risk Assessment Forum, Washington, DC. Available from: http://www.epa.gov/ncea/raf.

Vainio, H; Magee, P; McGregor, D; et al. (1992) Mechanisms of carcinogenesis in risk identification. IARC Sci. Pubs. No. 116. Lyon, France: IARC.

Van Der Fels-Klerx, IHJ; Goossens, LHJ; Saatkamp, HW; Horst, SHS. (2002) Elicitation of quantitative data from a heterogeneous expert panel: formal process and application in animal health.  Risk Anal.22:67-81.

R-17

Van Sittert, NJ; De Jong, G; Clare, MG; et al. (1985) Cytogenetic, immunological, and hematological effects in workers in an ethylene oxide manufacturing plant. Br J Indust Med 42:19–26.

Vater, ST; McGinnis, PM; Schoeny, RS; et al. (1993) Biological considerations for combining carcinogenicity data for quantitative risk assessment. Regul. Toxicol Pharmacol 18:403–418.

Vesselinovitch, SD; Rao, KVN; Mihailovich, N. (1979) Neoplastic response of mouse tissues during perinatal age periods and its significance in  chemical carcinogenesis. NCI Monogr 51:239.

Vogelstein, B; Fearon, ER; Hamilton, SR; et al. (1988) Genetic alterations during colorectal-tumor development.  N Eng J Med 319:525–532.

Walker, KD; MacIntosh, D; Evans, JS. (2001) Use of expert judgment in exposure assessment. Part I. Characterization of personal exposure to benzene.  J Exposure Environ Epidemiol 11:308-322.

Walker, KD; Catalano, P; Hammitt, JK; Evans, JS. (2003) Use of expert judgment in exposure assessment: part 2. Calibration of expert judgments about personal exposures to benzene. J Expo Anal Environ Epidemiol. 13:1-16.

Waters, MD; Stack, H; F.Jackson, MA. (1999) Short-term tests for defining mutagenic carcinogens. In: McGregor, DB; Rice, JM; Venitt, S, eds. The use of short term tests for carcinogens and data on genetic effects in carcinogenic hazard evaluation. Lyon, France: International Agency for Research on Cancer. IARC Sci. Publ. No. 146, pp.499-536.

Whitfield, RG;Wallsten, TS. (1989). A risk assessment for selected lead-induced health effects: an example of a general methodology. Risk Anal. 9:197-208.

Whysner, J; Williams, GM. (1996) Saccharin mechanistic data and risk assessment: urine composition, enhanced cell proliferation, and tumor promotion. Pharmacol Ther 71:225:252.

Willis, HH; DeKay, ML; Morgan, MG; Florig, HK; Fischbeck, PS. (2004) Ecological risk ranking: development and evaluation of a method for improving public participation in environmental decision making, Risk Anal. 24:363-78.

Winkler, RL; Wallsten, TS; Whitfield, RG; Richmond, HM; Rosenbaum, AS. (1995).  An assessment of the risk of chronic lung injury attributable to long-term ozone exposure. Operations Research 43:19-28.

Woo, YT; Arcos, JC. (1989) Role of structure-activity relationship analysis in evaluation of pesticides for potential carcinogenicity. In: Ragsdale, NN; Menzer, RE, eds. Carcinogenicity and

pesticides: principles, issues, and relationship. ACS Symposium Series No. 414. San Diego: Academic Press; pp. 175–200.

Yamasaki, H. (1995) Non-genotoxic mechanisms of carcinogenesis: Studies of cell transformation and gap junctional intercellular communication. Toxicol Lett 77:55–61.

Zeckhauser, RJ; Viscusi, WK. (1990). Risk Within Reason, Science 248:559-564.

# EXHIBIT 9

# Revised Glyphosate Issue Paper:
# Evaluation of Carcinogenic Potential

# EPA's Office of Pesticide Programs
# December 12, 2017



DP Barcode: D444689
TXR#: 0057688

**Table of Contents**

List of Acronyms ................................................................................................................... 7

List of Tables ..................................................................................................................... 10

1.0    Introduction ............................................................................................................ 12

1.1    Background ............................................................................................................. 12

1.2    Evaluation of Carcinogenic Potential .................................................................... 12

1.3    Overview of "Framework for Incorporating Human Epidemiologic & Incident Data in Health Risk Assessment" ........................................................................................... 14

1.4    Summary of the Exposure Profile in the United States ......................................... 15

1.5    Organization of this Document ............................................................................... 19

2.0    Systematic Review & Data Collection ................................................................... 19

2.1    Data Collection: Methods & Sources ..................................................................... 20

2.1.1  Open Literature Search .......................................................................................... 20

2.1.2  Studies Submitted to the Agency ........................................................................... 21

2.2    Evaluation of Relevant Studies .............................................................................. 22

3.0    Data Evaluation of Epidemiology .......................................................................... 23

3.1    Introduction ............................................................................................................ 23

3.2    Considerations for Study Quality Evaluation and Scope of Assessment ............... 23

3.2.1  Study Designs ......................................................................................................... 24

3.2.1.1    Analytical Studies ............................................................................................ 26

3.2.1.2   Descriptive Studies ............................................................................ 27

3.2.2   Exposure Measures ................................................................................ 28

3.2.3   Outcome Measures ................................................................................ 28

3.2.4   Confounding ........................................................................................ 28

3.2.5   Statistical Analyses .............................................................................. 29

3.2.6   Risk of Bias ......................................................................................... 29

3.3   Review of Quality Results ...................................................................... 30

3.3.1   "High" Quality Group ............................................................................ 31

3.3.2   "Moderate" Quality Group ..................................................................... 32

3.3.3   "Low" Quality Group ............................................................................. 32

3.4   Assessment of Epidemiological Studies for Relevance to Analysis ............. 44

3.5   Summary of Relevant Epidemiological Studies ........................................ 45

3.5.1   Solid Tumor Cancer Studies .................................................................. 45

3.5.2   Non-Solid Tumor Cancer Studies ........................................................... 53

3.6   Discussion ............................................................................................ 63

4.0   Data Evaluation of Animal Carcinogenicity Studies ................................. 69

4.1   Introduction ......................................................................................... 69

4.2   Consideration of Study Quality for Animal Carcinogenicity Studies .......... 69

4.3   Assessment of Animal Carcinogenicity Studies ....................................... 71

**4.4**    **Summary of Animal Carcinogenicity Studies** ................................................................ **74**

**4.5**    **Rat Carcinogenicity Studies with Glyphosate** ......................................................... **74**

**4.5.1   Lankas, 1981 (MRID 00093879)** ................................................................................ **74**

**4.5.2   Stout and Ruecker, 1990 (MRID 41643801)** .............................................................. **75**

**4.5.3   Atkinson *et al.*, 1993a (MRID 49631701)** ................................................................ **79**

**4.5.4   Brammer, 2001 (MRID 49704601)** .............................................................................. **80**

**4.5.5   Pavkov and Wyand 1987 (MRIDs 40214007, 41209905, 41209907)** ........................... **80**

**4.5.6   Suresh, 1996 (MRID 49987401)** ................................................................................ **81**

**4.5.7   Enemoto, 1997 (MRID 50017103-50017105)** ............................................................. **81**

**4.5.8   Wood *et al.*, 2009a (MRID 49957404)** ...................................................................... **81**

**4.5.9   Summary of Rat Data** ................................................................................................ **82**

**4.6**    **Mouse Carcinogenicity Studies with Glyphosate** .................................................... **85**

**4.6.1   Reyna and Gordon, 1973 (MRID 00061113)** ............................................................. **85**

**4.6.2   Knezevich and Hogan, 1983 (MRID 00130406)** ........................................................ **85**

**4.6.3   Atkinson, 1993b (MRID 49631702)** ........................................................................... **87**

**4.6.4   Wood *et al.*, 2009b (MRID 49957402)** ...................................................................... **88**

**4.6.5   Sugimoto, 1997 (MRID 50017108 - 50017109)** ......................................................... **89**

**4.6.6   Pavkov and Turnier, 1987 (MRIDs 40214006, 41209907)** ......................................... **90**

**4.6.7   Summary of Mouse Data** ........................................................................................... **90**

4.7     Absorption, Distribution, Metabolism, Excretion (ADME)........................... 93

4.8     Discussion.............................................................................................. 94

5.0     Data Evaluation of Genetic Toxicity ..................................................... 98

5.1     Introduction........................................................................................... 98

5.2     Scope of the Assessment Considerations for Study Quality Evaluation.................... 99

5.3     Tests for Gene Mutations for Glyphosate Technical ................................. 100

5.3.1   Bacterial Mutagenicity Assays............................................................ 100

5.3.2   *In vitro* Tests for Gene Mutations in Mammalian Cells ........................... 106

5.4     *In vitro* Tests for Chromosomal Abnormalities...................................... 108

5.4.1   *In vitro* Mammalian Chromosomal Aberration Test................................. 108

5.4.2   *In vitro* Mammalian Micronucleus Test................................................. 109

5.5     *In Vivo* Genetic Toxicology Tests........................................................... 114

5.5.1   *In Vivo* Assays for Chromosomal Abnormalities.................................... 114

5.5.1.1 Mammalian Bone Marrow Chromosomal Aberration Assays...................... 114

5.5.1.2 Rodent Dominant Lethal Test .............................................................. 114

5.5.1.3 *In Vivo* Mammalian Erythrocyte Micronucleus Assays ......................... 115

5.6     Additional Genotoxicity Assays Evaluating Primary DNA Damage ................. 122

5.7     Summary and Discussion ..................................................................... 129

6.0     Data Integration & Weight-of-Evidence Analysis Across Multiple Lines of Evidence
        132

6.1     Background ......................................................................................... 132

6.2     Dose-Response and Temporal Concordance ................................................ 132

6.3     Strength, Consistency, and Specificity ..................................................... 133

6.4     Biological Plausibility and Coherence ...................................................... 135

6.5     Uncertainty ....................................................................................... 136

6.6     Evaluation of Cancer Classification per the 2005 EPA Guidelines for Carcinogen
Risk Assessment ........................................................................................... 138

6.6.1   Introduction ...................................................................................... 138

6.6.2   Discussion of Evidence to Support Cancer Classification Descriptors ................ 141

6.7     Proposed Conclusions Regarding the Carcinogenic Potential of Glyphosate .......... 143

7.0     Collaborative Research Plan for Glyphosate and Glyphosate Formulations .......... 145

8.0     References .......................................................................................... 147

## List of Acronyms

ADME: Absorption, Distribution, Metabolism, and Excretion
AHS: Agricultural Health Study
AOP: Adverse Outcome Pathway
AMPA: Aminomethylphosphonic Acid
BrdU: Bromodeoxyuridine
CA: Chromosomal Aberration
CARC: Cancer Assessment Review Committee
CBPI: Cytokinesis Block Proliferation Index
CHL: Chinese Hamster Lung
CHO: Chinese Hamster Ovary
CPRC: Carcinogenicity Peer Review Committee
EFSA: European Food Safety Authority
EPSPS: 5-enolpyruvylshikimate-3-phosphate synthase
FAO: Food and Agriculture Organization
FIFRA: Federal Insecticide, Fungicide, and Rodenticide Act
FISH: Fluorescence *in situ* Hybridization
GC-MS: Gas Chromatography-Mass Spectrometry
HL: Hodgkin Lymphoma
HPLC: High-Performance Liquid Chromatography
HPRT: Hypoxanthine-Guanine Phosphoribosyl Transferase
IARC: International Agency for Research on Cancer
JMPR: Joint FAOWHO Meeting on Pesticide Residues
MGUS: Monoclonal Gammopathy of Undetermined Significance
MN: Micronuclei
MOA: Mode of Action
MPCE: Micronucleated Polychromatic Erythrocytes
MRID: Master Record Identifier (a unique number assigned to each study submitted to EPA)
MTD: Maximum Tolerated Dose
NB: Nuclear Bud
NCR: National Research Council
NHL: Non-Hodgkin Lymphoma
NPB: Nucleoplasmic Bridges
NTP: National Toxicology Program
OCSPP: Office of Chemical Safety and Pollution Prevention
OECD: Organization for Economic Cooperation and Development
OPP: Office of Pesticides Program
PCE: Polychromatic Erythrocytes
PK: Pharmacokinetic
PPE: Personal Protective Equipment
PWG: Pathology Work Group
RED: Registration Eligibility Decision
ROS: Reactive Oxygen Species
SAP: Scientific Advisory Panel
SCE: Sister Chromatid Exchange

SCGE: Single Cell Gel Electrophoresis
TAC: Total Antioxidant Capacity
TK: Thymidine Kinase
UDS: Unscheduled DNA Synthesis
USGS: United States Geological Survey
UV: Ultraviolet
WHO: World Health Organization
XPRT: Xanthine-Guanine Phosphoribosyl Transferase

**List of Figures**

Figure 1.1.  Source to outcome pathway (adapted from NRC, 2007)

Figure 1.2.  Glyphosate agricultural usage (pounds applied annually) from 1987- 2014. Boxes indicate years when glyphosate-resistant crops were introduced.  Source: Proprietary Market Research Data (1987 – 2014)

Figure 1.3. Map of estimated agricultural use for glyphosate in 1994 from USGS

Figure 1.4. Map of estimated agricultural use for glyphosate in 2014 from USGS

Figure 3.1.  Study evaluation process for epidemiological studies

Figure 3.2.  Forest plot of effect estimates (denoted as ES for effect sizes) and associated 95% confidence intervals (CI) for non-Hodgkin lymphoma (NHL)

Figure 7.1.  Results of HepG2 exposures following 24 hour incubation using different glyphosate formulations

## List of Tables

Table 3.1 Epidemiology Study Quality Considerations

Table 3.2.  Summary of Study Design Elements Impacting Study Quality Assignment and Overall Ranking

Table 3.3. Summary of Findings: Solid Tumor Cancer Studies

Table 3.4.  Summary of Findings: Non-Solid Tumor Cancer Studies

Table 4.1.  Testicular Interstitial Cell Tumors in Male Sprague-Dawley Rats (Lankas, 1981) Cochran-Armitage Trend Test & Fisher's Exact Test Results

Table 4.2.  Pancreatic Islet Cell Tumors in Male Sprague-Dawley Rats (Stout and Ruecker, 1990) Cochran-Armitage Trend Test & Fisher's Exact Test Results

Table 4.3.  Historical Control Data — Pancreatic Islet Cell Adenomas in Male Sprague-Dawley Rats (MRID No. 41728701)

Table 4.4.  Hepatocellular Tumors in Male Sprague-Dawley Rats (Stout and Ruecker, 1990) Cochran-Armitage Trend Test & Fisher's Exact Test Results

Table 4.5.  Historical Control Data - Hepatocellular Tumors in Male Sprague- Dawley Rats (MRID No. 41728701).

Table 4.6.  Thyroid C-Cell Tumors in Male Sprague-Dawley Rats (Stout and Ruecker, 1990) Cochran-Armitage Trend Test & Fisher's Exact Test Results

Table 4.7.  Thyroid C-Cell Tumors in Female Sprague Dawley Rats Cochran-Armitage Trend Test & Fisher's Exact Test Results (Stout and Ruecker, 1990)

Table 4.8.  Historical Control Data - Thyroid C-Cell Tumors in Female Sprague-Dawley Rats (MRID No. 41728701).

Table 4.9. Thyroid Non-Neoplastic Lesions (Stout and Ruecker, 1990)

Table 4.10.  Liver Adenomas in Male Wistar Rats (Brammer, 2001) Cochran-Armitage Trend Test and Fisher's Exact Test Results

Table 4.11.  Mammary Gland Tumor Incidences in Female Rats (Wood et al., 2009a) Fisher's Exact Test and Cochran-Armitage Trend Test Results

Table 4.12. Summary of Rat Carcinogenicity Studies

Table 4.13.  Renal Tubular Cell Tumors in Male CD-1 Mice (Knezevich and Hogan, 1983) Cochran-Armitage Trend Test & Fisher's Exact Test Results

Table 4.14. Historical Control Data- Kidney tumors in CD-1 Mice (TXR #0007252).

Table 4.15. Kidney Histopathological Alterations in Male CD-1 Mice (Knezevich and Hogan, 1983)

Table 4.16.  Hemangiosarcomas in Male CD-1 Mice (Atkinson, 1993b) Cochran-Armitage Trend Test and Fisher's Exact Test Results

Table 4.17.  Lung Tumors in Male CD-1 Mice (Wood et al., 2009b) Fisher's Exact Test and Cochran-Armitage Trend Test Results

Table 4.18.  Malignant Lymphomas in Male CD-1 Mice (Wood et al., 2009b) Fisher's Exact Test and Cochran-Armitage Trend Test Results

Table 4.19.  Hemangioma Incidences (Sugimoto, 1997) Fisher's Exact Test and Cochran-Armitage Trend Test Results

Table 4.20. Summary of Mouse Carcinogenicity Studies

Table 5.1.  *In vitro* Test for Gene Mutations in Bacteria: Glyphosate Technical

Table 5.2.  *In vitro* Mammalian Gene Mutation Assays: Glyphosate Technical

Table 5.3.  *In vitro* Tests for Chromosome Aberrations in Mammalian Cells- Glyphosate Technical

Table 5.4.  *In vitro* Tests for Micronuclei Induction in Mammalian Cells- Glyphosate Technical

Table 5.5.  *In Vivo* Tests for Chromosomal Aberrations in Mammals- Glyphosate Technical

Table 5.6.  In Vivo Tests for Micronuclei Induction in Mammals- Glyphosate Technical

Table 5.7 Assays for Detecting Primary DNA Damage- Glyphosate Technical

## 1.0    Introduction

### 1.1    Background

Glyphosate is a non-selective, phosphonomethyl amino acid herbicide registered to control weeds in various agricultural and non-agricultural settings.  The herbicide acts by inhibiting the 5-enolpyruvylshikimate-3-phosphate synthase (EPSPS) enzyme, which is not present in mammalian systems.  Glyphosate was initially registered in 1974.  Since then, several human health analyses have been completed for glyphosate.  In 1986, EPA issued the Glyphosate Registration Standard which updated the agency's toxicity database for this compound.  In 1993, EPA issued the registration eligibility decision (RED) that indicated that glyphosate was eligible for re-registration.

Currently, glyphosate is undergoing Registration Review[1], a program where all registered pesticides are reviewed at least every 15 years as mandated by the Federal Insecticide, Fungicide, and Rodenticide Act (FIFRA).  The initial docket opening for glyphosate occurred in 2009 with the publication of the human health scoping document and preliminary work plan[2].  As part of this process, the hazard and exposure of glyphosate are reevaluated to determine its potential risk to human and environmental health.  Risks are assessed using current practices and policies to ensure pesticide products can still be used safely.  Registration Review also allows the agency to incorporate new science.  For human health risk assessment, both non-cancer and cancer effects are evaluated for glyphosate and its metabolites, aminomethylphosphonic acid (AMPA) and *N*-acetyl-glyphosate; however, this document will focus on the cancer effects only.  EPA expects to complete its complete human health risk assessment in 2017 that will include an assessment of risk from anticipated exposures resulting from registered uses of glyphosate in residential and occupational settings.

### 1.2    Evaluation of Carcinogenic Potential

Since its registration, the carcinogenic potential of glyphosate has been evaluated by EPA several times.  In 1985, the initial peer review of glyphosate was conducted in accordance with the Proposed Guidelines for Carcinogen Risk Assessment.  The agency classified glyphosate as a Group C chemical (Possible Human Carcinogen), based on the presence of kidney tumors in male mice.  In 1986, the agency requested that the FIFRA Scientific Advisory Panel (SAP) evaluate the carcinogenic potential of glyphosate.  The panel determined that the data on renal tumors in male mice were equivocal (only an increase in adenomas was observed and the increase did not reach statistical significance).  As a result, the panel recommended a Group D chemical classification (Not Classifiable as to Human Carcinogenicity) for glyphosate and advised the agency to issue a data call-in notice for further studies in rats and/or mice to clarify the unresolved questions (FIFRA SAP Report, 1986)[3].

---

[1] Additional information on the Registration Review process can be found at: https://www.epa.gov/pesticide-reevaluation/registration-review-process

[2] Documents of the Registration Review can be found in the public docket at: EPA-HQ-OPP-2009-0361, accessible at www.regulations.gov.

[3] Review available at: http://www.epa.gov/pesticides/chem_search/cleared_reviews/csr_PC-103601_24-Feb-86_209.pdf

With the submission of two rat carcinogenicity studies following this data call-in, a second peer review was conducted in 1991 by the agency's Carcinogenicity Peer Review Committee (CPRC) to incorporate the new data.  In accordance with the agency's 1986 Draft Guidelines for Carcinogen Risk Assessment, the CPRC classified glyphosate as a Group E Chemical: "Evidence of Non-Carcinogenicity for Humans" based upon lack of evidence for carcinogenicity in mice and rats and the lack of concern for mutagenicity (TXR# 0008897).

Most recently, in September 2015, a third review was done by the Cancer Assessment Review Committee (CARC).  Relevant glyphosate data available to EPA at that time for glyphosate were reevaluated, including studies submitted by the registrant and studies published in the open literature.  The agency performed this evaluation in support of Registration Review in accordance with the 2005 Guidelines for Carcinogen Risk Assessment, classified glyphosate as "Not Likely to be Carcinogenic to Humans" (CARC, 2015; TXR #0057299).

In recent years, several international agencies have evaluated the carcinogenic potential of glyphosate.  In March 2015, the International Agency for Research on Cancer (IARC), a subdivision of the World Health Organization (WHO), determined that glyphosate was a probable carcinogen (group 2A) (IARC, 2015).  Later, in November 2015, the European Food Safety Authority (EFSA) determined that glyphosate was unlikely to pose a carcinogenic hazard to humans (EFSA, 2015).  In May 2016, the Joint Food and Agriculture Organization (FAO)/WHO Meeting on Pesticide Residues (JMPR), another subdivision of the WHO, concluded that glyphosate was unlikely to pose a carcinogenic risk to humans from exposure through the diet (JMPR, 2016).  Some individual countries in Europe (e.g., France, Sweden) have considered banning glyphosate uses based on the IARC decision, while other countries (e.g., Japan, Canada, Australia, New Zealand) have continued to support their conclusion that glyphosate is unlikely to pose a carcinogenic risk to humans.

The recent peer review performed by CARC served as an initial analysis to update the data evaluation for glyphosate at that time.  Based on an evaluation of the studies included in the recent analyses by IARC, JMPR, and EFSA, the agency then became aware of additional relevant studies not available to EPA.  As a result, EPA also requested information from registrants about studies that existed, but had never been submitted to the agency.  The current evaluation incorporates these additional studies. In addition, the agency conducted a systematic review of the open literature and toxicological databases for glyphosate by using a "Framework for Incorporating Human Epidemiologic & Incident Data in Health Risk Assessment".  As such, the current evaluation also provides a more thorough evaluation than the 2015 CARC review.

In December 2016, the FIFRA SAP was convened to evaluate the agency's Issue Paper regarding the human carcinogenic potential of glyphosate.  The panel's report was published in March 2017 and the current document incorporates revisions based on the panel's report (G. Akerman; 12-DEC-2017; TXR#0057689).  Additionally, information from a recently published analysis of glyphosate use and cancer incidence in the Agricultural Health Study (AHS) cohort (Andreotti et al., 2017) with a longer follow-up than the previously published data (De Roos et al., 2005) has been considered in this evaluation.

### 1.3    Overview of "Framework for Incorporating Human Epidemiologic & Incident Data in Health Risk Assessment"

In 2010, the Office of Pesticide Programs (OPP) developed a draft "Framework for Incorporating Human Epidemiologic & Incident Data in Health Risk Assessment" which provides the foundation for evaluating multiple lines of scientific evidence in the context of understanding of the mode of action (MOA)/adverse outcome pathway (AOP) (U.S. EPA, 2010).  The draft framework, which includes two key components, problem formulation and use of the MOA/AOP pathway frameworks, was reviewed favorably by the FIFRA SAP in 2010 (FIFRA SAP, 2010). In 2016, a final version of the framework was published[4], which incorporated improvements based on recommendations from the SAP, public comments, and the experience gained since 2010 conducting assessments on several pesticides for which epidemiological data were available.  Recently, EPA has applied this framework to the evaluation of atrazine and chlorpyrifos[5].

OPP's framework is consistent with updates to the World Health Organization/International Programme on Chemical Safety MOA/human relevance framework, which highlights the importance of problem formulation and the need to integrate information at different levels of biological organization (Meek *et al.*, 2014).  Consistent with recommendations by the National Research Council (NRC) in its 2009 report on *Science and Decisions*, OPP's framework describes the importance of using problem formulation at the beginning of a complex scientific analysis.  The problem formulation stage starts with planning dialogue with risk managers to identify goals for the analysis and possible risk management strategies.  This initial dialogue provides the regulatory context for the scientific analysis and helps define the scope of such an analysis.  The problem formulation stage also involves consideration of the available information regarding the pesticide use/usage, toxicological effects of concern, and exposure pathways and duration along with key gaps in data or scientific information.  Specific to glyphosate, the scoping document prepared for Registration Review (J. Langsdale *et al.*, 2009) along with the review conducted by the CARC (CARC, 2015) represent the problem formulation analyses for the weight-of-evidence evaluation for carcinogenic potential.  A summary of the US exposure profile is provided in Section 1.4 to provide context for interpreting the various lines of evidence.

One of the key components of the agency's framework is the use of the MOA framework/AOP concept (Figure 1.1) as a tool for organizing and integrating information from different sources to inform the causal nature of links observed in both experimental and observational studies. Specifically, the modified Bradford Hill Criteria (Hill, 1965) are used to evaluate strength, consistency, dose response, temporal concordance and biological plausibility of multiple lines of evidence in a weight-of-evidence analysis.

---

[4] https://www3.epa.gov/pesticides/EPA-HQ-OPP-2008-0316-DRAFT-0075.pdf
[5] Chlorpyrifos Revised Human Health Risk Assessment for Registration Review; 29-DEC-2014; D424485.
U.S. EPA 2010 SAP Background White Paper – Re-evaluation of Human Health Effects of Atrazine: Review of Experimental Animal and In Vitro Studies and Drinking Water Monitoring Frequency. EPA-HQ-OPP-2010-0125.
U.S. EPA 2011 SAP Issue Paper – Re-evaluation of Human Health Effects of Atrazine: Review of Cancer Epidemiology, Non-cancer Experimental Animal and In Vitro Studies and Drinking Water Monitoring Frequency. EPA-HQ-OPP-2011-0399.



**Figure 1.1.  Source to outcome pathway (adapted from NRC, 2007).**

## 1.4    Summary of the Exposure Profile in the United States

All pesticide products provide critical information about how to safely and legally handle and use pesticide products.  Pesticide labels are legally enforceable and all carry the statement "it is a violation of Federal law to use this product in a manner inconsistent with its labeling."  In other words, the label is law.  As a result, a key function of the pesticide product label is to manage the potential risk from pesticides.

Labeled uses of glyphosate include over 100 terrestrial food crops as well as other non-agricultural sites, such as greenhouses, aquatic areas, and residential areas.  It is also registered for use on glyphosate-resistant (transgenic) crop varieties such as corn, soybean, canola, cotton, sugar beets, and wheat.  Registered tolerances in the United States include residues of the parent compound glyphosate and *N*-acetyl-glyphosate, a metabolite found in/on glyphosate-tolerant crops[6].

Dietary (food and water) exposures are anticipated from applications to crops.  Since there are registered uses of glyphosate that may be used in residential settings, residential handlers may be exposed to glyphosate during applications.  Exposures may also occur from entering non-occupational areas that have been previously treated with glyphosate.  Occupational/commercial workers may be exposed to glyphosate while handling the pesticide prior to application (mixing and/or loading), during application, or when entering treated sites.  The agency considers all of the anticipated exposure pathways as part of their evaluation for human health.

Oral exposure is considered the primary route of concern for glyphosate.  Oral absorption has been shown to be relatively low for glyphosate (~30% of administered doses) with negligible accumulation in tissues and rapid excretion (primarily unchanged parent) via the urine.  Due to its low vapor pressure, inhalation exposure to glyphosate is expected to be minimal.  Dermal penetration has also been shown to be relatively low for human skin (<1%) indicating dermal exposure will only contribute slightly to a systemic biological dose.  Furthermore, in route-

---

[6] All currently registered tolerances for residues of glyphosate can be found in the Code of Federal Regulations (40 CFR §180.364).

specific inhalation and dermal toxicity studies, no adverse effects were observed.  This all suggests that there is low potential for a sustainable biological dose following glyphosate exposure.

In residential/non-occupational settings, children 1-2 years old are considered the most highly exposed subpopulation with oral exposures from dietary (food and water) ingestion and incidental oral ingestion (e.g., hand-to-mouth activities) in treated areas.  There is also potential for dermal exposures in previously treated areas.  Using OPP's standard exposure assessment methodologies which are based on peer-reviewed and validated exposure data and models[7], a high-end estimate of combined exposure for children 1-2 years old is 0.47 mg/kg/day (see Appendix E).

At the time of initial registration (1974), total use of glyphosate in the United States was approximately 1.4 million pounds (Benbrook, 2016).  In 1995, total use of glyphosate increased to approximately 40 million pounds with agriculture accounting for 70% of use.  With the introduction of transgenic crop varieties in the United States circa 1996, (such as soybean, cotton, and corn) use of glyphosate increased dramatically (Green and Owen, 2011), and in 2000 the total use of glyphosate in the United States was approximately 98.5 million pounds.  By 2014, total annual use of glyphosate was approximately 280-290 million pounds (based on Benbrook, 2016 and industry proprietary data accessible to EPA) with agriculture accounting for 90% of use.  Although glyphosate use has continuously increased up to 2012, the stabilization of glyphosate usage in recent years is due to the increase in a number of glyphosate-resistant weed species, starting with rigid ryegrass identified in California in 1998 and currently totaling 16 different weed species in the United States as of March 2016.  Figure 1.2 below provides a visual representation of the increased agricultural use of glyphosate in the United States using proprietary market research data from 1987-2014.

The increased use of glyphosate may be partly attributed to an increase in the number of farmers using glyphosate; however, it is more likely that individuals already using glyphosate increased their use and subsequent exposure.  With the introduction of transgenic crop varieties, glyphosate use shifted from pre-emergent to a combination of pre- and post-emergent applications.  Additionally, application rates increased in some instances and more applications were allowed per year (2-3 times/year).  Maps from the United States Geological Survey (USGS) displaying glyphosate use in the United States indicate that although use has drastically increased since 1994, areas treated with glyphosate for agricultural purposes appear to be approximately the same over time (Figures 1.3-1.4).  The introduction of transgenic crops in some cases led to a shift in crops grown on individual farms, such that more acreage within the farm would be dedicated to growing the glyphosate-tolerant crops replacing other crops.  In addition, during the 2000s there was also an increase in growing corn for ethanol production, which could also have resulted in increased acreage dedicated glyphosate-tolerant corn.

---

[7] Available: http://www2.epa.gov/pesticide-science-and-assessing-pesticide-risks/standard-operating-procedures-residential-pesticide



**Figure 1.2. Glyphosate agricultural usage (pounds applied annually) from 1987- 2014. Boxes indicate years when glyphosate-resistant crops were introduced. Source: Proprietary Market Research Data (1987 – 2014).**



**Figure 1.3. Map of estimated agricultural use for glyphosate in 1994 from USGS (http://water.usgs.gov/nawqa/pnsp/usage/maps/show_map.php?year=1994&map=GLYPHOSATE&hilo=H)**



**Figure 1.4. Map of estimated agricultural use for glyphosate in 2014 from USGS (http://water.usgs.gov/nawqa/pnsp/usage/maps/show_map.php?year=2014&map=GLYPHOSATE&hilo=H)**

The potential exposure to occupational handlers is dependent on the formulation, specific task (mixer, loader, and/or applicator), rate of application, and acreage treated.  Using HED's standard occupational exposure assessment methodologies which are based on peer-reviewed and validated exposure data and models[8], mixer/loaders result in the highest potential exposure estimates.  Assuming no personal protective equipment (PPE), exposure estimates for mixer/loaders range from 0.03-7 mg/kg/day using the maximum application rate for high acreage agricultural crops (6 lb ai/acre)[9].  For applicators, exposure would be lower with estimates ranging from 0.02-0.03 mg/kg/day using the same application rate and acreage.

The maximum potential exposures from currently registered uses of glyphosate in residential and occupational settings in the United States are used in the current evaluation to aid in the determination of whether findings in laboratory studies are relevant for human health risk assessment.  In Sections 4.0 and 5.0, descriptions are provided for animal carcinogenicity and genotoxicity studies, respectively.  Results from these studies, particularly those administering high doses, are put into context with the human exposure potential in the United States.

---

[8] Available: https://www.epa.gov/pesticide-science-and-assessing-pesticide-risks/occupational-pesticide-handler-exposure-data
[9] Based on use information provided by the Joint Glyphosate Task Force for the following end-use products: EPA Registration Nos.: 100-1182, 228-713, 524-343, 524-475, 524-537, 524-549, 524-579, 4787-23, and 62719-556.

## 1.5     Organization of this Document

In this analysis of the human carcinogenic potential of the active ingredient glyphosate, the agency has performed a comprehensive analysis of available data from submitted guideline studies and the open literature.  This includes epidemiological, animal carcinogenicity, and genotoxicity studies.  Consistent with the framework described in Section 1.3, the agency has evaluated these multiple lines of evidence and conducted a weight-of-evidence analysis.  Although there are studies available on glyphosate-based pesticide formulations, the agency is soliciting advice from the FIFRA SAP on this evaluation of human carcinogenic potential for the active ingredient glyphosate only at this time.  The remainder of this document is organized by the following:

- *Section 2.0 Systematic Review & Data Collection Methods* provides a description of methods used to compile all relevant studies used in the current evaluation.
- *Section 3.0 Data Evaluation of Epidemiology* describes the available epidemiological studies, evaluates relevant studies for study quality, and discusses reported effect estimates.
- *Section 4.0 Data Evaluation of Animal Carcinogenicity Studies* provides a description and evaluation of the available animal carcinogenicity studies for glyphosate.
- *Section 5.0 Data Evaluation of Genetic Toxicity* summarizes and discusses the various genotoxicity assays that have been tested with glyphosate.
- *Section 6.0 Data Integration & Weight of Evidence Analysis Across Multiple Lines of Evidence* integrates available data discussed in Sections 3.0-5.0 to consider concepts, such as strength, consistency, dose response, temporal concordance and biological plausibility in a weight-of-evidence analysis.  This section also provides discussion of the data in the context of cancer descriptors provided in the 2005 Guidelines for Carcinogen Risk Assessment.
- *Section 7.0 Collaborative Research Plan for Glyphosate and Glyphosate Formulations* provides a discussion of planned research that is intended to evaluate the role of glyphosate in product formulations and the differences in formulation toxicity.

## 2.0     Systematic Review & Data Collection

In recent years, the National Academy of Sciences National Research Council (NRC) has encouraged the agency to move towards systematic review processes to enhance the transparency of scientific literature reviews that support chemical-specific risk assessments to inform regulatory decision making (NRC, 2011).  The NRC defines systematic review as "a scientific investigation that focuses on a specific question and uses explicit, pre-specified scientific methods to identify, select, assess, and summarize the findings of similar but separate studies" (NRC, 2014).  Consistent with NRC's recommendations, EPA's Office of Chemical Safety and Pollution Prevention (OCSPP) is currently developing systematic review policies and procedures.  In short, OCSPP employs "fit for purpose" systematic reviews that rely on standard methods for ***collecting, evaluating, and integrating*** the scientific data supporting the agency's decisions.  The concept of fit for purpose implies that a particular activity or method is suitable for its intended use.  Inherent in this definition is the concept that one size does not fit all

situations and thus flexibility is allowed.  However, it is notable that with flexibility comes the importance of transparency of documented processes; including the importance of transparency and clarity in approaches to data collection, evaluation, and integration.  These are described throughout the document with data collection in Sections 2.1.1-2.1.2, evaluation in Sections 3-5, and integration in Section 6.

As a result, more recent evaluations are starting to reflect this progression in the agency's process.  Similar to the framework for incorporating human epidemiologic and incident data, systematic review begins with a problem formulation to determine the scope and purpose of the search.  Studies are considered based on their relevance to answer specific questions and those studies deemed relevant are then further considered for their usefulness in risk assessment.

The agency strives to use high-quality studies when evaluating the hazard potential of pesticidal chemicals and considers a broad set of data during this process.  This includes registrant generated studies required under FIFRA, as well as peer-reviewed scientific journals and other sources, such as other governments and academia.  A wide range of potential adverse effects are assessed using acute, subchronic, chronic, and route-specific studies; predominately from studies with laboratory animals, in addition to epidemiologic and human incident data.  All studies are thoroughly reviewed to ensure appropriate conduct and methodologies are utilized, and that sufficient data and details are provided.  In this way, hazards are identified and potential risks characterized to ensure that decisions are informed by the best science available.

## 2.1    Data Collection: Methods & Sources

Data were collected by searching the open literature (Section 2.1.1) and other publicly available sources (e.g., recent internal reviews, evaluations by other organizations) (Section 2.1.2).  Internal databases were also searched for submitted studies conducted according to Organization for Economic Cooperation and Development (OECD) test guidelines, OCSPP harmonized test guidelines, and other pesticide test guidelines (OPP guidelines) (Section 2.1.2).

It should be noted that glyphosate is primarily manufactured as various salts with cations, such as isopropylamine, ammonium, or sodium.  These salts are derivatives of the active substance glyphosate and increase the solubility of technical-grade glyphosate acid in water.  All of these forms were considered for the current evaluation.

## 2.1.1   Open Literature Search

As part of the evaluation of the human carcinogenic potential of glyphosate, the literature review described here uses concepts consistent with fit for purpose systematic review, such as detailed tracking of search terms and which literature have been included or excluded.  The primary goal of the literature search was to identify relevant and appropriate open literature studies that had the potential to inform the agency on the human carcinogenic potential of glyphosate.  Therefore, non-mammalian studies were not considered, and several terms were used in the search string in an attempt to exclude non-mammalian studies.

To obtain literature studies, OPP worked with EPA librarians to conduct searches in PubMed, Web of Science, and Science Direct.  A search was conducted on May 6, 2016 in PubMed and Web of Science using the following search string to yield 141 and 225 results, respectively:

> ((glyphosate OR "1071-83-6" OR roundup OR "N-(Phosphonomethyl)glycine") AND (aneuploid* OR chromosom* OR clastogenic* OR "DNA damag*" OR "DNA adduct*" OR genome* OR genotoxic* OR micronucle* OR cancer* OR carcinogen* OR oncogenic* OR mutagen* OR cytotoxic* OR tumor* OR tumour* OR malignanc* OR neoplasm* OR *oma)) NOT (fish* OR frog* OR tadpole* OR insect* OR eco* OR amphibian* OR reptil* OR invertebrate* OR fly OR flies OR aquatic OR bird* OR aqueous OR water OR yeast* OR worm* OR earthworm* OR bacteria* OR lichen OR resist* OR "herbicide resist")

Due to differences with using Science Direct, the search string was slightly changed.  This search was also conducted on May 6, 2016 and yielded 459 results:

> ((glyphosate OR "1071-83-6" OR roundup OR "N-(Phosphonomethyl)glycine") AND (aneuploid* OR chromosom* OR clastogenic* OR (DNA pre/2 (damag* OR adduct*)) OR genome* OR genotoxic* OR micronucle* OR cancer* OR carcinogen* OR oncogenic* OR mutagen* OR cytotoxic* OR tumor* OR tumour* OR malignanc* OR neoplasm* OR *oma)) AND NOT (eco* OR fish* OR frog* OR tadpole* OR invertebrate* OR bird* OR insect* OR fly OR flies OR amphibian* OR reptil* OR yeast* OR aquatic OR aqueous OR water OR worm* OR earthworm* OR bacteria* OR lichen OR resist* OR "herbicide resist")

After cross-referencing the results obtained from the three open literature searches for duplicates, a total of 735 individual articles were obtained (Appendix A) and one additional study (Alvarez-Moya et al., 2014) not identified in the search was added to this list for a total of 736 individual articles.  Three staff members independently evaluated all of the studies and came to consensus on which studies would be considered relevant to the issue of concern (i.e., human carcinogenic potential of glyphosate).  Many of the articles were not considered to be within the scope of the search or not considered relevant in general (657 articles).  Additionally, 27 articles were not appropriate due to the type of article (i.e., correspondence, abstract only, not available in English, retraction).  Of the 52 relevant articles, 42 were used in the current evaluation (31 genotoxicity, 9 epidemiological, and 2 animal carcinogenicity).  Three articles also reported on the potential of glyphosate and its metabolites to be developed into therapeutic drugs for cancer treatment.  The remaining 7 articles evaluated effects on glyphosate or glyphosate formulations on cellular processes, mostly focusing on epidermal cells, and were not considered informative for the current evaluation.

## 2.1.2   Studies Submitted to the Agency

For all pesticides, there are toxicology data requirements that must be submitted to the agency for registration.  These studies, defined under the 40 CFR Part 158 Toxicology Data Requirements, provide information on a wide range of adverse health outcomes, routes of exposure, exposure durations, species, and lifestages.  They typically follow OECD, OCSPP, or OPP accepted protocols and guidelines, which ease comparisons across studies and chemicals.

The toxicological databases for glyphosate[10] were reviewed and all relevant animal, genotoxicity, and metabolism studies were collected for consideration.

Several resources were used to ensure all relevant studies were included in the current evaluation. The list of studies obtained from the toxicological database and the open literature search were cross-referenced with recent internal reviews (CARC, 2015; S. Recore *et al.*, 2014). This list was also cross-referenced with review articles from the open literature [Chang and Delzell (2016), Greim et al. (2015), Kier and Kirkland (2013), Kier (2015), Mink *et al.* (2012), Schinasi and Leon (2014), and Williams *et al.* (2000)][11]. EPA requested studies from registrants that were not previously available to the EPA. As a result, numerous studies were subsequently submitted to the agency. Study reports for one animal carcinogenicity study and 17 genotoxicity studies were not available to the agency and have been noted in the relevant sections below. For these studies, data and study summaries provided in Greim et al. (2015) and Kier and Kirkland (2013) were relied upon for the current evaluation.

## 2.2     Evaluation of Relevant Studies

Studies submitted to the agency are evaluating based on OECD, OCSPP, or OPP test guideline requirements to determine whether studies are acceptable for use in risk assessment. In the current evaluation, animal carcinogenicity, genotoxicity, and metabolism studies located in the internal databases with access to full study reports were evaluated in this manner. Those classified as unacceptable were noted and subsequently excluded from the current evaluation.

In order to evaluate open literature studies, criteria described in the OPP guidance for considering and using open literature toxicity studies to support human health risk assessment was utilized (U.S. EPA, 2012). This guidance assists OPP scientists in their judgement of the scientific quality of open literature publications. More specifically, the document discusses how to screen open literature studies for journal articles/publications that are relevant to risk assessment, how to review potentially useful journal articles/publications and categorize them as to their usefulness in risk assessment, and how the studies may be used in the risk assessment. As with submitted studies, those deemed unacceptable were noted and subsequently excluded from the current evaluation.

---

[10] Glyphosate pesticide chemical (PC) codes: 103601, 103603, 103604, 103605, 103607, 103608, 103613, 128501, and 417300.
[11] All review articles, except Schinasi and Leon (2014), were funded and/or linked to Monsanto Co. or other registrants.

## 3.0    Data Evaluation of Epidemiology

### 3.1    Introduction

Epidemiological studies are valuable for risk assessment since they may provide direct evidence on whether human exposure to a chemical may cause cancer.  Studies of high quality and adequate statistical power are preferable and remove the need to account for extrapolation from animals to humans or extrapolation from high to low doses.  Epidemiological studies can also be integrated with experimental evidence when determining or clarifying the carcinogenic potential of a chemical for risk assessment.  The key considerations in evaluating epidemiologic studies are study design, exposure assessment, outcome assessment, confounding control, statistical analyses, and risk of other bias.

OPP routinely evaluates the available epidemiological literature.  As part of Registration Review of glyphosate, an evaluation was initially conducted in 2014 (S. Recore *et al.*, 2014) and subsequently another evaluation was performed in 2015 (CARC, 2015).  The 2015 evaluation began with the epidemiological studies previously identified in the 2014 evaluation and included three additional studies that were not included in the 2014 evaluation.  These studies were identified in review articles, included in the evaluation by IARC (2015), or were published since the 2014 OPP evaluation.  Both the 2014 and 2015 OPP evaluations considered the design and overall quality of the epidemiological studies; however, formal study quality evaluations and rankings were not conducted.  In the current review, all of the studies in the 2015 report, as well as additional epidemiological articles identified from a comprehensive search and cross-referencing with available resources as described under Section 2.0, were considered in the current evaluation.  The following sections provide a description of how epidemiological studies were evaluated for study quality and subsequent overall rankings, a summary of relevant studies, and a discussion of the overall results.

### 3.2    Considerations for Study Quality Evaluation and Scope of Assessment

This section summarizes how specific study characteristics were factored into the determination of a study's overall quality category.  It should be noted that these study quality considerations are specific to the issue of concern (i.e., carcinogenic potential of glyphosate).  These considerations are considered 'fit-for-purpose' under this context and could differ in another regulatory or scientific context.  Although the basic concepts apply broadly, the study quality considerations are tailored specifically to studies investigating the association between glyphosate exposure and cancer outcomes.  As with all research studies, the design elements of an epidemiological study have potential impacts on study quality and relevance to the research question under investigation.  Each study was, therefore, judged to be of high, moderate, or low quality in each of the following six domains affecting study quality: study design, exposure assessment, outcome assessment, confounder control, statistical analysis, and susceptibility to bias (See Section 3.2.1 and Table 3.1 for general considerations under each domain).  A similar approach was recently used by OPP for the evaluation of epidemiological studies for organophosphate pesticides (A. Lowit *et al.,* 2015).

Primary literature and associated meta-analyses evaluating the association between glyphosate exposure and a cancer outcome were the focus of this analysis.  Reviews were only used to identify individual studies that should be considered for study evaluation.  Commentaries, correspondence, and letters to the editor without original data were excluded.  Of the relevant studies identified, studies with the most complete analyses utilizing the greatest number of cases and controls (e.g., pooled case-control studies) were evaluated for ranking (see Appendix B for visual representation of these studies).  If studies did not collect exposure information on glyphosate from individual subjects, did not assess an outcome (e.g., biomonitoring studies), and/or did not provide a quantitative measure of an association between glyphosate and a cancer outcome, then these studies were assigned a low quality ranking and were not further evaluated in detail (see Figure 3.1).  A similar process was used by JMPR for their identification of epidemiological studies for evaluating the carcinogenic potential of glyphosate and two other pesticides (JMPR, 2016).



**Figure 3.1.  Study evaluation process for epidemiological studies.**

### 3.2.1   Study Designs

In judging an individual study's contribution to the strength of evidence in the epidemiologic literature base, the following general hierarchy of observational study designs was considered (from most to least preferred):  prospective cohort study (including nested case-control studies), case-control study, and cross-sectional study.  It is important to note, however, that this hierarchy of study designs reflects the *potential* for the collection of high quality information (related to exposure, outcome, confounders, and effect modifiers) and *potential* for efficient and valid estimation of the true association.  Thus, in deliberating on quality, care has been taken to

consider the circumstances and particulars of each individual study to consider whether the study was well conducted independent of the type of study design.

The study designs used in the epidemiological literature reviewed were analytical and descriptive studies.  Cohort and case-control study designs are analytical studies used to evaluate relative incidence of health and disease outcomes by exposure status.  Cross-sectional and ecological studies are generally considered descriptive or hypothesis-generating study designs; however, they can also be used to test hypotheses regarding prevalence of health outcomes and, under certain conditions, incidence as well.

| Table 3.1.  Epidemiological Study Quality Considerations[a]. | | | |
|---|---|---|---|
| **Parameter** | **High Score** | **Moderate Score** | **Low Score** |
| Study Design | Cohort | Case-control | Cross-sectional/Ecological |
| Exposure Assessment | Questionnaire and/or interview answered by subjects for chemical-specific exposure | Questionnaire and/or interview for chemical-specific exposure answered by subjects or proxy individuals | Low-quality questionnaire and/or interview; information collected for groups of chemicals rather than chemical-specific; no chemical-specific exposure information collected; ever/never use of pesticides in general evaluated |
| Outcome Assessment | State or National registries, physicians, and/or special surveillance programs with cases verified by histopathological evaluation for tumors; appropriate consideration of prevalent vs. incident cases; analysis by valid method specific for biomarkers | State or National registries, physicians, and/or special surveillance programs without histopathological verification for tumors; analysis by assays that are less specific for biomarkers of interest | No outcome evaluated; unclear/no consideration for whether prevalent or incident cases are appropriate; biomarker methods not validated |
| Confounder Control | Good control for important confounders related to cancer, standard confounders, and known confounders for glyphosate and cancer outcomes (e.g., exposure to multiple pesticides) through study design or analytic control with well measured co-exposures (i.e., cumulative exposure) | Moderately good control for confounders related to cancer; standard variables accounted for and; attempt to control for known confounders via a less efficient measure of co-exposure (e.g., ever/never use) | No adjustments for confounders |
| Statistical Analyses | Appropriate to study question and design, supported by relatively adequate sample size, maximal use of data, reported well | Acceptable methods, lower/questionable study power or sample size | Minimal attention to statistical analyses, sample size evidently low, comparison not performed or described clearly |

| Table 3.1.  Epidemiological Study Quality Considerations[a]. | | | |
|---|---|---|---|
| **Parameter** | **High Score** | **Moderate Score** | **Low Score** |
| Risk of (Other) Bias | Major sources of other potential biases not likely present, present but analyzed, unlikely to influence magnitude and direction of effect estimate, no/low potential of selection bias | Other sources of bias present, acknowledged but not addressed in study, may influence magnitude but not direction of estimate, evidence of potential selection bias with low impact on effect estimate | Major study biases present, unacknowledged or unaddressed in study, cannot exclude other explanation for study findings, evidence of selection bias with high potential to impact effect estimate |

[a] Overall study quality ranking based on comprehensive assessment across the parameters.

### 3.2.1.1 Analytical Studies

*(1) Cohort Study*

In a typical cohort study, such as the AHS, individuals are classified according to exposure status (i.e., presence, absence, or magnitude of exposure) and then followed over time to quantify and compare the development (i.e., incidence) of the health outcome of interest by exposure group. Conceptually, the non-exposed comparison group in a cohort study provides an estimate of the incidence of the outcome among the exposed, had they, counter-to-fact, not been exposed. Apart from chance variations, a valid cohort study comparing exposed individuals to non-exposed individuals provides an estimate of the relative risk (or rate) of the disease associated with exposure. Ideally, the exposed and non-exposed groups are exchangeable, in the sense that switching the exposed to non-exposed, and non-exposed to exposed would yield the same measure of association (e.g., relative risk). If this were the case then, apart from chance, a cohort study would yield a measure of association equivalent to that produced in a corresponding (intervention) study where exposure status was randomly assigned.

The chief advantage of the cohort study design is that it affords the investigator the opportunity to avoid and/or adjust for potential biases (i.e., selection bias, information bias, and confounding); however, these biases may also be avoided in other well-designed study designs, such as a case-control study. Cohort studies also allow for discernment of the chronological relationship between exposure and outcome, and can be particularly efficient for studying uncommon exposures. The primary disadvantage of the cohort study design is logistical inefficiency with respect to the necessary time, expense, and other resources needed to conduct them. Cohort studies are particularly inefficient for evaluating associations with rare outcomes and diseases with long induction or latency periods. Case-control studies that are nested within a cohort study (nested case-control studies) share the attributes of the cohort study and may be more efficient. However, when follow-up throughout the study period is incomplete, the potential for selection bias is increased, especially if follow-up rates are related to exposure status.

Two sub-categories of cohort studies – prospective and retrospective – are often applied to distinguish between studies in which the health outcome has occurred (retrospective study), or has not occurred (prospective study) at the time the investigators initiate the study. This distinction is important primarily as it pertains to the potential differences in the quality (e.g.,

completeness, accuracy, and precision) of information that can be ascertained by the investigators, and also as it relates to potential sources of bias. Although not always true, the prospective study design is considered the preferable of the two, as investigators can potentially have more choices in determining how exposure, outcome, and covariate information is collected. In a retrospective study conducted to evaluate the same hypothesis, by contrast, the investigators would have to rely on exposure information based on self-reporting or historical records. Such reporting is subject to (human) errors in recall, however when such errors are uncorrelated with disease state, there can be a bias towards the null due to random exposure measurement error (information bias) and only when such errors are correlated with the disease state can there be bias away from the null.

### (2) Case-Control Study

In a typical case-control study, individuals are classified according to their outcome status (i.e., cases who have developed the outcome of interest, and controls who represent the population from which the cases arise). The relative odds of exposure are then compared between cases and controls. The primary advantage of case-control studies is that they are logistically efficient relative to cohort studies, often being conducted at a fraction of the cost and in a fraction of the time as a corresponding cohort study. Case-control studies can be used to examine associations between multiple exposures and a given health outcome. They are particularly efficient for evaluating rare outcomes, but are inefficient for studying uncommon exposures. An important point to evaluate in each case-control study is the potential for selection bias, which arises if the exposure distribution among the control subjects is not representative of the exposure distribution among the population that gave rise to the cases. When participation rates between cases and controls are low or distinctly imbalanced, the potential for selection bias is increased, especially if participation rates are related to exposure status. Case-control studies that rely on self-reported exposure measures are also potentially susceptible to information bias which could result in bias towards the null or away from the null.

## 3.2.1.2 Descriptive Studies

Cross-sectional studies are used to evaluate associations between exposure and outcome prevalence in a population at a single point in (or period of) time. The primary advantage of a cross-sectional study is logistical efficiency. They are relatively quick and inexpensive to conduct, as a long period of follow-up is not required, and exposure and outcome assessments occur simultaneously. Cross-sectional studies have three primary *potential* disadvantages: 1) potential difficulty in discerning the temporal relationships (i.e., whether the exposure precedes the outcome); 2) estimating outcome prevalence rather than incidence of the outcome; and 3) the possible overrepresentation of cases of the outcome with long duration relative to the average in the population, and often with a better prognosis.

Ecological studies are used to evaluate associations between exposures and outcomes using population-level rather than individual-level data. The primary advantages of ecological studies are related to logistical efficiency, as they often rely on pre-existing data sources and require no individual-level exposure, outcome, or covariate assessments. The primary weakness of the ecologic study is the potential for confounding and resultant inappropriate extrapolation of associations observed on the aggregate-level to associations on an individual level. The

discrepancy that associations observed at the population level are not observed at the individual level is referred to as the ecological fallacy.  Semi-ecological studies are less susceptible to the ecological fallacy due to incorporation of individual-level data on outcomes and/or confounders.  The quality of these studies depends on the ability of the group exposure data to represent individual exposure and the research question of interest.

### 3.2.2   Exposure Measures

As described in Section 3.2 and Figure 3.1, studies assigned a low quality ranking based on an initial evaluation were not further evaluated in detail.  In all of the studies included in the analysis that were reviewed and ranked for study quality, exposure information was collected from subjects and/or proxy individuals via questionnaires and/or interviews.  These exposure assessments typically include questions to determine the amount of direct pesticide use or to collect information on behaviors and conditions associated with pesticide use (e.g., occupation, tasks).  This type of reporting likely misclassifies actual pesticide exposure.  If conducted as part of a prospective exposure assessment, these errors are likely to be non-differential with respect to the outcome(s) of interest.  In a retrospective assessment, the subject or proxy has knowledge of the outcome; therefore, these errors may be differential or non-differential.  Studies that exclusively used subjects rather than including proxy individuals were considered more reliable and given a higher weight given that the subjects would have a more accurate recollection of their own exposure.

### 3.2.3   Outcome Measures

All of the studies evaluated in detail, except one, utilized state or national cancer registries, physicians, and/or special surveillance programs to determine outcome status (i.e., subjects with or without a cancer of interest).  In several studies, the cases were also verified by histopathological evaluation.  Overall, outcome measures were relatively consistent across studies and these assessments are likely to have minimal errors.  The remaining study evaluated in detail (Koureas et al., 2014) assessed oxidative DNA damage rather than a type of cancer.  For this evaluation, the oxidation by-product 8-hydroxydeoxyguanosine (8-OHdG) was measured by enzyme immunoassay.  This type of assay generally exhibits low specificity.  More sensitive quantitative methods are available to analyze genomic DNA for 8-OHdG by high-performance liquid chromatography (HPLC) with electrochemical detection, gas chromatography-mass spectrometry (GC-MS), and HPLC tandem mass spectrometry.  Consideration of incident or prevalent cases should also be carried out.  By using only incident cases, there is greater confidence that exposures occurred prior to the development of the outcomes.  Inclusion of prevalent cases can lead to an over-representation of cases with a long course of disease.

### 3.2.4   Confounding

The degree to which confounders were controlled varied across studies.  Some studies adjusted for particular medical variables, while others did not.  Some standard variables, such as age, geographical location, and sex, were either adjusted for analytically or by matching in case-control studies.  Several studies collected information on potential confounders; however, not all of these variables were evaluated or results of the evaluation were not reported.  The direction and magnitude for confounders are, in general, difficult to determine because they are dependent

upon the relationship of each confounding factor with glyphosate and the cancer under investigation. Several studies considered the potential for confounding from co-exposure to other pesticides; however, only a few reported effect estimates between glyphosate exposure and cancer risk adjusted for the use of other pesticides. Given most people in the epidemiological studies who use pesticides occupationally will be exposed to multiple pesticides and, in some instances, those other pesticides were observed to be risk factors for the same cancer, this is a particularly important concern to address in either the study design or in the statistical analyses. Across numerous studies, co-exposures to other pesticides was found to be positively correlated with exposure to glyphosate and exposure to those other pesticides appear to increase the risk of some cancers. As a result, the direction of confounding would be to inflate any true effect of glyphosate in the absence of statistical control. This underlines the importance of adjusting for co-exposures to other pesticides.

For NHL, other potential confounders, such as exposure to diesel exhaust fumes, solvents, ultraviolet radiation, livestock, and viruses, have been identified. Some of these are more plausible than others. For example, occupational exposure to diesel exhaust fumes (e.g., McDuffie et al., 2002; Karunanayake et al. 2008; Baris et al. 2001; Maizlish et al. 1998) and solvents (Wang et al., 2009; Kato et al., 2005; Olsson and Brandt, 1988) are considered likely to increase the risk of NHL. Agricultural workers are exposed to diesel fumes when using agricultural vehicles when applying pesticides, such as glyphosate, and when using heavy equipment during mixing, loading, and/or applying pesticides. Agricultural workers are also exposed to solvents. Solvents are often used in pesticide products to aid the delivery of the active ingredient and enhance efficacy. Solvents are also used for cleaning and maintenance/repair of agricultural equipment used for mixing, loading, and/or applying pesticides. With an association between exposure and outcome of interest, it is reasonable to consider diesel exhaust fumes and solvents as probable confounders; however, neither of these factors were accounted for in any of the studies evaluated in detail. There is also evidence that ultraviolet (UV) radiation may increase the risk of NHL (Karipidis et al., 2007; Zhang et al., 2007). As a result, there is a support that UV radiation is also a potential confounder given the extended amount of time agricultural workers spend outside performing activities, including those associated with pesticide use. Lastly, contact with farm and other animals has been investigated as a suspected risk factor for hematopoietic and lymphoid tumors (McDuffie et al., 2002). Hypothesized mechanisms to explain this association include viral transmissions, chronic antigenic stimulation, and exposure to endotoxins, fungi, and mycotoxins. None of the aforementioned potential confounders were accounted for in the studies evaluated in detail.

### 3.2.5   Statistical Analyses

Statistical analyses that were appropriate to the study question and study design, supported by adequate sample size, maximized the use of available data, and were well characterized in the report were weighted most highly. Acceptable statistical methods, questionable study power or sample size, and analytical choices that resulted in the loss of information were given moderate weight. Reports with only minimal attention paid to the conduct and reporting of the statistical analyses were given the lowest weight.

### 3.2.6   Risk of Bias

The internal validity of the studies reviewed was judged by noting the design strategies and analytic methods used in each study to constrain or eliminate selection bias, information bias, and confounding.  Selection bias can occur when the sampling of the population by the investigator yields a study population that is not representative of the exposure and outcome distributions in the population sampled.  Put simply, selection bias occurs if selection of the study sample yields a different estimate of the measure of association than that which would have been obtained had the entire target population been evaluated.  Although there are numerous sources of selection bias, there are several mechanisms that may have induced selection bias in the studies reviewed: low participation rates of eligible individuals due to non-responsiveness or refusal (self-selection bias); loss to follow-up (i.e., failure to retain all study participants initially enrolled in the study); and, in a case-control study, control selection bias arising because the exposure distribution in the control sample does not represent the exposure distribution of the study base (i.e., the population that gave rise to the cases or more formally, the person-time experience of that population).

Information bias (also referred to as observation bias) arises when study participants are incorrectly categorized with respect to their exposure or outcome status, or when errors arise in the measurement of exposure or outcome, in the case of continuously distributed measures.  Epidemiologists often distinguish between two mechanisms or types of misclassification – those that are non-differential (or random) and those that are differential (non-random).  Non-differential misclassification of exposure (or non-differential exposure measurement error) occurs when the probability or magnitude of error in the classification or measurement of exposure is independent of the outcome status of the study participants.  Non-differential exposure measurement error typically results in a bias towards the null which may obscure any true effect of the exposure of interest.  Similarly, non-differential misclassification of outcome (or outcome measurement error) occurs when the probability or magnitude of error in the assignment of outcome status or level is independent of exposure status.  Non-differential outcome measurement error typically does not cause bias but does decrease the precision of effect estimates and therein inflates the width of confidence intervals.  In contrast, differential exposure misclassification (or measurement error) occurs when the error in the exposure assignment is not independent of the outcome status.  The mechanisms that cause non-differential misclassification in the currently reviewed literature include random errors in exposure recall from subjects or proxy respondents.  The mechanisms that could induce differential misclassification include recall bias and interviewer/observer bias.  Note that mismeasurement of confounders can result in residual confounding of the association of interest, even when adjustment for that confounder has been conducted in the analysis.

Studies in which major sources of potential biases were not likely to be present, studies in which potential sources of bias were present, but effectively addressed and analyzed to maximize the study validity, and studies in which sources of bias were unlikely to influence the magnitude and direction of the effect estimate were given more weight than studies where sources of bias may be present, but not addressed in the study.

## 3.3     Review of Quality Results

Each study was judged to be of high, moderate, or low quality in each of the six domains affecting study quality, as discussed above and in Table 3.1.  The results of the quality

assessment are presented separately for each group below. The quality rankings presented are specific to the current evaluation of the carcinogenic potential of glyphosate. As noted above and in Table 3.2, several studies were not included in the ranking evaluation because they did not represent the most complete analysis. Rather, the subjects were included in a larger analysis (e.g., pooled case-control study) to produce a greater number of cases and controls (see Appendix B for visual representation of these studies). For example, Cantor *et al.* (1992) was not individually evaluated for ranking because the data from this study were pooled with data from other studies in De Roos *et al.* (2003), which was included.

### 3.3.1    "High" Quality Group

Three studies were given a high quality ranking: De Roos *et al.* (2005), Eriksson *et al.* (2008), and Koutros *et al.* (2013).

De Roos *et al.* (2005) was a prospective cohort study that evaluated associations between various pesticide exposures, including glyphosate, and cancer incidence for numerous solid and non-solid tumors in the AHS. The aim of the AHS is to evaluate the role of agricultural exposures in the development of cancer and other diseases in the farming community. AHS recruited 52,934 licensed private pesticide applicators along with 32,345 of their spouses between 1993 and 1997. In the first two phases of the study, the cohort also included 4,916 commercial pesticide applicators from Iowa. As a prospective analysis of the AHS cohort, information was obtained from exposed subjects at enrollment and no proxies were necessary. Exposure was evaluated as ever/never use, cumulative lifetime exposure, and intensity-weighted cumulative exposure. Due to the study design, the potential for many biases were reduced. Additionally, the study adjusted and/or considered numerous factors, including use of other pesticides. Study participants provided detailed pesticide exposure information prior to enrollment in the study and this information has been incorporated into the study evaluation by determining tertile cut points and calculating effect estimates by comparing to the lowest tertile. Additional evaluations with quartiles and quintiles were performed for cancers with elevated effect estimates in the study and for NHL. As noted earlier in this document, an analysis of the AHS cohort was recently published (Andreotti *et al.*, 2017) and the findings were considered as part of this evaluation.

Eriksson *et al.* (2008) was a population-based case-control study that recruited a consecutive series of incident cases of NHL in several regions of Sweden from physicians treating lymphoma within specified health service areas. Cases were verified pathologically and matched to randomly selected controls from the national population registry by age, sex and health service area. Exposure information was collected from exposed individuals (i.e., no use of proxy respondents) using a comprehensive questionnaire including a total work history with in depth questions about exposures to pesticides, solvents, and other chemicals. Interviewers were blinded to case/control status. The study only reported minimal demographic information on subjects (age and sex) and a table with subject characteristics (e.g., smoking status, alcohol intake, physical activity, education) that could potentially be used to adjust effect estimates was not provided. Glyphosate exposure was reported in 29 cases and 18 controls during the study period. Multivariate analyses were adjusted for co-exposure to different agents, including MCPA, "2,4,5-Y and/or 2,4-D", mercurial seed dressing, arsenic, creosote, and tar. An analysis for a potential exposure-response relationship was also conducted; however, it was not clear

whether this analysis adjusted for co-exposure to other pesticides based on the statistical methods description. The number of cases and controls were also not reported for this analysis.

Koutros *et al.* (2013) was a prospective cohort study within the AHS that evaluated the association between pesticide use and prostate cancer. Exposure information was collected from exposed subjects (no proxies necessary) through the enrollment questionnaires, as well as in a follow-up questionnaire administered 5 years after enrollment. This study evaluated the association between glyphosate and prostate cancer diagnoses from enrollment (1993-1997) through 2007 resulting in a longer follow-up time than many of the other case-control studies that utilized AHS subjects. The study used lifetime cumulative exposure and intensity-weighted cumulative exposure metrics. Analyses were also conducted using unlagged exposure and 15-year lagged exposure, which excluded the most recent 15 years of exposure for both exposure metrics. Although the effect estimate reported for glyphosate in this study was not adjusted for co-exposure to other pesticides, additional analyses were not considered necessary since there was no association observed.

### 3.3.2 "Moderate" Quality Group

Twenty-one case-control studies were assigned a moderate quality rating (Table 3.2). In general, these studies share many study design characteristics. Exposure information was collected from subjects and/or proxy individuals, the outcome measurement(s) utilized state/national registries and surveillance programs, appropriate statistical analyses were performed, some covariates but maybe not all relevant covariates were evaluated and/or considered, and risks of bias were minimized to some extent. Sample sizes varied across studies. Case-control studies investigating solid tumors included study populations in the United States and Canada. For non-solid tumors, study populations were located in the United States, Canada, Sweden, France, Germany, Italy, Ireland, Spain, and the Czech Republic. Although several nested case-control studies shared most of the characteristics of the AHS cohort study, these studies were primarily given a moderate quality ranking since co-exposure to other pesticides was not accounted for in the analyses.

### 3.3.3 "Low" Quality Group

Seven case-control and 27 cross-sectional/ecological studies were assigned a low quality ranking. All of these studies, except one case-control study (Cocco *et al.*, 2013) and one descriptive study (Koureas et al., 2014), were not subjected to a detailed evaluation because they did not report a quantitative measure of an association between glyphosate exposure and a cancer outcome, did not collect information on glyphosate exposure from all subjects, and/or did not evaluate risk to a cancer outcome (Appendix D). In many instances, effect estimates were reported only for total pesticide exposure. Additionally, exposure was assumed and glyphosate-specific exposure information was not collected. In other studies, the aim of the study was to assess exposure methods for epidemiological studies and/or to evaluate the impact of exposure misclassification; therefore, there was no evaluation of a cancer outcome.

It should be noted that some of the studies assigned a low quality ranking in the current evaluation were included in the recent evaluation by IARC. There were a number of descriptive studies that evaluated the genotoxicity in human populations; however, these studies did not

meet the criteria for inclusion in the ranking as described in Section 3.2 and Figure 3.1.  In most instances, these studies reported effect estimates for total pesticide exposure and/or assumed glyphosate exposure without collecting glyphosate-specific exposure information.  For case-control studies, Cocco et al. (2013), Dennis et al. (2010) and Ruder et al. (2004) were included in the 2015 IARC evaluation, but were not considered informative in the current evaluation.

Detailed evaluations were not performed in the current evaluation for Dennis et al. (2010) and Ruder et al. (2004) because a quantitative measure of an association between glyphosate and a cancer outcome was not reported.  Cocco et al. (2013) received a detailed evaluation and was assigned a low quality ranking.  This case-control study, which evaluated lymphoma risk across six European countries, was not considered informative due to a combination of numerous limitations in the study.  The sample size of the study was low with only four cases and two controls exposed to glyphosate.  Control ascertainment was not consistent across countries, with a mix of hospital- and population-based controls used.  The overall participation rate for population-based controls was found to be much lower than the overall participation rates of the cases or hospital-based controls.  Lastly, the study was limited to ever/never use of glyphosate and did not adjust for confounders, in particular co-exposure to other pesticides.  Although this study was included in the IARC evaluation, IARC also stated that the study had very limited power to assess the effects of glyphosate on risk of NHL.

The other study subjected to a detailed evaluation and assigned a low quality ranking was Koureas *et al*. (2014).  This cross-sectional study evaluated the association between glyphosate exposure and oxidative DNA damage in 80 Greek pesticide sprayers.  Although the study reported a non-statistically significant effect estimate for glyphosate, it is limited in its ability to contribute to the overall evaluation of the carcinogenic potential of glyphosate.  The effect estimate was not adjusted for any standard covariates or potential confounders, including co-exposure to other pesticides.  The sample size of the study was questionable.  There were 80 subjects, but the number exposed to glyphosate was not reported.  The outcome is measured using an immunoassay that is less specific for measuring the biomarker of interest than other available analytical methods.  Lastly, the study evaluates primary DNA damage, but does not measure the consequence of genetic damage.  An increase in oxidative DNA damage may lead to cell death or initiate DNA repair rather than lead to a mutation.

Due to the limitations in the studies assigned a low quality ranking, they do not provide reliable information to evaluate associations between glyphosate exposure and cancer outcomes.  Therefore, the remaining sections of this document do not further discuss these studies except to note when a study is included in meta-analyses.

**Table 3.2.  Summary of Study Design Elements Impacting Study Quality Assignment and Overall Ranking.**

| Journal Article | Study Design | Exposure Assessment | Outcome Assessment | Confounder Control | Statistical Analyses | Risk of (Other) Bias | Overall Ranking |
|---|---|---|---|---|---|---|---|
| Alavanja *et al.* (2003) | This study was not included in the study quality ranking because the data were used in the updated analysis by Koutros *et al.* (2013). | | | | | | |
| Andreotti *et al.* (2009) | Nested Case-control | Questionnaire answered by subjects at study enrollment followed by take-home questionnaire; examined exposure for glyphosate as ever/never, and intensity-weighted cumulative exposure days; spouses either self-administered questionnaire (81%) or telephone interview (19%) | State cancer registries without histopathological verification; exclusion of subjects with prevalent cancer at enrollment; follow-up ~ 9 years | Adjusted for age, smoking, and diabetes for both exposure metrics as well as applicator type forever/never exposure metric  No adjustment for co-exposure to other pesticides or other potential confounders (e.g., solvents, diesel fumes, UV radiation) | Unconditional logistic regression to obtain OR and 95% CI | Exposure misclassification particularly for spouses, low response rate to take-home questionnaire (40%) but unclear if affected cases and controls differently, insufficient power for pesticide exposure interactions | Moderate |
| Band *et al.* (2011) | Population-based case-control  Males only | Self-administered questionnaire answered by subjects or proxies for deceased subjects requesting work history and demographic information; use of a job exposure matrix to estimate exposure to pesticides | Cancer registry with histopathological verification; excluded farmers that worked all outside of British Columbia; included prostate cancer cases prior to the PSA era | Adjustment for alcohol consumption, cigarette years, education level, pipe years, and respondent type. Marital status and ethnicity not significant  No adjustment for co-exposure to other pesticides or other potential confounders (e.g., solvents, diesel fumes, UV radiation) | Conditional logistic regression to obtain ORs and 95% CIs | Recall bias, use of proxy for deceased, exposure misclassification, participation rates cited from another study, use of cancer patients as controls (excluding lung and unknown cancer) | Moderate |
| Brown *et al.* (1990) | Pooled population-based case-control  Males only | In-person interviews using standardized questionnaire with subjects or proxies for deceased/incapacitated; supplementary questionnaire administered by telephone for Iowa subjects to obtain more | State cancer registry (Iowa) and special surveillance network including hospitals and pathology laboratories (Minnesota); cases ascertained retrospectively and prospectively (2 years after start of study); | Adjusted for vital status, age, state, ever used tobacco daily, close relative with lymphopoietic cancer, nonfarming job related to risk of leukemia in the study, exposure to substances related to risk in this study | Unconditional logistic models to obtain OR and 95% CI; questionable sample size (15 cases) | Recall bias; exposure misclassification, use of proxy respondents | Moderate |

**Table 3.2.  Summary of Study Design Elements Impacting Study Quality Assignment and Overall Ranking.**

| Journal Article | Study Design | Exposure Assessment | Outcome Assessment | Confounder Control | Statistical Analyses | Risk of (Other) Bias | Overall Ranking |
|---|---|---|---|---|---|---|---|
| | | detailed information from those indicating pesticide use | ~26% of cases deceased or too ill when identified and ~15% deceased or too ill at time of interview; histopathological verification by pathologists | (benzene, napthalene, hair dyes)<br><br>No adjustment for co-exposure to other pesticides or other potential confounders (e.g., solvents, diesel fumes, UV radiation) | | | |
| Brown *et al.* (1993) | Population-based case-control<br><br>Males only | In person interviews with standardized questionnaire to obtain detailed information on farm activities and use of pesticides from subjects or proxies | State cancer registry (Iowa) ascertained retrospectively and prospectively (2 years after start of study); ~26% of cases deceased or too ill when identified and ~15% deceased or too ill at time of interview; histopathological verification by pathologists | Adjusted for vital status and age; smoking and education evaluated and not found to be significant<br><br>No adjustment for co-exposure to other pesticides or other potential confounders (e.g., solvents, UV radiation) | Logistic models to obtain OR and 95% CI; questionable sample size (11 cases) | Recall bias; exposure misclassification, use of proxy respondents | Moderate |
| Cantor *et al.* (1992) | This study was not included in the study quality ranking because the data were used in the pooled analysis conducted by De Roos *et al.* (2003). | | | | | | |
| Carreon *et al.* (2005) | This study was not included in the study quality ranking because the data were used in the pooled analysis conducted by Yiin *et al.* (2012). | | | | | | |
| Cocco *et al.* (2013) | European multi-center case-control<br><br>Hospital-based and population-based (mixed for 2 countries, only hospital-based for the rest) | Trained interviewers conducted in person interviews using structured questionnaire answered by subjects; those identified as agricultural worker on questionnaire given subsequent questions about pesticide use, crops, etc. | Surveillance centers, 20% of slides from each center reviewed by pathologist | Adjustment for age, sex, education, and center.<br><br>No adjustment for co-exposure to other pesticides or other potential confounders (e.g., solvents, diesel fumes, UV radiation) | Unconditional logistic regression to obtain ORs and 95% CIs; Low sample size (4 cases, 2 controls) | Recall bias, selection bias (low response rate for population-based controls and differed from cases), exposure misclassification, mix of hospital- and population-based controls, | Low |
| De Roos *et al.* (2003) | Population-based case-control<br><br>Males only<br><br>Pooled analysis of | Interviews with subjects or proxy for deceased subjects.  Different interview techniques across states.  One study collected information on | State cancer registries (one state chose a random sample, other states chose all cases), surveillance programs, and hospitals without | Adjustment for age, study site, and other pesticides.<br><br>First degree relative with haematopoietic | Logistic regression and hierarchical regression to obtain ORs and 95% CIs | Recall bias, exposure misclassification, , use of proxy for deceased, , varying quality of questionnaire/interview techniques across studies | Moderate |

**Table 3.2.  Summary of Study Design Elements Impacting Study Quality Assignment and Overall Ranking.**

| Journal Article | Study Design | Exposure Assessment | Outcome Assessment | Confounder Control | Statistical Analyses | Risk of (Other) Bias | Overall Ranking |
|---|---|---|---|---|---|---|---|
| | Cantor *et al.*, 1992; Hoar *et al.*, 1986; Zahm *et al.*, 1990 | pesticide use and then followed-up with questions on selected specific pesticides, another study had a direct question about a selected list of specific pesticides, and the last study used an open ended question without prompting for specific pesticides | histopathological verification | cancer, education, and smoking not found to be important confounders.<br><br>No adjustment for other potential confounders (e.g., solvents, diesel fumes, UV radiation) | | | |
| De Roos *et al.* (2005) | Prospective cohort (licensed pesticide applicators) | Questionnaire answered by subjects at enrollment and with subsequent take-home questionnaire; examined exposure as ever/never, cumulative lifetime days, and intensity-weighted cumulative exposure days | State cancer registries without histopathological verification; follow-up ~7 years | Adjustment for state of residence, age, education, smoking history, alcohol consumption, family history of cancer, use of other common pesticides<br><br>No adjustment for other potential confounders (e.g., solvents, diesel fumes, UV radiation) | Poisson regression to obtain RRs and 95% CIs | Major sources of potential biases unlikely, potential exposure misclassification due to any changes in exposure since enrollment, follow-up period may be limited | High |
| Engel *et al.* (2005) | Nested case-control<br><br>Females only | Take-home questionnaire from spouses of enrolled applicators used to obtain farm exposures, general health information, and reproductive health history; Information obtained from applicators used as measure of possible indirect exposure to spouses | State cancer registries identifying malignant breast cancer; ~5 years average follow-up time | Adjusted for age, race and state.<br><br>Evaluated BMI, age at menarche, parity, age at first birth, menopausal status, age at menopause, family history of breast cancer, physical activity, smoking, alcohol consumption, fruit and vegetable consumption and education but none | Poisson regression to obtain RRs and 95% CIs | Exposure misclassification, exposure to other pesticides (however no association observed), lack of information on length of marriage could result in overestimating exposure based on husband | Moderate |

**Table 3.2.  Summary of Study Design Elements Impacting Study Quality Assignment and Overall Ranking.**

| Journal Article | Study Design | Exposure Assessment | Outcome Assessment | Confounder Control | Statistical Analyses | Risk of (Other) Bias | Overall Ranking |
|---|---|---|---|---|---|---|---|
| | | | | found to be significant<br><br>No adjustment for co-exposure to other pesticides or other potential confounders (e.g., solvents, diesel fumes, UV radiation) | | | |
| Eriksson *et al.* (2008) | Population-based case-control | Questionnaire answered by subjects; follow-up by phone if incomplete answers; excluded exposures that occurred during the same calendar year and year before diagnosis (cases) or enrollment (controls); minimal demographic information reported | Physicians treating lymphoma within specified health service areas and verified by pathologists | Adjustment for age, sex, year of diagnosis/enrollment, as well as exposure to other pesticides in multivariate analyses. Not stated what adjustments were made for other pesticides in latency analyses.<br><br>No adjustment other potential confounders (e.g., solvents, diesel fumes, UV radiation) | Unconditional logistic regression and multivariate analyses to obtain ORs and 95% CIs; not clear how multivariate was performed; questionable sample size (29 cases, 18 controls); also included analysis of ≤10 vs. >10 years exposure | Recall bias, exposure misclassification, lack of subject demographics/ characteristics (e.g., smoking, alcohol consumption, race, etc) | High |
| Flower *et al.* (2004) | Nested case-control | Questionnaire answered by applicators at enrollment; spouses enrolled through a questionnaire brought home by applicator; females (applicators and spouses) were asked to complete a questionnaire on female and family health that collected information on children born during or after 1975 | State cancer registry to identify childhood cancer cases (diagnosed from birth through 19 yrs of age) for children of parents enrolled; hybrid prospective/retrospective ascertainment; excluded female applicators | Child's age at parent's enrollment was included in model; parental age at child's birth, child's sex, child's birth weight, history of parental smoking, paternal history of cancer, and maternal history of miscarriage were evaluated but not found to be significant and not included in model<br><br>No adjustment for co- | Logistic regression to obtain OR and 95% CI; calculated standardized incidence ratios to compare observed number of childhood cancer cases identified to the expected number; low/questionable sample size (6 parental cases, 13 maternal cases) | Exposure misclassification, lack of timing data to determine if exposure occurred prior to conception or during pregnancy, exposure to other pesticides (however no association observed and lack of power for adjustment) | Moderate |

**Table 3.2.  Summary of Study Design Elements Impacting Study Quality Assignment and Overall Ranking.**

| Journal Article | Study Design | Exposure Assessment | Outcome Assessment | Confounder Control | Statistical Analyses | Risk of (Other) Bias | Overall Ranking |
|---|---|---|---|---|---|---|---|
| | | | | exposure to other pesticides or other potential confounders (e.g., solvents, diesel fumes, UV radiation) | | | |
| Hardell and Eriksson (1999) | This study was not included in the study quality ranking because the data were used in the pooled analysis conducted by Hardell *et al.* (2002). | | | | | | |
| Hardell *et al.* (2002) | Population-based case-control<br><br>Males only<br><br>Pooled analysis of Hardell and Eriksson 1999 and Nordstrom *et al.*, 1998 | Questionnaire answered by subjects or proxy for deceased subjects to obtain complete working history and exposure to different chemicals; follow-up with interview for clarification | Registries with histopathological verification | Adjustment for age, vital status, and county (by matching). Exposure to other pesticides in multivariate analysis.<br><br>No adjustment for other potential confounders (e.g., solvents, diesel fumes, UV radiation) | Conditional logistic regression to obtain OR and 95% CI (univariate and multivariate analyses). Questionable sample size (8 cases/8 controls) | Recall bias, exposure misclassification, use of proxy for deceased | Moderate |
| Hohenadel *et al.* (2011) | This study was not included in the study quality ranking because a more complete analysis was conducted by McDuffie *et al.* (2001). | | | | | | |
| Kachuri *et al.* (2013)<br><br>(extended analysis of Pahwa *et al.* 2012) | Population-based case-control<br><br>Males only | Questionnaire answered by subjects or proxies; pesticide use collected via detailed telephone interview on all participants with 10+ hours of pesticide use during lifetime and 15% random sample of those who did not; exposure based on lifetime exposure to glyphosate | Cancer registries or hospitals in 6 Canadian provinces with histopathological verification for 36.55% of samples | Adjustment for age, province, selected medical conditions, family history of cancer, use of proxy respondent, smoking status<br><br>No adjustment for co-exposure to other pesticides or other potential confounders (e.g., solvents, diesel fumes, UV radiation) | Unconditional logistic regression to obtain OR and 95% CI; trends examined using multiple logistic regression | Recall bias, exposure misclassification, control selection based on three different sources depending on province of residence, low participation rates among controls, use of proxy respondents | Moderate |
| Karunanayake *et al.* (2012) | Population-based case-control<br><br>Males only | Questionnaire answered by subjects; pesticide use collected via detailed telephone interview on all participants with 10+ hours of pesticide use during lifetime and 15% | Cancer registries or hospital in 6 Canadian provinces with histopathological verification for 49% of samples; difficulty recruiting control | Adjusted for age, province of residence, and significant medical history variables<br><br>No adjustment for co- | Conditional logistic regression to obtain OR and 95% CI | Recall bias, exposure misclassification, control selection based on three different sources depending on province of residence, low participation rates among | Moderate |

**Table 3.2.  Summary of Study Design Elements Impacting Study Quality Assignment and Overall Ranking.**

| Journal Article | Study Design | Exposure Assessment | Outcome Assessment | Confounder Control | Statistical Analyses | Risk of (Other) Bias | Overall Ranking |
|---|---|---|---|---|---|---|---|
| | | random sample of those who did not; exposure based on lifetime exposure to glyphosate | participants for older age groups | exposure to other pesticides or other potential confounders (e.g., solvents, diesel fumes, UV radiation) | | controls, unable to evaluate Epstein-barr virus exposure | |
| Koureas *et al.* (2014) | Cross-sectional | Questionnaire answered by pesticide sprayers | Genomic DNA extracted from peripheral blood samples and oxidation by-product 8-hydroxydeoxyguanosine (8-OHdG) was determined by enzyme immunoassay; more specific methods (HPLC, GC-MS) are available for measurement | No adjustments.  In univariate, occupational exposure, sex and alcohol consumption were statistically significant while DAP concentrations and smoking were not. | For univariate, chi-square test used to obtain RR and 95% CI; 8-OHdG levels transformed into binary variables (categorized as high and low using the 75th percentile cut-off); unknown number of exposed and unexposed cases (questionable sample size possible given total number of subjects is only 80) | Recall bias, did not control for risk factors identified as statistically significant for univariate analysis, does not measure the consequence of genetic damage | Low |
| Koutros *et al.* (2013) | Prospective cohort<br><br>Males only | Questionnaire answered by subjects at study enrollment; examined exposure as cumulative lifetime days and intensity-weighted cumulative exposure days | State cancer registries with histopathological verification; total and aggressive prostate cancers evaluated | Adjustment for age, state, race, smoking, fruit servings, family history of prostate cancer, and leisure time physical activity in the winter.<br><br>No adjustment for co-exposure to other pesticides or other potential confounders (e.g., solvents, diesel fumes, UV radiation) | Poisson regression to obtain RRs and 95% CIs; also included unlagged vs. lagged analysis | Exposure misclassification | High |
| Landgren *et al.* (2009) | Nested case-control[a]<br><br>Males only | Questionnaire answered by subjects at enrollment in AHS cohort and subsequent take-home questionnaire to collect | Venous blood collected from antecubital vein and analyzed for MGUS; same method as used for controls group in | Adjusted for age and education level<br><br>Association with other pesticides examined | Logistic regression models to obtain OR and 95% CI comparing to population-based | Exposure misclassification, control group not from geographical area (used control group with | Moderate |

**Table 3.2.  Summary of Study Design Elements Impacting Study Quality Assignment and Overall Ranking.**

| Journal Article | Study Design | Exposure Assessment | Outcome Assessment | Confounder Control | Statistical Analyses | Risk of (Other) Bias | Overall Ranking |
|---|---|---|---|---|---|---|---|
| | | information on 50 pesticides; occupational expoures, medical histories, and lifestyle factors updated with 5-year follow-up interview; subjects with prior history of lymphoproliferative malignancy excluded | Minnesota | and not found to be significant so no adjustment performed<br><br>No adjustment for other potential confounders (e.g., solvents, diesel fumes, UV radiation) | screening study in Olmsted County, Minnesota; questionable sample size (27 cases; 11 controls) | similar demographics from Minnesota) | |
| Lee *et al.* (2004a) | This study was not included in the study quality ranking because the data were used in the pooled analysis conducted by De Roos *et al.* (2003). | | | | | | |
| Lee *et al.* (2004b) | Population-based case-control<br><br>White males and females only | Subjects or proxies were interviewed by telephone; those living/working on a farm asked for detailed history of pesticide use and farming information | State cancer registry or review of discharge diagnosis and pathology records at 14 hospitals; only newly diagnosed cases with confirmed adenocarcinoma of stomach or esophagus retained; controls randomly selected from a prior study conducted in geographical area | Adjusted for age and sex; evaluated BMI, smoking, alcohol consumption, educational level, family history of stomach or esophageal cancer, respondent type, dietary intake of particular vitamins and minerals, protein, and carbohydrates (included in model if changed value of OR by more than 10%)<br><br>No adjustment for co-exposure to other pesticides or other potential confounders (e.g., solvents, diesel fumes, UV radiation) | Unconditional logistic regression to obtain OR and 95% CI; questionable sample size (12 cases for stomach; 12 cases for esophagus) | Recall bias, exposure misclassification, use of proxy respondents, control selection | Moderate |
| Lee *et al.* (2005) | Population-based case-control | Questionnaire and/or interview with subject or proxy individuals to collect information on use of specific pesticides; telephone follow-up for unclear responses | Referral by hospitals or through state cancer registries with histopathological verification; controls selected from a previous study | Adjusted for age and respondent type; evaluated history of head injury, marital status, education level, alcohol consumption, medical history of diabetes mellitus, | Unconditional logistic regression to obtain OR and 95% CI | Recall bias, exposure misclassification, large number of proxy respondents, control selection (historical control group from another cancer evaluation, differences in | Moderate |

**Table 3.2. Summary of Study Design Elements Impacting Study Quality Assignment and Overall Ranking.**

| Journal Article | Study Design | Exposure Assessment | Outcome Assessment | Confounder Control | Statistical Analyses | Risk of (Other) Bias | Overall Ranking |
|---|---|---|---|---|---|---|---|
| | | | | dietary intake of α- and β-carotene, and dietary fiber (included in model if changed value of OR by more than 10%)<br><br>No adjustment for co-exposure to other pesticides or other potential confounders (e.g., solvents, diesel fumes, UV radiation) | | exposure time period evaluated, needed to add younger controls, exposure information collected for different time periods for cases vs. controls) | |
| Lee *et al.* (2007) | Nested case-control | Questionnaire answered by subjects at enrollment in AHS cohort and subsequent take-home questionnaire to collect information on 50 pesticides | State cancer registries without histopathological verification; follow-up ~ 7 years | Adjustment for age, smoking, state, total days of pesticide application<br><br>No adjustment for co-exposure to other pesticides or other potential confounders (e.g., solvents, diesel fumes, UV radiation) | Unconditional multivariate logistic regression to obtain OR and 95% CI | Exposure misclassification, limited data on dietary factors, NSAID drug use and family cancer history | Moderate |
| McDuffie *et al.*, 2001 | Population based case-control<br><br>Males only | Questionnaire answered by subjects; pesticide use collected via detailed telephone interview on all participants with 10+ hours of pesticide use during lifetime and 15% random sample of those who did not; exposure based on lifetime exposure to glyphosate | Cancer registries or hospital in 6 Canadian provinces with histopathological verification for 84% of samples; ascertainment of cases stopped in each province once target numbers were reached | Adjustment for age, province, and significant medical variables (including history of cancer in study participants and family history).<br><br>No adjustment for co-exposure to other pesticides or other potential confounders (e.g., solvents, diesel fumes, UV radiation) | Conditional logistic regression to obtain OR and 95% CI | Recall bias, exposure misclassification, control selection based on three different sources depending on province of residence, relatively low participation rates | Moderate |
| Nordstrom *et al.*, 1998 | This study was not included in the study quality ranking because the data were used in the pooled analysis conducted by Hardell *et al.* (2002). | | | | | | |
| Orsi *et al.*, 2009 | Hospital-based case-control | Data collection in 2 stages: 1) self- | Hospital catchment area with histopathological/ | Adjustment for age, center, and | Unconditional logistic regression | Recall bias, exposure misclassification, | Moderate |

**Table 3.2.  Summary of Study Design Elements Impacting Study Quality Assignment and Overall Ranking.**

| Journal Article | Study Design | Exposure Assessment | Outcome Assessment | Confounder Control | Statistical Analyses | Risk of (Other) Bias | Overall Ranking |
|---|---|---|---|---|---|---|---|
| | Males only (occupationally exposed) | administered questionnaire on socioeconomic characteristics, family medical history, and lifelong residential and occupational histories and more specific information for each job held for at least 6 months, and 2) face-to-face interview with trained staff (blinded) using standardized questionnaire | cytological verification Controls were hospital based with no prior history of lymphoid neoplasms, excluding patients with cancer or a disease directly related to occupation, smoking or alcohol abuse (but history of any of these did not prevent selection as a control) | socioeconomic category. Education and housing not found to impact results. Flu immunization, previous history of mononucleosis, skin type, smoking, and drinking did not change results. Evaluated particular crops and animal husbandry as well.  No adjustment for co-exposure to other pesticides or other potential confounders (e.g., solvents, diesel fumes, UV radiation) | to obtain OR and 95% CI. Questionable sample size (12 cases/24 controls) | hospital-based controls | |
| Pahwa *et al.* (2011)  Males only | Population-based case-control | Questionnaire answered by subjects; pesticide use collected via detailed telephone interview on all participants with 10+ hours of pesticide use during lifetime and 15% random sample of those who did not; exposure based on lifetime exposure to glyphosate | Cancer registries or hospitals in 6 Canadian provinces with histopathological verification for 30% of samples | Adjustment for age group, province of residence, and statistically significant medical history variables  No adjustment for co-exposure to other pesticides or other potential confounders (e.g., solvents, diesel fumes, UV radiation) | Conditional logistic regression to obtain OR and 95% CI; trends examined using multiple logistic regression | Recall bias, exposure misclassification, control selection based on three different sources depending on province of residence, low participation rates among controls | Moderate |
| Pahwa *et al.* (2012)  Males only | Population-based case-control | Questionnaire answered by subjects; pesticide use collected via detailed telephone interview on all participants with 10+ hours of pesticide use during lifetime and 15% random sample of those | Cancer registries or hospitals in 6 Canadian provinces with histopathological verification for 36.5% of samples | Adjustment for age group, province of residence, and statistically significant medical history variables  No adjustment for co- | Conditional logistic regression to obtain OR and 95% CI; trends examined using multiple logistic regression | Recall bias, exposure misclassification, control selection based on three different sources depending on province of residence, low participation rates among controls | Moderate |

**Table 3.2.  Summary of Study Design Elements Impacting Study Quality Assignment and Overall Ranking.**

| Journal Article | Study Design | Exposure Assessment | Outcome Assessment | Confounder Control | Statistical Analyses | Risk of (Other) Bias | Overall Ranking |
|---|---|---|---|---|---|---|---|
| | | who did not; exposure based on lifetime exposure to glyphosate | | exposure to other pesticides or other potential confounders (e.g., solvents, diesel fumes, UV radiation) | | | |
| Yiin *et al.* (2012) | Population-based case-control<br><br>Pooled analysis of men with women analyzed in Carreon *et al.* (2005) | Questionnaire and/or interview for chemical-specific exposure answered by subjects or proxy individuals | Cases referred by physicians or through state cancer registries with histopathological verification; controls matched within state, but not county of residence | Adjustment for age, education, sex, and , sex, and farm pesticide exposure (yes/no)<br><br>No adjustment for other potential confounders (e.g., solvents, diesel fumes, UV radiation) | Unconditional logistic regression to obtain ORs and 95% CIs | Acknowledge other sources of bias.  Recall bias, exposure misclassification, control selection (low number of deceased controls obtained) | Moderate |

[a] Mixed methods used in the Landgren et al (2009) study, with cross-sectional study design used to calculate prevalence rates comparing the AHS to a reference population MN. Pesticide risk estimates (including glyphosate) calculated using nested case-control approach, comparing AHS exposed/unexposed (ever/never) study participants.

### 3.4    Assessment of Epidemiological Studies for Relevance to Analysis

Using the criteria summarized in Section 3.2, a total of 63 individual literature studies were identified in the literature review and were judged as high, moderate, or low quality.  The data from 7 of these studies were used in pooled analyses by other studies; therefore, they were not subjected to detailed evaluation. Overall, 3 studies, 19 studies, and 34 studies were assigned high, moderate, or low rankings, respectively.  All of the high and moderate quality studies were considered relevant to the current evaluation.  Additionally, the findings of a recently published analysis of the AHS cohort (Andreotti *et al.*, 2017) have been considered in this evaluation, when appropriate.

The majority of the studies were case-control studies evaluating a wide-range of cancers in the United States and Canada.  There were several case-control studies from Canada that utilized the same study population (Kachuri *et al.*, 2013; Karunanayake *et al.*, 2012; McDuffie *et al.*, 2001; Pahwa *et al.,* 2011; Pahwa *et al.*, 2012).  In a similar fashion, numerous studies in the United States were nested case-control studies, where the AHS cohort served as the source population for selecting cases and controls (Andreotti *et al*., 2009; Engel *et al*., 2005; Flower *et al*., 2004; Landgren *et al*., 2009; Lee *et al*., 2007).  In these studies, a subset of the AHS cohort was selected based on their outcome status for a particular cancer and exposure information was used from the AHS enrollment questionnaire and/or during follow-up interviews.  Nested case-control studies allow for testing of hypotheses not anticipated when the cohort was initially assembled.  In the AHS prospective cohort studies (De Roos *et al.*, 2005; Koutros *et al*., 2013; Andreotti *et al.*, 2017), exposure and demographic information were also obtained from the questionnaires at enrollment; however, subjects were enrolled prior to developing cancer outcomes of interest.  Subjects were then followed from enrollment to a subsequent time point to determine if subjects developed cancer outcomes of interest.  As such, all available subjects in the cohort are included in the evaluation of whether there was an association between a risk factor (e.g., glyphosate exposure) and outcome.

The moderate studies included a varying degree of control for confounding and biases across studies.  As moderate studies, they encompass a combination of strengths and limitations.  In particular, important factors that impacted the quality assessment for these studies included whether there was adjustment for known confounders, identification of control selection issues, sample size issues, and length of follow-up.  As noted previously, most people in these epidemiological studies used pesticides occupationally and were exposed to multiple pesticides over their working lifetime.  Therefore, exposure to other pesticides is a particularly important factor to adjust for and studies that made this adjustment were given more weight than those that did not.  Similarly, control selection issues were noted in a few studies and were given less weighting than those without control selection issues.  The issues ranged from concerns using hospital-based controls, using different population sources to ascertain controls within the same study, and appropriateness of using controls ascertained for another research question.  Numerous studies were limited by small sample sizes, which results in large confidence intervals and reduces the reliability of the results to demonstrate a true association.  Studies demonstrating low or questionable sample size were therefore given less weighting.  Lastly, the length of follow-up time varied across studies.

**3.5     Summary of Relevant Epidemiological Studies**

A summary of the relevant studies evaluating the association between glyphosate exposure and cancer are discussed below.  Results of the studies reporting data on glyphosate exposure and solid tumors (non-lymphohematopoietic) at various anatomical sites are presented in Table 3.3.  Results of the studies reporting data on glyphosate exposure and non-solid tumors (lymphohematopoietic) are presented in Table 3.4.  For study details, see Table 3.2 above and Appendix C.

**3.5.1   Solid Tumor Cancer Studies**

*(1) Cancer at Multiple Sites from the AHS Cohort*

De Roos *et al*., (2005) evaluated associations between glyphosate exposure and cancer incidence of all cancers combined in the AHS cohort study and did did not find an association [ever/never use relative risk ratio (RR) =1.0 with 95% confidence interval (CI) of 0.90–1.2) when adjusting for age, demographic and lifestyle factors, and exposure to other pesticides].  In addition, De Roos *et al*., 2005 evaluated cancer at specific anatomical sites.  Along with several nested case-control studies, no statistical evidence of an association with glyphosate was observed at any specific anatomical site (Table 3.3).  Specifically, AHS researchers reported no evidence of an association between glyphosate use and cancers of the oral cavity (De Roos *et al*., 2005), colon (De Roos *et al*., 2005; Lee *et al*., 2007), rectum (De Roos *et al*., 2005; Lee *et al*., 2007), lung (De Roos *et al*., 2005), kidney (De Roos *et al*., 2005), bladder (De Roos *et al*., 2005), pancreas (De Roos *et al*., 2005; Andreotti *et al*., 2009), breast (Engel *et al*., 2005), prostate (De Roos et al., 2005; Koutros *et al*., 2013) or melanoma (De Roos *et al*., 2005).  The adjusted RR or odds ratio (OR) and 95% CI for these studies are provided in Table 3.3.

Findings from the recently published analysis of the AHS cohort (Andreotti *et al*., 2017) with a longer follow-up period than De Roos *et al.* (2005) also did not find associations between glyphosate exposure and incidence of all cancers based on intensity-weighted lifetime days of glyphosate use.  Furthemore, there was no evidence of an association between glyphosate use and cancers of the oral cavity, colon, rectum, pancreas, lung, melanoma, prostate, testes, bladder, or kidney.  Although there was evidence of a significant positive association in one quartile only relative to intensity-weighted lifetime days of glyphosate exposure for pancreatic and lung cancer, there was no evidence of a significant positive association in any other quartile for either cancer type and the exposure-response trends were not statistically significant.  As a result, these isolated findings were not considered suggestive of an association.

*(2) Prostate Cancer*

In a Canadian population-based study (Band *et al.*, 2011), researchers reported non-statistically significant elevated odds of prostate cancer in relation to glyphosate use (OR=1.36; 95% CI=0.83–2.25).  There was no adjustment made for exposure to other pesticides.  This study included prostate cancer cases from 1983-1990, prior to the prostate-specific antigen (PSA) era.  Consequently, the study included more advanced tumors before diagnosis.  The AHS related studies (De Roos *et al*., 2005; Koutros *et al*., 2013; Andreotti *et al*., 2017), reflect PSA-era cases

(i.e., cases which are typically identified at an earlier stage in the progression of the disease) and also did not identify an association with prostate cancer.

### (3) Brain (Glioma) Cancer

Lee *et al*. (2005) investigated the association between brain cancer with farming and agricultural pesticide use.  Matching for age, sex, vital status, and region, study authors reported a non-significant elevated odds of glioma (OR=1.5; 95% CI=0.7–3.1) in relation to glyphosate use by male farmers; however, the results were significantly different between those who self-reported pesticide use (OR=0.4; 95% CI=0.1–1.6), and for those for whom a proxy respondent was used (OR=3.1; 95% CI=1.2–8.2), indicating recall bias was a potential factor in this study. Furthermore, there was no adjustment for co-exposure to other pesticides and issues noted with control selection.

A population-based case-control study evaluated the risk of brain cancer, specifically, glioma risk, among men and women participating in the Upper Midwest Health Study (Yiin *et al*., 2012).  Using a quantitative measure of pesticide exposure (in contrast to an ever-use metric), Yiin *et al*. (2012) observed no statistical evidence of an association with glyphosate with effect estimates roughly equal to the null value following adjustment for age, education, sex, and use of other pesticides (home and garden use: OR=0.98; 95% CI=0.67–1.43; non-farm jobs: OR=0.83; 95% CI=0.39–1.73).

### (4) Stomach and Esophageal Cancer

In a population-based case-control study in eastern Nebraska, Lee *et al*. (2004b) investigated pesticide use and stomach and esophageal adenocarcinomas.  There was no association observed between glyphosate exposure and either stomach cancer (OR=0.8; 95% CI=0.4–1.5) or esophageal cancer (OR=0.7; 95% CI=0.3–1.4) after adjustment for age and sex.  No adjustment was made for exposure to other pesticides.

### (5) Soft Tissue Sarcoma

A Canadian case-control study (Pahwa *et al*., 2011) examined exposure to pesticides and soft tissue sarcoma and found no relation with the use of glyphosate after adjustment for age, province of residence, and medical history variables (OR=0.90; 95% CI= 0.58–1.40); however, control selection issues were noted, including low response rate and selection from three different sources depending on the province of residence.

### (6) Total Childhood Cancer

Flower *et al*. (2004), a nested case-control study in the AHS cohort, examined the relation between parental pesticide use and all pediatric cancers reported to state registries among children of AHS participants and did not observe a significant association with maternal use exposure to glyphosate (OR=0.61; 95% CI= 0.32–1.16) or paternal (prenatal) exposure to glyphosate (OR=0.84; 95% CI= 0.35–2.54).  The models adjusted for the child's age at the time of parents' enrollment.  There was no adjustment for exposure to other pesticides.

| Table 3.3. Summary of Findings: Solid Tumor Cancer Studies | | | | | |
|---|---|---|---|---|---|
| **Study** | **Study Design** | **Study Location** | **Exposure Metric** | **Adjusted Effect Estimate: RR or OR (95% CI)[a]** | **Covariate Adjustments in Analyses** |
| *All Cancers Combined* | | | | | |
| De Roos *et al.* (2005) | Prospective Cohort | USA: Iowa and North Carolina | Ever/never | 1.0 (0.9-1.2) | Age, demographic and lifestyle factors, and other pesticides[b] |
| | | | Cumulative Exposure Days (by tertile cut points): 1-20 21-56 57-2,678 | 1.0 1.0 (0.9-1.1) 1.0 (0.9-1.1) | Age, demographic and lifestyle factors, and other pesticides[b] |
| | | | Intensity-Weighted Cumulative Exposure Days (by tertile cut points): 0.1-79.5 79.6-337.1 337.2-18,241 | 1.0 0.9 (0.8-1.0) 0.9 (0.8-1.1) | Age, demographic and lifestyle factors, and other pesticides[b] |
| *Lung* | | | | | |
| De Roos *et al.* (2005) | Prospective Cohort | USA: Iowa and North Carolina | Ever/never | 0.9 (0.6-1.3) | Age, demographic and lifestyle factors, and other pesticides[b] |
| | | | Cumulative Exposure Days (by tertile cut points): 1-20 21-56 57-2,678 | 1.0 0.9 (0.5-1.5) 0.7 (0.4-1.2) | Age, demographic and lifestyle factors, and other pesticides[b] |
| | | | Intensity-Weighted Cumulative Exposure Days (by tertile cut points): 0.1-79.5 79.6-337.1 337.2-18,241 | 1.0 1.1 (0.7-1.9) 0.6 (0.3-1.0) | Age, demographic and lifestyle factors, and other pesticides[b] |
| *Oral Cavity* | | | | | |
| De Roos *et al.* (2005) | Prospective Cohort | USA: Iowa and North Carolina | Ever/never | 1.0 (0.5-1.8) | Age, demographic and lifestyle factors, and other pesticides[b] |
| | | | Cumulative Exposure Days (by tertile cut points): 1-20 21-56 57-2,678 | 1.0 0.8 (0.4-1.7) 0.8 (0.4-1.7) | Age, demographic and lifestyle factors, and other pesticides[b] |

**Table 3.3. Summary of Findings: Solid Tumor Cancer Studies**

| Study | Study Design | Study Location | Exposure Metric | Adjusted Effect Estimate: RR or OR (95% CI)[a] | Covariate Adjustments in Analyses |
|---|---|---|---|---|---|
| | | | Intensity-Weighted Cumulative Exposure Days (by tertile cut points): 0.1-79.5 79.6-337.1 337.2-18,241 | 1.0 1.1 (0.5-2.5) 1.0 (0.5-2.3) | Age, demographic and lifestyle factors, and other pesticides[b] |
| *Kidney* | | | | | |
| De Roos *et al.* (2005) | Prospective Cohort | USA: Iowa and North Carolina | Ever/never | 1.6 (0.7-3.8) | Age, demographic and lifestyle factors, and other pesticides[b] |
| | | | Cumulative Exposure Days (by tertile cut points): 1-20 21-56 57-2,678 | 1.0 0.6 (0.3-1.4) 0.7 (0.3-1.6) | Age, demographic and lifestyle factors, and other pesticides[b] |
| | | | Intensity-Weighted Cumulative Exposure Days (by tertile cut points): 0.1-79.5 79.6-337.1 337.2-18,241 | 1.0 0.3 (0.1-0.7) 0.5 (0.2-1.0) | Age, demographic and lifestyle factors, and other pesticides[b] |
| *Bladder* | | | | | |
| De Roos *et al.* (2005) | Prospective Cohort | USA: Iowa and North Carolina | Ever/never | 1.5 (0.7-3.2) | Age, demographic and lifestyle factors, and other pesticides[b] |
| | | | Cumulative Exposure Days (by tertile cut points): 1-20 21-56 57-2,678 | 1.0 1.0 (0.5-1.9) 1.2 (0.6-2.2) | Age, demographic and lifestyle factors, and other pesticides[b] |
| | | | Intensity-Weighted Cumulative Exposure Days (by tertile cut points): 0.1-79.5 79.6-337.1 337.2-18,241 | 1.0 0.5 (0.2-1.3) 0.8 (0.3-1.8) | Age, demographic and lifestyle factors, and other pesticides[b] |

**Table 3.3. Summary of Findings: Solid Tumor Cancer Studies**

| Study | Study Design | Study Location | Exposure Metric | Adjusted Effect Estimate: RR or OR (95% CI)[a] | Covariate Adjustments in Analyses |
|---|---|---|---|---|---|
| *Melanoma* | | | | | |
| De Roos *et al.* (2005) | Prospective Cohort | USA: Iowa and North Carolina | Ever/never | 1.6 (0.8-3.0) | Age, demographic and lifestyle factors, and other pesticides[b] |
| | | | Cumulative Exposure Days (by tertile cut points): 1-20 21-56 57-2,678 | 1.0 1.2 (0.7-2.3) 0.9 (0.5-1.8) | Age, demographic and lifestyle factors, and other pesticides[b] |
| | | | Intensity-Weighted Cumulative Exposure Days (by tertile cut points): 0.1-79.5 79.6-337.1 337.2-18,241 | 1.0 0.6 (0.3-1.1) 0.7 (0.3-1.2) | Age, demographic and lifestyle factors, and other pesticides[b] |
| *Colon* | | | | | |
| De Roos *et al.* (2005) | Prospective Cohort | USA: Iowa and North Carolina | Ever/never | 1.4 (0.8-2.2) | Age, demographic and lifestyle factors, and other pesticides[b] |
| | | | Cumulative Exposure Days (by tertile cut points): 1-20 21-56 57-2,678 | 1.0 1.4 (0.9-2.4) 0.9 (0.4-1.7) | Age, demographic and lifestyle factors, and other pesticides[b] |
| | | | Intensity-Weighted Cumulative Exposure Days (by tertile cut points): 0.1-79.5 79.6-337.1 337.2-18,241 | 1.0 0.8 (0.5-1.5) 1.4 (0.8-2.5) | Age, demographic and lifestyle factors, and other pesticides[b] |
| Lee *et al.* (2007) | Nested Case-Control | USA: Iowa and North Carolina | Ever/never | 1.0 (0.7-1.5) | Age, smoking, state, total days of pesticide application |
| *Rectum* | | | | | |
| De Roos *et al.* (2005) | Prospective Cohort | USA: Iowa and North Carolina | Ever/never | 1.3 (0.7-2.3) | Age, demographic and lifestyle factors, and other pesticides[b] |
| | | | Cumulative Exposure Days (by tertile cut points): 1-20 21-56 57-2,678 | 1.0 1.3 (0.7-2.5) 1.1 (0.6-2.3) | Age, demographic and lifestyle factors, and other pesticides[b] |

**Table 3.3. Summary of Findings: Solid Tumor Cancer Studies**

| Study | Study Design | Study Location | Exposure Metric | Adjusted Effect Estimate: RR or OR (95% CI)[a] | Covariate Adjustments in Analyses |
|---|---|---|---|---|---|
| | | | Intensity-Weighted Cumulative Exposure Days (by tertile cut points): 0.1-79.5 79.6-337.1 337.2-18,241 | 1.0 1.0 (0.5-2.0) 0.9 (0.5-1.9) | Age, demographic and lifestyle factors, and other pesticides[b] |
| Lee *et al.* (2007) | Nested Case-Control | USA: Iowa and North Carolina | Ever/never | 1.6 (0.9-2.9) | Age, smoking, state, total days of pesticide application |
| *Colorectal* | | | | | |
| Lee *et al.* (2007) | Nested Case-Control | USA: Iowa and North Carolina | Ever/never | 1.2 (0.9-1.6) | Age, smoking, state, total days of pesticide application |
| *Pancreas* | | | | | |
| De Roos *et al.* (2005) | Prospective Cohort | USA: Iowa and North Carolina | Ever/never | 0.7 (0.3-2.0) | Age, demographic and lifestyle factors, and other pesticides[b] |
| | | | Cumulative Exposure Days (by tertile cut points): 1-20 21-56 57-2,678 | 1.0 1.6 (0.6-4.1) 1.3 (0.5-3.6) | Age, demographic and lifestyle factors, and other pesticides[b] |
| | | | Intensity-Weighted Cumulative Exposure Days (by tertile cut points): 0.1-79.5 79.6-337.1 337.2-18,241 | 1.0 2.5 (1.0-6.3) 0.5 (0.1-1.9) | Age, demographic and lifestyle factors, and other pesticides[b] |
| Andreotti *et al.* (2009) | Nested Case-Control | USA: Iowa and North Carolina | Ever/never | 1.1 (0.6-1.7) | Age group, cigarette smoking, diabetes, and applicator type |
| | | | Intensity-Weighted Exposure Days (by control median): ≤184 ≥185 | 1.4 (0.9-3.8) 0.5 (0.2-1.3) | Age group, cigarette smoking, and diabetes |
| *Prostate* | | | | | |
| De Roos *et al.* (2005) | Prospective Cohort | USA: Iowa and North Carolina | Ever/never | 1.1 (0.9-1.3) | Age, demographic and lifestyle factors, and other pesticides[b] |
| | | | Cumulative Exposure Days (by tertile cut points): 1-20 21-56 57-2,678 | 1.0 0.9 (0.7-1.1) 1.1 (0.9-1.3) | Age, demographic and lifestyle factors, and other pesticides[b] |

**Table 3.3. Summary of Findings: Solid Tumor Cancer Studies**

| Study | Study Design | Study Location | Exposure Metric | Adjusted Effect Estimate: RR or OR (95% CI)[a] | Covariate Adjustments in Analyses |
|---|---|---|---|---|---|
| Koutros *et al.* (2013)[c] | Prospective cohort | USA: Iowa and North Carolina | Intensity-Weighted Cumulative Exposure Days (by tertile cut points): 0.1-79.5 79.6-337.1 337.2-18,241 | 1.0 1.0 (0.8-1.2) 1.1 (0.9-1.3) | Age, demographic and lifestyle factors, and other pesticides[b] |
| | | | Intensity-Weighted Cumulative Exposure Days (by quartile): Q1 Q2 Q3 Q4 | Total prostate cancer: 0.91 (0.79-1.06) 0.96 (0.83-1.12) 1.01 (0.87-1.17) 0.99 (0.86-1.15) | Age, state, race, smoking, fruit servings, family history of prostate cancer, and leisure time physical activity in the winter |
| | | | Intensity-Weighted Cumulative Exposure Days (by quartile): Q1 Q2 Q3 Q4 | Aggressive prostate cancer: 0.93 (0.74-1.16) 0.91 (0.73-1.13) 1.01 (0.82-1.25) 0.94 (0.75-1.18) | Age, state, race, smoking, fruit servings, family history of prostate cancer, and leisure time physical activity in the winter |
| Band *et al.* (2011) | Case-Control | Canada: British Columbia | Ever/never | 1.36 (0.83-2.25) | Alcohol consumption, cigarette years, education level, pipe years, and respondent type |
| *Esophagus* | | | | | |
| Lee *et al.* (2004b) | Case-Control | USA: Nebraska | Ever/never | 0.7 (0.3-1.4) | Age and sex |
| *Stomach* | | | | | |
| Lee *et al.* (2004b) | Case-Control | USA: Nebraska | Ever/never | 0.8 (0.4-1.5) | Age and sex |
| *Breast* | | | | | |
| Engel *et al.* (2005) | Nested Case-Control | USA: Iowa and North Carolina | Ever/never | Wives who apply pesticides: 0.9 (0.7-1.1) Wives who never used pesticides: 1.3 (0.8-1.9) | Age, race, and state of residence |
| *Soft Tissue Sarcoma* | | | | | |
| Pahwa *et al.* (2011) | Case-Control | Canada | Ever/never | 0.90 (0.58-1.40) | Age group, province of residence, and statistically significant medical history variables |

| Study | Study Design | Study Location | Exposure Metric | Adjusted Effect Estimate: RR or OR (95% CI)[a] | Covariate Adjustments in Analyses |
|---|---|---|---|---|---|
| **Table 3.3. Summary of Findings: Solid Tumor Cancer Studies** | | | | | |
| *Brain (glioma)* | | | | | |
| Lee *et al.* (2005) | Case-Control | USA: Nebraska | Ever/never | Overall: 1.5 (0.7-3.1) Self-reported: 0.4 (0.1-1.6) Proxy respondents: 3.1 (1.2-8.2) | Age for overall analysis; age and respondent type for other analyses |
| Yiin *et al.* (2012) | Case-Control | USA: Iowa, Michigan, Minnesota, and Wisconsin | Ever/never | House/garden use: 0.98 (0.67-1.43) Non-farm jobs: 0.83 (0.39-1.73) | Age, education, sex, and use of other pesticides |
| *Total Childhood* | | | | | |
| Flower *et al.* (2004) | Nested Case-Control | USA: Iowa and North Carolina | Ever/never | Maternal use: 0.61 (0.32-1.16) Paternal use: 0.84 (0.35-2.34) | Child's age at enrollment |

[a] Some studies report multiple quantitative risk measurements.  This table reports the most highly adjusted quantitative measurements.
[b] De Roos *et al.* (2005) excluded subjects missing covariate data for demographic and lifestyle factors and exposure to other pesticides; therefore, the number of subjects included in each analysis varies.
[c] Effect estimates for glyphosate reported in the supplemental web material for Koutros *et al.* (2013).

### 3.5.2   Non-Solid Tumor Cancer Studies

*(1) Leukemia*

De Roos *et al*. (2005) reported no association between leukemia and glyphosate-exposed (ever/never used) pesticide applicators in the AHS cohort.  For applicators with the full data set (54,315), the RR was 1.1 (95% CI=0.6–2.4) with only adjustment for age.  In the fully adjusted model, the RR was similar (RR=1.0; 95% CI=0.5–1.9).  The number of participants included in the adjusted analysis was lower (n=40,716) due to the exclusion of subjects with missing covariate data.  Effect estimates using cumulative lifetime exposure and intensity-weighted cumulative exposure were also found to be non-statistically significant and did not demonstrate a trend with increasing exposure.  In the recently published analysis of the AHS cohort with a longer follow-up period (Andreotti *et al*., 2017), there was no association reported between chronic lymphocytic leukemia/small lymphocytic lymphoma and chronic myeloid leukemia.  For acute myeloid leukemia, an elevated but non-statistically significant association was reported in only one quartile relative to glyphosate exposure; however, there was a low number of observed cases in each of the quartiles and the overall trend was not significant.  There are no other studies available evaluating acute myeloid leukemia.  Given the limitations of the acute myeloid leukemia analysis, the agency will continue to follow the literature regarding the association between glyphosate exposure and risk of acute myeloid leukemia.

In a population-based case-control study in Iowa and Minnesota, Brown *et al*. (1990) did not observe an association with the ever-use of glyphosate (OR=0.9; 95% CI=0.5–1.6).  A limitation in the study was the low number of cases exposed to glyphosate (n=15).  Adjustments were made for several covariates, including vital status, age, tobacco use, family history of lymphopoietic cancer, high risk occupations, and high risk exposures; however, no adjustment was made for exposure to other pesticides.

Chang and Delzell (2016) conducted a meta-analysis exploring glyphosate exposure and leukemia using 3 studies (De Roos *et al*., 2005; Brown *et al*., 1990; and Kaufman *et al.,* 2009).  $I^2$ values were reported, which represented the percentage of the total variance explained by study heterogeneity and measure inconsistency in results.  Larger $I^2$ values indicate greater inconsistency.  A meta-risk ratio of 1.0 (95% CI=0.6-1.5) was obtained with an $I^2$ value of 0.0%, indicating consistency across the data sets.  It should be noted that this analysis included data from Kaufman *et al.* (2009), which is not considered in the current evaluation because it was assigned a low quality ranking because a quantitative measure of an association between glyphosate and a cancer outcome was not reported for that study.

*(2) Multiple Myeloma*

In a follow-up analysis of the study population from Iowa and Minnesota used in Brown *et al.* (1990), Brown *et al.* (1993) investigated whether pesticide use was related to multiple myeloma.  Among men in Iowa, the authors observed a non-statistically significant elevated association with glyphosate use (OR=1.7; 95% CI=0.8–3.6; 11 exposed cases); however, no adjustment was made for exposure to other pesticides.  The authors cautioned that while the study may lend

support to the role of pesticides in general, the study limitations preclude use of the evidence as a definitive finding for any one compound.

De Roos *et al*. (2005) reported a suggestive association between multiple myeloma and glyphosate-exposed pesticide applicators based on 32 multiple myeloma cases observed in the AHS cohort. For applicators with the full data set, the RR was 1.1 (95% CI=0.5–2.4) with only adjustment for age. In the fully adjusted model excluding subjects with missing covariate data, there was a non-statistically significant elevated risk following adjustment for age, demographic and lifestyle factors, and exposure to other pesticides (RR=2.6; 95% CI=0.7–9.4). The authors postulated that the increased myeloma risk could be due to bias resulting from a selection of subjects in adjusted analyses that differed from subjects included in unadjusted analyses or may be due to a confounder or effect modifier that is prevalent among the subgroup and has not been accounted for in the analyses. When exposure data were also stratified by tertiles with the lowest tertile of exposure as the referent category, trend analyses were not statistically significant. Non-statistically significant elevated RRs of 1.9 (95% CI: 0.6-6.3) and 2.1 (95% CI: 0.6-7.0) were estimated for the highest tertile of both cumulative and intensity-weighted exposure days, respectively. The study authors did note that small sample size precluded precise estimation (n=19 for adjusted analyses). When using never exposed as the referent category, the trend analysis was again non-statistically significant, but the RRs ranged from 2.3 (95% CI: 0.6-8.9) to 4.4 (95% CI: 1.0-20.2) from the lowest tertile to the highest tertile, respectively. When stratified by quartiles, a statistically significant trend is achieved and the RR increased to 6.6 (95% CI: 1.4-30.6); however, the authors noted that the cases were sparsely distributed for these analyses. In the recently published analysis of the AHS cohort with a longer follow-up period and 88 exposed cases (Andreotti *et al*., 2017), there was no association observed between glyphosate exposure and multiple myeloma.

Sorahan (2015)[12] re-analyzed the AHS data reported by De Roos *et al*. (2005) to examine the reason for the disparate findings in relation to the use of a full data set versus the restricted data set. Using Poisson regression, risk ratios were calculated without excluding subjects with missing covariate data. When adjusted for age and sex, the RR for ever-use of glyphosate was 1.12 (95% CI of 0.5–2.49). Additional adjustment for lifestyle factors and use of other pesticides did not have a large impact (RR=1.24; 95% CI=0.52–2.94). The authors concluded that the disparate findings in De Roos *et al*. (2005) could be attributed to the use of a restricted dataset that was unrepresentative.

Landgren *et al*. (2009), within the AHS study population, also investigated the association between pesticide use and prevalence of monoclonal gammopathy of undetermined significance (MGUS). MGUS is considered a pre-clinical marker of multiple myeloma progression. The authors did not observe an association with glyphosate use and MGUS using subjects from the AHS cohort (OR=0.50; 95% CI=0.20–1.0). No adjustment was made for exposure to other pesticides.

In a population-based case-control study (Pahwa *et al*., 2012) among men in six Canadian provinces, a non-statistically significant elevated odds of multiple myeloma was reported in relation to glyphosate use (OR=1.22; 95% CI = 0.77–1.93), based upon 32 glyphosate exposed

---

[12] Funded by Monsanto

multiple myeloma cases and 133 controls.  There was no adjustment for exposure to other pesticides.  In an extended analysis of these data, Kachuri *et al.* (2013), using the same Canadian study population, further explored multiple myeloma in relation to days per year that glyphosate was used.  Adjustment for exposure to other pesticides was also not performed in this study.  For ever-use, there was a slight non-statistically significant increased odds ratio (OR=1.19; 95% CI=0.76–1.87).  For light users (>0 and ≤2 days/year), there was no association (OR=0.72; 95% CI = 0.39–1.32; 15 exposed cases); whereas, for heavy users (>2 days/ year), there was a non-statistically significant increased odds ratio (OR=2.04; 95% CI=0.98–4.23; 12 exposed cases).  Similar results were obtained when proxy respondents were excluded from the analysis.  The low number of cases and controls exposed to glyphosate, particularly when exposed subjects were divided into light and heavy users, was a limitation of the study.  It would be expected that effect estimates would be reduced if adjustment for co-exposure to other pesticides had been performed.

In a hospital-based case-control study conducted by Orsi *et al.* (2009) in France, 56 multiple myleoma cases and 313 age- and sex-matched controls were identified.  A non-statistically significant elevated risk was observed (OR=2.4; 95% CI=0.8–7.3; 5 exposed cases and 18 exposed controls).  The wide CI range can primarily be attributed to the low number of exposed cases, which reduces the reliability of the results to demonstrate a true association.  Additionally, the study did not adjust for exposure to multiple pesticides.

Chang and Delzell (2016) conducted a meta-analysis exploring glyphosate exposure and multiple myeloma using data from the 6 studies described above (Brown *et al.*, 1993; De Roos *et al.*, 2005; Sorahan, 2015; Pahwa *et al.*, 2012; Kachuri *et al.*, 2013; Orsi *et al.*, 2009).  Meta-risk ratios were obtained using data from each of the 4 independent study populations, such that if a study population was already represented in the analysis by one study, then the same population analyzed by another study would not be included (e.g., Sorahan, 2015 and De Roos *et al.*, 2005 could not be used simultaneously in a meta-analysis).  The combined meta-risk ratio based on data from prioritized studies (Brown *et al.*, 1993; Kachuri *et al.*, 2013; Orsi *et al.*, 2009; and Sorahan, 2015) was 1.4 (95% CI=1.0-1.9) using random-effects and fixed-effects models and the $I^2$ value = 0.0% indicating consistency across data sets.  There was relatively no impact on the meta-risk ratio and associated 95% CI when secondary analyses were conducted using alternative estimates for a study population (e.g., substituting the data from Sorahan, 2015 for De Roos *et al.*, 2005).

### *(3) Hodgkin Lymphoma*

In a Canadian case-control study, Karunanayake *et al.*, (2012) evaluated Hodgkin lymphoma (HL) and observed no association with glyphosate exposure following adjustment for age, province of residence, and medical history variables (OR=0.99; 95% CI=0.62-1.56; 38 cases).  No adjustment was made for exposure to other pesticides.

In a hospital-based case-control study conducted by Orsi *et al*. (2009) in France, authors identified 87 HL cases and 265 age-and sex-matched controls.  There was a non-statistically significant elevated odds ratio observed (OR=1.7; 95% CI=0.6–5.0; 6 exposed cases and 15 exposed controls).  The wide CI range can primarily be attributed to the low number of exposed cases.  Also, as noted earlier, this study did not adjust for exposure to multiple pesticides.

Chang and Delzell (2016) conducted a meta-analysis exploring glyphosate exposure and HL using data from both of these studies.  A meta-risk ratio of 1.1 (95% CI=0.7-1.6) was obtained with a $I^2$ value of 0.0%, indicating consistency across the data sets.

HL was also evaluated in the recently published analysis of the AHS cohort (Andreotti *et al.*, 2017) and no association was observed with glyphosate use; however, the number of cases available for this analysis was limited.

### (4) Non-Hodgkin Lymphoma

NHL has about 60 subtypes classified by the WHO, which may have etiological differences (Morton *et al.*, 2014).  There are analyses available for particular subtypes of NHL; however, these are particularly limited by the small sample sizes.  As a result, this evaluation only presents results for total NHL with the exception of the recently published analysis of the AHS cohort (Andreotti *et al.,* 2017) where sample sizes were not limited for all subtypes.

There were six studies available that investigated the association between glyphosate exposure and NHL, which was the most for any type of cancer.  As discussed in Section 3.4, these studies encompass a combination of strengths and limitations.  These studies are therefore discussed in more detail in this section as compared to discussions of other cancer types in order to highlight the strengths and identify the limitations for each study.

De Roos *et al*. (2005) was the only prospective cohort study available; therefore, subjects were enrolled prior to developing cancer outcomes.  Disease status was determined through state cancer registries.  Exposure information was obtained from a large number of licensed pesticide applicators and no proxies were used.  Exposure was evaluated as ever/never use, cumulative lifetime exposure, and intensity-weighted cumulative exposure.  Due to the study design, the potential for many biases were reduced.  Additionally, the study adjusted and/or considered numerous factors, including use of other pesticides.  Median follow-up time was approximately 7 years.; however, as discussed in Section 3.3.1, study participants provided exposure information prior to enrollment and this information was incorporated into the cumulative lifetime and intensity-weighted cumulative exposure metrics.  As a result, the amount of time exposed was longer than just the follow-up time since enrollment.  For applicators with the full data set, the RR for ever/never use was 1.2 (95% CI=0.7–1.9; 92 cases) with only adjustment for age.  In the fully adjusted model excluding subjects with missing covariate data, the RR was similar following adjustment for age, demographic and lifestyle factors, and exposure to other pesticides (RR=1.1; 95% CI=0.7-1.9).  Effect estimates obtained using cumulative lifetime exposure and intensity-weighted cumulative exposure were below 1 (RR = 0.6-0.9 when comparing to the lowest tertile).  The recently published analysis of the AHS cohort with a longer follow-up

period of approximately 17.5 years (Andreotti *et al.,* 2017) also reported no association between glyphosate exposure and NHL overall or any of its subtypes.

De Roos *et al.* (2003) used pooled data from three case-controls studies evaluating NHL in white males from Nebraska, Kansas, and in Iowa and Minnesota (Cantor *et al.*, 1992; Hoar *et al.*, 1986; Zahm *et al.,* 1990; Appendix B).  Exposure information was obtained from exposed individuals or their next of kin (i.e., proxy respondents) if the subjects were dead or incapacitated; however, techniques varied across the three studies.  There is potential for selection bias due to exclusion of observations with missing covariate data, but only if the lack of the covariate data was associated with glyphosate exposure.  The effect estimates for the association between glyphosate exposure and NHL was significant (OR=2.1; 95% CI=1.1–4.0) in the logistic regression analyses adjusting for co-exposure to other pesticides.  However, utilizing alternative hierarchical regression techniques to adjust for co-exposure to other pesticide exposures, the odds ratio was still elevated, but the increase was not statistically significant (OR=1.6; 95% CI=0.90–2.8).

Eriksson *et al.* (2008) is a Swedish case-control study that used detailed exposure information from exposed individuals (i.e.*,* no use of proxy respondents), but only minimal demographic information was provided on subjects (age and sex) and a table with subject characteristics (e.g., smoking status, alcohol intake, physical activity, education) was not provided.  Cases were identified through physicians and verified histopathologically.  Glyphosate exposure, which was reported in 29 cases and 18 controls between 1999 and 2003, produced a statistically significant increased OR in the univariate analysis (OR=2.02; 95% CI=1.10–3.71); however, in the multivariate analysis adjustments were conducted for co-exposure to different agents including MCPA, "2,4,5-Y and/or 2,4-D", mercurial seed dressing, arsenic, creosote, and tar and the OR reduced to 1.51 (95% CI=0.77–2.94) and was not statistically significant.  Additional analyses were conducted to investigate the impact of various exposure times.  When exposure was for more than 10 cumulative days (the median number of days among exposed controls), the OR was 2.36 (95% CI=1.04–5.37; 17 exposed cases) and for exposure less than 10 cumulative days, the OR was 1.69 (95% CI=0.7–4.07; 12 exposed cases).  By dividing the exposed cases and controls using this exposure metric, wider CIs were observed due to smaller sample sizes, which reduces the reliability of the results to demonstrate a true association.  Additionally, these analyses did not account for co-exposure to other pesticides.   Similarly, wider CIs were also observed when exposed cases and controls were divided by a longer exposure metric.  ORs of 1.11 (95% CI=0.24-5.08) and 2.26 (95% CI=1.16-4.40) were obtained for 1-10 years and >10 years, respectively.  It was not clear whether this analysis adjusted for co-exposure to other pesticides based on the statistical methods description and the subjects for each exposure group were not reported.  This finding, while limited to a single study, suggests that cohort studies without sufficient follow-up time or other case-control studies which did not stratify by time since first exposure may be less sensitive in detecting risk.

Hardell *et al.* (2002) used pooled data from two case-control studies in Sweden (Hardell and Eriksson, 1999; Nordstrom *et al*., 1998; Appendix B) that examined hairy cell leukemia, a subtype of NHL, and NHL (not including hairy cell leukemia).  Exposure information was collected from individuals or proxy respondents based on a working history with specific questions on exposures to different chemicals.  Cases were identified from regional cancer

registries and verified histopathologically. In the univariate analysis, risk of NHL associated with glyphosate exposure was found to be significantly increased (OR=3.04; 95% CI=1.08–8.52), but when study site, vital status, and co-exposure to other pesticides were considered in the multivariate analysis, the OR noticeably attenuated and was found to be non-statistically significant (OR=1.85; 95% CI=0.55–6.20). The wide range of the CI resulting from the small sample size (only 8 glyphosate-exposed cases and 8 glyphosate-controls).

McDuffie *et al.* (2001) is a multicenter population-based study among men of six Canadian provinces. This case-control study utilized a well-conducted exposure assessment and cases were ascertained from cancer registries or hospitals in six provinces with histopathological verification for 84% of the samples. There are concerns with control selection. There was low control participation (48%) and different sources were used for selecting controls depending on the province of residence. Effect estimates were obtained using a considerable number of exposed cases and controls (51 cases and 133 controls); however, the study did not assess co-exposure to other pesticides. There was a non-statistically significant increased risk of NHL from glyphosate exposure when adjusting for age and province (OR=1.26; 95% CI=0.87–1.80) and when adjusting for age, province and medical variables (OR=1.20; 95% CI=0.83–1.74). Medical variables found to be statistically significant included history of measles, mumps, previous cancer, skin-prick allergy tests, allergy desensitization shots, and a positive family history of cancer in a first-degree relative. It would be expected that effect estimates would attenuate if adjustment for co-exposure to other pesticides had been performed. Additional analyses were conducted to investigate differences in exposure time. When exposure was for more than 2 days/year, the OR was 2.12 (95% CI=1.20-3.73; 23 exposed cases and 36 exposed controls) compared to unexposed subjects and for exposure more than 0 and ≤ 2 days/year, the OR was 1.00 (95% CI=0.63–1.57; 28 exposed cases and 97 exposed controls) compared to unexposed subjects.

Orsi *et al.* (2009) is a French hospital-based case-control study that obtained exposure information from subjects (no proxies used) using a detailed questionnaire with lifelong residential and occupational histories followed by a discussion with a trained interviewer who was blinded to case status. No issues regarding exposure or outcome assessment were identified; however, there is potential for selection bias given the study utilized hospital-based controls (primarily from orthopedic and rhematological departments) that may not be representative of the general population that gave rise to the cases. The study evaluated several potential confounders; however, it did not assess co-exposure to other pesticides. There was no association observed between NHL and glyphosate use (OR=1.0; 95% CI=0.5-2.2; 12 exposed cases and 24 exposed controls). The low number of cases and controls exposed to glyphosate and lack of adjustment for exposure to multiple pesticides were limitations of the study.

Schinasi and Leon (2014) conducted a meta-analysis exploring occupational glyphosate exposure and NHL using data from six of the above mentioned studies (McDuffie *et al.*, 2001; Hardell *et al.*, 2002; De Roos *et al.*, 2003; De Roos *et al.*, 2005; Eriksson *et al.*, 2008; and Orsi *et al.*, 2009). Since the authors identified a variety of sources of heterogeneity between publications, they decided a priori to calculate meta-risk ratio estimates and 95% CIs using random effect models, allowing between study heterogeneity to contribute to the variance. $I^2$ values were reported as a measure of inconsistency in results. For glyphosate, the meta-risk ratio was 1.5

with a 95% CI of 1.1–2.0 and the $I^2$ value was 32.7% indicating relatively low levels of heterogeneity among these studies. This study combined multiple smaller studies that on their own had limitations, including small sample sizes.

The 2015 IARC evaluation noted that fully adjusted effect estimates in two of the Swedish studies (Hardell *et al*., 2002 and Eriksson *et al*., 2008) were not used in the analysis conducted by Schinasi and Leon (2014). Consequently, the IARC Working Group conducted a reexamination of the results of these studies (IARC 2015). For an association between glyphosate exposure and NHL, the IARC estimated a meta-risk ratio of 1.3 (95% CI=1.03–1.65, $I^2$=0%; p=0.589 for heterogeneity).

Chang and Delzell (2016) conducted their own meta-analysis exploring glyphosate exposure and NHL using six independent studies (De Roos *et al.,* 2003; De Roos *et al.,* 2005; Eriksson *et al.,* 2008; Hardell *et al.,* 2002; McDuffie *et al.,* 2001; and Orsi *et al.,* 2009). A meta-risk ratio of 1.3 (95% CI=1.0-1.6) was obtained with an $I^2$ value of 0.0%. In a secondary analysis, the De Roos *et al.* (2003) OR using hierarchical regression was replaced by the logistic regression OR. This change had no impact on the meta-risk ratio and associated confidence interval (meta-risk ratio=1.3; 95% CI=1.0-1.6). In another secondary analysis, the OR from McDuffie *et al.* (2001) was replaced by the OR from Hohenadel *et al.* (2011), which evaluated the same study population (minus four previously misclassified NHL cases). This analysis also yielded similar results (meta-risk ratio=1.3; 95% CI=1.0-1.7). A final analysis was performed with the replacements for both secondary analyses [i.e., logistic regression OR from De Roos *et al.* (2003) and OR from Hohenadel *et al.* (2011)]. The results were relatively the same as the other meta-analyses (meta-risk ratio=1.4; 95% CI=1.0-1.8). Chang and Delzell (2016) also tested for publication bias using Egger's linear regression approach to evaluating funnel plot asymmetry, and found no significant asymmetry indicating little evidence of publication bias; however, given the small sample size (n=6), this analysis would lack power and the results are not considered meaningful.

**Table 3.4.  Summary of Findings: Non-Solid Tumor Cancer Studies.**

| Study | Study Design | Study Location | Exposure Metric | Adjusted Effect Estimate: RR or OR (95% CI)[a] | Covariate Adjustments in Analyses |
|---|---|---|---|---|---|
| | | | *Leukemia* | | |
| De Roos *et al.* (2005) | Prospective Cohort | USA: Iowa and North Carolina | Ever/never | 1.0 (0.5-1.9) | Age, demographic and lifestyle factors, and other pesticides[b] |
| | | | Cumulative Exposure Days (by tertile cut points): 1-20 21-56 57-2,678 | 1.0 1.9 (0.8-4.5) 1.0 (0.4-2.9) | Age, demographic and lifestyle factors, and other pesticides[b] |
| | | | Intensity-Weighted Cumulative Exposure Days (by tertile cut points): 0.1-79.5 79.6-337.1 337.2-18,241 | 1.0 1.9 (0.8-4.7) 0.7 (0.2-2.1) | Age, demographic and lifestyle factors, and other pesticides[b] |
| Brown *et al.* (1990) | Case-Control | USA: Iowa and Minnesota | Ever/never | 0.9 (0.5-1.6) | Vital status, age, tobacco use, family history of lymphopoietic cancer, high occupations, and high risk exposures |
| | | | *Multiple Myeloma* | | |
| De Roos *et al.* (2005) | Prospective Cohort | USA: Iowa and North Carolina | Ever/never | 2.6 (0.7-9.4) | Age, demographic and lifestyle factors, and other pesticides[b] |
| | | | Cumulative Exposure Days (by tertile cut points): 1-20 21-56 57-2,678 | 1.0 1.1 (0.4-3.5) 1.9 (0.6-6.3) | Age, demographic and lifestyle factors, and other pesticides[b] |
| | | | Intensity-Weighted Cumulative Exposure Days (by tertile cut points): 0.1-79.5 79.6-337.1 337.2-18,241 | 1.0 1.2 (0.4-3.8) 2.1 (0.6-7.0) | Age, demographic and lifestyle factors, and other pesticides[b] |
| Brown *et al.* (1993) | Case-Control | USA: Iowa | Ever/never | 1.7 (0.8-3.6) | Age and vital status |
| Kachuri *et al.* (2013) (extended analysis of Pahwa 2012) | Case-Control | Canada | Ever/never | 1.19 (0.76-1.87) | Age, province of residence, smoking status, selected medical conditions, family history of cancer, and use of a proxy respondent |
| | | | Days per year of use: 0 to ≤2 days/year >2 days/year | 0.72 (0.39-1.32) 2.04 (0.98-4.23) | Age, province of residence, smoking status, selected medical conditions, family history of cancer, and use of a proxy respondent |
| Pahwa *et al.* (2012) | Case-Control | Canada | Ever/never | 1.22 (0.77-1.93) | Age group, province of residence, and statistically significant medical history variables |

**Table 3.4.  Summary of Findings: Non-Solid Tumor Cancer Studies.**

| Study | Study Design | Study Location | Exposure Metric | Adjusted Effect Estimate: RR or OR (95% CI)[a] | Covariate Adjustments in Analyses |
|---|---|---|---|---|---|
| Orsi *et al.* (2009) | Case-Control | France | Ever/never | 2.4 (0.8-7.3) | Age, centre, and socioeconomic category |
| Sorahan (2015) | Prospective Cohort | USA: Iowa and North Carolina | Ever/never | 1.12 (0.5-2.49) | Age and sex |
| Reanalysis of De Roos *et al.* (2005) | | | | 1.24 (0.52-2.94) | Age sex, lifestyle factors, and other pesticides |
| *Monoclonal Gammopathy of Undetermined Significance (MGUS)* | | | | | |
| Landgren *et al.* (2009) | Nested Case-Control | USA: Iowa and North Carolina | Ever/never | 0.5 (0.2-1.0) | Age and education |
| *Hodgkin Lymphoma (HL)* | | | | | |
| Karunanayake *et al.* (2012) | Case-Control | Canada | Ever/never | 0.99 (0.62-1.56) | Age group, province of residence, and statistically significant medical history variables |
| Orsi *et al.* (2009) | Case-Control | France | Ever/never | 1.7 (0.6-5.0) | Age, centre, and socioeconomic category |
| *Non-Hodgkin Lymphoma (NHL)* | | | | | |
| De Roos *et al.* (2005) | Prospective Cohort | USA: Iowa and North Carolina | Ever/never | 1.1 (0.7-1.9) | Age, demographic and lifestyle factors, and other pesticides[b] |
| | | | Cumulative Exposure Days (by tertile cut points): 1-20 21-56 57-2,678 | 1.0 0.7 (0.4-1.4) 0.9 (0.5-1.6) | Age, demographic and lifestyle factors, and other pesticides[b] |
| | | | Intensity-Weighted Cumulative Exposure Days (by tertile cut points): 0.1-79.5 79.6-337.1 337.2-18,241 | 1.0 0.6 (0.3-1.1) 0.8 (0.5-1.4) | Age, demographic and lifestyle factors, and other pesticides[b] |
| De Roos *et al.* (2003) | Case-Control | USA: Iowa, Nebraska, Minnesota, and Kansas | Ever/never | 1.6 (0.9-2.8) | Age, study site, and use of other pesticides |
| Eriksson *et al.* (2008) | Case-Control | Sweden | Ever/never | Multivariate: 1.51 (0.77-2.94) | Age, sex, year of diagnosis or enrollment, and exposure to other pesticides |
| | | | Days per year of use: ≤ 10 days >10 days | 1.69 (0.70-4.07) 2.36 (1.04-5.37) | Age, sex, and year of diagnosis or enrollment |
| | | | Years of use: 1-10 years >10 years | 1.11 (0.24-5.08) 2.26 (1.16-4.40) | Unknown |

**Table 3.4.  Summary of Findings: Non-Solid Tumor Cancer Studies.**

| Study | Study Design | Study Location | Exposure Metric | Adjusted Effect Estimate: RR or OR (95% CI)[a] | Covariate Adjustments in Analyses |
|---|---|---|---|---|---|
| Hardell *et al.* (2002) | Case-Control | Sweden | Ever/never | Multivariate: 1.85 (0.55-6.20) | Study, study area, vital status, and exposure to other pesticides |
| McDuffie *et al.* (2001) | Case-Control | Canada | Ever/never | 1.20 (0.83-1.74) | Age, province of residence, and statistically significant medical variables |
| | | | Days per year of use: >0 and ≤ 2 days >2 days | 1.00 (0.63-1.57) 2.12 (1.20 -3.73) | Age and province of residence |
| Orsi *et al.* (2009) | Case-Control | France | Ever/never | 1.0 (0.5-2.2) | Age, centre, and socioeconomic category |

[a] Some studies report multiple quantitative risk measurements.  This table reports the most highly adjusted quantitative measurements.

[b] De Roos *et al.* (2005) excluded subjects missing covariate data for demographic and lifestyle factors and exposure to other pesticides; therefore, the number of subjects included in each analysis varies.

### 3.6     Discussion

A total of 63 individual studies were identified in the systematic review.  The data from 7 of these studies were used in pooled analyses by other studies; therefore, they were not subjected to detailed evaluation. Overall, 3 studies, 19 studies, and 34 studies were assigned high, moderate, or low rankings, respectively.  All of the high and moderate quality studies were considered informative with regard to the carcinogenic potential of glyphosate.  Additionally, the recently published analysis of the AHS cohort (Andreotti *et al.*, 2017) was also considered as part of this evaluation.

There was no evidence of an association between glyphosate exposure and solid tumors, leukemia, or HL.  These conclusions are consistent with those recently conducted by IARC, EFSA, and JMPR who also concluded there is no evidence of an association for these tumors at this time.  The data should be considered limited though with only one or two studies available for almost all of the cancer types investigated.  The remainder of this discussion focuses on multiple myeloma and NHL.  Study elements for the available studies and their potential to impact effect estimates are examined; however, the discussion is applicable in most cases to all of the epidemiological studies used in this evaluation.

*Multiple Myeloma*

Four studies were available evaluating the association between glyphosate exposure and risk of multiple myeloma in the initial evaluation presented to the SAP in December 2016 (Brown *et al.*, 1993; De Roos *et al.*, 2005; Orsi *et al.*, 2009; Pahwa *et al.*, 2012).  Since that time, a recent analysis of the AHS cohort has been published (Andreotti *et al.*, 2017), which included evaluation of multiple myeloma.  One reanalysis (Sorahan, 2015) and one extended analysis (Kachuri *et al.*, 2013) were also included in the evaluation.  The effect estimates for ever/never use ranged from 1.19 to 2.6 although none were found to be statistically significant.  Only one study (De Roos *et al.*, 2005) adjusted for co-exposures to other pesticides; therefore, potential confounding was not addressed in the other studies.  There was an indication of a possible exposure-response relationship; however, this was the only study that evaluated the exposure-response relationship for multiple myeloma.  Reanalysis of the full dataset by Sorahan (2015) raised concerns about whether the restricted dataset used for these analyses was representative of the whole cohort.  Furthermore, in the recent analysis of the AHS cohort (Andreotti *et al.*, 2017) with a longer follow-up period and almost 5 times more exposed cases, there was no evidence of an association between glyphosate exposure and risk of multiple myeloma.  There was a single study of MGUS, a precursor to multiple myeloma, which showed decreased risk with exposure to glyphosate; however, the study did not adjust for exposure to other pesticides.  Overall, the available evidence does not link glyphosate exposure to multiple myeloma.

*NHL*

Six studies were available evaluating the association between glyphosate exposure and risk of NHL in the initial evaluation presented to the SAP in December 2016.  Since that time, a recent analysis of the AHS cohort has been published (Andreotti *et al.*, 2017), which included evaluation of NHL.  Effect estimates for ever/never use ranged from 1.0-1.85 in adjusted

analyses with none reaching statistical significance (Figure 3.2). Two of these studies did not adjust for co-exposures to other pesticides (McDuffie *et al*., 2001; Orsi *et al*., 2009). Many of the evaluated studies were limited by small sample sizes, which resulted in large confidence intervals and reduced the reliability of the results to demonstrate a true association. Meta-analyses were performed by IARC (2015) and Chang and Delzell (2016) using these results for the ever/never use metric. Both analyses reported similar meta-risk ratios ranging from 1.3-1.5, depending on the effect estimates and studies included in the analyses. Any of the meta-analysis estimates that were statistically significant were all borderline with the lower limit of the 95% CI just slightly over 1. For example, the lower 95% confidence limit reported by IARC (2015) was 1.03 and the lower 95% confidence limit displayed in Figure 3.2 generated by the agency is 1.01. It should also be noted that publication bias may play a role in this evaluation given there is a tendency to only publish positive results and potential concerns regarding glyphosate have only been raised in recent years.

With respect to meta-analyses, caution should be taken when interpreting results. Meta-analyses are a systematic way to combine data from several studies to estimate a summary effect. Analyses were performed with 6 studies, which many would consider small for performing meta-analyses. Rarely will meta-analyses synthesize data from studies with identical study designs and methods. In the meta-analyses performed by IARC (2015) and Chang and Delzell (2016), inclusion was primarily based on whether a study addressed the broader question regarding the association between glyphosate exposure and risk of NHL. For meaningful results, careful consideration of whether studies are similar and should be combined in the analysis. Furthermore, the bias and confounding issues inherent for each individual study are carried over into the meta-analyses. Across the NHL studies, study characteristics varied, such as overall study design (i.e., cohort and case-control), source population, proxy respondent use, covariate adjustments, and confounding control. Even if these differences are not detected statistically, the meta-analysis estimate should be considered in the context of the data that are used to generate it.

Using cumulative lifetime and intensity-weighted cumulative exposure metrics, all effect estimates were less than 1 (OR = 0.6-0.9 when comparing to the lowest tertile) in the AHS cohort (De Roos *et al.*, 2005). Similar results were obtained in the recent analysis of the AHS cohort (Andreotti *et al.*, 2017). Two case-control studies (Eriksson *et al*., 2008; McDuffie *et al*., 2001) evaluated the association of glyphosate exposure and NHL stratifying exposure by days per year of use. These studies obtained effect estimates greater than 1, which conflicted with the results in the prospective cohort study; however, these estimates from the case-control studies do not appear to be adjusted for co-exposures to other pesticides. By dividing the total number of exposed cases and controls by these exposure metrics in Eriksson *et al*. (2008), wider confidence intervals were observed due to small sample sizes, which reduces the reliability of the results to demonstrate a true association. Furthermore, as mentioned previously (and will be discussed further below), there was clearly strong potential for confounding from exposure to other pesticides. In each instance where a study adjusted for co-exposure to other pesticides, the adjusted effect estimate decreased in magnitude, including other analyses performed in one of these case-control studies. Consequently, lack of adjustment for co-exposure to other pesticides in these analyses could partially explain the conflicting results between the cohort and case-control studies.



**Figure 3.2.  Forest plot of effect estimates (denoted as ES for effect sizes) and associated 95% confidence intervals (CI) for non-Hodgkin lymphoma (NHL).**

The possible effect of confounding factors, which are related to both the exposure of interest and the risk of disease, may make it difficult to interpret the results.  Control for confounding varied considerably across studies (Table 3.2).  Studies primarily adjusted for standard variables, such as age, gender, and residency location.  Co-exposure to other pesticides was considered for several of the NHL studies for ever/never use (De Roos *et al.*, 2003; De Roos *et al.*, 2005; Eriksson *et al.,* 2008; Hardell *et al.*, 2002); however, analyses of exposure-response and latency effects did not appear to adjust for these co-exposures.  The recent analysis by Andreotti *et al*. (2017) also adjusted for co-exposure to other pesticides.

There is clearly a strong potential for confounding by co-exposures to other pesticides since many are highly correlated and have been reported to be risk factors for NHL.  In the studies that did report a quantitative measure adjusted for the use of other pesticides, the risk was always found to be closer to the null than the risk calculated prior to this adjustment.  For examples, Eriksson *et al*. (2008) reported unadjusted and adjusted effect estimates of 2.02 (95% CI: 1.10-3.71) and 1.51 (95% CI: 0.77-2.94), respectively.  Comparing the magnitude of those effect sizes on the natural log scale, the unadjusted effect was $\beta$=0.70 (95% CI: 0.10, 1.31) while the adjusted effect was $\beta$=0.41 (95% CI: -0.26, 1.08), suggesting a difference compatible with a degree of confounding by those herbicide co-exposures which appeared to have inflated the unadjusted effect upwards by 70% on the natural log scale (or by 46% on the OR scale).  This demonstrates the profound effect this adjustment has on effect estimates and the concern for residual confounding by other pesticides that cause NHL themselves.  As discussed in Section 3.2.4, other potential confounders have also been identified.  With an association between glyphosate exposure and the outcome of interest, occupational exposure to diesel exhaust fumes, solvents, livestock and other farm animals, and UV radiation are highly likely confounders in the

NHL studies; however, none of the studies accounted for these potential confounders. These confounders and/or other unknown factors could explain the increased risk of NHL among farmers, particularly since increased risk of NHL to farmers has been previously documented and existed prior to the introduction of glyphosate.

Recall bias and missing data are also limitations in most of the studies. In epidemiologic studies, the quality of the exposure assessment is a major concern since the validity of the evaluations depends in large part on the ability to correctly quantify and classify an individual's exposure. Variation in the quality of exposure assessment, study design and methods, as well as available information concerning potential confounding variables could also explain discrepancies in study findings. During their lifetime, farmers are typically exposed to multiple pesticides and often several may be used together posing a challenge for identifying specific risk factors. Moreover, there is no direct information on pesticide exposure or absorbed dose because analyses are based on self-reported pesticide use. The studies included in this epidemiology assessment relied primarily on questionnaires and interviews to describe participants' past and/or current exposure to glyphosate. Since the questionnaires are commonly used to account for exposure and capture self-reporting, the results can be subject to misclassification and recall bias.

Furthermore, the use of proxy respondents has the potential to increase recall bias and thus may increase exposure misclassification, especially for proxy respondents not directly involved in farming operations that may be more prone to inaccurate responses than directly interviewed subjects. In some of the NHL studies, the study participants were interviewed directly to assess exposure (De Roos *et al.*, 2005; Eriksson *et al.*, 2008; McDuffie *et al.*, 2001; Orsi *et al.*, 2009), making proxy respondent use a non-issue for these studies. In other studies, however, study participants or proxy respondents were interviewed to assess exposure (Hardell *et al.*, 2002, De Roos *et al.*, 2003). De Roos *et al.* (2003) did not find type of respondent to be statistically significant, but Hardell *et al*. (2002) did not conduct analyses to evaluate the impact of proxy use. In non-NHL studies, proxy analyses were conducted in a small subset (Kachuri *et al.*, 2013; Lee *et al.,* 2004b; Lee *et al.,* 2005; Yiin *et al.*, 2012) and differences in effect estimates were often observed. In a few studies, respondent type was used as an adjustment variable when calculating effect estimates (Band *et al.*, 2011; Kachuri *et al.,* 2013; Lee *et al.*, 2005). As with all study design elements of case-control studies, one concern is whether or not the use of proxy respondents had a differential impact on the cases and controls included in the study because any differential impact may result in differential exposure misclassification. When use of proxy respondents was comparable for cases and controls in the full study population, it could be assumed that there is less concern for potential recall bias from the use of proxy respondents. In Hardell *et al.,* (2002), the percentage of cases and controls with proxy respondents was not fully reported for cases and controls though and this adds a potential source of uncertainty for the study. Moreover, when proxy respondents were used in a study, the percentages were usually reported only for the full study population and were not reported for the specific cases and controls exposed to glyphosate. This lack of information makes it difficult to assess the degree to which recall bias may have occurred due to the use of proxy respondents.

Previously, some have argued that the follow-up period (median = 7 years) in De Roos *et al*. (2005) is not sufficiently long to account for the latency of NHL (Portier *et al*., 2016); however, an analysis of the AHS cohort was recently published (Andreotti *et al*., 2017) with an extended

follow-up of 17.5 years.  This study reported no association between glyphosate exposure and all lymphohematopoietic cancers, NHL, or any of its subtypes across exposure metrics.  No association was observed in unlagged or lagged analyses, after adjustment for pesticides linked to NHL in previous AHS analyses, and after exclusion of multiple myeloma from the NHL grouping.

It was also noted that reference groups differed across studies.  For example, some studies (McDuffie *et al*., 2001; Hardell *et al*., 2002; and Eriksson *et al*., 2008) eliminated cases and controls who had been exposed to certain classes of pesticides, which may have resulted in selection bias and/or recall bias that may ultimately impact the effect estimates obtained in these studies.  In the dose-response analysis by De Roos *et al*. (2005), the lowest exposed tertile was used as the reference group in an effort to reduce the potential for residual confounding by unmeasured covariates due to lack of comparability observed between the never exposed group and the higher exposed groups.  Analyses were also performed using the unexposed group as the reference.  This study consistently found no evidence of an association between glyphosate exposure and NHL using different exposure metrics and reference groups.  Similarly, there was no evidence of an association observed in the recent analysis of the AHS cohort (Andreotti *et al.*, 2017) with a longer follow-up period.

There are conflicting views on how to interpret the overall results for NHL.  Some believe that the data are indicative of a potential association between glyphosate exposure and risk of NHL.  This is primarily based on reported effect estimates across case-control studies and the associated meta-analyses greater than 1.  Additionally, the analysis conducted by Eriksson *et al*. (2008) observed a slightly statistically significant increase for those with more than 10 years of exposure prior to diagnosis.  There were also two case-control studies that investigated the association of glyphosate exposure and NHL by stratifying exposure by days per year of use that reported effect estimates greater than 1 for groups with the highest exposure.

Conversely, others have viewed the effect estimates as relatively small in magnitude and observed associations could be explained by chance and/or bias, particularly since studies have reported farmers develop NHL at excess rates and this risk existed prior to the introduction of glyphosate.  All of the effect estimates for ever/never use were non-statistically significant.  Several studies reported effect estimates approximately equal to the null.  The widest confidence intervals were observed for the highest effect estimates indicating these effect estimate are less reliable.  Sample sizes were limited in several of these case-control studies.  Meta-analyses were based on studies with varying study characteristics.  Given the limitations and concerns discussed above for the individual studies included in this evaluation, chance and/or bias cannot be excluded as an explanation for the relatively small increase observed in the meta-risk ratios.  Meanwhile, analyses performed by De Roos *et al.* (2005) and Andreotti *et al.* (2017) reported effect estimates less than 1 for cumulative lifetime exposure and intensity-weighted cumulative exposure and these extensive analyses did not detect any exposure-response relationship, which conflicts with the two case-control studies that indicate potential for an exposure-response relationship comparing two groups stratified by days per year of use.  Although increased effect estimates were observed in one case-control study (Eriksson *et al*., 2008) for subjects exposed more than 10 years prior to diagnosis and in two case-control studies (McDuffie *et al*., 2001; Eriksson *et al*., 2008) that stratified exposure by days per year of use, none of these analyses

appeared to adjust for exposures to other pesticides, which has been found to be particularly important for these analyses and would be expected to attenuate these estimates towards the null. Furthermore, none of the studies in this evaluation of glyphosate exposure and risk of NHL accounted for other potential confounders, such as diesel exhaust fumes, solvents, animals, and UV radiation.

Based on the weight-of-evidence, the agency cannot exclude chance and/or bias as an explanation for observed associations in the database.  Due to study limitations and contradictory results across studies of at least equal quality, a conclusion regarding the association between glyphosate exposure and risk of NHL cannot be determined based on the available data.  The agency will continue to monitor the literature for studies and any updates to the AHS will be considered when available.

## 4.0    Data Evaluation of Animal Carcinogenicity Studies

### 4.1    Introduction

Cancer bioassays in animals have historically been the primary studies available to evaluate cancer hazard in humans since, until recently, epidemiological evidence was limited. The results of these bioassays, as well as results from screening assays for genotoxicity, are considered in a weight-of-evidence approach to determine the potential of a chemical to induce cancer in humans. Carcinogenicity studies in two rodent species are required for the registration of food use pesticides or when the use of a pesticide is likely to result in repeated human exposure over a considerable portion of the human lifespan (40 CFR Part 158.500). Rodent carcinogenicity studies identified from the data collection phase of the systematic review were evaluated for study quality and acceptable studies were evaluated in the context of the 2005 EPA Guidelines for Carcinogen Risk Assessment as described in Sections 4.2 and 4.3 below, respectively. This included studies using glyphosate salts, which dissociate quickly in aqueous environments to the glyphosate acid and the corresponding cation. The cations would not be expected to impact the toxicity results compared to studies where animals are treated with glyphosate acid alone.

### 4.2    Consideration of Study Quality for Animal Carcinogenicity Studies

The agency has published test guidelines on how to conduct carcinogenicity studies (OCSPP 870.4200) and combined chronic/carcinogenicity studies (OCSPP 870.4300) in rodents which have been harmonized with OECD guidelines (Test Nos. 451 and 453). Test substances are typically administered in animal carcinogenicity studies by the oral route for food use pesticides. The studies are generally conducted in mice and rats with exposure durations of 18-24 months for mice and 24 months for rats, which represent exposures of the majority of the expected lifespan in these animals. Guideline carcinogenicity studies are designed to test three or more doses in both sexes (with at least 50 animals/sex/dose) with adequate dose spacing to characterize tumor dose-response relationships. Key considerations when evaluating carcinogenicity studies for cancer hazard assessment include identification of target organs of carcinogenicity, increased incidence of tumors or proportion of malignant neoplasms, and reduction in the time to appearance of tumors relative to the concurrent control group (OECD TG 451).

There are a number of criteria the agency uses when evaluating the technical adequacy of animal carcinogenicity studies. A primary criterion is the determination of the adequacy of dosing. The 2005 EPA Guidelines for Carcinogen Risk Assessment recommends that the highest dose level selected should elicit signs of toxicity without substantially altering the normal life span due to effects other than tumors; or without inducing inappropriate toxicokinetics (e.g., overwhelming absorption or detoxification mechanisms); however, the high dose need not exceed 1,000 mg/kg/day (i.e., limit dose) (OCSPP 870.4200; OCSPP 870.4300). Additional criteria to judge the technical adequacy and acceptability of animal carcinogenicity studies are provided in the test guidelines as well as other published sources (NTP, 1984; OSTP, 1985; Chhabra *et al.*, 1990). As stated in the 2005 EPA Guidelines for Carcinogen Risk Assessment, studies that are judged to be wholly inadequate in protocol, conduct or results, should be discarded from

analysis.  Studies the agency consider acceptable are further evaluated for potential tumor effects.

Following study quality evaluation, a total of 8 chronic/carcinogenicity studies in the rat and 6 carcinogenicity studies in the mouse were considered acceptable for use in the current evaluation for the active ingredient glyphosate and were subsequently evaluated in the context of the 2005 EPA Guidelines for Carcinogen Risk Assessment as described in Section 4.3.  A number of studies were judged to be inadequate in protocol, conduct or reporting and were not considered in the analysis of glyphosate.  These studies and the justification for not including them in the analysis are listed below:

1. A two-year chronic oral toxicity study in Albino rats by Reyna (1974)[13].  The study was considered inadequate to assess carcinogenicity due to insufficient reporting on the histopathology findings in the control and treatment groups. Approximately 70 animals were unaccounted for across the study.

2. A two-year drinking water study in Wistar rats with a formulated product (13.6% ammonium salt) by Chruscielska *et al.*, (2000).  In addition to deficiencies including inadequate reporting of water consumption and body weight data, this study was conducted with a glyphosate formulated product and not the active ingredient glyphosate, which is the focus of this review. Glyphosate formulations contain various components other than glyphosate and it has been hypothesized these components are more toxic than glyphosate alone.  The agency is collaborating with NTP to systematically investigate the mechanism(s) of toxicity for glyphosate and glyphosate formulations. This project is discussed in more detail in Section 7.0 of this document.

3. An initiation-promotion study (George *et al.*, 2010) in male Swiss mice that tested a commercial formulation of glyphosate (41%) on the skin.  Study deficiencies included small number (20) of animals, tested only males, and lack of histopathological examination.

4. A carcinogenicity study in Swiss albino mice (Kumar, 2001)[14].  This study was not included due to the presence of a viral infection within the colony, which confounded the interpretation of the study findings. Malignant lymphomas were reported in this study in all dose groups.  However, lymphomas are one of the most common types of spontaneous neoplastic lesions in aging mice (Brayton *et al*., 2012).  Murine leukemia viruses (MuLVs) are also a common cause of lymphoma in many different strains of mice (Ward, 2006). For example, Tadesse-Heath *et al*. (2000) reported 50% lymphoma (mostly B-cell origin) incidence in a colony of Swiss mice infected with MuLVs.  Although the lymphoma incidences in Kumar (2001) were within or near normal background variation, it is not clear whether or not the viral infection may have contributed to the lymphoma incidence reported or the lower survival seen at the high dose in this study.

---

[13] MRID 00062507.
[14] MRID 49987403. In Greim *et al.* (2015), the same study is cited as Feinchemie Schwebda (2001).

5. A two year feeding study in Sprague-Dawley rats (Excel, 1997) was not included. The agency does not have access to this study to perform an independent assessment of its conduct and; however, Greim *et al.* (2015) stated that the study "is considered unreliable for carcinogenicity evaluation" and there were "several deviations from the OECD Test Guideline 453".

## 4.3     Assessment of Animal Carcinogenicity Studies

The agency considers many factors when interpreting the results of carcinogenicity studies. The 2005 EPA Guidelines for Carcinogen Risk Assessment are intended as a guidance only and does not provide a checklist for determining whether tumor findings are related to treatment. These guidelines emphasize the importance of weighing multiple lines of evidence in reaching conclusions regarding human carcinogenic potential of chemicals. Evaluation of observed tumor findings takes into consideration both biological and statistical significance. There are several factors in the 2005 EPA Guidelines for Carcinogen Risk Assessment used in the weight-of-evidence evaluation of individual studies. For this evaluation, the interpretation of the evidence related to tumor findings is described below.

### *Dose Selection*
Doses should be selected based on relevant toxicological information. Caution is taken in administering an excessively high dose that would confound the interpretation of the results to humans. As mentioned above, the 2005 EPA Guidelines for Carcinogen Risk Assessment recommends that the highest dose level selected should elicit signs of toxicity without substantially altering the normal life span due to effects other than tumors; or without inducing inappropriate toxicokinetics (e.g., overwhelming absorption or detoxification mechanisms); however, the high dose is not recommended to exceed 1,000 mg/kg/day (OCSPP 870.4200; OCSPP 870.4300). Doses should provide relevant dose-response data for evaluating human hazard for human health risk assessment. In the case of glyphosate, the low (oral) systemic toxicity and limited pharmacokinetic (PK) data for this chemical make it difficult to define a maximum tolerated dose (MTD) for the cancer bioassays. A large number of the carcinogenicity studies conducted with glyphosate approach or exceed the limit dose. The 2005 EPA Guidelines for Carcinogen Risk Assessment state that "weighing of the evidence includes addressing not only the likelihood of human carcinogenic effects of the agent but also the conditions under which such effects may be expressed". As such, the agency puts less weight on observations of increased incidence of tumors that only occur near or above the limit dose.

### *Statistical analyses to evaluate dose response and tumor incidences*
The main aim of statistical evaluation is to determine whether exposure to the test agent is associated with an increase in tumor development, rather than due to chance alone. Tumors were selected for statistical analyses in the current evaluation if the study report identified tumors as statistically significant and/or have been identified by the reviewer as potentially biologically significant based on the presence of an increasing monotonic dose-response and/or relative increases from concurrent controls. For toxicological studies submitted to the agency for pesticide registration, including animal carcinogenicity studies, detailed reviews are performed, which summarize study findings and identify effects, such as tumors, for evaluation.

Statistical analyses should be performed on each tumor type separately. The incidence of benign and malignant lesions of the same cell type, usually within a single tissue or organ, are considered separately, but may be combined when scientifically defensible (McConnell *et al.*, 1986). Trend tests and pairwise comparison tests are the recommended tests for determining whether chance, rather than a treatment-related effect, is a plausible explanation for an apparent increase in tumor incidence. The 2005 Guidelines for Carcinogen Risk Assessment states that:

"A trend test such as the Cochran-Armitage test (Snedecor and Cochran, 1967) asks whether the results in all dose groups together increase as dose increases. A pairwise comparison test such as the Fisher exact test (Fisher, 1950) asks whether an incidence in one dose group is increased over that of the control group. By convention, for both tests a statically significant comparison is one for which *p* is less than 0.05 that the increased incidence is due to chance. Significance in either kind of test is sufficient to reject the hypothesis that chance accounts for the result."

In the current evaluation, animals sacrificed for interim evaluations or died prior to the interim sacrifices were not included in the statistical evaluations to avoid dilution of a potential carcinogenic effect. Additionally, survival was evaluated across dose groups and no significant mortality differences were observed in any of the studies. As a result, there was no need to incorporate survival adjustments into the analyses (e.g., Peto prevalence test). The Cochran-Armitage Test for Trend (Snedecor and Cochran, 1967; one-sided) was used for trend analysis. For pairwise comparisons, the Fisher Exact Test (Fisher, 1950; one-sided) was used to determine if incidences observed in treated groups were different from concurrent controls. Furthermore, the 2005 EPA Guidelines for Carcinogen Risk Assessment state that "considerations of multiple comparisons should also be taken into account". Multiple comparison methods control the familywise error rate, such that the probability of Type I error (incorrect rejection of the null hypothesis or "false positive") for the pairwise comparisons in the family does not exceed the alpha level. In the current evaluation, the Benjamini-Hochberg correction method was used to adjust for multiple comparisons (Benjamini and Hochberg, 1995).

For the current evaluation, statistical significance observed in either test is judged in the context of all of the available evidence. Statistically significant responses may or may not be biologically significant and vice versa (Hsu and Stedeford, 2010; EPA, 2005). If a trend was found to be statistically significant, a closer examination of the tumor incidence was taken to determine whether the data demonstrate a monotonic dose-response where an increase in tumor incidence is expected with corresponding increase in dose. Therefore, statistically significant results with fluctuating tumor incidence across doses are not weighed as heavily as those displaying a monotonic dose-response. If a pair-wise comparison was found to be statistically significant, a closer examination of the tumor incidence and other lines of evidence was taken to determine whether the response was biologically significant. Factors considered in determining the biological relevance of a response are discussed below.

All statistical analyses were reanalyzed for the purposes of this evaluation to ensure consistent methods were applied (M. Perron; 12-DEC-2017; TXR#0057690).

*Historical Control Data*

As indicated in the 2005 EPA Guidelines for Carcinogen Risk Assessment (Section 2.2.2.1.3), the standard for determining statistical significance of tumor incidence comes from a comparison of tumors in dosed animals with those in concurrent control animals. Additional insight into the statistical and/or biological significance of a response can come from the consideration of historical control data (Tarone, 1982; Haseman, 1995; EPA, 2005). Historical control data can add to the analysis, particularly by enabling identification of uncommon tumor types or high spontaneous incidence of a tumor in a given animal strain. Generally speaking, statistically significant increases in tumors should not be discounted simply because incidence rates in the treated groups are within the range of historical controls or because incidence rates in the concurrent controls are somewhat lower than average.

Historical control data are also useful to determine if concurrent control tumor incidences are consistent with previously reported tumor rates (Haseman, 1995). Historical control data available to the agency from the performing laboratory for the same species and strain for a study were considered in the current evaluation. These data were primarily generated within 3 years and in limited cases within 5 years of the study date. Given the large number of age-related tumor outcomes in long-term rodent bioassays, and thus the large number of potential statistical tests run, caution is taken when interpreting results that have marginal statistical significance or in which incidence rates in concurrent controls are unusually low in comparison with historical controls since there may be an artificial inflation of the differences between concurrent controls and treated groups. Consequently, in the current evaluation, unusually low incidence in concurrent controls was noted when applicable and considered as part of the weight-of-evidence for the tumor findings. Identification of common or uncommon situations prompts further thought about the meaning of the response in the current study in context with other observations in animal studies and with other evidence about the carcinogenic potential of the agent.

*Evidence of supporting preneoplastic lesions or related non-neoplastic lesions*

Carcinogenicity rodent studies are designed to examine the production of tumors as well as preneoplastic lesions and other indications of chronic toxicity that may provide evidence of treatment-related effects and insights into the way the test agent produces tumors (EPA, 2005). As such, the presence or lack of supporting preneoplastic or other related non-neoplastic changes were noted in the current evaluation of each study and considered in the weight-of-evidence to aid in the determination of biological significance since these lesions would not be expected for age-related tumors in carcinogenicity with continuous treatment. In the current evaluation, the agency investigated lesions in organs where tumors were observed and demonstrated biological significance based on the presence of an increasing monotonic dose-response and/or relative increases from concurrent controls.

*Additional Considerations*

Other observations can strengthen or lessen the significance of tumor findings in carcinogenicity studies. Such factors include: uncommon tumor types; tumors at multiple sites; tumors in multiple species, strains, or both sexes; progression of lesions from preneoplastic to benign to malignant; reduced latency of neoplastic lesions (i.e., time to tumor); presence of metastases; unusual magnitude of tumor response; and proportion of malignant tumors (EPA, 2005). The

agency considers all of the above factors when determining the significance of tumor findings in animal carcinogenicity studies.

## 4.4      Summary of Animal Carcinogenicity Studies

A total of 8 chronic toxicity/carcinogenicity studies in the rat[15] and 6 carcinogenicity studies in the mouse were considered acceptable and evaluated in the weight-of-evidence analysis for glyphosate.  This includes all of the studies that were part of the 2015 CARC evaluation plus an additional 4 studies identified from the systematic review.  In the 2015 CARC evaluation, for some of the studies considered, the CARC relied on summary data that was provided in the supplement to the Greim *et al.* (2015) review article.  Due to the ongoing data collection effort and the acquiring of studies not previously submitted, the agency no longer needs to rely on the Greim *et al.* (2015) review article for the study data generated in relevant studies, allowing for a more complete and independent analysis.  It should be noted that studies have been cited differently in this evaluation as compared to Greim *et al.* (2015) so these alternative citations have been noted for applicable studies.

The carcinogenicity studies conducted in the rat and mouse that were considered for the analysis are discussed in Sections 4.5 and 4.6, respectively.  In these sections, short study summaries are presented which include information on the study design (including test material, strain of animal used, and doses and route of administration) as well as study findings including effects on survival, general toxicity observed, relevant non-neoplastic lesions, and the incidence and characterization of any tumor findings.  The characterization of the tumor response(s) is based on the considerations previously discussed in Section 4.3 for interpreting the significance of tumor findings in animal carcinogenicity studies.  The rat and mouse carcinogenicity studies are all summarized in Table 4.11 and Table 4.18, respectively.

## 4.5      Rat Carcinogenicity Studies with Glyphosate

### 4.5.1   Lankas, 1981 (MRID 00093879)[16]

In a chronic toxicity/carcinogenicity study, groups of Sprague-Dawley rats (50/sex/dose) were fed diets containing glyphosate (98.7%, pure) at dietary doses of 0, 3/3, 10/11, and 31/34 mg/kg/day (M/F) for 26 months.

There were no treatment-related effects on survival at any dose level.  The highest dose tested of approximately 31 mg/kg/day was not considered a maximum tolerable dose to assess the carcinogenic potential of glyphosate.  Consequently, a second study (Stout and Ruecker, 1990) was conducted at higher doses, which is summarized in the Section 4.5.3.

A statistically significant trend was reported for the testicular interstitial tumors; however, closer examination of the tumor incidence indicates that the data do not demonstrate a monotonic dose response with greater incidence observed at the low-dose as compared at the mid-dose.  The

---

[15] Note: the original draft of this Issue Paper included 9 studies in rats; however, one study (Burnett, 1979) was removed since the study was conducted with a contaminant of glyphosate, not the active ingredient glyphosate.
[16] In Greim *et al.* (2015), the same study is cited as Monsanto (1981).

incidence at the high dose was found to be statistically significant as compared to the concurrent controls (raw and adjusted p-values).

| Table 4.1. Testicular Interstitial Cell Tumors in Male Sprague-Dawley Rats (Lankas, 1981) Cochran-Armitage Trend Test & Fisher's Exact Test Results. | | | | |
|---|---|---|---|---|
| | 0 mg/kg/day | 3.05 mg/kg/day | 10.3 mg/kg/day | 31.49 mg/kg/day |
| Incidence | 0/47[a] | 3/49 | 1/47 | 6/50 |
| (%) | (0) | (6) | (2) | (12) |
| Raw p-value = | 0.011** | 0.129 | 0.500 | 0.016* |
| Adjusted p-value = | 0.032* | 0.172 | 0.500 | 0.032* |

Note: Trend test results denoted at control; * denotes significance at p=0.05; ** denotes significance at p=0.01.
a. Number of tumor-bearing animals/Number of animals examined, excluding those that died or were sacrificed prior to study week 52 (interim sacrifice).

The study report provided historical control information for 5 studies of similar duration (24-29 months) run concurrently within 9 months of the termination of the study in the same laboratory. The historical control range for this tumor type was 3.4%-6.7% (mean = 4.5%) when considering all animals. When only considering animals that survived to terminal sacrifice, the historical control range was 6.2%-27.3% (mean = 9.6%). These data indicate that the incidence of testicular cell tumors in concurrent controls (0%) appears to be unusually low for this tumor type. Furthermore, the incidence at all doses, including the high dose, was within the historical control range when evaluating animals at terminal sacrifice. There were no supporting preneoplastic or other related non-neoplastic changes observed.

### 4.5.2   Stout and Ruecker, 1990 (MRID 41643801)[17]

In a chronic toxicity/carcinogenicity study, groups of Sprague-Dawley rats (60/sex/dose) were fed diets containing glyphosate (96.5%, pure) at dietary doses of 0, 89/113, 362/457 or 940/1183 mg/kg/day M/F) for 24 months. The highest dose tested in this study approaches or exceeds the highest dose recommended in the test guidelines on how to conduct carcinogenicity studies (OCSPP 870.4200 and OCSPP 870.4300). Tumor findings at these high doses are given less weight.

There was no significant increase in mortality. Three types of tumors were evaluated in this study: pancreatic cell adenomas, hepatocellular adenomas, and thyroid C-cell adenomas in males. A discussion of each tumor type by organ is presented below:

1. Pancreas: Tumor incidences of pancreatic islet cell tumors in male rats are presented in Tables 4.2. The incidence of pancreatic islet cell tumors lacked monotonic dose-responses and trend analyses were not statistically significant. There was also no statistical significance of the pairwise comparisons. Historical control data were provided for 7 studies conducted in the same laboratory from 1983-1989 (within 1-4 years of when Stout and Ruecker (1990) was performed). The historical control range for the adenomas was 1.8%-8.3% (mean = 5.3%). These data are presented in Table 4.3 and indicate that the incidence of adenomas in concurrent controls (2%) was at the lower limit

---

[17] In Greim et al. (2015), the same study is cited as Monsanto (1990).

of the historical range. There were no supporting preneoplastic or other related non-neoplastic changes observed and no evidence of progression from adenomas to carcinomas.

**Table 4.2. Pancreatic Islet Cell Tumors in Male Sprague-Dawley Rats (Stout and Ruecker, 1990) Cochran-Armitage Trend Test & Fisher's Exact Test Results.**

| Tumor Type | 0 mg/kg/day | 89 mg/kg/day | 362 mg/kg/day | 940 mg/kg/day |
|---|---|---|---|---|
| Adenoma | | | | |
| Incidence | 1/43[a] | 8/45 | 5/49 | 7/48[b] |
| (%) | (2) | (18) | (10) | (15) |
| Raw p-value = | 0.176 | 0.018* | 0.135 | 0.042* |
| Adjusted p-value = | 0.176 | 0.071 | 0.176 | 0.083 |
| Carcinoma | | | | |
| Incidence | 1/43[c] | 0/45 | 0/49 | 0/48 |
| (%) | (2) | (0) | (0) | (0) |
| Raw p-value = | -[d] | -[d] | -[d] | -[d] |
| Adjusted p-value = | -[d] | -[d] | -[d] | -[d] |
| Combined | | | | |
| Incidence | 2/43 | 8/45 | 5/49 | 7/48 |
| (%) | (5) | (18) | (10) | (15) |
| Raw p-value = | 0.242 | 0.052 | 0.275 | 0.108 |
| Adjusted p-value = | 0.275 | 0.209 | 0.275 | 0.215 |

Note: Trend test results denoted at control; * denotes significance at p=0.05.
a. Number of tumor-bearing animals/Number of animals examined, excluding those that died or were sacrificed prior to study week 55 (interim sacrifice).
b. First adenoma in the study was observed at week 81 in the 940 mg/kg/day group.
c. First carcinoma in the study was observed at week 105 in the controls.
d. Trend p-value not reported since tumor incidence decreased with increasing dose.

**Table 4.3. Historical Control Data — Pancreatic Islet Cell Adenomas in Male Sprague- Dawley Rats (MRID No. 41728701).**

| Study No. | 1 | 2 | 3 | 4 | 5 | 6 | 7 | Mean |
|---|---|---|---|---|---|---|---|---|
| Study Year | 07/83 | 02/85 | 10/85 | 6/85 | 9/88 | 1/89 | 3/89 | - |
| Tumor Incidence | 2/68 | 5/59 | 4/69 | 1/57 | 5/60 | 3/60 | 3/59 | - |
| Percentage (%) | 2.9% | 8.5% | 5.8% | 1.8% | 8.3% | 5.0% | 5.1% | 5.3% |

2. Liver: Tumor incidences of liver tumors in male rats are presented in Tables 4.4. There was a statistically significant dose trend for liver adenomas; however, the trend was not statistically significant with an adjustment for multiple comparisons. Closer examination of the incidence indicates a relatively flat response at the low- and mid-dose with only an increase observed at the high-dose (940 mg/kg/day); however, the incidence of liver adenomas at the high-dose was not statistically significant when compared to the concurrent controls (raw or adjusted p-values). Carcinomas and combined adenomas/carcinomas lacked statistical significance in trend and pairwise comparisons (Table 4.4). Historical control data were provided for 7 studies conducted in the same laboratory from 1983-1989 (within 1-4 years of when Stout and Ruecker (1990) was performed). The historical control range was 1.4%-18.3% (mean = 9.2%) for the adenomas and 0%-6.7% for carcinomas (mean = 2.6%). These data are provided in Table 4.5 and indicate that the observed incidences at all dose levels were within the historical control ranges. Except for a single animal at the mid-dose late in the study (89

weeks), no hyperplasia, preneoplastic foci or other non-neoplastic lesions were observed. Furthermore, there was no evidence of progression from adenomas to carcinomas.

| Table 4.4. Hepatocellular Tumors in Male Sprague-Dawley Rats (Stout and Ruecker, 1990) Cochran-Armitage Trend Test & Fisher's Exact Test Results | | | | |
|---|---|---|---|---|
| Tumor Type | 0 mg/kg/day | 89 mg/kg/day | 362 mg/kg/day | 940 mg/kg/day |
| Adenoma Incidence (%) Raw p-value = Adjusted p-value = | 2/44[a] (5) 0.022* 0.089 | 2/45 (4) 0.700 0.700 | 3/49 (6) 0.551 0.700 | 7/48[b] (15) 0.101 0.202 |
| Carcinoma Incidence (%) Raw p-value = Adjusted p-value = | 3/44 (7) _[d] _[d] | 2/45 (4) _[d] _[d] | 1/49 (2) _[d] _[d] | 2/48[c] (4) _[d] _[d] |
| Combined Incidence (%) Raw p-value = Adjusted p-value = | 5/44 (11) 0.078 0.312 | 4/45 (9) 0.769 0.808 | 4/49 (8) 0.808 0.808 | 9/48 (19) 0.245 0.489 |

Note: Trend test results denoted at control; * denotes significance at p=0.05.
a. Number of tumor-bearing animals/Number of animals examined, excluding those that died or were sacrificed prior to study week 55 (interim sacrifice).
b. First adenoma in the study was observed at week 88 in the 940 mg/kg/day group.
c. First carcinoma in the study was observed at week 85 in the 940 mg/kg/day group.
d. Trend p-value not reported since tumor incidence decreased with increasing dose.

| Table 4.5. Historical Control Data — Hepatocellular Tumors in Male Sprague- Dawley Rats (MRID No. 41728701). | | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| Study No. | 1 | 2 | 3 | 4 | 5 | 6 | 7 | Mean |
| Study Year | 07/83 | 02/85 | 10/85 | 6/85 | 9/88 | 1/89 | 3/89 | - |
| Adenomas | | | | | | | | |
| Tumor Incidence | 5/60 | 11/68 | 1/70 | 3/59 | 11/60 | 5/60 | 4/60 | - |
| Percentage (%) | 8.3% | 16.2% | 1.4% | 5.1% | 18.3% | 8.3% | 6.7% | 9.2% |
| Carcinomas | | | | | | | | |
| Tumor Incidence | 4/60 | 0/68 | 1/70 | 2/59 | 3/60 | 1/60 | 0/60 | - |
| Percentage (%) | 6.7% | 0% | 1.4% | 3.4% | 5% | 1.7% | 0% | 2.6% |

3. Thyroid: Tumor incidences of thyroid tumors in male and female rats are presented in Tables 4.6 and 4.7, respectively. For males, no statistically significant trends were observed for adenomas, carcinomas, or combined adenomas/carcinomas. For females, a statistically significant trend was observed for adenomas and combined adenomas/carcinomas; however, the trend was not statistically significant with adjustment for multiple comparisons. There was no statistical significance in pairwise analyses. Historical control data were provided for 7 studies conducted in the same laboratory from 1983-1989 (within 1-4 years of when Stout and Ruecker (1990) was performed). The historical control range was 3.3%-10% (mean = 6.1%) for the adenomas and 0%-2.9% for carcinomas (mean = 0.9%). These data are provided in Table 4.8.

Non-neoplastic lesions (thyroid C-cell hyperplasia) were observed; however, there was a lack of a monotonic dose-response for these histopathological findings and no dose-related increase in severity to support tumor findings (Table 4.9).  There was also no evidence of progression from adenomas to carcinomas.

| Table 4.6.  Thyroid C-Cell Tumors in Male Sprague-Dawley Rats (Stout and Ruecker, 1990) Cochran-Armitage Trend Test & Fisher's Exact Test Results | | | | |
|---|---|---|---|---|
| Tumor Type | 0 mg/kg/day | 89 mg/kg/day | 362 mg/kg/day | 940 mg/kg/day |
| Adenoma | | | | |
| Incidence | 2/54[a, b] | 4/55 | 8/58 | 7/58 |
| (%) | (4) | (7) | (14) | (12) |
| Raw p-value = | 0.079 | 0.348 | 0.060 | 0.099 |
| Adjusted p-value = | 0.132 | 0.348 | 0.132 | 0.132 |
| Carcinoma | | | | |
| Incidence | 0/54 | 2/55[c] | 0/58 | 1/58 |
| (%) | (0) | (4) | (0) | (2) |
| Raw p-value = | 0.457 | 0.252 | 1.000 | 0.518 |
| Adjusted p-value = | 0.518 | 0.518 | 1.000 | 0.518 |
| Combined | | | | |
| Incidence | 2/54 | 6/55 | 8/58 | 8/58 |
| (%) | (4) | (11) | (14) | (14) |
| Raw p-value = | 0.087 | 0.141 | 0.060 | 0.060 |
| Adjusted p-value = | 0.116 | 0.141 | 0.116 | 0.116 |

Note: Trend test results denoted at <u>control</u>.
a.  Number of tumor-bearing animals/Number of animals examined, excluding those that died or were sacrificed prior to study week 55 (interim sacrifice).
b. First adenoma in the study was observed at week 54 in the controls.
c. First carcinoma in the study was observed at week 93 in the 89 mg/kg/day group.

| Table 4.7.  Thyroid C-Cell Tumors in Female Sprague Dawley Rats Cochran-Armitage Trend Test & Fisher's Exact Test Results (Stout and Ruecker, 1990). | | | | |
|---|---|---|---|---|
| Tumor Type | 0 mg/kg/day | 113 mg/kg/day | 457 mg/kg/day | 1183 mg/kg/day |
| Adenoma | | | | |
| Incidence | 2/57[a] | 2/60 | 6/59[b] | 6/55 |
| (%) | (4) | (3) | (10) | (11) |
| Raw p-value = | 0.040* | 0.710 | 0.147 | 0.124 |
| Adjusted p-value = | 0.159 | 0.710 | 0.196 | 0.196 |
| Carcinoma | | | | |
| Incidence | 0/57 | 0/60 | 1/59[c] | 0/55 |
| (%) | (0) | (0) | (2) | (0) |
| Raw p-value = | 0.494 | 1.000 | 0.509 | 1.000 |
| Adjusted p-value = | 0.509 | 1.000 | 0.509 | 1.000 |
| Adenoma/Carcinoma | | | | |
| Incidence | 2/57 | 2/60 | 7/59 | 6/55 |
| (%) | (4) | (3) | (12) | (11) |
| Raw p-value = | 0.042* | 0.710 | 0.090 | 0.124 |
| Adjusted p-value = | 0.166 | 0.710 | 0.166 | 0.166 |

Note: Trend test results denoted at <u>control</u>; * denotes significant at p=0.05.
a. Number of tumor-bearing animals/Number of animals examined, excluding those that died or were sacrificed prior to study week 55 (interim sacrifice).
b. First adenoma in the study was observed at week 72 in the controls.
c. First carcinoma in the study was observed at week 93 in the 457 mg/kg/day group.

**Table 4.8.  Historical Control Data — Thyroid C-Cell Tumors in Female Sprague- Dawley Rats (MRID No. 41728701).**

| Study No. | 1 | 2 | 3 | 4 | 5 | 6 | 7 | Mean |
|---|---|---|---|---|---|---|---|---|
| Study Year | 07/83 | 02/85 | 10/85 | 6/85 | 9/88 | 1/89 | 3/89 | - |
| Adenomas | | | | | | | | |
| Tumor Incidence | 2/60 | 3/69 | 7/70 | 3/59 | 5/59 | 5/60 | 2/60 | - |
| Percentage (%) | 3.3% | 4.3% | 10.0% | 5.1% | 8.5% | 8.3% | 3.3% | 6.1% |
| Carcinomas | | | | | | | | |
| Tumor Incidence | 1/60 | 2/69 | 0/70 | 1/59 | 0/59 | 0/60 | 0/60 | - |
| Percentage (%) | 1.7% | 2.9% | 0% | 1.7% | 0% | 0% | 0% | 0.9% |

**Table 4.9. Thyroid Non-Neoplastic Lesions (Stout and Ruecker, 1990)**

| **Males** | | | | |
|---|---|---|---|---|
| Dose | 0 mg/kg/day | 89 mg/kg/day | 362 mg/kg/day | 940 mg/kg/day |
| Total Incidences of thyroid C-cell hyperplasia and severity scores | 5/60<br>(8%)<br><br>Diffuse (moderate) – 1<br>Multi-focal (minimal) – 3<br>Focal (mild) – 1 | 1/60<br>(2%)<br><br>Focal (mild) – 1 | 6/60<br>(10%)<br><br>Focal (minimal) – 4<br>Multi-focal (minimal) – 1<br>Multi-Focal (mild) – 1 | 5/60<br>(8%)<br><br>Focal (minimal) – 2<br>Focal (mild) – 1<br>Multi-focal (mild) – 1<br>Multi-focal (moderate) – 1 |
| **Females** | | | | |
| | 0 mg/kg/day | 113 mg/kg/day | 457 mg/kg/day | 1183 mg/kg/day |
| Thyroid C-cell hyperplasia and severity scores | 10/60<br>(17%)<br><br>Diffuse (moderate) – 1<br>Focal (mild) – 1<br>Focal (minimal) – 1<br>Focal (mild) – 1<br>Focal (moderate) – 1<br>Multi-focal (minimal) – 3<br>Multi-focal (moderate) – 1<br>Diffuse (moderate) – 1 | 5/60<br>(8%)<br><br>Focal (mild) – 3<br>Focal (minimal) – 1<br>Multi-focal (minimal) – 1 | 9/60<br>(15%)<br><br>Focal (minimal) – 4<br>Multi-focal (minimal) – 2<br>Multi-focal (mild) – 3 | 5/60<br>(8%)<br><br>Focal (mild) – 1<br>Focal (minimal) – 1<br>Multi-focal (mild) – 2<br>Diffuse (moderate) – 1 |

*Data taken from pages 1071-2114 of the study report.

### 4.5.3   Atkinson *et al.*, 1993a (MRID 49631701)[18]

In a combined chronic toxicity/carcinogenicity study, glyphosate (98.9% pure) was administered to 50 Sprague-Dawley rats/sex/dose in the diet at doses of 0, 11/12, 112/109, 320/347, and 1147/1134 mg/kg/day for 104 weeks (M/F) for 104 weeks.  An additional 35 rats/sex/dose were included for 1-year interim sacrifice.

---

[18] Note: In Greim *et al.* (2015), the same study is cited as Cheminova (1993a).

No adverse effects on survival were seen in either sex across the doses tested.  There were no changes in histopathological findings observed.  There were no treatment-related increases in tumor incidences in the study.

### 4.5.4   Brammer, 2001 (MRID 49704601)[19]

In a combined chronic toxicity/carcinogenicity study, glyphosate acid (97.6% pure) was administered to groups of Wistar rats in the diet.  Groups of 52 rats/sex received diets containing doses of 0, 121/145, 361/437 or 1214/1498 mg/kg/day for 24 months, in males/females, respectively.  The highest dose tested in this study exceeds the highest dose recommended in the test guidelines on how to conduct carcinogenicity studies (OCSPP 870.4200 and OCSPP 870.4300).

A statistically significant higher survival (p=0.02) was observed in males at the highest dose tested at the end of 104 weeks relative to concurrent controls, and a statistically significant trend for improved survival was observed in treated males (p=0.03). The inter-current (early) deaths were 37/52, 36/52, 35/52, and 26/52 for the control, low-, mid-, and high-dose groups, respectively. The terminal deaths were 16/52, 17/52, 18/52, and 26/52 for the control, low-, mid- and high-dose groups, respectively. There were no treatment-related non-neoplastic lesions in any organs of either sex at any dose level tested.  As shown in Table 4.10, a statistically significant trend in the incidences of liver adenomas was observed in male rats; however, a monotonic dose-response was not observed upon closer examination of the incidence data. Tumor incidences appear to fluctuate with increases observed at the low- and high-dose and no tumors observed in the control and mid-dose.  Statistical significance with raw (unadjusted) p-values was observed for the tumor incidence at the high-dose (1214 mg/kg/day) when compared to concurrent controls; however, it was not statistically significant with an adjustment for multiple comparisons (p= 0.055).  The improved survival in the high-dose group may help explain a modestly higher incidence of an age-related background tumor like liver adenomas and this corresponds with the lack of associated lesions observed in the study.

| Table 4.10.  Liver Adenomas in Male Wistar Rats (Brammer, 2001) Cochran-Armitage Trend Test and Fisher's Exact Test Results. | | | | |
|---|---|---|---|---|
| | 0 mg/kg/day | 121 mg/kg/day | 361 mg/kg/day | 1214 mg/kg/day |
| Adenoma Incidence (%) | 0/44[a] (0) | 2/48 (4) | 0/48 (0) | 5/49 (10) |
| Raw p-value = | 0.010* | 0.269 | 1.000 | 0.037* |
| Adjusted p-value = | 0.029* | 0.269 | 1.000 | 0.055 |

Note: Trend test results denoted at <u>control</u>; * denotes significance at p=0.05; ** denotes significance at p=0.01
a. Number of tumor-bearing animals/Number of animals examined, excluding those that died or were sacrificed prior to study week 52 (interim sacrifice).

### 4.5.5   Pavkov and Wyand 1987 (MRIDs 40214007, 41209905, 41209907)

Glyphosate trimesium salt (sulfosate, 56.2% pure) was tested in a 2-year chronic feeding/carcinogenicity study in male and female Sprague-Dawley (Crl:CD[SD]BR) rats.  Sixty

---

[19] Note: In Greim *et al.* (2015), the same study is cited as Syngenta (2001).

animals/sex were tested in control group 1 (basal diet, no vehicle), 80/sex were tested in control group 2 (basal diet plus propylene g1ycol at 1% w/w vehicle) and in the low and mid-dose groups, and 90/sex were tested in the high dose group.  The following dose levels were tested: 0, 4.2/5.4, 21.2/27 or 41.8/55.7 mg/kg/day in males and females respectively.

Treatment had no effect on survival.  There were no changes in histopathological findings observed.  There were no treatment-related increases in tumor incidences in the study.

### 4.5.6   Suresh, 1996 (MRID 49987401)[20]

In a combined chronic toxicity/carcinogenicity study, glyphosate (96.0-96.8% pure) was administered to groups of Wistar rats in the diet.  Groups of 50 rats/sex/group received diets containing 0, 6.3/8.6, 59.4/88.5, and 595.2/886 mg/kg/day glyphosate for 24 months in males and females respectively.  The highest dose tested in females in this study approaches the highest dose recommended in the test guidelines on how to conduct carcinogenicity studies (OCSPP 870.4200 and OCSPP 870.4300).

No adverse effects on survival were observed in either sex across the doses tested.  There were no changes in histopathological findings observed.  There were no treatment-related increases in tumor incidence observed in the study.

### 4.5.7   Enemoto, 1997 (MRID 50017103-50017105)[21]

In a combined chronic toxicity and carcinogenicity study, groups of 50 Sprague-Dawley rats/sex/group received daily dietary doses of 0, 104/115, 354/393 and 1127/1247 mg/kg bw/day glyphosate for males and females, respectively.  In addition, 10 rats/sex/group were included for interim sacrifices at 26, 52, and 78 weeks.  The highest dose tested in this study exceeds the highest dose recommended in the test guidelines on how to conduct carcinogenicity studies (OCSPP 870.4200 and OCSPP 870.4300).

There were no changes in mortality at any of the doses tested.  There were no changes in histopathological findings observed.  There were no treatment-related increases in tumor incidence observed in the study.

### 4.5.8   Wood *et al.*, 2009a (MRID 49957404)[22]

In a combined chronic toxicity/carcinogenicity study, glyphosate (95.7% pure) was administered to groups of Wistar rats in the diet. Groups of 51 rats/sex/group received diets containing 0, 95.0, 316.9, and 1229.7 mg/kg/day glyphosate for males and female, respectively.  The highest dose tested in this study exceeds the highest dose recommended in the test guidelines on how to conduct carcinogenicity studies (OCSPP 870.4200 and OCSPP 870.4300).

---

[20] Note: In Greim *et al.* (2015), the same study is cited as Feinchemie Schwebda (1996).

[21] Note: In Greim *et al.* (2015), the same study is cited as Arysta Life Sciences (1997b).

[22] Note: In Greim *et al.* (2015), the same study is cited as NuFarm (2009b).

No adverse effects on survival were seen in either sex across the doses tested. There were no treatment-related preneoplastic or related non-neoplastic lesions in either sex at any dose level.

In female rats, mammary gland tumors were noted. Tumor incidences for mammary gland adenomas, adenocarcinomas, and combined adenomas/adenocarcinomas in female mice are presented in Table 4.11. Statistically significant trends were observed for the adenocarcinoma and combined analyses; however, statistical significance was only seen for the combined analyses following adjustment for multiple comparisons. There was no statistical significance observed in pairwise comparisons.

| Table 4.11 Mammary Gland Tumor Incidences in Female Rats (Wood *et al.*, 2009a) Fisher's Exact Test and Cochran-Armitage Trend Test Results | | | | |
|---|---|---|---|---|
| Tumor Type | 0 mg/kg/day | 95.0 mg/kg/day | 316.9 mg/kg/day | 1229.7 mg/kg/day |
| Adenoma Incidence (%) Raw p-value = Adjusted p-value = | 0/48[a] (0) 0.062 0.124 | 0/51 (0) 1.000 1.000 | 0/50 (0) 1.000 1.000 | 2/50 (4) 0.258 0.258 |
| Adenocarcinoma Incidence (%) Raw p-value = Adjusted p-value = | 2/48 (4) 0.043* 0.172 | 3/51 (6) 0.529 0.705 | 1/50 (2) 0.886 0.886 | 6/50 (12) 0.148 0.296 |
| Combined Incidence (%) Raw p-value = Adjusted p-value = | 2/48 (4) 0.007** 0.028* | 3/51 (6) 0.529 0.705 | 1/50 (2) 0.886 0.886 | 8/50 (16) 0.053 0.105 |

Note: Trend test results denoted at <u>control</u>; * denotes significance at p=0.05; ** denotes significant at p=0.01.
a. Number of tumor-bearing animals/Number of animals examined, excluding those that died or were sacrificed prior to study week 52 (interim sacrifice).

### 4.5.9   Summary of Rat Data

In 4 of the 8 rat studies conducted with glyphosate, no tumors were identified for evaluation. Of the remaining 4 rat studies, a statistically significant trend was observed for tumor incidences in the testes, liver, or mammary gland following adjustment for multiple comparisons. A statistically significant pairwise comparison was only observed following adjustment for multiple comparisons for testicular tumors at the highest dose tested (31 mg/kg/day) in one individual study. In some cases, the tumor incidence across doses did not demonstrate a monotonic dose response. There was no evidence of corroborating pre-neoplastic or related non-neoplastic lesions or evidence of tumor progression (progression from pre-neoplastic to malignancy) to support biological significance of tumor findings. In a limited number of cases, the agency considered historical control data to inform the relevance of a tumor increase, which indicated concurrent controls were unusually low or the observed incidences were within the historical control range in most instances.

| Table 4.12. Summary of Rat Carcinogenicity Studies | | | |
|---|---|---|---|
| **Study** | **Dose Range** | **Pre-Neoplastic or Related Non-Neoplastic Lesions** | **Tumors Incidences, Statistical Significance, and Related Comments** |
| **Lankas (1981)** <br><br> Sprague-Dawley rats | 98.7% Technical in diet <br> 0, 3/3, 10/11, and 31/34 mg/kg/day [M/F] | None observed | Statistically significant trend observed for testicular interstitial cell tumors; however, did not observe monotonic dose-response with higher incidence at low-dose than mid-dose.  Incidences were 0/47 in controls, 3/49 at low-dose, 1/47 at mid-dose, and 6/50 at high-dose.  Increased incidence at high-dose statistically significant, but unusually low control incidence (based on terminal sacrifice historical control data in study report) inflated increase at high-dose. |
| **Stout and Ruecker (1990)** <br><br> Sprague-Dawley rats | 96.5% Technical in diet <br> 0, 89/113, 362/457 and 940/1183 mg/kg/day [M/F] for 24 months | None observed | Pancreatic tumors lacked statistically significant trend.  Tumor incidence for pancreatic adenomas in males were 1/43 in controls, 8/45 at the low-dose, 5/49 at the mid-dose, and 7/48 at the high-dose.  Concurrent control incidence for this tumor type was at the lower bound of the historical control range for performing laboratory. Negative trend observed for carcinomas.  Combined adenoma/carcinoma incidence similar except low-dose was 2/43.  No statistically significant pairwise comparisons, including the highest dose tested which is approaching/exceeding 1,000 mg/kg/day. <br><br> No statistically significant trends or pairwise comparisons for hepatocellular tumors following adjustment for multiple comparisons.  Negative trend observed for carcinomas.  The highest dose tested approached/exceeded 1,000 mg/kg/day.  All incidences within historical control range for performing laboratory. <br><br> No statistically significant trend for thyroid C-cell tumors in males.  For females, statistically significant trend for combined adenomas/carcinomas following adjustment for multiple comparisons.  Incidences for combined adenomas/carcinomas were 2/57 in controls, 2/60 at the low-dose, 7/59 at the mid-dose, and 6/55 at the high-dose.  No statistically significant pairwise comparisons, including the highest dose tested which is approaching/exceeding 1,000 mg/kg/day. |
| **Atkinson _et al._ (1993a)** <br><br> Sprague-Dawley rats | 98.9% Technical in diet <br> 0, 11/12, 112/109, 320/347, and 1147/1134 mg/kg/day for 104 weeks (M/F) | None observed | There were no tumors identified for evaluation, including the highest dose tested which exceeded 1,000 mg/kg/day. |

| Table 4.12. Summary of Rat Carcinogenicity Studies | | | |
|---|---|---|---|
| **Study** | **Dose Range** | **Pre-Neoplastic or Related Non-Neoplastic Lesions** | **Tumors Incidences, Statistical Significance, and Related Comments** |
| **Brammer (2001)** <br><br> Wistar rats | 97.6% Technical in diet <br> 0, 121/145, 361/437 and 1214/1498 mg/kg/day [M/F] | None observed | Statistically significant trend in liver adenomas in males. Non-monotonic dose-response with incidences at 0/44 in controls, 2/48 at the low-dose, 0/48 at the mid-dose, and 5/49 at the high-dose. No statistically significant pairwise comparisons following adjustment for multiple comparisons, including the highest dose tested which exceeded 1,000 mg/kg/day. |
| **Pavkov and Wyand (1987)** <br><br> Sprague-Dawley rats | 56.2% Technical (Trimesium salt; Sulfosate) <br> 0, 4.2/5.4, 21.2/27 and 41.8/55.7 mg/kg/day [M/F] | None observed | There were no tumors identified for evaluation. |
| **Suresh (1996)** <br><br> Wistar rats | 96.0-96.8% Technical in diet <br> 0, 6.3/8.6, 59.4/88.5, and 595.2/886 mg/kg/day [M/F] | None observed | There were no tumors identified for evaluation, including the highest dose tested which exceeded 1,000 mg/kg/day. |
| **Enemoto (1997)** <br><br> Sprague-Dawley rats | 94.61-97.56% Technical in diet <br> 0, 104/115, 354/393 and 1127/1247 mg/kg/day [M/F] | None observed | There were no tumors identified for evaluation, including the highest dose tested which exceeded 1,000 mg/kg/day. |
| **Wood *et al.* (2009a)** <br><br> Wistar rats | 95.7% Technical in diet <br> 0, 86/105, 285/349 or 1077/1382 mg/kg/day [M/F] | None observed | Statistically significant trends were observed for the combined mammary gland adenoma/adenocarcinoma analyses following adjustment for multiple comparisons. Incidences were 2/48 in controls, 3/51 at the low-dose, 1/50 at the mid-dose, and 8/50 at the high-dose. No statistically significant pairwise comparisons, including the highest dose tested which exceed 1,000 mg/kg/day. |

## 4.6     Mouse Carcinogenicity Studies with Glyphosate

### 4.6.1    Reyna and Gordon, 1973 (MRID 00061113)

In an 18-month carcinogenicity study, groups of 50 Swiss white mice/sex/dose were fed glyphosate at dietary levels of approximately 17 mg/kg/day and 50 mg/kg/day. There was no effect on survival at any of the doses tested. There were no changes in histopathological findings observed. There were no treatment-related increases in tumor incidence observed in the study. Although only ten mice/sex/dose were examined for histopathological changes, there were no statistically significant increases in tumors observed in the study; therefore, this deficiency would not impact the overall conclusion regarding tumor findings.

### 4.6.2    Knezevich and Hogan, 1983 (MRID 00130406)[23]

Groups of 50 male and female CD-1 mice received glyphosate (99.78%, pure) at dietary doses of 0, 161/195, 835/968, 4945/6069 mg/kg/day for males and females, respectively for 24 months. The highest dose tested in this study far exceeds the highest dose recommended in the test guidelines on how to conduct carcinogenicity studies (OCSPP 870.4200 and OCSPP 870.4300). Furthermore, the mid-dose tested in this study was approaching 1,000 mg/kg/day. Tumor findings at these high doses are given less weight. No effect on survival was observed. A low incidence of renal tubule adenomas, which are considered rare, were noted in males. The incidences of renal tubule adenomas following initial evaluation of the study were reported as follows: 0/49 in the controls; 0/49 at the low-dose; 1/50 at the mid-dose; and 3/50 at the high dose (TXR# 0004370). In 1985, the registrant directed a re-evaluation of the original renal sections by a consulting pathologist. This re-evaluation identified a small renal tubule adenoma in one control male mouse, which was not diagnosed as such in the original pathology report. In 1986, at the request of the agency, additional renal sections (3 sections/kidney/mouse spaced at 150 micron intervals) were evaluated in all control and all glyphosate-treated male mice in order to determine if additional tumors were present. The additional pathological and statistical evaluations concluded that the renal tumors in male mice were not compound-related.

Subsequently, the agency requested a Pathology Work Group (PWG) evaluate the kidney sections. The PWG examined all sections of the kidney, including the additional renal sections, and were blinded to treatment group. The renal tubular-cell lesions diagnosed by the PWG are presented below in Table 4.13 with results from statistical analyses. The PWG noted that because differentiation between tubular-cell adenoma and tubular-cell carcinoma is not always clearly apparent and because both lesions are derived from the same cell type, it is appropriate to combine the incidences from these two tumor types for purposes of evaluation and statistical analysis. The PWG unanimously concluded that these lesions are not compound-related based on the following considerations: 1) renal tubular cell tumors are spontaneous lesions for which there is a paucity of historical control data for this mouse stock; 2) there was no statistical significance in a pairwise comparison of treated groups with the concurrent controls and there was no evidence of a statistically significant linear trend; 3) multiple renal tumors were not found in any

---

[23] Note: In Greim *et al.* (2015), the same study is cited as Monsanto (1983).

animal; and 4) compound-related nephrotoxic lesions, including pre-neoplastic changes, were not present in male mice in this study (TXR# 0005590).

| Table 4.13.  Renal Tubular Cell Tumors in Male CD-1 Mice (Knezevich and Hogan, 1983) Cochran-Armitage Trend Test & Fisher's Exact Test Results. | | | | |
|---|---|---|---|---|
| Tumor Type | 0 mg/kg/day | 161 mg/kg/day | 835 mg/kg/day | 4945 mg/kg/day |
| Adenoma Incidence (%) Raw p-value = Adjusted p-value = | 1/49 (2) 0.442 1.000 | 0/49 (0) 1.000 1.000 | 0/50 (0) 1.000 1.000 | 1/50 (2) 0.758 1.000 |
| Carcinoma Incidence (%) Raw p-value = Adjusted p-value = | 0/49 (0) 0.063 0.190 | 0/49 (0) 1.000 1.000 | 1/50 (2) 0.505 0.505 | 2/50 (4) 0.253 0.379 |
| Combined Incidence (%) Raw p-value = Adjusted p-value = | 1/49 (2) 0.065 0.259 | 0/49 (0) 1.000 1.000 | 1/50 (2) 0.758 1.000 | 3/50 (6) 0.316 0.633 |

Note: Trend test results denoted at <u>control</u>.

Historical control data from 14 studies conducted between 1977 and 1981 (within <1 to 3 years of when Knezevich and Hogan (1983) was performed) at the performing laboratory (Table 4.14) indicated that the mouse renal tubular adenomas ranged from 0 to 3.3% and the incidence in the current study was within the historical control range (TXR# 0007252).

| Table 4.14. Historical Control Data- Kidney tumors in CD-1 Mice (TXR #0007252). | | | | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Study Period | 6/78 - 7/80 | | 12/77- 4/80 | | 12/77- 3/80 | | 10/78- 4/81 | | 11/78- 4/81 | | 11/77- 4/80 | | 10/77- 4/80 | |
| No. Examined | 57 | 54 | 61 | 51 | 53 | 59 | 60 | 60 | 60 | 60 | 60 | 60 | 60 | 60 |
| Tubular Adenoma | 0 | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 2 | 0 | 0 | 0 | 0 |

Histopathological examinations noted chronic interstitial nephritis and tubular epithelial changes (basophilia and hypertrophy) in the kidneys of male rats in the study (Table 4.15). The increased incidence of chronic interstitial nephritis in males lacked a dose-response. The incidence in controls of bilateral interstitial nephritis was higher than low-dose group and approximately the same as the mid-dose group. Unilateral chronic interstitial nephritis was only seen in 1 animal in the low- and high-dose groups. Furthermore, chronic interstitial nephritis is not considered to be a precursor lesion for tubular neoplasms. A monotonic dose-response was not observed for the epithelial basophilia and hypertrophy, such that the incidence fluctuated with dose and the lowest incidence was observed at the highest dose tested. There was no increase in supporting preneoplastic or related non-neoplastic renal tubular lesions (e.g., tubular epithelial necrosis/regeneration, hyperplasia) observed in male mice.

**Page 86 of 216**

| Table 4.15. Kidney Histopathological Alterations in Male CD-1 Mice (Knezevich and Hogan, 1983) | | | | |
|---|---|---|---|---|
| **Males** | | | | |
| Dose | 0 mg/kg/day | 161 mg/kg/day | 835 mg/kg/day | 4945 mg/kg/day |
| Bilateral Chronic Interstitial Nephritis | 5/49 (10%) | 1/49 (2%) | 7/50 (14%) | 11/50 (22%) |
| Unilateral Chronic Interstitial Nephritis | 0/49 (0%) | 1/49 (2%) | 0/49 (0%) | 1/50 (2%) |
| Proximal Tubule Epithelial Basophilia and Hypertrophy | 15/49 (31%) | 10/49 (20%) | 15/50 (30%) | 7/50 (14%) |

*Data taken from page 305 and 306, and the study pathology report; incidences were moderate diffuse

### 4.6.3   Atkinson, 1993b (MRID 49631702)[24]

In a carcinogenicity study, glyphosate (>97% pure) was administered to groups of 50 CD-1 mice/sex/dose in the diet for 104 weeks at doses of 0, 98/102, 297/298, 988/1000 mg/kg/day for males and females, respectively.  No interim sacrifices were performed.

There was no effect on survival in the study.  There were no preneoplastic lesions or related non-neoplastic lesions observed.  As shown in Table 4.16, hemangiosarcomas were found in 4/45 (9%) of high-dose male mice (1000 mg/kg/day) compared to none in the concurrent controls or other treated groups.  Hemangiosarcomas are commonly observed in mice (generally more common in males for CD-1 strain) as both spontaneous and treatment-related tumors arising from endothelial cells.  As vascular tumors, they can occur at different sites, with liver and spleen tending to be the most common sites in mice.  In the high-dose mice with hemangiosarcomas, one had the tumors present in the liver and spleen, one had the tumor present in the liver only, one had the tumors present in the liver, spleen, and prostate, and one had the tumor present in the spleen only.  A statistically significant trend was observed.  Closer examination of the incidence indicates a relatively flat response at the low- and mid-dose with only an increase observed at the high-dose; however, the incidence of hemangiosarcomas at the high-dose was not statistically significant when compared to the concurrent controls.

| Table 4.16.  Hemangiosarcomas in Male CD-1 Mice (Atkinson, 1993b) Cochran-Armitage Trend Test and Fisher's Exact Test Results. | | | | |
|---|---|---|---|---|
| Dose (mg/kg/day) | 0 | 100 | 300 | 1000 |
| Hemangiosarcoma Incidence (%) | 0/47[a] (0) | 0/46 (0) | 0/50 (0) | 4/45 (9) |
| Raw p-value = | 0.003** | 1.000 | 1.000 | 0.053 |
| Adjusted p-value = | 0.006** | 1.000 | 1.000 | 0.053 |

Note: Trend test results denoted at <u>control</u>; * denotes significance at p=0.05; ** denotes significance at p=0.01
  a= Number of tumor bearing animals/Number of animals examined, excluding those that died before week 52.

---

[24] Note: In Greim *et al.* (2015), the same study is cited as Cheminova (1993b).

### 4.6.4   Wood *et al.*, 2009b (MRID 49957402)[25]

In a feeding study, CD-1 mice (50/sex/dose) received glyphosate (95.7%) for 80 weeks at dietary dose levels of 0, 71.4/97.9, 234.2/299.5, or 810/1081.2 mg/kg/day for males and females, respectively.  The highest dose tested in this study approaches or exceeds the highest dose recommended in the test guidelines on how to conduct carcinogenicity studies (OCSPP 870.4200 and OCSPP 870.4300).

There was no effect on survival in the study.  In male mice at the high dose, there were increases in the incidences of lung adenocarcinomas and malignant lymphomas.  A discussion of each tumor type is presented below:

1. Lung:  Tumor incidence for lung adenomas, adenocarcinomas, and combined adenomas/adenocarcinomas are presented in Table 4.17.  A statistically significant trend was only noted for the adenocarcinomas; however, the trend was not statistically significant with adjustment for multiple comparisons.  Closer examination of the tumor incidence indicates the dose-response was relatively flat at the low- and mid-dose with only an increase observed at the high-dose and the incidence of lung adenocarcinomas at the high-dose (810 mg/kg/day) was not statistically significant when compared to the concurrent controls.  There were no treatment-related preneoplastic or related non-neoplastic lesions observed.

2. Malignant lymphoma: Tumor incidence for malignant lymphoma are also presented in Table 4.18.  A statistically significant trend was observed and the incidence at the high-dose (810 mg/kg/day) was statistically significantly elevated as compared to concurrent controls with the raw (unadjusted) p-value; however, with an adjustment for multiple comparisons, the increased incidence at the high-dose was not statistically significant (p= 0.059).  Historical control data have been submitted (MRIDs 50464501and 50464601) from the same testing laboratory for 10 studies of similar duration.  These data were generated within approximately 5 years of the Wood *et al.* (2009b) study.  The historical control range was 0%-32% (mean = 8.7%).  All observed incidences of this tumor type were within the historical control range.

---

[25] Note: In Greim et al. (2015), the same study is cited as NuFarm (2009a).

**Table 4.17.  Lung Tumors in Male CD-1 Mice (Wood *et al.*, 2009b)
Fisher's Exact Test and Cochran-Armitage Trend Test Results.**

| Dose (mg/kg/day) | 0 | 71.4 | 234.2 | 810 |
|---|---|---|---|---|
| Lung Adenoma Incidence (%) Raw p-value = Adjusted p-value = | 9/44 (20) [b] [b] | 7/46 (15) [b] [b] | 9/48 (19) [b] [b] | 4/45 (9) [b] [b] |
| Lung Adenocarcinoma (%) Raw p-value = Adjusted p-value = | 5/44[a] (11) 0.026* 0.103 | 5/46 (11) 0.659 0.659 | 7/48 (15) 0.443 0.590 | 11/45 (24) 0.091 0.182 |
| Lung Combined Incidence (%) Raw p-value = Adjusted p-value = | 14/44 (32) 0.328 0.706 | 12/46 (26) 0.797 0.797 | 16/48 (33) 0.527 0.706 | 15/45 (33) 0.529 0.706 |

Note: Trend test results denoted at <u>control</u>; * denotes significance at p=0.05;** denotes significance at p=0.01
a= Number of tumor bearing animals/Number of animals examined, excluding those that died before week 52 (interim sacrifice).
b = Trend and pairwise p-values not reported since tumor incidence decreased with increasing dose.

**Table 4.18.  Malignant Lymphomas in Male CD-1 Mice (Wood *et al.*, 2009b)
Fisher's Exact Test and Cochran-Armitage Trend Test Results.**

| Dose (mg/kg/day) | 0 | 71.4 | 234.2 | 810 |
|---|---|---|---|---|
| Malignant Lymphoma Incidence (%) Raw p-value = Adjusted p-value = | 0/44 (0) 0.006** 0.025* | 1/46 (2) 0.511 0.511 | 2/48 (4) 0.269 0.359 | 5/45 (11) 0.029* 0.059 |

Note: Trend test results denoted at <u>control</u>; * denotes significance at p=0.05; ** denotes significance at p=0.01
a= Number of tumor bearing animals/Number of animals examined, excluding those that died before week 52 (interim sacrifice).

### 4.6.5   Sugimoto, 1997 (MRID 50017108 - 50017109)[26]

In a carcinogenicity study, glyphosate (purity 97.56 and 94.61%; two lots) was administered to groups of 50 male and 50 female Specific-Pathogen-Free (SPF) ICR (Crj: CD-1) mice/dose in the diet at dose levels of 0, 165/153.2, 838.1/786.8, or 4348/4116 mg/kg/day for males and females, respectively, for 18 months.  The highest dose tested in this study far exceeds the highest dose recommended in the test guidelines on how to conduct carcinogenicity studies (OCSPP 870.4200 and OCSPP 870.4300).  Furthermore, the mid-dose tested in this study was approaching 1,000 mg/kg/day.  Tumor findings at these high doses are given less weight.

---

[26]Note:  In Greim et al. (2015), the same study is cited as Arysta Life Sciences (1997b)

There were no treatment-related effects on mortality or survival.  There were no changes in histopathological findings observed.

Hemangiomas in female mice were found to occur at different sites.  The tumor incidences are presented in Table 4.19.  A statistically significant trend was observed.  Tumor incidence at the high-dose, which was approximately 4 times the recommended high-dose in test guidelines (4116 mg/kg/day), was statistically significant as compared to concurrent controls.

| Table 4.19.  Hemangioma Incidences (Sugimoto, 1997) Fisher's Exact Test and Cochran-Armitage Trend Test Results | | | | |
|---|---|---|---|---|
| Tumor Type | 0 mg/kg/day | 153.2 mg/kg/day | 786.8 mg/kg/day | 4116 mg/kg/day |
| Hemangioma Incidence (%) Raw p-value = Adjusted p-value = | 0/48 (0) 0.002** 0.005** | 0/47 (0) 1.000 1.000 | 2/45 (4) 0.231 0.231 | 5/45 (11) 0.024* 0.035* |

Note: Trend test results denoted at <u>control</u>; * denotes significance at p=0.05; ** denotes significance at p=0.01.
a= Number of tumor bearing animals/Number of animals examined, excluding those that died before week 52 (interim sacrifice).

### 4.6.6   Pavkov and Turnier, 1987 (MRIDs 40214006, 41209907)

Glyphosate trimesium salt (sulfosate, 56.2% pure) was tested in a 2-year chronic feeding/carcinogenicity study in male and female CD-1 mice.  Sixty animals/sex were tested in control group 1 (basal diet, no vehicle), 80/sex were tested in control group 2 (basal diet plus propylene glycol at 1% w/w vehicle) and in the low- and mid-dose groups, and 90/sex were tested in the high-dose group.  The following dose levels were tested:  0, 11.7/16, 118/159, and 991/1341 mg/kg/day for males and females, respectively.

No adverse effects on survival were seen in either sex across the doses tested.  There were no changes in histopathological findings observed.  There were no treatment-related increases in tumor incidence observed in the study.

### 4.6.7   Summary of Mouse Data

No tumors were identified for evaluation in 2 of the 6 mouse carcinogenicity studies.  In the remaining 4 mouse studies, 3 observed a statistically significant trend in tumor incidences in the hemangiosarcomas, malignant lymphomas, or hemangiomas following adjustment for multiple comparisons.  In one individual study, a statistically significant pairwise comparison was only observed following adjustment for multiple comparisons for hemangiomas at the highest dose tested, which was more than 4X the limit dose.  There was no evidence of corroborating pre-neoplastic or related non-neoplastic lesions or evidence of tumor progression (progression from pre-neoplastic to malignancy) to support biological significance of tumor findings.  In a limited number of cases, historical control data were available which the observed tumor incidences were within the historical control range.

| Table 4.20. Summary of Mouse Carcinogenicity Studies | | | |
|---|---|---|---|
| **Study** | **Dose Range** | **Pre-Neoplastic or Related Non-Neoplastic Lesions** | **Tumors Incidences, Statistical Significance, and Related Comments** |
| **Reyna and Gordon (1973)**<br><br>Swiss white mice | 0, 17 or 50 mg/kg/day for 18 months | None observed | There were no tumors identified for evaluation. |
| **Knezevich and Hogan (1983)**<br><br>CD-1 mice | 99.78% Technical in diet<br>0, 161/195, 835/968, 4945/6069 mg/kg/day for [M/F] for 24 months. | Chronic interstitial nephritis lacked dose-response and not considered relevant to renal tumors.  Tubular epithelial changes in kidney were approximately the same in controls, low- and mid-doses and then decreased at high-dose. | No statistical significance in trend or pairwise comparisons, including the mid- and high-doses which approached or exceeded 1,000 mg/kg/day. Incidence of adenomas within historical control range for performing laboratory. |
| **Atkinson *et al.* (1993b).**<br><br>CD-1 mice | 97.5 - 100.2% Technical in diet<br>0, 98/102, 297/298, 988/1000 mg/kg/day for 104 weeks (M/F) | None observed | Statistically significant trend for hemangiosarcomas that were only observed in 4/45 (9%) high-dose male mice.  Increased incidence was not statistically significant from the concurrent controls at all doses, including the highest dose tested which is approximately 1,000 mg/kg/day. |
| **Wood *et al.* (2009b)**<br><br>CD-1 mice | 95.7% Technical in diet<br>0, 71.4/97.9, 234.2/299.5, or 810/1081.2 mg/kg/day [M/F] for 80 weeks | None observed | No statistically significance in trend or pairwise comparisons following adjustment for multiple comparisons.  Negative trend observed for adenomas.<br><br>Statistically significant trend for malignant lymphoma with incidences of 0/44 in controls, 1/46 at the low-dose, 2/48 at the mid-dose, and 5/45 at the high-dose.  No statistically significant pairwise results following adjustment for multiple comparisons, including the highest dose tested which was approaching 1,000 mg/kg/day.  All observed incidences within historical control range for performing laboratory. |

| Table 4.20. Summary of Mouse Carcinogenicity Studies | | | |
|---|---|---|---|
| **Study** | **Dose Range** | **Pre-Neoplastic or Related Non-Neoplastic Lesions** | **Tumors Incidences, Statistical Significance, and Related Comments** |
| **Sugimoto (1997)** <br><br> CD-1 mice | 94.61 – 97.56% Technical in diet <br> 0, 165/153.2, 838.1/786.8, or 4348/4116 mg/kg/day [M/F] for 18 months | None observed | Statistically significant trend for hemangiomas in female mice following adjustment for multiple comparisons with incidences of 0/48 in controls, 0/47 at the low-dose, 2/45 at the mid-dose, and 5/45 at the high-dose. Increased incidence at high-dose statistically significant following adjustment for multiple comparisons.  Highest dose tested was more than 4X the limit dose. |
| **Pavkov and Turnier (1987)** <br><br> CD-1 mice | 56.2% Technical (Trimesium salt; Sulfosate) <br> 0, 11.7/16, 118/159, and 991/1341 mg/kg/day [M/F] for 24 months. | None observed | There were no tumors identified for evaluation, including the highest dose tested which approached/exceeded 1,000 mg/kg/day. |

## 4.7 Absorption, Distribution, Metabolism, Excretion (ADME)

The 2005 EPA Guidelines for Carcinogen Risk Assessment also permit analysis of other key data that may provide valuable insights into the likelihood of human cancer risk from exposure to a chemical, such as information regarding the absorption, distribution, metabolism, and excretion (ADME) of a test chemical. EPA's Harmonized Test Guidelines for pesticides include a series of studies for characterizing a chemical's metabolism and pharmacokinetics. As described in the test guideline (OCSPP 870.7485), testing of the disposition of a test substance is designed to obtain adequate information on its: absorption, distribution, biotransformation (metabolism), and excretion, which can all collectively aid in understanding the chemical's mechanism of toxicity. Basic pharmacokinetic/toxicokinetic parameters determined from these studies can also provide information on the potential for accumulation of the test substance in tissues and/or organs and the potential for induction of biotransformation as a result of exposure to the test substance. These data can be used to assess the adequacy and relevance of the extrapolation of animal toxicity data (particularly chronic toxicity and/or carcinogenicity data) to estimate human risk.

Oral exposure is considered the primary route of concern for glyphosate. The maximum absorption from the GI tract for glyphosate was estimated to be ~30% with one study showing up to 40% based upon radiolabel detected in the urine. In general, the amounts of glyphosate detected in tissues were negligible indicating low tissue retention following dosing. Parent glyphosate is the principal form excreted in urine and feces. The primary route of excretion following oral administration of glyphosate is the feces, as verified by the intravenous dosing and bile cannulation experiments. Within the dose ranges tested, elimination was essentially complete by 24 hours indicating that glyphosate does not bioaccumulate.

Multiple studies examined the pharmacokinetics of a single dose of radiolabeled glyphosate ranging from 5.6 – 400 mg/kg. Across these studies, time to reach peak plasma concentrations ($T_{max}$) appeared to increase with increasing dose; however, the reported range of $T_{max}$ (1-5.5 hours) suggests only a slight shift in absorption kinetics occurs despite large increases in dose. In the one study that tested two doses (NTP, 1992), data graphically show that peak blood levels were only roughly 3-fold with a 10-fold increase between the two doses. Reported area under the curve (AUC) values indicated conflicting results regarding whether linear or non-linear absorption kinetics was occurring at higher doses.

In general, EPA and OECD guideline ADME studies are designed for a different purpose and do not provide the information needed to adequately determine whether linear kinetics is still occurring at high doses of glyphosate. These studies are often limited to one or two doses and do not include time course data. A well-conducted pharmacokinetic study testing multiple doses is needed to conclusively make this determination.

## 4.8    Discussion

Glyphosate has been extensively tested in rodents to evaluate its carcinogenic potential.  A total of 14 rodent carcinogenicity studies were considered to be adequate for this analysis.   Eight studies were conducted in the rat and 6 studies were conducted in the mouse.  When a potential tumor signal was identified in a study, the agency considered several factors.  Consistent with the EPA's 2005 Guidelines for Carcinogen Risk Assessment, the agency evaluated the tumor responses for both statistical and biological significance by considering factors such as historical control data; rarity of tumor types; tumors at multiple sites; tumors in multiple species, strains, or both sexes; progression of lesions from preneoplastic to benign to malignant; reduced latency of neoplastic lesions (i.e., time to tumor); presence of metastases; unusual magnitude of tumor response; proportion of malignant tumors; and dose-related increases.  When these factors were considered together, the agency made a determination of whether or not the observed tumor was related to treatment with glyphosate.  A weight of the evidence approach was used to determine the carcinogenic potential of glyphosate in rodents.

In 4 of the 8 rat studies conducted with glyphosate, no tumors were identified for evaluation.  Of the remaining 4 rat studies, tumor incidences were evaluated in detail for testicular, pancreatic, hepatocellular, thyroid C-cell, and mammary gland tumors.  In 2 of the 6 mouse studies, no tumors were identified for evaluation.  In the remaining 4 mouse studies, tumor incidences were evaluated in detail for hemangiosarcomas, malignant lymphoma, hemangiomas, lung, and kidney tumors.  Below are the weight of evidence evaluations for each tumor type.

*Testicular Tumors*
In Table 4.1, a statistically significant trend was observed for testicular interstitial cell tumors (adjusted p-value = 0.032) and pairwise significance was observed at the highest dose tested of 31 mg/kg/day (adjusted p-value = 0.032) in male Sprague-Dawley rats (Lankas, 1981).  Closer examination of the tumor incidence indicated that the data do not demonstrate a monotonic dose response with greater incidence observed at the low-dose as compared at the mid-dose.  There was a lack of preneoplastic or related non-neoplastic lesions to support a treatment-related effect.  It was also noted that the incidence of testicular cell tumors in concurrent controls (0%) appears to be unusually low for this tumor type as compared to historical controls from the performing laboratory.  These data also indicated that the incidence at the highest dose tested was outside the historical control range when all animals were considered, but within the terminal historical control range for the performing laboratory.  Testicular interstitial cell tumors are relatively common in Sprague-Dawley rats and this tumor type is difficult to distinguish from simple hyperplasia.  Testicular tumors were not seen in the other 7 rat studies, many of which tested up to or beyond the limit dose (1000 mg/kg/day).  More specifically, of the 4 other studies performed in Sprague-Dawley rats (Stout and Ruecker, 1990; Atkinson *et al.*, 1993a; Pavkov and Wyand, 1987; Enemoto, 1997), 3 were tested at doses 30X higher or more than the highest dose tested in Lankas (1981) and no testicular tumors were observed.  Furthermore, there were no testicular tumors observed in the 6 mouse bioassays.

*Pancreatic Tumors*
In Table 4.2, no statistically significant trends were observed for pancreatic islet cell tumors in male Sprague-Dawley rats (Stout and Ruecker, 1990).  Raw p-values were statistically

significant for adenomas at the low and high dose for pairwise comparisons; however, these were not statistically significant following adjustment for multiple comparisons. Closer examination of the tumor incidence indicated that the data do not demonstrate a monotonic dose response with greater incidence observed at the low-dose as compared at the mid-dose and high-dose. There was a lack of preneoplastic or related non-neoplastic lesions to support a treatment-related effect. Historical control data from the performing laboratory for pancreatic adenomas indicated that the incidence in concurrent controls was at the lower limit of the historical control range. There was no evidence of progression to malignancy. Notably, carcinomas demonstrated a negative trend with decreasing tumor incidence with increasing dose. Pancreatic tumors were not observed in the other 7 rat studies, including 4 other studies performed in Sprague-Dawley rats (Atkinson *et al.*, 1993a; Pavkov and Wyand, 1987; Enemoto, 1997; Lankas, 1981). Furthermore, pancreatic tumors were not observed in the 6 mouse bioassays.

*Hepatocellular Tumors*
Hepatocellular tumors were evaluated in 2 rat carcinogenicity studies (Stout and Ruecker, 1990; Brammer, 2001). In Table 4.4, the raw p-value for trend was statistically significant for adenomas in male Sprague-Dawley rats (Stout and Ruecker, 1990); however, it was not statistically significant following adjustment for multiple comparisons. There were no statistically significant pairwise comparisons. Historical control data from the performing laboratory indicated that the incidence of hepatocellular tumors was within the historical control range at all doses. Closer examination of the tumor incidence indicated that the data fluctuated with no tumors observed in concurrent controls or the mid-dose and increases seen at the low-dose and high-dose. In Table 4.10, a statistically significant trend was observed for adenomas in male Wistar rats (adjusted p-value = 0.029) (Brammer, 2001). For pairwise comparisons, the raw p-value was statistically significant at the highest dose tested (1214 mg/kg/day); however, it was not statistically significant following adjustment for multiple comparisons. There was a lack of preneoplastic or related non-neoplastic lesions to support a treatment-related effect in both studies. There was no evidence of progression to malignancy. In particular, carcinomas demonstrated a negative trend with decreasing tumor incidence with increasing dose. Hepatocellular tumors were not observed in the other 6 rat studies, including 4 other studies in Sprague-Dawley rats (Atkinson *et al.*, 1993a; Pavkov and Wyand, 1987; Enemoto, 1997; Lankas, 1981) and 2 other studies in Wistar rats (Suresh, 1996; Wood *et al.* 2009a) the same rat strains. Furthermore, hepatocellular tumors were not observed in the 6 mouse bioassays.

*Thyroid Tumors*
In Table 4.6, there were no statistically significant trends or pairwise comparisons were observed for thyroid C-cell tumors in male Sprague-Dawley rats (Stout and Ruecker, 1990). In Table 4.7, a statistically significant trend for adenomas and combined adenomas/carcinomas was observed with raw p-values in female Sprague-Dawley rats (Stout and Ruecker, 1990); however, the trends were not statistically significant with adjustment for multiple comparisons. There were no statistically significant pairwise comparisons observed at any dose. There was a lack of preneoplastic or related non-neoplastic lesions to support a treatment-related effect. There was no evidence of progression to malignancy. Thyroid tumors were not observed in the other 7 rat studies, including 4 other studies performed in Sprague-Dawley rats (Atkinson *et al.*, 1993a; Pavkov and Wyand, 1987; Enemoto, 1997; Lankas, 1981). Furthermore, thyroid tumors were not observed in the 6 mouse bioassays.

*Mammary Gland Tumors*

In Table 4.11, raw trend p-values were statistically significant for mammary gland adenocarcinomas and combined adenomas/adenocarcinomas in female Wistar rats (Wood *et al.*, 2009a); however, only the combined p-value for trend remained statistically significant following adjustment for multiple comparison (adjusted p-value = 0.028).  There were no statistically significant pairwise comparisons.  There was a lack of preneoplastic or related non-neoplastic lesions to support a treatment-related effect.  Mammary gland tumors were not observed in the other 7 rat studies, including 2 other studies performed in Wistar rats (Brammer, 2001; Suresh, 1996).  Furthermore, mammary gland tumors were not observed in the 6 mouse bioassays.

*Kidney Tumors*

In Table 4.13, there were no statistically significant trend observed for renal tubular cell tumors in male CD-1 mice (Knezevich and Hogan, 1983).  This study tested up to almost 5000 mg/kg/day.  Historical control data from the performing laboratory indicated that the incidence of adenomas was within the historical control range.  There was a lack of preneoplastic or related non-neoplastic lesions to support a treatment-related effect.  There was no evidence of progression to malignancy.  Kidney tumors were not observed in the other 5 mouse studies, including 4 other studies performed in CD-1 mice (Atkinson *et al.*, 1993b; Wood *et al.*, 2009b; Sugimoto, 1997; Pavkov and Turnier, 1987).  Furthermore, kidney tumors were not observed in the 8 rat bioassays.

*Hemangiosarcomas*

In Table 4.16, a statistically significant trend was observed for hemangiosarcomas in male CD-1 mice (adjusted p-value = 0.006) (Atkinson *et al.*, 1993b).  There were no statistically significant pairwise comparisons.  There was a lack of preneoplastic or related non-neoplastic lesions to support a treatment-related effect.  There was no evidence of progression to malignancy.  Hemangiosarcomas are commonly observed in mice (generally more common in males for CD-1 strain) as both spontaneous and treatment-related tumors arising from endothelial cells.  Hemangiosarcomas were not observed in the other 5 mouse studies, including 4 other studies performed in CD-1 mice (Knezevich and Hogan, 1983; Wood *et al.*, 2009b; Sugimoto, 1997; Pavkov and Turnier, 1987).  Furthermore, hemangiosarcomas were not observed in the 8 rat bioassays.

*Lung Tumors*

In Table 4.17, the raw p-value for trend was observed for lung adenocarcinomas; however, the trend was not statistically significant following adjustment for multiple comparisons in male CD-1 mice (Wood *et al.*, 2009b).  There were no statistically significant pairwise comparisons.  Tumor incidences at all doses were within the historical control range for the performing laboratory.  There was a lack of preneoplastic or related non-neoplastic lesions to support a treatment-related effect.  Lung tumors were not observed in the other 5 mouse studies, including 4 other studies performed in CD-1 mice (Knezevich and Hogan, 1983; Atkinson *et al.*, 1993b; Sugimoto, 1997; Pavkov and Turnier, 1987).  Furthermore, lung tumors were not observed in the 8 rat bioassays.

*Malignant Lymphoma*
In Table 4.18, statistically significant trend was observed in male CD-1 mice (adjusted p-value = 0.025) (Wood *et al.*, 2009b).  For pairwise comparisons, the raw p-value for the highest dose tested was statistically significant; however, it was not statistically significant following adjustment for multiple comparisons.  Malignant lymphoma was not observed in the other 5 mouse studies, including 4 other studies performed in CD-1 mice (Knezevich and Hogan, 1983; Atkinson *et al.*, 1993b; Sugimoto, 1997; Pavkov and Turnier, 1987).  Furthermore, malignant lymphoma was not observed in the 8 rat bioassays.

*Hemangiomas*
In Table 4.19, a statistically significant trend was observed in female CD-1 mice (adjusted p-value = 0.005) (Sugimoto, 1997).  For pairwise comparisons, the incidence at the highest dose tested was statistically significant (adjusted p-value = 0.035).  The highest dose tested in this study was more than 4X the limit dose.  Hemangiomas were not observed in the other 5 mouse studies, including 4 other studies performed in CD-1 mice (Knezevich and Hogan, 1983; Atkinson *et al.*, 1993b; Wood *et al.*, 2009b; Pavkov and Turnier, 1987).  Furthermore, hemangiomas were not observed in the 8 rat bioassays.

Based on the weight-of-evidence evaluations, the agency has concluded that none of the tumors evaluated in individual rat and mouse carcinogenicity studies are treatment-related due to lack of pairwise statistical significance, lack of a monotonic dose response, absence of preneoplastic or related non-neoplastic lesions, no evidence of tumor progression, and/or historical control information (when available).  Tumors seen in individual rat and mouse studies were also not reproduced in other studies, including those conducted in the same animal species and strain at similar or higher doses.

**5.0     Data Evaluation of Genetic Toxicity**

**5.1     Introduction**

Genotoxicity is a broad term for any damage to the genetic material, whether the damage is transient or permanent.  Transient damage refers to unintended modifications to the structure of DNA, which may or may not undergo successful repair.  Permanent damage refers to heritable changes in the DNA sequence, known as mutations.  Types of mutations include: 1) changes in single base pairs, partial, single or multiple genes, or chromosomes, 2) breaks in chromosomes that result in transmissible deletion, duplication or rearrangement of chromosome segments, and 3) mitotic recombination (OECD, 2015).  In somatic cells, DNA-reactive chemicals can cause cancer if the mutations occur within regulatory genes that control cell growth, cell division and differentiation, such as proto-oncogenes, tumor suppressor genes and/or DNA damage response genes (OECD, 2015).  Additionally, DNA damage may signal the cell to undergo apoptosis (cell death) rather than cell division and, therefore, the damage is not "fixed" as a mutation and is not passed along to daughter cells.

Evaluation of genotoxicity data entails a weight-of-evidence approach that includes consideration of the various types of genetic damage that can occur. Since no single genotoxicity assay evaluates the many types of genetic alterations that can be induced by a chemical, one must employ a battery of genotoxicity tests to adequately cover all the genetic endpoints important for regulatory decisions.  EPA, like other regulatory agencies, considers genotoxicity information as part of the weight of evidence when assessing the potential of a chemical to induce cancer in humans. Under FIFRA, OPP requires genotoxicity tests of the technical grade active ingredient for the registration of both food and non-food use pesticides.  The current genotoxicity test battery (40 CFR Part 158.500) for pesticide registration consists of:

1) Bacterial reverse mutation test (typically conducted in bacteria strains *Salmonella typhimurium* and *Escherichia coli*),

2) *in vitro* mammalian (forward) gene mutation *and in vitro* mammalian chromosomal aberration test, and

3) *in vivo* test for micronucleus induction (mammalian erythrocyte micronucleus test) *or in vivo* chromosomal aberration test (mammalian bone marrow chromosomal aberration test).

In cases where equivocal or inconsistent results are obtained for the same endpoint in different test systems, additional testing may be required.  Test Guidelines on how to conduct the genotoxicity tests have been published by the agency and have been harmonized with the Organization for Economic Cooperation and Development (OECD, 2015; Cimino 2006).  These guidelines identify specific test species, genetic endpoints, test conditions, exposure durations as well information on how to report data and interpret the results.  The test guidelines provide a level of consistency and predictability for regulatory compliance and regulatory decision making.

## 5.2      Scope of the Assessment Considerations for Study Quality Evaluation

Previous genotoxicity assessments conducted as part of the CARC reviews for glyphosate in 1991 and 2015, considered only studies conducted with glyphosate technical and included only studies that provided adequate characterization of the test material (*i.e.* purity information provided).  In the current analysis, a fit-for-purpose systematic review process was conducted to identify relevant genotoxicity data from regulatory studies and published literature from open sources (published and unpublished) for both glyphosate technical and glyphosate-based formulations. Studies conducted with glyphosate formulations that were identified and considered relevant for genotoxicity evaluation are summarized in table form in Appendix F.  As described in Section 7.0 of this document, glyphosate formulations are hypothesized to be more toxic than glyphosate alone.  The agency is collaborating with NTP to systematically investigate the mechanism(s) of toxicity for glyphosate and glyphosate formulations.  However, the focus of this section is the genotoxic potential of glyphosate technical.

As described previously in Section 2.1.3, the list of studies identified in this process were also cross-referenced with genotoxicity review articles for glyphosate from the open literature [Kier and Kirkland (2013), and Williams *et al.* (2000)], as well as recent international evaluations of glyphosate (IARC 2015, EFSA 2015, JMPR 2016).  The current analysis also includes studies conducted by other registrants that were not previously available to the agency. Sixteen studies for glyphosate technical that were included in Kier and Kirkland (2013) were not available to the agency; therefore, data and study summaries provided in the review articles were relied upon in the current review and are identified in the data tables with a footnote. The Kier and Kirkland (2013) article serves as the original publication for these studies and provided relevant information on study design and conditions as well as summary data.  The data set includes *in vitro* and *in vivo* studies conducted in mammalian systems, with the exception of standard bacterial test strains, which have a long history of detecting chemicals that are mutagenic in humans. Studies conducted in non-mammalian species (e.g. worms, fish, reptiles, plants), were excluded because they were considered to be not relevant for informing genotoxic risk in humans.  Several epidemiological studies that evaluated biomarkers for genotoxicity were not included in this evaluation because these studies were assigned a low quality ranking as described in Section 3.3.

When evaluating the quality of the published and unpublished data for inclusion in the analysis, the agency considered the reporting quality (how well a study was reported), the study design and how well the study was conducted.  Critical elements in study design and interpretation for genotoxicity tests are described in the various EPA and OECD test guidelines.  Elements such as test conditions (e.g. solubility, pH, osmolarity, and cytotoxicity) and study design (e.g. number of test organisms, doses selected, use of positive and negative controls; blinded evaluation) were used to evaluate the quality of published and non-published studies.  In cases where inappropriate testing conditions or study design clearly had an impact on the outcome the study, the study was excluded from the analysis.  For example, early studies by Majeska (1982) were excluded from the analysis since it was clearly demonstrated that altered pH by the test chemical can result in false positive responses in several of *in vitro* genotoxicity tests (Majeska, 1985d,e,f).   In other cases, particularly with the published literature studies, where test conditions and/or study design differed from what is generally considered as acceptable

following in the EPA or OECD guidelines, the differences are noted, but the studies were not excluded from analysis unless the condition made the study unreliable.  Summaries of relevant genotoxicity studies can be found in TXR# 0057499.  Studies that were excluded from the analysis are listed in Appendix G.

The studies evaluating the genetic toxicity of the active ingredient glyphosate are presented in the following sections according to the type of genetic endpoints evaluated:  mutations, chromosomal aberrations and other assays evaluating DNA damage.  *In vitro* and *in vivo* assays are discussed separately according to the genetic endpoint.  For the purpose of this analysis, glyphosate and its salts are considered together when evaluating the genotoxic potential of the active ingredient glyphosate.

### 5.3    Tests for Gene Mutations for Glyphosate Technical

#### 5.3.1    Bacterial Mutagenicity Assays

Bacteria have traditionally been employed as a primary test organism for the detection of chemical mutagens.  The bacterial reverse mutation assay is routinely performed in the test strains of *Salmonella typhimurium* and *Escherichia coli.*  These test strains are mutant strains that are deficient for the synthesis of an essential amino acid.  The assay detects mutations that revert the test strains back to wild type for amino acid synthesis and the revertants are identified by their ability to grow in culture medium deficient of the specific amino acid(s).  This mutagenicity test identifies point mutations, which includes base substitutions and deletions and insertions of up to a few base pairs (OECD 471).  The tests are typically conducted in the presence and absence of an exogenous source of metabolic activation (e.g., S9 microsomal fraction of activated liver homogenates) to identify potential mutagenic metabolites.

Glyphosate has been extensively evaluated for its potential to induce mutations in bacteria.  Most of the studies considered consist of the full battery of bacterial strains (*i.e.* the recommend strains in EPA and OECD Test Guidelines) and were evaluated at appropriate test concentrations (up to cytotoxic or assay limit concentrations).

EPA identified 27 studies that tested glyphosate technical in bacterial mutagenicity assays by means of the standard plate incorporation method or the pre-incubation modification of the standard assay. Glyphosate was negative in the presence and absence of metabolic activation in all the studies.  The results of the bacterial reversion mutation assays evaluating glyphosate technical are presented in Table 5.1

**Table 5.1.  *In vitro* Test for Gene Mutations in Bacteria: Glyphosate Technical.**

| Test/ Endpoint | Test System | Concentrations | Purity | Results | Reference | Comments |
|---|---|---|---|---|---|---|
| Bacterial Reverse Mutation | *S. typhimurium* TA1535, TA1537, TA98 and TA100 and WP *uvrA* ± S9 | 156-5000 µg/plate | 95.68% | Negative ± S9 | Akanuma (1995) [MRID 50017102] | |
| Bacterial Reverse Mutation | *S. typhimurium* TA535, TA1537, TA98 and TA100 and *E. coli* WP2P and WP2P *uvrA* ± S9 | 100-5000 µg/plate in DMSO | 95.6% glyphosate acid | Negative ± S9 | Callander (1996) [MRID 44320617] | |
| Bacterial Reverse Mutation | *S. typhimurium* TA 1535, TA1537, TA98 and TA100 and *E. coli* WP2P and WP2P *uvrA* ± S9 | 100-5000 µg/plate in water | 60% potassium glyphosate salt | Negative ± S9 | Callander (1999)[1] | |
| Bacterial Reverse Mutation | *S. typhimurium* TA97a, TA98, TA100 and TA102, ± S9 | 25-2000 µg in aqueous solution | Not provided | Negative ± S9 | Chruscielska *et al.* (2000) | |
| Bacterial Reverse Mutation | *S. typhimurium* TA98, TA100, TA1535, TA1537 ± S9 | 10-1000 µg/plate | 98.4% | Negative ± S9 | Flowers and Kier (1978) [MRID 00078620] | |
| Bacterial Reverse Mutation | *S. typhimurium* TA98, TA100, TA102, TA1535, TA1537 ± S9 | 31.6-3160 µg/plate | 98.8% | Negative ± S9 | Flügge (2009a)[1] | |
| Bacterial Reverse Mutation | *S. typhimurium* TA98, TA100, TA102, TA1535, TA1537 ± S9 | 31.6-3160 µg/plate | 96.4% technical | Negative ± S9 | Flügge (2010b)[1] | |

**Table 5.1.  *In vitro* Test for Gene Mutations in Bacteria: Glyphosate Technical.**

| Test/ Endpoint | Test System | Concentrations | Purity | Results | Reference | Comments |
|---|---|---|---|---|---|---|
| Bacterial Reverse Mutation | *S. typhimurium* TA1535, TA1537, TA98 and TA100 | 310-5000 µg/plate (+S9); 160-2500 µg/plate (−S9) | 98.6% | Negative ± S9 | Jensen (1991a) [MRID 49961502] | |
| Bacterial Reverse Mutation | *S. typhimurium* TA98, TA100, TA102, TA1535, TA1537 ± S9 | 1-1000 µg/plate | 98.05% | Negative ± S9 | Miyaji (2008)[1] | |
| Bacterial Reverse Mutation | *S. typhimurium* TA98, TA100, TA1535, TA1537, TA1538 ± S9 | 5000 µg/plate | Not reported | Negative ± S9 | Moriya *et al.* (1983) | |
| Bacterial Reverse Mutation | *S. typhimurium* TA1535, TA97, TA98 and TA100 ± S9 | 33-10,000 µg/plate | 99% | Negative ± S9 | NTP (1992) | Hamster and rat S9 |
| Bacterial Reverse Mutation | *S. typhimurium* TA98, TA100, TA1535 and TA97a ± S9 | 1-5000 µg/plate | 61.27 % Glyphosate isopropyl- amine salt | Negative ± S9 | Ranzani (2000)[1] | |
| Bacterial Reverse Mutation | *S. typhimurium* TA98, TA100, TA102, TA1535, TA1537 ± S9 | 648-5000 µg/plate | 98.01% | Negative ± S9 | Ribeiro do Val (2007) [MRID 50000903] | |
| Bacterial Reverse Mutation | *S. typhimurium* TA98, TA100, TA1535, TA1537 and *E. Coli* WP2 *uvrA* ± S9 | 31.6-5000 µg/plate | 96.0% technical | Negative ± S9 | Schreib (2010)[1] | |

**Table 5.1.** *In vitro* Test for Gene Mutations in Bacteria: Glyphosate Technical.

| Test/ Endpoint | Test System | Concentrations | Purity | Results | Reference | Comments |
|---|---|---|---|---|---|---|
| Bacterial Reverse Mutation | *S. typhimurium* TA1535, TA1537, TA1538, TA98, TA100 and *E. coli* WP2 *hcr* ± S9 | 10-5000 µg/plate | 98.4% | Negative ± S9 | Shirasu *et al.* (1978) [MRID 00078619] | Published in Li & Long, 1988 |
| Bacterial Reverse Mutation | *S. typhimurium* TA98, TA100, TA1535, TA1537 and *E. coli* WP *uvrA* ± S9 | 3-5000 µg/plate (plate-incorporation), 33-5000 µg/plate (pre-incubation test) | 95.1% | Negative ± S9 | Sokolowski (2007a) [MRID 49957406] | |
| Bacterial Reverse Mutation | *S. typhimurium* TA98, TA100, TA1535, TA1537 and *E. coli* WP *uvrA* ± S9 | 3-5000 µg/plate (plate–incorporation) 33 – 5000 µg/plate (pre-incubation test) | 97.7% | Negative ± S9 | Sokolowski (2007b) [MRID 49957407] | |
| Bacterial Reverse Mutation | *S. typhimurium* TA98, TA100, TA1535, TA1537 and *E. coli* WP *uvrA* ± S9 | 3-5000 µg/plate (plate–incorporation) 33-5000 µg/plate (pre-incubation test) | 95.0% | Negative ± S9 | Sokolowski (2007c) [MRID 49957408] | |
| Bacterial Reverse Mutation | *S. typhimurium* TA98, TA100, TA1535, TA1537 and *E. coli* WP *uvrA* ± S9 | 3-5000 µg/plate | 96.66% technical | Negative ± S9 | Sokolowski (2009a)[1] | |

**Table 5.1.** *In vitro* Test for Gene Mutations in Bacteria: Glyphosate Technical.

| Test/ Endpoint | Test System | Concentrations | Purity | Results | Reference | Comments |
|---|---|---|---|---|---|---|
| Bacterial Reverse Mutation | *S. typhimurium* TA98, TA100, TA1535, TA1537 and *E. coli* WP2 *uvrA* pKM 101 and WP2 pKM 101 ± S9 | 3-5000 µg/plate | 96.3% glyphosate acid | Negative ± S9 | Sokolowski (2009b) [MRID 49961801] | |
| Bacterial Reverse Mutation | *S. typhimurium* TA98, TA100, TA1535, TA1537 and *E. coli* WP *uvrA* ± S9 | 3-5000 µg/plate | 97.16 % | Negative ± S9 | Sokolowski (2010) [MRID 50000902] | |
| Bacterial Reverse Mutation | *S. typhimurium* TA98, TA100, TA1535, TA1537, TA1538 ± S9 | 1-1000 µg/plate | 96.0% | Negative ± S9 | Suresh (1993a)[1] | |
| Bacterial Reverse Mutation | *S. typhimurium* TA98, TA100, TA1535, TA1537 and *E. coli* WP *uvrA* ± S9 | 0-5000 µg/plate | 95.3% | Negative ± S9 | Thompson (1996) [MRID 49957409] | |
| Bacterial Reverse Mutation | *S. typhimurium* TA98, TA100, TA102, TA1535, TA1537 ± S9 | 31.6-5000 µg/plate | 98.2% | Negative ± S9 | Wallner (2010)[1] | |
| Bacterial Reverse Mutation | *S. typhimurium* TA98 and TA100 ± S9 | 25 µg/plate | Not reported | Negative ± S9 | Wilderman and Nazar (1982) | Rat S9 and plant cell-free homogenates were used for metabolic activation |

**Table 5.1.  *In vitro* Test for Gene Mutations in Bacteria: Glyphosate Technical.**

| Test/ Endpoint | Test System | Concentrations | Purity | Results | Reference | Comments |
|---|---|---|---|---|---|---|
| Bacterial Reverse Mutation | *S. typhimurium* TA1535, TA1537, TA1538, TA98 and TA100 ± S9 | 0.12-10 mg/plate –S9 0.56-15 mg/plate +S9 | 90% glyphosate trimesium salt | Negative ± S9 | Majeska *et al.* (1982a) [MRID 00126612] | |
| Bacterial Reverse Mutation | *S. typhimurium* TA1535, TA1537, TA98 and TA100 ± S9 | 0.005-50 μL/mL | 55.6% glyphosate trimesium salt | Negative ± S9 | Majeska (1985a) [MRID 00155527] | |

[1] Study was cited in Kier and Kirkland (2013).  Supplementary information about the study was provided online including test guideline, test material purity, control chemicals and summary data tables.

### 5.3.2   *In vitro* Tests for Gene Mutations in Mammalian Cells

*In vitro* gene mutation studies in mammalian cells are conducted in cell lines with reporter genes for forward mutations.  The most common reporter genes are the endogenous thymidine kinase (TK) gene, endogenous hypoxanthine-guanine phosphoribosyl transferase (HPRT) gene and the xanthine-guanine phosphoribosyl transferase transgene (XPRT).  Mutations that occur within these reporter genes result in mutant cells that are resistant to the cytotoxic effect of the pyrimidine analogue trifluorothymidine (for TK) or the purine analogue 6-thioguanine (for HPRT and XPRT) (OPPTS 870.5330).  Suitable cell lines for this assay include L5178Y mouse lymphoma cells, Chinese hamster ovary (CHO) cells, hamster AS52 and V79 lung fibroblasts and human TK6 lymphoblastoid cells.  Similar to other *in vitro* assays, chemicals are tested both in the presence and absence of S9 metabolic activation.

A total of four studies were conducted for (forward) mutations in mammalian cells (Table 5.3).  Three studies were conducted with a high purity concentration of glyphosate technical (≥95.6%) and the remaining study was performed with glyphosate trimesium salt.  In four of the assays, mouse lymphoma L5178Y TK$^{+/-}$ cells were the target organism and one was conducted in CHO cells with the HPRT endpoint.  Glyphosate technical and the glyphosate trimesium salt were negative in the mouse lymphoma cell assays (Jensen, 1991b; Clay, 1996; Majesak, 1985b) when tested up to the current guideline limit concentration and glyphosate was negative in CHO/HPRT cells when tested up to cytotoxic concentrations (Li, 1983a).

**Table 5.2.** *In vitro* **Mammalian Gene Mutation Assays: Glyphosate Technical.**

| Test/Endpoint | Test System | Concentrations/ Conditions | Test Material Purity | Results | Reference | Comments |
|---|---|---|---|---|---|---|
| Gene Mutations in Mammalian Cells | Mouse lymphoma L5178Y TK$^{+/-}$ cells ± S9 | 296-1000 μg/mL | 95.6% | Negative | Clay (1996)[1] | Relative survival was 90% (-S9) and 57% (+S9) at top concentration |
| Gene Mutations in Mammalian Cells | Mouse lymphoma L5178Y TK$^{+/-}$ cells ± S9 | 520–4200 μg/mL (+S9); 610–5000 μg/mL (-S9) | 98.6% | Negative | Jensen (1991b) [MRID 49961504] | Reported no significant reduction in cloning efficiency at any concentration. |
| Gene Mutations in Mammalian Cells | Chinese hamster ovary (CHO) cells, HPRT locus ± S9 | 500–25000 μg/mL (+S9); 500-22500 μg/mL (-S9) | 98.7% | Negative | Li (1983a); [MRID 00132681] | Tested S9 from 1-10% Cytotoxic at 22.5 mg/mL (-S9, and with 1,2 and 10% S9) and at 17.5 mg/ml (10% S9) |
| Gene Mutations in Mammalian Cells | Mouse lymphoma L5178Y TK$^{+/-}$ cells ± S9 | 1-5 μl/mL | 55.6% *Glyphosate trimesium salt* | Negative | Majeska (1985b) [MRID 00155530] | Negative with pH adjusted |

[1] Study was cited in Kier and Kirkland (2013).  Supplementary information about the study was provided online including test guideline, test material purity, control chemicals and summary data tables.

## 5.4   *In vitro* Tests for Chromosomal Abnormalities

Cytogenetic assays are tests that can detect chemicals that cause structural chromosomal damage (clastogenicity) or affect the segregation of chromosomes during cell division and alter chromosome number (aneuploidy).  Generally, there are two types of *in vitro* cytogenetic assays that identify chemicals inducing chromosomal abnormalities: chromosomal aberration assays and micronucleus assays. Although chromosomal damage observed in these assays are not considered heritable mutations, chemicals that can induce these types of chromosomal damage can also induce transmissible mutations to daughter cells indicating their role in cancer (Yauk *et al.*, 2015; OECD 2015). In addition, assays such as (fluorescence *in situ* hybridization (FISH)) can provide additional mechanistic information on the formation of chromosomal abnormalities. It is important to note that factors such as cytotoxicity, solubility of the test substance, changes in pH or osmolality play a significant role in the outcome of the assay.  Like other *in vitro* assays, compounds are generally tested in the presence or absence of S9 metabolic activation to determine if metabolism affects the genotoxic activity of the parent compound and to determine if potential genotoxic metabolites are formed.

### 5.4.1   *In vitro* Mammalian Chromosomal Aberration Test

Chromosomal aberration assays detect both structural chromosomal and numerical aberrations. Structural chromosomal aberrations are of two types: chromatid and chromosome and include breaks, deletions and rearrangements (OPPTS 870.5375, OECD 2015).  Numerical chromosomal aberrations generally result from the loss of an entire chromosome mostly due to damage in the spindle fiber resulting in aneuploidy. The types of cells that are most commonly used in chromosomal aberration assays include established cell lines such as Chinese hamster lung (CHL) and CHO cells or primary cell cultures such as human or other mammalian peripheral blood lymphocytes.  In this assay, cells are typically sampled at a time equivalent to the length of approximately 1.5 cell cycles from the start of treatment.  Prior to harvesting, cells are treated with Colcemid® or colchicine to arrest cells at the first metaphase stage of the cell cycle following the beginning of exposure to the test article.  Once harvested, the cells are stained and metaphase cells are evaluated microscopically for various types of chromosome aberrations. (OECD TG 473). Data should be presented in a way that indicates the percentage of affected cells in the population of cells scored (e.g., % cells with aberrations or # aberrant cells/100 cells). Gaps should not be included in the analysis; they are scored but gaps alone in the absence of any additional chromosomal aberrations (e.g., a fragment or a ring chromosome) are not sufficient to define a cell as aberrant.

Glyphosate technical was evaluated in eight chromosomal aberrations tests to determine its potential to induce clastogenic effects *in vitro*. The findings are presented in Table 5.3.  Six of the eight studies were negative.  The two positive studies were both from the same laboratory where, Lioi *et al*. reported an increase in chromosomal aberrations at glyphosate concentrations of 8.5μM and above in bovine lymphocytes (Lioi *et al.*, 1998b) and at all concentrations of glyphosate tested (7-170 μM) in human lymphocytes (Lioi *et al.*, 1998a) following a 72-hour exposure period.  No chromosomal aberrations were observed as a result of exposure to glyphosate in one study using CHO cells (Majeska, 1985c) and in two studies with CHL cells

(Matsumoto, 1995; and Wright, 1996).  Sivikova and Dianovsky (2006) reported no statistically significant increases in chromosomal aberrations in bovine lymphocytes treated with glyphosate (62% pure) at concentrations up 1120 μM following 24-hour exposure. (Sivikova and Dianovsky, 2006).  In studies conducted with human lymphocytes treated with glyphosate (≥95%) for 24-96 hours at concentrations, no increase in chromosomal aberrations were seen at concentrations as high as 6000 μM (Fox, 1998; and Manas *et al*., 2009).

### 5.4.2   *In vitro* Mammalian Micronucleus Test

The *in vitro* micronucleus test can detect the induction of micronuclei in the cytoplasm of cells in the interphase stage of the cell cycle.  Micronuclei form from acentric chromosome fragments (i.e., chromosome fragments lacking a centromere) or when whole chromosomes are unable to migrate to the cellular poles during anaphase prior to cell division. (OECD 487).  Thus, the micronucleus assay can detect both structural and numerical chromosomal changes. It should be noted, however, that additional work is required to distinguish whether induced micronuclei have arisen from a clastogenic versus an aneugenic mechanism, *e.g*., staining micronuclei to detect the presence of kinetochore proteins.  The assay is typically performed with cell lines or primary cell cultures of human or rodent origin.  The assay can be conducted with the addition of cytochalasin B which inhibits cytokinesis resulting in the formation of binucleated cells.  The presence of binucleated cells, indicates that cells have undergone one round of mitosis, a necessary prerequisite for micronucleus formation.

Six studies evaluated glyphosate technical for its potential to induce micronuclei *in vitro* (Table 5.4). Four of the six studies were positive and the remaining two studies were equivocal. In a study by Koller *et al*. (2012), TR146 cells (derived from a human neck metastasis of buccal epithelial origin) were treated for 20 minutes with up to 20 mg/L (~0.12 mM) glyphosate (95%), the authors reported a statistically significant increase in binucleated cells with micronuclei at 15 (~0.09 mM) and 20 (~0.12 mM) mg/L, and also indicated significant apoptosis and necrosis at 20 mg/L.  The short exposure period in this study was unusually short (20 minutes) and was conducted in a tumor cell line that had not been well characterized in regards to its degree of chromosomal instability and DNA damage and repair capacity.  In another study, Roustan *et al*. (2014) reported positive findings +S9 only in CHO cells treated with glyphosate (unknown purity) at 10- 100 μg/mL with little evidence of a dose response over that concentration range.

Two other studies evaluated glyphosate technical in human lymphocytes (Mladinic *et al*., 2009a, 2009b).  These studies used an exposure protocol that is different from the OECD recommendations for the *in vitro* micronucleus assay.  OECD recommends that whole blood or isolated lymphocytes are cultured in the presence of a mitogen (e.g. phytohemagglutinin; PHA) prior to exposure of a test chemical in order to detect micronuclei formed via an aneugenic mechanism.  However, in these two studies, blood cells were exposed to glyphosate for 4 hours, washed, and then treated with PHA to stimulate cell division. Both studies reported a statistically significant increase in micronucleated cells at 580 μg/mL (~3.4 mM), but not at lower concentrations, following 4-hour exposures in the presence of S9.  The frequency of micronucleated cells (+S9) ranged from 11.3 to 28.7 in one study (Mladinic *et al*., 2009a) and 33.3 to 65.2 in the other study (Mladinic *et al*., 2009b) over the 1000-fold concentration range. No statistically significant increases in micronucleated cells were seen in either study in the absence of S9 activation.  When cells were evaluated with vital stains, cells treated with 580

µg/mL showed a significant (p<0.05) increase in the percentage of cells undergoing apoptosis and necrosis compared to the negative controls.

Piesova *et al.* (2004, 2005) conducted two *in vitro* micronucleus studies using glyphosate technical (62%) up to 560 µM in bovine lymphocytes.  In the 2004 study, bovine lymphocytes from two donors were treated for 24 or 48 hours without S9 metabolic activation, and for 2 hours (with and without S9 activation) or 48 hours (-S9) in the 2005 study.  Both studies yielded similar results following 48-hour exposure to glyphosate.  In both cases, the authors reported a weak induction of micronuclei in one donor at 280 µM and at 560 µM in the second donor.  The induction was approximately 2-fold (p < 0.05), but with no clear dose response. No effects on micronuclei induction were seen at the 2- or 24-hour time points; however, with these early time points it is unlikely that one cell division has occurred during or after treatment.

**Table 5.3.  *In vitro* Tests for Chromosome Aberrations in Mammalian Cells- Glyphosate Technical**

| Test/Endpoint | Test System | Concentrations/ Conditions | Test Material Purity | Results | Reference | Comments |
|---|---|---|---|---|---|---|
| *In vitro* Chromosomal Aberration | Chinese hamster ovary (CHO) cells | 4-10 µl/mL, ± S9 | 55.6% *Glyphosate trimesium salt* | Negative | Majeska (1985c) [MRID 00155530] | pH adjusted (7.4-7.6) |
| *In vitro* Chromosomal Aberration | Chinese Hamster lung (CHL) cells | ±S9: 0, 250, 500, 1000 and 2000 µg/mL; 24 and 48 h treatment - S9; 6 h treatment ±S9 harvest 24 h | 95.68% | Negative | Matsumoto (1995) [MRID 50017106] | Decline in pH noted at 500 and 1000 µg/mL. |
| *In vitro* Chromosomal Aberration | Chinese hamster lung (CHL) cells | -S9: 24 & 48-hr exposure: 0-1250 µg/mL; +S9: 0-1250 µg/mL | 95.3% | Negative | Wright (1996) [MRID 49957410] | Excessive decrease in pH >1250 µg/mL |
| *In vitro* Chromosomal Aberration | Bovine lymphocytes | -S9 only: 0, 7, 85 and 170 µM; 72 h exposure | ≥98% | Positive (all concs.) | Lioi *et al.* (1998b) | |
| *In vitro* Chromosomal Aberration | Bovine lymphocytes | ±S9: 0, 28, 56, 140, 280, 560 and 1120 µM; 24 h exposure | 62.0% | Negative | Sivikova and Dianovsky (2006) | Decreased MI and PI at ≥ 560 µM |
| *In vitro* Chromosomal Aberration | Human lymphocytes | ±S9: 100-1250 µg/mL cultures analyzed; 68 & 92 h | 95.6% | Negative | Fox (1998) [MRID 49961803] | Excessive decrease in pH >1250 µg/mL |
| *In vitro* Chromosomal Aberration | Human lymphocytes | -S9 only: 0, 5.0, 8.5, 17.0 and 51.1 µM; 72 h exposure | ≥98% | Positive ≥ 8.5 µM | Lioi *et al.* (1998a) | No significant ↓ in MI observed. |
| *In vitro* Chromosomal Aberration | Human lymphocytes | -S9: 0, 200, 1200 and 6000 µM; 48 h exposure | 96.0% | Negative | Manas *et al.* (2009) | No toxicity observed up to 6000 µM |

[1] Study was cited in Kier and Kirkland (2013).  Supplementary information about the study was provided online including test guideline, test material purity, control chemicals and summary data tables.

CA= chromosomal aberrations, MI= mitotic index, PI= proliferation index.

**Table 5.4.  *In vitro* Tests for Micronuclei Induction in Mammalian Cells- Glyphosate Technical**

| Test/ Endpoint | Test System | Concentrations/ Conditions | Test Material Purity | Results | Reference | Comments |
|---|---|---|---|---|---|---|
| *In vitro* Cytokinesis Block Micronucleus Assay (with FISH analysis) | TR146 cells (human-derived buccal carcinoma cell line) | 10, 15 and 20 mg/L; 20-minute exposure. | 95% | Positive  Statistically significant (p<0.05) increase in MN at 15 and 20 mg/L. | Koller *et al.* (2012) | Apoptosis and necrosis reported at 20 mg/L  Also reported ↑ in NB and NPB |
| *In vitro* Cytokinesis Block Micronucleus Test | CHO-K1 cells | 5 - 100 µg/mL, ±S9 | Not stated | Negative –S9 Positive +S9 at 10-100 µg/mL | Roustan *et al.*, (2014) | No clear dose response |
| *In vitro* Cytokinesis Block Micronucleus Test | Bovine lymphocytes (2 donors) | 0, 28, 56, 140, 280 and 560 µM 24 & 48 h exposure | 62% | 24 h: Negative  48 h: Equivocal  ↑ MN at 280 µM only (donor A) ↑ MN at 560 µM only (donor B) | Piesova, 2004 | No dose-response No significant decrease in CBPI observed. |
| *In vitro* Cytokinesis Block Micronucleus Test | Bovine lymphocytes (2 donors) | 0, 28, 56, 140, 280 and 560 µM; 2 h (±S9) and 48 h (-S9) exposure | 62% | 2 h: Negative  48 h: Equivocal  ↑ MN at 280 µM only (donor A) and at 560 µM only (donor B) | Piesova, 2005 | No dose-response; No significant decrease in CBPI observed. Metabolic activation had no effect on MN formation after 2 h exposure. |

**Table 5.4.  *In vitro* Tests for Micronuclei Induction in Mammalian Cells- Glyphosate Technical**

| Test/ Endpoint | Test System | Concentrations/ Conditions | Test Material Purity | Results | Reference | Comments |
|---|---|---|---|---|---|---|
| *In vitro* Cytokinesis Block Micronucleus Assay (with FISH analysis) | Human lymphocytes (treated with cytochalasin B) | 4h treatment ±S9; 0.5, 2.91, 3.50, 92.8 and 580 µg/mL; harvested 72 h | 98.0% | Negative –S9  Positive +S9, ↑ MN at 580 µg/mL, but not at 0.5-92.8 µg/mL  Also observed ↑ in NB at 580 µg/mL (±S9); ↑ NPB at 580 µg/mL (+S9) | Mladinic *et al.* (2009a) | Cells were exposed to glyphosate and washed prior to treatment with PHA. Authors did not report being blind to treatment. |
| *In vitro* Cytokinesis Block Micronucleus Assay (with FISH analysis) | Human lymphocytes (treated with cytochalasin B) | 4h treatment ±S9; 0.5, 2.91, 3.50, 92.8 and 580 µg/mL | 98% | Negative –S9  Positive +S9 ↑ MN at 580 µg/mL, but not at 0.5 -92.8 µg/mL  ↑ apoptosis and necrosis at 580 µg/mL (-S9); ↑ apoptosis at ≥ 2.91 µg/mL and necrosis at 580 µg/mL (+S9)  ↑ in NB at 580 µg/mL (±S9) and NPB at 580 µg/mL (+S9) | Mladinic *et al.* (2009b) | Cells were exposed to glyphosate and washed prior to treatment with PHA. Authors did not report being blind to treatment.  . |

CBPI= cytokinesis block proliferation index, FISH= fluorescent in situ hybridization; MN= micronuclei; NB= nuclear buds; NPB= nucleoplasmic bridges.

### 5.5   *In Vivo* Genetic Toxicology Tests

### 5.5.1   *In Vivo* Assays for Chromosomal Abnormalities

#### 5.5.1.1      Mammalian Bone Marrow Chromosomal Aberration Assays

The *in vivo* mammalian bone marrow chromosomal assay detects the ability of a chemical to cause structural chromosomal damage in cells in the bone marrow.  The assay is typically conducted in rodents (mouse or rat) and detects both chromosome-type and chromatid-type aberrations.  Chromatid-type aberrations are expressed when a single chromatid break occurs and/or a reunion between chromatids, and chromosome-type aberrations result from damage expressed in both sister chromatids (OPPTS 870.5385).  In this test, animals are exposed (typically via oral route or intraperitoneal injection) and sacrificed at sequential intervals.  Prior to sacrifice, animals are treated with a spindle inhibitor such as colchicine or Colcemid® to arrest cells at metaphase. Chromosome preparations from the bone marrow are stained and scored for chromosomal aberrations. (OPPTS 870.5385). Generally, the optimal time to detect chromosomal aberrations in the bone marrow is 24 hours after treatment.

Three *in vivo* mammalian bone marrow chromosomal assays were conducted with glyphosate technical for regulatory purposes and all were negative (Table 5.8).  In the first study, Sprague Dawley rats were administered glyphosate (98%) at 0 or 1000 mg/kg and the bone marrow was sampled at 6, 12 or 24 hours after dosing.  No significant increase in bone marrow chromosomal aberrations were observed (Li, 1983b).  In the second study, Swiss albino mice were treated twice by oral gavage (24 hours apart) with 0 or 5000 mg/kg glyphosate technical (96.8%) resulting in no significant increase in bone marrow chromosomal aberrations (Suresh, 1994). In a third study conducted with glyphosate trimesium salt, no increase in chromosomal aberrations were seen in the bone marrow of rats treated by oral gavage with up to 188 mg/kg (Majeska, 1982c).

#### 5.5.1.2      Rodent Dominant Lethal Test

Dominant lethal mutations cause embryonic or fetal death.  The induction of a dominant lethal mutation after exposure to a chemical indicates that the test chemical has affected the germinal tissue (sperm at some point in development, from stem cell to spermatocyte).  Dominant lethal effects are considered to result from chromosomal damage (structural or numerical), but may also reflect gene mutations or systemic toxicity (OPPTS 870.5450, OECD 2016).  In this test, male rodents are treated with the test material and mated with (untreated) virgin females.  The female animals are sacrificed at an appropriate time and the uteri are examined to determine the number of implants, and live and dead embryos.  Two dominant lethal studies were identified.  One study was conducted in the rat (Suresh, 1992) where male rats were dosed by oral gavage with glyphosate up to 5000 mg/kg.  The other study (Rodney, 1980) was conducted in male mice treated with up to 2000 mg/kg glyphosate (98.7%) by oral gavage.  No significant increase in dominant lethal mutations were observed in either study (Table 5.5).

### 5.5.1.3          *In Vivo* Mammalian Erythrocyte Micronucleus Assays

The mammalian micronucleus test is the most commonly conducted *in vivo* test to detect clastogenic or aneugenic chemicals.  The test identifies chemicals that induce micronuclei in proerythrocytes (progenitor cells) by assessing micronucleus frequency in immature erythrocytes (polychromatic erythrocytes, PCEs) sampled from the bone marrow or from the peripheral blood (reticulocytes).  This test is typically conducted in mice or rats.  When bone marrow erythroblasts develop into erythrocytes, the main nucleus is extruded following the final cell division (erythrocytes are the only mammalian cell that does not contain a nucleus). Any micronuclei formed after the final cell division may remain in the cytoplasm following extrusion of the main nucleus.  The visualization of micronuclei is facilitated by the lack of a nucleus in these cells (OPPTS 870.5395, OECD 474).  Micronuclei can originate from acentric chromosomes, lagging chromosome fragments, or whole chromosomes; thus, micronuclei are biomarkers of both altered chromosome structure or chromosome number. The assay is based on an increase in the frequency of micronucleated erythrocytes in treated animals, in either peripheral blood samples or bone marrow samples (OPPTS 870.5395).  Additional mechanistic information on the formation of chromosomal abnormalities can be obtained from the incorporation of centromeric and telomeric fluorescent probes (FISH) assay.   According to EPA test guidelines, a single dose of the test substance may be used in this test if the dose is the maximum tolerated dose (MTD), a dose that produces some indication of bone marrow cytotoxicity (e.g., a reduction in the proportion of immature erythrocytes (PCEs) to total erythrocytes by >50%) or a maximum limit dose of 5000 mg/kg.  The routes of administration for this test are typically oral or intraperitoneal injection and generally involve a single administration.

Glyphosate technical has been extensively evaluated for micronuclei induction in *in vivo* studies. Fourteen studies were conducted for regulatory purposes, four were identified from the open literature, and one study was conducted by the U.S. National Toxicology Program (NTP).  This included nine studies with administration of glyphosate by the intraperitoneal (i.p.) route and 10 studies by the oral route.  The findings are presented in Table 5.10.  Of the nine i.p. studies, seven (Costa, 2008; Chruscielska *et al.*, 2000; Durward, 2006; Gava, 2000; Marques, 1999; Rank *et al.*, 1993 and Zaccaria, 1996) were negative.  These studies tested doses as high as 2016 mg/kg (single and double administration) with sampling times at 24- and 48-hours post-dose. Two positive findings were reported when glyphosate technical was administered by i.p. Bolognesi *et al.* (1997) reported a significant increase in micronuclei in the bone marrow of male Swiss CD mice 24 hours after i.p. treatment with 300 mg/kg glyphosate technical (99.9%).  The dose in this study was administered as ½ dose (150 mg/kg) injections 24 hours apart to 3 male mice.  Manas *et al.* (2009) evaluated glyphosate technical (96%) in BALB/c male and female mice (5/sex/dose) administered 50, 100 or 200 mg/kg by two i.p. injections, 24 hours apart.  The results showed a significant increase in micronucleated erythrocytes at 200 mg/kg, but not at 50 or 100 mg/kg.  It should be noted that doses that resulted in the positive responses in these two studies were above the reported i.p. LD50 value (130 mg/kg) for glyphosate in mice (NTP 1992).

Glyphosate technical was also evaluated in nine micronucleus assays with administration by the oral route in mice and one in the rat.  Eight of the nine oral studies in the mouse were negative for micronuclei induction.  The single positive response was seen in female mice treated with

two 5000 mg/kg doses (limit dose), 24 hours apart with bone marrow sampling at 24-hours post-dose (Suresh, 1993b).  No increase was observed at lower doses (50 and 500 mg/kg) in females or at any dose in males.  The eight negative oral studies in mice included single dose administrations of 5000 mg/kg and bone marrow analysis at 24, 48, and/or 72 hours (Jensen, 1991c; Fox and Mackay, 1996) and one or two administrations of glyphosate technical with top doses between 30 and 2000 mg/kg (Honarvar, 2005; Honarvar, 2008; Jones, 1999; and Zoriki-Hosmi, 2007). It should be noted that evaluations at 48 and 72 hours post dose may be too late to detect chemically-induced micronucleated PCEs in the bone marrow as these cells may have already migrated into the peripheral blood.   No significant increase in micronucleated erythrocytes were seen in male or female mice following 13-weeks of dietary (feed) administration of glyphosate technical at doses up to 3393 mg/kg/day (NTP, 1992).  In the single study that evaluated micronuclei induction in rats, glyphosate technical did not induce significant induce micronuclei in CD1 rats treated by oral gavage at doses up to 2000 mg/kg (Flügge, 2009b). When glyphosate trimesium salt was evaluated, no increase in micronuclei induction was seen in mice treated orally up to 1100 and 800 mg/kg in males and females, respectively (Majeska, 1987).

**Table 5.5. *In Vivo* Tests for Chromosomal Aberrations in Mammals- Glyphosate Technical.**

| Test/Endpoint | Test System | Route of Administration | Doses | Test Material Purity | Results | Reference | Comments |
|---|---|---|---|---|---|---|---|
| Bone Marrow Chromosomal Aberration Test | Sprague Dawley rats (males and females) | Intraperitoneal injection; sampled at 6, 12 and 24 h after treatment | 0, 1000 mg/kg (6/sex/dose/sampling time) | 98% | Negative | Li (1983b) [MRID 00132683] | No toxicity observed. A separate study using $^{14}C$-glyphosate showed that glyphosate reaches BM 0.5 h after dosing with ½ life elimination at 7.6 h. Peak BM value was 400 ppm, corresponding to 2000 ppm plasma value. |
| Bone Marrow Chromosomal Aberration Test | Sprague Dawley rats (males and females) Vehicle: distilled water | Oral gavage, sampling after 6, 12, 24, 48 h and 5 d | 0, 21, 63 and 188 mg/kg | 58.5% *Glyphosate trimesium salt* | Negative | Majeska (1982c) [MRID 00132176] | |
| Bone Marrow Chromosomal Aberration Test | Swiss Albino mice (males and females) Vehicle: peanut oil | Oral gavage (2 treatments, 24 h apart); sampling after 24 h (last treatment) | 0, 5000 mg/kg (5/sex/dose) | 96.8% | Negative | Suresh (1994) [MRID 49987408] | Significant (p<0.05) decrease in bw of females at high dose. |
| Rodent Dominant Lethal Test | CD-1 mice Each dosed male mated with 2 females/week for 8 weeks | Oral gavage | 0, 200, 800, and 2000 mg/kg | 98.7% | Negative | Rodwell (1980) [MRID 00046364] | |
| Rodent Dominant Lethal Test | Wistar rat Each dosed male mated with 1 female/week for 10 weeks | Oral gavage | 0, 200, 100 and 5000 mg/kg | 96.8% | Negative | Suresh (1992) [MRID 49987404] | |

**Table 5.6.  In Vivo Tests for Micronuclei Induction in Mammals- Glyphosate Technical.**

| Test/Endpoint | Test System | Route of Administration | Doses | Test Material Purity | Results | Reference | Comments |
|---|---|---|---|---|---|---|---|
| Bone Marrow Micronucleus Test | Swiss CD1 mice (males only) | Intraperitoneal injection; 2 injections of half the dosage of 300 mg/kg 24 h apart; sampling at 6 and 24 h | 0, 300 mg/kg (3/dose) | 99.9% | Positive<br><br>Stat significant increase in MN at 24 h | Bolognesi *et al.* (1997) | Material and methods indicate 3 animals/dose; however, Table 1 of article indicates 4 animals were evaluated. |
| Bone Marrow Micronucleus Test | Balb C mice (males and females) Vehicle: Saline | Intraperitoneal Injection (two injections, 24 h apart); sampling after 24 h (last treatment) | 0, 50, 100, and 200 mg/kg (5/sex/dose) | 96% | Positive<br><br>↑MN at 200 mg/kg, but not at 50 or 100 mg/kg | Manas *et al.* (2009) | No significant signs of toxicity observed. |
| Bone Marrow Micronucleus Test | C3H mice (males only) Vehicle: water | Intraperitoneal Injection (single treatment); sampling after 24, 48 and 72 h | 0, 300 mg/kg | Not reported | Negative | Chruscielska *et al.* (2000) | |
| Bone Marrow Micronucleus Test | Swiss Albino mice (males and females) Vehicle: corn oil | Intraperitoneal Injection (2 treatments, 24 h apart); sampling after 24 h (last treatment) | 0, 15.62, 31.25, and 62.5 mg/kg (5/sex/dose) | 980 g/kg Glyphosate technical | Negative# | Costa (2008)[1] | OECD guideline 474<br><br>#Was not tested up to limit dose and did not demonstrate that compound was tested up to toxic dose.  No mention of BM toxicity or clinical signs. |

**Table 5.6.  In Vivo Tests for Micronuclei Induction in Mammals- Glyphosate Technical.**

| Test/Endpoint | Test System | Route of Administration | Doses | Test Material Purity | Results | Reference | Comments |
|---|---|---|---|---|---|---|---|
| Bone Marrow Micronucleus Test | Crl:CD-1TM(ICR) BR mice (males only[1]) Vehicle: PBS | Intraperitoneal Injection (single treatment); sampling after 24 and 48 h (high dose only) | 0, 150, 300 and 600 mg/kg (7/dose) | 95.7% | Negative | Durward (2006) [MRID 49957411] | Clinical signs reported at ≥ 150 mg/kg. Significant ↓ in %PCEs reported at 24 h in 600 mg/kg group. ↑in MN PCEs observed at 600 mg/kg (1.9± 0.7 vs. 1.0 ± 1.2 control; p<0.05), at 24 h, but not 48 h, within historical control range. |
| Bone Marrow Micronucleus Test | Swiss Albino mice (males and females) Vehicle: water | Intraperitoneal Injection (2 treatments, 24 h apart); sampling after 24 h (last treatment) | 0, 1008, 2016, and 3024 mg/kg 5/sex/dose | 612.7 g/kg (glyphosate technical Nufarm) | Negative | Gava (2000)[1] | LD50 was 4032 mg/kg Mortality observed in 1 animal at high dose (only 4 m/f scored for MPCEs). No effect on PCE/NCE. |
| Bone Marrow Micronucleus Test | Swiss Albino mice (males and females) Vehicle: water | Intraperitoneal Injection (2 treatments, 24 h apart); sampling after 24 h (last treatment) | 0, 187.5, 375 and 562.5 mg/kg 5/sex/dose | 954.9 g/kg (glyphosate technical Nufarm) | Negative | Marques (1999) [MRID 49957412] | LD50 was 750 mg/kg No significant signs of toxicity observed in main study |
| Bone Marrow Micronucleus Test | NMRI-Bom mice | Intraperitoneal Injection (single treatment); sampling after 24 h (all doses) and 48 h (150 and 200 mg/kg) | 0, 150, and 200 mg/kg (5/sex/dose) | glyphosate isopropyla mine (purity not specified) | Negative | Rank *et al.* (1993) | |

**Table 5.6.  In Vivo Tests for Micronuclei Induction in Mammals- Glyphosate Technical.**

| Test/Endpoint | Test System | Route of Administration | Doses | Test Material Purity | Results | Reference | Comments |
|---|---|---|---|---|---|---|---|
| Bone Marrow Micronucleus Test | Swiss albino mice (males and females) | Intraperitoneal Injection (2 treatments, 24 h apart); sampling after 24 h (last treatment) | 0, 68, 137, and 206 mg/kg ( | 360 g/L | Negative | Zaccaria (1996) [MRID 49961501] | Doses selected were reported as corresponding to 25, 50 and 75% $LD_{50}$ |
| Bone Marrow Micronucleus Test | CD-1 mice (males and females) Vehicle: saline | Oral gavage (single treatment); sampling after 24 and 48 h | 0, 5000 mg/kg 5/sex/dose | 95.6% | Negative | Fox and Mackay (1996) [MRID 44320619] | No significant signs of toxicity observed |
| Bone Marrow Micronucleus Test | NMRI mice (males and females) Vehicle: PEG 400 | Oral gavage (single treatment); sampling after 24 and 48 h (high dose only) | 0, 500, 1000, and 2000 mg/kg 5 sex/dose | 97.73% | Negative | Honarvar (2005)[1] | OECD guideline 474 No significant signs of toxicity observed |
| Bone Marrow Micronucleus Test | NMRI mice (males only) Vehicle: 0.5% carboxymethyl-cellulose | Oral gavage (single treatment); sampling after 24 and 48 h (high dose only) | 0, 500, 1000, and 2000 mg/kg (5/dose) | 99.1% | Negative | Honarvar (2008) [MRID 49961802] | No significant signs of toxicity observed |
| Bone Marrow Micronucleus Test | NMRI mice (males and females) Vehicle: 0.5% carboxymethyl-cellulose | Oral gavage (single treatment); sampling after 24, 48 and 72h | 0, 5000 mg/kg; 5/sex/dose | 98.6% | Negative | Jensen (1991c) [MRID 49961503] | No significant signs of toxicity observed |
| Bone Marrow Micronucleus Test | CD-1 mice (males only[1]) Vehicle: water | Oral gavage single treatment); sampling after 24 and 48 h | 0, 2000 mg/kg 5/dose | 59.3% potassium glyphosate salt | Negative | Jones (1999)[1] | OECD guideline 474 No significant signs of toxicity observed |
| Bone Marrow Micronucleus Test | Swiss albino mice; (males and females) Vehicle: peanut oil | Oral gavage (2 treatments, 24 h apart); sampling | 0, 50, 500, 5000 mg/kg 5/sex/dose | 96.8% glyphosate acid | Positive in females at 5000 | Suresh (1993b) [MRID 49987407] | No significant signs of toxicity observed |

**Table 5.6.  In Vivo Tests for Micronuclei Induction in Mammals- Glyphosate Technical.**

| Test/Endpoint | Test System | Route of Administration | Doses | Test Material Purity | Results | Reference | Comments |
|---|---|---|---|---|---|---|---|
| | | after 24 h (last treatment) | | mg/kg only. Negative in males at all doses | | | |
| Bone Marrow Micronucleus Test | Swiss mice (males only) Vehicle: corn oil | Oral gavage (2 treatments, 24 h apart); sampling after 24 h (last treatment) | 0, 8, 15 and 30 mg/kg (6/dose) | 980.1 g/kg | Negative | Zoriki Hosomi (2007) [MRID 50000901] | OECD guideline 474 No significant signs of toxicity observed |
| Bone Marrow Micronucleus Test | CD-1 mice (males and females) Vehicle:  distilled water | Oral gavage, Sampling 24, 48 and 72 h after treatment | Males: 0, 700, 900 and 1100 mg/kg Females: 0, 400, 600 and 800 mg/kg | 55.3% *Glyphosate trimesium salt* | Negative | Majeska (1987) [MRID 40214004] | |
| Bone Marrow Micronucleus Test | B6CF3 Mice (males and females) | Oral (dietary). MN assay conducted following 13-week feed study. | 0, 205/213, 410/421, 811/844, 1678/1690 and 3393/3393 mg/kg (m/f) (10/sex/dose) | 99% | Negative | NTP (1992) | |
| Bone Marrow Micronucleus Test | CD Rats (males and females) Vehicle: 0.8% hydroxypropylmethyl cellulose | Oral gavage (single treatment); sampling after 24 and 48 h (high dose only) | 0, 500, 1000, and 2000 mg/kg (5/sex/dose) | 98.8% | Negative | Flügge (2009b)[1] | OECD guideline 474 No significant signs of toxicity observed |

[1] Study was cited in Kier and Kirkland (2013).  Supplementary information about the study was provided online including test guideline followed, test material purity, control chemicals and summary data tables.
[2] Only males tested; report indicated that there was no difference between sexes seen in range finding study.
CA= chromosomal aberrations, MPCE= micronucleated polychromatic erythrocytes, NCE= normochromatic erythrocytes, PCE=polychromatic erythrocytes.

**5.6**     **Additional Genotoxicity Assays Evaluating Primary DNA Damage**

There are a number of genotoxicity assays that evaluate primary DNA damage, but do not measure the consequence of the genetic damage (*i.e.,* mutation or chromosomal damage). As discussed in the Guidance Document on Revisions to OECD Genetic Toxicology Test Guidelines (OECD 2015), the endpoints measured in primary DNA damage tests such as DNA adducts, comet assay, or unscheduled DNA synthesis may lead to cell death or may initiate DNA repair, rather than a mutation. These types of assays can, however, provide mechanistic information when interpreting positive findings in other genotoxicity tests or when determining whether a chemical is acting through a mutagenic mode of action. Additionally, indirect mechanisms of DNA damage such as oxidative DNA damage can be detected by these test systems. Oxidative damage results from oxidative stress, which occurs when there is a disturbance in the balance between the production of reactive oxygen species (ROS) and antioxidant defense systems. Normal cellular metabolism is a source of endogenous reactive oxygen species that accounts for background levels of oxidative damage in normal cells. Some types of oxidative damage are repairable while others lead to serious consequences in the cell. (Cooke et al, 2003). The various assays evaluating primary DNA damage in glyphosate technical are presented in Table 5.7. Details of the findings are discussed below.

Glyphosate technical is not electrophilic and is not considered to be DNA-reactive. In a study to evaluate the potential for glyphosate to directly interact with DNA, Peluso *et al.* (1998) reported that glyphosate technical did not form DNA adducts in mice when tested up to 270 mg/kg via i.p. Bolognesi *et al.* (1997) reported an increase in the oxidative damage biomarker 8-hydroxydeoxyguanosine (8-OHdG) in the liver 24 h after i.p. injection of 300 mg/kg in mice. No increase in 8-OHdG was seen in the kidney with glyphosate technical. The dose in this study was high (300 mg/kg) for an i.p. injection and within the i.p. LD$_{50}$ range (134- 545 mg/kg) that has been reported elsewhere (WHO, 1994).

The comet assay, also known as single cell gel electrophoresis (SCGE), is a sensitive and rapid method to detect DNA strand breaks in individual cells. In this assay, individual cells are embedded in agarose. The cells are then lysed (which digests the cellular and nuclear membranes) and the DNA is allowed to unwind under alkaline or neutral conditions. During electrophoresis, chromatin (which is in a supercoiled state) that has undergone steric relaxation due to DNA damage migrates away from the nucleoid (nucleus) toward the anode, yielding images that resemble a comet. The intensity of the comet tail relative to the comet head reflects the amount of DNA breakage (Tice *et al.*, 2000; Collins *et al.*, 2008). The comet assay can detect single and double strand breaks resulting from direct interactions with DNA, alkali labile sites, or transient DNA breaks resulting during DNA excision repair. These types of strand breaks may be, (a) repaired with no persistent effect, (b) be lethal to the cell or (c) be fixed as a mutation (OECD TG 489). DNA strand breaks in the comet assay can be measured by endpoints such as percent tail DNA (also referred to as % tail intensity), tail length, and tail moment. However, % tail DNA is the recommended metric for evaluating and interpreting results using this assay (OECD TG 489).

The five studies that evaluated glyphosate technical using the comet assay are summarized in Table 5.12. Two of the studies were conducted using tumor cell lines. Koller *et al.* (2012) reported positive comet effects (increased tail intensity) in a human buccal carcinoma cell line (TR146) following a 20-minute treatment with $\geq 20$ mg/L (~0.118 mM) glyphosate. Although no evidence of cytotoxicity was reported in this study, the authors did report an increase in apoptosis and necrosis at the same concentrations ($\geq 20$ mg/L) when the same cell line was tested for *in vitro* micronuclei induction (discussed previously). In a study using Hep-2 cells (presumably a HeLa cell derivative), Manas *et al.* (2009) reported a statistically significant increase in mean tail length, and tail intensity at all concentrations (3.0-7.5 mM) tested. In a comet study conducted on human lymphocytes, Alvarez-Moya *et al.* (2014) reported significant increases in tail length only (but not % tail DNA) following treatment with glyphosate concentrations of 0.7-700 μM. Mladinic *et al.* (2009a) evaluated DNA damage in non-dividing human lymphocytes (±S9) following treatment from 0.5 to 580 μg/mL using the standard alkaline comet method and a modified comet method that detects DNA damage due to oxidative damage (human 8-hydroxyguanidine DNA-glycosylase, hOGG1 comet method). In this study, the authors reported statistically significant increases in tail intensity at 3.5 μg/mL and higher in the absence of S9, with significance only at 580 μg/mL (~3.4 mM) in the presence of S9 using the alkaline method. This concentration also resulted in increased apoptosis and necrosis as well as an increase in plasma total antioxidant capacity (TAC) and changes in plasma lipid peroxidation (thiobarbituric reactive substances, TBARs); however, only a dose-related increase in tail length (not % tail DNA) was observed at 580 μg/mL (+S9) using the hOGG1 method. When the Manas *et al.* (2013) evaluated blood and liver cells following a 14-day drinking water study in mice treated with 40 and 400 mg/kg/day glyphosate, significant increases in tail intensity, tail length and tail moment were reported were observed at both doses in both tissues (except for DNA tail intensity in liver at 40 mg/kg); however, there were no substantial effects on oxidative stress measurements suggesting that DNA damage reported may not be due to oxidative damage.

The Unscheduled DNA Synthesis (UDS) test with mammalian liver cells *in vitro* identifies substances that induce DNA repair after excision and removal of a segment of damaged DNA. The test is typically conducted in liver cells, which have relatively few cells in the S-phase of the cell cycle. The assay measures the incorporation of radiolabeled nucleotide [$^3$H]-thymidine into DNA during the repair process in non-S phase cells. (OPPTS 870.5555). Substances that produce either a statistically significant dose-related increase or statistically significant and reproducible increase in $^3$H-TdR incorporation in at least one test point are considered to be positive in this test. A UDS study that evaluated glyphosate technical in rat primary hepatocytes was negative (Williams, 1978). Glyphosate technical was also negative in a DNA repair test conducted in bacteria (Rec-A test) (Shirasu, 1978).

In an alkaline elution assay, which detects single strand DNA breaks, Bolognesi *et al.* (1997) reported an increase in single strand breaks (i.e. increased DNA elution rate) in the liver and kidney 4 hours after a single i.p. injection of 300 mg/kg. The elution rate returned to control levels at 24 hours. Glyphosate technical was also negative in a DNA repair test conducted in *Bacillus subtilis* H17 (rec$^+$) and M45 (rec$^-$) bacterial Rec-A test (Shirasu, 1978).

Finally, the sister chromatid exchange (SCE) test is an assay that can measure the consequence of primary DNA damage.  The mechanism(s) of action for chemical induction of SCE is unclear.  The SCE assay detects the exchange of DNA between two sister chromatid arms within a single chromosome.  The assay can be performed *in vitro* or *in vivo*.  Following exposure, cells/animals are treated with bromodeoxyuridine (BrdU) to allow for the differentiation of the two sister chromatids (harlequin staining) and prior to harvest are treated with a spindle inhibitor to accumulate cells in metaphase.  The chromosome preparations are then stained and analyzed for SCEs (OPPTS 870.5900, 870.5915).  The SCE studies that evaluated glyphosate technical are also presented in Table 12.  Positive SCE findings were reported in all four studies; two evaluating bovine lymphocytes (Lioi, 1988b, Sivikova and Dianovksy, 2006) and two studies evaluating human lymphocytes (Lioi, 1988a; Bolognesi *et al.*, 1997).  In all four studies the induction did not demonstrate a clear dose response.

Additionally, although it is recognized that mechanisms other than genotoxicity may be involved in cell transformation, glyphosate trimesium salt was evaluated in the Balb/3T cell transformation assay (an *in vitro* tumor formation assay) and was negative up to 5.0 mg/ml (Majeska, 1982b).

**Table 5.7 Assays for Detecting Primary DNA Damage- Glyphosate Technical.**

| Test/Endpoint | Test System | Route of Administration | Doses/Concentrations | Test Material Purity | Results | Reference | Comments |
|---|---|---|---|---|---|---|---|
| DNA Adducts $^{32}$P-postlabeling | Swiss CD1 mice (males and females) Liver and kidney evaluated | Intraperitoneal injection; 24 h exposure | 0, 130 and 270 mg/kg | Not reported | Negative | Peluso *et al.* (1998) | |
| DNA oxidative damage: 8-OHdG formation | Swiss CD-1 mice (males) liver and kidney evaluated | Intraperitoneal injection (single dose); sampling 4 and 24 h after injection | 0, 300 mg/kg (3/dose) | 99.9% | Kidney: negative  Liver: positive (24 h) | Bolognesi *et al.* (1997) | |
| Single-cell gel electrophoresis (SCGE) assays- Comet assay | TR146 cells (human-derived buccal epithelial cell line). | NA (*in vitro*) | -S9: 10-2000 mg/L; 20-minute exposure. | 95% | Positive  Increased DNA migration at >20 mg/L | Koller *et al.* (2012) | Also measured multiple cellular integrity parameters to assess cytotoxicity.  No clear evidence of cytotoxicity seen except for increase in enzyme activity (indicative of membrane damage) in LDHe (extracellular lactate dehydrogenase) assay at >80 mg/L. No mention of monitoring pH |
| Single-cell gel electrophoresis (SCGE) assays- Comet assay | Hep-2 cells | NA (*in vitro*) | 0, 3, 4.5, 6, 7.5, 9, 12 and 15 mM | 96% | Positive  Stat. significant increase in mean tail length, and tail intensity at all concs. | Manas *et al.* (2009) | The authors did not report a source for the Hep-2 cells.  The agency presumes that this is a HeLa derived cervical carcinoma cell line. |

**Table 5.7 Assays for Detecting Primary DNA Damage- Glyphosate Technical.**

| Test/Endpoint | Test System | Route of Administration | Doses/ Concentrations | Test Material Purity | Results | Reference | Comments |
|---|---|---|---|---|---|---|---|
| Single-cell gel electrophoresis (SCGE) assays- Comet assay | Human lymphocytes | NA (*in vitro*) | 0, 0.7, 7, 70, 700 µM | 96% | Positive at all doses (increase in tail length only) | Alvarez-Moya *et al.*, (2014) | Issues were identified with this study resulting in a low quality ranking. These include: 1) blood was washed with PBS and then held at 4º C for an indeterminate amount of time before exposure to glyphosate. (2) Cells were treated for 20 hours at room temperature. (3) The same amount of damage was reported across 2 orders of magnitude concentration. |
| Single-cell gel electrophoresis (SCGE) assays- Comet assay | Human lymphocytes; ±S9 Alkaline and hOOG1 Comet assays performed | NA (*in vitro*) | 0, 0.5, 2.91, 3.5, 92.8 and 580 µg/mL | 98% | Positive ±S9 | Mladinic *et al.* (2009a) | The alkaline comet assay -S9: ↑ in mean tail length at 580 µg/mL and ↑ in tail intensity at ≥ 3.5 µg/mL). +S9: ↑ DNA tail length at ≥3.5 µg/mL. Tail intensity ↑ only at 580 µg/mL<br><br>hOOG1 comet assay: -S9 no effect on tail length, ↑tail intensity only at 3.50 µg/mL +S9: ↑ tail length at 580 µg/mL, no effect on tail intensity compared to controls at any conc. |

**Table 5.7 Assays for Detecting Primary DNA Damage- Glyphosate Technical.**

| Test/Endpoint | Test System | Route of Administration | Doses/ Concentrations | Test Material Purity | Results | Reference | Comments |
|---|---|---|---|---|---|---|---|
| Single-cell gel electrophoresis (SCGE) assays- Comet assay with oxidative stress measures | Balb/C mice; evaluated blood and liver | Drinking water (14 days) | 0, 40, and 400 mg/kg | 96% | Positive<br><br>Blood and liver at both doses | Manas *et al.* (2013) | Only minor effects seen on oxidative stress measurements (TBARs, SOD, CAT) |
| Sister Chromatid Exchange (SCE) | Bovine lymphocytes (3 donors) | NA (*in vitro*) | -S9:  0, 17, 85 and 170 µM; 72 h exposure | ≥98% | Positive Significant (p>0.05) increase in SC/cell at all concentrations | Lioi (1998b) | 1.8-, 2.1-, 1.6-fold increases, respectively |
| Sister Chromatid Exchange (SCE) | Human lymphocytes | NA (*in vitro*) | -S9: 0, 5, 8.5, 17 and 51 µM; 72 h exposure | ≥98% | Positive Significant (p>0.05) increase in SCE/cell at ≥ 8.5 µM | Lioi (1998a) | 1.9-, 2.8-, and 2.6-fold increase at 8.5, 17 and 51 µM, respectively |
| Sister Chromatid Exchange (SCE) | Human lymphocytes | NA (*in vitro*) | -S9: 0, 0.33, 1,3 and 6 mg/mL; 72 h exposure | 99.9% | Positive | Bolognesi *et al.* (1997) | Very limited information was provided on the methods used in this paper.  Authors report a dose –dependent increase in SCE frequency; however, no statistical analysis for dose response was reported.  Data presented graphically with no error bars. |
| Sister Chromatid Exchange (SCE) | Human lymphocytes | NA (*in vitro*) | 28, 56, 140, 280, 560 and 1120 µM; 24 h exposure ±S9 | 62% | Positive | Sivikova and Dianovsky (2006) | The increases in SCEs observed did not show a clear concentration related increase across a 40-fold increase in the concentrations tested |

**Table 5.7 Assays for Detecting Primary DNA Damage- Glyphosate Technical.**

| Test/Endpoint | Test System | Route of Administration | Doses/ Concentrations | Test Material Purity | Results | Reference | Comments |
|---|---|---|---|---|---|---|---|
| Alkaline elution assay- DNA single strand breaks | Swiss CD-1 mice (males) liver and kidney evaluated | Intraperitoneal injection (single dose); sampling 8 and 24 h after injection | 0, 300 mg/kg (3/dose) | 99.9% | Positive (Increased elution rate) at 4 hours in liver and kidney<br><br>At 24 h, elution rate returned to control levels | Bolognesi *et al.* (1997) | Return to control values may indicate DNA repair or reflect rapid elimination of compound |
| DNA Repair Test (Rec-A test) | *B. subtilis* H17 (rec+) and M45 (rec-) | NA (*in vitro*) | 20-2000 µg/disk | 98.4% | Negative | Shirasu (1978) [MRID 00078619] | |
| Unscheduled DNA synthesis (DNA repair) | F-344 rat primary hepatocytes | NA (*in vitro*) | 0, 0.0125, 0.0625, 0.125, 0.6.5, 1.25, 12.5, 125 µg/mL | 98% | Negative | Li and Long (1988) | |
| Cell Transformation Assay | BALB/3T cells | NA (*in vitro*) | 0.313-5.0 mg/mL | 90% *Glyphosate trimesium salt* | Negative | Majeska (1982b) [MRID 00126616] | |

h- hour; CAT= catalase, G6PD= glucose 6-phosphate dehydrogenase, NA= not applicable, hOOG1 = TBARs= thiobarbituric acid reactive substances, SOD= superoxide dismutase

## 5.7    Summary and Discussion

The genotoxic potential of glyphosate has been extensively investigated using a variety of test systems and genetic endpoints.  This assessment focuses only on test systems that the agency considered relevant for assessing genotoxic risks in humans.  The totality of the genetic toxicology information was evaluated using a weight of evidence approach to determine the genotoxic potential of glyphosate.  This involves the integration of *in vitro* and *in vivo* results as well as an overall evaluation of the quality, consistency, reproducibility, magnitude of response, dose-response relationship and relevance of the findings. In the weight of evidence analysis, studies evaluating endpoints that measured gene mutations and chromosomal aberrations (i.e. permanent DNA damage) were given more weight than endpoints reflecting DNA events that may be transient or reversible such as primary DNA damage (*e.g.,* comet assays).  *In vivo* studies in mammals were given the greatest weight and more weight was given to doses and routes of administration that were considered relevant for evaluating genotoxic risk based on human exposure to glyphosate.  Also, since the molecular mechanisms underlying the observation of SCEs are unclear and thus, the consequences of increased frequencies of SCEs are unclear, the data from this test were given low weight in the overall analysis.  A summary of the various lines of evidence of considered in the weight of evidence evaluation for the genotoxic potential of the active ingredient glyphosate is presented below.

Evidence of primary DNA damage

Glyphosate technical is not considered to be electrophilic and did not induce DNA adducts in the liver or kidney at an i.p. dose of 270 mg/kg.  However, evidence of DNA strand breaks was reported in a number mammalian cell studies using the comet assay.  Additionally, transient increases in alkali labile sites in the liver and kidney of mice and an induction of 8-OHdG in DNA were seen in the livers of mice following i.p. injections with 300 mg/kg glyphosate.  These effects were seen at high doses for the i.p. route in mice (LD$_{50}$ for mouse =130 mg/kg; NTP, 1992).  However, due to technical limitations identified in a number of these studies (e.g. use of cancer cell lines that have not been well-characterized, atypical exposure protocols and no indication of blind to treatment), caution should be exercised in interpreting the results.

*In vitro* mutations

Glyphosate technical was negative in all 39 studies for mutagenicity in bacteria.  In the four studies that tested for gene mutations in mammalian cells *in vitro,* no increase in mutations were observed.

*In vitro* chromosomal alterations

Mixed results were observed in studies evaluating *in vitro* chromosomal alterations with glyphosate treatment.  Three SCE studies reported positive findings (Lioi, 1998a, b; Bolognesi *et al*., 1997) bovine and human lymphocytes.  As stated previously, low weight is given to SCE results in the overall analysis given the uncertainty regarding the consequence of increases in the frequencies of SCEs. The SCE responses were weak and not concentration dependent.   Eight of the 10 studies measuring *in vitro* chromosomal aberrations were negative.  The two positive

findings were reported by Lioi *et al.*, one study was conducted with bovine lymphocytes and the other with human lymphocytes. The authors reported positive findings in these studies at concentrations much lower than four other studies that reported negative results using the same cell types. Additionally, in both studies, Lioi *et al.* used an atypical exposure protocol of 72 hours which is very long for analyzing one round of mitosis. Furthermore, in both studies, nearly the same level effect for aberration frequency and percent of cells with aberrations were observed for the same concentrations of glyphosate and the two other chemicals tested in those experiments.

Four of the six studies evaluating micronuclei induction *in vitro* were positive and two showed equivocal results. Three of the positive responses required S9 activation, two conducted with human lymphocytes and one conducted with CHO cells. The remaining positive micronucleus study was conducted using a TR146 cells which is a tumor cell line derived from human buccal mucosa. The authors state that this cell line had not been previously used for genotoxicity testing. It is difficult to interpret any genotoxicity findings conducted in a tumor cell line that has not been well-characterized regarding its DNA damage response and repair capacity, and its degree of chromosomal instability.

Glyphosate was negative in all three L5178Y mouse lymphoma cell studies which may detect chromosomal damage in addition to mutations.

<u>Mammalian *in vivo* chromosomal alterations</u>

All three *in vivo* mammalian studies evaluating chromosomal aberrations with glyphosate technical were negative. Two studies were conducted in rats (i.p. and oral) and one was conducted in mice (oral). In addition, glyphosate was also negative in a rodent dominant lethal test. Glyphosate was negative in 15 of the 19 bone marrow micronucleus studies evaluated. In two of the positive studies, glyphosate technical was administered by i.p. injection. In these studies, the authors reported positive findings at doses of 200-300 mg/kg. Based on the available ADME data for glyphosate, assuming 30% oral absorption, an oral dose of ~700-1000 mg/kg would be needed to achieve a dose of 200-300 mg/kg in the blood. Seven other i.p. studies in mice reported no increase in micronuclei induction at doses up to 3000 mg/kg. The remaining positive finding was reported in an oral gavage study in mice where an approximately 2-fold increase in micronuclei were reported in females only at a dose of 5000 mg/kg, which is considerably higher than the current guideline recommended limit dose of 2000 mg/kg. The effect was not seen in the 7 other oral gavage studies in mice when glyphosate was tested at similar doses. In addition, glyphosate was negative for micronuclei induction following a 13-week dietary study with a dose up to approximately 3000 mg/kg/day. A negative finding was also reported in the only study that evaluated *in vivo* micronuclei induction in the rat using doses up to 2000 mg/kg.

In a meta-analytic review of micronuclei frequency across mammalian and non-mammalian species (primarily fish, amphibians, reptiles and plants), Ghisi *et al.* (2016), not surprisingly, reported that different responses were observed when comparing mammalian results to phylogenetically distant non-mammalian species for micronuclei induction. Their analyses included most, but not all, of the mammalian studies that the agency evaluated and determined to

be negative for micronuclei induction. The authors reported a statistically significant increase in micronuclei by the i.p. route across the studies in the data set they considered; however, when glyphosate was administered by the oral route (which is the most physiologically relevant route for human exposure to glyphosate), no significant difference was observed.

<u>Conclusion for Glyphosate</u>

The overall weight of evidence indicates that there is no convincing evidence that glyphosate induces mutations *in vivo* via the oral route.  When administered by i.p. injection, the micronucleus studies were predominantly negative.  In the two cases where an increase in micronuclei were reported via this route, the effects occurred above the reported i.p. LD50 for mice and were not observed in other i.p. injection studies at similar or higher doses.  While there is limited evidence genotoxic for effects in some *in vitro* experiments, *in vivo* effects were given more weight than *in vitro* effects particularly when the same genetic endpoint was measured, which is consistent with current OECD guidance.  The only positive findings reported *in vivo* were seen at relatively high doses that are not relevant for human health risk assessment.

## 6.0     Data Integration & Weight-of-Evidence Analysis Across Multiple Lines of Evidence

### 6.1     Background

In 2010, OPP developed a draft "Framework for Incorporating Human Epidemiologic & Incident Data in Health Risk Assessment" which provides the foundation for evaluating multiple lines of scientific evidence (U.S. EPA, 2010).  In 2016, a final version of the framework was published. OPP's framework is consistent with updates to the World Health Organization/International Programme on Chemical Safety MOA/human relevance framework, which highlights the importance of problem formulation and the need to integrate information at different levels of biological organization (Meek et al, 2014).

One of the key components of the agency's framework is the use of modified Bradford Hill Criteria (Hill, 1965) like those described in the 2005 Guidelines for Carcinogen Risk Assessment.  These criteria are used to evaluate the experimental support considers such concepts as strength, consistency, dose response, temporal concordance and biological plausibility in a weight-of-evidence analysis.

### 6.2     Dose-Response and Temporal Concordance

Given the lack of consistent positive findings particularly at doses < 1000 mg/kg/day across the lines of evidence, lack of mechanistic understanding, and lack of biological activity in mammalian systems to the parent compound glyphosate, there are few data to assess key events in the biological pathway and any associated temporal or dose concordance.  Temporal concordance can be assessed using the experimental animal studies and epidemiological studies that evaluated exposure prior to outcomes.  Similarly, dose concordance can be assessed using findings of apical outcomes in experimental animal studies, as well as epidemiological studies that utilize exposure metrics that are stratified by the number of exposure days.

A prospective cohort study is designed to collect exposure information prior to the development of cancer.  As such, exposure is known to occur before the outcome.  In De Roos *et al.* (2005), a prospective cohort study, no association was observed between glyphosate exposure and all cancer outcomes evaluated in the AHS cohort.  Although the median follow-up time following recruitment into the cohort was approximately 7 years in De Roos *et al.* (2005), an updated analysis of the AHS cohort has been recently published (Andreotti *et al.*, 2017), which included an extended follow-up period of 17.5 years and also did not report an association between glyphosate exposure and all cancer outcomes evaluated.

Two case-control studies evaluating the risk of NHL (Eriksson *et al.*, 2008 and McDuffie *et al.*, 2001) observed increased effect estimates in the highest exposure categories analyzed.  Eriksson *et al.* (2008) found a greater effect estimate for subjects with >10 days (based on the median days of exposure among controls) and >10 years of exposure (for latency analysis) when compared to subjects with ≤10 days and 1-10 years of exposure, respectively; however, this analysis did not appear to adjust for co-exposures to other pesticides.  By dividing the total number of exposed cases and controls using these exposure metrics, wider confidence intervals were observed due to smaller sample sizes, which reduces the reliability of the results to demonstrate a true

association. This may indicate that a longer follow-up time is needed to detect the risk for NHL; however, given the latency analysis of NHL was limited to Eriksson *et al.* (2008) and lack of NHL latency understanding in general, further studies are needed to determine the true latency of NHL. McDuffie *et al.* (2001), stratifying based on the average number of days per year of exposure, observed similar effect estimates in the lower exposure category (>0 and ≤2 days/year) while a greater effect estimate was observed in the highest exposure category (>2 days/year). The results from these two case-control studies conflict with the results observed in the cohort study (De Roos *et al.*, 2005; Andreotti *et al.*, 2017), where no dose-response was seen across three exposure categories (stratified by tertiles); however, the case-control studies did not adjust for co-exposure to other pesticides. It is also difficult to make conclusions regarding dose-response with only two exposure categories used for the analyses by Eriksson *et al.* (2008) and McDuffie *et al.* (2001). It should also be noted that these analyses combine all NHL subtypes, which may have etiological differences (Morton *et al.*, 2014). Although some studies did provide effect estimates for subtypes, as stated in Section 3.5.2, these were not considered in the current evaluation due to the limited sample sizes. At this time, there are no data available to evaluate dose-response for NHL subtypes.

With respect to animal carcinogenicity studies, key events in a MOA/AOP are evaluated to confirm that they precede tumor appearance. This temporal concordance evaluation cannot be conducted for glyphosate since a MOA/AOP has not been established. It was noted that no preneoplastic or related non-neoplastic lesions were reported in any of the animal carcinogenicity studies to support any observed tumors. Furthermore, genotoxicity assays did not support a direct mutagenic MOA. While there is limited evidence of genotoxicity in some *in vitro* endpoints, multiple *in vivo* studies do not support a genotoxic risk at relevant human exposure levels.

## 6.3    Strength, Consistency, and Specificity

A large database is available for evaluating the carcinogenicity potential of glyphosate. Across animal carcinogenicity and genotoxicity studies, results were consistent. For epidemiological studies, only one or two studies were available for almost all cancers investigated. The largest number of studies was available investigating NHL; however, there were conflicting results across studies.

In epidemiological studies, there was no evidence of an association between glyphosate exposure and solid tumors, leukemia, and HL. This conclusion is consistent with those recently conducted by IARC, EFSA, and JMPR. Furthermore, the available studies do not link glyphosate exposure to multiple myeloma.

At this time, a conclusion regarding the association between glyphosate exposure and risk of NHL cannot be supported based on the available data due to conflicting results. Chance and/or bias cannot be excluded as an explanation for observed associations. The magnitude of adjusted risk estimates for ever/never use were relatively small ranging from 1.0 (no association) to 1.85 in adjusted analyses, with the widest confidence intervals observed for the highest effect estimates indicating less reliability in these estimates. All of the ever/never estimates were not statistically significant with several effect estimates approximately equal to the null. There were

various limitations identified in Section 3.6 for these studies that could impact calculated effect estimates and explain the weak responses observed. Meta-risk ratios using these studies were also of small magnitude ranging from 1.3-1.5. As discussed in Section 3.6, meta-analyses should be interpreted with caution and are susceptible to the same limitations identified for individual studies.

Although none of the effect estimates were below 1 using the ever/never exposure metric, risk estimates were all below 1 (0.6-0.9) when using cumulative lifetime and intensity-weighted cumulative exposure metrics in the prospective cohort study (De Roos *et al.*, 2005; Andreotti *et al.,* 2017). As discussed in Section 6.2, two case-control studies that investigated an exposure-response relationship conflicted with the extensive analyses conducted for the AHS cohort. This may be due to differences in confounding control, differences associated with study design, limitations from small sample sizes, and/or, as some may suggest, a potentially short follow-up time in the cohort. It should also be noted that publication bias may play a role in this evaluation given there is a tendency to only publish positive results and potential concerns regarding glyphosate have only been raised in recent years.

A total of 14 (8 rat and 6 mouse) animal carcinogenicity studies with glyphosate, glyphosate acid, or glyphosate salts were analyzed for the current evaluation. None of the tumors evaluated were considered to be treatment-related based on weight-of-evidence evaluations. Although statistically significant trends were observed following adjustment for multiple comparisons in a limited number of studies, statistically significant pairwise comparisons were only observed in 2 studies indicating tumor incidences were generally similar to concurrent controls. Additionally, none of the tumor results were reproduced in other studies, including those testing the same animal strain with similar or higher dosing. Furthermore, the tumors lacked a monotonic dose-response and/or corroborating preneoplastic or related non-neoplastic lesions.

Over 80 genotoxicity studies with the active ingredient glyphosate were analyzed for the current evaluation. The overall weight-of-evidence indicates that there is no convincing evidence that glyphosate is genotoxic *in vivo* via the oral route. When administered via i.p. injection the studies were predominantly negative. In the two cases where an increase in micronuclei were reported via this route, the effects were not observed in other i.p. injection studies at similar or higher doses. Technical glyphosate was negative in all gene mutation studies. There was limited evidence of positive findings in studies evaluating primary DNA damage; however, as discussed in Section 5.6, the endpoints measured in these assays are less specific in regards to detecting permanent DNA changes (mutations) and can be attributed to other factors, such as cytotoxicity or cell culture conditions. Although some positive findings were reported for chromosomal alterations *in vitro*, these findings were limited to a few studies and are not supported by the *in vivo* studies that are the most relevant for human risk assessment.

Overall, there is remarkable consistency in the database for glyphosate across multiple lines of evidence. For NHL, observed associations in epidemiological studies were non-statistically significant and were of relatively small magnitude. Chance and/or bias cannot be excluded as an explanation for the observed associations. For all other cancer types, there were no associations found; however, only one or two studies were available for evaluation of most cancer types. Across species, strain, and laboratory, none of the tumors evaluated were considered to be

treatment-related based on weight-of-evidence evaluations.  Statistically significant tumor results seen in individual studies were not reproduced in other studies, including those conducted using the same strain at similar or higher doses.  The genotoxicity studies demonstrate that glyphosate is not directly mutagenic or genotoxic *in vivo*.

## 6.4    Biological Plausibility and Coherence

The Guidelines for Carcinogen Risk Assessment (U.S. EPA, 2005) include the following guidance regarding the criteria of biological plausibility and coherence:

> "*evaluation of the biological plausibility of the associations observed in epidemiologic studies reflects consideration of both exposure-related factors and toxicological evidence relevant to identification of potential modes of action (MOAs). Similarly, consideration of the coherence of health effects associations reported in the epidemiologic literature reflects broad consideration of information pertaining to the nature of the biological markers evaluated in toxicologic and epidemiologic studies.* [p.39]."

The genotoxicity studies demonstrate that glyphosate is not directly mutagenic or genotoxic *in vivo*.  Immunodeficiency is another plausible MOA associated with tumorigenesis (i.e., altered immune surveillance).  Glyphosate was negative in an immunotoxicity study in mice at doses up to 1448 mg/kg/day (MRID 48934207).  Additionally, the toxicology database for glyphosate does not reveal any evidence of immunotoxicity.  Overall, the available data regarding non-cancer endpoints also do not provide any support for a carcinogenic process for glyphosate, and have shown glyphosate has relatively low toxicity.   Laboratory animals generally display non-specific effects (e.g., clinical signs, reduced body weight) following glyphosate exposure at relatively high-doses, and no preneoplastic or related non-neoplastic lesions were observed to corroborate any of the observed tumors in the carcinogenicity studies.

As discussed in Section 4.2, metabolism studies demonstrate low oral absorption and rapid excretion of glyphosate.  The data are not sufficient to determine whether linear kinetics is occurring at high doses where tumors were observed.  In the carcinogenicity test guideline (OCSPP 870.4200) and the 2005 Guidelines for Carcinogen Risk Assessment, inappropriate toxicokinetics (e.g., overwhelming absorption or detoxification mechanisms) should be avoided.  A study evaluating the toxicokinetic profile of glyphosate using multiple doses is needed to further investigate the pharmacokinetic properties between low- and high-dose levels.

Although many of the studies included in this document focus on the potential for glyphosate to cause a cancer outcome, the agency is also aware of a limited number of studies in the open literature that have shown glyphosate and its metabolite, AMPA, can inhibit proliferation and promote apoptosis in cancer cells indicating the compounds have potential to be developed into therapeutic drugs for cancer treatment (Li *et al,* 2013; Parajuli *et al.,* 2015; Parajuli *et al.,* 2016).  It is unknown if this is due to lack of additional studies that have investigated these compounds for cancer treatment or if this may be due to publication bias.  The bias towards only publishing positive and/or novel results can hamper the ability to evaluate whether there are plausible biological mechanisms for observed outcomes and/or sufficient information to support a cause-and-effect interpretation of an association.  Overall, this further supports the need for

mechanistic data to elucidate the true mammalian MOA/AOP for glyphosate. There is a distinct lack of mechanistic understanding for the toxicity of glyphosate in mammals and the plant MOA is not relevant for mammalian systems.

The agency does not consider any of the tumors observed in the animal carcinogenicity studies to be treatment-related; however, some believe that the increased tumor incidences in various studies at the highest doses tested are treatment-related. In almost all of these studies, the highest dose tested was approximately equal to or greater than the limit dose (1000 mg/kg/day). It is very unlikely for people to be exposed to such large doses of glyphosate via the oral route. Glyphosate is registered for pre- and post-emergence application to a variety of fruit, vegetable, and field crops, as well as desiccant applications to several commodities. The highest dietary exposure value for any population subgroup in an unrefined chronic dietary analysis would be 0.23 mg/kg/day for children (1-2 years old). Since glyphosate also has residential uses, including application to turf, there is also the potential for children at this age to be exposed via incidental oral exposures (e.g., hand to mouth, object to mouth and soil ingestion) from playing on treated lawns. The highest exposure for the incidental oral and dermal exposures would be 0.16 mg/kg/day (from hand-to-mouth behaviors for children) and 0.08 mg/kg/day, respectively. Combining exposures from the dietary and residential exposures for children would, therefore, result in an aggregate exposure of 0.47 mg/kg/day. These calculations use a number of assumptions that have been extensively peer-reviewed[27] and yet the potential oral exposure of glyphosate for the most highly exposed residential population subgroup is more than 2,000 times lower than the highest doses tested in the animal carcinogenicity studies (see Appendix E for more details regarding these calculations). The maximum potential exposure calculated for occupational handlers would be 7 mg/kg/day, which is still significantly lower than the highest doses tested in the animal carcinogenicity studies. As a result, even though increased tumor incidences were observed in some of the animal carcinogenicity studies, the possibility of being exposed to these excessive dietary doses over time is considered implausible based on the currently registered use pattern and not relevant to human health risk assessment.

## 6.5    Uncertainty

When evaluating a database, it is also important to assess the uncertainties associated with the available data. When uncertainty is high there is less confidence in the exposure and effect estimates and, therefore, informs the reliability of results. Understanding the sources of uncertainty within a database can help characterize observed results and aid in developing new research with reduced uncertainty.

In some instances, the agency did not have access to all of the data underlying the studies analyzed for the current evaluation. This includes all of the epidemiological studies, 17 genotoxicity studies, and 1 animal carcinogenicity study. For these studies, the agency had to rely upon information the study authors reported. Without the raw data, statistical analyses could not be replicated or recalculated. On the other hand, studies that include full reports with detailed methodology, analytically measured doses, and individual animal data may provide a

---

[27] Using the 2012 Standard Operating Procedures for Residential Exposure Assessment. Available: http://www2.epa.gov/pesticide-science-and-assessing-pesticide-risks/standard-operating-procedures-residential-pesticide

higher level of confidence. It also allows the agency to perform its own evaluation of the data using current practices and policies.

Several uncertainties have already been identified throughout this document. There are numerous metabolism studies available for glyphosate; however, the data are not sufficient to determine whether linear kinetics is occurring at high doses where tumors were observed in animal carcinogenicity studies. In the carcinogenicity test guideline (OCSPP 870.4200) and the 2005 Guidelines for Carcinogen Risk Assessment, inappropriate toxicokinetics (e.g., overwhelming absorption or detoxification mechanisms) should be avoided. A study evaluating the toxicokinetic profile of glyphosate using multiple doses is needed to further investigate the pharmacokinetic properties between low- and high-dose levels.

With respect to the epidemiological data, the database is limited for each investigated cancer with only one or two studies available. Although numerous studies were used in the evaluation of NHL, the results were constrained by the limitations of the individual studies, such as small sample size, missing data, and control selection issues. The quality of the exposure assessment is a major concern since the validity of the overall study results depend in large part on the ability of the study to correctly quantify and classify a subject's exposure. There was no direct information on pesticide exposure or absorbed dose because the exposures were self-reported. All of the studies conducted exposure assessments through questionnaires and interviews that are susceptible to recall bias, which can result in exposure misclassification. The cohort study (De Roos *et al.*, 2005), which was given a high ranking, did not find an association between glyphosate exposure and NHL; however, it has been noted that the median follow-up time for this study was ~7 years. Recently, an updated analysis was published (Andreotti *et al.*, 2017) with an extended follow-up period of 17.5 years that addresses concerns regarding follow-up time. This study reported no association between glyphosate exposure and all lymphohematopoietic cancers, NHL, or any of its subtypes across exposure metrics. No association was observed in unlagged or lagged analyses, after adjustment for pesticides linked to NHL in previous AHS analyses, and after exclusion of multiple myeloma from the NHL grouping. Furthermore, with the increased use of glyphosate following the introduction of glyphosate-tolerant crops in 1996, there is a need for more recent studies since a large number of studies were conducted prior to 1996. As described in Section 1.1, the use pattern changed following the introduction of transgenic crops, which may impact overall effect estimates.

Another consideration is that farmers and other applicators apply formulations, not the active ingredient alone. It is possible that different formulations were used across and/or within the different epidemiological studies. Formulations are end-use products that are sold as a mixture of registered pesticidal active ingredients, such as glyphosate, and additional substances that increase the effectiveness of a pesticidal product, which are often referred to as "inert ingredients." For example, inert ingredients may act as a solvent to allow a pesticide active ingredient to penetrate a plant's outer surface, may facilitate and accentuate the dispersion of the product, or may extend the pesticide product's shelf-life[28]. Inert ingredients and the proportion of these inert ingredients vary across formulations. It has been hypothesized that glyphosate formulations may be more toxic than glyphosate alone. Glyphosate has been studied in a multitude of studies and there are studies that have been conducted on numerous formulations

---

[28] https://www.epa.gov/pesticide-registration/inert-ingredients-overview-and-guidance

that contain glyphosate; however, there are relatively few research projects that have attempted to systematically compare glyphosate and the formulations in the same experimental design. Furthermore, there are even less instances of studies comparing toxicity across formulations. This is one aspect of the uncertainty in the database that the agency has been working to address by developing a strategic research plan in collaboration with NTP (see Section 7.0).

It is recognized that these uncertainties exist for the current database; however, the available data are adequate for evaluating the carcinogenic potential of glyphosate and determine the cancer classification using the 2005 Guidelines for Carcinogen Risk Assessment. As discussed in Section 6.3, there are a large number of studies available and the database is remarkably consistent across these studies.

## 6.6   Evaluation of Cancer Classification per the 2005 EPA Guidelines for Carcinogen Risk Assessment

### 6.6.1   Introduction

In the 2005 Guidelines for Carcinogen Risk Assessment, five classification descriptors are provided:
- Carcinogenic to Humans
- Likely to be Carcinogenic to Humans
- Suggestive Evidence of Carcinogenic Potential
- Inadequate Information to Assess Carcinogenic Potential
- Not Likely to be Carcinogenic to Humans

Descriptors are assigned using all available data from the multiple lines of evidence. The following text has been excerpted/summarized from the guidelines regarding these descriptors:

> Choosing a descriptor is a matter of judgment and cannot be reduced to a formula. Each descriptor may be applicable to a wide variety of potential data sets and weights of evidence. The weight-of-evidence, including the selected descriptor, is presented as a narrative laying out the complexity of information that is essential to understanding the hazard and its dependence on the quality, quantity, and type(s) of data available. The descriptors and narratives are intended to permit sufficient flexibility to accommodate new scientific understanding and new testing methods. The descriptors represent points along a continuum of evidence; consequently, there are gradations and borderline cases that are clarified by the full weight-of-evidence narrative. Rather than focusing simply on the descriptor, the entire range of information included in the weight-of-evidence narrative should be considered.

The weight-of-evidence presented in Sections 6.2-6.5 and based on the available epidemiological, animal carcinogenicity, and genotoxicity data for glyphosate was considered for each classification descriptor. For each descriptor, the guidelines provide examples and/or conditions for when the descriptor may be appropriate and the weight-of-evidence for glyphosate is assessed to determine which descriptor is supported by the available data. As stated in the 2005 EPA Guidelines for Carcinogen Risk Assessment, "the entire range of information included

in the weight-of-evidence should be considered". Based on all of the available data, the weight-of-evidence clearly do not support the descriptors "carcinogenic to humans" and "likely to be carcinogenic to humans" at this time. According to the 2005 Cancer Guidelines, "carcinogenic to humans" is appropriate "when there is convincing epidemiologic evidence of a causal association between human exposure and cancer." Similarly, "likely to be carcinogenic to humans" descriptor is appropriate "when the weight of the evidence is adequate to demonstrate carcinogenic potential to humans but does not reach the weight of evidence for the descriptor."

In epidemiological studies, there was no evidence of an association between glyphosate exposure and solid tumors, leukemia, or HL. Furthermore, the available studies do not link glyphosate exposure to multiple myeloma. A conclusion regarding the association between glyphosate exposure and risk of NHL cannot be determined based on the available data due to conflicting results and various limitations identified in studies investigating NHL. In 6 of the 14 animal carcinogenicity studies, no tumors were identified for evaluation. In the remaining 8 studies, the agency has concluded that none of the tumors evaluated in individual rat and mouse carcinogenicity studies are treatment-related due to lack of pairwise statistical significance, lack of a monotonic dose response, absence of preneoplastic or related non-neoplastic lesions, no evidence of tumor progression, and/or historical control information (when available). Tumors seen in individual rat and mouse studies were also not reproduced in other studies, including those conducted in the same animal species and strain at similar or higher doses. The tumor incidence increases in these studies were seen at or exceeding 1,000 mg/kg/day, except the testicular tumors in a single rat study, and these high doses would also not be considered relevant for human health risk assessment. The mammalian MOA/AOP is unknown for glyphosate and precursor events are unknown; however, the genotoxicity data were highly reproducible and consistent with a clear demonstration that glyphosate does not have a mutagenic MOA.

The descriptor "inadequate information to assess carcinogenic potential" is used when available data are judged inadequate for applying one of the other descriptors. Given the extensive size of the glyphosate database, which includes a multitude of well-designed and well-conducted studies, this classification descriptor is not supported. The epidemiological data at this time are limited and study results appear to be inconsistent across some cancer types. However, it is important to note that epidemiological studies are not available for most pesticides. Similarly, for most pesticides, generally, only two animal bioassays are available. EPA routinely evaluates human cancer potential using the small, more typical datasets. As such, for glyphosate, given the significant amount of information across multiple lines of evidence, the agency believes the database is sufficient to designate a cancer classification descriptor for glyphosate and that "inadequate information to assess carcinogenic potential" is not appropriate.

The remaining two cancer classification descriptors (*"Suggestive Evidence of Carcinogenic Potential"* and *"Not Likely to Be Carcinogenic to Humans")* from the 2005 EPA Guidelines for Carcinogen Risk Assessment are described in detail below. Subsequently, these descriptors are discussed in the context of whether the available evidence do or do not support them.

*"Suggestive Evidence of Carcinogenic Potential"*

This descriptor is appropriate when a concern for potential carcinogenic effects in humans is raised, but the data are judged not sufficient for a stronger conclusion. It covers a spectrum of

evidence associated with varying levels of concern for carcinogenicity. Depending on the extent of the database, additional studies may or may not provide further insights.

Some examples of when this descriptor may be appropriate include the following:

- If a small, and possibly not statistically significant, increase in tumor incidence observed in a single animal or human study that does not reach the weight-of-evidence for the descriptor of "likely to be carcinogenic to humans." The study generally would not be contradicted by other studies of equal quality in the same population group or experimental system;
- If there is evidence of a positive response in a study whose power, design, or conduct limits the ability to draw a confident conclusion (but does not make the study fatally flawed), but where the carcinogenic potential is strengthened by other lines of evidence;
- If there is a small increase in a tumor with a high background rate in that sex and strain, when there is some but insufficient evidence that the observed tumors may be due to intrinsic factors that cause background tumors and not due to the agent being assessed (when there is a high background rate of a specific tumor in animals of a particular sex and strain, then there may be biological factors operating independently of the agent being assessed that could be responsible for the development of the tumors). In this case, the reasons for determining that the tumors are not due to the agent are explained; or
- If there is a statistically significant increase at one dose only, but no significant response at the other doses and no overall trend.

*"Not Likely to Be Carcinogenic to Humans"*

This descriptor is appropriate when the available data are considered robust for deciding that there is no basis for human hazard concern. In some instances, there can be positive results in experimental animals when there is strong, consistent evidence that each MOA in experimental animals does not operate in humans. In other cases, there can be convincing evidence in both humans and animals that the agent is not carcinogenic.

This descriptor would be appropriate if any of the following was observed:

- Animal evidence demonstrates lack of carcinogenic effects in both sexes in well-designed and well-conducted studies in at least two appropriate animal species in the absence of other animal or human data suggesting a potential for cancer effects, or
- Convincing and extensive experimental evidence showing that the only carcinogenic effects observed in animals are not relevant to humans, or
- Convincing evidence that carcinogenic effects are not likely by a particular exposure route, or
- Convincing evidence that carcinogenic effects are not likely below a defined dose range.

**6.6.2   Discussion of Evidence to Support Cancer Classification Descriptors**

As stated above, the available data and weight-of-evidence clearly do not support the descriptors "carcinogenic to humans", "likely to be carcinogenic to humans", or "inadequate information to assess carcinogenic potential".  The following discusses the remaining cancer classification descriptors and how the evidence does or does not support the descriptors.

It could be argued that the "suggestive evidence of carcinogenic potential" descriptor would be appropriate.  The evidence to support this includes:

- Non-statistically significant effect estimates greater than the null were reported for NHL across studies and meta-analyses based on ever/never use ranged from 1.3-1.5.
- There was limited evidence of a possible exposure-response relationship between glyphosate exposure and NHL in case-control studies.
- In several animal carcinogenicity studies, a statistically significant trend was observed. In two studies, tumor incidences at the highest doses tested were statistically significant as compared to concurrent controls.
- Positive responses were observed in a limited number of genotoxicity assays evaluating chromosomal and primary DNA damage.

However, according to the 2005 EPA Guidelines for Carcinogen Risk Assessment, in order for the above evidence to support the "suggestive evidence of carcinogenic potential" descriptor, "the study generally would not be contradicted by other studies of equal quality in the same population group or experimental system".  Furthermore, the guidelines state that "rather than focusing simply on the descriptor, the entire range of information included in the weight-of-evidence narrative should be considered".  For the epidemiological studies evaluating NHL, several studies reported effect estimates approximately equal to the null.  The widest confidence intervals were observed for the highest effect estimates indicating these effect estimate are less reliable.  All of the effect ever/never estimates were non-statistically significant.  There were conflicting results in exposure-response assessments investigating glyphosate exposure and the risk of NHL.  Although two-case control studies (McDuffie *et al.*, 2001; Eriksson *et al.*, 2008) reported elevated effect estimates when analyzing for exposure-response relationships across two exposure categories, extensive analyses in a study of equal or higher quality (De Roos *et al.*, 2005) for cumulative lifetime exposure and intensity-weighted cumulative exposure contradicted these results reporting effect estimates less than null (ranging from 0.6-0.9) when analyzing across tertiles and these analyses were further supported by the recent evaluation of the AHS cohort by Andreotti *et al.* (2017).  Furthermore, the two-case control studies did not account for co-exposure to other pesticides, which would be expected to cause inflated effect estimates. Various limitations that could impact the calculated effect estimate were identified for these studies and discussed in Section 3.6.  The effect estimates greater than the null were not strengthened by other lines of evidence, as described in Sections 6.2-6.5.

In 6 (4 rat and 2 mouse) of the 14 animal carcinogenicity studies conducted with glyphosate, no tumors were identified for evaluation.  In the remaining 8 studies, although statistically significant trends following adjustment for multiple comparisons were observed in 6 of these studies for different individual tumor types, almost all of these lacked pairwise significance

following adjustment for multiple comparisons. Pairwise significance was only observed at the highest dose tested for testicular tumors (Lankas, 1981) and hemangiomas (Sugimoto, 1997). For testicular tumors, a closer examination of the incidence data across doses did not demonstrate a monotonic dose response and the tumor findings were not reproduced in studies of equal quality, including studies in the same animal species and strain at similar or higher doses. For hemangiomas, the statistical significance was seen at a dose more than 4X the limit dose, which would not be considered relevant for human health risk assessment. Furthermore, the tumor findings were not reproduced in studies of equal quality, including studies in the same animal species and strain at similar or higher doses. In all of the animal carcinogenicity studies, there was no evidence of corroborating pre-neoplastic or related non-neoplastic lesions to support a treatment-related effect, including the testicular tumors. In a limited number of cases, the agency also considered historical control data to inform the relevance of tumor findings and these data generally indicated that incidence rates in the concurrent controls were unusually low and/or observed tumor incidences were within historical control ranges.

Although positive responses were observed in a limited number of genotoxicity assays evaluating chromosomal and primary DNA damage, the overall weight-of-evidence indicates that there is no convincing evidence that glyphosate induces mutations *in vivo* via the oral route. When administered via i.p. injection the studies were predominantly negative. In the two cases where an increase in micronuclei were reported via this route of administration, the results were contradicted by numerous other studies at similar or higher doses using the same assays and route of administration. Technical glyphosate was negative in all gene mutation studies. There was limited evidence of positive findings in studies evaluating primary DNA damage; however, the endpoints measured in these assays are less specific in regards to detecting permanent DNA changes (mutations) and can be attributed to other factors, such as cytotoxicity or cell culture conditions. Although some positive findings were reported for chromosomal alterations *in vitro*, these findings were limited to a few studies and are not supported by the *in vivo* studies that are the most relevant for human risk assessment.

In summary, considering the entire range of information for the weight-of-evidence, the evidence outlined above to potentially support the "suggestive evidence of carcinogenic potential" descriptor are contradicted by other studies of equal or higher quality and, therefore, the data do not support this cancer classification descriptor.

For the "not likely to be carcinogenic to humans" descriptor, one of the considerations is whether there is "convincing evidence that carcinogenic effects are not likely below a defined dose range". In the case of glyphosate, the agency did not consider any of the tumors observed in the animal carcinogenicity studies to be treatment-related; however, some believe that the increased tumor incidences in various studies at the highest doses tested are treatment-related. In all of these studies, the highest dose tested was approximately equal to or greater than the limit dose (1000 mg/kg/day), except for the testicular tumors observed in a single study that were not considered treatment-related and were not reproduced in studies of equal quality, including studies in the same animal species and strain at similar or higher doses. In genotoxicity studies, assays with oral administration were negative except for one instance where an extremely high dose (5,000 mg/kg/day) was administered.

The 2005 EPA Guidelines for Carcinogen Risk Assessment also state that "weighing of the evidence includes addressing not only the likelihood of human carcinogenic effects of the agent but also the conditions under which such effects may be expressed". Increased tumor incidence was typically observed at doses of 1,000 mg/kg/day or greater; however, none of these were considered treatment-related by the agency based on the weight-of-evidence evaluations. Additionally, the only *in vivo* positive assays seen in the genotoxicity studies were administered via i.p. injection at doses of 200 mg/kg/day and 300 mg/kg/day or orally at 5,000 mg/kg/day. These high doses are not considered relevant to human health risk assessment based on the currently registered use pattern for glyphosate. Maximum potential glyphosate exposure in residential and occupational settings have been estimated at 0.47 mg/kg/day and 7 mg/kg/day, respectively, which are well-below the doses necessary to elicit the effects seen in these animal carcinogenicity and genotoxicity studies. Additionally, non-linear kinetics may also be occurring at the high doses. The carcinogenicity test guidelines (OCSPP 870.4200 and OCSPP 870.4300) and the 2005 Guidelines for Carcinogen Risk Assessment state that inappropriate toxicokinetics (e.g., overwhelming absorption or detoxification mechanisms) should be avoided. A well-conducted pharmacokinetic study evaluating the toxicokinetic profile of glyphosate is needed to further investigate the toxicokinetic properties between high and low dose levels to ensure that inappropriate toxicokinetics is avoided.

Overall, there is not strong support for the "suggestive evidence of carcinogenic potential" cancer classification descriptor based on the weight-of-evidence, which includes the fact that even small, non-statistically significant changes observed in animal carcinogenicity and epidemiological studies were contradicted by studies of equal or higher quality. The strongest support is for "not likely to be carcinogenic to humans".

## 6.7    Proposed Conclusions Regarding the Carcinogenic Potential of Glyphosate

Glyphosate is a non-selective, phosphonomethyl amino acid herbicide registered to control weeds in various agricultural and non-agricultural settings. Labeled uses of glyphosate include over 100 terrestrial food crops as well as other non-agricultural sites, such as greenhouses, aquatic areas, and residential areas. Following the introduction of glyphosate-resistant crops in 1996, glyphosate use increased dramatically; however, glyphosate use has stabilized in recent years due to the increasing number of glyphosate-resistant weed species.

Since its registration in 1974, numerous human and environmental health analyses have been completed for glyphosate, which consider all anticipated exposure pathways. Glyphosate is currently undergoing Registration Review. As part of this process, the hazard and exposure of glyphosate are reevaluated to determine its potential risk to human and environmental health using current practices and policies. The human carcinogenic potential of glyphosate has been evaluated by the agency several times. As part of the current evaluation for Registration Review, the agency has performed a comprehensive analysis of available data from submitted guideline studies and the open literature. This includes epidemiological, animal carcinogenicity, and genotoxicity studies.

An extensive database exists for evaluating the carcinogenic potential of glyphosate, including 63 epidemiological studies, 14 animal carcinogenicity studies, and nearly 90 genotoxicity studies for the active ingredient glyphosate.  These studies were evaluated for quality and results were analyzed across studies within each line of evidence.  The modified Bradford Hill criteria were then used to evaluate multiple lines of evidence using such concepts as strength, consistency, dose response, temporal concordance and biological plausibility.  The available data at this time do no support a carcinogenic process for glyphosate.  Overall, animal carcinogenicity and genotoxicity studies were remarkably consistent and did not demonstrate a clear association between glyphosate exposure and outcomes of interest related to carcinogenic potential.  In epidemiological studies, there was no evidence of an association between glyphosate exposure and numerous cancer outcomes; however, due to conflicting results and various limitations identified in studies investigating NHL, a conclusion regarding the association between glyphosate exposure and risk of NHL cannot be determined based on the available data.  Increases in tumor incidence were not considered treatment-related in any of the animal carcinogenicity studies.  In 6 of these studies, no tumors were identified for evaluation.  In the remaining studies, the tumors were not considered treatment-related due to lack of pairwise statistical significance, lack of a monotonic dose response, absence of preneoplastic or related non-neoplastic lesions, no evidence of tumor progression, and/or historical control information (when available).  Additionally, tumor findings seen in individual rat and mouse studies were also not reproduced in other studies, including those conducted in the same animal species and strain at similar or higher doses.  Furthermore, data from epidemiological and animal carcinogenicity studies do not reliably demonstrate expected dose-response relationships.  In genotoxicity studies, there was no convincing evidence that glyphosate is genotoxic *in vivo* via the oral route.

For cancer descriptors, the available data and weight-of-evidence clearly do not support the descriptors "carcinogenic to humans", "likely to be carcinogenic to humans", or "inadequate information to assess carcinogenic potential".  For the "suggestive evidence of carcinogenic potential" descriptor, considerations could be looked at in isolation; however, following a thorough integrative weight-of-evidence evaluation of the available data, the database would not support this cancer descriptor.  The strongest support is for "not likely to be carcinogenic to humans".

This analysis integrating multiple lines of evidence highlights the need for mechanistic studies to elucidate the MOA/AOP of glyphosate, as well as additional epidemiology studies and updates from the AHS cohort study to further investigate the carcinogenic potential of glyphosate in humans.  This evaluation focused on studies on the active ingredient glyphosate; however, additional research could also be performed to determine whether formulation components, such as surfactants, influence the toxicity of glyphosate formulations.  The agency has been working on plans to initiate research given these identified data gaps and these plans are described in Section 7.0.

**7.0     Collaborative Research Plan for Glyphosate and Glyphosate Formulations**

As previously mentioned, some have believed that glyphosate formulations may be more toxic than glyphosate alone.  Glyphosate has been studied in a multitude of studies and there are studies that have been conducted on numerous formulations that contain glyphosate; however, there are relatively few research projects that have attempted to directly compare glyphosate and the formulations in the same experimental design.  Furthermore, there are even less instances of studies comparing toxicity across formulations.

The agency has been collaborating with the NTP Division of the National Institute of Environmental Health Sciences to develop a research plan intended to evaluate the role of glyphosate in product formulations and the differences in formulation toxicity.  Four objectives were identified that laid out how research by NTP might contribute to these research questions: 1) compare the toxicity of glyphosate vs. formulations, as well as compare formulations vs. formulations, 2) provide publicly available toxicology data on cancer-related endpoints, 3) provide publicly available toxicology data on non-cancer endpoints, and 4) investigate the mechanisms of how glyphosate and formulations cause toxic effects.

As part of the first objective, NTP will investigate the differential biological activity of glyphosate, glyphosate formulations, and the individual components of formulations.  The NTP Laboratory Branch generated preliminary data by exposing human hepatoma cells (HepG2) to five different glyphosate products bought off the shelf.  The endpoint in the assay was cell viability, measured by ATP levels.  The data, presented in Figure 7.1, demonstrate at-a-glance that formulations are not equally toxic and that the toxicity is not being driven by the amount of glyphosate in the formulations, at least for the endpoint of cell viability. This observation highlights how informative the data generated from this research can be to the overall research questions.



**Figure 7.1.  Results of HepG2 exposures following 24 hour incubation using different glyphosate formulations.  Note: some of the formulations included other active ingredients besides glyphosate.**

For the second objective, NTP will contribute to the publicly available knowledge-base describing the biological effects of glyphosate and formulations by conducting guideline studies addressing genotoxicity and studies that evaluate the oxidative stress potential.  In order to organize publicly available data on glyphosate and formulations, IARC used 10 key characteristics of carcinogens as a way to help inform their conclusion (Smith *et al.*, 2016). Their review concluded that data were only available for two of these characteristics (genotoxicity and oxidative stress) and little to no information on the remaining characteristics was available.  However, when members of a NTP workgroup looked at the available data included in the IARC review, the group did not agree with IARC that the data provided strong or clear evidence for either genotoxicity or induction of oxidative stress given protocol deficiencies that could produce questionable results.

Currently, the publicly available information regarding non-cancer endpoints for glyphosate and glyphosate formulations is limited.  To begin to address the third objective, NTP will conduct a screening level analysis of the literature using text mining software, for studies regarding non-cancer endpoints resulting from glyphosate exposure.  The resulting scoping report will describe the evidence base for health outcomes investigated in connection to glyphosate, as well as help identify data gaps.

As discussed in Section 6.0, there is a need for mechanistic studies to elucidate the MOA/AOP of glyphosate.  Although there are data suggesting glyphosate may be genotoxic or cause oxidative stress, there is little mechanistic information to support these observations.  For the last objective, NTP will use *in vitro* screening assays to gain mechanistic information on the effects of glyphosate and different formulations for a variety of endpoints and allow for direct comparisons among them.  The screening approach will also allow for the identification of test substances that would be good candidates for further *in vivo* testing.  Since *in vivo* findings in genetic toxicology testing are generally considered as having a greater relevance to humans than *in vitro* findings, it is valuable to confirm the results seen at the cellular level at the whole animal level.

## 8.0   References

Akanuma, M. (1995).  HR-001: Reverse Mutation Test. Kodaira Laboratories. The Institute of Environmental Toxicology, Tokyo, Japan.  Laboratory Project ID: IET 94-0142. April 3, 1995.  MRID 50017102. Unpublished.

Alvarez-Moya *et al.* (2014) "Comparison of the in vivo and in vitro genotoxicity of glyphosate isopropylamine salt in three different organisms". *Genetics and Molecular Biology*, 37, 1, 105-110

Andreotti, G., Freeman, L.E., Hou, L., Coble, J., Rusiecki, J., Hoppin, J.A., Silverman, D.T., and Alavanja, M.C. (2009). Agricultural pesticide use and pancreatic cancer risk in the Agricultural Health Study Cohort. International Journal of Cancer *124*, 2495-2500.

Andreotti G., Koutros S., Hofmann J.N., Sandler D.P., Lubin J.H., Lynch C.F., Lerro C.C., De Roos A.J., Parks C.G., Alavanja M.C., Silverman D.T., Beane Freeman L.E.  Glyphosate Use and Cancer Incidence in the Agricultural Health Study. J Natl Cancer Inst. 110 (5). Nov. 2017.

Atkinson, C., Strutt, A., Henderson, W., *et al.* (1993a). 104-Week Chronic Feeding/ Oncogenicity study in rats with 52-week interim kill. MRID No. 49631701. Unpublished

Atkinson, C., Martin, T., Hudson, P., and Robb, D. (1993b). Glyphosate: 104 week dietary carcinogenicity study in mice. Inveresk Research International, Tranent, EH33 2NE, Scotland. IRI Project No. 438618. April 7, 1993. MRID 49631702. Unpublished.

Band, P.R., Abanto, Z., Bert, J., Lang, B., Fang, R., Gallagher, R.P., and Le, N.D. (2011). Prostate cancer risk and exposure to pesticides in British Columbia farmers. The Prostate *71*, 168-183.

Baris, D, Garrity, TJ, Telles, JL, Heineman, EF, Olshan, A, Hoar Zahm, S. 2001. American Journal of Industrial Medicine. 39: 463-476.

Benbrook. (2016). Trends in glyphosate herbicide use in the United States and globally. Environmental Sciences Europe. 28(3).

Benjamini, Y and Hochberg, Y. 1995. Controlling the false discovery rate: a practical and powerful approach to multiple testing. Journal of the Royal Statistical Society B. 57: 289-300.

Bolognesi, C., Bonatti, S., Degan, P., Gallerani, E., Peluso, M., Rabboni, R., Roggieri, P., and Abbondandolo, A. (1997). Genotoxic activity of glyphosate and its technical formulation roundup. Journal of Agricultural and Food Chemistry *45*, 1957-1962.

Brammer. (2001). Glyphosate Acid: Two Year Dietary Toxicity and Oncogenicity Study in Wistar Rats. Central Toxicology Laboratory, Alderley Park Macclesfield, Cheshire, UK: Syngenta. MRID 49704601. Unpublished.

Brown, L.M., Blair, A., Gibson, R., Everett, G.D., Cantor, K.P., Schuman, L.M., Burmeister, L.F., Vanlier, S.F., and Dick, F. (1990). Pesticide Exposures and Other Agricultural Risk Factors for Leukemia among Men in Iowa and Minnesota. Cancer Research *50*, 6585-6591.

Brown, L.M., Burmeister, L.F., Everett, G.D., and Blair, A. (1993). Pesticide Exposures and Multiple Myeloma in Iowa Men. Cancer Causes Control *4*, 153-156.

Brayton *et al.*, 2012.  Pathology of aging mice and GEM background strains and experimental design. Vet Path. 49 (1): 85-105.

Burnett, P., Borders, J.; Kush, J. (1979) Report to Monsanto Company: Two Year Chronic Oral Toxicity Study with CP- 76100 in Albino Rats: IBT No. 8560-08924. (Unpublished study received Jun 24, 1982 under 524-308; prepared by Industrial Bio-Test Laboratories, Inc., submitted by Monsanto Co., Washington, DC; CDL:247746-A; 247745; 247747; 247748; 247749; 247750; 247751; 247752)

Collander R.D. (1996).  Glyphosate Acid:  An Evaluation of Mutagenic Potential Using *S. typhimurium* and *E. coli*.  Central Toxicology Laboratory, Cheshire, UK. Laboratory Project ID: CTL/P/4874 Study No. YV3611. February 16, 1996.  MRID 44320617. Unpublished.

Cantor, K.P., Blair, A., Brown, L.M., Burmeister, L.F., and Everett, G. (1993). Pesticides and Other Agricultural Risk Factors for Non-Hodgkin's Lymphoma among Men in Iowa and Minnesota. Cancer Research *53*, 2421-2421.

Carreón, T., Butler, M.A., Ruder, A.M., Waters, M.A., Davis-King, K.E., Calvert, G.M., Schulte, P.A., Connally, B., Ward, E.M., Sanderson, W.T.*, et al.* (2005). Gliomas and Farm Pesticide Exposure in Women: The Upper Midwest Health Study. Environmental Health Perspectives *113*, 546-551.

Cimino, M.C. (2006).  Comparative overview of current international strategies and guidelines for genetic toxicology testing for regulatory purposes. Environmental and Molecular Mutagenesis 47 (9): 362-390.

Chang, E.T., and Delzell, E. (2016). Systematic review and meta-analysis of glyphosate exposure and risk of lymphohematopoietic cancers. Journal of environmental science and health Part B, Pesticides, food contaminants, and agricultural wastes *51*, 402-434.

Chhabra *et al.* (1990). An over view of prechronic and chronic toxicity/carcinogenicity experimental study designs and criteria used by the National Toxicology Program. Environ Health Perspect. 86: 313-321.

Chruscielska *et al.* (2000).  Glyphosate: evaluation of chronic activity and possible far-reaching effects. Part 1. Studies on chronic toxicity. Pestycydy (Warsaw). 3-4: 11-20.

Collins, A.R., Oscoz, A.A., Brunborg, G., Gaivão, I., Giovannelli, L., Kruszewski, M., C.C., Stetina, R. (2008). The Comet assay:  topical issues.  Mutagenesis 23 (3): 143-151.

Cocco, P., Satta, G., Dubois, S., Pili, C., Pilleri, M., Zucca, M., t Mannetje, A.M., Becker, N., Benavente, Y., de Sanjose, S., *et al.* (2013). Lymphoma risk and occupational exposure to pesticides: results of the Epilymph study. Occupational and environmental medicine *70*, 91-98.

Cooke *et al.*, (2003). Oxidative DNA damage: mechanisms, mutation, and disease. FASEB J. 17 (10): 1195-214.

Chruscielska, K. *et al.* 2000. Glyphosate Evaluation of chronic activity and possible far-reaching effects. Part 2. Studies on mutagenic activity. Pestycydy, 2000, (3-4), 21-25. Published.

Dennis, L.K., Lynch, C.F., Sandler, D.P., and Alavanja, M.C. (2010). Pesticide use and cutaneous melanoma in pesticide applicators in the agricultural heath study. Environ Health Perspect *118*, 812-817.

De Roos, A.J., Zahm, S.H., Cantor, K.P., Weisenburger, D.D., Holmes, F.F., Burmeister, L.F., and Blair, A. (2003). Integrative assessment of multiple pesticides as risk factors for non-Hodgkin's lymphoma among men. Occupational and environmental medicine *60*. 1-9.

De Roos, A. J., *et al.* (2005). "Cancer incidence among glyphosate-exposed pesticide applicators in the Agricultural Health Study." Environ Health Perspect 113(1): 49-54.

Durward, R. (2006). Technical Glyphosate: Micronucleus Test in the Mouse. Safepharm Laboratories Limited, Shardlow Business Park, Shardlow, Derbyshire DE72 2GD, UK, Study No. 2060/014. February 8, 2006. MRID 49957411. Unpublished.

Engel, L.S., Hill, D.A., Hoppin, J.A., Lubin, J.H., Lynch, C.F., Pierce, J., Samanic, C., Sandler, D.P., Blair, A., and Alavanja, M.C. (2005). Pesticide use and breast cancer risk among farmers' wives in the agricultural health study. Am J Epidemiol *161*, 121-135.

Enemoto, K. (1997), HR-001: 24-Month Oral Chronic Toxicity and Oncogenicity Study in Rats, Vol. 1. The Institute of Environmental Toxicology, Kodaira-shi, Tokyo, Japan, Arysta Life Sciences, Study No.: IET 94-0150. MRID 50017104, 50017105, 5001703. Unpublished.

Eriksson, M., Hardell, L., Carlberg, M., and Akerman, M. (2008). Pesticide exposure as risk factor for non-Hodgkin lymphoma including histopathological subgroup analysis. International journal of cancer *123*, 1657-1663.

Excel (1997). Combined chronic toxicity/carcinogenicity study of glyphosate technical in Sprague Dawley rats. Pune, India: Indian Institute of Toxicology.

Fisher, RA. (1950) Statistical methods for research workers. Edinburgh, Scotland: Oliver and Boyd.

Flower, K.B., Hoppin, J.A., Lynch, C.F., Blair, A., Knott, C., Shore, D.L., and Sandler, D.P. (2004). Cancer Risk and Parental Pesticide Application in Children of Agricultural Health Study Participants. Environmental Health Perspectives *112*, 631-635.

Flowers, L.J., and Kier, L.D., Hannah, L.H. (1978) Final Report on Salmonella Mutagenicity Assay of Glyphosate: Test No. LF-78-161. MRID 00078620. Unpublished.

Fontana et al (1998). Incidence rates of lymphomas and environmental measurements of phenoxy herbicides: ecological analysis and case-control study. Archives of Environmental Health: An International Journal. 53: 384-387.

Fox, V. (1998). Glyphosate acid:  In vitro cytogenetic assay in human lymphocytes. Central Toxicology Laboratory, Cheshire, UK.  Report CTL/P/6050.  October 29, 1998.  MRID 49961803. Unpublished

Fox and Mackay (1996).  Glyphosate acid:  Mouse bone marrow micronucleus test.  Central Toxicology Laboratory, Cheshire, UK. March 21, 1996. MRID 44320619. Unpublished.

Green and Owen, (2011).  Herbicide-resistant crops:  utilities and limitations for herbicide-resisitant week management. J. Agric Food Chem. 59 (11): 5819-29.

Greim, H., *et al.* (2015). "Evaluation of carcinogenic potential of the herbicide glyphosate, drawing on tumor incidence data from fourteen chronic/carcinogenicity rodent studies." Crit Rev Toxicol 45(3): 185-208.

George, J., *et al.* (2010). "Studies on glyphosate-induced carcinogenicity in mouse skin: a proteomic approach." J Proteomics 73(5): 951-964.

Ghisi, N.d.C., de Oliveira, E.C., and Prioli, A.J. (2016). Does exposure to glyphosate lead to an increase in the micronuclei frequency? A systematic and meta-analytic review. Chemosphere *145*, 42-54.

Giknis, M. L. A., and Clifford, C. B. (2005). Spontaneous Neoplastic Lesions in the Crl:CD1 (ICR) Mouse in Control Groups from 18 Month to 2 Year Studies. Charles River. http://www.criver.com/files/pdfs/rms/cd1/rm_rm_r_lesions_crlcd_l_icr_mouse.aspx

Hardell, L., Eriksson, M., and Nordstrom, M. (2002). Exposure to pesticides as risk factor for non-Hodgkin's lymphoma and hairy cell leukemia: Pooled analysis of two Swedish case-control studies. Leukemia & Lymphoma *43*, 1043-1049.

Hardell, L., and Eriksson, M. (1999). A case-control study of non-Hodgkin lymphoma and exposure to pesticides. Cancer *85*, 1353-1360.

Haseman, JK. (1995) Data analysis: Statistical analysis and use of historical control data. Regul Toxicol Pharmacol 21:52–59.

Hill AB (1965). The Environment and Disease: Association or Causation? Proc R Soc Med. May 1965; 58(5): 295–300.

Hoar *et al.* (1986). Agricultural herbicide use and risk of lymphoma and soft-tissue sarcoma. JAMA. 256:1141-1147.

Hohenadel, K., Harris, S.A., McLaughlin, J.R., Spinelli, J.J., Pahwa, P., Dosman, J.A., Demers, P.A., and Blair, A. (2011). Exposure to multiple pesticides and risk of non-Hodgkin lymphoma in men from six Canadian provinces. International journal of environmental research and public health *8*, 2320-2330.

Hornarvar, N. (2008).  Technical Glyphosate: Micronucleus Test of the Mouse. RCC, Cytotest Cell Research GmbH (RCC-CCR0, In den Leppsteinswiesen 19, 64380 Rossdorf, Germany, Study No. 1158500. June 9, 2008. MRID 49961802. Unpublished.

Hsu and Stedeford (2010). Cancer Risk Assessment: Chemical Carcinogenesis, Hazard Evaluation, and Risk Quantification. John Wiley & Sons.

Jensen, J.C., 1991a**.** Mutagenicity test:  Ames Salmonella Assay with Glyphosate, Batch 206-JaK-25-1.  Scantox A/S, Lemvig, Denmark.  Laboratory No. 12323.  October 9, 1991.  MRID 49961502.  Unpublished.

Jensen, J.C. (1991b).  Mutagenicity test:  In vitro mammalian cell gene mutation test with glyphosate, batch 206-JaK-25-1. Scantox A/S, Lemvig, Denmark.  Laboratory No. 12325.  October 9, 1991.  MRID 49961504.  Unpublished.

Jensen, JC (1991c).  Mutagenicity test:  Micronucleus test with Glyphosate, batch 206-JAK-25-1.  Scantox A/S, Lemvig, Denmark. Report number 12324. December 9, 1991.  MRID 49961503.

Kachuri, L., Demers, P.A., Blair, A., Spinelli, J.J., Pahwa, M., McLaughlin, J.R., Pahwa, P., Dosman, J.A., and Harris, S.A. (2013). Multiple pesticide exposures and the risk of multiple myeloma in Canadian men. International journal of cancer *133*, 1846-1858.

Karipidis *et al.* 2007. Occupational exposure to ionizing and non-ionizing radiation and risk of non-Hodgkin lymphoma. Int Arch Occup Environ Health. 80: 663-670.
Karunanayake, CP, McDuffie, HH, Dosman, JA, Spinelli, JJ, Pahwa, P. 2008. Occupational exposures and non-Hodgkin's lymphoma: Canadian case-control study. Environmental Health. 7:44.

Karunanayake, C.P., Spinelli, J.J., McLaughlin, J.R., Dosman, J.A., Pahwa, P., and McDuffie, H.H. (2012). Hodgkin lymphoma and pesticides exposure in men: a Canadian case-control study. Journal of agromedicine *17*, 30-39.

Kaufman, D.W., Anderson, T.E., and Issaragrisil, S. (2009). Risk factors for leukemia in Thailand. Annals of hematology *88*, 1079-1088.

Kato *et al.* (2005). Personal and occupational exposure to organic solvents and risk of non-Hodgkin's lymphoma (NHL) in women (United States). Cancer Causes & Control. 16:1215-1224.

Kier, L. D. (2015). "Review of genotoxicity biomonitoring studies of glyphosate-based formulations." Crit Rev Toxicol 45(3): 209-218.

Kier and Kirkland (2013). Review of genotoxicity studies of glyphosate and glyphosate-based formulations. Critical Reviews in Toxicology. 43: 283-315.

Knezevich, A.L and Hogan, G. K. (1983). A chronic feeding study of glyphosate in mice. Unpublished report prepared by Bio/Dynamic Inc., dated July 21, 1983. Report No. 77-2011. EPA Accession No. 251007 – 251009, and 251014.  EPA Accession no. 251007-09, 251014. Unpublished.

Koller, V.J., Furhacker, M., Nersesyan, A., Misik, M., Eisenbauer, M., and Knasmueller, S. (2012). Cytotoxic and DNA-damaging properties of glyphosate and Roundup in human-derived buccal epithelial cells. Archives of toxicology *86*, 805-813.

Koureas, M., Tsezou, A., Tsakalof, A., Orfanidou, T., and Hadjichristodoulou, C. (2014). Increased levels of oxidative DNA damage in pesticide sprayers in Thessaly Region (Greece). Implications of pesticide exposure. The Science of the total environment *496*, 358-364.

Koutros, S., Beane Freeman, L.E., Lubin, J.H., Heltshe, S.L., Andreotti, G., Barry, K.H., DellaValle, C.T., Hoppin, J.A., Sandler, D.P., Lynch, C.F.*, et al.* (2013). Risk of total and aggressive prostate cancer and pesticide use in the Agricultural Health Study. Am J Epidemiol *177*, 59-74.

Kumar, D.P.S. (2001), Carcinogenicity Study with Glyphosate Technical in Swiss Albino Mice, Toxicology Department Rallis Research Centre, Rallis India Limited.  Study No. TOXI: 1559.CARCI-M.  MRID 49987403. Unpublished.

Landgren, O., Kyle, R.A., Hoppin, J.A., Beane Freeman, L.E., Cerhan, J.R., Katzmann, J.A., Rajkumar, S.V., and Alavanja, M.C. (2009). Pesticide exposure and risk of monoclonal gammopathy of undetermined significance in the Agricultural Health Study. Blood *113*, 6386-6391.

J. Langsdale *et al.* (2009). Glyphosate. Human Health Assessment Scoping Document in Support of Registration Review. June 3, 2009. D362745.

Lankas, G, P. (1981) A Lifetime Study of Glyphosate in Rats. Report No. 77-2062 prepared by Bio Dynamics, Inc. EPA Accession. No. 247617 – 247621. December 23, 1981.  MRID 00093879.  Unpublished.

Lee, W.J., Cantor, K.P., Berzofsky, J.A., Zahm, S.H., and Blair, A. (2004a). Non-Hodgkin's lymphoma among asthmatics exposed to pesticides. International journal of cancer *111*, 298-302.

Lee, W.J., Lijinsky, W., Heineman, E.F., Markin, R.S., Weisenburger, D.D., and Ward, M.H. (2004b). Agricultural pesticide use and adenocarcinomas of the stomach and oesophagus. Occupational and environmental medicine *61*, 743-749.

Lee, W.J., Colt, J.S., Heineman, E.F., McComb, R., Weisenburger, D.D., Lijinsky, W., and Ward, M.H. (2005). Agricultural pesticide use and risk of glioma in Nebraska, United States. Occupational and environmental medicine *62*, 786-792.

Lee, W.J., Sandler, D.P., Blair, A., Samanic, C., Cross, A.J., and Alavanja, M.C. (2007). Pesticide use and colorectal cancer risk in the Agricultural Health Study. International journal of cancer *121*, 339-346.

Li, A.P. (1983a). CHO/HGPRT gene mutation assay with glyphosate.  Environmental Heath Lab, St. Louis, MO.  Study Number T830044. October 20, 1983.  MRID 00132681. Unpublished.

Li, A.P. (1983b).  In vivo bone marrow cytogenetic study of glyphosate in Sprague Dawley rats. Environmental Health Laboratory, St. Louis, MO.  October 20, 1983.  MRID 00132683. Unpublished.

Li, A. P. and T. J. Long (1988). An evaluation of the genotoxic potential of glyphosate.  Fundam Appl Toxicol 10(3): 537-546.

Lioi M.B., *et al.* (1998a).  Genotoxicity and oxidative stress induced by pesticide exposure in bovine lymphocyte cultures in vitro.  Mutation Research- Fundamental and Molecular Mechanisms of Mutagenesis.  403 (1-2), 13-20.

Lioi M.B., *et al.* (1998b).  Cytogenetic Damage and Induction of Pro-Oxidant State in Human Lymphocytes Exposed In Vitro to Gliphosate, Vinclozolin, Atrazine, and DPX-E9636. Environmental and Molecular Mutagenesis 32: 39-46.

Lioi, M.B., Scarfi, M.R., Santoro, A., Barbieri, R., Zeni, O., Salvemini, F., Di Berardino, D., and Ursini, M.V. (1998a). Cytogenetic damage and induction of pro-oxidant state in human lymphocytes exposed in vitro to gliphosate, vinclozolin, atrazine, and DPX-EP636. Environmental and Molecular Mutagenesis *32*, 39-46.

Lioi, M.B., Scarfi, M.R., Santoro, A., Barbieri, R., Zeni, O., Di Berardino, D., and Ursini, M.V. (1998b). Genotoxicity and oxidative stress induced by pesticide exposure in bovine lymphocyte cultures in vitro. Mutation Research-Fundamental and Molecular Mechanisms of Mutagenesis *403*, 13-20.

Lowit *et al.* (2015). Literature Review on Neurodevelopmental Effects & FQPA Safety Factor Determination for the Organophosphate Pesticides. September 15, 2015. D331251.

Maizlish, N, Beaumont, J, Singleton, J. 1998. Mortality among California highway workers. American Journal of Industrial Medicine. 13: 363-379.

Majeska, J.; Zameck, R.; Matheson, D. (1982a) SC-0224 (Lot No. 7269- 10): Mutagenicity Evaluation in Salmonella typhimurium: Report No. T-10847. MRID 00126612.  Unpublished.

Majeska, J. (1982b) Morphological transformation of Balb/3T3 cells. Report No. T-10884. MRID 00126616. Unpublished.

Majeska, J. (1982c) Mutagenicity evaluation of bone marrow cytogenetic analysis in rats. Report No. T10884. MRID 00132176. Unpublished.

Majeska, J. (1985a) Mutagenicity Evaluation in Salmonella typhimurium: SC-0224: Report No. T-12660. MRID 00155527.  Unpublished.

Majeska, J. (1985b) Mutagenicity Evaluation in Mouse Lymphoma Multiple Endpoint Test Forward Mutation Assay: SC-0224: Report No. T-12661. MRID 00155528.  Unpublished.

Majeska, J. (1985c) Mutagenicity Evaluation in Chinese Hamster Ovary Cytogenetic Assay: SC-0224: Report No. T-12663. MRID 00155530.  Unpublished.

Majeska, J (1987).  Mutagenic evaluation in bone marrow micronucleus.  Environmental Health Center, Farmington, CT.  Study Report No. T12689/SC-0024.  April 23, 1987.  MRID 40214004. Unpublished.

Mañas, F., Peralta, L., Raviolo, J., Ovando, H.G., Weyers, A., Ugnia, L., Cid, M.G., Larripa, I., and Gorla, N. (2009). Genotoxicity of glyphosate assessed by the comet assay and cytogenetic tests. Environmental toxicology and pharmacology *28*, 37-41.

Mañas, F., Peralta, L., Ugnia, L., Weyers, A., García Ovando, H., and Gorla, N. (2013). Oxidative stress and comet assay in tissues of mice administered glyphosate and ampa in drinking water for 14 days. BAG Journal of basic and applied genetics *24*, 67-75.

Marques, M.F.C. (1999).  A Micronucleus Study in Mice for Glifosate Tecnico Nufarm. Bioagri Laboratorios Ltda.  Study No: RF-G12.79/99.  December 27, 1999. MRID 49957412. Unpublished.

Matsumoto (1995).  HR-001:  In vitro cytogenetics test.  The Institute of Environmental Toxicology, Tokyo, Japan.  Laboratory Project ID: IET 94-0143.  May 29, 1995.  MRID 50017106. Unpublished.

McConnell, EE; Solleveld, HA; Swenberg, JA; *et al.* (1986) Guidelines for combining neoplasms for evaluation of rodent carcinogenesis studies. J Natl Cancer Inst 76:283–289.

McDuffie, H.H., Pahwa, P., McLaughlin, J.R., Spinelli, J.J., Fincham, S., Dosman, J.A., Robson, D., Skinnider, L.F., and Choi, N.W. (2001). Non-Hodgkin's lymphoma and specific pesticide exposures in men: Cross-Canada study of pesticides and health. Cancer Epidemiol Biomarkers Prev *10*, 1155-1163.

McDuffie, HH, Pahwa, P, McLaughlin, JR, Fincham, S, Robson, D, Dosman, JA, Hu, J. 2002. Canadian male farm residents, pesticide safety handling practices, exposure to animals and non-Hodgkin's lymphoma (NHL). American Journal of Industrial Medicine. 42: 54-61.

McDuffie, HH, P Pahwa, JJ Spinelli, JR McLaughlin, S. Fincham, D. Robson, JA Dosman, J. Hu. 2002. Canadian Male Farm Residents, Pesticide Safety Handling Practices, Exposure to Animals, and Non-Hodgkin's Lymphoma. American Journal of Industrial Medicine Supplement 2: 54-61

Meek ME, Boobis A, Cote I, Dellarco V, Fotakis G, Munn S, Seed J, Vickers C.  2014. New developments in the evolution and application of the WHO/IPCS framework on mode of action/species concordance analysis.  *J Appl Toxicol.* 2014 Jan;34(1):1-18.

Mink, P. J., *et al.* (2012). "Epidemiologic studies of glyphosate and cancer: a review." Regul Toxicol Pharmacol 63(3): 440-452.

Mladinic, M., Berend, S., Vrdoljak, A.L., Kopjar, N., Radic, B., and Zeljezic, D. (2009a). Evaluation of genome damage and its relation to oxidative stress induced by glyphosate in human lymphocytes in vitro. Environmental and molecular mutagenesis *50*, 800-807.

Mladinic, M., Perkovic, P., and Zeljezic, D. (2009b). Characterization of chromatin instabilities induced by glyphosate, terbuthylazine and carbofuran using cytome FISH assay. Toxicology letters *189*, 130-137.

Moriya, M. *et al.* 1983.  Further mutagenicity studies on pesticides in bacterial reverse assay systems.  Mutation Research, 116 (1983), 185-216.

Morton *et al.* (2014). Etiologic heterogeneity among non-Hodgkin lymphoma subtypes: the interlymp non-Hodgkin lymphoma subtypes project. J Natl Cancer Inst Monogr 48: 130-144.

Nordstrom, M., Hardell, L., Magnuson, A., Hagberg, H., and Rask-Andersen, A. (1998). Occupational exposures, animal exposure and smoking as risk factors for hairy cell leukaemia evaluated in a case-control study. Br J Cancer *77*, 2048-2052.

NTP (1992). NTP technical report on the toxicity studies of Glyphosate (CAS No. 1071-83-6) Administered In Dosed Feed To F344/N Rats And B6C3F1 Mice. Toxic Rep Ser 16: 1-d3.

OECD (2015).  Guidance Document on Revisions to OECD Genetic Toxicology Test Guidelines. August 31, 2015.

Olsson and Brandt (1988). Risk of non-Hodgkin's lymphoma among men occupationally exposed to organic solvents. Scandinavian Journal of Work, Environment, & Health. 14:246-251.

Orsi, L., Delabre, L., Monnereau, A., Delval, P., Berthou, C., Fenaux, P., Marit, G., Soubeyran, P., Huguet, F., Milpied, N., *et al.* (2009). Occupational exposure to pesticides and lymphoid neoplasms among men: results of a French case-control study. Occupational and environmental medicine *66*, 291-298.

Pahwa, P., Karunanayake, C.P., Dosman, J.A., Spinelli, J.J., McLaughlin, J.R., and Cross-Canada, G. (2011). Soft-tissue sarcoma and pesticides exposure in men: results of a Canadian case-control study. Journal of occupational and environmental medicine / American College of Occupational and Environmental Medicine *53*, 1279-1286.

Pahwa, P., Karunanayake, C.P., Dosman, J.A., Spinelli, J.J., McDuffie, H.H., and McLaughlin, J.R. (2012). Multiple myeloma and exposure to pesticides: a Canadian case-control study. Journal of agromedicine *17*, 40-50.

Parajuli, K. R., *et al.* (2015). "Aminomethylphosphonic acid and methoxyacetic acid induce apoptosis in prostate cancer cells." Int J Mol Sci 16(5): 11750-11765.

Parajuli, K. R., *et al.* (2016). "Aminomethylphosphonic acid inhibits growth and metastasis of human prostate cancer in an orthotopic xenograft mouse model." Oncotarget 7(9): 10616-10626.

Pavkov, K.Ll, Turnier, J.C. (1987) Two-Year Chronic Toxicity and Oncogenecity Dietary Study with SC-0224 in Mice.  Stauffer Chemical Company.  MRID 40214006.  Unpublished.

Pavkov, K.Ll, Wyand, S. (1987) Two-Year Chronic Toxicity and Oncogenecity Dietary Study with SC-0224 in Rats.  Stauffer Chemical Company.  MRID 40214006.  Unpublished.

Peluso M. *et al.* (1998).  32P-Postlabeling detection of DNA adducts in mice treated with herbicide Roundup.  Environ and Mol Mutagen 31:55-59.

Piesova, E. (2004). The influence of different treatment length on the induction of micronuclei in bovine lymphocytes after exposure to glyphosate. Folia Veterinaria *48*, 130-134.

Piesova, E. (2005). The effect of glyphosate on the frequency of micronuclei in bovine lymphocytes in vitro. Acta Veterinaria-Beograd *55*, 101-109.

Portier, C.J., Armstrong, B.K., Baguley, B.C., Baur, X., Belyaev, I., Belle, R., Belpoggi, F., Biggeri, A., Bosland, M.C., Bruzzi, P.,, *et al.* (2016). Differences in the carcinogenic evaluation of glyphosate between the International Agency for Research on Cancer (IARC) and the European Food Safety Authority (EFSA). Journal of epidemiology and community health.

Rank, J., *et al.* (1993). "Genotoxicity testing of the herbicide Roundup and its active ingredient glyphosate isopropylamine using the mouse bone marrow micronucleus test, Salmonella mutagenicity test, and Allium anaphase-telophase test." Mutat Res 300(1): 29-36.

Recore *et al.* (2014). Glyphosate: Tier II incident report. February 6, 2014. D417808.

Reyna, M.S. Gordon, D.E. (1973) 18-Month Carcinogenic Study with CP67573 in Swiss White Mice: IBT No. B569. (Unpublished study, including sponsor's validation report dated Feb 1, 1978, received Jun 21, 1978 under 524-308; prepared by Industrial Bio-Test Laboratories, Inc., submitted by Monsanto Co., Washington, D.C.; CDL:234136-G). MRID 00061113. Unpublished.

Reyna, M.S. Richter, W.R. Gordon, D.E. (1974) Two- Year Chronic Oral Toxicity Study with CP67573 in Albino Rats: IBT No. B564. MRID 00062507.  Unpublished.

Ribeiro do Val, R. (2007).  Bacterial reverse mutation test (Ames test) for Glifosato Technico Helm.  TECAM Tecnologia Ambiental Ltda., Sao Paulo, Brasil.  Study Number 3393/2007-2.0AM, Report Number RL3393/2007-2.0 AM-B, December 13, 2007.  MRID 50000903. Unpublished.

Rodney, DE (1980). Dominant lethal study in mice.  International Research and Development Corp. May 23, 1980.  MRID 0004634

Roustan, A., *et al.* (2014). "Genotoxicity of mixtures of glyphosate and atrazine and their environmental transformation products before and after photoactivation." Chemosphere 108: 93-100.

Ruder, A.M., Waters, M.A., Butler, M.A., Carreon, T., Calvert, G.M., Davis-King, K.E., Schulte, P.A., Sanderson, W.T., Ward, E.M., Connally, L.B.*, et al.* (2004). Gliomas and farm pesticide exposure in men: the upper midwest health study. Archives of environmental health *59*, 650-657.

Schinasi, L., and Leon, M.E. (2014). Non-Hodgkin lymphoma and occupational exposure to agricultural pesticide chemical groups and active ingredients: a systematic review and meta-analysis. International journal of environmental research and public health *11*, 4449-4527.

Shirasu, Y.; Moriya, M.; Ohta, T. (1978) Microbial Mutagenicity Testing on CP67573 (Glyphosate).  Apr 25, 1979 under 524-308; prepared by Institute of Environ- mental Toxicology, Japan, submitted by Monsanto Co., Washington, D.C.; CDL:238233-A.  MRID 00078619. Unpublished.

Sivikova, K. and J. Dianovsky (2006). "Cytogenetic effect of technical glyphosate on cultivated bovine peripheral lymphocytes." Int J Hyg Environ Health 209(1): 15-20.

Smith *et al.*, (2016). Key characteristics of carcinogens as a basis for organizing data on mechanisms of carcinogenesis. Environmental Health Perspectives. 124: 713.

Snedecor, GW; Cochran, WG. (1967) Statistical methods, 6th ed. Ames, Iowa: Iowa State University Press.

Sokolowski, A. (2007a).  *Salmonella typhimurium* and *Escherichia coli* Reverse Mutation Assay with Glyphosate Technical (NUP-05068).  RCC Cytotest Cell Research GmbH, Rossdorf, Germany. Study Number 1061401. March, 16, 2007.  MRID 49957406. Unpublished.

Sokolowski, A. (2007b).  *Salmonella typhimurium* and *Escherichia coli* Reverse Mutation Assay with Glyphosate Technical (NUP-05070).  RCC Cytotest Cell Research GmbH, Rossdorf, Germany. Study Number 1061402. March, 16, 2007.  MRID 49957407. Unpublished.

Sokolowski, A. (2007c).  *Salmonella typhimurium* and *Escherichia coli* Reverse Mutation Assay with Glyphosate Technical (NUP-05067).  RCC Cytotest Cell Research GmbH, Rossdorf, Germany. Study Number 1061403. March, 16, 2007.  MRID 49957408. Unpublished.

Sokolowski, A. (2009b).  Glyphosate technical- Salmonella Typhimurium and Escherichia Coli reverse mutation assay.  Cytotest Cell Research GmbH (Harlan CCR), Rossdorf, German. Study and Report Number 1264500.  December 18, 2009.  MRID 49961801. Unpublished.

Sokolowski, A. (2010).  *Salmonella typhimurium* and *Escherichia coli* Reverse Mutation Assay with Glyphosate TC spiked with glyphosine.  RCC Cytotest Cell Research GmbH, Rossdorf, Germany. Study Number 1332300. April 7, 2010.  MRID 500000902. Unpublished.

Sorahan, T. (2015). "Multiple Myeloma and Glyphosate Use: A Re-Analysis of US Agricultural Health Study (AHS) Data." Int J Environ Res Public Health 12(2): 1548-1559.

Stout, L. D. and Ruecker, P.A. (1990). Chronic Study of Glyphosate Administered in Feed to Albino Rats. MRID No. 41643801; Historical Controls. MRID 41728700.  Unpublished.

Sugimoto, K. (1997), HR-001: 18-Month Oral Oncogenicity Study in Mice, Vol. 1 and 2. The Institute of Environmental Toxicology, 2-772, Suzuki-cho, Kodaira-shi, Tokyo, 187, Japan, Study No.: IET 94-0151.  MRID 50017108, 50017109. Unpublished.

Suresh, T.P. (1993b). Mutagenicity-Micronucleus Test in Swiss Albino Mice. Rallis India Limited.  Study No: TOXI: 889-MUT.MN.  May 6, 1993. MRID 49987407. Unpublished.

Suresh, T.P. (1994).  Genetic Toxicology- In vivo mammalian bone marrow cytogenetic test-Chromosomal analysis.  Rallis Agrochemical Research Station, Bangalore, India.  January 1, 1994.  MRID 49987408.  Unpublished.

Suresh, T.P. (1996) Combined Chronic Toxicity and Carcinogenicity Study with Glyphosate Technical in Wistar Rats.  Toxicology Department Rallis Research Centre, Rallis India Limited, TOXI-1559, 002/1-GPT-CARCI-M.  MRID 49987401. Unpublished.

Taddesse-Heath, L.; Chattopadhyay, S.K.; Dillehay, D.; L.; Lander, M.R.; Nagashfar, Z.; Morse III, H.C.; Hartley, J.W. (2000): Lymphomas and high-level expression of murine leukemia viruses in CFW mice Journal of Virology 74:6832-6837

Tarone, RE. (1982).  The use of historical control information in testing for a trend in proportions. Biometrics 38:215–220.

Thompson, P.W. (1996).  Technical Glyphosate: Reverse Mutation Assay "Ames Test" using *Salmonella typhimurium* and *Escherichia coli.*  Safepharm Laboratories Limited, Derby, UK. Study Number 434/014.  February 20, 1996.  MRID 49957409. Unpublished.

Wang *et al.* (2009). Occupational exposure to solvents and risk of non-Hodgkin lymphoma in Connecticut women. American Journal of Epidemiology. 169:176-185.

Ward, J. M. (2006).  Lymphomas and leukemias in mice.  Experimental and Toxicologic Pathology, 57 (5-6): 377-381.

Weisenburger, D.D. (1992). Pathological Classsification of Non-Hodgkin's Lymphoma for Epidemiological Studies. Cancer Research *52*, 5456S-5462S.

Wilderman, A.G. and Nazar, R.N. (1982).  Significance of plant metabolism in the mutagenicity and toxicity of pesticides.  Canadian Journal of Genetics and Cytology 24(4): 437-449.

Williams, G. M., *et al.* (2000). "Safety Evaluation and Risk Assessment of the Herbicide Roundup and Its Active Ingredient, Glyphosate, for Humans." Regulatory Toxicology and Pharmacology 31(2): 117-165.

Wood, E., Dunster, J., Watson, P., and Brooks, P. (2009a) Glyphosate Technical:  Dietary Combined Chronic Toxicity/Carcinogenicity Study in the Rat.  Harlan Laboratories Limited, Shardlow Business Park, Shardlow, Derbyshire DE72 2GD, UK.  Study No. 2060-012.  April, 23, 2009.  MRID 49957404. Unpublished.

Wood, E., Dunster, J., Watson, P., and Brooks, P. (2009b) Glyphosate Technical:  Dietary Carcinogenicity Study in the Mouse.  Harlan Laboratories Limited, Shardlow Business Park, Shardlow, Derbyshire DE72 2GD, UK.  Study No. 2060-011.  April, 22, 2009.  MRID 49957402. Unpublished.

Wright, N.P. (1996).  Technical Glyphosate:  Chromosomal aberration test in CHL cells in vitro.  Safepharm Laboratories Limited, Derby, UK.  Study Number 434/015. March 13, 1996, MRID 49957410. Unpublished.

Yauk *et al.*, (2015).  Approaches to identifying germ cell mutagens:  Report of the 2013 IWGT workshop on germ cell assays.  Mutat Res Genet Toxicol Environ Mutagen, 783: 36-54.

Yiin, J.H., Ruder, A.M., Stewart, P.A., Waters, M.A., Carreon, T., Butler, M.A., Calvert, G.M., Davis-King, K.E., Schulte, P.A., Mandel, J.S.*, et al.* (2012). The upper midwest health study: a case-control study of pesticide applicators and risk of glioma. Environ Health *11*, 13.

Zaccaria, C.B. (1996). A micronucleus study in mice for the product Glyphosate. BioAgri. Study No: G.1.2 – 06/96.  November 18, 1996. MRID 49961501. Unpublished.

Zahm *et al* (1990). A case-control study of non-Hodgkin's lymphoma and the herbicide 2,4-dichlorophenoxyacetic acid (2,4-D) in Eastern Nebraska. Epidemiology. 1:349-356.

Zhang *et al.* (2007). Ultraviolet radiation exposure and risk of non-Hodgkin's lymphoma. American Journal of Epidemiology. 165: 1255-1264.

Zoriki-Hosmi, (2007).  Hosomi, R. (2007) Mammalian Erythrocyte Micronucleus Test for Glifosato Tecnico Helm. Project Number: RL/3393/2007/3/0MN/B.  MRID 50000901. Unpublished.

## Appendix A. Journal articles obtained from open literature search

| | |
|---|---|
| Abstract Only | Cebollero, L. R., et al. (2011). "Glyphosate based herbicides toxicity, a new approach." Toxicology Letters 205, Supplement: S233. |
| Abstract Only | Monroy, C. M., et al. (2004). "In vitro evaluation of glyphosate-induced DNA damage in fibrosarcoma cells HT1080 and Chinese hamster ovary (CHO) cells." Environ Mol Mutagen 44(3): 216-216. |
| Abstract Only | Ramos-Morales, P., et al. (2008). "Combined use of multiple biomarkers to evaluate the genotoxic activity of the herbicide Glyphosate." Environ Mol Mutagen 49(7): 577-577. |
| Abstract Only/Full article already identified | Sorahan, T. (2015). "Multiple Myeloma and Glyphosate Use: A Re-Analysis of US Agricultural Health Study (AHS) Data." Int J Environ Res Public Health 12(2): 1548-1559. |
| Article not in English | Kwiatkowska, M., et al. (2013). "GLYPHOSATE AND ITS FORMULATIONS - TOXICITY, OCCUPATIONAL AND ENVIRONMENTAL EXPOSURE." Med Pr 64(5): 717-729. |
| Article not in English | Lawson, R. and E. Estrade-Chapellaz (1999). "Intoxication volontaire par le glufosinate (Basta®)." Annales Françaises d'Anesthésie et de Réanimation 18(9): 1025-1026. |
| Article not in English | Mañas, F., et al. (2009). "Aberraciones cromosómicas en trabajadores rurales de la Provincia de Córdoba expuestos a plaguicidas." BAG. Journal of basic and applied genetics 20(1): 0-0. |
| Article not in English | Martinez, A., et al. (2007). "[Cytotoxicity of the herbicide glyphosate in human peripheral blood mononuclear cells]." Biomedica 27(4): 594-604. |
| Article not in English | Monroy, C. M., et al. (2005). "[Cytotoxicity and genotoxicity of human cells exposed in vitro to glyphosate]." Biomedica 25(3): 335-345. |
| Article not in English | Pieniazek, D., et al. (2003). "[Glyphosate--a non-toxic pesticide?]." Med Pr 54(6): 579-583. |
| Article not in English | Saratovskikh, E. A., et al. (2007). "Genotoxicity of the pestiside in Ames test and the possibility to formate the complexuses with DNA." Ekologicheskaya genetika V(3): 46-54. |
| Article not in English | В статье представлены результаты генотоксико логических, аллергологических и иммунологических исследований, проведенных в рамках медико-биологической оценки безопасности генно-инженерно-моди-фицированной кукурузы линии МОN 88017, устойчивой к глифосату и жуку Diabrotica spp. Анализ данных, полученных при изучении уровня повреждений ДНК и уровня хромосомных аберраций, тяжести активного анафилактического шока и интенсивности гуморального иммунного ответа, состояния гуморального и клеточного звеньев иммунитета, не выявил какого-либо генотоксического, аллергенного, иммуномодулирующего и сенсибилизирующего действия ГМ-кукурузы линии МОN 88017 по сравнению с ее традиционным аналогом. |
| Cancer treatment | Parajuli, K. R., et al. (2015). "Aminomethylphosphonic acid and methoxyacetic acid induce apoptosis in prostate cancer cells." Int J Mol Sci 16(5): 11750-11765. |
| Cancer treatment | Li, Q., et al. (2013). "Glyphosate and AMPA inhibit cancer cell growth through inhibiting intracellular glycine synthesis." Drug Des Devel Ther 7: 635-643. |
| Cancer treatment | Parajuli, K. R., et al. (2016). "Aminomethylphosphonic acid inhibits growth and metastasis of human prostate cancer in an orthotopic xenograft mouse model." Oncotarget 7(9): 10616-10626. |
| Correspondence article | Belle, R., et al. (2012). "LETTER TO THE EDITOR: TOXICITY OF ROUNDUP AND GLYPHOSATE." Journal of Toxicology and Environmental Health-Part B-Critical Reviews 15(4): 233-235. |
| Correspondence article | Carrasco, A. E. (2011). "Reply to the Letter to the Editor Regarding Our Article (Paganelli et al., 2010)." Chem Res Toxicol 24(5): 610-613. |
| Correspondence article | de Souza, L. and L. Macedo Oda (2013). "Letter to the editor." Food and Chemical Toxicology 53: 440. |
| Correspondence article | de Vendomois, J. S., et al. (2010). "Debate on GMOs Health Risks after Statistical Findings in Regulatory Tests." Int J Biol Sci 6(6): 590-598. |
| Correspondence article | Farmer, D. R. (2005). "Glyphosate results revisited." Environ Health Perspect 113(6): A365-A366. |
| Correspondence article | Grunewald, W. and J. Bury (2013). "Comment on "Long term toxicity of a Roundup herbicide and a Roundup-tolerant genetically modified maize" by Seralini et al." Food and Chemical Toxicology 53: 447-448. |
| Correspondence article | Huang, K. and W. Xu (2013). "Reply to letter to the editor." Food and Chemical Toxicology 59: 811-812. |
| Correspondence article | Korsaeth, A., et al. (2015). "Comments on the recently published study: "Compositional differences in soybeans on the market: Glyphosate accumulates in Roundup Ready GM soybeans", by T. Bøhn, M. |

| | Cuhra, T. Traavik, M. Sanden, J. Fagan and R. Primicerio (Food Chemistry 2014, 153: 207–215)." Food Chemistry 172: 921-923. |
|---|---|
| Correspondence article | Ollivier, L. (2013). "A Comment on "Séralini, G.-E., et al., Long term toxicity of a Roundup herbicide and a Roundup-tolerant genetically modified maize. Food Chem. Toxicol. (2012)," http://dx.doi.org/10.1016/j.fct.2012.08.005." Food and Chemical Toxicology 53: 458. |
| Correspondence article | Portier, C. J., et al. (2016). "Differences in the carcinogenic evaluation of glyphosate between the International Agency for Research on Cancer (IARC) and the European Food Safety Authority (EFSA)." J Epidemiol Community Health. |
| Correspondence article | Roberfroid, M. (2014). "Letter to the editor." Food and Chemical Toxicology 66: 385. |
| Correspondence article | Sanders, D., et al. (2013). "Comment on "Long term toxicity of a Roundup herbicide and a Roundup-tolerant genetically modified maize" by Seralini et al." Food and Chemical Toxicology 53: 450-453. |
| Correspondence article | Schorsch, F. (2013). "Serious inadequacies regarding the pathology data presented in the paper by Séralini et al. (2012)." Food and Chemical Toxicology 53: 465-466. |
| Correspondence article | Wallace Hayes, A. (2014). "Editor in Chief of Food and Chemical Toxicology answers questions on retraction." Food and Chemical Toxicology 65: 394-395. |
| Effects on cellular processes | Benachour, N. and G.-E. Seralini (2009). "Glyphosate Formulations Induce Apoptosis and Necrosis in Human Umbilical, Embryonic, and Placental Cells." Chem Res Toxicol 22(1): 97-105. |
| Effects on cellular processes | Chaufan, G., et al. (2014). "Glyphosate commercial formulation causes cytotoxicity, oxidative effects, and apoptosis on human cells: differences with its active ingredient." Int J Toxicol 33(1): 29-38. |
| Effects on cellular processes | Coalova, I., et al. (2014). "Influence of the spray adjuvant on the toxicity effects of a glyphosate formulation." Toxicology in Vitro 28(7): 1306-1311. |
| Effects on cellular processes | George, J., et al. (2010). "Studies on glyphosate-induced carcinogenicity in mouse skin: a proteomic approach." J Proteomics 73(5): 951-964. |
| Effects on cellular processes | George, J. and Y. Shukla (2013). "Emptying of Intracellular Calcium Pool and Oxidative Stress Imbalance Are Associated with the Glyphosate-Induced Proliferation in Human Skin Keratinocytes HaCaT Cells." ISRN Dermatol 2013: 825180. |
| Effects on cellular processes | Heu, C., et al. (2012). "A step further toward glyphosate-induced epidermal cell death: Involvement of mitochondrial and oxidative mechanisms." Environmental Toxicology and Pharmacology 34(2): 144-153. |
| Effects on cellular processes | Thongprakaisang, S., et al. (2013). "Glyphosate induces human breast cancer cells growth via estrogen receptors." Food Chem Toxicol 59: 129-136. |
| Not Relevant to current fit for purpose review | (1934). "The 1933 meeting of the American society of orthodontists at Oklahoma City." International Journal of Orthodontia and Dentistry for Children 20(1): 102-105. |
| Not Relevant to current fit for purpose review | (1938). "Supplementary report of region III: Reports of state chairmen." The Journal of Pediatrics 12(<HT>6</HT>): 846-850. |
| Not Relevant to current fit for purpose review | (1939). "Meeting of the Executive Board of the American Academy of Pediatrics." The Journal of Pediatrics 15(2): 294-315. |
| Not Relevant to current fit for purpose review | (1939). "Proceedings Meeting of the Executive Board of the American Academy of Pediatrics." The Journal of Pediatrics 14(2): 251-254. |
| Not Relevant to current fit for purpose review | (1967). "AORN Proceedings." AORN Journal 5(1): 82-91. |
| Not Relevant to current fit for purpose review | (1969). "AORN Proceedings." AORN Journal 9(5): 89-96. |
| Not Relevant to current fit for purpose review | (1969). "Nurse Recruitment Program—Stage I Winners." AORN Journal 10(<HT>6</HT>): 71-76. |
| Not Relevant to current fit for purpose review | (1970). "2036. Excretion of heliotrine in urine and bile: Jago, Marjorie, V., Lanigan, G. W., Bingley, J. B., Piercy, D. W. T., Whittem, J. H.&amp; Titchen, D. A. (1969). Excretion of the pyrrolizidine alkaloid heliotrine in the urine and bile of sheep. J. Path. 98, 115." Food and Cosmetics Toxicology 8(5): 607-608. |
| Not Relevant to current fit for purpose review | (1970). "2037. A round-up of fungal toxins: Krogh, P. (1969). The pathology of mycotoxicoses. J. stored Prod. Res. 5, 259." Food and Cosmetics Toxicology 8(5): 608. |
| Not Relevant to current fit for purpose review | (1972). "News and comment." American Journal of Orthodontics 62(3): 319-334. |
| Not Relevant to current fit for purpose review | (1976). "NHI proposals: a wide spectrum." AORN Journal 23(5): 814-818. |

| Not Relevant to current fit for purpose review | (1977). "The SR periodicals miscellany." Serials Review 3(2): 11-19. |
|---|---|
| Not Relevant to current fit for purpose review | (1980). "Appendix F — administrative procedures, facilities and standardization of testing." Survey of Ophthalmology 24, Supplement: 594-597. |
| Not Relevant to current fit for purpose review | (1981). "Calendar." Annals of Emergency Medicine 10(3): 5-6. |
| Not Relevant to current fit for purpose review | (1981). "Reviews of Books." The Lancet 317(8232): 1239-1240. |
| Not Relevant to current fit for purpose review | (1982). "Reviews of Books." The Lancet 320(8307): 1076-1078. |
| Not Relevant to current fit for purpose review | (1983). "Product news." Journal of Molecular Graphics 1(3): 89-91. |
| Not Relevant to current fit for purpose review | (1984). "24–27 October 1984 International meeting on artificial intelligence: Marseilles, France." Computer Compacts 2(3–4): 121-122. |
| Not Relevant to current fit for purpose review | (1985). "Newsview." Journal of Allergy and Clinical Immunology 76(2, Part 1): A36-A41. |
| Not Relevant to current fit for purpose review | (1990). "Regional direct marketing clubs/associations support DM education at local colleges/universities." Journal of Direct Marketing 4(1): 46-52. |
| Not Relevant to current fit for purpose review | (1990). "Subject index." Toxicology 61(3): 313-316. |
| Not Relevant to current fit for purpose review | (1990). "Volume contents." Toxicology 61(3): 319-320. |
| Not Relevant to current fit for purpose review | (1991). "4971677 Fluorescence detection type electrophoresis apparatus: Hideki Kambara, Yoshiko Katayama, Tetsuo Nishikawa, Hachiouji, Japan assigned to Hitachi Ltd." Biotechnology Advances 9(1): 89. |
| Not Relevant to current fit for purpose review | (1991). "4971903 Pyrophosphate-based method and apparatus for sequencing nucleic acids: Edward Hyman." Biotechnology Advances 9(1): 89. |
| Not Relevant to current fit for purpose review | (1991). "4971908 Glyphosate-tolerant 5-enolpyruvyl 3-phosphoshikimate synthase: Ganesh M Kishore, Dilip Shah assigned to Monsanto Company." Biotechnology Advances 9(1): 89. |
| Not Relevant to current fit for purpose review | (1991). "Author Index." Journal of Chromatography A 540: 479-482. |
| Not Relevant to current fit for purpose review | (1991). "Challenge to US computer fraud &amp; abuse act." Computer Fraud & Security Bulletin 1991(3): 5-6. |
| Not Relevant to current fit for purpose review | (1991). "Chemical index for volumes 16–17." Fundamental and Applied Toxicology 17(4): 848-850. |
| Not Relevant to current fit for purpose review | (1991). "Court case round-ups." Computer Fraud & Security Bulletin 1991(3): 5. |
| Not Relevant to current fit for purpose review | (1991). "FAT attacker!" Computer Fraud & Security Bulletin 1991(3): 5. |
| Not Relevant to current fit for purpose review | (1991). "FIGO news." International Journal of Gynecology & Obstetrics 35(3): 265-267. |
| Not Relevant to current fit for purpose review | (1991). "Local direct marketing clubs/associations support undergraduate/graduate level DM education." Journal of Direct Marketing 5(3): 61-65. |
| Not Relevant to current fit for purpose review | (1991). "Manipulation of molluscan haemocytes in vitro: ∗S.E. Fryer. Department of Zoology, Oregon State University, Corvallis OR 97331, USA." Developmental & Comparative Immunology 15, Supplement 1: S73. |
| Not Relevant to current fit for purpose review | (1991). "Preparation of monoclonal antibodies against hemolymph of the kuruma shrimp Penaeus japonicus (Crustacea: Decapoda): J. Rodriguez, V. Boulo, E. Bachère and E. Mialhe. IFREMER, Unité Pathol. Immunol. Génét. Mol., BP 133, 17390 La Tremblade, France." Developmental & Comparative Immunology 15, Supplement 1: S73. |
| Not Relevant to current fit for purpose review | (1991). "Round-up report from college/university direct marketing centers." Journal of Direct Marketing 5(2): 59-64. |
| Not Relevant to current fit for purpose review | (1992). "Forthcoming papers." Soil Biology and Biochemistry 24(1): 79. |

| Not Relevant to current fit for purpose review | (1992). "Subject index volume 85 (1992)." Plant Science 85(2): 235-237. |
|---|---|
| Not Relevant to current fit for purpose review | (1993). "Media watch." Physiotherapy 79(7): 496-498. |
| Not Relevant to current fit for purpose review | (1993). "Meetings and Notices." Journal of Equine Veterinary Science 13(9): 481-536. |
| Not Relevant to current fit for purpose review | (1993). "Meetings and notices." Journal of Equine Veterinary Science 13(8): 432-476. |
| Not Relevant to current fit for purpose review | (1993). "ROUND-UP Publications." Reproductive Health Matters 1(1): 109-110. |
| Not Relevant to current fit for purpose review | (1994). "Media Watch." Physiotherapy 80(11): 793-795. |
| Not Relevant to current fit for purpose review | (1994). "ROUND-UP Research." Reproductive Health Matters 2(4): 121-122. |
| Not Relevant to current fit for purpose review | (1994). "ROUND-UP Service Delivery." Reproductive Health Matters 2(3): 125-128. |
| Not Relevant to current fit for purpose review | (1995). "ROUND-UP Law and Policy." Reproductive Health Matters 3(<HT>6</HT>): 164-166. |
| Not Relevant to current fit for purpose review | (1995). "ROUND-UP Publications." Reproductive Health Matters 3(5): 146-151. |
| Not Relevant to current fit for purpose review | (1995). "ROUND-UP Service Delivery." Reproductive Health Matters 3(<HT>6</HT>): 167-169. |
| Not Relevant to current fit for purpose review | (1996). "5410871 Emission control device and method: Masters Ben F; Self James M Gastonia, NC, United States Assigned to Unlimited Technologies Inc." Environment International 22(2): XVI-XVII. |
| Not Relevant to current fit for purpose review | (1996). "5411697 Method for processing contaminated plastic waste: McGraw Peter S; Drake John; Hane Thomas H Severna Park, MD, United States Assigned to The United States of America as represented by the Secretary of the Navy." Environment International 22(2): XVII. |
| Not Relevant to current fit for purpose review | (1996). "5411944 Glyphosate-sulfuric acid adduct herbicides and use: Young Donald C Fullerton, CA, United States Assigned to Union Oil Company of California." Environment International 22(2): XVII. |
| Not Relevant to current fit for purpose review | (1996). "5412544 Method of illuminating and providing emergency egress guidance for hazardous areas: Derrick Donald E; Harris Hollis A; Marion Robert H; Tower William A; Towle L Christophe Hanover, NH, United States Assigned to Loctite Luminescent Systems Inc; The MTL Instruments Group." Environment International 22(2): XVII. |
| Not Relevant to current fit for purpose review | (1996). "Animal breeding and infertility: M.J. Meredith (Editor), Blackwell Science, Oxford, 1995, 508 pp., £60.00, ISBN 0-632-04038-6." Animal Reproduction Science 44(2): 135-136. |
| Not Relevant to current fit for purpose review | (1996). "Preliminary program of the ninety-sixth annual session, May 11–15,1996." American Journal of Orthodontics and Dentofacial Orthopedics 109(2): 196-214. |
| Not Relevant to current fit for purpose review | (1996). "Roundup of Federal Regulations on Food and Nutrition Issues." Journal of the American Dietetic Association 96(7): 654. |
| Not Relevant to current fit for purpose review | (1996). "ROUND-UP Research." Reproductive Health Matters 4(8): 149-153. |
| Not Relevant to current fit for purpose review | (1997). "ROUND-UP Conferences." Reproductive Health Matters 5(10): 180. |
| Not Relevant to current fit for purpose review | (1997). "ROUND-UP Research." Reproductive Health Matters 5(10): 162-167. |
| Not Relevant to current fit for purpose review | (1998). "E. coli antiserum." Journal of Equine Veterinary Science 18(8): 507. |
| Not Relevant to current fit for purpose review | (1998). "EIA in wild horses." Journal of Equine Veterinary Science 18(8): 507. |
| Not Relevant to current fit for purpose review | (1998). "Exercise-induced endotoxemia." Journal of Equine Veterinary Science 18(8): 506-507. |
| Not Relevant to current fit for purpose review | (1998). "Flamel Technologies sur les starting-blocks." Biofutur 1998(176): 41. |
| Not Relevant to current fit for purpose review | (1998). "Legislative roundup: protection of human subjects key issue for Congress." J Natl Cancer Inst 90(2): 97-98. |

| Not Relevant to current fit for purpose review | (1998). "ROUND-UP Conferences." Reproductive Health Matters <HT>6</HT>(12): 186. |
|---|---|
| Not Relevant to current fit for purpose review | (1999). "Research poster summaries from the ENA 1999 Annual Meeting." Journal of Emergency Nursing 25(<HT>6</HT>): 446-456. |
| Not Relevant to current fit for purpose review | (1999). "ROUND-UP Publications." Reproductive Health Matters 7(14): 196-201. |
| Not Relevant to current fit for purpose review | (2000). "Genome roundup." Nat Biotechnol 18(1): 9. |
| Not Relevant to current fit for purpose review | (2000). "ROUND-UP Law and Policy." Reproductive Health Matters 8(15): 171-174. |
| Not Relevant to current fit for purpose review | (2000). "ROUND-UP Research." Reproductive Health Matters 8(16): 190-192. |
| Not Relevant to current fit for purpose review | (2000). "Trauma news today." International Journal of Trauma Nursing <HT>6</HT>(3): 105-108. |
| Not Relevant to current fit for purpose review | (2001). "ROUND-UP Research." Reproductive Health Matters 9(18): 196-198. |
| Not Relevant to current fit for purpose review | (2002). "ROUND-UP Research." Reproductive Health Matters 10(19): 209-210. |
| Not Relevant to current fit for purpose review | (2003). "New Web site lights childhood obesity with fun." Journal of the American Dietetic Association 103(<HT>6</HT>): 671-672. |
| Not Relevant to current fit for purpose review | (2003). "ROUND-UP Law and Policy." Reproductive Health Matters 11(22): 199-203. |
| Not Relevant to current fit for purpose review | (2003). "ROUND-UP Research." Reproductive Health Matters 11(21): 201-204. |
| Not Relevant to current fit for purpose review | (2004). "Contemporary issues in women's health." International Journal of Gynecology & Obstetrics 87(2): 111-113. |
| Not Relevant to current fit for purpose review | (2004). "Contents page, CD logo." The Journal of Men's Health & Gender 1(4): 283-284. |
| Not Relevant to current fit for purpose review | (2004). "Editorial Board." European Journal of Oncology Nursing 8(4): i. |
| Not Relevant to current fit for purpose review | (2004). "Editorial Board." European Journal of Oncology Nursing 8(3): i. |
| Not Relevant to current fit for purpose review | (2004). "Editorial Board." European Journal of Oncology Nursing 8, Supplement 1: i. |
| Not Relevant to current fit for purpose review | (2004). "Editorial Board." European Journal of Oncology Nursing 8, Supplement 2: i. |
| Not Relevant to current fit for purpose review | (2004). "Research round-up." Complementary Therapies in Nursing and Midwifery 10(4): 262-263. |
| Not Relevant to current fit for purpose review | (2004). "ROUND-UP Condoms." Reproductive Health Matters 12(23): 176-177. |
| Not Relevant to current fit for purpose review | (2004). "ROUND-UP Publications." Reproductive Health Matters 12(24): 231-236. |
| Not Relevant to current fit for purpose review | (2004). "ROUND-UP Service Delivery." Reproductive Health Matters 12(23): 191-200. |
| Not Relevant to current fit for purpose review | (2004). "Volume Contents Index." The Journal of Men's Health & Gender 1(4): 413-415. |
| Not Relevant to current fit for purpose review | (2004). "WebWatch." The Journal of Men's Health & Gender 1(2–3): 240. |
| Not Relevant to current fit for purpose review | (2004). "You've Been Had! How the Media and Environmentalists Turned America into a Nation of Hypochondriacs: Melvin A. Benarde. Rutgers University Press, 2002. xiv + 308 pp. $28.00. ISBN 0-8135-3050-4." Chemical Health and Safety 11(2): 39-40. |
| Not Relevant to current fit for purpose review | (2005). "Contents page, CD logo." The Journal of Men's Health & Gender 2(4): 387. |
| Not Relevant to current fit for purpose review | (2005). "Contents page, CD logo." The Journal of Men's Health & Gender 2(2): 159-160. |

| | |
|---|---|
| Not Relevant to current fit for purpose review | (2005). "Editorial Board." European Journal of Oncology Nursing 9(4): i. |
| Not Relevant to current fit for purpose review | (2005). "Editorial Board." European Journal of Oncology Nursing 9(3): i. |
| Not Relevant to current fit for purpose review | (2005). "Editorial Board." European Journal of Oncology Nursing 9(2): i. |
| Not Relevant to current fit for purpose review | (2005). "Editorial Board." European Journal of Oncology Nursing 9(1): i. |
| Not Relevant to current fit for purpose review | (2005). "JournalWatch." The Journal of Men's Health & Gender 2(3): 353-356. |
| Not Relevant to current fit for purpose review | (2005). "News Round-up." The Journal of Men's Health & Gender 2(3): 360-363. |
| Not Relevant to current fit for purpose review | (2005). "News Round-up." The Journal of Men's Health & Gender 2(1): 116-118. |
| Not Relevant to current fit for purpose review | (2005). "News Round-up for jmhg vol 2 no 4 (Dec 2005)." The Journal of Men's Health & Gender 2(4): 444. |
| Not Relevant to current fit for purpose review | (2005). "Research round-up: a brief summary of research publications in CAM." Complementary Therapies in Clinical Practice 11(2): 139-141. |
| Not Relevant to current fit for purpose review | (2006). "ACFAOM newsletter." The Foot 16(4): 226-227. |
| Not Relevant to current fit for purpose review | (2006). "Aims &amp; Scope/Editorial board." The Journal of Men's Health & Gender 3(1): iii. |
| Not Relevant to current fit for purpose review | (2006). "Contents page, CD logo." The Journal of Men's Health & Gender 3(2): 119-120. |
| Not Relevant to current fit for purpose review | (2006). "Contents page, CD logo." The Journal of Men's Health & Gender 3(4): 315-316. |
| Not Relevant to current fit for purpose review | (2006). "Editorial Board." European Journal of Oncology Nursing 10(5): i. |
| Not Relevant to current fit for purpose review | (2006). "Editorial Board." European Journal of Oncology Nursing 10(4): i. |
| Not Relevant to current fit for purpose review | (2006). "Editorial Board." European Journal of Oncology Nursing 10(3): i. |
| Not Relevant to current fit for purpose review | (2006). "Editorial Board." European Journal of Oncology Nursing 10(2): i. |
| Not Relevant to current fit for purpose review | (2006). "Editorial Board." European Journal of Oncology Nursing 10(1): i. |
| Not Relevant to current fit for purpose review | (2006). "Editorial Board/Publication/Advertising info." Progress in Biophysics and Molecular Biology 92(1): CO2. |
| Not Relevant to current fit for purpose review | (2006). "News Round-up." The Journal of Men's Health & Gender 3(1): 93-96. |
| Not Relevant to current fit for purpose review | (2006). "News Round-up for jmhg vol 3 no 3 (September 2006)." The Journal of Men's Health & Gender 3(3): 304-306. |
| Not Relevant to current fit for purpose review | (2006). "Research." Reproductive Health Matters 14(28): 210-218. |
| Not Relevant to current fit for purpose review | (2006). "Research problems." Discrete Applied Mathematics 154(3): 604-607. |
| Not Relevant to current fit for purpose review | (2006). "Table of Contents." The American Journal of Emergency Medicine 24(4): A3-A4. |
| Not Relevant to current fit for purpose review | (2006). "Volume Contents Index: Volume 3." The Journal of Men's Health & Gender 3(4): 427-431. |
| Not Relevant to current fit for purpose review | (2006). "WebWatch for jmhg vol 3 no 1 (issue 9)." The Journal of Men's Health & Gender 3(1): 88. |
| Not Relevant to current fit for purpose review | (2007). "Art exhibit powered by geothermal energy." Renewable Energy Focus 8(<HT>6</HT>): 14. |

| Not Relevant to current fit for purpose review | (2007). "Contents." The Journal of Men's Health & Gender 4(2): 113-114. |
| Not Relevant to current fit for purpose review | (2007). "Contents page." The Journal of Men's Health & Gender 4(1): 1-2. |
| Not Relevant to current fit for purpose review | (2007). "Editorial Board." European Journal of Oncology Nursing 11, Supplement 2: ii. |
| Not Relevant to current fit for purpose review | (2007). "Editorial Board." European Journal of Oncology Nursing 11(5): i. |
| Not Relevant to current fit for purpose review | (2007). "Editorial Board." European Journal of Oncology Nursing 11(4): i. |
| Not Relevant to current fit for purpose review | (2007). "Editorial Board." European Journal of Oncology Nursing 11(3): i. |
| Not Relevant to current fit for purpose review | (2007). "Editorial Board." European Journal of Oncology Nursing 11(2): i. |
| Not Relevant to current fit for purpose review | (2007). "Editorial Board." European Journal of Oncology Nursing 11(1): i. |
| Not Relevant to current fit for purpose review | (2007). "In brief." Renewable Energy Focus 8(<HT>6</HT>): 18-19. |
| Not Relevant to current fit for purpose review | (2007). "North America." Renewable Energy Focus 8(5): 6. |
| Not Relevant to current fit for purpose review | (2007). "US could "eliminate CO2 emissions without nuclear power"." Renewable Energy Focus 8(5): 18. |
| Not Relevant to current fit for purpose review | (2008). "Editorial Board." European Journal of Oncology Nursing 12(5): i. |
| Not Relevant to current fit for purpose review | (2008). "Editorial Board." European Journal of Oncology Nursing 12(1): i. |
| Not Relevant to current fit for purpose review | (2008). "Editorial Board." European Journal of Oncology Nursing 12(4): i. |
| Not Relevant to current fit for purpose review | (2008). "Editorial Board." European Journal of Oncology Nursing 12(3): i. |
| Not Relevant to current fit for purpose review | (2008). "Editorial Board." European Journal of Oncology Nursing 12(2): i. |
| Not Relevant to current fit for purpose review | (2008). "In Brief." Renewable Energy Focus 9(3): 16. |
| Not Relevant to current fit for purpose review | (2008). "In brief – projects." Renewable Energy Focus 9(<HT>6</HT>): 15. |
| Not Relevant to current fit for purpose review | (2008). "Swiss FiT on slippery slope?" Renewable Energy Focus 9(5): 12. |
| Not Relevant to current fit for purpose review | (2008). "US wind heavyweights unite over PTC." Renewable Energy Focus 9(3): 17. |
| Not Relevant to current fit for purpose review | (2008). "Wärtsilä BioPower plant to use brewery spent grain." Renewable Energy Focus 9(2): 12. |
| Not Relevant to current fit for purpose review | (2009). "Acknowledgements." European Journal of Agronomy 31(3): iv. |
| Not Relevant to current fit for purpose review | (2009). "Carbon Trust calls for switch to biomass heating." Renewable Energy Focus 10(2): 15. |
| Not Relevant to current fit for purpose review | (2009). "Editorial Board." European Journal of Oncology Nursing 13(4): i. |
| Not Relevant to current fit for purpose review | (2009). "Editorial Board." European Journal of Oncology Nursing 13(3): i. |
| Not Relevant to current fit for purpose review | (2009). "Editorial Board." European Journal of Oncology Nursing 13(2): i. |
| Not Relevant to current fit for purpose review | (2009). "Editorial Board." European Journal of Oncology Nursing 13(1): i. |

| Not Relevant to current fit for purpose review | (2009). "EU renewables in short." Renewable Energy Focus 9(7): 14. |
|---|---|
| Not Relevant to current fit for purpose review | (2009). "Pickens scraps "mega" wind plans." Renewable Energy Focus 10(5): 18. |
| Not Relevant to current fit for purpose review | (2009). "Policy still needed for solar growth." Renewable Energy Focus 10(<HT>6</HT>): 16. |
| Not Relevant to current fit for purpose review | (2009). "Shell withdraws from wind and solar — focuses on biofuels." Renewable Energy Focus 10(3): 19. |
| Not Relevant to current fit for purpose review | (2010). "Communications orales du 27e congrès de la SFE." Annales d'Endocrinologie 71(5): 340-353. |
| Not Relevant to current fit for purpose review | (2010). "Ten GW US wind in 2009." Renewable Energy Focus 11(1): 13. |
| Not Relevant to current fit for purpose review | (2010). "UK introduces feed-in tariffs." Renewable Energy Focus 11(1): 8. |
| Not Relevant to current fit for purpose review | (2011). "€51 billion offshore wind market." Renewable Energy Focus 12(<HT>6</HT>): 12. |
| Not Relevant to current fit for purpose review | (2011). "December, 2010." The Lancet Neurology 10(3): 209. |
| Not Relevant to current fit for purpose review | (2011). "Directions &amp; Connections." Journal of the American Medical Directors Association 12(8): A14-A15. |
| Not Relevant to current fit for purpose review | (2011). "Directions &amp; Connections." Journal of the American Medical Directors Association 12(7): A14-A15. |
| Not Relevant to current fit for purpose review | (2011). "Directions &amp; Connections." Journal of the American Medical Directors Association 12(9): A10-A11. |
| Not Relevant to current fit for purpose review | (2011). "Editorial Board." Spectrochimica Acta Part A: Molecular and Biomolecular Spectroscopy 78(5): CO2. |
| Not Relevant to current fit for purpose review | (2011). "EU: huge renewables growth if projections met." Renewable Energy Focus 12(<HT>6</HT>): 10. |
| Not Relevant to current fit for purpose review | (2011). "Table of Contents." Regulatory Toxicology and Pharmacology 61(2): iii. |
| Not Relevant to current fit for purpose review | (2011). "Table of Contents." The American Journal of Emergency Medicine 29(4): A5-A7. |
| Not Relevant to current fit for purpose review | (2012). "Contents." The American Journal of Medicine 125(8): A5-A7. |
| Not Relevant to current fit for purpose review | (2012). "Directions &amp; Connections." Journal of the American Medical Directors Association 13(1): A10-A11. |
| Not Relevant to current fit for purpose review | (2012). "Directions &amp; Connections." Journal of the American Medical Directors Association 13(2): A14-A15. |
| Not Relevant to current fit for purpose review | (2012). "Impact sanitaire de la pollution environnementale et solutions pour la dépollution cellulaire." La Revue d'Homéopathie 3(3): 115-117. |
| Not Relevant to current fit for purpose review | (2012). "Revue de presse." La Revue d'Homéopathie 3(4): 159-160. |
| Not Relevant to current fit for purpose review | (2013). "December, 2012." The Lancet Neurology 12(3): 230. |
| Not Relevant to current fit for purpose review | (2015). "60 Seconds." New Scientist 225(3014): 7. |
| Not Relevant to current fit for purpose review | (2015). "60 Seconds." New Scientist 226(3022): 7. |
| Not Relevant to current fit for purpose review | (2015). "GLYPHOSATE UNLIKELY TO CAUSE CANCER, EU AGENCY FINDS." Chemical & Engineering News 93(45): 26-26. |
| Not Relevant to current fit for purpose review | (2016). "EDITORIAL BOARD." NeuroToxicology 52: IFC. |
| Not Relevant to current fit for purpose review | Abdullahi, A. E. (2002). "Cynodon dactylon control with tillage and glyphosate." Crop Protection 21(10): 1093-1100. |

| Not Relevant to current fit for purpose review | Acar, A., et al. (2015). "The Investigation of Genotoxic, Physiological and Anatomical Effects of Paraquat Herbicide on Allium cepa L." Cytologia 80(3): 343-351. |
| --- | --- |
| Not Relevant to current fit for purpose review | Acquavella, J., et al. (1999). "A case-control study of non-Hodgkin lymphoma and exposure to pesticides." Cancer 86(4): 729-731. |
| Not Relevant to current fit for purpose review | Aicher, R. H. (1999). "Vicarious Liability." Aesthetic Surgery Journal 19(4): 341. |
| Not Relevant to current fit for purpose review | Akaza, H. (2007). "Report from the 1st Japanese Urological Association-Japanese Society of Medical Oncology joint conference, 2006: 'A step towards better collaboration between urologists and medical oncologists'." Int J Urol 14(5): 375-383. |
| Not Relevant to current fit for purpose review | Akert, K. (1959). "Morphologue und physiologie des nervensystems: Paul Glees Georg Thieme, Verlag, Stuttgart, 1957, 445 pp. $13.50." Electroencephalography and Clinical Neurophysiology 11(1): 191-192. |
| Not Relevant to current fit for purpose review | Albrecht, B., et al. (1991). "In vivo utilization of N-(phosphonomethyl)-anilines and related substances by Pseudomonas spec. GS." J Basic Microbiol 31(6): 403-411. |
| Not Relevant to current fit for purpose review | Altenhoff, A. M. and C. Dessimoz (2009). "Phylogenetic and functional assessment of orthologs inference projects and methods." PLoS Comput Biol 5(1): e1000262. |
| Not Relevant to current fit for purpose review | Amaro, P. (2012). "O mancozebe é um óptimo exemplo da diversidade de classificação toxicológica dos pesticidas em Portugal." Revista de Ciências Agrárias 35(2): 118-125. |
| Not Relevant to current fit for purpose review | Andersson, K.-E. (2011). "This Month in Investigative Urology." The Journal of Urology 185(4): 1176. |
| Not Relevant to current fit for purpose review | Angelini, C. (2012). "Neuromuscular diseases: advances in therapy and diagnosis." The Lancet Neurology 11(1): 15-17. |
| Not Relevant to current fit for purpose review | Anklam, E. (1999). "The validation of methods based on polymerase chain reaction for the detection of genetically modified organisms in food." Analytica Chimica Acta 393(1–3): 177-179. |
| Not Relevant to current fit for purpose review | Antonini, A. (2012). "Movement disorders: towards new therapies in Parkinson's disease." The Lancet Neurology 11(1): 7-8. |
| Not Relevant to current fit for purpose review | Arjo, G., et al. (2013). "Plurality of opinion, scientific discourse and pseudoscience: an in depth analysis of the Seralini et al. study claiming that Roundup (TM) Ready corn or the herbicide Roundup (TM) cause cancer in rats." Transgenic Res 22(2): 255-267. |
| Not Relevant to current fit for purpose review | Astudillo, O. (2012). "Clinical trials: round-up." The Lancet Oncology 13(10): 976. |
| Not Relevant to current fit for purpose review | Atkinson, S. (2003). "Product developments in biotechnology and medical applications." Membrane Technology 2003(2): 10-11. |
| Not Relevant to current fit for purpose review | Avella, P., et al. (2007). "Metric inequalities and the Network Loading Problem." Discrete Optimization 4(1): 103-114. |
| Not Relevant to current fit for purpose review | Axelrad, J. C., et al. (2002). "Enhanced in vitro toxicity of the herbicide glyphosate to neuroblastoma cells chronically pre-treated with the organophosphate pesticide diazinon." Toxicology 178(1): 62-63. |
| Not Relevant to current fit for purpose review | Axelrad, J. C., et al. (2003). "The effects of acute pesticide exposure on neuroblastoma cells chronically exposed to diazinon." Toxicology 185(1–2): 67-78. |
| Not Relevant to current fit for purpose review | Azevedo, L., et al. (2010). "In Vivo Antimutagenic Properties of Transgenic and Conventional Soybeans." J Med Food 13(6): 1402-1408. |
| Not Relevant to current fit for purpose review | Bababunmi, E. A., et al. (1979). "The uncoupling effect of N-(phosphonomethyl)glycine on isolated rat liver mitochondria." Biochemical Pharmacology 28(<HT>6</HT>): 925-927. |
| Not Relevant to current fit for purpose review | Badr, A., et al. (2013). "Cytophysiological impacts of Metosulam herbicide on Vicia faba plants." Acta Physiologiae Plantarum 35(6): 1933-1941. |
| Not Relevant to current fit for purpose review | Barker, W. F. (1995). "The Western Vascular Society: Its first ten years." Journal of Vascular Surgery 22(4): 505-506. |
| Not Relevant to current fit for purpose review | Baron, R., et al. (2012). "Chronic pain: genes, plasticity, and phenotypes." The Lancet Neurology 11(1): 19-21. |
| Not Relevant to current fit for purpose review | Bar-Or, A. (2016). "Multiple sclerosis and related disorders: evolving pathophysiologic insights." The Lancet Neurology 15(1): 9-11. |
| Not Relevant to current fit for purpose review | Bartelink, H., et al. (1993). "Foreword." Radiotherapy and Oncology 29(2): xi-xii. |
| Not Relevant to current fit for purpose review | Bates, J. A. (2004). "Use of narrative interviewing in everyday information behavior research." Library & Information Science Research 26(1): 15-28. |

| Not Relevant to current fit for purpose review | Begna, S. H., et al. (2001). "Morphology and yield response to weed pressure by corn hybrids differing in canopy architecture." European Journal of Agronomy 14(4): 293-302. |
|---|---|
| Not Relevant to current fit for purpose review | Benachour, N., et al. (2007). "Time- and dose-dependent effects of roundup on human embryonic and placental cells." Arch Environ Contam Toxicol 53(1): 126-133. |
| Not Relevant to current fit for purpose review | Ben-Menachem, E. (2016). "Epilepsy in 2015: the year of collaborations for big data." The Lancet Neurology 15(1): 6-7. |
| Not Relevant to current fit for purpose review | Berdal, K. G. and A. Holst-Jensen (2001). "Roundup Ready (R) soybean event-specific real-time quantitative PCR assay and estimation of the practical detection and quantification limits in GMO analyses." European Food Research and Technology 213(6): 432-438. |
| Not Relevant to current fit for purpose review | Berer, M. (1996). "Men." Reproductive Health Matters 4(7): 7-10. |
| Not Relevant to current fit for purpose review | Berkovic, S. F. (2010). "Epilepsy: insights into causes and treatment dilemmas." The Lancet Neurology 9(1): 9-11. |
| Not Relevant to current fit for purpose review | Bermel, R. A. and J. A. Cohen (2011). "Multiple sclerosis: advances in understanding pathogenesis and emergence of oral treatment options." The Lancet Neurology 10(1): 4-5. |
| Not Relevant to current fit for purpose review | Bertheussen, K., et al. (1997). "A new sensitive cell culture test for tee assessment of pesticide toxicity." Journal of Environmental Science and Health Part B-Pesticides Food Contaminants and Agricultural Wastes 32(2): 195-211. |
| Not Relevant to current fit for purpose review | Bertucci, A., et al. (2015). "Detection of unamplified genomic DNA by a PNA-based microstructured optical fiber (MOF) Bragg-grating optofluidic system." Biosens Bioelectron 63: 248-254. |
| Not Relevant to current fit for purpose review | Bf (1995). "Let's Get Things Moving: Overcoming constipation." Physiotherapy 81(5): 301. |
| Not Relevant to current fit for purpose review | Bjerrum-Bohr, J. J., et al. (2012). "Hydrodynamics of a quark droplet." Nuclear Physics A 882: 90-106. |
| Not Relevant to current fit for purpose review | Blumann, W. and D. Fauth (1993). "Expensive NM standards round-up: Network Management Standards: OSI, SNMP and CMOL Protocols by Ulyses Black. Published by McGraw Hill, 1992, £38.95, 336 pp." Computer Communications 16(7): 449. |
| Not Relevant to current fit for purpose review | Bogler, O. and R. Sawaya (2008). "Foreword." Current Problems in Cancer 32(3): 95-96. |
| Not Relevant to current fit for purpose review | Bonn, D. (2005). "Web round-up: rare-tumour information." The Lancet Oncology <HT>6</HT>(3): 144. |
| Not Relevant to current fit for purpose review | Botha, G. M. and C. D. Viljoen (2009). "South Africa: A case study for voluntary GM labelling." Food Chemistry 112(4): 1060-1064. |
| Not Relevant to current fit for purpose review | Bournat, P. (1997). "Les techniques de transgénèse végétale." Biofutur 1997(172): 3-7. |
| Not Relevant to current fit for purpose review | Boutet, I., et al. (2004). "Molecular identification and expression of two non-P450 enzymes, monoamine oxidase A and flavin-containing monooxygenase 2, involved in phase I of xenobiotic biotransformation in the Pacific oyster, Crassostrea gigas." Biochim Biophys Acta 1679(1): 29-36. |
| Not Relevant to current fit for purpose review | Bowersox, T. W., et al. (1990). "Coppicing success of young Eucalyptus saligna in Hawaii." Biomass 23(2): 137-148. |
| Not Relevant to current fit for purpose review | Bowman, W. C. (1983). "Drugs and anesthesia—Pharmacology for anesthesiologists." Trends in Pharmacological Sciences 4: 358-359. |
| Not Relevant to current fit for purpose review | Brandenberger, L. P., et al. (2005). "Preemergence weed control in direct-seeded watermelon." Weed Technology 19(3): 706-712. |
| Not Relevant to current fit for purpose review | Breaden, A. (1991). "Victoria ASCCN." Confederation of Australian Critical Care Nurses Journal 4(3): 6. |
| Not Relevant to current fit for purpose review | Briscoe, M. and C. P. Wynne (1988). "State Round-Up Tasmanian Branch of A.S.C.C.N." CNSA Journal 1(1): 3-7. |
| Not Relevant to current fit for purpose review | Burkhart, C. G. (1981). "Looking at eyelid lesions--a clinical roundup." Geriatrics 36(8): 91-95. |
| Not Relevant to current fit for purpose review | Burr, T. J., et al. (1995). "SURVIVAL AND TUMORIGENICITY OF AGROBACTERIUM-VITIS IN LIVING AND DECAYING GRAPE ROOTS AND CANES IN SOIL." Plant Disease 79(7): 677-682. |
| Not Relevant to current fit for purpose review | Bushby, K. (2011). "Neuromuscular diseases: milestones in development of treatments." The Lancet Neurology 10(1): 11-13. |

| Not Relevant to current fit for purpose review | Butler, T. J., et al. (2002). "Broomsedge (Andropogon virginicus) response to herbicides and burning." Weed Technology 16(1): 18-22. |
|---|---|
| Not Relevant to current fit for purpose review | Cai, Z., et al. (2012). "3.102 PERINATAL LPS EXPOSURE INCREASES THE RISK FOR DOPAMINERGIC DISORDERS IN ADULT LIFE." Parkinsonism & Related Disorders 18, Supplement 2: S190. |
| Not Relevant to current fit for purpose review | Caloni, F., et al. (2015). "In vitro effects of glyphosate on cell proliferation and steroid production by bovine granulosa cells." Toxicology Letters 238(2, Supplement): S290. |
| Not Relevant to current fit for purpose review | Campbell, M. H. and A. R. Gilmour (1979). "EFFECT OF TIME AND RATE OF APPLICATION OF HERBICIDES ON SERRATED TUSSOCK (NASSELLA-TRICHOTOMA) AND IMPROVED PASTURE SPECIES .1. GLYPHOSATE AND 2,2-DPA." Australian Journal of Experimental Agriculture 19(99): 472-475. |
| Not Relevant to current fit for purpose review | Cao, G., et al. (2013). "Draft genome sequence of pseudomonas strain p818, isolated from glyphosate-polluted soil." Genome Announc 1(6). |
| Not Relevant to current fit for purpose review | Casorri, L., et al. (2010). "Testing Round-up Ready soybean along processing chain by traditional and innovative methods." Journal of Biotechnology 150, Supplement: 536. |
| Not Relevant to current fit for purpose review | Castillo, M., et al. (2014). "Seedbed Preparation Techniques and Weed Control Strategies for Strip-Planting Rhizoma Peanut into Warm-Season Grass Pastures." Crop Science 54(4): 1868-1875. |
| Not Relevant to current fit for purpose review | Cavusoglu, K., et al. (2011). "Protective effect of Ginkgo biloba L. leaf extract against glyphosate toxicity in Swiss albino mice." J Med Food 14(10): 1263-1272. |
| Not Relevant to current fit for purpose review | Cebeci, O. and H. Budak (2009). "Global Expression Patterns of Three Festuca Species Exposed to Different Doses of Glyphosate Using the Affymetrix GeneChip Wheat Genome Array." Comp Funct Genomics: 505701. |
| Not Relevant to current fit for purpose review | Chang, H. S., et al. (2001). "Allergenicity test of genetically modified soybean in Sprague-Dawley rats." Archives of Pharmacal Research 24(3): 256-261. |
| Not Relevant to current fit for purpose review | Chang, J.-S., et al. (1999). "Transformation of rat fibroblasts by phospholipase C-γ1 overexpression is accompanied by tyrosine dephosphorylation of paxillin." FEBS Letters 460(1): 161-165. |
| Not Relevant to current fit for purpose review | Charles, A. (2011). "Headache: new genes, new mechanisms, and new therapies." The Lancet Neurology 10(1): 13-14. |
| Not Relevant to current fit for purpose review | Charlton, C. G. and G. V. Muthian (2012). "3.101 PRENATAL SENSITIZATION AND POSTNATAL PRECIPITATION IN A MODEL OF PARKINSONISM." Parkinsonism & Related Disorders 18, Supplement 2: S189-S190. |
| Not Relevant to current fit for purpose review | Chee, P. P. and J. L. Slightom (1991). "TRANSFER AND EXPRESSION OF CUCUMBER MOSAIC-VIRUS COAT PROTEIN GENE IN THE GENOME OF CUCUMIS-SATIVUS." Journal of the American Society for Horticultural Science 116(6): 1098-1102. |
| Not Relevant to current fit for purpose review | Chen, L., et al. (2009). "Modeling Multi-typed Structurally Viewed Chemicals with the UMLS Refined Semantic Network." Journal of the American Medical Informatics Association 16(1): 116-131. |
| Not Relevant to current fit for purpose review | Chiò, A. and G. Lauria (2016). "Degenerative neuromuscular diseases: crucial gene and cell machinery discoveries." The Lancet Neurology 15(1): 12-13. |
| Not Relevant to current fit for purpose review | Chorfa, A., et al. (2013). "Specific Pesticide-Dependent Increases in alpha-Synuclein Levels in Human Neuroblastoma (SH-SY5Y) and Melanoma (SK-MEL-2) Cell Lines." Toxicological Sciences 133(2): 289-297. |
| Not Relevant to current fit for purpose review | Cichosz, G. and S. K. Wiackowski (2012). "[Genetically modified food--great unknown]." Pol Merkur Lekarski 33(194): 59-63. |
| Not Relevant to current fit for purpose review | Cooke, R. M. (1997). "Protein NMR extends into new fields of structural biology." Current Opinion in Chemical Biology 1(3): 359-364. |
| Not Relevant to current fit for purpose review | Cornish-Bowden, A. and M. L. Cardenas (2003). "Metabolic analysis in drug design." Comptes Rendus Biologies 326(5): 509-515. |
| Not Relevant to current fit for purpose review | Costa, M. d. D. L. d., et al. (2003). "Alterações de neuroimagem no parkinsonismo: estudo de cinco casos." Arquivos De Neuro-Psiquiatria 61(2B): 381-386. |
| Not Relevant to current fit for purpose review | Costello, J. (2015). "Research roundup." Int J Palliat Nurs 21(8): 410-411. |
| Not Relevant to current fit for purpose review | Coyle, C. (2003). "A Practical Guide to Intensity – Modulated Radiation Therapy." Clinical Oncology 15(8): 507. |

| | |
|---|---|
| Not Relevant to current fit for purpose review | Croft, S. M., et al. (1974). "Inhibition of chloroplast ribosome formation by N,N-bis(phosphonomethyl)glycine." Biochimica et Biophysica Acta (BBA) - Nucleic Acids and Protein Synthesis 335(2): 211-217. |
| Not Relevant to current fit for purpose review | Cross, J. R. (1995). "Modern Chinese Acupuncture - A review of acupuncture techniques as practised in China today." Physiotherapy 81(5): 302. |
| Not Relevant to current fit for purpose review | Cui, J., et al. (2011). "Detecting biological network organization and functional gene orthologs." Bioinformatics 27(20): 2919-2920. |
| Not Relevant to current fit for purpose review | Culbreth, M. E., et al. (2012). "Comparison of chemical-induced changes in proliferation and apoptosis in human and mouse neuroprogenitor cells." NeuroToxicology 33(6): 1499-1510. |
| Not Relevant to current fit for purpose review | Cundiff, J. S., et al. (1997). "A linear programming approach for designing a herbaceous biomass delivery system." Bioresource Technology 59(1): 47-55. |
| Not Relevant to current fit for purpose review | da Costa, M. D. L., et al. (2003). "Neuroimaging abnormalities in parkinsonism: study of five cases." Arquivos De Neuro-Psiquiatria 61(2B): 381-386. |
| Not Relevant to current fit for purpose review | D'Amico, D. B. (1978). "Critics prompt plans to revise health planning guidelines." AORN Journal 27(4): 702-706. |
| Not Relevant to current fit for purpose review | Dan, B. and P. Baxter (2014). "Paediatric neurology: a year of DNA technology." The Lancet Neurology 13(1): 16-18. |
| Not Relevant to current fit for purpose review | Dan, Y. H., et al. (2006). "MicroTom-a high-throughput model transformation system for functional genomics." Plant Cell Rep 25(5): 432-441. |
| Not Relevant to current fit for purpose review | Daniel, R. K., et al. (1986). "Tissue transplants in primates for upper extremity reconstruction: A preliminary report." The Journal of Hand Surgery 11(1): 1-8. |
| Not Relevant to current fit for purpose review | Das, M., et al. (2010). "A composite transcriptional signature differentiates responses towards closely related herbicides in Arabidopsis thaliana and Brassica napus." Plant Mol Biol 72(4-5): 545-556. |
| Not Relevant to current fit for purpose review | Das, M., et al. (2010). "A composite transcriptional signature differentiates responses towards closely related herbicides in Arabidopsis thaliana and Brassica napus." Plant Mol Biol 72(4-5): 545-556. |
| Not Relevant to current fit for purpose review | Datta, R. and H. Daniell (1996). "Transformation of the tobacco chloroplast genome with the arcA gene to confer glyphosate tolerance." Plant Physiol 111(2): 790-790. |
| Not Relevant to current fit for purpose review | Davis, W. M. and I. W. Waters (1999). "A new-drug roundup." Rn 62(4): 54-60; quiz 62. |
| Not Relevant to current fit for purpose review | De Marco, A., et al. (1992). "Importance of the type of soil for the induction of micronuclei and the growth of primary roots of Vicia faba treated with the herbicides atrazine, glyphosate and maleic hydrazide." Mutat Res 279(1): 9-13. |
| Not Relevant to current fit for purpose review | DeAngelis, L. M. (2010). "Neuro-oncology: new hope for patients with gliomas." The Lancet Neurology 9(1): 17-18. |
| Not Relevant to current fit for purpose review | Defarge, N., et al. (2016). "Co-Formulants in Glyphosate-Based Herbicides Disrupt Aromatase Activity in Human Cells below Toxic Levels." Int J Environ Res Public Health 13(3). |
| Not Relevant to current fit for purpose review | Dehghan, R., et al. (2015). "Optimization of overlapping activities in the design phase of construction projects." Automation in Construction 59: 81-95. |
| Not Relevant to current fit for purpose review | DeLuca, T. F., et al. (2006). "Roundup: a multi-genome repository of orthologs and evolutionary distances." Bioinformatics 22(16): 2044-2046. |
| Not Relevant to current fit for purpose review | Demarco, A., et al. (1995). "INFLUENCE OF SOIL CHARACTERISTICS ON THE CLASTOGENIC ACTIVITY OF MALEIC HYDRAZIDE IN ROOT-TIPS OF VICIA-FABA." Mutation Research-Genetic Toxicology 344(1-2): 5-12. |
| Not Relevant to current fit for purpose review | Demarco, A., et al. (1992). "IMPORTANCE OF THE TYPE OF SOIL FOR THE INDUCTION OF MICRONUCLEI AND THE GROWTH OF PRIMARY ROOTS OF VICIA-FABA TREATED WITH THE HERBICIDES ATRAZINE, GLYPHOSATE AND MALEIC HYDRAZIDE." Mutat Res 279(1): 9-13. |
| Not Relevant to current fit for purpose review | Demeke, T. and I. Ratnayaka (2008). "Multiplex qualitative PCR assay for identification of genetically modified canola events and real-time event-specific PCR assay for quantification of the GT73 canola event." Food Control 19(9): 893-897. |
| Not Relevant to current fit for purpose review | Deming, D. (1989). "Application of bottom-hole temperature corrections in geothermal studies." Geothermics 18(5–<HT>6</HT>): 775-786. |
| Not Relevant to current fit for purpose review | Desimone, C., et al. (1992). "GENOTOXIC EFFECT INDUCED BY HERBICIDES ATRAZINE GLYPHOSATE IN PLANTS OF VICIA-FABA GROWN IN DIFFERENT SOILS." Science of the Total Environment 123: 233-240. |

| Not Relevant to current fit for purpose review | Diener, H.-C. (2004). "Important advances in headache." The Lancet Neurology 3(1): 12. |
|---|---|
| Not Relevant to current fit for purpose review | Dong Kyu Kim, M. D., et al. (2015). "The Factors Associated with the Hypotension Development in Acute Glyphosate-surfactant Herbicide Poisoning." Journal of The Korean Society of Emergency Medicine 26(3): 248-255. |
| Not Relevant to current fit for purpose review | Donnan, G. A. (2004). "Stroke: prediction, prevention, and outcome." The Lancet Neurology 3(1): 9. |
| Not Relevant to current fit for purpose review | Dragutinovich, S. (1987). "Stimulus intensity reducers: Are they sensation seekers, extraverts, and strong nervous types?" Personality and Individual Differences 8(5): 693-704. |
| Not Relevant to current fit for purpose review | Druwe, I., et al. (2015). "Sensitivity of neuroprogenitor cells to chemical-induced apoptosis using a multiplexed assay suitable for high-throughput screening." Toxicology 333: 14-24. |
| Not Relevant to current fit for purpose review | Duncan, K., et al. (1984). "The complete amino acid sequence of Escherichia coli 5-enolpyruvylshikimate 3-phosphate synthase." FEBS Letters 170(1): 59-63. |
| Not Relevant to current fit for purpose review | Dunn, S. V. (1999). "Recognising our limits: the murky shores where science meets values and beliefs." Australian Critical Care 12(4): 130. |
| Not Relevant to current fit for purpose review | Ehlert, A., et al. (2008). "Development of a modular system for detection of genetically modified organisms in food based on ligation-dependent probe amplification." European Food Research and Technology 227(3): 805-812. |
| Not Relevant to current fit for purpose review | Elgorashi, E. E., et al. (2004). "Isolation of captan from Cyrtanthus suaveolens: the effect of pesticides on the quality and safety of traditional medicine." South African Journal of Botany 70(4): 512-514. |
| Not Relevant to current fit for purpose review | Elie-Caille, C., et al. (2010). "Morphological damages of a glyphosate-treated human keratinocyte cell line revealed by a micro- to nanoscale microscopic investigation." Cell Biol Toxicol 26(4): 331-339. |
| Not Relevant to current fit for purpose review | Endo, M. and S. Toki (2013). "Creation of herbicide-tolerant crops by gene targeting." Journal of Pesticide Science 38(1-2): 49-59. |
| Not Relevant to current fit for purpose review | Engel, K.-H., et al. (2006). "Quantification of DNA from genetically modified organisms in composite and processed foods." Trends in Food Science & Technology 17(9): 490-497. |
| Not Relevant to current fit for purpose review | Erickson, B. (2015). "GLYPHOSATE LINKED TO CANCER." Chemical & Engineering News 93(13): 5-5. |
| Not Relevant to current fit for purpose review | Ewald, M., et al. (2014). "From surface to intracellular non-invasive nanoscale study of living cells impairments." Nanotechnology 25(29). |
| Not Relevant to current fit for purpose review | Farrington, J. W. (1979). "Newsletters." Serials Review 5(2): 55-57. |
| Not Relevant to current fit for purpose review | Favata, A., et al. (2014). "A nonlinear theory of prestressed elastic stick-and-spring structures." International Journal of Engineering Science 80: 4-20. |
| Not Relevant to current fit for purpose review | Feng, Z., et al. (2005). "The influence of GFP-actin expression on the adhesion dynamics of HepG2 cells on a model extracellular matrix." Biomaterials 26(26): 5348-5358. |
| Not Relevant to current fit for purpose review | Feriotto, G., et al. (2002). "Biosensor technology and surface plasmon resonance for real-time detection of genetically modified Roundup Ready soybean gene sequences." J Agric Food Chem 50(5): 955-962. |
| Not Relevant to current fit for purpose review | Ferrara, G., et al. (2000). "Evaluation of antimutagenic and desmutagenic effects of humic and fulvic acids on root tips of Vicia faba." Environmental Toxicology 15(5): 513-517. |
| Not Relevant to current fit for purpose review | Ferrari, M. D. (2013). "Headache: the changing migraine brain." The Lancet Neurology 12(1): 6-8. |
| Not Relevant to current fit for purpose review | Fiers, T. (2004). "Lab-on-a-Chip. Miniaturised systems for (bio)chemical analysis and synthesis: (E. Oosterbroek, A. van den Berg) Elsevier. ISBN 0-444 51100-8." Clinica Chimica Acta 343(1–2): 245. |
| Not Relevant to current fit for purpose review | Figenschau, Y., et al. (1997). "A sensitive serum-free colorimetric assay for the detection of cytotoxic effects of pesticides." Journal of Environmental Science and Health Part B-Pesticides Food Contaminants and Agricultural Wastes 32(2): 177-194. |
| Not Relevant to current fit for purpose review | Fischer, G., et al. (2016). "Superficial Temporal Artery to Middle Cerebral Artery Bypass via a Minimized Approach: Operative Nuances and Problem-Solving Aspects." World Neurosurgery 88: 97-103. |
| Not Relevant to current fit for purpose review | Flóra, T. and Z. Simon (1982). "Thermische zersetzung des wirkstoffes von herbizid glyphosat." Thermochimica Acta 59(2): 125-132. |
| Not Relevant to current fit for purpose review | Forgacs, A. L., et al. (2012). "BLTK1 murine Leydig cells: a novel steroidogenic model for evaluating the effects of reproductive and developmental toxicants." Toxicol Sci 127(2): 391-402. |

| | |
|---|---|
| Not Relevant to current fit for purpose review | Forsyth, R. (2005). "Paediatrics: genetic insights and long-term follow-up." The Lancet Neurology 4(1): 8. |
| Not Relevant to current fit for purpose review | Fox, R. J. and R. A. Rudick (2004). "Multiple sclerosis: disease markers accelerate progress." The Lancet Neurology 3(1): 10. |
| Not Relevant to current fit for purpose review | Fox, S. (1999). "European Roundup - Positive news for Marimastat - British Biotech's drug shows promise against nonoperable gastric cancer." Genetic Engineering News 19(16): 20-+. |
| Not Relevant to current fit for purpose review | Fox, S. (2000). "European roundup - Genome research initiative launches in European union - Networking, training and mobility to be focus of integrated projects." Genetic Engineering News 20(21): 41-+. |
| Not Relevant to current fit for purpose review | Francisco Rossi, L., et al. (2016). "Chaetophractus villosus as a sentinel organism: Baseline values of mitotic index, chromosome aberrations and sister chromatid exchanges." Mutation Research-Genetic Toxicology and Environmental Mutagenesis 796: 40-45. |
| Not Relevant to current fit for purpose review | Fu, G. M., et al. (2016). "Optimization of liquid-state fermentation conditions for the glyphosate-degradation enzyme production of strain Aspergillus oryzae by ultraviolet mutagenesis." Prep Biochem Biotechnol. |
| Not Relevant to current fit for purpose review | Garry, V. F., et al. (2002). "Birth defects, season of conception, and sex of children born to pesticide applicators living in the Red River Valley of Minnesota, USA." Environ Health Perspect 110: 441-449. |
| Not Relevant to current fit for purpose review | Gasnier, C., et al. (2010). "Dig1 protects against cell death provoked by glyphosate-based herbicides in human liver cell lines." J Occup Med Toxicol 5: 29. |
| Not Relevant to current fit for purpose review | Gasnier, C. (2009). "Glyphosate-based herbicides are toxic and endocrine disruptors in human cell lines." Toxicology 262(3): 184-191. |
| Not Relevant to current fit for purpose review | Gatty, A. (1990). "South Australian branch ASCCN." Confederation of Australian Critical Care Nurses Journal 3(3): 10. |
| Not Relevant to current fit for purpose review | Gayen, D., et al. (2013). "Comparative analysis of nutritional compositions of transgenic high iron rice with its non-transgenic counterpart." Food Chemistry 138(2-3): 835-840. |
| Not Relevant to current fit for purpose review | Giakoumaki, E., et al. (2003). "Combination of amplification and post-amplification strategies to improve optical DNA sensing." Biosensors and Bioelectronics 19(4): 337-344. |
| Not Relevant to current fit for purpose review | Giuffrida, M. C., et al. (2015). "Isothermal circular-strand-displacement polymerization of DNA and microRNA in digital microfluidic devices." Anal Bioanal Chem 407(6): 1533-1543. |
| Not Relevant to current fit for purpose review | Goldstein, C. and R. Chervin (2016). "Waking up to sleep research in 2015." The Lancet Neurology 15(1): 15-17. |
| Not Relevant to current fit for purpose review | Gonzalez, F. R. and A. M. Nardillo (1997). "Retention in multistep programmed-temperature gas chromatography and flow control Linear head pressure programs." Journal of Chromatography A 757(1–2): 109-118. |
| Not Relevant to current fit for purpose review | Gonzalez, N. V., et al. (2011). "A combination of the cytokinesis-block micronucleus cytome assay and centromeric identification for evaluation of the genotoxicity of dicamba." Toxicology Letters 207(3): 204-212. |
| Not Relevant to current fit for purpose review | Graus, F. and J. Dalmau (2012). "CNS autoimmunity: new findings and pending issues." The Lancet Neurology 11(1): 17-19. |
| Not Relevant to current fit for purpose review | Graus, F. and A. Tortosa (2006). "Neuro-oncology: setting new standards of management." The Lancet Neurology 5(1): 8-9. |
| Not Relevant to current fit for purpose review | Gregg, J. (1995). "Discipline, control, and the school mathematics tradition." Teaching and Teacher Education 11(<HT>6</HT>): 579-593. |
| Not Relevant to current fit for purpose review | Gress, S., et al. (2015). "Cardiotoxic Electrophysiological Effects of the Herbicide Roundup((R)) in Rat and Rabbit Ventricular Myocardium In Vitro." Cardiovasc Toxicol 15(4): 324-335. |
| Not Relevant to current fit for purpose review | Grosicka-Maciag, E., et al. (2012). "Dithiocarbamate fungicide zineb induces oxidative stress and apoptosis in Chinese hamster lung fibroblasts." Pesticide Biochemistry and Physiology 102(1): 95-101. |
| Not Relevant to current fit for purpose review | Gubbiga, N. G., et al. (1996). "Root/rhizome exudation of nicosulfuron from treated johnsongrass (Sorghum halepense) and possible implications for corn (Zea mays)." Weed Science 44(3): 455-460. |
| Not Relevant to current fit for purpose review | Guchi, T., et al. (2008). "Development of event-specific quantitation method for GA21 maize, which is a GM event without CaMV35S promoter." Journal of the Food Hygienic Society of Japan 49(1): 16-22. |
| Not Relevant to current fit for purpose review | Guo, B., et al. (2015). "Co-expression of G2-EPSPS and glyphosate acetyltransferase GAT genes conferring high tolerance to glyphosate in soybean." Front Plant Sci 6: 847. |
| Not Relevant to current fit for purpose review | Guyton, K. Z., et al. (2015). "Carcinogenicity of tetrachlorvinphos, parathion, malathion, diazinon, and glyphosate." Lancet Oncology 16(5): 490-491. |

| Not Relevant to current fit for purpose review | Hammond, B., et al. (2004). "Results of a 13 week safety assurance study with rats fed grain from glyphosate tolerant corn." Food Chem Toxicol 42(6): 1003-1014. |
|---|---|
| Not Relevant to current fit for purpose review | Hanberry, B. B., et al. (2013). "Small Mammal Responses to Intensively Established Pine Plantations in Coastal Plain Mississippi." Southern Journal of Applied Forestry 37(1): 53-58. |
| Not Relevant to current fit for purpose review | Haritou, M., et al. (2000). "Agents facilitating the electric field-induced fusion of intact rabbit erythrocytes." Bioelectrochemistry 52(2): 229-238. |
| Not Relevant to current fit for purpose review | Harkin, D. G., et al. (2000). "A novel approach to studying the migratory morphology of embryonic mesenchymal cells." Biology of the Cell 92(7): 537-543. |
| Not Relevant to current fit for purpose review | Harlow, S. D. and O. M. R. Campbell (2000). "Menstrual dysfunction: A missed opportunity for improving reproductive health in developing countries." Reproductive Health Matters 8(15): 142-147. |
| Not Relevant to current fit for purpose review | Hassannayebi, E. and S. H. Zegordi "Variable and adaptive neighbourhood search algorithms for rail rapid transit timetabling problem." Computers & Operations Research. |
| Not Relevant to current fit for purpose review | Hatamie, S., et al. (2015). "Curcumin-reduced graphene oxide sheets and their effects on human breast cancer cells." Mater Sci Eng C Mater Biol Appl 55: 482-489. |
| Not Relevant to current fit for purpose review | Haupt, S. E. (2006). "A quadratic empirical model formulation for dynamical systems using a genetic algorithm." Computers & Mathematics with Applications 51(3–4): 431-440. |
| Not Relevant to current fit for purpose review | Healy, C., et al. (2008). "Results of a 13-week safety assurance study with rats fed grain from corn rootworm-protected, glyphosate-tolerant MON 88017 corn." Food and Chemical Toxicology 46(7): 2517-2524. |
| Not Relevant to current fit for purpose review | Heck, G. R., et al. (2005). "Development and characterization of a CP4 EPSPS-Based, glyphosate-tolerant corn event." Crop Science 45(1): 329-339. |
| Not Relevant to current fit for purpose review | Henderson, N., et al. (2016). "PCR-Based Detection and Quantification of a Transgenic Glyphosate-Tolerant Canola Using a Novel Reference Gene System." Food Analytical Methods 9(2): 353-361. |
| Not Relevant to current fit for purpose review | Héraux, F. M. G., et al. (2005). "Combining Trichoderma virens-inoculated compost and a rye cover crop for weed control in transplanted vegetables." Biological Control 34(1): 21-26. |
| Not Relevant to current fit for purpose review | Hernández, A. F., et al. (2006). "Influence of exposure to pesticides on serum components and enzyme activities of cytotoxicity among intensive agriculture farmers." Environmental Research 102(1): 70-76. |
| Not Relevant to current fit for purpose review | Herrmann, K. M. and L. M. Weaver (1999). "The shikimate pathway." Annual Review of Plant Physiology and Plant Molecular Biology 50: 473-503. |
| Not Relevant to current fit for purpose review | Heu, C., et al. (2012). "Glyphosate-induced stiffening of HaCaT keratinocytes, a Peak Force Tapping study on living cells." J Struct Biol 178(1): 1-7. |
| Not Relevant to current fit for purpose review | Hill, H. F. (1962). "Nakajima's Glaucoma Operation." American Journal of Ophthalmology 53(2): 391-392. |
| Not Relevant to current fit for purpose review | Hohzaki, R. (2006). "Search allocation game." European Journal of Operational Research 172(1): 101-119. |
| Not Relevant to current fit for purpose review | Hokanson, R., et al. (2007). "Alteration of estrogen-regulated gene expression in human cells induced by the agricultural and horticultural herbicide glyphosate." Hum Exp Toxicol 26(9): 747-752. |
| Not Relevant to current fit for purpose review | Hothorn, L. A. and R. Oberdoerfer (2006). "Statistical analysis used in the nutritional assessment of novel food using the proof of safety." Regulatory Toxicology and Pharmacology 44(2): 125-135. |
| Not Relevant to current fit for purpose review | Hour, B. T., et al. (2012). "Herbicide Roundup Intoxication: Successful Treatment with Continuous Renal Replacement Therapy." The American Journal of Medicine 125(8): e1-e2. |
| Not Relevant to current fit for purpose review | Hsu, M.-H., et al. (2007). "2-(3-Fluorophenyl)-6-methoxyl-4-oxo-1,4-dihydroquinoline-3-carboxylic acid (YJC-1) induces mitotic phase arrest in A549 cells." European Journal of Pharmacology 559(1): 14-20. |
| Not Relevant to current fit for purpose review | Hu, B.-b., et al. (2014). "Energy efficiency of massive MIMO wireless communication systems with antenna selection." The Journal of China Universities of Posts and Telecommunications 21(<HT>6</HT>): 1-8. |
| Not Relevant to current fit for purpose review | Hu, T., et al. (2011). "Isolation and characterization of a rice glutathione S-transferase gene promoter regulated by herbicides and hormones." Plant Cell Rep 30(4): 539-549. |
| Not Relevant to current fit for purpose review | Huang, C. C., et al. (2004). "Development and application of a nested polymerase chain reaction method for the detection of genetically modified soybean in Chinese traditional fermented soy food-sufu." Journal of Food and Drug Analysis 12(3): 266-272. |
| Not Relevant to current fit for purpose review | Huang, J. L., et al. (2016). "Enhancement of the genotoxicity of benzo[a]pyrene by arecoline through suppression of DNA repair in HEp-2 cells." Toxicology in Vitro 33: 80-87. |

| Not Relevant to current fit for purpose review | Huang, Y.-T., et al. (2014). "The depletion of securin enhances butein-induced apoptosis and tumor inhibition in human colorectal cancer." Chemico-Biological Interactions 220: 41-50. |
|---|---|
| Not Relevant to current fit for purpose review | Hübner, P., et al. (1999). "Quantitative competitive PCR for the detection of genetically modified organisms in food." Food Control 10(<HT>6</HT>): 353-358. |
| Not Relevant to current fit for purpose review | Hubner, P., et al. (2001). "Validation of PCR methods for quantitation of genetically modified plants in food." J AOAC Int 84(6): 1855-1864. |
| Not Relevant to current fit for purpose review | Huisman, W., et al. (1997). "Costs of supply chains of Miscanthus giganteus." Industrial Crops and Products <HT>6</HT>(3–4): 353-366. |
| Not Relevant to current fit for purpose review | Hultberg, M. (2007). "Cysteine turnover in human cell lines is influenced by glyphosate." Environmental Toxicology and Pharmacology 24(1): 19-22. |
| Not Relevant to current fit for purpose review | Huynh, Q. K., et al. (1988). "Site-directed mutagenesis of Petunia hybrida 5-enolpyruvylshikimate-3-phosphate synthase: Lys-23 is essential for substrate binding." J Biol Chem 263(24): 11636-11639. |
| Not Relevant to current fit for purpose review | Jackson, E. (1933). "Progressive Ophthalmology." American Journal of Ophthalmology 16(2): 154-155. |
| Not Relevant to current fit for purpose review | Jacobelli, J., et al. (2004). "New views of the immunological synapse: variations in assembly and function." Current Opinion in Immunology 16(3): 345-352. |
| Not Relevant to current fit for purpose review | Jank, B. and A. Haslberger (2000). "Recombinant DNA insertion into plant retrotransposons." Trends in Biotechnology 18(8): 326-327. |
| Not Relevant to current fit for purpose review | Jankovic, J. (2008). "Parkinson's disease and movement disorders: moving forward." The Lancet Neurology 7(1): 9-11. |
| Not Relevant to current fit for purpose review | Jennings, J. C., et al. (2003). "Determining whether transgenic and endogenous plant DNA and transgenic protein are detectable in muscle from swine fed Roundup Ready soybean meal." J Anim Sci 81(6): 1447-1455. |
| Not Relevant to current fit for purpose review | Jiang, L. X., et al. (2013). "Glyphosate effects on the gene expression of the apical bud in soybean (Glycine max)." Biochem Biophys Res Commun 437(4): 544-549. |
| Not Relevant to current fit for purpose review | Johnson, K. A. (2013). "A century of enzyme kinetic analysis, 1913 to 2013." FEBS Letters 587(17): 2753-2766. |
| Not Relevant to current fit for purpose review | Jones, W. E. (1986). "Genetic recreation of wild horses." Journal of Equine Veterinary Science <HT>6</HT>(5): 246-249. |
| Not Relevant to current fit for purpose review | Kang, M., et al. (1993). "Interactive partitioning criteria set method for multiple objective linear programming." Computers & Operations Research 20(4): 435-446. |
| Not Relevant to current fit for purpose review | Kang, S. (2014). "Research round-up." The Lancet Psychiatry 1(7): 502. |
| Not Relevant to current fit for purpose review | Kang, S. (2014). "Research round-up." The Lancet Psychiatry 1(4): 261. |
| Not Relevant to current fit for purpose review | Kang, S. (2015). "Research round-up." The Lancet Psychiatry 2(1): 17. |
| Not Relevant to current fit for purpose review | Kang, S. (2016). "Research round-up." The Lancet Psychiatry 3(4): 323. |
| Not Relevant to current fit for purpose review | Kang, Y., et al. (2011). "Knockout and pullout recombineering for naturally transformable Burkholderia thailandensis and Burkholderia pseudomallei." Nature Protocols 6(8): 1085-1104. |
| Not Relevant to current fit for purpose review | Keenan, R. J., et al. (2005). "DNA shuffling as a tool for protein crystallization." Proc Natl Acad Sci U S A 102(25): 8887-8892. |
| Not Relevant to current fit for purpose review | Kelly, D. (2003). "Research Round-up." European Journal of Oncology Nursing 7(3): 210-212. |
| Not Relevant to current fit for purpose review | Kiernan, M. C. (2014). "ALS and neuromuscular disease: in search of the Holy Grail." The Lancet Neurology 13(1): 13-14. |
| Not Relevant to current fit for purpose review | Kim, H. J., et al. (2007). "Engineering and characterization of the isolated C-terminal domain of 5-enolpyruvylshikimate-3-phosphate (EPSP) synthase." Journal of Microbiology and Biotechnology 17(8): 1385-1389. |
| Not Relevant to current fit for purpose review | Kim, I., et al. (2012). "Cloud computing for comparative genomics with windows azure platform." Evol Bioinform Online 8: 527-534. |
| Not Relevant to current fit for purpose review | Kim, J.-H., et al. (2015). "Detection of eight genetically modified canola events using two event-specific pentaplex PCR systems." Food Control 51: 183-189. |

| Not Relevant to current fit for purpose review | Kim, J.-H., et al. (2015). "A simplified and accurate detection of the genetically modified wheat MON71800 with one calibrator plasmid." Food Chemistry 176: 1-6. |
|---|---|
| Not Relevant to current fit for purpose review | Kim, Y. H., et al. (2013). "Mixtures of glyphosate and surfactant TN20 accelerate cell death via mitochondrial damage-induced apoptosis and necrosis." Toxicol In Vitro 27(1): 191-197. |
| Not Relevant to current fit for purpose review | Kim, Y. H., et al. (2014). "Heart rate–corrected QT interval predicts mortality in glyphosate-surfactant herbicide–poisoned patients." The American Journal of Emergency Medicine 32(3): 203-207. |
| Not Relevant to current fit for purpose review | Kira, J.-i. (2008). "MS: prevention of neural damage by early intervention." The Lancet Neurology 7(1): 3-5. |
| Not Relevant to current fit for purpose review | Kirkham, F. (2004). "Paediatric neurology: genes and the environment." The Lancet Neurology 3(1): 18. |
| Not Relevant to current fit for purpose review | Klein, E. T. (1977). "J. Lyndon Carman (1905–1977)." American Journal of Orthodontics 72(2): 213-214. |
| Not Relevant to current fit for purpose review | Knopper, L. D. and D. R. S. Lean (2004). "Carcinogenic and genotoxic potential of turf pesticides commonly used on golf courses." Journal of Toxicology and Environmental Health-Part B-Critical Reviews 7(4): 267-279. |
| Not Relevant to current fit for purpose review | Kohn, P. M., et al. (1987). "Relationships between psychometric and experimental measures of arousability." Personality and Individual Differences 8(2): 225-231. |
| Not Relevant to current fit for purpose review | Kordowska, J., et al. (2006). "Phosphorylated l-caldesmon is involved in disassembly of actin stress fibers and postmitotic spreading." Experimental Cell Research 312(2): 95-110. |
| Not Relevant to current fit for purpose review | Kovalic, D., et al. (2012). "The Use of Next Generation Sequencing and Junction Sequence Analysis Bioinformatics to Achieve Molecular Characterization of Crops Improved Through Modern Biotechnology." Plant Genome 5(3): 149-163. |
| Not Relevant to current fit for purpose review | Kresge, K. J. (2005). "Women and HIV. Women's research roundup." Beta 17(4): 30-33. |
| Not Relevant to current fit for purpose review | Kristensen, T. (2004). "Lethal pictures." Network Security 2004(10): 19-20. |
| Not Relevant to current fit for purpose review | Kristensen, T. (2004). "Microsoft leaves Win2000, XPSP1 users in lurch." Network Security 2004(11): 16-17. |
| Not Relevant to current fit for purpose review | Kristensen, T. (2005). "More holes than a phishing net." Network Security 2005(1): 18-19. |
| Not Relevant to current fit for purpose review | Kudtarkar, P., et al. (2010). "Cost-effective cloud computing: a case study using the comparative genomics tool, roundup." Evol Bioinform Online 6: 197-203. |
| Not Relevant to current fit for purpose review | Kulesa, P. M., et al. (2008). "Neural crest invasion is a spatially-ordered progression into the head with higher cell proliferation at the migratory front as revealed by the photoactivatable protein, KikGR." Developmental Biology 316(2): 275-287. |
| Not Relevant to current fit for purpose review | Kuramochi, Y., et al. (2006). "Neuregulin activates erbB2-dependent src/FAK signaling and cytoskeletal remodeling in isolated adult rat cardiac myocytes." Journal of Molecular and Cellular Cardiology 41(2): 228-235. |
| Not Relevant to current fit for purpose review | Kuribara, H., et al. (2002). "Novel reference molecules for quantitation of genetically modified maize and soybean." J AOAC Int 85(5): 1077-1089. |
| Not Relevant to current fit for purpose review | Kutateladze, T., et al. (2007). "Detection of biotechnological crops in Georgia." Journal of Biotechnology 131(2, Supplement): S37-S38. |
| Not Relevant to current fit for purpose review | Kwon, K., et al. (2012). "3.103 PREDICTION AND CHARACTERIZATION OF ARABIDOPSIS THALIANA HOMOLOGS OF PARKINSON DISEASE-ASSOCIATED GENES BASED ON SEQUENCE SIMILARITIES AND MOLECULAR MODELING." Parkinsonism & Related Disorders 18, Supplement 2: S190. |
| Not Relevant to current fit for purpose review | La Mura, M., et al. (2011). "Application of QUIZ for GM quantification in food." Food Chemistry 125(4): 1340-1344. |
| Not Relevant to current fit for purpose review | Lam, S. H. F., et al. "Use of Intravenous Fat Emulsion in the Emergency Department for the Critically Ill Poisoned Patient." The Journal of Emergency Medicine. |
| Not Relevant to current fit for purpose review | Lamb, G. C., et al. (2000). "Prolonging the MGA-prostaglandin F2α interval from 17 to 19 days in an estrus synchronization system for heifers." Theriogenology 53(3): 691-698. |
| Not Relevant to current fit for purpose review | Larkin, M. (2001). "Websites in brief." The Lancet 358(9284): 850. |

| Not Relevant to current fit for purpose review | Larkin, M. (2003). "Technology and Public Health." The Lancet Infectious Diseases 3(5): 314-315. |
|---|---|
| Not Relevant to current fit for purpose review | Larkin, M. (2004). "Sites accelerate global response to HIV." The Lancet Infectious Diseases 4(7): 472-473. |
| Not Relevant to current fit for purpose review | Larsen, R. J. and D. W. Baggs (1986). "Some psychophysical and personality correlates of the Strelau temperament inventory." Personality and Individual Differences 7(4): 561-565. |
| Not Relevant to current fit for purpose review | Larsen, R. J. and M. A. Zarate (1991). "Extending reducer/augmenter theory into the emotion domain: The role of affect in regulating stimulation level." Personality and Individual Differences 12(7): 713-723. |
| Not Relevant to current fit for purpose review | Lee, A. H. (2008). "A pilot intervention for pregnant women in Sichuan, China on passive smoking." Patient Education and Counseling 71(3): 396-401. |
| Not Relevant to current fit for purpose review | Lee, C.-H., et al. (2008). "The early prognostic factors of glyphosate-surfactant intoxication." The American Journal of Emergency Medicine 26(3): 275-281. |
| Not Relevant to current fit for purpose review | Lee, D., et al. (2010). "Quantitation using informative zeros (QUIZ): Application for GMO detection and quantification without recourse to certified reference material." Food Chemistry 118(4): 974-978. |
| Not Relevant to current fit for purpose review | Lee, E.-J., et al. (2004). "G2/M cell cycle arrest and induction of apoptosis by a stilbenoid, 3,4,5-trimethoxy-4′-bromo-cis-stilbene, in human lung cancer cells." Life Sciences 75(23): 2829-2839. |
| Not Relevant to current fit for purpose review | Lee, H. J., et al. (2010). "Cloning and Characterization of a 5-Enolpyruvyl Shikimate 3-Phosphate Synthase (EPSPS) Gene from Korean Lawn Grass (Zoysia japonica)." Korean Journal of Horticultural Science & Technology 28(4): 648-655. |
| Not Relevant to current fit for purpose review | Lee, S. R., et al. (2007). "Neuroprotective effects of kobophenol A against the withdrawal of tropic support, nitrosative stress, and mitochondrial damage in SH-SY5Y neuroblastoma cells." Bioorganic & Medicinal Chemistry Letters 17(7): 1879-1882. |
| Not Relevant to current fit for purpose review | Lees, K. R. (2009). "Stroke: success for extending acute treatment." The Lancet Neurology 8(1): 2-4. |
| Not Relevant to current fit for purpose review | Lerat, S., et al. (2005). "Real-time polymerase chain reaction quantification of the transgenes for roundup ready corn and roundup ready soybean in soil samples." J Agric Food Chem 53(5): 1337-1342. |
| Not Relevant to current fit for purpose review | Leva, A. (2015). "Computing systems and the network as a control education arena." IFAC-PapersOnLine 48(29): 265-276. |
| Not Relevant to current fit for purpose review | Levy, M. L. (2006). "What's in this issue." Primary Care Respiratory Journal 15(<HT>6</HT>): 321-322. |
| Not Relevant to current fit for purpose review | Li, G., et al. (2015). "A genetic algorithm-based decomposition approach to solve an integrated equipment-workforce-service planning problem." Omega 50: 1-17. |
| Not Relevant to current fit for purpose review | Li, H., et al. (2014). "Chaetoglobosins from Chaetomium globosum, an endophytic fungus in Ginkgo biloba, and their phytotoxic and cytotoxic activities." J Agric Food Chem 62(17): 3734-3741. |
| Not Relevant to current fit for purpose review | Li, L., et al. (2015). "A transcriptomic analysis for identifying the unintended effects of introducing a heterologous glyphosate-tolerant EPSP synthase into Escherichia coli." Molecular Biosystems 11(3): 852-858. |
| Not Relevant to current fit for purpose review | Li, R. and R. S. El-Mallakh (2000). "A novel evidence of different mechanisms of lithium and valproate neuroprotective action on human SY5Y neuroblastoma cells: caspase-3 dependency." Neuroscience Letters 294(3): 147-150. |
| Not Relevant to current fit for purpose review | Lian, Y., et al. (2016). "Direct and simultaneous quantification of ATP, ADP and AMP by 1H and 31P Nuclear Magnetic Resonance spectroscopy." Talanta 150: 485-492. |
| Not Relevant to current fit for purpose review | Liang, J., et al. (2009). "The Role of Seminal Vesicle Motion in Target Margin Assessment for Online Image-Guided Radiotherapy for Prostate Cancer." International Journal of Radiation Oncology*Biology*Physics 73(3): 935-943. |
| Not Relevant to current fit for purpose review | Liberatore, M., et al. (2010). "Forensic investigation of peer-to-peer file sharing networks." Digital Investigation 7, Supplement: S95-S103. |
| Not Relevant to current fit for purpose review | Lin, N. and V. F. Garry (2000). "In vitro studies of cellular and molecular developmental toxicity of adjuvants, herbicides, and fungicides commonly used in Red River Valley, Minnesota." J Toxicol Environ Health A 60(6): 423-439. |
| Not Relevant to current fit for purpose review | Lin, Y.-C., et al. (2011). "744 ZOLEDRONIC ACID INDUCES AUTOPHAGIC CELL DEATH IN HUMAN PROSTATE CANCER CELLS." The Journal of Urology 185(4, Supplement): e298-e299. |
| Not Relevant to current fit for purpose review | Lin, Y.-K., et al. (2013). "Multiple-objective heuristics for scheduling unrelated parallel machines." European Journal of Operational Research 227(2): 239-253. |

| Not Relevant to current fit for purpose review | Lipton, R. B. and M. E. Bigal (2005). "Headache: triumphs in translational research." The Lancet Neurology 4(1): 11-12. |
|---|---|
| Not Relevant to current fit for purpose review | Liu, M. (2008). "Stroke: encouragement and disappointment in clinical trials." The Lancet Neurology 7(1): 5-7. |
| Not Relevant to current fit for purpose review | Liu, S., et al. (2003). "A prospective study of the association between APOE genotype and the risk of myocardial infarction among apparently healthy men." Atherosclerosis 166(2): 323-329. |
| Not Relevant to current fit for purpose review | Lluis, M., et al. (2008). "Severe acute poisoning due to a glufosinate containing preparation without mitochondrial involvement." Hum Exp Toxicol 27(6): 519-524. |
| Not Relevant to current fit for purpose review | Lodge, G. M., et al. (1994). "EFFECTS OF GLYPHOSATE, FLUPROPANATE AND 2,2-DPA ON HYPARRHENIA-HIRTA (L) STAPF (COOLATAI GRASS)." Australian Journal of Experimental Agriculture 34(4): 479-485. |
| Not Relevant to current fit for purpose review | Lombardo, M. and G. Lombardo (2010). "Wave aberration of human eyes and new descriptors of image optical quality and visual performance." Journal of Cataract & Refractive Surgery 36(2): 313-331. |
| Not Relevant to current fit for purpose review | Loredano, P., et al. (2010). "CASCAT: The Power of the Combined Protein Engineering Approach: Evolution of A Glycine Oxidase for A Novel Mechanism of Glyphosate Tolerance." Journal of Biotechnology 150: S122-S123. |
| Not Relevant to current fit for purpose review | Lucentini, J. (2008). "Technology roundup." Scientist: 76-82. |
| Not Relevant to current fit for purpose review | Machado, A. F. L., et al. (2008). "Anatomical characterization of the leaf, stem and rhizome of Digitaria insularis." Planta Daninha 26(1): 1-8. |
| Not Relevant to current fit for purpose review | Mahmood, A. (2009). "Renewables in Asia – a roundup." Renewable Energy Focus 9(7): 19. |
| Not Relevant to current fit for purpose review | Main, C. L., et al. (2004). "Sulfentrazone persistence in southern soils: Bioavailable concentration and effect on a rotational cotton crop." Weed Technology 18(2): 346-352. |
| Not Relevant to current fit for purpose review | Makowski, M., et al. (2009). "Oestrogen receptor alpha polymorphisms in women with breast cancer and their clinical significance." Przeglad Menopauzalny 8(1): 40-44. |
| Not Relevant to current fit for purpose review | Malatesta, M., et al. (2008). "Hepatoma tissue culture (HTC) cells as a model for investigating the effects of low concentrations of herbicide on cell structure and function." Toxicol In Vitro 22(8): 1853-1860. |
| Not Relevant to current fit for purpose review | Malecot, M., et al. (2013). "Specific proteomic response of Unio pictorum mussel to a mixture of glyphosate and microcystin-LR." J Proteome Res 12(11): 5281-5292. |
| Not Relevant to current fit for purpose review | Malhotra, R. C., et al. (2010). "Glyphosate–surfactant herbicide-induced reversible encephalopathy." Journal of Clinical Neuroscience 17(11): 1472-1473. |
| Not Relevant to current fit for purpose review | Mariana, A., et al. (2009). "The impact of simultaneous intoxication with agrochemicals on the antioxidant defense system in rat." Pesticide Biochemistry and Physiology 94(2-3): 93-99. |
| Not Relevant to current fit for purpose review | Marques, M. R., et al. (2007). "The inhibition of 5-enolpyruvylshikimate-3-phosphate synthase as a model for development of novel antimicrobials." Current Drug Targets 8(3): 445-457. |
| Not Relevant to current fit for purpose review | Marrelli, M., et al. (2013). "A comparative study of phytochemical composition of genetically and non-genetically modified soybean (Glycine max L.) and evaluation of antitumor activity." Nat Prod Res 27(6): 574-578. |
| Not Relevant to current fit for purpose review | Marriott, G. and J. W. Walker (1999). "Caged peptides and proteins: new probes to study polypeptide function in complex biological systems." Trends in Plant Science 4(8): 330-334. |
| Not Relevant to current fit for purpose review | Mastaglia, F. L. (2005). "Neuromuscular disorders: molecular and therapeutic insights." The Lancet Neurology 4(1): 6-7. |
| Not Relevant to current fit for purpose review | Mavunganidze, Z., et al. (2014). "The impact of tillage system and herbicides on weed density, diversity and yield of cotton (Gossipium hirsutum L.) and maize (Zea mays L.) under the smallholder sector." Crop Protection 58: 25-32. |
| Not Relevant to current fit for purpose review | Mayeux, R. and P. S. G. Hyslop (2008). "Alzheimer's disease: advances in trafficking." The Lancet Neurology 7(1): 2-3. |
| Not Relevant to current fit for purpose review | McAlister, B. G. and J. van Staden (1995). "Effect of artificially induced stress conditions on the growth of the medicinal plant Hypoxis hemerocallidea." South African Journal of Botany 61(2): 85-89. |
| Not Relevant to current fit for purpose review | McClenaghan, J. S. (1994). "The 1993 newspaper science reporter: Contributing, creative, and responsible." The Social Science Journal 31(4): 467-477. |
| Not Relevant to current fit for purpose review | McDowell, L. M., et al. (2004). "Rotational-echo double-resonance NMR-restrained model of the ternary complex of 5-enolpyruvylshikimate-3-phosphate synthase." J Biomol NMR 28(1): 11-29. |

| | |
|---|---|
| Not Relevant to current fit for purpose review | McKeone, D. H. (1973). "Liquid crystals for display applications." Optics & Laser Technology 5(1): 39-40. |
| Not Relevant to current fit for purpose review | Meacham, M. (1976). "Development of school libraries around the world." International Library Review 8(4): 453-459. |
| Not Relevant to current fit for purpose review | Merlis, J. K. (1959). "Fundamentals of clinical neurophysiology: Paul O. Chatfield Charles C. Thomas, Springfield, Illinois, 1957, 292 pp. $8.50." Electroencephalography and Clinical Neurophysiology 11(1): 192. |
| Not Relevant to current fit for purpose review | Mesnage, R., et al. (2013). "Ethoxylated adjuvants of glyphosate-based herbicides are active principles of human cell toxicity." Toxicology 313(2-3): 122-128. |
| Not Relevant to current fit for purpose review | Milán, M. and S. M. Cohen (1999). "Notch Signaling Is Not Sufficient to Define the Affinity Boundary between Dorsal and Ventral Compartments." Molecular Cell 4(<HT>6</HT>): 1073-1078. |
| Not Relevant to current fit for purpose review | Miller, J. W., et al. (1991). "Phthalocyanine Photodynamic Therapy of Experimental Iris Neovascularization." Ophthalmology 98(11): 1711-1719. |
| Not Relevant to current fit for purpose review | Miller, S. P. and D. M. Ferriero (2013). "Paediatric neurology: improved care of the developing brain." The Lancet Neurology 12(1): 16-18. |
| Not Relevant to current fit for purpose review | Milligan, A. L., et al. (2003). "A field assessment of the role of selective herbicides in the restoration of British moorland dominated by Molinia." Biological Conservation 109(3): 369-379. |
| Not Relevant to current fit for purpose review | Mink, P. J., et al. (2011). "Epidemiologic studies of glyphosate and non-cancer health outcomes: a review." Regul Toxicol Pharmacol 61(2): 172-184. |
| Not Relevant to current fit for purpose review | Minshull, J., et al. (2005). "Predicting enzyme function from protein sequence." Current Opinion in Chemical Biology 9(2): 202-209. |
| Not Relevant to current fit for purpose review | Mo, Q. and X. Zhuang (2012). "Matrix splitting with symmetry and dyadic framelet filter banks over algebraic number fields." Linear Algebra and its Applications 437(10): 2650-2679. |
| Not Relevant to current fit for purpose review | Monsen, E. R. (1998). "ADA'S Nutrition Campaigns Link Dietitians and the Public's Health." Journal of the American Dietetic Association 98(7): 746. |
| Not Relevant to current fit for purpose review | Monsen, E. R. (1998). "Dietetics Professionals Fight Obesity." Journal of the American Dietetic Association 98(10): 1098. |
| Not Relevant to current fit for purpose review | Monsen, E. R. (1999). "The Past Dietetics Century and the Future Dietetics Century." Journal of the American Dietetic Association 99(12): 1498. |
| Not Relevant to current fit for purpose review | Monsen, E. R. (1999). "What's Fresh in this Month's Journal?" Journal of the American Dietetic Association 99(3): 274. |
| Not Relevant to current fit for purpose review | Moreano, F., et al. (2006). "Ligation-dependent probe amplification for the simultaneous event-specific detection and relative quantification of DNA from two genetically modified organisms." European Food Research and Technology 222(5-6): 479-485. |
| Not Relevant to current fit for purpose review | Morgensztern, D. and R. Govindan (2010). "Best of the month: a roundup of articles published in recent months." J Thorac Oncol 5(8): 1305-1307. |
| Not Relevant to current fit for purpose review | Morgensztern, D. and R. Govindan (2011). "A Roundup of Recently Published Articles Relevant to Thoracic Oncology." Journal of Thoracic Oncology <HT>6</HT>(7): 1295-1297. |
| Not Relevant to current fit for purpose review | Morgensztern, D. and R. Govindan (2011). "A roundup of recently published articles relevant to thoracic oncology." J Thorac Oncol 6(7): 1295-1297. |
| Not Relevant to current fit for purpose review | Morris, R. T., et al. (2011). "RiceRBP: A database of experimentally identified RNA-binding proteins in Oryza sativa L." Plant Science 180(2): 204-211. |
| Not Relevant to current fit for purpose review | Muntoni, F. and J. H. Cross (2015). "Paediatric neurology: from molecular mechanisms to targeted treatments." The Lancet Neurology 14(1): 16-18. |
| Not Relevant to current fit for purpose review | Myllynen, P. and K. Vähäkangas (2013). "Placental transfer and metabolism: An overview of the experimental models utilizing human placental tissue." Toxicology in Vitro 27(1): 507-512. |
| Not Relevant to current fit for purpose review | Nam, H.-J., et al. (2008). "The ERK-RSK1 activation by growth factors at G2 phase delays cell cycle progression and reduces mitotic aberrations." Cellular Signalling 20(7): 1349-1358. |
| Not Relevant to current fit for purpose review | Naydenova, E., et al. (2007). "Synthesis, cytotoxicity and clastogenicity of novel alpha-aminophosphonic acids." Amino Acids 33(4): 695-702. |
| Not Relevant to current fit for purpose review | Naydenova, E. D., et al. (2008). "Novel N-(phosphonomethyl) glycine derivatives: Design, characterization and biological activity." Eur J Med Chem 43(6): 1199-1205. |
| Not Relevant to current fit for purpose review | Neumann, G., et al. (2011). "Assessment of the genetic stability of GMOs with a detailed examination of MON810 using Scorpion probes." European Food Research and Technology 233(1): 19-30. |

| Not Relevant to current fit for purpose review | Newton, F. H. (1962). "Appraising New Techniques." American Journal of Ophthalmology 53(2): 392. |
|---|---|
| Not Relevant to current fit for purpose review | Norrving, B. (2006). "Stroke: the catch-up of underinvestigated topics." The Lancet Neurology 5(1): 10-11. |
| Not Relevant to current fit for purpose review | Novis, P. M., et al. (2009). "Identification and Characterization of Freshwater Algae from a Pollution Gradient Using rbcL Sequencing and Toxicity Testing." Arch Environ Contam Toxicol 57(3): 504-514. |
| Not Relevant to current fit for purpose review | Ocaña, K. A. C. S., et al. (2013). "Designing a parallel cloud based comparative genomics workflow to improve phylogenetic analyses." Future Generation Computer Systems 29(8): 2205-2219. |
| Not Relevant to current fit for purpose review | Oeding, L. and G. Ottaviani (2013). "Eigenvectors of tensors and algorithms for Waring decomposition." Journal of Symbolic Computation 54: 9-35. |
| Not Relevant to current fit for purpose review | Oguchi, T., et al. (2008). "Development of event-specific quantitation method for GA21 maize, which is a gm event without CaMV35S promoter." Shokuhin Eiseigaku Zasshi 49(1): 16-22. |
| Not Relevant to current fit for purpose review | Okamoto, T. (2015). "SecondDEP: Resilient Computing that Prevents Shellcode Execution in Cyber-Attacks." Procedia Computer Science 60: 691-699. |
| Not Relevant to current fit for purpose review | Olanow, C. W. (2006). "Movement disorders: a step in the right direction." The Lancet Neurology 5(1): 3-5. |
| Not Relevant to current fit for purpose review | Omrani, D. (1993). "Doesn't quite live up to expectations: Enterprise-Wide Computing: How to Implement and Manage LANs by Thomas W. Madron. Published by John Wiley, 1991, £25.95, 372 pp." Computer Communications 16(7): 449-450. |
| Not Relevant to current fit for purpose review | Onori, R., et al. (2013). "Traceability of genetically modified Roundup Ready soybean: A case study on sampling and analytical uncertainty along processing chain." Food Control 34(2): 494-501. |
| Not Relevant to current fit for purpose review | O'Rourke, K. (2004). "Genome roundup." J Am Vet Med Assoc 224(4): 491-492. |
| Not Relevant to current fit for purpose review | Ortiz, S., et al. (2006). "Acute cytotoxicity in mammal cells exposed in vitro to a glyphosate-based formulation." Environ Mol Mutagen 47(6): 473-473. |
| Not Relevant to current fit for purpose review | Park, S., et al. (2015). "The effects of nonyl phenoxypolyethoxyl ethanol on cell damage pathway gene expression in SK-N-SH cells." Korean Journal of Internal Medicine 30(6): 873-883. |
| Not Relevant to current fit for purpose review | Pasqualone, A., et al. (2007). "Detection of soft wheat in semolina and durum wheat bread by analysis of DNA microsatellites." J Agric Food Chem 55(9): 3312-3318. |
| Not Relevant to current fit for purpose review | Patterson, P. (1980). "Nurses hold own in federal battle for education funds." AORN Journal 32(1): 116-118. |
| Not Relevant to current fit for purpose review | Patton, M. L. and R. F. Grove (1992). "Statolith hair movements and the regulation of tonic gravity reflexes in the lobster, Homarus americanus." Comparative Biochemistry and Physiology Part A: Physiology 101(2): 259-268. |
| Not Relevant to current fit for purpose review | Perisse, P., et al. (2011). "Seed and seedling morphology of Dicliptera squarrosa Nees (Acanthaceae) as a character identification source, and its relationship with survival structures." Phyton-International Journal of Experimental Botany 80: 73-78. |
| Not Relevant to current fit for purpose review | Perret, R. (2012). "Wanted dead or alive? Western genre items in the 21st century United States library." Library Collections, Acquisitions, and Technical Services 36(1–2): 39-52. |
| Not Relevant to current fit for purpose review | Perumal, L., et al. (2016). "Analysis of thin plates with holes by using exact geometrical representation within XFEM." Journal of Advanced Research 7(3): 445-452. |
| Not Relevant to current fit for purpose review | Pervaiz, S. (2013). "Conference roundup MAC 2011." Mitochondrion 13(3): 153-154. |
| Not Relevant to current fit for purpose review | Petersen, R. C. (2010). "Alzheimer's disease: progress in prediction." The Lancet Neurology 9(1): 4-5. |
| Not Relevant to current fit for purpose review | Pöltl, D., et al. (2012). "3.104 CELL-DEATH PATHWAYS DOWNSTREAM OF MITOCHONDRIA IN HUMAN DOPAMINERGIC NEURON DEGENERATION." Parkinsonism & Related Disorders 18, Supplement 2: S190. |
| Not Relevant to current fit for purpose review | Posch, K. C. and R. Posch (1990). "Approaching encryption at ISDN speed using partial parallel modulus multiplication." Microprocessing and Microprogramming 29(3): 177-184. |
| Not Relevant to current fit for purpose review | Potrebic, O., et al. (2009). "Acute glyphosate-surfactant poisoning with neurological sequels and fatal outcome." Vojnosanitetski Pregled 66(9): 758-762. |
| Not Relevant to current fit for purpose review | Powell, S. L. (2000). "Herbal Supplements: What Works, What Doesn't. 1999. From National Health Video, Inc. 12021 Wilshire Blvd., Suite 550, Los Angeles, CA 90025, 1-800-543-6803, videotape, 15 minutes, $89.00." Journal of Nutrition Education 32(5): 292-293. |

| Not Relevant to current fit for purpose review | Printz, C. (2013). "A roundup of news and information from our community." Clin Transl Sci 6(2): 83-84. |
|---|---|
| Not Relevant to current fit for purpose review | Printz, C. (2014). "In the news: a roundup of news and information from our community." Clin Transl Sci 7(4): 287-288. |
| Not Relevant to current fit for purpose review | Printz, C. (2015). "In the news: a roundup of news and information from our community." Clin Transl Sci 8(1): 1-2. |
| Not Relevant to current fit for purpose review | Qin, F., et al. (2012). "Composition of Transgenic Soybean Seeds with Higher gamma-Linolenic Acid Content Is Equivalent to That of Conventional Control." J Agric Food Chem 60(9): 2200-2204. |
| Not Relevant to current fit for purpose review | Radenski, A. and L. Ehwerhemuepha (2014). "Speeding-up codon analysis on the cloud with local MapReduce aggregation." Information Sciences 263: 175-185. |
| Not Relevant to current fit for purpose review | Radtke, P. J., et al. (2010). "An evaluation of overhead laser scanning to estimate herbage removals in pasture quadrats." Agricultural and Forest Meteorology 150(12): 1523-1528. |
| Not Relevant to current fit for purpose review | Rao, C. D., et al. (2015). "An enzyme-linked immuno focus assay for rapid detection and enumeration, and a newborn mouse model for human non-polio enteroviruses associated with acute diarrhea." Journal of Virological Methods 224: 47-52. |
| Not Relevant to current fit for purpose review | Rappold, P., et al. (2012). "3.106 PARAQUAT NEUROTOXICITY IS MEDIATED BY THE DOPAMINE TRANSPORTER AND ORGANIC CATION TRANSPORTER-3." Parkinsonism & Related Disorders 18, Supplement 2: S190-S191. |
| Not Relevant to current fit for purpose review | Rau, F. J. (1995). "Video review roundup." Adolescent and Pediatric Gynecology 8(3): 165. |
| Not Relevant to current fit for purpose review | Rau, F. J. (1997). "Comprehensive Review of Colposcopy 1996." Journal of Pediatric and Adolescent Gynecology 10(1): 49. |
| Not Relevant to current fit for purpose review | Rau, F. J. and K. M. Mulchahey (1997). "Milner-Fenwick Video Counseling Library: Colposcopy and Treatment of Dysplasia." Journal of Pediatric and Adolescent Gynecology 10(2): 103-104. |
| Not Relevant to current fit for purpose review | Rau, F. J. and E. E. Yordan (1996). "Sexual Assault: The Collection of Evidence for Forensic Analysis." Journal of Pediatric and Adolescent Gynecology 9(3): 169. |
| Not Relevant to current fit for purpose review | Reeve, J. C. (1995). "Core Textbook of Respiratory Care Practice." Physiotherapy 81(5): 301. |
| Not Relevant to current fit for purpose review | Reis, L. F., et al. (2006). "GMOs: building the future on the basis of past experience." An Acad Bras Cienc 78(4): 667-686. |
| Not Relevant to current fit for purpose review | Richard, S., et al. (2005). "Differential effects of glyphosate and roundup on human placental cells and aromatase." Environ Health Perspect 113(6): 716-720. |
| Not Relevant to current fit for purpose review | Richter, L. (1979). "Summary and guideline to the status reports." Euromicro Newsletter 5(3): 111-112. |
| Not Relevant to current fit for purpose review | Ring, M. (2007). "Driven Out by Hitler, a Dental Historian Enriches America: The Story of Curt Proskauer." Alpha Omegan 100(1): 25-29. |
| Not Relevant to current fit for purpose review | Robinson, D. J. (1995). "Study Package." Physiotherapy 81(5): 302. |
| Not Relevant to current fit for purpose review | Rogoli, R. P., et al. (2008). "Resposta de plantas de beterraba (Beta vulgaris) e de cenoura (Daucus carota) à deriva simulada de glyphosate e clomazone." Planta Daninha 26(2): 451-456. |
| Not Relevant to current fit for purpose review | Rosculete, E., et al. (2015). "Detection and quantification of genetically modified soybean in food and feed traded in the Romanian market." Journal of Biotechnology 208, Supplement: S73. |
| Not Relevant to current fit for purpose review | Roskelley, C. D., et al. (1995). "A hierarchy of ECM-mediated signalling regulates tissue-specific gene expression." Current Opinion in Cell Biology 7(5): 736-747. |
| Not Relevant to current fit for purpose review | Rouquié, D., et al. (2010). "Investigation of endogenous soybean food allergens by using a 2-dimensional gel electrophoresis approach." Regulatory Toxicology and Pharmacology 58(3, Supplement): S47-S53. |
| Not Relevant to current fit for purpose review | Ryd, W. and B. Hagmar (1977). "In vitro Effects of Cytochalasin B on TA3 Tumor Cells." Beiträge zur Pathologie 161(2): 131-141. |
| Not Relevant to current fit for purpose review | Sakamoto, Y., et al. (2008). "A 104-week feeding study of genetically modified soybeans in F344 rats." Journal of the Food Hygienic Society of Japan 49(4): 272-282. |
| Not Relevant to current fit for purpose review | Sakr, J., et al. (2014). "First comprehensive GMOs testing in Lebanon: Screening, identification and quantification of GM soybean imports." Food Control 36(1): 146-152. |
| Not Relevant to current fit for purpose review | Sanfilippo, J. S. (1998). ""Get A Life"-My Old Kentucky Home." Journal of Pediatric and Adolescent Gynecology 11(1): 1. |

| | |
|---|---|
| Not Relevant to current fit for purpose review | Sarraj, A. and J. C. Grotta (2014). "Stroke: new horizons in treatment." The Lancet Neurology 13(1): 2-3. |
| Not Relevant to current fit for purpose review | Sauer, N. J., et al. (2016). "Oligonucleotide-mediated genome editing provides precision and function to engineered nucleases and antibiotics in plants." Plant Physiol. |
| Not Relevant to current fit for purpose review | Sbruzzi, F. A., et al. (2013). "Transgenic and conventional Brazilian soybeans don't cause or prevent preneoplastic colon lesions or oxidative stress in a 90-day in vivo study." Revista De Nutricao-Brazilian Journal of Nutrition 26(4): 443-453. |
| Not Relevant to current fit for purpose review | Schapira, A. H. V. (2010). "Movement disorders: advances in cause and treatment." The Lancet Neurology 9(1): 6-7. |
| Not Relevant to current fit for purpose review | Scherlen, A. (2008). "Local to Global: The Importance of State-Level Journals to Library Literature." Serials Review 34(2): 129-136. |
| Not Relevant to current fit for purpose review | Schoenen, J. and G. Coppola (2010). "Headache: spreading from molecules to patients." The Lancet Neurology 9(1): 11-12. |
| Not Relevant to current fit for purpose review | Scotter, E. L. and C. E. Shaw (2013). "Neuromuscular disease: new insights and avenues for therapy." The Lancet Neurology 12(1): 13-15. |
| Not Relevant to current fit for purpose review | Selvapandiyan, A., et al. (1996). "Evidence for the shikimate-3-phosphate interacting site in the N-terminal domain of 5-enolpyruvyl shikimate-3-phosphate synthase of Bacillus subtilis." Biochemistry and Molecular Biology International 40(3): 603-610. |
| Not Relevant to current fit for purpose review | Selvapandiyan, A. and R. K. Bhatnagar (1994). "CLONING OF GENES ENCODING FOR C-P LYASE FROM PSEUDOMONAS ISOLATES PG2982 AND GLC11 - IDENTIFICATION OF A CRYPTIC ALLELE ON THE CHROMOSOME OF PSEUDOMONAS-AERUGINOSA." Current Microbiology 29(5): 255-261. |
| Not Relevant to current fit for purpose review | Selvapandiyan, A., et al. (1995). "Point mutation of a conserved arginine (104) to lysine introduces hypersensitivity to inhibition by glyphosate in the 5-enolpyruvylshikimate-3-phosphate synthase of Bacillus subtilis." FEBS Lett 374(2): 253-256. |
| Not Relevant to current fit for purpose review | Shi, G., et al. (2011). "MultiMSOAR 2.0: an accurate tool to identify ortholog groups among multiple genomes." PLoS One 6(6): e20892. |
| Not Relevant to current fit for purpose review | Shields, R. and K. Pollock (1974). "The adhesion of BHK and PyBHK cells to the substratum." Cell 3(1): 31-38. |
| Not Relevant to current fit for purpose review | Shuttleworth, W. A. and J. N. Evans (1994). "Site-directed mutagenesis and NMR studies of histidine-385 mutants of 5-enolpyruvylshikimate-3-phosphate synthase." Biochemistry 33(23): 7062-7068. |
| Not Relevant to current fit for purpose review | Shuttleworth, W. A. and J. N. Evans (1996). "The H385N mutant of 5-enolpyruvylshikimate-3-phosphate synthase: kinetics, fluorescence, and nuclear magnetic resonance studies." Arch Biochem Biophys 334(1): 37-42. |
| Not Relevant to current fit for purpose review | Shuttleworth, W. A. and J. N. S. Evans (1994). "SITE-DIRECTED MUTAGENESIS AND NMR-STUDIES OF HISTIDINE-385 MUTANTS OF 5-ENOLPYRUVYLSHIKIMATE-3-PHOSPHATE SYNTHASE." Biochemistry 33(23): 7062-7068. |
| Not Relevant to current fit for purpose review | Shuttleworth, W. A. and J. N. S. Evans (1996). "The H385N Mutant of 5-Enolpyruvylshikimate-3-phosphate Synthase: Kinetics, Fluorescence, and Nuclear Magnetic Resonance Studies." Archives of Biochemistry and Biophysics 334(1): 37-42. |
| Not Relevant to current fit for purpose review | Shuttleworth, W. A., et al. (1992). "Over-production of 5-enolpyruvylshikimate-3-phosphate synthase in Escherichia coli: use of the T7 promoter." Protein Eng 5(5): 461-466. |
| Not Relevant to current fit for purpose review | Shuttleworth, W. A., et al. (1999). "Site-directed mutagenesis of putative active site residues of 5-enolpyruvylshikimate-3-phosphate synthase." Biochemistry 38(1): 296-302. |
| Not Relevant to current fit for purpose review | Sienkiewicz, Z. (2007). "Rapporteur report: Roundup, discussion and recommendations." Progress in Biophysics and Molecular Biology 93(1–3): 414-420. |
| Not Relevant to current fit for purpose review | Sikorski, J. A. and K. J. Gruys (1997). "Understanding Glyphosate's molecular mode of action with EPSP synthase: Evidence favoring an allosteric inhibitor model." Accounts of Chemical Research 30(1): 2-8. |
| Not Relevant to current fit for purpose review | Simonetti, E., et al. (2015). "An Interlaboratory Comparative Study on the Quantitative Determination of Glyphosate at Low Levels in Wheat Flour." J AOAC Int 98(6): 1760-1768. |
| Not Relevant to current fit for purpose review | Singh, N. and S. Srivastava (2014). "Biomonitoring of Genotoxic Effect of Glyphosate and Pendimethalin in Vigna mungo Populations." Cytologia 79(2): 173-180. |
| Not Relevant to current fit for purpose review | Singh, S. K. and S. Kumar (2011). "Novel adaptive color space transform and application to image compression." Signal Processing: Image Communication 26(10): 662-672. |

| | |
|---|---|
| Not Relevant to current fit for purpose review | Sinha, R. P., et al. (2003). "Wavelength-dependent induction of a mycosporine-like amino acid in a rice-field cyanobacterium, Nostoc commune: role of inhibitors and salt stress." Photochemical & Photobiological Sciences 2(2): 171-176. |
| Not Relevant to current fit for purpose review | Sliseris, J., et al. (2013). "Optimal Design of GFRP-Plywood Variable Stiffness Plate." Procedia Engineering 57: 1060-1069. |
| Not Relevant to current fit for purpose review | Smith, S. O. (1993). "Magic angle spinning NMR methods for internuclear distance measurements." Current Opinion in Structural Biology 3(5): 755-759. |
| Not Relevant to current fit for purpose review | Smitt, P. S. (2004). "Neuro-oncology: diagnosis in the spotlight." The Lancet Neurology 3(1): 14. |
| Not Relevant to current fit for purpose review | Somasiri, A., et al. (2000). "Phosphatidylinositol 3-Kinase is required for adherens junction-dependent mammary epithelial cell spheroid formation." Differentiation 66(2–3): 116-125. |
| Not Relevant to current fit for purpose review | Sorensen, P. S. (2005). "Multiple sclerosis: pathophysiology revisited." The Lancet Neurology 4(1): 9-10. |
| Not Relevant to current fit for purpose review | Spaeth, S. C. and T. R. Sinclair (1983). "Variation in nitrogen accumulation and distribution among soybean cultivars." Field Crops Research 7: 1-12. |
| Not Relevant to current fit for purpose review | Spector, L. S. (1990). "Not-so-open skies." Space Policy <HT>6</HT>(1): 9-18. |
| Not Relevant to current fit for purpose review | Sperling, R. A. and K. A. Johnson (2012). "Dementia: new criteria but no new treatments." The Lancet Neurology 11(1): 4-5. |
| Not Relevant to current fit for purpose review | Sroka, J., et al. (2002). "Phenotype modulation in non-adherent and adherent sublines of Walker carcinosarcoma cells: the role of cell-substratum contacts and microtubules in controlling cell shape, locomotion and cytoskeletal structure." The International Journal of Biochemistry & Cell Biology 34(7): 882-899. |
| Not Relevant to current fit for purpose review | Stanton, T. L., et al. (1990). "The Effects of Wet on Growing Heifer Brewers Grain Performance." The Professional Animal Scientist <HT>6</HT>(2): 31-34. |
| Not Relevant to current fit for purpose review | Stauffer, M. E., et al. (2001). "Shikimate-3-phosphate binds to the isolated N-terminal domain of 5-enolpyruvylshikimate-3-phosphate synthase." Biochemistry 40(13): 3951-3957. |
| Not Relevant to current fit for purpose review | Stobiecka, M., et al. (2007). "Piezoelectric sensor for determination of genetically modified soybean roundup ready((R)) in samples not amplified by PCR." Sensors 7(8): 1462-1479. |
| Not Relevant to current fit for purpose review | Stoessl, A. J. (2011). "Movement disorders: new insights into Parkinson's disease." The Lancet Neurology 10(1): 5-7. |
| Not Relevant to current fit for purpose review | Stovner, L. J. (2008). "Headache: new concepts, models, and treatments." The Lancet Neurology 7(1): 11-12. |
| Not Relevant to current fit for purpose review | Struyker-Boudier, H. A. J. (1983). "Clinical hypertension and hypotension." Trends in Pharmacological Sciences 4: 359. |
| Not Relevant to current fit for purpose review | Subramanian, A., et al. (2012). "A roundup of articles published in recent months." J Thorac Oncol 7(3): 626-628. |
| Not Relevant to current fit for purpose review | Sutou, S. and H. Shindo (1975). "Concanavalin a induces endoreduplication in cultured mammalian cells." Biochemical and Biophysical Research Communications 67(1): 79-84. |
| Not Relevant to current fit for purpose review | Suzuki, N., et al. (1996). "Purification and characterization of a cytosolic isozyme of 3-Deoxy-D-arabino-heptulosonate 7-phosphate synthase from cultured carrot cells." Journal of Plant Physiology 149(1–2): 19-22. |
| Not Relevant to current fit for purpose review | Swaney, S. (1995). "Spasmodic Torticollis." Physiotherapy 81(5): 301. |
| Not Relevant to current fit for purpose review | Tai, A., et al. (2008). "Estimate of Radiobiologic Parameters from Clinical Data for Biologically Based Treatment Planning for Liver Irradiation." International Journal of Radiation Oncology*Biology*Physics 70(3): 900-907. |
| Not Relevant to current fit for purpose review | Tai, H.-K., et al. (2011). "A one-time inducible transposon for terminating selectable markers in transgenic plants." Botanical Studies 52(4): 375-381. |
| Not Relevant to current fit for purpose review | Takabatake, R., et al. (2010). "Development and evaluation of event-specific quantitative pcr method for genetically modified soybean MON89788." Journal of Biotechnology 150, Supplement: 482-483. |
| Not Relevant to current fit for purpose review | Talbot, K. (2007). "Neuromuscular disorders: therapeutic advances." The Lancet Neurology <HT>6</HT>(1): 18-19. |
| Not Relevant to current fit for purpose review | Tan, A. and G. D. Badhwar (1997). "Detecting the dynamical state of the atmosphere from the orbital decay of the ODERACS spheres." Journal of Atmospheric and Solar-Terrestrial Physics 59(4): 431-437. |

| | |
|---|---|
| Not Relevant to current fit for purpose review | Tan, J. H., et al. (2013). "An interactive lung field segmentation scheme with automated capability." Digital Signal Processing 23(3): 1022-1031. |
| Not Relevant to current fit for purpose review | Tan, S., et al. (2006). "Herbicidal inhibitors of amino acid biosynthesis and herbicide-tolerant crops." Amino Acids 30(2): 195-204. |
| Not Relevant to current fit for purpose review | Tardieu, M. (2010). "Paediatric neurology: brain development at an interface between genetics, the environment, and the immune system." The Lancet Neurology 9(1): 13-14. |
| Not Relevant to current fit for purpose review | Taverniers, I., et al. (2004). "Cloned plasmid DNA fragments as calibrators for controlling GMOs: different real-time duplex quantitative PCR methods." Anal Bioanal Chem 378(5): 1198-1207. |
| Not Relevant to current fit for purpose review | Thakur, K. T., et al. (2015). "CNS infections in 2014: guns, germs, and will." The Lancet Neurology 14(1): 20-22. |
| | |
| Not Relevant to current fit for purpose review | Tong, X. H., et al. (2009). "Physiological and molecular mechanisms of glyphosate tolerance in an in vitro selected cotton mutant." Pesticide Biochemistry and Physiology 94(2-3): 100-106. |
| Not Relevant to current fit for purpose review | Tonkin, J. (1991). "South Australia CACCN." Confederation of Australian Critical Care Nurses Journal 4(3): 6. |
| Not Relevant to current fit for purpose review | Toyota, A., et al. (2006). "Quantification of genetically modified soybeans using a combination of a capillary-type real-time PCR system and a plasmid reference standard." Biosci Biotechnol Biochem 70(4): 821-827. |
| Not Relevant to current fit for purpose review | Trojano, M. and C. Tortorella (2015). "MS and related disorders: looking for markers of phenotypes." The Lancet Neurology 14(1): 11-13. |
| Not Relevant to current fit for purpose review | Trusler, C. S., et al. (2007). "Italian ryegrass (Lolium multiflorum) management options in winter wheat in Oklahoma." Weed Technology 21(1): 151-158. |
| Not Relevant to current fit for purpose review | Truta, E., et al. (2011). "Evaluation of Roundup-induced toxicity on genetic material and on length growth of barley seedlings." Acta Biol Hung 62(3): 290-301. |
| Not Relevant to current fit for purpose review | Turk, J. V. and D. L. Snedeker (1986). "Intro public relations texts: A round-up review." Public Relations Review 12(4): 48-55. |
| Not Relevant to current fit for purpose review | Tyshko, N. V., et al. (2008). "Medical and biological safety assessment of genetically modified maize event MON 88017. Report 2. Genotoxicologic, immunologic and allergologic examinations." Voprosy pitaniya 77(5): 13-17. |
| Not Relevant to current fit for purpose review | Ugarte, R. (2014). "Interaction between glyphosate and mitochondrial succinate dehydrogenase." Computational and Theoretical Chemistry 1043: 54-63. |
| Not Relevant to current fit for purpose review | Underwood, M. (1991). "Western Australia ASCCN." Confederation of Australian Critical Care Nurses Journal 4(3): 6. |
| Not Relevant to current fit for purpose review | Uppal, R. K. and M. J. Gooding (2013). "Gibberellin-responsive and -insensitive dwarfing alleles on wheat performance in contrasting tillage systems." Field Crops Research 141: 55-62. |
| Not Relevant to current fit for purpose review | Urda, A., et al. (2012). "Final voluntary assessment for Traumatology and Orthopaedic Surgery medical residents: A report on the results and a look at the future." Revista Española de Cirugía Ortopédica y Traumatología (English Edition) 56(3): 188-196. |
| Not Relevant to current fit for purpose review | Valencia, E., et al. (1999). "Yield and botanical composition of rhizoma peanut-grass swards treated with herbicides." Agronomy Journal 91(6): 956-961. |
| Not Relevant to current fit for purpose review | Van Caneghem, T. (2002). "EARNINGS MANAGEMENT INDUCED BY COGNITIVE REFERENCE POINTS." The British Accounting Review 34(2): 167-178. |
| Not Relevant to current fit for purpose review | van Duijn, G., et al. (1999). "Detection methods for genetically modified crops." Food Control 10(6): 375-378. |
| Not Relevant to current fit for purpose review | van Haselen, R. and R. Jütte (2013). "The placebo effect and its ramifications for clinical practice and research. Villa La Collina at Lake Como, Italy, 4–6 May 2012." Complementary Therapies in Medicine 21(2): 85-93. |
| Not Relevant to current fit for purpose review | Van Kampen, J. and J. D. Hundleby (1994). "An investigation of the associations between augmenting-reducing, reactivity, sensation seeking and body image." Personality and Individual Differences 16(3): 373-377. |
| Not Relevant to current fit for purpose review | Van Loon, A. J. (1991). "Glaciotectonic landforms and structures: J.S. Aber, D.G. Croot and M.M. Fenton. Kluwer Academic Publishers Group, Dordrecht, 1989, ix + 200 pp., Dfl.155.-, US$79.-, £49.-, ISBN 0-7923-0100-5 (hardcover)." Sedimentary Geology 75(1–2): 164-165. |

| Not Relevant to current fit for purpose review | Venancio, V. P., et al. (2012). "Conventional (MG-BR46 Conquista) and Transgenic (BRS Valiosa RR) Soybeans Have No Mutagenic Effects and May Protect Against Induced-DNA Damage In Vivo." Nutrition and Cancer-an International Journal 64(5): 725-731. |
|---|---|
| Not Relevant to current fit for purpose review | Vyn, T. J., et al. (2002). "Corn response to potassium placement in conservation tillage." Soil and Tillage Research 67(2): 159-169. |
| Not Relevant to current fit for purpose review | Walker, D. C., et al. (2004). "The epitheliome: agent-based modelling of the social behaviour of cells." Biosystems 76(1–3): 89-100. |
| Not Relevant to current fit for purpose review | Wallace, K., et al. (2015). "A multiplexed assay for determination of neurotoxicant effects on spontaneous network activity and viability from microelectrode arrays." NeuroToxicology 49: 79-85. |
| Not Relevant to current fit for purpose review | Wander, J. G. N. and H. J. Bouwmeester (1998). "Effects of nitrogen fertilization on dill (Anethum graveolens L.) seed and carvone production." Industrial Crops and Products 7(2–3): 211-216. |
| Not Relevant to current fit for purpose review | Wang, F., et al. (2008). "The microtubule plus end-binding protein EB1 is involved in Sertoli cell plasticity in testicular seminiferous tubules." Experimental Cell Research 314(1): 213-226. |
| Not Relevant to current fit for purpose review | Wang, G., et al. (2006). "Methyl protodioscin induces G2/M cell cycle arrest and apoptosis in HepG2 liver cancer cells." Cancer Letters 241(1): 102-109. |
| Not Relevant to current fit for purpose review | Wang, G., et al. (2012). "Damage to DNA caused by UV-B radiation in the desert cyanobacterium Scytonema javanicum and the effects of exogenous chemicals on the process." Chemosphere 88(4): 413-417. |
| Not Relevant to current fit for purpose review | Wang, G., et al. (2012). "3.105 GLYPHOSATE INDUCED CELL DEATH THROUGH APOPTOTIC AND AUTOPHAGIC MECHANISMS." Parkinsonism & Related Disorders 18, Supplement 2: S190. |
| Not Relevant to current fit for purpose review | Wang, M., et al. (2015). "Gene editing by co-transformation of TALEN and chimeric RNA/DNA oligonucleotides on the rice OsEPSPS gene and the inheritance of mutations." PLoS One 10(4): e0122755. |
| Not Relevant to current fit for purpose review | Wang, S.-A., et al. (2009). "Heat Shock Protein 90 Is Important for Sp1 Stability during Mitosis." Journal of Molecular Biology 387(5): 1106-1119. |
| Not Relevant to current fit for purpose review | Wang, X., et al. (2005). "Effects of Phe-to-Trp mutation and fluorotryptophan incorporation on the solution structure of cardiac troponin C, and analysis of its suitability as a potential probe for in situ NMR studies." Protein Science 14(9): 2447-2460. |
| Not Relevant to current fit for purpose review | Wang, X., et al. (2011). "Construction of a reference plasmid molecule containing eight targets for the detection of genetically modified crops." Appl Microbiol Biotechnol 90(2): 721-731. |
| Not Relevant to current fit for purpose review | Weng, H., et al. (2005). "Novel reference gene, High-mobility-group protein I/Y, used in qualitative and real-time quantitative polymerase chain reaction detection of transgenic rapeseed cultivars." J AOAC Int 88(2): 577-584. |
| Not Relevant to current fit for purpose review | White, A. K. and W. W. Metcalf (2004). "Two C-P lyase Operons in Pseudomonas stutzeri and their roles in the oxidation of phosphonates, phosphite, and hypophosphite." Journal of Bacteriology 186(14): 4730-4739. |
| Not Relevant to current fit for purpose review | Willenborg, C. J. and E. N. Johnson (2013). "Influence of seeding date and seeding rate on cow cockle, a new medicinal and industrial crop." Industrial Crops and Products 49: 554-560. |
| Not Relevant to current fit for purpose review | Williams, M. J., et al. (2002). "No-till establishment of rhizoma peanut." Agronomy Journal 94(6): 1350-1354. |
| Not Relevant to current fit for purpose review | Williamson, P. R., et al. (2016). "CNS infections in 2015: emerging catastrophic infections and new insights into neuroimmunological host damage." The Lancet Neurology 15(1): 17-19. |
| Not Relevant to current fit for purpose review | Wilson, R. (1970). "AORN RECRUITMENT PROGRAM ROUND-UP." AORN Journal 11(1): 66-68. |
| Not Relevant to current fit for purpose review | Wiznitzer, M. (2006). "Paediatric neurology: clinical advances with low technology." The Lancet Neurology 5(1): 14-15. |
| Not Relevant to current fit for purpose review | Wong, P. K. Y., et al. (1973). "Rapid, selective procedure for isolation of spontaneous temperature-sensitive mutants of Moloney leukemia virus." Virology 51(2): 424-431. |
| Not Relevant to current fit for purpose review | Wood, E. J. (1985). "From cells to atoms: an illustrated introduction to molecular biology: by A. R. Rees and M. J. E. Sternberg, Blackwell, 1984. £6.80 (viii + 94 pages) ISBN 0 632 00888 1." Trends in Biochemical Sciences 10(5): 214-215. |
| Not Relevant to current fit for purpose review | Wood, E. J. (1985). "Lecture notes on biochemistry: by J. K. Candish, Blackwell, 1984. £9.80 (vi + 290 pages) ISBN 0 632 01253 6." Trends in Biochemical Sciences 10(5): 214-215. |
| Not Relevant to current fit for purpose review | Wurz, A., et al. (1999). "Quantitative analysis of genetically modified organisms (GMO) in processed food by PCR-based methods." Food Control 10(<HT>6</HT>): 385-389. |

| | |
|---|---|
| Not Relevant to current fit for purpose review | Xia, J., et al. (2015). "Retraction of a study on genetically modified corn: Expert investigations should speak louder during controversies over safety." Bioscience Trends 9(2): 134-137. |
| Not Relevant to current fit for purpose review | Xu, J., et al. (2002). "Cloning of genomic DNA of rice 5-enolpyruvylshikimate 3-phosphate synthase gene and chromosomal localization of the gene." Sci China C Life Sci 45(3): 251-259. |
| Not Relevant to current fit for purpose review | Xu, J. W., et al. (2002). "Isolation of rice EPSP synthase cDNA and its sequence - Analysis and copy number determination." Acta Botanica Sinica 44(2): 188-192. |
| Not Relevant to current fit for purpose review | Xu, W. T., et al. (2011). "Establishment and evaluation of event-specific qualitative and quantitative PCR method for genetically modified soybean DP-356043-5." European Food Research and Technology 233(4): 685-695. |
| Not Relevant to current fit for purpose review | Yan, H.-Q., et al. (2011). "Novel AroA from Pseudomonas putida Confers Tobacco Plant with High Tolerance to Glyphosate." PLoS One 6(5). |
| Not Relevant to current fit for purpose review | Yang, L. T., et al. (2005). "Screening and construct-specific detection methods of transgenic Huafan No 1 tomato by conventional and real-time PCR." Journal of the Science of Food and Agriculture 85(13): 2159-2166. |
| Not Relevant to current fit for purpose review | Yang, R., et al. (2007). "Event-specific qualitative and quantitative PCR detection of roundup ready event GT73 based on the 3'-integration junction." Plant Cell Rep 26(10): 1821-1831. |
| Not Relevant to current fit for purpose review | Yang, Z. and X. Dong (2015). "Earnings roundup in private and public bank holding companies." Advances in Accounting 31(1): 96-99. |
| Not Relevant to current fit for purpose review | Yao, P., et al. (2015). "Improvement of glycine oxidase by DNA shuffling, and site-saturation mutagenesis of F247 residue." Int J Biol Macromol 79: 965-970. |
| Not Relevant to current fit for purpose review | Yılmaz, R., et al. "Verification of GMO analytical methods: DNA isolation and quantitative detection methods for Roundup Ready soy flour." New Biotechnology 29, Supplement: S196-S197. |
| Not Relevant to current fit for purpose review | You, Y., et al. (2012). "Effect of intravenous fat emulsion therapy on glyphosate-surfactant–induced cardiovascular collapse." The American Journal of Emergency Medicine 30(9): 2097.e2091-2097.e2092. |
| Not Relevant to current fit for purpose review | Yousef, M. I., et al. (1996). "A sensitive sperm-motility test for the assessment of cytotoxic effect of pesticides." Journal of Environmental Science and Health Part B-Pesticides Food Contaminants and Agricultural Wastes 31(1): 99-115. |
| Not Relevant to current fit for purpose review | Zanis, D. A., et al. (1997). "A comparison of three methods of measuring the type and quantity of services provided during substance abuse treatment." Drug and Alcohol Dependence 49(1): 25-32. |
| Not Relevant to current fit for purpose review | Zanoli, L. M., et al. (2013). "Peptide nucleic acid molecular beacons for the detection of PCR amplicons in droplet-based microfluidic devices." Anal Bioanal Chem 405(2-3): 615-624. |
| Not Relevant to current fit for purpose review | Zawahir, S., et al. (2009). "Acute intentional self-poisoning with a herbicide product containing fenoxaprop-P-ethyl, ethoxysulfuron, and isoxadifen ethyl: a prospective observational study." Clinical Toxicology 47(8): 792-797. |
| Not Relevant to current fit for purpose review | Zhan, T., et al. (2013). "Improving Glyphosate Oxidation Activity of Glycine Oxidase from Bacillus cereus by Directed Evolution." PLoS One 8(11). |
| Not Relevant to current fit for purpose review | Zhang, H., et al. (2008). "Development of one novel multiple-target plasmid for duplex quantitative PCR analysis of roundup ready soybean." Journal of Biotechnology 136, Supplement: S250. |
| Not Relevant to current fit for purpose review | Zhang, J., et al. (1998). "A transformation technique from RGB signals to the Munsell system for color analysis of tobacco leaves." Computers and Electronics in Agriculture 19(2): 155-166. |
| Not Relevant to current fit for purpose review | Zhang, M., et al. (2007). "Detection of Roundup Ready soy in highly processed products by triplex nested PCR." Food Control 18(10): 1277-1281. |
| Not Relevant to current fit for purpose review | Zhang, Q., et al. (2014). "Characterization of cytochalasins from the endophytic Xylaria sp. and their biological functions." J Agric Food Chem 62(45): 10962-10969. |
| Not Relevant to current fit for purpose review | Zheng, Q. and D. C. Chang (1991). "High-efficiency gene transfection by in situ electroporation of cultured cells." Biochimica et Biophysica Acta (BBA) - Gene Structure and Expression 1088(1): 104-110. |
| Not Relevant to current fit for purpose review | Zhou, H., et al. (1995). "Glyphosate-tolerant CP4 and GOX genes as a selectable marker in wheat transformation." Plant Cell Rep 15(3-4): 159-163. |
| Not Relevant to current fit for purpose review | Zhu, X., et al. (2012). "A high-throughput fluorescence resonance energy transfer (FRET)-based endothelial cell apoptosis assay and its application for screening vascular disrupting agents." Biochemical and Biophysical Research Communications 418(4): 641-646. |
| Not Relevant to current fit for purpose review | Ziegelberger, G., et al. (2006). "International commission on non-ionizing radiation protection." Progress in Biophysics and Molecular Biology 92(1): 1-3. |

| | |
|---|---|
| Not Relevant to current fit for purpose review | Zulet, A., et al. (2015). "Fermentation and alternative oxidase contribute to the action of amino acid biosynthesis-inhibiting herbicides." J Plant Physiol 175: 102-112. |
| Not Relevant to current fit for purpose review | 정원중, et al. (2006). "Prognostic Predictors of Outcome for Poisoning by Glyphosate-containing Herbicides, Based on Initial Findings." Journal of The Korean Society of Emergency Medicine 17(6): 630-636. |
| Not Relevant to current fit for purpose review | Boyle, W. S. and J. O. Evans (1974). "EFFECTS OF GLYPHOSATE AND ETHEPHON ON MEIOTIC CHROMOSOMES OF SECALE-CEREALE L." Journal of Heredity 65(4): 250-250. |
| Not Relevant to current fit for purpose review | Sherwood, M. M. and W. C. Davison (1957). "Correspondence." The Journal of Pediatrics 51(4): 486-487. |
| Not Relevant to current fit for purpose review | Belle, R., et al. (2007). "[Sea urchin embryo, DNA-damaged cell cycle checkpoint and the mechanisms initiating cancer development]." J Soc Biol 201(3): 317-327. |
| Not Relevant to current fit for purpose review | Gehin, A., et al. (2005). "Vitamins C and E reverse effect of herbicide-induced toxicity on human epidermal cells HaCaT: a biochemometric approach." Int J Pharm 288(2): 219-226. |
| Not Relevant to current fit for purpose review | Gehin, A., et al. (2006). "Glyphosate-induced antioxidant imbalance in HaCaT: The protective effect of vitamins C and E." Environmental Toxicology and Pharmacology 22(1): 27-34. |
| Not Relevant to current fit for purpose review | Lueken, A., et al. (2004). "Synergistic DNA damage by oxidative stress (induced by H2O2) and nongenotoxic environmental chemicals in human fibroblasts." Toxicol Lett 147(1): 35-43. |
| Not Relevant to current fit for purpose review | Baurand, P. E., et al. (2015). "Genotoxicity assessment of pesticides on terrestrial snail embryos by analysis of random amplified polymorphic DNA profiles." J Hazard Mater 298: 320-327. |
| Not Relevant to current fit for purpose review | Guilherme, S., et al. (2009). "Tissue specific DNA damage in the European eel (Anguilla anguilla) following a short-term exposure to a glyphosate-based herbicide." Toxicology Letters 189: S212-S212. |
| Not Relevant to current fit for purpose review | Marc, J., et al. (2004). "Glyphosate-based pesticides affect cell cycle regulation." Biol Cell 96(3): 245-249. |
| Not Relevant to current fit for purpose review | Marc, J., et al. (2003). "Embryonic cell cycle for risk assessment of pesticides at the molecular level." Environmental Chemistry Letters 1(1): 8-12. |
| Not Relevant to current fit for purpose review | Nwani, C. D., et al. (2014). "Induction of micronuclei and nuclear lesions in Channa punctatus following exposure to carbosulfan, glyphosate and atrazine." Drug Chem Toxicol 37(4): 370-377. |
| Not Relevant to current fit for purpose review | Owczarek, M., et al. (1999). "Evaluation of toxic and genotoxic activity of some pesticides in a soil-plant system." Human and Environmental Exposure to Xenobiotics: 755-762. |
| Not Relevant to current fit for purpose review | Perez-Iglesias, J. M., et al. (2016). "Effects of glyphosate on hepatic tissue evaluating melanomacrophages and erythrocytes responses in neotropical anuran Leptodactylus latinasus." Environ Sci Pollut Res Int. |
| Not Relevant to current fit for purpose review | Poletta, G. L., et al. (2009). "Genotoxicity of the herbicide formulation Roundup (glyphosate) in broad-snouted caiman (Caiman latirostris) evidenced by the Comet assay and the Micronucleus test." Mutat Res 672(2): 95-102. |
| Not Relevant to current fit for purpose review | Siddiqui, S., et al. (2012). "Glyphosate, alachor and maleic hydrazide have genotoxic effect on Trigonella foenum-graecum L." Bull Environ Contam Toxicol 88(5): 659-665. |
| Not Relevant to current fit for purpose review | Song, H.-Y., et al. (2012). "Cellular Toxicity of Surfactants Used as Herbicide Additives." J Korean Med Sci 27(1): 3-9. |
| Not Relevant to current fit for purpose review | Unver, T., et al. (2010). "Genome-wide profiling and analysis of Festuca arundinacea miRNAs and transcriptomes in response to foliar glyphosate application." Mol Genet Genomics 283(4): 397-413. |
| Relevant- Cancer Epi | Acquavella, J. F., et al. (2006). "Exposure misclassification in studies of agricultural pesticides - Insights from biomonitoring." Epidemiology 17(1): 69-74. |
| Relevant- Cancer Epi | Acquavella, J. F., et al. (2005). "Implications for epidemiologic research on variation by pesticide in studies of farmers and their families." Scandinavian Journal of Work Environment & Health 31: 105-109. |
| Relevant- Cancer Epi | Baker, B. A., et al. (2005). "Farm Family Exposure Study: methods and recruitment practices for a biomonitoring study of pesticide exposure." Journal of Exposure Analysis and Environmental Epidemiology 15(6): 491-499. |
| Relevant- Cancer Epi | Chang, E. T. and E. Delzell (2016). "Systematic review and meta-analysis of glyphosate exposure and risk of lymphohematopoietic cancers." J Environ Sci Health B 51(6): 402-434. |
| Relevant- Cancer Epi | De Roos, A. J., et al. (2005). "Cancer incidence among glyphosate-exposed pesticide applicators in the Agricultural Health Study." Environ Health Perspect 113(1): 49-54. |

| Relevant- Cancer Epi | Firth, H. M., et al. (2007). "Chemical exposure among NZ farmers." International Journal of Environmental Health Research 17(1): 33-43. |
|---|---|
| Relevant- Cancer Epi | Lash, T. L. (2007). "Bias analysis applied to Agricultural Health Study publications to estimate non-random sources of uncertainty." J Occup Med Toxicol 2: 15. |
| Relevant- Cancer Epi | Mink, P. J., et al. (2012). "Epidemiologic studies of glyphosate and cancer: a review." Regul Toxicol Pharmacol 63(3): 440-452. |
| Relevant- Cancer Epi | Sorahan, T. (2012). "Multiple myeloma and glyphosate use: A re-analysis of US Agricultural Health Study data." Toxicology Letters 211, Supplement: S169. |
| Relevant-Carcinogenicity | Greim, H., et al. (2015). "Evaluation of carcinogenic potential of the herbicide glyphosate, drawing on tumor incidence data from fourteen chronic/carcinogenicity rodent studies." Crit Rev Toxicol 45(3): 185-208. |
| Relevant-Carcinogenicity | Williams, G. M., et al. (2000). "Safety Evaluation and Risk Assessment of the Herbicide Roundup and Its Active Ingredient, Glyphosate, for Humans." Regulatory Toxicology and Pharmacology 31(2): 117-165. |
| Relevant- Genotoxicity | Alvarez-Moya et al. (2014) "Comparison of the in vivo and in vitro genotoxicity of glyphosate isopropylamine salt in three different organisms". *Genetics and Molecular Biology*, 37, 1, 105-110 |
| Relevant- Genotoxicity | Chan, P. and J. Mahler (1992). "NTP technical report on the toxicity studies of Glyphosate (CAS No. 1071-83-6) Administered In Dosed Feed To F344/N Rats And B6C3F1 Mice." Toxic Rep Ser 16: 1-d3. |
| Relevant- Genotoxicity | Bakry, F., et al. (2015). "Glyphosate herbicide induces genotoxic effect and physiological disturbances in Bulinus truncatus snails." Pestic Biochem Physiol 123: 24-30. |
| Relevant- Genotoxicity | Bolognesi, C., et al. (1997). "Genotoxic activity of glyphosate and its technical formulation roundup." J Agric Food Chem 45(5): 1957-1962. |
| Relevant- Genotoxicity | Bolognesi, C., et al. (2009). "Biomonitoring of genotoxic risk in agricultural workers from five colombian regions: association to occupational exposure to glyphosate." J Toxicol Environ Health A 72(15-16): 986-997. |
| Relevant- Genotoxicity | Da Silva, F. R., et al. (2014). "Genotoxic assessment in tobacco farmers at different crop times." Science of the Total Environment 490: 334-341. |
| Relevant- Genotoxicity | Dimitrov, B. D., et al. (2006). "Comparative genotoxicity of the herbicides Roundup, Stomp and Reglone in plant and mammalian test systems." Mutagenesis 21(6): 375-382. |
| Relevant- Genotoxicity | El-Shenawy, N. S. (2009). "Oxidative stress responses of rats exposed to Roundup and its active ingredient glyphosate." Environ Toxicol Pharmacol 28(3): 379-385. |
| Relevant- Genotoxicity | Fortes, C., et al. (2016). "Occupational Exposure to Pesticides With Occupational Sun Exposure Increases the Risk for Cutaneous Melanoma." J Occup Environ Med 58(4): 370-375. |
| Relevant- Genotoxicity | Ghisi Nde, C., et al. (2016). "Does exposure to glyphosate lead to an increase in the micronuclei frequency? A systematic and meta-analytic review." Chemosphere 145: 42-54. |
| Relevant- Genotoxicity | Heydens, W. F., et al. (2008). "Genotoxic potential of glyphosate formulations: mode-of-action investigations." J Agric Food Chem 56(4): 1517-1523. |
| Relevant- Genotoxicity | Kale, P. G., et al. (1995). "MUTAGENICITY TESTING OF 9 HERBICIDES AND PESTICIDES CURRENTLY USED IN AGRICULTURE." Environ Mol Mutagen 25(2): 148-153. |
| Relevant- Genotoxicity | Kier, L. D. (2015). "Review of genotoxicity biomonitoring studies of glyphosate-based formulations." Crit Rev Toxicol 45(3): 209-218. |
| Relevant- Genotoxicity | Koller, V. J., et al. (2012). "Cytotoxic and DNA-damaging properties of glyphosate and Roundup in human-derived buccal epithelial cells." Arch Toxicol 86(5): 805-813. |
| Relevant- Genotoxicity | Li, A. P. and T. J. Long (1988). "An evaluation of the genotoxic potential of glyphosate." Fundam Appl Toxicol 10(3): 537-546. |
| Relevant- Genotoxicity | Lioi, M. B., et al. (1998). "Genotoxicity and oxidative stress induced by pesticide exposure in bovine lymphocyte cultures in vitro." Mutat Res 403(1-2): 13-20. |
| Relevant- Genotoxicity | Manas, F., et al. (2009). "Genotoxicity of AMPA, the environmental metabolite of glyphosate, assessed by the Comet assay and cytogenetic tests." Ecotoxicol Environ Saf 72(3): 834-837. |
| Relevant- Genotoxicity | Manas, F., et al. (2009). "Genotoxicity of glyphosate assessed by the comet assay and cytogenetic tests." Environmental Toxicology and Pharmacology 28(1): 37-41. |
| Relevant- Genotoxicity | Mandel, J. S., et al. (2005). "Biomonitoring for farm families in the farm family exposure study." Scandinavian Journal of Work Environment & Health 31: 98-104. |
| Relevant- Genotoxicity | Mladinic, M., et al. (2009). "Evaluation of genome damage and its relation to oxidative stress induced by glyphosate in human lymphocytes in vitro." Environ Mol Mutagen 50(9): 800-807. |

| Relevant- Genotoxicity | Mladinic, M. and D. Zeljezic (2008). "Assessment of oxidative DNA damage by glyphosate applying hOGG1 modified comet and micronucleus assay." Toxicology Letters 180: S170-S171. |
|---|---|
| Relevant- Genotoxicity | Paz-y-Mino, C., et al. (2011). "Baseline determination in social, health, and genetic areas in communities affected by glyphosate aerial spraying on the northeastern Ecuadorian border." Rev Environ Health 26(1): 45-51. |
| Relevant- Genotoxicity | Paz-y-Mino, C., et al. (2007). "Evaluation of DNA damage in an Ecuadorian population exposed to glyphosate." Genetics and Molecular Biology 30(2): 456-460. |
| Relevant- Genotoxicity | Peluso, M., et al. (1998). "32P-postlabeling detection of DNA adducts in mice treated with the herbicide Roundup." Environ Mol Mutagen 31(1): 55-59. |
| Relevant- Genotoxicity | Piesova, E. (2005). "The effect of glyphosate on the frequency of micronuclei in bovine lymphocytes in vitro." Acta Veterinaria-Beograd 55(2-3): 101-109. |
| Relevant- Genotoxicity | Prasad, S., et al. (2009). "Clastogenic effects of glyphosate in bone marrow cells of swiss albino mice." J Toxicol 2009: 308985. |
| Relevant- Genotoxicity | Rank, J., et al. (1993). "Genotoxicity testing of the herbicide Roundup and its active ingredient glyphosate isopropylamine using the mouse bone marrow micronucleus test, Salmonella mutagenicity test, and Allium anaphase-telophase test." Mutat Res 300(1): 29-36. |
| Relevant- Genotoxicity | Roustan, A., et al. (2014). "Genotoxicity of mixtures of glyphosate and atrazine and their environmental transformation products before and after photoactivation." Chemosphere 108: 93-100. |
| Relevant- Genotoxicity | Silva Kahl, V. F., et al. (2016). "Telomere measurement in individuals occupationally exposed to pesticide mixtures in tobacco fields." Environ Mol Mutagen 57(1): 74-84. |
| Relevant- Genotoxicity | Sivikova, K. and J. Dianovsky (2006). "Cytogenetic effect of technical glyphosate on cultivated bovine peripheral lymphocytes." Int J Hyg Environ Health 209(1): 15-20. |
| Relevant- Genotoxicity | Vigfusson, N. V. and E. R. Vyse (1980). "The effect of the pesticides, Dexon, Captan and Roundup, on sister-chromatid exchanges in human lymphocytes in vitro." Mutat Res 79(1): 53-57. |
| Retracted Article | Séralini, G.-E., et al. (2014). "Retraction notice to "Long term toxicity of a Roundup herbicide and a Roundup-tolerant genetically modified maize" [Food Chem. Toxicol. 50 (2012) 4221–4231]." Food and Chemical Toxicology 63: 244. |

**Appendix B**



**Figure B.1.  Visual representation of studies included in De Roos *et al.* (2003).**



**Figure B.2.  Visual representation of studies included in Hardell *et al.* (2002).**



**Figure B.3.  Visual representation of the association between McDuffie *et al.* (2001) and the follow-up analysis by Hohenadal *et al.* (2011).**



**Figure B.4.  Visual representation of the association between Carreon *et al.* (2005), which investigated gliomas in women only, and Yiin *et al.* (2012), which investigated both sexes.**

## Appendix C

**Table C.1.  Design Characteristics of Epidemiological Studies Evaluated for Study Quality.**

| Study | Location | Study Years | Case Population | Control Population | Total Number of Subjects | Number of Glyphosate Exposed Cases | Proxy Use |
|---|---|---|---|---|---|---|---|
| Alavanja *et al.* (2003) | USA: Iowa and North Carolina | Enrollment (1993-1997) through 2001 | Males enrolled in AHS; licensed private and commercial applicators | Males enrolled in AHS; licensed private and commercial applicators | 566 cases 54,766 controls | not reported | No |
| Andreotti *et al.* (2009) | USA: Iowa and North Carolina | Enrollment (1993-1997) through 2004 | Participants enrolled in AHS; licensed private and commercial applicators and spouses | Participants enrolled in AHS; licensed private and commercial applicators and spouses | 93 cases (64 applicators, 29 spouses)  82,503 controls (52,721 applicators, 29,782 spouses) | 55 cases 48,461 controls | No |
| Band *et al.* (2011) | Canada: British Columbia | 1983-1990 | Male residents in British Columbia identified as cancer patients in British Columbia Cancer Registry (excluding farmers that worked all outside British Columbia) | Male residents in British Columbia identified as cancer patients in British Columbia Cancer Registry (excluding farmers that worked all outside British Columbia) with other cancer sites excluding lung cancer and cancers of unknown primary site | 1,153 cases 3,999 controls | 25 cases 60 controls | Yes (included in adjustment) |
| Brown *et al.* (1990) | USA: Iowa and Minnesota | Iowa: 1981-1983; Minnesota: 1980-1982  Initial interview 1981-1984 and supplemental interviews (Iowa only) in 1987 | White males (30 years or older) residing in Iowa or Minnesota diagnosed with leukemia | White males without lymphatic or hematopoietic cancer selected by random digit dialing (< age 65), Medicare records (age > 65) and state death certificate files (deceased controls) - frequency matched for 5-year age group, vital status, and state of residence | Initial: 578 cases; 1245 controls  Supplemental: 92 cases; 211 controls | 15 cases 49 controls | Yes (not evaluated) |
| Brown *et al.* (1993) | USA: Iowa | Iowa: 1981-1983; Interview 1981-1984 | White males (30 years or older) residing in Iowa diagnosed with multiple myeloma | White males without lymphatic or hematopoietic cancer selected by random digit dialing (< age 65), Medicare records (age > | 173 cases 650 controls | 11 cases 40 controls | Yes (not evaluated) |

| Study | Location | Study Years | Case Population | Control Population | Total Number of Subjects | Number of Glyphosate Exposed Cases | Proxy Use |
|---|---|---|---|---|---|---|---|
| | | | | 65) and state death certificate files (deceased controls) - frequency matched for 5-year age group, vital status, and state of residence | | | |
| Cocco *et al.* (2013) | Czech Republic, France, Germany, Italy, Ireland, and Spain | 1998-2004 | Adult patients first diagnosed with lymphoma residing in the referral area of the participating centers | Controls from Germany and Italy were randomly selected by sampling from the general population, matched to cases on sex, 5-year age-group, and residence area.  The rest of the centers used matched hospital controls, with eligibility criteria limited to diagnoses other than cancer, infectious diseases, and immunodeficient diseases | 2,348 cases 2,462 controls | 4 cases 2 controls | No |
| De Roos *et al.* (2003) | USA: Nebraska, Iowa, Minnesota, and Kansas | Nebraska: 1983-1986 Iowa: 1981-1983 Minnesota: 1980-1982 Kansas: 1979-1981 | White males diagnosed with NHL in one of the 4 states (21 years or older in Nebraska and Kansas; 30 years or older in Iowa and Minnesota) | Males living in same geographic area obtained by random digit dialing, Medicare records and state mortality files - frequency matched for race, sex, age, and vital status | 870 cases 2,569 controls | 36 cases 61 controls | Yes (not significant in covariate analysis) |
| De Roos *et al.* (2005) | USA: Iowa and North Carolina | Enrollment (1993-1997) through 2001 | Participants enrolled in AHS; licensed private and commercial applicators and spouses | Participants enrolled in AHS; licensed private and commercial applicators and spouses | 54,315 subjects included in this analysis | All cancers – 358 cases Lung – 26 cases Oral cavity – 10 cases Colon – 15 cases Rectum – 14 cases Pancreas – 7  cases Kidney – 9 cases Bladder – 17 cases Prostate – 145 cases Melanoma – 14 cases All lymphohematopoietic cancers – 36 cases NHL – 17 cases Leukemia – 9 cases | No |

**Table C.1.  Design Characteristics of Epidemiological Studies Evaluated for Study Quality.**

**Table C.1. Design Characteristics of Epidemiological Studies Evaluated for Study Quality.**

| Study | Location | Study Years | Case Population | Control Population | Total Number of Subjects | Number of Glyphosate Exposed Cases | Proxy Use |
|---|---|---|---|---|---|---|---|
| | | | | | | Multiple myeloma – 6 cases (13,280 subjects not exposed to glyphosate used for comparison population) | |
| Engel *et al.* (2005) | USA: Iowa and North Carolina | Enrollment (1993-1997) through 2000 | Wives of applicators enrolled in AHS study with no history of breast cancer | Wives of applicators enrolled in AHS study with no history of breast cancer | 309 cases 30,145 controls | 82 cases; 10,016 controls | No |
| Eriksson *et al.* (2008) | Sweden | 1999-2002 | Patients (18-74 years of age) residing in Sweden and diagnosed with NHL | Swedish residents randomly selected living in same health service regions as cases - frequency matched for age (in 10 years) and sex | 910 cases 1,016 controls | 29 cases 18 controls | No |
| Flower *et al.* (2004) | USA: Iowa | 1993-1997 | Children (born after 1975) of participants enrolled in AHS study who were diagnosed with childhood cancer up to 19 years of age | Children (born after 1975) of participants enrolled in AHS study not diagnosed with childhood cancer up to 19 years of age | 50 cases out of 17,357 total study population | Maternal use: 13 cases of 6075 total exposed Paternal use: 6 cases of 3231 total exposed | No |
| Hardell *et al.* (2002) | Sweden | NHL: 1987-1990 HCL: 1987-1992 | NHL: Male residents of one of four northern or three middle counties in Sweden age 25 years and older diagnosed with NHL; identified from regional cancer registries HCL: Living male residents of Sweden age 25 years and older diagnosed with HCl; identified from the Swedish Cancer Registry | NHL: Two male controls for each case matched by age, year of death if deceased, and county HCL: Four male controls for each case matched by age and county | 515 cases 1,141 controls | 8 cases 8 controls | Yes (not evaluated) |
| Kachuri *et al.* (2013) | Canada: Alberta, British Columbia, Manitoba, Ontario, | 1991–1994 | Men aged ≥ 19 years (≥ 30 years in analysis) - pulled from hospital records in Quebec, | Men aged ≥ 19 years (30 years in analysis) - pulled from provincial health insurance records in | 342 cases 1,357 controls | 32 cases 121 controls | Yes (included in adjustment) |

| Table C.1. Design Characteristics of Epidemiological Studies Evaluated for Study Quality. | | | | | | | |
|---|---|---|---|---|---|---|---|
| Study | Location | Study Years | Case Population | Control Population | Total Number of Subjects | Number of Glyphosate Exposed Cases | Proxy Use |
| | Quebec, and Saskatchewan | | cancer registries in all other provinces | Alberta, Saskatchewan, Manitoba, and Quebec; computerized telephone listings in Ontario; voter lists in British Columbia | | | |
| Karunanayake *et al.* (2012) | Canada: Alberta, British Columbia, Manitoba, Ontario, Quebec, and Saskatchewan | 1991–1994 | Men aged ≥ 19 years - pulled from hospital records in Quebec, cancer registries in all other provinces | Men aged ≥ 19 years - pulled from provincial health insurance records in Alberta, Saskatchewan, Manitoba, and Quebec; computerized telephone listings in Ontario; voter lists in British Columbia | 316 cases 1,506 controls | 38 cases 133 controls | No |
| Koureas *et al.* (2014) | Greece | 2010 | Inhabitants of the city of Larissa; Eligibility criteria for pesticide sprayers were 1) to personally apply pesticides systematically, and 2) to have recently applied pesticides (no longer than 7 days between last application and sampling). | The rural residents group were occupied in administrative services, public order services, health services, education or trade. Inclusion criteria for this group: absence of any involvement in agricultural activities either as a primary or secondary occupation by participant or any member of household. Also recruited urban residents (mainly blood donors) from the city of Larissa. | 80 pesticide sprayers, 85 rural residents, and 121 individuals | Not reported | No |
| Koutros *et al.* (2013) | USA: Iowa and North Carolina | Enrollment (1993-1997) through 2007 | Males enrolled in AHS; licensed private and commercial applicators | Males enrolled in AHS; licensed private and commercial applicators | 1,962 incident cases (including 919 aggressive prostate cancers) among 54,412 applicators | 1464 cases 42,420 controls | No |
| Landgren *et al.* (2009) | USA: Iowa and North Carolina | Exposure information: enrollment (1993-1997) and 5-year follow-up interview | Males enrolled in AHS; licensed private and commercial applicators | Males enrolled in AHS; licensed private and commercial applicators | 678 participants | 27 cases out of 570 total exposed | No |

**Table C.1. Design Characteristics of Epidemiological Studies Evaluated for Study Quality.**

| Study | Location | Study Years | Case Population | Control Population | Total Number of Subjects | Number of Glyphosate Exposed Cases | Proxy Use |
|---|---|---|---|---|---|---|---|
| | | Blood samples: 2006-2007 (Iowa) and 2008 (North Carolina) | | | | | |
| Lee *et al.* (2004b) | USA: Nebraska | 1988-1993 | White residents of 1 of 66 Nebraska counties age 21 years or older with a newly confirmed case of adenocarcinoma of the stomach or Cases identified from the Nebraska Cancer Registry (1988–1990) or from discharge diagnosis and pathology records from 14 Nebraska hospitals (1991–1993) | Frequency matched by age and sex to the combined distribution of glioma, stomach, and esophageal cancer cases from a control group from a previous study (1986–1987) that selected controls from the general population by random digit dialing for those under 65 years, Health Care Financing Administration Medicare files for those over 65 years, mortality records for deceased and matched by race, sex, vital status (or year of death if deceased) | Stomach: 170 cases Esophagus: 137 cases 502 Controls | 12 cases 46 controls | Yes (analysis showed differences) |
| Lee *et al.* (2005) | USA: Nebraska | 1988-1993 | White residents of 1 of 66 Nebraska counties age 21 years or older with confirmed adult glioma. Cases identified from Nebraska Cancer Registry or from participating hospitals in Lincoln and Omaha, Nebraska | Frequency matched by age, sex, and vital status to the combined distribution of glioma, stomach, and esophageal cancer cases from a control group from a previous study (1986–1987) that selected controls from the general population by random digit dialing for those under 65 years, Medicare files for those over 65 years, mortality records for deceased and matched by race, sex, vital status (or year of death if deceased), and 5-year age groups to the overall case distribution. Additional | 251 glioma cases 498 controls | 17 cases 32 controls | Yes (analysis showed differences, included in adjustment) |

| Table C.1.  Design Characteristics of Epidemiological Studies Evaluated for Study Quality. | | | | | | | |
|---|---|---|---|---|---|---|---|
| Study | Location | Study Years | Case Population | Control Population | Total Number of Subjects | Number of Glyphosate Exposed Cases | Proxy Use |
| | | | | younger controls were brought into the study through random digit dialing and from death certificates | | | |
| Lee *et al.* (2007) | USA: Iowa and North Carolina | 1993-97; follow-up to 2002 | Agricultural Health Study participants: private and commercial applicators licensed in Iowa or North Carolina with no history of colorectal cancer at enrollment. Followed through 2002 for incident colorectal cancer | Agricultural Health Study participants: private and commercial applicators licensed in Iowa or North Carolina with no history of colorectal cancer at enrollment. Followed through 2002 for incident colorectal cancer | 56,813 licensed pesticide applicators<br><br>305 incident colorectal cancer cases (212 colon, 93 rectum)<br><br>56,508 controls | Colon - 151 cases; 49 controls<br><br>Rectum - 74 cases; 18 controls<br><br>Colorectal - 225 cases; 67 controls | No |
| McDuffie *et al.* (2001) | Canada: Alberta, British Columbia, Manitoba, Ontario, Quebec, and Saskatchewan | 1991-1994 | Male residents of six Canadian provinces age 19 years and older diagnosed with STS, HD, NHL, or MM; this study only evaluated those with NHL. Cases were identified from Canadian Cancer Registries; in Quebec, hospital ascertainment was used | Random control subject selection using Health Insurance records, computerized telephone listings, and voters' lists; males 19 years and older from same six Canadian provinces as cases matched by age (within 2 years) | 517 cases 1506 controls | Univariate analysis: 51 cases; 133 controls (multivariate analysis also conducted - glyphosate exposed numbers not reported) | No |
| Orsi *et al.* (2009) | France | 2000-2004 | Men aged 20–75 years living in the catchment areas of the main hospitals in Brest, Caen, Nantes, Lille, Toulouse, and Bordeaux, with no history of immunosuppression or taking immunosuppressant drugs.  Cases ascertained from hospital records. | Patients from the same hospital catchment area as the cases.  Patients were hospitalized for orthopedic or rheumatological conditions (89.3%), gastrointestinal or genitourinary tract diseases (4.8%), cardiovascular diseases (1.1%), skin and subcutaneous tissue disease (1.8%), and infections (3.0%), excluding patients admitted for cancer or a disease directly related to | 491 cases 456 controls | NHL: 12 cases 24 controls<br><br>HL: 6 cases 15 controls<br><br>Lymphoproliferative syndromes: 4 cases 18 controls<br><br>Multiple myeloma: 5 cases;18 controls<br><br>Lymphoid neoplasms: 27 cases; 24 controls | No |

| Table C.1.  Design Characteristics of Epidemiological Studies Evaluated for Study Quality. | | | | | | | |
|---|---|---|---|---|---|---|---|
| Study | Location | Study Years | Case Population | Control Population | Total Number of Subjects | Number of Glyphosate Exposed Cases | Proxy Use |
| | | | | occupation, smoking, or alcohol abuse | | | |
| Pahwa *et al.* (2011) | Canada (Alberta, British Columbia, Manitoba, Ontario, Quebec, and Saskatchewan) | 1991-1994 | Men aged ≥ 19 years - pulled from hospital records in Quebec, cancer registries in all other provinces | Men aged ≥ 19 years - pulled from provincial health insurance records in Alberta, Saskatchewan, Manitoba, and Quebec; computerized telephone listings in Ontario; voter lists in British Columbia | 342 cases 1,506 age/resident matched controls | 32 cases 133 controls | No |
| Pahwa *et al.* (2012) | Canada (Alberta, British Columbia, Manitoba, Ontario, Quebec, and Saskatchewan) | 1991-1994 | Men aged ≥ 19 years - pulled from hospital records in Quebec, cancer registries in all other provinces | Men aged ≥ 19 years - pulled from provincial health insurance records in Alberta, Saskatchewan, Manitoba, and Quebec; computerized telephone listings in Ontario; voter lists in British Columbia | 342 cases 1506 age/resident matched controls | 32 cases 133 controls | No |
| Yiin *et al.* (2012) | USA: Upper Midwest Health Study (Iowa, Michigan, Minnesota and Wisconsin) | 1995-1997 | Age 18–80 (at ascertainment or diagnosis in 1995 through January 1997) residing in counties where the largest population center had fewer than 250,000 residents.  Referral by physicians or through state cancer registries with cases verified by histological evaluation. | Controls age 18–64 randomly selected from state driver's license/nondriver ID records, and those age 65–80 were selected from Health Care Financing Administration's (HCFA) Medicare data within 10-year age group strata, with the proportion/stratum determined by the age distribution of glioma cases in that state from 1992 to 1994. Controls were frequency-matched within a state but not by county of residence.  Selected even if they had a self-reported history of cancer other than glioma. | 798 glioma cases; 1,175 controls | 12 cases 19 controls | Yes (analysis showed no differences) |

**Appendix D. List of studies assigned a low quality ranking and not evaluated in detail**

As described in Section 3.2, if studies did not collect exposure information on glyphosate from all subjects, did not assess an outcome (e.g., biomonitoring studies), and/or did not provide a quantitative measure of an association between glyphosate and a cancer outcome, then these studies were assigned a low quality ranking and were not further evaluated in detail.  These studies included the following 32 studies:

Acquavella *et al.* 2006; Andre *et al.*, 2007; Baker *et al.* 2005; Benedetti *et al.*, 2013; Bolognesi *et al.*, 2002; Bolognesi *et al.*, 2004; Bolognesi *et al.* 2009; Bortoli *et al.*, 2009; Costa *et al.*, 2006; Da Silva *et al.* 2014; Dennis *et al.* 2010; Firth *et al.* 2007; Gomez-Arroyo *et al.*, 2013; Gregio D'Arce *et al.*, 2000; El-Zaemey *et al.*, 2013; Fortes *et al.*, 2016; Fritschi *et al.*, 2005; Hernandez *et al.*, 2006; Kaufman *et al.* 2009; Khayat *et al.*, 2013; Lebailly *et al.*, 2003; Mandel *et al.* 2005; Martinez-Valenzuela *et al.*, 2009; Monge *et al.*, 2007; Pastor *et al.*, 2003; Paz-y Mino *et al.*, 2007; Paz-y Mino *et al.* 2011; Ruder *et al.* 2004; Shaham *et al.*, 2001; Silva Kahl *et al.* 2016; Simoniello *et al.*, 2008; Vlastos *et al.*, 2006.

**Appendix E**

*Chronic Dietary Exposure*

The agency uses Dietary Exposure Evaluation Model- Food Consumption Intake Database (DEEM-FCID; version 3.16), which incorporates consumption data from United States Department of Agriculture (USDA) National Health and Nutrition Examination Survey, What We Eat in America (NHANES/WWEIA; 2003-2008) to calculate potential chronic dietary exposures.  In an unrefined chronic dietary analysis, several conservative assumptions are used to generate high end estimates of potential exposure.  These assumptions include tolerance-level residues for all registered commodities, 100% crop treated, and drinking water values from a direct application to water scenario, as well as DEEM default processing factors.  For glyphosate, the highest exposure value for any population subgroup in an unrefined chronic dietary analysis would be 0.23 mg/kg/day for children 1-2 years old (Table E.1; see T. Bloem, 30-NOV-2017, D429229 for DEEM inputs and results).

| Table E.1. Chronic dietary exposure estimates | |
|---|---|
| **Population Subgroup** | **Exposure (mg/kg/day)** |
| General U.S. Population | 0.089771 |
| All Infants (< 1 year old) | 0.138338 |
| **Children 1-2 years old** | **0.228379** |
| Children 3-5 years old | 0.212036 |
| Children 6-12 years old | 0.147749 |
| Youth 13-19 years old | 0.088362 |
| Adults 20-49 years old | 0.074650 |
| Adults 50-99 years old | 0.061258 |
| Females 13-49 years old | 0.069318 |

*Post-application Incidental Oral and Dermal Exposure*

Glyphosate has residential uses, including application to turf, which would result in the highest potential post-application exposures; therefore, there is potential for children to be exposed via incidental oral and dermal routes from playing on treated lawns.  For this assessment, the agency evaluates exposures from hand-to-mouth behavior, object-to-mouth behavior, incidental soil ingestion, and dermal contact using the 2012 Standard Operating Procedures for Residential Pesticide Exposure Assessment[29].  Incidental oral exposures from hand-to-mouth, object-to-mouth, and incidental soil ingestion are considered inter-related and, therefore, not combined. To calculate high end estimates of exposures, the following is assumed according to the 2012 SOP to be health-protective:  1) maximum label rates are applied to the turf, 2) exposures are assumed to occur every day to the residue values on the day of application (i.e., no dissipation), and 3) individuals engage in post-application activities for the maximum amount of time represented by data for children spending time outdoors and not specifically engaged in activities

---

[29] Available: http://www2.epa.gov/pesticide-science-and-assessing-pesticide-risks/standard-operating-procedures-residential-pesticide

on turf, when in actuality children do not spend all of their outdoor time on turf.  The highest exposure from incidental oral scenarios using the maximum application rate for turf applications would be 0.16 mg/kg/day from hand-to-mouth behaviors by children (1 to <2 years old).  Dermal post-application to children 1 to <2 years old would be 0.08 mg/kg/day.

**Table E.2.  Post-application Exposure Estimates for Application of Glyphosate to Turf[1].**

| Lifestage | Post-application Exposure Scenario | | Exposure (mg/kg/day) |
|---|---|---|---|
| Children 1 to <2 year old | Turf – sprays | Hand-to-Mouth | 0.16 |
| | | Object-to-Mouth | 0.005 |
| | | Incidental Soil Ingestion | 0.0003 |
| | | Dermal (high contact activities) | 0.08 |

[1]  Based on Roundup® Weed & Grass Super Concentrate, EPA Reg. No. 71995-25.

**Appendix F**

*Genotoxicity Studies with Glyphosate Based Formulations*

While the focus of this analysis to determine the genotoxic potential of glyphosate, the agency has identified numerous studies conducted with glyphosate-based formulations that contain various concentrations of the glyphosate as well as other components of the end use products and are presented in Tables F.1-F.5.

**Table F.1. *In vitro* Test for Gene Mutations in Bacteria: Glyphosate Formulations.**

| Test/Endpoint | Test System | Concentrations | Test Material/ Concentration | Results | Reference | Comments |
|---|---|---|---|---|---|---|
| Bacterial Reverse Mutation | *S. typhimurium* TA1535, TA1537, TA1538, TA98 and TA100; *E. coli* WP2 *uvrA* pKM101 ± S9 | 1.6-5000 µg/plate ± S9 (plate incorporation) | ICIA 0224 57.6% in water | Negative ± S9 | Callander (1988) | |
| Bacterial Reverse Mutation | *S. typhimurium* TA98, TA100, TA1535, TA1537*; E. coli* WP2P and *uvrA* ± S9 | 100-5000 µg/plate ±S9 plate incorporation & pre-incubation protocols | TMSC (tri-methyl-sulfonium chloride) 95% purity | Negative ± S9 | Callander (1993) | |
| Bacterial Reverse Mutation | *S. typhimurium* TA98, TA100, TA102, TA1535, and TA1537 ± S9 | 26, 43, 72, 120, 200 µg/plate | Glyphosate liquid formulation (480 g/L isopropylamine salt) | Negative ± S9 | Camolesi (2009)[1] | |
| Bacterial Reverse Mutation | *S. typhimurium* TA98, TA100, TA102, TA1535, and TA1537 ± S9 | 26, 43, 72, 120, 200 µg/plate | MON 77280 equivalent of glyphosate acid: 495 g/L | Negative ± S9 | Camolesi (2010) | |
| Bacterial Reverse Mutation | *S. typhimurium* TA98, TA100, TA102, TA1535, and TA1537 ± S9 | 0.2-2000 µg/plate | MON 76190 53.2% glyphosate | Negative ± S9 | Catoyra (2009)[1] | |
| Bacterial Reverse Mutation | *S. typhimurium* TA97a, TA98, TA100 and TA102± S9 | 2 µg/plate (toxic) | Perzocyd 10 SL formulation | Negative ± S9 | Chruscielska *et al.* (2000) | |
| Bacterial Reverse Mutation | *S. typhimurium* TA98, TA100, TA102, | 0.03-3.0 µL/plate | MON 8080 (87.6%) | Negative ± S9 | Flowers (1981) | |

**Table F.1.** *In vitro* Test for Gene Mutations in Bacteria: Glyphosate Formulations.

| Test/Endpoint | Test System | Concentrations | Test Material/ Concentration | Results | Reference | Comments |
|---|---|---|---|---|---|---|
| | TA1535, and TA1537 ± S9 | | | | | |
| Bacterial Reverse Mutation | *S. typhimurium* TA98, TA100, TA102, TA1535, and TA1537 ± S9 | 3.16-1000 µg/plate | TROP M (Glyphosate 480); 35.84% purity based on acid, 48.46% pure based on IPA salt | Negative ± S9 | Flügge (2010a)[1] | |
| Bacterial Reverse Mutation | *S. typhimurium* TA98, TA100, TA102, TA1535, and TA1537 ± S9 | 0.316-100 | Glyphosate 757 g/kg granular formulation (76.1% monoammonium glyphosate salt) | Negative ± S9 | Flügge (2010d)[1] | |
| Bacterial Reverse Mutation | *S. typhimurium* TA97a, TA98, TA100, and TA1535 ± S9 | 1-5000 µg/plate | Roundup WG 784 g/kg ammonium salt equivalent | Negative ± S9 | Gava (1998) | |
| Bacterial Reverse Mutation | *S. typhimurium* TA98, TA100, TA1535, TA1537± S9 | 50-5000 µg/plate | Rodeo® (containing IPA salt and water only); 40% glyphosate (acid equivalent) | Negative ± S9 | Kier *et al.*, (1992) | |
| Bacterial Reverse Mutation | *S. typhimurium* TA98, TA100, TA1535, TA1537 ± S9 | 5-500 µg/plate (-S9)/ 15-1500 µg/plate (+S9) | MON 2139 (Roundup®) 31% Glyphosate (acid equivalent) | Negative ± S9 | Kier *et al.*, (1992) | Cytotoxic at top concentrations |
| Bacterial Reverse Mutation | *S. typhimurium* TA98, TA100, TA1535, TA1537 ± S9 | 5-500 µg/plate (-S9)/ 15-1500 µg/plate (+S9) | MON 14445 (Direct®); 75% Glyphosate (acid equivalent) | Negative ± S9 | Kier *et al.*, (1992) | Cytotoxic at the top concentrations, occasionally at lower concentrations |
| Bacterial Reverse Mutation | *S. typhimurium* TA98, TA100, TA1535, TA1537 ± S9 | 0.2-2000 µg/plate | MON 79672 (Roundup Ultramax); 74.7% monoammonium | Negative ± S9 | Lope (2008)[1] | |

**Table F.1. *In vitro* Test for Gene Mutations in Bacteria: Glyphosate Formulations.**

| Test/Endpoint | Test System | Concentrations | Test Material/ Concentration | Results | Reference | Comments |
|---|---|---|---|---|---|---|
| | | | glyphosate salt; 68.2% glyphosate | | | |
| Bacterial Reverse Mutation | *S. typhimurium* TA1535, TA1537, TA1538, TA98 and TA100 ± S9 | 0.617-50 μL/plate ± S9 | SC-0224, 19.2% purity | Negative ± S9 | Majeska (1982) | |
| Bacterial Reverse Mutation | *S. typhimurium* TA98, TA100, TA1535, TA1537 and *E. coli* WP2 *uvrA* ± S9 | TA strains: 10 - 5000 μg/plate (+S9); 3.33-3330 μg/plate (-S9); E. coli: 33.3-5000 μg/plate (+/- S9) | MON 78239 36.6% glyphosate (44.9% potassium salt of glyphosate) | Negative | Mecchi (2003a) | Increase in revertants seen in TA98 and TA1535 -S9 on first trial, not conc-dep; however no increase in revertants seen in repeat in those strains; overall negative. |
| Bacterial Reverse Mutation | *S. typhimurium* TA98, TA100, TA1535, TA1537 and *E. coli* WP2 *uvrA* ± S9 | TA strains: 3.33-3330 μg/plate (+S9); 1.0-1000 μg/plate (-S9); E. coli: 33.3-5000 μg/plate (+/- S9) | MON 78634 65.2% w/w glyphosate (71.8% w/w as monoammonium salt of glyphosate) | Negative | Mecchi (2003b) | |
| Bacterial Reverse Mutation | *S. typhimurium* TA 98, TA100, TA1535, TA1537 and *E. coli* WP2 *uvrA* ± S9 | 10 - 5000 μg/plate (+/-S9) | MON 79864 38.7% glyphosate acid (wt %) | Negative | Mecchi (2008a) | Inhibited growth seen at ≥2000 -S9 |
| Bacterial Reverse Mutation | *S. typhimurium* TA 98, TA100, TA1535, TA1537 and *E. coli* WP2 *uvrA* ± S9 | 33.3-5000 μg/plate | MON 76313 30.9% glyphosate acid | Negative | Mecchi (2008b) | |

**Table F.1.** *In vitro* **Test for Gene Mutations in Bacteria: Glyphosate Formulations.**

| Test/Endpoint | Test System | Concentrations | Test Material/ Concentration | Results | Reference | Comments |
|---|---|---|---|---|---|---|
| Bacterial Reverse Mutation | *S. typhimurium* TA 98, TA100, TA1535, TA1537 and *E. coli* WP2 *uvrA* ± S9 | 10-5000 µg/plate (+/-S9) | MON 76171 31.1% glyphosate | Negative | Mecchi (2008c)[1] | |
| Bacterial Reverse Mutation | *S. typhimurium* TA 98, TA100, TA1535, TA1537 and *E. coli* WP2 *uvrA* ± S9 | 10-5000 µg/plate (+/-S9) | MON 79991 71.6% glyphosate acid | Negative | Mecchi (2009a) | |
| Bacterial Reverse Mutation | *S. typhimurium* TA 98, TA100, TA1535, TA1537 and *E. coli* WP2 *uvrA* ± S9 | 10-5000 µg/plate (+/-S9) | MON 76138 38.5% glyphosate | Negative | Mecchi (2009b)[1] | |
| Bacterial Reverse Mutation | *S. typhimurium* TA97a, TA98, TA100, and TA1535 ± S9 | 1-5000 µg/plate | MON 77280 646.4 g/L salt equivalent | Negative | Perina (1998) | |
| Bacterial Reverse Mutation | *S. typhimurium* TA98 and TA100 ± S9 | 0-1440 µg/plate (calculated as glyphosate IPA salt) | Roundup, 480 g/L glyphosate isopropylamine salt | Negative – S9, Equivocal +S9 | Rank *et al.* (1993) | Stat significant increase at 360 µg/plate for TA98 (-S9) and 720 µg/plate for TA100 (+S9).  Not significant at higher concentrations and were not replicated. Effects occurred at close to toxic levels. |

**Table F.1.  *In vitro* Test for Gene Mutations in Bacteria: Glyphosate Formulations.**

| Test/Endpoint | Test System | Concentrations | Test Material/ Concentration | Results | Reference | Comments |
|---|---|---|---|---|---|---|
| Bacterial Reverse Mutation | *S. typhimurium* TA98, TA100, TA102, TA1535, and TA1537 ± S9 | 500-5000 µg/plate; | 495 g/L glyphosate isopropylamine salt; 371.0 g/L (equivalent of glyphosate acid) | Negative ± S9 | Silvino (2011) | |
| Bacterial Reverse Mutation | *S. typhimurium* TA98, TA100, TA102, TA1535, and TA1537 ± S9 | 1.5-5000 µg/plate | MON 8709 495 g/L glyphosate isopropylamine salt; 371.0 g/L (equivalent of glyphosate acid) | Negative ± S9 | Silvino (2011) | |
| Bacterial Reverse Mutation | *S. typhimurium* TA98, TA100, TA102, TA1535, and TA1537 ± S9 | 15-5000 µg/plate | MON 76313 468 g/L glyphosate isopropylamine salt (351 g/L glyphosate acid equivalent) | Negative ± S9 | Silvino (2012) | Cytotoxic at 5000 µg/plate for some strains |
| Bacterial Reverse Mutation | *S. typhimurium* TA97a, TA98, TA100 and TA1535 ± S9 | 1-5000 µg/plate | Glifos formulation (glyphosate isopropylammoni um salt, Berol 907 and water) | Negative ± S9 | Vargas (1996) | Cytotoxic at the two upper concentrations |
| Bacterial Reverse Mutation | *S. typhimurium* TA98, TA100, TA102, TA1535, TA1537± S9 | 3.16-316 µg/plate | FSG 3090-H1 360 g/L | Negative ± S9 | Uhde (2004)[1] | |
| Bacterial Reverse Mutation | *S. typhimurium* TA98, TA100 ± S9 | 0.01-100 µg/plate | 64% (glyphosate Isopropylammon ium salt) | Negative ± S9 | Wang *et al.* (1993) | |
| Bacterial Reverse Mutation | *S. typhimurium* TA98, TA100, TA1535, | All strains: 33.3-5000 µg/plate | MON 78910 30.3% glyphosate acid | Negative ± S9 | Xu (2006) | Cytotoxic ≥1000 µg/plate (-S9) |

**Table F.1. *In vitro* Test for Gene Mutations in Bacteria: Glyphosate Formulations.**

| Test/Endpoint | Test System | Concentrations | Test Material/ Concentration | Results | Reference | Comments |
|---|---|---|---|---|---|---|
| | TA1537 and *E. coli* WP2 *uvrA* ± S9 | (+S9); 10-3330 μg/plate (-S9) | | | | |

[1] Study was cited in Kier and Kirkland (2013).  Supplementary information about the study was provided online including test guideline, test material purity, control chemicals and summary data tables.

**Table F.2. *In Vitro* Tests for Chromosome Damage in Mammalian Cells- Glyphosate Formulations**

| Test/Endpoint | Test System | Concentrations | Test Material/ Concentration | Results | Reference | Comments |
|---|---|---|---|---|---|---|
| *In vitro* **Chromosomal Aberration using fluorescent in situ hybridization (FISH)** | Bovine lymphocytes (from two 6-8 month old calves) -whole chromosome (1) painting probe | 28-1120 μM  24 h exposure | 62% Isopropylamine salt of glyphosate (38% inert ingredients) | Negative. | Holeckova (2006) | Small but significant increase in polyploidy seen at 56μM No positive control reported. |
| *In vitro* **Cytokinesis Block Micronucleus Assay (with FISH analysis)** | TR146 cells (human-derived buccal epithelial cell line) | 0, 10, 15 and 20 mg/L; 20 minute exposure. | Roundup Ultra Max (450 g/l glyphosate acid) | Positive  Increase in MN at all test concentrations | Koller *et al.* (2012) | No apoptosis observed at any conc.  Necrosis reported at 20 mg/L.  Increase in NB and NPB seen at all concentrations |

MI= mitotic index. FISH= fluorescent in situ hybridization, MN= micronuclei; NB= nuclear buds; NPB= nucleoplasmic bridges.

**Table F.3.  *In Vivo* Tests for Chromosomal Aberrations in Mammals- Glyphosate Formulations.**

| Test/Endpoint | Test System | Route of Administration | Doses | Test Material Purity | Results | Reference | Comments |
|---|---|---|---|---|---|---|---|
| Bone Marrow Chromosomal Aberration | Swiss albino mice (males only) Vehicle: DMSO | Intraperitoneal injection; sampling 24, 48 and 72 h | 0, 25 and 50 mg/kg (5/dose) | Roundup (>41% isopropylamine glyphosate) | Positive  Increase in MN at all time points at both doses | Prasad *et al.* (2009) | Significant decrease in mitotic index seen at all doses and time points |
| Bone Marrow Chromosomal Aberration | C57BL mice (males only) Vehicle: water | Oral administration; sampling 6, 24, 48, 72, 96 and 120 h | 0.05, 0.01, 0.5 and 1.0% (8/dose) | Roundup | Negative | Dimitrov *et al.* (2006) | |
| Bone Marrow Chromosomal Aberration | New Zealand white rabbits (males only) Vehicle: | Drinking water for 60 days | 0, 750 ppm (5/dose) | Roundup | Positive | Helal and Moussa (2005) | |

BM= bone marrow, SC= spermatocyte.

**Table F.4.** *In Vivo* Tests for Micronuclei Induction in Mammals- Glyphosate Formulations.

| Test/Endpoint | Test System | Route of Administration | Doses | Test Material Purity | Results | Reference | Comments |
|---|---|---|---|---|---|---|---|
| **Bone Marrow Micronucleus Test** | Swiss CD1 mice (males only) | Intraperitoneal injection; 2 injections of half the dosage of 135 mg/kg 24 h apart; sampling at 6 and 24 h | 0, 450 mg/kg roundup, equiv. to 135 kg glyphosate (3/dose) | Roundup, 30.4% glyphosate | Positive | Bolognesi *et al.* (1997) | Stat significant increase in MN at 6 and 24 h |
| **Bone Marrow Micronucleus Test** | C3H mice (males only) Vehicle: water | Intraperitoneal Injection (single treatment); sampling after 24, 48 and 72 h | 0, 90 mg/kg | Not reported | Negative | Chruscielska *et al.* (2000) | |
| **Bone Marrow Micronucleus Test** | Swiss mice (males and females) Vehicle: water | Intraperitoneal Injection (2 treatments, 24 h apart); sampling after 24 h (last treatment) | 0, 50, 100 and 200 mg/kg | 480g/L Isopropyla mine salt of glyphosate | Negative | Grisolia (2002) | |
| **Bone Marrow Micronucleus Test** | CD-1 mice (males and females) | Intraperitoneal injection; sampling 24, 48 and 72 h | 0, 140, 280, and 555 mg/kg | Roundup (31% glyphosate salt) | Negative | Kier (1992) | Some deaths observed at high dose (HD), ↓PCE/NCE ratio at HD at 48 h in males. |
| **Bone Marrow Micronucleus Test** | Swiss albino mice (males and females) | Intraperitoneal Injection (2 treatments, 24 h apart); sampling after 24 h (last treatment) | 0, 212.5, 425 and 637.5 mg/kg | MON 77280 646.4 g/L glyphosate salt equivalent | Negative | Monma (1998) | Doses tested corresponded to 25%, 50% and 75% LD50 |

**Table F.4.** *In Vivo* Tests for Micronuclei Induction in Mammals- Glyphosate Formulations.

| Test/Endpoint | Test System | Route of Administration | Doses | Test Material Purity | Results | Reference | Comments |
|---|---|---|---|---|---|---|---|
| **Bone Marrow Micronucleus Test** | NMRI-Bom mice | Intraperitoneal Injection (single treatment); sampling after 24 h | 0, 133 and 200 mg/kg (4/sex/dose) | Roundup, 480 g glyphosate isopropyla mine salt per liter | Negative | Rank *et al.* (1993) | BM toxicity indicated by %PCE decreased at 200 mg/kg |
| **Bone Marrow Micronucleus Test** | Swiss albino mice (males only[2]) Vehicle: water | Oral gavage (two treatments, 24 h apart); sampled at 18 and 24 h after last dose | 0, 2000 mg/kg | MON 8709494.7 g/L salt of isopropyla mine (371.0 glyphosate acid) | Negative | Claro (2011) | OECD 474 Guideline No significant signs of toxicity observed in main study. |
| **Bone Marrow Micronucleus Test** | C57BL mice (males only) Vehicle: water | Oral administration; sampling 6, 24, 48, 72, 96 and 120 h | 0.05, 0.01, 0.5 and 1.0% (1%=1080 mg/kg) (8/dose) | Roundup | Negative | Dimitrov *et al.* (2006) | Toxicity seen in 1.0% dose group |
| **Bone Marrow Micronucleus Test** | Crl:CD-1(ICR) BR mice (males only[2]) Vehicle: water | Oral gavage (single treatment); sampling after 24 and 48 h (high dose only) | 0, 500, 1000, and 2000 (mg/kg) (5/dose) | MON 78239 (36.6% glyphosate) | Negative | Erexson (2003a) | EPA Guideline (84-2) No significant signs of toxicity observed in main study. |
| **Bone Marrow Micronucleus Test** | Crl:CD-1(ICR) BR mice (males only[2]) Vehicle: water | Oral gavage (single treatment); sampling after 24 and 48 h (high dose only) | 0, 500, 1000, and 2000 (mg/kg) (5/dose) | MON 78634 (65.2% glyphosate) | Negative | Erexson (2003b) | EPA Guideline (84-2) No significant signs of toxicity observed in main study. |
| **Bone Marrow Micronucleus Test** | Crl:CD-1(ICR) BR mice (males only[2]) Vehicle: water | Oral gavage (single treatment); sampling after 24 and 48 h (high dose only) | 0, 500, 1000, and 2000 (mg/kg) (5/dose) | MON 78910 (30.3% glyphosate) | Negative | Erexson (2006) | EPA Guideline (84-2) No significant signs of toxicity observed in main study. |

**Table F.4.** *In Vivo* **Tests for Micronuclei Induction in Mammals- Glyphosate Formulations.**

| Test/Endpoint | Test System | Route of Administration | Doses | Test Material Purity | Results | Reference | Comments |
|---|---|---|---|---|---|---|---|
| **Bone Marrow Micronucleus Test** | NMRI mice (males and females) Vehicle: 0.8% hydroxypropylmethyl cellulose | Oral gavage (single treatment); sampling after 24 and 48 h (high dose only) | 0, 500, 1000, and 2000 mg/kg (5/sex/dose) | TROP M (Glyphosate 480); 358.4 g/L glyphosate acid; 483.6 g/L IPA salt | Negative | Flügge (2010c)[1] | OECD Guideline 474 No significant signs of toxicity observed in main study. |
| **Bone Marrow Micronucleus Test** | Swiss mice (males only[2]) Vehicle: water | Oral gavage (2 treatments, 24 h apart); sampling after 24 h (last treatment) | 0, 2000 mg/kg (6/dose) | A17035A 289.7 g/L glyphosate | Negative | Negro Silva (2009)[1] | OECD Guideline 474 No significant signs of toxicity observed in main study. |
| **Bone Marrow Micronucleus Test** | Swiss mice (males only[2]) Vehicle: water | Oral gavage (2 treatments, 24 h apart); sampling after 24 h (last treatment) | 0, 2000 mg/kg (6/dose) | Glyphosate SL (499.35 g/L glyphosate) | Negative | Negro Silva (2011)[1] | OECD Guideline 474 No significant signs of toxicity observed in main study |
| **Bone Marrow Micronucleus Test** | Hsd:CD-1(ICR) mice (males only[2]) Vehicle: water | Oral gavage (single treatment); sampling after 24 and 48 h (high dose only) | 0, 500, 1000, and 2000 (mg/kg) (5/dose) | MON 79864 (38.7% glyphosate) | Negative # | Xu (2008a) | EPA Guideline (84-2) /OECD 474 No significant signs of toxicity observed in main study. |
| **Bone Marrow Micronucleus Test** | CD-1(ICR)BR mice (males only[2]) Vehicle: water | Oral gavage (single treatment); sampling after 24 and 48 h (high dose only) | 0, 500, 1000, and 2000 (mg/kg) (5/dose) | MON 76171 (31.1% glyphosate) | Negative | Xu (2008b) | EPA Guideline (84-2) /OECD 474 No significant signs of toxicity observed in main study. |
| **Bone Marrow Micronucleus Test** | CD-1(ICR)BR mice (males only[2]) Vehicle: water | Oral gavage (single treatment); sampling after 24 and 48 h (high dose only) | 0, 500, 1000, and 2000 (mg/kg) (5/dose) | MON 79991 (71.6% glyphosate) | Negative | Xu (2009a) | EPA Guideline (84-2) /OECD 474 No significant signs of toxicity observed in main study. |

**Table F.4.  *In Vivo* Tests for Micronuclei Induction in Mammals- Glyphosate Formulations.**

| Test/Endpoint | Test System | Route of Administration | Doses | Test Material Purity | Results | Reference | Comments |
|---|---|---|---|---|---|---|---|
| **Bone Marrow Micronucleus Test** | CD-1(ICR)BR mice (males only[2]) Vehicle: water | Oral gavage (single treatment); sampling after 24 and 48 h (high dose only) | 0, 500, 1000, and 2000 (mg/kg) (5/dose) | MON 76138 (38.5% glyphosate) | Negative | Xu (2009b)[1] | EPA Guideline (84-2) /OECD 474 No significant signs of toxicity observed in main study. |
| **Bone Marrow Micronucleus Test** | Hsd:CD-1(ICR)BR mice (males only[2]) Vehicle: water | Oral gavage (single treatment); sampling after 24 and 48 h (high dose only) | 0, 500, 1000, and 2000 (mg/kg) (5/dose) | MON 76313 (30.9% glyphosate) | Negative | Xu (2009c)[1] | EPA Guideline (84-2) /OECD 474 No significant signs of toxicity observed in main study. |
| **Bone Marrow Micronucleus Test** | CD rats (males and females) Vehicle: 0.8% hydroxypropylmethyl cellulose | Oral gavage (single treatment); sampling after 24 and 48 h (high dose only) | 0, 500, 1000, and 2000 mg/kg (5/sex/dose) | 757 g/kg granular formulation (69.1% glyphosate acid) | Negative | Flügge (2010e)[1] | OECD Guideline 474 No significant signs of toxicity observed in main study |

[1] Study was cited in Kier and Kirkland (2013).  Supplementary information about the study was provided online including test guideline, test material purity, control chemicals and summary data tables.

[2] Only males tested; report indicated that there was no difference between sexes seen in range finding study.

BM= bone marrow, CA= chromosomal aberrations, MN= micronucleated erythrocytes, NCE= normochromatic erythrocytes, PCE=polychromatic erythrocytes.

| Table F.5. Other Assays for Detecting DNA Damage- Glyphosate Formulations. | | | | | | | |
|---|---|---|---|---|---|---|---|
| **Test/Endpoint** | **Test System** | **Route of Administration** | **Doses/ Concentrations** | **Test Material/ Concentration** | **Results** | **Reference** | **Comments** |
| **Bacterial SOS Chromotest** | *Escherichia coli* PQ37 strain | NA (*in vitro*) | 0.25μg/sample | Roundup BIO formulation; | Positive | Raipulis *et al.* (2009) | |
| **DNA Adducts $^{32}$P-postlabeling** | Swiss CD1 mice (males and females) Liver and kidney evaluated | Intraperitoneal injection | 0, 400, 500 and 600 mg/kg, corresponding to 122, 152 and 182 mg/kg glyphosate salt | Roundup (30.4% isopropylammonium salt of glyphosate) | Positive (liver and kidney) | Peluso *et al.* (1998) | |
| **DNA oxidative damage: 8-OHdG formation** | Swiss CD-1 mice (males) liver and kidney evaluated | Intraperitoneal injection (single dose); sampling 4 and 24 h after injection | 900 mg/kg corresponding to 270 mg/kg glyphosate (3/dose) | 900 mg/kg corresponding to 270 mg/kg glyphosate | Kidney: positive at 8 and 24 h  Liver: negative | Bolognesi *et al.* (1997) | |
| **Single-cell gel electrophoresis (SCGE) assays- COMET assay** | TR146 cells (human-derived buccal epithelial cell line). Alkaline conditions | NA (*in vitro*) | | Roundup Ultra Max (450 g/l glyphosate acid) | Induced DNA migration at >20 mg/L | Koller *et al.* (2012) | Also measured multiple cellular integrity parameters to assess cytotoxicity. Formulation was more toxic than technical. Significant increase in LDHe at all concentrations tested. Cytotoxic ≥ 60 mg/L |
| **Sister Chromatid Exchange (SCE)** | Bovine lymphocytes | NA (*in vitro*) | 28 - 1112 μM; ±S9; sampling at 24 and 48 h | 62% Isopropylamine salt of glyphosate | Positive | Sivikova & Dianovsky (2006) | |

**Table F.5.  Other Assays for Detecting DNA Damage- Glyphosate Formulations.**

| Test/Endpoint | Test System | Route of Administration | Doses/ Concentrations | Test Material/ Concentration | Results | Reference | Comments |
|---|---|---|---|---|---|---|---|
| **Sister Chromatid Exchange (SCE)** | Human lymphocytes (2 donors) | NA (*in vitro*) | 250, 2500 and 25000 µg/mL | Roundup; Isopropylamine salt of glyphosate (purity not stated) | Stat. significant increase (p<0.001) at 250 µg/mL in both donors, and in one donor at 2500 µg/mL | Vigfusson and Vyse (1980) | No growth seen at highest concentration (25 mg/mL) |
| **Sister Chromatid Exchange (SCE)** | Human lymphocytes | NA (*in vitro*) | -S9: 0, 0.1 and 0.33 mg/mL; 72 h exposure | Roundup, 30.4% glyphosate | Positive | Bolognesi *et al.* (1997) | Stat significant increase in SCE/cell at ≥ 0.1 mg/mL |
| **Alkaline elution assay- DNA single strand breaks** | Swiss CD-1 mice (males) liver and kidney evaluated | Intraperitoneal injection (single dose); sampling 4 and 24 h after injection | 900 mg/kg corresponding to 270 mg/kg glyphosate (3/dose) | 900 mg/kg corresponding to 270 mg/kg glyphosate | Positive (Increased elution rate) at 4 hours in liver and kidney  At 24 h, returned to control levels | Bolognesi *et al.* (1997) | Return to control values at 24 h may indicate DNA repair or reflect rapid elimination of compound |

h= hour, NA= not applicable, SCE= sister chromatid exchange, LDHe= extracellular lactate dehydrogenase

**Appendix G**

The following studies were considered during the systematic review, but were excluded from the analysis.

Amer S.M. et al (2006).  In vitro and in vivo evaluation of the genotoxicity of the herbicide glyphosate in mice.  Bulletin of the National Research Centre (Cairo) 31 (5): 427-446.

Aboukila, R.S. *et al.* (2014). Cytogenetic Study on the Effect of Bentazon and Glyphosate Herbicide on Mice.  Alexandria Journal of Veterinary Sciences, 41: 95-101.

Majeska (1982d) MRID 00126616

Majeska (1982e) MRID 00126614

Majeska (1982f) MRID 00126615

# EXHIBIT 10

Docket Number EPA-HQ-OPP-2009-0361
www.regulations.gov



# Glyphosate

# Proposed Interim Registration Review Decision
## Case Number 0178

## April 2019

Approved by: _____

Charles "Billy" Smith
Acting Director
Pesticide Re-evaluation Division

Date: ___4/23/19___

Docket Number EPA-HQ-OPP-2009-0361
www.regulations.gov

<div align="center">**Table of Contents**</div>

I.   INTRODUCTION .................................................................................................................3
  A.   Summary of Glyphosate's Registration Review ............................................................4
  B.   Updates Since the Issuance of the Glyphosate Risk Assessments ...............................6
  C.   Summary of Public Comments on the Draft Risk Assessments and Agency Responses.............6
II.   USE AND USAGE ...........................................................................................................18
III.   SCIENTIFIC ASSESSMENTS.......................................................................................19
  A.   Human Health Risks.....................................................................................................19
    1.   Risk Summary .......................................................................................................19
    2.   Human Incidents and Epidemiological Analysis ..................................................23
    3.   Tolerances .............................................................................................................24
    4.   Human Health Data Needs ....................................................................................25
  B.   Ecological Risks...........................................................................................................25
    1.   Risk Summary .......................................................................................................25
    2.   Ecological Incidents ..............................................................................................30
    3.   Ecological and Environmental Fate Data Needs ..................................................32
  C.   Risk Characterization ..................................................................................................32
  D.   Benefits Assessment.....................................................................................................34
IV.   PROPOSED INTERIM REGISTRATION REVIEW DECISION...................................35
  A.   Proposed Risk Mitigation and Regulatory Rationale ..................................................35
    1.   Spray Drift Management........................................................................................35
    2.   Herbicide Resistance Management .......................................................................37
    3.   Non-target Organism Advisory Statement ............................................................37
    4.   Label Consistency Measures.................................................................................38
  B.   Tolerance Actions ........................................................................................................40
  C.   Proposed Interim Registration Review Decision .........................................................40
  D.   Data Requirements .......................................................................................................40
V.   NEXT STEPS AND TIMELINE .....................................................................................40
  A.   Proposed Interim Registration Review Decision .........................................................40
  B.   Implementation of Mitigation Measures .....................................................................41
  Appendix A:  Summary of Proposed Actions for Glyphosate....................................................42
  Appendix B:  Proposed Labeling Changes for Glyphosate Products .........................................43
  Appendix C.  Proposed Maximum Application Rates for Glyphosate Ground and Aerial Application 48
  Appendix D: Endangered Species Assessment............................................................................53
  Appendix E: Endocrine Disruptor Screening Program ...............................................................54

Docket Number EPA-HQ-OPP-2009-0361
www.regulations.gov

# I. INTRODUCTION

This document is the Environmental Protection Agency's (the EPA or the agency) *Proposed Interim Registration Review Decision* (PID) for glyphosate acid and its various salt forms (PC Codes 103601, 103604, 103605, 103607, 103608, 103613, and 417300, case 0178), and is being issued pursuant to 40 CFR § 155.56 and 155.58. A registration review decision is the agency's determination whether a pesticide continues to meet, or does not meet, the standard for registration in the Federal Insecticide, Fungicide, and Rodenticide Act (FIFRA). The agency may issue, when it determines it to be appropriate, an Interim Registration Review decision before completing registration review. Among other things, the Interim Registration Review Decision may require new risk mitigation measures, impose interim risk mitigation measures, identify data or information required to complete the review, and include schedules for submitting the required data, conducting the new risk assessment and completing the registration review case. Additional information on glyphosate can be found in the EPA's public docket (EPA-HQ-OPP-2009-0361) at www.regulations.gov.

FIFRA, as amended by the Food Quality Protection Act (FQPA) of 1996, mandates the continuous review of existing pesticides. All pesticides distributed or sold in the United States must be registered by the EPA based on scientific data showing that they will not cause unreasonable risks to human health or to the environment when used as directed on product labeling. The registration review program is intended to make sure that, as the ability to assess and reduce risk evolves and as policies and practices change, all registered pesticides continue to meet the statutory standard of no unreasonable adverse effects. Changes in science, public policy, and pesticide use practices will occur over time. Through the registration review program, the agency periodically re-evaluates pesticides to make sure that as these changes occur, products in the marketplace can continue to be used safely. Information on this program is provided as http://www2.epa.gov pesticide-reevaluation. In 2006, the agency implemented the registration review program pursuant to FIFRA § 3(g) and will review each registered pesticide every 15 years to determine whether it continues to meet the FIFRA standard for registration.

The EPA is issuing a PID for glyphosate so that it can (1) move forward with aspects of the registration review case that are complete and (2) implement interim risk mitigation (see Appendices A, B, and C). The agency is currently working with the U.S. Fish and Wildlife Service and the National Marine Fisheries Service (together, the Services) to develop methodologies for conducting national threatened and endangered (listed) species assessments for pesticides in accordance with the Endangered Species Act (ESA) § 7. Therefore, although the EPA has not yet fully evaluated risks to listed species, the agency will complete its listed species assessment and any necessary consultation with the Services for glyphosate prior to completing the glyphosate's registration review. Likewise, the agency will complete endocrine screening for glyphosate, pursuant to the Federal Food, Drug, and Cosmetic Act (FFDCA) § 408(p), before completing registration review. Last, the EPA will determine whether pollinator exposure and effects data are necessary to make a final registration review decision for glyphosate and issue a data call-in (DCI) to obtain any such data prior to completing the glyphosate registration review case. See Appendices D and E, respectively, for additional information on the listed species assessment and the endocrine screening for the glyphosate's registration review.

Docket Number EPA-HQ-OPP-2009-0361
www.regulations.gov

The glyphosate registration review case covers glyphosate acid (PC code 417300) and the
following salt forms with active pesticide registrations: isopropylamine salt (pc code 103601),
ammonium salt (PC code 103604), ethanol amine salt (PC code 103605), diammonium salt (PC
code 103607), dimethyl ammonium salt (PC code 103608), and the potassium salt (PC code
103613). Glyphosate is a non-selective, systemic herbicide registered for use in a wide array of
both agricultural and non-agricultural settings. Agricultural uses include stone and pome fruits,
citrus fruits, berries, nuts, vegetables, cereal grains, and other field crops. Non-agricultural uses
include residential spot treatments, aquatic areas, forests, rights of ways, recreational turf,
ornamentals, non-food tree crops, and Conservation Reserve Program land. Glyphosate is also
registered for use on glyphosate-resistant crops such as alfalfa, corn, soybean, cotton, canola, and
sugar beets. The first pesticide product containing glyphosate was registered in 1974; a
Reregistration Eligibility Decision (RED) for glyphosate was completed in 1993. Since then, the
EPA has reviewed the risk assessments for glyphosate to determine if updates were necessary
when new uses were added to glyphosate labels.

This document is organized in five sections: the *Introduction*, which includes this summary and a
summary of public comments and the EPA's responses; *Use and Usage*, which describes how
and why glyphosate is used and summarizes data on its use; *Scientific Assessments*, which
summarizes the EPA's risk and benefits assessments, updates or revisions to previous risk
assessments, and provides broader context with a discussion of risk characterization; the
*Proposed Interim Registration Review Decision*, which describes the mitigation measures
proposed to address risks of concern and the regulatory rationale for the EPA's proposed interim
registration review decision; and, last, the *Next Steps and Timeline* for completion of this
registration review.

## A. Summary of Glyphosate's Registration Review

Pursuant to 40 CFR § 155.50, the EPA formally initiated registration review for glyphosate with
the opening of the registration review docket for the case. The following summary highlights the
docket opening and other significant milestones that have occurred thus far during the
registration review of glyphosate.

- July 2009 - The *Glyphosate Preliminary Work Plan (PWP)*, Human Health Scoping
  Document, and Environmental Fate and Effects Problem Formulation were posted to the
  docket for a 60-day public comment period.

- December 2009 - The *Glyphosate Final Work Plan (FWP)* was issued. Comments
  received on the PWP covered the following topics: opposition to the use of glyphosate,
  the toxicity of glyphosate formulations and inert ingredients, use and usage trends, human
  health risks, ecological risks, endocrine disruption, and the benefits of glyphosate. The
  public comments received did not change the schedule, risk assessment needs, or
  anticipated data requirements in the FWP.

- September 2010 - A Generic Data Call-In (GDCI) for glyphosate was issued for data
  needed to conduct the registration review risk assessments. All required data were

Docket Number EPA-HQ-OPP-2009-0361
www.regulations.gov

> submitted and reviewed. The registration review GDCI for glyphosate is considered satisfied.

- December 2016 – The agency convened a FIFRA Scientific Advisory Panel meeting to consider and review a set of scientific issues related to the EPA's evaluation of the carcinogenic potential of glyphosate. The meeting agenda, the agency's cancer issue paper, charge questions for the panel, transcript, and final report are available on EPA's website: https://www.epa.gov/sap/meeting-materials-december-13-16-2016-scientific-advisory-panel. Additional supporting materials and comments received from the public can be found in docket EPA-HQ-OPP-2016-0385 at www.regulations.gov.

- December 2017 – The agency published the *Revised Glyphosate Issue Paper: Evaluation of Carcinogenic Potential* (dated December 12, 2017), the *Response to the Final Report of the Federal Insecticide, Fungicide, and Rodenticide Act Scientific Advisory Panel (FIFRA SAP) on the Evaluation of the Human Carcinogenic Potential of Glyphosate* (dated December 12, 2017), the *Glyphosate Draft Human Health Risk Assessment for Registration Review* (dated December 12, 2017), the *Registration Review – Preliminary Ecological Risk Assessment for Glyphosate and its Salts* (dated September 8, 2015) online (https://www.epa.gov/ingredients-used-pesticide-products/draft-human-health-ecological-risk-assessments-glyphosate).

- February 2018 - The agency announced the availability of the human health and ecological risk assessments for a 60-day public comment period. Over 238,000 comments were received during the comment period, most of which came from various mass mail campaigns. Approximately 2,244 unique submissions were received from various stakeholders, including pesticide registrants, industry groups, farmers, grower groups, private citizens, non-governmental organizations, states, and the US Department of Agriculture (USDA). These comments and the agency's responses are summarized below. The comments did not change the risk assessments or registration review timeline for glyphosate.

- September 2018 – The Environmental Working Group, joined by Ben & Jerry's Homemade, Inc., Happy Family Organics, MegaFood, MOM's Organic Market, National Co+op Grocers, Nature's Path Foods Inc., One Degree Organic Foods USA, Inc., and Stonyfield Farm, Inc. summitted a petition to the agency. The petition requested that the EPA lower the tolerance for oats and explicitly prohibit preharvest use on oats on glyphosate US labels. The agency is still reviewing this petition and has issued a Federal Register Notice of Filing for public comment in docket EPA-HQ-OPP-2019-0066. The agency intends to respond to this petition concurrently with the issuance of the *Interim Registration Review Decision* for glyphosate.

- March 2019 - The agency is now announcing the availability of the *Proposed Interim Registration Review Decision* (PID) in the docket for glyphosate, for a 60-day public comment period. Along with the PID, the following documents are also posted to the glyphosate docket:

Docket Number EPA-HQ-OPP-2009-0361
www.regulations.gov

- o *Glyphosate: Response to Comments, Usage, and Benefits* (dated April 18, 2018)
- o *Glyphosate: Response to Comments on the Human Health Draft Risk Assessment* (dated April 23, 2019)
- o *Response to Public Comments on the Preliminary Ecological Risk Assessment for Glyphosate* (dated November 21, 2018)

## B. Updates Since the Issuance of the Glyphosate Risk Assessments

The Agency received on September 27, 2018 a petition from the Environmental Working Group, Ben & Jerry's Homemade, Inc., Happy Family Organics, MegaFood, MOM's Organic Market, National Co+op Grocers, Nature's Path Foods Inc., One Degree Organic Foods USA, Inc., and Stonyfield Farms, Inc. The petitioners request that the agency reduce the tolerance of the pesticide glyphosate in or on oats from 30 ppm to 0.1 ppm and modify labels to explicitly prohibit preharvest use on oats. The petitioners assert that the current tolerance level for oat is not protective enough when taking into consideration the actual dietary exposure to glyphosate in oats and the potential carcinogenicity of glyphosate. The agency is still reviewing this petition. Since this petition was submitted outside of the public comment period for the human health and ecological risk assessments, which closed on April 30, 2018, EPA has not considered it as a public comment on the risk assessments in preparation of this Proposed Interim Registration Review Decision. However, the Agency will treat this petition as a public comment on this Proposed Interim Registration Review Decision; a copy of the petition will be posted to the glyphosate registration review docket. The EPA intends to address this petition concurrently with the development of the Interim Registration Review Decision for glyphosate, taking into consideration issues raised in the petition and any comments the agency receives on its Notice of Filing.

In accordance with FFDCA section 408(d)(3), EPA is publishing EWG's petition for public comment; the public comment period will close 30 days after publication. The full petition is posted in docket EPA-HQ-OPP-2019-0066 at www.regulations.gov. This Proposed Interim Decision reflects the conclusions of EPA's most recent risk assessments and does not address the claims raised in the petition.

## C. Summary of Public Comments on the Draft Risk Assessments and Agency Responses

During the 60-day public comment period for the glyphosate preliminary risk assessments, which opened on February 27, 2018 and closed on April 30, 2018, the agency received 238,290 comments. Approximately 2,244 unique submissions were received from various stakeholders, including glyphosate registrants, grower groups, non-governmental organizations, pesticide industry groups, states, and the US Department of Agriculture. Most comments came from mass mail campaigns, and approximately 200 substantive comments were received from various stakeholders. Comments relating to widespread concerns, comments of a broader regulatory nature, and the agency's responses to those comments are summarized below. Due to the high volume of comments received for glyphosate, the agency has combined comments by topic instead of responding to individual stakeholders and has focused its responses on comments that have not been addressed previously via the FIFRA SAP meeting or in previous registration

Docket Number EPA-HQ-OPP-2009-0361
www.regulations.gov

review documents for glyphosate. The comments did not result in changes to the agency's risk assessments. The agency thanks all commenters for their comments and has considered them in developing this PID.

For more detailed responses to comments relating to the human health risk assessment, see the *Glyphosate: Response to Comments on the Human Health Draft Risk Assessment*. For more detailed responses to comments relating to the ecological risk assessment, see the *Response to Public Comments on the Preliminary Ecological Risk Assessment for Glyphosate*. For detailed responses to comments on the use/usage of glyphosate and the benefits, see the *Glyphosate: Response to Comments, Usage, and Benefits*. All responses to comments documents are available in the public docket for glyphosate.

## Comments About the EPA's Cancer Evaluation:

Many commenters expressed disagreement with the EPA's cancer conclusion, citing the International Agency for Research on Cancer's (IARC's) 2015 classification of glyphosate as "probably carcinogenic to humans." Comments were also received regarding the EPA's weight of evidence evaluation of the animal carcinogenicity data.

**The EPA Response:** The EPA conducted an independent evaluation of the carcinogenic potential of glyphosate and has determined that glyphosate is "not likely to be carcinogenic to humans." The agency's cancer classification is based on a thorough weight-of-evidence review of all relevant data and is in accordance with the agency's 2005 *Guidelines for Carcinogen Risk Assessment*.[1] The agency presented its draft cancer evaluation to the FIFRA Scientific Advisory Panel (SAP) in December 2016. Although the SAP did not reach consensus on several questions, none of the panelists believed that glyphosate should be classified as "likely to be carcinogenic to humans" or "carcinogenic to humans." Given the variety of opinions expressed, the agency revised its cancer evaluation and addressed comments from the SAP where consensus appeared to be reached. EPA's full weight-of-evidence evaluation can be found in the *Revised Glyphosate Issue Paper: Evaluation of Carcinogenic Potential*, available in the glyphosate public docket (EPA-HQ-OPP-2009-0361).

Comments received from stakeholders concerning the weight of evidence evaluation were previously addressed in the *Response to the Final Report of the Federal Insecticide, Fungicide, and Rodenticide Act Scientific Advisory Panel (FIFRA SAP) on the Evaluation of the Human Carcinogenic Potential of Glyphosate* (also available in the glyphosate public docket).

EPA's cancer evaluation is more robust than IARC's evaluation. IARC's evaluation only considers data that have been published or accepted for publication in the openly available scientific literature. As a result, IARC only considered a subset of the studies included in the EPA's evaluation. For instance, IARC only considered 8 animal carcinogenicity studies while the agency used 15 acceptable carcinogenicity studies in its evaluation. The EPA also excluded some studies that were not appropriate for determining the human carcinogenic potential of glyphosate, such as studies in non-mammalian species (*i.e.*, worms, fish, reptiles, and plants) which IARC used in its evaluation.

---

[1] https://www.epa.gov/risk/guidelines-carcinogen-risk-assessment

Docket Number EPA-HQ-OPP-2009-0361
www.regulations.gov

The Agency's cancer evaluation for glyphosate is also more transparent. EPA's draft cancer evaluation was presented to a FIFRA SAP for external peer review. EPA solicited public comment on the carcinogenic potential of glyphosate as part of the SAP process, which is well-documented with an agenda, transcript, meeting notes, and final SAP report. EPA responded to the SAP report, addressed panel recommendations, and made revisions to its cancer assessment that were transparent and provided to the public. EPA also solicited public comment on its full human health and ecological risk assessment for glyphosate in February 2018. In contrast, IARC meetings are not accessible to the public. Its deliberations are closed, its process does not allow for public comments to be submitted for consideration, there are no materials provided in advance of the meeting, and IARC's reports are final without an external peer review.

The EPA has not identified any new information received during the public comment period which ended on April 30, 2018 that would result in changes to the conclusion of its cancer assessment. The agency's cancer conclusion is consistent with other regulatory authorities and international organizations, including the Canadian Pest Management Regulatory Agency, the Australian Pesticide and Veterinary Medicines Authority, the European Food Safety Authority, the European Chemicals Agency, the German Federal Institute for Occupational Safety and Health, the Joint FAO/WHO Meeting on Pesticide Residues, the New Zealand Environmental Protection Authority, and the Food Safety Commission of Japan.

**Comments on the EPA's Use of Open Literature Studies:**

Many commenters asserted that the EPA relies too heavily on industry-funded studies and that these studies are not accessible to the public. Commenters requested that the EPA use open literature studies to assess glyphosate and point to various open literature studies describing various human health and ecological effects.

**The EPA Response:** The EPA requires a substantial amount of data to be collected and submitted for pesticide registration and registration review (see 40 CFR part 158 data requirements, https://www.epa.gov/pesticide-registration/data-requirements-pesticide registration). The required data provide a wide range of information and include the following: product chemistry, product performance, studies that determine hazard to humans and domestic animals, studies that determine hazard to non-target organisms, post-application exposure studies, applicator/user exposure studies, pesticide spray drift studies, environmental fate, and residue chemistry studies. Although many of these studies are submitted by pesticide producers, the EPA has rigorous guidelines for how studies should be conducted (https://www.epa.gov/test-guidelines-pesticides-and-toxic-substances/master-list-test-guidelines-pesticide-and ). The agency independently evaluates required studies for scientific acceptability. Laboratories conducting studies must address Good Laboratory Practices (GLP) designed to ensure data quality and integrity. The EPA's Office of Enforcement and Compliance Assurance (OECA) periodically inspects labs that conduct required studies to ensure that labs are in compliance with GLP regulations.

When studies are submitted to the agency for review, test reports must summarize and supply all the individual data obtained as part of the study. An independent evaluation is prepared for each study and a Data Evaluation Record (DER) is generated to summarize the study methods, results, and conclusions. DERs are subject to an internal peer review process and scientific review

8

Docket Number EPA-HQ-OPP-2009-0361
www.regulations.gov

committees within the Office of Pesticide Programs to ensure accuracy and consistency of interpretation prior to finalization.

Registrant-submitted studies are proprietary, and under FIFRA, cannot be released to any representative of a multinational pesticide producer or to anyone who intends to deliver such information to a multinational pesticide producer. Anyone not associated with a multinational pesticide producer may file Freedom of Information Act (FOIA) requests to access studies evaluated by the agency. For information on how to submit FOIA requests to access certain glyphosate studies, visit the EPA's website: https://www.epa.gov/foia/foia-request-process.

The EPA also reviewed the open literature to conduct both human health and ecological risk assessments.

The open literature review conducted for human health risk assessment is described in the document *Glyphosate—Systematic Review of Open Literature*. For its cancer evaluation, the EPA conducted an additional fit-for-purpose systematic review to obtain relevant and appropriate open literature studies with the potential to inform the human carcinogenic potential of glyphosate. This additional review is described in the agency's *Revised Glyphosate Issue Paper: Evaluation of Carcinogenic Potential* which is available in the public docket. The extensive list of journal citations provided by some commenters was screened for new studies not previously considered in the EPA's search of the open literature and did not turn up any studies that would impact the conclusions the EPA reached in its human health risk assessment.

The open literature data evaluated for ecological risk assessment is described in the agency's *Registration Review – Preliminary Ecological Risk Assessment for Glyphosate and its Salts* and also in *Appendix G Bibliography of Ecotox Papers*. The extensive list of journal citations provided by some commenters was screened for potential new information relevant to the ecological risk assessment. The information submitted generally support the conclusions the EPA reached in its ecological risk assessment and do not warrant any changes.

The EPA's criteria for evaluating open literature data for both human health and ecological risk assessment are available online (https://www.epa.gov/pesticide-science-and-assessing-pesticide-...-identifying-selecting-and-evaluating-open).

## Comments on Glyphosate Residues in Foods and Beverages:

Many commenters pointed to reports of glyphosate residues being detected in food/beverage commodities such as cereal, wine, orange juice, and others and express concerns about consumer safety. Others pointed to use of glyphosate as a pre-harvest desiccant for wheat as a source of glyphosate residues in cereal products.

**The EPA Response:** The EPA is aware of reports of glyphosate residues being detected in various foods and beverages. Due to its widespread use, trace amounts of glyphosate residues may be found in various food/beverage commodities. However, these trace amounts are below maximum residue levels established by the agency for those commodities and are not expected to pose risks of concern to consumers. For example, EPA has received results of testing of glyphosate residues in orange juice at a maximum of 26 parts per billion (ppb). At this

9

Docket Number EPA-HQ-OPP-2009-0361
www.regulations.gov

concentration, a 10 kg child would have to consumer approximately 385 liters of orange juice every day to reach the chronic reference dose of 1 mg/kg/day (the maximum acceptable oral dose that is the threshold of concern).

EPA evaluated dietary exposure to all population subgroups, including children, infants, and women of child-bearing age. There were no dietary risks of concern for glyphosate using an unrefined analysis, which (1) assumes that all food commodities contain maximum legal residues (*i.e.*, tolerance-level residues) and all registered food crops have been treated with glyphosate, and (2) uses high-end estimates of glyphosate in drinking water.

Commenters point to the use of glyphosate as a pre-harvest desiccant for wheat as a source of glyphosate residues in cereal products. The wheat desiccant use was considered in the agency's dietary risk assessment; EPA assumed maximum legal residues in wheat and other cereal grains. Taking exposures from those residues into consideration in its most recent human health risk assessment, EPA's estimation of risk from aggregate exposure to glyphosate, even including residues from pre-harvest desiccant use on wheat, is below the agency's level of concern. However, the agency has received a petition from the Environmental Working Group concerning the tolerance for oats and pre-harvest use on oats for which the agency is taking public comment. Additional information is described in section I.B of this document.

**Comments on Formulations Toxicity:**

Many commenters expressed concerns that glyphosate formulations are more toxic than glyphosate alone and questioned the toxicity of inert ingredients and the lack of transparency for inert ingredients and other contaminants in pesticide products.

**The EPA Response:** Most pesticide products contain substances in addition to the active ingredient (known as inert ingredients) which aid in the performance and effectiveness of the pesticide product. All active and inert ingredients must be approved by the agency when a pesticide product is first registered, including for glyphosate products. Since there are over 500 glyphosate products registered at different times in the US, the agency has assessed new inert ingredients at multiple points over the years for different formulations of glyphosate. The EPA evaluates the active and inert ingredients' hazard potential (*i.e.*, toxicity) with a battery of toxicity data. Any contaminants or impurities associated with formulation components must be reported to the agency and evaluated on a case-by-case basis. The agency reviews the amount in the formulation, the manufacturing information, and information on what steps are taken to limit or remove impurities. EPA can require that any inert ingredients of toxicological concern be listed in the ingredients statement of the label if determined to pose a hazard to humans or the environment (CFR § 156.10(g)(7)).

Glyphosate has been studied in a multitude of studies, including on multiple formulations that contain glyphosate. All studies of adequate scientific caliber that the Agency was aware of were incorporated into the risk assessment. For the glyphosate ecological risk assessment, ecotoxicity data on glyphosate formulations were reviewed in addition to data on glyphosate alone and relevant studies were summarized in the *Registration Review – Preliminary Ecological Risk Assessment for Glyphosate and its Salts.*

Docket Number EPA-HQ-OPP-2009-0361
www.regulations.gov

For human health risk assessment, the EPA searched the open literature to find glyphosate formulations toxicity data but there are few research projects that have attempted to directly compare technical grade glyphosate to the formulations under the same experimental design. Furthermore, there are even fewer instances of studies comparing toxicity across formulations. Most studies using commercial formulations identified as part of EPA's review were *in vitro* studies, which are difficult to translate into *in vivo* effects where metabolism and clearance would play a large role in potential toxicity. EPA gave *in vivo* studies greater weight, however none of the *in vivo* studies with commercial formulations were found to be of adequate quality for use in human risk assessment. Common limitations observed in *in vivo* formulations studies include: lack of test material information, exposure conditions not adequately described/documented, data were presented only as graphs and measures of variability were not included, samples sizes were too small or not reported, only one dose was tested, age/health of study animals were not reported, and a mode of action/adverse outcome pathway was not established.

The EPA has been collaborating with the National Toxicology Program (NTP) of the National Institute of Environmental Health Sciences to develop research intended to evaluate the role of glyphosate in product formulations and the differences in formulation toxicity. The results of this research will be considered when available. Additional information on the NTP research plan for glyphosate is available online: https://ntp.niehs.nih.gov/results/areas/glyphosate/index.html.

If at any time, information becomes available that indicates adverse human health effects of concern for exposure to glyphosate or its formulations, the EPA intends to review it and determine the appropriate regulatory action.

## Comments About the Monarch Butterfly:

Many commenters such as the Center for Food Safety, Center for Biological Diversity, Natural Resource Defense Council, and Beyond Pesticides expressed concerns that the EPA's risk assessment is not protective of monarch butterflies and plant resources for monarchs, such as milkweed. In general, commenters asserted that the EPA has not done enough to protect monarch butterflies when monarch populations have been in decline in recent decades. Commenters urged the EPA to restrict or ban glyphosate on the grounds that it is killing milkweed, a key resource for monarch butterfly larvae.

**The EPA Response:** Monarch butterfly conservation is an important issue for the agency. While herbicides like glyphosate have been implicated in the decline of the monarch butterfly population, it is not known to what extent pesticides in general may play a role. It is important to note that threats to the monarch butterfly population are multi-pronged and include loss of breeding habitat, loss of overwintering habitat in Mexico,[2] changes in weather patterns (including winter storms), disease, and other factors.[3]

---

[2] Vidal, O., Lopez-Garcia, J., and Rendon-Salinas, E. (2014), Trends in Deforestation and Forest Degradation after a Decade of Monitoring in the Monarch Butterfly Biosphere Reserve in Mexico. *Conservation Biology*, 28: 177-186.
[3] Agrawal, A. and Inamine, H. (2018), Mechanisms behind the monarch's decline. *Science*, 22: vol. 360, Issue 6395, pp.1294-1296.

11

Docket Number EPA-HQ-OPP-2009-0361
www.regulations.gov

A holistic approach is needed for monarch conservation and such an approach should consider herbicides in general as well as other factors that may play a role in the monarch decline. In addition, it is important to balance weed management needs with monarch conservation needs. To that end, the EPA published the *Risk Management Approach to Identifying Options for Protecting the Monarch Butterfly* for public comment in 2015 (available in docket EPA-HQ-OPP-2015-0389 at www.regulations.gov). In this document, the EPA sought feedback from stakeholders on strategies for managing risks to monarch butterflies and sought specific information on factors affecting the monarch population, including information such as:

   i. volume of use of various herbicides in areas critical to the monarch butterfly and where milkweed species are commonly found;
   ii. information on the monarch butterfly lifecycle, seasonal distribution, its population demographics over time, and any modeling analysis relevant to critical life stage parameters;
   iii. availability of laboratory or field data that specifically relates to the effects of various herbicides on the milkweed plant species;
   iv. information on both spatial and temporal parameters of weed management needs particularly where herbicide use may overlap with habitat of the monarch butterfly development, reproduction, and migration; and
   v. information on existing practices that promote co-occurrence of agricultural production with maintenance of milkweed populations.

Overall, the EPA received good suggestions from stakeholders on how to manage risks to monarch butterflies. Suggestions from stakeholders include the following:

   i. broad stakeholder involvement, outreach, and partnering;
   ii. focusing on voluntary, incentive-based, and locally-led initiatives;
   iii. promotion and use of best management practices to reduce pesticide exposure;
   iv. promotion and use of integrated pest management;
   v. development of label language to protect the monarch butterfly;
   vi. supporting milkweed habitat in non-agricultural areas;
   vii. more communication, education, and outreach on the monarch butterfly;
   viii. continue to better understand monarch biology and needs; and
   ix. ensure that any actions taken are done in a manner that balances monarch conservation priorities with other priorities such as native and invasive weed control.

In general, the EPA has focused its monarch conservation efforts on activities that are within the purview of the Office of Pesticide Programs (OPP) and are possible to implement through OPP's registration review, registration, and stakeholder outreach activities. The EPA is focused on four main areas: label language; cooperative efforts between the EPA and other federal, state, and private partners/stakeholders; outreach and communication; promoting best management practices and integrated pest management; and science and risk assessment. In the last several years, the EPA has made progress in many of these focus areas. Major milestones achieved include the following:

   • In 2017, the EPA promoted pollinator/monarch conservation activities at the state level by finalizing the *2018-2021 FIFRA Cooperative Agreement Guidance*[4] for states. The

---

[4] https://www.epa.gov/compliance/fiscal-year-2018-2021-fifra-cooperative-agreement-guidance

Docket Number EPA-HQ-OPP-2009-0361
www.regulations.gov

*2018-2021 Cooperative Agreement Guidance* was modified to include the following
monarch conservation activities:

- ○ Establish/maintain relationships with federal, state, tribal and local agencies,
  beekeeper organizations, grower organizations (e.g., commodity groups), crop
  advisors, pesticide manufacturers (registrants), and other stakeholder groups
  within the region to assist where needed in combined pollinator protection
  activities.
- ○ Providing continuing education opportunities to keep growers, applicators, and
  handlers up-to-date on the most recent methods to protect pollinators (including
  monarchs), such as integrated pest management, best management practices, and
  integrated vegetation management.
- ○ Developing and implementing managed pollinator protection plans focusing on
  managed bees, as well as monarch butterflies and other native pollinators.
- ○ Work with co-regulators and stakeholders to develop measures to determine the
  effectiveness of these plans in reducing pesticide risk to pollinators.
- ○ Provide technical assistance, education and outreach to support habitat restoration
  efforts to enhance/supplement forage for bees and other pollinators, such as the
  monarch butterfly.
- ○ Promote the use of best management practices, integrated roadside vegetation
  management, and mowing best practices in roadsides, rights-of-ways, or managed
  natural areas which may support pollinator habitat and in turn support foraging
  honeybees, monarch butterflies, and other pollinators.

EPA regulates the registration, distribution, sale, and use of pesticides. The states have
primary authority for pesticide compliance monitoring and enforcement. EPA provides
funds to the states for pesticide education and outreach as well as compliance monitoring
and enforcement activities under the FIFRA State and Tribal Continuing Environmental
Program cooperative agreements[4]. FIFRA Cooperative Agreement Guidances, which are
periodically updated, outline areas of cooperation between the EPA and the states and
tribes, and describe specific pesticide program activities where grant money may be
disbursed. Adding monarch conservation activities to the 2018-2021 FIFRA Cooperative
Agreement Guidance empowers states to prioritize pollinator/monarch conservation
activities depending on each state's needs and priorities.

- In 2017, the EPA adopted advisory environmental hazards label language for pesticide
  products that are toxic to plants in its Interim Registration Review Decisions to alert
  pesticide users of potential effects to non-target organisms: *"This product is toxic to
  plants and may adversely impact the forage and habitat of non-target organisms,
  including pollinators, in areas adjacent to the treated area. Protect the forage and
  habitat of non-target organisms by minimizing spray drift. For further guidance and
  instructions on how to minimize spray drift, refer to the Spray Drift Management section
  of this label."*

- In 2018, the EPA organized four webinars to educate stakeholders on ways to reduce
  pesticide spray drift and ways to use integrated pest management principles in managing
  agricultural lands. The webinars are as follows:

13

Docket Number EPA-HQ-OPP-2009-0361
www.regulations.gov

- o *Strategies for Managing Pesticide Spray Drift Webinar*, covered the fundamentals of spray drift management.[5]
- o *Integrated Pest Management: Strategies for Pollinator Habitat Promotion and Conservation in Agricultural Areas*, covered integrated pest management principles for managing agricultural lands.[6]
- o *Best Practices for Aerial Application*, a more in-depth look at aerial application.[6]
- o *Best Practices for Ground Application*, a more in-depth look at ground application.[6]

- The EPA is continuing to collaborate with states, federal agencies, and other stakeholders in order to coordinate on conservation efforts and aid in scientific risk assessment. For example, the EPA is currently working with the Fish and Wildlife Service on the assessment of the monarch butterfly species status, and is engaged in discussions with the US Department of Agriculture, the State FIFRA Issues Research And Evaluation Group (SFIREG), and the Association of American Pesticide Control Officials (AAPCO) on various pesticide policy issues, including pollinator/monarch protection efforts.

Stakeholders are encouraged to visit the EPA's new monarch butterfly website for resources and news on the monarch front: https://www.epa.gov/pollinator-protection protecting-monarch-butterflies-pesticides. In this proposed interim registration review decision for glyphosate, the agency is proposing risk mitigation measures to manage off-target spray drift to protect non-target organisms. Further information on the EPA's proposed interim decision and the agency's rationale is described in Section IV of this document.

**Comments About Pollinators:**

Several commenters, including the Pollinator Stewardship Council and Colorado State Beekeepers Association, discussed potential direct effects to honey bees and their health, particularly as it related to sublethal effects on honey bee navigation and appetite and cited various open literature references about honey bee health.

**The EPA Response:** The agency appreciates this additional information concerning honey bee toxicity data. There is uncertainty regarding the relationship of sublethal effects such as inhibition of navigation and loss of appetite, relative to the EPA's standard assessment endpoints (*i.e.*, impaired survival; growth; development). Additionally, the ecological assessment included discussion about a study that tested for colony-level effects (Thompson et al, 2014), which did not show that glyphosate adversely affected adult or developing young (brood). The EPA may require additional pollinator data in order to complete its evaluation of risk to bees prior to a final decision for registration review.

---

[5] This webinar's materials are posted online at: https://www.epa.gov/reducing-pesticide-drift/strategies-managing-pesticide-spray-drift-webinar-materials
[6] EPA is working on posting the materials for this webinar.

Docket Number EPA-HQ-OPP-2009-0361
www.regulations.gov

## Comments on the Presence of Glyphosate in Surface Water:

Several commenters such as Beyond Pesticides and Friends of the Earth cited a recent report
from the US Geological Survey (USGS) indicating that glyphosate had been detected in aquatic
systems.

**The EPA Response:** The agency is aware of the recent 2014 USGS report
( _____ gov highlights_2014-04-23-glyphosate_2014.html). The USGS monitoring
data were considered as part of the EPA's ecological risk assessment (see Section 3.4 of the
ecological risk assessment). The USGS data are ambient monitoring data and not targeted
spatially or temporally to glyphosate use, so the extent that monitoring detections directly
correlate to certain glyphosate applications is uncertain. These data have limited use for risk
calculation but are useful as an additional line of evidence. The occurrence of glyphosate in some
waterbodies (aside from its uses that include direct applications to certain waterbodies) is
consistent with the EPA's analysis and was factored into risk assessment.

## Comments Relating to Endangered Species Risk Assessment and Synergy:

The Center for Biological Diversity (CBD) submitted comments which focus on the EPA's duty
to consult with the Services on the registration review of glyphosate in accordance with the
Endangered Species Act (ESA). The CBD's comments mention various aspects of the risk
assessment process, specifically use of the best available data, including all necessary data and
studies, particularly to develop listed species risk assessments, and evaluation of effects on listed
species and their designated critical habitat. CBD also expressed concern regarding the rigor of
the agency's preliminary determinations regarding the effects of glyphosate on listed species and
their designated critical habitat for the glyphosate registration review. In addition, CBD
expressed concern about effects on pollinators and other beneficial insects, effects on human
health or environmental safety concerning endocrine disruption, and any additive, cumulative or
synergistic effects of the use of the pesticide.

**The EPA Response:** The EPA plans to address many of the concerns regarding listed species as
part of the implementation plan for assessing the risks of pesticides to listed species based on the
recommendations of the April 2013 National Academy of Sciences (NAS) report. See
Endangered Species Assessment in Appendix D of this document for more information. The
EPA will address concerns specific to glyphosate particularly with regard to pollinators, ESA,
and endocrine disruption, in connection with the development of its final registration review
decision for this pesticide. See Endocrine Disruptor Screening Program in Appendix E of this
document for more information regarding endocrine disruption. The EPA is currently developing
an agency policy on how to consider claims of synergy being made by registrants in their
patents. The EPA intends to release this policy for public comment. After the agency has
received and considered public comment on the proposed policy, and once that policy has been
finalized, the EPA will consider its implications on the EPA's registration review decision for
glyphosate.

Docket Number EPA-HQ-OPP-2009-0361
www.regulations.gov

## Comments Relating to the EPA's Use Reports for Glyphosate:

A number of private citizens expressed concern that the EPA did not adequately assess the large volume of glyphosate use and the large number of use sites as part of registration review. Some commenters, such as Center for Food Safety, requested that the EPA update its use reports for glyphosate and provide more accurate estimates of use and usage.

**The EPA Response:** At various points in registration review, the EPA has provided estimates of agricultural usage for glyphosate. The following use reports were previously published in the glyphosate registration review docket: the 2008 *Screening Level Estimates of Agricultural Uses of the Case Glyphosate* and the 2015 *Updated Screening Level Usage Analysis (SLUA) Report for Glyphosate Case PC #s (103601, 103604, 103607, 103608, 103613, 417300)*. As part of this proposed interim registration review decision, the EPA is also providing updated agricultural and non-agricultural usage information, which are included in the *Glyphosate: Response to Comments, Usage, and Benefits*, also available in the public docket. A summary of all the current use sites for glyphosate along with current labeled applications rates and other application parameters are also available in the *Joint Glyphosate Task Force's Use Summary Matrix*, available in the glyphosate public docket.

## Comments on Glyphosate's Connection to Resistant Weeds:

Many stakeholders (*e.g.*, Beyond Pesticides, Center for Food Safety, Center for Biological Diversity) commented on glyphosate's connection to weed resistance, stating that widespread use of glyphosate has resulted in increased weed resistance, particularly in glyphosate-resistant crops. Commenters noted that there is potential for resistance to spread between herbicide resistant crops and related plants. Other stakeholders (*e.g.*, Kansas Agribusiness Retailers Association, Almond Alliance of California, Iowa Corn Growers Association) state that glyphosate is effective on weeds that are resistant to other herbicides and is still a useful tool for growers despite weed resistance issues.

**The EPA Response:** Whenever a herbicide is used, there is a potential for that use to contribute to the evolution of herbicide resistance, particularly if the population of a weed species is subjected to repeated sublethal doses of herbicide. Weed resistance commonly occurs but despite resistance problems, glyphosate remains an important weed management tool. Glyphosate is still effective on many weed species that have shown resistance to other herbicides. To combat weed resistance, EPA encourages tank-mixing herbicides, rotating different mechanisms of action, crop rotation, and the use of integrated pest management programs. To maintain some of the most important benefits of glyphosate, growers must use herbicides responsibly as part of an integrated weed control strategy and be proactive in employing good weed resistance management practices.

Herbicide resistance can occur through pollen-mediated gene flow from resistant crops to weedy relatives. Additionally, glyphosate-resistant biotypes of some weeds can rapidly disperse through pollen-mediated gene flow. The United States Department of Agriculture's Animal and Plant Health Inspection Service (USDA-APHIS) regulates the planting, importation, or transportation of genetically engineered plant crops under the Plant Protection Act. Most genetically engineered plants are "regulated articles" and must receive prior approval from APHIS before introduction.

16

Docket Number EPA-HQ-OPP-2009-0361
www.regulations.gov

Helping to educate growers on how to manage weed resistance is a top priority for the agency.
The EPA is proposing to require herbicide resistance management labeling as part of this
Proposed Interim Registration Review Decision (see section IV of this document). The EPA has
also published two Pesticide Registration Notices (PRNs) which address pest resistance
management. PRN 2017-1[7] promotes mechanism of action labeling by pesticide registrants. PRN
2017-2[8] provides specific guidance for managing herbicide resistance, including labeling,
education, training, and stewardship strategies for pesticide manufacturers, producers,
formulators, states, grower groups, growers, and other interested stakeholders.

## Comments from Mass Mail Campaigns:

The EPA received comments from nine mass mail campaigns. Two mass mail campaigns were
organized by Bayer Crop Science and an unidentified organization and included comments from
farmers, agricultural professionals, and general consumers urging the EPA to keep glyphosate
accessible. Seven mass mail campaigns came from the following environmental non-
governmental organizations: Friends of the Earth, Center for Food Safety, Environmental Action,
Pesticide Action Network, Organics Consumer Association, Center for Biological Diversity, and
an unidentified organization. These seven campaigns urged the EPA to restrict glyphosate,
protect the monarch butterfly, and/or reconsider its cancer conclusion.

**The EPA Response:** The agency has conducted comprehensive human health and ecological
risk assessments for glyphosate and has not received any information from public comments that
would warrant revising the conclusions of its risk assessments. The EPA did not identify any
risks of concern for humans from exposure to glyphosate. In addition, the agency determined
glyphosate is not likely to be carcinogenic to humans. The EPA has identified risks primarily
from spray drift for non-target organisms. The agency has weighed the risks and benefits of
glyphosate use as part of its proposed interim registration review decision. In general, the
benefits that glyphosate confers to growers outweighs the geographically limited risks to non-
target organisms. It is important to balance the needs of weed management with protections for
non-target organisms and the agency is proposing risk mitigation measures to manage off-target
spray drift and promote weed resistance management. Further information on the EPA's
proposed interim decision and the agency's rationale is described in Section IV of this document.

## Comments from USDA's Office of Pest Management Policy:

In its comments to the glyphosate registration review docket, USDA submitted information on
the benefits of glyphosate, and furnished information on the non-agricultural uses of glyphosate,
particularly in non-food tree crops, aquatic areas, and pasture/natural lands.

**The EPA Response:** The agency thanks USDA for its comments and especially appreciates the
information on use of glyphosate in non-agricultural areas, as that information is not readily

---

[7] *Guidance for Pesticide Registrants on Pesticide Resistance Management Labeling.* https:/www.epa.gov/pesticide-
registration/guidance-pesticide-registrants-pesticide-resistance-management
[8] *Guidance for Herbicide-Resistance Management, Labeling, Education, Training, and Stewardship.*
www.pesticide-registration.prn-2017-2-guidance-herbicide-resistance-management-labeling-

Docket Number EPA-HQ-OPP-2009-0361
www.regulations.gov

available. The benefits and information on application rate, timing, and typical practices for non-agricultural uses have been considered as part of this Proposed Interim Registration Review Decision.

## II.   USE AND USAGE

Glyphosate is a broad-spectrum, systemic glycine herbicide which inhibits the enzyme enolypyruvyl shikimate-3-phosphate (EPSP) synthase in plants and inhibits aromatic amino acid synthesis. It is the only herbicide in the Weed Science Society of America's (WSSA) group 9 class and it has a unique mode of action. Glyphosate is formulated as ready-to-use solution, water-dispersible granules, soluble concentrate, emulsifiable concentrate, flowable concentrate, water soluble packaging, pressurized liquid, pellets/tablets, and tree injection shells. It can be applied as a pre-emergent, post-emergent, or as a pre-harvest application to the crop to treat a variety of emerged grass and broadleaf weeds. In a few crops (ex. sugarcane), glyphosate is used as a plant growth regulator.

Glyphosate is registered for use in a wide array of both agricultural and non-agricultural settings. Agricultural uses include stone and pome fruits, citrus fruits, berries, nuts, vegetables, legumes, cereal grains, and other field crops. Glyphosate is also registered for use on glyphosate-resistant (transgenic) crops such as corn, soybean, cotton, canola, sugar beets, and alfalfa. Registered non-agricultural uses include: tree injections, residential spot treatments, aquatic areas, forests, rights of ways, recreational turf, ornamentals, non-food tree crops, and Conservation Reserve Program land.

Application methods vary for glyphosate and include aircraft, various ground equipment, and various handheld equipment. Application types include: aerial spray, ground boom spray, strip treatment, band treatment, broadcast spray, spot treatment, tree injection, stump treatment, and wipe-on/wiper treatments. The maximum single application rate on labels is up to 8 pounds acid equivalent per acre (lb ae/A) (acid equivalents or ae are used to assess the different acid and salt forms of glyphosate) for the following uses: pastures, non-food tree crops, forestry, aquatic areas, and non-crop. However, for agricultural row crop uses, maximum single application rates are 1.55 lb ae/A for aerial applications and 3.75 lb ae/A for ground applications. Maximum annual application rates are generally 6 to 8 lbs ae/A.

The EPA completed a new usage analysis for glyphosate by analyzing agricultural market research data from 2012 to 2016. Approximately 281 million pounds of glyphosate was applied to 298 million acres annually in agricultural settings. Most glyphosate was applied to soybean (approximately 117.4 million lbs applied annually), corn (approximately 94.9 million lbs applied annually), and cotton (approximately 20 million lbs applied annually). Many citrus fruits (e.g., grapefruit, oranges, lemons), field crops (e.g., soybean, corn, cotton), and tree nuts (e.g., almonds, walnuts, pistachios) have the highest percentage of their acres treated with glyphosate.

Approximately 24 million pounds of glyphosate are applied to non-agricultural sites annually, on average. The majority of non-agricultural use is for the homeowner market (approximately 5 million lbs applied annually), turf (approximately 4.9 million lbs applied annually), forestry

18

Docket Number EPA-HQ-OPP-2009-0361
www.regulations.gov

(approximately 3.6 million lbs applied annually), and roadways (approximately 3.3 million lbs
applied annually).

## III.   SCIENTIFIC ASSESSMENTS

### A. Human Health Risks

A summary of the agency's human health risk assessment is presented below. The agency used
the most current science policies and risk assessment methodologies to prepare a risk assessment
in support of the registration review of glyphosate. For additional details on the human health
assessment for glyphosate, see the *Glyphosate Draft Human Health Risk Assessment for
Registration Review*, which is available in the public docket.

### 1.  Risk Summary

The EPA thoroughly assessed risks to humans from exposure to glyphosate from all uses and all
routes of exposure and did not identify any risks of concern. Both non-cancer and cancer effects
were evaluated for glyphosate and its metabolites, aminomethyl phosphonic acid (AMPA) and
N-acetyl-glyphosate. The different components of the EPA's human health risk assessment are
described below.

*Cancer Assessment*

The EPA convened a FIFRA SAP meeting in December 2016 to consult on the carcinogenic
potential of glyphosate. Recommendations from the Scientific Advisory Panel meeting were
published in March 2017. The EPA revised its cancer assessment based on comments received
from the SAP and responded to the SAP in the *Response to the Final Report of the Federal
Insecticide, Fungicide, and Rodenticide Act Scientific Advisory Panel (FIFRA SAP) on the
Evaluation of the Human Carcinogenic Potential of Glyphosate*. The EPA's final cancer
conclusion and its rationale for reaching this conclusion is described in the *Revised Glyphosate
Issue Paper: Evaluation of Carcinogenic Potential*. The EPA's final cancer assessment includes
the newly published analysis of glyphosate use and cancer incidence in the Agricultural Health
Study (AHS). The AHS study is a long-term epidemiological study of over 54 thousand pesticide
applicators to investigate the association between pesticide exposures and incidence of various
types of cancer and non-cancer outcomes. The EPA's review of the AHS study is described in
the *Summary Review of Recent Analysis of Glyphosate Use and Cancer Incidence in the
Agricultural Health Study*.  The agency has determined that glyphosate is not likely to be
carcinogenic to humans and therefore a quantitative cancer assessment was not conducted.

All documents relating to the cancer evaluation for glyphosate are published in the public
registration review docket for glyphosate (EPA-HQ-OPP-2009-0361). The deliberations of the
glyphosate FIFRA SAP meeting, including agenda, meeting notes, SAP recommendations, the
EPA's presentation to the FIFRA SAP, and other supporting documents are published in the
glyphosate FIFRA SAP docket (EPA-HQ-OPP-2016-0385) at www.regulations.gov.

Docket Number EPA-HQ-OPP-2009-0361
www.regulations.gov

The Agency has received a September 27, 2018 petition from the Environmental Working
Group, Ben & Jerry's Homemade, Inc., Happy Family Organics, MegaFood, MOM's Organic
Market, National Co+op Grocers, Nature's Path Foods Inc., One Degree Organic Foods USA,
Inc., and Stonyfield Farms, Inc. requesting that the agency reduce the tolerance of the pesticide
glyphosate in or on oats and modify labels to explicitly prohibit preharvest use on oats. The
agency is still reviewing this petition and has issued a Federal Register Notice of Filing for
public comment in docket EPA-HQ-OPP-2019-0066. The petition references EPA's cancer
evaluation and includes the following arguments:

1) EPA's tolerance for oats is not adequately protective of children, due to the widespread
   use of glyphosate and a lack of glyphosate residue monitoring data. The petitioners
   submit results of residue testing from the EWG of glyphosate levels in various granola,
   instant oat, breakfast cereal, and snack commodities as evidence of this assertion.
2) Glyphosate is a possible carcinogen according to the International Agency for Research
   on Cancer (IARC), who classified glyphosate as "probably carcinogenic to humans" in
   2015.
3) Human studies demonstrate a likely link between glyphosate exposure and non-Hodgkin
   lymphoma.
4) Animal models, when viewed in total, suggest glyphosate is a rodent carcinogen.
5) Analyses of glyphosate animal studies by the European Food Safety Authority and the
   European Chemicals Agency were flawed, and the incidence of tumors is higher than
   reported.
6) Petitioners point to comments sent from the Office of Research and Development, which
   were sent to the Office of Pesticide Programs (OPP) while the agency's cancer evaluation
   was being drafted in 2015, as a line of evidence, contending that OPP should have been
   more circumspect about rejecting IARC's cancer conclusion.
7) EWG calculated its own cancer risk level and proposed that the level protective of
   children's health is 0.01 milligrams of glyphosate per day. The petitioners contend that
   EPA's dietary risk assessment is not adequately protective of children.

Since this petition was submitted outside of the public comment period for the human health and
ecological risk assessments, which closed on April 30, 2018, EPA has not considered it as a
public comment in the preparation this Proposed Interim Registration Review Decision. EPA
will respond to this petition concurrent with the development of its Interim Registration Review
Decision for glyphosate. The risk findings described herein reflect the conclusions of EPA's
December 12, 2017 human health risk assessment.

*Dietary (Food + Water) Risks*

An acute dietary assessment was not completed because an acute reference dose could not be
established due to the absence of observable adverse effects seen in acute studies. A cancer
dietary assessment was not conducted because glyphosate is classified as not likely to be
carcinogenic to humans.
Long-term toxicity studies in mice, rats, and dogs demonstrate that glyphosate is of very low
toxicity following repeated oral exposure. Rabbits were the most sensitive species tested and the
endpoint chosen for chronic dietary assessment was based on diarrhea and few/no feces. A

20

Docket Number EPA-HQ-OPP-2009-0361
www.regulations.gov

conservative chronic dietary risk assessment was conducted assuming tolerance-level residues, modeled drinking water estimates from direct application to water scenarios, 100% crop treated assumptions, and default modeling parameters. The resulting chronic dietary risk estimates were not of concern. Children 1-2 years old were the most highly exposed population subgroup (chronic population adjusted dose [cPAD] = 23%, where a cPAD above 100% exceeds the agency's level of concern).

*Breast Milk Analysis*

In response to concerns from certain segments of the public related to the potential presence of glyphosate in human breast milk, the EPA analyzed human breast milk samples collected by the National Children's Study for residues of glyphosate and glyphosate metabolites (N-acetyl-glyphosate and AMPA). A total of 39 samples from 39 mothers were analyzed. Glyphosate and its metabolites were not detected in human breast milk samples. For additional details on the EPA's breast milk analysis and methodology, please view the following documents in the glyphosate registration review docket:

- *Analysis of Human Milk for Incurred Residues of Glyphosate and its Metabolites, ACB Project #B14-46—Updated from Report Dated September 18, 2015* (dated April 26, 2016)
- *Analytical Method for the Determination of N-Acetylglyphosate and Other Analytes in Various Animal Matrices Using LC/MS/MS* (undated)

The results of the EPA's breast milk analysis is consistent with the scientific literature for glyphosate, which indicates that glyphosate does not bioaccumulate in the human body.

*Residential Handler Risks*

The EPA considered the potential for short-term dermal and inhalation exposures to homeowners who mix and apply products containing glyphosate (residential handlers). A quantitative residential handler assessment was not completed due to lack of toxicity from short- and intermediate-term dermal and inhalation routes of exposure. Residential handler risks are not anticipated from currently registered uses of glyphosate.

*Residential Post-Application Risks*

Post-application dermal and inhalation assessments were not quantitatively assessed due to lack of toxicity. However, a short- and intermediate-term post-application incidental oral exposure assessment was conducted to assess potential risk from two scenarios: 1) for hand-to-mouth behavior on treated lawns and 2) for swimmers via short-term post-application incidental oral exposure to glyphosate from the aquatic use. Post-application incidental oral risk estimates for the turf use were not of concern, with Margins of Exposure (MOEs) ranging from 640 to 290,000, where MOEs below 100 are of concern. Post-application swimmer risk estimates for the aquatic use were not of concern (MOEs range from 210,000 to 2,200,000, where MOEs below 100 are of concern). Therefore, residential post-application risks are not anticipated from currently registered uses of glyphosate.

Docket Number EPA-HQ-OPP-2009-0361
www.regulations.gov

*Non-Occupational Bystander Spray Drift Risks*

The EPA assessed the potential for risk to non-occupational bystanders from off-target movement of glyphosate via spray drift, to protect from indirect exposure (*e.g.*, children playing on lawns where residues have deposited next to treated fields). Since glyphosate is registered for use on turf, it was considered whether the existing turf post-application assessment was protective of bystander exposure via spray drift. If the maximum application rate on crops adjusted by the amount of drift expected is less than or equal to existing turf application rates, the existing turf assessment is considered protective of spray drift exposure. The currently registered maximum single agricultural application rate for glyphosate is 8 lbs ae/A (for use on pastures, forestry, non-food tree crops, etc.). The highest fraction of spray drift for any application method immediately adjacent to a treated field results in a deposition fraction of 0.26 of the application rate (from AgDrift modeling). The maximum application rate adjusted by the 0.26 adjustment factor for drift (8 lb ae/A x 0.26 lb ae/A=2.08 lb ae/A) is less than the assessed maximum direct spray residential turf application rate (10.5 lb ae/A). Therefore, the turf post-application assessment is protective for any potential bystander spray drift exposure, and a quantitative spray drift assessment for glyphosate was not required. Therefore, non-occupational bystander spray drift risks are not of concern for glyphosate.

*Aggregate Risks*

Aggregate risk assessment considers exposure from food, drinking water, and residential exposures combined. The EPA conducted short-term (food, water, residential) and chronic (food and water) aggregate risk assessments. Acute and cancer aggregate risk assessments were not conducted since an appropriate endpoint attributable to a single dose was not identified for the general U.S. population or any population subgroup and glyphosate is classified as not likely to be carcinogenic to humans, respectively. An intermediate-term assessment was not conducted since the short-term assessment is protective of intermediate-term exposure (the endpoints for these durations are identical). Short-term aggregate risks were not of concern (MOE for children = 260, MOE for adults = 1,300, where MOEs below 100 are of concern). The MOE for children represents exposure from chronic dietary (food and water) and incidental oral ingestion exposure from turf use, which was the highest exposure scenario. The MOE for adults represents chronic dietary exposure (food and water) and incidental oral ingestion exposure resulting from aquatic use, the highest exposure scenario.

Chronic aggregate risks were also not of concern. Chronic aggregate exposure is from dietary (food and water) exposure only, based on the use pattern, and are the same as the chronic dietary risk estimates (≤23% cPAD, see dietary section).

*Cumulative Risks*

The EPA has not made a common mechanism of toxicity to humans finding as to glyphosate and any other substance and it does not appear to produce a toxic metabolite produced by other substances. Therefore, the EPA did not assess cumulative risks for this assessment.
*Occupational Risks*

Docket Number EPA-HQ-OPP-2009-0361
www.regulations.gov

A quantitative occupational exposure assessment was not conducted due to lack of toxicity via
the occupational handler and post-application dermal and inhalation routes of exposure.
Therefore, occupational risks from currently registered uses of glyphosate are not of concern.

The current restricted entry interval (REI) on the labels is 12 hours or 4 hours, depending on the
glyphosate formulation. The current human health risk assessment supports a 4 hour REI for
glyphosate the active ingredient, but the different glyphosate formulations were not assessed.
According to *PRN 95-3: Reduction of Worker Protection Standard (WPS) Interim Restricted
Entry Intervals (REIs) for Certain Low Risk Pesticides*, certain glyphosate formulations may
qualify for a reduced 4 hour REI. Glyphosate registrants may use the existing label amendment
process to request a reduction in the existing 12 hour REI to a 4 hour REI on the label, on a
formulation by formulation basis.

## 2.  Human Incidents and Epidemiological Analysis

The EPA conducted an extended incident search for glyphosate human health incidents in
February 2014. Five pesticide incident data sources were reviewed: Office of Pesticide Programs
Incident Data System (IDS; 2008-2012), National Pesticide Information Center (NPIC; 2007-
2013), California's Pesticide Incident Surveillance Program (PISP; 2005-2010), National
Institute of Occupational Safety and Health's Sentinel Event Notification System for
Occupational Risks (NIOSH/SENSOR; 1998-2009), and the American Association of Poison
Control Centers (AAPCC; 2001-2012). Thousands of glyphosate incidents were reported but
most reported incidents were minor in severity. The high number of reported incidents across the
databases is likely a result of glyphosate being among the most widely used pesticides by
volume. Health effects reported in the incident databases include dermal, ocular, and respiratory
symptoms and effects are generally mild and resolve rapidly. Data from IDS and NPIC suggest
that homeowner mixing/loading/applying (usually due to human error and container leaks of
glyphosate products) are responsible for almost half of reported incidents. Data from SENSOR-
Pesticides are consistent with IDS and NPIC and show that glyphosate application results in the
most reported incidents. Occupational handling of equipment is responsible for most incidents in
California's PISP database due to equipment leaks and malfunction. Across SENSOR, IDS, and
NPIC, children's exposure was due to post-application exposure, accidental ingestion, and
tampering with the product.

The medical-case literature was reviewed, and most accidental ingestion of glyphosate
formulations result in mild symptoms. Intentional ingestions caused moderate to severe
symptoms and involved multiple organ systems.

The epidemiological literature was also reviewed but most studies were hypothesis-generating in
nature. The EPA found there was insufficient evidence to conclude that glyphosate plays a role
in any human diseases. The agency will continue to monitor the incident information. Additional
analyses will be conducted if ongoing human incident monitoring indicates a concern.

An updated incident search was conducted in the IDS on October 26, 2018 for new human health
incidents. From January 1, 2014 to October 25, 2018, 249 incidents were reported in the Main
IDS involving glyphosate. Of these, there were 3 deaths, 24 incidents were classified as major

23

Docket Number EPA-HQ-OPP-2009-0361
www.regulations.gov

severity, 216 incidents were classified as moderate severity, 5 incidents were classified as minor severity, and 1 incident had no or unknown effects. Of the three reported deaths, two were suicides and one was described as a "Roundup overdose." From January 1, 2014 to October 25, 2018, 3,123 incidents were reported to Aggregate IDS involving glyphosate; most were classified as minor severity and the rest had no effects or unknown effects.

For more information on reported human incidents, see the *Glyphosate: Tier II Incident Report*, available in the in the public docket for glyphosate.

### 3. Tolerances

Tolerances are established for residues of glyphosate in/on numerous plant commodities in 40 CFR § 180.364. Glyphosate tolerances range from 0.2 to 400 ppm. The EPA evaluated the glyphosate residue chemistry database to determine if the established tolerances conform to current practices and to determine whether updates were necessary for current crop group/subgroup definitions. The EPA intends to establish new tolerances for various vegetable and fruit groups and subgroups, as listed in Table 1. Upon establishment of these new crop group tolerances, EPA intends to remove the following individual tolerances, since they will no longer be needed: acerola; aloe vera; ambarella; asparagus; atemoya; avocado; bamboo, shoots; banana; biriba; breadfruit; cactus, fruit; cactus, pads; canistel; cherimoya; custard apple; date, dried fruit; durian; feijoa; fig; fruit, stone, group 12; guava; ilama; imbe; imbu; jaboticaba; jackfruit; longan; lychee; mamey apple; mango; mangosteen; marmaladebox; noni; nut, tree, group 14; olive; palm heart; papaya; papaya, mountain; passionfruit; pawpaw; persimmon; pineapple; pistachio; pomegranate; pulasan; rambutan; rose apple; sapodilla; sapote, black; sapote, mamey; sapote, white; soursop; Spanish lime; star apple; starfruit; sugar apple; Surinam cherry; tamarind; vegetable, leafy, brassica, group 5; vegetable, leafy, except brassica, group 4; watercress, upland; and wax jambu.

| Table 1. Proposed Changes to the Tolerance Levels or Commodity Definitions for Glyphosate. | | | | |
|---|---|---|---|---|
| **Current** | | **Proposed Change** | | **Comment** |
| **Commodity** | **Tolerance (ppm)** | **Commodity** | **Tolerance (ppm)** | |
| Soybean, forage | 100.0 | Soybean, forage | 100 | change in number of significant figures |
| Soybean, hay | 200.0 | Soybean, hay | 200 | |
| Soybean, hulls | 120.0 | Soybean, hulls | 120 | |
| Soybean, seed | 20.0 | Soybean, seed | 20 | |
| Fruit, stone, group 12 | 0.2 | Fruit, stone, group 12-12 | 0.2 | update to the current crop group definitions; coconut was excluded from the tree nut crop group tolerances as the residues were not within 5x (coconut tolerance at 0.1 ppm) |
| Nut, tree, group 14 | 1.0 | Nut, tree, group 14-12 (except coconut) | 1.0 | |
| Vegetable, leafy, except brassica, group 4 | 0.2 | Vegetable, leafy, group 4-16 | 0.2 | update to the current crop group definitions |
| Vegetable, leafy, brassica, group 5 | 0.2 | Vegetable, *Brassica*, head and stem, group 5-16 | 0.2 | |

Docket Number EPA-HQ-OPP-2009-0361
www.regulations.gov

| Table 1. Proposed Changes to the Tolerance Levels or Commodity Definitions for Glyphosate. | | | | |
|---|---|---|---|---|
| **Current** | | **Proposed Change** | | |
| **Commodity** | **Tolerance (ppm)** | **Commodity** | **Tolerance (ppm)** | **Comment** |
| Several | 0.2-0.5-- | Vegetable, stalk and stem, subgroup 22A | 0.5 | |
| | 0.2 | Vegetable, leaf petiole, subgroup 22B | 0.2 | |
| | 0.2 | Fruit, tropical and subtropical, edible peel, group 23 | 0.2 | |
| | 0.2 | Fruit, tropical and subtropical, small fruit, inedible peel, group 24A | 0.2 | |
| | 0.2 | Fruit, tropical and subtropical, medium to large fruit, smooth, inedible peel, group 24B | 0.2 | |
| | 0.2 | Fruit, tropical and subtropical, large fruit, rough or hairy, inedible peel, group 24C | 0.2 | |
| | 0.2 | Fruit, tropical and subtropical, vine, inedible peel, group 24E | 0.2 | |

In accordance with FFDCA, the Agency will be conducting rulemaking to implement any tolerance changes identified for glyphosate.

### 4. Human Health Data Needs

No human health data needs have been identified for glyphosate. The human health data required as part of the registration review DCI has been satisfied.

### B. Ecological Risks

A summary of the agency's ecological risk assessment is presented below. The agency used the most current science policies and risk assessment methodologies to prepare a risk assessment in support of the registration review of glyphosate. For additional details on the ecological assessment for glyphosate, see the *Registration Review—Preliminary Ecological Risk Assessment for Glyphosate and Its Salts*, which is available in the public docket.

The EPA is currently working with its federal partners and other stakeholders to implement an interim approach for assessing potential risk to listed species and their designated critical habitats. Once the scientific methods necessary to complete risk assessments for listed species and their designated critical habitats are finalized, the agency will complete its endangered species assessment for glyphosate. See Appendix D for more details. As such, potential risks for non-listed species only are described below. See section III.C of this document for additional risk characterization.

### 1. Risk Summary

*Terrestrial Risks*

To assess risk to mammals, birds, terrestrial invertebrates, and terrestrial plants, the EPA reviewed both registrant-submitted studies and studies from the open literature. When available, formulation-specific data were also considered in addition to data on glyphosate alone.

25

Docket Number EPA-HQ-OPP-2009-0361
www.regulations.gov

## Mammals

Acute risks to mammals are expected to be low for technical grade glyphosate. Acute risk quotients (RQs) were not calculated for mammals because the lethal dose sufficient to kill 50% of a population ($LD_{50}$) is greater than the highest concentrations tested (up to 4,800 milligrams acid equivalent per kilogram of bodyweight [mg ae/kg-bw]) in the available acute oral toxicity study. Estimated Environmental Concentrations (EEC)s for all uses except spot treatment are below the highest concentration tested in the available acute oral and acute dietary studies. However, the application rate for spot treatments is adjusted to a per acre basis and conservatively assumes that the entire area is treated at that high rate.

In addition to toxicity studies with technical grade glyphosate, acute dose-based toxicity studies were available for various formulations. RQs exceeded the level of concern (LOC) of 0.5 for one formulation (11.4% glyphosate; acute RQs ≤ 2.1) for labeled use on broadcast brush at a rate of 7.2 lb ae/A. Data for most formulations showed $LD_{50}$ values greater than the highest dose tested.

Chronic dietary-based RQs for technical grade glyphosate did not exceed the LOC for any use patterns, except spot treatment (RQs ≤ 1.92, where the LOC=1). However, chronic dose-based RQs did exceed the LOC for the following scenarios:

  i.   application to sugarcane at rates of 2.25 lb ae/A and above (RQ=1.02),
  ii.  application to most conventional crops by ground at rates of 3.75 lb ae/A and above (RQ ≤ 1.21),
  iii. application to Roundup-ready crops at the maximum annual rate of 6 lb ae/A (RQs ≤1.11),
  iv.  application to tree crops at a rate of 8 lb ae/A (RQs ≤ 1.03),
  v.   application to food trees and vine, berry, and small fruits at the maximum annual rate of 8 lb ae/A (RQs ≤1.60),
  vi.  application to forestry, pastures, non-crops areas at a rate of 8 lb ae/A (RQs ≤ 2.04),
  vii. application as spot treatments assuming a rate of 40 lb ae/A (RQs ≤ 10.2).

Most chronic dose-based risk exceedances are slightly above the LOC, except for residential spot treatments. The application rate for spot treatment conservatively assumes that the entire acre is treated at a high rate of 40 lb ae/A. Potential risk to mammals from spot treatment use should be limited to residential areas and limited in area.

## Birds, Reptiles, and Terrestrial-Phase Amphibians

Potential acute risks to birds from exposure to technical grade glyphosate are likely to be nearer to the level of concern at application rates lower than 8 lb ae/A. There were no mortalities in any of the acute oral or acute dietary avian studies with technical glyphosate ($LD_{50}$ values >3,196.3 mg ae/kg-bw and >4,971 mg ae/kg-diet, respectively). Since definitive LD or $LC_{50}$ values were not determined, RQs were not calculated. EECs for all uses except spot treatment are below the highest concentration tested in the available acute oral and acute dietary studies. However, the application rate for spot treatments is adjusted to a per acre basis and conservatively assumes that the entire area is treated at that high rate.

26

Docket Number EPA-HQ-OPP-2009-0361
www.regulations.gov

Regarding the acute toxicity of glyphosate formulations, RQs exceeded the LOC of 0.5 for one formulation (68.5% glyphosate monoammonium salt: acute RQs $\leq$ 1.26, based on an $LD_{50}$ value of 1,131 mg ae/kg-bw for bobwhite quail). Acute avian studies were available for the degradate AMPA and data show it is no more toxic than the parent glyphosate.

Chronic avian RQs were not calculated because the most sensitive endpoint in the avian reproduction study resulted in a non-definitive NOAEC. However, EECs for multiple uses are greater than the lowest concentration tested in the mallard study where effects on body weight were observed (NOAEC <501 mg ae/kg; MRID 48876602). To further characterize the potential for chronic risk from exposure to glyphosate, RQs were calculated using the non-definitive NOAEC from the avian reproduction study with the bobwhite quail where no effects were observed at the highest concentration tested, 830 mg ae/kg-diet. The following scenarios exceed the LOC of 1:

i.    application to most conventional crops at the maximum single aerial rate (1.55 lb ae/A), the maximum single ground rate (3.75 lb ae/A), or above,
ii.   application to Roundup ready crops by ground at the maximum single rate of 3.75 lb ae/A or above,
iii.  application to sugarcane at rates of 2.25 lb ae/A or above,
iv.   application to tree crops at rates of 8 lb ae/A,
v.    application to food trees and vine, berry, and small fruits at 8 lb ae/A, and
vi.   application to forestry, pasture, and non-crop areas at a rate of 8 lb ae/A.

RQs for the scenarios above were marginal (RQs ranged from approximately 1 to $\leq$ 2.5). Given that there were no reported effects up to the highest concentration tested in the bobwhite quail avian reproduction study, these RQs may be conservative for most uses, but to a lesser extent for use on forests, pastures, and non-crop areas. Application as spot treatment at a rate of 40 lb ae/A resulted in higher risk exceedances, but this scenario was conservatively assessed (RQ $\leq$ 11.6). Evidence from multiple studies suggest that exposure to glyphosate may result in decreases in body weight, but reproductive parameters such as number of eggs laid, embryo viability, and eggshell thickness may not be impacted.

Terrestrial Invertebrates (honeybees)

Potential risk to terrestrial invertebrates is uncertain, as acute contact and oral honeybee $LD_{50}$ values are greater than the highest doses tested (103 µg ai/bee for contact, 182 µg ai/bee for oral exposure). Application rates higher than 5.7 lb ae/A exceed the highest tested oral concentrations. Risks to individual bees at application rates lower than 5.7 lb ae/A are expected to be low, but risks are uncertain at rates above 5.7 lb ae/A.

In a colony-level study, no adverse effects were reported based on exposure to residues from an application at a rate of 1.92 lb ae/A.

Data are available for other types of terrestrial invertebrates (predatory mites, earthworms, parasitic wasps) where no effects are reported up to the highest dose tested. The most sensitive endpoint was for predatory mite, and data suggest possible effects up to 69 ft from the edge of

Docket Number EPA-HQ-OPP-2009-0361
www.regulations.gov

the field for an application rate at 8 lb ae/A, and 16 ft from the edge of the field for an
application rate at 3.75 lb ae/A.

Additional data may be necessary to fully evaluate risks to non-target terrestrial invertebrates,
especially pollinators. Although the EPA identified the need for certain data to evaluate potential
effects on pollinators when initially scoping the registration review for glyphosate, the problem
formulation and registration review DCI for glyphosate, were both issued prior to the EPA's
issuance of the June 2014 *Guidance for Assessing Pesticide Risks to Bees*[9]. This 2014 guidance
lists additional pollinator studies that were not included in the glyphosate registration review
DCI. Therefore, the EPA is currently determining whether additional pollinator data are needed
for glyphosate. If the agency determines that additional pollinator exposure and effects data are
necessary to help make a final registration review decision for glyphosate, then the EPA will
issue a DCI to obtain these data. The pollinator studies that could be required for glyphosate are
listed in Table 2 below.

**Table 2. Potential Pollinator Data Requirements for Glyphosate**

| Guideline # | Study |
|---|---|
| Tier 1 | |
| 850.3020 | Acute contact toxicity study with adult honey bees |
| 850.3030 | Honey bee toxicity of residues on foliage |
| Non-Guideline (OECD 213) | Honey bee adult acute oral toxicity |
| Non-Guideline (OECD 237) | Honey bee larvae acute oral toxicity |
| Non-Guideline | Honey bee adult chronic oral toxicity |
| Non-Guideline | Honey bee larvae chronic oral toxicity |
| Tier 2[†] | |
| Non-Guideline | Field trial of residues in pollen and nectar |
| Non-Guideline (OECD 75) | Semi-field testing for pollinators |
| Tier 3[†] | |
| 850.3040 | Full-Field testing for pollinators |

[†] The need for higher tier tests for pollinators will be determined based upon the results of lower tiered tests and/or
other lines of evidence and the need for a refined pollinator risk assessment.

Terrestrial Plants

Exposure to glyphosate may impact non-target terrestrial plants. Risks from runoff due to
glyphosate applications are anticipated to be low. Runoff estimated environmental
concentrations were lower than the no observable adverse effect level for plants (based on
seedling emergence data).

Potential risks to terrestrial plants are primarily from spray drift. Based on vegetative vigor data,
dicots are generally more sensitive to glyphosate than monocots. The most sensitive species
tested was cucumber, based on vegetative vigor data for a glyphosate formulation where
phytotoxicity was observed (leaf discoloration). A spray drift analysis was completed for both
ground and aerial application of glyphosate at various application rates up to 8 lb ae/A, assuming

---

[9] http://www2.epa.gov/sites/production/files/2014-
06/documents/pollinator_risk_assessment_guidance_06_19_14.pdf

Docket Number EPA-HQ-OPP-2009-0361
www.regulations.gov

default droplet size parameters. Fine to medium droplets were assessed for aerial application and very fine to fine droplets were assessed for ground application (based on the American Society of Agricultural and Biological Engineers' [ASABE] droplet size classification standard). Results for the most sensitive species tested, cucumber, are presented in Table 3.

Given its importance as a critical food resource for the monarch butterfly, the agency also completed a spray drift analysis for common milkweed. Reported toxicity endpoints in the literature for common milkweed are similar to the vegetative vigor endpoints for cucumber, the most sensitive species tested ($IC_{25}$ for cucumber is 0.074 lb ae/A; $IC_{25}$ for common milkweed is 0.126 lb ae/A). Distances from the edge of the field to be below toxicity threshold (i.e., buffer distances) for both cucumber and milkweed are listed in Table 3.

**Table 3. Results of spray drift assessment for terrestrial plants for both aerial and ground application of glyphosate at various application rates**

| Application rate (lb ae/A), assuming 1 application at each rate | Distance from the edge of the field to be below toxicity threshold for most sensitive species tested (cucumber) | Distance from the edge of the field to be below toxicity threshold for the common milkweed | Spray method |
|---|---|---|---|
| 1.55 | 190 | 118 | Aerial (fine to medium droplets) |
| 2.25 | 282 | 171 | |
| 3.75 | 466 | 279 | |
| 8 | >1,000 | 620 | |
| 1.55 | 52 | 33 | Ground (very fine to fine droplets) |
| 2.25 | 79 | 46 | |
| 3.75 | 128 | 75 | |
| 8 | 253 | 157 | |

Ground applications result in less spray drift than aerial applications in general. For the most sensitive species, cucumber, applications at 8 lb ae/A result in buffer distances of 253 ft for ground application and over 1,000 ft for aerial application. Applications at rates of 3.75 lb ae/A result in much lower buffer distances (128 ft for ground application and 466 ft for aerial application).

*Aquatic Risks*

To assess potential risk to aquatic organisms, the EPA reviewed both registrant-submitted studies and open literature studies. The EPA also assessed risk from exposure to technical grade glyphosate and for formulated glyphosate, including formulations containing polyoxyethylene tallow amine (POEA). While POEA is not used in glyphosate formulations labeled for aquatic use sites, terrestrial formulations may still contain POEA and may contribute to exposure via runoff. Risk from runoff and spray drift were assessed. Exposure from both terrestrial and aquatic applications were considered.

Data on the degradate aminomethylphosphonic acid (AMPA) were available for fish and aquatic invertebrates and were reviewed as part of the aquatic assessment. Based on existing data,

Docket Number EPA-HQ-OPP-2009-0361
www.regulations.gov

AMPA appears to be less acutely toxic to aquatic organisms than the parent glyphosate and the existing aquatic assessment is considered protective for exposure to AMPA.

Fish, Aquatic Invertebrates, and Aquatic-Phase Amphibians

Risks to fish, aquatic invertebrates, and aquatic-phase amphibians did not exceed the LOC for exposure to glyphosate alone (acute RQs < 0.01, where the acute LOC = 0.5; chronic RQs ≤ 0.12, where the chronic LOC = 1). Risks are also likely to be low for exposure to formulations containing POEA (acute RQs ≤ 0.07). Formulations that do not contain POEA similarly did not show risks of concern (acute RQs < 0.01).

Aquatic Vascular and Non-Vascular Plants

Risks to aquatic plants did not exceed the level of concern for exposure to glyphosate alone (acute RQs ≤ 0.17, where the LOC=1). Risks are likely to be low for exposure to formulations containing POEA via terrestrial applications (acute RQs ≤ 0.68). Risks exceed the level of concern for exposure to formulations without POEA for applications to aquatic environments (acute RQs ≤ 2.6). This is not surprising, given that some glyphosate formulations are tailored to treat aquatic weeds.

Evaluation of risk to terrestrial plants from exposure to spray drift via glyphosate formulations is described in the terrestrial plant section, and the calculated distances off-field to be below toxicity threshold would apply to emergent aquatic vegetation as well as terrestrial plants. For emergent aquatic vascular plants, there is potential for risk from exposure to spray drift from terrestrial uses (distance from the edge of the field to below toxicity threshold is over 1,000 ft, for application rates at 8 lb ae/A, see table 2).

## 2. Ecological Incidents

A review of the Ecological Incident Information System (EIIS) and the Avian Monitoring Information System (AIMS) was conducted on February 21, 2014. A search of the Office of Pesticide Incident Data system (IDS) for aggregated incidents (i.e., registrant-reported incidents) was conducted on February 27, 2014. Incidents in EIIS are classified as "possible," "probable," and "highly probable." Incidents in AIMS are classified as "possible," "probable," "likely," "highly likely," and "certain." The majority of the glyphosate incidents are for terrestrial plants, fewer incidents were reported for terrestrial and aquatic wildlife.

*Terrestrial plant incidents*

Plant incidents for glyphosate and its various salt forms involved either direct treatment or spray drift and resulted in either plant damage or mortality. Approximately 602 individual plant incidents were reported, and 724 aggregate incidents were reported. Reports were classified from "possible" to "highly probable." Most plant incidents involved spray drift onto adjacent agricultural crops and grass. There were a few incidents of trees being damaged or killed. There was one incident which involved use on a right-of-way that was classified as highly probable.

Docket Number EPA-HQ-OPP-2009-0361
www.regulations.gov

### Terrestrial wildlife incidents

Five wildlife incidents were reported for glyphosate for uses on rangeland/pasture, home/lawn, and a tree farm. One consisted of accidental misuse on corn where an unknown bird was reported as dead. Two incidents classified as "possible" involved mortality to three birds from drift and mortality to several dogs from runoff. No additional details were provided for the dog mortalities. For the bird mortalities, other chemicals were applied at the same time, including atrazine, s-metolachlor, and permethrin. One incident involved honeybees and was classified as "possible" where it was reported that an herbicide containing sulfometuron methyl and glyphosate was applied near flowering areas and twitching or dead bees were observed near three hives. One "probable" incident reported incapacitation of two iguanas following ingestion of dandelions sprayed with glyphosate. In the IDS aggregate database, there were 38 reports of wildlife incidents, but additional details were not available.

### Aquatic incidents

One "possible" 2003 incident involved 10 dead goldfish, 2 incapacitated fish, and other fish observed "gasping" at the water surface; investigators reported it was not possible to determine a reason for the fish kill due to lack of water measurements. Eleven fish incidents were reported from 1990 to 2003 with classifications ranging from "possible" to "highly probable." One "highly probable" incident involved misuse where thousands of shad were killed. Four other incidents of misuse were also reported. Two fish kill incidents were reported where glyphosate was applied directly to the fish pond, in both cases investigations indicated that elevated ammonia and reduced dissolved oxygen may have been reason for the fish kill. One incident involved glyphosate being applied to the perimeter of a pond and fish kills were reported 2 months later; the report indicated that overstocking and improper dissolved oxygen may have killed the fish. In one incident, glyphosate was applied to 80 acres next to a fish pond, when it rained the next day, 700 fish were found dead, but no other details were provided.

### Incident update

As of 2017, all ecological incidents are migrated and combined into IDS. An updated search for new ecological incidents since 2014 was conducted in IDS on November 26, 2018. There were 24 reported incidents of on-site crop damage from application of glyphosate in combination with other pesticides. Twelve incidents were on treated corn and were classified as "possible" to "probable"; the adverse effects observed in corn included crop injury, discoloration, or death. There were 12 incidents of crop damage on soybean, incident classifications ranged from "possible" to "probable" and adverse effects observed were browning/death or discoloration/bleaching.

There were 5 reported incidents of off-target spray drift damage. One "probable" incident in 2014 involved drift onto a nearby vineyard from a non-crop area application nearby and resulted in the withering and yellowing of grape leaves. Another "possible" incident in 2014 involved dead or dying bees on a sidewalk from application of glyphosate and pendimethalin in the area; no further details were provided. A "possible" incident in 2015 involved drift from a glyphosate ditch area application which resulted in death in 7 bee hives nearby a week later; the beekeeper reported loss of over 100,000 bees. Another "probable" incident in 2015 involved drift from a

31

Docket Number EPA-HQ-OPP-2009-0361
www.regulations.gov

field corn application which resulted in phytotoxicity in a garden nearby. A "possible" incident
in 2017 involved drift damage to 20 acres of roses and 22 thousand potted roses; multiple
herbicide applications were reported nearby by multiple growers.

### 3. Ecological and Environmental Fate Data Needs

The ecological effects data required as part of the glyphosate registration review DCI were
received and found to be adequate for risk assessment. As noted in Table 1, pollinator data may
still be needed. The agency will issue a DCI for pollinator data as part of a separate action if it
determines that additional pollinator data are necessary to help make a final registration review
decision for glyphosate.

### C. Risk Characterization

*Birds and Mammals*

Potential risks were identified for mammals and birds feeding on foliar dietary items treated with
glyphosate. There were marginal risk exceedances for applications at the maximum single aerial
application rate of 1.55 lb ae/A, the maximum single ground application rate of 3.75 lb ae/A,
application to sugarcane, and applications to tree crops, forests, pastures, and non-crop areas at 8
lb ae/A. Risks from these scenarios are likely limited to the treated field and areas near the
treated field. Risk to mammals and birds were primarily for application as spot treatment. Spot
treatments are limited to residential areas and limited to small areas, so risks from this use are
likely spatially limited. In addition, the risk assessment assumes that birds and mammals will
consume food items treated with glyphosate as 100% of their diet, this is unlikely to occur from
spot treatment application.

According to USDA, use on non-food tree crops, forestry, pastures, and non-crop areas are also
geographically limited.[10] The high application rate of 8 lb ae/A intended for these uses are for
small spot treatments in highly concentrated and localized areas for management of invasive
weeds and for conservation purposes on non-agricultural lands. The application methods used for
these sites are unlikely to drive drift, as application is usually by small mechanically-pressurized
or handheld equipment. Exposure to birds and mammals under such conditions are likely to be
localized and minimal.

Non-food tree crop applications are intended for private forestry management. According to
USDA, glyphosate is applied in this setting as part of a tank mix for weed resistance
management, and the rate used is no more than 4.5 or 5 lbs ae/A. Application for forestry
management is usually made by helicopter equipped with drift control technologies, including
micro-foil boom and raindrop nozzles which allow for precise applications. Glyphosate is also
applied to conifer and hybrid cottonwood establishments in the Pacific Northwest, and
recommended use rates for site preparation range from 1.5 to 3 lb ae/A.

---

[10] See USDA's comments on the glyphosate ecological risk assessment in the glyphosate registration review docket
at: https://www.regulations.gov/document?D=EPA-HQ-OPP-2009-0361-1618

Docket Number EPA-HQ-OPP-2009-0361
www.regulations.gov

Glyphosate use in pastures is for renovation and habitat restoration efforts. According to USDA, glyphosate is applied at 2.25 lb ae/A for forage renovation (to convert common bermudagrass to hybrid bermudagrass) with 2 consecutive fall applications. In natural areas or utility rights of way, glyphosate rates may reach 4 lb ae/A. Application above 4 lb ae/A is usually applied by handgun for spot treatment of invasive weeds, such as cogon grass, and are not likely to drive risk concerns.

Since these uses are very localized and application to these use sites are either with lower application rates than assessed or done with application equipment that is unlikely to contribute to spray drift, risk to mammals and birds from these uses is expected to be lower than estimated.

*Terrestrial and Aquatic Plants*

Consistent with its mode of action as an herbicide, risk to non-target terrestrial and aquatic plants were primarily from spray drift and the resulting buffer distances were heavily dependent on the application rate used (Table 2). The maximum labeled single application rate for ground application to agricultural row crops is 3.75 lb ae/A; at this rate, the distance from the edge of the field to get below toxicity threshold is 128 ft. The maximum labeled single application rate for aerial application to agricultural row crops is 1.55 lb ae/A; at this rate, the distance from the edge of the field to get below toxicity threshold is 190 ft.

The EPA recently completed an updated analysis of glyphosate usage (see the *Glyphosate: Response to Comments, Usage, and Benefits* document), and data from 2012 to 2016 indicate that for many crops, the average single application rates used by growers are even lower than the application rates assessed by the EPA for ground and aerial row crop applications. Average single application rates used by growers vary from crop to crop but range from 0.67 lb ae/A for canola to 1.84 lb ae/A for table grapes. The majority of glyphosate is applied to corn (approximately 94.9 million lb ae applied annually) and soybean (approximately 113.9 million lb ae applied annually). The average single application rate used for corn is 0.95 lb ae/A and the average single application rate used for soybean is 0.97 lb ae/A. If average application rates are close to typical grower practices, spray drift risk to non-target terrestrial and aquatic plants from row crop applications is expected to be lower than estimated.

For detailed crop by crop usage and rate information, see the *Glyphosate: Response to Comments, Usage, and Benefits* document in the glyphosate docket at www.regulations.gov.

*Aquatic Uses*

USDA submitted additional information on aquatic applications of glyphosate (2018). Application of glyphosate in aquatic use sites at rates of 8 lb ae/A are for perennial grass control (ex., the invasive torpedograss in Florida). Application at the 8 lb ae/A rate occurs only once per site per year, and aerial applications in such instances are atypical. Perennial grasses like *Arundo* (giant reed) and *Phragmites* (common reed) can be controlled with lower rates and with one application per year. Programs to control giant salvinia (an invasive aquatic fern) in Louisiana involve multiple applications of glyphosate at 1-2 lb ae/A, up to the yearly maximum of 8 lb ae/A. As such, risk to non-target organisms from application to aquatic use sites would be geographically limited.

33

Docket Number EPA-HQ-OPP-2009-0361
www.regulations.gov

To view the information submitted from USDA on the non-agricultural uses described
previously, please visit the glyphosate public docket at www.regulations.gov (EPA-HQ-OPP-
2009-0361-1618).

## D. Benefits Assessment

Glyphosate is the most commonly used agricultural herbicide in the United States, in terms of
area treated. It is a broad-spectrum herbicide that controls broadleaf, sedge, and grass weeds with
minimal residual toxicity to crops or non-target vegetation. Glyphosate is a unique herbicide as it
is the only herbicide classified as a Group 9 herbicide by the Weed Science Society of America
(WSSA). Glyphosate is a relatively inexpensive herbicide to apply in agricultural situations, with
the cost of applications to most crops ranging $1 to $13 per acre.

Glyphosate is registered for use in agriculture, including horticulture, viticulture, and
silviculture, as well as non-agricultural sites including commercial, industrial, and residential
areas. Current glyphosate-resistant field crops include soybean, corn, cotton, canola, alfalfa, and
sugar beet. Many of these crops, such as corn, cotton, soybean, and sugar beet, have
exceptionally high percentages of their acreage treated with glyphosate (approximately 90
percent of acres treated in each crop). Genetically-engineered (transgenic) glyphosate-resistant
(GR) varieties of these crops can be sprayed over-the-top with minimal or no crop phytotoxicity,
and glyphosate may also be used as a pre-plant burndown in many of these crops. On average, 84
percent of glyphosate applied in agricultural settings, in terms of pounds, is applied to soybeans,
corn, or cotton per year.

Glyphosate is also beneficial as part of weed control programs in orchards and specialty crops.
Glyphosate use is prevalent in orchard and vineyards floor management and most acres of crops
such as tree nuts, citrus, and grapes are treated with glyphosate. Glyphosate is the most diverse
herbicide in orchard floor management because it may be used for under tree weed control,
chemical wiping, chemical mowing, and spot treatment. Since glyphosate controls a broad
spectrum of weeds and does not have residual soil activity, it can be used to control emerged
weeds prior to planting high value crops such as fruits and vegetables, where growers sometimes
have limited weed control options.

Glyphosate is also important for noxious and invasive weed control in aquatic systems,
pastures/rangelands, public lands, forestry, and rights-of-ways. Invasive weeds controlled by
glyphosate include cattails and water hyacinth, which can impede water flow and impede
irrigation. Improper weed management can cause water to stagnate, which provides a breeding
habitat for mosquitos, therefore effective weed control is important for controlling mosquito-borne
diseases. Glyphosate is also important for habitat restoration efforts. It is used to control invasive
annual, perennial, and woody plants in riparian habitats and rangeland. Glyphosate use in rights of
ways helps keep roadways and railroad tracks safe by protecting the stability of the surface,
maintaining visibility for operators, and allowing for the distribution of goods, services, and
utilities (gas and electric). Glyphosate is the top active ingredient used to control invasive species
in the United States.

Docket Number EPA-HQ-OPP-2009-0361
www.regulations.gov

Glyphosate is a versatile active ingredient and can be applied with many different types of application equipment depending on the needs of the user. In addition to the broadcast spray applications, it can be applied via application methods such as cut stump treatment, stem/tree injection, wick applications, spot treatment, under hooded sprayers, and as a directed spray.

For more information on the benefits of glyphosate, see the *Glyphosate: Response to Comments, Usage, and Benefits* and the 2018 comment from USDA in the glyphosate public docket (EPA-HQ-OPP-2009-0361-1618)

# IV.    PROPOSED INTERIM REGISTRATION REVIEW DECISION

## A. Proposed Risk Mitigation and Regulatory Rationale

The EPA did not identify any human health risks from exposure to any use of glyphosate. The agency identified potential risk to mammals and birds, however these risks are expected to be limited to the application area or areas near the application area. The EPA identified potential risk to terrestrial and aquatic plants from off-site spray drift, consistent with glyphosate's use as a herbicide.

Glyphosate is a versatile herbicide that provides a broad spectrum of weed control across numerous agricultural and non-agricultural sites. Glyphosate is generally inexpensive in agricultural settings. Glyphosate is important in the management of invasive/noxious weeds and is essential in habitat restoration efforts for rangeland and pastures. It is used for weed management for rights-of-ways, forestry, industrial settings, residential areas, and aquatic environments.

The EPA concludes that the benefits outweigh the potential ecological risks when glyphosate is used according to label directions. To reduce off-site spray drift to non-target organisms, the EPA is proposing certain spray drift management measures. To preserve glyphosate as a viable tool for growers and combat weed resistance, the EPA is also proposing that herbicide resistance management language be added to all glyphosate labels. The EPA is also proposing certain labeling clean-up/consistency efforts to bring all glyphosate labels up to modern standards. The EPA has discussed these measures with the Joint Glyphosate Task Force, a registrant consortium, which does not oppose the proposed risk mitigation outlined herein.

### 1.  Spray Drift Management

The agency is proposing label changes to reduce off-target spray drift and establish a baseline level of protection against spray drift that is consistent across all glyphosate products. Reducing spray drift will reduce the extent of environmental exposure and risk to non-target plants and animals. Although the agency is not making a complete endangered species finding at this time, these label changes are expected to reduce the extent of exposure and may reduce risk to listed species whose range and/or critical habitat co-occur with the use of glyphosate.

Docket Number EPA-HQ-OPP-2009-0361
www.regulations.gov

The agency is proposing the following spray drift mitigation language to be included on all glyphosate product labels for products applied by liquid spray application. The proposed spray drift language is intended to be mandatory, enforceable statements and supersede any existing language already on product labels (either advisory or mandatory) covering the same topics. The agency is providing recommendations which allow glyphosate registrants to standardize all advisory language on glyphosate product labels. Registrants must ensure that any existing advisory language left on labels does not contradict or modify the new mandatory spray drift statements proposed in this PID, once effective.

- Applicators must not spray during temperature inversions.
- For aerial applications, do not apply when wind speeds exceed 15 mph at the application site. If the wind speed is greater than 10 mph, the boom length must be 65% or less of the wingspan for fixed wing aircraft and 75% or less of the rotor blade diameter for helicopters. Otherwise, the boom length must be 75% or less of the wingspan for fixed-wing aircraft and 90% or less of the rotor diameter for helicopters.
- For aerial applications, the release height must be no higher than 10 feet from the top of the crop canopy or ground, unless a greater application height is required for pilot safety.
- For ground boom applications, apply with the release height no more than 4 feet above the ground or crop canopy.
- For ground and aerial applications, select nozzle and pressure that deliver "fine" or coarser droplets as indicated in nozzle manufacturers' catalogues and in accordance with American Society of Agricultural & Biological Engineers Standard 572.1 (ASABE S572.1).

The Agency's goal is to manage off-target spray drift from applications of glyphosate while continuing to preserve glyphosate's utility for growers and allow growers continued flexibility when making applications. The agency assessed the potential impact on growers of the proposed spray drift management restrictions and has determined that these measures are not expected to substantially reduce the benefit of glyphosate to users. Prohibiting glyphosate applications during temperature inversions may impact the usability of glyphosate products by reducing the amount of time users have to apply glyphosate, but growers can switch to other products if they encounter temperature inversions.

The EPA considered the impact of requiring "fine" or coarser droplets (*i.e.*, requiring growers to deliver droplets no smaller than "fine") on glyphosate labels and has determined that such a requirement is not likely to affect the efficacy of glyphosate when used alone since it is systemic. Glyphosate is a compound that is frequently tank mixed with other herbicides. Because the proposed language provides flexibility with droplet size for tank mixed partners, the EPA does not expect there would be concerns for tank mixing with other herbicides. However, since glyphosate can be applied as a burndown treatment, insecticides may be included in the tank mix. Insecticides are generally considered to provide better efficacy with smaller droplets. The EPA is uncertain if requiring "fine" or coarser droplets will impact the efficacy of insecticides tank mixed with glyphosate because some insecticides could be more effective at droplet sizes smaller than "fine" (such as "very fine" or "extremely fine"). If reduced efficacy occurred, the agency would expect growers to respond by increasing the application rates (if allowed by the label), increasing the number of applications, increasing the application rates of tank mix partners, making additional applications, or switching to a different active ingredient.

36

Docket Number EPA-HQ-OPP-2009-0361
www.regulations.gov

In addition to including the spray drift restrictions on glyphosate labels, all references to volumetric mean diameter (VMD) information for spray droplets are proposed to be removed from all glyphosate labels where such information currently appears. The proposed new language above, which cites ASABE S572.1, eliminates the need for VMD information. The agency is also proposing the addition of a non-target organism advisory statement. The protection of pollinating organisms is a priority for the agency. It is possible that pollinators and other non-target organisms may be indirectly impacted from effects on forage and habitat. It is the agency's goal to reduce spray drift whenever possible and to educate growers on the potential for indirect effects on the forage and habitat of pollinators and other non-target organisms. Therefore, the EPA is proposing non-target organism advisory language to be placed on glyphosate labels to address this potential concern.

## 2. Herbicide Resistance Management

On August 24, 2017, the EPA finalized a Pesticide Registration Notice (PRN) on herbicide resistance management.[11] Consistent with the Notice, the EPA is proposing the implementation of herbicide resistance measures for existing chemicals during registration review, and for new chemicals and new uses at the time of registration. In registration review, herbicide resistance elements will be included in every herbicide PID.

The development and spread of herbicide resistant weeds in agriculture is a widespread problem that has the potential to fundamentally change production practices in U.S. agriculture. While herbicide resistant weeds have been known since the 1950s, the number of species and their geographical extent, has been increasing rapidly. Currently there are over 250 weed species worldwide with confirmed herbicide resistance. In the United States, there are over 155 weed species with confirmed resistance to one or more herbicides.

Management of herbicide resistant weeds, both in mitigating established herbicide resistant weeds and in slowing or preventing the development of new herbicide resistant weeds, is a complex problem without a simple solution. Coordinated efforts of growers, agricultural extension, academic researcher, scientific societies, pesticide registrants, and state and federal agencies are required to address this problem.

The EPA is requiring measures for the pesticide registrants to provide growers and users with detailed information and recommendations to slow the development and spread of herbicide resistant weeds. This is part of a more holistic, proactive approach recommended by crop consultants, commodity organizations, professional/scientific societies, researchers, and the registrants themselves.

## 3. Non-target Organism Advisory Statement

The protection of pollinators and other non-target organisms is a priority for the agency. While the agency did not identify risks to individual bees from glyphosate applications at rates below 5.7 lb ae/A, risks to terrestrial invertebrates at higher application rates are uncertain. In addition,

---

[11] PRN 2017-2, "Guidance for Herbicide Resistance Management Labeling, Education, Training, and Stewardship"

Docket Number EPA-HQ-OPP-2009-0361
www.regulations.gov

glyphosate may impact non-target plants via spray drift and impact nectar sources and habitat for pollinators and other non-target organisms. EPA is proposing a non-target organism advisory statement to alert users of potential impact to non-target organisms: "This product is toxic to plants and may adversely impact the forage and habitat of non-target organisms, including pollinators, in areas adjacent to the treated site. Protect the forage and habitat of non-target organisms by following label directions intended to minimize spray drift."

### 4. Label Consistency Measures

There are currently 555 Section 3 registrations and 37 Section 24(c) registrations for glyphosate. Labels directions for glyphosate vary significantly from label to label, and newer stamped labels in general have better instructions than older labels. The EPA is proposing to update all glyphosate labels to modern standards. The components of the label the agency proposes to update are as follows: the maximum application parameters, the environmental hazards statement for aquatic use, and clarification on rotational crop timing. In addition, the agency is providing guidance to glyphosate registrants on acceptable marketing statements.

*Maximum Application Parameters*

In 2013, at the agency's request and in preparation for risk assessment, the Joint Glyphosate Task Force, a consortium of glyphosate registrants, created a *Use Summary Matrix*, which was intended to summarize all use sites being supported as part of registration review and outline important application parameters such as maximum single and yearly application rates. EPA's risk assessments for glyphosate were based on maximum application parameters as described in the *Use Summary Matrix*. EPA is proposing that maximum labeled rates on current labels be consistent with the maximum application rates that were assessed by the agency and supported by the Joint Glyphosate Task Force. These maximum application parameters are described in Appendix C of this document.

Many older glyphosate labels do not define any maximum application parameters. EPA proposes that maximum application parameters be clearly defined and must not exceed the maximum application parameters as described in Appendix C. It is not EPA's intention to change the current application rates on glyphosate labels, but the agency is proposing to define the rate limits in order to establish better consistency and clarity on labels. Appendix C lists the maximum application parameters by use site for both aerial and ground application.

*Statements for Aquatic Uses*

The EPA is proposing to update the environmental hazards statements for aquatic use products to be consistent with modern standards and to be in line with newer pesticide labels. The glyphosate Reregistration Eligibility Decision (RED) issued in 1993 specified that glyphosate labels formulated for aquatic use have language intended to warn users of potential fish suffocation for aquatic applications. The EPA is proposing to update the existing language to be consistent with current labeling guidelines (see the EPA's Label Review Manual). Proposed environmental hazards statements are listed in table 4.

Docket Number EPA-HQ-OPP-2009-0361
www.regulations.gov

In addition, the agency is proposing an additional statement under "directions for use" for aquatic use labels to instruct users to apply in strips to help avoid oxygen depletion when emerged weed infestations cover the total surface area of an impounded water body; the proposed statement also appears in table 4. These statements already appear on some newer labels and the agency is proposing to apply these statements to all labels.

**Table 4. Proposed Statements for Glyphosate for Aquatic Use**

| Product Type | Proposed Statement |
|---|---|
| Environmental hazards: for labels with terrestrial uses only | "Do not apply directly to water, to areas where surface water is present or to intertidal areas below the mean high-water mark. Do not contaminate water when cleaning equipment or disposing of equipment wash waters and rinsate." |
| Environmental hazards: for labels with aquatic uses only | "Killing aquatic weeds can result in depletion or loss of oxygen in the water due to decomposition of dead plant material. This oxygen loss can cause fish suffocation. Consult with your State agency with primary responsibility for regulating pesticides before applying to public waters to determine if a permit is required. Do not contaminate water when cleaning equipment or disposing of equipment wash waters and rinsate." |
| Environmental hazards: for labels with both aquatic and terrestrial uses | "Killing aquatic weeds can result in depletion or loss of oxygen in the water due to decomposition of dead plant material. This oxygen loss can cause fish suffocation. Consult with your State agency with primary responsibility for regulating pesticides before applying to public waters to determine if a permit is required. For terrestrial uses, do not apply directly to water, to areas where surface water is present or to intertidal areas below the mean high-water mark [*Optional text, if applicable*: except when applying this product by air over the forest canopy]. Do not contaminate water when cleaning equipment or disposing of equipment wash waters and rinsate." |
| Directions for use for aquatic uses | "When emerged weed infestations cover the total surface area of an impounded waterbody, apply this product to the emerged vegetation in strips to help avoid oxygen depletion in the water due to decaying vegetation. Oxygen depletion in the water can result in increased fish mortality." |

## Clarification on Rotational Crop Timing

Many glyphosate labels lack instructions for crop rotation. The EPA is proposing to clarify that treated fields may be rotated to a labeled crop at any time. For fields being rotated to a non-labeled crop, any glyphosate application must be made a minimum of 30 days prior to planting.

## Label Claims

During meetings with the agency in 2018, the Joint Glyphosate Task Force proposed to clarify on existing labels a statement about how glyphosate works. The following statement is proposed: "Glyphosate works by targeting an enzyme that is essential for plant growth." The proposed revision is consistent with the requirements of 40 CFR § 156.10(a)(5). Registrants may use alternate claims, as long as alternate claims meet labeling requirements. Registrants can refer to 40 CFR § 156.10(a)(5) for requirements regarding label claims prior to submitting updated labels for registration review.

Docket Number EPA-HQ-OPP-2009-0361
www.regulations.gov

### B.  Tolerance Actions

The EPA is proposing that the number of significant figures be modified for several tolerances, and that new tolerances be established for various vegetable and fruit groups and subgroups. The new tolerance groupings remove the need for certain older tolerances, which are proposed to be deleted. The Agency will issue a Federal Register notice announcing these proposed tolerance changes under FFDCA following issuance of an Interim Decision for glyphosate. Refer to section III.A.3 of this document for the proposed tolerance changes.

### C.  Proposed Interim Registration Review Decision

In accordance with 40 CFR § 155.56 and 155.58, the agency is issuing this Proposed Interim Registration Review Decision. Except for the EDSP, ESA and pollinator components of this case, the agency has made the following Proposed Interim Registration Review Decision: (1) no additional data are required at this time; and (2) changes to the affected registrations and their labeling are needed at this time, as described in Section IV. A. and Appendices B and C.

In this proposed interim registration review decision, the EPA is making no human health or environmental safety findings associated with the EDSP screening of glyphosate, nor is it making a complete endangered species finding or a complete assessment of effects to pollinators. Although the agency is not making a complete endangered species finding at this time, the proposed mitigation described in this document is expected to reduce the extent of environmental exposure and may reduce risk to listed species whose range and/or critical habitat co-occur with the use of glyphosate. The agency's final registration review decision for glyphosate will be dependent upon the result of the agency's ESA assessment and any needed Section 7 consultation with the Services, an EDSP FFDCA section 408(p) determination, and an assessment of non-target exposure to pollinators (bees).

### D.  Data Requirements

No additional data are required as part of this proposed interim registration review decision. The EPA will consider requesting the glyphosate registrants to submit pollinator data as a separate action.

## V.  NEXT STEPS AND TIMELINE

### A.  Proposed Interim Registration Review Decision

A Federal Register Notice will announce the availability of this proposed interim registration review decision for glyphosate and will allow a 60-day comment period on the proposed interim decision. If there are no significant comments or additional information submitted to the docket during the comment period that leads the agency to change its proposed interim decision, the EPA may issue an interim registration review decision for glyphosate. However, a final decision for glyphosate may be issued without the agency having previously issued an interim decision. A

Docket Number EPA-HQ-OPP-2009-0361
www.regulations.gov

final decision on the glyphosate registration review case will occur after: 1) an EDSP FFDCA section 408(p) determination, 2) an endangered species determination under the ESA and any needed Section 7 consultation with the Services, and 3) a more in-depth assessment of non-target exposure to pollinators, if determined to be necessary.

## B. Implementation of Mitigation Measures

Once the Interim Registration Review Decision is issued the glyphosate registrants must submit amended labels that include the label changes described in Appendices A, B, and C. The revised labels must be submitted to the agency for review within 60 days following issuance of the Interim Registration Review Decision.

Docket Number EPA-HQ-OPP-2009-0361
www.regulations.gov

**Appendix A: Summary of Proposed Actions for Glyphosate**

Registration Review Case#: 0178
PC Codes: 103601, 103604, 103605, 103607, 103608, 103613, 417300
Chemical Type: herbicide
Chemical Family: glycine derivative
Mode of Action: targets the 5-enolpyruvyl-3-shikimate phosphate synthase enzyme

| Affected Population(s) | Source of Exposure | Route of Exposure | Duration of Exposure | Potential Risk(s) of Concern | Proposed Actions | Comment (used to briefly clarify or elaborate on risk or mitigation) |
|---|---|---|---|---|---|---|
| Terrestrial and aquatic plants | Spray drift | Foliar absorption | Acute Chronic | Survival, biomass | Require enforceable spray drift management language; updated environmental hazards language | |
| Birds | Residues on food items (via deposition or spray drift) | Dietary | Acute Chronic | Growth | Require enforceable spray drift management language | Risks are likely limited to the field and areas near the application field. |
| Mammals | Residues on food items (via deposition or spray drift) | Dietary | Acute Chronic | Growth and reproduction | Require enforceable spray drift management language | Risks to are likely limited to the field and areas near the application field. |
| Terrestrial invertebrates | Residues on nectar sources (via deposition or spray drift) | Dietary | Acute Chronic | Effects on nectar sources of terrestrial invertebrates | Non-target organism environmental hazards language | Risks to bees are uncertain at application rates higher than 5.7 lb ae/A. The agency may require additional pollinator data to fully assess risk to terrestrial invertebrates. |

Docket Number EPA-HQ-OPP-2009-0361
www.regulations.gov

## Appendix B: Proposed Labeling Changes for Glyphosate Products

| Description | Proposed Label Language for Glyphosate Products | Placement on Label |
|---|---|---|
| | End Use Products | |
| Mode/Mechanism of Action Group Number | <br><br>Glyphosate    GROUP    9    HERBICIDE | Front Panel, upper right quadrant.<br><br>All text should be black, bold face and all caps on a white background, except the mode of action code, which should be white, bold face and all caps on a black background; all text and columns should be surrounded by a black rectangle. |
| Non-target Organism Advisory Statement | "NON-TARGET ORGANISM ADVISORY STATEMENT: This product is toxic to plants and may adversely impact the forage and habitat of non-target organisms, including pollinators, in areas adjacent to the treated site. Protect the forage and habitat of non-target organisms by following label directions intended to minimize spray drift." | Environmental Hazards |
| Environmental Hazards Statement for Aquatic Use | *For labels without aquatic uses:* "Do not apply directly to water, to areas where surface water is present or to intertidal areas below the mean high-water mark. Do not contaminate water when cleaning equipment or disposing of equipment wash waters and rinsate."<br><br>*For labels with aquatic uses only:* "Killing aquatic weeds can result in depletion or loss of oxygen in the water due to decomposition of dead plant material. This oxygen loss can cause fish suffocation. Consult with your State agency with primary responsibility for regulating pesticides before applying to public waters to determine if a permit is required. Do not contaminate water when cleaning equipment or disposing of equipment wash waters and rinsate."<br><br>*For labels with both aquatic and terrestrial uses:* "Killing aquatic weeds can result in depletion or loss of oxygen in the water due to decomposition of dead plant material. This oxygen loss can cause fish suffocation. Consult with your State agency with primary responsibility for regulating pesticides before applying to public waters to determine if a permit is required. For terrestrial uses, do not apply directly to water, to areas where surface water is present or to intertidal areas below the mean high-water mark [*Optional text, if applicable:* except when applying this product by air | Environmental Hazards |

43

Docket Number EPA-HQ-OPP-2009-0361
www.regulations.gov

| Description | Proposed Label Language for Glyphosate Products | Placement on Label |
|---|---|---|
| | over the forest canopy]. Do not contaminate water when cleaning equipment or disposing of equipment wash waters and rinsate." | |
| **Aquatic Use Statement** | "When emerged weed infestations cover the total surface area of an impounded waterbody, apply this product to the emerged vegetation in strips to help avoid oxygen depletion in the water due to decaying vegetation. Oxygen depletion in the water can result in increased fish mortality." | Directions for Use |
| **HERBICIDE RESISTANCE MANAGEMENT: Weed Resistance Management** | Include resistance management label language for herbicides from PRN 2017-1 and PRN 2017-2 (https://www.epa.gov/pesticide-registration/pesticide-registration-notices-year) | Directions for Use, prior to directions for specific crops under the heading "WEED RESISTANCE-MANAGEMENT" |
| **Additional Required Labelling Action** (Applies to all products delivered via liquid spray applications) | Remove information about volumetric mean diameter from all labels where such information currently appears. | Directions for Use |
| **Rotational crop information** | "Treated fields may be rotated to a labeled crop at any time. For treated fields being rotated to a non-labeled crop, application must be made a minimum of 30 days prior to planting." | Directions for Use |
| **Label claims** | "Glyphosate works by targeting an enzyme that is essential for plant growth."

[Alternate claims, if used, must meet labeling requirements. Refer to 40 CFR § 156.10(a)(5) for requirements regarding label claims.] | Product Information |

44

Docket Number EPA-HQ-OPP-2009-0361
www.regulations.gov

| Description | Proposed Label Language for Glyphosate Products | Placement on Label |
|---|---|---|
| **Clarification of application rates** | Ground and aerial applications rates on the labels must not exceed the maximum application parameters as noted in Appendix C of this document, which were maximum application parameters assessed by the EPA. Application rates may only be clarified for uses that are currently approved on labels. | Directions for Use |
| **Mandatory Spray Drift Management Language for all products delivered via liquid spray application and allow aerial application** | **"SPRAY DRIFT** <br> **Aerial Applications:** <br> • Do not release spray at a height greater than 10 ft above the ground or vegetative canopy, unless a greater application height is necessary for pilot safety. <br> • Applicators are required to use a fine or coarser droplet size (ASABE S572.1). <br> • Applicators must use ½ swath displacement upwind at the downwind edge of the field. <br> • Do not apply when wind speeds exceed 15 mph at the application site. If the windspeed is greater than 10 mph, the boom length must be 65% or less of the wingspan for fixed wing aircraft and 75% or less of the rotor diameter  for helicopters. Otherwise, the boom length must be 75% or less of the wingspan for fixed-wing aircraft and 90% or less of the rotor diameter for helicopters. <br> • Do not apply during temperature inversions." | Directions for Use, in a box titled "Spray Drift" under the heading "Aerial Applications," and before use rates and or application instructions |
| **Enforceable Spray Drift Management Language for products that allow airblast applications** | **"SPRAY DRIFT** <br> **Airblast Applications:** <br> • Sprays must be directed into the canopy. <br> • Do not apply when wind speeds exceed 15 miles per hour at the application site. <br> • User must turn off outward pointing nozzles at row ends and when spraying outer rows. <br> • Do not apply during temperature inversions." | Directions for Use, in a box titled "Spray Drift" under the heading "Airblast Applications" |
| **Enforceable Spray Drift Management Language for products that are applied as liquids and allow ground boom applications** | **"SPRAY DRIFT** <br> **Ground Boom Applications:** <br> • User must only apply with the release height recommended by the manufacturer, but no more than 4 feet above the ground or crop canopy. <br> • Applicators are required to use a fine or coarser droplet size (ASABE S572.1). <br> • Do not apply when wind speeds exceed 15 miles per hour at the application site. <br> • Do not apply during temperature inversions." | Directions for Use, in a box titled "Spray Drift" under the heading "Ground Boom Applications" |

45

| | | |
|---|---|---|
| **Enforceable Spray Drift Management Language for products that are applied as liquids and allow boom-less ground sprayer applications** | **"SPRAY DRIFT Boom-less Ground Applications:** <br> • Applicators are required to use a fine or coarser droplet size (ASABE S572.1) for all applications. <br> • Do not apply when wind speeds exceed 15 miles per hour at the application site. <br> • Do not apply during temperature inversions." | Directions for Use, in a box titled "Spray Drift" under the heading "Boom-less Applications" |
| **Advisory Spray Drift Management Language for all products delivered via liquid spray application** | **"SPRAY DRIFT ADVISORIES** <br> THE APPLICATOR IS RESPONSIBLE FOR AVOIDING OFF-SITE SPRAY DRIFT. BE AWARE OF NEARBY NON-TARGET SITES AND ENVIRONMENTAL CONDITIONS. <br><br> **IMPORTANCE OF DROPLET SIZE** <br> An effective way to reduce spray drift is to apply large droplets. Use the largest droplets that provide target pest control. While applying larger droplets will reduce spray drift, the potential for drift will be greater if applications are made improperly or under unfavorable environmental conditions. <br><br> **Controlling Droplet Size – Ground Boom** *(note to registrants: remove if ground boom is prohibited on product labels)* <br> • Volume - Increasing the spray volume so that larger droplets are produced will reduce spray drift. Use the highest practical spray volume for the application.  If a greater spray volume is needed, consider using a nozzle with a higher flow rate. <br> • Pressure - Use the lowest spray pressure recommended for the nozzle to produce the target spray volume and droplet size. <br> • Spray Nozzle - Use a spray nozzle that is designed for the intended application. Consider using nozzles designed to reduce drift. <br><br> **Controlling Droplet Size – Aircraft** *(note to registrants: remove if aerial application is prohibited on product labels)* <br> • Adjust Nozzles - Follow nozzle manufacturers' recommendations for setting up nozzles.  Generally, to reduce fine droplets, nozzles should be oriented parallel with the airflow in flight. <br><br> **BOOM HEIGHT – Ground Boom** *(note to registrants: remove if ground boom is prohibited on product labels)* <br> For ground equipment, the boom should remain level with the crop and have minimal bounce. <br><br> **RELEASE HEIGHT - Aircraft** *(note to registrants: remove if aerial application is prohibited on product labels)* <br> Higher release heights increase the potential for spray drift. <br><br> **SHIELDED SPRAYERS** | Directions for Use, just below the Spray Drift box, under the heading "Spray Drift Advisories" |

46

| | |
|---|---|
| | Shielding the boom or individual nozzles can reduce spray drift. Consider using shielded sprayers. Verify that the shields are not interfering with the uniform deposition of the spray on the target area.<br><br>**TEMPERATURE AND HUMIDITY**<br>When making applications in hot and dry conditions, use larger droplets to reduce effects of evaporation.<br><br>**TEMPERATURE INVERSIONS**<br>Drift potential is high during a temperature inversion. Temperature inversions restrict vertical air mixing, which can cause small droplets to remain suspended in a concentrated cloud. This cloud can move in unpredictable directions due to the light variable winds common during inversions. Temperature inversions are characterized by increasing temperatures with altitude and are common on nights with limited cloud cover and light to no wind. They can begin to form in late afternoon/early evening and often continue into the morning. Their presence can be indicated by ground fog. If fog is not present, inversions can also be identified by the movement of smoke from a ground source or an aircraft smoke generator. Smoke that layers and moves laterally in a concentrated cloud (under low wind conditions) indicates an inversion, while smoke that moves upward and rapidly dissipates indicates good vertical air mixing.<br><br>**WIND**<br>Drift potential generally increases with wind speed. AVOID APPLICATIONS DURING GUSTY WIND CONDITIONS.<br>Applicators need to be familiar with local wind patterns and terrain that could affect spray drift." | |
| **Advisory Spray Drift Management Language for products that are applied as liquids and allow boom-less ground sprayer applications** | **"SPRAY DRIFT**<br>**Boom-less Ground Applications:**<br>• Setting nozzles at the lowest effective height will help to reduce the potential for spray drift." | Directions for Use, just below the Spray Drift box, under the heading "Spray Drift Advisories" |
| **Advisory Spray Drift Management Language for all products that allow liquid applications with handheld technologies** | **"SPRAY DRIFT**<br>**Handheld Technology Applications:**<br>• Take precautions to minimize spray drift." | Directions for Use, just below the Spray Drift box, under the heading "Spray Drift Advisories" |

Docket Number EPA-HQ-OPP-2009-0361
www.regulations.gov

## Appendix C. Proposed Maximum Application Rates for Glyphosate Ground and Aerial Application

| Crop Group | Ground Maximum Single Application Rate (lb a.e./A) | Aerial Maximum single application rate (lb a.e./A) | Maximum Annual Application Rate (lb a.e./A) |
|---|---|---|---|
| Round-up Ready 2 Yield Soybeans | 3.75 | 1.55 | 6 |
| Root Tuber Vegetables: arracacha, arrowroot, carrot, chinese artichoke, Jerusalem artichoke, beet (garden), burdock, canna, cassava (bitter and sweet), celeriac, chayote (root), chervil (turnip-rooted), chicory, chufa, dasheen (taro), galangal, ginger, ginseng, horseradish, leren, kava (turn-rooted), parsley (turnip-rooted), parsnip, potato, radish, rutabaga, oriental radish, salsify, skirret, sweet potato, tanier, turmeric, turnip, wasabi, yacon, yam bean. true yam | 3.75 | 1.55 | 6 |
| Rangelands | 0.38 | 0.38 | 2.25 |
| Pome Fruits: including apple, crabapple, loquat, mayhaw, pear, oriental pear, quince | 3.75 | 1.55 | 8 |
| Pastures | 8 | 8 | 8 |
| Oilseed Crops: borage, buffalo gourd, calendula, canola, castor oil plant, chinese tallow tree, crambe, cuphea, echium, euphorbia, evening primrose, flax (seed), gold of pleasure, hare's ear mustard, jojoba, lesquerella, meadow foam, milkweed, mustard (seed), niger (seed), oil radish, poppy seed, rapeseed, rose hip, safflower, sesame, stokes aster, sunflower, sweet rocket, tallow wood, tea oil plant, veronia. | 3.75 | 1.55 | 6 |
| Non-Food Tree Crops: pine, poplar, eucalyptus, christmas trees, other non-food tree crops | 8 | 8 | 8 |
| Miscellaneous Tree Food Crops: cactus (fruit and pads), palm (heart, leaves, oil) | 3.75 | 1.55 | 8 |
| Miscellaneous Crops: aloe vera, bamboo shoots, globe artichoke, okra, peanut (ground nut), strawberry, sugar beet, asparagus, pineapple | 3.75 | 1.55 | 6 |
| Legume Vegetables: Succulent varieties of Bean (Lupinus: includes grain lupin, sweet lupin, white lupin, white sweet lupin); Bean (Phaseolus: includes field bean, kidney bean, lima bean, navy bean, pinto bean, runner bean, snap bean, tepary bean, wax bean); Bean (Vigna: includes adzuki bean, asparagus bean, blackeyed pea, catjang, Chinese longbean, cowpea, crowder pea, moth bean, mung bean, rice bean, southern pea, urd bean, yardlong bean); Broad bean (fava); Chickpea (garbanzo); Guar; Jackbean; Lablab bean; Lentil; Pea (Pisum: includes dwarf pea, edible-podded pea, English pea, field pea, garden pea, green pea, snowpea, sugar snap pea); Pigeon pea; Soybean (immature seed); Sword bean. Dry varieties of Bean (Lupinus: includes grain lupin, sweet lupin, white lupin, white sweet lupin); Bean (Phaseolus: includes field bean, kidney bean, lima bean, navy bean, pinto bean, runner bean, snap bean, tepary bean, wax bean); Bean (Vigna: includes adzuki bean, asparagus bean, blackeyed pea, catjang, Chinese longbean, cowpea, crowder pea, moth bean, mung bean, rice bean, southern pea, urd bean, yardlong bean); | 3.75 | 1.55 | 6 |

Docket Number EPA-HQ-OPP-2009-0361
www.regulations.gov

| Crop Group | Ground Maximum Single Application Rate (lb a.e./A) | Aerial Maximum single application rate (lb a.e./A) | Maximum Annual Application Rate (lb a.e./A) |
|---|---|---|---|
| Broad bean (fava); Chickpea (garbanzo); Guar; Jackbean; Lablab bean; Soybean (immature seed); Sword bean | | | |
| Dry varieties of Lentil; Pea (Pisum: includes dwarf pea, edible-podded pea, English pea, garden pea, green pea, snowpea, sugar snap pea); Pigeon pea | | | |
| Leafy Vegetables: Amaranth (Chinese spinach); Arugula (roquette); Beet greens; Cardoon; Celery; Chinese celery; Celtuce; Chaya; Chervil: Edible-leaved chrysanthemum; Garland chrysanthemum; Corn salad; Cress (garden and upland); Dandelion; Dock (sorrel); Dokudami; Endive (escarole); Florence fennel; Gow kee; Lettuce (head and leaf); Orach, Parsley; Purslane (garden and winter); Radicchio (red chicory); Rhubarb; Spinach; New Zealand spinach; Vine spinach; Swiss chard; Watercress (upland); Water spinach | 3.75 | 1.55 | 6 |
| Herbs and Spices: Allspice, Angelica, Star anise, Annatto (seed), Balm, Basil, Corage, Burnet, camomile, Caper buds, Caraway, Black caraway, Cardamom, Cassia bark, Cassia buds, Catnip, Celery seed, Chervil (dried), Chive, Chinese chive, Cilantro (leaf), Cilantro (seed), Cinnamon, Clary, Clove buds, Coriander leaf (cilantro or Chinese parsley), Coriander seed (cilantro), Costmary, Cumin, Curry (leaf), Dill (dillweed), Dill (seed), Epazote, Fennel seed (common and Florence), Fenugreek, White ginger flower, Grains of paradise, Horehound, Hyssop, Juniper berry, Lavender, Lemongrass, Lovage (leaf and seed), Mace, Marigold, Marjoram (including oregano), Mexican oregano, Mioga flower, Mustard (seed), Nasturtium, Nutmeg, Parsley (dried), Pennyroyal, Pepper (black and white), Pepper leaves, Peppermint, Perilla, Poppy (seed), Rosemary, Rue, Saffron, Sage, Savory (summer and winter), Spearmint, Stevia leaves, Sweet bay, Tansy, Tarragon, Thyme, Vanilla, Wintergreen, Woodruff, Wormwood | 3.75 | 1.55 | 6 |
| Grass/Turfgrass/Sod Production | 3.75 | 1.55 | 6 |
| Grain Sorghum | 3.75 | 1.55 | 6 |
| Fruiting Vegetables: Eggplant; Groundcherry (Physalis spp); Pepino; Pepper (includes bell pepper, chili pepper, cooking pepper, pimento, sweet pepper); Tomatillo; Tomato | 3.75 | 1.55 | 6 |
| Forestry | 8 | 8 | 8 |
| Fallow | 3.75 | 1.55 | 6 |
| Cucurbits Vegetables/Fruit: Chayote (fruit): Chinese waxgourd (Chinese preserving melon); Citron melon; Cucumber; Gherkin; Edible gourd (includes hyotan, cucuzza, hechima, Chinese okra); Melons (all); Momordica spp (includes balsam apple, balsam pear, bittermelon, Chinese cucumber); Muskmelon (includes cantaloupe, casaba, crenshaw melon, golden pershaw melon, honeydew melon, honey ball melon, mango melon, Persian melon, pineapple melon, Santa Claus melon, snake melon); Pumpkin; Summer squash (includes crookneck squash, scallop squash, straightneck squash, vegetable marrow, zucchini); Winter squash (includes butternut squash, calabaza, hubbard squash, acorn squash, spaghetti squash); Watermelon | 3.75 | 1.55 | 6 |

49

Docket Number EPA-HQ-OPP-2009-0361
www.regulations.gov

| Crop Group | Ground Maximum Single Application Rate (lb a.e./A) | Aerial Maximum single application rate (lb a.e./A) | Maximum Annual Application Rate (lb a.e./A) |
|---|---|---|---|
| Cotton | 3.75 | 1.55 | 6 |
| Corn (Field, Seed, Silage, Popcorn) | 3.75 | 1.55 | 6 |
| Conservation Reserve Program | 3.75 | 1.55 | 6 |
| Citrus Fruit Crop: All cultivars, varieties and/or hybrids of Calamondin; Chironja; Citron; Citrus hybrids; Grapefruit (including Japanese summer); Kumquat; Lemon; Lime (including Australian desert lime, Australian finger lime, Australian round lime, Brown river finger lime, Mount white, New Guinea wild, Russell river, sweet, and Tahiti); Mandarin (including Mediterranean and Satsuma); Orange (all); Pummelo; Tangelo; Tangerine (Mandarin); Tangor; Uniq Fruit (ugli) | 3.75 | 1.55 | 8 |
| Cereal and Grain Crop: barley, buckwheat, millet, oats, rye, quinoa, teff, teosinte, triticale, wild rice, rice, feed barley, wheat | 3.75 | 1.55 | 6 |
| Bulb Vegetables: All cultivars, varieties and/or hybrids of Chive (fresh leaves, including Chinese chive); Daylily (bulb); Elegans hosta; Fritillaria (bulb and leaves); Garlic (bulb, including great-headed and serpent garlic); Kurrant, Leek (including lady's and wild leek); Lily (bulb); Onion (including Beltsville bunching, bulb, Chinese bulb, fresh, green, macrostem, pearl, potato bulb, tree tops and Welsh onion tops); Shallot (bulb and fresh leaves) | 3.75 | 1.55 | 6 |
| Brassica Vegetable: Broccoli; Chinese broccoli (gai lon); Broccoli raab (rapini); Brussels sprouts; Cabbage; Chinese cabbage (bok choy); Chinese cabbage (napa); Chinese mustard cabbage (gai choy); Cauliflower; Cavalo broccoli; Collards; Kale; Kohlrabi; Mizuna; Mustard greens; Mustard spinach; Rape greens | 3.75 | 1.55 | 6 |
| Round-up Ready Flex Cotton | 3.75 | 1.55 | 6 |
| Round-up Ready Cotton | 3.75 | 1.55 | 6 |
| Round-up Ready Corn (GA-21) | 3.75 | 1.55 | 6 |
| Round-up Ready Corn 2 (NK603) | 3.75 | 1.55 | 6 |
| Round-up Ready Alfalfa | 1.55 | 1.55 | 6 |
| Round-up Ready Sugarbeets | 3.75 | 1.55 | 6 |
| Tropical/Subtropical Trees/Fruits: Ambarella; Atemoya: Avocado; Banana; Barbados cherry (acerola); Biriba; Blimbe; Breadfruit; Cacao (cocoa bean: Canistel; Carambola (starfruit); Cherimoya; Coffee; Custard apple: Dates; Durian; Feijoa; Figs: Governor's plum; Guava; Ilama; Imbe; Imbu; Jaboticaba; Jackfruit; Longan; Lychee; Mamey apple; Mango; Mangosteen; Marmaladebox (genip); Mountain papaya; Noni (Indian mulberry); Papaya; Pawpaw; Plantain; Persimmon; Pomegranate; Pulasan; Rambuttan; Rose apple; | 3.75 | 1.55 | 8 |

50

Docket Number EPA-HQ-OPP-2009-0361
www.regulations.gov

| Crop Group | Ground Maximum Single Application Rate (lb a.e./A) | Aerial Maximum single application rate (lb a.e./A) | Maximum Annual Application Rate (lb a.e./A) |
|---|---|---|---|
| Sapodilla; Sapote (black, mamey, white); Spanish lime; Soursop; Star apple; Sugar apple; Surinam cherry; Tamarind; Tea; Ti (roots and leaves); Wax jambu | | | |
| Tree Nut Crops: Cultivars, varieties, and/or hybrids of African nut-tree; Almond; Beechnut; Brazil nut; Brazilian pine; Bunya; Burr oak; Butternut; Cajou nut; Candlenut; Cashew; Chestnut; Chinquapin; Coconut; Coquito nut; Dika nut; Ginkgo; Guiana chestnut; Hazelnut (Filbert); Heartnut; Hickory nut; Japanese horse-chestnut; Macadamia nut; Mongongo nut; Monkey-pot; Monkey puzzle nut; Okari nut; Pachira nut; Peach palm nut; Pecan; Pequi; Pili nut; Pine nut; Pistachio; Sapucaia nut; Tropical almond; Walnut (black, English); Yellowhorn | 3.75 | 1.55 | 8 |
| Sweet Corn | 3.75 | 1.55 | 6 |
| Sugar Cane | 3.75 | 2.25 | 6 |
| Stone Fruit: All cultivars, varieties and/or hybrids of Apricot; Cherry (sweet and tart); Nectarine; Olive; Peach; Plum/Prune (all types); Plumcot | 3.75 | 1.55 | 8 |
| Round-Up Ready Canola (Winter Varieties) | 1.55 | 1.55 | 6 |
| Soybeans | 3.75 | 1.55 | 6 |
| Sweet Corn with Round-Up Ready 2 Technology | 3.75 | 1.55 | 6 |
| Round-Up Ready Canola (Spring Varieties) | 1.55 | 1.55 | 6 |
| Vine Crops: grapes (raisin, table, wine), hops, passion fruit, kiwi | 3.75 | 1.55 | 8 |

51

Docket Number EPA-HQ-OPP-2009-0361
www.regulations.gov

| Crop Group | Ground Maximum Single Application Rate (lb a.e./A) | Aerial Maximum single application rate (lb a.e./A) | Maximum Annual Application Rate (lb a.e./A) |
|---|---|---|---|
| Non Crop: Airports, airfields, apartment complexes, commercial sites, ditch banks, driveways, ramps, alleys, lanes, paths, trails, sidewalks, walkways, access roads, farm roads, highways (including aprons, medians, guardrails, and rights-of-way), paved areas and prior to paving, dry ditches, dry canals, fences and fencerows, golf courses, greenhouses, industrial sites, landscape areas, lumber yards, manufacturing sites, municipal sites, natural areas, office complexes, ornamentals, parks, campgrounds, sports areas, tennis courts, parking areas, cemeteries, petroleum or other tank farms and pumping installations, refineries, around telephone and communications equipment, public areas, drive-in theaters, railroads (including ballasts, shoulders, crossings and spot treatments), recreation areas, residential areas, rights-of-way, roadsides, firebreaks, schools, shadehouses, sports complexes, storage areas, substations, construction and pre-construction sites, turfgrass areas, around ornamental gardens, around ornamental trees and shrubs, power and utility sites, around commercial or industrial outbuildings, warehouse areas, bare ground, gravel yards, mulched areas, beaches, habitat restoration and management areas, uncropped farmstead areas, uncultivated non-agricultural areas, vacant lots, wastelands, shelter belts, and wildlife management areas. Natural Woodlands, including Wildlife and Habitat Management Areas, Wildlife Openings, Natural Areas (such as Wildlands and Wildlife Refuge), Campgrounds, Parks and Recreational Areas in Natural Forests, and Reforestation Treatments in Natural Forests | 8 | 8 | 8 |
| Aquatic | 8 | 8 | 8 |
| Alfalfa, Clover, and Other Forage Legumes, including: kudzu, lespedeza, lupin, sainfoin, trefoil, velvet bean, vetch, kenaf, leucaena | 3.75 | 1.55 | 6 |
| Berry and Small Fruit Crops: All cultivars, varieties and/or hybrids of Amur River grape; Aronia berry; Bayberry; Bearberry; Bilberry; Blackberry (including Andean blackberry, arctic blackberry, bingleberry, black satin berry, boysenberry, brombeere, California blackberry, Chesterberry, Cherokee blackberry, Cheyenne blackberry, common blackberry, coryberry, darrowberry, dewberry, Dirksen thornless berry, evergreen blackberry, Himalayaberry, hullberry, lavacaberry, loganberry, lowberry, Lucretiaberry, mammoth blackberry, marionberry, mora, mures deronce, nectarberry, Northern dewberry, olallieberry, Orgeon evergreen berry, phenomenalberry, rangeberry, ravenberry, rossberry, Shawnee blackberry, Southern dewberry, tayberry, youngsberry, zarzamora); Blueberry (highbush and lowbush); Buffaloberry; Che; Chilean guava; Chokecherry; Cloudberry; Cranberry (including highbush); Currant (black, Buffalo, red, native); Elderberry; European barberry; Gooseberry; Grape; Honeysuckle (edible); Huckleberry; Jostaberry; Juneberry (Saskatoon berry); Kiwifruit (fuzzy and hardy); Ligonberry; Maypop; Mountain pepper berries; Mulberry; Muntries; Partridgeberry; Phalsa; Pincherry; Raspberry (black, red and wild); Riberry; Salal; Schisandra berry; Sea buckthorn; Serviceberry | 3.75 | 1.55 | 8 |

52

Docket Number EPA-HQ-OPP-2009-0361
www.regulations.gov

## Appendix D: Endangered Species Assessment

Consistent with EPA's responsibility under the Endangered Species Act (ESA), EPA intends to complete national-level endangered species Biological Evaluations for glyphosate to assess risks to federally threatened and endangered (listed) species from registered uses of pesticides. This Biological Evaluation will be completed in accordance with the joint Interim Approaches developed to implement the recommendations of the April 2013 National Academy of Sciences (NAS) report, *Assessing Risks to Endangered and Threatened Species from Pesticides.* The NAS report[12] outlines recommendations on specific scientific and technical issues related to the development of pesticide risk assessments that EPA and the Services must conduct to meet their obligations under the ESA. The methods developed as part of the joint Interim Approaches will continue to be vetted before EPA utilizes these methods broadly to meet its ESA obligations.

In November 2013, the U.S. Fish and Wildlife Service, the National Marine Fisheries Service (together, the Services), EPA, and the U.S. Department of Agriculture released a white paper containing a summary of their joint Interim Approaches for assessing risks to listed species from pesticides. These Interim Approaches were developed jointly by the agencies in response to the NAS recommendations, and reflect a common approach to risk assessment shared by the agencies as a way of addressing scientific differences between the EPA and the Services. Details of the joint Interim Approaches are contained in the November 1, 2013 white paper, *Interim Approaches for National-Level Pesticide Endangered Species Act Assessments Based on the Recommendations of the National Academy of Sciences April 2013 Report.* [13]

The ecological risk assessment supporting this Proposed Interim Registration Review for glyphosate does not contain a complete, national-level ESA analysis, including effects determinations for specific listed species or designated critical habitat. The agency intends to complete an assessment of risk to listed species prior to completing its final registration review decision for glyphosate. Final Biological Opinions for glyphosate will be developed by the Services. EPA intends to address risks to listed species identified in the Biological Opinions for glyphosate as part of its final registration review decision for glyphosate, and implement geographically-specific risk mitigation for listed species and designated critical habitats, as necessary, via *Bulletins Live! Two.* More information on *Bulletins Live! Two* is accessible at https://www.epa.gov/endangered-species/bulletins-live-two-view-bulletins.

---

[12] http://www.nap.edu/catalog.php?record_id=18344
[13] http://www.epa.gov/espp/2013/nas.html

Docket Number EPA-HQ-OPP-2009-0361
www.regulations.gov

## Appendix E: Endocrine Disruptor Screening Program

As required by FIFRA and FFDCA, the EPA reviews numerous studies to assess potential adverse outcomes from exposure to chemicals. Collectively, these studies include acute, sub-chronic and chronic toxicity, including assessments of carcinogenicity, neurotoxicity, developmental, reproductive, and general or systemic toxicity. These studies include endpoints which may be susceptible to endocrine influence, including effects on endocrine target organ histopathology, organ weights, estrus cyclicity, sexual maturation, fertility, pregnancy rates, reproductive loss, and sex ratios in offspring. For ecological hazard assessments, the EPA evaluates acute tests and chronic studies that assess growth, developmental and reproductive effects in different taxonomic groups. As part of its most recent registration decision for glyphosate, the EPA reviewed these data and selected the most sensitive endpoints for relevant risk assessment scenarios from the existing hazard database. However, as required by FFDCA § 408(p), glyphosate is subject to the endocrine screening part of the Endocrine Disruptor Screening Program (EDSP).

The EPA has developed the EDSP to determine whether certain substances (including pesticide active and other ingredients) may have an effect in humans or wildlife similar to an effect produced by a "naturally occurring estrogen, or other such endocrine effects as the Administrator may designate." The EDSP employs a two-tiered approach to making the statutorily required determinations. Tier 1 consists of a battery of 11 screening assays to identify the potential of a chemical substance to interact with the estrogen, androgen, or thyroid (E, A, or T) hormonal systems. Chemicals that go through Tier 1 screening and are found to have the potential to interact with E, A, or T hormonal systems will proceed to the next stage of the EDSP where the EPA will determine which, if any, of the Tier 2 tests are necessary based on the available data. Tier 2 testing is designed to identify any adverse endocrine-related effects caused by the substance, and establish a dose-response relationship between the dose and the E, A, or T effect.

Under FFDCA § 408(p), the agency must screen all pesticide chemicals. Between October 2009 and February 2010, the EPA issued test orders/data call-ins for the first group of 67 chemicals, which contains 58 pesticide active ingredients and 9 inert ingredients. The agency has reviewed all of the assay data received for the List 1 chemicals and the conclusions of those reviews are available in the chemical-specific public dockets. Glyphosate is on List 1 and the review conclusions are available in the glyphosate public docket (see EPA-HQ-OPP-2009-0361). A second list of chemicals identified for EDSP screening was published on June 14, 2013,[14] and includes some pesticides scheduled for Registration Review and chemicals found in water. Neither of these lists should be construed as a list of known or likely endocrine disruptors. For further information on the status of the EDSP, the policies and procedures, the lists of chemicals, future lists, the test guidelines and the Tier 1 screening battery, please visit the EPA website.[15] In this PID, the EPA is making no human health or environmental safety findings associated with the EDSP screening of glyphosate. Before completing this registration review, the agency will make an EDSP FFDCA § 408(p) determination.

---

[14] See http://www.regulations.gov =!documentDetail;D=EPA-HQ-OPP-2009-0_____ for the final second list of chemicals.

[15] https://www.epa.gov/endocrine-disruption

# EXHIBIT 11

**UNITED STATES ENVIRONMENTAL PROTECTION AGENCY**
**WASHINGTON, DC 20460**

OFFICE OF CHEMICAL SAFETY
AND POLLUTION PREVENTION

August 7, 2019

Dear Registrant,

We are writing to you concerning label and labeling requirements for products that contain glyphosate.

On July 7, 2017, California listed glyphosate as a substance under Proposition 65[1], based on the International Agency for Research on Cancer's (IARC's) classification of the pesticide as "probably carcinogenic to humans." EPA disagrees with IARC's assessment of glyphosate. EPA scientists have performed an independent evaluation of available data since the IARC classification to reexamine the carcinogenic potential of glyphosate and concluded that glyphosate is "not likely to be carcinogenic to humans." EPA considered a more extensive dataset than IARC, including studies submitted to support registration of glyphosate and studies identified by EPA in the open literature as part of a systematic review. For more detailed information on this evaluation, please see the 2017 Revised Glyphosate Issue Paper: Evaluation of Carcinogenic Potential[2]. Further, EPA's cancer classification is consistent with other international expert panels and regulatory authorities, including the Canadian Pest Management Regulatory Agency, Australian Pesticide and Veterinary Medicines Authority, European Food Safety Authority, European Chemicals Agency, German Federal Institute for Occupational Safety and Health, New Zealand Environmental Protection Authority, and the Food Safety Commission of Japan.

On February 26, 2018, the United States District Court for the Eastern District of California issued a preliminary injunction enjoining California from enforcing the state warning requirements involving the pesticide glyphosate's carcinogenicity, in part on the basis that the required warning statement is false or misleading[3].

Given EPA's determination that glyphosate is "not likely to be carcinogenic to humans," EPA considers the Proposition 65 warning language based on the chemical glyphosate to constitute a false and misleading statement. As such, pesticide products bearing the Proposition 65 warning statement due to the presence of glyphosate are misbranded pursuant to section 2(q)(1)(A) of FIFRA and as such do not meet the requirements of FIFRA. In registering pesticides, EPA must determine that the labeling complies with the requirements of FIFRA including that the product

---

[1] California's Safe Drinking Water and Toxic Enforcement Act of 1986 (also known as Proposition 65) requires businesses to inform Californians about significant exposures to chemicals that, under the terms of Proposition 65, are believed to cause cancer, birth defects or other reproductive harm. *See* California Office of Environmental Health Hazard Assessment, "Proposition 65," at https://oehha.ca.gov/proposition-65.
[2] https://www.regulations.gov/document?D=EPA-HQ-OPP-2009-0361-0073
[3] National Association of Wheat Growers, et al. v. Zeise, 309 F.Supp.3d 842 (E.D.Cal.)

not be misbranded. See FIFRA 3(c)(5)(B). Therefore, EPA will no longer approve labeling that includes the Proposition 65 warning statement for glyphosate-containing products.  The warning statement must also be removed from all product labels where the only basis for the warning is glyphosate, and from any materials considered labeling under FIFRA for those products.

For any pesticide product that currently contains Proposition 65 warning language exclusively on the basis that it contains glyphosate, EPA requests the submission of draft amended labeling that removes such language within ninety (90) days of the date of this letter.

Sincerely,

Michael L. Goodis, P.E.
Director, Registration Division
Office of Pesticide Programs

# EXHIBIT 12

Nos. 20-70787, 20-70801

---

UNITED STATES COURT OF APPEALS
FOR THE NINTH CIRCUIT

---

NATURAL RESOURCES DEFENSE COUNCIL, et al.,
*Petitioners*,

v.

UNITED STATES ENVIRONMENTAL PROTECTION AGENCY,
*Respondent.*

RURAL COALITION, et al.,
*Petitioners*,

v.

UNITED STATES ENVIRONMENTAL PROTECTION AGENCY,
*Respondent.*

---

On Petition for Review of Final Agency Action of the
United States Environmental Protection Agency

---

**BRIEF FOR U.S. ENVIRONMENTAL PROTECTION AGENCY**

---

Jean E. Williams
*Acting Assistant Attorney General*
Of Counsel:                              Bruce S. Gelber
                                         *Deputy Assistant Attorney General*
DEVI CHANDRASEKARAN
*Attorney Advisor*                       BENJAMIN CARLISLE

FORREST PITTMAN
*Attorney Advisor*
Office of General Counsel
U.S. Environmental Protection
Agency
Mail Code 2333A
1200 Pennsylvania Avenue, N.W.
Washington, DC 20460

U.S. Environmental Protection
Agency

*Senior Attorney*
ROBERT WILLIAMS
*Senior Trial Attorney*
Environment and Natural Resources
Division
U.S. Department of Justice
Post Office Box 7411
Washington, D.C. 20044
(202) 514-9771 (Carlisle)
Benjamin.Carlisle@usdoj.gov
(202) 305-0206 (Williams)
Robert.P.Williams@usdoj.gov

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ...................................................... iv

GLOSSARY ........................................................................ xii

INTRODUCTION ................................................................ 1

STATEMENT OF JURISDICTION ............................................. 3

STATEMENT OF THE ISSUES ................................................ 3

PERTINENT STATUTES AND REGULATIONS ................................ 4

STATEMENT OF THE CASE .................................................. 5

I.     Statutory and regulatory background. ............................ 5

       A.     Federal Insecticide, Fungicide, and Rodenticide
              Act ("FIFRA"). ........................................... 5

       B.     Endangered Species Act ("ESA"). ........................... 9

II.    The glyphosate registration review. ............................. 10

       A.     Glyphosate. ............................................... 10

       B.     Overview of the glyphosate registration review
              process. ................................................. 13

       C.     The Interim Decision. .................................... 14

       D.     Motion for voluntary remand. ............................ 16

SUMMARY OF ARGUMENT .................................................. 17

STANDARD OF REVIEW ...................................................... 19

ARGUMENT ..................................................................... 22

I.    The Court should not consider Petitioners' extra-record evidence...........................................................................22

II.   EPA's conclusion that glyphosate does not pose human-health risks of concern is supported by substantial evidence...........................................................................24

III.  Petitioners' attempts to contradict EPA's expert human-health analysis misconstrue the record. ..........................30

      A.    EPA thoroughly considered cancer risk and its decision is supported by substantial evidence......................30

      B.    Substantial evidence supports EPA's analysis of workers' skin exposure to glyphosate. ...................................40

      C.    EPA's consideration of glyphosate formulations was consistent with its regulations and supported by substantial evidence.........................................................44

      D.    EPA thoroughly assessed human-health risks raised in comments. ............................................................56

IV.   Petitioners fail to show that EPA is violating the ESA................57

V.    Petitioners' ESA claim is prudentially moot..................................65

VI.   Remedy. ...................................................................................69

      A.    Petitioners' are wrong in claiming that vacatur of the Interim Decision means vacating hundreds of glyphosate registrations. .......................................................69

      B.    Vacatur of over five hundred glyphosate registrations is not an appropriate remedy. .........................74

CONCLUSION ............................................................................................77

STATEMENT OF RELATED CASES .....................................................78

CERTIFICATE OF COMPLIANCE ........................................................ 79

CERTIFICATE OF SERVICE................................................................. 80

ADDENDUM ........................................................................................ 81

# TABLE OF AUTHORITIES

## Cases

*A.L. Mechling Barge Lines v. United States,*
    368 U.S. 324 (1961) ................................................................. 66

*Alaska Survival v. Surface Transp. Bd.,*
    705 F.3d 1073 (9th Cir. 2013) .............................................. 43

*Alon Ref. Krotz Springs, Inc. v. EPA,*
    936 F.3d 628 (D.C. Cir. 2019) .............................................. 36

*Arkansas v. Oklahoma,*
    503 U.S. 91 (1992) ................................................................. 20

*ASARCO, Inc. v. Occupational Safety & Health Admin.,*
    746 F.2d 483 (9th Cir. 1984) ...................................... 21, 39, 44

*Ass'n of Data Processing Serv. Orgs., Inc. v. Bd. of Governors of Fed.
Reserve Sys.,*
    745 F.2d 677 (D.C. Cir. 1984) ............................................. 20

*Baltimore Gas & Elec. Co. v. NRDC,*
    462 U.S. 87 (1983) ................................................................. 21

*Bonnichsen v. United States,*
    357 F.3d 962 (9th Cir. 2004) ............................................... 20

*Bowman Transp., Inc. v. Ark.-Best Freight Sys., Inc.,*
    419 U.S. 281 (1974) ........................................................ 20, 51

*Cal. Cmtys. Against Toxics v. EPA,*
    688 F.3d 989 (9th Cir. 2012) ........................................... 75, 76

*Cal., Dep't of Educ. v. Bennett,*
    843 F.2d 333 (9th Cir. 1988) ............................................... 40

*Cal. Sportfishing Prot. All. v. FERC,*
   472 F.3d 593 (9th Cir. 2006) ................................................................. 61

*Camp v. Pitts,*
   411 U.S. 138 (1973) ............................................................................. 22

*Chamber of Commerce v. U.S. Dep't of Energy,*
   627 F.2d 289 (D.C. Cir. 1980) ......................................................... 66, 67

*Chamber of Commerce v. SEC,*
   412 F.3d 133 (D.C. Cir. 2005) ............................................................. 52

*Cmtys. for a Better Env't v. EPA,*
   748 F.3d 333 (D.C. Cir. 2014) ............................................................. 33

*Conner v. Burford,*
   848 F.2d 1441 (9th Cir. 1988) ............................................................. 63

*Ctr. for Biological Diversity v. U.S. Fish & Wildlife Serv.,*
   450 F.3d 930 (9th Cir. 2006) ......................................................... 22, 23

*Deutsche Bank Nat'l Tr. Co. v. FDIC,*
   744 F.3d 1124 (9th Cir. 2014) ............................................................. 66

*Dickinson v. Zurko,*
   527 U.S. 150 (1999) ............................................................................. 19

*Earth Island Inst. v. Carlton,*
   626 F.3d 462 (9th Cir. 2010) ............................................................... 21

*FCC v. Fox TV Stations, Inc.,*
   556 U.S. 502 (2009) ............................................................................. 72

*FCC v. Prometheus Radio Project,*
   141 S. Ct. 1150 (2021) ........................................................................ 52

*Fla. Power & Light Co. v. Lorion,*
    470 U.S. 729 (1985) ............................................................... 22

*Friends of the Earth v. Hintz,*
    800 F.2d 822 (9th Cir. 1986) ................................................ 23

*Friends of the Santa Clara River v. USACE,*
    887 F.3d 906 (9th Cir. 2009) ................................................ 67

*Hunt v. Imperial Merch. Servs.,*
    560 F.3d 1137 (9th Cir. 2018) .............................................. 10

*Lands Council v. McNair,*
    537 F.3d 981 (9th Cir. 2008),
    *overruled in part on other grounds by* 555 U.S. 7 (2008 ......... 17, 20, 40,
    ................................................................................. 52, 56

*Lands Council v. McNair,*
    629 F.3d 1070 (9th Cir. 2010) .............................................. 22

*Lands Council v. Powell,*
    379 F.3d 738 (9th Cir. 2004) ................................................ 42

*Lane Cty. Audubon Soc'y v. Jamison,*
    958 F.2d 290 (9th Cir. 1992) ................................................ 63

*League of Wilderness Defs./Blue Mountains Biodiversity Project v.
    Connaughton,*
    752 F.3d 755 (9th Cir. 2014) ................................................ 43

*Lee v. City of Los Angeles,*
    250 F.3d 668 (9th Cir. 2001) ................................................ 23

*Nathan Kimmel, Inc. v. DowElanco,*
    275 F.3d 1199 (9th Cir. 2002) ............................................... 5

*Nat'l Ass'n of Wheat Growers v. Becerra,*
    468 F. Supp. 3d 1247 (E.D. Cal. 2020) ................................. 32

*Nat'l Family Farm Coal. v. EPA,*
966 F.3d 893 (9th Cir. 2020) ............................ 10, 39, 52, 55, 74, 75, 76

*Nat. Res. Def. Council v. EPA,*
735 F.3d 873 (9th Cir. 2013) ............................ 19, 21, 31, 33, 39, 44, 51

*N. Plains Res. Council, Inc. v. Surface Transp. Bd.,*
668 F.3d 1067 (9th Cir. 2011) .............................................. 42

*Norton v. S. Utah Wilderness All.,*
542 U.S. 55 (2004) ..................................................... 72

*Nw. Food Processors Ass'n v. Reilly,*
886 F.2d 1075 (9th Cir. 1989) ............................................. 20

*Padgett v. Wright,*
587 F.3d 983 (9th Cir. 2009) ........................................... 23, 45

*Pollinator Stewardship Council v. EPA,*
806 F.3d 520 (9th Cir. 2015) .............................................. 21

*Reckitt Benckiser Inc. v. EPA,*
613 F.3d 1131 (D.C. Cir. 2010) ...................................... 7, 70, 71

*Reeve Aleutian Airways v. United States,*
889 F.2d 1139 (D.C. Cir. 1989) ........................................... 67

*Rybachek v. EPA,*
904 F.2d 1276 (9th Cir. 1990) ............................................. 22

*Sierra Club v. EPA,*
671 F.3d 955 (9th Cir. 2012) .............................................. 42

*Singh-Kaur v. INS,*
183 F.3d 1147 (9th Cir. 1999) ............................................. 19

*Sw. Ctr. for Biological Diversity v. U.S. Forest Serv.,*
  100 F.3d 1443 (9th Cir. 1996) ................................................ 9

*United States v. Kimble,*
  107 F.3d 712 (9th Cir. 1997) ................................................ 43

*Western Watersheds Project v. Matejko,*
  468 F.3d 1099 (9th Cir. 2006) .............................................. 61

**Statutes**

5 U.S.C. § 701 .................................................................... 21

5 U.S.C. § 706(2)(A) .......................................................... 21

7 U.S.C. § 136(bb) .............................................................. 6

7 U.S.C. § 136a-1 .............................................................. 13

7 U.S.C. § 136a ................................................................ 75

7 U.S.C. § 136a(a) .......................................................... 5, 69

7 U.S.C. § 136a(c) .............................................................. 5

7 U.S.C. § 136a(c)(1)(A)-(F) .................................................. 5

7 U.S.C. § 136a(c)(2)(B) ...................................................... 6

7 U.S.C. § 136a(c)(5) .......................................................... 6

7 U.S.C. § 136a(d)(1) .......................................................... 5

7 U.S.C. § 136a(g) .............................................................. 6

7 U.S.C. § 136a(g)(1)(A)(i) .................................................. 69

7 U.S.C. § 136a(g)(1)(A)(iii) ........................................ 13, 45, 73

7 U.S.C. § 136a(g)(1)(A)(v) ...................................................... 9, 18, 57, 70, 73

7 U.S.C. § 136a(g)(2) ................................................................................. 6

7 U.S.C. § 136d(a)(1) ............................................................................... 76

7 U.S.C. § 136d(b)-(c) ............................................................................... 7

7 U.S.C. § 136d(b) ...................................................... 7, 8, 57, 70, 71, 72

7 U.S.C. § 136d(d) ..................................................................................... 8

7 U.S.C. § 136j(a)(2)(G) ...................................................................... 6, 75

7 U.S.C. § 136n(b) ............................................................................... 3, 19

16 U.S.C. § 1536(a)(2) ............................................................................... 9

16 U.S.C. § 1536(b)(3) ............................................................................. 10

21 U.S.C. § 346a ..................................................................................... 50

28 U.S.C. § 2401(a) ................................................................................. 45

**Rules**

Fed. R. Evid. 201 ..................................................................................... 23

**Code of Federal Regulations**

40 C.F.R. pt. 152 ....................................................................................... 5

40 C.F.R. § 152.3 ..................................................................................... 46

40 C.F.R. § 155.40 ............................................................................ 6, 7, 45

40 C.F.R. § 155.40(a)(2) ........................................................................... 70

40 C.F.R. § 155.42 ..................................................................................... 6

40 C.F.R. § 155.42(a) ................................................... 45

40 C.F.R. § 155.48 ....................................................... 6

40 C.F.R. § 155.50 ....................................................... 6

40 C.F.R. § 155.53 ....................................................... 7

40 C.F.R. § 155.53(a) ............................................... 46, 63

40 C.F.R. § 155.53(b) ................................................. 46

40 C.F.R. § 155.53(b)(2) ............................................ 46

40 C.F.R. § 155.56 ....................................................... 7

40 C.F.R. § 155.57 ....................................................... 6

40 C.F.R. § 155.58(b)(2) .............................................. 7

40 C.F.R. § 155.58(b)(4) .............................................. 7

40 C.F.R. § 155.58(d) ................................................. 72

40 C.F.R  pt. 158 ..................................................... 5, 55

40 C.F.R. § 158.110(b) ............................................... 41

40 C.F.R. § 158.500(d) ............................................... 41

40 C.F.R. § 158.500(e) ............................................... 41

40 C.F.R. pt. 164 ....................................................... 8

40 C.F.R. pt. 180 ...................................................... 50

50 C.F.R. § 402.02 .................................................. 9, 58

50 C.F.R. § 402.13 ..................................................................... 10

50 C.F.R. § 402.13(c) ................................................................. 10

50 C.F.R. § 402.14 ..................................................................... 10

50 C.F.R. § 402.14(a) ............................................................. 9, 58

50 C.F.R. § 402.14(b)(1) ......................................................... 9, 10

50 C.F.R. § 402.46 ..................................................................... 10

**State Regulations**

Cal. Code Regs. 27 § 25306(a) .................................................. 32

Cal. Code Regs. 27 § 25306(m) ................................................. 32

**Federal Registers**

65 Fed. Reg. 24,586 (Apr. 21, 2000) ......................................... 47

69 Fed. Reg. 47,732 (Aug. 5, 2004) ............................................. 5

70 Fed. Reg. 40,251 (July 13, 2005) ............................... 45, 47, 48

71 Fed. Reg. 45,720 (Aug. 9, 2006) ................................... 45, 48

74 Fed. Reg. 28,616 (June 17, 2009) ......................................... 53

# GLOSSARY

ATSDR                    U.S. Agency for Toxic Substances and Disease
                         Registry

EPA                      Environmental Protection Agency

ESA                      Endangered Species Act

FIFRA                    Federal Insecticide, Fungicide, and Rodenticide
                         Act

IARC                     World Health Organization's International
                         Agency for Research on Cancer

Interim Decision         EPA's Interim Registration Review Decision for
                         glyphosate

NRDC                     Natural Resources Defense Council

ORD                      EPA's Office of Research and Development

SAP                      Scientific Advisory Panel

# INTRODUCTION

In its Interim Registration Review Decision for glyphosate

("Interim Decision"), EPA reasonably concluded that glyphosate is not

likely to be a human carcinogen and poses no human-health risks of

concern. The record underlying these conclusions is robust, reflecting

more than a decade of analysis and thorough review of the scientific

literature. Petitioners respond to this record with a studied blindness,

attempting to inflate the appearance of risk while disregarding the

reams of evidence that rebut their arguments. Petitioners cannot

overturn EPA's expert scientific conclusions, which are entitled to the

highest deference, merely by arguing that there is some evidence in the

record that might support an alternative conclusion or closing their eyes

to the record as a whole. That record supports EPA's conclusions with

well more than substantial evidence.[1]

Petitioners also contend that EPA violated the Endangered

Species Act ("ESA") by not completing a consultation pursuant to

---

[1] EPA's Interim Decision included other analysis, including in particular of ecological risks, but by separate motion filed simultaneously herewith, EPA is seeking voluntary remand without vacatur of that portion of its decision.

1

Section 7(a)(2) "prior to registering glyphosate." This claim fails on its face, as the Interim Decision did not register glyphosate. It is evident that the true aim of Petitioners' ESA claim is not to compel consultation on the Interim Decision, but rather to take glyphosate off the market. To justify such relief, Petitioners mischaracterize the Interim Decision as a registration decision and the cause of all alleged effects of glyphosate. But because the Interim Decision is neither a registration decision nor the cause of the effects Petitioners complain of, their "failure to consult" claim fails. Petitioners do not show that the Interim Decision "may affect" ESA-listed species or critical habitats, which is the trigger for consultation. In fact, Petitioners defeat their own argument by contending that the Interim Decision fails to alter the status quo. Furthermore, EPA has already committed to complete a comprehensive, nationwide ESA consultation of the effects of glyphosate before it issues its final registration review decision. Ordering EPA to consult on the Interim Decision—or vacating it—would be counterproductive.

To call Petitioners' proposed remedy an overreach would be an understatement. Their request that the Court abruptly declare each of

the more than five hundred glyphosate product registrations unlawful is contrary to FIFRA, which forbids automatic cancellation of product registrations as a result of the registration review process. It would also cause widespread disruption, as glyphosate is the most widely used herbicide in the United States, such that this remedy would be inappropriate even if it were lawful.

The Court should deny the petitions for review.

## STATEMENT OF JURISDICTION

The consolidated petitions for review of the Interim Decision were timely filed on March 20, 2020, "within 60 days after the entry of [the] order." 7 U.S.C. § 136n(b).

## STATEMENT OF THE ISSUES

(1)    Have Petitioners carried their burden to show that EPA's conclusion that glyphosate does not pose human-health risks of concern is not supported by substantial evidence, where they disregard key components of the record, EPA's analysis, and governing regulations?

(2)    Have Petitioners shown that EPA breached a duty to complete ESA consultation on the Interim Decision, when that action did not register glyphosate or cause the effects of glyphosate, and

Petitioners make no showing that the Interim Decision, itself, "may affect" any listed species or critical habitat?

(3)     Is Petitioners' claim that EPA failed to complete ESA consultation prudentially moot, where EPA has committed to complete a comprehensive, nationwide consultation on glyphosate prior to issuing its final registration review decision, to begin by November 12, 2021, and consulting on the Interim Decision would likely delay that consultation?

(4)     Is vacatur of more than 500 glyphosate product registrations a lawful and appropriate remedy where FIFRA forbids automatic cancellation of such registrations as a result of the registration review process and such cancellation would cause profound disruption?

## PERTINENT STATUTES AND REGULATIONS

The pertinent statutes and regulations not provided in Petitioners' briefs are set forth in the Addendum following this brief.

# STATEMENT OF THE CASE

## I.    Statutory and regulatory background.

### A.    Federal Insecticide, Fungicide, and Rodenticide Act ("FIFRA").

FIFRA generally precludes the distribution or sale of any pesticide unless it is "registered" by EPA. 7 U.S.C. § 136a(a); 40 C.F.R. pts. 152, 158.  Entities that seek such a registration must provide EPA information about the applicant, their specific pesticide product, and the pesticide label.  7 U.S.C. § 136a(c).  Once granted, a FIFRA registration is a license conferred to the applicant that establishes the terms and conditions under which the applicant's specific pesticide product may be lawfully sold, distributed, and used in the United States.  7 U.S.C. §§ 136a(c)(1)(A)-(F), 136a(d)(1); *see also Nathan Kimmel, Inc. v. DowElanco*, 275 F.3d 1199, 1204 (9th Cir. 2002); 69 Fed. Reg. 47,732, 47,733 (Aug. 5, 2004).

EPA will register a pesticide if it determines that the pesticide "will perform its intended function without unreasonable adverse effects on the environment," and "when used in accordance with widespread and commonly recognized practice it will not generally cause unreasonable adverse effects on the environment," among other

requirements. 7 U.S.C. § 136a(c)(5). FIFRA defines "unreasonable adverse effects on the environment" to include "any unreasonable risk to man or the environment, taking into account the economic, social, and environmental costs and benefits of the use of any pesticide." *Id.* § 136(bb). It is unlawful to use a pesticide "in a manner inconsistent with its labeling." *Id.* § 136j(a)(2)(G).

EPA must periodically review pesticide registrations. *Id.* § 136a(g); 40 C.F.R. § 155.40 *et seq.*[2] A registration review reflects EPA's "determination whether a pesticide meets, or does not meet, the standard for registration in FIFRA." 40 C.F.R. § 155.57. EPA will create a "registration review case" for one or more active ingredients in a pesticide and all of the products containing such ingredients, establish a docket for public participation, and provide an opportunity for comment. *Id.* §§ 155.42, 155.50. It may "call in" data necessary to conduct its review. *See* 7 U.S.C. §§ 136a(c)(2)(B), (g)(2); 40 C.F.R. § 155.48. EPA will assess changes since the pesticide's last review and

---

[2] EPA is currently reviewing roughly 1,140 pesticide active ingredients. *See* https://www.epa.gov/pesticide-reevaluation/registration-review-process.

6

conduct new assessments as needed. 40 C.F.R. § 155.53. In the course of a registration review, EPA may determine that certain label restrictions are appropriate. *See id.* § 155.58(b)(2), (4).

EPA need not tackle the entirety of the registration review at once, but rather may make an "interim registration review decision." *Id.* § 155.56. "Among other things, the interim registration review decision may require new risk mitigation measures, impose interim risk mitigation measures, identify data or information required to complete the review, and include schedules for submitting the required data, conducting the new risk assessment and completing the registration review." *Id.*

A FIFRA registration remains effective until EPA cancels it, which is a statutorily defined administrative action subject to specific safeguards. *See* 7 U.S.C. § 136d(b); 40 C.F.R. § 155.40; *Reckitt Benckiser Inc. v. EPA*, 613 F.3d 1131, 1134 (D.C. Cir. 2010). If EPA concludes that a pesticide product does not meet FIFRA's standard, cancellation is not automatic. Rather, EPA has discretion to initiate cancellation proceedings. *See* 7 U.S.C. § 136d(b). To do so, EPA must typically notify the Secretary of Agriculture, provide the Secretary an

analysis of the impact of cancellation on the agricultural economy, and afford the Secretary an opportunity to comment. *Id.* EPA must then send the registrant notice of EPA's intent to cancel the registration or to hold a hearing on cancellation, and publish that notice. *Id.* If EPA issues a notice of intent to cancel the registration (rather than a notice of intent to hold a hearing), EPA may cancel the registration unless the registrant corrects the defect EPA identified or "a person adversely affected by the notice" requests a hearing. *Id.* If a hearing is requested or EPA has issued a notice of intent to hold a hearing, the final decision on cancellation will occur only after completion of an administrative adjudicatory hearing. *See id.* § 136d(b), (d); 40 C.F.R. pt. 164. In making a decision, EPA "shall" consider restricting a pesticide's use or uses as an alternative to cancellation, taking into account the impact of its decision on agriculture. 7 U.S.C. § 136d(b).

This rule—that cancellation of a FIFRA registration cannot be automatic—extends to registration review. Congress provided that pesticide registrations shall not be cancelled "as a result of the registration review process unless [EPA] follows the procedures and

substantive requirements" for cancellation set forth in Section 136d.  *Id.* § 136a(g)(1)(A)(v).

## B.    Endangered Species Act ("ESA").

ESA Section 7(a)(2) directs each federal agency to insure that "any action authorized, funded, or carried out by such agency . . . is not likely to jeopardize the continued existence of" a listed species or destroy or adversely modify designated critical habitat. 16 U.S.C. § 1536(a)(2).  To facilitate compliance with those mandates, the ESA's implementing regulations outline a process whereby federal "action agencies" consult with the appropriate expert "consulting agency" (either the National Marine Fisheries Service or the U.S. Fish & Wildlife Service or both, depending on the species involved) to, among other things, analyze the potential impacts of a proposed action on listed species and designated critical habitat.  50 C.F.R. §§ 402.13(a), 402.14(b)(1).

Consultation is required whenever a proposed federal action "may affect" listed species or critical habitat.  *Id.* § 402.14(a).  Agency "action" and "effects of the action" are defined terms under the ESA.  *Id.* § 402.02.  If the action will not affect listed species or designated critical habitat, then consultation is not required.  *Sw. Ctr. for Biological*

*Diversity v. U.S. Forest Serv.*, 100 F.3d 1443, 1447-48 (9th Cir. 1996);

*Nat'l Fam. Farm Coal. v. EPA*, 966 F.3d 893, 924 (9th Cir. 2020);

*Friends of the Santa Clara River v. USACE*, 887 F.3d 906, 927 (9th Cir. 2018).

If, however, the action agency determines that the action "may affect" listed species or critical habitat, it must consult, either formally or informally. 50 C.F.R. §§ 402.13-402.14. Formal consultation is required unless the action agency determines, with the consulting agency's written concurrence, that the proposed action is "not likely to adversely affect" a listed species or critical habitat. *Id.* §§ 402.13(c), 402.14(b)(1). If formal consultation is required, then the consulting agency must prepare a biological opinion stating whether the proposed action is likely to "jeopardize the continued existence of" any listed species or destroy or adversely modify critical habitat. 16 U.S.C. § 1536(b)(3); 50 C.F.R. §§ 402.14, 402.46.

## II. The glyphosate registration review.

### A. Glyphosate.

Glyphosate is a versatile, broad-spectrum herbicide used in an array of agricultural and other settings. 1-RC_ER-15-16; 2-RC_ER-267.

It functions by inhibiting an enzyme produced by plants. 1-RC_ER-10; 1-RC_ER-15-16; 7-RC_ER-1497.

There are many reasons that glyphosate has become the most commonly used agricultural herbicide in the United States. 1-RC_ER-15. It is a simple-to-use, relatively inexpensive, broad-spectrum herbicide that can be applied with many different types of equipment and used in a variety of agricultural and non-agricultural applications. 1-RC_ER-15-16; 2-RC_ER-267; 2-RC_ER-271; 2-RC_ER-272. This includes its extensive use with glyphosate-resistant crops. 1-RC_ER-15-16; 2-RC_ER-272; 2-RC_ER-284. Glyphosate can be used with such resistant crops to kill weeds, with minimal toxicity to the crop. 1-RC_ER-15-16; 2-RC_ER-267.

Glyphosate is also important in weed-control programs in orchards and high-value specialty crops. 1-RC_ER-15-16; 2-RC_ER-267; 2-RC_ER-276; 2-RC_ER-285-86. It is the "most versatile herbicide in orchard floor management" and can be used to control weeds prior to planting high-value crops. 1-RC_ER-15-16.

Noxious and invasive weed control in aquatic systems, pastures/range lands, public lands, forestry, and rights-of-way also rely

heavily on glyphosate.  1-RC_ER-15-16; 2-RC_ER-267 ("Rights-of-way applications are critical to maintaining vital infrastructure and safety . . . ."); 2-RC_ER-287-88 (discussing harms of invasive plant species); 2-RC_ER-288-89 (invasive aquatic weeds "have cascading ecological effects," and other adverse impacts); 2-RC_ER-290.  By providing effective weed control, glyphosate can also help control mosquito borne illness.  1-RC_ER-15-16.

Use of glyphosate carries environmental benefits.  2-RC_ER-271-72 (discussing "glyphosate's role in no-till farming and conservation tillage and reduced carbon emissions," "reduc[ing] soil erosion," and "conserv[ing] soil moisture").  Glyphosate "reduces or eliminates the need for other weed control methods, including other herbicides, many of which pose more risk to humans or the environment."  2-RC_ER-272; 2-RC_ER-271.

Because glyphosate has a broad spectrum of weed control, it "is likely to reduce farm inputs by reducing the number of herbicides and the number of trips over the field for weed control or tillage."  2-RC_ER-272-73.  This, in turn, tends to lower labor and fuel costs compared to

other weed-control systems.  2-RC_ER-272-73; *see also* 2-RC_ER-271; 2-RC_ER-284.

## B.   Overview of the glyphosate registration review process.

The first pesticide product containing glyphosate was registered in 1974.  1-RC_ER-6.  The safety of glyphosate was re-assessed in "reregistration" proceedings, *see* 7 U.S.C. § 136a-1, culminating in a 1993 Reregistration Eligibility Decision.  1-RC_ER-6.  EPA has also completed risk assessments for glyphosate when new uses were added to glyphosate labels.  1-RC_ER-6.  In 2009, EPA began its registration review for glyphosate.  *See* 7 U.S.C. 136a(g)(1)(A)(iii); 7-RC_ER-1477; 7-RC_ER-1493-95.

In December 2017, EPA released a "Draft Human Health Risk Assessment in Support of Registration Review" for public comment.  3-RC_ER-514-54; *see also* 3-RC_ER-498 (response to comments).  This document explained EPA's conclusion that glyphosate did not pose human health risks of concern.  3-RC_ER-516 (low toxicity across species, with effects observed in most studies "at or above the limit dose"; no effects in route-specific dermal and inhalation studies; no evidence it is neurotoxic or immunotoxic; classified as not likely to be

13

carcinogenic to humans). As to cancer risks, EPA's analysis was supported by a 216-page revised issue paper. This paper was the result of years of investigation, consideration of a vast array of data and studies, and revised after the input of a scientific advisory panel. *See* 1-SER-39-41; 1-SER-46-49 *see also* 1-SER-16. EPA also prepared a "Preliminary Ecological Risk Assessment for Glyphosate and Its Salts" and took comment on this document. *See* 5-RC_ER-945; 3-RC_ER-440.

In April 2019, EPA published its "Glyphosate—Proposed Interim Registration Review Decision," summarizing its proposed conclusions weighing the costs and benefits of glyphosate and set forth certain proposed label requirements. 2-RC_ER-211. EPA responded to comments on this document as well. *See* 2-SER-386; 2-SER-399.

## C. The Interim Decision.

The Interim Decision was signed on January 22, 2020. 1-RC_ER-3. EPA issued that decision in order to "(1) move forward with aspects of the registration review case that are complete and (2) implement interim risk mitigation." 1-RC_ER-5. Among other things, the Interim Decision finalized the draft human-health and ecological risk assessments referenced above. 1-RC_ER-6.

14

The Interim Decision summarized EPA's conclusions (as of the date of signature) on the risks and benefits associated with glyphosate. As to human health, "EPA thoroughly assessed risks to humans from exposure to glyphosate from all registered uses and all routes of exposure and did not identify any risks of concern." 1-RC_ER-11; 1-RC_ER-16. It also summarized EPA's conclusions as to ecological risks. *See* 1-RC_ER-14-17.

EPA concluded that there were certain low-cost measures that would be appropriate to mitigate potential ecological risks posed by glyphosate. These included restrictions on how and when glyphosate can be sprayed, in order to reduce drift of such sprays, a "non-target organism advisory," and herbicide-resistance measures. *See* 1-RC_ER-17-19.

The Interim Decision noted aspects of EPA's registration review that EPA had not yet finalized. 1-RC_ER-5; 1-RC_ER-22. First, EPA was in the process of working with the FWS and NMFS to develop methodologies for conducting national threatened and endangered species assessment for pesticides in accordance with the ESA. 1-RC_ER-5. It therefore "will complete its listed species assessment and

any necessary consultation with the Services for glyphosate prior to completing the glyphosate registration review." 1-RC_ER-5. Second, EPA did not make an Endocrine Disruptor Screening Program determination under the Federal Food, Drug, and Cosmetic Act § 408(p) for glyphosate. *See* 1-RC_ER- 37-38 ("In this ID, the EPA is making no human health or environmental safety findings associated with the EDSP screening of glyphosate."); 1-RC_ER-5; 1-RC_ER-22. Third, EPA was not addressing certain issues relating to an administrative petition submitted in September 2018. 1-RC_ER-5. Finally, EPA acknowledged that "additional data may be necessary to fully evaluate risks to bees." 1-RC_ER-5; 1-RC_ER-14.

### D.    Motion for voluntary remand.

Simultaneously herewith EPA has filed a motion for partial voluntary remand without vacatur of the portions of the Interim Decision that do not relate to its conclusions on human health risks or the usage and benefits of glyphosate. Specifically, EPA seeks remand of its finalization of its analysis of the ecological risks and other potential (non-human-health) costs associated with glyphosate. EPA's response

brief thus focuses on Petitioners challenges to EPA's analysis of human-health risks and their arguments under the ESA.

## SUMMARY OF ARGUMENT

EPA reasonably concluded that glyphosate is not likely to be a human carcinogen and that it does not pose human-health risks of concern. *See* Argument II. This conclusion is the result of a decade of analysis, review by a scientific advisory panel, revisions in light of that review, and EPA's expert judgment on how the evidence should be weighed. None of the scientific advisory panel believed that glyphosate should be categorized as a likely human carcinogen. EPA's consideration of occupational risks, including the risks associated with dermal exposure and glyphosate formulations, was consistent with its regulations and guidance, and supports the agency's determination that glyphosate does not pose human-health risks of concern. *See* Argument III. This Court's review is to assess whether EPA supported its conclusions "with studies that the agency, in its expertise, deems reliable," and not—as Petitioners would have it—to serve as superintending scientist or re-weigh the evidence and reach its own conclusions. *Lands Council v. McNair*, 537 F.3d 981, 988 (9th Cir.

2008) (en banc), *overruled in part on other grounds by Winter v. NRDC, Inc.*, 555 U.S. 7, 21-22 (2008).

Petitioners fail to show that EPA breached a duty to consult under the ESA on the Interim Decision. *See* Argument IV. The Interim Decision did not register glyphosate, is not the cause of the ongoing effects of glyphosate use, and Petitioners fail to show that the Interim Decision, itself, may affect ESA-listed species or designated critical habitats. Moreover, EPA has a longstanding plan in place to complete a comprehensive, nationwide ESA consultation of the effects of glyphosate use before it completes its final registration review of glyphosate. Petitioners' ESA "failure to consult" claim is prudentially moot. *See* Argument V.

Petitioners seek vacatur of the Interim Decision and incorrectly claim that this will effectively cancel more than 500 individual glyphosate product registrations, which are not subject to judicial review in this action. *See* Argument VI. This claim is contrary to the plain text of FIFRA, which provides that no registration shall be cancelled "as a result of the registration review process" unless EPA follows the requirements for cancellation set forth in FIFRA. 7 U.S.C. §

136a(g)(1)(A)(v).  The actual consequence of vacatur of the aspects of the Interim Decision that remain following EPA's request for voluntary remand would be far more limited: further consideration by EPA. Moreover, even if Petitioners' argument were not foreclosed by the statutory text, the Court should refuse to take this drastic approach. Petitioners do not dispute the massive disruptive effect that this remedy would entail, and any purported errors in the Interim Decision are not serious and are likely to be readily correctable on remand.

## STANDARD OF REVIEW

Under FIFRA, EPA's order on registration review "shall be sustained if it is supported by substantial evidence when considered on the record as a whole." 7 U.S.C. § 136n(b).  This standard is "extremely deferential," *Singh-Kaur v. INS,* 183 F.3d 1147, 1149 (9th Cir. 1999) (citations omitted), more so than the "clearly erroneous" standard for appellate review of trial court findings.  *Dickinson v. Zurko*, 527 U.S. 150, 162, 164 (1999).

Courts "must affirm the Administrator's finding where there is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion even if it is possible to draw two inconsistent

conclusions from the evidence." *Nat. Res. Def. Council ("NRDC") v. EPA*, 735 F.3d 873, 877 (9th Cir. 2013) (internal quotation marks and citations omitted); *see Nw. Food Processors Ass'n v. Reilly*, 886 F.2d 1075, 1080 (9th Cir. 1989). A reviewing court "should not supplant the agency's findings merely by identifying alternative findings that could be supported by substantial evidence." *Arkansas v. Oklahoma*, 503 U.S. 91, 113 (1992); *see Lands Council*, 537 F.3d at 988 (courts should not "act as a panel of scientists" that "instructs [a federal agency] how to validate its hypotheses," "chooses among scientific studies," or "orders the agency to explain every possible scientific uncertainty"). Agency decisions must be sustained so long as the agency's path "may reasonably be discerned." *Bowman Transp., Inc. v. Arkansas-Best Freight Sys, Inc.*, 419 U.S. 281, 286 (1974).

Courts—including the Ninth Circuit—have recognized that the distinction between the "substantial evidence" and "arbitrary and capricious" tests is largely semantic, particularly as applied to review of agency factual conclusions. *See Bonnichsen v. United States*, 357 F.3d 962, 980 n.19 (9th Cir. 2004); *Ass'n of Data Processing Serv. Orgs., Inc. v. Board of Governors of Federal Reserve Sys.*, 745 F.2d 677, 683-84

(D.C. Cir. 1984) (Scalia, J.) (noting that this appeared to be the consensus view). *But see Pollinator Stewardship Council v. EPA*, 806 F.3d 520, 533 (9th Cir. 2015) (N.R. Smith, J., concurring).

When, as here, "the agency is making predictions, within its area of special expertise, at the frontiers of science" a reviewing court must "generally be at its most deferential." *NRDC*, 735 F.3d at 877 (quotation marks omitted); *see also Baltimore Gas & Elec. Co. v. NRDC*, 462 U.S. 87, 103 (1983). An agency "is not required to support its finding with anything approaching scientific certainty." *ASARCO, Inc. v. Occupational Safety & Health Admin.*, 746 F.2d 483, 490 (9th Cir. 1984) (quotation marks omitted).

The Administrative Procedure Act ("APA"), 5 U.S.C. § 701 *et seq.*, provides the standard of review for Petitioners' ESA claim. Under the APA, a reviewing court may only set aside an agency action that is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A); *see, e.g.*, *Earth Island Inst. v. Carlton,* 626 F.3d 462, 468 (9th Cir. 2010). A decision is arbitrary and capricious only if the agency "relied on factors Congress did not intend it to consider, entirely failed to consider an important aspect of the

problem, or offered an explanation that runs counter to the evidence before the agency or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise." *Lands Council v. McNair*, 629 F.3d 1070, 1074 (9th Cir. 2010) (internal quotation marks and citation omitted).

## ARGUMENT

## I. The Court should not consider Petitioners' extra-record evidence.

Petitioners ask the Court to consider a variety of extra-record materials. *See, e.g.*, RC Br. at 11-15 nn.5-16, 44 & n.27, 52; NRDC Br. at x-xi, 11 nn.4-5, 13 n.6, 15-16, 19. These materials include testimony in separate judicial proceedings and declarations. *See* RC Br. at 44 & n.27, 52. None of these materials are properly before the Court.

First, the Court's review is confined to the administrative record EPA compiled. *See Fla. Power & Light Co. v. Lorion*, 470 U.S. 729, 743–44 (1985); *Camp v. Pitts*, 411 U.S. 138, 142 (1973); *Ctr. for Biological Diversity v. U.S. Fish & Wildlife Serv.,* 450 F.3d 930, 943 (9th Cir. 2006); *Rybachek v. EPA*, 904 F.2d 1276, 1296 n.25 (9th Cir. 1990) (rejecting motion to take judicial notice). If Petitioners believed these materials had a bearing on EPA's decision, the proper course would

have been to bring them to EPA's attention during the public comment period. Petitioners have not moved to supplement the administrative record, and they do not even acknowledge the pertinent standard for seeking consideration of extra-record material. *See Ctr. for Biological Diversity,* 450 F.3d at 943; *Friends of the Earth v. Hintz*, 800 F.2d 822, 829 (9th Cir. 1986). They have thus waived any argument that they meet this standard. *See, e.g.*, *Padgett*, 587 F.3d at 985 n.2.

Second, even if judicial review were not confined to the administrative record, Petitioners' blanket request fails to support taking judicial notice of these materials. These materials do not pertain to matters of indisputable public record, but rather are cited to prove the truth of Petitioners' specific and detailed factual claims regarding glyphosate. *See* Fed. R. Evid. 201 (materials must be "not subject to reasonable dispute" and from a source whose accuracy cannot be reasonably questioned); *Lee v. City of Los Angeles*, 250 F.3d 668, 690 (9th Cir. 2001). It is particularly clear that the testimony Petitioners cite from other cases and the untested declarations they have proffered do not meet the standard for judicial notice.

23

## II.  EPA's conclusion that glyphosate does not pose human-health risks of concern is supported by substantial evidence.

EPA assessed both cancer and non-cancer effects of glyphosate and its metabolites.  1-RC_ER-11.  EPA did not identify any risks of concern to human health from glyphosate.  1-RC_ER-11; 2-RC_ER-229; *cf.* 7-RC_ER-1494 (summarizing previous analyses).

After glyphosate was initially classified in 1985 as a "possible human carcinogen," a 1986 scientific advisory panel recommended it be reclassified as "not classifiable as to human carcinogenicity" and that EPA should obtain further data.  1-SER-39.  EPA's assessment of glyphosate's cancer risk was revised in 1991 to "evidence of non-carcinogenicity for humans."  1-SER-40; *see also* 7-RC_ER-1494.

In 2015, EPA's Cancer Assessment Review Committee classified glyphosate as "not likely to be carcinogenic to humans."  1-SER-40. Considering this analysis, other scientific studies, and analyses by the World Health Organization's International Agency for Research on Cancer ("IARC") and other international agencies, EPA prepared an issue paper discussing cancer risk.  1-SER-40; *see also infra* at 32 (responding to Petitioner's reliance on IARC's conclusions).  This paper

was supported by a "systematic review of the open literature and toxicological databases for glyphosate." 1-SER-40; 1-SER-47-48.

EPA convened a Scientific Advisory Panel ("SAP") to consider this issue paper and the "scientific issues associated with EPA's evaluation of the carcinogenic potential of glyphosate." 4-RC_ER-576; 4-RC_ER-578; 4-RC_ER-585-86; *see also* 4-RC_ER-588 (SAP considered public comments). The SAP's conclusions reflect the thoroughness of EPA's consideration of possible glyphosate-related cancer risk. *See, e.g.*, 4-RC_ER-589-90; 4-RC_ER-594-95 (concluding, for example, that EPA's literature review methods were transparent and appropriate and that EPA had evaluated the relevant epidemiological studies and used a "sound, appropriate, and acceptable approach").

There were certain differences of opinion among members of the SAP. Some panelists suggested EPA should revise its discussion of the epidemiological evidence to state that EPA "cannot exclude the possibility" that observed positive associations between glyphosate exposure and risk of non-Hodgkin lymphoma "suggest human carcinogenic potential." 4-RC_ER-591-92. Other panelists "strongly disagreed," concurring with EPA's analysis in the issue paper that the

epidemiological studies did not suggest carcinogenic potential generally or a link with non-Hodgkin lymphoma in particular. 4-RC_ER-592. The SAP was also divided on whether certain animal studies suggested any link to cancer in rodents. Some panelists agreed that these studies "do not indicate carcinogenicity of glyphosate"; others argued that the studies suggested glyphosate may be a "weak rodent carcinogen and/or tumor promoter." 4-RC_ER-592; *see also* 4-RC_ER-593-94. In the context of these animal studies, the SAP identified concerns that EPA's analysis may have departed from its 2005 Cancer Guidelines in some respects. 4-RC_ER-593.

In the main, while a number of panelists agreed with the EPA issue paper's conclusion that glyphosate is "not likely to be carcinogenic to humans," others "felt that the better descriptor for glyphosate is 'suggestive evidence of carcinogenic potential.'" 4-RC_ER-597. None of the panelists, however, believed that glyphosate should be classified as "likely to be carcinogenic to humans" or "carcinogenic to humans". *See* 4-RC_ER-597; 1-SER-26.

Taking into account the SAP's analysis, EPA prepared a 216-page revised issue paper summarizing EPA's "comprehensive analysis of

available data from submitted guideline studies and the open literature." 1-SER-170-71. EPA concluded that the strongest evidence supported a cancer classification of "not likely to be carcinogenic to humans." 1-SER-170-71; *see also* 1-SER-168-70. EPA's expert conclusion on the animal carcinogenicity and genotoxicity studies was that they "did not demonstrate a clear association between glyphosate exposure and outcomes of interest related to carcinogenic potential." 1-SER-171. Epidemiological studies provided "no evidence of an association between glyphosate exposure and numerous cancer outcomes." 1-SER-171; *see also* 1-SER-40.[3] After recognizing there were some "considerations [that] could be looked at in isolation" that might support concluding that there was "suggestive evidence of [glyphosate's] carcinogenic potential," EPA concluded that the "strongest support" was for classifying glyphosate as "not likely to be carcinogenic to humans." 1-SER-171.

---

[3] EPA noted that "due to conflicting results and various limitations identified in studies investigating [non-Hodgkin lymphoma], a conclusion regarding the association between glyphosate exposure and risk of NHL cannot be determined based on the available data." 1-SER-171; *cf. infra* at 37-39 (explaining, in further detail, EPA's consideration of non-Hodgkin lymphoma).

EPA specifically addressed the SAP's concerns, including as to EPA's 2005 Cancer Guidelines. 1-SER-17, 21-24. In light of the panel's division on the overall weight of the evidence of glyphosate's carcinogenic potential, EPA affirmed "that the strongest support is for 'not likely to be carcinogenic to humans'" and explained that alternative proposed classifications by some panelists were not consistent with its cancer guidelines. 1-SER-26. It further noted that "none of the panel members believed glyphosate should be classified as 'likely to be carcinogenic to humans' or 'carcinogenic to humans.'" 1-SER-26.

EPA summarized its analysis in its draft human-health risk assessment. *See* 3-RC_ER-516-17; 3-RC_ER-528.[4] It then took and responded to comments on this document. 3-RC_ER-498-500. It finalized the draft human-health risk assessment in the Interim Decision, 1-RC_ER-6; 1-RC_ER-11-12, but only after again taking comments. *See* 2-SER-399. EPA also considered evidence on carcinogenicity obtained after the SAP's review in response to comment

---

[4] The April 23, 2018, date in this document appears to be a typographical error, and should read "April 23, 2019." *See* Motion to Supplement, Reaves Decl. ¶ 4; *cf.* RC Br. at 20 (arguing that this document issued prior to the close of the comment period).

28

and other documents. *See, e.g.*, 2-SER-383 (in study of over 54,000 pesticide applicators, "no evidence of a significant positive association was observed between glyphosate exposure and any type of cancer"); 2-SER-387-88.

EPA's analysis of the non-cancer risks of glyphosate was also detailed and thorough, and revealed no risks of concern. 1-RC_ER-11; 3-RC_ER-502 (discussing review of "entire toxicity database"); *see also* 3-RC_ER-514-18; 3-RC_ER-525-28. This analysis included considering glyphosate incident reports, which revealed that most incidents were minor in severity and resolved rapidly. 1-RC_ER-12; 2-RC_ER-233-34. EPA also reviewed the epidemiological literature, finding there was "insufficient evidence to conclude that glyphosate plays a role in any human diseases." 1-RC_ER-12; 3-RC_ER-507-08; 3-RC_ER-540.[5]

---

[5] Petitioners claim that EPA has found glyphosate is a "liver and kidney toxin." RC Br. at 11; *see also* NRDC Br. at 14. What EPA actually said was that there are "minor indicators of toxicity to the eyes, liver, and kidney" seen at doses at or above the limit dose in most studies. 3-RC_ER-525.

## III. Petitioners' attempts to contradict EPA's expert human-health analysis misconstrue the record.

### A. EPA thoroughly considered cancer risk and its decision is supported by substantial evidence.

EPA's evaluation of human-health risks was thorough, and it reasonably concluded that glyphosate was not likely to be carcinogenic to humans, including to occupational users. EPA found no risks of concern relating to occupational routes of exposure (dermal- and inhalation-based exposure) to glyphosate, and therefore properly concluded that a detailed quantitative study of occupational risks was not necessary. 2-RC_ER-229; 2-RC_ER-232-33; 3-RC_ER-517; 3-RC_ER-521; 3-RC_ER-525 (no dermal hazard identified); 3-RC_ER-527; 1-SER-42-43. EPA's review of epidemiological studies, animal studies, and genotoxicity studies supported the conclusion that occupational uses of glyphosate do not pose cancer risks. *See, e.g.*, 2-RC_ER-229; 2-SER-383-85; 1-SER-42, 1-SER-45, 1-SER-163, 1-SER-170 (discussing exposure; maximum potential exposure for occupational handlers is "well-below" the doses at which effects were observed in animal carcinogenicity and genotoxicity studies); *see also* 1-SER-50-95 (summarizing extensive evaluation of epidemiological data).

30

Petitioners barely engage with the record supporting EPA's determination. Indeed, Petitioners entirely omit EPA's revised issue paper, which is the most thorough discussion of the reams of evidence EPA assessed on human carcinogenicity, from their excerpts of record. Instead, Rural Coalition argues that certain agencies or individuals—the IARC, some members of the SAP, or members of EPA's Office of Research and Development ("ORD")—expressed different views from EPA on glyphosate's cancer risk.[6] *See* RC Br. at 37-39. But Rural Coalition cannot carry its burden merely by showing that "it is possible to draw two inconsistent conclusions from the evidence." *NRDC*, 735 F.3d at 877 (holding also that courts must be at their most deferential toward agency scientific conclusions). This alone disposes of much of Rural Coalition's argument, because it is not enough to simply point to contrary views rather than demonstrate that EPA's analysis *lacked* substantial evidence.

---

[6] Rural Coalition also points to certain jury verdicts, *see* RC Br. at 11-12, which were decided on de novo records created before a lay jury, assessed on the preponderance-of-the-evidence standard. They are irrelevant to this Court's deferential review of EPA's expert analysis of glyphosate based on the record before EPA at the time it made its decision.

Regardless, Rural Coalition's suggestion of a scientific consensus that glyphosate is likely carcinogenic, *see* RC Br. at 22, 36, flies in the face of the evidence. Although IARC characterized glyphosate as "probably carcinogenic to humans" in a 2015 paper, *every single one* of the numerous other agencies and organizations that has recently conducted a scientific review of glyphosate has concluded that glyphosate does not pose a likely risk of cancer in humans. 2-SER-410-11; 1-SER-39-40; 3-RC_ER-499-500.[7] Moreover, EPA expressly addressed IARC's findings and explained why EPA's conclusion was both more robust and more transparent than IARC's analysis. *See* 2-RC_ER-217-18; 3-RC_ER-499-500; 4-RC_ER-585; 5-RC_ER-939 (IARC conclusion reflects "'limited evidence' of carcinogenicity," but "chance, bias, or confounding could not be ruled out with reasonable confidence").

---

[7] IARC is an "authoritative body" for purposes of California's listing of carcinogens; California automatically lists chemicals as "known to the state to cause cancer" based on the findings of such "authoritative bodies." *See* Cal. Code Reg. § 25306(a), (m); <https://oehha.ca.gov/proposition-65/how-chemicals-are-added-proposition-65-list>; *Nat'l Ass'n of Wheat Growers v. Becerra*, 468 F. Supp. 3d 1247, 1251-52 (E.D. Cal. 2020) (discussing this process as to glyphosate).

Rural Coalition also mischaracterizes the SAP's conclusions. *None of the panelists concluded that glyphosate should be classified as carcinogenic to humans or likely to be carcinogenic to humans.* Many agreed with EPA's classification of glyphosate as not likely to be carcinogenic to humans, while others merely thought there was "suggestive evidence of carcinogenic potential." *See supra* at 26. EPA considered the views of the SAP and, in its expert judgment, reasonably concluded that the strongest support was for classifying glyphosate as not likely to be carcinogenic to humans. *See id.*; *NRDC*, 735 F.3d at 877; *Cmtys. for a Better Env't v. EPA*, 748 F.3d 333, 337 (D.C. Cir. 2014) (EPA acted reasonably in reaching its conclusion notwithstanding that scientific advisory committee indicated that record evidence could support a different result; EPA is entitled to weigh evidence).

Nor is Rural Coalition's rhetoric that the SAP "found EPA flouted its Cancer Guidelines" accurate. RC Br. at 38. Rather, the SAP identified specific possible points of departure from those guidelines related to EPA's assessment of certain animal studies. The SAP's concerns included:

33

- whether EPA relied on the absence of a monotonic dose relationship, in which increased doses correlate to increased risks, in assessing certain animal studies;

- urging a better explanation of EPA's use of historical control data;

- EPA's statistical testing, including its use of pairwise testing versus trend testing in rodent tumor studies;[8] and

- how EPA treated results generated by doses exceeding the "limit dose" or 1000 mg/kg/day.

*See* 4-RC_ER-593-94; 4-RC_ER-596; 4-RC_ER-624-28; 4-RC_ER-651; 4-RC_ER-657.[9] Often, only some members of the panel held these concerns, with others disagreeing. *See* 4-RC_ER-593-94; 4-RC_ER-621; 4-RC_ER-624-27; 4-RC_ER-657; *see also* 1-SER-23.

EPA carefully addressed the SAP's concerns. *See, e.g.*, 1-SER-21-23 (EPA considered both trend and pairwise tests; providing context from EPA's guidance; discussing revisions to the issue paper in

---

[8] A "trend test" compares data across all groups studied to determine whether an effect is seen, such as increased effects at increased doses. A "pairwise" test compares results from two particular groups to determine if any observed difference is statistically significant.

[9] At least one of the sound bites from Rural Coalition's string-citation, *see* RC Br. at 38, does not relate to the application of EPA's cancer guidelines. *See, e.g.*, 4-RC_ER-621 (discussion of EPA's non-Hodgkin lymphoma analysis).

34

response to the SAP analysis); 1-SER-23-24 (EPA updated discussion of historical control data where studies had such data); 1-SER-24 (EPA did not exclude high-dose data that exceeded 1000 mg/kg/day; EPA's approach was consistent with its guidelines); *id.* (lack of monotonic dose response was only one line of evidence EPA considered, in only certain studies); *cf.* 1-SER-18-20 (response to SAP relating to certain concerns about epidemiological studies, including as to non-Hodgkin lymphoma). This is exactly how the SAP process is supposed to work, with the panel identifying potential issues and EPA considering their views.

EPA ORD's comments, *see* 5-RC_ER-939-41, are hardly the definitive conclusions that Rural Coalition makes them out to be, *see* RC Br. at 37-38. This review reflected a preliminary discussion by a handful of scientists nine months before EPA finished its initial issue paper on glyphosate carcinogenicity, let alone the SAP review and subsequent revisions. 5-RC_ER-939 ("an in-depth review of the original literature was not undertaken" by many of the commenters); 5-RC_ER-941 ("ORD reviewers have not extensively discussed which descriptor might be most appropriate for glyphosate."). ORD recommended ways that EPA could strengthen its assessment, including by providing "a

detailed and thorough discussion of the rationale that caused [EPA's Office of Pesticide Programs] to come to a different conclusion than IARC" and that EPA develop charge questions for the SAP. 5-RC_ER-0941. EPA did just that. *See* 2-RC_ER-217-18; 3-RC_ER-499-500; 4-RC_ER-585; 5-RC_ER-939.[10] These preliminary comments cannot (and do not attempt to) negate the hundreds of pages of evidence and analysis supporting EPA's conclusions.

EPA considered—and rejected—Rural Coalition's recycled argument regarding N-nitrosoglyphosate (NNG) contamination first raised nearly 30 years ago, finding that NNG content was not toxicologically significant. *See* RC Br. at 40; 2-RC_ER-93*;* 3-RC_ER-505; 2-SER-417.[11] EPA reasonably relied on this conclusion given that "[n]o new data have been presented to warrant a reevaluation of the Agency's conclusion." 3-RC_ER-505; *see* 40 C.F.R. § 155.53(a) (registration review "assess[es] changes since a pesticide's last review" and looks at "new data or information"); *see also Alon Ref. Krotz*

---

[10] EPA also addressed ORD's comments on assessment of rodent tumor studies. *See* RC Br. at 37; 5-RC_ER-940.

[11] https://www3.epa.gov/pesticides/chem_search/reg_actions/reregistratio n/red_PC-417300_1-Sep-93.pdf

36

*Springs, Inc. v. EPA*, 936 F.3d 628 (D.C. Cir. 2019) (per curiam) (once EPA resolves an issue, it may defend against related criticism by referring to the prior proceeding).

Regardless, this conclusion is also reasonable on its substance. The vast majority of the samples assessed (more than 92%) contained levels of NNG *below* the 1.0 part-per-million threshold.  3-RC_ER-505; 2-SER-417.  Thus, for purposes of EPA's overarching consideration of glyphosate in registration review, the conclusion that NNG content generally "is not toxicologically significant" is supported by substantial evidence.[12]  If individual products contain contaminants that exceed EPA's level of concern, these must be reported to EPA and are assessed on a case-by-case basis.  *See* 3-RC_ER-505.

Rural Coalition cites epidemiological studies summarized in a draft report from the U.S. Agency for Toxic Substances and Disease Registry ("ATSDR") as evidence that EPA "failed to consider" risks of non-Hodgkin lymphoma.  RC Br. at 39.  Rural Coalition omits that this

---

[12] Rural Coalition's argument is also contradicted by the epidemiological studies that do not establish a connection between actual glyphosate use (which would incorporate the effects of exposure to commonly occurring contaminants) and cancer risk.  *See supra* at 27.

was a draft report which "does not represent and should not be construed to represent any agency determination or policy." 2-RC_ER-298. Rural Coalition's argument also has no basis in fact. EPA considered each of the epidemiological studies concerning non-Hodgkin lymphoma in reaching its conclusions, including its own assessment of their quality and weight. *See* 1-SER-57-70, 1-SER-85-89; 2-SER-387-88; 1-RC_ER-12.

Relatedly, Rural Coalition is wrong that EPA otherwise did not adequately consider non-Hodgkin lymphoma risk, including glyphosate's effects on bone-marrow. *See* RC Br. at 40-41; 1-SER-125, 141-43; 1-SER-144-48 (summary table); 1-SER-161. EPA considered at length whether glyphosate might be connected to non-Hodgkin lymphoma. 1-SER-56; 1-SER-58-59; 1-SER-83-95; 1-SER-18-20. As many members of the SAP agreed, the available studies did not demonstrate that glyphosate had *any* effect on non-Hodgkin lymphoma risk that could not be explained as the result of chance or bias. *See* 1-SER-94; 3-RC_ER-592; 2-SER-383 (in 54,000 applicator study "no evidence of a significant positive association was observed between glyphosate exposure and any type of cancer"); 2-SER-387-88 (when EPA

corrected for errors it identified in Zhang meta-analysis, risk of non-Hodgkin lymphoma was not statistically significant). Even to the extent that some panelists thought there might be some effect on non-Hodgkin lymphoma risk, they concluded that any effect would be "relatively small in magnitude." 1-SER-94.

The record thus confirms that EPA thoroughly examined cancer risk, and properly acknowledged residual uncertainty as to non-Hodgkin lymphoma. *See* 1-SER-171. Notwithstanding this limited area of uncertainty, substantial evidence supports EPA's expert judgment that the weight of the evidence most strongly supports the overall conclusion that glyphosate is not likely to be carcinogenic to humans. *See* 1-SER-170-71; *see also* 1-SER-168-70; *supra* Argument II; *see NRDC*, 735 F.3d at 877; *Nat'l Family Farm Coal. v. EPA*, 966 F.3d 893, 919 (9th Cir. 2020); *ASARCO, Inc.*, 746 F.2d at 490 (agencies need not achieve anything approaching scientific certainty).

In short, consistent with nearly every other agency that has considered glyphosate's carcinogenicity in recent years, EPA reasonably concluded that glyphosate is not likely to be carcinogenic to humans. This Court's role is not to re-weigh the evidence before EPA and reach

its own conclusion. *See Lands Council*, 537 F.3d at 988; *Cal., Dep't of Educ. v. Bennett*, 843 F.2d 333, 338 (9th Cir. 1988).

## B. Substantial evidence supports EPA's analysis of workers' skin exposure to glyphosate.

Rural Coalition also claims that EPA failed to conduct a necessary analysis of risks associated with workers' skin exposure to glyphosate. *See* RC Br. at 31-35. Rural Coalition is wrong for several reasons.

EPA relied on the dermal toxicity study that Rural Coalition cites in assessing "short- and intermediate-term dermal" effects. 3-RC_ER-527. This study reflected that even at very high exposure levels (the "limit dose") there was "no dermal or systemic toxicity." 3-RC_ER-527. As a result, EPA reasonably determined that a precise quantification of dermal risk was not necessary. 3-RC_ER-527. Similarly, and consistent with EPA's guidelines, because glyphosate did not pose a dermal hazard even at high exposure levels, EPA reasonably determined that it did not need to conduct further in-depth studies of how much glyphosate may be absorbed through the skin. 3-RC_ER-525; 3-RC_ER-542 (table noting such a study was not required under EPA's 40 C.F.R. Part 158 data requirements); 9-RC_ER-2057 (EPA guidelines reflecting that absorption studies may be required on an

40

individual basis where compounds show serious toxic effect); *see also* 40 C.F.R. §§ 158.500(d), Table 1, and (e), test note 35 & 158.110(b) (dermal penetration study is only "conditionally required," if specified conditions are met and based on, among other things, results of previous testing).

Nor was this the only evidence before EPA that skin exposure does not pose a significant health risk. Incident reports reflect that the dermal hazards associated with glyphosate use are not significant. 1-RC_ER-12; 2-RC_ER-233-34. Likewise, epidemiological studies provided "insufficient evidence to conclude that glyphosate plays a role in any human diseases," including those that pose longer-latency risks, such as cancer. 1-RC_ER-12; *see also* 1-SER-90, 1-SER-171; 1-SER-50-95 (summarizing studies); 2-SER-277-78, 2-SER-283-88 (epidemiological studies reflect real-world exposure; epidemiological studies did not provide sufficient evidence to conclude glyphosate plays a role in any of the health outcomes studied, including cancer). Such studies included assessments of occupational exposure to glyphosate. *See, e.g.*, 2-SER-383 (no evidence of a significant positive association between glyphosate exposure and any type of cancer). The SAP also agreed that the epidemiological studies EPA identified provided no

reliable evidence of an association between glyphosate exposure and most types of cancer. *See* 4-RC_ER-589-90; 1-SER-90.

Rural Coalition declares the dermal toxicity study "outdated" and "stale" solely because it was conducted in 1982. RC Br. at 31-32. The cases Rural Coalition relies on do not support this fallacy. In *Sierra Club v. EPA*, not only was the data at issue (emissions) mutable over time, but the record also contained updated data generated from an improved methodology. 671 F.3d 955, 963-68 (9th Cir. 2012). Rural Coalition's other cases are similar. *See Lands Council v. Powell*, 379 F.3d 738, 748-49 (9th Cir. 2004) (reliance on thirteen-year old study was improper because such data could not address "current habitat conditions, and any degradation or improvement in the last thirteen years"); *N. Plains Res. Council, Inc. v. Surface Transp. Bd.*, 668 F.3d 1067, 1086 (9th Cir. 2011) (reliance on old aerial surveys did not account for the possible changes in landscape and habitat that may occur over time).

Rural Coalition focuses only on this study's age. It offers no reason as to why this sound study is no longer reliable or why the age of the study calls its conclusions into question. It has therefore not carried

its burden. *See, e.g.*, *League of Wilderness Def./Blue Mountains Biodiversity Project v. Connaughton*, 752 F.3d 755, 763 (9th Cir. 2014) (plaintiffs unlikely to prevail in arguing that data were stale when plaintiffs failed to provide reliable evidence that the results were incorrect); *Alaska Survival v. Surface Transp. Bd.*, 705 F.3d 1073, 1088 (9th Cir. 2013) (similar).[13]

Regardless, Rural Coalition's demand for a further dermal penetration study on the theory that this dermal toxicity study was the sole evidence before EPA on risks to workers due to skin exposure is also unavailing, for at least two reasons. First, Rural Coalition fails to establish that analysis of dermal penetration was required at all. *See* 3-RC_ER-542; 9-RC_ER-2057 (EPA guidelines did not call for such a study); *see supra* at 40-41. Even assuming that glyphosate may penetrate skin and be absorbed into the body, this does not show that

---

[13] Because Rural Coalition has failed to show that additional data is necessary, its citations to EPA's regulations authorizing EPA to obtain such additional data, RC Br. at 33-34, are irrelevant. Rural Coalition also baldly asserts that "there are many additional human health data needs." *Id.* at 34. This argument is waived because Rural Coalition fails to adequately develop it in its brief. *See, e.g.*, *United States v. Kimble*, 107 F.3d 712, 715 n.2 (9th Cir. 1997).

43

such absorption causes any harmful effect. *See* 9-RC_ER-2057 ("Dermal absorption studies are complex kinetic studies which, in and of themselves, provide no information on the biological activity (toxicity) of a compound").

Second, Rural Coalition is simply wrong that EPA did not consider dermal penetration of glyphosate. It found that dermal penetration of glyphosate is "relatively low for human skin (<1%) indicating dermal exposure will only contribute slightly to a systemic biological dose." *See* 1-SER-42; *cf. also* 2-SER-422-23 ("Small amounts of glyphosate can be absorbed after dermal exposures"; "no more than 2%" absorption of a particular formulation).

The record reflects EPA has reasonably considered dermal exposure to glyphosate. Rural Coalition fails to establish that EPA's conclusions are not supported by substantial evidence. *See NRDC*, 735 F.3d at 877; *ASARCO, Inc.*, 746 F.2d at 490.

## C. EPA's consideration of glyphosate formulations was consistent with its regulations and supported by substantial evidence.

The record also does not support Rural Coalition's argument that EPA ignored the effects of glyphosate in "the real world" (i.e., as

formulated). RC Br. at 41; *see id.* at 30. Rural Coalition demands that EPA must conduct an individual and in-depth assessment of each and every glyphosate formulation. *See id.* at 42 ("*all* of the registered products containing glyphosate"); *id.* at 44-45 ("formulation-specific testing"; "much less all of them"). This request that the Court vastly multiply the extensive analysis that EPA performed over the last decade misunderstands the registration review process and ignores the record EPA compiled.

EPA's regulations governing registration review are found in 40 C.F.R. Part 155, Subpart C, § 155.40 *et seq.*, and were first promulgated in 2006. *See* 71 Fed. Reg. 45720 (Aug. 9, 2006). Rural Coalition does not challenge these regulations and therefore has waived any argument attempting to do so. *See, e.g.*, *Padgett v. Wright*, 587 F.3d 983, 985 n.2 (9th Cir. 2009). Regardless, the statute of limitations for such a challenge has long passed. *See* 28 U.S.C. § 2401(a).

Under these regulations, EPA creates a "registration review case" composed of "one or more active ingredients" and all of the products containing such ingredients. 40 C.F.R. § 155.42(a); *see also* 7 U.S.C. § 136a(g)(1)(A)(iii); *cf.* 70 Fed. Reg. 40,251, 40,258-59 (July 13, 2005)

("Decisions made on the active ingredients would apply to products in the case."). As to the "pesticide," EPA will "assess changes since a pesticide's last review." 40 C.F.R. § 155.53(a) (EPA "will assess any changes that may have occurred since the Agency's last registration decision"). It will "consider" whether a new risk assessment for a pesticide is warranted based on "any new data or information on the pesticide," *id.*, and whether a "new assessment of the pesticide is needed." *Id.* at § 155.53(b).

EPA will also "consider" whether "new data or information regarding an individual pesticide product," including as to inert ingredients, warrant additional review of the pesticide product's registration. *Id.* at § 155.53(a); *id.* at 152.3 ("pesticide product" means the "particular form . . . in which the pesticide is, or is intended to be, distributed or sold"). If EPA finds that "additional review of an individual product's registration is needed, it will review the pesticide product label, confidential statement of formula, product-specific data, or other pertinent data or information, as appropriate." *Id.* at 155.53(b)(2).

46

Thus, EPA's regulations do not require individualized review of every single pesticide product in a registration review case, but are rather directed toward considering specific concerns raised by changes since a pesticide's last review and newly available data or information. EPA made this explicit when it proposed these regulations, explaining that it was proposing a "tailored approach" under which the "scope and depth of the review would be commensurate with the complexity of the issues presented by the pesticide." 70 Fed. Reg. at 40,261 (citing 40 C.F.R. § 155.53 as reflecting this tailored approach); 65 Fed. Reg. 24,586, 24,589 (Apr. 26, 2000). For instance, EPA considered what the "unit of review" should be in assessing pesticide registrations. 70 Fed. Reg. at 40,258-59, 40,261. Rather than separately review each individual pesticide product (or each different formulation), EPA proposed that its unit of review should be on the level of the pesticide's active ingredient. 70 Fed. Reg. 40,251; *see also id.* at 40,258-59 (because advances in science are developed generically, product-specific unit of review might not be "scientifically sound").

EPA further explained that it would assess inert ingredients "in a process that is separate from registration review," without separately

"[e]stablish[ing] registration review cases for inert ingredients." *See* 70 Fed. Reg. 40,251, 40,258-59. EPA stated that it would "check to see whether there are any issues concerning the inert ingredients in a product that is undergoing registration review." *Id.*; *see also id.* at 40,267-68 (EPA will consider whether "new data or information . . . warrant additional review of the pesticide product's registration," such as where the evidence before EPA gives it "concerns about an inert ingredient"). And it explained that given that there were 15,000 registered pesticide products, it was not "practical to conduct a comprehensive review of the composition, labeling, and product-specific data for each product." *Id.* at 40,261-62; *see also* 3-RC_ER-505.

EPA reiterated that it was adopting this tailored approach in the final rule promulgating these regulations. It rejected proposals that it conduct a comprehensive, product-specific review of every individual product registration, explaining that the need for a review of particular individual product registrations could be addressed through the comment process. *See* 71 Fed. Reg. at 45,724, 45,726; *see also id.* at 45,729 (product-specific data requirements are generally met through

48

registration and reregistration process; such data would generally not be needed to support registration review).

Thus, while EPA agrees that its registration review takes into account glyphosate formulations, Rural Coalition is wrong to argue that EPA must conduct a product-by-product review of every single glyphosate formulation. EPA assesses specific formulations or inert ingredients where EPA determines that newly available data or information demonstrates a need to do so. Here, EPA's consideration of the overarching evidence did not reflect the need for a more granular review of a particular formulation.

First, because "there are over 500 glyphosate products registered at different times in the US, the agency has assessed new inert ingredients at multiple points over the years for different formulations of glyphosate." 2-RC_ER-220 (EPA considers hazard potential using a "battery of toxicity data"); *see also* 3-RC_ER-441 (inert ingredients are assessed when proposed for use as part of a pesticide product); 3-RC_ER-504-05. Furthermore, EPA assesses inert ingredients when establishing tolerances or tolerance exemptions for residues of inert ingredients in pesticide formulations that may be present in or on food.

*See* 21 U.S.C. § 346a; 40 C.F.R. Part 180. Any further agency consideration of inert ingredients in glyphosate formulations occurs against the backdrop of this already extensive testing.

Second, EPA considered incident reports and epidemiological studies, which reflect the real-world effects of glyphosate use, as formulated. *See* 7-RC_ER-1504-06; 7-RC_ER-1527-73. The incident reports reflected that health effects, including dermal effects, "were generally mild and resolved rapidly." 1-RC_ER-12; 2-RC_ER-233-34; 3-RC_ER-540; 6-RC_ER-1264; *cf.* 2-SER-253-55, 2-SER-288 (noting four cases that presented more significant dermal effects, most of which resolved over time; incidents are "generally mild/minor to moderate and resolve rapidly"). As just discussed, epidemiological studies also did not demonstrate that there was a connection between glyphosate use in the real world and cancer or any other diseases. *See supra* at 27, 29-30, 41. Such studies "better reflect toxicity *of the end-use product*, as opposed to the active ingredient as well as *exposure to a mixture of compounds*" than animal studies. *See* 2-SER-277-78 (emphasis added).

Third, EPA considered "[a]ll studies [addressing glyphosate formulations] of adequate scientific caliber" in considering the toxicity

of glyphosate formulations. 2-RC_ER-220-21 (explaining that while *in vivo* studies are more probative than *in vitro* studies, the *in vivo* studies were not of adequate scientific caliber); 3-RC_ER-504-05 (similar); 2-SER-375-82 (similar, including summary table). In the revised issue paper, EPA also identified and summarized the available studies on genotoxic potential of glyphosate formulations. *See* 1-SER-230-42.

Pursuant to EPA's regulations, the record before EPA was, therefore, sufficient to sustain its conclusions on the absence of human-health risks of concern. Rural Coalition fails to meaningfully engage with this record and attempts to sidestep the limited nature of this Court's review.

This Court's task is only to ensure that EPA's decision was supported by "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *NRDC*, 735 F.3d at 877 ("more than a mere scintilla, but less than a preponderance"); *see also Bowman Transp.*, 419 U.S. at 284 (agency decisions must be sustained so long as the agency's path "may reasonably be discerned"). EPA's inquiry is shaped by the nature of the problem in front of it, and EPA need not resolve every scientific uncertainty in order to make a decision.

*See, e.g.*, *Lands Council*, 537 F.3d at 988; *Chamber of Commerce of the United States v. SEC*, 412 F.3d 133, 142 (D.C. Cir. 2005); *Nat'l Family Farm Coal.*, 966 F.3d at 919 (EPA may rely on limited evidence; citing supporting cases); *cf. FCC v. Prometheus Radio Project*, 141 S. Ct. 1150, 1160 (2021) ("The APA imposes no general obligation on agencies to conduct or commission their own empirical or statistical studies."). EPA's assessment of glyphosate, including its formulations, easily exceeds this standard.

In fact, the record speaks directly to the concerns Rural Coalition now raises. EPA considered exactly the dermal effects from glyphosate formulations described in incident reports that Rural Coalition cites. *See* RC Br. at 43-44. Rural Coalition simply omits that such dermal effects typically are mild and resolve rapidly.[14] Similarly, EPA's consideration of epidemiological studies speak to whether glyphosate formulations pose risks of systemic toxicity or longer-term risks, such as

---

[14] Rural Coalition also attacks EPA's analysis with an extra-record declaration, RC Br. at 44, which is not properly before the Court. Regardless, this declaration is simply the anecdotal assertions of a single individual who perfunctorily attributes certain harms to glyphosate.

cancer. *See id.* at 44-46. Again, EPA found no links between glyphosate as-used and any human diseases. *See supra* at 41.

As discussed, EPA considers inert ingredients in registration review where specific new information is brought to its attention about particular ingredients. Rural Coalition's brief addresses only one specific type of surfactant: POEA. RC Br. at 45-46. But the evidence Rural Coalition is relying on reflects that EPA has examined the health risks of the class of surfactants to which POEA belongs (alkyl amine polyalkoxylates or "AAPs"). EPA found that AAPs were sufficiently safe that it could exempt them from the requirement that a food-residue tolerance be established. *See* 74 Fed. Reg. 28,616, 28,618 (June 17, 2009); 7-RC_ER-1578-80 (AAPs are "not acutely toxic," "[t]here is no evidence that the AAPs are neurotoxic, mutagenic, or clastogenic," and there is "no clear target organ" affected by AAPs); 7-RC_ER-1589 ("There is no evidence that the AAPs are carcinogenic."); 7-RC_ER-1579-80; 7-RC_ER-1607-08 (no occupational handler risks of concern except for workers applying AAPs to ornamental plants in greenhouses using specific equipment, at the maximum allowed percentages of

AAPs).[15]  Tellingly, even Petitioner Center for Food Safety acknowledged in its comments to EPA that "[t]here is insufficient evidence to conclude that glyphosate preparations containing POEA are more toxic than those containing alternative surfactants." 2-RC_ER-87 (quotation marks and citation omitted).

Rural Coalition further rehashes its argument that EPA should have conducted dermal absorption studies, now demanding such studies for every single glyphosate formulation.  *See* RC Br. at 44-47.  This argument fails for similar reasons as discussed above.  *See supra* Argument III.B.  Rural Coalition also reiterates its discredited claims that glyphosate itself is genotoxic, a carcinogen, or poses other health hazards.  RC Br. at 45-46.  Again, EPA reasonably concluded to the contrary.  *See supra* Argument III.A.  Finally, the views of certain Monsanto scientists which pre-date the extensive array of more recent

---

[15] The barely seven-page European Food Safety Authority ("EFSA") report that Rural Coalition also cites reflects that, while summary data suggested that POEA was more toxic than glyphosate alone, EFSA lacked adequate information to perform the relevant health risk assessments.  *See* 6-RC_ER-1224; 6-RC_ER-1229.  But even if it had reached a conclusion that POEA posed human-health risks, *see* RC Br. at 46, this is insufficient as a matter of law to show that EPA's analysis lacks substantial evidence.  *See supra* at 19-20.

evidence on which the Interim Decision relies also do not undermine EPA's decision. *See* RC Br. at 44, 46; 1-SER-174-216 (listing references); 1-RC_ER-12; 3-RC_ER-540; 2-SER-383-85. Nor do these materials attempt to speak to the validity of the evidence before EPA in the form of, for example, incident reports.

EPA recognized that further study of glyphosate formulations could be beneficial, and described a four-objective research plan. *See* 1-SER-172-73; 2-RC_ER-220-21. Moreover, as EPA has acknowledged, it has a continuing obligation to respond to emerging risk concerns, and not to defer action until its next registration review. *See Nat'l Family Farm Coal*, 966 F.3d at 922-23. Thus, should particular information be developed that one or more of the over 500 glyphosate formulations may pose a health risk, these concerns can—and will—be proactively considered on an ongoing basis. *Cf.* 40 C.F.R Part 158 (data requirements for registration of pesticides, including Subpart F requirements for certain product-specific toxicology data). EPA did not, however, need to wait for additional studies of every single glyphosate formulation before reaching a conclusion on health risks.

### D. EPA thoroughly assessed human-health risks raised in comments.

EPA considered and addressed comments on the draft human-health risk assessment and exhaustively assessed the potential risks to human-health related to glyphosate, including the laundry list of risks NRDC perfunctorily alleges. *See* NRDC Br. at 58; 2-SER-386 (comments were duplicative of issues EPA had already considered and did not result in changes to the risk assessment); 1-RC_ER-8-9; 2-RC_ER-231-33; 3-RC_ER-498-508; 3-RC_ER-514-18; 3-RC_ER-524-25; 3-RC_ER-527-28; 3-RC_ER-530-34; 3-RC_ER-538; 7-RC_ER-1503-05; *cf.* 1-RC_ER-22 (EPA has not finalized its analysis of potential endocrine risks). The analysis EPA prepared on human-health risks constitutes well more than substantial evidence for its decision. It is not this Court's role to act as a superintending scientist. *See Lands Council*, 537 F.3d at 988; *cf.* NRDC Br. at 59 (conceding that EPA may determine which studies are "integral" to assessing health risks of

glyphosate).  NRDC also claims that EPA did not include the ATSDR draft report in the record.  NRDC Br. at 59.  This claim is not true.[16]

## IV.  Petitioners fail to show that EPA is violating the ESA.

Petitioners contend that EPA is violating the ESA because it has not completed a consultation "prior to registering glyphosate."  RC Br. at 68; *accord id.* at 6, 8, 62, 79.  The plain, and fatal, defect with this claim is that the Interim Decision did not "register glyphosate."  By law, a registration review decision neither registers a pesticide nor cancels an existing registration.  7 U.S.C. §§ 136a(g)(1)(A)(v), 136d(b).  Petitioners' erroneous premise that the Interim Decision "registered glyphosate" is puzzling given their acknowledgement that the first of the hundreds of glyphosate product registrations dates to 1974, and that EPA reregistered glyphosate in 1993.  RC Br. at 8, 72.

It is evident that Petitioners are attempting to use the Interim Decision as a surrogate to challenge EPA's prior registration orders.  This, they may not do.  Any challenge to these earlier separate and distinct actions is time-barred.  The only agency "action" before the

---

[16] *See* https://www.regulations.gov/document?D=EPA-HQ-OPP-2009-0361-14431 (attachment six); Certified Index, *NRDC v. EPA*, No. 20-70787, Doc. 11737189 at 59; Index-RC_ER-ii; 2-RC_ER-297.

Court here is the Interim Decision, and the only question is whether Petitioners have shown that *that* action "may affect" listed species or designated critical habitat that Petitioners assert an interest in. 50 C.F.R. § 402.14(a). That showing is absent. Petitioners' entire effort is to mischaracterize the Interim Decision as a "registration decision" and misattribute alleged effects of EPA's prior registration decisions to it. There is no showing that the Interim Decision itself causes effects.

The ESA defines "effects of the action" as "all consequences to listed species or critical habitat *that are caused by the proposed action*, including the consequences of other activities that are caused by the proposed action. A consequence is caused by the proposed action if it would not occur but for the proposed action and it is reasonably certain to occur." 50 C.F.R. § 402.02 (emphasis added). The Interim Decision is plainly not the cause of registration decisions that preceded it or their effects. The Interim Decision did two things. First, it finalized two assessments: (1) Glyphosate Draft Human Health Risk Assessment for Registration Review; and (2) Registration Review—Preliminary Ecological Risk Assessment for Glyphosate and Its Salts. 1-RC_ER-6. Second, it determined that certain interim risk mitigation measures

were necessary, including labeling changes to add a "non-target organism advisory" to "alert users" that glyphosate is toxic to plants and steps to "manage off-target spray drift," including maximum wind speeds for spraying and minimum droplet sizes.  1-RC_ER-17-22. Petitioners do not identify evidence showing that the act of finalizing the assessments or issuing the non-target organism advisory, and/or measures to manage off-target spray drift "may affect" ESA-listed species or critical habitats.[17]

Rather, Petitioners assert that the "advisory changes nothing about how glyphosate will continue to be used" and that EPA "offers no information as to how any of the[] three 'mitigation' measures will reduce the known risks to plants, birds, fish, amphibians, or aquatic invertebrates."  RC Br. at 77; *id*. at 24; *accord id*. at 57 (asserting that "EPA's label mitigation measures in its decision—which address pesticide resistance, non-target organisms, and spray drift—differ little from those on current glyphosate product labels").  Petitioners refute

---

[17] Petitioners assert that EPA included the non-target organism advisory "instead of consulting."  RC Br. at 77.  EPA has not stated, however, that the advisory was intended as a substitute for consultation.

their own "failure to consult" claim by claiming that the Interim
Decision does not alter the status quo.  To "affect" under ESA Section 7
"is to bring about a change."  Endangered Species Consultation
Handbook (March 1998) at x, available at www.fws.gov/endangered/esa-
library/pdf/esa_Section7_handbook.pdf.  An action that does not alter
the status quo does not "affect" and, hence, does not trigger a duty to
consult.

While arguing on the one hand that the Interim Decision changes
nothing, Petitioners argue inconsistently on the other hand that the
Interim Decision causes any and all effects of glyphosate.  For the latter
assertion, Petitioners recite EPA's findings of effects from its draft
Biological Evaluation ("BE").  The problem with Petitioners' reliance on
the BE is that EPA prepared the BE to assess the duty to consult on the
effects of glyphosate, which is not in dispute.  As explained below, EPA
has committed to consult on glyphosate.  And as explained above,
glyphosate was authorized for sale and use pursuant to EPA actions
long before the Interim Decision.  The Interim Decision does not cause
listed species or critical habitats to be "exposed to glyphosate" as
Petitioners contend.  RC Br. at 71.  Thus, Petitioners do not show that

the Interim Decision itself triggered ESA consultation by pointing to the draft BE's analysis of EPA's prior registration orders.

Petitioners' true complaint here is not that the Interim Decision will cause new effects, but rather that it does not eliminate pre-existing effects. Petitioners relatedly contend that ESA consultation could lead to additional mitigation. RC Br. at 76. But the consultation duty is triggered by what an agency action *does*, not what it *does not do*. "Ninth Circuit cases have emphasized that section 7(a)(2) consultation stems only from 'affirmative actions'" and that "'inaction' is not 'action' for section 7(a)(2) purposes." *Western Watersheds Project v. Matejko*, 468 F.3d 1099, 1108 (9th Cir. 2006); *see also Cal. Sportfishing Prot. All. v. FERC*, 472 F.3d 593 (9th Cir. 2006). Thus, any claim that EPA failed to mitigate alleged effects of previous product registrations through the Interim Decision is alleged inaction, which does not trigger a consultation duty. Petitioners' disapproval of the Interim Decision's labeling changes is a substantive disagreement with the merits of the Interim Decision, not a basis to claim that ESA consultation was triggered.

The fallacy of Petitioners' "failure to consult" claim is further illustrated by the fundamental disconnect between the legal violation they allege and the relief they request. Petitioners do not request that EPA be ordered to reconsider whether the Interim Decision requires consultation by making an effects determination. Instead, Petitioners ask this Court to reach beyond the Interim Decision and cancel all existing registrations for products containing glyphosate. RC Br. at 79. This request underscores that Petitioners' true quarrel is not with effects allegedly caused by the Interim Decision itself, but rather with those resulting from EPA's prior product registrations, and with the length of time required to complete a final registration review decision accompanied by ESA consultation. Vacating the Interim Decision would not produce the result that Petitioners seek of canceling glyphosate registrations or hastening completion of the final registration decision and consultation on that action. Rather, vacating the Interim Decision would likely delay adoption of the measures that EPA determined would reduce risk to listed species whose range and/or critical habitat co-occur with glyphosate use.

Practically speaking, EPA has not produced ESA effects
determinations or completed consultation on interim registration
review decisions, as those decisions are used to implement mitigation
measures more quickly than waiting for a final registration review
decision.  40 C.F.R. § 155.53(a).  The practical effect of requiring ESA
analysis at the interim review stage would be to further complicate and
delay, and thereby discourage the issuance of such discretionary
actions.

Petitioners' reliance on cases in which this Court took issue with
the scope of ESA consultation is misplaced.  *See* RC Br. at 66, 78 (citing
*Conner v. Burford*, 848 F.2d 1441 (9th Cir. 1988) and *Lane County
Audubon Soc'y v. Jamison*, 958 F.2d 290 (9th Cir. 1992)).  In each of
those cases, the Court held that consultation could not be deferred until
later stages of agency decision making if doing so could lead to a
narrower scope of analysis and consideration of effects than an earlier,
more comprehensive consultation.  *See Conner*, 848 F.2d at 1453-55;
*Lane County*, 958 F.2d at 294.  That concern over the scope of
consultation is not present here.  As is apparent from the draft BE, EPA
is proceeding with a comprehensive nationwide consultation on the

effects of glyphosate.  The dispute here is not over the scope of consultation, but rather its timing.  Petitioners complain that consultation has not been completed on glyphosate sooner than EPA has committed to do.  But Petitioners have not shown that the Interim Decision triggered this consultation or that consultation on the Interim Decision would be superior to, or could be completed any sooner than, the consultation EPA already plans to complete on the final registration review decision.  Petitioners' claim that EPA "failed to consult" on the Interim Decision will not hasten completion of the final registration review decision or consultation on that decision.

In sum, Petitioners do not show that EPA failed to consult on the Interim Decision itself.  It is not the action that Petitioners claim it is, and it does not cause the effects that Petitioners claim it does.  Vacating the Interim Decision would not produce the relief that Petitioners seek. In fact, ordering EPA to complete an effects determination on the Interim Decision would be redundant to, and likely delay, the comprehensive consultation EPA has already committed to complete before it issues its final registration review decision.

## V.   Petitioners' ESA claim is prudentially moot.

Not only have Petitioners failed to show that EPA breached a duty
to consult on the Interim Decision, their "failure to consult" claim is
prudentially moot because EPA has already committed to "complete
nationwide ESA section 7(a)(2) effects determination for glyphosate
and, as appropriate, request initiation of any ESA section 7(a)(2)
consultations with the Services that EPA may determine to be
necessary as a result of those effects determinations."[18]  1-RC_ER-36.
EPA reached a significant milestone towards this commitment on
November 27, 2020 when it issued a draft BE.  The draft BE is a
comprehensive, nationwide assessment of the effects of glyphosate on
ESA-listed species and critical habitats that determines the need for
consultation, and its scope.

Preparation of the draft BE was a significant undertaking given
the hundreds of different pesticide products containing glyphosate that
have been registered for wide-ranging uses across wide-ranging

_____

[18] EPA announced its intention to prepare the effects determination in
July 2015 as part a settlement reached in prior litigation.  *Ctr. for Biol.*
*Diversity, et al. v. EPA, et al.*, No. 3:07-cv-02794-JCS (N.D. Cal.), Stip.
Amending Original Stip. Settlement (ECF 154 at 4, ¶¶ 1, 3).

environments, requiring EPA to assess potential effects to all 1,795 ESA-listed species and 792 designated critical habitats. Though ESA consultation is not a public process, EPA took public comment on the draft BE for 60 days, which it extended by 45 days. EPA concluded in the draft BE that formal consultation is required for 1,676 listed species and 759 designated critical habitats. EPA will issue its final BE and begin consultation with the Services by November 12, 2021.[19]

The doctrine of prudential mootness allows a court to "stay its hand" and "withhold relief it has the power to grant." *Chamber of Commerce v. U.S. Dep't of Energy*, 627 F.2d 289, 291 (D.C. Cir. 1980) (citation omitted). Prudential mootness is particularly apt where, as here, "it appears that a challenged 'continuing practice' is, at the moment adjudication is sought, undergoing significant modification so that its ultimate form cannot be confidently predicted." *A.L. Mechling Barge Lines v. United States*, 368 U.S. 324, 331 (1961); *see also Deutsche Bank Nat'l Tr. Co. v. FDIC*, 744 F.3d 1124, 1135-38 (9th Cir. 2014)

---

[19] *See Ctr. for Biol. Diversity, et al. v. EPA*, No. 3:11-cv-00293-JCS (N.D. Cal.), Stip. Partial Settlement Agreement (ECF 364 at 3, 6 ¶ 2); *see also id.* at ECF 383 at 2, ¶ 1.

(applying the doctrine of prudential mootness); *Hunt v. Imperial Merch. Servs.*, 560 F.3d 1137, 1142 (9th Cir. 2009) (Court "assum[ing] that we have discretion to dismiss this case as 'anticipatorily moot'") (citing *Chamber of Commerce*, 627 F.2d at 291); *Reeve Aleutian Airways v. United States*, 889 F.2d 1139, 1144 (D.C. Cir. 1989).

As noted above, Petitioners do not appear to actually seek consultation on the Interim Decision, only vacatur of product registrations, which not result from vacating the Interim Decision. But even if Petitioners pivot on reply to request that EPA be ordered to make an effects determination for the Interim Decision, it would be appropriate for this Court to stay its hand and withhold such relief given that EPA has a longstanding schedule in place to complete a comprehensive consultation on the final registration decision for glyphosate, and is taking a voluntary remand of the Interim Decision's ecological risk assessment to determine how that assessment may be impacted by the findings of the draft BE. While EPA cannot prejudge the outcome of its analysis on remand, it may be that the results of the BE lead EPA to adopt additional or different mitigation measures than those currently specified in the Interim Decision. Thus, it is uncertain

at this stage what mitigation measures, in the form of labeling amendments, EPA ultimately may determine are necessary. Moreover, vacating the Interim Decision would likely be counterproductive by delaying EPA's currently-planned mitigation measures and consultation on the final registration decision.

Petitioners make little attempt to show that their "failure to consult" claim on the Interim Decision is not moot in light of EPA's existing consultation plan, despite basing their claim almost entirely on the very draft BE that EPA prepared to guide its planned consultation. RC Br. at 70-72. Petitioners make no showing that EPA could complete such a consultation any sooner than the one it already plans to complete, or that a consultation on the Interim Decision would be superior to one performed on the final registration review decision. Rather, Petitioners request vacatur of product registrations, which is not an available remedy on the claim they allege.

## VI.  Remedy.

### A.  Petitioners' are wrong in claiming that vacatur of the Interim Decision means vacating hundreds of glyphosate registrations.

Petitioners, citing the standard for registration under FIFRA, claim that vacating the Interim Decision would mean that every glyphosate registration immediately becomes unlawful.  *See* NRDC Br at 69, 72-73; RC Br. at 80.  This argument assumes that the status of each FIFRA product registration is automatically contingent on the outcome of registration review.  *Cf.* NRDC Br at 72-73 (citing 7 U.S.C. § 136a(a)).  Their argument is expressly foreclosed by FIFRA.

Nothing in FIFRA makes the status of individual registrations contingent on the outcome of registration review.  In substance, the registration review provision requires only that "[t]he registrations of pesticides are to be periodically reviewed."  7 U.S.C. § 136a(g)(1)(A)(i).  It does not provide that EPA's past registration decisions are overturned even if EPA affirmatively finds during this review that the pesticide does not meet the FIFRA standard—let alone if EPA makes an *interim* registration review decision assessing *some* risks, but a court then requires EPA to reassess aspects of its analysis.

In fact, FIFRA says the opposite: "[n]o registration shall be canceled as a result of the registration review process unless the Administrator follows the procedures and substantive requirements of section 136d of this title," which govern cancellation of registrations. 7 U.S.C. § 136a(g)(1)(A)(v). Congressional intent is plain. The registration review process is not a basis to automatically overturn any individual product registration, and certainly does not allow immediate cancellation en masse. This provision is written broadly and in the passive voice, forbidding *any* cancellation of any FIFRA registration "as a result of the registration review process," absent further agency action according to the parameters specified by Congress. *Id.*

The only action currently subject to judicial review by this Court is the Interim Decision—not the review of any (let alone all) individual glyphosate product registrations. And a "pesticide product remains registered until EPA or the registrant cancels it." *Reckitt Benckiser*, 613 F.3d at 1134. Even if EPA determines that a pesticide product does not meet the FIFRA standard, cancelling a FIFRA registration requires separate agency action, following a specific, congressionally mandated procedure. *See supra* at 7-9; 7 U.S.C. § 136d(b); 40 C.F.R. §

155.40(a)(2); *see also Reckitt Benckiser*, 613 F.3d at 1134 (cancellation decisions are subject to judicial review). Initiating cancellation proceedings is discretionary with EPA, and occurs on no particular timetable. *See* 7 U.S.C. § 136d(b) (EPA "may" initiate cancellation proceedings). For example, rather than immediately instituting cancellation proceedings EPA might negotiate with the registrant to remove uses that EPA has found pose unreasonable risks, otherwise bring its product into compliance with FIFRA, or voluntarily cancel its registration.

Registration review is just that: an initial review that may lead to cancellation in subsequent administrative proceedings. Adopting Petitioners' requested remedy and vacating each of the more than 500 product-specific glyphosate registrations, *see* 2-RC_ER-221, would leapfrog the agency process, substitute the Court's judgment for EPA's, and vitiate required statutory safeguards.

Petitioners attempt to bypass EPA's determination on whether glyphosate does or does not meet the FIFRA standard. *See* 7 U.S.C. § 136d(b). Even at the time it was issued, the Interim Decision found, based on EPA's analysis so far, that glyphosate *does not* pose human

health risks of concern and, when used according to its label, *does not* pose potential ecological risks outweighing its benefits. Assuming the Court grants EPA's request for voluntary remand, the remaining aspect of the Interim Decision subject to this Court's review will be EPA's conclusion that glyphosate *does not* pose human health risks of concern. Petitioners are asking that the Court treat vacatur of this decision for further consideration by EPA as equivalent to a final decision concluding glyphosate *does* have such unreasonable adverse effects. EPA has never made any finding that glyphosate poses unreasonable adverse effects, and the Court should reject Petitioners' request that it barge ahead of EPA. *See Norton v. S. Utah Wilderness All.*, 542 U.S. 55, 65 (2004) (where the content of agency action is left to the agency's discretion, a court "has no power to specify what the action must be"); *FCC v. Fox TV Stations, Inc.*, 556 U.S. 502, 513 (2009) (courts may not substitute their judgment for that of the agency).

In addition, Petitioners would supplant EPA's discretion over when to initiate cancellation proceedings. Section 136d(b) provides only that EPA "may" initiate cancellation proceedings in certain circumstances, and provides no particular timetable. 7 U.S.C. §

136d(b); *see also* 40 C.F.R. § 155.58(d). Petitioners treat the text as if it used the mandatory "shall" and required cancellation immediately, which would rob EPA of its ability to attempt to resolve issues through negotiation with product registrants. And, in bypassing the required administrative cancellation proceedings, Petitioners would also effectively write out of the statute all of the numerous safeguards Congress required before even one registration can be cancelled, much less all of them. *See supra* at 7-8.

On Petitioners' view EPA gets only one shot at registration review before the Court may abruptly declare hundreds of registrations for the most common herbicide in the United States unlawful. Under this perverse approach, the Court would declare glyphosate unlawful based on an *inchoate* registration review even though Congress forbade the automatic cancellation of registrations where EPA has made a *complete* (and even judicially upheld) registration review decision. 7 U.S.C. § 136a(g)(1)(A)(v).[20]

_____

[20] Moreover, EPA's registration review here is an interim decision, and the deadline to conduct registration review has not yet elapsed. *See* 7 U.S.C. § 136a(g)(1)(A)(iii). It would be strange to declare glyphosate

If the Court finds fault with the remaining aspects of the Interim Decision, the consequence of vacatur is—by law—far less draconian than Petitioners maintain. Vacatur would have no effect on individual glyphosate registrations, but rather simply vacate the Interim Decision itself.

**B.      Vacatur of over five hundred glyphosate registrations is not an appropriate remedy.**

Vacating the Interim Decision does not mean immediately cancelling every single glyphosate registration. But if it did, the Court should refuse to vacate that decision on equitable grounds. Whether agency action should be vacated depends on the seriousness of any errors and the disruptive consequences of an interim change that may itself be changed. *Nat'l Family Farm Coal.*, 966 F.3d at 929-30. The Court also looks to whether the agency would likely be able to offer better reasoning or adopt the same rule on remand. *See id.*

NRDC entirely fails to address the disruptive consequences of its request, despite recognizing that this factor must be weighed. NRDC Br. at 70. While Rural Coalition gestures at addressing this factor, in

---

registrations invalid when EPA has not yet finalized, and has further time to complete, its registration review.

doing so it gives a masterclass on understatement, acknowledging only that "there may be disruptive economic consequences alleged." RC Br. at 80.[21]

There is extensive and undisputed record evidence—not mere allegations—reflecting the disruption Petitioners' remedy would cause. In the short term, the entire array of benefits attendant to glyphosate would rapidly diminish as vacation of the product registrations would render sale or distribution unlawful. And, at the same time, the usage limitations provided on the labels would no longer be enforceable for existing stocks of the products already distributed to end users. *See* 7 U.S.C. §§ 136a, 136j(a)(2)(G), 136l (FIFRA regulates sale and distribution of pesticides; use of unregistered pesticides does not violate FIFRA). After existing stocks were depleted, glyphosate would be unavailable, rendering investments in glyphosate resistant crops moot,

---

[21] Rural Coalition also suggests that the only cognizable disruptive consequence the Court can consider is environmental harm. *See* RC Br. at 79-80. There is no such rule. *See, e.g.*, *Nat'l Family Farm Coal.*, 966 F.3d at 929-30; *Cal. Cmtys. Against Toxics*, 688 F.3d at 994 ("If saving a snail warrants judicial restraint, so does saving the power supply" (citation omitted)).

harming manufacturers and sellers of glyphosate, and requiring users to adopt an alternative approach to weed control. *See supra* at 10-13.[22] Vast sectors of the agricultural economy, including the most commonly grown crops in America, would be affected. *See id.* So would the control of invasive species and the other circumstances in which glyphosate is used. *See id.* There would likely be negative environmental consequences, including as users switched to other pesticides that pose greater risk to the environment, and increased costs of labor. *See id.*

For the reasons explained above, should this Court find some error in the Interim Decision, that error is unlikely to be serious. *See, e.g.*, *Nat'l Family Farm Coal.*, 966 F.3d at 929-30; *Cal. Cmtys. Against Toxics*, 688 F.3d at 993. Petitioners' claims that glyphosate poses a human-health risk are contradicted by extensive record evidence. Even if credited, Petitioners' flawed assertions of residual uncertainty do little to show that EPA could not adopt the same decision on remand.

---

[22] Under certain circumstances, EPA has authority to permit continued sale and use of existing stocks where a registration has been cancelled. *See* 7 U.S.C. § 136d(a)(1).

The Court should reject Petitioners havoc-causing request to overturn every single individual glyphosate product registration.

## CONCLUSION

For the foregoing reasons the petitions for review should be denied.

Respectfully submitted,

Jean E. Williams
*Acting Assistant Attorney General*
Bruce S. Gelber
*Deputy Assistant Attorney General*

Of Counsel:

/s/ Benjamin Carlisle

DEVI CHANDRASEKARAN
*Attorney Advisor*
FORREST PITTMAN
*Attorney Advisor*
Office of General Counsel
U.S. Environmental Protection Agency
Mail Code 2333A
1200 Pennsylvania Avenue, N.W.
Washington, DC 20460

U.S. Environmental Protection Agency

DATED: May 18, 2021

BENJAMIN CARLISLE
*Senior Attorney*
ROBERT WILLIAMS
*Senior Trial Attorney*
Environment and Natural Resources Division
U.S. Department of Justice
Post Office Box 7411
Washington, D.C. 20044
(202) 514-9771 (Carlisle)
Benjamin.Carlisle@usdoj.gov
(202) 305-0206 (Williams)
Robert.P.Williams@usdoj.gov

## STATEMENT OF RELATED CASES

There are no known related cases pending in this Court.

# CERTIFICATE OF COMPLIANCE

1.     This document complies with the type-volume limit established in Ninth Circuit Rule 32-1 because, excluding the parts of the document exempted by Federal Rule of Appellate Procedure 32(f) this document contains 13,990 words.

2.     This document complies with the typeface requirements of Federal Rule of Appellate Procedure 32(a)(5) and the type-style requirements of Federal Rule of Appellate Procedure 32(a)(6) because this document has been prepared in a proportionally spaced typeface using Microsoft Word 2016 in 14-point Century Schoolbook font.

/s/ *Benjamin Carlisle*
Benjamin Carlisle

## CERTIFICATE OF SERVICE

I hereby certify that on May 18, 2021, I electronically filed the foregoing Respondents' Brief with the Clerk of the Court for the United States Court of Appeals for the District of Columbia Circuit by using the appellate CM/ECF system.

The participants in the case are registered CM/ECF users and service will be accomplished by the appellate CM/ECF system.

/s/ *Benjamin Carlisle*
BENJAMIN CARLISLE

# EXHIBIT 13

Nos. 20-70787, 20-70801

───────────────────

UNITED STATES COURT OF APPEALS
FOR THE NINTH CIRCUIT

───────────────────

NATURAL RESOURCES DEFENSE COUNCIL, et al.,
*Petitioners*,

v.

UNITED STATES ENVIRONMENTAL PROTECTION AGENCY,
*Respondent.*

RURAL COALITION, et al.,
*Petitioners*,

v.

UNITED STATES ENVIRONMENTAL PROTECTION AGENCY,
*Respondent.*

───────────────────

On Petition for Review of Final Agency Action of the
United States Environmental Protection Agency

───────────────────

**MOTION FOR
PARTIAL REMAND WITHOUT VACATUR**

───────────────────

<table>
<tr><td></td><td>Jean E. Williams<br>*Acting Assistant Attorney General*</td></tr>
<tr><td>Of Counsel:</td><td>Bruce S. Gelber<br>*Deputy Assistant Attorney General*</td></tr>
<tr><td>DEVI CHANDRASEKARAN</td><td></td></tr>
</table>

*Attorney Advisor*
FORREST PITTMAN
*Attorney Advisor*
Office of General Counsel
U.S. Environmental Protection
Agency
Mail Code 2333A
1200 Pennsylvania Avenue, N.W.
Washington, DC 20460

U.S. Environmental Protection
Agency

BENJAMIN CARLISLE
*Senior Attorney*
ROBERT WILLIAMS
*Senior Trial Attorney*
Environment and Natural Resources
Division
U.S. Department of Justice
Post Office Box 7411
Washington, D.C. 20044
(202) 514-9771 (Carlisle)
Benjamin.Carlisle@usdoj.gov
(202) 305-0206 (Williams)
Robert.P.Williams@usdoj.gov

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ..................................................................ii

GLOSSARY ........................................................................................ v

INTRODUCTION ............................................................................... 1

BACKGROUND .................................................................................. 2

    A.    Legal Background ................................................................ 2

        1.    Federal Insecticide, Fungicide, and Rodenticide Act ......................................................... 2

        2.    Endangered Species Act ................................................ 4

    B.    The Glyphosate Interim Decision ...................................... 6

    C.    Procedural History ............................................................. 9

STANDARD OF REVIEW ................................................................ 11

ARGUMENT .................................................................................... 12

I.    Remand Is Proper to Allow EPA to Address this Court's Subsequent Decisions and Other Intervening Events. ............................................................................... 12

II.    Vacatur of the Interim Risk Mitigation Measures Is Not Appropriate............................................................... 18

III.    Vacatur of 500+ Individual Glyphosate Product Registrations Is Not Available Relief ........................... 21

CONCLUSION ................................................................................ 24

i

# TABLE OF AUTHORITIES

## Cases

*Allied–Signal, Inc. v. U.S. Nuclear Regulatory Comm'n,*
   988 F.2d 146 (D.C. Cir. 1993) ........................................................ 12, 19

*B.J. Alan Co., Inc. v. ICC,*
   897 F.2d 561 (D.C. Cir. 1990) ............................................................... 14

*Cal. Cmtys. Against Toxics v. EPA,*
   688 F.3d 989 (9th Cir. 2012) .............................................. 12, 13, 14, 19

*Ethyl Corp. v. Browner,*
   989 F.2d 522 (D.C. Cir. 1993) ....................................................... 13, 14

*Friends of Santa Clara River v. USACE,*
   887 F.3d 906 (9th Cir. 2018) .................................................................. 6

*Limnia, Inc. v. U.S. Dep't of Energy,*
   857 F.3d 379 (D.C. Cir. 2017) ............................................................... 15

*Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.,*
   463 U.S. 29 (1983) ................................................................................ 13

*Nathan Kimmel, Inc. v. DowElanco,*
   275 F.3d 1199 (9th Cir. 2002) ................................................................ 3

*Nat'l Family Farm Coal. v. EPA,*
   960 F.3d 1120 (9th Cir. 2020) ....................................................... 10, 16

*Nat'l Family Farm Coal. v. EPA,*
   966 F.3d 893 (9th Cir. 2020) ...................................................... 6, 10, 16

*Pollinator Stewardship Council v. EPA,*
   806 F.3d 520 (9th Cir. 2015) ................................................................ 20

*Reckitt Benckiser Inc. v. EPA*,
    613 F.3d 1131 (D.C. Cir. 2010) ....................................................... 4, 23

*SKF USA, Inc. v. United States*,
    254 F.3d 1022 (Fed. Cir. 2001) ................................................. 13, 14, 15

*Sw. Ctr. for Biological Diversity v. U.S. Forest Serv.*,
    100 F.3d 1443 (9th Cir. 1996) ................................................................ 5

**Statutes**

7 U.S.C. § 136(bb) ................................................................................ 4

7 U.S.C. § 136a(a) ................................................................................ 3

7 U.S.C. § 136a(c)(1)(A)-(F) ................................................................ 3

7 U.S.C. § 136a(c)(5) ........................................................................... 3

7 U.S.C. § 136a(d)(1) ........................................................................... 3

7 U.S.C. § 136a(g) ............................................................................... 4

7 U.S.C. § 136a(g)(1)(A)(i) ................................................................ 23

7 U.S.C. § 136a(g)(1)(A)(iii) .............................................................. 24

7 U.S.C. § 136a(g)(1)(A)(iii)(I) ......................................................... 19

7 U.S.C. § 136a(g)(1)(A)(v) .............................................................. 23

7 U.S.C. § 136d(b) ...................................................................... 4, 5, 23

7 U.S.C. § 136j(a)(2)(G) ....................................................................... 4

16 U.S.C. § 1536(a)(2) .......................................................................... 5

16 U.S.C. § 1536(b)(3) .......................................................................... 6

## Code of Federal Regulations

40 C.F.R. pt. 152 ...............................................................................3

40 C.F.R. pt. 158 ...............................................................................3

40 C.F.R. § 155.40. ...........................................................................4

40 C.F.R. § 155.56 .................................................................. 4, 9, 25

50 C.F.R. § 402.02 .............................................................................5

50 C.F.R. § 402.13 .............................................................................6

50 C.F.R. § 402.13(a) .....................................................................5, 6

50 C.F.R. § 402.14 .............................................................................6

50 C.F.R. § 402.14(a) ........................................................................5

50 C.F.R. § 402.14(b)(1) ................................................................5, 6

50 C.F.R. § 402.46 .............................................................................6

## Federal Registers

69 Fed. Reg. 47,732 (Aug. 5, 2004) ...............................................3

86 Fed. Reg. 7037 (Jan. 25, 2021) .......................................... 11, 12

## Other

Charles H. Koch Jr., *Administrative Law & Practice* § 8:31, at 187 (3d
    ed. 2010) ................................................................................13

**GLOSSARY**

| | |
|---|---|
| EPA | Environmental Protection Agency |
| ESA | Endangered Species Act |
| FIFRA | Federal Insecticide, Fungicide, and Rodenticide Act |
| Interim Decision | EPA's Interim Registration Review Decision for glyphosate |

# INTRODUCTION

Petitioners challenge the U.S. Environmental Protection Agency's ("EPA") issuance of an interim decision on certain aspects of its registration review for the herbicide glyphosate ("Interim Decision") under the Federal Insecticide, Fungicide, and Rodenticide Act ("FIFRA"). The Interim Decision finalized certain portions of EPA's analysis of glyphosate's risks. It also determined that certain interim risk mitigation measures were necessary, including label changes to address risks associated with glyphosate spray drift and herbicide resistance. In particular, Petitioners challenge EPA's conclusions that glyphosate does not pose human health risks, EPA's assessment of glyphosate's ecological and other risks, EPA's balancing of glyphosate's risks versus its benefits, and the lack of consultation under the Endangered Species Act ("ESA") until completion of its final registration review.

In light of intervening decisions from this Court following issuance of FIFRA registration actions, EPA's publication of its draft biological evaluation for glyphosate, and other factors, EPA now seeks partial voluntary remand of the Interim Decision. Specifically, EPA seeks

partial voluntary remand of the portions of the Interim Decision that do not relate to its conclusions on human health risks or the usage and benefits of glyphosate. This remand would include the Agency's analysis of the ecological risks and other potential costs associated with glyphosate and EPA's weighing of such risks against the benefits of glyphosate. The remaining challenges in this action, should this motion be granted, will be to EPA's human-health risk analysis and the lack of ESA consultation. EPA also seeks such partial remand without vacatur of the interim risk mitigation measures specified by the Interim Decision.

EPA has conferred with counsel for the other parties to this action. Petitioners stated that they reserve taking a position until they have an opportunity to review the motion. Intervenors stated that they do not anticipate opposing this motion.

## BACKGROUND

### A. Legal Background

#### 1. Federal Insecticide, Fungicide, and Rodenticide Act

FIFRA generally precludes the distribution or sale of any pesticide unless it is "registered" by EPA pursuant to FIFRA and EPA's

2

regulations. 7 U.S.C. § 136a(a); 40 C.F.R. pts. 152, 158. Once granted, a

FIFRA registration is a license conferred to the applicant that

establishes the terms and conditions under which the applicant's

specific pesticide product may be lawfully sold, distributed, and used in

the United States. 7 U.S.C. §§ 136a(c)(1)(A)-(F), 136a(d)(1); *see also*

*Nathan Kimmel, Inc. v. DowElanco*, 275 F.3d 1199, 1204 (9th Cir.

2002); 69 Fed. Reg. 47,732, 47,733 (Aug. 5, 2004).

EPA will register a pesticide if it determines that the pesticide

"will perform its intended function without unreasonable adverse effects

on the environment," and "when used in accordance with widespread

and commonly recognized practice it will not generally cause

unreasonable adverse effects on the environment," among other

requirements. 7 U.S.C. § 136a(c)(5); *see also id.* § 136(bb). In making

this determination, EPA will consider any restrictions it has imposed on

the use of the pesticide. *Id.* § 136(bb). It is unlawful to use a pesticide

"in a manner inconsistent with its labeling." 7 U.S.C. § 136j(a)(2)(G).

EPA must periodically review pesticide registrations. 7 U.S.C. §

136a(g); *see* 40 C.F.R. § 155.40 *et seq.* EPA need not conduct the

entirety of the registration review at once, but rather has discretion to

make an "interim registration review decision."  40 C.F.R. § 155.56.

"Among other things, the interim registration review decision may require new risk mitigation measures, impose interim risk mitigation measures, identify data or information required to complete the review, and include schedules for submitting the required data, conducting the new risk assessment and completing the registration review."  *Id.*

An applicant's registration of a pesticide remains effective until EPA cancels it, which is a statutorily defined administrative action subject to specific procedural safeguards.  *See* 7 U.S.C. § 136d(b); *see also* 40 C.F.R. § 155.40; *Reckitt Benckiser Inc. v. EPA*, 613 F.3d 1131, 1134 (D.C. Cir. 2010).  Congress provided that pesticide registrations shall not be cancelled "as a result of the registration review process unless [EPA] follows the procedures and substantive requirements" for cancellation set forth in Section 136d.  7 U.S.C. § 136a(g).  Cancellation is subject to a set of mandatory statutory safeguards.  *See* 7 U.S.C. § 136d(b).

## 2.    Endangered Species Act

ESA Section 7(a)(2) directs each federal agency to insure that "any action authorized, funded, or carried out by such agency . . . is not likely

4

to jeopardize the continued existence of" a listed species or destroy or adversely modify designated critical habitat. 16 U.S.C. § 1536(a)(2). To facilitate compliance with those mandates, the ESA's implementing regulations outline a process whereby federal "action agencies" consult with the appropriate expert "consulting agency" (either the National Marine Fisheries Service or the U.S. Fish & Wildlife Service or both, depending on the species involved) to, among other things, analyze the potential impacts of a proposed action on listed species and designated critical habitat. 50 C.F.R. §§ 402.13(a), 402.14(b)(1).

Consultation is required whenever a proposed federal action "may affect" listed species or critical habitat. *Id.* § 402.14(a). Agency "action" and "effects of the action" are defined terms under the ESA. *Id.* § 402.02. If the action will not affect listed species or designated critical habitat, then consultation is not required. *Sw. Ctr. for Biological Diversity v. U.S. Forest Serv.*, 100 F.3d 1443, 1447-48 (9th Cir. 1996); *National Family Farm Coal. v. EPA*, 966 F.3d 893, 924 (9th Cir. 2020); *Friends of Santa Clara River v. USACE*, 887 F.3d 906 (9th Cir. 2018).

If, however, the action agency determines that the action "may affect" listed species or critical habitat, it must consult (formally or

informally) with the appropriate consulting agency. 50 C.F.R. §§ 402.13-402.14.  Formal consultation is required unless the action agency determines, with the consulting agency's written concurrence, that the proposed action is "not likely to adversely affect" a listed species or critical habitat. *Id*. §§ 402.13(a), 402.14(b)(1). If formal consultation is required, then the consulting agency must prepare a biological opinion stating whether the proposed action is likely to "jeopardize the continued existence of" any listed species or destroy or adversely modify critical habitat. 16 U.S.C. § 1536(b)(3); 50 C.F.R. §§ 402.14, 402.46.

## B.    The Glyphosate Interim Decision

Glyphosate is a versatile, broad-spectrum herbicide used in an array of agricultural and other settings.  1-RC-15-16; 2-RC267.[1]  It is the most common agricultural herbicide used in the United States.  1-RC-15.

The Interim Decision was signed on January 22, 2020.  1-RC-3. EPA issued that decision in order to "(1) move forward with aspects of the registration review case that are complete and (2) implement

---

[1] Citations to __-RC_ER-__ are to Rural Coalition, et al.'s excerpts of record, submitted with their opening brief.

6

interim risk mitigation." 1-RC-5. Among other things, the Interim

Decision "finalize[d] the agency's draft supporting documents

*Glyphosate Draft Human Health Risk Assessment for Registration*

*Review* and *Registration Review—Preliminary Ecological Risk*

*Assessment for Glyphosate and Its Salts*." 1-RC-6.

The Interim Decision briefly summarized EPA's conclusions (as of

the date of signature) on the risks and benefits associated with

glyphosate. As to human health, "EPA thoroughly assessed risks to

humans from exposure to glyphosate from all registered uses and all

routes of exposure and did not identify any risks of concern." 1-RC-11;

1-RC-16. The Interim Decision also summarized EPA's conclusions as

to ecological risks, including EPA's assessment of risks to non-target

plants due to potential drift of glyphosate sprays to nearby areas. 1-

RC-14-15. EPA also analyzed the substantial benefits of glyphosate as

an effective, inexpensive, versatile, and widely used method of weed

control in a variety of applications. 1-RC-15-17; *see also* 2-RC266-96.

EPA concluded that, with interim risk mitigation measures, "the

benefits outweigh the potential ecological risks when glyphosate is used

according to label directions." 1-RC-17.

7

Those interim risk mitigation measures included label amendments restricting how and when glyphosate can be sprayed, a "non-target organism advisory," and herbicide resistance measures. *See* 1-RC-17-19. However, because EPA was still in the process of responding to an administrative petition[2] requesting certain labeling changes, it did not immediately solicit updated proposed labels from registrants that would include changes based on the Interim Decision. 1-RC-23. EPA explained that it will solicit such label amendment submissions once it completes its response to that petition. 1-RC-23. To date, EPA has not solicited such label submissions.

Consistent with EPA's regulations, *see* 40 C.F.R. § 155.56, the Interim Decision noted aspects that would be completed in EPA's final registration review decision. 1-RC-5; *see also* 1-RC-22. While EPA was working on the Interim Decision, EPA was in the process of working with the FWS and NMFS to develop methodologies for conducting national threatened and endangered species assessments for pesticides

---

[2] Environmental Working Group Petition to Reduce the Glyphosate Tolerance on Oats and Prohibit Preharvest Use on Oats, EPA-HQ-OPP-2019-0066.

8

in accordance with the ESA.  1-RC-5.[3]  It therefore explained in the
Interim Decision that it "will complete its listed species assessment and
any necessary consultation with the Services for glyphosate prior to
completing the glyphosate registration review."  1-RC-5.

## C.    Procedural History

After the Interim Decision was signed on January 22, 2020, the
Ninth Circuit issued two decisions addressing petitions for review
under FIFRA.  In the first, *National Family Farm Coalition v. EPA*, 960
F.3d 1120 (9th Cir. 2020) (*NFFC I*), this Court vacated and remanded
certain conditional registrations for dicamba-based herbicides.  The
Court concluded that EPA had failed to properly acknowledge the risks
and impacts of spray drift associated with dicamba use.  *See id.* at 1137-
39.  The Court also concluded that EPA had "failed to acknowledge an
economic cost that is virtually certain to result from the conditional
registrations."  *See id.* at 1142-43.

_____

[3] These revised methodologies were finalized in March 2020, following
public comment.  *See* <https://www.epa.gov/endangered-species/revised-
method-national-level-listed-species-biological-evaluations-
conventional>.

9

In the second, *National Family Farm Coal. v. United States EPA*, 966 F.3d 893, 916-17 (9th Cir. 2020) (*NFFC II*), this Court remanded, but did not vacate, the registration of Enlist Duo, a combination product containing 2,4-dichlorophenoxyacetic acid (2,4-D) and glyphosate. It concluded that EPA had not properly assessed the risks of increased 2,4-D use on in-field (on-target) monarch butterfly habitat. *See id.*

On November 25, 2020, EPA issued its draft biological evaluation for glyphosate.[4] This draft document assesses potential risks that registered uses of glyphosate may pose to an individual of a species listed under the ESA or designated critical habitat. Glyphosate Executive Summary for Draft Biological Evaluation at 1. This draft proposed to find that, of 1,795 listed species that may be affected by glyphosate use, such use was likely to adversely affect 1,676 of those species. *See id.* at 5.

EPA moved for a sixty-day abeyance in this case on February 5, 2021. *See* Motion for Abeyance, *NRDC v. EPA*, No. 20-70787, Dkt. Entry 72-1, Doc. No. 11994414 (9th Cir. Feb. 5, 2021). EPA explained

---

[4] Available at <https://www.epa.gov/endangered-species/draft-national-level-listed-species-biological-evaluation-glyphosate>.

10

that, on January 20, 2021, President Biden issued an "*Executive Order on Protecting Public Health and the Environment and Restoring Science to Tackle the Climate Crisis*," ("Executive Order").  86 Fed. Reg. 7037 (Jan. 25, 2021).  The Executive Order directs agencies to "immediately review all existing regulations, orders, guidance documents, policies, and any other similar agency actions (agency actions) promulgated, issued, or adopted between January 20, 2017, and January 20, 2021," for consistency with the policy set forth in that order to:

> listen to the science; to improve public health and protect our environment; to ensure access to clean air and water; to limit exposure to dangerous chemicals and pesticides; to hold polluters accountable, including those who disproportionately harm communities of color and low-income communities; to reduce greenhouse gas emissions; to bolster resilience to the impacts of climate change; to restore and expand our national treasures and monuments; and to prioritize both environmental justice and the creation of the well-paying union jobs necessary to deliver on these goals.

*Id.*  The Court granted EPA's motion for an abeyance on February 17, 2021.  *See* Order, *NRDC v. EPA*, No. 20-70787, Dkt. Entry 75, Doc. No. 12007345 (9th Cir. Feb. 17, 2021).

## STANDARD OF REVIEW

Voluntary remand of a challenged agency action is proper where the agency seeks to reconsider its initial action. *California Communities*

*Against Toxics v. EPA*, 688 F.3d 989, 992 (9th Cir. 2012). "Whether agency action should be vacated depends on how serious the agency's errors are 'and the disruptive consequences of an interim change that may itself be changed.'" *Id*. (quoting *Allied–Signal, Inc. v. U.S. Nuclear Regulatory Comm'n*, 988 F.2d 146, 150–51 (D.C. Cir. 1993)).

## ARGUMENT

### I. Remand Is Proper to Allow EPA to Address this Court's Subsequent Decisions and Other Intervening Events.

EPA satisfies the standard for voluntary remand because it wishes to consider whether components of its analysis may be affected by intervening events, including two decisions of this Court.

Agencies have inherent authority to reconsider past decisions and to revise, replace, or repeal initial actions. *Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 42 (1983). Allowing for voluntary remand is consistent with this principle. *See Ethyl Corp. v. Browner*, 989 F.2d 522, 524 (D.C. Cir. 1993). In litigation, courts have recognized that an "agency may take one of five positions" with respect to remand of the challenged action, including "seek[ing] a remand to reconsider its decision because of intervening events outside of the

12

agency's control." *SKF USA, Inc. v. United States*, 254 F.3d 1022, 1027-28 (Fed. Cir. 2001); *see also Cal. Cmtys.*, 688 F.3d at 992 (same and citing *SKF*, 254 F.3d at 1029); Charles H. Koch Jr., *Administrative Law & Practice* § 8:31, at 187 (3d ed. 2010). When an agency seeks a remand on such grounds, "remand to the agency is required, absent the most unusual circumstances verging on bad faith." *SKF*, 254 F.3d at 1029-30.

Indeed, this Court affirmed that it should only "refuse voluntarily requested remand when the agency's request is frivolous or made in bad faith." *Cal. Cmtys.*, 688 F.3d at 992. This is for good reason: "[a]dministrative reconsideration is a more expeditious and efficient means of achieving an adjustment of agency policy than is resort to the federal courts." *B.J. Alan Co., Inc. v. ICC*, 897 F.2d 561, 562 n.1 (D.C. Cir. 1990) (cleaned up). As the D.C. Circuit explained, "[w]e commonly grant such [relief], preferring to allow agencies to cure their own mistakes rather than wasting the courts' and the parties' resources reviewing a record that both sides acknowledge to be incorrect or incomplete." *Ethyl Corp.*, 989 F.2d at 524.

Several considerations support a voluntary remand of all portions of the Interim Decision other than those related to (1) EPA's assessment

13

of human health risks and (2) the usage and benefits of glyphosate.[5]  A

confession of error is not necessary for voluntary remand so long as the

agency is committed to reconsidering its decision.  *SKF*, 254 F.3d at

1029.  For example, remand may be appropriate if an agency "wishe[s]

to consider further the governing statute, or the procedures that were

followed," or if an agency has "doubts about the correctness of its

decision or that decision's relationship to the agency's other policies."

*Id.*; *see also Limnia, Inc. v. U.S. Dep't of Energy*, 857 F.3d 379, 387 (D.C.

Cir. 2017) (An agency does not need to "confess error or impropriety in

order to obtain a voluntary remand" so long as it has "profess[ed] [an]

intention to reconsider, re-review, or modify the original agency decision

that is the subject of the legal challenge.").

First, voluntary remand will afford EPA the opportunity to

determine how its analysis in the Interim Decision may be impacted by

its analysis in its draft biological evaluation, issued in November 2020.

*See* Reaves Decl. ¶ 9.  While EPA cannot prejudge the outcome of its

---

[5] None of the Petitioners bring any argument that EPA's assessment of the usage and benefits of glyphosate is not supported by substantial evidence or is otherwise unlawful.

analysis, it may be that the results of EPA's biological evaluation lead it to adopt additional or different mitigation measures than those specified in the Interim Decision. *See id.* ¶ 10.

Second, in light of this Court's decision in *NFFC II*, it wishes to reconsider its ecological analysis in the Interim Decision as it relates to in-field effects of glyphosate on monarch butterfly habitat. *See* 966 F.3d at 916-17. Voluntary remand is appropriate to allow EPA to address this issue. *See* Reaves Decl. ¶¶ 11-12.

Third, this Court's decision in *NFFC I* addressed, among other things, spray-drift risks as well as economic and social costs associated with another herbicide, dicamba. *See NFFC I*, 960 F.3d at 1137-39. Voluntary remand will allow EPA to consider this intervening decision, including whether it affects EPA's analysis of glyphosate or whether further explanation of EPA's analysis is warranted. *See* Reaves Decl. ¶¶ 11-12.

Fourth, voluntary remand will allow EPA to better evaluate the Interim Decision in light of the change in Administration and the policies announced in the January 20, 2021, Executive Order. It will afford EPA an opportunity to consider whether there are other aspects

15

of its analysis of ecological risks or other costs related to glyphosate that should be reassessed or for which additional explanation should be provided. *See* Reaves Decl. ¶ 13.

Fifth, EPA is already conducting certain analyses that were left outstanding in its Interim Decision, and a final registration review decision on glyphosate is still forthcoming. *See supra* at 8-9. Thus, to the extent that EPA determines to reassess aspects of the ecological or other non-human health risks and costs of glyphosate, it can do so as a component of this final decision. This will allow EPA to consider, as a whole, what risk mitigation measures may be appropriate to address such ecological or other non-human health risks and costs of glyphosate.[6] *See* Reaves Decl. ¶ 14.

EPA therefore requests voluntary remand of the portions of the Interim Decision that do not relate to its conclusions on human health risks or the usage and benefits of glyphosate. *See* Reaves Decl. ¶ 8. Specifically, EPA seeks remand of its finalization of its analysis of the ecological risks and other potential (non-human-health) costs associated

---

[6] EPA cannot prejudge the outcome of its analysis, including whether or what mitigation measures may be appropriate.

with glyphosate. *See, e.g.*, 1-RC-6 (noting that the Interim Decision finalized EPA's "*Registration Review—Preliminary Ecological Risk Assessment for Glyphosate and Its Salts*."). Accordingly, it also seeks remand of its conclusion that "the benefits outweigh the potential ecological risks when glyphosate is used according to label directions." 1 RC-17.

EPA currently intends to address the issues subject to this remand and EPA's further consideration, including its assessment of the non-human health risks and costs of glyphosate and any appropriate mitigation measures addressing such risks, in issuing its final registration review decision. *See* Reaves Decl. ¶ 15. At its discretion, however, it may address some or all of these issues in one or more interim decisions. *See id.*

As to human health risks, EPA has reviewed the Interim Decision and believes that this component of its analysis should be sustained by this Court. EPA also understands that it is Petitioners' position that an ESA consultation was required as to the Interim Decision, and that they wish to advance this argument notwithstanding EPA's remand as discussed above. Thus, EPA has set forth in its response brief its

17

arguments in response to Petitioners' challenge to EPA's analysis of human health risks and their arguments on the ESA. EPA also addresses Petitioners' inappropriate requested remedy, which arguments are also briefly summarized below. The Court need not reach any other aspect of Petitioners' challenges to the Interim Decision, which will be addressed under the remand EPA is requesting.

On remand, EPA will conduct its review and any analyses for glyphosate as expeditiously as practicable. EPA issued the Interim Decision well before the statutory deadline for its final registration review decision of October 1, 2022, *see* 7 U.S.C. § 136a(g)(1)(A)(iii)(I), reflecting both that EPA has been working in good faith to expeditiously complete its analyses and that the statutory deadline to do so has not yet elapsed. *See* Reaves Decl. ¶ 16.

## II. Vacatur of the Interim Risk Mitigation Measures Is Not Appropriate.

To determine whether vacatur is warranted, the Court undertakes an equitable analysis. "[T]he decision whether to vacate depends on the seriousness of the order's deficiencies (and thus the extent of doubt whether the agency chose correctly) and the disruptive consequences of an interim change that may itself be changed." *Allied-Signal*, 988 F.2d

18

at 150-51 (cleaned up); *Cal. Cmtys.*, 688 F.3d at 992 (same). Also relevant to the analysis is whether EPA "could adopt the same rule on remand, or whether such fundamental flaws in the agency's decision make it unlikely that the same rule would be adopted on remand." *Pollinator Stewardship Council v. EPA*, 806 F.3d 520, 532 (9th Cir. 2015).

The Interim Decision stated that certain labeling amendments are necessary that would impose restrictions on how and when glyphosate can be sprayed, a "non-target organism advisory," and herbicide resistance measures. *See* 1-RC17-19. However, because EPA was responding to an administrative petition requesting certain labeling changes, it explained that it will solicit such label amendment submissions once it completes its response to that petition. 1-RC-23. To date, EPA has not done so.

At this stage, it is unclear what mitigation measures, in the form of labeling amendments, EPA may determine are necessary based on its analysis following partial remand. However, although Petitioners challenge the interim risk mitigation measures in the Interim Decision as insufficiently protective, no party challenges them as too stringent.

19

Thus, although these measures are not currently in effect, EPA
respectfully requests that the Court's partial remand be without
vacatur of these interim risk mitigation measures. *See* Reaves Decl. ¶¶
17-18. This will allow EPA flexibility to solicit the labeling
amendments during its analysis following partial remand, should it
determine that doing so is appropriate.[7]

Moreover, EPA has identified an issue in the Interim Decision
that needs reconsideration due to intervening caselaw relating to the
effects of herbicide use on in-field (on-target) monarch butterfly habitat.
This reconsideration, however, does not relate to the risks addressed by
the necessary labeling changes specified by the Interim Decision: drift
of glyphosate to areas *outside* of the target field and herbicide
resistance. EPA has also not fully considered, in light of *NFFC II*,
whether there are any risks posed to monarch butterflies from on-field
use of glyphosate, and if so, what measures might be necessary to
mitigate such risks so that they are not unreasonable. While EPA

---

[7] EPA currently takes no position on any risk mitigation measures it
may find necessary following partial remand. EPA cannot prejudge the
outcome of its administrative process that will occur following partial
remand.

20

intends to consider its analysis on spray drift and other aspects of the Interim Decision on partial remand, including in light of *NFFC I*'s analysis of dicamba drift and other intervening information, it has not yet conducted this analysis or determined whether it will reach a different result following partial remand.

Because EPA has not yet solicited labeling amendment submissions, there is currently no burden imposed on regulated parties—who, in any event, have not challenged these requirements. Partial remand without vacatur of the labeling restrictions found to be necessary in the Interim Decision will allow EPA flexibility to update what labeling changes are necessary, consistent with the remanded Interim Decision, if appropriate.

## III. Vacatur of 500+ Individual Glyphosate Product Registrations Is Not Available Relief

In their merits briefs, Petitioners claim that vacating the Interim Decision means that every glyphosate registration immediately becomes unlawful. *See* NRDC Br. at 72-73; RC Br. at 80. To the extent that Petitioners may argue for that result due to the partial voluntary remand requested here, Petitioners are wrong for the same reasons as articulated in EPA's response brief, which are briefly summarized here.

Petitioners in this action do not seek judicial review of any individual glyphosate product registrations. And a "pesticide product remains registered until EPA or the registrant cancels it." *Reckitt Benckiser Inc.*, 613 F.3d at 1134. In substance, the registration review provision requires only that "[t]he registrations of pesticides are to be periodically reviewed." 7 U.S.C. § 136a(g)(1)(A)(i). It does not provide that EPA's past registration decisions are overturned even if EPA affirmatively finds during its review that the pesticide does not meet the FIFRA standard—or if EPA finds the pesticide *does* meet that standard but a court conducting judicial review requires EPA to reassess some points of its analysis.

In fact, FIFRA says the opposite: "[n]o registration shall be canceled as a result of the registration review process unless the Administrator follows the procedures and substantive requirements of section 136d of this title," which govern cancellation of registrations. 7 U.S.C. § 136a(g)(1)(A)(v); *see* 7 U.S.C. § 136d(b) (setting forth these safeguards and procedures). Adopting Petitioners' requested remedy and vacating each of the more than 500 product-specific glyphosate registrations, *see* 2-RC-221, would leapfrog the agency process,

22

substituting the Court's judgment for EPA's and vitiating the statutory safeguards Congress included in FIFRA.

Moreover, even if Petitioners' requested remedy was available, the Court should decline to order vacatur. There is extensive and undisputed record evidence of the disruption Petitioners' remedy would cause. After existing stocks were depleted, glyphosate would be unavailable, rendering investments in glyphosate resistant crops moot, harming manufacturers and sellers of glyphosate, and requiring users to adopt an alternative approach to weed control. *See* EPA Response Br. at 10-13. Vast sectors of the agricultural economy, including the most commonly grown crops in America, would be affected. *See id.* So would the control of invasive species and the other circumstances in which glyphosate is used. *See id.* There would likely be negative environmental consequences, including as users switched to other pesticides that pose greater risk to the environment, and increased costs of labor. *See id.*

Partial voluntary remand will afford EPA an opportunity to reassess aspects of its Interim Decision, and EPA might yet reach the same result following partial remand. Moreover, the deadline to

conduct registration review has not yet elapsed.  *See* 7 U.S.C. § 136a(g)(1)(A)(iii).  Even if it was an available remedy to declare glyphosate individual registrations invalid as the result of the registration review process, doing so would be decidedly odd where EPA has volunteered to re-examine aspects of its decision and the time to make a final registration review decision has not yet elapsed.  Granting this remedy would disincentivize EPA from issuing interim decisions, as well as from seeking voluntary remand to reexamine its decisions.  If EPA were to stop issuing interim decisions, valuable mitigation measures that address portions of a pesticide's risk concerns and collection of data and information required to complete registration review could be delayed. *See* 40 C.F.R. § 155.56.

## CONCLUSION

For the foregoing reasons, the Court should partially remand the Interim Decision, specifically those portions which do not relate to EPA's human-health risk analysis and assessment of the usage and benefits of glyphosate, without vacatur of EPA's determination that certain additional labeling restrictions are necessary as described in the Interim Decision.

Respectfully submitted,

Jean E. Williams
*Acting Assistant Attorney General*
Bruce S. Gelber
*Deputy Assistant Attorney General*

Of Counsel:

/s/ Benjamin Carlisle

DEVI CHANDRASEKARAN
*Attorney Advisor*
FORREST PITTMAN
*Attorney Advisor*
Office of General Counsel
U.S. Environmental Protection
Agency
Mail Code 2333A
1200 Pennsylvania Avenue, N.W.
Washington, DC 20460

U.S. Environmental Protection
Agency

BENJAMIN CARLISLE
*Senior Attorney*
ROBERT WILLIAMS
*Senior Trial Attorney*
Environment and Natural Resources
Division
U.S. Department of Justice
Post Office Box 7411
Washington, D.C. 20044
(202) 514-9771 (Carlisle)
Benjamin.Carlisle@usdoj.gov
(202) 305-0206 (Williams)
Robert.P.Williams@usdoj.gov

DATED: May 18, 2021

## CERTIFICATE OF COMPLIANCE WITH TYPE-VOLUME LIMIT, TYPEFACE REQUIREMENTS, AND TYPE-STYLE REQUIREMENTS

I hereby certify that this motion complies with the type-volume limitation of Fed. R. App. P. 27(d)(2) because it contains 4,493 words, according to the count of Microsoft Word. I further certify that this motion complies with the requirements of Fed. R. App. P. 32(a)(5) and (6) because it has been prepared in Microsoft Word using 14-point Century Schoolbook, a proportionally spaced font.

/s/ Benjamin Carlisle
Benjamin Carlisle

Counsel for Respondent EPA

1

## CERTIFICATE OF SERVICE

I hereby certify that I electronically filed the foregoing document using the Electronic Case Filing ("ECF") system of this Court. The ECF system will send a "Notice of Electronic Filing" to the attorneys of record.

/s/ Benjamin Carlisle
Benjamin Carlisle

# EXHIBIT 14

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| IN RE: ROUNDUP PRODUCTS LIABILITY LITGATION | MDL No. 2741 |
| | Case No. 16-md-02741-VC |
| This document relates to: | **PRETRIAL ORDER NO. 160: GRANTING IN PART AND DENYING IN PART MONSANTO'S MOTION FOR JUDGMENT AS A MATTER OF LAW ON PUNITIVE DAMAGES; DENYING MONSANTO'S MOTION FOR A NEW TRIAL ON COMPENSATORY DAMAGES** |
| *Hardeman v. Monsanto Co.*, 16-cv-00525-VC | |

This order addresses Monsanto's post-trial challenge to Mr. Hardeman's damages award. The approximately $5 million compensatory damages award is sufficiently supported by the evidence, and Monsanto's request for a new trial on that issue is therefore denied. The jury's decision to award punitive damages is reasonable as well, but the size of the award – $75 million – is constitutionally impermissible. This will be reduced to $20 million, for a total award of $25,267,634.10.

I.

State law governs review of a compensatory damages award in a diversity action. *See Gasperini v. Ctr. for Humanities, Inc.*, 518 U.S. 415, 430-31 (1996); *Foradori v. Harris*, 523 F.3d 477, 497 (5th Cir. 2008). Under California law, a new trial may be granted on the basis of an excessive award only if "after weighing the evidence the court is convinced from the entire record,

including reasonable inferences therefrom, that the court or jury clearly should have reached a different verdict or decision." Cal. Civ. Proc. Code § 657; *see also Seffert v. L.A. Transit Lines*, 56 Cal. 2d 498, 507 (1961) (explaining that the trial judge has "the power to weigh the evidence and judge the credibility of the witnesses" when assessing an award).[1] An award need not be tainted by passion or prejudice for the trial judge to conclude that it is excessive. *Seffert*, 56 Cal. 2d at 507 (explaining that while an appellate court may only intervene if an award is "so large as to indicate passion or prejudice," the "power of the appellate court differs materially from that of the trial court in passing on this question"). Here, Monsanto challenges as excessive the jury's $5,066,667 noneconomic damages award, comprised of $3,066,667 in past noneconomic damages and $2 million in future noneconomic damages.

It is easy to uphold the award of past noneconomic damages. Mr. Hardeman presented substantial evidence of his past emotional and physical suffering, including the terror of being diagnosed with non-Hodgkin's lymphoma, the uncertainty surrounding his long-term prognosis, and the debilitating effects of chemotherapy. There is no basis for questioning the jury's valuation of that suffering. *See Velez v. Roche*, 335 F. Supp. 2d 1022, 1038 (N.D. Cal. 2014).

Looking ahead, Mr. Hardeman is in remission, and Dr. Nabhan, Mr. Hardeman's expert, described his prognosis as "very good," noting that it was "extremely unlikely" his NHL would return. Mr. Hardeman therefore did not seek damages for future physical pain or impairment; the

---

[1] This standard does not appear materially different from the federal standard. *See Williams v. Gaye*, 895 F.3d 1106, 1136 (9th Cir. 2018) (noting that a trial judge "can weigh the evidence and assess the credibility of witnesses" when ruling on a motion for a new trial (quoting *Kode v. Carlson*, 596 F.3d 608, 612 (9th Cir. 2010))); *Handgards, Inc. v. Ethicon, Inc.*, 743 F.2d 1282, 1297 (9th Cir. 1984) ("A jury's finding of the amount of damages must be upheld unless the amount is grossly excessive or monstrous, clearly not supported by the evidence, or only based on speculation or guesswork.") (internal quotations omitted).

award of future damages is limited to damages for anxiety, mental suffering, loss of enjoyment of life, emotional distress, and inconvenience. There is certainly sufficient evidence to support damages for those future harms. According to Dr. Nabhan's unchallenged testimony, the chemotherapy put Mr. Hardeman at an "increased risk" (albeit an unquantified one) of developing "other types of cancers." He will therefore need lifelong monitoring, including biyearly physical exams and blood tests, to watch for a recurrence of cancer. And with lifelong monitoring comes lifelong anxiety: Mr. Hardeman will live the rest of his life with the fear associated with an increased risk of cancer. Finally, remission is no guarantee. Mr. Hardeman testified that any feeling of safety was only temporary, and soon after each appointment he would again start to "worry about the non-Hodgkin's lymphoma coming back." Cancer is, as Mrs. Hardeman put it, "tenacious," and "you look upon life a little differently after you have gone through" it.

But the size of the future noneconomic award – $2 million – is borderline. The jury valued Mr. Hardeman's past physical suffering and mental anguish at approximately $3 million. That award encompasses the physical pain he endured from the chemotherapy, in addition to the anxiety surrounding his diagnosis, treatment, and long-term prognosis. And his past anxiety, which involved not knowing whether he would live or die, was surely greater than the anxiety suffered by someone in remission. Thus, it is somewhat difficult to rationalize a conclusion that the suffering he will face is, effectively, two-thirds of the suffering he has already endured.[2]

---

[2] Monsanto relies on the ratio of economic to noneconomic damages to argue that the award must be reduced, but medical expenses simply do not provide a meaningful metric for the value of anxiety and mental suffering. Moreover, the case Monsanto cites to argue that California law requires tying emotional distress to economic loss is clearly inapplicable. *See Major v. W. Home Ins. Co.*, 169 Cal. App. 4th 1197, 1214 (2009). That decision involved a bad faith action against an insurance company, and damages for emotional distress were therefore only "compensable as incidental damages flowing from the initial breach [of the insurance policy]." *Id.* (alterations and internal quotations omitted).

However, Mr. Hardeman's counsel raised one point at oral argument that helps mitigate this concern: the jury likely intended the future award to compensate a longer period of suffering. While the past award covers the four-year period from Mr. Hardeman's diagnosis to the trial, his lawyer argued at closing that the jury's award of future damages should account for the next fifteen years.[3] Viewed on a year-by-year basis, the difference between compensation for past and future suffering is within the realm of rationality – roughly $750,000 for each past year and roughly $130,000 for each future year. Recognizing that pain and suffering are inherently hard to quantify, the jury could reasonably conclude that Mr. Hardeman's ongoing fear and anxiety warrants an award that, while significant, is still materially lower on an annual basis than his award for past harm.[4]

Therefore, although it's a close question, the Court cannot conclude, after weighing the evidence presented at trial, that the jury clearly should not have awarded $2 million for future noneconomic damages.

## II.

Monsanto raises two challenges to the punitive damages award: (1) any award of punitive damages is unsupported by the evidence; and (2) even assuming some award of punitive damages is appropriate, $75 million exceeds the constitutional ceiling set by the Due Process Clause.

Monsanto is wrong on the first point. Based on the evidence that came in at trial, Monsanto

---

[3] While it would have been improper to instruct the jury on life expectancy, it was permissible for plaintiff's counsel to "ask the jury to measure the plaintiff's pain and suffering on a 'per diem' basis." *Loth v. Truck-A-Way Corp.*, 60 Cal. App. 4th 757, 765 n.8 (1998); *see also* Dkt. No. 3191.

[4] The Court does not find the damages awards in the other cases cited by the parties to be instructive here. Given the differences in factual circumstances – not to mention the substantial discretion afforded to the jury – the awards don't provide much of a compass. *See Seffert*, 56 Cal. 2d at 508 ("Injuries are seldom identical and the amount of pain and suffering involved in similar physical injuries varies widely.").

deserves to be punished. As relevant here, California law provides for an award of punitive

damages where the defendant acted with malice, meaning either "conduct which [was] intended by

the defendant to cause injury to the plaintiff" or "despicable conduct which [was] carried on by the

defendant with a willful and conscious disregard of the rights or safety of others." Cal. Civ. Code

§ 3294(c)(1). It was reasonable for the jury to put Monsanto's behavior in the latter category,

because the evidence easily supported a conclusion that Monsanto was more concerned with

tamping down safety inquiries and manipulating public opinion than it was with ensuring its

product is safe.

But while punitive damages are appropriate, the size of this award is constitutionally

impermissible. Unlike compensatory damages, which are designed to redress the harm caused by a

defendant's conduct, punitive damages "are aimed at deterrence and retribution." *State Farm Mut.*

*Auto. Ins. Co. v. Campbell*, 538 U.S. 408, 416 (2013). Thus, an award of punitive damages

implicates the Due Process Clause's prohibition "of grossly excessive or arbitrary punishments on a

tortfeasor." *Id.* To guard against such awards, courts follow "three guideposts" when reviewing an

award of punitive damages: "(1) the degree of reprehensibility of the defendant's misconduct; (2)

the disparity between the actual or potential harm suffered by the plaintiff and the punitive damages

award; and (3) the difference between the punitive damages awarded by the jury and the civil

penalties authorized or imposed in comparable cases." *Id.* at 418; *see also BMW of N. Am., Inc. v.*

*Gore*, 517 U.S. 559, 574-75 (1996).

Starting with the first guidepost, the evidence presented at trial showed that Monsanto's

approach to the safety of its product was indeed reprehensible, but there was mitigating evidence as

well. While this jury concluded it was more likely than not that Roundup caused Mr. Hardeman's

NHL, the metaphorical jury is still out on whether glyphosate causes NHL. The trial showed that

there is credible evidence on both sides of the scientific debate, and the repeated approvals of glyphosate by the EPA, the European Chemicals Agency, Health Canada, and other worldwide regulatory agencies, surely diminish – to a degree – Monsanto's culpability. The scientific landscape was even more favorable to Monsanto during the time Mr. Hardeman was using Roundup, because he stopped using it in 2012, while IARC's decision to classify glyphosate as "probably carcinogenic to humans" was not released until 2015. For purposes of this case, to the extent IARC's decision shifted the scientific debate closer to equipoise, Monsanto's conduct as it relates to Mr. Hardeman should be viewed through the lens of the pre-IARC landscape.

Moreover, Mr. Hardeman did not present evidence that Monsanto hid evidence from the EPA or, alternatively, that it had managed to capture the EPA. While Mr. Hardeman presented evidence that Monsanto had a cozy relationship with particular EPA employees, he did not present any evidence that would reasonably support an inference that this relationship rendered invalid the EPA's approval process for Roundup. Nor did Mr. Hardeman present any evidence that Monsanto was in fact aware that glyphosate caused cancer but concealed it, thus distinguishing this case from the many cases adjudicating the conduct of the tobacco companies.

That said, the evidence presented at trial about Monsanto's behavior betrayed a lack of concern about the risk that its product might be carcinogenic. Despite years of colorable claims in the scientific community that Roundup causes NHL, Monsanto presented minimal evidence suggesting that it was interested in getting to the bottom of those claims. *See State Farm*, 538 U.S. at 419 (instructing courts to consider whether the defendant displayed "an indifference to or a reckless disregard of the health or safety of others"). While Monsanto repeatedly intones that it stands by the safety of its product, the evidence at trial painted the picture of a company focused on attacking or undermining the people who raised concerns, to the exclusion of being an objective

arbiter of Roundup's safety. For example, while the jury was shown emails of Monsanto employees crassly attempting to combat, undermine or explain away challenges to Roundup's safety, not once was it shown an email suggesting that Monsanto officials were actively committed to conducting an objective assessment of its product. Moreover, because the jury was aware that Monsanto has repeatedly sold – and continues to sell – Roundup without any form of warning label, it was clear that Monsanto's "conduct involved repeated actions," rather than "an isolated incident." *Id.*; *see also Philip Morris USA v. Williams*, 549 U.S. 346, 355 (2007).

On the second factor, "courts must ensure that the measure of punishment is both reasonable and proportionate to the amount of harm to the plaintiff and to the general damages recovered." *State Farm*, 538 U.S. at 426. And it bears repeating that compensatory damages already provide full compensation, so punitive damages are purely an additional sanction. *See id.* at 419. Taking this into account, the Supreme Court has suggested that a four-to-one ratio between punitive and compensatory damages "might be close to the line of constitutional impropriety," and further that "in practice, few awards exceeding a single-digit ratio" will satisfy due process. *Id.* at 425 (citing *Pac. Mut. Life Ins. Co. v. Haslip*, 499 U.S. 1, 23-24 (1991)); *see also Gore*, 517 U.S. at 580-81 (benchmarking the four-to-one ratio against the early English practice of using double, treble, or quadruple damages for certain civil wrongs).

Here, the jury's punitive damages award was approximately 15 times the size of the compensatory damages award. Monsanto's conduct, while reprehensible, does not warrant a ratio of that magnitude, particularly in the absence of evidence showing intentional concealment of a known or obvious safety risk. Indeed, in the first case to go to trial against Monsanto on allegations that Roundup causes non-Hodgkin's lymphoma, Judge Bolanos of the San Francisco Superior Court

concluded that a one-to-one ratio of compensatory to punitive damages was appropriate.[5]

Finally, the third guidepost is not particularly helpful here. Monsanto asserts that the punitive damages award exceeds the civil fines available for failure to warn of a product's risks under FIFRA and the California Health and Safety Code, but it fails to identify in any detail what those civil fines are or how they would be calculated. *See* 7 U.S.C. § 136j(a)(1)(E); 40 C.F.R. § 19.4; Cal. Health & Safety Code § 25249.7. Because both state and federal law calculate penalties per violation, it seems entirely possible that Monsanto's liability could, over time, become quite high. But absent an explanation from either party about how these penalties would be calculated, it is difficult to use them as a benchmark.

Guided first and foremost by the nature of Monsanto's conduct, the Court concludes that punitive damages of $20 million – approximately four times the compensatory damages award – is the maximum award that comports with due process. The Court will therefore enter judgment for punitive damages in that amount. *See Leatherman Tool Grp., Inc. v. Cooper Indus., Inc.*, 285 F.3d 1146, 1151 (9th Cir. 2002) (holding that a new trial is usually unnecessary where "a punitive damages award exceeds the constitutional maximum").

**IT IS SO ORDERED.**

Date: July 15, 2019

_____
Honorable Vince Chhabria
United States District Court

---

[5] Nor does Monsanto's wealth support such a high ratio of punitive to compensatory damages. While a company's worth is relevant when considering the deterrent power of an award, it nevertheless "cannot justify an otherwise unconstitutional punitive damages award." *State Farm*, 538 U.S. at 427; *see also Gore*, 517 U.S. at 585 (noting that a "large corporation" is still entitled "to fair notice" of the nature of the penalty a state might impose).