# EXHIBIT 13

Nos. 20-70787, 20-70801

_____

UNITED STATES COURT OF APPEALS
FOR THE NINTH CIRCUIT

_____

NATURAL RESOURCES DEFENSE COUNCIL, et al.,
*Petitioners*,

v.

UNITED STATES ENVIRONMENTAL PROTECTION AGENCY,
*Respondent.*

RURAL COALITION, et al.,
*Petitioners*,

v.

UNITED STATES ENVIRONMENTAL PROTECTION AGENCY,
*Respondent.*

_____

On Petition for Review of Final Agency Action of the
United States Environmental Protection Agency

_____

**MOTION FOR
PARTIAL REMAND WITHOUT VACATUR**

_____

Of Counsel:

DEVI CHANDRASEKARAN

Jean E. Williams
*Acting Assistant Attorney General*
Bruce S. Gelber
*Deputy Assistant Attorney General*

*Attorney Advisor*
FORREST PITTMAN
*Attorney Advisor*
Office of General Counsel
U.S. Environmental Protection
Agency
Mail Code 2333A
1200 Pennsylvania Avenue, N.W.
Washington, DC 20460

U.S. Environmental Protection
Agency

BENJAMIN CARLISLE
*Senior Attorney*
ROBERT WILLIAMS
*Senior Trial Attorney*
Environment and Natural Resources
Division
U.S. Department of Justice
Post Office Box 7411
Washington, D.C. 20044
(202) 514-9771 (Carlisle)
Benjamin.Carlisle@usdoj.gov
(202) 305-0206 (Williams)
Robert.P.Williams@usdoj.gov

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ...................................................................ii

GLOSSARY ......................................................................................... v

INTRODUCTION ................................................................................ 1

BACKGROUND ................................................................................... 2

    A.    Legal Background ................................................................ 2

        1.    Federal Insecticide, Fungicide, and Rodenticide Act ....................................................... 2

        2.    Endangered Species Act ................................................ 4

    B.    The Glyphosate Interim Decision ........................................ 6

    C.    Procedural History ............................................................. 9

STANDARD OF REVIEW ................................................................... 11

ARGUMENT ..................................................................................... 12

I.    Remand Is Proper to Allow EPA to Address this Court's Subsequent Decisions and Other Intervening Events. ...................................................................................... 12

II.    Vacatur of the Interim Risk Mitigation Measures Is Not Appropriate ................................................................. 18

III.    Vacatur of 500+ Individual Glyphosate Product Registrations Is Not Available Relief ................................. 21

CONCLUSION .................................................................................. 24

i

# TABLE OF AUTHORITIES

## Cases

*Allied–Signal, Inc. v. U.S. Nuclear Regulatory Comm'n,*
  988 F.2d 146 (D.C. Cir. 1993) ........................................ 12, 19

*B.J. Alan Co., Inc. v. ICC,*
  897 F.2d 561 (D.C. Cir. 1990) ............................................. 14

*Cal. Cmtys. Against Toxics v. EPA,*
  688 F.3d 989 (9th Cir. 2012) .............................. 12, 13, 14, 19

*Ethyl Corp. v. Browner,*
  989 F.2d 522 (D.C. Cir. 1993) ....................................... 13, 14

*Friends of Santa Clara River v. USACE,*
  887 F.3d 906 (9th Cir. 2018) ................................................. 6

*Limnia, Inc. v. U.S. Dep't of Energy,*
  857 F.3d 379 (D.C. Cir. 2017) ............................................. 15

*Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.,*
  463 U.S. 29 (1983) ............................................................... 13

*Nathan Kimmel, Inc. v. DowElanco,*
  275 F.3d 1199 (9th Cir. 2002) ............................................... 3

*Nat'l Family Farm Coal. v. EPA,*
  960 F.3d 1120 (9th Cir. 2020) ....................................... 10, 16

*Nat'l Family Farm Coal. v. EPA,*
  966 F.3d 893 (9th Cir. 2020) ..................................... 6, 10, 16

*Pollinator Stewardship Council v. EPA,*
  806 F.3d 520 (9th Cir. 2015) ............................................... 20

*Reckitt Benckiser Inc. v. EPA,*
  613 F.3d 1131 (D.C. Cir. 2010) ........................................................ 4, 23

*SKF USA, Inc. v. United States,*
  254 F.3d 1022 (Fed. Cir. 2001) ................................................ 13, 14, 15

*Sw. Ctr. for Biological Diversity v. U.S. Forest Serv.,*
  100 F.3d 1443 (9th Cir. 1996) ................................................................ 5

