# EXHIBIT 1

JS 44 (Rev. 02/19)

# CIVIL COVER SHEET

The JS 44 civil cover sheet and the information contained herein neither replace nor supplement the filing and service of pleadings or other papers as required by law, except as provided by local rules of court. This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet. *(SEE INSTRUCTIONS ON NEXT PAGE OF THIS FORM.)*

## I. (a) PLAINTIFFS
Joseph Matthew Blair and Tiara Smith Blair, individually and on behalf of their minor children

**(b)** County of Residence of First Listed Plaintiff  MARION
*(EXCEPT IN U.S. PLAINTIFF CASES)*

**(c)** Attorneys *(Firm Name, Address, and Telephone Number)*
Jones & Odom, LLP, J. Marshall Jones, Jr.
2124 Fairfield Ave., Shreveport LA 71104
Tel: 318-221-1600

## DEFENDANTS
Monsanto Company, Bayer Corporation, and Bayer, AG

County of Residence of First Listed Defendant  St. Louis County, MO
*(IN U.S. PLAINTIFF CASES ONLY)*

NOTE:  IN LAND CONDEMNATION CASES, USE THE LOCATION OF THE TRACT OF LAND INVOLVED.

Attorneys *(If Known)*

## II. BASIS OF JURISDICTION *(Place an "X" in One Box Only)*

- ☐ 1  U.S. Government Plaintiff
- ☐ 2  U.S. Government Defendant
- ☐ 3  Federal Question *(U.S. Government Not a Party)*
- ☒ 4  Diversity *(Indicate Citizenship of Parties in Item III)*

## III. CITIZENSHIP OF PRINCIPAL PARTIES *(Place an "X" in One Box for Plaintiff and One Box for Defendant)*
*(For Diversity Cases Only)*

|  | PTF | DEF |  | PTF | DEF |
|---|---|---|---|---|---|
| Citizen of This State | ☒ 1 | ☐ 1 | Incorporated *or* Principal Place of Business In This State | ☐ 4 | ☐ 4 |
| Citizen of Another State | ☐ 2 | ☐ 2 | Incorporated *and* Principal Place of Business In Another State | ☐ 5 | ☒ 5 |
| Citizen or Subject of a Foreign Country | ☐ 3 | ☐ 3 | Foreign Nation | ☐ 6 | ☐ 6 |

## IV. NATURE OF SUIT *(Place an "X" in One Box Only)*
Click here for: Nature of Suit Code Descriptions.

| CONTRACT | TORTS | | FORFEITURE/PENALTY | BANKRUPTCY | OTHER STATUTES |
|---|---|---|---|---|---|
| ☐ 110 Insurance | **PERSONAL INJURY** | **PERSONAL INJURY** | ☐ 625 Drug Related Seizure of Property 21 USC 881 | ☐ 422 Appeal 28 USC 158 | ☐ 375 False Claims Act |
| ☐ 120 Marine | ☐ 310 Airplane | ☒ 365 Personal Injury - Product Liability | ☐ 690 Other | ☐ 423 Withdrawal 28 USC 157 | ☐ 376 Qui Tam (31 USC 3729(a)) |
| ☐ 130 Miller Act | ☐ 315 Airplane Product Liability | ☐ 367 Health Care/ Pharmaceutical | | | ☐ 400 State Reapportionment |
| ☐ 140 Negotiable Instrument | ☐ 320 Assault, Libel & Slander | Personal Injury | | **PROPERTY RIGHTS** | ☐ 410 Antitrust |
| ☐ 150 Recovery of Overpayment & Enforcement of Judgment | ☐ 330 Federal Employers' Liability | Product Liability | | ☐ 820 Copyrights | ☐ 430 Banks and Banking |
| ☐ 151 Medicare Act | ☐ 340 Marine | ☐ 368 Asbestos Personal Injury Product Liability | | ☐ 830 Patent | ☐ 450 Commerce |
| ☐ 152 Recovery of Defaulted Student Loans (Excludes Veterans) | ☐ 345 Marine Product Liability | **PERSONAL PROPERTY** | | ☐ 835 Patent - Abbreviated New Drug Application | ☐ 460 Deportation |
| ☐ 153 Recovery of Overpayment of Veteran's Benefits | ☐ 350 Motor Vehicle | ☐ 370 Other Fraud | **LABOR** | ☐ 840 Trademark | ☐ 470 Racketeer Influenced and Corrupt Organizations |
| ☐ 160 Stockholders' Suits | ☐ 355 Motor Vehicle Product Liability | ☐ 371 Truth in Lending | ☐ 710 Fair Labor Standards Act | **SOCIAL SECURITY** | ☐ 480 Consumer Credit |
| ☐ 190 Other Contract | ☐ 360 Other Personal Injury | ☐ 380 Other Personal Property Damage | ☐ 720 Labor/Management Relations | ☐ 861 HIA (1395ff) | ☐ 485 Telephone Consumer Protection Act |
| ☐ 195 Contract Product Liability | ☐ 362 Personal Injury - Medical Malpractice | ☐ 385 Property Damage Product Liability | ☐ 740 Railway Labor Act | ☐ 862 Black Lung (923) | ☐ 490 Cable/Sat TV |
| ☐ 196 Franchise | | | ☐ 751 Family and Medical Leave Act | ☐ 863 DIWC/DIWW (405(g)) | ☐ 850 Securities/Commodities/ Exchange |
| **REAL PROPERTY** | **CIVIL RIGHTS** | **PRISONER PETITIONS** | ☐ 790 Other Labor Litigation | ☐ 864 SSID Title XVI | ☐ 890 Other Statutory Actions |
| ☐ 210 Land Condemnation | ☐ 440 Other Civil Rights | **Habeas Corpus:** | ☐ 791 Employee Retirement Income Security Act | ☐ 865 RSI (405(g)) | ☐ 891 Agricultural Acts |
| ☐ 220 Foreclosure | ☐ 441 Voting | ☐ 463 Alien Detainee | | **FEDERAL TAX SUITS** | ☐ 893 Environmental Matters |
| ☐ 230 Rent Lease & Ejectment | ☐ 442 Employment | ☐ 510 Motions to Vacate Sentence | | ☐ 870 Taxes (U.S. Plaintiff or Defendant) | ☐ 895 Freedom of Information Act |
| ☐ 240 Torts to Land | ☐ 443 Housing/ Accommodations | ☐ 530 General | | ☐ 871 IRS—Third Party 26 USC 7609 | ☐ 896 Arbitration |
| ☐ 245 Tort Product Liability | ☐ 445 Amer. w/Disabilities - Employment | ☐ 535 Death Penalty | **IMMIGRATION** | | ☐ 899 Administrative Procedure Act/Review or Appeal of Agency Decision |
| ☐ 290 All Other Real Property | ☐ 446 Amer. w/Disabilities - Other | **Other:** | ☐ 462 Naturalization Application | | ☐ 950 Constitutionality of State Statutes |
| | ☐ 448 Education | ☐ 540 Mandamus & Other | ☐ 465 Other Immigration Actions | | |
| | | ☐ 550 Civil Rights | | | |
| | | ☐ 555 Prison Condition | | | |
| | | ☐ 560 Civil Detainee - Conditions of Confinement | | | |

## V. ORIGIN *(Place an "X" in One Box Only)*

- ☒ 1  Original Proceeding
- ☐ 2  Removed from State Court
- ☐ 3  Remanded from Appellate Court
- ☐ 4  Reinstated or Reopened
- ☐ 5  Transferred from Another District *(specify)*
- ☐ 6  Multidistrict Litigation - Transfer
- ☐ 8  Multidistrict Litigation - Direct File

## VI. CAUSE OF ACTION
Cite the U.S. Civil Statute under which you are filing *(Do not cite jurisdictional statutes unless diversity)*:
28 USC 1332(a)(1)
Brief description of cause:
This matter in controversy exceeds $75,000 and is between citizens of different states.

## VII. REQUESTED IN COMPLAINT:
☐ CHECK IF THIS IS A CLASS ACTION UNDER RULE 23, F.R.Cv.P.
DEMAND $
CHECK YES only if demanded in complaint:
JURY DEMAND: ☒ Yes ☐ No

## VIII. RELATED CASE(S) IF ANY
*(See instructions)*
JUDGE  Vince Chhabria
DOCKET NUMBER  MDL No. 2741

DATE  8-22-2019
SIGNATURE OF ATTORNEY OF RECORD  J. Marshall Jones

**FOR OFFICE USE ONLY**

RECEIPT #_____  AMOUNT_____  APPLYING IFP_____  JUDGE_____  MAG. JUDGE_____

# UNITED STATES DISTRICT COURT

## EASTERN DISTRICT OF TEXAS

### MARSHALL DIVISION

JOSEPH MATTHEW BLAIR, and
TIARA SMITH BLAIR, individually
and on behalf of their minor
children,

              Plaintiff(s)

**versus**

MONSANTO COMPANY; BAYER
CORPORATION; and BAYER, AG,

              **Defendants**

CIVIL CASE NO. <u>2:19cv284</u>

**<u>COMPLAINT FOR DAMAGES</u>**

**JURY DEMAND**

NOW COMES Plaintiffs, JOSEPH MATTHEW BLAIR and TIARA SMITH BLAIR, husband and wife, individually and on behalf of their two (2) minor children, through his attorneys of record, Jones & Odom, L.L.P., for causes of action against the above-named Defendants, and hereby alleges as follows:

## I. <u>PARTIES</u>

**<u>Plaintiff</u>**

1.1.   Joseph Matthew Blair ("Plaintiff") is 22 years of age and has been a resident of the City of Jefferson, Marion County, Texas for +15 years.   On information and belief, Plaintiff was exposed to +100,000 gallons of concentrated Roundup containing the active ingredient glyphosate and the surfactant polyethoxylated tallow amine ("POEA") in various counties in the States of Texas,

Arkansas and Louisiana, from his very first day of employment on or about September 16, 2016 with EDKO, L.L.C. ("EDKO") until his last day of employment with EDKO on or about November 9, 2018, immediately prior to his initial diagnosis of non-Hodgkin's lymphoma.

