**WILKINSON STEKLOFF LLP**
Brian L. Stekloff (*pro hac vice*)
(bstekloff@wilkinsonstekloff.com)
Rakesh Kilaru (*pro hac vice*)
(rkilaru@wilkinsonstekloff.com)
2001 M St. NW
10th Floor
Washington, DC 20036
Tel:    202-847-4030
Fax:    202-847-4005

**HOLLINGSWORTH LLP**
Eric G. Lasker (*pro hac vice*)
(elasker@hollingsworthllp.com)
1350 I St. NW
Washington, DC 20005
Tel: 202-898-5843
Fax: 202-682-1639

**COVINGTON & BURLING LLP**
Michael X. Imbroscio (*pro hac vice*)
(mimbroscio@cov.com)
One City Center
850 10th St. NW
Washington, DC 20001
Tel: 202-662-6000

**BRYAN CAVE LEIGHTON PAISNER LLP**
K. Lee Marshall (CA Bar No. 277092)
(klmarshall@bclplaw.com)
Three Embarcadero Center, 7th Floor
San Francisco, CA 94111
Tel: 415-675-3400
Fax: 415-675-3434

Jed P. White (CA Bar No. 2392339)
(jed.white@bclplaw.com)
120 Broadway, Suite 300
Santa Monica, CA 90401
Tel:  310-576-2100
Fax: 310 -576-2200

*Attorneys for Defendant Monsanto Company*

# UNITED STATES DISTRICT COURT

# NORTHERN DISTRICT OF CALIFORNIA

| IN RE: ROUNDUP® PRODUCTS LIABILITY LITIGATION | MDL No. 2741 |
|---|---|
| | Case No.: 3:16-md-02741-VC |
| *Chapman v. Monsanto Co.*, 3:20-cv-01277-VC *Vosper v. Monsanto Co.*, 3:19-cv-05525-VC | **DEFENDANT MONSANTO COMPANY'S MOTION TO EXCLUDE TESTIMONY OF DR. WILLIAM SAWYER UNDER RULE 702** |
| | Hearing date: December 13, 2021 Time: TBD |

**TO THE COURT, ALL PARTIES, AND THEIR ATTORNEYS OF RECORD:**

**PLEASE TAKE NOTICE THAT** beginning on December 13, 2021 in Courtroom 4 of the United States District Court, Northern District of California, located at 450 Golden Gate Avenue, San Francisco, CA 94102, or as ordered by the Court, Defendant Monsanto Company ("Monsanto") will present its Motion to Exclude Testimony of Dr. William Sawyer.  Monsanto seeks an order excluding opinions of this witness under Federal Rule of Evidence 702.

DATED:  September 22, 2021

Respectfully submitted,

*/s/ Eric G. Lasker*

HOLLINGSWORTH LLP
Eric G. Lasker (*pro hac vice*)
(elasker@hollingsworthllp.com)
1350 I St. NW
Washington, DC 20005
Tel: 202-898-5843
Fax: 202-682-1639

# **TABLE OF CONTENTS**

Page

INTRODUCTION ...................................................................................................1

BACKGROUND ....................................................................................................2

I.   The Court Should Exclude Dr. Sawyer's General Causation Opinions....................................6

II.  The Court Should Exclude Dr. Sawyer's Specific Causation Opinion.................................8

   A.   Dr. Sawyer's Opinion that Roundup® is a "Substantial Contributing Factor" to Each Plaintiff's NHL is Not the Proper Subject of Toxicology Expert Testimony.................................8

      1.   Dr. Sawyer is Not Qualified to Draw Conclusions on Causation from the Epidemiology Studies..........................9

      2.   Dr. Sawyer's Comparison of Plaintiffs' Alleged Exposure Doses to "Exposure Thresholds" in Various Epidemiological Studies Does Not Support His Opinion on Specific Causation. ............9

      3.   The Epidemiology Data on Which Dr. Sawyer Relies is Unreliable.............11

   B.   Dr. Sawyer Did Not Consider Other Potential Causes of Plaintiff's NHL................12

III. The Court Should Exclude Dr. Sawyer's Opinions Regarding the George Study.................13

CONCLUSION ..................................................................................**Error! Bookmark not defined.**

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*In re Accutane Prod. Liab. Litig.*,
  511 F. Supp. 2d .......................................................................................... 7

*Allison v. McGhan Med. Corp.*,
  184 F.3d 1300 (11th Cir. 1999)................................................................... 7

*Apple, Inc. v. Samsung Electronics Co., Ltd.*,
  2013 WL 5955666 (N.D. Cal. Nov. 6, 2013)............................................... 6

*City of New York v. FedEx Ground Package Sys., Inc.*,
  No. 13 Civ. 9173 (ER), 2018 WL 2941455 (S.D.N.Y. Oct. 10, 2018)................................... 15

*Cooper v. Brown*,
  510 F.3d 870 (9th Cir. 2007)....................................................................... 6

*Daubert v. Merrell Dow Pharm., Inc.*,
  509 U.S. 579 (1993).............................................................................. 5, 6

*Dura Auto. Sys. of Ind., Inc. v. CTS Corp.*,
  285 F.3d 609 (7th Cir. 2002)....................................................................... 9

*Gen. Elec. Co. v. Joiner*,
  522 U.S. 136 (1997)............................................................................ 7, 13

*Guidroz-Brault v. Missouri Pacific R. Co.*,
  254 F.3d 825 (9th Cir. 2001)..................................................................... 14

*Hall, et al. v. Monsanto Co.*,
  No. 1622-CC01071 (Mo. Cir. Ct. St. Louis Cty. May 23, 2018) ........................................... 14

*In re Lockheed Litig. Cases*,
  23 Cal. Rptr. 3d 762 (2005), *rev. dismissed by* 83 Cal. Rptr. ....................................... 7

*Marmo v. Tyson Fresh Meats, Inc.*,
  457 F.3d 748 (8th Cir. 2006)............................................................. 6, 8, 12

*Oracle America Inc., et al. v. Hewlett Packard Enterprise Co.*,
  No. 16-cv-01393-JST, 2018 WL 6511146 (N.D. Cal. Dec. 11, 2018) ................................. 15

*Pilliod v. Monsanto Co.*,
  No. RG-170862702 (Cal. Sup. Ct. Alameda Cnty. Apr. 3, 2019) ........................... 10, 14, 15

*Richardson v. Richardson-Merrell, Inc.*,
  857 F.2d 823 (D.C. Cir. 1988) ..................................................................... 7

