# EXHIBIT 3

```
 1                UNITED STATES DISTRICT COURT
                NORTHERN DISTRICT OF CALIFORNIA
 2

     IN RE:  ROUNDUP PRODUCTS           MDL No. 2741
 3   LIABILITY LITIGATION

 4

     This document relates to:
 5

     Vosper v. Monsanto Co.,
 6   Case No. 3:19-cv-05525

 7                           - - -

 8                      AUGUST 30, 2021

 9                           - - -

10          Remote videotaped deposition of

         WILLIAM R. SAWYER, PhD, held at the location of the
11       witness, commencing at 8:40 a.m., on the above date,

         before Joan L. Pitt, Registered Merit Reporter,
12       Certified Realtime Reporter, and Florida

         Professional Reporter.
13

                             - - -
14

                  GOLKOW LITIGATION SERVICES
15          877.370.3377 ph | 917.591.5672 fax

                    deps@golkow.com
16

17

18

19

20

21

22

23

24

25
```

```
 1              APPEARANCES VIA VIDEOCONFERENCE
 2
 3   Counsel for Plaintiff:
 4       CHRISTIAN P. LABLETTA, ESQUIRE
         LaBletta & Walters LLC
 5       200 Barr Harbor Drive, Suite 400
         Conshohocken, Pennsylvania 19428
 6       610.828.3339
         clabletta@lablettawalters.com
 7
 8   Counsel for Defendants:
 9       JOHN M. KALAS, ESQUIRE
         Hollingsworth LLP
10       1350 I Street NW
         Washington, DC 20005
11       202.898.5848
         jkalas@hollingsworthllp.com
12
         MAURA SOKOL, ESQUIRE
13       Covington & Burling LLP
         One CityCenter
14       850 Tenth Street NW
         Washington, DC 20001
15       202.662.6000
         msokol@cov.com
16
17
18   ALSO PRESENT:
19       Josh Coleman, Videographer
20
21
22
23
24
25
```

William R. Sawyer, Ph.D.

```
 1                          - - -

 2                   I N D E X

 3                          - - -

 4    TESTIMONY OF:  WILLIAM R. SAWYER, PhD

 5    DIRECT EXAMINATION BY MR. KALAS                    7

 6

 7

 8              E X H I B I T   I N D E X

 9    SAWYER              DESCRIPTION             PAGE

10    Exhibit 1   Defendant Monsanto Company's Notice    6

11                of Videotaped Deposition of William

12                Sawyer, PhD

13    Exhibit 2   Expert Report dated June 24, 2021      6

14    Exhibit 3   Invoice dated August 10, 2021          6

15    Exhibit 4   Invoice dated August 10, 2021          6

16    Exhibit 5   Invoice dated August 9, 2021           6

17    Exhibit 6   Document from Texas Heart Institute    35

18    Exhibit 7   "Glyphosate Use and Cancer            71

19                Incidence in the Agricultural

20                Health Study," Andreotti, et al.,

21                2018

22

23

24

25
```

William R. Sawyer, Ph.D.

| | | | |
|---|---|---|---|
| 1 | Exhibit 8 | "Non-Hodgkin's Lymphoma and | 77 |
| 2 | | Specific Pesticide Exposures in | |
| 3 | | Men: Cross-Canada Study of | |
| 4 | | Pesticides and Health," McDuffie, | |
| 5 | | et al., 2001 | |
| 6 | Exhibit 9 | "Glyphosate Use and Associations | 84 |
| 7 | | with Non-Hodgkin Lymphoma Major | |
| 8 | | Histological Sub-Types: Findings | |
| 9 | | from the North American Pooled | |
| 10 | | Project," Pahwa, et al. | |
| 11 | | | |
| 12 | | | |
| 13 | | | |
| 14 | | | |
| 15 | | | |
| 16 | | | |
| 17 | | | |
| 18 | | | |
| 19 | | | |
| 20 | | | |
| 21 | | | |
| 22 | | | |
| 23 | | | |
| 24 | | | |
| 25 | | | |

William R. Sawyer, Ph.D.

```
 1                          - - -
 2           THE VIDEOGRAPHER:  We are now on the record.
 3    My name is Josh Coleman.  I'm the videographer for
 4    Golkow Litigation Services.
 5           Today's date is August 30, 2021, and the time
 6    is approximately 8:40 a.m.
 7           This remote video deposition is being held in
 8    the matter of In Re:  Roundup Products Liability
 9    Litigation.  This relates to Vosper vs. Monsanto
10    Company, Case No. 3:19-cv-05525.  This is for the
11    United States District Court, Northern District of
12    California.
13           The deponent is Dr. William Sawyer.
14           All parties to this deposition are appearing
15    remotely and have agreed to the witness being sworn
16    in remotely.  Due to the nature of remote reporting,
17    please pause briefly before speaking to ensure that
18    all parties are heard completely.
19           Will counsel now please identify themselves for
20    the record.
21           MR. LABLETTA:  Christian LaBletta from the law
22    firm of LaBletta & Walters on behalf of the
23    plaintiffs.
24           MR. KALAS:  John Kalas on behalf of Monsanto
25    Company.
```

William R. Sawyer, Ph.D.

```
 1            MS. SOKOL:  Maura Sokol of Covington & Burling.

 2            THE VIDEOGRAPHER:  And the court reporter is

 3       Joan Pitt and will now swear in the witness.

 4            THE COURT REPORTER:  Doctor, let me have you

 5       raise your right hand, please.  Do you swear or

 6       affirm the testimony you give will be the truth, the

 7       whole truth, and nothing but the truth?

 8            THE WITNESS:  Yes, I do.

 9            THE COURT REPORTER:  Thank you.

10                        -  -  -

11            (Sawyer Exhibit 1, Defendant Monsanto Company's

12  Notice of Videotaped Deposition of William Sawyer, PhD,

13  was marked for identification.)

14            (Sawyer Exhibit 2, Expert Report dated

15  June 24, 2021, was marked for identification.)

16            (Sawyer Exhibit 3, Invoice dated

17  August 10, 2021, was marked for identification.)

18            (Sawyer Exhibit 4, Invoice dated

19  August 10, 2021, was marked for identification.)

20            (Sawyer Exhibit 5, Invoice dated

21  August 9, 2021, was marked for identification.)

22                        -  -  -

23

24

25
```

William R. Sawyer, Ph.D.

```
 1          WILLIAM R. SAWYER, PhD, called as a witness by

 2   the Defendant, having been first duly sworn, testified

 3   as follows:

 4                    DIRECT EXAMINATION

 5   BY MR. KALAS:

 6        Q.   Morning, Dr. Sawyer.

 7        A.   Morning.

 8        Q.   How are you?

 9        A.   Good.

10        Q.   Good.  I just wanted to ask you some questions

11   today about the Vosper matter.  Like the last deposition

12   we did on Zoom, I've included a link in the chat, which

13   will have where the exhibits are.  I've premarked five

14   exhibits over the past few minutes and I want to walk

15   through those to start; so if you can open that link,

16   please.

17        A.   I'm not finding the link.

18        Q.   Okay.  Do you see the chat function at the

19   bottom of your screen?

20        A.   I see mute, stop video, participants, share

21   screen, reactions, apps.

22             Oh, there it is.  Okay, thank you.

23        Q.   Yeah.  So click on that; and I put a link in

24   there.

25        A.   Okay.  One on one and group meetings,
```

```
 1   business --

 2       Q.   It should be a link that said "Golkow Remote,"

 3   and there should be five exhibits there.  Exhibit 1

 4   Sawyer notice, Exhibit 2 Sawyer report, so on and so

 5   forth.

 6       A.   I don't think I'm in the right thing.  It says

 7   "apps," but then the choices --

 8       Q.   No, it shouldn't be apps.  So if you -- if you

 9   click on chat on the -- on the thing that says "chat" at

10   the bottom, if you just click on it, your chat screen

11   will open, and then there should be one link there.

12            I'll resend it now, and then it will be the

13   most recent thing there again.

14       A.   Okay, I'll try that.

15       Q.   Did something just come up?

16       A.   The only choice showing is "my apps."

17       Q.   Is there an e-mail address I can send you this

18   link to?

19       A.   Yes.

20       Q.   Okay.

21       A.   Wrs@tox.email.

22       Q.   Wrs@tox.email.  Okay.  I'm sending it now.

23       A.   I don't think I need it now.  I clicked on

24   "more" instead of "apps" and there it does show "chats,"

25   and now I'm clicking on the link.
```

William R. Sawyer, Ph.D.

```
 1        Q.   Okay.  Perfect.
 2        A.   It was under -- it was under "more" for some
 3   reason.  Okay.  So now I have the choice of Exhibit 1
 4   through 5.
 5        Q.   All right.  Perfect.
 6             All right.  So if you can open up Exhibit 1,
 7   please.
 8        A.   Okay.  Yes.  The notice.
 9        Q.   Yes.  And have you seen this document before,
10   sir?
11        A.   Yes.
12        Q.   Okay.  When did you first see it?
13        A.   This morning.
14        Q.   Okay.  And did you conduct a search of
15   documents that you had that were responsive to this?
16        A.   Yes.  And everything's been turned in.
17        Q.   Yeah, the only thing -- the only thing that I
18   didn't see was an updated testimony list.  And I assume
19   you gave an updated testimony list in the Chapman depo
20   last week to Mr. Hogue?
21        A.   Yeah.  Jenn was on vacation all last week, so
22   she has not updated it for me yet.
23        Q.   Okay.  So you don't have anything more recent
24   than what you gave Mr. Hogue last week?
25        A.   That's right.
```

William R. Sawyer, Ph.D.

1       Q.   Okay.  All right.  And then I marked as

2    Exhibit 2 your expert report.  Take a look at that,

3    please.

4       A.   All right.  I'm just trying to think how to --

5    okay.  So I'll just go back to "tab."  Exhibit 2.  Okay.

6    I see.  It's opening different tabs.

7            Okay.  So, yeah, I have the report open, yeah.

8       Q.   Okay.  And is this a true and correct copy of

9    your report?

10      A.   Yes, it is.

11      Q.   Okay.  And does it contain all the opinions you

12   intend to offer in this matter?

13      A.   Yes.

14      Q.   Okay.  Does it contain all the materials you've

15   reviewed in preparing your opinions in this case?

16      A.   Yes.

17      Q.   Okay.  And have you reviewed any of the expert

18   reports of Monsanto's experts in this matter?

19      A.   Only briefly.

20      Q.   Okay.  Which reports have you reviewed?

21      A.   As I recall, I think the weed expert's name was

22   Smeda, S-m-e-d-a, I think.

23      Q.   Okay.

24      A.   And the industrial hygienist.

25      Q.   Okay.  And do you have any opinions you intend

1    to offer regarding their reports?

2         A.   In general, yes.

3         Q.   Okay.  What opinions do you intend to offer

4    regarding the reports of Monsanto's experts in this

5    case?  And the two reports being -- when I say "reports

6    of Monsanto's experts," I mean the ones you've reviewed.

7         A.   Yeah, I'm looking at -- it just opened up -- I

8    had to find it, but I opened up the report of Matthew

9    Call --

10        Q.   Okay.

11        A.   -- C-a-l-l, who's a certified industrial

12   hygienist.

13             Well, his primary three opinions, No. 1, I

14   disagree with, that in conjunction -- the exposure-days

15   in conjunction with an assessment of the individual, in

16   this case Mr. Vosper's lack of PPE, flip-flops, shorts,

17   T-shirt, the systemic dose that he sustained is greater

18   than that of the typical average applicator and that in

19   conjunction with a specific assessment of his exposures,

20   his experiences, his dermal contact with the

21   glyphosate-based herbicide in conjunction with the

22   exposure-days does provide a reasonable estimate of his

23   systemic dose compared to that of applicators in the

24   referenced human epidemiological studies.

25             Number 2, with respect to risk estimate, his

1    dose reconstructions are not consistent with those

2    established and published in the generally accepted

3    literature and Monsanto's own in-house study of backpack

4    applicators.

5        Q.   Okay.  You said there was a third thing?

6        A.   That overall his approach of using a calculated

7    systemic dose to compare to -- to compare it to human

8    epidemiological studies that were based on exposure-days

9    is an invalid methodology and should be excluded.

10            Nowhere in the human epidemiological studies

11   that have assessed the risk rate of NHL have blood

12   samples been taken, or even urine samples, within those

13   studies that have been equated to a various degree of

14   increased risk of NHL; and it is wholly inappropriate to

15   provide an opinion on causation through exposure dose

16   based only on animals, which he has done, using the rat

17   studies and the California nonsignificant risk level,

18   NSRL.

19            That is an animal extrapolation study and

20   cannot be used in itself to determine causation as it is

21   a regulatory model, not a methodology that is generally

22   accepted for the use in causation analyses.

23       Q.   Okay.  And are those your main areas of

24   disagreement with Mr. Call?

25       A.   Yes.

1    Q.   Okay.  Just a couple things I want to follow up

2    on there.  There was a time in this litigation when you,

3    in fact, did calculate internal doses for plaintiffs

4    when assessing their cases; right?

5    A.   Certainly.  I still do, but not for the

6    comparison to a human epidemiological study but to

7    determine whether that person's systemic dose was

8    consistent with that of applicators.  A big difference.

9    Q.   Okay.  But just to be clear for the record, you

10   have not calculated an internal dose for Mr. Vosper

11   specifically in this case; right?

12   A.   No.  Rather, I have carefully assessed his

13   history of exposures and accidents, his lack of PPE, and

14   addressed the studies that describe what the systemic

15   doses are for such individuals and have found that he is

16   certainly at a level of a typical applicator, but

17   actually much higher based upon his lack of PPE and

18   history of use.

19   Q.   Okay.  So it's your opinion that Mr. Vosper's

20   internal dose was higher than a typical applicator even

21   though you have not calculated what his internal dose

22   was; fair?

23   A.   Yes.  I used referenced peer-reviewed generally

24   accepted studies that show what the dose is, for

25   example, the Machado study, that shows what the dose is

1    under different levels of PPE and use, and I applied

2    those various studies to Mr. Vosper, which demonstrates

3    that his systemic dose is certainly higher than the

4    average applicator.

5         Q.   What is the dose in an average applicator?

6         A.   Well, I believe, according to Solomon, it's

7    approximately 0.00026 milligram per kilogram per day.

8         Q.   Okay.  Do you disagree with that figure, that

9    that's the dose in a typical applicator?

10         A.   I find it to be certainly on the -- not

11    consistent with some of the peer-reviewed studies.

12         Q.   Well, then I'm confused, because I asked you

13    what the dose was in a typical applicator and you

14    pointed me to Solomon, but then you say you disagree

15    with that figure.  So what do you believe the internal

16    dose is in a typical applicator?

