# EXHIBIT 6

1                    UNITED STATES DISTRICT COURT

                    NORTHERN DISTRICT OF CALIFORNIA

2

     --------------------------------§

3    IN RE:  ROUNDUP PRODUCTS          § MDL No. 2741

     LIABILITY LITIGATION              §

4    _____ §

                                       §

5    This document relates to:         §

                                       §

6    Chapman v. Monsanto Co.,          §

     Case No. 3:20-cv-01277-VC         §

7    -------------------------------- §

8

9                          - - -

10                      August 25, 2021

11                          - - -

12

13

14

15          This is the Remote Videotaped Deposition of

16     WILLIAM SAWYER, Ph.D., commencing at 8:05 a.m., EDT,

17     on the above date, before Kelly J. Lawton,

18     Registered Professional Reporter, Certified Court

19     Reporter, and Licensed Court Reporter.

20                          - - -

21              GOLKOW LITIGATION SERVICES

22          877.370.3377 ph | 917.591.5672 fax

23                   deps@golkow.com

24

25

```
 1    APPEARANCES VIA REMOTE COUNSEL/ZOOM TECHNOLOGY:

 2    GOLDBERG & OSBORNE LLP

 3    BY:  DAVID J. DIAMOND, ESQUIRE

 4         ddiamond@goldbergandosborne.com

 5    698 East Wetmore Road, Suite 200

 6    Tucson, Arizona 85705

 7    Phone:  (520) 620-3975

 8    Representing the Plaintiff

 9

10

11

12    NELSON MULLINS RILEY & SCARBOROUGH LLP

13    BY:  MICHAEL W. HOGUE, ESQUIRE

14         michael.hogue@nelsonmullins.com

15    1320 Main Street, 17th Floor

16    Columbia, South Carolina 29201

17    Phone:  (803) 255-9514

18    Representing Defendant Monsanto

19

20

21

22  ALSO PRESENT:

23    JACQUETTA JONES, Videographer

24

25
```

William R. Sawyer, Ph.D.

```
 1                        - - -
 2                     I N D E X
 3                        - - -
 4   Testimony of:  WILLIAM SAWYER, Ph.D.          PAGE
 5        DIRECT EXAMINATION BY MR. HOGUE............  6
 6
 7
 8                  E X H I B I T S
 9              (Attached to transcript)
10   WILLIAM SAWYER, Ph.D., DEPOSITION EXHIBITS     PAGE
11   Exhibit 1     Defendant Monsanto Company'S First    6
                   Amended Notice of Videotaped
12                 Deposition of William Sawyer, Ph.D.
13   Exhibit 2     Expert Report                         7
14   Exhibit 3     Curriculum Vitae                      7
                   William R. Sawyer, Ph.D.
15
     Exhibit 4     William R. Sawyer, Ph.D.              7
16                 Trials and Depositions - Past Four
                   Years
17
     Exhibit 5     August 9, 2021 Invoice for           20
18                 Professional Services
19   Exhibit 6     August 9, 2021 Letter Regarding      22
                   Invoice for Services
20
     Exhibit 7     July 12, 2021 - Invoice #11590       45
21                 in reference to Stephens v.
                   Monsanto
22
     Exhibit 8     MSD - Glyphosate Centrifuge Feed     57
23                 MONGLY 00052410 through 52413
24   Exhibit 9     Sawyer Invoices Summary              71
25
```

```
 1                     E X H I B I T S
 2                 (Attached to transcript)
 3     WILLIAM SAWYER, Ph.D., DEPOSITION EXHIBITS        PAGE
 4     Exhibit 10    William R. Sawyer, Ph.D.              74
                     Trials and Depositions - Past Three
 5                   Years
                     Exhibit 20 from 2/26/2018
 6
       Exhibit 11    May 11, 2021 Invoice in reference      84
 7                   to Mares v. Monsanto
 8     Exhibit 12    November 17, 2019 Invoice #11382 in    84
                     reference to Kathleen Caballero v.
 9                   Monsanto, et al.
10
       Exhibit 13    January 28, 2019 Invoice #11276 in     86
11                   reference to Alberta and Alva
                     Pilliod v Monsanto Company, et al.
12
13     Exhibit 14    July 26, 2019 Invoice #11345           89
                     in reference to Burrell Lamb,
14                   et al., v. Monsanto Company
15     Exhibit 15    November 17, 2019 Invoice #11378 in    92
                     reference to Emanuel Giglio v.
16                   Monsanto Co., et al.
17     Exhibit 16    July 26, 2019 Invoice #11346 in        91
                     reference to Maurice Cohen, et al.,
18                   v. Monsanto Company
19     Exhibit 17    July 20, 2019 Invoice #11341 in        92
                     reference to Maurice Cohen, et al.,
20                   v. Monsanto Company
21
22
23
24
25
```

```
 1                    - - -

 2             THE VIDEOGRAPHER:  We are now on the record.

 3     My name is Jacquetta Jones.  I am a videographer

 4     for Golkow Litigation Services.  Today's date is

 5     August 25th, 2021, and the time is 8:33 a.m.

 6             This remote video deposition is being held

 7     in the matter of Chapman, et al., vs. Monsanto,

 8     et al., for the United States District Court,

 9     Northern District of California.

10             The deponent is Dr. William Sawyer.

11             All parties to this deposition are appearing

12     remotely and have agreed to the witness being

13     sworn in remotely.  Due to the nature of remote

14     reporting, please pause briefly before speaking

15     to ensure all parties are heard completely.

16             Will counsel please identify themselves.

17             MR. DIAMOND:  David Diamond for the

18     Plaintiff.

19             MR. HOGUE:  Michael Hogue for Monsanto.

20             THE VIDEOGRAPHER:  The court reporter is

21     Kelly Lawton and will now swear in the witness.

22             THE COURT REPORTER:  Doctor, would you

23     please raise your right hand?

24             Do you swear or affirm the testimony you're

25     about to give will be the truth, the whole truth,
```

1      and nothing but the truth?

2           THE WITNESS:  Yes, I do.

3           THE COURT REPORTER:  Thank you.

4           WILLIAM SAWYER, Ph.D., called as a witness

5    by the Defendant, having been first duly sworn,

6    testified as follows:

7                    DIRECT EXAMINATION

8    BY MR. HOGUE:

9      Q.   Good morning, Dr. Sawyer.  We've met before.

10   I've done -- we've taken depositions together a few

11   times, so I know that you know the background rules,

12   so I'm going to skip with that, other than say you

13   understand you're under oath, right?

14     A.   Yes.

15     Q.   All right.  As I've done in some other

16   depositions after this, if we mark exhibits, I'll

17   send them to the court reporter and to Plaintiff's

18   counsel, and I think that you normally have your

19   report with you.  Is that correct, Doctor?

20     A.   I do, yes.

21          MR. HOGUE:  All right.  Well, I'm going to

22      mark as Exhibit 1 the notice of deposition in the

23      case.

24          (Sawyer Exhibit 1 was marked for

25   identification.)

William R. Sawyer, Ph.D.

```
 1    BY MR. HOGUE:

 2        Q.   Did you receive that?

 3        A.   Yes.

 4        Q.   And we've requested certain documents and

 5    we'll go over that.  I'm going to mark as Exhibit 2

 6    your report in the case, Exhibit 3 your CV, and

 7    Exhibit 4 the list of your testimony that I have

 8    received in this case.

 9             (Sawyer Exhibit 2 was marked for

10    identification.)

11             (Sawyer Exhibit 3 was marked for

12    identification.)

13             (Sawyer Exhibit 4 was marked for

14    identification.)

15    BY MR. HOGUE:

16        Q.   You have all of those documents; is that

17    correct, Doctor?

18        A.   Yes.

19        Q.   All right.  Is there a materials considered

20    list or other reference list that you have in this

21    case, other than what's cited in your report?

22        A.   No.

23        Q.   Okay.  Are all of your opinions in your

24    expert report?

25        A.   Yes.
```

William R. Sawyer, Ph.D.

```
 1      Q.   All right.  If you go to Page 1 of your
 2   report --
 3      A.   Yes.
 4      Q.   -- you indicate at one point, it says:
 5   "...Chapman's medical history and diagnoses as
 6   reported in his medical records."
 7           And then it says:  "I am limiting my
 8   opinions specifically to dose, glyphosate/Roundup
 9   constituent formulations, absorption, distribution,
10   metabolism, and excretion (ADME) and Roundup's
11   mechanism of action regarding genotoxicity."
12           Do you see that?
13      A.   Yes.
14      Q.   And is that what you intend to limit your
15   opinions to?
16      A.   Yes.
17      Q.   Okay.  So you don't have any opinions on the
18   causes of Mr. Chapman's non-Hodgkin lymphoma; is
19   that right?
20           MR. DIAMOND:  Form.  You can answer, though.
21      A.   I do with respect to dose, whether the dose
22   was consistent with the studies that have reported a
23   statistically increased risk of NHL.
24      Q.   But you're not going to give an opinion that
25   Roundup was the actual cause of Mr. Chapman's
```

```
 1    non-Hodgkin lymphoma, are you?

 2       A.   No.   I believe that would be the -- in the

 3    area of Clayton Smith.

 4       Q.   Okay.   What have you done to prepare for

 5    your report in this case?   Strike that.

 6            What have you done to prepare your report in

 7    this case?

 8            MR. DIAMOND:  Michael, just stepping in for

 9       just a second, and I don't want to really say

10       anything more than form and foundation, which I

11       think will keep you happy, but I think the judge

12       has made a ruling in this case as to the areas

13       that Dr. Sawyer should testify about and the

14       areas that he shouldn't.

15            And so he's -- while he may have opinions

16       about some of these other areas, for this case

17       it's limited to what the judge is allowing him to

18       testify about.

19            MR. HOGUE:   Okay.

20    BY MR. HOGUE:

21       Q.   All right.   Dr. Sawyer, what have you done

22    to prepare your report in this case?

23       A.   Just general review.

24       Q.   Have you reviewed Mr. Chapman's medical

25    records?
```

William R. Sawyer, Ph.D.

```
 1        A.    I have not re-reviewed the pathology

 2    reports, no.

 3        Q.    Have you reviewed any of his medical

 4    records?

 5        A.    As stated in my report.

 6        Q.    And what did you state?  Did you review his

 7    medical records?

 8        A.    Page 208.

 9        Q.    Okay.

10        A.    Pathology reports, West Houston Medical

11    Center; expert report of Clayton Smith, M.D.

12        Q.    So other than Mr. Chapman's pathology

13    reports, you haven't reviewed any of his other

14    medical records; is that fair?

15        A.    Yes.

16        Q.    Have you talked to anyone in this case?

17        A.    Yes.

18        Q.    I think that you indicate that -- in your

19    report, you talked to Mr. Chapman; is that right?

20        A.    Correct.

21        Q.    Other than the interviews or discussions,

22    telephone calls referenced in your report, have you

23    had any other discussions with anybody in this case?

24        A.    I would say no, other than a brief call with

25    Attorney David Diamond.
```

1      Q.   Okay.  You haven't had any discussions with

2    any treating doctor in this case?

3      A.   No.

4      Q.   And you haven't had any other discussions --

5    well, strike that.

6           You haven't had any discussions with any

7    other expert about the Chapman case; is that right?

8      A.   Correct.

9      Q.   Have you read any depositions in the case?

10     A.   Yes.

11     Q.   And which depositions have you read?

12     A.   Deposition of Otis Chapman, April 9th, 2021,

13   with exhibits.

14     Q.   And have you read any other deposition of

15   any other person, whether it's a doctor or other

16   fact witness in this case?

17     A.   No.

18     Q.   Have you reviewed any interrogatory

19   responses in this case?

20          MR. DIAMOND:  Michael, I don't think we have

21      interrogatory responses in this case.

22          MR. HOGUE:  Well, then it doesn't look like

23      he's reviewed any.

24          MR. DIAMOND:  Trick question.

25   BY MR. HOGUE:

1      Q.   All right.  And, Doctor, I think on Page 208

2   you list that you reviewed Mr. Chapman's Plaintiff

3   Fact Sheet and the First Amended Plaintiff's Fact

4   Sheet; is that right?

5      A.   Yes.

6      Q.   And other than his two fact sheets, his

7   deposition, the pathology reports, and the expert

8   report of Clayton Smith, have you reviewed anything

9   else specific to Mr. Chapman?

10      A.   Only the exhibits that I referenced, that is

11   the deposition exhibits.

12      Q.   Okay.

13      A.   Other than that, no.

14      Q.   All right.  And does -- looking at these

15   references and the materials we just discussed, is

16   that everything you've reviewed for your opinions in

17   this case?

18      A.   Yes, including documents in my 467 reference

19   list.

20      Q.   Are there any references in your 467

21   references that are new since your last deposition?

22      A.   No.

23      Q.   Did you bring any additional documents with

24   you to the deposition in response to the request in

25   the deposition notice?

