# EXHIBIT 13

Case 3:16-md-02741-VC   Document 13779-14   Filed 09/22/21   Page 2 of 10

William Sawyer, Ph.D.

```
 1                 UNITED STATES DISTRICT COURT
                 NORTHERN DISTRICT OF CALIFORNIA
 2
 3   IN RE:  ROUNDUP PRODUCTS      |  MDL No. 2741
                                   |
 4   LIABILITY LITIGATION          |
                                   |
 5   ------------------------------|
     This document relates to:     |
 6                                 |
     John Schafer v. Monsanto Co.  |
 7   Case No. 3:19-cv-02169        |
                                   |
 8   ------------------------------|
 9
10                          - - -
11               Tuesday, February 16, 2021
12                          - - -
13
14           This is the Remote Videotaped Deposition of
15   WILLIAM SAWYER, Ph.D., commencing at 8:34 a.m., on
16   the above date, before Susan D. Wasilewski,
17   Registered Professional Reporter, Certified Realtime
18   Reporter, Certified Manager of Reporting Services,
19   Certified Realtime Captioner, and Florida
20   Professional Reporter.
21                          - - -
22              GOLKOW LITIGATION SERVICES
23         877.370.3377 ph | 917.591.5672 fax
24                   deps@golkow.com
25
```

```
 1   applying; is that right?
 2        A.   Of course.  That is the methodology that has
 3   been used in the six studies that offer dose
 4   metrics.
 5        Q.   Okay.  And in the simple additive
 6   mathematical methodology, it does not consider the
 7   types of equipment a person is using when applying
 8   Roundup; is that right?
 9        A.   That's correct.
10        Q.   And it doesn't consider the type of clothing
11   a person is wearing while applying Roundup; is that
12   right?
13        A.   Yes.
14        Q.   And the simple additive mathematical
15   methodology does not consider the types of personal
16   protective gear a person is using or wearing while
17   applying Roundup, right?
18        A.   Correct.  The studies are limited in those
19   respects, yes.
20        Q.   And the simple additive mathematical
21   methodology does not consider whether a person is
22   spot-spraying or continuously spraying Roundup; is
23   that right?
24        A.   Correct.  And I should state that, as
25   covered in my report, glyphosate is not
```

1  instantaneously fully absorbed through the skin.  It
2  takes hours, many hours, to fully absorb the
3  glyphosate.  So in a case where a homeowner only
4  sprays for two hours on a given day will continue to
5  absorb that exposure over the next 12 to 24 hours.
6       If a person is working eight hours a day,
7  even though they accumulate more exposure, on a
8  relative basis that person who sprayed only two
9  hours is actually continuing to absorb even though
10 that person did not work eight hours.
11      So that is something to be aware of when
12 considering studies that did not require a full
13 eight hours of exposure.
14   Q.  So in the simple additive mathematical
15 methodology, does spot-spraying count the same as
16 continuous spraying?
17   A.  I'm not sure I understand the question.
18   Q.  Well, if I go out in my yard and I
19 spot-spray, I walk around and I spray occasionally
20 when I see a, you know, weed that I want to kill,
21 does that count the same for a one-hour period, if I
22 do that for an hour, as if I'm out spraying
23 continuously for an hour?
24       MS. FREDONA:  Objection; form, incomplete
25    hypothetical.

