**WILKINSON STEKLOFF LLP**
Brian L. Stekloff (*pro hac vice*)
(bstekloff@wilkinsonstekloff.com)
Rakesh Kilaru (*pro hac vice*)
(rkilaru@wilkinsonstekloff.com)
2001 M St. NW
10th Floor
Washington, DC 20036
Tel:   202-847-4030
Fax:   202-847-4005

**HOLLINGSWORTH LLP**
Eric G. Lasker (*pro hac vice*)
(elasker@hollingsworthllp.com)
1350 I St. NW
Washington, DC 20005
Tel: 202-898-5843
Fax: 202-682-1639

**COVINGTON & BURLING LLP**
Michael X. Imbroscio (*pro hac vice*)
(mimbroscio@cov.com)
One City Center
850 10th St. NW
Washington, DC 20001
Tel: 202-662-6000

**BRYAN CAVE LEIGHTON PAISNER LLP**
K. Lee Marshall (CA Bar No. 277092)
(klmarshall@bclplaw.com)
Three Embarcadero Center, 7th Floor
San Francisco, CA 94111
Tel: 415-675-3400
Fax: 415-675-3434

Jed P. White (CA Bar No. 2392339)
(jed.white@bclplaw.com)
120 Broadway, Suite 300
Santa Monica, CA 90401
Tel:  310-576-2100
Fax: 310 -576-2200

*Attorneys for Defendant Monsanto Company*

# UNITED STATES DISTRICT COURT

# NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| IN RE: ROUNDUP® PRODUCTS LIABILITY LITIGATION <br><br> *Vosper v. Monsanto Co.*, 3:19-cv-05525-VC | MDL No. 2741 <br><br> Case No.: 3:16-md-02741-VC <br><br> **DEFENDANT MONSANTO COMPANY'S MOTION TO EXCLUDE TESTIMONY OF DR. D. BARRY BOYD UNDER RULE 702** <br><br> Hearing date: December 13, 2021 <br> Time: TBD |

**TO THE COURT, ALL PARTIES, AND THEIR ATTORNEYS OF RECORD:**

**PLEASE TAKE NOTICE THAT** beginning on December 13, 2021 in Courtroom 4 of the United States District Court, Northern District of California, located at 450 Golden Gate Avenue, San Francisco, CA 94102, or as ordered by the Court, Defendant Monsanto Company ("Monsanto") will present its Motion to Exclude Testimony of Dr. D. Barry Boyd. Monsanto seeks an order excluding opinions of this witness under Federal Rule of Evidence 702.

DATED: September 22, 2021

                                               Respectfully submitted,

                                               /s/ Eric G. Lasker
                                               Eric G. Lasker, Esq.
                                               (elasker@hollingsworthllp.com)
                                               Hollingsworth LLP
                                               1350 I Street, NW
                                               Washington, DC 20005
                                               Tel:    202-898-5800
                                               Fax:   202-682-1639

                                               *Attorney for Defendant*
                                               *Monsanto Company*

# **TABLE OF CONTENTS**

Page

INTRODUCTION ..................................................................................................................1

BACKGROUND ....................................................................................................................2

    I.    Plaintiff Had Risk Factors Associated with NHL. ......................................................3

    II.   Dr. Boyd Purports to Use a Differential Diagnosis in Forming His Specific Causation Opinion..................................................................................................3

LEGAL STANDARD .............................................................................................................4

ARGUMENT ..........................................................................................................................6

    A.   Dr. Boyd Failed to Reliably Rule in Roundup® as a Cause of Plaintiff's NHL. ......................................................................................................7

    B.   The Subset of Cherry-Picked Epidemiological Studies Provides an Insufficient Bases to Rule Glyphosate as a Cause of Plaintiff's NHL. .........................................................................................................................8

    C.   Dr. Boyd's Opinion Is Based on Flawed Exposure Days Calculations..................................................................................................8

    II.   Dr. Boyd Always Points to Roundup®. ..........................................................9

CONCLUSION .....................................................................................................................10

**TABLE OF AUTHORITIES**

Page(s)

**Cases**

*In re Aredia & Zometa Prods. Liab. Litig.*,
   483 F. App'x 182 (6th Cir. 2012) ............................................................................................. 5

