# EXHIBIT 3

# Expert Report of

# Matthew Call, MS, CIH, CSP

in the matter of
Ira Vosper v. Monsanto Company

**August 5th, 2021**



## Contents

Statement of Qualifications ............................................................................................. 3

Scope of Analysis ........................................................................................................... 5

Documents Reviewed and Background Data for Glyphosate ........................................... 5

    Chemical Properties of Glyphosate ............................................................................. 5

    Potential Routes of Entry ........................................................................................... 6

    Dermal studies ......................................................................................................... 9

    Toxicokinetics ......................................................................................................... 12

    Passive Dosimetry and Biomonitoring ...................................................................... 14

    Human Epidemiological Studies ............................................................................... 16

    Regulatory Levels .................................................................................................... 19

    Label and SDS reviews ............................................................................................. 20

Exposure and Dose Risk Assessment Methodology ...................................................... 22

    Interpretation of Risk Assessment Results ................................................................ 24

Description of Ira Vosper's use of Glyphosate-Based Herbicides .................................. 25

Dermal Exposure Estimation Using ADD ...................................................................... 29

    Confounding factors ................................................................................................ 42

Site visits ...................................................................................................................... 42

Rebuttal ........................................................................................................................ 42

Opinions ....................................................................................................................... 45

Conclusion .................................................................................................................... 46

## Statement of Qualifications

I am the owner and President of Industrial Hygiene Resources, Ltd. (IHR), an independent industrial hygiene consulting firm based in Boise, ID. My consultation practice focuses on the protection of worker health, including exposure assessments, risk assessments, application of toxicity data, review of applicable regulations and standards, and recommendation of actions designed to reduce exposures and risks, where applicable. My educational background includes a Bachelor of Science degree in Public Health with an emphasis on Industrial Hygiene from Utah State University and a Master of Science degree in Environmental Science with an emphasis in environmental toxicology from Washington State University. I am also a Certified Industrial Hygienist (a diplomat of the American Board of Industrial Hygiene [ABIH]) and Certified Safety Professional by the Board of Certified Safety Professionals. I am an active member of the American Industrial Hygiene Association (AIHA). I am a past-president and current treasurer of the Idaho Section of the AIHA. I have been practicing industrial hygiene for over 15 years.

My current duties at IHR involve consulting for a variety of companies and government agencies, many of which do not have the resources to have a full-time industrial hygienist (small to medium sized businesses, school districts, etc.). My duties to clients include protection of employees (or other individuals potentially exposed to occupational hazards) by using scientific methods to provide an objective assessment of potential workplace exposures to identified hazards associated with specific job tasks or work environments. Exposure and risk assessments are interpreted using toxicity data, regulatory requirements, and consensus standards with the goal of developing recommendations for ensuring a safe, healthful, and productive workplace.

I am experienced in studying the known mechanisms of toxicity of chemical and biological compounds such as particles (metals, silica, asbestos), volatile organic compounds (VOCs), herbicide/pesticides, bacterial and mold, and toxic gases such as carbon monoxide or hydrogen sulfide. I have personally conducted dozens of industrial hygiene exposure assessment projects each year for over 10 years with IHR and have planned and directed many more from the office. I have also performed retroactive exposure assessments as necessary (not part of a litigation) to estimate past potential employee exposures to compounds including asbestos and respirable crystalline silica. I have been retained in this case as an expert in industrial hygiene.

My previous work with herbicides and pesticides includes airborne exposure assessments for 2,4-D, chlordane, lindane, aldrin, dieldrin, endrin, thiram, imidacloprid, thiamethoxam, azoxystrobin,

fludioxonil, spinosad, and others. I also have experience working directly with herbicides and pesticides. I worked briefly as a mixer/loader for a crop-dusting company in Twin Falls, Idaho after graduating from high school.

Industrial hygiene is the science of protecting and enhancing the health and safety of people at work and within their communities. Anticipation, recognition, evaluation, and control of hazards, including chemical hazards, is the principal goal of the profession. The evaluation of chemical exposures is not limited to estimating exposure. Industrial hygienists also work with exposure limits and biological exposure markers that are based on the dose, route(s) of entry, target organ(s), metabolites, metabolic pathways, and excretion of the chemical compounds of interest. A Certified Industrial Hygienist (CIH) is an individual who has met the minimum requirements for education and experience, and through examination, has demonstrated a minimum level of knowledge and skills in the following rubric (subject matter) areas: air sampling & instrumentation, analytical chemistry, basic science, biohazards, biostatistics & epidemiology, community exposure, engineering controls and ventilation, ergonomics, health risk analysis & hazard communication, industrial hygiene program management, noise, non-engineering Controls, radiation – ionizing and non-ionizing, thermal stressors, toxicology, and work environments & industrial processes.

During my career as an independent Certified Industrial Hygienist, I have gained extensive experience with worker and community exposure to a wide range of chemical products that includes herbicides/pesticides, corrosive products (acids and bases), cleaning products such as organic solvents, chlorinated compounds, oxidizers, building product with asbestos, lead, or silica, and various others. My experience in assessing exposures to chemical products includes exposure quantification methods, exposure and dose modeling methods, review of toxicokinetic data, and review of toxicology data. My experience also includes both hazard communication, using product data, safety data sheets, and product labels; and risk communication, using exposure data and work practice observations.

I also conduct training courses for industry personnel and professionals about the hazards and risks of their work, and how workers who are potentially exposed to hazardous agents can minimize the risk of adverse health effects. My teaching experience may range from formal classroom training to informal discussions with small groups or individual workers.

A copy of my curriculum vitae is attached in Appendix A of this report. The opinions in this report are based on currently available research and information and are stated with a reasonable degree of scientific certainty. I reserve the right to amend my opinions should new information become available. I have not been deposed or testified in trial in the past four years. My hourly rate for expert witness services is $450.00 per hour.

## Scope of Analysis

I have been retained as an expert in toxicology and industrial hygiene. I have been asked to conduct an assessment of the available literature and data regarding the absorption, distribution, metabolism, and excretion of glyphosate in individuals using glyphosate-based herbicides. I have also been asked to conduct a retroactive assessment of Mr. Vosper's exposure to glyphosate and internal dose of glyphosate and then to compare these to established regulatory risk levels and dosing published in carcinogenicity studies.

## Documents Reviewed and Background Data for Glyphosate

I have reviewed scientific literature concerning the chemical properties and toxicology of glyphosate and glyphosate salts, including dermal studies (in vitro and in vivo), toxicokinetic studies, biomonitoring and passive dosimetry studies, and epidemiological studies. I have reviewed materials from government agencies regarding occupational exposure assessments as well as the safety data sheets (SDSs) and labels for products containing glyphosate salts. I have also reviewed the complaint and depositions of Mr. and Mrs. Vosper. I have also reviewed the report of plaintiff's expert, Dr Sawyer. A list of case-specific documents I have reviewed is presented in the Materials Considered List.

### Chemical Properties of Glyphosate
A review of chemical properties is essential in any exposure assessment to determine which routes of entry into the body are relevant when glyphosate-based herbicides are used. There are four major routes of entry for any chemical to enter the body: inhalation, absorption (through skin or eyes), ingestion, and injection. The chemical properties of a substance heavily influence how it is transported through the environment and which entry route(s) is available into the body. I reviewed the chemical properties of glyphosate acid (Chemical Abstract Service [CAS] #1071-83-6) and glyphosate-isopropylamine salt (CAS #38641-94-0) as it is one of the most common active ingredients in consumer Roundup formulations. The chemical properties reviewed are summarized in Table I.

Glyphosate acid (referred to as simply glyphosate) has the molecular formula $C_3H_8NO_5P$. Glyphosate contains carbon and phosphorus, and is technically classified as an organophosphonate compound (O'Brien [1967]). It is sometimes referred to as an "organophosphate that is not a cholinesterase inhibitor" (NCBI 2019a) and it should not be confused with the organophosphate insecticides that do inhibit cholinesterase. Pure glyphosate is a crystalline solid or powder with a molecular weight of is 169.1 grams per mole (g/mol). Glyphosate is moderately soluble in water at standard ambient temperature at 10.5 g/L at 25°C (Turner 2018). The vapor pressure of glyphosate is extremely low at $9.83 \times 10^{-8}$ Torr. The octanol/water partition coefficient indicates how hydrophilic (water-loving) or how hydrophobic (water-fearing) a chemical substance is, and is expressed as log $K_{ow}$. A positive log $K_{ow}$ generally indicates that a compound is lipophilic (fat-loving) and can dissolved into lipids, while a negative log $K_{ow}$ shows that the compound is water soluble. The log $K_{ow}$ for glyphosate is less than -3.2 (Turner 2018). These chemical properties help to define how glyphosate will behave upon contact with a semi-permeable membrane, such as the skin.

Glyphosate isopropylamine salt is also a crystalline solid or powder. It has the molecular formula $C_6H_{17}N_2O_5P$ and has a molecular weight of 228.18 g/mol (NCBI 2019b). Importantly, glyphosate amine salts are readily soluble in water at 1,050 g/L at 25°C (NCBI 2019b). The vapor pressure of glyphosate isopropylamine salt is even lower than that of the acid at $1.58 \times 10^{-8}$. The $K_{ow}$ is also lower for the isopropylamine salt at -5.4, which is congruent with the higher water solubility.

**Table I.** Chemical properties of glyphosate acid and glyphosate isopropylamine salt (Turner 2018; NCBI 2019 a&b)

|  | Glyphosate acid | Glyphosate isopropylamine salt |
|---|---|---|
| Chemical formula | $C_3H_8NO_5P$ | $C_6H_{17}N_2O_5P$ |
| Molecular weight | 169.07 g/mol | 228.18 g/mol |
| Solubility | 10.5 g/L (at 25°C) | 1,050 g/L (at 25°C) |
| Vapor Pressure | $9.83 \times 10^{-8}$ Torr (at 25°C) | $1.58 \times 10^{-8}$ Torr (at 25°C) |
| Log $K_{ow}$ | <-3.2 | -5.4 |

Potential Routes of Entry

The above chemical properties, as well as the method of application, are major factors in determining potential exposure pathways and potential routes of entry during normal use of glyphosate-based products.

*Inhalation*

Due to its extremely low vapor pressure, glyphosate does not become airborne through evaporation in a normal range of ambient temperatures and pressures. Therefore, the only way glyphosate would be available for inhalation is through an aerosolization of liquid droplets (spray). Because the droplet size is typically large during normal spray application and the spray is directed towards the ground, inhalation should not be a significant exposure pathway for glyphosate. Several studies have confirmed that airborne concentrations from spray applications do not present a significant exposure potential.  Edmiston 1995 studied CalTrans workers and found that their potential inhalation exposure was less than 1% of their potential dermal exposure while applying glyphosate. Chang 2011 studied airborne glyphosate concentrations during two growing seasons in Mississippi and Iowa and found a range of only <0.01 – 9.1 ng/m$^3$ (Non-detectable to ~1 ppt). Solomon 2016 used the airborne concentrations reported by Chang 2011 and estimates of respiratory volume and absorption to calculate an estimated internal dose from inhalation of only 1.04 x 10$^{-6}$ mg/kg bw/day. Solomon reported the dose from skin absorption (90[th] centile dose) to be 0.0014 mg/kg bw/day. Therefore, the dose from inhalation was less than 1/1000[th] of measured biomonitoring dose. Jauhianen 1991 studied air concentrations of glyphosate in the breathing zone of applicators using a relatively high concentration (8%) of glyphosate. During spraying activities that lasted between one and six hours, Jauhianen 1991 reports low airborne concentrations of glyphosate that ranged from non-detectable to 15.7 micrograms per cubic meter (µg/m$^3$). Because the recommended product concentrations for residential use are much lower than 8% (typically 1-2%), the airborne concentration that Jauhianen 1991 reported represents a much higher exposure potential than would be expected from typical residential use. Acquavella 2004 also cites Jauhianen 1991 to support the fact that the assertion that inhalation is not a likely route of exposure. Pierce 2020 reported air concentrations present in each of the breathing zones of 12 applicators during mixing and continuous spraying of 16.3 gallons of a 0.96% glyphosate solution. The airborne concentrations ranged from 3 µg/m$^3$ to 7.5 µg/m$^3$, less than half of the low concentrations reported by Jauhianen 1991.

