EXHIBIT 2

1  UNITED STATES DISTRICT COURT

   NORTHERN DISTRICT OF CALIFORNIA

2  ------------------------------------------X

   This document relates to:

3

   Troy Wilson Thomas and Josephine

4  Ventura, husband and wife,

   v. Monsanto Company

5  Case No. 3:20-cv-08051-VC

6                              .

   ------------------------------------------X

7

8

9            TUESDAY, AUGUST 17, 2021

10         VIDEOTAPED DEPOSITION of Marc J.

11  Braunstein, M.D., conducted at the Inn at

12  Great Neck, 30 Cutter Mill Road, Great Neck,

13  New York, commencing at 9:05 a.m., on the

14  above date, before Nicole Veltri, Registered

15  Professional Reporter and Certified Realtime

16  Reporter.

17

18

19

20

21

22

23

24

1   A P P E A R A N C E S:

2

    WAPNER, NEWMAN, BRECHER & MILLER, PC
3       Attorneys for the Plaintiffs
        2000 Market Street, Suite 2750
4       Philadelphia, Pennsylvania 19103
        BY: JARAD L. SILVERSTEIN, ESQ.
5       jsilverstein@wapnernewman.com

6

    THE PIORKOWSKI LAW FIRM, PC
7       Attorneys for the Defendant
        MONSANTO COMPANY
8       1800 K Street, NW, Suite 1000
        Washington, DC, 20006
9       BY: JOSEPH D. PIORKOWSKI, JR., ESQ.
        JPiorkowski@PiorkowskiLaw.com

10

11  NELSON MULLINS
        Attorneys for the Defendant
12      MONSANTO COMPANY
        1320 Main Street, 17th Floor
13      Columbia, South Carolina 29201
        BY: ELAINE YAP, ESQ.
14      elaine.yap@nelsonmullins.com

15

16

    ALSO PRESENT:
17  DANNY ORTEGA: Legal Videographer

18       *     *     *

19

20

21

22

23

24

1          VIDEOGRAPHER:  We are now on the

2     record.  My name is Danny Ortega, and

3     I'm the legal videographer for Golkow

4     Litigation Services.  Today's date is

5     August 17th, 2021; and the time is

6     9:05 a.m.

7          This video deposition is being

8     held at 30 Cutter Mill Road, Great

9     Neck, New York, in the matter of

10     Roundup, Troy Wilson Thomas and

11     Josephine Ventura, versus Monsanto

12     Company, in the United States District

13     Court Northern District of California.

14          The deponent today is Marc J.

15     Braunstein, MD.  Counsel, please

16     identify yourselves for the record.

17          MR. SILVERSTEIN:  Jarad

18     Silverstein of the law firm Wapner

19     Newman on behalf of the plaintiffs.

20          MR. PIORKOWSKI:  Joseph D.

21     Piorkowski, Jr., Piorkowski Law Firm on

22     behalf of Monsanto.

23          VIDEOGRAPHER:  The court

24     reporter --

1          MS. YAP:  Elaine Yap of Nelson

2     Mullins for the defendant, Monsanto.

3          VIDEOGRAPHER:  The court reporter

4     today is Nicole Veltri who will now

5     swear in the witness.

6 M A R C   B R A U N S T E I N, called as a

7 witness, having been first duly sworn by a

8 Notary Public of the State of New York, was

9 examined and testified as follows:

10 EXAMINATION BY

11 MR. PIORKOWSKI:

12     Q.   Good morning, Dr. Braunstein.  How

13 are you?

14     A.   Good morning, sir.  How are you?

15     Q.   Would you state your full name for

16 the record?

17     A.   My full name is Marc Justin

18 Braunstein.  That's Marc with a C.

19     Q.   And what's your address, Dr.

20 Braunstein?

21     A.   My work address?

22     Q.   That's fine.

23     A.   Sure.  It's 120 Mineola Boulevard,

24 Mineola, New York 11501.

1    Q.   And I understand you're here today

2  in your role as an expert witness on behalf

3  of the plaintiffs; is that correct?

4    A.   The retaining counsel hired me to

5  give my expert opinion, yes.

6    Q.   Let me just kind of explain the

7  proceedings because this is a little bit

8  different than some depositions where it's

9  just one case.

10    A.   Thank you.

11    Q.   My understanding is that you've

12  been designated as an expert witness on

13  behalf of three different clients; is that

14  correct?

15    A.   Correct.  There are three

16  different cases.

17    Q.   It included Mr. Troy, Mr. Savory,

18  and Ms. Spector?

19    A.   Yes.

20    Q.   So the deposition today is going

21  to be focused on -- in part on Mr. Troy --

22  Mr. Thomas, rather.

23    A.   Okay.

24    Q.   And, additionally, we're going to

1  try to cover as many general issues as we

2  can today because as you recognize, there

3  are a number of things in each of your

4  reports that are general in nature, for

5  example, the relationship between glyphosate

6  and non-Hodgkin's lymphoma.

7       A.   I understand, yes.

8       Q.   The questions I'm going to ask

9  today, especially the generic questions,

10 they're going to be applicable to our other

11 depositions that we're going to do tomorrow

12 with respect to these general issues, okay?

13      A.   Yes.

14      Q.   And if in my questioning I refer

15 to these cases, I'm referring to all three

16 of the cases as opposed to just Mr. Thomas'

17 case, okay?

18      A.   I understand.  Just please orient

19 me if we're talking about a specific case.

20      Q.   I will.

21           So to come back to my original

22 question, you've been designated as an

23 expert on behalf of Mr. Thomas, Mr. Savory,

24 and Ms. Spector, correct?

1    A.   Yes.  I presented myself as an
2  expert for these three cases.
3    Q.   And you're being compensated for
4  your work on their behalf; is that correct?
5    A.   By the plaintiffs' attorney,
6  retaining counsel, yes.
7    Q.   At what rate are you being
8  compensated?
9    A.   My rate is $350 per hour for work,
10  and then -- for the work done to date; and
11  then for the deposition is 3,500 per day.
12    Q.   And have you agreed upon a rate if
13  you had to go to trial?
14    A.   It would be the same rate as for
15  the deposition rate.
16    Q.   Okay.
17       Do you have any understanding of
18  whether you would bill for your travel time?
19    A.   We haven't established that.
20    Q.   So have you given a deposition
21  before?
22    A.   No, I have not, sir.
23    Q.   So let's just kind of go over some
24  of the ground rules for your benefit?

1        A.    Absolutely.

2        Q.    You understand that you're

3   testifying under oath the same as you would

4   be if you were in a court of law?

5        A.    Yes.

6        Q.    If I ask a question and you don't

7   understand the question or you think I use a

8   word the wrong way or you don't understand

9   what I'm asking, would you ask me to clarify

10  it?

11       A.    I will.

12       Q.    If you go ahead and answer the

13  question, I'll assume that you understood

14  it; is that fair?

15       A.    That's fair, yes.

16       Q.    It's important especially today

17  when we're all in masks and doing our best

18  to help the court reporter, --

19       A.    I understand.

20       Q.    -- it's particularly important to

21  give verbal answers to questions; and so,

22  you know, in conversation we often say

23  uh-huh or uh-uh or those kinds of

24  expressions.  So if possible, try to give a

1  yes or a no, you know, when it's

2  appropriate, okay?

3      A.   And, of course, please direct me

4  if I make that mistake.  Thank you.

5      Q.   I'll try to do that.  I bet about

6  80 percent.

7           The next thing is, it's important

8  for us to try not to talk over each other or

9  our court reporter will be an unhappy

10  camper.  If I ask you a question and you

11  think you know where the question is going,

12  which is what we often do in normal

13  conversation, you may start to answer.  For

14  purposes of the deposition today, please let

15  me try to finish my question.  I'll let you

16  try to finish your answer, and I think that

17  will keep the record more clear.

18      A.   I'll do my best, yes.

19      Q.   There may be an objection from

20  time to time.  If there's an objection

21  unless there's a specific instruction for

22  you to not answer the question, you go ahead

23  and answer the question.  Objections are

24  mainly for the purpose of preserving our

1   objections on the record if the case goes to

2   trial later, okay?

3        A.   I understand.

4        Q.   Finally, this is not an endurance

5   contest; so if there's some reason you need

6   to take a break, you know, whether it's a

7   call from the office that's urgent or

8   whatever, just let me know.  And we can take

9   a break, okay?

10       A.   I appreciate it, thank you.

11       Q.   Is there any reason you can't give

12  truthful and honest testimony today?

13       A.   No.

14       Q.   Are you taking any medications

15  that can affect your memory or your

16  judgments?

17       A.   No.

18       Q.   Have you spoken with any current

19  or former employees of Monsanto or Bayer

20  about any issues related to this case?

21       A.   No, sir, no.

22       Q.   Have you been provided with any

23  internal Monsanto documents that have been

24  produced in connection with the litigation?

1       A.    Internal Monsanto documents that

2  are not publicly available; is that what

3  you're asking, sir?

4       Q.    Well, that's a difficult question

5  because I think at this point all the

6  internal Monsanto documents are publicly

7  available; but what I'm asking is, have

8  you -- I understand you've reviewed

9  scientific literature, correct?

10       A.    Correct.

11       Q.    Articles and that sort of thing?

12       A.    Yes, sir.

13       Q.    Has anyone shown you any internal

14  emails from, you know, one Monsanto employee

15  to another Monsanto employee?

16       A.    I understand.  No, I have not seen

17  any emails.

18       Q.    Okay.

19            Or any memos that are internal

20  memos?

21       A.    Not seen my internal memos.

22       Q.    And with that understanding of

23  what I mean by Monsanto internal documents,

24  to your knowledge you haven't reviewed any

1    Monsanto internal documents; is that

2    correct?

3         A.   That's correct.

4         Q.   Have you read the deposition

5    testimony or trial testimony of any Monsanto

6    scientist or any other Monsanto employee?

7         A.   Not to my knowledge.

8         Q.   Do you have any education or

9    experience in the marketing of pesticides or

10   any other chemicals?

11        A.   I do not.

12        Q.   Are you offering any opinions in

13   these cases, meaning all three of these

14   cases, criticizing the manner in which

15   Monsanto marketed Roundup for residential

16   use?

17        A.   No.  I've been retained not for

18   that purpose, sir.

19        Q.   Are you offering any opinions in

20   this case criticizing any aspect of

21   Monsanto's conduct?

22        A.   No.

23             MR. SILVERSTEIN:  Objection.

24        Vague.

1      Q.   To your understanding.

2      A.   Can you repeat the question?  I'm

3  sorry.

4      Q.   Are you offering any opinions in

5  these cases criticizing any aspect of

6  Monsanto's conduct?

7           MR. SILVERSTEIN:  Note my

8      objection.  You can answer.

9      A.   I am not offering any opinion

10  criticizing Monsanto.  I've been retained to

11  review the scientific literature and opine

12  on the aspects of the cancers.

13      Q.   Okay.

14           Have you reviewed the reports of

15  any other experts who have been designated

16  by plaintiffs in the Roundup litigation?

17      A.   Well, I've read the -- I don't

18  know if you call it rebuttal reports that

19  were provided to me about a week ago for

20  each of the three cases.

21      Q.   You're talking about the defense

22  experts?

23      A.   The defense experts, yes.

24      Q.   I'm going to get to that in a

1    second.

2         A.    Sure.

3         Q.    Right now I'm asking about reports

4    of experts who have been designated by the

5    plaintiffs in the Roundup litigation.

6         A.    In -- are you asking in general or

7    specific for these cases?  I'm not sure I

8    understand.

9         Q.    Well, let's ask in general first.

10        A.    Okay.  So in my expert reports, I

11   have listed the other examples of reports

12   that I've read.  I can't recall them

13   offhand.  I would have to look at my report;

14   but those I did have access to, yes.

15             MR. PIORKOWSKI:  Can we get a few

16        exhibit numbers just put it as

17        Braunstein Exhibit 1 through 10.

18             (Whereupon, the aforementioned

19        Braunstein expert report for Thomas

20        case was marked as Braunstein Exhibit 1

21        for identification as of this date by

22        the Reporter.)

23        Q.    Doctor, I've handed you what I've

24   marked as Braunstein Exhibit 1.  Is that the

1    report you prepared in connection with the

2    Thomas case?

3         A.   Let me just have a look

4    (perusing).  Yes, this is the report.

5         Q.   So to go back to my previous

6    question, I think you said you needed to

7    refer to a report to identify which specific

8    things you looked at; is that right?

9         A.   Yes.

10        Q.   So can you take a look at

11   Exhibit 1 and see if that --

12        A.   Yes, sir.  So here I have listed

13   on page three --

14        Q.   Okay.

15        A.   The -- I guess it's the second

16   paragraph.

17        Q.   Okay.

18        A.   We have prior expert witness

19   testimonies from Seidl, S-E-I-D-L, versus

20   Monsanto Company, Cervantes versus Monsanto

21   Company, Schafer, S-C-H-A-F-E-R, versus

22   Monsanto.  And those are the prior reports;

23   and then there are general causation reports

24   I have listed here from, Chadhi Nabhan.  Do

1  you need the spelling?  C-H-A-D-H-I and

2  N-A-B-H-A-N.  And Dr. Beate, B-E-A-T-E,

3  Ritz, R-I-T-Z.

4      Q.   So let's focus on these.  So Dr.

5  Nabhan is an oncologist; is that correct?

6      A.   I can't recall.

7      Q.   What is it you read of Dr.

8  Nabhan's?  You read a general causation

9  expert report?

10     A.   So these reports were really meant

11  to serve as an example of reports so that I

12  could prepare mine in a thorough fashion,

13  but I didn't necessary glean information

14  that would be used to prepare my report

15  specific to this case.

16     Q.   So did you glean information from

17  any of these materials that you listed here?

18     A.   Only to the extent the template

19  they used to prepare their reports.

20     Q.   So formatting purposes of

21  understanding how a report is organized?

22     A.   Correct.

23     Q.   But substantively you're not

24  relying on those materials for any purpose?

1          A.    That's correct.

2          Q.    And this may just be a word

3    choice, but when you say prior expert

4    testimonials, what do you mean by the word

5    testimonials?

6          A.    Reports, yeah, reports.

7          Q.    So this is not deposition

8    testimony --

9          A.    I'm sorry, yes, that's correct.  I

10   meant reports.

11         Q.    And so to go back to my original

12   question, these are all expert reports that

13   you've reviewed that were prepared by

14   plaintiffs' experts in other Roundup cases?

15         A.    These I can't recall if they were

16   plaintiffs or not.  These were the ones that

17   were provided to me as templates.

18         Q.    And with respect to deposition

19   testimony or trial testimony, you have not

20   reviewed any testimony of any expert that's

21   been designated by plaintiffs in Roundup

22   litigation, correct?

23         A.    I'm just trying to recall if I

24   reviewed because I was given -- after I

1  prepared my report, I was given the reports

2  of the retaining counsel's experts, other

3  experts; but to my knowledge have not

4  reviewed trial reports.

5      Q.   So you remember -- have you been a

6  consultant before in litigation ever before

7  this or not?

8      A.   As an expert?

9      Q.   Yes.

10      A.   Yes.

11      Q.   You reviewed, for example,

12  Mr. Thomas' deposition transcript I think

13  you said, right?

14      A.   In my report I say it.

15      Q.   So you understand that a

16  deposition transcript, the way it appears,

17  it's a series of questions and answers?

18      A.   Yes.

19      Q.   And so as far as you know, you

20  haven't reviewed anything that had questions

21  and answers with respect to any of the

22  plaintiffs' experts?

23      A.   In terms of Mr. Thomas' case

24  you're asking specific now?

1        Q.   I'm going to ask you -- I'm going

2   to go through these; but, yes, let's stick

3   with Mr. Thomas' case.

4        A.   I have not reviewed any of the

5   plaintiffs' expert depositions, no.

6        Q.   How about with respect to

7   Ms. Spector's case?

8        A.   No.

9        Q.   And with respect to Mr. Savory's

10  case?

11       A.   No, sir.

12       Q.   Separate and apart from their

13  cases, have you reviewed anything with

14  respect to general opinions about the

15  litigation that's testimony?

16       A.   Not to my knowledge.

17       Q.   Okay.

18            Have you spoken with anyone who

19  has served as an expert on behalf of

20  plaintiff in the Roundup litigation?

21       A.   No, sir.

22       Q.   And then to come back to the

23  question you asked earlier whether I meant

24  generally or specifically and I said

1    generally, do you remember that when we got

2    into this line of questions?

3         A.   (Witness nods head.)

4         Q.   Would the same answers be true if

5    I asked you individually with respect to

6    these cases?  In other words, is there any

7    testimony you've reviewed with respect to

8    any of these three individual cases?

9         A.   Since we had a difference of

10   testimony, the word testimony, do you mean

11   deposition transcripts?

12        Q.   Meaning either a deposition or a

13   trial where there's a written question and

14   answer that's being record by a court

15   reporter.

16        A.   Not to my knowledge other than the

17   plaintiff's deposition.

18        Q.   Okay.

19             Now, you indicated that you have

20   received and reviewed some reports of

21   experts who have been designated by

22   Monsanto; is that correct?

23        A.   I have, yes.  That's correct.

24        Q.   And with respect to Mr. Thomas'

1   case, what reports have you received?

2        A.   I have them listed out here.  Can

3   I just take a look?

4        Q.   Sure.

5        A.   So I've received an expert report

6   from David Grinblatt, G-R-I-N-B-L-A-T-T, and

7   from Bruce Woda.

8        Q.   Bruce, I'm sorry?

9        A.   Bruce Woda, W-O-D-A.

10       Q.   Anything else?

11       A.   Those are the two defense reports

12  that I've received in response to my report.

13       Q.   And we'll talk about the -- I

14  assume you also received some Savory and

15  Spector cases?

16       A.   Correct.

17       Q.   We'll talk about those.

18       A.   Okay.

19       Q.   Have you reviewed those two

20  reports you just --

21       A.   I received them this past weekend;

22  but I've had a chance to review them over,

23  yes.

24       Q.   You have?

1     A.   I have, yes.

2     Q.   Now, the same question that I

3   asked before about deposition or trial

4   testimony, have you reviewed any deposition

5   or trial testimony of any expert that has

6   been designated on behalf of the defendant,

7   Monsanto?

8     A.   Nothing other than anything listed

9   in my expert report --

10          (Reporter clarification.)

11     A.   (continuing) I'm sorry.  Nothing

12   other than what's listed in my expert report

13   as templates for my report.

14     Q.   Have you ever spoken with anyone

15   who has testified as an expert on behalf of

16   Monsanto?

17     A.   No.

18     Q.   With respect to Mr. Thomas, you

19   have never examined him; is that correct?

20     A.   That's correct.

21     Q.   And you are not his doctor and

22   never have been his doctor, correct?

23     A.   That's correct, sir.

24     Q.   Have you ever spoken with

1    Mr. Thomas?

2         A.    I have not, sir.

3         Q.    Do you have any plans to speak to

4    Mr. Thomas?

5         A.    I do not.

6         Q.    Have you ever spoken to Dr. Gupta?

7         A.    I have not.

8         Q.    Have you ever spoken to Dr.

9    Mercado (phonetic)?

10        A.    No, sir.

11        Q.    Have you ever spoken to any of

12   Mr. Thomas' other treating physicians?

13        A.    No, sir.

14        Q.    Have you discussed this case with

15   any of your colleagues?

16        A.    No, sir.

17        Q.    Have you discussed your opinions

18   with any other person who is serving as an

19   expert witness in this case?

20        A.    No, sir.

21        Q.    Is there any other person with

22   whom you discussed the case other than

23   counsel for the plaintiff?

24        A.    No, sir.

1          Q.    Doctor, I've handed you what I've

2    marked as Exhibit 2 (handing).

3                (Whereupon, the aforementioned CV

4          was marked as Braunstein Exhibit 2 for

5          identification as of this date by the

6          Reporter.)

7          Q.    Would you please identify that?

8          A.    This is a copy of my curriculum

9    vitae, my CV.

10         Q.    Is this current as of today?

11         A.    Can I just have a look (perusing)?

12   There is one new publication.  I have a more

13   recent copy of my CV if you would like me to

14   submit that.

15         Q.    Sure.

16         A.    (Handing).

17         Q.    This is the more recent copy?

18         A.    Yes, sir.

19               MR. PIORKOWSKI:  And, counsel,

20         with your agreement, I think we only

21         have one; but we'll mark it as 3.

22               MR. SILVERSTEIN:  Sure.

23               (Whereupon, the aforementioned

24         updated CV was marked as Braunstein

1         Exhibit 3 for identification as of this

2         date by the Reporter.)

3         Q.   Could you just explain what --

4    I'll hand this back to you, Doctor -- what's

5    on Exhibit 3 that's new or different from

6    Exhibit 2?

7         A.   Yes, absolutely.  There is an

8    additional publication that I have -- that I

9    listed here.  If you would like to see it

10   publication number one there.  I have it in

11   order from most recent to past, so that is

12   more recent; and that was just published

13   last week.  It hasn't been fully -- the

14   proofs are still being reviewed, but it is

15   published --

16        (Reporter clarification.)

17        A.   (continuing) I'm sorry.  In

18   prepublication where they post the abstract

19   and are still working on the proofs.

20        Q.   So this publication, the first

21   author is Timilsina, T-I-M-I-L-S-I-N-A; is

22   that right?

23        A.   Yes.

24        Q.   And you are listed as the last

1  author, correct?

2      A.   Yes, correct.

3      Q.   Is that because you're the senior

4  person on the paper?

5      A.   I supervised the study as the

6  mentor of the project, yes.

7      Q.   And the title is Characterization

8  of Second Primary Malignancies in

9  Mucosa-Associated Lymphoid Tissue Lymphomas,

10  and SEER database interrogation, correct?

11      A.   Yes.

12      Q.   Are there any other changes to

13  Exhibit 3 that are different from Exhibit 2?

14      A.   There may be one additional

15  lecture I gave on mantle cell lymphoma.  So

16  it's Section C here.  That lecture is

17  listed.  If you can compare it to the second

18  exhibit, and that was a virtual lecture I

19  gave.

20      Q.   Section C?

21      A.   It should be on page four, under

22  presentations.

23      Q.   Oh, Optimizing the Cancer of

24  Mantle Cell Lymphoma?

1      A.    Yes.

2      Q.    Optimizing the Treatment of Cancer

3  of --

4      A.    The treatment.  I don't remember

5  the exact title; but it's listed there, yes.

6      Q.    With whom did you --

7      A.    That was a virtual lecture to

8  colleagues.

9      Q.    So is your -- are you full-time

10  academic -- do you have a full-time academic

11  position?

12      A.    Yes, I do.

13      Q.    And your employer is NYU Langone

14  Medical Center?

15      A.    The name changes a lot, so my

16  employer NYU Langone Health or NYU Langone

17  Medical Center.

18      Q.    Say that again.

19      A.    The titles of the institutions

20  have been changing as we merged institution.

21  My employer is NYU Langone Health; but I'm

22  also part of the medical school, which was

23  conceived a few years ago.  That's called

24  NYU Long Island School of Medicine.

1    Q.   And is your -- what is your

2  position with respect to the medical school?

3    A.   I am assistant professor of

4  medicine.

5    Q.   And is that part of your position

6  at NYU Langone also?

7    A.   It's part of my position in the

8  health system, but my academic position is

9  under the auspices of the Long Island School

10  of Medicine.

11    Q.   Are the two institutions related?

12    A.   They are, and it may get even more

13  confusing here because I'm also part of the

14  NYU Perlmutter Cancer Center,

15  P-E-R-L-M-U-T-T-E-R; and that is the cancer

16  center in which I operate in terms of

17  programmatically.  It's connected to the

18  Manhattan campus at NYU's cancer center.

19  But academically I'm under the auspices of

20  the Long Island School of Medicine, so I

21  apologize if it's a little confusing.  It's

22  sometimes confusing for us too.

23    Q.   So what are your responsibilities

24  as an assistant professor of medicine with

1    respect to the medical school?

2         A.   I teach in the medical school, so

3    I co-direct the hematology organ system for

4    the medical school.  Our medical school is a

5    three-year medical school.  It's also

6    tuition free, and the first year encompasses

7    the traditional two years in a sense; so I

8    teach the two-week hematology organ system

9    block, which encompasses the benign and

10   malignant hematology.  And I also serve on

11   several committees in the medical school.

12        Q.   How much of your time is clinical

13   versus administrative versus research?

14        A.   So I would estimate about

15   80 percent is clinical.  Probably more than

16   20 percent is other things; but technically

17   speaking my time is divided about 20 percent

18   for everything else, administration,

19   research, and supervising fellowship and

20   academic work.

21        Q.   Are you actively involved in

22   clinical research now?

23        A.   I am, sir.

24        Q.   You have ongoing clinical trials?

1        A.    Yes, sir.

2        Q.    Are you involved in any clinical

3   trials on therapeutic interventions for

4   hematological malignancies?

5        A.    Yes, sir.

6        Q.    What clinical trials do you have

7   ongoing?

8        A.    So I'm just going to take a peek

9   at my CV just to make sure --

10       Q.    Yes.  And just for clarification,

11  this is not a memory test; and so at any

12  point during the deposition if you need to

13  refer to something to give an accurate and

14  truthful answer, please feel free to do

15  that.

16       A.    I appreciate that.  So I'm

17  involved in clinical trials primarily for

18  the blood cancer multiple myeloma; and,

19  currently, I have an active phase three

20  trial in that area.

21       Q.    And is that listed on your CV?

22       A.    It is.

23       Q.    Where is that?

24       A.    That is on page five under

1   Research Studies NYU Langone Long Island,

2   Part D.

3       Q.   And am I reading your CV correctly

4   that you have two additional open trials as

5   well?

6       A.   Yes.  However, those are closed to

7   enrollment; but they're still active.

8       Q.   Okay.

9            And the companies that sponsored

10  those clinical trials are Janssen and

11  Celgene?

12      A.   Or BMS it's now called; but, yes,

13  that's correct.

14      Q.   And Janssen is part of J&J?

15      A.   Yes.

16      Q.   Have you ever been involved in any

17  research on behalf of Bayer or Monsanto?

18      A.   Not to my knowledge, no.

19      Q.   Have you ever served as a

20  consultant to Bayer or Monsanto for any

21  purpose?

22      A.   No.

23      Q.   If we look at your clinical

24  time -- well, when we look at your

1  publications, it appears that multiple

2  myeloma is a strong area of research

3  interest it appears?

4      A.   That's correct.

5          MR. SILVERSTEIN:  Objection to

6      form.

7      Q.   And it appears that over half of

8  your publications relate to multiple

9  myeloma; is that correct?

10     A.   I haven't tallied them up but a

11 substantial portion, yes.

12     Q.   Within hematology/oncology

13 community, are you regarded as the -- for

14 lack of a better term -- in-house expert on

15 multiple myeloma?

16         MR. SILVERSTEIN:  Objection to the

17     form.  You can answer.

18     A.   Among my colleagues, yes.  They

19 ask me for advice on multiple myeloma, yes.

20     Q.   How -- your practice

21 encompasses -- let me back up.

22         So you are a hematologist and an

23 oncologist, correct?

24     A.   Yes.

1          Q.   And a -- explain what a

2     hematologist is.

3          A.   So it can sometimes be confusing

4     because the field of hematology can

5     encompass cancer as well; and so we think of

6     an oncologist as someone who treats cancer,

7     and sometimes that term is meant to treat

8     only solid tumors.  And a hematologic

9     oncologist treats blood cancers, but a

10    hematologist may also see benign cases like

11    bleeding or clotting disorders as well so

12    the terminology sometimes can be confusing.

13               (Reporter clarification.)

14         A.   (continuing) I'm sorry, bleeding

15    and clotting disorders.

16         Q.   So issues like thrombosis?

17         A.   Exactly, yes.

18         Q.   Or clotting disorders, that kind

19    of thing?

20         A.   Correct.

21         Q.   So do you see non-hematologic

22    malignancy, hematological disorders as part

23    of your clinical practice?

24         A.   I'm a little bit confused.  Are

1   you asking if I see benign hematology cases?

2       Q.   That's a better way to put it,

3   yes.

4       A.   Yes, I do.  I also supervise our

5   fellows' clinic, which is a teaching

6   practice; and they tend to see a lot more

7   benign hematology than I do.  But every now

8   and then because of my reputation in the

9   healthcare system, a colleague in internal

10  medicine may ask me as a favor to see a

11  benign case, you know, but most of my

12  practice is malignant hematology.

13      Q.   And when you're referring to

14  benign hematology, just so we're all on the

15  same page, is that what you're referring to,

16  for example, as clotting disorders and

17  thrombosis and things of that nature?

18      A.   You know, it's almost a misnomer

19  too because often those cases are not so

20  what we call colloquially benign.  They can

21  be very emergent; but I would call benign

22  hematology is something that's not

23  malignancy, not cancer.

24      Q.   Okay.

1                  So anything related to the blood

2     that's not cancer you're calling benign

3     hematology?

4          A.   Yes.

5          Q.   Ranging from anemia to

6     hemochromatosis to thrombotic problems?

7          A.   You got it.  Exactly.

8          Q.   Okay.

9                  And so we talked about your 80/20

10    division, clinical versus other?

11         A.   Yes.

12         Q.   Of the clinical time, what

13    percentage is spent doing benign hematology?

14         A.   Very small.  I would say less than

15    ten percent.

16         Q.   Okay.

17                 And then of the remainder, is most

18    of the time spent on hematological

19    malignancies?

20         A.   Yes, sir.

21         Q.   And is the majority of that spent

22    on patients with multiple myeloma?

23         A.   No.  It's balanced between -- it's

24    mostly B-cell malignancies.  Multiple

1  myeloma is cancer of plasma cells, which are

2  differentiated B-cells; so I encompass that

3  in my B-cell malignancy specialty, so I see

4  both lymphomas and B-cell lymphomas and

5  multiple myeloma.

6      Q.   Okay.

7           And do you have both an inpatient

8  and an outpatient practice?

9      A.   Well, I have an outpatient

10  practice of my own; and then I cover

11  patients in the hospital as well.  We rotate

12  between a different faculty in my division.

13      Q.   So when you say you have an

14  outpatient practice of your own, you don't

15  mean a private practice separate and apart

16  from NYU Langone?

17      A.   No, sir.

18      Q.   You mean within that health

19  system, you have your own outpatient

20  practice?

21      A.   Patients that are my

22  responsibility primarily who I make the

23  decisions for as opposed to in the hospital

24  where some of those patients might be mine

1  who I cover in the outpatient setting, but

2  they may also be my colleagues who I oversee

3  while I'm on service.

4       Q.   And what's the structure of your

5  professional practice?  Is it -- are there a

6  group of doctors who are all collectively

7  responsible for a group of patients, but

8  then you're assigned an individual

9  responsibility for one or more patients; or

10  what's the relationship generally between

11  the doctors that are in your practice at NYU

12  Langone?

13       A.   We are primarily subspecialty

14  based.  Now, hematology/oncology is a

15  subspecialty of internal medicine; so you

16  can call it a sub-subspecialty based, but we

17  cover different sub-subspecialties of

18  oncology.

