# EXHIBIT 1

1          UNITED STATES DISTRICT COURT

         NORTHERN DISTRICT OF CALIFORNIA

2

                    - - - - -

3

4  IN RE:  ROUNDUP PRODUCTS      MDL No. 2741

5  This document relates to:

6  BRADLEY KOEN v.               No  3:20-cv-3074-VC

   MONSANTO COMPANY

7

8                  - - - - -

9

           Monday, August 30, 2021

10

11                 - - - - -

12          Remote Videotaped Deposition of MICHAEL

13  SCOLA, M.D., conducted at the location of the

14  witness in Morristown, New Jersey, commencing at

15  10:41 a.m., by and before Robin L. Clark, Registered

16  Professional Reporter and Notary Public in and for

17  the State of New Jersey.

18                  - - - - -

19

20

21

22

23

24

```
 1   REMOTE APPEARANCES:
 2
             HENDLER FLORES LAW
 3           BY:  CLARE NOLAN, ESQ.
             901 South MoPac Expressway, Building 1
 4           Suite 300
             Austin, Texas 78746
 5           512-439-3200
             cnolan@hendlerlaw.com
 6                    For the Plaintiff
 7
 8           HOLLINGSWORTH LLP
             BY:  MARCHELLO D. GRAY, ESQ.
 9           1350 I Street NW
             Washington, D.C. 20005
10           202-898-5843
             mgray@Hollingsworthllp.com
11                    For the Defendant
12
     ALSO PRESENT:
13
             DANIEL ORTEGA, VIDEOGRAPHER
14
             ANNA KINARD, Paralegal
15
                    - - - - -
16
17
18
19
20
21
22
23
24
```

Michael Scola, M.D.

```
 1                    I N D E X
 2  WITNESS                                 PAGE
 3  MICHAEL SCOLA, M.D.
       BY MR. GRAY:                            6
 4     BY MS. NOLAN:                         300
 5
 6                  E X H I B I T S
 7  NUMBER          DESCRIPTION           MARKED
 8  Scola
 9  Exhibit 1    Notice of Deposition        10
10  Exhibit 2    Exposure Summary            39
11  Exhibit 3    Medical Chronology          41
12  Exhibit 4    NCBI Follow-up of DLBCL     43
                 Article
13
    Exhibit 5    Scola Expert Report         47
14
    Exhibit 6    Testimonial List            56
15
    Exhibit 7    Curriculum Vitae            77
16
    Exhibit 8    Weisenburger Article       195
17
    Exhibit 9    Agriculture Health Study   225
18
    Exhibit 10   Zhang Article              236
19
    Exhibit 11   Memorandum dated 1/6/2020  270
20
    Exhibit 12   Donato Article             276
21
    Exhibit 13   Notes                      294
22
    Exhibit 14   Regional Cancer Care       295
23               Associates Article
24
```

Michael Scola, M.D.

```
1               DEPOSITION SUPPORT INDEX

2

                      - - - - -

3

4    Direction to Witness Not to Answer

5    Page  Line

6    NONE

7    Request for Production of Documents

8    Page  Line

9    NONE

10   Question Marked

11   Page  Line

12   NONE

13

14

15

16

17

18

19

20

21

22

23

24
```

Michael Scola, M.D.

```
 1                    THE VIDEOGRAPHER:  We

 2          are now on the record.  My name is

 3          Daniel Ortega.  I'm the legal

 4          videographer for Golkow Litigation

 5          Services.  Today's date is

 6          August 30, 2021, and the time is

 7          10:41 a.m.

 8                    This deposition is being

 9          held in the matter of Roundup,

10          Bradley Koen versus Monsanto

11          Company for the United States

12          District Court, Northern District

13          of California.  The deponent today

14          is Michael Scola.  Counsel, please

15          identify yourselves for the record.

16                    MR. GRAY:  Marchello

17          Gray of Hollingsworth, LLP for

18          Defendant Monsanto.

19                    MS. NOLAN:  Clare Nolan

20          for the Plaintiff.

21                    THE VIDEOGRAPHER:  The

22          court reporter is Robin Clark and

23          will now swear in the witness.

24                    THE STENOGRAPHER:  Do
```

Michael Scola, M.D.

```
 1            you want to raise your right hand,

 2            please, so I can swear you in?  Do

 3            you swear the testimony you are

 4            about to give in this deposition

 5            will be the truth, the whole truth,

 6            and nothing but the truth, so help

 7            you God?

 8                 THE WITNESS:  I do.

 9                 - - - - -

10            MICHAEL SCOLA, M.D., having

11            been duly sworn, was examined and

12            testified as follows:

13                 - - - - -

14   BY MR. GRAY:

15        Q.   Good morning, Doctor.  My name

16   is Marchello Gray.  We won't have the

17   pleasure of meeting in person today due to

18   COVID precautions, but I appreciate you

19   meeting here virtually with me.  If you

20   will, please provide your name and your

21   business address for the record.

22        A.   Michael Scola, 100 Madison

23   Avenue, Morristown, New Jersey 07960.

24        Q.   The address you gave me, is
```

Michael Scola, M.D.

1    that a hospital or your practice or where

2    is that?

3         A.   It's a hospital.  I belong to a

4    hospital-based practice.

5         Q.   Okay.  What hospital is that?

6         A.   Morristown Medical Center.

7         Q.   Okay.  And it looks like you

8    have been deposed a couple of times before;

9    is that correct?

10        A.   A couple of times.

11        Q.   Okay.  So I won't go into

12   detail.  I assume you generally know how a

13   deposition is conducted.

14        A.   Yes.

15        Q.   I will just remind you of a few

16   instructions.  The first and most important

17   one is let's try our best not to talk one

18   over one another.  If you will give me the

19   courtesy of letting me get my question out.

20   I suspect, the large majority of the time,

21   you will know the answer to my question

22   about halfway through.  And, you know, our

23   natural tendency is to start answering, but

24   just so we have a good, clean record, let

Michael Scola, M.D.

```
1    me get the whole question out.  And then

2    your counsel may have an objection, that

3    generally would be to the form of the

4    question.  So maybe leave a second for

5    Ms. Nolan to object and then you can give

6    your answer and I will give you the same

7    courtesy of not interrupting while you're

8    speaking.  That way we'll have a good,

9    clean record.  Okay?

10           A.   Very good.

11           Q.   If you don't understand any

12   question, let me know I will try to

13   rephrase it for you.  I suspect that at

14   some point I will either mispronounce or

15   misuse some medical terminology throughout

16   this deposition.  And if you -- if

17   something that I ask you doesn't make

18   sense, let me know.  Please feel free to

19   correct me if I'm saying something wrong.

20   If you do understand my question, I'll

21   assume that you understood it and knew what

22   it meant; is that fair?

23           A.   Yes.

24           Q.   If you don't know the answer to
```

Michael Scola, M.D.

```
 1    a question, that's fine.  I don't know is a
 2    perfectly acceptable answer.  This is not a
 3    memory test.  We can find something if we
 4    need it for you; is that fair?
 5         A.   Yes.
 6         Q.   And, finally, you're doing a
 7    good job of this already.  We have to give
 8    verbal responses.  I know we're looking at
 9    one another, so head nods and headshakes
10    while I can see you on the camera, but the
11    person reading the transcript won't be able
12    to see that.  So I'll ask you to give a
13    verbal yes or no or whatever else is
14    required to answer a question.  Okay?
15         A.   Yes.
16         Q.   Okay.  I'm going to see if we
17    can -- we'll try this here.  I'm going to
18    mark what we'll use as Exhibit 1 to the
19    deposition and that's going to be your
20    Notice of Deposition.  Let's see if I can
21    pull it up.  Okay.  Can you see this,
22    Doctor?
23         A.   Yes.
24                   - - - - -
```

Michael Scola, M.D.

```
 1                    (Notice of Deposition marked

 2              Scola Exhibit 1 for

 3              identification.)

 4                    - - - - -

 5    BY MR. GRAY:

 6         Q.   Okay.  And this is the notice

 7    for your deposition.  Have you ever seen

 8    this before?

 9         A.   Yes.

10         Q.   Okay.  And if so, we'll go down

11    here to the attachments.  There's a list

12    here at the bottom that asks you to produce

13    some documents.  Have you seen this list

14    before?

15         A.   Yes.

16         Q.   And did you conduct a search

17    for these documents?

18         A.   Yes, I did.

19         Q.   Okay.  What did you do?

20         A.   The documents that I made

21    reference to in compiling my report were

22    submitted to counsel.

23         Q.   Okay.  The first document here,

24    or the first request here, number one asks
```

Michael Scola, M.D.

1    for documents sufficient to show the total

2    amount that you billed in connection with

3    your work as an expert in Roundup.

4         A.   Okay.

5         Q.   Do you have any such documents?

6         A.   Yes, I do.  Yeah, and that has

7    not been submitted.

8         Q.   Okay.  So you haven't submitted

9    any bills to Plaintiff's counsel yet?

10        A.   No, I have it in front of me.

11   But, no, it has not been submitted.

12        Q.   Okay.  While we're here, do you

13   mind to tell me how much you have on that

14   bill currently?

15        A.   Yes, I submitted for a total of

16   14 hours, $375 an hour for a total of

17   $5,250.

18        Q.   And that's current through

19   today?

20        A.   Yes.  That doesn't include

21   review and preparation for this deposition.

22        Q.   Okay.  So that -- what date is

23   that bill current to then?

24        A.   So this was submitted July 12,

Michael Scola, M.D.

1    2021.  There were no other billable

2    activities up until this weekend in

3    preparation for the deposition.

4         Q.   Okay.  So I'm a little

5    confused.  Have you submitted this bill or

6    not, you keep saying it was submitted, but

7    I thought you told me you didn't submit it?

8         A.   I did submit it, but I didn't

9    submit it.  I work through a third party,

10   so it was submitted to the third party.  It

11   was not submitted to counsel directly.  I

12   work through National Medical Consultants.

13        Q.   Okay.  And what is National

14   Medical Consultants?

15        A.   So National Medical Consultants

16   is an organization that provided me with

17   the content information regarding this

18   case.  So I believe they help coordinate

19   between law firms and medical experts.  I

20   have not worked with them very long.

21   They're based in New York.

22        Q.   When did you start working with

23   them.

24        A.   I would say a year ago, late

Michael J. Scola, M.D.

1    2020.

2         Q.   And this company, I guess, is

3    this you advertise your medical-legal

4    consulting services and attorneys can find

5    you that way?

6         A.   Yes, one of my partners have

7    been active with them for many years and

8    there was a case available that he could

9    not take.  He didn't have the time.  And

10   asked if I would help and so at that point,

11   I registered as a medical expert and I've

12   done two or three cases over the past year.

13        Q.   So for this case, did you --

14   how does it work?  Who contacts who?  Do

15   you contact the lawyers or do the lawyers

16   contact you?

17        A.   I'm contacted by a

18   representative from Medical Consultants,

19   tells me briefly about the case, and then

20   at that point documents are released.  I

21   review the documents and then dialogue

22   usually ensues with the -- with the

23   attorney or attorney's office.

24        Q.   Okay.  So a third party,

Michael Scola, M.D.

1    someone from National Medical Consultants,

2    told you about this case and you said that

3    sounds interesting, I'll take it?

4          A.    That's correct.

5          Q.    And they sent you documents.

6    What kind of documents do they send you?

7          A.    Documents, medical documents

8    pertinent to this case, basically, Mr.

9    Koen's medical record.

10         Q.    Does the consultants, do they

11   send you any of the literature or how did

12   you get that stuff?

13         A.    No, the literature I obtained

14   on my own.

15         Q.    Okay.

16         A.    Some of the literature, two

17   documents was provided by the Plaintiff's

18   office.

19         Q.    Do you know what documents

20   those were?

21         A.    Clare, do you have that at your

22   fingertips?

23               MS. NOLAN:  That's,

24         actually, I can -- I mean they're

Michael Scola, M.D.

```
 1            in the list and I can, if this
 2            makes it easier, I can try to do a
 3            responsive document to some of
 4            these questions, but I can send you
 5            what we've sent him.  I think it
 6            was three things, like he said.
 7                      MR. GRAY:  Okay.
 8                      MS. NOLAN:  Maybe at the
 9            break, I can do it.  If I did it
10            right now, I think I would stop
11            paying attention.
12                      MR. GRAY:  Yeah, no,
13            that's fine.  And I assume they're
14            documents that are in the --
15                      MS. NOLAN:  It's all
16            included except for this one that
17            was a link and, like, we want to
18            make it into a PDF and it's
19            actually very short and been talked
20            about at almost more than worth
21            reading in length, but I'll get to
22            you at the break, if that's
23            possible.
24                      MR. GRAY:  Okay.  And we
```

Michael Scola, M.D.

1          can go through the list of

2          documents you have, Dr. Scola, and

3          hopefully, you can tell me which

4          onces you found on your own and

5          which ones the lawyers sent to you,

6          correct?  Would you be able to do

7          that?

8                    THE WITNESS:  Yes.

9   BY MR. GRAY:

10          Q.  And so this consultant from

11   National Medical Consultants, what did they

12   tell you about the case?

13          A.  It was a very brief overview.

14   Literally, two or three sentences.  Patient

15   with lymphoma who had exposure to

16   glyphosate.  That was really it.  It's not

17   their purpose to sort of delve deep into

18   the material.

19          Q.  And what did they tell you or

20   you were asked to do?

21          A.  They asked if I would review

22   the medical documents and speak to the

23   Plaintiff attorney and render an opinion.

24          Q.  Actually, my question is a

Michael Scola, M.D.

1    little different.  What were you -- did

2    they tell you -- what were you asked --

3    what was the question you were asked to

4    answer?

5            A.    Whether there was potential

6    causation between Mr. Koen's exposure to

7    this product and his subsequent development

8    of lymphoma.

9            Q.    So after that conversation,

10   they sent you medical records; is that

11   correct?

12           A.    That's correct.

13           Q.    And when did you first speak to

14   Plaintiff's counsel -- I'm sorry, let me

15   scratch that.  When did you receive that

16   call from the National Medical Consultants?

17           A.    I would say, I can't give you a

18   precise date, but I would say it was

19   towards the end of June of this year.

20           Q.    And when did you first talk to

21   Plaintiff's counsel?

22           A.    It was very -- it was just

23   prior to the submission of my document.  I

24   would say one week prior or so, so I'm

Michael Scola, M.D.

1    going to say early July 2021.

2          Q.   Had you written your report

3    already at that time?

4          A.   No, I had not.

5                    MS. NOLAN:  I think the

6          deadline was end of June.

7                    THE WITNESS:  End of

8          June.

9                    MS. NOLAN:  Sorry, I

10         believe.

11   BY MR. GRAY:

12         Q.   Maybe this will short circuit

13   it, is it fair to say it was a couple of

14   weeks from the time that you received a

15   call about this case until you spoke to

16   Plaintiff's counsel until you submitted

17   your report?

18         A.   Yes, I spoke to Plaintiff's

19   counsel just prior to submission of my

20   report.  I believe it was the week prior

21   was the initial contact or so and I'm

22   looking at the date of my report, it's

23   June 29.  So Clare -- so we should probably

24   back everything up by maybe two weeks.  I

Michael Scola, M.D.

1    probably spoke to National Medical

2    Consultants early June and spoke to counsel

3    mid part of June.  And the report was

4    compiled and submitted on June 29.

5         Q.   And from early June when you

6    received a phone call until, let's say, the

7    mid part of June when you spoke to counsel,

8    what did you do?

9         A.   Very little at that point.

10   Really, it was after speaking to counsel

11   that I was able to dedicate time to this

12   project and review the medical record and

13   compile the literature and formulate my

14   report.

15        Q.   Okay.  So you said you did very

16   little, what does that mean?  What did you

17   do?

18        A.   Well, I don't do this

19   full-time.  I'm a full-time clinician.  So

20   it's -- I have to make time to do this kind

21   of work.  And so I was aware of this case,

22   but I didn't have the time to commit to

23   formulating my thoughts or preparing the

24   report until the week prior to submission.

Michael Scola, M.D.

```
 1          Q.   Okay.  So you -- the way I'm

 2   understanding you is you got a call.  You

 3   agreed to look at it.  And then about a

 4   week before June 29, somewhere around

 5   June 21, June 22, you spoke to Plaintiff's

 6   counsel.  And then in that week that

 7   followed, you reviewed the medical records

 8   and did a literature search and compiled

 9   your report; is that correct?

10          A.   Yes.

11          Q.   And did Plaintiff's counsel

12   send you any documents in that week?

13          A.   Yes, they sent me the reports,

14   two pieces of literature.  And I'm trying

15   to get the name as we speak of those two

16   pieces.  One of them came from Regional

17   Cancer Care Associates.  I'm having trouble

18   opening it right now.  So they sent -- they

19   sent those two pieces of literature.  They

20   also sent the Roundup exposure summary that

21   week.  There may have been one additional

22   document as well.  So, right, so the other

23   manuscript that was sent was from Science

24   Direct entitled "Exposure to
```

Michael Scola, M.D.

1    glyphosate-based herbicide and risk for

2    non-Hodgkin lymphoma:  A meta-analysis and

3    supporting evidence."  So that was one that

4    was sent.

5         Q.    Who is the author on that?

6         A.    Sorry, let me go back.  Okay.

7    All right.  Yeah.  So this Zhang,

8    Z-H-A-N-G.  I think I pulled that

9    independently as well.

10               And the second one was just a

11   news article from a website, Regional

12   Cancer Care Associates, which is a single

13   specialty medical group here in New Jersey.

14   I believe they also go outside the State of

15   New Jersey.  I was actually a part of our

16   CCA many years ago.  And I believe this was

17   on their website and it's entitled "Weed

18   Killer and Non-Hodgkin Lymphoma."  The date

19   is July 6,2020.  So those two documents

20   were provided directly from counsel.

21        Q.    Okay.  That's one we don't

22   have, Clare?

23               MS. NOLAN:  Yeah, that's

24         the one I wanted to make into a PDF

Michael Scola, M.D.

```
1              or principal format so just for

2              ease of going through it.  And if I

3              could do that in a break, that

4              would be great.  And we just

5              finished a pretty long deposition

6              last week and so I apologize for

7              not having that ready.

8                        MR. GRAY:  Okay.  I

9              mean, if you -- if it's easier, if

10             you want to send me a link, I can

11             get somebody in to my office to put

12             it into a PDF if that will ease the

13             burden.

14                        MS. NOLAN:  Okay.  If I

15             could just do it at a break, that

16             would be appreciated.

17                        MR. GRAY:  Sure.  Sure.

18                        MS. NOLAN:  Not so much

19             for multitasking.

20    BY MR. GRAY:

21         Q.   So Dr. Scola, prior to reaching

22    this call from National Medical

23    Consultants, you had no involvement in any

24    litigation related to glyphosate; is that
```

Michael Scola, M.D.

```
 1   right?

 2          A.    No, sir.

 3          Q.    And do you sign a retention

 4   agreement with Plaintiff's counsel or is

 5   there an agreement with National Medical

 6   Consultants?

 7          A.    With National Medical

 8   Consultants.

 9          Q.    Okay.  So you don't have a

10   retainer agreement with the Plaintiff's

11   counsel?

12          A.    I do not.

13          Q.    And you submit your bills to

14   National Medical Council [sic]?

15          A.    That's correct, yes.

16          Q.    I'm going to ask you, not right

17   now, but if you could to send the bill that

18   you sent to National Medical Consultants,

19   can you also send that to Ms. Nolan so that

20   she can produce that to me?

21          A.    Yes.

22          Q.    Okay.  Thank you.  And you said

23   so far you've billed a little over $5,000?

24          A.    Yes.
```

Michael Scola, M.D.

```
1          Q.   Now, when you talk with

2     Plaintiff's counsel, is there, is someone

3     from National Medical Consultants also on

4     the phone with you?

5          A.   No.

6          Q.   Okay.  So it's just you and the

7     lawyers, they don't have to act as a bridge

8     or be involved in the case?

9          A.   That's correct.  They do not.

10         Q.   Do you have any other Roundup

11    cases besides Mr. Koen's?

12         A.   No.

13         Q.   Have you worked with these

14    lawyers on any other cases?

15         A.   No.

16         Q.   When you were contacted by

17    National Medical Consultants about the

18    case, did you agree to take the case right

19    away that day?

20         A.   I believe I did.

21         Q.   So are you told which law firms

22    or lawyers you would be working with at

23    that time?

24         A.   No, no.
```

Michael Scola, M.D.

1          Q.   So, I'm sorry, I'm curious

2     about how the process of how this works.

3     So after they told you, they call you and

4     say, hey, we've got a case where a guy had

5     a non-Hodgkin's lymphoma, you know, and the

6     question is whether or not it was caused by

7     Roundup, do you want to take on the case

8     and and you just say, you signed up right

9     then there?

10         A.   Well, I said yes.  And it's

11    always predicated upon review of the case,

12    the medical case.  So usually at that

13    point, the medical documents will be sent

14    out and then I'll review, I'll review the

15    case.  And usually, at that point, I do

16    reach out to counsel and get additional

17    information.  And then I'll usually compile

18    a report.

19         Q.   Okay.  And had you reached an

20    opinion on causation before you contacted

21    the lawyers?

22         A.   No.

23         Q.   And you understood they were

24    lawyers for the Plaintiffs?

Michael Scola, M.D.

```
 1          A.   Yes.

 2                    MS. NOLAN:  And just for

 3          clarification, I think it has been

 4          called National Medical, I think,

 5          is it Consultants, because I think

 6          Mr. Gray said National Medical

 7          Council.

 8                    THE WITNESS:  Consultant

 9          s.

10                    MR. GRAY:  My apologies,

11          yes, National Medical Consultants.

12                    MS. NOLAN:  I just don't

13          want those two things to be

14          conflated.  Thank you.

15                    MR. GRAY:  Right, thank

16          you very much.  That makes sense.

17          Madam Court Reporter, if you want

18          to go back and fix the times I

19          messed it up, I would appreciate

20          it.

21                    THE STENOGRAPHER:  Okay.

22    BY MR. GRAY:

23          Q.   Okay.  So then you had the one

24    meeting before you submitted your report,
```

Michael Scola, M.D.

```
1    that's correct?
2         A.   Yes.
3         Q.   Would that be a Zoom, via
4    telephone, or did you meet in person?
5         A.   It was via telephone.
6         Q.   And I'm not asking you to tell
7    me what you guys discussed, but
8    approximately how long did you meet?
9         A.   No more than half an hour, 20
10   minutes, half hour.
11        Q.   Okay.  And after that 20-minute
12   meeting, that's when you started to
13   actually do your review of the materials?
14        A.   Yes.  There was some urgency.
15   I don't think I appreciated the deadline
16   for submission and I think I had the phone
17   call maybe on a Wednesday or Thursday and
18   the submission deadline, I believe, was the
19   following Monday and so the next several
20   days, I, you know, worked diligently to try
21   to prepare this document.
22        Q.   So from Wednesday or Thursday
23   to the following Monday, you reviewed all
24   of Mr. Koen's medical records, the medical
```

Michael Scola, M.D.

1    literature on Roundup, came to a conclusion

2    and drafted your opinion?

3         A.   Yes.

4         Q.   And it sounds like you were --

5    Plaintiff's counsel might have been in a

6    jam if you reached a different opinion,

7    huh?

8         A.   I imagine so.

9                   MS. NOLAN:  Object to

10        form.

11   BY MR. GRAY:

12        Q.   Have you ever met or spoke to

13   Mr. Koen?

14        A.   No.

15        Q.   You've never conducted any type

16   of medical exam with Mr. Koen?

17        A.   No.

18        Q.   And you didn't think you needed

19   to see him physically or do any type of

20   examination to form your opinion?

21        A.   No.

22        Q.   And is that because there's

23   nothing you can learn from a physical

24   examination of him that would indicate

Michael Scola, M.D.

1    whether or not his cancer was caused by

2    Roundup?

3          A.   Yes, that's a fair statement.

4    I think the medical records well detailed

5    his medical course.  At the time that I

6    compiled my report, he was recovering from

7    his most recent treatment.  And so the

8    majority of his medical history had already

9    occurred.

10          Q.   Do you know who any of the

11    other experts that have been retained by

12    Plaintiffs are?

13          A.   I do not.

14          Q.   Dr. Scola, did you, as you were

15    doing your review of the material, did you

16    make any notes?

17          A.   Well, no.  I highlighted some

18    of the articles and may have written in the

19    margin of some of the articles.

20          Q.   Okay.  So you made handwritten

21    notes on the -- in the margins of the

22    articles themselves?

23          A.   Yes.

24          Q.   Do you still have your paper

Michael Scola, M.D.

1   copies of the articles that you read?

2          A.   I have them here, yes.

3          Q.   Can you tell me which ones you

4   have there?

5          A.   Well, I have most -- I have

6   everything, I believe, that was submitted

7   for review.  Do you want me to go

8   through -- do you want me to go through

9   them?

10         Q.   Yeah, maybe just tell me the

11  first author name, and that's usually how I

12  can find most of these papers in this

13  litigation.  So, like, I know you said you

14  got the Zhang paper from 2019?

15         A.   Yes.  Yes.  Okay.  So I have

16  Weisenburger.

17         Q.   Is that the 2021 paper?

18         A.   That is 2021, yes.  I have

19  Williams, Gary Williams, and this is 2016.

20  I have Rana, R-A-N-A, and this is 2020.  I

21  have Kabat, K-A-B-A-T, likewise, 2020.  I

22  have an editorial by Guyton, G-U-Y-T-O-N,

23  and this was Lancet, Lancet Oncology, 2015.

24  I have Andreotti, it's a 2017.  I have

Michael Scola, M.D.

1    Ward, W-A-R-D, an editorial, 2017.

2          Q.    What's the title of that Ward

3    paper?

4          A.    "Glyphosate use and Cancer

5    Incidence in the Agricultural Health Study:

6    An Epidemiologic Perspective."  I don't

7    know if I actually looked at this.  I

8    pulled it.  I printed it.  I don't know if

9    I ever used it to compile my report.

10         Q.    That one wasn't in the stuff

11   you sent me.

12         A.    Okay.  I'm happy to submit it.

13   I don't believe I used this.  What else do

14   I have?  So this one I already mentioned.

15   I have Donato, D-O-N-A-T-O, and this is

16   from 2019.  And I have Tarazona,

17   T-A-R-A-Z-O-N-A, in 2017.  And then, of

18   course, the Zhang article.  And I believe,

19   I believe that's everything.

20         Q.    Okay.

21                MS. NOLAN:  And just for

22         my benefit, is that a fair

23         reflection of what you received in

24         the Dropbox?

Michael Scola, M.D.

```
 1                    MR. GRAY:  I don't think
 2           the Ward paper or the Tarazona
 3           paper or the Rana paper were in
 4           there.
 5                    MS. NOLAN:  Well, we can
 6           supplement it.
 7                    MR. GRAY:  If you want
 8           to just do a list, you don't have
 9           to send me the actual paper, I've
10           got it, but if you just want to do
11           a list, that would be good.  I
12           think today if we could get an
13           solid list of what he -- an
14           exhaustive list of what he's
15           relying on.
16                    MS. NOLAN:  Yes.  And
17           then also you want included ones
18           that he's not relying on and might
19           have printed out?
20                    MR. GRAY:  Yes, if he's
21           considering them, even if he's not
22           going to affirmatively testify
23           about them.
24
```

Michael Scola, M.D.

```
1    BY MR. GRAY:
2         Q.   All right.  Doctor, in that
3    week, or I guess less than a week, the few
4    days that you spent reading and writing
5    your report, about how much did you spend?
6         A.   So I submitted a total of 14
7    hours, review and preparation.
8         Q.   And that would have been 14
9    hours from, say, June 23 or 24 until
10   June 28?
11        A.   Yes.
12        Q.   And you didn't do anything or
13   look at anything between June 28 and this
14   past weekend?
15        A.   That's true, yes.
16        Q.   How much time did you spend
17   preparing for your deposition this past
18   weekend?
19        A.   I would say four to six hours.
20        Q.   Was that all time spent with
21   counsel?
22        A.   Was that time spent with
23   counsel?  I'm sorry.
24        Q.   Yes, sir.
```

Michael Scola, M.D.

1          A.    No, that was not spent with

2    counsel.

3          Q.    Did you spend time with counsel

4    preparing for the deposition?

5          A.    We spoke just before signing on

6    for the deposition for 15 minutes.

7          Q.    And I guess you said you spoke

8    for no more than 30 minutes the first time,

9    so all in, you guys have spoken for about

10   45 minutes total; is that fair?

11         A.    Yes, we spoke on the night of

12   the submission of the article, but it was

13   primarily just the logistics of getting the

14   article to her, because we were up against

15   a hard time point and so there was an

16   exchange, but again, it was just the

17   logistics of transmitting the article.

18         Q.    When you say the article, are

19   you referring to your expert report?

20         A.    My report, yes.

21         Q.    Did anyone help you write your

22   report, Doctor?

23         A.    No.

24         Q.    And did you exchange or submit

Michael Scola, M.D.

1    drafts to counsel before you sent them the

2    final report?

3         A.    No.

4         Q.    The four to six hours you spent

5    preparing for the deposition this weekend,

6    what did you do?

7         A.    Read through my report,

8    summarizing his medical history, reviewed

9    the pertinent literature.

10        Q.    Did you have conversations with

11   anyone else?

12        A.    No.

13        Q.    Have you been paid by National

14   Medical Consultants yet?

15        A.    Yes.

16        Q.    Have you in preparing for your

17   deposition this weekend, reviewing what

18   appeared in your report, did you make any

19   new notes or any -- a cheat sheet or

20   anything like that to use today?

21        A.    I have a -- I summarized one of

22   the articles on a Word document.

23        Q.    Okay.  Is that, it's a Word

24   document that's on your computer now?

Michael Scola, M.D.

```
1          A.    Yes.

2          Q.    And which article was that that

3    you summarized?

4          A.    The article by Dennis

5    Weisenburger.

6          Q.    Is that something you plan to

7    use today as we do this deposition?

8          A.    Well, I have it before me as a

9    potential reference.

10          Q.    Okay.  Maybe on our first

11    break, if you could -- do you have it

12    electronically as well?

13          A.    I do.

14          Q.    Okay.  Could you send it to

15    your attorney so they can send that to me?

16          A.    Yes.

17          Q.    Okay.  Other than your notes on

18    the Weisenburger article, have you made any

19    other notes or anything else that you plan

20    to use today?

21          A.    No.

22          Q.    Doctor, the documents that we

23    received, and I haven't really talked about

24    this a bunch, but the documents that you
```

Michael Scola, M.D.

1    guys sent to me, that's the full extent of

2    the material that you reviewed and will be

3    relying upon for your opinion?

4         A.   Yes.

5         Q.   And I'll tell you what I have

6    and tell me if anything is missing.  Okay?

7    And so, and I'll represent to you as well,

8    I got a big, sort of a link to a big file

9    of material when you originally served your

10   report.

11        A.   Yes.

12        Q.   That pretty closely tracks what

13   you told me.  So let me run through the

14   list of everything that I've gotten as

15   represented from you and you tell me if

16   anything is missing.  Okay?

17        A.   Okay.

18        Q.   So I've got a copy of your

19   written report.  I've got several thousand

20   pages of medical records from Mr. Koen.  He

21   had a pretty extensive medical record,

22   right?

23        A.   Yes.

24        Q.   Yeah, there's somewhere five,

Michael Scola, M.D.

```
 1   6,000 pages worth of records; is that fair?
 2        A.   Sounds about right, yes.
 3        Q.   I got the Plaintiff Fact Sheet.
 4        A.   Yes.
 5        Q.   Do you recall that document?
 6        A.   Yes.
 7        Q.   Okay.  Did you review that
 8   document?
 9        A.   I did.  Yes, I did.  Because of
10   the time crunch, I couldn't review anything
11   in detail, but I did scan it, yes.
12        Q.   Okay.  And is that something
13   that the lawyer sent to you or that
14   National Medical Consultants sent to you?
15        A.   The lawyer sent to me.
16        Q.   Okay.  I also have the
17   Complaint that was filed in this lawsuit.
18   Do you remember that?
19        A.   I do.
20        Q.   Okay.  Is that something you
21   reviewed?
22        A.   Yes.
23        Q.   I have Mr. Koen's deposition.
24        A.   Yeah --
```

Michael Scola, M.D.

```
 1          Q.   I'll show you this and then you
 2   can tell me.  Okay.  Sorry, I actually
 3   don't have that.  So did you read Mr.
 4   Koen's deposition?
 5          A.   I don't believe I read it, no.
 6   It might have been sent out, but I did not
 7   read it.
 8          Q.   Okay.  So you received it, you
 9   just didn't read it?
10          A.   I believe that's correct, yes.
11          Q.   Have you read any depositions
12   in this case?
13          A.   No.
14          Q.   And I'm going to show you what
15   we'll mark as Exhibit 2.  Do you see this?
16          A.   Yes.
17                    - - - - -
18               (Exposure Summary marked Scola
19          Exhibit 2 for identification.)
20                    - - - - -
21   BY MR. GRAY:
22          Q.   Okay.  This is it looks like a
23   summary of Mr. Koen's deposition; is that
24   fair?  Have you seen this document before?
```

Michael Scola, M.D.

1    Let me ask you that.  Let's start there.

2          A.   To be honest, I can't say for

3    sure.  I can't say for sure.  I did not

4    review it in detail.

