# EXHIBIT 2

Michael D. Freeman, MedDr., Ph.D.

```
 1                  UNITED STATES DISTRICT COURT

 2                 NORTHERN DISTRICT OF CALIFORNIA

 3

 4   IN RE:  ROUNDUP PRODUCTS         ) MDL No. 2741

     LIABILITY LITIGATION            )

 5                                    )

                                      )

 6   BRADLEY KOEN,                    )

             Plaintiff,              )

 7                                    )

     VS.                             )NO. 3:20-cv-03074-VC

 8                                    )

     MONSANTO COMPANY,                )

 9         Defendant.                 )

10

         VIDEOCONFERENCE DEPOSITION OF MICHAEL D. FREEMAN,

11                      MedDr., Ph.D.,

12                        VOLUME I

13              TAKEN ON BEHALF OF DEFENDANT

14                          * * *

15        BE IT REMEMBERED THAT, pursuant to the Federal

16   Rules of Civil Procedure, the video deposition of

17   MICHAEL D. FREEMAN, MedDr., Ph.D., was taken before

18   Paula D. Tieger, a Registered Professional Reporter and

19   Oregon Certified Shorthand Reporter, on August 17, 2021,

20   commencing at the hour of 9:06 a.m.; the witness

21   responding to questions by videoconference from Salem,

22   Oregon; the questions being propounded from Washington,

23   DC; and proceedings reported remotely via videoconference

24   from Portland, Oregon.

25                          * * *
```

```
 1                 APPEARANCES:
 2      Hendler Flores Law
            By:  Clare Nolan (Via Videoconference)
 3               Attorney at Law
                 901 S. MoPac Expressway, Building 1,
 4               Suite 300
                 Austin, Texas 78746
 5               512-439-3200
                 cnolan@hendlerlaw.com
 6                   Counsel for the Plaintiff
 7
        Hollingsworth LLP
 8          By:  John M. Kalas (Via Videoconference)
                 Attorney at Law
 9               1350 I Street, NW
                 Washington, DC 20005
10               202-898-5843
                 jkalas@hollingsworthllp.com
11                   Counsel for the Defendant
12
        Also Present:  Anna Kinard - Paralegal for Hendler
13                      Flores Law PLLC - (Via
                        Videoconference)
14
                        Mark Ancalade - Videographer (Via
15                      Videoconference)
16
17
18                         *  *  *
19
20
21
22
23
24
25
```

Michael D. Freeman, MedDr., Ph.D.

```
 1          (Exhibit Nos. 10-16 were premarked)

 2              THE VIDEOGRAPHER:  We're now on the record.

 3   My name is Mark Ancalade, the videographer.  I am the

 4   videographer with Golkow Litigation Services.  Today is

 5   Tuesday, August the 17th, 2021.  The time is

 6   approximately 9:06 a.m.  This is the remote video

 7   deposition in the matter of In Re:  Roundup Products

 8   Liability Litigation.  The deponent today is Dr. Michael

 9   Freeman.  All parties to this deposition are appearing

10   remotely and have agreed to the witness being sworn in

11   remotely.  Due to the nature of remote recording, please

12   pause briefly before speaking, to ensure all parties are

13   heard completely.

14          Will counsel please identify themselves.

15              MS. NOLAN:  Clare Nolan for the plaintiff.

16              MR. KALAS:  John Kalas for Monsanto Company.

17              THE VIDEOGRAPHER:  Will the court reporter,

18   Ms. Paula Tieger, please swear in the witness.

19          MICHAEL D. FREEMAN, MedDr., Ph.D.,

20   having first been sworn by the Oregon Certified Shorthand

21   Reporter to tell the truth, testified under oath as

22   follows:

23                      EXAMINATION

24   BY MR. KALAS:

25   Q    All right.  Good morning, Dr. Freeman.
```

Michael D. Freeman, MedDr., Ph.D.

```
 1   A     Good morning.

 2   Q     My name is John Kalas.

 3         And we've never met until a few minutes ago;

 4   right?

 5   A     Correct.

 6   Q     Okay.  And you're very familiar with the deposition

 7   process; correct?

 8   A     I am.

 9   Q     Okay.  If you need a break at any time today, let me

10   know, and we'll go off the record, as long as we're not

11   in the middle of a question.

12   A     I appreciate it.

13   Q     And we are breaking this deposition up over two days.

14   And so, today I'm going to plan to go about four hours on

15   the record.  And then we'll finish the final three, if

16   necessary, on the 25th.

17         Does that work for you?

18   A     Sounds great.

19   Q     Okay.

20   A     I appropriate being able to do that.

21   Q     Yeah.  No problem.

22         So, did you get a link from your counsel to

23   Exhibit -- the exhibit folder that Golkow provided us?

24   A     I don't think so.

25   Q     Okay.  I'm going to put it into the chat, then -- if
```

Michael D. Freeman, MedDr., Ph.D.

```
 1    you give me a second -- that's how you're going to be

 2    able to see the exhibits that I mark.

 3               MS. NOLAN:  Is that the link you just sent,

 4    like, a little bit ago?

 5               MR. KALAS:  Yes.  I sent it about

 6    10 minutes ago.

 7               MS. NOLAN:  Okay.

 8               MR. KALAS:  So, I'll just put it in the

 9    chat, and then you can have it open.

10               THE WITNESS:  Has that been forwarded to

11    me, or...

12               MR. KALAS:  I don't know.  But it's in the

13    chat.  So, basically, when I mark an exhibit, you can see

14    it in that link.  You may need to refresh it after I mark

15    it for it to show up.

16          But that's how we'll mark exhibits.

17               THE WITNESS:  Got it.  Okay.

18               MR. KALAS:  And, Counselor, Ms. Nolan, do

19    you have any objection to me publishing exhibits on the

20    screen as I mark them so we can all track along?

21               MS. NOLAN:  No.  I haven't had a chance to

22    look at the exhibits in the link.  I will forward him the

23    link, too.

24               MR. KALAS:  Nothing's been marked yet.

25               MS. NOLAN:  Okay.
```

```
 1                    MR. KALAS:  Yeah.

 2                    MS. NOLAN:  I don't have that.

 3                    MR. KALAS:  Yeah.  So, as I mark them, I'll

 4    put them up.  Okay.

 5    Q    BY MR. KALAS:  Now, Doctor, I'm going to mark as

 6    Exhibit 1 the notice of deposition in this matter.  Just

 7    give me a moment.

 8           (Exhibit No. 1 was marked)

 9                    MR. KALAS:  Okay.

10    Q    BY MR. KALAS:  So, that just got marked as Exhibit 1.

11           Let me know when you can see it.  And I'll also

12    put it on the screen.

13    A    Got it.

14    Q    Okay.  And when did you receive the notice of

15    deposition, sir?

16    A    Hold on half a minute here.  Let me just look in my

17    file and see what I've got.

18                    MS. NOLAN:  We didn't receive a notice for

19    deposition for today.  Are we --

20                    MR. KALAS:  Right.

21                    MS. NOLAN:  -- referring to the one for

22    August 5?  Okay.  I think that led to a little bit of

23    confusion on our part.  Okay.

24                    MR. KALAS:  Yeah.  I apologize for that.  We

25    just never updated it -- that's on us -- after you guys
```

Michael D. Freeman, MedDr., Ph.D.

1   asked to move the date.  So...

2   Q    BY MR. KALAS:  But you received this document, sir?

3   A    I have the one that says August 5.  Is that the one

4   we're --

5   Q    Okay.

6   A    Yeah.

7   Q    Yeah.

8   A    I do have that.  Just got that within --

9              MR. KALAS:  Did we lose him?

10  Q    BY MR. KALAS:  Dr. Freeman, your answer got cut off

11  there.

12       Can you just repeat it?

13  A    Sure.  I got it within the last day or so.  It was

14  forwarded to me by my assistant.

15       I don't know when she got it.

16  Q    Okay.  And did you conduct a search for responsive

17  documents in response to this notice of deposition?

18  A    I did.  I looked through the deposition to make sure

19  that I had everything that I could bring that you guys

20  were asking for.

21  Q    Okay.  And those were sent over by counsel earlier

22  today, to your knowledge?

23  A    I don't know anything about what counsel sent.

24  Q    Okay.  Well, we'll mark those when I can actually get

25  ahold of them and walk through them.

Michael D. Freeman, MedDr., Ph.D.

```
 1            You provided a report in this case; true?

 2   A    I did.

 3   Q    Okay.  And does that report contain all of the

 4   opinions you intend to offer in this case?

 5   A    If it gets to be a problem, then I'll just go to the

 6   phone audio.  I don't want a record that is too broken

 7   up, or if this becomes an issue.

 8            So, please let me know.

 9   Q    Yeah.  It froze a little there, but I'm going to --

10   I'll ask the question again.  And if we need to go off

11   the record, we will.

12            Does your report contain all the opinions you

13   intend to offer in this case?

14   A    Except for anything you might ask me today that's

15   outside the scope of the report or something asked to

16   elaborate on, yes, it does.

17   Q    Okay.  And do you intend to offer opinions in this

18   case regarding epidemiology surrounding Roundup and

19   glyphosate?

20   A    Yes.

21   Q    Do you intend to offer opinions in this case

22   regarding the animal toxicology studies surrounding

23   Roundup and glyphosate?

24   A    Oh.  Just in a very superficial way.  That's

25   really -- that's less so my area.
```

Michael D. Freeman, MedDr., PhD.

```
 1   Q    Okay.

 2   A    So, to the extent I cover it my report, which is to

 3   say there is animal evidence, I don't really go into any

 4   depth.

 5   Q    Okay.  Do you intend to offer opinions in this case

 6   regarding mechanistic studies regarding Roundup or

 7   glyphosate; specifically, genetic toxicology and/or

 8   oxidative stress studies?

 9   A    Only to the extent that it's just mentioned in my

10   report that that literature exists; and generally what it

11   says.

12        But not as an expert in those topics, no.

13   Q    Okay.  Do you intend to offer opinions regarding

14   human exposure or internal dose data regarding glyphosate

15   or Roundup?

16   A    To the extent it's in my report, as far as dose data

17   on frequency of exposure and how that was used for dose

18   response analysis, yes.  As far as how many micrograms

19   per deciliter are found in the urine or -- of exposed

20   people and that sort of thing, no.  I mean, I know

21   something about it, but it's not -- I don't consider

22   myself to be the expert to be talking about that sort of

23   thing in any great deal.

24   Q    Okay.  Do you intend to offer any opinions regarding

25   a differential diagnosis or differential etiology in this
```

Michael D. Freeman, MedDr., PhD.

```
 1   case?

 2   A    Well, you talk about a differential etiology, but

 3   it's not a differential diagnosis.  In other words --

 4   Q    Okay.

 5   A    -- is the variate of non-Hodgkin lymphoma that was

 6   diagnosed in Mr. Koen accurate or should it be something

 7   else will not be something I'll get into.  That's more of

 8   a clinical medical question.  As far as differential

 9   etiology, that would be the nature of the causal

10   analysis.

11          So, yes, that would be part of what I'm talking

12   about.

13   Q    Okay.  Do you intend to offer any opinions on

14   warnings or labeling in this case?

15   A    No.

16   Q    Okay.  Now, you live in Oregon; correct?

17   A    I do.

18   Q    Okay.  And you're not a licensed medical physician;

19   correct?

20   A    That's correct.

21   Q    You don't render medical treatment in Oregon?

22   A    That is correct, or anywhere else.

23   Q    And you're not a clinician?

24   A    That is correct.

25   Q    Okay.  And your medical degree from Sweden would not
```

```
 1    let you sit for a medical exam; correct, as far as

 2    becoming an M.D.?

 3    A    Not without additional training for me to be able to

 4    take the testing in the U.S.

 5          That's not what it's intended for.

 6    Q    When did you first hear of glyphosate?

 7    A    Well, I've known about Roundup ever since I was a

 8    kid.  And I'm -- you know, I'm 60.  So, that means I've

 9    heard about it for a long time.  But the chemical

10    component of it I probably didn't start hearing about

11    until half a dozen years ago or so, when some of the

12    epidemiology started coming out and more prominently

13    being featured in the literature that I was seeing.

14    Q    Okay.  So, let's start with Roundup.  You said you've

15    known Roundup since you were a kid.

16          How did you first learn about Roundup?

17    A    Just other folks talking about using it as a weed

18    killer.

19    Q    Okay.  Did folks use it in your home, growing up?

20    A    No, I don't think so.

21    Q    Okay.  And then, you said you first started hearing

22    about the epidemiology surrounding glyphosate about half

23    a dozen years ago, you said?

24    A    Give or take, yes.

25    Q    Okay.  And you've never published anything on
```

Michael D. Freeman, MedDr., PhD.

```
1    glyphosate; right?

2    A    I have not.

3    Q    You've never published anything on Roundup; correct?

4    A    I have not.

5    Q    Okay.  Now, a large part of your job is providing

6    consulting services to legal clients; correct?

7    A    About 70 percent of my time.  That's correct.

8    Q    Okay.  And you've testified in many cases over your

9    career; correct?

10   A    I have.

11   Q    Now, I read that, as of 2015, you estimated that

12   you've given 700 depositions.

13        About how many would you estimate you've given

14   today, in total?

15   A    Oh.  It's well over 900 now.

16   Q    Okay.  And, likewise, in 2015, I read that you had

17   appeared in 250 to 300 court appearances.

18        How many would you estimate you've appeared in

19   today?

20   A    Probably more than 400.

21   Q    Okay.  And is it still a breakdown of about

22   85 percent of testimony in civil litigation for

23   plaintiffs and 15 percent for defendants?

24   A    Not testimony but case breakdown.

25   Q    Okay.  Do you agree that a potential problem with
```

1   expert information provided by parties involved in tort

2   cases is that they have, to a large extent, opposing

3   interests?  The victim has an incentive to overstate the

4   likelihood that his injury was caused by the tortious

5   act; and the injurer has an incentive to argue that there

6   is no evidence that the tortious act is related to the

7   claimed damage?

8   A    Yes.

9   Q    Okay.

10  A    Did I write that?

11  Q    You did.

12  A    Okay.

13  Q    I just want to make sure you still agree with it.

14  A    It sounds like the kind of thing I'd write.

15  Q    Do you still agree that, just based on the fact that

16  merely being paid by one of the parties, the quality of

17  the opinion provided by an expert can change?

18  A    One more time, please.

19  Q    Do you still agree that, merely by the fact that --

20  or excuse me.  Strike that.

21       Do you still agree that the fact that an expert

22  is merely being paid by one of the parties, the quality

23  of the opinion provided by the expert can change?

24  A    I don't understand that.

25  Q    Okay.  So, we'll mark it just so you can see the

1    context.  And then I'll ask you again.

2    A    Sure.

3    Q    While we're doing that, I'm going to mark, just so we

4    have a record, your report and CV as Exhibits 2 and 3.

5            (Exhibit Nos. 2 & 3 were marked)

6                    THE WITNESS:  Do you have a current CV for

7    me?

8                    MR. KALAS:  I believe I do; although, I'll

9    have you look at it to make sure, and then we will get to

10   that exhibit.

11                   THE WITNESS:  Okay.  If it says August,

12   then it's current.

13                   MR. KALAS:  Okay.  So, I'm only marking on

14   your report the report without all of the appendices.

15   The appendices were about 7,000 pages.

16          So, I'm just going to note that for the record.

17                   THE WITNESS:  My report has 7,000 pages of

18   appendices?

19                   MR. KALAS:  Yeah.  There was a bunch of,

20   like, medical records attached to it.

21                   THE WITNESS:  Oh.  Oh.  Oh, I see.

22                   MR. KALAS:  So --

23                   THE WITNESS:  I didn't attach them as

24   appendices, but I think that must have been the way it

25   came to you.

```
 1                MR. KALAS:  Right.

 2                THE WITNESS:  Would you like me to send you

 3    just the report?

 4                MR. KALAS:  I just marked it as Exhibit 2.

 5           So, if you can just take a look at Exhibit 2 and

 6    just confirm that that's a true and accurate copy of your

 7    report.

 8                THE WITNESS:  Yes.  Hold on here.  I like

 9    this system.

10                MR. KALAS:  Yeah.  It works pretty good.

11                THE WITNESS:  Yeah.  How do I get back to

12    my list of files?  There we go.  Okay.  Yes.  So, notice

13    of depo, report.  CV is -- that is nowhere near a current

14    CV.

15                MR. KALAS:  Okay.  So, that says September

16    2020.  So, if you have a different one, I'd -- did you

17    provide that today, Clare, an updated one?

18                MS. NOLAN:  Yeah.  I think everything was

19    updated at least as of June 2021.

20                MR. KALAS:  Okay.

21                MS. NOLAN:  What he provided.  So, if he has

22    something that's even -- oh.  It looks like he's given us

23    an even more -- thank you, Dr. Freeman.

24                THE WITNESS:  You bet.  And just to not bog

25    things down, I don't know what you guys -- since the CV
```

1    is so old, if you also have an old Rule 26 disclosure, I

2    can send -- I can give you the most recent one.

3                    MS. NOLAN:  So, if old is June 2021, then we

4    have updated as of June 2021.  I said that.

5                    THE WITNESS:  That is my most recent one.

6    So, we're okay there.

7                    MR. KALAS:  Okay.  All right.  Well, then, I

8    will mark as Exhibit 4 the CV you just provided, if you

9    bear with me for one second.

10          (Exhibit No. 4 was marked)

11                    MR. KALAS:  Okay.  So, that's been marked as

12   Exhibit 4.  And that's Freeman, M.D., CV, as opposed to

13   Freeman CV, as Exhibit 4.

14                    THE WITNESS:  Oh, okay.

15   Q    BY MR. KALAS:  And so, Exhibit 4 is a true and

16   correct copy of your CV?

17   A    I'm sorry.  I'm looking at the list.  I can't --

18   they're not numbered.  That's the problem.

19   Q    Yeah.  Hold on.  I'll number them for you.  And then

20   I'll just have you refresh.

21   A    Great.  So, is this just -- technically, is the way I

22   get back to the list of documents just by refreshing?

23   Q    Yes.

24   A    Okay.  I did not -- I think I was doing it the wrong

25   way.

1  Q    Okay.  If you refresh now, they should be renumbered.

2  A    Exhibit 4 is my current CV, yes.

3  Q    Perfect.  Okay.

4           MR. KALAS:  I'm going to mark as Exhibit 5

5  the document we were just discussing.

6           (Exhibit No. 5 was marked)

7           MR. KALAS:  Okay.  You can refresh and find

8  that.  Let me know when you've had a chance to open it.

9           THE WITNESS:  Yeah.  I'm going to open it

10  right now.  Oh, yeah.  It's a book chapter.  Okay.

11           MR. KALAS:  Right.

12  Q    BY MR. KALAS:  So, this is a book chapter you wrote;

13  right?

14  A    Co-wrote it.  It was primarily written by my European

15  colleagues.

16  Q    Okay.  And I'm just going to share it up on the

17  screen here.  And the title of the chapter is The Role of

18  the Expert Witness; right?

19  A    Right.  In European codes.

20  Q    Right.  Right.  And if we go down to 140, it's a

21  textbook called Principles of Forensic Epidemiology?

22  A    No.  That's actually the section of the book --

23  Q    Got it.

24  A    -- Principles.  The book is called Forensic

25  Epidemiology:  Practice and -- Principles and Practice.

Michael D. Freeman, MedDr., PhD.

```
1   Q    Okay.  And you wrote here (indicating) -- and this
2   was what I was asking about -- that "a problem that's
3   been extensively dealt with in the literature concerns
4   the fact that merely by being paid by one of the parties,
5   the quality of the opinion provided by the expert can
6   change."
7        Do you see that?
8   A    I do see that, yes.
9   Q    Okay.  Do you still agree with that statement from
10  your book chapter?
11  A    You know, I mean, I was -- I partly edited it because
12  it was -- I was the only person who English is first
13  language, I think, in the group.  And looking at it, I
14  don't really know what it means.  "Quality" wouldn't be
15  the word that I would use.  But I think I understood how
16  they were talking about it.
17       I don't know who Mandel is.  So, I'm not quite
18  sure what they're --
19  Q    You weren't an economics major, were you?
20  A    No, definitely not.  And this is very economic
21  philosophy driven, this chapter, which is really --
22  that's a -- you make a really good point.  So, that's why
23  I can't say I know exactly what they mean by "quality."
24  That has a different -- probably has a different meaning
25  than to the primary chapter authors.  So, I wouldn't
```

```
 1    say -- I wouldn't say, like, as soon as you pay an expert

 2    you're going get a better quality report or a poorer

 3    quality report.  Paying an expert is going to maybe bias

 4    the opinion you're going to get, because there is going

 5    to be maybe a different question asked of that expert; or

 6    possibly the expert might bend things a little bit their

 7    way.  That can happen, too.

 8         But I wouldn't use "quality" to differentiate

 9    between those scenarios.

10    Q    Okay.  Would it be fair to say that, once an expert

11    is paid and compensated for their lost professional time,

12    the focus of their opinion can change?

13    A    No.  I think the process is that the -- once the --

14    once the expert agrees to function as an expert for a

15    particular fee, that that's when the focus of what the

16    expert is going to do will -- what the expert's going to

17    do comes into focus.

18         I don't think getting the money then changes

19    that.

20    Q    Okay.  Moving on to this sentence here (indicating),

21    the authors, of which you were one, wrote, "This may be

22    especially problematic in cases where no scientific

23    certainty exists yet; and, hence, differences of opinions

24    may exist."

25         Did I read that correctly?
```

Michael D. Freeman, MedDr., PhD.

```
 1   A    Yes.

 2   Q    Is there scientific certainty that glyphosate causes

 3   non-Hodgkin's lymphoma?

 4   A    I would say there is a preponderance of evidence

 5   supporting that conclusion.  But certainty is a different

 6   level.  And I would say no, that the level of evidence

 7   that would be needed to say it's certain, it's done, it's

 8   cigarettes and lung cancer, is further down the road.

 9   Q    Okay.  Now, you said that, as of today, about

10   70 percent of your income is coming from forensic

11   epidemiology use or work?

12   A    70 percent of my time is devoted --

13   Q    70 percent of your time.  Okay.

14        How much of your income?

15   A    Oh.  More than that.  Probably 80, 85 percent,

16   average, over the last five years comes from my forensic

17   work.

18   Q    Okay.  And I've read that, from 2009 to 2014, you

19   averaged an income of approximately 900,000 to a million

20   dollars a year doing forensic work.

21        Is that still what you get doing forensic work,

22   or has that changed?

23   A    Probably.  That's probably in the ballpark.

24   Q    Okay.  Now, in this case you're going to tell the

25   jury that glyphosate-based herbicides caused Mr. Koen's
```

```
 1   cancer; correct?

 2   A    Not exactly.

 3   Q    Okay.  What are you going to tell them?

 4   A    I'm going to say that, of all the potential causes of

 5   non-Hodgkin lymphoma -- particularly the type that

 6   Mr. Koen has, that he was exposed to -- the one that

 7   stands out that is the most probable is the persisting

 8   relatively high level exposure to Roundup over the years,

 9   which contains glyphosate.

10   Q    Okay.  Are there any other compounds in Roundup that

11   you're going to argue cause NHL besides glyphosate?

12   A    No.  But I will acknowledge the -- at least the

13   discussion in the literature that compounds including

14   glyphosate -- particularly those that are designed to

15   increase permeability of the chemicals into the weeds --

16   that they, at least in animal studies, tend to be

17   considered more toxic.  That's something that's

18   acknowledged.  But I don't think that that is

19   sufficiently explored in the epidemiologic literature to

20   say just glyphosate is the X increased risk, and

21   glyphosate-containing compounds is 2X.  I don't -- I

22   haven't seen the evidence that would allow me to say

23   that.

24         So, I would only say that there is a -- that

25   there is certainly a trend in the literature saying -- to
```

```
 1   say that, when you put glyphosate into compounds, it --
 2   there is a potential for it to become more toxic.
 3   Q    Okay.  And you used the word "toxic" twice in that
 4   answer.
 5        Toxicity is not the same thing as
 6   carcinogenicity; right?
 7   A    That's correct.
 8   Q    Okay.  Toxicity can mean a lot of health effects
 9   beyond carcinogenicity; right?  It's a broader term.
10   A    Yes.
11   Q    Okay.  And so, the fact that formulated Roundup
12   products may be more toxic than glyphosate alone does
13   not, ergo, mean that formulated Roundup products are a
14   more potent potential carcinogen than glyphosate alone;
15   true?
16   A    It may mean that, but it's not evidence of that.
17   Q    Okay.
18   A    It's evidence of a potential mechanism that would say
19   "Maybe we should study it this way."  But it doesn't give
20   you the evidence to say "And now we know it."
21   Q    Right.  And just to be clear, all the epidemiology
22   you reviewed involved individuals exposed to formulated
23   products; Roundup or Roundup-like products, not
24   glyphosate alone?
25   A    I can't say that I know that for sure, because some
```

Michael D. Freeman, MedDr., PhD.

1    of the studies just refer to glyphosate.

2         But most of them refer to

3    glyphosate-containing -- what is it?  Glyphosate --

4    Q    Glyphosate-based herbicides.

5    A    GBH.  That's it.  Thank you.

6    Q    Do you know if glyphosate as a stand-alone product is

7    sold anywhere in the world?

8    A    I can't say that I do, no.

9    Q    Okay.  And do you know if farmers apply glyphosate

10   without surfactins in a formulated product?

11   A    I don't have any information on that.  I don't know.

12   Q    Okay.  So, you wouldn't disagree that the

13   epidemiology -- you have no reason to disagree with the

14   statement, or agree with the statement, that all of the

15   epidemiology is involving formulated products?

16   A    Yeah.  I mean, if that's been -- if it's been

17   carefully reviewed for that specific issue, which is

18   something I haven't done, then I would accept that as

19   being perfectly reasonable.

20   Q    Okay.  Now, we covered that you're not a medical

21   doctor.

22        Within that, you're not an oncologist or

23   hematologist; right?

24   A    Well, when you say I'm not a medical doctor, I have a

25   Doctor of Medicine degree.  I'm not a clinical --

Michael D. Freeman, MedDr., PhD.

```
 1   Q    Clinical medical doctor.

 2   A    Right.

 3   Q    Okay.  Let me rephrase that question.  We covered

 4   you're not a clinical medical doctor.

 5        And, to that end, you're not an oncologist or

 6   hematologist; true?

 7   A    That's correct.

 8   Q    Okay.  And you don't diagnosis cancer?

 9   A    I do not.

10   Q    You don't diagnose -- or excuse me.  You don't treat

11   cancer?

12   A    I do not.

13   Q    You're not a pathologist?

14   A    I am not.  I'm trained in forensic pathology in a

15   fellowship, but I do not call myself a pathologist.

16   Q    Okay.  So, you don't look at cancer cells from people

17   under a microscope as part of your daily job?

18   A    That's correct.  I have done it for my training but

19   not as part of my job.

20   Q    Okay.  You've never run a two-year roto (ph)

21   carcinogenicity bioassay?

22   A    Wait.  Did you say two-year?

23   Q    Yes, sir.

24   A    No.  I have not done any kind of bioassay for

25   carcinogens for any period of time.
```

Michael D. Freeman, MedDr., PhD

```
1   Q    Okay.  And you've never been an employee of the

2   US EPA?

3   A    No, I have not.

4   Q    Okay.  You've never been asked to consult with the

5   US EPA on scientific issues?

6   A    I have not.

7   Q    Okay.  And you're not opining on FIFRA in this case;

8   correct?

9   A    Excuse me.  On what?

10  Q    FIFRA.  Federal Insecticide Rodenticide -- or excuse

11  me.  Federal Insecticide, Fungicide, and Rodenticide Act.

12  It's a regulatory scheme that covers pesticides.

13       You're not opining on that?

14  A    No.  I'd have to get that acronym down first.

15  Q    Okay.

16  A    It's not something that I comment on in my report, I

17  don't believe.

18  Q    Okay.  You've never published a peer-reviewed article

19  on herbicides?

20  A    I'm sorry.  I have to think.  I have a lot of

21  publications.  No, I don't think I have.  I think

22  that's -- yeah, I think that's correct.

23  Q    Okay.  You've never worked as a pesticide applicator?

24  A    No.

25  Q    Okay.  You're not a dermatologist?
```

Michael D. Freeman, MedDr., PhD.

```
 1   A    I am not.

 2   Q    Okay.  Have you ever designed an in vitro dermal

 3   absorption study?

 4   A    I have not.

 5   Q    Have you ever designed a biomonitoring study?

 6   A    I have not.

 7   Q    Have you ever used Roundup?

 8   A    Not that I can recall, no.

 9   Q    Okay.  Now, in the previous suits you've testified

10   in -- and I know it's quite a bit -- but has there been

11   times where you've had to rely on Environmental

12   Protection Agency data?

13   A    Sometimes.

14   Q    Okay.

15   A    But never exclusively.

16   Q    Okay.  Have you found the EPA data you've relied upon

17   to be sufficiently reliable for you to base your opinion

18   on?

19   A    I don't have a specific recollection where I looked

20   at EPA data and said, "Well, this is just garbage.  So,

21   I'm not going to rely on this.  I don't find this

22   helpful."  So, it -- well, at least until this case.

23        But outside of that, I can't recall having had

24   that reaction or thought.

25   Q    Okay.  So, prior to this case, then, when you've
```

1    encountered EPA data in the past, you have found it not

2    to be -- I think the word you used was "garbage."

3         You haven't it found it to be garbage; right?

4    A    I don't have a recollection of having had that

5    perception.

6    Q    Okay.  And in this case it's your opinion that the

7    EPA data is garbage?

8         That's what I'm taking by implication there.

9    A    Well, I didn't say that.  It's certainly curiously at

10   odds with the World Health Organization.

11   Q    Okay.  I'm sorry.  Go ahead.

12   A    And seems to rely very heavily on industry

13   publication or unpublished information from industry to

14   arrive at its -- their conclusions, as opposed to the

15   more standard procedure that was taken by IARC, I-A-R-C.

16   Q    Okay.  Now, I asked you if you've ever consulted with

17   the EPA on scientific matters.

18        But have you ever talked or worked with

19   scientists who work at EPA over the course of your

20   career?

21   A    No.

22   Q    Okay.  Can you -- do you have any opinion one way or

23   another on why the EPA evaluation here is not as strong

24   as in your previous cases, in your opinion?

25   A    Well, it's not applicable to what we're doing in this

Michael D. Freeman, MedDr., PhD.

```
 1   case.  It doesn't mean much.  I mean, the EPA

 2   determination had more to do with people who were in the

 3   environment and not occupationally exposed.

 4           So, they didn't really look at occupational

 5   exposure.

 6   Q    Okay.

 7   A    They also used a lot of unpublished literature and a

 8   large number -- a large proportion of literature from

 9   the -- from industry; and didn't look at any

10   epidemiologic studies that -- so, that was -- it was

11   surprising that -- to have such a diversity of opinion.

12   For me, usually IARC is sort of the authority on

13   carcinogens and whether something is considered possibly

14   or probably carcinogenic.  And usually EPA is in line

15   with them.

16           So, understanding why there is a difference was

17   something that I did want to understand.

18   Q    Okay.

19   A    Yeah.  Because I'm not pointing fingers at EPA and

20   saying, "Well, these guys don't know what they're doing."

21           But I did want to understand what the difference

22   was in the process.

23   Q    Did you -- so, you mentioned that they looked at

24   industry studies that were unpublished.

25           Did you ask to see those studies as well so you
```

Michael D. Freeman, MedDr., PhD.

```
1    could form an independent opinion on them?
2    A    No.  I've already formed an independent opinion.  I
3    mean, how they came to their opinion, which didn't relate
4    to the kind of applicator or occupational exposure that
5    we're talking about in this case, it's just not a helpful
6    opinion to understand what's going on with Mr. Koen.
7         And so --
8    Q    Okay.
9    A    -- it seems very tangential to what it is that IARC
10   did.  So, I don't need to go back and try to fix what
11   they're doing or interact with them and say, "Well, I
12   think you did it wrong," or whatever.
13        I mean, that's something that isn't really part
14   of what I'm trying to do here.
15   Q    Now, I may have missed this.  And Clare can correct
16   me if I'm wrong.  But I didn't see a separate materials
17   considered list accompanying your report.  So, I had your
18   report with all its cites, and then I had the thousands
19   of pages of medical records that followed it.
20        And I take that you didn't create a materials
21   considered list for this case?
22   A    Well, I brought my file --
23   Q    Okay.
24   A    -- which has the materials that were potentially
25   considered, which I'm obviously more than happy just to
```

Michael D. Freeman, MedDr., PhD.

1    run through and tell you what's in there.

2         But no, I didn't do that for this case; at least

3    not within the report.

4    Q    Okay.  Were there materials that you looked at that

5    were not cited in the report?

6    A    Let's see.  Well, I did give a list of documents that

7    were reviewed.  It's on page 3 of my report.

8    Q    Okay.  Right.

9    A    I just didn't do it in detail.

10   Q    Okay.

11   A    So --

12   Q    So, let me go to page 3, and we'll talk about it real

13   quick here.

14              MS. NOLAN:  And those are all included in

15   the Dropbox link that we sent to you.

16              MR. KALAS:  Okay.  Let me see if I can --

17              MS. NOLAN:  They're the ones from the case.

18              MR. KALAS:  Right.  Okay.  We'll -- let me

19   link back to this after we take our first break.  Because

20   I got a ShareFile from a parallel, and I'll be able to

21   see what's in there.

22         Okay.  Let's move on.

23   Q    BY MR. KALAS:  Did you ever speak to Mr. Koen?

24   A    No.

25   Q    Okay.  Did you inspect the properties where Mr. Koen

Michael D. Freeman, MedDr., PhD.

```
 1   applied Roundup?

 2   A    No.

 3   Q    Did you inspect the equipment Mr. Koen used to apply

 4   Roundup?

 5   A    I did not.

 6   Q    Did you inspect the PPE Mr. Koen wore when he applied

 7   Roundup?

 8   A    I did not.

 9   Q    Okay.  Did you make any determination as to whether a

10   change in the warnings on the Roundup label would have

11   affected whether Mr. Koen would have used Roundup?

12   A    No.

13   Q    Okay.  All right.  So, as your report states, you're

14   a forensic epidemiologist; correct?

15   A    Let me pull up my report.  I don't think I actually

16   refer to myself as a forensic epidemiologist.  I just say

17   I'm a consultant in forensic medicine generally and

18   forensic epidemiology specific -- specifically.

19   Q    All right.

20   A    But that's certainly correct.  I've certainly

21   referred to myself as forensic epidemiologist and a

22   forensic medical doctor in the past.

23   Q    Okay.  And you're not just a forensic epidemiologist

24   for litigation; correct?

25   A    Correct.
```

Michael D. Freeman, MedDr., PhD.

```
 1   Q     You consult --

 2   A     I consult --

 3   Q     -- outside of litigation on forensic epidemiology

 4   matters?

 5   A     Certainly; and teach, most prominently.

 6   Q     Right.  That was my next question.

 7         You teach forensic epidemiology?

 8   A     I do.

 9   Q     Okay.  You present in -- at seminars and conventions

10   regarding forensic epidemiology?

11   A     Certainly.

12   Q     Okay.  And you use the same methodology when

13   evaluating epidemiology data, whether you're testifying

14   in litigation or teaching students or presenting at a

15   seminar; right?

16   A     Yes.  If I'm talking about forensic epidemiology,

17   you're -- ultimately, everything has to be able to go in

18   front of a fact finder.

19         So, if I'm teaching about people -- I'm teaching

20   people, how do you -- what does a fact finder need;

21   what's the legal question that's being asked; and how do

22   you evaluate that in the context of what you do, then,

23   yes, it always ends up being basically the same concepts,

24   just not necessarily presented in a legal setting.

25   Q     And as I understand it, in a nutshell -- and you can
```

Michael D. Freeman, MedDr., PhD.

```
 1    tell me where I'm wrong, if I'm wrong anywhere.  But as I
 2    understand it, what you do when you're conducting a
 3    forensic epidemiology evaluation is you apply
 4    epidemiology principles and methodologies to
 5    determinations of specific causation; is that correct?
 6    A    Yes.  In a very, very tight nutshell, yes, that's
 7    correct.
 8    Q    Okay.
 9    A    It's a hybrid discipline.  So, you're also
10    incorporating other information into your evaluation.
11    Q    What sort of other information are you incorporating
12    beyond epidemiology principles and methodology?
13    A    Well, you have to be able to understand the factors
14    associated with the exposure and with the illness.  And
15    so, there has to be enough medical knowledge to
16    understand what the illnesses are and subtle differences
17    within the illness that may be associated with certain
18    kinds of exposures.  Then you also have to understand the
19    exposures.
20         So, there has to be enough understanding of
21    toxicology or pharmacology or biomechanics and
22    engineering principles to understand an exposure.  And
23    then, there has to be enough information or understanding
24    about the medicine, including the pathology --
25    pathophysiology or pharmacokinetics of an exposure as
```

Michael D. Freeman, MedDr., PhD.

1    well.  And then, the -- that has to be synthesized into

2    what -- the legal question that's being asked; and what

3    is the specific task that, as the epidemiologist, you're

4    being tasked to do.

5         So, it's not something -- you can't pick up an

6    epidemiologist out of a public health agency and say,

7    "You're now a forensic epidemiologist."  There is

8    additional information, training, and skill sets that are

9    required.

10   Q    Okay.  So, to that point, what is the specific task

11   you were asked to do here?

12   A    Evaluate the causal relationship between Mr. Koen's

13   history of exposure to glyphosate-based herbicides, GBHs,

14   and his subsequent diagnosis of non-Hodgkin lymphoma

15   first as, I think it's, follicular lymphoma initially,

16   and then diffuse B-cell.

17   Q    Were you asked to evaluate the potential causal

18   relationship -- without telling me about any

19   communications with counsel.

20        But was it your understanding you were asked to

21   evaluate the potential causal relationship between other

22   potential risk factors Mr. Koen had and his non-Hodgkin's

23   lymphoma?

24   A    Yes.

25   Q    Okay.  Now, breaking down the methodology -- and, you

Michael D. Freeman, MedDr., PhD.

```
1    know, I've read some things from the past.  So, tell me
2    where I'm wrong, if I'm wrong.  But -- and, hopefully,
3    streamlining this, I think I got it right.
4         Breaking down your methodology, if I understand
5    it correctly, your first step is to examine whether or
6    not there is evidence of an association generally; true?
7    A    When assessing plausibility, the first step, yes.
8    Q    Okay.  And you're usually going to assess that
9    through evaluation of epidemiology studies, or only one
10   study if that's all that's available; right?
11   A    That's the first place I'm going to start.
12        If I don't have that information, then there are
13   other steps.
14   Q    Okay.  And here you had that information; right?
15   A    Correct.
16   Q    Okay.  So, in this particular case with glyphosate,
17   you first examined whether or not there is evidence of an
18   association generally?
19   A    Yes.
20   Q    Okay.  And when you're looking at those epidemiology
21   studies just generally, outside of the glyphosate
22   context, you're going to look to see if the studies have
23   been conducted in a way that took into account the
24   influence of bias and confounding and random variation or
25   just chance; correct?
```

```
 1   A     Yes.

 2   Q     Okay.  And confounding refers to a situation where an

 3   association between an exposure and outcome is all or

 4   partly the result of a third factor that affects the

 5   outcome but is unaffected by the exposure; true?

 6   A     Yes.

 7   Q     Bias refers -- strike that.  Bias refers to a form of

 8   error that may threaten the validity of a study by

 9   producing results that are systematically different than

10   the true results; true?

11   A     Yes.

12   Q     Two main categories of bias in epidemiologic studies

13   are selection bias, which occurs when study subjects are

14   selected as a result of another unmeasured variable that

15   is associated with both the exposure and outcome of

16   interest; and information bias, which is systematic error

17   in the assessment of a variable; true?

18   A     Yes.

19   Q     And recall bias is a subset of information bias;

20   true?

21   A     Yes.

22   Q     What is recall bias?

23   A     It's a bias that may occur when asking somebody about

24   a historical event that has been colored by subsequent

25   events.
```

1          So, for example, if I took 100 people who were in

2     a traffic crash and weren't injured and then I took 100

3     people who were in a traffic crash who were injured and I

4     said, "How big was the crash?  I mean, how much damage

5     was there to your car?"  The people who weren't injured

6     may say, "No, not that much"; more so than the people who

7     were injured who may be saying, "Well, I mean, how else

8     would I have been hurt?  There must have been a lot of

9     damage to my car."

10          And so, there's going to be a tendency for them

11     to recall -- either recall damage in more detail or

12     possibly to recall that there is more damage than there

13     actually was.

14     Q    And in the case of epidemiology studies when you're

15     dealing especially with a retrospective study design,

16     individuals who have the injury in question may be more

17     likely to recall exposures than individuals who do not

18     have the injury question; true?

19     A    Yes.

20     Q    Okay.  And then, going back to the random variation

21     and chance portion of the question I asked a few

22     questions ago, the way we account for random variation or

23     chance is by looking for statistical significance; true?

24     A    Yes.

25     Q    Okay.  And in order to establish general causation,

Michael D. Freeman, MedDr., PhD.

1    one needs to properly account for confounding, bias, and

2    chance; true?

3    A    Yes.

4    Q    And use odds ratios or relative risk where possible

5    that best account for that; true?

6    A    Yes.

7    Q    As a forensic epidemiologist, what do you do if

8    you're dealing with a study or a body of studies that

9    can't account for chance, bias, and confounding?

10   A    Well, you give it the weight that's appropriate.  You

11   have a case study or a case series where somebody's

12   describing what they think is a cause and effect

13   relationship.  And you look at the -- what's the quality

14   of information here; what am I being told.  So, it can

15   be -- that sort of information can be useful, can be

16   helpful in informing other determinations, but it's not

17   enough on its own.

18          So -- and I can -- I guess I can give you an

19   example, if you -- for anything, if you want me to.  But

20   I don't want to tell you stuff -- I don't want to give

21   you stuff you don't need.  But if you want more

22   explanation, please ask.

23   Q    Well, let me ask you this:  If you can't account for

24   chance, bias, and confounding in a body of data, can you

25   establish whether there is an association generally, just

Michael D. Freeman, MedDr., PhD.

```
1    using the epidemiology data?

2    A     Yes, you can.

3    Q     Okay.  How?

4    A     By ruling out any other possible explanation.

5    Q     And how would you do that in a body of epidemiology

6    data, where you still are dealing with these latent

7    chance, bias, and confounding issues?

8    A     Sure.  I'm going to give you an example, if I may.

9    Q     Sure.

10   A     Let's say you're standing in line at a water fountain

11   10 people deep.  And you see the first person take a

12   drink and stand up, and the next person goes to take a

13   drink and that person passes out.  And then the next

14   person takes a drink and passes out.  And the third

15   person starts to drink.  You have to make a decision of

16   is there something going on here.  You don't know what it

17   is, but what you do know is there is a very close

18   temporal proximity between the exposure and an outcome

19   that you're seeing.

20         And it -- that makes it very likely to be causal,

21   not because just drinking out of a water fountain has a

22   strong association with making people pass out, but being

23   in a line and just standing around, for two people who

24   are unrelated and don't have anything to do with each

25   other is even less likely they're both going to pass out
```

Michael D. Freeman, MedDr., PhD.

1    right exactly the same point in time.

2         So, because causality is based on this concept of

3    counterfactual reasoning or counterfactual approach, it

4    means that not only are you interested in how likely is

5    it that that exposure caused the illness, you're also

6    interested in how likely is it this person was going to

7    have the illness at the exact same point in time had they

8    not been exposed.  And so, those two factors have to be

9    balanced against each other.

10        That's the attributable risk or relative risk

11   concept that is the underlying metric of causation or

12   causality.

13   Q    Okay.  Now, under your methodology, once you've

14   established general causation using the best epidemiology

15   studies you can get your hands on, you then turn to

16   specific causation; true?

17   A    Yes.

18   Q    Okay.  And that's the probability that the exposure

19   which you've previously established could plausibly cause

20   the injury caused this injury in this individual; right?

21   A    Yes.

22   Q    Okay.  And as important as it is to quantify the risk

23   of injury associated with exposure to a compound, it is

24   just as important in your causation analysis to answer

25   the corollary question of what is the probability that

1  the individual were to have the injury at the same time

2  if the exposure had not occurred; true?

3  A    Yes.  That's counterfactual causation, what we were

4  just talking about; or what I was blabbing on about.

5       But you put it more concisely.

6  Q    Well, you put it more concisely previously.  But --

7  and you have stated -- or excuse me.

8       You've professed a methodology that the results

9  of an injury causation analysis can be quantified using a

10  comparative risk ratio; right?

11  A    Yes.

12  Q    Okay.  And that comparative risk ratio should be

13  accompanied by a 95 percent confidence interval; right?

14  A    Yes.

15  Q    Okay.

16  A    If possible, yes.

17  Q    Okay.  And then you can convert that comparative risk

18  ratio into an attributable probability; right?

19  A    Yes; or a probability of cause.

20  Q    Okay.  And did you follow that methodology of

21  calculating a comparative risk ratio and then going to an

22  attributable probability in this case?

23  A    I did.

24  Q    Okay.  So, where in your report did you calculate a

25  comparative risk ratio?

```
 1   A    So, the -- what you'll see on page 20 of my report --

 2   Q    Okay.  Going down to it.

 3        Is that the section called Conclusions?

 4   A    Yes.

 5   Q    Okay.

 6   A    I state that the most probable -- more than

 7   50 percent -- known cause of non-Hodgkin lymphoma in

 8   Bradley Koen's history through Roundup exposure; and,

 9   thus, it was a substantial factor in causing his cancer.

10   That really is the conclusion.

11        I don't go through the process of trying to

12   calculate a comparative risk ratio because we have the

13   meta-analyzed values.  We have multiple studies that I

14   talk about previously under Plausibility showing that

15   there is a more than doubling of risk in a number of

16   studies; and reliable, less than doubling of risk but

17   still increased risk in other studies.

18   Q    So, let me table -- I know what you're saying, and

19   I'm going to get to it here in my questions.

20        But you did not calculate a comparative risk

21   ratio, as you've outlined in previous published

22   literature that you've authored, for this case?

23   A    I just characterized this in terms of probability of

24   causation and meeting or exceeding a certain threshold.

25   Q    Okay.
```

Michael D. Freeman, MedDr., PhD.

```
 1   A    So, it's a similar sort of thing.  If you read

 2   through how you'd come up with a comparative risk

 3   ratio -- it's in the textbook -- you will see that it can

 4   be derived from an odds ratio or a relative risk.

 5   Q    Okay.  But I can't look at your report and see that

 6   the number that you're relying on for that comparative

 7   risk here, as far as the ratio, because you didn't

 8   calculate one?

 9   A    Only the body of evidence.  That's correct.

10   Q    Okay.  And, likewise, you didn't calculate an

11   attributable probability or anything like that in this

12   case, because you're relying on the assay that you say

13   caused -- shows a doubling of the risk?

14   A    I did give you the more than 50 percent.  That's --

15   Q    Okay.

16   A    -- an attributable risk calculation.  It's the exact

17   same thing as a probability of cause.

18        So, that actually is the same thing.  But --

19   Q    Okay.

20   A    -- I don't state it in terms of meeting or exceeding

21   a threshold.

22   Q    Got it.  And that's what I'm getting to next.  Well,

23   maybe not.  Hold on.  Let me ask a different question.

24        You've also used a probability of causation test;

25   right?
```

1    A    A probability of causation test, did you say?

2    Q    Yes.  Yes.  That's what it was characterized as.

3    A    Maybe give me a little more information on that.

4    Q    Sure.  It's "probability of causation expresses the

5    amount of causation attributable to a component cause

6    which is equal to the reduction of the risk of the

7    condition in a population not exposed to the cause."

8    A    Oh.  Yeah.  That wouldn't be applicable at all in

9    this case.

10   Q    Okay.  Why not?

11   A    Well, you'd have to pull that from case control

12   studies.  It's just a different approach that doesn't

13   apply in this case.  I mean, you could say -- it would

14   work better for, like, smoking -- cigarette smoking and

15   lung cancer.  Say, if you get rid of cigarette smoking,

16   how much lung cancer do you eliminate.  Probably, if you

17   get rid of Roundup, you don't -- you probably don't

18   eliminate more than one or two percent of non-Hodgkin

19   lymphoma in the -- based on studies.

20   Q    Okay.

21   A    It might be a bit more than that, but not a lot more

22   than that.

23   Q    So, if you were to calculate a probability of

24   causation test here, the difference between individuals

25   not exposed to Roundup and individuals exposed to

 1   Roundup, as far as rate of NHL, in your opinion, might

 2   only be two percent?

 3   A    Not exactly.  What you would find is if -- out of

 4   100 people who have NHL, you would only find that -- and

 5   maybe you did say this correctly and I heard it wrong.

 6   You'd find less than five percent of those people have

 7   any exposure history to NHL; and you would only expect

 8   that half of them were going to get NHL regardless.

 9         So, then, the leftover part, the two and a half

10   percent, that's the etiologic fraction out of the

11   totality of everybody who gets NHL regardless of

12   exposure.

13   Q    Okay.  I think I understand what you're saying.

14         So, using that probability of causation test, it

15   would turn out that, of all the cases of NHL in America

16   or worldwide or whatever of folks who have gotten NHL,

17   about two percent would be attributable to Roundup?

18   A    Right, assuming that around four percent of them were

19   exposed to Roundup --

20   Q    Okay.

21   A    -- if we were able to do such a hypothetical study.

22   Q    Okay.

23   A    So --

24         (Crosstalk between counsel and the witness)

25              THE WITNESS:  Very much, because if we're

1   talking about Mr. Koen, Mr. Koen, doesn't -- is not

2   included in the group of people who have NHL but who are

3   never exposed to Roundup.  He's only included in the

4   small proportion -- four percent, five percent, three

5   percent, whatever that number is -- of people with NHL

6   who also were exposed to Roundup.

7               MR. KALAS:  Okay.  I understand.

8   Q    BY MR. KALAS:  And so, because you don't have the

9   data to make that -- or because this case doesn't fit

10  that test, you didn't apply that methodology here?

11  A    Well, that methodology doesn't apply to the question

12  we're trying to answer --

13  Q    Okay.

14  A    -- which is, if he would have been exposed to Roundup

15  at a relatively high level and you also have NHL, what's

16  the chance the NHL -- what's the chance you'd still have

17  the NHL if you had taken away the exposure.

18        That's really the, sort of, counterfactual

19  causation question.

20  Q    In your mind, under your methodology, how much of a

21  contribution do you need from an exposure for it to be a

22  substantial contributing factor to plaintiff's cancer?

23  A    It has to be more than trivial.  The exposure has to

24  be more than trivial.  Fortunately, we have pretty -- we

25  have literature that has talked about what higher or

```
 1    lower levels of application are; two days a year, 10 days

 2    a year.  We have certain thresholds.

 3           So, we can look at Mr. Koen's history and say,

 4    "Well, he's got, what, 25, 26 years of pretty high

 5    application levels, exposures."  He's -- we know his

 6    exposure is in the upper end of what's described in the

 7    literature.

 8    Q    So, my question was directed at something a little

 9    bit different.  It wasn't about the exposure portion of

10    that question; it was about the percent contribution to

11    somebody's cancer.  In other words, how much of a

12    contribution -- in other words, is 10 percent more likely

13    that they are going to get cancer enough of a

14    contribution for it to be a substantial contributing

15    factor, in your mind?  Is 50 percent?  Is 100 percent?

16           What threshold do you operate under for something

17    to be a substantial contributing factor to somebody's

18    cancer?

19    A    I see what you're saying.  I'm sorry.  I did give you

20    the wrong answer.  I -- you said -- I thought you said

21    exposure, and that's what threw me off.

22    Q    Yeah.

23    A    So, proportionally, how much increased risk would you

24    have.  And I feel okay saying we have a doubling of risk

25    based on the epidemiologic data.  I think I make that
```

1  point fairly well, particularly for the DBLCL [verbatim]

2  variate of non-Hodgkin's lymphoma.

3      But if you're talking about a trivial

4  contribution, I would certainly consider anything less

5  than five percent increased risk generally to be trivial.

6  I would say that is a threshold set in science of what we

7  consider to be kind of an acceptable threshold where we

8  consider something not to be de minimis, if you will;

9  below five percent.  I have never given an opinion in a

10  case in which I saw less than 25 percent contribution,

11  just maybe because of the kind of cases that I've been

12  involved with.

13      But I've -- so, if I was looking at, for example,

14  eight percent or 10 percent, I'd have to look at it very

15  carefully and understand what the legal question is as

16  well.

17  Q    And does that data need to be statistically

18  significant; that that per- -- whatever the percent

19  contribution is, do you need a statistically significant

20  epidemiology study in order to attribute causation?

21  A    Well, certainly, the smaller strength of association

22  would need to be very, very strong.  You would want --

23  Q    You're very tight bound on the confidence interval?

24  A    Exactly.  You'd want to see -- if you -- if you're

25  going to go into court and say, "Well, I think this is

```
 1    more than trivial; therefore, it's a substantial factor,
 2    and it's" -- "because it's a 10 percent increased risk;
 3    that is, one out of 11 people who have this illness are
 4    only going to have it because of this contribution" --
 5    "contributing risk, but it's a triggering factor or added
 6    effect in this person's life," however the -- that would
 7    be characterized.
 8          You would want to see, you know, tens of
 9    thousands of people in studies and reliably demonstrate
10    that it's 10 percent; and that, like you say, a very
11    tight confidence interval for that sort of a statement.
12    The larger it gets, the strength of association, the less
13    the need for really, really huge studies, as long as it's
14    shown repeatedly or consistently.
15    Q    When you don't have the confidence interval that's
16    statistically significant, can you rule out chance as a
17    potential explanation for the data?
18    A    Well, that's a philosophical discussion that lots of
19    folks have.  I mean, for example, if your confidence
20    interval is 1.0 to 1.6 or 7 and you're 1.3, but it's --
21    if it's a large study, is it reasonable to infer that --
22    you know, first of all, I'll just wipe my confidence
23    interval to 94 percent, and then, all of a sudden, I have
24    statistical -- I have a statistical significance.  I
25    don't like to do that kind of manipulation personally
```

1    only because it draws some scrutiny to, "Okay.  These

2    guys here paid you to get this result.  And now you're

3    not doing things the way everybody does it all the time."

4         It still may be correct to do it that way, but I

5    think that just because we're -- it's -- it is --

6    evidence is going to be given in an adversarial setting,

7    it's -- I would be more comfortable writing about it in a

8    paper and letting the peer reviewers have at it, if that

9    makes sense, so that I don't appear to have dog in the

10   fight.

11   Q    So, it's your methodology in litigation to try to

12   rely on 95 percent confidence intervals and look for

13   statistical significance in those where possible?

14   A    Yes, with rare exceptions; like, for example, if it's

15   a standard in the literature for the particular topic.

16   There are some analyses that rely on a 90 percent

17   confidence interval, but that's relatively few and far

18   between, in my experience.  But this is a controversial

19   topic in science.  Say, why is it one in 20?  You know,

20   what's this 95 percent confidence thing?  I mean, why is

21   that?  And, of course, it goes back to Carl Popper and,

22   you know, the 19-teens and '20s of philosophical

23   arguments about this whole counterfactual causation

24   approach, not to get into the philosophical aspects of

25   it.

Michael D. Freeman, MedDr., PhD.

```
1              But it is quite interesting, actually.

2   Q    If you're applying epidemiologic principles to

3   specific causation and -- which is what I think you're

4   doing in this particular case as your specific causation

5   methodology, you're looking for a doubling of the risk to

6   apply to a specific case; right?

7   A    If your standard is preponderance of evidence.

8   Q    Okay.  And 1.4 -- if your odds ratio or relative risk

9   is 1.4, even if statistically significant, is not a

10  doubling of the risk; true?

11  A    That is correct.  It would meet substantial factor;

12  would not meet preponderance of evidence.

13  Q    Okay.  And break that down for me.  Because that's

14  some lingo that may mean something, in your mind.

15              What is a substantial factor versus what is

16  preponderance of the evidence, in your mind?

17  A    Well, substantial factor causation just means that a

18  particular cause is a cause.  And if it's present in

19  somebody's history, they have other -- they have a --

20  it's a multifactorial condition like non-Hodgkin

21  lymphoma.  I mean, it -- there are a lot of factors that

22  go into causing non-Hodgkin lymphoma, and most of them

23  are unexplored or unknown.  And so, given that fact,

24  substantial factor causation becomes a more appropriate

25  approach.
```

Michael D. Freeman, MedDr., PhD.

```
 1            It's -- I can -- I've written about this topic
 2     and how it's --
 3     Q    Right.
 4     A    -- how this has been used in mesothelioma litigation.
 5     Q    Okay.  And if I understand correctly, when you say
 6     something's a substantial factor, it means that it is a
 7     causative factor in somebody's disease but not the only
 8     causative factor?
 9     A    That's correct.
10     Q    Okay.  And then, preponderance of the evidence,
11     what's that mean to you?
12     A    That is the probability that the factor -- the causal
13     factor is a more probable than not factor, such that it
14     is the largest single contributing factor to the cause.
15     Q    All right.
16     A    Because substantial factor causation accounts for the
17     concept of a straw that breaks the camel's back.  And
18     more probable than not doesn't, really.  In other -- but
19     you might say -- because it takes into account the --
20     sort of the fragility of the individual.  And so, the
21     reason that they use -- an individual uses Roundup and
22     gets non-Hodgkin lymphoma when another person uses the
23     same amount of Roundup and gets non-Hodgkin lymphoma,
24     that difference is in that person's substrate.  There is
25     something about them that made them more likely to get
```

1   non-Hodgkin lymphoma.

2         The question is:  Did the Roundup add to it.  And

3   that's where we have to go to the epidemiology.

4   Q    Okay.  And in this case you're opining on the

5   preponderance of evidence standard, not the substantial

6   factor standard?

7   A    Well, I'm giving you both, really, because I think --

8   Q    Okay.

9   A    -- I think we meet the doubling of risk standard.

10  But I think that the standard that the -- I don't -- and

11  I have not asked anybody about the legal standard.  I

12  don't know if the jurisdiction that we're in says

13  substantial factor or not.  And so, that's something I

14  just -- I have not had that conversation.

15        But because non-Hodgkin lymphoma is a multicausal

16  condition, referring to the type of causation we're doing

17  here as substantial factor is appropriate.

18  Q    Okay.  So, I just want to nail this down.  Are you

19  opining -- I think I know the answer to this, but I just

20  want to nail it down.

21        Are you opining that Roundup was a substantial

22  factor in Mr. Koen's NHL?

23  A    Yes.

24  Q    Are you opining Roundup was the single -- largest

25  single factor by a preponderance of the evidence in the

1   cause of his NHL?

2   A    Yes.

3   Q    Okay.  And the standards for those two opinions are

4   different.  The preponderance requires a doubling of the

5   risk in a well-controlled epidemiology study, while the

6   substantial factor does not?

7   A    Correct.

8   Q    Okay.

9          MR. KALAS:  Do you guys want to take a

10  break?  We've gone for about an hour 10.

11         THE WITNESS:  Yeah.  That would be great.

12  I'll get a little more coffee.

13         MR. KALAS:  Okay.  Let's take about five.

14         THE WITNESS:  Okay.  Sounds good.  Thanks.

15         THE VIDEOGRAPHER:  We're going off the

16  record.  The time is 10:17.

17       (Recess held from 10:17-10:26)

18         THE VIDEOGRAPHER:  We are now back on the

19  record.  The time is 10:26.

20  Q    BY MR. KALAS:  Doctor, do you recall testifying in a

21  case called Porter v. Smithkline Beecham?

22  A    Is that the birth defect case?

23  Q    It's the Zoloft case, sir, against Pfizer in

24  Philadelphia.

25  A    Yeah.  I mean, I don't recall it very well, but I

Michael D. Freeman, MedDr., PhD.

1    know about the case.

2    Q     Okay.  Do you recall the judge excluded your opinions

3    in that case?

4    A     I do.  Excluded all of the plaintiff experts.

5    Q     I just want to ask you a few questions.

6          Do you agree with the judge in that case that

7    there is no science of forensic epidemiology which is not

8    totally dependent upon the methodology of the science of

9    epidemiology?

10   A     It's -- it is basic -- no.  It's incorrect.  It's an

11   incorrect statement.

12   Q     Okay.

13   A     It's an incorrect inference.  And I think that the

14   textbook that you've been reading from clearly

15   establishes that.

16   Q     Okay.  Do you agree with the judge in that case that

17   proper epidemiological methodology begins with published

18   study results which demonstrate an association between a

19   drug and an unfortunate effect?

20   A     Well, a proper epidemiologic approach to evaluating a

21   forensic question starts with that.  Proper epidemiologic

22   methods are quite broad, of course.

23          So -- but if that's referring to the kind of case

24   that, if I recall correctly, that was, then I would agree

25   with that.  Sure.

Michael D. Freeman, MedDr., PhD.

```
 1   Q    Okay.  Do you agree with his statement that it must

 2   be determined whether the observed results in the

 3   epidemiology studies are due to a real association or

 4   merely the result of chance?

 5   A    Yes, of course.

 6   Q    Do you agree with his statement that appropriate

 7   scientific studies must be analyzed for the possibility

 8   that the apparent associations were the result of chance,

 9   confounding, or bias?

10   A    Of course.

11   Q    And do you agree with his statement that it must also

12   be considered whether the results have been replicated?

13   A    That should always be considered, to look for

14   consistency, yeah.

15   Q    All right.  Do you agree with his statement that

16   generally accepted epidemiologic methodology considers

17   statistically significant replication of study results in

18   different populations because apparent associations may

19   reflect flaws in methodologies?

20   A    Yeah.  That's standard epidemiology.

21   Q    Okay.

22             MS. NOLAN:  Can you -- although I'm not the

23   court reporter, but can you slow down just a little bit?

24             MR. KALAS:  Sorry.  Yes.

25   Q    BY MR. KALAS:  Last question on this, and we'll move
```

```
 1   on.  The judge criticized you in that case -- from my

 2   reading at least -- for professing to apply a

 3   jurisdictionally-based standard to causation.  And we

 4   touched on this a little bit earlier.

 5        Do you apply the same scientific standard to your

 6   preponderance of evidence or substantial factor test no

 7   matter what jurisdiction you're in, or --

 8   A    Yeah.

 9   Q    -- does the test change?

10   A    No.  No.  That's a completely incorrect or complete

11   garbling of anything I would have testified to.

12   Q    Okay.

13   A    I would never say, for a different jurisdiction, I'm

14   going to use a 90 percent confidence interval versus a

15   95 percent confidence interval or whatever.  I'm talking

16   about my understanding of legal requirements for meeting

17   causation.  When it comes to substantial factor versus

18   preponderance of evidence, which you and I have talked

19   about at some length already, and say that that's some

20   different scientific level, that's simply not true.

21        They all have to show -- they all have to have

22   the same degree reliability of the evidence, whatever

23   standard you're testifying to.

24   Q    Understood.  Let's turn to IARC for a moment.

25        IARC classifies what it believes to be
```

1   carcinogenic hazards; correct?

2   A    Yes.

3   Q    Okay.  And there is a difference between hazard and

4   risk; true?

5   A    Depends on who you're asking.  I mean, hazard can be

6   used as a proxy for risk.

7        But risk implies quantification; whereas, hazard

8   is more qualitative.

9   Q    Right.

10  A    But you could talk about hazard ratios, which,

11  essentially, is a risk.

12            THE WITNESS:  Paula, IARC is I-A-R-C.

13            THE REPORTER:  Thank you.

14  Q    BY MR. KALAS:  Hazard, as I understand it, looks at

15  whether a substance might cause cancer at a hypothetical

16  dose, whether or not that dose is realistic; true?

17  A    That's one definition of hazard.  I mean, I don't

18  know if -- if you're talking about how IARC uses it, that

19  may be --

20  Q    Yes.

21  A    -- how they define it.

22        I'm talking about how it's used in epidemiology.

23  Q    Okay.  Do you know how IARC defines hazard?

24  A    Well, you just told me, I think.

25  Q    Well, no.  You suggested that was IARC's definition.

Michael D. Freeman, MedDr., PhD.

```
 1   I didn't say that.

 2          So, my question is --

 3   A    Then you said yes.

 4   Q    No.

 5   A    No.  I -- what you're talking about, you're talking

 6   about the use of a term that is used in a variety of

 7   ways.  The terms hazard and risk are sometimes used

 8   synonymously.  So, some would say, "Well, I think hazard

 9   is different than risk."  Then it may be a very specific

10   description that might even be discipline-specific, or,

11   you know, might only be in cancer epidemiology.

12          It really depends on what you're looking at.

13   Q    Well, let me ask you about your discipline, forensic

14   epidemiology.  If I understand -- well, you tell me.

15   You're the expert.

16          Does hazard mean a substance may cause the

17   outcome at some dose somewhere?

18   A    The term hazard refers to danger.

19   Q    Okay.

20   A    If I say a substance is hazardous, it's the same

21   thing as saying the substance is dangerous.  It doesn't

22   quantify it or tell -- it doesn't tell you how much

23   danger there is.  I mean, it's dangerous to smoke

24   cigarettes, but you got to smoke them for a long time to

25   get sick.  It's also dangerous to, you know, swallow
```

1    cyanide.  But the penetration of the danger per event,

2    per exposure is way different.  They're both hazardous.

3    They're both dangerous.

4           But there is no risk that's quantified, and there

5    is nothing specified to the degree of exposure.

6    Q    Right.  So, a great white shark in the middle of the

7    Atlanta Ocean is a hazard for a shark bite; right?

8    A    Yes.

9    Q    But I'm not really at risk of that shark bite if I'm

10   in the mountains of Colorado; right?

11   A    Sure.  I mean, you could define -- you can define it

12   that way as well.  I consider a great white shark to be a

13   very dangerous thing.  So, I'm going to stay away from

14   it.

15          It doesn't mean it's a hazard to me or a risk to

16   me.

17   Q    Right.  Exactly.  Risk looks at the chance in the

18   context of epidemiology or in the context of risk

19   assessment.  Risk looks at the chance a substance might

20   cause cancer in a hypothetical individual given a

21   specific dose; correct?

22          In other words, the dose or exposure component

23   comes into risk where it's not really present in hazard?

24   A    Yes.  That is how risk -- that is certainly how risk

25   is used in an evaluation of specific causation.

Michael D. Freeman, MedDr., PhD.

```
 1   Q    Okay.  And, meanwhile, causation is something

 2   different than even hazard or risk.

 3        Causation is concern with whether a substance

 4   caused or substantially contributed to the development of

 5   a particular person's cancer; right?

 6   A    Right.  But the metric of causation is characterized

 7   by language of risk and comparisons of risk.

 8        So, they're very closely interrelated.

 9   Q    We use risk assessments to determine how likely

10   something caused somebody's cancer?

11   A    Yes.

12   Q    Got it.  Now, you would agree with me you cannot have

13   risk without having a hazard; true?

14   A    Yes, that's correct.

15   Q    But you can have a hazard without having a realistic

16   risk; true?

17   A    Oh.  If you use it that way, yes, I agree.  Yeah.

18   Q    Okay.  IARC conducts hazard evaluations only;

19   correct, not risk assessments?

20   A    That's an interesting question.  I would say

21   generally that's true.

22        I agree with that.

23   Q    Okay.  And EPA and other regulatory agencies are

24   tasked with conducting both hazard and risk evaluations

25   on chemicals; true?
```

Michael D. Freeman, MedDr., PhD.

```
 1    A     That's another interesting question.  Yeah, I suppose
 2    that's true.
 3          Yeah, I think I agree with that generally.
 4    Q     Okay.  Now, glyphosate is considered to have a small
 5    molecular weight; correct?
 6    A     I'm not an expert on the molecular composition of
 7    glyphosate.
 8    Q     Okay.
 9    A     I've seen what it looks like and then forgot about
10    it, because chemistry is -- I mean, that's not what I'm
11    here as, an industrial economist.
12    Q     Okay.  Well, you agree with IARC and EPA that the
13    main route of exposure for individuals applying
14    glyphosate is dermal; right?
15    A     Yes.
16    Q     Okay.  Now, have you heard of Dr. Chris Portier?
17    A     Chris Portier?
18    Q     Yes, sir.  He's been designated as a general
19    causation expert by plaintiffs.
20    A     I'm not familiar with the name, no.
21    Q     Okay.  Up until the IARC review, was there any
22    discussion in the scientific literature, to your
23    understanding, that glyphosate and/or Roundup could cause
24    non-Hodgkin's lymphoma in exposed individuals?
25    A     I'm not prepared to answer that question.
```

```
 1   Q    Okay.  So, you don't have an opinion one way or

 2   another about when the scientific literature was

 3   established enough to conclude Roundup was a carcinogen

 4   in people?

 5   A    Yeah.  I haven't looked at the literature with that

 6   in mind.

 7        So, I can't answer that, as we sit here.

 8   Q    Okay.  Now, there is about 60 separate diseases that

 9   make up NHL; true?

10   A    Probably, yeah.

11   Q    Okay.  And each of those diseases have separate

12   genetic translocations associated with the diseases?

13   A    Yes.

14   Q    And each of those diseases have their own

15   pathological fingerprint?

16   A    Yes.

17   Q    And each of those diseases have their own etiology or

18   etiologies; true?

19   A    I don't know if that's true.

20   Q    Okay.  Well, for instance, HIV is only associated

21   with certain types of non-Hodgkin's lymphoma; right?

22   A    Yes.

23   Q    But it's not associated with other types of

24   non-Hodgkin's lymphoma; right?

25   A    Right.
```

1    Q     Okay.

2    A     But a cause is not exclusive to only one type.

3    That's why -- I interpreted your question as saying each

4    one of the types has a different cause.

5    Q     No.  No.  My question was just that each one of the

6    types may have unique causes, or that they could share

7    across types?

8    A     Yeah.  Sure.

9    Q     Okay.  Which -- are all subtypes of NHL caused by

10   exposure to Roundup or glyphosate?

11   A     I don't know that there has been any study that has

12   broken it down into the very tiny subtypes.  So, it's --

13   just a couple of subtypes make up the majority; and one

14   of them, of course, being the diffuse B-cell type; and

15   then, follicular lymphoma.  So, those are really the

16   majority of the lymphomas.  Some of them aren't --

17   haven't even been studied with enough detail to be able

18   to answer your question.

19          I mean, there might be a subtype which is only

20   half a percent or one percent.  As you were saying, there

21   is a number of subtypes that are relatively rare, but

22   they may occur 20 times more often when there is exposure

23   to glyphosate.

24          We just don't have the statistical power to

25   detect that relationship.

Michael D. Freeman, MedDr., PhD.

1    Q     Well, you're aware that DLBCL, even in and of itself,

2    is a collection of multiple subtypes of NHL; right?

3    A     Yeah.

4    Q     Okay.  Because of the statistical power point that

5    you're discussing here, are you relying on epidemiology

6    data for NHL generally in glyphosate?

7    A     In part, yes.

8    Q     Okay.  And can you name a cause of NHL that has been

9    established to cause all 60 types of NHL?

10   A     I have never looked at anything with that idea.

11         So, as I sit here, I can't do it because I

12   haven't tried to.

13   Q     Okay.  Now, Mr. Koen first was diagnosed with

14   follicular lymphoma; right?

15   A     Right.

16   Q     Are you opining that Roundup exposure caused his

17   follicular lymphoma?

18   A     Generally, his NHL is more probably than not caused

19   by his exposure to Roundup.  And that would include both

20   the follicular and the DLBCL.

21   Q     Okay.  And have you made a determination as to

22   whether the DLBCL was independently caused by Roundup

23   exposure or caused by the manifestation of follicular

24   lymphoma that then transformed to DLBCL?

25   A     I have not made that determination.

```
 1   Q    Okay.  And so, for you, the operative causation event
 2   is the follicular lymphoma manifestation after use of
 3   Roundup?
 4        That's the first injury from Roundup?
 5   A    It was the first form of the NHL that was discovered
 6   in his body.  That is correct.
 7   Q    Okay.  Are you going to tell the jury about the
 8   epidemiology data on the follicular lymphoma subtype?
 9   A    Outside of what's in my report, no.
10   Q    Okay.  But you've relied on studies that do look at
11   that subtype; correct?
12   A    Yes.  It's described -- you know, the frequency of
13   that particular subtype is described in brief detail in
14   my report.
15   Q    Okay.  Are you aware of any genetic marker that
16   indicates glyphosate-induced NHL?
17   A    I've never heard of any such thing.
18   Q    Are you aware of any pathological marker that
19   indicates glyphosate-induced NHL?
20   A    I'm unaware of any discovery of such a marker.
21   Q    Okay.  Now, it's true that most cases of NHL have no
22   known cause; right?
23   A    Yes.
24   Q    Okay.  But I'm correct that you do believe there are
25   some environmental causes of NHL beyond glyphosate;
```

Michael D. Freeman, MedDr., PhD.

```
 1   right?

 2   A     That's correct.

 3   Q     Okay.  What are the other environmental causes --

 4         (Watch interruption)

 5               MR. KALAS:  Sorry.  Sorry.  My watch.

 6   Strike that.

 7   Q     BY MR. KALAS:  What are some of the other

 8   environmental causes that you believe can be substantial

 9   contributing factors or causes by a preponderance of

10   evidence of NHL?

11   A     Well, NHL is an immune -- generally, immune-mediated

12   cancer.  So, anything that's going to negatively impact

13   the immune system might have an effect.  I'd say there is

14   good evidence of a relationship between PCB exposure --

15   cumulative PCB exposure and non-Hodgkin lymphoma.  The

16   same thing is true with some other organophosphates.

17         So, without giving you any kind of exhaustive

18   list, those would be just a couple of potential

19   environmental exposures.

20   Q     Now, you mentioned organophosphates.

21         Do you mean organophosphate pesticides?

22   A     Yes.

23   Q     Okay.  You're -- and you're aware that glyphosate is

24   not an organophosphate; it's an organophosphenate (ph);

25   correct?
```

Michael D. Freeman, MedDr., PhD.

```
1    A    I am.

2    Q    Okay.  Is benzene an environmental cause of NHL?

3    A    Yes.

4    Q    Okay.  Is 1,3-Butadiene an environmental cause of

5    NHL?

6    A    I don't know.

7    Q    Okay.  Is hepatitis C a cause of NHL?

8    A    Oh.  It's not an environmental cause.

9    Q    No.  That's why I didn't say environmental cause.

10   A    Okay.  I would say that hep C may increase incidents.

11        But I'm not familiar with that literature to tell

12   you that that's the case.

13   Q    Okay.

14   A    I wouldn't have a problem with the concept behind it.

15   Same thing with HIV.

16        But I can't tell you that I -- that I've reviewed

17   that for the purposes of this deposition.

18   Q    Is tobacco smoking an environmental cause of NHL?

19   A    I don't think there is really great evidence for

20   that, but I'd have to go -- I'd have to look at it more

21   carefully.

22        I don't think there is great evidence for tobacco

23   and non-Hodgkin lymphoma.

24   Q    How about subtypes like follicular lymphoma?

25   A    Maybe.  Maybe.  It's not something I've examined to
```

Michael D. Freeman, MedDr., PhD.

```
 1    be able to answer that authoritatively.

 2    Q    Okay.  And so, the ones that seemed like you did have

 3    opinions on are PCBs, other pesticides; specifically,

 4    organophosphates and benzene; correct?

 5    A    Yes.

 6    Q    Okay.  Now, going back to the IARC monograph for a

 7    bit, IARC looks at three main lines of evidence; right?

 8         They look at epidemiology, toxicology, and

 9    mechanistic studies; correct?

10    A    Generally, yes.

11    Q    Okay.  And they also will talk about, in their

12    monographs, exposure data, though that is not part of the

13    causality assessment?

14    A    Okay.

15    Q    Okay.  Now, epidemiology -- I don't even think we've

16    defined it yet.

17         Epidemiology is the study of disease and health

18    outcomes in human populations; right?

19    A    Yes.

20    Q    Okay.  And one of the great things about epidemiology

21    is it looks at what happens to people who have real-world

22    exposures; right?

23    A    Yes.

24    Q    Okay.  And then, toxicology is the study of potential

25    adverse effects of chemicals on living systems; true?
```

Michael D. Freeman, MedDr., PhD.

```
 1   A    Yeah.  That's a good definition.

 2   Q    Okay.  And one difference from epidemiology is that

 3   toxicology studies are usually carried out in a

 4   controlled setting like a laboratory; right?

 5   A    Yes.

 6   Q    Okay.  And another difference from epidemiology is

 7   toxicology studies are usually carried out in animals as

 8   opposed to humans; right?

 9   A    If you're not talking about attempting to do an

10   observational study, yes.

11   Q    Okay.

12   A    I mean, you're talking about the difference between

13   experimental studies and observational studies.

14   Q    Yeah.

15   A    Experimental studies is, you give a poison to some

16   poor animal -- you can call that a toxicology study --

17   and then see what the effect is; whereas, an

18   observational study is you wait for the exposure to

19   happen.

20   Q    Toxicology is literally the study of poisons.  That's

21   what it's defined as?

22   A    Yes.

23   Q    Okay.  And there is important biological differences

24   between rodents and people; right?

25   A    Generally.  I mean, it depends on the person.
```

Michael D. Freeman, MedDr., PhD.

```
1    Q    When you're conducting your Bradford Hill analysis,

2    you do look at toxicology, at least at a high level, for

3    your biologic plausibility; right?

4    A    Sure.

5    Q    Okay.  But you'd never say that a finding of

6    carcinogenicity or toxicity in a rodent study means that,

7    in and of itself, a compound is going to be carcinogenic

8    or toxic in people; right?

9    A    I agree.

10   Q    Okay.  And then, going to the mechanistic data IARC

11   looks at, mechanistic data are things like genotoxicity

12   studies; right?

13   A    Yes.

14   Q    Oxidative stress studies?

15   A    Right.

16   Q    Endocrine disruption studies?

17   A    Sure.

18   Q    Immunotoxicity studies?

19   A    Sure.

20   Q    Okay.  And those can be done either in vitro or

21   in vivo; right?

22   A    I would imagine so, yes.  I've never conducted one of

23   those studies.

24        So, it's not my area of expertise.

25   Q    Okay.  What's the difference between an in vitro and
```

```
 1    in vivo study, if you know?

 2    A    An in vitro study is done in a lab, and an in vivo

 3    study is done in live subjects.

 4    Q    Okay.  And what those mechanistic studies are

 5    designed to do is to detect cellular damage from the

 6    administered chemical; right?

 7    A    That's my understanding, yes.

 8    Q    Okay.  And that cellular damage in a mechanistic

 9    study can be the first step towards a cancer; right?

10    A    Sure.

11    Q    Okay.  But a lot more things need to happen in a

12    living human before they develop cancer; right?

13    A    Yes.  It's -- you're breaking down steps of what may

14    produce a cancer, but you're certainly not demonstrating

15    cancer, per se.

16    Q    For instance, the genotoxic damage still needs to

17    produce a mutation in order to lead to cancer; right?

18    A    Yes.

19    Q    Okay.  And it can't just be any mutation; it needs to

20    be a mutation that either inhibits cell apoptosis or

21    increases cell replication for cancer to occur?

22    A    That sounds generally correct, yes.

23    Q    Okay.  And even then, the body has lots of systems to

24    fight off that effect?

25    A    Oh, yes.  Lots of, well, genetic mechanisms for
```

1   fixing bad genes.

2           THE WITNESS:  Apoptosis is

3   A-P-O-P-T-O-S-I-S.

4           THE REPORTER:  Thank you.

5   Q   BY MR. KALAS:  You agree that just because IARC found

6   that the mechanistic data was strong for glyphosate does

7   not mean, in and of itself, that glyphosate causes

8   lymphoma?

9   A   I do.

10  Q   Okay.  Going back to the epidemiology data real

11  quick, when you're trying to decide whether an

12  epidemiology study provides evidence to support the

13  carcinogenicity of a substance, what factors do you take

14  into account when you look at that study?

15  A   Can I get the first part of the question again?  I

16  just want to make sure I understand it.

17  Q   Sure.  When you're trying to decide whether an

18  epidemiology study provides evidence to support the

19  carcinogenicity of a substance -- so, this is in your

20  general causation analysis -- what factors do you take

21  into account when looking at the study?

22  A   I don't really use epidemiologic studies to evaluate

23  whether or not a carcinogen actually is a carcinogen.

24  The epidemiologic studies are more for looking at the

25  associations in certain specific populations between

1    exposures and cancer outcomes.

2           So, the carcinogenicity of a substance is

3    explored via other ways, like the litany of evidence that

4    you described that IARC reviews.

5           That's who's going to talk about the

6    carcinogenicity of a substance.

7    Q    Okay.

8    A    So, the information we're talking about is -- the

9    purpose is not to find out whether something is a

10   carcinogen.  That's got to come from additional evidence.

11          You can't just use an epidemiologic study to

12   determine that.

13   Q    Okay.  So, now I need to figure that out.

14          Okay.  So, if what I understand -- I think what I

15   understand from your answer is that epidemiological

16   studies, in and of themselves, cannot establish general

17   causation, in your mind?

18   A    That is not what I said.

19   Q    Okay.  So, then, I don't understand your answer.

20          So, if you can start from the beginning, what

21   I -- what I'm after, just to sort of help here, is, you

22   know, you're back at that first step where you're trying

23   to establish general causation.  You're looking at the

24   epidemiology studies.

25          What factors are you taking into account when

1    looking at the studies as far as study quality, power,

2    that sort of thing?

3    A    Ah.  Okay.  When you're talking about

4    carcinogenicity, I'm hearing a different word.

5    Q    Okay.

6    A    I'm hearing a different concept, basically --

7    Q    Okay.

8    A    -- which encompasses all that IARC type analysis that

9    we're talking about.

10         If you're talking about what effect does an

11   exposure have on a population with regard to certain

12   types of cancers, I'm going to be looking for a

13   well-designed observational study that's going to account

14   for certain confounders.  I'm going to look for,

15   obviously -- with a relatively rare or unusual exposure

16   in a relatively rare disease, typically that's going to

17   be case control studies.

18         There are cohort studies that are designed that

19   can look at exposure and follow forward in time.  But

20   when you're talking about cancers, those are not always

21   ideal, because you have -- there is a lag time between

22   exposure and illness, which is why the prospective

23   studies are a bit problematic with regard to this topic.

24   But for the case control studies, I'm going to look for

25   adequate adjustment for confounders; looking for whether

Michael D. Freeman, MedDr., PhD.

```
 1   putting -- you know, using Roundup is a proxy for using

 2   other pesticides.  That's a real classic confounder.

 3          It would be like saying, you know, how often do

 4   you use a hose.  But it also turns out people who use a

 5   hose more often work outside more often.  People who work

 6   outside more often use Roundup or other types of

 7   pesticides.

 8          So, that would be a true confounder, where --

 9   Q   Like the coffee bladder cancer or smoking from the

10   '70s at Harvard, the MacMahon study?

11   A   Exactly.

12   Q   Yeah.

13   A   So, the other thing I'm going to look for,

14   particularly if we're interested in trying to understand

15   something about the exposure, is whether there was an

16   evaluation of degree of exposure.  Because a very

17   critical finding that's very important in this case, to

18   my mind, is the knowledge of a dose response that's been

19   repeatedly shown for exposure to glyphosate or GBH and

20   non-Hodgkin lymphoma risk.

21          So, those are the major factors.  I mean, that's

22   assuming that the cases and controls have been acquired

23   in a way that keeps the populations relatively similar.

24   Q   Do you look for data that's collected from users as

25   opposed to proxies?
```

```
1   A    Users as opposed to proxies.

2   Q    Yes.  In other words, if you have a deceased

3   population and they ask the spouse whether or not the

4   decedent was exposed, do you find it more reliable to

5   have data from people who actually recall their exposure

6   versus a proxy who recalls somebody else's exposure?

7   A    It depends.  I mean, there is --

8   Q    Okay.

9   A    There is ways to control for that lack of proximity

10  that can be -- that can help.

11       I mean, you can ask for details that basically

12  would demonstrate whether the proxy is misrecollecting.

13  Q    Okay.

14  A    So, there is just ways to design a study to account

15  for that.

16  Q    Okay.  And then, one thing I think we talked about

17  before but I didn't hear you mention there, I just want

18  to touch on it, is, do -- does the fact that data is

19  statistically significant make the study stronger as far

20  as establishing causation, in your mind?

21  A    Well, typically, that's going to be the case.  I

22  mean, if I have 20 studies and they all show risk ratios

23  of -- or odds ratios of 1.8 or 1.9 and the confidence

24  intervals are all just a bit wider, just slightly

25  include 1; you know, .99 or 1.0, that consistency is
```

1    going to be important, and it's going to be basically

2    asking for pooling of the data or meta-analysis of data

3    to strengthen the conclusion that -- that's going to tell

4    me, you know, probably, if I put all these together, if

5    we just had few more people in the study, we'd probably

6    reach statistical significance, as opposed to seeing it

7    kind of all over the map and then say, "Oh.  You know

8    what?  I'm not going to make the effort because nothing's

9    pushing me that direction."

10          So, generally, the answer to your question is

11   yes, with a little asterisk of "but if I'm seeing real

12   good consistency, that also might be helpful and give me

13   additional evidence."  It's just not going to be -- I'll

14   have not ruled out the effect of chance to the same

15   degree with the data that don't have statistical

16   significance.

17   Q    Okay.  You mentioned the dose response and the data

18   is important to you.

19          Now, it's true, isn't it, that both the McDuffie

20   and the Eriksson studies, which you discuss in your

21   report -- and we can mark them if you need to see them.

22   But those are not looking at response; those are looking

23   at exposure response; true?

24   A    Exposure is dose.  It's just dose in terms of time.

25   Q    Okay.  So, let's unpack that for a minute, because

Michael D. Freeman, MedDr., PhD.

```
 1   I'm not sure if I understand that answer.
 2          Would you agree with me that exposure in the case
 3   of Roundup refers to how many days, in the case of the
 4   epidemiology study, somebody used the product?
 5   A    Yes.
 6   Q    Okay.  It doesn't tell you how much of the product
 7   got into their body, if any; right?
 8   A    No.  It just tells you the opportunity to get the
 9   product into their body was over a longer period of time.
10   Q    Right.  And so, when I talk about -- or would you
11   agree with me that dose is the actual amount of the
12   product that gets into the body, while exposure is the
13   number of times you're around the product?
14   A    No.  It's just another measure of dose.  You can
15   measure dose -- I mean, you can measure dose in the least
16   practical possible way, which is that you have to
17   actually measure the dose in the person.  And then, to
18   conclude, "Well, we didn't do that for anybody, so we
19   have no idea what the dose is, so nobody gets sick," I
20   mean, you can just throw your hands up and say, "If I
21   don't have this exact quantification and" -- "of this
22   toxin, which peaks at six hours and, you know, goes away
23   within the next day or whatever, then I don't have
24   anything."  That's definitely not the way scientific
25   inquiry works.  So, you go to the next best thing, which
```

1    is going to be, "Well, I'm going to have to historically

2    look at how long people are exposed."

3           Now, if it turns out that longer exposure and

4    shorter exposure don't show any relationship, then I'm

5    going to conclude that there is not a dose response.  But

6    if I do find that longer exposure does tend to be

7    associated with higher risk of illness, then I'm going to

8    say, "Well, it's probable that longer exposure is higher

9    dose or more consistent dose" -- "dosage of the toxin."

10          And that is not a -- that virtually can't be an

11   artifact of confounding.

12   Q    How many days -- or strike that.

13          I'll represent to you that I fill up my car once

14   a week, okay, with gasoline, okay?  I've been driving

15   since I was 16.  I'm 36.  So, that's 50 times 20,

16   whatever that number is.  I guess that's 10,000 days;

17   right?

18   A    Okay.

19   Q    Yeah.  No.  1,000 days.  I have 1,000 days exposure

20   in my life to benzene; right?

21   A    Okay.

22   Q    Would you agree with that, under my hypothetical?

23   A    Okay.

24   Q    50 times 20.

25   A    Yeah.  I'm just -- I am taking the hypothetical as

```
 1   read.  So --

 2   Q    Okay.

 3   A    -- I agree that's part of the hypothetical.

 4   Q    Am I at a greater risk for AML from my 1,000 exposure

 5   days to benzene?

 6   A    Than who?

 7   Q    Than background (ph).

 8   A    I don't know.  We'd have to have some sort of data to

 9   show that you have -- that having that greater exposure

10   equates to sufficient exposure to benzene to actually

11   trigger illness.

12   Q    The dose of the benzene absorbed into my body would

13   matter there; right?  I would -- my 1,000 exposure days

14   to benzene would be very different than somebody who

15   worked in a petroleum refinery for 1,000 days; true?

16   A    I certainly agree with that.  Yes.

17   Q    Okay.  And so, in the glyphosate epidemiology data,

18   all exposure days are not created equal.

19        You'd agree with that?

20   A    No.  They have an average effect.

21   Q    Okay.

22   A    Throughout the population there is an average degree

23   of actual dose of glyphosate that is absorbed by the

24   body.

25   Q    And so --
```

```
 1   A     If in the hypothetical -- in the hypothetical we're

 2   talking about, if I actually could assay urine levels of

 3   glyphosate or blood levels of glyphosate right at the

 4   time, we would find a distrib- -- Bell-shaped

 5   distribution based on how the application was performed

 6   and over how much time during the day the application

 7   was, and, you know, all the other variables that may

 8   actually affect amount absorbed.

 9         There would be an average.  And that average is

10   going to be the same, typically, amongst the people who

11   distribute less than two days and people who distribute

12   more than two days.  That principle of central tendency

13   of the mean -- central tendency of the population is

14   going to apply on higher or lower.  So, the question then

15   is, since we can assume, on average, the same absorbed

16   dose per day for everybody -- because they all vary, and

17   there is nothing that says that people who do more than

18   two days do it way different than people who do less than

19   two days.

20         We don't have any --

21   Q    That's where I disagree with you, actually.

22         Do you know how many times a year a farmer who

23   applies Roundup to their GMO crops applies Roundup?

24   A    The average farmer?

25   Q    Yes, sir.  What the label calls for.
```

Michael D. Freeman, MedDr., PhD.

```
 1   A    No.  I couldn't tell you the answer to that.

 2   Q    Okay.  Would it surprise you that a farmer

 3   applying -- what -- let me back up and ask a foundational

 4   question.

 5        You agree farmers apply large quantities of

 6   Roundup; true?

 7   A    I do, yeah.

 8   Q    Okay.  Would it surprise you to learn that

 9   application is only called for two times a year over

10   crops?

11   A    No.

12   Q    Okay.  On the other hand, somebody using a knapsack

13   sprayer who is applying at a golf course may apply

14   Roundup 20 or 30 days a year; right?

15   A    Sure.

16   Q    Okay.  But the amount that the farmer applied -- the

17   dose that the farmer was exposed to at least -- would be

18   much higher than the individual applying at the golf

19   course; right?

20   A    Maybe.  It depends on the PPE that -- for someone who

21   applies it.  I mean, maybe the guy at the golf course has

22   no PPE, and the farmer actually is taking precautions.

23   Q    Right.  You haven't looked at the biomonitoring data,

24   as I understand it, to determine whether or not the

25   internal dose in individuals like the golf course worker
```

1   are the same, higher, or lower than the farmer, have you?

2   A    I have not, because that would not assist in the

3   analysis that I'm doing.

4   Q    You cannot rule out misclassification that may be

5   differential in the epidemiology data in the dose

6   response in Eriksson and McDuffie; right?

7   A    I cannot rule it out?  If I'm given a certain

8   hypothetical as an alternative explanation, I can examine

9   it more closely.  It's not something that I've looked at.

10  I have not found -- I haven't taken one study and said,

11  "This is the only study for me."  I've looked at all the

12  literature I could find and then tried to take into

13  account the weight of all of that literature.  All --

14  every single study can be picked apart.  Every single

15  study, there can be weaknesses found which -- on both

16  sides; the studies that say there is no effect, the

17  studies that say there is an effect.

18         So, ruling out possible sources of

19  misclassification is very, very difficult to do.  And I

20  have not attempted to do that in the studies, because

21  ruling out is not the level of evidence I'm looking for.

22  I'm not looking for absent certainty.  I'm looking for

23  what's most probable.

24  Q    Do you would agree with me that exposure is a proxy

25  for dose in the epidemiology studies?

Michael D. Freeman, MedDr., PhD.

```
 1   A     Exposure duration?

 2   Q     Yes, sir.

 3   A     Yes, I do.

 4   Q     Okay.  Do you agree with me that an exposure

 5   algorithm that takes into account levels of PPE method of

 6   application is a more detailed proxy for dose than just

 7   days of use?

 8   A     Perhaps.

 9   Q     Okay.  What is the latent -- I'm sorry.

10   A     It might be.

11   Q     Okay.  What is the average latency for manifestation

12   of NHL following exposure to Roundup?

13   A     Well, I think generally it's considered to be at

14   least 10 years.

15   Q     Okay.  At least or average?

16         So, in other words, does it take 10 years from

17   first exposure for the first cases to manifest, or is

18   that the average time?

19   A     No.  The average is at least 10 years.

20   Q     Got it.  Okay.  And so, an epidemiology study that

21   looks at exposures to glyphosate for a time period

22   earlier than 10 years -- so, exposures five years before,

23   three years before, seven years before -- may not

24   actually be counting cases of NHL from glyphosate;

25   correct?
```

1    A    It's possible, yes.

2    Q    Okay.  Now, you mentioned earlier a cohort study.

3    And you talked a bit about it.  I don't recall actually

4    the answer.

5         But what is a cohort study?

6    A    A cohort study is a study that assembles groups of

7    people based on exposure status.

8              THE REPORTER:  I'm sorry.  "Exposure" what?

9    I missed that.

10             THE WITNESS:  Status.

11             THE REPORTER:  Thank you.

12             THE WITNESS:  So, for example, if we wanted

13   to look at glyphosate, we'd take 100 people who use

14   glyphosate, and we'd follow them forward in time.  And

15   then we'd take 100 people as much like them as possible

16   but who don't use glyphosate; maybe somebody from their

17   family or something; or maybe even a different

18   environment where they're -- we think there is no

19   glyphosate present.  And we follow them forward in time,

20   and we look to see whether or not they develop an illness

21   that we think might be related.  And we look at the

22   frequency of illness in the two groups.  That would be

23   prospective.

24        We could also do it retrospectively as well.

25   Q    BY MR. KALAS:  Are prospective cohort studies

```
1    considered a strong design in an epidemiology study?

2    A    They can be.

3    Q    Okay.  In what ways are prospective cohort studies

4    superior to case control studies, as far as a design

5    point of view?

6    A    Well, you've got the best information on exposure.

7    Q    Okay.

8    A    You're sending out a baseline saying, "Okay.  We know

9    what the exposure is."

10        So, you eliminate issues of recall bias.

11   Q    Okay.  And then, retrospective case control studies,

12   a lot of the glyphosate studies are retrospective case

13   control studies; right?

14   A    Right.

15   Q    Okay.  What are some of the advantages of those

16   studies?

17   A    The advantage of those studies is, if you have a

18   relatively rare illness or a relatively rare illness plus

19   exposure, you can gather together the cases and then look

20   backwards in time to find out, in comparison to a group

21   of controls who don't -- aren't ill, what their exposure

22   history is.

23   Q    And what are some of the disadvantages of the case

24   control design?

25   A    Well, it's going to be more difficult to get precise
```

Michael D. Freeman, MedDr., Ph.D.

```
 1   levels of exposure.

 2   Q    And that's because of the recall bias issues?

 3   A    Yeah.  Just -- it's not -- you won't have had any

 4   opportunity to actually measure or make measurements.

 5   You can use a proxy for measurement; like, we were

 6   talking about time.  But, you know, the ideal study would

 7   be to get -- the absolute ideal study would be to get

 8   thousands of people, following them in time, look at the

 9   actual -- not just their exposure as far as their job

10   description, but actually do the monitoring --

11   biomonitoring, as we're talking about, and watch that

12   over time, to be able to follow them over multiple decade

13   for looking at a cancer, for example.

14   Q    What internal dose of glyphosate is needed on a

15   chronic basis to put me at an increased risk for NHL?

16   A    I don't believe that that's ever been established by

17   anybody.

18   Q    If I sprayed five squirts of Roundup over 10 days of

19   my life, would I be -- each day five squirts, would I be

20   at a 136 percent increased risk of NHL, in your opinion,

21   based on the Eriksson study?

22   A    Shall we look at Eriksson so I can answer the

23   question?

24   Q    Sure.  You know what?  I'll put a pin in that one and

25   come back to it.
```

```
 1   A    Okay.

 2   Q    We'll look at it in a bit.

 3              MR. KALAS:  What time are we at?  You got --

 4   you feeling okay for one more subject, and then we'll

 5   take another break?

 6              THE WITNESS:  Sure.

 7              MR. KALAS:  Okay.  Now I am going to mark

 8   the IARC monograph here real quick.  Okay.  I just marked

 9   that.  I'm going to label it as Exhibit 6.

10         (Exhibit No. 6 was marked)

11              THE WITNESS:  I don't need to pull it up, do

12   I?  Or do you want me to look at it?

13              MR. KALAS:  It's up to you.  I'm going to

14   ask some specific questions about it.  But it's up to you

15   whether or not you want to look at it.  If you can

16   remember without looking at it, be my guest.

17              THE WITNESS:  Oh.  No.  No.  I -- sorry.  I

18   did not understand.  I didn't know if you were just

19   putting it on there because it's something you wanted to

20   have as an exhibit.

21              MR. KALAS:  No.  No.  No.

22              THE WITNESS:  Okay.  I got it.  Sorry.

23   Just -- I just misunderstood what you were doing with it.

24              MR. KALAS:  No worries.  Okay.

25   Q    BY MR. KALAS:  So, the IARC working group reviewed
```

Michael D. Freeman, MedDr., PhD.

```
 1   epidemiologic data as part of its analysis of glyphosate;

 2   right?

 3   A    Yes.

 4   Q    Okay.  The working group reviewed epidemiologic

 5   studies that had been published in the peer-reviewed

 6   literature as of March 2015; true?

 7   A    Okay.  I'm looking at -- oh.  You just pulled up the

 8   glyphosate part of the IARC --

 9   Q    Yes, sir.

10   A    -- study.  Got you.

11   Q    Is that okay, or do you want to look at the whole

12   thing?

13   A    No.  No.  Of course it is.  I was -- my monograph is

14   a gazillion pages because it's got everything in it.

15        So, this is much more convenient, actually, to

16   look at this.  So...

17   Q    So, they -- it says March 2015.

18        So, they reviewed the data from March 2015 and

19   previous; right?

20   A    Where are you looking?

21   Q    So, that question's actually probably not in the

22   document as far as the date.

23        Do you recall when the IARC group -- monograph

24   group met?

25   A    It is not in this particular copy of the --
```

Michael D. Freeman, MedDr., PhD.

```
 1   Q    Right.

 2   A    -- monograph.

 3        Is this -- is it the 2016 publication or 2015

 4   publication?

 5   Q    2015.  Well, let me do this a different way.  Give me

 6   a sec.

 7             MR. KALAS:  Now I'll mark the big one.

 8        (Exhibit No. 7 was marked)

 9             MR. KALAS:  Okay.

10   Q    BY MR. KALAS:  So, I've marked the big one now.  And

11   if you look at -- I think it's the second page.  It's the

12   page that has the, like, copyright and stuff on it.

13        Let me call it up on the screen.

14   A    This says that they met in March of 2015.

15   Q    Right.

16   A    But it was published in 2017.

17   Q    Okay.  But you see here that it's dated 2015; right?

18   A    Yeah.

19   Q    Okay.  And if you go to the actual monograph, you saw

20   that they met March 2015.

21        So, they consider that to be epidemiologic data

22   only up until March 2015; true?

23   A    Yes.

24   Q    Okay.  And so, the IARC working group did not review

25   the Andreotti 2018 updated Agricultural Health Study;
```

Michael D. Freeman, MedDr., PhD.

1    true?

2    A    They could not have.

3    Q    Right.  And they also did not review the Pahwa 2019

4    pooled study; correct?

5    A    I'm not going to look up those studies to see what

6    they are.

7          But just as a category, anything that was

8    published after they met they could not have reviewed.

9    Q    Right.  And so, the Leon study was published after

10   they met; right?  L-E-O-N.

11   A    I'm going to have to --

12   Q    Feel free to refer to your report on that, but...

13   A    -- look at my report.  Yeah.  L-E-O-N.  I don't refer

14   to Leon.  Oh, yes, I do.  There is a Schinasi paper?

15   Schinasi, Leon?

16   Q    No.  That's 2014.  That's the IARC meta-analysis.

17          Did you not review the Leon 2019 paper?

18   A    It's not cited in my report.

19   Q    Okay.  And I haven't gone through the materials that

20   were sent to us.  So, we'll put a pin in that.

21          But suffice it to say any of the meta-analyses

22   published after 2015 IARC also did not review; true?

23   A    Yes.  I agree with that.

24   Q    Okay.  And do you know -- and IARC reached a

25   conclusion on the epidemiologic data that there was

Michael D. Freeman, MedDr., PhD.

```
 1    limited evidence of an association between glyphosate and

 2    NHL.

 3           Do you recall that?

 4    A    I do.

 5    Q    And do you agree with that?

 6    A    At the time, yes.

 7    Q    Okay.  What -- well, when you say "at the time," did

 8    you agree with IARC at the time, or do you agree that the

 9    data at that time was only limited?

10    A    I agree that the data at that time was limited.

11    Q    Okay.  What data has come out since IARC that --

12    well, strike that.  Let me ask a different question.

13           Do you agree that, at the time in 2015, chance,

14    bias, and confounding could not be ruled out for

15    explaining the epidemiology data?

16    A    Well, I think "ruled out" implies a very high degree

17    of certainty that there is no chance, no confounding, no

18    bias.  And I would say that's always difficult with an

19    epidemiologic study.  But I think if you look at the --

20    all of the evidence -- because IARC doesn't just look at

21    epidemiologic evidence -- that -- in other words, if they

22    have, you know, a mechanism, they have animal studies,

23    they have smaller reports that are not full epidemiologic

24    studies, that that also is going to affect how they're

25    going to view the epidemiologic evidence.
```

1          It makes it less likely that the epidemiologic

2     evidence of an association is somehow in error for some

3     sort of systematic -- systematically incorrect or

4     systematically flawed reason.

5     Q    If you go Exhibit 7, it's the big monograph.  It has

6     the preamble at the front.  And if you go to Exhibit 7,

7     can you go to page 27?

8     A    Page -- the page that has 27 at the bottom or the --

9     Q    Yes, sir.

10    A    -- 27th page?

11    Q    Yep.  27 at the bottom.

12    A    Okay.  Got it.

13    Q    I'm calling it up here.

14         Do you see this is a discussion of

15    carcinogenicity in humans?

16    A    Yes.

17    Q    Okay.  And the definition of limited evidence of

18    carcinogenicity is here.  It says, "A positive

19    association has been observed between exposure to the

20    agent and cancer for which a causal interpretation is

21    considered by the working group to be credible.  But

22    chance, bias, or confounding could not be ruled out with

23    reasonable confidence."

24         Did I read that correctly?

25    A    Yes, you did.

Michael D. Freeman, MedDr., PhD.

1    Q    Okay.  Do you agree with IARC that the epidemiology

2    data as of 2015, one, could not rule out chance, bias, or

3    confounding with reasonable confidence?

4    A    Yeah.  And I didn't mean to sound like I wasn't

5    agreeing with that.

6    Q    Okay.

7    A    I -- it's very difficult to rule out those factors.

8    Q    Even with reasonable confidence?

9    A    It's very difficult to rule out those factors at any

10   time in any study.

11        There is always going to be something hidden in a

12   study, no matter how well designed it is.

13   Q    Well, but there is another category; right?

14        Sufficient evidence of carcinogenicity; right?

15   A    Yes.

16   Q    And IARC has ruled it out in its Group 1 carcinogens,

17   like tobacco smoking or benzene; correct?

18   A    I don't have tobacco smoking and benzene up in front

19   of me.  And it's not something I can comment on just off

20   the cuff.

21        But I would say that's probably true.

22   Q    Okay.  And so, there is a collection of data that an

23   IARC working group could see where they could rule out

24   chance, bias, and confounding with reasonable confidence;

25   right?

```
 1   A    If there is more evidence or evidence that's deemed

 2   that to be at that level, sure.

 3   Q    Okay.  And IARC didn't feel like they could do that

 4   in the case of glyphosate; right?

 5   A    Well, I'd have to go to the glyphosate section.

 6   Q    Well, sure.  Let's go -- so, if you go back to

 7   Exhibit 6 and you go to Section 6, it's the last page of

 8   the monograph before the references that looks at cancer

 9   in humans.

10   A    Uh-huh.

11   Q    You'll see that they classified it as having limited

12   evidence.

13        Do you see that?

14   A    Is that what we're looking at right now?  No.

15   Q    No.  I'm looking at the definition.  But we'll go

16   down to it.  Give me one sec here.

17        So, you see we're in Glyphosate here?  Do you see

18   that, Glyphosate, on my screen?

19   A    Yes.

20   Q    Okay.  We're going to go down to page 398 here.

21        Okay.  Do you see Evaluation?

22   A    Yes.

23   Q    Okay.  "There is limited evidence in humans for the

24   carcinogenicity of glyphosate.  Positive association has

25   been observed for non-Hodgkin lymphoma."
```

```
 1            Do you see that?

 2   A    Yes.

 3   Q    So, that means IARC could not rule out chance, bias,

 4   or confounding with reasonable confidence; right?

 5   A    It doesn't say that here.  I mean, it says that in

 6   another part of it that's not glyphosate.

 7            But if that's what they consider their definition

 8   of limited evidence, then I don't have a problem with

 9   that.

10   Q    Okay.  You agree with that; that there was limited

11   evidence as of 2015?

12   A    I do agree that there was limited evidence as of

13   2015.

14            The evidence has --

15   Q    Right.

16   A    -- evolved, and it's only gotten stronger over time.

17   Q    Okay.  So, that's where I wanted to go to next.

18            What has come out from 2015 to today that has

19   made the evidence stronger for causation, in your mind?

20   A    Well, I would say -- I'm going to go to my report.

21   Q    Sure.

22   A    So, the meta-analysis by Zhang, Z-H-A-N-G.

23   Q    Is there any -- go ahead.  I'm sorry.

24            Anything else?

25   A    Yes.  The summary discussion by Weisenburger was, I
```

1    found, very persuasive; and accounted for the possibility

2    of inconsistencies in the literature or -- and in the

3    studies that have been published.

4    Q    Anything else?

5    A    Those are the two biggest considerations that only

6    strengthen the probable carcinogen status that IARC gave

7    glyphosate in 2015, or published in 2017.

8    Q    Okay.  Are you aware Dr. Weisenburger is a retained

9    expert for plaintiffs in litigation involving glyphosate?

10   A    I am.

11   Q    Are you aware Dr. Zhang is a retained expert for

12   plaintiffs in litigation involving glyphosate?

13   A    I am.

14   Q    Okay.  Does the fact that both of them are retained

15   experts in litigation cause you any pause in assessing

16   whether or not their opinions are unbiased?

17   A    Well, it's not a matter of bias.  I mean, I'm a

18   retained expert as well.  And I know that that same

19   criticism would be directed at anything that I published

20   as well.  It's one thing to be a retained expert.  It's

21   another thing to be a retained expert for one side for

22   which there is systematic error made always in favor of

23   the people who retain you.  So, just being retained on

24   one side doesn't necessarily mean that you're giving

25   erroneous or biased opinions.  It could be, but it

1    doesn't mean that.  It doesn't -- those two things don't

2    go together necessarily.

3            So, what I really wanted to do was to look at the

4    controversies in the literature and try to understand why

5    there is a difference of opinion.  Why is the EPA saying,

6    well, it's not a carcinogen.  IARC's saying it is a

7    carcinogen.  How is that being explained?  So, I was very

8    interested in that explanation.

9            And also, in looking at the literature for --

10   like, for example, from Dinato (ph), who we have an

11   expert for industry defending glyphosate litigation, who

12   comes up with a meta-analysis that says, "Well, we don't

13   actually find a relationship," except they kind of give

14   you a relationship for DLCBL -- or DLBCL, excuse me.  But

15   then they back off of that.  Well, okay.

16           So, I think I really am trying to be as good and

17   as impartial of a judge of the evidence as I can, which

18   is the best I can do.  And that means being able to

19   answer questions you ask me.  It's, like, "Why didn't you

20   consider this?  Why didn't you consider that?"  I'm doing

21   my best to answer that and not have my opinions be just

22   because I like who -- it makes the people who hired me

23   happy.  That's not what I'm looking to do here.

24           So, I'm very interested in the discussion, then,

25   of, "Okay.  So, why shouldn't I pay attention to the

Michael D. Freeman, MedDr., PhD.

```
 1    agricultural perspective study?  What's wrong with that?
 2    Isn't that good evidence?"  And if it's not good
 3    evidence, why?  I mean, what's the argument for that?  Is
 4    it just stuff I want to hear, or is it stuff that makes
 5    sense to me?  Why -- what is a possible reason that the
 6    only meta-analysis that's found no relationship
 7    incorporated perspective data that didn't actually have a
 8    latency that was sufficient to actually find the disease?
 9    Is that important?  Yeah, that could be important.  So,
10    I'm trying to weigh that evidence.  I'm trying to say,
11    "Should we throw out everything, forget IARC?  Let's go
12    with the EPA.  Let's" -- "you know, who do we listen to?"
13           So, I'm -- I apologize for this really long
14    explanation.  But I am -- I'm trying to explain that the
15    evidence that's come up since 2015 has been, for me,
16    meta-analyzed evidence; particularly Zhang.  But also
17    what is it that Weisenburger said as far as why shouldn't
18    I be convinced by some of the no association literature
19    or what's out there?  And what -- when I take the balance
20    of all the literature, all the information, what do I
21    come up with?  So, that's why it was important to me.
22    Not just because it was another epidemiologic study, but
23    because it gave me perspective on the previously
24    published epidemiologic studies and the discrepancies in
25    the literature.
```

1          Again, I apologize for that long answer.  It

2     was -- I did not mean to go on as much as I did.  But you

3     asked me a question.  I really wanted to be able to

4     explain why I did what I did and why I perceived what I

5     perceived as best as I could.

6     Q    Dr. Weisenburger has a financial conflict of interest

7     that should be disclosed when publishing on Roundup?

8     A    Yes.

9     Q    Does Dr. Zhang have a financial conflict of interest

10    that should be disclosed when publishing on Roundup?

11    A    Yes.

12    Q    The meta-analysis Dr. Zhang conducted, is the only

13    study that she used in that meta-analysis that came out

14    since 2015 and the IARC monograph the Andreotti study?

15    A    I don't think I can pull it up from memory, without

16    looking at my report, well enough to answer that.

17          So, hold on just a minute.

18    Q    We'll mark it so you can answer that.  And then we'll

19    get ready to take a break here again.

20    A    Okay.

21    Q    Give me a sec.

22    A    And I'm just going to -- I'm going to open up my copy

23    of Zhang so it's easier for me to --

24    Q    Okay.

25    A    -- zip around there, if that's okay.

1   Q    That's fine.

2   A    I can get to my page more easily.

3            MR. KALAS:  So, I marked that as Exhibit 8.

4       (Exhibit No. 8 was marked)

5            MR. KALAS:  I'm going to go down here to the

6   forest plot, and I'll put it up on the screen here.

7   Q    BY MR. KALAS:  Do you see the forest plot here that

8   Zhang used?

9   A    Yes.

10  Q    Okay.  Is the only study that came out after IARC's

11  2015 the Andreotti study?

12  A    It looks that way, yes.

13  Q    Okay.  And the Andreotti study is a null study;

14  right?

15        It does not show a relationship between NHL and

16  glyphosate exposure; true?

17  A    That's correct.  Not -- certainly not according to

18  that -- this particular forest plot.

19  Q    Right.  And you've read that study, too.

20        You recall that at least; right?

21  A    What do you mean I recall that at least?

22  Q    No.  I mean -- I don't mean that -- that came out

23  bad.  I don't -- you recall at least from the study,

24  without looking at it, is what I'm trying to get at

25  there.

1   A    Yes.

2   Q    Okay.

3   A    I remember some stuff.  I know where I live.

4   Q    No.  No.  I know.  I didn't mean it that way.  I'm

5   sorry.

6        And it's your opinion that, despite the fact that

7   the only study to come out after IARC included in Zhang

8   showed a null finding, that, despite that, Zhang

9   strengthens the evidence for the association between

10  glyphosate and NHL?

11  A    Yeah.  I think there was an additional evaluation

12  using -- showing that the cumulative evidence as of 2019

13  demonstrated that there is a relationship between

14  glyphosate and NHL.

15  Q    IARC conducted their own meta-analysis; right?

16       Schinasi and Leon; you cite that from 2014?

17  A    Yes.

18  Q    And even despite the fact they did their own

19  analysis, of all the studies that were in Zhang, except

20  for Andreotti, they only found limited evidence; true?

21  A    I'm looking at Schinasi right now.  You know, I think

22  there is this problem with adding information from the

23  Agricultural Health Study that I've been made aware of

24  that may be -- have a tendency to produce a null effect.

25       So, that may be a factor in why the evidence was

1   considered limited.  But there is still evidence.

2   Q    Okay.  But your opinion is the evidence has moved

3   beyond limited today to, I take, sufficient; right?

4   A    There is -- overall, there is sufficient evidence,

5   yes.

6   Q    Okay.

7            MR. KALAS:  I'm going to mark as

8   Exhibit 9 --

9            THE WITNESS:  I'm not IARC.  So, I'm not

10  using your same standards.

11           MR. KALAS:  Okay.  I'm going to mark as

12  Exhibit 9 a document called IARC Priorities List 2020 to

13  2024.

14       (Exhibit No. 9 was marked)

15           MR. KALAS:  Please take a look at that when

16  you get a moment.

17       Let me know when you have it open.

18           THE WITNESS:  It says "Missing pdf file."

19  Let me refresh and see if that gets it for me.

20       I have it open.

21           MR. KALAS:  Okay.

22  Q    BY MR. KALAS:  And do you see that this is a document

23  that's put out by IARC; right?

24  A    Yeah.

25  Q    And it says, "Report of the advisory group to

1    recommend priorities for the IARC monographs during 2020

2    to 2024."

3         Do you see that?

4    A    Yes.

5    Q    Okay.  And if you just go back to page 103 of this

6    document -- and that's the number at the bottom, not the

7    pdf page.

8    A    Right.

9    Q    Do you see they discuss glyphosate here?

10   A    I do.

11   Q    Okay.  And they discuss their evaluation in

12   Volume 112, including the limited evidence of

13   carcinogenicity in humans; right?

14   A    Yes.

15   Q    Okay.  If you go down to the epidemiological data,

16   they discuss the IARC evaluation, and then they dis- --

17   or excuse me, cancer in humans is how they describe it,

18   not epidemiological data.

19        But they discuss some of the publications that

20   came after the IARC monograph; right?

21   A    Yes.

22   Q    Okay.  And if you go down to their summary, which is

23   on page 104, they say that "The advisory group reviewed

24   the evidence published since IARC monograph Volume 112,

25   and concluded that the evidence on cancer in humans

Michael D. Freeman, MedDr., PhD.

```
 1   appears to remain limited."

 2         Did I read that correctly?

 3   A    You did.

 4   Q    Okay.  And you disagree with the IARC group, that the

 5   evidence appears to remain limited?

 6   A    Well, I'm not defining "limited evidence" the same

 7   way that IARC is.

 8   Q    Okay.

 9   A    I mean, it's limited in that it's not comprehensive.

10   You don't have 25, 30, 40, 50 studies.  What your

11   standard is for how many studies you have to have, that's

12   a different thing.  There is a couple of meta-analyses

13   out there.  There is a good description of pooled data.

14   There is a consideration of the null findings.

15         And I think that when you put all that together

16   what you come out with at the end is, there is sufficient

17   data to conclude -- sufficient epidemiologic data to

18   conclude that there is a dose response relationship

19   between GBH exposure and non-Hodgkin lymphoma.

20   Q    Can chance, bias, and confounding be ruled out with

21   reasonable confidence in the epidemiology data at this

22   point?

23   A    The potential that there is some degree of chance,

24   bias, or confounding is always present.  However, the

25   studies that I am considering I consider to be
```

1  well-designed and to account for chance, bias, and

2  confounding.  I mean, chance is accounted for by a

3  confidence interval that does not include 1.0 at the

4  bottom end of the range.  So, chance is actually

5  accounted for and is ruled out by definition.

6         Bias and confounding is something that is more

7  judgment based.  I consider at least a number of the

8  studies that I've cited to be well-designed and to

9  account for bias and confounding.  They can't rule it out

10 in all respects.  And that's only because we have a

11 disease where you don't know what the cause is in

12 everybody, as you mentioned.  Most people, they don't

13 actually know the cause of non-Hodgkin lymphoma.  Then

14 all you can do is make inferences, frequencies, and

15 associations.

16         It always makes it a little tougher job.

17 Q    Okay.

18              MR. KALAS:  We'll get into that in a little

19 bit.  But I think we're at a good time to take a break.

20              THE WITNESS:  Okay.  You want to do four

21 hours today?

22              MR. KALAS:  If it's possible.  I know I'm

23 running into West Coast lunchtime.  So...

24              THE WITNESS:  Oh, no.  I don't do lunch.

25              MR. KALAS:  See, I don't eat breakfast.

1    That's me.  Let's go off the record.

2              THE VIDEOGRAPHER:  We're now off the

3    record.  The time is 11:40.

4         (Recess held from 11:40-11:59)

5              THE VIDEOGRAPHER:  We're now back on the

6    record.  The time is 11:59.

7              MR. KALAS:  All right.

8    Q   BY MR. KALAS:  Dr. Freeman, I've marked some --

9    premarked some exhibits that we're going to take a look

10   at.  If you can open up the document -- or the exhibit

11   link, please.  Now, one of the things I think you told me

12   earlier -- and I want to make sure I understood

13   correctly -- is that EPA did not assess occupational

14   exposure.

15        Is that what you told me earlier, or did I

16   mishear you?

17   A   My understanding is that their assessment was more

18   for environmental exposure rather than occupational

19   exposures.

20   Q   Okay.  And the other thing I think you said is that

21   EPA did not assess the epidemiology.

22        Did I mishear you on that, or is that your

23   understanding?

24   A   I don't recall that EPA considered the case control

25   studies.

Michael D. Freeman, MedDr., PhD.

1    Q    Okay.  All right.  So, if you can open Exhibit 10,

2    please.

3            Have you seen this document before, sir?

4    A    I'll let you know in just a second.  I just got to

5    get it open.  Yep, I have.

6            I haven't read it extensively.

7    Q    Okay.  If you go -- I'm just going to put the word

8    "occupational" in here in the search.

9            Do you see there are 41 hits in the 2017 EPA

10   paper for the word "occupational"?

11   A    Yes.

12   Q    Okay.  Do you see that EPA is completing a human

13   health risk assessment that assesses risks from

14   anticipated exposures from uses of glyphosate in

15   residential and occupational settings?

16   A    I see it saying that.

17   Q    Did you look at the human health risk assessment that

18   EPA did?

19   A    No.  I looked at the -- I looked at discussions of

20   the discrepancies between EPA and IARC.

21   Q    Right.  You looked at the Weisenburger paper and the

22   Benbrook paper; right?

23   A    Well, I looked at other ones, too.

24   Q    You didn't go look at the EPA paper, though, to see

25   if that -- what they were representing was truthful?

1    A    Well, no.  No, that's not correct.  I mean, I didn't

2    really go back and forth and check them.  I'm just trying

3    to understand why there's discrepancies between EPA and

4    IARC.

5         I did review EPA.  I didn't review it -- like,

6    every single page of it.  I wanted to understand what

7    their conclusions were, rather than --

8    Q    Okay.

9    A    -- all the methods they went through.

10   Q    Okay.

11   A    So...

12   Q    So, they talk about potential exposure to

13   occupational handlers from glyphosate in this paper.

14        Do you see that?

15   A    Yes.

16   Q    Okay.  And then you mention the case control studies.

17        So, one of the case control studies is McDuffie;

18   right?

19   A    Yes.

20   Q    Okay.  Do you see that EPA assessed McDuffie on

21   page 41 of this paper?

22        Do you see that?

23   A    Okay.

24   Q    Okay.  And the EPA criticized McDuffie for risk of

25   other bias for issues of recall bias, exposure

```
 1   misclassification, control selection based on three

 2   different sources depending on province of residence,

 3   relatively low participation rate.

 4        Do you see that?

 5   A   I can't see what the top of the category is, if

 6   that's --

 7   Q   There it is (indicating).

 8   A   Oh.  It's just risk of bias.  Okay.

 9   Q   Right.  And they talk about all those issues here;

10   right?

11   A   Right.  Those aren't criticisms.  They're just

12   potential sources of risk of bias.

13   Q   Right.  And they say "No adjustment for co-exposure

14   to other pesticides or other potential confounders; e.g.,

15   solvents, diesel fumes, UV radiation."

16        Do you see that?

17   A   Yes.

18   Q   So, EPA did review McDuffie, a case control study;

19   right?

20   A   They -- it looks like that's the one that they

21   reviewed, yeah.

22   Q   Okay.  Well, let's look at another one.  Eriksson is

23   a case control study; right?

24        Is that true, Doctor, that Eriksson's a case

25   control study?
```

Michael D. Freeman, MedDr., PhD.

```
 1   A    Yes.

 2   Q    Do you see the EPA reviewed Eriksson here?

 3   A    Okay.

 4   Q    Okay.  That's true; right?

 5   A    I see Eriksson mentioned.

 6        I don't know how it was considered in the study.

 7   Q    Well, they discuss it here for a whole paragraph.

 8   They talk about a Swedish case control study used

 9   detailed exposure information from exposed individuals,

10   et cetera, et cetera.

11        Do you see that?

12   A    Right.  But I don't know how it was considered in

13   coming to the conclusion that glyphosate is not a

14   carcinogen.

15   Q    Okay.  But --

16   A    I don't understand that.  I mean, the fact that they

17   mentioned it doesn't mean they considered it in coming to

18   that conclusion.

19   Q    Well, they don't just mention it; right?  I mean,

20   they talk about -- here about exposure metrics.  They

21   talk about -- here about multivariate analysis

22   adjustments.

23        I mean, they analyzed it; correct?

24   A    No.

25   Q    You saw this?
```

Michael D. Freeman, MedDr., PhD.

1    A    They describe it.  I don't know how they considered
2    it.  I don't know how you consider -- I don't know how
3    you look at studies of multiple case control studies
4    showing that there is an association; describe them in
5    your 216-page document; and then come to a conclusion
6    that there is no evidence of carcinogenicity.  That's the
7    part that confuses me.  That's the part I'm struggling
8    with, because I don't understand -- whether or not they
9    mentioned it, I don't understand how they didn't consider
10   it or describe why it wasn't a factor.
11        That was the thing I didn't get out of reading
12   the EPA conclusions.
13   Q    Okay.  So, I misunderstood you before.  You weren't
14   saying that EPA did not review the case control studies;
15   right?
16   A    No.  They're -- my understanding is they're not
17   considered in coming to a conclusion.
18   Q    Okay.
19   A    That --
20   Q    That wasn't my question.
21   A    My question was --
22   Q    That wasn't my question.
23        You're not saying that EPA did not review the
24   case control studies; right?
25   A    Well, obviously, they talk about it.  Yeah.

1    Q    Okay.  You're saying that you don't understand how

2    EPA came to the conclusion they came to after reviewing

3    the case control studies?

4    A    Right.  Reviewing and considering are two different

5    things here.

6    Q    Okay.  So, let's look at their -- let's look at EPA's

7    conclusion on epidemiological data.  This is in the

8    Discussion section here, 3.6.  And this is at page 63.

9    And they talk about NHL.  And it goes on for -- let's

10   see.  It starts on page 63, and they discuss the case

11   control studies; carries over to 64, 65, 66, 67, 68.

12        Do you see that?  So, five pages discussing their

13   analysis of the NHL data; right?

14   A    Right.

15   Q    Okay.  And what EPA says in their conclusion is

16   "Based on the weight of the evidence, the agency cannot

17   exclude chance and/or bias as an explanation for observed

18   associations in the database.  Due to study limitations

19   and contradictory results across studies of at least

20   equal quality, a conclusion regarding the association

21   between glyphosate exposure and risk of NHL cannot be

22   determined based on the available data."

23        That's what they say; right?

24   A    That is what they say.

25   Q    Okay.  And you disagree with that?

```
 1   A     Well, it's a 216-page document.

 2   Q     Okay.  But I'm asking about that sentence.

 3   A     Hold on.  Hold on.  So, it's a 216-page document that

 4   considers a whole bunch of information.  The information

 5   is of relatively wide variance; and it's from different

 6   sources.  I want to know why they disregard the

 7   observational evidence of a relationship between

 8   glyphosate and non-Hodgkin lymphoma when the

 9   peer-reviewed literature does not.  I want to understand

10   that.

11         And I don't get an explanation saying, "You can't

12   exclude."  It doesn't mean anything.  You can't exclude

13   certain explanations.  Is that the explanation?  Where is

14   the explanation that random variation is an issue in this

15   study?  Point that out for me.  That's what I'm looking

16   for.  Again, I'm not looking at the EPA and saying what

17   the EPA is doing is wrong.  I'm looking at the EPA and

18   saying "Why did the EPA come up with something different

19   than IARC."

20         That's what I'm trying to figure out.

21   Q     Okay.

22   A     And the difference between the two is the EPA just

23   completely disregards the epidemiologic evidence.  They

24   don't consider it in coming to a conclusion that

25   glyphosate is not carcinogenic.  I don't understand that.
```

1          And so, that's -- that is the -- that is an

2     important issue that I have; and potentially one of the

3     big reasons why there is a difference between IARC and

4     EPA.

5     Q    Okay.  Is EPA by themselves -- in concluding that the

6     evidence does not support the carcinogenicity of

7     glyphosate, are they all alone on an island on that

8     opinion?

9     A    What -- alone with whom?  Are you talking about other

10    agencies?

11    Q    Well, are -- did -- has every other regulatory agency

12    on earth that's assessed glyphosate determined glyphosate

13    does cause cancer, except for the EPA?

14    A    That is not something that I have evaluated for every

15    other single regulatory body on earth.

16    Q    When you say EPA -- I want to be clear on this.  When

17    you say EPA did not consider the case control studies,

18    what you're saying is you cannot understand how they came

19    to conclusion they came to based on the data you've

20    reviewed; correct?

21    A    Right.  Based on the actual observed information.

22         I mean, how do you disregard that?

23    Q    You're not -- sorry.  I didn't mean to cut you off.

24    A    Sorry.  No.  No.  I'm cutting you off.  Please.

25    Q    You're not saying that EPA did not offer an

1    explanation for their conclusion?

2    A    I don't consider that an explanation.  I don't

3    consider just saying there is risk of bias.  I mean, you

4    know, I've supervised and conducted and published

5    systematic reviews, quite a few of them, in the

6    literature.  I understand how this process works.  You --

7    at the end of the process you wouldn't come to a

8    conclusion that we're just going to exclude it by just

9    naming some stuff that might be present in the study;

10   that there might be some risk of bias.  You got to do a

11   little better than that if you're going to say "I'm

12   completely going to discount that there is a body of

13   literature that has been meta-analyzed; and, in fact,

14   here's our meta-analyze -- here's our forest plot; and

15   here is what we find.  But we're still going to disregard

16   it."

17          You got to do better than that, from my

18   perspective.  I just don't understand that.  And that's

19   why the IARC information seems to be better considered to

20   me, more considered.  It makes more sense to me.  I can't

21   make good sense of the EPA conclusion.

22   Q    There are Ph.D. epidemiologists who work at EPA;

23   right?

24   A    I'm sure there are.

25   Q    Okay.  And you're not a Ph.D. epidemiologist; right?

```
 1   A     Where did you get that from?

 2   Q     I'm just asking.

 3         Are you a Ph.D. epidemiology?

 4   A     That's what my Ph.D. is in.

 5   Q     Okay.

 6   A     And my Master's in public health.

 7   Q     Let's go back to Exhibit 11.  Exhibit 11 is --

 8         (Crosstalk between counsel and the witness)

 9              THE WITNESS:  Epidemiology, by the way.

10   Q   BY MR. KALAS:  Exhibit 11 is the EFSA conclusion on

11   pesticide peer review -- conclusion on the peer review of

12   the pesticide risk assessment of the active substance

13   glyphosate.

14         Have you seen this document before?

15   A   I'm not even where you are.

16         Which exhibit are you on?

17   Q   Exhibit 11, sir.

18   A   Okay.  And this is EFSA.  Okay.

19   Q   Okay.  Have you seen this document before?

20   A   I don't think I have.

21   Q   Okay.  This is an agency in the European Union;

22   correct?

23   A   Yes.

24   Q   Okay.  And when I was asking if EPA was on an island,

25   I was -- what I was referring to, is EPA the only
```

1   regulatory agency on earth to conclude that glyphosate

2   does not cause NHL.  And so, this is another regulatory

3   agency.  And I'm going to go here to page 11.  And I'll

4   call it up on the screen.  It says, "From the wealth of

5   epidemiological studies, the majority of experts

6   concluded that there is very limited evidence for an

7   association between glyphosate-based formulations and

8   non-Hodgkin lymphoma; overall inconclusive for a causal

9   or clear associative relationship between glyphosate and

10  cancer in human studies."

11        Did I read that correctly?

12  A    It looks like it.  Yes.

13  Q    And that's a conclusion of another regulatory agency

14  you disagree with based on your assessment of the epi

15  studies?

16  A    I don't know what they're talking about.  Are they

17  talking about in the food chain?  Are they talking about

18  for applicators that are occupationally exposed?  I don't

19  know.  This is -- this looks like it's a food safety

20  organization.  Is it talking only about food and

21  what's -- what we have on crops?  I don't actually know

22  what's referred to, because, as you just noted, this is

23  something I haven't seen.

24        So, if you say -- I mean, it doesn't seem like

25  there is good evidence that eating food that has been

Michael D. Freeman, MedDr., PhD.

1    exposed to glyphosate is associated with increased risk

2    of cancer.

3    Q    Okay.

4    A    So, I'd have to review it to be able to agree with

5    you that it's the same thing that the EPA is saying.

6    Q    Okay.  Let's look at another agency.  Go to

7    Exhibit 11, please.

8    A    That was Exhibit 11, wasn't it?

9    Q    Excuse me.  Exhibit 12, please.

10        Do you see this is a document from a group called

11   the European Chemicals Agency, Committee for Risk

12   Assessment?

13   A    I do see that, yes.

14   Q    Okay.  And that is -- they're discussing glyphosate

15   here.

16        Do you see that?

17   A    Yes.

18   Q    Okay.  Go to page -- I believe it's at the bottom --

19   page 31 -- or 30 to 31.  Bottom of 30, carrying into 31.

20   And if you can just read that first paragraph to yourself

21   real quick.

22        (The witness reviews the document)

23            THE WITNESS:  You said 30 into 31?

24            MR. KALAS:  Yeah.  It's Humans -- evidence

25   in humans; the section called Humans.

```
1                (The witness reviews the document)

2                     MR. KALAS:  And just let me know when you're

3     done.

4                (The witness reviews the document)

5                     THE WITNESS:  Okay.

6                     MR. KALAS:  Okay.

7     Q    BY MR. KALAS:  And do you see they're discussing the

8     Andreotti -- or at least the Agricultural Health Study

9     there, along with the case control studies on glyphosate

10    in non-Hodgkin's lymphoma?

11    A    Yes.

12    Q    Okay.  And if you go to the next paragraph, it

13    states, "The DS" -- that's Dossier State (ph) --

14    "concluded that the overall epidemiological data did not

15    provide convincing evidence that glyphosate exposure in

16    humans might be related to any cancer type, including

17    NHL."

18           Did I read that correctly?

19    A    Yes.

20    Q    You disagree with that, too; right?

21    A    Who is the Dossier submitter?  What does the DS refer

22    to, before I -- just -- I just want to understand what

23    I'm looking at, since I haven't seen this before.

24    Q    Sure.  I'm just asking if you disagree with the

25    statement that there is no evidence for NHL.  But --
```

1    A    It depends on what they're talking about.  I mean,

2    you know, they're classifying the agricultural study as

3    being the -- as being the best epidemiologic evidence.

4    And that's as of March 2017.  And I don't -- I think, as

5    of March 2017, there were pretty limited time of

6    exposure.  So, it wasn't very long exposure.

7         So, null evidence is -- you have to look at that

8    evidence, the quality of that evidence, to see if you've

9    actually studied the question at hand, where you have

10   enough evidence to talk about the question at hand.  Even

11   if it's a prospective study, that's -- it doesn't make it

12   better if it doesn't have all the parameters that will be

13   able to match it against the retrospective studies, the

14   case control studies.  So, I'd have to read this more

15   carefully to understand what it is that they are

16   referring to.

17        But putting too much weight into the agricultural

18   study, at least from what I've reviewed in the

19   literature -- remember we were talking about I'm trying

20   to understand why there is difference of opinions.  That

21   seems to be a major driving factor in a difference of

22   opinion; yet, the agricultural study may have some pretty

23   serious flaws or serious limitations that limits what you

24   can say about it.

25   Q    Okay.  Open Exhibit 13, please.

Michael D. Freeman, MedDr., PhD.

1          Can you see this is a document from Health

2     Canada, their re-evaluation decision on glyphosate 2017?

3     A     Yes.

4     Q     Okay.  And this, like all the documents we've looked

5     at, were written after the IARC conclusion; right?  2015,

6     2016, 2017 time period?

7     A     When was IARC published?  IARC was published --

8     Q     IARC came out in The Lancet on March 20th, 2015.

9     A     The monograph is 2017.

10    Q     Well, not -- no.  But that's okay.  The monograph

11    actually was released July 29th, 2015.

12    A     Okay.

13    Q     I remember when it happened.  My glyphosate --

14    A     Excuse me.  I take your word for it.  I mean,

15    you're -- you are submerged in this world, and I am not.

16    Q     Yeah.  That's all right.  The facts of that will

17    speak for themselves.

18          If you go to page 22 of this Health Canada

19    document...

20    A     At page 22, did you say?

21    Q     Yes, sir.  They state -- regarding non-Hodgkin's

22    lymphoma, they state, "The interpretate-" -- the bottom

23    paragraph, "The interpretation of available

24    epidemiological studies involving glyphosate is

25    problematic due to a lack of adequate characterization of

Michael D. Freeman, MedDr., PhD.

```
 1   glyphosate exposures, a small number of cancer cases,

 2   other confounding variables.

 3         "For example, glyphosate exposure was analyzed

 4   with several other pesticides, exposure was generally

 5   based on questionnaires, classification of the type of

 6   cancer was not consistent, and the contribution of

 7   toxicity from formulants could not be assessed.  Only

 8   once an association is possibly established can criteria

 9   such as Bradford Hill be considered to determine whether

10   a causal relationship exists.  Without a causal

11   relationship, epidemiology data cannot be used to

12   establish reference doses or occupational end points."

13         Did I read that correctly?

14   A    You did.

15   Q    Okay.  Do you agree that -- with Health Canada that

16   the interpretation of available epidemiologic studies

17   involving glyphosate is problematic due to confounding

18   variables, among other things?

19   A    Not to the point where you can exclude it.  If it

20   was, I would not have included it in my analysis as being

21   evidence for the relationship between glyphosate and

22   non-Hodgkin lymphoma.  I don't agree that confounding is

23   a substantial limiting factor.  I certainly don't agree

24   there is no adjustment for other pesticides in some of

25   the studies.  And I don't agree with a couple of other
```

1    statements there.

2          So, I'm surprised.  But I would say -- as an

3    epidemiologist, I would say that characterization of the

4    epidemiologic evidence is not consistent with my

5    interpretation of it.

6    Q    Okay.  If you go down here to page 24, the last

7    bulletpoint at the top of that page, it says, "The

8    current available" -- "currently available epidemiology

9    evidence does not support a causal relationship between

10   exposure to glyphosate and cancer outcomes"

11         Did I read that correctly?

12   A    You did.

13   Q    That was the opinion of Health Canada in April 2017;

14   correct?

15   A    Yes.

16   Q    To your knowledge, they haven't changed that opinion?

17   A    I don't know anything about this report.  I don't

18   know if it's updated, not undated.

19         I know nothing about it.

20   Q    It wasn't sent to you?

21   A    By plaintiff's counsel?

22   Q    Yes, sir.

23   A    No.

24   Q    Okay.  And they go on to say, "The PMRA's

25   determination on the carcinogenic potential of glyphosate

Michael D. Freeman, MedDr., PhD.

```
 1   is consistent with the most recent conclusions of other

 2   international regulatory authorities and

 3   intergovernmental organizations."  They mention the

 4   US EPA, the EFSA, the JMPR, ECHA, and NZ EPA.

 5        Do you see that?

 6   A   I do.

 7   Q   Okay.  So, you agree, after looking at these and this

 8   summary here, that EPA is not alone in its conclusion

 9   that glyphosate is not carcinogenic; correct?

10   A   Not alone with regard to the community of regulatory

11   bodies internationally as opposed to just individuals,

12   yes, I agree with that.

13   Q   Okay.  And there is no regulatory body that you have

14   seen that agrees with IARC that glyphosate is a probable

15   human carcinogen; true?

16   A   I have not looked for such a thing.

17        I can't tell you yes or no.

18   Q   Okay.  You're not aware of one, sitting here today?

19   A   Since I haven't looked at it, I'm not aware of it.

20        That's correct.

21   Q   Okay.  EPA -- has EPA ever classified glyphosate as

22   carcinogenic?

23   A   Has the EPA ever done so?

24   Q   Uh-huh.

25   A   I'm not sure, actually.
```

1   Q    Okay.  To your knowledge -- well, strike that.  One

2   more, because it wasn't listed there in the list from

3   Health Canada.

4        If you go to Exhibit 14, please.  This is from

5   the Australian regulatory authorities; correct?

6   A    I'm sorry.  What are you looking at here, now?

7   Q    Exhibit 14, please.

8   A    Oh, shoot.  I lost that link page.  Hold on a second

9   here.

10        And this is 14, you said?

11   Q    Yes, sir.

12   A    Okay.

13   Q    Okay.

14   A    Sorry.  I have got Windows open.  So, I'm losing

15   track of what's open.

16   Q    No worries.  You see this is from the Australian

17   regulatory authorities?

18   A    Yep.

19   Q    Okay.  And if you go down to page 60 of this

20   document, and it's the third-to-last paragraph on

21   page 60.

22   A    Okay.  Got it.

23   Q    It says, "The APVMA agreed with the international

24   assessments of the available epidemiologic data that,

25   while epidemiological data is of limited value for

1    detecting carcinogenic potential of a pesticide, the

2    weight of evidence does not provide convincing evidence

3    for an association between glyphosate exposure in humans

4    and any cancer type, as there was no consistent pattern

5    of statistical associations that would suggest a causal

6    relationship between glyphosate exposure and the

7    development of cancer in adults or children, total or

8    site-specific."

9           Did I read that correctly?

10   A    You did.

11   Q    So, again, the Australian regulatory authorities

12   agreed with all the other regulatory authorities we've

13   looked at that the epi data does not support a causal

14   relationship; right?

15   A    Well, certainly, they seem to be consistent with the

16   other documents that you have shown me.

17   Q    Okay.  And the -- without an established causal

18   association under the rubric laid out by Sir Austin

19   Bradford Hill, one does not apply the Bradford Hill

20   factors; true?

21   A    No.  That is just completely wrong.

22   Q    That is completely wrong?  Okay.

23   A    Completely wrong.  That's an improper application of

24   the Bradford Hill factors, which I've written about a

25   couple dozen times and published on, including the

Michael D. Freeman, MedDr., PhD.

1    textbook you're reading from.

2         That is incorrect.

3    Q    Okay.  Please open Exhibit 15.

4         Have you seen this document before?

5    A    I don't think I have.

6    Q    Okay.  This is a document dated January 6, 2020, on

7    US EPA letterhead; true?

8    A    Yes.

9    Q    Okay.  And its subject is Glyphosate:  Epidemiology

10   Review of Zhang and Leon, publications for Response to

11   Comments on the Proposed Interim Decision.

12        Did I read that correctly?

13   A    Yes.

14   Q    Okay.  And Zhang is a meta-analysis that we talked

15   about before that looks at all the exigent data, up to

16   that point at least -- or at least portions of the

17   exigent data up to that point -- that then combines that

18   data and comes up with a relative risk for the combined

19   data; right?

20   A    Yes.

21   Q    Okay.  And what EPA says about Zhang is that the --

22   well, let's start here (indicating).  It says, "The six

23   studies retained by Zhang authors were evaluated, along

24   with the recent AHS updated by Andreotti, by quality

25   scores using the Newcastle-Ottawa Scale."

1          I -- did I read that correctly?

2    A    I'm sorry.  What page are you on, here?

3    Q    Let me get it on my share screen.  I'm on page 4.

4    A    Oh, okay.  All right.

5    Q    It says, "The six studies retained by the Zhang

6    authors were evaluated, along with the recent AHS updated

7    by Andreotti, by quality scores using the

8    Newcastle-Ottawa Scale."

9          Did I read that correctly?

10   A    Yes.

11   Q    Okay.  What is the Newcastle-Ottawa Scale?

12   A    It's a quality of study, basically; a way to rank the

13   quality of published observational studies.

14   Q    And is it a scale you've used before?

15   A    No.  I don't use the Newcastle-Ottawa.  I use the

16   PRISM --

17   Q    Okay.

18   A    -- grading system.

19   Q    Did you undertake a PRISM grading system assessment

20   of the epidemiological studies you reviewed?

21   A    And it came out PRISM.  It's PRISMA.  I'm sorry.

22   PRI- --

23   Q    Sorry.  PRISMA.

24   A    It's all caps, P-R-I-S-M-A.

25          I did not perform meta-analysis on any of the

1    data because I'm not the original author of any of these

2    studies.

3    Q    Well, I wasn't asking about meta-analysis.  I was

4    asking about a quality ranking.

5         Did you perform a quality ranking of any type on

6    the epidemiology studies here?

7    A    Well, that would be something I would do in

8    preparation for a meta-analysis.  But no, I did not.  I

9    reviewed the studies, and I assessed the quality -- a

10   qualitative assessment of quality, if you will, of the

11   studies I was reviewing.

12        But I did not use a scale.

13   Q    Okay.  Going down to here (indicating) discussing

14   Zhang, they say, "The authors stated their analyses

15   differ from several earlier meta-analyses by focusing on

16   an a priori hypothesis targeting biologically-relevant

17   exposure magnitude and including new updated AHS

18   information from Andreotti."

19        Did I read that correctly?

20   A    Yes.

21   Q    Okay.  And then they talk about the fact that they

22   looked at effect sizes associated with the high-end

23   exposures, the GBHs within the studies; right?

24   A    Yes.

25   Q    Okay.  And the EPA goes on to state, "For least

 1   Andreotti -- the largest study and of the highest

 2   quality -- this hypothesis does not appear to be

 3   supported by initial examination of categorized exposures

 4   since there are not statistically significant results, no

 5   trend is observed (nor monotonicity), and the confidence

 6   interval around each effect size estimate by

 7   characterized exposure overlapped considerably.  In other

 8   words, there is no readily apparent indication of a trend

 9   towards higher odds ratios with higher exposures in

10   Andreotti (2018).  So, there appears to be very

11   little" -- or excuse me.  "There appears to be little

12   evidence supporting the authors' stated a priori

13   hypothesis."

14           Did I read that correctly?

15   A    You did.

16   Q    Okay.  Let me ask you:  Do you agree that there is no

17   readily apparent indication of a trend towards higher

18   odds ratios with higher exposures than the Andreotti

19   study?

20   A    Yes.

21   Q    Okay.  And do you agree that that lack of trend does

22   not support the a priori hypothesis of the Zhang authors?

23   A    Not necessarily.

24   Q    Okay.  Do you see here this is a table excerpted from

25   Andreotti (indicating)?

Michael D. Freeman, MedDr., PhD.

```
 1   A     Yes.

 2   Q     Okay.  And do you see here, for the 20-year lag,

 3   right, that's the longest lag that you -- they have in

 4   that study, there is no statistically significant

 5   increased risk at any of the quartiles?

 6   A     I see that.

 7   Q     And there is no trend; correct?

 8   A     Yes.  The -- there is no statistically significant

 9   trend.

10   Q     Okay.  There is no dose response either; right?  The

11   Quartile 1, in fact, has the highest relative risk as

12   compared to Quartile 2, 3, and 4; right?

13   A     Yes.

14   Q     Okay.  That's not what one would expect if glyphosate

15   were carcinogenic; right?

16         You wouldn't expect to see data that way?

17   A     It really does depend on the study design.  So, for

18   me to be able to respond -- for me to be able to respond

19   affirmatively or -- one way or the other, I have to read

20   this entire document, understand what these criticisms

21   are.  Because some of the criticisms, just from my

22   initial blush, don't actually look like they are -- this

23   looks very, very nit-picky in a way that I'm kind of

24   surprised at.

25         This looks like someone who doesn't want -- they
```

1   didn't want to go after Zhang.  And they're going after

2   them for things that aren't really meaningful; like, the

3   comment -- the -- I just went by something that was

4   talking about fixed versus random effects modeling, which

5   is not even an issue here; that it appears to be one

6   of -- that it created any differences.

7        So, I really would have to review this -- this is

8   something new to me -- to be able to give you meaningful

9   comments, at least from my perspective.

10  Q    Were you aware EPA did their own meta-analysis in

11  this document?

12  A    I haven't seen this document.  So, I --

13  Q    Did you do a literature search to find all of the

14  meta-analyses exigent in the literature on glyphosate?

15  A    No.  That wasn't my -- it wasn't the purpose of my

16  analysis.  But I certainly would not have included this

17  document from the EPA.  I mean, I've already heard from

18  the EPA.

19        The EPA says it's noncarcinogenic.

20  Q    Well, aren't you interested in how they justify that?

21  A    Well, I understand how they justify it.  Look at what

22  they've got from Andreotti.  I mean, they're weighting --

23  they're weighting the Andreotti as more than a third of

24  all cases; yet, it's completely different methogies (ph)

25  by the other studies.  I have to look at that.

1          I don't know if that's appropriate to do that.  I

2    have to look at it.

3    Q    Andreotti has 440 exposed cases of NHL in it, doesn't

4    it?

5    A    Again, that's -- I'm going to have to defer to your

6    notes or what you have in front of me.

7          That's not something I can tell you off the top

8    of my head.

9    Q    That's just up here.  When EPA ran their own

10   meta-analysis, including the case control studies you

11   cite and the Andreotti study, the result they found in

12   Figure 4 in this EPA document, Exhibit 15, is a null

13   finding, not statistically significant; true?

14   A    True.  Not surprising.

15   Q    Okay.  Not surprising.  But this finding, 1.14, with

16   a confidence interval of .87 to 1.5 would not establish

17   general causation if that was the only number we had;

18   right?

19   A    No.  According to this document, what I'm seeing is

20   that you should take Roundup to decrease your risk of

21   NHL, because Andreotti says that it's protective; that

22   there is a 15-percent reduction; and that somehow, if you

23   get more exposure to Roundup, contrary to what everybody

24   else says and what -- the mechanistic studies and all the

25   other studies out there, that if you have increased

1    exposure, you have decreased risk.

2         Until I am able to understand how they come up

3    with a positive effect on health by being exposed to

4    something that's described as a toxin, I can't understand

5    this study.  And I certainly can't understand mixing

6    those results in with the other results in the

7    meta-analysis.

8         Again --

9    Q    Okay.

10   A    -- I have to read the whole thing to be able to

11   answer that question.  But right now, that stands out to

12   my eye.  It's the kind of the thing I look at and say,

13   "Well, wait a minute.  I mean, glyphosate isn't" -- "this

14   isn't an ingredient in a health drink.  This is something

15   that either it's bad for you or it's neutral.  But it

16   can't make you better."

17        So, that's the thing I would want to understand

18   first.

19   Q    Okay.  Well, we'll get to some individual studies

20   probably next time.  I do want to ask you about one other

21   paper, though, before we probably call it a day.  Well,

22   maybe we'll get through few more.  You know what?  Let's

23   go to Andreotti.  Let's start with that, since we've been

24   talking about it.  Working Andreotti is Exhibit 16.

25        This is an article entitled Glyphosate Use and

1    Cancer Incidence in the Agricultural Health Study;

2    correct?

3    A    Yes.

4    Q    Okay.  And it was published in the journal of the

5    National Cancer Institute; correct?

6    A    Yes.

7    Q    Peer-reviewed journal?

8    A    Yes.

9    Q    Okay.  And the authors, if you look at the

10   affiliations, are individuals who work at the National

11   Cancer Institute; right?

12   A    Yep.

13   Q    The National Institute of Health?

14   A    Yep.

15   Q    The National Institute of Environmental Health

16   Sciences?

17   A    Sorry.  I see that.

18   Q    Okay.  The Department of Epidemiology at the

19   University of Iowa?

20   A    Yeah.  I've got to open this pa- -- I can't see this

21   very well on the screen.  So --

22   Q    Oh, sure.

23   A    -- I'm going to open my version of it --

24   Q    Yep.

25   A    -- so I can just follow along, if that's okay.  There

Michael D. Freeman, MedDr., PhD.

 1   we go.

 2          Okay.  Now, I can answer your question.

 3   Q    And I said the Department of Epidemiology at the

 4   University of Iowa?

 5   A    Yes.

 6   Q    And the Department of Epidemiology at the -- at

 7   Drexel University?

 8   A    Yes.

 9   Q    Okay.  Give me one second.  I think I marked a

10   version without the supplemental tables.  I did.  So, I'm

11   going to -- if you give me -- bear with me, I'm going to

12   mark the supplemental table version as Exhibit 17.

13          (Exhibit No. 17 was marked)

14          MR. KALAS:  Okay.  I've marked a version of

15   the supplemental tables as Exhibit 17.  Okay.  If we

16   go -- I'll call up Exhibit 17 now.

17          THE WITNESS:  Sorry.  17 is the

18   supplemental tables?

19          MR. KALAS:  It's just the same study, but

20   it has these tables at the back.

21          THE WITNESS:  Oh, okay.

22          MR. KALAS:  Supplementary tables.  All

23   right.

24   Q    BY MR. KALAS:  The Agricultural Health Study

25   assessment of glyphosate is what's known as the

Michael D. Freeman, MedDr., PhD.

```
 1    perspective cohort study; right?

 2    A    A prospective cohort, yes.

 3    Q    Okay.  And we talked about the advantages and

 4    disadvantages of those types of studies earlier.  So, we

 5    won't go into that again.  But the study evaluated dose

 6    response in a few ways.

 7              First, they looked at exposure days; right?

 8    A    I've got to pull up what you're looking at.  So, give

 9    me just a minute here.

10    Q    Sure.

11    A    I downloaded your -- the one with the tables, because

12    I don't know if I have that or not.

13    Q    Okay.

14    A    Okay.

15    Q    So, I'm looking here -- you're looking here at

16    Supplementary Table 1.  And they have lifetime days of

17    glyphosate use in the Agricultural Health Study.

18              Do you see that?

19    A    Cancer incidents in relation to lifetime days.  Yes.

20    Q    Okay.  And so, they looked at exposure days; right?

21    A    Yes.

22    Q    Okay.  And that's similar to what they did in the

23    McDuffie and the Eriksson study; true?

24    A    Yes.

25    Q    Okay.  But then they also looked at something called
```

1   intensity-weighted exposure days.

2          Do you see that?  Table 2?

3   A    Yes.

4   Q    Okay.  And do you know how they calculated the

5   intensity-weighted exposure days?

6   A    Not off the top of my head, no.

7   Q    Did you go -- they discussed it in their methods.

8          Did you -- if you go up here (indicating), they

9   talk about how they calculated their intensity score.

10  And it says, "The intensity score was derived from an

11  algorithm based on literature-based measurements and

12  information provided by the applicator; specifically,

13  whether the participant mixed or applied pesticides,

14  repaired pesticide-related equipment, used personal

15  protective equipment, and application method used."

16         Do you see that?

17  A    Yes.

18  Q    Okay.  Is that more detailed information that could

19  give you some insight into dose beyond just exposure

20  days?

21  A    Oh, yes.

22  Q    And so -- and let's establish something, you know,

23  that I don't even think we established, because I think

24  we all know it, but the record may not reflect it.

25         You can't go and measure somebody's blood for

```
1   glyphosate exposure from a year ago; right?

2   A    Right.  We talked about that a little bit.

3   Q    Right.  It's not like a perfluorinated chemical where

4   it stays in the body for a very long time; right?

5   A    Correct.

6   Q    Right.  The half life I think you mentioned was six

7   hours, something like that?

8   A    Oh, peak is six hours in the urine after exposure.

9   Q    Okay.  And so, you do need to have some sort of proxy

10  for dose; right?

11  A    Yes.

12  Q    Okay.  And the intensity-weighted algorithm here is

13  more detailed than just exposure days?

14  A    I agree.

15  Q    Okay.  And if you go to Table 3, in addition to

16  looking at exposure days -- intensity-weighted exposure

17  days, they also looked at lagged intensity-weighed

18  exposure days.

19       Do you see that?

20  A    Yes.

21  Q    Okay.  And why would you want a lag in a prospective

22  study like this?

23  A    Well, if you have an illness that takes a time --

24  period of time for it to occur, then you would want to

25  increase the lag between --
```

Michael D. Freeman, MedDr., PhD.

```
 1   Q    Right.

 2   A    -- the exposure and the evaluation of the illness.

 3   Q    And I think you told me 10 years at least, on

 4   average, for NHL from glyphosate exposure; right?

 5   A    Yes.

 6   Q    Okay.  And so, we have a five-year lag here and a

 7   20-year lag; right?

 8   A    Yeah.

 9   Q    Okay.  And then, if you go to the supplementary

10   tables, we also have, in the intensity-weighted, a

11   10-year and 15-year lag.

12        Do you see that?

13   A    I'm sorry.  Which table is this?

14   Q    Supplementary Table 2.

15   A    Oh.  I thought we were on 3.  Okay.

16   Q    No.  2.  We have a 10-year and 15-year lag on

17   intensity-weighted.

18        Do you see that?

19   A    I will in a second.

20   Q    Oh.  Sorry.

21   A    You're going too fast for me.

22        Yes, I see it now.

23   Q    Okay.  And then, on Supplementary Table 3 we have

24   lagged lifetime days; right?

25   A    Right.
```

1    Q    Okay.  Now, let's focus first on just lifetime days

2    of exposure so we can compare apples to apples with

3    Eriksson and McDuffie.

4         Eriksson has a cutoff of greater than 10 days of

5    use, less than 10 days of use over lifetime; right?

6    A    By memory, I can't tell you that that's the case.

7         But I -- to make things move along, I'll accept

8    that as read for now.

9    Q    Okay.  If you go down to the quartiles here in

10   Supplementary Table 1 for days of use, do you see that

11   Quartile 1 is 1 to 13.74 days?

12   A    I'm sorry.  Where -- tell -- we're on Table 3?

13   Q    No.  We're on Table 1, or Supplementary Table 1,

14   page 9 and 10 of the pdf.

15   A    Okay.

16   Q    And we're looking at cancer incidents in relation to

17   lifetime days of glyphosate use.  And then they have a

18   little cross here next to glyphosate use.  And then you

19   go down to the key on page 10, and the cross tells you

20   what the quartiles mean on the lifetime days.

21        Do you see that?

22   A    I do.

23   Q    Okay.  And so, Quartile 1 is 1 to 13.74 days.

24        Do you see that?

25   A    Yes.

1    Q    And then, Quartile 2 is 13.75 to 38.74 days; right?

2    A    Yes.

3    Q    Quartile 3 is 38.75 to 108.4 days?

4    A    Yep.

5    Q    And Quartile 4 is 108.5 days or greater; right?

6    A    Yes.

7    Q    Okay.  And so, the high exposed group in Eriksson,

8    certain members of that high exposed group -- people who

9    have 11, 12, or 13 days -- would be in the lowest exposed

10   group in the Andreotti study; right?

11   A    I've got to have Eriksson in front of me.

12   Q    Sure.  We'll mark Eriksson just so we can do this.

13   Give me a sec.

14   A    I mean, you don't have to pull up Eriksson for me.  I

15   have Eriksson.

16        But I do have to open it to be able to answer the

17   question.

18   Q    Yeah.  So, we'll mark it for the depo.  I mean,

19   we're -- I'm sure we'll talk about it next time if we

20   don't talk about it this time, so...

21        (Exhibit No. 18 was marked)

22             MR. KALAS:  So, I marked it as Exhibit 18.

23   But you can feel free to look at your personal copy if

24   you want.  I'm --

25             THE WITNESS:  Okay.  Sorry.  It's easier

1    for me to scroll around my copy of it.  That's why I

2    point that out.  Okay.

3                    MR. KALAS:  Okay.

4    Q    BY MR. KALAS:  And you see Table 2 of Eriksson?

5    A    I do.

6    Q    Okay.  You see Table 2 for glyphosate on the

7    GEOS (ph) metric has less than 10 days and greater than

8    10 days?

9    A    Yes, I do see that.

10   Q    Okay.  And so, going back to Exhibit 17, which is

11   Andreotti, the Quartile 1 group, in the lifetime days,

12   would -- if an Eriksson subject had 11, 12, or 13 days of

13   exposure, they'd be in the high dose in Eriksson but in

14   the very lowest dose in Andreotti; right?

15   A    Yes.

16   Q    Okay.  And in Andreotti, a full quarter of the

17   participants had exposure days greater than 108.5 days;

18   right?  That's Quartile 4.

19   A    Yes, that's correct.

20   Q    Okay.  Would you consider somebody who used

21   glyphosate over 108.5 days in their life highly exposed?

22   A    Certainly compared to what else is described in the

23   literature, yes.

24   Q    Okay.  And for Quartile 4 for non-Hodgkin's lymphoma,

25   for 108.5 days or greater, they had 116 subjects.

1          Do you see that?

2    A    Yes.

3    Q    Okay.  And they had a relative risk of .8; right?

4    A    Yes.

5    Q    A confidence interval of .6 to 1.06; right?

6    A    Yes.

7    Q    And that is a null finding; true?

8    A    It's a -- it certainly trends to protection.

9    Q    Right.  But it's a null finding?

10   A    Well, it is not statistically significant.

11   Q    Okay.  And, likewise, you mentioned B -- diffuse

12   large B-cell lymphoma; right?

13   A    I mentioned that?

14   Q    Well, you mentioned it earlier in the context of

15   Mr. Koen.

16   A    Oh, yes.

17   Q    Okay.  And they had 26 subjects for that; right --

18   A    Yeah.

19   Q    -- in the highest exposed group?  And an odds

20   ratio -- or excuse me.  A relative risk of .97; right?

21   A    Yes.

22   Q    With a confidence interval of .52 to 1.81; right?

23   A    Yep.

24   Q    Again, a null finding?

25   A    That would be a null finding.  I agree.

Michael D. Freeman, MedDr., PhD.

1    Q    Okay.  And for follicular lymphoma, the first disease

2    to manifest in Mr. Koen, they only had enough data to

3    separate them into tertiles.

4         Do you see that?

5    A    Yeah.

6    Q    Okay.  And if we go down here (indicating), that

7    meant the highest exposed group had greater than 62 days

8    of exposure; right?

9    A    Yep.

10   Q    Still highly exposed, in your opinion; greater than

11   62 days?

12   A    Well, compared to what Eriksson used, certainly.

13   Q    Okay.  And for folks with greater than 62 days of

14   exposure, they had a relative risk of .73 with a

15   confidence interval of .33 to 1.62; right?

16   A    Yep.

17   Q    It's a null finding; right?

18   A    That would be a null finding.

19   Q    Okay.  Now, some of this data here isn't lagged;

20   right?  I mean, this is just everybody in the study.

21        So, you'd also want to look at the lag data;

22   true?

23   A    True.

24   Q    Okay.  So, let's look at the lag data.  And let's go

25   to the 10-year lag, since that was sort of our cutoff

Michael D. Freeman, MedDr., PhD.

```
 1    point.  This is lagged -- well, let's go to lagged

 2    lifetime days, because that's a little easier to deal

 3    with.  Then we'll get to the intensity-weighted.

 4         Lagged lifetime days, our key down here says

 5    that, for the 10-year quartiles, the Quartile 4 group is

 6    87 -- greater than 87 days.

 7         Do you see that?

 8    A    I do.

 9    Q    Okay.  And that would be a highly exposed person;

10    right?

11    A    Yes.

12    Q    Okay.  For non-Hodgkin's lymphoma in the 10-year lag

13    lifetime days, the 92 subjects, the relative risk was .85

14    with a confidence interval of .65 to 1.12; right?

15    A    Yes.

16    Q    Okay.  That's a null finding; right?

17    A    Generally, yes.

18    Q    Okay.  And then, likewise, for diffuse large B-cell

19    lymphoma, we had 24 subjects in Quartile 4 with a

20    relative risk of 1.06, confidence interval of .61 to

21    1.83.

22         Do you see that?

23    A    I do.

24    Q    Also a null finding?

25    A    Yes.
```

1   Q    Okay.  And, likewise, for follicular, we have

2   18 subjects.  And now we're in tertiles again.  So, that

3   is greater than 56 days, with a relative risk of 1.31,

4   confidence interval of .62 to 2.77.

5        Do you see that?

6   A    I do.

7   Q    Still a null finding; true?

8   A    Yep.

9   Q    Okay.  Going to the intensity-weighted group -- and

10  we'll just focus on the Quartile 4 here; although, we

11  haven't gone through the work of figuring out where

12  Mr. Koen would fit into the intensity-weighting based on

13  his PPE or whatever.  But we'll look at the highest

14  exposed group.

15       For the highest exposed group in the

16  intensity-weighted metric -- this is Table 2 of the

17  Andreotti study -- we had 111 subjects, with a con- --

18  with a relative risk of .87, confidence interval of .64

19  to 1.2.

20       Do you see that?

21  A    Yep.

22  Q    Null finding?

23  A    Yes.

24  Q    Okay.  For DLBCL Quartile 4, we had 22 subjects;

25  relative risk of .97, confidence interval of .51 to 1.85.

Michael D. Freeman, MedDr., PhD.

1           Do you see that?

2    A    I do.

3    Q    Is that a null finding?

4    A    It is.

5    Q    Okay.  And for follicular lymphoma, in Tertile 3, we

6    had 20 subjects; relative risk of .85, with a confidence

7    interval of .36 to 2.03; right?

8    A    Yeah.

9               THE REPORTER:  For Paula's benefit, tertile

10   or tertile is T-E-R-T-I-L-E.

11              THE REPORTER:  Thank you, sir.

12              MR. KALAS:  Okay.

13   Q    BY MR. KALAS:  Is that a null finding?

14   A    Yes.

15   Q    Okay.  The data we've just looked at in the

16   Agricultural Health Study, is this what you would expect

17   to see if no relationship existed between Roundup and

18   NHL?

19        Is this sort of data what you'd expect to see?

20   A    Well, the data you've pointed out.

21        The data I wouldn't expect to find would be a

22   protective effect.

23   Q    Okay.  But I pointed out data specific to the highest

24   exposed group at the 10-year lag at the highest

25   intensity-weighted group and then at the ever/never

1    group.

2        And all of that was null findings; right?  All

3    the crossed ones just didn't show a relationship one way

4    or another; true?

5    A    The ones you pointed out, that's certainly true.

6    Q    Okay.  And just to be clear, so the record's clear,

7    you would totally expect to see data like this if no

8    relationship existed between Roundup and NHL?

9    A    That's true.

10   Q    Okay.

11   A    If that conclusion was true, if I knew that was true,

12   then I would expect to find the things that you've

13   pointed out.  Absolutely.

14   Q    Okay.  So, begs the question.  In your weight of

15   evidence analysis that you conducted here, why do you

16   think that the case control studies should be elevated

17   above this study, the Andreotti study?

18   A    Well, there is this big problem with this kind of

19   protective effect overall coming from this study.  I

20   don't know what is -- if something systematically is

21   wrong, but you don't expect to find less cancer amongst

22   people who are exposed to a toxin than people who are not

23   exposed to it.  So, that makes me really wonder and be

24   concerned about what's going on within this study that

25   may be biasing their results.

1          That's something I really want to look at, and

2     look at it carefully, in order to answer your question.

3     Q     Well, haven't you looked at it carefully when you put

4     together your report?  I mean, you know, you put together

5     a report.  You're offering opinions in this case.

6          Don't -- haven't you dug into that question?

7     A     I would dig into it further to be able to answer your

8     question.

9     Q     Okay.  Do you know what replacement pesticides are

10    substituted for glyphosate when farmers can't use

11    glyphosate for whatever reason?

12    A     No, I can't say I do.

13    Q     Okay.  Do you know if those pesticides are risk

14    factors for NHL?

15    A     Since I don't know what they are, I couldn't possibly

16    answer that question.

17    Q     Could one explanation for the protective effect, as

18    you characterize it, in the data be that the other

19    pesticides being substituted for glyphosate in the

20    nonusers are greater risk for NHL than glyphosate

21    potentially could be?

22    A     No.  That would be, then, a pretty big error rate in

23    this whole study.  Because if we have a bunch of

24    pesticides being used and we're not accounting for them,

25    then now you're creating the problems that there is some

Michael D. Freeman, MedDr., PhD.

1    criticisms of the case control studies for, for not

2    actually looking at other pesticide use.

3    Q    Right.

4    A    So, is that possible?  Sure.

5         That is not something I've examined this data

6    for.

7    Q    Okay.  So, confounding's a big problem, in your

8    mind --

9    A    Con --

10   Q    -- just generally?

11   A    What is a big problem is glyphosate is not -- should

12   not convey protection against non-Hodgkin lymphoma.

13        And according to this study, it does.

14   Q    Where do the authors say in this study -- I'll give

15   you as long as you need to read it -- that glyphosate is

16   protective of NHL?

17        Take a look at it.

18   A    Well, it's not going to be what they said.

19        It's going to be what they reported.

20   Q    Where is the odds ratio that they report a

21   statistically significant negative finding for NHL?  I'm

22   looking at it right here, Table 2.

23        These are all null findings, aren't they?

24   A    Yeah.  Let's go back to the exhibit before this one

25   where the EPA did a meta-analysis.

Michael D. Freeman, MedDr., PhD.

1    Q    Right.

2    A    The weight that they gave to Andreotti was a .85 of

3    the statistically significant confidence interval around

4    that in their meta-analysis.

5    Q    Okay.  So, my question is this study, though.  I'm

6    not asking about the EPA meta-analysis.

7         Where in this study do they report a protective

8    effect in any of these odds ratios or relevant risks?

9    A    Well, if you want me to look within this study and

10   find out where the EPA rebuttal to Zhang came up within

11   their meta-analysis and be able to say "Here's where they

12   report .85" or "Here's where they got the data for that

13   .85 value," I have to go back and look at both documents

14   to be able to do that.

15   Q    But that's not what I'm asking you to do.  What I'm

16   asking you is:  Where do the authors report a

17   statistically significant protective effect for

18   glyphosate from NHL in an odds ratio in this study?  Or

19   excuse me, a relevant risk?

20   A    Same answer I just gave you, which is, I've got to

21   find out why the EPA says that they did.  The EPA says

22   that Andreotti reported a protective effect for NHL, .85.

23   Statistically significant.

24        I just -- I would just need to go and find out

25   where they got that from in the paper.

```
 1   Q    Do you know -- or do you have an opinion, sitting

 2   here today, that there is a specific systemic error you

 3   can point to in the Andreotti study?

 4   A    I can point to a result of --

 5   Q    A result that you don't believe.

 6        But where is the error?

 7   A    I can provide -- I can present -- I can point to a

 8   result which is not predicted by any hypothesis.  This

 9   hypothesis -- the hypothesis behind the study was

10   glyphosate might be a cause of cancer and, therefore,

11   we're going to try to see if people who were exposed to

12   glyphosate over a period of time get cancer more often.

13        In no place is the a priori hypothesis -- or,

14   also, we're going to see if it's protective.  So, that's

15   not -- so, if you get a result where it's contradicted by

16   your hypothesis and it's contrary to a lot of the biology

17   that's out there and a lot of the publications and, you

18   know, IARC, what IARC says, then you have to look back at

19   your methods and say, "Is there an error that we made?"

20        I'm not telling you what that error is.  What I'm

21   telling you is a result that is so inconsistent with the

22   a priori hypothesis that you have to step back and say,

23   "Geez, did we do something wrong?"

24        That's what I'm putting out there.

25   Q    It sounds to me like you are suggesting something may
```

1    be wrong with the study, but you don't have an opinion as

2    to what is wrong with the study.

3         Is that fair?

4    A    In order to get the protective effect, yes.

5    Q    I'm not -- but you keep saying there is a protective

6    effect, and I'm chal- -- I'm not even challenging you.

7    I'm asking you to point me where in the study it says

8    there is a protective effect.

9         But putting that aside, my question is:  Is there

10   something specific in the methodology of the study or in

11   the interpretation of the results of the study that you

12   can point me to that suggests the study is flawed?

13   A    Well, I would say interpreting the results at a

14   showing that there is not a relationship when you

15   actually have a relationship but the relationship is the

16   wrong direction, that that is self-evident of some

17   problem with the data.  I cannot tell you what the

18   problem is with the data.  I can tell you that's the way

19   the EPA has interpreted it.

20        And I'd have to look and put the two together,

21   because that was the first time I've seen that EPA

22   document.

23   Q    Okay.  Let's look at the authors' conclusions.  The

24   authors state, "In conclusion, we found no evidence of an

25   association between glyphosate use and risk of any solid

Michael D. Freeman, MedDr., PhD.

```
 1   tumors, of lymphoid malignancies, including NHL and its

 2   subtypes.  However, we found some evidence of a possible

 3   association between glyphosate use and AML.  This

 4   association was consistent across different exposure

 5   metrics and for unlagged and lagged exposures.  Given the

 6   prevalence of use of the herbicide worldwide,

 7   expedious [verbatim] efforts to replicate these findings

 8   are warranted."

 9          Did I read that correctly?

10   A    "Expeditious," would be the only thing I would have

11   a --

12   Q    Oh.  Excuse me.

13   A    But, otherwise, you read it perfectly.

14   Q    Okay.  So, the authors don't report that glyphosate

15   is protective in their study; true?

16   A    They don't put it in their conclusions.

17   Q    Okay.  And the authors, the only association they

18   report is a possible association between glyphosate use

19   and acute myeloid leukemia; right?

20   A    Right.  The only positive association.  Correct.

21   Q    They don't say positive.  They say possible

22   association.

23   A    Well, possible in a positive direction as opposed

24   to --

25   Q    Okay.
```

1   A     -- a negative direction for the overall.

2   Q     Okay.  So, my -- again, coming back to my original

3   question, I understand you want to look deeper into the

4   EPA analysis and how they got their number.

5         But that EPA analysis aside, the authors here do

6   not report a protective effect, do they?  They report a

7   null study.

8   A     Well, I -- what you read in the conclusions is what

9   they said in their conclusions.

10  Q     Okay.

11  A     I mean, I'm certainly not going to disagree with

12  that.

13  Q     Okay.  Are you aware of any study that had more cases

14  of NHL evaluated -- excuse me.  More exposed cases of NHL

15  evaluated than the AHS study?

16  A     No.

17  Q     And if you want to add them up, it's 440 here.

18  A     No.  I -- No.  I'm not aware of any study with more

19  exposed.

20  Q     Okay.  And this study looked at over 57,000

21  applicators of pesticides; right?

22  A     That is correct.

23  Q     Okay.  Is there any case control study as well

24  powered as this study?

25  A     I can't use that terminology here because of the way

Michael D. Freeman, MedDr., PhD.

1     they broke everything down into quartiles and tertiles,

2     because they definitely sapped some of the strength of

3     the study by doing so, when you start to break things up.

4          I mean, had they dichotomized exposures, there

5     may be different ways to look at these data that might

6     produce different results by simple dichotomization.  I'd

7     have to get my hands on the data and play around with it

8     to be able to answer the -- that question.

9          It's just -- it's -- for me at least, it's not as

10    simple as that.  It's a -- kind of a complex

11    biostatistical issue.

12    Q    Okay.  Let's go -- you got another 15 minutes in you?

13    A    Sure.

14    Q    Okay.  Let's go to the McDuffie study.

15             MR. KALAS:  I'm going to mark that as

16    Exhibit 19.

17          (Exhibit No. 19 was marked)

18             THE WITNESS:  And I'm going to pull that up

19    on my --

20             MR. KALAS:  Okay.

21             THE WITNESS:  -- from my laptop, if that's

22    okay, just so I can follow along --

23             MR. KALAS:  Absolutely.

24             THE WITNESS:  -- easily.

25    Q    BY MR. KALAS:  This is one of the studies that you

```
 1    rely on for your dose response opinion; true?

 2    A    Give me a minute here, if you will.

 3    Q    Sure.

 4    A    I'll pull it up.  Yes.

 5    Q    Okay.  And it's a case control study; right?

 6    A    Yes.

 7    Q    All right.  If you go down to the number of NHL

 8    cases, we have 517, right, in Table 1?

 9    A    Maybe I better follow along with where you're going.

10    Yeah, there we go.

11         Yes.  Correct.

12    Q    Okay.  And controls, we have 1,506; right?

13    A    Yes.

14    Q    But unlike the Eriksson study, all 517 of those NHL

15    cases are not exposed to glyphosate; right?

16    A    Correct.  It's not an exposure study.

17    Q    Right.

18    A    It's an illness study.

19    Q    Right.  In fact, there is 51 exposed cases in the

20    McDuffie study; right?

21    A    Yes.

22    Q    Okay.  It's about one-eighth of the amount of exposed

23    cases in the Andreotti study?

24    A    That sounds about right, yeah.

25    Q    All right.  And one of the things they found here was
```

Michael D. Freeman, MedDr., PhD.

```
 1    that a family history of cancer in any first-degree

 2    relative showed a statistically significant increased

 3    risk for NHL.

 4           Do you see that?

 5    A    Yes.

 6    Q    Okay.  And ███████████████████ right?

 7    A    I don't have the -- my report up in front of me, but

 8    that sounds right.

 9    Q    Okay.  And so, Mr. -- ████████████████████████

10    ████████ put him at increased risk for NHL, according

11    to the data in this study you relied on, in a

12    statistically significant manner?

13    A    Yes.

14    Q    Okay.  If you go down here to the ever/never

15    evaluation for glyphosate, we have two odds ratios.  We

16    have a 1.26, with a confidence interval of .87 to 1.81,

17    and a 1.2, with a confidence interval of .83 to 1.74.

18           Do you see that?

19    A    Yes.

20    Q    Okay.  And if you go down here to the key, the first

21    odds ratio I read to you was, they controlled for age and

22    providence of residence.

23           Do you see that?

24    A    Yes.

25    Q    And the second odds ratio I read to you controlled
```

 1   for statistically significant medical variables, age, and

 2   providence of residence; right?

 3   A    And including a history of family cancer.

 4   Q    Right.  That's the medical variables.  So, measles,

 5   mumps, cancer, allergies, desensitization shots, and

 6   positive family history of cancer?

 7   A    Yes.

 8   Q    Okay.  So, neither of those odds ratios controlled

 9   for other pesticide exposures; right?

10   A    That's correct.

11   Q    Okay.  And despite that, both of those are null

12   findings; right?

13   A    That's true.

14   Q    Okay.  Going down to Table 8, frequency of exposure

15   to selected herbicides, insecticides, fungicides, and

16   fumigants stratified by the number of days per year of

17   exposure, we have the glyphosate data, and we have

18   unexposed, zero to two days and greater than two days.

19          Do you see that?

20   A    Yes.

21   Q    Okay.  And the zero to two-day group has an odds

22   ratio of 1, with a confidence interval .63 to 1.57;

23   right?

24   A    Yes.

25   Q    And the greater than two day group has an odds ratio

1    of 2.12, with a confidence interval of 1.2 to 3.73.

2           Do you see that?

3    A    Yep.

4    Q    Okay.  And the greater than two day group here is one

5    of the two main sources you're using for your dose

6    response opinion; right, along with the Eriksson study?

7    A    Yes.

8    Q    Okay.  How did they select two days as the cutoff?

9    A    I'd have to go back into the study and look at it.

10          Typically, it is where the data are dichotomized.

11   Q    Do you know if it would have been statistically

12   significant if they had made the cutoff at greater than

13   three days?

14   A    Well, if they would have eliminated the majority of

15   their cases and only had, like -- I mean, their data are

16   split for zero to two at 28 and more than two at 23.  So,

17   it was probably a convenient cutoff and whole day

18   numbers.  But as you went to more than three days or five

19   days or whatever the number was that they used, you might

20   end up with just a very small number in the higher

21   exposed group.  And that would have certainly diminished

22   the ability to discriminate between the groups.

23          The -- random chance would have played a much

24   higher role.

25   Q    Is this odds ratio controlled for other pesticides?

1   A    No.  It's controlled for medical conditions like the

2   one you asked me about.

3   Q    Is it?  Look at what it's controlled for down

4   here (indicating).

5   A    Oh.  I'm sorry.  I was using the key from a prior

6   table.

7        You're right.  Variable age and province.

8   Q    Okay.  So, it's not controlled for other medical

9   conditions that we know may be associated with NHL;

10  right?

11  A    True.

12  Q    And it's not controlled for other pesticides that you

13  stated earlier could be risk factors for NHL, like

14  organophosphates; right?

15  A    Right.

16  Q    Okay.  How are you able to determine that this is not

17  confounded -- this number 2.12 is not confounded by those

18  other exposures -- other potential exposures?

19  A    Right.  So, you'd have to have a biologically

20  credible reason to believe that somebody who has a family

21  history of cancer is more likely to use Roundup for more

22  than two days a year.

23  Q    Yeah.

24  A    There is not really a credible basis for believing

25  that.

1    Q    I was more focused on the other pesticide use.

2         How are you able to eliminate other pesticide use

3    as confounding this data?

4    A    I cannot eliminate it because it's not examined in

5    the data.

6    Q    Well, they do examine, though, in number of

7    pesticides used by the applicators; right?

8         If you look here at Table 9, do you see that?

9    A    Yes.

10   Q    Okay.  And we have our NHL cases.  And unexposed is

11   the vast majority.  But then we have exposed to one,

12   exposed to two to four, and exposed to greater than --

13   greater than or equal to five.

14        Do you see that?  And this is just herbicides.

15   A    Yep.

16   Q    Okay.  And of the exposed NHL cases, it appears about

17   two out of every three were exposed to more than one

18   herbicide; right?  About 100 in the two to five range,

19   and about 45 here (indicating)?

20   A    Yeah.  Thereabouts.

21   Q    Okay.  So, going back up to Table 8, we have to

22   assume that two out of every three individuals in the

23   greater than two day group are exposed to more than one

24   pesticide; right?  Or more than one herbicide?

25   A    I think that's reasonable.

1   Q    And is glyphosate use correlated with dicamba use?

2                 THE REPORTER:  I'm sorry.  With what use?  I

3   missed that.  Dicamba.  There it is.  Thank you.

4                 THE WITNESS:  I can't tell you the answer to

5   that.

6   Q    BY MR. KALAS:  Is glyphosate use correlated with

7   mecoprop use?

8   A    I can't tell you the answer to that.

9   Q    Okay.  Mecoprop had two statistically significant

10  odds ratios; right?

11  A    Yes.

12  Q    Okay.  If glyphosate use is correlated with mecoprop

13  use, we could be counting the mecoprop-increased risk in

14  the glyphosate thena (ph); right?

15  A    It's possible.  I'd have to think about it a bit

16  to -- I mean, if you -- in order to answer that question,

17  I'd have to spend some time with the paper; look at it

18  and try to understand the relationship of these values

19  compared to what I know from other papers that have

20  stratified by pesticide use, if you -- to specifically

21  answer the question you just asked me.

22  Q    Is there a multivariate -- so, let me be very precise

23  there.

24            Is there a dose response relationship you've

25  observed in the epidemiology data that remains

1   statistically significant for glyphosate after

2   controlling for other pesticide use?

3   A    I'd have to look back in at the data to tell you that

4   for sure.

5   Q    Okay.  Can you think of one right now?

6   A    No.  I'd have to go back to my last answer.

7   Q    This is certainly not one you could point to as a

8   multivariate data point controlled for other pesticide

9   use that is statistically significant in a dose response

10  analysis because it's not controlled for other pesticide

11  use; right?

12  A    Yes.

13  Q    Okay.

14  A    I think that point has been well-hammered home --

15  Q    Okay.

16  A    -- in what you've talked about with this paper.

17  Q    Okay.  And you'd agree with IARC, then, that one

18  cannot rule out the potential of confounding explaining

19  this data?

20  A    Yes.  I don't disagree with that.

21              MR. KALAS:  I'm going to mark as Exhibit 20

22  the Eriksson study.

23          (Exhibit No. 20 was marked)

24              MS. NOLAN:  I think you already have it as

25  an exhibit.

```
 1              MR. KALAS:  Yeah.  It -- that was -- it was
 2    the online version.  I don't know why that was in my
 3    exhibits.
 4              MS. NOLAN:  Oh.
 5              MR. KALAS:  So, you can disregard 18.
 6              THE WITNESS:  I'm going to be ready for a
 7    break here pretty soon.
 8              MR. KALAS:  Yeah.  This is the last thing
 9    I'm going to ask you about.  We're going to go -- we're
10    going to be done.
11              THE WITNESS:  Okay.
12              MR. KALAS:  Unless you want to take a break
13    now and come back for this one.
14         But it's up to you.
15              THE WITNESS:  No.  Let's just push through.
16              MR. KALAS:  Okay.
17    Q   BY MR. KALAS:  So, this is the other study -- other
18    main study you're relying upon for your dose response
19    opinion; correct?
20    A    That is true.  Yep.
21    Q    Okay.  And this is a case control study as well;
22    right?
23    A    Yep.
24    Q    Okay.  And it's -- we looked at Table 2 earlier.  I
25    think you called it up.  Table 2 is the operative table
```

1   where you were looking at less than 10 days, greater than

2   10 days of use; right?

3   A    Yes.

4   Q    Okay.  And they have 17 exposed cases in the greater

5   than 10 days of use group here; right?

6   A    Yep.

7   Q    Okay.  And 29 exposed cases overall; right?

8   A    Yes.

9   Q    So, that's about a tenth of the exposed cases as we

10  had in the Andreotti study; right?

11  A    Yes.

12  Q    Okay.  And for ever/never use, we have an odds ratio

13  of 2.02, confidence interval of 1.1 to 3.71.

14       Do you see that?

15  A    Yep.

16  Q    Okay.  And for greater than 10 days use, we have an

17  odds ratio of 2.36, with a confidence interval of 1.04 to

18  5.37.

19       Do you see that?

20  A    Yes.

21  Q    Okay.  Both of those are statistically significant;

22  right?

23  A    Correct.

24  Q    Okay.  And for the greater than 10 days use, that is

25  what you're using to inform your dose response analysis

1   that you're then carrying over into your causation

2   analysis for Mr. Koen; right?

3   A    Well, I'm using it as a basis to say that dose

4   response has been demonstrated in some of the literature.

5   Q    Right.  And you're using it also as a basis to say

6   that Roundup use was a substantial factor in Mr. Koen's

7   NHL?

8   A    No.  I'm using all the information to say -- that I

9   talk about to say that NHL -- his NHL was more probably

10  than not caused by his exposure, whether it was a

11  substantial factor in causing it, not just the dose

12  response.

13  Q    Okay.  The adjustment here for confounders was made

14  for age, sex, year of diagnosis.

15       Do you see that?

16  A    Yes.

17  Q    They did not account for other pesticides; right?

18  A    Well, no.  I mean, they did a univariate analysis of

19  other pesticides --

20  Q    Right.

21  A    -- and found that it didn't make a difference.

22  Q    Okay.  You mean they did a -- are you saying they did

23  a multivariate analysis and found it didn't make a

24  difference?

25  A    No.  They did a univariate analysis.

1   Q    Right.  So, they didn't control for other pesticide

2   exposures here; right?

3   A    Well, you didn't have to control for it if it didn't

4   come up in the univariate analysis.

5   Q    I'm not sure if I understand you, but --

6   A    You look and see is it -- if you add herbicide or

7   take away herbicide, you see if it makes a difference

8   overall.  That's the univariate part.

9          And then you decide whether you want to put it

10  into your model where you're adjusting for it.

11  Q    Okay.  Well --

12  A    So, that's up to you whether you want to do that or

13  not, or whether you should do that or not.

14  Q    Well, let's look down here when they -- so, if you go

15  here (indicating), they talk about the fact that, in

16  their data, mixed exposure to several pesticides was more

17  a rule than an exception; and all single agents were

18  analyzed without adjusting for other exposure.

19          Do you see that?

20  A    Yeah.

21  Q    Okay.  So, they did a multivariate analysis to

22  elucidate the relevant importance of different

23  pesticides.

24          Do you see that?

25  A    Yeah.

1    Q    Okay.  And so, if you go down here to the

2    multivariate analysis, when they did that for glyphosate,

3    the ever/never figure went from 2.02 to 1.51; right?

4    A    Yeah.

5    Q    Got cut in half?

6    A    If you added adjustment for age, sex, and year of

7    diagnosis or enrollment.

8    Q    Well, no, that's not true.  If you look at the title,

9    it says, "Multivariate analyses, including agents

10   according to specified criteria.  See text."

11   A    Right.  That was -- but are we not looking at the

12   statement below that where it says odds ratios?

13   Q    Do you see the "See text," though?  And then we

14   looked at multivariate analysis.

15        That's the text.

16   A    What is the -- I -- you got to go back, because I got

17   to understand what is being referred to in the text

18   underneath the table.

19   Q    The text underneath the table is controlling for the

20   same adjustments that the univariate analysis did in

21   Table 2.  You see Table 2 has age, sex, year of

22   diagnosis.  Table 7 says age, sex, year of diagnosis.

23   But then they say, "See text for the multivariate

24   analysis."

25   A    Oh, I see.  I see.  Okay.

Michael D. Freeman, MedDr., PhD.

1    Q    Okay.

2    A    Got it.

3    Q    And when they controlled for other pesticides, it

4    went from 2.02 to 1.51; right?

5    A    Yeah.

6    Q    Okay.  And it -- the confidence interval went from

7    statistically significant to being not statistically

8    significant; right?

9    A    Right.  You cut down your numbers drastically by

10   elucidating various agents.

11   Q    This is a null finding in the multivariate analysis;

12   right?

13   A    Well, it tells you that if you break these data into

14   too many small pieces it looses meaning.

15        That's certainly true.

16   Q    That wasn't my question, though.

17        Is .77 to 2.94 a null finding?

18   A    It is not a statistically significant finding

19   attached to the point estimate.

20   Q    Okay.  And, in fact, every single one of these odds

21   ratios went down; right?

22   A    Right.  Unsurprisingly.

23   Q    Okay.  Do you think mercurial seed dressing causes

24   NHL?

25   A    I have not examined the issue --

Michael D. Freeman, MedDr., PhD.

```
 1   Q    Okay.

 2   A    -- whether that's the case or not.

 3   Q    Let's look -- and this is a larger point.  For almost

 4   each and every one of the herbicides investigated here,

 5   each and every odds ratio for the herbicides, we have an

 6   odds ratio greater than 1, don't we?

 7   A    Let's see.  Well, for quite a few of them.

 8   Q    Would you expect to see data like that by chance, or

 9   would you expect that that's caused by some sort of

10   confounding?

11   A    Well, that's -- that just looks like it is a

12   univariate analysis of exposures by dose or duration.

13   Q    Well, do you think all those herbicides listed there

14   cause NHL?

15   A    I do not think that all of those herbicides cause

16   NHL.

17          It's not something I've examined, however.

18   Q    Well, right.  But if they don't cause NHL, then why

19   do they all have elevated odds ratios?

20   A    I do not have an answer for you because I have not

21   examined those specific substances and how closely they

22   are used with glyphosate.

23          What I see is that the duration of exposures to

24   other herbicides other than glyphosate is not

25   statistically significant, which is an important finding
```

1    in that table you were showing me.

2   Q    Let's look at the pesticides listed here in Table 4.

3         Do you see that all these pesticides, for almost

4    every single odds ratio, it's greater than 1?

5   A    Yeah.

6   Q    Okay.  Do all of those pesticides cause NHL?

7   A    Doubtful.

8   Q    Then why do they all have odds ratios greater than 1?

9   A    Because in this analysis the -- this particular

10   analysis is not a multivariate analysis.

11        And so, it is going to have causal pesticides

12   mixed in with noncausal pesticides.

13   Q    Right.

14   A    So, it's going to be confounded by that.

15   Q    So, confounding is an issue in the univariate

16   analyses in this study; right?

17   A    It would be, yes.

18   Q    Okay.  Last two -- or last two or three questions and

19   we'll be done for the day.

20        Going down here to -- I'm on page 1661.  It says,

21   "Thus, the use of phenoxyacetic" --

22        MR. KALAS:  Sorry, Paula.

23   Q   BY MR. KALAS:  -- "herbicides, which earlier were

24   dominating both its weed killers in agriculture and

25   against hardwood in forestry, have substantially

1    decreased during the last decade.  2,4,5-T, which was

2    contaminated by TCDD, was prohibited in Sweden in 1977.

3    2,4-D was withdrawn from the market in 1990.  MCPA, even

4    if still used, has been largely substituted by other

5    agents, among which glyphosate has been clearly

6    dominating."

7            Did I read that correctly?

8    A    Yes.

9    Q    Okay.  And so, the authors did a latency analysis.

10            Did you see that when you read this study?

11    A    Probably.  I didn't refer to it in my report.

12            So, it's not something I committed to memory.

13    Q    Okay.  And it says -- they're talking -- back here at

14    the bottom of 1658 into 1659, it says, "Regarding phenoxy

15    herbicides and glyphosate, an analysis was made taken the

16    account" -- "taken the latency period for exposure into

17    account [verbatim].  For the latency period 1 to

18    10 years, no exposed cases were found for MCPA and

19    2,4,5-T and/or 2,4-D."

20            Did I read that correctly?

21    A    Yes.

22    Q    Okay.  And that makes sense based on what we just

23    read later in the paper, that glyphosate replaced MCPA,

24    and 2,4,5-T and 2,4-D were outlawed; right?

25    A    Yep.

1    Q    Okay.  And then it says, "Regarding glyphosate, the

2    odds ratio was 1.11 (95 percent confidence interval

3    .24 to 5.08) was obtained."

4         Do you see that?

5    A    Yes.

6    Q    Okay.  And so, we know that that odds ratio was not

7    confounded by MCPA or 2,4,5-T or 2,4-D; right?  Because

8    they weren't used in those 1- to 10-year period?

9    A    I'm not following you.

10   Q    So, for the 1- to 10-year latency period, we have an

11   odds ratio that's a null finding; right?  1.11, with a

12   confidence interval of .24 to 5.08; right?

13   A    Oh, I see.  There were no exposures for year 1 to 10.

14   Q    Right.

15   A    Okay.

16   Q    That glyphosate number there is not confounded by

17   MCPA or by 2,4,5-T, 2,4-D; right?

18   A    Okay.

19   Q    Agree with that?

20   A    Yes.

21   Q    Okay.  But then, when they looked at the latency

22   period for greater than 10 years, they found a

23   statistically significant odds ratio for MCPA.

24        Do you see that?

25   A    Yeah.

1   Q    Okay.  For 2,4,5-T, 2,4-D, it was almost

2   statistically significant.

3         Do you see that?

4   A    Uh-huh.

5   Q    And for glyphosate, it was statistically significant.

6         Do you see that?

7   A    Yes.

8   Q    Okay.  And so, when glyphosate is now being measured

9   in a univariate analysis when MCPA and 2,4,5-T, 2,4-D are

10  being used, there is a statistically significant odds

11  ratio.  But when it's being measured when we know they

12  weren't being used, there was no statistically

13  significant odds ratio.

14        Is that fair?

15  A    Well, isn't that the 1- to 10-year period --

16  Q    Yes.

17  A    -- where we don't think that -- we don't expect any

18  cases?

19  Q    Well, I'm just asking:  When there was no

20  confounding, the odds ratio was null; and when there was

21  confounding, the odds ratio was statistically

22  significant.

23        Is that fair?

24  A    Well, if you get rid of the confounders.  But then

25  you actually -- you add another layer of -- to the

1    analysis, which means that you don't expect to find

2    cases, then you're sort of just excluding the potential

3    for the cases, to some degree.

4           So, I would expect the odds ratio to go down if

5    you're only looking at the 1- to 10-year period.

6    Q    Okay.  And you would also expect the odds ratio to go

7    down if the data were no longer confounded?

8    A    Not necessarily.

9    Q    In other words, if gly- -- is that -- well, we know

10   glyphosate was associated with MCPA; right?  Because

11   MCPA -- glyphosate replaced MCPA.

12          That's what the paper says?

13   A    Right.

14   Q    Okay.  And so, MCPA and glyphosate are correlated;

15   right?

16   A    Yeah.  I mean, that's complicated, if you've got

17   something that substitutes for something else.

18          I'd have to think about how you would -- how

19   these data would represent that.

20   Q    Right.  But the authors didn't -- I'm sorry.

21   A    Are you never going to find MCPA at the same time

22   you'd find glyphosate kind of suggests that -- and I'd

23   have to think about that, really, to give you an answer

24   for what I -- how those things all work together, given

25   this description here.

Michael D. Freeman, MedDr., PhD.

1    Q    Okay.  But the authors did not control for MCPA

2    exposure in their glyphosate odds ratios in this paper,

3    except for the single multivariate analysis we saw?

4    A    I think that's correct.  Yes.

5    Q    Okay.  All right.

6              MR. KALAS:  With that, let's put a pin in

7    it, and we'll pick it up next week.

8              THE WITNESS:  Okay.

9              MR. KALAS:  Let's go off the record.

10             THE VIDEOGRAPHER:  We are now off the

11   record.  The time is 1:32.

12        (DEPOSITION ADJOURNED AT 1:32 P.M.)

13        (Signature not requested)

14   ///

15   ///

16   ///

17   ///

18   ///

19   ///

20   ///

21   ///

22   ///

23   ///

24   ///

25   ///

```
 1                    EXAMINATION INDEX
 2                                          Page
 3    Examination by Mr. Kalas                3
 4
 5
 6
 7                     EXHIBIT INDEX
 8
 9    No.                Item                Page
10    Exhibit 1    Notice of deposition        6
11    Exhibit 2    Report of M. Freeman,
                   KOEN000224-245             14
12
      Exhibit 3    September 2020 CV of
13                 M. Freeman                 14
14    Exhibit 4    August 2021 CV of M. Freeman  16
15    Exhibit 5    The Role of the Expert Witness,
                   Chapter 5                  17
16
      Exhibit 6    IARC Monographs            89
17
      Exhibit 7    IARC Monographs with Tables  91
18
      Exhibit 8    Study of L. Zhang         102
19
      Exhibit 9    IARC WHO Report of the Advisory
20                 Group to Recommend Priorities
                   for the IARC Monographs during
21                 2020-2024                 104
22    Exhibit 10   Revised Glyphosate Issue Paper:
                   Evaluation of Carcinogenic
23                 Potential.  EPA's Office of
                   Pesticide Programs
24                 December 12, 2017         109
      Exhibit 11   EFSA Conclusion on Pesticide
25                 Peer Review, 2015         118
```

 1    Exhibit 12    3/15/17 ECHA Committee for
                    Risk Assessment RAC Opinion    120
 2
      Exhibit 13    Health Canada Re-evaluation
 3                  decision                       122
 4    Exhibit 14    September 2016 Australian
                    government regulatory
 5                  position                       126
 6    Exhibit 15    1/6/20 letter from D. Miller
                    to C. Olinger                  129
 7
      Exhibit 16    2018 Article:  Glyphosate Use
 8                  and Cancer Incidence in the
                    Agricultural Health Study      136
 9
      Exhibit 17    2018 Article:  Glyphosate Use
10                  and Cancer Incidence in the
                    Agricultural Health Study
11                  with Supplementary Tables      138
12    Exhibit 18    M. Eriksson, et al, study:
                    Pesticide exposure as risk
13                  factor for non-Hodgkin
                    lymphoma including
14                  histopathological subgroup
                    analysis                       144
15
      Exhibit 19    H. McDuffie, et al, study:
16                  Non-Hodgkin's Lymphoma and
                    Specific Pesticide Exposures
17                  in Men:  Cross-Canada Study of
                    Pesticides and Health          159
18
      Exhibit 20    M. Eriksson, et al, study:
19                  Pesticide exposure as risk
                    factor for non-Hodgkin lymphoma,
20                  including histopathological
                    subgroup analysis              167
21
22    (Attached hereto.)
23                              * * *
24
25

Michael D. Freeman, MedDr., PhD.

```
 1                   CERTIFICATE

 2      I, Paula D. Tieger, a Registered Professional Reporter

 3   and Oregon Certified Shorthand Reporter, hereby certify

 4   that said witness appeared before me via videoconference

 5   telephone at the time and place set forth in the caption

 6   herein; that at said time and place I reported in

 7   stenotype all testimony adduced and other oral

 8   proceedings had in the foregoing matter; that thereafter

 9   my notes were transcribed through computer-aided

10   transcription, under my direction; and that the foregoing

11   pages constitute a full, true and accurate record of all

12   such testimony adduced and oral proceedings had, and of

13   the whole thereof.

14      I further certify review of the transcript was not

15   requested.

16      Witness my hand at Portland, Oregon, this 19th day of

17   August 2021.

18

19

20   _____

21        Paula D. Tieger, RPR 49268

22        Expires 9/30/22

23        Oregon CSR 20-0476

24

25
```

```
 1                 UNITED STATES DISTRICT COURT

 2                NORTHERN DISTRICT OF CALIFORNIA

 3

 4   IN RE:  ROUNDUP PRODUCTS        ) MDL No. 2741

     LIABILITY LITIGATION           )

 5                                   )

                                     )

 6   BRADLEY KOEN,                   )

             Plaintiff,             )

 7                                   )

     VS.                             )NO. 3:20-cv-03074-VC

 8                                   )

     MONSANTO COMPANY,               )

 9         Defendant.               )

10

         VIDEOCONFERENCE DEPOSITION OF MICHAEL D. FREEMAN,

11                      MedDr., Ph.D.,

12                        VOLUME II

13              TAKEN ON BEHALF OF DEFENDANT

14                         * * *

15        BE IT REMEMBERED THAT, pursuant to the Federal

16   Rules of Civil Procedure, the video deposition of

17   MICHAEL D. FREEMAN, MED. DR., Ph.D., was taken before

18   Paula D. Tieger, a Registered Professional Reporter and

19   Oregon Certified Shorthand Reporter, on August 25, 2021,

20   commencing at the hour of 10:09 a.m.; the witness

21   responding to questions by videoconference from Salem,

22   Oregon; the questions being propounded from Washington,

23   DC, and Austin, Texas; and proceedings reported remotely

24   via videoconference from Portland, Oregon.

25                         * * *
```

```
 1                   APPEARANCES:
 2      Hendler Flores Law PLLC
            By:  Clare Nolan (Via Videoconference)
 3               Attorney at Law
                 901 S. MoPac Expressway, Building 1,
 4               Suite 300
                 Austin, Texas 78746
 5               512-439-3200
                 cnolan@hendlerlaw.com
 6                   Counsel for the Plaintiff
 7
        Hollingsworth LLP
 8          By:  John M. Kalas (Via Videoconference)
                 Attorney at Law
 9               1350 I Street, NW
                 Washington, DC 20005
10               202-898-5843
                 jkalas@hollingsworthllp.com
11                   Counsel for the Defendant
12
        Also Present:  Anna Kinard - Paralegal for Hendler
13                      Flores Law PLLC - (Via
                        Videoconference)
14
                        Mark Ancalade - Videographer - (Via
15                      Videoconference)
16
17
18                           * * *
19
20
21
22
23
24
25
```

Michael D. Freeman, MedDr., Ph.D.

```
 1              (Exhibit No. 21 marked prior to depo)

 2              THE VIDEOGRAPHER:  We're now on the record.

 3   My name is Mark Ancalade, the videographer, with Golkow

 4   Litigation Services.  Today's date is August the 25th,

 5   2021.  This is the continuation of the videotaped

 6   deposition of Dr. Michael D. Freeman.  And the time is

 7   approximately 10:09 a.m.

 8          Counsel, (inaudible).

 9              MR. KALAS:  This is John Kalas on behalf of

10   Monsanto Company.

11              MS. NOLAN:  And Clare Nolan on behalf of the

12   plaintiff.

13              MR. KALAS:  All right.  Shall we proceed,

14   Dr. Freeman?

15              THE WITNESS:  Absolutely.

16              MR. KALAS:  All right.

17          MICHAEL D. FREEMAN, MedDr., Ph.D.,

18   having been previously sworn by the Oregon Certified

19   Shorthand Reporter to tell the truth, testified under

20   oath as follows:

21                      EXAMINATION

22   BY MR. KALAS:

23   Q    Thanks for being back with us here today.  I

24   appreciate it.

25          Do you have the link to exhibits again?  I sent
```

1    it to Ms. Kinard a little earlier.

2    A    I do.  I will -- while we were waiting, I went and

3    downloaded the Exhibit 21 that you have up.

4    Q    Perfect.  Great.  Yeah.  So, I marked that right

5    before the depo.  And just so you know, Exhibits 1

6    through 20 are not in that folder.  But to the extent you

7    need to refer back to them, I can reload them on as

8    Exhibit 1 through 20, and you can go look at them; or you

9    can look at your personal files, if you just reflect it

10   on the record.

11        Whatever works for you.

12   A    Great.  Thank you.

13   Q    Yeah.  So, the Exhibit 21 is not a document that

14   appears on the materials you've reviewed in forming your

15   opinion in this matter; is that true?

16   A    Yes, that's correct.

17   Q    Okay.  And this is a document that was published in a

18   journal called Risk Analysis?

19   A    That's what it looks like.  Yes.

20   Q    Okay.  Is that a journal you're familiar with at all?

21   A    Yes.  I might have published in this once.

22   Q    Okay.  It's a peer-reviewed journal?

23   A    Yes.

24   Q    Okay.  And do you see that the date in the bottom

25   right-hand corner of the first page is 2019?

Michael D. Freeman, MedDr., PhD.

```
 1   A     I do.

 2   Q     Okay.  So, this was written -- or at least published

 3   after IARC; right?

 4   A     Yes.

 5   Q     Okay.  And the title is The Potential Effects of

 6   Recall Bias and Selection Bias on the Epidemiological

 7   Evidence for the Carcinogenicity of Glyphosate.

 8         Did I read that correctly?

 9   A     Yes.

10   Q     Okay.  And those concerns that are outlined in that

11   title, recall bias/selection bias, those are concerns you

12   have, just generally, when looking at a body of evidence

13   for the general causation prong of your opinion; right?

14   A     Of course.  Yes.

15   Q     Okay.  And we discussed that last time; right?

16   A     I think we did, yeah.

17   Q     Okay.  And if you go down here to the introduction

18   section, starting with the second sentence in the first

19   paragraph, it states, "The International Agency for

20   Research on Cancer, IARC, 2015, concluded that there was

21   limited evidence in humans for the carcinogenicity of

22   glyphosate, but sufficient in animals, and particularly

23   noted positive associations with non-Hodgkin lymphoma

24   (NHL) in humans.  Since the IARC determination, other

25   agencies have not concurred with IARC's conclusion
```

1    (European Food Safety Authority [EFSA], 2015; World

2    Health Organization [WHO], 2016; United States

3    Environmental Protection Agency [USEPA], 2019)."

4          Did I read that correctly?

5    A    You did.

6    Q    Okay.  And as far as you know, is that a true

7    statement?

8    A    Yes.  I think you spent some time going over all of

9    that when we were together last.

10   Q    Okay.  And then, the next sentence states, "Whether

11   or not glyphosate presents a risk of NHL remains

12   controversial."

13         Did I read that correctly?

14   A    You did.

15   Q    Do you agree with that statement?

16   A    Well, there is certainly a controversy in the

17   literature.  Yes.

18   Q    Okay.  If you go to the next sentence, it says, "The

19   principle human evidence regarding a link between

20   glyphosate exposure and NHL is contained in five

21   case-control studies," and then it lists the Eriksson

22   study, Hardell, McDuffie, Orsi, and De Roos; "and two

23   cohort studies," and it lists the Andreotti and De Roos

24   2005 study, "both of which are based on a cohort defined

25   in the Agricultural Health Study."

1          Those studies that are listed there, are those

2     the principal, primary studies on the potential link

3     between glyphosate and NHL, in your opinion?

4     A     Well, it's the principal documentary evidence of

5     human -- or documented evidence of an effect in human

6     population, I should say.

7     Q     Okay.  Yeah.  And what I'm getting at is, those

8     aren't meta-analyses where they put together a bunch of

9     studies to come up with a relative risk or odds ratio.

10          Those are primary data; right?

11    A     Yes.  Correct.

12    Q     Okay.  And those are all studies that you've

13    reviewed; right?

14    A     Yes.

15    Q     Okay.  Going to the next sentence, it says, "In each

16    of the case-control studies, the evidence on the extent

17    of pesticide exposure comes from self-reporting by both

18    cases and controls."

19          Did I read that correctly?

20    A     Yes.

21    Q     Is that a true statement?

22    A     Yes.

23    Q     Okay.  The next sentence states, "This raises a

24    potential for recall bias because cases may carefully

25    search their memories trying to recall an exposure that

1    may be the cause of their disease; whereas, controls have

2    no such motivation and may not attempt to recall previous

3    exposures as fastidiously as those who have diagnosed

4    disease."

5         Did I read that correctly?

6    A    You did.

7    Q    Do you agree with that statement?

8    A    As long as you keep the caveat "may," yes.

9    Q    Okay.  So, you agree with that statement as written,

10   then?

11   A    Yes.  That it --

12   Q    Okay.

13   A    -- it may be a source of a recall bias.

14   Q    Okay.  And then he cites a couple textbooks here.

15   And then, below that, after that second block quote, he

16   says, "If recall bias is operating in the case-control

17   studies, it will tend to make glyphosate appear

18   carcinogenic even if it is not."

19        Did I read that correctly?

20   A    Yes.

21   Q    Do you agree with that?

22   A    It depends.

23   Q    Okay.  Depends on what?

24   A    It's a very broad statement.

25   Q    Depends on what?

```
 1   A    Depends on the degree.  It depends on what the recall

 2   bias is.  I mean, it depends on what they're asked.  I

 3   mean, if -- it depends on what the exposure was.  It

 4   depends on the time of their exposure, given the

 5   exponential increase in use of glyphosate.  It -- it's

 6   just a whole bunch of assumptions.  This isn't -- it's

 7   not like cigarette smoking and lung cancer, because

 8   cigarette smoking is something that people did daily, and

 9   they didn't really -- you know, not necessarily change

10   once people started to do it.  They kept doing it.

11        This is a changing landscape for exposure to

12   glyphosate.

13   Q    Okay.  So, putting it into the context of the

14   glyphosate studies -- because you said it depends what

15   they were asked; depends on -- you know, you've listed a

16   whole list there.

17        Putting it in the context of the glyphosate

18   case-control studies, if recall bias were operating in

19   the glyphosate case-control studies you've reviewed --

20   which there are those five that we listed earlier --

21   would it tend to make glyphosate appear carcinogenic even

22   if it is not?

23   A    It simply does depend.

24   Q    Okay.

25   A    It does depend.  If -- I mean, for example, if you
```

1  asked, "Did you smoke cigarettes; did you use

2  glyphosate-containing pesticides; did you use other kinds

3  of pesticides," it depends on your belief.  I mean, do

4  you believe that one of these is more likely to be

5  linked?  I mean, maybe you're more likely to say

6  cigarette smoking.

7       So, that's why I say it depends.  It's just --

8  it's possible.  There is -- the potential is there.

9  Q    Okay.

10  A    I mean, that's certainly -- it's a -- certainly a

11  legitimate question to ask.

12  Q    Okay.  So, let me ask you if you agree with this

13  statement.  "If recall bias is operating in the

14  glyphosate case-control studies, it is possible that it

15  will tend to make glyphosate appear carcinogenic even if

16  it is not."

17  A    Yes, I agree with that.

18  Q    Okay.  Moving to the next paragraph, Dr. Crump here

19  says, "A related source of bias that will exasperate" --

20  or excuse me, "exacerbate the effect of recall bias may

21  be present in two of the case-control studies; Eriksson

22  2008, Hardell 2002.  These studies excluded from some

23  odds ratio calculations for glyphosate the

24  unexposed-to-glyphosate cases and controls who reported

25  exposures to other pesticides."

1          Did I read that correctly?

2     A    You did.

3     Q    Okay.  Is that a source of bias, what he described

4     there?

5     A    I don't necessarily agree.  It was -- if they were

6     excluded from both the cases and controls, I'd have to

7     look at the data to see if that -- I have to look at the

8     data and see what that would do with or without it.

9          I'd want to test this theory with a sensitivity

10    analysis.

11    Q    Okay.  Now, did the authors of Eriksson or Hardell

12    test that theory with a sensitivity analysis?

13    A    I can't possibly answer the question off the top of

14    my head.

15    Q    All right.  Can you refer back to Eriksson?

16         Do you have access to it?

17    A    Would you like me to do that?

18    Q    Yeah.  Sure.

19    A    Okay.  I have Eriksson open.

20    Q    Okay.  Can you look in there and see if they did any

21    sensitivity analysis for the potential selection bias

22    flagged by Dr. Crump here?

23         (The witness reviews the document)

24              THE WITNESS:  I don't want to slow things

25    down here, but it's kind of a dense paper and requires

Michael D. Freeman, MedDr., PhD.

```
 1   careful reading to be able to answer the question.

 2          So, if you're okay with me just still looking

 3   through this...

 4                MR. KALAS:  Go for it.  I asked the

 5   question, and I asked you to look at the paper to see if

 6   you could find it.

 7                THE WITNESS:  Okay.  I just wanted to let

 8   you know I was --

 9                MR. KALAS:  Yeah.

10                THE WITNESS:  -- working on it.

11          (The witness reviews the document)

12                MS. NOLAN:  And, Ms. Tieger, court reporter,

13   could you tell me where we are in terms of time overall

14   for this deposition?

15                THE REPORTER:  That would be more of a

16   videographer question.

17                MS. NOLAN:  Okay.

18                MR. KALAS:  I have three hours 59 from last

19   depo, after looking at the transcript.

20                THE VIDEOGRAPHER:  I have three hours and

21   58 minutes, give or take.

22                THE WITNESS:  We didn't -- are we okay for

23   me to answer now?

24                MR. KALAS:  Absolutely.

25                THE WITNESS:  So, they didn't do a specific
```

Michael D. Freeman, MedDr., PhD.

1    sensitivity analysis putting in and taking out, but they

2    did examine the proportions of exposures to different

3    herbicides and different pesticides in the cohort --

4              MR. KALAS:  Okay.

5    Q    BY MR. KALAS:  But did they look at --

6    A    -- with emphasis -- I'm sorry.

7    Q    I -- sorry.  Were you done with your answer?

8    A    Well, I was just going to go on to talk about the way

9    the analysis was for looking at all the various

10   pesticides.

11        I don't -- it's very difficult to look at this

12   and say that recall bias would have been a factor here.

13   Q    Sure.

14   A    I don't see anything that jumps out at me and tells

15   me that.  But I don't see -- I mean, they certainly don't

16   say anything, you know, "sensitivity analysis."  I was

17   looking for something that might be sort of analogous to

18   that; maybe, if considered, their univariate analyses and

19   then their multivariate analyses for each of the

20   pesticides to be something like a -- that kind of an

21   analysis.

22        I don't see them referring to it as a sensitivity

23   analysis, however.

24   Q    So, I don't know if you were looking for the right

25   thing.  You said "recall bias" in that answer.  And what

1    I was actually asking about is:  Did they do a

2    sensitivity analysis in the Eriksson study to account for

3    the potential selection bias of using controls that were

4    unexposed to all pesticides, not just glyphosate.

5    A    Did I not use the term "selection"?

6    Q    No.  You used the term "recall."  So --

7    A    Oh.  I'm sorry.  Yeah.  So, because they individually

8    looked at -- because they said that the -- it was the

9    rule rather than the exception that they were multiple

10   exposures, they chose to just pick individual exposures.

11   And they did that for each of the pesticides they

12   examined or that they describe.

13        I don't know that that would have actually served

14   as a source of selection bias, because, of course, the

15   difference is bias between the cases and the controls.  I

16   don't know if -- why would that be different from the

17   cases and the controls?

18   Q    Well, let's read on in Crump and take a look here.

19   If you go down to the next sentence, he says, "If recall

20   bias is operating, cases that do not claim exposure to

21   glyphosate will be more likely than similarly unexposed

22   controls to claim exposure to other pesticides.  Thus,

23   cases that claim no exposure to glyphosate will be more

24   likely to be excluded from the analysis than controls who

25   claim no glyphosate exposure.  The result is a form of

1    selection bias that will exacerbate the effect of any

2    recall bias present; and will, like recall bias acting

3    alone, tend to exaggerate evidence for the

4    carcinogenicity of glyphosate."

5         Did I read that correctly?

6    A    You did.

7    Q    Okay.  Is that a potential effect of selection bias

8    if it is present in the Eriksson and Hardell studies?

9    A    I don't know.  It's kind of contorted, since we're

10   looking at more than one pesticide.  I -- the logic --

11   that logic escapes me.  I'm not really quite sure how

12   that would work the way he's suggesting.  But, I mean,

13   I'm open to hearing more about it.

14        Is it possible?  Absolutely.  Have I ruled it

15   out?  No.  Because it's the first time I'm really being

16   asked this specific question about this specific study.

17   Q    So, when you went out and you were gathering the

18   literature -- I assume you did an independent literature

19   search to gather literature in this case?

20   A    Yes.  But it had been done by so many before me, it

21   was pretty easy.

22   Q    Okay.  What do you mean by that?

23   A    There is a bunch of meta-analyses out there.

24   Q    Okay.  So -- but I assume you went on -- and maybe

25   I'm assuming wrong.

1          Did you go on PubMed and put in "glyphosate" or

2    "Roundup" or anything like that to see what was in the

3    world's literature for you to review?

4    A     Yeah, of course.

5    Q     Okay.  So, when you did that did you see the Crump

6    article that is looking at the potential effects of

7    recall bias and selection bias in the glyphosate FB

8    studies?

9    A     Oh, yeah.  I've seen the Crump article.

10   Q     You've seen the Crump article?

11   A     Uh-huh.

12   Q     Okay.

13   A     Yes.

14   Q     Why is it not cited in your report?

15   A     It doesn't -- it is completely unhelpful; and it

16   places all this weight on the Andreotti study.

17   Q     Okay.  Now, you didn't put together a materials

18   considered list with your report; right?

19   A     No.  I wouldn't do that unless I cite to it.

20   Q     Okay.  So, you have a reliance list in your report

21   but not a considered list?

22   A     Yeah.  But it's not something I've ever done.

23   Q     Okay.  Have you ever -- have you -- do you have a

24   collection on your computer of all the materials that

25   you've looked at when preparing your opinion in this

1   case, not being cited --

2   A    What I have in my file is the stuff that's cited.

3   Q    Okay.  And so, you do not record the articles that

4   you look at and say are -- well, let me back up.

5        Do you consider the Crump article irrelevant to

6   the question being asked here:  Does glyphosate cause

7   cancer?

8   A    It doesn't change the results of my analysis.  It

9   does very strongly rely on Andreotti.  And that --

10  Andreotti is so problematic that -- all of the criticisms

11  that are being leveled with the case-control studies

12  because of the retrospective nature, they're getting kind

13  of a free pass on Andreotti, without looking at what the

14  criticisms of Andreotti have been and what others have

15  said about Andreotti in the literature; and concerns

16  about exposure, you know, problems and bias of exposure.

17  Q    Okay.

18           MR. KALAS:  I'm going to move to strike as

19  nonresponsive.  My question wasn't about what the

20  article's position is.  My question is whether or not

21  it's irrelevant to the ultimate question being asked

22  here, which is:  Does glyphosate cause NHL.

23  Q    BY MR. KALAS:  Is the Crump article irrelevant to

24  that question?

25  A    It's unhelpful in answering that question, for the

Michael D. Freeman, MedDr., PhD.

1    reason that I gave you before.

2    Q    Okay.

3              MR. KALAS:  So, I'm just going to note for

4    the record here that, given the fact that Dr. Freeman has

5    just testified under oath that he has considered facts or

6    data beyond what is cited in his report, we believe that

7    his expert disclosure is not in compliance with

8    Rule 26(2)(B) subpart 2, facts or data considered by the

9    witness in forming his opinions.  We would ask

10   plaintiff's counsel to supplement that.

11             And that's not a question.  That's a statement

12   for the record, Dr. Freeman.

13             MS. NOLAN:  Right.  So, the first time, I

14   just -- objection to mischaracterizing or characterizing

15   the question.  You actually asked him if he had

16   considered it or decided that it was irrelevant the first

17   time you asked him.

18             Mischaracterizing what he had said.  So --

19             MR. KALAS:  Okay.  I think the record --

20             MS. NOLAN:  -- we can supplement.

21             MR. KALAS:  Yeah.  I mean, I think the

22   record will speak for itself.  We reserve whatever relief

23   may be available pending outcome of conversations after

24   this.

25             Let's keep moving on with the Crump article.

1   Q    BY MR. KALAS:  If you go on to the next paragraph on

2   the right side, first full paragraph on the right side,

3   it says, "The case-control studies examined the

4   relationship of NHL and exposure to not only glyphosate

5   in groups of pesticides including glyphosate, but to many

6   individual pesticides and groups of pesticides, including

7   groups of fungicides, herbicides not including

8   glyphosate, impregnating agents, insecticides,

9   rodenticides.

10         "In addition to individual ORs computed for

11   exposure (yes or no) to individual pesticides or groups

12   of pesticides, in many cases there are multiple ORs

13   computed for each pesticide or pesticide group in order

14   to explore the effect of exposure on different

15   subcategories of NHL.  The effect of different ways of

16   quantifying exposure, times from first or last exposure

17   to diagnosis, et cetera.

18         "Each of these OR calculations, regardless of its

19   purpose, is at risk of being biased due to any recall

20   bias or selection bias that may be operating."

21         Did I read that correctly?

22   A    Yes.

23   Q    Okay.  Do you agree with the last sentence there:

24   "Each of these OR calculations, regardless of its

25   purpose, is at risk of being biased due to any recall

1    bias or selection bias that may be operating"?

2    A    Definitely.

3    Q    Okay.  Moving on to the paragraph -- last paragraph

4    on this page, it states, first sentence, "If a pesticide

5    has no effect upon cancer risk and the calculation is

6    unbiased, odds ratios and relevant risk will have

7    approximately equal chances of being greater than or less

8    than 1.0.  Thus, the probability that an odds ratio or a

9    risk ratio" -- "relative risk is greater than 1.0 would

10   be approximately .5."

11        Did I read that correctly?

12   A    Yes.

13   Q    Do you agree that if a calculation is unbiased in an

14   epidemiology study that the probability of the odds

15   ratios and relative risks being greater than or less

16   than 1 -- or excuse me, being greater than 1 is

17   approximately .5?

18   A    It really depends on the distribution.  I mean,

19   generally, that makes sense.  But if you've got a skewed

20   distribution of variance, then no.  So, that's just the

21   first thing that occurs to me.  I hadn't really thought

22   about that.

23        But, yeah, generally, it makes sense.  Sure.

24   Q    Okay.  And you also agree that there is an,

25   essentially, .5 probability that the odds ratio or

1    relative risk will be less than 1 if the calculation is

2    unbiased?

3    A    It depends on the variance.  Because you can only go

4    down from 1.0 to 0 but you can go up from 1.0 to

5    infinity, that's the problem.  And so, if -- there is

6    more room for variance to the right than to the left.

7    And that's why I'm not -- I'd have to think about that to

8    be able to answer that and say, yeah, I, for sure, agree

9    with it.

10   Q    Well, let's -- sorry.  Go ahead.

11   A    But, generally, that's reasonable.  I mean, if, on

12   average, it's 1.0, then it should be distributed around

13   the 1.0 a little more evenly.

14   Q    Okay.

15   A    So, that's -- you know, that's not crazy.  It's, you

16   know, sort of a Bell curve of distribution.

17   Q    Okay.  And let's be clear what an odds ratio or

18   relevant risk is, just to define our terms here.

19   Basically what you're measuring in the odds ratio or

20   relevant risk -- and relative risk is probably a littler

21   easier to define -- is the proportion of your folks who

22   have no cancer and have exposure versus the proportion of

23   your folks who have cancer and have exposure; and then,

24   your power is dependent on how many people you've

25   measured, what have you.

Michael D. Freeman, MedDr., PhD.

1          But putting aside the confidence interval, that

2     relative risk is just a ratio that says there are, you

3     know, 1.2 people with cancer who have used the product as

4     opposed to every -- for every one person who didn't use

5     the product.

6          Is that fair?

7     A     Yeah.  That is correct.

8     Q     Okay.

9     A     And relative risks are much easier to grasp than odds

10    ratios.

11         If we're talking about a relatively rare

12    outcome --

13    Q     Right.

14    A     -- then the odds ratios and relative risks are going

15    to be pretty close.

16    Q     Right.  Okay.  And NHL is a relatively rare outcome,

17    in your opinion; right?

18    A     Correct.

19    Q     Okay.  Moving down this paragraph --

20              MS. NOLAN:  Just quickly, I appreciate that

21    Dr. Freeman is keeping up with you, but if we're going

22    to -- like, you're reading whole paragraphs, and I think

23    we're at risk of having compound questions, where he's

24    having to -- you're asking one question but it's --

25    really, he's having to juggle several different factors.

```
1          So, if you could go a little slower, I'd

2   appreciate it, and get answers as you go through the

3   reading.

4               MR. KALAS:  Okay.  Certainly, if you think a

5   question is objectionable, please object.  And,

6   Dr. Freeman, if you ever think that you don't know what

7   question you're answering or anything like that, please

8   let me know.

9               THE WITNESS:  Yeah.  So far, I feel like

10  I'm able to follow what you're asking me.  Just -- I

11  don't have necessarily readily -- ready answers to all

12  the questions.

13      There are a lot of good questions you're asking.

14              MR. KALAS:  Like I said, if you ever need to

15  refer something -- refer to something we've already

16  marked or something else, let me know and we'll go there.

17              THE WITNESS:  Sure.

18  Q   BY MR. KALAS:  If we continue down this paragraph to

19  the -- about the middle of it, do you see the sentence

20  that starts "Any recall bias"?

21  A   Yes.

22  Q   Okay.  And I think I know -- we've asked some

23  previous questions similar to this.  So, the sentence

24  here says, "Any recall bias present will have the effect

25  of artificially increasing odds ratios or relevant
```

Michael D. Freeman, MedDr., PhD.

1    risks."

2         Did I read that correctly?

3    A    Yes.

4    Q    Okay.  And let me ask you this:  Do you agree that

5    any recall bias present will potentially have the effect

6    of artificially increasing odds ratios or relevant risks?

7    A    I do.

8    Q    Okay.  Moving down to the sentence that starts "A

9    preponderance," "A preponderance of odds ratios for NHL

10   greater than 1.0 for practically all categories of

11   pesticides suggests that recall bias perhaps exacerbated

12   by selection bias may be responsible for any observed

13   associations between glyphosate and NHL."

14        Did I read that correctly?

15   A    You did.

16   Q    Do you agree with that statement?

17   A    It's an interesting argument.  I haven't really

18   looked at the other pesticides.  You asked me about this

19   last time that we got together.  I haven't looked at the

20   evidence for the other pesticides.

21        I would say that it is possible and that it may

22   be responsible; that caveat of "may."  But then to say,

23   for any observed association, it may be responsible for

24   some; some, a portion, none, all, we don't know what that

25   is because we haven't been able to go back and look at

Michael D. Freeman, MedDr., PhD.

1    the data and see how it may be influenced.

2    Q    Okay.

3    A    So, you know, with some hedging, I would say,

4    generally, that's not unreasonable.

5    Q    Okay.  So, if you go down to -- or go to Table 1 --

6    and this is on page 4 of this study -- do you see that

7    Dr. Crump ran some simulations here to look at the effect

8    of recall bias alone and with selection bias?

9    A    Yes.

10   Q    Okay.  And do you see that when -- well, let me back

11   up and ask a more foundational question.

12          What is a simulation, when you run a simulation

13   and look at the effect of bias?

14   A    It's like a sensitivity analysis in a way.  I mean,

15   you use some assumptions and see what the assumptions do

16   to the outcomes.

17   Q    Okay.  And do you see here that he has a column on

18   the left-hand side of recall bias?

19          Do you see that?

20   A    Yes.

21   Q    Okay.  And if you go down to the subpart B, it says,

22   "Recall bias is introduced into each simulation by

23   computing the prevalence of each herbicide exposure among

24   cases as prevalence among controls times 1 plus recall

25   bias."

Michael D. Freeman, MedDr., PhD.

1          Did I read that correctly?

2    A    You did.

3    Q    Okay.  And so, essentially, what he's simulating

4    there, if I understand it, is, he's upping the ante on

5    recall bias over time to say, you know, it's five percent

6    of people had recall bias; 10 percent of people had

7    recall bias, et cetera; and then looking at what that

8    would do to odds ratio.

9          Is that fair?

10   A    Yeah.

11   Q    Okay.  And is that an appropriate sensitivity

12   analysis here?

13   A    Well, no idea.

14   Q    Okay.

15   A    It's all entirely hypothetical with no evidence to

16   support it.  And I understand what the purpose of the

17   paper was, which was to ask these questions.  But, you

18   know, the degree of recall bias for glyphosate, given the

19   fact that glyphosate prevalence change over time, is --

20   that's the part that really starts to throw a monkey

21   wrench into this kind of a simulation.

22          There is too many moving parts to make one single

23   assumption like this, which is just recall bias.

24   Q    Okay.

25   A    I mean, how about an ecological effect, which is the

 1  entire landscape is changing after, what is it, Roundup

 2  Ready?  Isn't that the name of the program, Roundup

 3  Ready, from Monsanto, where there is starting to be a

 4  rapid ramping up of the use of glyphosate?

 5          So, without controlling for those other factors

 6  and other moving parts, this is -- it's a theoretical

 7  exercise that I can't tell you that, "Yes, I agree this

 8  is the way to assess this issue."

 9          Sorry for the long answer.

10  Q    Yeah.  I'm not sure I understand -- I'm not sure if I

11  understand the last part of that answer.

12          Was the last part of the answer you agree this is

13  a good way to assess the potential effects of recall bias

14  and/or selection bias, but the rest of your opinion is

15  there is too many other moving parts to say these are the

16  only things going on?

17  A    Well, I agree this is a way to assess recall bias and

18  see what does recall bias do when it's present.  I mean,

19  you don't have to run this simulation, because all he's

20  doing is just proving what he said on the first page,

21  which is that, yeah, recall bias, you're going to get

22  bigger ORs.  Fair enough.  And he's demonstrating that.

23  Mathematically that's great.  Or statistically that's

24  great.

25          Whether that is -- has anything to do or

 1   potentially anything to do at all with glyphosate, that's

 2   the question that I would be asking and saying, "Well,

 3   how would that work for something where there is these

 4   multiple moving parts; specifically, with glyphosate?"

 5   Because that's what he's talking about here.

 6   Q    Okay.  I understand what you're saying now.

 7   A    Yeah.

 8   Q    Going back to some of the case-control studies,

 9   Roundup Ready crops were introduced in the mid 1990s;

10   correct?

11   A    Yeah.  Was it '96, I think.

12   Q    Okay.  And they were only introduced in the United

13   States; right?

14        They've never been used in Europe?

15   A    I couldn't tell you that.  I'm not an expert on

16   Monsanto's market practices.

17   Q    Assuming they've never been used in Europe, GMO

18   crops, they would not be an issue in the Eriksson,

19   Hardell, or Orsi studies; correct?

20   A    I can't tell you what the prevalence of Roundup use

21   is in --

22   Q    Right.

23   A    -- in cohorts.

24   Q    Well, correct.  But my question was -- you mentioned

25   Roundup Ready crops and the increased prevalence of use

1   based on those -- based on the introduction of those.

2        Assuming Roundup Ready crops were not used in

3   Europe, that is not an issue for the European groups;

4   correct?

5   A    Well, specifically, the program of Roundup Ready

6   crops, if they weren't used overseas, is -- that's

7   certainly an issue.  But -- or not an issue.  But the

8   increased prevalence of the use of glyphosate may very

9   well still be an issue.

10        I'd have to --

11  Q    Sure.

12  A    -- look at that and say, "Well, how did" -- "you

13  know, how did they match to what the U.S. was doing."

14  Q    Okay.  And going back to De Roos 2003 -- and I'm

15  happy to mark it if you would like -- that included three

16  groups of subjects who were exposed in the 1970s and

17  '80s; right?

18  A    Yeah.  I -- off the top of my head.  I'd have to go

19  back in and look at my --

20  Q    Sure.

21  A    -- look at the study to be able to answer the

22  question.

23  Q    Well, let's mark it.  Give me a second to call it up.

24  A    And I'm trying to find it in my list here.

25  Q    Well, I'm -- well, feel free to find it on your end,

1    but I'm still going to mark it just so we have a copy.

2              MR. KALAS:  So, I've marked that in the

3    exhibit folder as Exhibit 22.

4    Q    BY MR. KALAS:  Take a look at that when you get a

5    chance.

6    A    I am making my way back there.  Oh, yeah.  The 2003

7    paper.  Right.

8         And the question at hand is?

9    Q    So, the question at hand is when the study

10   populations were measured.  And that's in Methods under

11   Study Population, and it's pages 1 to 2.

12   A    I see that.

13   Q    And, specifically, I asked:  Were the populations

14   exposed between the 1970s and 1980s?

15   A    Yes, they would be.

16   Q    Okay.  And so, if the populations were exposed

17   between the 1970s and 1980s and Roundup Ready crops were

18   not introduced to the market until 1996, again, that's

19   another study that did not have that ecological

20   confounder you mentioned; correct?

21   A    Well, not that specifically-named ecological

22   confounder, that's correct.

23   Q    Okay.  And then, the last study is the McDuffie

24   study.  And the McDuffie study -- and we've previously

25   marked this as Exhibit 19, if you still have access to

1    that.  But if not, I'm happy to put it back up on the

2    screen.

3           So, just let me know.

4    A    I've got that pulled up.

5    Q    Okay.  And the McDuffie study looked at a population

6    who were diagnosed between 1991 and 1994; correct?

7    A    Yes.

8    Q    Okay.  And so, again, the McDuffie study does not

9    have the ecological confounder of Roundup Ready crops

10   that you mentioned; right?

11   A    That's true.  It wouldn't affect this particular one.

12   Q    Okay.

13   A    I agree.

14   Q    Okay.  So, none of the case-control studies --

15   assuming GMO crops were not used in Europe, which I know

16   you said you don't know.

17          But assuming that to be true, none of the

18   case-control studies have the confounder of increased

19   ecological use of glyphosate from Roundup Ready crops;

20   right?

21   A    Let's see.  Oh.  As opposed to the cohort studies,

22   yes.

23   Q    Well, I'm not -- I haven't gotten there yet.  But

24   yes.

25   A    Right.

Michael D. Freeman, MedDr., PhD.

```
 1    Q     That's true.

 2    A     Right.

 3    Q     Okay.  But the only study to measure the increased

 4    use of glyphosate following the introduction of Roundup

 5    Ready crops is the Andreotti study; true?

 6    A     No.

 7    Q     Okay.  Why is that?

 8    A     Well, they -- for the reasons that Andreotti is so

 9    problematic for me, which is that they measured baseline

10    exposure and then they just asked about five years later

11    exposure and only asked about exposure from the prior

12    year.  So, that was the follow-up survey.  And then they

13    based all of the exposure on what the exposure was five

14    years later, and followed that forward in time, just

15    assumed that was the same, even though that was during

16    Roundup Ready.  That's the part that I'm really having a

17    hard time with.

18          I mean, why didn't we measure exposure as it

19    changed over time?  That would have been -- that seems

20    like a critical failing.  And then, that also goes into

21    their imputation methods as well, where they had such a

22    large dropout or failed -- not dropout, failure to follow

23    up and get secondary data.  Then that imputation went

24    back to their baseline.  So, that's even more likely to

25    be biased by the Roundup Ready program.
```

```
 1            So, that's the part where I'm -- I struggle with

 2      these data and trying to understand why are we

 3      giving -- why are we being so critical of the

 4      case-control studies, and saying, "Well, they all have

 5      this recall bias," and then say, "But we're not going to

 6      pay attention to this, sort of, flipped-around exposure

 7      bias issue that is going on because of this ecological

 8      factor that may be driving Andreotti."

 9            And maybe Andreotti's right, but I don't see

10      evidence that that's the case.  And as we mentioned last

11      time, Andreotti, according to the EPA, shows a protective

12      effect against non-Hodgkin lymphoma for people who are

13      exposed to glyphosate versus not exposed.  And that is

14      really problematic.

15      Q    Okay.  There is a lot to unpack there.

16      A    Yeah.  Sorry.

17      Q    No.  No.  Don't apologize.  I'm just trying to find

18      out your opinions.

19            Okay.  So, let me ask this, before we get into

20      that answer.  Have you read the expert report of Beate

21      Ritz?

22      A    No.

23      Q    Have you ever heard of Beate Ritz?

24      A    Maybe.

25      Q    Have you -- go ahead.
```

Michael D. Freeman, MedDr., PhD.

```
 1   A    It's a name that I would think would stand out in my
 2   mind, but -- and I'm not, offhand, saying yes, I know who
 3   that person is.
 4        But I've come across a lot of names.
 5   Q    Have you read any of her depositions in this matter?
 6   A    No.
 7   Q    Have you read any of plaintiff's experts' depositions
 8   in this matter?
 9        Not for your reliance list, but have you read
10   them, since --
11   A    No.
12   Q    -- I don't have a considered list?
13        Okay.  Have you read any of their reports?
14   A    No.
15   Q    Okay.  Have you read the Weisenburger 2021 article in
16   the literature?
17   A    Yes.
18   Q    Okay.  And he's an expert for plaintiffs.  We talked
19   about that last time.
20   A    You said he's an expert for plaintiffs in this case?
21   Q    In -- yeah.  I mean, he's a general expert, I
22   believe, across the MDL, but...
23   A    Oh.  I have no knowledge of that.
24   Q    Okay.  Andreotti; you mentioned a few different
25   issues there.  And you said there is this exposure bias
```

1    in Andreotti.  The exposure bias, as I understand what

2    you're describing, is, their follow-up questionnaire

3    asked them about exposures approximately five years

4    following their first questionnaire; right?

5    A    The exposures over the last year.

6    Q    Right.

7    A    Right.

8    Q    The questionnaire was about -- given about five years

9    after the initial questionnaire, and it asked them about

10   exposure over the last year?

11   A    Yes.

12   Q    Okay.  And your concern is that that would lead to

13   problems in the dose response analysis, I would take?

14   A    No.

15   Q    Okay.

16   A    It leads to bias between the groups.  If there is

17   increasing use of glyphosate over the next 11 years of

18   the study that go on and we're not recording it because

19   we're only looking at what it was five years after

20   enrollment, and they were also imputing what it is for

21   the 37 percent missing values, it creates a lot of

22   potential for moving towards the null, as far as effect

23   goes.

24   Q    Right.

25   A    I mean, we're just not getting our exposure that may

1    be going on there.  And so, people that we're saying are

2    unexposed or minimally exposed, maybe they're a higher

3    level of exposure starting a very short time after the

4    last time we said how much exposure they have.

5          So, that --

6    Q    I think I understand what you're saying.

7    A    Yeah.

8    Q    You're concerned that there is nondifferential

9    misclassification within the groups that have biased the

10   result towards the null in the Andreotti study?

11   A    Well, that's one concern, yes.

12   Q    Okay.  Nondifferential misclassification between the

13   groups that would bias the results towards the null, the

14   result of that in the Andreotti study would be making the

15   relevant risks appear higher than they actually are;

16   right, because all of their relevant risks are below 1?

17   A    That would push the relative -- if we had higher

18   exposures in the unexposed and lower exposed, then that

19   would push our relative risks up.

20          That's correct.

21   Q    Towards 1 but still less than 1, because all the

22   odds -- relative risks are below 1; right?

23   A    No.  I mean, I don't --

24   Q    Okay.  How would it cross 1?

25          Explain to me theoretically how a nondifferential

 1    misclassification would cross 1.

 2    A    Well, because if you continue to increase your

 3    exposure, then you show that, amongst the people who are

 4    sick, you don't classify them as being unexposed.

 5         You find out that more people who are sick have

 6    been exposed.

 7    Q    But this is nondifferential.

 8    A    That could be five.  That could be 10.

 9    Q    But it's nondifferential; true?  It's not

10    differential.

11         What does nondifferential mean?

12    A    Well, you called it nondifferential.

13    Q    And you agreed to it.

14         Do you disagree now?

15    A    I don't -- you've used the term "nondifferential

16    bias."  I said it's going to create bias between the

17    groups, and it's going to result -- push the result to a

18    null.  I don't know what -- I don't know how you're using

19    the term "nondifferential bias."

20         That's not a term that I normally use.

21    Q    Okay.  You don't -- that's fine.  If you don't use

22    that term, that's fine.

23         Is there any study that looked at outcomes in

24    individuals exposed to glyphosate after the use of

25    Roundup Ready crops, beyond Andreotti?  Whatever issues

1    you have with it, is there any other study?

2    A    Off the top of my head, I can't recall having seen

3    something that would tell me what that -- what the

4    uses -- I mean, I know -- I know that the majority of

5    glyphosate use occurred in the 10 years before 2014 and

6    '15, in at least one study that I reviewed.

7    Q    Benbrook study; correct?

8    A    Now I don't even remember.  It -- I didn't rely on it

9    and I didn't cite to it, but I do remember having seen

10    something about that, which is, you know, further

11    information about the increased use of glyphosate over

12    time.

13          But as far as measuring it in a cohort that was

14    examining illness as well, a human study, I have not seen

15    anything like that.

16    Q    Okay.  So, I think I understood your answer, but I'm

17    not sure because there were a few parts there.

18          Given that the North American case-control

19    studies had exposures only up to 1994; given, I represent

20    to you, in Europe, GMOs were not introduced, is there any

21    study besides the Andreotti study that measured effects

22    of glyphosate use following the introduction of Roundup

23    Ready crops, that you have reviewed?

24    A    Yeah.  I think I came at the wrong direction on your

25    question.  It was a long question and I got sort of, you

```
 1   know, down a rabbit hole there, thinking about the

 2   direction I was going.

 3        And the answer is no.

 4   Q   Okay.

 5   A   There is nothing else out there.

 6        I apologize for not giving you the right answer

 7   for the question you were asking.

 8   Q   There is no right answers here.  It's just your

 9   answers.  Whatever you answer is the right answer.

10        So, let's keep going to page 5.

11   A   Well, my intent is to try to answer your questions as

12   you're asking them --

13   Q   Fair enough.

14   A   -- not to give you a whole bunch of unnecessary

15   information.

16        That's not my goal.

17   Q   If you go to page 5, Table 2, Dr. Crump looked at the

18   totals for no glyphosate and the totals including

19   glyphosate for odds ratios above 1.

20        Do you see that in the two right-hand columns?

21   A   Did you say Table 2?

22   Q   Yes, sir.

23   A   Yeah.  Let me just rotate this real quick.  There we

24   go.

25        Okay.  Got it.  Table 2.
```

1   Q    All right.  And if you look there for no glyphosate

2   for the case-control studies, he found that 89.7 percent

3   of the odds ratios in Hardell for non-glyphosate

4   pesticides were greater than 1.

5         Do you see that, 89.7 percent?

6   A    Yes.

7   Q    Okay.  For Eriksson, he found 89.8 percent of the

8   odds ratios for no glyphosate were greater than 1; right?

9   A    Yes.

10  Q    For McDuffie, he found 93.2 percent of the odds

11  ratios for no glyphosate were greater than 1; right?

12  A    Yes.

13  Q    For Orsi, he found 76.1 percent of the odds ratios

14  for no glyphosate were greater than 1; correct?

15  A    Yes.

16  Q    And then, for De Roos, he found 52.8 percent of odds

17  ratio for no glyphosate were greater than 1; right?

18  A    Yes.

19  Q    And then, he did an analysis with glyphosate as well

20  for each; right?

21  A    Yeah.

22  Q    And all those ratios of odds ratios greater than 1

23  were roughly equal to the no glyphosate levels; right?

24  A    Yes.

25  Q    Okay.  If you go to page 7, he discusses this.  And

1    he talks about Table 2 on the left-hand side there of

2    page 7.  And it's in the sentence that starts, "In the

3    case-control studies."

4         Let me know if you're there.

5    A    Sorry.  I'm not finding -- where is this again?

6    Q    Left-hand column, page 7, second full paragraph about

7    five lines down, "In the case-control studies."

8    A    Second full paragraph.

9    Q    Yeah.  The one that starts "Table 2."

10   A    Oh.  Third full paragraph.  Okay.

11   Q    Yeah.  The first -- anyway, yes.  If you're where I'm

12   at, that's fine.

13   A    Yeah.  Oh, I see.  Yes.  It's a -- we have a little

14   paragraph.

15   Q    Right.

16   A    Or orphan, or whatever the heck you call that.

17        Okay.  Go ahead.  I'm sorry.  I'm following you

18   now.

19   Q    "In the case-control studies of Hardell, Eriksson,

20   and McDuffie, 90 percent or more of all odds ratios from

21   pesticide groups not containing glyphosate are greater

22   than 1.0.  In these three studies, the percentage of odds

23   ratios greater than 1.0 exceeds 80 percent in all

24   pesticide groupings; fungicides, herbicides not including

25   glyphosate, impregnating agents, and insecticides, as

1   well as groupings that contain glyphosate."

2          Did I read that correctly?

3   A    Yes.

4   Q    Do you disagree with that?

5   A    No.  It's just repeating what he found or described

6   in Table 2.

7   Q    Okay.  Moving down to the paragraph -- the next

8   paragraph near the bottom, it says, "In the two cohort

9   studies, the percentages of relative risk greater than

10  1.0 in cancer groupings not containing NHL in both

11  studies are 54 percent.  And, overall, with NHL included

12  are 49.5 percent (Table 2).  Thus, these results from the

13  two cohort studies, which are not subject to recall bias

14  or selection bias, are reasonably consistent with what

15  would be expected if these studies are free of

16  statistical bias and glyphosate has no effect upon cancer

17  rates."

18          Did I read that correctly?

19  A    You did.

20  Q    Okay.  Do you agree with Dr. Crump that the results

21  from the two cohort studies are not subject to recall

22  bias?

23  A    Not necessarily.  I mean, the -- their methods are

24  going to involve some degree of recall bias.  It's just

25  going to be minimized by the prospective design.

1    Q    Okay.  Then, do you agree that the results of the two

2    cohort studies -- or excuse me.

3         Do you agree that the design of the two cohort

4    studies minimizes the concern for recall bias?

5    A    They -- I would say, as a general principle, that

6    recall bias is going to be less of a concern with

7    prospective study -- any prospective study.

8         So, I think generally that premise is correct, is

9    that you're less -- it's less concerning.

10   Q    Do you agree that the results of the two cohort

11   studies reflected in Table 2 are reasonably consistent

12   with what would be expected if those studies are free of

13   statistical bias and glyphosate has no effect on cancer

14   rates?

15   A    I can't look at that conclusion without thinking

16   about that protective effect that they came up with.

17        So --

18   Q    You keep saying, "They came up with."

19        You mean EPA; right?

20   A    It's Andreotti's data.

21   Q    Andreotti -- go ahead.

22   A    It's Andreotti's data.  All they did was just

23   collapse any exposure to no exposure.

24        I mean, that's all the EPA did.  And so --

25   Q    Did Andreotti report that data that was in the EPA

1    meta-analysis?

2    A    Yes.

3    Q    Okay.

4    A    That's where the data came from.

5    Q    And you were unable last time -- and we spent a bit

6    of time on it -- to show me where Andreotti reports a

7    protective effect of glyphosate; right?

8    A    They failed to report a protective effect of

9    glyphosate.

10         That's the problem.

11   Q    Okay.

12   A    Their studies -- their study results shows 15 percent

13   decreased risk of non-Hodgkin lymphoma.  Something's

14   wrong.  That's the problem, is, it's incorrect to say

15   glyphosate is not related to NHL.  No.  Glyphosate is

16   related to decreased NHL in their study.  They broke up

17   the exposure categories so that you couldn't see the

18   aggregate effect.  But if you look at the aggregate

19   effect from exposure to no exposure, then you see a

20   protective effect.

21         That -- there is a problem.

22   Q    Okay.  You keep saying there is a problem.

23         Do you agree, then, that there may be a problem

24   with the case-control studies as well, given they keep

25   showing an increased risk for any and every pesticide

Michael D. Freeman, MedDr., PhD.

1   they looked at?

2   A    That is certainly something that can be discussed and

3   looked at there.  I just don't -- I don't find Andreotti

4   in any way validates them, but they can be -- but their

5   methods can be examined; at least discussed.  The

6   explanation may have nothing to do with the actual effect

7   of glyphosate, or it might have something to do with it.

8   That's the -- I would certainly give you that

9   characterization of it.

10          But I -- but giving, you know, a 35, 40 percent

11   weight to Andreotti in a meta-analysis when we can't

12   explain Andreotti's findings is very problematic for me.

13   Q    Okay.  I think I understand what you're saying.

14          THE WITNESS:  Would you mind if I went down

15   and got some coffee and find out why my dogs continue to

16   bark?

17          MR. KALAS:  Sure.  Let's go off the record.

18          THE WITNESS:  Okay.  Thanks.

19          THE VIDEOGRAPHER:  We're now off the

20   record.  The time is 11:08.

21      (Recess held from 11:08-11:20)

22          THE VIDEOGRAPHER:  We are now back on the

23   record.  And the time is 11:20.

24   Q    BY MR. KALAS:  Doctor, moving on with this Crump

25   article, going down to the right paragraph -- or right

1    column of page 7, the paragraph that starts, "Given this

2    evidence," do you see that?

3    A    Yeah.

4    Q    It says, "Given this evidence, one could reasonably

5    conclude that at least four of the case-control studies

6    of glyphosate and NHL are contaminated by statistical

7    basis and, consequently, are not suitable for reaching

8    conclusions about the potential ability of glyphosate to

9    cause NHL."

10         Did I read that correctly?

11   A    Yes.

12   Q    Okay.  Assuming the four case-control studies

13   identified by Dr. Crump are contaminated by statistical

14   bias -- and that would be the Hardell, Eriksson, Orsi,

15   and McDuffie studies.  Assuming his hypothesis is

16   correct, would you agree that those studies are not

17   suitable for reaching conclusions about the potential

18   ability of glyphosate to cause NHL?

19   A    No, I don't agree with that, because it all comes

20   down to degree.  And what is the degree of statistical

21   bias that's present?  Is it enough to alter the findings,

22   the ultimate conclusions?

23         There -- I need more information to even know

24   whether that's a reasonable conclusion.

25   Q    So, one thing you might want to see is the

1    sensitivity analysis where you do a challenge/dechallenge

2    of adding and removing potential -- well, strike that.

3    Let me ask a different question.  Let me ask the same

4    question with an issue that we talked about last

5    deposition, which is confounding.

6         If there were confounding that was contaminating

7    the case-control studies, would those case-control

8    studies still be suitable for reaching conclusions about

9    the potential ability of glyphosate to cause NHL?

10   A    Again, it depends.  I mean, confounding usually has

11   to involve a factor that can't be causal.  You know, it's

12   a nuance factor.  And the other data, you know, the stuff

13   that IARC talks about as far as the animal studies and

14   the -- all of the Hill criteria tell us, yeah, it's

15   really reasonable that this exposure to this chemical

16   could cause non-Hodgkin lymphoma.  So, it's --

17   confounding is a little bit more tricky that way.

18        You know, it's not -- I think you mentioned, what

19   was it, smoking and coffee drinking studies.  You know,

20   coffee drinking can't cause lung cancer.  So, we can

21   definitely find that smoking is a confounder for coffee

22   drinking, the relationship to lung cancer.  But we don't

23   have that here.

24        So, I think, in a perfect world, we would be able

25   to tease out all these relationships with tons and tons

1    of data.  That would be great.  And there is certainly a

2    criticism that can be leveled at all of the literature

3    for one thing or another.  I agree with that.  But when I

4    come to the end of the day, I say, "I think that there is

5    a more probable than not relationship here that is

6    demonstrated by these studies, despite the fact that

7    there is weaknesses which may or may not be present to

8    one or other effect or degree."

9           I'm fine exceeding to that.

10   Q    Now, you mentioned that you think there is a more

11   probable than not effect.  We talked about the more

12   probable than not, and we also talked about the

13   substantial contributing factor paradigms last time we

14   got together.

15          Can you state, to a reasonable degree of

16   scientific certainty, that there would still be a more

17   probable than not relationship if the issues of recall

18   bias and confounding were reasonably accounted for in the

19   case-control studies?

20   A    And I apologize.  I used the term "more probable than

21   not" in a way that is -- was confusing, I think.

22   Q    Okay.

23   A    Because I didn't say that Mr. Koen's illness was

24   caused on a more probable than not basis.  I said that

25   the weight of the scientific evidence more probably than

1    not indicates that glyphosate is a cause of non-Hodgkin

2    lymphoma at -- to some degree.

3    Q    Okay.  So, are you offering an opinion that it is

4    more probable than not that glyphosate was the primary

5    cause of Mr. Koen's NHL?

6    A    No.

7    Q    Okay.  Are you offering an opinion that it --

8    glyphosate was a substantial contributing factor to

9    Mr. Koen's non-Hodgkin's lymphoma?

10    A    I am.

11    Q    Okay.

12    A    And that I do mean on a more probable than not basis

13    based on my analysis of the -- all the literature and all

14    the other things we talked about.

15    Q    All right.  So the record's clear, you think it's

16    more probable than not that glyphosate can cause NHL, and

17    that glyphosate was a substantial contributing factor to

18    Mr. Koen's NHL?

19    A    That's correct.

20    Q    Okay.  Do you hold an opinion, to a reasonable degree

21    of scientific certainty, that glyphosate can cause NHL?

22    A    I interpret the term "reasonable degree of scientific

23    certainty" being more than 50 percent, which is the exact

24    same thing as more probable than not, to my ear.

25    Q    Okay.  All right.  Fair enough.  Last question on

Michael D. Freeman, MedDr., PhD.

```
 1    this paper.  Page 8, left-hand column, the paragraph that

 2    starts "Any bias."  It says, "Any bias in the studies

 3    going into a meta-analysis, if not adjusted for in some

 4    way, will cause the meta-analysis to be similarly biased.

 5    Each of the three meta-analyses of glyphosate in NHL

 6    relied on some of the case-control studies that showed

 7    evidence of statistical bias."

 8         Did I read that correctly?

 9    A    Yes.

10    Q    Okay.  Do you agree with the statement that "Any bias

11    in the underlying studies going into a meta-analysis, if

12    not adjusted in some way, will cause the meta-analysis to

13    be similarly biased"?

14    A    Yes.

15    Q    Okay.  And that is what's been called colloquially as

16    the garbage in garbage out phenomenon?

17    A    Not quite.  I mean, it -- I mean, these are

18    complicated, big studies.

19         I wouldn't call them garbage.

20    Q    Oh, no.  No.  I'm not talking about these specific

21    studies.

22    A    Okay.

23    Q    I'm just talking about that concept that bias that

24    goes into a meta-analysis will also be reflected in the

25    outcome of the meta-analysis.  That's --
```

Michael D. Freeman, MedDr., PhD.

```
 1   A    Right.

 2   Q    -- the garbage in --

 3   A    And that goes both ways.

 4   Q    Right.

 5   A    Bias -- you know, Type 1 bias where we accept that

 6   this is a -- that glyphosate is a cause versus a

 7   different kind of Type 1 bias where we accept that

 8   glyphosate is protective, you have to look at both of

 9   those.

10   Q    Right.  Okay.  Now, go back to the McDuffie study.

11   A    Okay.

12   Q    If you go to the dose analysis, which is Table 8.

13   A    Got it.

14   Q    Okay.  How did the authors control for confounding in

15   their dose analysis of glyphosate from other pesticides?

16   A    I'm going to have to look this over to be able to

17   answer that question.

18        It's not something I can answer off the top of my

19   head.

20   Q    Sure.  And if it helps at all -- and maybe it

21   doesn't -- take a look at the key at the bottom where

22   they talk about what they control for.

23   A    Yeah.  I will definitely -- I'm definitely heading my

24   way down there.

25   Q    Okay.
```

1          (The witness reviews the document)

2               THE WITNESS:  And the question was how do

3     they -- would you give me the question one more time?

4               MR. KALAS:  Sure.

5     Q    BY MR. KALAS:  Did the authors control for

6     confounding from other pesticides in the dose analysis

7     for glyphosate?

8     A    Ah.  No, they did not.

9     Q    Okay.  How did the authors control for the potential

10    effect of recall bias in their dose analysis for

11    glyphosate?

12              (The witness reviews the document)

13              THE WITNESS:  Give me a minute to look

14    there.

15              MR. KALAS:  Sure.

16              (The witness reviews the document)

17              THE WITNESS:  Well, it's not controlled

18    for -- the risk of -- sorry.  The risk of recall bias is

19    controlled to some degree by the fact that they asked

20    this very wide variety of questions about a whole bunch

21    of different chemicals.

22              MR. KALAS:  All right.

23              THE WITNESS:  I'd have to look at the

24    prevalence of exposure and frequency of exposures to

25    answer the -- to be able to give you a better answer than

1    that.

2         But to some degree, by asking a whole lot of

3    different questions and a whole lot of potential

4    exposures and finding that some pop out, if you will,

5    that is one way to try to reduce recall bias.

6              THE REPORTER:  I'm sorry.  Excuse me.  Did

7    you say produce or reduce?

8              THE WITNESS:  Reduce.  Wait.  Did I say

9    reduce or control for?  Reduce.  Reduce.

10             THE REPORTER:  Thank you.

11             MR. KALAS:  Okay.

12   Q    BY MR. KALAS:  So, it's your opinion the authors

13   controlled for the potential effect of recall bias here

14   by asking a lot of questions.

15        Is that fair?

16   A    Well, I would say that that is an oversimplification

17   of what I just said.

18   Q    All right.  The authors -- go ahead.

19   A    You just said -- if you just asked about one

20   exposure, one particular exposure, then, obviously,

21   that's going to promote more -- the potential for recall

22   bias.  If you ask about a whole bunch of different

23   exposures, then that is going to reduce the risk of

24   recall bias; or at least it's going to show you the

25   recall bias.

Michael D. Freeman, MedDr., PhD.

 1          So, for example, going back to Dr. Crump's paper,

 2    if every single thing lit up, you would say, "Well, wait

 3    a minute.  Maybe" -- "because there is" -- "we threw in a

 4    few questions where we knew it couldn't be related.  And

 5    so, that is maybe a fact that we should look at."

 6          There is a lot of ways to design around potential

 7    for recall bias and try to minimize anyway.  You can't

 8    eliminate it completely, of course.

 9    Q    You mentioned that if every single thing lit up, that

10    would be more evidence there is recall bias, because

11    people are --

12    A    It might be.  Or it might be evidence that all of

13    these things are sort of together; that they're not

14    completely separated; that the multi-pesticide -- in

15    other words, the herbicide use -- is more the rule than

16    the exception, which is, at least what I have gleaned

17    from the literature, seems to be the general consensus.

18    Q    Right.  And so, if you look at the odds ratios in

19    Table 8, almost all of them are greater than 1.

20          In fact, every single one is either 1 or greater

21    than 1; right?

22    A    Yeah.

23    Q    And one would not expect to see that by chance; you

24    agree with that?

25    A    That is true.

1    Q    Okay.

2    A    The confidence interval certainly tells us the ones

3    that are statistically significant after adjustment we

4    didn't see by chance.

5    Q    Well, that -- my question was directed at something

6    else, which is not about the confidence interval.

7         It's that, if I were to just randomly simulate

8    odds ratios in a population, one would not expect every

9    single one of them to be greater than 1; right?

10   A    If the -- unless the odds ratio was measuring

11   something that we knew we were going to find was true.

12   So, like, if you looked at 60-year-old people versus

13   30-year-old people and asked "How many places do you

14   hurt," and they say, "Well" -- you know, they endorse,

15   you know, 20 out of 20 versus the younger group, you'd

16   say, "Oh.  Well, I mean, this is an invalid study."  Or,

17   you know, maybe there is -- maybe people who are 60 --

18   and I ought to know -- hurt more than people who are 30.

19   Q    But that wouldn't be by chance.

20         (Crosstalk between counsel and the witness)

21   Q    BY MR. KALAS:  That wouldn't be by chance.  I'm

22   sorry.  That wouldn't be by chance.

23         That would be showing a true effect; right?

24   A    Correct.

25   Q    Okay.

```
1    A    So, if there is potential for a true effect, then it

2    wouldn't be random.  You just said -- you said if you

3    randomly allocate odds ratios in a population, then the

4    population --

5    Q    And the null hypothesis is true, there is no effect,

6    would you expect to see --

7    A    Oh.  Oh, yes.  Then I would expect to see a

8    relatively Bell-shaped distribution around 1.0.

9    Q    Okay.  But here we don't see that in Table 8; right?

10        We see all greater than or equal to 1; right?

11   A    Yes.

12   Q    Okay.  So, you'd agree something in Table 8 may be

13   contributing and/or causing NHL; right?

14   A    Sure.  Yes.

15   Q    But we have not controlled for co-exposures in

16   Table 8; true?

17   A    True.

18   Q    Okay.  And so, if somebody is exposed to both

19   glyphosate and malathion, for instance, we don't know if

20   the odds ratio we see for glyphosate is actually counting

21   malathion, or vice versa; right?

22   A    That is true for this study.  I agree.

23   Q    Okay.  The most controlled figure in this study, in

24   the Eriksson study, is in Table 2; correct?

25        That's the ever/never OR adjusted B?
```

```
 1    A    Aren't we looking at McDuffie?

 2    Q    Yeah.  Did I say Eriksson?

 3    A    You did.

 4    Q    I'm sorry.  The most controlled figure in McDuffie is

 5    in Table 2.

 6         That's the OR adjusted B; correct?

 7    A    OR adjusted -- yes.

 8    Q    Okay.

 9    A    The far right column.

10    Q    Right.  And that one showed an odds ratio slightly

11    greater than 1.  1.2; right?

12    A    Oh.  You're talking about for glyphosate.  Yes.

13    Q    Yes, sir.  And that was not statistically

14    significant; correct?

15    A    Yeah.

16    Q    It's a null finding?

17    A    It wasn't -- it was a -- not a statistically

18    significant finding.  I mean, you can't tell me, for

19    Table 3, everybody is over 1 and that's wrong; and then

20    this is a null finding when it's 1.2.

21         It's over 1.  It just isn't statistically

22    significant.

23    Q    Okay.  And where I was going to was something

24    different, which is, they don't control here for

25    confounding from other pesticides; right, in OR
```

1    adjusted B?

2    A    Not in that particular OR.  No.

3    Q    Okay.  And they don't control for -- in a formal way

4    at least, for any effects of recall or proxy bias; right?

5    A    Yeah.  I'm not sure how you would do that and adjust

6    for the OR.  But at least that value -- it's the -- the

7    study design is what controls for -- or tries to minimize

8    it.

9    Q    Okay.  And so --

10   A    Not the OR.  And that -- well, let's see.  I guess

11   you could control for something that might increase the

12   risk of recall bias.

13        But I have to look at -- so, like, controlling

14   for a positive family history of cancer might be a form

15   of control for recall bias.

16   Q    Okay.  You can't say, to a reasonable degree of

17   scientific certainty, that that OR would not be 1 or even

18   less than 1, had they controlled for confounding and/or

19   any residual recall bias; true?

20   A    I can't tell you how the -- your hypothetical would

21   affect that value.

22        That's true.

23   Q    Okay.  Let's take a look at Eriksson --

24   A    Okay.

25   Q    -- please.

Michael D. Freeman, MedDr., PhD.

1          How did the authors of Eriksson control for

2    confounding from co-exposures in Table 2?

3    A    Let's take a look here.

4          (The witness reviews the document)

5              THE WITNESS:  I would say it's frequency

6    matching.

7    Q    BY MR. KALAS:  I'm confused by that answer.

8          Can you elaborate, please?

9    A    You said how they control for confounding.  It's not

10   confounded by age or sex because it's frequency matched

11   between the cases and the controls.

12   Q    I'm sorry.  I thought I asked, but maybe I didn't.

13        How did they control for confounding from

14   co-exposures?

15   A    Oh.  Oh.  Well, not in that table.  I don't see that.

16        It seems like it's just a univariate analysis.

17   Q    Okay.  And so, again, like in McDuffie, Table 8, if

18   somebody used glyphosate and used MCPA, and,

19   hypothetically, glyphosate was causing NHL and MCPA was

20   not, then the MCPA odds ratio would appear to be

21   elevated -- or would be elevated even though we weren't

22   measuring an effect of MCPA; right?

23   A    If everybody took gly- -- who you -- was exposed to

24   glyphosate was also exposed to MCPA, that would be

25   correct.

```
 1   Q    Okay.  And the flip side of that would be true as

 2   well.  If MCPA were causative and glyphosate were not,

 3   the glyphosate odds ratio would appear to be elevated due

 4   to glyphosate use when, in fact, you're measuring MCPA

 5   use; right?

 6   A    The same caveat that the --

 7   Q    Okay.

 8   A    -- use is the same.  Yeah.

 9   Q    Okay.  And, again, Table 2 does not control, in any

10   formal way, besides the study design, for recall bias;

11   correct?

12   A    One more time, please.

13   Q    Table 2 does not control, in any formal way, for

14   recall bias, beyond the study design; correct?

15   A    Yes, that's correct.

16   Q    Okay.  And if we go back again to Table 7 -- and we

17   talked about this a bit last time, so I don't want to

18   belabor it.

19        But when they controlled for co-exposures in

20   Table 7, the odds ratio was cut in half and the

21   confidence interval was no longer statistically

22   significant; right?

23   A    Yes, that's correct.

24   Q    Okay.  And can you state, to a reasonable degree of

25   scientific certainty, that, had the authors here
```

Michael D. Freeman, MedDr., PhD.

1    accounted for residual recall bias issues, the odds ratio

2    still would have been greater than 1?

3    A    I don't have any reason to believe that's true.

4         But it might have affected it.

5    Q    Okay.

6    A    I mean, they were asked about a whole bunch of

7    different things.

8    Q    Okay.

9    A    So, that's -- you know, that's that effect of asking

10   about a whole laundry list and the particular exposure of

11   interest is within it.

12   Q    Okay.

13   A    But --

14   Q    I'm sorry.

15   A    No.  That's fine.  Just -- that's the only point I

16   would make.

17   Q    Okay.

18         MR. KALAS:  I want to mark as Exhibit 23

19   another study.  And I don't know if you have seen this

20   study.  So, let's just take a look at it and figure this

21   out.  This is a study called Hohenadel 2011.  Okay.

22   Q    BY MR. KALAS:  If you look at Exhibit 23 when you get

23   a moment, please.

24   A    Sure.  I'm going to download it so I can see it

25   easily here.

Michael D. Freeman, MedDr., PhD.

```
 1   Q    Have you seen this study before?

 2   A    I don't recall.

 3   Q    Okay.

 4   A    It's old enough.  I mean, it's not something that

 5   just came out in the last few months.

 6        So, it's the kind of thing that I would have come

 7   across in -- potentially, in my review of the literature.

 8   Q    But it's not listed in your report; correct?

 9   A    I didn't rely on it.  That's correct.

10   Q    Okay.  And you -- it -- you may have considered it.

11        You're not sure?

12   A    Well, considering -- looking at it is not the same

13   thing as considering --

14   Q    Okay.

15   A    -- obviously.  But let's see.

16        I just don't recall it offhand.

17   Q    Sure.  Is there a difference, in your mind, between

18   looking at and considering a study?

19   A    Yes.

20   Q    Okay.  What's the difference?

21   A    Well, I would say you could kind of rank it as far as

22   the degree to which you rely on something.

23        It -- I may look at something and realize that

24   this is -- this shouldn't be considered at all.

25   Q    Okay.
```

Michael D. Freeman, MedDr., PhD.

```
 1   A    Yeah.

 2   Q    I didn't want to cut you off.  I'm sorry.

 3   A    No.  Go ahead.  You were going to ask me something.

 4   Q    And is there a difference between considering and

 5   relying on a study?

 6   A    Yes.

 7   Q    Okay.

 8   A    So --

 9   Q    What's the difference between that?

10   A    Yeah.  So, looking at something versus considering

11   it, you know, like I say, it's ranked.  It is just to --

12   maybe just to determine this is something that shouldn't

13   be considered at any level.  And then, looking at

14   something and considering what's in the particular

15   article is going to obviously require a little bit more

16   review.  And there may be a determination that this is

17   not something I -- that I should rely on or need to rely

18   on.

19        And then, actually, by the time I get my opinion

20   out, anything that's important to my opinion is the stuff

21   that I rely on.

22   Q    Got it.

23   A    So, if you ask me a question, say, "Well, did you

24   ever look at this," and I say, "Yeah, I did look at that,

25   and it's not anything that I relied on in coming up with
```

1    my opinion, but it's something that, having looked at it,

2    I can maybe answer a question that you ask me."

3            So, it's, like, taking it to the next level by

4    asking me questions about it.

5    Q    That's helpful.

6    A    You ask a lot of really good and probing questions.

7    And I have to stop and think about it.

8            And maybe, you know, I've reviewed something that

9    might help me.

10   Q    And I hope I don't cut you off or anything when I'm

11   asking those questions.  Sometimes I go fast.  So, I

12   appreciate you being patient with me.

13           Are there materials you considered in this case

14   but did not rely on?

15   A    Well, there is lots of things that I looked at that

16   didn't become reliance documentation.  So, to the extent

17   that there is some sort of legal meaning attached to

18   "consideration," I wouldn't use that expression.  I would

19   have looked at and it said, "It's not something I'm going

20   to rely on for my report."

21   Q    Right.  So, I -- so, as I understood it, your

22   reliance materials are things -- and I think you said

23   this two answers ago, but tell me if I misheard -- things

24   that you looked at that you decided supported your

25   opinion.

1        Those were your reliance materials; is that fair?

2   A    Yes.  Or played some sort of part in something that

3   made its way into my report.  Yes.

4   Q    Okay.  Are there things that you considered, when

5   looking at the literature, that you decided did not

6   support your opinion; and, thus, you would not list in

7   the body of your report?

8   A    Well, I definitely wanted to be fair.  I didn't want

9   to take -- for example, if I just didn't even list

10  Andreotti; said, "Well, that doesn't support my opinion.

11  My opinion is that glyphosate is causal.  And Andreotti

12  doesn't support that, so I'm not going to talk about

13  Andreotti," that would be absolutely improper.

14        So, when you say "in support of my opinion," it's

15  a reference in -- not every reference in my report

16  supports my final conclusion, I guess is the way I should

17  put it.  Because it would be improper for me to operate

18  that way.  I'd just be cherry picking.  I tried to give a

19  relatively fair review of what's out there in the

20  literature.

21        But there may be something that I missed, or

22  something could be brought to my attention.  And I'm wide

23  open to that.

24  Q    Okay.  So, I just want to make sure we're crystal

25  clear here before we get into Hohenadel.

1          There are materials you reviewed that you read --

2    and by "read," I mean at least read the article or read

3    the position of the regulator or what have you -- that

4    did not make it into the report; is that fair?

5    A    Yes.

6    Q    Okay.  And you've read those materials in the context

7    of forming your expert opinion; is that fair?

8    A    Yes, that is fair.

9    Q    Okay.  Let's go to Hohenadel, which I marked.  Now,

10   if you look at the data source here in Part 2,

11   Section 2.1, they discuss here that the data in these

12   analyses are part of the cross-Canada study of pesticides

13   and health.

14          Do you see that?

15   A    Yes.

16   Q    Okay.  And the cross-Canada study of pesticides and

17   health -- and feel free to refer back to Exhibit 19 if

18   you need to -- that's the McDuffie study; right?

19   A    Yes.

20   Q    Okay.  And it's the same time period listed here,

21   1991 to 1994.

22          Do you see that?

23   A    Yes.

24   Q    Okay.  And so, this appears to be the same data set;

25   right?

Michael D. Freeman, MedDr., PhD.

```
 1   A     Yes.

 2   Q     Okay.  And if you go down to the -- or, actually,

 3   let's go back up to the title.  The title is Exposure to

 4   Multiple Pesticides and Risk of Non-Hodgkin Lymphoma in

 5   Men from Six Canadian Provinces.

 6         Did I read that correctly?

 7   A     You did.

 8   Q     Okay.  And this exposure to multiple pesticides, this

 9   is sort of implicating the confounding issues we've been

10   talking about; right?

11   A     Right.

12   Q     Okay.  And so, if you go down to the data here in

13   this study and you go to Table 4, which is on

14   page 2326 -- let me know when you get there.

15   A     Got it.

16   Q     Okay.  Do you see the fourth row here looks at

17   malathion and glyphosate?

18   A     Yes.

19   Q     Okay.  And if you go to the bottom there, they look

20   at individuals who used malathion and glyphosate; right?

21   A     Yes.

22   Q     Okay.  And so, the folks who used malathion and

23   glyphosate, we had an odds ratio of 2.10; correct?

24   A     Yes.

25   Q     With a confidence interval of 1.31 to 3.37; right?
```

Michael D. Freeman, MedDr., PhD.

```
 1   A     Yes.

 2   Q     Okay.  And this is looking at non-Hodgkin's lymphoma;

 3   true?

 4   A     Yes.

 5   Q     Okay.  And so, in individuals who used malathion and

 6   glyphosate, we saw a greater than doubling of the risk

 7   that was statistically significant; right?

 8   A     Yes.

 9   Q     Okay.  If we go up to the first row or -- there,

10   which is malathion only, we had an odds ratio of 1.95;

11   right?

12   A     Yes.

13   Q     Okay.  And we had a confidence interval of 1.29 to

14   2.93; right?

15   A     Yes.

16   Q     And so, in those individuals who just used malathion

17   and did not use glyphosate, we saw a nearly doubling of

18   the risk that was statistically significant; correct?

19   A     Yes.

20   Q     Okay.  Then, for glyphosate, we had an odds ratio of

21   .92; right?

22   A     Yes.

23   Q     Okay.  And a confidence interval of .54 to 1.55;

24   right?

25   A     Yes.
```

1   Q    That's a null finding; true?

2   A    Yeah, I would say that is a null finding.

3        It's pretty evenly balanced around the 1.0.

4   Q    Okay.  And so, in the individuals who used glyphosate

5   only, in the McDuffie study population, the authors of

6   Hohenadel were unable to see any increased risk from that

7   glyphosate-only use; correct?

8   A    Yes.

9   Q    Okay.  And so, given the fact that we saw a doubling

10  of the risk in the malathion and glyphosate group, which

11  is a uni- -- well, let me back up and ask a foundational

12  question.

13       If we were just studying malathion and glyphosate

14  exposure in NHL, the malathion/glyphosate group, if it

15  was reported as a glyphosate-only figure, that would be a

16  univariate analysis not controlling for malathion use;

17  right?

18  A    Yes.

19  Q    Okay.  And, likewise, if it was reported as a

20  malathion-only figure, that would be a univariate

21  analysis not controlling for glyphosate use; right?

22  A    Yes.

23  Q    Okay.  Then if we had the malathion-only group, that

24  would be a multivariate analysis controlling for

25  glyphosate use; right?

Michael D. Freeman, MedDr., PhD.

1    A    Yes.

2    Q    Okay.  And, likewise, the glyphosate-only group would

3    be a multivariate analysis controlling for malathion use;

4    right?

5    A    I'm sorry.

6    Q    The glyphosate --

7    A    Can you say it one more time, please?

8    Q    Yeah.  If our study population was malathion and

9    glyphosate users and we want to know what the effect of

10   those pesticides were on NHL, if we reported a

11   glyphosate-only group, and controlled for malathion use,

12   then that would be a multivariate number; correct?

13   A    Yeah.  I don't know if this is control.  I think --

14   Q    Okay.

15   A    -- this is a restricted analysis.

16   Q    Okay.

17   A    I think they restricted it to people who only had

18   malathion exposure, people who had only glyphosate

19   exposure, and then people who have both malathion and

20   glyphosate exposure.  I think that's what I'm looking at

21   here.

22         But I haven't looked through it carefully enough

23   to know if this is actually multivariate or not.

24   Q    Okay.  Well, certainly, I'd give you time to take a

25   look, if you want.  But only one more question.  So, if

1    you don't want to take a look, it's up to you.

2         Does --

3         (Crosstalk between counsel and the witness)

4              MR. KALAS:  Whatever you want.

5    Q    BY MR. KALAS:  But does this analysis raise concern,

6    in your mind, that the glyphosate univariate figure in

7    the same population in the McDuffie study was confounded

8    by malathion use?

9    A    The way you characterized the question was the part

10   I've lost.  So, I was listening to the last part of it.

11        Just the first part of the question again, if you

12   don't mind.

13   Q    Yeah.  Let me repeat the question.

14   A    Okay.

15   Q    And I'll re-ask a question that's foundational for --

16   just to center ourselves.

17        This is the same study population as McDuffie;

18   right?

19   A    I -- well, that's -- that was the predicate you gave

20   me.

21   Q    Well, okay.  But we went back up here, and you agreed

22   that McDuffie was the cross-Canada study of pesticides

23   and health; right?

24   A    Right.

25   Q    That's in 2.1?

Michael D. Freeman, MedDr., PhD.

```
 1   A     Right.

 2   Q     And we agreed that it was 1991 to 1994; right?

 3   A     Well, yeah.

 4   Q     If you want to look back --

 5   A     I'm not assuming it's -- sorry.

 6   Q     You can look back to McDuffie and compare.

 7   A     I'm not assuming it's different.

 8         I'm not assuming that some unique cohort was

 9   assembled.

10   Q     Okay.  And so -- and, in fact, if you look at

11   Citation 6 here on page 2325 and 232- -- or excuse me,

12   2328, Citation 5 and Citation 6, Citation 5 is the

13   McDuffie study; right?

14   A     Yes.

15   Q     Okay.  And they cited up here in page 2321, the --

16   right where we were looking about the cross-Canada study

17   of pesticides and health, the citation is to Citation 5;

18   right?

19   A     Yes.

20   Q     Okay.

21   A     I was just looking -- I was looking at some of the

22   other information.  I just wanted to make sure that there

23   isn't -- there is not additional data that are

24   considered.

25         That's the part I was trying to figure out.
```

1    Q    Okay.  And, certainly, if you want a moment to read

2    this, I am not trying to rush you.  Because I think this

3    is an important point.

4         So, if you want to take a moment to read this

5    article, then go for it, and then we can carry on.

6    A    You know, let me just quickly --

7    Q    Sure.

8    A    -- look through the methods here, because I just have

9    an overview of it.

10   Q    Yep.

11        (The witness reviews the document)

12            MR. KALAS:  I'm sure you've been told many

13   times "Read the article put in front you."  So...

14            THE WITNESS:  That, and eat your vegetables.

15        (The witness reviews the document)

16            THE WITNESS:  Okay.

17            MR. KALAS:  Okay.

18   Q    BY MR. KALAS:  Do you agree -- let's be clear here,

19   before we finish this up.

20        Do you agree this appears to be the same study

21   population as the McDuffie 2001 study?

22   A    I do.  It sure looks like it.

23   Q    Okay.  Do you agree -- well, let me go back to

24   Table 4 now.

25        Do the results for malathion and glyphosate in

1    the restricted analysis, as you described it, raise

2    your -- raise any concern, in your mind, that the

3    glyphosate figures in the McDuffie study may be

4    confounded by malathion use?

5    A    It's possible.

6    Q    Okay.  Why is it possible based on these results?

7    A    Well, there appears to be some sort of intersection

8    between the two of them.  Malathion and glyphosate

9    together have a higher odds ratio than malathion only.

10   Glyphosate, it looks like it's got a lot of scatter in

11   the data.

12        I'm not sure what the underlying total exposure

13   figures are for that analysis.

14   Q    McDuff- -- go ahead.  Sorry.

15   A    Yeah.  So, I guess I'd have to look within the data a

16   little bit more.

17        But it's certainly a reasonable question to ask;

18   what effect might this have.

19   Q    Based on these results in Hohenadel 2011, is it

20   possible that the glyphosate data -- or the glyphosate

21   results in McDuffie 2001 are explained in part or in

22   whole by confounding for malathion?

23   A    It is possible that, to some degree, the relationship

24   is confounded by malathion, based on what you're showing

25   me here.

```
 1             I don't have a problem with that.

 2   Q     Okay.  Can you state, to a reasonable degree of

 3   scientific certainty, that the dose response data in

 4   Table 8 would still remain elevated and statistically

 5   significant in the McDuffie study, had they controlled

 6   for malathion?

 7   A     No.  I can't tell you that.

 8   Q     Okay.

 9   A     That would be completely speculative.

10   Q     Okay.  Let's turn to Mr. Koen for just a moment.

11             ███████████████████████████████████████

12   ███████; correct?

13   A     Yes.

14   Q     And just to be clear, █████████████████████████

15   ███████; right?

16   A     Right.

17   Q     Okay.  If you go back to the McDuffie study,

18   Exhibit 19, and you go to Table 1 --

19   A     Hold on.  You're faster than I am here.  Okay.  I'm

20   back on McDuffie.  And I'm at Table 1.

21   Q     Okay.  Do you see the odds ratio there for family

22   history of cancer, any first degree relative?

23   A     Yes.

24   Q     Okay.  And do you see that it is 1.31, with a

25   confidence interval of 1.05 to 1.62?
```

```
 1    A     Yes.

 2    Q     Is that statistically significant?

 3    A     It is.

 4    Q     Okay.  The McDuffie study, it's true, showed a

 5    statistically significant increased risk for NHL from

 6    having a family history of cancer in any first degree

 7    relative; right?

 8    A     In these -- this population, yes.

 9    Q     Okay.  And this is the same population you applied to

10    your causation analysis for Mr. Koen; true?

11    A     It's the same population I considered --

12    Q     Okay.

13    A     -- in my causation analysis for Mr. Koen.

14    Q     Do you agree that ███████████████████████████████

15    ████████████████████████ -- well, strike that.  Let me ask a

16    different question.  Go back to Exhibit 22, please.  I

17    believe that's De Roos 2003.

18    A     Okay.

19    Q     Okay.  And De Roos -- well, actually, strike that,

20    because I'm going to come to that later.

21          So, going back to McDuffie, then, for a second,

22    do you agree that having a first degree relative with NHL

23    is a substantial risk factor for -- that's a bad

24    question.  Strike that.

25          Do you agree that having a first degree relative
```

Michael D. Freeman, MedDr., PhD.

1    with cancer is a substantial risk factor for NHL, in the

2    McDuffie population?

3    A     It is.

4    Q     Okay.  Do you agree that ████████████████████

5    ████████████████████████████████████████████████

6    ██████████

7    A     It may have been.

8    Q     Okay.  Can you state, to a reasonable degree of

9    scientific certainty, that ████████████████████████

10   ████████████████████████████████████████████████████

11   ██████████████████████

12   A     I don't think I can parse it out to that degree.  So,

13   no, I can't give you that, because I don't know what the

14   ████████████████████████████████████  is while

15   these -- from these data.  That relationship hasn't been

16   explored enough.

17         That's why substantial factor is the most

18   reasonable conclusion that can be drawn from these data,

19   rather than more probable than not.

20   Q     Okay.

21   A     I can't say more probable than not not or more

22   probable than not yes for a variety of factors here, or

23   really any specific factor at that level of certainty for

24   Mr. Koen specifically.

25   Q     To that same point but slightly different, can you

 1    say, to a reasonable degree of scientific certainty, that

 2    Mr. Koen would not have gotten NHL at the exact same time

 3    and of the exact same severity had he not used Roundup

 4    ██████████████████████████████████████████████

 5    A    That's an interesting question.  We know that

 6    Mr. Koen -- if it's okay if I give you my thinking on

 7    this, because it's a question I haven't thought about

 8    exactly the way you've asked it.

 9         We know that Mr. Koen had all these -- whatever

10    risk factors he had, known and unknown, including

11    glyphosate exposure, ████████████████████████████

12    and any other exposures in his life, and that that made

13    up basically the pie; you know, a pie chart of his risks;

14    and we know he got non-Hodgkin lymphoma.

15         We know that most men in his age group will not

16    get non-Hodgkin lymphoma.  In fact, he was in a

17    relatively young age group for non-Hodgkin lymphoma.  I

18    think the risk is something like 1 in 357 per year for

19    all men in his age group.  So, it's reasonable to say, if

20    you take away any of his substantial risk factors for

21    non-Hodgkin lymphoma, more likely than not he doesn't get

22    it.  That's not unreasonable, because everything had to

23    be there for him.  It was a perfect storm, at least

24    within Mr. Koen, that produced his non-Hodgkin's

25    lymphoma.

```
 1              And as -- and the glyphosate is a more than

 2    trivial contribution to that, which can't be exactly

 3    quantified; just that it's a substantial factor.  But all

 4    his other -- all the other risk factors, known and

 5    unknown, also individually contributed as substantial

 6    factors.  Or the ones that are substantial factors, I

 7    should say.

 8              So, take away the -- ████████████████████

 9    ████████████████████████████    That's not

10    unreasonable.  Take away his glyphosate, does he not get

11    it?  That's not unreasonable.  But any of those factors

12    that contribute to that pie of substantial factors that

13    are taken away are theoretically going to drop him into a

14    very low risk group.

15    Q    Okay.

16              MR. KALAS:  Can I go off the record for a

17    moment, please?

18              THE WITNESS:  Yeah.  Are you going to ask

19    me about that question?

20              MR. KALAS:  No.  I have a child banging on

21    my office door.

22              THE WITNESS:  Oh, okay.  I'm going to take

23    a break just to check on the dogs again, if that's okay.

24              MR. KALAS:  Yeah.  Sure.

25              THE WITNESS:  Okay.  Thanks.
```

Michael D. Freeman, MedDr., PhD.

```
 1              MR. KALAS:  All right.

 2         (Recess held from 12:07-12:23)

 3              THE VIDEOGRAPHER:  We're now back on the

 4  record.  The time is 12:23.

 5  Q    BY MR. KALAS:  Dr. Freeman, before we took a break,

 6  you mentioned that Mr. Koen was the perfect storm.

 7         Do you remember that answer?

 8  A    Well, his non-Hodgkin lymphoma was a product of a

 9  perfect storm within him.

10  Q    Okay.

11  A    Yes.

12  Q    Are any of these risk factors that Mr. Koen had

13  substantial in and of themselves, in the absence of the

14  other risk factors he had, to cause his non-Hodgkin's

15  lymphoma?

16  A    Well, anything that's a known risk factor that would

17  be part of that pie is a substantial factor.  And if you

18  take it away, then you would say, more likely than not,

19  they probably won't have the illness, because the illness

20  is unusual.  It's rare.  So, you have to put everything

21  together.  It -- it's not he was just doing great and had

22  no risks, and then you just give him some glyphosate and

23  that's going to trigger it.  Because look at how many

24  people who are exposed to glyphosate don't get

25  non-Hodgkin lymphoma.
```

Michael D. Freeman, MedDr., PhD.

```
1              It's got to be other stuff.

2    Q    Understood.  Okay.  Another risk factor that ██████

3    ████████████████████████████████████████   correct?

4    A    Yes.  More -- let me look at my report and -- since

5    we're talking about Mr. Koen.

6              I don't think I actually mention that in my

7    report.

8    Q    Okay.  You are aware, from reading his deposition, he

9    has an ████████████████████████████

10             MS. NOLAN:  Objection, facts not in

11   evidence.

12             THE WITNESS:  It's not something I committed

13   to memory.

14             MR. KALAS:  Okay.  Well, let's look at his

15   deposition, then, if you give me a moment.

16             THE WITNESS:  Sure.

17             MR. KALAS:  So, I was going to mark these

18   at the end, but I'll mark this one now and then mark the

19   rest at the end.

20             I'm marking as Exhibit 24 part 2 of the Koen

21   transcript, which has been Bates stamped by counsel for

22   plaintiffs.

23   Q    BY MR. KALAS:  Open it up when you get a chance,

24   please.

25   A    Okay.  Oh, geez.  I -- I'm much better off just
```

Michael D. Freeman, MedDr., PhD.

```
 1    pulling up my -- it's 34 megs.

 2    Q    Okay.  Exhibit 24 is that big?  Okay.  Well -- oh, it

 3    is.  I see that.  Okay.  Well, just open it when you get

 4    a chance, and then, I'll refer you to the page.

 5          Do you have it open yet?

 6    A    No.  I was -- I thought, "Well, just let it

 7    download," but that's not really going well.  So, hold

 8    on.  Let me just pull up my -- here we go.  This is

 9    part 1, did you say?

10    Q    Part 2, sir.

11    A    Part 2.  Okay.  I'm open.  Thank you.

12    Q    Okay.  And if you go to page 192 at the bottom of

13    that deposition.

14    A    Okay.  Yes.

15    Q    Okay.  Do you see, at 1:22:25, ██████████████

16    ████████  ████████████████████████████

17    ████████  ████████  ████████  ████████  ████████████

18    ██████████████████████████  ████████  ██████  ████████

19    ████████████████████████████████████████

20    ████████████

21          Did you read this portion of the deposition?

22    A    I read all the depositions.  So, I'm sure I came

23    across it.

24    Q    Okay.  Are you aware -- well, strike that.

25          As somebody who's reviewed epidemiology data
```

Michael D. Freeman, MedDr., PhD.

```
1    their whole career, are you aware of any genetic

2    predispositions to cancer that ████████████████████

3    may have?

4    A    Yes.

5    Q    Okay.  What awareness do you have?

6    A    Just that ██████████████████████████████████

7    ████████████████████ I should say, is probably more

8    accurate --

9    Q    Okay.

10   A    -- is a risk factor for -- well, it's certainly a

11   risk factor for osteoporosis; and there are some cancers

12   that it's a risk factor for.  I know there is some

13   limited evidence of non-Hodgkin lymphoma that I've come

14   across.

15        I've not made a study of it, though.

16   Q    Okay.  And in this case you didn't look into the

17   epidemiology on ████████████████████ to determine whether

18   or not ██████████████████████████████████████████████████

19   ██████████████

20   A    My assumption is he is at elevated risk.  That's why

21   he got sick.

22   Q    Okay.

23   A    Yeah.  All that stuff had to come together to cause

24   him to become ill.

25   Q    Okay.  So, that's another independent risk factor,
```

Michael D. Freeman, MedDr., PhD.

```
 1    along with his ████████████████████████████ and

 2    his Roundup use, that you would agree all contributed to

 3    his NHL?

 4    A    It may have contributed.  I'd have to look and see

 5    what the evidence is for the ██████████████ and what

 6    the penetrants would be from his background.  I'm seeing

 7    something that's says it's, like -- in the depo that I

 8    pulled up real quickly, that it might be fairly remote.

 9    I don't know.

10         I'd have to -- I'd just have to look at that and

11    say, "Yeah, okay, that's reasonable," or, "No, that seems

12    pretty remote," if I could even tell.

13    Q    What is BRCA, B-R-C-A, 2?

14    A    It's a -- BRCA2 is a breast cancer gene.

15    Q    Okay.  It's a mutation -- it's a gene that, if there

16    is mutations on it, can lead to an increased incidence of

17    certain types of cancer; correct?

18    A    Right.  Specifically the BRCA2 gene mutations, what

19    it refers to, yeah.

20    Q    Okay.  And are you aware that the BRCA2 mutation

21    incidence is five times higher in ██████████████

22    individuals in the background population?

23    A    No.  I can't tell you that I know what the exact

24    frequency is.

25    Q    Okay.  Did -- are you aware that it's elevated in
```

Michael D. Freeman, MedDr., PhD.

1    ███████████████████

2    A    Yeah.  Breast cancer would be one of the risk

3    factors -- or ██████████ -- ████████████ would be

4    one of the risk factors for breast cancer, as far as I

5    understand.

6    Q    Okay.  Did Mr. Koen undergo any genetic testing for

7    BRCA2 mutations?

8    A    I don't think I have that in my report.

9         And if it's not in my report, I can't -- I

10    wouldn't be able to answer that off the top of my head.

11    Q    Okay.

12    A    Give me just a minute.

13         No, I don't mention it in my report.

14    Q    Okay.

15    A    So, I can't answer the question.

16    Q    Okay.  And genetic testing would have been something

17    you would have found relevant to your report; correct?

18         I mean, this is something that would inform the

19    causation of his cancer?

20    A    I've only been asked whether or not exposure to

21    glyphosate was a substantial factor in causing his

22    cancer.

23         That's -- it's -- unless there is an exposure

24    that always causes non-Hodgkin lymphoma or causes

25    non-Hodgkin lymphoma more than 50 percent of the time,

1    then that's not going to change my substantial factor

2    analysis of the glyphosate.

3    Q    Can you say, to a reasonable degree of scientific

4    certainty, glyphosate was the most substantial factor in

5    his NHL?

6    A    No.  Absolutely cannot.  I cannot say that.  I

7    don't -- it would be -- I -- there is no one who could

8    say that, in my opinion.

9    Q    Okay.

10   A    There simply -- there isn't evidence that has parsed

11   out the risk factors for NHL, which is multifactorial.

12   Just its general nature is multifactorial.

13          That -- that just -- certainly not for

14   glyphosate, no.

15   Q    Okay.  And we talked about the ███████████████

16   █████████████

17          Specifically, ██████████████████████

18   ████████; correct?

19   A    I think that sounds correct.

20   Q    Okay.  And ███████████████████████████████

21   correct?

22   A    Hold on.

23   Q    Sure.

24   A    I just want to make -- I just want to see if I

25   specified that or if I just have to go off of memory.

```
 1                    MS. NOLAN:  I apologize.  ████████████

 2   ████████████████████████████████████████████

 3                    MR. KALAS:  Okay.  ████████████████

 4   █████████████████   █████████████████████    Thank

 5   you for that clarification.  So, let me strike that.

 6   Strike that answer.  We'll start over again.

 7   Q    BY MR. KALAS: ████████████████████████████████

 8   ██████    And this is at page 181 of the deposition we

 9   marked.

10          (The witness reviews the document)

11                    THE WITNESS:  Yes.

12                    MR. KALAS:  Okay.

13   Q    BY MR. KALAS: ████████████████████████████████████

14   right?

15   A    Yes.

16   Q    Okay.  And █████████████████████ -- strike that.

17          You mentioned before breast cancer is associated

18   with BRCA2 mutations?

19   A    Yes.

20   Q    Okay.  Is prostate cancer associated with BRCA2

21   mutations?

22   A    I don't know the answer to that.  It's such a highly

23   prevalent cancer, I don't know what the association is

24   with BRCA2.

25   Q    Okay.
```

```
 1              MR. KALAS:  I've marked as Exhibit 25 an

 2    article -- or a letter that appeared in a journal called

 3    J MED Genet, by Kadouri, et al.  That is K-A-D-O-U-R-I.

 4    Q    BY MR. KALAS:  I assume you haven't seen this before?

 5    A    If I have, I certainly didn't commit it to my memory.

 6    Q    Okay.  And if you look down here at Table 2, they

 7    looked at the frequency of cancers other than breast

 8    cancers and ovarian cancer in female BRCA1/2 ████████

 9    mutation carriers.

10         Do you see that?

11    A    Yes.

12    Q    Okay.  And for lymphoma, they found, with BRCA2, an

13    odds ratio -- or a hazard ratio of 11.9, with a

14    confidence interval of 3.1 to 46.2.

15         Do you see that?

16    A    Let's see.  For BRCA2, yeah, there is the 11.92.

17    Yep.

18    Q    Right.

19    A    I see that.

20    Q    Okay.  And so, this is at least one article in the

21    literature that found an increased risk of NHL -- or at

22    least lymphoma, excuse me, not NHL.

23         Or increased risk of lymphoma with a BRCA2

24    mutation; right?

25    A    Yes.
```

Michael D. Freeman, MedDr., PhD.

```
 1   Q    Okay.  If we go --

 2              MR. KALAS:  I'm going to mark as

 3   Exhibit 26 -- one moment.  I've marked as Exhibit 26 a --

 4   what appears to be a previous CV from you.

 5   Q    BY MR. KALAS:  Have you seen this before?

 6   A    That's, what is it, 17 years old?

 7   Q    Yes.

 8   A    15 years old, something like that?

 9   Q    15 years old.

10   A    Okay.

11   Q    Does it appear to be a true and correct copy of your

12   CV, as it existed in 2006?

13   A    No idea whatsoever.

14   Q    Okay.  Is this you, Michael D. Freeman, DC, MD, MPH,

15   Ph.D.?

16   A    I don't claim an M.D.  My medical degree is MED. DR.

17   Q    Okay.  So, going down to the CV, did you used to work

18   or live at 205 Liberty Street, Suite B, Salem, Oregon?

19   A    Boy, I don't know.  Maybe.

20   Q    Okay.  ███████████████████

21   A    Yeah.

22   Q    Okay.  Do you have a Ph.D. from Oregon State in

23   epidemiology in 1997?

24   A    Yeah.

25   Q    Do you know anybody else who graduated with a Ph.D.
```

```
 1    in epidemiology in 1997 from Oregon State with your name?

 2    A     I'm unaware of anybody like that.

 3    Q     Okay.  And do you have a Doctor of Chiropractic from

 4    1987?

 5    A     Yeah.

 6    Q     Okay.  And did you testify in a case named Morales v.

 7    Sam's East (ph)?

 8    A     No idea.

 9    Q     Okay.  Go -- just take a minute to look at

10    Exhibit 26, and scroll down it, and tell me if it appears

11    to be your credentials, journals that you worked at, what

12    have you; or if there is anything that seems incorrect

13    here.

14    A     I couldn't tell you if there is something incorrect.

15    I mean, there is a whole bunch of stuff on there.

16          It's certainly not what my CV looks like now.

17    Q     Okay.  Let me ask you this:  If you go down to your

18    board certification/organizations on this CV -- let me

19    know when you're there.

20    A     Yeah.

21    Q     Were you, at one point, a member of the American

22    Board of Forensic Examiners?

23    A     Yes.

24    Q     Okay.  Were you, at one point, a member of the

25    American Board of Forensic Medicine?
```

Michael D. Freeman, MedDr., PhD.

```
 1   A    I was.

 2   Q    Okay.  Those are no longer listed on your CV; right?

 3   A    Yes.

 4   Q    Why?

 5   A    The organization that awarded that credential is

 6   completely discredited.

 7   Q    Okay.  So --

 8   A    And I --

 9   Q    Tell me about that.

10   A    Well, I just withdrew from the organization.  So, I

11   don't have anything to do with them at all.

12        It just came up later that they were doing kind

13   of credentialing for sale.

14   Q    Okay.  So, starting at the beginning, when did you

15   get your credentials from the American Board of Forensic

16   Medicine?

17   A    I don't know.

18   Q    Okay.

19   A    Maybe in the '80s.

20   Q    Why did you get credentials from the American Board

21   of Forensic Medicine?

22   A    I don't remember.

23   Q    Okay.  You had to take an exam for that; right?

24   A    Probably.

25   Q    Okay.  And you said that they've been discredited as
```

1    credentialing for sale.

2          Where did you hear that?

3    A    Oh, I've seen it a couple times, because I've come

4    across people who claim credentials from that

5    organization as being, like, their -- like, some sort of

6    training or something that gives them an authority.  And

7    then, it's sort of -- it's come up in cases that I've had

8    in the past.

9          And I've seen some -- I've seen something -- I

10   had a murder case from, like, Mississippi or something,

11   where the forensic pathologist claimed that's where his

12   board certification was.  And I knew, because I had had

13   the -- you know, the, quote, "board certification," from

14   that group from going way back.  But there was no

15   training involved.  It was a test or whatever.  And so,

16   it wasn't really legitimate training certification.  And

17   so, I think it came about through that.

18         It was a guy who was famous for bite mark

19   analysis and putting people in jail for -- who didn't

20   belong in prison.

21   Q    Okay.  And so, when you found out that it was

22   credentialing for sale, you withdrew; is that fair?

23   A    Yeah.  Yeah.  Yeah.

24   Q    Okay.  And are there any other organizations that

25   you've been board certified by that you've withdrawn

Michael D. Freeman, MedDr., PhD.

 1   from?

 2   A    Well, I was a member of that board.  I don't know

 3   if I was board -- that's not -- I wouldn't say board

 4   certified.  I no longer am a member of the Association

 5   for Advancement of Automotive Medicine.  I don't know

 6   what my status is with the ITMA, International Traffic

 7   Medicine Association.  I am a -- like, sus- -- not

 8   suspended but, like, when you -- what would you call it?

 9   It's -- I'm a member of the North American Spine Society,

10   but I don't pay them dues.  And so, I'm, like, a -- like,

11   I could just send them dues.  I don't have to apply to

12   them again.  So, it's, like, I'm -- just because it's not

13   something I'm really involved with.

14          American Board of Medicolegal Death

15   Investigators, I haven't done anything with that board

16   for a while.  FARO I'm still a member of.  In fact, I

17   just re-upped that, Forensic Accident Reconstructionists

18   of Oregon.  I was a diplomat, board certified, American

19   Academy of Pain Management.  I don't know if I still am,

20   because I don't pay them dues.  And I'm a fellow now of

21   the American Academy of Forensic Sciences, as well as a

22   bunch of other stuff that's on my current CV.

23   Q    Okay.  Can you recall, for what purpose did you

24   attempt -- or did you join the American Board of Forensic

25   Examiners and the American Board of Forensic Medicine?

```
 1   A    You already asked me that.

 2   Q    Did I?  Okay.

 3   A    I don't remember.

 4   Q    Okay.  All right.  I'm sorry.  Let's go back to the

 5   Zhang study.  And I think the Zhang version I marked last

 6   time did not have supplemental tables.

 7            And so, I am going to --

 8   A    I'm sorry.  Which study?

 9   Q    Zhang.  Zhang.

10   A    Zhang.

11   Q    I've been corrected by her coworker that it's Zhang.

12   A    Yes.

13   Q    So, I try to...

14   A    Thank you for that, because I would continue to say

15   it wrong myself.

16   Q    Yeah.

17   A    Okay.  Zhang 2019; correct?

18   Q    Right.

19            MR. KALAS:  And I've marked a version with

20   the tables, I hope, now.  Yes.  Okay.  So, I have the

21   supplementary tables now.  I wanted to go -- so, that's

22   Exhibit 27.

23   Q    BY MR. KALAS:  I wanted to go to pages 35 and 36

24   here.

25   A    Okay.  And can I just use my version, or do you --
```

1    Q    Sure.  Sure, as long as you're at the supplemental

2    tables.  These are Supplemental Table 2 and 3.  If not, I

3    can throw them up on the screen.

4    A    Got you.  Well, let me download this to make sure

5    I've got the same one you're looking at.

6    Q    Okay.

7    A    Okay.  I got it up.

8    Q    Okay.  Now, one thing we've talked about a bit is

9    study quality.  In fact, I think we both agree we spent a

10   lot of time talking about study quality.

11         Are you aware that the Zhang authors scored the

12   epidemiology studies they looked at for quality?

13   A    Yes.

14   Q    Okay.  And if you go to page 35, we have Table 2

15   here, which is Andreotti and De Roos; correct?

16   A    Let me find 35 here.  Hold on a second.

17   Q    Sure.

18   A    Okay.  Now I've got to turn it sideways.

19   Q    Yeah, I know.  It's annoying.

20   A    Okay.  I've got it up.

21   Q    Okay.  And if you look at Table 2 here on page 35,

22   it's titled Quality Assessment of the Cohort Studies in

23   Meta-analysis; right?

24   A    Yeah.

25   Q    Okay.  And if you look at the overall quality score

1    for Andreotti 2018, they have an overall quality score

2    of 8; correct?

3    A    Yes.

4    Q    And for De Roos 2005, which was the previous version

5    of the Andreotti analysis, they have an overall quality

6    score of 7; correct?

7    A    Yes.

8    Q    Okay.  Then, if you go down to page 36, we have

9    Table 3, which is Quality Assessment of the Case-Control

10   Studies in Meta-analysis; right?

11   A    Yes.

12   Q    Okay.  And for quality scores there, we have a 6 for

13   De Roos 2003; correct?

14   A    Yes.

15   Q    A 7 for Eriksson 2008; correct?

16   A    Yes.

17   Q    A 6 for Hardell 2002; correct?

18   A    Yes.

19   Q    A 6 for McDuffie 2002 -- or 2001; correct?

20   A    Yes.

21   Q    And then, a 2 for Orsi 2009; correct?

22   A    Yes.

23   Q    Okay.  And so, you agree with me that, in overall

24   quality, the Zhang authors ranked Andreotti at the

25   highest overall quality study; right?

```
 1   A    Yes.

 2   Q    Okay.  Do you disagree with their ranking of

 3   McDuffie -- or excuse me, Andreotti as the highest

 4   overall quality study?

 5   A    I'm sorry.  I'm just looking at the table that you

 6   showed me here.  And they have got Orsi at 2, but it

 7   looks like they've actually got Orsi at 5.

 8        Am I misreading that?  It looks like they mis- --

 9   Q    Yeah.  That looks like a typo there.

10   A    Yeah.  So -- yeah.

11   Q    Good catch.  Good catch.

12   A    That is kind of weird.

13   Q    But you can add up all the 1s, if you want, if you

14   don't trust their overall quality, which is fair.

15   A    Well, now I don't.

16   Q    Yeah.  And make sure that that's the only 8.

17        So, feel free to do that, if you would like.

18   A    Andreotti is the only 8.

19   Q    Yes.  And if you want to add them up, add them up

20   but --

21   A    No.

22   Q    Okay.  Then, do you agree with the Zhang authors that

23   Andreotti is the highest quality study in this --

24   A    It's the highest ranked study, according to the

25   Newcastle-Ottawa Quality Assessment.
```

1    Q    Okay.  Do you agree this is a quality assessment

2    carried out by the Zhang authors in the peer-reviewed

3    literature; right?

4    A    Yes.

5    Q    Okay.  Do you agree with the Zhang authors that the

6    Andreotti study is the highest quality study pursuant to

7    the Newcastle-Ottawa Quality Assessment?

8    A    Yes.

9    Q    You do agree?

10   A    Yep.  It has the highest score.

11   Q    Okay.  Now, the methodology of Zhang, as I understand

12   it -- and we can go back up here to their Materials and

13   Methods section.  That will help us walk through this.

14   If you give me a moment to get there.

15        So, the -- it -- this is on pages 5 to 6, is

16   where I'm looking.

17   A    Okay.

18   Q    They walk through their methodology here on

19   Section 2.6.

20        Do you see that?

21   A    Well, they walk through the specific subsection of

22   selection of most highly exposed category.

23   Q    Right.  And the most highly exposed category is the

24   only category they used in their meta-analysis; right?

25   A    I couldn't tell you that off the top of my head.  I

1    don't know if -- how -- if they did ever/never versus the

2    high to low; included in the high to low, particularly if

3    you're talking about all those tables.

4    Q    Well, sure.  Let's look at the abstract.  Start

5    there, okay?  If we go to the Abstract, they say, "Using

6    the highest exposure groups when available in each study,

7    we report the overall meta-relative risk of NHL in

8    GBH-exposed individuals was increased by 41 percent

9    (meta-RR 1.41, 95 percent confidence interval:  1.13 to

10    1.75)."

11         Do you see that?

12    A    Yes.

13    Q    Okay.  And that's the same meta-RR you reported in

14    your expert report; right?

15    A    Yes.

16    Q    Okay.  So, that's the one that you're finding most

17    relevant in this study; right?

18    A    It was the one that I found relevant enough to put

19    into my report, for sure.

20    Q    Okay.  So, if we go back down, then, to their

21    a priori methodology for that, for getting to that

22    meta-RR, we have the methodology where they use, if it's

23    available, the highest cumulative exposure and longest

24    lag or latency; right?

25    A    Yes.

1    Q    Okay.  And the only study that had that was the

2    Andreotti study; right?

3         That was the one that had a 20-year lag and the

4    highest cumulative exposure; right?

5    A    Yeah.  Like, 17 years lag, something like that.

6    Q    Right.  Then, the next thing they use is the highest

7    cumulative exposure; right?

8    A    Right.

9    Q    Okay.  And the highest cumulative exposure, that's

10   where they used the McDuffie data and the Eriksson data

11   for the days per year or lifetime days of use; right?

12   A    Yes.

13   Q    Okay.  Then, after that, they used longest exposure

14   duration and longest lag or latency, longest exposure

15   duration, longest lag or latency, and ever exposure.

16        Do you see that?

17   A    Yes.

18   Q    Okay.  And so, the ever exposure would encompass the

19   other studies we talked about; right?  And that would be

20   Orsi, Hardell, De Roos 2003; correct?

21   A    Right.  That was why I struggled to answer your

22   question when you said, "Is this the analysis they did,"

23   because they did the ever exposure -- ever/never as well.

24   Q    Right.  They used -- for the studies that were

25   ranked -- if we go back to pages 35 and 36, for the

1    studies that were ranked as lower quality; that is, Orsi,

2    Hardell, and De Roos 2003, those are all the studies that

3    got 6s; or 5 in the case of Orsi.

4         For those, they used ever/never; correct?

5    A    Oh.  I'd have to go in and look and see how they

6    analyzed them.  I mean, I'll take what you're saying as

7    being correct.  I mean, I am not saying, "No.  I know

8    that's wrong."

9    Q    Well, let me couch it as a hypothetical.

10   A    Okay.

11   Q    Let me say -- I'll represent to you they used

12   ever/never in De Roos, Hardell, and Orsi; fair?

13   A    Great.  Great.

14   Q    Okay.  And those are the lowest ranked quality

15   studies, along with the McDuffie, in their quality

16   analysis; true?

17   A    Yes.

18   Q    Okay.  And then, for McDuffie and Eriksson, which are

19   mid-ranked, I would argue -- well, I won't argue

20   anything.

21        For McDuffie and Eriksson, which are higher

22   ranked than the ever/never studies but not as highly

23   ranked as Andreotti, they used their greater than two

24   days a year or greater than 10 days lifetime; correct?

25   A    Right.  Yes.

1   Q    Okay.  And then, for Andreotti, they used the 20-year

2   lag, highest exposure group data; correct?

3   A    Yes.

4   Q    Okay.  Now, when you're using all of these different

5   studies in a meta-analysis, one thing that you do is you

6   weight the studies; right?

7   A    Yes.

8   Q    Okay.  And what is that weighting based on?

9   A    Typically, it's N, accounts -- the number of subjects

10  in the study; although, it can be weighted based on

11  quality of study as well.

12  Q    Okay.  And here, if we go to the meta-analysis, which

13  is on -- I think you can see on page -- well, let's find

14  the table rather than that.  Give me a sec.

15       Okay.  If you go to Table 4 on page 37.

16  A    Got it.

17  Q    Okay.  Do you see the weighting here?

18  A    Yes.

19  Q    Okay.  And the weighting is not based on the quality

20  score.  It's based on the N; correct?  Because,

21  otherwise -- and the reason I'd ask you to give an

22  opinion on that is, otherwise, Hardell would be ranked

23  above Orsi, for instance, as weighting?

24  A    It looks like it's N-based, yes.

25  Q    Okay.  And --

1          THE WITNESS:  Oh.  Sorry.  For Paula, N is

2   just capital N.

3          THE REPORTER:  Thank you.

4          THE WITNESS:  Just the letter N.

5          MR. KALAS:  Okay.

6   Q   BY MR. KALAS:  And the upshot of using the Andreotti

7   Quartile 4, 20-year lag data, is, they may have

8   eliminated much of the power of that study; correct?

9   A   By cutting out the other quartiles.  Sure.

10  Q   Yes.  And by cutting out the non-20-year lagged

11  folks; correct?

12  A   Cutting out the non-20-year from the De Roos study.

13  Right.

14  Q   Yes.

15  A   Yes.

16  Q   Okay.  And so, for their highest quality study,

17  they're only using some of the data reported by the

18  authors; fair?

19  A   Yeah.

20  Q   Okay.  For their lowest quality study, Orsi and then

21  Hardell and then De Roos 2003, they're using all the

22  data; right?  Because they're using ever/never?

23  A   Yeah.  Oh.  I see what you are saying.  Yeah.  If

24  that's the criteria, then it's -- that's tautologic and

25  would be all the data.

1          I agree.

2    Q    Correct.  So, the methodology of the Zhang

3    meta-analysis results in using only a portion of their

4    highest quality data they have access to, while all of

5    their lower quality data they have access to; true?

6    A    No.  Don't -- let's not call the data the highest

7    quality, because of the things that I've talked about.

8    That wouldn't be my perspective.  I would say it got the

9    highest score using the Newcastle-Ottawa scoring system.

10         But I don't think that I can agree that they used

11   the highest quality, because of the ever/never protective

12   effect that is unexplainable.

13   Q    Okay.  So, let's rephrase that, then.

14         The upshot of the methodology of the Zhang

15   authors is to use only a portion of the data from the

16   studies they adjudged to be highest quality using

17   Newcastle scores, while using all of the data from the

18   studies they adjudged to be lowest quality using the

19   Newcastle scores; is that fair?

20   A    Yeah.  That's what -- that is definitely represented

21   in this table.

22   Q    Okay.  Have you looked at any meta-analyses that use

23   all of the data from all of the studies that are

24   available?

25   A    Well, I think that is what the EPA meta-RR analysis

1   was.

2   Q    Okay.  And that study did not find an effect from

3   glyphosate exposure on NHL; right?

4   A    No, they didn't, because they included a protective

5   effect from Andreotti.

6   Q    Okay.  Let's look at a couple other studies that have

7   looked at that in the peer-reviewed literature.

8         Have you heard of a -- or -- well, let me move --

9   mark it.

10            MR. KALAS:  I'm marking as Exhibit 28 a

11   study by Donato.

12   Q    BY MR. KALAS:  Have you seen this study before?

13   A    Oh, yes.

14   Q    Okay.

15   A    I -- it's one of my reliance materials --

16   Q    Right.

17   A    -- in my report.

18   Q    And this study looked at the same studies that

19   Dr. Zhang looked at; correct?

20   A    Yes.

21   Q    Along with Leon, which is a pooled study that

22   includes two cohorts from Europe and the AHS study;

23   right?

24   A    Yes.

25   Q    Okay.  And the result of their meta-analysis -- oh.

Michael D. Freeman, MedDr., PhD.

```
 1    Strike that.
 2          And what they did not do here that Dr. Zhang did
 3    is, they did not exclude data from the other three
 4    quartiles or from the 15-, 10-, five-year lag sets;
 5    correct?
 6          They used all the AHS data?
 7    A    Yes.
 8    Q    Okay.  And what they found, when they used all the
 9    AHS data and all other data, is on page 69.  This is
10    their meta-analysis.
11          And what they found there was that the relative
12    risk across all the glyphosate NHL studies was 1.03;
13    right?
14    A    Right.
15    Q    With a confidence interval of .86 to 1.21; right?
16    A    Right.
17    Q    And that's a null finding; correct?
18    A    Yes.
19    Q    That suggests if -- strike that.
20          That relative risk and confidence interval does
21    not show an effect between glyphosate exposure and NHL;
22    true?
23    A    That's true.  That is correct.
24    Q    Okay.  And then, there are -- go ahead.
25    A    Sorry.  In the subtype, I think they come up with a
```

Michael D. Freeman, MedDr., PhD.

```
 1    finding for the DLBCL.

 2    Q    Right.  So, let's go -- if -- I'll bring that up.

 3    Mr. Koen's NHL manifested as follicular lymphoma;

 4    correct?  We talked about that last time.

 5         That was the first manifestation?

 6    A    Right.  And then he was diagnosed with DLBCL.

 7    Q    Right.  And we talked about that the first injury

 8    from -- allegedly from his glyphosate use was the

 9    follicular lymphoma; right?

10         Do you remember that?

11    A    I just considered it as two different diagnoses that

12    he had while he was being treated for NHL.

13    Q    Okay.  Are you -- do you have any opinion that the

14    follicular lymphoma was not caused by glyphosate but the

15    DLBCL was?

16    A    It's my opinion that all NHL is -- that there is

17    evidence for all categories of NHL; strongest for DLBCL.

18    And there may be categories that it could be maybe not

19    related.  But that hasn't -- had yet to be explored.

20         So, I don't have any information that says we

21    should take follicular out, particularly since follicular

22    is the -- what -- the second most common type of NHL.

23    And this whole thing might be driven by the fact that

24    DLBCL is the biggest category.  But no, I wouldn't pull

25    it out and say, "Well, that one's not related."  There is
```

1    no evidence for me to say that.

2          I can broadly say NHL is related in a number of

3    studies.  And there seems to be some subtype evidence as

4    well.

5    Q    Okay.

6                MR. KALAS:  I marked as Exhibit 29 a

7    meta-analysis by Kabat.

8    Q    BY MR. KALAS:  Have you seen this before?

9    A    Let me just take a look here.  I've seen a lot of

10   stuff; kind of a flurry coming out in the last year.  So,

11   let me see if this is one of the things I've looked at or

12   seen.

13         (The witness reviews the document)

14               THE WITNESS:  Oh.  This was the sensitivity

15   analysis.  Yeah, I've come across this.

16               MR. KALAS:  All right.

17   Q    BY MR. KALAS:  This isn't on your reliance list;

18   right?

19   A    No, it was not on my reliance list.

20   Q    Okay.  Is it something you considered and then chose

21   not to put on your reliance list?

22   A    No.  It's something that didn't -- it gave me --

23   it -- there was no -- it's like argumentation, basically.

24   Q    Okay.  It's a meta-analysis that appears in a

25   peer-reviewed journal; correct?

```
1    A    Yeah.  It's -- and it's the same thing as what Donato
2    did.  There was -- there -- it wasn't helpful because it
3    was a sensitivity analysis that they did.  But they --
4    like the other studies like Donato, they relied very
5    heavily on Andreotti.
6           I mean, Andreotti got more than a third of the
7    weight for the study.
8    Q    That is true.  Andreotti -- when you look at the
9    meta-analysis relative risk, they found a relative risk
10   of, I believe, 1.05.
11          This is on page 3 just to the left of the forest
12   plot there.
13   A    Yeah.
14   Q    They found a meta-analysis including all the studies
15   with a summary relative risk of 1.05, with a confidence
16   interval of .87 to 1.28.
17          Do you see that?
18   A    Yeah.
19   Q    Okay.  And do you agree that's a null finding?
20   A    It's a non- -- it's not a statistically significant
21   finding.  I agree.
22   Q    Okay.  Do you agree a relative risk of 1.05, with a
23   confidence interval of .87 to 1.28, is not evidence that
24   supports the hypothesis that glyphosate causes NHL?
25   A    If the only thing you're looking at is just that
```

1   number and its confidence interval, then I agree with it.

2   Q    Okay.  If you go down -- you said it didn't add

3   anything.  And I just have one question.  They did

4   sensitivity analyses in Table 1 excluding studies.

5        Do you see that?

6   A    Yes.

7   Q    Okay.  And one of the studies they excluded was, in

8   fact, the Andreotti, which we talked about; right?

9   A    Yeah.  Hold on.

10  Q    Okay.

11  A    Yes.

12  Q    Okay.  And the Andreotti study is, in fact, the only

13  cohort study here; right?

14  A    Yes.

15  Q    Okay.  And so, excluding Study 1 in your sensitivity

16  analysis, it's essentially creating a meta-analysis of

17  your case-control studies; fair?

18  A    Yeah.

19  Q    Okay.  And when they excluded Andreotti, they found a

20  relative risk of 1.19, with a confidence interval of .92

21  to 1.52.

22        Do you see that?

23  A    Yeah.

24  Q    Okay.  And that's not statistically significant;

25  right?

```
 1   A    Correct.

 2   Q    All right.  And as we discussed before, a

 3   meta-analysis is only as good as the studies that go into

 4   it; right?

 5   A    Yes.

 6   Q    So, the 1.19, with a confidence interval of .92 to

 7   1.52, does not account for any residual confounding in

 8   those studies from exposure to other pesticides like

 9   malathion; right?

10   A    That's correct.

11   Q    And it does not connect for -- or correct for any

12   residual recall bias in those studies that could not be

13   controlled for in those studies' study designs; right?

14   A    Yes.

15   Q    Okay.  And even then, with those potential issues

16   hanging out there, they were not able to exclude chance

17   to a 95 percent degree of certainty for the results they

18   saw from just the case-control studies; true?

19   A    In the -- using the methods they used, that's

20   correct.

21   Q    Okay.  And you agree that, even if we looked at just

22   the case-control studies, we can't exclude chance for the

23   results that we see?

24   A    You mean from this analysis?

25   Q    Just generally.
```

Michael D. Freeman, MedDr., PhD.

```
 1              I mean, you haven't done this meta-analysis;
 2    right?
 3    A     No.
 4    Q     Okay.  And so, are you aware of any meta-analysis on
 5    all the case-control data that's out there besides this
 6    one?
 7    A     As opposed to, like, Zhang?
 8    Q     Well, Zhang isn't on all the data; right?  Because
 9    Zhang uses only the highest exposure data from Eriksson
10    and McDuffie?
11    A     Oh.  I see what you're asking.
12    Q     Yes.
13    A     You know, I'd have to spend a little more time with
14    this paper to be able to give you -- I'd have to spend
15    more time with this paper to be able to answer this
16    question, I think; or to be able to comment reasonably on
17    why these -- this study arrives at different results than
18    Zhang does.
19              I am not aware of -- I'm not aware of any other
20    study that put all of the data in, though.  That's a
21    reasonable question.  And that's one I can't tell you,
22    yes, that I do know of another study.
23    Q     Okay.  Assuming that this data has been calculated
24    correctly for the case-control studies, can we say that,
25    when we look at all the case-control data in a
```

1   meta-analysis, we can exclude chance for the results

2   we're seeing?

3   A    Yes.

4   Q    We can say we can exclude chance?

5   A    I'm sorry.  I must have misunderstood the question,

6   then.

7   Q    Sure.

8   A    You just rephrased my answer, and it sounded like I

9   did not answer it the way I wanted to.

10  Q    Okay.  Yeah.  Sorry.  Let me ask it again.

11       Assuming that all of the case-control data is

12  included in the exclude Study 1 sensitivity analysis, and

13  assuming that this is the only analysis of all that data

14  out there, can we exclude chance for the results seen in

15  the case-control studies collectively on glyphosate and

16  NHL?

17  A    We can't, according to the results of this study.

18  Q    Okay.  Now, we talked a bit about internal dose

19  earlier, and I -- or this was last time.  And I think I

20  know the answer to this, but I just want to make sure.

21       You don't have an opinion about the internal dose

22  Mr. Koen had of glyphosate when he used Roundup products;

23  right?

24  A    That is correct.  That's still true.

25  Q    Are you aware the state of California has set a no

1    significant risk level for an internal dose of glyphosate

2    at which they don't believe anybody is at a --

3    anything -- well, strike that.  Let me ask the question

4    again.

5           More basic question.  Are you aware the state of

6    California has set a no significant risk level for --

7               THE REPORTER:  I'm sorry.  You're going to

8    have to slow down a little bit and repeat your question.

9               MR. KALAS:  Sure.

10              THE REPORTER:  I couldn't understand that.

11   Q    BY MR. KALAS:  Are you aware the state of California

12   has set a no significant risk level for glyphosate?

13   A    I have come across that somewhere in what I've

14   reviewed.  Yes.

15   Q    Okay.  And do you know what that level is?

16   A    No, not --

17   Q    Have you --

18   A    I mean, I did at one time, when I read it.

19          I did not commit it to memory.

20   Q    Have you dealt with no significant risk levels in the

21   past in litigation?

22   A    Yes.

23   Q    Okay.  What is your understanding of what a no

24   significant risk level is?

25   A    Well, it's a threshold, typically, based on

1   experimental data or sometimes observational data at --

2   which is believed to be a fraction below the effective

3   dose to cause illness.

4   Q    Okay.

5   A    So, it's going to be -- typically, it's going to be

6   an order of, you know, one-tenth or one one-hundredth or

7   something like that, is relatively typical for that sort

8   of thing.

9        But it varies by the toxin that's being examined.

10        MR. KALAS:  I'll mark as Exhibit 30 --

11   Mark, how much time do I have left?

12        THE VIDEOGRAPHER:  You just used another

13   50 minutes.

14        MR. KALAS:  Okay.  So, that should leave me

15   at, like, 25?

16        THE VIDEOGRAPHER:  I'm adding it up now.

17   That's six hours and 34 minutes, sir.

18        MR. KALAS:  Okay.  I'm going to mark as

19   Exhibit 30 a document from the State of California.

20   Q    BY MR. KALAS:  And do you see that this is a no

21   significant risk level set by the State of California

22   OEHHA for glyphosate?

23   A    OEHHA.  Oh.  The Office of Environmental Health

24   Hazard Assessment.

25   Q    Right.

Michael D. Freeman, MedDr., PhD.

```
 1   A     It turns out to be OEHHA, O-E-H-H-A.

 2   Q     Yes.

 3   A     Yes, I do see that.

 4   Q     Okay.  And do you see that the level they set there

 5   in the first paragraph is 1,100 micrograms per day?

 6   A     Yes.

 7   Q     Okay.  And if you go down to page 17 of this document

 8   to the paragraph that starts, "Furthermore, as stated in

 9   Section 25703."

10   A     Page 17, did you say?

11   Q     Yep.

12   A     There is "Furthermore."  Okay.

13   Q     Okay.  Do you see that the NSRL is defined as the

14   level which is calculated to result in one excess case of

15   cancer in exposed population of 100,000, assuming

16   lifetime exposure at the level in question?

17   A     Yes.

18   Q     Okay.  And so, these regulatory values, like the

19   NSRL, for a chronic disease like cancer, assumes exposure

20   every day at the level; correct?

21   A     Yes.

22   Q     Okay.  And 1,100 micrograms normalized to a

23   100-kilogram person is 11 micrograms per kilogram; right?

24   I'm trying to use base 100s here.  So, 1,100.

25   110 micrograms per 10 kilograms.  11 micrograms per
```

1    kilogram; right?

2    A    That's sounds right.

3    Q    Okay.  And 11 micrograms per kilogram is essentially

4    .001 milligrams per kilo- -- or excuse me,

5    .011 milligrams per kilogram; right?

6    A    Give that to me one more time.

7    Q    11 micrograms per kilogram is .011 milligrams per

8    kilogram; true?  Because you go down 1,000 spots.

9    A    Right.  Yeah.  I'm just trying to -- I'm trying to

10   just picture the numbers in my head.  Okay.

11   Q    Is that true?

12   A    You know, I -- it's the kind of thing where I'd want

13   to just write it down and look at it.

14   Q    So, feel free.  I'll stipulate I'm not marking it as

15   an exhibit.  It's important that we're on the same page

16   on that.

17          So, would you agree with me 11 micrograms per

18   kilogram is the same as .011 milligrams per kilogram?

19   A    Oh.  Yes.

20   Q    Okay.

21   A    Yeah.  Just -- got you.

22   Q    Okay.

23          MR. KALAS:  I'll mark as Exhibit 31 an

24   article from the peer-reviewed literature written by

25   Kougias, et al.  This article's entitled Risk Assessment

1    of Glyphosate Exposures from Pilot Study with Simulated

2    Heavy Residential Consumer Application of Roundup Using a

3    Margin of Safety Approach.

4    Q    BY MR. KALAS:  Did I read that correctly?

5    A    Yes.

6    Q    Okay.  And did this appear in a journal called Risk

7    Analysis?

8    A    Yes.

9    Q    Okay.  And if you go to the Methods, which is on

10   page 3, bottom left-hand column, they talk about having

11   six study participants per exposure group with equal

12   representation of each gender, for a total of

13   12 applicators.  "For the dermal exposure group,

14   applicators wore shorts, T-shirts, athletic shoes, and

15   half-face respirators equipped with OV/AG/P100

16   cartridges; whereas, for the inhalation exposure group,

17   applicators wore Tyvek suits and chemical-resistant

18   gloves but no respirator."

19         Did I read that correctly?

20   A    Yes.

21   Q    Okay.  And so, this is an exposure study that is

22   biomonitoring for glyphosate; right?

23   A    Yes.

24   Q    Okay.  And then, if you go down -- well, let me ask

25   you this:  Mr. Koen, when he applied Roundup, did he wear

1   something similar to shorts, T-shirts, athletic shoes?

2   A    No.

3   Q    Okay.  What did he wear?

4   A    He wore gloves and long-sleeved shirt, at least for

5   some of the application.

6   Q    Okay.  So, he wore more PPE than the individuals in

7   this study; fair?

8   A    Some of the individuals, yes.

9   Q    Okay.  And then, if you go down to the next

10  paragraph, it says, "The applicators mixed and, using a

11  backpack sprayer, applied a commercially available

12  glyphosate-containing herbicide (Roundup Weed and Grass

13  Killer, Super Concentrate)."

14        Did I read that correctly?

15  A    Yes.

16  Q    Okay.  Continuing down, they talk about the fact that

17  "10 fluid ounces of Roundup concentrate containing

18  50.2 percent glyphosate was added to the backpack sprayer

19  with four gallons of water to create a .96 percent

20  glyphosate-containing solution."

21        Did I read that correctly?

22  A    You did.

23  Q    Okay.  And Mr. Koen generally used a one to two

24  percent glyphosate-containing solution, depending on what

25  formulation he happened to be using; right?

1   A    A one to two percent, did you say?

2   Q    Yes.

3   A    That's not something that I can tell you that I know

4   for sure.

5   Q    Okay.

6   A    Exactly what solution he used.

7         My understand- -- I thought somewhere I was

8   thinking Roundup was, like, 40-odd percent or 50 percent

9   glyphosate.

10  Q    That's Roundup Original, sir.  I -- Mr. Koen used a

11  ready-to-use mix; right?

12        He did not mix and load?

13  A    I thought he said he did mix.

14  Q    Okay.  Well, let's go to your report and make sure

15  we're all on the same page so we aren't --

16  A    Yeah.

17             MS. NOLAN:  Objection, facts not in

18  evidence.

19        It depended on the application he used for

20  different locations and...

21             MR. KALAS:  Okay.  So, let's go to the

22  report.

23        (Crosstalk between counsel and the witness)

24             MR. KALAS:  Let's go to the report.  I want

25  to be on the same page.  Well, actually, let's go to a

 1  document that was provided to us that I'll mark at the

 2  end here.  But let's mark it now as Exhibit 32.

 3       Do you see --

 4            THE WITNESS:  I'm sorry.  Let me correct

 5  myself.  Because I see that it's the foreman who diluted

 6  it --

 7            MR. KALAS:  Right.

 8            THE WITNESS:  -- in my report.

 9       So, I had a recollection of mixing.  I just got

10  the -- it was the foreman rather than Mr. Koen.  Okay.

11            MR. KALAS:  Right.

12            THE WITNESS:  So, I follow you.

13  Q   BY MR. KALAS:  He used a Roundup product that was

14  premixed; right?  I marked as Exhibit 32 a memo on his

15  Roundup exposure use.

16       Do you see that?

17  A   Oh, okay.  Hold on.  I don't see it yet, but I'm

18  going.  Oh.  Great.  Okay.

19  Q   Okay.  And this was a document provided to you by

20  plaintiff's counsel?

21  A   Yes.

22  Q   Okay.  If you go down to the second page of this

23  document, they talk about the fact that he used

24  nonconcentrated Roundup products that were premixed.

25       Do you see that?

```
 1   A    I do.

 2   Q    Okay.  And so, you don't know, sitting here today,

 3   what the concentration of a premixed product is; right?

 4   A    I'm sorry.  I don't know what the concentration of a

 5   what is?

 6   Q    Premixed Roundup product is.

 7        In other words, you don't know how much

 8   glyphosate is in that premixed product, the Roundup Weed

 9   and Grass Killer discussed here?

10   A    Right.  It's not something I've attempted to

11   determine.

12   Q    Sure.

13   A    But you mentioned one percent.  I'm assuming that's

14   probably pretty much in the area.

15   Q    Right.  I said one to two percent, because certain

16   ones are two percent; certain ones are one percent.

17   A    That's -- I'm comfortable with that assumption for

18   the hypothetical.

19   Q    Okay.  So, assuming that is the correct level of

20   glyphosate in those products, Mr. Koen, hypothetically,

21   would have used a dilution similar to what the sprayers

22   were using here in the Kougias study; right?

23   A    Yes.

24   Q    Okay.  And it says here, later on down this

25   paragraph, that the applicators applied for a total of
```

```
 1    100 minutes; right?

 2         It's the bottom of the paragraph we were looking

 3    at.

 4    A    Yes.

 5    Q    And they had four mixing and spraying events per

 6    applicator.

 7         Do you see that?

 8    A    Yes.

 9    Q    Okay.  And they had a four-gallon sprayer.

10         We saw that above; right?

11    A    Yes.

12    Q    Okay.  So, these applicators were spraying 16 gallons

13    of dilute Roundup; fair?

14    A    Total, yes.

15    Q    Okay.  Did Mr. Koen ever spray 16 gallons of dilute

16    Roundup in a day?

17    A    Not that I recall seeing.

18    Q    Okay.  If you go down to the internal doses and

19    margins of safety section, which is page 8, 3.5.

20    A    Okay.  I'm at 8.

21    Q    Do you see that they have Approach 1 here?

22    A    On page 8?

23    Q    Page 8, 3.5.1, Approach 1.

24    A    Oh, yeah.  There it is.  Yeah.

25    Q    Okay.  And what they did here -- take a second to
```

Michael D. Freeman, MedDr., PhD.

```
 1    read that to yourself.

 2            But what they did here is, they combined the

 3    internal doses of the inhalation group and the dermal

 4    groups; correct?

 5    A    Well, yeah.  Let me --

 6    Q    Take a look.

 7    A    -- take a look at this.

 8            (The witness reviews the document)

 9                THE WITNESS:  Okay.

10                MR. KALAS:  Okay.

11    Q    BY MR. KALAS:  Do you see they combined the

12    inhalation and the dermal group here?

13    A    I do.

14    Q    Okay.  And the highest dose they recorded in the

15    combined inhalation and dermal group here was

16    4.347 micrograms per kilogram; right?

17    A    Right.

18    Q    Okay.  And that is below that California NSRL number;

19    correct?

20    A    Oh, God.  Now I got to remember what the milligram

21    for kilogram.

22            Did we decide it was 11?

23    Q    Yes, sir.

24    A    Okay.

25    Q    So, you agree, if it's 11, that that's below that?
```

```
1    A    Yes, I do.

2    Q    All right.  And then, moving on to page 11, they have

3    a second approach for calculating dose, 3.5.2.

4    A    Yeah.  Okay.

5    Q    And combining that -- the data using that approach,

6    the highest dose they saw was 5.9 micrograms per

7    kilogram; right?

8    A    Yep.

9    Q    Okay.  And the -- just to be clear, the dermal arm of

10   this study had individuals wearing less personal

11   protective equipment than Mr. Koen; right?

12   A    Yes.

13   Q    And the inhalation arm --

14   A    Well, at least for which he described when he was

15   working on the farm.

16   Q    Right.  And the inhalation arm of this study included

17   individuals inhaled glyphosate as opposed to their

18   absorbed via skin glyphosate; right?

19   A    Yes.

20   Q    Okay.  And the individuals in the study for both arms

21   applied more glyphosate in a day than Mr. Koen ever

22   reported applying; right?

23   A    Yeah.  I mean, I don't remember that there was a --

24   that we quantified the amount that he applied when he was

25   working on the farm, did we?
```

Michael D. Freeman, MedDr., PhD.

```
 1              Let me just take a look at that real quick.
 2   Q    All right.
 3              (The witness reviews the document)
 4              THE WITNESS:  So, I have this -- the
 5   250 gallon tank.
 6              MR. KALAS:  Right.
 7   Q    BY MR. KALAS:  Do you know how much glyphosate was in
 8   that?
 9   A    Five gallon container of water in the tank.  Pull the
10   trailer behind a tractor.
11              I can't tell you that I can -- that I know how
12   many gallons he's spraying in a day from this.
13   Q    Okay.  So, putting that -- putting, then, the
14   250 gallon tank aside that he believes he only used three
15   to four times, when he purchased Roundup, he purchased
16   one-gallon bottles; right?
17   A    Right.
18   Q    And he'd purchase it five times a year; right?
19              That's at the bottom of the second page of
20   Exhibit 32.
21   A    Yeah.
22   Q    Okay.  And then, when he moved to Austin, three times
23   a year; right?
24   A    Right.
25   Q    Okay.  So, at most, if he was buying one-gallon
```

1  bottles of Roundup, he'd only apply a third over the

2  course of the year of what the individuals in the Kougias

3  study applied in a single day; right?

4  A    Oh, yeah, for sure.  I mean, when it was residential,

5  he was way below what he was doing when he was on the

6  farm.

7  Q    Okay.  And the farm is only three to four times;

8  right?  Or three to five times later on.  It's three to

9  four times in depo 1 at page 1; three to five times in

10  depo 2 -- or depo 3 on page 3.

11              MS. NOLAN:  He also said that he used the

12  bottle while he was at the ranch, later on in the

13  deposition.

14              MR. KALAS:  Okay.

15              MS. NOLAN:  And I don't -- I think that was

16  on a more frequent basis.

17         It wasn't limited to three to five times.

18              MR. KALAS:  Okay.

19  Q    BY MR. KALAS:  When you used -- let's clear this up.

20  Putting aside the 250 gallon tank three to four to three

21  to five time applications, putting that aside for a

22  moment, are you aware of any application day where

23  Mr. Koen applied as much as what was described in

24  Kougias?

25  A    No.  The 16 gallon value, I haven't seen anything

1    that approaches that.

2    Q    Okay.  And the 16 gallon value, the internal dose

3    does not approach the California NSRL -- well, does not

4    reach the California NSRL value; correct?

5    A    Yes.

6    Q    Okay.  And the California NSRL value is understood to

7    be an internal dose that somebody can have every single

8    day of their life and not have a 1 in 100,000 excess

9    cancer risk; right?

10   A    Yes.  I don't know how they arrive at the figure, but

11   that is the description, at least, of what that value is.

12   Q    Okay.  And if somebody is not at a 1 in 100,000

13   excess cancer risk from their exposure, would you agree

14   that that exposure is a negligible risk for cancer?

15   A    Depends on what their risk is.  I mean, if they're at

16   a 5 per 100,000 risk and you add 1 to that, then it would

17   be more than negligible.

18        If they're at a 150 per 100,000, then it would be

19   negligible.

20   Q    Okay.

21   A    It depends on the proportions that you -- that

22   they --

23        (Crosstalk between counsel and the witness)

24              THE WITNESS:  -- applied to that value.

25   Q    BY MR. KALAS:  It depends on the baseline; right?

```
 1   A     Yes.  Given --

 2   Q     Okay.

 3   A     -- the age and sex adjusted baseline.

 4   Q     Okay.

 5               MR. KALAS:  I'm going to mark the other

 6   documents that were produced to us, and then I will

 7   reserve my time beyond that.  So, let me get those

 8   marked.  I think I'm going to get them all on here.

 9   Okay.  I'll rename them here.  Give me a moment.  I don't

10   want to use Clare's time here.

11               MS. NOLAN:  Are you using it?

12               MR. KALAS:  I'm using my time to just rename

13   these on the record, and then, I'm going to turn the

14   witness over.

15        Okay.  I have marked as Exhibits 33 through 44

16   documents that were produced at the last deposition.  I'm

17   just marking them for the record.  With that, I will

18   reserve my time.

19        Thank you, Dr. Freeman.

20               THE WITNESS:  Yeah.  My pleasure.

21               MS. NOLAN:  Is it okay if I take a quick

22   break before I start?

23               THE WITNESS:  Absolutely.

24               MS. NOLAN:  I don't to be scrambling for --

25               THE VIDEOGRAPHER:  We're now off the
```

1    record.  The time is 1:35.

2          (Recess held from 1:35-1:48)

3               THE VIDEOGRAPHER:  We're now back on the

4    record.  The time is 1:48.

5                    EXAMINATION

6    BY MS. NOLAN:

7    Q    Just generally, Dr. Freeman, backing up, when you

8    gave the report in this case, you gave an opinion about

9    the role that Roundup could have played or was a factor

10   in Mr. Koen's NHL; is that correct?

11         Or is that not a fair characterization?

12   A    That is a fair characterization.

13   Q    Okay.  And you felt comfortable standing by that

14   finding or by that opinion?

15   A    Oh, most definitely, yes.

16   Q    And that is notwithstanding, you said, other known or

17   unknown risks?

18   A    That's correct.  That's the -- there -- it is a lot

19   of risk factors that went into causing Mr. Koen's

20   non-Hodgkin lymphoma.  And a substantial one of those

21   risk factors was his glyphosate exposure.

22   Q    And if you can describe it for a layperson, someone

23   less -- such as myself, why are you comfortable coming to

24   that conclusion or having that opinion?

25   A    I've looked at the information that is available that

1   was considered by, well, IARC, the International Agency

2   for Research on Cancer, and I looked at the human

3   exposure data; and particularly looked at the information

4   which is contrary to everything else that -- or most

5   everything else that's come out, which has come from the

6   exposure study.  And when I weigh all of that, I still

7   find that glyphosate is a risk factor for non-Hodgkin

8   lymphoma that can be demonstrated beyond the level of

9   chance.

10          Knowing exactly how it contributed to an

11  individual's cancer is impossible, but knowing that it's

12  not a trivial factor if someone has had repeated

13  exposures to glyphosate over a period of years, it

14  absolutely stands to make the glyphosate exposure a

15  substantial factor in causing non-Hodgkin lymphoma.

16  Q    Okay.  So, if two people similarly situated in age,

17  both male, with some of the other characteristics or,

18  quote-unquote, "risk factors" that have been discussed

19  earlier, your conclusion is that one having been exposed

20  to glyphosate versus one not having been exposed -- like,

21  how do you get -- is there a but-for analysis?

22          Or how do you get to that point?

23              MR. KALAS:  Objection to form.

24              THE WITNESS:  You get to that point by

25  looking at the epidemiologic and other evidence

1    indicating that there is a general causal relationship

2    between glyphosate exposure and non-Hodgkin lymphoma; and

3    then asking whether this person was exposed.  And knowing

4    that non-Hodgkin lymphoma -- even for somebody with all

5    the risk factors minus the glyphosate, that person is not

6    likely to develop non-Hodgkin lymphoma.

7          So, knowing that the alternative probability,

8    which is take away any other risk factors -- I mean, I

9    was -- when I was talking to counsel earlier and asked

10   about whether the -- ███████████████████████

11   ████████████████ -- and, actually, I don't think I

12   answered necessarily ████████████████   But ███████

13   ████████████████████████████████████████████

14   █████████████████████████████████ is a risk factor

15   for non-Hodgkin lymphoma, that, in no way, means that

16   adding glyphosate exposure doesn't increase that risk or

17   contribute to that risk in a more than trivial way.

18         And so, we don't have any indication of a high

19   prevalence or incidence of non-Hodgkin lymphoma in people

20   like Mr. Koen as he would be, absent the non-Hodgkin

21   lymphoma.  ████████████████████████████

22   ████████████████████   There is, you know, lots of

23   people who have ██████████████████████████

24   ████████████████████████████████████████████

25   or a variety of other factors.  And their rate of

Michael D. Freeman, MedDr., PhD.

1    non-Hodgkin lymphoma is quite small.

2              So, if we say that that was Mr. Koen's personal

3    risk, in the absence of the glyphosate -- and we know

4    that he did have all those risk factors and the

5    glyphosate; and we know he did get non-Hodgkin

6    lymphoma -- then you have to take any of those factors

7    and treat them like a -- not a straw that breaks the

8    camel's back, but maybe a load of bricks that breaks the

9    camel's back.

10             MS. NOLAN:  Okay.

11   Q    BY MS. NOLAN:  And now I'm going to go to the most

12   recent, I think, and go backwards, if that's okay.  And

13   you were asked some questions about I think it's

14   Exhibit -- the final statement.  So, it's Exhibit --

15   Monsanto's Exhibit Number 30.

16             You were asked if you were aware if there was a

17   finding or statement in California regarding whether

18   glyphosate was -- posed no significant risk; is that

19   correct?

20   A    Yes.

21   Q    And what is the context of that?

22             Was that for the purpose of legislation?  Do you

23   know?

24   A    I'd have to read through it.

25             I couldn't tell you exactly what the entire

1    purpose of it was for.

2    Q    Okay.  And you were referred to -- I want to go to

3    the correct page.  I think you were asked questions --

4    well, if you could refer back to Exhibit 30 and go to

5    their page number 17.

6         And you were asked about dose response

7    assessments, I understand, in this context; is that

8    correct?

9              MR. KALAS:  Objection.

10             THE WITNESS:  Not dose response but just

11   minimum threshold doses.

12             MS. NOLAN:  Okay.

13   Q    BY MS. NOLAN:  And if you refer to that first

14   paragraph -- well, like, the first two paragraphs talk

15   about -- I don't want to oversimplify -- but the

16   calculated risk resulting in one excess case of cancer in

17   exposed population of 100,000.

18         You were asked about that; is that correct?

19   A    Yes.

20   Q    Okay.  If you look at the first paragraph and look at

21   footnote 50 and 51, were these -- well, I guess, maybe

22   just read to yourself what it's saying about -- in the

23   first paragraph.

24         Is it your understanding that the dose response

25   assessments came from the studies listed for the -- if

1    you look at 51, the European Safety Authority, that that

2    is where they got one of the numbers for the assessments

3    for pesticide risk; is that your understanding?

4              MR. KALAS:  Objection to form,

5    mischaracterizes the document.

6         You can answer.

7              THE WITNESS:  Well, specifically, they

8    actually say that the reference doses are not relevant --

9    that are set by the other agencies were not relevant to

10   their rulemaking.  It appears that their rulemaking may

11   have come from an animal study.  But I'd have to look at

12   this more carefully.

13        They talk about feeding mice glyphosate.

14             MS. NOLAN:  Okay.

15             THE WITNESS:  In fact, specifically saying

16   that's that the data that was used, was what they fed

17   mice.

18   Q    BY MS. NOLAN:  If we could go to -- I'm going to try

19   to circle back to that.  But if you could go -- you were

20   asked about, I guess, an increased risk for not NHL but

21   for lymphoma due to having the BRCA1 or BRCA2 mutation;

22   is that correct?

23        Do you remember that?

24   A    I do remember that, yes.

25   Q    And I believe that's from -- I want to get the right

1    exhibit number.  You were referred specifically to a

2    study or a synopsis of a study talking about cancer risks

3    in carriers of the BRCA1 and 2 ▓▓▓▓▓ founder

4    mutation; is that correct?

5    A    Yes.

6    Q    And I want to -- I can't get to the exact -- it's 25.

7    So, Monsanto's Exhibit 25.  And if you could look at --

8    if you could refer to this exhibit.  And I think it would

9    be -- if you could look at the first two paragraphs in

10   the second column of the first page and then look at, I

11   guess, the first half of the last full paragraph in the

12   second column of the first page.

13   A    Which paragraphs am I looking at again?  One more

14   time, please.

15   Q    So, the first two paragraphs of the second column of

16   the first page.

17   A    Okay.

18   Q    And then look at the first -- I mean, the first half

19   of pretty much the last paragraph on that page.

20   A    Okay.

21   Q    So, this study actually was a study of all females;

22   is that your understanding?  It begins with -- the last

23   full paragraph begins with a total 1,616 females, all of

24   Ashkenazi origin, were tested for BRCA1 and 2 mutations.

25          Do you see that?

1    A    I do.

2    Q    So -- and also, if we could go farther up, back to

3    the first two paragraphs, this study was taking all women

4    who had either the BRCA1 or BRCA2 carriers and then

5    filtered out -- it says, "We limited the sample to

6    individuals affected with breast cancer and/or ovarian

7    cancer both in the carrier control group."

8         So, was your understand- -- your understanding of

9    this set of people who are studied is all women and all

10   women who either were affected with breast cancer and/or

11   ovarian cancer?

12   A    It looks like it's stated as the population.

13   Correct.

14   Q    Okay.  So, these factors would be -- would -- the

15   factors that were shared by all the people in this sample

16   for this study would be very different from the factors

17   that you might look at for Bradley Koen.  He's not --

18              MR. KALAS:  Objection.

19   Q    BY MS. NOLAN:  -- female; is that correct?

20              MR. KALAS:  Objection to form.

21              THE WITNESS:  Yes.

22   Q    BY MS. NOLAN:  He's not female.  He is not someone

23   who has been affected with breast cancer or ovarian

24   cancer?

25   A    That's correct.

1   Q      When you were asked about the BRCA1 and BRCA2

2   mutations, you understood it to be related to breast

3   cancer; is that correct?

4                  MR. KALAS:  Objection to form.

5                  THE WITNESS:  Well, breast cancer -- I think

6   the question I was asked, I think, was about the

7   relationship between BRCA2 and breast cancer.

8         That's what I associated it with.  It's also

9   associated with ovarian cancer.

10                 MS. NOLAN:  Okay.

11                 THE WITNESS:  As far as the mutation, I

12  should say, not just the gene.

13  Q    BY MS. NOLAN:  And you were asked a question about

14  whether you understood, from looking at Bradley Koen's

15  profile, if he had undergone genetic testing?

16  A    Yes.  I -- that's correct.

17  Q    And you didn't recall him undergoing genetic testing?

18  A    No.  I don't think I have it in my report.

19        So, it wasn't something that I commented on.

20  Q    And if you don't know that, that's fine.

21        But is your understanding that persons who are

22  requested to go -- undergo genetic testing, it would be

23  related to the known risks associated with the BRCA1 and

24  BRCA2?

25                 MR. KALAS:  Objection to form, outside the

1    scope.

2                    THE WITNESS:  I don't think I -- I actually

3    don't think I follow the question.

4         Were you asking me generally why do people get

5    genetic testing?

6                    MS. NOLAN:  Yes.

7    Q    BY MS. NOLAN:  I'm -- you were -- I'll try to go

8    back.  And I appreciate the objection.  However, it was

9    asked of you whether Mr. Koen -- if you had seen if there

10   was genetic testing.

11        So, would you just have any reason to expect to

12   see genetic testing, looking through his profile?

13                   MR. KALAS:  Objection.  Same objection.

14                   THE WITNESS:  It would -- I'm --

15                   MS. NOLAN:  That's fine.

16                   THE WITNESS:  -- agnostic about it, if you

17   will.

18                   MS. NOLAN:  Yeah.

19                   THE WITNESS:  I mean, he might have been

20   tested because he's -- he has the diagnosis of the

21   cancer.  He might not have been tested.

22        I don't have an opinion on that.

23                   MS. NOLAN:  Okay.  That's fine.  Thank you.

24   I just have one more question about that, if you will

25   bear with me.

1    Q    BY MS. NOLAN:  If you would go to the -- I think it's

2    the second-to-last paragraph of the report.  It's on

3    page 470.

4    A    Okay.

5    Q    If you go -- and starting with the sentence that

6    begins, "Again."

7    A    The second-to-last paragraph is in the left column.

8    Q    Right, in the left column.  And there is a -- it

9    begins with, "Again."

10   A    Oh.  "Again, in a case-control study."  Got it.

11   Q    Right.  So, I guess I'll just read a couple of the

12   sentences and see if this accurately reflects what you

13   read.  So, "Again, in a case-control study of

14   286 ████████████████ patients with lymphoma, only two

15   BRCA carriers were found."

16        Does that accurately reflect what you can read in

17   that sentence?

18   A    Yes.

19   Q    Okay.  "And whether the elevated lymphoma incidents

20   we and others observed in BRCA2 patients are related to

21   treatment, owing to the role of BRCA2 in double-strand

22   breaks repair, should be further investigated."

23        Is that how you read it?

24   A    It is.

25   Q    Okay.  So, this study is -- specifically has a sample

Michael D. Freeman, MedDr., PhD.

1    of women with -- affected either by breast cancer and/or

2    ovarian cancer with the BRCA1 or BRCA2 gene with

3    mutation, with these specific caveats being described at

4    the end of the study?

5    A    Generally, yes.  Those are potential explanations for

6    the findings.

7    Q    Okay.  Which might limit their relevance to Bradley

8    Koen's situation significantly; is that correct?

9             MR. KALAS:  Objection to form.

10            THE WITNESS:  I cannot see that -- how this

11   actually relates to Bradley Koen, because it talks about

12   two patients with lymphoma without specifying what kind

13   of lymphoma it is, who were a BRCA2 carrier.  It's not --

14   it doesn't tell you much.  I mean, maybe there is an

15   association here.  Maybe not.  It's -- it doesn't do much

16   for us.  And it does even less for us understanding about

17   Mr. Koen, who, as I mentioned during my testimony, he got

18   sick with non-Hodgkin lymphoma because of all the risk

19   factors acting on him.  And one of those risk factors is

20   glyphosate exposure over a period of years.  That's my

21   conclusion.

22            Knowing whether or not having a BRCA2 gene

23   mutation is associated with lymphoma and at what level

24   does not tell us that glyphosate isn't a substantial

25   factor in causing his illness.

Michael D. Freeman, MedDr., PhD.

```
 1                    MS. NOLAN:  Okay.
 2   Q    BY MS. NOLAN:  And I just wanted go through a couple
 3   of times where you had a response that I -- you were
 4   asked -- if I can -- and please rephrase it if I'm not
 5   phrasing it correctly.
 6        But in the context of whether there is
 7   contamination or bias contaminating a study, whether that
 8   contamination would affect a meta-analysis.
 9   A    Yes.  We talked quite a bit about the potential role
10   of bias or confounding in the retrospective studies, the
11   case controls.
12   Q    Okay.  And you were asked about the term "garbage in
13   garbage out"?
14   A    Yes.
15   Q    And I think you had time to explain.
16        And would you like to explain more about why you
17   thought that it was an oversimplification to say, "Well,
18   that means that the whole meta-analysis has been
19   contaminated; it was garbage in and then garbage out"?
20                    MR. KALAS:  Objection to form.
21                    THE WITNESS:  Yeah.  Well, Dr. Crump
22   certainly took the position that there was a lot of bias
23   in the studies, or a lot of potential for bias in the
24   studies, and made an argument for it.  That may be true.
25   I don't think we can quantify how it affects the results.
```

Michael D. Freeman, MedDr., PhD.

```
 1          But the only study that -- and he favors the

 2   Andreotti study.  And that's the only study that has an

 3   opposite result of what the a priori hypothesis was,

 4   which is that glyphosate exposure is bad for you.  They

 5   showed you that glyphosate exposure was good for you.

 6   And so, that means I've got to set Andreotti aside and

 7   say, "Something's going wrong here.  You can't come to

 8   that conclusion.  That is not right."

 9          So, I don't know what to do with that, other than

10   to say "I can't consider that."  That doesn't help me.

11   In fact, that misleads me into thinking, when I mix in

12   their results with all the other results, having a -- the

13   other ones have results that either no result or they

14   show a deleterious effect of being exposed.  That makes

15   sense.  It's a weed killer.  It's -- you know, there

16   is -- it might hurt people.  To show that people are

17   doing better means that we have to set that aside.

18          And so, now everything that we've done where

19   we've included Andreotti is much more contaminated by

20   that protective effect that Andreotti talked about.  I

21   see that as a much, much bigger problem, even though the

22   Andreotti data were characterized and used by Zhang and

23   others in different ways.  And in the other

24   meta-analysis -- I can't remember the name of the author,

25   the first author of that meta-analysis.  But it
```

```
 1   doesn't -- without examining this fact, that these

 2   results can't be true, without including that in our

 3   analysis, there is really not a whole lot of point in

 4   continuing on with these data and saying, "Well, I'm

 5   going to really, you know, strain at gnats, but I'm going

 6   to swallow a camel's hole over here [verbatim]."

 7           I mean, the case-control studies might be wrong.

 8   They might have some problems.  Some of them more than

 9   others.  Some of them less than others.  But none of them

10   came up with a result that was impossible.  And that's

11   where I'm -- I have the biggest difficulty in any

12   analysis that includes Andreotti.  Even if you just use

13   some of these data from Andreotti, something's going

14   wrong with those data.  Something's going on with their

15   results.

16           I really do have -- I apologize, but I have to

17   excuse myself because I have another Zoom meeting that I

18   have to go to.  I don't know how to work that out.

19               MR. KALAS:  Ms. Nolan, what do you want to

20   do?

21               MS. NOLAN:  Well, you reserved your time.

22   So, you still would want to go.

23               MR. KALAS:  I have no follow-ups, if you

24   stop here.

25           So, it's sort of up to you.
```

Michael D. Freeman, MedDr., PhD.

```
1                    MS. NOLAN:  Well, I want to let him go if he

2     has a conflict.  I don't know that -- I was kind of -- I

3     think I was just kind of going over some things maybe

4     partly for my own benefit, since you guys may go on

5     to (inaudible).

6                    MR. KALAS:  So --

7                    THE WITNESS:  I am going to excuse myself,

8     if that's okay, and let you guys work out whatever you

9     work out.

10         Is that all right?

11                   MR. KALAS:  Yeah.  Do you want to --

12    assuming we stop here, the court reporter will want to

13    know are you going to read and sign.

14                   THE WITNESS:  Is it okay if I just check

15    with counsel?

16                   MR. KALAS:  Yeah, I guess that's fine.

17    Unless you need to know now, Paula.

18         Do you need to know now?

19                   THE REPORTER:  He can let me know later.

20                   MR. KALAS:  Okay.

21                   THE WITNESS:  Great.  Okay.  Thank you.

22    Bye, everybody.

23                   MR. KALAS:  Bye.

24                   THE VIDEOGRAPHER:  Do you want to go off

25    the record?
```

```
 1                   MR. KALAS:  Yeah.  Let's go --

 2                   MS. NOLAN:  I'll be able to give an answer

 3     in, like, two minutes.  I'm just going to ask now, but...

 4                   MR. KALAS:  Yeah.  Let's go off while you

 5     confer with Anna.  And then, we can get back on.  All

 6     right.

 7                   THE VIDEOGRAPHER:  We're now off the

 8     record.  The time is 2:18.

 9            (Recess held from 2:18-2:23)

10                   THE VIDEOGRAPHER:  We're now back on the

11     record.  The time is 2:23.

12                   MR. KALAS:  I'm just going to note for the

13     record that Exhibits 43 and 44 are going to be designated

14     as confidential, only because they are medical records of

15     Mr. Koen.

16          And with that, I'll turn it over to Ms. Nolan.

17                   MS. NOLAN:  And I'm requesting that --

18     Dr. Freeman's already had to leave due to another time

19     conflict.  And I am going to let you all know by close of

20     business if I have any more questions for rehabilitation

21     or not.

22                   MR. KALAS:  And I have no objection to that.

23          And presuming you don't have additional

24     questions, I have no follow-up questions to your

25     redirect.  So...
```

Michael D. Freeman, MedDr., PhD.

```
 1                THE VIDEOGRAPHER:  Okay.  We're now off the

 2    record.  The time is 2:24.

 3             (DEPOSITION ADJOURNED AT 2:24 P.M.)

 4             (Signature not requested at time of expedited

 5             production)

 6    ///

 7    ///

 8    ///

 9    ///

10    ///

11    ///

12    ///

13    ///

14    ///

15    ///

16    ///

17    ///

18    ///

19    ///

20    ///

21    ///

22    ///

23    ///

24    ///

25    ///
```

Michael D. Freeman, MedDr., PhD.

```
 1                    EXAMINATION INDEX
 2                                           Page
 3   Examination by Mr. Kalas               186
 4   Examination by Ms. Nolan               313
 5
 6
 7
 8
 9
10                     EXHIBIT INDEX
11
12   No.                  Item                Page
13   Exhibit 21   The Potential Effects of Recall
                  Bias and Selection Bias on the
14                Epidemiological Evidence for the
                  Carcinogenicity of Glyphosate,
15                by K. Crump                 186
16   Exhibit 22   Integrative assessment of
                  multiple pesticides as risk
17                factors for non-Hodgkin?s
                  lymphoma among men, by
18                A.J. De Roos, et al         213
19   Exhibit 23   Exposure to Multiple Pesticides
                  and Risk of Non-Hodgkin Lymphoma
20                in Men from Six Canadian Provinces,
                  by K. Hohenadel, et al      244
21
     Exhibit 24   Transcript of deposition of
22                B. Koen, Volume II,
                  (Not attached)             264
23
     Exhibit 25   Cancer risks in carriers of
24                the BRCA1/2 ███████ founder
                  mutations, by L. Kadouri,
25                et al                      271
```

```
 1   Exhibit 26   2006 CV of M. Freeman          272
 2   Exhibit 27   Exposure to Glyphosate-Based
                  Herbicides and Risk for
 3                Non-Hodgkin Lymphoma:  A
                  Meta-Analysis and Supporting
 4                Evidence, by L. Zhang, et al  277
 5   Exhibit 28   Exposure to glyphosate and
                  risk of non-Hodgkin lymphoma
 6                and multiple myeloma:  An updated
                  meta-analysis, by F. Donato,
 7                et al                          288
 8   Exhibit 29   Brief report on recent
                  meta-analyses of exposure to
 9                glyphosate and risk of
                  non-Hodgkin lymphoma in humans,
10                by G. Kabat, et al             290
11   Exhibit 30   Office of Environmental Health
                  Hazard Assessment:  Glyphosate NSRL -
12                Final Statement of Reasons     298
13   Exhibit 31   Risk Assessment of Glyphosate
                  Exposures from Pilot Study with
14                Simulated Heavy Residential
                  Consumer Application of Roundup?
15                using a Margin of Safety (MOS)
                  Approach, by D. Kougias,
16                et al                          300
17   Exhibit 32   Hendler Flores Law memo re:
                  Brad Koen Roundup Exposure Use,
18                KOEN007428-7431                304
19   Exhibit 33   2021 fee schedule for M. Freeman,
                  KOEN007406-7407                312
20
     Exhibit 34   2017-2021 Rule 26 disclosure of
21                M. Freeman, April 2017-May 2021,
                  KOEN007408-7427                312
22
     Exhibit 35   8/16/21 invoice 8787 from
23                Forensic Research + Analysis
                  to S. Hendler                  312
24
     Exhibit 36   8/16/21 invoice 8788 from Forensic
25                 Research + Analysis to Koen 312
```

```
 1   Exhibit 37   8/16/21 invoice 8789 from
                  Forensic Research + Analysis
 2                to Koen                          312
 3   Exhibit 38   Plaintiff fact sheet,
                  KOEN006941-6960                  312
 4
     Exhibit 39   Transcript of deposition of
 5                S. Koen,
                  (Not attached)                   312
 6
     Exhibit 40   Complaint                        312
 7
     Exhibit 41   4/15/21 transcript of B. Koen
 8                deposition,
                  KOEN007203-7298                  312
 9
     Exhibit 42   Transcript of deposition of
10                B. Koen, Volume I,
                  (Not attached)                   312
11
     Exhibit 43   Photos and exhibits marked at
12                deposition of B. Koen,
                  (Designated confidential and
13                not attached)                    312
14   Exhibit 44   Medical records relied on by
                  M. Freeman,
15                (Designated confidential and
                  not attached)                    312
16
17   (Attached hereto, except where otherwise noted.)
18                        * * *
19
20
21
22
23
24
25
```

Michael D. Freeman, MedDr., PhD.

```
 1                    CERTIFICATE

 2      I, Paula D. Tieger, a Registered Professional Reporter

 3   and Oregon Certified Shorthand Reporter, hereby certify

 4   that said witness appeared before me via videoconference

 5   at the time and place set forth in the caption herein;

 6   that at said time and place I reported in stenotype all

 7   testimony adduced and other oral proceedings had in the

 8   foregoing matter; that thereafter my notes were

 9   transcribed through computer-aided transcription, under

10   my direction; and that the foregoing pages constitute a

11   full, true and accurate record of all such testimony

12   adduced and oral proceedings had, and of the whole

13   thereof.

14      I further certify review of the transcript was not

15   requested at time of expedited production.

16      Witness my hand at Portland, Oregon, this 27th day of

17   August 2021.

18

19

20                _____

21                Paula D. Tieger, RPR 49268

22                Expires 9/30/22

23                Oregon CSR 20-0476

24

25
```