# EXHIBIT 3

# F R+A

## Forensic Research + Analysis

June 30, 2021

Scott Hendler
CEO and Managing Partner
Hendler Flores Law, PLLC
901 S. MoPac Expressway
Building 1, Suite 300
Austin, Texas 78746

RE: *Bradley Koen v Monsanto.*

| | |
|---|---|
| Plaintiff: | Bradley Lawrence Koen |
| Date of birth: | |
| Roundup exposure date range: | 1992 to 2018 |
| Date of NHL diagnosis: | March 7, 2018 |

Dear Mr. Hendler,

I am in receipt of your correspondence and materials regarding the above-named action. The purpose of this report was to evaluate the scientific evidence supporting a causal relationship between exposure to the herbicide Roundup (glyphosate) and subsequent non-Hodgkin's lymphoma (NHL), and how this information is related to the cause of Bradley Koen's NHL.

My opinions in this matter pertain to the field of forensic medicine and forensic epidemiology. Forensic medicine refers to the intersection of medicine and law. Epidemiology is defined as the scientific study of disease and injury in populations, including prevalence, risk, and incidence in specific populations. Inferential conclusions regarding the prevalence, incidence, risk, and causation of disease must be based on the proper interpretation of epidemiologic study and the proper application of epidemiologic methods. The scientific field that dictates how probabilities may be inferred from epidemiologic data and methods and how the inferences can be applied to individuals or groups of individuals in a legal setting is forensic epidemiology, a hybrid discipline combining methods from forensic medicine and epidemiology. Forensic epidemiology provides the scientific basis for the evaluation of individual causation, to the extent that probability or likelihood of causation may be evaluated. The methods applied in this report are consistent with those outlined in the Reference Guide on Epidemiology, from the Reference Manual on Scientific Evidence, published by the Federal Judicial Center and the National Academies of Science (3rd Edition, 2011), as well as in the text Forensic Epidemiology: Principles and Practice, published by Elsevier (2016).

4500 Kruse Way, Kruse Plaza I, Suite 385 Lake Oswego, Oregon 97035 T:971.255.1008

KOEN000224

Scott Hendler

RE: *Bradley Koen v Monsanto*

June 30, 2021

Page 2 of 22

My opinions in this case relate to and address issues of causal probability as they pertain to Bradley Koen's circumstances, but not to the standard of care for any relevant clinical disciplines.

My qualifications to perform the analysis and render the opinions described herein are as follows: I am a consultant in the fields of forensic medicine and forensic epidemiology and hold qualification as a member of the Faculty of Forensic and Legal Medicine (FFLM) of the Royal College of Physicians (UK). I hold the following relevant academic degrees and certifications: a doctor of medicine degree (Med.Dr.) from Umeå University, a doctor of philosophy (Ph.D.) in public health/ epidemiology from Oregon State University, a master of public health (MPH) in epidemiology and biostatistics, also from Oregon State University, a master's degree in forensic medical sciences (MScFMS) with the Academy of Forensic Medical Sciences in the United Kingdom, i.a. In addition to my degreed education, I have completed a 2-year post-doctoral fellowship in forensic pathology at Umeå University in Sweden and hold a Diploma of Legal Medicine (DLM) with the FFLM. I am a fellow of both the American Academy of Forensic Sciences and the American College of Epidemiology. I am also a Fulbright Fellow, and held a 3-year roster appointment (2017-20) with the United States Department of State as a Fulbright Specialist in the field of forensic medicine.

I serve as tenured Associate Professor of Forensic Medicine and Epidemiology at Maastricht University, and a joint Clinical Professor of Psychiatry and Public Health and Preventative Medicine at Oregon Health and Science University School of Medicine, where I have taught courses for the past >20 years in forensic medicine, forensic epidemiology, and injury epidemiology. From 2005-2017 I held an appointment as an Adjunct Professor of Forensic Medicine and Epidemiology at the Institute of Forensic Medicine, Faculty of Health Sciences, Aarhus University, Aarhus, Denmark, and am a visiting professor at University of Indonesia in the Faculty of Medicine.

I serve or have served as an associate editor or editorial board member of 14 scientific peer-reviewed journals and have published approximately 220 scientific papers, abstracts, book chapters and books, including the text for Elsevier, Forensic Epidemiology: Principles and Practice (2016). My scientific publications have been cited by other authors of peer-reviewed publications approximately 3,500 times.

I have provided testimony in more than 350 civil and criminal trials in state and Federal courts throughout the United States, Canada, Australia, and Europe. Please see my CV for further details.

KOEN000225

Scott Hendler

RE: *Bradley Koen v Monsanto*

June 30, 2021

Page 3 of 22

### Documents reviewed:

In forming my opinions in this matter, I have reviewed the following case-specific documents:

- Complaint;
- Deposition of Bradley Koen, March 25, 2021; April 13, 2021; and April 15, 2021: transcripts and exhibits; and
- Mr. Koen's Medical records:
  - ○ Dr. Steven Dobberfuhl;
  - ○ St. David's South Austin Medical Center; and
  - ○ Texas Oncology Midtown Austin.

### Report table of contents:

1. The relevant medical facts pertaining to Bradley Koen
2. Summary of Mr. Koen's exposures to the herbicide Roundup (glyphosate)
3. Methods of epidemiologic investigation of causation
4. Evidence of a plausible relationship between exposure to Roundup and non-Hodgkin's lymphoma
5. Evaluation of temporality
6. Alternative plausible explanations
7. Discussion of Hill criteria
8. Causality conclusion

### Relevant medical facts pertaining to Bradley Koen

On January 12, 2018, at 18:22, Bradley Koen,                  presented to St. David's South Austin Medical Center ED reporting an achy, crampy, stabbing sensation in the left upper quadrant of his abdomen. The pain began at about 13:00 and worsened as the day progressed, so he presented to ED. Mr. Koen described the level of pain as 10 on a scale of 10. He also indicated that for the last several months he had been waking up more often during the night because of a need to urinate.

