**WILKINSON STEKLOFF LLP**
Brian L. Stekloff (*pro hac vice*)
(bstekloff@wilkinsonstekloff.com)
Rakesh Kilaru (*pro hac vice*)
(rkilaru@wilkinsonstekloff.com)
2001 M St. NW
10th Floor
Washington, DC 20036
Tel:    202-847-4030
Fax:    202-847-4005

**HOLLINGSWORTH LLP**
Eric G. Lasker (*pro hac vice*)
(elasker@hollingsworthllp.com)
1350 I St. NW
Washington, DC 20005
Tel: 202-898-5843
Fax: 202-682-1639

*Attorneys for Defendant*
*MONSANTO COMPANY*

**COVINGTON & BURLING LLP**
Michael X. Imbroscio (*pro hac vice*)
(mimbroscio@cov.com)
One City Center
850 10th St. NW
Washington, DC 20001
Tel: 202-662-6000

**BRYAN CAVE LEIGHTON PAISNER LLP**
K. Lee Marshall (CA Bar No. 277092)
(klmarshall@bclplaw.com)
Three Embarcadero Center, 7th Floor
San Francisco, CA 94111
Tel:  415-675-3400
Fax: 415-675-3434

Jed P. White (CA Bar No. 2392339)
(jed.white@bclplaw.com)
120 Broadway, Suite 300
Santa Monica, CA 90401
Tel: 310-576-2100
Fax: 310 -576-2200

# UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| IN RE: ROUNDUP PRODUCTS LIABILITY LITIGATION <br><br> ——————————————— <br><br> *Carl and Karen Savory, husband and wife* v. Monsanto Company Case No. 3:20-cv-02403 | MDL No. 2741 <br><br> Case No.: 3:16-md-02741-VC <br><br> **DEFENDANT MONSANTO COMPANY'S NOTICE OF MOTION AND MOTION TO EXCLUDE TESTIMONY OF PLAINTIFF'S EXPERT ARIEL TEITEL ON RULE 702 GROUNDS** <br><br> Hearing date: 12/13/21 <br> Time: TBD |

1

2    **TO THE COURT, ALL PARTIES, AND THEIR ATTORNEYS OF RECORD:**

3    **PLEASE TAKE NOTICE THAT** beginning on December 13, 2021 in Courtroom 4 of the United

4    States District Court, Northern District of California, located at 450 Golden Gate Avenue, San

5    Francisco, CA 94102, or as ordered by the Court, Defendant Monsanto Company ("Monsanto") will

6    present its Motion to Exclude Testimony of Dr. Ariel Teitel.  Monsanto seeks an order excluding

7    opinions of this witness under Federal Rule of Evidence 702.

8

9    DATED:  September 22, 2021

10                                              Respectfully submitted,

11                                              */s/ Eric G. Lasker*

12                                              Eric G. Lasker (*pro hac vice*)
                                                (elasker@hollingsworthllp.com)
13                                              Hollingsworth LLP
                                                1350 I St. NW
14                                              Washington, DC 20005
                                                Tel: 202-898-5843
15

16

17

18

19

20

21

22

23

24

25

26

27

28

MONSANTO'S MOTION TO EXCLUDE SPECIFIC CAUSATION EXPERT TESTIMONY IN WAVE THREE
CASES
3:16-MD-02741-VC

## TABLE OF CONTENTS

**INTRODUCTION** ...................................................................................................................1

**BACKGROUND** ....................................................................................................................1

**I.**     **Dr. Teitel is a New Expert to this Litigation.** ......................................................1

**II.**    **Plaintiff Had Risk Factors Associated with NHL.** ...............................................2

III.    **Plaintiff's Expert Does Not Use Any Scientific Methodology in Forming His
        Specific Causation Opinions.** ..................................................................................3

**LEGAL STANDARD** ...........................................................................................................3

**ARGUMENT** .........................................................................................................................4

**I.**     **Dr. Teitel Is Not Qualified and His Opinions Are Not the Product of a
        Reliable Methodology.** ...........................................................................................4

        **A.**     **Dr. Teitel Conducted an Insufficient Review of the Relevant
                Literature and Based His Opinions Primarily on the Report of
                Plaintiff's Exposure Expert.** .......................................................................4

        **B.**     **Dr. Teitel Only Concluded That There "Could Be" an Association
                Between Glyphosate and NHL.** ...................................................................6

