**WILKINSON STEKLOFF LLP**
Brian L. Stekloff (*pro hac vice*)
(bstekloff@wilkinsonstekloff.com)
Rakesh Kilaru (*pro hac vice*)
(rkilaru@wilkinsonstekloff.com)
2001 M St. NW
10th Floor
Washington, DC 20036
Tel: 202-847-4030
Fax: 202-847-4005

**HOLLINGSWORTH LLP**
Eric G. Lasker (*pro hac vice*)
(elasker@hollingsworthllp.com)
1350 I St. NW
Washington, DC 20005
Tel: 202-898-5843
Fax: 202-682-1639

*Attorneys for Defendant*
*MONSANTO COMPANY*

**COVINGTON & BURLING LLP**
Michael X. Imbroscio (*pro hac vice*)
(mimbroscio@cov.com)
One City Center
850 10th St. NW
Washington, DC 20001
Tel: 202-662-6000

**BRYAN CAVE LEIGHTON PAISNER LLP**
K. Lee Marshall (CA Bar No. 277092)
(klmarshall@bclplaw.com)
Three Embarcadero Center, 7th Floor
San Francisco, CA 94111
Tel: 415-675-3400
Fax: 415-675-3434

Jed P. White (CA Bar No. 2392339)
(jed.white@bclplaw.com)
120 Broadway, Suite 300
Santa Monica, CA 90401
Tel: 310-576-2100
Fax: 310 -576-2200

**UNITED STATES DISTRICT COURT**

**NORTHERN DISTRICT OF CALIFORNIA**

| IN RE: ROUNDUP PRODUCTS LIABILITY LITIGATION<br>________________________<br>*Carl and Karen Savory, husband and wife* v. Monsanto Company<br>Case No. 3:20-cv-02403 | MDL No. 2741<br><br>Case No.: 3:16-md-02741-VC<br><br>**DEFENDANT MONSANTO COMPANY'S NOTICE OF MOTION AND MOTION TO EXCLUDE TESTIMONY OF PLAINTIFF'S EXPERT MARC BRAUNSTEIN ON RULE 702 GROUNDS**<br><br>Hearing date: 12/13/21<br>Time: TBD |
|---|---|

**TO THE COURT, ALL PARTIES, AND THEIR ATTORNEYS OF RECORD:**

**PLEASE TAKE NOTICE THAT** beginning on December 13, 2021 in Courtroom 4 of the United States District Court, Northern District of California, located at 450 Golden Gate Avenue, San Francisco, CA 94102, or as ordered by the Court, Defendant Monsanto Company ("Monsanto") will present its Motion to Exclude Testimony of Dr. Marc Braunstein. Monsanto seeks an order excluding opinions of this witness under Federal Rule of Evidence 702.

DATED: September 22, 2021

Respectfully submitted,

*/s/ Eric G. Lasker*

Eric G. Lasker (*pro hac vice*)
(elasker@hollingsworthllp.com)
Hollingsworth LLP
1350 I St. NW
Washington, DC 20005
Tel: 202-898-5843

**TABLE OF CONTENTS**


INTRODUCTION ..... 1

BACKGROUND ..... 1

I. Dr. Braunstein's Background ..... 1

II. Plaintiff Had Risk Factors Associated with NHL. ..... 2

III. Plaintiff's Expert Does Not Use Any Scientific Methodology in Forming His Specific Causation Opinions ..... 3

LEGAL STANDARD ..... 3

ARGUMENT ..... 4

I. Dr. Braunstein's Opinions Are Not the Product of a Reliable Methodology. ..... 4

A. Dr. Braunstein's Deposition Testimony is Inconsistent with an Opinion of Causation to a Reasonable Degree of Medical Certainty ..... 4

IV. Dr. Braunstein Failed to Adequately Assess Potential Alternative Causes of Plaintiff's NHL. ..... 5

A. Dr. Braunstein Did Not Adequately Consider All of Mr. Savory's Risk Factors, Did Not Consistently Evaluate Risk Factors, and Admitted That Some Risk Factors Cannot be Ruled Out ..... 6

V. Dr. Braunstein Has Not Reliably Ruled Out Unknown Causes of Plaintiff's NHL and Instead Always Point to Roundup. ..... 8

CONCLUSION ..... 9

**TABLE OF AUTHORITIES**

**Page(s)**

**Cases**

*In re Aredia & Zometa Prods. Liab. Litig.*, 483 F. App'x 182 (6th Cir. 2012) .......... 4

