# EXHIBIT 1

Sanford R. Katz, M.D.

1               UNITED STATES DISTRICT COURT

2             NORTHERN DISTRICT OF CALIFORNIA

3

4    IN RE: ROUNDUP PRODUCTS          CASE NO. MDL NO.

     LIABILITY LITIGATION             3:16-MD-02741-VC

5

6    BLAIR, ET AL                     MDL NO. 2741

7    VERSUS                           CASE NO.

                                      3:19-CV-07984-VC

8    MONSANTO COMPANY

9

10           Videoconference videotaped deposition of

11   SANFORD R. KATZ, M.D., taken on Wednesday, the 7th

12   day of July 2021 commencing at 1:06 p.m.

13

14

15

16

17

18

19

20

21

22   REPORTED BY:

23        SHARI PECK

          CERTIFIED COURT REPORTER

24

25

1   APPEARANCES OF COUNSEL:

2

3   FOR THE PLAINTIFF, JOSEPH BLAIR:

4        WINCHELL & JOSEPH

5        (BY:  CURTIS RAY JOSEPH, JR., ESQUIRE)

6        2124 FAIRFIELD AVENUE

7        SHREVEPORT, LOUISIANA  71104

8        CURTIS@WJLAWFIRM.NET

9

10

11   FOR THE DEFENDANT, ROUNDUP:

12        THE PIORKOWSKI LAW FIRM, PC

13        (BY:  JOSEPH D. PIORKOWSKI, JR., ESQUIRE)

14        1800 K STREET, NW  SUITE 1000

15        WASHINGTON, DC  20006

16        JPIORKOWSKI@LAWDOC1.COM

17

18

19

20        ALSO PRESENT:

21        ANNE HOVIR-THE PIORKOWSKI LAW FIRM

22

23

24

25

Sanford R. Katz, M.D.

```
 1                I N D E X

 2                                  PAGE

 3

 4   Title.....................................1

 5   Appearances...............................2

 6   Index.....................................3

 7   Stipulation...............................4

 8

 9   EXAMINATION BY MR. PIORKOWSKI.............5

10

11                   EXHIBITS

12   EXHIBIT 1 (NOD)...........................

13   EXHIBIT 2 (KATZ DOCS.)....................34

14   EXHIBIT 3 (Initial Consult doc.)..........54

15   EXHIBIT 4 (Follow-up doc.)................54

16   EXHIBIT 5 (Affidavit)....................54

17   EXHIBIT 6 (Report).......................54

18   EXHIBIT 7 (invoice)......................54

19   EXHIBIT 8 (records)......................56

20   EXHIBIT 9 ...............................78

21   EXHIBIT 10 (Castille paper)..............86

22   EXHIBIT 11 (LETTER)......................94

23

24

25
```

Sanford R. Katz, M.D.

```
 1                  S T I P U L A T I O N

 2        IT IS STIPULATED AND AGREED by and between

 3   counsel the videotaped deposition of SANFORD R.

 4   KATZ, M.D., is hereby being taken under the Federal

 5   Rules of Civil Procedure 30 for all purposes

 6   permitted under the law.

 7        That the formalities of reading and signing are

 8   specifically not waived;

 9         That the formalities of sealing, certification

10   and filing are hereby waived; the party responsible

11   for services of the discovery material shall retain

12   the original;

13        That all objections, except those as to the form

14   of the questions and/or the responsiveness of the

15   answers, are hereby reserved until the time as this

16   deposition, or any part thereof, may be used or

17   sought to be used in evidence.

18

19

20                    *   *   *   *   *

21

22        SHARI PECK, Certified Court Reporter, in and for

23   the State of Louisiana, officiated in administering

24   the oath to the witness.

25
```

Sanford R. Katz, M.D.

```
 1                SANFORD R. KATZ, M.D.

 2                2600 Kings Highway

 3             Shreveport, Louisiana  71103,

 4     after having been first duly sworn by the

 5     above-mentioned Court Reporter, did testify as

 6     follows:

 7               THE VIDEOGRAPHER:

 8               We are now on the record.  My name is

 9          Meghan Etines.  I'm the videographer for Golkow

10          Litigation Services.  Today's date is July 7th,

11          2021.  And the time is 1:06 p.m.  This remote

12          deposition is being held in the matter of the

13          Roundup Liability Litigation for the United

14          States District Court Northern District of

15          California.  The deponent is Dr. Sanford Katz.

16          All parties to the deposition are appearing

17          remotely and have agreed to witness being sworn

18          in remotely.  Due to the nature of remote

19          reporting, please pause briefly before speaking

20          to make sure all parties are heard completely.

21          Will counsel please identify yourselves for the

22          record.

23               MR. PIORKOWSKI:

24               My name is Joseph Piorkowski.  I'm counsel

25          for Roundup.
```

Sanford K. Katz, M.D.

```
 1              MS. HOVIS:
 2              I'm Ann Hovis.  I'm counsel in the
 3         Piorkowski Law Firm.
 4              MR. JOSEPH:
 5              Curtis Joseph, counsel for Joseph Blair.
 6              THE VIDEOGRAPHER:
 7              The court reporter is Shari Peck.
 8              Will you now swear in the witness.
 9                        (Whereupon, the witness was
10                        sworn in.)
11    EXAMINATION BY MR. PIORKOWSKI:
12         Q    Good morning, Dr. Katz, how are you?
13         A    Good morning.
14         Q    Before we get started, I understand you
15    have a hard time limit today; is that right?
16         A    Yes.  I'm blocked out until 4:00 this
17    afternoon.
18         Q    We'll try to get done what we can get
19    done.  I'm not 100 percent sure we will be able to
20    finish today with all the things about your record
21    but we'll make our best effort.  Will you introduce
22    yourself.  Since this videotape could potentially be
23    played to a jury, could you just briefly introduce
24    yourself to the ladies and gentlemen of the jury?
25         A    Yes.  I'm Dr. Sanford Katz.  I'm a
```

Sanford R. Katz, M.D.

1    radiation oncologist, and I was the treating

2    physician to Mr. Joseph Blair, one of his

3    physicians.

4        Q    What's your business address, Dr. Katz?

5        A    It's Wills-Knighton Cancer Center

6    Department of Radiation Oncology, 2600 Kings Highway

7    Shreveport, Louisiana 71103.

8        Q    And you understand we're doing this

9    deposition today by Zoom?  I'm in Washington DC.

10   Where are you, Dr. Katz?

11       A    I'm in Shreveport, Louisiana.

12       Q    Okay.  And we'll do our best.  There's --

13   depositions by Zoom have some challenges related to

14   exchanging documents and disconnects from the

15   Internet and things like that, but we'll do our best

16   to try to get through, all right?

17       A    Okay.

18       Q    You're aware that plaintiff Joseph Blair

19   was diagnosed with non-Hodgkin lymphoma, correct?

20       A    Yes.

21       Q    In the lawsuit, he alleges that Roundup

22   caused his non-Hodgkin lymphoma?

23       A    Yes.

24       Q    And we're here today to ask you about your

25   care and treatment of Mr. Blair.  Do you understand

1    that Mr. Blair has not alleged that you did anything

2    wrong or inappropriate with respect to the care that

3    you provided to him?

4        A    Yes, that's my understanding.

5        Q    And you understand that you are neither a

6    plaintiff or a defendant in this lawsuit, right?

7        A    Yes, that's my understanding.

8        Q    And you are being deposed as a witness to

9    discuss the care and treatment that you provided to

10   one of your patients; is that your understanding?

11       A    Yes, that's my understanding.

12       Q    And we've never met or spoken before

13   today; is that right?

14       A    No, sir.

15       Q    And you've never had any conversations

16   with any lawyers representing Bayer or Monsanto

17   Company before today, right?

18       A    That's correct.

19       Q    Have you ever been deposed before?

20       A    I have.

21       Q    On how many occasions?

22       A    Three.

23       Q    And were those depositions in a capacity

24   as a fact witness or as an expert witness or were

25   they unrelated to -- first of all, were they medical

Sanford R. Katz, M.D.

```
 1   cases or non-medical cases?
 2        A    They were medical cases and they were --
 3   can you define a fact witness?
 4        Q    A fact witness is somebody who provided
 5   care and treatment to the plaintiff but is not being
 6   specifically retained as an expert witness?
 7        A    Right.  Those were all fact witnesses.
 8        Q    Okay.  And have you ever served as an
 9   expert witness in a case?
10        A    I have not.
11        Q    Okay.  Have you ever given testimony in
12   court in a case?
13        A    I have.
14        Q    And was that also in one of those three
15   cases that we just alluded to where you gave
16   depositions?
17        A    Correct.
18        Q    Okay.  Can you just briefly tell me what
19   you can remember about those cases?  I don't need to
20   know details.  Did any of them involve non-Hodgkin
21   lymphoma?
22        A    No.
23        Q    Did any of them involve any claim of
24   exposure to pesticides or Roundup or glyphosate?
25        A    No.
```

Sanford R. Katz, M.D.

```
 1        Q     Did any of those cases in your review have

 2   any relationship or bearing to the issues in this

 3   case?

 4        A     No.

 5        Q     Were they all cases that were based in

 6   Louisiana?

 7        A     Yes.

 8        Q     And on how many occasions did you testify

 9   in court?

10        A     One.

11        Q     And do you remember the name of the

12   plaintiff in that case?

13        A     I don't.

14        Q     No.  How long ago was that?

15        A     More than 15 years ago.

16        Q     And were these other cases more than

17   15 years ago or some of them more recently?

18        A     I think they were more than ten years ago.

19        Q     They were all more than ten years old?

20        A     Yes.

21        Q     So since it's been awhile since you've

22   given a deposition, let me just go over some ground

23   rules so -- to make this flow more easily,

24   hopefully.  It's especially important since we're on

25   the Zoom and there's volume issues with voices and
```

Sanford R. Katz, M.D.

```
 1   so forth, that if for some reason you don't hear my
 2   question or you don't understand my question, would
 3   you ask me to repeat it or rephrase it?
 4       A    Okay.
 5       Q    And if you do, I'll assume you understood
 6   my question; is that fair?
 7       A    Fair.
 8       Q    Secondly, and I think you've been doing a
 9   pretty good job of this so far, we need to make an
10   effort not to talk over each other, so there's a lot
11   of circumstances where you may know where you think
12   I'm going with a question and kind of jump in with
13   the answer.  I want you to -- because a written
14   transcript is being kept, it's -- we need to keep
15   our court reporter happy, and we can only do that if
16   we're only talking one person at a time, okay?
17       A    Fair enough.
18       Q    And separately, although in normal
19   conversation it's often normal to say "uh-huh" or
20   "uh-uh" or nods of the head and that sort of thing,
21   it is important to have a verbal "yes" or "no" kind
22   of answer to the questions just so the record is
23   clear, all right?
24       A    Okay.
25       Q    If you don't know the answer to a question
```

Sanford R. Katz, M.D.

```
 1    I ask or you can't remember the information, just
 2    please let me know.  I don't want you to speculate
 3    about anything.  That is not advanceable for
 4    anybody, okay?
 5         A    Okay.
 6         Q    And you understand that you're testifying
 7    under oath today?
 8         A    Yes.
 9         Q    Is there any reason you're unable to give
10    true and accurate testimony?
11         A    No.
12         Q    Are you taking any medications that could
13    interfere with your memory or ability to
14    concentrate?
15         A    Not that I would -- not that I would think
16    so.
17         Q    Have you ever been involved in any
18    capacity in a lawsuit as a plaintiff or a defendant
19    in the past?
20         A    I'm currently a plaintiff -- plaintiff --
21    defendant in a lawsuit.
22         Q    Is that a medical malpractice?
23         A    It is.
24         Q    In your capacity as a radiation
25    oncologist?
```

Sanford R. Katz, M.D.

```
 1       A    It is.

 2       Q    Does that case involve any issue with

 3  non-Hodgkin lymphoma?

 4       A    No, it does not.

 5       Q    Are you represented by counsel in the

 6  case?

 7       A    I am.

 8       Q    Who's your counsel?

 9       A    Bobby -- shoot -- I'm trying to remember

10  his last name.  I always call him Bobby.  Can I get

11  back to you on that?

12       Q    Yes.

13            MR. JOSEPH:

14            Could I interject on that, Counsel?

15            MR. PIORKOWSKI:

16            Yes.

17            MR. JOSEPH:

18            Could it be Bobby Pugh?

19            THE WITNESS:

20            That's it.

21            MR. PIORKOWSKI:

22            Thank you.  Curtis, I appreciate it.

23            MR. JOSEPH:

24            I know him from being a defense lawyer

25       around here.
```

Sanford R. Katz, M.D.

```
 1            MR. PIORKOWSKI:

 2            Got it.

 3   BY MR. PIORKOWSKI:

 4       Q    And is -- are you the only defendant in

 5   this case or are there multiple defendants?

 6       A    There're multiple defendants.

 7       Q    And is the institution a defendant as

 8   well?

 9       A    It is not.

10       Q    Are you an employee of your institution or

11   are you an independent contractor?

12       A    I'm independent.

13       Q    So you're a medical doctor, correct?

14       A    Correct.

15       Q    Your speciality is radiation oncology; is

16   that correct?

17       A    Correct.

18       Q    And in your specialty, you use radiation

19   as a therapeutic tool to treat a variety of types of

20   cancer; is that right?

21       A    Correct.

22       Q    And in some cases you use radiation to try

23   to shrink the tumor; is that fair?

24       A    That's true.

25       Q    And in other cases, you use radiation to
```

Sanford R. Katz, M.D.

1   eliminate the cancer all together?

2       A    Correct.

3       Q    How long have you been practicing

4   medicine?

5       A    Twenty-one years following my completion

6   of residency, and I have been an M.D. for twenty-six

7   years.

8       Q    And you've been -- you've practice

9   radiation oncology throughout the entire time?

10      A    I have.

11      Q    Have you ever practiced any other

12  specialty?

13      A    I have not.

14      Q    And you're now affiliated with the

15  Willis-Knighton Hospital?  Is it called hospital or

16  medical --

17      A    Health System.

18      Q    Health System, okay.  And are you

19  affiliated with any other hospitals or institutions?

20      A    I have faculty appointments at the LSU

21  University Hospital here.

22      Q    And what's your faculty appointments,

23  clinical faculty?

24      A    Yes, I am gratis assistant professor in

25  the department of otolaryngology-head and neck

Sanford R. Katz, M.D.

1  surgery, as well as the department of oral and

2  maxillofacial surgery, as well as the department of

3  radiology.

4      Q    And are you -- do you give didactic

5  lectures or is it limited to clinical teaching?

6      A    I give didactic lectures.  I attend tumor

7  boards.  I participate in training of the residents

8  and fellows and medical students, and I do rotations

9  in my department here, as well as running various

10  conferences over there at the institution.  As I

11  mentioned, I participate in research as well.  So

12  it's a rather comprehensive participation.

13      Q    So I'm clear, when you say you're on the

14  faculty at LSU, is that -- is there a clinical

15  aspect to that at LSU?  I know you said that

16  students rotate through your practice.

17      A    Right.

18      Q    But do you practice independently at LSU

19  in addition to Willis-Knighton?

