**WILKINSON STEKLOFF LLP**
Brian L. Stekloff (*pro hac vice*)
(bstekloff@wilkinsonstekloff.com)
Rakesh Kilaru (*pro hac vice*)
(rkilaru@wilkinsonstekloff.com)
2001 M St. NW
10th Floor
Washington, DC 20036
Tel: 202-847-4030
Fax: 202-847-4005

**HOLLINGSWORTH LLP**
Eric G. Lasker (*pro hac vice*)
(elasker@hollingsworthllp.com)
1350 I St. NW
Washington, DC 20005
Tel: 202-898-5843
Fax: 202-682-1639

*Attorneys for Defendant*
*MONSANTO COMPANY*

**COVINGTON & BURLING LLP**
Michael X. Imbroscio (*pro hac vice*)
(mimbroscio@cov.com)
One City Center
850 10th St. NW
Washington, DC 20001
Tel: 202-662-6000

**BRYAN CAVE LEIGHTON PAISNER LLP**
K. Lee Marshall (CA Bar No. 277092)
(klmarshall@bclplaw.com)
Three Embarcadero Center, 7th Floor
San Francisco, CA 94111
Tel: 415-675-3400
Fax: 415-675-3434

Jed P. White (CA Bar No. 2392339)
(jed.white@bclplaw.com)
120 Broadway, Suite 300
Santa Monica, CA 90401
Tel: 310-576-2100
Fax: 310 -576-2200

**UNITED STATES DISTRICT COURT**

**NORTHERN DISTRICT OF CALIFORNIA**

| IN RE: ROUNDUP PRODUCTS LIABILITY LITIGATION<br>____________________________<br>*Beth Spector and Chuck Spector, wife and husband v. Monsanto Company*<br>Case No. 3:20-cv-05532 | MDL No. 2741<br><br>Case No.: 3:16-md-02741-VC<br><br>**DEFENDANT MONSANTO COMPANY'S NOTICE OF MOTION AND MOTION TO EXCLUDE TESTIMONY OF PLAINTIFF'S EXPERTS MARC BRAUNSTEIN AND RONALD KENDALL ON RULE 702 GROUNDS**<br><br>Hearing date: 12/13/21<br>Time: TBD |
|---|---|

**TO THE COURT, ALL PARTIES, AND THEIR ATTORNEYS OF RECORD:**

**PLEASE TAKE NOTICE THAT** beginning on December 13, 2021 in Courtroom 4 of the United States District Court, Northern District of California, located at 450 Golden Gate Avenue, San Francisco, CA 94102, or as ordered by the Court, Defendant Monsanto Company ("Monsanto") will present its Motion to Exclude Testimony of Dr. Marc Braunstein and Dr. Ronald Kendall. Monsanto seeks an order excluding opinions of these witnesses under Federal Rule of Evidence 702.

DATED: September 22, 2021

Respectfully submitted,

*/s/Eric G. Lasker*

Eric G. Lasker (*pro hac vice*)
(elasker@hollingsworthllp.com)
Hollingsworth LLP
1350 I St. NW
Washington, DC 20005
Tel: 202-898-5843

# TABLE OF CONTENTS


INTRODUCTION ..... 1

BACKGROUND ..... 2

I. Plaintiff Has Disclosed Specific Causation Experts. ..... 2

II. Plaintiff Had Risk Factors Associated with NHL. ..... 3

III. Plaintiff's Experts Do Not Use Any Scientific Methodology in Forming Their Specific Causation Opinions. ..... 3

LEGAL STANDARD ..... 4

ARGUMENT ..... 5

I. Each of Plaintiff's Experts Has an Insufficient Basis for their Opinions. ..... 5

A. Dr. Braunstein's Opinions Are Not the Product of a Reliable Methodology. ..... 5

1. Dr. Braunstein's Deposition Testimony is Inconsistent with an Opinion of Causation to a Reasonable Degree of Medical Certainty. ..... 5

B. Dr. Kendall's Opinions are Not the Product of a Reliable Methodology. ..... 6

1. Dr. Kendall Opinions and Methodolgy Are Not Reliable Because They Were Directly Copied from a Prior Expert and Are Not His Own. ..... 6

2. Dr. Kendall's Deposition Testimony is Inconsistent with an Opinion of Causation to a Reasonable Degree of Medical Certainty. ..... 9

3. Dr. Kendall Cannot Be Certain Whether Plaintiff Had a High Enough Exposure to Glyphosate to Cause Cancer. ..... 10

II. Plaintiff's Experts Failed to Adequately Assess Potential Alternative Causes of Plaintiff's NHL. ..... 10

A. Dr. Braunstein Only Considered Glyphosate Exposure and Smoking as Risk Factors for Ms. Spector's MZL. ..... 11

B. Dr. Kendall Does Not Have a Methodology for Assessing Risk Factors ..... 12

III. Plaintiff's Experts Have Not Reliably Ruled Out Unknown Causes of Plaintiff's NHL and Instead Always Point to Roundup. ..... 13

