# EXHIBIT 1

```
 1                  UNITED STATES DISTRICT COURT

                 NORTHERN DISTRICT OF CALIFORNIA

 2

 3   IN RE:  ROUNDUP PRODUCTS      MDL No. 2741

     LIABILITY LITIGATION

 4   _____

 5   SPECTOR V. MONSANTO, CO.,     *

     Case no. 3:20-cv-05532        *

 6   _____

 7

     ****************************************************

 8

             REMOTE VIDEOTAPED DEPOSITION OF

 9                RONALD J. KENDALL, Ph.D.

                     AUGUST 26, 2021

10

     ****************************************************

11

12

13

14

15

16             DEPOSITION of RONALD J. KENDALL,

17   Ph.D., produced as a witness at the instance of the

18   Defendant, and duly sworn, was taken in the

19   above-styled and numbered cause on the 26th day of

20   August, 2021, from 9:02 a.m. to 3:52 p.m., before

21   Christy R. Sievert, CSR, RPR, in and for the State

22   of Texas, reported remotely by machine shorthand,

23   pursuant to the Federal Rules of Civil Procedure and

24   the provisions stated on the record or attached

25   hereto.
```

```
 1              A P P E A R A N C E S
 2               (Appearing remotely)
 3
 4   FOR THE PLAINTIFF:
 5     MR. MARC G. BRECHER
       Wapner Newman
 6     2000 Market Street, Suite 2750
       Philadelphia, Pennsylvania  19103
 7     Phone:     267-281-5128
       E-mail:    mbrecher@wapnernewman.com
 8
 9   FOR THE DEFENDANT:
10     MR. JOHN M. KALAS
       MS. DEVARATI DAS
11     Hollingsworth, LLP
       1350 I Street, NW
12     Washington, DC 20005
       Phone:     202-898-5800
13     E-mail:    jkalas@hollingsworthllp.com
                  ddas@hollingsworthllp.com
14
15   ALSO PRESENT:
16     COLIN COUGHENOUR, Videographer
17
18
19
20
21
22
23
24
25
```

Ronald U. Kendall, Ph.D.

```
 1   least for the last decade, it cases like this one."

 2   Something dropped.

 3        A.   Okay.  For probably the last decade, I've

 4   been the prime on all the cases and projects that

 5   I've handled, pretty close to that last, say, ten

 6   years or so, approximately.

 7   BY MR. KALAS:

 8        Q.   Okay.  Did you -- were you able to open

 9   that link on your other computer?

10        A.   Let me -- okay.  It's opening now.  Okay.

11   I've got it.

12                (Exhibit No. 1 identified.)

13   BY MR. KALAS:

14        Q.   Okay.  So I've premarked five exhibits

15   there.  And, first of all, if you could open

16   Exhibit 1, please, sir.

17        A.   I've got it.

18        Q.   Okay.  That's the expert disclosure in this

19   matter.  Have you seen this document before?

20        A.   (Audio drop).

21        Q.   I missed your answer there.

22             Have you seen that document before?

23        A.   Yes, I have.

24        Q.   Okay.  And it says here on page 4 of this

25   document that you will testify on issues of specific
```

1    causation and will testify regarding forensic

2    toxicology and environmental risk assessment of

3    Roundup usage, evaluation of the chronicity, and

4    amount of Roundup exposure, how personal protective

5    gear affects the amount of exposure, and

6    epidemiological factors.  Did I read that correctly?

7        A.   Yeah.  I'm getting to that point.  I'm not

8    sure -- I'm looking here on page 3, and it's got

9    Dr. Braunstein's hourly rate, and that's not me.

10       Q.   No, no, you're the next page.  Page 4.

11       A.   Okay.  I'm on page 4.  Okay.

12       Q.   Okay.  And so I just read in the first

13   sentence of the disclosure for you there underneath

14   your name.  Does -- does that first sentence

15   accurately describe the -- in broad strokes, the

16   areas you intend to testify on?

17       A.   Yes, that's -- that's approximately

18   correct.

19       Q.   Okay.  What is forensic toxicology?

20       A.   That's the evaluation of toxic chemical

21   exposures to determine their potential or actual

22   impact in causing health concerns for -- for, say,

23   human exposure or environmental wildlife exposure.