**Statutes**

7 U.S.C. § 136(bb) ................................................................................ 4

7 U.S.C. § 136a(a) ................................................................................ 3

7 U.S.C. § 136a(c)(1)(A)-(F) ................................................................ 3

7 U.S.C. § 136a(c)(5) ............................................................................ 3

7 U.S.C. § 136a(d)(1) ............................................................................ 3

7 U.S.C. § 136a(g) ................................................................................ 4

7 U.S.C. § 136a(g)(1)(A)(i) .................................................................. 23

7 U.S.C. § 136a(g)(1)(A)(iii) ................................................................ 24

7 U.S.C. § 136a(g)(1)(A)(iii)(I) ............................................................ 19

7 U.S.C. § 136a(g)(1)(A)(v) .................................................................. 23

7 U.S.C. § 136d(b) ........................................................................ 4, 5, 23

7 U.S.C. § 136j(a)(2)(G) ........................................................................ 4

16 U.S.C. § 1536(a)(2) .......................................................................... 5

16 U.S.C. § 1536(b)(3) .......................................................................... 6

iii

## Code of Federal Regulations

40 C.F.R. pt. 152 ...................................................................................3

40 C.F.R. pt. 158 ...................................................................................3

40 C.F.R. § 155.40. ...............................................................................4

40 C.F.R. § 155.56 ........................................................................4, 9, 25

50 C.F.R. § 402.02 .................................................................................5

50 C.F.R. § 402.13 .................................................................................6

50 C.F.R. § 402.13(a) ..........................................................................5, 6

50 C.F.R. § 402.14 .................................................................................6

50 C.F.R. § 402.14(a) .............................................................................5

50 C.F.R. § 402.14(b)(1) .....................................................................5, 6

50 C.F.R. § 402.46 .................................................................................6

## Federal Registers

69 Fed. Reg. 47,732 (Aug. 5, 2004) ........................................................3

86 Fed. Reg. 7037 (Jan. 25, 2021) ...................................................11, 12

## Other

Charles H. Koch Jr., *Administrative Law & Practice* § 8:31, at 187 (3d ed. 2010) .............................................................................................13

# GLOSSARY

| | |
|---|---|
| EPA | Environmental Protection Agency |
| ESA | Endangered Species Act |
| FIFRA | Federal Insecticide, Fungicide, and Rodenticide Act |
| Interim Decision | EPA's Interim Registration Review Decision for glyphosate |

# INTRODUCTION

Petitioners challenge the U.S. Environmental Protection Agency's ("EPA") issuance of an interim decision on certain aspects of its registration review for the herbicide glyphosate ("Interim Decision") under the Federal Insecticide, Fungicide, and Rodenticide Act ("FIFRA"). The Interim Decision finalized certain portions of EPA's analysis of glyphosate's risks. It also determined that certain interim risk mitigation measures were necessary, including label changes to address risks associated with glyphosate spray drift and herbicide resistance. In particular, Petitioners challenge EPA's conclusions that glyphosate does not pose human health risks, EPA's assessment of glyphosate's ecological and other risks, EPA's balancing of glyphosate's risks versus its benefits, and the lack of consultation under the Endangered Species Act ("ESA") until completion of its final registration review.

In light of intervening decisions from this Court following issuance of FIFRA registration actions, EPA's publication of its draft biological evaluation for glyphosate, and other factors, EPA now seeks partial voluntary remand of the Interim Decision. Specifically, EPA seeks

partial voluntary remand of the portions of the Interim Decision that do not relate to its conclusions on human health risks or the usage and benefits of glyphosate. This remand would include the Agency's analysis of the ecological risks and other potential costs associated with glyphosate and EPA's weighing of such risks against the benefits of glyphosate. The remaining challenges in this action, should this motion be granted, will be to EPA's human-health risk analysis and the lack of ESA consultation. EPA also seeks such partial remand without vacatur of the interim risk mitigation measures specified by the Interim Decision.

EPA has conferred with counsel for the other parties to this action. Petitioners stated that they reserve taking a position until they have an opportunity to review the motion. Intervenors stated that they do not anticipate opposing this motion.