1.2.   As a direct and proximate result of short-term but massive exposure to +100,000 gallons of concentrated Roundup, Plaintiff was diagnosed with diffuse large B-cell non-Hodgkin's lymphoma in or around November 2018.

1.3   Plaintiff Tiara Smith Blair (hereinafter sometimes referred to as "Mrs. Blair") is 21 years of age, is married to Plaintiff and also resides in Jefferson, Marion County, Texas.  On information and belief, Mrs. Blair was likely exposed to concentrated Roundup containing the active ingredient glyphosate and the surfactant polyethoxylated tallow amine ("POEA") by virtue of her marital relationship and daily exposure to Plaintiff.

1.4.   Additionally, immediately prior to Plaintiff and Mrs. Blair learning of Plaintiff's initial diagnosis of non-Hodgkin's lymphoma, Mrs. Blair and Plaintiff learned that Mrs. Blair was pregnant with a second child of their marriage.  On or about May 16, 2019, Plaintiff and Mrs. Blair's second daughter DB was born in Longview, Texas.   Based upon information and belief, Plaintiff's second daughter was likely exposed to concentrated Roundup containing the active ingredient glyphosate and the surfactant polyethoxylated tallow amine ("POEA") by virtue of her exposure to Plaintiff.  Similarly, based upon information and

-2-

belief, Plaintiff and Mrs. Blair's first daughter Alex (born December 3, 2014) was possibly exposed to concentrated Roundup containing the active ingredient glyphosate and the surfactant polyethoxylated tallow amine ("POEA") by virtue of her daily exposure to Plaintiff.

1.5.    Plaintiff and Mrs. Blair, both individually and on behalf of their two (2) minor children, are sometimes hereinafter collectively referred to as "Plaintiffs."

**Defendants**

1.6.    Defendant Monsanto Company ("Monsanto") is a Delaware corporation with its headquarters in St. Louis, Missouri.

1.7.    Monsanto advertises and sells goods, specifically Roundup, in the State of Texas.

1.8.    Monsanto transacted and conducted business within the State of Texas that relates to the allegations in this Complaint.

1.9.    Monsanto derived substantial revenue from goods and products used in the State of Texas.

1.10.    Monsanto expected or should have expected its acts to have consequences within the State of Texas.

1.11.    Monsanto engaged in the business of designing, developing, manufacturing, testing, packaging, marketing, distributing, labeling, and/or selling Roundup.

-3-

1.12. Defendant Bayer Corporation ("Bayer Corporation" is an Indiana corporation with its headquarters in New Jersey.

1.13. Bayer Corporation has derived substantial revenue from goods and products produced and used in the State of Texas.

1.14. Upon information and belief, Defendant Bayer AG ("Bayer AG") is a publicly-held corporation headquartered in Leverkusen, Germany, with its principal place of business in the United States located in Pittsburgh, Pennsylvania.

1.15. Upon information and belief, Bayer AG is the parent/holding company of Defendants Monsanto and Bayer Corporation.

1.16. Bayer AG acquired Monsanto on or about June 7, 2018.

1.17. Upon information and belief, Monsanto is an indirect, wholly-owned herbicidal subsidiary of Bayer AG, and at all times relevant to this Complaint Monsanto was the entity that discovered the herbicidal properties and manufacturer of Roundup.

1.18. Monsanto, Bayer Corporation and Bayer AG are collectively referred to herein as "Defendants."

## II. **JURISDICTION AND VENUE**

2.1. Federal diversity jurisdiction in this Court is proper under 28 U.S.C. § 1332 because Plaintiffs are citizens of the State of Texas, a different State from the States in which Defendants claim citizenship, namely, the States of Missouri,

New Jersey and Pennsylvania.  The aggregate amount in controversy exceeds $75,000.00, exclusive of interest and costs.

2.2.  This Court has personal jurisdiction over Defendants under C.C.P. § 410 because Defendants knew, or should have known, that their Roundup products are sold throughout the State of Texas and, more specifically, that Plaintiffs could be exposed to Roundup in the State of Texas.

2.3.  In addition, Defendants maintain sufficient contacts with the State of Texas such that this Court's exercise of personal jurisdiction over it does not offend traditional notions of fair play and substantial justice.

2.4.  Venue is proper within this Court under 28 U.S.C. § 1391 because a substantial part of the events and omissions giving rise to the claims asserted in this Complaint, specifically, (a) Plaintiffs are residents of this District; (b) Plaintiff's use and/or exposure to Roundup occurred in this District; and (c) a substantial part of the events or omissions giving rise to Plaintiffs' claims occurred in this District.  Further, Defendants, as corporate entities, are deemed to reside in any jurisdictional district in which they are subject to personal jurisdiction.

## III. **FACTS**

3.1.  In 1970, Defendant Monsanto discovered the herbicidal properties of glyphosate and began marketing it in products in 1974 under the brand name Roundup.  Roundup is a non-selective herbicide used to kill weeds that commonly compete with the growing of crops.  By 2001, glyphosate had become the most-

used active ingredient in American agriculture with 85-90 million pounds used annually. The number grew to 185 million pounds by 2007.[1] As of 2013, glyphosate was the world's most widely used herbicide.

3.2     Monsanto is a multinational agricultural biotechnology corporation based in St. Louis, Missouri. It is the world's leading producer of glyphosate-based herbicides. Its parent company is Bayer AG, a German corporation with its principal office in the United States located in Pennsylvania. As of 2009, Monsanto was the world's leading producer of seeds, accounting for 27% of the world seed market.[2] The majority of these seeds are of the Roundup Ready brand. The stated advantage of Roundup Ready crops is that they substantially improve a farmer's ability to control weeds, since glyphosate-based herbicides can be sprayed in the fields during the growing season without harming their crops. In 2010, an estimated 70% of corn and cotton, and 90% of soybean fields in the United States were Roundup Ready.[3] Forty percent of the world's genetically modified crops are grown in the United States, where Monsanto controls 80% of the genetically modified corn market and 93% of the genetically modified soy

---

[1] Arthur Grube, et al, U.S. Envtl. Prot. Agency, *Pesticides Industry Sales and Usage, 2006-2007 Market Estimates* 14 (2011), available at https://www.epa.gov/sites/production/files/2015-10/documents/market estimates 2007.pdf.

[2] ETC Group, *Who Will Control the Green Economy?* 22 (2011), available at http://www.etcgroup.org/files/publication/pdf file/ETC wwctge 4web Dec 2011.pdf.

[3] William Neuman &Andrew Pollack, *Farmers Cope With Roundup-Resistant Weeds*, N.Y. TIMES, May 3, 2010, available at http://www.nytimes.com/2010/05/04/business/energy-environment/04weed.html?pagewan.

market.[4]

3.3.    Monsanto's glyphosate products are registered in 130 countries and approved for use on over 100 different crops.[5]  They are ubiquitous in the environment.    Numerous studies confirm that glyphosate is found in rivers, streams, and ground water in agricultural areas where Roundup is used.[6]  It has been found in food,[7] in the urine of agricultural workers,[8] and even in the urine of urban dwellers that are not in direct contact with glyphosate.[9]  On March 20, 2015, the International Agency for Research on Cancer ("IARC"), an agency of the World Health Organization ("WHO"), issued an evaluation of several herbicides,

---

[4] Zack Kaldveer, *U.S. and Monsanto Dominate Global Market for GM Seeds*, Organic Consumers Association, August 7, 2013, https://www.organicconsumers.org/essays/us-and-monsanto-dominate-global-market-gm-seeds.

[5] Monsanto, Backgrounder-History of Monsanto's Glyphosate Herbicides (Sep. 2 2015), available at http://www.monsantoglobal.com/global/au/products/pages/roundup.aspx.

[6] See U.S. Geological Survey, *USGS Technical Announcement: Widely Used Herbicide Commonly Found in Rain and Streams in the Mississippi River Basin* (2011), available at https://archive.usgs.gov/safewater/pdfs/factsheets/soc/tech/glyphosa.pdf.

[7] Thomas Bohn, et al, *Compositional Differences in Soybeans on the Market: Glyphosate Accumulates in Roundup Ready GM Soybeans*, 153 FOOD CHEMISTRY 207 (2013), available at http://www.sciencedirect.com/science/article/pii/S0308814613019201.

[8] John F. Acquavella, et al, *Glyphosate Biomonitoring for Farmers and Their Families: Results from the Farm Family Exposure Study*, 112(3) ENVTL. HEALTH PERSPECTIVES 321 (2004), available at https://www.ncbi.nlm.nih.gov/pmc/articles/PMC1241861/pdf/ehp0112-000321.pdf; Kathryn S. Guyton, et al, *Carcinogenicity of Tetrachlorvinphos, Parathion, Malathion, Diazinon & Glyphosate*, 112IARC Monographs 76, section 5.4 (2015), available at http://dx.doi.org/10.1016/S1470-2045(15)70134-8.

[9] Dirk Brandli & Sandra Reinacher, *Herbicides found in Human Urine*, 1 ITHAKA JOURNAL 270 (2012), available at http://www.ithaka-journal.net/druckversionen/e052012-herbicides-urine.pdf.

including Monsanto's products which contain glyphosate. That evaluation was based, in part, on studies of exposures to glyphosate in several countries around the world, and it traces the health implications from exposure to glyphosate since 2001.