*In re: Roundup® Prods. Liab. Litig.*,
  390 F. Supp. 3d 1102 (N.D. Cal. 2018) .................................................. 3, 7, 10, 11

*Sanchez v. Boston Sci. Corp.*,
  No. 2:12-CV-05762, 2014 WL 4851989 (S.D. W. Va. Sept. 29, 2014) ................................ 15

*Sardis v. Overhead Door Corp.*,
  No. 20-1411, 2021 WL 3699753 (4th Cir. Aug. 20, 2021) ................................................. 5, 10

*Soldo v. Sandoz Pharm. Corp.*,
  244 F. Supp. 2d 434 (W.D. Pa. 2003) ..................................................................... 7

*White v. Ford Motor Co.*,
  312 F.3d 998 (9th Cir. 2002) ..................................................................................... 5

**Other Authorities**

Federal Rule of Evidence 702 ................................................................................... *passim*

**INTRODUCTION**

Wave 3 Plaintiffs Ira Vosper and Otis Chapman have designated Dr. William Sawyer to provide testimony regarding their alleged levels of exposure to various Roundup®-branded herbicides ("Roundup®").  Dr. Sawyer *also* seeks to offer an opinion regarding general causation and specific causation.  For the reasons below, Dr. Sawyer's opinions do not meet the requirements for expert admissibility under Federal Rule of Evidence 702 and should be excluded.

*First*, with respect to Dr. Sawyer's purported general causation opinion, in Wave 1, the plaintiffs admitted that Dr. Sawyer would "not offer an opinion on general causation," *see* Dkt. 9141, Amended Pretrial Order No. 201, causing the Court to find this portion of Monsanto's motion to be moot.  *Id.*  Dr. Sawyer again purports to offer general causation opinions in his *Vosper* and *Chapman* reports.  *See, e.g.*, Declaration of Eric Lasker, Ex. 1, Sawyer *Vosper* Rpt. at 7, 24-177; Ex. 2, Sawyer *Chapman* Rpt. at 7, 33-169.[1]  To the extent Dr. Sawyer seeks to offer the opinion that Roundup® generally is capable of causing non-Hodgkin's lymphoma ("NHL"), that opinion should be excluded because it does not follow any valid or recognizable methodology.

*Second*, with respect to Dr. Sawyer's specific causation opinions, the Wave 1 plaintiffs conceded that Dr. Sawyer would not "offer a differential diagnosis opinion as to any individual plaintiff." *See.* Dkt. 9142, Amended Pretrial Order No. 201.  Accordingly, the Court found that "[Dr. Sawyer] may not opine that a plaintiff's 'exposure to Roundup® was sufficient to cause NHL.'"  *Id.* Despite the Court's earlier ruling, Dr. Sawyer now attempts to assert what is a specific causation opinion with respect to Mr. Vosper and Mr. Chapman, opining at his deposition and in his reports that Plaintiffs' Roundup® exposure caused or substantially contributed to their development of NHL.  *See* Ex. 3, Sawyer *Vosper* Dep. at 64:1-6; *see also* Ex. 1, Sawyer *Vosper* Rpt. at 6 (opining that Plaintiff Vosper's exposure levels resulted in "increased risk levels of developing NHL."); Ex. 2, Sawyer *Chapman* Rpt. at 182 (opining that Plaintiff Chapman's exposure levels "substantially increased his risk of the development of" a subtype of NHL).

These opinions should be excluded because Dr. Sawyer does not follow a valid methodology

---

[1] All exhibits referenced herein are attached to the Declaration of Eric Lasker, filed contemporaneously herewith.

in reaching them.  Rather, he concludes that Roundup® was a potential cause of a Plaintiff's NHL based purely on extrapolation from cherry-picked epidemiology studies, notwithstanding his lack of training in epidemiology and his consistent admissions in this and other Roundup® cases that he has not actually analyzed the epidemiological details of any of the studies from which he plucks individual, exposure-related data points.  And he did not reliably analyze or rule out many other possible causes of Plaintiffs' NHL.  Dr. Sawyer's conclusion that Roundup® caused or substantially contributed to the development of Plaintiffs' cancers is therefore based on nothing more than impermissible *ipse dixit* and is not helpful to the jury.

*Third*, Dr. Sawyer's opinions are based on data that is universally considered to be inadequate for scientific analysis.  Specifically, Dr. Sawyer's reliance on the George mouse study to demonstrate that Roundup® is a cancer "promoter" is inconsistent with the conclusions of all scientific panels and regulators that have reviewed that study, including both the EPA (which has concluded on multiple occasions that Roundup® is not a human carcinogen) and IARC.  Indeed, IARC concluded that the George study is "inadequate" for the evaluation of glyphosate.  Nevertheless, Dr. Sawyer attempts to offer opinions based primarily on the George study.

*Fourth*, Dr. Sawyer's opinion that trace chemicals in Roundup® caused or contributed to Plaintiffs' cancers is based merely on assertions that those chemicals have been associated with cancer *at much higher doses*.  There is no scientific causation evidence linking them to NHL at doses remotely comparable to those at issue here, nor is there any scientific evidence suggesting that exposure to Roundup® is a cancer risk because of these trace chemicals.  Indeed, Dr. Sawyer does not even calculate the doses of these chemicals to which Plaintiffs were allegedly exposed.

*Fifth*, Dr. Sawyer seeks to offer opinions regarding Monsanto company documents and regulatory duties, which are beyond his area of expertise and the realm of proper expert testimony.

## BACKGROUND

Plaintiffs have designated Dr. Sawyer as an expert.  *See, e.g.,* Exs. 4 & 5, Plaintiff's R. 26 Expert Designations and Disclosures in *Vosper* and *Chapman*.  Among other topics, Dr. Sawyer's reports set forth opinions on what he characterizes as "general causation" but also include opinions that can be fairly characterized as specific causation.  *See, e.g.,* Ex. 1, Sawyer *Vosper* Rpt. at 7, 186; Ex. 2,

Sawyer *Chapman* Rpt. at 7, 182.  Dr. Sawyer seeks to opine that Plaintiffs' alleged exposures to Roundup® caused or substantially contributed to Plaintiffs' NHL.  *See* Ex. 3, Sawyer *Vosper* Dep. at 100:16-25 ("I can state to toxicological certainty that certainly his Roundup use was a substantial contributing risk factor."), 64:1-6 (affirming that 32 exposure days was sufficient to "cause[] or substantially contribute[] to" Plaintiff Vosper's NHL); Ex. 2, Sawyer *Chapman* Rpt. at 182 (concluding that Plaintiff Chapman's Roundup exposures "substantially increased" risk of NHL).  In addition, Dr. Sawyer also purports to offer an unsupported opinion that Roundup® is a cancer promoter, based on the George study, and that various trace chemicals in Roundup® contributed to each Plaintiff's development of NHL.  Finally, Dr. Sawyer purports to offer opinions regarding various EPA regulations and Monsanto's corporate state of mind.