17         A.   Well, that's the figure that Dr. Murphy and

18    many other experts in the Monsanto Roundup litigation

19    have used, isn't it?

20         Q.   Well, I'm not asking about the experts for

21    Monsanto's opinions.  I'm asking about your opinion.

22              What is your expert opinion as to what the

23    typical dose in an -- or excuse me -- the typical dose

24    in a typical applicator is?  Is it .00026 as set forth

25    by Dr. Solomon, or is it something else?

William R. Sawyer, Ph.D.

1      A.   Well, there are different studies referenced in

2  my report.  In fact, I think it might be Table -- it

3  could be Table 7 in my report, out of memory, which is

4  actually the Machado study showing with PPE and without

5  PPE.

6      Q.   Okay.  So let's go to that.

7      A.   There are references within my report.

8      Q.   Well, show me -- I guess help me understand in

9  your report where you say what the typical dose in a

10 typical applicator is, and then -- and then I'll be able

11 to understand how you're comparing it to Mr. Vosper.

12     A.   I'm just going to rely on the Solomon range of

13 0.000003 up to 0.034 milligram per kilogram per day.

14     Q.   Okay.  So that's the range.  And are you also

15 going to rely on the .00026 milligram per kilogram as

16 the dose of a typical applicator?

17     A.   Yes.

18     Q.   Okay.  Going to Exhibits 3 through 5, those are

19 the invoices that were produced to us by Mr. LaBletta.

20     A.   Hold on a moment.  I need to --

21     Q.   Sure.

22     A.   -- go back to that tab and then click on it.

23 Let's see.

24          No, that's not the tab.  I'm not sure why my

25 box has disappeared.

```
 1        Q.   Can you find it, Doctor?
 2        A.   Well, my tabs have -- there were tabs across
 3   the top of the browser.  Now they're gone.
 4        Q.   You can reclick on the link in the chat and get
 5   it back.
 6             MR. LABLETTA:  Yeah.
 7        A.   Yeah, that's the box that's missing.
 8        Q.   The chat box is missing?
 9        A.   Okay.  Now I -- now I've expanded it.  Now it's
10   back.  Okay.  So it should be fine now.
11             All right.  So there we go.  Now my tab is --
12   okay.  Exhibit 3?
13        Q.   If you can just look at 3 through 5.  I'm just
14   going to ask you a few questions collectively about
15   them.
16        A.   All right.  Hang on.  Let me just open the
17   three of those.
18             Okay.  The first one is simply the invoice from
19   August 10, '21, and the second one --
20             I don't want all the files.  Maybe that's what
21   I should do.  No, that's not it.
22             MR. LABLETTA:  If you click back on the last
23        exhibit, it'll bring -- it'll bring up the list and
24        you can bring up 4 then, and 5, and so forth.
25             THE WITNESS:  Okay.  Yeah, that worked.
```

William R. Sawyer, Ph.D.

```
 1              Okay.  Number 4 is invoice for professional
 2       services for half day deposition, and then No. 5 is
 3       August 9, 2021, professional services invoice.
 4  BY MR. KALAS:
 5       Q.   Okay.  And are these the three invoices you
 6  submitted to Mr. LaBletta so far in this matter?
 7       A.   That's correct.
 8       Q.   Okay.  If you'd keep Exhibit 5 open for a
 9  moment and go down to the second to last page.
10       A.   Okay.
11       Q.   You have an entry there at the bottom right
12  above "balance due" for March 30, 2021.  Do you see
13  that?
14       A.   Yes.
15       Q.   Okay.  And that was a retainer of $9,420?
16       A.   Yes.
17       Q.   Okay.  And then right above that you have a
18  line entry for $26,384.28; right?
19       A.   Yes.
20       Q.   Okay.  And I take that you billed the first
21  $9,420 of that line entry for $26,000-plus -- the first
22  $9,420 was billed against the retainer?
23       A.   That's right.
24       Q.   Okay.  And then the remainder is down there at
25  the bottom, balance due $16,964.28; right?
```

William R. Sawyer, Ph.D.

```
 1      A.   Yes.

 2      Q.   Okay.  And so up to the point of August 9 you

 3  had invoiced $26,384.28 on this matter; correct?

 4      A.   Yes.

 5      Q.   Okay.  And then after that, on August 10, you

 6  submitted an invoice for $3,400 for the deposition

 7  today; right?

 8      A.   Was that Exhibit 3?

 9      Q.   That was Exhibit 4.

10      A.   All right.  Let me look.

11           That's right.  Yes.

12      Q.   Okay.  And we sent you a check for that;

13  correct?

14      A.   Yes.

15      Q.   Okay.  And then going back to Exhibit 3,

16  following that you prepared for deposition on August 27;

17  right?

18      A.   Yes.

19      Q.   Okay.  And that was in the amount of $1,570;

20  right?

21      A.   Yes.  And there was some additional review and

22  reading over the past day or two.

23      Q.   Okay.  How much more time would you estimate

24  you've spent on preparing for this deposition?

25      A.   Approximately an hour and a half.
```

William R. Sawyer, Ph.D.

```
1        Q.   Okay.  And so overall would it be fair to say
2   you've invoiced or will invoice so far about 33 --
3   $32,000 on this matter?
4        A.   Yes.
5        Q.   Okay.  Now, were you retained, I guess, in late
6   March when you received your retainer fee?
7        A.   I'm backing up to check the date.
8             My retainer was that date, yes; however, it
9   looks like I received a Plaintiff's Fact Sheet on -- at
10  least it's -- the date in my computer, date modified,
11  January 15, '21.
12       Q.   Okay.  So you were retained at some point in
13  this calendar year?
14       A.   Yes.
15       Q.   Okay.  And when you were retained, did you
16  recommend that Mr. LaBletta work with Dr. Boyd as well?
17       A.   Probably.  I don't recall.  Probably.
18       Q.   Okay.  And did you discuss this case with
19  Dr. Boyd or any of plaintiff's other experts?
20       A.   I don't believe so.
21       Q.   Okay.  Are you aware Dr. Boyd has relied on
22  your report in this matter?
23       A.   I'm not aware of that, but I'm not surprised.
24       Q.   Okay.  You have not relied on Dr. Boyd's report
25  in this matter; however, you are deferring to him on
```

William R. Sawyer, Ph.D.

```
 1   certain issues; correct?

 2       A.   Yes.

 3       Q.   Okay.  And we'll get into that in a minute.

 4            Now, going to page 1 of Exhibit 2 --

 5       A.   Okay.  I don't remember which Exhibit 2 is.

 6       Q.   That's your report.

 7       A.   Oh, okay.  Hang on.

 8       Q.   We'll spend a lot of time in your report today,

 9   so...

10       A.   Yeah, I have it open as a PDF.  Okay.

11       Q.   All right.  So on page 1 of that report you

12   state in the second paragraph that you're limiting your

13   "...opinions specifically to dose, glyphosate/Roundup

14   constituent formulations, absorption, distribution,

15   metabolism and excretion, ADME, and Roundup's mechanism

16   of action regarding genotoxicity.  Additionally, I have

17   identified other toxicological exposures that could

18   potentially serve as confounding factors."

19            Did I read that correctly?

20       A.   Yes, John; and as usual, you're a very good

21   reader.

22       Q.   Thank you.  I expect -- well, strike that.

23            Will you -- strike that.

24            Are you not planning to opine outside those

25   areas I just listed at trial in this matter?
```

William R. Sawyer, Ph.D.

```
 1      A.   Yes, I'm going to be testifying regarding
 2   identification of these confounding factors.  I'm a
 3   toxicologist.  I'm providing that information.  I'm
 4   providing information on the overall exposures, the
 5   systemic ADME, analysis of the human epidemiologic
 6   studies with respect to dose and the analysis of dose in
 7   this case based on exposure-years and in conjunction, in
 8   tandem with, Mr. Vosper's specific exposures; and I am
 9   relying ultimately on the medical oncologist to apply a
10   differential diagnosis based upon information I'm
11   providing to ultimately provide an answer on the
12   causation opinion.
13      Q.   So just to be clear, are you going to opine
14   Roundup exposure caused Mr. Vosper's NHL?
15      A.   No, I'm going to opine to reasonable
16   toxicological certainty that Mr. Vosper's exposures were
17   above all the thresholds identified within the human
18   epidemiologic studies and thus significantly and
19   substantially increased his risk of developing the DLBCL
20   which he was diagnosed with.
21      Q.   In 2010; correct?
22      A.   Yes.
23      Q.   Okay.  Will you opine to a reasonable degree of
24   toxicological certainty that his internal dose of
25   Roundup, when applying Roundup, exceeded any regulatory
```

1   value?

2        A.   No, I haven't assessed regulatory values.  I've

3   assessed his exposure history and all of the factors,

4   including dermal absorption, the type of exposures he

5   experienced, the duration, and the exposure-days, and

6   based upon all that data in total have determined

7   whether he was at a substantially increased risk.

8        Q.   Okay.  Going back to page 1, you state above

9   the part that I read earlier that you're going to defer

10  to Barry Boyd on medical diagnostic specific causation

11  opinions.  General causation opinions you'll be

12  deferring to or -- let me back up and strike that

13  question, because you don't say the word "defer."  Let

14  me reask it.

15       Beginning at that paragraph, you say you're

16  relying on the medical diagnosis -- diagnostic specific

17  causation opinions of Barry Boyd, the general causation

18  opinions of Chris Portier, and the human epidemiological

19  opinions and findings previously answered by Beate,

20  B-e-a-t-e, Ritz; correct?

21       A.   Yes.

22       Q.   Okay.  And I was just looking at your materials

23  considered list.  And we already talked about Dr. Boyd,

24  but I didn't see that you reviewed the most recent

25  reports from either Dr. Portier or Dr. Ritz either; is

William R. Sawyer, Ph.D.

1    that correct?

2        A.    I would need the dates to understand the

3    question.

4        Q.    Okay.  Well, do you have any reports from

5    Dr. Ritz on your materials considered list?

6        A.    No, but I have reviewed her deposition dating

7    way back to 2016, I believe it was, and her reports that

8    were issued on earlier cases, including federal matters.

9    I haven't recently reviewed them but historically have.

10        Q.    Okay.  So when you say you're relying on

11    Dr. Ritz and Dr. Portier's reports, or opinions, you're

12    relying on reports that are not listed on your materials

13    considered list, at least to Dr. Ritz; true?

14        A.    And Dr. Portier, that's correct.

15        Q.    Okay.  Do you know if Dr. Ritz, starting with

16    her, has addressed the most recent epidemiology in an

17    expert report or in deposition?

18        A.    I don't believe she has.

19        Q.    Okay.  And so you don't know if Dr. Ritz has

20    even considered the Donato meta-analysis; right?

21            MR. LABLETTA:  Object to the form.

22        A.    Correct, but, as you know, I have included in

23    my reports a published generally accepted study that has

24    assessed the reliability of the Donato study.

25        Q.    Well, now, you say it's a published generally

William R. Sawyer, Ph.D.

1   accepted study.  It's actually a letter; right?  It's

2   not peer-reviewed.  The Rana opinion.

3       A.   Letters are peer-reviewed.  They do not get

4   into peer-reviewed journals without review.

5       Q.   Do you know the journal that the Rana letter

6   appeared in?

7       A.   Environmental Research.

8       Q.   Okay.  Let's go back really quickly here to

9   Dr. Ritz.  Do you know if Dr. Ritz has considered the

10  Kabat meta-analysis?  K-a-b-a-t.

11          MR. LABLETTA:  Objection to the form.

12          You can answer, yeah.

13      A.   I don't know.

14      Q.   You have not considered the Kabat

15  meta-analysis; true?

16      A.   Correct.

17      Q.   Do you know if Dr. Ritz has considered the

18  Boffetta 2021 meta-analysis?

19          MR. LABLETTA:  Same objection to the form.

20      A.   I'm not sure.

21      Q.   You have not considered the Boffetta 2021

22  meta-analysis; true?

23      A.   I think I've only reviewed it in abstract form,

24  not in detail; and as I recall, there was a significant

25  finding for DLBCL.

William R. Sawyer, Ph.D.

1    Q.   Are you offering expert opinions on the

2  Boffetta 2021 meta-analysis, or are you deferring?

3    A.   I'm not relying on it, simply because I don't

4  remember that it provided any exposure metrics,

5  exposure-days.

6    Q.   Okay.

7    A.   All I recall is that it was a positive study

8  with respect to DLBCL.

9    Q.   Have you ever offered -- well, strike that.

10  Let me ask it a different way.

11        You're not offering the opinion that DLBCL is

12  the only type of NHL glyphosate causes, are you?

13    A.   No.

14    Q.   Okay.  Do you know -- last one on Dr. Ritz.

15  Then we'll talk about Dr. Portier for a moment.

16        Do you know if Dr. Ritz has considered the

17  Crump, C-r-u-m-p, 2020 analysis of recall bias in the

18  case-control studies?

19    A.   No, I'm not aware of that.  I can't answer it.

20    Q.   Okay.  And you have not considered that; right?

21    A.   No.  It really gets into the internal design of

22  the meta-analyses and so on.  I'm a toxicologist.  I've

23  had training in epidemiology.  I've taught epidemiology.

24  I've relied on it for 34 years in my work as a

25  toxicologist.  I participated in actually writing and

William R. Sawyer, Ph.D.

1   performing an epidemiologic study for the health

2   department in New York State involving PCEs, exposures

3   in firemen.  You know, I'm certainly well-versed in the

4   use of epidemiologic studies in my practice; however,

5   I'm not an epidemiologist such as Dr. Ritz, and I would

6   defer the internal design and strengths and weaknesses

7   of a meta-analysis to the epidemiologist.

8        Q.   In fact, when I put the Crump study in front of

9   you I think a year and a half ago, you told me that you

10  weren't prepared to answer questions on it, would defer

11  to the epi.  Do you remember that?

12       A.   I don't, but that's consistent with what I just

13  explained.

14       Q.   Okay.  Going back to Dr. Portier, do you know

15  if Dr. Portier has considered the Crump 2020 study, the

16  Kabat meta-analysis, or the Boffetta meta-analysis?

17       A.   I believe he has.  I have spoken with him a

18  couple times.  We shared some newer studies over the

19  past two years, roughly.  I believe he has.

20       Q.   Did you share any of those studies with him?

21       A.   Which studies?

22       Q.   The three I just mentioned:  Crump 2020,

23  Boffetta 2021, Kabat 2020.

24       A.   I don't think so.

25       Q.   Did he share any of those studies with you?

1      A.   Just in discussion.  He didn't actually send

2   them to me, but we have spoken about, in brief, on some

3   new findings.

4      Q.   What did he say about those studies?

5      A.   The only thing I remember specifically is

6   discussing with him the Donato study very briefly.

7      Q.   So I didn't ask about the Donato study.  Did

8   he -- do you recall him saying anything about the Crump

9   2020, Boffetta 2021, or Kabat 2020 studies?