William R. Sawyer, Ph.D.

```
 1      A.   No.  Everything's been turned over.

 2      Q.   Have you issued a depo -- excuse me.

 3           Have you issued an invoice in this case?

 4      A.   Yes, and I believe that was provided to

 5   Attorney Diamond about a week or so ago.

 6           MR. HOGUE:  Mr. Diamond, would you forward

 7      that to me?

 8           MR. DIAMOND:  Absolutely.  Do you need me to

 9      forward it to you right now, or do you -- is it

10      okay if I just -- I've asked my assistant to

11      forward it and she probably just hasn't gotten

12      around to doing it yet.

13           MR. HOGUE:  Well, if during this deposition

14      you could e-mail it to me, that would be helpful.

15      I think you have my e-mail address, but if not, I

16      can give it to you.

17           MR. DIAMOND:  Yeah, I think I do, too.  So,

18      yeah, during -- I will take a look and see if I

19      can find it and forward it to you while we're

20      going.

21           MR. HOGUE:  That would be helpful.

22           MR. DIAMOND:  I think I may have sent you

23      something previously.  Have I sent you any of the

24      billing information?

25           MR. HOGUE:  I have not received any in this
```

William R. Sawyer, Ph.D.

```
 1        case.
 2             MR. DIAMOND:  All right.  I will take a look
 3        and see if I can forward it on.
 4   BY MR. HOGUE:
 5        Q.  All right.  Doctor, one of the requests was
 6   for each of your invoices in this case and other
 7   cases related to Roundup, and I know that you have,
 8   in the past, produced at least some of your
 9   invoices.  I know that some were produced in July,
10   and we might go through a few of those.
11             You don't have any objection to providing us
12   with your invoices in the Roundup litigation cases,
13   do you, Doctor?
14        A.  No, and I provided all of the invoices to
15   date in the Chapman case.
16        Q.  Well, one of the invoices --
17        A.  I'm sorry, not the Chapman case.  I meant
18   the Clark -- the Clark matter, when I was deposed,
19   and in fact, in that deposition I would estimate at
20   least 20 to 30 minutes were devoted to going through
21   the pile of invoices.
22        Q.  Well, I was the one taking the Clark
23   deposition.  I think that those were produced in the
24   Stephens case, and I have some follow-up questions
25   that we can clarify today, one of which relates to
```

1    the Lamb matter, but we'll do that toward the end,

2    if need be.

3         Doctor, one, I don't think that we've

4    received, either in the Clark case or in the

5    Stephens case, is the Stephens invoice.  You have

6    issued invoices in the Stephens case, right?

7    A.    Yes, and those were provided.

8    Q.    Well --

9    A.    If you wish, I can send it again in a few

10   minutes.

11   Q.    That would be -- that would be great.  I

12   have --

13   A.    I will send it to Attorney Diamond.

14   Q.    Sure.  All right, Doctor.

15   A.    I know that was provided.  The case is in

16   trial.

17   Q.    Well, it wasn't provided to -- it hasn't

18   been provided to me and I'm pretty sure it hasn't

19   been provided to Steven -- the counsel for Monsanto,

20   but I am not -- perhaps I am wrong about that.

21   A.    Well, there may be a misunderstanding that

22   the invoice that was provided is it, and there was

23   no other invoices following that, but I'll send the

24   latest invoice again in a few minutes.

25   Q.    Okay.

```
 1      A.   Or I'll do it right now, if you wish.

 2      Q.   Sure.  You can send it to Mr. Diamond.

 3           Is there any --

 4      A.   Okay.  Well, hold on for a second while I

 5   send it.

 6      Q.   Sure.

 7      A.   Okay.  Sent.

 8      Q.   All right.  Thank you.  Doctor, if you can,

 9   go to Page 7 of your report.

10      A.   Okay.

11      Q.   The paragraph that starts off with "Hence,"

12   and you say that you have four fundamental

13   objectives; is that right?

14      A.   Yes.

15      Q.   All right.  The first one is to arrive at a

16   scientifically-reliable exposure dose estimate --

17   estimation for Mr. Chapman in units of eight-hour

18   time-weighted exposure days based upon the available

19   objective evidence.

20           What do you mean by that fundamental

21   objective?

22      A.   To determine what the exposure dose was in

23   the units of eight-hour time-weighted exposure days

24   as published in the generally accepted studies on

25   glyphosate applicators.
```

William R. Sawyer, Ph.D.

1      Q.   And why do you calculate units of eight-hour

2   time-weighted exposure days?

3      A.   That was specified in the Eriksson study

4   using the Swedish workday.

5      Q.   And is that --

6      A.   And I contacted and researched the

7   government of Sweden and discovered that in the

8   1980s, at one point they were experimenting with

9   either a six- or seven-hour workday, but during the

10   time of the study it was actually an eight-hour

11   workday in Sweden, which the author referred to.

12      Q.   And why is the eight-hour time-weighted

13   exposure day an important metric to you?

14      A.   Because that was used in the human

15   epidemiologic studies and I am following the

16   methodology without deviation.

17      Q.   Okay.  Your second fundamental objective is

18   to assess the potential of compounding toxicological

19   risk factors contributing to his non-Hodgkin

20   lymphoma onset to be determined by Dr. Smith.

21          So are you relying upon Dr. Smith for your

22   opinions?

23      A.   No, just the opposite.  I am providing the

24   toxicological information for Dr. Smith to opine on.

25   He is not a toxicologist.  He doesn't have

1    familiarity with the thousands of chemicals that a

2    toxicologist has, and I have been very thorough in

3    my assessment in determining if there are any other

4    potential confounding factors, and ultimately,

5    Dr. Smith can determine that, whether or not the

6    factors identified are of any significance.

7        Q.   Okay.  Can you tell me what toxicological

8    risk factors you found for Mr. Chapman?

9        A.   Sure.  Turn to Page 19.

10       Q.   Okay.

11       A.   I found no pharmaceuticals that have the

12   capacity to induce or exacerbate NHL.  He never used

13   any cyclophosphamide or cyclosporine A or other

14   drugs known to participate in the development of

15   lymphoma.

16           He has used wasp killer; however, the

17   Spectracide is not a carcinogen that can cause NHL.

18   He used an ant killer that's called Amdro,

19   A-m-d-r-o.  Again, that is not a carcinogen and not

20   a carcinogen that could cause NHL.

21           He pulled a spreader by a tractor with weed

22   and feed, weed and feed granules, which eliminates

23   the -- any significant drift of mist or other

24   exposure pathways.

25           He's used granular snail bait, which is not

William R. Sawyer, Ph.D.

1    carcinogenic and does not cause NHL.

2         And he's used latex paint also, not

3    carcinogenic, does not cause NHL in humans.

4    Q.   So are you saying that you identified no

5    toxicological risk factors for Mr. Chapman?

6    A.   Correct.  I found potential exposures to

7    evaluate, which I did, but no evidence that they

8    could be carcinogenic with respect to NHL in humans.

9    Q.   Right under that chart on Page 20, you say:

10   "Mr. Chapman denied exposure to any chemicals

11   occupationally."

12        Is that correct?

13   A.   Yes.

14   Q.   And that includes the fact that he did

15   not -- well, strike that.

16        Mr. Chapman was not exposed to Roundup

17   occupationally, correct?

18        MR. DIAMOND:  Michael, I e-mailed it to you

19     just a minute or two ago.

20        MR. HOGUE:  Okay.

21   A.   On Page 11 I stated Mr. Chapman used Roundup

22   residentially beginning in March 1987, referencing

23   the First Amended Plaintiff Fact Sheet.  He has

24   never used it for occupational purposes.

25        MR. HOGUE:  Mr. Diamond, the invoice I think

1      that you sent me appears to be one page and it's

2      for a half-day deposition in the Chapman case,

3      $3,400.

4          MR. DIAMOND:  Oh, I think I sent you the

5      wrong -- there -- I think that's the one -- all

6      right.  Let me take a look.  There's another one

7      that I thought I sent you.  I apologize.

8          MR. HOGUE:  And we'll mark them both, but --

9  BY MR. HOGUE:

10     Q.   So, Doctor, is it your understanding that

11  you're charging $3400 for your deposition today?

12     A.   Yes.

13         MR. DIAMOND:  And, Michael, I thought I

14     forwarded that on to you, maybe Anthony in your

15     office, for payment, but -- for Dr. Sawyer prior

16     to the deposition, but that's neither here nor

17     there.  But I think I have another one, too, so

18     let me just double-check.

19         MR. HOGUE:  All right.  And we'll mark --

20     let me write this down.  Exhibit 5 will be your

21     invoice for the deposition in this case.

22         (Sawyer Exhibit 5 was marked for

23  identification.)

24  BY MR. HOGUE:

25     Q.   And when I get it, I'll mark Exhibit 6 as

William R. Sawyer, Ph.D.

```
 1    your invoice for your report or other matters that

 2    you've billed for in this case.  All right.

 3           Doctor, you mention on Page 11 of your

 4    report that Mr. Chapman smoked 100 cigars in his

 5    lifetime; is that right?

 6    A.    Yes.

 7    Q.    Is -- well, are smoking cigars a risk factor

 8    for non-Hodgkin lymphoma?

 9    A.    Not on that basis.  The studies I've

10    referenced require many more pack-years of smoking

11    than -- a hundred cigars is just a miniscule

12    fraction of a pack-year.  That's insignificant and

13    inconsequential based on the human epidemiological

14    and toxicological studies.

15    Q.    And you didn't review Mr. Chapman's

16    medical --

17    A.    Actually, I didn't finish the question.

18    Q.    Oh, okay.  Go ahead.

19    A.    Based upon the CDC classification of a

20    smoker versus a lifetime nonsmoker, Mr. Chapman

21    qualifies as a lifetime nonsmoker, as he smoked less

22    than 100 cigars in his lifetime.

23    Q.    Okay.

24    A.    That is the question I ask because that is

25    the definition and the question posed under the CDC
```

```
 1    questionnaire -- questionnaires that have been

 2    designed over the years.  The cut-off threshold is

 3    100.

 4          MR. DIAMOND:  Michael, would you do me a

 5       favor and double-check now to see if I sent you a

 6       different invoice.

 7          MR. HOGUE:  You did, and it indicates that

 8       his fee was $18,674.28 for -- it looks like for

 9       reviewing this matter and preparing a report, and

10       we'll mark that as Exhibit 6.

11          (Sawyer Exhibit 6 was marked for

12    identification.)

13          MR. HOGUE:  I'll cover that in a minute.

14       Thank you.

15          MR. DIAMOND:  You're welcome.

16    BY MR. HOGUE:

17       Q.   Doctor, you have not reviewed his medical

18    records to examine all the potential medical risk

19    factors for Mr. Chapman's non-Hodgkin lymphoma; is

20    that right?

21       A.   That's correct.  I defer that to the medical

22    oncologist.  And again, I want to make it very

23    clear, I'm making every effort to be careful in

24    terms of only testifying to what Honorable Chhabria

25    has recommended and I am not going to overstep that
```

William R. Sawyer, Ph.D.

```
 1    ruling.
 2    Q.   Okay.  Doctor, but going back to Page 7 of
 3    your report, your third fundamental objective is to
 4    provide a general causation assessment of personal
 5    protective equipment, PPE, product formulation, and
 6    toxicological factors such as absorption,
 7    distribution, metabolism, and excretion, ADME, as
 8    well as Roundup's mechanism of genotoxic action.
 9         Can you just generally tell me what you're
10    referring to there?  And specifically, I guess my
11    question is you say a general causation assessment
12    of personal protective equipment.  What are you
13    talking about.
14    A.   If you were to turn to Page 33, I think that
15    will help you understand, under paragraph Personal
16    Protective Equipment and Measured Dermal Exposure
17    Levels.
18         The purpose of my investigation is to
19    determine, ultimately, the dose of exposure to
20    Mr. Chapman, and there are numerous studies that
21    have assessed the protective measures needed to
22    implement and reduce exposures to Roundup, and I
23    detail those studies and relied on those studies in
24    terms of determining whether Mr. Chapman received
25    significant dermal absorption of Roundup, that is
```

William R. Sawyer, Ph.D.

1    glyphosate, during application.

2       Q.   Okay.  Your fourth objective, it says:  If

3    asked to render a scientifically supported and

4    reliable opinion as to whether Mr. Chapman's Roundup

5    exposure (dose) were sufficiently above the

6    threshold identified by Dr. Ritz within the

7    peer-reviewed studies that established statistically

8    and significantly increased risk of -- the risk of

9    development of non-Hodgkin lymphoma.

10          So that's your fourth objective?

11      A.   Yes, and -- it is.  There are six primary

12   epidemiological studies within my report that cover

13   dose metric aspects of general causation.

14          I will make it clear that the studies are

15   not cherry-picked, as you accused me of in the Clark

16   case; rather, they represent the only group of human

17   epidemiologic studies that collectively address

18   dose.  The prescribed methodology as published in

19   these studies express dose in units of exposure

20   days.  I've therefore employed the generally

21   accepted exposure day methodology to evaluate

22   whether Plaintiff's exposures exceeded the maximum

23   thresholds within the epidemiologic studies at the

24   95 percent upper confidence interval.

25          So what I'm getting at is that this form of

1    metrics is generally accepted, it's used in other

2    chemical causation analyses, such as benzene,

3    exposure assessment in leukemia, or even lymphoma

4    assessments with benzene are based on benzene PPM

5    years.

6           So I want to make it clear, because I think

7    you misunderstood in the last year, that I have not

8    cherry-picked.  Evidence of that is I even included

9    in all of any reports the negative NAL study, the

10   Agricultural Health study.  If I were

11   cherry-picking, why would I include that?  It's a

12   negative study.

13          So just to make it clear, I see you

14   misunderstood grossly in the last case, that is the

15   Clark matter, with respect to the Sargon motion you

16   filed.

17   Q.   What thresholds are you looking at for

18   determining whether there is an increased risk of

19   non-Hodgkin lymphoma?