1    Q.   So if a person sprays Roundup, hits the
2    trigger six times in an hour versus 60 times in an
3    hour, do they count the same in your exposure model?
4         MS. FREDONA:  Same objection.
5    A.   The studies, for example, Eriksson, do not
6    make such a distinction.  It's simply number of
7    hours of working as a sprayer.  There's no
8    distinction in the human studies as to how many
9    times the trigger is pushed.
10   Q.   Okay.
11   A.   I'm sure that makes, you know, an
12   interesting point for you to use in a Daubert
13   motion, but it's utter nonsense, because the studies
14   do not record how many times the triggers are
15   pushed.  Rather, it's a matter of how many hours in
16   a working day, in the Eriksson study, are used to
17   certify that person as an exposure day.
18        Other studies that I've referenced just use
19   the given exposure-day, that is, it was used on a
20   given day and that is counted as a day.  So these
21   studies are not providing the level of detail you're
22   asking, and then you turn around and say it's my
23   design.  It's not my design.  It's the studies that
24   I am following very closely and assessing
25   Mr. Schafer in comparison to those studies, and the

```
 1      A.   Yes.
 2      Q.   And if a person tells you they go out in the
 3   yard and they continuously spray for an hour, do you
 4   count that as one hour of spraying Roundup?
 5           MS. FREDONA:  Same objection.
 6      A.   Yes.
 7      Q.   In your assessment of exposure using the
 8   simple additive mathematical methodology, does it
 9   matter to you whether the person spot-spraying
10   sprays often or doesn't spray often?
11           MS. FREDONA:  Objection; form.
12      A.   I don't understand the question.
13      Q.   When you are assessing the exposure of an
14   individual, do you ask them, when they are spraying,
15   how they -- how they go about spraying Roundup?
16           MS. FREDONA:  Objection; form.
17      A.   Yes.  That's covered in detail in my report.
18      Q.   Okay.  And does that detail in your report
19   about how they spray, does that affect the time that
20   you identify in your time-weighted eight-day average
21   for exposure?
22      A.   Yes, it is, in the sense that my report
23   details the intensity of exposure.  However, the
24   methodology of the studies are strictly based upon
25   exposure days, and in the Eriksson study, an
```

```
 1   eight-hour exposure day.
 2           So I used the eight-hour exposure day in my
 3   calculations because that is the methodology that is
 4   followed and presented in the six studies.  The six
 5   studies do not make any calculation differences for
 6   the intensity of spraying; however, I do provide in
 7   my report an assessment of the intensity of
 8   exposure, for example, whether the person wore
 9   gloves, whether they had spillage on their back from
10   a backpack, the level of accidents in terms of
11   dermal exposure accidents, washing of hands with
12   soap, the time between spray time and showering or
13   bathing with soap, et cetera.
14           Those are all factors that are important and
15   I reference from studies in the literature; however,
16   the dose metric studies in humans do not include
17   those details.  They're just simply based on
18   exposure days.
19      Q.   So those features about how much Roundup a
20   person actually gets on their skin you describe as
21   intensity of the exposure?
22           MS. FREDONA:  Objection; form.
23      A.   I didn't understand the question.
24      Q.   Okay.  What -- you used the word "intensity"
25   of the exposure.  What is the intensity of exposure,
```

 1   delineate that level of detail, and it's --

 2   therefore, I follow the methodology that was used in

 3   the studies that offer dose metric to calculate

 4   exposure days, but I also supplement that in my

 5   report with more specific information as to the

 6   nature of the exposures.

 7       And I don't know why you have a problem with

 8   that.  I really, honestly, don't.  I think

 9   there's -- you're just making up stuff.

10   Q.   So the additive mathematical model doesn't

11   include intensity of exposure in the analysis; is

12   that correct?

13   A.   As I said, it does not include a detailed

14   analysis of the intensity of exposure.  It simply is

15   based upon exposure day.  So the studies are taking

16   an average of people who are exposed, some of which

17   may be fully equipped with PPE, others who are in

18   shorts and sandals.  It's a -- it's -- it does not

19   delineate.  It's simply an average of all of them.

20   Q.   Are the circumstances of how a person

21   applies Roundup important for your assessment of

22   causation?

23   A.   Yes.

24   Q.   Is the intensity of exposure important for

25   your assessment of causation?

1    A.   Yes, it is helpful to determine what level
2    of intensity the exposures were, of course.  That
3    holds true for any chemical exposure.
4    Q.   And the calculation of the number of
5    exposure days does not factor in either the
6    intensity or the circumstances of the application;
7    is that right?
8    A.   That is correct.  That's how the studies are
9    designed and it is what it is.  That's what we have
10   to work with.  This nonsense of conveying to the
11   court that it's my -- it's my methodology and my
12   failure to include these things in the design is
13   unfounded.  I am following the study design, the
14   peer-reviewed, generally accepted studies.
15            And I can't go back and change those
16   studies.  It is what it is.  They use an exposure
17   day and the number of exposure days, and those
18   studies are showing a dose-response based upon the
19   number of exposure days.  You know, that's what we
20   have to work with, and I'm still a little confounded
21   why you have a problem with it.
22   Q.   So you say the studies have a dose-response.
23   Are you meaning that the higher the dose or exposure
24   to Roundup, the higher the risk of non-Hodgkin
25   lymphoma?

```
 1                    C E R T I F I C A T E

 2            I, Susan D. Wasilewski, Registered

 3    Professional Reporter, Certified Realtime Reporter,

 4    Certified Manager of Reporting Services, Certified

 5    Realtime Captioner, and Florida Professional

 6    Reporter, hereby certify that the witness named

 7    herein appeared via Remote Counsel/Zoom technology

 8    on Tuesday, February 16, 2021, and was duly sworn.

 9            I FURTHER CERTIFY that I was authorized to

10    and did stenographically report the examination of

11    the witness named herein; that a review of the

12    transcript was not requested; and that the foregoing

13    transcript is a true record of my stenographic

14    notes.

15            I FURTHER CERTIFY that I am not related to

16    or an employee of any of the parties, nor am I

17    related to or an employee of any of the parties'

18    attorneys or counsel connected with this action, nor

19    am I financially interested in the outcome of this

20    action.

21            WITNESS my hand this 17th of February, 2021.

22

23    _____

24            Susan D. Wasilewski, RPR, CRR, CMRS, CRC, FPR

25
```