*Brown v. Burlington N. Santa Fe Ry. Co.*,
   765 F.3d 765 (7th Cir. 1996)..................................................................................................... 5

*Chapman v. Proctor & Gamble Distrib., LLC*,
   766 F.3d 1296 (11th Cir. 2014).................................................................................................. 5

*Clausen v. M/V New Carissa*,
   339 F.3d 1049 (9th Cir. 2003)........................................................................................... 3, 6, 7

*Cooper v. Brown*,
   510 F.3d 870 (9th Cir. 2007)..................................................................................................... 5

*Cooper v. Smith & Nephew*,
   259 F.3d 194 (4th Cir. 2001)..................................................................................................... 5

*Daniels-Feasel v. Forest Pharms., Inc.*,
   No. 1:17-cv-04188-LTS-JLC, 2021 WL 4037820 (S.D.N.Y. Sept. 3, 2021) ........................... 8

*Daubert v. Merrell Dow Pharms., Inc.*,
   509 U.S. 579 (1993) ......................................................................................................... 4, 5, 8

*Guinn v. AstraZeneca Pharms. LP*,
   602 F.3d 1245 (11th Cir. 2010).................................................................................................. 5

*Kilpatrick v. Breg, Inc.*,
   613 F.3d 1329 (11th Cir. 2010).................................................................................................. 5

*In re Lipitor (Atorvastatin Calcium) Mktg. Sales Practices and Prods. Liab. Litig.*,
   892 F.3d 624 (4th Cir. 2018)................................................................................................. 2, 5

*McClain v. Metabolife Int'l, Inc.*,
   401 F.3d 1233 (11th Cir. 2005).................................................................................................. 5

*Poust v. Huntleigh Healthcare*,
   998 F. Supp. 478 (D.N.J. 1998) ................................................................................................ 5

*In re: Roundup Prods. Liab. Litig.*,
   358 F. Supp. 3d 956 (N.D. Cal. 2019) .................................................................................. 5, 9

*In re: Roundup Prods. Liab. Litig.*,
   390 F. Supp. 3d 1102 (N.D. Cal. July 10, 2018) (J. Chhabria)............................................ 2, 8

*Sardis v. Overhead Door Corp.*,
   No. 20-1411, 2021 WL 3699753 (4th Cir. Aug. 20, 2021) .................................................. 4, 9

*Sims v. Kia Motors of Am., Inc.*,
   839 F.3d 393 (5th Cir. 2016) .................................................................................................... 5

*Soldo v. Sandoz Pharms. Corp.*,
   244 F. Supp. 2d 434 (W.D. Pa. 2003) ...................................................................................... 5

*Tamraz v. Lincoln Elec. Co.*,
   620 F.3d 665 (6th Cir. 2010) .................................................................................................... 1

*White v. Ford Motor Co.*,
   312 F.3d 998 (9th Cir. 2002) .................................................................................................... 4

**Rules**

Federal Rule of Evidence 702 ................................................................................................. *passim*

# INTRODUCTION

Plaintiff must present reliable expert evidence that Roundup®-branded products ("Roundup®") specifically caused his non-Hodgkin's lymphoma (NHL), a disease with more than sixty different subtypes and no identifiable cause in the majority of cases. Plaintiff's specific causation expert, Dr. D. Barry Boyd, purports to apply a differential diagnosis methodology to reach his specific causation opinions: a two-step process whereby he first purports to "rule in" all possible causes of Plaintiff's NHL (in which he includes Roundup®), and then purports to "rule out" all causes except Roundup®.

Dr. Boyd's mere invocation of the phrase "differential diagnosis," *see* Declaration of Eric Lasker, Ex. 1, Boyd *Vosper* Rpt. at 34[1] ("i.e., the application of a critical differential diagnosis"), cannot sanitize what is otherwise an outcome-driven conclusion devoid of any reliable scientific basis. *Tamraz v. Lincoln Elec. Co.*, 620 F.3d 665, 674 (6th Cir. 2010) ("[S]imply claiming that an expert used the phrase 'differential diagnosis' method is not the same incantation that opens the *Daubert* gate." (citation and quotation marks omitted)). Dr. Boyd failed to meet *Daubert's* reliability requirements for each of the two steps of a differential diagnosis analysis.