*Absorption (dermal)*

The relatively high solubility and negative log K$_{ow}$ of both glyphosate and its salt indicate that neither compound will quickly or efficiently pass through skin. However, both compounds can slowly permeate skin in small amounts. Even with its slow permeation through skin, several studies have shown this to be the primary exposure route, accounting for up to 99.9% of total exposure (Lavy et al. 1992, Flack et al. 2008, Vitali et al. 2009).  Small amounts of glyphosate can

be absorbed through the skin (from 0 to ~2% of the amount applied to the skin over the testing time period) as shown by Wester 1991, Smith 2014a, b, 2015, Ward 2010a, b, c, Davies 2015a, 2015b, 2016, and 2017, Franz 1983, and Nielsen 2007 & 2009. These in vitro studies confirm that small amounts of glyphosate can be absorbed through the skin (<~2%). These studies are discussed later in further detail.

The available research involving herbicide applicators confirms that dermal absorption is the principal route of exposure while demonstrating the slow rates of permeation. The Farm Family Exposure Study (Acquavella et al. 2004) conducted biomonitoring for farmers and their spouses and children. The systemic dose of those farmers that did not use gloves was well below the EPA reference dose (due to the slow permeation rate); however, those that did wear gloves had far lower systemic doses, indicating that dermal absorption is the primary exposure route. Edmiston 1995, mentioned in the previous section, had similar results regarding dermal exposures. The absorbed doses of the CalTrans workers were all well below the reference dose, and the vast majority of those small doses were shown to be from dermal absorption.

*Ingestion*

Commercial products containing formulations of glyphosate isopropylamine salt are most commonly in the liquid form, making ingestion a possible, but unlikely, route of exposure. Intentional ingestion is rare and has little relevance to incidental exposures. Inadvertent ingestion would typically involve small amounts of glyphosate (Connolly 2019). However, as unlikely as ingestion is as a potential exposure route, I will discuss the available data regarding distribution, metabolism, and elimination of glyphosate after ingestion. The data available from ingestion studies is useful when comparing internal doses from other exposure routes.

*Injection*

To my knowledge, glyphosate-containing products are not sprayed with high enough pressure to break through intact skin. Therefore, inadvertent injection through the skin is not a reasonable route of exposure. Intentional IV dosing in animal studies is relevant in the study of toxicokinetics because these studies indicate what happens to the small amount of glyphosate that may get past the skin barrier, and these studies can achieve very good mass balance (near 100%). However, injection is not a significant route of exposure to users of glyphosate-based herbicides and will not be discussed further.

Dermal studies

The following dermal studies involve testing how glyphosate-based herbicides are absorbed through the skin. It is relevant to briefly discuss the structure of the skin.

The skin is the largest organ in the human body and is the barrier that both protects the body from substances in the environment and limits the loss of fluids from the body. It is made up of several parts: the epidermis (including the stratum corneum), dermis, hypodermis, and hair, hair follicles, sebaceous and sweat glands, and other skin structures (See figure 1). The stratum corneum (SC) is described as a brick and mortar structure: multiple layers of flattened, dead cells act as the bricks and the lipids act as the mortar. The main protective barrier against external chemicals is provided by the lipid matrix in the SC.



**Figure 1.** Sketch of the structure of human skin layers. From Lu 2018

The lipids in the skin resist absorption and penetration of external chemicals, particularly water-based chemicals (as opposed to lipophilic solvents that may be more readily absorbed). Because the outer layer of skin (stratum corneum) is comprised of non-viable (dead) cells, human skin may be excised and used for *in vitro*[1] laboratory tests. The Organization for Economic Cooperation and Development (OECD) has published testing guidelines for skin permeation to facilitate the selection of appropriate *in vitro* procedures to ensure reliable test results.

---

[1] Taking place in a test tube, or elsewhere outside of a living organism

Most of the studies discussed here were performed with formulated glyphosate products that contained both active ingredients (glyphosate) and inactive ingredients, including surfactants such as polyoxyethyleneamine (POEA- CAS No. 61791-26-2). In general, surfactants are added to break the natural surface tension of water to allow water to better coat the surfaces it is applied to.

The Wester 1991 study used formulated Roundup and human thigh skin in glass penetration cells to perform both *in vitro* and *in vivo* percutaneous absorption tests. The *in vitro* tests reported a percentage range of glyphosate that permeated the skin from zero to about 2 percent over 16 hours. Further testing showed that vast majority of the applied glyphosate was recovered from the top of the penetration cell (i.e., the glyphosate was not absorbed). From the percent absorption reported, I calculated the absorption rate as flux to compare to other studies that report flux. The flux is the amount of glyphosate that penetrates a square centimeter of skin in one hour. The flux measured in this study ranged from 0.000 to 0.077 $\mu g/cm^2/hr$, with an average of 0.012 $\mu g/cm^2/hr$.

The Smith 2014a, 2014b, and 2015 studies used three different initial concentrations of formulated glyphosate and two dilutions to simulate an applicator's exposure. The herbicide was applied to the skin and left for six hours. The investigators then washed the skin and continued to measure absorption of glyphosate for a total of 24 hours. The reported flux measurements ranged from 0.001 to 0.056 $\mu g/cm^2/hr$, with an average of 0.016 $\mu g/cm^2/hr$.

The Ward 2010a, b, and c studies used three different initial concentrations of formulated glyphosate and six additional dilutions to simulate an applicator's exposure. The herbicide was applied to the skin and left for six hours. The investigators then washed the skin and continued to measure absorption of glyphosate for a total of 24 hours. The reported flux measurements ranged from 0.001 to 0.027 $\mu g/cm^2/hr$, with an average of 0.011 $\mu g/cm^2/hr$.

The Davies 2015a, 2015b, 2016, and 2017 studies used four different initial concentrations of formulated glyphosate and two additional dilutions to simulate an applicator's exposure. The herbicide was applied to the skin and left for six hours. The investigators then washed the skin and continued to measure absorption of glyphosate for a total of 24 hours. The reported flux measurements ranged from 0.001 to 0.027 $\mu g/cm^2/hr$, with an average of 0.012 $\mu g/cm^2/hr$.

The Franz 1983 study used three different initial concentrations of glyphosate, including two formulated product concentrations similar to a concentrate and a spray mix that would normally be used by consumers. The herbicide was applied to the skin and left for up to 48 hours. The flux measurements were calculated from the percent absorbed data and ranged from 0.004 to 0.094 $\mu g/cm^2/hr$, with an average of 0.055 $\mu g/cm^2/hr$.

In the Nielsen 2007 study, the authors used a glyphosate solution to test *in vitro* skin absorption over 48 hours in both intact and damaged skin. The flux measured for the intact skin was 0.016 $\mu g/cm^2/hr$, well within to range of the previous tests performed with formulated products.

In the Nielsen 2009 study, the authors investigated the effect that the physiochemical properties of glyphosate had on lag time, skin deposition, and skin penetration in tests with human skin. The highest flux reported for glyphosate was 0.0236 $\mu g/cm^2/hr$. The lag time was close to 8 hours, the deposition after 48 hours totaled 0.7% of the applied amount, and only 0.4% had penetrated the skin into the receptor chamber.

One *in vitro* study with rat skin (van Bergsteden 2003) reported as high as 10% absorption. This study was problematic for several reasons. Firstly, and perhaps obviously, rat skin does not approximate human skin nearly as well as human skin does. But more importantly, the authors themselves found the data to be unreliable. They stated, "The results of the autoradiography show too much variation to draw any conclusions." They went on to say "Due to the high variation in dermal penetration within the test groups and the poor recoveries, the data presented in this report are not acceptable for regulatory use and risk assessment." Finally, in the conclusion section of the study, the authors repeated, "In general, the poor recoveries combined with the high variation within the glyphosate test groups make the data generated in this study unsuitable for risk assessment." There also appeared to be several errors and inconsistencies within the data reported, such as the initial concentrations of formulated product, amount applied, and flux values.

I will use the flux values from the above human skin studies later in this report to compare to the flux values I calculate as part of my risk assessment. I will calculate the expected flux values from information given in the plaintiff's deposition to estimate the dose associated with his use of glyphosate-based herbicides. The expected flux values should fall within the same general range as the values reported in the literature.

When exposure conditions allow for a small portion of the glyphosate-based herbicide that comes into contact with skin to penetrate through the skin, that portion enters into the blood stream. Once the herbicide enters into the blood stream, it will behave the same regardless of how it got in the blood stream. The following section on toxicokinetics addresses the distribution, metabolism, and elimination of glyphosate in the blood, which applicable to internal doses of glyphosate from any route of entry.

<u>Toxicokinetics</u>

As discussed above, very little glyphosate is absorbed through the skin. However small the amount that passes through the skin, the glyphosate will enter the blood stream. The same is true for other routes of exposure: whether glyphosate is absorbed through the lungs, the GI tract, or the skin, it will pass into the blood. Once in the blood stream, glyphosate can be distributed to other body tissues or metabolized into other compounds. Notably, absorbed glyphosate is almost all (96-99%) eliminated in the urine without being metabolized (Wester 1991). In the Wester 1991 study, 96-99% of two intravenous doses in monkeys (Doses A and B) of a formulated Roundup product were recovered in the urine. These doses show that formulated product in the blood stream is eliminated in the urine. In addition, two topical applications of formulated product were applied (Doses C and D) and only 2.2% and 0.8%, respectively, of the applied doses were recovered in the urine. These doses show that only 2.2% and 0.8% of the applied doses may have absorbed through the skin, respectively. A portion of the topical dose D (3.6%) was recovered from the feces of the monkey. Based on the data from the previous three doses (A-C), this portion of the applied product never entered the blood stream, but was likely ingested by the monkey and then recovered in the feces (see next paragraph). Doses A and B show that when formulated glyphosate product enters the blood stream, it is almost all excreted in the urine. This observation is consistent with the expectation that chemicals with high water solubility such as glyphosate will be excreted from the blood almost exclusively in the urine.

In the case of an oral dose, studies relied upon by regulators have reported that a range of 7-40% of an oral dose of glyphosate is absorbed from the gastrointestinal (GI) tract into the blood. In the Brewster 1991 study, a range of 35-40% of an oral dose of glyphosate in rats was absorbed from the gastrointestinal (GI) tract into the blood and tested in the urine. The NTP[2] 1992 study estimated approximately 30-34% of a single oral dose of glyphosate was absorbed from the GI

---

[2] National Toxicology Program (U.S.)



tract in rats (as tested in urine). The ATSDR[3] toxicological profile for glyphosate 2019 reports a range of 7-36% from several unpublished studies. These studies can determine the percent of an oral dose that is absorbed from the GI tract into the blood by testing urine because almost all the glyphosate in blood (99%) is excreted in the urine, regardless of how it entered the blood (i.e., through skin absorption or GI absorption).

The Brewster 1991 study reported that after 7 days, virtually all of the large doses given to test animals (approximately 99%) had been eliminated, without being metabolized. This is supported by The Pesticide Manual, published by the British Crop Production Council, which states that glyphosate does not bioaccumulate in the body (Turner, 2018). These results are supported by the Connolly 2018b study that determined an average half-life of glyphosate in the body of 7.25 hours. The Brewster 1991 study also reported that the primary environmental metabolite (AMPA) was tested and was not present except in a few rats at less than 0.1% of the dose, indicating that glyphosate is excreted unchanged. In a case of intentional ingestion (suicide attempt), the total urinary excretion included a glyphosate to AMPA ratio of 148:1, further demonstrating that glyphosate does not undergo significant metabolism (ATSDR 2019). The ATSDR also summarized a study where small amounts of AMPA (0.2-0.4% of the administered oral dose of pure glyphosate) were present in urine and feces and no AMPA was present following IV injection. These studies all confirm that glyphosate is not metabolized in significant amounts after a dermal, oral, or IV dose.

The Wester 1991 study also confirms that glyphosate is not stored in body organs (no bioaccumulation). No traces of the radiolabel $C^{14}$ glyphosate was present in the spleen, ovaries, kidney, brain, liver, abdominal fat, bone marrow, upper spinal column, or nervous system fluid after the 7-day excretion period. The McEwen study published in the German BfR 2015 also tested distribution into organs (in rats) after 6 hours, 18 hours, and 7 days of an oral dose. Only 0.3% of the original dose was still present in the carcass. Notably, only a maximum of 0.12% of the original dose was present in the bone after 6 hours, which decreased to 0.02% after 7 days. In bone marrow, only a maximum of 0.01% of the original dose was present in the bone after 6 hours, which decreased to <0.01% (not detectable) after 7 days. These studies show that glyphosate does not remain in body tissues such as skin, bone, or bone marrow and they confirm that any glyphosate that may be absorbed into the blood stream is eliminated in the urine.