19       Q.   And how many clinicians are there

20  in the hematology/oncology practice?

21       A.   My practice there are now 11

22  including me.

23       Q.   And do you have cross-coverage

24  when you're on vacation and that sort of

1  thing?

2      A.   We may cover for emergencies, but

3  we don't necessarily see patients unless

4  there's something urgent in which case we'll

5  get a sign out from the person who is on

6  vacation.

7      Q.   Could you briefly just explain

8  what an oncologist does on a day-to-day

9  basis?

10      A.   Certainly.  So an oncologist is

11  someone who takes care of patients with

12  cancer, but the job is so much more than

13  that.  We diagnose.  We provide prognosis.

14  We provide treatment plans and alternatives

15  to those treatment plans and also

16  survivorship care which people often forget

17  is important as well, so we build a strong

18  relationship with patients and their

19  families; and we aim to treat their cancer.

20      Q.   And what is -- you alluded to

21  survivorship; what does that mean?

22      A.   Sure.  That's generally regarded

23  as the time after the cancer directed

24  treatment has been completed, and there's

1  usually a response to that treatment; and

2  now you're trying to prevent any long-term

3  consequences of the treatment or anything

4  else related to the chemotherapy or the

5  treatment you may have provided and allow

6  them to live longer life.

7      Q.   So did you complete a fellowship

8  in rheumatology?

9      A.   I did not, sir.

10     Q.   Are you Board Certified in

11  rheumatologist?

12     A.   No, sir.

13     Q.   Do you consider yourself to be an

14  expert in rheumatology?

15     A.   No, sir.

16     Q.   Did you complete a fellowship in

17  pulmonology?

18     A.   No, sir.

19     Q.   Are you Board Certified in

20  pulmonology?

21     A.   I am not.

22     Q.   Do you consider yourself to be an

23  expert in pulmonology?

24     A.   No, sir.

1        Q.    Did you complete a fellowship in

2  gastroenterology?

3        A.    I did not.

4        Q.    Are you Board Certified in

5  gastroenterology?

6        A.    No, sir.

7        Q.    Do you consider yourself an expert

8  in gastroenterology?

9        A.    No, sir.

10       Q.    Are you board -- I'm sorry, did

11  you complete a fellowship in hepatology?

12       A.    No, sir.

13       Q.    Are you Board Certified in

14  hepatology?

15       A.    I am not.

16       Q.    Do you consider yourself to be an

17  expert in hepatology?

18       A.    No, sir.

19       Q.    As an oncologist, do your patients

20  with non-Hodgkin's lymphoma often ask why

21  they developed a disease?

22       A.    For non-Hodgkin's lymphoma,

23  patients very often ask why this happened to

24  them or they may ask why did I develop this,

1    yes.

2         Q.   And is it true that in the vast

3    majority of cases, you're not able to

4    determine what was the cause of their

5    non-Hodgkin's lymphoma?

6         A.   It's a case-by-case basis, and

7    non-Hodgkin's lymphoma is a broad term for

8    different types of lymphoma.  When we can,

9    we try to help them identify something that

10   may be reversible; but they do often ask

11   that question.

12        Q.   So my -- I understand there are

13   individual cases where you may be able to

14   identify something reversible like,

15   H. pylori infection for MALT, M-A-L-T?

16        A.   Of course.

17        Q.   In that case, you would treat the

18   underlying infection as part of your overall

19   treatment?

20        A.   That's correct.

21        Q.   But my question is, if you look at

22   the majority of patients that you see, is it

23   fair to say that in the majority of cases

24   you're not able to identify the specific

1   cause for non-Hodgkin's lymphoma?

2       A.   I would agree with that for the

3   majority of cases you're not able to.

4       Q.   Before you became involved in this

5   litigation, had you ever told any of your

6   patients that Roundup was the cause of their

7   non-Hodgkin's lymphoma?

8       A.   No, sir.

9       Q.   Have you ever told a patient that

10  Roundup was the cause of their lymphoma

11  including since you became involved?

12      A.   Not to my knowledge, no.

13      Q.   Have you ever published any

14  articles about risk factors or causes of

15  non-Hodgkin's lymphoma generally or diffuse

16  large B-cell lymphoma specifically?

17      A.   I have not.

18      Q.   Have you published any article

19  about any aspect of the diagnosis or

20  treatment of non-Hodgkin's lymphoma?

21      A.   I have not.

22      Q.   Have you ever designed an

23  epidemiologic study on Roundup or

24  glyphosate?

1        A.   I have not.

2        Q.   Have you ever defined an

3    epidemiologic study on any pesticide?

4        A.   No, sir.

5        Q.   Have you ever conducted an

6    epidemiologic study on Roundup or

7    glyphosate?

8        A.   No, I have not.

9        Q.   Have you ever conducted an

10   epidemiologic study on any pesticide?

11       A.   I have not.

12       Q.   Have you ever published an

13   epidemiologic study on Roundup or

14   glyphosate?

15       A.   No, sir.

16       Q.   Have you ever published an

17   epidemiologic study on any pesticide?

18       A.   I have not.

19       Q.   Do you have any -- do you have an

20   advanced graduate degree in addition to your

21   medical degree?

22       A.   I am a PhD as well, yes.

23       Q.   What did you study as part of your

24   PhD?

1    A.    My degree is in cellular and

2  molecular biology.

3    Q.    On what did you do your thesis?

4    A.    My thesis work was in the area of

5  multiple myeloma, and we were looking at the

6  bone marrow in the microenvironment, which

7  is the part of the bone marrow that

8  surrounds the tumor cells; and we were

9  looking at the gene expression patterns,

10  which is the functional part of the cells

11  that comparing the plasma cells which cause

12  multiple myeloma and the bone marrow

13  microenvironment cells.

14    Q.    Do you have any graduate degree in

15  epidemiology or biostatistics?

16    A.    No, sir.

17    Q.    Do you consider yourself to be an

18  expert in epidemiology or biostatistics?

19    A.    I do not consider myself to be an

20  expert though we collaborate with those --

21        (Reporter clarification.)

22    A.    (continuing) Sorry.  We

23  collaborate with some of those individuals

24  for our research.

1        Q.   And you're talking about

2   specifically in your clinical trials?

3        A.   Clinical trials for some of the

4   retrospective studies we do that are not

5   clinical trials.

6        Q.   What retrospective studies have

7   you done that are listed in your CV?

8        A.   Well, we spoke about the SEER

9   analysis.  That was the first one you

10  referenced in my CV, and then looking at the

11  others just for a moment.  In the reference

12  by Considerations for Management of Oncology

13  Patients during COVID-19, that's number six

14  on my updated CV.  That study involved

15  looking back at charts of patients in our

16  practice who presented to the office before

17  and after the peek of the pandemic in 2020

18  in New York.  That should be reference

19  number, I guess, five on your list.  It's

20  this one (pointing), Considerations for the

21  Management of Oncology Patients.  This one

22  (pointing).

23       Q.   So now that I'm looking at this,

24  I'm wondering if there's more than one

1  reference.  Let me just see this for one

2  second.  So would you take a look at these

3  for me?  It looks to me like number three on

4  Exhibit 3 is also not listed on Exhibit 2

5  (handing).

6      A.   I apologize.  Let me take a look.

7      Q.   I just want to make sure it's

8  clear.

9      A.   So number three here, the study by

10 Weltz and Daveys is included.

11          (Reporter clarification.)

12     A.   (continuing) I'm sorry.  By Weltz,

13 W-E-L-T-Z, and Daveys is listed over here

14 (pointing).

15     Q.   But my question is different.  My

16 question is the one that's number three

17 on --

18     A.   Here (indicating).

19     Q.   That exhibit, yes, on Exhibit 3,

20 that is not listed on Exhibit 2; is it, or

21 am I just missing it?

22     A.   Perhaps not.  Maybe that was added

23 additionally.  I apologize.

24     Q.   Okay.

1          So there are two publications on

2   Exhibit 3 that were not listed on Exhibit 2?

3       A.   Yes.  There were two, I apologize.

4       Q.   That's fine.  I just want to make

5   sure.

6          So to go back to my original

7   question, you were talking about case --

8   retrospective studies that you did.  So

9   could you identify on Exhibit 3 the numbers

10  of which studies were retrospective?

11      A.   So number three, that was the one

12  we were looking -- I'm sorry.  This was --

13  yes, this is number three.  So number --

14  scratch that, number five, -- scratch that.

15  It was number six was the retrospective one

16  I originally mentioned about the COVID-19

17  cases, and then let me just have a look at

18  the rest of it.  Number eight here was

19  looking at -- additional looking across

20  different institutions of patients with

21  multiple myeloma who were infected with

22  COVID-19 and looking retrospectively at

23  outcomes.  Just give me one moment.

24  Those -- so just to recap, so that was

1   number six and that was number eight.

2        Q.   On Exhibit 3?

3        A.   Yes, yes.

4        Q.   Have you ever designed or

5   conducted animal studies on Roundup for

6   glyphosate?

7        A.   No, sir.

8        Q.   Have you ever designed or

9   conducted animal studies on any pesticide?

10        A.   No, sir.

11        Q.   Do you consider yourself to be an

12   expert in the design and conduct of animal

13   carcinogenicity studies?

14        A.   I don't consider myself an expert.

15        Q.   Have you ever served as a

16   consultant to a company or to a regulatory

17   agency with respect to interpretation of

18   animal carcinogenicity studies?

19        A.   No, sir.

20        Q.   Have you ever designed or

21   conducted genotoxicity studies on Roundup or

22   glyphosate?

23        A.   No, sir.

24        Q.   Have you ever designed or

1  conducted genotoxicity studies on any

2  pesticide?

3       A.   No, sir.

4       Q.   Do you consider yourself to be an

5  expert in the design and conduct of

6  genotoxicity studies?

7       A.   So I have -- in my PhD work, I

8  have done studies looking at cell viability;

9  but I would not consider myself to be an

10  expert in genotoxicity.

11       Q.   Can you explain what research you

12  did with respect to cell viability?

13       A.   We were looking at an agent that

14  inhibits a protein called heat shock protein

15  70, seven zero; and so we would treat

16  cultures of myeloma cells or cell lines and

17  look at their cell viability.

18       Q.   And is that related to

19  genotoxicity?

20       A.   That's related to cell viability,

21  but not to genotoxicity.

22       Q.   Okay.

23       A.   But, yes.

24       Q.   Have you ever done, designed or

1   conducted, genotoxicity studies on any

2   chemical product?

3        A.   No, sir.

4        Q.   Other than the reading that you've

5   done for this case, do you have any

6   experience, education, or expertise in the

7   carcinogenicity of glyphosate or Roundup?

8        A.   No, sir.

9        Q.   Have you ever personally used

10  Roundup?

11       A.   I have not.

12       Q.   So let me just ask you some

13  questions.  This is under the heading of

14  cell biology and understanding some things

15  about lymphocytes.

16       A.   Sure.

17       Q.   Is it correct that most of the

18  cells in our body replicate; is that right?

19       A.   That's not correct.

20       Q.   That's not correct?

21       A.   I disagree.  There are some cells

22  that are senescent meaning they tend to stay

23  put and don't divide, and then there are

24  some cells that divide infrequently; and

1  then there are cells that do divide

2  frequently.

3      Q.   Well, do most cells divide whether

4  frequent or unfrequently?

5      A.   I wouldn't say most.  I can give

6  you an example, so hair cells.  Gut cells

7  tend to divide frequently.  Neurological

8  cells tend to divide infrequently, if at

9  all.

10      Q.   So if we talk about lymphocytes?

11      A.   Yes.

12      Q.   Lymphocytes divide very

13  frequently, right?

14      A.   Lymphocytes develop frequently,

15  yes.

16      Q.   Divide.

17      A.   I'm sorry.  Divide, yes, they

18  divide.

19      Q.   And how often do they divide,

20  thousands of millions of times a day?

21      A.   I can't give you any estimate.  I

22  can't give you an exact estimate, but they

23  are derived from stem cells in the bone

24  marrow that divide infrequently; and then

1    differentiate or develop into mature B-cells

2    that divide less frequently.

3         Q.   Okay.

4              Is it correct that when cells

5    replicate, there will likely be some genetic

6    replication errors?

7              MR. SILVERSTEIN:  Objection to

8         form.

9         A.   When cells replicate, you know,

10   depends on the context; but our genome is

11   designed such that there can be errors, and

12   we have repair mechanisms to fix that.

13        Q.   We're going to get to that in a

14   second.

15        A.   Absolutely.

16        Q.   But it's fair to say that when

17   cells are replicating, there's likely to be

18   some replication errors, true?

19             MR. SILVERSTEIN:  Objection to

20        form.

21        A.   It's possible.  It's possible that

22   there are errors.  I can't quantify it, but

23   it's possible.

24        Q.   When replication errors occur, are

1    those referred to as mutations?

2         A.   That's a type of mutation, yes.

3         Q.   It's a type of mutation?

4         A.   Yes.

5         Q.   Is it correct that mutations can

6    range from having essentially no physiologic

7    effect to having very significant and

8    important physiological effects?

9         A.   Yes.  That's very true.

10         Q.   And is it true that in some cases

11   a mutation can be the first step in

12   transforming a regular healthy cell into a

13   cancer cell?

14         A.   Yes.

15         Q.   Is it true that lymphocytes are

16   particularly prone to mutations because they

17   have the ability to rearrange their own DNA

18   to enable them to be effective in fighting

19   infections?

20              MR. SILVERSTEIN:  Objection to the

21        form.

22         A.   Yes.  Lymphocytes rearrange their

23   DNA.  They're one of the few cells to

24   actually do that; and that can make them

1 prone to mutations, yes.

2    Q.   And -- but that's by design, if

3 you will, intended to be a helpful effect to

4 help us fight infections, right?

5    A.   Interestingly, yes, that's how

6 nature works.

7    Q.   Are you familiar with the work of

8 Dr. Vogelstein at Hopkins?

9    A.   I mean, he's a big name in

10 oncology; so I'm familiar with some of his

11 work, yes.

12    Q.   Are you familiar with his

13 mathematical modeling in terms of mutations

14 for different forms of cancer?

15    A.   I'm not intimately familiar.

16 Vaguely familiar with some of the work he's

17 done.  I'm familiar somewhat with the

18 Vogelgram, which is how colon cancers

19 develop.

20    Q.   Let me just ask you about one of

21 the basis premises of his research and see

22 if that's something that you subscribe to,

23 okay?

24    A.   Yes, sir.

1    Q.   He divides mutations into three

2  basic categories.  One is mutations that

3  occur as a result of replication errors.

4  Two is mutations that are inherited.

5    A.   Okay.

6    Q.   And three is mutations that are

7  caused by environmental exposures of some

8  type.  Is that a basic construct that you

9  agree with?

10         MR. SILVERSTEIN:  Objection to

11     form.

12    A.   That's a construct that we take

13  somewhat to -- for granted in oncology that

14  there are different ways to develop

15  mutations, so I agree with his assessment

16  that there are different ways to initiate

17  mutations.

18    Q.   Okay.

19         And are those the main three; are

20  there any fourth ways that you left off?

21    A.   Can you repeat them again,

22  replication errors; and what were the other

23  two?

24    Q.   Yes.

1          So replication errors are one.

2    Inherited mutations are two, and mutations

3    related to environmental exposures are

4    three.

5         A.   Yes.  Environmental exposures is a

6    broad term.  It can be something in the

7    microenvironment; but, yes, those are three

8    major mechanisms.  I can't think of another

9    offhand, but there may be others.

10        Q.   And I'll represent I think when he

11   talked about infection exposures, he's

12   talking not just about chemicals, but

13   bacteria and other --

14        A.   Radiation.

15        Q.   Radiation, exactly.

16        A.   Yes.

17        Q.   Are you aware that with respect to

18   non-Hodgkin's lymphoma, Dr. Vogelstein found

19   that the vast majority of mutations, well

20   over 90 percent, were due to random

21   replication errors as opposed to inherited

22   mutations or environmental exposures?

23             MR. SILVERSTEIN:  Objection to

24        form.

1    A.    I'm not familiar with the exact

2  study; but if you're telling me, I'll make

3  an assumption that that's what the research

4  is showing.

5    Q.    Did you in connection with your

6  work in this case take a look at any of his

7  research?

8    A.    I have not, no.

9    Q.    There's another researcher that

10  works with him, Dr. Tomasetti; did you come

11  across any of his --

12    A.    I don't recall.

13    Q.    So I want to talk a minute about

14  the difference between mutations and -- on

15  one hand and the initiation of cancer.  You

16  started alluding to that earlier.

17    A.    Okay.

18    Q.    So I think you said earlier that

19  mutations may simply not have any

20  physiological effects essentially what we

21  may be calling a no harm, no foul mutation;

22  is that --

23    A.    I don't recall if I said that

24  but --

1       Q.   You didn't say that.  I'm not

2   representing you said that.

3       A.   It is possible that you can have

4   sometimes what's called silent mutation,

5   which has no physiologic consequence; but is

6   an alteration of the genome.

7       Q.   Right.

8            So in other words, something

9   happens to the DNA that doesn't have any

10  effect on the function of the cell?

11      A.   And we may never know that it's

12  there.

13      Q.   Right.

14           There can also be mutations that

15  do have a potential effect but can result in

16  what's called programmed cell death; is that

17  right?

18      A.   Yes.  That's one way that the cell

19  may be altruistic at destroying itself for

20  the good of the organism, yes.

21      Q.   Is that referred to as apoptosis?

22      A.   There are many mechanisms of a

23  programmed cell death or necrosis, but there

24  are many other ways other than apoptosis to

1    cause cell death.

2         Q.   But essentially what's happening

3    is the cell destroys itself for the sake of

4    the body; is that a good way to put it?

5         A.   In an organism, yes, ideally

6    that's what happens if you have a cell

7    that's mutated.

8         Q.   And then there can also be a

9    mutation that affects a cell in such a way

10   as to potentially trigger a mutation that

11   would have the potential for malignant

12   transformation; is that true?

13        A.   Yes.

14        Q.   Of mutations overall, is it fair

15   to say -- what percentage of mutations would

16   potentially lead to malignant

17   transformation?

18        A.   That's a very broad question

19   because there are some cancers where a

20   single type of mutation is kind of what we

21   would call pathognomonic or all of the other

22   cells of that cancer, where there are other

23   cancers whether there may be many mutations,

24   so it's hard to kind of give you an estimate

1    in general terms.

2        Q.   Well, I want to go back to

3    something you said earlier.

4        A.   Sure.

5        Q.   Is it true that even when a cell

6    mutates in such a way as to have a

7    potentially cancerous transformation, the

8    body has a mechanism for identifying and

9    killing those mutated cells?

10       A.   Well, it's interesting.  Yes.

11   There are mechanisms for the body to

12   identify it.  One is the immune system; and

13   if we have an intact immune system, we may

14   be able to eradicate that cell.  That's also

15   one reason why people who are

16   immunocompromised may be more prone to

17   developing cancer in some instances.

18       Q.   Under normal circumstances if the

19   immune system is functioning, there are

20   killer T-cells that are implicated to help

21   destroy cells that have gone awry; is that

22   fair?

23           MR. SILVERSTEIN:  Object to the

24       form.

1    A.   It's hard to quantify that, but we

2  do know that T-cells are a healthy part of

3  preventing cancer.  In fact, the Nobel prize

4  was recently awarded a couple of years ago

5  for the discovery of immune checkpoint

6  inhibiters that reactivate T-cells in cancer

7  patients to kill the tumor.

8    Q.   Who won the Nobel prize for that?

9    A.   I think it was James Allison and

10 another Japanese scientist, I believe.  I

11 don't remember the other name offhand.  I'm

12 sorry.

13      MR. PIORKOWSKI:  How are you

14   doing?  Are you doing all right?  Do

15   you want a break?

16      THE WITNESS:  I can go a little

17   bit more.

18      MR. PIORKOWSKI:  Sure.

19   Q.   I want to talk to you a little bit

20 about causes and risk factors for

21 non-Hodgkin's lymphoma.

22   A.   Sure, absolutely.

23   Q.   And, first of all, just so we're

24 on the same page in terms of terminology, do

1  you recognize a difference between the term

2  cause and risk factor?

3      A.   Well, yes.  I mean, cause -- if

4  you want me to explain.  Cause would mean

5  something that has a cause and effect, and a

6  risk factor would be something that can

7  potentially cause an effect and -- but not

8  all the time.

9      Q.   So I'm just thinking.

10     A.   Take your time.

11     Q.   So when you say risk factors could

12 potentially cause an effect but not all the

13 time, is there anything that you can think

14 of that causes NHL a hundred percent of the

15 time?  In other words, let me explain what

16 I'm saying here.

17          For example, we talked about

18 H. pylori and MALT, for example; and that's

19 probably close to cause and effect

20 relationship; is that fair?

21     A.   Yes.  Well, patients -- not all

22 patients who have H. pylori will develop a

23 gastric Hodgkin's lymphoma; but it can be a

24 causative agent of it that's established.

1    Q.   Okay.  And that's exactly why I

2   picked that example because I wanted to

3   flesh this out a little bit.

4    A.   Of course.

5    Q.   So when you said a risk factor,

6   you said a risk factor can potentially cause

7   an effect but not all the time; and so

8   that -- under that definition, H. pylori

9   would be a risk factor, right, as opposed to

10  a cause?

11   A.   Well, sometimes they can be both.

12   Q.   Okay.

13   A.   It's somewhat vague as

14  terminology, but sometimes they can be both.

15  A cause -- a risk factor can eventually

16  cause a disease.

17   Q.   So a cause would always be a risk

18  factor; is that fair?

19   A.   I have to think about that for a

20  second.

21   Q.   Think about it.

22   A.   A cause would always be a risk

23  factor, off the top of my head, yes.  I

24  agree with that.

1    Q.   When we evaluate risk factors,

2   we're usually looking at statistical

3   associations in studies, right?

4    A.   Well, if something is established

5   as a risk factor, there would have been

6   studies done to show that more likely than

7   not that that is a risk factor for the

8   disease based on studies, yes.

9    Q.   But, for example, in your report,

10   like, you list various risk factors

11   including age over 65, right?

12    A.   Yes.

13    Q.   Now, is age over 65 something that

14   causes non-Hodgkin's lymphoma; or is it just

15   non-Hodgkin's lymphoma occurs more

16   frequently in age 65 and over?

17    A.   That's a good question.  I think

18   age is perhaps a surrogate marker for a

19   patient -- of people who may develop

20   lymphoma.  It's not that -- the age itself

21   is just a number.  It's some other

22   underlying factor aging that is associated

23   as a risk factor for lymphoma development.

24    Q.   Is age potentially a risk factor

1  because people who are over 65 have more

2  cumulative random mutations than somebody

3  who's 55 or 45?

4      A.   That is a theory I think that is

5  still being established.  It's interesting

6  to bring that up because we know more

7  recently that our blood cells tend to

8  accumulate mutations over time, and so that

9  might be one underlying reason why as we age

10  we're more prone to blood cancers or cancers

11  in general.

12      Q.   Is there any other theory that is

13  understood by oncologists such as yourself

14  as to why age is a risk factor for

15  non-Hodgkin's lymphoma?

16      A.   Again, well, the longer you're

17  alive, it's understood that you're going to

18  be exposed to more things in the

19  environment.  I don't think we understand

20  all of those things, for example, the role

21  of the microbiome, which is the bacteria and

22  other organisms that live with us, that they

23  also may contribute; and those things can

24  change as we age and experience different

1    things in the environment.  So it may be

2    multifactorial.  Again, age is just a

3    number; but there may be other things to

4    essentially associate with things that are

5    risk factors.

6         Q.   As on oncologist, do you consider

7    yourself to be an expert in risk factors for

8    non-Hodgkin's lymphoma?

9         A.   Yes.  I think.  I mean, I think

10   it's something that I understand.

11        Q.   So to go back to the word causes,

12   understanding that there's some overlap

13   between causes and risk factors, but let's

14   focus on causes for a moment.  What do you

15   understand to be the causes of non-Hodgkin's

16   lymphoma that are well accepted by the

17   medical and oncology community?

18             MR. SILVERSTEIN:  Object to the

19        form.  You can answer.

20        A.   So when we're talking about

21   causes, sometimes the cause is unknown.

22   Sometimes we can find risk factors; and I

23   know I'm using the word risk factor, not

24   cause.  But sometimes we can identify risk

1  factors that are or are not modifiable; but

2  when we talk about the word cause, we're

3  really talking about the breath of

4  information in the patient's history that

5  would lead us to believe that that was most

6  likely the underlying reason for the

7  lymphoma.  And so I can give examples of

8  that, radiation, H. pylori, you raised that

9  as an example.  There are others.

10      Q.   So radiation is one.  What about

11  immunodeficiency?

12      A.   So we talked about HIV.  I would

13  consider that a form of immunodeficiency,

14  and I think that's in part due to the

15  example of T-cell -- the effect of impaired

16  T-cells in patients with lymphoma.

17      Q.   Would you consider

18  immunodeficiency to be a cause of

19  non-Hodgkin's lymphoma?

20      A.   Immunodeficiency is a broad term.

21  I would say that there are the examples for,

22  like, HIV where you are immunodeficient; but

23  not all patients who are immunodeficient

24  necessarily develop lymphomas.  But I would

1    consider it in some instances, yes, to be a

2    risk factor.

3         Q.   Are there other types of

4    immunodeficiency besides HIV that you would

5    consider to be causes of non-Hodgkin's

6    lymphoma?

7         A.   Well, there's what we would call

8    iatrogenic immunodeficiency where we give

9    medications to suppress the immune system.

10        Q.   Would you regard that as you're

11   talking about in the context of

12   chemotherapy?

13        A.   That's one example.

14        Q.   Or in the context of transplant

15   immunosuppression?

16        A.   Yes.  That's definitely an

17   example, yes.

18        Q.   In those examples, you're

19   purposefully keeping the immune system from

20   functioning at its full capacity for an

21   alternative medical purpose?

22        A.   Well, you're not intentionally

23   doing it; but it's a complication of

24   weighing, you know, you have to weigh the

1  risk and benefits of treating the cancer

2  versus the sequence.

3       Q.    Let me break that up.

4             In the context of a transplant --

5       A.    Yes, sir.

6       Q.    -- you're intentionally

7  suppressing the immune system, right?

8       A.    In the context of an allogeneic

9  transplant where you're using a donor's

10  immune system, yes, in order to accept the

11  donor cells, you have to immunosuppress the

12  recipient.

13       Q.    In the context of chemotherapy,

14  you're not necessarily intending to

15  adversely affect their immune system but

16  it's a consequence -- a known side effect of

17  the therapy; is that fair?

18       A.    I mean, we can agree that

19  chemotherapy is a broad term; but many of

20  the chemotherapies that are used to treat

21  non-Hodgkin's lymphoma as a side effect do

22  suppress the healthy immune system.

23       Q.    What about treatment with

24  rituximab, which is a monoclonal antibody;

1    that's not really chemotherapy, right?

2         A.   You know, it's interesting because

3    I sometimes struggle to explain that -- to

4    patients that what the difference is between

5    immunotherapy and chemotherapy; but I

6    consider that more of an immunotherapy than

7    chemotherapy that's not as selective for a

8    cell.

9         Q.   Okay.

10             And what rituximab does is it

11   basically kills the B-cells, right?

12        A.   Well, it's multifactorial; so

13   rituximab is an antibody.  It's what's

14   called a monoclonal antibody, so it

15   specifically binds to a target called CD20,

16   which is expressed --

17             (Reporter clarification.)

18        A.   (continuing) A target called CD20

19   and that is expressed on mature B-cells; and

20   in doing so, it partly activates apoptosis

21   but also other mechanisms that activate

22   other portions of immune system to target

23   that cell for destruction.

24        Q.   But isn't that an effect of

1  rituximab therapy to temporarily kill

2  B-cells?

3      A.   Well, to permanently ideally

4  destroy the cancer is B-cells; but it may

5  temporarily suppress the healthy B-cells as

6  well.

7      Q.   Okay.

8          So we talked about HIV.  We talked

9  about different kinds of iatrogenic

10 immunodeficiency.  Are there other kinds of

11 inherited immunodeficiencies that are causes

12 of non-Hodgkin's lymphoma besides HIV and

13 iatrogenic immunodeficiency?

14     A.   I'm not an expert in inherited

15 immunodeficiencies because often those are

16 managed by an allergist or immunologist, so

17 I'm just trying to think offhand of other

18 inherited immunodeficiency syndromes.  I

19 mean, I'm aware of certain ones where you

20 have impaired B or T-cell immunity.  The

21 bubble boy is colloquially known --

22          (Reporter clarification.)

23     A.   (continuing) The bubble boy, so to

24 speak, are people who have suppressed B or

1   T-cell immunity due to the affects of birth,

2   but I'm not as familiar with their

3   connection to non-Hodgkin's lymphoma.

4        Q.   So you alluded to allergy and

5   immunology.  Is that a separate specialty?

6        A.   Yes, sir.

7        Q.   Did you train in that specialty?

8        A.   No, sir.

9        Q.   And are you an expert in that

10   specialty?

11       A.   No, sir.

12       Q.   Are there infectious causes, or

13   are there infectious causes for

14   non-Hodgkin's lymphoma?

15       A.   For certain non-Hodgkin's

16   lymphoma, yes, there are.

17       Q.   Can you explain?

18       A.   So we talked about H. pylori.

19   There is another infectious organism called

20   chlamydia, not the one that caused sexually

21   transmitted disease.  It causes a type of

22   ocular low-grade lymphoma.  Epstein-Barr

23   virus has been implicated in some lymphomas,

24   and I'm trying to think of others.  I'm

1  missing some.  We talked about HIV.

2      Q.   Hepatitis?

3      A.   Hepatitis, yes.  Hepatitis is

4  also -- thank you for reminding me.  Yes,

5  hepatitis is also a risk factor for some

6  lymphomas.

7      Q.   Is that hepatitis B or C or both?

8      A.   The one I'm familiar with

9  hepatitis C.

10      Q.   And when you say it's a risk

11  factor, you mean falls short of being a

12  cause?

13      A.   I would consider it, you know,

14  sort of splitting hairs; but, yes, it can be

15  causative just like H. pylori, yes.

16      Q.   Now, you said when I asked about

17  infectious etiologies, you said for some

18  types of non-Hodgkin's lymphoma, right?

19      A.   Well, it's been associated with

20  some types of non-Hodgkin's lymphoma, yes.

21      Q.   Let me back up one second.  When

22  we talk about non-Hodgkin's lymphoma, is it

23  correct to say that non-Hodgkin's lymphoma

24  is not one disease; it's an umbrella term

1   that's used for several different diseases?

2       A.   In some regard, yes.  I mean, we

3   don't tell a patient you just have

4   non-Hodgkin's lymphoma.  We explain to them

5   based on the pathology exactly what type you

6   have.

7       Q.   And the different types have

8   different pathogenesis and different

9   etiologies?

10      A.   Sometimes, yes.  So the type we

11  were talking about with H. pylori is

12  associated with a type of gastric lymphoma,

13  and that can be different from other types

14  like diffuse large B-cell lymphoma.