5                    MS. NOLAN:  If I could

6               jump in, he's referred earlier to

7               an exposure summary that he

8               reviewed and I believe that this is

9               that document.

10                    THE WITNESS:  Ah, yes,

11              okay.  If this is the exposure

12              summary, and I see at the top, it

13              is, I did review this.

14   BY MR. GRAY:

15         Q.   So this is not something that

16   you put together yourself?

17         A.   No, sir.

18         Q.   Okay.  And it looks like this

19   is a summary of Mr. Koen's testimony about

20   his exposure from his depositions?

21         A.   Yes.

22         Q.   Do you know -- and I'm sorry

23   I'm a little confused.  Did you review this

24   one or not?

Michael Scola, M.D.

```
1              A.   I did review this.

2              Q.   Okay.  And then I have what

3    we'll mark as Exhibit 3.  You can see this?

4              A.   Yes.

5                        - - - - -

6              (Medical Chronology marked

7               Scola Exhibit 3 for

8               identification.)

9                        - - - - -

10   BY MR. GRAY:

11             Q.   Okay.  Now, this appears to be

12   sort of a medical chronology for Mr. Koen?

13             A.   Yes.

14             Q.   Is that correct?

15             A.   Yes.

16             Q.   And it also it looks like a

17   summary of his medical condition and

18   treatment; is that fair?

19             A.   Yes.

20             Q.   Okay.  Is this something that

21   you put together?

22             A.   I did not put this together.

23             Q.   Okay.  This was something that

24   was sent to you by the lawyers as well?
```

Michael Scola, M.D.

```
1          A.   It was.

2          Q.   Have you reviewed this?

3          A.   Yes.

4          Q.   And there are, let's see, do

5    you see here at the top of page 5, there's

6    some highlighting?

7          A.   Yes.

8          Q.   Did you make that highlighting

9    or did the attorneys?

10         A.   The attorneys.

11         Q.   And is this document something

12   that you used in assessing Mr. Koen's

13   medical condition and writing your report?

14         A.   I did, yes.

15         Q.   How did you use this document?

16         A.   I reviewed it page by page.

17   This only took us so far through his

18   medical course, however.

19         Q.   And do the highlighted portions

20   have -- were they significant to you in any

21   way?

22         A.   Not particularly.

23         Q.   Okay.  And I'll show you what

24   we'll mark -- what number are we on?
```

Michael Scola, M.D.

```
 1                    THE STENOGRAPHER:  I

 2        think four.

 3   BY MR. GRAY:

 4         Q.   Okay.  Thank you very much.

 5   Okay.  I'll show you what we'll mark here

 6   as Exhibit number 4 and it looks like a --

 7   actually, can you tell me what this is?

 8   Have you seen this before?

 9         A.   I don't believe so, no.

10                   - - - - -

11              (NCBI Follow-up of DLBCL

12               Article marked Scola Exhibit 4 for

13               identification.)

14                   - - - - -

15   BY MR. GRAY:

16         Q.   This is part of the expert

17   report package that I received for you.

18   This is not something you reviewed before?

19         A.   No.

20         Q.   Okay.  And I'll represent this

21   is from the NCBI Bookshelf, the National

22   Guideline Alliance of the UK,

23   "Non-Hodgkin's Lymphoma:  Diagnosis and

24   Management," and it just starts with number
```

Michael Scola, M.D.

```
 1    six.  I'm not sure if there are Chapters 1
 2    through 5 somewhere available, but Chapter
 3    6 is about the follow-up with DLBCL.  Is
 4    that an accurate reflection of what we have
 5    here, Doctor?
 6         A.   Yes.
 7         Q.   But this is not something
 8    you've seen or would have considered?
 9         A.   No.
10         Q.   Okay.  But if it was in that,
11    the trove of documents we received from
12    your counsel, is it fair to say that it was
13    likely something that was sent to you?
14         A.   It may very well have been.  I
15    don't believe I've ever seen this document
16    previously.
17         Q.   Okay.  And you didn't -- I
18    guess it's also fair to say that maybe you
19    didn't review everything that the lawyer
20    sent to you?
21         A.   That is fair.
22         Q.   I'll take this one down.  Let's
23    see.  Okay.  And so are the only things,
24    other than the list of literature you gave
```

Michael Scola, M.D.

1    me, which is Zhang 2019, Weisenburger 2021,

2    Williams 2016, Rana 2020, Kabat 2021,

3    Guyton 2015, Andreotti 2017, Ward 2017,

4    Donato 2019, and Tarazona 2017, is that,

5    what we've just listed there, does that

6    represent the entirety of the material that

7    you considered and/or are relying upon?

8         A.   Yes.

9         Q.   Now, is there anything that you

10   reviewed that was not in the list that I

11   just read out?

12        A.   No.

13        Q.   Have you reviewed expert

14   reports from any of the other Plaintiff

15   experts in this case?

16        A.   No.

17        Q.   The same question, have you

18   reviewed any reports by the defense experts

19   in this case?

20        A.   No.

21        Q.   And I presume that means you

22   don't intend to offer any rebuttal to the

23   defense expert reports?

24        A.   No.

Michael Scola, M.D.

```
 1            Q.   And, likewise, I assume that
 2    means you won't be relying on anything from
 3    the Plaintiff expert reports?
 4            A.   That's correct.
 5                 - - - - -
 6            (Stenographer clarification.)
 7                 - - - - -
 8                 MS. NOLAN:  With regard
 9            to rebuttal, that is not something
10            that we've spoken about and
11            generally experts aren't always the
12            ones who make those decisions.  So
13            object to -- object to the form.
14            That's something we've talked about
15            and so to the extent that he's
16            aware.
17                 MR. GRAY:  Sure.  I just
18            want to know if he's going to -- if
19            he's going to show up in trial and
20            tell me my experts are all quacks,
21            I want to know.  But if he hasn't
22            reviewed anything that they've
23            written, that's fine, I understand.
24
```

Michael Scola, M.D.

```
 1   BY MR. GRAY:
 2        Q.   Actually, Doctor, while we're
 3   here, why don't we go ahead and mark your
 4   report.  This is a copy of your expert
 5   report that I received.  Does this look --
 6        A.   Yes.
 7        Q.   -- like a document you
 8   submitted?
 9        A.   Yes.
10        Q.   Okay.
11             - - - - -
12             (Scola Expert Report marked
13          Scola Exhibit 5 for
14          identification.)
15             - - - - -
16   BY MR. GRAY:
17        Q.   And so this report along with
18   the materials that we just listed
19   represents everything you got for this
20   case, right?
21        A.   Yes.
22        Q.   Do you have a copy of your
23   report there with you?
24        A.   I do.
```

Michael Scola, M.D.

```
 1        Q.   Okay.  I'll take that down.  We
 2   may refer to it later, but if you've got a
 3   paper copy, that will make it a little bit
 4   easier.  I told you I would test your
 5   memory, and you might have told me this and
 6   I've just forgotten.  You did a literature
 7   search yourself?
 8        A.   Yes.
 9        Q.   Okay.  Tell me how you did that
10   search.
11        A.   Well, I used search terms such
12   as glyphosate and non-Hodgkin's lymphoma,
13   glyphosate and malignancy.  I looked
14   through PubMed, I believe that was the
15   primary body, search engine that I used,
16   which compiles, you know, most, if not at
17   all, of the medical literature.
18             When I had one fairly recent
19   article, I might have used some of the
20   references in that article to extract other
21   articles, to obtain other articles.
22        Q.   Okay.  So you mostly did a
23   PubMed search; is that fair?
24        A.   That's fair.
```

Michael Scola, M.D.

```
1          Q.   Did you consult any other

2    databases?

3          A.   No, I might have done a Google

4    search initially just as a broad overview,

5    but it was primarily PubMed.

6          Q.   And did you do that PubMed

7    search before or after you talked to the

8    lawyers the first time?

9          A.   I did everything after I spoke

10   to the lawyers for the first time.

11         Q.   Now, are there -- were there

12   papers or articles that you found during

13   your search that you recall seeing but not

14   reading or paying any attention to?

15         A.   Certainly.  But I wouldn't

16   have -- I wouldn't have printed those

17   articles or read them, but just based upon

18   the title or maybe read the abstract,

19   determined that they weren't relevant to

20   this topic and so didn't move forward.

21         Q.   Do you recall any of those,

22   what any of those were?

23         A.   Not specifically.

24                    MS. NOLAN:
```

Michael Scola, M.D.

```
 1              Notwithstanding the ones we
 2              mentioned earlier, those ones he
 3              mentioned earlier.
 4                   - - - -
 5         (Stenographer clarification.)
 6                   - - - - -
 7                   MS. NOLAN:  The one he
 8          mentioned earlier that he printed
 9          but didn't consider.
10    BY MR. GRAY:
11         Q.   I think that was the Ward
12    paper; is that correct?
13         A.   That's correct.
14         Q.   And I know you, obviously,
15    practice in the field of oncology, so I
16    know you have professional knowledge of NHL
17    and DLBCL and follicular lymphoma, are
18    there certain papers or studies that you
19    reviewed in the past not related to this
20    litigation that you would also be relying
21    on for your opinions in the case?
22         A.   Not directly.  It may have
23    formulated my opinion, you know, indirectly
24    over time, but none that I solicited to
```

Michael Scola, M.D.

1    formulate this report.

2         Q.   As you say that now, are there

3    specific papers that you're thinking about?

4         A.   Not specifically.  You know,

5    I'm constantly referencing books, articles,

6    materials that I have at my disposal for

7    patient-related matters.  But not pertinent

8    to this case, directly pertinent.

9         Q.   And I apologize, I know this is

10   a little tedious.  I just want to make

11   sure, anything that you may potentially be

12   talking about or testifying about at trial,

13   this is my chance to get to know what that

14   is and, you know, test your bases for

15   the -- to cross-examine you about those

16   papers.  So I want to make sure that I

17   understand everything that you might be

18   relying upon, talking about, et cetera.

19   Does that make sense?

20        A.   Yes.

21        Q.   Okay.  And so it sounds like to

22   me you're saying, you know, I'm a

23   practicing physician and -- you're a

24   practicing physician and you stay up to

Michael Scola, M.D.

1    date, you know, with medical literature in

2    your field about oncology or about these

3    particular diseases, so you, obviously,

4    have some knowledge from that type of

5    research; is that right?

6            A.    That's what I'm saying.

7            Q.    Okay.  But there's nothing that

8    you can think of that you directly want to

9    be using as part of your testimony in this

10   case?

11           A.    Correct.

12           Q.    Now, did you ever look at any

13   scientific literature related to glyphosate

14   prior to being retained in this case?

15           A.    No.

16           Q.    Now, do you anticipate doing

17   any additional work or research on your own

18   between now and whenever the trial may

19   happen in this case?

20           A.    I do not.

21           Q.    We looked at the med chron,

22   that medical chronology document and the

23   highlighting that was in that, you told me

24   was from the attorneys and you used that to

Michael Scola, M.D.

```
1    get Mr. Koen's medical history; is that

2    fair?

3         A.   Yes.

4         Q.   Did you also review any of his

5    medical records?

6         A.   Yes, I did.

7         Q.   Was there anything you didn't

8    see in the medical records that you were

9    looking for?

10        A.   Well, I just went through it

11   chronologically to understand the evolution

12   of his disease and the treatments that were

13   rendered.

14        Q.   Right.  My question is a little

15   different.  I'm asking was there anything

16   that -- I mean, you know what the medical

17   record for a typical, you know, follicular

18   transformed DLBCL patient would look like.

19   Was there anything that you would -- any

20   study or, you know, anything in the medical

21   records that you would have expected to see

22   there that you didn't?

23        A.   No, not necessarily.  I think

24   it was well represented.  I walked away
```

Michael Scola, M.D.

1    with a fairly good understanding of his

2    disease course and how it was managed over

3    time.

4         Q.   Is there anything additional

5    that you feel like you would need to see in

6    order to support your opinion?

7         A.   No.

8         Q.   Okay.  We have been going about

9    an hour 20, do we need to take a break?

10        A.   I can go either way.  So I'm

11   fine if you want to continue, but if the

12   consensus is to take a break, I'll be here.

13                  MS. NOLAN:  If I could

14        have five minutes.

15                  MR. GRAY:  Yeah, sure.

16                  THE VIDEOGRAPHER:  The

17        time right now is 11:53 a.m.  We

18        are off the record.

19                  - - - - -

20        (A recess was taken at this time.)

21                  - - - - -

22                  THE VIDEOGRAPHER:  The

23        time right now is time 12:20 p.m.

24        We're back on the record.

Michael Scola, M.D.

```
 1    BY MR. GRAY:

 2         Q.   Dr. Scola, I believe you told

 3    me this is not the first time you have been

 4    deposed, right?

 5         A.   Yes, that's correct.

 6         Q.   How many times have you been

 7    deposed in the past?

 8         A.   Maybe five.

 9         Q.   Do you recall all of those

10    depositions?

11         A.   I do.

12         Q.   Okay.  Let's just start at the

13    top.  Can you tell me about them one by one

14    actually?  You know what, let me do one

15    thing.

16                    MS. NOLAN:  I feel like

17         we gave a testimonial history to

18         you, did you not receive it or --

19                    MR. GRAY:  I did, I'm

20         going to introduce it, but I do

21         want to hear from him what he did

22         in those cases.

23                    THE WITNESS:  So the

24         first, the first case was I was a
```

Michael Scola, M.D.

```
 1          medical -- I was a treating

 2          physician in a class action lawsuit

 3          using the anticoagulant Xarelto.

 4          So I was deposed as the

 5          individual's treating physician.  I

 6          was not named in the lawsuit in any

 7          way, but as the treating physician,

 8          I had to give deposition.  And

 9          then --

10  BY MR. GRAY:

11          Q.   Do you recall when that was?

12          A.   I am really just guessing, but

13  I would say no more than four years ago, so

14  right around 2017.

15          Q.   Okay.  Let me do one thing

16  here, that might help you a little bit.

17  And I'll introduce what we'll use as

18  Exhibit 6.

19                  - - - - -

20          (Testimonial List marked Scola

21          Exhibit 6 for identification.)

22                  - - - - -

23  BY MR. GRAY:

24          Q.   Okay.  Can you see that?
```

Michael Scola, M.D.

```
1          A.   Yes.

2          Q.   This was provided to me as the

3   cases where you've testified in the last

4   four years.

5          A.   Okay.  What's not represented

6   here is the case I just mentioned.

7          Q.   Okay.

8          A.   And, again, I can get you the

9   specific date, but I would say it's in the

10  four- to five-year time frame.  The rest of

11  these are medical legal cases --

12         Q.   Hang on.  Let me ask you a

13  question first about -- I don't want to

14  jump off that Xarelto case.  Do you

15  remember the names of the parties in that

16  case?

17         A.   I do not.

18         Q.   Okay.  And did you provide any

19  causation testimony in that case?

20         A.   No, not directly, no.  No.

21         Q.   You hesitated and you said "not

22  directly," what did that mean?

23         A.   Well, I guess I had to sort of

24  think what causation testimony meant.  No,
```

Michael Scola, M.D.

1    we really just went through my medical

2    records and they asked for my opinion about

3    medical decisions that were made.

4         Q.   And what were the claims in

5    that case, that Xarelto caused what?

6         A.   It was a gentleman who

7    presented with a major bleed who was on

8    Xarelto anticoagulation, and so he got

9    involved in a class action lawsuit and that

10   led to my involvement.

11        Q.   And were the claims in that

12   case that Xarelto --

13        A.   Yes, it was against Janssen

14   Pharmaceutical, the manufacturer of

15   Xarelto, that Xarelto promotes major bleeds

16   and that his bleed was from the use of this

17   medication.

18        Q.   And I take it you did not offer

19   testimony one way or the other about

20   whether Xarelto caused the bleed?

21        A.   I did not.

22        Q.   Do you know if that case is

23   still ongoing?

24        A.   No, it was settled in favor of

Michael Scola, M.D.

1    Janssen Pharmaceutical.  And, again, I'm

2    not privy to specific details, but that's

3    what I heard in a follow-up phone call.

4         Q.   And now this list, your

5    testimony list that we have here, is this

6    something that you put together?

7         A.   Yes.

8         Q.   Is there a reason you didn't

9    include this Xarelto case on this list?

10        A.   Well, I sort of went through it

11   with Clare.  I gave her the information and

12   she put it in print.  I don't recall why

13   the Xarelto case wasn't included.  Maybe

14   because it wasn't medical legal.  I don't

15   recall.  Maybe it slipped my mind.

16        Q.   Okay.  Are there other cases

17   that you have testified in the last four

18   years that aren't listed on this?

19        A.   No, this is pretty

20   comprehensive.

21        Q.   And that goes for being an

22   expert witness, a fact witness, any kind of

23   case at all?

24        A.   Well, deposition, this is the

Michael Scola, M.D.

```
1   extent of my depositions.

2        Q.   Okay.  I'm not sure that

3   answered my question.

4        A.   I have been involved as a

5   medical expert, but I have not been deposed

6   in those cases.  I have done other cases

7   through National Medical Consultants, but I

8   have not been deposed in any of those

9   cases.

10        Q.   Let's talk about those cases

11   first and then we'll get to your

12   depositions, okay?  How many cases --

13              MS. NOLAN:  It sounds

14         like he's talking about pending

15         cases.  That's my guess.

16   BY MR. GRAY:

17        Q.   Well, I'll ask him.  Are these

18   cases where you're a current expert witness

19   in, Doctor?

20        A.   Yes, I do believe they're

21   current.  I'm actually not privy to the

22   status of -- I'm involved in two of them,

23   to be frank.  And I'm not sure of the

24   status at this point.  But they're fairly
```

Michael Scola, M.D.

1    recent cases, so I wouldn't be surprised if

2    they're still pending.

3            Q.    And if you didn't provide

4    deposition testimony, what did you do?

5            A.    Medical opinion, medical expert

6    opinion.

7            Q.    And without giving me details,

8    what are these cases about?

9            A.    One individual was involved in

10   a motor vehicle accident and developed a

11   blood clot, and to be honest, I'm not even

12   sure who was sort of named in the suit, but

13   I was asked to simply review the record and

14   give an opinion about whether the blood

15   clot might have emanated from the event.

16   And that was the extent of my involvement

17   in that case.  And it was simply phone

18   call.  I don't -- I don't -- I didn't put

19   anything in writing.  It was just a phone

20   call with the lawyer.  And then the

21   other --

22           Q.    Let me stop you there.  What

23   was your opinion in that case?

24           A.    My opinion is that there was

Michael Scola, M.D.

1    not causation.  That the event happened

2    many months before the medical outcome and

3    that there was not cause.

4         Q.   And this was -- were you

5    talking to the plaintiff's lawyer in that

6    case?

7         A.   That's correct, yes.  I didn't

8    even get to the lawyer.  I think I spoke to

9    a representative.  I didn't even talk to

10   the lawyer.

11        Q.   A representative from where?

12        A.   Maybe a paralegal from the law

13   firm.

14        Q.   And so you talked to the

15   plaintiff's law firm, you said I don't

16   think there's causation here, I assume they

17   said thank you for your time and that was

18   it?

19        A.   The way it ended, she was going

20   to talk to the client and extract more

21   information and I never heard back.  So I

22   assume the case didn't move forward.

23        Q.   You think the case didn't move

24   forward, or do you think they didn't move

Michael Scola, M.D.

```
 1    forward with you since you had an adverse

 2    opinion --

 3          A.    I don't know.  There were no

 4    subsequent conversations.

 5          Q.    Okay.  And the second case?

 6          A.    Second case was a gentleman who

 7    received his care through the VA Medical

 8    Center and was ultimately diagnosed with

 9    brain lymphoma, central nervous system

10    lymphoma.  And the claim was that outcomes

11    could have been different if diagnosis was

12    made sooner and I was asked to rendered an

13    opinion regarding that.

14          Q.    Okay.  What was your opinion?

15          A.    My opinion is that outcomes

16    would have been different if diagnosis was

17    rendered sooner.

18          Q.    Have you been -- were you

19    retained by the plaintiff's law firm in

20    that case?

21          A.    That's correct.

22          Q.    Did they ask you to write a

23    report?

24          A.    Yes.
```

Michael Scola, M.D.

1          Q.    Okay.  So you did prepare a

2   report in that one?

3          A.    I did.

4          Q.    How long ago was that, if you

5   recall?

6          A.    Within the past six months.

7   There was a follow-up email a month ago

8   that I was asked to address.

9          Q.    When you say "asked to

10  address," what does that mean?

11         A.    There was a follow-up email

12  with additional questioning from, from a

13  lawyer who represented the VA Medical

14  Center who wanted clarification on some of

15  the aspects of my report.  And so I

16  addressed his inquiry in the form of an

17  email, an email response.  And that was

18  submitted probably three weeks ago.  And

19  I've had no communication since.

20         Q.    No deposition in that case?

21         A.    No, sir.

22         Q.    Of all the cases that you

23  have -- actually, let me scratch that.

24  With those two cases and this current case,

Michael Scola, M.D.

```
1    does cover all the cases you've gotten from

2    National Medical Consultants?

3         A.   Yes.

4         Q.   And those have all been for

5    plaintiffs?

6         A.   Yes.

7         Q.   Are all the cases from National

8    Medical Consultants for plaintiffs?

9         A.   I don't believe so, no.

10        Q.   How do you choose which cases

11   you take from there?

12        A.   Well, they tend to filter the

13   cases based on my medical expertise, my

14   medical specialty.  And, generally,

15   initially, I'm paid simply to review the

16   case.  So most of the cases I accept.  So

17   that's really been the extent of my

18   involvement for the majority of the cases

19   thus far.

20        Q.   Well, you've had three cases,

21   two of them, you've had causation opinions

22   for the plaintiffs and you've written

23   reports, and this one you're giving a

24   deposition, correct?
```

Michael Scola, M.D.

```
1          A.    Yes.
2          Q.    And the third case, you had an
3    opinion that was, we'll say, unfavorable to
4    the plaintiff, correct?
5          A.    That's correct.
6          Q.    And they didn't ask you to do
7    anything further, that's right?
8          A.    That's correct.
9          Q.    Okay.  So it sounds like you've
10   done a little more than just review the
11   cases, right?
12         A.    Yes.  I mean, you know,
13   National Medical Consultants puts forth
14   that they will review the case and
15   determine if there is substance to move
16   forward is my understanding.  And so a
17   large part of what they do is screening
18   potential cases.  And I think that's been
19   my involvement primarily to review and sort
20   of summarize the report, the medical facts.
21         Q.    Well, and to offer causation
22   opinions, right?
23         A.    That's correct.
24         Q.    I'm not sure we -- I think we
```

Michael Scola, M.D.

1    might have missed a question, so I'll ask

2    it again.  How do you decide which cases

3    you're going to take?

4         A.   Well, I don't, I don't really

5    decide, I guess, I would say.  Because I

6    have very limited conversation when the

7    initial contact takes place.  The gentleman

8    that reaches out to me is a retired

9    pediatrician.  He doesn't have expertise in

10   this area.  We'll often have a

11   conversation.  He'll ask me questions and

12   if there's a feeling that there might be

13   substance, then we usually move on to

14   medical review.

15        Q.   And who is this person?

16        A.   Well, I've dealt with different

17   people from this outfit.

18        Q.   Who is the person who called

19   you about this case?

20        A.   I can get you the name shortly.

21        Q.   And what did he tell you about

22   this case that made you think it had merit

23   and you should review it?

24        A.   I'm sorry, the answer to your

Michael Scola, M.D.

```
1    first question is Eugene DeBlasio.

2    E-U-G-E-N-E, DeBlasio, D-E-B-L-A-S-I-O.

3         Q.   He's your contact at National

4    Medical Consultants?

5         A.   One of the principal contacts,

6    yes.

7         Q.   Okay.  So back to my question,

8    what did Mr. DeBlasio tell you that made

9    you think that this case might have merit

10   and you should take it?

11        A.   Well, truthfully, I was given

12   very limited information.  I was told there

13   was a gentleman with an aggressive lymphoma

14   who had an exposure history and the concern

15   was that there might be causation.  And

16   that was enough to prompt me to review the

17   case.

18        Q.   And prior to that, you hadn't

19   looked into anything involving glyphosate

20   and NHL before?

21        A.   Not in a formal way, no.

22        Q.   Okay.  Let's go back to this,

23   your testimony list here that we have.  Why

24   don't we work our way back.  We'll start
```

Michael Scola, M.D.

```
 1    with the most recent case here at the
 2    bottom, that's Renee Maurin versus Elad
 3    Levy, MD.
 4         A.   Yes.
 5         Q.   Can you tell me about what that
 6    case was about?
 7         A.   So Elad Levy is a neurosurgeon,
 8    a spine surgeon, and he operated on Renee
 9    Maurin and she developed a postoperative
10    clot, venous thrombosis, which culminated
11    in a lethal event, a pulmonary embolism.
12    And it was alleged that Dr. Levy should
13    have acted differently that might have led
14    to a different outcome.
15         Q.   Okay.  And who were you
16    retained by in this case?
17         A.   So I was retained by Renee
18    Maurin's legal team and I really wasn't to
19    comment on the clotting event or his
20    surgery or even the outcome, but rather
21    hematologic aspects of this case.  Renee
22    had some hematologic abnormalities and
23    opinions were rendered about those
24    hematologic abnormalities and I was deposed
```

Michael Scola, M.D.

```
 1    and to comment on those abnormalities.
 2    That was my role principally.
 3         Q.   Okay.  So you were -- were you
 4    asked to give a standard of care opinion?
 5         A.   I was asked to give a standard
 6    of care opinion.
 7         Q.   Okay.  And you were asked to
 8    determine whether or not Dr. Levy complied
 9    with the standard of care in his treatment
10    of Ms. Maurin?
11         A.   Well, yes, but not as it
12    pertains to the management of the clot, the
13    recognition of the clot.  But more
14    interpretation of laboratory data.
15         Q.   Okay.  And you said you gave a
16    deposition?
17         A.   I -- did I give a deposition?
18         Q.   Oh, I'm sorry, I apologize,
19    this says court testimony.
20         A.   Yes.
21         Q.   So you testified at a trial?
22         A.   That's correct.
23         Q.   Okay.  And it was -- was it
24    your opinion that Dr. Levy did not comport
```

Michael Scola, M.D.

1    with the standard of care?

2         A.   It was my opinion that some of

3    the conclusions that he and his team drew

4    in interpreting the lab results were not,

5    were not accurate.

6         Q.   Okay.  So that sounds like a

7    yes to my question.

8         A.   Yes.

9         Q.   Okay.  Do you know what

10   happened in that case, what the outcome

11   was?

12        A.   Yeah, I was just there the

13   first day and the case went on for a better

14   part of a week or more, but ultimately, it

15   did settle in favor of Dr. Levy.

16        Q.   Did you write an expert report

17   if that case?

18        A.   Yes, I did.

19        Q.   And that case had nothing to do

20   with cancer or lymphoma, correct?

21        A.   No, it did not.

22        Q.   Do you have a copy of your

23   trial testimony?

24        A.   Yes, I would.

Michael Scola, M.D.

1          Q.   All right.  Let's go to the

2    next case.  Smith versus Oak Hill Hospital,

3    Nakhl, et al.?

4          A.   Yes.

5          Q.   Do you recall this case?

6          A.   Yes, I do.

7          Q.   Okay.  Can you tell me what

8    happened in this case?

9          A.   Nakhl and his associates were

10   hematologists/oncologists involved in the

11   management of Ms. Smith.  She came in for

12   bypass surgery and postoperatively, she had

13   low blood counts, low platelet count and

14   she was managed according to one diagnosis,

15   which led to adverse outcome.  She ended up

16   requiring an amputation, whereas in fact

17   the true diagnosis was probably something

18   else and management should have evolved in

19   a different direction and might have

20   prevented the adverse outcome.  So, again,

21   it was a hematology case.  And I think

22   there was a settlement in that case.

23         Q.   Okay.  Were you retained --

24         A.   I'm sorry, it never went to

Michael Scola, M.D.

```
1    trial.
2         Q.   Okay.  Sorry for interrupting.
3    Were you retained by Mrs. Smith's counsel?
4         A.   Yes.
5         Q.   Okay.  And you -- so that what
6    it sounds like, this was a misdiagnosis
7    case?
8         A.   Yes.
9         Q.   Okay.  And your testimony was
10   that Dr. Nakhl and his team missed the
11   diagnosis?
12        A.   Yes.
13        Q.   Okay.  And were you deposed?
14        A.   I was.
15        Q.   Okay.  This settled before
16   trial, so just your deposition.  Did you
17   also write a report?
18        A.   I did.
19        Q.   Okay.  And do you have copies
20   of both of those?
21        A.   Yes.
22        Q.   Okay.  And let's talk about the
23   last case that's on the list, Wyatt SAP
24   versus Newark Beth Israel Medical Center.
```

Michael Scola, M.D.

```
1   Do you recall that case?

2        A.   Yes.

3        Q.   You were retained by the

4   plaintiffs, Wyatt SAP?

5        A.   And I'm sorry, to go back to

6   Smith and Oak Hill, I did not write a

7   report.  A report was not indicated

8   according to Florida laws is my

9   understanding, so I never wrote a formal

10  report in that case.  But I was deposed by

11  Wyatt's plaintiff attorney.

12       Q.   Okay.  Let's go ahead.  Let me

13  start over.  So the Wyatt case --

14       A.   Yes.

15       Q.   -- were you retained by

16  plaintiff or defendant?

17       A.   Plaintiff.

18       Q.   Okay.  And what was that case

19  about?

20       A.   Mr. Wyatt required urgent back

21  surgery.  He was hospitalized.  He was

22  operated on.  And afterwards, he had severe

23  thrombosis involving the legs, which

24  culminated in tissue damage and he
```

Michael Scola, M.D.

1   ultimately required amputation.  And the

2   argument was that he should have been

3   treated differently postoperatively that

4   would have prevented this adverse outcome.

5        Q.   Okay.  And your -- I take it

6   your testimony was that the physicians at

7   Newark Beth Israel failed to comply with

8   the standard of care in their treatment of

9   Mr. Wyatt?

10        A.   That's correct.

11        Q.   How did you -- did you get

12   these three cases through National Medical

13   Consultants?

14        A.   No, I was not working with them

15   at the time.

16        Q.   Okay.  This, let's start back

17   at the beginning with the Renee Maurin

18   case.  Do you know how the attorneys found

19   you in that case?

20        A.   I think, yes, I think the

21   initial inquiry was with my partner who

22   could not take this case and asked if I

23   might be interested.

24        Q.   Okay.  Have you worked with any

1    type of expert consultant service before

2    National Medical Consultants?

3         A.    No, sir.

4         Q.    Have you ever been an expert

5    for the defense?

6         A.    I have not.

7         Q.    I'm going to take this down.

8    So we talked about these three cases, I

9    guess, that take you back to 2019.  Have

10   you -- how many other cases have you -- how

11   many other times have you been an expert

12   witness?  You know, scratch that.  Let me

13   ask you a better question.

14              Do you know how many times

15   over the course of your career you have

16   been retained as an expert witness?

17        A.    I believe that's it in summary,

18   the cases that we've discussed.

19        Q.    Okay.  So the three cases on

20   your -- that you provided and then the two

21   cases that you told me about and this case

22   makes six?

23        A.    Yes.

24        Q.    So you've never offered an

Michael Scola, M.D.

```
 1    opinion in any case about the cause,

 2    besides this case, you haven't offered any

 3    opinion about the cause of a person's

 4    cancer?

 5         A.   No.

 6         Q.   Have you been asked to opine on

 7    the cause of someone's cancer beyond this

 8    case?

 9         A.   No.

10         Q.   All right.  I'm going to pull

11    up what we'll mark as Exhibit 7.  Okay.

12    Does this look familiar to you, Doctor?

13         A.   Yes.

14              - - - - -

15              (Curriculum Vitae marked Scola

16          Exhibit 7 for identification.)

17              - - - - -

18    BY MR. GRAY:

19         Q.   And is this your CV?

20         A.   It is.

21         Q.   Okay.  So you were born on

22    ██████████████, so your 66th birthday

23    coming?

24         A.   Fifty-six.
```

Michael Scola, M.D.

```
1          Q.    Fifty-six, I'm sorry, I'm
2     terrible with math.  I'm aging you, I
3     apologize.  So happy early birthday.  I
4     doubt we'll talk on ███████, Happy
5     Birthday.
6          A.    Thank you.
7          Q.    And one thing I'm curious
8     about, across the top here, it says filed
9     with the Erie County clerk on October 9,
10    2019; is that right?  Do you see that at
11    the top?
12         A.    Yes.
13         Q.    Okay.  What is that from?
14         A.    I haven't the foggiest.  I have
15    no idea.  I don't know.
16         Q.    Okay.  Did you provide this CV
17    to your attorneys?
18         A.    I did.  I must have.  It must
19    have come through National Medical
20    Consultants, I imagine.  And I don't know
21    how that stamp appeared on the top.
22         Q.    Okay.  And so let me get this
23    clear.  Did you -- this copy of your CV
24    that we have here, did you provide this to
```

Michael Scola, M.D.

1   Ms. Nolan or Ms. Kinard?

2        A.   I do not believe I provided

3   them directly to them.  Clare, I don't know

4   if you have a recollection, but I don't

5   believe I provided it directly.