Vital signs included temperature, 97.5°F; pulse, 59; respiration, 16; blood pressure, 180/112; and estimated weight, 223 pounds. Abnormal blood labs included elevated BUN, 22; glucose, 137; white blood count, 15.3; and neutrophils, 11.3. Chest radiograph was normal.

At 19:32 abdominal CT revealed prominent inflammatory changes associated with the proximal renal collecting systems bilaterally, with extensive mid-abdominal, retroperitoneal inflammatory stranding and lymphadenopathy. There was abnormal enhancement of his kidney parenchyma bilaterally. Hepatic steatosis and multifocal splenic hypo-enhancement, concerning for multiple infarcts, were seen.

KOEN000226

Scott Hendler

RE: *Bradley Koen v Monsanto*

June 30, 2021

Page 4 of 22

Mr. Koen was admitted. Intravenous medications, Dilaudid for pain and antibiotic therapy with Zosyn, were initiated. Preliminary diagnoses included bilateral pyelonephritis, splenic infarcts, hypertension, morbid obesity, and chronic gastro-esophageal reflux disease (GERD).

On January 13, 2018, MRI of the abdomen showed heterogenous signal and enhancement likely indicating splenic inflammation, extensive inflammation and abnormal soft tissue in both renal hila, and multiple enlarged lymph nodes. There was also peripancreatic edema and abdominal signal enhancement of the spleen noted.

On January 15, 2018, Dr. Sanjay Vinjamaram (Hematology) was consulted, and Mr. Koen's anticoagulant therapy was changed from Lovenox to Eliquis.

Also on January 15, 2018, Dr. Brian Metzger (Infectious disease) was consulted, and he recommended to continue with Zosyn while inpatient and then switch to oral Cipro 500mg twice daily to complete a total 14-day course. He recommended a repeat CT if symptoms do not improve by the end of the antibiotic course.

On January 17, 2018, Mr. Koen was discharged home.

On February 5, 2018, Mr. Koen presented to Dr. Vinjamaram for follow-up assessment. He reported that his abdominal pain had improved somewhat, but that he still needed to take oxycodone occasionally for pain. Dr. Vinjamaram recommended a hypercoagulable panel to evaluate potential etiology of splenic infarct and a repeat MRI in approximately 3 weeks.

On February 23, 2018, abdominal MRI revealed sequela of focal infarction in the inferior aspect of the spleen. Mild interval worsening of retroperitoneal lymphadenopathy was seen and amorphous soft tissue extending to bilateral renal hila. The leading consideration remained retroperitoneal lymphoma and tissue sampling was recommended.

On March 2, 2018, Mr. Koen presented to St. David's South Austin Medical Center for an ultrasound-guided core biopsy of a right axillary lymph node. Pathology revealed follicular lymphoma, with a nodular and diffuse growth pattern, with an increased Ki-67 and loss of CD23 in the diffuse areas. Flow cytometry showed monoclonal B cell population, lambda positive, CD10 positive. The pathology results were interpreted as follicular lymphoma, mostly low grade, but there were some areas of high-grade proliferation but not meeting the criteria for diffuse large B-cell lymphoma (but could not be ruled out).

KOEN000227

Scott Hendler

RE: *Bradley Koen v Monsanto*

June 30, 2021

Page 5 of 22

On March 12, 2018, a left subclavian central venous catheter was placed, and an excisional biopsy of the right axillary lymph node was done. Pathology revealed follicular lymphoma, nodular pattern, with an increased Ki-67 stain. Dr. Megan Kressin (Pathology) commented that in contrast to his core biopsy, the excisional biopsy more clearly demonstrated a nodular pattern of B-cells. "There is a low number of centroblasts corresponding with a low-grade follicular lymphoma (Grade 1/2 of 3); however, the Ki-67 stain highlights a markedly increased cell cycling rate. A subset of morphologically low-grade follicular lymphomas with a high proliferation index has been described; these cases behaved more aggressively than those with a low proliferation index, and similarly to a Grade 3 follicular lymphoma. The high cell cycling rate in this tumor may portend a more aggressive clinical course."

On March 15, 2018, body PET/CT scan revealed widespread extensive adenopathy above and below the diaphragm, with the most active nodes in right axilla.

Also on March 15, 2018, a bone marrow biopsy was obtained from Mr. Koen. Histology showed follicular lymphoma with atypical lymphoid aggregates with paratrabecular features, with morphologic and immunophenotypic features characteristic of involvement by lymphoma.

On March 19, 2018, Mr. Koen presented to Dr. Ruben De Celis (oncology) for his initial evaluation at Texas Oncology. Dr. De Celis recommended chemotherapy involving 6 cycles of R-CHOP (Rituximab + Cyclophospha-mide + Doxorubicin + Vincristine + Prednisone).

On March 27, 2018, Mr. Koen began his first cycle of R-CHOP chemotherapy

Mr. Koen received a total of 6 cycles of R-CHOP chemotherapy. The 6th cycle began on July 9, 2018.

On August 3, 2018, impressions from a PET/CT scan included a positive therapeutic response with interval decrease in size and of lymphadenopathy above and below the diaphragm and near complete resolution of multifocal osseous uptake.

Mr. Koen was prescribed Rituximab maintenance therapy but only took one dose due to what he perceived as side effects.

By April 2019, Mr. Koen relapsed.