**II.**    **Dr. Teitel Failed to Adequately Assess Potential Alternative Causes of
        Plaintiff's NHL.** .......................................................................................................7

        **A.**     **Dr. Teitel Acknowledged the Significant Increased Risk of NHL from
                RA and Has No Basis to Rule it Out.** ..........................................................8

        **B.**     **Dr. Teitel Did Not Address Any of Mr. Savory's Risk Factors Other
                Than RA and Exposure to Glyphosate.** .......................................................8

**III.**   **Plaintiff's Expert Has Not Reliably Ruled Out Unknown Causes of Plaintiff's
        NHL and Instead Always Point to Roundup.** ..........................................................9

**CONCLUSION** .....................................................................................................................10

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*In re Aredia & Zometa Prods. Liab. Litig.,*
  483 F. App'x 182 (6th Cir. 2012) ............................................................................. 4

*Clausen v. M/V New Carissa,*
  339 F.3d 1049 (9th Cir. 2003) ................................................................................. 7

*Daubert v. Merrell Dow Pharms., Inc.,*
  509 U.S. 579 (1993) ................................................................................................. 3

*Hardeman v. Monsanto Co.,*
  997 F.3d 941 (9th Cir. 2021) ................................................................................. 10

*In re Lipitor (Atorvastatin Calcium) Mktg., Sales Practices & Prods. Liab. Litig.,*
  892 F.3d 624 (4th Cir. 2018) ............................................................................... 4, 9

*Poust v. Huntleigh Healthcare,*
  998 F. Supp. 478 (D.N.J. 1998) .............................................................................. 4

*In re: Roundup Prods. Liab. Litig.,*
  358 F. Supp. 3d 956 (N.D. Cal. 2019) ................................................................. 4, 9

**Other Authorities**

Federal Rule of Evidence 702 ................................................................... 1, 3, 8, 10

FRCP 26(a)(2)(B)(ii) .................................................................................................. 5

FRCP 37(c)(1) ........................................................................................................... 5

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**INTRODUCTION**

The Wave 3 Plaintiffs have designated a new specific causation expert, Dr. Ariel Teitel, who does not meet the requirements of Federal Rule of Evidence 702 or the standards this Court imposed in Pre-Trial Order 85 ("PTO 85").  Although Dr. Teitel's report contains the language "to a reasonable degree of medical certainty," his deposition testimony revealed that he does not have a basis to attribute the Plaintiff's NHL to Roundup exposure.  He made multiple clear and definitive statements about his views on the relationship between glyphosate or Roundup and Non-Hodgkin Lymphoma ("NHL") which are inherently inconsistent with a conclusion that the Plaintiff's NHL was caused by exposure to glyphosate or Roundup to a reasonable degree of medical certainly.  Further, he conducted a nearly non-existent review of the literature (including not reviewing any general causation reports).

In addition, Dr. Teitel does not mention "differential etiology" and asserts that he was only retained to determine the relative risks of rheumatoid arthritis ("RA") and Roundup as risk factors for NHL.  He does not specify exactly what his method is, but whatever it is, it does not include ruling out Plaintiff's other risk factors for NHL.  His opinion is nakedly outcome-driven.  He acknowledged a two-fold increase in risk of NHL from RA, and cannot opine even as to any certain increase in risk from NHL, but somehow finds NHL to be the main cause of Plaintiff's NHL while finding that RA was not a substantial factor.  Moreover, he did not consider or review any literature on any other risk factor for NHL, although the Plaintiff had several such risk factors.

The Court has previously described the "daunting challenge" of establishing specific causation in these cases.  This new expert does not meet that challenge, and the Court should exclude him.

**BACKGROUND**

**I.      Dr. Teitel is a New Expert to this Litigation.**

Plaintiff has disclosed specific causation expert Dr. Ariel D. Teitel, a rheumatologist.  See Declaration of Eric Lasker, Ex. 1, Teitel *Savory* Report at 1; Ex. 2, Teitel *Savory* Dep. at 10:1-3[1]. He

_____

[1]  All exhibits referenced herein are attached to the Declaration of Eric Lasker, filed contemporaneously herewith.

is not an expert in oncology or hematology. Ex. 2, Teitel *Savory* Dep. at 15:14-16, 20-22.  Other than less than two hours of research he conducted in this case, he has no experience, education or expertise in the carcinogenicity of glyphosate or any other pesticide.  *Id*. at 25:12-20. He has never published an article on NHL, risk factors or causes of NHL, or any aspect of the diagnosis, treatment or causes of NHL, including rheumatoid arthritis as a risk factor for NHL.  *Id*. at 21:3-5, 23:10-19.