*Clausen v. M/V New Carissa*, 339 F.3d 1049 (9th Cir. 2003).......... 5, 6

*Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579 (1993).......... 4

*Hardeman v. Monsanto Co.*, 997 F.3d 941 (9th Cir. 2021).......... 9

*In re Lipitor (Atorvastatin Calcium) Mktg., Sales Pracs. & Prods. Liab. Litig.*, 892 F.3d 624 (4th Cir. 2018).......... 4, 8

*Poust v. Huntleigh Healthcare*, 998 F. Supp. 478 (D.N.J. 1998) .......... 4

*In re: Roundup Prods. Liab. Litig.*, 358 F. Supp. 3d 956 (N.D. Cal. 2019) .......... 4, 9

**Other Authorities**

Federal Rule of Evidence 702 .......... *passim*

## INTRODUCTION

This Wave 3 Plaintiff has designated a new specific causation expert, Dr. Marc Braunstein, who does not meet the requirements of Federal Rule of Evidence 702 or the standards this Court imposed in Pre-Trial Order 85 ("PTO 85"). Although his report contains language "to a reasonable degree of medical certainty," his deposition testimony revealed that he does not have a basis to attribute the Plaintiff's NHL to Roundup exposure. He made multiple clear and definitive statements about his views on the relationship between glyphosate or Roundup and NHL which are inherently inconsistent with a conclusion that the Plaintiff's NHL was caused by exposure to glyphosate or Roundup to a reasonable degree of medical certainly.

In addition, he does not mention "differential etiology," perhaps in an effort to circumvent the Court's standards in PTO 85. He does not specify exactly what his method is, but whatever it is, it does not include ruling out Plaintiff's other risk factors for NHL. What has not changed is that this expert continues to be nakedly outcome-driven. He considers Roundup based on the same flawed studies the general causation experts rely on without accounting for the Plaintiff's specific NHL sub-type. But even setting that deficiency aside, he offers no coherent, defensible principle undergirding his specific causation opinions and has offered deposition testimony which in inconsistent with his conclusions. With respect to Plaintiff, he ultimately acknowledges that he cannot rule out significant risk factors for NHL, while with respect to other risk factors, he simply agrees that he did no research on the topic or was unaware that it was a risk factor.

The Court has previously described the "daunting challenge" of establishing specific causation in these cases. Dr. Braunstein does not meet that challenge, and the Court should exclude him.

## BACKGROUND

### I. Dr. Braunstein's Background

Plaintiff has disclosed specific causation expert Dr. Marc Braunstein, a hematologist and oncologist. *See* Declaration of Eric Lasker, Ex. 1, Braunstein *Thomas* Dep. at 32:22-24[1]. Other than

[1] All exhibits referenced herein are attached to the Declaration of Eric Lasker, filed contemporaneously herewith.

the reading that he has done in connection with his work as a litigation expert in the Roundup cases, he has no experience, education or expertise in the carcinogenicity of glyphosate or Roundup. *Id*. at 50:4-8. He has never designed or conducted an epidemiologic study, animal carcinogenicity study, or genotoxicity study on Roundup or glyphosate. *Id.* at 42:22-43:1, 43:12-15; 48:4-7, 48:20-23. In his own practice, he has never told a patient that Roundup was the cause of his or her lymphoma, even since becoming involved in the Roundup cases. *Id*. at 42:4-12. He has never published an article about any aspect of the diagnosis or treatment of Non-Hodgkin's Lymphoma ("NHL"), including risk factors or causes of NHL or diffuse large B-cell lymphoma ("DLBCL"). *Id*. at 42:13-21.

**II. Plaintiff Had Risk Factors Associated with NHL.**

As set forth at length in Monsanto's prior motion to exclude specific causation experts, (MDL ECF No. 2420), "non-Hodgkin lymphoma" ("NHL") is an umbrella term used to describe more than sixty different sub-types of cancer involving the lymphocytes, a type of white blood cell. The various sub-types have different clinical and prognostic characteristics and often have different risk factors and causes. However, in the vast majority of all NHL cases, the cause is unknown.