20      A    Right.  There was a period of time when I

21  did practice clinically at LSU a number of years

22  ago.  And now I don't practice there anymore

23  clinically.  I practice here.  But we share

24  patients.  I will treat patients in conjunction with

25  the physicians at LSU and the other departments like

Sanford R. Katz, M.D.

```
 1   otolaryngology, oral max four, oral maxillofacial

 2   surgery, and medical oncology.  But since our

 3   facility is far more advanced than their's, I

 4   elected to limit my practice clinically at this

 5   facility because the care was superior.

 6        Q    Did you bring with you a CV or a resumé?

 7        A    I have one that I can send to you, if you

 8   would like.

 9        Q    Okay, that will be great.

10        A    Would you like me to do that now or save

11   it to the end?

12        Q    We can do that on a break.  There may be

13   some things I want to ask you about on your CV.

14        A    That's fine.

15        Q    You went to the University of Maryland

16   Medical School; is that right?

17        A    I did.

18        Q    Did you grow up in the Northeast or where

19   did you grow up?

20        A    I grew up in New York until I was 15, and

21   then moved to the DC subs of Maryland.

22        Q    So you got your MD from Maryland in what

23   year?

24        A    1995.

25        Q    I'm trying to piece this together from
```

Sanford R. Katz, M.D.

1  what I can find on the website, but it looks like

2  you did a residency at some combination of

3  Georgetown and Greater Baltimore Medical Center?

4      A    That's correct.  I did a year of internal

5  medicine at Greater Baltimore Medical Center, and

6  then I went on to my residency in radiation oncology

7  at Georgetown.

8      Q    And was Georgetown the institution at that

9  time or was it MedStar?

10     A    No, it was the institution.  It was not

11 yet MedStar.

12     Q    What years was that?

13     A    So I was there from 1996 to 2000.

14     Q    In the years I represented Georgetown.

15 Did you do any fellowship training after residency?

16     A    I did not.

17     Q    Are you board certified by the American

18 College of Radiology?

19     A    The American Board of Radiology.

20     Q    And the American Board of Radiology has

21 different board certifications; is that right?

22     A    Generally it's broken down to diagnostic

23 radiology and therapeutic radiology.

24     Q    And what are you board certified in?

25     A    Therapeutic radiology.

Sanford R. Katz, M.D.

1          Q     Okay.  And can you briefly explain to the
2    jury what it means to be board certified?
3          A     Yes.  So basically you have to
4    successfully complete a residency and demonstrate
5    proficiency in your specialty through a series of
6    written exams, as well as oral exams.  And in the
7    case of radiation oncology, you have to complete
8    board written examinations showing proficiency in
9    radiation and nuclear physics, radiation biology and
10   clinical oncology as well as specifics of radiation
11   oncology as a subspecialty.  And following
12   completion of that, successful passing of that
13   written exam, you go on to take an oral examination
14   which is a full day -- it's a full-day examination
15   where you have eight subsections in each -- in
16   various subsites of cancers with individual
17   examiners running through cases and you have to pass
18   all eight of those subsections and at that point
19   you'd be board certified.  And then to maintain that
20   board certification, you would have to successfully
21   complete a certain amount of continuing medical
22   education each year practicing improvement projects
23   and things of that sort and going on.  And then
24   there is -- at ten years, there was a
25   recertification exam that you -- that I had to pass,

Sanford R. Katz, M.D.

1   and I continued to maintain the continuing medical

2   education component.

3        Q    What year were you first board certified?

4        A    2000.

5        Q    And then did you have to do it again in

6   2010 you're saying?

7        A    In 2010.  And then once again -- and then

8   I was recertified again in 2020.

9        Q    Okay.  All right.  You are not board

10  certified in internal medicine, correct?

11       A    I am not.

12       Q    Or boarded in hematology?

13       A    No, sir.

14       Q    In your practice, do you prescribe

15  chemotherapy for cancer patients?

16       A    I do not.

17       Q    Are you credentialed at any institutions

18  who prescribe chemotherapy?

19       A    I am not.

20       Q    And that's the role of the primary medical

21  oncologist; is that right?

22       A    That's correct.

23       Q    And with respect to Mr. Blair, that would

24  be Dr. Patel?

25       A    That is correct.

Sanford R. Katz, M.D.

```
 1        Q    Is Dr. Patel also associated with your
 2   same institution?
 3        A    He is.
 4        Q    You don't prescribe or perform subcell
 5   transplants or CAR T-cell therapy, correct?
 6        A    Correct.
 7        Q    Is it fair to say that cancer doctors try
 8   to use a team approach in terms of providing care to
 9   cancer patients?
10        A    Yes, I'd say that's fair to say.
11        Q    And radiation oncologists are part of that
12   team; is that fair?
13        A    Correct.
14        Q    Can you explain the relationship between
15   the medical oncologist and radiation oncologist?
16        A    So we coordinate care depending upon the
17   disease site and the extent of disease and the type
18   of cancer.  Our specialty -- care is multi-specialty
19   depending upon those factors.  In this particular
20   case, Mr. Blair's case, following his diagnosis, his
21   treatment, standard of care was for him to receive
22   both systemic therapy and radiation therapy.  When
23   he was seen, we discussed the case and we come up
24   with a treatment plan and then we work
25   collaboratively.
```

Sanford R. Katz, M.D.

```
 1        Q    By "we," you mean you and Dr. Patel?
 2        A    That's correct.
 3        Q    Anybody else on the team besides the two
 4   of you?
 5        A    Yes, there was.  Dr. Glen Lee Watkins made
 6   the diagnosis and he is the ENT.
 7        Q    Are you a member of any professional
 8   organizations?
 9        A    I am.  I am a member of the ASTRO,
10   American Society of Therapeutic Radiation Oncology,
11   and I'm also a member of ACRO, American College of
12   Radiation Oncology.
13        Q    Are you a member of the Louisiana State
14   Medical Society?
15        A    I am.  Actually, I'm a member of the
16   Shreveport Medical Society, and I'm also a member of
17   the American Society of Clinical Oncology.
18        Q    You're a member of the American Medical
19   Association?
20        A    I am not.
21        Q    Have you had any leadership rolls in the
22   organizations that you belong to?
23        A    I'm sorry, could you repeat the question?
24        Q    Have you had any leadership rolls in the
25   organizations that you belong to?
```

Sanford R. Katz, M.D.

```
1        A    No.  But I have been recognized and
2   awarded as a fellow of the American College of
3   Radiation Oncology.
4        Q    Okay.  Now from your website, it looks
5   like the biggest percentage of your practice is
6   comprised of breast, prostate, and in your case lung
7   cancer, and cancer of the head and neck, correct?
8        A    Yes.  I don't really know what my website
9   says.  It's an institutional website but my practice
10  is composed primarily of cancers of the upper area
11  digestive tract which includes primarily head and
12  neck cancers but as well as esophageal cancers and
13  lung cancers.  I do see breast cancers and prostate
14  cancers as well as previous palliative cases as
15  well.  But I would say that the majority of my cases
16  are cancers of the head and neck.
17       Q    Okay.  So you're counting like esophageal
18  adenocarcinoma as cancer of the head and neck?
19       A    I'm sorry, repeat the question.
20       Q    Like esophageal adenocarcinoma, would you
21  consider that a cancer of the head and neck?  Would
22  you consider that a cancer of the head and neck or
23  that's too low?
24       A    No, sir, that would not be head and neck.
25  So head and neck would be -- would essentially be up
```

Sanford R. Katz, M.D.

```
 1   to the level or I should say down to the level of

 2   the esophagus.

 3        Q    Sure.  So oropharynx, larynx, sinuses,

 4   salivary glands?

 5        A    Correct.

 6        Q    That would be within?

 7        A    Correct.  Right.  So that would be oral

 8   cavity, nasopharynx, nasal cavity, paranasal

 9   sinuses, hypopharynx, larynx, as well as skin

10   cancers.

11        Q    Okay.  And what -- I know it is sometimes

12   difficult to ballpark these things but what

13   percentage of your overall practice is lung cancer?

14        A    Currently, I would say it represents about

15   15 percent.

16        Q    15?

17        A    15.

18        Q    And what about prostate?

19        A    I would say also about maybe 10 to

20   15 percent.

21        Q    And what about breast cancer?

22        A    Probably 10 percent.

23        Q    And so the remainder -- or that list of

24   cancers that we just talked about would be head and

25   neck?
```

```
 1        A    That's correct.
 2        Q    Okay.  Do you -- apart from breast,
 3   prostate, lung, and head and neck, do you -- are you
 4   involved in radiation therapy to any other part of
 5   the body, like do you get involved in GI cancer,
 6   brain cancer, or anything of that nature?
 7        A    So on occasion, I may have a patient who I
 8   have to treat a metastatic focus to let's say the
 9   spine, to the bone, but it's an occasional part of
10   my practice.
11        Q    In terms of your typical work week, do you
12   do the same thing every day -- or if you take a
13   surgeon, for example, they have two days in the OR,
14   and one day they are doing pre-opt.  Do you have
15   kind of a systematic schedule that repeats itself
16   week after week or do you do the same thing every
17   day?  What's your schedule like?
18        A    My schedule is dependent upon the day.  I
19   do different things on different days.  On some
20   days, I do the same thing depending on what the task
21   is.
22        Q    So do you have certain days set aside to
23   do consults or that can happen on any day?
24        A    Yes.  So a typical workweek for me is on
25   Mondays I will see each of my patients who are
```

Sanford R. Katz, M.D.

1   currently on treatment since my patients are treated

2   every day and they need to be seen at least once a

3   week to assess how well they are tolerating

4   treatment and to manage side effects.  Tuesdays, I

5   typically will see follow-up patients.  I generally

6   follow my patients every three to six months for

7   five years.  And on Wednesdays, the bulk of my time

8   is seeing new consults.  Thursdays are also days

9   that I will see follow-up patients.  And Fridays is

10  seeing new consults as well.  Depending upon how

11  busy we are and the urgency in which consults need

12  to be seen, I may see consults on any of the days

13  during the week even on the days that I'm seeing

14  primarily follow-ups.  And then of course there's

15  always patients that are in the hospital that need

16  to be seen on a more urgent basis.  And then I'll

17  see those after hours in addition to whatever else

18  I'm doing that day.  And then I have some

19  non-clinical work as far as non-direct patient care

20  work related to radiation treatment planning and

21  electronic medical records and things of that sort

22  that I also do in between when I have time.

23      Q    So do you actually administer radiation

24  therapy to patients yourself?

25      A    I do not.  I evaluate the patient.  I

Sanford R. Katz, M.D.

1   determine the appropriate treatment, whether that

2   involves radiation or not.  I determine what kind of

3   radiation they would need.  I coordinate with any

4   other physicians that may be involved with their

5   care.  I'm involved in the radiation treatment

6   planning, overseeing the process, determining what

7   needs to be treated, how much needs to be treated

8   and the schedule.  And I oversee the quality of

9   insurance on a daily basis verifying that the

10  treatments being delivered on the machines by the

11  technologist is appropriate.  And then as I said, I

12  see the patients on a weekly basis just to follow

13  their response.

14      Q    When you're talking about the patients

15  you're seeing on Mondays, are those hospitalized

16  patients or are those outpatients?

17      A    No, they're all the patients.  So any

18  patient that's being treated is typically seen once

19  a week.  Most of the time, that's on Mondays.

20      Q    So who does give the radiation therapy?

21      A    Certified techs.

22      Q    And do you spell out all the details so

23  they know exactly where the radiation is supposed to

24  go and not go?

25      A    Right.  So there's a process where we

Sanford R. Katz, M.D.

```
 1  start off with a CT scan with some form of

 2  immobilization.  We use that to generate a

 3  three-dimensional model of the patients anatomy in

 4  our computers.  I direct that process at which point

 5  then it moves on where I have a team of what's

 6  called dosimetrist.  They use those images.  They

 7  bring in any other clinical images like PET scans or

 8  other CAT scans.  We do fusions and I use that

 9  information to delineate target structures and

10  critical sensitive structures to be avoided, and

11  then basically assign specific radiation doses to

12  these various structures.  And then a team of

13  dosimetrist use a treatment planning system to

14  generate a treatment plan.  It then goes to a team

15  of physicists.  We have five physicists in our

16  department, and they verify that the delivery is

17  appropriate prior to the patient's treatment by

18  using what we call basically phantoms but they are

19  essentially fake patients.  They maintain all of the

20  quality and control and they maintain the machines.

21  And then we have certified technicians who deliver

22  the treatment each day.  And on their first day of

23  treatment, I verify that once again that everything

24  is appropriate.  And then each day images are taken.

25  Generally CT scans are generated from the treatment
```

Sanford R. Katz, M.D.

1  machines themselves immediately prior to the

2  treatment, and I review those scans each day

3  comparing them to the initial scan that was used for

4  planning to verify that the appropriate area is

5  treated.

6      Q    And you mentioned earlier where we were

7  talking about that part of your practice involves

8  clinical research.  Did I understand you correctly?

9      A    So not -- part of my practice does involve

10  clinical research.  I do not perform clinical

11  research with LSU.  The research that I have done

12  with LSU has been primarily academic retrospective

13  chart reviews and things of that sort, but it has

14  not been patient related clinical research where LSU

15  patients were treated in our department.  Let me

16  correct that for just a moment.  I believe that

17  there may have been a couple of instances where

18  there was an interesting case that was treated in

19  our department and a resident wrote that case up as

20  a case report because it was unusual.

21      Q    Fair enough.  You have alluded to clinical

22  research.  So can you explain what clinical research

23  you do if it is not associated with LSU?

24      A    Yes.  So the clinical research that we do

25  that involves treating the patients and over the

Sanford R. Katz, M.D.

```
 1    years we've had quite a number of studies either
 2    specifically radiation related or perhaps related to
 3    a medication or a protective agent to decrease side
 4    effects.  And we've had an active research program
 5    now for well over 10 years.
 6         Q    And is your research industry sponsored?
 7         A    I'm sorry, could you repeat the question?
 8         Q    Is your research industry sponsored?
 9         A    Some of it is industry sponsored, and some
10    of it is a cooperative group.  What I mean by that
11    is that we participate in a research consortium with
12    other academic centers, both nationally and
13    internationally, looking at various treatment
14    modalities, so we may a study that compares one type
15    of radiation with another type of radiation and
16    recording outcomes.  And we do that in collaboration
17    with these other institutions.  We have other
18    studies that may be looking at just outcomes,
19    finding outcomes from a particular treatment let's
20    say proton therapy.  We have studies that are
21    industry sponsored where we may be participating in
22    a particular evaluation of a drug or a therapy.
23    We -- I've been particularly active looking at
24    protective agents to reduce toxicity from radiation
25    both with respect to skin and also the mucosa or the
```

Sanford R. Katz, M.D.

1    lining of the head and neck.

2         Q    What industry sponsors have you done

3    research for in terms of companies?

4         A    The companies, I would have to refer to my

5    CV because I don't want to leave any out.  It's

6    extensive, so I would prefer to just send you my CV

7    and they are all listed there.

8         Q    It's clearly indicated who you've done

9    research for on your CV?

10        A    Yes.  Yes, sorry.

11        Q    So what percentage of your practice is

12   comprised of treating patients with non-Hodgkin's

13   lymphoma?

14        A    I would say about five percent.

15        Q    And do you have any estimate of how many

16   NHL patients you treat in a year, a ballpark?

17        A    I would say -- let's say in the order of

18   about 20 patients a year, maybe 25 patients a year.