CONCLUSION ..... 14

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*In re Aredia & Zometa Prod. Liab. Litig.*,
483 F. App'x 182 (6th Cir. 2012) .......... 4

*Clausen v. M/V New Carissa*,
339 F.3d 1049 (9th Cir. 2003).......... 10, 11

*Daubert v. Merrell Dow Pharms., Inc.*,
509 U.S. 579 (1993).......... 4

*Hardeman v. Monsanto Co.*,
997 F.3d 941 (9th Cir. 2021).......... 14

*In re Lipitor (Atorvastatin Calcium) Mktg., Sales Pracs. & Prods. Liab. Litig.*,
892 F.3d 624 (4th Cir. 2018).......... 4, 13

*Moore v. BASF Corp.*,
No. 11-1001, 2012 WL 6002831 (E.D. La. Nov. 30, 2012) .......... 7

*Poust v. Huntleigh Healthcare*,
998 F. Supp. 478 (D.N.J. 1998) .......... 4

*Raymo v. Sec'y of Health & Human Servs.*,
No. 11-0654V, 2014 WL 1092274 (Fed. Cl. Feb. 24, 2014) .......... 7

*In re: Roundup Prods. Liab. Litig.*,
358 F. Supp. 3d 956 (N.D. Cal. 2019) .......... 14

*Spiral Direct Inc. v. Basic Sports Apparel Inc.*,
2017 U.S. Dist. LEXIS 225205 (M.D. Fla. Apr. 13, 2017) .......... 6, 7

**Statutes**

Vaccine Act.......... 7

**Other Authorities**

Federal Rule of Evidence 702 .......... 1, 4, 11, 14

## INTRODUCTION

This Wave 3 Plaintiff has designated new specific causation experts, Dr. Marc Braunstein and Dr. Ronald Kendall, who do not meet the requirements of Federal Rule of Evidence 702 or the standards this Court imposed in Pre-Trial Order 85 ("PTO 85"). Although each of the experts' reports conclude that Roundup exposure was a substantial contributing factor or caused Ms. Spector's NHL, their deposition testimony revealed that they do not have a basis to attribute the Plaintiff's NHL to Roundup exposure. The experts each made multiple clear and definitive statements about their views on the relationship between glyphosate or Roundup and NHL which are inherently inconsistent with a conclusion that the Plaintiff's NHL was caused by exposure to glyphosate or Roundup to a reasonable degree of medical certainly. Further, one of Plaintiff's experts simply copied a large portion of his report from a long-time plaintiffs' expert in prior Roundup cases. Additionally, Plaintiff's exposure expert argues that an internal dose, as opposed to simply exposure, to glyphosate must exist to increase a person's risk of NHL; that he could not quantify Plaintiff's internal dose at any time; and that it was not known what internal dose is required to increase the risk of NHL.

In addition, neither of the Plaintiff's experts mention "differential etiology," perhaps in an effort to circumvent the Court's standards in PTO 85. They do not specify exactly what their method is, but whatever it is, it does not include ruling out Plaintiff's other risk factors for NHL. What has not changed is that both of these experts continue to be nakedly outcome-driven. They continue to consider Roundup based on the same flawed studies the general causation experts rely on without accounting for the Plaintiff's specific NHL sub-type. But even setting that deficiency aside, they offer no coherent, defensible principle undergirding their specific causation opinions and have offered deposition testimony which in inconsistent with their conclusions. With respect to Plaintiff, they ultimately acknowledge that they cannot rule out significant risk factors for NHL, while with respect to other risk factors, they simply agree that they did no research on the topic or were unaware that it was a risk factor.

Finally, PTO 85 requires the Plaintiff's experts to prove that Plaintiff is one of the many people who would have suffered from NHL regardless of their exposure to glyphosate. Plaintiff's

exposure expert, Dr. Kendall, clearly states that he cannot make that assertion, so his specific causation opinion should be excluded.

The Court has previously described the "daunting challenge" of establishing specific causation in these cases. Dr. Braunstein and Dr. Kendall do not meet that challenge, and the Court should exclude them.

## BACKGROUND

### I. Plaintiff Has Disclosed Specific Causation Experts.

Plaintiff has disclosed the following specific causation experts.[1]

- **Dr. Marc Braunstein**, a hematologist and oncologist. *See* Declaration of Eric Lasker Ex. 1, Braunstein *Thomas* Dep. at 32:22-24[2]. Other than the reading that he has done in connection with his work as a litigation expert in the Roundup cases, he has no experience, education or expertise in the carcinogenicity of glyphosate or Roundup. *Id*. at 50:4-8. He has never designed or conducted an epidemiologic study, animal carcinogenicity study, or genotoxicity study on Roundup or glyphosate. *Id.* at 42:22-43:1, 43:12-15; 48:4-7, 48:20-23. In his own practice, he has never told a patient that Roundup was the cause of his or her lymphoma, even since becoming involved in the Roundup cases. *Id*. at 42:4-12. He has never published an article about any aspect of the diagnosis or treatment of Non-Hodgkin's Lymphoma ("NHL"), including risk factors or causes of NHL or diffuse large B-cell lymphoma ("DLBCL"). *Id*. at 42:13-21.