24       Q.   Okay.  What --

25       A.   And it could -- and it could lead to legal

1    Q.   Are you an expert on human factors?

2    A.   I'm an expert on -- on pesticide

3    application and both commercial and -- and

4    residential use because I've done -- I've done a lot

5    of this.  I've evaluated sites, exposures, dead

6    birds, all kinds of things over the years.  I could

7    go -- I could spend the whole day talking about

8    evaluation of pesticide exposure to both the

9    environment and human health.

10       And as far as human factors, if you're

11   implying about exactly how people think when they're

12   using this, no, except I know that everybody doesn't

13   use it, a product consistent with the label.  And --

14   and that's just -- that's just how it is.

15   Q.   Okay.  I want to make sure I understand

16   that.  You agree with me that you aren't -- or

17   strike that.

18       You agree with me that you are not an

19   expert on how individuals interpret labeling, but

20   it's your experience that individuals do not always

21   follow the label.  That's what you're trying to say?

22   A.   Yes.

23   Q.   Okay.  Now, you're not an oncologist, true?

24   A.   Correct.

25   Q.   You're not a hematologist, right?

1       A.   I didn't hear that.

2       Q.   You're not a hematologist, right?  Not a

3  hematologist?

4       A.   No.

5       Q.   Okay.  You're not a medical doctor?

6       A.   No, sir.

7       Q.   You don't diagnose cancer, correct?

8       A.   That's correct.

9       Q.   Okay.  You don't treat cancer, correct?

10      A.   Correct.

11      Q.   You don't examine patients, correct?

12      A.   Correct.

13      Q.   You're not a pathologist, true?

14      A.   I'm -- I've evaluated a lot of pathology

15  data.  Technically, I'm not a pathologist, but I've

16  evaluated, as far as research and cases, a lot of

17  pathology data over many years.

18      Q.   Okay.

19      A.   So, no, I'm not a pathologist.

20      Q.   Okay.  Outside the context of litigation,

21  you don't offer opinions professionally about the

22  specific causes of individuals' cancers; is that

23  fair?

24      A.   Please ask that question again.

25      Q.   Sure.  Outside the context of litigation,

Ronald J. Kendall, Ph.D.

1   you don't offer expert opinions about the specific

2   causes of individuals' cancers, true?

3       A.   That's kind of true, because in the context

4   of teaching, working with students, utilizing and

5   being a part of textbooks, we're talking about the

6   factors that result in disease and disease states

7   that can lead to pathology.  And so this -- this is

8   part of -- it's just part of the process of what I

9   do as a toxicologist.

10          So -- so the comment that I only would do

11  this as part of an expert opinion on a legal case is

12  incorrect.  I do this as part of working with

13  students that will go on to be future toxicologists

14  and help them critically think and evaluate how

15  do -- how do we rule out or identify factors that

16  that -- that lead to development of disease that is

17  particularly related to chemicals and their

18  chemistries.  So that's something I do a lot.

19  Almost on a daily basis.

20      Q.   All right.  But my question was a little

21  bit different.  It wasn't about teaching about

22  potential risk factors.  It was about specifically

23  identifying the cause of cancers in individuals.

24  Okay.  Do you understand -- do you understand what

25  I'm getting at there, a person, an individual?  Do

1  glyphosate has a role in cell damage,

2  particularly -- particularly effects on the DNA;

3  however, I will not speak to glyphosate individually

4  as carcinogen as I will speak to glyphosate-based

5  herbicides.

6      Q.   Okay.  So if I understand correctly, tell

7  me if I'm wrong because I'm trying to make sure I

8  understand, you will tell the jury glyphosate-based

9  herbicides are a carcinogenic as a mixture, but you

10  will not tell the jury glyphosate by itself is

11  carcinogenic individually; is that fair?

12      A.   Yes.

13      Q.   Okay.  Will you tell the jury the

14  surfactants used in glyphosate in and of

15  themselves -- excuse me.  Let me rephrase that.

16  Strike the question.

17          Will you tell the jury the surfactants

18  used glyphosate-based herbicides in and of

19  themselves are carcinogenic?