## BACKGROUND

### A.    Legal Background

#### 1.    Federal Insecticide, Fungicide, and Rodenticide Act

FIFRA generally precludes the distribution or sale of any pesticide unless it is "registered" by EPA pursuant to FIFRA and EPA's

2

regulations. 7 U.S.C. § 136a(a); 40 C.F.R. pts. 152, 158. Once granted, a FIFRA registration is a license conferred to the applicant that establishes the terms and conditions under which the applicant's specific pesticide product may be lawfully sold, distributed, and used in the United States. 7 U.S.C. §§ 136a(c)(1)(A)-(F), 136a(d)(1); *see also Nathan Kimmel, Inc. v. DowElanco*, 275 F.3d 1199, 1204 (9th Cir. 2002); 69 Fed. Reg. 47,732, 47,733 (Aug. 5, 2004).

EPA will register a pesticide if it determines that the pesticide "will perform its intended function without unreasonable adverse effects on the environment," and "when used in accordance with widespread and commonly recognized practice it will not generally cause unreasonable adverse effects on the environment," among other requirements. 7 U.S.C. § 136a(c)(5); *see also id.* § 136(bb). In making this determination, EPA will consider any restrictions it has imposed on the use of the pesticide. *Id.* § 136(bb). It is unlawful to use a pesticide "in a manner inconsistent with its labeling." 7 U.S.C. § 136j(a)(2)(G).

EPA must periodically review pesticide registrations. 7 U.S.C. § 136a(g); *see* 40 C.F.R. § 155.40 *et seq.* EPA need not conduct the entirety of the registration review at once, but rather has discretion to

make an "interim registration review decision." 40 C.F.R. § 155.56. "Among other things, the interim registration review decision may require new risk mitigation measures, impose interim risk mitigation measures, identify data or information required to complete the review, and include schedules for submitting the required data, conducting the new risk assessment and completing the registration review." *Id.*

An applicant's registration of a pesticide remains effective until EPA cancels it, which is a statutorily defined administrative action subject to specific procedural safeguards. *See* 7 U.S.C. § 136d(b); *see also* 40 C.F.R. § 155.40; *Reckitt Benckiser Inc. v. EPA*, 613 F.3d 1131, 1134 (D.C. Cir. 2010). Congress provided that pesticide registrations shall not be cancelled "as a result of the registration review process unless [EPA] follows the procedures and substantive requirements" for cancellation set forth in Section 136d. 7 U.S.C. § 136a(g). Cancellation is subject to a set of mandatory statutory safeguards. *See* 7 U.S.C. § 136d(b).

## 2. Endangered Species Act

ESA Section 7(a)(2) directs each federal agency to insure that "any action authorized, funded, or carried out by such agency . . . is not likely

4

to jeopardize the continued existence of" a listed species or destroy or adversely modify designated critical habitat. 16 U.S.C. § 1536(a)(2). To facilitate compliance with those mandates, the ESA's implementing regulations outline a process whereby federal "action agencies" consult with the appropriate expert "consulting agency" (either the National Marine Fisheries Service or the U.S. Fish & Wildlife Service or both, depending on the species involved) to, among other things, analyze the potential impacts of a proposed action on listed species and designated critical habitat. 50 C.F.R. §§ 402.13(a), 402.14(b)(1).

Consultation is required whenever a proposed federal action "may affect" listed species or critical habitat. *Id.* § 402.14(a). Agency "action" and "effects of the action" are defined terms under the ESA. *Id.* § 402.02. If the action will not affect listed species or designated critical habitat, then consultation is not required. *Sw. Ctr. for Biological Diversity v. U.S. Forest Serv.*, 100 F.3d 1443, 1447-48 (9th Cir. 1996); *National Family Farm Coal. v. EPA*, 966 F.3d 893, 924 (9th Cir. 2020); *Friends of Santa Clara River v. USACE*, 887 F.3d 906 (9th Cir. 2018).

If, however, the action agency determines that the action "may affect" listed species or critical habitat, it must consult (formally or

informally) with the appropriate consulting agency. 50 C.F.R. §§ 402.13-402.14. Formal consultation is required unless the action agency determines, with the consulting agency's written concurrence, that the proposed action is "not likely to adversely affect" a listed species or critical habitat. *Id*. §§ 402.13(a), 402.14(b)(1). If formal consultation is required, then the consulting agency must prepare a biological opinion stating whether the proposed action is likely to "jeopardize the continued existence of" any listed species or destroy or adversely modify critical habitat. 16 U.S.C. § 1536(b)(3); 50 C.F.R. §§ 402.14, 402.46.

## B. The Glyphosate Interim Decision

Glyphosate is a versatile, broad-spectrum herbicide used in an array of agricultural and other settings. 1-RC-15-16; 2-RC267.[1] It is the most common agricultural herbicide used in the United States. 1-RC-15.