3.4. On July 29, 2015, IARC issued the formal monograph relating to glyphosate. In that monograph, the IARC Working Group provides a thorough review of the numerous studies and data relating to glyphosate exposure in humans.

3.5. The IRAC Working Group classified glyphosate as a Group 2A herbicide, which means that it is probably carcinogenic to humans. The IARC Working Group concluded that the cancers most associated with glyphosate exposure are non-Hodgkin's lymphoma and other hematopoietic cancers, including lymphocytic lymphoma/chronic lymphocytic leukemia, B-cell lymphoma, and multiple myeloma.[10]

3.6. The IARC evaluation is significant. It confirms what has been believed for years: that glyphosate is toxic to humans

3.7 Nevertheless, Monsanto, since it began selling Roundup, has represented it as safe to humans and the environment. Indeed, Monsanto has repeatedly proclaimed and continues to proclaim to the world, and particularly to

---

[10] See Guyton, et al, *Carcinogenicity of Tetrachlorvinphos, Parathion, Malathion, Diasinon & Glyphosate, supra.*

United States consumers, that glyphosate-based herbicides, including Roundup, create no unreasonable risks to human health or to the environment and require no protective masks or other protective equipment for safe use.

## Registration of Herbicides Under Federal Law

3.8.     The manufacture, formulation, and distribution of herbicides, such as Roundup, are regulated under the Federal Insecticide, Fungicide, and Rodenticide Act ("FIFRA" or "Act"), 7 U.S.C. § 136 *et seq.*  FIFRA requires that all pesticides be registered with the Environmental Protection Agency ("EPA") prior to their distribution, sale or use, except as described by the Act.  7 U.S.C. § 136a(a).

3.9.     Because pesticides are toxic to plants, animals and humans, at least to some degree, the EPA requires as part of the registration process, among other things, a variety of tests to evaluate the potential for exposure to pesticides, toxicity to people and other potential non-target organisms, and other adverse effects on the environment.  Registration by the EPA, however, is not an assurance or finding of safety.  The determination the EPA must make in registering or re-registering a product is not that the product is "safe," but rather that use of the product in accordance with its label directions "will not generally cause unreasonable adverse effects on the environment."  7 U.S.C. § 136a(c)(5)(D).

3.10.    FIFRA defines "unreasonable adverse effects on the environment" to mean "any unreasonable risk to man or the environment, taking into account the

economic, social, and environmental costs and benefits of the use of any pesticide." 7 U.S.C. § 136(bb).   FIFRA thus requires the EPA to make a risk/benefit analysis in determining whether a registration should be granted or allowed to continue to be sold in commerce.

3.11.  The EPA and the State of Texas registered Roundup for distribution, sale and manufacture in the United States and the State of Texas.

3.12.  FIFRA generally requires that the registrant, Monsanto in the case of Roundup, conduct the health and safety testing of pesticide products.  The EPA has protocols governing the conduct of tests required for registration and the laboratory practices that must be followed in conducting these tests.  The data produced by the registrant must be submitted to the EPA for review and evaluation.  The government is not required, nor is it able, however, to perform the product tests that are required of the manufacturer.

3.13.  The evaluation of each pesticide product distributed, sold, or manufactured is completed at the time the product is initially registered.  The data necessary for registration of a pesticide has changed over time.  The EPA is now in the process of reevaluating all pesticide products through a Congressionally-mandated process called "re-registration."  7 U.S.C. § 136a-1.   In order to reevaluate these pesticides, the EPA is demanding the completion of additional tests and the submission of data for the EPA's review and evaluation.

3.14. In the case of glyphosate, and therefore Roundup, the EPA had planned on releasing its preliminary risk assessment – in relation to the registration process – no later than July 2015. The EPA completed its review of glyphosate in early 2015, but it delayed releasing the risk assessment pending further review in light of the WHO's health-related findings.

## Scientific Fraud Underlying the Marketing and Sale of Glyphosate/Roundup

3.15. Based on early studies showing that glyphosate could cause cancer in laboratory animals, the EPA originally classified glyphosate as possibly carcinogenic to humans (Group C) in 1985. After pressure from Monsanto, including contrary studies it provided to the EPA, the EPA changed its classification to evidence of non-carcinogenicity in humans (Group E) in 1991. In so classifying glyphosate, however, the EPA made clear that the designation did not mean the chemical does not cause cancer: "It should be emphasized, however, that designation of an agent in Group E is based on the available evidence at the time of evaluation and should not be interpreted as a definitive conclusion that the agent will not be a carcinogen under any circumstances.[11]

3.16. On two occasions, the EPA found that the laboratories hired by

---

[11] U.S. Envtl. Prot. Agency, *Memorandum, Subject: SECOND Peer Review of Glyphosate 1* (1991), available at https://archine.org/stream/SecondPeerReviewOfGlyphosateEPAOct 301991/Second%20Peer%20Review%20of%20Glyphosate%20-%20EPA%20-%20%20Oct %2030.%201991 djvu.txt.

Monsanto to test the toxicity of its Roundup products for registration purposes committed fraud.

3.17. In the first instance Monsanto, in seeking initial registration of Roundup by the EPA, hired Industrial Bio-Test Laboratories ("IBT") to perform and evaluate pesticide toxicology studies relating to Roundup.[12] IBT performed about 30 tests on glyphosate and glyphosate-containing products, including 9 of the 15 residue studies needed to register Roundup.

3.18. In 1976 the United States Food and Drug Administration ("FDA") performed an inspection of IBT that revealed discrepancies between the raw data and the final report relating to the toxicological impacts of glyphosate. The EPA subsequently audited IBT; it too found the toxicology studies conducted for the Roundup herbicide to be invalid.[13] An EPA reviewer stated, after finding "routine falsification of data" at IBT, that it was "hard to believe the scientific integrity of the studies when they said they took specimens of the uterus from male rabbits."[14]

---

[12] Monsanto, *Backgrounder, Testing Fraud: IBT and Craven Laboratories* (June 2005), available at https://monsanto.com/app/uploads/2017/06/ibt_craven_bkg.pdf.

[13] U.S. Envtl. Prot. Agency, *Summary of the IBT Review Program Office of Pesticide Programs* (1983), available at https://nepis.epa.gov/Exe/ZyNET.exe/91014ULV.TXT?ZyActionD=ZyDocument&Client=EPA&Index=1981+Thru+1985&Docs=&Query=&Time=&EndTime=&SearchMethod=1&TocRestrict=n&Toc=&TocEntry=&QField=&QFieldYear=&oFieldMonth=QFieldDay=&IntQFieldOp=0&ExtQFieldOp=0&XmlQuery=&File=D%3A%5CIndex%20Data%5C81thru85%5CTxt%5C00000022%5C91014ULV.txt&User=ANONYMOUS&Password=anonymous&SortMethod=h%7C&MaximumDocuments=1&FuzzyDegree=0&ImageQuality=r75g8/r75g8/x150y150g16/i425&Display=hpfr&DefSeekPage=x&SearchBack=ZyActionS&BackDesc=Results%20page&MaximumPages=1&ZyEntry=1&SeekPage=x&ZyPURL.

[14] Marie-Monique Robin, *The World according to Monsanto: Pollution, Corruption and the Control of the World's Food Supply* (2011) (*citing* U.S. Envtl. Prot. Agency, *Data Validation, Memo*

3.19.  Three top executives of IBT were convicted of fraud in 1983.

3.20.  In the second incident of data falsification, Monsanto hired Craven Laboratories in 1991 to perform pesticide and herbicide studies, including for Roundup.  In that same year, the owner of Craven Laboratories and three of its employees were indicted, and later convicted, of fraudulent laboratory practices in the testing of pesticides and herbicides.[15]

3.21.  Despite the falsity of the tests that underlie its registration, within a few years of its launch Monsanto was marketing Roundup in 115 countries.

## The Importance of Roundup to Monsanto's Market Dominance Profits

3.22.  The success of Roundup was key to Monsanto's continued reputation and dominance in the marketplace.  Largely due to the success of Roundup sales, Monsanto's agriculture division was out-performing its chemicals division's operating income, and that gap increased yearly.  But with its patent for glyphosate expiring in the United States in the year 2000, Monsanto needed a strategy to maintain its Roundup market dominance and to ward off impending competition.

3.23  In response, Monsanto began the development and sale of genetically engineered Roundup Ready seeds in 1996.  Since Roundup Ready crops are

_____

*from K. Locke, Toxicology Branch, to R. Taylor, Registration Branch.*  Washington, D.C. (August 9, 1978)).

[15] Dr. Roger A. Novak, *The Long Arm of the Lab Laws*, (November 2001) available at https://pubs.acs.org/subscribe/archive/tcaw/10i11/html/11regs.html.

-13-

resistant to glyphosate, farmers can spray Roundup onto their fields during the growing season without harming the crop. This allowed Monsanto to expand its market for Roundup even further; by 2000 Monsanto's biotechnology seeds were planted on more than 80 million acres worldwide and nearly 70% of American soybeans were planted from Roundup Ready seeds. It also secured Monsanto's dominant share of the glyphosate/Roundup market through a marketing strategy that coupled proprietary Roundup Ready seeds with continued sales of its Roundup herbicide.

3.24. Through a three-pronged strategy of increased production, decreased prices, and by coupling with Roundup Ready seeds, Roundup became Monsanto's most profitable product. In 2000 Roundup accounted for almost $2.8 billion in sales, outselling other herbicides by a margin of five to one and accounted for close to half of Monsanto's revenue.[16] Today, glyphosate remains one of the world's largest herbicides by sales volume.