General and Specific Causation

Three types of evidence are used to evaluate whether an agent is capable of causing a particular outcome at human-relevant exposure levels: epidemiological, animal, and mechanistic evidence.  *See In re: Roundup Prods. Liab. Litig.*, 390 F. Supp. 3d 1102, 1115-1130 (N.D. Cal. 2018).  Epidemiology, which studies the incidence and etiology of disease in human populations, is "central to the general causation inquiry, and where such evidence exists, it must be addressed." *Id.* at 1116.  Dr. Sawyer, however, has conceded repeatedly that he has not evaluated the merits of any of the epidemiology studies for purposes of determining causation, and instead is "deferring" to other experts on that subject.  *See, e.g.,* Ex. 1, Sawyer *Vosper* Rpt. at 1, 33-34; Ex. 3, Sawyer *Vosper* Dep. at 23:10–26:13, 85:23–86:3; Ex. 2, Sawyer *Chapman* Rpt. at 1, 23-24; Ex. 6, Sawyer *Chapman* Dep. at 47:18-48:2. The general causation portions of Dr. Sawyer's report instead discuss glyphosate's history; the ingredients in various Roundup® formulations; the routes of potential exposure to glyphosate; and various factors purportedly affecting dermal absorption.  *See* Ex. 1, Sawyer *Vosper* Rpt. at 40-177; Ex. 2, Sawyer *Chapman* Rpt. at 29-169.  In other words, Dr. Sawyer's "general causation" opinion is merely a discussion of the properties of Roundup®, not an analysis of whether Roundup® can cause NHL in humans when used in accordance with label instructions.

Dr. Sawyer's reports also address specific causation—whether Roundup® caused Plaintiffs' cancers specifically—but do so only by attempting to determine whether Plaintiffs' exposures were

similar to those sustained by applicators in various epidemiology studies.  Ex. 1, Sawyer *Vosper* Rpt. at 6, 33-37, 185; Ex. 2, Sawyer *Chapman* Rpt. at 6, 23-27, 180-181.  As Dr. Sawyer admits, however, he has not calculated any actual absorption dose of Roundup® for Plaintiffs.  *See* Ex. 1, Sawyer *Vosper* Rpt. at 6; Ex. 3, Sawyer *Vosper* Dep. at 13:9-14:4; Ex. 2, Sawyer *Chapman* Rpt. at 6; Ex. 6, Sawyer *Chapman* Dep. at 29:6-30:12.  Instead, he merely compares the number of days Plaintiffs allege they were exposed to Roundup® to data in certain epidemiological studies whose quality and methodology he did not evaluate.  Specifically, Dr. Sawyer describes Plaintiffs' alleged uses of Roundup®, which he based on "historical information received through review of personal fact sheets, deposition, photographs and direct interview pertaining to [Plaintiffs' alleged] exposure events, circumstances and details."  Ex. 1, Sawyer *Vosper* Rpt. at 6; Ex. 2, Sawyer *Chapman* Rpt. at 6.  Dr. Sawyer's analysis consists of comparing the total number of days on which Plaintiff allegedly used Roundup® to various "exposure day" levels mentioned in six epidemiology studies.  Ex. 1, Sawyer *Vosper* Rpt. at 6-7, 33-39, 185; Ex. 2, Sawyer *Chapman* Rpt. at 6, 23-29, 180-181.

Importantly, Dr. Sawyer's "specific causation" opinion does not reliably account for other possible medical causes of Plaintiffs' NHL.  *See* Ex. 1, Sawyer *Vosper* Rpt. at 180-181; Ex. 6, Sawyer *Chapman* Dep. at 22:17-23:1 (admitting he did not examine all potential medical risk factors for NHL).  In other words, unlike other specific causation experts in the litigation, Dr. Sawyer does not conduct a true differential diagnosis.

Promotion

The George study is a small mouse study in which various combinations of (1) a known carcinogen, (2) a known tumor promotor, (3) Roundup®, (4) 7, 12-dimethylbenz[a]anthracene ("DMBA"), and (5) 12-O-tetradecanoyl-phorbol-13-acetate ("TPA") were painted on the skin of the subject animals.  Ex. 7, George, J., et al., *Studies on glyphosate-induced carcinogenicity in mouse skin: A proteomic approach*, 73 J. Proteomics 951 (2010) ("George 2010").  While it purported to find that Roundup® facilitated the growth of cancer, *id.* at 952, due to multiple flaws in the study design— including that it omitted histopathology (the standard scientific confirmation of cancer)—the George study has been rejected as evidence of promotion (or carcinogenicity), including by both IARC and EPA.  *See*, *e.g.*, Ex. 8, EPA Office of Pesticide Programs, *Revised Glyphosate Issue Paper: Evaluation*

*of Carcinogenic Potential* (Dec. 12, 2017) at 70; Ex. 9, IARC, *Glyphosate in Some Organophosphate Insecticides and Herbicides: Diazinon, Glyphosate, Malathion, Parathion, and Tetrachlorvinphos, Monograph Vol. 112 on the Evaluation of Carcinogenic Risks to Humans* (2015) at 32. Notwithstanding this uniform disapproval of the George study, Dr. Sawyer relies on the study to support his conclusion that Roundup® can promote cancer in Plaintiffs. *See, e.g.,* Ex. 1, Sawyer *Vosper* Rpt. at 63-68, 184-185; Ex. 2, Sawyer *Chapman* Rpt. at 53-58, 179-180.

<u>Trace Chemicals</u>

Roundup®, like all herbicides, contains certain trace chemicals as byproducts of the manufacturing process. Dr. Sawyer seeks to testify that various trace chemicals in Roundup® are carcinogens, and thus caused or contributed to Plaintiffs' NHL. Dr. Sawyer provides no science linking any of the trace chemicals to NHL at any dose remotely approximating the minuscule amounts to which Plaintiffs could have been exposed, and none attributing NHL in people exposed to Roundup® to the presence of those trace chemicals. Dr. Sawyer never even calculates a dose of these trace chemicals to which Plaintiffs allegedly were exposed.