10     A.   I don't recall.

11     Q.   When was the last time you talked to

12  Dr. Portier?

13     A.   I would have to estimate probably May or June

14  of 2021.

15     Q.   When was last time you talked to Dr. Benbrook?

16     A.   I bet it's been a month or two.  I need to give

17  Chuck a call.  I haven't spoken to him in a while.

18     Q.   What did you talk about with Dr. Benbrook?

19  Well, strike that.

20          Did you talk about glyphosate the last time you

21  spoke to Dr. Benbrook?

22     A.   I don't recall.  It could have been that or

23  chlorpyrifos.

24     Q.   Okay.

25     A.   Or it could have been regarding potential new

William R. Sawyer, Ph.D.

1    cases in which we were both concerned about the ability

2    of the potential new law firm to be up to the caliber

3    that we want to engage with.

4         Q.   Are you working with Dr. Benbrook on

5    chlorpyrifos litigation?

6         A.   Yes.

7         Q.   Are you working with Dr. Portier on

8    chlorpyrifos litigation?

9         A.   No.

10        Q.   Going back to your report -- now, one of the

11   things, when I was reading your report, that you're

12   going to talk about at trial are genotoxicity studies;

13   right?  You talk about that on page 1?

14        A.   Yes.

15        Q.   Okay.  And some of those are in vitro

16   genotoxicity studies; right?

17        A.   Yes.

18        Q.   Okay.  And in vitro means they're not in a

19   living system, they're in a test tube or a Petri dish or

20   what have you; right?

21        A.   They're not within the living body.

22        Q.   Right.  And one of the downsides when we're

23   interpreting those studies is that there's no cellular

24   repair process in an in vitro study; right?

25        A.   True.

1    Q.   Okay.  And the purpose of in vitro studies, if

2    I understand correctly, is to evaluate mechanism of

3    action; right?

4    A.   Yes.

5    Q.   Okay.  And a positive result in an in vitro

6    genotoxicity study does not mean a compound causes

7    cancer -- right? -- in and of itself?

8    A.   Correct.  There's, obviously, much more that is

9    involved with making that determination.

10   Q.   Right.  And, likewise, a positive result in an

11   in vivo genotoxicity study doesn't mean in and of itself

12   a compound causes cancer; right?

13   A.   No.  It certainly raises the concern.

14   Q.   Right.  But more needs to be done?

15   A.   Yes.  As in the case of Roundup, yes.

16   Q.   Okay.  Now, one of the things a good in vitro

17   genotoxicity study will look out for and take into

18   account is something called cytotoxicity; right?

19   A.   Yes.  I was asked these very same questions by

20   your colleague Eric about a week ago.

21   Q.   Mr. Hogue, actually.  It was Michael.  And I

22   know you were asked about this.  I'm actually going to

23   something a little different here.  I'm just laying some

24   foundation.

25        Just to be clear for the record, though,

1    cytotoxicity is when the dose of the test substance

2    kills the cell; right?

3        A.   Yes.

4        Q.   Okay.  When a cell gets killed, you're going to

5    see genetic damage; right?

6        A.   Generally.  Not necessarily.  It depends on the

7    mechanism of cellular death.

8        Q.   Okay.  But when you do see that genetic damage

9    after a cytotoxic dose, that genetic damage may be an

10   artifact of killing the cell as opposed to a

11   carcinogenic process; true?

12       A.   It can be, but one looks at the percentage of

13   cells with cytotoxicity as well that quantitatively

14   measures the cytotoxic intensity versus actual

15   double-strand breaks and other genetic anomalies.

16       Q.   Right.  And because of that issue -- right? --

17   one of the things you quite candidly talk about in your

18   report is dosing in these genotox studies; right?

19   That's something you're interested in?

20       A.   Yes.

21       Q.   Okay.  You agree that if a genotox study is

22   conducted at doses that are shown to be cytotoxic it

23   can't be used to argue that the observed mechanism in

24   that study shows a potential carcinogenic mechanism

25   because of the confounding from the cytotoxicity?

William R. Sawyer, Ph.D.

```
 1      A.   No, that's not entirely true.  One has to

 2  measure the percentage of cells with cytotoxicity on a

 3  dose-response basis and then compare that with the

 4  double-strand breaks or other genetic markers.

 5      Q.   Okay.

 6      A.   And determine what impact the cytotoxicity had,

 7  if any.

 8      Q.   Okay.  If a -- when you say "look at the

 9  dose-response," you're looking for, essentially, a

10  statistically significant cytotoxic effect compared to

11  controls; right?

12      A.   Yes, but also quantitatively the degree.  For

13  example, is it 10 percent, 5 percent, or 30 percent.

14      Q.   Okay.  And so what is your threshold when

15  you're looking at a genotox study at which you say that

16  is too cytotoxic to draw conclusions about carcinogenic

17  mechanism?

18      A.   Well, there is no magic number.  One has to

19  look at the dose-response simultaneously that's going on

20  with the genetic damage and make a comparison between

21  the two.

22      Q.   So when you say "there's no magic number" --

23  you know us lawyers, we like to look for magic

24  numbers -- if you saw 50 percent cytotoxic damage in a

25  study, would that be something that you'd say, "I can't
```

1    make heads or tails of this"?

2        A.    Again, it depends on the degree of genetic

3    damage at a lower dosage.

4        Q.    Well, right, you could make conclusions --

5    sorry.  I didn't mean to cut you off.

6              But you could make conclusions at the lower

7    doses, but I'm talking specifically at the dose with

8    50 percent cytotoxicity.  Could you make any conclusions

9    about that dose?

10       A.    I would need to see the dose-response for the

11   genetic markers in conjunction that parallel the various

12   percentage or degrees of cytotoxicity.

13       Q.    Okay.

14       A.    But that's what the studies have done,

15   actually.

16       Q.    Okay.  One of the things you talk about when

17   looking at this dose point is studies like the Prasad

18   study where you talk about the Prasad study being

19   conducted at doses that are close to human doses; right?

20       A.    They are reasonable, a reasonable degree.

21   There are some genotoxicity studies, and I'm sure you're

22   familiar with these, where the drug or the chemical is

23   given at thousands of times or even tens of thousands of

24   times higher dose --

25       Q.    Right.

William R. Sawyer, Ph.D.

1    A.   -- where in the Prasad study the differential
2    was no more than a factor of 20.
3    Q.   Right.  And we talked about that, I think two
4    years ago, those human equivalent dose calculations you
5    did there; right?
6    A.   Yes.  The HED.  Correct.
7    Q.   Right.  And the human equivalent dose
8    conversion, is that something you can do with an in
9    vitro study the way you can do it with an in vivo study,
10   or do you need to look at that differently?
11   A.   I applied it to the in vivo study, which is
12   appropriate.  Now, you're asking me about in vitro
13   studies.  I don't know that I've -- whether that's the
14   generally accepted approach or not.  It certainly is for
15   the in vivo study.  That's what it's designed for.
16   Q.   Right, because in the -- because, if I
17   understand the HED methodology, what you're looking at
18   is the size and the surface area of the organism and
19   you're converting the dosage that was in whatever test
20   organism you're looking at to what the dosage would be
21   in something the size of a human; right?
22   A.   In general, that's correct.
23   Q.   Okay.  And in an in vitro study you can't do
24   that because you're looking at a Petri dish or a test
25   tube and there's no readily available way to convert

1    that into the size of a human; fair?

2        A.   In general, yes.

3        Q.   Okay.  Now, one thing we know about glyphosate

4    is that following absorption via the skin glyphosate is

5    distributed systemically throughout the bloodstream;

6    right?  It goes to all the tissues in the body?

7        A.   Yes.  It is analogous to ethanol.  It has a

8    really wide distribution.

9        Q.   Right.  It goes all the way down to my toes and

10   all the way up to my ears; right?  And everywhere in

11   between?

12       A.   Yes.  And that has been studied and reported by

13   Brewster in my current report.

14       Q.   Okay.  And I know you're going to talk about at

15   trial glyphosate's alleged affinity for bone, but you do

16   agree with me that glyphosate that's absorbed, a portion

17   of that absorbed glyphosate may be in my bloodstream in

18   the legs, a portion in my arms, a portion in my ears?

19   It's all not in one place is what I'm getting at; is

20   that fair?

21       A.   Certainly.  That's exactly what Brewster shows.

22   I mean, the radiolabeled tracer studies give a very

23   finite and reliable distribution of C14-labeled

24   glyphosate throughout the animal.

25       Q.   Okay.  And I read somewhere that there are 35

William R. Sawyer, Ph.D.

1    trillion cells in the human bloodstream.  Does that

2    sound right to you?

3        A.   I have no idea.

4        Q.   All right.  Well, let me mark where I read it

5    then.

6        A.   That's an interesting number.

7        Q.   Well, it's too -- it's too exact for me to have

8    made up; right?  Let me find it.

9        A.   I just know you, and you're generally pretty

10   exact.  I'm sure it's probably been written somewhere.

11                        - - -

12        (Sawyer Exhibit 6, Document from Texas Heart

13   Institute, was marked for identification.)

14                        - - -

15   BY MR. KALAS:

16       Q.   All right.  So I marked as Exhibit 6 a document

17   from the Texas Heart Institute, which is a cardiology

18   center in Texas.  Let me know when you get a chance to

19   open it up.

20       A.   That's in the process of opening.

21       Q.   Sure.

22       A.   It must be a large document.

23            Okay, there it is.  Texas Heart Institute.

24   Texasheart.org.

25       Q.   All right.

 1      A.   I don't know if this is peer-reviewed,

 2   but let's see if it is.

 3      Q.   I don't think it is, so that's fair, but if

 4   you'd just take a second to look over it.  It talks

 5   about blood being a tissue made up of cells and that

 6   sort of thing.  And, you know, just if you could just

 7   read down, I guess -- read as much as you like, but my

 8   question is going to be on page 2, so...

 9      A.   Okay, I've read through page 2.

10      Q.   Okay.  And do you see there the bullet points

11   that talk about platelets, red blood cells, and white

12   blood cells?

13      A.   Yes.

14      Q.   Okay.  And those -- do you agree those are the

15   three main type of blood cells circulating within the

16   plasma?

17      A.   Yes.

18      Q.   Okay.  And they talk about the platelets, and

19   then they go down to the red blood cells and they talk

20   about the fact that a healthy adult has 35 trillion red

21   blood cells.  Do you see that?

22      A.   Yes, but that's -- I don't know how that's

23   relevant to NHL.  The red blood cells have nothing to do

24   with hematopoietic malignancies.

25      Q.   Okay.  I'm just asking if that's what it says.

1    Right?

2        A.    Correct.

3        Q.    Okay.  And it says that there's 2.4 million red

4    blood cells created each and every second; right?

5        A.    Right.  And I know from medical school

6    pathology that the average life of a red blood cell is

7    100 days.

8        Q.    Right.  It says 120 here, but, you know.

9        A.    I learned 100, but maybe that was because that

10   was 30 -- what is that? -- 38 years ago?  Well, I

11   graduated -- okay.  Go ahead.

12       Q.    But then if you go down to the white blood

13   cells, those are the ones we care about with lymphoma;

14   right?

15       A.    Yes.

16       Q.    Okay.  And they say there's about 700 times

17   less white blood cells than red blood cells; right?

18       A.    Yes, although there are many different types of

19   white blood cells, and only certain progenitor or stem

20   cells are of interest in the development of DLBCL.

21       Q.    Okay.  But 35 trillion divided by 700, by my

22   math, is 50 billion.  Okay?  And I don't know if you

23   want to do that math on your calculator there on your

24   computer, but I have 50 billion.  Does that make sense?

25       A.    Yes.

1    Q.   Okay.  And so do you have any reason to

2  disagree there are approximately 50 billion white blood

3  cells in the body at any one time?

4    A.   No, but I see we're heading into one of your

5  new magical tricks, as I call them, but go ahead.

6    Q.   Okay.  Well, when I'm conducting a Petri dish

7  or test tube study, and in vitro genotox study, we're

8  going to have somewhere around 50,000 to 100,000 cells

9  in that Petri dish; right?

10    A.   That's -- I don't want to say necessarily true,

11  but that can happen, yes.

12    Q.   Okay.  And so when we're -- even if it is

13  higher, it's not going to be 50 billion white blood

14  cells in a Petri dish in an in vitro study; right?

15    A.   No.  No, definitely not.

16    Q.   It's not even usually going to be a million;

17  right?

18    A.   A million is typical.

19    Q.   Okay.  A million is typical.  Okay.

20    A.   Or more.  Yeah, it could be more.

21    Q.   Could be more.  Okay.

22         When we're thinking about doses in the in vitro

23  studies, one thing to be taken into account is whatever

24  dose is absorbed in the human body is diluted across 50

25  billion white blood cells while it's only diluted across

1    50,000, even a million, in an in vitro study; fair?

2        A.   No, not -- it's not fair.  That's not correct

3    science.  The measure in micromole of chemical per liter

4    of liquid or, if you wish, micromole per milliliter of

5    liquid, in the actual in vivo system is directly related

6    to a similar or a ratio of that value in the -- in the

7    Petri dish.

8            Now, the number of lymphocytes, for example, in

9    vivo is obviously going to be far, far greater than that

10   in a Petri dish, but, by ratio, the current amount of

11   micromole per liter per unit of chemical is the same.

12       Q.   Okay.  Well, I wasn't asking about chemicals at

13   all.  I mean --

14       A.   Well, but your question implies that there's a

15   difference in the Petri plate of the number of cells

16   versus chemical as opposed to into the body, and that's

17   not true.

18       Q.   Well, I really wasn't asking that, so let me

19   ask the question again, because I think you answered a

20   question I wasn't asking there.

21       A.   Well, if you listen to my wording, I said

22   "implies."  I said -- I used the word "implicated," if

23   you read the transcript.

24       Q.   Okay.  Well, don't take any implication of my

25   question.  I'm just asking a question about the science

William R. Sawyer, Ph.D.

1    here.

2        A.    Okay.

3        Q.    One thing you have to take into account as a

4    toxicologist when you're looking at the doses in in

5    vitro studies is that whatever dose is absorbed into the

6    human body in vivo is going to be diluted across 50

7    billion white blood cells while in an in vitro Petri

8    dish study it's going to be diluted across a much

9    smaller number of white blood cells; is that fair?

10            You have to think about that?

11       A.    No.  No, I agree with that.  And keep in mind

12   then that the situation you just described renders the

13   in vitro analysis less power to detect a mutagenic event

14   whereas in the body there's many, many more cells and

15   that mutagenic effect could occur but could be missed in

16   the Petri plate because we're not using as many test

17   cells as in the true body.

18            So it basically is just saying that the in

19   vitro test doesn't have quite the sensitivity that the

20   actual in vivo system would have.