20   A.   Page 28, Table 5.  These are all of the

21   studies that have included dose metrics.  There's no

22   cherry-picking.  This is it.  This is the only set

23   of studies that provides dose metrics.

24   Q.   Well, the Pahwa study has data other than

25   two days per year, right?

William R. Sawyer, Ph.D.

```
 1        A.    I'm sorry.  I don't understand the question.

 2        Q.    The Pahwa study includes lifetime days of

 3   exposure as well as a metric, correct?

 4        A.    Yes.

 5        Q.    And the Pahwa study includes duration,

 6   number of years, as a dose metric as well, correct?

 7        A.    Yes.

 8        Q.    And you didn't include that in your report?

 9        A.    No.

10        Q.    But you would -- you would identify, for the

11   Pahwa study, lifetime exposure days as an important

12   metric as well, would you not?

13        A.    I would have to look at the study again.  I

14   don't remember.

15        Q.    Would you not also include the duration

16   identified in the Pahwa study as an important dose

17   metric?

18        A.    Possibly.  I would have to review the study

19   again and determine whether the dose metrics are

20   substantiated with statistical analyses and whether

21   they are reliable, et cetera.  I don't remember.

22        Q.    Okay.  And for the McDuffie study, at two

23   days per year, how you calculate the exposure days

24   in the -- for the McDuffie study?

25        A.    I don't understand the question.
```

1    Q.   Well, is it two eight-hour days?  Is it any

2    time, 30 seconds twice a year?  What's -- how do --

3    what are you using to calculate for the McDuffie

4    study?

5    A.   The McDuffie study doesn't state an answer

6    to that question, so I'm being very conservative and

7    using eight-hour time-weighted days, as in Eriksson,

8    which is a very demanding study.

9         If McDuffie were using just any exposure on

10   a given day, that would not be as demanding as the

11   metric I'm using.

12        I want to be clear on this.  A couple years

13   ago I tried reaching Dr. McDuffie in Canada but she

14   had recently passed on and no one in her office was

15   able to answer that question for me.

16   Q.   So for the McDuffie study, the Eriksson

17   study, and the Pahwa study, when you talk about days

18   per year, you're talking about eight-hour weighted

19   days per year; is that your methodology?

20   A.   No, it's not my methodology.  The exposure

21   days are -- it's a methodology consistent throughout

22   the studies.  There is some question as to whether

23   all of the authors used eight-hour days versus any

24   amount of time in a day.

25        I have taken a view on this to be the most

1    conservative, that is the most demanding aspect

2    would be using an eight-hour day.  That could have

3    an impact in the analysis, and if I am wrong, if I

4    am in error, I am being overdemanding and the error

5    would be helpful for the defendants.

6        Q.   So, Doctor, I'm just trying to understand.

7    When -- I'm not saying you designed these studies.

8    What I'm saying is when you do your calculations of

9    an exposure day, whether you're talking about

10   McDuffie, Eriksson or Pahwa, you're talking about an

11   eight-hour exposure day in your calculations; is

12   that correct?

13       A.   Yes.  That presents the most demanding

14   statistical test.

15       Q.   And you just discussed being conservative.

16   Is it your approach that when you were calculating

17   potential exposure of a plaintiff in a case, you use

18   conservative exposure estimates based upon all of

19   the objective evidence?

20       A.   I have, yes.

21       Q.   And do you do that in all the cases?

22       A.   Yes.

23       Q.   All right, Doctor.  You don't have any

24   opinion in this case regarding Mr. Chapman's

25   prognosis; is that correct?

1     A.   Correct.

2     Q.   And you don't have any opinions regarding

3  any treatment that Mr. Chapman may or may not need,

4  right?

5     A.   Correct.

6     Q.   Did you conduct an exposure analysis to

7  identify a milligrams per kilogram per day dose

8  exposure for Mr. Chapman?

9     A.   I did not, because none of the dose metric

10  studies have used measurements on terms of milligram

11  per kilogram per day, and the only useful

12  possibility of making such a calculation would be to

13  compare that dose to that of applicators as

14  published in Sullivan, for example, Sullivan 2019, I

15  believe, to determine whether that dose is at least

16  consistent with that dose measured in applicators.

17        Beyond that, the calculation would be

18  useless.

19     Q.   Okay.  So you haven't used the POEM model or

20  method or any other standardized quantification

21  model to estimate the degree or quantity of exposure

22  to which Mr. Chapman was exposed; is that correct?

23     A.   Correct.

24     Q.   And you have not quantified Mr. Chapman's

25  exposure level -- other than time of exposure, you

1    haven't quantified his level of exposure to Roundup

2    on any specific day; is that right?

3        A.   I'm not sure I understand the question

4    regarding specific day.

5        Q.   Yes.  I mean, you -- you have not determined

6    any internal exposure dose to which Mr. Chapman was

7    exposed on any specific day, correct?

8        A.   No.  That would be a useless exercise with

9    respect to relating that to the six epidemiologic

10   studies that offer dose metrics as they were

11   measured in exposure days, not milligram per

12   kilogram body weight.

13       Q.   Well, you haven't done a specific analysis

14   as -- based upon his body size, the clothing he was

15   wearing, how long he was spraying, whether his --

16   whether he was spraying close to weeds or far away

17   from weeds, and whether it was windy or not windy on

18   any specific day; is that correct?

19       A.   Correct.  He does not remember the details

20   for any specific calender day historically.  When I

21   interviewed him, for example, if I said what were

22   the conditions on October 5th, well, he doesn't

23   remember that.  It's a ridiculous question.

24       Q.   Doctor, are there any other specific areas

25   of opinions specific to Mr. Chapman -- and when I

William R. Sawyer, Ph.D.

1   say areas, we're going to talk about exposure, we're

2   going to talk about things, but other than these

3   objectives, is there anything else -- and when I'm

4   talking about specific, I'm talking about whether

5   it's -- if you had an opinion on his prognosis or

6   anything specific to Mr. Chapman.  Is there anything

7   else I need to cover with you?

8        MR. DIAMOND:  Form.

9        Q.   Doctor, I don't know if you answered.  Is

10  there any other areas of your opinion -- do you have

11  any other areas other than exposure specifically

12  related to Mr. Chapman?

13       A.   I'm reading my report.  It's 208 pages, so

14  it will take a few minutes to answer the question.

15       Q.   Well, let me say so anything else that you

16  might discuss related to Mr. Chapman is set forth in

17  your report; is that right?

18       A.   I'm sorry?  Say again.

19       Q.   Anything else that you would discuss related

20  to Mr. Chapman is set forth specifically in your

21  report; is that right?

22       A.   Are you asking me if I have opinions beyond

23  those within the report?

24       Q.   Yes, sir.

25       A.   No.

William R. Sawyer, Ph.D.

1    Q.   In your report, on Page 1 at the bottom, you

2    say you're going to discuss Roundup's genotoxicity

3    and mode of action.

4         Is that some -- is there anything -- well,

5    let me ask it this way.

6         Your report also refers to the OECD or OECD

7    guidelines a number of times.  It's over 30 when I

8    calculate it.  What are the OECD guidelines?

9    A.   That is referring to the Organization for

10   Economic and Cooperative Development, OECD, which is

11   an international body that provides recommendations

12   on chemical and toxicological recommendations under

13   their regulatory guidelines.

14   Q.   Are the OECD guidelines important to you?

15   A.   Certainly.  As a toxicologist, yes.

16   Q.   And are there OECD guidelines for testing

17   chemicals?

18   A.   Yes.

19   Q.   Are there OECD guidelines for genotoxicity

20   studies?

21   A.   Yes.

22   Q.   And are the OECD guidelines for genotoxicity

23   studies important to you?

24   A.   Of course.

25   Q.   And have you cited any in your report?

William R. Sawyer, Ph.D.

```
 1      A.   With respect to dermal absorption, yes.

 2      Q.   Have you cited any OECD guidelines related

 3   to genotoxicity in your report?

 4      A.   No.

 5      Q.   And why not?

 6      A.   I'm looking.

 7           Well, in review I see that I have referenced

 8   several key studies, such as Wozniak and

 9   Suarez-Larios, S-u-a-r-e-z-L-a-r-i-o-s, et cetera,

10   and if my summaries of the studies, I did not come

11   across any deviations of the regulatory policies of

12   EOCD [sic].

13      Q.   But you're familiar with the OECD

14   genotoxicity guidelines; is that correct?

15      A.   Yeah.  I mean, I don't have it memorized but

16   I have reviewed them, yes.

17      Q.   Are there OECD guidelines for in vitro comet

18   assays?

19      A.   Probably.  I don't recall exactly.

20      Q.   Are there any OECD guidelines for in vivo

21   comet assay studies?

22      A.   I don't recall in the in vivo.  In vivo

23   animal, yes; in human, no.

24      Q.   Do you know whether the OECD guidelines have

25   deleted or withdrawn certain tests as no longer
```

William R. Sawyer, Ph.D.

```
1    either important or as important as other

2    genotoxicity tests for chemicals?

3        A.   I don't recall.

4        Q.   Do you know what an indicator study is under

5    the OECD guidelines for genotoxicity?

6        A.   It may be a screening test but I'm not sure.

7    I would have to check the guidelines.  They are

8    rather voluminous.

9        Q.   And what do you mean by a screening study?

10       A.   An in vitro screening study.

11       Q.   And is it important that an in vitro

12   screening study be followed up with other

13   genotoxicity studies in either -- in vivo, so in

14   animals?

15       A.   That would be helpful, yes.

16       Q.   If a -- if a chemical causes cytotoxicity in

17   a cell at a certain dose, what will the result of a

18   comet assay show?

19       A.   Generally, oxidative damage.

20       Q.   What will the appearance of the comet assay

21   look like?

22       A.   Positive.

23       Q.   So if a chemical causes cytotoxicity, will

24   the DNA break up and show as a positive finding on a

25   comet assay?
```

William R. Sawyer, Ph.D.

```
 1      A.   It can.

 2      Q.   If that cytotoxicity is killing the cell and

 3   the cell is breaking down, the comet assay will show

 4   a positive on that comet assay test, right?

 5      A.   It could, yes.

 6      Q.   But dead cells --

 7      A.   But it can also occur secondary to very

 8   significant DNA damage.

 9      Q.   Okay.  But cells that are dead and breaking

10   up can't replicate; is that correct?

11      A.   Yes.

12      Q.   And cells that can't replicate do not lead

13   to cancer; is that correct?

14      A.   In general, yes.

15      Q.   Is it a well-accepted principle that tests

16   to assess cancer-causing agents via comet assay need

17   to make sure there's not a level of -- or a

18   significant level of cytotoxicity?

19      A.   That is a parameter that we look at, yes.

20      Q.   And that's because if you have a level of

21   cytotoxicity with a chemical, that the finding on

22   the comet assay could falsely or wrongly suggest

23   some genotoxic or mutagenic effect that's not

24   accurate; is that correct?

25      A.   It can.
```

1      Q.   Are you an expert in comet assay tests or

2   studies?

3      A.   No.

4      Q.   Have you ever conducted a comet assay study

5   or test?

6      A.   I have not.

7      Q.   Have you ever published anything on a comet

8   assay study or test?

9      A.   No.  I have been trained as a toxicologist

10  how to conduct genotoxicity testing and how to

11  interpret the results, how to look for a lipid for

12  oxidation, imbalance in the redox state, and other

13  markers, and understanding how to -- how to

14  interpret the data, but I'm not a specialized expert

15  with the comet assay.

16          I've been trained how to use and apply the

17  results of the comet assay as a toxicologist, but

18  I'm not a comet assay expert, as you asked.

19      Q.   And do you agree that the mutagenicity

20  results and events that alter the DNA and/or

21  chromosomal structure that are passed on to

22  subsequent generations?

23      A.   All right.  I'm going to have to ask you to

24  read back the question, please.

25      Q.   Yes.  The mutagenicity results and events

1    that alter the DNA and/or chromosomal structure and

2    are passed on to subsequent generations, do you

3    agree with that?

4        A.   I -- it's not making sense.  Maybe if you

5    ask it as a question, it would make sense.

6        Q.   Okay.  Do you agree that for a substance to

7    be mutagenic, the DNA needs to be passed on to

8    subsequent generations?

9        A.   Well, I guess my problem with your question

10   is when you say passed on to generations, are you

11   referring to generations of additional stem cells,

12   or are you referring to first, second, third

13   generation births?

14       Q.   Well, generations of cells.  Actually, this

15   is what is indicated in the OECD genetic toxicology

16   guidelines, is the definition of mutagenicity and

17   I'm trying to figure out if you agree of disagree

18   with the guidelines' definition.

19       A.   Well, if we're speaking of new generations

20   of cells, of course, that's the basis of it, but I

21   was confused whether you were using the term

22   "generations" as the next generation of rat pups,

23   and then the second generation of rat pups, and so

24   on.

25       Q.   No.  I was referring to generation of cells.

William R. Sawyer, Ph.D.

1      A.   Okay.  Well, I'm just trying to be careful

2  and understand your questions correctly.

3      Q.   Okay.  And with that understanding of DNA

4  needing to be passed on to the next generation of

5  cells, do you agree that mutagens need to be able to

6  pass on the DNA damage to the next cell generations

7  in order to be classified as a mutagen?

8      A.   Of course.

9      Q.   All right.  Doctor, if we go back to the

10  exposure for Mr. Chapman -- let's see.  Well, at

11  Page -- where do you start your discussion of his

12  exposure?  I think it's around Page 16.