First, he claimed to rule in Roundup® as a cause of Plaintiff's NHL, a common group of cancers that have no known cause (i.e., are idiopathic) in the vast majority of cases. He did so through a cherry-picked subset of primarily unadjusted epidemiological data about glyphosate exposure—not by conducting a detailed analysis of the Plaintiff's individual characteristics or medical condition. Dr. Boyd offered no explanation for how Roundup® operated to cause cancer in Plaintiff or in what dose.

Second, Dr. Boyd purported to "rule out" other potential causes of Plaintiff's NHL, but, the record makes clear that Dr. Boyd paid little attention to each of the risk factors, offering no explanation for ruling out some of them beyond his own say-so. Under *Daubert*, Dr. Boyd should use the same standards he uses in ruling out the non-Roundup® potential causes for considering Roundup®, and if he did use the same standards, he should have ruled out Roundup® as well.

The bottom line for Dr. Boyd is that as long as Plaintiff was exposed to Roundup® for what he deemed to be a "sufficient" amount of time based on Dr. Boyd's reliance on a smattering of unreliable epidemiological studies, then Roundup® must be the cause of Plaintiff's NHL. Dr. Boyd did not take

---

[1] All exhibits referenced herein are attached to the Declaration of Eric Lasker, filed contemporaneously herewith.

into account when or how Plaintiff used Roundup® (which are important factors in determining the extent to which use of Roundup® might translate into an actual ingested dose), when Plaintiff contracted NHL, or the fact that the causes of NHL are unknown in the vast majority of cases. Dr. Boyd's always-Roundup® opinion is just the type courts have justifiably rejected as *ipse dixit* conclusions that do not meet the admissibility requirements of Rule 702. *See e.g.*, *In re Lipitor (Atorvastatin Calcium) Mktg. Sales Practices and Prods. Liab. Litig.*, 892 F.3d 624, 644–45 (4th Cir. 2018) (affirming exclusion of specific causation expert who "appeared to simply conclude that 'so long as the patient took Lipitor and developed diabetes, then Lipitor was a substantial contributing factor'" (citation omitted)).

Defendant respectfully submits that the cursory, outcome-driven analysis of Dr. Boyd does not come close to satisfying the "daunting" specific causation inquiry, nor does it move past the general causation analysis in any meaningful way. *See In re: Roundup Prods. Liab. Litig.*, 390 F. Supp. 3d 1102, 1109 (N.D. Cal. July 10, 2018) (J. Chhabria). As such, the Court should exclude Plaintiff's specific causation expert, Dr. D. Barry Boyd, under Rule 702.

## BACKGROUND

Plaintiff Ira Vosper has designated specific causation expert Dr. D. Barry Boyd, an oncologist, *see* Ex. 1, Boyd *Vosper* Rpt. at 34, who has been disclosed in multiple Roundup® cases across the country. Dr. Boyd does not meet the Rule 702 standards this Court imposed in the Wave 2 Plaintiffs Pre-Trial Order 85 ("PTO 85"). *See* Dkt. 2799. While purporting to rely on the same differential etiology/diagnosis methodology the Court earlier permitted, Dr. Boyd falls woefully short of the Court's previously imposed standards when he opines that Roundup® specifically caused Plaintiff's NHL. Like Plaintiff's toxicology expert, Dr. William Sawyer, Dr. Boyd continued to "rule in" Roundup® based on a subset of flawed studies without accounting for the Plaintiff's specific NHL sub-types. Even setting that deficiency aside, Dr. Boyd does real methodological violence in his consideration of other potential risk factors. In his unwavering adherence to the conclusion that Roundup® is always to blame, Dr. Boyd offered no coherent, defensible principle undergirding his specific causation opinion.

Relying on nothing more than the exact same epidemiology and other studies that Dr. Sawyer

relied on, including IARC's classification of glyphosate as a Group 2A probable carcinogen to humans, Dr. Boyd also identified pesticides as a risk factor, including specifically Roundup®, even though no physician who has ever treated Plaintiff attributed his NHL to Roundup®.