---

[3] Agency for Toxic Substances and Disease Registry

Passive Dosimetry and Biomonitoring

Scientists have used both passive dosimetry (gauze patches attached to the outside of the body or clothing) and biomonitoring (urine analysis) to measure the exposure and dose of potential glyphosate exposure during use of herbicides. Passive dosimetry studies have been useful in defining the if and how exposure occurs.

Passive dosimetry studies conducted for applicators using glyphosate in similar ways to many consumers (application with a wand sprayer) indicate that the main location for dermal exposure is, not surprisingly, the legs, especially the lower legs/ankles. Lavy 1992 showed that among applicators using hand sprayer and tractor sprayers (nursery workers), the vast majority (>98%) of the exposure was to the ankles (77%) and thighs (21%). Johnson 2005 studied municipal roadside weed control workers and found that approximately 85% of potential dermal exposure was on the upper (~20%) and lower legs (~65%), with ~12% of exposure to the back (from use of backpack sprayers).

Passive dosimetry was also used to measure how normal work clothing affected potential skin exposure to glyphosate. Lavy 1992 used passive dosimetry inside and outside of clothing to conclude that clothing played a protective role, observing that only about 23% of the exposure penetrated the clothing. Johnson 2005 found that, of formulated product found on the outside of the workers' clothing, only approximately 11% had passed through the clothing to the skin. These results were consistent with the Oltmanns 2016 conclusion that normal clothing provided a 70.5% protection factor. Espanhol-Soares 2013 studied both 100% cotton and 61/39 Cotton-polyester blend garments over time. The 100% cotton garment provided over a 90% protection factor after 30 washes and the blended garment provided over a 70% protection factor after 30 washes. Between these four studies, normal work clothing provided a protection factor range between about ~70-90%.

Passive dosimetry is limited, however, when studying health effects or toxicokinetics in that it does not directly measure an individual's internal dose. Biomonitoring, on the other hand, does directly measure a marker of an individual's internal dose. In the case of glyphosate, biomonitoring using urinalysis is an effect measure of dose given that more than 96% of glyphosate that enters the bloodstream is excreted in the urine within days of the exposure (Wester 1991). The Cowell 1990a study tested forestry nursery workers using both passive dosimetry and biomonitoring. The passive dosimetry indicated that there was exposure to glyphosate, but the biomonitoring showed no detectable dose. The authors concluded that doses

of glyphosate in urine were unmeasurable[4] due to clothing protection and low dermal penetration. Passive dosimetry alone does not directly measure either of these factors.

Solomon 2016 and the updated Solomon 2019 noted that studies that use biomonitoring (vs. passive dosimetry alone) for glyphosate provide the most useful data to assess the risk of adverse health outcomes. He stated, "For compounds, such as glyphosate, where the excretion kinetics is well understood, biological monitoring provides a measure of the actual amount of the chemical in the body. For this reason, data from these studies are most appropriate for risk assessment." I agree with Solomon that biomonitoring data is the best indicator of dose and is the most appropriate for risk assessment. Solomon goes on to say that passive dosimetry can be used in conjunction with absorption data, body surface area data, and clothing protection data for the assessment of systemic dose.

It is important to note that Acquavella 2004 reported in his study of farmers that some of the applicators did not have glyphosate in their urine despite applying the product to over 100 acres. On the day of application, ~60% of farmers had some detectable level of glyphosate in urine, and this percentage went down in subsequent days after application. From this data, we can infer that at least 40% of the farmers who used glyphosate to treat very large areas (10 to >400 acres) did not receive any measurable dose of glyphosate, demonstrating that a person may use glyphosate without receiving an exposure or measurable internal dose. This information clearly indicates that the use of glyphosate-based herbicides is not of itself a measure of exposure or dose.

In addition, Acquavella 2004 estimated systemic doses from the biomonitoring data in the Farm Family study. The distribution of systemic doses was highly skewed: >90% of the estimated doses were below 0.001 mg/kg/d. The mean systemic dose was 0.0001 mg/kg/d and the maximum dose was 0.004 mg/kg/d. The herbicide use associated with this maximum dose included:
   1) Applying herbicide to a farm between 45 and 124 acres
   2) Spills were observed during both mixing/loading and application
   3) No use of rubber gloves was observed
   4) Skin contact with the herbicide was observed
   5) Contaminated equipment was repaired during the observation period
   6) No closed system or cab was used to mix, load, or apply

---

[4] Below limits of detection. Later studies have since achieved lower limits of detection.



Based on this highest recorded dose, it is clear that the resulting dose is well below regulatory levels. A similar conclusion was reached in Kougias 2020 where the highest dose (from both inhalation and dermal) following a 100-minute application with a backpack sprayer while wearing shorts and a t-shirt and multiple mixing/loading procedures was 5.9 x10$^{-3}$ mg/kg.

<u>Human Epidemiological Studies</u>

I have reviewed several studies used in carcinogenicity assessments performed by the International Agency for Research on Cancer (IARC), the Environmental Protection Agency (EPA), the Joint FAO/WHO Meeting on Pesticide Residues (JMPR), and the Australian Pesticides and Veterinary Medicine Authority (APVMA). The IARC 2015 Monograph classified glyphosate as Group 2A, meaning probably carcinogenic to humans, based on "limited" evidence of cancer in humans and "sufficient" evidence of cancer in animals. The EPA concluded that glyphosate is "not likely to be carcinogenic to humans". The JMPR concluded that glyphosate is unlikely to pose a carcinogenic risk to humans from exposure through the diet. The APVMA initially reviewed glyphosate in 1997, and re-reviewed it in 2016 (after the IARC assessment). APVMA 2017 concluded that glyphosate does not pose a carcinogenic risk to humans and that there were no grounds to place it under formal reconsideration.

In my practice as an industrial hygienist, I review epidemiological studies in order to assess the potential hazards of a substance as they relate to exposure and risk. To an industrial hygienist, a hazard is defined as a source of *potential* harm. In other words, a hazard is something that *can* cause damage, even if only in extreme situations. A risk is defined as the chance or probability that a person will be harmed in a specific exposure scenario. That is to say risk is the likelihood that something *does* cause damage in an actual situation. However, it is important to note that being at risk from a hazard is not to say that the hazard has caused or will cause damage.

My assessment of the risks of exposure to individual Roundup users is centered around an established dose limit, such as the EPA reference dose. The methods used to derive such dose limits depend on the accepted toxicological endpoints for a specific chemical. The method used to derive dose limits for carcinogens is very different from the method used to derive dose limits for non-carcinogens. The purpose of my review of the relevant literature was to determine the appropriate methodology for my risk assessment of individual Roundup users.

The Agricultural Health Study (AHS) is the largest and highest quality study of glyphosate-based herbicides and cancer (including NHL) to date. Data from the Agricultural Health Study (AHS) was

published by De Roos 2005 and updated by Andreotti 2018. The updated study was not considered by IARC (the monogram preceded the update). The AHS included 44,932 subjects who used glyphosate. The study categorized cases into quartiles based on intensity-weighted lifetime days of use of glyphosate-based herbicides. The intensity weighting was based on what application method was used and whether the person had mixed concentrated herbicide, sprayed diluted herbicide, repaired potentially-contaminated equipment, or used personal protective equipment. The intensity weighting helped to approximate the likely dose range of the participant. The results were adjusted for adjusted for age, smoking, alcohol use, family history, and use of other pesticides. The AHS found that the use of glyphosate-based products was not associated with total cancer or NHL specifically. None of the individual exposure quartiles were associated with total cancer or NHL. The third quartile (2nd to the highest exposure) showed the highest risk estimate at 0.88 (CI: 0.65, 1.19), showing no association with NHL. The 4th and highest exposure group resulted in a technically lower risk estimate (RR: 0.87; CI: 0.64, 1.19), though both of these higher exposure quartiles had an almost identical relative risk, both showing no association with NHL.

From the perspective of an industrial hygienist, the excellent quality of the AHS is due not only to its size, but also because it considers dose by measuring intensity-weighted lifetime days of glyphosate use. The classification of subjects into quartiles using intensity weighting allows the authors to accurately estimate exposure levels to glyphosate and to then determine a dose-response based on NHL cases within that exposure quartile. Dosemeci 2002 showed that exposures could be estimated if the intensity of the glyphosate use is understood. Coble 2011 later refined the intensity weighting methods to more accurately estimate doses from the AHS. This approach differs from that of studies that only differentiates between someone who has ever used glyphosate and someone who has never used it (ever/never data), or those that only measure total lifetime days of use. As established previously in this report, the fact that glyphosate was used (with no other data about the intensity of the use) does not correlate with dose.

The Eriksson 2008 study claims to find an association between glyphosate use and NHL. However, the study is a case-control study, where individuals with cancer (cases) and individuals without cancer (controls) were asked about past exposures to glyphosate. This questionnaire-based study introduces both recall and selection bias. Recall bias is a well-known problem for case-control studies. This recall bias was likely exacerbated by selection bias, where cases and controls are either included or excluded from the study based on their answers to the questionnaire. The

selection bias augmented the recall bias in Eriksson 2008 and caused the reported risk level to artificially high, as shown by Crump 2019. Also, the metric studied by Eriksson 2008 was lifetime days of use, and did not consider the intensity of use or attempt to estimate dose. Finally, the Eriksson 2008 study does not initially adjust for common confounders, most notably smoking or the use of other pesticides. Within the study, the authors perform a multivariate analysis that adjusts for the use of other pesticides, as well as age, sex and year of diagnosis or enrollment. When the study accounts for the use of other pesticides, it finds no statistically significant association between glyphosate and NHL.

The Hardell 2002 study performed a pooled analysis of two case-control studies. This study was very similar to the Eriksson 2008 study in that the same recall and selection bias as discussed above were present as shown by Crump 2019. Also, it did not initially adjust for the use of other pesticides. When the results are properly adjusted to account for confounding factors, there is no statistically significant increase in the risk estimate.

I also reviewed the McDuffie 2001 study. As a small case-control study, it likely overestimated the risk of NHL from exposure to glyphosate due to the presence of recall and selection bias (Crump 2019). The data collected from cases and control was initially ever/never use data, followed up with the total time per year of exposure. No estimation of dose was attempted. Also, the results were not adjusted for common confounding variables, such as the use of other pesticides. No statistically significant increase in risk was reported in this study, after controlling for other variables.

There have been several meta-analyses conducted on glyphosate and NHL. It is important to remember that the results of a meta-analysis are only as good as the data used as input into the analysis. Many meta-analyses used studies like McDuffie and Eriksson without taking into account the methodological issues in those studies (discussed above). I give low weight to such meta-analyses. That said, the most recently published meta-analyses, which have acknowledged the potential for bias in the case-control studies, have not shown a statistically-significant relationship between glyphosate exposure and NHL (Donato 2020, Kabat 2021).

Based on my review of data from the available literature, the weight of evidence shows no association between the use of glyphosate-based herbicides and NHL.

Regulatory Levels

Industrial hygienists commonly refer to regulatory or consensus standards to help interpret exposure data and determine relative risk. These standards establish exposure limits, typically for airborne concentrations or biological exposure indicators of dose (e.g., metabolites in urine). These limits can be compared to measured values of exposure or dose to help make decisions that minimize risk in potentially exposed populations.

For glyphosate, there are no established airborne exposure limits or limits of biological exposure indicators (e.g. ACGIH TLV® or OSHA PEL). There are, however, relevant regulatory limits on glyphosate dose (i.e., the amount that enters the body). My exposure and dose reconstruction, detailed in the following sections, will use the available exposure data to model the dose. The estimated dose will then be compared with the relevant dose limits published by both U.S. and international agencies.

I reviewed the relevant regulatory dose limits for glyphosate published by the US EPA, as well as other limits established globally, including the World Health Organization (WHO), the European Food Safety Authority (EFSA), and the California Office of Environmental Health Hazard Assessment (OEHHA). Table II shows the regulatory dose limits published by five agencies. These limits may not be enforceable outside the agencies' jurisdictions, but all five are listed for reference.

These dose limits vary due to the methods used to derive them and the studies considered during each risk assessment. Neither the EPA, JMPR/WHO, nor EFSA found sufficient evidence of carcinogenicity, and therefore, all three of these agencies based their dose limits on the lowest No Observable Adverse Effect Level (NOAEL) among the group of studies considered, with an applied uncertainty factor of 100 to account for inter- and intraspecies differences. The EFSA limits for operators applied an additional factor of 20% to account for limited oral absorption. OEHHA was required to adopt the IARC conclusions and listed glyphosate as a carcinogen for Prop 65 purposes, while the others performed their own assessment and concluded that glyphosate was not a human carcinogen (or not likely to be). Because OEHHA listed glyphosate as carcinogenic under the Prop 65 requirements, the Ca NSRL was extrapolated from a linearized multistage model. Starting with animal data from existing studies that involve very high doses, the model was used to extrapolate what low doses everyday over the course of a lifetime would produce a potential risk of 1 excess cancer case in 100,000.