15      Q.   So when you mentioned H. pylori,

16  is H. pylori only associated with gastric

17  MALT lymphoma?

18      A.   It is also associated with gastric

19  carcinoma.

20      Q.   But in terms of NHL?

21      A.   That's the one I'm most familiar

22  with is gastric MALToma.

23      Q.   Are you aware of any association

24  between H. pylori and any other type of

1   non-Hodgkin's lymphoma?

2        A.   Not to my knowledge, no.

3        Q.   What about with respect to

4   chlamydia, is it just the ocular lymphoma?

5        A.   Yes.

6        Q.   And is it a particular type of

7   lymphoma?

8        A.   It's also usually a marginal zone

9   or MALT.   It's sometimes called a marginal

10  zone.

11       Q.   What does marginal zone mean?

12       A.   So the life of a B-cell begins in

13  the bone marrow, and then it goes through

14  lymph nodes.   Normally, it does that to get

15  educated in order to fight infections.

16  There are different zones in a lymph node,

17  and it derives from a zone called the

18  marginal zone.

19       Q.   The cell derives from a marginal

20  zone?

21       A.   The cell becomes -- goes through

22  that zone; and if it develops into a

23  lymphoma, it becomes arrested in that phase

24  of its development.

1        Q.   I see.  When you mentioned you
2   said Epstein-Barr virus can be implicated in
3   some types of lymphoma, what types?
4        A.   Sometimes it's associated with
5   Hodgkin's lymphoma.  Sometimes it's
6   associated with post-transplant
7   lymphoproliferative diseases.  Those are the
8   most common ones I'm familiar.
9        Q.   What about hepatitis C?
10       A.   Hepatitis C to my knowledge is
11   typically associated with what we call
12   low-grade lymphomas like MALT lymphomas, and
13   we're talking about generally active
14   hepatitis C.
15       Q.   In your report, you allude to
16   certain autoimmune diseases as being risk
17   factors for non-Hodgkin's lymphoma?
18       A.   Yes, sir.
19       Q.   Are certain autoimmune diseases
20   also causes of non-Hodgkin's lymphoma?
21       A.   Well, you know, these are terms
22   that we may interchange in clinical
23   practice; but I would define them as risk
24   factors because I don't think it's known

1    whether they cause.  In other words, when I

2    think of cause I think that if you have

3    this.  You're very likely to develop the

4    disease.  I would consider them more risk

5    factors.  In other words, you have it.  It's

6    a potential risk that increases.

7         Q.   What autoimmune diseases do you

8    regard as being risk factors for the

9    development of non-Hodgkin's lymphoma?

10        A.   I would say the most -- two that

11   are most common are rheumatoid arthritis and

12   lupus, systemic lupus; but I believe also

13   others such as Sjogren's disease could be a

14   risk factor.

15        Q.   Do you know whether psoriatic

16   arthritis is a risk factor?

17        A.   I'm not sure.

18        Q.   With respect to rheumatoid

19   arthritis and systemic lupus, are they

20   associated with a particular type of

21   non-Hodgkin's lymphoma; or is that a general

22   association of --

23        A.   I believe it's a general

24   association.  They may have been associated

1    more with one particular type, but I believe

2    it's a general association.

3        Q.   Is the idea with autoimmune

4    diseases -- is the understanding among

5    oncologists -- let me start over.

6            Is it your understanding as an

7    oncologist that the mechanism behind

8    autoimmune diseases potentially causing

9    non-Hodgkin's lymphoma is that the

10   autoimmune disease provides chronic

11   antigenic stimulation?

12           MR. SILVERSTEIN:  Objection to the

13       form.

14       A.   Well, I'm not sure if it

15   necessarily causes the lymphoma.  It

16   increases the risk.  I would agree in part

17   due to modification of the immune system.

18       Q.   Is it correct that autoimmune

19   diseases including rheumatoid arthritis and

20   lupus do cause chronic antigenic stimulation

21   of the immune system?

22       A.   Again, I'm not an expert in

23   autoimmune diseases; but autoimmune diseases

24   in part deal with hematology because some

1  autoimmune diseases can cause reduction of

2  blood counts, for example.  So if you have a

3  immune system in disarray or an immune

4  system that is abnormal, it can affect other

5  parts of the body.

6        MR. PIORKOWSKI:  We've been going

7     close to an hour and a half, do you

8     want to take a quick break?

9        MR. SILVERSTEIN:  Yes.

10        VIDEOGRAPHER:  Time right now is

11     10:26 a.m.  We are now off the record.

12        (Whereupon, an off-the-record

13     discussion was held.)

14        VIDEOGRAPHER:  Time right now is

15     10:46 a.m.  We are back on the record.

16        MR. SILVERSTEIN:  We're back on

17     the record after a break.

18     Q.   Doctor, any answers you gave

19  earlier that need to be changed or amended?

20     A.   No.

21     Q.   So I'm looking at your report that

22  we marked as Exhibit 1.

23     A.   Yes.

24     Q.   I've actually been looking at the

1    bottom of eight, top of page nine, where you

2    talked about the etiology of lymphoma; do

3    you see that?

4         A.    I'm on page nine, yes.

5         Q.    Look at the bottom of page eight,

6    last full paragraph, last three lines.

7         A.    Page eight or page nine?

8         Q.    Page eight.

9         A.    The last paragraph that starts

10   with the etiology of?

11        Q.    Exactly.

12        A.    Okay.

13        Q.    So we were talking about, I

14   believe I had asked earlier what were causes

15   of non-Hodgkin's lymphoma that were

16   recognized and well accepted by the medical

17   community; do you recall that?

18        A.    Yes, sir.

19        Q.    And we've gone through a number of

20   factors including radiation, certain

21   immunodeficiencies, certain infections,

22   certain autoimmune diseases; and you have

23   in -- at the top of page nine, you also say

24   certain medications such as

1   immunosuppressants?

2       A.   Correct.

3       Q.   We talked a little bit about

4   immunosuppressants earlier, right?

5       A.   Yes.

6       Q.   They can create

7   immunodeficiency-type situation at least on

8   a temporary basis?

9       A.   Yes, correct.

10      Q.   Are there other medications that

11  you're aware of that have been associated

12  with non-Hodgkin's lymphoma in the medical

13  literature?

14      A.   Well, you know, I'm sorry, other

15  than immunosuppressants or --

16      Q.   Yes.

17      A.   Not to my knowledge.  I mean,

18  there may be but not offhand.  I can't think

19  of them offhand.

20      Q.   Have you ever looked at the

21  literature concerning -- are you familiar

22  with a class of drugs called nonsteroidal

23  anti-inflammatory medications?

24      A.   I've heard of them.  I'm not

1    intimately familiar.  I don't prescribe them

2    often but, yes.

3        Q.    And they're referred to NSAIDs as

4    a class?

5        A.    Oh, yes.  I'm familiar with

6    NSAIDs, yes.

7        Q.    Are you aware of any medical

8    literature indicating that NSAIDs have been

9    associated with non-Hodgkin's lymphoma?

10       A.    I'm not aware of literature on

11   that.

12       Q.    Are you aware of any literature

13   looking at acetaminophen and whether it's

14   associated with non-Hodgkin's lymphoma?

15       A.    No, sir.

16       Q.    Are you aware of any literature on

17   tricyclic antidepressant medications and

18   association with non-Hodgkin's lymphoma?

19       A.    I don't prescribe them.  I'm not

20   familiar; I'm sorry.

21       Q.    Whether you prescribe them or not

22   though, if a medication had an association,

23   that would still be relevant to you?

24       A.    That is a fair point.  I agree

1    with that.

2         Q.   Any other medications that you had

3    in mind besides immunosuppressants when you

4    mentioned certain medications in your

5    report?

6         A.   Yeah.  So methotrexate is an

7    example but that falls into the category

8    also of immunosuppressants and chemotherapy

9    sometimes too, so that would be an example.

10   There's some immunosuppressants that are

11   used to treat autoimmune diseases as an

12   example too.

13        Q.   Okay.

14             Is that disease modifying

15   rheumatoid arthritis drugs?

16        A.   Some of those, yes.

17        Q.   One of the things you have listed

18   here is prior chemotherapy.  When a patient

19   undergoes chemotherapy for non-Hodgkin's

20   lymphoma, is there an understanding of the

21   amount of time that will affect a patient's

22   immune system adversely?

23        A.   Not quantitatively so much.  We

24   know that, for example, we talked before

1    about rituximab, that can suppress the

2    healthy humoral immunity through B-cells;

3    and so patients may be immunosuppressed for

4    several months following that.  There isn't

5    something clinical to measure, okay, this is

6    the point for which the effect of the

7    chemotherapy has resolved.  There are some

8    elements to the system we can routinely

9    measure in the clinical practice; but

10   there's no one particular marker that we say

11   that the immune system is restored, you

12   know, where it was suppressed as a

13   consequence of chemotherapy.

14        Q.   What -- are there markers of

15   B-cells that tell you that rituximab therapy

16   is effective?

17        A.   When you say effective, you mean

18   to treat the underlying cancer?

19        Q.   Well, whether -- is there

20   something like the B-cell count or something

21   like that that tells you whether -- what

22   effect it's had on the B-cells?

23        A.   Clinically, we could measure

24   something called quantitative

1    immunoglobulins or QIs for short.  That can

2    tell you a patient's overall production of

3    immunoglobulins or antibodies some of which

4    may be produced by blood cancer, and some of

5    which may be produced by healthy immune

6    cells.

7        Q.   You had mentioned CD20 as being a

8    marker on B-cells; is that right?

9        A.   As the target of Rituxan, yes.

10       Q.   Is there a way to quantify B-cell

11   counts using CD20?

12       A.   So when we diagnose lymphoma, some

13   of the tissue is sent for something called

14   flow cytometry; and that can quantify the

15   content in cells by their -- what I

16   sometimes refer to as bar code, but it's

17   basically what's technically the

18   immunophenotype of a cell.  So whether it's

19   CD19 or whether they express CD20, you can

20   quantify cells that way.  It's particular

21   for the tissue though that you're

22   quantifying it in.

23       Q.   You go on to make reference to

24   occupational or environmental exposures such

1    as benzene and tobacco smoke, so let's just

2    talk about benzene first.

3         A.   Okay.

4         Q.   Benzene has been long regarded as

5    a cause of leukemia, correct?

6         A.   I believe it's been associated

7    with various malignancies, yes.

8         Q.   Is benzene also associated with

9    non-Hodgkin's lymphoma?

10        A.   Yes.

11        Q.   And do you regard benzene exposure

12   as a cause of non-Hodgkin's lymphoma?

13        A.   Well, I would regard it as a risk

14   factor that can lead to the development of

15   non-Hodgkin's lymphoma.

16        Q.   And the reason you say a risk

17   factor is because not everybody who's

18   exposed to benzene is going to get

19   non-Hodgkin's lymphoma?

20        A.   Yes.  I agree with that.

21        Q.   Are there other occupational

22   exposures that you're aware of besides

23   benzene that are well accepted as being

24   causes or risk factors for non-Hodgkin's

1  lymphoma?

2      A.   Yes.  Unfortunately survivors of

3  the World Trade Center attack, what we call

4  9/11 exposure, there does seem to be

5  increased risk of both lymphoma and multiple

6  myeloma.

7      Q.   So that's a situation-specific

8  risk?

9      A.   Right.  I wouldn't call it

10  necessarily a work exposure, although there

11  were first responders.

12      Q.   Is there an understanding of what

13  the cause of non-Hodgkin's lymphoma is in

14  those workers?

15      A.   I don't believe so.

16      Q.   Is there a prevailing theory?

17      A.   As far as I'm aware, it's the

18  exposure to the dust that was multi, you

19  know, had multiple components into it.

20  That's all I know.

21      Q.   Okay.  All right.

22           Any other examples you can think

23  of?

24      A.   If somebody had radiation exposure

1    in their work.  I mean, we also spoke about

2    radiation in general; but it could be work

3    exposure.  I work with colleagues who

4    deliver radiation therapeutically.

5         Q.    Radiology oncologists?

6         A.    Exactly.

7         Q.    They generally are careful to

8    monitor their own exposure to radiation --

9              (Reporter clarification.)

10        Q.    (continuing) They're generally

11   careful to monitor their radiation exposure

12   in an attempt to minimize it, correct?

13        A.    Just on a very general level, I

14   know that they wear monitors to check that

15   they're not exceeding certain limits.

16        Q.    Okay.

17             You also mentioned in your report

18   on page nine tobacco smoke.  Is tobacco

19   smoke a recognized cause or risk factor for

20   non-Hodgkin's lymphoma?

21        A.    So it's been associated as a risk

22   factor in some studies for certain types of

23   non-Hodgkin's lymphoma, yes.

24        Q.    For follicular?

1        A.    I'm not sure about follicular

2   lymphoma.

3        Q.    What are you aware of that tobacco

4   smoke has been associated?

5        A.    In my report, there's a section on

6   tobacco smoke.  Maybe not for this case

7   specific to Thomas.  I have to look back at

8   the report.  Give me one second.  So it's

9   not in this report.  If I'm able to take a

10   look at -- I believe it's the Savory case.

11        Q.    I'll tell you what, we'll take it

12   up when we talk about Mr. Savory tomorrow.

13        A.    Sounds good.

14        Q.    That's fine.

15              You also indicate family history

16   of hematologic malignancy.

17        A.    Yes.

18        Q.    Is that recognized as a risk

19   factor for non-Hodgkin's lymphoma?

20        A.    If you have a first-degree

21   relative with non-Hodgkin's lymphoma, it's

22   been reported in the literature, yes.

23        Q.    Is it a first-degree relative with

24   non-Hodgkin's lymphoma; or is it a

1    first-degree relative with any hematologic

2    malignancy, which would include

3    non-Hodgkin's lymphoma, multiple myeloma, so

4    forth?

5         A.   In this case, I was referring to

6    non-Hodgkin's lymphoma -- a first-degree

7    relative with non-Hodgkin's lymphoma.

8         Q.   Did you know whether there's data

9    in the medical literature suggesting that a

10   family history of any type of cancer in a

11   first-degree relative is a risk factor for

12   non-Hodgkin's lymphoma?

13        A.   Well, I've read the defense report

14   that mentioned about prostate cancer, for

15   example; so I've seen some literature from

16   that that I was not as familiar with because

17   typically we're looking at first-degree

18   relatives with non-Hodgkin's lymphoma as a

19   risk factor in clinic.  But there's

20   literature that exists, yes.

21        Q.   Do you have an opinion as to

22   whether first-degree relatives with cancer

23   other than non-Hodgkin's lymphoma, whether

24   that presents a risk of an increased risk of

1  non-Hodgkin's lymphoma?

2      A.   Can you be a little bit more

3  specific?  An opinion in terms of what

4  specifically?

5      Q.   Do you have an opinion about if

6  somebody -- I'll tell you what, there's

7  another place when we start talking about

8  the studies where we can take this question

9  up, so I'll defer to that.

10      A.   Sure.

11      Q.   So going back to the beginning

12  back on the bottom of page eight.  We talked

13  about age over 65.  Another risk factor is

14  male gender; is that right?

15      A.   Well, another associated risk

16  factor with non-Hodgkin's lymphoma has been

17  it's been more common in males.

18      Q.   And how much more common is it,

19  like, 55/45, or 75/25?

20      A.   It's about two times.

21      Q.   Two times more common?

22      A.   That's what I recall.

23      Q.   Is there an understanding of the

24  reason behind that?

1      A.   I am not aware.

2      Q.   White ethnicity, is that

3  recognized as a risk factor?

4      A.   Well, it's recognized as that the

5  incidence of non-Hodgkin's lymphoma is more

6  prevalent in white males; but I don't know

7  if it's necessarily a risk factor.  There

8  are, you know, like, we've been talking

9  there are plenty of individuals who are male

10 or white and do not have non-Hodgkin's

11 lymphoma; but I from my understanding, there

12 is a increased incidence, yeah.

13     Q.   So what you mean is in terms of

14 how frequently it occurs on a per capita

15 basis is greater in white ethnicity as

16 opposed to African American or Asian; is

17 that what you're saying?

18     A.   Yes.  That's fair.

19     Q.   You also mention obesity.  What's

20 your understanding of obesity as a risk

21 factor for non-Hodgkin's lymphoma?

22     A.   Well, that individuals who are

23 classified as obese have an increased risk

24 of multiple cancers including non-Hodgkin's

1   lymphoma.

2        Q.   When you say classified as obese,

3   what do you mean?

4        A.   What I mean may be different from

5   what's classified in the literature; but I

6   believe technically obese is a BMI greater

7   than 30, body mass index.

8        Q.   And that's why I'm asking this

9   clarification because I'm interested in what

10  your opinion is.

11       A.   I see.

12       Q.   So do you have an opinion about

13  whether using that definition of BMI,

14  greater than 30, patients -- well, I'm going

15  to rephrase the question.

16            Do you have an opinion about

17  whether patients who have a BMI greater than

18  30 are at increased risk of non-Hodgkin's

19  lymphoma?

20       A.   Well, it's a fair question.  You

21  know, just to clarify, if a patient has a

22  BMI of 30 or above, that is the clinical

23  definition of obesity.  There's no question

24  about that.  It's a spectrum; and there's

1  morbid obesity, which is a BMI, I believe,

2  of greater than 40.  So it's a spectrum.  In

3  the literature that I've reviewed, there

4  were different cut offs used to define the

5  risk at different BMIs.  Does that answer

6  your question, or do you want me to rephrase

7  it?

8      Q.   I think it's responsive, but I'm

9  not sure it answered it entirely.

10         So my question is, do you have an

11  opinion yourself based on your review of the

12  literature about whether -- and let me back

13  up.  I actually took the word obesity out of

14  the question so that we're not getting into

15  definitional issues with what that means.

16     A.   Of course.

17     Q.   So my question is, do you have an

18  opinion about whether a person who has a BMI

19  over 30 has an increased risk of

20  non-Hodgkin's lymphoma based on the data

21  that you reviewed?

22     A.   So in my report, I believe it was

23  for this case.  Let me just -- if you will

24  allow me to just take a look.

1        Q.    Certainly.

2        A.    At Spector's (perusing).  So in

3   the report on page eight under obesity,

4   there were some reports I noted that showed

5   no association with body mass index whereas

6   others showed excess risk with morbid

7   obesity with BMI over 40; so most I think --

8   I'll talk in general and then I'll come to

9   myself -- most clinicians would just call

10  obesity over 30 and say that's a risk

11  factor.  I think if we look at some of these

12  studies, they stratify it by different BMI;

13  but I think it's fair to say that if you're

14  obese, there's literature of BMI greater

15  than 30 and some BMI greater than 40.

16       Q.    That shows an increased risk of

17  non-Hodgkin's lymphoma?

18       A.    Correct, yes.  That is per my

19  report, yes.

20       Q.    Do you know from your review of

21  the literature whether that relationship is

22  more pronounced with any particular subtype

23  of non-Hodgkin's lymphoma?

24       A.    Well, diffuse large B-cell

1  lymphoma is the most common type; so that

2  one has been studied the most and reported

3  most often.

4      Q.   And let me drill down on that

5  answer just a little bit --

6      A.   Sure.

7      Q.   -- because if we go down to sort

8  of when we were talking about the concept of

9  incidents being recurrence per, let's say,

10  hundred patients.

11      A.   Okay.

12      Q.   Are you saying that DLBCL, just

13  because it's the most common subtype, is

14  most commonly reported, or are you saying

15  that the incidence in patients with DLBCL is

16  greater than the incidence in patients with

17  other subtypes of NHL?

18      A.   The former, the first one you said

19  that it's more commonly reported.

20      Q.   So you have no basis to say that

21  DLBCL -- there's a greater risk associated

22  with DLBCL versus other types other than

23  frequency in which those occur?

24      A.   Well, I'm not sure.

1        Q.    Okay.

2              We'll come back to that, talk

3    about that in a little more detail later

4    when we talk about Mr. Thomas.

5        A.    Sure.

6        Q.    You also have a statement in there

7    that says there's an increased risk related

8    to geographic location?

9        A.    Yeah.   There has been literature

10   that certain regions may have more, higher

11   incidence of one lymphoma --

12             (Reporter clarification.)

13       A.    (continuing) Type of one level of

14   non-Hodgkin's lymphoma or others.   I'm not

15   intimately familiar with the geography, but

16   I've read in general terms that that has

17   also been a risk factor.

18       Q.    Do you know what regions --

19       A.    I do not.

20       Q.    Do you know whether the geographic

21   regions that tend to be associated with

22   higher rates of lymphoma apply to

23   Mr. Thomas?

24       A.    Can you ask that again?   I'm not

1  sure what you're --

2      Q.   Yes.

3           So -- well, where does Mr. Thomas

4  live; what's your understanding?

5      A.   So for that, I'll have to refer

6  back to my reports.

7      Q.   Sure.

8      A.   Since there's multiple cases; so

9  he's lived -- according to my report, he's

10  lived in multiple properties in various

11  regions.  So I'm not sure if any of those

12  regions are -- have a higher incidence.

13      Q.   How would you -- if you wanted to

14  research that issue, how would you go about

15  researching it?

16      A.   Multiple ways.  You look at the

17  literature.  You look at review papers in

18  the literature, and you -- I suppose you may

19  even consult with a local expert on, you

20  know, toxicology or epidemiology who knows

21  that particular region.

22      Q.   Are there any other established

23  causes and risk factors for the development

24  of NHL that we haven't discussed?

1    A.   Well, let me look back at my

2  report if I mentioned just to jog my memory.

3    Q.   Sure.

4    A.   So, you know, obviously there's

5  also pesticide exposures have been

6  associated; and, obviously, that's pertinent

7  to Mr. Thomas' case.

8    Q.   Well, so is -- and that goes back

9  to the way my question was worded.

10    Is pesticide exposure generally

11  accepted in the medical and scientific

12  community as a cause of non-Hodgkin's

13  lymphoma?

14    MR. SILVERSTEIN:  Object to the

15    form.

16    A.   I would say that there are some

17  references, some literature I reviewed that

18  added it as a risk factor.

19    Q.   Okay.

20    My question is, do you have an

21  understanding of whether there's a general

22  consensus in the oncology community about

23  whether pesticides are a cause or even a

24  risk factor for non-Hodgkin's lymphoma?

1    A.   I'm not an expert in all

2  pesticides or pesticides as I mentioned;

3  but, again, there's literature to say that

4  pesticides -- and maybe that literature is

5  being too broad -- but that pesticides are

6  associated with as a risk factor for

7  non-Hodgkin's lymphoma.  But whether it's

8  accepted, I don't know if others accept

9  that.

10    Q.   Have you ever seen pesticide

11  exposure listed in a textbook as a cause of

12  non-Hodgkin's lymphoma?

13    A.   I don't recall.

14    Q.   So just in general about your

15  report?

16    A.   Yes.

17    Q.   Exhibit 1, does this -- when you

18  prepared this, did you attempt to include

19  all the opinions you intend to offer at the

20  time of trial?

21    A.   I attempted to.  There may be

22  others if new information becomes available.

23    Q.   And are you prepared to offer all

24  the opinions that are included in Exhibit 1

1  under oath at the time of trial?

2       A.   Yes.

3       Q.   Did you also attempt to include in

4  your report an explanation of the basis of

5  the opinions you intend to offer?

6       A.   Yes.

7       Q.   Are you awaiting any additional

8  information at this time?

9       A.   No, sir, not to my knowledge.

10      Q.   So as we sit here today, is your

11  report complete?

12      A.   What do you mean by complete?

13      Q.   Is -- you're not waiting for any

14  additional information; there are no

15  additional opinions that needed to be added

16  to it?

17      A.   Well, I've -- since the report, I

18  received the defense expert's information.

19      Q.   Okay.

20      A.   I've also received the plaintiffs'

21  other experts, toxicologists, I believe it

22  was, and pulmonologists and rheumatologists

23  for various of these cases.  That could shed

24  light on some of those, so I didn't review

1   those because they weren't available at the

2   time of the report.

3        Q.   Okay.

4             Well, let me ask you this, as of

5   the time before you received those pieces of

6   information, did Exhibit 1 contain all of

7   the opinions you intended to testify about

8   at trial?

9        A.   Yes, sir.

10        Q.   So have you reviewed -- let me

11   just back up.  I think you identified that

12   you received the report of Dr. Grinblatt and

13   Dr. Woda; is that --

14        A.   For the Thomas case, yes.  Let me

15   just tell you the correct -- yes, it's Dr.

16   Woda and Dr. Grinblatt.

17        Q.   Have you already reviewed those?

18        A.   I've had the chance to read

19   through them within the past about a week or

20   so since I've received them.  I could

21   probably benefit from a little bit more time

22   to review them; but I've had a chance to

23   review them, yes.

24        Q.   And when you alluded to the

1  pulmonologist report, I believe you probably

2  talked to me about Dr. Metersky, right?

3      A.   Yes.  That's correct.

4      Q.   In the Spector case?

5      A.   Yes, that's correct.

6      Q.   And when you're talking about the

7  rheumatologist, you're talking about Dr.

8  Teitel in the Savory case?

9      A.   That's correct.

10     Q.   Apart from those two, are there

11 other experts on behalf of the plaintiff?

12     A.   There is also Dr. Kendall.

13     Q.   Dr. Kendall.  And what does Dr.

14 Kendall do?

15     A.   I have the report here.  I just

16 want to get his title correct.  He's the

17 Director of Institute of Environmental and

18 Human Health and Department Chairman of the

19 Department of Environmental Toxicology at

20 Texas Tech University.

21     Q.   Okay.

22     A.   Is that sufficient?

23     Q.   Yes.

24          Have you read Dr. Kendall's

1  report?

2       A.   I did.

3       Q.   Did you read that since you

4  prepared your report?

5       A.   After I reviewed my report.

6       Q.   After you submitted --

7       A.   I submitted my report; and then I

8  read this, yes.

9       Q.   Did you ask for that, or was that

10  just provided to you?

11       A.   It was provided to me.

12       Q.   And does Dr. Kendall's report

13  change your opinions in any way?

14       A.   No, sir.

15       Q.   Are you relying on Dr. Kendall's

16  report for any reason?

17       A.   Am I relying on Dr. Kendall's

18  report?  I think it's helpful to have an

19  expert of his caliber to review the case; so

20  if that's what you mean by relying, yes.

21       Q.   Is there anything that you're

22  looking to him to say that you're not

23  prepared to say yourself?

24            MR. SILVERSTEIN:  Objection to the

1    form.

2        A.   Well, reading his report, he

3    provides expertise in dose estimates in

4    toxicology that -- or even the landscape,

5    you know, that I did not go into great depth

6    in my report and don't claim to be an expert

7    in; so I would rely on that information,

8    yes.

9        Q.   So you didn't perform any

10   estimates of the dose of glyphosate received

11   by Mr. Thomas; is that right?

12       A.   Well, I focused more on the

13   duration of exposure than the dose.

14       Q.   You focused on the length of time

15   in which he says he used the product?

16       A.   I agree with that, yes, correct.

17       Q.   You have no information about how

18   much actual dermatologic exposure he had,

19   correct?

20       A.   By dermatologic exposure, you mean

21   the quantitative dose or just over how much

22   time or --

23       Q.   I'm talking about how much he got

24   on his skin over the course of time he used

1  it.

2      A.   Outside of what he described in

3  his deposition, I think it was a cover sheet

4  too, I don't know.

5      Q.   You have no information about his

6  internal dose of glyphosate, if any?

7          MR. SILVERSTEIN:  Objection to the

8      form.

9      A.   I don't know how that would be

10  assessed, but it hasn't been provided to me.

11      Q.   And did you do any kind of

12  calculations or estimates of either absorbed

13  dose or internal dose with respect to

14  Mr. Thomas?

15      A.   No, I did not.

16      Q.   And those are things that Dr.

17  Kendall talks about in his report?

18      A.   I believe he mentions that in his

19  report, yes.

20      Q.   Do you have reports from Dr.

21  Kendall in each of the three cases?

22      A.   I believe I do.  Let me just

23  verify that.

24      Q.   Sure.

1        A.    I don't want to confuse the three

2   cases.  So that was Thomas, Savory; and I

3   believe it's also in Spector as well, but

4   let me just verify.  Yes, it's in Spector as

5   well.

6        Q.    So based on -- let's just talk

7   about the Thomas case.

8             Based on having reviewed Dr.

9   Kendall's report, did you need to make any

10  changes or amendments to your report, which

11  is Exhibit 1?

12       A.    Let me just review the report

13  again just to jog my memory if there was

14  anything specific that I recall.

15       Q.    Sure.

16       A.    No.  There's nothing else to

17  addend.

18       Q.    When's the last time you read your

19  report which is Exhibit 1?

20       A.    Well, I read it today; but before

21  this, I've read it in the past week.

22       Q.    And when you last reviewed it, did

23  you see anything that you thought needed to

24  be changed or corrected to make it accurate?

1      A.   There may have been slight

2  typographical errors here and there that I

3  can correct, but I think it was a reference

4  or two that didn't get through my reference

5  maker.  Otherwise, not to my knowledge.

6      Q.   Okay.

7           What references -- we'll talk

8  about that in a second.

9      A.   Okay.

10     Q.   Do you have any plans to submit

11 the opinions in Exhibit 1 for publication?

12     A.   No, sir.

13     Q.   Did you write this report which is

14 Exhibit 1?

15     A.   Yes, sir.

16     Q.   Did you have anyone else assist

17 you in the preparation?

18     A.   No, sir.

19     Q.   When you alluded to Dr. Grinblatt

20 and Dr. Woda, are there issues raised in

21 their report -- well, having read their

22 report, do you feel the need to amend or

23 supplement your report?

24     A.   There may be a need to amend it

1  with counterarguments to their assessment,

2  but it doesn't necessarily change the thrust

3  of my report.

4      Q.   Okay.

5          What additional things would you

6  need to add in response to Dr. Grinblatt's

7  report?

8          MR. SILVERSTEIN:  Objection to the

9      form.

10     A.   It's a little bit different to

11 answer that in general because I really

12 would have to look one by one at the report,

13 but I can try to just quickly flip through

14 it.  For example -- let me just go through

15 this.  This is Dr. Grinblatt's report.

16 Really I'm talking about, you know, any

17 difference of opinion in their conclusions

18 of different literature; but, again, I would

19 have to do that in a more granular detail.

20 I think we have just differing opinions

21 about the weight of different literature.

22     Q.   With respect to the relationship

23 between glyphosate and non-Hodgkin's

24 lymphoma?

1          A.    Correct.

2          Q.    Any other issues?

3          A.    Let me just take another look

4    because I think I recall perhaps in the

5    exposures or, you know, other potential risk

6    factors because he mentions about hepatitis

7    C virus.

8                MR. SILVERSTEIN:  Take your time,

9          Doctor.

10         A.    Sure, sure.

11               Yeah, I mean, I think that's to

12   mean the difference of opinion in assessing

13   the literature and the association.

14         Q.    Is there an issue concerning

15   hepatitis C in Mr. Thomas' case?

16         A.    I don't believe so.  I don't

17   believe he had a history of hepatitis C.

18         Q.    With respect to Dr. Woda's report,

19   do you plan to amend or supplement your

20   report to address anything in Dr. Woda's

21   report?