6        Q.   Okay.  But you had to provide

7   your CV to National Medical Consultants at

8   some point?

9        A.   Yes.

10       Q.   And you're not sure what

11  this -- it also says "NYSCEF doc number

12  143."  Do you see that at the top left?

13       A.   Yes.

14       Q.   You don't know what that is

15  either?

16       A.   No, I apologize, this is the

17  first time I'm seeing this.

18       Q.   Now, is that -- I guess this

19  date, 10/9/2019, that would predate when

20  you signed up with National Medical

21  Consultants, right?

22       A.   Correct.

23       Q.   Are you required to -- scratch

24  that.  Did you have to -- do you have a

Michael Scola, M.D.

1    recollection of actually providing National

2    Medical Consultants with a CV?

3          A.   I do not have a concrete

4    recollection, but --

5          Q.   What I'm driving at here is did

6    you give them this or is this something

7    they went and pulled from some Erie County

8    website?

9          A.   They might have pulled it.

10         Q.   Okay.

11         A.   They very well might have.  I

12   don't have a concrete recollection of

13   directly providing it.

14         Q.   So did you have to register a

15   CV at some point with Erie County or with

16   any other kind of state agency?

17         A.   Not that I'm aware of, nope.

18         Q.   Now, this says 2019, so I'm

19   assuming this is a version of your CV from

20   2019?

21         A.   Yes.

22         Q.   Has anything changed for you

23   professionally since 2019?

24         A.   Not substantially, no.

Michael Scola, M.D.

1          Q.    Okay.  Well, unsubstantially,

2    what has changed?

3          A.    You know, maybe committee

4    membership, but my primary employment has

5    not changed.

6          Q.    Okay.  Have you published

7    anything since October 2019 that wouldn't

8    be in this document?

9          A.    No, I don't believe so, no.

10         Q.    Okay.  And what are your board

11   certifications, Doctor?

12         A.    I'm board certified in

13   hematology and medical oncology.

14         Q.    And on page 2, I see the

15   narcotics certification, what is that?

16         A.    Well, we need to maintain

17   federal narcotic certification, so every

18   year, we recertify.

19         Q.    Okay.  That makes sense.  I

20   didn't know if that was some program where

21   you were working with the DEA or the state.

22   I thought that's maybe why you would have

23   had to --

24         A.    No, it's simply to be a

Michael Scola, M.D.

```
1    prescriber in good standing.

2         Q.   Okay.  That makes sense.

3    Moving on -- I'm sorry, let's go to page 3.

4    We've got your teaching and your hospital

5    appointments.  Okay.  Well, where are you

6    working now, Doctor?  How long have you

7    been there?

8         A.   Yes, I work for Morristown

9    Medical Center, which is a large community,

10   community hospital system in Morristown,

11   New Jersey.  And I have been here since

12   December of 2018.  So coming up on three

13   years.

14                  MS. NOLAN:  I believe we

15        produced a more current CV or we

16        produced a CV that doesn't have the

17        court reference on the top, if you

18        need us to resend it.

19   BY MR. GRAY:

20        Q.   Oh, no, that's fine, I was

21   just -- I was just curious about that.  I

22   didn't know what it was.

23                  And what is your practice at

24   Morristown Medical Center, Doctor?
```

Michael Scola, M.D.

```
 1          A.    Where is it at?

 2          Q.    I said what is your practice,

 3    what do you do there?

 4          A.    I practice general

 5    hematology/oncology, but particularly

 6    specialize in hematology, which is the care

 7    of individuals with blood disorders, benign

 8    and malignant.

 9          Q.    Okay.  So do you have a clinic

10    where you see patients daily?

11          A.    Yes.

12          Q.    How many days a week are you

13    seeing patients in the clinic?

14          A.    Typically five.

15          Q.    And what types of cancer are

16    you treating in those patients?

17          A.    Well, I do treat the entire

18    spectrum of hematology/oncology, but

19    within, within our group, we do tend to

20    subspecialize and emphasize particular

21    medical conditions and I tend to see a

22    disproportionate number of patients with

23    blood disorders.

24          Q.    Okay.  And would non-Hodgkin's
```

Michael Scola, M.D.

```
1   lymphoma be part of that group?

2       A.   That's correct, yes.

3       Q.   What other types of blood

4   disorders?

5       A.   Leukemia, myeloma, a variety of

6   benign blood disorders.  Too many blood

7   counts, not enough blood counts, clotting

8   and bleeding disorders.

9       Q.   Where were you before

10  Morristown Medical Center?

11      A.   I was at Summit Medical Group

12  which is a multi-specialty medical group in

13  the, spans across northern New Jersey.

14      Q.   And what was your practice at

15  Summit Medical Group?

16      A.   Similar, I was part of a large

17  hematology/oncology group.

18      Q.   Were you seeing patients in

19  your clinic there?

20      A.   Yes.

21      Q.   How frequently?

22      A.   Five days a week.

23      Q.   How many patients do you

24  typically see in a week?
```

Michael Scola, M.D.

```
1          A.   I would say both in the office
2   as well as in the hospital, somewhere
3   between 100 to 130.
4          Q.   How long has it been the case
5   that you were seeing that patient load
6   weekly?
7          A.   For the past many years.  I
8   have a pretty, pretty mature established
9   practice.
10         Q.   What percentage of those
11  patients do you see that are non-Hodgkin's
12  lymphoma patients?
13         A.   What percent of the patients
14  are non-Hodgkin's lymphoma patients?  Maybe
15  10 percent, 10 to 15 percent, somewhere
16  around there.
17         Q.   Has it kind of always been that
18  way that, 10 to 15 percent of your patient
19  load are NHL patients?
20         A.   I would say so.
21         Q.   And, forgive me, I may say NHL
22  for non-Hodgkin's lymphoma throughout the
23  day.  Can we agree to use that
24  abbreviation?
```

Michael Scola, M.D.

```
 1          A.    Sure.

 2          Q.    And I know we'll talk about Mr.

 3   Koen who eventually developed diffuse large

 4   B-cell lymphoma.  I may also refer to that

 5   as DLBCL.

 6          A.    Yes.

 7          Q.    Is that okay?

 8          A.    Absolutely.

 9          Q.    Okay.  I see you're currently

10   the director of the Atlantic Thrombosis

11   Center?

12          A.    Yes.

13          Q.    What is that?

14          A.    Well, the Atlantic Thrombosis

15   is sort of a sub, subdivision of our

16   general hematology/oncology practice that

17   focuses primarily on clotting and bleeding

18   disorders.  So we tend to focus our

19   attention on individuals that have a

20   variety of clotting and/or bleeding

21   disorders.

22          Q.    So that's another setting in

23   which you're actively seeing patients?

24          A.    Yes.
```

Michael Scola, M.D.

```
 1          Q.   But those aren't cancer
 2   patients, right?
 3          A.   No.  Many of them have cancer
 4   and subsequently develop a clot, but that's
 5   not the primary focus of the clinic.
 6          Q.   Okay.  What else are you doing
 7   with your professional time other than
 8   treating patients?
 9          A.   Well, we're a large medical
10   center and we do have a variety of
11   residents and fellows in training.  In
12   fact, we just started a hematology/oncology
13   training program for individuals that
14   finished their internal medicine residency
15   and which to subspecialize in
16   hematology/oncology, so a three-year
17   fellowship program.  So there's a lot of
18   teaching opportunities.
19               We're also actively involved
20   in a variety of clinical trials.  So
21   there's opportunity for clinical research
22   teaching.  The bulk of what I do is take
23   care of patients though.  Most of what I do
24   is clinical activity.
```

Michael Scola, M.D.

```
1          Q.   What's your -- you said you're
2    involved in a number of clinical trials.
3    What kind of trials are you working on?
4          A.   We have a variety of clinical
5    trials that sort of span the gamut.  Most
6    of them are geared towards patients with
7    malignant conditions.  We have Phase II and
8    Phase III clinical trials, but we also have
9    Phase I clinical trials, which are new
10   drugs that are just in the early phase of
11   investigation.  So we're fortunate to have
12   a very robust clinical trial program.
13         Q.   Have you done any trials
14   focused on -- scratch that.  Let me ask you
15   this.  So are all the trials, these are
16   drug trials?
17         A.   Yes.
18         Q.   Okay.  Any drug trials focused
19   on treating non-Hodgkin's lymphoma?
20         A.   Yes, we have a variety of
21   trials for non-Hodgkin's lymphoma.
22         Q.   And you don't have to go into
23   super great detail, but can you tell me a
24   little bit about those?
```

Michael Scola, M.D.

```
1          A.   Well, we have, we have several

2    trials for patients with follicular

3    lymphoma, small cell lymphoma, mantle cell

4    lymphoma, diffuse large B-cell lymphoma.

5    It's sort of a revolving platform in that

6    trials open, when we meet accrual goal,

7    they close, new trials open.  We have a

8    very rich clinical trial program for

9    hematologic malignancies in general.

10         Q.   And these trials are looking at

11   new drugs that are designed to, I assume,

12   chemotherapy drugs that are designed to

13   treat these various cancers?

14         A.   That's correct.  Yeah, not

15   always chemotherapy, they may be

16   alternative therapeutics, but they are

17   therapeutic trials, so looking to offer

18   treatments beyond standard of care.

19         Q.   And I take it you don't have

20   any trials that are designed to identify

21   the cause of someone's cancer, right?

22         A.   We do not have any of those

23   trials, no.

24         Q.   You don't have any trials that
```

Michael Scola, M.D.

1    are specific to patients that were exposed

2    to glyphosate?

3           A.   We do not.

4           Q.   Looking real quick here at

5    Section 15, this is the Consultant/Speaker

6    Bureau.  What does that mean?

7           A.   So I have, I have spoken on

8    behalf of these companies.  Generally

9    discussing a drug that is commercially

10   available to other clinicians.  So I'll

11   review the data that led to FDA approval,

12   the indications for the drug, review

13   toxicity.

14          Q.   And these are all, I assume

15   you're doing it for pharmaceutical cancer

16   drugs?

17          A.   Yes.

18          Q.   Now, I'm going to assume no

19   speeches on any pesticides or herbicides or

20   agricultural chemicals for these companies,

21   right?

22          A.   No.

23          Q.   I mean, and across the board,

24   you've never given any talks about those

Michael Scola, M.D.

1    types of chemicals, right?

2          A.    I have not.

3          Q.    Have you ever done any work for

4    Monsanto?

5          A.    No.

6          Q.    Any work for Bayer?

7          A.    No.

8          Q.    You paused a minute.  Are you

9    sure?

10         A.    Well, we may have a Bayer

11   Pharmaceutical trial available, but not

12   specifically as it pertains to glyphosate.

13         Q.    And I'm talking about broader

14   than glyphosate, just have you done any

15   work for Bayer?  You don't have to get into

16   specifics if it's something that's --

17         A.    I may have.  I'm sure I have

18   over the course of my career been involved

19   in a clinical trial put forth by Bayer

20   Pharmaceuticals.

21         Q.    Other than these pharmaceutical

22   companies, have you done work for any other

23   chemical companies?

24         A.    No, I have not.

Michael Scola, M.D.

1          Q.    And I'll go down here to what I

2    have as Section 20 in your scientific

3    presentations.  Does this represent a

4    complete list of the presentations you've

5    given?

6          A.    Yes.

7          Q.    We can conclude from this list,

8    you've never given any presentations on --

9          A.    I'm sorry, just one minute.

10                    MR. GRAY:  Let's just go

11          off for a second.

12                    THE VIDEOGRAPHER:  The

13          time right now is 1:11 p.m.  We are

14          off the record.

15                    - - - - -

16        (A recess was taken at this time.)

17                    - - - - -

18                    THE VIDEOGRAPHER:  The

19          time right now is 1:12 p.m.  We're

20          back on the record.

21    BY MR. GRAY:

22          Q.    Okay.  Doctor, we can conclude

23    from your list of -- I think I asked you

24    this, but I just want to make sure, we can

Michael Scola, M.D.

```
 1   conclude from this list that you've never

 2   given any presentations on Roundup

 3   specifically or pesticides generally?

 4         A.   No, I have not.

 5         Q.   And then the last page here is

 6   your publications.  Does this represent all

 7   of your articles in the published

 8   literature?

 9         A.   Yes, I believe it does.

10         Q.   So, again, you've never

11   published on glyphosate?

12         A.   No.

13         Q.   Never published on any

14   pesticides?

15         A.   No.

16         Q.   And it looks like you never

17   published about any causes of non-Hodgkin's

18   lymphoma?

19         A.   No, I have not.

20         Q.   Nothing about the risk factors

21   for non-Hodgkin's lymphoma?

22         A.   No.

23         Q.   Let me take this down.  Dr.

24   Scola, what scientific areas would you
```

Michael Scola, M.D.

1    consider yourself an expert?

2          A.    Well, I consider myself an

3    expert in the clinical management of

4    hematology/oncology, but particularly

5    hematologic conditions.

6          Q.    Okay.  Do you consider yourself

7    an expert in epidemiology?

8          A.    No.

9          Q.    You're not an expert in animal

10   carcinogenicity studies, right?

11         A.    No.

12         Q.    You've never conducted any

13   studies in animals regarding pesticides and

14   cancer?

15         A.    No.

16         Q.    I actually don't see any

17   discussion of the animal studies in

18   glyphosate in your expert report and

19   nothing in the materials you provided me,

20   so can we assume you won't be offering

21   opinions on the animal studies?

22         A.    That's correct.  Just what was

23   referred to in the articles, but I didn't

24   pull any primary animal study articles.

Michael Scola, M.D.

```
 1          Q.    Okay.  When you say "just what
 2     was referred to in the articles," what do
 3     you mean?
 4          A.    Well, some of the articles do
 5     quote other literature that does deal with
 6     animal studies, but these don't represent
 7     the primary literature.
 8          Q.    Okay.  So what you're saying is
 9     you've read stuff that talks about the
10     animal studies generally, but you haven't
11     reviewed any animal studies yourself?
12          A.    That's correct.
13          Q.    You won't be offering any --
14     you might -- you're aware of whatever
15     conclusions might be in a paper, but you
16     won't be offering any of your own
17     independent opinions or conclusions about
18     the animal studies?
19          A.    Not necessarily, no.
20          Q.    There's also a collection of in
21     vitro and in vivo and genotoxicity studies
22     in the litigation that has been
23     collectively referred to as the mechanistic
24     data.  That's not your area of expertise
```

Michael Scola, M.D.

```
 1   either, right?

 2           A.    It is not.

 3           Q.    And so the same question, you

 4   won't be offering opinions about the

 5   mechanistic data?

 6           A.    Well, not primarily.  I can

 7   offer opinions based on my -- the

 8   conclusion of authors that have summarized

 9   the data.

10           Q.    But you never looked at any of

11   that data yourself?

12           A.    I have not.

13           Q.    Now, you have never conducted a

14   genotoxicity study?

15           A.    No.

16           Q.    You've never conducted an

17   immunogenicity study?

18           A.    No.

19           Q.    Never conducted any studies

20   themselves or test tubes involving

21   pesticides and cancer?

22           A.    I have not.

23           Q.    You're not an expert in EPA

24   regulations, are you?
```

Michael Scola, M.D.

```
 1          A.    No.
 2          Q.    Have you ever consulted for the
 3    EPA?
 4          A.    No.
 5          Q.    Have you ever been involved in
 6    the manufacturer -- manufacture, testing,
 7    or marketing of any chemical products?
 8          A.    No.
 9          Q.    I assume you don't consider
10    yourself an expert in pesticides?
11          A.    No.
12          Q.    I assume you don't consider
13    yourself an expert in product labeling?
14          A.    No.
15          Q.    All right.  I want to start to
16    talk a little bit about your opinions
17    involving the alleged association between
18    glyphosate and non-Hodgkin's lymphoma.  I
19    believe you said you first started looking
20    into the science of this when you were
21    retained for this case?
22          A.    That's correct.
23          Q.    And were you at least aware of
24    the lawsuits alleging a link before you
```

Michael Scola, M.D.

```
 1   were retained?

 2        A.   I was.

 3        Q.   Okay.  And were you aware of

 4   the IRAC monograph before you were

 5   retained?

 6        A.   No.

 7                    THE STENOGRAPHER:  The

 8        what?

 9                    MR. GRAY:  The IRAC,

10        I-R-A-C, monograph.

11                    THE STENOGRAPHER:  Okay.

12        Thank you.

13   BY MR. GRAY:

14        Q.   You have a lot of -- you treat

15   patients with cancer, was there -- was it

16   just something that didn't interest you

17   prior to this?

18        A.   I guess it didn't really have

19   any bearing on the management of patients.

20   And I think the literature is vast and I've

21   never had a need to sort of delve deeply

22   into the literature.

23        Q.   You said it doesn't bear on the

24   management of patients, is that because for
```

Michael Scola, M.D.

```
1   you in your practice, trying to pinpoint

2   the cause of someone's lymphoma is not

3   really part of your clinical care?

4        A.   Well, I think it's an important

5   part of the management of any patient to

6   try to fully understand the disease and

7   that means the origins of the disease, but

8   it doesn't necessarily have direct bearing

9   on the treatment program.

10       Q.   Okay.  How often in your

11  practice do you divine to figure out the

12  origin of your patient's lymphoma?

13       A.   Well, I think it's always a

14  part of the assessment, the initial

15  assessment of a patient to ascertain

16  exposure history, to learn a little bit

17  about family history, and to try to

18  understand the pathological basis of the

19  individual's lymphoma.

20       Q.   Okay.  You said you want to get

21  people's exposure history; is that correct?

22       A.   Yes.

23       Q.   What type of exposures have you

24  typically looked at?
```

Michael Scola, M.D.

```
1          A.   Well, I think, I think it's for

2   many malignancies, including lymphoma,

3   exposures to chemicals, toxins, radiation

4   can have bearing on the development of the

5   malignancy.  And so that history is

6   important.  And we usually inquire about

7   those exposures as we're sort of

8   formulating our initial opinion of the

9   patient.

10         Q.   And you said -- what sort of

11  chemicals or toxins do you ask your

12  non-Hodgkin's lymphoma patients about?

13         A.   We usually get the detailed

14  occupational history.  Do the work around

15  chemicals or toxins.  Are they in an

16  industry where exposure might be relevant.

17  We usually get a detailed smoking history.

18  We usually get a detailed history of where

19  they lived throughout their lives and where

20  that might have taken them.  For example,

21  with somebody in the military, that might

22  open up avenues of potential exposure.  So

23  this is an important part of the initial

24  encounter with the patient.
```

Michael Scola, M.D.

1          Q.   What specifically, which -- are

2     there specific chemicals or toxins that you

3     ask people about?

4          A.   Well, not really.  You know, I

5     tend to start my inquiry broad and then

6     sort of narrow it down if there's, if

7     there's a potential exposure of interest.

8     So if somebody works as an insurance agent,

9     that may be less of a concern than if

10    somebody is a chemist or somebody is a

11    farmer or somebody has, you know, had

12    potential exposure to radioactive material.

13         Q.   Okay.  Let's talk about farmers

14    then.  If a patient comes in and tells you

15    he or she is a farmer, are there specific

16    chemicals that you ask them whether or not

17    they have been exposed to?

18         A.   I usually don't ask about

19    specific chemicals.  But I will ask the

20    nature of the farming.  Do they have

21    exposure to pesticides, herbicides, if so,

22    what degree.  And try to get a sense for

23    what, what farming means.  So I think

24    those, those industries are associated with

1   a higher risk of non-Hodgkin's lymphoma,

2   although we don't always understand why

3   that is and why it occurs in certain

4   individuals, we do try to gain more

5   specific information about, about potential

6   exposures.

7        Q.   And so you don't ask your

8   patients, even your farming patients,

9   specifically whether they have been exposed

10  to Roundup.

11       A.   I don't, specifically about

12  Roundup.  I will ask about just in general,

13  do you have exposure to pesticides,

14  chemicals, herbicides, but not specifically

15  Roundup.

16       Q.   And that's because there's been

17  some suspected link between exposure to

18  agricultural chemicals and non-Hodgkin's

19  lymphoma for 50 or 60 years or more,

20  correct?

21       A.   I don't know the duration of

22  that alleged association, but there are

23  data that suggest that those occupations

24  are associated with a higher risk of

Michael Scola, M.D.

1  hematologic malignancies, including

2  non-Hodgkin's lymphoma.

3        Q.   And let me ask a more direct

4  question.  That data that you say -- that

5  you say or that you note suggests a higher

6  incidence, that predates the introduction

7  of Roundup, correct?

8        A.   I don't know if I can answer

9  that.  I truly don't know the extent of

10  research into that association.

11        Q.   Okay.  So you don't know if

12  that goes back beyond the '70s?

13        A.   I don't.

14        Q.   Do you have any reason to think

15  that it wouldn't?

16        A.   Well, I think epidemiologic

17  tools and analysis have, like everything

18  else, matured over time and I'm not sure

19  the epidemiologic expertise was established

20  at that time to draw those sort of

21  conclusions.

22        Q.   You think we could have -- I

23  shouldn't say we, but you think there

24  wasn't good epidemiology before the '70s?

Michael Scola, M.D.

```
 1          A.   Yeah, I mean, like in
 2   everything, I think it's contingent to
 3   mature.  I don't think we had the tools
 4   necessary, necessarily the bandwidth, the
 5   ability, the funding to do the detailed
 6   analysis that we do now.
 7          Q.   Okay.  When do you think we
 8   gained the ability to do epidemiological
 9   studies of farmers?
10          A.   I'm not, you know, I'm not
11   privy to that, I'm not an epidemiologist,
12   but I think like every scientific endeavor,
13   it has matured with time.
14          Q.   Before we -- actually, let me
15   back up.  You said that you don't ask your
16   patients about Roundup specifically,
17   correct?
18          A.   No, I don't ask specifically
19   about Roundup.  I often, I do ask about
20   pesticides, herbicides, toxins, various
21   chemicals.  When this comes up.  I mean, I
22   don't have a lot of farmers in Morristown,
23   you know, Morristown, New Jersey, that are
24   presenting themselves as patients.
```

Michael Scola, M.D.

```
 1          Q.    You've never told any of your
 2   patients that you think Roundup caused
 3   their cancer, right?
 4          A.    I don't believe I've ever said
 5   that, no.
 6          Q.    And so I want to kind of
 7   understand your opinion here.  I'm looking
 8   at the end of your report.  You say "It is
 9   difficult to establish a link between
10   glyphosate exposure and cancer in general;"
11   is that fair?
12          A.    Yes.
13          Q.    And then you go on to say based
14   on your interpretation of the literature
15   that it's possible that glyphosate exposure
16   contributed to Mr. Koen's diagnosis of NHL;
17   is that right?
18          A.    That's correct.
19          Q.    So my question, Doctor, as we
20   sit here today, can you say one way or the
21   other whether glyphosate exposure caused --
22   causes non-Hodgkin's lymphoma?
23          A.    Well, I think the contemporary
24   literature is compelling, is suggestive
```

Michael Scola, M.D.

1    that glyphosate can be a variable promoting

2    the development of non-Hodgkin's lymphoma.

3    I don't know if anybody can say with

4    certainty the degree to which it might have

5    caused malignancy non-Hodgkin's lymphoma in

6    Mr. Koen, but there are, you know, unique

7    features of this case that would certainly

8    make one suspicious.

9         Q.   Okay.  So you, if I'm right,

10   you're saying it's possible that Mr. Koen's

11   NHL was caused in part by his exposure to

12   glyphosate, but you can't say for certain

13   with any degree of scientific certainty

14   whether it was or not?

15        A.   I don't -- I don't think we

16   have the tools to say that, but I think

17   given the unique aspects of Mr. Koen's

18   case, his exposure history, the nature of

19   his malignancy, and his younger age, very

20   dramatic exposure history, in light of the

21   prevailing literature that does suggest a

22   causative role, I am suspicious that there

23   was causative effect.

24        Q.   Okay.  I understand that.  I

Michael Scola, M.D.

1    guess I'm asking a different question.  I

2    understand that you are suspicious or think

3    that it's possible.  I'm trying to figure

4    out whether you can say with any degree of

5    scientific certainty that Mr. Koen's

6    exposure to Roundup caused his cancer?

7         A.   I can't say with certainty that

8    it caused his cancer.  There is no, there

9    is no diagnostic tests.  There's no

10   pathological analysis and, you know,

11   lymphoma, like all malignancies, there

12   often isn't one variable, but rather

13   compounding effects by multiple variables,

14   including some patient-specific

15   susceptibility variables.

16        Q.   Okay.  So you can't say with

17   any certainty, can you -- can you say

18   whether -- scratch that.  Okay.  You're not

19   certain, but can you see say whether it was

20   more likely than not that Roundup caused

21   his non-Hodgkin's lymphoma?

22        A.   I would say it's more likely

23   than not that, again, based on my reading

24   and interpretation of the literature that

Michael Scola, M.D.

1    it played a significant role in the

2    development of his non-Hodgkin's lymphoma.

3          Q.   Okay.  And you said a

4    significant role, so does that mean that

5    you believe a cause of a person's NHL is

6    multifactorial?

7          A.   It always is.  I think that's

8    true of every malignancy, NHL

9    notwithstanding.

10         Q.   Okay.  So there can be more

11   than one cause of someone's NHL?

12         A.   Yes.

13         Q.   And do the causes stack on top

14   of one another?  Does that question make

15   sense?

16         A.   Yes.  Are they synergistic or

17   additive?  Yes, yes, I think that's fair.

18   They're often multiple variables and

19   variables we don't even always understand

20   that and there's probably an intricate

21   interplay between these variables that

22   ultimately lead to disease development.

23         Q.   So what other things do you

24   think could have contributed to Mr. Koen's

Michael Scola, M.D.

1    NHL?

2         A.    Well, a healthy degree of bad

3    luck.  You know, I don't have a detailed

4    report of Mr. Koen's lifestyle.  I don't

5    know, I don't know how he conducts himself,

6    his social behaviors, smoking history,

7    other chemical and toxin exposure, but all

8    these things we have to think about.

9    Lymphomas sometimes occur in individuals

10   with chronic inflammation.  Again, I'm not

11   privileged to that aspect of his history.

12   So there may be other variables at play.

13   And often, it's difficult to pinpoint any

14   potential cause as a variable.

15        Q.    I take it from that, you're

16   saying you don't have any information or

17   knowledge about other, any other exposures

18   that Mr. Koen might have had?

19        A.    I don't.  I don't have that.

20        Q.    Do you know what he did for a

21   living?

22        A.    I don't.

23        Q.    You don't know if he smoked?

24        A.    I do not.

Michael Scola, M.D.

```
1            Q.   So is the only variable that

2    you investigated, his exposure to Roundup?

3            A.   Well, yes, I mean, it's the

4    only variable that I explored in detail.

5            Q.   So there could be other and

6    likely are other variables that could have

7    contributed in part or as a whole to him

8    developing cancer, but you just haven't

9    looked into those or wouldn't know about

10   those?

11                   MS. NOLAN:  Objection to

12           the form.  Mischaracterizes the

13           earlier testimony.

14                   MR. GRAY:  You can

15           answer.

16                   THE WITNESS:  Yeah, I

17           think it's hard when you're talking

18           about many malignancies, including

19           non-Hodgkin's lymphoma, to ascribe

20           the diagnosis to any particular

21           variable.  So we try to formulate

22           an opinion, but there's not direct

23           cause and effect with most, most

24           forms of non-Hodgkin's lymphoma to
```

Michael Scola, M.D.

```
 1              a high degree.  So, although, it's

 2              important to try to identify these

 3              variables as part of our history,

 4              this type of malignancy,

 5              particularly the diffuse large

 6              B-cell subtype, typically doesn't

 7              have that sort of readily

 8              identifiable cause and effect the

 9              way some malignancies do.

10                   And in addition, it

11              doesn't tend to influence the way

12              we think about treatment in most

13              cases, again, talking primarily

14              about diffuse large B-cell

15              lymphoma.  So, although I think

16              it's important for understanding

17              the individual and trying to

18              understand the origins of his or

19              her malignancy, we don't tend to

20              spend a lot of time necessarily

21              dissecting, dissecting that aspect

22              of the patient's case.

23     BY MR. GRAY:

24              Q.   Okay.  I appreciate that.  I
```

Michael Scola, M.D.

1    think my question was a little different.

2    My question, sir, is there could be other

3    exposures, other occupational exposures,

4    other recreational exposures, other

5    lifestyle factors that could contribute to

6    Mr. Koen's non-Hodgkin's lymphoma, but you

7    don't know whether those things exist one

8    way or the other?

9          A.    That's true.

10                     MS. NOLAN:  Object to

11        form.

12                     THE WITNESS:  Yes.

13                     MS. NOLAN:  Compound

14        question.

15    BY MR. GRAY:

16          Q.    Okay.  And I believe you told

17    me with your patients in your clinic that

18    you typically get, you said, a detailed

19    employment and lifestyle history when

20    you're assessing their case?

21          A.    At the time of initial

22    encounter, yes.

23          Q.    And so your evaluation of Mr.

24    Koen was different than what you do with

Michael Scoria, M.D.

1    your normal patients when you're looking at

2    what might have caused and how you're going

3    to treat their lymphoma, correct?

4         A.   Well, I wasn't -- I wasn't

5    evaluating Mr. Koen as a potential patient.

6    So I didn't approach, you know, him in that

7    fashion.

8         Q.   True.  But you said what you do

9    with your patients in trying to assess the

10   etiology of their cancer is you get a

11   detailed occupational and lifestyle

12   background in order to make that

13   determination, correct?

14        A.   Yes.

15        Q.   But you didn't do that with Mr.

16   Koen, correct?

17        A.   Well, I sort of limited it to

18   the records that I had available at hand

19   and I'm sure I came across his smoking

20   history as part of my review.  I just don't

21   recall that information at this time.

22        Q.   But you would be looking for

23   things beyond smoking, correct?

24        A.   Well, I would, again, I'm sort

Michael Scola, M.D.

1   of limited by the record before me.  If I

2   had met Mr. Koen in my office, yeah, I

3   would want to know more about what he does

4   for a living, what he does recreationally,

5   and how he spends his time.  What sort of

6   chemicals and toxins he might come in

7   contact with, what frequency, the nature of

8   those chemicals.  And that would all be

9   documented in my initial, you know, my

10  initial assessment.

11       Q.  And you didn't review his

12  deposition to look for any of that

13  information, correct?

14       A.   I did not.  I went through his

15  records sequentially and whatever was

16  available, I reviewed.  I don't recall kind

17  of a detailed assessment.  I don't know if

18  I had his initial encounter with the

19  oncologist.  I don't know if I had that

20  particular record, the initial consultation

21  note.

22       Q.  Okay.  And I'm asking you a

23  different question, Doctor.  I understand

24  you looked at the medical records.  I'm

1    talking about his deposition and the

2    lawsuit, that's not something you reviewed

3    to look at or you reviewed in order to get

4    an idea of his lifestyle background, et

5    cetera?

6           A.   I didn't.  I did not look at

7    it.

8           Q.   Are you aware that Mr. Koen's

9    doctors have always been deposed, doctor --

10   do you know the name of his treating

11   oncologist?

12          A.   I don't.

13          Q.   Okay.  Were you aware that

14   those doctors have also been deposed?

15          A.   No.

16          Q.   Doctor, it would be fair to say

17   that exposure to glyphosate would not

18   always cause cancer, correct?

19          A.   That's fair.

20          Q.   Presumably, there are plenty of

21   people who have been exposed to Roundup and

22   have not developed cancer?

23          A.   Yes.

24          Q.   And conversely, there are,

Michael Seole, M.D.

1    obviously, plenty of people who have

2    developed cancer without being exposed to

3    Roundup?

4          A.   Yes.

5          Q.   Have you ever had a patient ask

6    you if Roundup caused their cancer?

7          A.   I have not.  I have not had

8    that inquiry, no.

9          Q.   You never told a patient to

10   stop using Roundup because of any risk of

11   cancer, correct?

12         A.   Not Roundup specifically.  I

13   have told patients who are survivors of

14   non-Hodgkin's lymphoma to minimize toxins

15   in pesticide, herbicide exposure, chemical

16   exposure, radiation.

17         Q.   But that's in general, right,

18   you know, nothing specific or unique to

19   Roundup, that's in general for all types of

20   pesticides or herbicides, right?

21         A.   That's correct.

22         Q.   I believe you said this, but

23   it's accurate, right, to say that for most

24   people with non-Hodgkin's lymphoma, we

Michael Scoria, M.D.

```
 1   don't really know what caused it?

 2        A.   That's true.

 3        Q.   Is that normally what you tell

 4   your patients when they ask you why they

 5   developed non-Hodgkin's lymphoma, you don't

 6   really know?

 7                   MS. NOLAN:  Objection to

 8        form.

 9                   MR. GRAY:  You can

10        answer.

11                   THE WITNESS:  Well, yes,

12        I mean, I try to answer that

13        question in a very broad, in a

14        broad way discussing the

15        underpinnings of cancer in general

16        and non-Hodgkin's lymphoma.  But in

17        terms of identifying a specific

18        variable, it's not typical I can

19        offer patients that answer.

20   BY MR. GRAY:

21        Q.   You said it's rare you can

22   offer any patients any answer as to what

23   caused their cancer?

24        A.   A specific answer, correct.
```

```
 1          Q.   Dr. Scola, I'm going to ask you
 2   some really some very broad questions about
 3   NHL.  I'm going to make sure we're on the
 4   same page.  Hopefully, you can help me.
 5   Like I said, I'm likely going to
 6   misunderstand or misinterpret some things.
 7   So let me, let's sort of set a baseline,
 8   okay?
 9          A.   Sure.
10          Q.   As simple as you can explain
11   it, what is cancer?
12          A.   Cancer is the aberrant,
13   abnormal growth behavior of a cell where
14   the regulatory mechanisms that control cell
15   division are no longer operational.  So the
16   cell grows in an autonomous fashion and
17   continues to evolve at a molecular level
18   often becoming more and more dissimilar
19   from its original type.
20          Q.   And specifically, what is
21   non-Hodgkin's lymphoma?
22          A.   Non-Hodgkin's lymphoma is a
23   malignancy of lymphocytes, which are cells
24   that are part of our immune system
```

Michael Scola, M.D.