Mr. Koen was started on Gazyva (obinutuzumab) with bendamustine on April 4, 2019 and was given a total of 6 cycles of between April and August 22, 2019.

KOEN000228

Scott Hendler

RE: *Bradley Koen v Monsanto*

June 30, 2021

Page 6 of 22

On August 19, 2019, Mr. Koen presented to Dr. Aravind Ramakrishnan (Oncology) to discuss the role of autologous stem cell transplant in the management of his follicular lymphoma. Dr. Ramakrishnan opined that follicular lymphoma with a rapid relapse after initial therapy as in the case of Mr. Koen generally is associated with a poor prognosis but that salvage therapy with an autologous transplant can prolong remissions.

On September 19, 2019, impressions from a PET/CT scan were consistent with lymphomatous disease progression and hypermetabolic lymph nodes were seen in the right lower neck, axilla, and upper arm.

On September 23, 2018, Mr. Koen returned to Dr. De Celis. Because of PET/CT findings showing an area of increased uptake in the left side of his pelvis against the iliac crest, there was concern for a transformation into a diffuse large B-cell lymphoma type (DLBCL). A CT-guided biopsy of a pelvic lymph node was scheduled for September 26, 2019, to re-stage Mr. Koen's lymphoma.

Mr. Koen reportedly underwent a bone marrow transplant. Records indicate that he was scheduled to be admitted on October 9, 2019, for the transplant. Records associated with this treatment were not available for me to review.

On February 19, 2020, CT of the chest, abdomen, and pelvis showed mild interval progression of disease with enlarging right axillary lymphadenopathy and new pelvic lymphadenopathy.

It is my understanding that Mr. Koen's lymphoma was re-staged as DLBCL. He participated in an open-label Phase I/II study evaluating the safety and clinical activity of AUT03, a CAR-T cell treatment targeting CD19 and CD22 with Anti PD-1 Antibody in patients with relapsed or refractory diffuse large B cell lymphoma. Records associated with the re-staging and the CAR-T cell treatment were not available for me to review.

On June 8, 2020, CT of the chest, abdomen, and pelvis was performed to evaluate Mr. Koen's response to the CAR-T cell treatment. The imaging studies revealed a positive treatment response in lymphomatous disease above and below the diaphragm with a significant decrease in the size of lymphadenopathy. Improving bilateral hydronephrosis and interval decreases in the size of the spleen and a left pleural effusion were also observed. These findings were confirmed by a PET/CT scan performed on the same day.

KOEN000229

Scott Hendler

RE: *Bradley Koen v Monsanto*

June 30, 2021

Page 7 of 22

*Prior medical history*

Hypertension, GERD, hepatic steatosis and obesity. ACL reconstruction surgery in 2007.

On January 4, 2017, Mr. Koen presented to his primary care physician Dr. Steven Dobberfuhl (Internal medicine) reporting anxiety, acid reflux. He was prescribed Xanax for anxiety and Dexilant for reflux. Mr. Koen was taking lisinopril to control his ongoing hypertension.

### Mr. Koen's pre-morbid exposure history to Roundup (glyphosate)

Bradley Koen provided details concerning his exposure to the herbicide Roundup (glyphosate) during his deposition on March 25, 2021; April 13, 2021; and April 15, 2021. The following is a summary of his history of exposure to the chemical.

Beginning approximately in 1992, Mr. Koen started using the herbicide Roundup to control weeds on a 25-acre parcel of land on his father's ranch ██████████████████. This practice began upon the advice of the ranch foreman who had purchased a 250-gallon tank equipped with a hose and a nozzle mounted on a trailer and powered by a gas motor for Bradley Koen's father. The foreman would dilute the pesticide concentrate purchased in 5-gallon containers with water in the tank (10 to 25 gallons herbicide, 125 to 150 gallons water). Mr. Koen would pull the trailer behind a tractor stopping periodically to spray the diluted solution propelled by the gas motor over a given segment of land and then move on to another segment until the entire 25-acres had been treated. It took approximately 6 hours to complete the application, around 75% of that time was devoted to the actual herbicide spraying. On the advice of the foreman Mr. Koen wore gloves, long-sleeved shirt, and long pants during the application. He tried to apply Roundup on days when it was warm and sunny and when the wind speed was low. Mr. Koen stopped applying Roundup at the ranch using this method after 3 or 4 years because the tank delivery system stopped working. In addition to applying Roundup using the tank and trailer system, Mr. Koen testified that applied it around the ranch house yard using regular spray bottles about once per month (involving about one hour of application time). Mr. Koen discontinued Roundup application at the ranch after his father sold it in July of 1997.

After the ranch was sold in 1997, Mr. Koen moved into the home of his girlfriend ████ at ████ ████████████████████████ Mr. Koen testified that he used Roundup about 3 times per month while he lived at that location; he reported that he spent approximately 45 minutes spraying Roundup at each application. In June 2016, Mr. Koen and his wife ████ purchased a home at ████ ████████████████████ and they moved out of the ████████████████████

KOEN000230

Scott Hendler

RE: *Bradley Koen v Monsanto*

June 30, 2021

Page 8 of 22

rented the ▮▮▮▮▮▮▮▮ after they moved, and Mr. Koen continued to apply Roundup at that location when he maintained the yard between tenants (typically once per year). He continued in that manner until he became sick in 2018.

Mr. Koen testified that when he and ▮▮▮ moved into their home in ▮▮▮▮▮▮▮▮ in July 2016 the previous owners left a 5-gallon bottle of Roundup in the garage. His wife made him apply Roundup every weekend; each application took approximately one hour. When using Roundup from the large bottle left by the previous owners, he would transfer it to a handheld sprayer for application. In addition, Mr. Koen estimated that he used approximately three one-gallon bottles of Roundup per year on their property on ▮▮▮▮▮▮▮▮ between June 2016 and when he became sick in early 2018.