**II.     Plaintiff Had Risk Factors Associated with NHL.**

As set forth at length in Monsanto's prior motion to exclude specific causation experts, (MDL ECF No. 2420), "non-Hodgkin lymphoma" ("NHL") is an umbrella term used to describe more than sixty different sub-types of cancer involving the lymphocytes, a type of white blood cell.  The various sub-types have different clinical and prognostic characteristics and often have different risk factors and causes.  However, in the vast majority of all NHL cases, the cause is unknown.

Carl Savory, a resident of ▮▮▮▮▮▮▮▮▮, was diagnosed with diffuse large B-cell lymphoma ("DLBCL") in September 2019 at the age of 64. *See* Ex. 3, *Savory* First Amended Plaintiff Fact Sheet at 4 (hereinafter "*Savory* First Amended PFS"); Ex. 4, *Savory* Trial Preservation Dep. at 44:20-24.  Mr. Savory used Roundup residentially for nearly 30 years, and his testimony is clear and unequivocal that his actual exposure was minimal (e.g., he handled concentrate when mixing as if he was working in a "biolab;" he reported only a few skin exposures which he immediately washed off, and he kept a hose nearby for the "emergency" of getting splashed.) *See* Ex. 3, *Savory* First Amended PFS at 8; Ex. 5, *Savory* Discovery Dep. at 93:12-94:14, 137:13-139:19; Ex. 4, *Savory* Trial Preservation Dep. at 42:7-20, 85:5-9.  Mr. Savory has several risk factors for NHL.  He has long-term rheumatoid arthritis (which caused him to go on permanent disability in 2005 and which experts on both sides agree at least doubles the risk of NHL). *See* Ex. 5, *Savory* Discovery Dep. at 154:17-21; Ex. 4, *Savory* Trial Preservation Dep. at 45:4-7;  Ex. 6, Braunstein *Savory* Dep. at 88:19-23.  He took the medications Xeljanz, which plaintiff's rheumatologist acknowledges has a "black box warning" for cancer, *see* Ex. 2, Teitel *Savory* Dep. at 77:8-11, and Otezla, both of which have an immunosuppressive effect. *See* Ex. 7, Reshef *Savory* Report at 4-5.  Mr. Savory also had Hepatitis C, psoriatic arthritis (another autoimmune disease), long-term use of NSAIDs, and a first-degree family history or cancer, in addition to being obese and being a heavy smoker.  *See* Ex. 3, *Savory* First

Amended PFS at 3-4; Ex. 2, Teitel *Savory* Dep. at 40:11-14, 75:13-21, 118:24-119:6; Ex. 6, Braunstein *Savory* Dep. at 73:13-75:5, 85:9-15; Ex. 5, *Savory* Discovery Dep. at 158:23-24, 170:16-171:3, 186: 6-14; Ex. 4, *Savory* Trial Preservation Dep. at 67:22-24, 98:14-99:1, 100:15-20.

III.   **Plaintiff's Expert Does Not Use Any Scientific Methodology in Forming His Specific Causation Opinions.**

Dr. Teitel uses no real scientific process to reach his opinions and strays far from any reliable methodology. In fact, there is no stated methodology. He "rules in" Roundup, while refusing to also give any weight to Mr. Savory's RA, even though he agrees that it is a well-accepted as NHL risk factor that doubles a person's risk of NHL. Other than RA, he completely ignores Mr. Savory's many other relevant NHL risk factor except Roundup, without applying the same reasoning and methodological rigor to the potential alternative causes that he applies to Roundup. This expert also ignores altogether the possibility that Plaintiff's NHL may have no identifiable cause, as would be the case where NHL is caused by a yet to be discovered factor or the result of naturally-occurring random mutations that constantly occur through normal cell division. According to Dr. Teitel, if the Plaintiff came into contact with Roundup, that fact alone automatically excludes the possibility of an idiopathic or unknown cause.