Carl Savory, a resident of [REDACTED], was diagnosed with diffuse large B-cell lymphoma ("DLBCL") in September 2019 at the age of 64. *See* Ex. 2, *Savory* First Amended Plaintiff Fact Sheet at 4 ("*Savory* First Amended PFS"); Ex. 3, *Savory* Trial Preservation Dep. at 44:20-24. Mr. Savory used Roundup residentially for nearly 30 years, and his testimony is clear and unequivocal that his actual exposure was minimal (e.g., he handled concentrate when mixing as if he was working in a "biolab;" he reported only a few skin exposures which he immediately washed off, and he kept a hose nearby for the "emergency" of getting splashed.) *See* Ex. 2, *Savory* First Amended PFS at 8; Ex.4, *Savory* Discovery Dep. at 93:12-94:14, 137:13-139:19; Ex. 3, *Savory* Trial Preservation Dep. at 42:7-20, 85:5-9. Mr. Savory has several risk factors for NHL. He has long-term rheumatoid arthritis (RA; which caused him to go on permanent disability in 2005 and which experts on both sides agree at least doubles the risk of NHL). *See* Ex. 4, *Savory* Discovery Dep. at 154:17-21; Ex. 3, *Savory* Trial Preservation Dep. at 45:4-7. Ex. 5 Braunstein *Savory* Dep. at 88:19-23. He took the medications Xeljanz, which plaintiff's rheumatologist

acknowledges has a "black box warning" for cancer, *see* Ex. 6, Teitel *Savory* Dep. at 77:8-11, and Otezla, both of which have an immunosuppressive effect. *See* Ex. 7, Reshef *Savory* Report at 4-5. Mr. Savory also had Hepatitis C, psoriatic arthritis (another autoimmune disease), long-term use of NSAIDs, and a first-degree family history or cancer, in addition to being obese and being a heavy smoker. *See* Ex. 2, *Savory* First Amended PFS at 3-4; Ex. 6, Teitel *Savory* Dep. at 40:11-14, 75:13-21, 118:24-119:6; Ex. 5, Braunstein *Savory* Dep. at 73:13-75:5, 85:9-15; Ex. 4, *Savory* Discovery Dep. at 158:23-24, 170:16-171:3, 186: 6-14; Ex. 3, *Savory* Trial Preservation Dep. at 67:22-24, 98:14-99:1, 100:15-20.

**III. Plaintiff's Expert Does Not Use Any Scientific Methodology in Forming His Specific Causation Opinions**

Dr. Braunstein uses no real scientific process to reach his opinions and strays far from any reliable methodology. In fact, there is no stated methodology. He "rules in" Roundup, while refusing to also give any weight other known NHL risk factors, even those he agrees are widely accepted as NHL risk factors. He ignores or purports to rule out every other relevant NHL risk factor except Roundup, without applying the same reasoning and methodological rigor to the potential alternative causes that he applies to Roundup. And, despite acknowledging that the cause of most NHL cannot be established, throughout his analyses, he ignores altogether the possibility that Plaintiff's NHL may have no identifiable cause, as would be the case where NHL is caused by a yet to be discovered factor or the result of naturally-occurring random mutations that constantly occur through normal cell division. According to Dr. Braunstein, if the Plaintiff came into contact with Roundup, that fact alone automatically excludes the possibility of an idiopathic or unknown cause.

**LEGAL STANDARD**

Under Federal Rule of Evidence 702, an expert may give opinion testimony only if (a) the expert's "scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue"; (b) "the testimony is based on sufficient facts or data"; (c) "the testimony is the product of reliable principles and methods"; and (d) the expert "has reliably applied the principles and methods to the facts of the case." Fed. R. Evid. 702. In other words, an expert must be qualified and must offer testimony that is both relevant and reliable. *Id.*; *see also*

*Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579, 589 (1993). Here, the expert's opinions should be excluded on the grounds that (1) they are not reliable, and (2) they are not helpful to the jury because the experts automatically conclude Roundup was the cause without weighing or eliminating other risk factors in any reliable manner.