19   It's been entirely dependent upon the size of our

20   practice.  Our practice has increased in size.  Back

21   during the first 10, 12 years of my practice, there

22   were only two of us.  And then we gradually

23   increased three firm reviews, and then four, and

24   then more recent five doctors.  So over the last few

25   years, some of the older physicians, myself

Sanford R. Katz, M.D.

```
 1   included, has slowed down our practice a little bit
 2   so that we see fewer patients than we have.  So I
 3   would say -- I would say in the first 12 years to
 4   15 years of my practice I probably saw on the outer
 5   of about 40 patients a year with non-Hodgkin's
 6   lymphoma, and now it is probably down to about 20 to
 7   25.  We have since kind of redistributed some of our
 8   volume.
 9        Q    And I assume that the context in which you
10   are including them is in the context of head and
11   neck cancers primarily; is that right?
12        A    In my situation, yes, primarily it's
13   patients with head and neck.
14        Q    It's fair to say that the vast majority of
15   non-Hodgkin lymphoma patients do not receive
16   radiation therapy, right?
17        A    Actually, I want to clarify the previous
18   answer, not just head and neck but lot of these
19   lymphomas occur in the chest, so it would be --
20   generally, typically, it would be above the
21   diaphram, so that would also include in the lung and
22   what we call the mediastinum which is in the center
23   part of the chest.
24        Q    Primary would be B-Cell lymphomas?
25        A    Not necessarily primary B-Cell lymphomas.
```

1    It would be any type of lymphomas non-Hodgkin's or

2    Hodgkin's.  But many of them present, if not in the

3    head and neck, in the chest area.  Some of them

4    occur in the abdomen in the pelvis but the majority

5    of the ones that I see are above the diaphram.

6         Q    Okay.  Is it fair to say that the vast

7    majority of NHL patients do not receive radiation

8    therapy?

9         A    I would say that's a fair statement.  Let

10   me qualify that statement for a moment, please.

11        Q    Sure.

12        A    But the treatment paradigm for

13   non-Hodgkin's lymphoma has also changed over the

14   last 20 years and so there has been less of a role

15   for radiation therapy I would say over the last 5 to

16   10 years than they had been in the previous decade.

17        Q    Right.  But the main go-to is either the

18   protoxin lab or chemotherapy for most NHL patients;

19   is that right?

20        A    That's correct.

21        Q    Are you involved in any studies?  I know

22   there has been some research into looking at earlier

23   follicular cell cancer and radiation therapy, are

24   you involved in any research of that nature?

25        A    When you say "early follicular," can you

Sanford R. Katz, M.D.

1  clarify that?

2      Q    Early -- oncology -- early stage

3  follicular meaning there aren't very many early

4  stage folliculars because folliculars usually -- but

5  to the extent that there are early stages diagnosed,

6  my understanding is that radiotherapy has been

7  showing some promise.  Are you familiar with that?

8      A    Yes.  Yes.  So I wouldn't say that that is

9  research, however, though.  It is pretty standard

10  for early stage lymphomas, particularly low-grade

11  lymphomas, inflicted lymphomas to treat primarily

12  with radiation, so there are some sites -- some

13  classes of lymphomas that we would treat without the

14  use of chemotherapy.  And I have done that

15  clinically since I've started my practice and it's

16  rather routine.  I've not been involved specifically

17  with research in that as much as it's just standard

18  medical practice.

19      Q    Okay.  Fair enough.  You see in the

20  exhibits that I sent you in your e-mail, do you see

21  Exhibit 2?

22      A    Exhibit 2?  Yes.

23      Q    And I'll represent to you that Exhibit 2

24  is a Medline search that we conducted using your

25  name.  And the challenge here is that there is more

Sanford R. Katz, M.D.

```
 1   than a few S. Katz's in the database.  So I want to
 2   make sure, first of all, that the articles published
 3   here on Exhibit 2 are in fact your articles?  I
 4   think they probably are.
 5       A    (Views document.)  Yes.
 6       Q    Yes, these are all of the articles that
 7   you were either the author of or coauthor of?
 8       A    Yes, that I participated in the research.
 9       Q    And the flip side of the question then,
10   since I don't have your CV yet, are there additional
11   articles that you published in the peer review
12   literature besides these?
13       A    Yes.
14       Q    And are all of those listed on your CV?
15       A    They're listed on my CV.
16       Q    When was your CV last updated?
17       A    I think about two months ago.
18       Q    Okay.  And have you ever done any research
19   that's focused on the treatment of non-Hodgkin
20   lymphoma specifically?
21       A    I have not.
22       Q    Have you ever published papers on the
23   cause of non-Hodgkin's lymphoma?
24       A    I have not.
25       Q    Have you ever made any presentation at a
```

Sanford R. Katz, M.D.

```
 1    professional meeting on the causes and treatment of
 2    non-Hodgkin's lymphoma?
 3         A    I have not.
 4         Q    I just want to run through some questions.
 5    Have you ever designed, conducted, or published any
 6    epidemiological study on Roundup or glyphosate?
 7         A    I have not.
 8         Q    Have you ever designed, conducted, or
 9    published any epidemiological for any pesticides?
10         A    I have not.
11         Q    Have you ever designed, conducted, or
12    published any animal studies looking at any aspect
13    of the toxicity of Roundup or glyphosate?
14         A    I have not.
15         Q    Same answer for any other pesticide?
16         A    Same answer.
17         Q    Have you ever designed, conducted, or
18    published any study evaluating the mutagenicity or
19    genotoxicity of Roundup or glyphosate?
20         A    I have not.
21         Q    Or any other pesticide?
22         A    I have not.
23         Q    Have you ever designed, conducted, or
24    published any research evaluating the potential for
25    glyphosate or Roundup to cause oxidated stress?
```

Sanford R. Katz, M.D.

```
1        A    I have not.

2        Q    And same answer for any other pesticide?

3        A    Correct.

4        Q    Okay.  Have you ever published any

5   professional articles concerning any aspect of the

6   potential cariogenicity of glyphosate or Roundup?

7        A    I have not.

8        Q    Have you ever published any professional

9   article concerning any aspect of a potential

10  carcinogenicity of any pesticide?

11       A    I have not.

12       Q    Do you serve as a reviewer for any medical

13  journals?

14       A    I don't.

15       Q    Have you in the past?

16       A    No, sir.

17       Q    Are there medical journals that you review

18  on a regular basis?

19       A    Can you explain what you mean by "review"?

20       Q    I mean you look at them to determine

21  whether there are any articles of interest to your

22  practice and --

23       A    Yes, sir.

24       Q    And if so, reading the articles that you

25  have identified that are of interest?
```

Sanford R. Katz, M.D.

```
 1       A    Yes, sir.

 2       Q    So using that definition, are there peer

 3  review medical journals that you review on a regular

 4  basis?

 5       A    Yes, sir.

 6       Q    What are those?

 7       A    The International Journal of Radiation

 8  Oncology, Radiology Oncology Biology and Physics.

 9  The Journal of Clinical Oncology, Practical

10  Radiation Oncology are probably the primary ones.

11  Occasionally, the New England Journal of Medicine.

12  Occasionally, JAMA, the Journal of the American

13  Medical Association.

14       Q    So three of those are radiation journals

15  that are primarily focused on radiation oncology?

16       A    There's other ones too.  There's

17  brachytherapy.  There's other minor journals that I

18  periodically will take a look at.  Seminars in

19  radiation oncology.  Oncology itself.  There's a

20  journal called Oncology.  But as far as on a monthly

21  basis, the main ones are the ones that I gave you.

22       Q    About your review, do you get an e-mail

23  blast like the New England Journal sends an email

24  once a week that tells you what's on their agenda?

25  How do you stay on top of it?
```

Sanford R. Katz, M.D.

```
 1        A    Yes.  So I review hard journals, the
 2   actual bound journals.  I get -- each issue comes to
 3   my office, the ones that are primarily oncology.
 4   The best journals for our field are the Journal of
 5   Clinical Oncology and the International Journal of
 6   Radiation Oncology.  Those are the two big ones for
 7   us.  And so I receive those.  I review those and the
 8   articles to my interest are the ones that I review.
 9   I also get e-mail blasts from experts in the field
10   who compile a list of relevant papers that they
11   think would be of interest.  And so they send that
12   out.  There is usually some summaries of various
13   topics with links to those journal articles and
14   critiques.  And I'll review that and often times
15   that will direct me to the primary source which
16   could be a European journal, could be another
17   journal that I don't frequently look at.  So I would
18   say that I could potentially be looking at 20
19   different journals in the course of a month
20   depending upon the e-mails that I get or sometimes a
21   colleague will say, hey, look at this interesting
22   paper published in this other journal that normally
23   I wouldn't look at, so.  There are also -- as you
24   said, there are also e-mail blasts from our society
25   pointing out certain physician papers and citing
```

Sanford R. Katz, M.D.

1    references, so there's a number of sources.

2        Q    The service that you alluded to that sends

3    you periodic survey results of literature, is that a

4    service that you prescribe to?

5        A    Yes.  It's basically -- it's not a paid

6    subscription.  It's a free -- it's basically a free

7    subscription.

8        Q    Okay.  What's the name of the service?

9        A    It's Editorials in Radiation Oncology.

10       Q    All right.  Do you have any specialized

11   education or advanced degree in epidemiology or

12   biostatistics like a master's in public health or a

13   master's degree in clinical research?

14       A    I don't, other than what I was taught in

15   medical school and residency.

16       Q    And you consider yourself to be an expert

17   in epidemiology or biostatistics?

18       A    I do not.

19       Q    Do you hold any kind of certification in

20   medical toxicology?

21       A    I do not.

22       Q    Do you have any specialized education or

23   training in toxicology?

24       A    I do not.

25       Q    Do you consider yourself to be an expert

Sanford R. Katz, M.D.

1  in toxicology?

2      A    I do not.

3      Q    What did you do to prepare for the

4  deposition today?

5      A    I reviewed Mr. Blair's clinical chart.  I

6  reviewed a previous affidavit that I produced, and I

7  also reviewed the IARC Monograph Volume 112 from I

8  believe it was 2015.  It's entitled Organophosphate

9  and Insecticides and Herbicides.

10     Q    Okay.  And when you are saying you

11 reviewed it, did you read the entire section on

12 glyphosate or did you read selective sections?

13     A    I read through the section on glyphosate,

14 specifically with respect to the epidemiology of the

15 epidemiological studies relating to glyphosate and

16 risks of cancers.

17     Q    Did you look at the sections on animal

18 studies or genotoxicity?

19     A    Yes, I reviewed that previously prior to

20 my affidavit.  But I did not review the animal

21 studies in preparation for this deposition.

22     Q    Did you look at any of the underlying

23 studies that they reference in the IARC library?

24     A    Not in preparation for this deposition.  I

25 did review them previously prior to generating my

Sanford R. Katz, M.D.

```
 1  affidavit.
 2      Q    We will look at that in a minute.  And any
 3  other materials that you looked at in terms of
 4  preparing for your deposition?
 5      A    No, sir.
 6      Q    And how much time did you spend reviewing
 7  those things?
 8      A    Well, previously, I had spent probably
 9  somewhere in the order of 4 to 6 hours reviewing the
10  monograph and reviewing some of the primary sources
11  and generating the affidavit.  And so I think as I
12  mentioned in an e-mail to Mr. Martinez that
13  typically I would estimate about four hours of
14  preparation for the deposition.  But in this case
15  since I had previously reviewed all of this
16  information and generated an affidavit previously,
17  at the time I spent about two hours since I had
18  already generated my conclusions based upon
19  previous -- prior review.
20      Q    I appreciate that.  And how much time is
21  divided up between looking at the IARC Monograph and
22  looking at Mr. Blair's records?
23      A    I'm sorry, can you repeat that?  I missed
24  some of it.
25      Q    Yes.  So I think what you said earlier is
```

Sanford R. Katz, M.D.

1    that you reviewed his medical records, right, and

2    your entries in his medical records and you also

3    reviewed the IARC Monogram 112, right?

4         A    That's right.

5         Q    And you said you spent about a total of

6    two hours doing that in preparation for the

7    deposition, right?

8         A    That's correct.

9         Q    I'm just asking how was that divided up?

10   How much time did you spend on Mr. Blair's records

11   versus the IARC Monograph?

12        A    I would you say I spent about 30 minutes

13   looking at his records and an hour and a half

14   reviewing the monograph that I previously read with

15   highlighted sections that I had previously

16   annotated.

17        Q    And do you have a version of the IARC

18   Monogram that you previously highlighted?

19        A    This one right here.

20        Q    We may ask to have the court reporter make

21   a copy of that so that we can see what you included

22   in the concept.  Did you talk to Mr. Blair or any

23   member of his family in preparation for the

24   deposition?

25        A    I did not.

Sanford R. Katz, M.D.

```
 1        Q    When's the last time you had any contact
 2   with Mr. Blair?
 3        A    It looks as though the last time I saw him
 4   according to his medical record was on
 5   September 22nd, 2020.
 6        Q    That's correct.  My question is a little
 7   bit different which is when's the last time you
 8   spoke to him?  Was that the last time you spoke to
 9   him?
10        A    I believe that's the last time I had any
11   interaction with him.
12        Q    Okay.  Correct.  And the same answer with
13   his family members?
14        A    That's correct.
15        Q    Did you talk to Dr. Patel at all about
16   Mr. Blair in preparation for the deposition?
17        A    I asked -- what did I ask him?  I think we
18   were talking about another patient, and I mentioned
19   to him that I had another deposition.
20        Q    And what, if anything, else was part of
21   that conversation?
22        A    I asked him how much he charged.
23        Q    For what?
24        A    For the deposition.
25        Q    For the deposition?
```

Sanford R. Katz, M.D.

```
1        A     For the deposition.

2        Q     What did he say?

3        A     He said he charged $2,000.

4        Q     And have you had any discussion with

5   Dr. Patel about any aspect of Mr. Blair's care since

6   he was discharged as a patient?

7        A     Well, I don't think I discharged him as a

8   patient.  I believe that I continued to see him as a

9   patient.  So I have had discussion with Dr. Patel

10   regarding his case in terms of coordinating what we

11   think would be an appropriate followup for him

12   because his case is a bit exceptional.  And so our

13   coordinated followup with him is going to be -- is

14   going be more intensive than what we would typically

15   do for somebody who had non-Hodgkin lymphoma who did

16   not have exposure to glyphosate, so we have

17   discussed his case in the last number of months.

18        Q     So you said you last talked to him on

19   September 20th, right, or since September 2020 was

20   the last time you --

21        A     You're referring to -- yes, Mr. Blair,

22   yes, as far as I recall, that seems to be the last

23   time I had spoke with him.

24        Q     So we're now in July of 2021, right?

25        A     That's correct.
```

Sanford R. Katz, M.D.

1        Q     Okay.  And I think you said earlier that
2    you see your follow-up patients every three months;
3    is that right?
4        A     That's right.
5        Q     So why has 10 months passed since --
6        A     Yes.  I would have to check with my nurse,
7    but I think he's missed appointments.  And my
8    understanding that some of it was perhaps related to
9    lack of insurance or a payment source.  And so these
10   patients are scheduled, and then they appear on my
11   schedule if they are here.  And if they are not
12   here, then I'm not seeing them.  But I'm not
13   necessarily aware that a patient of mine didn't keep
14   an appointment or needed a reschedule appointment.
15   So in this particular instance, my last follow-up
16   appointment, I said for six months, which would have
17   been in March.  It's quite possible because of Covid
18   he wasn't seen because we had canceled all of our
19   non-essential appointments including follow-up
20   appointments.  So it's I think very likely in that
21   his situation particularly because I would do what's
22   called nasopharyngoscopy which is an invasive
23   procedure to the nose that I was not doing during
24   the covid period, that his follow-up appointments
25   got pushed back because of that.  I can't tell you

Sanford R. Katz, M.D.

1    specifically in his case why I didn't see him last

2    week or the week before.

3        Q    Is somebody -- and I'm sure you're not the

4    person but is somebody responsible to ensure that

5    patients or whose appointments are canceled are

6    rescheduled at some point in time?

7        A    That's correct.  That would be my nurse.

8        Q    And who's that?

9        A    Her name is Lisa Cary.

10       Q    Is it like that Lisa would know what the

11   facts were surrounding why he hasn't been seen since

12   September 2020?

13       A    She would be the person who would have the

14   most information in our department.