**Dr. Ronald Kendall,** a forensic toxicologist, *see, e.g.*, Ex. 2, Kendall *Spector* Dep. at 18:24–19:23. Dr. Kendall is not an oncologist, hematologist, pathologist, nor does he diagnose or treat cancer patients. *Id.* at 42:23–43:19. He is not a medical doctor. He holds a MS in Wildlife Biology and a PhD in Fisheries and Wildlife Sciences, with some post-doctoral "training" in toxicology. *See* Ex. 3, Kendall curriculum vitae. He works as a Professor of Environmental Toxicology at the Institute of Environmental and Human Health. *Id.*

---

[1] For ease of review and efficiency, Monsanto is filing a single brief to address each of the specific causation experts Plaintiff has named in this case.

[2] All exhibits referenced herein are attached to the Declaration of Eric Lasker, filed contemporaneously herewith.

## II. Plaintiff Had Risk Factors Associated with NHL.

As set forth at length in Monsanto's prior motion to exclude specific causation experts, (MDL ECF No. 2420), "non-Hodgkin lymphoma" ("NHL") is an umbrella term used to describe more than sixty different sub-types of cancer involving the lymphocytes, a type of white blood cell. The various sub-types have different clinical and prognostic characteristics and often have different risk factors and causes. However, in the vast majority of all NHL cases, the cause is unknown.

Beth Spector, a resident of [redacted], was diagnosed with pulmonary marginal zone lymphoma ("MZL") in 2007. *See* Ex. 4, Spector Dep. at 197:2-6; Ex. 5, Braunstein (*Spector*) Dep. at 20:10-13. Ms. Spector used Roundup at her residence for nearly 30 years to do follow-up spraying to kill any weeds that her landscaper had missed. *See* Ex. 6, First Amended Plaintiff Fact Sheet at 8 ("First Amended PFS"); Ex. 4, Spector Dep. at 93:9-15, 101:2-8, 116:6 - 117:19. Ms. Spector's medical records strongly support that she had a primary immunodeficiency, which left her susceptible to repeated pulmonary infections (including but not limited to non-tuberculous mycobacterium), with these repeated infections leading to progressive destruction of her lung tissue, a condition known as bronchiectasis. *See* Ex. 7, Reshef *Spector* Report at 6. Ms. Spector's immunodeficiency as well as the resulting infections probably contributed to the development of her MZL. Additionally, Ms. Spector had a first-degree family history of cancer. *See* Ex. 4, Spector Dep. at 228:1-5; Ex. 6, First Amended PFS at 3.

## III. Plaintiff's Experts Do Not Use Any Scientific Methodology in Forming Their Specific Causation Opinions.

Dr. Braunstein and Dr. Kendall use no real scientific process to reach their opinions and stray far from any reliable methodology. In fact, there is no stated methodology. They "rule in" Roundup as a contributing factor without taking account of the Plaintiff's specific subtype of NHL. The experts either ignore or purport to rule out every other relevant NHL risk factor except Roundup, without considering the specific sub-type at issue, and without applying the same reasoning and methodological rigor to the potential alternative causes that they apply to Roundup. And, despite acknowledging that the cause of most NHL cannot be established, throughout their analyses, these experts ignore altogether the possibility that Plaintiff's NHL may have no

identifiable cause, as would be the case where NHL is caused by a yet to be discovered factor or the result of naturally-occurring random mutations that constantly occur through normal cell division. According to each of these experts, if the Plaintiff came into contact with Roundup, that fact alone automatically excludes the possibility of an idiopathic or unknown cause.

## LEGAL STANDARD

Under Federal Rule of Evidence 702, an expert may give opinion testimony only if (a) the expert's "scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue"; (b) "the testimony is based on sufficient facts or data"; (c) "the testimony is the product of reliable principles and methods"; and (d) the expert "has reliably applied the principles and methods to the facts of the case." Fed. R. Evid. 702. In other words, an expert must be qualified and must offer testimony that is both relevant and reliable. *Id.*; *see also Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579, 589 (1993). Here, the experts' opinions should be excluded on the grounds that (1) they are not reliable, and (2) they are not helpful to the jury because the experts automatically conclude Roundup was the cause without weighing or eliminating other risk factors in any reliable manner.