20      A.   No.

21      Q.   Okay.  Have you published a peer reviewed

22  article on the purported toxic effects of inert

23  herbicide ingredients?

24      A.   No, but I've considered it professionally

25  for 40 years.  I've been doing pesticide studies

1    since the early '80s, back to '81, related to

2    chemical formulations and their actual application.

3    I'm not talking about theoretical.  I'm talking

4    about literally working with the formulation,

5    working with the applicators and measuring the

6    response of organisms subsequent to exposure.

7         Q.   It is true that EPA regulates both the

8    accurate ingredient -- or strike that.

9              It is true EPA regulates the active

10   ingredient, the inert ingredients, and the

11   formulated products in pesticides sold in America,

12   correct?

13        A.   They mainly regulate the active ingredient.

14        Q.   Okay.  That wasn't my question.  It wasn't

15   my question, sir.  I'll break up the question.

16        A.   Okay.

17        Q.   EPA regulates the active ingredients of

18   pesticides sold in America, true?

19        A.   True.

20        Q.   EPA regulates inert ingredients in

21   pesticides sold in America, true?

22        A.   In terms of our evaluations on the

23   Scientific Advisory Panel, we were generally working

24   with -- with the active ingredient.  The label --

25   the label will -- the label, which is the legal

1       Q.    What is the Expert Institute?

2       A.    It's just an organization that

3    identifies -- they reach out to you and ask -- and

4    ask you questions.  They get your CV and they try to

5    match you up with potential cases based on your

6    background and based on what their knowledge is of

7    the cases.  And so that would kind of be, like, you

8    know -- I don't know if that's advertising or not,

9    but it's -- it's been -- it's been very

10   professional.  They've been -- they've been terrific

11   and a very good group to work with.

12           So other than that, I usually just get a

13   phone call or an e-mail because of my academic

14   reputation and -- and just ask am I interested by

15   potential clients and so on.

16           And, like I said, I don't do this full

17   time.  I take only cases I think are relevant, I can

18   contribute to and would interest me.  So, again, I

19   have found it a challenging part of my career and

20   invigorating opportunities to use my academic

21   background to assist in case issues.

22      Q.    Is there a fee that the Expert Institute

23   receives for this matchmaking, to your knowledge?

24      A.    To my knowledge, they don't get any of my

25   fees.  I think there is a, like -- I don't really

Ronald J. Kendall, Ph.D.

```
 1   to the agency, acclaim.  And that's in the writing

 2   on a gold plaque on my wall.  And I'm really proud

 3   of that, because I was trying to help the

 4   Environmental Protection Agency do the best job

 5   possible at regulating pesticides.

 6       Q.   EPA's mission is to protect public health,

 7   true?

 8       A.   That's part of their mission, yes.

 9       Q.   And have you found that the scientists

10   there do their best to protect public health?

11       A.   Yes, but there are also interpretations and

12   issues that we dealt with over the years both when I

13   was at the Science Advisory Panel and when I was

14   with other organizations dealing with the agency

15   where interpretation was not as clear, was not as

16   precise, and we would bring to bear science and

17   facts and data that would be very compelling to them

18   to look at another side of the -- of the equation,

19   so to speak.

20       Q.   So --

21       A.   So, again, they aren't perfect.  And so I

22   know that intimately because I dealt with it.

23   And -- and you've got to understand, the EPA is

24   trying to do their best job, but they're working

25   under very tight situations.  They don't necessarily
```

Ronald J. Kendall, Ph.D.

1    NHL are associated with glyphosate-based herbicide

2    exposures?

3        A.   Large -- large B-cell differentiated

4    lymphomas.  Some of the -- that's -- that's one of

5    the big ones.  I think soft tissue sarcomas.  One

6    second.  Small lymphocyte, lymphocytic lymphomas.

7    Chronic lymphocytic leukemia.  So there are a number

8    of subtypes --

9        Q.   Can you just -- I'm sorry, go ahead.

10        A.   -- that can be classified.  You have to do

11    it under the microscope.

12        Q.   Can you just let the record reflect what

13    you've been looking at there?  I know you grabbed

14    some papers.