The Interim Decision was signed on January 22, 2020. 1-RC-3. EPA issued that decision in order to "(1) move forward with aspects of the registration review case that are complete and (2) implement

---

[1] Citations to __-RC_ER-__ are to Rural Coalition, et al.'s excerpts of record, submitted with their opening brief.

6

interim risk mitigation." 1-RC-5. Among other things, the Interim Decision "finalize[d] the agency's draft supporting documents *Glyphosate Draft Human Health Risk Assessment for Registration Review* and *Registration Review—Preliminary Ecological Risk Assessment for Glyphosate and Its Salts*." 1-RC-6.

The Interim Decision briefly summarized EPA's conclusions (as of the date of signature) on the risks and benefits associated with glyphosate. As to human health, "EPA thoroughly assessed risks to humans from exposure to glyphosate from all registered uses and all routes of exposure and did not identify any risks of concern." 1-RC-11; 1-RC-16. The Interim Decision also summarized EPA's conclusions as to ecological risks, including EPA's assessment of risks to non-target plants due to potential drift of glyphosate sprays to nearby areas. 1-RC-14-15. EPA also analyzed the substantial benefits of glyphosate as an effective, inexpensive, versatile, and widely used method of weed control in a variety of applications. 1-RC-15-17; *see also* 2-RC266-96. EPA concluded that, with interim risk mitigation measures, "the benefits outweigh the potential ecological risks when glyphosate is used according to label directions." 1-RC-17.

7

Those interim risk mitigation measures included label amendments restricting how and when glyphosate can be sprayed, a "non-target organism advisory," and herbicide resistance measures. *See* 1-RC-17-19. However, because EPA was still in the process of responding to an administrative petition[2] requesting certain labeling changes, it did not immediately solicit updated proposed labels from registrants that would include changes based on the Interim Decision. 1-RC-23. EPA explained that it will solicit such label amendment submissions once it completes its response to that petition. 1-RC-23. To date, EPA has not solicited such label submissions.

Consistent with EPA's regulations, *see* 40 C.F.R. § 155.56, the Interim Decision noted aspects that would be completed in EPA's final registration review decision. 1-RC-5; *see also* 1-RC-22. While EPA was working on the Interim Decision, EPA was in the process of working with the FWS and NMFS to develop methodologies for conducting national threatened and endangered species assessments for pesticides

---

[2] Environmental Working Group Petition to Reduce the Glyphosate Tolerance on Oats and Prohibit Preharvest Use on Oats, EPA-HQ-OPP-2019-0066.

8

in accordance with the ESA. 1-RC-5.[3] It therefore explained in the Interim Decision that it "will complete its listed species assessment and any necessary consultation with the Services for glyphosate prior to completing the glyphosate registration review." 1-RC-5.

## C.     Procedural History

After the Interim Decision was signed on January 22, 2020, the Ninth Circuit issued two decisions addressing petitions for review under FIFRA. In the first, *National Family Farm Coalition v. EPA*, 960 F.3d 1120 (9th Cir. 2020) (*NFFC I*), this Court vacated and remanded certain conditional registrations for dicamba-based herbicides. The Court concluded that EPA had failed to properly acknowledge the risks and impacts of spray drift associated with dicamba use. *See id.* at 1137-39. The Court also concluded that EPA had "failed to acknowledge an economic cost that is virtually certain to result from the conditional registrations." *See id.* at 1142-43.

---

[3] These revised methodologies were finalized in March 2020, following public comment. *See* <https://www.epa.gov/endangered-species/revised-method-national-level-listed-species-biological-evaluations-conventional>.

In the second, *National Family Farm Coal. v. United States EPA*, 966 F.3d 893, 916-17 (9th Cir. 2020) (*NFFC II*), this Court remanded, but did not vacate, the registration of Enlist Duo, a combination product containing 2,4-dichlorophenoxyacetic acid (2,4-D) and glyphosate. It concluded that EPA had not properly assessed the risks of increased 2,4-D use on in-field (on-target) monarch butterfly habitat. *See id.*

On November 25, 2020, EPA issued its draft biological evaluation for glyphosate.[4] This draft document assesses potential risks that registered uses of glyphosate may pose to an individual of a species listed under the ESA or designated critical habitat. Glyphosate Executive Summary for Draft Biological Evaluation at 1. This draft proposed to find that, of 1,795 listed species that may be affected by glyphosate use, such use was likely to adversely affect 1,676 of those species. *See id.* at 5.