### Monsanto Has Known For Decades That It Falsely Advertises The Safety of Roundup

3.25 In 1996, the New York Attorney General ("NYAG") filed a lawsuit against Monsanto based on its false and misleading advertising of Roundup products. Specifically, the lawsuit challenged Monsanto's general representations

---

[16] David Barboza, *The Power of Roundup; A Weed Killer Is A Block for Monsanto to Build On*, N.Y. Times, Aug. 2, 2001, available at http://www.nytimes.com/2001/08/02/business/the-power-of-roundup-a-weed-killer-a-block-for-monsanto-to-build-on.html.

that its spray-on glyphosate-based herbicides, including Roundup, were "safer **than table salt**" and "practically **non-toxic**" to mammals, birds and fish. Among the representations the NYAG found deceptive and misleading about the human and environmental safety of Roundup are the following:

(a)     Remember that environmentally-friendly Roundup herbicide is biodegradable. It won't build up in the soil so you can use Roundup with confidence along customers' driveways, sidewalks and fences.

(b)     Remember that Roundup is biodegradable and won't build up in the soil. That will give you the environmental confidence you need to use Roundup everywhere you've got a weed, brush, edging or trimming problem.

(c)     Roundup biodegrades into naturally occurring elements.

(d)     Remember that versatile Roundup herbicide stays where you put it. That means there's no washing or leaching to harm customers' shrubs or other desirable vegetation.

(e)     This non-residual herbicide will not wash or leach in the soil. It . . . stays where you apply it.

(f)     You can apply Roundup with "confidence because it will stay where you put it," it bonds tightly to soil particles, preventing leaching. Then, soon after application, soil microorganisms biodegrade Roundup into natural products.

(g)     Glyphosate is less toxic to rats than table salt following acute oral ingestion.

(h)     Glyphosate's safety margin is much greater than required. It has over a 1,000-fold safety margin in food and over a 700-fold safety margin for workers who manufacture it or use it.

(i) You can feel good about using herbicides by Monsanto. They carry a toxicity category rating of "practically non-toxic" as it pertains to mammals, birds and fish.

(j) "Roundup can be used where kids and pets will play and breaks down into natural material." This ad depicts a person with his head in the ground and a pet dog standing in an area which has been treated with Roundup.[17]

3.26. On November 19, 1996, Monsanto entered into an Assurance of Discontinuance with NYAG in which Monsanto agreed, among other things, "to cease and desist from publishing or broadcasting any advertisements [in New York] that represent, directly or by implication" that:

(a) its glyphosate-containing pesticide products or any component thereof are safe, non-toxic, harmless or free from risk;

(b) its glyphosate-containing pesticide products or any component thereof manufactured, formulated, distributed or sold by Monsanto are biodegradable;

(c) its glyphosate-containing pesticide products or any component thereof stay where they are applied under all circumstances and will not move through the environment by any means;

(d) its glyphosate-containing pesticide products or any component thereof are "good" for the environment or are "known for their environmental characteristics;

(e) its glyphosate-containing pesticide products or any component thereof are safe or less toxic than common consumer products other than herbicides; and

---

[17] Attorney General of the State of New York, in the Matter of Monsanto Company, Assurance of Discontinuance Pursuant to Executive Law § 63(15) (Nov. 1996).

(f)  its glyphosate-containing pesticide products or any component thereof might be classified as "practically non-toxic."

3.27.  Monsanto did not alter its advertising in the same manner in any state other than New York, and on information and belief still has not done so today.

3.28.  In 2009 France's highest court ruled that Monsanto had not told the truth about the safety of Roundup.  The French court affirmed an earlier judgment that Monsanto had falsely advertised its herbicide Roundup as "biodegradable" and that it "left the soil clean."[18]

### Classification and Assessments of Glyphosate

3.29.  The IARC process for the classification of glyphosate followed the stringent procedures for the evaluation of a chemical agent.  Over time, the IARC Monograph program has reviewed 980 agents.   Of those reviewed, it has determined 116 agents to be Group 1 (Known Human Carcinogens); 73 agents to be Group 2A (Probable Human Carcinogens); 287 agents to be Group 2B (Possible Human Carcinogens); 503 agents to be Group 3 (Not Classified); and one agent to be Probably Not Carcinogenic.

3.30.  The established procedure for IARC Monograph evaluations is

---

[18] Monsanto Guilty in "False Ad" Row, BBC, Oct. 15, 2009, available at http://news.bbc.co.uk/2/hi/europe/8308903.stm.

described in the IARC Programme's Preamble.[19]  Evaluations are performed by panels of international experts, selected on the basis of their expertise and the absence of actual or apparent conflicts of interest.

3.31.  One year before the Monograph meeting, the meeting is announced and there is a call both for data and for experts.  Eight months before the Monograph meeting, the Working Group membership is selected and the sections of the Monograph are developed by the Working Group members.  One month prior to the Monograph meeting, the call for data is closed and the various draft sections are distributed among the Working Group members for review and comment.  Finally, at the Monograph meeting, the Working Group finalizes review of all literature, evaluates the evidence in each category, and completes the overall evaluation.  Within two weeks after the Monograph meeting, the summary of the Working Group findings is published in *The Lancet Oncology*, and within a year after the meeting the final Monograph is finalized and published.

3.32.  In assessing an agent, the IARC Working Group reviews the following information: (a) human, experimental, and mechanistic data; (b) all pertinent epidemiological studies and cancer bioassays; and (c) representative mechanistic data.  The studies must be publicly available and have sufficient detail for meaningful review, and reviewers cannot be associated with the underlying study.

---

[19] World Health Org., *IARC Monographs on the Evaluation of Carcinogenic Risks to Humans: Preamble* (2006), available at http://monographs.iarc.fr/ENG/Preamble/Current Preamble.pdf.

3.33. In March 2015 IARC reassessed glyphosate. The summary published in *The Lancet Oncology* reported that glyphosate is a Group 2A agent and probably carcinogenic in humans.

3.34. On July 29, 2015, IARC issued its Monograph for glyphosate in Volume 112. For the volume that assessed glyphosate, a Working Group of 17 experts from 11 countries met at IARC from March 3-10, 2015 to assess the carcinogenicity of certain herbicides, including glyphosate. The March meeting culminated nearly a one-year review and preparation by the IARC Secretariat and the Working Group, including a comprehensive review of the latest available scientific evidence. According to published procedures, the Working Group considered "reports that have been published or accepted for publication in the openly available scientific literature" as well as "data from governmental reports that are publicly available."

3.35. The studies considered the following exposure groups: occupational exposure of farmers and tree nursery workers in the United States, forestry workers in Canada and Finland, municipal weed-control workers in the United Kingdom, and para-occupational exposure in farming families.

3.36. Glyphosate was identified as the second-most used household herbicide in the United States for weed control between 2001 and 2007, and the most-heavily used herbicide in the world in 2012.

3.37. Exposure pathways are identified as air (especially during spraying), water, and food. Community exposure to glyphosate is widespread and found in soil, air, surface water and groundwater, as well as in food.

3.38. The assessment of the IARC Working Group identified several case-control studies of occupational exposure in the United States, Canada and Sweden. These studies show a human health concern from agricultural and other work-related exposure to glyphosate.

3.39. The IARC Working Group found an increased risk between exposure to glyphosate and non-Hodgkin's lymphoma ("NHL") and several subtypes of NHL, and the increased risk persisted after adjustment for other pesticides.

3.40. The IARC Working Group also found that glyphosate caused DNA and chromosomal damage in human cells. One study in community residents reported increases in blood markers of chromosomal damage (micro nuclei) after glyphosate formulations were sprayed.

3.41. In male CD-1 mice, glyphosate induced a positive trend in the incidence of a rare tumor, renal tubule carcinoma. A second study reported a positive trend for haemangiosarcoma in male mice. Glyphosate increased pancreatic islet-cell adenoma in male rats in two studies. A glyphosate formulation promoted skin tumors in an initiation-promotion study in mice.

3.42. The IARC Working Group also noted that glyphosate has been detected in the urine of agricultural workers, indicating absorption. Soil microbes

degrade glyphosate to aminomethylphosphoric acid ("AMPA"). Blood AMPA detection after exposure suggests intestinal microbial metabolism in humans.

3.43. The IARC Working Group further found that glyphosate and glyphosate formulations induced DNA and chromosomal damage in mammals, and in human and animal cells in utero.

3.44. The IARC Working Group also noted genotoxic, hormonal, and enzymatic effects in mammals exposed to glyphosate.[20] Essentially, glyphosate inhibits the biosynthesis of aromatic amino acids, which leads to several metabolic disturbances, including the inhibition of protein and secondary product biosynthesis and general metabolic disruption.

3.45. The IARC Working Group also reviewed an Agricultural Health Study consisting of a prospective cohort of 57,311 licensed pesticide applicators in Iowa and North Carolina.[21] While this study differed from others in that it was based on a self-administered questionnaire, the results support an association between glyphosate exposure and Multiple Myeloma, Hairy Cell Leukemia ("HCL"), and Chronic Lymphocytic Leukemia ("CLL"), in addition to several other cancers.

---

[20] Guyton, et al., *Carcinogenicity of Tetrachlorvinphos, Parathion, Malathion, Diazinon & Glyphosate, supra* at 77.

[21] Anneclare J. DeRoos, et al., *Cancer Incidence Among Glyphosate-Exposed Pesticide Applicators in the Agricultural Health Study*, 113 Envtl. Health Perspectives 49-54 (2005), available at http://www.ncbi.nlm.nih.gov/pmc/articles/PMC1253709/pdf/ehp0113-000049.pdf.

## Other Earlier Findings About Glyphosate's Dangers to Human Health

3.46. The EPA has a technical fact sheet, as part of its "Drinking Water and Health, National Primary Drinking Water Regulations" publication, relating to glyphosate. This technical fact sheet predates the IACR March 20, 2015 evaluation. The fact sheet describes the release patterns for glyphosate as follows:

**Release Patterns**

Glyphosate is released to the environment in its use as an herbicide for controlling woody and herbaceous weeds on forestry, right-of-way, cropped and non-cropped sites. These sites may be around water and in wetlands.