<u>EPA Regulations and Corporate State of Mind</u>

Finally, Dr. Sawyer seeks to offer improper opinion testimony regarding the relevant EPA regulations, Monsanto's corporate state of mind, and the sufficiency of the Roundup® label. Dr. Sawyer is unqualified to discuss these topics, which are plainly outside the scope of his expertise.

## **LEGAL STANDARD**

A proposed expert witness must possess "knowledge, skill, experience, training, or education" sufficient to qualify him as an expert on the subject to which his testimony relates. Fed. R. Evid. 702. When an expert's field of expertise is not related to the subject on which he seeks to offer testimony, such testimony is inadmissible. *See White v. Ford Motor Co.*, 312 F.3d 998, 1008-09 (9th Cir. 2002). Apart from qualifications, expert testimony must be (1) based upon sufficient facts or data, (2) the product of reliable principles and methods, and (3) the result of applying those principles and methods reliably to the facts of the case. Fed. R. Evid. 702. The trial judge is charged with the responsibility of acting as a gatekeeper to "ensure that any and all scientific testimony … is not only relevant, but reliable." *Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579, 589 (1993); *see also Sardis v.*

*Overhead Door Corp.*, No. 20-1411, 2021 WL 3699753, at *7 (4th Cir. Aug. 20, 2021) (district court its discretion when it "abandoned its gatekeeping function" by declaring reliability and relevance arguments to be province of jury because they went to weight, not admissibility).  Indeed, the Supreme Court instructs that an expert's error-prone application of his or her methodology is inherently unreliable; and reliability is within the province of the trial court as the gatekeeper.  *Daubert*, 509 US at 589.  The proponent of the expert bears the burden of proving that the expert's proffered testimony is admissible.  *See, e.g.*, *Cooper v. Brown*, 510 F.3d 870, 942 (9th Cir. 2007).

## ARGUMENT

## I.    The Court Should Exclude Dr. Sawyer's General Causation Opinions.

Dr. Sawyer should not be allowed to offer an opinion on general causation—*i.e.,* that Roundup® is generally capable of causing NHL in humans—because he has not followed any valid methodology to reach such an opinion.  As an initial matter, courts have repeatedly held that an expert may not testify on matters outside his specific subject matter of expertise, *Apple, Inc. v. Samsung Electronics Co., Ltd.*, No. 11-cv-08146-LHK, 2013 WL 5955666, at *2 (N.D. Cal. Nov. 6, 2013).   In the context of toxicologists specifically, courts have noted that although "a toxicologist may testify that exposure to a chemical caused a person's symptoms and injuries," there is no "blanket rule that toxicologists are qualified to render an opinion on causation."  *Marmo v. Tyson Fresh Meats, Inc.*, 457 F.3d 748, 758 (8th Cir. 2006).  Dr. Sawyer's reports do not adequately set forth an acceptable methodology for reaching a general causation opinion.

The specific methodology the Court approved for general causation at the *Daubert* stage is the Bradford Hill methodology, which requires training in epidemiology.  To the extent Dr. Sawyer attempts to apply the Bradford Hill criteria to reach a general causation opinion, he has not reliably applied that methodology.  The Bradford Hill criteria can be applied only *after* epidemiology data demonstrates an association.  *See* Ex. 10, Ref. Manual on Sci. Evid. at 598–99 ("We emphasize that these guidelines are employed only *after* a study finds an association to determine whether that association reflects a true causal relationship.") (emphasis in original); *see also* Ex. 11, A. Bradford Hill, *The Environment and Disease: Association or Causation?*, 58 Proc. R. Soc. Med. 295, 295 (1965).  Epidemiology is "central to the general causation inquiry, and where such evidence exists, it must be

addressed by the experts." *See In re: Roundup*, 390 F. Supp. 3d at 1102.

Critically, Dr. Sawyer has admitted that he has not evaluated the epidemiological studies for purposes of determining general causation. *See, e.g.,* Ex. 1, Sawyer *Vosper* Rpt. at 33 (admitting that he relied on the six epidemiology studies referenced in his reports "primarily with respect to <u>dose assessment</u>.") (emphasis added); Ex. 2, Sawyer *Chapman* Rpt. at 23 (same); Ex. 3, Sawyer *Vosper* Dep. at 20:22-21:12. Rather, he has abandoned the detailed analysis of the epidemiology studies to other experts. Ex. 1, Sawyer *Vosper* Rpt. at 1, 33-34; Ex. 2, Sawyer *Chapman* Rpt. at 1, 23-24; Ex. 3, Sawyer *Vosper* Dep. at 22:8-21, 25:14–26:13 ("I would defer the internal design and strengths and weaknesses of a meta-analysis to the epidemiologist."); Ex. 6, Sawyer *Chapman* Dep. at 47:18-48:2 (same). Dr. Sawyer has admitted time and again that he lacks the expertise to testify about those studies. *E.g.*, Ex. 3, Sawyer *Vosper* Dep. 25:14-26:7 ("I'm not an epidemiologist"); Ex. 12, Sawyer *Giglio* Dep. 57:23-58:16, 64:2-11. Because Dr. Sawyer has not—and could not—analyze the epidemiology evidence to determine whether there is an association between Roundup® and NHL in the first place, he cannot then apply the Bradford Hill criteria to properly reach any general causation opinion.

Nor can Dr. Sawyer testify about animal or mechanism studies without explaining how such evidence can be properly extrapolated to humans. *See, e.g.*, *Gen. Elec. Co. v. Joiner*, 522 U.S. 136, 145 (1997) (excluding animal data where expert failed to adequately extrapolate to humans).[2] Although Dr. Sawyer describes certain animal and genotoxicity studies in his reports, he did not fully analyze them for purposes of determining causation and offers no explanation for how the results of those studies can be extrapolated to reach a conclusion that Roundup can cause NHL in humans. *See, e.g.*, Ex. 3, Sawyer *Vosper* Dep. at 33:3–34:2 (testifying that one cannot apply human equivalent dose

---

[2] *See also In re Lockheed Litig. Cases*, 23 Cal. Rptr. 3d 762, 780 (Ct. App. 2005), *rev. dismissed by* 83 Cal. Rptr.3d 478 (ruling animal data legally insufficient where expert did not account for dosage or species extrapolation); *Allison v. McGhan Med. Corp.*, 184 F.3d 1300, 1314 (11th Cir. 1999) (plaintiff "failed to adequately establish the link between the animal, retinal, and anti-collagen studies and Allison's complaints of disease"); *Richardson v. Richardson-Merrell, Inc.*, 857 F.2d 823, 830 (D.C. Cir. 1988) (animal studies of "scant utility in drawing conclusions about whether a substance will cause birth defects in humans"); *Soldo v. Sandoz Pharm. Corp.*, 244 F. Supp. 2d 434, 546 (W.D. Pa. 2003) ("This Court observes that studies of laboratory animals are routinely excluded as irrelevant and unreliable when proffered as a basis for medical causation testimony."); *In re Accutane Prods. Liab.*, 511 F. Supp. 2d 1288, 1294-95 (M.D. Fla. 2007) ("The problem with this approach is also extrapolation-whether one can generalize the findings from the artificial setting of tissues in laboratories to whole human beings.").

calculations to *in vitro* genotoxicity studies because *in vitro* studies do not occur in living systems).