21       Q.    Sounds to me like you're saying that you'd

22   rather look at in vivo tests, all other things being

23   equal, than in vitro tests, because those are more

24   likely to detect an effect in the body; is that fair?

25       A.    Yeah, that's reasonable.  Yes.

William R. Sawyer, Ph.D.

1    Q.   Okay.  Do you need a break?  We've been going

2  about an hour, and I probably have an hour 15, hour 20

3  more questions.

4    A.   No.  I'm ready to proceed.

5    Q.   Okay.  All right.  So let's turn to Mr. Vosper,

6  at least in more detail.  Mr. Vosper's 44; correct?

7    A.   Let me go back to the report.

8         Yeah.  He was born in April ███ so he turned

9  44

10   Q.   Okay.  And he was diagnosed with NHL in 2010 at

11 the age of 33; correct?

12   A.   Yeah.  February ███  Correct.

13   Q.   Okay.  And specifically DLBCL; right?

14   A.   Yes.

15   Q.   And, unfortunately, 33-year-olds were diagnosed

16 with NHL prior to the introduction of glyphosate to the

17 market; is that true?

18   A.   Yeah, John, we've been through this so many

19 times, this set of questions.  Yes.

20   Q.   Okay.  And even today there are 33-year-olds

21 who are diagnosed with NHL who have never used Roundup;

22 right?

23   A.   Correct, but he was at a substantially

24 significantly increased risk.

25   Q.   Okay.  Just because Mr. Vosper used Roundup and

1   was diagnosed with NHL does not mean in and of itself

2   Roundup use caused his NHL.  Do you agree with that?

3          MR. LABLETTA:  Objection to the form.

4      A.   Can you repeat that?

5      Q.   Just because Mr. Vosper used Roundup and was

6   diagnosed with NHL does not mean in and of itself

7   Roundup use caused his NHL.  Do you agree with that?

8          MR. LABLETTA:  Same objection.

9      A.   Yes, with the qualifier that a greater degree

10  of assessment is needed than what you just said.  Keep

11  in mind he was in his sandals.  He had higher dermal

12  exposure than that of most applicators.  The duration of

13  use was extensive and the units of exposure-days.  He

14  was markedly many times above the highest threshold

15  within the human peer-reviewed studies.  There are

16  numerous factors that must be considered before making a

17  blanket statement such as that.

18     Q.   Well, right.  That actually was what I was

19  getting at.  You look in your toxicological analysis at

20  more than just this guy was exposed to Roundup and he

21  got NHL, ergo, Roundup caused his NHL.  You conduct a

22  more searching analysis; right?

23     A.   I looked and very carefully questioned him,

24  reviewed his records with respect to other chemical

25  exposures, other conditions, such as the use of

1    cyclosporin A or other drugs that are known to induce

2    NHL, his family history with respect to first-generation

3    relatives, and any immune deficiencies, HIV/AIDS, lupus,

4    ulcerative colitis, Crohn's disease, et cetera.

5        Q.   Right.  I think we're exactly on the same page.

6    It would be malpractice for you to go out there and say

7    this guy used Roundup, this guy has NHL, therefore,

8    Roundup caused his NHL, without doing something more;

9    right?

10       A.   Of course.  That's why I -- my report is 213

11   pages long and it includes an in-depth analysis and

12   careful consideration of all other potential

13   toxicological confounding factors, including even

14   radiation.  He had a number of PT scans prior to the

15   development of the disease, et cetera.

16       Q.   Now, I saw you looked -- in your invoices, I

17   saw you looked at some Google Earth pictures of places

18   where Mr. Vosper says he applied, but it is true you did

19   not conduct an inspection of his property; right?

20       A.   Correct.

21       Q.   Okay.  You did speak with Mr. Vosper twice in

22   interviews; correct?

23       A.   Oh, yes.  Yeah.  I also did a follow-up

24   interview, so correct.

25       Q.   Okay.  And neither of those interviews were

William R. Sawyer, Ph.D.

```
1        Q.   Okay.  Mr. Vosper said he sprayed Roundup at

2   many locations; true?

3        A.   Yes.

4        Q.   He sprayed at ███████████████████████████

5   right?

6        A.   Yes.  That is his current home since the fall

7   of 2008.

8        Q.   Okay.  He sprayed at 12-I          ; correct?

9        A.   Correct.  The          farm.  140 to 150 acres.

10        Q.   Okay.  He sprayed at 23 Quarry Road, which is

11   the Rinox/Techo-Bloc office; correct?

12        A.   Yes.

13        Q.   Was that "yes"?  Sorry.  I didn't catch it.

14        A.   Yes, that was "yes."

15        Q.   Okay.  He sprayed at his mother's house in

16   Upper Lake Sparta; correct?

17        A.   Correct.

18        Q.   Okay.  Sprayed at the Grinnell sales displays;

19   correct?

20        A.   Yes.

21        Q.   Okay.  And the Grinnell sales displays first

22   were in Home Depots or Lowe's or what have you, and then

23   they later on were at, like, larger landscaping supply

24   stores; right?

25        A.   Yes.
```

```
1       Q.   Okay.  And then he potentially sprayed at a
2   location called the H & K Group; right?  He didn't know
3   if it was Roundup or not he sprayed?
4       A.   Yes.
5       Q.   Okay.  And, likewise, at Sussex County and at
6   Farmstead he assumed he sprayed Roundup, but he did not
7   actually know it was Roundup that he sprayed at those
8   locations; is that fair?
9       A.   I think you're referring to where he worked as
10  a laborer before and after senior year of high school,
11  two summers?
12      Q.   Yes, sir.
13      A.   That's correct.
14      Q.   Okay.  And was there anyplace else he sprayed
15  beyond the places we've just listed?
16      A.   Well, I don't know if we covered Rinox.
17      Q.   That was Quarry Road; right?  23 Quarry Road?
18      A.   Yes.
19      Q.   Okay.  We covered that.  Anywhere else?
20      A.   I don't think so.
21      Q.   Okay.
22      A.   Well, Farmstead Golf Course.
23      Q.   Right.  I mentioned Farmstead was Sussex.  When
24  I said that he potentially sprayed at Farmstead, it's
25  because he wasn't the one who purchased or put the
```

William R. Sawyer, Ph.D.

1    Roundup in the jug.  He just assumed it was Roundup;

2    right?

3        A.   Right.

4        Q.   So the places we're sure it was Roundup he

5    sprayed, based on his testimony and your interviews, are

6                                    ,        house in Upper

7    Lake Sparta, and the Grinnell sales displays.  Those

8    five; is that fair?

9        A.   I think so, but I would need to really review

10   my summary section.

11       Q.   Well, as -- you can either review it -- and

12   that's fine, take your time -- or we can just march

13   through each of those locations and, if something else

14   occurs to you, you can let us know.  Which would you

15   rather do?

16       A.   Well, that's fine.

17       Q.   Okay.  So let's start with Grinnell.  Okay?

18       A.   Okay.  Yeah, the Grinnell I have on page 30.

19   I've summarized it.

20       Q.   Right.  And you say the Grinnell applications

21   were his most significant applications; right?

22       A.   Let's see.  Well, really, from -- you know, not

23   concerning whether it's occupational or residential, the

24                   is the most significant.

25       Q.                    .  Okay.  So that's

William R. Sawyer, Ph.D.

```
1              Okay, that's fine.  I thought I had read
2   something else about Grinnell, but that's fair.
3              Let's focus on Grinnell.  We'll get to
4                What he did for Grinnell -- Grinnell is a
5   company that makes, like, pavers; right?
6        A.   Blocks.  Yes.
7        Q.   Okay.  And what he did for Grinnell is he
8   constructed patio displays so when you walk into Home
9   Depot you see this nice, beautiful patio and you say, I
10  want to buy some Grinnell blocks; right?
11       A.   I think so.  I think that's --
12       Q.   Okay.
13       A.   I think that's the idea.
14       Q.   Okay.  And what he'd have to do as part of that
15  job is maintain those displays; right?
16       A.   Right.
17       Q.   Okay.  And part of the maintenance of those
18  displays was spraying and removing weeds that would pop
19  up between the pavers; fair?
20       A.   Yeah.  Weeds, grass.  Any type of growth.
21  Correct.
22       Q.   Okay.  And on a typical application he'd apply
23  Ready-to-Use Roundup; right?
24       A.   Yes.
25       Q.   Okay.  When he moved on to the landscaping
```

1    stores, away from the Home Depot accounts to the

2    landscaping stores, he applied a premixed Roundup, but

3    it may have been from a concentrate; right?

4         A.   Yes.

5         Q.   Okay.  He did not mix and load concentrated

6    Roundup in the context of his Grinnell work; true?

7         A.   Correct.

8         Q.   Okay.  And when he'd apply to these paving

9    displays, he'd typically apply 15 to 20 minutes; right?

10        A.   Well, it varied between years 2000 and 2001.

11   One hour per week during the weeks of April, May, June;

12   30 minutes per week the 13 weeks, July, August,

13   September; one hour per week in 2001 for 13 weeks,

14   April, May, June.

15        Q.   Okay.  I'm looking at Table 4 then, because

16   that -- I don't know if that's matching up with Table 4.

17   So if you can go to Table 4 of your report on page 32.

18   But maybe it is.  Maybe I'm being dense.

19        A.   Okay.

20        Q.   All right.  So Table 2 has a Grinnell entry

21   there, I guess in the bottom right, or -- bottom

22   right -- in the second to the last row.  Do you see

23   that?

24        A.   Yes.

25        Q.   Okay.  And so if I understand correctly, for

William R. Sawyer, Ph.D.

1    the 2000 to 2001 period -- and that's when he was

2    working at Home Depots -- he would apply one hour a week

3    for 13 times a year for that 2000 to 2001 period, and

4    then in one of those two seasons he'd also apply half an

5    hour a week 13 times a year; right?

6        A.   Correct.  And that's what the table shows.

7        Q.   Okay.  And so -- and so his maximum application

8    in a given week during those seasons would have been one

9    hour, and then some weeks it would have been half an

10   hour as opposed to one hour; right?

11       A.   Yes.  And that's --

12       Q.   Okay.

13       A.   That's what he stated, and he explained that

14   was due to the differential on weather and how fast the

15   weeds grew.

16       Q.   Fair.  Okay.  In 2001 to 2003, he moved over to

17   the landscape store accounts as opposed to Home Depot;

18   right?

19       A.   Yes.

20       Q.   Okay.  And when he was working on the landscape

21   store accounts, that was for one and a half seasons;

22   right?

23       A.   Right.  And that's in Table 4.

24       Q.   Right.  And at those accounts he'd apply 15 to

25   20 minutes in a typical application; right?

1      A.   Right.  And that's in Column No. 5.  .25 to .33

2   hours.

3      Q.   Okay.  And you have 26 events per season, and

4   that would stretch from, I guess, April to October or

5   thereabouts?

6      A.   13 weeks.  Yes.

7      Q.   Okay.  Well, you say "13 weeks."  Now, you have

8   26 events listed there.  So he applied two times a week?

9      A.   No, no.  That's because, if you look at

10  Column 2, it shows 2001 through 2003.  That's more than

11  one year.

12     Q.   Right.  But you account for that in total

13  seasons; right?  How many years?

14     A.   Well, 13 per season, but here we have two

15  years, so that's 13 times 2 is 26.

16     Q.   Well, then what's the 1.5 for seasons that

17  you're multiplying?

18     A.   The total seasons?  1.5.

19     Q.   Because if you've already put the 26 in the

20  events per season, I'm confused why you'd have 1.5 in

21  total seasons.  You wouldn't need a total seasons

22  denominator.

23     A.   Yeah, that would mean -- events per season

24  means he's spraying 26.  That would be twice per week.

25     Q.   Right.  So that's what I was asking.  It was

1    twice per week 15 to 20 minutes; fair?

2        A.   Right.

3        Q.   Okay.  And when he'd apply, he'd wear a

4    collared shirt, jeans, and work boots at the Grinnell

5    locations; right?

6        A.   Yes.

7        Q.   Okay.  Then moving to the Rinox/Techo-Bloc

8    locations, he applied there from -- I think you have it

9    here -- 2005 to 2010; right?

10       A.   Yes.

11       Q.   Okay.  And the reason you stopped it at 2010 is

12   because he was diagnosed with DLBCL in 2010; right?

13       A.   Yes.

14       Q.   Okay.  And so applications after 2010 would not

15   be toxicologically relevant to his diagnosis of DLBCL

16   under Bradford Hill's temporality requirement; fair?

17       A.   Yes.

18       Q.   Okay.  And when he'd apply at Rynox/Techo-Bloc,

19   he'd wear his work clothes; right?

20       A.   Yes.

21       Q.   Okay.  And that was a T-shirt, long pants, and

22   I think it was leather gloves; right?

23       A.   Yes.

24       Q.   Okay.  And again at Rinox Techo-Bloc he'd apply

25   a ready-to-use product; right?

```
 1      A.   Correct.

 2      Q.   Okay.  Moving up to Upper Sparta, that is

 3  house; right?

 4      A.   Yes.

 5      Q.   Okay.  And at mom's house he -- it was a third

 6  of an acre; correct?

 7      A.   Yes.

 8      Q.   Okay.  And he'd apply there once a month for 15

 9  minutes; correct?

10      A.   Yes.

11      Q.   Okay.  And that would also be a ready-to-use

12  product; right?

13      A.   Yes.

14      Q.   Okay.  Grandparents' farm.  That's one we

15  didn't mention before.  You have the grandparents' farm

16  in here; right?

17      A.   Yes.

18      Q.   Okay.  And the grandparents' house, he

19  testified that he'd spray occasionally there as well;

20  right?

21      A.   Yes.  Two events per season for nine seasons at

22  half an hour to 45 minutes each event.

23      Q.   Okay.  And one thing I didn't see in his

24  deposition.  I don't know if it came up in your

25  interview.  Did he apply ready-to-use or concentrated
```

1    glyphosate he mixed and loaded at the grandparents'

2    farm?

3        A.   It was actually concentrated glyphosate that

4    was mixed by his father.

5        Q.   Okay.  So he applied a concentrated product,

6    but his father mixed it for him?

7        A.   Yes.

8        Q.   Okay.  And what did he wear when he applied

9    Roundup at the grandparents' farm?

10       A.   His typical dress included either a tank top or

11   no shirt at all, shorts, non-waterproof sneakers without

12   socks.

13       Q.   Okay.  Moving on to          ,           was

14   his       home; right?

15       A.   Yes.

16       Q.   Okay.  And he lived there off and on from 1985

17   to 2004?

18       A.   Maybe.  I have him spraying from 1986 to 1992,

19   based on his testimony.

20       Q.   Right.  And then after '92, if you recall, his

21   dad let the property go a bit and he was there less, or

22   spraying less.  Do you remember that?  From '92 to '95?