13          Nope.  It's a little earlier than that.

14  Page --

15      A.   Page 12.

16      Q.   Yes, Page 12.  So you talk about his

17  residential Roundup use history, and you indicate

18  that he started Roundup residentially beginning in

19  about -- in March of 1987; is that right?

20      A.   Yes.

21      Q.   You also list exposures in 2003 through 2017

22  to Roundup after he was diagnosed with non-Hodgkin

23  lymphoma, right?

24      A.   Yes.

25      Q.   But his exposures to Roundup in 2003 to 2017

William R. Sawyer, Ph.D.

1    did not cause Mr. Chapman to develop his non-Hodgkin

2    lymphoma; is that right?

3        A.   I'll defer that to the medical oncologist,

4    in keeping with the orders in this case.

5        Q.   Well, his non-Hodgkin lymphoma developed in

6    2000 -- I think it's 2003.

7        A.   I understand that, but you asked me if it

8    caused it, and I think that's an inappropriate

9    question on your part.

10       Q.   Okay.  So --

11       A.   Let's stay -- let's stay with what Honorable

12   Chhabria has asked and requested.  Don't start

13   asking me if it caused cancer or not.

14       Q.   Well, in your assessment of his exposure,

15   you're not including any exposure from 2003 to 2017

16   in your assessment; is that correct?

17       A.   Yes.  That's a fair question.  Thank you.

18       Q.   Did you answer it?

19       A.   Yes.

20       Q.   Okay.  Page 16, in the middle you -- second

21   paragraph under Personal Protective Equipment, it

22   says, "He also recalled the taste..."

23            Do you see that?

24       A.   I do.

25       Q.   "He also recalled the taste of Roundup in

1    his mouth from 'blow-back' when he used the pump

2    sprayer, and he would brush his teeth and rinse his

3    mouth with Listerine to get rid of the taste when he

4    went indoors."

5            And your Reference 42 says something about

6    his testimony about spraying in windy days.

7            Did Mr. Chapman describe in his deposition

8    or describe in his interview with you that he got

9    blow-back in his mouth that he could taste?

10    A.    I believe that came from the interview;

11   however, he also testified in deposition that he did

12   not generally try to avoid spraying Roundup on windy

13   days.

14    Q.    Was "blow-back" a term that Mr. Chapman used

15   in his interview with you?

16    A.    I believe he -- no.  I believe he used it in

17   the deposition on Page 192.

18    Q.    Did he --

19    A.    Whether he used the term in interview or

20   not, I'm not sure.  He may have.  I didn't -- I

21   didn't take note of that, but I believe he used the

22   term "blow-back" in the deposition.

23    Q.    And this interview that you had with

24   Mr. Chapman was over the phone; is that right?

25    A.    It was.

1      Q.   And did you record that interview?

2      A.   No.

3      Q.   Any reason why not?

4      A.   I'm really not set up for that.  I'm a

5  toxicologist, not a -- I'm not going to purport and

6  pretend to be a court reporter.  That's not my role.

7      Q.   Well, if the interview were recorded, we

8  could listen to see if the term "blow-back" was

9  something that Mr. Chapman used in the interview,

10  right?

11      A.   I suppose, yeah.

12      Q.   Did Mr. Chapman describe what Roundup tasted

13  like?

14      A.   No.

15      Q.   Did Mr. Chapman describe any eye irritation

16  from Roundup getting on his face?

17      A.   No.

18      Q.   Do you believe that Mr. Chapman had any

19  significant amount of oral exposure to Roundup?

20      A.   No, I was not able to quantitate that.

21  There are no studies in humans that have assessed

22  ingestion routes of Roundup due to ethics.

23      Q.   Do you believe that Mr. Chapman had any

24  significant inhalation exposure to Roundup?

25      A.   Yes.

William R. Sawyer, Ph.D.

```
 1        Q.   Did you do any calculation of what his
 2   inhalation exposure was in comparison to his dermal
 3   exposure?
 4        A.   Yes, based on a new peer-reviewed study that
 5   I referenced in my report.
 6        Q.   And what study is that?
 7        A.   That would be on Page 95, and I'm referring
 8   to the Pierce, et al., 2020 study.
 9        Q.   Okay.  And did the Pierce 2020 study
10   identify how much of the exposure to an applicator
11   was obtained dermally versus through inhalation?
12        A.   Yes, and the quantity of inhalation exposure
13   is much higher than previously reported by Monsanto.
14   Monsanto referred to it as a nonsignificant or
15   irrelevant exposure pathway compared to dermal
16   absorption, and it turns out that inhalation is
17   actually more important than once thought --
18        Q.   How much of --
19        A.   -- based upon this study.
20        Q.   Do you recall what this study, Pierce,
21   identified as the inhalation percentage of exposure
22   versus the dermal exposure?
23        A.   Well, I applied the ratio on Page 98, the
24   first paragraph.  Concentrations ranged from 3.79 to
25   17.23 nanogram per mil for inhalation expose, and
```

1    5.5 to 310 nanogram per mil for the dermal exposure

2    group.  Excluding the 310 nanogram point as an

3    outlier, the highest urinary glyphosate level

4    measured was 57.36 in the dermal exposure group.

5         So the numbers do provide an approximate

6    ratio.  I think it's best seen graphically on

7    Page 97, where we see the peak level of glyphosate

8    at approximately 11 or 12 nanogram per mil on the

9    inhalation, and about 65 nanogram per mil on the

10   oral -- or I mean the dermal.

11        So if you were to ratio that, it would be

12   about 65 to 12, and using a hand calculator, if I

13   were to take 65 divided by 12, that's roughly a

14   five-to-one ratio.

15   Q.   And --

16   A.   For about 20 -- for about 20 percent

17   inhalation, 80 percent dermal.

18   Q.   Okay.  And this chart on Page 97 of your

19   report indicates that the Roundup is excreted from

20   the body in about 36 hours; is that right?

21   A.   Yes.

22   Q.   Well, actually, on the bottom, the Section B

23   is 36 hours.  In the top it looks like it's

24   24 hours, correct?

25   A.   Yeah.  I had that in the report on Page 98,

```
 1   last paragraph.

 2       Q.   All right.  Doctor, why don't we take a

 3   break right now and -- take about five minutes and

 4   we will come back and I'll mark these two -- well, I

 5   want to make sure I ask questions about your

 6   invoices and I don't want to interrupt too much on

 7   this, but why don't we take about a five-minute

 8   break and we'll come right back.  Does that sound

 9   good?

10       A.   Okay.

11           MR. HOGUE:  Does that work for you, David?

12           MR. DIAMOND:  Yeah, it works fine, and I

13       forwarded I think it's the Clark invoice to you

14       as well.

15           MR. HOGUE:  All right.  Thank you, sir.

16           THE VIDEOGRAPHER:  Time now is 9:42 a.m.  We

17       are now off the record.

18           (Recess from 9:42 a.m. until 9:51 a.m.)

19           THE VIDEOGRAPHER:  The time now is 9:51 a.m.

20       We are now on the record.

21           MR. HOGUE:  I did check and I -- Mr. Diamond

22       has sent me the invoice to the Stephens case as

23       well, so we'll mark that as Exhibit 7 and I'll

24       cover that a little bit later in the deposition,

25       the invoices in this case.
```

```
 1              (Sawyer Exhibit 7 was marked for

 2      identification.)

 3      BY MR. HOGUE:

 4      Q.   So, Doctor, we were talking about your

 5      opinions on your exposure for Mr. Chapman.

 6              When you interviewed him, was there anybody

 7      on the phone other than you and Mr. Chapman?

 8      A.   Well, I don't know that Mr. Chapman was on

 9      the call.  That -- on the call would have been -- I

10      believe Bonnie was on the call, taking information

11      down for me.

12      Q.   Who is Bonnie?

13      A.   I don't recall Mr. Chapman.  Bonnie Serling,

14      she's one of my employees.

15      Q.   Well, who are you talking to when you did

16      the interview?

17      A.   Mr. Chapman.  I'm sorry.  I -- I am

18      confusing -- Attorney Diamond was not on the call.

19      I misunderstood you.

20      Q.   So who was on the call other than yourself?

21      A.   Bonnie Serling and Mr. Chapman.

22      Q.   And who is Bonnie?

23      A.   Bonnie Serling, she works for me.

24      Q.   Okay.  Did you take any notes during that

25      interview?
```

William R. Sawyer, Ph.D.

```
 1      A.   I did type things into the draft where I had

 2   highlights, but really, for the most part, Bonnie

 3   took down the information.  She's much faster than I

 4   am.

 5      Q.   All right.  If you go to Page 22 of your

 6   report --

 7      A.   Okay.

 8      Q.   -- you have a Table 3 where you calculate

 9   the eight hours per day exposure; is that correct?

10      A.   Yes.

11      Q.   And so your estimates range from 33 to

12   43 days of eight-hour exposures to Roundup for

13   Mr. Chapman from, I think, 1987 through 2002; is

14   that correct?

15      A.   Yes.

16      Q.   And that's the exposure estimates you're

17   basing your opinions on in this case for

18   Mr. Chapman?

19      A.   Yes.

20      Q.   And you say that Mr. Chapman fell in the

21   second quartile of the Agricultural Health Study; is

22   that correct?

23      A.   Yes.

24      Q.   And is that important to you?

25      A.   Yes.  It's consistent with that of
```

1    applicators.

2    Q.   Okay.  And when you say that's consistent of

3    the applicators, of the lower half of the exposure

4    range of applicators, correct?

5    A.   Yes.

6    Q.   And there wasn't any significant association

7    with Roundup exposure in the second quartile in the

8    Agricultural Health Study; is that correct?

9    A.   Correct.  It was overall a null study for

10   NHL.  Null means not finding anything statistically

11   significant.

12   Q.   When you were comparing Mr. Chapman's

13   exposure levels to the exposure metrics in the six

14   studies that you rely upon, were you looking at the

15   data for non-Hodgkin lymphoma overall, or for his

16   specific subtype of non-Hodgkin lymphoma?

17   A.   Overall.

18   Q.   When you were looking at the exposure

19   metrics in the six studies that you were analyzing,

20   is it important that the association or the odds

21   ratio identified for that exposure range is adjusted

22   for other confounders, including other pesticides?

23   A.   Yes, and I want to be clear on this.  I have

24   relied on Dr. Ritz for that analysis.  I want to

25   make it clear to you that I'm not the do-everything

```
 1    expert.  I do rely on other experts in this case
 2    and, thus, I defer to him.
 3        Q.   Mr. Chapman would not fall into the group of
 4    people analyzed in the Zhang 2019 study; is that
 5    right?
 6        A.   I disagree.
 7        Q.   Okay.  In the Zhang 2019 study, Dr. Zhang
 8    used the fourth quartile for the Agricultural Health
 9    Study, correct?
10        A.   Yeah, she did use the higher quartile.  I
11    remember that.
12        Q.   Mr. Chapman was not in the exposure range of
13    the fourth quartile of the Agricultural Health
14    Study, correct?
15        A.   No.  He was -- let's see.  I want to check
16    his range.
17             He was from 33 to 43, so, no, no, he was not
18    in the fourth.
19        Q.   And Mr. -- well, strike that.
20             And the Zhang study used the Agricultural
21    Health Study on a 20-year lag time, correct?
22        A.   Yes.
23        Q.   And Mr. Chapman did not have 20 years from
24    his first exposure to the time of his diagnosis,
25    correct?
```

1    A.    Correct.   However, I'd have to check the

2   Zhang study again more closely because I don't

3   recall Dr. Zhang having a minimum latency

4   requirement.   I thought that was a peak latency, but

5   I would need to double-check on that.

6    Q.    Well, in the Agricultural Health Study there

7   was Andreotti 2018.   That's the one we're referring

8   to, right?

9    A.    Yes.

10    Q.    In the Andreotti 2018 study, they had

11   overall data, five-year lag data, and 20-year lag

12   data specifically set forth, right?

13    A.    Yeah, but what I'm getting at is that the

14   20-year lag, I believe, includes the five-year lag.

15   It doesn't mean that they are only measuring people

16   with exposures 20 years and longer.   The five-year

17   lag, I think, measures people only up possibly to

18   five years.

19         I would have to check the study again.   I'm

20   not certain.

21    Q.    So, Doctor, if you were trying to plot a

22   Zhang analysis for Mr. Chapman, you would want to

23   use the second quartile and all of the data, meaning

24   the unlagged data from the Agricultural Health

25   Study; is that correct?

1    A.    Yes.

2    Q.    On Page 23 of your report, you reference NHL

3    latency interval.  Do you see that?

4    A.    Yes.

5    Q.    And you reference his, I guess, maximum

6    latency interval of approximately 16 years; is that

7    right?

8    A.    Well, it's not a maximum.  That is the

9    latency interval.  The latency interval is defined

10   as from the time of first exposure to the

11   development of the disease, so his latency interval

12   is 16 years.

13   Q.    Okay.  Well, I guess why I said maximum is

14   his first exposure would be 16 years before his

15   diagnosis, but his exposures in 2002 would have been

16   one year before his diagnosis, right?

17   A.    Right, but latency is measured from the

18   initial exposure to date of diagnosis.

19   Q.    Okay.  And why are you discussing the

20   non-Hodgkin lymphoma latency interval in

21   Mr. Chapman's case in your report?

22   A.    Because I have assessed the exposure.  The

23   physician, that is the medical oncologist, may not

24   be certain when the first exposure occurred, so I am

25   documenting that for the medical oncologist as the

1    latency period of 16 years.