I. **Plaintiff Had Risk Factors Associated with NHL.**

As set forth at length in Monsanto's prior motion to exclude specific causation experts, (Dkt. 2420), "non-Hodgkin's lymphoma" is an umbrella term used to describe more than 60 different sub-types of cancer involving the lymphocytes, a type of white blood cell. The various subtypes have different clinical and prognostic characteristics and different risk factors and causes. However, in the vast majority of all NHL cases, the cause is unknown. The relevant medical history, NHL diagnosis, and alleged Roundup® exposure for Plaintiff is summarized below.

- Plaintiff is a resident of ▮▮▮▮ and was diagnosed with diffuse large B-cell non-Hodgkin's lymphoma ("DLBCL") in September 2010, Ex. 1, Boyd *Vosper* Rpt. at 5;
- Plaintiff's use of Roundup® was both in the residential and occupational setting, with the primary exposure occurring in the residential setting from 1986 to 2018, *Id.* at 17;
- Plaintiff had significant family history of cancer. His ▮▮▮▮ was diagnosed with acute lymphocytic leukemia (ALL) at age 63, *Id.* at 4;
- Plaintiff's ▮▮▮▮ was diagnosed with high grade B-cell lymphoma in 2015, with a final diagnosis of unclassified diffuse lymphoma with features of both diffuse large B-cell lymphoma and Burkitt-like B-cell lymphoma. *Id.*;
- Plaintiff's maternal grandfather had a possible history of melanoma, *Id.*;
- Plaintiff's weight ranged from overweight to class 1 obese, *Id.* at 30;
- Plaintiff previously developed squamous cell carcinoma of the skin on the neck and often spent time in the sun without UV protection during his childhood, *Id.* at 31; and
- Plaintiff had occupational exposures to other chemicals, *Id.* at 32.

II. **Dr. Boyd Purports to Use a Differential Diagnosis in Forming His Specific Causation Opinion.**

Like other specific causation experts previously assessed in this MDL, Dr. Boyd purports to reach his specific causation opinions through what he asserts to be a differential diagnosis. *See* Ex. 1, Boyd *Vosper* Rpt. at 34 ("i.e., the application of a critical differential diagnosis"). As this Circuit has acknowledged, "differential diagnosis" is a term courts use to describe the "scientific technique of identifying the cause of a medical problem by eliminating the likely causes until the most probable one is isolated." *Clausen v. M/V New Carissa*, 339 F.3d 1049, 1057 (9th Cir. 2003) (quoting *Westberry v.*

- 3 -

*Gislaved Gummi AB*, 178 F.3d 257, 262 (4th Cir. 1999)). This process requires an expert to first "rule in" potential causes, *i.e.*, "to compile a comprehensive list of hypotheses that might explain the set of salient clinical findings under consideration." *Id.* The expert must then "rule out" possible causes using a scientific method until only the most likely cause remains. *Id.* at 1058.

Dr. Boyd does not conduct a true differential diagnosis. First, his report rules in Roundup® by uncritically relying on the same flawed studies Plaintiff's toxicology expert—Dr. William Sawyer—relies on and without taking Dr. Sawyer's significantly re-calculated exposure data into account. *E.g.*, Ex. 2, Boyd *Vosper* Dep. at 77:10–78:22. Second, Dr. Boyd purports to rule out every other relevant NHL risk factor except Roundup® and without applying any reasoning or methodological rigor to the potential alternative causes. Throughout his analysis, Dr. Boyd ignores altogether the possibility that Plaintiff's NHL may have no currently known cause, as would be the case where NHL is caused by a yet to be discovered factor or from a random mutation of the sort that inevitably occurs through normal cell division. According to Dr. Boyd, if the Plaintiff came into contact with Roundup®, that fact alone automatically excluded the possibility of an idiopathic or unknown cause.