**Table II**.  Published dose limits in the United States and Europe.

| Agency | Published dose limit (mg/kg bw/day) | Calculated limits based on 70 kg body weight (mg/day) |
|---|---|---|
| EPA Chronic RfD | 1* | 70 |
| JMPR/WHO ADI | 1 | 70 |
| EFSA (operators) | 0.1 | 7 |
| EFSA (consumers) | 0.5 | 35 |
| Ca NSRL | - | 1.1 |

*In January 2020, the EPA released the interim decision finalizing the 2017 Glyphosate Draft Human Health Risk Assessment for Registration Review, with an RfD of 1 mg/kg bw/day
ADI = Acceptable daily intake
NSRL = No Significant Risk Level

## Label and SDS reviews

Product labels and (material) safety data sheets (SDSs, or previously MSDSs) are two distinct ways of communicating information about a chemical product to different types of end users. For example, pesticide labels affixed to retail chemical products are written for consumer users. The information required on these labels is determined by the EPA and the directions given on the label should be read and followed by the consumer. The information required on an SDS, however, is determined by OSHA, and must accompany chemicals only in an occupational setting. There are no directions for use on an SDS, but employees should be familiar with the information on an SDS as they use a product as directed by their employer.

I have reviewed the labels and SDSs for the Roundup products that are believed to be used by the plaintiff. In my private industrial hygiene consulting practice, reviewing the labels and SDSs is an essential part of all projects that involve potential exposure to chemical products. I frequently review safety data sheets to gather information about potential hazards associated with a chemical product and I use this information to perform an exposure/risk assessment.

Pesticide labels are required and regulated by the EPA under the Federal Insecticide, Fungicide, and Rodenticide Act (FIFRA). Labels are the authoritative document and must be affixed to the product. They contain safety and use information intended for both occupational and non-occupational end users. For non-occupational use, product labels are the only source of safety and use information required to be provided to the user.

In contrast, SDSs are only required to be made available to employees by their employers. They are intended for occupational users, and include more detailed information regarding hazard classification, composition, first-aid measures, fire-fighting measures, accidental release measures, handling and storage, appropriate exposure control and personal protection, physical and chemical properties, toxicological information, ecological information, disposal considerations, transportation information, regulatory information, and other information. SDSs do not provide directions for use of the products. In the case of pesticides, labels and safety data sheets often have differing information. The following paragraphs describe the differences between the two and what the basis is for those differences.

Through its Hazard Communication Standard, the U.S. Occupational Health and Safety Administration (OSHA) requires that 1) manufacturers and importers classify the hazards of chemicals they produce or import, and 2) employers provide information to employees about the hazards of chemicals to which they are potentially exposed. These regulatory requirements must be carried out by manufacturers/importers and employers by means of a Hazard Communication Program which includes: labels and other forms of warning, safety data sheets (SDSs), and information and training.

Prior to 2012, SDSs were known as Material Safety Data Sheets (MSDSs). They are a portion of a larger program meant to ensure that employees have access to information about the hazards of a chemical they may be exposed to while performing their job duties. They are not meant to communicate risk of exposure or disease. They are not meant to dictate handling procedures or personal protective equipment (PPE) requirements, though they do provide information about handling procedures and PPE that would be effective, if needed. There is no requirement to provide SDSs to consumers who may purchase chemical products in retail.

Pesticides are specifically exempt from the labeling requirements of the OSHA Hazard Communication standard, because they are subject to the label requirements of the EPA under the Federal Insecticide, Fungicide, and Rodenticide Act (FIFRA). Label requirements for consumer herbicide products under EPA/FIFRA are intended for consumers. The labels reflect the information about the risks associated with use of the product. The label requirements related to exposure risk typically include such qualifying statements as "when used according to label directions".

With pesticides especially, the SDS and the label are written for different audiences to communicate different information. For this reason, the information contained in each may differ. For non-occupational consumer use, the product label is the authoritative document. The instructions and warnings on the product label are the most relevant and accessible information. The SDS is not intended for the non-occupational end user; however, SDSs are commonly available online to consumers via a simple web search.

**Exposure and Dose Risk Assessment Methodology**

The assessment of exposure risk involves two parts; 1) the estimation of the internal dose that may have potentially resulted from the exposure, and 2) the comparison that estimated internal dose to established dose limits discussed above. I have conducted a scientific analysis of estimated dose based on the available exposure information to evaluate the allegations of risk associated with cancer in relation to the use of glyphosate.

The purpose of my analysis is to provide an assessment of the risk associated with potential exposures to glyphosate while using glyphosate-based herbicides. Simply put, a hazard is something that *can* cause harm or disease, while a risk is the likelihood that a hazard will cause harm or disease. For example, the IARC monograph focused on the potential hazards of glyphosate, but per their mandate, no evaluation of risks or characterization of exposure was performed. The exposure and internal dose of glyphosate must be at least estimated for the completion of a valid risk assessment. Without risk assessment, toxicity and hazard data cannot be used to assess the relevance of those hazards to humans.

As an industrial hygienist, my assessment focuses on reconstructing a reasonable estimation of the dermal exposure from the available data on the use of glyphosate-based herbicides. The exposure data, such as the product used, frequency and duration of use, clothing worn, etc., can be used to model the dose. Exposure is the amount of a chemical that is available to be absorbed by the body, and the dose is the amount that actually is absorbed into the body. This determination of dose using well-established models is calculated from the reported exposure to Roundup (from plaintiff's deposition) and used to determine whether the dose is of a sufficient magnitude to produce adverse health effects.

One specific method for estimating exposure and dermal absorbed dose is the Absorbed Daily Dose (ADD) model for dermal absorption. This model was published in Mathematical Models for Estimating Occupational Exposure to Chemical (AIHA press) and in the U.S. EPA Risk Assessment Guidance for Superfund (RAGS) in 2004. The model is based on Fick's law of diffusion, which describes the concentration of a chemical within the skin as functions of both the distance traveled into the skin and time. In the model, Fick's law is used to predict the absorption rate of chemical into the body through the skin.

Inputs into the ADD model include data gathered about an individual's use of Roundup (or any other glyphosate-containing herbicide), the chemical properties, reported use of the product, body weight, and clothing worn during use of the herbicide. In order to determine highest reasonable estimate of what the internal dose might have been, the high end of any reported data ranges was entered into the model. For example, if an herbicide user reports spraying for 15-20 minutes a day, 2-3 times per month, then the input to the model would be 20 minutes a day, 3 times per month. Other conservative assumptions are also made when using this model, such as the assumption that half of exposed and unexposed skin that contacts the herbicide is uniformly (50%) covered. The Lavy 1992 study showed that skin exposure was highly varied, even between samples locations in close proximity to each other on the same body part. Therefore, even a 50% coverage scenario is not realistic in actual exposure situations; however, I will use this scenario to both simplify and reasonably overestimate exposures.

The ADD model also requires an estimation of the surface area of skin exposed during a given exposure event. The skin surface area is determined by the type of use (e.g. mixing vs. spraying with handheld container and wand vs. backpack sprayer vs. ATV with front mounted spray nozzle) and the clothing worn during application. From the plaintiff's deposition and from the information published in the passive dosimetry studies from Lavy 1992, Johnson 2005, Solomon 2016, and Acquavella 2004, the body surfaces that were potentially exposed above a de minimis level were identified. The skin surface area from these potentially exposed body parts was determined using average skin surface areas reported in EPA studies (see Figure 2). Any skin surface that was reported to be covered (clothed) was still counted, with the surface area of such body parts multiplied by a factor of 0.1 (90% protection for cotton per Espanhol-Soares 2013) to account for the protection given by the clothing itself.

| Body Part | Percentile | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|
| | Mean | 5th | 10th | 15th | 25th | 50th | 75th | 85th | 90th | 95th |
| Adult Males | | | | | | | | | | |
| Total | 2.06 | 1.73 | 1.80 | 1.84 | 1.93 | 2.07 | 2.23 | 2.34 | 2.41 | 2.52 |
| Head | 0.136 | 0.123 | 0.126 | 0.128 | 0.131 | 0.136 | 0.143 | 0.147 | 0.149 | 0.154 |
| Trunk[a] | 0.827 | 0.636 | 0.672 | 0.701 | 0.74 | 0.820 | 0.918 | 0.984 | 1.02 | 1.10 |
| Upper Extremities | 0.393 | 0.332 | 0.346 | 0.354 | 0.369 | 0.395 | 0.425 | 0.442 | 0.456 | 0.474 |
| Arms | 0.314 | 0.253 | 0.265 | 0.274 | 0.289 | 0.316 | 0.346 | 0.364 | 0.379 | 0.399 |
| Upper arms | 0.172 | 0.139 | 0.145 | 0.149 | 0.156 | 0.169 | 0.185 | 0.196 | 0.205 | 0.220 |
| Forearms | 0.148 | 0.115 | 0.121 | 0.125 | 0.132 | 0.146 | 0.163 | 0.173 | 0.181 | 0.197 |
| Hands | 0.107 | 0.090 | 0.093 | 0.096 | 0.100 | 0.107 | 0.115 | 0.121 | 0.124 | 0.131 |
| Lower Extremities | 0.802 | 0.673 | 0.703 | 0.721 | 0.752 | 0.808 | 0.868 | 0.903 | 0.936 | 0.972 |
| Legs | 0.682 | 0.560 | 0.587 | 0.603 | 0.634 | 0.686 | 0.746 | 0.780 | 0.811 | 0.847 |
| Thighs | 0.412 | 0.334 | 0.349 | 0.360 | 0.379 | 0.4113 | 0.452 | 0.478 | 0.495 | 0.523 |
| Lower Legs | 0.268 | 0.225 | 0.234 | 0.241 | 0.252 | 0.271 | 0.292 | 0.302 | 0.312 | 0.324 |
| Feet | 0.137 | 0.118 | 0.123 | 0.125 | 0.130 | 0.138 | 0.147 | 0.152 | 0.156 | 0.161 |

[a]   Trunk includes neck.

Source: Based on U.S. EPA (1985) and NHANES 2005–2006.

**Figure 2.** Surface area of adult males (21 years and older) in square meters. From EPA 2011.


Interpretation of Risk Assessment Results

Once the dose from glyphosate exposure has been estimated, it is compared to acceptable dose limits that have been established by regulatory agencies. Agencies such as the U.S. EPA, the World Health Organization (WHO), and European Food Safety Agency (EFSA) have established dose limits based on studies that evaluate exposure in the context of risk. The relevant dose limits were presented previously in this report (Table II).

**Description of Ira Vosper's use of Glyphosate-Based Herbicides**

From the deposition of Mr. Ira Vosper, glyphosate use information (frequency and duration) was collected and used to calculate a reasonably conservative estimate of dose. Table III summarizes the duration of potential exposure (spraying duration), the frequency of exposure, and the reported clothing worn during spraying.

**Table III.** Herbicide use information reported in the deposition of Ira Vosper

| Property | Years of use | Duration per use (min) | Number of times used | | | Clothing worn during use |
| --- | --- | --- | --- | --- | --- | --- |
| | | | Per day | Per month | Per year | |
| Residential and Farm | | | | | | |
| Jones Ln. 1986-1995 | 9 | Not given* (Est. 2 hour) | Not given* (Est. 1) | Not given* (Est. 2) | Not given* (Est. 12) | shorts, flip-flops |
| Grandparents' farm 1989-99 | 10 | 45 min | 1 | <1 | 2 | Shorts, flip-flops |
| Sparta 1993-1999 | 6 | 15 min | 1 | 1 | 6 | Shorts, flip-flops |
| Jones Ln. 1999-2004 | 5 | Not given* (Est. 2 hour) | Not given* (Est. 1) | Not given* (Est. 2) | Not given* (Est. 12) | Shorts, flip-flops |
| Partridge Ln 2008-2018 | 10 | Not given* (Est. 1 hour) | Not given* (Est. 1) | Not given* (Est. 1) | Not given* (Est. 6) | Shorts, flip-flops |
| Occupational | | | | | | |
| Grinnell 1999-2002 | 3 | 15 min | 1 | Not given* (Est. 20) | Not given* (Est. 90) | Long pants, shoes, socks, shirt |
| H&K 2003-2004 | 1 | 120 min | 1 | <1 | 2 | Long pants, shoes, socks, shirt |
| Rinox 2004-2012 | 8 | 60 min | 1 | 2 | 12 | Long pants, shoes, socks, shirt |
| Techo-Bloc 2012-(2018) | 6 | 10 min | 1 | <1 | 3 | Long pants, shoes, socks, shirt |

* The frequency and duration of residential glyphosate use was estimated based on the size of the property and spray area given in the deposition.