22         A.    Again, the difference in

23   viewpoints on the literature.  And let me

24   just have another look.

1    Q.    Sure.  Take your time.

2    A.    Thank you.

3    Q.    So we calculated a slightly

4  different -- or we assessed a slightly

5  different BMI, body mass index at different

6  times; so I may have to addend my report to

7  reflect the BMI that he assessed or I

8  assessed.

9    Q.    So where in your report is BMI --

10    A.    This is Dr. Woda's report on page

11  20.

12    Q.    Okay.

13          I was actually asking with respect

14  to your report though.  Where is your BMI

15  assessment with respect to --

16    A.    That's on -- this is exhibit.

17    Q.    Exhibit 1.

18    A.    Yes.  This is the actual exhibit.

19  So that's on page eight.

20    Q.    Okay.

21    A.    Part B.

22    Q.    Okay.

23          Well, you say in your report that

24  he is noted to be obese prior to his gastric

1  lap band in 2004, correct?

2       A.   Yes.

3       Q.   And you said earlier that you

4  defined obese to be a BMI of 30, above 30?

5       A.   That's correct.

6       Q.   Thirty or above?

7       A.   Thirty, that's correct.

8       Q.   Now, he had a BMI over 30 for a

9  long time after 2004, correct?

10      A.   Correct.

11      Q.   I mean --

12      A.   Yes, correct.

13      Q.   Is there a time where he didn't

14  have a BMI over 30 that you're aware of?

15      A.   I'm not aware.  Yeah, I would have

16  to look back; but I'm not aware.

17      Q.   You have in here by the way that

18  obesity is associated with chronic low grade

19  inflammation specific in immune modulations

20  including changes in inflammation and

21  predisposed to non-Hodgkin's lymphoma.

22      A.   (Witness nods head.)

23      Q.   What are those changes?

24      A.   You know, I don't think we know

1    exactly the details.  Just general

2    alteration of the immune system.

3        Q.   Okay.

4             But in terms of -- is what you're

5    saying here that this isn't just a

6    statistical relationship, that there also

7    are mechanistic data that will explain why

8    obesity can increase the risk of NHL?

9        A.   What do you mean by mechanistic?

10       Q.   You're talking about chronic low

11   grade inflammation.  Chronic low grade

12   inflammation is something that can cause

13   non-Hodgkin's lymphoma, right?

14       A.   Well, it can be a risk factor for

15   it and potentially cause it; so there may be

16   studies in animals where they've looked at

17   obese animals, but I'm not intimately aware.

18       Q.   But your point in including that

19   sentence is that you're saying that there's

20   a pathway by which obesity may cause -- may

21   predispose to non-Hodgkin's lymphoma?

22            MR. SILVERSTEIN:  Objection to the

23       form.

24       Q.   That's your words.  I mean, may

1  predispose to non-Hodgkin's lymphoma,

2  correct?

3      A.   May predispose, yes.

4      Q.   So when were you first contacted

5  about these cases?

6      A.   That I believe was in March of

7  this year.

8      Q.   And by whom were you contacted?

9      A.   Well, I was contacted, I suppose

10  it's through the retaining counsel here; but

11  it is through the Expert Institute.

12      Q.   And what is the Expert Institute?

13      A.   I believe they're a company that

14  links individuals who have expertise in

15  different areas with attorneys like

16  yourselves who are looking -- or more

17  perhaps others, I'm not sure.  Other

18  specialties that are looking for an expert

19  to help them with something.

20      Q.   So it's, like, an expert

21  consulting service for lawyers?

22      A.   And perhaps other specialties, I'm

23  not sure; but I believe that lawyers use us

24  the most.

1          Q.    That's your understanding?

2          A.    Yes.

3          Q.    And does the Expert Institute

4    advertise to your knowledge?

5          A.    I don't know if they explicitly

6    advertise.  I know that once I signed up, I

7    received, you know, emails from them about

8    various things; but I don't know if they

9    advertise on different platforms.

10         Q.    Do you know whether they've ever

11   advertised your services as an expert?

12         A.    I don't know if if they've

13   advertised it outside of their own website

14   to offer, you know, experts in various

15   categories.  I don't recall signing anything

16   releasing permission to advertise me in some

17   way for their own benefit.

18         Q.    Have you ever looked on their

19   website to see whether you're listed?

20         A.    I believe I have.  I am listed

21   there, yes.

22         Q.    Do they have a picture and a

23   biography, or how does it work?

24         A.    I upload my CV and some of my, you

1    know, basic information about who I am and

2    what I do.

3         Q.   And so how does the arrangement

4    with the Expert Institute work?  They

5    just -- do they get a fee for making the

6    connection; or do they take a portion of the

7    amount that you bill or what's the

8    arrangement, if any?

9         A.   To be honest, I don't know what --

10   I assume they have to make money somehow;

11   and I assume it comes from the people

12   seeking an expert paying some amount to be

13   able to identify an expert, but I don't

14   really know.

15        Q.   Do they bill for your time, or do

16   you bill for your time directly?

17        A.   Once the retaining counsel

18   establishes a retainer, which is not always

19   on paper, just retains the expert, the

20   billing is done through the parties, not

21   through the Expert Institute.

22        Q.   And for how long have you been

23   affiliated with the Expert Institute?

24        A.   I can't give you an exact

1   estimate, but I would say it's around two

2   years.

3        Q.   How did you originally -- how did

4   they get onto your radar screen?

5        A.   Sure, sure.  So various ways.  So

6   one was I was offered an opportunity to do

7   expert witness work through a colleague who

8   introduced me to this field.  Another way

9   was through lectures, biomedical doctors who

10  served as experts and talked about what this

11  is all about.  I took it upon myself to

12  explore different avenues to get into this

13  line of work.

14       Q.   You heard lectures by doctors who

15  have served as experts talking about the

16  benefit of being an expert witness?

17       A.   Not necessarily the benefit, but

18  the ins and outs, the responsibility of it,

19  all of those things.

20       Q.   And was that a public lecture?

21       A.   I believe it was a grand rounds.

22       Q.   At NYU Langone?

23       A.   Yeah.  Well, at my site in

24  Mineola, yes.

1    Q.   Was it put on by a number of

2 different people or one particular speaker?

3    A.   It was in the -- you know, a year

4 or two ago.  It was one speaker.  I don't

5 remember the name of the speaker, but it was

6 just one speaker.

7    Q.   Was it a faculty member at NYU?

8    A.   No, it was not.

9    Q.   So after hearing the lecture, how

10 did you then come to be connected with the

11 Expert Institute?

12    A.   Well, I don't know if that was

13 before.  I don't recall if that was before

14 or after I was already connected with them.

15 I think the lecture, if anything, just

16 reminded me of the responsibility of this

17 position and didn't necessarily motivate me

18 one way or another to connect with the

19 Expert Institute.

20    Q.   But how did you make the initial

21 connection with the Expert Institute?

22    A.   I don't recall.  I believe I just

23 signed up looking for different avenues for

24 getting involved.

1          Q.   Like, online you went to their

2   website?

3          A.   I -- may have just been a Google

4   search looking for expert witness work, and

5   I've seen which avenues people used.

6          Q.   Coming back to this case, so you

7   were first asked by somebody from the Expert

8   Institute whether you would be interested in

9   consulting in this case?

10         A.   I believe the first thing they do

11  is send a message saying whether you have

12  conflicts with anybody involved in the

13  party, and that's a hard stop.

14         Q.   Okay.

15         A.   And then if you don't, then they

16  establish a phone call introducing me, the

17  expert, to the, you know, retaining counsel

18  who's looking for the expert.

19         Q.   Okay.

20              So I'm assuming you had no

21  conflicts, and so you had a phone call with

22  counsel for plaintiff?

23         A.   Correct.

24         Q.   Mr. Silverstein?

1      A.   Yes, sir.

2      Q.   And when was that, sir?

3      A.   I believe that was around March of

4  this year.

5      Q.   Okay.

6      A.   Shortly after that.

7      Q.   And were you -- had you ever

8  worked with him previously?

9      A.   No, sir.

10     Q.   At the time you were originally

11 retained, had you already -- did you already

12 have an opinion about whether glyphosate or

13 Roundup caused non-Hodgkin's lymphoma?

14     A.   No, sir.

15     Q.   Prior to the time you were

16 retained as an expert, had you ever read any

17 articles in the medical literature

18 concerning glyphosate and non-Hodgkin's

19 lymphoma?

20     A.   Not that I recall, no.

21     Q.   When's the first time to your

22 recollection that you ever heard about a

23 possible association between Roundup and

24 NHL?

1        A.    For this case or these cases?

2        Q.    So before becoming involved in

3   this litigation, it's fair to say you never

4   read an article in the medical journal or

5   heard a presentation at a medical meeting in

6   which the author or the speaker took the

7   position that glyphosate or Roundup caused

8   non-Hodgkin's lymphoma, correct?

9        A.    Yes, correct.

10       Q.    And were you -- what was your

11  understanding of your initial assignments in

12  this case and by this -- let me back up.

13            Because there's three different

14  cases and there are some general issues, I'm

15  going to try to parse this out in a way that

16  makes sense.

17       A.    Sure.

18       Q.    So were you retained in all three

19  cases at the same time?

20       A.    Yes, I think so.

21       Q.    You were asked to look at all

22  three cases?

23       A.    Yes.

24       Q.    So I would understand that there

1  are some general issues, for example, the

2  literature relating to glyphosate and

3  non-Hodgkin's lymphoma that have

4  applicability to all three cases, right?

5      A.  Yes.  That's fair to say, yes,

6  sir.

7      Q.  And then there are individual

8  issues within each case concerning, you

9  know, the plaintiff's condition and the

10 plaintiff's prognosis, things that are

11 potentially alternative causes; is that

12 fair?

13     A.  Yes.  No two cases are necessarily

14 the same.

15     Q.  So what was your understanding of

16 your initial assignment with respect to

17 these cases?

18     A.  I was asked to opine -- well,

19 first actually I was asked to summarize the

20 facts of the case, the medical --

21     Q.  Let me interrupt you one second.

22 So I'm trying to get an understanding of

23 what you understood your assignment to be,

24 but there's a privilege I don't want to

1    intrude on here, --

2         A.   I see.

3         Q.   -- which has to do with the

4    communications between you and

5    Mr. Silverstein are protected.  So I'm just

6    interested in your understanding of the your

7    assignment, not necessarily what was said

8    back and forth, okay?

9         A.   I guess I'm not sure then what you

10   mean by assignment.  Can you be a little bit

11   more specific?

12        Q.   Well, what is your understanding

13   of what your task was?

14        A.   I was going to prepare reports

15   summarizing the case and then determining

16   whether or not I felt that glyphosate or

17   Roundup in this case, in these cases, played

18   a role in the development of non-Hodgkin's

19   lymphoma.

20        Q.   Okay.

21             And I'll represent that

22   Mr. Silverstein provided me with an invoice

23   that we're going to mark as an exhibit, but

24   the invoice also contains an entry for

1  document review for reports for settled

2  cases; and I'm not going to ask you about

3  those cases, but were there additional cases

4  in addition to these three that you

5  originally looked at?

6        A.    Yes, sir.

7        Q.    And so there originally were five

8  cases?

9        A.    Yes, sir.

10       Q.    So you prepared summaries and made

11  your determination in each of these -- each

12  of these cases about whether or not Roundup

13  played a role; is that right?

14       A.    I don't recall what happened with

15  the other two cases since it was much -- it

16  was settled much earlier; but in these three

17  cases, yes, you have my reports.

18       Q.    So when you're talking about

19  summaries, the summary is the report that

20  you're alluding to?

21       A.    That's what I understand by

22  summary, yes.

23       Q.    So how did you go about -- let me

24  back up.

1          Were you provided by counsel with

2   specific medical literature regarding these

3   issues?

4          A.   I was not provided with primary

5   literature.  That was entirely done by

6   myself.

7          Q.   So as I understand, you haven't

8   heard about this alleged relationship

9   between Roundup and NHL previous to your

10   retention, right?

11          A.   I was not familiar with the

12   intricacies of the literature, no.

13          Q.   Well, I think you said you never

14   read anything about it.

15          A.   Right.  So I wasn't familiar

16   myself.

17          Q.   How did you go about educating

18   yourself about the relationship between

19   glyphosate and non-Hodgkin's lymphoma?

20          A.   So I looked at the literature like

21   I would do for anything in a patient's

22   medical history and reviewed -- I started

23   with some review papers just reviewing the

24   topic.  I looked at some of the references,

1   you know, most of the references listed in

2   my reports that are not specific to general

3   things about non-Hodgkin's lymphoma; and I

4   read, you know, some of the primary studies

5   examining the pretty broad literature on

6   examining this very topic.

7       Q.   So when you said you looked at

8   some review papers, do you know what you

9   looked at first?

10      A.   Well, first I looked into

11  literature on, you know, what is glyphosate.

12  What is, you know, what is Roundup and why

13  are the two associated with one another just

14  to orient myself.

15      Q.   Before getting involved in this

16  litigation, had you ever even heard of

17  Roundup?

18      A.   I did, yes.

19      Q.   In what context?

20      A.   Well, it's been in the popular

21  press of recent times.

22      Q.   I see.

23      A.   But not in a way that's, you know,

24  professional.  Just hearing about it.

1      Q.   All right.

2           And so you educated yourself about

3  what glyphosate is and what Roundup is?

4      A.   At a basic level, yes.

5      Q.   And then what did you do after

6  that?

7      A.   Then I -- well, then I read the

8  cases, you know, I read the cases at that

9  time; and then I looked at the literature to

10  support or refute the association with

11  non-Hodgkin's lymphoma.

12      Q.   So when you say you read the

13  cases, you were referring to the plaintiff's

14  medical records?

15      A.   Yes.  Not necessarily in that

16  order.  I think I looked at the records

17  first; and then to make the leap to

18  understand the interpretation of the

19  association of glyphosate and NHL, I turned

20  to the literature.

21      Q.   And with respect to the literature

22  on glyphosate and NHL, how did you approach

23  that?  Did you do a Medline search as a

24  first step?

1          A.    Yes.  I used PubMed to look at the

2    various studies.  There's thousands and

3    thousands of papers.  I looked at various

4    elements of the literature, whether it's the

5    epidemiology, whether it's the, you know,

6    animal studies, et cetera; and I also looked

7    at papers that took an opinion one way or

8    the other and saw what their viewpoints

9    were.  And some of those I listed in my

10   reports.

11         Q.    So are -- and I want to come back

12   to this more systematically later.

13         A.    Of course.

14         Q.    But I think we've already talked

15   about materials that you looked at either

16   prior to your report or since your report

17   with respect to other experts' opinions,

18   right?

19         A.    Yes.  That's correct.

20         Q.    The ones that you looked at for

21   form, and then the ones you looked at since

22   giving your report?

23         A.    Yes.

24         Q.    And then separately, you've looked

1  at certain medical records of the plaintiff

2  in this case, Mr. Thomas, right?

3      A.   Yes.

4      Q.   And those are reviewed in

5  paragraph three of your report; is that

6  right?

7      A.   I'm sure you have it correctly.

8  Paragraph three of any particular page, page

9  three?

10     Q.   Paragraph three, page three, yes.

11     A.   That's where it starts, yes.

12     Q.   No.

13          But I'm saying the records that

14  are listed there, those are the one --

15     A.   Oh, I'm sorry, the materials

16  reviewed?

17     Q.   Yes.

18     A.   Yes.  That was what was provided

19  to me.

20     Q.   Okay.

21          And is this still an accurate

22  summary of what you've looked at that

23  provides information about Mr. Thomas' case

24  specifically?

1      A.   Well, these are the records that I

2  reviewed.  I haven't reviewed anything else.

3      Q.   Okay.

4           Now, did you review any of the

5  plaintiff fact sheets?

6      A.   If it was listed here for that

7  particular individual, then I reviewed it.

8  I think there was one that may have been the

9  Thomas case that did not have that included.

10     Q.   Okay.

11          So you didn't review a fact sheet

12  for Mr. Thomas?

13     A.   If it's not listed here, I did not

14  review it.

15     Q.   Did you review deposition

16  transcripts of any of the treating doctors?

17     A.   Only if it's listed; so for the

18  Thomas case if it's not listed, I did not

19  review it.  Only of the individual of

20  Mr. Thomas and his wife.

21     Q.   So all the plaintiffs' specific

22  materials are in paragraph three?

23     A.   Yes.

24     Q.   We already talked about the

1    information in paragraph two; and then at

2    the end of your report are a series of

3    references, correct?

4         A.   Yes.  It starts on page -- on page

5    14.

6         Q.   And goes to page 19, right?

7         A.   That's correct, yes.

8         Q.   And is this a totality of the

9    studies and other materials that you

10   reviewed in connection with your opinions in

11   the Thomas case?

12        A.   For the report, yes.  There may

13   have been other papers that were listed in

14   the defenses reports that I glanced at; but

15   for the report, yes, these are the papers.

16        Q.   So as of the time of issuing your

17   report, these references from page 14 to 19

18   are the sum total of the studies and

19   materials that you had looked at; is that

20   right?

21        A.   Yes.

22        Q.   Do you recall when you did your

23   literature search, what search terms you

24   used?

1        A.   I mean, I recall some of them.

2   Obviously, I used glyphosate, Roundup,

3   non-Hodgkin's lymphoma, the various types

4   either marginal zone lymphoma or DLBCL; and

5   then once I read the literature, then my

6   search may have expanded, you know, for case

7   control, cohort, epidemiology, animal

8   studies.  But, you know, the initial search

9   was more broad.  It was more general.

10       Q.   So with the initial studies, you

11  looked at principally epidemiology studies?

12       A.   Yes, yes, sir.

13       Q.   That was your starting point?

14       A.   Well, my starting point, you know,

15  was partly that.  I mean, I looked at -- I

16  was led down a path to look at the major

17  literature that's referenced such as the

18  IARC report, DHS.

19           (Reporter clarification.)

20       A.   (continuing) I'm sorry, IARC.

21  That seemed to be the ones that were most

22  referenced to in the literature and those

23  contain -- well, the IARC report contains

24  some animal studies or other studies within

1    it.

2         Q.   So did you actually review the

3    original IARC report?

4         A.   Yes.  And I have it.  I believe I

5    have it as one of my references.

6         Q.   Okay.

7              And did you read the entire

8    section of glyphosate?

9         A.   I only read the section on

10   glyphosate.

11        Q.   So when I say the entire section

12   though, so let me back up.  The document

13   you're talking about is called the

14   Working -- it was called the 112 Working

15   Group?

16        A.   The monograph.

17        Q.   The monograph?

18        A.   Yes.

19        Q.   And that Working Group actually

20   during that meeting evaluated five different

21   pesticides; is that your understanding?

22        A.   There were other -- I don't know

23   if you called them chapters; but you're

24   correct.  I agree there were other parts,

1    yes.

2          Q.   And one of the five was

3    glyphosate?

4          A.   Yes.

5          Q.   Okay.

6               And so couple of things.  One is,

7    IARC divides their discussion into different

8    subsections, agreed?

9          A.   I don't recall exactly, but there

10   were different -- they started out a little

11   bit more general about glyphosate and then

12   talked about specific, you know, studies.

13         Q.   They provide some background

14   information, then they separately talk about

15   human epidemiological studies; and they talk

16   separately about animal studies; they talk

17   separately about mechanistic studies, and

18   then they have some discussion about

19   exposures.  Is that consistent with your

20   recollection?

21         A.   Yes.  And they have some tables

22   included in that.  I can look back in the

23   report, but that's what I remember.

24         Q.   And, actually, IARC's report was

1 not just referring to non-Hodgkin's

2 lymphoma; it was looking at cancer overall,

3 right?

4      A.   I don't recall if it looks at

5 cancer overall.  I focused primarily on the

6 parts of non-Hodgkin's lymphoma.

7      Q.   Did you for lack of a better term

8 get into the weeds on the animal studies and

9 review the details of rodent studies and

10 genotox studies.  Did you review all of that

11 detail, or did you just look it over

12 quickly?

13           MR. SILVERSTEIN:  Objection to the

14      form.

15      A.   I reviewed it to the extent that I

16 wanted to see what other papers were

17 referencing to because what's so interesting

18 about this literature is that different

19 bodies place different emphasis on different

20 parts of it, and so my understanding of

21 the -- we'll call it the IARC is that they

22 incorporated, you know, those -- I may call

23 them free clinical studies; but they

24 incorporate these animal studies and, you

1   know, cell studies, cell genotoxicity

2   studies and place emphasis on that, I

3   believe, to make that conclusion.  So

4   although I didn't go into every study

5   because there are so many, I understood what

6   they were looking at in that context.

7        Q.   And then did you look at -- so you

8   reviewed what IARC had to say about the

9   animal studies they reviewed; is that what

10  you're saying?

11       A.   Yes.

12       Q.   Did you go back yourself and look

13  at any of the animal studies themselves

14  apart from hearing what IARC had to say

15  about them?

16       A.   No.  I didn't go to each

17  individual study, no.

18       Q.   And with respect to the

19  mechanistic studies, did you go back and

20  look at original mechanistic studies on

21  genotoxicity; or did you just review what

22  IARC had to say about genotoxicity?

23       A.   Well, not just IARC.  Other

24  analyses and reviews had within it reference

1  to some of those studies, and I familiarized

2  myself with what they meant by genotoxicity

3  or oxidative stress as I understood it; but

4  I didn't go back to every individual study

5  to look at methodology in the weeds, I think

6  you called it, details, yes.

7      Q.   So what other reviews are you

8  alluding to besides IARC with respect to

9  genotoxicity?

10     A.   There's a study, I believe, in my

11  references by Portier.

12     Q.   Portier?

13     A.   Yes.  That's reference 58 on page

14  19 of the Thomas report.

15     Q.   And do you know who Dr. Portier

16  is?

17     A.   I've heard his name mentioned

18  several times.  I don't recall what his

19  position was.

20     Q.   What's the date of publication of

21  whatever were referenced here?

22     A.   Of this reference?

23     Q.   Yes.

24     A.   2016.

1      Q.   Are you aware that Dr. Portier is

2  an expert witness on behalf of plaintiffs in

3  the Roundup litigation?

4      A.   I'm not aware.

5      Q.   This publication that you alluded

6  to, number 58, is entitled Differences in

7  the Carcinogenic Evaluation of Glyphosate

8  Between the International Agency for

9  Research on Cancer (IARC) and the European

10  Food Safety Authority (EFSA), correct?

11      A.   Yes, sir.

12      Q.   And your understanding of what

13  he's talking about there, is it your

14  understanding that EFSA reached a different

15  conclusion than IARC?

16      A.   Yes, sir.

17      Q.   And what Dr. Portier is explaining

18  in this paper is his view of why the

19  conclusions of these two organizations were

20  different?

21          MR. SILVERSTEIN:   Objection to

22      form.

23      A.   I assume as the author of this

24  paper that he put in his perspective on the

1  literature.

2       Q.   So when I asked you whether

3  there's any other references you're relying

4  on, you alluded to Dr. Portier's and you

5  cited number 58.

6            Are there any other references

7  that review the details of genotoxicities

8  testing that you're relying on other than

9  IARC's monograph?

10      A.   Can I look at the references?

11      Q.   Yes.  Take your time.  Absolutely.

12      A.   Let's see (perusing).  Actually,

13  it's probably better to start from the end

14  of the references since more of the

15  discussions are towards the end.

16           So, you know, the reference 56,

17  the Benbrook Reference, also alludes to what

18  Dr. Portier talks to about, the difference

19  in reaching conclusions and does address

20  some of the weight that they placed on

21  different elements of the genotoxicity

22  studies.  The EPA report also, I believe

23  that's Reference 55, talks about some of the

24  genotoxicity.  Going back, the ones on page

1   18 are mostly the reviews meta-analyses and

2   clinical data; so, again, Reference 43 by

3   Portier is a comprehensive analysis of the

4   animal carcinogenicity data.  That's

5   Reference 43 on page 18.  And Reference 42

6   by Lioi, L-I-O-I, about cytogenetic damage.

7        Q.   So let me just interrupt you for a

8   second and I'll come back and give you a

9   chance to finish your answer, but number 42

10  is actually original research; is that

11  right?

12       A.   Fair enough, yes.  That is a

13  primary study.

14       Q.   That's a primary study?

15       A.   Yes, that's correct.  That's right

16  I was --

17       Q.   The other things you alluded to

18  are essentially reviews of existing work,

19  right?

20       A.   Yes.  That is fair, yes.

21       Q.   I'm sorry.  I interrupted, you

22  were going through this backwards and so --

23       A.   Yes.

24       Q.   -- if you can complete your

1    answer.

2         A.   Yes.  I apologize.  I lost track

3    of the original question.

4         Q.   The original question was, I was

5    asking you whether you had looked at actual

6    genotox data or whether you had looked at

7    IARC; and you said there were a number of

8    review articles that you reviewed, and then

9    you were listing for me which ones they were

10   as we were going through.  And I think you

11   made your way back to what, number 42?

12        A.   Right.  So 41 is another review.

13   It's a reply of the review.  Just remind me

14   again, we're just talking about the

15   genotoxicity right now or in general all

16   types of studies?

17        Q.   Genotoxicity.

18        A.   Just genotoxicity.  I believe the

19   Weisenburger reference, that's 34, touches

20   on genotoxicity in the beginning of this

21   report.  I think those are pretty much -- I

22   think that's pretty much where the rest of

23   the, you know, glyphosate reference is in.

24        Q.   Okay.

1          Is it important to you in -- when

2    you review scientific literature to evaluate

3    whether the author of the publication you're

4    looking at has bias or interest in the

5    subject matter?

6          A.   I think if you want to be

7    thorough, it's important to consider the

8    author's intentions.  I think that all

9    papers, whether it's a review or a primary

10   study may have certain -- I don't know if

11   you want to call them biases or certain

12   perspectives that are weighted based on the

13   author's intentions or opinions, yes.

14         Q.   Would you think if an author is

15   serving as an expert on behalf of a party in

16   litigation and then is publishing a paper on

17   that very subject that there's likely to be

18   bias?

19              MR. SILVERSTEIN:  Objection to

20         form.

21         A.   I wouldn't know what -- not

22   knowing what the author, author's stake in

23   the process is, I wouldn't know what their

24   intentions are; but I think if they were

1    trying to argue for something and they were

2    publishing this paper as their argument in

3    that matter, that they would focus more on

4    the studies that built their argument the

5    the way wanted it to.

6        Q.   So I mentioned Dr. Portier; so two

7    of the papers you referenced were authored

8    by Dr. Portier, correct?

9        A.   Correct.

10       Q.   And he testified I'll represent

11   about a week ago in a case in California on

12   behalf of the plaintiffs.  You also

13   referenced a paper by Dr. Benbrook, right?

14       A.   Yes, sir.

15       Q.   Do you know Dr. Benbrook is an

16   expert on behalf of plaintiffs?

17       A.   Not aware.

18       Q.   He's going to testify this week in

19   trial in California.

20       A.   I understand.

21       Q.   You also referenced number 34, Dr.

22   Weisenburger, right?

23       A.   That's correct.

24       Q.   Do you know Dr. Weisenburger is an

1    expert on behalf of plaintiff --

2         A.   I'm not aware.

3         Q.   Your report, Exhibit 1, doesn't

4    contain any opinion concerning the warnings

5    contained on any Roundup product labels,

6    correct?

7         A.   That is correct, sir.

8         Q.   And you do not intend to offer any

9    opinions on that issue at the time of trial,

10   correct?

11        A.   I suppose if the question is

12   asked, and I'm given ability to examine the

13   label, I would opine on it in some way; but

14   I don't intend to offer that if I'm not

15   asked.

16        Q.   Do you view yourself as an expert

17   in product labeling for pesticides?

18        A.   No, sir.

19        Q.   Have you ever drafted a product

20   label for a pesticide?

21        A.   No, sir.

22        Q.   Are you offering any opinions on

23   the accuracy of Mr. Thomas' diagnosis?

24        A.   When you say the accuracy, are you

1  saying whether or not he had the correct

2  cancer diagnosis?

3      Q.   Yes.

4      A.   To the extent that I reviewed

5  the -- I'm not a pathologist; but to the

6  extent that I'm familiar with those reports

7  in my practice, yes, I would think that that

8  information is critical to making any kind

9  of association for any subsequent opinion on

10  the case if I have the diagnosis wrong, then

11  I can't establish anything else about the

12  case if something is in error like that.

13      Q.   What's your understanding of what

14  Mr. Thomas' diagnosis was?

15      A.   So --

16      Q.   From his treating physicians.

17      A.   Right.  So, again, I'm just going

18  to make sure I have --

19      Q.   As I said, please refer to your

20  report as you need to.

21      A.   Thank you.  Thank you.

22          So his diagnosis was, I believe,

23  it was extranodal diffuse large B-cell

24  lymphoma.

1    Q.   I didn't want to interrupt you.

2  Are you done?

3    A.   Oh, it was extranodal diffuse

4  large B-cell lymphoma, yes.

5    Q.   Do you agree with that based on

6  your review?

7    A.   Yes.  The pathology report that

8  I -- or the data I reviewed from the chart

9  in the records, I agree with that diagnosis.

10    Q.   And do you agree with the stage?

11    A.   Well, I've listed the stage, yes;

12  so that's the stage that I assessed.

13    Q.   Do you know if that's consistent

14  with the stage that they assessed?

15    A.   I don't recall if I reviewed their

16  assessment of the stage in this case, in the

17  notes.

18    Q.   Do you have any opinions

19  concerning the appropriateness of the

20  medical treatment that Mr. Thomas received

21  for his non-Hodgkin's lymphoma?

22    A.   Yeah.  I believe in my report;

23  and, again, I really want to make sure

24  because we're talking about three separate

1  cases that I'm not confused between the

2  cases -- but in page six on Section 3,

3  treatment, or rather page seven at the end

4  of that section, second paragraph on page

5  seven, that it was medically necessary,

6  justifiable so I do agree with that

7  treatment.

8       Q.   Where are you reading from?

9       A.   Sorry.  Page seven, the paragraph

10 that starts with the standard first line

11 regimen and the end of that paragraph.

12      Q.   So what you're saying is, he

13 received what would be used as standard of

14 care for DLBCL?

15      A.   RCHOP, is the standard first line

16 regimen; so, yes, I think this is, could be

17 considered a standard of care.  There may be

18 some mild variations for others depending on

19 their age, functional status, cardiac

20 status; but, yes, I agree.

21      Q.   And you don't have any criticisms

22 of the treating doctors for using RCHOP

23 therapy in Mr. Thomas' case?

24      A.   No, sir.

1        Q.   I'm handing you what I marked as

2   Exhibit 4 (handing).

3            (Whereupon, the aforementioned

4        Defendant Monsanto Company's Notice to

5        Take Oral and Videotaped Deposition of

6        Dr. Marc Braunstein, August 17, 2021,

7        was marked as Braunstein Exhibit 4 for

8        identification as of this date by the

9        Reporter.)

10       A.   Okay.

11       Q.   Have you seen this?

12       A.   Yes.  I believe I have a copy of

13   it.  If nothing has changed between the copy

14    retaining counsel has provided me is --

15       Q.   Third page, it says request for

16   production.