1    responsible for making antibodies and

2    orchestrating an immune response.  So when

3    a normal lymphocyte becomes malignant,

4    undergoes malignant transformation, it's

5    given the designation of non-Hodgkin's

6    lymphoma.

7         Q.   Where are lymphocytes

8    developed?

9         A.   Where are lymphocytes

10   developed?  Well, there's two major type of

11   lymphocytes.  There's B lymphocytes, B as

12   in boy, and T lymphocytes.  B lymphocytes

13   tend to develop initially in the bone

14   marrow and sort of complete their

15   development and maturation in the lymphoid

16   tissue kind of scattered throughout the

17   body.  And T lymphocytes tend to mature in

18   a gland in the chest called the thymus

19   gland.

20        Q.   Okay.  And those, so for the

21   case of follicular lymphoma or DLBCL, those

22   B cells from the bone marrow cells are what

23   give rise to the cells that cause NHL?

24        A.   That's correct.

Michael Scole, M.D.

```
 1            Q.    B cells undergo DNA

 2   recombination and rearrangement as part of

 3   their normal process, right?

 4            A.    Yes.

 5            Q.    And is part of the reason that

 6   those cells mutate so they can generate

 7   different antibodies to fight against

 8   viruses and whatever else may be invading

 9   the body?

10            A.    That's true.

11            Q.    Now, those cells are doing that

12   recombination and rearrangement all the

13   time, right?

14            A.    Yes.

15            Q.    What are chromosomal

16   rearrangements?

17            A.    Well, DNA is organized in the

18   form of chromosomes.  Each cell has a set

19   of chromosomes.  Ordinarily, 46

20   chromosomes.  Occasionally, as part of the

21   cell becoming malignant, part of one

22   chromosome can break off and attach to

23   another chromosome, which is abnormal.  And

24   that can alter gene expression.  The
```

Michael Scola, M.D.

```
 1   abnormal juxtaposition of one chromosome on

 2   another chromosome can put two genes next

 3   to each other that shouldn't be next to

 4   each other.  And that can give rise to

 5   abnormal protein expression.  If the genes

 6   are abnormally active, you can have more

 7   protein expressed than typical and that can

 8   ultimately lead to altered cell behavior.

 9        Q.   And that occurs or can occur

10   totally randomly, correct?

11        A.   That's correct.

12        Q.   Is the ability to evade growth

13   suppressors a hallmark of cancer?

14              - - - - -

15        (Stenographer clarification.)

16              - - - - -

17              THE WITNESS:  Well, our

18         immune system does patrol for

19         abnormal cells and can help

20         suppress further growth and

21         propagation of an abnormal cell.

22         So individuals who have a weak

23         immune system are at a higher risk

24         of a variety of malignancies,
```

```
1              including lymphomas.  The cells
2              also have mechanisms for
3              correcting, you know, DNA errors
4              and chromosomal errors and those
5              mechanisms often falter and as
6              such, the mutations are retained
7              and if they're retained, they can
8              lead to abnormal cell activity.
9   BY MR. GRAY:
10       Q.   We talked about our B cells
11  doing their rearrangement, recombining, how
12  many B cells do we have in our body that
13  are doing that?
14       A.   Well, it's part of the normal
15  maturation of a B lymphocyte to undergo
16  maturation and that generates the
17  diversity.  We need to have a very diverse
18  population of B lymphocytes to confront the
19  variety of antigens that it might come in
20  contact with.  So it's part of building a
21  diverse population of B lymphocytes is this
22  genetic rearrangement.
23       Q.   So I guess what I'm trying to
24  get at, is there -- we have tons of B cells
```

Michael Scola, M.D.

1    that are doing this all day every day,

2    right?

3         A.   Billions.

4         Q.   And as part of that normal

5    process that's occurring in billions of our

6    cells, at all times, there can be sporadic

7    mutations that cause a normal cell to

8    become a non-Hodgkin's lymphoma; is that

9    correct?

10        A.   Correct.  It's usually more

11   than just one abnormality or one

12   translocation, but yes, it can be, in a

13   stepwise fashion, lead ultimately to the

14   development of non-Hodgkin's lymphoma.

15        Q.   Well, you say it's normally not

16   one, so explain what you mean?

17        A.   Well, usually, it requires a

18   series of mutations.  So it's not the

19   acquisition that just a single

20   translocation or a single mutation, but one

21   mutation can beget another mutation and so

22   on and so forth.  Because the mutation

23   often gives that cell a growth advantage

24   and so the DNA is replicating more

Michael Scola, M.D.

1   frequently than normal and whenever DNA

2   replicates, there's the potential for

3   additional mutations to be acquired.  So

4   it's usually a stepwise progressive

5   process.

6          Q.   Okay.  So, you know, if a

7   mutation happens, you know, randomly or

8   something causes it or causes some cellular

9   damage just that one time doesn't cause, is

10  not a cancer, right, it has to happen

11  multiple times before, or something has to

12  happen multiple times or there's a process

13  before it eventually becomes cancerous?

14         A.   Typically.  You know, for some,

15  for some malignancies, a single mutation

16  can drive the malignancy, but more

17  commonly, there's a series of mutations

18  that are acquired over time.

19         Q.   And so specific to NHL,

20  there's -- it's not typical to see that one

21  driver mutation, it's a series of mutations

22  that has to happen, correct?

23         A.   Certainly for the more advanced

24  lymphomas like diffuse large B-cell

```
1   lymphoma, that is true.
2         Q.   And so, again, you've said for
3   some of the more advanced lymphomas.  Now,
4   there are several subtypes of non-Hodgkin's
5   lymphoma, am I right?
6         A.   Yes.
7         Q.   And I've heard different
8   numbers.  I've heard 50 or 60 or 70.  How
9   many different subtypes would you say?
10        A.   I would say probably close to
11  50.
12        Q.   And each one of those subtypes
13  is considered a different disease?
14        A.   Yes.  To a large degree, yes.
15        Q.   And each one of those different
16  subtypes all have, they can have different
17  causes, they have different symptoms, and
18  ultimately different prognoses, correct?
19        A.   That's true.
20        Q.   So when we talk about NHL,
21  generally, it's more of a heading than an
22  individual disease?
23        A.   It's a very broad
24  categorization, yes.
```

Michael Scola, M.D.

```
1         Q.   So that broad categorization,
2    that's a tough word for me, that broad
3    categorization, does that make NHL a fairly
4    common type of cancer?
5         A.   Yeah.  Yes, it is a common type
6    of cancer.
7         Q.   And Mr. Koen had -- this is
8    actually a question I need to ask, so Mr.
9    Koen had follicular lymphoma that
10   transformed into diffuse large B cell; is
11   that correct?
12        A.   So, that is the suspicion.  His
13   initial biopsy did show a higher grade,
14   more aggressive form of follicular
15   lymphoma.  My suspicion is that he had
16   diffuse large B-cell lymphoma very early on
17   in his treatment course and maybe even at
18   the time of diagnosis, just based on the
19   way he, the way he behaved and responded to
20   treatment.  But I believe, if I had to
21   speculate, and again, this is speculation,
22   he probably started out with a follicular
23   lymphoma, but very early on transferred to
24   diffuse large B cell.  But even from the
```

1    outset -- I'm sorry, he had a very, a very

2    aggressive form of follicular lymphoma,

3    which would have put him in a high risk of

4    this transformation.

5         Q.   But he's only had one disease,

6    he didn't have two different types of

7    cancer, right?

8         A.   It is one disease, but it's

9    sort of an evolution along the -- along a

10   trajectory, if you will, of degree of

11   aggressiveness and he sort of evolved along

12   that spectrum or along that trajectory.

13        Q.   Is follicular lymphoma a common

14   type of non-Hodgkin's lymphoma?

15        A.   It is.

16        Q.   What about DLBCL?

17        A.   Yes.

18        Q.   Where would you rank them on a

19   list of subtypes?

20        A.   Where would I rank them on the

21   list?

22        Q.   Yes, in terms of more common.

23        A.   Follicular lymphoma is the most

24   common low grade lymphoma and follicular is

Michael Scola, M.D.

1    classified as a low grade.  Now, the type

2    of follicular he had is starting to border

3    on a higher grade type of lymphoma.  So

4    even within follicular, there's grading

5    systems.  So we could shade it towards more

6    aggressive and less aggressive.  And the

7    diffuse large B cell is the most common

8    intermediate to high grade lymphoma.  So

9    they're both common, common malignancies.

10        Q.   Okay.  And we talked about the

11   different genetic mutations or

12   translocations that cause cancer.  Is it

13   correct that no matter the cause that a

14   particular mutation or translocation has to

15   happen to cause a certain type of cancer?

16        A.   Well, many cancers are

17   characterized by a particular mutation or

18   translocation, so that mutation or

19   translocation can be pathognomonic, can be

20   a fingerprint for that particular

21   malignancy.

22        Q.   Okay.  Let me ask a better

23   question.  Let me ask it this way.

24   What's -- is there a particular mutation or

Michael Scola, M.D.

1   translocation that causes follicular

2   lymphoma?

3           A.   There are mutations that are

4   commonly found in follicular lymphoma.  So

5   they play an important role in the

6   development of the lymphoma.

7           Q.   What are those?

8           A.   Well, one that is relevant to

9   follicular lymphoma is a translocation

10  between chromosome 14 and chromosome 18 and

11  this is very commonly found in most

12  follicular lymphomas.

13          Q.   Did Mr. Koen have that?

14          A.   I don't know if I saw his

15  actual pathology report, nor would I

16  necessarily have looked for that.  It is

17  fairly ubiquitous, and so I imagine it was

18  present.

19          Q.   Now, is there the same kind of

20  a marker or mutation for diffuse large B

21  cell?

22          A.   I mean, there really isn't a

23  specific, as specific a marker or mutation

24  for diffuse large B cell.  There's more

Michael Scola, M.D.

1  heterogeneity in that population.

2       Q.   What does heterogeneity mean in

3  this context?

4       A.   I'm sorry, there's more genetic

5  variability in diffuse large B-cell

6  lymphoma.

7       Q.   What's a risk factor, Dr.

8  Scola?

9       A.   What is a risk factor for

10  malignancy?  I think a risk factor is

11  anything that puts an individual at a

12  higher risk of developing the outcome,

13  whatever the outcome is.  If we're talking

14  about cancer, then it's a variable that

15  heightens the risk of that cancer outcome.

16       Q.   Okay.  And so the different

17  subtypes of NHL have different risk

18  factors?

19       A.   Yes, I think that's a fair

20  statement.

21       Q.   And so for instance, not

22  everything that causes marginal zone

23  lymphoma will also cause DLBCL?

24       A.   That's correct.

1          Q.   Are the risk factors for DLBCL
2    and follicular lymphoma the same?
3          A.   No, I don't know if we can say
4    that.  I think they're less -- I think
5    there's, there's a more established role
6    for toxin exposure and chemical exposure in
7    the higher grade lymphomas, the more
8    aggressive lymphomas.  Although, to some
9    degree, these risk factors kind of play a
10   role, I think, universally in the
11   development of all lymphoma and may be more
12   broadly all malignancies.  But I believe
13   the data would some more support a
14   causative role for the more aggressive
15   lymphomas.
16         Q.   Is age a risk factor for
17   non-Hodgkin's lymphoma?
18         A.   Yes, yes, by all means.
19   Generally, as one gets older, there's a
20   greater risk of developing lymphoma in
21   general.
22         Q.   And is that sort of purely -- I
23   shouldn't say purely.  Is that an effect of
24   chance?  Let me ask a better question.  You

Michael Scola, M.D.

```
1    said before that, you know, we ourselves

2    are dividing and mutating and rearranging

3    all the time and sometimes mutations then

4    sporadically happen, correct?

5           A.   Correct.

6           Q.   And so does that make, you

7    know, cancer in general, NHL specifically,

8    just more likely by chance, as you get

9    older, you've had more mutations, so the

10   opportunity for mutations to happen and one

11   to go awry and just cause cancer, just as

12   you get older, you've had more of them and

13   so you have more opportunities for that?

14          A.   Yes.

15                    MS. NOLAN:  Object to

16          form.  Object to form.

17                    THE WITNESS:  Yeah, I

18          think that's a fair, a fair

19          statement.  So, again, you know,

20          most -- for a cell to become fully

21          malignant, it usually does require

22          stepwise acquisition of multiple

23          mutations and that can take time.

24          Sometimes, decades, sometimes, a
```

Michael Scola, M.D.

```
 1              lifetime.  And so, you know, based
 2              on that premise, it's not
 3              surprising that we see cancer more
 4              commonly in older people.
 5     BY MR. GRAY:
 6         Q.   And so cancer is also -- or I'm
 7     sorry, age is a risk factor for DLBCL and
 8     follicular specifically as well, right?
 9         A.   Yes, it is.
10         Q.   Is race a risk factor for NHL?
11         A.   To some degree.  To some
12     degree, there are some racial differences.
13     I don't know if that's really been well
14     borne out, but there are, and there's a lot
15     that sort of plays into that.
16         Q.   And is it that it's more common
17     in Caucasians?
18         A.   Yes, I believe that's true.  It
19     is more common in Caucasians.  So there are
20     some racial disparities.
21         Q.   Is gender a risk factor for
22     NHL?
23         A.   It is.
24         Q.   I mean, it's more common in
```

Michael Scola, M.D.

1  men?

2      A.   In general, more common in men,

3  yes.

4      Q.   You mentioned, you take a

5  patient's family history as part of your

6  assessment.  So is then a family history of

7  cancer a risk factor for NHL?

8      A.   You know, most cases of NHL are

9  sporadic, so there's usually not a striking

10  family history.  But, occasionally, you do

11  see this where it runs in families or

12  there's a higher prevalence in families.

13      Q.   Do you know if Mr. Koen had any

14  history of cancer in his family?

15      A.   I don't.

16      Q.   But if he did, that would be a

17  risk factor to consider?

18      A.   It would.

19      Q.   Are autoimmune diseases risk

20  factors for non-Hodgkin's lymphoma?

21      A.   Yes, can be.

22      Q.   I believe we kind of, we talked

23  about the immune system some earlier, but

24  in some cases, your immune system can

Michael Seele, M.D.

```
1   intervene between the initial -- in the
2   stepwise process that you described, right,
3   between the initial mutation and to the
4   point that something could become
5   malignant, often, your immune system will
6   step in and either repair or kill the
7   mutate itself?
8       A.   Yes.
9       Q.   And when your immune system is
10  compromised, that's, obviously, less likely
11  to happen, right?
12      A.   Yes, that's correct.
13      Q.   Is obesity or inflated BMI a
14  risk factor for NHL?
15      A.   I believe it is, yes.
16      Q.   Would that have been a risk
17  factor for Mr. Koen?
18      A.   I don't, I don't recall his
19  BMI.
20      Q.   At what point does -- what's
21  the level of being overweight that
22  contributes to that, the cause of NHL?
23      A.   I don't think that's been well
24  delineated.  I imagine it's linear, but I
```

Michael Scola, M.D.

1    don't know if there's a threshold beyond

2    which the risk is present and below which

3    it's not.

4           Q.   Can an unhealthy diet be a risk

5    factor for NHL?

6           A.   I guess I would want to know

7    what is meant by an unhealthy guy, but yes,

8    I think there's a high risk of cancer in

9    general in individuals that tend to be more

10   sedentary, tend to --

11          Q.   I'm sorry, I think --

12               MS. NOLAN:   I think he

13        didn't hear the question.

14   BY MR. GRAY:

15          Q.   Yeah, I said an unhealthy diet.

16          A.   Oh, okay.  Yes, it can be a

17   risk factor for malignancy in general and

18   non-Hodgkin's lymphoma.

19          Q.   Describe what that unhealthy

20   diet would mean to you?

21          A.   Well, from a cancer risk

22   perspective, we tend to focus on a diet

23   that's more akin to a Mediterranean-type

24   diet.  So one that's rich in fruits and

Michael Scola, M.D.

1   vegetables and low in saturated fats and

2   animal-based fats and, you know, moderate

3   in carbohydrates and animal-based meats.

4   So rich in legumes.  So as we deviate away

5   from that diet, as we often do in Western

6   societies, it becomes an increasing

7   concern.

8        Q.   Okay.  So a meat-and-potatoes

9   diet might be something you consider closer

10  to being a risk factor?

11       A.   Yes. I don't know if the data

12  are extremely well established for

13  non-Hodgkin's lymphoma, but in terms of

14  cancer risk in general, yes.

15       Q.   Is inflammation a risk factor

16  for non-Hodgkin's lymphoma?

17       A.   It is.  Or can be.

18       Q.   Can you tell us how?

19       A.   Well, I don't think we know

20  exactly, but whenever there's chronic

21  inflammation, there's recruitment of

22  lymphoid cells, our immune system is

23  active.  There's a lot of cell turnover,

24  which means a lot of cell division, which

Michael Scola, M.D.

1   as a consequence can promote the

2   acquisition of mutations.  So anything that

3   promotes extensive cell division can

4   ultimately promote the whole transformative

5   process.

6          Q.   Are there certain infections or

7   viruses that are risk factors for

8   non-Hodgkin's lymphoma?

9          A.   For some lymphomas.

10          Q.   Which ones, which viruses for

11   which lymphomas?

12          A.   Well, so for marginal zone

13   lymphoma, there has been an association

14   with a variety of microorganisms.  For

15   gastric marginal zone lymphoma, there's an

16   association with a bacteria called H.

17   pylori that often resides in the stomach.

18   Chlamydia has been associated with some

19   forms of marginal zone lymphoma.

20   Epstein-Barr virus is implicated in

21   lymphomas, particularly, the Hodgkin's form

22   of lymphoma.  HIV has been associated with

23   an increased risk of lymphoma and a lot of

24   that has to do with immune surveillance

1    and, you know, dampening of the immune

2    system.

3         Q.   With HIV, does the -- do

4    the immunosuppressing drugs, is that what

5    eventually becomes the issue?

6         A.   With HIV?

7         Q.   Yes.

8         A.   Well, it's not so much the

9    drugs, although immunosuppressing drugs do

10   increase risk of lymphoma, but it's more

11   the disease itself which directly affects

12   the immune system.  Fortunately, not so

13   much anymore with effective therapies, but,

14   you know, back in the day, our immune

15   system was weakened by HIV and could no

16   longer perform normal, what we call immune

17   surveillance.

18        Q.   Is smoking marijuana a risk

19   factor?

20        A.   Well, smoking in general has

21   been implicated in a variety of

22   malignancies and perhaps, perhaps all

23   cancers.  So I don't think we have really

24   good data on marijuana specifically, but

Michael Scola, M.D.

1    whenever you inhale a combustible

2    substance, you're putting yourself --

3    you're inhaling carcinogens, potential

4    carcinogens, and it can put you at risk.

5         Q.   What about exposure to benzene?

6         A.   Yeah, I mean, benzene has been

7    implicated in a variety of malignancies,

8    including hematologic malignancies.

9         Q.   So we can put benzene down as a

10   risk factor for NHL specifically?

11        A.   I mean, you know, again, I'm

12   not going to purport to be a cancer

13   epidemiologist, but yes, benzene has been

14   implicated as a potential drug for cancers,

15   including hematological malignancies.

16        Q.   What about history of skin

17   cancer?

18        A.   I don't believe that per se

19   would increase one's risk.

20        Q.   What about exposure to dioxins?

21        A.   I'm not aware of data.

22        Q.   Do you know if exposure to

23   chemical solvents is a risk factor for NHL?

24        A.   I would be concerned.

Michael Scola, M.D.

1          Q.   And that would be something

2    that would, if Mr. Koen had exposure to

3    solvents, that would be something you would

4    have to add into your equation for figuring

5    out the potential causes of his NHL?

6          A.   It would be duly noted.

7          Q.   And I believe you've -- you're

8    on record saying that exposure to

9    insecticides and herbicides generally, you

10   view, or pesticides, you view, as potential

11   risk factors for non-Hodgkin's lymphoma,

12   right?

13         A.   Yes.

14         Q.   You don't have specific ones

15   that come to mind when you say that?

16         A.   No, I don't.

17         Q.   But it's your opinion that

18   agricultural work in general increases the

19   risk of non-Hodgkin's lymphoma?

20         A.   Yes.

21         Q.   What's the basis for that

22   opinion?

23         A.   You know, I think it's well

24   established that individuals in these

Michael Scola, M.D.

1    particular occupations are at a higher risk

2    of non-Hodgkin's lymphoma.  It's something

3    that has been recognized for some time.

4    Individuals that work in a more rural

5    setting or tend to be in those, in those

6    fields, occupational fields, and the

7    presumed source is that they have more

8    exposure to organic toxins, toxins that

9    are, you know, lipophilic and able to

10   penetrate cells and potentially intercalate

11   with DNA and cause DNA damage.

12          Q.   You said organic toxins?

13          A.   Organic substances, yes.

14          Q.   Okay.  Okay.  Have we -- is

15   there anything else that we haven't

16   identified here in the last few minutes

17   that you would consider to be a risk factor

18   for non-Hodgkin's lymphoma?

19          A.   Right.  So yeah, I think we've

20   touched upon the most salient risk factors.

21   I mean, radiation is certainly a risk

22   factor.  We mentioned inflammation.  And I

23   think that's -- it's pretty comprehensive.

24          Q.   And do you consider exposure to

Michael Scola, M.D.

```
1  glyphosate specifically to be a risk factor

2  for NHL generally?

3        A.   I think that the contemporary

4  data does certainly raise a suspicion that

5  exposure to this drug, particularly if it's

6  meaningful and substantial exposure, that

7  it can increase one's risk of non-Hodgkin's

8  lymphoma, particularly diffuse large B cell

9  or similarly aggressive subtypes.

10       Q.   There are plenty of patients

11 that you have with NHL that don't have any

12 of these identifiable risk factors, right?

13       A.   That's true.

14       Q.   I mean, would you agree that

15 the majority of people with non-Hodgkin's

16 lymphoma likely have no known risk factors

17 other than maybe age or gender?

18       A.   That's true.

19                 MS. NOLAN:  Object to

20        form.

21 BY MR. GRAY:

22       Q.   And also, there's plenty of

23 cases of people with NHL who don't even

24 have age or gender as a risk factor?
```

Michael Scola, M.D.

```
 1          A.   Yes.  Yes, there are cases that
 2    are sporadic and occur in younger people,
 3    yes.
 4          Q.   And what percentage of your
 5    patients would you say have no known risk
 6    factors?
 7          A.   I would say for the majority of
 8    patients, it's difficult to identify a
 9    particular risk factor, particularly for
10    diffuse large B-cell lymphoma.  Nor do we,
11    nor do we often pursue an exhaustive
12    investigation into that for the reasons I
13    alluded to earlier, that it doesn't often
14    have direct bearing on the treatment
15    program.
16          Q.   Okay. No, that makes sense.  So
17    you say the majority of the NHL,
18    particularly the diffuse large B cell that
19    you see is caused by sporadic mutations
20    with no known environmental or genetic
21    cause?
22                    MS. NOLAN:  Objection to
23          form.  Mischaracterizes the
24          testimony.
```

Michael Scola, M.D.

```
 1                    MR. GRAY:  You can
 2          answer.
 3                    THE WITNESS:  Yeah, the
 4          majority of patients with diffuse
 5          large B-cell lymphoma don't have an
 6          identifiable risk factor and are
 7          sporadic.
 8  BY MR. GRAY:
 9      Q.   All right.  Let's talk about
10  Mr. Koen's medical course a little bit.  I
11  believe you looked at some of his medical
12  records, correct?
13      A.   Yes.
14                    MS. NOLAN:  Can we have
15          a break?  I think, so we're almost
16          at 2:30.  I know it's, it was
17          supposed to start at 10:30, so it
18          has been --
19                    MR. GRAY:  Sure.  We can
20          go off the record right now.
21                    MS. NOLAN:  Thank you.
22                    THE VIDEOGRAPHER:  The
23          time right now is 2:26 p.m.  We are
24          off the record.
```

Michael Scola, M.D.

```
 1                 - - - - -

 2        (A recess was taken at this time.)

 3                 - - - - -

 4                    THE VIDEOGRAPHER:  The

 5           time right now is 2:48 p.m.  We're

 6           back on the record.

 7    BY MR. GRAY:

 8        Q.   Welcome back, Doctor.  I

 9    believe you told us you looked at some of

10    Mr. Koen's medical records, correct?

11        A.   Yes.

12        Q.   Did you look at any pathology

13    specimens?

14        A.   Not the primary pathology

15    specimens, but perhaps the pathology

16    summarized in the record.

17        Q.   Right.  I'm asking did you look

18    at any slides?

19        A.   No.

20        Q.   Okay.  Then you didn't put

21    anything under the microscope?

22        A.   No.

23        Q.   Did you look at any imaging?

24        A.   Not directly, no.
```

Michael Scola, M.D.

```
 1          Q.    Same question.  I understand
 2     you may have looked at the reports from
 3     them, I'm asking did you look at any scans?
 4          A.    No.
 5          Q.    Okay.  And do you recall
 6     whether you looked at pathology reports or
 7     not?  You said earlier you may not have
 8     looked at those.
 9          A.    I don't believe I did.
10          Q.    We'll talk about specifics
11     here, but generally, do you take any issue
12     with the treatment Mr. Koen has received
13     from his doctors so far?
14          A.    Could you repeat the question?
15          Q.    I said do you take issue with
16     any of the treatment that Mr. Koen has
17     received from his physicians?
18          A.    Not, not strongly.  I might
19     have approached some things differently,
20     but no.
21          Q.    Briefly, what might have you
22     approached differently?
23          A.    I might have biopsied one of
24     the lymph nodes a little sooner than it was
```

Michael Scola, M.D.

1    actually done.  He was started on

2    maintenance therapy.  I don't know if I

3    would have done that without a biopsy of

4    one of the lymph nodes.  It wouldn't have

5    changed his overall treatment program or

6    the outcomes.

7         Q.   There was nothing about his

8    treatment that his doctors had to do

9    outside of the normal standard of care

10   specifically because he had been exposed to

11   Roundup, correct?

12        A.   That's true.

13        Q.   Can you describe for us how Mr.

14   Koen initially presented to the hospital

15   and how he was eventually diagnosed with

16   lymphoma?

17        A.   So he presented with abdominal

18   discomfort, nausea, and sweats, which

19   prompted CT scan imaging and he was found

20   with lymph node swelling as well as some

21   abnormalities with the kidneys.  At that

22   time, the diagnosis wasn't made.  He was

23   treated for suspected kidney infection, but

24   when the lymph nodes persisted and

Michael Scola, M.D.

```
 1    progressed, that ultimately did prompt a

 2    biopsy, which was done the early part of

 3    2018.

 4         Q.   Okay.  And I think you -- let

 5    me back up, sorry.  There was nothing

 6    particularly unusual about his

 7    presentation, correct?

 8         A.   No.

 9                   MS. NOLAN:  Objection to

10         form.

11                   THE WITNESS:  I mean,

12         it's hard to answer that question

13         and be specific, because there

14         often is no usual presentation for

15         lymphoma.  It can present in a

16         myriad of different ways.

17    BY MR. GRAY:

18         Q.   Yeah, that's fair.  I guess my

19    question is there was nothing particularly

20    unique or extraordinary about his

21    presentation?

22         A.   I think that's true.

23         Q.   I think you note in his

24    report -- I'm sorry, in your report, you
```

Michael Scola, M.D.

1    found pathology that he had a grade 1-2

2    follicular lymphoma -- final pathology

3    found a grade 1-2 follicular lymphoma that

4    had an increased proliferative index that

5    felt more consistent with a grade 3

6    follicular lymphoma; is that correct?

7            A.   Yes.

8            Q.   Do you recall by chance where

9    you saw that?  I only ask, because I

10   thought he was initially Stage 2 and then

11   wasn't thought to be Stage 3 until his

12   recurrence in 2019.

13           A.   Well, this is the grading, the

14   grading system and not necessarily the

15   stage.  The grade really describes how the

16   cells appear under the microscope, whereas

17   the stage describes the extent of lymphoma

18   involvement.

19           Q.   Okay.  Okay.  I'm juxtaposing

20   terms, that's where I got myself all messed

21   up.

22           A.   Yes.

23           Q.   So after that initial

24   diagnosis, he received R-CHOP chemotherapy;

Michael Scola, M.D.

1    is that correct?

2            A.    That's correct.

3            Q.    What, very briefly, what is

4    R-CHOP?

5            A.    R-CHOP is a combination of

6    three chemotherapy drugs, the CHO with

7    higher dose of a steroid, a corticosteroid,

8    prednisone, that's the P.  And then

9    incorporation of Rituxan, which is a

10   monoclonal antibody and that is one of, one

11   of the treatment options for somebody with

12   follicular lymphoma.  And also a very

13   common treatment for diffuse large B-cell

14   lymphoma.

15           Q.    Okay.  So suffice to say, he

16   got a common or fairly standard treatment

17   for people with his disease at the time?

18           A.    He did.

19           Q.    Unfortunately, that didn't work

20   right, he had a recurrence pretty soon

21   thereafter in the winter of 2018?

22           A.    Yes, he had imaging -- let's

23   see here.  So he had imaging upon

24   completion of his chemotherapy that showed

1    persistent activity.  So that would be

2    worrisome for someone that's having a

3    suboptimal response to therapy, but you're

4    right, his disease really didn't declare

5    itself in a meaningful way until later.

6            Q.   And so the decision was made

7    after that to treat him with maintenance

8    Rituxan; is that right?

9            A.   Yes, which is commonly employed

10    in the management of follicular lymphoma.

11    If he had gone into remission, that would

12    be a very appropriate maneuver to try to

13    prevent the lymphoma from reactivating or

14    pushing back the time until it reactivates.

15            Q.   Is it your opinion that he

16    wasn't in active remission at this time

17    when they started the maintenance Rituxan?

18            A.   That's correct.  He ultimately,

19    I believe, only got one dose of maintenance

20    and that wasn't until later on, but yes,

21    right, there's no indication that he was in

22    remission when maintenance was actually

23    started.

24            Q.   So he got the one dose of

Michael Scola, M.D.

1    maintenance Rituxan but his disease

2    continued to progress; is that right?

3         A.    That's correct.

4         Q.    And then he went to the next

5    option the doctors try which is salvage

6    chemotherapy?

7         A.    Yes.

8         Q.    And that was a regimen of

9    obinutuzumab and bendamustine?

10                   THE STENOGRAPHER:  Wait

11        a minute obinutuzumab and what?

12                   THE WITNESS:

13        O-B-I-N-U-T-U-Z-I-M-A-B [sic],

14        obinutuzumab and Rituxan,

15        R-I-T-U-X-A-N.

16   BY MR. GRAY:

17        Q.    I think he actually got

18   bendamustine, right?

19        A.    I apologize, this is a typo,

20   son of a gun.  Yes, it should be

21   bendamustine.

22        Q.    When you said a typo, what are

23   you looking at?

24        A.    Not a typo, but it's, it's an

Michael Scola, M.D.

```
1    error.  Instead of Rituxan in my report, it
2    should be bendamustine.  I didn't number
3    the pages, but I think it's the second
4    page.
5         Q.   Yeah, it's the first sentence
6    in the fourth paragraph on the second page?
7         A.   That's it.
8         Q.   Yeah.  Okay.  And is that --
9    what is salvage chemotherapy?
10        A.   When somebody doesn't respond
11   to first-line therapy or responds and then
12   relapses, we'll introduce other
13   chemotherapy, usually non-competing drugs,
14   drugs that weren't seen as part of the
15   initial treatment program.  And that's what
16   he received.
17        Q.   Okay.  So, again, this is
18   standard for someone who had the kind of
19   relapse that he had?
20        A.   Yes.  Now, I think the concern
21   level should have been high that he had
22   diffuse large B-cell lymphoma at this point
23   sort of prompting another biopsy.  And this
24   is where I would have deviated from the
```

1    sort of standard treatment program, but I

2    think, ultimately, basing treatment

3    decisions on the original pathology, the

4    only pathology that's available is not

5    unreasonable.  I take that back, I think

6    they had tapped his pleural fluid and they

7    had additional cells to analyze, which is

8    not, not the best way to sort of confirm

9    relapse.  We ideally want to go after a

10   lymph node, but that's a little more

11   invasive.  But assuming this is a

12   continuation of his follicular lymphoma

13   and, again, I believe his large cell was

14   active at this point, this would represent

15   a very reasonable regimen, in my opinion.