KOEN000231

Scott Hendler

RE: *Bradley Koen v Monsanto*

June 30, 2021

Page 9 of 22

## *Causation Analysis:*

### Methods

Unlike a diagnosis, *the cause of an injury or disease cannot be observed*, and thus causation can only be inferred based on a comparison of risk. As an illustrative example, lung cancer is diagnosed via biopsy and observation of the types of cells within a lung mass. Even if a patient has smoked for his entire life, however, there is nothing that can be observed histologically or otherwise that indicates what *caused* the cancer. The *cause* of the cancer is inferred by comparing the frequency of cancer observed in populations who smoke (the exposed population) to the frequency of cancer in populations who don't smoke (the unexposed population). This allows for an evaluation of the critical "but-for" question of causation, as in "*but-for the exposure to the harm, would this person still have the injury?'*" Thus, all causation evaluations require the understanding and comparison of risks from populations, which are then applied to the circumstances of an individual injury or disease.

There are systematic methods for assessing questions of injury causation in a medicolegal setting that have been described extensively in the peer-reviewed literature. Most simply put, an injury causation analysis for a specific individual is performed by assessing the risk of injury from a harmful event and comparing it to the probability that the injuries or conditions would have been present at the same point in time *in the individual* if the harmful event had not occurred. The analysis is accomplished via the application of expertise and knowledge from several disciplines depending on the source and type of injury, nearly always including medicine and epidemiology.[2-3]

The methods, described as a 3-step process, have been extensively described in the peer-reviewed literature, and been deemed generally accepted by US Courts, and described as part of case law in the United States.[4-5] The method is based on a distillation and application of the principles enumerated in the Hill criteria.[1,2]

The three fundamental elements of an injury causation analysis are as follows:

1) Whether the injury mechanism had the potential to cause the injury in question (general causation), and if known, the magnitude of that potential (risk);

[1] Federal Judicial Center. Reference manual on scientific evidence. 3rd ed. Washington, DC: National Academy Press; 2011::611.
[2] Freeman MD, Zeegers M. Principles and applications of forensic epidemiology in the medicolegal setting. *Law, Probability, & Risk* 2015; doi:10.1093/lpr/mgv010.
[3] Dianita Ika Melia et al. A review of causal inference in forensic medicine. *For Sci Med Path* 2020:doi.org/10.1007/s12024-020-00220-9.
[4] 35 F.Supp.3d 1360 United States District Court, D. Colorado. Donald L. Etherton, Plaintiff, v. Owners Insurance Company, a Michigan Insurance Company, Defendant. Civil Action No. 10–cv–00892– PAB–KLM
[5] Etherton v. Owner Insurance Company. U.S. District Court of Appeals, 10th Circuit. Case No. 14-1164.

KOEN000232

Scott Hendler

RE: *Bradley Koen v Monsanto*

June 30, 2021

Page 10 of 22

2) The degree of temporal proximity between the injury mechanism and the onset of the symptoms reasonably indicating the presence of the injury; and

3) Whether there is a more likely alternative explanation for the occurrence of the injury at the same point in time, versus the investigated cause (also known as a differential etiology/ diagnosis). This alternative or competing cause is quantified for the individual, given their predictive characteristics and the temporal relationship quantified in step 2.

The result of the analysis is a comparison of risks; the risk of injury from the harmful exposure (step 1 above) versus the risk of the same injury occurring at the same time in the specific individual, but in the absence of the harmful exposure (step 3 above). If the injury risk from the exposure is greater than the injury risk in the absence of the exposure, then the exposure is the cause of the injury on a more probable than not basis (>50% probability). The conclusion can be presented as either exceeding or failing to exceed the 50% threshold, or if the risks can be accurately quantified it can be quantified as a risk ratio, which can be converted to a Probability of Causation.[2]

KOEN000233

Scott Hendler

RE: *Bradley Koen v Monsanto*

June 30, 2021

Page 11 of 22

## Causal analysis of Bradley Koen's historical exposure to Roundup and his subsequent diagnosis of non-Hodgkin's lymphoma

Mr. Koen consistently used the herbicide Roundup to control weed growth at 3 different locations between 1992 and when he was diagnosed with follicular lymphoma, a type of non-Hodgkin's lymphoma (NHL), in March 2018. The connection between exposure to Roundup and subsequent non-Hodgkin's lymphoma has been extensively evaluated in peer-reviewed research studies. It "makes sense" that Mr. Koen's extensive exposure to a cancer-causing substance played a role in his later development of cancer. In the remainder of this report, I will detail the results of my causal analysis of the relationship between Roundup exposure and non-Hodgkin's lymphoma in general and for Mr. Koen in particular, and demonstrate how the scientific evidence supports the inference that the Mr. Koen's exposure history is related to his illness.

My analysis of the 3 causal elements described above is as follows:

### Plausibility – can and does Roundup cause non-Hodgkin's lymphoma?

In the following section are the results of a review of the medical literature to assess the plausibility of a causal association between Roundup exposure and NHL. The information from the review is matched to the Hill criteria directed at plausibility for this step of the analysis.[1] Before addressing the association NHL with Roundup use, I will first provide a brief overview of the epidemiology and etiology of NHL as well as some basic information about the herbicide Roundup (glyphosate).

### Non-Hodgkin's lymphoma

Non-Hodgkin lymphoma is a heterogeneous group of malignancies that arises from two distinct lymphocyte types, B or T lymphocytes, at various stages of differentiation.[6] While 60 to 75 % of NHL develops or presents in the lymphoid tissues, such as lymph nodes, spleen, and bone marrow, it can occur in almost any tissue. NHL accounts for about 4.3% of new cancer diagnoses in the USA.[7,8,9] It is the seventh most diagnosed cancer in both men and women in the USA, with approximately 81,560 new cases expected in 2021.