**LEGAL STANDARD**

Under Federal Rule of Evidence 702, an expert may give opinion testimony only if (a) the expert's "scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue"; (b) "the testimony is based on sufficient facts or data"; (c) "the testimony is the product of reliable principles and methods"; and (d) the expert "has reliably applied the principles and methods to the facts of the case." Fed. R. Evid. 702. In other words, an expert must be qualified and must offer testimony that is both relevant and reliable. *Id.*; *see also Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579, 589 (1993). Here, the expert's opinions should be excluded on the grounds that (1) they are not reliable, and (2) they are not helpful to the jury because the experts automatically conclude Roundup was the cause without weighing or eliminating other risk factors in any reliable manner.

In the specific causation context, Rule 702 requires experts purporting to use a differential

diagnosis to carry out both aspects of that methodology—"ruling in" all possible causes and "ruling out" all but the subject cause—in a reliable fashion.  To reach an admissible causation opinion through a reliable differential diagnosis, an expert must "accurately diagnose the nature of the disease, reliably rule in the possible causes of it, and reliably rule out the rejected causes."  *In re Aredia & Zometa Prods. Liab. Litig.*, 483 F. App'x 182, 188 (6th Cir. 2012).  Because the inherent malleability of this methodology can shroud what may be little more than subjective guesswork, the district court must "delve into the particular witness's method of performing a differential diagnosis to determine if his or her ultimate conclusions are reliable."  *Poust v. Huntleigh Healthcare*, 998 F. Supp. 478, 496 (D.N.J. 1998).  Courts have consistently held that expert opinions that pay lip service to this methodology but do not reliably apply it should be excluded.  *See, e.g.*, *In re Lipitor (Atorvastatin Calcium) Mktg., Sales Practices & Prods. Liab. Litig.*, 892 F.3d 624, 642–45 (4th Cir. 2018).  And if Plaintiff fails to present an admissible expert opinion to establish specific causation, summary judgment is appropriate.  *In re: Roundup Prods. Liab. Litig.*, 358 F. Supp. 3d 956, 957 (N.D. Cal. 2019). ("To defeat Monsanto's motion for summary judgment on this issue, the plaintiffs must present at least one admissible expert opinion to support [his] specific causation argument.").

## ARGUMENT

**I.**     **Dr. Teitel Is Not Qualified and His Opinions Are Not the Product of a Reliable Methodology.**

     **A.**     **Dr. Teitel Conducted an Insufficient Review of the Relevant Literature and Based His Opinions Primarily on the Report of Plaintiff's Exposure Expert.**

Other than the work he has performed in the *Savory* case, Dr. Teitel has no experience, education or expertise in the carcinogenicity of glyphosate or any other pesticide.  Ex. 2, Teitel *Savory* Dep. at 25: 12-20.  Prior to being retained as an expert in the Savory case, Dr. Teitel had never read a medical journal article or heard a presentation at a medical meeting where the author/speaker said that glyphosate or Roundup caused NHL. *Id.* at 26:1-7.  Dr. Teitel is simply not qualified to provide causation testimony here.

At his deposition, Dr. Teitel could not identify a single study regarding GBHs and NHL that he had reviewed prior to writing his report.  *Id*. at 13-24.  Dr. Teitel conceded that he spent "not that much time" reviewing literature on glyphosate and lymphoma. *Id*. at 65:21-66:3.  He testified that,

1   in about two hours (122 minutes), Dr. Teitel (1) conducted all of his research and completed his

2   reading about the alleged relationship between glyphosate based herbicides ("GBHs") and NHL; (2)

3   did all of his research and reading about the relationship between NHL and rheumatoid arthritis

4   ("RA") -- a form of autoimmune disease from which Mr. Savory undisputedly suffered – and (3)

5   wrote his expert report.  *Id* at. 66:4-9.  Dr. Teitel's report did not contain even one reference to a

6   study related to a potential association between glyphosate or GBHs and NHL, nor did Dr. Teitel

7   produce a list of materials considered.[2]  Ex. 1, Teitel *Savory* Report.  Finally, Dr. Teitel cannot

8   profess to have relied on Plaintiff's general causation experts in reaching his opinions, as he

9   testified that he has "never" reviewed any report, deposition transcript, or trial transcript of any of

10  Plaintiff's experts other than the report of Dr. Kendall, the specific causation and exposure expert in

11  this case.  Ex. 2, Teitel *Savory* Dep. at 72:24-73:10.

12          When asked if he reviewed the IARC monograph on glyphosate, Dr. Teitel answered that "I

13  don't know.  I may have seen it and literally glanced at it….I think it's quite possible that I glanced

14  at it as an abstract," although, at the same time, he claimed that he was relying on it "for the

15  question of glyphosate and the association with lymphoma."  Ex. 2, Teitel *Savory* Dep. 67:8-68:1.