In the specific causation context, Rule 702 requires experts purporting to use a differential diagnosis to carry out both aspects of that methodology—"ruling in" all possible causes and "ruling out" all but the subject cause—in a reliable fashion. To reach an admissible causation opinion through a reliable differential diagnosis, an expert must "accurately diagnose the nature of the disease, reliably rule in the possible causes of it, and reliably rule out the rejected causes." *In re Aredia & Zometa Prods. Liab. Litig.*, 483 F. App'x 182, 188 (6th Cir. 2012). Because the inherent malleability of this methodology can shroud what may be little more than subjective guesswork, the district court must "delve into the particular witness's method of performing a differential diagnosis to determine if his or her ultimate conclusions are reliable." *Poust v. Huntleigh Healthcare*, 998 F. Supp. 478, 496 (D.N.J. 1998). Courts have consistently held that expert opinions that pay lip service to this methodology but do not reliably apply it should be excluded. *See, e.g., In re Lipitor (Atorvastatin Calcium) Mktg., Sales Pracs. & Prods. Liab. Litig*., 892 F.3d 624, 642–45 (4th Cir. 2018). And if Plaintiff fails to present an admissible expert opinion to establish specific causation, summary judgment is appropriate. *In re: Roundup Prods. Liab. Litig.*, 358 F. Supp. 3d 956, 957 (N.D. Cal. 2019). ("To defeat Monsanto's motion for summary judgment on this issue, the plaintiffs must present at least one admissible expert opinion to support [his] specific causation argument.").

## ARGUMENT

### I. Dr. Braunstein's Opinions Are Not the Product of a Reliable Methodology.

#### A. Dr. Braunstein's Deposition Testimony is Inconsistent with an Opinion of Causation to a Reasonable Degree of Medical Certainty

While Dr. Braunstein repeatedly "defers to general causation experts" in his report, he concludes that "to a reasonable degree of medical certainty that Mr. Savory's aggressive NHL was caused by his Roundup exposure." Ex. 8, Braunstein *Savory* Report at 14. However, during his deposition, he admits that:

- "The literature is not definitive on" whether glyphosate causes NHL;
- "I would concede that there is debate in the field [of medicine] and in the world about the status of glyphosate as a carcinogen;" and
- Reasonable scientific minds "do" differ about whether glyphosate can cause NHL.

Ex. 1, Braunstein *Thomas* Dep. at 180:2-24; 181:19-23.

Additionally, at his deposition, Dr. Braunstein agreed that the medical literature consistently showed no relationship between Roundup and NHL when the data was adjusted for other pesticides. He agreed that, of the six studies included in Table 1 of his report, five and a half of them showed either (a) no statistically significant increase in risk of NHL for ever users of glyphosate or (b) no statistically significant increase in the risk of NHL for ever users of glyphosate when the data was adjusted for other pesticides. Ex. 5, Braunstein *Savory* Dep. at 227:13-14. Similarly, he agreed that both the Pahwa study and the 2019 North American Pooled Project showed no statistically significant increase in NHL or any subtype of NHL with ever use of glyphosate when adjusted for other pesticides. Id. at 228:10-12, 231:8-12, 233:24-234:14, 235:16-236:19.

His statements regarding the lack of definitiveness of the literature, the lack of consensus in the medical community, and the consistent findings of no increased risk across nearly all studies when including cases where the data was adjusted for other pesticide use are inconsistent with his conclusion that glyphosate use caused Mr. Savory's NHL to a reasonable degree of medical certainty.

## IV. Dr. Braunstein Failed to Adequately Assess Potential Alternative Causes of Plaintiff's NHL.

Dr. Braunstein also failed to adequately address the numerous potential causes of Plaintiff's NHL other than Roundup, which is required for his opinions to be admissible. *See Clausen v. M/V New Carissa*, 339 F.3d 1049, 1058 (9th Cir. 2003) ("A differential diagnosis that fails to take serious account of other potential causes may be so lacking that it cannot provide a reliable basis for an opinion on causation.") (quoting *Westberry v. Gislaved Gummi AB,* 178 F.3d 257, 265 (4th Cir. 1999)); *see also* PTO 85 ("The next question is whether the experts adequately assessed all of the potential causes of the plaintiffs' NHL, and properly ruled out factors other than glyphosate, while at

the same time declining to rule out glyphosate itself.”). The first step in a differential diagnosis is to “compile a comprehensive list of hypotheses that might explain” the plaintiff's injury. *Id.* The Ninth Circuit instructs experts to “[i]nclud[e] even rare entities in the list [to] ensure[] that such disorders are not overlooked.” *Id.* (citation and quotation marks omitted). Then, in the second step of a differential diagnosis, the expert must “rule out” each of the possible causes until only the most likely cause remains. Dr. Braunstein failed to consider (or “rule in”) known alternative causes altogether, thus failing to satisfy step one. Even when he did mention potential alternative causes, he dealt with such causes so casually that it is impossible to even discern whether he ruled in a cause and then ruled it out, or did not rule it in the cause in the first place.