15       Q    Have you had discussions with -- we talked

16   about your conversations with Dr. Patel.  Have you

17   had any conversations with Dr. Patel since September

18   2020 --

19       A    Yes.

20       Q    -- about Mr. Blair?

21       A    Yes.

22       Q    And when were those conversations?

23       A    As I said, I spoke with him earlier today.

24       Q    You spoke with him earlier today.  But I

25   thought you told me earlier today you only asked him

Sanford R. Katz, M.D.

1    how much he charged for his deposition and you said

2    $2,000?

3        A    That's correct.

4        Q    Let me rephrase the question to make it

5    clear.  When was the last time you had a substantive

6    discussion about Mr. Blair's case with Dr. Patel?

7        A    The last time we had -- I guess today

8    during that conversation I think I did mention to

9    him that my plan for him was that I was going to

10   continue to see him ongoing and essentially

11   indefinitely.

12       Q    You mentioned that to Dr. Patel?

13       A    Yes, that basically -- normally we would

14   follow patients for five years and they would get

15   blood work primarily.  But in his particular case,

16   we agreed that he needed to be followed indefinitely

17   with regular blood work.

18       Q    What's the basis for needing to follow him

19   indefinitely?

20       A    So his risk of secondary malignancy is

21   very high.  Based upon our interpretation of the

22   literature, he's at risk for secondary malignancies

23   because of his exposure and that would be lifelong.

24   And those include not only additional lymphomas but

25   perhaps multiple myeloma and he's also at risk for

Sanford R. Katz, M.D.

```
 1    secondary malignancies related to his treatment,
 2    whether that would be some bone marrow disorders,
 3    leucemias, myelodysplastic syndromes, other
 4    chemo-related side effects, late side effects that
 5    you can see in any patient receiving chemotherapy
 6    and for that matter also cancers that are caused
 7    from radiation therapy that you might see in many
 8    patients.  The vast majority of our patients that we
 9    treat are older and so that risk is -- the risk is
10    the same but the likelihood of them developing a
11    secondary malignancy during the remainder of their
12    life as an absolute number is much less.  But since
13    Mr. Blair is young, his risk is lifelong.  And then
14    at the same time his risk is presumably higher
15    because of what we understand to be a very high
16    exposure to what we believe to be a carcinogen.  So
17    based upon our assessment, we think that he needs to
18    be followed lifelong.  And then the last thing is
19    given his age.  A young person is much more
20    sensitive to the damaging effects of the therapy and
21    are at greater risk for developing secondary
22    malignancies relating to the treatment.  So that's
23    why we decided that in his particular case he
24    requires lifelong followup.
25         Q    For a patient that is young that's
```

Sanford R. Katz, M.D.

1  underdone the therapy he's undergone, he would have

2  an increased risk of secondary malignancies

3  regardless of his glyphosate use simply because of

4  his age, correct?

5      A    That is correct.

6      Q    Okay.  Is there anything in the medical

7  literature that you can point me to that says that

8  patients who have been previously diagnosed with

9  non-Hodgkin lymphoma have a greater risk of

10  recurrence for a secondary malignancy compared with

11  patients who have not been exposed to glyphosate?

12      A    No.  I would say that -- when I say -- use

13  the term "secondary malignancy," what I'm talking

14  about is a treatment related malignancy.  That is a

15  cancer that occurs because of the radiation or

16  because of the chemotherapy.  That's a secondary

17  malignancy.  That's how we use that term.  However,

18  with my understanding of the monograph is that there

19  is increased risk of malignancies other than

20  non-Hodgkin's lymphoma.  And particularly, I think

21  multiple myelomas was one of them, and so my sense

22  is that risk would be lifelong.  In addition, he has

23  other issues that would require lifelong followup

24  relating to his treatment which include let's say

25  dental complications related from his head-neck

Sanford R. Katz, M.D.

1    radiation, hypothyroidism, things of that sort, so

2    those themselves also require a long-term followup.

3         Q    Those things are related to the fact that

4    he received radiation for his head and neck?

5         A    That is correct.

6         Q    Those would be potential complications or

7    things that would need to be followed up on

8    regardless of glyphosate exposure, correct?

9         A    That is correct.

10        Q    Okay.  Is there any substantive

11   conversation you had with Dr. Patel other than that

12   one we just averted to concerning Mr. Blair?

13        A    Not recently.  Typically, we would discuss

14   his case prior to his treatment and we would discuss

15   his case during his treatment.  We may discuss his

16   case after his treatment to coordinate our follow-up

17   care so we alternate our appointments appropriately.

18   I might call him and say, Dr. Patel, I saw Mr. Blair

19   today, I was going to order some labs for him -- I

20   was going to order him this, that, and whatever and

21   is there anything in particular else that you might

22   like while I have him in the lab.  It might be that

23   sort.  But those conversations are not documented.

24        Q    And the conversation about needing to

25   continue to monitor him lifelong, that also is not

Sanford R. Katz, M.D.

1    documented, correct?

2        A    That is correct.

3        Q    Are there any other physicians with whom

4    you might discuss Mr. Blair's case?

5        A    Not that I recall.

6        Q    Did you talk with any attorneys either in

7    person or by phone in preparation for the deposition

8    today?

9        A    I'm sorry, can you say that question

10   again?

11       Q    Sure.  Did you talk with any attorneys

12   either in person or by phone in preparation for the

13   deposition today?

14       A    I did not talk to any attorneys by phone

15   or in person.

16       Q    So you had no conversations with counsel

17   for Mr. Blair?

18       A    I did not have --

19       Q    In preparation for your deposition?

20       A    Not phone conversations.  There was some

21   e-mail correspondence where Mr. Joseph sent me

22   copies of previous documents that I've submitted.

23       Q    Are the copies that he sent you the -- we

24   will mark everything in a second.  But basically,

25   your records, your affidavit, your letter to him,

Sanford R. Katz, M.D.

```
1    and your invoice are the records we are talking
2    about?
3         A    That's correct.
4         Q    Anything in addition to that?
5         A    No, sir.
6         Q    And that was just as a courtesy to let you
7    know here are your things before the deposition?
8         A    That's correct.  I think as I mentioned to
9    Mr. Martinez I had been out of town a week prior
10   when all of these was being arranged, and so I
11   believe Mr. Joseph as a courtesy forwarded these
12   things to me so that I could review them in part
13   when I was out of the office.
14        Q    Okay.  Have you at any point spoken with
15   anyone who works at Monsanto or worked with Monsanto
16   in the past about issues with glyphosate?
17        A    No, sir.
18        Q    Have you spoken to anyone from a
19   regulatory agency like the Environmental Protection
20   Agency or any other agency?
21        A    No, sir.
22        Q    Have you spoken to anyone who worked as an
23   expert witness in connection with any of the Roundup
24   litigation?
25        A    No, sir.
```

Sanford R. Katz, M.D.

1      Q    Is there any third party that I didn't
2  specifically ask you about with whom you've spoken
3  about Mr. Blair's case?
4      A    No, sir.
5      Q    I would like to have you take a look at
6  Exhibits 3, 4, 5, 6, and 7 for a minute.
7      A    Okay.
8      Q    So -- first of all, I think this is the
9  same documents we just referred to that you
10 referred.  Are these documents all documents that
11 you prepared yourself?
12     A    Yes.
13     Q    And am I correct that Exhibit 3 reflects
14 an initial radiation oncology visit on
15 November 15th, 2018, correct?
16     A    That is correct.
17     Q    And that's the first time you ever saw
18 Mr. Blair as a patient?
19     A    Correct.
20     Q    You didn't know him before that visit; is
21 that right?
22     A    I did not.
23     Q    At the time he came to see you, he had
24 already been diagnosed with diffuse large B-Cell
25 lymphoma; correct?

Sanford R. Katz, M.D.

```
 1        A    That is correct.

 2        Q    Okay.  And then -- and I just really want

 3   to go through this to identify what the documents

 4   are and I will circle back, and we will talk about

 5   them a little more.  Exhibit 4 reflects another

 6   follow-up visit on February 7th, 2019, correct?

 7        A    That is correct.

 8        Q    And that's also one of your records,

 9   right?

10        A    That is correct.

11        Q    And Exhibit 3 and 4 are part of

12   Mr. Blair's medical record from Willis-Knight,

13   correct?

14        A    That's correct.

15        Q    Now Exhibit 5 is an affidavit that you

16   signed on August 20th, 2019, correct?

17        A    Yes.

18        Q    And that affidavit was in connection with

19   a Workers' Comp claim that Mr. Blair was filing with

20   the State of Louisiana, right?

21        A    That's correct.

22        Q    Again, we are going to come back and talk

23   about it in more detail.  But I want to clarify,

24   exhibit 5 is not a part of Mr. Blair's formal

25   medical record; is that right?
```

Sanford R. Katz, M.D.

1        A     That is correct.

2        Q     And Exhibit 6 similarly is a letter from

3   you to Mr. Blair's attorneys dated December 18th,

4   2019; is that right?

5        A     That's correct.

6        Q     And Exhibit 7 is an invoice for your time

7   related to the preparation of Exhibit 6, right?

8        A     Yes.

9        Q     And also, just so the record is clear,

10  Exhibit 6 and 7 are not part of Mr. Blair's medical

11  record, correct?

12       A     That is correct.

13       Q     Now -- so here's where I get confused and

14  I need your help.  Are there other medical records

15  that you're aware of that reflect your notes for

16  your care and treatment of Mr. Blair that are not

17  included in Exhibit 3 and 4?

18       A     I have his chart in front of me, so I'm

19  just looking to see what's in his chart.

20       Q     If it's helpful, we didn't talk about

21  Exhibit 8 yet.  Exhibit 8, it's a larger document.

22  It's a copy of his Willis-Knight records generally

23  which I think includes 3 and 4 in there.

24       A     Okay.  If you give me a moment, I want to

25  review this for just a second, please.

Sanford R. Katz, M.D.

```
1       Q    Certainly.  Yes.

2       A    Okay.  So I have a follow-up record in his

3  chart from June the 5th, 2019 that I don't see,

4  unless it's in No. 8 which may be a very big

5  document.

6       Q    I don't think I saw it in No. 8 either.

7  Is it similar to Exhibit 4?

8       A    Let's see Exhibit 4 being a follow-up

9  note, that is correct.

10      Q    Has the same format typically?

11      A    It does.  So that would be June the 5th,

12 2019.  There was also what's called an End of

13 Treatment Summary which basically describes the

14 treatment that he received, the dates that he

15 received it, the dose, and just a very brief

16 clinical summary of how well he tolerated the

17 treatment.  That was dated March 28th, 2019.  There

18 are additional clinical records in his chart that

19 are -- there are additional records in his chart

20 that are related to his treatment in terms of

21 operative notes from other physicians, pathology

22 notes, and various radiation records, specifics,

23 calculations, dose -- he has a reasonably thick

24 chart that, obviously, it is not more than what you

25 presented me here.  It also contains Dr. Patel's
```

Sanford R. Katz, M.D.

1    notes and things like that, radiology reports, nurse

2    intakes.

3            MR. PIORKOWSKI:

4            Curtis, I don't think some of these things

5        were produced as a part the plaintiff produced

6        records.

7            MR. JOSEPH:

8            I'm just making myself a note to request.

9        I do not.  I have what you have there, 8, and

10       so I request the opportunity to supplement the

11       record with those.

12           THE WITNESS:

13           Let me add that I believe when records are

14       requested what's generally requested is a copy

15       of clinic notes, consultations, and followups,

16       and things of that sort and that's what we

17       provide.  If you want a full record of all the

18       physics, some of which I don't even understand

19       myself, that's certainly available too.

20   BY MR. PIORKOWSKI:

21       Q    So you should not admit that under oath.

22       A    Admit that.

23       Q    No, I said you should not admit that under

24   oath.

25       A    Admit what, that I don't understand?

Sanford R. Katz, M.D.

```
 1        Q    Yes.

 2        A    It was kind of a joke.  I'm sorry, I was

 3   being funny.

 4        Q    I was trying to be as well.

 5        A    I won't be funny.

 6        Q    So let me -- I want to make sure we can

 7   get this.

 8             MR. PIORKOWSKI:

 9             Meghan, are you in a position to make a

10        copy of the record that he's talking about?

11             THE VIDEOGRAPHER:

12             Did you say am I in a position?

13             MR. PIORKOWSKI:

14             Yes.  I was under the impression that you

15        were physically there with him.

16             MR. JOSEPH:

17             We're all over the place, man.

18             MR. PIORKOWSKI:

19             That's the problem.  I was under the

20        understanding that I thought you were there

21        which some of my questions didn't make sense.

22             Curtis, what do you want to do here?  We

23        want a copy of all of the physics and stuff and

24        all of the stuff he has.

25             MR. JOSEPH:
```

Sanford R. Katz, M.D.

```
 1                And the CV as well.
 2                MR. PIORKOWSKI:
 3                The CV can be e-mailed in the meantime.
 4                THE WITNESS:
 5                So the problem is that, so we have his
 6      clinical chart, and you know, I was making a
 7      joke about the physics stuff but there's a
 8      tremendous amount of information that goes into
 9      treatment planning.  And we have PhD physicists
10      who have their own role in how the treatment is
11      done.  And they are board certified in medical
12      physics.  I'm not board certified in medical
13      physics and so because we have -- it's a
14      collaborative job between everyone who has
15      their specific specialties, there's stuff
16      that's not included in his clinical chart
17      that's in electronic medical records.  So when
18      I say I don't understand, it's because it's
19      outside my purview of specialization but that's
20      because that's their particular area of
21      expertise and we work collaboratively.  So it's
22      available but it's -- I don't think it's
23      anything that you are going to be able to
24      interpret.  You can have it.
25                MR. JOSEPH:
```

Sanford R. Katz, M.D.

```
1              I'm sure Joe's got some people who can
2         sift through that.
3              MR. PIORKOWSKI:
4              It's just important to have a
5         comprehensive set of the records.  We can't
6         sort of preemptively say in the front end that
7         it's not important and --
8              THE WITNESS:
9              I understand.
10    BY MR. PIORKOWSKI:
11         Q    And separately, even with respect to you,
12    I mean, one of my questions, and I think you
13    actually answered part of it already is it looked
14    like in February that you prescribed certain
15    radiation therapy to him but then my question was so
16    when did he get it and there was nothing in the
17    record that I could see to reflect that he actually
18    got it.
19         A    I'm sorry, I don't mean to talk over you.
20    In that respect, you're missing some of those
21    records.
22         Q    Right.  And I don't have your note from
23    June 5th, which we need also.  So I think what we
24    should do is get the whole record, and then we'll be
25    able to piece this together in another way.  Now,
```

Sanford R. Katz, M.D.

1    earlier though you had said you saw him in September

2    2020 last, right?

3        A    That's correct.

4        Q    Do you have a note or a follow-up that

5    reflects the September 2020 visit?

6        A    I do.

7        Q    What's the date of that?

8        A    I'm sorry, September 22nd, 2020.

9        Q    22nd.  Okay.  And that's similar to

10   Exhibit 4, it's just kind of a dictated follow-up

11   note?

12       A    That's correct.

13       Q    Now between -- we've talked about November

14   2018.  Exhibit 4 talks about February 2019 and you

15   just alluded to June 2019 and then it jumps to

16   September 2020.  Were there any other visits between

17   June 5th, 2019 and September 22nd, 2020?

18       A    Can you give me those dates again?

19       Q    Right.  And I'm just doing this off of

20   what you gave me, but you said there was one on

21   June 5th, 2019, right?

22       A    That's correct.

23       Q    And I think you said the last time you saw

24   him was September 22nd, 2020?