In the specific causation context, Rule 702 requires experts purporting to use a differential diagnosis to carry out both aspects of that methodology—"ruling in" all possible causes and "ruling out" all but the subject cause—in a reliable fashion. To reach an admissible causation opinion through a reliable differential diagnosis, an expert must "accurately diagnose the nature of the disease, reliably rule in the possible causes of it, and reliably rule out the rejected causes." *In re Aredia & Zometa Prod. Liab. Litig.*, 483 F. App'x 182, 188 (6th Cir. 2012). Because the inherent malleability of this methodology can shroud what may be little more than subjective guesswork, the district court must "delve into the particular witness's method of performing a differential diagnosis to determine if his or her ultimate conclusions are reliable." *Poust v. Huntleigh Healthcare*, 998 F. Supp. 478, 496 (D.N.J. 1998). Courts have consistently held that expert opinions that pay lip service to this methodology but do not reliably apply it should be excluded. *See, e.g., In re Lipitor (Atorvastatin Calcium) Mktg., Sales Pracs. & Prods. Liab. Litig.*, 892 F.3d 624, 642–45 (4th Cir. 2018).

## ARGUMENT

### I. Each of Plaintiff's Experts Has an Insufficient Basis for their Opinions.

#### A. Dr. Braunstein's Opinions Are Not the Product of a Reliable Methodology.

##### 1. Dr. Braunstein's Deposition Testimony is Inconsistent with an Opinion of Causation to a Reasonable Degree of Medical Certainty.

Other than the research he has performed for his work as an expert in the Roundup cases, Dr. Braunstein has no experience, education or expertise in the carcinogenicity of glyphosate or any other pesticide. Ex. 1, Braunstein *Thomas* Dep. at 50:4-8. Prior to being retained as an expert in the Roundup cases, Dr. Braunstein had never read a medical journal article or heard a presentation at a medical meeting where the author/speaker said that glyphosate or Roundup caused NHL. *Id.* at 120:10-121:9. He had never told a patient that Roundup was a cause of their lymphoma. *Id.* at 42:4-12.

While Dr. Braunstein repeatedly "defers to general causation experts" in his report, he concludes that "to a reasonable degree of medical certainly that Ms. Spector's NHL was caused by her Roundup exposure." See Ex. 8, Braunstein *Spector* Report at 13. However, during his deposition, he admits that:

- "The literature is not definitive on" whether glyphosate causes NHL;
- "I would concede that there is debate in the field [of medicine] and in the world about the status of glyphosate as a carcinogen;" and
- Reasonable scientific minds "do" differ about whether glyphosate can cause NHL.

Ex. 1, Braunstein *Thomas* Dep. at 180:2-24; 181:19-23.

Additionally, at his deposition, Dr. Braunstein agreed that the medical literature consistently showed no relationship between Roundup and NHL when the data was adjusted for other pesticides. He agreed that, of the six studies included in Table 1 of his report, five and a half of them showed either (a) no statistically significant increase in risk of NHL for ever users of glyphosate or (b) no statistically significant increase in the risk of NHL for ever users of glyphosate when the data was adjusted for other pesticides. See Ex. 1, Braunstein *Thomas* Dep. at 227:13-14. Similarly, he agreed that the Pahwa study showed no statistically significant increase in NHL or any subtype of

NHL with ever use of glyphosate when adjusted for other pesticides. *Id.* at 228:10-12, 231:8-12, 233:24-234:14. He also agreed that the 2019 North American Pooled Project reported no statistically significant increase in NHL for ever use of glyphosate when adjusted for other pesticide use. *Id.* at 235:16-236:19.

His statements regarding the lack of definitiveness of the literature, the lack of consensus in the medical community, and the consistent findings of no increased risk across nearly all studies when including cases where the data was adjusted to other pesticide use are inconsistent with his conclusion that glyphosate use caused Ms. Spector's NHL to a reasonable degree of medical certainty. There does not appear to be any reliable methodology for ruling in glyphosate, which is a necessary part of a differential etiology.

**B. Dr. Kendall's Opinions are Not the Product of a Reliable Methodology.**

**1. Dr. Kendall Opinions and Methodolgy Are Not Reliable Because They Were Directly Copied from a Prior Expert and Are Not His Own.**

Alarmingly, much of Dr. Kendall's analysis and report is not his own. A substantial portion of Dr. Kendall's report is directly copied from a report of Dr. Sawyer, a long-time general causation expert in Roundup cases, who was not disclosed as either a general or specific causation expert in this case. In addition, Dr. Kendall did not even disclose the Sawyer report from which he plagiarized in his list of materials considered (until he filed an amended list after being confronted at his deposition with billing 3 hours for reviewing Dr. Sawyer's report). Moreover, under oath during deposition, he attempted to hide his reliance on Dr. Sawyer's report and continued to refuse to admit that he copied Dr. Sawyer's report despite acknowledging that many portions of the two reports were identical.