15        A.   Yeah, just -- just the papers I've -- I've

16    been referring to.

17        Q.   Can you -- which names of the papers were

18    you looking at there, please?

19        A.   Susan Slager, et al., Medical History,

20    Lifestyle, Family History and Occupational Risk

21    Factors for Chronic Lymphocytic Leukemia/Small

22    Lymphocytic Lymphoma:  The Inter Non-Hodgkin's

23    Lymphoma Subtypes Project.

24        Q.   Okay.  Anything -- anything else you were

25    looking at there, or is that that one --

```
 1              Starting with Exhibit 6 that I have

 2    marked, is that a true and correct copy of your CV

 3    as it stands today?

 4         A.   It's loading now.

 5         Q.   Yeah.

 6         A.   Yes, that's the latest updated copy.

 7    July 8th, 2021.

 8         Q.   Okay.  And then Exhibit 7, does that

 9    reflect all the invoices you've submitted in this

10    matter?

11         A.   Yes, sir, it does.

12         Q.   Okay.  I was just looking at it on the

13    break.  If you go to the entry for March 26, 2021 --

14    let me know when you get there.

15         A.   Okay.

16         Q.   It says here on March 26, 2021, "Phone

17    conference with Jarad Silverstein, .3 hours."  And

18    then, "Review complaints of Thomas, Dooley, Savory,

19    Wiley, and Spector clients.  Reviewed toxicology

20    report by W.R. Sawyer in regard to Schaefer v.

21    Monsanto, three hours."

22              Did I read that correctly?

23         A.   Yes, sir.

24         Q.   Okay.  What is Schafer v. Monsanto?

25         A.   I need to look.  Give me a minute.
```

Ronald J. Kendall, Ph.D.

```
1      Q.   Sure.

2      A.   That was the report by Moll on the Schafer

3   vs. Monsanto case.

4      Q.   Okay.  Can you hold that up, what you're

5   looking at there?

6      A.   Yeah.

7      Q.   Okay.  How did you get that report?

8      A.   Just one second.

9      Q.   Sure.

10     A.   I believe that was sent to me by Jarad

11  Silverstein.

12     Q.   Okay.  And do you see that it says it's a

13  toxicology report by W.R. Sawyer?  I'm looking at

14  your -- I'm looking at your invoice, sir.

15     A.   Yeah, that's -- that's -- that's just --

16  that's just a typo.

17     Q.   That's a typo?  It's not a toxicology

18  report by William Sawyer?

19     A.   No.

20     Q.   I recognize the letterhead.  The company's

21  name is TCAS, Toxicology Consultants and

22  Specialists, or something like that?

23     A.   Yeah.  Schafer was the -- was the client --

24     Q.   Right.

25     A.   -- the individual that was being evaluated.
```

Ronald J. Kendall, Ph.D.

```
 1      Q.   Right.  And the report is a report by an
 2   expert witness in the Schafer matter, correct?
 3      A.   Right.
 4      Q.   Okay.  Now, you're not an expert on the
 5   Schafer case, right?
 6      A.   No, it's just -- just -- I was just
 7   provided some information materials.  I looked --
 8   you can see I didn't spend a lot of time it.
 9      Q.   Sure.
10      A.   I went through those materials.  I was
11   looking at reports, going through the literature,
12   you know, to the best of my ability.
13      Q.   But you billed for reviewing the toxicology
14   report by Dr. Sawyer in the course of your work on
15   this case; is that true?
16      A.   Not much, because I've spent the time on
17   the Thomas, Dooley, Savory -- I was working on
18   those -- those in the Spector client reports.
19   That's what I was really working on.
20      Q.   All right.  Well, the invoice will speak
21   for itself.
22           Let me ask you this:  Did the report from
23   Dr. Sawyer make its way to your materials considered
24   list?
25      A.   I don't see it here.
```

Ronald J. Kendall, Ph.D.

1  met with this witness and things are being hidden

2  that he has reviewed.

3          MR. BRECHER:  You're saying it's

4  something that he considered in drafting his opinion

5  and his report.  He may not have considered this at

6  all in drafting his opinion and report.  This is an

7  opinion of somebody else.