EPA moved for a sixty-day abeyance in this case on February 5, 2021. *See* Motion for Abeyance, *NRDC v. EPA*, No. 20-70787, Dkt. Entry 72-1, Doc. No. 11994414 (9th Cir. Feb. 5, 2021). EPA explained

---

[4] Available at <https://www.epa.gov/endangered-species/draft-national-level-listed-species-biological-evaluation-glyphosate>.

that, on January 20, 2021, President Biden issued an "*Executive Order on Protecting Public Health and the Environment and Restoring Science to Tackle the Climate Crisis*," ("Executive Order").  86 Fed. Reg. 7037 (Jan. 25, 2021).  The Executive Order directs agencies to "immediately review all existing regulations, orders, guidance documents, policies, and any other similar agency actions (agency actions) promulgated, issued, or adopted between January 20, 2017, and January 20, 2021," for consistency with the policy set forth in that order to:

> listen to the science; to improve public health and protect our environment; to ensure access to clean air and water; to limit exposure to dangerous chemicals and pesticides; to hold polluters accountable, including those who disproportionately harm communities of color and low-income communities; to reduce greenhouse gas emissions; to bolster resilience to the impacts of climate change; to restore and expand our national treasures and monuments; and to prioritize both environmental justice and the creation of the well-paying union jobs necessary to deliver on these goals.

*Id.*  The Court granted EPA's motion for an abeyance on February 17, 2021.  *See* Order, *NRDC v. EPA*, No. 20-70787, Dkt. Entry 75, Doc. No. 12007345 (9th Cir. Feb. 17, 2021).

## STANDARD OF REVIEW

Voluntary remand of a challenged agency action is proper where the agency seeks to reconsider its initial action. *California Communities*

11

*Against Toxics v. EPA*, 688 F.3d 989, 992 (9th Cir. 2012). "Whether agency action should be vacated depends on how serious the agency's errors are 'and the disruptive consequences of an interim change that may itself be changed.'" *Id.* (quoting *Allied–Signal, Inc. v. U.S. Nuclear Regulatory Comm'n*, 988 F.2d 146, 150–51 (D.C. Cir. 1993)).

## ARGUMENT

### I. Remand Is Proper to Allow EPA to Address this Court's Subsequent Decisions and Other Intervening Events.

EPA satisfies the standard for voluntary remand because it wishes to consider whether components of its analysis may be affected by intervening events, including two decisions of this Court.

Agencies have inherent authority to reconsider past decisions and to revise, replace, or repeal initial actions. *Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 42 (1983). Allowing for voluntary remand is consistent with this principle. *See Ethyl Corp. v. Browner*, 989 F.2d 522, 524 (D.C. Cir. 1993). In litigation, courts have recognized that an "agency may take one of five positions" with respect to remand of the challenged action, including "seek[ing] a remand to reconsider its decision because of intervening events outside of the

12

agency's control." *SKF USA, Inc. v. United States*, 254 F.3d 1022, 1027-28 (Fed. Cir. 2001); *see also Cal. Cmtys.*, 688 F.3d at 992 (same and citing *SKF*, 254 F.3d at 1029); Charles H. Koch Jr., *Administrative Law & Practice* § 8:31, at 187 (3d ed. 2010). When an agency seeks a remand on such grounds, "remand to the agency is required, absent the most unusual circumstances verging on bad faith." *SKF*, 254 F.3d at 1029-30.

Indeed, this Court affirmed that it should only "refuse voluntarily requested remand when the agency's request is frivolous or made in bad faith." *Cal. Cmtys.*, 688 F.3d at 992. This is for good reason: "[a]dministrative reconsideration is a more expeditious and efficient means of achieving an adjustment of agency policy than is resort to the federal courts." *B.J. Alan Co., Inc. v. ICC*, 897 F.2d 561, 562 n.1 (D.C. Cir. 1990) (cleaned up). As the D.C. Circuit explained, "[w]e commonly grant such [relief], preferring to allow agencies to cure their own mistakes rather than wasting the courts' and the parties' resources reviewing a record that both sides acknowledge to be incorrect or incomplete." *Ethyl Corp.*, 989 F.2d at 524.