It may also be released to the environment during its manufacture, formulation, transport, storage, disposal, and cleanup, and from spills. Since glyphosate is not a listed chemical in the Toxics Release Inventory, data on releases during its manufacture and handling are not available.

Occupational workers and home gardeners may be exposed to glyphosate by inhalation and dermal contact during spraying, mixing, and cleanup. They may also be exposed by touching soil and plants to which glyphosate was applied. Occupational exposure may also occur during glyphosate's manufacture, transport, storage, and disposal.[22]

3.47. In 1995 the Northwest Coalition for Alternatives to Pesticides reported that in California, the state with the most comprehensive program for reporting of pesticide-caused illness, glyphosate was the third most commonly reported

---

[22] U.S. Envtl. Prot. Agency, *Technical Factsheet on: Glyphosate, supra.*

cause of pesticide illness among agricultural workers.[23]

## **The Toxicity of Other Ingredients in Roundup**

3.48.  In addition to the toxicity of the active ingredient glyphosate, several studies support the hypothesis that the glyphosate-based formulation in Defendants' Roundup products is more dangerous and toxic than glyphosate alone.  Indeed, as early as 1991, available evidence demonstrated that glyphosate formulations were significantly more toxic than glyphosate alone.[24]

3.49.  In 2002, a study by Julie Marc, entitled "Pesticide Roundup Provokes Cell Division Dysfunction at the Level of CDK 1/ Cyclin B Activation," revealed Roundup causes delays in the cell cycles of sea urchins but that the same concentrations of glyphosate alone were ineffective and did not alter cycles.[25]

3.50.  A 2004 study by Marc and others, entitled "Glyphosate-based pesticides affect cell cycle regulation," demonstrated a molecular link between glyphosate-based products and cell cycle dysregulation.  The researchers noted that "[c]ell cycle dysregulation is a hallmark of tumor cells and human cancer.

---

[23] Caroline Cox, *Glyphosate, Part 2: Human Exposure and Ecological Effects*, 15 J. PESTICIDE REFORM 4 (1995); W.S. Peas, et al., *Preventing pesticide-related illness in California agriculture: Strategies and priorities.  Environmental Health Policy Program Report*, Univ. of Cal. School of Public Health, Calif. Policy Seminar (1993).

[24] Martinez, T.T. and K. Brown, *Oral and pulmonary toxicology of the surfactant used in Roundup herbicide*, PROC. WEST. PHARMACOL. SOC. 34:43-46 (1991).

[25] Julie Marc, et al., *Pesticide Roundup Provokes Cell Division Dysfunction at the Level of CDK1/Cyclin B Activation*, 15 CHEM. RES. TOXICOL. 326-331 (2002), available at http:// pubs.acs.org/doi/full/10.1021/tx)15543g.

Failure in the cell cycle checkpoints leads to genomic instability and subsequent development of cancer from the initial affected cell." Further, "[s]ince cell cycle disorders such as cancer result from dysfunction of a unique cell, it was of interest to evaluate the threshold dose of glyphosate affecting the cells."[26]

3.51. In 2005, a study by Francisco Peixoto, entitled "Comparative effects of Roundup and glyphosate on mitochondrial oxidative phosphorylation," demonstrated that Roundup's effects on rat liver mitochondria are far more toxic than equal concentrations of glyphosate alone. The Piexoto study further suggested that the harmful effects of Roundup on mitochondrial bioenergetics could not be exclusively attributed to glyphosate but could be the result of other chemicals such as the surfactant POEA, or the alternative, due to potential synergic effect between glyphosate and other ingredients in the Roundup formulation.[27]

3.52. In 2009, Nora Benachour and Gilles-Eric Seralini published a study examining the effects of Roundup and glyphosate that were far below agricultural recommendations, corresponding with low levels of residue in food. The researchers ultimately concluded that supposed "inert" ingredients, and possibly

---

[26] Julie Marc, et al., *Glyphosate-based pesticides affect cell cycle regulation*, 96 BIOLOGY OF THE CELL 245, 245-249 (2004), available at http://onlinelibrary.wiley.com/doi/10.1016/j.biolcel.2003.11.010/epdf.

[27] Francisco Peixoto, *Comparative effects of the Roundup and glyphosate on mitochondrial oxidative phosphorylation*, 61 CHEMOSPHERE 1115, 1122 (2005), available at http://www.ask-force.org/web/Seralini/Pexioto-Comparative-Effects-RR-Glyphosate-2006.pdf.

POEA, alter human cell permeability and amplify toxicity of glyphosate alone. The researchers further suggested that assessments of the glyphosate toxicity should account for the presence of adjuvants or additional chemicals used in the formulation of the complete pesticide. The study confirmed that the adjuvants present in Roundup are not, in fact, inert and that Roundup is potentially far more toxic than its active ingredient glyphosate alone.[28]

### Recent Worldwide Bans on Roundup/Glyphosate

3.53. Several countries around the world have instituted bans on the sale of Roundup and other glyphosate-containing herbicides, both before and since IARC first announced its assessment for glyphosate in March 2015, and more countries undoubtedly will follow suit as the dangers of the use of Roundup are more widely known. The Netherlands issued a ban on all glyphosate-based herbicides in April 2014, including Roundup, which took effect by the end of 2015. In issuing the ban, the Dutch Parliament member who introduced the successful legislation stated: "Agricultural pesticides in user-friendly packaging are sold in abundance to private persons. In garden centers, Roundup is promoted as harmless, but unsuspecting customers have no idea what the risks of this product are. Especially children are sensitive to toxic substances and

---

[28] Nora Benachour, et al., *Glyphosate Formulations Induce Apoptosis and Necrosis in Human Umbilical, Embryonic, and Placental Cells*, 22 CHEM. RES. TOXICOL. 97-105 (2008), available at https://big.assets.huffingtonpost.com/france.pdf.

should therefore not be exposed to it."[29]

3.54.  The Brazilian Public Prosecutor in the Federal District requested that the Brazilian Justice Department suspend the use of glyphosate.[30]

3.55.  France banned the private sale of Roundup and glyphosate following the IARC assessment for glyphosate.[31]

3.56.  Bermuda banned both the private and commercial sale of glyphosates, including Roundup.  The Bermuda government explained its ban as follows: "Following a recent scientific study carried out by a leading cancer agency, the importation of weed spray Roundup has been suspended."[32]

3.57.  The Sri Lankan government banned the private and commercial use of glyphosates, particularly out of concern that glyphosate has been linked to fatal

---

[29] *Holland's Parliament Bans Glyphosate Herbicides*, The Real Agenda, April 14, 2014, available at https://real-agenda.com/hollands-parliament-bans-gylphosate-herbicides/.

[30] Christina Sarich, *Brazil's Public Prosecutor Wants to Ban Monsanto's Chemicals Following Recent Glyphosate-Cancer Link*, GLOBAL RESEARCH, MAY 14, 2015, available at https://www.globalresearch.ca/brazils-public-prosecutor-wants-to-ban-monsanto's-chemicals-following-recent-glyphosate-cancer-link/5449440; *see* Ministerio Publico Federal, *MPF/DF reforca pedido para que glifosato seja banido do Mercado nacional*, April 14, 2015, available at http://noticias.pgr.mpf.mp.br/noticias/noticias-do-site/copy-of-meio-ambiente-e-patrimonio-cultural/mpf-df-reforca-pedido-para-que-glifosato-seja-banido-do-mercado-nacional.

[31] Zoe Schlanger, *France Bans Sales of Monsanto's Roundup in Garden Centers, 3 Months After U.N. Calls it 'Probable Carcinogen*,' Newsweek, June 15, 2015, available at https://www.newsweek.com/france-bans-sale-monsanto's-roundup-garden-centers-after-un-names-it-probable-343311.

[32] *Minister: Importation of Roundup Suspended*, Bernews, May 11, 2015, available at http://bernews.com/2015/05/importation-weed-spray-round-suspended.

kidney disease in agricultural workers.[33]

3.58. The government of Columbia announced its ban on using Roundup and glyphosate to destroy illegal plantations of coca, the raw ingredient for cocaine, because of the WHO's finding that glyphosate is probably carcinogenic.[34]

3.59. In 2015, California's Office of Environmental Health Hazard Assessment (OEHHA) announced that it intended to list glyphosate under California's Proposition 65 as a chemical known to cause cancer, birth defects, or other reproductive harm. While Monsanto challenged this decision, the Superior Court of Fresno County and the Fifth Appellate District found in favor of the OEHHA.[35]

3.60. In the case of *Dewayne Johnson, et al v. Monsanto*, a San Francisco jury recently returned a verdict of approximately $290 million, finding that Monsanto's glyphosate-containing Roundup products caused Mr. Johnson's terminal non-Hodgkin's lymphoma.[36]

---

[33] *Sri Lanka's New President Puts Immediate Ban on Glyphosate Herbicides*, Sustainable Pulse, May 25, 2015, available at https://sustainablepulse.com/2015/05/25/sri-lankas-new-president-puts-immediate-ban-on-glyphosate-herbicides/#.XBgQINtKgc0.

[34] *Columbia to ban coca spraying herbicide glyphosate*, BBC, May 10, 2015, available at http://www.bbc.com/news/world-latin-america-32677411.

[35] *Monsanto Company v. Office of Environmental Health Hazard Assessment, et al*, 22 Cal. App. 5th 534 (Apr. 19, 2018).

[36] *Dewayne Johnson v. Monsanto Company, et al*, No. 3:2016cv01244 (N.D. Cal. 2016).