## II.       The Court Should Exclude Dr. Sawyer's Specific Causation Opinion.

Dr. Sawyer likewise did not use a reliable methodology to reach his specific causation opinions, which should be excluded.  Dr. Sawyer did not examine Plaintiffs and did not perform a differential diagnosis in these cases.  *See* Ex. 1, Sawyer *Vosper* Rpt. at 24-26, 28-29 (discussing interviews with Plaintiff Vosper); Ex. 2, Sawyer *Chapman* Rpt. at 17-19 (discussing interview with Plaintiff Chapman).  Nevertheless, he seeks to opine that Roundup® was a substantial contributing risk factor to Plaintiffs' development of NHL.  *E.g.*, Ex. 3, Sawyer *Vosper* Dep. at 100:16-25; Ex. 2, Sawyer *Chapman* Rpt. at 181-82.  That opinion should be excluded because Dr. Sawyer has not followed any valid methodology.  *See*, *e.g.*, *Marmo*, 457 F.3d at 758 (affirming district court's exclusion of toxicologist where toxicologist "interviewed [plaintiff] but did not examine her and did not inquire about other toxic exposures . . . [and] did not exclude confounding factors, which leaves open the possibility of competing causes of the disease and raises questions about the competency of expert testimony.") (citation and quotation marks omitted).

Dr. Sawyer apparently concludes that Roundup® is a substantial contributing factor for each Plaintiff's NHL based primarily on exposure-related data extracted from epidemiology studies, which, as explained above, he has not fully evaluated for purposes of determining causation.  Moreover, there is nothing "specific" about such a causation analysis—it would deem Roundup® to be a "substantial contributing factor" for *any individual* who alleges exposure to Dr. Sawyer's hypothetical threshold amount of glyphosate.  As if to confirm the point, Dr. Sawyer did not attempt to analyze many of Plaintiffs' other potential medical risk factors, instead deferring that analysis to other experts.  *See, e.g.*, Ex. 1, Sawyer *Vosper* Rpt. at 1, 9, 26 n.88, 33-34; Ex. 3, Sawyer *Vosper* Dep. at 25:14-26:7, 85:15-86:7, 92:14-18; Ex. 2, Sawyer *Chapman* Rpt. at 1, 19 n. 44; Ex. 6, Sawyer *Chapman* Dep. at 22:17-23:1.  Dr. Sawyer's results-driven process does not resemble any sort of valid specific causation analysis and should be excluded.

### A.       Dr. Sawyer's Opinion that Roundup® is a "Substantial Contributing Factor" to Plaintiff's NHL is Not the Proper Subject of Toxicology Expert Testimony.

The purported foundation for Dr. Sawyer's "specific causation" opinions is his comparison of the number of days Plaintiffs used Roundup® to thresholds from six epidemiology studies, which,

according to him, demonstrate that a person with a certain level of exposure, calculated by Dr. Sawyer in "exposure days," is always at an increased risk of developing NHL.  Ex. 1, Sawyer *Vosper* Rpt. at 5-7, 32-39, 183-186; Ex. 2, Sawyer *Chapman* Rpt. at 6, 23-29, 180-181.  Dr. Sawyer should be prohibited from offering his "specific causation" opinion for multiple reasons.

1.   Dr. Sawyer is Not Qualified to Draw Conclusions on Causation from the Epidemiology Studies.

Dr. Sawyer is not an epidemiologist, does not consider himself an epidemiology expert and has specifically disclaimed any attempt to evaluate or interpret the relevant epidemiology studies for purposes of determining causation.  *See, e.g.,* Ex. 1, Sawyer *Vosper* Rpt. at 1, 33-34; Ex. 2, Sawyer *Chapman* Rpt. at 1, 23-24;  Ex. 3, Sawyer *Vosper* Dep. at 22:8-21, 25:14–26:13 ("I would defer the internal design and strengths and weaknesses of a meta-analysis to the epidemiologist."), 85:23–86:3.  Indeed, Dr. Sawyer consistently testifies that he defers to epidemiologists on virtually every aspect of the epidemiology studies, from big-picture questions about the sufficiency of human data to show a connection between Roundup® and NHL, to other matters such as epidemiological study design, statistical analysis of data, and the validity of epidemiological studies.  *See, e.g.,* Ex. 1, Sawyer *Vosper* Rpt. at 1, 33-34; Ex. 2, Sawyer *Chapman* Rpt. at 1, 23-24;  Ex. 3, Sawyer *Vosper* Dep. at 22:8-21, 25:14–26:13, 85:23–86:3; Ex. 6, Sawyer *Chapman* Dep. at 47:18-48:2.  The Court should not allow Dr. Sawyer to opine on topics that exceed his expertise, including extracting alleged thresholds from studies he is not qualified to evaluate.  *See Dura Auto. Sys. of Ind., Inc. v. CTS Corp.*, 285 F.3d 609, 614 (7th Cir. 2002).

2.   Dr. Sawyer's Comparison of Plaintiffs' Alleged Exposure Doses to "Exposure Thresholds" in Various Epidemiological Studies Does Not Support His Opinion on Specific Causation.