23       A.   Yeah.  During the six-month season April to

24   October once per month for a half hour.

25       Q.   Okay.  And if we go -- do you recall what

William R. Sawyer, Ph.D.

```
 1    livestock his father had on the farm?

 2        A.   His father used to raise cattle.

 3        Q.   Okay.

 4        A.   And his father did use a pesticide rope on the

 5    cattle.

 6        Q.   Okay.  And as it went to glyphosate, his father

 7    mixed and loaded Roundup until Ira Vosper was old enough

 8    to mix and load; right?

 9        A.   Correct.

10        Q.   Okay.  And you don't know -- well, strike that.

11             Do you know what concentration the glyphosate

12    was mixed at?

13        A.   No.

14        Q.   Okay.  And when he'd spray at          , he'd

15    spray along the fences for the livestock; right?

16        A.   Right.  And the walking paths, along the rock

17    walls, so on.

18        Q.   And he'd spray also to kill some rose bushes;

19    right?

20        A.   Yes.  He did a lot of work on scrub brush that

21    had to be cut and the stumps killed by manually pouring

22    the Roundup on top of the stumps.

23        Q.   So I had a question about that, because you

24    talk about it a bit in your report, the killing of the

25    rose bushes and what have you, and that was a one-time
```

William R. Sawyer, Ph.D.

1    event; right?  In other words, once you pour the Roundup

2    on the stump of the rose bush, it's not like he came

3    back a year later and did it again; right?

4        A.   Well, he may have had to, because it's not

5    clear what the concentration was of the Roundup.  If one

6    were to look at the Roundup label for stumps, the label

7    refers to concentrations typically of 1:6 or even 1:3 as

8    opposed to typical dilutions designed to kill grass and

9    weeds.

10            It doesn't appear that they were using -- I

11   mean, there's no evidence that they were using

12   concentrated Roundup on the stumps, thus it's likely

13   that the stumps would have regrown at some point.  At

14   least some of them.

15       Q.   Did you follow up with him in the interview or

16   did you see anything in the deposition where he talked

17   about how often he had to do this sort of stump killing?

18       A.   Yeah.  More than once.

19       Q.   Okay.  More than once, but was it every year?

20   Every other year?  Twice only?  I mean, do you have any

21   more details you can give than more than once?

22       A.   Well, he started doing it at age nine and

23   continued doing it for years after that.  So it was not

24   a one -- a one-day event.

25       Q.   Okay.  And he used a pump sprayer when applying

William R. Sawyer, Ph.D.

```
 1   on the farm; right?

 2       A.   Yes.

 3       Q.   Okay.  And he did it April to October; right?

 4       A.   Yes.

 5       Q.   Okay.  And going back to your report, it was --

 6   the events took half an hour to an hour and he would do

 7   it about 14 times a season in those first seven years;

 8   right?

 9       A.   Can you repeat that?

10       Q.   In those first seven years, he'd spray half an

11   hour to an hour at a time 14 times a year; right?

12       A.   Yes.

13       Q.   Okay.  And then later -- and then those last

14   four years or so it cut back some; right?

15       A.   Right.

16       Q.   Okay.  And he'd wear sneakers or flip-flops,

17   shorts, and maybe a tank top when applying Roundup;

18   right?

19       A.   Or no shirt at all.

20       Q.   Right.          is the current home; right?

21               ?

22       A.   Yes.

23       Q.   Okay.  And you have -- in Table 4, you have

24   applications through 2014.  Do you see that?

25       A.   Yes.
```

1      Q.   Okay.  Now, in fact, he was diagnosed with

2  DLBCL in 2010; right?

3      A.   Yes.

4      Q.   Okay.  And so from a temporality view point

5  under the Bradford Hill criteria, exposures after 2010

6  could not have caused his DLBCL; is that fair?

7      A.   Yes, but I just need to check his diagnosis to

8  see if he developed a second malignancy.  I'm not sure.

9           Well, he suffered a reoccurrence of his

10  lymphoma in 2018, so I probably included that under the

11  basis of promotion.

12      Q.   Okay.  That's not your typical methodology in

13  these cases; right?  You typically calculate

14  exposure-days up to the date of diagnosis of their first

15  manifestation of NHL; right?

16      A.   Correct.  And I think, for the purpose of

17  accuracy, the 19.5 midlevel exposure-days at

18      actually should be 3.9, which decreases his overall

19  exposure-days from 57 to 53.1.  And I'm making that

20  correction to my report.

21      Q.   Okay.  I appreciate that.  I'm confused by the

22  math there.  You said 19.5 should be 3.9?

23      A.   Yeah, and only one year of exposure at

24              rather than --

25      Q.   Okay.

William R. Sawyer, Ph.D.

```
1       A.   -- rather than six seasons.

2       Q.   Right.  So --

3       A.   Well, let me -- let me check his diagnosis

4   date.

5       Q.   Okay.  Yeah.  I have two years, I mean, because

6   his diagnosis, I think, was in September or October.  So

7   I thought that that should be 6.5.

8       A.   Yeah, I agree.

9       Q.   Okay.  So 6.5, but then that would take 13 away

10  from the 57; right?  You would go from 19.5 to 6.5, so

11  57 becomes 44; fair?

12      A.   Yes.

13      Q.   Okay.  All right.  Now, at         , he used

14  Ready-to-Use Roundup and went through about 2 gallons

15  per application; right?

16      A.   I have that he often used two 1-gallon bottles

17  at each application, and that's based upon his

18  deposition, page 36.

19      Q.   Great.  We're in agreement there.  And when

20  he'd spray, he'd spray flower beds, rock walls, and

21  pavers; he'd also spray to clear trees; right?

22      A.   Yes.  He explained that the property was in

23  need of clearing and that he had very little grass in

24  the beginning.  He did a lot of clearing and

25  chain-sawing and sprayed weed killer, Roundup, in the
```

1    areas --

2         Q.   Okay.

3         A.   -- as he said, in areas where you, quote,

4    "couldn't get down, you know, below the dirt."  And that

5    was, again, from his deposition, page 240.

6         Q.   Okay.  And he'd wear shorts, sneakers, and a

7    tank top or no shirt; right?

8         A.   That's right.

9         Q.   And he recalled skin contact, but he did not

10   recall any specific spill incidents; is that fair?

11        A.   Yes.

12        Q.   Okay.  And that's the same for all the

13   locations he applied?  He didn't recall any specific

14   incidents of spilling Roundup onto his skin; right?

15        A.   No, that's incorrect.

16        Q.   Okay.  Where did he recall a spill?

17        A.   On page 15 of my report, last paragraph,

18   "Mr. Vosper testified that he often got Roundup on his

19   body.  Quote, 'As a kid, probably every use.'  Although

20   his father mixed the concentrated Roundup, it would

21   spill on him when it was being transferred from a

22   5-gallon pail to the pail he would carry, and also, when

23   walking with the pail to the rose bushes, it would spill

24   on the way there."

25        Q.   Okay.

William R. Sawyer, Ph.D.

```
 1        A.    "However, Mr. Vosper would just keep walking
 2   and not wash the Roundup off."
 3              And he explained in the interview that it
 4   spilled directly on his legs from the bucket.  Splashed
 5   back and forth in the bucket.  It splashed on his legs.
 6   That's a very significant exposure.
 7        Q.    Okay.  So let's be clear then, because I missed
 8   that in your report.  So outside of          , he did
 9   not recall any spill incidents; is that fair?
10        A.    I believe that's correct.  And I also must
11   comment it's unusual for you to miss anything in my
12   reports.
13        Q.    Sorry about that.
14        A.    That's --
15        Q.    Well, there's a first time for everything.
16              Now -- okay.  Now, going back to your Table 4
17   real quick here --
18        A.    Okay.
19        Q.    -- I want to focus real quick on            at
20   the top there.  Or -- yeah, at the top.  So I was
21   looking at your calculations from 1986 to 1992, and you
22   have for six total seasons, 14 events per season, and
23   the hours per event are .5 to 1.0.
24              Do you see that?
25        A.    Yes.
```

William R. Sawyer, Ph.D.

```
 1      Q.   Okay.  And so taking the maximum, because you

 2   do minimum, midpoint, maximum, 6 times 14, by my math,

 3   is 84.  Do you agree with that?

 4      A.   Yes.

 5      Q.   Okay.  And one hour per event would be 84 times

 6   1; right?

 7      A.   I came up with 84.  Yes.

 8      Q.   Okay.  And so your maximum here is listed as

 9   216, not 84.  Do you see that?

10      A.   I do.

11      Q.   Okay.  And so if you have 84 hours in your

12   maximum, that would mean your maximum days would be

13   10.5; right?

14      A.   Yes.

15      Q.   Okay.  And, likewise, for minimum, if you did

16   84 times .5, your minimum would be 42 total hours;

17   right?

18      A.   Correct.

19      Q.   Okay.  And that would result in 5.2

20   exposure-days -- right? -- for your minimum?

21      A.   Right.

22      Q.   Okay.  And then the midpoint of that would

23   be -- between 5.2 and 10.5 is -- I came up with 7.9.  Is

24   that fair?

25      A.   Yes, but before we go any further, I just want
```

William R. Sawyer, Ph.D.

1   to check --

2       Q.   Sure.

3       A.   -- the information from

4            Yeah, this is some type of an error that I

5   can't explain.

6       Q.   Okay.  So if our midpoint -- and we'll just say

7   eight days is our midpoint to make the math easy.  If

8   our midpoint is eight days as opposed to 20 days, that

9   would take your midpoint exposure-days down from 44 to

10  32; is that fair?

11      A.   Yes.

12      Q.   Okay.  And 32 exposure-days, just to be clear,

13  are still sufficient under your methodology to determine

14  Roundup was a substantial contributing factor to

15  Mr. Vosper's NHL; right?

16      A.   I don't understand the term "your methodology"

17  as it implies I made it up, when, in fact, it's the

18  methodology used in the six human epidemiologic studies

19  that have dose metrics information.

20      Q.   Dr. Sawyer, again, I don't -- I'm not implying

21  anything, so don't read an implication into my question.

22           You have a methodology you used in this report;

23  right?

24      A.   I used the methodology as prescribed in the

25  human epidemiological literature.

```
1        Q.   Okay.  And using the methodology you used in
2   this report, 32 exposure-days, in your opinion, is still
3   sufficient to opine Mr. Vosper's NHL was caused or
4   substantially contributed to by his Roundup exposure;
5   right?
6        A.   Correct.
7        Q.   Okay.  Now, one other question I have on Table
8   4 before we move on to a few other things and wrap up
9   here.
10        You talk about, on page 178, that you've
11   surmised a latency of 2 to 25 years from exposure to NHL
12   diagnosis.
13        A.   On which page?
14        Q.   178 of your report, sir.  This is the last
15   paragraph.
16        THE VIDEOGRAPHER:  Just FYI -- this is the
17        videographer -- we are about five minutes away from
18        that two-hour mark.
19        MR. KALAS:  Okay.
20        A.   Okay.  But to answer your question, actually,
21   my intent in this report, and I think I spelled this out
22   at the beginning, was simply to provide the latency
23   period to Dr. Boyd, and he is going to opine on
24   causation, whether there is causation or not, and take
25   into account latency.
```

William R. Sawyer, Ph.D.

1           So I'm not -- I'm not making the causal

2   entrance here.  I'm just stating what studies provide in

3   terms of latency period.

4       Q.   Right.

5       A.   Minimal latency of 2 to 25 years.

6       Q.   Totally understand that you're deferring to

7   Dr. Boyd there.

8       A.   And the peak latency, studies have shown -- and

9   I summarized this -- that the longer latencies generally

10  reveal higher numbers of NHL as per the shortest latency

11  period of two years.

12      Q.   Okay.  So this goes back, though, to Table 4,

13  because this relates to Table 4.  So the shortest

14  latency for NHL is two years.  If we go back to Table 4

15  on page 32 of your report -- and I want to understand

16  this, because this is sort of an issue that was unclear

17  to me when I was looking.

18           The              exposures in 2009 to 2010 --

19  right -- and also the Rinox exposure in 2009 and 2010,

20  those exposures would have been within two years before

21  his diagnosis of NHL; right?

22      A.   Yes.

23      Q.   Okay.  And you talk about latency on page 178.

24  I think you're quite candid on this.  Cancer doesn't

25  manifest instantly; right?

William R. Sawyer, Ph.D.

```
 1        A.    Correct.
 2        Q.    You say in your report a distinct amount of
 3   time must pass; right?
 4        A.    Right.  And that's well established in the
 5   pathology literature in terms of time for doubling to
 6   occur.
 7        Q.    Okay.  And so if you --
 8        A.    Double, double, double, double, and keep
 9   doubling, to create a large enough number of cells to
10   result in a clinically diagnosed malignancy.
11        Q.    Okay.  And so the exposures to glyphosate in
12   2009 and 2010 -- well, strike that.  Let me ask a
13   different question.
14             The exposures to glyphosate that would have
15   caused Mr. Vosper's NHL, in your opinion, would have
16   occurred in 2008 or earlier based on the latency
17   literature; right?
18        A.    No.  The methodology does not operate that way
19   in the scientific literature.
20        Q.    Okay.
21        A.    The exposures are from the latency up until the
22   time of clinical diagnosis, and that is because certain
23   chemicals are full carcinogens, that is, they're
24   promoters as well as initiators; other chemicals are
25   only initiators.  There are different types of
```

William R. Sawyer, Ph.D.

```
 1   carcinogens.  In this case, we're dealing with a

 2   carcinogen that has both mutagenic properties and

 3   promotion, and thus the exposures are relevant right up

 4   to the time of diagnosis.

 5           MR. KALAS:  Okay.  Let's go off the record to

 6       change the video real quick, and then we can get

 7       back on when you're ready.

 8           THE WITNESS:  All right.  Five minutes then?

 9           MR. KALAS:  Five minutes is great.

10           THE WITNESS:  Okay.

11           MR. KALAS:  All right.

12           THE VIDEOGRAPHER:  We are now going off the

13       video record.  The time is currently 10:38 a.m.

14           (Recess from 10:38 a.m. until 10:47 a.m.)

15           THE VIDEOGRAPHER:  We are now back on the video

16       record.  The time is currently 10:47 a.m.

17   BY MR. KALAS:

18       Q.  All right.  Dr. Sawyer, thanks.  We'll try to

19   wrap up here.

20           Really quick question on page 33 of your

21   report, because you've mentioned it a few times today.

22           Starting on 33, you talk about these epi

23   studies and you have a table, I think -- or not table,

24   but you kind of number each of them 1 through 6 in

25   your -- in your report.
```

William R. Sawyer, Ph.D.