2         I'm not offering any opinions with respect

3    to the latency period, simply that is the latency

4    period.

5    Q.   Okay.  If Mr. Chapman's latency interval was

6    four years, it wouldn't change any of your opinions

7    specific to Mr. Chapman or his exposure; is that

8    right?

9         Well, let me strike that.  That's

10   probably --

11        So you're just simply calculating the

12   latency from first exposure to the time of

13   diagnosis; is that right?

14   A.   Yes, in accord with the methodology.  That

15   is how it is done.

16   Q.   Okay.  Doctor, if you go to Page 47 of your

17   report, you discuss contaminants with Roundup.

18   A.   Yes.

19   Q.   In the, I guess, the box there on Page 47,

20   it looks like you have a quote from the Tarazona

21   article where you say POE -- or POEAs, polyethylated

22   tallowamines [sic], are several orders of magnitude

23   more cytoxic than glyphosate.

24        Is -- do you agree with that statement?

25   A.   Yes.  In terms of the Mesnage study,

```
 1    M-e-s-n-a-g-e, et al., study, 2013, that was shown
 2    to be the case, yes.
 3        Q.   Okay.  That does not mean that POE causes
 4    cancer, does it?
 5        A.   Not that particular finding, no.
 6        Q.   A chemical that kills a cell is cytotoxic,
 7    right?
 8        A.   Yes.
 9        Q.   And as we've discussed, dead cells do not
10    develop into cancer, do they?
11        A.   Correct, but there can be interaction
12    between a cytotoxic agent and a mutagen.
13        Q.   Do you know what surfactant, if any, was
14    used in the Roundup sprayed by Mr. Chapman?
15        A.   On Page 48, Table 11, I have a compilation
16    of surfactants used at various years of production.
17    For example, polyoxyethylene alkyl amine was used in
18    the year 2002 in the U.S. in Roundup.
19            If we go back to earlier years -- I really
20    don't have much of the data for earlier years.  I
21    have 1992, where pelargonic acid was used, and also
22    polyoxyethylene alkyl amine was used in 1992 in some
23    of the products.
24            Unfortunately in this case, the defendant
25    has not been forthcoming in providing the
```

1    confidential formulation of what Mr. Chapman used,

2    so all I have to work with is the various

3    formulation data that I've accumulated over time.

4        Q.   Does it matter to you for your opinions

5    which of the surfactants was in the Roundup sprayed

6    by Mr. Chapman?

7        A.   It would if he was using the Roundup

8    designed for use in aqueous environments, which does

9    not contain any POEA.  That would make a difference.

10   That would decrease the overall toxicity of the

11   product.

12           However, I don't believe that was the

13   product he used based on his use and not being in an

14   aqueous environment.

15       Q.   On page 50 you reference formaldehyde.

16       A.   That's right.

17       Q.   You don't know what trace levels of

18   formaldehyde, if any, there was in the Roundup

19   sprayed by Mr. Chapman, do you?

20       A.   I do know they used Roundup in 1987, and in

21   1985 quantitative data was available from Monsanto,

22   as shown in my report on Page 51.

23       Q.   And is that the 2.8 part per million that

24   you're referring to?

25       A.   As the calculated air level, yes.  That

1  would have been an exposure level that was

2  calculated by J.W. Worley at Monsanto.

3      Q.   On the second bullet point on Page 51 you

4  say:  It is also noteworthy that in 1995 a

5  glyphosate centrifuge feed MSDS was created by

6  Monsanto that revealed glyphosate centrifuge feed

7  contains up to 1.3 percent formaldehyde.

8          Is that correct?

9      A.   Yes.

10     Q.   And that's what you say is equivalent to

11 13,000 parts per million, right?

12     A.   Yeah, it is.

13     Q.   And you cite to a document, Footnote 101,

14 and the 13,000 parts per million number is based

15 solely on that 1995 MSDS for glyphosate centrifuge

16 feed, right?

17     A.   Right.

18     Q.   Doctor, I'm going to -- let me see if I can

19 attempt to anyway, show you that document based upon

20 the citation.

21          Doctor, are you seeing this Monsanto

22 material safety data document?

23     A.   Yes.

24     Q.   All right.  And is that the document you

25 reference in your report?

William R. Sawyer, Ph.D.

```
 1            If you want to look, it's got this same

 2   MONGLY number.

 3      A.   Yeah, that's it.

 4      Q.   All right.  And so is this the 1.3 percent

 5   that you're referring to?

 6      A.   Yes.

 7      Q.   And is that 1.3 percent equivalent to 13,000

 8   parts per million?

 9      A.   Yes.

10      Q.   Is the phrase "glyphosate centrifuge feed"

11   defined anywhere in this document?

12      A.   No.

13      Q.   What is a centrifuge?

14      A.   It's a device that spins at high RPM and the

15   gravitational force separates liquid from solid

16   particulate.

17      Q.   And so the centrifuge removes certain

18   materials from the glyphosate centrifuge feed,

19   right?

20      A.   Yeah.  Yeah, it removes liquid from the

21   cake.

22      Q.   So part of the process of this centrifuge is

23   to remove the contaminants, like formaldehyde, from

24   the actual glyphosate cake, correct?

25      A.   No.  The purpose is to remove the glyphosate
```

1    from the solid cake.

2        Q.   Have you ever manufactured a pesticide

3    before?

4        A.   No.

5        Q.   Have you ever worked with a centrifuge

6    before?

7        A.   Yes, all the time, many, many years.

8        Q.   Have you ever manufactured glyphosate?

9        A.   No.

10       Q.   And you don't consider yourself an expert in

11   glyphosate manufacturing, do you?

12       A.   No, but I'm an expert on centrifuges.

13       Q.   Your expert report does not contain any

14   opinions regarding the process by which glyphosate

15   is manufactured, correct?

16       A.   Correct.

17       Q.   And you're not qualified to give a

18   step-by-step process regarding the manufacture of

19   glyphosate, are you?

20       A.   I don't intend to, no.

21       Q.   Is central --

22            MR. DIAMOND:  Michael -- oh, sorry.  I'm

23       just -- I'm taking notes here and I wasn't sure

24       what number exhibit this is.

25            MR. HOGUE:  This will be Exhibit 8.  Sorry.

1          MR. DIAMOND:  Thank you.

2          (Sawyer Exhibit 8 was marked for

3     identification.)

4     BY MR. HOGUE:

5     Q.   Centrifuge feed is the slurry that goes into

6     the centrifuge, right?

7     A.   Yes.

8     Q.   It's not the product that emerges from the

9     centrifuge, right?

10    A.   No.  The product is the liquid glyphosate

11    which emerges.

12    Q.   So the MSDS on glyphosate centrifuge feed

13    certainly does not refer to the finished glyphosate

14    which is used as an ingredient in Roundup products,

15    right?

16    A.   Could you repeat that?

17    Q.   The MSDS on glyphosate centrifuge feed

18    certainly does not refer to the finished glyphosate

19    which is used as an ingredient in Roundup products,

20    right?

21    A.   Not in -- well, in part it does.  The

22    difference is the -- at that point, at that stage,

23    the adjuvants and other additives have not been

24    added to the product.

25    Q.   Have you seen any document anywhere in the

1  world that says Roundup used by either residential

2  users or commercial applicators contains 13,000

3  parts per million of formaldehyde?

4      A.    No.  I base my report on the 2.8 PPM in the

5  air.  I didn't make any calculation based on that

6  1.3 percent, 13,000 PPM level.  I'm simply stating

7  as a fact in the case that's what was in the

8  centrifuge feed, and that's an important fact

9  because that fact in the case helps explain why 2.8

10  PPM was calculated in the air.

11          In other words, the document that I

12  referenced is simply referring to evidence that the

13  glyphosate centrifuge feed contained 1.3 percent

14  formaldehyde.  That's exactly what the document says

15  and that's my opinion, that glyphosate centrifuge

16  feed contains up to 1.3 percent formaldehyde.

17          It sounds like you are trying to attempt or

18  accuse me of using that number to make some

19  calculation, and I have not done so.

20      Q.    Well, that would be false and misleading to

21  tell a jury that Roundup has 13,000 parts per

22  million of formaldehyde in the product that is used

23  by people spraying Roundup, wouldn't it?

24      A.    That would be more information than what was

25  stated.

William R. Sawyer, Ph.D.

1          What I would state to the jury is simply

2     that there is evidence of Roundup in 1995 -- not

3     Roundup, but glyphosate centrifuge feed in 1995

4     containing 13,000 PPM formaldehyde.

5     Q.   But it would be false and misleading to tell

6     a jury that Roundup has 13 parts per million of

7     formaldehyde in the product that is used by people

8     spraying Roundup, wouldn't it?

9     A.   Well, I would -- I would want to explain to

10    the jury that the precursor, the actual glyphosate

11    feed that came off the centrifuge, contained that

12    amount.  I would not state that the final product

13    did.  We don't know exactly what was in the final

14    product.  How much water is added to reach the

15    41 percent glyphosate level is a factor that would

16    dilute that to some extent.  There could be some

17    evaporative loss in production.  So we don't know

18    exactly what was in the final product because

19    Monsanto didn't report that data.

20    Q.   No study has ever suggested that there is a

21    high level of formaldehyde in the Roundup that's

22    used residentially or commercially when it's sprayed

23    by people in the field, right?

24    A.   Roundup in the field, no, that has not been

25    reported by Monsanto.  Monsanto has not made any

1    measurements of that sort.

2         However, in the J.W. Worley document it was

3    calculated that the air would contain 2.8 PPM, and

4    it's important for the jury to understand that

5    that's 28 times above the NIOSH short-term exposure

6    limit of .1 PPM.  It's above the ACGIH threshold

7    value of 2 PPM.  That is a significant air level.

8         And I'm going to say -- put with only

9    testifying as to what facts in the case would

10   provide.  I'm not making any calculations or any

11   estimates or any off-the-cuff opinions other than

12   what I have just stated.

13   Q.   IARC has never said that Roundup has a high

14   level of formaldehyde in it, did they?

15   A.   No.  IARC was not provided any information

16   from Monsanto as to what was in the product.

17        Fortunately, the various attorneys in this

18   case were able to obtain documents from Monsanto

19   through a legal challenge to obtain this document

20   that shows the 2.8 PPM.  In fact, I believe that was

21   on a series of e-mails.

22        So I don't believe that NIOSH -- not NIOSH

23   -- IARC would have access to Monsanto's internal

24   e-mails, so your question is rather unfounded.

25   Q.   The EPA has never found or stated that

1    there's a high level of formaldehyde in Roundup,

2    right?

3        A.   I don't -- no, I don't think EPA had access

4    to the confidential e-mails at Monsanto.

5        Q.   Have you ever tested Roundup sprayed by

6    people in the formulated product to determine the

7    level of formaldehyde?

8        A.   No.  Again, I'm relying on the Monsanto

9    documents in my report.

10       Q.   Well, if it's an important part of your

11   opinion that you're going to tell a jury about, why

12   not, as a toxicologist, test a Roundup bottle to

13   determine how much formaldehyde is in it?

14       A.   Again, I'm relying on the information I

15   received.  I have not been asked to perform testing

16   of the products.  Doing so would result in testing

17   of a 2021 product, where in this case the worker or

18   the home applicator stopped using the product about

19   18 years prior to that date of 2021, so I'm not sure

20   that would be appropriate anyway, but I have not

21   done so.

22       Q.   So, Doctor, you actually don't know what

23   level of formaldehyde was in any Roundup ever

24   sprayed, do you?

25       A.   No.  Again, I'm relying only upon the

1    documents on Page 51 in my report.  I'm not making

2    any extrapolations or guesswork of any type.  I'm

3    just relying on the data as is.

4         Q.   Right.  And the 13,000 parts per million is

5    in glyphosate centrifuge feed to which no one was

6    ever exposed when they sprayed Roundup, right?

7         A.   Correct, and I didn't state that in my

8    report.  I'm going to testify that ferrets were

9    exposed to 13,000 PPM.  That's not what my report

10   says.

11        I think you need to look at it at face value

12   and understand that that is my position and

13   testimony.  It's simply using these documents as

14   factually as stated.

15        Q.   And it would be misleading to a jury to

16   suggest that Roundup had -- that was actually

17   sprayed by the plaintiff had anywhere near 13 parts

18   per million of formaldehyde in it, wouldn't it?

19             MR. DIAMOND:  Form.

20        A.   Can you clarify that question?

21        Q.   Yeah.  It would be misleading to a jury to

22   tell them that Roundup sprayed by the plaintiff had

23   anywhere near 13,000 parts per million of

24   formaldehyde in the product, right?

25        A.   Correct.  However, it would be important for

1    the jury to understand that the glyphosate

2    centrifuge feed contains up to 13,000 PPM, as per

3    the Monsanto document, and that is important in

4    understanding the risk assessment performed by J.W.

5    Worley on May 30th, 1985.

6        Q.   Do you know what it means to catalyze the

7    byproducts formaldehyde and formic acid to carbon

8    dioxide?

9        A.   Yes.

10       Q.   And what does that mean?

11       A.   It's an attempt to reduce the chemical to a

12   harmless carbon dioxide.

13       Q.   And so if the centrifuge manufacturing

14   process -- strike that.

15           So if the manufacturing process from the

16   centrifuge feed to the final product catalyzed the

17   formaldehyde to carbon dioxide, that would

18   significantly change the formaldehyde level that was

19   later used in the formulated product that's sprayed

20   by the plaintiff, right?