## LEGAL STANDARD

A proposed expert witness must possess "knowledge, skill, experience, training, or education" sufficient to qualify him as an expert on the subject to which his testimony relates. Fed. R. Evid. 702. When an expert's field of expertise is not related to the subject on which he seeks to offer testimony, such testimony is inadmissible. *See White v. Ford Motor Co.*, 312 F.3d 998, 1008-09 (9th Cir. 2002). Apart from qualifications, expert testimony must be (1) based upon sufficient facts or data, (2) the product of reliable principles and methods, and (3) the result of applying those principles and methods reliably to the facts of the case. Fed. R. Evid. 702. The trial judge is charged with the responsibility of acting as a gatekeeper to "ensure that any and all scientific testimony … is not only relevant, but reliable." *Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579, 589 (1993); *see also Sardis v. Overhead Door Corp.*, No. 20-1411, 2021 WL 3699753, at *7 (4th Cir. Aug. 20, 2021) (district court in wrongful death suit abused its discretion when it "abandoned its gatekeeping function" by declaring reliability and relevance arguments to be province of jury because they went to weight, not admissibility). Indeed, the Supreme Court instructs that an expert's error-prone application of his or

her methodology is inherently unreliable; and reliability is within the charge of the trial court as the gatekeeper. *Daubert*, 509 US at 589. The proponent of the expert bears the burden of proving that the expert's proffered testimony is admissible. *See, e.g.*, *Cooper v. Brown*, 510 F.3d 870, 942 (9th Cir. 2007).

Here, Dr. Boyd's opinions should be excluded on the grounds that (1) they are not reliable, and (2) they are not helpful to the jury because he concluded Roundup® was the cause without properly ruling in Roundup® and without weighing or eliminating other risk factors in any reliable manner. Rule 702 requires experts purporting to use a differential diagnosis method to reach a specific causation conclusion to carry out both aspects of that methodology—"ruling in" all possible causes and "ruling out" all but the subject cause—and that they do so in a reliable fashion. *See McClain v. Metabolife Int'l, Inc.*, 401 F.3d 1233, 1253 (11th Cir. 2005) ("[A]n expert does not establish the reliability of his techniques or the validity of his conclusions simply by claiming that he performed a differential diagnosis on a patient."); *In re Aredia & Zometa Prods. Liab. Litig.*, 483 F. App'x 182, 188 (6th Cir. 2012) (expert offering a differential diagnosis must "accurately diagnose the nature of the disease, reliably rule in the possible causes of it, and reliably rule out the rejected causes"); *Soldo v. Sandoz Pharms. Corp.*, 244 F. Supp. 2d 434, 551 (W.D. Pa. 2003) ("[T]he mere statement by an expert that he or she applied differential diagnosis in determining causation does not *ipso facto* make that application scientifically reliable or admissible."). Because the inherent malleability of this methodology can shroud what may be little more than subjective guesswork, the district court must "delve into the particular witness's method of performing a differential diagnosis to determine if his or her ultimate conclusions are reliable." *Poust v. Huntleigh Healthcare*, 998 F. Supp. 478, 496 (D.N.J. 1998). Courts have consistently held that expert opinions that pay lip service to this methodology but do not reliably apply it should be excluded. *See, e.g.*, *In re Lipitor*, 892 F.3d at 642–45.[2]

If Plaintiff fails to present an admissible expert opinion to establish specific causation, summary judgment is appropriate. *In re: Roundup Prods. Liab. Litig.*, 358 F. Supp. 3d 956, 957 (N.D. Cal. 2019)

---

[2] *See also, e.g.*, *Sims v. Kia Motors of Am., Inc.*, 839 F.3d 393, 401–02 (5th Cir. 2016); *Chapman v. Proctor & Gamble Distrib., LLC*, 766 F.3d 1296, 1309 (11th Cir. 2014); *Guinn v. AstraZeneca Pharms. LP*, 602 F.3d 1245, 1253 (11th Cir. 2010); *Kilpatrick v. Breg, Inc.*, 613 F.3d 1329, 1342–43 (11th Cir. 2010); *Cooper v. Smith & Nephew*, 259 F.3d 194, 200 (4th Cir. 2001); *Brown v. Burlington N. Santa Fe Ry. Co.*, 765 F.3d 765, 773–74 (7th Cir. 1996).

("To defeat Monsanto's motion for summary judgment on this issue, the plaintiffs must present at least one admissible expert opinion to support [his] specific causation argument.").