Limited information about the parameters for duration and frequency of use was reported in the deposition. Where Roundup use information was limited, reasonable estimates were made to determine the duration and frequency of use in order to ultimately estimate dose.

For three years from 1986 to 1989, Mr. Vosper's roundup use was on his father's property on Jones Ln. Mr. Vosper testified that it would take approximately three days to spray the entire farm, though he would not do that all in one day or in consecutive days (Ira Vosper deposition, p 362, 402). With this information, it is reasonable to evenly distribute the total spraying time of three, eight-hour days (24 hours) over a growing season (April to October). Based on Mr. Vosper's pattern of use at other properties, a reasonable maximum estimate of this distribution includes spraying two hours per spraying event, twice per month for six months, for a total of 24 hours spent spraying per year (12 days per year, 2 hours per day).

For the four years from 1989 to 1993, Mr. Vosper testified that he sprayed at both his father's property on Jones Ln. and at his Grandparent's farm (p. 363-5). To determine the total exposure during this period, the Roundup use at the Jones Ln. property (calculated from the parameters listed above) were added to the exposures from the Grandparent's farm. At the Grandparent's farm, Mr. Vosper testified that he sprayed for 30-45 minutes (I will use 45 minutes in the model) a couple of times each year (p. 365).

For the two years from 1993 to 1995, Mr. Vosper testified that he sprayed at Jones Ln, his Grandparent's farm, and at his mother's home in Sparta. The exposures from the Jones Ln. and Grandparent's farm are describes above, and the exposures from the Sparta home were then added to it. At the Sparta home, Mr. Vosper testified that he sprayed for 15 minutes once per month during the growing season, April to October (p.233-235). The total is six spray events per year at the Sparta property.

For the 4 years from 1995 to 1999, Mr. Vosper testified that he sprayed at both his Grandparent's farm and at his mother's home in Sparta (p. 233-235). To determine the total exposure during this period, the exposures from the Grandparent's property (calculated from the parameters listed above) were added to the exposures from the Sparta home (calculated from the parameters listed above).

For the three years from 1999 to 2002, Mr. Vosper returned to live at his father's farm on Jones Ln., and I'll assume that he also resumed helping with the farm chores such as spraying Roundup. For this period, I will add his use at the Jones Ln. farm to his occupational use at Grinnell for these years. At Grinnell, Mr. Vosper testified that he spent 15 minutes spraying displays, and he would spray on average one display per day (p. 371-372). With a spray event frequency of 5 displays per week, the daily average for time spent is 15 minutes per day. Mr. Vosper testified that spraying

was more concentrated in the months where things grow the most (p. 131). Therefore, the frequency of Roundup use was reasonably estimated to be 20 days per month for the half of the growing season (three months) and 10 days per month for the other half. A total of 90 days per year was estimated from three months at 20 days/month and three months at 10 days/month.

In 2003 and 2004 (2 years), Mr. Vosper was still living at the Jones Ln. property, but had begun work at ███████████████ (H&K). These two uses will be combined for this time period. At H&K, Mr. Vosper testified to using ready-to-use (RTU) Roundup only a couple of times for approximately two hours (p.154).

For the four years from 2004 to 2008, Mr. Vosper's use of Roundup was associated with his work at Rinox (p. 67-68). He testified to using RTU Roundup once every two to three weeks for one hour (p.162-163). In a six-month growing season, we can calculate approximately 12 spraying events per year (twice per month for six months).

For the four years from 2008 to 2012, Mr. Vosper continued using Roundup at Rinox as described above, and in addition he used Roundup at his home on Partridge Ln. (p. 240). Mr. Vosper testified to using three to four bottles of Roundup per month over a growing season (p. 229). He used about one gallon per week (p. 229) and the spraying was done on the weekend (p. 179). In the Kougias 2020 study, four gallons of Roundup were sprayed in approximately 20 minutes during heavy residential use, or five minutes per gallon. Since Mr. Vosper's use was likely some combination of intermittent and continuous spraying, it is reasonable to estimate that Mr. Vosper sprayed for approximately 15 minutes, four times per month during the six-month growing season.

For the six years from 2012 to 2018, Mr. Vosper's use of Roundup included his use at his home on Partridge Ln. (as described above) and his use at work for ██████████ Mr. Vosper testified to using RTU Roundup at Techo-Bloc for ten minutes, once every two months for the growing season (p.167-168).

Mr. Vosper's reported his body weight to be about 200 lbs (~91 kg) since he graduated college in 1999 (p. 169). During college, he weighed 250 lbs (~114 kg), but lost weight his senior year and weighed approximately 185 lbs. (p.169). No information was given regarding Mr. Vosper's weight between the ages of 9 and 18. The CDC growth chart for average weight for age[5] was used to estimate body weight during these years. Mr. Vosper reported that, when spraying on the Jones

---

[5] https://www.cdc.gov/growthcharts/data/set1/chart03.pdf



Ln. farm, he wore shorts and sneakers (sometimes flip-flops), and no shirt (p.211). In work settings, Mr. Vosper wore long pants, short sleeved shirts, and work boots (p. 83, 145). Estimates for exposed and clothed surface areas were taken from average surface areas of individual body regions from EPA 2009, based on EPA 1985 and NHANES data. The average value for skin surface area was estimated as follows:

*Parameters*
- Residential spraying events completed with shorts and sneakers, no shirt
- Occupational spraying events completed with long pants, collared shirt, and leather boots
- Spray was both towards the ground and up onto a fountain or rock wall (waist height). The entire front half of the legs and feet were included to account for any drift.
- Half of the hands will also be included to account for any leaks around the sprayer handle.

*Calculations*
- The surface area of clothed skin for residential spraying events is (values in m$^2$ from Figure 2 above):
  - Front half of thighs = 0.412/2 = 0.2060
  - Top half of feet = 0.1370/2 = 0.0685
  - 90% protection factor for clothed surface areas = (0.2060 + 0.0685) x 0.1 = 0.0275
- The surface area of bare skin for residential spraying activities is (values from Figure 2 above):
  - Half of lower legs = 0.2680/2 = 0.134
  - Half of hands = 0.107/2 = 0.0535
  - Subtotal = 0.1875
- Total surface area during residential spraying activities = 0.0275 + 0.1875 = 0.2150 m$^2$ = **2150 cm$^2$**
- The surface area of clothed skin for occupational spraying events is (values in m$^2$ from Figure 2 above):
  - Front half of legs = 0.6820/2 = 0.3410
  - Top half of feet = 0.1370/2 = 0.0685
  - 90% protection factor for clothed surface areas = (0.3410 + 0.0685) x 0.1 = 0.0410
- The surface area of bare skin for occupational spraying activities is (values from Figure 2 above):
  - Half of hands = 0.107/2 = 0.0535
- Total surface area for occupational spraying events = 0.0945 m$^2$ = **945 cm$^2$**

## Dermal Exposure Estimation Using ADD

The ADD model consists of the main conceptual equation shown below, where the dose rate is averaged over the period of exposure and the daily dose rate is expressed as mass per unit of body weight per day.

$$ADD = \frac{DA_{event} \times EV \times ED \times EF \times SA}{BW \times AT}$$

where,

$ADD$ = average daily dose, mg/kg-day
$DA_{event}$ = absorbed dose per event, mg/cm$^2$-event
$EV$ = exposure frequency, events/day
$ED$ = exposure duration, years
$EF$ = days/year
$SA$ = skin surface area available for contact, cm$^2$
$BW$ = body weight, kg
$AT$ = averaging time, days

The absorbed dose per event ($DA_{event}$) used in the above model is calculated using the equation:

$$DA_{event} = K_p \times C_w \times T_{event}$$

where,

$DA_{event}$ = absorbed dose per event, mg/cm$^2$-event
$K_p$ = appropriate permeability coefficient in water, cm/hr
$C_w$ = concentration of the substance in water, mg/cm$^3$
$t_{event}$ = duration of event, hr/event

<u>ADD Calculation</u>

As a summary, Tables IV(a) – (h) describe the information that was input into the model. An ADD for each time period is calculated, and then the ADD for each period is combined into a single time-weighted ADD for the entire period of Roundup use from 1986-2018.

**Table IV(a)- 1986-1989: Jones**. Parameters used to calculate the average daily dose of glyphosate from Mr. Vosper's reported use at the Jones Ln. property.

| Parameter | Value | Comments |
|---|---|---|
| $K_p$ | $4.0 \times 10^{-6}$ cm/hr | From scientific literature: Nielsen 2007 |
| $C_{RTU}$ | 23.4 mg/cc (2%) | Conservative estimate of concentration of the product sprayed |
| $t_{Jones}$ | 2 hrs/event | The estimated average duration of residential use |
| EV | 1 event/day | Presumed |
| $EF_{Jones}$ | 12 days/yr | Reasonable estimate from deposition (p. 362, 402) |
| $ED_{1986-1989}$ | 3 years | From deposition (p. 362, 402) |
| $SA_{Res}$ | 2150 cm$^2$ | From Tables 7.12-7.13 EPA 2011 |
| BW | 34 kg | CDC growth chart: Weight for age percentiles |
| $AT_{1986-1989}$ | 1095 days | $ED_{1986-1989} \times 365$ day/yr |

With the parameters from Table IV(a), the ADD model results are as follows, in milligrams of glyphosate per kilogram body weight per day (mg/kg BW/d):

$$ADD_{1986\text{-}1989} = \frac{(K_p \times C_{RTU} \times t_{Jones}) \times EV \times ED_{1986-1989} \times EF_{Jones} \times SA_{Res}}{BW \times AT_{1986-1989}}$$

$$= \frac{(4.0 \times 10^{-6}\, cm/hr \times 23.4\, mg/cc \times 2\, hr/event) \times 1\, event/day \times 3\, yr \times 12\, days/yr \times 2150\, cm^2}{34\, kg \times 1095\, days}$$

$$= 3.89 \times 10^{-4} \text{ mg/kg BW/d}$$

**Table IV(b)- 1989 − 1993: Jones Ln. & Grandparent's farm**. Parameters used to calculate the average daily dose of glyphosate from Mr. Vosper's reported use.

| Parameter | Value | Comments |
|---|---|---|
| $K_p$ | $4.0 \times 10^{-6}$ cm/hr | From scientific literature: Nielsen 2007 |
| $C_{RTU}$ | 23.4 mg/cc (2%) | Conservative estimate of concentration of the product sprayed |
| $t_{Jones}$ | 2 hrs/event | The estimated average duration of residential use |
| $t_{Grand}$ | 0.75 hrs/event | Deposition, p. 365 |
| EV | 1 event/day | Presumed |
| $EF_{Jones}$ | 12 days/yr | Reasonable estimate from deposition (p. 362, 402) |
| $EF_{Grand}$ | 2 days/yr | Deposition, p. 365 |
| $ED_{1989-1993}$ | 4 years | From deposition (p. 365) |
| $SA_{Res}$ | 2150 cm$^2$ | From Tables 7.12-7.13 EPA 2011 |
| BW | 61 kg | CDC growth chart: Weight for age percentiles |
| $AT_{1989-1993}$ | 1460 days | $ED_{1989-1993} \times 365$ day/yr |