17       A.   Yes, sir.

18       Q.   And it asks you to bring certain

19   documents with you today?

20       A.   Yes.

21       Q.   First it says documents sufficient

22   to show the total amount you billed in

23   connection with your work as an expert in

24   litigation involving Roundup including but

1  not limited to your work regarding plaintiff

2  in this case, correct?

3      A.   Yes, sir.

4      Q.   So I'll represent to you that I've

5  been provided with Exhibit 5.

6           (Whereupon, the aforementioned Dr.

7      Braunstein's invoice was marked as

8      Braunstein Exhibit 5 for identification

9      as of this date by the Reporter.)

10     Q.   And would you identify Exhibit 5

11  for the record, please (handing).

12     A.   Yes.  This is the invoice -- the

13  only invoice that I sent to the retaining

14  counsel.

15     Q.   And let me just see that one

16  second.

17     A.   Sure (handing).

18     Q.   Since we only have one copy.  I'm

19  sorry.

20     A.   Of course.

21     Q.   So it includes a total of 13.5

22  hours totaling $4,725; is that right?

23     A.   Yes.

24     Q.   Okay.

1        And it's dated on June the 29th,

2   2021; is that right also?

3        A.   Yes.  That's correct.

4        Q.   And your reports are all dated on

5   June 25th, 2021, correct?

6        A.   I'll just look at the -- with

7   Thomas I believe they are very similar

8   dates.  Yes, that's correct for Mr. Thomas.

9        Q.   So this would represent the bill

10  for all of the time that you spent working

11  on these cases as of the time you issued

12  your report; is that right?

13       A.   This does not necessarily

14  represent every hour of every minute I spent

15  reading the literature because I did take

16  some time to review it myself and not

17  necessarily bill for that time; but this

18  represents what I considered an estimate of

19  the time I would, you know, require for at

20  least drafting the reports and, you know,

21  including the references.

22       Q.   So you had an initial meeting with

23  Mr. Silverstein to discuss the case that

24  indicates it was in June for half an hour?

Marc J. Braunstein, M.D.

1      A.    That meeting may just have been to

2  talk about --

3      Q.    I don't need to know --

4      A.    I'm sorry.

5            MR. SILVERSTEIN:  What we

6      discussed is off.  He's just asking a

7      general question.

8      A.    Oh, I'm sorry.  If it's billed

9  there on the date, then, yes, we must have

10  had a conversation.  I don't recall exactly.

11      Q.    And then there's four hours billed

12  for your review of two cases Dooley and

13  Wiley, which is indicated as settled cases,

14  correct?

15      A.    Yes.

16      Q.    And that's four hours?

17      A.    Yes.

18      Q.    So did any of the work you did for

19  Dooley and Wiley overlap with your work

20  you're doing for these cases?

21      A.    Well, not necessarily when it

22  comes to the background since they have

23  their own individual medical history; but I

24  don't remember exactly where those reports

1    ended, so they may not have had the same --

2         Q.   I don't need to know that either.

3    I'm just trying to understand, get an

4    understanding of how much time you spent --

5         A.   I'm sorry.  I see.

6         Q.   -- formulating the opinions that

7    you formed in this case.  So --

8         A.   I don't recall then exactly

9    whether it overlapped with those reports.

10        Q.   So you billed a total of nine

11   hours for three cases that we're discussing

12   today and tomorrow, right?

13        A.   Yes.

14        Q.   And that includes the review of

15   their records?

16        A.   Yes.

17        Q.   It includes your review of the

18   medical literature?

19        A.   Some of it.  I mean, I didn't

20   necessarily bill every hour I spent reading

21   articles.  There may have been additional

22   time that was not billed.

23        Q.   So why would you not bill for the

24   time you spent reviewing articles?

1       A.    That's a fair question.  I think

2  that I needed sometime to review the

3  literature myself, and I didn't necessarily

4  bill for that time.

5       Q.    And how much time, what's your

6  best estimate of the amount of time you

7  spent reviewing the medical literature for

8  which you did not bill?

9       A.    It's difficult to answer that

10  question because I don't have a stopwatch,

11  but I was -- many hours.  I can't give you

12  an exact estimate.  Could have been five.

13  Could have been ten hours.  Could have been

14  more.

15       Q.    You think it could have been more

16  than ten possibly?

17       A.    Possibly, yes.

18       Q.    And since Exhibit 5, this was

19  dated at the end of June; and we're now here

20  on August 17th.  What additional time have

21  you spent, let's just start with looking on

22  the Thomas case?

23       A.    So as I mentioned we had the -- I

24  had the opportunity to review the defense's

1  reports and the report by Dr. Kendall; so,

2  again, if you're going to hold me to the

3  exact time, it's difficult.  But if it was

4  also maybe an additional five hours doing

5  that and looking at some of the references

6  that they had, so roughly five hours but --

7      Q.   For the Thomas case?

8      A.   Yes.

9      Q.   Okay.

10          Well, do you keep track of this?

11 I mean, when you go to bill, is there a

12 record somewhere that you look to to make

13 sure that your billing is accurate?

14      A.   Well, I understand how much time I

15 spent at the computer typing up the report

16 but, no.  I wouldn't say there is some

17 record that I'm keeping hour by hour.  Maybe

18 I'm not billing how I should, but that's how

19 I bill.

20      Q.   Is the same true for the other two

21 cases that you spent about five hours per

22 case?

23      A.   I would say probably more.  Some

24 of the defense's reports were a little bit

1  more detailed in a way; so it may have been

2  more, even more hours than that.

3      Q.   So what's your best estimate for

4  the Savory case of how many hours you spent?

5      A.   Between five and ten.

6      Q.   How about for the Spector case?

7      A.   About the same.  Although some of

8  these time may have overlapped.

9      Q.   That's what I was going to ask

10  you.  A lot of these issues deal with

11  general issues that cross over cases, right?

12      A.   Yes.

13      Q.   And so this would include both

14  whatever was related to the individual cases

15  as well as the general issues you're talking

16  about?

17      A.   Yes.

18      Q.   So what's your best total estimate

19  of the number of hours for all three cases,

20  between -- about 20?

21      A.   Maybe around there, yes.  Again,

22  it's hard to give a pinpoint number but

23  maybe around there, yes.

24      Q.   I mean --

1        A.    That's fair.

2        Q.    As you sit here today?

3        A.    That's fair.

4        Q.    And then in addition to that work

5   related to looking at articles and reading

6   reports, did you have additional time

7   spent -- you mentioned you read over your

8   own report.  You had meetings with counsel;

9   any other activities like that?

10            (Reporter clarification.)

11       Q.    (continuing) Have you had any

12  meetings with counsel?

13       A.    We had a meeting with counsel last

14  week just to say what should I bring today,

15  what is this day going to unfold like, you

16  know, what are we going to do because this

17  is my first deposition.

18       Q.    And how long did that last?

19       A.    I believe it was an hour.

20       Q.    And what about time spent doing

21  other preparation; did you go back and

22  reread any studies, reread your report,

23  those kinds of things?

24       A.    I probably included that in the

1    time estimates we went through.

2         Q.   The 20 --

3         A.   Yeah, generally.

4         Q.   Okay.

5              Do you have a retention agreement

6    in this case?

7         A.   I believe so, no.  Nothing on

8    paper.

9              MR. PIORKOWSKI:  I'm probably at a

10        good breaking point if you want to

11        break for lunch at this point.

12             MR. SILVERSTEIN:  Okay.

13             MR. PIORKOWSKI:  Is that all

14        right?

15             THE WITNESS:  Okay.

16             VIDEOGRAPHER:  Time right now is

17        12:17 p.m.  We are off the record.

18             (Whereupon, a short recess was

19        taken.)

20             VIDEOGRAPHER:  Time right now is

21        1:22 p.m.  We are back on the record.

22        Q.   So, Doctor, before the lunch

23   break -- well, actually before we move on,

24   before you move on, is there anything in

1   your testimony from this morning that you

2   need to add to or correct?

3        A.   No.

4        Q.   Before the lunch break, you were

5   talking about Exhibit 4; and we were kind of

6   going through the request for production.

7   Do you remember that?

8        A.   Yes, sir, yes.

9        Q.   And I think we had talked about

10  request number one?

11       A.   That's right.  That's correct.

12       Q.   Then request number two asks for

13  each invoice or bill; and I think that also

14  includes what was produced as Exhibit 5,

15  correct?

16       A.   Correct.

17       Q.   There's been no other invoices or

18  bills thus far, correct?

19       A.   No.  There's been no other

20  invoices.

21       Q.   And the next one is all documents

22  that you'll consider in support of your

23  deposition testimony in this case.  We

24  haven't generally required people to bring

1    the documents with them but do ask that they

2    list them.  Are all of the documents that

3    you intend to rely on in support of your

4    testimony listed in Exhibit 1 under the

5    references?

6         A.   Yes.  In the references and I have

7    them on electronic forms.

8         Q.   Okay.

9              So a couple of questions.  Earlier

10   when I was asking you about genotox studies,

11   you had identified 42, an article by

12   L-I-O-I?

13        A.   Correct.

14        Q.   And as you said, that's a primary

15   research article in genotoxicity; is that

16   correct?

17        A.   Yes.

18        Q.   Are there any other primary

19   research articles in genotoxicity that you

20   looked at?

21        A.   Other than what's in the

22   references, no.

23        Q.   I --

24        A.   Or you want to know --

1      Q.   You can take a look at the

2   references.  I don't know any of them to

3   be -- I'll give you a chance to --

4      A.   Sure.  So that was the primary

5   literature.  I reviewed some of the studies,

6   but that's the primary.

7      Q.   So apart from 42, there's no other

8   primary genotox literature that you

9   reviewed?

10      A.   That's the only one I see

11   referenced.

12      Q.   And the same -- I wanted to just

13   make sure the record was clear with respect

14   to animal studies.  I understand that you

15   reviewed the IARC paper, the IARC Monograph

16   with respect to glyphosate?

17      A.   Correct.

18      Q.   And you also identified a number

19   of review articles that you reviewed as

20   well, correct?

21      A.   Correct.

22      Q.   Apart from those review articles

23   in the IARC Monograph, did you look at any

24   of the underlying animal studies, any of the

1   primary studies?

2       A.   No, I did not.

3       Q.   Couple of other questions.  I

4   think you said that you have reviewed the

5   IARC Monograph; but when I'm looking at the

6   references, I don't see it there.  Am I

7   missing it?

8       A.   So it may not be referenced in

9   here, but in the reference -- the last

10  series of references in the article do

11  allude to it; so you're right.  The original

12  reference is not --

13      Q.   Okay.

14           But for completion purposes, the

15  IARC Monograph should be added to this,

16  correct?

17      A.   Yes.  Fair enough, yes.

18      Q.   Also you're aware that numerous

19  regulatory agencies have looked at the

20  question of whether glyphosate is

21  carcinogenic, correct?

22      A.   Yes.  I'm aware that other

23  regulatory agencies have, yes.

24      Q.   Okay.

1          And I see on your reference list,

2   there's a reference 55 to an ETA evaluation

3   from 2016?

4      A.   Yes.  That's reference 55.

5      Q.   Okay.

6          And did you review that reference?

7      A.   Not in as thorough detail as the

8   IARC Monograph, but I reviewed it.

9      Q.   And is there a reason you didn't

10  review it in as thorough detail as the IARC

11  Monograph?

12      A.   Because the IARC Monograph was

13  a -- basically review of animal studies and

14  epidemiology studies, and I understood the

15  breath of data that was being reviewed; and

16  then the other papers like Portier paper

17  kind of addressed why there were differences

18  between the two analyses.  And from there, I

19  kind of understood what the EPA was looking

20  at differently from the IARC; so it wouldn't

21  have changed my ultimate completion.

22      Q.   What's your understanding of what

23  the EPA -- so wait a minute.  Let me back

24  up.

1          So your understanding of what was

2     different from what the EPA looked at versus

3     IARC came from reading the Portier paper?

4          A.    Well, in part, the Portier and

5     there were others like the Benbrook studies

6     review as well.

7          Q.    Okay.

8          And based on the review of the

9     Portier and Benbrook papers, what's your

10    understanding of the difference between

11    IARC's review and EPA's review?

12         A.    Sure.  So the IARC reviewed only

13    published literature is one of my

14    understanding elements.  They relied, again,

15    as I mentioned before, on genotoxicity

16    studies a little bit more heavily, slightly

17    different genotoxicity studies, different

18    models; and they -- those were the main

19    differences.  And the EPA also relied on

20    unpublished industry-sponsored papers as

21    well whereas the IARC used only the

22    literature that was published.

23         Q.    And because the EPA relied on

24    unpublished industry sponsored studies, do

1  you believe that was entitled to less

2  weight?

3      A.   Entitled to less weight by the

4  EPA.

5      Q.   No.

6      A.   Oh, by my analysis.

7      Q.   By you.

8      A.   I believe that there were

9  different approaches; and, therefore, I

10 relied more on the IARC Monograph to

11 formulate my conclusions.

12     Q.   Do you understand the difference

13 in what the IARC undertook to do and what

14 the EPA undertook to do in terms of their

15 objective?

16         MR. SILVERSTEIN:  Objection to

17     form.

18     A.   Their objective as I understood

19 it, is to assess the carcinogenicity of

20 various pesticides including glyphosate

21 which was the focus of my review.  That's my

22 understanding of the difference of what

23 their intentions were.  What individuals

24 were involved that I don't know the

1  difference -- I didn't look into the

2  differences in terms of who actually was

3  involved.

4      Q.   Do you know the difference between

5  a hazard identification and a risk

6  assessment?

7      A.   No, I don't know -- I don't use

8  those terms in practice.

9      Q.   Do you know what IARC states its

10  own mission is with respect to hazard

11  identification versus risk assessment?

12      A.   I don't.

13      Q.   Do you know what the EPA's task is

14  with respect to hazard identification versus

15  risk assessment?

16      A.   I do not.

17      Q.   Other than the 2016 paper, it's

18  2016 EPA review, which is number 55.

19      A.   Mhm.

20      Q.   Did you look at any other EPA

21  reviews with respect to glyphosate?

22      A.   No, I did not.

23      Q.   Did you look at any reviews

24  conducted by Health Canada?

1        A.    I don't know if it was called

2    Health Canada, but some of the meta-analyses

3    included data from Canada.

4        Q.    You're talking about the McDuffie

5    study?

6        A.    McDuffie.  And I believe it was on

7    Zhang as well.

8        Q.    Zhang included McDuffie.  We're

9    going to talk about that in a second.

10        A.    Right.

11        Q.    But those are actually studies.

12    I'm talking about Health Canada you

13    understand is a regulatory body in Canada

14    similar to the EPA?

15        A.    Correct.  No, not that I recall.

16        Q.    So you didn't look at any Health

17    Canada reviews?

18        A.    Not that I recall.

19        Q.    And there separately have been

20    European, a number of different European

21    authorities, that have looked at this

22    question; is that correct?

23        A.    There is a reference, you know,

24    the Portier reference that includes the

1  European Free Safety Authority; but I

2  haven't looked at the details of that

3  particular report.

4      Q.   Okay.

5           Did you review Article 41 on your

6  reference list?

7      A.   Yes.

8      Q.   And is Article 41, is it your

9  understanding --

10     A.   I'm sorry.  I thought you said 43.

11  Forty-one, no, I did not look at that

12  reference in detail.

13     Q.   So you listed it because you

14  looked at it or --

15     A.   Just looked at it, but not into

16  the details of the study in terms of the

17  abstract.

18     Q.   Do you know who Dr. Tarazona is?

19     A.   I do not.

20     Q.   Is there any other review that was

21  conducted by a regulatory authority of any

22  country that you looked at or considered in

23  your evaluation?

24     A.   Regulatory, like, the EPA as an

1    example?

2         Q.    EPA, Health Canada, European Free

3    Safety Administration.

4         A.    Not that report specifically, no,

5    sir.

6         Q.    When you conducted your literature

7    searches, did you download or print out the

8    results of the searches?

9         A.    The results of all the searches,

10   no, I did not.

11        Q.    Did you download or print out the

12   results of any of the searches?

13        A.    Only the literature as referenced

14   here.  I didn't download the results of the

15   number of, you know, hundreds or thousands,

16   however many came out, no.

17        Q.    Did you do the literature searches

18   yourself, or did you have someone assist you

19   with those?

20        A.    I did them myself.

21        Q.    And when you were doing the

22   literature searches, did you exercise care

23   to find all the relevant articles?

24        A.    What do you mean by exercise care?

1    Q.   Were you careful to be

2  comprehensive in terms of identifying

3  articles that were relevant to the topic?

4    A.   I suppose.  I mean, I searched for

5  articles that I thought would help me make

6  an assessment of the case.  I guess one

7  person may have found slightly different

8  references but, yes.

9    Q.   So when you looked for articles,

10  did you just look for articles that

11  supported the plaintiff's position; or did

12  you try to identify all relevant articles

13  regardless of which articles conclusion was

14  supporting?

15    A.   I thought it was important to find

16  dialogues in the articles about why people

17  come to different conclusions about the

18  data, so I didn't just look for articles

19  supporting the plaintiff's case.

20    Q.   So I think we've talked about

21  pretty much everything that you've reviewed.

22  So we've talked about the materials listed

23  in paragraph two that you reviewed for

24  purposes of formatting?

1          A.    Correct.

2          Q.    We've talked about the materials

3    reviewed in paragraph three which were

4    specific to Mr. Thomas?

5          A.    Correct.

6          Q.    We talked about the reports,

7    various reports, that you've received since

8    issuing your report, correct?

9          A.    Yes.

10          Q.    And we've talked about all the

11    references including the IARC Monograph that

12    were listed in your report?

13          A.    That's correct.

14          Q.    Apart from those materials, are

15    there any other materials that you

16    considered or reviewed that you -- that we

17    have not discussed?

18          A.    Not to my knowledge, no.

19          Q.    Have you ever -- I know you said

20    you haven't given any -- I know you said you

21    haven't given any deposition recently.  Have

22    you ever given a deposition period?

23          A.    I have not.  This is my first

24    time.

1       Q.    In an expert capacity or in any

2    other capacity?

3       A.    In any other capacity, I have not.

4       Q.    Have you ever -- prior to this

5    case, have you ever done litigation

6    consulting work?

7       A.    Yes.

8       Q.    And for how many years have you

9    done litigation consulting work?

10      A.    About two years.

11      Q.    And has that all been entirely

12   through the Expert Institute?

13      A.    No.  It has not been the Expert

14   Institute.  It also was just from, you know,

15   local lawyers who may have reached out to a

16   colleague and the colleague told me about

17   the case; and we connected that way.

18      Q.    Okay.

19            And so has your work been -- I

20   don't want to ask any of the details about

21   the work -- well, let me ask you, have you

22   ever issued an expert report in any other

23   case similar to what you did in this case?

24      A.    No.  I've issued a review of the

1  case, but not an expert report like this.

2      Q.   So basically your consulting work

3  has dealt with talking back and forth with

4  attorneys about the facts of the case?

5      A.   For the most part, yes.

6      Q.   And what percentage of your

7  overall income has come from litigation

8  consulting over the last two years?

9      A.   I estimate less than five percent.

10         THE WITNESS:  Is anybody else a

11     little bit hot?

12         MR. SILVERSTEIN:  Let's go off.

13         VIDEOGRAPHER:  Time right now is

14     1:40 p.m.  We are off the record.

15         (Whereupon, an off-the-record

16     discussion was held.)

17         VIDEOGRAPHER:  Time right now is

18     1:47 p.m.  We are back on the record.

19     Q.   Doctor, what -- you regularly

20  review journals in the medical literature?

21     A.   Yes.  It's part of what we do,

22  yes.

23     Q.   The downside of the air

24  conditioning is now you're going to have to

1  keep our voice up.

2      A.   Yes.  That's part of what I do in

3  medicine, yes.

4      Q.   And what are the major

5  peer-reviewed journals in the field of

6  oncology that you review?

7      A.   So some of them include the New

8  England Journal of Medicine, Journal of

9  Clinical Oncology, Blood, Lancet, and The

10 Lancet subspecialty journals like Lancet

11 Oncology.  And then there are various

12 subspecialty journals like the Journal of

13 Hematology.  Those are the primary ones I

14 would say.

15     Q.   So New England Journal of Medicine

16 is a journal of general subject matter,

17 right?

18     A.   Yes.  It's not specific to any one

19 topic, but it does include some oncology

20 papers.

21     Q.   Journal of Clinical Oncology is

22 peer-reviewed journal that's devoted to

23 oncology, right?

24     A.   Yes.  That's correct.

1       Q.   Blood, is Blood a journal devoted
2   to oncology or to hematology or both?
3       A.   It's both.  They may publish
4   Benign Hematology as well as Malignant
5   Hematology, but it's mostly focused on blood
6   cancers; and if they're going to focus --
7   publish an oncology topic, it's going to be
8   blood cancers.
9       Q.   Lancet is also like the New
10  England Journal where it's a journal of
11  general subject matter?
12      A.   Yes.
13      Q.   Lancet's Oncology though is
14  devoted to oncology issues?
15      A.   Yes, that's correct.
16      Q.   And American Journal of
17  Hematology, is that particular to blood in
18  that it includes both hematology and
19  oncology?
20      A.   It's most likely focused on
21  hematology.
22      Q.   Any other peer-reviewed journals
23  that you regularly reviewed that are focused
24  on oncology?

1        A.   There's Clinical Lymphoma,

2   Leukemia, and Myeloma.  There's, I believe,

3   it's called Reviews in Hematology/Oncology.

4   It's mostly review articles.  It's not

5   primary studies; and then we also get, you

6   know, magazines from different, like,

7   American Society of Hematology, that kind

8   of --

9            (Reporter clarification.)

10       A.   (continuing) Like, American

11  Society of Hematology, different

12  professional societies that kind of review,

13  you know, the latest dates.

14       Q.   More newsletters?

15       A.   Exactly, exactly.  I wouldn't call

16  them journals, yeah.

17       Q.   But these other journals you

18  referred to are all peer-reviewed journals?

19       A.   Correct.

20       Q.   All recognized by the oncology

21  community?

22       A.   Yes, sir.

23       Q.   And so the IARC conclusion

24  concerning glyphosate was published in 2015,

1    correct?

2         A.   Yes.

3         Q.   Since 2015, are you aware of any

4    article published in any of the journals you

5    just referenced that took the position that

6    glyphosate or Roundup was cause or a risk

7    factor for non-Hodgkin's lymphoma?

8         A.   No, sir, I'm not.

9         Q.   Are you -- in your report back to

10   Exhibit 1, you say in your very first

11   paragraph you're describing your background;

12   and in the last sentence of the paragraph,

13   you say in this role as an expert witness, I

14   abide by the highest ethical standards of my

15   profession.  And I take this role seriously,

16   correct?

17        A.   Yes, sir.

18        Q.   And can you explain what you mean

19   by that?

20        A.   Sure.  I would say that it means

21   that I'm sworn to tell the truth, and that's

22   certainly an ethical thing to do.  That I

23   have not been coerced in any way, or I have

24   not done anything clandestine or secretive

1   in this role; and that I'll use my fund of

2   knowledge in medicine to apply to this case

3   and take it seriously.

4       Q.   Okay.

5           Do you know are you aware that the

6   American Medical Association has ethical

7   standards that govern physicians giving

8   testimony?

9       A.   I am not intimately aware.  I am

10  not a member of the American Medical

11  Association.  I have not seen it applied in

12  practice so, no.

13      Q.   You have not seen what applied in

14  practice?

15      A.   I have not seen it applied in my

16  practice in some way or any institutions,

17  so, no.

18      Q.   Well, let me just ask you, is it

19  your understanding that physicians who

20  testify as an expert witness -- physicians

21  who testify as expert witnesses must

22  evaluate cases objectively and provide an

23  independent opinion?

24      A.   I don't know if that's what they

1  stipulate, but I would think that that's

2  important.

3      Q.   I'm not asking you whether that's

4  what the --

5      A.   Right.

6      Q.   -- AMA says.  I'm just asking you

7  whether that's something you agree with and

8  you understand to be part of your

9  obligation?

10     A.   Can you repeat the statement

11 again, please?

12     Q.   Yes.

13          Whether a physician who testifies

14 as an expert witness must evaluate the case

15 objectively and provide an independent

16 opinion.

17     A.   I think the role of expert,

18 whether you're a physician or not, is to try

19 to evaluate something objectively; so I

20 think that's a fair statement.

21     Q.   Is it your understanding that you

22 have an obligation to be -- to try to be

23 unbiased in your assessment?

24     A.   I think it's important not to be

1  biased in the sense of coming to a

2  conclusion and finding the literature to

3  support it, but I think everybody is biased

4  in some way based on their educational

5  background and their understanding of a case

6  or something like that.

7      Q.   Is it your understanding that as

8  an expert witness, you have an obligation to

9  try to be fair to both sides?

10     A.   I think that's very important,

11  yes.

12     Q.   Is it your understanding that as

13 an expert witness you have an obligation to

14 appropriately characterize the theory on

15 which testimony is based if the theory is

16 not widely accepted in the profession?

17         MR. SILVERSTEIN:  Objection to

18     form.

19     A.   I think it's a little bit

20 hypothetical there.  I don't know what

21 theory you're referring to.

22     Q.   Well, let's talk about the theory

23 that glyphosate can cause non-Hodgkin's

24 lymphoma?

1          A.    Okay.

2          Q.    Would you agree with me that

3   there's not a consensus in the medical

4   profession that glyphosate causes

5   non-Hodgkin's lymphoma?

6          A.    I would agree that the literature

7   is -- the literature is not definitive on

8   that; and, therefore, that leads the debate.

9          Q.    Well, not only is it not

10  definitive, there's a number of individuals

11  who have strongly staked out the position

12  that glyphosate does not cause non-Hodgkin's

13  lymphoma, correct?

14          MR. SILVERSTEIN:  Objection to the

15      form.

16          A.    I am not aware of which

17  individuals you're referring to; but I would

18  say, you know, based on different things

19  I've read, there are differences in

20  opinions.  So, you know, it clearly --

21  there's debate about this; so I would

22  concede that there is debate in the field in

23  general and in the world about the status of

24  glyphosate as a carcinogen.

1      Q.   It's fair to characterize it as

2   controversial?

3           MR. SILVERSTEIN:  Objection to

4      form.

5      A.   Well, it's not; controversial is

6   necessarily a term we use frequently in

7   literature.  I mean, controversy may be

8   argumentive in a way whereas debate, you

9   know, it's debatable how you interpret the

10  literature.  If you want to call it

11  controversial, sure.

12     Q.   When we were talking earlier, you

13  were alluding to people who had different

14  views of the literature as differing in your

15  assessment of how they understood the

16  science.  Do you recall that discussion?

17     A.   I think that's part of -- yes, I

18  think that's part of science in general.

19     Q.   And do you think that with respect

20  to the question of whether glyphosate can

21  cause non-Hodgkin's lymphoma, that

22  reasonable scientific minds can differ?

23     A.   I think they do in this case, yes.

24     Q.   I want to turn to -- hang on one

1    second.

2         MR. PIORKOWSKI:  Let's go off the

3    record for a second.

4         VIDEOGRAPHER:  Time right now is

5    1:58 p.m.  We are off the record.

6         (Whereupon, an off-the-record

7    discussion was held.)

8         VIDEOGRAPHER:  Time right now is

9    2:01 p.m.  We are back on the record.

10        Q.   Doctor, in your report we have a

11   section where you talked about carcinogenic

12   properties of glyphosate starting on Part D

13   on page ten; do you see that?

14        A.   Yes.

15        Q.   And then Subpart, A, is

16   epidemiology studies in humans linking

17   glyphosate to lymphoma?

18        A.   Yes.

19        Q.   In the second paragraph you say

20   case-control epidemiologic studies compare

21   an exposed group to a control or unexposed

22   group, correct?

23        A.   Yes.

24        Q.   And that's just the definition of

1  case-control study, right?

2      A.   Yes.  You have a exposed case

3  group and a control or unexposed group.

4      Q.   Well, let me just -- I want to be

5  clear.  So case-control studies are actually

6  where you start with a diseased population;

7  and you find a control group of undiseased

8  patients, right?

9      A.   Correct.

10     Q.   Versus prospective or cohort study

11 where you would compare exposed patients to

12 unexposed patients, right?

13     A.   Correct.

14     Q.   So the case-control studies that

15 you list in your chart on Table 1 are not

16 comparing the exposed groups to unexposed

17 groups; they're comparing diseased patients

18 to undiseased patients and looking at their

19 glyphosate usage, correct?

20     A.   Yes.  That's what these

21 case-control studies do.

22     Q.   And you say among the six

23 case-control studies of GBFs and you're

24 using GBFs to -- as an abbreviation for

1  glyphosate-based formulations, correct, GBF?

2      A.   Correct.

3      Q.   And the reason your using GBFs and

4  not glyphosates is because the product

5  Roundup contains some other ingredients in

6  addition to glyphosate, right?

7      A.   That's correct.

8      Q.   And one of those ingredients is a

9  surfactant, correct?

10      A.   Yes.  That's correct.

11      Q.   Do you have any opinions that

12  you're offering in this case about the

13  toxicity of any of the ingredients other

14  than glyphosate?

15      A.   Well, my understanding of

16  surfactant is that as a product, there's a

17  herbicide; and the surfactant increases the

18  absorption of the glyphosate, so that's

19  really what I'm offering just in terms of

20  the effectiveness of the surfactant.

21      Q.   You're not offering any opinions

22  about any other ingredient having any

23  toxicity other than surfactant increasing

24  the absorption?

1      A.   No.  It's focused on glyphosate.

2      Q.   And when you talk about

3 glyphosate-based formulations also, you're

4 using that because the people in these

5 studies obviously didn't use pure

6 glyphosate; they all used some

7 glyphosate-based formulation?

8      A.   Some of them refer to, yes, as

9 formulations.

10     Q.   So you say on the second sentence

11 among the six case-control studiies of GPFs

12 shown in Table 1 below, five showed an

13 increased odds ratio for likelihood for NHL

14 compared to controls, correct?

15     A.   Yes.  That's what it says.

16     Q.   So you're suggesting that there

17 are essentially five out of six studies had

18 a positive result; is that fair?

19     A.   Well, if you look at it through

20 the lens of the table, yes; but even within

21 those studies, it depended on the exposure.

22 So even with the studies, there were data

23 that were not showing an increased odds

24 ratio or risk ratio.

1     Q.   I'm going to hand you -- actually,

2  before I do that, so how did you -- the six

3  case-control studies that you put together

4  in Table 1, how did you choose them?

5     A.   Well, I didn't put this table

6  together.  This is a table that I referenced

7  that was referenced -- sorry.  From

8  Reference 34 as I said in the title of the

9  table.

10     Q.   Got it.

11          So this is from Dr. Weisenburger's

12  paper?

13     A.   Correct.

14     Q.   Now, all of these studies that are

15  in Table 1 are all on your reference list,

16  correct?

17     A.   They are, yes.

18     Q.   Have you had a chance to read and

19  review all of these studies?

20     A.   I've reviewed them.  I probably

21  need to look at them individually if we're

22  going to go into details on that just so I

23  can refresh my memory.