16        Q.   Okay.  So at this point, after

17   he had that salvage chemotherapy, they

18   eventually did a scan of a pelvic mass that

19   showed that the follicular had transformed

20   to diffuse large B cell?

21        A.   Yes.  It was, it was very

22   concerning by virtue of the fact that his

23   disease had worsened.  But, ultimately, you

24   want to make that diagnosis based on the

Michael Scola, M.D.

1    scan, you would need pathologic, you know,

2    confirmation.  So he had a biopsy which

3    ultimately confirmed it.

4          Q.   And you said in your report, I

5    think we talked about earlier that this

6    transformation from I guess what we'll call

7    high-grade follicular to DLBCL is, it

8    happens in some folks?

9          A.   From low grade to the

10   follicular to the large diffuse large B.

11   Follicular is considered low grade.

12         Q.   Right?

13         A.   So he had a higher grade

14   variant.

15         Q.   Higher grade of follicular,

16   correct?

17         A.   Yeah.  But ultimately

18   transformed to a follicular large cell.

19         Q.   Okay.

20         A.   And yeah, it's not uncommon.

21   It occurs 20 to 30 percent of the time.

22         Q.   So he treated the DLBCL with a

23   different immunochemotherapy regimen called

24   B chemotherapy or R-ICE; is that right?

Michael Scola, M.D.

1          A.   Well, he got two cycles of

2    R-ICE.  So the decision was made to go to a

3    transplant, which is considered standard

4    savage regimen for diffuse large B cell.

5    So second line regimen for diffuse large B

6    cell, but you want to try to get the

7    disease under control before transplant and

8    they did that by giving two cycles of this

9    R-ICE chemotherapy.  And then right before

10   the transplant, he got additional

11   chemotherapy, this BEAM chemotherapy and

12   then proceeded to transplant.

13         Q.   Okay.  And so stem cell

14   transplant, that's around the end of 2019,

15   right?

16         A.   Yes.

17         Q.   And then CT in February 2020

18   showed some increasing axillary lymph

19   nodes; is that right?

20         A.   Correct.

21         Q.   And so then he was enrolled in

22   a clinical trial for CAR-T therapy; is that

23   right?

24         A.   That's right.

Michael Scola, M.D.

```
 1          Q.    And what is CAR-T therapy?

 2          A.    So CAR-T is a newer therapeutic

 3   option for patients with relapsed diffuse

 4   large B-cell lymphoma.  Generally, patients

 5   that have relapsed beyond transplant.  And

 6   it's an FDA-approved therapy where an

 7   individual's T lymphocytes are harvested

 8   and manipulated in such a way that now the

 9   T lymphocytes will recognize the lymphoma

10   as foreign and will initiate an immune

11   response directed against the lymphoma.

12   And that's the therapy he received.  Now,

13   he received it on trial, even though it's

14   FDA approved.  He received a newer version

15   of these CAR-Ts where the T lymphocyte is

16   designed to recognize more than one antigen

17   on the malignant B lymphocyte.  So a little

18   more sophisticated product.

19          Q.    And so it seems the CAR-T

20   worked and he was declared in complete

21   remission, right?

22          A.    That's correct.

23          Q.    He's been in remission for over

24   a year now?
```

Michael Scola, M.D.

1          A.   I don't -- yes, okay.  Yes,

2     see, I don't have any update.  I didn't

3     have any updated follow-up information

4     beyond, beyond the spring of 2020.  So I

5     can't comment on his current status.

6          Q.   Okay.  You haven't seen any

7     medical records since the spring of 2020?

8          A.   I believe that was the last

9     documentation I had.

10          Q.   Okay.  I assume, assume for me,

11     I'll represent to you that his records show

12     that he is still in remission and that his

13     oncologist has testified that he is still

14     in remission.  Given that, he's now over a

15     year in remission post-CAR-T therapy, do

16     you have an opinion on his prognosis?

17          A.   I think his prognosis is

18     excellent.  Those that achieve a remission

19     quickly at first follow-up imaging tend to

20     have the highest probability of sustained

21     disease control, i.e., remission or cure.

22     Of course, they can't use the term "cure"

23     until he's followed out for much longer.

24          Q.   Right.  And, Dr. Scola, nothing

Michael Scola, M.D.

1    about the treatment that Mr. Koen had or

2    his prognosis now is specific to the fact

3    that you believe his NHL may have been

4    caused by exposure to glyphosate, right?

5         A.   No.

6         Q.   And you note that his

7    post-CAR-T course has been complicated by

8    pancytopenia; is that right?

9         A.   Yes, there was documentation of

10   that.

11        Q.   Same question, Doctor, that you

12   don't attribute that pancytopenia to any

13   glyphosate exposure, right?

14        A.   No.

15        Q.   Based on his clinical course,

16   when do you think Mr. Koen's initial sort

17   of, initial mutation that led to his cancer

18   would have occurred?

19        A.   It's always hard, it's always

20   hard to answer that question, because his

21   lymphoma, like anybody's lymphoma or

22   anybody's malignancy, in general, starts as

23   a single cell that transforms.  And by the

24   time he pursued medical opinion or had

1   symptoms, we're talking, we're talking

2   about billions and billions of cells.  So

3   to go from one cell to that requires a lot

4   of doubling times.  Now, he had an

5   aggressive lymphoma, so that cell was

6   doubling at a fairly rapid rate.  If I had

7   to speculate, I would say a year or more,

8   you know, before he presented, somewhere

9   around there.

10          Q.   Okay.  What is latency?

11          A.   What is latency?

12          Q.   Yes.

13          A.   As it applies to?

14          Q.   To cancer, like, to cancer

15   development.

16          A.   Well, I guess it's used in

17   various -- I mean, there's no fixed

18   definition for it, but I guess as it

19   applies to cancer -- I mean, there is no

20   real fixed oncologic term for latency.  But

21   latency is typically a period where disease

22   is not manifesting, but may still be

23   present.

24          Q.   Uh-huh.

Michael Scola, M.D.

```
 1          A.    I assume that's what you're

 2    alluding to.

 3          Q.    What would the -- what would

 4    the latency period, so as you define it,

 5    the disease is present, but not

 6    manifesting, what would that period be for

 7    non-Hodgkin's lymphoma?

 8          A.    I mean, it can be lengthy,

 9    particularly for the less aggressive, lower

10    grade lymphomas.  It could be years, if not

11    decades.  And for the higher grade

12    lymphomas, it's a short, certainly a

13    shorter latency period, you know,

14    reflecting the more rapid doubling time of

15    the tumor.  So for most, you know,

16    aggressive lymphomas, it's many months to

17    maybe a year or slightly more.

18          Q.    So for someone like Mr. Koen

19    who had the more aggressive lymphoma, it

20    would have been that shorter time period?

21          A.    Yes.  You know, again, we

22    don't, we don't really have a sense for how

23    his disease evolved completely.  How long

24    he was harboring follicular lymphoma, when
```

1   transformation took place.  I suspect it

2   took place very early on, perhaps when he

3   initially presented, but we don't know

4   leading up to that time whether he had

5   follicular lymphoma or diffuse large B

6   cell, if he had follicular lymphoma, how

7   long that was sort of percolating in the

8   background.

9        Q.   And how long can follicular

10  percolate in the background, as you say?

11       A.   Like I said, decades.  It could

12  be present for decades.

13       Q.   Dr. Scola, was there anything

14  in Mr. Koen's medical records that led you

15  to determine that Roundup was a possible --

16  possibly contributed to him developing

17  lymphoma?

18       A.   Well, the two things that stood

19  out were the depth of exposure to Roundup.

20  It was more than just casual exposure.  The

21  fact that he had a more aggressive course.

22  So he had primary refractory disease.  He

23  really never went into a remission with

24  chemo.  You know, he is younger when he

Michael Scola, M.D.

1    presented and as we had discussed earlier,

2    lymphoma, in general, particularly the

3    non-Hodgkin's tends to increase the

4    incidence, tends to increase with age.  So

5    he was a younger guy, more aggressive, more

6    refractory lymphoma, and a substantial

7    Roundup exposure.

8          Q.   Okay.  And I understand that's

9    his, sort of his background and I'm asking

10   specifically about the medical records.

11   Was there a lab value or a test result or

12   something medically that you could point to

13   and say, oh, I see this here, that's how I

14   know this was -- his NHL was caused by

15   glyphosate?

16         A.   No.  Nothing of the sort

17   exists, to the best of my knowledge.

18         Q.   Right.  There's nothing

19   specific about any patient as far as in

20   their medical records that you can look at

21   to determine that their NHL was caused by

22   Roundup, correct?

23         A.   That's correct.

24         Q.   And there's no clinical feature

Michael Scola, M.D.

1    that is unique to NHL allegedly caused by

2    Roundup?

3                    MS. NOLAN:  Object to

4         form.  Mischaracterizes his

5         testimony.

6                    THE WITNESS:  Not that

7         I'm aware of.

8    BY MR. GRAY:

9         Q.   There's no histological subtype

10   that's unique to NHL allegedly caused by

11   Roundup?

12        A.   I'm not aware of that being the

13   case, no.

14        Q.   Same question, no pathologic or

15   genetic markers?

16        A.   No.

17        Q.   Nothing you can look at under a

18   microscope or on X-ray that will tell you

19   someone's NHL was caused by Roundup?

20        A.   No.

21        Q.   So, ultimately, if two people

22   both have NHL and one has been exposed to

23   Roundup and one hasn't, medically, there's

24   nothing that's going to differentiate the

Michael Scola, M.D.

1    two, right?

2              A.   Not that I'm aware of, no.

3              Q.   So I'm curious what

4    specifically you did specific to Mr. Koen

5    to determine whether or not his NHL was

6    caused by Roundup.

7                   MS. NOLAN:  Object to

8              form.  Asked and answered.  He's

9              answered this question.

10                  THE WITNESS:  There's

11             nothing I did and there's no way

12             that I can conclude that Roundup

13             caused his lymphoma, but you know,

14             again, based upon his exposure

15             history and data that suggests a

16             potential causative effect, I

17             concluded that there's -- there is,

18             I think, beyond a reasonable doubt

19             speculation that it may have played

20             a role.

21   BY MR. GRAY:

22             Q.   Okay.  So there was no

23   scientific method that you followed to

24   reach that opinion?

Michael Scola, M.D.

```
 1          A.   No.

 2                    MS. NOLAN:   And Dr.

 3          Scola, I don't know if there's a

 4          way to position your camera so we

 5          can see your face.

 6                    THE WITNESS:   I

 7          apologize.

 8   BY MR. GRAY:

 9          Q.   There we go.  That's good.  Do

10   you know what a Bradford Hill analysis is,

11   Doctor?

12          A.   No, I don't know much about it,

13   no.

14          Q.   And there is, does the term

15   "differential etiology" or "differential

16   diagnosis" mean anything to you?

17          A.   Yes, I mean, a differential

18   diagnosis are different possible causes for

19   a patient's presenting symptoms and signs.

20          Q.   And did you do a differential

21   for Mr. Koen?

22          A.   Well, no, I did not do a

23   differential.  I mean, it's something that

24   the original physician who assessed Mr.
```

Michael Scola, M.D.

1    Koen would do, would generate a

2    differential to potentially account for his

3    symptoms, his presenting symptoms and sign,

4    signs.

5         Q.   Okay.  So as you're describing

6    it, the differential diagnosis, it's to try

7    to figure out what's causing a patient's

8    symptoms, right?

9         A.   That's correct.  That's the way

10   that term is typically used.

11        Q.   Okay.  And it is, for you, it's

12   not something that you would do to

13   determine the cause of someone's disease?

14        A.   No.  Particularly something for

15   non-Hodgkin's lymphoma where it's, you

16   know, perhaps hard to concretely identify a

17   cause and there's often not one cause, it's

18   not something we would do.

19        Q.   Did you determine an odds risk

20   for Mr. Koen?

21        A.   Odds risk of what outcome?

22        Q.   Of what was the risk of him

23   developing NHL due to his exposure of

24   Roundup.

Michael Scoble, M.D.

1          A.    No, I don't know if there's any
2     way to concretely do that.  I don't know if
3     there's any mathematical model that would
4     allow one to do that.
5          Q.    Did you consider any other risk
6     factors for Mr. Koen beyond his exposure to
7     Roundup?
8          A.    No, again, I'm not, I'm not his
9     treating doctor, so I didn't -- I'm not
10    able to interview him and obtain that sort
11    of historical information.  And I don't
12    recall any of that information being
13    ascertained at the time of the oncology
14    consultation, the original oncology
15    consultation where that information is
16    typically gathered.  I can't even say for
17    sure that I saw the original oncology
18    consultation.
19         Q.    Right.  And I'm trying to, you
20    know, figure out what you did here to reach
21    your opinion.  And it sounds like beyond,
22    you know, evaluating his exposure to
23    Roundup, you didn't evaluate his, any other
24    possible risk factors for his NHL, correct?

Michael Seofe, M.D.

```
 1                    MS. NOLAN:  Objection to
 2           the form.
 3                    THE WITNESS:  No, I did
 4           not.  And again, typically, we
 5           review toxin exposure, smoking
 6           history, and chemical occupational
 7           history and that's really about the
 8           extent of it.  It's not sort of an
 9           exhaustive, you know, list of
10           potential contributing causes.
11   BY MR. GRAY:
12           Q.   No, I understand.  I just want
13   to make sure we have been establishing what
14   you did here.  That's not something you did
15   in this case specific to Mr. Koen, right?
16           A.   No.
17           Q.   But if there were other toxin
18   exposure, other solvent exposure, diet,
19   smoking history, family history of cancer,
20   those sorts of things would need to be
21   considered and factored in determining what
22   would be the ultimate cause of his cancer,
23   correct?
24           A.   Oh, absolutely.  I think, yes,
```

1   in formulating a comprehensive opinion

2   about the origins of his lymphoma, one

3   would want to detail that sort of exposure

4   history.

5         Q.   All right.  Fair to say you

6   can't have a comprehensive assessment of

7   his potential causes without that

8   information?

9         A.   Yes, if I were the treating

10   oncologist, I would want to inquire about,

11   about all those items.

12         Q.   Well, I don't mean just for

13   treating purposes, I mean for, you know, as

14   you said, having a comprehensive assessment

15   of a potential etiology of his disease, you

16   would need to factor in -- you would need

17   to know and consider all those factors,

18   correct?

19         A.   One would want to know and

20   think about all those factors.  I was asked

21   to comment primarily on, on glyphosate as a

22   potential contributing variable and not

23   really to formulate kind of his global

24   lymphoma risk.

```
 1          Q.   Okay.  So that helps.  So does
 2    that, tell me if I'm wrong, but what I
 3    understand you're saying is you evaluated
 4    whether it was possible that glyphosate
 5    could have contributed to his cancer,
 6    correct?
 7                     MS. NOLAN:  Object to
 8          form.
 9                     THE WITNESS:  Yeah, I
10          mean, that was the premise of my
11          review to really investigate and
12          focus on the potential role that
13          glyphosate may have played in the
14          development of his lymphoma.
15    BY MR. GRAY:
16          Q.   Right.  But you didn't, you
17    didn't consider glyphosate as a factor in
18    the larger context of Mr. Koen's, you know,
19    full medical and historical and exposure
20    condition, correct?
21                     MS. NOLAN:  Object to
22          form.
23                     THE WITNESS:  Yeah.  I
24          don't know if I had all that
```

Michael Scott, M.D.

```
 1              information readily, readily
 2              available.  Again, I did not read
 3              his deposition.  It sounds like a
 4              lot of that information might have
 5              been gleaned from his deposition.
 6    BY MR. GRAY:
 7         Q.   Okay.  Sorry, I just received
 8    from your counsel the notes that you made
 9    on Dr. Weisenburger's paper.  If I can get
10    them, then we'll use them as an exhibit,
11    but in the interim, I note in your report,
12    you mention Dr. Weisenburger's paper as
13    providing a plausible mechanism for B
14    lymphocyte transformation caused by
15    glyphosate exposure, right?
16         A.   Yeah.
17         Q.   Caused by exposure to
18    glyphosate?
19         A.   Yes, that's correct.
20         Q.   And you also note Dr.
21    Weisenburger did a review of the
22    epidemiological animal and genotoxic
23    studies to come up with this mechanism?
24         A.   Yes.
```

1          Q.   And can you tell me what that

2   mechanism is?

3          A.   Well, he sort of summarized

4   contemporary literature kind of focusing on

5   some of the more recent case-control

6   studies.  But then he transitioned and

7   summarized some of the laboratory analysis

8   and laboratory studies looking at potential

9   cellular toxic effects and mutational

10   effects of glyphosate to support his

11   conclusion that there's a plausible

12   association between glyphosate exposure and

13   the development of non-Hodgkin's lymphoma.

14   And it's a very, you know, detailed and

15   somewhat elaborate summary.  I didn't, as

16   we talked about at the very beginning of

17   this deposition, I didn't pull any of

18   these, it's certainly outside of my area of

19   expertise, but pull any of these primary

20   reports or articles.  So but he does detail

21   that in his, in his journal article.

22          Q.   Okay.  So you didn't, as you

23   said, you didn't pull any of the primary

24   studies that he's talking about that he

Michael Scola, M.D.

1    summarizes in the article, right?

2         A.   That's correct.

3         Q.   And you, obviously, didn't

4    undertake your own research to test or

5    replicate what Dr. Weisenburger posited in

6    his article?

7         A.   No.

8         Q.   Okay.  So you independently

9    don't have an opinion as to how glyphosate

10   can cause or could cause NHL, the mechanism

11   by which it could cause NHL, right?

12                    MS. NOLAN:  Objection to

13        form.

14                    THE WITNESS:  When you

15        say "independently," what do you

16        mean by that, can you clarify?

17   BY MR. GRAY:

18        Q.   Well, maybe more plainly,

19   what -- it sounds like to me you're saying

20   is that I read Dr. Weisenburger's paper, he

21   puts forth the hypothesis of how glyphosate

22   could cause NHL, and that hypothesis sounds

23   reasonable to you?

24        A.   Correct.

1          Q.   Right, but on your own, outside

2     of Dr. Weisenburger's hypothesis, you don't

3     have an independent idea or your own

4     hypothesis or idea about a possible

5     mechanism by which glyphosate causes NHL,

6     right?

7          A.   No, my level of knowledge is

8     gleaned from, from -- my level of knowledge

9     in this matter is gleaned from my review of

10    the literature.  Some of the other

11    literature that I submitted also do detail

12    some of the bench work looking at this

13    issue of potential cellular damage by

14    glyphosate, glyphosate.  I believe the

15    Zhang article also does summarize some of

16    the relevant literature in this regard.

17         Q.   Okay.  So you've looked at the

18    summaries of the literature, but you

19    haven't investigated the or, you know,

20    tested the veracity of the information

21    that's being summarized, right?

22         A.   I have not.

23              MS. NOLAN:  Objection to

24         form.

Michael Scorza, M.D.

1    BY MR. GRAY:

2         Q.   And I assume you haven't,

3    obviously, have not communicated with Dr.

4    Weisenburger about his paper at all?

5         A.   No.

6         Q.   Were you aware that he's a

7    retained expert for the plaintiffs in this

8    litigation?

9         A.   Am I aware of that?

10        Q.   Yes.

11        A.   No.

12        Q.   Okay.  And did you know that he

13   had been retained as an expert for the

14   plaintiffs in this litigation for several

15   years before he published that paper?

16             MS. NOLAN:  Can you

17        rephrase the question?  I think

18        it's confusing, because it's

19        referring to plaintiffs, but not

20        who he has been retained by.

21        Simply, could you rephrase it,

22        plaintiffs generally or plaintiffs

23        within the MDL?

24

Michael Scofia, M.D.

```
 1   BY MR. GRAY:

 2        Q.   So were you aware that in the

 3   larger -- okay.  Are you there?  Are you

 4   good?

 5        A.   Yes.

 6        Q.   So were you aware that Dr.

 7   Weisenburger had been retained in the

 8   overall Roundup litigation by the

 9   plaintiffs, not Mr. Koen or his lawyers

10   specifically, but for all the plaintiffs,

11   that Dr. Weisenburger had been retained as

12   an expert?

13        A.   No, I was not aware of that.

14        Q.   Okay.  And you didn't know that

15   he had been working as an expert for the

16   plaintiffs globally for several years

17   before he published his paper?

18        A.   No, I was not aware of that.

19        Q.   I understand.  And so I guess

20   my question, Doctor, is have you -- and

21   maybe I should say does that, the fact that

22   Dr. Weisenburger is a paid expert for the

23   plaintiffs, does that impact the way that

24   you evaluated or the weight that you give
```

Michael Scola, M.D.

1    to his paper?

2         A.   Well, I think one has to

3    conclude that there's the potential for

4    bias.  Again, I would want to know the

5    specifics, but just based on what you're

6    describing, there's the potential for bias.

7    You know, I think the data as it was put

8    forth in his paper certainly sounds

9    reasonable.  He comments on independent

10   studies, case-control studies.  He does

11   introduce his own opinion throughout, but

12   the data are sort of independently sound

13   and I can understand why he comes to the

14   conclusions that he does.  So as I read

15   through the paper, and try to identify, you

16   know, clear elements of bias, it may be

17   there at a subtle level, but I don't think

18   it completely clouds the journal article or

19   the conclusions.

20        Q.   Now, you said he presents the

21   data, but it's -- he doesn't present all

22   the data from every single study, correct?

23        A.   No.  No, his focus is more on

24   some of the recent analysis.

Michael Scola, M.D.

1          Q.   But even in -- my point is

2     different, it's in Dr. Weisenburger's

3     paper, he's not giving you every, every

4     number, every fact, every figure --

5          A.   No.

6          Q.   -- from every study, correct?

7          A.   No.

8          Q.   So it's the things that he

9     deems important or the things as he's

10    interpreted it, correctly -- correct?

11         A.   I imagine to some degree, there

12    is that.  I mean, there's only so many

13    well-designed case-control studies that are

14    out there that have looked and it looks

15    like most of the articles that I submitted

16    refer back to these case-control studies

17    kind of going back to the 1990s, maybe even

18    the 1980s.  So at least in terms of the

19    core data that he presents, I'm not sure

20    there's much else out there.  He does also

21    identify some of the larger cohort studies

22    and some of the other things that are

23    widely quoted.  But there's no way that

24    this is an amalgam of everything that's

Michael Scola, M.D.

1    published.

2         Q.   Right.  And to be fair, without

3    having, for you without having seen the

4    primary studies, you can't fully evaluate

5    whether what Dr. Weisenburger has presented

6    is the most fulsome, the most accurate

7    representation of what's in those studies,

8    correct?

9                   MS. NOLAN:  Objection to

10         form.

11                  THE WITNESS:  Well, the

12         conclusions of the studies are the

13         conclusions of the studies.  And

14         it's hard to sort of shave down or

15         manipulate it.  So and many of

16         these, many of the studies that

17         were quoted in this report, I did

18         pull up and I've submitted.  But

19         even those that I didn't pull up,

20         the conclusions, I think, are

21         really kind of fixed and not

22         necessarily open to interpretation.

23    BY MR. GRAY:

24         Q.   Dr. Scola, have you seen

1    anything setting forth a plausible

2    mechanism for glyphosate to cause NHL other

3    than this paper by one of the Plaintiff's

4    hired experts?

5                    MS. NOLAN:  Objection to

6          form.

7                    THE WITNESS:  Well, as I

8          mentioned earlier, Zhang did

9          comment on some of the basic

10         science, meaning some of the

11         genotoxic data and some of the

12         cellular studies.  Now, whether

13         there's overlap between the two

14         papers, I really can't comment.  I

15         have not dissected it to that

16         degree.  And some of the other

17         submitted papers may also touch

18         upon some of the basic science and,

19         you know, pathophysiologic data

20         supporting a likely mechanism.

21   BY MR. GRAY:

22       Q.   Okay.  I understand what you're

23   saying.  I think my question was a little

24   different.  I'm asking have you, Dr. Scola,

1    read anything, any paper or study that sets

2    forth the mechanism on which glyphosate

3    causes NHL other than this paper by

4    Plaintiff's hired expert, Dr. Weisenburger?

5              MS. NOLAN:  Objection.

6         Asked and answered.

7              THE WITNESS:  Yeah, if

8         you're asking have I seen a

9         clear-cut mechanism by which

10        glyphosate causes lymphoma, no, I

11        haven't.  His paper, and presumably

12        other papers, allude at various

13        mechanisms whereby the cell could

14        be damaged or altered in such a way

15        that it could give rise to a

16        malignancy.

17   BY MR. GRAY:

18        Q.   So and, Doctor, you said "and

19   presumably other papers" and I'm asking

20   you, do you know if those other papers

21   exist or not?

22        A.   Just the ones that I mentioned.

23        Q.   Which ones did you --

24        A.   Zhang, I think Zhang also kind

Michael Scola, M.D.

1    of dove into some of the geno -- I mean, I

2    could certainly take a look.

3         Q.   Now, I'm not asking you to

4    look, I'm asking you what you know.  We'll

5    talk about Zhang eventually.

6         A.   Sure.

7         Q.   Let me ask you this.  Did you

8    know that Dr. Zhang is also an expert that

9    works for the plaintiffs in this

10   litigation?

11        A.   No, I wasn't aware of that.

12              MS. NOLAN:  And again,

13         could you qualify that, because I

14         think --

15              MR. GRAY:  When I say

16         plaintiffs in this instance, I mean

17         the larger litigation.

18              THE WITNESS:  No.

19   BY MR. GRAY:

20        Q.   Okay.  So I assume you have the

21   same caveats about bias that you said for

22   Dr. Weisenburger would apply to Dr. Zhang's

23   paper?

24        A.   Well, again, I would want to

Michael Scola, M.D.

1    know when he became a medical expert for

2    the plaintiff in comparison to when the

3    paper was published.  So yes, there's

4    always the element of bias.  It's human

5    nature, but you've got to look, I guess, at

6    the specifics.  Again, you know, I think

7    the data are sound.  I'm not an

8    epidemiologist, but presumably these are

9    well designed, well orchestrated, well

10   funded meta-analysis based on good

11   case-control studies published in reputable

12   journals.  So I don't know if we can

13   necessarily, you know, disregard or

14   dispense with the conclusions of these

15   articles necessarily.

16        Q.    And you said presumably these

17   are good studies in good journals and is it

18   fair to say you have to say presumably

19   because you haven't looked at those studies

20   yourself?

21        A.    Well, look, I'm an expert, I'm

22   not an expert in this field and the field

23   is vast.  There's a lot that's published.

24   But most of the articles that I submitted

Michael Scola, M.D.

1    are published in reputable peer-reviewed

2    journals and they're often quoted.  And as

3    I alluded to, the case-control studies date

4    back to the 1980s and are referenced time

5    and time again by the two meta-analyses

6    that I mentioned, as well as other

7    meta-analyses and so there's, there's no

8    reason to doubt the validity or substance

9    of these, of these studies.

10        Q.   And you said the literature is

11   vast, which I think is right there.  It's

12   fair to say there's a lot of literature out

13   there about glyphosate and a possible

14   association with NHL, right?

15        A.   Yes.

16        Q.   And do you feel that you were

17   able to adequately identify and review and

18   assess and reach a conclusion on that vast

19   body of literature along with

20   understanding, reviewing and understanding

21   Mr. Koen's extensive medical record and

22   producing a report in a matter of 14 hours

23   over four days?

24                  MS. NOLAN:  Object to

Michael Scola, M.D.

```
1          form.  It's compound.
2                    MR. GRAY:  You can
3          answer, Doctor.
4                    THE WITNESS:  Well,
5          that's why I limited -- I really
6          limited the literature review to
7          the most contemporary studies,
8          those over the past few years and
9          without, you know, going back,
10         because I think things change and
11         things evolve and more data becomes
12         available and our ability to do
13         these statistical analyses
14         continues to improve.  So I really
15         limited my review to the past few
16         years.  I don't know if anybody can
17         purport to be an expert, certainly
18         I can't, given the limited time
19         frame in reviewing and digesting
20         the literature.  But I do spend a
21         lot of time reading journal
22         articles and I think I am pretty
23         savvy in going through the medical
24         literature.  So given the time
```

1              constraints I had, I think I did a

2              pretty good job of digesting,

3              thinking about, and incorporating

4              the contemporary literature on this

5              matter.

6     BY MR. GRAY:

7          Q.   Right.  And by no means,

8     Doctor, I'm not suggesting that you didn't

9     do a good job or anything of the sort.  My

10    question, maybe it's a little different and

11    what I'm asking is, given the time

12    constraints that you've described to us, it

13    wasn't possible for you to fully review and

14    digest the body of literature on glyphosate

15    and NHL; is that fair to say?

16              MS. NOLAN:  Object to

17         form.

18              THE WITNESS:  No, I

19         would not purport to have digested

20         the body of literature on

21         glyphosate and NHL.

22              MS. NOLAN:  Earlier, he

23         was trying to answer a question

24         about, I think, the Zhang or Zhang

```
 1              article or study and he said that
 2              he could go back and look at it.
 3              So I don't know if that's something
 4              you want to let him do in order to
 5              fully answer your question.
 6                   MR. GRAY:  My only
 7              question that I asked him about the
 8              Zhang article was did he know that
 9              Dr. Zhang was an expert for the
10              plaintiffs, but if you want to talk
11              about Zhang later, we can.  But I
12              don't know that he needed to see
13              the paper to answer that question.
14                   Doctor, is your
15              understanding of Dr. Weisenburger's
16              mechanism that there is -- that
17              glyphosate is genotoxic and causes
18              cellular damage; is that right?
19                   THE WITNESS:  Yes.
20    BY MR. GRAY:
21         Q.   And then that cellular damage
22    could then potentially lead to a
23    cancer-causing mutation; is that fair?
24         A.   That's fair.
```

Michael Scola, M.D.

1          Q.   Is there more to that mechanism

2     that I'm not describing there?

3          A.   No, I mean, that's it.  He

4     gives, you know, he gives on, he goes on to

5     give several laboratory studies that show

6     various forms of cellular injury and then

7     does describe animal studies where there's

8     altered cell proliferation as a consequence

9     of drug exposure.

10          Q.   And I know, I think it's fair

11     to say you're not an expert in

12     genotoxicity, correct?

13          A.   I am not.

14          Q.   But you are aware that

15     genotoxicity is essentially cellular

16     damage, right?

17          A.   Well, yeah, damage to the

18     genome or DNA.

19          Q.   So that's something that can

20     happen naturally during cell replication,

21     right?

22          A.   Yes, it can.

23          Q.   And damage that is caused by

24     genotoxic effect can be and is most of the

Michael Scola, M.D.

1    time repaired by cells, correct?

2         A.   Well, our cells have mechanisms

3    to exact repair, yes.

4         Q.   Or sometimes the cells just

5    die?

6         A.   Or sometimes the cells die.

7         Q.   And also, DNA breaks that might

8    result from genotoxicity can lead to the

9    process of cell death, correct?

10        A.   Correct.

11        Q.   And cellular damage on its own

12   is not enough to cause cancer, correct?

13        A.   That's correct.

14        Q.   Something has to be mutagenic

15   in order to cause cancer?

16        A.   Well, ultimately, a mutation is

17   an alteration in the DNA.  So, yes,

18   ultimately there needs to be a fixed

19   mutation within the DNA to cause cancer.

20        Q.   And Dr. Weisenburger's paper

21   doesn't describe or highlight any studies

22   that show actual mutagenicity, does it?

23        A.   I would have to go back,

24   honestly, I would have to go back and

Michael Scola, M.D.

1    really take a look.  He showed in vitro

2    data of toxic effect to the genome, but

3    what that means precisely, I don't know.

4         Q.   Right.  But it showed toxic

5    effect, but it didn't show whether or not

6    that effect was repaired or if it led to

7    cell death or if it led to mutations,

8    correct?

9         A.   I'm just not privy to that

10   information.  I don't have that

11   information.

12        Q.   You don't have that information

13   because it wasn't in the paper or

14   because -- why don't you have that

15   information?

16        A.   I don't believe it was in the

17   paper --

18        Q.   Okay.

19        A.   -- that level of detail.

20        Q.   Okay.  So Dr. Weisenburger's

21   paper, and fair to say also Dr. Zhang's

22   paper, highlight that glyphosate is

23   genotoxic, but don't highlight whether it's

24   mutagenic or replicable mutations, correct?

Michael Scola, M.D.

```
 1          A.   Again, I'm not -- I don't have

 2    that information at my fingertips, so I

 3    can't comment precisely whether it's in the

 4    paper or not.

 5          Q.   As we sit here today, do you

 6    recall reading anything like that anywhere?

 7          A.   I don't recall reading anything

 8    that concrete anywhere.  There are animal

 9    studies suggesting an increased risk of

10    developing lymphoma upon rodent exposure to

11    glyphosate.  But I don't see anything

12    specifically about mutations, certainly

13    nothing that's quoted in the paper.

14          Q.   And you're not an expert in

15    rodent studies, right?

16          A.   No.

17          Q.   And rodent studies, you

18    wouldn't consider those to be a good

19    measure for whether or not something is

20    carcinogenic to humans, right?

21                    MS. NOLAN:  Objection to

22          form.

23                    THE WITNESS:  No, I

24          think there's always concern, but
```

Michael Scole, M.D.

1          one can't extrapolate from rodent

2          studies to humans automatically.