The annual incidence rate of NHL from 2007 to 2011, estimated from the Surveillance, Epidemiology, and End-Results (SEER) Program of the National Cancer Institute, was 19.7 cases

---

[6] Chiu BC, Hou N. Epidemiology and etiology of non-hodgkin lymphoma. Cancer Treat Res. 2015;165:1-25.

[7] Howlader N, et al (eds). SEER Cancer Statistics Review, 1975-2018, National Cancer Institute. Bethesda, MD, https://seer.cancer.gov/csr/1975_2018/, based on November 2020 SEER data submission, posted to the SEER web site, April 2021.

[8] National Cancer Institute, Surveillance, Epidemiology, and End Results Program. Cancer Stat Facts: Non-Hodgkin Lymphoma. https://seer.cancer.gov/statfacts/html/nhl.html

[9] Siegel RL, et al. Cancer Statistics, 2021. CA Cancer J Clin. 2021;71(1):7-33.

KOEN000234

Scott Hendler

RE: *Bradley Koen v Monsanto*

June 30, 2021

Page 12 of 22

per 100,000 persons, and it increased exponentially with age (9.3 per 100,000 persons under 65 years and 91.5 per 100,000 persons age 65 years and older).[7] The overall incidence of NHL is about 50% higher in men (23.9 per 100,000) than in women (16.4 per 100,000) in the USA. *Table 1* summarizes the probability of males developing NHL by age.[9]

*Table 1.* Probability (%) of Developing NHL Within Selected Age Intervals in Males, United States, 2015 to 2017.[9]

| Age range | Probability |
|---|---|
| Birth to 49 | 0.3 (1 in 375) |
| 50 to 59 | 0.3 (1 in 345) |
| 60 to 69 | 0.6 (1 in 177) |
| 70 and older | 1.9 (1 in 54) |
| Birth to death | 2.4 (1 in 42 |

NHL is presently classified according to the fourth edition of the World Health Organization (WHO) classification of tumors of hemopoietic and lymphoid tissues that distinguishes between precursor and mature neoplasms corresponding to stages of differentiation. Approximately 85 to 90% of all lymphomas arise from B lymphocytes and the remainder derives from T lymphocytes or natural killer lymphocytes.[6] The two most common types of NHL are diffuse large B-cell lymphoma (DLBCL) and follicular lymphoma, accounting for approximately 35 and 20 % of all lymphomas, respectively (*Figure 1*).[5]

*Mr. Koen was ▮▮▮▮▮▮ when he was diagnosed with the follicular lymphoma subtype of NHL in March 2018. Records suggest that he underwent transformation into DLBCL by September 2018.*

KOEN000235

Scott Hendler

RE: *Bradley Koen v Monsanto*

June 30, 2021

Page 13 of 22

*Figure 1.* Incidence Rates of NHL subtypes in the USA, 2000–2011.[9]



### Roundup (glyphosate)

A Swiss chemist working for a pharmaceutical company, Dr. Henri Martin, discovered glyphosate [N-(phosphonomethyl) glycine] in 1950, but no pharmaceutical applications were identified.[10] Glyphosate was discovered to be an herbicide by Monsanto scientist John Franz and was patented as such in 1970. In 1974 Monsanto brought glyphosate to market under the trade name Roundup.

Glyphosate is an herbicide that is applied to the leaves of plants to kill both broadleaf plants and grasses.[11] People apply it in agriculture and forestry, on lawns and gardens, and for weeds in industrial areas. Glyphosate is the most heavily used herbicide in the world.

---

[10] Benbrook CM. Trends in glyphosate herbicide use in the United States and globally. Environ Sci Eur. 2016;28(1):3.
[11] National Pesticide Information Center. Glyphosate. http://npic.orst.edu/factsheets/glyphogen.html

KOEN000236

Scott Hendler

RE: *Bradley Koen v Monsanto*

June 30, 2021

Page 14 of 22

Glyphosate is a non-selective herbicide, meaning it will kill most plants. Glyphosate works by preventing plants from making certain proteins that are needed for plant growth by stopping a specific enzyme pathway that is necessary for plants and some microorganisms. Most glyphosate-based formulations (GBFs), such as Roundup, are either made or used with a surfactant, which helps glyphosate penetrate plant cells.

### Health effects of glyphosate

Farmers, forestry and nursery workers, horticulturists, landscapers, homeowners, and bystanders may be heavily exposed to GBFs during application, mainly by dermal and inhalation exposures. Glyphosate biomonitoring of farmers has shown that 60% had low levels of glyphosate in their urine on the day of application and that urine levels were 5 times higher in those who did not wear gloves when mixing glyphosate.[13] Studies of horticulturists using GBFs for recreational or ornamental purposes found urine levels like those seen in farmers.[12]

On February 11, 1985, the carcinogenic potential of glyphosate was first considered by an EPA panel, called the Toxicology Branch Ad Hoc Committee. The Committee, in a consensus review dated March 4, 1985, then classified glyphosate as a Class C Carcinogen. A Class C Carcinogen has "Possibly Carcinogenic to Humans: Agents with limited animal evidence and little or no human data" according to the EPA.[13] In 2015, the International Agency for Research on Cancer (IARC), a part of the World Health Organization and an authoritative body for the evaluation of carcinogenic hazards to humans, published its assessment of the carcinogenicity of glyphosate.[14] The IARC concluded that glyphosate and GBFs are probably carcinogenic to humans (group 2A) based on limited epidemiologic evidence in humans, mainly for NHL, and *significant evidence of carcinogenicity in animals*. The IARC also found strong evidence that glyphosate and GBFs can operate through 2 key characteristics of known human carcinogens, specifically genotoxicity and the induction of oxidative stress in cells.[15]

### Glyphosate and NHL

Numerous epidemiologic studies of the relationship of glyphosate exposure to cancer in humans have been reported, and these studies have not shown an association for most of the cancers studied. However, there have been multiple case-control studies of NHL and most have shown an

---

[12] Connolly A, et al. Characterising glyphosate exposures among amenity horticulturists using multiple spot urine samples. Int J Hyg Environ Health. 2018;221(7):1012-1022.