16  He did not review any of the scientific reviews conducted by EPA or other regulatory agencies.  *Id*.

17  at 68:18-20.  He was "not aware" of the large, prospective cohort study (Andreotti) finding no

18  increased risk of NHL or its subtypes from exposure to glyphosate.  *Id*. at 171:22-172:4.  After

19  completing his report and later reviewing the report of defense expert Mark Fisher, Dr. Teitel

20  conducted an additional "five, ten minutes" of research on the topic and quickly surveyed four

21  additional documents that he had not seen previously, one of which was an article authored by

22  plaintiff's expert Dennis Weisenburger.  *Id*. at  47:9-48:22, 50:2-51:11.

23          Rather than educating himself on the actual medical literature on the potential relationship

24  between glyphosate and NHL, Dr. Teitel did read and rely on the report of plaintiff's *exposure*

25  expert, Dr. Kendall.  *See, e.g., id*. at 66:17, 66:21, 69:3, 69:5.  In fact, in response to the question of

26

---

27  [2]     FRCP 26(a)(2)(B)(ii) requires retained experts to disclose the facts or data considered in
    forming their expert opinions.  Dr. Teitel's report disclosed no facts or data which he considered in
28  forming his opinions regarding GBHs and NHL.  This failure alone is a sufficient basis to strike the
    testimony of Dr. Teitel as an expert under Rule FRCP 37(c)(1).

1   what medical literature he was referring to in his report when it stated that "I have reviewed the

2   medical literature regarding GBH and lymphoma," Dr. Teitel stated that, "Well, I more read

3   Kendall's report." *Id*. at 66:13-17. He confirmed that he was relying on the exposure expert's

4   report for "the toxicity of it and the carcinogenicity of glyphosate." *Id*. at 69:6-18.

5         Dr. Teitel's brief and cursory review of medical literature and his review of and reliance on

6   the report of plaintiff's exposure expert is not a reliable methodology for evaluating a potential

7   association between glyphosate and NHL or the relative risks of glyphosate and rheumatoid arthritis

8   to NHL. While Dr. Teitel went to medical school, he did little more than that to qualify as an expert

9   to testify about the supposed causal relationship between glyphosate and NHL. Because he is not

10  qualified, he should not be permitted to testify.

11        **B.      Dr. Teitel Only Concluded That There "Could Be" an Association Between
                  Glyphosate and NHL.**

12        During his deposition, Dr. Teitel was asked whether the medical literature he reviewed

13  convinced him that there was, in fact, an association between glyphosate and NHL. He responded

14  that, "It suggests to me that experts that are certainly much more knowledgeable than me thought

15  that there certainly could be…"[3] *Id*. at. 161:20-162:2. He then conceded that there is a "big

16  difference" between saying there "could be" and saying that "there is" an association. *Id*. at. 162:6-

17  8. He again was asked, for clarification, to which he replied, "I'm not the toxicologist, so I'm not

18  going to opine. In my view, there *could be* to the extent that more qualified professionals think that

19  there is. I'm certainly open to the toxicologists' and epidemiologists' interpretation of data that

20  suggests that *there may well be*. *Id*. at 162:9-16 (emphasis added). Thus, although Dr. Teitel is

21  unable to say to a reasonable degree of medical certainty that NHL is even associated with an

22  increased risk of NHL, he is willing to opine that Mr. Savory's exposure to glyphosate in Roundup

23  was "a substantial factor and, in my opinion, the main cause of his development of NHL." Ex. 1,

24  Teitel *Savory* Report at 4. It is conceptually impossible for Dr. Teitel to reach the conclusion with a

25  reasonable degree of medical certainty that Roundup exposure was a substantial factor in Mr.

26

27  _____

28  [3] As noted previously, Dr. Teitel reviewed no report or deposition or trial transcript of any of
    Plaintiff's general cause witnesses, so the reference to "experts that are certainly much more
    knowledgeable than me" could not be a reference to Plaintiff's general cause experts.