Regardless of which step in the differential diagnosis is involved, Dr. Braunstein's testimony reveals that he did not seriously consider that something other than Roundup could have caused Plaintiff's NHL. Instead, he started with the conclusion that Roundup was the cause, and then sought to justify that conclusion—and insulate it from scrutiny by the Court—by paying lip service to other potential causes. An expert conducting a differential diagnosis “must provide reasons for rejecting alternative hypotheses ‘using scientific methods and procedures’ and the elimination of those hypotheses must be founded on more than ‘subjective beliefs or unsupported speculation.’” *Clausen*, 339 F.3d at 1058 (quoting *Claar v. Burlington N. R.R. Co.*, 29 F.3d 499, 502 (9th Cir. 1994)). Plaintiff's expert has failed to do so here, and instead has engaged in a flawed, results-driven “always Roundup” methodology—precisely the type of unreliable approach that Rule 702 prohibits.

### A. Dr. Braunstein Did Not Adequately Consider All of Mr. Savory's Risk Factors, Did Not Consistently Evaluate Risk Factors, and Admitted That Some Risk Factors Cannot be Ruled Out

There are numerous risk factors that Dr. Braunstein did not even consider with respect to Mr. Savory. With respect to some of these risk factors, such as psoriatic arthritis and NSAID use, Dr. Braunstein simply was “not aware” or “not sure” whether there was an association with NHL and so did not consider them as risk factors in the development of Mr. Savory's NHL. Ex. 1, Braunstein *Thomas* Dep. at 77:15-17; 82:7-11. With respect to immunosuppressants, he mentioned them generally in his report as risk factors for NHL, but did not address them with respect to Mr. Savory. *See* Ex. 8, Braunstein *Savory* Report at 9. However, he testified at deposition that he

"didn't specifically consider" Xeljanz, an immunosuppressant used by Mr. Savory (with a black box warning for cancer), nor did his report mention Mr. Savory's use of Otezla. Ex. 5, Braunstein *Savory* Dep. at 77:8-11; 91:12-16. With respect to still other risk factors, such as first-degree family relative with cancer, he acknowledged that "there's literature that exists, yes," but he did not consider that as risk factor. *Id.* at 90:8-20.

Dr. Braunstein's report did consider the risk factors of obesity, Hepatitis C, and RA. Ex. 8, Braunstein *Savory* report at 9-10. With respect to all three, though, Dr. Braunstein ruled them out in his report, but admitted during his deposition that he could not in fact completely rule them out. With respect to Hepatitis C, Dr. Braunstein excluded it primarily because Mr. Savory's Hepatitis C was not active at the time of diagnosis. *Id.* at 9-10. However, at his deposition, he said that was "not sure" what the latency period was between exposure to Hepatitis C and NHL, that he had no idea how long Mr. Savory had Hepatitis C, and that he could have suffered with Hepatitis C for over a decade. Ex. 5, Braunstein *Savory* Dep. at 89:20-90:21. When asked whether Hepatitis C could be excluded for Mr. Savory because of the time between his active Hepatitis C and his NHL diagnosis, Dr. Braunstein responded, "I would say that if you don't know the latency [which he did not], then you wouldn't be able to judge that." *Id*. at 90:22-91:10. With respect to obesity, Dr. Braunstein's report notes that "several studies have found a significant positive association between obesity and NHL risk, whereas others reported no association…" Ex. 8, Braunstein *Savory* Report at 9. Nonetheless, he discounted that risk factor in his report because certain studies related specifically to DLBCL linked the association to a higher body mass index (BMI) than that of Mr. Savory. *Id*. However, in his deposition, when asked if he is able to exclude obesity as a contributing factor to Mr. Savory's NHL, he answered "I don't think we can exclude it entirely…I agree with the studies we looked at yesterday defined obesity as it is with a BMI over 30, so it can't be a hundred percent excluded." Ex. 5, Braunstein *Savory* Dep. at 79:13-22.

Finally, Dr. Braunstein called RA one of the two most common autoimmune diseases that he regarded as being risk factors for NHL. *Id.* at 77:7-12. He indicated in his report that "studies suggest a two-fold increase in lymphoma with RA" and testified that RA is not associated with a "particular type" of NHL. Ex. 8, Braunstein *Savory* Report at 10; Ex. 5, Braunstein *Savory Dep.* at

77:18-78:2. He conceded during his deposition that "there is no test" to determine whether RA was a contributing factor, "so it can't be entirely excluded." *Id.* at 89:4-10.