25       A    That's correct.  And I'm just going to

Sanford R. Katz, M.D.

```
 1   check one other source to make sure that this record

 2   is complete because what has happened since this

 3   time we've moved to electronic and this is a -- this

 4   is a physical chart, and so I just want to make sure

 5   that things weren't taken out and scanned and

 6   digitized that might not be reflected here, so let

 7   me see.  Yes, those are the only encounters that I

 8   see.  There are additional -- there's a few

 9   additional notes from when he was on treatment when

10   I saw him weekly and just made note of how he was

11   doing and I don't know if you have those notes.

12       Q    I don't.  Basically, what I sent you is

13   everything I have that has your name on it other

14   than something you were copied on.

15       A    I understand.

16       Q    So are there other documents --

17            MR. PIORKOWSKI:

18            So, Curtis, can we agree -- is your office

19       in a position to perhaps pick a copy up from

20       Dr. Katz's facility?

21            MR. JOSEPH:

22            Do you mean today?

23            MR. PIORKOWSKI:

24            No, I don't mean today.  I mean sometime

25       in the near future here.
```

Sanford R. Katz, M.D.

```
 1              MR. JOSEPH:

 2              Absolutely, yes.

 3              MR. PIORKOWSKI:

 4              And you can circulate it?

 5              MR. JOSEPH:

 6              I can scan it and e-mail to you.  I know I

 7       have Anthony's information.  I was expecting to

 8       see him.  I think I have got at least one

 9       e-mail from you today.

10              MR. PIORKOWSKI:

11              Yes, you did.

12              MR. JOSEPH:

13              So I have a valid address.

14              MS. HOVIS:

15              Is there part of the medical record that

16       is electronic and part then is written?  I

17       think that's what it sounded like and I don't

18       know if Joe --

19              THE WITNESS:

20              That's correct.

21    BY MR. PIORKOWSKI:

22       Q    So the hard copy you just eluded to is not

23    the entirety, there may be more you're saying?

24       A    Yes, there's physics related stuff that is

25    electronic that's not in the physical -- so the
```

Sanford R. Katz, M.D.

1   physical chart is basically for the clinician.  So

2   what's in the physical chart is all the things that

3   are clinically relevant to the physician or for that

4   matter, any other physician who might request

5   records.  Since this time, we really moved away from

6   the physical charts and moved more and more into the

7   digital charts.  And so the physical charts being

8   just for the clinician, there's additional

9   information.  As I said, there's physics things and

10  other things that are not relevant -- if I'm talking

11  to a patient or not relevant when I'm talking to to

12  another physician.  Or for that matter, if a

13  physician request records, this all the stuff that's

14  relevant that they would need.

15       Q    So one of things you're saying though is

16  because he's young in light of the dose that he

17  received, in part he needs ongoing monitoring.  So

18  part of what factors into that equation is the dose

19  that he received, correct?

20       A    That's correct.

21       Q    So if I asked the question this way, what

22  we need to do to get everything which would include

23  the hard copy that you have available and the

24  digital stuff?

25       A    I can get that.  I just need to ask

Sanford R. Katz, M.D.

1  somebody.  I think what happens is when the request

2  for records comes what they provide is the clinical

3  record, and they don't provide all of the numbers

4  and mathematics and digital outputs from our

5  computer treatment planning system.  It is certainly

6  there.  But it's usually not provided because it's

7  non-interpretable from everyone unless you're -- you

8  know, like I said, unless you have -- so if you

9  would like all that stuff, I'm happy to have it

10  provided to you.

11      Q    Yes, I think we would like to do that and

12  we'll -- I think rather than marking it as an

13  exhibit I think we will agree to have you produce

14  those two things and separately a copy of your

15  marked up IARC Monograph, and we can arrange to have

16  Curtis' shop I guess pick up from your office at a

17  convenient time sometime in the next few days,

18  hopefully.

19      A    That would not be a problem.

20           MR. PIORKOWSKI:

21           Curtis, are you okay with that?

22           MR. JOSEPH:

23           Absolutely.

24  BY MR. PIORKOWSKI:

25      Q    All right.  Let me ask you, separate and

Sanford R. Katz, M.D.

1    apart from the medical records that we talked about,

2    some of which I haven't seen yet, do you have any

3    other personal notes or files or memos that concern

4    Mr. Blair or any aspect of his glyphosate use that

5    are not part of his medical records other than

6    Exhibit 5, 6, and 7?

7        A    I don't have any notes.  I think that -- I

8    don't have any additional notes, no.

9        Q    You don't have a file on his case that's

10   not part of the medical record other than you just

11   eluded to the IARC Monograph that you have?

12       A    Yes, that's not part of the medical

13   record.  It is part of the -- you know, from my

14   affidavit which I didn't include that in his medical

15   record.

16       Q    Right.  But do you have any notes that you

17   used in preparing the affidavit on his case?

18       A    Yes, I have that monograph and I have some

19   of the primary papers.

20       Q    Right.  But I'm not talking about medical

21   literature.  I'm talking about notes that reflect

22   facts about his use of glyphosate.

23       A    I don't.  I recall conversations that he

24   and I had regarding the specific nature of his work.

25   You know, I didn't necessary dictate those specifics

Sanford R. Katz, M.D.

```
1    at the time of the consultation.
2        Q    Do you have a recollection right now about
3    the details of that conversation?
4        A    I do.  I remember what he described to me.
5        Q    So why don't you tell me in as much detail
6    as you can what he described to you based on your
7    recollection?
8        A    Based on my recollection, he described
9    sitting on the back of a truck and driving around
10   various structures on sides of roads where he would
11   spray -- he would spray the glyphosate at various
12   vegetation and he described it as a concentrate and
13   high pressure hose out in the air, that he did not
14   wear any protective gear, was not issued protective
15   gear, was not offered protective gear.  I think he
16   even eluded to asking about protective gear and that
17   he felt it was dismissed.  When I gave him
18   additional -- when I asked him specific questions
19   about his clothing, if he wore specific clothing and
20   then changed his clothes after work, I believe he
21   said he wore his street clothes and he said that he
22   would be often times covered in the material that he
23   was spraying, you know, all over himself because
24   there was wind and breeze and some of it would blow
25   back onto him and that he would do this for many
```

Sanford R. Katz, M.D.

```
 1   hours during the day.  And I don't recall for how
 2   long he did this job.  I didn't specify that in the
 3   medical record because it wasn't -- I didn't think
 4   it was directly related to his diagnosis or his
 5   treatment.
 6        Q    You didn't think what was directly related
 7   to his --
 8        A    At the time, all those specifics I didn't
 9   think was directly related to his treatment at the
10   time.  Much of that information I kind of gathered
11   over the course of his -- our weekly visits and
12   things of that sort, so I got more and more
13   information as time went on during our weekly visits
14   and during our conversations.
15        Q    So what else can you remember about what
16   he told you prior to your completing the affidavit?
17        A    Related to his exposure?
18        Q    Yes.
19        A    I think that was the gist of it.
20        Q    When you say that as time has gone on you
21   have learned more, is the additional information you
22   have learned let's say since the time you completed
23   the affidavit, is that documented in his medical
24   record?
25        A    I did not learn any additional information
```

Sanford R. Katz, M.D.

1    since completing the affidavit.

2         Q    About his exposure?

3         A    No.

4         Q    Okay.

5         A    The information I have was prior to the

6    affidavit.  It was during the course of our clinical

7    visits.

8         Q    Okay.  I understand.  So since the

9    affidavit, you have no new information about his

10   exposure that you didn't have at the time you filled

11   out the affidavit?

12        A    That's correct.

13        Q    Let me just ask you in general about

14   medical records.  As part of your practice as a

15   treating clinician, I assume you keep medical

16   records on all of your patients, correct?

17        A    That's correct.

18        Q    And what's the purpose of keeping medical

19   records?

20        A    The purpose is for me to review, or any

21   clinician in my practice, to review his treatment

22   plan and to have reference from which to continue to

23   provide care so we have a record of what his

24   previous care was and current situation and history

25   was.  And it was to provide any information to

Sanford R. Katz, M.D.

```
 1   anyone who might follow if I was to let's say leave
 2   my practice and someone was to take on his care that
 3   they would have relevant information, if he was to
 4   see another practitioner that needed information,
 5   where his radiation was relevant, that that
 6   information would be there.  It's -- I suppose it's
 7   important for medical legal reasons as well,
 8   obviously.
 9        Q    Just logistically, looking back at
10   Mr. Blair's record like take Exhibit 3, for example,
11   is that something you took it in, do you dictate it,
12   do you write it in longhand and somebody transcribes
13   it?  How does it get from your brain onto the paper?
14        A    I dictate that.
15        Q    You dictate it.  Okay.  And you do that
16   contemporaneous with the visit or after the visit is
17   over?
18        A    I generally do it contemporaneously.
19        Q    All right.  In judging from Exhibit 3, it
20   looks like the kinds of details you include are the
21   symptoms that the patient reported; is that right?
22        A    That's correct.
23        Q    Patient's past medical history?
24        A    That's correct.
25        Q    Findings from your own physical exam?
```

Sanford R. Katz, M.D.

```
1        A     Correct.

2        Q     The results of any tests that might have

3   been conducted?

4        A     Yes.

5        Q     Diagnoses?

6        A     Yes.

7        Q     A treatment plan?

8        A     Yes.

9        Q     Documentation of your conversations with

10  the patients?

11       A     Yes.

12       Q     And I assume you don't record every detail

13  in your records, but is it fair to say that you try

14  to record anything that's of importance in your

15  medical record entries?

16       A     That's correct.

17       Q     And I assume you try to be honest and

18  accurate when you're making your medical record

19  entries, correct?

20       A     That's correct.

21       Q     So looking back at Exhibit 3, your initial

22  visit with Mr. Blair, that's when you first became

23  aware that he had been exposed to Roundup; is that

24  right?

25       A     That's correct.
```

Sanford R. Katz, M.D.

1      Q    And you made a note in Exhibit 3 that says
2  he worked for vegetation management applying Roundup
3  around power lines, correct?
4      A    That's correct.
5      Q    Now, did he bring that up or is that
6  something you asked him about?
7      A    So we generally ask employment, what
8  people do for a living because it may be relevant to
9  their diagnosis and certainly relevant to their
10  ability to continue doing that job, whether that job
11  is no longer appropriate for them, whether it's
12  something they can continue during treatment,
13  whether it's something they can do after treatment,
14  so it's relevant.
15      Q    And are you -- so you asked him about his
16  occupation, is that what I'm gathering?
17      A    That's correct.
18      Q    And he said -- what I'm asking is who
19  brought up Roundup?  Was that you that brought it up
20  or him that brought it up?
21      A    No, sir.  The way that our consults are
22  done is the patient is first interviewed by our
23  nurse and the nurse gets most of the history.  And
24  she has a note in here as well, or she might.  I
25  have to look through.  And so she gets the history

Sanford R. Katz, M.D.

```
1   and that's generally written down.  So I think -- we
2   wouldn't specifically ask somebody what agent they
3   would use.  If he said he works in vegetation
4   management, I don't think we would directly ask if
5   he uses Roundup or what agent he used, so that
6   information was provided to my nurse.  And I wasn't
7   there, so I don't know if she specifically asked
8   about Roundup or if that was something that he
9   volunteered.
10       Q    Right.  Is it your practice when you're
11  taking a patient's history -- up to that time, was
12  it your practice to ask about Roundup or glyphosate
13  exposure?
14       A    No, sir.
15       Q    Is it your practice today?
16       A    No, sir.
17       Q    Prior to Mr. Blair becoming your patient,
18  did you have any experience with any other patient
19  with non-Hodgkin lymphoma who had been exposed to
20  Roundup or glyphosate?
21       A    I wouldn't know the answer to that
22  question because I don't know the capacity in which
23  they might be exposed, let's say in terms of buying
24  the commercial product and use it around their home,
25  so I can't say how much exposure a patient of mine
```

Sanford R. Katz, M.D.

1  might have had or not.  I don't specifically ask

2  about Roundup exposure.  We ask about occupation.

3  And so in this particular case, it was relevant

4  because he brought it up and he would have thought

5  it was relevant.

6       Q    Let me rephrase the question to make it a

7  little more clear.  Prior to Mr. Blair becoming your

8  patient, to the best of your knowledge, did any of

9  your previous patients who had MHL have a history of

10  exposure to Roundup or glyphosate?

11       A    I don't know the answer to that question.

12       Q    So to the best of your knowledge, you're

13  not aware of anybody who had exposure, is that what

14  you're saying?

15       A    It's not something I specifically ask

16  about.  And once again, I don't know what exposure

17  people have in their personal lives to Roundup since

18  I understand it's a commercial product that you can

19  buy at hardware stores.

20       Q    Prior to Mr. Blair becoming your patient,

21  did have any experience determining whether Roundup

22  or glyphosate caused or contributed to non-Hodgkin's

23  lymphoma?

24       A    I did not.

25       Q    Prior to Mr. Blair, had you ever told any

Sanford R. Katz, M.D.

```
1   patient that Roundup or glyphosate caused or
2   contributed in any way to their cancer?
3        A    I can say that there are certain
4   occupations that are associated with increased risks
5   of non-Hodgkin lymphomas.  The general consensus is
6   that from my experience, I'm sorry, is that that is
7   related to exposure to various pesticides.  I have
8   had patients who were farmers and work in the
9   agricultural field who have had non-Hodgkin's
10  lymphoma and in the past, I may have had discussions
11  saying that -- when they asked me how did I get
12  this, I may have had conversations saying --
13  explaining that it is more common in people who work
14  in agriculture and that it's thought that it is
15  possible that it is related to pesticides and
16  herbicides.
17       Q    Okay.  So my question, though, is you
18  never told a patient before Mr. Blair -- let me
19  rephrase.  Before Mr. Blair came to you as a
20  patient, you've never told a patient that Roundup or
21  glyphosate was the cause of their non-Hodgkin
22  lymphoma or any other cancer, is that right?
23       A    That's correct.
24       Q    Okay.  And what you just described,
25  actually, there are studies going back probably
```

Sanford R. Katz, M.D.

```
1    30 years showing that farmers occupationally have an

2    increased risk of non-Hodgkin lymphoma vis-a-vis

3    from the rest of the population, is that what you're

4    eluding to?

5        A    That's my understanding.  I seem to recall

6    learning that in medical school.

7        Q    And whether that's do to pesticides or

8    herbicides or insecticides or something else has not

9    really been definitively determined; is that fair?

10       A    I believe that the -- what I had learned

11   was that organophosphates specifically increased

12   risk of development of non-Hodgkin's lymphoma.

13       Q    You learned that where?

14       A    In medical school.

15       Q    In what course was that taught?

16       A    I couldn't tell you.  I don't recall

17   specifically.  It may also have been in residency in

18   some related materials and textbooks.  But it's too

19   long ago.  I can't tell you the specific source.

20       Q    Fair enough.  Prior to Mr. Blair becoming

21   your patient, were you aware of lawsuits that have

22   alleged that Roundup caused or contributed to

23   non-Hodgkin lymphoma?

24       A    I was aware, yes.

25       Q    How did you become aware of those?
```

Sanford R. Katz, M.D.

```
1        A    I think it was just probably in the lay
2   press and in the general news and things of that
3   sort.
4        Q    I just want to send you something else.
5   Are you doing okay?  You need a break?
6        A    No, I'm fine.
7        Q    So I just sent you a couple of additional
8   exhibits.  Let me know when that comes up.
9        A    I can send you my CV.  It's already loaded
10  up, if you want me to hit send and send it to you.
11       Q    That would be great.
12       A    And this was as of May.
13       Q    Okay.
14       A    I haven't received anything from you yet.
15       Q    Let me know when that shows up.
16       A    It just showed up.  Okay.
17       Q    Okay.  So I would like you to take a look
18  at the first -- have you read Mr. Blair's deposition
19  in this case?
20       A    I'm sorry?
21       Q    You understand that Mr. Blair gave a
22  deposition?
23       A    I'm seeing that now, yes.
24       Q    And I have included a couple of pages from
25  his deposition transcript --
```