In *Spiral Direct Inc. v. Basic Sports Apparel Inc*., 2017 U.S. Dist. LEXIS 225205 (M.D. Fla. Apr. 13, 2017), the Court excluded an expert's opinion where the expert plagiarized "large sections of another expert's report, which she did not acknowledge until confronted in her deposition." *Id.* at *8. The factors that the Court took into account included that (1) the expert did not reference the other expert's report in her report, (2) the expert's report "provided no hint whatsoever" that she relied on another expert's report, (3) the expert did not "provide any citation or attribution" to the

other expert's report, and (4) the expert "did not show a willingness to reveal her plagiarism to anyone in the case until [counsel] confronted her about it near the end of her deposition. *Id.* at *5-7. Due to the expert's "attempt to appropriate the opinions of" another expert and "play them off as her own," the Court found that the expert's report was unreliable and must be excluded. *Id.* at *7.

*See also Moore v. BASF Corp.*, No. 11-1001, 2012 WL 6002831, at *7 (E.D. La. Nov. 30, 2012) ("Dr. Kura's use of Dr. Kopstein's work is particularly problematic in that Dr. Kura first testified that the report he proffered was his original drafting and that he had not reviewed other expert reports. When asked to explain why many of his sentences were nearly identical to Dr. Kopstein's, he later conceded that he saw Dr. Kopstein's report and at the very least took notes. The likelihood that substantial portions of Dr. Kura's report do not reflect his original work is yet another reason the Court finds that Dr. Kura's opinions in general are unreliable."); *Raymo v. Sec'y of Health & Human Servs.*, No. 11-0654V, 2014 WL 1092274, at *13 (Fed. Cl. Feb. 24, 2014) ("There is preponderant evidence that Dr. Becker plagiarized his expert report from one authored by Dr. Douglas Kerr and filed in another Vaccine Act case. When asked questions about how his report was prepared, Dr. Becker's answers were deliberately misleading. When an expert witness attempts to mislead the court on an issue as fundamental as the origin of his expert opinion, I assess his credibility as so severely compromised as to preclude reliance upon his opinion and testimony.").

In the instant case, Dr. Kendall prepared an invoice reflecting three hours of reviewing a report by Dr. Sawyer, an expert witness in the *Schafer* case. Ex. 2, Kendall *Spector* Dep. 153:8-23. Dr. Kendall only revealed that he had reviewed the report of Dr. Sawyer after being asked at deposition about the invoice reference, and, even then, he attempted to deny it, initially saying that the referenced report was by "Moll" and that the invoice reference to a toxicology report by Dr. Sawyer was a "typo." *Id.* at 153:16-155:3. When asked for what purpose he reviewed the report of another expert in another Roundup case that he was not involved with to form his opinions, he responded, "It was just information for me. It's just information. I reviewed a lot of reports." *Id.* at 157:19-158:1.

Contrary to Dr. Kendall's sworn testimony, a substantial portion of his report was

plagiarized from Dr. Sawyer's *Schafer* report; Dr. Kendall even plagiarized some of Dr. Sawyer's tables. *See, e.g.*, Ex. 9, Sawyer *Schafer* Report, at 33, 38–39, 188–91; Ex. 10, Kendall *Spector* Report, at 14–18; Ex. 11, Kendall *Savory* Dep. at 183:5–225:15. At Dr. Kendall's deposition, counsel went through sentence after sentence and paragraph after paragraph identifying where Dr. Kendall's report is either completely identical to, or is essentially the same with an occasional word change as, Dr. Sawyer's *Schafer* report. Ex. 11, Kendall *Savory* Dep. at 183:5–225:15.

Dr. Sawyer was not disclosed either as a general causation expert or a specific causation expert in the *Spector* case. *See* Ex. 12, Plaintiff's Expert Disclosures General Causation dated June 29, 2021; Ex. 13, Plaintiff's R.26 Specific Causation Expert Disclosures. Moreover, Dr. Kendall did not disclose that he had relied on Dr. Sawyer's report in his original "list of materials reviewed" attached to his report. *See* Ex. 10, Kendall *Spector* Report at 20-21. He only amended that list to include references to Dr. Sawyer's reports in the *Schafer* cases once he was confronted with his invoice for reviewing Sawyer's report during his deposition. *See* Ex. 14, Kendall Amended List of Materials Reviewed.

Worse yet, Dr. Kendall never did admit to the plagiarism, insisting that he had simply reviewed Dr. Sawyer's report and that the words came out identically because "if he's a toxicologist we – we talk the same language." Ex. 11, Kendall *Savory* Dep. at 201;13-14. He testified that "I read things, I don't take notes, and I just knock things out. And this just all came to me because this is the logical way – this is exactly the way I'm thinking." *Id.* at 194:25-195:3. The closest he came to an admission was that "It is maybe close. It's maybe close." *Id.* at 201:12.