8          MR. KALAS:  This is facts and data

9  provided to him by counsel, which are called for in

10  Rule 26.  So you can characterize it however you

11  like, Mr. Brecher, but at the end of the day, it's

12  my position the Rule 26 disclosure requirements have

13  not been met.

14          MR. BRECHER:  I understand that's your

15  position.

16  BY MR. KALAS:

17     Q.   Okay.  Let me ask the question again,

18  Dr. Kendall.

19          For what purpose did you review the report

20  of another expert in another Roundup case that you

21  are not involved in in forming your opinions in this

22  case?

23     A.   It was just information for me.  It's just

24  information.  I reviewed a lot of reports.  I

25  reviewed defendant's expert reports.  I reviewed a

1   lot of different reports.  That's the point.  And I

2   came to some conclusions, which I expressed in my

3   conclusionary statement in my expert report.  And

4   I'm willing to tell you how I reached those

5   conclusions, and that's what I've been trying to do

6   today.

7               MR. KALAS:  All right.  I am going to

8   mark a document as Exhibit 9.

9   BY MR. KALAS:

10      Q.   Well, actually, before I do that, I've

11  marked Exhibit 8.  Is that a true and correct copy

12  of your testimonial history that you provided to

13  plaintiff's counsel?

14      A.   It's -- it's loading.

15      Q.   Okay.

16      A.   What was the question, now?

17      Q.   Is Exhibit 8 a true and correct copy of

18  your testimonial history that you provided to

19  plaintiff's counsel?

20      A.   It looks like it, yes.

21              (Exhibit No. 9 identified.)

22  BY MR. KALAS:

23      Q.   Okay.  Now, I've marked as Exhibit 9 an EPA

24  document.  And if you can, just take a look at that

25  when you get a moment.

1    carcinogenic to humans?

2        A.    "Not likely to be carcinogenic in humans"

3    does not say it is not carcinogenic in humans.  It

4    is not likely, which is a far different conclusion

5    than saying it is not carcinogenic in humans.  So I

6    don't disagree with what they say because I know why

7    they say it, because there's still some question

8    about this.  That's why they use "not likely."

9        Q.    Is there any classification below "not

10   likely" where EPA can say "not carcinogenic in

11   humans"?  Is there that classification in the regs?

12       A.    They say "not carcinogenic."

13       Q.    Okay.  Okay.  If that's your position on

14   the regulations, that's fine.

15           How about this, EPA elsewhere in this

16   document -- and we can find it if you need to, but

17   in some ways -- anyway, we can find it if we need

18   to.

19           EPA elsewhere in that document talks about

20   the fact that glyphosate is not genotoxic.  Do you

21   disagree with that statement?

22       A.    I think there's a lot of controversy on

23   that subject because there -- okay.  Glyphosate and

24   then glyphosate formulation.  Okay.  Glyphosate,

25   based on what I've seen, is not as genotoxic as the

1    formulation in terms of the ability to induce

2    oxidative stress, particularly, or to induce any

3    genetic damage.  So the formulation is more potent

4    in that -- in that particular context.

5            So I -- I -- I'll leave it at that.

6        Q.   I'm not sure if you answered my question

7    now.  So I just want to make sure I understand your

8    position on this.

9            Do you disagree with EPA when they state

10   glyphosate is not genotoxic?

11       A.   I think that's a debatable answer based on

12   where we are today.  And in terms of -- it's

13   according to how we classify genetic toxicity as far

14   as potency.  And I think it's debatable.

15       Q.   Okay.  Now, you mentioned formulated

16   products.  I'm going to mark as exhibit -- well, let

17   me ask you this, can you go through one more

18   document, or do you need a break?  We've gone

19   50 minutes or so.

20       A.   Either way.

21       Q.   Okay.

22       A.   You know, five minutes would be great, or

23   we can go through another document.

24       Q.   Sure.  Yeah, I think I can do this one in

25   five minutes.  Give me one second.

Ronald J. Kendall, Ph.D.

1    Japanese, the EFSA, the European Chemicals Agency,

2    and the JMPR.  Are you aware there have been

3    evaluations by those agencies?