Several considerations support a voluntary remand of all portions of the Interim Decision other than those related to (1) EPA's assessment

13

of human health risks and (2) the usage and benefits of glyphosate.[5]  A
confession of error is not necessary for voluntary remand so long as the
agency is committed to reconsidering its decision.  *SKF*, 254 F.3d at
1029.  For example, remand may be appropriate if an agency "wishe[s]
to consider further the governing statute, or the procedures that were
followed," or if an agency has "doubts about the correctness of its
decision or that decision's relationship to the agency's other policies."
*Id.*; *see also Limnia, Inc. v. U.S. Dep't of Energy*, 857 F.3d 379, 387 (D.C.
Cir. 2017) (An agency does not need to "confess error or impropriety in
order to obtain a voluntary remand" so long as it has "profess[ed] [an]
intention to reconsider, re-review, or modify the original agency decision
that is the subject of the legal challenge.").

First, voluntary remand will afford EPA the opportunity to
determine how its analysis in the Interim Decision may be impacted by
its analysis in its draft biological evaluation, issued in November 2020.
*See* Reaves Decl. ¶ 9.  While EPA cannot prejudge the outcome of its

---

[5] None of the Petitioners bring any argument that EPA's assessment of
the usage and benefits of glyphosate is not supported by substantial
evidence or is otherwise unlawful.

analysis, it may be that the results of EPA's biological evaluation lead it to adopt additional or different mitigation measures than those specified in the Interim Decision. *See id.* ¶ 10.

Second, in light of this Court's decision in *NFFC II*, it wishes to reconsider its ecological analysis in the Interim Decision as it relates to in-field effects of glyphosate on monarch butterfly habitat. *See* 966 F.3d at 916-17. Voluntary remand is appropriate to allow EPA to address this issue. *See* Reaves Decl. ¶¶ 11-12.

Third, this Court's decision in *NFFC I* addressed, among other things, spray-drift risks as well as economic and social costs associated with another herbicide, dicamba. *See NFFC I*, 960 F.3d at 1137-39. Voluntary remand will allow EPA to consider this intervening decision, including whether it affects EPA's analysis of glyphosate or whether further explanation of EPA's analysis is warranted. *See* Reaves Decl. ¶¶ 11-12.

Fourth, voluntary remand will allow EPA to better evaluate the Interim Decision in light of the change in Administration and the policies announced in the January 20, 2021, Executive Order. It will afford EPA an opportunity to consider whether there are other aspects

15

of its analysis of ecological risks or other costs related to glyphosate that should be reassessed or for which additional explanation should be provided. *See* Reaves Decl. ¶ 13.

Fifth, EPA is already conducting certain analyses that were left outstanding in its Interim Decision, and a final registration review decision on glyphosate is still forthcoming. *See supra* at 8-9. Thus, to the extent that EPA determines to reassess aspects of the ecological or other non-human health risks and costs of glyphosate, it can do so as a component of this final decision. This will allow EPA to consider, as a whole, what risk mitigation measures may be appropriate to address such ecological or other non-human health risks and costs of glyphosate.[6] *See* Reaves Decl. ¶ 14.

EPA therefore requests voluntary remand of the portions of the Interim Decision that do not relate to its conclusions on human health risks or the usage and benefits of glyphosate. *See* Reaves Decl. ¶ 8. Specifically, EPA seeks remand of its finalization of its analysis of the ecological risks and other potential (non-human-health) costs associated

---

[6] EPA cannot prejudge the outcome of its analysis, including whether or what mitigation measures may be appropriate.

16

with glyphosate.  *See, e.g.*, 1-RC-6 (noting that the Interim Decision
finalized EPA's "*Registration Review—Preliminary Ecological Risk
Assessment for Glyphosate and Its Salts*.").  Accordingly, it also seeks
remand of its conclusion that "the benefits outweigh the potential
ecological risks when glyphosate is used according to label directions."
1 RC-17.

EPA currently intends to address the issues subject to this
remand and EPA's further consideration, including its assessment of
the non-human health risks and costs of glyphosate and any
appropriate mitigation measures addressing such risks, in issuing its
final registration review decision.  *See* Reaves Decl. ¶ 15.  At its
discretion, however, it may address some or all of these issues in one or
more interim decisions.  *See id.*

As to human health risks, EPA has reviewed the Interim Decision
and believes that this component of its analysis should be sustained by
this Court.  EPA also understands that it is Petitioners' position that an
ESA consultation was required as to the Interim Decision, and that
they wish to advance this argument notwithstanding EPA's remand as
discussed above.  Thus, EPA has set forth in its response brief its

17

arguments in response to Petitioners' challenge to EPA's analysis of human health risks and their arguments on the ESA.  EPA also addresses Petitioners' inappropriate requested remedy, which arguments are also briefly summarized below.  The Court need not reach any other aspect of Petitioners' challenges to the Interim Decision, which will be addressed under the remand EPA is requesting.