## IV.  PLAINTIFF'S EXPOSURE TO ROUNDUP

4.1     Plaintiff was first exposed to Roundup beginning on his very first day of employment with EDKO on or about September 16, 2016 until his last day of employment on or about November 9, 2018.

4.2     In connection with his employment with EDKO, Plaintiff was instructed to use highly concentrated Roundup on a daily basis, and during the majority of each work day, to spray trees, bushes and vegetation intruding on various utility rights-of-way located in the States of Texas, Arkansas and Louisiana.  Plaintiff was also instructed to use high pressure hoses to spray large quantities of Roundup each and every work day, which work days were comprised of as many as 8-10 hours per day.

4.3.    Throughout each and every day, as Plaintiff sprayed tremendous quantities of concentrated Roundup on a daily basis, Plaintiff was never provided with any sort of protective clothing or protective equipment; to the contrary, Plaintiff was instructed to continue to spray tremendous quantities of concentrated Roundup throughout each and every day while he was dressed in his jeans and shirt, and standing on "skidders" being pulled down the various rights-of-way by tractor.

4.4.    Throughout each and every day, Plaintiff experienced tremendous quantities of concentrated Roundup "raining down" on his face; into his mouth, eyes, nose and ears; and onto his exposed skin and hair.

4.5.   Throughout each and every day, the concentrated Roundup sprayed by Plaintiff would soak his exposed skin and clothes multiple times each work day, and Plaintiff often swallowed the Roundup as it fell onto his exposed head and face.

4.6.   Throughout each and every day, when Plaintiff utilized Roundup he believed it was not a carcinogen, and he specifically relied on the labeling and promotion of Roundup as being safe to humans.

4.7.   Plaintiff did not learn of the link between Roundup exposure and non-Hodgkin's lymphoma until recently.

4.8.   In November of 2018, doctors diagnosed Plaintiff with diffuse large B-cell lymphoma.  As a result, for the past many months Plaintiff has undergone both "chemotherapy" and radiation treatment, and is still under the care of his treating physician, a board certified radiation oncologist.   Plaintiff has also suffered other personal injuries that are the direct result of the cancer and necessary "chemotherapy" and radiation treatment.

4.9.   During the entire time in which Plaintiff was exposed to Roundup, he did not know that exposure to Roundup was injurious to his health or the health of others.   In fact, representatives of Defendants and EDKO continued to specifically advise Plaintiff that Roundup was not injurious to Plaintiff's health or the health of others.

4.10.  Plaintiff's personal physician and treating oncologist, having previously reviewed much of the relevant body of scientific literature investigating the carcinogenic potential of herbicides, with specific emphasis on glysophate and non-Hodgkin's lymphoma; and having estimated the elevated risk association to have specifically resulted in Plaintiff developing his lymphoma, is of the medical opinion that it is more likely than not that Plaintiff's exposure to glysophate caused Plaintiff's non-Hodgkin's lymphoma.

## V.  **TOLLING OF THE STATUTE OF LIMITATIONS DISCOVERY RULE TOLLING**

5.1.  The running of any statute of limitations has been tolled by reason of Defendants' fraudulent concealment.  Defendants, through their affirmative misrepresentation and omissions, actively concealed from Plaintiff the true risks associated with Roundup and glyphosate.

5.2.  At all relevant times, Defendants and EDKO have maintained that Roundup is safe, non-toxic, and non-carcinogenic.

5.3.  Even as recent as July 2016, Defendants continued to represent to the public that "Regulatory authorities and independent experts around the world have reviewed numerous long-term carcinogenicity and genotoxicity studies and agree that there is no evidence that glyphosate, the active ingredient in Roundup brand herbicides and other glyphosate-based herbicides, causes cancer, even at

very high doses, and that it is not genotoxic.[37]

5.4.   As a result of Defendants' actions. Plaintiff was unaware and could not reasonably know or have learned through reasonable diligence that Roundup and/or glyphosate contact exposed him to the risks alleged herein and that those risks were the direct and proximate result of Defendants' acts and omissions.

5.5.   Furthermore, Defendants are estopped from relying on any statute of limitations because of their fraudulent concealment of the true character, quality and nature of Roundup.   Defendants were under a duty to disclose the true character, quality and nature of Roundup because this was non-public information over which Defendants had and continue to have exclusive control, and because Defendants knew that this information was not available to Plaintiff or to distributors of Roundup.   In addition, Defendants are estopped from relying on any statute of limitations because of their intentional concealment of these facts.

5.6.   Plaintiff had no knowledge that Defendants were engaged in the wrongdoing alleged herein.   Because of the fraudulent acts of concealment of wrongdoing by Defendants, Plaintiff could not have reasonably discovered the wrongdoing at any time prior.   Also, the economics of this fraud should be considered.   Defendants had the ability to and did spend enormous amounts of

---

[37] Backgrounder – Glyphosate: No Evidence of Carcinogenicity, Updated November 2014, available at https://www.monsantoglobal.com/global/jp/products/Documents/no-evidence-of-carcinogenicity.pdf.

money in furtherance of their purpose of marketing, promoting and/or distributing a profitable herbicide, notwithstanding the known or reasonably known risks. Plaintiff and medical professionals could not have afforded and could not have possibly conducted studies to determine the nature, extent and identity of related health risks, and were forced to rely on only the Defendants' representations. Accordingly, Defendants are precluded by the discovery rule and/or the doctrine of fraudulent concealment from relying upon any statute of limitations.

## VI.  CAUSES OF ACTION

### CLAIM ONE
### STRICT LIABILITY (DESIGN DEFECT)

6.1.    Plaintiffs incorporate by reference each and every allegation set forth in the preceding paragraphs as if fully stated herein.

6.2.    Plaintiffs bring this strict liability claim against Monsanto for defective design.

6.3.    At all times relevant to this litigation, Monsanto engaged in the business of testing, developing, designing, manufacturing, marketing, selling, distributing and promoting Roundup products, which are defective and unreasonably dangerous to consumers, handlers or users, including the Plaintiff, thereby placing Roundup products into the stream of commerce. These actions were under the ultimate control and supervision of Monsanto. At all times relevant to this litigation, Monsanto designed, researched, developed,

-32-

manufactured, produced, tested, assembled, labeled, advertised, promoted, marketed, sold and distributed Roundup products used by Plaintiff, as described above.

6.4.   At all times relevant to this litigation, Defendants' Roundup products were manufactured, designed and labeled in an unsafe, defective and inherently dangerous manner that was dangerous for use by or exposure to the public and, in particular, the Plaintiffs.

6.5.   At all times relevant to this litigation, Defendants' Roundup products reached the intended consumers, handlers and users, or other persons coming into contact with these products, in Texas and throughout the United States, including Plaintiffs, without substantial change in their condition as designed, manufactured, sold, distributed, labeled and marketed by Defendants.

6.6.   Defendants' Roundup products, as researched, tested, developed, designed, licensed, manufactured, packaged, labeled, distributed, sold and marketed by Defendants were defective in design and formulation in that when they left the hands of Monsanto's manufacturers and/or suppliers, they were unreasonably dangerous and dangerous to an extent beyond that which an ordinary consumer would contemplate.

6.7.   Defendants' Roundup products, as researched, tested, developed, designed, licensed, manufactured, packaged, labeled, distributed, sold and marketed by Defendants were defective in design and formulation in that when

they left the hands of Monsanto's manufacturers and/or suppliers, the foreseeable risks exceeded the alleged benefits associated with their design and formulation. Defendants' Roundup products remained unchanged between leaving Monsanto's manufacturers and/or suppliers and being handled and utilized by the Plaintiff.

6.8.    At all times relevant to this action, Defendants knew, or had reason to know, that their Roundup products were defective and were inherently dangerous and unsafe when used in the manner instructed and provided by Monsanto.

6.9.    Therefore, at all times relevant to this litigation, Monsanto's Roundup products, as as researched, tested, developed, designed, licensed, manufactured, packaged, labeled, distributed, sold and marketed by Monsanto were defective in design and formulation, in one or more of the following ways:

(a)    When placed in the stream of commerce, Monsanto's Roundup were defective in design and formulation and, consequently, dangerous to an extent beyond that which an ordinary consumer would contemplate.

(b)    When placed in the stream of commerce, Monsanto's Roundup products were unreasonably dangerous in that they were hazardous and posed a grave risk of cancer and other serious illnesses when used in a reasonably anticipated manner.

(c)    When placed in the stream of commerce, Monsanto's Roundup products contained unreasonably dangerous design defects and were not reasonably safe when used in a reasonably anticipated or intended manner.

(d)     Monsanto did not sufficiently test, investigate or study its Roundup products and, specifically, the active ingredient glyphosate.

(e)     Exposure to Roundup and glyphosate-containing products presents a risk of harmful side effects that outweigh any potential utility stemming from the use of the herbicide.

(f)     Monsanto knew, or should have known, at the time of marketing its Roundup products that exposur3e to Roundup and, specifically, its active ingredient glyphosate, could result in cancer and other severe illnesses and injuries.

(g)     Monsanto did not conduct adequate post-marketing surveillance of its Roundup products.

(h)     Defendants could have employed safer alternative designs and formulations for its Roundup products.

6.10. As more specifically detailed above, Plaintiff was exposed to Monsanto's Roundup products in the course of Plaintiff's handling and use of Roundup products, as described above, without knowledge of their dangerous characteristics.

6.11. At all times relevant to this litigation, Plaintiff used and/or was exposed to the use of Monsanto's Roundup products in an intended or reasonably foreseeable manner without knowledge of their dangerous characteristics.

6.12. Plaintiff could not have reasonably discovered the defects and risks associated with Roundup or glyphosate-containing products before or at the time of exposure.