Even if Dr. Sawyer were qualified to analyze the epidemiology data on which he based his opinions, that analysis could not justify his conclusion that Roundup® caused Plaintiffs' cancers.  Dr. Sawyer has repeatedly confirmed that under his counting-of-days "analysis," all of the following are deemed irrelevant: the actual amount of Roundup® allegedly absorbed in Plaintiffs' bodies, the intensity of any exposure, the type of equipment Plaintiffs used to apply Roundup®, Plaintiffs' use of any personal protective equipment, and Plaintiffs' efforts to clean Roundup® off of skin after exposure events.  *See, e.g.,* Ex. 6, Sawyer *Chapman* Dep. at 30:13-23; Ex. 1, Sawyer *Vosper* Rpt. at 6, 29-32;

- 9 -

Ex. 2, Sawyer *Chapman* Rpt. at 6, 21-22; *see also* Ex. 13, Sawyer *Schafer* Dep. at 44:5-45:13, 47:1-9, 49:18-50:18, 52:10-53:21.   Instead, the sole determining factor for his "analysis" is the number of "exposure days" Plaintiffs allegedly experienced and whether that number exceeds thresholds from Dr. Sawyer's handpicked epidemiology studies.   However, even *general* causation cannot be established with epidemiology alone, as Plaintiffs' experts concede and as this Court has previously determined.   *See* Ex. 14, Tr. of Proceedings, Testimony of Dr. Christopher J. Portier, *Pilliod v. Monsanto Co.,* No. RG-17862702 (Cal. Super. Ct. Alameda Cnty. Apr. 3, 2019) at 1893:3–8; *see also In re: Roundup*, 390 F. Supp. 3d at 1116 ("[w]hether [an] agent *causes* the outcome, however, cannot be proven by epidemiological studies alone").   Without question, it cannot establish specific causation.   But that is what Dr. Sawyer has done: he has concluded that Roundup® caused Plaintiffs' cancers merely because Plaintiffs were exposed to Roundup® for a number of days that exceeds the minimal "exposure days" threshold presented by certain epidemiological data points from studies he has not fully analyzed.

A final problem with Dr. Sawyer's proposed opinions based on Plaintiffs' exposure days, at least in Plaintiff Vosper's case, is Dr. Sawyer's wholly incorrect calculation of those days.   Dr. Sawyer admitted that due to mathematical errors and errors in counting exposure days that occurred after Plaintiff Vosper's NHL diagnosis (*i.e.*, exposure days that could not possibly have caused Plaintiff Vosper's cancer), he needed to revise his exposure day calculation from 57 days down to 32.   *See* Ex. 3, Sawyer Vosper Dep. at 58:4-11.   His conceded mistakes resulted in him presenting a number that was 178% of the actual number of exposure days.   *See* Ex. 3, Sawyer *Vosper* Dep. at 59:13–63:11 (Dr. Sawyer discussing the revision of his exposure day calculation down to 32 days from 57).[3]   Despite the admitted mistakes and the significant overstatement of Plaintiff Vosper's actual number of exposure days, Dr. Sawyer nonetheless held to his original opinion.   These significant mistakes and errors in his analysis render his report unreliable and inadmissible within the meaning of Rule 702.   *See Sardis*, No. 20-1411, 2021 WL 3699753, at *8 (where there are "critical questions of the sufficiency of an expert's basis [for his testimony], and the application of the expert's methodology" are questions of admissibility) (alterations in original)).

---

[3] After his deposition in Plaintiff Vosper's case where multiple, material errors were noted, Dr. Sawyer felt compelled to amend his expert report to correct the errors in his exposure days calculations.  *See* Ex. 25, Sawyer *Vosper* Supp'l Rpt.

### 3.    The Epidemiology Data on Which Dr. Sawyer Relies is Unreliable.

Additionally, most of the epidemiology data on which Dr. Sawyer relies for his specific causation opinion is unreliable because it was not adjusted for the use of other pesticides.  Although his report focuses on six epidemiology studies, Dr. Sawyer has stated in this MDL that the "three primary studies" on which he relies for his specific causation opinions are McDuffie, Eriksson, and Andreotti.  Ex. 12, Sawyer *Giglio* Dep. at 66:5-10.[4]  Dr. Sawyer concedes that Andreotti, which is part of the Agricultural Health Study, "did not find a statistically elevated risk of NHL" (Ex. 1, Sawyer *Vosper* Rpt. at 34-35; Ex. 2, Sawyer *Chapman* Rpt. at 25), so that study does not support his conclusions on specific causation.  Dr. Sawyer also relies on Eriksson and McDuffie, which he states reported odds ratios of 2.36 and 2.12, respectively, for those with greater than ten days per lifetime of exposure (in Eriksson) and greater than two days per year of exposure (in McDuffie).  Ex. 1, Sawyer *Vosper* Rpt. at 34; Ex. 2, Sawyer *Chapman* Rpt. at 24.  However, those studies did not adjust for exposure to other pesticides.  *See* Ex. 12, Sawyer *Giglio* Dep. at 78:13-80:18; *see also In re: Roundup*, 390 F. Supp. 3d at 1119–20.  As this Court has already determined, "[f]ailing to take account of likely confounders by presenting and relying upon only unadjusted (or minimally adjusted) estimates is a serious methodological concern."  *Id.* at 1140.  At the same time, Dr. Sawyer declines to consider a study *that examines the same underlying data* but <u>did not</u> find an association.[5]  Dr. Sawyer's reliance on unreliable data from studies that did not adjust for other pesticide use provides another basis for exclusion of his

---

[4] The other three studies on which Dr. Sawyer relies—Leon, Zhang, and Pahwa—are not "principal" studies.  Rather, they are meta-analyses or pooled analyses that combine data from *other* principal studies like McDuffie, Eriksson, and Andreotti.  *See* Ex. 1, Sawyer *Vosper* Rpt. at 33-37; Ex. X, Sawyer *Chapman* Rpt. at 23-27.  Furthermore, Leon found no association between risk of NHL overall and use of glyphosate.  Ex. 1, Sawyer *Vosper* Rpt. at 35-36; Ex. 2, Sawyer *Chapman* Rpt. at 25-26; *see also* Ex. 15, EPA, *Memorandum: Glyphosate: Epidemiology Review of Zhang et al. (2019) and Leon et al. (2019) publications for Response to Comments on the Proposed Interim Decision* (Jan. 6, 2020) at 13-17.  Thus, that study does not support Dr. Sawyer's conclusions.  And Zhang has been sharply criticized for its faulty methodologies and flawed conclusions.  *See id.* at 2-13.