1          I understand what you're saying when you say
2    that Eriksson or McDuffie have an exposure dose metric
3    to them.  Same thing on Andreotti.  I understand that.
4    And same thing on Pahwa.  I understand that.
5          I don't understand in Leon where they have an
6    exposure dose metric, because that is an ever/never
7    study, as I understand it.  Can you please explain that
8    to me?
9          And, in fact, if it helps you, Table 6 is
10   probably where to go to.
11       A.   No, I was looking at my paragraph on page 36.
12   Top paragraph.  Yeah, indeed it is never use/ever use
13   with a statistical measurement.  Also a measurement here
14   with respect to DLBCL.  It is still a metric.
15   Obviously, it doesn't provide a dose-response over a
16   gradient but at least gives a single point dose
17   measurement based in exposure-days, and that is either
18   one -- more than one or none.
19       Q.   Well, right.  And --
20       A.   One or more or none.
21       Q.   And one thing that I think you and Mr. Hogue,
22   when I was reading the Chapman transcript, got into it a
23   bit is about, you know -- I think you thought there was
24   an implication you've cherry-picked studies.  Again, I'm
25   not implying anything here, but, you know, when I --

William R. Sawyer, Ph.D.

1    when I look at your epi section, you're talking about

2    that you're looking at studies with exposure-day

3    metrics.

4           And it's fair to say that the Leon study, like

5    some of the studies you haven't discussed in your

6    report, does not have an exposure-day metric; is that

7    fair?

8    A.   Well, I disagree.  Looking at the actual Leon

9    study itself, the assessment was based upon studies that

10   were in units of exposure-days.

11   Q.   That being the Andreotti?

12   A.   I'm sorry?

13   Q.   That study being Andreotti?

14   A.   Yes.  On page 1522, bottom left column, the

15   paragraph states that the follow-up time is calculated

16   as the number of days between the start of follow-up and

17   date of following, and then it goes on and talks about

18   the -- there are several places where the studies in the

19   design came from the Agricultural Health Study, CNAP,

20   and AGRICAN.

21   Q.   Please go to page 38 of your report.

22           Are you there?

23   A.   Almost.

24           Okay.

25   Q.   Okay.  Do you have Table 6 there that you're

William R. Sawyer, Ph.D.

1    looking at?  Exposure-Day Parameters for Six Referenced

2    Epidemiology Studies?

3        A.   Yes.

4        Q.   Okay.  And if you look there at Table 6, it

5    says, for the Leon study, the metric dose interval is

6    ever use; right?

7        A.   Right.

8        Q.   Okay.  And the dose interval dose information

9    odds ratio you're reporting in your study is for -- or

10   strike that -- in your report is for ever use; right?

11   Not a stratified use based on days of year or days

12   lifetime; right?

13       A.   Yes.

14       Q.   Okay.  Likewise, for Zhang, the relative risk

15   you're reporting in your report is for ever use and not

16   for a stratified dose metric; right?

17       A.   Correct, but Dr. Zhang actually used the

18   exposure-day quartiles from AHS; and I know that because

19   I directly spoke with her about that.

20       Q.   Okay.  You directly spoke with Dr. Zhang about

21   that.  When did you do that?

22       A.   On August 24.

23       Q.   When -- for what purpose did you discuss her

24   study with Dr. Zhang?

25       A.   Regarding another matter.

```
 1      Q.   A litigation matter?
 2      A.   Yes.
 3      Q.   Are you planning to testify in the Vosper case
 4  about what Dr. Zhang told you about her study?
 5      A.   No.
 6      Q.   Okay.  In that other litigation matter, have
 7  you been disclosed as an expert?
 8      A.   Yes.
 9      Q.   Have you already been deposed as an expert in
10  that matter?
11      A.   No.
12      Q.   Okay.  Going back to Dr. Zhang's study, she
13  also used case-control studies that had ever/never use
14  in her meta-analysis; right?
15      A.   Yes.
16      Q.   Okay.  And so at best her meta-analysis is a
17  mixed analysis of ever/never use and tertile use;
18  correct?
19      A.   Yes.  Tertiles based on exposure-days.
20  Correct.
21      Q.   Okay.  Now, going back to Mr. Vosper, I'm going
22  to mark as Exhibit 7 the Andreotti study.
23                          - - -
24           (Sawyer Exhibit 7, "Glyphosate Use and Cancer
25  Incidence in the Agricultural Health Study," Andreotti,
```

1   et al., 2018, was marked for identification.)

2                              - - -

3   BY MR. KALAS:

4       Q.   And that should have just populated into the

5   marked exhibits.  Let me know when you've called that

6   up, please.

7       A.   Okay.

8       Q.   Okay.  And Mr. Vosper, we've established now,

9   had 32 eight-hour days of exposure; right?

10      A.   Yes.

11      Q.   Okay.  And if we go to Supplementary Table 1

12  here in the Agricultural Health Study, Cancer Incidence

13  in Relation to Lifetime Days of Glyphosate Use; right?

14      A.   Correct.

15      Q.   Okay.  If we go down to NHL, which is on page

16  10 --

17      A.   Yes.  We've done this exercise many times,

18  John.  Yes.

19      Q.   Yes, we have, but it's different for every

20  plaintiff, so we're going to do it again.

21           Quartile 2, if you go down to the key, are

22  13.75 to 38.74 days; right?

23      A.   Yes.

24      Q.   Okay.  And 32 days would fit in there; right?

25      A.   Yes.

1     Q.   Okay.  For NHL Quartile 2, the relative risk

2  was .87, confidence interval .66 to 1.14; right?

3     A.   Yes.

4     Q.   Okay.  That's a null finding; correct?

5     A.   Yes.

6     Q.   Okay.  So for individuals who had 32

7  exposure-days in the Agricultural Health Study, they did

8  not see any increased risk for NHL based on those

9  exposure-days; right?

10     A.   Right.  Consistent with my report.  I stated

11  this was a null study.

12     Q.   Okay.  And, likewise, it's null for the

13  subtypes as well; right?

14     A.   Yes.

15     Q.   Okay.  We can move on from that.

16          Now, Mr. Vosper again would fit into the

17  greater than 10 days use in Eriksson; right?

18     A.   Yes.

19     Q.   Okay.  And that you talk about in your report

20  being statistically significant; fair?

21     A.   Yes.

22     Q.   Okay.  And so for individuals like Mr. Vosper,

23  in Eriksson, they did find an increased risk for NHL

24  based on his exposure-day metrics; right?

25     A.   Yes.

```
 1        Q.   Okay.  But you agree Eriksson, unlike the
 2   Agricultural Health Study, did not control for other
 3   pesticide exposures in those applicators; right?
 4        A.   Correct, but Pahwa did.
 5        Q.   Pahwa doesn't -- Pahwa doesn't pool the
 6   Eriksson data, does it?
 7        A.   No.
 8        Q.   Okay.  So just to be clear, Eriksson does not
 9   correct for other pesticide exposures in the applicators
10   in the dose metric Mr. Vosper fits in the way Andreotti
11   did; true?
12        A.   Correct.
13        Q.   Okay.  Now, for Mr. Vosper, we now have 32
14   eight-hour exposure-days over the course of 23 years;
15   right?
16        A.   Yes.
17        Q.   Okay.  And that is less than two eight-hour
18   exposure-days per year; right?
19        A.   No, there were years where he exceeded that.
20        Q.   Okay.  Well, we're going to go back to Table 4,
21   but let's start with the on average.  On average, 32
22   eight-hour exposure-days per year is less than two
23   eight-hour exposure-days per year; right?
24        A.   Yes, but he exceeded that number on certain
25   years.
```

1    Q.   Okay.  Well, let's go back to Table 4 and let's

2    find those years.  So if we go to Table 4 on page 32 --

3    let me know when you're there.

4    A.   I'm there.

5    Q.   Okay.  The only years that I can see on here

6    that he exceeded eight hours -- two eight-hour

7    exposure-days per year, so we would have had three

8    eight-hour exposure-days, was 2009 to 2010; is that

9    fair?

10   A.   Yes.

11   Q.   Okay.  So the only two -- so he had two years

12   with 3.2 eight-hour exposure-days; right?

13   A.   Right.

14   Q.   Okay.  And that's those two years immediately

15   before his NHL manifested; right?

16   A.   Right.

17   Q.   Okay.  And if we excluded those two years and

18   just looked at the 1986 to 2008 period, you would agree

19   with me there was no year where he exceeded two-hour

20   exposure-days -- or two eight-hour exposure-days -- is

21   that true? -- for that period?

22   A.   Yes.  However, it's possible you're

23   misinterpreting the study with respect to the

24   description of two eight-hour exposure-days.

25   Q.   What study am I talking about?

1      A.   Well, let me remind you that Eriksson

2   specifically stated eight-hour exposure-days because he

3   used the term a Swedish working day --

4      Q.   Okay.

5      A.   -- which in Sweden is eight hours.  McDuffie

6   did not specifically state whether it required a full

7   eight-hour period to get us to an exposure-day.

8      Q.   Okay.  I think you read again an implication in

9   my question.  And I wasn't asking about any study.  I'm

10  just asking about numbers here.  So if you can refocus

11  on my question, please.

12       You agree with me that from 1986 to 2008

13  Mr. Vosper did not have any year where he had three or

14  more eight-hour exposure-days; true?

15     A.   Correct.

16     Q.   Okay.  Now, you mentioned there the McDuffie

17  study.  And the McDuffie study was pooled into the Pahwa

18  study; right?

19     A.   Yes.

20     Q.   Okay.  And in the McDuffie and Pahwa studies,

21  for zero to less than or equal to two days of exposure

22  they did not find any statistically significant

23  relationship between NHL and glyphosate use; right?

24     A.   No, but as I recall, there was a

25  significantly -- not significantly -- an increased risk

1    ratio that was not significant at the 95 percentile

2    level of confidence; and as you know, toxicologists and

3    scientists don't close their eyes to that information.

4    It's still part of the assessment.

5        Q.   I'm not sure if that's true, actually,

6    Dr. Sawyer, and, you know, we've certainly looked at

7    this study many times, but I think you're actually

8    misremembering it, so let's mark it.  I'm going to mark

9    as Exhibit 8 the McDuffie study.

10                        - - -

11            (Sawyer Exhibit 8, "Non-Hodgkin's Lymphoma and

12    Specific Pesticide Exposures in Men: Cross-Canada Study

13    of Pesticides and Health," McDuffie, et al., 2001, was

14    marked for identification.)

15                        - - -

16   BY MR. KALAS:

17        Q.   If you'd go to Table 8, please, when you get

18    that open.

19            Do you have it open, sir?

20        A.   Yes.

21        Q.   Do you see Table 8, which is the days per year

22    metric table?

23        A.   I do.

24        Q.   Okay.  And for the 0 to less than or equal to 2

25    days group, they actually had an odds ratio of 1.00;

William R. Sawyer, Ph.D.

1    right?

2        A.   Right, but greater than 2 is --

3        Q.   Greater than -- yeah, but we were talking about

4    that 0 to 2 group, remember?  And you said it was

5    elevated?

6        A.   Yeah, let me check another table.  I thought it

7    was.

8        Q.   Okay.  Go ahead and check real quick, but if

9    you don't find it, I want to come back to this.

10       A.   Okay.  No, that's correct.

11       Q.   Okay.  So let me reask the question just so we

12   have a clear record here.  You agree with me that for

13   the 0 to equal to or less than 2 days a year group they

14   did not find any elevated risk for NHL in the McDuffie

15   study; right?

16       A.   Correct.

17       Q.   Okay.  And for the greater than 2 day a year

18   risk group, they did; fair?

19       A.   Yes.

20       Q.   Okay.  And, again, like Eriksson, that's not --

21   that number's not controlled for other pesticides;

22   right?

23       A.   Correct.

24       Q.   Okay.  Now, if -- I want to really focus on

25   Mr. Vosper here in that 1986 to 2008 time period.  If

William R. Sawyer, Ph.D.

1  Mr. Vosper had one year in that time period or any

2  plaintiff had one year in that time period with greater

3  than two days a year -- well, strike that.  Let me ask

4  it a different way.

5         If you had a plaintiff you were dealing with

6  who had one year with greater than two days a year and

7  that was all you had, would you say they were at an

8  increased risk of NHL from glyphosate exposure?

9      A.   If that were the only study in existence, I

10  would not draw that conclusion.

11     Q.   Okay.  Well, what if you had a plaintiff who

12  had three years with three days a year of exposure to

13  glyphosate and that was all they had?  So they had nine

14  total days.  Would you say that plaintiff was at

15  increased risk of glyphosate -- or increased risk of NHL

16  from glyphosate exposure?

17     A.   In this case, I would, because exposure started

18  at nine years, and multiple studies and even the EPA

19  document on early-life exposures reveals typically at

20  least a 2.6-fold adjustment for susceptibility for

21  children.  So if you were talking specifically about

22  this man, the childhood exposure starting at age nine,

23  that factor would have to be considered.

24     Q.   Okay.  So I want to make sure I understand

25  that.  You would -- because somebody with three days a

1    year for three years would have nine total days of

2    exposure.  We agree on that; right?

3        A.   Yes.

4        Q.   Okay.  And they would be then not fitting into

5    the Eriksson statistically significant increased group;

6    right?

7        A.   Well, they would if they started spraying at

8    nine, age nine, yes.

9        Q.   But I'm not asking about -- I'm trying to

10   understand your methodology here, because right now as

11   I -- I may interpret the exposure-days for Mr. LaBletta

12   different than you, but I want to understand the

13   methodology and how he would fit into it.

14            If Mr. LaBletta did -- excuse me.  Mr. Vosper.

15   Sorry, Christian.

16            If Mr. Vosper exceeded the McDuffie data for

17   greater than two days a year of use but did not exceed

18   the Eriksson data of 10 days lifetime, could you opine

19   to a reasonable degree of toxicological certainty that

20   Roundup caused his NHL?

21       A.   Yes.

22       Q.   Okay.  Why?

23       A.   Because he had -- would have exceeded the

24   McDuffie study and would have had -- would have exceeded

25   the dose requirements in several other studies.

William R. Sawyer, Ph.D.

```
1        Q.   Well, what other studies --

2        A.   The McDuffie study places him at a 2.2 -- I

3   think it's approximately a 2.12 odds ratio that is

4   statistically significant, and he would have also

5   exceeded all of the other study metrics except for the

6   most demanding Eriksson metric that would be greater

7   than 10 days.

8        Q.   Okay.  Well, I'm not sure if I understand that.

9   What other study would he exceed in that hypothetical?

10  Because just -- we can walk through them, but Leon's

11  ever/never; right?  So there's no dose metric you're

12  reporting there in your report?

13       A.   Well, it is a dose -- there is a dose metric in

14  Leon.  It's based upon studies that included

15  exposure-day requirements.

16       Q.   Well, I think that study speaks for itself and

17  your Table 6 speaks for itself.  You have ever use as

18  your metric for dose in Table 6 in Leon; right?

19       A.   Yes.

20       Q.   Okay.  So the dose he exceeds in Leon would be

21  ever use; fair?

22       A.   No, because the studies require him to exceed

23  an exposure-day.  You have to have an exposure-day.

24       Q.   So now we're down to one exposure-day is

25  enough?
```

William R. Sawyer, Ph.D.