21       A.   Yes.  It would reduce that level from

22   13,000.

23       Q.   It could reduce it to zero, correct?

24       A.   Not likely.

25       Q.   But you don't know how much the process of

William R. Sawyer, Ph.D.

1    catalyzing the formaldehyde in the product reduced

2    the formaldehyde level, correct?

3        A.   No, but I do know based on the assessment

4    made by J.W. Worley it didn't reduce it to zero.

5        Q.   But J.W. Worley, he didn't actually take a

6    measurement in the air, right?

7        A.   No.  He made a risk assessment calculation.

8        Q.   So the product described on the MSDS

9    glyphosate centrifuge feed is not the product that

10   is being handled or sprayed by the plaintiff, right?

11       A.   I have already explained that several times,

12   that it is the precursor, it is not the final

13   product.  I don't understand why you don't get that.

14       Q.   And the process of catalyzing it would be an

15   ongoing effort to reduce the level of formaldehyde

16   in any product that's actually used by a plaintiff,

17   right?

18       A.   Yeah.  It's a routine procedure used on

19   everything from baby shampoo to other products

20   containing formaldehyde, and one 1,4-dioxane, and

21   other byproducts that are formed during oxidation

22   reactions.

23       Q.   And the result of that process is that the

24   formaldehyde level in a finished Roundup product was

25   at a -- only a trace level of formaldehyde; is that

1    correct?

2        A.    I don't see any evidence of what level it

3    was.  I don't have any test results that document

4    trace level, but I do agree that certainly that

5    process would reduce the level.

6        Q.    Do you know what exposure level to

7    formaldehyde would result in almost immediate eye

8    irritation or sharp burning sensation of your nose

9    of throat?

10       A.    Approximately 20 PPM would be the immediate

11   acute level.

12       Q.    And what are you referring to, Doctor?

13       A.    I'm referring to the IDLH value, which is 20

14   PPM.

15       Q.    You are looking at a book.  What book are

16   you looking at?

17       A.    I'm looking at my NIOSH Pocket Guide to

18   Chemical Hazards.

19       Q.    All right.  And according to NIOSH, if you

20   are exposed to 10 to 20 parts per million of

21   formaldehyde, it would produce immediate eye

22   irritation and sharp burning; is that right?

23       A.    Well, somewhere -- really, somewhere between

24   the short-term limit of two PPM and IDLH of 20 PPM,

25   somewhere in that range.  It's going to vary with

```
 1   individual to individual.

 2      Q.   And you've personally used Roundup before,

 3   right?

 4      A.   Yes.

 5      Q.   And you didn't get any eye irritation, did

 6   you?

 7      A.   No, I don't believe so.

 8      Q.   And Mr. Chapman got Roundup all over his

 9   face, including in his mouth, right?

10      A.   Yes.

11      Q.   And he didn't describe any eye irritation,

12   correct?

13      A.   Correct.

14      Q.   So based upon the NIOSH data, that would

15   certainly indicate that the level of formaldehyde

16   that was in any Roundup that he sprayed was not at a

17   level that would cause any eye irritation, right?

18      A.   No, that's not true.

19      Q.   And why is that?

20      A.   Because the eye irritation would begin

21   somewhere between two and 20 PPM of formaldehyde.

22      Q.   So there certainly wasn't between two and 20

23   formaldehyde in the Roundup sprayed by Mr. Chapman,

24   right?

25      A.   That's incorrect.  The lower threshold is
```

William R. Sawyer, Ph.D.

1    somewhere between two and 20.  It could have been

2    19, it could have been 2.5, anywhere in that range.

3    We don't know exactly where his personal eye

4    irritation level would start with formaldehyde,

5    somewhere within that range.

6        Q.   So it certainly wasn't anywhere near 13,000

7    parts per million, right?

8        A.   I don't understand the question.  I never

9    implied or said it was 13,000 PPM.

10       Q.   Okay.  And in fact --

11       A.   I don't understand.  What do you mean by

12   that, 13,000 PPM?  That's what was in the centrifuge

13   feed.

14       Q.   So we're in agreement that what was in the

15   centrifuge feed is a not a level of formaldehyde in

16   Roundup that's sprayed by people when they buy it

17   from the shelves, right?

18       A.   Yeah.  I stated that about 15 minutes ago,

19   what it was.

20       Q.   And you -- and you actually don't know what

21   level of formaldehyde was in the products sprayed by

22   the plaintiff, right?

23       A.   Correct.  I'm relying on the assessment of

24   J.W. Worley.  Monsanto has never issued any further

25   information on formaldehyde levels in their finished

William R. Sawyer, Ph.D.

```
 1    product, so what I'm relying on is on Page 51 in my

 2    report, nothing further.

 3        Q.   All right.  Doctor, I'm going to mark as

 4    Exhibit 5 the invoice that you had for the

 5    deposition in this case.  I got it by e-mail but let

 6    me see if I can find it.

 7             Do you have that invoice with you?

 8        A.   I can call it up.  What was the date?

 9        Q.   It was August 9, 2021, to David Diamond, and

10    it's in the amount of $3400.

11        A.   August 21?

12        Q.   No.  August 9.

13        A.   Oh, August 9.

14             Yeah, it was an invoice for $9,254.28.  I

15    have it called up.

16        Q.   Well, for the -- the deposition invoice is

17    for $3,400?

18        A.   Okay.  I didn't open that one but I do

19    recall that, yes.

20        Q.   Okay.  That would be your standard fee for a

21    three-hour deposition, right?

22        A.   Yes.

23        Q.   All right.  So your invoice -- I'm going to

24    mark as Exhibit 6 your invoice in the Chapman case

25    for the preparation of your report, and that one is
```

William R. Sawyer, Ph.D.

```
 1    dated August 9 as well, in Chapman vs. Monsanto, and

 2    it is actually for $18,674.28, right?

 3        A.   Yes.

 4        Q.   And you were paid a retainer of $9,000,

 5    which you deducted from that amount.  Well, $9,420,

 6    right?

 7        A.   Yes.

 8        Q.   And is that the typical retainer that you

 9    require in these cases related to Roundup?

10        A.   It varies on the complexity of the case.

11        Q.   What's the range for your retainers in

12    Roundup cases?

13        A.   Between eight and 12 hours.

14        Q.   At what rate?

15        A.   785.

16        Q.   So somewhere between 6,000 and 9,000 or

17    10,000, somewhere in that range?

18        A.   Yes.

19        Q.   So is $18,674.28 a typical amount that you

20    charge for reviewing materials and preparing your

21    report?

22        A.   Yeah, it's within probably middle range.

23        Q.   Doctor --

24        A.   I would say lower to middle range, actually.

25        Q.   You say lower to middle range.  Your typical
```

William R. Sawyer, Ph.D.

1    review of a case in preparation of a report is more

2    time and with an invoice of a little over $20,000?

3        A.   Yes.  Yeah.  It seems that I've had a number

4    of very complex cases that go way over that.  For

5    example, the Jimenez case, very complex, a lot of

6    hours.

7        Q.   And how many -- well, do you know what the

8    invoice in the Jimenez case will be?

9        A.   No, I haven't prepared it yet.  I haven't

10   had time to put it together.

11       Q.   Doctor, do you have the Stephens invoice

12   with you?  It is dated July 12th, 2021.

13       A.   Yes.  That was a very complex case, very

14   large invoice, 46 -- or, well, $45,610.

15       Q.   Okay.  And if you break that up, it was

16   $38,810.18 for your review of materials in

17   preparation of your report; is that correct?

18       A.   Yes.

19       Q.   And $6,800 for your deposition in that case;

20   is that right?

21       A.   Right, right.  The report itself was

22   50.19 hours.

23       Q.   So your total with the deposition and

24   preparation of your report in the Stephens case was

25   $45,610.18, right?

1     A.   Right.

2     Q.   And you will spend additional time in that

3   case after your deposition as well, correct?

4     A.   Well, I did, yeah.  It shows on Page 4 of

5   the invoice about 13 hours of work responding to the

6   Daubert motion or Sargon motion, whichever it was.

7     Q.   All right.  And that case -- well, that case

8   is in trial, so you will spend additional time as

9   you prepare for that trial, right?

10    A.   Yes.

11    Q.   Okay.  So I just -- the 45,000 is not the

12  total amount of time that you will spend and be paid

13  for in the Stephens case, right?

14    A.   Correct.

15    Q.   All right.  Let me see, Doctor.

16         I want to mark as Exhibit 9 kind of a

17    summary of at least some of the invoices that I

18    have and make sure I understand this.

19         (Sawyer Exhibit 9 was marked for

20    identification.)

21  BY MR. HOGUE:

22    Q.   How can I send it to you so that you can

23  pull it up?  Or I can send it to Mr. Diamond, we

24  could take a break and him get it to you.

25    A.   I'd rather not do the break thing, but can

William R. Sawyer, Ph.D.

```
 1   you just do it on a share screen?
 2       Q.   Sure.  Well, I can try to do it.
 3            All right.  Are you seeing -- this is what
 4   I'm going to mark as Exhibit 9 and it relates to six
 5   of your cases for your invoices.  Can you see that?
 6       A.   Yes.
 7       Q.   I have a question mark in the Pilliod case
 8   under deposition.
 9            You were actually deposed in the Pilliod
10   case, right?
11       A.   Yes.
12       Q.   And do you recall what you would have
13   charged back in that time period for your
14   deposition?
15       A.   Yeah.  I see it on the page to the right,
16   6500.
17       Q.   Well, that's for Caballero right here, but
18   for Pilliod, I for some reason don't have the
19   actual --
20       A.   Well, to the right where it says "other."
21       Q.   Yeah.
22       A.   That 6500, that's what I charged for
23   deposition.
24       Q.   No, that 6500 -- we can go through it.
25   That's why I wanted to make sure.  That 6500 is for
```

```
1     your one day of testimony at trial in the Pilliod
2     case, right?
3        A.   But that's the same price --
4        Q.   Okay.
5        A.   -- as deposition.  Now, the trial cost might
6     have been in that above figure.  It says 21,206.
7     There may have been the -- because I was there more
8     than one day, I know that, and there was quite a bit
9     of preparation as well.
10       Q.   All right, Doctor.  Hold on.  Let me see.
11    Just one second.  Let me -- I wish I could share two
12    screens.  That's why I was going to send it to you.
13          So, Doctor, if we go to -- this wasn't
14    marked as an exhibit in your Johnson case, the first
15    case, and we discussed this a little bit last time,
16    but I wanted to make sure my numbers are right.
17          There was $36,000 you billed in that case,
18    and then there was $6,000 that was in that case, and
19    a 29,000 number that was billed in that case,
20    $7,000, we had three depositions at $4600, an
21    additional -- this was the $21,000 that was for your
22    trial preparation and --
23       A.   Take a look and see if that includes that
24    6500 that was in the other column.
25       Q.   Well, we were talking about Pilliod.  This
```

1    is Johnson and Johnson --

2         A.   Oh, okay.  You're right.

3         Q.   -- 4600.  I would have made it easier and

4    included this 27, you know, thousand, but I didn't

5    include in this calculation whatever taxis and hotel

6    rooms.

7              So I can send these to you at the end of the

8    deposition.  I just want to make sure that I'm clear

9    when I'm highlighting new things and adding them up

10   on here that they reflect -- let's see.

11             That's why I was going to send this.  Why

12   can't I share screen?  God, I hate going back and

13   forth.

14             All right.  So is this showing the Sawyer

15   invoice I'm going to mark as Exhibit Number 9 again?

16   So we talked about this in the Johnson case and it's

17   highlighted, the 36,000, the 57,000, 15,000, 6,000,

18   29,000.  That comes up to $146,027.87, your three

19   depositions of $13,800, and your time after your

20   deposition in preparation for trial and testifying

21   at trial was 33,000.

22             I can attach as Exhibit 10 all of those

23   invoices with those highlights that show those

24   numbers for the Johnson case.

25             (Sawyer Exhibit 10 was marked for

1    identification.)

2    BY MR. HOGUE:

3       Q.   And, Doctor, would you agree that that

4    193,000 number is in the range of what you invoiced

5    for that case?

6       A.   I don't know.  I mean, I really can't be

7    certain that what you have in each column is

8    accurate.  It's probably close but I don't know.

9       Q.   Well, Doctor, if I send you the invoices

10   broken out by exhibits, would you identify in an

11   errata sheet any differences that you have in this

12   group of six cases?

13      A.   I think I would have to have the invoices

14   and then check them to make sure that in the other

15   column things aren't being duplicated.

16      Q.   Okay.

17      A.   But I would need the data to work from.

18      Q.   Why don't we do this.  I can e-mail you this

19   Exhibit 9, and I'll send it to Mr. Diamond right

20   now, and we'll walk right through it and make sure

21   that these numbers are accurate.