## ARGUMENT

### I. Dr. Boyd Did Not Apply a Reliable Differential Diagnosis.

The first step in a differential diagnosis is to "compile a comprehensive list of hypotheses that might explain" the plaintiff's injury. *Clausen*, 339 F.3d at 1057. The Ninth Circuit instructs experts to "[i]nclud[e] even rare entities in the list [to] ensure[] that such disorders are not overlooked." *Id.* at 1058 (citation and quotation marks omitted). Then, in the second step of a differential diagnosis, the expert must "rule out" each of the possible causes until only the most likely cause remains. Dr. Boyd's analysis of other risk factors confirms that his specific causation opinion should be excluded. Part of conducting a differential diagnosis is properly "ruling out" possible causes. *See Id.* at 1061 (quoting *Claar v. Burlington N. R. Co.*, 29 F.3d 499, 502 (9th Cir. 1994)); *see also* PTO 85 at 4 ("The next question is whether the experts adequately assessed all of the potential causes of the plaintiffs' NHL, and properly ruled out factors other than glyphosate, while at the same time declining to rule out glyphosate itself.").

It is undisputed that NHL has several well-established risk factors including family history, age, autoimmune disease, certain infections, immunosuppressant state, obesity, exposure to radiation, and exposure to certain chemicals. *See* Ex. 1, Boyd *Vosper* Rpt. at 22-23. It is also undisputed that several of these risk factors are present in Plaintiff's case, such as family history, obesity, gender, and chemical exposure. But Dr. Boyd offers little analysis of any of these factors. Even when Dr. Boyd does mention potential alternative causes, he deals with those causes so casually that it is impossible to discern whether he ruled in a cause and then ruled it out, or did not rule in the cause in the first place. *Id.* at 31 (determining the "association of NHL and [squamous cell carcinoma] is very weak" without analysis).

Regardless of which step in the differential diagnosis is involved, Dr. Boyd's testimony reveals that he does not seriously consider that something other than Roundup® could have caused Plaintiff's NHL. Ultimately, he concedes this point by his various admissions concerning alternative risk factors present in this case. Most significantly, Dr. Boyd testified that Plaintiff had a significant family history of cancer, yet there was no genetic testing performed to determine his predisposition; this is genetic

- 6 -
MONSANTO'S MOTION TO EXCLUDE TESTIMONY OF DR. D. BARRY BOYD

testing Dr. Boyd himself would have ordered if he were the treating oncologist. Ex. 2, Boyd *Vosper* Dep. at 38:1-20 ("I might have [ordered genetic testing] because I'm his -- if I was his treating oncologist."). Dr. Boyd not only admits that Plaintiff had an increased risk for NHL as opposed to someone without a first-degree relative with cancer, *see id.* 72:14-19, he also admits that Plaintiff has a more than doubled risk of NHL from having a first degree relative with hematopoietic cancer as opposed to someone who does not have such a relative, *see id.* 74:15-20. In other words, his other risk factors make it more likely than not he would be diagnosed with NHL as opposed to someone without those risk factors.

Dr. Boyd's failure to consider, or dismissive consideration of, other possible risk factors of Plaintiff's NHL—including genetic predisposition, personal history of cancer, family history of cancer, other chemical exposures, among others—confirms that his "specific causation" opinion is not, in fact, a specific causation opinion at all. Ex. 1, Boyd *Vosper* Rpt. at 29-32. An expert conducting a differential diagnosis "must provide reasons for rejecting alternative hypotheses 'using scientific methods and procedures' and the elimination of those hypotheses must be founded on more than 'subjective beliefs or unsupported speculation.'" *Clausen*, 339 F.3d at 1058 (quoting *Claar*, 29 F.3d at 502). Dr. Boyd has failed to do so here, and instead has engaged in a flawed, results-driven always Roundup® methodology—precisely the type of unreliable approach that Rule 702 prohibits.

**A.     Dr. Boyd Failed to Reliably Rule in Roundup® as a Cause of Plaintiff's NHL.**

Dr. Boyd "rules in" glyphosate as a cause of Plaintiff's NHL by the combination of: (1) plucking exposure data from a small subset of epidemiological studies primarily evaluating use of glyphosate, (2) utilizing Dr. Sawyer's severe miscalculation of Plaintiff's exposure days, and (3) deducing that Plaintiff's residential use of Roundup® is sufficient to fall within agricultural exposure parameters set forth in the cherry-picked studies. On this basis alone, Dr. Boyd concludes that Roundup® is the cause of Plaintiff's NHL. Under Dr. Boyd's approach, the only salient variable is Plaintiff's purported exposure to Roundup®—if Plaintiff used Roundup® more days than set forth in Dr. Boyd's chosen studies, then he will rule in Roundup® as a potential cause of a person's NHL.