With the parameters from Table IV(b), the ADD model results are as follows, in milligrams of glyphosate per kilogram body weight per day (mg/kg BW/d):

$$\text{ADD}_{Jones} = \frac{(K_p \times C_{RTU} \times t_{Jones}) \times EV \times ED_{1989-1993} \times EF_{Jones} \times SA_{Res}}{BW \times AT_{1989-1993}}$$

$$= \frac{(4.0 \times 10^{-6}\,{}^{cm}/_{hr} \times 23.4\,{}^{mg}/_{cc} \times 2\,{}^{hr}/_{event}) \times 1\,{}^{event}/_{day} \times 4\,yr \times 12\,{}^{days}/_{yr} \times 2150\,cm^2}{61\,kg \times 1460\,days}$$

$$= 2.17 \times 10^{-4} \text{ mg/kg BW/d}$$

$$\text{ADD}_{Grand} = \frac{(K_p \times C_{RTU} \times t_{Grand}) \times EV \times ED_{1989-1993} \times EF_{Grand} \times SA_{Res}}{BW \times AT_{1989-1993}}$$

$$= \frac{(4.0 \times 10^{-6}\,{}^{cm}/_{hr} \times 23.4\,{}^{mg}/_{cc} \times 0.75\,{}^{hr}/_{event}) \times 1\,{}^{event}/_{day} \times 4\,yr \times 2\,{}^{days}/_{yr} \times 2150\,cm^2}{61\,kg \times 1460\,days}$$

$$= 1.36 \times 10^{-5} \text{ mg/kg BW/d}$$

$\text{ADD}_{1989-1993} = \text{ADD}_{Jones} + \text{ADD}_{Grand}$

$\qquad = 2.17 \times 10^{-4}$ mg/kg BW/d + $1.36 \times 10^{-5}$ mg/kg BW/d

$\qquad = 2.31 \times 10^{-4}$ mg/kg BW/d

**Table IV(c)- 1993 – 1995: Jones Ln, Grandparent's farm, & Sparta home**. Parameters used to calculate the average daily dose of glyphosate from Mr. Vosper's reported use.

| Parameter | Value | Comments |
|---|---|---|
| $K_p$ | $4.0 \times 10^{-6}$ cm/hr | From scientific literature: Nielsen 2007 |
| $C_{RTU}$ | 23.4 mg/cc (2%) | Conservative estimate of concentration of the product sprayed |
| $t_{Jones}$ | 2 hrs/event | The estimated average duration of residential use |
| $t_{Grand}$ | 0.75 hrs/event | Deposition, p. 365 |
| $t_{Sparta}$ | 0.25 hrs/event | Deposition, p. 233-235 |
| EV | 1 event/day | Presumed |
| $EF_{Jones}$ | 12 days/yr | Reasonable estimate from deposition (p. 362, 402) |
| $EF_{Grand}$ | 2 days/yr | Deposition, p. 365 |
| $EF_{Sparta}$ | 6 days/yr | Deposition, p. 233-235 |
| $ED_{1993-1995}$ | 2 years | From deposition (p. 233-235) |
| $SA_{Res}$ | 2150 cm$^2$ | From Tables 7.12-7.13 EPA 2011 |
| BW | 114 kg | Deposition, p. 169 |
| $AT_{1993-1995}$ | 730 days | $ED_{1993-1995} \times 365$ day/yr |

With the parameters from Table IV(c), the ADD model results are as follows, in milligrams of glyphosate per kilogram body weight per day (mg/kg BW/d):

$$ADD_{Jones} = \frac{(K_p \times C_{RTU} \times t_{Jones}) \times EV \times ED_{1993-1995} \times EF_{Jones} \times SA_{Res}}{BW \times AT_{1993-1995}}$$

$$= \frac{(4.0 \times 10^{-6} \, cm/hr \times 23.4 \, mg/cc \times 2 \, hr/event) \times 1 \, event/day \times 2 \, yr \times 12 \, days/yr \times 2150 \, cm^2}{114 \, kg \times 730 \, days}$$

$$= 1.16 \times 10^{-4} \text{ mg/kg BW/d}$$

$$ADD_{Grand} = \frac{(K_p \times C_{RTU} \times t_{Grand}) \times EV \times ED_{1993-1995} \times EF_{Grand} \times SA_{Res}}{BW \times AT_{1993-1995}}$$

$$= \frac{(4.0 \times 10^{-6} \, cm/hr \times 23.4 \, mg/cc \times 0.75 \, hr/event) \times 1 \, event/day \times 2 \, yr \times 2 \, days/yr \times 2150 \, cm^2}{114 \, kg \times 730 \, days}$$

$$= 7.25 \times 10^{-6} \text{ mg/kg BW/d}$$

$$ADD_{Sparta} = \frac{(K_p \times C_{RTU} \times t_{Sparta}) \times EV \times ED_{1993-1995} \times EF_{Sparta} \times SA_{Res}}{BW \times AT_{1993-1995}}$$

$$= \frac{(4.0 \times 10^{-6} \, cm/hr \times 23.4 \, mg/cc \times 0.25 \, hr/event) \times 1 \, event/day \times 2 \, yr \times 6 \, days/yr \times 2150 \, cm^2}{114 \, kg \times 730 \, days}$$

$$= 7.25 \times 10^{-6} \text{ mg/kg BW/d}$$

$ADD_{1993-1999} = ADD_{Jones} + ADD_{Grand} + ADD_{Sparta}$

$\quad\quad\quad = 1.16 \times 10^{-4}$ mg/kg BW/d + $7.25 \times 10^{-6}$ mg/kg BW/d + $7.25 \times 10^{-6}$ mg/kg BW/d

$\quad\quad\quad = 1.31 \times 10^{-4}$ mg/kg BW/d

**Table IV(d)- 1995 – 1999: Grandparent's farm & Sparta home**. Parameters used to calculate the average daily dose of glyphosate from Mr. Vosper's reported use.

| Parameter | Value | Comments |
|---|---|---|
| $K_p$ | $4.0 \times 10^{-6}$ cm/hr | From scientific literature: Nielsen 2007 |
| $C_{RTU}$ | 23.4 mg/cc (2%) | Conservative estimate of concentration of the product sprayed |
| $t_{Grand}$ | 0.75 hrs/event | Deposition, p. 365 |
| $t_{Sparta}$ | 0.25 hrs/event | Deposition, p. 233-235 |
| EV | 1 event/day | Presumed |
| $EF_{Grand}$ | 2 days/yr | Deposition, p. 365 |
| $EF_{Sparta}$ | 6 days/yr | Deposition, p. 233-235 |
| $ED_{1995-1999}$ | 4 years | From deposition (p. 233-235) |
| $SA_{Res}$ | 2150 cm$^2$ | From Tables 7.12-7.13 EPA 2011 |
| BW | 114 kg | Deposition, p. 169 |
| $AT_{1993-1999}$ | 1460 days | $ED_{1995-1999} \times 365$ day/yr |

With the parameters from Table IV(c), the ADD model results are as follows, in milligrams of glyphosate per kilogram body weight per day (mg/kg BW/d):

$$ADD_{Grand} = \frac{(K_p \times C_{RTU} \times t_{Grand}) \times EV \times ED_{1995-1999} \times EF_{Grand} \times SA_{Res}}{BW \times AT_{1995-1999}}$$

$$= \frac{(4.0 \times 10^{-6} \, cm/hr \times 23.4 \, mg/cc \times 0.75 \, hr/event) \times 1 \, event/day \times 4 \, yr \times 2 \, days/yr \times 2150 \, cm^2}{114 \, kg \times 1460 \, days}$$

$$= 7.25 \times 10^{-6} \text{ mg/kg BW/d}$$

$$ADD_{Sparta} = \frac{(K_p \times C_{RTU} \times t_{Sparta}) \times EV \times ED_{1995-1999} \times EF_{Sparta} \times SA_{Res}}{BW \times AT_{1994-1999}}$$

$$= \frac{(4.0 \times 10^{-6} \, cm/hr \times 23.4 \, mg/cc \times 0.25 \, hr/event) \times 1 \, event/day \times 4 \, yr \times 6 \, days/yr \times 2150 \, cm^2}{114 \, kg \times 1460 \, days}$$

$$= 7.25 \times 10^{-6} \text{ mg/kg BW/d}$$

$$ADD_{1995-1999} = ADD_{Grand} + ADD_{Sparta}$$

$$= 7.25 \times 10^{-6} \text{ mg/kg BW/d} + 7.25 \times 10^{-6} \text{ mg/kg BW/d}$$

$$= 1.45 \times 10^{-5} \text{ mg/kg BW/d}$$

**Table IV(e)- 1999 – 2002: Jones Ln. & Grinnell**. Parameters used to calculate the average daily dose of glyphosate from Mr. Vosper's reported use.

| Parameter | Value | Comments |
|-----------|-------|----------|
| $K_p$ | $4.0 \times 10^{-6}$ cm/hr | From scientific literature: Nielsen 2007 |
| $C_{RTU}$ | 23.4 mg/cc (2%) | Conservative estimate of concentration of the product sprayed |
| $t_{Jones}$ | 2 hrs/event | The estimated average duration of residential use |
| $t_{Grinnell}$ | 0.25 hrs/event | Deposition, p. 120, 131 |
| $EV_{Jones}$ | 1 event/day | Presumed |
| $EV_{Grinnell}$ | 1 events/day | Deposition, p. 371-372 |
| $EF_{Jones}$ | 12 days/yr | Reasonable estimate from deposition, p. 362, 402 |
| $EF_{Grinnell}$ | 90 days/yr | Estimate from info in deposition, p. 120, 131 |
| $ED_{1999-2002}$ | 3 years | From deposition p. 77 |
| $SA_{Res}$ | 2150 cm$^2$ | From Tables 7.12-7.13 EPA 2011 |
| $SA_{Occ}$ | 945 cm$^2$ | From Tables 7.12-7.13 EPA 2011 |
| BW | 91 kg | Deposition, p. 169 |
| $AT_{1999-2002}$ | 1095 days | $ED_{1999-2002} \times 365$ day/yr |

With the parameters from Table IV(d), the ADD model results are as follows, in milligrams of glyphosate per kilogram body weight per day (mg/kg BW/d):

$$\text{ADD}_{Jones} = \frac{(K_p \times C_{RTU} \times t_{Jones}) \times EV_{Jones} \times ED_{1999-2002} \times EF_{Jones} \times SA_{Res}}{BW \times AT_{1999-2002}}$$

$$= \frac{(4.0 \times 10^{-6}\,^{cm}/_{hr} \times 23.4\,^{mg}/_{cc} \times 2\,^{hr}/_{event}) \times 1\,^{event}/_{day} \times 3\,yr \times 12\,^{days}/_{yr} \times 2150\,cm^2}{91\,kg \times 1095\,days}$$

$$= 1.45 \times 10^{-4} \text{ mg/kg BW/d}$$

$$\text{ADD}_{Grinnell} = \frac{(K_p \times C_{RTU} \times t_{Grinnell}) \times EV_{Grinnell} \times ED_{1999-2002} \times EF_{Grinnnell} \times SA_{Occ}}{BW \times AT_{1999-2002}}$$

$$= \frac{(4.0 \times 10^{-6}\,^{cm}/_{hr} \times 23.4\,^{mg}/_{cc} \times 0.25\,^{hr}/_{event}) \times 1\,^{event}/_{day} \times 3\,yr \times 90\,^{days}/_{yr} \times 945\,cm^2}{91\,kg \times 1095\,days}$$

$$= 5.99 \times 10^{-5} \text{ mg/kg BW/d}$$

$$\text{ADD}_{1999-2002} = \text{ADD}_{Jones} + \text{ADD}_{Grinnell}$$

$$= 1.45 \times 10^{-4} \text{ mg/kg BW/d} + 5.99 \times 10^{-5} \text{ mg/kg BW/d}$$

$$= 2.05 \times 10^{-4} \text{ mg/kg BW/d}$$

**Table IV(f)- 2003 – 2004: Jones Ln. & Haines and Kibblehouse**. Parameters used to calculate the average daily dose of glyphosate from Mr. Vosper's reported use.

| Parameter | Value | Comments |
|---|---|---|
| $K_p$ | $4.0 \times 10^{-6}$ cm/hr | From scientific literature: Nielsen 2007 |
| $C_{RTU}$ | 23.4 mg/cc (2%) | Conservative estimate of concentration of the product sprayed |
| $t_{Jones}$ | 2 hrs/event | The estimated average duration of residential use |
| $t_{H\&K}$ | 2 hrs/event | Deposition, p. 154 |
| $EV_{Jones}$ | 1 event/day | Presumed |
| $EV_{H\&K}$ | 1 event/day | Presumed |
| $EF_{Jones}$ | 12 days/yr | Reasonable estimate from deposition, p. 362, 402 |
| $EF_{H\&K}$ | 2 days/yr | Deposition, p. 153 |
| $ED_{2003-2004}$ | 2 years | From deposition p. 149, 160 |
| $SA_{Res}$ | 2150 cm$^2$ | From Tables 7.12-7.13 EPA 2011 |
| $SA_{Occ}$ | 945 cm$^2$ | From Tables 7.12-7.13 EPA 2011 |
| BW | 91 kg | Deposition, p. 169 |
| $AT_{2003-2004}$ | 730 days | $ED_{2003-2004} \times$ 365 day/yr |