24     Q.   I'm going to hand you what I've

1    marked as Exhibit 6 (handing).

2              (Whereupon, the aforementioned

3         McDuffie article entitled,

4         "Non-Hodgin's Lymphoma and Specific

5         Pesticide Exposures in Men:

6         Cross-Canada Study of Pesticides and

7         Health" was marked as Braunstein

8         Exhibit 6 for identification as of this

9         date by the Reporter.)

10        Q.   This is a copy of an article by

11   first author McDuffie, correct?

12        A.   That's correct.

13        Q.   And this is number 54 on your list

14   of references, correct?

15        A.   Let me just verify that.

16        Q.   Sure.

17        A.   Did you say 54?  I believe it's

18   Reference 46.  It's Reference 46.

19        Q.   I'm sorry, 46.

20        A.   Yes.  That's it, yes, sir.

21        Q.   And is it correct that this study

22   was conducted in Canada?

23        A.   Let me just verify that to be

24   sure.  Yes.  In the method section, it says

1  we conducted a population-based case-control

2  study among men residents in the six

3  Canadian provinces.

4       Q.   And the data from this study were

5  later included in the Pahwa paper which is

6  Reference 45 on your --

7       A.   Yes, I believe so, yes.

8       Q.   Now, this study, McDuffie, did not

9  just look at -- well, it looked at numerous

10 different pesticides, correct?

11      A.   Yes, sir.

12      Q.   It did not just look at

13 glyphosate?

14      A.   Yes.  That's correct.

15      Q.   And if you look at Table 2, Table

16 2 shows that they looked at 14 different

17 chemical classes and individual chemicals of

18 herbicides, correct?

19      A.   I don't know; but, yes, if you

20 counted it, yes, there are various

21 herbicides in the table, yes.

22      Q.   They also in Table 3 looked at 15

23 different chemical classes and chemicals of

24 insecticides, correct?

1      A.   Yes.  I agree with that.

2      Q.   In Table 4 they also looked at

3  nine different classes of fungicides and

4  individual fungicides, right?

5      A.   Yes.  That's what it says,

6  different fungicides.

7      Q.   So in total, they looked as part

8  of the study; they were looking at 38

9  different classes or chemicals as part of

10  the study, right?

11      A.   I haven't counted it; but, yes, if

12  you have counted it, that would be the --

13      Q.   Now, the main prespecified

14  analysis for all of these chemicals was

15  using what's called ever/never use, correct?

16      A.   Yes.  Ever exposed -- yes.

17      Q.   Just so we're clear on the

18  definition by ever/never use, that basically

19  divides people into two categories, that you

20  either use the chemical, in which case you

21  were an ever; or you didn't, and you were a

22  never; is that right?

23      A.   Yes.

24      Q.   And for each chemical or class of

1  chemical, the authors calculated two

2  different odds ratios, correct?

3      A.   I can take a look.  Yeah, there

4  was an odds ratio and an adjusted odds ratio

5  that's listed in the tables.

6      Q.   And an odds ratio provides an

7  estimate of risk; is that correct?

8      A.   Well, it's a fraction of how I

9  understand it of likely versus not likely;

10  and if it's greater than one, it's more

11  likely a risk.

12      Q.   And every odds ratio includes

13  something called confidence interval?

14      A.   In many of these studies, yes, the

15  confidence interval was included.

16      Q.   A confidence interval provides a

17  range of values on each side of the odds

18  ratio, correct?

19      A.   The odds ratio includes a range of

20  values, yes.

21      Q.   And when the confidence interval

22  includes one, the result is considered as

23  not statistically significant; is that

24  correct?

1      A.   If the range includes one, it's

2  generally considered not statistically

3  significant, yes.

4      Q.   So if we go back to the abstract

5  on the first page, this is a fairly long

6  abstract; but if you see about two-thirds of

7  the way down on the first page, it says we

8  found that among major chemical classes of

9  herbicides, the risk of NHL was

10 statistically significantly increased by

11 exposure to and then it goes on to list

12 individual chemicals; do you see that?

13     A.   Yes.

14     Q.   What does that mean when it says

15 statistically significantly increased?

16          MR. SILVERSTEIN:  Objection to

17     form.

18     A.   I mean, my understanding is that

19 they're talking about a statistical analysis

20 where the results met some measure of

21 statistical significance being more likely

22 than not due to chance or likely not due to

23 chance.

24     Q.   And then it goes on to talk about

1  fungicides fumigant carbon tetrachloride

2  also being statistically significantly

3  increased, right?

4      A.   In the abstract, yes.

5      Q.   In the abstract.  Then it goes on

6  to say among individual compounds in the

7  multivariate analysis, the risk of NHL was

8  statistically significantly increased by

9  exposure to; and then it lists number of

10 herbicides, right?

11     A.   I see that, yes.

12     Q.   When a result is statistically

13 significant, what that means is, it's not

14 likely due to chance; is that right?

15     A.   Statistical significance as I

16 understand it is set at a specific level;

17 and that sometimes means that, you know,

18 95 percent of the time if you repeat an

19 experiment, 95 percent of the time you get

20 the same result.  So statistical

21 significance means that you're more likely

22 to get the same result if you repeated the

23 study.

24     Q.   Okay.

1          And that's the reason why when the

2   authors record the results, they focus on

3   statistical significance, correct?

4          A.    That's generally accepted as a way

5   of reporting results that are likely to be

6   replicated.

7          Q.    Have you in your work -- I know

8   you said you had some ongoing Phase 3

9   clinical trials; is that right?

10         A.    Yes, sir.

11         Q.    Have you done Phase 3 clinical

12  trials in the past?

13         A.    No, sir.  This is the first time.

14         Q.    Phase three clinical trials are

15  intended to determine the safety and

16  efficacy of the product or treatment method?

17         A.    Yeah.  Phase 3 trials are intended

18  to determine the efficacy -- it could be of

19  a product or a clinical test or something

20  like that, sure.

21         Q.    But the purpose is to -- for

22  medication to show that it works, right?

23         A.    It's to show -- well, it's not to

24  show that it works.  Sometimes it doesn't

1 work.  It's to show that -- it's to test it

2 in a study.

3      Q.   Far better than I said it.  The

4 purpose is to test whether it works?

5      A.   Right, right.

6      Q.   And the way they measure whether

7 it works is they have a prespecified measure

8 of efficacy, correct?

9      A.   Well, that's complicated.  They

10 usually have statisticians that will

11 determine how many patients are estimated to

12 be included or what degree of significance.

13 Sometimes they use a complicated term called

14 power analysis, but these are the kinds of

15 things that they would do in advance to get

16 a sense of how many patients they expect to

17 enroll.

18      Q.   But at the end of the day, when

19 the FDA evaluates something, they will only

20 approve the product if the study showed a

21 statistically significant demonstration of

22 efficacy, correct?

23           MR. SILVERSTEIN:  Objection to

24      form.

1       A.   I don't know what the FDA does

2   exactly to approve drugs or tests, but I

3   assume that they're looking at whether a

4   result is significant.

5       Q.   Going back to the McDuffie paper.

6       A.   Yes.

7       Q.   For each of these different

8   chemicals and chemical classes, the authors

9   reported two different odds ratios, correct?

10      A.   Yes.

11      Q.   And the odds ratio, the first one

12  was -- included age and province of

13  residence; but the adjusted one included a

14  number of other medical variables, correct?

15      A.   Which table?  I'm sorry.

16      Q.   If you look at Table 2 to start

17  with and look at A and B.

18      A.   Yes.  I agree with that

19  assessment.

20      Q.   And you notice that one thing that

21  they adjusted for in B is a positive family

22  history of cancer?

23      A.   Yeah.  Other medical variables

24  that included a family history of a

1   first-degree relative.

2       Q.   You see on Table 1 where they talk

3   about some of the demographic factors, and

4   they talk about family history of cancer in

5   any first-degree relative at the very

6   bottom?

7       A.   I'm reading the subtext.

8       Q.   Very bottom of Table 1.

9       A.   Oh, at the bottom inside the

10  table, yes, I see family history of cancer,

11  any first-degree relatives.

12      Q.   Right.

13           And what they found is that for

14  family history of cancer and any

15  first-degree relative, there was an odds

16  ratio of 1.31 with confidence intervals that

17  did not include one and were statistically

18  significant, correct?

19      A.   That's correct.

20      Q.   Are you aware of any other studies

21  that have found -- that may have found that

22  family history of cancer as opposed to

23  family history of NHL is at increased risk

24  for non-Hodgkin's lymphoma?

1    A.   Well, we were talking in the

2    beginning of the day about how first-degree

3    relatives with hematologic malignancy

4    increased the risk for hematologic

5    malignancy; so there is literature for that.

6    I can't quote the exact study; but there is

7    literature for that, yes.

8    Q.   Now, one thing that McDuffie did

9    not adjust for is whether the individual was

10   also using other pesticides or herbicides or

11   fungicides; is that true?

12   A.   I don't recall if they adjusted

13   for that, but they essentially reported on

14   the ones that they listed in the tables.

15   Q.   So in the -- in Table 2 and 3 and

16   4, under Footnote B, where they tell you

17   what they adjusted for, they do not indicate

18   that they adjusted for other use of other

19   pesticides, correct?

20   A.   No.  They only say medical

21   variables and history of first-degree

22   relatives.

23   Q.   We're going to come back and talk

24   about this in a little bit, but I'm going to

1  hand you what I've marked as Exhibit 7

2  (handing).

3          (Whereupon, the aforementioned

4      Zhang article entitled, "Exposure to

5      Glyphosate-Based Herbicides and Risk

6      for Non-Hodgkin Lymphoma: A

7      Meta-analysis and Supporting Evidence"

8      was marked as Braunstein Exhibit 7 for

9      identification as of this date by the

10     Reporter.)

11     A.   Yes, sir.

12     Q.   This is a paper by Zhang.  I

13  believe this is number 53 on your reference

14  list; is that right?

15     A.   I think that's correct.  I'll

16  double-check.  Yes, that's correct.

17     Q.   And we're going to come back and

18  talk about this more in a minute, but if you

19  turn to Table 4 on page 196.

20     A.   Okay.

21     Q.   The McDuffie paper is included as

22  one of the studies that Zhang included in

23  the meta-analysis, correct?

24     A.   That's correct.

1      Q.   Do you see down in the first full

2  paragraph on the same page, it says,

3  although there are different perspectives on

4  the best way to account for other pesticide

5  exposures, we selected RR, meaning relative

6  risk, estimates that adjusted for other

7  pesticide use over their unadjusted

8  counterparts to mitigate potentially

9  substantial confounding; is that right?

10      A.   Yes.  I see it.

11      Q.   And you agree that individuals

12  especially in the farming community who are

13  exposed to one chemical herbicide or

14  pesticide are often exposed to multiple

15  chemicals?

16         MR. SILVERSTEIN:  Objection.

17      A.   I couldn't say for sure.  I can

18  make an assumption, but it may not be

19  correct that farmers use various pesticides;

20  but I don't know.

21      Q.   Did any of the case studies that

22  you've reviewed specifically look at that to

23  your knowledge?

24      A.   To look at what?  I'm sorry.

1    Q.   To look at -- question whether

2  individuals who used one pesticide likely

3  used other pesticides as well?

4    A.   Yes.  They may have looked at

5  other pesticides, yes.

6    Q.   Now, if you go back to McDuffie,

7  if we look at Tables 2, 3, and 4, there are

8  highlighted in bold those compounds and

9  classes of compounds for which they found a

10 statistically significant increased risk,

11 correct?

12   A.   I agree with that, yes.

13   Q.   And in these three tables, there

14 are a total of 13 compounds that showed an

15 increased, statistically significant

16 increased odds ratio in both analyses; is

17 that correct?

18   A.   Again, I haven't totaled it; but

19 I'll assume, yes, there are a number bolded

20 odds ratios.  So, yes, that's fair.

21   Q.   And if the number turns out to be

22 13 out of 38, that's over a third of the

23 chemicals they looked at had an increased

24 odds ratio, correct?

1     A.   Yes.  That's numerically correct,
2  yes.
3     Q.   Now, when more than a third of the
4  chemicals in the study show an increased
5  risk, does that suggest to you that there is
6  systematic bias in the study?
7     A.   Not necessarily.  There could be
8  differences in the different chemicals.
9     Q.   What is recall bias?
10    A.   Recall bias?
11    Q.   Yes, sir.
12    A.   Recall bias as I understand it is
13  when the individuals involved in the study
14  aren't able to provide accurate information
15  if they don't accurately recall the events,
16  for example, due to a delay in time.
17    Q.   And is there a tendency -- is
18  recall bias a problem generally in
19  case-control studies?
20    A.   I think any retrospective study
21  where you are providing some kind of
22  questionnaire can potentially be brought to
23  recall bias, yes.
24    Q.   Well, any study in which you're

1   using a questionnaire can be prone to

2   inaccuracy, correct?

3       A.   Well, that's fair.  But if you're

4   asking the individuals to recall something,

5   yes, that could be recall bias.

6       Q.   So I guess my question is, I'm

7   trying to differentiate a little bit between

8   difficulty remembering accurately --

9       A.   Okay.

10      Q.   -- and recall bias as a concept in

11  epidemiology, okay?

12          So recall bias refers to a

13  tendency of people who have disease to

14  remember exposure to a greater degree than

15  people who don't have the disease; is that

16  consistent with your understanding?

17      A.   Yes.  Recall bias is something

18  that is an unfortunate part of a study where

19  it could lead to incorrect results, yes.

20      Q.   And related to recall bias, what

21  is proxy bias?

22      A.   Proxy bias is -- this is how I

23  understand it.  If you have an individual

24  who is reporting on behalf of another

1 individual, that they could be reporting

2 something incorrect.

3      Q.   And do you know whether in the

4 case of proxy bias, there's a tendency for

5 the proxies of deceased individuals to

6 remember exposure to a greater extent than

7 in unexposed patients, I'm sorry, in

8 nondiseased patients?

9           MR. SILVERSTEIN:  Object to the

10      form.

11      A.   I think in terms of proxy bias

12 similar to recall bias, it's a bias because

13 the term inherently applies that you are

14 more likely to do something that could cause

15 a study to be faulted.

16      Q.   So to go back to Zhang, Exhibit 7.

17 We talked about if we go back to the

18 paragraph on page 196 where we were reading

19 about mitigating substantial confounding?

20      A.   That was the second paragraph,

21 yes.

22      Q.   It says five of the seven studies

23 adjusted for a combination of different

24 pesticides, correct?

1       A.    That's correct.

2       Q.    And then she cites references 16,

3  17, 18, 20, and 25; and those references do

4  not include the McDuffie study, correct?

5       A.    Doesn't look like it.  Let me

6  just --

7       Q.    Take your time.  Take your time.

8       A.    There's just a range of studies in

9  different order.

10       Q.    Please take your time.

11       A.    It doesn't include it.  I agree.

12       Q.    Okay.

13            Now, in the McDuffie study, when

14  we look at in Table 2 the compounds that the

15  herbicides that were associated with a

16  statistically significant increased risk,

17  glyphosate was not one of them, correct?

18       A.    Correct.  It's not involved, and

19  confidence intervals as such were not

20  significant.

21       Q.    Now, the only statistically

22  significant finding in the McDuffie paper

23  was an analysis that divided glyphosate to

24  two or less days and greater than two days

1   at most, correct?

2       A.   Yes.  I believe that's Table 9 or

3   maybe table --

4       Q.   Table 8.

5       A.   Table 8, yes.  Sorry, yes.

6       Q.   And do you have any -- is there

7   any evidence in this paper that that

8   analysis was prespecified?

9       A.   Not to my knowledge.

10      Q.   Is there something special or

11  biologically significant about two days that

12  would suggest there would be a difference in

13  risk between somebody exposed for two days

14  or less and greater than two days?

15      A.   Are you talking specifically about

16  glyphosate study or in general?

17      Q.   Let me ask you specifically about

18  glyphosate first, and then I'll ask you

19  generally.

20      A.   So it's an interesting question

21  because there's debate over the period of

22  exposure, how you define that because it's

23  defined differently in different studies.

24  My understanding is that what you look,

1  parse the data, and look at different

2  lengths of exposure, there are differences;

3  and sometimes it's revealed that there is a

4  significant -- statistically significant

5  increase in the association with the odds

6  ratio when you parse out the amount of time

7  of exposure as they did here with two days

8  or less.

9       Q.   I guess my question is, is the

10 choice of two days a random choice?

11      A.   I see.

12      Q.   Or is there some scientific reason

13 to pick two days?

14           MR. SILVERSTEIN:  Objection to

15      form.

16      A.   Well, in this study, they chose

17 two days; but I'm not sure if there was a

18 specific -- well, I don't recall if there

19 was a specific reason why they chose two

20 days particularly.

21      Q.   And I mean -- and that wasn't the

22 cut off that they used for every other

23 compound, right?

24      A.   I agree with that.

1    Q.   For example, if you look at 2,4-D,

2 it broke that down into four different

3 categories of exposed patients, right?

4    A.   Yes.  Zero through two, two

5 through five, and et cetera.

6    Q.   So do you have any understanding

7 of why they broke it down into several

8 categories to 2,4-D, which is two categories

9 for glyphosate?

10    A.   Well, it may be because of the way

11 the majority of the patients fell into those

12 two groups.

13    Q.   What do you mean by that?

14    A.   So in other words, that was the --

15 if you divided them into day three or more,

16 there would have been an unequal balance

17 between the two groups; so I think they

18 divided that in a way that they could

19 balance the groups to have more statistical

20 power in terms of the data, the way the data

21 were reported; and then they divide it into

22 those two groups based on the number of

23 days.

24    Q.   So does the greater than two --

1 does the greater than two days or two days

2 or less dichotomy, strike that.

3          Hypothetically, you could have a

4 patient who used glyphosate for twice a year

5 for 20 years, right?

6      A.   I suppose you could have any

7 frequency of exposure, yes.

8      Q.   And that person under this scheme

9 would be in the low exposure group?

10      A.   Because they used it for two days

11 or less.

12      Q.   Yes.

13      A.   I suppose if that's how the

14 authors classified it, yes.

15      Q.   And on the other hand, you could

16 have somebody who used it for three days for

17 two years, and that person would be in the

18 high exposure?

19      A.   If the authors divided into two

20 days counting it in a lifetime, you know,

21 use, yes.

22      Q.   Well, they didn't do a lifetime

23 data analysis?

24      A.   That's correct.  But in the

1    lifetime study.

2         Q.   Did you look at the Hohenadel

3    paper?

4         A.   The what?

5         Q.   Hohenadel was the last author --

6    I'm going to hand you what I've marked as

7    Exhibit 8 (handing).

8              (Whereupon, the aforementioned

9              Hohenadel article entitled, "Exposure

10             to Multiple Pesticides and Risk of

11             Non-Hodgkin Lymphoma in Men from Six

12             Canadian Provinces was marked as

13             Braunstein Exhibit 8 for identification

14             as of this date by the Reporter.)

15        Q.   Is that a paper that you

16   considered -- I don't believe it was on

17   your --

18        A.   Let me just double-check.  I don't

19   see it.

20        Q.   Take a minute.  Take a minute.

21        A.   I don't see it in my reference

22   list.

23        Q.   Okay.

24        A.   It may have been considered in

1    other studies, but I don't see in my --

2         Q.   I'll represent to you that this

3    was conducted in the same population as --

4    in the same population as the McDuffie paper

5    was published.

6         A.   Fair enough.

7         Q.   You haven't had a chance to look

8    at it yet.

9         A.   Fair enough.

10        Q.   So the next paper that's listed on

11   Table 1 is Hardell 2002, correct.

12             (Whereupon, the aforementioned

13        Hardell article entitled, "Exposure to

14        Pesticides as Risk Factor for

15        Non-Hodkin's Lymphoma and Hairy Cell

16        Leukemia: Pooled Analysis of Two

17        Swedish Case-control Studies" was

18        marked as Braunstein Exhibit 9 for

19        identification as of this date by the

20        Reporter.)

21        A.   Yes.

22        Q.   That's what I've marked as

23   Exhibit 9.

24        A.   Correct.

1       Q.   And the Hardell 2002 study was

2  also a study about pesticides broadly, not

3  just about glyphosate, correct?

4       A.   Let me refresh my memory here.

5       Q.   Take your time.

6       A.   Yes.  It includes other

7  pesticides.

8       Q.   And the glyphosate findings were

9  based on eight glyphosate cases and eight

10  controls?

11       A.   That's correct.

12       Q.   And the authors included two odds

13  ratios, one that was not adjusted for

14  potential confounding other pesticides and

15  that showed a statistically significant

16  increased risk for ever/never use, correct?

17       A.   Are you looking at any particular

18  table or just in general?  I'm trying to

19  review the -- multivariate analysis.

20       Q.   Yes, I'm looking at Table 7 at the

21  top of 1037.

22       A.   Right.  They performed a

23  multivariate analysis.

24       Q.   But did not adjust for other

1  pesticides that showed a statistically

2  significant increased risk, and separately

3  they reported an odds ratio for a

4  multivariate analysis that reported a

5  non-statistically significant risk for

6  ever/never use; is that correct?

7       A.   That's correct.

8       Q.   So I've handed you what I've

9  marked as Exhibit 10.

10            (Whereupon, the aforementioned De

11       Roos article entitled, "Integrative

12       Assessment of Multiple Pesticides as

13       Risk Factor for Non-Hodgkin's Lymphoma

14       Among Men" was marked as Braunstein

15       Exhibit 10 for identification as of

16       this date by the Reporter.)

17       Q.   And is this the De Roos 2003

18  study, which is the third study listed in

19  Table 1 of your report.

20       A.   Yes.  I believe that's Table 48 in

21  my report, yes.

22       Q.   And De Roos 2003 is a paper that

23  reported on the results of three separate

24  studies conducted in the United States; is

1  that correct?

2       A.   Three case-control studies, yes.

3       Q.   And similar to McDuffie and

4  Hardell, De Roos 2003 is a study that looks

5  at multiple pesticides, not just glyphosate,

6  correct?

7       A.   Yes.  I agree.

8       Q.   Now, the analyses in this study

9  did adjust for the use of other pesticides,

10  correct?

11       A.   Yes.  That's correct.  Table 2.

12       Q.   Now, the authors in this study

13  conducted two different types of analysis;

14  is that right?

15       A.   There is a pooled study, and then

16  one that includes multiple pesticides if

17  that's the one you're referring to.

18       Q.   Well, they did a logistic

19  regression analysis, correct?

20       A.   I would have to review the methods

21  again but if you --

22            MR. SILVERSTEIN:  Take a look.

23       Q.   Take a second.

24       A.   Sure, sure.  Yes.  They say that

1   they employed standard and logistic --

2   standard logistic regression.

3       Q.   You report the results of that

4   logistic regression in the -- well, you said

5   Table 1 was not your table.  That table was

6   taken from somebody else, correct?

7       A.   Yes.  That's from the Weisenburger

8   paper.

9       Q.   Right.

10          Now, so the logistic regression

11  reported a statistically significant

12  increased risk even when adjusted for

13  pesticides, right?

14      A.   Just I don't want to mix this up.

15  You're talking about the De Roos paper we

16  have as Exhibit 10?

17      Q.   Talking about the De Roos paper,

18  Table 3, glyphosate logistic regression

19  analysis?

20      A.   Can you repeat the question one

21  more time?

22      Q.   For the logistic regression

23  analysis in the De Roos 2003 paper, the

24  authors report a statistically increased

¹ risk of non-Hodgkin's lymphoma for

² glyphosate even though the results were

³ adjusted for use of other pesticides,

⁴ correct?

⁵     A.   Yes.  That's correct.

⁶     Q.   Now, in that result which was 2.1

⁷ with confidence intervals of 1.1 to 4.0 is

⁸ included in Table 1, correct?

⁹     A.   Table 1 of the same paper.

¹⁰     Q.   Table 1 of your report, yes.

¹¹     A.   That's correct.  That's correct.

¹²     Q.   My fault.  I should have been more

¹³ clear.

¹⁴     A.   Sure.  That's correct.

¹⁵     Q.   Now, in addition to the logistic

¹⁶ regression, they also conducted something

¹⁷ called a hierarchical regression, correct?

¹⁸     A.   Yes.

¹⁹     Q.   And if you look at the first page

²⁰ of the De Roos 2003 article?

²¹     A.   Okay.

²²     Q.   The third full paragraph about

²³ seven lines down.

²⁴     A.   The one that starts in principle,

1  that --

2      Q.   The paragraph starts in principle,

3  correct?

4      A.   Okay.

5      Q.   The authors state, quote, the

6  hierarchical regression models, also known

7  as multilevel or multistage models, allow

8  the researcher to specify prior

9  distributions for multiple effect parameters

10  of interest, parenthesis, for example,

11  pesticide effects, end parenthesis, and to

12  adjust the observed likelihood estimates

13  towards these prior distributions with the

14  objective of obtaining increased precision

15  and accuracy for the ensemble of estimates,

16  correct?

17      A.   Yes.

18      Q.   And when they do this analysis,

19  the result is that it does not show a

20  statistically significant increased risk on

21  the hierarchical regression analysis,

22  correct?

23      A.   Which table are you --

24      Q.   I'm still on Table 3 on the

1  right-hand side.

2      A.   Oh, with the hierarchical

3  regression.

4      Q.   Yes.

5      A.   That's correct.

6           MR. SILVERSTEIN:  Objection.

7      A.   Yes, that's correct.

8      Q.   To the best of your knowledge, is

9  the logistic regression analysis in De Roos

10  2003 the only time that a case-control study

11  in the published literature that was

12  adjusted for the use of other pesticides

13  showed a statistically significant increased

14  risk in ever users of glyphosate?

15      A.   I'm not sure.  There may have been

16  other studies, but I'm not sure.

17      Q.   So of the three we've talked about

18  so far, this is the only one, right?

19      A.   That's correct.

20      Q.   We'll look at the other ones.

21      A.   Sure.

22      Q.   Is it also your understanding that

23  the data from De Roos 2003 was included in

24  the Pahwa or the NAPP, North American Pooled

1  Project study?

2      A.   Yes.  I think we have it as an

3  exhibit, yes.

4      Q.   So the Pahwa paper supersedes both

5  the De Roos 2003 and the McDuffie 2001

6  paper, correct?

7           MR. SILVERSTEIN:  Object to form.

8      A.   What do you mean by supersede

9  because I'm not sure --

10      Q.   I mean, they did additional

11  analysis of the data.  They double-check the

12  diagnoses.  They dug deeper on the exposure

13  levels.

14           MR. SILVERSTEIN:  Objection to

15      form.

16      A.   It's a meta-analysis, so I don't

17  know if it supersedes it; but it includes

18  more studies.

19      Q.   What's a meta-analysis?

20      A.   Kind of an analysis of more than

21  one study combined when the data are

22  combined to try to increase your ability to

23  accurately determine outcomes by combining

24  studies that would be too difficult to

1    compile, you know, as a single study.

2         Q.   So is there a difference between a

3    meta-analysis and a pooled analysis?

4         A.   I'm not sure.

5         Q.   The data in the North American

6    Pool Project by definition --

7         A.   Correct.

8         Q.   -- pooled data from the De Roos

9    2003 study --

10        A.   Sure.

11        Q.   -- which itself was pooled data

12   from three studies and also the McDuffie

13   paper; is that right?

14        A.   (Witness nods head.)

15        Q.   Whether we call it pooled or

16   meta-analysis, it included those?

17        A.   I agree.

18        Q.   And it doesn't include any other

19   outside data points; there were no other

20   data added other than the McDuffie and the

21   De Roos data; is that your understanding?

22        A.   I believe it included the AHS

23   cohort as well.

24        Q.   Why don't you take a look.

1      A.    Okay.  We're talking about --

2      Q.    We're talking about Pahwa --

3      A.    Oh, sorry.  I'm sorry.  I believe

4  Zhang did, but Pahwa did not.  That's

5  correct.

6      Q.    Yes.  I'm jumping around.

7      A.    I'm sorry, yes.

8      Q.    Pahwa just included basically the

9  data for McDuffie 2001 and the data from De

10  Roos 2003?

11      A.    Yes.

12      Q.    And by the way, the reason I'm

13  specifying De Roos 2003 is because there

14  separately is a paper De Roos 2005, which

15  provided an earlier report of data from the

16  Agricultural Health Study.

17          I'll hand you what I've marked as

18  Exhibit 11 (handing)

19          (Whereupon, the aforementioned

20      Erikkson article entitled, "Pesticide

21      Exposure as Risk Factor for

22      Non-Hodgkin's Lymphoma Including

23      Histopathological Subgroup Analysis"

24      was marked as Braunstein Exhibit 11 for

1    identification as of this date by the

2    Reporter.)

3    A.    Thank you.

4    Q.    This is a study -- Exhibit 11 is a

5    study by Eriksson; is that right?

6    A.    Correct, 2008.

7    Q.    And this is the fourth study on

8    Table 1 in your report, right?

9    A.    Right.  Reference 49 in my study,

10   yes.

11   Q.    And in Table 7 -- actually,

12   preliminarily, as was true with McDuffie,

13   Hardell, and De Roos, Eriksson is also a

14   study of pesticide exposure more broadly,

15   not just in glyphosate?

16   A.    Yes.

17   Q.    If we look at Table VII, page

18   1661, Eriksson reported the results of a

19   multivariate analysis -- I'm sorry, reported

20   the results of a univariate analysis, which

21   was not adjusted for the use of other

22   pesticides and which showed statistically

23   significant increase of non-Hodgkin's

24   lymphoma in glyphosate users, correct?

1     A.   You're talking about Table VI,
2  correct?
3     Q.   VII.
4          MR. SILVERSTEIN:  Table VII.
5     A.   Table VII, I apologize.  In the
6  multivariate analysis, you're correct.  The
7  confidence interval is not --
8          (Reporter clarification.)
9     A.   (continuing) I'm sorry.  In Table
10  VII, you're correct.  The confidence
11  interval was not significant in the
12  multivariate analysis.
13     Q.   Okay.
14          And that was for ever/never use,
15  right?
16     A.   Yes, I believe so.
17     Q.   Eriksson also reported on exposure
18  to herbicides for ten days or less than or
19  greater than ten days, correct?
20     A.   Yes.
21     Q.   And that's reported in Table 2,
22  correct?
23     A.   Yes, correct.
24     Q.   And for glyphosate more than ten

1  days, he reports an odds ratio of 2.36 with

2  confidence intervals of 1.04 to 5.37,

3  correct?

4      A.   That's correct.

5      Q.   Now, that -- those data in Table 2

6  are not adjusted for use of other

7  pesticides?

8      A.   That's right.  These are just the

9  cases and controls without the adjustment.

10          MR. SILVERSTEIN:  Do you want to

11      take a few minutes?

12          MR. PIORKOWSKI:  I'm fine if you

13      want to take five now.

14          THE WITNESS:  It's up to you.

15          MR. PIORKOWSKI:  Why don't we take

16      five now?  Off the record.

17          VIDEOGRAPHER:  Time right now is

18      2:56 p.m.  We are off the record.

19          (Whereupon, an off-the-record

20      discussion was held.)