3     BY MR. GRAY:

4          Q.   And Dr. Weisenburger

5     acknowledges in his paper, right, that

6     federal regulators have the same studies

7     that he has and has come to different

8     conclusions, correct?

9          A.   I'm sorry, could you repeat

10    that?

11         Q.   I said Dr. Weisenburger

12    acknowledges in his paper that federal

13    regulators have the same studies that he

14    has and have come to different conclusions,

15    correct?

16         A.   Federal regulators.

17              MS. NOLAN:  Object to

18         form.  Also, maybe if you could

19         give him a minute to look at the

20         paper so he can answer.

21              MR. GRAY:  Sure.  Why

22         don't we -- we'll mark it.

23              THE WITNESS:  Can you

24         point out the particular paragraph

Michael Scola, M.D.

```
 1          that you're making reference to?
 2   BY MR. GRAY:
 3          Q.   Sure.  Give me one second.
 4   Okay.  This is the paper we're talking
 5   about, correct?
 6          A.   Yes.
 7                    THE WITNESS:  We'll mark
 8            this as Exhibit 8.
 9                  - - - - -
10            (Weisenburger Article marked
11            Scola Exhibit 8 for
12            identification.)
13                  - - - - -
14   BY MR. GRAY:
15          Q.   Do you see this here, we're on
16   page 6?
17          A.   Yes.
18          Q.   And he notes "However,
19   industry-sponsored reviews and EPA have
20   concluded that glyphosate and GBFs do not
21   pose a genotoxic hazard, and explain away
22   the positive findings in the IARC
23   assessment and their own analyses as owing
24   to technical and/or methodologic issues, or
```

Michael Scola, M.D.

1    cytotoxicity rather than genotoxicity."

2    Did I read that correctly?

3         A.   Yes.

4         Q.   So there he's acknowledging

5    that the EPA looked at these same studies

6    and they don't show that glyphosate poses a

7    genotoxicity hazard, correct?

8         A.   Yes.

9         Q.   And he notes that the EPA has

10   reached that conclusion because they've

11   identified technical or methodologic issues

12   or cytotoxicity in the studies, correct?

13        A.   Correct.

14        Q.   I take it because you haven't

15   reviewed those studies, you couldn't

16   comment on whether or not that was an

17   accurate assessment or not?

18                  MS. NOLAN:  Objection to

19        form.

20                  THE WITNESS:  No, I'm

21        not in a position to comment.

22   BY MR. GRAY:

23        Q.   So it's possible that Dr.

24   Weisenburger -- scratch that.  So while Dr.

Michael Scola, M.D.

1    Weisenburger has set forth a hypothesis for

2    glyphosate being genotoxic and possibly

3    leading to cancer, there's a

4    counterviewpoint to that, correct?

5            A.   Yeah, there seems to be a

6    counterviewpoint.  I mean, he does go on in

7    the rest of that paragraph to address why

8    he feels that the studies he is referencing

9    may be, may be more valid or hold more

10   weight, but it's clear there's a

11   counterviewpoint, yes.

12           Q.   So that counterviewpoint is not

13   something that you looked at, right?

14           A.   Not primarily, other than just

15   reading through this, this article.

16           Q.   Right, you read Dr.

17   Weisenburger's assessment of the critiques

18   of his report, but not his actual -- not

19   the actual critiques, correct?

20           A.   That's correct.  It's correct,

21   I have not read through the critiques of

22   his report.

23           Q.   So you couldn't judge whether

24   or not those were valid or not?

Michael Scola, M.D.

```
 1          A.    To be fair, I don't know if

 2     that's a direct critique of his report or

 3     simply came to an opposing conclusion.

 4          Q.    That's -- you're right, that's

 5     very fair.  I guess the point is, you

 6     haven't looked at the -- any of the

 7     underlying data or studies, so you couldn't

 8     really judge whether Dr. Weisenburger is

 9     right or whether the EPA is right?

10                     MS. NOLAN:  Objection to

11          form.

12                     THE WITNESS:  No, I

13          could not.  And it's not really my

14          role either.  My role is simply to

15          acknowledge that there are in vitro

16          studies that suggest potential

17          harmful effect of this drug.

18     BY MR. GRAY:

19          Q.    Well, respectfully, Doctor,

20     without looking at the studies or even a

21     different analysis of the study beyond Dr.

22     Weisenburger's, you can't really sit here

23     today and say that those studies do show

24     that.  You only know that Dr. Weisenburger
```

Michael Scola, M.D.

1    said they do, but you don't know if they do

2    or they don't, right?

3          A.    Well, I assume Dr. Weisenburger

4    is not misquoting the conclusion of the

5    studies or the P values, so I assume the

6    data that he is quoting is accurate.  But

7    one would have to be a biochemist or an

8    expert in this particular area to review

9    all the studies and come up with a

10   definitive conclusion.

11         Q.    I'm sorry, I didn't mean to

12   interrupt you.  Go ahead.

13         A.    I mean, all I can say is that

14   there are credible in vitro studies

15   suggesting potential mechanisms of cellular

16   harm that are referenced here in this

17   article.

18         Q.    Again, even if Dr. Weisenburger

19   acknowledged that the other people, the EPA

20   for one, doesn't find that those studies

21   are credible, right?

22                     MS. NOLAN:  Objection to

23         form.

24                     THE WITNESS:  I don't

1          know if the EPA report directly

2          comments on these studies and the

3          credibility of these studies.  I

4          just don't know that.

5    BY MR. GRAY:

6          Q.   Let me ask you this way.  You

7    can reach a conclusion that says one thing

8    in a study -- or scratch that.  You could

9    do a study the wrong way and get a result

10   that says something that's not accurate,

11   correct?

12         A.   You could.  This happens all

13   the time in, you know, based on science

14   research.

15         Q.   Bad methodology begets bad

16   data, right?

17         A.   That's correct.

18         Q.   And so if there were

19   methodological flaws in those studies, even

20   if they did reach a conclusion that

21   suggests some genotoxic effect, if the

22   methodology was bad, then that wouldn't

23   actually be evidence of a genotoxic effect,

24   right?

```
 1                  MS. NOLAN:  Objection to

 2          form and speculation.  Calling for

 3          speculation.

 4                  THE WITNESS:  I think

 5          that's true of any, any scientific

 6          study, either a basic science study

 7          or a clinical study that the

 8          methodologies have to be, have to

 9          be sound or it can influence the

10          conclusions.

11  BY MR. GRAY:

12       Q.   Okay.  And that's fair.  I

13  agree with you.  Let's move on to the

14  epidemiology.  You looked at that a little

15  bit closer, correct?

16       A.   Yes.

17       Q.   You discuss a handful of the

18  epidemiology studies in your report, I

19  assume, is it fair to say those are the

20  main bases for your opinions today?

21       A.   Yes.

22       Q.   And I think we've established

23  this, you reviewed those, you talk about

24  the meta-analysis, the meta-analyses, you
```

Michael Scola, M.D.

1    reviewed those papers, the meta-analysis

2    papers, you did not review the primary

3    underlying studies, right?

4                         MS. NOLAN:  Objection to

5              form.

6                         THE WITNESS:  I did not,

7              no, I did not pull the various

8              case-control studies that were

9              referenced in the meta-analysis.  I

10             looked at a summary, a summary of

11             the case-control studies that

12             defines the population and the

13             conclusions, but I did not pull the

14             primary studies.

15   BY MR. GRAY:

16        Q.   Okay.  And, obviously, you're

17   not an epidemiologist, so you didn't do

18   your own epidemiological analysis, right?

19        A.   That's correct.

20        Q.   In your report, you note that

21   there was -- excuse me, you note a concern

22   over a link between NHL and cancer was

23   started by the IARC monograph in 2015; is

24   that right?

Michael Scola, M.D.

```
1           A.    Yes, that's right.

2           Q.    Are you relying on IARC's

3    determination as support for your opinions

4    in this case?

5           A.    Yes.

6           Q.    I believe you actually quote

7    this, but you note that IARC said there was

8    limited evidence in humans regarding an

9    association between NHL and glyphosate,

10   correct?

11          A.    Correct.  That's often quoted.

12          Q.    Uh-huh.  And evidence in humans

13   is another way to describe epidemiology,

14   correct?

15          A.    Well, yes, I mean, it's one

16   form of epidemiology and certainly, if

17   you're trying to draw a conclusion that's

18   pertinent to humans, that's the kind of

19   epidemiologic evidence you want.

20          Q.    Sir, and I guess what I meant

21   was when IARC used that term, they were

22   referring to the epidemiology studies,

23   right?

24          A.    Yes.
```

Michael Scott, M.D.

```
 1           Q.   Now, are you aware that IARC

 2   did something that's called a hazard

 3   assessment?

 4           A.   No.

 5           Q.   I'm sorry, could you say that

 6   one more time?  I had some background

 7   noise.

 8           A.   No, I'm not.

 9           Q.   Do you know the difference

10   between a hazard assessment and a risk

11   assessment?

12           A.   Well, to some degree, but maybe

13   not in the context that you're referring to

14   it.

15           Q.   Well, tell me what you

16   understand that to be.

17           A.   Well, when we talk about

18   hazard, it often gets at the concept of

19   risk and risk difference between two

20   groups.  But, again, I may be way off.

21           Q.   Have you heard the difference

22   being a hazard assessment looks to whether

23   something, whether it's possible for

24   something to cause a result and a risk
```

1    assessment looks at whether there's an

2    actual risk of the result at sort of

3    relevant exposure levels?

4         A.   I have to admit, I'm unaware of

5    the differences applied in that regard.

6         Q.   Okay.  Now, you're aware that

7    the -- well, let me back up and say what do

8    you understand that IARC determined from

9    its review of glyphosate?

10        A.   Well, the determination was

11   that there is a potential carcinogenic risk

12   to humans with exposure to this drug and it

13   was assigned a -- it was categorized

14   according to that risk as group 2A

15   suggesting a probable cause and effect.

16   With the caveats that are put forth here,

17   you know, based on limited human evidence.

18        Q.   Uh-huh.  You're aware that the

19   EPA has also reviewed glyphosate, right?

20        A.   Yes.

21        Q.   And are you aware that the EPA

22   has reviewed glyphosate several times since

23   IARC's 2015 publication?

24        A.   Yes.

```
 1            Q.   Okay.  And you know what the
 2   EPA has concluded?
 3            A.   Yes, I do.
 4            Q.   And what is that?
 5            A.   That there is, in essence, no
 6   harmful effect from exposure to glyphosate.
 7            Q.   That it does not pose a
 8   carcinogenic risk to humans, correct?
 9            A.   Yes.
10            Q.   Have you reviewed any of the
11   EPA papers regarding glyphosate?
12            A.   Not in its entirety.  I
13   probably still would be reviewing it.
14            Q.   Okay.  I don't know if that
15   answered my question, Doctor.  Have you
16   reviewed any of the EPA's -- have you
17   looked at any of the EPA's reviews relating
18   to glyphosate?
19            A.   No.  I've looked at summaries
20   of the review, but I have not looked at the
21   primary document.
22            Q.   When you say you've looked at
23   summaries of the review, does that mean
24   you -- are you referring to the discussion
```

1    of the EPA's ruling that's in the papers

2    that you submitted to me?

3          A.    That's correct.

4          Q.    Now, you weren't with -- I

5    think you said you work with FDA as part of

6    your clinical trials, right?

7          A.    Well, yes, I mean, not directly

8    with the FDA, although certainly they have

9    oversight of all the clinical trials.

10         Q.    And it's fair, what I'm getting

11   at, Doctor, is you're familiar with the

12   prescription drug regulatory process to

13   some degree, right?

14         A.    Yes.

15         Q.    And you recognize that the FDA

16   is the body that's put in charge of

17   determining whether or not the drugs that

18   you're testing are safe for humans to use?

19         A.    That's correct.

20         Q.    And you understand that the

21   corollary to that is the EPA is tasked with

22   regulating and looking at the pesticide

23   chemicals and determining whether or not

24   they're safe to humans to use, right?

Michael Scole, M.D.

```
 1          A.   Yes.

 2          Q.   And was there a reason that you

 3   chose not to look at any of the EPA

 4   analysis of this drug that you were tasked

 5   with looking at?

 6          A.   Well --

 7               MS. NOLAN:  Objection to

 8       form.  I don't think it's called a

 9       drug.

10   BY MR. GRAY:

11          Q.   I apologize, the chemical.

12          A.   Yeah.  My, you know, plain and

13   simply, I did not have time to review these

14   documents, the primary documents.  These

15   are lengthy documents, very detailed, and

16   so I was forced to refer to secondary

17   documents that sort of summarized the

18   conclusions of the primary documents.

19          Q.   Okay.  And you, I believe you

20   included in your materials that IARC

21   monograph, correct?

22          A.   Yes.

23          Q.   And that's nearly 100 pages

24   long, correct?
```

Michael Scott, M.D.

```
 1          A.    That's correct.

 2          Q.    Did you review that?

 3          A.    Not in its entirety.

 4          Q.    Did you review it at all?

 5          A.    I may have looked.  I don't

 6  recall, honestly, I may have looked at the

 7  first pages and several pages throughout in

 8  the conclusion or discussion.

 9          Q.    Okay.  Was there a reason that

10  you chose to do that with the IARC paper

11  but not any of the EPA papers?

12          A.    I don't believe I pulled the

13  EPA paper.

14          Q.    Well, there are several papers,

15  you didn't pull any of them?

16          A.    I don't believe so, no.

17          Q.    If you didn't pull them, how do

18  you know how long they are?

19          A.    Well, I'm just summarizing.  I

20  truly don't know how long they are, but I

21  could surmise that they are lengthy papers.

22  And, again, my position was not to become

23  an expert on glyphosate.  I think that

24  would take the better part of a year to do.
```

1    But to review the contemporary literature

2    that other experts who have taken the time

3    and maybe are epidemiologists or scientists

4    have reviewed and to extrapolate on their

5    analysis and their conclusions.  So I

6    didn't set forth to review any of the

7    primary documents in their -- in their

8    entirety.  That was not my purpose.

9         Q.   You keep saying the primary

10   documents.  Do you know if the EPA has

11   summary documents?

12        A.   I imagine they probably do and

13   I think I've come across a couple.

14        Q.   Okay.  And what I'm trying to

15   understand, Doctor, is you were, you were

16   tasked with determining whether or not it

17   was possible for glyphosate to have

18   contributed to Mr. Koen's NHL, correct?

19        A.   Correct.

20        Q.   And you did that, correct?

21        A.   That's correct.

22        Q.   Or that's what you were tasked

23   to do, I should say.  And you've looked at

24   and you understood that there was on one

Michael Scola, M.D.

1    side, IARC who says, yes, it is possible,

2    and on the other side, there is EPA that

3    says no, it's not possible, correct?

4                    MS. NOLAN:  Objection to

5          form.

6                    THE WITNESS:  I think I

7          make reference to both in my

8          summary.

9    BY MR. GRAY:

10         Q.   Right.  So you understood that

11   there were two sides of the coin here?

12         A.   Yes.

13         Q.   And I'm just trying to

14   understand why you didn't look at both

15   sides of the coin?

16         A.   Well, I'm not sure I looked at

17   IARC either.  I may have glanced at, like I

18   said, I may have glanced at the first few

19   pages, but I certainly didn't look through

20   the entire document.  I published it, I

21   printed it, and submitted it, because I

22   made reference to it in my report, but I

23   didn't mean to insinuate that I had read

24   through the document in its entirety.

Michael Scott, M.D.

1          Q.   So why didn't you -- you said

2     you mentioned the EPA and IARC in your

3     paper, right?

4          A.   Yes.

5          Q.   And because you mentioned IARC,

6     you went and found the IARC document,

7     looked through it, and submitted it, right?

8          A.   That's correct.

9          Q.   And I'm still trying to

10    understand why you didn't do the same with

11    the EPA.

12                    MS. NOLAN:  Objection.

13           Asked and answered.

14                    THE WITNESS:  I would

15           say it's an oversight, because I

16           did make reference to it.  I

17           certainly could have pulled it and

18           printed it and submitted it.

19    BY MR. GRAY:

20          Q.   Well, you also didn't even

21    review it at all, right?

22          A.   Well, again, I reviewed, I

23    reviewed other authors' review of it.  I

24    did not review the primary document.

Michael Scott, M.D.

```
 1          Q.    All right.  Doctor, there are

 2   two types of epidemiology studies that have

 3   been done with Roundup, correct?

 4          A.    Correct.

 5          Q.    There were cohort studies and

 6   case-control studies?

 7          A.    That's correct.

 8          Q.    And case-control studies are

 9   retrospective studies, right?

10          A.    Yes.

11          Q.    You find people who have the

12   disease that you want to study; is that

13   right?

14          A.    Yes.

15          Q.    And then you evaluate whether

16   they had exposure in the past to the

17   substance you're evaluating, right?

18          A.    Yes.

19          Q.    And those people are called the

20   cases?

21          A.    Yes.

22          Q.    And then you find similarly

23   situated people who don't have exposure to

24   the substance, right?
```

Michael Scola, M.D.

```
1              A.     Correct.

2              Q.     And those are your controls?

3              A.     Yes.

4              Q.     And is it fair to say that case

5    controls have some inherent problems?

6              A.     Yes.

7                        MS. NOLAN:  Objection to

8          form.

9                        THE WITNESS:  I think

10         any epidemiologic study has

11         potential problems.

12   BY MR. GRAY:

13             Q.     And for case-control studies,

14   the one main problem is recall bias, right?

15             A.     That's correct.

16             Q.     And recall bias is where if

17   you're talking to somebody who already has

18   the disease and then you ask them about

19   things that they may have been exposed to

20   that could have caused the disease, they're

21   more likely to remember exposures that

22   might not have actually happened, correct?

23             A.     Yes.

24             Q.     And then the other way to do
```

Michael Scott, M.D.

1    epidemiology studies is called a cohort

2    study, right?

3           A.    That's correct.

4           Q.    And cohort studies are

5    prospective studies?

6           A.    Yes.

7           Q.    You find people who don't have

8    the disease, but instead are being exposed

9    to the substance that you want to study,

10   right?

11          A.    Correct.

12          Q.    And then you, typically, in the

13   study will take down the details of how the

14   people use the substance and what their

15   exposure to it is, right?

16          A.    That's right.

17          Q.    And then you follow those

18   people for as long as it would take for the

19   disease to show up, correct?

20          A.    Correct.

21          Q.    And then at the end of the

22   study, at that point, you look to whether

23   there is more disease in a group of people

24   that were exposed versus the people that

1    weren't exposed, right?

2          A.   That's right.

3          Q.   And not to say cohort studies

4    are without their potential problems, but

5    they don't have quite the same issue with

6    recall bias that case-control studies do;

7    is that right?

8          A.   Well, there's lots of that

9    potential, correct.

10          Q.   Is it fair to say that because

11    of that lack of potential bias, and

12    generally epidemiology cohort studies tend

13    to carry a bit more weight in the analysis

14    of a disease than case-control studies?

15                    MS. NOLAN:  Objection to

16          form.

17                    THE WITNESS:  Well, I

18          think, in general, prospective

19          studies do carry more weight than

20          retrospective studies.

21    BY MR. GRAY:

22          Q.   Okay.  Another way to measure

23    the strength of an epidemiological study is

24    to look at the power of the study, correct?

Michael Scola, M.D.

```
1           A.    That's correct.

2           Q.    And power simply means the size

3    of the study?

4           A.    Yes.

5           Q.    So the more people that are

6    included or the bigger the study, the

7    better, more powerful results, right?

8           A.    That's right.

9           Q.    And that's because the larger

10   numbers reduce the likelihood of an

11   association, any association found being

12   the result of chance?

13          A.    That's right.

14          Q.    So a study with thousands of

15   people is more powerful and would carry

16   more weight than a study with 100 people,

17   right?

18          A.    Yes.

19          Q.    Okay.  When you are

20   interpreting the results of the

21   case-control study, we look at what's

22   called the odds ratio, right?

23          A.    Yes.

24          Q.    And that's the odds or the
```

Michael Scott, M.D.

1    chance of disease in the exposed group, I

2    guess, divided by the chance of the disease

3    in the unexposed group, right?

4         A.   That's right.

5         Q.   And if you get anything over

6    one, that's an increased risk, anything

7    under one is a decreased risk?

8         A.   That's right.

9         Q.   And the corollary in a cohort

10   study was called the relative risk?

11        A.   Yes.

12        Q.   Now, when we're evaluating the

13   risk ratios, we look for statistical

14   significance; is that fair?

15        A.   That's fair.

16        Q.   And statistical significance is

17   how we determine the result was not

18   observed just by chance, right?

19        A.   That's right.

20        Q.   Do you believe that statistical

21   significance is required to have competence

22   in a scientific result?

23        A.   Well, it certainly garners the

24   highest respect.  If something is just shy

Michael Scott, M.D.

```
1    of statistical significance, it could still
2    be meaningful, but certainly statistical
3    significance does garner the highest value.
4         Q.   Sure.  Is there -- there's no
5    other method that you would use for
6    evaluating whether or not an association
7    is, you know, important beyond statistical
8    significance, right?
9         A.   I don't know if there's --
10   okay.  That's fair.
11        Q.   Okay.  And so to find
12   statistical significance, we're looking, in
13   these studies, in particular, we were
14   looking for 95 percent interval that
15   doesn't cross one; is that right?
16        A.   Yes.
17        Q.   If one is in the interval, then
18   it's -- we can't rule out the possibility
19   of chance and so the result is not
20   statistically significant, correct?
21        A.   Correct.
22        Q.   And to be fair, even if
23   something is statistically significant, the
24   failure of a statistically significant
```

Michael Scorie, M.D.

1    association, that doesn't mean there's a

2    definite causal relationship, right?

3         A.    No.

4         Q.    Would you agree that getting a

5    statistically significant odds ratio or

6    relative risk, it's hypothesis generating

7    more than anything?

8                    MS. NOLAN:  Objection to

9              form.  I mean he tried to answer

10             you earlier about statistical

11             significance and then you tend to

12             use the one, so -- after he tried

13             qualifying.

14   BY MR. GRAY:

15        Q.    Is there something that you

16   didn't get to say that you need to, Doctor?

17        A.    I don't believe so, not at this

18   point.

19        Q.    Okay.  And so my question was

20   would you agree that statistically

21   significant risk ratios are hypothesis

22   generating more than anything?

23        A.    Well, one wants to see

24   additional supportive evidence to draw any

Michael Scola, M.D.

1   definitive conclusion.

2        Q.   Right.  That's fair.  That's

3   what I'm getting at.  If you got -- you

4   found a statistically significant

5   association in a study, that would lead

6   you, that should be the basis for some

7   further and maybe different testing?

8        A.   Yes.

9        Q.   Another issue that comes up in

10  epidemiological studies is confounding,

11  right?

12       A.   Yes.

13       Q.   And confounder is any

14  extraneous variable that affects one of the

15  variables that's being studied?

16       A.   That's correct.

17       Q.   So in this case, the confounder

18  would be anything other than glyphosate in

19  the study that might also have a potential

20  relationship with non-Hodgkin's lymphoma?

21       A.   Potentially, yes, that could be

22  a confounder.

23       Q.   Now, the presence of

24  confounders in a study, that messes up the

Michael Scola, M.D.

1   reliability of any association that might

2   be found, right?

3        A.    That's right.

4        Q.    Because you can't be sure if

5   the association you observed is the result

6   of the substance you were studying or this

7   confounding variable, right?

8        A.    That's right.

9        Q.    It is fair to say that in

10  studies looking at glyphosate, the major

11  confounder would be other pesticide

12  exposure?

13       A.    Potentially, yes.

14       Q.    Right.  You've noted before

15  that there's been, there's been an

16  acknowledged risk or association between

17  agricultural work, working with pesticides

18  and herbicides generally and NHL, right?

19       A.    Yes.

20       Q.    So in order to try to determine

21  if there's one particular chemical that --

22  or, yeah, chemical that is driving the

23  association, you would have to control for

24  all the other pesticides and herbicides,

Michael Scott, M.D.

```
 1   right?

 2        A.   Ideally, yes.

 3        Q.   And without doing that, you run

 4   the risk of confounding your results?

 5        A.   Correct.

 6                    MR. GRAY:  Can we take

 7              just a really short break?  I need

 8              to run to the facilities.

 9                    MS. NOLAN:  Can it be,

10              like, not a ten-minute break, but a

11              five-minute break, but it really

12              has been a while since the last

13              one.

14                    MR. GRAY:  Sure.  We

15              can, we can take shorter ones.

16                    MS. NOLAN:  I'm trying

17              to, like, eat and caffeinate as we

18              go, because it was only, like,

19              three hours and ten minutes.  I

20              don't know.  And I feel like you're

21              going trying to go all seven.

22                    MR. GRAY:  I hope not.

23              Depending on --

24                    MS. NOLAN:  Oh, don't
```

Michael Scola, M.D.

```
1              say depending on me.  The last one

2              I was in, it was six hours and 56

3              minutes, not including me at all.

4                        MR. GRAY:  That's

5              impressive.  Yeah, I don't know

6              that I have a ton, ton left.

7                        THE STENOGRAPHER:  Can

8              we go off the record?

9                        MR. GRAY:  Yes, sorry.

10                       THE VIDEOGRAPHER:  The

11             time now is 4:26 p.m.  We are off

12             the record.

13                       - - - - -

14        (A recess was taken at this time.)

15                       - - - - -

16                       THE VIDEOGRAPHER:  The

17             time right now is 4:42 p.m.  We're

18             back on the record.

19   BY MR. GRAY:

20        Q.   All right.  Dr. Scola, welcome

21   back.

22        A.   Sure.

23        Q.   Now, we have been going for a

24   while.  If you start to need breaks more
```

Michael Scola, M.D.

1    frequently or something, let me know.

2    Okay?

3         A.   Okay.

4         Q.   Hopefully, we won't be at this

5    too much longer.  Okay.  The first study

6    that you note in -- or epidemiology study

7    that you note in your report is the

8    Agriculture Health Study; is that correct?

9         A.   Yes.

10        Q.   And I will bring this up.  Can

11   you see that?

12        A.   Yes.

13               MR. GRAY:  All right.

14          We'll mark this as Exhibit 9.

15               - - - - -

16          (Agriculture Health Study

17          marked Scola Exhibit 9 for

18          identification.)

19               - - - - -

20   BY MR. GRAY:

21        Q.   Now, this was a prospective

22   cohort study that looked at cancer

23   incidence in pesticide applicators, right?

24        A.   Yes.

Michael Scott, M.D.

```
 1          Q.   So as a prospective cohort
 2    study, the design is the strength of this
 3    study, right?
 4          A.   Yes.
 5          Q.   And pesticide applicators are
 6    people that we can assume have some regular
 7    and prolonged exposure; is that fair?
 8          A.   Presumably.
 9          Q.   And so since they looked at
10    exposure prior to diagnosis, we were --
11    they were likely able to limit recall bias
12    in the cohort to some degree, right?
13          A.   Uh-huh.
14          Q.   So that's another strength of
15    this one?
16          A.   Yes.
17          Q.   And we can see here highlighted
18    that it looked at 54,251 applicants that
19    had 5,779 incident cancer cases, right?
20          A.   Uh-huh, yes.
21          Q.   To your knowledge, does that
22    make the AHS the largest epidemiology
23    studies or epidemiology study of the ones
24    done in glyphosate?
```

Michael Scola, M.D.

```
1          A.    Yes, I believe it does.

2          Q.    So the power of this study is

3    another strength, right?

4          A.    Yes.

5          Q.    Again, because this is a

6    prospective cohort study, that would also

7    allow for them to examine and control for

8    different pesticides, right?

9          A.    Yes, presumably, yes.

10         Q.    So that should limit the effect

11   of confounding in this study, yes?

12         A.    Reduce the risk, yes.

13         Q.    So overall, do you consider

14   this a good study, Doctor?

15         A.    Well, again, I haven't reviewed

16   it primarily, so I don't know if I can draw

17   that conclusion, but based on the number of

18   participants, it's, it's certainly a robust

19   study.  I think we can surmise that.

20         Q.    Okay.  So this isn't one that

21   you've really read before?

22         A.    I have not read before?

23         Q.    Yes.

24         A.    That's correct.
```

Michael Scott, M.D.

1          Q.    Okay.  And I'll just show you

2     the conclusion here.  That says and I'll

3     read it.  It says "In this large

4     prospective cohort study, no association

5     was apparent between glyphosate and any

6     solid tumors or lymphoid malignancies

7     overall, including NHL and its subtypes.

8     There was some evidence of increased risk

9     of AML among the highest exposed group that

10    requires confirmation."  Did I read that

11    correctly?

12         A.    Yes.

13         Q.    So this large, well-designed,

14    well-structured study found no risk; is

15    that correct?

16         A.    That's correct.

17         Q.    How did this study factor into

18    your evaluation of glyphosate's association

19    with NHL?

20         A.    I think I made reference to it

21    and came to the same conclusion in my

22    report.  You know, as is true with all

23    these studies, there's always critique and

24    there's always potential sources of bias.

Michael Scola, M.D.

1    I believe some of the sources of critique

2    and bias were the shorter follow-up, so the

3    limited lag time that might have affected

4    the development of non-Hodgkin's lymphoma.

5    In other words, it's possible there wasn't

6    enough time for lymphoma to manifest.  And

7    then another potential bias that has been

8    referenced is surveys that were conducted

9    over time that they might have been

10   incomplete and that several of the

11   participants might not have responded or

12   responded in time.  So data collection

13   might have been adversely affected.  So I

14   think with any study, there's going to be

15   critiques that surface, comments, and

16   potential bias.  And those are some that

17   have been articulated, but to answer your

18   question, I did reference the conclusion in

19   my report.

20        Q.   Okay.  Now let's look here in

21   the methods and they note that glyphosate

22   use was based on information from

23   enrollment from '93 to '97 and then '99 to

24   2005.  And in this, in here, we note the

Michael Scola, M.D.

1  sentence before, "We updated the previous

2  evaluation of glyphosate with cancer

3  incidence through 2012 and 2013."  So some

4  of these we've got up to 20 years of

5  follow-up there, right?

6        A.   Yes.

7        Q.   And would you agree that 20

8  years would be enough time, enough

9  follow-up to see cancer incidence?

10        A.   Well, yes, if that 20 years

11  applied to every participant, but it is

12  likely that many of the participants

13  weren't followed for that long.  But yes,

14  for those that were in the study and able

15  to be analyzed out to 20 years, that would

16  be a sufficient amount of time.  You know,

17  I think, when it comes to cancer in

18  general, the longer the time, because it

19  can often be decades for a malignancy to

20  develop because of that sort of stepwise

21  transformative process and acquisition of

22  mutations that sometimes does take decades.

23        Q.   Okay.  And do you know how --

24  you mentioned that there was some -- that

1    you said there was some issue or you read

2    that there was an issue with the follow-up

3    responses for some of the folks?

4         A.    Yes.

5         Q.    Tell me again what you

6    understood the criticisms from other folks

7    of this study to be.

8         A.    So one of the criticisms that

9    has been mentioned is the inability to

10   fully collect reporting forms from all of

11   the participants.  So not all the

12   participants were able to mail back or

13   report, you know, appropriately.  So there

14   may be a little deficit in the reporting.

15   And numbers have been quoted upwards of a

16   third of applicators failed to respond.  So

17   some of the -- some of the assumptions

18   might be based on limited, limited data.

19        Q.    Okay.  And what was the -- and

20   I notice you're reading.  What are you

21   reading from there?

22        A.    Well, again, I'm looking at

23   Weisenburger and I know I keep going back

24   to this, just because he tends to summarize

Michael Scola, M.D.

 1    things very nicely, so that's where I got

 2    that 37 percent.

 3         Q.   Okay.  But that's not a -- to

 4    understand it, that's not something

 5    you've -- you haven't read that AHS study

 6    to know what they did for follow-up, right?

 7         A.   That's correct, and that's on

 8    the updated AHS publication, which

 9    presumably is what you had up.

10         Q.   All right.  Do you know what

11    study, did you read the original study, the

12    De Roos study?

13         A.   No.

14              MS. NOLAN:  Could you

15         include a link with the exhibits so

16         we could look at the exhibits while

17         we're watching, because sometimes,

18         I think than putting them on the

19         screen, it might be quicker if we

20         can reference them.  I don't know.

21              MR. GRAY:  I'm sorry,

22         say that again.

23              MS. NOLAN:  Did you send

24         a link with the exhibits, because I

Michael Scola, M.D.

```
 1          understand sometimes you're putting

 2          parts of them under this -- on the

 3          screen, but it might be quicker if

 4          we have a link to the studies

 5          that -- if you're going to run

 6          through a bunch of them.

 7                    MR. GRAY:  I think they

 8          all should be ones that he has.

 9          I'll see if I can get someone to

10          pull me a link though.

11                    Okay.  Do you have

12          anything else on the AHS other than

13          what Dr. Weisenburger has said

14          about it?

15                    THE WITNESS:  No.  I

16          think it just illustrates that with

17          all these studies, I mean, how do

18          you account for the discrepancy in

19          conclusion of these various

20          studies?  I think, you know, it

21          boils down to sort of datasets and,

22          you know, the statistical

23          methodological methods that are

24          used and that end up questioning
```

Michael Scola, M.D.

```
1              the validity of the conclusions.
2              And I think that's the power of the
3              meta-analysis is to bring these
4              various disparate studies together
5              in aggregate and try to draw some
6              conclusion.
7   BY MR. GRAY:
8          Q.   And meta-analysis is just sort
9   of a statistical tool, right, where the
10  results from multiple studies are combined
11  together to try to give them a little more
12  power?
13         A.   Yes.  That's right.
14         Q.   And they don't, they don't
15  generate new data?
16         A.    No, they don't generate new
17  data, but it's a powerful tool to take, you
18  know, existing studies, one of which might,
19  might not have all the answers because of a
20  small number of patients or because it's
21  limited to a particular geographical region
22  or a particular subject that was analyzed
23  and try to diversify the study pool while
24  also increasing the number of subjects that
```

Michael Scola, M.D.