[13] Williams GM, et al. A review of the carcinogenic potential of glyphosate by four independent expert panels and comparison to the IARC assessment. Crit Rev Toxicol. 2016;46(sup1):3-20.

[14] IARC Working Group on the Evaluation of Carcinogenic Risks to Humans. Some organophosphate insecticides and herbicides. Lyon, France: International Agency for Research on Cancer; 2017. (IARC Monographs on the Evaluation of Carcino- genic Risks to Humans, No. 112.) https://www.ncbi.nlm.nih.gov/books/NBK436774/

[15] Weisenburger DD. A Review and Update with Perspective of Evidence that the Herbicide Glyphosate (Roundup) is a Cause of Non-Hodgkin Lymphoma. Clin Lymphoma Myeloma Leuk. 2021:S2152-2650(21)00151-8.

KOEN000237

Scott Hendler

RE: *Bradley Koen v Monsanto*

June 30, 2021

Page 15 of 22

association with glyphosate exposure.[16,17,18,19,20,21,22] The findings of 6 of these studies are summarized in *Table 2*.

*Table 2*. Epidemiologic Case-Control Studies of Non-Hodgkin Lymphoma and Glyphosate-Based Formulations.[15] The results in bold are statistically significant because the 95% confidence interval does not include 1.0, meaning that they cannot be explained by chance alone.

| Reference Location Time | Population Studied | Exposure Category | Exposed Cases | Risk Estimates Odds ratio [OR] (95% confidence interval) |
|---|---|---|---|---|
| McDuffie et al.[20] Canada 1991-19946i | 517 cases 1506 controls | Exposed ≤ 2 days/year > 2 days/year | 051 028 023 | 1.20 (0.83-1.74) 1.0 (0.63-1.57) **2.12 (1.2-3.73)** |
| Hardell et al.[18] Sweden 1987-1992 | 515 cases 1411 controls | Exposed | 08 008 | **3.04 (1.08-8.52)** |
| De Roos et al.[16] Midwest USA 1979-1986 | 650 cases 1933 controls | Exposed | 036 | **2.1 (1.1-4.0)** |
| Eriksson et al.[17] Sweden 1999-2002 | 910 cases 1016 controls | Exposed ≤ 10 days > 10 days | 029 029 012 017 | **2.02 (1.1-3.71)** 1.69 (0.70-4.07) **2.36 (1.04-5.37)** |
| Orsi et al.[19] France 2000-2004 | 244 cases 454 controls | Exposed | 012 | 1.00 (0.50-2.20) |
| Cocco et al.[21] Europe 1998-2004 | 2348 cases 2462 controls | Exposed | 004 | 3.10 (0.60-17.10) |

[16] De Roos AJ, et al. Integrative assessment of multiple pesticides as risk factors for non-Hodgkin's lymphoma among men. Occup Environ Med. 2003;60(9):E11.

[17] Eriksson M, et al. Pesticide exposure as risk factor for non-Hodgkin lymphoma including histopathological subgroup analysis. Int J Cancer. 2008;123(7):1657-63.

[18] Hardell L, et al. Exposure to pesticides as risk factor for non-Hodgkin's lymphoma and hairy cell leukemia: pooled analysis of two Swedish case-control studies. Leuk Lymphoma. 2002;43(5):1043-9.

[19] Orsi L, et al. Occupational exposure to pesticides and lymphoid neoplasms among men: results of a French case-control study. Occup Environ Med. 2009;66(5):291-8.

[20] McDuffie HH, et al. Non-Hodgkin's lymphoma and specific pesticide exposures in men: cross-Canada study of pesticides and health. Cancer Epidemiol Biomarkers Prev. 2001;10(11):1155-63.

[21] Cocco P, et al. Lymphoma risk and occupational exposure to pesticides: results of the Epilymph study. Occup Environ Med. 2013;70(2):91-8.

[22] Meloni F, et al. Occupational exposure to glyphosate and risk of lymphoma: results of an Italian multicenter case-control study. Environ Health. 2021;20(1):49.

KOEN000238

Scott Hendler

RE: *Bradley Koen v Monsanto*

June 30, 2021

Page 16 of 22

The most recent case-control study published was a multicenter Italian study of occupational exposure to glyphosate.[22] Those analyses revealed that the risk of <u>follicular lymphoma</u> was elevated 7-fold in subjects classified as ever exposed to glyphosate with medium-high confidence, 4.5-fold in association with medium-high cumulative exposure level, 12-fold with medium-high exposure intensity, and 6-fold with exposure for 10 days or more per year. As noted in the clinical history section of this report, Mr. Koen was diagnosed with follicular lymphoma, and his exposure level falls into the higher categories described in the literature (>10 days/ year).