1    Savory's lymphoma when he cannot even say to a reasonable degree of medical certainty that

2    Roundup can cause NHL.

3    **II.     Dr. Teitel Failed to Adequately Assess Potential Alternative Causes of Plaintiff's NHL.**

4              Plaintiff's expert failed to adequately address the numerous potential causes of Plaintiff's

5    NHL other than Roundup, which is required for his opinions to be admissible.  *See Clausen v. M/V*

6    *New Carissa*, 339 F.3d 1049, 1058 (9th Cir. 2003) ("A differential diagnosis that fails to take serious

7    account of other potential causes may be so lacking that it cannot provide a reliable basis for an

8    opinion on causation.") (quoting *Westberry v. Gislaved Gummi AB*, 178 F.3d 257, 265 (4th Cir.

9    1999)); *see also* PTO 85 ("The next question is whether the experts adequately assessed all of the

10   potential causes of the plaintiffs' NHL, and properly ruled out factors other than glyphosate, while at

11   the same time declining to rule out glyphosate itself.").  The first step in a differential diagnosis is to

12   "compile a comprehensive list of hypotheses that might explain" the plaintiff's injury.  *Id.*  The Ninth

13   Circuit instructs experts to "[i]nclud[e] even rare entities in the list [to] ensure[] that such disorders

14   are not overlooked."  *Id.* (citation and quotation marks omitted).  Then, in the second step of a

15   differential diagnosis, the expert must "rule out" each of the possible causes until only the most likely

16   cause remains.  Plaintiff's experts failed to consider (or "rule in") known alternative causes altogether,

17   thus failing to satisfy step one.  Even when the expert did mention potential alternative causes, he

18   dealt with such causes so casually that it is impossible to even discern whether they ruled in a cause

19   and then ruled it out, or did not rule in the cause in the first place.

20             Regardless of which step in the differential diagnosis is involved, the expert's testimony

21   reveals that he did not seriously consider that something other than Roundup could have caused

22   Plaintiff's NHL.  Instead, he started with the conclusion that Roundup was the cause, and then sought

23   to justify that conclusion—and insulate it from scrutiny by the Court—by paying lip service to one

24   other potential causes while simply ignoring all of the others.  An expert conducting a differential

25   diagnosis "must provide reasons for rejecting alternative hypotheses 'using scientific methods and

26   procedures' and the elimination of those hypotheses must be founded on more than 'subjective beliefs

27   or unsupported speculation.'"  *Clausen*, 339 F.3d at 1058 (quoting *Claar v. Burlington N. R.R. Co.*,

28   29 F.3d 499, 502 (9th Cir. 1994)).  Plaintiff's expert has failed to do so here, and instead has engaged

in a flawed, results-driven "always Roundup" methodology—precisely the type of unreliable approach that Rule 702 prohibits.

### A. Dr. Teitel Acknowledged the Significant Increased Risk of NHL from RA and Has No Basis to Rule it Out.

In his report, Dr. Teitel acknowledges that RA, and particularly severe RA, increase the risk of NHL. He cites medical literature to establish that (1) "It is known that patients with RA are at increased risk of malignancies, including NHL;" (2) "The risk is approximately two fold that of age and risk matched controls;" and (3) The risk of lymphoma for RA patients is correlated with the level of disease activity. More severe RA confers higher risk." Ex. 1, Teitel *Savory* Report at 3. Despite all of these foundational concessions about RA and the corresponding risk of NHL-- a relationship that has been recognized by the medical community for decades -- Dr. Teitel simply asserts the unsubstantiated conclusion that Mr. Savory's RA was not a significant contributing factor in his NHL and, rather, his glyphosate exposure was the cause.

Dr. Teitel's approach is methodologically bankrupt. Although Dr. Teitel has a minimalist view about the length of time for which Mr. Savory had "severe" RA, he admits that all RA patients have an increased risk of NHL. *Id*. And although Dr. Teitel concedes that the risk is increased, he is not able to quantify the extent to which Mr. Savory's risk of NHL was increased on account of his RA. Ex. 2, Teitel *Savory* Dep. at 159:16-19. By contrast, although Dr. Teitel cannot even say that, to a reasonable degree of medical certainty, exposure to Roundup in general increases the risk for NHL (see *supra*), by opining that Mr. Savory's NHL is due to his Roundup exposure and not to his RA, Dr. Teitel is implicitly making a quantitative comparison of the risks – without any basis or methodology whatsoever.