Further, Dr. Braunstein once again demonstrates his lack of a reliable methodology when he assesses the risk factors of Roundup and RA. Despite admitting that (a) RA is one of the two most common autoimmune diseases regarded as risk factors for NHL, (b) that literature suggests a two-fold increase in the risk of lymphoma with RA, and (c) that there is a general association rather than an association with a specific type of NHL, he tries to discount this factor by referring to inconsistent study results pertaining to DLBCL in particular. Ex. 8, Braunstein *Savory* Report at 10. In contrast, when he discusses NHL, he refers to a single case control study showing "a significant two-fold increase" for DLBCL and glosses over the huge disparities in test results among case control studies adjusted or not adjusted for other pesticides, the entire large body of AHS data showing no increase in NHL, the numerous EPA analyses that determined that glyphosate is not carcinogenic, the admitted lack of consensus in the medical profession, and the admitted lack of definitive literature supporting the association between Roundup and NHL *Id*. at 12.

Despite the conclusions in his report, Dr. Braunstein did not even consider many of Mr. Savory's risk factors and agreed that three of the four risk factors that he considered and rejected cannot be ruled out.

* * *

Taken as a whole, Dr. Braunstein's reasoning closely tracks that of the experts excluded in *Lipitor*, whose conclusions "focused almost exclusively on the fact that [the plaintiff] took the drug and later developed the disease, rather than explaining what led her to believe that it was a substantial contributing factor as compared to other possible causes." *Lipitor*, 892 F.3d at 645. Here, as in *Lipitor*, the expert's report simply "dismiss[es] other possible causes in favor of [Roundup] in a cursory fashion that appeared closer to an *ipse dixit* than a reasoned scientific analysis." *Id.* The Court should exclude Dr. Braunstein's opinion on that basis.

**V. Dr. Braunstein Has Not Reliably Ruled Out Unknown Causes of Plaintiff's NHL and Instead Always Point to Roundup.**

Just as he failed to engage with the known alternative risk factors confronting Plaintiff, this

expert takes an equally unscientific and dismissive approach to the idiopathic causes responsible for most NHL cases: he simply ignores the prospect. Dr. Braunstein admits that for "the majority of cases you're not able to" identify the specific cause for non-Hodgkin's lymphoma. *See, e.g.*, Ex. 1, Braunstein *Thomas* Dep. at 41:21–42:3, but does not actually consider that possibility.

This Court has already acknowledged that because the vast majority of NHL cases have no identifiable cause, an expert's specific causation opinion is inadmissible if it fails to account for or adequately grapple with idiopathy. *In re: Roundup*, 358 F. Supp. 3d at 959. To be admissible "an expert must have a way to differentiate Roundup users who developed NHL because they used the product from Roundup users who would have developed NHL regardless." *Id.* Dr. Braunstein is unable to offer any reliable method for placing Plaintiff in one category and not the other, and thus any such testimony cannot possibly be helpful to a jury tasked with that very assessment. Indeed, unlike prior experts, which the Ninth Circuit concluded adequately accounted for idiopathy, *see Hardeman v. Monsanto Co.*, 997 F.3d 941, 966-67 (9th Cir. 2021), Dr. Braunstein does not "rel[y] heavily on the plaintiffs' exposure levels in drawing their conclusions." PTO 85 at 6. Rather, he engages in an "always Roundup" methodology that determines Roundup to be the cause no matter the exposure. But, as this Court made clear in discussing idiopathy, exposure alone is not enough.

**CONCLUSION**

For the foregoing reasons, the Court should grant Monsanto's motion to exclude this specific causation expert on Rule 702 and *Daubert* grounds.

Dated: September 22, 2021

By: */s/ Eric G. Lasker*

Eric G. Lasker (*pro hac vice*)
(elasker@hollingsworthllp.com)
Hollingsworth LLP
1350 I St. NW
Washington, DC 20005
Tel: 202-898-5843

Attorney for Defendant Monsanto Company

**CERTIFICATE OF SERVICE**

I HEREBY CERTIFY that on this 22nd day of September, 2021, a copy of the foregoing was filed with the Clerk of the Court through the CM/ECF system which sent notice of the filing to all appearing parties of record.

*/s/ Eric G. Lasker*