Sanford R. Katz, M.D.

```
 1        A    Okay.
 2        Q    -- that I just wanted to ask you about.
 3   And if you see there at the bottom --
 4             MR. PIORKOWSKI:
 5             And Curtis, I sent you a copy of this.
 6        I'm reading from page 126 and 127.
 7   BY MR. PIORKOWSKI:
 8        Q    So I'm just going to read it into the
 9   record.  It says -- starting on-line 17, it says,
10   "What told you what the causes of your lymphoma
11   were?"  And he says, "Both of my doctors did and
12   didn't just come out and say it.  They, you know,
13   kind of hinted to me.  They asked what I did for a
14   living because they were curious because I was so
15   young.  And then they said they've never seen
16   anybody with this type of cancer before.  And I told
17   them when I found out that I, you know, did, I
18   sprayed weed killers onto trees and they told me
19   that if it was him he would go see a lawyer.  And
20   the then other one told me have you heard about the
21   lawsuit that was going on and he said I can't say
22   nothing because of legal reasons he said, but you
23   get my drift, you know."
24        A    Okay.  Let me look at this --
25        Q    Let me just finish it.
```

```
 1        A     Okay.  Fine.
 2        Q     And then we can -- "So you said both of
 3   your doctors hinted at it.  Which of the two doctors
 4   are you referring to?"  He said, "Katz and Patel."
 5   "And then which ones said if it was him he would go
 6   see a lawyer?"  "Patel."  "Okay, and which one said
 7   have you heard about a lawsuit I can't say anything
 8   because of legal reasons?"  "Dr. Katz."  And my
 9   question is just do you recall a conversation along
10   those lines with Mr. Blair?
11        A     I would like an opportunity to just look
12   at this.
13        Q     Sure.
14        A     I'm having a little trouble following this
15   but what was your question?
16        Q     Do you have a recollection of a
17   conversation along those lines with Mr. Blair?
18        A     I remember having a conversation with him
19   asking more in detail what he did for a living
20   because, yes, in fact, he was so young and his tumor
21   I recall was rather impressively bulky and it was a
22   very bulky presentation of a non-Hodgkin's lymphoma
23   that we often don't see, especially not in somebody
24   his age.  And so given that, and you're always kind
25   of curious about things, you know, what is the
```

Sanford R. Katz, M.D.

```
 1   explanation for why we're seeing something unusual.
 2   And so I personally did inquire wanting to know more
 3   about what he did for a living.  And given my
 4   understanding that herbicides can be a cause of
 5   non-Hodgkin's lymphoma, I was very interested in the
 6   nature of his work and the details of his work.  And
 7   it sounds as though from what he's describing is
 8   that Dr. Patel was as interested.  In terms of
 9   getting a lawyer, I mean, it's generally my practice
10   not to get involved, you know, recommending to
11   patients that they get lawyers.  And so if a patient
12   tells me that they are not working and their company
13   fired them because they got sick, regardless -- I
14   may say to them, I said, Well, you may want to
15   explore that further, see what your legal rights
16   are.  Especially if you're going to lose your
17   insurance, you may want to explore things but only
18   in a general sense.  I never -- it's not my practice
19   to give legal advice to patients or to tell them to
20   seek legal counsel certainly to sue pharmaceutical
21   companies or chemical companies.  So I think what
22   he's saying here, if I'm reading it correctly, is
23   that nobody came out and said anything to him
24   specifically, in terms of getting -- at least not me
25   telling him to get a lawyer or specifically about,
```

Sanford R. Katz, M.D.

```
 1   hey, there's a lawsuit that you need to get involved
 2   with, if I'm reading this correctly.
 3       Q    Do you have any recollection of saying
 4   anything along the lines of "I can't say anything
 5   because of legal reasons?"
 6       A    I don't know what that means.
 7       Q    I don't know what that means either.
 8       A    I'm not certain what that means, "I can't
 9   say anything because of legal reason."
10       Q    It may have got lost in translation and
11   that's why I'm asking you, so.
12       A    I don't really understand what that's
13   referring to, so I don't specifically recall saying
14   that.
15       Q    Did you advise Mr. Blair to go see an
16   attorney?
17       A    I don't recall that.
18       Q    Have you ever worked with Mr. Jones or his
19   partner Marshal Jones on cases in the past?
20       A    I have not worked with either of them in
21   this capacity.
22       Q    Have you worked with them in some other
23   capacity?
24       A    Yes.
25       Q    What capacity?
```

Sanford R. Katz, M.D.

```
1       A     Mr. Joseph wrote a letter on my behalf to
2   a company who I was having some difficulty with over
3   some problems with some pool equipment.
4       Q     Mr. Joseph, was he at the Jones & Odom Law
5   Firm?
6       A     I believe he was at the time.
7       Q     And was that something where you retained
8   them or they did something as a favor?
9       A     I retained him.
10      Q     All right.  Going back to Exhibit 3, which
11  is in -- your first visit, he came to the visit
12  accompanied by his mother, correct?
13      A     Let me go back to that one.
14      Q     Yep.
15      A     Yes, I made note that his mother was
16  there.
17      Q     And you have in your notes you kind of
18  discussed that both his and her questions were
19  answered, right?
20      A     That's correct.
21      Q     And we already established at that time he
22  had already been diagnosed here and he had a
23  tonsillectomy about a week earlier; is that right?
24      A     Yes.
25      Q     What was your recommendation at that time
```

Sanford R. Katz, M.D.

1    and what was the basis for the recommendation?

2        A    So my recommendation was a combination of

3    chemotherapy upfront followed by radiation therapy.

4    The basis for that was national guidelines for the

5    treatment of this condition at this particular

6    stage.

7        Q    By "this condition," you're referring to

8    DLBCL?

9        A    The Stage 1A diffuse large B-cell

10   lymphoma.

11       Q    And is that recommendation specific to the

12   location?  In other words, is the treatment

13   recommendation you just outlined related

14   specifically to the location of the DLBCL?

15       A    No.

16       Q    So that would be the recommendation for

17   DLBCL at that stage anywhere in the body?

18       A    Generally, unless let's say it was like it

19   originated in the intestine, let's say, or in the

20   abdomen.

21       Q    Does radiation come into play because it's

22   an early stage?  What's the rational for the

23   radiation?

24       A    The rational is that you want to minimize

25   toxicity while maintaining efficacy.  So since both

Sanford R. Katz, M.D.

1    modalities have toxicity by combining reduced dose

2    chemotherapy, reduced dose radiation, there is

3    synergy between them and by using them both to a

4    lesser degree than if you use one alone, you reduce

5    the potential for acute and long-term toxicity from

6    both the chemotherapy and the radiation.

7         Q    Is it inappropriate to include in your

8    note a discussion of any other potentially relevant

9    risks factors to non-Hodgkin lymphoma?

10        A    Could you explain your question a little

11   bit more?

12        Q    Yes, when you're evaluating your patient

13   that has non-Hodgkin lymphoma, there's a lot of

14   potential risks for non-Hodgkin lymphoma, right?

15        A    Okay.

16        Q    You agree with me there?

17        A    Well, you mean the risks in terms of just

18   having it or related to the treatment?

19        Q    No, I'm talking about the risk of

20   developing it in the first place.

21        A    I'm sorry, I don't follow your question.

22        Q    Well, if he had a history of rheumatoid

23   arthritis or hepatitis C, would you have written

24   that into the record?

25        A    Yes.

Sanford R. Katz, M.D.

1    Q    Why?

2    A    Because it may be relevant to his

3  treatment, his risks of side effects, you know

4  his -- which particular medications that might be

5  safe to administer.

6    Q    Are you aware of clinical studies that

7  show that obesity is -- that there is a

8  statistically significant increased risk of job

9  generally and DLBCL specifically with increasing

10  BMI?

11    A    I'm not.

12    Q    The next exhibit that I sent you is an

13  exhibit by somebody named Larson from 2007 which is

14  a med analysis of the number of studies that looked

15  at excess body weight and DLBCL and non-Hodgkin's

16  lymphoma.  Is that a paper that you're familiar

17  with?

18    A    It's not.

19    Q    I also sent you Exhibit 10 which is a

20  paper by Castille that is separately in other med

21  analysis that found an increased BMI is associated

22  with a higher relevant risk of DLBCL.  Are you

23  familiar with that?

24    A    I'm not.

25    Q    I noticed you don't have in your record --

Sanford R. Katz, M.D.

```
 1   and it's probably in some other record that I don't
 2   have, but I don't see anything with his height and
 3   weight.  But I will represent to you in his
 4   deposition he testified that at the time of his
 5   diagnosis he was five-eleven and he weighed
 6   260 pounds.  Do you know where that puts him in the
 7   spectrum of overweight obese?
 8        A    Yes, I mean, that would put him in the
 9   obese category.  I can also tell you that I weigh
10   225 pounds and I'm five-foot-eight-and-a-half.  I
11   would fall under the obesity category as well, but I
12   assure you I'm far from obese, so the BMI does not
13   take it into account body habitus, you know, whether
14   someone has a muscular frame.  So I think it's
15   flawed in that respect.  So I can say as a physician
16   I'm certainly not obese, and I can't find a
17   physician who would say that I'm obese clinically
18   but the BMI states that I am.
19        Q    All right.  Well, when people do studies
20   they have to rely on the information they have and
21   usually the information they have is BMI, right?
22        A    Yes, I understand but I think you made
23   reference to obesity.
24        Q    I did make reference to obesity.  But
25   obesity is categorized according to BMI, right?
```

Sanford R. Katz, M.D.

1      A    Okay.  All right.  I'm not going to argue.

2   I understand where you're going.

3      Q    And I'm not arguing about your own body

4   mass index or your own situation, I'm asking about

5   the patient here.

6      A    I understand.  The reason why -- and this

7   is a tangent I don't think we need to go over.  But

8   there is a clinical obesity that when we see a

9   patient we assess their nutritional status and

10  obesity.  So, you know, if I'm going to classify a

11  patient as being obese, I'm going to take it into

12  account their body habitus, not their BMI.  Now I

13  understand that for the purpose of epidemiological

14  studies they use BMI.  But I think BMI is a

15  surrogate on how fat somebody is and it doesn't take

16  into account whether they are muscular and whether

17  they work out and things of that sort and I think

18  that's clinically relevant.  But it's very hard to

19  tease that out from just BMI.  So they use BMI,

20  because for the vast majority of people, high BMIs

21  are to their fat content.  So I don't know that that

22  necessarily reflects everybody with a BMI who weighs

23  232 pounds, so I just want to put that on record

24  because I think it is relevant in this case.

25     Q    Well, he went from about 180 pounds in

Sanford R. Katz, M.D.

```
 1   2016 to 260 pounds in 2018.  That wasn't building up
 2   muscle mass over that two years, would you agree?
 3              MR. JOSEPH:
 4              I would object.  You have no bases for
 5         that, Counsel.  Zero bases for that.  All do
 6         respect.
 7   BY MR. PIORKOWSKI:
 8        Q    Do you have an opinion?  Do you have an
 9   opinion about whether Mr. Blair was clinically obese
10   at the time you saw him in November of 2018?
11        A    I'm looking at his -- I'm looking at my
12   records.  I said he was well-developed and
13   well-nourished.  I didn't make reference to the fact
14   that he was obese when I saw him.  I have a record
15   in, let's see, on March 25th, 2019 that he was
16   232 pounds and I would look to see.  There may be
17   additional records here that state -- here we go --
18   looking for it here.  Yes, when I saw him initially
19   on November 15th, 2019, he was 230 pounds six feet
20   tall with a BMI of 31.2, yes, and I have -- Oh, and
21   I also have listed under his social history that for
22   exercise activity that he does weight training.  So
23   it appears since he mentioned weight training and
24   from my recollection that he was not specifically
25   clinically obese and I said he was well-developed
```

Sanford R. Katz, M.D.

1    and well-nourished, my impression would be that much

2    of that weight was related to his weight training

3    and that fact that he was young at 22 and had

4    greater muscular mass than perhaps a BMI of 31.2

5    reflecting him being obese because of increased

6    adiposity.

7        Q    Let's look at Exhibit 5 which is the

8    affidavit.

9        A    (Views document.)  I'm sorry, I had a few

10   e-mails sent in between the ones that you sent me,

11   so I'm having to constantly go back and find so it

12   is taking me a minute.

13       Q    Sure.  Take your time.

14       A    I'm looking for Exhibit 5.  Okay.

15       Q    So can you explain how did this affidavit

16   come about?

17       A    Yes.  I was -- at the request of

18   Mr. Blair's attorneys, I was asked to give my

19   opinion regarding -- basically.  I was asked to

20   provide my personal opinion about the potential role

21   that his exposure to Roundup may have had with

22   respect to his development of his cancer.

23       Q    When you say "his attorney," who are you

24   talking about?

25       A    Marshal Jones.

Sanford R. Katz, M.D.

1      Q      So they were also representing him in the

2  Workers' Comp action?

3      A      Yes, that was a Workmen's Comp related

4  issue.

5      Q      And did Marshal Jones ask you to rate the

6  affidavit?

7      A      Yes, I was asked to rate the affidavit.

8      Q      Now, am I correct that there is nowhere in

9  Mr. Blair's medical record anywhere where you

10  specially state that Roundup caused or contributed

11  to the development of his non-Hodgkin lymphoma; is

12  that correct?

13      A      That's correct.

14      Q      Do you know how Mr. Jones knew that you

15  would be willing to sign an affidavit to that

16  affect?

17      A      I think I was asked -- I think I was

18  specially asked about his care and my records were

19  requested.  I was asked specifically about the care

20  that I delivered and I was asked if I thought that

21  his exposure to Roundup could potentially have been

22  a cause or contributed to the development of his

23  cancer.  And based upon what I knew, I said that,

24  yes, I think it was a potential contributor.  And so

25  based upon that, I was asked to write an affidavit

Sanford R. Katz, M.D.

1   and I said I would.

2       Q    So the words you just used were you

3   thought it was potential contributor, is that what

4   you said?

5       A    I thought it was very likely a cause of

6   his cancer, and the reason I use the term "potential

7   contributor" rather than "cause" is because I think

8   not everybody who uses Roundup or any type of

9   carcinogen will necessarily get a cancer.  There are

10  host factors and then there are also carcinogens and

11  that's true for smoking as well.  I say it was a

12  contributor or potential cause.

13      Q    Did you write the affidavit?

14      A    I wrote -- let's see what I wrote -- I

15  will tell you what I wrote.  I'm sorry, I'm looking

16  for it right now.  I basically wrote what was in the

17  affidavit, and it was then transcribed into I guess

18  legal form.

19      Q    What do you mean, like you wrote it on

20  another separate document?

21      A    In other words, I wrote it as a letter and

22  then the letter was transcribed into this legal

23  document with the ones and the twos and the three

24  subsections I guess for legal purposes.  And then I

25  signed it.

Sanford R. Katz, M.D.

1       Q    Okay.  Was the substance of the affidavit

2  any different than the substance of your letter that

3  you sent?

4       A    What do you mean by "substance"?

5       Q    The opinions that you expressed, the facts

6  that you stated.

7       A    Yes.

8       Q    It was different?

9       A    I'm sorry, are you saying was it

10  different?

11      Q    Yes.  Let me start over again.  Were there

12  any differences between the letter that you wrote to

13  Mr. Jones and the affidavit in terms of the language

14  that's included?

15      A    Yes.  Let me look -- I think there was a

16  slight difference, if you give me a moment.  (Views

17  document.)  Yes, there were a couple of differences

18  like, for example, I wrote for additional specifics

19  with respect to my training and other

20  qualifications, "Please reference my CV which is

21  enclosed."  That was omitted.