The factors in this case mirror those in *Spiral Direct* that caused the court there to exclude the expert's report: a large portion of Dr. Kendall's report was taken from the report in a prior case of Dr. Sawyer, who is not disclosed as a general or specific causation expert in this case; he attempted to hide his reliance on Dr. Sawyer's report, even after being confronted with his own invoice reflecting his three-hour review of Dr. Sawyer's report; he failed to provide citation or attribution to Dr. Sawyer's report; he failed to even list Dr. Sawyer's report in his List of Materials Considered until confronted at his deposition; and he continues to attempt to mislead the Court by insisting that no matter how much material in his report is virtually identical to that of Dr. Sawyer's,

that he did not copy Dr. Sawyer's report. Dr. Kendall's opinions are simply not his own. It cannot be a reliable methodology to copy the report of another expert. Dr. Kendall should be excluded.

### 2. Dr. Kendall's Deposition Testimony is Inconsistent with an Opinion of Causation to a Reasonable Degree of Medical Certainty.

Dr. Kendall has no basis on which to conclude to a reasonable degree of medical certainty that Ms. Spector's exposure to glyphosate or GBHs was a "substantial contributing factor" to her development of NHL. Ex. 10, Kendall *Spector* Report at 18. During deposition, he would not answer whether he considered glyphosate to be carcinogenic or genotoxic, generally just stating that it was "debatable" and that the "studies do reflect different outcomes." Ex. 2, Kendall *Spector* Dep. at 185:19- 186:14, 194:8-12, 219:11-17. He admitted that "the answers aren't clear cut." *Id.* at 48:11-15.

Dr. Kendall also agreed that, although he would not tell a jury that glyphosate is carcinogenic, and he would not tell a jury that the surfactants used in Roundup are carcinogenic, he would opine that GBHs are carcinogenic. *Id.* at 47:6-20. When asked how non-carcinogenic glyphosate and non-carcinogenic surfactants can combine to form a carcinogenic GBH, he had no reasonable methodology for his conclusion, relying solely on "plausibility" and his suspicions ("I think that biological plausibility exists because of the biochemistry of these substances.)" *Id.* at 44:12-24. When asked whether he had identified a mechanism where glyphosate and surfactants acting in concert can cause lymphoma when acting individually they cannot, Dr. Kendall answered "I'm suspicious of it." *Id.* at 56:3-7. And again later, explaining how he could reach his conclusion about the carcinogenicity of GBHs, he said "it may not have the direct effects. It may. We don't – we still don't know exactly." *Id.* at 53:16-25.

Dr. Kendall sets forth no reasonable basis on which to assert that the combination of glyphosate and surfactants are carcinogenic, when he cannot opine that, individually they are carcinogenic. He certainly does not demonstrate his theory with any supporting scientific or toxicological data. In fact, he admits that this premise is "not known" and that the combination of these ingredients "may not have a direct effect." This testimony is inconsistent with his assertion that "to a reasonable scientific and toxicological certainty," Ms. Spector's exposure to Roundup was

a substantial contributing factor in his development of NHL. His reliance on plausibility, suspicion, debatable principles, and absolutely no scientific data do not rise to the level of a reliable methodology.

### 3. Dr. Kendall Cannot Be Certain Whether Plaintiff Had a High Enough Exposure to Glyphosate to Cause Cancer.

Dr. Kendall testified 1) that an internal dose of Roundup, rather than just exposure, is required to cause cancer; 2) that it is not known what the required internal dose is to increase cancer risk; and 3) that he could not say, for example, that plaintiff Ms. Spector ever had a sufficient internal dose to increase her risk of NHL. He stated that exposure to glyphosate is different than an internal dose of glyphosate and that an internal dose of glyphosate is necessary to cause cancer. *See, e.g.*, Ex. 11, Kendall *Savory* Dep. at 95. He also testified that the threshold internal dose at which someone is at risk of NHL from glyphosate exposure "hasn't been determined yet," and that "we haven't really determined yet in the whole area of *theory* as what – what are the threshold levels for carcinogenic response. What are they? We don't know." Ex. 2, Kendall *Spector* Dep. at 219:18-21, 232:24-233:2 (emphasis added). And, for example, he testified that "we don't know" whether Ms. Spector had an internal dose on any given day that put her at an increased risk for NHL. *Id.* at 232:22-235:1. He could "not rule out" that Ms. Spector still would have gotten NHL if she had never been exposed to Roundup. Ex. 11, Kendall *Savory* Dep. at 114:11-13; 111:10-13. Untested "theories" that haven't "been determined yet" as classic examples of opinion testimony that should be excluded under *Daubert*.