4         A.    I am.

5         Q.    Okay.  Are you aware all of those agencies

6    have classified glyphosate as not carcinogenic?

7         A.    I'm aware of some of them, yes.

8         Q.    Okay.  And assuming all those agencies have

9    classified glyphosate as not carcinogenic, I take it

10   you would not agree or disagree with those agencies

11   as well?

12        A.    I think it's a debatable issue.

13        Q.    Okay.  And, again, you have not reviewed,

14   to your knowledge, all of the material that those

15   agencies have reviewed in reaching their decisions,

16   right?

17        A.    I suspect all of those agencies haven't

18   reviewed all the other materials of the other

19   agencies in reaching those decisions either.  So the

20   answer is no.

21        Q.    Okay.  Is there an agency on earth,

22   including the IARC, that has classified

23   glyphosate-based herbicides, in other words, the

24   formulated product, as carcinogenic?

25        A.    No.

1      A.    I thought the Zhang study was very well

2  done, and it was a strong analysis.  And what they

3  really said, which made a lot of sense, was that as

4  you work your way up the dose response curve to the

5  more exposed individuals, the statistical

6  significance became stronger.  And that seems to

7  make sense because when you get to the lower dose

8  levels, it's much more difficult to detect effects,

9  that they occurred because sometimes the subtlety of

10  the response at low dose levels.

11      So that seemed to make sense to me as they

12  presented that data, which I thought was very well

13  presented.  So, again, it's -- there's a lot of

14  debate in all of this and -- and, of course, these

15  studies do reflect different outcomes, which is not

16  surprising because of the -- the very complex issues

17  we're talking about here.

18      Q.    What is the threshold internal dose at

19  which somebody is at risk of NHL from glyphosate

20  exposure?

21      A.    That hasn't been determined yet.

22      Q.    Okay.  Now, you brought up dose there.  And

23  I just want to get a sense, if we can, of what dose

24  Ms. Spector may have been exposed to when she was

25  applying Roundup.

Ronald J. Kendall, Ph.D.

1    like a very, very small amount over -- over seven

2    days or over a month daily.  It's about irregular

3    exposures that are occurring in a chronic scenario

4    over not days and months but years and decades.

5        Q.    Okay.  Is there any regulatory -- go ahead.

6        A.    If you put all of that together, it's much

7    more difficult to evaluate that chronicity when

8    you're looking at the subtleties of how some of

9    these chemicals behave.

10           And as -- as we -- as I discussed earlier,

11   there are various epidemiological studies that show

12   no association between Non-Hodgkin's lymphoma and

13   glyphosate, yet there are others that do show

14   associations.  And this is exactly what I'm talking

15   about based on the people you're measuring, the

16   types of measurements being taken, how the data are

17   being analyzed, how studies are being applied to --

18   to looking at these questions.

19           And so as I look at the whole spectrum of

20   the weight-of-the-evidence, we can -- we can discuss

21   these numbers and these -- these dose levels, but at

22   the same time we're talking about something that

23   poses, in my opinion, biological plausibility for a

24   carcinogenic response.  And we haven't really

25   defined yet in that whole area of theory as what --

1   what are the threshold levels for carcinogenic

2   response.  What are they?  We don't know.

3          That's -- that evolves with the person

4   involved, the stress factor, any immune system

5   impairment, any factors that could be involved,

6   whether you're pregnant or not or whether you're

7   having confounding factors like smoking.  So I could

8   go on and on.

9          So from my perspective, one has to look at

10  Ms. Spector's exposure in the context of the case,

11  her health, what are the confounding factors and so

12  on.

13     Q.   Okay.  Thank you for that answer.

14          Returning to I think what I was asking

15  about, is there any regulatory value on earth that

16  would suggest that somebody exposed to

17  .006 milligrams per kilogram in a given day is at a

18  human health risk?

19     A.   I'm not aware of it.

20     Q.   Okay.  And just to be clear, because you

21  mentioned about these acute exposures, glyphosate

22  does not bioaccumulate the way a substance like

23  perfluorinated chemicals might?

24     A.   It -- it does not in the human body.

25     Q.   Okay.