On remand, EPA will conduct its review and any analyses for glyphosate as expeditiously as practicable.  EPA issued the Interim Decision well before the statutory deadline for its final registration review decision of October 1, 2022, *see* 7 U.S.C. § 136a(g)(1)(A)(iii)(I), reflecting both that EPA has been working in good faith to expeditiously complete its analyses and that the statutory deadline to do so has not yet elapsed.  *See* Reaves Decl. ¶ 16.

## II.  Vacatur of the Interim Risk Mitigation Measures Is Not Appropriate.

To determine whether vacatur is warranted, the Court undertakes an equitable analysis. "[T]he decision whether to vacate depends on the seriousness of the order's deficiencies (and thus the extent of doubt whether the agency chose correctly) and the disruptive consequences of an interim change that may itself be changed." *Allied-Signal*, 988 F.2d

18

at 150-51 (cleaned up); *Cal. Cmtys.*, 688 F.3d at 992 (same). Also relevant to the analysis is whether EPA "could adopt the same rule on remand, or whether such fundamental flaws in the agency's decision make it unlikely that the same rule would be adopted on remand." *Pollinator Stewardship Council v. EPA*, 806 F.3d 520, 532 (9th Cir. 2015).

The Interim Decision stated that certain labeling amendments are necessary that would impose restrictions on how and when glyphosate can be sprayed, a "non-target organism advisory," and herbicide resistance measures. *See* 1-RC17-19.  However, because EPA was responding to an administrative petition requesting certain labeling changes, it explained that it will solicit such label amendment submissions once it completes its response to that petition.  1-RC-23. To date, EPA has not done so.

At this stage, it is unclear what mitigation measures, in the form of labeling amendments, EPA may determine are necessary based on its analysis following partial remand.  However, although Petitioners challenge the interim risk mitigation measures in the Interim Decision as insufficiently protective, no party challenges them as too stringent.

19

Thus, although these measures are not currently in effect, EPA respectfully requests that the Court's partial remand be without vacatur of these interim risk mitigation measures. *See* Reaves Decl. ¶¶ 17-18. This will allow EPA flexibility to solicit the labeling amendments during its analysis following partial remand, should it determine that doing so is appropriate.[7]

Moreover, EPA has identified an issue in the Interim Decision that needs reconsideration due to intervening caselaw relating to the effects of herbicide use on in-field (on-target) monarch butterfly habitat. This reconsideration, however, does not relate to the risks addressed by the necessary labeling changes specified by the Interim Decision: drift of glyphosate to areas *outside* of the target field and herbicide resistance. EPA has also not fully considered, in light of *NFFC II*, whether there are any risks posed to monarch butterflies from on-field use of glyphosate, and if so, what measures might be necessary to mitigate such risks so that they are not unreasonable. While EPA

---

[7] EPA currently takes no position on any risk mitigation measures it may find necessary following partial remand. EPA cannot prejudge the outcome of its administrative process that will occur following partial remand.

intends to consider its analysis on spray drift and other aspects of the Interim Decision on partial remand, including in light of *NFFC I*'s analysis of dicamba drift and other intervening information, it has not yet conducted this analysis or determined whether it will reach a different result following partial remand.

Because EPA has not yet solicited labeling amendment submissions, there is currently no burden imposed on regulated parties—who, in any event, have not challenged these requirements. Partial remand without vacatur of the labeling restrictions found to be necessary in the Interim Decision will allow EPA flexibility to update what labeling changes are necessary, consistent with the remanded Interim Decision, if appropriate.

## III. Vacatur of 500+ Individual Glyphosate Product Registrations Is Not Available Relief

In their merits briefs, Petitioners claim that vacating the Interim Decision means that every glyphosate registration immediately becomes unlawful. *See* NRDC Br. at 72-73; RC Br. at 80. To the extent that Petitioners may argue for that result due to the partial voluntary remand requested here, Petitioners are wrong for the same reasons as articulated in EPA's response brief, which are briefly summarized here.

Petitioners in this action do not seek judicial review of any individual glyphosate product registrations. And a "pesticide product remains registered until EPA or the registrant cancels it." *Reckitt Benckiser Inc.*, 613 F.3d at 1134. In substance, the registration review provision requires only that "[t]he registrations of pesticides are to be periodically reviewed." 7 U.S.C. § 136a(g)(1)(A)(i). It does not provide that EPA's past registration decisions are overturned even if EPA affirmatively finds during its review that the pesticide does not meet the FIFRA standard—or if EPA finds the pesticide *does* meet that standard but a court conducting judicial review requires EPA to reassess some points of its analysis.