6.13. The harm caused by Monsanto's Roundup products far outweighed their benefit, rendering Monsanto's products dangerous to an extent beyond that which an ordinary consumer would contemplate. Monsanto's Roundup products were, and are, more dangerous than alternative products and Monsanto could have designed its Roundup products to make them less dangerous. Indeed, at the time that Monsanto designed its Roundup products, the state of the industry's scientific knowledge was such that a less risky design or formulation was attainable.

6.14. At the time Roundup products left Monsanto's control, there was a practical, technically feasible and safe alternative design that would have prevented the harm without substantially impairing the reasonably anticipated or intended function of Monsanto's herbicides.

6.15. Monsanto's defective design of its Roundup products was willful, wanton, fraudulent, malicious and conducted with reckless disregard for the health and safety of users of the Roundup products, including the Plaintiff.

6.16. Therefore, as a result of the unreasonably dangerous condition of its Roundup products, Monsanto is strictly liable to Plaintiffs.

6.17. The defects in Monsanto's Roundup products were substantial and contributing factors in causing Plaintiffs' injuries and, but for Monsanto's misconduct and omissions, Plaintiffs would not have sustained Plaintiffs' injuries.

6.18. Monsanto's conduct, as described above, was reckless. Monsanto risked the lives of consumers and users of its products, including Plaintiff, with knowledge of the safety problems associated with Roundup and glyphosate-containing products, and suppressed this knowledge from the general public. Monsanto made conscious decisions not to redesign, warn or inform the unsuspecting public. Monsanto's reckless conduct warrants an award of punitive damages.

6.19. As a direct and proximate result of Monsanto placing its defective Roundup products into the stream of commerce, Plaintiffs have suffered, and continue to suffer, serious injuries, and have endured physical pain and discomfort, as well as economic hardship, including considerable financial expenses for medical care and treatment. Plaintiffs will continue to incur these expenses in the future.

6.20. THEREFORE, Plaintiffs respectfully request that this Court enter judgment in Plaintiffs' favor for compensatory and punitive damages, together with interest, costs herein incurred, attorneys' fees and all such other and further relief as this Court deems just and proper. Plaintiff also demands a jury trial on the issues contained herein.

**CLAIM TWO**

**STRICT LIABILITY (FAILURE TO WARN)**

6.21.  Plaintiffs incorporate by reference each and every allegation set forth in the preceding paragraphs as if fully stated herein.

6.22.  Plaintiffs bring this strict liability claim against Defendants for failure to warn.

6.23. At all times relevant to this litigation, Monsanto engaged in the business of testing, developing, designing, manufacturing, marketing, selling, distributing and promoting Roundup products which are defective and unreasonably dangerous to consumers, including Plaintiff, because they do not contain adequate warnings or instructions concerning the dangerous characteristics of Roundup and, specifically, the active ingredient glyphosate. These actions were under the ultimate control and supervision of Defendants.

6.24. Defendant Monsanto researched, developed, designed, tested, manufactured, inspected, labeled, distributed, marketed, promoted, sold and otherwise released into the stream of commerce its Roundup products and, in the course of same, directly advertised or marketed the products to handlers, users and end users, including Plaintiff, and therefore had a duty to warn of the risks associated with the use of Roundup and glyphosate-containing products.

6.25. At all times relevant to this litigation, Defendants had a duty to properly test, develop, design, manufacture, inspect, package, label, market,

promote, sell, distribute, maintain, supply, provide proper warnings, and take such steps as necessary to ensure its Roundup products did not cause users and consumers to suffer from unreasonable and dangerous risks. Monsanto had a continuing duty to warn Plaintiff of the dangers associated with Roundup and glyphosate use and exposure. Monsanto, as manufacturer, seller, or distributor of chemical herbicides is held to the knowledge of an expert in the field.

6.26. At the time of manufacture, Monsanto could have provided the warnings or instructions regarding the full and complete risks of Roundup and glyphosate-containing products because it knew, or should have known, of the unreasonable risks of harm associated with the use of and/or exposure to such products.

6.27. At all times relevant to this litigation, Monsanto failed to investigate, study, test or promote the safety, or to minimize the dangers to users and consumers of its product and to those who would foreseeably use or be harmed by Defendants' herbicides, including Plaintiff.

6.28. Despite the fact that Monsanto knew, or should have known, that Roundup posed a grave risk of harm, it failed to exercise reasonable care to warn of the dangerous risks associated with use and exposure. The dangerous propensities of its products and the carcinogenic characteristics of glyphosate, as described above, were known to Monsanto, or scientifically knowable to Monsanto, through appropriate research and testing by known methods, at the time it

distributed, supplied or sold the product, and not known to end users and consumers, such as Plaintiff.

6.29. Monsanto knew, or should have known, that its products created significant risks of serious bodily harm to consumers, as alleged herein, and Monsanto failed to adequately warn consumers and reasonably foreseeable users of the risks of exposure to its products. Monsanto has wrongfully concealed information concerning the dangerous nature of Roundup and its active ingredient glyphosate and, further, made false and/or misleading statements concerning the safety of Roundup and glyphosate.

6.30. At all times relevant to this litigation, Defendants' Roundup products reached the intended consumers, handlers and users or other persons coming into contact with these products in Texas and throughout the United States, including Plaintiff, without substantial change in their condition as designed, manufactured, sold, distributed, labeled and marketed by Monsanto.

6.31. Plaintiff was exposed to Defendants' Roundup products in the course of Plaintiff's routine handling and use of Roundup products, as described above, without knowledge of their dangerous characteristics.

6.32. At all times relevant to this litigation, Plaintiff handled and used and/or was exposed to the use of Monsanto's Roundup products in their intended or reasonably foreseeable manner, without knowledge of their dangerous characteristics.

6.33. Plaintiffs could not have reasonably discovered the defects and risks associated with Roundup or glyphosate-containing products prior to, or at the time of, Plaintiff's exposure. Plaintiffs relied upon the skill, superior knowledge and judgment of Monsanto.

6.34. Monsanto knew, or should have known, that the minimal warnings disseminated with its Roundup products were inadequate, failed to communicate adequate information on the dangers and safe use/exposure, and failed to communicate warnings and instructions that were appropriate and adequate to render the products safe for their ordinary, intended and reasonably foreseeable uses, including agricultural and horticultural applications.

6.35. The information that Monsanto did provide or communicate failed to contain relevant warnings, hazards, and precautions that would have enabled regular handlers and users of Roundup products, such as Plaintiff, to utilize the products safely and with adequate protection. Instead, Monsanto disseminated information that was inaccurate, false and misleading, and which failed to communicate accurately or adequately the comparative severity, duration and extent of the risk of injuries with use of and/or exposure to Roundup and glyphosate; continued to aggressively promote the efficacy of its products, even after it knew, or should have known, of the unreasonable risks from use or exposure; and concealed, downplayed or otherwise suppressed, through aggressive marketing and promotion, any information or research about the risks

-41-

and dangers of exposure to Roundup and glyphosate.

6.36. To this day, Defendants have failed to adequately and accurately warn of the risks of cancer associated with the use of and exposure to Roundup and its active ingredient glyphosate.

6.37. As a result of their inadequate warnings, Monsanto's Roundup products were defective and unreasonably dangerous when they left the possession and/or control of Monsanto, and were regularly handled and used by Plaintiff.

6.38. Monsanto is liable to Plaintiffs for injuries caused by its negligent or willful failure, as described above, to provide adequate warnings or other clinically relevant information and data regarding the appropriate use of its products and the risks associated with the use of, or exposure to, Roundup and glyphosate.

6.39. Had Monsanto provided adequate warnings and instructions, and properly disclosed and disseminated the risks associated with its Roundup products, Plaintiffs could have avoided the risk of developing injuries as alleged herein.

6.40. As a direct and proximate result of Monsanto placing its defective Roundup products into the stream of commerce, Plaintiffs have suffered, and continue to suffer, severe injuries, and have endured physical and emotional pain and discomfort, as well as economic hardship, including considerable financial expenses for medical care and treatment. Plaintiffs will continue to incur these

expenses in the future.

THEREFORE, Plaintiffs respectfully requests that this Court enter judgment in Plaintiffs' favor for compensatory and punitive damages, together with interest, costs herein incurred, attorneys' fees, and all such other and further relief as this Court deems just and proper. Plaintiffs also demand a jury trial on the issues contained herein.

## CLAIM THREE

### NEGLIGENCE

6.41. Plaintiffs incorporate by reference each and every allegation set forth in the preceding paragraphs as if fully stated herein.

6.42. Defendants, directly or indirectly, caused Roundup products to be sold, distributed, packaged, labeled, marketed, promoted and/or handled and used by Plaintiff.

6.43. At all times relevant to this litigation, Monsanto had a duty to exercise reasonable care in the design, research, manufacture, marketing, advertisement, supply, promotion, packaging, sale and distribution of their Roundup products, including the duty to take all reasonable steps necessary to manufacture, promote and/or sell a product that was not unreasonably dangerous to consumers and users of the product.

6.44. At all times relevant to this litigation, Monsanto had a duty to exercise reasonable care in the marketing, advertisement and sale of its Roundup

products. Monsanto's duty of care owed to consumers and the general public

included providing accurate, true and correct information concerning the risks of

using Roundup products, and appropriate, complete and accurate warnings

concerning the potential adverse effects of exposure to Roundup products and, in

particular, its active ingredient glyphosate.

6.45. At all times relevant to this litigation, Monsanto knew, or in the

exercise of reasonable care should have known, of the hazards and dangers of

Roundup products and, specifically, the carcinogenic properties of glyphosate.

6.46. Accordingly, at all time relevant to this litigation, Monsanto knew, or

in the exercise of reasonable care should have known, that use of or exposure to

its Roundup products could cause or be associated with Plaintiff's injuries and,

thus, created a dangerous and unreasonable risk of injury to the handlers and

users of these products, including Plaintiff.