[5] *See* Ex. 16, Kabat, G. et al., *On Recent Meta-Analyses of Exposure to Glyphosate and Risk of Non-Hodgkin's Lymphoma in Humans*, 32 Cancer Causes & Control 409 (2021).  *See also* Ex. 19, Sawyer *Schaffner* Dep. at 109:24-110:4 (recognizing that if Kabat applied a dose-metric (it does) then it should have been included in his analysis even if Kabat did not find an association (it did not)).  While, Dr. Sawyer discusses Donato 2020—another meta-analysis examining the same data and <u>not</u> finding an association—he mentions only Donato's purported failings while ignoring similar criticisms that apply to his favored study, Zhang.  Ex. 17, Donato, F. et al., *Exposure to Glyphosate and Risk of Non-Hodgkin Lymphoma and Multiple Myeloma: An Updated Meta-Analysis*, 111 La Medicina Del Lavoro 63 (2020).  *See also supra* fn. 3.

specific causation opinions.  *See Daniels-Feasel v. Forest Pharms., Inc.*, No. 1:17-cv-04188-LTS-JLC, 2021 WL 4037820, at *7 (S.D.N.Y. Sept. 3, 2021) (excluding expert causation opinion as unreliable because "he fails to adequately support his conclusions using the selectively favorable data he relies upon, unjustifiably disregards inconsistent data, and admittedly ignore categories of relevant evidence.")

### B.    Dr. Sawyer Did Not Consider Other Potential Causes of Each Plaintiff's NHL.

Dr. Sawyer's failure to consider other possible causes of each Plaintiff's NHL confirms that his "specific causation" opinion is not a reliable opinion on *specific* causation.  While he attempted to disclaim that he was providing a specific causation opinion, *See* Ex. 3 , Sawyer *Vosper* Dep. at 21:13-20; Ex. 6, Sawyer *Chapman* Dep. at 8:1-9:3, he repeatedly stated otherwise.  *See*  Ex. 3, Sawyer *Vosper* Dep. at 64:1-6 (testifying that Plaintiff Vosper's Roundup® exposure "caused or substantially contributed to" Plaintiff Vosper's development of NHL); 100:16-25 ("I can state to toxicological certainty that certainly his Roundup® use was a substantial contributing risk factor."); *see also* Ex. 1, Sawyer *Vosper* Rpt. at 6 (opining that Plaintiff Vosper's exposure levels resulted in an "increased risk levels of developing NHL."); Ex. 2, Sawyer *Chapman* Rpt. at 6 (same).

Yet Dr. Sawyer fails to properly consider, analyze, rule out, and testify about other potential causes of Plaintiffs' NHL.  *See, e.g.,* Ex. 6, Sawyer *Chapman* Dep. at 22:17-23:1 (admitting he did not examine Plaintiffs' medical risk factors for NHL).  By omitting a fulsome analysis of Plaintiffs' potential risk factors or deferring such an analysis to other experts, Dr. Sawyer relinquished any basis to offer a specific causation opinion.  He cannot properly reach such an opinion without considering each Plaintiff's individual circumstances, such as whether their cancers might be attributable to some factor other than Roundup®.  *See, e.g., Marmo*, 457 F.3d at 758 (affirming exclusion of toxicologist where toxicologist "did not exclude confounding factors, which 'leaves open the possibility of competing causes of the disease' and raises questions about the competency of expert testimony.").

In sum, there is nothing "specific" about Dr. Sawyer's specific causation opinion.  His methodology consists of simply counting days of exposure and seeing if they exceed exposure-days plucked from hand-selected epidemiology studies he is not qualified to analyze, with only a cursory and incomplete examination of Plaintiffs' unique circumstances.  Thus, any specific causation opinion

1    concerning glyphosate's alleged contribution to Plaintiffs' cancers that he attempted to offer would be

2    based on nothing more than his say-so and should be excluded.

3    **III.    The Court Should Exclude Dr. Sawyer's Opinions Regarding the George Study.**

4            Based primarily on the George study, Dr. Sawyer seeks to opine that Roundup® "promoted"

5    cancer in Plaintiffs.  This opinion should be excluded because the George study has been rejected as

6    inadequate for scientific analysis.  The George study was a small study that, in relevant part, was

7    designed to determine if glyphosate *initiated* tumors or if it *promoted* tumors generated by a known

8    tumor initiator.  It concluded that glyphosate "*failed* to provoke neoplastic development when tested

9    as tumor initiator or complete carcinogen," but did show "carcinogenic potential" as a tumor promotor.

10   Ex. 7, George 2010 at 954 (emphasis added).   The George study was evaluated by several major

11   national and international agencies—including EPA and IARC—and the study was uniformly found

12   by them to be inadequate for scientific purposes:

13   •   Ex. 8, EPA, Office of Pesticide Programs, *Revised Glyphosate Issue Paper: Evaluation of
14       Carcinogenic Potential* (Dec. 12, 2017) at 70 ("A number of studies were **judged to be
         inadequate in protocol, conduct or reporting** and were not considered in the analysis of
15       glyphosate. …An initiation-promotion study (George et al., 2010) in male Swiss mice that
         tested a commercial formulation of glyphosate (41%) on the skin.  Study deficiencies included
16       small number (20) of animals, tested only males, and lack of histopathological examination."
         (emphasis added)).

17   •   Ex. 9, IARC, *Glyphosate in Some Organophosphate Insecticides and Herbicides: Diazinon,
18       Glyphosate, Malathion, Parathion, and Tetrachlorvinphos, Monograph Vol. 112 on the
         Evaluation of Carcinogenic Risks to Humans* (2015) at 32 ("Short duration of treatment, no
19       solvent controls, and lack of any histopathological evaluation, Age at start, NR (mice weighed
         12–15 g bw) The Working Group concluded **this was an inadequate study for the evaluation
20       of glyphosate**." (emphasis added)).

21   •   Ex. 18, BAuA[6], *Proposal for Harmonized Classification and Labeling: N-(phosphonomethyl)
22       glycine; Glyphosate (ISO), CLH Report for Glyphosate* (2016) at 66 ("[**George**] **cannot
         contribute to a decision on the classification of glyphosate**." (emphasis added)).

23

24           Despite this consensus view rejecting the George study as inadequate and unreliable, Dr.

25   Sawyer strays far into the realm of speculation by opining that Roundup® can promote cancer in

26   humans and did promote cancer in Plaintiffs, based primarily on his interpretation of this study.  In

27   fact, Dr. Sawyer has testified that animal studies cannot prove causation.  *See* Ex. 19, Sawyer *Schaffner*

28

---

[6] The BAuA is Germany's Federal Institute for Occupational Safety and Health.

Dep. at 60:18-21 ("Q. By itself, animal data cannot be used to prove or disprove cancer causation in people.  You agree with that statement?   A. By itself as a single factor, absolutely.").  Moreover, Dr. Sawyer makes an unsupported leap by inferring from a study of chemicals painted on mouse skin that Roundup® specifically can promote *NHL* in *humans.  See, e.g.*, *Joiner*, 522 U.S. at 145.  Yet that is effectively what Dr. Sawyer seeks to do, warranting exclusion of such opinion.