1    A.    Not by itself.  You have to look at all the

2    studies as a whole, not just one.

3    Q.    Let me ask you this:  If you had somebody

4    who -- let's flip what I was asking you about.  If you

5    had somebody who exceeded 10 days a year in Eriksson but

6    never exceeded greater than two days a year in McDuffie,

7    could you opine to a reasonable degree of toxicological

8    certainty that Roundup caused their NHL?

9    A.    Not based just on one study, no.

10   Q.    Okay.  If you had somebody -- and this is true

11   of a lot of Mr. Vosper's years in here.  If you had

12   somebody who had been exposed one hour a year per year

13   or two hours a year per year, but it was over five

14   years, could you opine that their NHL was caused by

15   their glyphosate exposure, if that's all you had, based

16   just on the epi?

17   A.    Can you simplify that?  I don't --

18   Q.    Sure.  You have the six epi studies listed in

19   Table 6, and now, because of your answer on Leon, I'm

20   asking this question because I'm not sure if I

21   understand:

22         The person I'm asking about now is only exposed

23   one hour a year over the course of five years.  Okay?

24   And so they don't fit into McDuffie for greater than two

25   days a year, they don't fit into Eriksson for greater

1   than 10 days, but they would, under the metrics of Leon

2   and Zhang, fit in, could you opine that person's NHL was

3   caused by glyphosate exposure?

4       A.   Well, considering Leon was a pooled analysis

5   of, I think, about 300,000 individuals and the Zhang

6   study used, I think, about six different studies --

7   Pahwa as well used multiple studies -- there's probably

8   sufficient evidence there to conclude an increased risk

9   ratio under those circumstances, yes.

10      Q.   For one hour a year over five years.  How about

11  one hour a year in one year?  Would that be enough?

12      A.   No, that would not meet the requirements of

13  Pahwa; and Pahwa is an important study that considered

14  despeciation of just glyphosate.

15      Q.   So I don't understand how -- I don't understand

16  how that doesn't meet Pahwa.  Well, I do understand how

17  it doesn't meet Pahwa.  It doesn't meet Pahwa, McDuffie,

18  or Eriksson.

19           My question is:  Based on your testimony about

20  Zhang and Leon, would one hour a year in one year be

21  enough for you to opine somebody was at an increased

22  risk of NHL from exposure?

23      A.   Can you repeat that?

24      Q.   Yeah.  Based -- so I understand one hour a year

25  over one year does not meet McDuffie, doesn't meet

William R. Sawyer, Ph.D.

1    Eriksson, doesn't meet Pahwa, but I'm confused about

2    your Zhang and Leon testimony.

3            And so based on Zhang and Leon, would somebody

4    who's only been exposed one hour in their life over one

5    year be enough for you to opine their NHL was caused by

6    glyphosate exposure?

7        A.    No.

8        Q.    Okay.  So what is the cutoff between one hour

9    over one year and one hour over five years?  What do you

10   need to see?

11       A.    Well, the Pahwa case-control study along with

12   the meta-analyses of Leon and Zhang provide sufficient

13   evidence.

14       Q.    But I really don't understand what you mean

15   when you say that, because -- and I'm not trying to

16   argue with you here, but Pahwa -- and I'll mark it so

17   you can look at it.

18                         - - -

19            (Sawyer Exhibit 9, "Glyphosate Use and

20   Associations with Non-Hodgkin Lymphoma Major

21   Histological Sub-Types: Findings from the North American

22   Pooled Project," Pahwa, et al., was marked for

23   identification.)

24                         - - -

25            ///

William R. Sawyer, Ph.D.

1    BY MR. KALAS:

2       Q.   Okay.  I marked Pahwa as Exhibit 9.  Pahwa,

3    like McDuffie, because it's pooling the McDuffie data,

4    finds an increased risk for NHL overall with greater

5    than two days a year of glyphosate use; right?  That's

6    Table 4.

7       A.   Okay.

8       Q.   Okay.  So Pahwa has that dose metric that

9    McDuffie has.  And so you stated earlier in your

10   testimony that somebody who applied one hour a day for

11   five years would be at an increased risk for NHL, in

12   your opinion, based on Zhang and Leon, but when I came

13   back to --

14      A.   Can you repeat that, please?

15      Q.   Yeah.  If somebody was exposed one day a year

16   over five years, so -- or excuse me -- one hour a year

17   over five years, so one hour in 2006, one hour in 2007,

18   2008, 2009, 2010, five years, in your opinion, would

19   that person be at an increased risk of NHL based on the

20   epi you've reviewed?

21      A.   So you're saying, instead of five days, five

22   hours?

23      Q.   Yeah, it's one hour a year over the course of

24   five years.

25      A.   I don't know.  I've never really considered

1    that.  That's a very low number and I would have to -- I

2    think I'd really have to discuss that with an

3    epidemiologist or even Dr. Weisenburger.

4        Q.   Okay.

5        A.   Or -- I could completely defer that question to

6    Dr. Weisenburger.  I think he's involved in this case,

7    isn't he?

8        Q.   I don't -- I don't know, actually.

9        A.   He's not an expert in this current one?

10       Q.   Christian can answer that.  I'm not deposing

11   him in this one, I'll tell you that.

12            MR. LABLETTA:  Weisenburger is listed.  It's

13       okay.

14            MR. KALAS:  Okay.  Sorry.  Anyway.  So --

15            MR. LABLETTA:  I believe he's listed.

16            MR. KALAS:  Okay.

17   BY MR. KALAS:

18       Q.   So you'll defer on that issue.  That's fine.

19       A.   Yeah, I think that's appropriate.  He would

20   certainly have a much better handle on the internal

21   design of the analysis than I.

22       Q.   Am I correct that for you to have the most

23   confidence in your opinion you would like to see greater

24   than two days a year of exposure in a plaintiff and

25   greater than 10 days lifetime in a plaintiff based on

1    the available epi?

2            MR. LABLETTA:  Objection to the form.

3        A.   Well, I don't understand the how I "would like

4    to" part.  What I've stated is that is the most

5    demanding dose metric.

6        Q.   Those two things?

7        A.   Being in -- being in excess of the thresholds

8    of all five studies.  Obviously, the threshold on the

9    Agricultural Health Study is a null study, so -- but

10   being above the threshold of the other five studies, I

11   think, is the approach that I have taken as it is the

12   most challenging and conservative approach in making

13   this assessment.

14       Q.   Okay.  And if you're dealing with a plaintiff

15   who exceeds the threshold in some of the studies but not

16   all of the studies, how do you deal with that?

17       A.   Well, if the three studies were exceeded --

18   when I say "the three studies," Pahwa, Zhang, and

19   Leon --

20       Q.   You're forgetting Eriksson, aren't you?

21       A.   Well, Eriksson with respect to being between

22   greater or equal to one day and less than 10 days, but

23   not above 10 days.

24       Q.   Okay.

25       A.   You're asking me a different question.

1    Q.   I want to make sure you're answering the

2    question that I'm asking, because I know -- I know we

3    want to move on to something else here.

4         If you are dealing with a plaintiff who exceeds

5    the day metric in Eriksson but not in Pahwa, or vice

6    versa, exceeds it in Pahwa but not in Eriksson, how do

7    you deal with that as a toxicologist?

8    A.   Well, if all three studies -- Leon, Zhang, and

9    Pahwa -- were exceeded, that involves a massive pool of

10   participants with a very low probability of a Type 1

11   error, that is, Type 1 error in biostatistics is when

12   one finds causation and it's not really there, that is,

13   finding a change and it's not really there, those three

14   studies are very powerful in supporting the findings.

15        So you're asking me if -- I think, if I

16   understand your question, if those three studies --

17   Leon, Zhang, and Pahwa -- were exceeded, how would I

18   interpret that.

19   Q.   No, that's not what I'm asking.

20   A.   No.  Okay.

21   Q.   Okay.  What I'm asking is:  You have -- you

22   have Pahwa, which is a -- which is an updated McDuffie,

23   and you have Eriksson; right?  Those are the two

24   exposure-day studies that show an increased risk.  Agree

25   with me so far?

```
 1        A.   No.  There's also McDuffie and --

 2        Q.   Right.  McDuffie and Pahwa is the same data;

 3   right?  Pahwa is a pooled study including McDuffie and

 4   De Roos 2003; right?

 5        A.   Yes, but it's not the same study.

 6        Q.   Okay.  I'm just focusing on the two-day metrics

 7   you talk about in your report.  You have greater than

 8   two days of use and 10 days lifetime use, and the

 9   greater than two days of use is pooled from McDuffie and

10   Pahwa; right?

11        A.   Yes.

12        Q.   Okay.  And the greater than 10 days of use is

13   pooled from Eriksson; right?

14        A.   Yes.

15        Q.   Okay.  And if you have a plaintiff that exceeds

16   the 10 days of use in Eriksson but does not exceed the

17   greater than two days of use in McDuffie/Pahwa, how do

18   you deal with that?

19        A.   From a toxicological standpoint, I would put

20   less weight on the requirement of two days in a given

21   year, because that is what we call an acute exposure,

22   and toxicological analyses of carcinogenesis cumulative

23   exposures are far more important than single acute

24   exposures.

25        Q.   Okay.  So then let me ask the inverse, because
```

William R. Sawyer, Ph.D.

```
 1    I think, based on that, I know what your answer's going
 2    to be, but I want to make sure.
 3           If you have somebody who exceeds the greater
 4    than two days of use metric in McDuffie/Pahwa but does
 5    not exceed the 10 days lifetime use metric in Eriksson,
 6    how do you deal with that as a toxicologist?
 7      A.   I would then consider the Leon, Zhang, and
 8    Pahwa data and base my opinion on that.  However, I
 9    think, with respect to Leon, Zhang, and the Pahwa
10    studies, that question should best be answered by
11    Dr. Weisenburger --
12      Q.   Okay.
13      A.   -- who has much better knowledge on the
14    internal design operations of the meta-analyses.
15      Q.   All right.  Let's go back to Mr. Vosper for a
16    few more questions and we'll wrap up.
17           Mr. Vosper was exposed to livestock while
18    living at         ; true?
19      A.   Yes.
20      Q.   Specifically cattle?
21      A.   Yes, but I specifically asked him if he ever
22    had handled the pesticide rope for the livestock, and he
23    said no, he never -- his father handled the pesticide
24    rope.  He saw it.  In fact, I believe he said that that
25    practice was abandoned, and I forgot what point in time,
```

1   but when he was very young he did see his father with

2   the pesticide rope hanging.

3        Q.   You're aware, of course, that there are

4   multiple studies in the peer-reviewed literature that

5   show statistically significant increased risk for NHL

6   from living around livestock?  Are you aware of that?

7        A.   Right, but that's not from hearing them mooing

8   out the window.  It's from -- it's been postulated that

9   is from handling the pesticides and the pesticide rope.

10       Q.   Okay.  My question was not about the mechanism

11  by which the cancer occurs.  My question was whether or

12  not there are multiple peer-reviewed studies in the

13  literature which show statistically significant

14  increased risk for NHL from living around livestock.

15  Are there or aren't there?

16       A.   Yes.  And farmers also, who have livestock,

17  very often use Roundup.

18       Q.   Okay.

19       A.   So there's confounding factors in that study.

20  Well, the studies you're pointing to, I think one of

21  them came out of South Carolina, as I recall, but the

22  confounding factors are enormous in those studies.

23       Q.   That's a good point, Dr. Sawyer.  Did the

24  McDuffie study account for livestock handling with the

25  greater than two years of use -- or two days a year of

William R. Sawyer, Ph.D.

```
1    use?

2         A.   It did in the sense that it determined what

3    pesticides/herbicides were used.

4         Q.   Okay.  Did the Eriksson study account for

5    livestock handling?

6         A.   Not for the animals, but the pesticide, it did.

7         Q.   Okay.  And if the pesticide wasn't causing NHL

8    from being around livestock but instead an airborne

9    disease given off by the animals were causing NHL, the

10   pesticide rope would have nothing to do with that; true?

11        A.   Right, but there's no credible evidence of any

12   magic air emissions coming from the cattle that causes

13   NHL.

14        Q.   If that's your opinion, that's fine.  The

15   studies will speak for themselves.

16             Now, I'm correct that you're deferring on any

17   genetic predisposition to Dr. Boyd; right?

18        A.   Yes.

19        Q.   Okay.  But Mr. Vosper's family does have a

20   history of lymphatic cancer; right?

21        A.   Let me check.  I think the ███████ who used --

22   also used Roundup, also developed NHL.  Let me just

23   check.

24             Yeah.  She actually had ALL, a hematopoietic

25   malignancy.  She also, as per Mr. Vosper, noted that she
```

```
 1   loved to landscape and use Roundup on the farm.  So

 2   there's a confounding factor there.

 3       Q.   Okay.  My question wasn't about that.  So I'll

 4   be more specific.  Mr. Vosper's       was diagnosed

 5   with ALL in 2008; right?

 6       A.   Yes, a hematopoietic malignancy, and she also

 7   was a Roundup user.

 8       Q.   Okay.  Dr. Sawyer, Mr. Vosper's ████ was

 9   diagnosed with ALL in 2008; right?  I'm not asking about

10   whether it was a hematopoietic malignancy.  I'm not

11   asking about Roundup use.

12           Was Mr. Vosper's ████ diagnosed with ALL in

13   2008?

14       A.   Yes; however, she was also a Roundup user.

15       Q.   Okay.  Have you made a causation analysis of

16   Mr. Vosper's ████

17       A.   No.  I'm pointing out that there is a

18   confounding factor present; and to ignore it would be

19   shady.

20       Q.   Shady.  Okay.  I think that that's an

21   implication from you, sir, but let's go back to

22   Mr. Vosper's ████

23           What is her genetic history?  Did her ████

24   have ALL or NHL?

25       A.   Neither.
```

```
 1       Q.   Did her [REDACTED] have NHL or ALL?

 2       A.   No.

 3       Q.   How do you know?  How do you know what

 4   Mr. Vosper's [REDACTED] -- how do you know what

 5   Mr. Vosper's [REDACTED] had?  Did you ask him?

 6       A.   Okay.  First of all, the studies only concern

 7   themselves with first-generation.  However, I have

 8   included beyond that, in Table 2, [REDACTED]

 9       Q.   [REDACTED] I'm asking about

10   Mrs. Vosper, Mr. Vosper's [REDACTED] I'm asking about her

11   medical history.  Did she have a lineage of lymphatic

12   cancer in siblings?

13       A.   Not that Mr. Vosper is aware of.  No.

14       Q.   Okay.  But you didn't ask her, because she has,

15   unfortunately, passed away; right?

16       A.   Correct.

17       Q.   And you didn't ask her whether she fit your

18   criteria for NHL -- excuse me -- lymphatic cancer

19   causation from Roundup use, because you couldn't

20   interview her; right?

21       A.   I didn't draw any conclusion on causation.

22       Q.   Okay.

23       A.   I stated that there is a possible confounding

24   factor there since she was a Roundup user.

25       Q.   Mr. Vosper's uncle also had NHL; right?
```

1    A.   Yes.  However, he is not, obviously, a

2   first-generation relative.