22           MR. DIAMOND:  Michael.

23           MR. HOGUE:  Yes.

24           MR. DIAMOND:  Was that exhibit something

25      that your office had put together?

```
 1          MR. HOGUE:  Yes.  It's just a summary of
 2     exactly what are in his invoices.
 3          MR. DIAMOND:  And so right now you just want
 4     him to go back and double-check his invoices that
 5     you're going to --
 6          MR. HOGUE:  Yeah.  I just want to make sure
 7     that this is -- that it's being counted correctly
 8     so that I can do it for the other cases and
 9     that we're in -- that this is the right way to do
10     it.  I don't want to have any double counting.
11          And I don't know why I can't send this.  No,
12     don't leave the meeting.  I'm not sharing a
13     screen right now, right?  So let me see if I can
14     -- Outlook box is open?  What the heck?
15          Can we go off the record one second?  Let me
16     see -- I'm trying to e-mail this to -- oh, there
17     it is.  Hold on a second.
18          THE VIDEOGRAPHER:  Do you still want to go
19     off the record?
20          MR. HOGUE:  No, that's all right.
21          Diamond, David Diamond.
22          MR. DIAMOND:  Yes.
23          MR. HOGUE:  I'm going to send you this
24     invoice and if you don't mind sending it to
25     Dr. Sawyer so he can have it, and then I can pull
```

1       up another document on the screen.

2               MR. DIAMOND:  I don't mind.

3               MR. HOGUE:  Why don't we just take the last

4       five-minute break and then we'll --

5               All right.  Let's go off the record for just

6       two minutes and then I'll get Dr. Diamond to send

7       it to -- Mr. Diamond to send it to Dr. Sawyer.

8               THE VIDEOGRAPHER:  The time now is 10:48 a.m.

9       We are now off the record.

10          (Recess from 10:48 a.m. until 10:54 a.m.)

11              THE VIDEOGRAPHER:  The time now is 10:54 a.m.

12      We are now on the record.

13      BY MR. HOGUE:

14      Q.   Doctor, do you have Exhibit 9, which is the

15      summary for these six cases?

16      A.   Yes.

17      Q.   All right.  So if you have that, you can

18      then look at my screen.  Can you do that so that we

19      can compare the numbers?

20      A.   I can because I'm currently printing the

21      document, so I need to be on the screen.

22      Q.   Okay.  Am I sharing the screen yet or not?

23      No?

24      A.   All right.  I have the printed document.

25      Q.   Well, why isn't that showing?  Hold on a

William R. Sawyer, Ph.D.

1    second.

2              MR. HOGUE:  No, I'm not -- am I sharing a

3        screen yet?  Because I'm not trying to.  I'm

4        trying to find the actual screen page.

5              MR. DIAMOND:  Not yet.

6              MR. HOGUE:  All right.  Technology is fun.

7              Well, why won't it -- okay.

8    BY MR. HOGUE:

9        Q.   So is this showing a document that starts

10   off with "Trials and Depositions - Past 3 Years"?

11       A.   Yes.

12       Q.   All right.  So that should be on one page.

13   All right.  So now I'm with me.

14             So if you go down, on the second page of

15   that -- what was a deposition exhibit, you have

16   these invoices that were produced in the Johnson

17   case.  This is your first case and it just dealt

18   with your review of all these materials.  We covered

19   this a little bit last time but I want to make sure.

20             If you look at the summary chart, I'm going

21   to go through the things that are highlighted on

22   this document, and I'll mark this Johnson exhibit as

23   Exhibit 10 to this deposition, this Johnson invoice.

24             So you see your professional services were

25   $36,857.13, that is represented correctly on

William R. Sawyer, Ph.D.

1    Exhibit 9, right?

2       A.   Yes.

3       Q.   Then there's an invoice for an additional

4    $57,637.98, right?

5       A.   Yes.

6       Q.   And there's an additional invoice for

7    $15,555.80, right?

8       A.   Yes.

9       Q.   Then there's an additional invoice for

10   $6,799.43, right?

11      A.   Yes.

12      Q.   And finally, around December of 2017, you

13   invoiced $29,177.53 in that Johnson -- that first

14   case, right?

15      A.   Yes.

16      Q.   And so you don't have to use a calculator

17   but we can calculate -- use a calculator and get to

18   $146,027.  Do you see that?

19      A.   Yeah.  So that represents about 317 hours of

20   work.

21      Q.   Okay.  And then as we've discussed before,

22   you had three days of deposition, so it was $13,800,

23   right?

24      A.   Yes.

25      Q.   And those are highlighted on here, too.

```
 1    There's the first day and there are two more days.

 2    Okay?

 3           In addition, you -- to the deposition days,

 4    you have a fee of $7,823.19 that was after your

 5    deposition, so it was in the February 2018 time

 6    frame, right?

 7       A.   Okay.

 8       Q.   All right.  So that's the 7,823.

 9           And then we -- the trial invoices, you had a

10    $21,209.11 and an invoice of $4600.

11           Do you see that?

12       A.   Right.

13       Q.   All those are shown accurately in Exhibit 9

14    on this chart, right?

15       A.   Yes.

16       Q.   Okay.  If we go to Mares, it will be a lot

17    easier and I'll mark Mares as Exhibit -- specific

18    invoices -- when I say invoices, in that case you

19    sent invoices but we received supplemental

20    disclosure.  So let's just -- let me show it to you.

21           It actually makes it a lot easier.  Let me

22    see.  Share screen.

23           All right.  So you have -- am I sharing

24    this -- your invoice here, the May 11, 2011?

25       A.   2021, yes.
```

1      Q.   I mean, excuse me, 2021.

2          So that's the invoice for your deposition of

3    3400, right?

4      A.   Yes.

5      Q.   That's on the chart correctly.  And then

6    there's this supplemental disclosure by Mr. Holt.

7    He's the plaintiff's counsel in that case, right?

8      A.   Yes.

9      Q.   And it said Mr. Sawyer, he has been paid

10   another $19,109.68 for a total of $48,609.68 to

11   date.

12          Do you see that?

13     A.   I see that.

14     Q.   All right.  And that's in addition to the

15   $3400 that you were paid for your deposition, wasn't

16   it?

17     A.   Yes.  However, I prefer to have the review

18   of the individual invoices.

19     Q.   Well, if you will send them to me, I will be

20   glad to add those, but this is all we received in

21   that case.

22     A.   Well, that's -- I provided those to the

23   attorney.  I'm not going to send anything directly

24   to you.  I have already sent those to the attorney.

25     Q.   When you say to the attorney, you sent them

William R. Sawyer, Ph.D.

```
1    to Mr. Holt?

2        A.   That's right.

3        Q.   Okay.  But you don't disagree with his

4    statement that you were paid $48,619.68 in that case

5    for your review of materials and preparation of your

6    report, right?

7        A.   Well, I guess I'd have to take a few minutes

8    but I'm going to have to -- if you want me to answer

9    that question, I have to actually look at the

10   invoices.

11       Q.   If that's what you need to do.

12       A.   Well, I mean, you are asking if I agree with

13   that number.  The only way I can answer your

14   question is to look at the invoices.

15       Q.   You don't have any reason to believe that

16   Mr. Holt overstated or understated the amount that

17   you had charged him in the case, do you?

18       A.   No, no, but I'm just -- you asked me to

19   confirm the number.  That is impossible for me to do

20   out of memory.  I would have to, you know, look at

21   the actual invoices and add them up.

22       Q.   And you spent a lot of time in the Mares

23   case, right?

24       A.   Yes.  It was a very complex case.  A lot of

25   the time was spent due to defendant's claim that the
```

1    refinery had something to do with his cancer.

2    Q.   So you don't have any disagreement that you

3    were paid approximately $52,000 in the Mares case,

4    right?

5    A.   Can you repeat that, the first part of the

6    question?

7    Q.   You don't have any reason to disagree that

8    you were paid about $52,000 in the Mares case for

9    your time -- work on that case, including your

10   deposition, right?

11   A.   No.   That -- without adding up the invoices,

12   I don't have any reason to agree or disagree.

13   Q.   So this number is -- in this disclosure by

14   Plaintiff's counsel in that case you think is -- I

15   mean, you say you don't have any reason to agree or

16   disagree.   This doesn't give you any reason to agree

17   that that number is accurate?

18   A.   It probably is but, I mean, you're asking me

19   to answer a question that I can't answer in a

20   reliable fashion without looking at the invoices and

21   adding them up.

22   Q.   Okay.

23   A.   Now, we did that with Johnson, we actually

24   looked at invoices and added them up.

25   Q.   Well, if you'll --

1    A.   You're asking me a question that I cannot

2    answer in a reliable fashion unless we actually call

3    them up and look.

4    Q.   Well, if you will provide them, I'll be glad

5    to go through them.

6    A.   I've already provided them to Attorney Holt.

7    So how shall I -- you know, I can send them again to

8    Attorney Holt, but I don't know that that's going

9    to -- I think you need to go back and get them from

10   Attorney Holt.

11   Q.   All right, Doctor.  So -- well, do you

12   disagree that 52,000 is an estimate of the amount of

13   money that you were paid in that case?

14   A.   Yes, I think it's an estimate.

15        MR. HOGUE:  All right.  And I thought that

16     was going to be the fast one, but we'll -- I'll

17     mark that as Exhibit what, 11, the Mares invoice

18     and Plaintiff's disclosure.

19        (Sawyer Exhibit 11 was marked for

20   identification.)

21        MR. HOGUE:  I'll mark as Exhibit 12 the

22     Caballero invoices.

23        (Sawyer Exhibit 12 was marked for

24   identification.)

25   BY MR. HOGUE:

1    Q.   Is it sharing the screen?

2    A.   Yes.  It's showing the invoice submitted to

3    -- I don't see -- there it is.  It shows the name of

4    the case, Caballero.

5    Q.   All right.  So Caballero, and here we are in

6    Caballero, you charged $26,540.78 up through your

7    preparation of your report; is that right?

8    A.   Agreed.

9    Q.   Okay.  And then you charged 6500 for your

10   deposition in the case.  Let me get there.  6500 for

11   your deposition in the case, right?

12   A.   Yes, but I think you have to go back.  I saw

13   a 7800 figure.  I'm not sure what that was.  Oh,

14   that was a retainer.

15   Q.   So I'm not being duplicative by adding a

16   retainer to the amount you served -- I mean the

17   amount you invoiced.  So the total with the retainer

18   and the amount you were paid is $26,540.78, right?

19   A.   Well, I was paid at that point in time 7800

20   with a balance due of 18,740.

21   Q.   But you were also paid the 18,740, right?

22   A.   Right.  That adds up to 26,540, and that I

23   agree with.

24   Q.   Okay.  So it's 26,000 and then the $6500 you

25   were paid for your deposition, right?

```
1        A.    Correct.  And then --
2        Q.    You were also paid $28,065.73 for your other
3    time after your deposition, right, trial
4    preparation?
5        A.    Yes.
6        Q.    So based upon those invoices, is it accurate
7    to say you were paid about $61,000 in the Caballero
8    case?
9        A.    Well, let me ask you.  Is the math in the
10   summary sheet done by Excel or was it done manually?
11       Q.    Well, if you have -- you said you had a
12   calculator there, right?
13       A.    Yeah.  I mean, I could just do a rough
14   calculation here.
15             19.8 plus 21.2 plus 6.5 equals 47.5.
16             So, yeah, this is -- oh, no, I just added up
17   Pilliod.  I didn't add up the right numbers.  Hold
18   on.
19             26.5 plus 28.1 equals 61.1.
20             So, yeah, that adds up.
21       Q.    Okay.  Well, let's go to -- the next one is
22   Pilliod.  I'll mark Pilliod as Exhibit 12.  No, the
23   next one.  Caballero is 12.  13 will be Pilliod.
24             (Sawyer Exhibit 13 was marked for
25   identification.)
```

William R. Sawyer, Ph.D.

```
 1    BY MR. HOGUE:

 2        Q.   All right.  This is the Pilliod case, right?

 3        A.   Yes.

 4        Q.   And your invoices, as shown, you have

 5    19,804?

 6        A.   Back up, please.

 7        Q.   Sure.

 8        A.   Okay.  No retainer.

 9        Q.   So you invoiced for 19,084.59, right?

10        A.   Right.

11        Q.   And you also -- you were deposed, right, in

12    that case?

13        A.   Yes.

14        Q.   And you were paid for your deposition,

15    right?

16        A.   Yes.

17        Q.   Do you know whether it was 4600 or whether

18    it was 6500?

19        A.   I think 6500.

20        Q.   So if I included 6500 in this chart and

21    added that to the amount, that would -- that would

22    be an accurate statement, right?

23        A.   Once I see the invoice that shows the 6500

24    to be certain that was really trial and not

25    deposition.
```

1    Q.   Sure.  I'll get to the rest of them.

2         So under the other -- after the deposition

3    or preparation for trial, this is in -- you can see

4    travel to Houston, travel from San Francisco

5    airport, to time in Oakland.  You invoiced 21,206.

6    That's on the chart, right?

7    A.   Yes.

8    Q.   All right.  And then you have another $6500

9    for one day of trial, right?

10   A.   Well, now this is confusing, because I see

11   the taxi, airfare, hotel.  Were any of these things

12   listed above if you back up?  I want to make sure

13   it's not redundant.

14        Back up further.

15   Q.   Oh, sure.

16   A.   Okay.  Yeah, I think that's right.  I don't

17   see any redundancy.

18   Q.   Yeah.  I wanted to make your expenses,

19   that's -- you didn't actually make income on

20   expenses, right?

21   A.   Right.

22   Q.   So that's why I didn't use the total bill of

23   29,000, I used the lesser number of 21,000 plus the

24   6500, and that's what's shown in the chart, right?