**B.    The Subset of Cherry-Picked Epidemiological Studies Provides an Insufficient Bases to Rule Glyphosate as a Cause of Plaintiff's NHL.**

Simply relying on a subset of previously-considered studies misses the critical distinction between general and specific causation. Plaintiff must adduce sufficient additional evidence to meet the "daunting challenge" of showing that "glyphosate caused the NHL *they developed*." *In re: Roundup*, 390 F. Supp. 3d at 1109 (emphasis added). Dr. Boyd makes questionable use of study results for the apparent goal of reaching his desired conclusion. For example, Dr. Boyd cites data from the North American Pooled Project that found a purported risk estimate for diffuse large B-cell NHL of 2.83 (95% CI), but when the data was further adjusted and the risk estimate decreased, Dr. Boyd conceded that risk differences over subtype "may have been chance findings." Ex. 1, Boyd *Vosper* Rpt. at 27.

Dr. Boyd fails to consider studies that looked specifically at the subtype of NHL Plaintiff developed, with only cursory mentions of the subtype in the studies Dr. Boyd cited. *Id.* at 25-27. Dr. Boyd's slipshod assessment of the epidemiological evidence confirms that his method should be excluded and does not meet the rigors of *Daubert*. *See Daniels-Feasel v. Forest Pharms., Inc.*, No. 1:17-cv-04188-LTS-JLC, 2021 WL 4037820, at *7 (S.D.N.Y. Sept. 3, 2021) (excluding expert causation opinion as unreliable because expert "fails to adequately support his conclusions using the selectively favorable data he relies upon, unjustifiably disregards inconsistent data, and admittedly ignore categories of relevant evidence").

**C.    Dr. Boyd's Opinion Is Based on Flawed Exposure Days Calculations.**

Dr. Boyd concedes he depends on Dr. Sawyer's exposure day calculations. *See Id.* at 33. Dr. Sawyer admitted at his deposition that he severely miscalculated Plaintiff's exposure days—presenting a number that was 178% of the actual number.[3] When pressed about his reliance on Dr. Sawyer's erroneous exposure day metric, *see* Ex. 2, Boyd *Vosper* Dep. at 56:6-8, Dr. Boyd admitted that he did not notice Dr. Sawyer's calculation errors, *see id.* at 60:1-6. Instead, he continued to defer to Dr. Sawyer, accepting Dr. Sawyer's new exposure calculation, *see id.* at 59:20-25, despite being

---

[3] After his deposition where multiple, material errors were noted, Dr. Sawyer felt compelled to amend his expert report to correct the errors in his exposure days calculations. *See* Ex. 5, Sawyer *Vosper* Supp'l Rpt.

"concern[ed] that it's changed," *see id.* at 78:16-79:14.[4]  What's more, Dr. Boyd did not offer any convincing explanation for his immediate acceptance and use of Dr. Sawyer's revised exposure calculation to reach the same conclusion.  *Id.* at 78:16–79:14.  Dr. Boyd even failed to calculate an exposure dose, nor could he, as he relied on Dr. Sawyer's flawed exposure day calculations.

Dr. Boyd's "concern" with Dr. Sawyer's calculation subsequently caused him to issue a belated and improper supplemental report[5] in which he confirms that he unquestioningly relies on Dr. Sawyer's calculations rather than performing his own exposure assessment: "I rely on the expert toxicologist [Dr. Sawyer] to provide exposure information in order to reach conclusions regarding causation."  Ex. 4, Boyd *Vosper* Supp'l Rpt. at 1.  In addition to confirming Dr. Boyd's complete reliance on Dr. Sawyer's exposure days calculation, Dr. Boyd's attempt to issue a supplemental report confirms the importance of that calculation to Dr. Boyd's methodology (even if Dr. Boyd now claims that the error correction "changes nothing about my opinion").