With the parameters from Table IV(e), the ADD model results are as follows, in milligrams of glyphosate per kilogram body weight per day (mg/kg BW/d):

$$ADD_{Jones} = \frac{(K_p \times C_{RTU} \times t_{Jones}) \times EV_{Jones} \times ED_{2003-2004} \times EF_{Jones} \times SA_{Res}}{BW \times AT_{2003-2004}}$$

$$= \frac{(4.0 \times 10^{-6}\, ^{cm}/_{hr} \times 23.4\, ^{mg}/_{cc} \times 2\, ^{hr}/_{event}) \times 1\, ^{event}/_{day} \times 2\, yr \times 12\, ^{days}/_{yr} \times 2150\, cm^2}{91\, kg \times 730\, days}$$

$$= 1.45 \times 10^{-4} \text{ mg/kg BW/d}$$

$$ADD_{H\&K} = \frac{(K_p \times C_{RTU} \times t_{H\&K}) \times EV_{H\&K} \times ED_{2003-2004} \times EF_{H\&K} \times SA_{Occ}}{BW \times AT_{2003-2004}}$$

$$= \frac{(4.0 \times 10^{-6}\, ^{cm}/_{hr} \times 23.4\, ^{mg}/_{cc} \times 2\, ^{hr}/_{event}) \times 1\, ^{event}/_{day} \times 2\, yr \times 2\, ^{days}/_{yr} \times 945\, cm^2}{91\, kg \times 730\, days}$$

$$= 1.07 \times 10^{-5} \text{ mg/kg BW/d}$$

$ADD_{2003-2004} = ADD_{Jones} + ADD_{H\&K}$

$\qquad = 1.45 \times 10^{-4}$ mg/kg BW/d + $1.07 \times 10^{-5}$ mg/kg BW/d

$\qquad = 1.56 \times 10^{-4}$ mg/kg BW/d

**Table IV(g)- 2004 – 2008: Rinox.** Parameters used to calculate the average daily dose of glyphosate from Mr. Vosper's reported use.

| Parameter | Value | Comments |
|---|---|---|
| $K_p$ | $4.0 \times 10^{-6}$ cm/hr | From scientific literature: Nielsen 2007 |
| $C_{RTU}$ | 23.4 mg/cc (2%) | Conservative estimate of concentration of the product sprayed |
| $t_{Rinox}$ | 1 hrs/event | Deposition, p. 162-163 |
| $EV_{Rinox}$ | 1 event/day | Presumed |
| $EF_{Rinox}$ | 12 days/yr | Deposition, p. 162-163 |
| $ED_{2004-2008}$ | 4 years | From deposition p. 67-68 |
| $SA_{Occ}$ | 945 cm$^2$ | From Tables 7.12-7.13 EPA 2011 |
| BW | 91 kg | Deposition, p. 169 |
| $AT_{2004-2008}$ | 1460 days | $ED_{2004-2008} \times 365$ day/yr |

With the parameters from Table IV(f), the ADD model results are as follows, in milligrams of glyphosate per kilogram body weight per day (mg/kg BW/d):

$$ADD_{2004-2008} = \frac{(K_p \times C_{RTU} \times t_{Rinox}) \times EV_{Rinox} \times ED_{2004-2008} \times EF_{Rinox} \times SA_{Occ}}{BW \times AT_{2004-2008}}$$

$$= \frac{(4.0 \times 10^{-6}\ cm/hr \times 23.4\ mg/cc \times 1\ hr/event) \times 1\ event/day \times 4\ yr \times 12\ days/yr \times 945\ cm^2}{91\ kg \times 1460\ days}$$

$$= 3.20 \times 10^{-5}\ \text{mg/kg BW/d}$$

**Table IV(h)- 2008 – 2012: Rinox and Partridge Ln.** Parameters used to calculate the average daily dose of glyphosate from Mr. Vosper's reported use.

| Parameter | Value | Comments |
|---|---|---|
| $K_p$ | $4.0 \times 10^{-6}$ cm/hr | From scientific literature: Nielsen 2007 |
| $C_{RTU}$ | 23.4 mg/cc (2%) | Conservative estimate of concentration of the product sprayed |
| $t_{Rinox}$ | 1 hrs/event | Deposition, p. 162-163 |
| $t_{Partridge}$ | 0.25 hrs/event | Estimated from information in deposition (p.229) |
| $EV_{Rinox}$ | 1 event/day | Presumed |
| $EV_{Partridge}$ | 1 event/day | Presumed |
| $EF_{Rinox}$ | 12 days/yr | Deposition, p. 162-163 |
| $EF_{Partridge}$ | 24 days/yr | Deposition, p. 229, 179 |
| $ED_{2008-2012}$ | 4 years | From deposition p. 240 |
| $SA_{Res}$ | 2150 cm$^2$ | From Tables 7.12-7.13 EPA 2011 |
| $SA_{Occ}$ | 945 cm$^2$ | From Tables 7.12-7.13 EPA 2011 |
| BW | 91 kg | Deposition, p. 169 |
| $AT_{2008-2012}$ | 1460 days | $ED_{2008-2012} \times 365$ day/yr |

With the parameters from Table IV(g), the ADD model results are as follows, in milligrams of glyphosate per kilogram body weight per day (mg/kg BW/d):

$$ADD_{Rinox} = \frac{(K_p \times C_{RTU} \times t_{Rinox}) \times EV_{Rinox} \times ED_{2008-2012} \times EF_{Rinox} \times SA_{Occ}}{BW \times AT_{2008-2012}}$$

$$= \frac{(4.0 \times 10^{-6}\,cm/hr \times 23.4\,mg/cc \times 1\,hr/event) \times 1\,event/day \times 4\,yr \times 12\,days/yr \times 945\,cm^2}{91\,kg \times 1460\,days}$$

$$= 3.20 \times 10^{-5}\ \text{mg/kg BW/d}$$

$$ADD_{Partridge} = \frac{(K_p \times C_{RTU} \times t_{Partridge}) \times EV_{Partridge} \times ED_{2008-2012} \times EF_{Partridge} \times SA_{Res}}{BW \times AT_{2008-2012}}$$

$$= \frac{(4.0 \times 10^{-6}\,cm/hr \times 23.4\,mg/cc \times 0.25\,hr/event) \times 1\,event/day \times 4\,yr \times 24\,days/yr \times 2150\,cm^2}{91\,kg \times 1460\,days}$$

$$= 3.64 \times 10^{-5}\ \text{mg/kg BW/d}$$

$ADD_{2008-2012} = ADD_{Rinox} + ADD_{Partridge}$

$= 3.20 \times 10^{-5}$ mg/kg BW/d + $3.64 \times 10^{-5}$ mg/kg BW/d

$= 6.84 \times 10^{-5}$ mg/kg BW/d

**Table IV(i)- 2012 – 2018: Techo-Bloc and Partridge Ln.** Parameters used to calculate the average daily dose of glyphosate from Mr. Vosper's reported use.

| Parameter | Value | Comments |
|---|---|---|
| $K_p$ | $4.0 \times 10^{-6}$ cm/hr | From scientific literature: Nielsen 2007 |
| $C_{RTU}$ | 23.4 mg/cc (2%) | Conservative estimate of concentration of the product sprayed |
| $t_{Techo-Bloc}$ | 0.167 hrs/event | Deposition, p. 168 |
| $t_{Partridge}$ | 0.25 hrs/event | Estimated from information in deposition (p.229) |
| $EV_{Techo-Bloc}$ | 1 event/day | Deposition, p. 167 |
| $EV_{Partridge}$ | 1 event/day | Presumed |
| $EF_{Techo-Bloc}$ | 3 days/yr | Deposition, p. 167 |
| $EF_{Partridge}$ | 24 days/yr | Deposition, p. 229, 179 |
| $ED_{2012-2018}$ | 6 years | Deposition, p. 167 |
| $SA_{Res}$ | 2150 cm$^2$ | From Tables 7.12-7.13 EPA 2011 |
| $SA_{Occ}$ | 945 cm$^2$ | From Tables 7.12-7.13 EPA 2011 |
| BW | 91 kg | Deposition, p. 169 |
| $AT_{2012-2018}$ | 2190 days | $ED_{2012-2018} \times 365$ day/yr |

With the parameters from Table IV(h), the ADD model results are as follows, in milligrams of glyphosate per kilogram body weight per day (mg/kg BW/d):

$$ADD_{Techo-Bloc} = \frac{(K_p \times C_{RTU} \times t_{Techo-Bloc}) \times EV_{Techo-Bloc} \times ED_{2012-2018} \times EF_{Techo-Bloc} \times SA_{Occ}}{BW \times AT_{2012-2018}}$$

$$= \frac{(4.0 \times 10^{-6}\ cm/hr \times 23.4\ mg/cc \times 0.167\ hr/event) \times 1\ event/day \times 6\ yr \times 3\ days/yr \times 945\ cm^2}{91\ kg \times 2190\ days}$$

= 1.33 x 10$^{-6}$ mg/kg BW/d

$$ADD_{Partridge} = \frac{(K_p \times C_{RTU} \times t_{Partridge}) \times EV_{Partridge} \times ED_{2012-2018} \times EF_{Partridge} \times SA_{Res}}{BW \times AT_{2012-2018}}$$

$$= \frac{(4.0 \times 10^{-6}\ cm/hr \times 23.4\ mg/cc \times 0.25\ hr/event) \times 1\ event/day \times 6\ yr \times 24\ days/yr \times 2150\ cm^2}{91\ kg \times 2190\ days}$$

= 3.64 x 10$^{-5}$ mg/kg BW/d

$ADD_{2012-2018} = ADD_{Techo-Bloc} + ADD_{Partridge}$

= 1.33 x 10$^{-6}$ mg/kg BW/d + 3.64 x 10$^{-5}$ mg/kg BW/d

= 3.77 x 10$^{-5}$ mg/kg BW/d

The ADDs from all time periods were then combined as a weighted average to determine a single average daily dose during the total period of Roundup use from 1986 to 2018, as follows:

Combined average daily dose:

$$= \frac{(ADD_{86-89} \times 3 \text{ yr}) + (ADD_{89-93} \times 4 \text{ yr}) + (ADD_{93-95} \times 2 \text{ yr}) + (ADD_{95-99} \times 4 \text{ yr}) + (ADD_{99-02} \times 3 \text{ yr}) + (ADD_{03-04} \times 2 \text{ yr}) + (ADD_{04-08} \times 4 \text{ yr}) + (ADD_{08-12} \times 4 \text{ yr}) + (ADD_{12-18} \times 6 \text{ yr})}{32 \text{ years}}$$

$$= \frac{(3.89 \times 10^{-4} \times 3) + (2.31 \times 10^{-4} \times 4) + (1.31 \times 10^{-4} \times 2) + (1.45 \times 10^{-5} \times 4) + (2.05 \times 10^{-4} \times 3) + (1.56 \times 10^{-4} \times 2) + (3.2 \times 10^{-5} \times 4) + (6.84 \times 10^{-5} \times 4) + (3.77 \times 10^{-5} \times 6)}{32}$$

$$= \frac{(1.17 \times 10^{-3}) + (9.24 \times 10^{-4}) + (2.62 \times 10^{-4}) + (5.80 \times 10^{-5}) + (6.15 \times 10^{-4}) + (3.12 \times 10^{-4}) + (1.28 \times 10^{-4}) + (2.74 \times 10^{-4}) + (2.26 \times 10^{-4})}{32}$$

**$= 1.24 \times 10^{-4}$**

This combined ADD is for the 32-year period of glyphosate use. Incorporating years where glyphosate was not used would decrease the average daily dose.

<u>Event Dose Calculation</u>

The event dose used in the calculation of the ADD is the product of the $K_p$, concentration, and event exposure time and is expressed in units of $mg/cm^2$ of skin area. In order to compare the modeled event dose to systemic doses reported in the literature, it must be converted into an event dose in milligrams per day (mg/d) and in milligrams per kilogram body weight per day (mg/kg/d). The first conversion is performed by multiplying the event dose by the exposed skin surface area to achieve units of mg/d. The second conversion is performed by dividing the event dose in mg/d by the body weight of the individual to achieve mg/kg BW/d.