21          VIDEOGRAPHER:  Time right now is

22      3:13 p.m.  We're back on the record.

23      Q.   Doctor, I'm going to hand you what

24  I've marked as Exhibits 12 and 13 (handing).

1              (Whereupon, the aforementioned

2       Cocco article entitled, "Lymphoma Risk

3       and Occupational Exposure to

4       Pesticides: Results of the Epilymph

5       Study" was marked as Braunstein Exhibit

6       12 for identification as of this date

7       by the Reporter.)

8              (Whereupon, the aforementioned

9       Orsi article entitled, "Occupational

10      Exposure to Pesticides and Lymphoid

11      Neoplasms Among Men: Results of a

12      French Case-Control Study" was marked

13      as Braunstein Exhibit 13 for

14      identification as of this date by the

15      Reporter.)

16      A.    Thank you.

17      Q.    And I think I marked them

18   backwards, but I think Exhibit 12 is the

19   Cocco study; and Exhibit 13 is the Orsi

20   study.

21      A.    That's correct.

22      Q.    And those are number five and six

23   in Table 1 in your report?

24      A.    Number five and six in the table,

1    yes.

2        Q.   In Table 1.  Let's start with the

3    Orsi study just briefly.  Orsi is a French

4    case-control study, correct?

5        A.   Yes.

6        Q.   As with the previous case-control

7    studies, this study looked at pesticides

8    generally, not just glyphosate, correct?

9        A.   Yes.  That's correct.

10       Q.   The Orsi study did not find a

11   statistically significant increased risk of

12   NHL in ever users of the glyphosate,

13   correct?

14       A.   That's correct.

15       Q.   And then if you would turn to

16   Exhibit 12.

17       A.   Twelve, yes.

18       Q.   Which is the Cocco paper, which is

19   number six in Table 1 in your report.

20       A.   Yes, correct.

21       Q.   And Cocco is part of what's

22   referred to as the Epilymph study?

23       A.   Yes.

24       Q.   What is the Epilymph study?

1    A.   This is a study to look at the

2  role of occupational exposure in certain

3  groups and in terms of different types of

4  non-Hodgkin's lymphoma --

5         (Reporter clarification.)

6    A.   (continuing) Of different groups

7  in terms of its relationship to

8  non-Hodgkin's lymphoma of different

9  pesticides.

10   Q.   So actually what I was asking is,

11 are you familiar with the Epilymph study is

12 sort of an ongoing consortium; is that the

13 right word?

14   A.   I think so, yes.

15   Q.   And I assume is -- the Epilymph

16 study provides a lot of data on a lot of

17 different potential relationships with

18 non-Hodgkin's lymphoma; is that correct?

19   A.   I think that's correct, yes.

20   Q.   And in Cocco paper, this, again,

21 was a look at pesticides generally not just

22 glyphosate, correct?

23   A.   That's correct, yes.

24   Q.   And the glyphosate results here

1  were based on very small numbers, four cases

2  and two controls; is that right?

3      A.   What do you mean by very small

4  numbers?

5      Q.   There are four cases and two

6  controls.

7      A.   Yes.

8      Q.   And the Cocco study did not find a

9  statistically significant increased risk of

10  non-Hodgkin's lymphoma in glyphosate users,

11  correct?

12      A.   Yes.

13      Q.   So to summarize what we've gone

14  over in Table 1 in your report, out of the

15  six case-control studies that we've

16  reviewed, five and a half of them either

17  showed no statistically significant

18  increased risk of NHL in ever users of

19  glyphosate or showed no statistically

20  significant increased risk when adjusted for

21  other pesticides; is that correct?

22      A.   When you look into the results by

23  certain analyses like the multivariate

24  analyses, that is correct.

1    Q.   And of those six studies, and I

2  asked you this earlier, but we haven't gone

3  through the other ones, but the only study

4  that showed statistically significant

5  increased risk of non-Hodgkin's lymphoma in

6  ever users that adjusted for other

7  pesticides was the logistic regression

8  analysis in De Roos 2003, correct?

9    A.   That's correct in adjustments.

10   Q.   Now, the Pahwa study, which we've

11 alluded to but I don't think we've marked it

12 yet.

13        (Whereupon, the aforementioned

14      Pahwa article entitled, "Glyphosate Use

15      and Associations with Non-Hodkin

16      Lymphoma Major Histological Sub-types:

17      Findings from the North American Pooled

18      Project" was marked as Braunstein

19      Exhibit 14 for identification as of

20      this date by the Reporter.)

21   Q.   I've handed you what I've marked

22 as Exhibit 14 (handing).  This is the same

23 paper we discussed before that includes data

24 from both McDuffie and De Roos 2003.

1        A.    Two studies.

2        Q.    If you turn to Table 2 --

3   actually, before you do that, let's turn to

4   page 602.  Turn to page 602.

5             Do you see at the bottom left the

6   last paragraph on the bottom, it

7   discusses -- beings with to evaluate?

8        A.    I see that.

9        Q.    The article says, quote, to

10  evaluate whether the use of other pesticides

11  might have confounded the association

12  between specific pesticides, example,

13  glyphosate, and NHL, we used a two-pronged

14  approach.  First, a correlation matrix of

15  pooled data was produced to determine the

16  presence and extent of correlation between

17  ever use of glyphosate and each individual

18  herbicide, insecticide, and fungicide

19  reportedly used by NAPP subjects, correct?

20       A.    Yes.  That's what it says.

21       Q.    And by NAPP subjects, we're

22  referring to this study being the North

23  American Pooled Product, right?

24       A.    Yes.  I agree.

1    Q.   And they said if the use of two

2  pesticides are not correlated, then

3  confounding cannot occur, correct?

4    A.   Yes.  That's correct.

5    Q.   And then they go on to say,

6  second, previously published articles based

7  on the individual case-control studies

8  comprising NAPP were searched to identify

9  any positive or significant relationships

10  between individual pesticides and NHL risk,

11  correct?

12    A.   Yes.

13    Q.   Pesticides that were most strongly

14  correlated with glyphosate use, and then

15  they have a definition in parenthesis, and

16  that were statistically significant or

17  strongly associated with NHL in previous

18  studies were evaluated as confounding,

19  correct?

20    A.   That's correct.

21    Q.   So this is an approach to

22  confounding.  We talked about previously the

23  fact that McDuffie had not adjusted for

24  confounding by use of other pesticides?

1    A.   That's correct.  That was the

2  first one.

3    Q.   And you talked about the fact in

4  De Roos 2003, they used two different

5  methods by which to evaluate the use of

6  other pesticides, correct?

7    A.   Correct.

8    Q.   So my question to you is, here

9  they're describing the method that they're

10  using for adjusting for use of other

11  pesticides, correct?

12    A.   Yes.

13    Q.   Okay.

14      And it's essentially a two-step

15  process.  Basically saying step one being is

16  the pesticide correlated with glyphosate

17  use, and the second one being is there some

18  scientific basis to suggest that the

19  pesticide is associated with non-Hodgkin's

20  lymphoma risk; is that a fair summary?

21    A.   Well, yes.  They combine studies

22  and use the analysis to try to use

23  confounding variables.

24    Q.   My question to you is, from your

1  vantage point as a clinician/scientist who's

2  reading this study, does that approach make

3  sense to you as a reasonable approach to

4  adjusting for confounding?

5      A.   I'm a little confused.  Which

6  approach makes sense to me?  You said does

7  that approach.  Which approach?

8      Q.   We're talking about the two-step

9  process they used --

10     A.   I see.

11     Q.   -- to make adjustments for

12  confounding -- potential confounding, right?

13     A.   Right.

14     Q.   Does this process that they

15  identified make sense to you as being

16  reasonable, scientific, logical?

17     A.   I think it's reasonable, yes.

18     Q.   I ask that question because at

19  least in theory, it's possible to

20  overcorrect for data, right?

21     A.   In theory, you can make any

22  mistake or overcorrect for anything, yes.

23     Q.   But here they're trying to make

24  sure one, there's correlation; and, two,

1    there's a basis for suggesting that the

2    other pesticide could affect the outcome?

3        A.   Well, those are two really

4    important questions; so I agree, they may

5    want to examine that.

6        Q.   Just saying it's a sensible

7    approach from your vantage point as a

8    clinician; is that fair?

9        A.   It's a sensible approach to use a

10   particular statistical approach to try to

11   combine studies.  They're may be more than

12   one approach, but I think it's reasonable.

13       Q.   Then it goes on to say that,

14   quote, in the herbicides 2,4-D -- I'm not

15   going to try to read the whole thing.

16       A.   Right.

17       Q.   And Dicamba as well as the

18   insecticide malathion, met both criteria and

19   were, therefore, included in the more fully

20   adjusted secondary logistic regression

21   models, correct?

22       A.   Okay.  We'll take it at the

23   author's word, yes.

24       Q.   Now, in Table 2, it shows the

1  results of ever use glyphosate and under

2  OR -- odds ratio B, odds ratio B included

3  adjustment for those three other pesticides

4  that met those two criteria that we just

5  discussed, correct?

6      A.  Yes.  They adjusted for it says

7  age, sex, state, province, lymphatic or

8  hematopoietic cancer, first-degree relatives

9  use of a proxy responding or use of any

10 personal protective equipment or use of

11 other pesticides.

12     Q.  Specifically, three other

13 pesticides?

14     A.  The ones we mentioned, yes.

15     Q.  And when they did that analysis,

16 there was no statistically significant

17 increased risk of non-Hodgkin's lymphoma

18 overall for ever use of glyphosate, correct?

19     A.  Correct.  Just actually when

20 you're looking at -- let me rephrase that.

21 For the ever -- ever use glyphosate there

22 was an odds ratio of 1.43 that was

23 statistically significant for NHL overall;

24 and for diffuse large B-cell lymphoma for

1  ever use, there was also a statistically

2  significant odds ratio of 1.6.

3      Q.   But my question was about the

4  adjusted odds ratio.

5      A.   Oh, I'm sorry.  For B, you're

6  correct.  For those there were no confidence

7  intervals that were statistically

8  significant.  Sorry.

9      Q.   And each and every one of the

10  subtypes that were analyzed also did not

11  show statistically significant increase for

12  ever use of glyphosate, correct?

13      A.   When they broke it into different

14  types of NHL, that's correct.

15      Q.   Yes.

16          Now, in your report on page 11 you

17  say in the last sentence on the page, for

18  example, the North American Pooled Project

19  study in 2019 of glyphosate use and

20  non-Hodgkin's lymphoma was also published

21  and demonstrated that glyphosate exposure

22  for greater than two days per year resulted

23  in a significant twofold increased risk for

24  DLBCL; and then you give the odds ratio and

1    confidence intervals, correct?

2         A.    Correct.

3         Q.    Now, I want to direct your

4    attention to the discussion section that

5    appears on 606.

6         A.    Okay.

7         Q.    And you see it's middle of the

8    paragraph.  It says although there is a

9    statistically significant association

10   between ever glyphosate use and

11   non-Hodgkin's lymphoma overall, this

12   association was attenuated and became no

13   longer statistically significant when

14   adjusted for recorded use of 2,4-D Dicamba

15   and malathion.  Did I read that correctly?

16        A.    Yes, you did.

17        Q.    That's what we just discussed a

18   minute ago?

19        A.    I agree, yes.

20        Q.    Then it goes on to say, however,

21   the significant excess risk among those who

22   reported use of glyphosate for greater than

23   or equal to two days per year was not

24   eliminated by adjustment for other

1  pesticides, which is the point you're making

2  in your report, correct?

3       A.   Yes.

4       Q.   Then the sentence goes on to say

5  although the trend test was not

6  statistically significant after adjustment

7  for other pesticides?

8       A.   Yes.

9       Q.   What does that mean?

10       A.   It means when they adjusted for

11  other pesticides that were studied in these

12  studies, that they did not find a

13  statistically significant result.

14       Q.   And the next sentence says, there

15  was no pattern of increasing the risk of NHL

16  overall with increasing years of use of

17  glyphosate.  Did I read that correctly?

18       A.   Yes.  You read that correct, yes.

19       Q.   What does that mean?

20       A.   Well, pattern means either a trend

21  or a finding of increased risk of NHL of all

22  the subgroups that were involved in this

23  study when they looked at number of years of

24  glyphosate use.

1        Q.    Now, can you turn back to page 603

2  for a second.

3        A.    Yes.

4        Q.    Do you see in the section called

5  results?

6        A.    Yes.

7        Q.    So they're summarizing the number

8  of available cases as a part of the overall

9  analysis in the North American Pooled

10 Project overall?

11       A.    You are talking about the second

12 part of the results; it says glyphosate use

13 and association to NHL overall --

14       Q.    I'm actually talking about the

15 very first sentence that says total of 16 --

16       A.    Oh, I'm sorry.

17       Q.    -- 90 NHL cases and 51/31 controls

18 was available for analysis.

19       A.    And the question again was what

20 again?

21       Q.    That's describing the population

22 that was studied in the pooled analysis,

23 correct?

24       A.    Yes.

1      Q.   And then it says all NHL cases and

2  controls including those proxy respondents

3  were included in the analysis of ever/never

4  glyphosate use, correct?

5      A.   Correct.

6      Q.   Then it goes on to say for

7  assessments involving duration of use, 1,520

8  cases and 4,183 controls were included,

9  right?

10     A.   Correct.

11     Q.   And then it says for frequency and

12  lifetime days' analysis, 898 cases and 2,938

13  controls were included, right?

14     A.   Yes, correct.

15     Q.   Now, 898 cases out of 1,690 cases

16  is a little more than 55 percent; is that

17  right?

18     A.   Roughly, yes.

19     Q.   And so with respect to the numbers

20  that they're reporting for frequency and

21  lifetime days' information, only

22  approximately 55 percent of this study

23  population had any data to contribute to

24  that question; is that right?

1    A.   Well, I assume that's why they
2  selected those 898 cases, yes.
3    Q.   I'm going to hand you what I've
4  marked as Exhibit 15 (handing).
5        (Whereupon, the aforementioned
6        Andreotti article entitled, "Glyphosate
7        Use and Cancer Incidence in the
8        Agricultural Health Study" was marked
9        as Braunstein Exhibit 15 for
10       identification as of this date by the
11       Reporter.)
12   Q.   Take a second to look at it.
13   A.   I've seen this before.
14   Q.   I suspect you have.  Okay.
15       Now, can you identify Exhibit 15?
16   A.   So this is the Agricultural Health
17  Study, AHS, by Andreotti from 2000 -- I
18  think it was 2018.  2018, yes.
19   Q.   And is it your understanding that
20  this is a prospective study?
21   A.   Yes, sir.
22   Q.   Is it your understanding that it's
23  a cohort study?
24   A.   Yes, yes, sir.

1       Q.   Do you have an understanding of

2   who sponsored the study?

3       A.   I believe it was the US

4   government.

5       Q.   And by the US government, you mean

6   National Institutes of Health, National

7   Cancer Institute, the Division of Cancer

8   Epidemiology and Genetics, and the National

9   Institute of Environmental Health Sciences?

10      A.   Those are the affiliation of the

11  authors.  I'm not certain if they sponsored

12  it.

13      Q.   Now, this study involved 54,251

14  participants, and I'm referring to where the

15  results section is under page 511.

16      A.   Yes.  They call them applicators;

17  but, yes, I agree those were the

18  participants or applicators.  Yes, we're in

19  agreement.

20      Q.   And 44,932 of those or 82.8

21  percent reported being ever users of

22  glyphosate at the time of enrollment,

23  correct?

24      A.   Yes.

1    Q.   So just to put it bluntly 82

2  percent of the patients they studied had

3  exposure to glyphosate by their own history?

4    A.   Yes.

5    Q.   We talked earlier about the Zhang

6  paper, which was Exhibit 7.

7    A.   Yes.

8    Q.   Do you have that handy?

9    A.   Yes, I have it.

10    Q.   Zhang was the meta-analysis we

11  talked about earlier.

12    A.   Yes.  The various case-control

13  studies, yes.

14    Q.   Not just the case-control studies.

15  She also included some data in the

16  Agricultural Health Studies, correct?

17    A.   Yes, she did.  She included data

18  from AHS.

19    Q.   So if we look at Table 4 on page

20  196.

21    A.   Right.

22    Q.   You see that she actually did two

23  different analyses.  She did one analysis

24  with what she calls AHS 2018, which is the

1    data that we just looked at from --

2         A.    Exhibit.

3         Q.    -- Exhibit 15?

4         A.    Yes.

5         Q.    And then she did another analysis

6    which she calls AHS 2005.  It's based on the

7    study we referred to earlier which is De

8    Roos 2005, right?

9         A.    Yes.

10        Q.    Now, one of the things -- and

11   she -- in Table 4 she lists AHS cohort; and

12   she lists case-control studies there, right?

13        A.    Yes.

14        Q.    One of the things that she does in

15   this paper as a part of this meta-analysis

16   is, she has objective criteria by which she

17   ranks the quality of the studies that she

18   uses in her meta-analysis, correct?

19        A.    Yes.

20        Q.    And on Table 2, she divides this

21   up into cohort studies and case-control

22   studies in Table 2 and 3 respectively,

23   correct?

24        A.    Yes.  That's correct.  Table 2 is

1  the cohort, and Table 3 is the case control.

2      Q.   Right.

3           But with respect to in Table 2,

4  she evaluates the Andreotti, the quality of

5  the Andreotti study; and she gives it a

6  score of eight, correct?

7      A.   Overall quality score, yes.

8      Q.   And that's eight out of a possible

9  nine; is that right?

10     A.   I don't remember; but if that's

11 what you read in the methods, I'll take that

12 for granted, yes.

13     Q.   If you look at the scoring system

14 she uses, you either get one point or zero

15 points?

16     A.   Yes.  I see it, yes.  Okay.  I

17 agree.

18     Q.   Okay.

19          So of -- and then with respect to

20 the other case-control studies, she

21 evaluates them and in Table 3, right?

22     A.   Correct.

23     Q.   And you'll agree with me that she

24 gives Andreotti the highest quality

1  assessment score of any of the studies in

2  her meta-analysis; is that fair?

3     A.   The others were less than eight,

4  yes.

5     Q.   Okay.

6          Do you agree that the Andreotti

7  2018 study was well conducted?

8          MR. SILVERSTEIN:  Objection to the

9     form.

10    A.   Well, I think we have to give the

11 authors credit for embarking on a -- such a

12 large study.  It was prospective as compared

13 to case-control studies; so it's a different

14 approach.  In my opinion, there are flaws to

15 this study; but I think it was conducted in

16 a way that nicely contributed to the

17 literature in certain regards.

18    Q.   And what in your view did it

19 contribute to the literature?

20    A.   Well, again, it was a prospective

21 study; and they're of a large population of

22 individuals who were reported glyphosate

23 use.  It's an ongoing study as I understand;

24 so, you know, it's going to continue to

1  assess exposure over time and reported

2  outcomes of -- including non-Hodgkin's

3  lymphoma.  And it allows us to track the

4  large population over time.  I think that's

5  its greatest contribution.

6      Q.   Now, do you recall that the

7  average -- I shouldn't say average, the

8  median time of pesticide use at the time of

9  enrollment was approximately 15 years in the

10  city subjects in the Agricultural Health

11  Study?

12      A.   I have to check if that was the

13  median -- my understanding was the median

14  was less than that in the initial analysis.

15  Let me see if we can ascertain that.  They

16  say that the median time use was 8.5.

17      Q.   Where are you looking?

18      A.   This is page 511, results.  It's

19  in the first paragraph.  Among participants

20  reporting ever used glyphosate at enrollment

21  or follow up.  Among participants who use

22  glyphosate, the median lifetime days use was

23  48; and the median lifetime year use was

24  8.5, and then we have to look at the median

1  follow-up time.  In the methods in the study

2  design, they enroll patients between 1993

3  and 1997.  Just one second.

4       Q.   Take your time.

5       A.   Sure.  Sorry.  I'm having a hard

6  time finding that number.

7       Q.   Let me ask you this, separate

8  from -- I know you read this particular

9  paper that we've marked as Exhibit 15.  Did

10  you read any of the other papers like the

11  design papers that were published concerning

12  the Agricultural Health Study?

13       A.   Design studies, I don't know.

14       Q.   Do you know that the outset of a

15  major study they often publish what they

16  call a design paper?

17       A.   Well --

18       Q.   Where the authors describe what

19  their intended objectives are and what their

20  analysis -- how they're going to go about

21  their analysis?

22       A.   Since my report -- in Dr. Reshef's

23  report, he didn't allude to the imputation

24  method that they used in the study; and that

1  was by the same authors of this current

2  study, so that I read.

3       Q.   The imputation method is having to

4  do with a slightly different issue.  I'm

5  just asking about there's some design papers

6  by Alavanja?

7       A.   I have not.

8       Q.   Let me ask you this, is it fair to

9  say that the Agricultural Health Study is

10  the largest study of glyphosate users in the

11  published literature?

12       A.   I think it's fair to say it's the

13  largest prospective study, yes.

14       Q.   Is there a larger retrospective

15  study?

16       A.   Not that I'm aware of so, yes.

17       Q.   And I'm going to ask you to just

18  turn to -- in addition to looking at

19  non-Hodgkin's lymphoma, the Agricultural

20  Health Study looked at a variety of

21  different kinds of cancer; is that right?

22       A.   Yes.  I believe in Table 2 they

23  separated by different types of cancers.

24       Q.   And the results of the study were

1  that they found overall there was no

2  increase in the incidence of cancer compared

3  to the nonglyphosate users; is that fair?

4      A.   Yes.  I believe that was the

5  conclusion.

6      Q.   Now, I want to ask you to turn

7  to -- you just alluded to Table 2.  Can you

8  turn to Table 2 where it reports the data

9  for a lot of combined end points like

10  non-Hodgkin's lymphoma, and then it actually

11  breaks the data down into some individual --

12      A.   That's correct, yes.

13      Q.   So turn to non-Hodgkin's lymphoma,

14  which is the fourth one down on page 513.

15      A.   Yes.  I see it.

16      Q.   And what this tells you in the --

17  do you have an understanding of what Q1, Q2,

18  Q3, Q4 means?

19      A.   I believe there were quartiles of

20  different lengths of exposure.

21      Q.   So if we wanted to identify the

22  total number of non-Hodgkin's lymphoma cases

23  that occurred in glyphosate users in the

24  Agricultural Health Study, --

1       A.    Yes.

2       Q.    -- we would basically take the sum

3  of the Q1, Q2, Q3, and Q4 numbers; is that

4  right?

5       A.    That should add up to the total

6  number of patients in this analysis with

7  non-Hodgkin's lymphoma.

8       Q.    If you do the math, does it look

9  like that comes out to 440?

10      A.    Yes.  It would be about that much.

11  I mean, I didn't do it in my head; but it

12  seems like each quartile is about a hundred,

13  so it would be about 400.

14      Q.    Yes.  I'll represent that it's --

15      A.    I believe you.

16      Q.    So if there are 440 cases of

17  non-Hodgkin's lymphoma that occurred among

18  44,932 glyphosate users, what that means is

19  that over the course of this study, less

20  than one percent of the patients that were

21  exposed to glyphosate were diagnosed with

22  non-Hodgkin's lymphoma; is that true?

23      A.    That's correct, yes.

24      Q.    Now, you alluded earlier to, I

1  think you said you thought there was some

2  flaws with the study?

3      A.   Well, one of the criticisms of the

4  study is the response rates in terms of the

5  return of the surveys or responses of, I

6  believe the number was 37 percent of the

7  respondents did not follow up; so this

8  imputation method was a way to kind of fill

9  in those gaps.

10     Q.   So let me ask you, have you been

11 involved -- I mean, I know we talked about

12 your work with respect to glyphosate and

13 Roundup; and you haven't done any studies,

14 but have you done any prospective studies

15 generally in your professional capacity?

16     A.   So clinical trials are prospective

17 studies.  I haven't done toxicology studies.

18     Q.   So you're alluding to a randomized

19 controlled clinical trial?

20     A.   That would be prospective, yes.

21     Q.   That would be prospective, sure.

22     A.   Yes.

23     Q.   Have you ever done an

24 observational prospective study?

1      A.   Observational -- by observational

2   you mean where you don't have an

3   intervention but you're just looking for an

4   outcome among individuals without an

5   intervention?

6      Q.   Right.

7           Well, the trials you're describing

8   are randomized trials, correct?

9      A.   Phase three randomized.

10     Q.   So when somebody signs up for the

11  trial, they don't know whether they're going

12  to be in the treatment group or the control

13  group?

14     A.   Right.  That's how they're

15  randomized, yes.

16     Q.   So that's referred to as a

17  controlled clinical trial, right?

18     A.   Randomized controlled or RCT,

19  randomized controlled trial.

20     Q.   But definition, it's prospective,

21  right?  You're looking -- you're assigning

22  people to treatment or not treatment and

23  then following it forward in time, right?

24     A.   I don't think you can do a

1   retrospective clinical trial; so, yes, by

2   nature they're prospective.

3       Q.   So, yes, what I'm talking about,

4   have you done any -- so the Agricultural

5   Health Study is by definition a prospective

6   observational cohort study, right?

7       A.   That's correct.

8       Q.   Have you done any kind of

9   prospective observational cohort outside of

10  your experience with clinical trials?

11      A.   No.

12      Q.   Have you ever designed a

13  prospective observational cohort study?

14      A.   I've designed prospective

15  non-interventional studies, for example,

16  microbiology of individuals but I have not

17  designed prospective observational studies

18  where you're just asking about an outcome, I

19  guess.

20      Q.   Okay.  Fair enough.

21           You understand that when you're

22  doing a prospective study and you're

23  following a cohort of people forward in

24  time, there's always going to be some amount

1  of your study population that's lost to

2  follow up?

3      A.   It's one of the potential issues

4  with any population study, yes.

5      Q.   I mean, because by definition, you

6  can't force a study subject to stay involved

7  in the study, right?

8      A.   Things happen in every study; and,

9  yes, sometimes that happens.

10     Q.   The idea of loss to follow up in a

11 prospective study is a common problem,

12 right?

13     A.   I mean, common is a broad term;

14 but it is a potential, potential problem

15 that can happen especially when you have

16 larger numbers you can increase the number

17 of people who follow up on the studies.

18     Q.   When I say common, I mean,

19 virtually every prospective observational

20 study has some level of loss to follow up?

21     A.   I agree with that.

22     Q.   May be low or may be high, but

23 there's always going to be some loss to

24 follow up?

1    A.   Very likely, yes.  I will agree

2  with that.

3    Q.   And because of the -- because this

4  is a common problem, biostatisticians and

5  epidemiologists have developed methods for

6  dealing with loss to follow up in a

7  scientifically reasonable fashion; is that

8  fair?

9    A.   Yes.  They've come up with methods

10  to adjust for those inevitable issues with a

11  prospective study, yes.

12    Q.   One of the tools that scientists

13  use to help understand the data in

14  situations where there is loss to follow up

15  is a tool called imputation; is that fair?

16    A.   Well, they've used it in this

17  study.  I don't know if they've used it in

18  other studies.

19    Q.   Do you know whether imputation is

20  a tool that's generally used by

21  epidemiologists and biostatisticians?

22    A.   I have not seen it used elsewhere,

23  so I don't know.

24    Q.   Did you review as part of your

1   material -- let me back up.

2           Are you aware that after the

3   publication of the Agricultural Health Study

4   in 2018, there was a letter to the editor

5   that was sent identifying this potential --

6   this loss to follow up problem and asking

7   whether it adversely affected the results?

8       A.   I believe there was.  Maybe I have

9   it in my references.  I don't think I have

10  any references.  I'm not aware of that.  I'm

11  not aware of that letter.

12      Q.   So I had asked you about

13  identifying flaws in the Agricultural Health

14  Study, and you mentioned the loss to follow

15  up issue.  Are there other flaws that you

16  believe apply to this study?

17      A.   You know, in addition to -- we

18  talked about biases and the case-control

19  study.  There may be biases in a prospective

20  study as well in terms of the ability to

21  recall information, so that could

22  potentially be a bias as well.  It may be

23  less in a prospective study, but it may

24  still be present.

1          Q.   Are you aware that one of the

2    reasons for undertaking Agricultural Health

3    Study was because case-control studies -- or

4    because prospective studies don't have the

5    issue of recall bias?

6               MR. SILVERSTEIN:  Objection to

7          form.

8          A.   Well, the rate is reduced,

9    exact -- I agree with that statement.  It

10   was reduced with a prospective study.

11         Q.   So are you aware that there were

12   validation studies conducted on the

13   Agricultural Health Study to evaluate

14   whether the information that was received

15   from the study subjects was accurate?

16         A.   No, I'm not aware.

17         Q.   With respect to exposure -- with

18   respect to exposure, the Agricultural Health

19   Study included three different metrics for

20   assessment of exposure; is that correct?

21         A.   I believe so, yes.

22         Q.   And the three metrics were --

23         A.   I think was ever --

24         Q.   Ever/never use, lifetime days of

1  use, and intensity weighted lifetime days of

2  use, correct?

3      A.   Yes.

4      Q.   Is there any other study that

5  you've read that evaluates exposure with

6  that same level of granularity?

7      A.   No.

8      Q.   Am I also correct that the

9  Agricultural Health Study evaluated --

10  included an evaluation of dose response?

11      A.   They broke the patients -- the

12  participates up into quartiles, different

13  degrees of response, yes.

14      Q.   And did they find any --

15  notwithstanding that overall they found no

16  increase in non-Hodgkin's, was there any

17  trend towards increasing non-Hodgkin's

18  lymphoma that was identified as a part of

19  the study with increasing dose?

20      A.   Not in the quartiles, no.

21      Q.   Let's turn to the Zhang paper.

22  Are you aware by the way that Dr. Zhang is

23  an expert on behalf of the plaintiffs in the

24  Roundup litigation?

1         A.    I am not.

2         Q.    Now, I want to -- what Dr. Zhang

3    is doing in this -- I'm sorry.  One last

4    question.

5              The Andreotti 2018 data that we

6    just talked about that we were talking about

7    with the Agricultural Health Study, those

8    data from that study were -- had not been

9    published at the time of the IARC

10   evaluation, correct?

11        A.    It had not been published, that's

12   correct.

13        Q.    So the only information IARC had

14   available from the Agricultural Health Study

15   was the data that had been published 13

16   years earlier by De Roos in 2005?

17        A.    Including that study.  They also

18   had animal study and genotoxicity study,

19   yes.

20        Q.    But I'm talking about with respect

21   to the Andreotti, the data for the

22   Agricultural Health Study?

23        A.    Yes.  They did not have that.

24        Q.    And so when IARC reached its

1  conclusion in 2015, it did not have the

2  benefit of the data from the Agricultural

3  Health Study; is that correct?

4       A.   That's my understanding, yes.

5       Q.   Now, if we turn to the Zhang

6  paper.

7            MR. PIORKOWSKI:  Are you doing all

8       right?

9            THE WITNESS:  I'm good.  We can

10      continue by all means.

11      Q.   Couple things I just want to ask

12  you about in the Zhang paper.  On page 187,

13  under the ubiquitous exposure in humans; do

14  you see that?