1    are studied.  Because at the end of the

2    day, one needs to reconcile these

3    discrepant findings.

4          Q.   Now, meta-analyses, and I think

5    we've kind of talked about this before, but

6    they're also dependent on the quality of

7    the underlying data, right?

8          A.   Sure.

9          Q.   If you put bad data into a

10   meta-analysis, you're going to get

11   unreliable data as a result, right?

12         A.   Yes, absolutely.

13         Q.   And methodological flaws, you

14   know, sort of doom some of the underlying

15   studies, those same methodological flaws

16   are carried into the meta-analysis, right?

17         A.   Potentially, yes.

18         Q.   And so if you use a study with

19   confounded data, it's -- you introduce that

20   same confounded problem just into a larger

21   dataset, right?

22         A.   Potentially, yes.

23         Q.   And is there -- well, let's

24   look at the first meta-analysis you talk

Michael Scola, M.D.

1    about, the Zhang paper.  You've got a copy

2    of that with you, don't you?

3              A.   Yes.

4                        MR. GRAY:  All right.

5              Let's mark Zhang 2019 as

6              Exhibit 10.

7                        - - - - -

8                   (Zhang Article marked Scola

9              Exhibit 10 for identification.)

10                       - - - - -

11                       THE WITNESS:  Yes.

12   BY MR. GRAY:

13             Q.   Okay.  This -- do you recognize

14   this paper that I've got up on the screen?

15             A.   Yes.

16             Q.   Okay.  And this was a

17   meta-analysis of six studies, right?

18             A.   Yes.

19             Q.   It combined one cohort study,

20   the AHS, and then five smaller case-control

21   studies?

22             A.   That's correct.

23             Q.   Those studies were De Roos

24   2003, McDuffie 2001, Eriksson 2008,

Michael Scott, M.D.

1    Hardell, 2002, and Orsi 2009?

2          A.    Yes.

3          Q.    Is that right?

4          A.    Yes.

5          Q.    Okay.  In general, do you think

6    that's an appropriate way to combine

7    results of these studies, to combine

8    case-control studies and cohort studies

9    together?

10         A.    Well, again, I'm not a

11   statistician or biostatistician, so I don't

12   know if my opinion really matters.  But you

13   take the studies that are available and

14   those are the ones that you process as part

15   of your meta-analysis.  So I don't know if

16   it's a, you know, flawed statistical total.

17   It seems like it was done over and over

18   again.

19         Q.    Doctor, I hear you typing.

20   What are you typing into the --

21         A.    Oh, I'm sorry, once in a while,

22   my computer logs out, so I have to put my

23   password in to get the screen back up.

24         Q.    Oh, I understand that.  The

Michael Scotia, M.D.

```
 1   number of times I have to log back in a day

 2   is frightening.

 3         A.   Yeah, if I don't touch it, it

 4   goes black.

 5         Q.   Yeah.  That's fair, but it's

 6   true that those different study types have

 7   different safeguards in place to ensure

 8   they have the appropriate level of

 9   randomness and intentionality in the data

10   pool, right?

11         A.   Yes.

12         Q.   And it sounds like you don't

13   necessarily, obviously, have epidemiology

14   expertise, but we can presume that there is

15   some danger of throwing that ratio, that

16   balance off when you combine the different

17   types of studies, right?

18         A.   Potentially.

19         Q.   Now, we mentioned the

20   underlying case-control studies.  You

21   didn't review those studies, right?

22         A.   No.

23         Q.   And so what this Zhang author

24   set out to do was -- let's actually go here
```

Michael Scott, M.D.

1    to the first page.  Here we go.  I'm on

2    page 188 at Section 2.2, a priori

3    hypothesis.  So their hypothesis, right, is

4    that the highest exposure to glyphosate at

5    high levels for longer duration will lead

6    to an increased risk of NHL; is that right?

7           A.    Yes.

8           Q.    And so to do that, they took

9    the highest exposure group from each of

10   these studies; is that right?

11          A.    Yes.

12          Q.    Now, do you know how the

13   highest exposure groups in the studies were

14   defined?

15          A.    No.

16          Q.    Would it -- does it make a

17   different -- would it make a difference to

18   you if they were, the groups were defined

19   differently?

20          A.    If the groups were defined

21   differently, meaning what?

22          Q.    So we'll say for one, for one

23   study, if the, you know, the highest

24   exposure group was 1,000 days of exposure

Michael Scola, M.D.

```
 1   and for another group, the highest day --
 2   for another study, the highest exposure
 3   group was, say, 10 days exposure, would
 4   that make a difference in how it would
 5   affect the results?
 6          A.   It potentially could.  It could
 7   be a source of bias or confounding, but I
 8   think with these meta-analyses, when you're
 9   talking about different studies, there's
10   often not uniformity in the subgroups and
11   you just try to do the best you can in
12   harmonizing.
13          Q.   Right, but in the scenario I've
14   just proposed to you, that would
15   potentially weed out a large group of
16   people from one study that might have had
17   somewhere between 10 days of exposure and
18   1,000 days of exposure that aren't captured
19   in the cohort, right?
20          A.   It sounds like potentially it
21   could.
22          Q.   Do you know if the Zhang
23   authors were able to control for any
24   confounding data in their study?
```

Michael Scola, M.D.

```
 1          A.   I have no information
 2   suggesting that they were able to or less
 3   able to control for confounding any more or
 4   less than any other meta-analysis.
 5          Q.   Doctor, would it make a
 6   difference in the quality of the Zhang
 7   study if some of the underlying studies
 8   used data that was controlled for other
 9   pesticide exposure and some of the other
10   studies used data that wasn't controlled
11   for pesticide exposures?
12          A.   Yes, but again, this is the
13   power of a meta-analysis is that you hope
14   to neutralize some of those differences by
15   looking at large datasets, larger datasets.
16          Q.   Okay.  So you think that the
17   meta-analysis structure makes up for the
18   fact that some studies used unadjusted data
19   and some studies used adjusted data?
20          A.   I don't know if I would say
21   makes up for it, but may help negate some
22   of the confounding that's introduced by
23   that.
24          Q.   Okay.  But it would potentially
```

Michael Scola, M.D.

1   affect the reliability of the results,

2   right?

3           A.   I mean, yes, it could be a

4   potential source.

5           Q.   Do you have any criticism of

6   the Zhang paper, Doctor?

7           A.   Well, again, you know, I'm not

8   a biostatistician, but I'm sure there have

9   been many criticisms of the Zhang paper,

10  but, you know, I think we live in an

11  imperfect world and if we're going to

12  dismiss every study that has been

13  criticized, there would be no, there would

14  be no datasets, no publications in the

15  literature.  But at the end of the day, we

16  ought to draw conclusions from the best

17  data that we have and the greatest

18  analysis.  I think all these studies were

19  done thankfully and earnestly with the

20  intention of generating solid data.  And

21  none of these studies is perfect, so I

22  think one has to kind of look across the

23  board at all the studies and try to draw

24  some conclusion.

Michael Scola, M.D.

```
1           Q.   Yeah.  And, Doctor, I'm not
2  asking you to discount it or what I'm just
3  trying to get your opinions on it.  And I'm
4  just curious, do you, Dr. Scola, have any
5  criticisms of the Zhang paper?  The answer
6  may very well be no.
7           A.   I don't know if I do, but
8  again, I've not read through it in detail
9  with the intention of finding criticism.
10 So I don't know if I'm in a position to
11 find criticism.
12          Q.   Okay.  So this isn't one that
13 you read in any way great detail?
14          A.   This is not.
15          Q.   And maybe --
16                    MS. NOLAN:  Objection to
17           form.  It's not exactly what he
18           said.  He said with the eye towards
19           criticizing to reviewing --
20 BY MR. GRAY:
21          Q.   Let's ask a more plain
22 question.  Doctor, did you do a detailed
23 review of the Zhang paper?
24          A.   I did not do a detail -- it
```

Michael Scola, M.D.

```
1    depends how you define a detailed review.
2    No, I look at the premise of the study.  I
3    looked at the basic methods of the study
4    and the conclusion.
5         Q.   All right.  So this is not one
6    where you read every word of the study and
7    then you looked at the underlying --
8         A.   No, sir.
9         Q.   -- papers?  Did you read every
10   word of the Weisenburger paper?
11        A.   Did I read every word?  I read
12   through it in detail, yes.  So I read
13   through it from start to finish.
14        Q.   Other than the Weisenburger
15   paper, are there any other studies that you
16   read through in detail?
17        A.   Well, all those that were
18   submitted, I looked through.  I don't know
19   if I've read other, other papers in detail.
20   I mean, I read through bits and pieces of
21   all the articles that were submitted, but I
22   don't know if I can say I read through
23   anything completely from start to finish.
24        Q.   Okay.  So all the papers that
```

Michael Scola, M.D.

1  we listed earlier that you submitted, you

2  would not have read those from beginning to

3  end in detail in order to do any type of

4  analysis of them?

5       A.   Most of them I read, again, the

6  abstract, the study intent, you know, the

7  methods, and then the conclusions for most

8  of the papers that were submitted.  I

9  didn't have any of the case control, I

10  didn't pull any of those.  I read through

11  the meta-analysis that were included in my

12  report, Donato's and Zhang's and then the

13  Weisenburger.

14       Q.   Okay.  For Donato and Zhang,

15  you did what you described just a moment

16  ago and read the abstract and I guess the

17  methods and the conclusion?

18       A.   Correct.

19       Q.   Did you look at the Leon study?

20  It's another meta-analysis of some of the

21  cohort studies that have been done?

22            MS. NOLAN:  Dr. Scola,

23       maybe if you could put your phone

24       on vibrate.

Michael Scola, M.D.

```
1                    THE WITNESS:  Yes.

2                    MS. NOLAN:  And also

3          adjust your tablet, so we can see

4          your face again.  I know sometimes

5          you're looking down, but thank you.

6                    THE WITNESS:  The Leon

7          study, could you give me the title

8          of that study?

9    BY MR. GRAY:

10         Q.   "Pesticide use and risk of

11   non-Hodgkin lymphoid malignancies in

12   agricultural cohorts from France, Norway,

13   and the USA."

14         A.   No, I'm familiar with the

15   study.  I'm familiar with it, but I did not

16   read it.

17         Q.   Okay.  And that's not one we

18   discussed in your report, right?

19         A.   I did not, no.  I did not

20   reference it.

21         Q.   It was in the material that you

22   sent me is why I asked it.  Is there a

23   reason you didn't include that one?

24         A.   I sent you that article, did I?
```

Michael Scott, M.D.

```
 1          Q.   In what I received from your
 2   attorneys, that article was included.
 3                    MS. NOLAN:  I included
 4          everything we sent him, so maybe
 5          it's something that he didn't look
 6          at.  Maybe it was something that I
 7          sent him that was part of what he
 8          wasn't able to look at.
 9                    MR. GRAY:  Okay.
10                    THE WITNESS:  No, I
11          didn't look at it.  I didn't look
12          at it in formulating my report.
13   BY MR. GRAY:
14          Q.   All right.  So there were
15   some -- maybe I misunderstood earlier.  The
16   attorneys did send you some scientific
17   literature as well?
18          A.   Yes, the two that were
19   mentioned earlier.
20          Q.   Okay.  The reason I -- Leon's
21   study wasn't one of those two that was
22   mentioned?
23                    MS. NOLAN:  So what I'm
24          trying to explain happened is I
```

Michael Scola, M.D.

1            probably sent it to him and then

2            maybe it was not part of what was

3            considered and I mean, maybe the

4            email went -- wasn't even opened.

5            Like, so I tried to include

6            everything and maybe I didn't

7            realize that.

8   BY MR. GRAY:

9            Q.   No, I'm with you.  I just want

10  to understand what he got and what he

11  looked at and what he's relying on.  It

12  sounds like the Leon study is not one of

13  those?

14           A.   It was not in the formulation

15  of my report.

16           Q.   Okay.  Well, we won't worry

17  about that one then.  Okay.  The next

18  meta-analysis that you mention in your

19  report is the Kabat study.

20           A.   Yes.

21           Q.   Do you have that paper there?

22           A.   Yes, I do.

23           Q.   Madam Court Reporter, Kabat is

24  spelled K-A-B-A-T.  Now, as you note in

Michael Scola, M.D.

1  your report, this was a further analysis of

2  the Zhang meta-analysis, right?

3      A.   Yes.

4      Q.   And here if we look at Table 1,

5  Table 1 that's on page -- they don't have

6  page numbers, sorry.  Do you see that

7  table?

8      A.   Yes, I have it in front of me,

9  yeah.

10     Q.   And here's the studies that it

11  included, right?

12     A.   Yes.

13     Q.   We have some of the

14  case-control studies, Andreotti,

15  Eriksson -- or Eriksson, Hardell, and Orsi

16  and then it includes Andreotti, which is

17  the AHS, right?

18     A.   Uh-huh.

19     Q.   And then it includes the Pahwa

20  study, that's the North American pooled

21  project.  Are you familiar with that one?

22     A.   Yes.

23     Q.   And that's a pooled analysis of

24  the North American case-control studies,

Michael Scott, M.D.

```
1    right?

2           A.    Yes.

3           Q.    Okay.  And the Zhang paper

4    didn't use the Pahwa data, correct?

5           A.    Correct.

6           Q.    So this has got, Kabat has got

7    some updated, some updated data from the

8    time that Zhang was done; is that fair to

9    say?

10          A.    Yes.

11          Q.    And then let's look at what

12   they found.  It says here "In our

13   meta-analysis of ever-exposure with no lag

14   period, the summary relative risk with

15   updated estimates was 1.05, 95 percent

16   confidence interval of .87 to 1.28."  Did I

17   read that correctly?

18          A.    Yes.

19          Q.    Now, did you read this Kabat

20   paper?

21          A.    I did.

22          Q.    And so you're aware that the

23   Kabat authors wanted to do this study

24   because there was some questions regarding
```

Michael Scott, M.D.

1    the risk estimates that were included in

2    the Zhang paper, right?

3         A.    Yes.

4         Q.    If we look here at the bottom

5    of, end of page 1, the very last sentence

6    starts "The selection of risk estimates

7    from the six studies included in that

8    meta-analysis is open to question on a

9    number of grounds."  The first was

10   "inconsistent definitions of exposure

11   across the studies, two, evidence of bias

12   in case-control studies, three, uncertainty

13   about the latency period for NHL; and four,

14   selection of highest available estimates

15   from the AHS, and from a pooled analysis of

16   the U.S. case-control studies."  Did I read

17   that correctly?

18        A.    Yes.

19        Q.    So this was in essence a bit of

20   a critique of the Zhang study, right?

21        A.    Yeah, well, correction, yes.

22        Q.    We should back up and note what

23   you note about the Kabat study in your

24   report is simply that it confirms the

Michael Scola, M.S.

```
 1   relative risk number from the highest
 2   exposure, longest lag group from the Zhang
 3   study, right?
 4        A.   Yes.
 5        Q.   Was there a reason that you
 6   didn't note these questions that were being
 7   raised by the Kabat authors?
 8        A.   For brevity.
 9        Q.   Don't you think that's an
10   important discussion point when evaluating
11   these studies is questions that are being
12   raised about them?
13        A.   Yes.  I think they're relevant
14   questions.
15        Q.   And we've noted that while the
16   Zhang authors did an estimate or an
17   analysis based only on the highest days or
18   the highest exposure groups, the Kabat
19   authors here did an ever/never analysis
20   too, right?
21        A.   Yes.
22        Q.   And the ever/never analysis
23   showed no association?
24        A.   That's correct.
```

Michael Scola, M.D.

```
 1          Q.   They also did some sensitivity
 2   analysis, right?  Do you recall that about
 3   the study, Doctor?
 4          A.   Can you point out what you're
 5   making reference to?
 6          Q.   Here.  I'll show you right
 7   here.
 8          A.   Ah, yes, okay.
 9          Q.   And when they did the
10   sensitivity analysis and they excluded one
11   study at a time, they found a range of
12   relative risk estimates that ranged from 1
13   to 1.9 with none of them being
14   statistically significant, right?
15          A.   Uh-huh.
16          Q.   And then if we look here when
17   they substituted the relative risk of
18   ever/never exposure in the highest group
19   from the AHS for the 20-year lag number,
20   they also found a non-statistically
21   significant result, right?
22          A.   Uh-huh, yes.
23                    THE STENOGRAPHER:  Are
24        you saying never ever or ever ever?
```

Michael Scofie, M.B.

```
1                    MR. GRAY:  Ever never.

2                    THE STENOGRAPHER:  Ever

3         never, okay.

4    BY MR. GRAY:

5         Q.   So basically what the Kabat

6    authors found is the relative risk estimate

7    from Zhang was dependent on using those

8    20-year lag numbers from the AHS; is that

9    fair?

10        A.   That's fair.

11        Q.   Now, if we head to the

12   discussion section, the Kabat authors note

13   that the use of that 20-year lag number is

14   based on a flawed premise, right?

15                   MS. NOLAN:  Objection to

16        the form.

17   BY MR. GRAY:

18        Q.   Do you recall that about this

19   paper, Doctor?

20        A.   Can you show me where you're

21   at?

22        Q.   Sure.  Let's -- I wish there

23   were page numbers here.  Page 4, this

24   paragraph here that starts "we found the
```

Michael Scola, M.D.

1    strength of evidence"?

2         A.   Yes, got it.

3         Q.   I know this is in the

4    discussion section, but would this have

5    been something that you reviewed in this

6    paper?

7         A.   I highlighted it, so I must

8    have reviewed it.

9         Q.   Okay.  And so we've got, I'll

10   just, I'll read this section to you that

11   you highlighted, it says, "In order to

12   support their use of the 20-year lag

13   estimate from the AHS in their

14   meta-analysis, Zhang, et al. cited a claim

15   by Weisenburger that median latency periods

16   could be 15 to 20 years of NHL.  The

17   Weisenburger estimate was not based on NHL

18   data, however, but rather was a hypothesis

19   based on an early estimate of the latency

20   period for acute leukemia after exposure to

21   benzene.  Evidence that NHL risk is

22   associated with benzene exposure remains

23   limited.  Furthermore, a recent study

24   indicates that the latency period for acute

Michael Scoria, M.D.

1    leukemia after benzene exposure is ten

2    years or less, and a recent review

3    concluded that estimates of latency periods

4    from lymphoma range from two to ten years."

5    Do you see that?

6         A.   Yes.

7         Q.   And leukemia is a different

8    disease than NHL, right?

9         A.   Yes.

10        Q.   And so using latency estimates

11   for leukemia wouldn't be an accurate

12   measure for setting the signs of NHL, would

13   it?

14        A.   Not necessarily.

15        Q.   And here they go on to note

16   that "Recent studies have shown the latency

17   period from lymphoma range from two to ten

18   years."  Do you see that?

19        A.   Yes.

20        Q.   Do you have any reason to

21   disagree with that?

22        A.   I don't, but I've seen

23   conflicting data, some suggesting shorter

24   and others suggesting longer latency

Michael Scole, M.D.

```
 1   periods.

 2        Q.   But either way, it would

 3   suggest that using -- excluding latency

 4   periods less than 20 years doesn't really

 5   match up with the current science on NHL;

 6   is that fair?

 7        A.   Well, yeah, I don't know how

 8   current it is, because the reference that

 9   he identifies was published in 2014, so.

10        Q.   You said that he identifies,

11   who do you mean?

12        A.   The author, he or she, I

13   apologize.

14        Q.   Oh, Kabat?

15        A.   Yeah, Kabat.

16        Q.   Okay.

17        A.   Reference 24.

18        Q.   Well, you said you've seen

19   shorter, references to shorter latency

20   periods too, right?

21        A.   Shorter, yes.

22        Q.   So what I'm saying, based on

23   what you know of the latency of NHL,

24   excluding latency or excluding data based
```

Michael Scott, M.D.

1    on latency periods less than 20 years would

2    be excluding relevant data, right?

3         A.    Potentially.

4         Q.    Okay.  And then let's go back

5    up to page 3.  And here the Zhang -- or the

6    Kabat authors note that there was an

7    additional analysis of the underlying

8    studies included in the Zhang meta-analysis

9    in an effort to understand the role of

10   bias, right?

11                  MS. NOLAN:  Can you

12         maybe refer him to where you are,

13         because you have gone all over the

14         place.

15   BY MR. GRAY:

16        Q.    Do you see that there at the

17   bottom of page 3?

18        A.    Yes.

19        Q.    And this is, so they wanted to

20   determine whether bias was an issue in the

21   underlying studies?

22        A.    Yes.

23        Q.    All right.  If we skip down

24   just a bit here, I'll read this, it says

Michael Scola, M.D.

```
 1    "Crump concluded, this article provides

 2    evidence that at least four of the five

 3    case-control studies of glyphosate exposure

 4    and NHL are contaminated by statistical

 5    bias, likely stemming in the main from

 6    recall bias, exacerbated by selection bias

 7    in two of the studies.  Crump's analysis

 8    indicated that the case-control studies by

 9    Hardell and Eriksson, which contributed the

10    highest odds ratio estimates, might be

11    particularly subject to bias."  Did I read

12    that correctly, Doctor?

13         A.   Yes.  Yes, you did.

14         Q.   And so if Mr. Crump who wrote

15    that paper was right, that would mean the

16    case-control studies are not particularly

17    reliable measures of the association or of

18    any possible association, right?

19                   MS. NOLAN:  Object to

20         form.

21                   THE WITNESS:  Well, in

22         this one investigator's opinion.

23    BY MR. GRAY:

24         Q.   Okay.  But you've told me that
```

Michael Scola, M.D.

1  all these investigators are doing their

2  best and have no reason to not give

3  accurate and good data, right?

4      A.   Well, yes, that's true.  And at

5  the end of the day, that's why the

6  meta-analyses are done, to try to as best

7  as possible to aggregate the data and

8  lessen some of the influence of bias.

9      Q.   At the very least, it would

10  suggest that the AHS should be more of a

11  driving force in understanding the human

12  data on glyphosate; is that fair?

13      A.   Well, the bias has been raised

14  regarding the AHS study, as we previously

15  alluded to.

16      Q.   You know, it's interesting,

17  Doctor, when you told me about the bias

18  that Dr. Weisenburger noted in the AHS, and

19  you seem to just accept that as fact and

20  you're kind of fighting me on this bias

21  that this paper acknowledges in the

22  case-control studies.  Why is that?

23      A.   Well, no, I think --

24              MS. NOLAN:  Objection.

1           That's a mischaracterization of his

2           responses.  Object.

3                   THE WITNESS:  I feel

4           that all of studies have the

5           potential for bias.  And I think

6           the points that are raised by the

7           various authors, there's no reason

8           for me refute them, I think they

9           are relevant points.  But I think

10          we have to give, we have to

11          acknowledge all the biases that are

12          raised.  I think with any study,

13          with any study, there's going to be

14          editorials and comments and

15          critiques and authors are going to

16          raise, raise concerns.  Hopefully,

17          we, in a perfect world, we want

18          every study to minimize bias and to

19          be well designed, but when you're

20          dealing with something as

21          challenging as exposure, exposure

22          history over many, many years, I

23          think that's very difficult to do.

24

Michael Scott, M.D.

1    BY MR. GRAY:

2         Q.   Okay.  But as I understand it,

3    you have no reason to doubt what the Kabat

4    authors and the Crump author are saying

5    about the bias in the case-control studies?

6         A.   I do.  And I also point out his

7    conclusion about the relative risk for the

8    longest, longest exposure, those -- the

9    cohorts with the largest exposure.

10        Q.   Doctor, is that in response to

11   what question?

12        A.   Well, no --

13        Q.   I asked you about the bias, the

14   discussion of bias in the case-control

15   studies, right?

16        A.   Yes.

17              MS. NOLAN:  And he

18          answered your question that you

19          asked.

20              MR. GRAY:  So he's not

21          answering a question that I asked,

22          are you, Doctor?

23              THE WITNESS:  No, I do

24          acknowledge the bias that was

Michael Scorie, M.D.

1              pointed out.  I do acknowledge

2              that.

3    BY MR. GRAY:

4         Q.   Okay.  Well, you can put that

5    away.  I want to move to a different

6    document.

7         A.   Right, and I'm simply

8    highlighting --

9         Q.   Doctor, again, you're not

10   answering, you're not responding to a

11   question.  If your counsel wants to ask you

12   about something, she can.

13        A.   Okay.

14        Q.   Doctor, are you aware that the

15   EPA -- oh, I'm sorry.

16        A.   I'm good.

17        Q.   Are you aware that EPA also did

18   a reanalysis of the Zhang paper?

19        A.   Yes.

20        Q.   You did see that?

21        A.   I did.  Yes, I did.

22        Q.   Okay.  Is that something that

23   you're relying upon?

24        A.   No, it's not one of the

Michael Scola, M.S.

1    principal documents I'm relying upon.

2         Q.   Okay.  Did you review the EPA's

3    analysis of the Zhang paper?

4         A.   I don't believe I reviewed it.

5    I may have looked at it, but without

6    printing it.

7         Q.   So, again, is there a reason

8    that you chose not to look at what the EPA

9    had to say about this?

10        A.   No.  And, again, I do reference

11   the EPA's comments in my report.

12        Q.   Can you -- do you know where in

13   your report you reference the EPA's

14   comments about the Zhang paper?

15        A.   No, I did not reference that

16   particular aspect of it.

17        Q.   Okay.  So you talked about the

18   Zhang paper and then you talked about the

19   Kabat paper -- well, part of the Kabat

20   paper.  You noted simply that Kabat

21   confirmed the relative risk from the

22   highest exposure group.  You didn't discuss

23   any of the questions or critiques that the

24   Kabat paper raised about the Zhang paper;

Michael Scola, M.D.

```
1    is that fair?

2           A.   That's fair.

3           Q.   And then you apparently looked

4    at or were aware of the EPA's analysis of

5    the Zhang paper, but you chose not to read

6    or consider that?

7           A.   I don't know if I consciously

8    chose not to --

9                     MS. NOLAN:  Object to

10           form.

11                    MR. GRAY:  I'm sorry,

12           could you repeat your answer?

13                    THE WITNESS:  I don't

14           know if I consciously chose not to

15           include it.

16    BY MR. GRAY:

17           Q.   What does that mean?

18           A.   That means you asked if I came

19    across the paper and I think I may have

20    come across the paper, but I didn't

21    consciously choose to exclude it.

22           Q.   Okay.  It's, I mean, Doctor,

23    it's curious to me that, again, here's a --

24    well, we'll look at the paper in a second,
```

Michael Scola, M.D.

1  but it's information that sort of disputes

2  the conclusion that you're ultimately

3  reaching and you didn't read it or even

4  mention it in your paper.

5       A.   But in all fairness, there are

6  a lot of critiques out there and it's not

7  feasible to corporate all the critiques in

8  this paper.  It plain and simply isn't.  So

9  I tried to focus on the primary

10  meta-analysis and highlight the consistency

11  of the conclusion of the meta-analysis.

12  The purpose wasn't necessarily to look at

13  the various commentaries, many of which

14  were critiques.  That wasn't, that wasn't

15  my intent.

16       Q.   Well, that's fair.  You note

17  that there are various and many critiques.

18  I understand you can't include them all in

19  this.  I'm curious why not a single one

20  made it into your report.

21       A.   That wasn't the purpose of this

22  report.  It really was just to highlight

23  the data supporting, supporting an

24  association between --

Michael Scola, M.D.

1          Q.    Maybe that's, maybe that's

2    my -- was your understanding of your job

3    was only to showcase the data that says

4    there was an association?

5          A.    Yes.

6                    MS. NOLAN:  Object to

7            form.

8                    THE WITNESS:  I wasn't

9            charged with writing a

10           comprehensive historical review of

11           glyphosate and malignancy.  That's

12           not what I was charged with doing.

13           So I highlighted the most relevant

14           data.  Those that generated the

15           critiques and the commentaries.

16   BY MR. GRAY:

17         Q.    Doctor, do you think it is

18   not -- analysis of this -- I mean, analysis

19   of the data that you presented, you don't

20   think that analysis is relevant?

21         A.    Well, it's not that it's not

22   relevant, but I think this report would

23   become excessive and burdensome.  Now, I

24   did include many of the articles that we

Michael Scola, M.D.

1    referenced earlier, many of the reports,

2    the regulatory agency reports.  And --

3            Q.   What regulatory agency reports

4    did you include here, Doctor?

5            A.   The EPA report.

6            Q.   Did you include the EPA report

7    somewhere?  It wasn't in your materials.

8    You know what, let's actually strike that

9    question.

10               Let me ask you this, Doctor.

11   If you were writing a scientific paper, and

12   you had a hypothesis and you did, you know,

13   experiments or data or generated data to

14   support your hypothesis and then there were

15   a myriad of other publications or other

16   data that was counter to what your

17   hypothesis was, would you not include any

18   of that in your scientific paper?

19               MS. NOLAN:  Objection to

20          form.  Several compound questions

21          there in one question, variables

22          included.

23               MR. GRAY:  If you don't

24          understand, I'm happy to repeat it

Michael Scola, M.D.

```
 1              if you need me to.
 2                   THE WITNESS:  Sure.  No,
 3              I understand.  Simply, I didn't
 4              have the time or ability to do that
 5              degree of a comprehensive report.
 6              So what I, what I focused, again,
 7              was the primary publications, which
 8              includes some of the salient
 9              meta-analysis and some of the
10              larger studies.  Again, kind of
11              focusing on more of the
12              contemporary studies and I do
13              mention the meta-analysis.  But I
14              do mention the AHS study, as well
15              as the EPA study, both of which
16              were negative to give some
17              historical background.  But I,
18              plain and simply, could not
19              include, make it more comprehensive
20              and include critiques or the
21              various articles that support some
22              of the conclusions of the
23              meta-analysis.
24
```

Michael Scola, M.D.

1    BY MR. GRAY:

2        Q.   Well, Doctor, it's not that you

3    didn't include them, based on what you're

4    telling me, you didn't even review them.

5                    MS. NOLAN:  Objection to

6            the form.  Mischaracterizes his

7            testimony.

8                    THE WITNESS:  I looked

9            at a lot of -- I looked at a lot of

10           stuff, but in terms of the

11           documents that were used to

12           formulate my paper, those that I

13           reviewed in greater detail, I did

14           not include those.

15   BY MR. GRAY:

16       Q.   Let's, I'm going to pull up

17   what we'll mark as Exhibit 11, Clare, and I

18   apologize, I thought this was in his stuff,

19   but it's not.

20                    - - - - -

21           (Memorandum dated 1/6/2020

22           marked Scola Exhibit 11 for

23           identification.)

24                    - - - - -

```
 1                    MS. NOLAN:  Is this the

 2         Andreotti?

 3                    MR. GRAY:  No, the

 4         Andreotti is the AHS study.  So

 5         he's got that.

 6    BY MR. GRAY:

 7         Q.   Have you seen this document

 8    before, Doctor?

 9         A.   I don't believe I have.

10         Q.   And this is -- I know we talked

11    about you wanted to review contemporary

12    literature.  This is from January 6, 2020.

13    Do you see that?

14         A.   Yes.

15         Q.   And this is the epidemiology

16    review of Zhang, et al. 2019 and Leon, et

17    al. 2019 publications for response to

18    comments on the proposed interim decision.

19    Do you see that?

20         A.   Yes.

21         Q.   And this document is from David

22    J. Miller, the acting chief of the EPA

23    toxicology and epidemiology branch; is that

24    correct?
```

Michael Scola, M.D.

1        A.    Yes.

2        Q.    And this is something you never

3    have seen or considered as part of your

4    opinion?

5        A.    I don't believe I have.

6        Q.    Okay.  And this is a long paper

7    and I know you don't have a copy, so we

8    won't systematically walk through

9    everything that the EPA had to say about

10   Zhang, but I wanted to show you a few

11   things.  Let's look at page 6.  Okay.  Why

12   don't you take a second to read this

13   highlighted portion, which begins at the

14   first full paragraph on page 6 of this

15   document.  I'll give you a second to read

16   it.

17              So is it fair to say that the

18   EPA's position was that the hypothesis that

19   was a premise of the Zhang authors'

20   decision to use the high exposure numbers

21   was essentially flawed from the start?

22       A.    That's the conclusion of the

23   author.

24       Q.    Well, and this is the chief of

Michael Scott, M.D.

1    the toxicology and epidemiology branch of

2    the EPA, right?

3         A.   Yes.

4         Q.   And if we look at here on

5    page 7, and I'll read this here, they say,

6    "It seems apparent --" well, let's back up.

7    So they show, this is Table 3 from the

8    Andreotti study near the top of the paper,

9    right?  Or no, where we see copied from

10   page 514 of Andreotti, so this is data

11   straight from the AHS?