The results of the case-control studies have been summarized by systematic reviews and meta-analyses (study of studies). Most of the meta-analyses were positive for an association between NHL risk and ever use of glyphosate. The first study by Schinasi and Leon found significant associations between glyphosate and NHL. Specifically, an increased meta-risk ratio (meta-RR) of 1.5 (95% CI, 1.1-2.0) for all NHL and 2.0 (95% CI, 1.1-3.6) for B-cell NHL.[23]

More recently, Zhang and collaborators conducted a new meta-analysis that included the most recent update of the Agricultural Health Study cohort published in 2018[24] along with five case-control studies.[25] Using the highest exposure groups when available in each study, they reported the overall meta-RR of NHL in glyphosate-exposed individuals was increased by 41% (meta-RR, 1.41; 95% CI, 1.13-1.75). To contextualize their findings of an increased NHL risk in individuals with high glyphosate exposure, they reviewed available animal and mechanistic studies, which provided supporting evidence for the carcinogenic potential of glyphosate. They documented further support from studies of malignant lymphoma incidence in mice treated with pure glyphosate, as well as potential links between glyphosate exposure and immunosuppression, endocrine disruption, and genetic alterations that are commonly associated with NHL. The authors concluded that in accordance with evidence from experimental animal and mechanistic studies, as well as their meta-analysis of human epidemiological studies provided compelling evidence for a link between exposures to glyphosate and increased risk for NHL.

In contrast, the meta-analysis performed by Donato and colleagues found no overall evidence of an increased risk for NHL in subjects occupationally exposed to glyphosate.[26] The meta-RR of NHL was 1.03 (95% CI, 0.86-1.21) and meta-RR of NHL for highest category of exposure was 1.49 (95%

[23] Schinasi L, Leon ME. Non-Hodgkin lymphoma and occupational exposure to agricultural pesticide chemical groups and active ingredients: a systematic review and meta-analysis. Int J Environ Res Public Health. 2014;11:4449–4527.
[24] Andreotti G, et al. Glyphosate Use and Cancer Incidence in the Agricultural Health Study. J Natl Cancer Inst. 2018;110(5):509-516.
[25] Zhang L, et al. Exposure to glyphosate-based herbicides and risk for non-Hodgkin lymphoma: A meta-analysis and supporting evidence. Mutat Res. 2019;781:186-206.
[26] Donato F, et al. Exposure to glyphosate and risk of non-Hodgkin lymphoma and multiple myeloma: an updated meta-analysis. Med Lav. 2020;111(1):63-73.

KOEN000239

Scott Hendler

RE: *Bradley Koen v Monsanto*

June 30, 2021

Page 17 of 22

CI, 0.37-2.61) based upon 3 studies. For NHL subtypes the meta-RR for DLBCL was 1.31 (95% CI, 0.93-1.75); that for follicular lymphoma was 0.82 (95% CI, 0.93-1.70).

Most recently, Weisenburger summarized the results of the 6 case-control studies shown in *Table 2*.[15] Of these 6 case-control studies, 5 showed elevated NHL risk in workers exposed to glyphosate. Only one study showed no increase, but the statistical power of that study was limited by sample size.[19] Four of the 5 positive studies showed statistically significant increases in the risk for NHL (see bolded risk estimates), and the 2 studies in which an exposure-response effect was evaluated showed significantly increased risks of NHL with an increased number of days that glyphosate was used or days per year used. In all 5 positive studies, odds ratio of greater than 2.0 were demonstrated, and these were statistically significant in 4 of the studies. Weisenburger concluded that the results of these epidemiologic studies provided ample evidence for an association between exposure to glyphosate and an increased risk of NHL. See the *Appendix* of this report for a discussion of additional causal analysis described in the study.

*Plausibility summary*

The results of my review of the medical literature described above, provide reliable epidemiologic evidence for the plausibility of Roundup-associated NHL in persons exposed to the herbicide, and demonstrate a doubling or more of risk in most studies relevant to Mr. Koen's circumstances.

KOEN000240

Scott Hendler

RE: *Bradley Koen v Monsanto*

June 30, 2021

Page 18 of 22

*The temporal relationship between Mr. Koen's exposure to Roundup and the onset of his NHL symptoms and diagnoses*

The next step in the causal analysis of Mr. Koen's NHL is an evaluation of the timing of the Roundup exposure relative to his NHL diagnosis. If an exposure causes a disease, the exposure must occur before the disease develops. As detailed in the relevant facts section of this report Mr. Koen used Roundup to control weed growth at 3 different locations between 1992 and when he became ill with NHL in early 2018. The timing of these exposures relative to the NHL diagnosis is summarized in *Figure 2*.

Figure 2. Timeline of Mr. Koen's exposures to Roundup relative to his NHL diagnosis.



Also relevant to the discussion of temporality is an evaluation of the amount of time between the exposure and manifestation of the disease. Kabat and associates recently described the importance of a lag or period of latency between exposure to glyphosate and the NHL disease outcome.[27] Using the highest reported exposure levels, evidence of an association between glyphosate and NHL was strongest when estimates from analyses in the cohort study with a 20-year lag (RR, 1.41; 95% CI 1.13–1.76) and a 15-year lag (RR, 1.25; 95% CI 1.01–1.25) were included. In comparison, the meta-analysis of ever-exposure with no lag period as associated with a relative risk estimate of 1.05 (95% CI 0.87–1.28). Mr. Koen was consistently exposed to Roundup for the 26 years preceding his follicular NHL diagnosis. The temporal relationship between Mr. Koen's Roundup exposure and his NHL diagnosis is appropriate in both sequence and lag period.

---

[27] Kabat GC, et al. On recent meta-analyses of exposure to glyphosate and risk of non-Hodgkin's lymphoma in humans. Cancer Causes Control. 2021;32(4):409-414.