### B. Dr. Teitel Did Not Address Any of Mr. Savory's Risk Factors Other Than RA and Exposure to Glyphosate.

Dr. Teitel makes clear in his report that he was only retained to look at whether Mr. Savory's NHL was "more likely due" to his exposure to Roundup or to his chronic RA. Ex. 1, Teitel *Savory* Report at 1. He was not retained to review all of Mr. Savory's risk factors and determine which might have caused or contributed to his NHL. *Id*. Dr. Teitel confirmed that he

knew of Carl Savory's many other risk factors for NHL, but did not do any research on them, review any articles on them, or mention them in his report.  He confirmed that Mr. Savory took Xeljanz and that Xeljanz has a "black box warning" for "cancer and heart issues," but he did no literature search and read no articles about the potential association between Xeljanz and NHL, nor did he mention it in his report.  Ex. 2, Teitel *Savory* Dep. at 77:4-21.  He knew that Mr. Savory had psoriatic arthritis and that there was some literature associating psoriatic arthritis and NHL, but he "did not at all" look into this association in connection with the *Savory* case.  *Id*. at 74:2-19, 127:17-131:5.  He knew of Mr. Savory's history of Hepatitis C and use of NSAIDs, but did no literature search and looked at no publications or textbooks on the relationship between these and NHL, nor did he mention them in his report.  *Id*. at 74:2-19, 75:5-21, 76:6-9.  He knew of Mr. Savory's obesity, but did not research the relationship between obesity and NHL and did not mention obesity in his report.  *Id*. at 117:17, 119:22-25.  He knew of the reports that Mr. Savory was an "every day smoker," but did not mention this in his report.  *Id*. at 112:1-4.

*              *              *

Taken as a whole, this expert's reasoning closely tracks that of the experts excluded in *Lipitor*, whose conclusions "focused almost exclusively on the fact that [the plaintiff] took the drug and later developed the disease, rather than explaining what led her to believe that it was a substantial contributing factor as compared to other possible causes."  892 F.3d at 645.  Here, as in *Lipitor*, the expert's report simply "dismiss[es] other possible causes in favor of [Roundup] in a cursory fashion that appeared closer to an *ipse dixit* than a reasoned scientific analysis," *id*, while completely ignoring other factors.  The Court should exclude this expert's opinion on that basis.

### III.  Plaintiff's Expert Has Not Reliably Ruled Out Unknown Causes of Plaintiff's NHL and Instead Always Point to Roundup.

Just as he fails to engage with the known alternative risk factors confronting Plaintiff, this expert takes an equally unscientific and dismissive approach to the idiopathic causes responsible for most NHL cases:  he simply ignores the prospect.  This Court has already acknowledged that because the vast majority of NHL cases have no identifiable cause, an expert's specific causation opinion is inadmissible if it fails to account for or adequately grapple with idiopathy.  *In re: Roundup*, 358 F.

1   Supp. 3d at 959.  To be admissible "an expert must have a way to differentiate Roundup users who

2   developed NHL because they used the product from Roundup users who would have developed NHL

3   regardless." *Id.*  Dr. Teitelis unable to offer any reliable method for placing Plaintiff in one category

4   and not the other, and thus any such testimony cannot possibly be helpful to a jury tasked with that

5   very assessment.   Indeed, unlike prior experts, which the Ninth Circuit concluded adequately

6   accounted for idiopathy, *see Hardeman v. Monsanto Co.*, 997 F.3d 941, 966-67 (9th Cir. 2021),

7   Plaintiff's expert in this cases does not "rel[y] heavily on the plaintiffs' exposure levels in drawing

8   their conclusions."  PTO 85 at 6.  Rather, he engages in an "always Roundup" methodology that

9   determines Roundup to be the cause no matter the exposure.  But, as this Court made clear in

10  discussing idiopathy, exposure alone is not enough.

11                                  **CONCLUSION**

12          For the foregoing reasons, the Court should grant Monsanto's motion to exclude these specific

13  causation experts on Rule 702 grounds.

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

- 10 -

1

2

Dated:  September 22, 2021

By:  _/s/ Eric G. Lasker_

3

4

Eric G. Lasker (*pro hac vice*)
(elasker@hollingsworthllp.com)
Hollingsworth LLP
1350 I St. NW
Washington, DC 20005
Tel: 202-898-5843

5

6

7

8

Attorney for Defendant Monsanto Company

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

**CERTIFICATE OF SERVICE**

I HEREBY CERTIFY that on this 22nd day of September, 2021, a copy of the foregoing was filed with the Clerk of the Court through the CM/ECF system which sent notice of the filing to all appearing parties of record.

_/s/ Eric G. Lasker_