22      Q    Can I ask you, are you looking at the

23  original letter that you sent?

24      A    Yes, sir.

25      Q    Do you have a copy of that?

Sanford R. Katz, M.D.

```
 1        A    I do.

 2        Q    Can we mark that as an exhibit?

 3             MR. PIORKOWSKI:

 4             Curtis, can we agree to just mark it as an

 5        exhibit and he can provide it to you when you

 6        pick up the rest of the records?  Is that all

 7        right?

 8             MR. JOSEPH:

 9             Yes.  No objection.

10   BY MR. PIORKOWSKI:

11        Q    I'm sorry to interrupt you.

12        A    Yes.  And like I said, there were some

13   sentences that I suppose were not relevant.  I wrote

14   it in the letter form and then it was placed as an

15   affidavit form, so I can't say word for word it was

16   exactly the same but the substance of it was the

17   same in terms of -- I gave an opinion and it was

18   then written as an affidavit for the pertinent

19   things that I put in my opinion, and I signed the

20   affidavit as reflecting my opinion.

21        Q    Okay.  Were you compensated for preparing

22   the affidavit?

23        A    I was.

24        Q    How much were you compensated?

25        A    I don't recall.
```

Sanford R. Katz, M.D.

```
1        Q    Did you say earlier that you spent
2   approximately six hours reviewing documents and
3   literature at the time?
4        A    I believe that that was the case, yes.
5        Q    Would you have billed for six hours of
6   time at your regular rate?
7        A    I think that was an estimation, so I can't
8   say that specifically how many hours I billed for it
9   and what my rate was at the time.  I believe that
10  Mr. Joseph may have those records and I don't know
11  that I can produce them.
12       Q    Do you still have a copy of your invoice
13  from back then?
14       A    I would have to look for it.  I don't know
15  for certain that I could find it.
16            MR. JOSEPH:
17            I will see if we can find it and get that
18       to you, Joe.
19            MR. PIORKOWSKI:
20            All right.  I appreciate it.
21  BY MR. PIORKOWSKI:
22       Q    So when you are preparing an affidavit for
23  a legal proceeding, you realize that you're getting
24  into the realm of becoming an expert witness; is
25  that right?
```

Sanford R. Katz, M.D.

```
1        A    I do.

2        Q    Are you aware that there are certain

3   ethical guidelines for physicians who serve as

4   expert witnesses?

5        A    I would assume there would be, yes.

6        Q    Let me ask you, I want to turn to --

7   before you were talking about the opinions that you

8   looked at, and I just want to kind of figure out how

9   this searched happened.  You said with IARC

10  Monograph 112 and all these questions are related to

11  at the time you originally were preparing your

12  affidavit.  I assume that was over the course of a

13  couple of weeks, am I right?

14       A    I would assume so.  I don't remember the

15  specifics of the timeframe.

16       Q    So it was IARC Monograph 112, was that

17  your starting point?

18       A    I believe it was.

19       Q    Is that the first thing that you looked

20  at?

21       A    I can't recall the first thing.  I know

22  that it was a major component of what I read, and I

23  know that there were other sources as well.  I can't

24  tell you the first thing that I looked at.

25       Q    So can you just describe for me how you
```

Sanford R. Katz, M.D.

1    approached your task of looking at the literature?

2        A     I believe -- what I typically do is I use

3    PubMed.  Do I need to explain what PubMed is?

4        Q     No.

5        A     So I would have done a PubMed search and

6    reviewed various articles, both review articles and

7    primary sources, and I may have reviewed abstracts

8    or some of them.  I may have looked at the entirety

9    of the article and then eventually would have

10   narrowed it down to some primary sources that are

11   relevant and certainly this monograph is very

12   complete and represents I think a comprehensive

13   review from the World Health Organization with

14   experts from around the world looking at all the

15   available data and so that certainly was a primary

16   source.

17       Q     When you said you did a PubMed search, did

18   you save a copy of those search results?

19       A     I did not.

20       Q     Do you know what search terms you used?

21       A     I do not recall.

22       Q     I know you said you had a copy of the

23   printout of the IARC Monograph, correct?

24       A     I do.

25       Q     Did you also print out certain articles

1    that you thought were relevant?

2         A    I believe I did.

3         Q    Do you still have copies of those?

4         A    I don't believe I do.  I've since moved

5    and I don't know that those articles necessarily

6    moved with me.

7         Q    Is there any way to reconstruct what

8    things you looked at?  Let me ask you this, does the

9    IARC Monograph margin notes reflect -- the IARC

10   Monograph does discuss individual studies, correct?

11        A    Yes.  I think very likely what I probably

12   did was reviewed articles on my computer rather than

13   printing out.  So in that situation, I would have

14   read the article and not necessarily printed it out,

15   so I wouldn't have a permanent record of it.  And

16   so, you know, when I wrote my affidavit, I think I

17   made reference to the monograph but I don't know

18   whether I made reference to other specific papers.

19   So at the time I didn't see that it would be

20   relevant for me to print out all of the papers that

21   I looked at and read and keep records of them.  I

22   didn't anticipate that to be necessary.

23        Q    So as you sit here today, though, there is

24   no way to reconstruct what articles you specifically

25   looked at; is that fair?

Sanford R. Katz, M.D.

```
 1        A     I don't think that would be possible.

 2        Q     Did you look at any materials from any

 3   regulatory agencies?

 4        A     I don't recall.

 5        Q     Are you aware that the EPA has conducted

 6   several comprehensive assessments about the safety

 7   of glyphosate?

 8        A     I'm aware -- yes, I'm aware of some

 9   information to that affect, yes.

10        Q     Did you consider that information at the

11   time you prepared your affidavit?

12        A     I did.

13        Q     Do you remember what the EPA's conclusion

14   was?

15        A     The EPA's conclusion was not nearly as

16   strong as those of the World Health Organization

17   with respect to glyphosates being a carcinogen.

18        Q     Not nearly as strong as in they concluded

19   it was not a carcinogen, right?

20        A     Correct.

21        Q     Did you look at any other regulatory

22   agencies' review such as Health Canada or any of the

23   European regulators?

24        A     Yes, I recall looking at some of those as

25   well.
```

Sanford R. Katz, M.D.

1    Q    Do you recall what those conclusions were?

2    A    To answer your question, there was a

3  paragraph in the letter that I wrote to Marshal

4  Jones that was not included in the affidavit, and I

5  would like an opportunity to read that because I

6  think it does reflect the fact that I did read some

7  sources that conflicted with the conclusions of the

8  IARC.  Can I read that?

9    Q    Certainly.

10    A    "I have reviewed much of the relevant body

11  of scientific literature investigating the

12  carcinogenic potential of herbicides with particular

13  emphasis on glyphosate and non-Hodgkin's lymphoma,

14  specifically.  When combining the inherent

15  challenges specific to epidemiological studies and

16  the difficulties associated with toxicology research

17  in general, the publication of a body of research

18  with sometimes conflicting results does not

19  effectively support the conclusion that such a

20  relationship does not exhibit but merely there is

21  some controversy.  It is important to understand

22  that in failing to approve an association, a study

23  does not prove the lack of one.  Furthermore, the

24  failure of a study that demonstrates sufficient

25  statistical significance in support of a causal

Sanford R. Katz, M.D.

1  relationship does prove a lack of an association but

2  rather may merely demonstrate the inherent

3  weaknesses of the study, its methods, the design and

4  argue in favor of conducting further research

5  incorporating different studies, altering methods,

6  and attempting to minimize the impact of cofounders

7  which may serve to obscure otherwise positive

8  results."

9      Q    So what you were trying to communicate in

10  the paragraph didn't make it's way into the

11  affidavit per se?

12     A    It doesn't appear to have.

13     Q    And you would agree that the information

14  set forth in that paragraph is still true today?

15     A    Yes, I do.  It's still my opinion.

16     Q    And it's fair to say that I think you used

17  the word "controversial" or "controversy" that

18  whether glyphosate and Roundup do or do not cause

19  cancer is the subject of significant scientific

20  controversy, would you agree with that?

21     A    I would agree that it is the subject of

22  controversy.  I don't know how significant that

23  controversy is, but I would say certainly is

24  controversial.

25     Q    Well, if every regulatory agency on the

Sanford R. Katz, M.D.

```
 1    planet that has looked at the question has

 2    determined that glyphosate is not carcinogenic --

 3              MR. JOSEPH:

 4              Objection to the form.

 5    BY MR. PIORKOWSKI:

 6       Q    -- or has been to be carcinogenic and on

 7    the other side you have IARC saying that it is

 8    carcinogenic, would you consider that to be

 9    controversy?

10              MR. JOSEPH:

11              I would object to form.

12              But go ahead.

13              THE WITNESS:

14              Do I need to answer the question?

15              MR. JOSEPH:

16              Answer the question.

17              THE WITNESS:

18              I would say that is significant

19         controversy.

20    BY MR. PIORKOWSKI:

21       Q    And what you were trying to do in that

22    paragraph is in fairness acknowledge that there is

23    significant controversy and this is not a settled

24    scientific question, right?

25       A    What I was trying to say in that statement
```

Sanford R. Katz, M.D.

```
 1    was that negative results or results that fail to
 2    prove the association do not prove that there is not
 3    an association and that the nature of
 4    epidemiological studies is often flawed and requires
 5    a large body of research to be looked at
 6    holistically in order to tease out associations that
 7    may not be apparent when you look at smaller studies
 8    or more limited studies from one country or from
 9    another country.  And so the strength of the IARC is
10    that they looked at multiple countries, and I don't
11    know the degree to which the EPA has done that as
12    comprehensively as the AIRC -- I'm sorry, the IARC.
13        Q    All right.  We can take a look at that
14    next time, I guess.  Let me just ask you a couple of
15    things.  I want to make sure we're -- excuse me one
16    second.
17        A    I would add that these regulatory agencies
18    are political.  I think they are governmental.  They
19    are subject to political influences, and I think the
20    World Health Organization is a more independent
21    organization that is perhaps less subject to
22    political or other influences.
23        Q    What's your basis for saying that?
24        A    My basis for saying that is, you know, I
25    think using the example of climate change.  Yes, I
```

Sanford R. Katz, M.D.

1  think it's certainly there is significant

2  controversy on climate change, although I think the

3  vast majority of countries acknowledge climate

4  change to a greater degree than the United States

5  does.  So I think that -- I think that looking at --

6  when you look at the world as a whole and not just

7  experts from your own country, I think that it adds

8  to the conversation to have a more holistic view of

9  things and so I'm not discounting the EPA by any

10 means.  I certainly acknowledge that the EPA is an

11 expert organization.  But I do hold the World Health

12 Organization in pretty high regard.

13     Q    Let me ask you this, I mean -- and I think

14 your point is well taken that it's important to see

15 not just what the U.S. regulator agency says but

16 what regulators around the world say, correct,

17 that's what you're pointing out?

18     A    I don't know about regulators.  I'm

19 talking in terms of scientific literature, not

20 specifically regulators.  Sir, I live in Louisiana

21 and there's lot of things that are regulated and not

22 regulated in Louisiana with respect to water and

23 toxicology and things of that nature.  So, I mean, I

24 like to refer to scientific literature and

25 scientists as more of a source than regulators.

1      Q     Okay.  You understand the difference in

2   the process between -- let's say the process that

3   EPA uses to make a conclusion in the process that

4   IARC uses to make a conclusion?

5      A     No, sir.

6      Q     Are you familiar with the term "Notice In

7   Comment" what that means?

8      A     No, sir.

9      Q     Have you had any involvement at any point

10  with FTA or any kind of regulatory agency in

11  Washington DC?

12     A     I have worked for the FDA.

13     Q     You worked for the FDA.  Okay, so you have

14  never come across Notice In Comment?

15     A     I didn't work in that capacity.  I worked

16  in primary research for the FDA.

17     Q     When did you work for the FDA?

18     A     I worked in a lab.  Probably I must have

19  been 1987 through 1988, '89 at the National

20  Institute of Health.

21     Q     Is that on your CV?

22     A     It may not have been.  Let me double

23  check.  Yes, sir, it is.

24     Q     It is, okay.  Did you look at what the FDA

25  had to say about glyphosate --

Sanford R. Katz, M.D.

```
1        A    I did not.

2        Q    So to go back to this Notice In Comment,

3   when the EPA or the FDA or any United States

4   regulatory agency is issuing findings that are

5   preliminary findings that are issued followed by a

6   period of Notice In Comment where the public or

7   anybody, scientists, industry people, regulators,

8   special interests groups, whatever, have an

9   opportunity to basically make comments on the

10  preliminary findings.  Okay.  And it's not until

11  those comments have all been considered and

12  addressed that an agency issues its financial

13  report.  Now, do you know whether IARC has anything

14  similar to that where before they issue a final

15  report there's an opportunity for basically

16  transparency in the decision by allowing people to

17  comment on what the findings are?

18       A    I do not.

19       Q    Let me just ask you some things about IARC

20  here and about their conclusion.  You're

21  understanding is that IARC is not a regulatory

22  agency, right?

23       A    That's my understanding.

24       Q    And that they don't have authority or

25  responsibility for regulating any product or proving
```

Sanford R. Katz, M.D.

1    any product, anything of that nature, right?

2        A    That's my understanding.

3        Q    Let me see if I can share something here

4    on the screen.  So would you agree with me that when

5    you look at a finding that IARC makes, it's always

6    important to understand the context to appreciate

7    the context of a finding?  Is that a fair statement?

8        A    Okay, I will agree with that.

9        Q    So let me see if I can share.  Can you see

10   that on the screen?

11       A    Yes.

12       Q    Okay.  So what do you see on the screen?

13       A    I see some people holding up beverages.

14       Q    What do the beverages appear to be?

15       A    I don't know what the beverages are.  I

16   know that the glasses that they are using are

17   typically used for wine but that doesn't necessarily

18   mean that there is wine in those glasses.

19       Q    Okay.  All right.  So, basically, I'll

20   represent to you that this depicts a few friends

21   sitting around a fireplace and having a glass of

22   wine; is that fair?

23       A    I suppose -- that's the premise, yes.

24       Q    Okay.  That's the premise.  Now, if we

25   sort of look at that picture with IARC glasses on,

1    we would see two people who are ingesting a

2    Category 1 known carcinogen being the alcohol and

3    needlessly exposing themselves to fumes from burning

4    wood which according to IARC is Category 2A probably

5    carcinogenic the same as glyphosate.  I mean, those

6    are -- do have an understanding about those findings

7    from IARC?

8        A    I think that -- my understanding is, is

9    that there are carcinogens that are generated from

10   burning wood and that consuming alcohol can increase

11   your risk for developing certain types of cancer and

12   that the risks is often related to the intensity,

13   the amount, and the duration of the exposure.

14       Q    We'll get to that in a second.  And if

15   these people just before they sat down in front of

16   the fire had a nice steak dinner before they moved

17   to the fireplace, they would have exposed themselves

18   to red meat which is also probably carcinogenic

19   Category 2A, right?

20       A    I think that's reasonable.

21       Q    Okay.  Now, you wouldn't conclude even if

22   we stipulated that that's wine in the glasses based

23   on these facts that these people were to develop

24   cancer just because they're enjoying some red wine

25   in front of a cozy fire, right?