## II. Plaintiff's Experts Failed to Adequately Assess Potential Alternative Causes of Plaintiff's NHL.

Each of Plaintiff's experts failed to adequately address the numerous potential causes of Plaintiff's NHL other than Roundup, which is required for their opinions to be admissible. *See Clausen v. M/V New Carissa*, 339 F.3d 1049, 1058 (9th Cir. 2003) ("A differential diagnosis that fails to take serious account of other potential causes may be so lacking that it cannot provide a reliable basis for an opinion on causation.") (quoting *Westberry v. Gislaved Gummi AB*, 178 F.3d

257, 265 (9th Cir. 2003); *see also* PTO 85 ("The next question is whether the experts adequately assessed all of the potential causes of the plaintiffs' NHL, and properly ruled out factors other than glyphosate, while at the same time declining to rule out glyphosate itself."). The first step in a differential diagnosis is to "compile a comprehensive list of hypotheses that might explain" the plaintiff's injury. *Id.* The Ninth Circuit instructs experts to "[i]nclud[e] even rare entities in the list [to] ensure[] that such disorders are not overlooked." *Id.* (citation and quotation marks omitted). Then, in the second step of a differential diagnosis, the expert must "rule out" each of the possible causes until only the most likely cause remains. Plaintiff's experts failed to consider (or "rule in") known alternative causes altogether, thus failing to satisfy step one. Even when the experts did mention potential alternative causes, they dealt with such causes so casually that it is impossible to even discern whether they ruled in a cause and then ruled it out, or did not rule in the cause in the first place.

Regardless of which step in the differential diagnosis is involved, the experts' testimony reveals that they did not seriously consider that something other than Roundup could have caused Plaintiff's NHL. Instead, each started with the conclusion that Roundup was the cause, and then sought to justify that conclusion—and insulate it from scrutiny by the Court—by paying lip service to other potential causes or simply ignoring them. An expert conducting a differential diagnosis "must provide reasons for rejecting alternative hypotheses 'using scientific methods and procedures' and the elimination of those hypotheses must be founded on more than 'subjective beliefs or unsupported speculation.'" *Clausen*, 339 F.3d at 1058 (quoting *Claar v. Burlington N. R.R. Co.*, 29 F.3d 499, 502 (9th Cir. 1994)). Plaintiff's experts have failed to do so here, and instead have engaged in a flawed, results-driven "always Roundup" methodology—precisely the type of unreliable approach that Rule 702 prohibits.

### A. Dr. Braunstein Only Considered Glyphosate Exposure and Smoking as Risk Factors for Ms. Spector's MZL.

Dr. Braunstein freely admitted during his deposition that the only two risk factors that he considered for Ms. Spector were smoking (which he claims she did briefly as a teenager) and glyphosate exposure. Ex. 5, Braunstein *Spector* Dep. at 57:20-58:9. With respect to her risk factor

of having a first-degree family relative with cancer, he acknowledged that "there's literature that exists, yes," but he did not consider that as risk factor for Ms. Spector despite her sister's melanoma. Ex. 1, Braunstein *Thomas* Dep. at 90:8-20. He mentioned autoimmune disorders in his report as risk factors for NHL, but did not address it with respect to Ms. Spector. Ex. 8, Braunstein *Spector* Report at 8. He failed to consider that Ms. Spector's medical records strongly support that she had a primary immunodeficiency, which left her susceptible to repeated pulmonary infections (including but not limited to non-tuberculous mycobacterium), with these repeated infections leading to progressive destruction of her lung tissue, a condition known as bronchiectasis, and that her immunodeficiencies as well as the resulting infections could have contributed to the development of her MZL. *See* Ex. 7, Reshef *Spector* Report at 6. When asked at deposition whether he had formed an opinion about primary immunodeficiency, he responded, "No, I have not." Ex. 5, Braunstein *Spector* Dep. at 62:7-9.

In short, Dr. Braunstein considered no risk factors for Ms. Spector other than glyphosate exposure and short-term smoking in the distant past.

**B. Dr. Kendall Does Not Have a Methodology for Assessing Risk Factors**

Dr. Kendall does not have a method by which he systematically rules in all potential causes and then systematically rules out potential alternative causes to arrive at his conclusion as to what caused a plaintiff's NHL. Without really addressing Plaintiff's other risk factors, Dr. Kendall concludes that Ms. Spector's use of Roundup was the cause of her NHL. *See, e.g.*, Ex. 10, Kendall *Spector* Report. (In fact, he opines that glyphosate was a substantial contributing factor to Ms. Spector's DLBCL when Ms. Spector was never diagnosed with DLBCL. See *Id.* at 18. However, when specifically asked at deposition, there were a number of factors that Dr. Kendall he could not rule out as causes of Ms. Spector's NHL.

In fact, with respect to Ms. Spector, Dr. Kendall looked at no risk factors at all. *Id.*. During deposition, when asked if Ms. Spector's NHL could have been due to her increased risk from having a first degree relative with cancer, independent of other causes, Dr. Kendall stated, "It's possible. We can't rule that out." Ex. 11, Kendall *Savory* Dep. at 117:3-7. His report did not

address her primary immunodeficiency or the infections caused thereby. Ex. 10, Kendall *Spector* Report.