In fact, FIFRA says the opposite: "[n]o registration shall be canceled as a result of the registration review process unless the Administrator follows the procedures and substantive requirements of section 136d of this title," which govern cancellation of registrations. 7 U.S.C. § 136a(g)(1)(A)(v); *see* 7 U.S.C. § 136d(b) (setting forth these safeguards and procedures). Adopting Petitioners' requested remedy and vacating each of the more than 500 product-specific glyphosate registrations, *see* 2-RC-221, would leapfrog the agency process,

22

substituting the Court's judgment for EPA's and vitiating the statutory safeguards Congress included in FIFRA.

Moreover, even if Petitioners' requested remedy was available, the Court should decline to order vacatur. There is extensive and undisputed record evidence of the disruption Petitioners' remedy would cause. After existing stocks were depleted, glyphosate would be unavailable, rendering investments in glyphosate resistant crops moot, harming manufacturers and sellers of glyphosate, and requiring users to adopt an alternative approach to weed control. *See* EPA Response Br. at 10-13. Vast sectors of the agricultural economy, including the most commonly grown crops in America, would be affected. *See id.* So would the control of invasive species and the other circumstances in which glyphosate is used. *See id.* There would likely be negative environmental consequences, including as users switched to other pesticides that pose greater risk to the environment, and increased costs of labor. *See id.*

Partial voluntary remand will afford EPA an opportunity to reassess aspects of its Interim Decision, and EPA might yet reach the same result following partial remand. Moreover, the deadline to

conduct registration review has not yet elapsed. *See* 7 U.S.C.
§ 136a(g)(1)(A)(iii). Even if it was an available remedy to declare
glyphosate individual registrations invalid as the result of the
registration review process, doing so would be decidedly odd where EPA
has volunteered to re-examine aspects of its decision and the time to
make a final registration review decision has not yet elapsed. Granting
this remedy would disincentivize EPA from issuing interim decisions, as
well as from seeking voluntary remand to reexamine its decisions. If
EPA were to stop issuing interim decisions, valuable mitigation
measures that address portions of a pesticide's risk concerns and
collection of data and information required to complete registration
review could be delayed. *See* 40 C.F.R. § 155.56.

## CONCLUSION

For the foregoing reasons, the Court should partially remand
the Interim Decision, specifically those portions which do not relate to
EPA's human-health risk analysis and assessment of the usage and
benefits of glyphosate, without vacatur of EPA's determination that
certain additional labeling restrictions are necessary as described in the
Interim Decision.

Respectfully submitted,

Jean E. Williams
*Acting Assistant Attorney General*
Bruce S. Gelber
*Deputy Assistant Attorney General*

Of Counsel:

/s/ Benjamin Carlisle
DEVI CHANDRASEKARAN      BENJAMIN CARLISLE
*Attorney Advisor*      *Senior Attorney*
FORREST PITTMAN      ROBERT WILLIAMS
*Attorney Advisor*      *Senior Trial Attorney*
Office of General Counsel      Environment and Natural Resources
U.S. Environmental Protection      Division
Agency      U.S. Department of Justice
Mail Code 2333A      Post Office Box 7411
1200 Pennsylvania Avenue, N.W.      Washington, D.C. 20044
Washington, DC 20460      (202) 514-9771 (Carlisle)
      Benjamin.Carlisle@usdoj.gov
U.S. Environmental Protection      (202) 305-0206 (Williams)
Agency      Robert.P.Williams@usdoj.gov

DATED: May 18, 2021

25

# CERTIFICATE OF COMPLIANCE WITH TYPE-VOLUME LIMIT, TYPEFACE REQUIREMENTS, AND TYPE-STYLE REQUIREMENTS

I hereby certify that this motion complies with the type-volume limitation of Fed. R. App. P. 27(d)(2) because it contains 4,493 words, according to the count of Microsoft Word. I further certify that this motion complies with the requirements of Fed. R. App. P. 32(a)(5) and (6) because it has been prepared in Microsoft Word using 14-point Century Schoolbook, a proportionally spaced font.


/s/ Benjamin Carlisle
Benjamin Carlisle

Counsel for Respondent EPA

## CERTIFICATE OF SERVICE

I hereby certify that I electronically filed the foregoing document using the Electronic Case Filing ("ECF") system of this Court.  The ECF system will send a "Notice of Electronic Filing" to the attorneys of record.

<u>/s/ Benjamin Carlisle</u>
Benjamin Carlisle