6.47. Monsanto also knew, or in the exercise of reasonable care should have

known, that users and consumers of Roundup products were unaware of the risks

and the magnitude of the risks associated with use of and/or exposure to

Roundup products and glyphosate-containing products.

6.48. As such, Monsanto breached its duty of reasonable care and failed to

exercise ordinary care in the design, research, development, manufacture, testing,

marketing, supply, promotion, advertisement, packaging, sale and distribution of

its Roundup products, in that Monsanto manufactured and produced defective

herbicides containing the chemical glyphosate; knew, or had reason to know, of the defects inherent in its products; knew, or had reason to know, that a user's or consumer's exposure to the products created a significant risk of harm and unreasonably dangerous side effects; and failed to prevent or adequately warn of these risks and injuries.

6.49. Despite its ability and means to investigate, study and test its products and to provide adequate warnings, Monsanto has failed to do so. Indeed, Monsanto has wrongfully concealed information and has further made false and/or misleading statements concerning the safety and/or exposure to Roundup products and glyphosate.

6.50. Monsanto's negligence included:

(a)     Manufacturing, producing, promoting, formulating, creating, developing, designing, selling and/or distributing its Roundup products without thorough and adequate pre- and post-market testing;

(b)     Manufacturing, producing, promoting, formulating, creating, developing, designing, selling and/or distributing Roundup while negligently and/or intentionally concealing and failing to disclose the results of trials, tests and studies of exposure to glyphosate and, consequently, the risk of serious harm associated with human use of and exposure to Roundup;

(c)     Failing to undertake sufficient studies and conduct necessary tests to determine whether or not Roundup products and glyphosate-containing products were safe for their intended use in agriculture and horticulture;

(d)     Failing to use reasonable and prudent car in the design, research, manufacture and development of Roundup products so as to avoid the risk of serious harm associated with the

prevalent use of Roundup/glyphosate as an herbicide;

(e) Failing to design and manufacture Roundup products so as to ensure they were at least as safe and effective as other herbicides on the market;

(f) Failing to provide adequate instructions, guidelines and safety precautions to those persons Defendants could reasonably foresee would use and be exposed to its Roundup products;

(g) Failing to disclose to Plaintiff, users/consumers and the general public that use of and exposure to Roundup presented severe risks of cancer and other grave illnesses;

(h) Failing to warn Plaintiff, consumers and the general public that the product's risk of harm was unreasonable and that there were safer and effective alternative herbicides available to the Plaintiff and other consumers;

(i) Systematically suppressing or downplaying contrary evidence about the risks, incidence and prevalence of the side effects of Roundup and glyphosate-containing products;

(j) Representing that its Roundup products were safe for their intended use when, in fact, Defendants knew, or should have known, that the products were not safe for their intended use;

(k) Declining to make or propose any changes to Roundup products' labeling or other promotional materials that would alert consumers and the general public of the risks of Roundup and glyphosate;

(l) Advertising, marketing and recommending the use of the Roundup products, while concealing and failing to disclose or warn of the dangers known by Defendants to be associated with or caused by the use of or exposure to Roundup and glyphosate;

(m) Continuing to disseminate information to consumers which indicate or imply that Defendants' Roundup products are not unsafe for use in the agricultural and horticultural industries; and

(n)     Continuing the manufacture and sale of its products with the knowledge that the products were unreasonably unsafe and dangerous.

6.51.  Monsanto knew, and/or should have known, that it was foreseeable that consumers such as Plaintiff would suffer injuries as a result of Monsanto's failure to exercise ordinary care in the manufacturing, marketing, labeling, distributing and sale of Roundup.

6.52.  Plaintiffs did not know the nature and extent of the injuries that could result from the intended use of and/or exposure to Roundup or its active ingredient glyphosate.

6.53.  Monsanto's negligence was the proximate cause of the injuries, harm and economic losses that Plaintiffs have suffered, and will continue to suffer, as described herein

6.54.  Monsanto's conduct, as described above, was reckless.  Monsanto regularly risks that lives of consumers and users of its products, including Plaintiffs, with full knowledge of the dangers of its products.  Monsanto has made conscious decisions not to redesign, re-label, warn or inform the unsuspecting public, including Plaintiffs.  Monsanto's reckless conduct therefore warrants an award of punitive damages.

6.55.  As a proximate result of Monsanto's wrongful acts and omissions in placing its defective Roundup products into the stream of commerce without adequate warnings of the hazardous and carcinogenic nature of glyphosate,

Plaintiffs have suffered, and continue to suffer, severe and permanent physical and emotional injuries. Plaintiffs have endured pain and suffering, have suffered economic losses (including significant expenses for medical care and treatment), and will continue to incur these expenses in the future.

THEREFORE, Plaintiffs respectfully request that this Court enter judgment in Plaintiffs' favor for compensatory and punitive damages, together with interest, costs herein incurred, attorney's fees, and all such other and further relief as this Court deems just and proper. Plaintiffs also demand a jury trial on the issues contained herein.

## CLAIM FOUR

## BREACH OF IMPLIED WARRANTIES

6.56. Plaintiffs incorporate by reference each and every allegation set forth in the preceding paragraphs as if fully stated herein.

6.57. At all times relevant to this litigation, Monsanto engaged in the business of testing, developing, designing, manufacturing, marketing, selling, distributing and promoting their Roundup products, which are defective and unreasonably dangerous to consumers, including Plaintiff, thereby placing Roundup products into the stream of commerce. These actions were under the ultimate control and supervision of Defendants.

6.58. Before the time that Plaintiff was exposed to the use of Roundup products, Monsanto impliedly warranted to its consumers, including Plaintiff, that

its Roundup products were of merchantable quality and safe and fit for the use for which they were intended, specifically, as agricultural and horticultural herbicides.

6.59. Monsanto, however, failed to disclose that Roundup has dangerous propensities when used as intended and that the use of and/or exposure to Roundup and glyphosate-containing products carries an increased risk of developing severe injuries, including Plaintiffs' injuries.

6.60. Plaintiffs reasonably relied upon the skill, superior knowledge and judgment of Monsanto and upon its implied warranties that the Roundup products were of merchantable quality and fit for their intended purpose or use.

6.61. Plaintiffs are the intended third-party beneficiaries of implied warranties made by Monsanto to the purchasers and users of its agricultural and horticultural herbicides and, as such, Plaintiffs are entitled to assert this claim.

6.62. The Roundup products were expected to reach and did, in fact, reach consumers and users, including Plaintiff, without substantial change in the condition in which they were manufactured and sold by Monsanto.

6.63. At all times relevant to this litigation, Monsanto was aware that consumers and users of its products, including Plaintiff, would use Roundup products as marketed by Monsanto, which is to say that Plaintiff was a foreseeable handler and/or user of Roundup.

6.64. Monsanto intended that its Roundup products be used in the manner in which Plaintiff used them, and Monsanto impliedly warranted each product to be of merchantable quality, safe and fit for this use despite the fact that Roundup was not adequately tested or researched.

6.65. In reliance upon Monsanto's implied warranty, Plaintiff handled and used Roundup as instructed and labeled and in the foreseeable manner intended, recommended, promoted and marketed by Monsanto.

6.66. Plaintiff could not have reasonably discovered or known of the risks of serious injury associated with Roundup or glyphosate.

6.67. Monsanto breached its implied warranty to Plaintiffs that its Roundup products were not of merchantable quality, safe or fit for their intended use, or adequately tested. Roundup has dangerous propensities when used as intended and can cause serious injuries, including those injuries complained of herein.

6.68. The harm caused by Monsanto's Roundup products far outweighed their benefit, rendering the products more dangerous than an ordinary consumer or user would expect, and more dangerous than alternative products.

6.69. As a direct and proximate result of Monsanto's wrongful acts and omissions, Plaintiffs have suffered severe and permanent physical and emotional injuries. Plaintiffs have endured pain and suffering, have suffered economic loss (including significant expenses for medical care and treatment), and will continue to incur these expenses in the future for medical care and future medical

monitoring.

THEREFORE, Plaintiffs respectfully request that this Court enter judgment in Plaintiffs' favor for compensatory and punitive damages, together with interest, costs herein incurred, attorney's fees, and all such other and further relief as this Court deems just and proper. Plaintiffs also demand a jury trial on the issues contained herein.

## VII. <u>PRAYER FOR RELIEF</u>

THEREFORE, Plaintiffs request that the Court enter judgment in their favor and against Defendants, in solido, awarding the Plaintiffs as follows:

(a)     compensatory damages in an amount to be proven at trial;

(b)     punitive damages;

(c)     costs, including reasonable attorneys' fees, court costs and other litigation expenses; and

(d)     any other relief the Court may deem just and proper.

## VIII. <u>JURY TRIAL DEMAND</u>

Plaintiffs demand a trial by jury on all of the triable issues within this Complaint. Plaintiffs further request that this case be transferred for pretrial consideration into MDL No. 2741.

Respectfully submitted this 22ND day of *August*, 2019.

JONES & ODOM, L.L.P.

By _____

J. Marshall Jones, Jr.
Texas Bar #00785636
2124 Fairfield Avenue
Shreveport, Louisiana 71104
Tel. 318-221-1600
Fax 318-425-1256
jamajo@jodplaw.com

COUNSEL FOR PLAINTIFF

**Please serve as follows:**

Monsanto Company, through its
Registered Agent:
Corporation Service Company
501 Louisiana Avenue
Baton Rouge, LA 70802

Bayer Corporation and Bayer AG,
through its Registered Agent:
Corporation Service Company
501 Louisiana Avenue
Baton Rouge, LA 70802