## IV.    The Court Should Exclude Dr. Sawyer's Opinions Regarding Trace Chemicals.

Like most pesticides, Roundup® contains trace amounts of certain chemicals in addition to its active ingredient.  EPA considers these chemical "impurities" to be safe because they are present at extremely low (i.e. "trace") levels.  *See, e.g.*, Ex. 20, EPA, *Proposed Interim Registration Review Decision Case No. 0178* (April 2019) at 10 (finding that glyphosate is not likely to be carcinogenic to humans despite noting that "[m]ost pesticide products contain substances in addition to the active ingredient").[7]  There is no scientific evidence of causation linking these trace chemicals to NHL at doses remotely comparable to those at issue here; indeed, Dr. Sawyer does not even calculate the dose of these chemicals to which Plaintiffs were allegedly exposed.  And Dr. Sawyer has pointed to no scientific evidence suggesting that exposure to Roundup® is a cancer risk *because of these trace chemicals.  See* Ex. 1, Sawyer *Vosper* Rpt. at 60-62; Ex. 2, Sawyer *Chapman* Rpt. at 50-52.

Dr. Sawyer nevertheless intends to offer unsupported testimony that trace levels of these chemicals (assuming they were even present in the particular bottles of Roundup® allegedly used by Plaintiffs) are carcinogenic *and* that they caused or contributed to Plaintiffs' cancers.  *See* Ex. 1, Sawyer *Vosper* Rpt. at 60-62; Ex. 2, Sawyer *Chapman* Rpt. at 50-52.  This testimony is designed solely as a sideshow to distract, confuse, and provoke fear in the jury.  At a previous Roundup® trial, Dr. Sawyer dramatically implied, without any scientific evidence, that trace ingredients in Roundup® could kill a person upon opening the Roundup® bottle.  Ex. 21, Tr. of Proceedings, Testimony of Dr. William R. Sawyer, *Pilliod v. Monsanto Co.,* No. RG-17862702 (Cal. Super. Ct. Alameda Cnty. Apr. 11, 2019) at 3131:6-3132:16 ("A: [Ethylene oxide] is a sterilization gas.  It kills every type of biological life on earth . . . if I had a little air in the bottle, as one of our jurors has sitting there, that over time that air in

---

[7] *See also* Ex. 22, Tr. of the Dep. of Charles Benbrook, *Hall v. Monsanto Co.,* No. 1622-CC01071 (Mo. Cir. Ct. St. Louis Cnty. May 23, 2018) at 277:20-278:5 (admitting that he has no reason to believe that the "impurities" in Roundup® can cause NHL).

the bottle, the ethylene oxide would accumulate in that air space.  Q: . . .  So this actually has Roundup

that's been sitting in here for a while.  If I were to open up this cap, what would happen?  A:  There

would be ethylene oxide escaping from that head space.").  Dr. Sawyer's unsupported comments on

these trace chemicals are speculative, inappropriate, and inadmissible.  *See Guidroz-Brault v. Missouri*

*Pac. R. Co.*, 254 F.3d 825, 829 (9th Cir. 2001).  They should be excluded.

## V.    Dr. Sawyer Should Not Be Permitted to Opine on Monsanto Company Documents and Regulatory Duties.

If permitted, Dr. Sawyer also intends to offer inadmissible expert testimony on Monsanto

company documents and Monsanto's regulatory duties.  This proffered testimony is beyond Dr.

Sawyer's area of expertise and beyond the realm of proper expert testimony.  Having an expert narrate

company documents, under the guise of explaining terminology, is improper expert testimony because

it invades the province of the jury.  *See Sanchez v. Boston Sci. Corp.*, No. 2:12-CV-05762, 2014 WL

4851989, at *32 (S.D. W. Va. Sept. 29, 2014); *City of New York v. FedEx Ground Package Sys., Inc.*,

No. 13 Civ. 9173 (ER), 2018 WL 4961455, at *4 (S.D.N.Y. Oct. 15, 2018).  Moreover, even a properly

qualified expert may not opine as to the intent, motive, or state of mind of a corporation or its officers,

because that would substitute the expert's judgment for the jury's.  *See, e.g.,  Oracle America Inc., et*

*al. v. Hewlett Packard Enter. Co.*, No. 16-cv-01393-JST, 2018 WL 6511146, at *3 (N.D. Cal. Dec. 11,

2018).  Accordingly, Dr. Sawyer should be precluded from offering opinions related to Monsanto

company documents or Monsanto's supposed state of mind.

Relatedly, Dr. Sawyer is not qualified to opine on the ultimate issue of the adequacy of

Roundup®'s EPA-regulated labeling.  He has never drafted the labeling for an herbicide.  *See*  Ex. 23,

Tr. of the Dep. of William Sawyer, *Pilliod v. Monsanto Co.*, No. RG17862702 (Cal. Super. Ct.

Alameda Cnty. Feb. 6, 2019) at 337:7-11.  He has never been asked by EPA or any other regulator to

opine on the contents of a label for an herbicide.  *Id.* at 337:22-338:2.  And he has never been invited

by EPA to advise on labeling.  *Id.* at 338:3-6.  In fact, in the past, Dr. Sawyer has specifically deferred

to other experts on these topics and has refused to answer questions about them.  *See, e.g.,* Ex. 24, Tr.

of the Dep. of William Sawyer, *Lamb v. Monsanto Co.*, No. 17SL-CC03681 (Mo. Cir. Ct. St. Louis

Cnty. July 22, 2019) at 177:23-178:18; 191:5-19.  Dr. Sawyer is unqualified to offer any opinions about

Monsanto's compliance with EPA regulatory requirements, and accordingly, any such opinions should be excluded.

## CONCLUSION

For the reasons set forth above, the Court should grant Monsanto's Motion to Exclude Testimony of Dr. William Sawyer.

DATED: September 22, 2021                     Respectfully submitted,

*/s/* Eric G. Lasker
Hollingsworth<sub>LLP</sub>
Eric G. Lasker (*pro hac vice*)
(elasker@hollingsworthllp.com)
1350 I St. NW
Washington, DC 20005
Tel: 202-898-5843
Fax: 202-682-1639

*Attorneys for Defendant Monsanto Company*

**CERTIFICATE OF SERVICE**

I HEREBY CERTIFY that on this 22nd day of September, 2021, a copy of the foregoing was filed with the Clerk of the Court through the CM/ECF system which sent notice of the filing to all appearing parties of record.

/s/ Eric G. Lasker
*Attorney for Defendant Monsanto Company*