3    Q.   Okay.  And Mr. Vosper's ████████ had

4   melanoma; right?

5    A.   Yes.  And about 50 percent of all living

6   individuals by the time they reach old age will have had

7   some type of malignancy if you include basal cell

8   carcinoma.  So it's not unusual that he had melanoma.

9        That's -- you know, if we look at -- if we go

10   back and start looking at aunts, uncles, grandparents,

11   great-grandparents, of course we're going to find some

12   cancer.  That's expected.

13    Q.   It is accurate to say Mr. Vosper has a family

14   history of hematopoietic cancer.  Is that an accurate

15   statement?

16    A.   With respect to first-generation relatives, it

17   is.  However, that first-generation relative used

18   Roundup.

19    Q.   You don't know if that first-generation

20   relative used enough Roundup to cause their

21   hematopoietic cancer; right?  You're not offering an

22   expert opinion on that?

23    A.   No, I'm stating that there is a possible

24   confounding factor there that should be disclosed; and

25   if not, it is shady.

William R. Sawyer, Ph.D.

```
1        Q.   Did that first-degree relative have significant

2   exposure to benzene?

3        A.   That's not the question.  The question was

4   regarding NHL and --

5        Q.   No, that relative had ALL, sir.

6        A.   ALL.  Sorry.

7        Q.   Okay?  And benzene exposure has been associated

8   with ALL; true?

9        A.   Yes.

10       Q.   Okay.  Did that first-degree relative have

11  exposure to benzene that could have caused her ALL?

12       A.   It's possible.

13       Q.   You don't know; right?  You're just throwing

14  out potential hypotheticals that you don't know to a

15  reasonable degree of toxicological certainty whether or

16  not she had exposure to; right?

17       A.   What I do know is you're trying to generate a

18  motion argument to throw her Monsanto Roundup use under

19  the rug, and that's not right.  It should be presented

20  to the jury that although she did develop NHL in her

21  lifetime, she was also exposed to Roundup, and that is a

22  potential confounding factor; and to hide that is not

23  right.

24       Q.   ALL, sir.  ALL.

25       A.   I'm sorry.  ALL.  Yes.
```

1      Q.   Okay.  What study of users of Roundup -- users

2   of Roundup -- have shown an increased risk for ALL from

3   using Roundup?  What epidemiological study?

4      A.   Well, the Agricultural Health Study found a

5   highly significant increase of AML, which is a leukemia.

6      Q.   Okay.  I asked about ALL; right?  Do you

7   remember that?

8      A.   Yes.  I think the Parks study showed a

9   significant statistically increased rate of ALL.

10      Q.   The Parks study is not in users; right?  It's

11   in people living around spraying areas; isn't that true?

12      A.   Based on distance, they found a statistically

13   significant dose-response relationship based upon the

14   number of meters the person resided from the application

15   field.

16      Q.   Right.  And that study didn't control for other

17   pesticides that somebody was exposed to also living near

18   that field; right?  Didn't control for the dicamba

19   exposure, or the 2,4-D exposure, or the chlorpyrifos

20   exposure; right?

21      A.   Correct.

22      Q.   Okay.  So what study shows an increased risk,

23   statistically significant, for ALL in applicators of

24   Roundup?

25      A.   Only the leukemia studies that I just

William R. Sawyer, Ph.D.

1  mentioned.  Parks and --

2      Q.   Okay.  And Parks is not in applicators?

3      A.   Parks and Agricultural Health Study.

4      Q.   Parks is not in applicators; true?

5      A.   No, but that doesn't dismiss the study

6  evidence.  That's ridiculous.

7      Q.   Okay.  AHS did not show an increased risk for

8  ALL, that specific disease; true?

9      A.   No, but AML, it did.

10     Q.   Okay.  Now, I mentioned the ████ before.  And

11 the uncle, Mr. Rogers, is actually a plaintiff in

12 Roundup lawsuits as well, isn't he?

13     A.   Yes, he has also been exposed to Roundup.

14     Q.   Okay.  And he has a financial interest in

15 exaggerating his use in the PFS that you looked at;

16 right?

17          MR. LABLETTA:  Objection.  With respect to

18     Mr. Vosper or Mr. Rogers?

19          MR. KALAS:  Mr. Rogers.

20          MR. LABLETTA:  Yeah, I'll object.  I'll object

21     to that question.

22          MR. KALAS:  Okay.

23     A.   I have no way to evaluate that.  I believe that

24 would be best for the jury to decide and you're

25 misplacing my duties as a toxicologist.

William R. Sawyer, Ph.D.

1      Q.   Well, you didn't call Mr. Rogers to find out

2   how much he applied Roundup; right?

3      A.   No, but I am identifying potential confounding

4   factors.  I'm not doing a -- I've not been asked to

5   perform a causation analysis on Mr. Vosper's uncle.

6   That's going well beyond the scope of my work in this

7   matter.

8      Q.   Right.

9      A.   I'm pointing out other potential confounding

10   factors, and these are --

11      Q.   Let's -- go ahead.

12      A.   -- these are potential confounding factors that

13   ultimately Dr. Boyd will decide using his abilities as a

14   physician and oncologist using a differential diagnosis

15   methodology.  So I again think you're misplacing me into

16   a role that other experts in this case are handling.

17      Q.   Okay.  You made a good point there, and I think

18   it's only fair.  You did not conduct the same sort of

19   searching, in-depth toxicological causation analysis for

20   Mr. Vosper's ████ or uncle that you did for

21   Mr. Vosper; right?

22      A.   Correct.  I'm only pointing out the potential

23   confounding factor of them both using Roundup.

24      Q.   Okay.  Now -- I got it.  We know for many of

25   the epidemiological studies that you cite in your report

William R. Sawyer, Ph.D.

1  having a first-degree relative with cancer can lead to a

2  statistically significant risk of NHL; right?

3      A.   I didn't quite follow.

4      Q.   Okay.  We know from the epi studies you cite in

5  your report that having a first-degree relative with

6  cancer can lead to a statistically significant increased

7  risk of NHL; true?

8      A.   That's correct.

9      Q.   Okay.  And we know that having a first-degree

10  relative with hematopoietic cancer more than doubles the

11  risk of NHL; true?

12      A.   Correct, but, again, one has to take into

13  consideration -- and that would be Dr. Boyd in this

14  case -- the fact that that individual was also a Roundup

15  user, which may potentially void that relationship.

16      Q.   Okay.  Sitting here today, based on the family

17  history of hematopoietic cancer, living around

18  livestock, can you state to a reasonable degree of

19  scientific or toxicological certainty that Mr. Vosper's

20  Roundup use was his most significant risk factor for

21  NHL?  Or will you defer that to Dr. Boyd?

22      A.   Well, I can state to toxicological certainty

23  that certainly his Roundup use was a substantial

24  contributing risk factor.  That would be in addition to

25  any other underlying risk factors.

William R. Sawyer, Ph.D.

```
 1       Q.   Right.  And my question was a little different.

 2   And I appreciate the answer, "substantial contributing

 3   risk factor."

 4            My question was a little different.  Was it the

 5   most substantial contributing risk factor?

 6       A.   I will defer that to Barry Boyd, because I

 7   think at that point you're asking for a final causation

 8   analysis.

 9       Q.   Okay.  Can you state to a reasonable degree of

10   toxicological certainty Mr. Vosper would not have gotten

11   NHL if he never used Roundup?

12            MR. LABLETTA:  Objection to the form.

13       A.   No.  I can state that his risk would have been

14   substantially, significantly lower.  That's for certain

15   based upon the studies and his exposure analysis.

16       Q.   Okay.  Last question before I turn it over to

17   Mr. LaBletta.  There's a bunch of textbooks behind you

18   there.  I see Environmental Forensics, Forensic

19   Toxicological Medical Examiners, Journal of Forensic

20   Sciences, some PDRs, and some other books.

21            I know you have a screen behind you, like a --

22   like a background, but are you familiar with that book

23   shelf I'm talking about?

24       A.   That is my office you're looking at.

25       Q.   Okay.
```

```
 1        A.   It's not -- let me explain.  When I tried to

 2   start the deposition today, there was some kind of blur

 3   problem --

 4        Q.   Right.

 5        A.   -- and so I switched on to my photo of my

 6   office.

 7        Q.   Right.

 8        A.   I could turn my camera to the other position

 9   right now and move the camera and show you that

10   position.  That is my office you're looking at.

11        Q.   No, I believe it's your office.  It's a

12   picture.

13        A.   But that was my office, picture of my office,

14   when COVID started, and since then I've been using,

15   rather than a photo, my actual live office.  But for

16   some reason today as we were getting an in-and-out blur,

17   so I switched to the photo.

18        Q.   Okay.  Just a question about those textbooks.

19   Do any of those textbooks up there behind you in that

20   photo or from your office that you had pre-COVID, do any

21   of them state that glyphosate causes NHL?

22        A.   I don't know that I have any textbooks that are

23   up to date enough.  Probably not, because -- let's see

24   what we have.

25        Q.   Reaching behind the picture.
```

1    A.    Yeah, I'm reaching and looking at my various

2    textbooks.  And I don't think I have anything in

3    textbook form that's actually recent enough to address

4    that issue.  When I say "recent enough," post the World

5    Health Organization determination date.

6    Q.    Okay.  Are you aware of a textbook used by

7    toxicologists that lists glyphosate as a carcinogen?

8    A.    Well, if you're speaking with respect to a

9    Casarett & Doull Toxicology, I don't have anything post

10   2016 from Casarett & Doull.

11   Q.    Well, I asked about awareness.

12   A.    I'm sorry?

13   Q.    I asked you about your awareness, not about

14   what you had.  Are you aware of any textbook, a

15   toxicology textbook, that lists glyphosate as a

16   carcinogen?

17   A.    I haven't looked.

18         MR. KALAS:  Okay.  I don't have any further

19         questions, unless Mr. LaBletta does.

20         MR. LABLETTA:  I don't have any questions.

21         MR. KALAS:  All right.  Then we are done for

22         the day.  Thank you, Dr. Sawyer.

23         THE WITNESS:  Okay.  Review and sign.

24         MR. KALAS:  Okay.

25         MR. LABLETTA:  Yeah, read and sign.

William R. Sawyer, Ph.D.

```
 1              MR. KALAS:  Good to see you, sir.

 2              THE VIDEOGRAPHER:  We are now going off the

 3        video record.  The time is currently 11:46 a.m.

 4              (Whereupon, the deposition concluded at

 5      11:46 a.m.)

 6

 7

 8

 9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

William R. Sawyer, Ph.D.

```
 1               C E R T I F I C A T E

 2

 3          I, Joan L. Pitt, Registered Merit Reporter,

 4    Certified Realtime Reporter, and Florida Professional

 5    Reporter, do hereby certify that the witness named

 6    herein appeared remotely via videoconference on

 7    August 30, 2021, and was duly sworn.

 8          I FURTHER CERTIFY that I was authorized to and

 9    did stenographically report the examination of the

10    witness named herein; that a review of the transcript

11    was requested; and that the foregoing transcript is a

12    true record of my stenographic notes.

13          I FURTHER CERTIFY that I am not related to or

14    an employee of any of the parties, nor am I related to

15    or an employee of any of the parties' attorneys or

16    counsel connected with this action, nor am I financially

17    interested in the outcome of this action.

18          WITNESS my hand this September 1, 2021.

19

20          Joan L. Pitt, RMR, CRR, FPR

21

22

23

24

25
```

William R. Sawyer, Ph.D.

1                    INSTRUCTIONS TO WITNESS

2

3

4            Please read your deposition over carefully and

5    make any necessary corrections.  You should state the

6    reason in the appropriate space on the errata sheet for

7    any corrections that are made.

8

9            After doing so, please sign the errata sheet

10   and date it.  It will be attached to your deposition.

11

12           It is imperative that you return the original

13   errata sheet to the deposing attorney within thirty (30)

14   days of receipt of the deposition transcript by you.  If

15   you fail to do so, the deposition transcript may be

16   deemed to be accurate and may be used in court.

17

18

19

20

21

22

23

24

25

William R. Sawyer, Ph.D.

```
 1                    - - - - - -

 2                  E R R A T A

 3                    - - - - - -

 4    PAGE    LINE    CHANGE

 5    _____   _____   _____

 6      REASON: _____

 7    _____   _____   _____

 8      REASON: _____

 9    _____   _____   _____

10      REASON: _____

11    _____   _____   _____

12      REASON: _____

13    _____   _____   _____

14      REASON: _____

15    _____   _____   _____

16      REASON: _____

17    _____   _____   _____

18      REASON: _____

19    _____   _____   _____

20      REASON: _____

21    _____   _____   _____

22      REASON: _____

23    _____   _____   _____

24      REASON: _____

25
```

William R. Sawyer, Ph.D.

1                 ACKNOWLEDGMENT OF DEPONENT

2

3        I, _____, do hereby

4   acknowledge that I have read the foregoing pages,

5   1 - 104, and that the same is a correct transcription of

6   the answers given by me to the questions therein

7   propounded, except for the corrections or changes in

8   form or substance, if any, noted in the attached Errata

9   Sheet.

10

11

12   _____   _____

13   WILLIAM R. SAWYER, PhD              DATE

14

15

16

17

18   Subscribed and sworn to before me this

19   ____ day of _____, 20___.

20   My Commission expires: _____

21

22   _____

     Notary Public

23

24

25

William R. Sawyer, Ph.D.

```
 1                    LAWYER'S NOTES

 2   PAGE   LINE

 3   _____  _____   _____

 4   _____  _____   _____

 5   _____  _____   _____

 6   _____  _____   _____

 7   _____  _____   _____

 8   _____  _____   _____

 9   _____  _____   _____

10   _____  _____   _____

11   _____  _____   _____

12   _____  _____   _____

13   _____  _____   _____

14   _____  _____   _____

15   _____  _____   _____

16   _____  _____   _____

17   _____  _____   _____

18   _____  _____   _____

19   _____  _____   _____

20   _____  _____   _____

21   _____  _____   _____

22   _____  _____   _____

23   _____  _____   _____

24   _____  _____   _____

25
```