25   A.   Yeah.

```
1        Q.   So in Pilliod you were paid the 47,500, as
2    long as those numbers add up, and plus $6500, so
3    roughly -- that's going to be 54,000, roughly, in
4    the Pilliod case; is that right?
5        A.   I'm checking the math.
6             Roughly 54 is what I'm coming up with.
7             (Sawyer Exhibit 14 was marked for
8    identification.)
9    BY MR. HOGUE:
10       Q.   All right.  The next invoice will be Lamb,
11   and this is one I wanted to make sure I got
12   clarification on.
13            Do you see this invoice in Lamb?
14       A.   Yes.
15       Q.   Well, I've lost my other screen.  Hold on a
16   second.
17            All right, Doctor.  So in Lamb, the invoice
18   is for 43,000.  That's for the invoices in the Lamb
19   case, right?
20       A.   I don't know.  You went too quickly.  Go
21   back to the top.
22            Why is that redacted at the top?
23       Q.   Why is it redacted?
24       A.   Yeah.
25       Q.   That's the way it was sent to us.
```

```
 1        A.   Hmm.  Go a little slower going through it.

 2        Q.   Yeah.  I think that's your -- I don't know

 3   if it's a billing number or whatever else, but

 4   that's -- I think that it was required or wanted to

 5   be redacted so it didn't give away your or the law

 6   firm's information.  I don't have any problem not

 7   using one that's redacted.

 8             And you see there's discussions in here

 9   about the bill being split with the Cohen invoice.

10   Do you see that?

11        A.   Yeah.

12        Q.   That was my question.  I don't have a Cohen

13   invoice and, you know, you were paid 6500 for your

14   deposition, half of it was billed on this invoice to

15   the Lamb case; is that correct?

16        A.   Yeah.  There are items that appear to be

17   shared 50/50.

18        Q.   And do you have another invoice that you

19   sent to Plaintiff's counsel for the Cohen case?

20        A.   I'll check on that.  I really thought I

21   turned everything over I had, but I'll check.

22        Q.   That's the one that I am missing, and in

23   your deposition you testified that you had spent

24   about 50 hours in each case, or a hundred total, and

25   that would add up to more than the 43,000 here, and
```

1    the indications that times are split suggests

2    there's a separate invoice for Cohen than there is

3    for Lamb.

4       A.   Correct.  All right.  Next question?

5       Q.   All right.  Did you find an invoice for

6    Cohen?

7       A.   Well, I will look.

8            I have an invoice for Cohen and it has the

9    share splits on it from the Lamb, and the invoice is

10   dated July 26, 2019, and the total amount of the

11   invoice was 46,764.78 plus a 3250 deposition charge,

12   totaling $50,014.78.

13      Q.   Do you mind sending that invoice to

14   Mr. Diamond and I will add that once I receive it,

15   marked as Exhibit 16 to the deposition?

16      A.   Okay.  I'm sending it now.

17           (Sawyer Exhibit 16 was marked for

18   identification.)

19           MR. DIAMOND:  All right.  I have just

20       forwarded it.

21           MR. HOGUE:  Okay.  We will mark that as

22       Exhibit 16.

23   BY MR. HOGUE:

24      Q.   So my last question on this -- on the Lamb

25   case is the chart accurately reflects 43,809.45,

William R. Sawyer, Ph.D.

```
1    plus the $32,500 [sic] for your deposition; is that
2    correct.
3        A.   Yes.  And I found another invoice on Cohen,
4    so I just sent that to Attorney Diamond.
5        Q.   All right.  We will mark --
6        A.   So there's two invoices on Cohen.
7        Q.   All right.  And so I'll mark them as
8    Exhibits 16 and 17 to the deposition once I receive
9    them.
10           (Sawyer Exhibit 17 was marked for
11   identification.)
12           (Sawyer Exhibit 15 was marked for
13   identification.)
14   BY MR. HOGUE:
15       Q.   All right, Doctor.  The last one I wanted to
16   cover with you today is Gigli -- am I saying that
17   right -- Giglio or Giglio invoice?
18       A.   It was pronounced Giglio.
19       Q.   Giglio.  All right.
20       A.   Yeah.  He's the fellow, I believe, who put
21   in the artificial turf and carpet spray prior to
22   planting.
23       Q.   Okay.  And this is the Giglio case invoice
24   that you sent in that case, right?
25       A.   Yes.
```

1      Q.    And that will be Exhibit 15, and so if you

2   go down in that one, you billed $37,504.66, right?

3      A.    Yes.

4      Q.    And you have $6500 for your deposition in

5   that case, right?

6      A.    Yes.

7      Q.    And so that total is $44,004.66 that you

8   were paid up through the time of your deposition,

9   right?

10     A.    Yes.

11     Q.    Do you know if you did any other invoices in

12  the Giglio case?

13     A.    Let's go to the last item, the last billable

14  item.

15     Q.    The last one I have is right there.

16     A.    Right, but go up so I can see what was --

17  finish and edit the report.  So, no, that would have

18  been it.

19     Q.    Okay.

20     A.    Wait a minute.  Finish and edit the rebuttal

21  to Dr. Le Beau.  Okay.

22           Go up further.  I want to see if my report

23  was finished.

24           I don't know.  That doesn't really -- I

25  don't see where I issued the report.

William R. Sawyer, Ph.D.

1          Oh, there it is, Giglio report continued,

2     final edits and submission.  Yeah.  No, that's it.

3       Q.   Okay.

4       A.   Yup.

5       Q.   All right.  Let me stop share here.

6            So, Doctor, if you look at the Exhibit 9,

7     which is the summary of these six cases, with the

8     addition of $6500 the Pilliod deposition and

9     assuming that this calculation is correct, you have

10    been paid about $450,000 in those six cases; is that

11    right?

12      A.   Yes.

13      Q.   And then in the Cohen case you were paid

14    more than $50,000, right?

15      A.   I think so.  I forwarded those invoices, so

16    that will have to be looked at.

17      Q.   So in those seven cases you were paid a

18    little over $500,000, right?

19      A.   Yes.

20      Q.   And then we have the invoice in this case

21    and the Stephens case and the other cases that would

22    be added to this, right?

23      A.   Yes.

24      Q.   In the Clark case I asked you if you have

25    any estimation of you total amount of money you have

William R. Sawyer, Ph.D.

1    been paid in Roundup litigation.  At that point you

2    didn't have an estimate.

3         Have you looked at your invoices to come up

4    with a best estimate of how much you've been paid in

5    the Roundup litigation to date?

6    A.   You're asking me specific to the Clark

7    invoice?

8    Q.   No, specific to the Roundup litigation in

9    total.  Have you attempted to estimate how much

10   you've been paid in the litigation so far?

11   A.   No, I've never made such an attempt.

12   Q.   Okay.  One way to do it would be for you to

13   take your invoices and add them up like I've done it

14   here in Exhibit 9, right?

15   A.   Yes.

16   Q.   All right.  And you agree that Exhibit 9

17   accurately reflects what you've been paid in those

18   six cases, right?

19   A.   Yes.

20   Q.   Okay.  Just one second.  Let me see if

21   there's other things.

22        Doctor, all of your current income comes

23   from serving as an expert in litigation; is that

24   right?

25   A.   Not always as a testifying expert, but in

1    some forensic form, yes.  I'm a forensic

2    toxicologist and that's what I've been trained to

3    do.

4        Q.   And have you talked to Dr. Portier and

5    Dr. Benbrook about the business of being an expert

6    witness?

7        A.   The business?  No.

8        Q.   Okay.  Have you talked to -- have you given

9    any advice to Dr. Portier about advertising for

10   services as an expert witness?

11       A.   Never.

12       Q.   Have you ever talked to Dr. Portier about

13   how to become more involved in litigation as an

14   expert?

15       A.   No.  No.  The only thing I've talked to

16   Dr. Portier about that's even closely related is how

17   to handle new clients that call in terms of vetting

18   them to determine whether they have the wherewithal

19   and experience to handle such a highly complex case

20   as this one, and -- in other words, I had a concern,

21   so did Dr. Benbrook and Chris, that we really didn't

22   want to get involved with these Monsanto cases

23   unless the law firm really has the history, the

24   experience, and wherewithal to handle such highly

25   contested matters.

William R. Sawyer, Ph.D.

1    Q.   Have you helped connect Dr. Portier with

2    plaintiffs' counsel in litigation cases?

3    A.   I'm not sure what you mean by that.  You

4    mean did I refer him?

5    Q.   Yes.

6    A.   I think I have referred Dr. Portier on some

7    cases, yes.

8    Q.   Have you referred Dr. Portier to plaintiffs'

9    counsel in litigation outside of Roundup?

10   A.   No.

11   Q.   Have you had any other discussions with

12   Dr. Portier regarding payments in litigation or

13   referrals to plaintiffs' expert in litigation?

14   A.   With respect to payment, no, none what --

15   none at all.

16        In terms of referring him to other clients,

17   I have.  I have referred him on some other cases.

18   Q.   Is there anything additional that's new in

19   your report in the Chapman case on any of your

20   generic opinions that you've added?  I think you've

21   identified one, like a peer study.  Is there

22   anything else that's new in this report compared to

23   Mares or Stephens or Clark?

24   A.   What do you mean by new?

25   Q.   I mean -- I mean, have you added a new

William R. Sawyer, Ph.D.

```
1    opinion related to Roundup since then?

2        A.   I would say no new opinions.  They are

3    already in the report.

4            MR. HOGUE:  All right.  Thank you, Doctor.

5        I appreciate you answering my questions today.

6            THE WITNESS:  Okay.  Very good.

7            MR. HOGUE:  David, do you have questions?

8            MR. DIAMOND:  I do not.

9            MR. HOGUE:  All right.  Then we can -- well,

10       I'm going to need to stay on and get the court

11       reporter's e-mail, but I don't know that we need

12       the doctor to do that.

13           And I will send these invoices in the

14       next -- I mean invoices -- these exhibits to the

15       court reporter and Mr. Diamond in the next,

16       hopefully, half hour or so.

17           THE VIDEOGRAPHER:  One second so I can go

18       off record.

19           The time now is 11:30 a.m.  We are now off

20       the record.

21           (Whereupon, the deposition concluded at

22       11:30 a.m.)

23

24

25
```

```
 1              C E R T I F I C a T E

 2

 3         I, KELLY J. LAWTON, Registered Professional

 4    Reporter, Licensed Court Reporter, and Certified

 5    Court Reporter, do hereby certify that prior to the

 6    commencement of the examination, WILLIAM SAWYER,

 7    Ph.D., was duly remotely sworn by me to testify to

 8    the truth, the whole truth, and nothing but the

 9    truth.

10         I do further certify that the foregoing is a

11    verbatim transcript of the testimony as taken

12    stenographically by me at the time, place, and on

13    the date hereinbefore set forth, to the best of my

14    ability.

15         I do further certify that I am neither a

16    relative nor employee nor attorney not counsel of

17    any of the parties of this action, and that I am

18    neither a relative nor employee of such attorney or

19    counsel, and that I am not financially interested in

20    the action.

21

22    ___ _____ _____

23         KELLY J. LAWTON, RPR, LCR, CCR

24

25
```

William R. Sawyer, Ph.D.

```
 1                  INSTRUCTIONS TO WITNESS

 2

 3

 4          Please read your deposition over carefully

 5     and make any necessary corrections.  You should

 6     state the reason in the appropriate space on the

 7     errata sheet for any corrections that are made.

 8

 9          After doing so, please sign the errata sheet

10     and date it.  It will be attached to your

11     deposition.

12

13          It is imperative that you return the

14     original errata sheet to the deposing attorney

15     within thirty (30) days of receipt of the deposition

16     transcript by you.  If you fail to do so, the

17     deposition transcript may be deemed to be accurate

18     and may be used in court.

19

20

21

22

23

24

25
```

```
1                        - - - - - -

2                       E R R A T A

3                        - - - - - -

4     PAGE   LINE    CHANGE

5     _____  _____   _____

6        REASON: _____

7     _____  _____   _____

8        REASON: _____

9     _____  _____   _____

10       REASON: _____

11    _____  _____   _____

12       REASON: _____

13    _____  _____   _____

14       REASON: _____

15    _____  _____   _____

16       REASON: _____

17    _____  _____   _____

18       REASON: _____

19    _____  _____   _____

20       REASON: _____

21    _____  _____   _____

22       REASON: _____

23    _____  _____   _____

24       REASON: _____

25
```

```
 1                ACKNOWLEDGMENT OF DEPONENT

 2

 3          I, WILLIAM SAWYER, Ph.D., do hereby

 4     acknowledge that I have read the foregoing pages, 1

 5     to 101, and that the same is a correct transcription

 6     of the answers given by me to the questions therein

 7     propounded, except for the corrections or changes in

 8     form or substance, if any, noted in the attached

 9     Errata Sheet.

10

11

12     _____        _____

13     WILLIAM SAWYER, Ph.D.                             DATE

14

15

16

17

18     Subscribed and sworn to before me this

19     _____ day of _____, 20___.

20     My Commission expires: _____

21

22     _____

       Notary Public

23

24

25
```

1                          LAWYER'S NOTES

2      PAGE    LINE

3      _____   _____   _____

4      _____   _____   _____

5      _____   _____   _____

6      _____   _____   _____

7      _____   _____   _____

8      _____   _____   _____

9      _____   _____   _____

10     _____   _____   _____

11     _____   _____   _____

12     _____   _____   _____

13     _____   _____   _____

14     _____   _____   _____

15     _____   _____   _____

16     _____   _____   _____

17     _____   _____   _____

18     _____   _____   _____

19     _____   _____   _____

20     _____   _____   _____

21     _____   _____   _____

22     _____   _____   _____

23     _____   _____   _____

24     _____   _____   _____

25