This type of opinion—where there are "critical questions of the sufficiency of an expert's basis [for his testimony], and the application of the expert's methodology"—are questions of admissibility.  *Sardis*, No. 20-1411, 2021 WL 3699753, at *8 (citation omitted, alterations in original).

## II.      Dr. Boyd Always Points to Roundup®.

This Court has already acknowledged that because the vast majority of NHL cases have no identifiable cause, an expert's specific causation opinion is inadmissible if it fails to account for or adequately grapple with idiopathy: "[A]n expert must have a way to differentiate Roundup users who developed NHL because they used the product from Roundup users who would have developed NHL regardless."  *In re: Roundup*, 358 F. Supp. 3d at 959.  Just as he fails to engage with the known

---

[4] By contrast, Monsanto's exposure expert, Matthew Call, developed an exposure and dose assessment revealing that Plaintiff's average daily dose rate was "well below" all regulatory dose limits for exposure to glyphosate-based herbicides.  Ex. 3 Call *Vosper* Rpt. at 40.

[5] Plaintiff served the report on September 21, 2021, the day before Monsanto filed this Rule 702 motion.  Dr. Boyd claims his new report is "due to the submission of new documents that were unavailable at the time of [his] deposition," but the submitted documents were created for and submitted by plaintiff in an attempt to rehabilitate Dr. Sawyer.  Plaintiff cannot manufacture new documents in order to justify giving his experts a chance to evade the admissions and errors identified during their depositions.  Monsanto will be filing a motion to strike Dr. Boyd's unjustified supplemental report.

alternative risk factors confronting Plaintiff, Dr. Boyd takes an equally unscientific and dismissive approach to the idiopathic causes responsible for most NHL cases: he simply ignores the prospect. In the seven cases thus far that Dr. Boyd has been retained, he has found Roundup® to be the cause of a plaintiff's NHL each and every time. Dr. Boyd is unable to offer any reliable method for placing Plaintiff in one category and not the other, and thus the testimony he wishes to give cannot possibly be helpful to a jury tasked with that very assessment. Indeed, unlike prior experts, he does not "rel[y] heavily on the plaintiffs' exposure levels in drawing their conclusions." PTO 85 at 6. Rather, he engages in a seemingly "always Roundup®" methodology that determines Roundup® to be the cause no matter the exposure. Dr. Boyd's attempted supplemental report highlights the extent to which Dr. Boyd is invested in this ligation as an advocate rather than a testifying expert witness offering a scientific opinion he has formed by applying a reliable methodology of the sort he uses in his medical practice. Dr. Boyd even admits that his supplement is his attempt at his own re-direct examination. He declares he is "replying to the defense attorney's questioning," some of which he claims was "a striking and shocking example of either scientific illiteracy or contempt for the science on the part of the defense lawyer." Ex. 4, Boyd *Vosper* Supp'l Rpt. at 2. Tellingly, Dr. Boyd testified that he currently treats a patient with NHL who has been exposed to glyphosate and determined that "there may be a correlation" based seemingly on speculation. Ex. 2, Boyd *Vosper* Dep. at 38:10–39:8. As the Court made clear in discussing the role of idiopathy, exposure to glyphosate alone is not enough to establish causation. Here, Dr. Boyd's report does not address idiopathy at all. *See* Ex. 1, Boyd *Vosper* Rpt.

## **CONCLUSION**

For the reasons set forth above, the Court should grant Monsanto's Motion to Exclude Testimony of Dr. D. Barry Boyd.

DATED: September 22, 2021          Respectfully submitted,

/s/ *Eric G. Lasker*
Eric G. Lasker, Esq.
(elasker@hollingsworthllp.com)
Hollingsworth LLP
1350 I Street, NW
Washington, DC 20005
Tel:  202-898-5800
Fax: 202-682-1639

*Attorneys for Defendant*
*Monsanto Company*

- 11 -
MONSANTO'S MOTION TO EXCLUDE TESTIMONY OF DR. D. BARRY BOYD

**CERTIFICATE OF SERVICE**

I HEREBY CERTIFY that on this 22nd day of September, 2021, a copy of the foregoing was filed with the Clerk of the Court through the CM/ECF system which sent notice of the filing to all appearing parties of record.

/s/ Eric G. Lasker