In order to calculate the highest event dose that may have been received, I will consider the spraying events performed for the longest time per day (spraying on the Jones Ln. farm). The input from Table IV(a) was used to calculate the event dose such a spraying activity, and this event dose would be considered the highest single event dose.

$$\begin{aligned} DA \quad &= K_p \times C_{RTU} \times t_{Jones} \times SA \\ &= \left( 4.0 \times 10^{-6} \; {}^{cm}/_{hr} \times 23.4 \; {}^{mg}/_{cc} \times 2 \; {}^{hr}/_{day} \right) \times 2150 \; cm^2 \\ &= \mathbf{0.4025 \; mg/d} \\ &= (0.4025 \; mg/d) \; / \; 91 \; kg \; BW \\ &= \mathbf{0.0044 \; mg/kg \; BW/d} \end{aligned}$$

The final ADD and Event Doses were calculated to be:

Combined Average daily dose (ADD) rate =                                            $1.24 \times 10^{-4}$ mg/kg BW/d
Event dose (highest dose per single day: (Jones Ln. farm) =          0.4025 mg/d
Event dose (highest does per kilogram body weight per single day) =    0.0044 mg/kg BW/d

The average daily dose rate is approximately 0.012% of the recently released EPA Reference Dose (RfD), the most relevant dose limit based on location. However, the dose is also well below the JMPR/WHO and EFSA (for operators) dose limits, 0.012% and 0.124%, respectively. Based on the average body weight of 91 kg, Mr. Vosper's daily dose estimate (ADD x 91 kg) is also well below (1%) the California No Significant Risk Level (NSRL).

<u>Data Quality Verification</u>

The results of the ADD model are dependent on the permeability of the chemical (defined by $K_p$), the chemical concentration, and how the chemical was used (duration of use and exposure skin surface area). The specific duration of use and exposed skin surface area during   Roundup use varies with each applicator. However, the flux (amount of glyphosate that permeates a given skin area per hour) is only dependent on the concentration of Roundup used and should not vary greatly from empirically derived flux values reported in the literature. In order to verify the quality of the data from the ADD model, the following Table V compares the range of flux values in the cited literature to the flux value calculated from the ADD model.

**Table V.** Average flux values either reported in the literature or derived from the reported concentration and $K_p$ values.

| Reference | Number of studies | Flux (μg/cm/hr) | Range (μg/cm/hr) |
|---|---|---|---|
| Ward 2010 a, b, c | 9 | 0.0112 | $0.0006 - 0.0270$ |
| Wester 1991 | 25 | 0.0123 | $0.0000 - 0.0770$ |
| Smith 2014, 2015 | 5 | 0.0161 | $0.0007 - 0.0560$ |
| Davies 2015-2017 | 6 | 0.0116 | $0.0002 - 0.0340$ |
| Franz 1983 | 3 | 0.0552 | $0.0043 - 0.0942$ |
| Nielsen 2007 | 1 | 0.0160 | n/a |
| Nielsen 2009 | 1 | 0.0236 | n/a |
| | **Average:** | **0.0209** | |
| Vosper ADD model | | 0.0936 | n/a |

*Calculated flux values from the literature were derived using the equation Flux = $K_p$ x Concentration

With flux values very similar to those in the dermal absorption literature, the results of the ADD model are consistent with the published literature. The flux values from my ADD model are on the high end of the published range, and this is consistent with my goal of a conservatively high estimate. The basic assumptions about glyphosate permeability within the ADD model are supported by the scientific research and therefore, indicating that the ADD model produces reasonable estimates of internal dose.

In addition, the systemic dose resulting from the ADD model in this case is consistent with estimated and measured exposure ranges found in the scientific literature. Solomon 2016 used two different methods to determine the range of systemic doses that could be expected from operator exposure to glyphosate-based herbicides. Solomon estimated the systemic dose range from passive dosimetry and also measured the dose range from biomonitoring data. My conservatively high estimation of the single event dose using the ADD model falls near the high end of these ranges (Table VI), further demonstrating that the ADD model produces reasonable data.

**Table VI.** Comparison of systemic doses of glyphosate from use of glyphosate-based herbicides.

| Reference | Result |
| --- | --- |
| Solomon 2016 from passive dosimetry | 0.000001 – 0.064 mg/kg BW/d |
| Solomon 2016 from biomonitoring | 0.000013 – 0.0046 mg/kg BW/d |
| Event dose from ADD model | 0.0044 mg/kg BW/d |

The event dose represents the highest amount of glyphosate that may have entered the body on any given day the product was used. The estimated event dose of 0.0044 mg/kg BW/d was insignificant compared to the doses used in the EPA animal studies, ranging up to ~34 mg/kg BW/d for up to 26 months. Another EPA study administered doses of up to 940 mg/kg BW/d for up to 24 months (ATSDR 2019). The estimated event dose was also within the ranges reported in the literature. Bleeke 2007 reported doses for applicators between 0.000013 and 0.00207 mg/kg BW/d and Acquavella 2004 reported a mean of 0.0001 mg/kg/d and a maximum of 0.004 mg/kg/d.  The range of internal doses calculated from the Pierce 2020 data (reported in Kougias 2020) was from 0.000353 to 0.006 mg/kg/d. My estimated event dose was near the high end of the ranges found in the literature, consistent with a conservatively high estimate.

Confounding factors

While the purpose of this report was to reconstruct the exposure potential and assess the risk of that potential exposure, it is within my purview as an industrial hygienist to be familiar with the evidence in the scientific literature regarding both the hazards of glyphosate and the known and suspected causes of non-Hodgkin Lymphoma (NHL).

It was noted that Mr. Vosper testified that he used to sleep only three to four hours per night (p. 277). He also testified to having ███████████████████████████ since approximately the year 2000 (p. 264). He also testified that close relative have been ████████████████ (p. 188, 291), such as his ███████████████████████████████ All of the above may be confounding factors in an NHL diagnosis. I am not attributing a cause to Mr. Vosper's as that is outside of my expertise and I have not been asked to do so. However, if attempting to attribute a cause to Mr. Vosper's NHL, then exposure and scientific data relating to all confounding factors must be considered objectively.

**Site visits**

A site visit has not been performed. I reserve the right to conduct a site visit in the future and revise my opinions, if necessary, based on that visit.

**Rebuttal**

I have reviewed the plaintiff expert report of Dr. William R. Sawyer. In this section, I will summarize a few of the key problems that I identified with his claims. This is not an exhaustive list of every point of disagreement in these reports.

Dr. Sawyer Report

1) Throughout Dr. Sawyer's report, he discusses the concepts of glyphosate application, exposure, and dose as if they were one single concept. On page 6 of his report, Dr. Sawyer lists his objectives: "(1) to arrive at a scientifically-reliable exposure dose estimation for Mr. Vosper (*in units of 8-hour time-weighted exposure days*)". As discussed above based on Acquavella 2004, the number of days a glyphosate product was used is not a measurement of exposure (amount available for bodily intake), neither is it a measure of dose (amount actually taken into the body). What Dr. Sawyer does is calculate a duration of potential exposure, which is very different from an estimation of exposure or dose. Thus Dr. Sawyer does not achieve his first objective.

2) Dr. Sawyer opines that a surfactant (POEA) "significantly increases penetration in plant cells as well as in animal cells". He supports his claim using a study of glyphosate and human placental cells; this is a poor study to use for support when there are several human skin penetration studies using formulated Roundup.

Several studies (see Dermal Studies section, pg. 9-12 of this report) have used formulated Roundup products with surfactants to test skin penetration using human skin. None of the studies showed that surfactants caused increased skin penetration. The Franz 1983 study compared high and low concentration of formulated product on human skin samples from the same donor and showed that the concentration of the formulated product was the greatest factor in determining the rate of skin absorption.

3) Dr. Sawyer opines that "Since dermal glyphosate exposure is the primary route of exposure contributing to systemic exposure in agricultural users, the assumption that distribution, metabolism, and excretion are identical by IV and dermal routes of exposure leads to egregious errors in systemic dose calculations". To support this opinion, Dr. Sawyer refers to the Brewster 1991 study where 1% of an oral dose remained in bone tissue. He seems to imply that absorption, distribution, metabolism, and excretion (ADME) after a dermal exposure would be more similar to ADME after an oral dose.

Brewster 1991 determined that the half-life of glyphosate after an <u>oral</u> dose was approximately 2 days. The study showed that glyphosate was eliminated quickly from all body parts except bone, where elimination from bone was slower than from blood. This observation is not surprising given the low vascularization of bone. However, Connolly 2018b studied the half-life of glyphosate in humans after applying glyphosate-based pesticide products using a backpack sprayer (a <u>dermal</u> dose). The study revealed a half-life of 7.25 hours using the urinary excretion rates (UER) measurement method. This shorter half-life suggests that glyphosate does not persist in the human body. This half-life is based on human data after applying glyphosate-based products and is therefore much more relevant than rat studies.

The Ridley 1988 study found that >97.5% of glyphosate is excreted in the urine and feces following both oral and IV doses. The Wester 1991 study showed that glyphosate did not

significantly bind to powdered stratum corneum, and once in the blood 96.4-99.8% was excreted in the urine and feces following an IV dose. These studies show that the vast majority of oral, IV, and dermal doses are excreted in the urine and feces, and are not significantly retained in body tissues.

Wester 1991 and McEwen 1995 also studied the deposition of glyphosate in bone marrow from dermal and oral doses, respectively. Neither found significant amounts of glyphosate in the bone marrow. These results contrast the deposition and slow elimination of glyphosate from bone that Brewster 1991 identified and the lack of any deposition of glyphosate in bone marrow observed by Wester 1991 and McEwen 1995.

It is important to note the difference between bone and bone marrow because Dr. Sawyer uses the evidence of slow elimination from bone to support his opinion that glyphosate is distributed to bone marrow.

Dr. Sawyer claims that assuming that the ADME is identical from IV and dermal doses leads to egregious errors, but then makes similarly incorrect assumptions. He assumes that the ADME from dermal and oral doses are identical and that slow elimination from bone and deposition in bone marrow are identical. He then uses these incorrect assumptions to suggest that glyphosate persists in the body.

4) Dr. Sawyer criticizes several studies from the Dermal Technology Laboratory (DTL). See above discussion of Davies 2015a, 2015b, 2016, 2017 and Ward 2010a, 2010b, and 2010c. These studies from the DTL follow the OECD methodology requirements and are both internally consistent and consistent with other studies. One of Dr. Sawyer's principal criticisms is that the dermal absorption rates found in these studies are lower than the dermal absorption found in one experiment in the Wester 1991 study that produced the highest total dermal absorption (4.4%). The 4.4% total absorption was driven by a suspiciously high glyphosate value found in the feces of a rhesus monkey. Because other studies, such as Ridley 1988 and Wester 1991 itself, have shown that the vast majority of glyphosate is excreted in the urine after a dermal or IV dose, it is this fecal excretion result that should treated as an outlier. Instead, Dr. Sawyer treats the one Wester 1991 excretion results as the true results and any results that do not agree as outliers.

5) Dr. Sawyer references the TNO Study, van Burgsteden 2003 to claim that skin absorption of glyphosate may be as high as ~10%. However, this study used rat skin instead of human skin. The results were so varied and the recoveries so poor that the authors of the study stated that "The results of the autoradiography show too much variation to draw any conclusions." They went on to say "Due to the high variation in dermal penetration within the test groups and the poor recoveries, the data presented in this report are not acceptable for regulatory use and risk assessment." Finally, in the conclusion section of the study, the authors repeated, "In general, the poor recoveries combined with the high variation within the glyphosate test groups make the data generated in this study unsuitable for risk assessment." This study should not be used to draw any conclusions or used in any part of a risk assessment.

## Opinions

Based on the analysis above, I have reached the following opinions in this case to reasonable degree of scientific certainty.

1. My evaluation of the available information regarding this case leads to the conclusion that Mr. Vosper's use of glyphosate-based herbicides is not of itself a measure of exposure or dose.
2. I have conducted a risk assessment, including a reconstruction of exposure and dose from a model, using reasonable conservative assumptions of exposure parameters. The estimated dose using these parameters was much lower than all established and recognized safe dose limits.
3. Mr. Vosper's exposure to glyphosate-based herbicides, and the associated dose estimation, was so low that it is unlikely to be a contributing factor to his non-Hodgkin Lymphoma, especially where other confounding risk factors, including a family history of cancer.

**Conclusion**

In conclusion, my assessment indicates that Mr. Vosper's exposure to and associated dose of glyphosate-based herbicides presented no risk of adverse health effects, including non-Hodgkin Lymphoma. I specifically reserve the right to modify and supplement these opinions based on additional information that my become available through further discovery or by any other means.

Respectfully submitted,

Matthew Call, CIH, CSP
President
Industrial Hygiene Resources
8/5/2021