15      A.   Yes, sir.

16      Q.   This is at the very bottom of 187,

17  quote, limited data exists on internal

18  glyphosate levels among GBH-exposed

19  individuals, correct?

20      A.   Yes, I see that.  Correct.

21      Q.   And is that consistent with your

22  understanding of the science?

23      A.   Well, I didn't specifically look

24  at internal glyphosate levels in these

1  individuals in the studies or in the science

2  in general; so I wasn't focusing my

3  attention of internal glyphosate levels, but

4  they have a reference here.  So I'll make

5  that assumption that that's correct, I

6  suppose.

7       Q.   Okay.

8            So do you see on page 188, the

9  authors described their a priori hypothesis,

10  right?

11       A.   Yes.

12       Q.   It states, our a priori hypothesis

13  is that the greater exposure to GBHs, i.e.,

14  higher levels, longer durations, and/or with

15  sufficient lag and latency, will lead to

16  increased risk of non-Hodgkin's lymphoma in

17  humans, correct?

18       A.   Yes, correct.

19       Q.   So what she's saying there is,

20  she's saying their hypothesis is that

21  there's a dose response relationship either

22  with longer durations of use or higher

23  amounts of use; is that fair?

24            MR. SILVERSTEIN:  Objection to the

1     form.

2          A.   I think that -- I don't know what

3     she is saying, but that's how I interpreted

4     that she's -- or the authors are making

5     hypothesis that more -- essentially more

6     exposure, whether you call it higher levels

7     or longer durations will lead to an

8     increased risk of NHL in humans.

9          Q.   Now, logically, if you're going to

10    test that hypothesis, you need to test it

11    with data that includes people who've had

12    high exposure and people who have low

13    exposure; is that true?

14         A.   Well, it depends -- it's not just

15    high in terms of concentration.  It could be

16    length of time, but those could be relative

17    values.

18         Q.   Fair enough.

19              Whether it's length of time,

20    whether it's number of days per year,

21    whether it's number of lifetime years, you

22    need to have some data in order to test the

23    hypothesis.  You need -- if you're going to

24    look at an underlying study, the study has

1  to give you some information about here is

2  the risk of higher exposed patients or

3  subjects; here is the risk of lower exposed

4  patients, right?

5      A.   Well, if you don't have a higher

6  exposed comparative group, you can't test

7  the hypothesis; so I agree.

8      Q.   And a study that doesn't

9  differentiate between higher exposed and

10  lower exposed really can't add to the

11  information to test the hypothesis, true?

12          MR. SILVERSTEIN:  Objection to

13      form.

14      A.   The study to test the hypothesis

15  can't test it if the groups that they want

16  to compare are not included.

17      Q.   Fair enough, okay.  I think we're

18  saying the same thing.

19          Turn to Table 4 for a moment.

20      A.   In the same exhibit.

21      Q.   Yes.

22      A.   Table 4 you said.

23      Q.   Yes.

24          Now, we alluded to this a little

1  bit before; but there are two analyses she

2  does.  One is with the AHS 2018; one is with

3  the AHS 2005, correct?

4       A.   Yes.  I see it.

5       Q.   But the primary analysis is the

6  2018 analysis, right?

7       A.   What do you mean by primary

8  analysis?

9       Q.   Well, that's the main analysis.

10 She discusses her results.  She's discussing

11 the 2018 analysis results.

12      A.   Yes.  I agree.

13      Q.   Now, Table 4 talks about the

14 different studies that she used, right?

15      A.   Right.  The AHS cohort, the case

16 control group.

17      Q.   And you understand that with

18 respect to the Agricultural Health Study,

19 she used only a small fraction of the

20 Agricultural Health Study data; is that your

21 understanding?

22      A.   She didn't use the entire

23 population.  I don't know if it was a small

24 fraction, but she did not include the entire

1    population.

2         Q.   What's your understanding of what

3    the numbers mean; you see where it says

4    Table 4 exposed/total?

5         A.   That would be the number of

6    individuals exposed over the exposed plus

7    unexposed; is that what you mean?

8         Q.   What does 55 mean?

9         A.   Those are the cases of exposed

10   individuals in the study.

11        Q.   Fifty-five cases?

12        A.   I think that's how I understand

13   it.

14        Q.   And 575 exposed individuals?

15        A.   No.  The total is 575.

16        Q.   Total number of cases?

17        A.   The total number of cases, yes.

18   It's the total exposed and the total number

19   of cases.

20        Q.   If you look at the studies that

21   they include, do you see it has AHS cohort;

22   and it has case-control studies in Table 4,

23   right?

24        A.   Yes.  I see it.

1       Q.   Now, if you look at the

2    case-control studies that she references, do

3    you see she has category called exposure

4    category, right?

5       A.   I see it.

6       Q.   So out of the five case-control

7    studies that she cites, three of the five

8    report only ever/never use, right?

9       A.   Yes.  That's correct.

10       Q.   And if they report only ever/never

11    use and they don't differentiate between

12    people who are higher exposed and people who

13    are lower exposed, then those studies can't

14    really contribute meaningfully to test the

15    hypothesis that she's putting forward; can

16    it?

17       A.   Well, if you're looking at the

18    data in aggregate, they can contribute to

19    the exposed individuals; but they can't

20    contribute to any kind of length of exposure

21    because ever could mean a day or it could

22    mean more than that so --

23       Q.   The comparison she's doing though

24    is, she's not comparing exposed people to

1  unexposed people; she's comparing people

2  with low exposure or short exposure to

3  people with long exposure, correct?

4      A.    Right.

5      Q.    Okay.

6            And if that's the comparison

7  you're making, a study that has only

8  ever/never data can't contribute to test the

9  hypothesis; can it?

10     A.    If -- well, it could if you are

11  including the never patients in more

12  granularity to the number of days or years

13  that the ever group included and then

14  compare that in aggregate to another group

15  outside of that study that had never use or

16  less use.

17     Q.    Do you know whether that's what

18  she did?

19     A.    I don't think that's what she did.

20     Q.    You don't think that's what she

21  did?

22     A.    I don't know for certain, but I

23  don't think that's what she did.

24     Q.    Now, you see you read earlier the

1  paragraph that says, although there are

2  different perspectives on the best way to

3  account for other pesticide exposures, --

4       A.   Yes.

5       Q.   -- we selected relative risk

6  estimates that adjusted for other pesticide

7  use over their unadjusted counterparts to

8  mitigate potentially substantial

9  confounding.  Now, I read that correctly?

10      A.   Yes, yes.

11      Q.   If you see, you go to the risk

12 estimate under Eriksson, do you see the risk

13 estimate under Eriksson?

14      A.   Yes.

15      Q.   The Eriksson study, did, in fact,

16 adjust for use of other pesticides with

17 respect to its ever/never analysis; do you

18 recall that?

19      A.   Yes.

20      Q.   But do you remember the data point

21 we looked at for 2.36, and you can refer

22 back to it if you need to, the 2.36 data,

23 2.36 odds ratio for use for greater than ten

24 days was not adjusted for use of other

1    pesticides; is that correct?

2         A.   Yes.  I recall that.

3         Q.   So I promised we'd finish up by

4    5:00; so I'm going to turn to some stuff

5    related to Mr. Thomas, okay?

6         A.   Okay.  Sure.

7         Q.   I just wanted to ask you

8    something.  I want to make sure I'm not

9    missing something or misunderstanding

10   something.

11             On your report on page eight,

12   there's a paragraph that starts genes that

13   can't promote cancer development; do you see

14   that?

15        A.   Yes.

16        Q.   And then on page nine, there's

17   what appears to me to be the same paragraph

18   with the exception of the last sentence.

19   Yes.

20        A.   It appears to be the same

21   paragraph, yes.

22        Q.   Was there a particular reason for

23   including or that was just --

24        A.   I think it's just --

1        Q.    Call it a replication error?

2        A.    That could be that part of it or

3   maybe it was just pertinent to repeat.  I

4   mean, it might have been just been a copy

5   and paste mistake; but I think it adds to,

6   you know, the general and then specific to

7   his case.

8        Q.    And then similarly under the

9   lymphoma caused by Roundup, you see on page

10  eight it says in general cancer is caused by

11  inherited or prior defects?

12       A.    I see that, yes.

13       Q.    And you see on page seven, it's

14  the same paragraph?

15       A.    Yes.  I see it.

16       Q.    So, again, there's not a purpose

17  of putting that in twice.  It's just --

18       A.    No.  I think it's worth

19  reiterating, I guess, in different context,

20  general and then specifically.

21       Q.    On page six, you talk about

22  Mr. Thomas' prognosis.

23       A.    Yes, sir.

24       Q.    So -- and I've reviewed this; but

1   I guess my question is, at the end of the

2   day when you take all this information

3   together, what is your best estimate of

4   Mr. Thomas' prognosis?

5            MR. SILVERSTEIN:  Objection to

6        form.

7        A.   So what I've included in my report

8   is the way clinically we may speak to

9   patients when they ask us, you know, how

10  long am I going to live or, you know, how

11  long am I going to stay in remission; and so

12  the International Prognostic Index or IPI is

13  one way to kind of quantify that using a few

14  variables and although it may not apply as

15  well to a DLBCL that is in a less common

16  location, using that estimate, you know, in

17  this case, we asked -- I estimated that the

18  five-year survival for a Stage 1 would be

19  74 percent.

20       Q.   And that's based on his staging?

21       A.   That's based on Stage 1 DLBCL, and

22  he was a Stage 1.

23       Q.   Okay.

24            And are there other factors that

1    in your view detract from the estimate?

2         A.   Not specifically, no.

3         Q.   So if he were to ask you what's my

4    five-year survival based on my staging, your

5    answer would be, you know, we can't tell you

6    exactly; but based on our international

7    prognostic index, 74 percent?

8         A.   Yes.

9         Q.   Do you have an opinion given -- is

10   he currently in remission in your view?

11        A.   As far as I know at the last

12   follow up, he is.

13        Q.   Do you have any opinion that you

14   plan to express at trial about the

15   likelihood that he will have a recurrence?

16        A.   Well, using the IPI, you can also

17   calculate something called a progression

18   free survival, which is the time an

19   individual is expected to stay in remission;

20   and if we calculate that for him, it would

21   be somewhere to 80 to 94 percent give or

22   take an additional value, a laboratory value

23   that contributes to the score which we

24   didn't have.  But it would be between 80 to

1    94 percent at four years that he would

2    remain in remission according to that score.

3         Q.    Indefinitely?

4         A.    That's not how the progression

5    free survival is calculated.  It would be at

6    four years, and it doesn't go beyond that so

7    I don't think you can extrapolate.

8         Q.    So 80 to 94 percent that at the

9    four year mark he won't have a relapse?

10        A.    Correct.

11        Q.    But there's nothing that gives you

12   any information about ten years or fifteen

13   years; is that what you're saying?

14        A.    Yes, sir.

15        Q.    There's nothing in Mr. Thomas'

16   case about his pathology or his laboratory

17   tests that suggests to you that his

18   lymphoma -- let me just ask you -- let me

19   restart.

20             Are there any laboratory tests or

21   specific histopathologic features that are

22   unique to Roundup and glyphosate or suggest

23   that a non-Hodgkin's lymphoma is caused by

24   Roundup glyphosate?

1    A.   None that I'm aware of that are

2 used clinically.

3    Q.   So you're not planning to come in

4 at trial and say, oh, because of the

5 positive CD20 markers or something, that

6 that means that his non-Hodgkin's lymphoma

7 was caused by Roundup?

8    A.   I agree with you.  I'm not.

9    Q.   I'm just asking.  Trying to

10 clarify.

11         You talk in your report about the

12 fact that his non-Hodgkin's lymphoma

13 developed in his spleen?

14    A.   In his spleen, yes, correct.

15    Q.   And that's an uncommon location?

16    A.   Typically the lymphoma arises in

17 the lymph nodes or bone marrow.

18    Q.   What's the significance of the

19 fact that his non-Hodgkin's lymphoma arose

20 in his spleen?

21    A.   Just that it's a less common

22 location, and I don't think it has any other

23 specific significance.  It's just an

24 uncommon feature especially Stage 1.  More

1  commonly marginal zone lymphomas occur in

2  the spleen.

3      Q.   Does the fact that his

4  non-Hodgkin's lymphoma developed in his

5  spleen make it any more or less likely that

6  Roundup was implicated in etiology?

7          MR. SILVERSTEIN:  Objection to

8      form.

9      A.   Well, there would be no test to

10  ascertain that one way or the other other

11  than on pathology so --

12     Q.   Were the symptoms that Mr. Thomas

13  experienced during his treatment typical of

14  consisting with the symptoms that patients

15  typically develop when they undergo RCHOP

16  chemotherapy?

17     A.   Let me just have a look to refresh

18  my memory of what I wrote in the report.

19     Q.   Sure.

20     A.   Summarize the complications.  So

21  in my report, it says he suffered

22  constipation.  That can happen with RCHOP

23  chemotherapy.  Headaches, perhaps.  Dysuria,

24  it's not necessarily common.  Insomnia, yes.

1  Fatigue, yes.  And generalized anxiety about

2  recurrence is not specific to RCHOP, but

3  obviously happens with many cancer patients.

4       Q.   Doctor, I'm going to hand you what

5  I've marked as Exhibit 16 (handing).

6            (Whereupon, the aforementioned

7       Larsson article entitled, "Obesity and

8       Risk of Non-Hodgkin's Lymphoma: A

9       Meta-Analysis" was marked as Braunstein

10      Exhibit 16 for identification as of

11      this date by the Reporter.)

12      A.   Okay.

13      Q.   Are you familiar with this?  Is

14 this the article that's --

15      A.   Yes.

16      Q.   -- indicated on Exhibit 23?

17      A.   Correct.

18      Q.   And you reviewed this paper

19 before?

20      A.   Yes.  I believe it's referenced in

21 my report.

22      Q.   And this is a meta-analysis; is

23 that correct?

24      A.   Yes.  It says it.

1      Q.   Which looks at a variety of

2  different studies in the literature as of

3  the time this was published?

4      A.   Yes.   Just like the Zhang paper,

5  yes.

6      Q.   And this is published by the

7  National Institute -- well, the author is

8  affiliated with the National Institute of

9  Environmental Medicine; is that right?

10      A.   Yes.   I agree.

11      Q.   Now, in this paper, one of the

12  things they looked at was the relationship

13  between body mass index or BMI and the risk

14  of non-Hodgkin's lymphoma; is that correct?

15      A.   Yes.   That's correct.

16      Q.   And what they found is that you

17  can see the paragraph after the sentence

18  abstract that starts with meta-analysis?

19      A.   Yes.   I see that.

20      Q.   It says meta-analysis stratified

21  by histological subtypes showed that obesity

22  was associated with a statistically

23  significant increased risk of diffuse large

24  B-cell lymphoma, correct?

1       A.    Yes, in six studies.

2       Q.    Relative risk was 1.4 with

3  confidence intervals that range from 1.18 to

4  1.66, correct?

5       A.    Yes.  That's what it says, yes.

6       Q.    That they at the same time found

7  that they did not find the statistically

8  significant increased risk for follicular

9  lymphoma or small lymphocytic lymphoma,

10  chronic lymphocytic leukemia, correct?

11       A.    The confidence intervals were not

12  significant in six studies for follicular

13  lymphoma and three studies for small or

14  lymphocytic lymphoma or chronic lymphocytic

15  leukemia.

16       Q.    And it says these findings

17  indicate that excess body weight is

18  associated with an increased risk of

19  non-Hodgkin's lymphoma especially of diffuse

20  large B-cell lymphoma, correct?

21       A.    Yes.  That's correct.

22       Q.    And B-cell lymphoma is what

23  Mr. Thomas had, correct?

24       A.    Correct.

1    Q.   And his BMI notwithstanding his

2  gastric surgery was consistently above 30

3  prior to his diagnosis of DLBCL, true?

4    A.   Yes.

5    Q.   I'm going to hand you what I've

6  marked as Exhibit 17 (handing).

7    A.   Thank you.

8        (Whereupon, the aforementioned

9        Castillo article entitled, "Obesity Is

10       Associated With Increased Relative Risk

11       of Diffuse Large B-Cell Lymphoma: A

12       Meta-Analysis of Observational Studies"

13       was marked as Braunstein Exhibit 17 for

14       identification as of this date by the

15       Reporter.)

16   Q.   I'll represent that this is a

17 paper in the published medical literature,

18 although I did not see it on your reference

19 list.

20   A.   Yes.  I agree.

21   Q.   Is this a paper you're familiar

22 with or that you have seen before?

23   A.   No.  I have not seen it.

24   Q.   Okay.

1        This is a paper that deals with

2    obesity; or the title is, "Obesity Is

3    Associated With Increased Risk of Diffuse

4    Large B-cell Lymphoma:  A Meta-analysis of

5    Observational Studies," correct?

6        A.   That's the title of the study,

7    yes.

8        Q.   The previous study that we looked

9    at from Castillo was published in 2007,

10   correct -- I'm sorry, from Larsson was

11   published in 2007?

12       A.   It was published in 2007, correct.

13       Q.   And this study was published in

14   2014, correct?

15       A.   Correct.

16       Q.   Now, in the abstract here, the

17   authors state that the relative risk of

18   DLBCL in overweight men and women was 1.22

19   and 1.27 respectively, correct?

20       A.   Yes.  That's what it says.

21       Q.   And that the relative risk of

22   DLBCL in obese men and woman was 1.4 and

23   1.34 respectively, correct?

24       A.   Correct.

1      Q.   And 1.4 is very consistent with

2  what Larsson found in the 2007

3  meta-analysis, correct?

4      A.   Yes.  That's correct.

5      Q.   It says in obese individuals --

6  let me back up.  It says in obese

7  individuals, the relative risk in

8  prospective studies was 1.25.  In

9  case-control studies, it was 1.33.  Meta

10 regression analysis showed a 14 percent

11 increase in DLBCL incidence for every ten

12 kilogram per meters squared increase in body

13 mass index, correct?

14     A.   Yes.

15     Q.   What that means is as you were

16 saying earlier people who have morbid

17 obesity have a much higher risk, correct?

18     A.   That's what I implied from that,

19 yes.  Higher BMI, greater risk.

20     Q.   But this is saying that the risk

21 for someone who's obese is elevated and then

22 it's essentially linear as you have higher

23 body mass index?

24     A.   It's not zero, right.

1          MR. PIORKOWSKI:  Let me take a

2     short break and -- because I want to

3     make sure we finish my 5:00.

4          MR. SILVERSTEIN:  Sure.

5          MR. PIORKOWSKI:  I want to make

6     sure we finish all the Thomas stuff

7     today.

8          MR. SILVERSTEIN:  Great.

9          MR. SILVERSTEIN:  Let me just

10    confer with my colleague here; and if

11    we're done with the Thomas stuff, then

12    I have other stuff I can do until 5:00.

13         MR. SILVERSTEIN:  Okay.

14         VIDEOGRAPHER:  Time right now is

15    4:36 p.m.  We are off the record.

16         (Whereupon, an off-the-record

17    discussion was held.)

18         VIDEOGRAPHER:  Time right now the

19    4:43 p.m.  We are back on the record.

20    Q.   Doctor, earlier in the day when we

21 were talking about the causes of

22 non-Hodgkin's lymphoma, I think it was in a

23 discussion of autoimmune disease, you made

24 the comment that you can determine it's a

1  cause because if you have it you're very

2  likely to develop the disease; do you

3  remember that?

4      A.   That's sounds like what I said,

5  yes.

6      Q.   Now, if we look at the data, from

7  the Agricultural Health Study, these

8  patients were followed, for many of them, as

9  much as 18 years, correct?

10      A.   Yes.

11      Q.   As we talked about earlier, less

12  than one percent of the patients who were

13  exposed to glyphosate developed

14  non-Hodgkin's lymphoma over a period of

15  time, correct?

16      A.   One -- yes, less than one percent

17  of the study population.

18      Q.   So you would not be able to say

19  that if someone was exposed to glyphosate,

20  that they're very likely to develop

21  non-Hodgkin's lymphoma, correct?

22          MR. SILVERSTEIN:  Object to the

23      form.

24      A.   Well, I think that's a stretch

1    from the -- that's making a conclusion based

2    on the percentage in that -- of individuals

3    in that study.  I don't think that's the

4    only study that shows some association

5    between glyphosate and non-Hodgkin's

6    lymphoma.  Based on the Agricultural Health

7    Study, you can make interpretations from

8    that result; but I don't think you can

9    necessarily say that.

10        Q.    You don't think you can

11   necessarily say that the vast majority of

12   patients who are exposed to glyphosate will

13   not develop non-Hodgkin's lymphoma?

14            MR. SILVERSTEIN:  Objection to

15        form.

16        A.    Well, in that study, as you said,

17   it was less than one percent.  So that is

18   one of several studies; and if you

19   extrapolate in the population, that's the

20   conclusion you're making.  I don't know if

21   you can necessarily apply that given the

22   flaws of the study.

23        Q.    Given what?

24        A.    Some of the flaws of the study;

1  but if you're taking numbers as you

2  presented them, yes, it would be the

3  minority of patients.

4       Q.   Well, it's not just a minority;

5  it's a fraction of a percent?

6       A.   Agreed.

7            MR. SILVERSTEIN:  Objection to

8       form.

9       Q.   And I mean, you can't extrapolate

10 from case-control studies because

11 case-control studies don't provide you with

12 an incidence rate, correct?

13      A.   I would agree you can't

14 necessarily extrapolate.

15      Q.   Is there any other study you know

16 of that provides data on that question?

17      A.   Well, we said the AHS study was

18 the largest prospective study; so there

19 wouldn't be one as large.

20      Q.   Do you know what the rate of

21 non-Hodgkin's lymphoma was in patients

22 with --

23           (Reporter clarification.)

24      Q.   (continuing) Do you know what the

1  rate of percentage of patients who are not

2  exposed to glyphosate in the Agricultural

3  Health Study was?

4      A.   I can't quote it; but if they

5  didn't find a difference, it was probably

6  similar to the rate of non-Hodgkin's.

7      Q.   In your report with respect to

8  Mr. Thomas, you talk about the fact that he

9  was very careful with respect to his

10  exposure to glyphosate?

11     A.   Well, he took some precautions, so

12  he took measures to limit his exposure is

13  what I said in my report.

14     Q.   Okay.

15          Do you have any information that

16  Mr. Thomas was exposed to enough glyphosate

17  either through dermal exposure or through

18  inhalation to have -- to cause him to have

19  non-Hodgkin's lymphoma?

20          MR. SILVERSTEIN:  Objection to the

21     form.

22     A.   Well, we have the report from the

23  retaining counsel's expert Dr. Kendall who

24  opines on that; but not from his -- not from

1    the materials I reviewed.

2        Q.   Are you personally going to

3    express an opinion about that?

4        A.   Not about -- you asked me about

5    the dose?

6        Q.   About whether the dose that he

7    received was, you know -- in other words,

8    you can sit and spray glyphosate for 20

9    years and not get it on your skin; you're

10   not going to have to get an internal dose in

11   order to get non-Hodgkin's lymphoma, right?

12       A.   Yes, correct.

13       Q.   And we don't really have any

14   evidence in his case that he got an internal

15   dose; that's an assumption, right?

16            MR. SILVERSTEIN:  Objection to

17       form.

18       A.   Well, again, I didn't dive into

19   the science of the estimating the internal

20   dosing; so I wouldn't be able to assess it.

21       Q.   All I'm asking is whether you're

22   going to be offering an opinion on that

23   personally?

24       A.   No.

1       Q.   I think -- are there any other
2  aspects of Mr. Thomas' case that are not in
3  your report or that we have not talked about
4  today that you plan to offer an opinion in
5  at the time of trial?
6       A.   I just have to take a look.
7            MR. SILVERSTEIN:  I'm going to
8       object to the form.  It's a very broad
9       question, but take a look at your
10      report.
11      A.   Sure.  I mean, with respect to the
12  report, we talked about all the different
13  sections; so, you know, unless asked, I
14  think I would just stick to what's in the
15  report.
16      Q.   We had mentioned reviewing the
17  plaintiff's experts -- I'm sorry, the
18  defense expert reports.  Are there any
19  opinions as you sit here today, you plan to
20  offer in response to those?
21      A.   Well, their reports took a
22  different perspective; so if asked on that,
23  I may offer a rebuttal from my point of
24  view.  I would probably need more time to

1    tell you that I churned through their

2    reports but potentially.

3        Q.   But as you sit here today today,

4    there's not a specific thing that you intend

5    to say in response to reading those reports?

6        A.   Not that I can think of

7    specifically as of today.

8            MR. SILVERSTEIN:  If

9        Mr. Braunstein issues a rebuttal

10       report, we'll serve that report and

11       give you the opportunity to ask him

12       some questions about the rebuttal.

13           MR. PIORKOWSKI:  Fair enough.

14       This is probably a good break point, so

15       let's call it a day.

16           Just for the record, we've agreed

17       that I'm going to finish some of the

18       generic exam tomorrow; and we won't

19       have that much more, and we'll also do

20       Spector -- Savory and Spector cases

21       tomorrow.

22           MR. SILVERSTEIN:  Agreed.

23           MR. PIORKOWSKI:  So we are going

24       to conclude this deposition for today.

1          Do you have any questions?

2               MR. SILVERSTEIN:  I don't at this

3     time.  I'll just put for the record

4     that the witness will read and sign.

5               MR. PIORKOWSKI:  I would strongly

6     encourage read and sign on this given

7     the train and the air conditioner and

8     masks and so forth.

9               Anyway, all right, so we're going

10    to conclude for today, Doctor.  Thank

11    you for your time.

12               THE WITNESS:  Thank you.

13               MR. PIORKOWSKI:  And we'll see you

14    tomorrow.

15               THE WITNESS:  Sounds good.  Thank

16    you.

17               VIDEOGRAPHER:  Time right now is

18    4:52 p.m.  We are off the record.

19               (Whereupon, an off-the-record

20    discussion was held.)

21               MR. SILVERSTEIN:  I'm ordering a

22    copy.

23                    *****

24               (Whereupon, at 4:52 p.m., the

1          Examination of this witness was

2     concluded.)

3

4                    0      0      0      0

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

1                   D E C L A R A T I O N

2

3        I hereby certify that having been first

4    duly sworn to testify to the truth, I gave

5    the above testimony.

6

7        I FURTHER CERTIFY that the foregoing

8    transcript is a true and correct transcript

9    of the testimony given by me at the time and

10   place specified hereinbefore.

11

12

13

                     _____

14                   MARC J. BRAUNSTEIN, M.D.

15

16

17   Subscribed and sworn to before me

18   this _____ day of _____ 20___.

19

20

     _____

21     NOTARY PUBLIC

22

23

24

1
2                    I N D E X
3
4  Witness                                      Page
5  Marc J. Braunstein, M.D.
6  EXAMINATION BY
7  MR. PIORKOWSKI                                  4
8              E X H I B I T S
9
10 BRAUNSTEIN EXHIBITS:
11
12 EXHIBIT              EXHIBIT              PAGE
13 1              Braunstein expert           14
                  report for Thomas case
14
   2              CV                          24
15
   3              Updated CV                  24
16
   4              Defendant Monsanto         148
17                Company's Notice to
                  Take Oral and
18                Videotaped Deposition
                  of Dr. Marc Braunstein,
19                August 17, 2021
20 5              Dr. Braunstein's           149
                  invoice
21
   6              McDuffie article           187
22                entitled, "Non-Hodgin's
                  Lymphoma and Specific
23                Pesticide Exposures in
                  Men: Cross-Canada Study
24                of Pesticides and Health"

| | | | |
|---|---|---|---|
| 7 | Zhang article entitled, "Exposure to Glyphosate-Based Herbicides and Risk for Non-Hodgkin Lymphoma: A Meta-Analysis and Supporting Evidence" | 198 |
| 8 | Hohenadel article entitled, "Exposure to Multiple Pesticides and Risk of Non-Hodgkin Lymphoma in Men from Six Canadian Provinces | 209 |
| 9 | Hardell article entitled, "Exposure to Pesticides as Risk Factor for Non-Hodkin's Lymphoma and Hairy Cell Leukemia: Pooled Analysis of Two Swedish Case-control Studies" | 210 |
| 10 | De Roos article entitled, "Integrative Assessment of Multiple Pesticides as Risk Factor for Non-Hodgkin's Lymphoma Among Men" | 212 |
| 11 | Eriksson article entitled, "Pesticide Exposure as Risk Factor For Non-Hodgkin's Lymphoma Including Histopathological Subgroup Analysis" | 220 |
| 12 | Cocco article entitled, "Lymphoma Risk and Occupational Exposure to Pesticides: Results of the Epilymph Study" | 224 |
| 13 | Orsi article entitled, | 224 |

```
 1                    "Occupational Exposure
                      to Pesticides and
 2                    Lymphoid Neoplasms
                      Among Men: Results of a
 3                    French Case-control
                      Study"
 4
    14                Pahwa article entitled,    228
 5                    "Glyphosate Use and
                      Associations with
 6                    Non-Hodkin Lymphoma
                      Major Histologist
 7                    Sub-types: Findings
                      from the North American
 8                    Pooled Project"
 9  15                Andreotti article          240
                      entitled, "Glyphosate
10                    Use and Cancer
                      Incidence in the
11                    Agricultural Health
                      Study"
12
    16                Larsson article            276
13                    entitled, "Obesity and
                      Risk of Non-Hodgkin's
14                    Lymphoma: A
                      Meta-Analysis"
15
    17                Castillo article           279
16                    entitled, "Obesity Is
                      Associated With
17                    Increased Relative Risk
                      of Diffuse Large B-Cell
18                    Lymphoma: A
                      Meta-Analysis of
19                    Observational Studies"
20
21
22
23
24
```

1                   C E R T I F I C A T E

2

3   STATE OF NEW YORK    )

                        :  SS.:

4   COUNTY OF SUFFOLK    )

5

6        I, NICOLE VELTRI, RPR, CRR, a Notary

7   Public for and within the State of New York,

8   do hereby certify:

9        That the witness whose examination is

10  hereinbefore set forth was duly sworn and

11  that such examination is a true record of

12  the testimony given by that witness.

13       I further certify that I am not related

14  to any of the parties to this action by

15  blood or by marriage and that I am in no way

16  interested in the outcome of this matter.

17       IN WITNESS WHEREOF, I have hereunto set

18  my hand this 17th day of August 2021.

19

20                 _Nicole Veltri_

        _____

21              NICOLE VELTRI, RPR, CRR

22

23

24

```
1                  -  -  -  -  -  -

                E  R  R  A  T  A

2                  -  -  -  -  -  -

3

4    PAGE   LINE   CHANGE

5    _____  _____  _____

6          REASON:  _____

7    _____  _____  _____

8          REASON:  _____

9    _____  _____  _____

10         REASON:  _____

11   _____  _____  _____

12         REASON:  _____

13   _____  _____  _____

14         REASON:  _____

15   _____  _____  _____

16         REASON:  _____

17   _____  _____  _____

18         REASON:  _____

19   _____  _____  _____

20         REASON:  _____

21   _____  _____  _____

22         REASON:  _____

23   _____  _____  _____

24         REASON:  _____
```