12        A.   Okay.

13        Q.   And the EPA notes that "It

14   seems apparent from the above expert,

15   however, that, one, there's no discussion

16   of a trend toward higher relative risk at

17   higher exposures, P trend, .62 with the Q4

18   value in fact being the only third highest

19   of the four quartile value, (i.e., one up

20   from the bottom); two, none of the relative

21   risks associated with any of the quartiles

22   is significant or appear to come close to

23   it; and three, all the relative risks seem

24   roughly similar at the null equal to one.

Michael Scott, M.D.

1    Given that, it doesn't appear that

2    extracting only the Q4 value from the

3    relative risks here and choosing to move

4    forward only with that selection is

5    necessarily well-supported or justified,

6    particularly since this considerably lowers

7    the sample size (by about twofold for this

8    20-year leg and eight-fold compared to an

9    ever/never analysis).  This is of

10   particular importance because Andreotti et

11   al. (2018) as a prospective cohort study

12   that is the highest-quality of all the

13   studies selected for the meta-analysis."

14   Did I read that correctly?

15        A.   Yes.

16        Q.   And so there was no

17   justification for them to use only that

18   high exposure number, right?

19        A.   Yes.

20        Q.   And not only did they use a

21   number that they didn't need to use, but it

22   compounded things by excluding a large

23   portion of the sample size from the

24   strongest study that we have, right?

Michael Scola, M.D.

```
 1                      MS. NOLAN:  Objection to
 2           the form and the characterization.
 3                      MR. GRAY:  You can
 4           answer, Doctor.
 5                      THE WITNESS:  Yes.
 6  BY MR. GRAY:
 7           Q.   And in nontechnical speak, the
 8  EPA is essentially saying they feel like
 9  the Zhang study, the Zhang authors
10  cherrypicked which risk ratios to use; is
11  that fair?
12           A.   That's fair.  I think we
13  already questioned some of the reporting of
14  exposure data from the Andreotti analysis
15  and so the way they determine exposure
16  history may be questionable because of
17  impaired or flawed or limited reporting.
18           Q.   Okay.  We'll move on from this
19  document.  And the last study that you
20  mentioned that we'll look at briefly is the
21  Donato study.  That's one that you
22  reviewed, right?
23           A.   Yes.
24           Q.   We'll mark this as Exhibit 12,
```

Michael Scola, M.D.

```
1    if I can get it up on the screen.  Do you

2    have a copy there with you?

3              A.    I do.

4                        - - - - -

5              (Donato Article marked Scola

6           Exhibit 12 for identification.)

7                        - - - - -

8    BY MR. GRAY:

9              Q.    Okay.  That will make this a

10   little easier. All right.  Why don't we,

11   all right.  Can you see this here, Doctor,

12   I'm on page 67?

13             A.    Okay.

14             Q.    And this shows the studies that

15   it included so again we've got McDuffie,

16   Hardell, De Roos, Eriksson, Orsi, Cocco,

17   and the Leon study?

18             A.    Yes.

19             Q.    And the Leon study is, this is

20   the only meta-analysis to include the Leon

21   study, right?

22             A.    Yes.

23             Q.    And so the Leon study, I think

24   we've established, that included the AHS
```

Michael Scofield, M.D.

```
 1   data, right?

 2        A.   Yes.

 3             MS. NOLAN:  I think we

 4        didn't discuss the Leon study,

 5        because he said that he had not

 6        reviewed it.

 7             MR. GRAY:  Oh, right.

 8        Right.

 9             MS. NOLAN:  So you

10        didn't go into the questioning on

11        the Leon study at all.

12             MR. GRAY:  Right, I

13        apologize, Doctor.

14             THE WITNESS:  But I am

15        familiar with it.

16   BY MR. GRAY:

17        Q.   Okay.  You are familiar with

18   it, and you see here in this study

19   population tab, it says pooled analysis of

20   three cohort studies of pesticide

21   applicators AGRICAN, CNAP, and AHS?

22        A.   Yes.

23        Q.   Okay.  Let's see if I can get

24   us back to the front.  And I believe, as
```

Michael Scott, M.D.

1    you note in your report, the ultimate

2    finding from this study is that the

3    relative risk of NHL was 1.03 with a

4    confidence interval of .86 to 1.21, which

5    is not statistically significant?

6         A.   Right.

7         Q.   And if we look -- can you see

8    this, or do you need me to make it a little

9    bigger?

10        A.   I see it.

11        Q.   Okay.  And their overall

12   conclusion was, right, was that "This

13   meta-analysis provided no overall evidence

14   of an increased risk for both NHL and

15   multiple myeloma in subjects exposed to

16   glyphosate."

17        A.   Yes.

18        Q.   And like the Zhang study, they

19   also did a meta relative risk for the

20   highest category of exposure and they got

21   1.49 with a confidence interval of .37 to

22   2.61, which is not statistically

23   significant, right?

24        A.   Yes.

Michael Scale, M.D.

```
1          Q.   They also broke down the
2    results by NHL subtype and got
3    non-statistically significant meta relative
4    risk results for DLBCL and follicular,
5    right?
6          A.   Right.
7          Q.   Now, in your report, I believe
8    you noted, in secondary analyses, "They
9    detected a small increase in risk for the
10   category with highest level exposure as
11   well as for diffuse large B-cell lymphoma."
12   That's what you noted from this study?
13         A.   That is.
14         Q.   But if we turn over to page 71.
15   Let me know when you're there.
16         A.   Yes.
17         Q.   They note here in the first
18   paragraph "The secondary analysis of risk
19   subtypes of NHL, based on three studies,
20   showed no increased risk of follicular
21   lymphoma or CLL/SLL, while a small,
22   nonsignificant, increase was suggested for
23   DLBCL."  Did I read that correctly?
24         A.   Yes.
```

Michael Scola, M.D.

1          Q.   So that small increased risk

2    that you noted was actually not

3    statistically significant, correct?

4          A.   That's correct.

5          Q.   And non-statistically

6    significant risk or not something we

7    usually use as evidence of causation,

8    right?

9                     MS. NOLAN:   Objection to

10          form.

11                     THE WITNESS:   Well,

12          again, if you have a premise, even

13          if it's not statistically

14          significant, if it's trending

15          towards significant, I don't think

16          it could be summarily dismissed.

17          Otherwise, it wouldn't have been

18          mentioned in the conclusion.

19    BY MR. GRAY:

20          Q.   Well, do you think they

21    mentioned it just so that they, you know,

22    provided the things that supported their

23    conclusion as well the things that went

24    against their conclusion?

Michael Scoria, M.D.

```
 1                    MS. NOLAN:  Objection to
 2           form.
 3                    THE WITNESS:  Well, no,
 4           I think the goal of the authors is
 5           to report the data and if you have
 6           something that's trending towards
 7           statistical significance, even if
 8           it hasn't achieved that, that that
 9           might be relevant to the reader.
10           If for a larger sample size or so,
11           it perhaps could have crossed the
12           threshold to statistical
13           significance and that's why it was
14           reported.
15  BY MR. GRAY:
16           Q.   Let's look at the conclusion
17  here.  It says "In conclusion, we found no
18  consistent indication of an association
19  between exposure to glyphosate and risk of
20  NHL or MM," which is multiple myeloma,
21  correct?
22           A.   Yes.
23           Q.   "Even of the data for the
24  latter neoplasm are limited.  The
```

Michael Scola, M.D.

1   suggestion of an association between

2   glyphosate exposure and risk of NHL came

3   from small studies that suffered from

4   publication and possibly other forms of

5   bias; better-designed studies that were

6   recently reported did not confirm the

7   results of the earlier studies.  The weak

8   association with risk of DLBCL reported by

9   Leon et al. deserves replication."  Did I

10  read that correctly?

11       A.   Yes.

12       Q.   So the authors are saying they

13  found no association and the

14  non-statistically significant association

15  from Leon should be reexamined?

16       A.   Yes.

17       Q.   Okay.  We can put that one

18  away.  Doctor, is there anything that we

19  haven't covered today that you're relying

20  on in support of your opinions?

21       A.   No, I think, I think it has

22  been a very comprehensive review.

23       Q.   And looking at the end of your

24  report, I'm on the very last page, do you

Michael Scola, M.D.

1    have that handy?

2         A.   Yes.

3         Q.   And I'll start in the middle of

4    that last paragraph where you say "Although

5    it is difficult to establish a link between

6    glyphosate exposure and cancer in general,

7    there are more compelling data suggesting a

8    causal relationship with NHL, particularly

9    with more substantial exposure and with

10   higher grade variants of NHL.  Mr. Koen

11   reported a rather extensive glyphosate

12   exposure, and he continues to receive care

13   for his aggressive high grade, diffuse

14   large B-cell NHL.  Based on this and my

15   interpretation of the prevailing

16   literature, it is possible that glyphosate

17   exposure contributed to his NHL."  Did I

18   read that correctly?

19        A.   Yes.

20        Q.   And so as I'm -- is it your

21   opinion that there are only a risk of -- or

22   that the possible risk of NHL from

23   glyphosate exposure only occurs at levels

24   of high exposure?

1          A.    You know, based on my digestion

2     of the literature, there seems to be some

3     correlation between the development of

4     diffuse large B-cell lymphoma and exposure

5     history.  So I think that's a reasonable

6     conclusion that there is a correlation with

7     overall exposure history.

8          Q.    Is there a point that you can

9     identify which there becomes a risk?

10         A.    No, I don't know if that's

11    possible for anybody.  And the threshold

12    for one individual wouldn't apply to the

13    individual -- to another individual.

14    Because, you know, it's more complicated

15    than just that, just exposure history.

16         Q.    When you say it's more

17    complicated than that, what do you mean?

18         A.    Well, I think we have, we have

19    to conclude that there are patient- or

20    individual-specific variables that

21    interplay with exposure history.  And we

22    talked about some of them today.  There's

23    personal susceptibility issues, genetic

24    susceptibility, resistance, immunologic

Michael Scola, M.D.

```
 1   issues.

 2        Q.   Right, but those are things

 3   that you didn't get to evaluate for Mr.

 4   Koen, right?

 5        A.   Yeah, I'm not sure there's any

 6   way to really quantify them anyway.  You

 7   can't just plug these variables into a, you

 8   know, a mathematical model and generate a

 9   score, unfortunately.

10        Q.   Right, but Doctor, I'm asking a

11   different question.  Whether there's a

12   model or not, you did not actually consider

13   those things regardless, right?

14              MS. NOLAN:  Objection to

15         form.

16              THE WITNESS:  I didn't

17         and there would be no way to

18         consider them.  There would be no

19         way to interpret those variables

20         and determine with any degree of

21         certainty how it, how it shades

22         exposure risk.

23   BY MR. GRAY:

24        Q.   Doctor, do you think a single
```

Michael Scola, M.D.

1    exposure to Roundup would -- could

2    potentially cause or contribute to

3    someone's non-Hodgkin's lymphoma?

4         A.   I doubt that, because if that

5    association were true, for the majority of

6    individuals, I think there would be

7    convincing evidence of it and a strong

8    association at this point.  And, you know,

9    when you think about other potential

10   toxins, potential other mutagenic agents, I

11   don't know if there's a single example

12   where solitary exposure could engender the

13   disease.

14        Q.   And how does, you know, I think

15   you noted that for some people, there's

16   just a healthy dose of bad luck, I believe,

17   is how you described it in referring to the

18   cause of their NHL; is that fair?

19        A.   Yes.

20                  MS. NOLAN:  Objection to

21        the form.

22   BY MR. GRAY:

23        Q.   And did you weigh the

24   possibility a healthy dose of bad luck as a

Michael Scola, M.D.

```
 1   risk factor for Mr. Koen?

 2                   MS. NOLAN:  Objection to

 3           form.

 4                   THE WITNESS:  Well, at

 5           the end of the day, if you have ten

 6           people that have exactly the same

 7           exposure history to multiple

 8           variables and one of them comes

 9           down with a malignancy, in this

10           case, diffuse large B-cell

11           lymphoma, and the other nine don't,

12           clearly there's biological

13           interaction that took place that we

14           can't clearly identify.  And so

15           whether it's luck or whether it's

16           something that we just don't have a

17           way to measure, or identify, or

18           label, you know, is unknown.

19   BY MR. GRAY:

20       Q.   Doctor, I apologize, I don't

21   know that I was following you.  So I'll try

22   my question again.  Did you consider what

23   you noted as a healthy dose of bad luck in

24   determining the odds or risks of Mr. Koen
```

Michael Scofe, M.D.

1    developing cancer, developing NHL?

2                        MS. NOLAN:  Objection.

3           Asked and answered.  Objection to

4           form.

5                        THE WITNESS:  Again, I

6           would say you can have several

7           individuals with similar exposure

8           history and why one or a few of the

9           individuals come down with

10          non-Hodgkin's lymphoma and the rest

11          don't, you can describe that as

12          luck, which may just be a way of

13          saying we don't know what it is

14          about the individuals that came

15          down with the disease that the

16          individuals didn't come down with

17          the disease don't have.  We are

18          just not able to quantify it or

19          identify what those specific

20          variables are.  Individuals with a

21          similar exposure history, you know.

22   BY MR. GRAY:

23          Q.   Doctor, I'm talking very

24   specifically about Mr. Koen.  Let me ask

Michael Scola, M.D.

1    you this.  You told me earlier that for the

2    majority of your patients and for most

3    people, the cause of their NHL is, you

4    know, a sporadic mutation, right?

5         A.   Yes.

6         Q.   So wouldn't the most likely

7    cause of Mr. Koen's NHL be a sporadic

8    mutation?

9              MS. NOLAN:  Objection to

10         form.

11              THE WITNESS:  Well,

12         again, there's no one specific

13         mutation, but a series of

14         mutations.  But if you're asking is

15         it possible that his lymphoma was

16         purely sporadic and if he spent his

17         life in a bubble and would he still

18         have come down with diffuse large

19         B-cell lymphoma, the answer has to

20         be yes.

21    BY MR. GRAY:

22         Q.   Doctor, what medical journals

23    do you read?

24         A.   Well, regularly, Blood, which

Michael Scolie, M.D.

1    is -- are you familiar with Blood?

2         Q.   Yeah, I am.  It's just such a

3    funny name to me, a magazine being called

4    Blood, but yeah.

5         A.   Yeah.  Blood, JCO, Journal of

6    Clinical Oncology, and New England Journal,

7    and a variety of, you know, miscellaneous,

8    maybe less important journals.

9         Q.   And none of those journals have

10   ever stated that glyphosate or Roundup is a

11   possible cause of non-Hodgkin's lymphoma,

12   have they?

13        A.   I don't know if there's been an

14   article dedicated primarily to that topic.

15   I don't believe so.

16        Q.   Okay.  So the answer to that

17   question is no?

18        A.   To the best of my knowledge.

19                  MS. NOLAN:  Objection.

20        Asked and answered.

21   BY MR. GRAY:

22        Q.   I'm sorry, say that one more

23   time, Doctor.

24        A.   To the best of my knowledge,

1    there has not been a primary article

2    reviewing this topic.

3          Q.   Do you recall any type of

4    article about this?

5          A.   Well, there are articles about

6    lymphogenesis, the genesis of lymphoma and

7    about lymphoma in general, where they may

8    talk about, you know, variables that

9    contribute to the development and might

10   mention, you know, the agricultural history

11   exposure to toxins, chemicals, pesticides,

12   herbicides, but I don't believe there has

13   been a dedicated article specifically

14   correlating glyphosate and lymphoma.

15         Q.   And I understand what you're

16   saying.  I'm asking a very, very specific

17   question, Doctor.  As you sit here today,

18   can you think of one article that you have

19   read in any medical journal where -- that

20   has said that exposure to glyphosate or

21   Roundup is a possible cause of

22   non-Hodgkin's lymphoma?

23         A.   Other than the journals that we

24   referenced today?

Michael Scolia, M.D.

```
 1          Q.   I'm talking about the medical
 2   journals that you described --
 3          A.   The three journals that I
 4   mentioned?
 5          Q.   Yeah, you said Blood, Journal
 6   of -- JCO, Journal of Clinical Oncology,
 7   and New England Journal of Medicine.
 8                    MS. NOLAN:  Objection,
 9           asked and answered.  He did answer
10           this earlier.
11   BY MR. GRAY:
12          Q.   Okay.  And any of those three
13   journals, Doctor, do you recall an article
14   that specifically mentioned exposure to
15   glyphosate as a possible cause of
16   non-Hodgkin's lymphoma?
17          A.   I do not.
18          Q.   And have you seen any other
19   medical or scientific organization besides
20   IARC that have reached the conclusion that
21   Roundup is a possible cause of
22   non-Hodgkin's lymphoma in humans?
23          A.   Medical organization?  Can you
24   define what you mean by that?
```

Michael Scola, M.D.

```
 1          Q.   American Cancer Association,

 2   the American Medical Association, any, you

 3   know, groups like that.  Frankly, any

 4   organization, period.  Have you seen anyone

 5   other than IARC say, that has done a review

 6   of glyphosates, say that Roundup is a

 7   possible or probable human carcinogen?

 8          A.   I'm not aware of that

 9   information.

10          Q.   Have you ever reviewed any

11   other IARC monographs, Doctor?

12          A.   No.

13          Q.   Prior to looking at the

14   monograph on glyphosate, you never looked

15   to any IARC publication for information on

16   the cause of cancer?

17          A.   No.

18          Q.   I'm just about done, a little

19   housekeeping --

20                    MS. NOLAN:  Are we at

21        seven hours?

22                    MR. GRAY:  Danny, let's

23        go off the record here while we do

24        this.
```

```
 1                    THE VIDEOGRAPHER:  The
 2           time right now is 6:14 p.m.  We are
 3           off the record.
 4                - - - - -
 5      (A recess was taken at this time.)
 6                - - - - -
 7                    THE VIDEOGRAPHER:  The
 8           time right now is 6:18 p.m.  We're
 9           back on the record.
10   BY MR. GRAY:
11        Q.   Okay.  Doctor, I want to pull
12   up what we'll mark as Exhibit 13.  Can you
13   see this, Doctor?
14        A.   Yes.
15                - - - - -
16           (Notes marked Scola Exhibit 13
17           for identification.)
18                - - - - -
19   BY MR. GRAY:
20        Q.   Okay.  These are the notes that
21   you have prepared for the Dr. Weisenburger
22   article that you sent to me?
23        A.   Yes, I dictated them, so it
24   didn't transcribe perfectly.
```

Michael Scola, M.D.

1          Q.   No, I understand.  Okay.  We

2    can stop that.  And then I will show you

3    what we'll mark as Exhibit 14.  And this is

4    an article from the Regional Center for

5    Cancer; is that right?

6          A.   Cancer Care Associates.

7          Q.   Cancer Care, Regional Cancer

8    Care Associates; is that right?

9          A.   Yes.

10                   - - - - -

11              (Regional Cancer Care

12          Associates Article marked Scola

13          Exhibit 14 for identification.)

14                   - - - - -

15   BY MR. GRAY:

16          Q.   Okay.  And is this something

17   that you found or is this something that

18   was sent to you by counsel?

19          A.   It was sent to me by counsel.

20          Q.   And when did you receive this?

21          A.   Around that week that I

22   mentioned.

23          Q.   Okay.  Do you know what the

24   Regional Cancer Care Associates is?

Michael Scola, M.D.

```
1          A.    Yes, yes.

2          Q.    What is that organization?

3          A.    I used to belong to it.  It's a

4   group of, it's a group of private practice

5   oncology that -- a group of private

6   practice oncology -- oncologists that

7   merged together as a single specialty

8   entity referred to as Regional Cancer Care

9   Associates.  Originally, localized here in

10  New Jersey, but I believe now they span to

11  Pennsylvania and even Maryland, so multiple

12  individual practices and several hundred

13  hematology/oncology doctors.

14         Q.    So this is not, this is not an

15  organization that actually provides medical

16  care; is that right?

17         A.    Yeah, oh yeah.  They're

18  practicing clinical oncologists that

19  practice oncologic/hematologic care.

20         Q.    Right, but not under the banner

21  of Regional Cancer Care Associates, right?

22         A.    That is the name of the

23  organization.

24         Q.    Okay.  So if I got sick, and
```

Michael Scola, M.D.

1    thought I had cancer, can I go to the

2    Regional Cancer Care Associates office and

3    get treatment?

4         A.   Yes, that's what they do.

5         Q.   Okay.  I mean, where is the

6    office?

7         A.   They're scattered throughout

8    New Jersey.  And now extend into Maryland

9    and Pennsylvania.  They were a bunch of

10   private practices that merged together into

11   a single taxpayer ID number.

12        Q.   Okay.  And did you review this

13   document?

14        A.   Yes.

15        Q.   Okay.  And are you relying on

16   this in any way for your opinions?

17        A.   I mean, not directly.  I didn't

18   reference it or quote it in my report.

19        Q.   Okay.  It sounds like -- go

20   ahead.

21        A.   I'm sorry, it's really meant

22   for consumers.

23        Q.   Uh-huh.

24        A.   It's not, you know, it's not an

```
1    academic article.  It's really more

2    informational.

3         Q.   Okay.  I think I'm about done,

4    Dr. Scola.  Is there -- have there been

5    any -- are there any opinions that you

6    haven't told me about today that you intend

7    to offer at trial?

8         A.   No, no, I believe that pretty

9    much summarizes my opinions.

10        Q.   Okay.  And do you intend to do

11   any additional follow-up work between now

12   and trial?

13        A.   Follow-up work, does that mean

14   additional investigations?

15        Q.   Whatever -- I'm just curious if

16   you -- if you're going to show up and trial

17   and say, oh, I spent, you know, the last

18   two months really digging into things, I

19   want to know now so I can ask about them.

20        A.   Well, I may, I may review some

21   of the articles that were referenced today,

22   some of the critiques that were mentioned

23   today to refine my opinion.

24        Q.   Okay.  Well, if your opinion
```

Michael Scola, M.D.

```
1    happens to change, once you -- if you

2    review other things and there's some

3    amendment to your opinion, I would ask that

4    you let me know.  Okay?

5         A.    Okay.

6                   MR. GRAY:  I'm going to

7          pass you off to Ms. Nolan now.

8                   MS. NOLAN:  And I think

9          we've been pretty forthright in

10         giving you everything.  In fact, I

11         gave you things that even maybe the

12         doctor didn't consider.  So we will

13         communicate with you if there's

14         anything to supplement or I guess

15         what you just asked the doctor, we

16         will follow up with that.  I would

17         like a break before I decide if I'm

18         going to ask you questions or not.

19                   MR. GRAY:  Absolutely.

20                   MS. NOLAN:  So I'm going

21         to go off the record for a few

22         minutes if we can.

23                   THE VIDEOGRAPHER:  The

24         time right now is 6:25 p.m.  We are
```

Michael Scola, M.D.

```
 1            off the record.

 2                 - - - - -

 3       (A recess was taken at this time.)

 4                 - - - - -

 5                 THE VIDEOGRAPHER:  The

 6            time right now is 6:42 p.m.  We're

 7            back on the record.

 8  BY MS. NOLAN:

 9       Q.   Dr. Scola, this is Clare Nolan

10  and I represent the Plaintiff and I just

11  have a couple follow-up questions.  I know

12  we've all been here a long time today.  You

13  wrote a report and you expressed an opinion

14  at the end of the report; is that correct?

15       A.   Yes.

16       Q.   Okay.  And do you stand by that

17  opinion?

18       A.   Yes.

19       Q.   And if you don't mind just

20  summarizing that opinion for us.

21       A.   My opinion is that given his

22  exposure history to glyphosate and the

23  nature of his diagnosis, diffuse large

24  B-cell lymphoma, that it is possible that
```

Michael Scola, M.D.

1   his exposure to glyphosate contributed to

2   his development of his lymphoma.

3         Q.   You were asked about other risk

4   factors, including age; is that true?

5         A.   Yes.

6         Q.   And how old, how old was -- are

7   you aware of how old Brad Koen was when he

8   was diagnosed?

9         A.   He was 47 as of January 12,

10  2018.

11        Q.   Where does that put him on the

12  spectrum in terms of, is that old for --

13  does that put him kind of the older side of

14  the spectrum or where does that put him on

15  the spectrum in terms of risk of age in

16  contracting lymphoma?

17        A.   He would be younger than the

18  median age for individuals with diffuse

19  large B-cell lymphoma.  I mean, it is a

20  diagnosis of advancing age.  It's

21  exceedingly rare in children and teenagers

22  and even individuals in their twenties and

23  thirties.

24        Q.   You explained earlier that --

Michael Scola, M.D.

1    okay.  And you were asked about the risk

2    factor of obesity; is that correct?

3         A.   Yes, yes.

4         Q.   Okay.  And you did review the

5    medical records in their entirety, the ones

6    that were sent to you?

7                    MR. GRAY:  Objection,

8         leading.  You can answer.

9                    THE WITNESS:  Yeah, I

10        reviewed the records in detail,

11        yes.

12   BY MS. NOLAN:

13        Q.   Okay.  And you don't recall

14   seeing anything about that risk factor in

15   your review of the record?

16        A.   I don't recall.

17        Q.   And you explained earlier today

18   that you responded that there was a degree

19   of aggressiveness in how the disease

20   manifested for Mr. Koen.  Could you explain

21   that a little bit?

22        A.   Well, he should have gone into

23   remission and he should have stayed in

24   remission.  And if this was a higher grade

1    follicular or a diffuse large B-cell

2    lymphoma from the outset, he very well

3    could have been cured with his

4    chemotherapy.

5              If it was follicular, he

6    could have relapsed, but that relapse

7    typically comes late.  And most patients

8    with the highest grade follicular lymphomas

9    and diffuse large B cell are cured, so the

10   intent of chemotherapy was to cure him.

11   Not only was he not cured, but it looks

12   like he had primary refractory lymphoma.

13        Q.   Okay.  And you were asked

14   earlier today a question about the majority

15   of patients that you treat with lymphoma

16   don't have a series or don't have several

17   risk factors.  Do you recall a question

18   like that?

19        A.   I do.

20                  MR. GRAY:  Object to

21        form.

22   BY MS. NOLAN:

23        Q.   And isn't it true -- is that

24   true that the patients you generally see

1    don't carry or have any risk factors with

2    them?

3                         MR. GRAY:  Object to

4              form.

5                         THE WITNESS:  Yes,

6              that's true.  For most, most

7              patients, it's difficult to

8              identify a particular risk factor

9              that might have heightened the

10             chance or risk of developing the

11             disease.

12   BY MS. NOLAN:

13        Q.   Okay.  I appreciate that.

14   Maybe that's something I needed

15   clarification on.  There was a lot of

16   discussion about issues with potential

17   recall bias or confounders or other

18   possible issues with data.  How do you

19   respond knowing that there are potential

20   issues with all datasets, how do you

21   respond to these studies kind of

22   understanding that there are potential

23   issues with some of the data?

24                         MR. GRAY:  Just I'm

Michael Scola, M.D.

```
1              going to object to the form,

2              compound, but you can answer.

3                   THE WITNESS:  I mean,

4              this is the challenge of every

5              study.  Even well-designed,

6              double-blinded, dummy-controlled

7              studies have the potential to

8              introduce some element of bias.  So

9              if that's the gold standard, these

10             studies, all these studies fall

11             short of the gold standard.  So

12             there's going to be an element of,

13             you know, methodological challenge

14             and bias in study design

15             variability.  But these are the

16             best studies we have at the end of

17             the day.  So we've got to work with

18             what we have.  Given the complexity

19             of the question at hand, and the

20             fact that you can't cage human

21             beings and expose them to just one

22             variable.  These are the best

23             studies we have and we've got kind

24             of work with it.
```

Michael Scofea, M.S.

1    BY MS. NOLAN:

2         Q.   Are there concerns or issues

3    with prospective studies, that was given as

4    an example, one type of study?

5         A.   Yes.  I mean, there's a

6    potential for the same things that affect

7    case-control studies can also affect

8    prospective studies.  I mean, the best

9    designed prospective study is where you

10   have two groups and you can follow them

11   moving forward and they're blinded so they

12   don't know what they're getting or they're

13   not aware of their exposure history and nor

14   is the investigator.  That study is not

15   possible when you're talking about an

16   exposure such as this.

17        Q.   I didn't mean to talk over you.

18        A.   No.  So yes, there's clearly

19   avenues for bias even with cohort studies.

20        Q.   Also, I think you kind of

21   hinted that already, just, it might be

22   impracticable to do one or several of those

23   type of studies in the real world?

24                  MR. GRAY:  Object to

Michael Scola, M.D.

```
 1          form.  Is there a question?
 2   BY MS. NOLAN:
 3          Q.  Well, I'm asking, do you agree
 4   that it's -- there's a practicality that
 5   it's difficult to make those type of
 6   studies and isolate all the other
 7   variables?
 8                    MR. GRAY:  Object to
 9          form.
10                    THE WITNESS:  Well --
11   BY MS. NOLAN:
12          Q.  And if the way I've
13   characterized isn't, please just correct
14   me.
15          A.  When you say those type of
16   studies --
17          Q.  I guess I mean the prospective
18   studies.
19          A.  So, yes.  So the one that I
20   alluded to as the gold standard, it's
21   impossible to do when you're asking this
22   sort of question.  So, you know, so you do
23   the best studies that you can and, you
24   know, case-control studies are easy,
```

1  because you can identify individuals with

2  the affective ailment and individuals that

3  don't have the affective ailment and kind

4  of work with same groups, so they're easier

5  to do and they're also less expensive and

6  they are valid studies.  Case-control

7  studies have been done forever to answer

8  questions.  So I don't think we can dismiss

9  them as invalid just because they fall

10  short of the gold standard.

11        Q.   Okay.  Are there any ethical

12  concerns with doing a prospective study

13  over a long period of time if there's a

14  concern about something being carcinogenic?

15        A.   Well, I mean, there's ethical

16  concerns with any study and so one has to

17  be careful with that.  You know, the

18  potential carcinogen was not, was not

19  introduced.  Subjects weren't forced to

20  have that exposure.  It was simply looking

21  at natural, natural exposure.

22                 MS. NOLAN:  Okay.  I

23        don't think I have any more

24        questions.  Just some housekeeping,

```
1            housekeeping stuff.  So we can

2            probably go off the record.

3                    THE VIDEOGRAPHER:  We're

4            ready to go off?  The time right

5            now is 6:54 p.m.  We are off the

6            record.

7                    - - - - -

8       (A recess was taken at this time.)

9                    - - - - -

10                   THE VIDEOGRAPHER:  The

11           time right now is 6:56 p.m.  We're

12           back on the record.

13                   MR. GRAY:  Dr. Scola, I

14           have no further questions for you.

15           Thank you very much for your time

16           today.

17                   THE WITNESS:  Okay.

18           Thank you both.

19                   THE VIDEOGRAPHER:  The

20           time right now is 6:57 p.m.  We're

21           off the record.

22                   THE STENOGRAPHER:

23           Ms. Nolan, do you want a copy of

24           the transcript?
```

Michael Scola, M.D.

```
 1                    MS. NOLAN:  I do.

 2                    THE STENOGRAPHER:  Thank

 3          you.

 4                    MS. NOLAN:  Usually we

 5          just do E trans.  Thank you.  If we

 6          could have a rough too, thank you.

 7                    - - - - -

 8            (Whereupon, the deposition was

 9          concluded at 6:57 p.m.)

10                    - - - - -

11

12

13

14

15

16

17

18

19

20

21

22

23

24
```

Michael Scola, M.D.

```
 1              C E R T I F I C A T I O N

 2

 3

 4          I HEREBY CERTIFY that the proceedings and

 5   evidence are contained fully and accurately in the

 6   stenographic notes taken by me upon the foregoing

 7   matter on August 30, 2021, and that this is a

 8   correct transcript of same.

 9

10

11

12

13                    Robin L. Clark

14   _____

15          Robin L. Clark

     Registered Professional Reporter

16

17

18

19

20

21          (The foregoing certification of this

22   transcript does not apply to any reproduction of the

23   same by any means unless under the direct control

24   and/or supervision of the certifying reporter.)
```

Michael Scola, M.S.

```
 1                    -  -  -  -  -  -

                    E R R A T A

 2                    -  -  -  -  -  -

 3

 4    PAGE   LINE   CHANGE

 5    _____  _____  _____

 6        REASON:  _____

 7    _____  _____  _____

 8        REASON:  _____

 9    _____  _____  _____

10        REASON:  _____

11    _____  _____  _____

12        REASON:  _____

13    _____  _____  _____

14        REASON:  _____

15    _____  _____  _____

16        REASON:  _____

17    _____  _____  _____

18        REASON:  _____

19    _____  _____  _____

20        REASON:  _____

21    _____  _____  _____

22        REASON:  _____

23    _____  _____  _____

24        REASON:  _____
```

Michael Scola, M.D.

```
 1

 2            ACKNOWLEDGMENT OF DEPONENT

 3

 4            I,_____, do

 5    hereby certify that I have read the

 6    foregoing pages, and that the same is

 7    a correct transcription of the answers

 8    given by me to the questions therein

 9    propounded, except for the corrections or

10    changes in form or substance, if any,

11    noted in the attached Errata Sheet.

12

13

14    _____

15     [!WITNESS NAME]              DATE

16

17

18    Subscribed and sworn
      to before me this

19    _____ day of _____, 20____.

20    My commission expires:_____

21

      _____

22    Notary Public

23

24
```