KOEN000241

Scott Hendler

RE: *Bradley Koen v Monsanto*

June 30, 2021

Page 19 of 22

### *Alternative explanations*

The final step in the causal analysis of Mr. Koen's NHL is an evaluation of plausible alternative explanations for the follicular lymphoma other than Roundup. In the following section, I will review other risk factors for NHL in general, and for Mr. Koen in particular.

As described in the plausibility section of this report, NHL risk increases exponentially with age (9.3 per 100,000 persons under 65 years and 91.5 per 100,000 persons age 65 years and older). At age 47 Mr. Koen was at a low annual risk for NHL (1 in 375 for males younger than 50).

Congenital and acquired states of immunosuppression are the strongest factors known to increase NHL risk.[5] These conditions include:

- Ataxia-telangiectasia;
- Wiskott-Aldrich syndrome;
- Common variable hypogammaglobulinemia;
- X-linked lymphoproliferative syndrome;
- Severe combined immunodeficiency;
- HIV infection;
- Immunosuppressive therapy after solid organ transplant; and
- Patients who receive chemotherapy and/or radiation.

A history of NHL or other hematolymphoid cancer in close relatives has also been shown to increase the risk of NHL by 2- to 3-fold.[6] Certain occupations have been associated with increased risk for the development of NHL, including farmers, pesticide applicators, benzene workers, rubber workers, petroleum refinery workers, dry cleaners, firefighters, and chemists. Common exposures in these occupations include benzene, pesticides, herbicides, and other organic solvents.

Based upon my review of Mr. Koen's deposition transcripts and medical records, none of the risks described above apply to him. The only notable risk factor for NHL in his history is extensive use of the pesticide Roundup.

KOEN000242

Scott Hendler

RE: *Bradley Koen v Monsanto*

June 30, 2021

Page 20 of 22

### Conclusions

My review of the relevant scientific and epidemiologic evidence demonstrates a well-established causal relationship between Roundup exposure and increased risk of NHL, particular when exposure is more frequent (>10 times/yr), as it was for Mr. Koen over the 26 years preceding his NHL diagnosis. Additional evidence of linking Mr. Koen's exposure to his cancer is his diagnosis of follicular NHL, a subtype that is associated with glyphosate exposure in a dose-dependent manner.[22]

Thus, in the absence of evidence of a competing cause of which I am unaware, the most probable (>50%) known cause of NHL in Bradley Koen's history is his Roundup exposure, and thus it was a substantial factor in causing his cancer.

I reserve the right to alter or revisit my opinions in this matter should new information be brought to my attention.

The preceding opinions were given as reasonable medical and scientific probabilities.

Very truly yours,

Michael D. Freeman, MedDr, PhD, MScFMS, MPH, MFFLM, DLM, FACE
Associate Professor of Forensic Medicine
University of Maastricht Medical Center
Faculty of Health, Medicine, and Life Sciences
Maastricht University, Maastricht, Netherlands

Member, Faculty of Forensic and Legal Medicine, Royal College of Physicians (UK)
Fellow, American College of Epidemiology
Fellow, American Academy of Forensic Sciences

KOEN000243

Scott Hendler

RE: *Bradley Koen v Monsanto*

June 30, 2021

Page 21 of 22

### Appendix

#### *Hill criteria*

As part of his evaluation of evidence that glyphosate is a cause of NHL, Weisenburger extended his analysis beyond summarizing results of these epidemiologic studies.[13] He also evaluated other evidence, using the guidelines for evaluation of general causation set forth by Austin Bradford Hill, and which are broadly relied on for the evaluation of the evidence for causal relationships between environmental exposures and disease.[28] Weisenburger's discussion of how the "Hill criteria" applied to the relationship between glyphosate exposure and NHL was of particular relevance to Mr. Koen's circumstances, and were as follows:

- *Temporal Relationship.* If an exposure causes a disease, the exposure must occur before the disease develops. This criterion was met by all of the epidemiologic and animal studies evaluated.
- *Strength of Association.* In the epidemiologic case-control studies, relative risks of greater than 2.0 were seen in 5 of the 6 studies.
- *Exposure-Response Relationship.* The case-control studies in which an exposure-response effect was evaluated showed significantly increased risks with the number of days per year or total number of days that glyphosate was used.
- *Replication of Results.* All the studies of glyphosate have included primarily participants of European ancestry using Western farming techniques. Five of the 6 case-control studies had positive findings for NHL, and these were performed by different investigators in the USA, Canada, Sweden, and 6 other countries in Europe.
- *Disease Specificity.* The only cancer linked to glyphosate exposure to date is NHL.
- *Biological Plausibility.* The occurrence of NHL in people exposed to glyphosate-based-formulations (GBFs) is consistent with the genotoxic effects of these chemicals observed in exposed individuals, as well as in the numerous positive in vitro studies of human lymphocytes (the precursor cell of NHL) and in other animal and cell models. The fact that mice exposed to glyphosate also develop NHL contributes to biological plausibility.
- *Alternative Explanations.* Alternative explanations for an association, such as recall bias or confounding factors in epidemiologic studies. There was no evidence that the studies reviewed had significant issues in design or analytic methodology.
- *Coherence.* The evidence is coherent and is consistent with other relevant knowledge concerning pesticides as a cause of NHL. Other pesticides have also been implicated as causes of NHL by similar mechanisms.

---

[28] Bradford Hill A. The environment and disease: association or causation? Proc R Soc Med. 1965;58:295–300.

KOEN000244

Scott Hendler

RE: *Bradley Koen v Monsanto*

June 30, 2021

Page 22 of 22

Weisenburger concluded that the epidemiologic, animal, and mechanistic studies together provide a coherent and compelling pattern of evidence that glyphosate and GBFs are a cause NHL in humans exposed to these agents.

KOEN000245