Sanford R. Katz, M.D.

```
 1        A    That's correct.

 2        Q    And the reason is because you have some

 3   context for what IARC means when it makes these

 4   findings, right?

 5        A    Could you restate that, please?

 6        Q    Sure.  Well, let me back up and ask you

 7   this theory.  What IARC does, right, its own

 8   admission, if you read the monograph, not just this

 9   monograph but any monograph is IARC performs the

10   identification, not risk assessment, is that a

11   difference you are familiar with?

12        A    Identification meaning?

13        Q    This is IARC's own characterization.  They

14   identify hazards.  They don't assess risks.

15        A    Okay.

16        Q    Let me see.  I want to make sure this is

17   your understanding, that I'm not --

18        A    But the studies that they site do use

19   risks.  They do use assessments of risks.  So the

20   actual studies when you look at them do talk about

21   relative risks and so IARC's conclusion is maybe one

22   thing.  But when I look at these studies

23   individually and I look at the relative risks, I see

24   a trend certainly that suggest increased risks.

25   Whether IARC says it, it is the individual studies
```

Sanford R. Katz, M.D.

1    to me that are actually evaluating risks.

2        Q    What studies -- the problem here -- let's

3    just talk about IARC generally for a second because

4    I want to make sure we are understanding.  We can

5    talk about your understanding of what IARC said.

6    But when IARC makes a determination, is the

7    determination they make is can this compound cause

8    cancer in some circumstances, right?

9        A    Yes.

10       Q    They don't -- and their choices are

11   definitely, probably, possibly, or definitely not,

12   right?

13       A    Right.

14       Q    And for context, you know, over the years

15   IARC has looked at thousands of -- over a thousand

16   chemicals and compounds, do you know how many times

17   they have concluded an exposure does not cause

18   cancer?

19       A    No.

20       Q    Once is the answer.  So hopefully that

21   provides --

22            MR. JOSEPH:

23            Objection.  But go ahead.

24   BY MR. PIORKOWSKI:

25       Q    In any event, but a conclusion that is

Sanford R. Katz, M.D.

```
 1   substance can cause cancer can be based on limited
 2   evidence in humans, true?
 3       A    Limited in terms of the ability to measure
 4   it conclusively like you can let's say in animals.
 5   It's much harder.
 6       Q    When IARC says something can cause cancer
 7   or probably cause cancer, they provide no indication
 8   about the duration of years of exposure that would
 9   be required to cause a person to --
10           MR. JOSEPH:
11               Objection.  Objection, Counsel.  I don't
12           know that you are necessary testifying to
13           IARC's conclusions and things of that nature.
14           I think you are here to ask the doctor
15           questions.
16           MR. PIORKOWSKI:
17               I'm asking him questions.
18           MR. JOSEPH:
19               I think we are getting beyond the pale,
20           and I have been kind of tolerant because I want
21           this to go so we can get on to the next one.
22           But I think you are getting well beyond asking
23           him questions.  You are testifying.  You are
24           testifying.
25           MR. PIORKOWSKI:
```

```
 1              He has said he is basing his conclusion in

 2        large part on --

 3              MR. JOSEPH:

 4              Right, you can ask him questions about

 5        that.  You are not necessarily -- I mean,

 6        you're an officer of the court as I am but

 7        you're not sworn as a witness to testify here.

 8              MR. PIORKOWSKI:

 9              These are all in the form of questions,

10        Curtis.

11              MR. JOSEPH:

12              They are direct statements.  You are

13        testifying, Joe.

14              MR. PIORKOWSKI:

15              They all have question marks at the end.

16              MR. JOSEPH:

17              You have to ask him questions.  You are

18        testifying about -- you can ask him questions.

19        He's answering your questions.  You've been

20        testifying for 30 minutes.

21   BY MR. PIORKOWSKI:

22        Q    When IARC reaches a conclusion, they

23   provide no indication about the duration of years of

24   exposure that would be required to cause a person to

25   development cancer, true or not?
```

Sanford R. Katz, M.D.

1        A    I don't know the answer to that question.

2        Q    Do you know whether IARC makes any

3   findings about quantitative information like the

4   dose that would be required to produce cancer?

5        A    I'm not able to answer that question

6   because I don't know the ends and outs of IARC

7   specifically.  What I read was a review of various

8   studies that were performed which I then used as a

9   jumping point as part of my review of the literature

10  and then went and look at some of those studies

11  specifically to get additional information regarding

12  their conclusions, and so I used that to form my

13  general opinion that it is more likely than not that

14  the Roundup contributed significantly to the

15  development in this non-Hodgkin's lymphoma in this

16  gentleman that presented at an atypical age to --

17  with a very bulky disease with unusually high

18  exposures that I believe are foreign in excess of

19  what was studied in any of those studies since many

20  of those studies used farmers and part -- one of

21  them the assessment is did you have more than

22  ten days or less than ten days of exposure.  And I

23  believe that Mr. Blair, the exposure that he had,

24  was off the charts relative to anything any of those

25  people studied in any of the studies whether it had

Sanford R. Katz, M.D.

```
 1    been anything that was IARC or probably anything
 2    that EPA studied because his exposure was so
 3    unusual.  It wasn't even as a farmer.  And so --
 4    that's what I used.  I didn't use the conclusion of
 5    IARC as something.  None of these studies -- you
 6    specifically talk about the duration, the amount of
 7    exposure.  I mean, my understanding is the
 8    concentration he was exposed to, the amount he was
 9    exposed to, the duration that he was exposed to, all
10    those things are far in excess of anything that they
11    looked at in any of those studies.  And so since
12    many of those studies do show an increased risk in
13    people who had much less exposure than he, I think
14    it is more likely than not that the Roundup
15    contributed to, if not the cause, to his cancer.  So
16    I -- if he had some red meat after having gone to
17    work and didn't wash his hands and the combination
18    of the red meat that he cooked over a fire after
19    spending a day with Roundup, you know, I mean, you
20    can say, hey, it could have been the red meat, but I
21    think it more likely than not that it was the
22    excessive extraordinary exposure to Roundup that
23    caused this unusual cancer in somebody his age.
24         Q    Your opinion is predicated on the fact
25    that there is a dose relationship, right?
```

Sanford R. Katz, M.D.

```
1       A    There is generally a dose response
2  relationship to everything that is related to
3  cancer.  I mean, if I have one cigarette my risk of
4  developing cancer is much less than if I have a
5  million cigarettes.  I mean, in my -- radiation
6  exposure can cause cancer but it -- certainly the
7  dose and the amount and the duration in which you
8  are getting exposed to the radiation, which I know
9  something about radiation, it's definitely a
10 carcinogen.  But it's exposure, the age at which you
11 are exposed to it, the duration, the total dose, I
12 mean, most carcinogens, those are the things that
13 are important.  It's not like, oh, you got exposed
14 to a little bit, you're going to get cancer.  So I
15 think it is relevant in this case.
16      Q    We are coming up at 1:00 and we will
17 continue this and let's make sure we have everything
18 we need in terms of documents and so forth.  So the
19 way we've left it is, Dr. Katz, you're going to
20 provide the hard copy of the records you have
21 available to Mr. Jones' office.  You're going to
22 provide some digital version of the records that are
23 digitized also whether that's on a flash drive or
24 something, correct?
25      A    Yes.
```

Sanford R. Katz, M.D.

```
 1        Q    You're going to provide a copy of your

 2   highlighted version or notated version of the IARC

 3   monograph and --

 4        A    I'm sorry, what was that last one?

 5        Q    You said you have a version of the IARC

 6   Monograph that has highlights and notes?

 7        A    That's correct.

 8        Q    So you're going to provide a copy of that

 9   that has the highlights and notes on it?

10        A    Yes.

11        Q    And then you're going to provide us with

12   the copy of the letter that you originally sent that

13   later became Exhibit 5, correct?

14        A    Yes.  Yes.

15        Q    And with respect to --

16             MR. PIORKOWSKI:

17             Curtis, we should have a discussion off

18        the record about a couple of things.  We don't

19        need to do it now for the next go round.

20   BY MR. PIORKOWSKI:

21        Q    Let me ask you quickly, Exhibit 6 and 7, 6

22   is a letter you sent also to Mr. Jones; is that

23   right?

24        A    That's correct.

25        Q    And what prompted that letter to be sent?
```

Sanford R. Katz, M.D.

1      A    My recollection is that this was requested

2  because the case with Workmen's Comp kind of trying

3  to determine how much care, medical care Mr. Blair

4  would require going forward.  And so I provided what

5  I felt was appropriate future follow up for him and

6  some of the risks factors and -- which is why I

7  think it may or may not be part of his medical

8  record.  But anyway, it was certainly relevant to

9  his particular medical care as opposed to anything

10 related to the Roundup.

11     Q    In the NCCN guidelines, those are accepted

12 national guidelines?

13     A    I would say so, yes.

14     Q    And the invoice for 375, which is

15 Exhibit 7, that was billed to the law firm for the

16 preparation of the letter?

17     A    Let me look at that.  Yes.

18     Q    And have you been asked to serve as a

19 testifying expert by Mr. Jones on behalf of

20 Mr. Blair for this case?

21     A    I think I was informed that because of my

22 participation in this -- in the Workmen's Comp that

23 I would end up being involved with future cases

24 moving forward, that committing myself to this

25 effectively meant my participation moving forward.

Sanford R. Katz, M.D.

```
 1                MR. PIORKOWSKI:
 2                Curtis, are you able to clarify on the
 3        record under Rule 26 is he --
 4                MR. JOSEPH:
 5                I spoke with Anthony last week and we will
 6        be providing y'all with the information
 7        required on that form, yes.
 8                MR. PIORKOWSKI:
 9                Well, I guess my question is, is he going
10        to issue a report or how is this going to
11        proceed?
12                MR. JOSEPH:
13                I think he's already issued a report.  He
14        issued an opinion, and I provided you with his
15        medical records, and he's testifying right now.
16                MR. PIORKOWSKI:
17                But the report he issued doesn't satisfy
18        Rule 26 for a retained expert.  It's up to you.
19        I'm not pressing you one way or the other.  We
20        don't have to have this conversation on the
21        record.  We can talk about this afterwards.
22                MR. JOSEPH:
23                Yes.  But we will have him and likely he
24        will.  We toyed with that because he is in a
25        dual capacity as far as he's the treating
```

Sanford R. Katz, M.D.

```
 1          physician.
 2               MR. PIORKOWSKI:
 3               I understand that.
 4               MR. JOSEPH:
 5               Right, so I think we decided and I told
 6          Anthony this when I talked to him on Friday,
 7          Thursday or Friday that we would be
 8          supplementing with Rule 26 information, yes.
 9               MR. PIORKOWSKI:
10               Okay.  All right.
11     BY MR. PIORKOWSKI:
12          Q    So, Doctor, thank you for your time.  Do
13     you have any questions?  Did you understand my
14     questions today?
15          A    Yes, I did.
16          Q    Were you able to answer honestly and I
17     treated you courteously?
18          A    You did and I won't make jokes next time.
19          Q    And tried to make a joke back at you.
20          A    You did.  Yes, it was fine.  You were very
21     courteous.
22               MS. HOVIS:
23               And one last thing, Mr. Joseph, was going
24          to also going give you a copy of the invoice
25          from the original affidavit.  That's on the
```

Sanford R. Katz, M.D.

```
1        list as well.

2            MR. JOSEPH:

3            I have that written down.  And I also

4        would like to be sure we have it on the record

5        that I would reserve my right to ask questions

6        when we resume this deal.

7            MR. PIORKOWSKI:

8            Yes.  Certainly.  So we are going to

9        suspend the deposition for now.  And I assume

10       at some point they will probably give you a

11       chance to read it, Doctor, at least part one

12       and we will figure out a time to resume at a

13       convenient time for you.

14           THE WITNESS:

15           Did you say read it?

16           MR. JOSEPH:

17           She will give us a transcript.

18           MR. PIORKOWSKI:

19           Since it is sworn testimony, you have an

20       opportunity to read over to make sure that the

21       words were transcribed right or you didn't say

22       whether and it came out weather.  There are

23       dual spellings of words or ambiguities and that

24       kind of stuff, so, anyway, you'll have a chance

25       to read and review your transcript.
```

```
 1          THE WITNESS:

 2          Very good.

 3          MR. PIORKOWSKI:

 4          So we are suspending your deposition

 5     today.

 6          THE VIDEOGRAPHER:

 7          We are off the record at 4:01.

 8                    (Whereupon, the deposition was

 9                    concluded at 4:01 p.m.)

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

Sanford R. Katz, M.D.

```
 1                   REPORTER'S PAGE

 2        I, Shari Peck, Certified Court Reporter

 3   in and for the State of Louisiana, the officer, as

 4   defined in Rule 28 of the Federal Rules of Civil

 5   Procedure and/or Article 1434(B) of the Louisiana

 6   Code of Civil Procedure, before whom this proceeding

 7   was taken, do hereby state on the Record:

 8             That due to the interaction in the

 9   spontaneous discourse of this proceeding, dashes

10   (--)have been used to indicate pauses, changes in

11   thought, and/or talkovers; that same is the proper

12   method for a Court Reporter's transcription of

13   proceeding, and that the dashes (--) do not indicate

14   that words or phrases have been left out

15   of this transcript;

16             That any words and/or names which could

17   not be verified through reference material have been

18   denoted with the phrase "(spelled phonetically)."

19

20                        _____

21                        Shari Peck

22

23

24

25
```

Sanford R. Katz, M.D.

```
 1              REPORTER'S CERTIFICATE
 2      This certification is valid only for a
   transcript accompanied by my original signature
 3  and original required seal on this page.
 4      I, Shari Peck, Certified Court Reporter in
   and for the State of Louisiana, as the officer
 5  before whom this testimony was administered, do
   hereby certify that SANFORD KATZ, M.D., after having
 6  been  duly sworn by me upon authority of R.S.
   37:2554, did testify as hereinbefore set forth in
 7  the foregoing 125 pages;
 8      That this testimony was reported by me in
   the stenotype reporting method; was prepared and
 9  transcribed by me or under my personal direction
   and supervision, and is a true and correct
10  transcript to the best of my ability and
   understanding;
11      That the foregoing transcript has been
   prepared in compliance with transcript format
12  guidelines required by statute or by the Rules
   of the Louisiana Certified Shorthand Reporter
13  Board; and that I am informed about the complete
   arrangement, financial or otherwise, with the
14  person or entity making arrangement for deposition
   services; that I have acted in  compliance with the
15  prohibition on contractual relationships, as defined
   by the Louisiana Code    of Civil Procedure Article
16  1434 and in rules and advisory opinions of the
   board;
17      That I have no actual knowledge of any
   prohibited employment or contractual
18  relationship, direct or indirect, between a
   court reporting firm and any party litigant in
19  this matter, nor is there any such relationship
   between myself and a party litigant in this
20  matter;
21      That I am not of counsel, not related to
   counsel or the parties herein, nor am I otherwise
   interested in the outcome of this matter.
22
23              _____
24                SHARI PECK
                CERTIFIED SHORTHAND REPORTER
25
```

Sanford R. Katz, M.D.

```
 1                    WITNESS' CERTIFICATE

 2

 3            I, SANFORD KATZ, M.D., the undersigned, do

 4    hereby certify that I have read the foregoing

 5    deposition and it contains a true and correct

 6    transcript of the testimony given by me:

 7

 8

 9            (   )Without corrections.

10            (   )With corrections as reflected

11                 the errata sheet(s) prepared by

12                 me and made a part hereof.

13

14

15

16            _____

17            SANFORD KATZ, M.D.

18

19

20            _____

21            DATE

22

23

24

25
```

Sanford R. Katz, M.D.

```
 1                    CORRECTION SHEET

 2    PAGE        LINE                       DESCRIPTION

 3    _____       _____        _____

 4    _____       _____         _____

 5    _____       _____        _____

 6    _____       _____        _____

 7    _____       _____        _____

 8    _____       _____        _____

 9    _____       _____        _____

10    _____       _____       _____

11    _____       _____       _____

12    _____       _____       _____

13    _____       _____       _____

14    _____       _____       _____

15    _____       _____       _____

16

17

18

19

20

21

22

23

24

25
```