Dr. Kendall revealed the hodgepodge of his "methodology" during deposition testimony. When answering a questions about other risk factors as potentially independent causes of NHL, Dr. Kendall responded, ""It is – it's possible, but you've got to – I would rank all these things…If you rank them from 0 to 10, I would rank the immune system and suppression of the immune system at a 9 or 10 as a risk…I would evaluate weight might be a 2, obesity might be a 2, inflammation, that might be a 5. So again, it's – It's in there." Ex. 11, Kendall *Savory* Dep. at 162:18-163:1. When asked "what would you rank glyphosate," Dr. Kendall answered, "I don't know right now because I – I look at glyphosate interacting with – with other variables on a multifactorial (inaudible)." *Id*. at 163:3-6.

Clearly Dr. Kendall had no scientific method for assessing and ruling out alternative causes for the plaintiff's NHL.

*   *   *

Taken as a whole, these experts' reasoning closely tracks that of the experts excluded in *Lipitor*, whose conclusions "focused almost exclusively on the fact that [the plaintiff] took the drug and later developed the disease, rather than explaining what led her to believe that it was a substantial contributing factor as compared to other possible causes." 892 F.3d at 645. Here, as in *Lipitor*, the experts' reports simply "dismiss other possible causes in favor of [Roundup] in a cursory fashion that appeared closer to an *ipse dixit* than a reasoned scientific analysis." *Id.* The Court should exclude each expert's opinion on that basis.

## III. Plaintiff's Experts Have Not Reliably Ruled Out Unknown Causes of Plaintiff's NHL and Instead Always Point to Roundup.

Just as they fail to engage with the known alternative risk factors confronting Plaintiff, these experts take an equally unscientific and dismissive approach to the idiopathic causes responsible for most NHL cases: they simply ignore the prospect. This Court has already acknowledged that because the vast majority of NHL cases have no identifiable cause, an expert's specific causation

opinion is inadmissible if it fails to account for or adequately grapple with idiopathy. *In re: Roundup Prods. Liab. Litig.*, 358 F. Supp. 3d 956, 959 (N.D. Cal. 2019). To be admissible "an expert must have a way to differentiate Roundup users who developed NHL because they used the product from Roundup users who would have developed NHL regardless." *Id.* These experts are unable to offer any reliable method for placing Plaintiff in one category and not the other, and thus any such testimony cannot possibly be helpful to a jury tasked with that very assessment. Indeed, unlike prior experts, which the Ninth Circuit concluded adequately accounted for idiopathy, *see Hardeman v. Monsanto Co.*, 997 F.3d 941, 966-67 (9th Cir. 2021), Plaintiff's experts in these cases do not "rel[y] heavily on the plaintiffs' exposure levels in drawing their conclusions." PTO 85 at 6. Rather, they engage in an "always Roundup" methodology that determines Roundup to be the cause no matter the exposure. But, as this Court made clear in discussing idiopathy, exposure alone is not enough.

Dr. Braunstein admits that for "the majority of cases you're not able to" identify the specific cause for non-Hodgkin's lymphoma. *See, e.g.*, Ex. 1, Braunstein *Thomas* Dep. at 41:21–42:3. Dr. Kendall also agrees that most cases of NHL have no known cause. Ex. 2, Kendall *Spector* Dep. at 121:12-14. According to PTO 85, "The question for any particular plaintiff, then, is whether there is evidence from which a jury could conclude by a preponderance of the evidence that the plaintiff falls into the category of people whose NHL was caused by glyphosate. To assist the jury in making this assessment, an expert must have a way to differentiate Roundup users who developed NHL because they used the product from Roundup users who would have developed NHL regardless." These experts offer no explanation for how they differentiate Ms. Spector as one who would have developed NHL regardless, and, in fact, Dr. Kendall specifically claims that he "can't rule out" that Ms. Spector would have gotten NHL in the absence of her Roundup use and that he could not opine that Ms. Spector never would have developed NHL had she not been exposed to Roundup. Ex. 11, Kendall *Savory* Dep. at 111:1-13, 114:11-13.

## CONCLUSION

For the foregoing reasons, the Court should grant Monsanto's motion to exclude these specific causation experts on Rule 702 and *Daubert* grounds.

Dated: September 22, 2021

By: */s/ Eric G. Lasker*

Eric G. Lasker (*pro hace vice*)
(elasker@hollingsworthllp.com)
Hollingsworth LLP
1350 I St. NW
Washington, DC 20005
Tel: 202-898-5843

Attorney for Defendant Monsanto Company

**CERTIFICATE OF SERVICE**

I HEREBY CERTIFY that on this 22nd day of September, 2021, a copy of the foregoing was filed with the Clerk of the Court through the CM/ECF system which sent notice of the filing to all appearing parties of record.

*/s/ Eric G. Lasker*