# EXHIBIT 11

Ronald J. Kendall, Ph.D.

```
 1              UNITED STATES DISTRICT COURT
                NORTHERN DISTRICT OF CALIFORNIA
 2
 3   IN RE:  ROUNDUP PRODUCTS       MDL No. 2741
     LIABILITY LITIGATION
 4   _____
 5   SAVORY V. MONSANTO, CO.,       *
     Case No. 3:20-cv-02403         *
 6                                  *
     -and-                          *
 7                                  *
     THOMAS V. MONSANTO, CO.,       *
 8   Case No. 3:20-cv-08051         *
     _____
 9
10   ****************************************************
11            REMOTE VIDEOTAPED DEPOSITION OF
                 RONALD J. KENDALL, Ph.D.
12                  SEPTEMBER 1, 2021
13   ****************************************************
14
15
16            DEPOSITION of RONALD J. KENDALL,
17   Ph.D., produced as a witness at the instance of the
18   Defendant, and duly sworn, was taken in the
19   above-styled and numbered cause on the 1st day of
20   September, 2021, from 8:28 a.m. to 3:06 p.m., before
21   Christy R. Sievert, CSR, RPR, in and for the State
22   of Texas, reported remotely by machine shorthand,
23   pursuant to the Federal Rules of Civil Procedure and
24   the provisions stated on the record or attached
25   hereto.
```

```
 1                A P P E A R A N C E S
 2                  (Appearing remotely)
 3
 4   FOR THE PLAINTIFF:
 5     MR. MARC G. BRECHER
       Wapner Newman
 6     2000 Market Street, Suite 2750
       Philadelphia, Pennsylvania  19103
 7     Phone:     267-281-5128
       E-mail:    mbrecher@wapnernewman.com
 8
 9   FOR THE DEFENDANT:
10     MR. JOHN M. KALAS
       MS. DEVARATI DAS
11     Hollingsworth, LLP
       1350 I Street, NW
12     Washington, DC 20005
       Phone:     202-898-5800
13     E-mail:    jkalas@hollingsworthllp.com
                  ddas@hollingsworthllp.com
14
15   ALSO PRESENT:
16     RICHARD REINSTRA, Videographer
17
18
19
20
21
22
23
24
25
```

Ronald J. Kendall, Ph.D.

```
 1                   I N D E X

                                          PAGE
 2
     Appearances.................................. 2
 3
     Exhibits.................................. 4-5
 4
     Proceedings................................. 6
 5
     RONALD J. KENDALL, Ph.D.:
 6
        Examination by Mr. Kalas.................... 8
 7
 8   Reporter's Certification................ 227-228
 9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

```
 1                  E X H I B I T S
 2   NUMBER         DESCRIPTION                 PAGE
 3   Exhibit 1      Notice of Deposition          8
                    (Savory matter)
 4
     Exhibit 2      Notice of Deposition          8
 5                  (Thomas matter)
 6   Exhibit 3      Materials Considered list     9
                    (Spector matter)
 7
     Exhibit 4      Materials Considered list     9
 8                  (Savory matter)
 9   Exhibit 5      Materials Considered list     9
                    (Thomas matter)
10
     Exhibit 6      8-7-19 letter from EPA        12
11
     Exhibit 7      4-3-09 letter from EPA        23
12
     Exhibit 8      Glyphosate's Synergistic      52
13                  Toxicity in Combination With
                    Other Factors as a Cause of
14                  Chronic Kidney Disease of
                    Unknown Origin
15
     Exhibit 9      Cancer Stat Facts: Non-Hodgkin 79
16                  Lymphoma
17   Exhibit 10     The Mechanism of DNA Damage   124
                    Induced By Roundup 360 PLUS,
18                  Glyphosate and AMPA in Human
                    Peripheral Blood Mononuclear
19                  Cells - Genotoxic Risk Assessment
20   Exhibit 11     Studies on Glyphosate-Induced 132
                    Carcinogenicity in Mouse Skin:
21                  A Proteomic Approach
22   Exhibit 12     IARC Monograph               144
23   Exhibit 13     Declaration of Dr. Kendall   147
                    Savory matter
24
     Exhibit 14     Declaration of Dr. Kendall   147
25                  Thomas matter
```

Ronald J. Kendall, Ph.D.

```
 1                    E X H I B I T S
                        (continued)
 2
     NUMBER          DESCRIPTION                    PAGE
 3
     Exhibit 15    Declaration of Dr. Kendall      147
 4                 Savory matter (PDF)
 5   Exhibit 16    Declaration of Dr. Kendall      147
                   Thomas matter (PDF)
 6
     Exhibit 17    Non-Hodgkin Lymphoma Causes,     165
 7                 Risk Factors, and Prevention
 8   Exhibit 18    Substances Listed in the        180
                   Fourteenth Report on Carcinogens
 9
     Exhibit 19    Plaintiffs' Rule 26 Specific    181
10                 Causation Expert Disclosures
11   Exhibit 20    Plaintiffs' Rule 26 Specific    181
                   Causation Expert Disclosures
12
     Exhibit 21    William Sawyer report           182
13
14
15
16
17
18
19
20
21
22
23
24
25
```

```
 1                P R O C E E D I N G S
 2                THE VIDEOGRAPHER:  All right.  We are
 3      now on the record.  My name is Richard Reinstra.
 4      I'm a videographer for Golkow Litigation Services.
 5                Today's date is September 1, 2021, and the
 6      time is approximately 8:28 a.m.
 7                This remote video deposition is being held
 8      in the matter of Roundup Products Liability
 9      Litigation, Savory vs. Monsanto Corp. and Thomas vs.
10      Monsanto Corp.
11                The deponent today is Dr. Ronald J.
12      Kendall, Ph.D.
13                All parties to this deposition are
14      appearing remotely and have agreed to the witness
15      being sworn in remotely.  Due to the nature of
16      remote reporting, please pause briefly before
17      speaking to ensure that all parties are heard
18      completely.
19                Will counsel please identify yourselves
20      for the record?  And we can start with Mr. Kalas.
21                MR. KALAS:  John Kalas on behalf of
22      Monsanto Company.
23                MR. BRECHER:  Marc Brecher on behalf
24      of Mr. Savory and Mr. Thomas.
25                THE VIDEOGRAPHER:  All right.  The
```

Ronald J. Kendall, Ph.D.

```
 1    court reporter today is Christy Sievert, and she

 2    will now swear in the witness.

 3              (Oath administered.)

 4              MR. KALAS:  I'll just note for the

 5    record, Devarati Das is also appearing on behalf of

 6    Monsanto Company, and she is present.

 7                   RONALD J. KENDALL, Ph.D.

 8              having been first duly sworn,

 9                testified as follows:

10                   EXAMINATION

11    BY MR. KALAS:

12        Q.   Dr. Kendall, good morning.  How are you

13    today?

14        A.   Good morning.  I'm fine, sir.  How are you?

15        Q.   I'm good.  Thank you.

16              So we talked about this before the

17    deposition, but I just want to make sure it's clear

18    for the record.  You are going to be referring back,

19    as needed, to exhibits that were marked in the

20    deposition we took last week regarding the Spector

21    matter, and you have access to those exhibits,

22    correct?

23        A.   Correct.

24              MR. KALAS:  Okay.  I have marked in

25    the exhibit link for today the notice of deposition
```

Ronald J. Kendall, Ph.D.

```
 1    in the Savory and Thomas matters, and those are the

 2    two matters we will be talking about today.  Those

 3    have been marked as Exhibits 1 and 2.

 4              (Exhibit Nos. 1 & 2 marked.)

 5    BY MR. KALAS:

 6       Q.   So if you can, take a look at those real

 7    quick, please.

 8       A.   Okay.  Would it -- would it be Exhibits 1

 9    and 2 from last week's exhibit list or today's link?

10       Q.   Today's link, sir.

11       A.   Okay.  Let me go -- let me go back to

12    today's link.

13       Q.   Okay.

14       A.   Just one second, please.

15       Q.   Yeah.  If you refresh today's link, they

16    should appear, Dr. Kendall.

17       A.   Okay.  Yes, sir.  Okay.  It came up that

18    time.

19              So, Mr. Kalas, can you -- what -- please

20    re- -- tell me what you need me to do.

21       Q.   Sure.  I was just noting that I had marked

22    as Exhibits 1 and 2 the notices of deposition in the

23    Savory and Thomas cases, and those notices are

24    marked there.  And have you seen those notices

25    before?
```

Ronald J. Kendall, Ph.D.

1      A.   I have.

2      Q.   Okay.  And in response to those notices,

3  you produced responsive documents, correct?

4      A.   Yes.  Yes, I have.

5      Q.   Okay.  And one of the things you produced

6  last week at the Spector deposition was a list of

7  your invoices, correct?

8      A.   I did.

9      Q.   Okay.  And I assume you haven't submitted

10  any invoices between the Spector deposition and

11  today.  Right?

12     A.   No, sir.

13     Q.   Okay.  And then another thing you provided

14  was an updated CV at the Spector deposition last

15  week.  Do you recall that?

16     A.   Yes.

17     Q.   Okay.  And I, again, assume you haven't

18  updated your CV between the Spector deposition and

19  today?

20     A.   That's correct.

21          (Exhibit Nos. 3 - 5 marked.)

22  BY MR. KALAS:

23     Q.   Okay.  And then I've marked as Exhibits 3

24  through 5 there updated materials considered lists,

25  and those for the Spector case, the Savory case and

1    the Thomas case.  Do you see that?

2        A.   Yes.

3        Q.   Okay.  And am I correct that that is a full

4    and complete list of materials you've considered in

5    reaching your opinions in those three cases?

6        A.   Yes, sir.

7        Q.   Okay.  There's nothing else that you think,

8    you know, upon reflection sitting here today you

9    want to add to that?

10       A.   No, sir.

11       Q.   Okay.  If Monsanto wanted to put a cancer

12   warning on the Roundup label today, would they be

13   allowed by EPA to do that?

14       A.   I'm not sure.  I think they -- they may be

15   able to -- I think they could use language that

16   there may be carcinogenic properties within this

17   formulation and appropriate care and personal

18   protective equipment should be used, and then that

19   should be identified.  It could probably be some

20   language like that, based on my recollection of

21   language for -- for labels.  I haven't -- I haven't

22   worked on labels for years, but that would be my

23   recollection.

24       Q.   Okay.  Are you aware EPA has specifically

25   told glyphosate registrants that they cannot label

Ronald J. Kendall, Ph.D.

1   glyphosate-containing herbicides as carcinogenic?

2      A.   Not -- not specifically like that.

3      Q.   Okay.

4      A.   But there are other ways to articulate

5   something like that with -- with various levels of

6   whether it's "hazardous" or "caution should be

7   used," "danger," whatever.  Those are -- those are

8   words used on the label as related to the potential

9   toxicity of the substance to humans or the

10  environment.

11     Q.   I'm not sure if I understood that answer.

12  Let's back up a second.

13     A.   Okay.

14     Q.   When you said "not specifically like that,"

15  at first I thought you were referring that you had

16  no awareness, but then the context of that answer

17  made it seem like you had awareness and you're aware

18  they couldn't list it like that but that they could

19  do other things.  So let me just ask the question

20  again because I'm unclear on what you meant there.

21          Are you aware -- or do you have any

22  awareness that EPA has told glyphosate registrants

23  that they cannot list or -- or label

24  glyphosate-containing herbicides as carcinogenic?

25  Do you have any awareness of that?

1       A.   As I sit here today, I'm not specifically

2    aware of the communication between EPA and

3    glyphosate registrants.

4              MR. KALAS:   Okay.   I have marked as

5    Exhibit 6 in today's link a letter from EPA from

6    August 7, 2019.

7              (Exhibit No. 6 marked.)

8    BY MR. KALAS:

9       Q.   Let me know when you have that, and we can

10   take a look at that.

11      A.   Okay.

12      Q.   Okay.   And go ahead and take a minute just

13   to read it to yourself before I ask any questions

14   about it.

15      A.   Okay.

16              (Reviews document.)

17              MR. BRECHER:   I don't have Exhibit 6.

18   I have your first five exhibits, but I don't have

19   Exhibit 6.

20              MR. KALAS:   Try to refresh the link,

21   Marc, and then it -- and then it should show up.

22              MR. BRECHER:   It did.   Okay.

23   BY MR. KALAS:

24      Q.   Okay.   All right.   Have you finished

25   reading it?

Ronald J. Kendall, Ph.D.

```
1       A.   I have.

2       Q.   Okay.  And just -- first of all, this is a

3   document that is on EPA letterhead, right?

4       A.   It is.

5       Q.   Okay.  And these sorts of letters are --

6   are one of the ways the Agency communicates with

7   product registrants, right?

8       A.   Right.

9       Q.   Okay.  And it's written, if you go to the

10  end, by somebody named Michael Goodis, who is

11  director of the registration division at The Office

12  of Pesticide Programs.  Do you see that?

13      A.   I do.

14      Q.   Okay.  What does the director of the

15  registration division at The Office of Pesticide

16  Programs do, if you know?

17      A.   He -- he oversees the final registration

18  proceedings for pesticide products utilized in the

19  United States.

20      Q.   Okay.  And so when you say he oversees the

21  final registration proceedings for pesticide

22  products registered in the United States, he is the

23  person who has to sign off on the registration of

24  pesticides; is that fair?

25      A.   That's fair.
```

Ronald J. Kendall, Ph.D.

1     Q.   Okay.  And he is the person who has to sign

2  off on the labeling of pesticides; is that fair?

3     A.   That's fair.

4     Q.   Okay.  And what Mr. Goodis said in the last

5  paragraph of the first page is he said, "Given EPA's

6  determination that glyphosate is not likely to be

7  carcinogenic to humans, EPA considers the

8  Proposition 65 warning language based on the

9  chemical glyphosate to constitute a false and

10  misleading statement."

11        Did I read that correctly?

12     A.   You did.

13     Q.   Okay.  Could pesticide labels contain false

14  and misleading statements?

15     A.   They should not.

16     Q.   Okay.  Why are they not allowed to under

17  EPA regulations?

18     A.   In the United States, the label is the

19  legal contract between the registrant and the

20  commercial buyer --

21     Q.   Okay.  And --

22     A.   -- as -- as administered by the EPA.

23     Q.   Okay.  And so EPA acts as -- well, let me

24  back up and ask -- ask a more basic question.

25        Is the goal of EPA to avoid false and

Ronald J. Kendall, Ph.D.

1    misleading statements on pesticide labels?

2        A.    That's -- that's their intention.

3        Q.    Okay.  Would labeling a pesticide as

4    carcinogenic when it is, in fact, not carcinogenic

5    be a false and misleading statement?

6        A.    It's according to how you interpret it.

7    They state here based on their interpretation, the

8    California Proposition 65, that highly engaged the

9    evaluation done with International Agency for

10   Research on Cancer, they viewed that as not correct.

11   So there is substantial disagreement and debate on

12   the appropriate language.  However, in the -- if you

13   use that product in the United States, the

14   governance of it, the oversight of it falls under

15   the legislation, the Federal Insecticide and

16   Rodenticide Act, as administered by the

17   Environmental Protection Agency.

18       Q.    Okay.  And I wasn't talking about

19   glyphosate in particular there.  I was asking a

20   broader question.  And so I understand you answered

21   in the context of glyphosate, and that's fair and

22   fine.

23           But just broadly, if you label the

24   pesticide as carcinogenic when it, in fact, is not

25   carcinogenic, would that be false and misleading?

Ronald J. Kendall, Ph.D.

```
 1        A.   It would be based on the regulatory
 2   authority and where it's governed, because these
 3   products are used worldwide we're talking about, and
 4   they're governed by many different agencies around
 5   the world.  Generally speaking, at least in the
 6   United States, labeling should engage the
 7   appropriate science and interpretation.  And it gets
 8   more complicated when there's so much debate around
 9   the world related to many of these products.  And we
10   dealt with this all the time when I was chairman of
11   the -- the FIFRA Scientific Advisory Panel at EPA
12   debating all these pesticide risk assessment issues.
13        Q.   Okay.  And, you know, you -- you answered
14   my question as it was asked, and I appreciate that.
15   You mentioned that it depends on where it's
16   registered.  So I'll ask it a bit more narrowly.
17             In the United States, if you labeled a
18   pesticide as carcinogenic when it was, in fact, not
19   carcinogenic, would that be mislabeling false and
20   misleading -- strike that.  Let me ask it again.
21        A.   Okay.
22        Q.   In the United States, if you labeled a
23   pesticide as carcinogenic when it was, in fact, not
24   carcinogenic, would that be a false and misleading
25   statement under FIFRA regulations?
```

1        A.    Yes, it would.

2        Q.    Okay.   And if we continue with Exhibit 6,

3   he goes down to say, "In registering pesticides, EPA

4   must determine that the labeling complies with the

5   requirements of FIFRA, including that the product

6   not be misbranded."

7              Did I read that correctly?

8        A.    Yes.

9        Q.    And you agree with that interpretation of

10  FIFRA?

11       A.    Yes.

12       Q.    Okay.   Continuing on, it says, "Therefore,

13  EPA will no longer approve labeling that includes

14  the Proposition 65 warning statement for

15  glyphosate-containing products.   The warning

16  statement must also be removed from all product

17  labels where the only basis for the warning is

18  glyphosate, and from any materials considered" --

19  "considered labeling under FIFRA for those

20  products."

21             Did I read that correctly?

22       A.    Yes.

23       Q.    Okay.   And so after seeing this letter,

24  would you agree that a pesticide company would not

25  be allowed to list a glyphosate-based herbicide as

Ronald J. Kendall, Ph.D.

1   carcinogenic on its label?

2       A.   Based on -- on the evaluation done back in

3   2019, that was their position.

4       Q.   Okay.  And are you aware of EPA changing

5   their position at all between 2019 and today?

6       A.   I'm not aware.  Except --

7       Q.   Okay.  And glyphosate was introduced -- go

8   ahead, I'm sorry.

9       A.   Except the administrations have changed,

10  and -- and the Agency is -- based on my

11  interactions, the Agency is different now than it

12  was in the previous administration.  So I have no

13  idea where this is all going except as of August of

14  2019, that was their position, and they haven't

15  changed it as of yet, to my knowledge.

16      Q.   Right.  And that's -- that's a good point.

17  EPA has changed their position since the Biden

18  administration has come in on many chemicals, right?

19      A.   Right.

20      Q.   I mean, one example is ethylene oxide.

21      A.   Exactly.

22      Q.   Ethylene oxide, the Agency has changed

23  their position, correct?

24      A.   Yes.

25      Q.   Okay.  And since the Biden administration

Ronald J. Kendall, Ph.D.

```
1   has come in, the Agency has changed their position
2   on perfluorinated chemicals, correct?
3        A.   Absolutely.
4        Q.   Since the Biden administration has come in,
5   the Agency has changed their position on
6   chlorpyrifos, which is a pesticide, correct?
7        A.   Correct.
8        Q.   Okay.  And, to your knowledge, since the
9   Biden administration has come in, EPA has not
10  changed their position on glyphosate, fair?
11       A.   To my knowledge.  But it's still a
12  moving -- moving process.
13       Q.   Okay.  And, in fact, when we're talking
14  about administrations, glyphosate was first
15  registered in 1974, right?
16       A.   Correct.
17       Q.   Okay.  And the president of 1974 was
18  Richard Nixon and/or Gerald Ford, right?
19       A.   That is correct.
20       Q.   Okay.  And under those two administrations,
21  glyphosate was not labeled as carcinogenic by the
22  Agency, right?
23       A.   To my recollection, within -- within the
24  United States under the EPA.
25       Q.   Okay.  Okay.  And, likewise, in the Jimmy
```

Ronald J. Kendall, Ph.D.

```
 1    Carter administration, a Democrat, glyphosate was
 2    not listed as carcinogenic by the EPA, right?
 3         A.   To my knowledge, it was not.
 4         Q.   Okay.  And then Ronald Reagan and George
 5    Bush were both president.  They were both
 6    republicans.  Glyphosate was not labeled as
 7    carcinogenic in either of their administrations,
 8    true?
 9         A.   True.
10         Q.   Okay.  And then Bill Clinton came in, a
11    Democrat.  Glyphosate was not labeled as
12    carcinogenic in his administration, right?
13         A.   That's correct.
14         Q.   Okay.  And then we had George Bush, a
15    Republican, the younger one, and we had Barack
16    Obama, a Democrat, and then we had Donald Trump, a
17    Republican.  And in all three of their
18    administrations, glyphosate was not labeled as
19    carcinogenic, right?
20         A.   That's correct.
21         Q.   Okay.  Now, one of the allegations that
22    have been brought up in this litigation has been
23    allegations about things like ghostwriting.  Have
24    you heard of that term, "ghostwriting"?
25         A.   I've heard of it, but I don't -- I don't
```

Ronald J. Kendall, Ph.D.

1    know what you're referring to, though.

2        Q.   Okay.  Well, what is your understanding of

3    the term "ghostwriting"?

4        A.   I don't know.  I guess somebody writes

5    something and you don't know who they are that wrote

6    it, or something, I guess.

7        Q.   Right.  And -- and some of the allegations

8    involve allegations that, you know, articles were

9    put out there in the literature or statements put

10   out there in the literature are written by somebody

11   else and then accredited to the person on the "by

12   line."  Would that be a wrong thing to do, in your

13   opinion?

14       A.   It depends on what it was.  I guess so.

15       Q.   Okay.  And -- and, I mean -- and the reason

16   is, is that authorship should be ascribed to the

17   person who actually wrote the statements, right?

18       A.   I suppose so.

19       Q.   Okay.  And, you know, some of -- one of the

20   things you can do when there's been folks who've

21   advised or informed is you can, you know, in a peer

22   reviewed article put in the acknowledgments, for

23   instance, you know, acknowledging the contribution

24   of that person, right?

25       A.   Right.

Ronald J. Kendall, Ph.D.

```
 1        Q.   Okay.  And that would be -- that would be
 2   something that's done in the literature, right?
 3        A.   Yes.
 4        Q.   For instance, when you worked on eco risk
 5   as a consultant on atrazine issues and you would
 6   publish in the peer reviewed literature, you would
 7   acknowledge that Novartis Chemical or Syngenta had
 8   either funded your work or had provided, you know,
 9   information for your work, right?
10        A.   Yes.
11        Q.   Okay.  And that's the right thing to do?
12        A.   Yes.
13        Q.   Okay.  And so, likewise, if there was a
14   paper funded by Monsanto on glyphosate and it was
15   acknowledged in the acknowledgment section that
16   Monsanto had some involvement with that paper,
17   that's sufficient to let a reader know that Monsanto
18   was involved in some way in that paper, right?
19        A.   I would -- I would think so.
20        Q.   Okay.  But, you know, if you didn't
21   acknowledge the contribution of the Monsanto
22   scientist, or whatever scientist, that would be
23   wrong because then you would be hiding from the
24   reader the contribution of that person, right?
25        A.   I suppose so.
```

Ronald J. Kendall, Ph.D.

```
 1       Q.   Okay.  Let's. . .

 2            All right.  Now, we talked a little bit

 3  last time about the fact that EPA regulates inert

 4  pesticide ingredients.  Do you recall that?

 5       A.   Yes.

 6       Q.   Okay.  And these inert ingredients, they

 7  include surfactants, adjuvants, any additive

 8  products besides water to the -- to the finished

 9  pesticide product, right?

10       A.   Correct.

11       Q.   Okay.  And I take from looking at your MCL,

12  you have not reviewed the EPA approval documents for

13  the surfactants used in Roundup products.  Is that

14  fair?

15       A.   That's fair.

16            MR. KALAS:  Okay.  I'm just going to

17  mark one of those so we can look at it.  Give me a

18  second.  It's not in there yet.

19            (Exhibit No. 7 marked.)

20  BY MR. KALAS:

21       Q.   Okay.  I have marked as Exhibit 7 the

22  document dated April 3, 2009.

23       A.   Okay.

24       Q.   All right.  Have you seen this document

25  before?
```

Ronald J. Kendall, Ph.D.

```
1        A.    I have not.

2        Q.    Okay.  And this is, again, a document on

3   EPA letterhead, right?

4        A.    It is.

5        Q.    Okay.  And the subject is "Alkyl Amine

6   Polyalkoxylates."  Do you see that?

7        A.    Right.

8        Q.    Okay.  And one of the surfactants that gets

9   talked about a lot in Roundup litigation is POEA.

10  And you have heard of POEA, right?

11       A.    Yes.

12       Q.    Okay.  And that's a surfactant that's used

13  in lots of pesticide products, not just Roundup,

14  right?

15       A.    Right.

16       Q.    Okay.  And POEA is part of this family of

17  surfactants, the alkyl amine polyalkoxylates, true?

18       A.    True.

19       Q.    Okay.  And if you look down here, this is a

20  document that's signed by a whole host of EPA

21  employees, and it's sent to the team leader for the

22  inert ingredient assessment branch.  Do you see

23  that?

24       A.    I do.

25       Q.    Okay.  So EPA actually has a specific
```

Ronald J. Kendall, Ph.D.

```
1   branch focused on the evaluation of inert
2   ingredients in pesticide products, right?
3       A.   Right.
4       Q.   Okay.  And so there are -- there are
5   chemists and toxicologists whose only job is to
6   evaluate toxicology data on inert ingredients, fair?
7       A.   Fair.
8       Q.   Okay.  And if you go down here, they have
9   done a human health risk assessment on these alkyl
10  amine polyalkoxylates, right?
11      A.   It appears so.  I haven't read it, though.
12      Q.   Okay.  I'm just looking at the header there
13  above the table of contents.
14      A.   Okay.
15      Q.   And if you want to take time to read this
16  document -- again, I'm the one who marked it.  So if
17  you want to take a look at it and then answer
18  questions, that's fine.  But I have some questions
19  about some specific tests they did there.  So stop
20  me if you want to read the whole thing.
21      A.   Let me -- give me just a minute.  Let me
22  look -- just look at it real quick.
23      Q.   Sure, familiarize yourself with it.  Go
24  ahead.
25      A.   (Reviews document.)
```

Ronald J. Kendall, Ph.D.

1          Okay.  I read the executive summary real

2    quick.

3      Q.   Okay.  And when EPA conducts the human

4    health risk assessment, what -- what are they doing?

5      A.   Well, they're -- they're looking at

6    evidence for exposure in either the general

7    population or workers handling materials and so on.

8    Then they're evaluating the data derived from

9    usually the registrants, data derived from

10   laboratory animal studies, experimental animal

11   toxicology data.  And then they will also look at

12   evidence of, say, genotoxicity, cellular-type in

13   vitro studies to determine mechanisms of action and

14   potential targets for toxicological effects.

15          So they're combining all of that into a

16   theoretical risk assessment to try to evaluate

17   how -- how hazardous a substance could be to -- to

18   human health.

19     Q.   All right.  And they're not just looking at

20   acute effects.  They're also looking at chronic

21   effects, right?

22     A.   Yes.  Absolutely.

23     Q.   Okay.  And chronic effects would include

24   cancer?

25     A.   Yes.

```
 1        Q.   Okay.  And so if you go into this document
 2   and you go down to -- I think it's page -- give me a
 3   moment.
 4             All right.  If you go to page 57 and 58 --
 5   or excuse me -- 58 -- no, 57 and 58.  I was right.
 6             Starting at the bottom of page 57, it says
 7   here that there had been a --
 8        A.   I'm not quite there.
 9        Q.   Okay.  I'm sorry.
10        A.   I'm getting there.
11        Q.   Okay.
12        A.   I'm just about there.
13        Q.   All right.
14        A.   I'm scrolling through this thing.  It's
15   just moving a little slow, but I'm about there.
16        Q.   Yes, sir.
17        A.   Okay.  I'm on 57 now.
18        Q.   Okay.  So we're on 57.  And if you look at
19   the bottom of 57, sir.
20        A.   Okay.
21        Q.   You'll see there that they discuss the
22   bacterial reverse mutation test 870.5100 being used
23   on a surfactant called MON 59112.  Do you see that?
24        A.   I do.
25        Q.   Okay.  And the bacterial reverse mutation
```

Ronald J. Kendall, Ph.D.

```
 1    test, that's the Ames assay we talked about last

 2    time?

 3         A.   Right.

 4         Q.   Okay.  And 870.5100 refers to the EPA

 5    guideline that Monsanto is following in running this

 6    test?

 7         A.   Right.

 8         Q.   Okay.  And it says here there was, "No

 9    evidence of induced mutant colonies over

10    background."

11              Do you see that?

12         A.   I do.

13         Q.   What does that mean?

14         A.   That means there was no evidence of

15    mutation by the substance in this particular assay.

16         Q.   Okay.  And if you --

17         A.   In other words, it --

18         Q.   -- go down to the next -- I'm sorry.

19         A.   It didn't -- the substance tested did not

20    have mutagenic properties.  That's what it means in

21    this test under these guidelines.

22         Q.   Okay.  And if you go down to the next page,

23    it says here they conducted the same test in a

24    surfactant called MON 0818.  Do you see that?

25         A.   Yes.
```

Ronald J. Kendall, Ph.D.

1      Q.   Okay.  And it says there MON -- in the

2   results, "MON 0818 was tested up to cytotoxic

3   concentrations in all strains but failed to induce a

4   mutagenic response in this test system.  The

5   positive controls induced the expected mutagenic

6   responses in the appropriate strain.  There was no

7   evidence of induced mutant colonies over

8   background."

9           Did I read that correctly?

10     A.   You did.

11     Q.   Okay.  And what does that mean, that there

12  was no evidence of induced mutant colonies over

13  background in the context of MON 0818?

14     A.   It means there was no evidence that

15  MON 8- -- MON 0818 had any mutagenic properties in

16  this particular assay under the test conditions

17  ascribed to it in this particular report.

18     Q.   Okay.  And MON 0818, that is, in fact,

19  POEA, right?

20     A.   I believe it is.

21     Q.   Okay.  Going down, it says here that they

22  conducted mammalian erythrocyte micronucleus tests

23  in both MON 0818 and MON 59112.  Do you see that?

24     A.   I do.

25     Q.   Okay.  And the guideline they put there is

1    870.5395, right?

2        A.   Right.

3        Q.   Okay.  And so these are guideline tests

4    that EPA tells registrants they need to carry out on

5    inert ingredients, right?

6        A.   Right.

7        Q.   Okay.  And for the MON 0818 -- well, let me

8    back up and ask the question.

9             Are these 870.5395 micronucleus tests, are

10   these in vivo or in vitro?

11       A.   In vitro.

12       Q.   Okay.  Are you sure about that?  If you

13   see --

14       A.   No, I think -- I think they're in vivo.

15   Yeah, I just --

16       Q.   Okay.  Right.

17       A.   Yeah.

18       Q.   Okay.  And so in vivo means they're

19   actually in a living animal, right?

20       A.   Right.

21       Q.   Okay.  And so for the MON 0818, it says,

22   "No significant increase in frequency of

23   micronucleated polychromatic erythrocytes in bone

24   marrow after any harvest time up to maximum

25   tolerated dose."

Ronald J. Kendall, Ph.D.

1          Did I read that correctly?

2     A.    Yes.

3     Q.    Okay.  What's that mean?

4     A.    That means in the erythrocytes located in

5     the bone marrow sampling, when they harvested the

6     erythrocytes to evaluate the micronucleus response,

7     there was none up to the maximum tolerated dose,

8     which means the maximum dose that the test animal

9     could handle.

10     Q.    And when you say "the maximum dose the test

11     animal could handle," you -- I take what you mean is

12     that's the maximum dose before toxicity was

13     observed, right?

14     A.    Yes.  It's the maximum tolerated dose.

15     Q.    Okay.  And then likewise, for MON 59112, it

16     says, "No significant increase in the frequency of

17     MPCEs in any treatment group at either harvest

18     time."

19          Did I read that correctly?

20     A.    You did.

21     Q.    Okay.  What's that mean for MON 59112?

22     A.    For -- in this particular in vivo test,

23     there was no increase in erythrocytes collected from

24     probably bone marrow in any treatment group at any

25     of the harvest times that was recorded under the

Ronald J. Kendall, Ph.D.

1    guidelines established of this test.

2        Q.    Okay.  And bone marrow is, in fact, where

3    B-cell lymphocytes mature, correct?

4        A.    Right.

5        Q.    Okay.  And so if you're interested in

6    Non-Hodgkin's lymphoma, bone marrow would be one of

7    the main tissues of interest, right?

8        A.    It would.

9        Q.    Okay.  If we go down to page 68 and 69 --

10   let me know when you've gotten down there.

11       A.    Okay.  Okay.  I'm at 68.

12       Q.    Okay.  Do you see there, they have Appendix

13   B, "Structure-Activity Relationship Discussion"?

14       A.    Yes.

15       Q.    Okay.  And what is the structure-activity

16   relationship?

17       A.    You're looking at the chemical structure of

18   a -- of a substance and its activity and acting as a

19   toxicant to a target system.

20       Q.    Okay.  And is that something that is a

21   standard evaluation that toxicologists might look at

22   to gain some understanding of potential

23   carcinogenicity?

24       A.    Yes.

25       Q.    Okay.  And is -- is it the type of analysis

Ronald J. Kendall, Ph.D.

```
 1    that you've carried out before in your career?
 2         A.   Yes.
 3         Q.   Okay.  And have you found the
 4    structure-activity relationship evaluations to give
 5    useful information?
 6         A.   Yes.
 7         Q.   Okay.  And are they -- how would you
 8    characterize their predictiveness of potential
 9    carcinogenicity?  Are they good at it?
10         A.   They provide --
11         Q.   Are they not good at it?
12         A.   They provide -- they provide the structure
13    activity relationship type studies, provide
14    information of how a substance may chemically
15    interact with, say, the DNA or certain cell
16    processes and so one.  That's what -- that's what we
17    look for, the possibility that --
18         Q.   Okay.  And --
19         A.   -- the substance can -- can have a
20    structure that can exert certain toxic effects based
21    on the mechanism of action.
22         Q.   Okay.  And if you go down to the bottom of
23    69, the last paragraph, it states, "DEREK did not
24    identify any structural alerts of concern for the
25    larger molecule tested and a single respiratory
```

Ronald J. Kendall, Ph.D.

1    irritation alert was identified for the smaller

2    molecule.  The respiratory irritation alert is

3    expected for small amine molecules, which are known

4    to be irritating.  DEREK has developed more alerts

5    for genotoxicity and carcinogenicity than other end

6    points in the system.  Considering what is already

7    known about these specific compounds and other long

8    chain fatty acid compounds, along with the lack of

9    structure alerts for carcinogenicity, chronic

10   toxicity or genotoxicity, HED has no specific

11   concerns regarding chronic exposures other than

12   those identified in the subchronic toxicity studies

13   for this cluster."

14          Did I read that correctly?

15      A.   Yes.

16      Q.   Okay.  And DEREK, just so it's clear for

17   the record, that is the structure-activity

18   relationship computer program they're running this

19   through?

20      A.   Right.

21      Q.   Okay.  And HED, that abbreviation is Health

22   Effects Division at the EPA, right?

23      A.   Right.

24      Q.   Okay.  So it's true that EPA, when they

25   evaluated the structure of surfactants used in

Ronald J. Kendall, Ph.D.

1    Roundup products like POEA, did not identify any

2    alerts for carcinogenicity within that structure,

3    right?

4        A.   Based on what this says here, yes.

5        Q.   Okay.  Okay.  Now, we've talked a little

6    bit last deposition about formulated products.  And

7    it's true that all the regulators, regulatory

8    agencies that have looked at glyphosate have not

9    found any carcinogenic effects, right?  We talked

10   about that last time?

11       A.   Yes.  Please say that one more time.

12       Q.   It's true all the regulatory agencies -- so

13   I'm excluding IARC here.  All the national

14   regulatory agencies have not alleged any

15   carcinogenic effects from glyphosate, right?

16            MR. BRECHER:  But you're excluding --

17   excuse me.  You're excluding IARC from this

18   question?

19            MR. KALAS:  Well, IARC is not a

20   regulatory agency, Marc.  It's not a national

21   regulatory agency.  It's an extraterritorial body.

22   BY MR. KALAS:

23       Q.   So -- so I want to be clear.  Let me ask

24   that foundational question.

25            IARC is not a regulatory agency, true?

Ronald J. Kendall, Ph.D.

1      A.   That's -- it's a scientific arm for cancer

2  research in the World Health Organization.

3      Q.   Right.  But their pronouncements don't have

4  any regulatory effect in any country on earth,

5  right?

6      A.   I'm not aware it.

7      Q.   Okay.

8      A.   They provide guidance.

9      Q.   So when I say "regulatory" -- right.

10  Exactly.

11           And so when I say "regulatory agency," I

12  mean the USEPA or Health Canada or the European Food

13  Safety Agency.  I mean, these -- these national or

14  multinational regulatory agencies who set risk

15  levels.  Do you understand what I mean when I say

16  "regulatory agency"?

17      A.   I do.

18      Q.   Okay.  And there's no regulatory agency,

19  you're aware of, that has classified glyphosate as

20  carcinogenic, right?

21      A.   If we strictly separate regulatory agencies

22  from the International Agency for Research on

23  Cancer, which -- which I thought had a pretty

24  impressive evaluation and monograph on glyphosate,

25  but if you say -- if you strictly separate

Ronald J. Kendall, Ph.D.

1   regulatory agencies from scientific advisory

2   organizations, I'm not aware of it.  At least

3   Canada, Australia and the U.S.

4       Q.    Right.  And I think we talked before about

5   New Zealand and the Europeans as well.  Right?

6       A.    We talked about New Zealand.  Europe is

7   very complex.

8       Q.    Okay.  Okay.  And there's no regulatory

9   agency you're aware of -- and this would include

10  IARC.  So let me ask the question broader.

11          There's no agency you're aware of that has

12  classified the surfactants in glyphosate-based

13  herbicide as carcinogenic, right?

14      A.    I'm not aware of it.  But I'm -- I'm

15  looking at the surfactants completely different.

16  The surfactants are there to provide better

17  solubility to products like glyphosate for

18  application either aerially or ground.  And -- and a

19  lot of times these -- these surfactants, they have

20  components in them to make them not only dissolve

21  the chemical better, say, in a water medium, but

22  also to be absorbed better by the plant either

23  through the root or through surface contact.  So

24  that in itself sets the stage to facilitate perhaps

25  greater exposure to a human being.

Ronald J. Kendall, Ph.D.

1          Because what you're trying to do is get

2     the product in -- say in the case of herbicides

3     here, you're trying to get it into the plant.  And

4     the best way to do that is to have anything that can

5     facilitate the active ingredient moving either

6     through the soil or through direct contact with the

7     leaves or whatever and get into the plant.

8          So that's -- you know, that's how I am

9     interested and concerned about the -- the additives

10    that go into these formulations.  And I -- but I --

11    and I'm going to agree with you, I'm not aware of at

12    least the surfactants we have discussed this

13    morning, if any -- I am not aware if any -- if any

14    regulatory agency has classified them as

15    carcinogenic.

16    Q.   Okay.  And not just the ones we have

17    discussed this morning, you're not aware, sitting

18    here today, of any surfactant used in

19    glyphosate-based herbicides sold by Monsanto in the

20    United States that has been classified as

21    carcinogenic, right?  You don't have any awareness

22    of that?

23    A.   No, I don't have any awareness of that.

24    Q.   Okay.  And so if glyphosate has been

25    classified by every regulatory agency as not

Ronald J. Kendall, Ph.D.

1    carcinogenic, putting aside IARC, and the

2    surfactants have been classified as -- by every

3    regulatory agency as not carcinogenic, at least the

4    ones they have evaluated, how does glyphosate-based

5    herbicides, how do they cause cancer when the

6    constituent separate ingredients do not?  How do

7    they get put together and somehow become a

8    carcinogenic substance?

9         A.   Well, when you look at the -- I've got

10   several prospectus on this.  You've asked me a broad

11   question, and I'm going to try to answer it.

12        Q.   Okay.

13        A.   When you look at -- when you look at

14   materials like this, glyphosate, and the

15   formulation, not only do we need to consider -- and,

16   again, first of all, we're using enormous volumes of

17   these products across the country and around the

18   world, and literally millions of people are using

19   routinely glyphosate-based herbicides in their

20   yards, on their farms, and whatever.

21             When a lot of these tests are done, the

22   toxicology tests, we -- we have set limits of

23   animals for -- a lot of times experimental animals

24   that we can use because of ethics, because of

25   statistical design, and because of just handling

Ronald J. Kendall, Ph.D.

1    them all.  So a lot of times substances that act not

2    as a strong toxicant but maybe a weaker toxicant,

3    it's much harder to pick up the effects.  So we have

4    to use more animals in tests to pick up more subtle

5    effects because the statistical inadequacies in

6    proving such substances, if they act in a weaker

7    nature, it's harder to prove that.

8           So this gets us into what I've talked

9    about before, weight-of-the-evidence approach.  So

10   when I look at -- look at some of these products,

11   even like glyphosate and the formulation, we do know

12   exposure occurs and we do know that -- we've debated

13   about the percent -- percent absorbed after exposure

14   and, you know, we know it's fairly low if it gets on

15   your skin, maybe a little more if you ingest it, and

16   so on.

17          But, again, if you're spraying it and

18   handling it, as I have done many, many times years

19   ago, it's just hard to completely avoid getting it

20   on you unless you're -- you're geared up for it.  So

21   I know.  I've handled it hundreds of times.

22          So, again, we know exposure occurs.  We

23   know it gets into the body.  We know it gets into

24   the bloodstream.  We have data to show that, at

25   least in the parts per billion range.  So that

Ronald J. Kendall, Ph.D.

1   molecule is in human bloodstreams, although,

2   generally the parts per billion range.  So we do

3   know exposure is occurring.

4          At the same time, a lot of these

5   substances may not directly act as a carcinogen, but

6   they may act in a promotion context or to facil- --

7   or synergize with other substances.  And -- and that

8   becomes very challenging toxicologically to take

9   those pieces apart.  But we have evidence even with

10  a mouse skin bioassay that glyphosate exposure,

11  along with a known -- a carcinogen, the addition of

12  the glyphosate promotes the carcinogen to form

13  tumors.

14         And that's my point, is that this context

15  of synergistic effects is extremely important,

16  because, again, the Environmental Protection Agency,

17  in all due respect, are looking at the active

18  ingredient, generally.  They're looking directly at

19  the active ingredient.  That's -- I've been there

20  many years evaluating data on the active ingredient.

21  The formulations are what's being used in the real

22  world.

23         At the same time, the -- in the context of

24  what we're seeing with -- with something like --

25  with glyphosate, based on the biochemistry and how

1    it acts as a toxicant both in a plant and

2    potentially in a -- in a human, we -- we have the

3    potential for long-term subtle effects.  And that's

4    the reason, when you look at the epidemiological

5    studies, we generally -- in the outcomes, there are

6    various studies, there are various outcomes, but --

7    but a general tendency is when you look at higher

8    levels of exposure with a lag time of over 20 years,

9    we're seeing more evidence of effects, including

10   lymphomas and leukemias.

11          And that's my point.  The chronicity and

12   how these substances can act both directly and in

13   synergistic modes; in other words, if you're exposed

14   to paraquat along with glyphosate, you could be at

15   higher risk from carcinogenic potential or to damage

16   to organs.  And -- and this is not unusual,

17   particularly in agriculture, to have multiple

18   chemical exposures.

19          And scientific papers are emerging that I

20   think have biological plausibility that the

21   synergistic activity of these substances cannot be

22   discounted.  And it's very difficult for the Agency

23   to engage this.

24          I was a very big part back years ago when

25   I was chairman of the Scientific Advisory Panel of

1    bringing probable risk assessment to the front and

2    assisting the Agency when I was chairman to move

3    into that arena.  And it took years for them to

4    really evolve sophisticated improved risk assessment

5    using probability theory.  I think the same thing

6    exists currently with the concept of synergistic

7    effects.  It's very difficult, and it -- it engages

8    a whole realm of issues tied to toxicology and

9    health and well-being.

10        But I think you asked me a question that

11   said how in the world can these substances, if they

12   are not precisely directly carcinogens, have

13   anything to do with cancer.  Well, they can do it by

14   synergistic effects.  And that's how -- that's how a

15   lot of this, in my opinion, has not been fully

16   explored and fully vetted in the scientific -- in

17   the scientific arena.

18        So, you know, I have a lot of prospectuses

19   on this, and I'll stop there.  But I don't think we

20   can discount synergistic effects with

21   glyphosate-based formulations.

22        Q.   Okay.  A few things I want to follow up on

23   there, but I think you were sort of answering my

24   question there at the end of that answer.  And I

25   appreciate everything you said.  So thank you.

Ronald J. Kendall, Ph.D.

1        A.    I tried to give you some background of why

2    I was going to answer it the way I did.

3        Q.    No, no, no, I -- I appreciate it.

4              Let me follow up a little bit on the back

5    end of that answer.  So you said that synergistic

6    effects cannot be excluded.  And -- and I guess what

7    I'm not -- what I'm interested in is not hypotheses.

8    What I'm interested in are conclusions that you have

9    to a reasonable degree of toxicological certainty.

10   And so I understand that it's your opinion

11   synergistic effects cannot be excluded.

12             But to that end, sir, and this is my

13   question, how specifically -- or do you have an

14   opinion specifically how a substance glyphosate that

15   is not listed as carcinogenic and a substance or

16   substances, surfactants that are not listed as

17   carcinogenic can combine in a formulation of

18   glyphosate-based herbicide to cause a carcinogenic

19   effect?  How mechanistically is that happening?  Do

20   you have an opinion on that, or is it an open

21   question in your mind?

22       A.    As I mentioned to you, I think that

23   biological plausibility exists because of the

24   biochemistry of these substances, glyphosate and the

25   formulation, that there -- there could be an

Ronald J. Kendall, Ph.D.

1   association with cancer development, particularly in

2   the blood.  And because it gets in the blood, we

3   know it, we have the data, in the parts per billion

4   range, at least, that we do have exposure to cells,

5   particularly the white blood cells.

6       Q.   All right.  So you used the words "because

7   of the biochemistry" there.  And, specifically, what

8   is it about the biochemistry of glyphosate and

9   surfactants used in glyphosate-based herbicides that

10  when they get together causes a carcinogenic effect?

11      A.   Glyphosate could be behaving

12  synergistically with -- there are risk factors.  I

13  accept there are risk factors that are tied into

14  these -- these chronic diseases, lymphomas,

15  leukemias, and whatever.  But the action of

16  glyphosate behaving as an amino acid analog of

17  glycine, that interferes with natural protective

18  processes from other exposures.  And that, to me,

19  is -- is an area that is being explored more and

20  more with -- with our substantial exposure to a

21  variety of chemicals.

22          I've already said on the record, you know,

23  I don't oppose herbicides at all.  I think they're

24  very valuable in our economy and our world.  At the

25  same time, when you have millions of people, many of

Ronald J. Kendall, Ph.D.

```
1    which are not properly trained how to handle these
2    compounds and -- and they just aren't -- they're
3    just average citizens and they're not really aware
4    of all these thing, when they're being exposed,
5    that's a lot of samples out there.  Unlike a mouse
6    study with maybe 100 animals on a test, we're
7    talking about millions of people.
8           And I've also talked about, you know, I --
9    I referred in our last conversation to biological
10   variability that occurs, and I used intake of
11   alcohol as an example.  Some people can drink one
12   beer and go to sleep.  Some people can drink a case
13   all day and never even act like they've had a beer.
14   So it's -- it's this wide range of biological
15   variability.
16          And when you override that with millions
17   of people of exposure -- under exposure, then more
18   sensitive of individuals can emerge.  And that's
19   what I'm talking about.  And -- and can all of these
20   toxicological tests pick this up?  It's very
21   difficult because -- because, again, the limitations
22   of experimental studies with the number of animals
23   you can have, with how many interacting variables
24   you can test.
25          And -- and, like I said, generally
```

Ronald J. Kendall, Ph.D.

```
 1   speaking, the requirements from the EPA are --
 2   are -- for the most part, it's the active
 3   ingredient.  It's the active ingredient that's --
 4   that's regulated under FIFRA.  That's what we
 5   generally looked at in the scientific advisory
 6   panel.
 7            So those are -- those are just some
 8   prospectuses on -- on how complicated this really --
 9   really is.  It's actually very complicated.  And --
10   but, again, as I look at the big picture, as we look
11   at these questions I'm alluding to on synergism,
12   particularly with multiple chemical exposures,
13   that's an area that's -- that's intrigued me for a
14   long time.
15            We have -- we have -- we have a family
16   friend, works on a cotton farm, sprays glyphosate.
17   He developed lymphoma.  Healthy guy.  Just healthy,
18   normal guy.  All of a sudden, he was diagnosed with
19   lymphoma.  And so it really intrigued me, you know,
20   what -- what could -- what could be doing that, what
21   could be happening there.  And this -- this has
22   really interested me.
23            I haven't been involved with any other
24   Roundup cases.  You know, this is it.  But I -- I'm
25   very interested in this from a toxicological
```

1    perspective.  And so -- so, again, I -- you know,

2    you asked me a very broad question, so I've opined

3    on, you know, what my prospectus are as a

4    toxicologist kind of dealing with these issues for

5    41 years now as a professor.  And that involves both

6    engagement of my students and trying to train the

7    future leaders in toxicology and also, you know,

8    dealing with the Environmental Protection Agency and

9    dealing with complex scientific questions and

10   complex legal questions.

11        So I think there's -- there's a -- a

12   basket of opinions here, and I think that that's why

13   this has been such a complex and difficult

14   scientific process to unfold with exactly clear-cut

15   answers.  So the answers aren't clear-cut.

16   Q.  All right.  All right.  And I -- you know,

17   I appreciate all that answer.  I think we're getting

18   down to where I'm trying to figure out your

19   opinions.

20   A.  Okay.

21   Q.  You -- you mentioned in that answer that

22   glyphosate's ability to act as an amino acid analog

23   of glycine influenced its ability to cause lymphoma.

24   And based on your --

25   A.  No, no, it --

Ronald J. Kendall, Ph.D.

1        Q.   -- materials considered list --

2        A.   I didn't say that.  It -- it could impair

3    natural protective mechanisms in terms of --

4        Q.   Got it.  Natural --

5        A.   -- of protective mechanisms.  And that --

6    that sets the stage.  As we talked in our last

7    conversation, the body has repair mechanisms.  Every

8    mutation does not result in cancer in a cell.  But

9    the body has repair mechanisms.  And particularly

10   when you look at, let's say, Non-Hodgkin's lymphoma,

11   there are risk factors, and the biggest risk factor

12   is the immune system, impairment, suppression of the

13   immune system, which means, say, the lymph nodes and

14   the white blood cells and the cells that protect us

15   from foreign proteins are being suppressed and/or

16   disturbed, such that foreign proteins or foreign

17   molecules have a better ability to get in the body

18   and exert toxic action at receptor sites.

19            And so this is what I'm saying, is these

20   are all interacting variables.  And I think

21   Non-Hodgkin's lymphoma is a multifactorial issue.

22   It doesn't happen from one thing caused by one

23   thing.  It's -- it's a multifactorial issue, and

24   it -- and there are risk factors, as you know, that

25   could set people up to be more sensitive, and

1    particularly if you've got an immune -- a suppressed

2    immune system, or maybe you're fighting another

3    disease or inflammation or whatever.

4           So -- so, again, this goes back to many

5    years ago for me.  A lot of substances just don't

6    have a direct toxic effect.  They -- it's a -- it's

7    a multifactorial issue that could involve nutrition,

8    your genetics, particularly your immune system, and

9    how you're exposed and how -- how much you're

10   exposed to.

11          And then -- then that's overriding this

12   biological variability.  I mean, I can -- I can just

13   think of experiments right now where you can take 20

14   animals from the same strain, the same age, the same

15   sex and everything, and test them, and it's amazing

16   sometimes the variability we get.  And it's -- it's

17   never ceased to amaze me that when you -- you can

18   get something so close in terms of being able to

19   biologically replicate them and you still get

20   variability, and that's what just makes toxicology

21   such a very challenging area of science.  And

22   that's -- you know, it's -- it's never ceased to

23   challenge me in all these years of doing it.

24                  THE STENOGRAPHER:  He's freezing for

25   me.  Is he for anyone else?

Ronald J. Kendall, Ph.D.

```
 1              MR. BRECHER:  No.

 2              MR. KALAS:  No, ma'am, Christy.

 3  We're hearing him.  Are you good now, Christy?

 4              (Discussion regarding technical

 5               issues.)

 6  BY MR. KALAS:

 7     Q.   All right.  Doctor, we are going to take a

 8  break here in a second because we have been going

 9  about an hour.  I just want to ask you a few

10  follow-ups to that answer again.

11     A.   Yes, sir.

12     Q.   So what you just told me, amine acid analog

13  of glycine and that this interferes with natural

14  protective mechanisms against other exposures, it

15  appears to me that you were reading from an article

16  by -- I want to get the name right.

17     A.   Gunatilake.

18     Q.   G-u- -- yeah, G-u-n-a-t-i-l-a-k-e,

19  Gunatilake.

20     A.   Yes, sir.

21     Q.   Okay.  And that's -- and that's an article

22  on your materials considered list?

23     A.   Yes, sir, it is.  I found this --

24     Q.   Okay.  And I'll mark that -- go ahead.

25     A.   I found this very interesting in parallel
```

Ronald J. Kendall, Ph.D.

```
 1    to some of my thinking, and I -- it's -- it's -- it

 2    gets into some of these real issues that I've

 3    thought about a long time.

 4                  (Exhibit No. 8 marked.)

 5    BY MR. KALAS:

 6        Q.   Okay.  And I've marked that article as

 7    Exhibit 8.

 8        A.   Okay.

 9        Q.   And just very quickly on this article, this

10    article is an article entitled, "Glyphosate

11    Synergistic Toxicity in Combination With Other

12    Factors As a Cause of Chronic Kidney Disease of

13    Unknown Origin."

14        A.   Yes, sir.

15        Q.   Okay.  And so this is an article about

16    kidney disease, not lymphoma, right?

17        A.   It -- that's true.

18        Q.   Okay.  And, in fact, they -- this article,

19    if you search the word "lymphoma," mentions the word

20    "lymphoma" exactly once, right?

21        A.   That's all I saw.

22        Q.   Okay.  And that's in the context of

23    discussing jury verdicts in cases in California,

24    right?

25        A.   Right.
```

Ronald J. Kendall, Ph.D.

1        Q.   The authors of this article never allege

2   that glyphosate acting as an amino acid analog of

3   glycine somehow causes lymphoma via that mechanism,

4   right?

5        A.   They -- they did not discuss lymphoma, but,

6   still, the mechanism of chronic disease with these

7   kind of interactions.  And that's -- that's my

8   point.

9        Q.   Okay.

10       A.   You know, it's a pretty compelling article.

11  And it is chronic kidney disease, but it's still a

12  pathology that has its -- its routes argued in the

13  context of synergism.  And that's -- that's just my

14  point.

15       Q.   Okay.

16       A.   And, you know, again, as you, you know,

17  challenged me earlier on to address how in the world

18  could glyphosate as a substance in a formulation

19  have any potential to act as -- as a threat in the

20  development of, say, a blood cancer, you know,

21  that's how we got onto this topic.  And my answer,

22  again, is it may not have the direct effects.  It

23  may.  We don't -- we still don't know exactly, but

24  it can -- it can act synergistically with either

25  risk factors or other substances.

Ronald J. Kendall, Ph.D.

1          And that appears to be the case in the --

2   in the George article that had to do when looking at

3   skin tumors.  With DMBA, when you put tar from

4   cigarette smoke onto a skin -- mouse skin, then you

5   added glyphosate in the formulation, it was a tumor

6   promoter.  Again, it was a promoter.  And that's my

7   point, again (audio drop) --

8               MR. KALAS:  Now he froze up for me.

9               MR. BRECHER:  Now he did.

10      A.   -- human health risk factor, it doesn't

11   necessarily have to act (audio drop).

12              THE STENOGRAPHER:  He is freezing up?

13              MR. KALAS:  Yeah.

14              THE VIDEOGRAPHER:  Yeah, his internet

15   went to red.  He's frozen.

16              MR. KALAS:  Yeah.  All right.

17              THE VIDEOGRAPHER:  There he is.

18   BY MR. KALAS:

19      Q.   Doctor.  Doctor, we lost the end of your

20   answer there after you said, "That's not my

21   point. . ."  Do you recall what you said after that?

22      A.   I just think I asked Christy was she

23   hearing me.

24      Q.   Okay.  She wasn't.  So if that's what you

25   said after that, that's fine.

1       A.   It was something like that.  I was -- I

2   think that's -- well, Mr. Brecher appeared on my

3   screen, and he appeared frozen and that's when I

4   stopped talking.

5       Q.   All right.  Fair.

6            MR. KALAS:  Let's take a break, if

7   it's okay for everybody right now, for five minutes,

8   and we'll pick back up.

9            THE WITNESS:  Okay.  Thank you, sir.

10            THE VIDEOGRAPHER:  We're off the

11   record at 9:49 a.m.  This concludes Media 1.

12            (Break taken, 9:49 a.m. to 9:58 a.m.)

13            THE VIDEOGRAPHER:  We are back on the

14   record at 9:58 a.m., beginning of Media 2.

15   BY MR. KALAS:

16       Q.   Doctor, right before the break I think you

17   said that the amino acid glycine analog point you

18   were making was just an example of synergistic

19   effects but wasn't directly related to lymphoma.  Is

20   that -- is that a fair characterization?

21       A.   Yes.

22       Q.   Okay.  Then going back to my question from

23   a few questions ago, is there a mechanism that

24   you've identified by which glyphosate and

25   surfactants acting in concert can cause lymphoma,

Ronald J. Kendall, Ph.D.

1   when acting individually they cannot?

2        A.   Can you please ask that question again?

3        Q.   Sure.  Is there a mechanism you've

4   identified where glyphosate and surfactants acting

5   in concert can cause lymphoma, when acting

6   individually they cannot?

7        A.   I'm suspicious of it, but not 100 percent

8   confirmed as to the mechanism.

9        Q.   Okay.  Now, you mentioned a few other

10  things in -- in some of the answers we just had.  I

11  just want to follow up on them.

12       A.   Okay.

13       Q.   You mentioned that NHL is a multifactorial

14  process, right?  Do you remember saying that?

15       A.   I think -- I think so.

16       Q.   Okay.  For all three plaintiffs:  Spector,

17  Savory, Thomas, you would agree with me that you are

18  not saying Roundup is the only cause of their

19  lymphoma.  Is that fair?

20       A.   I'm saying that I think within a reasonable

21  degree of scientific certainty, that glyphosate was

22  a significant contributor to the ultimate

23  development of NHL in those three clients based on

24  my evaluation of their very limited exposure to any

25  other toxic substances, if any, and -- and their

1   long-term use of it and the latency.  All of them

2   have a latency period of 20 years or greater.  And

3   they all developed Non-Hodgkin's lymphoma.  And they

4   used this product and, for the most part, the only

5   pesticide they used for 30 years.

6           So when I put all of those pieces

7   together, I think there's an association.  And, you

8   know, again, you know, they developed Non-Hodgkin's

9   lymphoma, and -- and that -- that's the difference

10  between me and them.  I don't have that, and they

11  do.  And the question becomes, how did -- how did

12  they ultimately get that?

13          And I do -- I do stand behind the context

14  of it's a multifactorial disease.  I told you I

15  think there's a genetic predisposition.  There --

16  particularly, the immune system is suppressed.  I

17  think there's a chemical correlate to it.  I think

18  that -- that amplifies the potential expression of

19  the disease.  It's an amplification.

20          And -- and I think the effects are subtle.

21  That's why it takes millions of people to come up

22  with effects versus a 100 animal lab study in the

23  case of a mouse or a rat study, which did

24  demonstrate very unique cancers, particularly renal

25  carcinomas, renal tubular carcinomas with glyphosate

Ronald J. Kendall, Ph.D.

1    exposure.  So, again, it's just all of these pieces

2    in a very complex puzzle.

3        Q.   All right.  I think we agree, although I'm

4    not sure, because it was a bit of a long answer.

5        A.   Okay.

6        Q.   So you agree with me, then, that Roundup is

7    not the only cause of the three plaintiffs' cancer,

8    right?  You agree with that?

9        A.   It was -- I think Roundup was a significant

10   contributing factor, but there were other components

11   of the disease.  It's not just one issue.

12       Q.   Okay.  Fair.

13       A.   The predisposition of genetics, its immune

14   function and so on.

15       Q.   Okay.

16       A.   Okay.  So I -- you know. . .

17       Q.   Right.  Okay.

18            Now, you've mentioned there that in all

19   three plaintiffs -- and this deposition is about

20   Savory and Thomas.  So let's just focus on those two

21   right now.

22       A.   Okay.

23       Q.   But Savory and Thomas, your -- and, again,

24   your methodology in all these Roundup cases -- well,

25   strike that.  Let me back up.

1        You reached your causation determination

2   regarding the plaintiffs based on the fact that they

3   used Roundup, right?

4        A.   Right.

5        Q.   One part of it.  They had a history of

6   using Roundup that extended past 20 years, right?

7        A.   All three.

8        Q.   Okay.  Roundup was the only chemical -- or

9   one of the only chemicals you could identify that

10  they used, right?

11       A.   According to their depositions.  And also

12  their occupations.  They weren't in highly chemical

13  exposed occupation.  One was a house framer, one

14  managed a department store, and one was a housewife

15  or worked in the house with a -- with a company.  So

16  it wasn't like they were farmers or they were

17  working at a chemical plant or even a mechanic.

18       So I -- I've looked at that, too.  And --

19  and they had a long latency period, better than

20  20 years.  And when -- if you look at the data, at

21  least the case controlled studies, as well as the

22  cohort study, when you look at that latency period

23  the past 20 years, you may not have seen lymphoma

24  but you saw leukemia.  There was evidence that

25  leukemia, that's a blood cancer.

Ronald J. Kendall, Ph.D.

```
 1              So -- so, again, all of these pieces, I --
 2    I look at -- look at in a very integrated fashion.
 3    And this is how we had to operate when I was
 4    chairman of the Scientific Advisory Panel to
 5    implement the Federal Insecticide and Rodenticide
 6    Act for the EPA, to give them scientific advice.
 7    It's just -- we really had to bring all the pieces
 8    of the weight-of-the-evidence together.  And we --
 9    we kind of -- kind of wrote the book at that point
10    on the context of the weight-of-the-evidence.  Of
11    course, Glenn Suter at EPA was a big leader in
12    development of the weight-of-the-evidence and -- and
13    all.  But, again, as we worked at our SAP panels,
14    you know, this was just -- just how we had to
15    operate.
16              So this is -- this is how I thought about
17    these three cases.  It's just not one thing.
18    It's the exposure paradigm, what else they were
19    being exposed to, their occupations, their --
20    perhaps their risk factors, and the fact that,
21    according to what they said -- and I think they all
22    appear to be reasonable, responsible citizens.  And,
23    you know, that's what they used.
24              And that's very reasonable to me.
25    They're -- they're just people that have a home.
```

Ronald J. Kendall, Ph.D.

1    And they don't like weeds; they go spray the weeds.

2    That's about as straightforward as you can get.  And

3    we can debate about how much they used and how much

4    they got on them or whatever, but I do believe they

5    used the product, as I did, for many, many years,

6    and -- and so that's how I've come to what I believe

7    and -- and, you know, I hadn't changed my mind on

8    it.  You know, I'm trying to be very clear.

9        Q.   I've never had an expert deposition where

10   I've changed the expert's mind, Dr. Kendall.  So

11   that's fine.

12       A.   Okay.  All right.  Okay.

13       Q.   Let me --

14       A.   I accept that.

15       Q.   Let me -- let me start at the beginning

16   there.  Because I just want to make sure I have the

17   list that I understand of all the puzzle pieces you

18   put together in your weight-of-the-evidence

19   evaluation for these claims.

20            So one of the things that went into that

21   is that they used Roundup, right?  That was one of

22   the first things you looked at, did they use

23   Roundup?

24       A.   Mr. Kalas, you just cut out on me.

25       Q.   I'm sorry.  Okay.

Ronald J. Kendall, Ph.D.

```
 1            One of the things you looked at was
 2    whether or not they used Roundup, right?
 3        A.   Right.
 4        Q.   Okay.  Another thing you looked at was the
 5    latency.  You looked at the fact that these people
 6    used Roundup greater than 20 years ago, right?
 7        A.   Yes.  That was, I thought, relevant.
 8        Q.   Okay.  And I'm not saying it's not.  I'm
 9    just trying to get the puzzle pieces here.
10            You looked at their other chemical
11    exposures and whether or not they had any other
12    chemical exposures, right?
13        A.   Yes.  In other words, are they a farmer
14    that used five or six different products on a -- on
15    a given year or not.  But they weren't.  They
16    weren't.  They were just homeowners with --
17        Q.   You looked at --
18        A.   -- you know, specific kind of jobs and, you
19    know, that really did not have a lot of chemical
20    exposure, technically.
21        Q.   Right.  That's the next thing I'm getting
22    to.  You looked at their occupation, right?
23        A.   Yes.
24        Q.   Okay.  And then you determined that they
25    were diagnosed with NHL, right?
```

Ronald J. Kendall, Ph.D.

```
1        A.   That -- those -- that's what the medical
2   records said.
3        Q.   Okay.  And based on those puzzle pieces,
4   you concluded to a reasonable degree of scientific
5   certainty, that glyphosate was a substantial
6   contributing factor to their NHL, right?
7        A.   That, interfaced with all the data from
8   the -- the epidemiological studies, which are
9   limited, I agree, but they're signals.  And --
10       Q.   Okay.
11       A.   -- and the animal carcinogenicity data that
12  we have and the genetic toxicity data.  And so,
13  again, from the International Agency for Research on
14  Cancer monograph on glyphosate, there's a lot of
15  information there on evidence of genotoxicity,
16  including oxidative stress as well as genotoxic.
17  There are -- there's evidence of animal
18  carcinogenicity with both glyphosate and the
19  formulation.
20            And they did consider these
21  epidemiological studies, which I think -- you know,
22  epidemiological studies are -- you know, they're
23  statistical evaluations, and they -- they can have
24  confounding factors.  We understand that, and I
25  respect that.
```

1           And they can -- again, but I look at all
2    of those pieces and -- and interface with the fact
3    that these -- these particular individuals:
4    Mr. Savory, Ms. Spector, Mr. Thomas, they developed
5    NHL, and -- and then if you look at the interface of
6    all the other factors you just iterated for me on my
7    behalf recalling what I told you, we -- we have
8    biological plausibility here.
9           And it's -- you know, again, if we were
10   talking about -- and I'm -- I'm very aware of the
11   farming community, and -- and I live in West Texas.
12   So this is big cotton country.  And so a lot of
13   these farmers handle all kinds of materials during
14   the year, all kinds of products.  And so that would
15   be much more difficult for me because these three
16   people were not really handling anything else
17   except -- according to their depositions, and that's
18   what I read as you did, I'm sure.
19       Q.   Okay.  So all that information you just
20   relayed to me at the back end of that answer where
21   you're talking about interfacing, the interfacing
22   you were doing with the epidemiology, the animal
23   studies, the genotoxin oxidative stress studies,
24   that interfacing was focused on, essentially, can
25   glyphosate or can glyphosate-based herbicides cause

```
 1   NHL, right?  That's general causation, right?
 2      A.   Yes.  Yeah, that's fair.
 3      Q.   Okay.  And so for specific causation,
 4   again, it was those list of five factors you looked
 5   at for these plaintiffs that you were interfacing
 6   with the general causation information to reach a
 7   specific causation determination, right?
 8      A.   Right.  And, again, that's within a
 9   reasonable degree.  That's all.  I mean, that's --
10      Q.   Sure.
11      A.   -- within a reasonable degree.
12      Q.   Okay.  And the 20-year latency data that
13   you pointed me to in the cohort study was for acute
14   amyloid leukemia, right?
15      A.   That's correct.  That's correct.
16      Q.   Okay.  And they also had 20-year latency
17   data for NHL in that study, right?
18      A.   Yes.
19      Q.   Okay.  And acute amyloid leukemia is a
20   different disease from NHL.  They're both
21   hematopoietic cancers, but AML is a different
22   disease, fair?
23      A.   Fair.
24      Q.   And for NHL, it was a null finding in that
25   agricultural health study for 20-year latency, true?
```

Ronald J. Kendall, Ph.D.

1        A.    True.

2        Q.    Okay.  Now, you mentioned cotton farming,

3    and you mentioned your friend.  Who I'm very sorry

4    to hear about his lymphoma, or her lymphoma.  But

5    you mentioned that cotton farmers are exposed to

6    much, much more than the typical homeowner, right?

7        A.    Absolutely.

8        Q.    Okay.  And you're not going to opine to the

9    jury that your friend got NHL from handling Roundup,

10   right?

11       A.    No.  No.

12       Q.    Okay.  Now, you mentioned in one of your

13   answers -- go ahead.  I'm sorry.

14       A.    But it did intrigue my interest.  And his

15   primary use of chemicals were -- was

16   glyphosate-based.  And that was his job, keep the

17   weeds down.  And he -- he wasn't the head guy.  And

18   so that's all I'm saying.  It intrigued my interest.

19   But I do not plan to opine on that in front of a

20   jury.  I just wanted to bring it up so you knew

21   where I was coming from.  You know, I --

22       Q.    Okay.

23       A.    I've got interest in this.  It's -- it's

24   interesting.  It's -- it's concerning.

25             I meant to also tell you that my father

Ronald J. Kendall, Ph.D.

```
 1    died of Parkinson's disease.  And there's a lot of

 2    interest of paraquat in Parkinson's disease now.  So

 3    that intrigues me a lot, too.

 4           And so, again, you know -- you know, I

 5    just don't -- I don't want you to think I'm in some

 6    city and never been in a cotton field or a tobacco

 7    field or a soybean field.  I've been in all of those

 8    places.  I know a lot of about agriculture.  I know

 9    a lot about chemicals.  And -- and I've sat on the

10    EPA science advisory panel for years dealing with

11    the Federal Insecticide and Fungicide Act.  So, you

12    know, I'm very aware of these things.

13           And I'm trying to be very straightforward

14    and answer your questions.  But I have a lot of

15    thoughts on this, and they just didn't come up over

16    the last two weeks.  I have been thinking about this

17    for years.  And -- because as we tease apart

18    diseases and what -- what are health threats, it's

19    just -- it's just not a straight line, generally.

20           If you're exposed to an organophosphate

21    pesticide like parathion, yeah, you can just drop

22    over dead.  I mean, it's -- that is so clear the

23    cause and effect and it's so active related to the

24    duration of exposure between exposure and death,

25    yeah, that's a clear-cut one.  We don't have many of
```

1    them anymore.

2         It's -- most of these substances are --

3    they're more difficult to deal with.  They're more

4    insidious.  The questions are more complicated.  And

5    that's all I'm trying to get at is, you asked me

6    kind of my general thinking process to come to

7    support of Mr. Savory, Ms. Spector and Mr. Thomas as

8    to maybe the role of chemicals related to their NHL,

9    and I've done my best to fully explain that to you.

10   Q.   Yes, sir.  I appreciate that.  And you did

11   your best to fully lay out your thoughts as well

12   that you have in your expert report, right?  And

13   that contains the opinions you are going to offer to

14   the jury?

15   A.   Yes, sir.  That's about as -- that expert

16   report is exactly how I'm thinking, and that's

17   exactly how I will communicate it.  And it's just --

18   Q.   Okay.

19   A.   -- it's very straightforward.

20   Q.   Okay.  And that's where you put your

21   thoughts down that you came up with in your expert

22   report?

23   A.   Yeah, that's exactly how I'm thinking.  But

24   I haven't changed my thinking.  And I did -- I mean,

25   I -- that is exactly how I'm thinking, and --

Ronald J. Kendall, Ph.D.

```
 1        Q.   Okay.

 2        A.   -- and I haven't changed that thinking.

 3   And I kind of alluded to earlier, I respectfully

 4   read your six experts' review of these three cases.

 5   Okay.  And I thought -- I was thinking, have I

 6   changed any of my opinions based on their critique

 7   of my expert report or their comments or whatever,

 8   and I want to say I haven't changed one of my

 9   opinions.  I -- not a one.  And I'm willing to

10   address their critiques and so on.  I'm very happy

11   to.  But I did respectfully read them and consider

12   them.  So. . .

13        Q.   All right.

14        A.   But as a toxicologist and just how I think

15   and how I put -- how I put this line of -- this --

16   these scientific issues together to come up with a

17   language that would communicate kind of how I came

18   to these conclusions, I -- I think I've done that.

19   I tried.

20        Q.   Right.  Right.  And just going back to the

21   cotton farmer there for a moment.

22        A.   Okay.

23        Q.   Cotton farmers handle pesticides like

24   aldicarb, right?

25        A.   They can.
```

Ronald J. Kendall, Ph.D.

```
 1        Q.   Okay.  And aldicarb is so toxic, that a

 2   single drop of it absorbed through your skin can

 3   kill you, right?

 4        A.   It's pretty toxic.  For some people, that's

 5   probably true.

 6        Q.   Okay.  And there are other pesticides

 7   handled by cotton farmers that are in the pyrethroid

 8   family, correct?

 9        A.   Correct.

10        Q.   Organophosphate family, correct?

11        A.   Sometimes.

12        Q.   Okay.  And pyrethroids and organophosphates

13   have also been associated with cancers in these

14   farmers, right?

15        A.   I'm not aware of the pyrethroids.  Some of

16   the OPs, organophosphates, there's -- there's

17   emerging evidence that they can.  Some -- some can

18   have a carcinogenic potential.

19        Q.   Okay.  Now, you mentioned that you've

20   handled Roundup hundreds of times.

21        A.   Yeah.

22        Q.   You said that before the break, right?

23        A.   Yeah.  Over --

24        Q.   Okay.  And you do not have NHL -- you do

25   not have NHL despite handling it hundreds of times,
```

Ronald J. Kendall, Ph.D.

```
1   right?
2       A.   I don't have NHL.  But I'm real careful
3   with it.  Really careful.  And I was not
4   knowledgeable.
5           And I'll also note two things -- that's a
6   fair point.  Two things.  I've handled it a number
7   of times, but I'm real careful with it.  I was a
8   certified pesticide applicator decades ago, and so
9   I -- I was made aware of all of this.  So I was real
10  careful in handling it.
11          Number two, even being careful, it's hard
12  to keep it off of you.  Even wearing long -- I would
13  wear long-sleeve shirts, my gloves, whatever, but,
14  you know, you're spraying it.  I've used hand
15  sprayers.  I have used wands.  I've used the gallon
16  jugs, the mixed sprays.  So I've handled it all.
17  But it's really -- when you're on the ground and
18  you're working with it, it's really hard to keep it
19  all off of you.  And so I'm aware of that.
20          That's why I'm thinking about these
21  citizens and -- you know, even in spite of
22  Mr. Savory reading the label, I think he did.  I
23  think he tried.  It's just very difficult for
24  unsophisticated knowledge with handling this to keep
25  it off of you.  And there I was -- and I know this
```

Ronald J. Kendall, Ph.D.

1    because I've had backwash before.  I've had the wind

2    change direction real quick.  And I -- I can go on

3    and on.

4            So -- and, again, it's -- it's just when

5    you're handling these materials on a -- on a

6    long-term chronic basis -- and I just know that

7    every time I handle it, I was really careful and --

8    and very aware.  And so the only thing I can say is

9    from my perspective, these individuals:  Mr. Savory,

10   Ms. Spector, Mr. Thomas, if you didn't have my level

11   of knowledge, your probable ability to make sure you

12   didn't get it on you was reduced considerably.

13   That's my -- that's my prospectus.

14      Q.   All right.  Well, let me -- let me break

15   that down because there are a few things you said in

16   there that I want to make sure I understand.

17           First of all, you've handled Roundup

18   dating back more than 20 years ago, right?

19      A.   Yeah.  That's a fact.

20      Q.   Okay.

21      A.   And I don't know how many times.  You know,

22   I -- you know, I've handled it a number of -- lots

23   of times.  So I can't give you exactly the number,

24   because I never really thought about that.  But on

25   the other side --

Ronald J. Kendall, Ph.D.

```
 1        Q.   Okay.
 2        A.   -- I've handled it well over 20 years.
 3   That's a fact.
 4        Q.   Okay.  Handled it well over 20 years.
 5             And despite your best efforts, you got
 6   Roundup onto you when you handled it?
 7        A.   Oh, yeah.
 8        Q.   Onto your body?
 9        A.   A few times.
10        Q.   Okay.
11        A.   Not much.  I can remember just a couple of
12   times with maybe some backwash or the wind changed
13   directions on me real quick.  And -- and so I -- I
14   can just see that happening if -- if somebody's not
15   really aware what's going on.  And I'm a weather
16   buff.  I am very careful about the weather.  And
17   so. . .
18        Q.   So you're -- you're a very careful
19   operator, yet Roundup got on you, fair?
20        A.   It got on me, yeah.  Leaking bottle, too.
21   I've had it leak.
22        Q.   Sure.  Okay.  And --
23        A.   In other words, the top would kind of
24   disassociate from the main part of the bottle, and
25   it would soak the glove real quick or something.
```

Ronald J. Kendall, Ph.D.

```
1    I've had that happen.  You know, again, it's not

2    perfect.  I mean, it's just -- it's a pretty good

3    system, but it's not perfect.  And --

4        Q.   Okay.

5        A.   -- particularly, if you're looking at

6    handling these materials for a long period of time

7    when you're not educated into what -- you know, what

8    kind of threats they could be.

9        Q.   Okay.  And your occupation when you were

10   handling it was a college professor, right?

11       A.   Yeah.  Yeah.

12       Q.   Okay.

13       A.   We have a ranch, and I used it around the

14   ranch.

15       Q.   Okay.  And --

16       A.   And -- but I'm a -- I'm a college

17   professor.  But, like I said, I received my

18   pesticide application certification credentials

19   decades ago.  So I -- I was really made aware of

20   this, and -- and it's much harder to get your

21   pesticide application license than it is your

22   driver's license.

23       Q.   Okay.  And, again, we established you don't

24   have NHL today, happily, right?

25       A.   I do not.
```

Ronald J. Kendall, Ph.D.

1        Q.   Okay.  If you were diagnosed with NHL

2   tomorrow, would you opine that that glyphosate

3   handling caused it, based on those factors we just

4   laid out?

5              MR. BRECHER:  I object to the form of

6   the question.

7   BY MR. KALAS:

8        Q.   Or substantially contributed to it?

9              MR. BRECHER:  I mean, that's such a

10  personal question, I don't think that -- this is --

11  I just object to the form of the question.

12       A.   I would have to give that some thought and

13  reflection, because I haven't thought about that

14  yet.

15  BY MR. KALAS:

16       Q.   Okay.

17       A.   I haven't analyzed myself like I have

18  Mr. Savory, Ms. Spector, and Mr. Thomas.

19       Q.   Okay.  Now, going back to -- you mentioned

20  enormous volumes of Roundup have been applied over,

21  I think you said, the past 20 years.  I think that

22  was your answer.  Do you -- do you recall --

23       A.   I thought -- I mean, the data is very

24  clear, it's probably the most heavily used pesticide

25  in the country now.

Ronald J. Kendall, Ph.D.

```
1        Q.    Sure.

2        A.    I suspect.

3        Q.    Are you -- are you familiar with the SEER

4   Registry, S-E-E-R?

5        A.    I am not.

6        Q.    Okay.  Would it surprise you that the

7   National Cancer Institute's registry for cancer in

8   America has shown a declining rate of NHL over the

9   past seven years?

10       A.    What was your question about that?

11       Q.    Well, I'm just asking, would it surprise

12  you that the National Cancer Institute's registry

13  for NHL has shown a declining rate of NHL incidents

14  in America over the past seven years?

15       A.    Not -- not necessarily surprise me because

16  that's -- that's separate from what we're talking

17  about here, about Mr. -- Ms. Spector and Mr. Savory

18  and Mr. Thomas.  They did get NHL.  And what we're

19  talking about is what may be responsible for that,

20  at least reasonably responsible.

21            So, again -- again -- and, yeah, the --

22  you know, and I'm not discounting the benefits of

23  glyphosate in agriculture and in home weed control.

24  I'm not discounting that.  I'm just saying that the

25  volume of use has been pretty significant, and I --
```

Ronald J. Kendall, Ph.D.

1    and I -- and everybody that handles glyphosate
2    doesn't get NHL.  I -- I agree with that.
3            It's -- it's the -- the predisposition,
4    your immune system, your genetics, your handling of
5    it, the duration of the handling, the latency
6    between initial exposure and effects, all of those
7    factors play into this.  And I think that's --
8    that's fair when looking -- when -- when you've
9    asked me to consider this in the context of how
10   could we get from a point of just the chemical and
11   the formulation ultimately to being a part of the
12   etiology of a disease that may demonstrate itself as
13   NHL.
14       Q.   Let me -- let me ask you a follow-up there.
15           Assuming what I told you is correct, that
16   the rate of NHL has declined in this country in the
17   past seven years.
18       A.   Okay.
19       Q.   From an ecological point of view, you would
20   agree with me that the increase in use of Roundup
21   has not led to an increasing rate of NHL in this
22   country if what I told you was true?
23       A.   In general, not having seen the data, it's
24   really hard for me to -- to generalize this
25   completely.  But I'm going to have -- you know, even

```
 1   when you look back the last 20 years, 30 years,
 2   we're becoming more and more urbanized, and -- and
 3   more and more people don't live -- they live in
 4   cities.  They live in a more urbanized situation.
 5   And probably their exposure to general agricultural
 6   chemicals, to a large degree, have decreased because
 7   fewer and fewer people live on the farms anymore.
 8   That's -- that's fact.  And at the same time, the
 9   use of these materials, due to the increasing
10   urbanization of our society, I don't know what those
11   data are saying right now, how they're being used.
12           I know that the use of glyphosate in
13   agriculture has dramatically increased, particularly
14   with the -- the introduction of glyphosate-resistant
15   crops, like cotton.  And so that's been a big, big
16   area.  I don't know what the commercial sales have
17   been in -- you know, for homeowner use.  I don't
18   know.  But -- but we're becoming a -- just a more
19   urbanized society.  People eat out more.  Have less
20   yards.  You know, it's just we're -- we're a
21   different culture than we were when I was a kid in
22   this country.
23           And so it's just hard for me to give you a
24   direct answer when I'm -- I'm just looking at all of
25   these variables that, you know, I consider out here
```

Ronald J. Kendall, Ph.D.

1    in West Texas and -- because Lubbock is growing --

2        Q.   Can you look at Exhibit -- can you look

3    at Exhibit --

4        A.   Lubbock is growing dramatically because

5    people are leaving the farms and coming to the city

6    and retiring or wanting to live in a more urbanized

7    environment.  We're seeing that out here.

8            What am I supposed to look at it?

9        Q.   Exhibit 9 that I just marked, sir.

10           (Exhibit No. 9 marked.)

11       A.   Okay.  Okay.

12   BY MR. KALAS:

13       Q.   So do you see this is a document from the

14   National Cancer Institute?

15       A.   I do.

16       Q.   Okay.  And we talked about the National

17   Cancer Institute last time, right?

18       A.   Right.

19       Q.   Okay.  And do you see this says, "Cancer

20   Stat Facts:  Non-Hodgkin Lymphoma"?

21       A.   I do.

22       Q.   Okay.  And if you go down here to the -- I

23   think it's the -- it's PDF page 10 of this document.

24   It says, "New Cases, Deaths and Five-Year Relative

25   Survival."

Ronald J. Kendall, Ph.D.

```
 1      A.   I've got it.
 2      Q.   Okay.  And do you see there they have in
 3  the light green, "Rate of New Cases"?
 4      A.   I do.
 5      Q.   Okay.  And would you agree with me, the
 6  rate of new cases increased from 1975 to 1990, and
 7  then the increase slowed from 1990 to 2005, and then
 8  it began to decline around there?
 9      A.   I'm not sure I'm on the right page.
10      Q.   Okay.  So I'm looking at page 10.
11      A.   I -- do I need to scroll down?
12      Q.   Yes, sir.
13      A.   Okay.
14      Q.   Yes, sir.  And I'll show you what I'm
15  looking at on the screen here.  I just shared my
16  screen?
17      A.   Okay.  All right.  Thank you.  Give me a
18  second.  Let me get back.
19      Q.   Sure.
20      A.   Okay.  I'm there.
21      Q.   Okay.  And do you see here for new cases,
22  the rate of new cases is there in the light green?
23      A.   I see it.
24      Q.   Okay.  And do you agree with me that the
25  rate of new cases increased from 1975 to 1990 and
```

1    then increased more slowly from 1990 to 2005 and

2    they began to decline after 2005?

3         A.   I do see where case -- rate of new cases

4    did increase between 1975 and 1990.  It appears

5    there was a small trend upwards after 1990, but

6    relatively -- relatively plateaued.  I don't know if

7    that -- it looks fairly plateaued to me.  I'm not

8    sure that -- any decrease is significant, say, after

9    2010.  So I -- I would say it's fairly plateaued

10   there after 1990.

11        Q.   Okay.  After 1990, it's fairly plateaued.

12   Now, glyphosate was not introduced to the market --

13   again, we've established this -- until 1974, right?

14        A.   That's correct.

15        Q.   Okay.  And you've also mentioned a few

16   times in your causation analysis that the 20-year

17   lag data is particularly important to you because

18   cancer takes some time to develop, fair?

19        A.   It -- it appears that way if you look at

20   the epidemiological evidence, yes.

21        Q.   Okay.  And you would -- you would agree

22   with me, then, that the most significant period to

23   look at, if we were looking at a 20-year lag from

24   glyphosate's introduction to the market, would be

25   1994 to 2018 in this graph, right?

Ronald J. Kendall, Ph.D.

```
1        A.    Yes.

2        Q.    Okay.  And for 1994 to 2018, after the

3   introduction of glyphosate to the market, did NHL

4   cases in this country sharply increase?

5        A.    It does not appear they sharply increased.

6   And that doesn't surprise me.

7        Q.    Okay.  In fact, it was your testimony that

8   the cases in that time period, 1994 to 2018, were

9   plateaued, right?

10       A.    It looks plateaued to me.

11       Q.    Okay.  And going to 1996, which is when

12  GMOs were introduced, in 1996, the use of glyphosate

13  sharply increased in this country, right?

14       A.    Yeah, but mainly in agriculture, not in

15  residential use, I would not suspect.

16       Q.    Okay.  And even though -- well,

17  agricultural cases would be caught by this, right,

18  for NHL?  This is NHL in all Americans.

19       A.    Well, you -- you would be suspicious of

20  that, yes.

21       Q.    Okay.  So even though they're counting

22  farmers in this graph, we didn't see a sharp

23  increase in NHL in the 2016 to 2018 period on this

24  graph, right?

25       A.    Well, I don't -- I don't know.  This is the
```

Ronald J. Kendall, Ph.D.

1    first time I've ever seen these data.  You know, I

2    don't know.  I don't know.  I told -- I did -- I did

3    tell you that that curve looked fairly plateaued to

4    me after 1990.

5        Q.    Well, it's certainly not increasing from

6    2016 to 2018.  We can agree on that?

7        A.    Yes.

8        Q.    Okay.  And so, again, from an ecological

9    point of view, the introduction of GMOs does not

10   appear to have, at least at this state, caused a

11   sharp increase in NHL in this country.  Is that a

12   fair statement?

13       A.    Yeah, but you're talking about fewer people

14   using larger volumes of it tied to agriculture.

15   That's my -- that's my point.  I mean, when you're

16   treating a cotton field versus your backyard, that's

17   orders of magnitude different.

18       Q.    Okay.  And so of all the epidemiology

19   studies we have looked at in the last time we talked

20   and on your materials considered lists, the one that

21   looked at these individuals applying huge amounts of

22   glyphosate was the agricultural health study, right?

23       A.    Right.

24       Q.    And that study did not see any increased

25   risk in these highly exposed individuals for NHL,

1    true?

2       A.   Based on that -- the experimental design of

3    that study, that is true.

4       Q.   Okay.  Now, you mentioned you reviewed our

5    experts' opinions in this case, and I want to focus

6    on Savory and Thomas, where I believe it was

7    Dr. Phalen and Dr. Murphy.  No, strike that.  It was

8    Dr. Phalen and Dr. Schafer in the Savory and Thomas

9    cases, and then the two lead scientists as well in

10   those cases.  Do you have any opinions you intend to

11   offer regarding the reports you reviewed in Savory

12   and Thomas of Monsanto's experts?

13      A.   Yes, I do.

14      Q.   Okay.  What opinions do you intend to

15   offer?

16      A.   Okay.  Regarding the Savory case, I

17   reviewed the report of Dr. Schafer.  And he goes to

18   great lengths to generate an estimated average

19   exposure dose to Mr. Savory.  And -- and although I

20   appreciate the mathematical analysis and model

21   applications that he's generated, I think it's very

22   difficult to -- to come up with a good estimate

23   along those lines related to the fact that

24   Mr. Savory was using this regularly for many years

25   over a large lot.  A 3.37-acre home -- home lot is

Ronald J. Kendall, Ph.D.

```
 1    huge and when you're trying to maintain it by hand.
 2             So anyway, you know, I just -- I just -- I
 3    look at this analysis and say, well, you know, we
 4    can try to mathematically argue that exposure was
 5    limited.  On the other side, we do know that
 6    exposure can occur, and we can get it in our bodies,
 7    particularly in the blood.  And that's what I'm
 8    interested in.
 9             So -- so anyway, I don't have any strong
10    opinions otherwise in his -- Dr. Schaefer's report.
11             And Dr. Carol Mallory Smith's report, this
12    is in regards to the Savory case, she -- on page 39,
13    she gets into about how much Mr. Savory sprayed
14    and -- and it references his testimony.  But we do
15    know he was operating on a 3.37-acre tract of land.
16    He was primarily taking care of the property and the
17    weeds.
18             I had a video, which I did disclose to
19    you, I had a drone video of that property.  And
20    you're talking about a very complex suite of
21    vegetation components in, basically, an eastern
22    deciduous forest interfaced with open ground,
23    receding sunlight, therefore generating weeds.  So
24    we can debate about how many times he sprayed a week
25    or whatever; I am going to get to that in a second.
```

1                But going on -- going on, I -- I noticed

2       the pictures that she took when she visited

3       apparently in July of 2021, or I think

4       approximately, I was very interested in the

5       pictures, and -- and what Mr. Savory had said was he

6       hadn't been able to take care of the property since

7       he was diagnosed with NHL.  And the leaves were

8       thick on the ground and obviously nothing -- when

9       you've got leaves covering the ground in July, that

10      means nobody raked them the previous, you know,

11      fall.  So, again, I look -- look at it and think,

12      you know, if you've got anything covered in leaves,

13      you're suppressing vegetation growth, the ground --

14      ground vegetation.

15               More specifically, she, on page 46,

16      debates about how many times a week he sprayed and

17      about how many times per month and whatever.  And,

18      you know, I read his deposition.  So she thinks I've

19      overestimated it.  But when you look at what

20      Mr. Savory said, sometimes he was spraying two hours

21      at a time, sometimes an hour, sometimes one to two

22      times a week, sometimes less, sometimes more.

23               But, again, you know, we can debate all we

24      want when we talk about case control studies and

25      people having a little bit difficult time sometimes

1  remembering exactly what they did over 20 years in

2  terms of exposure, but I thought I gave a fairly

3  conservative estimate and -- but, you know,

4  considering he had 3.37 acres of property.

5           In terms of personal protective equipment,

6  when you're spraying that much property trying to

7  control weeds -- and he admitted in his testimony he

8  got it -- got it on him several times, got it on his

9  face.  He even tasted it.  And, again, it's hard to

10  segregate out how many times that might have

11  happened when he didn't realize it and -- because

12  when you're spraying that much, and that's -- that's

13  a lot.  I mean, a property that large is a huge

14  responsibility to keep up with for a homeowner.

15           So, again, you know, I just think we could

16  debate -- we could debate how much -- how long he

17  sprayed and how many times he sprayed and whatever.

18  But, again, even if you took her most conservative

19  analysis compared to me, he -- he's still at 43.5

20  eight-hour days' exposure over that close to

21  30 years, even if you used her analysis.

22           And so, again, my point is, we can try to

23  split hairs on here to determine how many times he

24  sprayed, because, again, as he was going through the

25  testimony, he was having -- he was struggling.  And

1    he was subsequent to NHL.  He went through literally

2    a very difficult time with NHL with bone cancer,

3    with, you know, serious shoulder problems, health

4    problems, whatever.  So, I mean, he was struggling

5    trying to remember and recall what -- what -- you

6    know, how many times he had used it.  But there is

7    no doubt he used it, and he used it for many, many

8    years.  So those are just a few of my prospectuses

9    on the Savory case.

10          Now, for the Thomas case, I read the --

11   respectfully read the report of Dr. Creech related

12   to the exposure of Mr. Thomas.  And, you know, just

13   in a nutshell, you know, again, I agree with the

14   value of herbicides in our country and our economy.

15   I agree with the value of herbicides in agriculture

16   and in home lawn maintenance.  So I don't disagree

17   with him at all.

18          The essence of his report is that

19   Mr. Thomas lived in the desert, and they don't have

20   weeds in the desert, so he didn't need to spray.

21   And so I disagree with that.  Because, first of all,

22   Mr. Thomas, during the time frame that he testified

23   he used glyphosate, he was living in Massachusetts

24   for -- and using it for a number of years, five and

25   a half years.  He was using it in Irvine,

Ronald J. Kendall, Ph.D.

1    California.  He was in Las Vegas, Nevada, for four

2    years.  Mr. -- Dr. Creech was mainly referring to

3    Goodyear, Arizona, and -- because that's the place I

4    think he visited.

5            But I still -- I still argue that you

6    get -- you get the monsoons this time of year and

7    earlier, you've got a lot of weeds.  I live

8    basically in a desert.  We don't have but 16 inches

9    of rain here a year.  And you get any moisture, say

10   April -- March, April, boom.  And, in fact, the

11   weeds are literally more invasive because they --

12   they take advantage of the environmental variables

13   when they give them the chance.  Anyway.  But he's

14   here, lived on -- in Richfield, Nevada, as well as

15   Las Vegas, Nevada.

16           So, again, I disagree with Dr. Creech that

17   just because he lives -- he lived in Goodyear,

18   Arizona for six years out of the more than 20 years

19   he was using it, he didn't -- he didn't have to

20   spray because there were no weeds.  I don't agree

21   with that, because I know one thing, the weeds we

22   get here, we -- I mean, we can have as few of six to

23   seven inches a rain, sometimes it's average 16.

24   We've had, you know, some more than that.  But,

25   generally, I live, basically, in desert and -- or a

Ronald J. Kendall, Ph.D.

```
 1   semi-desert.

 2           Now, Dr. Phalen, he -- I look at his

 3   comments related to -- to my report, and -- you

 4   know, first of all, in terms of exposure, I've

 5   handled these materials and -- before, hand bottles,

 6   sprayers and whatever, and it's just hard to

 7   100 percent keep it off of you unless you are really

 8   geared up.  So, again, it's not like I hadn't been

 9   an environmental toxicologist for 41 years.  Done

10   many field studies, pesticide application studies

11   for the EPA.  I've handled all kinds of PPE gear.

12   Understand respirators, all of that.

13           But my point -- the only point was I was

14   trying to convey is -- is it's -- when you're using

15   it as a -- the average citizen and handling it as

16   long as these people did, Mr. Savory in this case,

17   it's hard to ignore that, yeah, probably

18   predominantly skin absorption.  But at the same

19   time, any blow back whatsoever, you've got it in

20   your face and you've got it in your mouth in a

21   hurry.  So -- and that's where I -- I'm looking at

22   that.

23           He goes into great lengths about dermal

24   absorption.  We can debate that.  I invoked the

25   George study.  Just -- just the point there is we
```

Ronald J. Kendall, Ph.D.

```
 1   know we get absorption at least to the surface cells
 2   because we -- we demonstrated tumorigenic activity
 3   with glyphosate formulation.  And so that's my
 4   point.  We get absorption.  We know we do.
 5            Generally speaking, we can debate
 6   2 percent, 1 percent, 3 percent, but we do get some
 7   absorption through the skin.  It's not like we get
 8   zero absorption.  And we do know that, generally,
 9   glyphosate will clear in six to eight hours through
10   the urine if it doesn't get in your blood.  And if
11   it gets in your blood, it can remain a lot longer.
12   So, again, with the toxicokinetics, this will vary
13   depending on what tissue that -- that material has
14   gotten in.
15            The -- the epidemiology studies, again, I
16   understand there are -- we can criticize -- we can
17   criticize any scientific study.  Anything.  My point
18   was that, generally speaking, when you looked at --
19   so he went through, Dr. Phalen did, and gave
20   discussion as to the inadequacies of all of these
21   epidemiology studies.  I don't think there's ever
22   been a perfect epidemiology study.  It's very
23   difficult when you're trying to look at recollection
24   of exposure, who got exposed to what, how long, what
25   the outcomes were, the statistical models used in
```

Ronald J. Kendall, Ph.D.

1    the analysis, how thorough they were, how robust

2    they were.  I could go on and on.

3            The only thing I'm saying is there appears

4    to be association with -- with long-term exposure,

5    chronicity, and the demonstration of evidence that

6    NHL does appear to be associated with that.  At

7    least blood cancer, in general, but NHL.

8            I agree that there are confounding

9    factors.  He makes the statement that -- that I

10   noted in my report they weren't toxicological

11   confounding factors, because, to my knowledge, as I

12   stated it, I wasn't aware that Mr. Savory,

13   Ms. Spector or Mr. Thomas were using other chemicals

14   that I would have been really concerned about that

15   would have been carcinogens.  I didn't see it.

16   That's -- that's what I saw in their depositions.

17           So I do agree that there are risk factors.

18   He's noted obesity as a risk factor.  The -- the

19   American Cancer Society, for instance, obesity is

20   probably a lower risk factor than immunosuppression.

21   We can debate all these risk factors, and they're --

22   they're not equally.

23           But at the same time, we know Mr. Thomas

24   earlier in his use appeared to be quite obese, but

25   he had the lap band surgery.  Lost a lot of weight.

Ronald J. Kendall, Ph.D.

```
 1   I don't know how that fit into this.  But he could

 2   have actually had some risk factors, as Mr. Savory

 3   did when in 2001 he was -- Mr. Savory was diagnosed

 4   with rheumatoid arthritis, a significant

 5   inflammation in the body.

 6          So, again, all of these factors not only

 7   are a risk factor for Non-Hodgkin's lymphoma, but

 8   they also could be a risk factor for setting you up

 9   physiologically to be more responsive to develop

10   Non-Hodgkin's lymphoma with certain kind of

11   exposures.

12          So -- so, again, Dr. Phalen, you know,

13   he's welcome to his points, but I think that, you

14   know, we -- we can -- I was -- I was curious --

15   I mean, just real quick, I respected Dr. Phalen's

16   comments, but I -- I also evaluated -- evaluated him

17   as a scientist of standing in the world.  And the

18   only thing you've got to do is run Google Scholar on

19   him.  He shows 224 citations of all of his science

20   he's published.  His h-index is 9 and his i10-index

21   is 8.  And that -- that gives you a metric related

22   to scientific and academic standing.

23          If you run a Google Scholar on me, you'll

24   see I have way over 7,000 citations in my -- of my

25   science.  My h-index is at 45, which ranks very high
```

Ronald J. Kendall, Ph.D.

```
 1    in the world.  That means that I have over 40- -- I
 2    have 45 publications with at least 40 scientific
 3    citations in the world literature.  And my
 4    i10-index, his is 8, mine is 129.
 5            So my point is, he can be critical.  I
 6    accept it.  But I also evaluate him from his
 7    academic standing as a scientist.  And, you know,
 8    again, I -- I look at this and the whole -- the
 9    whole prospectus, because, you know, as I engage
10    people all over the world in doing science,
11    reviewing science, you know, I view him as very
12    early in his career in scientific standing when you
13    look at the data.  And I could go on and on.
14            But my point is, is I am a well-known
15    researcher, highly published, well-known in the
16    world, have served as an editor and associate editor
17    of the Journal of Environmental Toxicology and
18    Chemistry for 32 years, have served as chairman of
19    the Science Advisory Panel of the Federal
20    Insecticide, Fungicide and Rodenticide Act of EPA
21    for three years, which is unheard of to have a
22    chair.  I was on the panel many other years.  I have
23    served on many EPA panels over the years.
24            And, again, I think when you bring all
25    this together, you know, I -- I have thoughtfully
```

1    and scientifically and -- and appropriately tried to

2    communicate with -- with information and prospectus

3    of -- of Mr. Savory and Mr. Thomas in terms of these

4    critical reviews of their -- their information, and

5    also Ms. Spector that we discussed last Thursday.

6            But I took particular exception with

7    Dr. Phalen and will enjoy debating him later.

8            That's all I have to say.

9        Q.   Okay, sir.  Does that constitute the

10   opinions you intend to offer at trial regarding

11   Monsanto's expert reports, the answer you just gave

12   there?

13       A.   Yes.  That -- it would be no more than

14   that.  It would be no more.

15       Q.   Okay.  And it strikes me that you are not

16   going to argue that the -- Monsanto's experts, the

17   four we just discussed, do not hold Ph.D.s in the

18   relevant fields on which they are opining?

19       A.   No, they -- they -- they have Ph.D.s in

20   relevant fields.

21       Q.   Okay.  And, likewise, Dr. Phalen and

22   Dr. Schafer, they're both certified industrial

23   hygienists, right?

24       A.   Right.  But they're not toxicologists.

25       Q.   Okay.  Certified industrial hygienists are

```
1    individuals who work in the field of exposure
2    assessment of toxicological substances, right?
3        A.   In general, yes.
4        Q.   Okay.  And I don't know if I just asked
5    this, I might have, but I don't think I did:  You
6    are not a certified industrial hygienist, right?
7        A.   I am not.
8        Q.   Okay.  And they have to have taken an exam
9    to become a certified industrial hygienist, true?
10       A.   I don't know about that.
11       Q.   Okay.  And you're not going to opine to the
12   jury that the modeling used by the certified
13   industrial hygienist is not an appropriate type of
14   modeling that is used in their field, right?
15       A.   I'm not -- I'm not intending to.
16       Q.   Okay.  And you're not going to opine to the
17   jury that you are a weed scientist, right, somebody
18   that works in a weed extension program, for
19   instance, at a --
20       A.   No.
21       Q.   -- at a university?
22       A.   No.
23       Q.   Okay.  And weed scientists at universities,
24   these are individuals who are experts in the
25   identification and management of weeds, true?
```

Ronald J. Kendall, Ph.D.

```
 1      A.   True.
 2           MR. BRECHER:  I'll just object to the
 3   form of the question as stating anybody is an
 4   expert.
 5   BY MR. KALAS:
 6      Q.   Okay.  And you in your career have not
 7   worked as a professor who identifies and manages
 8   weeds in a weed extension program at a university,
 9   right?
10      A.   Yeah, at a university.  But on a ranch,
11   yes, I have.
12      Q.   Okay.  At Texas Tech, you have a weed
13   extension program, right?
14      A.   Yeah, we do.
15      Q.   Okay.  And your -- you don't work in that
16   department, right?
17      A.   No.
18      Q.   Okay.  Now, you talked a bit there about --
19   about some sort of scoring system, and I just -- I
20   just want to -- well, that's really -- I'll come
21   back to that.
22           You said a couple of other things in that
23   the answer that I want to follow up on.  You said
24   that when you get blow back, you're going to get
25   some glyphosate in your mouth.  Do you remember
```

Ronald J. Kendall, Ph.D.

```
 1   saying that?

 2        A.    Yeah, if you -- say, you got -- yes, it's

 3   possible.

 4        Q.    Okay.

 5        A.    It is possible.  That's all I'm saying.

 6        Q.    Okay.  Sure.  Yeah.

 7              And if you get glyphosate in your mouth,

 8   you're going to have an oral ingestion of

 9   glyphosate, right?

10        A.    It's possible.

11        Q.    Okay.  And if you have an oral ingestion of

12   glyphosate, you've seen data that reports that

13   orally ingested glyphosate is absorbed at

14   approximately 1 percent in the human body, right?

15        A.    It varies.  The animal data is not

16   consistent with that, but human data, it's -- it's a

17   low percentage.  I don't recall exactly --

18        Q.    Okay.  And -- were you done?  I'm sorry, I

19   don't want to cut you off.

20        A.    I'll leave it at that.

21        Q.    Okay.  You don't recall exactly.

22        A.    Okay.

23        Q.    The rest of the glyphosate that is not

24   absorbed via the gut passes out of the body

25   unchanged, right?
```

Ronald D. Kendall, Ph.D.

```
 1        A.   Yes.
 2        Q.   Okay.  And it's not toxicologically
 3   available for the bloodstream when it passes through
 4   the gut, right?
 5        A.   Less.
 6        Q.   Okay.  And you said if glyphosate gets in
 7   your blood, it remains longer.  And I have never
 8   heard that before, sir, and I've taken a lot of --
 9        A.   Well, I was --
10        Q.   -- depositions in this litigation.  So let
11   me -- let me ask my question.  I haven't asked the
12   question yet.
13             My question is, what are you relying on to
14   argue that glyphosate in the blood lasts longer than
15   the six-hour half life reported in the literature?
16        A.   I read -- I read some information.  I don't
17   know, I've read a lot of information.  I've tried to
18   disclose everything I've looked at.  But I did see
19   some information that -- that did relate that it
20   appeared to remain longer than in the blood than it
21   just -- just rapid excretion.  And it's 24 hours or
22   less.  It may -- may not be six or eight hours; it
23   may be longer.
24             So I can't say exactly right now.  I just
25   remember there were parts per billion levels that
```

Ronald D. Kendall, Ph.D.

1    was in the blood, and -- and it appeared to be

2    longer than just general excretion.  And that would

3    make sense if it did get into your bloodstream.

4    So. . .

5        Q.   Well, my -- with all due respect, sir, I

6    need to understand your opinions.  That's what this

7    deposition is for.

8        A.   Okay.

9        Q.   I was looking at your expert report just

10   now when you were giving that answer.  I did not see

11   any discussion of a half life longer than six hours

12   in the blood.

13       A.   Yeah, I --

14       Q.   It's not in there, right?

15       A.   I -- I would say that -- okay.  That's a

16   fair point.  I just -- I had read that there may be

17   longer residence time in the blood.  But, you know,

18   I'm -- I'm willing to say it -- even if it cleared

19   in six to eight hours, we do get access to the

20   blood, particularly through absorption through the

21   skin.

22            So -- so, anyway, I'm not going -- I'm not

23   going to argue with you that it stays in the blood X

24   amount of time more than -- than regular residence

25   time in the body because I don't -- I don't have --

1    I don't have those papers right here in front of me.

2           And, again, as I'm -- as I'm looking at

3    all of this, this information -- I've read about

4    this for a long time.  And so, you know, again, I

5    just -- I'm not going -- I'm going to say I'm

6    suspicious that residence time can be longer in the

7    blood, but I'm not going to definitively say it is

8    right now until I can find that information again.

9    But -- but, again, the point is -- the big point is,

10   is that it can get into the blood and in measurable

11   quantities that we have evidence of.

12       Q.   So -- okay.  I want to make sure we're on

13   the same page here.  We both agree that absorbed

14   glyphosate gets into the bloodstream, right?

15       A.   Right.

16       Q.   Okay.  And sitting here today, you are

17   suspicious that absorbed glyphosate in the

18   bloodstream may stay in the bloodstream longer than

19   a half life of six hours, right?

20       A.   Yes, that's fair.

21       Q.   But you don't have a citation you can point

22   me to sitting here today for that opinion, right?

23       A.   Sitting here today, I can't point you to

24   exact -- that exact citation at this point in time.

25       Q.   Okay.  And is it true, then, because you

Ronald D. Kendall, Ph.D.

1    cannot point me to the citation at this point in

2    time, if trial were today, you would not opine that

3    the half life of glyphosate in the blood is longer

4    than six hours to a reasonable degree of scientific

5    certainty?

6        A.   I would not.

7        Q.   Okay.

8        A.   But it's based on -- it's based on where we

9    are right now today.  So. . .

10       Q.   Okay.  Now seems like a good time to take a

11   break for me.  I don't know if you would like to

12   take a break for a few moments.

13       A.   That would be great.

14            MR. KALAS:  Okay.  Let's take five or

15   so and come back.

16            THE VIDEOGRAPHER:  All right.  We are

17   off the record at 11:10 a.m.  This concludes Media

18   No. 2.

19            (Break taken, 11:10 a.m. to 11:18 a.m.)

20            THE VIDEOGRAPHER:  We're back on the

21   record at 11:18 a.m., beginning of Media 3.

22   BY MR. KALAS:

23       Q.   Dr. Kendall, would you like to say anything

24   before we continue questioning?

25       A.   Yes, Mr. Kalas, thank you for giving me

Ronald D. Kendall, Ph.D.

1    this opportunity.

2            I looked at the International Agency for

3    Research in Cancer, the glyphosate monograph, and on

4    page 76, it says glyphosate was measured in human

5    blood, and then on page 77, in a study in rats, the

6    half life of glyphosate in plasma was estimated to

7    be more than one day, indicating glyphosate is not

8    rapidly eliminated from the blood.  That -- that

9    was, in general, what I was referring to.

10           But I'm not -- in humans, we do know it

11   can get in the blood.  But from -- from rat data, we

12   know it stays in the blood longer than six hours.

13   That was my only point.  But I'm going to -- I'm

14   going to rest it at that.

15      Q.   All right.  And you haven't reviewed a

16   study, at least it doesn't appear on your materials

17   considered list, by Connolly, et al., in 2018, that

18   looked at the half life of glyphosate in humans,

19   right?

20      A.   No, I didn't look at that.

21      Q.   Okay.  Now, one of the things you talk

22   about in a few of your expert reports is -- is

23   individuals -- and, specifically, I'm thinking

24   Mr. Savory here -- who washed his skin after using

25   Roundup.  Do you recall that?

```
 1      A.   Yes.  He said he did.  Mr. Savory said he
 2  did.
 3      Q.   Okay.  And there's data --
 4      A.   Or at least rinsed it -- or at least rinsed
 5  it off with a garden hose.
 6      Q.   Okay.  And there's data in the literature
 7  that shows that rinsing skin with even just water
 8  after glyphosate-based herbicide exposure is
 9  effective at clearing the glyphosate off the skin,
10  right?  You've seen that?
11      A.   Which study are you referring to?  Do you
12  remember?
13      Q.   Well, I'm referring to a few studies, sir.
14  I'm referring to Wistar, 1991.  I'm referring to
15  Zhai, Z-h-a-i, 2008.  Have you -- have you reviewed
16  any of those studies or seen any of that data?
17      A.   I've seen them referenced in other places,
18  but not directly them.  But I don't -- I don't have
19  a reason to disagree with that, though.  That
20  washing --
21      Q.   Okay.  And that makes sense --
22      A.   -- washing your hands off can remove a
23  great deal of the glyphosate.  That's assuming you
24  know you've got it on you.  And what I tried to
25  relate to you earlier, I'm not -- I'm confident that
```

1    you don't necessarily know you get it on you every

2    time.  With a big exposure, with a big blow back,

3    yeah, you would probably realize (audio drop).

4              THE STENOGRAPHER:  Did he freeze for

5    everyone else?

6    BY MR. KALAS:

7       Q.   All right.  We lost you at, "Yeah, you

8    would probably realize. . ."  Did you say anything

9    after that?

10      A.   I said I think -- I think that was just the

11   point I was trying to make.  I think.

12      Q.   All right.  So you would expect, given its

13   chemical properties as well, that washing even with

14   just water would reduce the level of glyphosate on

15   the skin because glyphosate is hydrophilic; it's

16   attracted to water?

17      A.   Exactly.  No, I agree.

18      Q.   Okay.  And, likewise, sweating would reduce

19   the amount of glyphosate on the skin because our

20   sweat is mostly water, right?

21      A.   I would agree.

22      Q.   Okay.  Now, we -- you mentioned a few times

23   about -- we talked about this multifactorial idea a

24   few times.  Are you going to opine that either

25   Mr. Savory or Mr. Thomas had a specific biological

Ronald D. Kendall, Ph.D.

```
1   variability in their history that made them

2   predisposed to cancer from Roundup exposure?

3      A.   Mr. Kalas, you cut out on me at

4   "biological."

5      Q.   Okay.  I'll ask it again.

6           Are you going to argue that Mr. Savory or

7   Mr. Thomas had a specific biological variability in

8   their medical histories that made them predisposed

9   to cancer from glyphosate-based herbicide exposure?

10     A.   I'm not intending to unless --

11     Q.   I can break that up.

12     A.   Pardon?

13     Q.   I'm sorry, I could break it up by

14  plaintiff, if that's easier.

15     A.   Well, if I was asked that question, I would

16  probably say, yes, that there was some

17  predisposition, but I'm not intending to opine on

18  it.

19     Q.   Okay.  So let me -- let me make sure I --

20  I'm sorry, were you done?

21     A.   I -- you know, that -- I wasn't planning to

22  get there and -- and -- on the stand and go in that

23  direction, no.  But if I was asked were there some

24  variables that may have affected these people, I'd

25  say it's a possibility.  It goes back to, you know,
```

Ronald D. Kendall, Ph.D.

1    that last question you asked me during the Spector

2    deposition.  Do you remember that question?  It was

3    the last one.

4        Q.   I -- I remember it, but I don't remember

5    exactly how I asked it.  So if you -- if you --

6        A.   Yeah, because it was very confusing to me,

7    and I'm not sure I got it right.  Because I -- I

8    recall asking you to rephrase it three times, or

9    several times, because it was kind of like you asked

10   me, I guess in a nutshell:  Do you think Ms. Spector

11   would have gotten NHL anyway without even glyphosate

12   exposure?  Wasn't that the angle?  Something like

13   that.

14       Q.   Well, yeah, that was -- that's -- that is

15   generally a question I ask in depositions, and I'll

16   ask you about the other two as well.

17       A.   Well, you know, I would like to -- you

18   know, again, I -- I have really tried to be straight

19   with you and answer your questions.  I really try.

20   But that one, has -- you know, it has bothered me

21   because, you know, you can't rule anything out

22   with -- you know, you've got to look at risk

23   factors, the biology there.

24            So I don't necessarily expect that she

25   would have gotten NHL if she hadn't gotten

1    glyphosate exposure, you know, because, you know, we

2    don't know that.  We can't rule out these factors.

3    And at the same time she did have exposure to

4    glyphosate, she wasn't using other -- other

5    chemicals.  We can go through that whole logic

6    profile I gave to you earlier.

7              So, again, I mean, I just don't expect

8    these people to -- you know, they -- they didn't --

9    in my opinion, none of the three, Mr. Savory,

10   Mr. Thomas or Ms. Spector, had a whole bunch of

11   underlying conditions or serious risk factors that,

12   you know, looks like they were going to get it

13   anyway.  I don't think that.  I really don't.

14             There could be some relationships.  You --

15   you presented the evidence from Ms. Spector that her

16   sister had had melanoma, which, again, a cancer that

17   close to her.  Although, she had not had cancer

18   before NHL.  Ms. Spector, that is.

19             So, again, I mean, I -- you know, I didn't

20   debate you on that, but, again, it's, like, she

21   didn't have an overwhelming number of -- of risk

22   factors that were sailing her into a probable NHL

23   diagnosis.  And that's why I -- you know, I just

24   wanted to clarify that, is that it was very -- you

25   know, when I -- when I reviewed her case, and I feel

1    like I know the lady, I -- I think she had very few

2    risk factors and -- and so on.

3            So I just -- you know, I'm trying to, as

4    best as I can, articulate what my opinions are and

5    why and -- and help you to understand that.  So,

6    again, I just wanted to clarify on the record, I'm

7    not sure I got my response right the other day with

8    Ms. Spector when you asked me that question, because

9    I -- you know, it was hard for me to -- you know, to

10   understand it.  It really was.

11           And I -- and I appreciate you giving me a

12   chance here just to kind of comment on that.  And

13   I'll continue to answer your questions on Mr. Savory

14   and Mr. Thomas.  Thank you.

15       Q.   Okay.  So a couple of things there.  Number

16   one, though, this deposition is not noticed for

17   Beth Spector, I'm going to need to follow up on some

18   of the things you said there.  And so I will ask you

19   a few questions about Ms. Spector here in a moment.

20   Let's take each plaintiff in turn.

21       A.   Okay.

22       Q.   Are you going to argue to the jury that

23   Beth Spector had a specific genetic predisposition

24   or predisposition from some other risk factor that

25   exacerbated her risk of NHL from Roundup use?

Ronald D. Kendall, Ph.D.

```
 1              And you're frozen.  Dr. Kendall, you're --
 2    you were frozen there.
 3         A.   Yes, sir.  I didn't hear your question.
 4         Q.   Okay.  You're frozen again.  So we're going
 5    to try this again.
 6              All right.  Dr. Kendall?  Can you hear me,
 7    Dr. Kendall?
 8         A.   I can now.
 9         Q.   Okay.  Are you going to opine to the jury
10    that Beth Spector had a specific genetic
11    susceptibility to NHL that was exacerbated by her
12    Roundup use?
13         A.   No.
14         Q.   Okay.  Are you going to argue to the jury
15    that Beth Spector had a specific predisposition to
16    NHL from any other risk factor that was exacerbated
17    by her Roundup use?
18         A.   Please -- please state that again.  I want
19    to make sure I hear it.
20         Q.   Are you going to argue to the jury that
21    Beth Spector had a predisposition to NHL from any
22    other risk factor that was exacerbated by her
23    Roundup use?
24         A.   (Audio drop).
25              Mr. Kalas?
```

Ronald B. Kendall, Ph.D.

1      Q.   Yes, sir.

2      A.   I answered, "No," to that question.

3      Q.   Okay.  Sorry.  We missed that.  Thank you

4   for following up there.

5           Are you going to argue to the jury that

6   Ms. Spector would not have developed NHL had she

7   never been exposed to Roundup?

8      A.   You cut out on the first part of the

9   question.

10      Q.   Are you going to argue to the jury that

11   Ms. Spector never would have developed NHL had she

12   not been exposed to Roundup?

13      A.   No.

14      Q.   Okay.  Let's go --

15           MR. KALAS:  Marc, did you say

16   something there, or was it just a --

17           MR. BRECHER:  I thought it was kind

18   of, like, a double negative.  I was a little

19   confused by the question, but. . .

20   BY MR. KALAS:

21      Q.   All right.  Did you understand my question,

22   Doctor, or do you need me to ask it again?

23      A.   Please ask it one more time.  I'm trying to

24   listen to you.

25      Q.   Sure.

Ronald D. Kendall, Ph.D.

```
1              Are you going to argue to the jury that
2   had Ms. Spector never used Roundup, she never would
3   have developed NHL?
4       A.   What I -- what I intend to say or have an
5   opinion on is that within a reasonable degree of
6   scientific certainty, I think her use and extensive
7   use (audio drop).
8              THE STENOGRAPHER:  Is he frozen for
9   you-all?
10             MR. BRECHER:  Yeah, he's frozen.
11             MR. KALAS:  Yeah.
12             THE STENOGRAPHER:  Should we do like
13  we did the last time, go off the record, and he can
14  call on the phone?
15             MR. KALAS:  Yeah, that's --
16             MR. BRECHER:  Why doesn't -- yeah, why
17  doesn't the court reporter just read back his
18  partial answer so he can move forward with that?
19  BY MR. KALAS:
20      Q.   We lost you there, Doctor.  She's going to
21  read what she got down, and then if you can pick it
22  up.
23      A.   I'm sorry.
24             THE STENOGRAPHER:  "What I intend to
25  say or have an opinion on is that within a
```

Ronald D. Kendall, Ph.D.

1    reasonable degree of scientific certainty, I think

2    her use and extensive use. . ."

3         A.   Of -- of Roundup was a significant

4    contributing factor to her development of NHL.

5    BY MR. KALAS:

6         Q.   Okay.  But I don't know if that answered my

7    question, which is different, which is, do you

8    intend --

9         A.   Well, I just -- I'm trying to see if we can

10   meet in the middle here because I --

11        Q.   Yeah.

12        A.   That's kind of what I -- what my opinion

13   is.  And I'm trying -- you kind -- you kind of got

14   me a double negative question here.  So I -- I'm

15   really trying to listen here.

16        Q.   Okay.  Okay.  What -- let me flip it, then.

17        A.   Okay.

18        Q.   Is it your opinion that Ms. Spector's NHL

19   would not have manifested if she was not a Roundup

20   user?

21        A.   I just don't think -- you know, it's

22   difficult to answer that.  I just don't think we can

23   rule -- rule all of this out right now.  I think --

24   I just think it was -- can you hear me?  I think it

25   was a contributing factor.

Ronald D. Kendall, Ph.D.

1      Q.   Yeah.  Well, I understand you think it was

2  a contributing factor.  But there are people in this

3  world who manifest NHL who've never used Roundup,

4  right?

5      A.   That's fair.

6      Q.   Okay.  Ms. Spector may have manifested NHL

7  had she never used Roundup; is that fair?

8      A.   You cut out on me again.  I don't know why.

9      Q.   Ms. Spector -- Ms. Spector may not have --

10  or -- strike that.

11          Ms. Spector may have manifested NHL even

12  if she had never used Roundup; is that fair?

13      A.   It's possible.  We can't rule that out.

14      Q.   Okay.  And so based on that, you won't tell

15  the jury that had Ms. Spector never touched Roundup,

16  she would not have gotten NHL?

17              MR. BRECHER:  Well, I object to the

18  form of the question.

19  BY MR. KALAS:

20      Q.   You can't rule out -- because you can't

21  rule out the point we just made before.  That's all

22  I'm trying to ask.

23              MR. BRECHER:  Well, I think you've

24  tried to ask him many different ways.  He's given

25  you his answer what his opinion is, and I think --

Ronald B. Kendall, Ph.D.

```
 1                  MR. KALAS:  Well, Marc, he keeps --
 2                  MR. BRECHER:  -- you're trying to keep
 3    twist --
 4                  MR. KALAS:  -- talking about --
 5                  MR. BRECHER:  Well, that's his
 6    opinion.
 7                  MR. KALAS:  Marc, he keeps talking
 8    about --
 9                  MR. BRECHER:  You're asking him to
10    give --
11                  MR. KALAS:  Marc, you --
12                  MR. BRECHER:  John.
13                  MR. KALAS:  No, I'm asking if he's
14    going to say something at trial.  Is he -- if he's
15    not going to say it, that's fine.  If he is going to
16    say it, that's fine.  I just need to what he's going
17    to say.
18                  MR. BRECHER:  I think he's told you
19    what he --
20       A.   What I am going to say is -- I'll answer it
21    again.  What I intend to say is, that Ms. Spector
22    developed NHL.  In -- in the process of development
23    of NHL, I believe, within a reasonable degree of
24    scientific certainty, that a significant
25    contributing factor was her long-term, extended use
```

Ronald D. Kendall, Ph.D.

1   of Roundup.  That's about as clear as I can get it.

2   BY MR. KALAS:

3       Q.   Did you have any preparation sessions for

4   this deposition between the Spector deposition and

5   today with counsel?

6       A.   No, sir.  No.

7       Q.   Okay.

8       A.   No, sir.

9       Q.   Let's go back to Mr. Savory.

10      A.   Yes, sir.

11      Q.   On Mr. Savory's case, do you intend to tell

12  the jury that Mr. Savory had a genetic

13  predisposition to NHL that was exacerbated by his

14  Roundup use?

15      A.   No, I don't.

16      Q.   Do you intend to tell the jury that

17  Mr. Savory had a predisposition to NHL from any

18  source that was exacerbated by his Roundup use?

19      A.   I don't -- I don't plan to.  That's not my

20  plan.

21      Q.   Okay.  Do you intend to tell the jury that

22  Mr. Savory would not have manifested NHL had he

23  never used Roundup?

24      A.   I intend to tell the jury that due to the

25  long-term chronic exposure and use of Roundup, this

1   was a significant contributing factor to his

2   ultimate development of NHL.

3       Q.   Okay.  Returning to Ms. Spector for a

4   moment.  Could Ms. Spector have manifested NHL via

5   her increased risk of NHL from a first degree

6   relative with cancer independent of other causes?

7       A.   It's possible.  We can't rule that out.

8       Q.   Okay.  Could Mr. Savory have manifested NHL

9   via his increased risk from having rheumatoid

10  arthritis independent of other causes?

11      A.   It's possible, but we can't rule that out.

12  But on the other side, that inflammation could have

13  made him more sensitive to this from -- from

14  long-term chemical exposure.  I don't know.  We

15  can't rule it out.

16      Q.   Okay.  Let's go to Mr. Thomas.  In the case

17  of Mr. Thomas, do you intend to tell the jury that

18  Mr. Thomas had a genetic predisposition to NHL that

19  was exacerbated by his Roundup use?

20      A.   No.

21      Q.   Do you intend to tell the jury that

22  Mr. Thomas had any predisposition to NHL from any

23  other factor that was exacerbated by his Roundup

24  use?

25      A.   I don't think we can rule anything out.

Ronald D. Kendall, Ph.D.

1    But, generally speaking, I would say I wouldn't say

2    that.

3         Q.   Okay.  Do you intend to tell the jury that

4    Mr. Thomas would not have gotten NHL had he never

5    used Roundup?

6         A.   I intend to tell the jury that due to

7    long-term use and chronic exposure to Roundup,

8    Mr. Thomas developed NHL, and, within a reasonable

9    degree of scientific certainty, I believe glyphosate

10   was a significant contributing factor to his

11   development of NHL.

12        Q.   Do you -- do you intend to tell the jury

13   that Mr. Thomas would not have gotten NHL from his

14   obesity and diabetes independent of any Roundup use?

15        A.   Please ask me that again.

16        Q.   Sure.  Well, let's lay a bit of foundation

17   there.

18             Mr. Thomas was obese, right?

19        A.   At least for a period of his life.

20        Q.   Okay.  And Mr. Thomas has diabetes, right?

21        A.   It's under control.  Yes, but it's under

22   control.

23        Q.   Okay.  Both -- both diabetes and obesity

24   have been shown to be risk factors for DLBCL in the

25   literature, true?

Ronald D. Kendall, Ph.D.

```
 1       A.   Yes, but not the highest risk factors.
 2       Q.   Okay.  So my question is, will you tell the
 3  jury that Mr. Thomas never would have manifested NHL
 4  or -- strike that.  Let me ask it again.
 5            Are you going to tell the jury that
 6  Mr. Thomas would not -- or strike that.
 7            Based on Mr. Thomas's obesity and
 8  diabetes, you would agree with me that we cannot say
 9  that he would not have gotten NHL from those risk
10  factors even if he had never been exposed to
11  Roundup?
12            MR. BRECHER:  I'm just going to
13  consistently object to the form of this question
14  because I think it's a double negative and -- and
15  you're trying to put a square peg in a round hole
16  in -- in this question.
17            THE WITNESS:  Thank you, Mr. Brecher.
18  BY MR. KALAS:
19       Q.   You can answer, sir.  You can answer, sir,
20  if you understand.
21       A.   Pardon, I didn't understand you.
22       Q.   I said you can answer the question if you
23  understood it.  If you don't understand it, I'll
24  restate it.
25       A.   I don't understand it.
```

1      Q.   Okay.  If Mr. Thomas had the same obesity

2    history, had the same diabetes history but had never

3    used Roundup, are you going to be able to tell the

4    jury that he would have not gotten NHL?

5      A.   I intend to say based on the background of

6    Mr. Thomas, that I -- that I reviewed medical (audio

7    drop) that his development of NHL was to a

8    significant degree of scientific certainty, that

9    the -- a contributing factor was that use of

10   glyphosate over 20 years.

11     Q.   All right, sir.  But my hypothetical didn't

12   include glyphosate.  So let me -- let me change the

13   question slightly, and maybe you can understand it,

14   what I'm getting at.

15               MR. BRECHER:  John, can I just -- just

16   for this entire line of questioning, I'm just going

17   to have a continuing objection to the form so I

18   don't have to object every time you ask the question

19   and keep interrupting.

20               MR. KALAS:  That's fine.

21               MR. BRECHER:  But I just think --

22               MR. KALAS:  This goes -- this goes --

23               MR. BRECHER:  It goes to this line

24   of --

25               MR. KALAS:  I mean, this goes -- this

1   goes right to his differential, but that's fine.

2            THE STENOGRAPHER:  I want to say,

3   Counsel, I feel like he's -- in that answer I lost

4   part of it, and it seems to be -- do you want me to

5   interrupt in the middle of his answer when it seems

6   like he's frozen, or do you want me to let him

7   finish his answer and then I interrupt?  So I will

8   know how to go forward.

9            MR. KALAS:  I would let -- I would let

10  him finish, but I defer to Marc on that since he's

11  defending.

12           MR. BRECHER:  Well, I think -- you

13  know, look, as the court reporter, you've got to

14  be -- you've got to be sure of his answer.  Yes, you

15  can go back and look at the video and try to fill it

16  in, but while he's here, I think the best move would

17  be to repeat what you have recorded until his image

18  froze, and then let him finish his answer.  I think

19  that's the best way to move forward on something

20  like this.  It's kind of -- look, this is -- with

21  the Zoom depositions, it's -- this is awkward at

22  times and people -- you know, we're freezing and

23  it's happening, but let's try to do the best of it.

24  And I think that's the best way to handle it.  Take

25  down what you've taken down, and then read that back

1    to him and then let him finish that answer if he --

2    if he can.

3              MR. KALAS:  I'm good with that.

4              THE STENOGRAPHER:  Okay.  So in this

5    last answer, nobody saw him freeze up?  It was just

6    me?  That's the part where I don't know if everybody

7    else is --

8              THE VIDEOGRAPHER:  This is Richard,

9    the videographer.  He did freeze up.

10             MR. BRECHER:  Yeah, I think he froze

11   up for a few seconds.  Although, I do think that he

12   ended the answer -- everything seemed to fit.  I

13   don't know if there was anything that was missing.

14   But, again -- no, I can't be sure.

15             THE STENOGRAPHER:  I think we should

16   take this moment to read back the answer and see if

17   there is a spot where it missed.

18             MR. BRECHER:  Sure.  Or you can say --

19   read back what you have, and ask him if that was his

20   complete answer, one or the other.

21             THE STENOGRAPHER:  Okay.  One moment

22   while I pull it back up.

23             "I intend to say based on the background

24   of Mr. Thomas, that I -- that I reviewed medical,

25   that his development of NHL was to a significant

Ronald D. Kendall, Ph.D.

```
 1    degree of scientific certainty, that the -- a
 2    contributing factor was that use of glyphosate over
 3    20 years."
 4          And I think where we dropped was where he
 5    said, "that I reviewed medical, that his development
 6    of NHL was to a significant degree of scientific
 7    certainty."
 8               MR. BRECHER:  Doctor, was that your
 9    complete answer?  Is there anything that she missed?
10               THE WITNESS:  What she read the first
11    time seemed complete to me.
12               MR. BRECHER:  Okay.
13               THE WITNESS:  What she read the first
14    time.
15    BY MR. KALAS:
16       Q.   All right.  Hypothetically, if an attorney
17    approached you with a case where you had a plaintiff
18    who had a history of obesity, a history of diabetes
19    and no Roundup use, what would you say contributed
20    to that individual's NHL?
21       A.   I don't know.  I haven't really thought
22    about it.
23       Q.   Okay.  And if Mr. Thomas had a history of
24    obesity, a history of diabetes and no Roundup use,
25    you would agree that it is still possible he could
```

Ronald B. Kendall, Ph.D.

```
 1    have had NHL, right?

 2         A.   Yeah, we can't rule that out.  I agree.

 3         Q.   Okay.

 4              MR. KALAS:  Okay.  Now, I am going to

 5    mark as Exhibit -- I think I lost my exhibit.  Give

 6    me a second.

 7              All right.  Sorry about that.  I am going

 8    to mark as Exhibit 10, I think we're at, the Wozniak

 9    article.  That should appear in your share file in a

10    second.

11              (Exhibit No. 10 marked.)

12    BY MR. KALAS:

13         Q.   Let me know when you have it open, please.

14         A.   I have it open.

15         Q.   Okay.  And this is the one mechanistic

16    study that you have listed on your materials

17    considered list, right?

18         A.   Yes.

19         Q.   Okay.  And so you've reviewed this study,

20    right?

21         A.   I did.

22         Q.   Okay.  And this is the study of the

23    mechanism of DNA damage induced by Roundup 360 PLUS

24    in human peripheral blood, right?

25         A.   Right.
```

Ronald D. Kendall, Ph.D.

1      Q.   Okay.  Now, Roundup 360 PLUS, that is a

2  formulated product containing glyphosate?

3      A.   Containing what?

4      Q.   Glyphosate.

5      A.   Okay.  Yes.

6      Q.   Okay.  And it is a formulated product

7  containing glyphosate that contains distinct

8  surfactants in it, right?

9      A.   Yes.

10     Q.   What surfactants are in Roundup 360 PLUS?

11     A.   I know it has surfactants in it.  I never

12 used 360 PLUS.  Off the top of my head, I don't know

13 exactly.

14     Q.   Okay.  Do you know if Roundup 360 PLUS is

15 sold in America?

16     A.   I think it is.

17     Q.   Okay.  Okay.  Did you ask -- well, strike

18 that.  Let me not ask a compound question.

19          Have you reviewed the confidential

20 statement of formula for Roundup 360 PLUS?

21     A.   No, I haven't.

22     Q.   Did you ask to review the confidential

23 statement of formula for Roundup 360 PLUS?

24     A.   No, I didn't.

25     Q.   Do you know if the formulated product

1    tested here on Roundup 360 PLUS was used by

2    Ms. Spector, Mr. Savory or Mr. Thomas?

3        A.   I do not think it was used by Ms. Spector.

4    I do not think it was used by Mr. Thomas.  And it

5    may have been used by Mr. Savory.

6        Q.   Okay.  And do you know if the surfactants

7    present in Roundup 360 PLUS are the same that

8    were -- as the -- are the same as the surfactants

9    that were present in the products used by either

10   Ms. Spector or Mr. Thomas?

11       A.   I don't know.

12       Q.   Okay.  Now, the assay that was used in the

13   study is known as a Comet assay, right?  C-o-m-e-t.

14       A.   Yes.

15       Q.   And the Comet assay is an assay that is not

16   capable of measuring DNA repair mechanisms, right?

17       A.   Right.

18       Q.   And you can't tell, then, from damage

19   that's recorded in a Comet assay whether the damage

20   is going to be transient or permanent, right?

21       A.   That's fair.

22       Q.   Okay.  And as we established before, our

23   body has mechanisms to repair DNA damage when it

24   happens, right?

25       A.   It does.

Ronald D. Kendall, Ph.D.

```
1        Q.   Okay.  And another thing the Comet assay
2   does not monitor for is cellular cytotoxicity, true?
3        A.   True.
4        Q.   Okay.  And one of the things they did
5   measure in the study in a different assay is
6   cytotoxicity of the formulations that they applied
7   in the Comet assay, right?  That's in Table 1?
8        A.   Right.
9        Q.   Okay.  And if you look at Table 1, what
10  they found on the cytotoxicity and the viability of
11  cells was up that to the 50-mole -- or I think it's
12  micromole -- concentration of --
13       A.   Micromole.
14       Q.   Okay -- concentration of Roundup 360 PLUS,
15  there was no statistically significant change in
16  cellular viability, right?
17       A.   I'm just. . .
18       Q.   Yeah, I'm looking at the formulated product
19  data there on concentration and micromole.
20       A.   Okay.  At 50 micromole, that looks
21  significant.
22       Q.   Well, right.  I said up to 50.
23       A.   Okay.  Yeah, yeah.
24       Q.   So I'm excluding 50 from that question.
25       A.   Okay.  I agree with that.
```

Ronald D. Kendall, Ph.D.

```
 1        Q.   Okay.  And then at 50, they did see
 2   statistically significant cytotoxicity, right?
 3        A.   Right.
 4        Q.   Okay.  And so the results that were seen at
 5   the 50 micromoles may not indicate an effect of
 6   direct genetic damage but may, in fact, indicate
 7   cytotoxic damage, right?
 8        A.   Right.
 9        Q.   Okay.  Has there ever been a concentration
10   in human blood measured at 10 micromoles after
11   occupational exposure?
12        A.   Probably not.
13        Q.   Okay.  How about at 5?
14        A.   Don't know.  I've seen it parts per
15   billion.  Maybe 100, 200 parts per billion at the
16   most.  I -- I don't know.  5.  I don't know, 5
17   micromoles.
18        Q.   Okay.  When you were assessing this study,
19   did you evaluate in any way whether the
20   concentrations being used in this study reflected
21   the amount of Roundup that was in the human
22   bloodstream following absorption?
23        A.   No, I -- I mainly looked at the dose
24   response of the cellular data tied to -- to the --
25   the different formulations.
```

Ronald D. Kendall, Ph.D.

```
1        Q.   Okay.  And so when we go to the dose
2   response of the cellular data, that would be down
3   at, I think, tables -- well, I think it's Figure 2
4   and Figure 3, which are on the pages 515 and 516.
5        A.   Okay.
6        Q.   All right.  Is that the data that you were
7   looking at when you were looking for the dose
8   response?
9        A.   Yeah.
10       Q.   Okay.  And as we were just discussing
11   there, they have different concentrations of
12   Roundup 360 PLUS reflected here in Figure 2, right?
13       A.   You cut out on me, that -- your last
14   sentence.
15       Q.   As we were -- I'm sorry.  As we were just
16   discussing there, they have different concentrations
17   of Roundup 360 PLUS reflected in Figure 2, right?
18   It's at the bottom of 515.
19       A.   Give me just a second.  I moved my
20   computer, and it cut me off.
21       Q.   Absolutely.
22       A.   Okay.  I'm -- just give me a second.
23            What figure are you referring to now,
24   currently?
25       Q.   I'm in Figure 2, Table A on page 515.
```

Ronald D. Kendall, Ph.D.

1        A.    Okay.

2        Q.    Okay.  And so if you look here, they have

3   different concentrations of Roundup 360 PLUS, right?

4        A.    Right.

5        Q.    Okay.  And what they found here was that up

6   to 1 micromole of Roundup 360 PLUS, they did not see

7   any statistically significant increase in DNA strand

8   breaks, right?

9        A.    Right.

10        Q.    Okay.  And what that means in layman's

11   terms is up to 1 micromole Roundup 360 PLUS, they

12   didn't see any significant genetic damage, right?

13        A.    That would be fair.

14        Q.    Okay.  And you can't state sitting here

15   today that the internal dose in human blood exceeds

16   1 micromole, right?

17        A.    Can you state that question again, please?

18        Q.    Yeah, yeah.  That was a bad question.

19              You can't state sitting here today that

20   the internal dose in human blood exceeds 1 micromole

21   in applicators, right?

22        A.    I don't know.  There's -- the -- the

23   blood data -- the blood analytical data is pretty

24   variable.

25        Q.    Okay.  And, likewise, they conducted an

Ronald D. Kendall, Ph.D.

1   analysis in Figure 3, part A --

2       A.   Figure 3.

3       Q.   -- of oxidative stress, which is on

4   page 516.

5       A.   Okay.

6       Q.   Do you see -- do you see there, we're

7   looking at human 8-oxoguanine DNA glycosylase?

8       A.   Right.  Right.

9       Q.   Okay.  That's a measure of oxidative

10  stress, right?

11      A.   You froze up on me again.

12      Q.   Yeah, you froze up on me, too.

13           That's a measure of oxidative stress,

14  right?

15      A.   Right.

16      Q.   Okay.  And, again, up to 1 micromole, they

17  did not see any increased oxidative stress in this

18  assay, right?

19      A.   Correct.

20      Q.   Okay.  And so just to sort of wrap up the

21  Wozniak paper, the genetic damage observed in the

22  Wozniak paper may or may not be relevant to human

23  exposures to glyphosate because we don't know if the

24  levels observed -- or levels tested in that study

25  that would have saw an effect actually are the

```
 1   levels present in people; is that fair?
 2       A.   That's fair.
 3                MR. KALAS:  Okay.  I am going to mark
 4   as Exhibit 11, the George study.
 5                (Exhibit No. 11 marked.)
 6   BY MR. KALAS:
 7       Q.   I just marked that.  So take a moment to
 8   look at that, please.
 9       A.   Okay.
10       Q.   This is the George study that's on your
11   materials considered list, right?
12       A.   Yes.
13       Q.   Okay.  And this is a study that I believe
14   you argue shows glyphosate-based herbicides having
15   tumor promotion properties.  Right?
16       A.   Correct.
17       Q.   Okay.  Now, this study also looked at
18   initiation, right?
19       A.   Right.
20       Q.   Okay.  And you agree with me that
21   glyphosate-based herbicides were not shown to be a
22   tumor initiator in this study, right?
23       A.   Right.
24       Q.   Okay.  What is -- just let's define some
25   terms here.  What is a tumor initiator?
```

1        A.   That means in the context of a study done,

2   a tumor initiator has a mechanism to initiate or

3   start a tumor by itself in the context of a study

4   design.

5        Q.   Okay.  And what is a tumor promotor?

6        A.   A tumor promoter promotes the development

7   of a tumor and perhaps synergistically with another

8   substance.

9        Q.   Okay.

10       A.   So it promotes --

11       Q.   And so --

12       A.   -- the development of the tumor by an

13   interaction with another substance.

14       Q.   Okay.  And so if I understand correctly, a

15   tumor initiator can cause cancer while a tumor

16   promoter can only enhance or amplify an already

17   existing carcinogenic process; is that fair?

18       A.   That's fair.

19       Q.   Okay.  Is it your opinion that glyphosate

20   is only -- or excuse me.

21            Is it your opinion that glyphosate-based

22   herbicides are only tumor promoters and not tumor

23   initiators?

24       A.   In this study, in the George study,

25   glyphosate-based herbicides were a -- were a tumor

1    promoter.  But in other -- other studies, they've

2    been tumor initiators as well.  So, again, it

3    just -- it just varies to the study and the study

4    design.  But in this particular study, I will agree

5    that glyphosate-based herbicide was a promoter.

6        Q.   Okay.  But it's your opinion -- what you're

7    going to tell the jury, you're going to talk more

8    about than just this study, and what you're going to

9    tell the jury is that glyphosate-based herbicide are

10   complete carcinogens, initiators and promoters; is

11   that fair?

12       A.   Well, it can be.  For instance, when you go

13   to the International Agency for Cancer Research

14   monograph, there are -- there are studies showing

15   direct tumor development in both mice and rats

16   from -- from the administration of glyphosate as

17   well as glyphosate-based formulations, and -- and

18   the mechanistic data there was from oxidative stress

19   as well as genetic toxicity is there.  So, again, it

20   would -- it would vary by study.  And, like I said,

21   it's just very difficult to have every study outcome

22   the same based on your variables that go into the

23   study.

24            But in the George study, it was --

25   definitely very clear-cut a promoter in this

1    situation in terms of -- of a skin -- a skin test

2    for tumorigenic activity.

3        Q.   Okay.  And just to be clear, for the

4    record, the George study is the single primary --

5    and when I say "primary," what I mean by that is

6    when you look at the raw data, the actual study and

7    not a summary of the study, the George study is the

8    single primary study on animals that you've reviewed

9    in this case, right?

10       A.   Well, as far as -- as far as the

11   tumorigenic activity, yes.

12       Q.   Okay.  Yeah, and what I'm getting at -- I'm

13   not casting aspersions or anything.  You did not

14   review the 12 extant animal bioassays for

15   carcinogenesis that had been run on glyphosate,

16   right?

17       A.   Run by who?

18       Q.   By registrants, sir.

19       A.   Oh.  No, I -- no, I didn't.  I was mainly

20   looking at primary open literature.

21       Q.   Okay.  Now, one thing that's necessary in a

22   study like this, like the George study, is to have a

23   vehicle via which to administer the test compound,

24   right?

25       A.   That's correct.

Ronald D. Kendall, Ph.D.

1      Q.   Okay.  And in this case, the vehicle that

2    they used was a 50 percent mixture of ethanol and

3    acetone, right?

4      A.   That's correct.

5      Q.   Okay.  But in this study, there is no

6    positive vehicle control, right?

7      A.   That's fair.

8      Q.   Okay.  And without a positive vehicle --

9    vehicle control, it's difficult to tease out whether

10    you're seeing an effect in the study from the

11    glyphosate-based herbicide or from the vehicle

12    interacting with the glyphosate-based herbicide; is

13    that fair?

14      A.   It -- it could be.

15      Q.   Okay.  And so given that, you can't say

16    that the vehicle might not cause an effect alone and

17    in the presence of glyphosate and -- or strike that.

18    Let me ask a different question.

19          Acetone, we mentioned was 50 percent of

20    this.  Acetone is a solvent that can irritate the

21    skin, right?

22      A.   It's possible.

23      Q.   Okay.  It can be -- it's found in nail

24    polish remover?

25      A.   Yes.

Ronald D. Kendall, Ph.D.

```
 1      Q.   Okay.  Now, another thing that you look for
 2  in a study like this is the purity of the test
 3  substances, right?
 4      A.   That would be -- that would be part of it.
 5      Q.   Okay.  Are the purity of the test
 6  substances defined as a percentage in this study?
 7      A.   I don't -- I don't recall they were.
 8      Q.   Okay.  Is the source of the test substances
 9  that were used defined?
10      A.   Well, they talk about the commercial
11  formulation of the herbicide, Roundup Original,
12  glyphosate 41 percent, POEA 15 percent.  And they
13  quote Monsanto Company in St. Louis, Missouri.  But
14  I'm not sure if they got it directly from Monsanto
15  or not.
16      Q.   Okay.  Well --
17      A.   A lot of times -- a lot of times over --
18  over my career, the chemical companies have been
19  very forthcoming in providing test material.  And so
20  I -- I don't -- I don't know what Monsanto's policy
21  was.  But it looks to me they reached out to them
22  for this, and they got --
23      Q.   Well --
24      A.   -- they got the formulation.  At least it
25  was 41 percent glyphosate.
```

```
1        Q.   Well, let's read that whole sentence.
2   Okay.  It says --
3        A.   Okay.
4        Q.   -- "Commercial formulation of the herbicide
5   glyphosate," and then it has the chemical name,
6   "Roundup Original, glyphosate 41 percent, POEA
7   approximately 15 percent, Monsanto Company,
8   St. Louis, Missouri USA, was used, which contains
9   360 grams per liter glyphosate acid equivalent as
10  the isopropylamine salt and was procured from local
11  market."
12           Do you see that?
13       A.   Yeah, I see it.
14       Q.   Okay.  Is that the typical way you would
15  want to procure a test substance in a study like
16  this from a local market?
17       A.   I guess -- you know, I remember that.  I
18  think they were just probably trying -- generally
19  not.  But they were trying to look at what people
20  would buy off the shelves, would that have the
21  ability to induce skin or dermal tumors.
22       Q.   Okay.  And this --
23       A.   And that I think that's how they were
24  looking at it.  But, generally, we would -- we would
25  have a certified, purified material.  Generally.
```

1      Q.   Right.  Because this -- and this study was

2    conducted in India, right?

3      A.   Right.

4      Q.   Okay.  And you're aware from your --

5      A.   And I work with a lot of Indian scientists

6    in India, and they do some good work over there.

7    So, again, I think where they were coming from in

8    this particular case was what was coming off the

9    shelf, would that have the ability to induce skin

10   tumors.  That's it.

11     Q.   And I -- and I do not mean to imply at all

12   that there aren't good scientists in India.  I'm

13   sure there are plenty of good scientists in all the

14   countries the glyphosate tests are tested on.

15          I was going to ask you about something

16   separate, which is in certain countries, like India,

17   there is a problem with counterfeit with pesticides.

18   You encountered that at EPA, right?  I missed --

19     A.   You kind of --

20     Q.   -- your answer.  Did you hear me?

21     A.   No, sir, I didn't.

22     Q.   Okay.  In certain countries around the

23   world, there's a problem with counterfeit

24   pesticides.  Did you encounter that at EPA?

25     A.   Not a lot, because we were generally

Ronald D. Kendall, Ph.D.

```
1   looking at EPA U.S.-based products, you know, for
2   the -- the Agency was respons- -- can you hear me?
3        Q.   Yeah.
4             MR. BRECHER:  No, he just froze.
5        A.   I can -- I'll start over again.
6             MR. BRECHER:  Okay.
7   BY MR. KALAS:
8        Q.   Sure.
9        A.   I -- well, at our work with the -- on our
10  work with the SAP at EPA, we didn't really deal with
11  counterfeit pesticides in other countries.  We dealt
12  with mainly U.S. registered products utilized in the
13  U.S. (audio drop).  We did -- we did consider
14  international use --
15       Q.   We lost you after -- we lost you after,
16  "utilized in the U.S."  What did you say after that?
17       A.   Utilized in the U.S. (audio drop), but --
18  but we did have -- on my panels, we did have
19  international scientists from all over the world at
20  times, and we would get input from, you know, really
21  a broad base of scientists from around the world,
22  depending on the subject and the pesticide at issue
23  and all.  But I -- I really didn't get in -- into
24  counterfeit pesticides very much, not -- not in
25  FIFRA SAP.
```

Ronald D. Kendall, Ph.D.

```
 1                    THE STENOGRAPHER:  Doctor, you cut out

 2   in the beginning of your answer.  "Utilized in the

 3   U.S.," and then you froze up when you were repeating

 4   what you said.  I have, "Utilized in the U.S. but we

 5   did have -- on my panels, we did have international

 6   scientists from all over the world."

 7                    THE WITNESS:  Can you say it (audio

 8   drop)?

 9                    THE STENOGRAPHER:  You were repeating

10   your answer.

11                    MR. BRECHER:  He's not -- now he's

12   back.

13                    THE WITNESS:  Okay.

14                    THE STENOGRAPHER:  Okay.  He was

15   repeating what we missed in his first -- this is

16   getting -- can we go off the record for a second?

17                    MR. KALAS:  Yes.

18                    MR. BRECHER:  Yes.

19                    THE VIDEOGRAPHER:  We are off the

20   record at 12:16 p.m.  This concludes Media No. 3.

21                    (Break taken, 12:16 p.m. to 12:53 p.m.)

22                    THE VIDEOGRAPHER:  We're back on the

23   record at 12:53 p.m., beginning with Media 4.

24   BY MR. KALAS:

25       Q.   Doctor, before the break, I had asked you a
```

Ronald D. Kendall, Ph.D.

1    question and we didn't catch your answer a few

2    times.  I am just going to ask the question again.

3            While you were working at -- with EPA on

4    the SAP and et cetera, did you have to deal with

5    counterfeit pesticide issues emanating from other

6    countries?

7        A.   Not -- not really.  We -- we almost totally

8    dealt with U.S. registered products or products that

9    were under registration review that were governed

10   under the FIFRA environmental law, but we did

11   consider international issues and we did have

12   international people on our panels at times.  So

13   that -- that would come into discussion.  But in

14   terms of charge to the panel deliberations, it was

15   predominantly U.S. products.

16       Q.   Okay.  And are you aware that there have

17   been issues with counterfeit pesticide products in

18   other countries?

19       A.   Yes.  I'm -- I'm not currently completely

20   up to speed on that, but I am aware of it, yes.

21       Q.   Okay.  And because the Roundup product was

22   procured from a local market as opposed to being

23   procured from Sigma-Aldrich or from Monsanto itself,

24   we cannot exclude the fact that the Roundup used in

25   this study may have been counterfeit Roundup, true?

Ronald D. Kendall, Ph.D.

```
 1        A.   It's possible.
 2        Q.   Okay.  And one of the issues with
 3   counterfeit pesticide products is their purity may
 4   not be as intended by the manufacturer, right?
 5        A.   It's possible.
 6        Q.   Okay.  And another thing in the George
 7   study that they did not do is they did not conduct
 8   pathological analyses of the skin lesions in this
 9   study, true?
10        A.   True.
11        Q.   Okay.  Now, isn't it true that
12   noncarcinogenic skin lesions can mimic carcinogenic
13   skin lesions to the naked eye?
14        A.   I think so.
15        Q.   Okay.  Pathological confirmation that the
16   skin lesions observed here were carcinogenic would
17   make this a stronger study, right?
18        A.   Yes, it would.  But there was still pretty
19   strong tumorigenic activity, though, compared to the
20   control values.  But it could have been stronger.
21   It could have -- it could have been stronger.
22        Q.   Okay.  Now, you held up earlier the IARC
23   Monograph.
24        A.   Yes.
25                  MR. KALAS:  Okay.  I am going to mark
```

1   that as Exhibit 12.  And I am just marking the

2   subsection on glyphosate, not the entire monograph,

3   just for the record.

4                 (Exhibit No. 12 marked.)

5        A.   Okay.

6   BY MR. KALAS:

7        Q.   All right.  Let me know when you have that

8   open, please.

9        A.   I've got it.

10       Q.   Okay.  And if you go to page 34 of this

11  monograph, they discuss the George study, correct?

12       A.   Correct.

13       Q.   All right.  And if you go to the end of the

14  section on the George study, which is 3.1.2, they

15  have a section there in brackets, right?

16       A.   Yeah, I'm not quite there, but I'm -- I'm

17  familiar with what you're talking about.

18       Q.   Okay.  And when IARC puts a section in

19  brackets, that's meant to be commentary from the

20  working group, right?

21       A.   Right.

22       Q.   Okay.  And it says there -- well, let me

23  know when you're there, because I'm going to read

24  it, and I want to reflect for the record I read it

25  correctly.  So let me know when you're there.

1       A.   Okay.  I'm getting there.

2       Q.   Okay.

3       A.   Okay.  I'm on 34.

4       Q.   Okay.  And in this section in the brackets

5    at the end where they're discussing the George

6    study, they state, "The glyphosate formulation

7    tested appeared to be a tumor promoter in this

8    study."

9            And that -- did I read that correctly?

10      A.   Yeah.  Yes.

11      Q.   Okay.  And -- and you agree with that

12   assessment, right?

13      A.   I agree.

14      Q.   Okay.  Moving on, they say, "The design of

15   the study was poor, with short duration of

16   treatment, no solvent controls, small number of

17   animals and lack of histopathological examination.

18   The working group concluded that this was an

19   inadequate study for the evaluation of glyphosate."

20           Did I read that correctly?

21      A.   You did.

22      Q.   Okay.  And previously, you described the

23   IARC evaluation of the available scientific evidence

24   as strong.  Do you remember that?

25      A.   Yes, I do.

Ronald B. Kendall, Ph.D.

```
 1        Q.   Okay.  Do you agree with the IARC working
 2   group, that the George study is an inadequate study
 3   for the evaluation of glyphosate?
 4        A.   Stand-alone, I agree with them.  I look
 5   at -- I look at the George study as a continuum of a
 6   whole lot of pieces of information, and they've got
 7   to be taken into context.  I will admit some of the
 8   inadequacy of the George study, but it still
 9   demonstrated tumorigenicity, at least in the context
10   of the limitations of the study.  I didn't make any
11   conclusions or decisions based on that study alone.
12   But it was in the context of all the information
13   I've shared with you today in a
14   weight-of-the-evidence approach.
15        Q.   Do you agree with IARC, that the design of
16   the George study was poor?
17        A.   I agree.
18        Q.   Do you agree with IARC that -- well, strike
19   that.
20             MR. KALAS:  Okay.  I am going to mark
21   as Exhibits 13 and 14 your reports in the Savory and
22   Spector cases.  I don't think I have marked those
23   yet.  Maybe I have.  I'm sorry.  Give me one moment
24   here.  I'm just trying to get it saved here.
25             All right.  I have marked as Exhibit 13
```

1    your expert report in Savory.

2              (Exhibit Nos. 13 and 14 marked.)

3    BY MR. KALAS:

4         Q.   If you can, just take a moment to look at

5    that and let me know if that's a true and correct

6    copy of your report.

7         A.   I'm able to bring it up, but I'm not able

8    to move -- it locks the page above Exhibit 11, and

9    it won't let me move it.  Even I'm double-clicking

10   on it, and I reloaded it.

11        Q.   All right.  So I have them Word -- I have

12   them as Word versions.  Let me save them as PDF

13   versions and mark them as 15 and 16 and see if that

14   will help.

15        A.   Okay.

16        Q.   Give me one moment to just get that set up.

17   I'm sorry for the clunkiness here.

18        A.   No problem.

19              (Exhibit Nos. 15 and 16 marked.)

20   BY MR. KALAS:

21        Q.   I have marked as Exhibit 15 a PDF version

22   of your expert report in Savory.  Please take a

23   moment to look at that and tell me if that's a true

24   and correct copy of your expert report.

25        A.   The Savory report, the text of the report

1    is my expert report.  The materials reviewed and

2    considered, this is not the latest that I submitted,

3    the updated of all the materials I submitted.

4        Q.   Okay.  So the text of the report is a true

5    and correct copy of your report --

6        A.   Yes.

7        Q.   -- and you have dated your materials

8    considered list, fair?

9        A.   And I sent -- I assume you got my updated

10   materials, but. . .

11       Q.   We marked those as Exhibits 3 through 5,

12   sir, already today.

13       A.   Okay.  Very good.  Very good.

14       Q.   And then Exhibit 16, is that a true and

15   correct copy of your expert report in the Thomas

16   matter?  Again, putting aside the updated materials

17   considered list.

18       A.   Okay.  Let me scroll down here.

19       Q.   Sure.

20       A.   Yes, that looks -- that looks accurate.

21       Q.   Okay.  All right.  So I want to start with

22   Mr. Savory, and then -- and then we'll go to

23   Mr. Thomas here.

24       A.   Okay.

25       Q.   Starting with Mr. Savory, it's your opinion

1    that Mr. Savory, at a minimum, sprayed Roundup twice

2    per week for approximately four months per year for

3    close to 30 years when he was diagnosed with NHL,

4    right?

5        A.    That's -- that's my estimate.

6        Q.    Okay.  And, again, the highest internal

7    dose you've seen in the literature you have reviewed

8    is from the Kougias study we looked at in the

9    Spector depo, right, .0006 mgs per kg?

10       A.    Right.

11       Q.    All right.  And so it would be appropriate

12   if we were doing a literature-based worst case dose

13   to multiply two times a week times four months per

14   year times 30 years to get a lifetime absorbed dose

15   of glyphosate.  Would you agree with that?

16       A.    An estimate, yes.

17       Q.    Okay.  And Mr. Savory testified that he did

18   not recall ever spilling or splashing glyphosate on

19   himself while mixing.  Do you remember that?

20       A.    I do.

21       Q.    Okay.

22       A.    He didn't recall the actual --

23       Q.    Okay.  And Mr. Savory testified -- okay.

24   And Mr. Savory testify that if he got Roundup on his

25   hands, he would wash them with soap and cold water,

```
 1   and he handled the Roundup like he worked in a bio

 2   lab.  Do you remember him talking about that?

 3        A.   I do.

 4        Q.   Okay.  And if he washed his hands with soap

 5   and cold water when he felt Roundup on his hands,

 6   that would have reduced his exposure to the Roundup,

 7   right?

 8        A.   Theoretically.

 9        Q.   Okay.  And, in fact, he recalled reading on

10   the label that if you had skin contact, you should

11   wash your hands, right, or wash your skin?

12        A.   Right.

13        Q.   Okay.  And Monsanto, putting that on the

14   label, would -- the upshot of that would be a

15   reduction in exposure to applicators who follow that

16   label, right?

17        A.   Right.

18        Q.   Okay.  And Mr. Savory would wear long

19   pants, leather 12-inch high boots that had been

20   sprayed with silicone, a shirt, either a T-shirt or

21   a flannel long-sleeve shirt and a ball cap when

22   spraying Roundup, right?

23        A.   That's what he said.

24        Q.   Okay.  And that's much more clothing than

25   the applicators in Kougias who had that .006 mg per
```

Ronald D. Kendall, Ph.D.

```
 1   kg dose, right?

 2       A.   I agree.

 3       Q.   Okay.  Now, Mr. Savory did recall getting

 4   Roundup on his face once, right?

 5       A.   A couple of times he did recall that.

 6       Q.   Right.  And he recalled tasting it once,

 7   right?

 8       A.   That's what he said.

 9       Q.   Okay.  But, again, that time it got in his

10   mouth, it would have been an oral injection,

11   whatever was absorbed, not a dermal or inhalation

12   ingestion, correct?

13       A.   Right.

14       Q.   Okay.  And when he remembered getting it on

15   his face, he would wash it off right away instead of

16   letting it soak in, right?

17       A.   That's what he said to the best of his

18   recollection at the time he was deposed.

19       Q.   Okay.  And you haven't talked to

20   Mr. Savory, right?

21       A.   I did not interview him.

22       Q.   Okay.  You don't have any information that

23   would contradict that testimony, right?

24       A.   No.

25       Q.   Okay.  And washing the face immediately
```

Ronald D. Kendall, Ph.D.

1    after feeling it on his face would have reduced his

2    exposure as well, fair?

3        A.   I agree.

4        Q.   Okay.  Now, Mr. Savory was a smoker for a

5    period of time, right?

6        A.   That's -- that's what he said.  It was

7    fairly limited.

8        Q.   Okay.  And when you say "limited," you mean

9    limited in quantity, correct?  It was half to

10   three-quarters of a pack of cigarettes per day?

11       A.   Right.

12       Q.   But it was over a period of time that

13   stretched somewhere between 17 and 30 years, right?

14       A.   Right.

15       Q.   Okay.  And cigarettes, during that time

16   period he smoked, they featured warnings on them

17   regarding potential cancer causation, right?

18       A.   I was never a smoker, but I do recall that.

19   I actually do.

20       Q.   Okay.  Okay.  And despite the fact that

21   those warnings were present on cigarettes,

22   Mr. Savory still did smoke, right?

23       A.   According to what he said.

24       Q.   Okay.  And do you have any reason to state

25   to a reasonable degree of toxicological certainty,

1    that had Roundup products contained a cancer

2    warning, Mr. Savory would not have used them?

3        A.   Can you please say that again?

4        Q.   Do you have any reason to state -- or do

5    you have any opinion at all -- maybe that's a better

6    question.  Let me ask that.

7             Do you have any expert opinion at all that

8    if Roundup products had contained a cancer warning,

9    Mr. Savory would not have used them?

10       A.   I have an opinion on that.

11       Q.   Okay.

12       A.   Cigarettes in themselves are -- are

13   addictive, the nicotine.  And -- and so people are

14   willing to take risks every day.  For instance,

15   driving a car is a significant risk for injury or

16   death, depending on where you live.  But cigarettes

17   would be something that would be an addictive

18   situation.  Many people have a very hard time

19   quitting.  Therefore, major numbers of people

20   continue to smoke even when it was said that there

21   could be the possibility of cancer, that -- I don't

22   remember exactly the language, but there was a --

23   there was potential for carcinogenicity.

24            That -- that motivation, in my opinion,

25   based on just dealing with chemicals, people in

1    general are afraid of chemicals, and they have a

2    whole different perspective on chemicals and

3    chemical use.  That's why their perception of risk

4    with chemical can be sometimes increased because of

5    all of the debate we have constantly of what's safe,

6    what's not safe, what used to be safe is no longer

7    safe.

8           Because for -- I can remember through

9    childhood, college, my early adult life, you know,

10   everybody thought smoking cigarettes was safe, and

11   the cigarette companies said so.  And so people's

12   perception of risk was pretty obscured, and -- and

13   then I remember -- I remember when data finally came

14   forward and labeling came on cigarette packs, I do

15   remember that, saying it was carcinogenic.  I

16   just -- I think some people were still willing to

17   take the risk.

18          And so, again, with chemicals, as you

19   posed it, based on my reading of Mr. Savory's -- of

20   his deposition, and -- I think he was a thoughtful

21   man.  He -- he did say he read the label and he did

22   say he tried to do it right as far as application.

23   He said so.  If that language on that label had said

24   a potential carcinogenic effect from the use of this

25   product, be extremely careful, I think he would have

Ronald D. Kendall, Ph.D.

```
 1    taken that very serious.  And, in fact, I'm not sure

 2    he would have used it based on what he said in his

 3    deposition.

 4          So that's just my general perspective.

 5    But, you know, I -- I can't, you know, tell you

 6    precisely how he would react.  But I think just my

 7    assessment of his personality and what he did in

 8    handling materials, particularly glyphosate-based

 9    herbicides, that would be my impression.

10       Q.   Okay.

11       A.   Did I freeze?  Did I freeze then or. . .

12       Q.   You froze for, like, a half second.  I

13    don't think we missed a word there, but I don't know

14    if Marc felt like we did.

15          MR. BRECHER:  I don't think -- I don't

16    think we did.

17    BY MR. KALAS:

18       Q.   Okay.

19       A.   All right.

20       Q.   Let me -- let me come back there.  So it's

21    your opinion in the case of Mr. Savory that his risk

22    assessment may have been different for a chemical he

23    was addicted to, cigarettes, as opposed to a

24    chemical he was not addicted to, Roundup; is that

25    fair?
```

Ronald D. Kendall, Ph.D.

```
1        A.    Yeah, that -- and that's -- that's common
2   sense.  And I just think --
3        Q.    Okay.
4        A.    -- you know, smoking is very addictive,
5   and -- and I can understand, you know -- you know,
6   as I commented, the reason -- the reason -- even
7   under FIFRA, the reason -- FIFRA is one of the
8   toughest environmental laws we have.  Why?  It's
9   because people are deeply concerned about
10  pesticides.  And an herbicide is a form of a
11  pesticide.
12             And the Congress, responding to their
13  constituencies, wrote FIFRA with a lot of teeth in
14  it.  It's got more teeth than about any
15  environmental law I've dealt with at the EPA.  And
16  that's because people have an unbelievable amount of
17  concern about chemicals and threats to their health,
18  and -- and that translates into -- pesticide
19  regulation compared to all other toxic substances is
20  phenomenal.  The data requirements, the -- all the
21  issues that have to be dealt with because of public
22  concern.
23             And that's a little bit where I'm coming
24  from, of why I think Mr. Savory would have -- would
25  have reacted very differently if, like cigarettes,
```

Ronald D. Kendall, Ph.D.

1    it had had a statement on there the possibility of

2    carcinogenicity when utilizing this product, I think

3    his handling and use of it would -- would have been

4    changed to maybe not using it or seeking an

5    alternative or being even more careful.

6        Q.   Okay.  You said something there I just want

7    to follow up on.  But you're frozen.  So I'll wait.

8    Can you hear me now?

9        A.   I can hear you now.

10       Q.   Okay.  You said something there I want to

11   follow up on.  You stated that FIFRA is one of the

12   toughest regulations out there.  Do you remember

13   saying that?

14       A.   I do.  It is.

15       Q.   Okay.  Pesticides are some of the most

16   heavily regulated chemicals in our environment,

17   true?  I missed your answer.

18            Pesticides are one of the most heavily

19   regulated chemicals in our environment, true?

20       A.   True.

21       Q.   Okay.  And despite that, EPA has never

22   classified glyphosate as carcinogenic, true?

23       A.   True.

24       Q.   Okay.  Now, going back to Mr. Savory,

25   Mr. Savory worked as a carpenter, right?

Ronald D. Kendall, Ph.D.

```
 1              Yeah, we lost you.  Yeah, we lost -- I
 2    don't think he caught that.  All right.  We're going
 3    to -- we're going to try this a little more, Doctor,
 4    and then we might go back to the phone.  Okay?
 5         A.   Okay.
 6         Q.   Mr. Savory worked as a carpenter, true?
 7         A.   A framer.
 8         Q.   Okay.
 9         A.   A carpenter, yes, but a framer.
10         Q.   He was a woodworker?
11         A.   A house framer.
12         Q.   Okay.  Okay.  You would agree, he was a
13    woodworker, right?
14         A.   (Audio drop).
15              MR. KALAS:  All right.  I think we're
16    going to have to go off the record and try this with
17    the phone.
18              Doctor, we've got to go off the record and
19    try this with the phone.  I think the steps -- let's
20    go off the record, and then we'll walk through the
21    steps.
22              THE VIDEOGRAPHER:  All right.  We're
23    off the record at 1:25 p.m.
24              (Break taken, 1:25 p.m. to 1:30 p.m.)
25              THE VIDEOGRAPHER:  Back on the record
```

1    at 1:30 p.m.

2    BY MR. KALAS:

3        Q.   Dr. Kendall, Mr. Savory was a woodworker,

4    right?

5        A.   Yes, sir, he was a framer.

6        Q.   Okay.  And you're aware that the

7    epidemiology in the published literature have

8    associated woodworking and carpentry with

9    Non-Hodgkin's lymphoma, right?

10       A.   Say that, please, one more time.

11       Q.   Are you aware that the literature, the peer

12   reviewed literature, has associated woodworking and

13   carpentry with Non-Hodgkin's lymphoma?

14       A.   Yeah, but there's not a strong association

15   there.

16       Q.   Why do you -- what do you mean by "not a

17   strong association"?  What do you mean by that?

18       A.   Well, to my recollection -- I'm just

19   thinking.  To my recollection -- you know, he was a

20   framer.  He wasn't really a carpenter.  He was

21   taking the pieces to frame -- to frame a house.

22   That's what he did.  He was pretty clear about that.

23   I mean, he wasn't sawing a lot of wood as a

24   carpenter would.  He was framing with, like, you

25   know, 4-by-8s and whatever.  That's the way I

Ronald D. Kendall, Ph.D.

```
1    interpreted it.

2        Q.   All right.  You don't recall that he

3    testified in his deposition that he worked with hand

4    saws and electric saws and cut --

5        A.   He did some.

6        Q.   -- and cut a lot of wood?  You don't

7    remember that?

8        A.   I do.  But that wasn't his -- he emphasized

9    he mainly was a framer.  That's what he did.  So, I

10   mean, he wasn't -- it one, like, you're there -- I

11   have worked in a sawmill before as a kid, and we

12   were cutting -- we were cutting wood.  It was a --

13   we were processing wood a lot and cutting (audio

14   drop).

15               THE STENOGRAPHER:  Is he dropping?

16               MR. KALAS:  Yeah.  Yeah.  We're going

17   to have to. . .

18   BY MR. KALAS:

19       Q.   We lost you after "processing wood a

20   lot. . ."

21       A.   Okay.  All right.  I interpreted it that he

22   was mainly a framer.  He did some cutting to frame

23   up the houses, but it wasn't like that was what he

24   did all day every day.  Sometimes --

25       Q.   All right.
```

Ronald D. Kendall, Ph.D.

1    A.   -- with wood processing, you know, you're

2    really handling, you know, a lot of sawing and

3    whatever (audio drop) framed up, you're done.  Then

4    they start putting the Sheetrock on and everything

5    else.  And that's kind of what he said.  He said he

6    was a framer.  And so my -- am I freezing up again?

7    Q.   You did.  We lost you after "sawing and

8    whatever" and then we picked you up at "Sheetrock."

9    A.   Okay.  Well, as I mentioned, once -- if

10   you're a framer of a house, basically, you're

11   putting a frame in and then you're done.  The other

12   components move in, like, Sheetrock and so on.  So

13   that's what I'm saying.  So you're primarily outside

14   even if you are cutting some wood in the process of

15   framing.

16   Q.   All right.  Well, putting aside Mr. Savory,

17   you do agree the literature has associated

18   woodworking and/or carpentry within NHL, right?

19   A.   Yeah.

20   Q.   Okay.  The literature has also associated

21   rheumatoid arthritis with a more than doubling the

22   risk of NHL, true?

23   A.   It is a factor.  And he was diagnosed with

24   rheumatoid arthritis in 2001.  And I think that

25   could have played into all of this with -- with his

1    exposure to the herbicide as well as having that

2    condition, because it is, basically, inflammation.

3        Q.   All right.  Well, let me ask you, then, a

4    basic question.  Are you opining his glyphosate

5    exposure caused or contributed to his rheumatoid

6    arthritis?

7        A.   No.

8        Q.   Okay.  In fact, glyphosate has been -- has

9    failed to demonstrate -- strike that.  Let me ask

10   the question correctly.

11           In fact, the literature has failed to

12   demonstrate an association between glyphosate

13   exposure and rheumatoid arthritis, right?

14       A.   Right.

15       Q.   Okay.  And you agree that rheumatoid

16   arthritis by itself may be an independent cause of

17   somebody's NHL, true?

18       A.   It is -- it's possible, but you've got

19   to -- I would rank all these things.  And so I would

20   put right at -- if you -- if you took -- took a

21   ranking from 0 to 10, I would rank the immune system

22   and suppression of the immune system at a 9 or a 10

23   as a risk.  I would risk -- I would evaluate weight

24   might be a 2, obesity might be a 2.  Inflammation

25   and -- and all might be a 5.  So, again, it's --

Ronald D. Kendall, Ph.D.

1    it's in there.  I look at rheumatoid arthritis as

2    degenerative and inflammation.

3        Q.   What would you rank glyphosate?

4        A.   I don't know right now because I -- I look

5    at it is glyphosate interacting with -- with other

6    variables on a multifactorial (audio drop).

7             THE STENOGRAPHER:  He dropped.

8             MR. KALAS:  Yeah.

9    BY MR. KALAS:

10       Q.   You said, "glyphosate interacting with

11   other variables on a multifactorial," and then we

12   lost you.

13       A.   And then I -- so I -- I looked at

14   information like the American Cancer Society, the

15   literature, what was some of the -- what is -- what

16   does the evidence suggest as being some of the

17   higher risk factors, medium risk factors, lower risk

18   factors.  The American Chemical Society, you know,

19   talks about, you know, a variety of things:  Age,

20   gender, race, ethnicity, family history.  But

21   exposure to certain chemicals and drugs, it's

22   right at their top few.  But, you know, a weakened

23   immune system I think is right up at the top.  There

24   are a lot of risk factors that could be interacting

25   with chemical exposures.  And this is even (audio

Ronald D. Kendall, Ph.D.

1    drop).

2               THE STENOGRAPHER:  He dropped.

3    A.    (Audio drop) information out of the

4    American Cancer Society, which I think is a pretty

5    reasonable organization, responsible.

6    BY MR. KALAS:

7    Q.   All right.  Doctor, we lost you again.  I

8    don't even know where we lost you.

9               MR. KALAS:  Christy, can you just let

10   us know where we lost him, please?

11              THE STENOGRAPHER:  So in the answer it

12   was, "There are a lot of risk factors that could be

13   interacting with chemical exposures.  And this is

14   even," and then we dropped him, "information out of

15   the American Cancer Society."

16   A.    Yeah, and I -- and I think the American

17   Cancer Society is a responsible organization.

18   They're -- they're putting out information, I think

19   is -- is reasonable (audio drop).

20              THE STENOGRAPHER:  Is reasonable and

21   what, Doctor?  We lost you again.

22   A.    Well, I said I think the American Cancer

23   Society is a responsible organization that -- that's

24   put out some information related to Non-Hodgkin's

25   lymphoma, causes, risk factors, and prevention.

Ronald D. Kendall, Ph.D.

```
 1              MR. KALAS:  All right.  I've marked as
 2   Exhibit 17, the American Cancer Society document.
 3              (Exhibit No. 17 marked.)
 4   BY MR. KALAS:
 5      Q.   If you could, look at that, please.
 6      A.   Sure.
 7           Okay.  I've got it.
 8      Q.   Okay.  And this is the American Cancer
 9   Society document, Exhibit 17, that's listed in your
10   materials considered list, right?
11      A.   Yes, it is.
12      Q.   Okay.  If I go into this document, at the
13   bottom of page 3, rheumatoid arthritis is
14   specifically listed as a risk factor for NHL, true?
15      A.   Yes.
16      Q.   Okay.  And Mr. Savory had rheumatoid
17   arthritis, right?
18      A.   He did.
19      Q.   Okay.  On the top of page 5, long-term
20   infection with hepatitis C virus is listed as a risk
21   factor for certain types of lymphoma.  Do you see
22   that?
23      A.   Top of page 5?
24      Q.   Yes, sir.  Last bullet point.
25      A.   Yes.
```

Ronald D. Kendall, Ph.D.

1     Q.   Okay.  And Mr. Savory had hepatitis C,

2  diagnosed in 1990, true?

3     A.   Yes.  But it was controlled within a year

4  or so with interferon treatment.  So he didn't have

5  it that long, based on what I was able to interpret.

6     Q.   Mr. Savory's father had prostate cancer,

7  right?

8     A.   That's what he said.

9     Q.   Okay.  And we saw the last deposition in

10  the Spector case that history of a first degree

11  relative with cancer is associated with a

12  statistically significant increased risk for NHL,

13  right?

14     A.   Yes, we discussed that.

15     Q.   Okay.  Nowhere in this risk factor document

16  is the word "glyphosate" mentioned; is that true?

17     A.   They don't mention any -- they mention

18  benzene.  That's all.

19     Q.   Okay.  Nowhere in this risk factor document

20  is the word "Roundup" mentioned, true?

21     A.   True, but they do mention herbicides.

22     Q.   Okay.  They mention herbicides.  And as you

23  stated before -- go ahead, I'm sorry.  I don't mean

24  to cut you off.

25     A.   Yeah, it says, "Exposure to certain

```
 1   chemicals and drugs, some studies have suggested

 2   that chemicals such as benzene and certain

 3   herbicides may be linked to an increased risk of

 4   NHL."

 5        Q.   Okay.  And you mentioned --

 6        A.   So that's -- and it's herbicides.

 7        Q.   Okay.  You mentioned in the last deposition

 8   that organophosphate herbicides have been associated

 9   with NHL, right?

10        A.   It's -- it is thought organophosphate

11   insecticide.

12        Q.   And organophosphate herbicides, like,

13   2,4-D, right --

14        A.   Right.

15        Q.   -- has been associated with NHL literature?

16             And so, again, they do not specifically

17   call out Roundup or glyphosate by name as a risk

18   factor in this document, right?

19        A.   They do not.

20        Q.   Okay.  You agree with me -- I'll return to

21   Mr. Thomas -- that Mr. Savory had risk factors for

22   NHL that could have been independent causes of his

23   NHL absent Roundup use, right?

24        A.   I agree, but they also could have made him

25   more susceptible to that -- that particular effect
```

Ronald D. Kendall, Ph.D.

1   by chemical exposure.  It can go both ways.  So,

2   again, the way I look at it, that rheumatoid

3   arthritis in itself, I think it's -- it's

4   inflammation, and it was chronic inflammation.

5        So as I mentioned earlier today in our --

6   in our discussion, I think it -- I think it's

7   plausible that chemical effects can be more

8   pronounced when certain physiological conditions

9   exist, particularly if you may have inflammation or

10  suppression of the immune system.

11       Q.   And you have not gone through a process in

12  reaching your causation determination of ruling in

13  the potential causes of Mr. Savory's cancer, be it

14  rheumatoid arthritis, first degree history in the

15  family, hepatitis C, and then ruling out all of

16  those causes except for Roundup, right?  That's not

17  the process you followed?

18       A.   The process I followed is I did -- I think

19  the rheumatoid arthritis was definitely a risk

20  factor.  Although, his -- his job, for the most

21  part, whether -- whether -- when he was in the Navy,

22  he was just changing lightbulbs, and, you know,

23  checking circuits.  He wasn't dealing with a lot of

24  chemicals.  And even as a framer, he really -- you

25  know, you could call him a carpenter or woodworker,

Ronald D. Kendall, Ph.D.

```
 1    but it's -- it's very straightforward when you're
 2    framing a house.  And framers get the framing done
 3    and get out.
 4           And I looked particularly at the fact that
 5    he had a 3.37-acre lot that he took care that was
 6    predisposed to poison ivy, all kinds of weed issues.
 7    So I -- I -- the way I saw it -- and it kind of was
 8    reflected in his deposition, you know, it was hard
 9    to say it was an hour, hour and a half, two hours.
10    You know, he -- I could tell he spent a lot of time
11    out there managing his yard, particularly when
12    you've got that much of a lot.
13           And I know what that's like because
14    growing up, my job was to take care of the lawn.  We
15    had an acre lot.  And it was major.  I had to cut it
16    and keep weeds taken care of and everything.  So an
17    acre was a lot.  That's three times bigger.  And I
18    was impressed with the drone video I had just --
19    just how much property Mr. Savory had.
20           So just when I add everything up -- and as
21    I mentioned, when I -- when I add it all up, and as
22    I stated in my opinion, I think that his exposure to
23    Roundup over 30 years -- and we can debate how much
24    and how many times he sprayed a week or how many
25    months a year, but I think that was a contributing
```

1    factor within reasonable scientific certainty

2    against that backdrop of -- of chronic inflammation,

3    which I think -- through rheumatoid arthritis, which

4    I think could have made him more sensitive to this

5    type of exposure and effect.

6       Q.   Thank you, Doctor.  I appreciate you

7    describing your process there.  I just want to make

8    sure I understand what you did not do as well.

9       A.   Okay.

10      Q.   And my question was focused on something

11   different, which is, you did not go through a

12   process of listing out the potential causes of

13   Mr. Savory's cancer, that being rheumatoid

14   arthritis, family history of cancer, hepatitis C,

15   whatever you considered as potential causes of his

16   NHL, and then eliminate each one of those causes

17   except for Roundup.  That is not the process you

18   followed.  Instead, the process you followed is what

19   you just told us in the previous answer.  Is that

20   fair?

21      A.   That's fair.

22      Q.   Okay.  Mr. Thomas, moving on to that case

23   for a moment.  We'll just have a few more questions

24   and then I think be close to done.

25           According to your report, Mr. Thomas used

1    Roundup -- I want to get to your -- at a minimum, he

2    sprayed Roundup once per week for six months each

3    over 20 years, right?

4         A.   That's what I assessed from his deposition.

5         Q.   Okay.  And, again, to get a lifetime

6    internal dose, worst case, we could take the Kougias

7    data and multiply .006 mgs per kg times the once a

8    week, six months, 20 years, fair?

9         A.   Fair.

10        Q.   Okay.  And Mr. Thomas applied at a great

11   many addresses, right?

12        A.   Yes.  And he was pretty articulate at

13   explaining that and with his job history.  He -- he

14   moved around a number of times with mainly

15   management positions.

16        Q.   Right.  And he -- he lived in

17   Massachusetts, Nevada, Arizona, and California,

18   right?

19        A.   Correct.

20        Q.   Sprayed in all those places, right?

21        A.   That's what he said.

22        Q.   Okay.  And at some of the locations, he --

23   or strike that.

24             At all of the locations, he used a

25   ready-to-use product, right?

1        A.    That's what he said.

2        Q.    Okay.  So he did not mix and load Roundup

3    the way Mr. Savory did, right?

4        A.    I agree.

5        Q.    Okay.  And as we've seen in the pesticide

6    biomonitoring studies, mixing and loading Roundup is

7    one of the highest exposure events you can have,

8    right?

9        A.    I agree.

10       Q.    Okay.  And so the fact that he used a

11   ready-to-use formulation would have reduced his

12   exposure in comparison to mixers and loaders, all

13   other things being equal, fair?

14       A.    Theoretically fair.

15       Q.    Okay.  Mr. Thomas said he tried not to get

16   Roundup on his skin when he sprayed, right?

17       A.    That's what he said.  But he also said he

18   wore long sweat pants or long pants sometimes, but

19   he wore short pants just as much.  I would say

20   50 percent of the time he sprayed, he had short

21   pants on and a short-sleeve shirt because of the

22   part of the country he lived in.  That's what he

23   said.

24       Q.    Right.  And he lived in Arizona and he

25   lived in Nevada, and we all know those are very hot

Ronald D. Kendall, Ph.D.

1   climates.  Right?

2       A.   Yes.

3       Q.   Okay.  And so he -- but that being said, he

4   did not recall Roundup ever coming into contact with

5   his skin when he sprayed, right?

6       A.   That's what he said.

7       Q.   Okay.  And when he was wearing the long

8   pants and the long-sleeve shirt for any of these

9   plaintiffs, wearing the long pants and long-sleeve

10  shirt would have reduced exposure as compared to

11  somebody who a short-sleeve shirt and short pants,

12  right?

13      A.   I would agree.

14      Q.   Okay.  And as we established before,

15  Mr. Thomas had lap band surgery in December 2014,

16  right?

17      A.   That's what he said.

18      Q.   Okay.  And he weighed about 350 pounds

19  prior to that surgery, right?

20      A.   Yes.  And he lost 100 pounds after -- after

21  it.

22      Q.   Right.  And we've seen in the literature

23  that being obese and having a BMI over 30 can lead

24  to an increased risk of some type of NHL Mr. Thomas

25  has, DLBCL, right?

Ronald D. Kendall, Ph.D.

```
1        A.   Yes, but it's not as strong an association.
2   Even the American Cancer Society, they -- they talk
3   about, you know, the risk factors and body weight.
4   Some studies have suggested that being overweight or
5   obese might increase your risk of NHL.  More
6   research is needed to confirm these findings.  Okay.
7            So it's -- it's -- that's not a real
8   high -- for instance, compared to immunosuppression
9   or disturbance in your immune system, this would
10  rank much lower as a risk factor.  And that's what
11  they were trying to communicate.  So -- but it's
12  possible.
13       Q.   Okay.  And that's fair.
14       A.   Okay.
15       Q.   So when you say more research is needed
16  or research -- or research is continuing to clarify
17  links, that means it's a lower risk factor, right?
18       A.   Apparently so.  That's what the American
19  Cancer Society is saying.
20       Q.   Okay.  If you looked at page 2 for the
21  discussion of chemicals like benzene and certain
22  herbicides and insecticides, the American Cancer
23  Society said research to clarify these possible
24  links is still in progress, right?
25       A.   Correct.
```

1        Q.   Okay.  So they consider the association

2   between herbicides and NHL to also be weaker in

3   comparison to some of these other risk factors?

4        A.   Well, they say the research -- research is

5   still in progress.  So you would -- that would imply

6   that.

7        Q.   Okay.  And, again, we talked about earlier

8   Mr. Thomas had diabetes, right?

9        A.   Yeah, but it was under control.

10        Q.   Okay.  And do you know how long it was not

11   under control prior to his diagnosis in 2014, 2015?

12        A.   Not exactly the -- the exact number of

13   years, no.

14        Q.   Okay.  And if you go -- well, let me ask

15   you this:  Did you do any evaluation about whether

16   or not Mr. Thomas lived near pollution sites?

17        A.   No, he never mentioned that in his

18   deposition.

19        Q.   Did you do any research on EPA available

20   programs to look up his home addresses and see

21   whether or not they were near superfund sites?

22        A.   Well, if you look at his home addresses,

23   they all appear to be very nice homes in very nice

24   neighborhoods.  So having worked on superfund sites

25   across the country for my career, I didn't -- I

Ronald D. Kendall, Ph.D.

```
 1    didn't see any potential to be near a hazardous
 2    waste dump or a superfund site.
 3        Q.   Well, it's funny you say that, because my
 4    home actually is on top of a superfund plume in New
 5    Jersey, because you can't go anywhere in New Jersey
 6    and not be near a superfund site.
 7        A.   What kind of -- do you have -- do you have
 8    groundwater contamination?  Do you have groundwater?
 9        Q.   It's a dry -- yeah, yeah, a vapor
10    intrusion.
11        A.   Okay.  Well, I -- well, yeah, I can -- I
12    understand that.  I understand.  But generally --
13              MR. BRECHER:  John, is that why you
14    have a halo on top of your head?
15              MR. KALAS:  That's right.  You've got
16    it.
17        A.   Well, my impression was, these looked like
18    very nice homes in very nice neighborhoods, and,
19    generally, I would not assume -- I've been to a lot
20    of superfund sites.  I mean it, from coast to coast.
21    These are not the places I would have generally
22    looked for.  However groundwater contamination is a
23    potential and move businesses.
24        Q.   Okay.  And, again, that's -- to be fair to
25    you, that's not something you looked into in this
```

Ronald D. Kendall, Ph.D.

1   case, right?

2       A.   That's correct.  I had no reason to.

3       Q.   Okay.  Okay.  Well, you say you have no

4   reason to.  You were trying to assess potential

5   exposures to carcinogens, right?

6       A.   I was trying -- you know, that's a good

7   question.  I was trying to look at what these people

8   could have been exposed to.  But to -- in reading

9   their depositions, I saw no evidence of any

10  hazardous chemicals in the water of any chemical

11  plants nearby emitting chemicals.  You know, I just

12  didn't see that.

13          You know, I -- I -- there was no signal

14  there that they were concerned about -- most people,

15  when they live -- particularly Mr. Savory, living

16  there as long as he did, as well as Ms. Spector, I

17  mean, they're pretty aware if -- I mean, if a

18  newspaper article comes out that there's a hazardous

19  waste plume in your water or there's a chemical

20  plant just down the road releasing ethylene oxide or

21  something, you know, the people are generally aware

22  of that.  And that did not come out in the

23  deposition.

24          So I -- I assume, particularly with the

25  Savory location, it was pretty remote.  I mean, it

```
 1    was pretty isolated and on a pretty large tract of

 2    land.  And Spector's was too.  That was -- that was

 3    a 1.25 acre lot, too, and it looked very (audio

 4    drop).

 5                 THE STENOGRAPHER:  He dropped.

 6                 MR. KALAS:  Yeah.

 7        A.   (Audio drop) of any adjacent chemical

 8    threat.

 9    BY MR. KALAS:

10        Q.   We lost you after "Spector had a 1.5 acre

11    lot."  What did you say after that?

12        A.   Yeah, Spector had a 1.25 acre lot, and --

13    and just to summarize it real quick, on --

14    Mr. Savory and Ms. Spector, they -- they had very

15    large lots in relatively isolated areas, largely

16    surrounded by deciduous forest.

17                 And Mr. Thomas, looked like to me, was

18    very nice neighborhoods, you know, very well managed

19    lawns, as far as I could see on his houses.  So I

20    just -- I had no reason to believe there was a

21    chemical plant nearby or there was a groundwater

22    plume of toxicants because it just did not come out

23    in the deposition at all.

24                 And I think these people seem to be very

25    reasonable, responsible people, and I think they
```

Ronald D. Kendall, Ph.D.

1    would have mentioned, that they were concerned about

2    the water they were drinking.  And so I -- again,

3    that's just a summary of my perception.

4        Q.   All right.  And so you -- you don't --

5    well, strike that.

6             If you don't have an opinion on it, you

7    don't have an opinion on it, and that's fine.

8        A.   Okay.

9        Q.   Have you ever referred to a document called

10   the National Toxicology Program Report on

11   Carcinogens in your career?

12       A.   I'm sorry, Mr. Kalas, you cut out at first.

13       Q.   Have you ever referred to a document called

14   the National Toxicology Program Report on

15   Carcinogens in your career?

16       A.   Yes, it's been a while.

17       Q.   Okay.  What is the National Toxicology

18   Program Report on Carcinogens?

19       A.   It's -- it's an updated document that

20   continues to identify evidence of potential

21   carcinogens in commerce.

22       Q.   Okay.  And -- and I think we talked about

23   at the last deposition what the National Toxicology

24   Program is, but I can't recall your answer.  Could

25   you just remind me what the National Toxicology

Ronald D. Kendall, Ph.D.

1    Program is?

2        A.   Yeah, the National Toxicology Program is

3    part of the NIH dealing with -- NIH -- NIH -- NIEHS

4    dealing with toxicological questions and issues

5    facing our country.  And carcinogens are a component

6    of it.  And they have certain groups that deal with

7    that, and they produce a National Toxicology Program

8    document to identify carcinogens and identify

9    potential risk to the public.

10       Q.   Okay.  And is that list of carcinogens

11   considered authoritative by toxicologists in the

12   field, like yourself?

13       A.   Yes.  Yes.

14       Q.   Okay.

15            MR. KALAS:  Okay.  I've marked as

16   Exhibit 18, the most recent National Toxicology

17   Program Report on Carcinogens.  It's the 14th

18   edition.

19            (Exhibit No. 18 marked.)

20       A.   Okay.

21   BY MR. KALAS:

22       Q.   This is a list of all the chemicals listed

23   by the NTP for carcinogenic properties.  Is

24   glyphosate listed on this list of chemicals?

25       A.   I don't see it.

```
 1                 MR. KALAS:  Okay.  Give me one moment

 2    here.

 3            I've marked as Exhibits 19 and 20,

 4    Plaintiffs' Rule 26 disclosures, their expert

 5    disclosures in the Savory and Thomas matters.

 6                 (Exhibit Nos. 19 and 20 marked.)

 7    BY MR. KALAS:

 8        Q.   If you could, just take a moment to look at

 9    those, sir.

10        A.   What am I -- okay.  Where am I, again?

11        Q.   Exhibits 19 and 20.

12        A.   19 and 20?

13        Q.   Yes, sir.  If you could, just look at those

14    real quick.

15        A.   Okay.  Do I need to go through the whole

16    thing or. . .

17        Q.   You can take a look at the whole document

18    if you would like.  It's -- it's not that long.

19        A.   (Reviews document.)

20             Okay.

21        Q.   Okay.  And do Exhibits 19 and 20 correctly

22    state the scope of the expert opinions you intend to

23    offer in the Savory and Thomas cases incorporated in

24    your report?

25        A.   Yes, sir.
```

1      Q.   Okay.  Going back to the revised materials

2   considered list you provided us in the three cases,

3   which are Exhibits 3 through 5, you cite on there an

4   expert report by a gentleman named William Sawyer.

5   Is that right?

6      A.   Yes.

7           MR. KALAS:  Okay.  And I am marking

8   that expert report that I believe you looked at as

9   Exhibit 21.  Let me just label that.  Okay.  I've

10  marked that as Exhibit 21.

11          (Exhibit No. 21 marked.)

12  BY MR. KALAS:

13     Q.   Take a look at that when you get a second,

14  please.

15     A.   It's not coming up for me.

16     Q.   Did you refresh the link, sir?

17     A.   Twice, three times.

18     Q.   Okay.  Let's -- let's try it again.  Make

19  sure I put it in the right place in the exhibits.

20  Yeah.  It should be "Exhibit 21, Sawyer Schafer

21  expert report."  It looks like it got put in above

22  Exhibit 20, because I named Exhibit 20 "Expert 20"

23  for some reason.  So let me fix that.

24          But in your -- in your file with the

25  marked exhibits, it should be near the bottom,

Ronald D. Kendall, Ph.D.

```
 1   either. . .
 2        A.    Okay.  Okay.
 3        Q.    Okay.  Do you have it open, sir?
 4        A.    I do.
 5        Q.    Okay.  And is this the expert report
 6   that -- by Dr. Sawyer that you reviewed in reaching
 7   your opinions in this matter?
 8        A.    I considered it, yes.  I reviewed it.
 9        Q.    Explain to me how you used this when you
10   were considering your opinions.
11        A.    Well, I'm a toxicologist, and I was working
12   my way through the toxicologies of this whole --
13   whole issue, and I -- the -- the line of thinking as
14   I was reading all these materials was to bring
15   together exposure aspects of absorption,
16   distribution, excretion, the evidence which I was
17   aware was of the epidemiological studies that could
18   provide some evidence as to the potential
19   relationship between epidemiological statistics and
20   the correlation and association between glyphosate
21   and NHL; although, there's some differences in the
22   outcomes of those cases, control studies.
23             And then I worked my way through estimates
24   of the exposure duration of Mr. Savory, Ms. Spector
25   and Mr. Thomas, and also what were their potential
```

Ronald D. Kendall, Ph.D.

```
 1   toxicological confounding the variables, and there
 2   were really very little to none of the toxicological
 3   confounding.
 4          And then I went on to consider the
 5   ultimate demonstration of NHL as an outcome and --
 6   and what was associated with that based on the
 7   literature, particularly looking at the animal
 8   toxicological data and what evidence we had and what
 9   was in my knowledge base related to the genetic
10   toxicity.
11          And that was, you know, a lot going into
12   the toxicological literature, such as Casarett &
13   Doull's, "Toxicology:  The Basic Science of
14   Poisons."  And as I mentioned to you before, when
15   our friend got -- got lymphoma and had used a lot of
16   glyphosate associated with the cotton business,
17   cotton, I became a lot more interested in this.  And
18   so I had done a good bit of reading over the last
19   couple of years.  So that was -- that whole process
20   and logic that I went through, I evaluated what that
21   report went through.
22          I know one thing is that in terms of my
23   report, I stand by everything that I say, and I --
24   I -- that is exactly the way I'm thinking about it.
25   And I had no idea who this individual is, nor the
```

Ronald D. Kendall, Ph.D.

```
1    Sawyer case, I had no idea.  I just was going
2    through the lit- -- the information I had access to
3    and what I had read in the past and what I had read
4    currently as I was putting all this together to come
5    to my opinion and conclusions.  So that's kind of
6    the process I went through.
7            And then -- and it's literally -- you
8    know, it's literally what I do every day.  I mean,
9    it's -- it's just what I do.  And so I -- you know,
10   I just go through that -- that kind of process and
11   trying to think through do we have biological
12   plausibility here or not.  And that's kind of where
13   I came out -- came out the end of the thinking
14   process to get to.  So that's -- that's my thought
15   process.
16       Q.   And that -- fair.  And so I think -- I
17   think what you said there in that answer, I'm going
18   to make sure, you know, your report are your
19   opinions, right?
20       A.   Absolutely.
21       Q.   It is your opinions?
22       A.   Absolutely.  I stand 100 percent behind,
23   you know, my -- my thinking process and where I
24   ended up in my thinking process with my opinions
25   I've given you today.
```

Ronald D. Kendall, Ph.D.

1      Q.   Okay.  And so even though you read a report

2  of another toxicologist who's not on those

3  disclosures we looked at on Exhibits 19 and 20,

4  named William Sawyer, even though you looked at his

5  report, the opinions you offered in your report are

6  not Dr. Sawyer's opinions, they're your opinions?

7      A.   Absolutely not.  They're my opinions,

8  100 percent.

9      Q.   Okay.  Let's -- let's look at Exhibit 21.

10  And if you could, go to page 33 of Exhibit 21,

11  please.  It's entitled, "Glyphosate Human NHL

12  Studies."

13              MR. BRECHER:  What page are you on,

14  John?

15              MR. KALAS:  33 of Exhibit 21.

16              MR. BRECHER:  Okay.

17  BY MR. KALAS:

18      Q.   Are you there, sir?

19      A.   I am.

20      Q.   Okay.  And then I'm also looking at your

21  expert report in Savory.  I'm at page 11.  So if you

22  could have that document open in front of you as

23  well, please.

24      A.   What -- what page where?

25      Q.   Page 11 of your report in the Savory case.

1    So I'm looking at page 33 of Dr. Sawyer's report,

2    page 11 of your report.

3         A.   Okay.

4         Q.   Okay.  And if you look at the top of

5    page 33 of Dr. Sawyer's report in Schafer, it says,

6    "Glyphosate Human NHL Studies," right?

7         A.   Right.

8         Q.   And the top of your -- in the middle of

9    page 11 of your report, it says, "Glyphosate Human

10   NHL Studies," right?

11        A.   That's what we were talking about,

12   that's -- glyphosate human NHL studies.

13        Q.   Okay.  And Dr. Sawyer wrote in the first

14   paragraph of his report, "My toxicological opinions

15   with respect to dose are based, in part, on six

16   primary epidemiology" -- "epidemiological studies

17   that provide objective data with respect to several

18   prongs of the Bradford Hill criteria."

19            Did I read that correctly?

20        A.   That's exactly it.  And that's the six

21   studies I had, and I've used the Bradford Hill

22   criteria for 20 years.

23        Q.   Okay.  And what you wrote in your first

24   sentence -- I'm just asking if I'm reading things

25   correctly here, sir.  So just -- just bear with me.

Ronald D. Kendall, Ph.D.

1          What you wrote in the first sentence of

2    page 11, paragraph 6 here is, "Toxicological

3    evaluations and expert opinions with respect to

4    dose, Roundup exposure to humans causing NHL are

5    based, in part, on six primary epidemiology studies

6    that provide objective data of causation based on

7    Bradford Hill criteria."

8          Did I read that correctly?

9    A.    That is 100 percent accurate for me.

10   That's exactly how I think --

11   Q.    Okay.  And then Dr. Sawyer wrote -- I'm

12   sorry, I'm not trying to cut you off.

13   A.    That's fine.  But that's exactly -- I mean,

14   I could not say it more clearly.  And, like I said,

15   I've used the Bradford Hill criteria -- we have used

16   that in many papers we have written over the last --

17   since the '90s.  So that's just how I think and how

18   I interpret things.

19   Q.    Okay.

20   A.    So I'm trying to bring together

21   associations for biological plausibility that

22   chemicals can have certain effects and certain

23   target organs or target systems, humans, wildlife.

24   So that is exactly what I'm talking about.

25          And these are the six primary studies that

1    have been invoked, what -- what I -- what I had

2    started already looking at related to this whole

3    with subject.  So -- so, again, these studies are

4    being reevaluated, as we talked the other day with

5    new meta-analysis and so on, but, historically,

6    these have been six of the foundational studies that

7    have been used, particularly up to date, related to

8    looking at the human evidence for a relationship

9    between glyphosate and human carcinogenicity.

10           And, in fact, the International Agency for

11   Cancer Research heavily relied on these studies as

12   EPA did not.  And so I -- again, going back to the

13   IARC document, this is right front and center of the

14   component of that working group looking at, although

15   limited human evidence, there is evidence as being

16   additionally evaluated.  I respect that.  But --

17   but, again, this is pretty foundational.

18       Q.   Doctor, I'm really just asking if I'm

19   reading things correctly.  I appreciate the answer,

20   but I --

21       A.   Okay.  All right.  I'm just trying to

22   explain my logic.

23       Q.   Okay.  The next sentence of Dr. Sawyer's

24   report states at page 33, second sentence, top

25   paragraph, "My toxicological opinion is grounded in

1   animal experimental evidence, in vitro human

2   studies, and human epidemiological studies as

3   summarized within this report and previously

4   provided by Dr. Portier, et al., in the federal

5   Daubert motion proceedings."

6           Did I read that correctly?

7       A.   Yes.

8       Q.   Okay.

9       A.   Yeah.

10      Q.   Your second sentence of that paragraph

11  states, "Toxicological evaluation and ultimately

12  opinion is supported in animal experimental

13  evidence, in vitro human studies, and human

14  epidemiological studies as summarized within this

15  report."

16          Did I read that correctly?

17      A.   Yes.  And that's exactly what I've been

18  talking about with two depositions with you.  That's

19  exactly, precisely what -- you know, I have been

20  trying to tell you is it's not just one thing.  It's

21  that whole suite of evidence we've called the

22  weight-of-the-evidence based on those components of

23  toxicological evaluation.  There's no other way to

24  say it.  I mean, it's just -- that's just -- that's

25  just how it is.  That's what I do.  That's what I

1    think trying to put together, do we have biological

2    and toxicological plausibility for exposure that

3    might result in an effect.

4         Q.    Doctor, let's go to the third sentence of

5    Dr. Sawyer's top paragraph on page 3.  The third

6    sentence of the top paragraph on page 33 states,

7    "Specifically, I have assessed dose response,

8    temporality, latency period, biological plausibility

9    (toxicological mechanisms), coherence (demonstrated

10   by molecular-based studies) and animal studies as

11   well as the strength of association and consistent

12   with the toxicological mechanisms of Roundup

13   formulation ingredients."

14        Did I read that correctly?

15        A.    Yes.

16        Q.    The third sentence of your paragraph,

17   middle of page 11, states, "Specifically, I have

18   assessed dose response, latency period, biological

19   plausibility (toxicological mechanisms),

20   temporality, coherence (demonstrated by

21   molecular-based studies) and animal studies as well

22   as the strength of association and consistency with

23   the toxicological mechanisms of Roundup formulation

24   ingredients including glyphosate."

25        Did I read that correctly?

1    A.   Yes, that's exactly what I told you all
2    through today.  We've talked about -- we've gone
3    through the dose response in both the cell studies
4    and the animal studies.  I've really talked about
5    the latency period of 20 years, studies that -- the
6    animal experimental evidence, particularly with the
7    mice and rat studies, that we talked about the
8    unique tumors, the in vitro human studies with --
9    with cell micronuclei, chromosomal breaks, the six
10   original human epidemiological studies, as well as
11   the meta-analyses.
12        So, I mean, that is the foundation of
13   everything -- the process of everything I'm thinking
14   as what I've conveyed to you today and last Thursday
15   related to how a toxicologist would approach these
16   issues.  And this is pretty fundamental -- pretty
17   fundamental toxicology.
18   Q.   Okay.  Let's look at the fourth sentence of
19   the paragraph at the top of page 33 in Dr. Sawyer's
20   report.  This is the last sentence of the top
21   paragraph on page 33.
22        Dr. Sawyer states, "I have used the six
23   primary epidemiological studies, which include
24   Eriksson, et al., 2008, McDuffie, et al., 2001,
25   Andreotti, et al., 2018, Leon, et al., 2019, Zhang,

1    et al., 2019 and Pahwa, et al., 2019, primarily with

2    respect to dose assessment."

3           Did I read that correctly?

4    A.   You did.

5    Q.   Okay.  And what you wrote in the last -- or

6    the last sentence of the paragraph in the middle of

7    page 11 is, "I have used the six epidemiology

8    studies, which include McDuffie, et al., 2001,

9    Eriksson, et al., 2008, Andreotti, et al., 2018,

10   Leon, et al., 2019, Zhang, et al., 2019, and Pahwa,

11   et al., 2019, primarily with respect to dose

12   assessment."

13          Did I read that correctly?

14   A.   That's correct.  And that makes total logic

15   sense.  I started with McDuffie back in 2010.  And

16   we got -- I got the current studies from -- I worked

17   my way up from Eriksson in 2008, Andreotti, 2018, on

18   to Pahwa, 2019.  And we were looking at the amount

19   of exposure, the dose response.  That's what this

20   was -- that was driving this.  How many days -- how

21   many eight-hour days of exposure were occurring over

22   what length of time.

23          And that's -- that's how I came up with

24   Mr. Savory as well as Mr. Thomas and Ms. Spector,

25   were they in those thresholds or not.  I mean, that

Ronald D. Kendall, Ph.D.

1    seemed -- that seemed to be about as logical as I
2    could get it when you are thinking about evaluating
3    somebody exposed for 20 to 30 years.
4             So, I mean, to me, this is about as
5    straightforward, fundamental as I could -- this is
6    exactly how I'm thinking.  This is precisely what
7    I've communicated to you in this deposition.  And I
8    could do it off the top of my head.  This is what I
9    do.  And so that -- anyway, that's -- that's how
10   I --
11       Q.   Did I read it -- did I read it correctly?
12       A.   Yeah.
13       Q.   Okay.  Dr. Kendall, did you copy the top
14   paragraph on page 33 in Dr. Sawyer's report -- let
15   me finish my question -- into your report and switch
16   around the words?
17       A.   Not really.  I -- I read -- you know what?
18   I probably read his report in 20 -- 15 minutes,
19   20 minutes.  And --
20       Q.   Okay.
21       A.   -- I just, I read it, and I had a whole
22   bunch of them I was reading that day.  And so I read
23   it.  I gave it some thought, and I just started
24   knocking -- I just let -- just went -- that's how I
25   do things.  I read things, I don't take notes, and I

1    just knock things out.  And this just all came to me

2    because this is the logical way -- this is exactly

3    the way I'm thinking.  This is exactly the way I've

4    communicated to you in my deposition.  I could do it

5    blindfolded.  You know, that's -- that's exactly how

6    I'm thinking.

7              And I stand by everything in that report

8    because that's how -- that's how I put things

9    together, and -- and that's how I want to

10   communicate it because that's how I see it.  And I

11   think that will be clearly reflected in the record

12   of how I've communicated this in my depositions,

13   both today and last Thursday.

14      Q.   Dr. Kendall, you answered my question with,

15   "Not really."  So I just -- I just want to

16   understand your process.

17             Did you copy the first paragraph on

18   page 33 from the Sawyer report into your report and

19   switch around the words?

20      A.    Not copy.  I read it.  And I -- and I

21   generated what I saw as the logic profile, which was

22   very similar to mine.  I -- that's how I was

23   thinking.

24      Q.   So you didn't -- so you did not copy and

25   paste that paragraph --

Ronald D. Kendall, Ph.D.

```
 1        A.   No.  No, no, no.  No.

 2        Q.   -- into your report and switch around the

 3   words?

 4        A.   I did not.

 5        Q.   Okay.  Let's go to the next paragraph.

 6             The next paragraph of Dr. Sawyer's report

 7   on page 33 states, "My toxicological focus on these

 8   studies is on study design, statistical power and

 9   exposure thresholds at different odds ratios, et

10   cetera."

11             Did I read that correctly?

12        A.   Yeah.  And that's exactly what we've talked

13   about, study design, exposure and statistical power.

14        Q.   Sir, I'm just asking if I read Dr. Sawyer's

15   report correct.

16        A.   Yes.

17        Q.   Dr. Sawyer's first sentence in the second

18   paragraph says, "My toxico-" -- are you looking at

19   Dr. Sawyer's report or your report?

20        A.   No, I'm looking over here.  I'm looking at

21   both.

22        Q.   Dr. Sawyer's report states, "My

23   toxicological focus on these studies is on study

24   design, statistical power and exposure thresholds at

25   different odds ratios, et cetera."
```

```
 1            Did I read that correctly?
 2     A.    Yes.
 3     Q.    Okay.  Your first sentence of the next
 4  paragraph on paragraph -- on page 11 states, "My
 5  basic toxicological focus on these studies is on
 6  study design, exposure and statistical pattern."
 7            Did I read that correctly?
 8     A.    That's it.  That's exactly what I said all
 9  day.
10     Q.    Okay.  So Dr. Sawyer's report says, "study
11  design, statistical power and exposure thresholds."
12  Your report says, "study design, exposure and
13  statistical power," right?
14     A.    Exactly.
15     Q.    Did you copy that sentence into your report
16  to switch around the words?
17     A.    No, because that's exactly what we have
18  talked about, the study design, the exposure, how
19  long these people were exposed, and then the
20  statistics used to interpret that data and the power
21  of those statistics.  In other words, the
22  probability levels and the confidence zones.
23     Q.    Okay.  Let's go to the next sentence of
24  Dr. Sawyer's report that was on your reliance list.
25  The next sentence says --
```

Ronald D. Kendall, Ph.D.

```
1          A.   Which one are you on?

2          Q.   Page 33, second paragraph, second sentence.

3          A.   Okay.

4          Q.   Dr. Sawyer says, "I am using these study

5     results in my toxicological assessment in

6     conjunction with generally accepted peer reviewed

7     studies on genotoxicity (including direct human

8     studies), mechanisms of action (promotion, et

9     cetera,) absorption, distribution, metabolism, and

10    excretion, ADME, et cetera."

11         Did I read that correctly?

12         A.   Yeah, that's correct.

13         Q.   Your second sentence on page 11 at the

14    bottom paragraph states, "I am using these results

15    in my toxicological assessment in conjunction with

16    generally accepted peer reviewed studies on

17    genotoxicity (including direct human studies),

18    mechanisms of action (promotion, et cetera),

19    absorption, distribution, metabolism and excretion,

20    et cetera."

21         Did I read that correctly?

22         A.   Yes.

23         Q.   Okay.  Dr. Sawyer wrote "genotoxicity

24    (including direct human studies), mechanisms of

25    action (promotion, et cetera)."
```

Ronald D. Kendall, Ph.D.

```
1              Is that correct?
2       A.   That's --
3       Q.   Dr. Sawyer wrote that?
4       A.   That's exactly what I've --
5       Q.   And you wrote --
6       A.   -- been saying for the last two
7  depositions, is the genotoxicity, we were looking at
8  direct human studies, particularly if you go into
9  the IARC report with people exposed aerially with
10 treatment, they had chromosomal breaks.  The
11 mechanisms of action.  We've talked about promotion
12 considerably and the George study.
13             So this is exactly my logic process.
14 We've talked a lot about absorption through the
15 skin, inhalation, and ingestion.  We have agreed
16 that the skin appears to be the predominant.
17 Distribution in the body is through the blood.
18 We -- we have agreed that it does reside in the
19 blood.  The metabolism is low in the body, and its
20 excretion is generally through the iron.
21             So, I mean, this is exactly the thought
22 process as I assimilated how I was going to address
23 this question.  It's -- it's the toxicology.  It's
24 how a toxicologist approaches this.
25      Q.   Doctor, my question was only, Dr. Sawyer
```

1    has a portion of that sentence that says,

2    "Genotoxicity (including direct humans studies),

3    mechanisms of action (promotion, et cetera),"

4    correct, Dr. Sawyer has that?

5         A.   Yes.  And that's exactly what we're talking

6    about here.

7         Q.   Okay.  And you have in your report,

8    "genotoxicity (including direct human studies),

9    mechanisms of action (promotion, et cetera)."  You

10   have the exact same phraseology in your report, the

11   exact same parentheses, true?

12        A.   Well, it makes absolute sense --

13        Q.   Is that true?

14        A.   -- because we were -- genotoxicity

15   generally implies the in vitro mechanisms with

16   various -- like salmonella and so on.  But the

17   direct human studies were incredibly valuable

18   because they showed humans could be exposed and have

19   actually genotoxicity effects.

20             The mechanism of action is critical

21   because it -- it appears that promotion is a

22   significant part of -- of how this chemical may act.

23   I don't -- I don't know what level compared to

24   direct action with genetic mechanisms, but promotion

25   is -- is right there.

1          So it's -- it's -- to me -- we went

2     through absorption, distribution, metabolism and

3     excretion.  I've gone through all of that with you

4     in my deposition as to my line of thinking as to why

5     I state in this process right here in my report

6     exactly like I stated it.  And I stand behind it

7     100 percent.

8       Q.   And you stated it in your report exactly

9     how Dr. Sawyer stated in his report, true?

10          MR. BRECHER:  Object to the form of

11     the question.

12       A.   It is maybe close.  It's maybe close.  But

13     if he's a toxicologist, we -- we talk the same

14     language.  I don't know him.

15     BY MR. KALAS:

16       Q.   All right.  Let's go to his --

17       A.   I don't know him.

18       Q.   All right.  Let's go -- let's go to the

19     next sentence on page 33 of Dr. Sawyer's report.

20     The next sentence in that last paragraph, third

21     sentence.  It starts, "In genera. . ."

22          Dr. Sawyer wrote, "In general, I have

23     relied on studies that have documented the various

24     aspects of the Bradford Hill criteria at or in

25     excess of the 95 percent of confidence threshold."

Ronald D. Kendall, Ph.D.

1           Did I read that correctly?

2      A.   That's exactly what I did.  And what --

3      Q.   Okay.  I didn't ask --

4      A.   Yes, you read it correctly.

5      Q.   -- what you did.  Okay.

6      A.   Yes, you read it --

7      Q.   You wrote in your --

8      A.   -- correctly.

9           THE STENOGRAPHER:  One at a time.

10          MR. KALAS:  Okay.

11   BY MR. KALAS:

12     Q.   You wrote in your third sentence, "In

13   general, I have relied on studies that have

14   documented the various aspects of the Bradford Hill

15   criteria at or in excess of the 95 percent

16   confidence threshold."

17          Did I read that correctly?

18     A.   Yes.  And I do that all the time.  That is

19   exactly the -- that is exactly the methodology I

20   follow.

21     Q.   Did you copy the first three sentences of

22   the second paragraph of page 33 of Dr. Sawyer's

23   Schafer report into your report?

24     A.   No.

25     Q.   Okay.  Let's --

```
1        A.   I read his -- I read his, and I will admit,
2   it was -- it was very clear.  I -- I sat down and
3   started knocking all of this out, and -- and, again,
4   this is -- this -- what I'm -- what I'm saying is,
5   every -- everything we've talked about here, the
6   whole level of thinking we've just gone through is
7   exactly what I've discussed with you the whole day
8   here as to a line of thinking and why I've reached
9   certain conclusions as a function of -- of all the
10  aspects of the toxicology of this substance,
11  including the human epidemiological studies, the --
12  the animal testing evidence, as well as -- as well
13  as the genetic toxicity and the oxidative stress as
14  to the mechanistic toxicology.
15       It all -- it all comes together in a very
16  logical format for me.  And so the way I look at it,
17  what -- what I've got is exactly -- in my report is
18  it exactly consistent with how I'm thinking and how
19  I've communicated it with you and how I intend to
20  communicate it to wherever I need to.  I could do it
21  blindfolded.
22       Q.   Go to -- please go to page 38 of
23  Dr. Sawyer's Schafer report.
24       A.   Okay.
25       Q.   Do you see Table 7?
```

Ronald D. Kendall, Ph.D.

1        A.   Yes.

2        Q.   "Exposure Parameters for Six Referenced

3   Epidemiological Studies"?

4        A.   Yes.

5        Q.   Okay.  And you have Table 3 on page 12 of

6   your report, "Summary of Epidemiological Studies."

7   Do you see that?

8        A.   Yes.

9        Q.   And Dr. Sawyer, in his Schafer report, has

10  a summary of the data in the epidemiological studies

11  where he lists the "Study," the "Type of Study,"

12  "Metrics (Dose Intervals)," "Cutoff Between Cases

13  and Controls."  Those are his four headers in the

14  Schafer report?

15       A.   That (audio drop).

16            THE STENOGRAPHER:  He dropped.

17            MR. KALAS:  Yeah, we lost his answer.

18       A.   (Audio drop) metrics, the dose involved.

19  That gives us exposure.  And then --

20  BY MR. KALAS:

21       Q.   Dr. Kendall, I don't want to cut you --

22  Dr. Kendall, we lost the front of your answer.  So I

23  am going to just ask it again, and you can answer.

24  You froze.

25            The four headers on Table 7 of

1    Dr. Sawyer's report in Schafer are "Study," "Type of

2    Study," "Metrics (Dose Intervals)" and "Cutoff

3    Between Cases and Controls."

4        A.   I can't --

5        Q.   Did I read that correctly?

6        A.   I can't hear.

7        Q.   Okay.  I'll start over.

8             The four headers on the top of Table 7 in

9    Dr. Sawyer's report are, "Study," "Type of Study,"

10   "Metric (Dose Intervals)" and "Cutoff Between Cases

11   and Controls."

12            Are those the four headers on his table?

13       A.   Yes.  And that's exactly logical, because

14   as we looked at all of these -- these studies, we

15   looked at the study, we've talked about the type of

16   study, case control, cohort, whatever, the metrics

17   where the dose -- the dose -- the dose interval, the

18   days exposed.  That was all laid out in the -- in

19   the reports as well as the cutoff between cases and

20   controls.  That's -- that's how we provided some

21   interpretation here related to the outcomes, the

22   diagnoses.

23       Q.   Okay.  You agree with me that the -- the

24   headers -- the four headers in Table 3 of your

25   report and the headers in Table 7 of Dr. Sawyer's

Ronald D. Kendall, Ph.D.

1    Schafer report are identical, right?

2        A.    Yeah.  And why not?  You know, that's --

3    it's the study, type of study, the metric, the dose

4    interval, and the cutoff between cases in control.

5    That is exactly how I would say this.  Exactly.

6        Q.    Okay.  And for the six studies here,

7    McDuffie, Eriksson, Andreotti, Leon, Zhang and

8    Pahwa, and then the information put in in the rows

9    for each study, I cannot find one difference between

10   your table and Dr. Sawyer's table.  Can you find a

11   difference for me sitting here?

12       A.    I don't -- I don't -- I looked -- I looked

13   at his information.  I went back to the studies, and

14   it just made -- it was very clear, it's exactly -- I

15   don't see how it could be more precise.  Going to

16   McDuffie, case control of men in six Canadian

17   provinces.  It had unexposed zero days to less than

18   two days and greater than two days a year.  Those

19   were the dose metrics.  And then cutoff between

20   cases and control, you know, the cases were

21   diagnosed with -- with these subgroups of NHL.

22             So I don't know, I just -- I can't get --

23   I could not get it any clearer than it -- it's laid

24   out here to give me a road -- to have a roadmap as

25   how I can walk through and explain these projects

Ronald D. Kendall, Ph.D.

1    and what were the outcomes.  It's very clear.

2         Q.   Okay.  Dr. Kendall, I had a different

3    question than whether or not it was clear.  I asked

4    if you could find one difference in the verbiage in

5    any of the language between Table 7 in Dr. Sawyer's

6    Schafer report and Table 3 in your Savory report.

7    Is there any difference in the language anywhere?

8         A.   I don't know.

9         Q.   Or is it exactly the same?

10        A.   I don't --

11        Q.   Go ahead and compare.  Go ahead and

12   compare.  Take a moment.

13        A.   (Reviews document.)

14             It looks very close if not extremely

15   close.  On the other side, this was the most

16   pertinent extraction of information that could be

17   summarized for these individual studies that you

18   could get.  That's exactly -- it laid out whether

19   there was a meta-analysis in the case of Zhang to a

20   case control in the case of the McDuffie, the dose

21   intervals, and how the cases were reported.

22             I don't know, I just -- to me, it's --

23   it's very clear and it's -- it's communicated in a

24   way that you can -- you can get what was said with

25   those studies in terms of data generation in a very

```
 1   precise manner.
 2       Q.   You said they were pretty close to very
 3   close.  They are identical, aren't they, sir?
 4       A.   Yeah, it looks like it to me.
 5       Q.   Okay.  Did you --
 6       A.   But why not?
 7       Q.   -- copy and paste Table --
 8       A.   Actually --
 9       Q.   Did you copy and paste Table 7?
10       A.   I actually worked it all up, and I -- I put
11   it all together, and I -- I did look back at that,
12   his table.  But this table is -- this table is this
13   table.  It's just -- it reflects a database.  That's
14   it.  It's not an interpretation.
15       Q.   Did you --
16       A.   It's extracted.  It's a database that was
17   extracted from these studies.  And --
18       Q.   Dr. Kendall --
19       A.   -- he had an opportunity to communicate
20   that, and I did too.  And this is where I ended up,
21   and I think it's -- I've been talking about this
22   for -- for two days with you.
23       Q.   Well, I understand, Dr. Kendall.  I'm
24   trying to ask a very simple question here, which is,
25   did you copy Table 7 from Dr. Sawyer's report into
```

Ronald B. Kendall, Ph.D.

```
1    your report and mark it as Table 3?

2         A.   I wouldn't say that.  I said -- I would say

3    I generated a table.  I had -- I had an opportunity

4    to -- to look at his.  But I generated a table.  I

5    thought through how I wanted to communicate that

6    table, and I can -- I can communicate this off the

7    top of my head because I -- I embodied that data and

8    information in a way in which I wanted to

9    communicate it in my expert report.

10        Q.   And the way you chose to communicate it in

11   your expert report was using every single word the

12   same as Dr. Sawyer used in Table 7 of his expert

13   report, fair?

14        A.   Well, it -- it looked -- it's about as

15   clean as you can get it as to what the essence of

16   the datasets were and the best way and the -- and

17   the cleanest way to communicate it.  That's -- this

18   is exactly what we have talked about.  So, again, it

19   was -- to me, it's exactly my thinking and how I

20   wanted to relate that data and information as I

21   would ultimately reach a conclusion.

22        Q.   All right.  Let's go to page 39 of

23   Dr. Sawyer's report in Schafer.  Dr. Sawyer has a

24   header on page 39 called, "Comparisons of Exposure

25   Days to Human Epidemiological Studies."
```

1           Did I read that correctly?

2      A.   Just a minute.  I'm trying to find that

3  page.

4      Q.   It's the one right after the table.

5      A.   Okay.  Yes.

6      Q.   Okay.  You have a header on the bottom of

7  page 12 underneath your table that also says,

8  "Comparisons of Exposure Days to Human

9  Epidemiological Studies."

10     A.   That's what --

11     Q.   Did I read that correctly?

12     A.   -- it is.  It's human exposure days.

13  That's exactly what these studies were -- were

14  reporting, and we compared them.  That is exactly

15  what we did.

16     Q.   Okay.  So I'm just asking if I read it

17  correctly.  Did I read it correctly?

18     A.   Yes.  That's exactly what we did,

19  comparison of exposure days to human epidemiological

20  studies.

21     Q.   Go back to page 39 of Dr. Sawyer's report.

22  Dr. Sawyer says, "The results of the 'exposure-day'

23  calculations (based on validated, reported exposure

24  intervals in the above tables) indicate that

25  Mr. Schafer's cumulative exposures were above all

Ronald D. Kendall, Ph.D.

1  the exposure threshold metric cutoffs.  That is, he

2  exceeded the 'ever use' threshold, the 'zero to two

3  days' threshold, the 'two days per year' threshold,

4  the 'greater than one day less than ten days'

5  threshold, and the 'greater than ten days' total

6  exposure threshold."

7          Did I read that correctly?

8      A.   Yes.

9      Q.   Okay.  Your report states at the bottom of

10  page 12, "The results of the 'exposure-day'

11  calculations (based on estimated exposure Mr. Savory

12  experienced while treating his property with

13  Roundup) indicate that Mr. Savory's cumulative

14  exposures were above all of the exposure threshold

15  metric cutoffs.  That is, he exceeded the 'ever use'

16  threshold, the 'greater than zero less than two

17  days' threshold, and the 'greater than two days per

18  year' threshold, the 'greater than one day less than

19  ten days' total threshold, and the 'greater than ten

20  days' total threshold exposed."

21          Did I read that correctly?

22      A.   Yes.  And he did, he exceeded those

23  thresholds.

24      Q.   Okay.  Did you copy the top paragraph of

25  page 39 in Dr. Sawyer's report into your report and

1    substitute Mr. Savory for Mr. Schafer?

2         A.    No, because Mr. Savory, as I went through

3    that analysis with him, when you look at the metrics

4    of exposure, when I evaluated these epidemiological

5    studies, he exceeded them all.  And I state that

6    very clear, he -- he exceeded all of these

7    thresholds, assuming that his treatment was

8    consistent with what he said in his deposition.  So,

9    I mean, I don't -- I don't see how that can be any

10   clearer said.

11        Q.    Please go to page 188 of Dr. Sawyer's

12   report.

13        A.    That's going to take me a. . .

14        Q.    Sure.  We'll wait a moment.

15        A.    188?

16        Q.    Yes, sir.

17        A.    Okay.

18        Q.    Do you see Dr. Sawyer has a heading listed,

19   "Evidential Consideration"?

20        A.    The evidence, yes.

21        Q.    Okay.  He has a header that says,

22   "Evidential Considerations," right?

23        A.    Correct.

24        Q.    Okay.  And you, on page 13, also have a

25   header that says, "Evidential Considerations,"

1  right?

2      A.   That's -- that's exactly how I would say

3  it.  It's the evidence, evidential considerations.

4      Q.   Okay.  And Dr. Sawyer's first sentence

5  under "Evidential Considerations" on page 188 says,

6  "The following evidential factors are useful in

7  formulating an objective toxicological assessment of

8  Mr. Schafer with regards to his Roundup exposures

9  and subsequent NHL diagnosis."

10         Did I read that correctly in Dr. Sawyer's

11  report?

12     A.   Yes.

13     Q.   Okay.  And the first sentence of your

14  report at page 13 states, "The following evidential

15  factors are useful in formulating an objective

16  toxicological assessment of Mr. Savory with regards

17  to his Roundup exposures and subsequent NHL

18  diagnosis."

19         Did I read that correctly?

20     A.   Yeah, I don't know how you could say it any

21  clearer.  I don't know how I could say it any

22  clearer.

23     Q.   Other -- other than switching "Schafer"

24  with "Savory," is every single word exactly the same

25  between Dr. Sawyer's first sentence there and your

Ronald D. Kendall, Ph.D.

1    first sentence here?

2        A.   Yeah, and that's exactly how I state -- how

3    I would state it.  Exactly.  If you asked me

4    blindfolded, I would say the same thing.  The

5    evidence factors are useful in formulating an

6    objective toxicological (audio drop).

7                    THE STENOGRAPHER:  He muted himself.

8    BY MR. KALAS:

9        Q.   You muted yourself.  You muted yourself.

10   You're still muted.

11                   THE VIDEOGRAPHER:  If you put your

12   cursor on the bottom left of your screen, you'll see

13   a microphone with a red dash through it.  Just click

14   it.

15                   THE WITNESS:  Okay.  Can you hear me

16   now?

17   BY MR. KALAS:

18       Q.   All right.  Yeah, I'll ask the question

19   again so you can give your full answer.

20       A.   Okay.

21       Q.   The first sentence under "Evidential

22   Considerations" in Dr. Sawyer's report and your

23   report are exactly the same, save for switching the

24   name "Schafer" for "Savory," true?

25       A.   Yes.  But this is exactly how I would say

1  it.  This is exactly.  The following evidential

2  factors are useful in formulating (audio drop).

3           THE STENOGRAPHER:  He froze.

4      A.   (Audio drop) and subsequent NHL diagnosis.

5      Q.   We lost you -- we lost you after

6  "formulating."  You said, "This is exactly how I

7  would say it."

8      A.   This is exactly (audio drop) --

9      Q.   Oh, my God.

10     A.   -- the evidential factors and -- and

11 formulate an objective toxicological assessment with

12 regards to his Roundup exposure and subsequent NHL

13 diagnosis.  I mean, that -- that -- that is exactly

14 my thinking and how I would communicate that.

15     Q.   All right.  Did you copy the first sentence

16 out of page 188 of Dr. Sawyer's report and put it

17 into your report?

18     A.   No.  That's exactly how I would say it

19 right now.  That's how a toxicologist would say

20 that.

21     Q.   Okay.  And Dr. Sawyer has five bullet

22 points, right?  "Diagnosis," "Prolonged Acute

23 Exposure and Absorption," "Chronic Glyphosate

24 Exposure," "Dermal Absorption Rates Higher Than

25 Presented By Monsanto," and "Lack of Personal

Ronald D. Kendall, Ph.D.

1    Protective Equipment."  Do you see those first five
2    bullet points he has?
3        A.   Yes.
4        Q.   Okay.  You have five bullet points as well.
5    "Diagnosis," "Prolonged Acute Exposure and
6    Absorption," "Chronic Glyphosate Exposure," "Dermal
7    Absorption Rates Higher Than Presented By Monsanto,"
8    "Lack of Personal Protective Equipment," correct?
9    And that's on pages 13 to 14 of your report.
10       A.   Correct.  And that's exactly how I was
11   considering it.  The diagnosis, his acute exposure
12   and absorption, the chronic exposure.  And I've
13   emphasized the importance of that.  The dermal
14   absorption.  We've debated that.  And the personal
15   protective equipment.  That is exactly what I've
16   told you today.  That's exactly how the logic I
17   followed.  That's how a toxicologist would look at
18   this.
19       Q.   Okay.  So it is just a -- by chance that
20   Dr. Sawyer used the phrasing, "Dermal Absorption
21   Rates Higher Than Presented By Monsanto," and you,
22   as well, used the exact phrasing, "Dermal
23   Absorptions Rate Higher Than Presented By Monsanto";
24   that's just chance?
25       A.   I -- based on my reading, I thought there

1   was some debate on that as far as was it 2 percent,

2   3 percent, whatever.  It seemed reasonable.  And --

3        Q.   Dr. Kendall, I don't --

4        A.   So, again --

5        Q.   -- mean to cut you off --

6        A.   -- as I --

7        Q.   -- but you're missing the question.

8        A.   Okay.

9        Q.   You're missing my question, sir.  It's not

10   about the data here.

11       A.   Okay.

12       Q.   It's about the phraseology.

13            Is it just by chance that Dr. Sawyer said,

14   quote/unquote, "Dermal Absorptions Rates Higher Than

15   Presented By Monsanto," and you, too, said, "Dermal

16   Absorption Rates Higher Than Presented By Monsanto"?

17   Is that just by chance?

18       A.   Probably when I read his document, that

19   was -- that was a useful perspective, because I

20   believe that, and I -- and I probably related to

21   that because I believed it.  And -- because I think

22   there's -- that's -- there's still some debate about

23   what is the actual dermal exposure rate.

24            And so, like I said, when I went through

25   his material, it -- I could highly relate to it.

1    Because it -- he's a toxicologist.  I don't know

2    him.  He's a toxicologist, and this all --

3    particularly this dermal absorption issue, that had

4    been very intriguing to me.  The George study did

5    indicate absorption, what had to occur or we

6    wouldn't have gotten tumors.

7          So, again, as I relate all to this, I

8    think I've been very clear today of my logic and

9    thinking and how I worked my way through these

10   questions.

11   Q.   All right.  After that section, Dr. Sawyer

12   has a section called, "Mechanism of

13   Carcinogenicity," right, on page 189?

14   A.   You have been asking about that all day

15   with me, and I've told you what my thoughts were.

16   Q.   I'm not asking -- does Dr. Sawyer have a

17   section right after those first five things we just

18   listed called, "Mechanism of Carcinogenicity"?

19   A.   What page are you on?

20   Q.   Page 189, sir.

21   A.   189.  Yeah.  Yes.  Okay.

22   Q.   Okay.  And -- and you, too, right after

23   those first five points, have a section called

24   "Mechanism of Carcinogenicity," right?

25   A.   Yeah.  That was the exact -- that's exactly

Ronald D. Kendall, Ph.D.

1    what you would be thinking once we've gone through

2    the evidence of exposure, absorption and so on.

3    That's what we're thinking.  That was -- that's the

4    whole essence of where we're working ourselves to.

5        Q.  All right.  And we're not -- we're not

6    going to belabor all this, because it goes on quite

7    a bit of pages, but in this paragraph, Dr. Sawyer

8    states, "Mr. Schaefer's exposures are to the Roundup

9    product, not to glyphosate alone.  Roundup and

10   glyphosate have been demonstrated in several studies

11   to repeatedly cause DNA damage with promotion by

12   Roundup being more damaging than glyphosate alone.

13   Genotoxicity is the first stage in cancer formation.

14   Wozniak, et al., and other studies as referenced in

15   this report further demonstrate that Roundup at a

16   higher dose was even able to impede the natural

17   repair of damaged DNA."

18           Did I read that correctly from

19   Dr. Sawyer's report?

20       A.  Yes.  Yes.

21       Q.  Okay.  Your report underneath "Mechanism of

22   Carcinogenicity" states, "Mr. Savory's exposures are

23   to Roundup product, not to glyphosate alone.

24   Roundup and glyphosate have been demonstrated in

25   several studies to repeatedly cause DNA damage with

1    promotion by Roundup being more damaging than

2    glyphosate alone.  Genotoxicity is the first stage

3    of cancer formation.  Wozniak, et al., 2018, and

4    other studies as referenced in this report further

5    demonstrate that Roundup at a higher dose was even

6    able to impede the natural repair of damaged DNA,

7    Casarett & Doull, 2018."

8          Did I read that correctly?

9     A.   That's exactly what I've told you in my

10    deposition.

11     Q.   Okay.

12     A.   Yes.

13     Q.   Did you copy -- did you copy the paragraph

14    after "Mechanism of Carcinogenicity" from

15    Dr. Sawyer's report and put it into your report?

16     A.   No.  That's exactly the way I've told you

17    in my deposition and how I've communicated it here.

18    And we've talked about the mechanisms of

19    carcinogenicity and the genotoxicity, as I've told

20    you, is the first stage in cancer formation.  We

21    discussed the Wozniak report.

22          And what's important here is that if we

23    can impede the natural repair mechanisms for damaged

24    DNA, as discussed in Casarett & Doull, 2018, that

25    makes this thing even more serious.  So that's

1   exactly what I have been saying and what I have been

2   communicating.

3       Q.   Okay.  Again, not going to belabor it.  The

4   next bullet point for Dr. Sawyer on page 190 is,

5   "Latency of Non-Hodgkin's Lymphoma," right?

6       A.   Yes.  And I've discussed that with you,

7   too.

8       Q.   Okay.  Then the next bolded area in your

9   report on page 15 is, "Latency of Non-Hodgkin's

10  Lymphoma," right?

11      A.   I've talked about that extensively about

12  over 20 years.

13      Q.   Sir, my question was whether that was the

14  next bolded area of your report, "Latency of

15  Non-Hodgkin's Lymphoma"?

16      A.   Yes.  Yes, that's a logical flow.

17      Q.   The next bullet point in Dr. Sawyer's

18  report is, "Scope of Exposure in Comparison to

19  Epidemiological Studies."  That's on page 190,

20  right, of Dr. Sawyer?

21      A.   That's -- that's what we're talking --

22  we've talked about the scope of exposure compared to

23  those -- when those of -- of dose that occurred in

24  those six epidemiological studies.  That's exactly

25  what I've talked about.

1      Q.   And the next bold area in your report is,

2   "Scope of Exposure in Comparison to Epidemiological

3   Studies," right?

4      A.   That's what we -- yeah.  That's -- that was

5   the foundation that gave us some limited human

6   evidence.

7      Q.   Okay.  And Dr. Sawyer's next header is,

8   "Summary and Conclusions."  That's on page 191,

9   right?

10      A.   Yes, on 191.

11      Q.   Okay.  And your next header on page 15 is,

12   "Summary and Conclusions," right?

13      A.   Right.

14      Q.   Okay.  And just going to the last paragraph

15   in Dr. Sawyer's report on page 191, it says, "Based

16   on the findings of applicable studies as noted

17   herein and on the basis of sufficient exposure,

18   dose, duration and episodic exposures to Roundup

19   consistent with the human exposure durations in the

20   epidemiological studies, it is my opinion, to

21   reasonable toxicological certainty, that

22   Mr. Schafer's calculated eight-hour time-weighted

23   midpoint exposure dose of 39 days to Roundup was a

24   substantial contributing factor to his development

25   and subsequent diagnosis of his diffuse large B-cell

Ronald D. Kendall, Ph.D.

```
1    lymphoma."

2           That's what Dr. Sawyer wrote on page 191,

3    right?

4       A.   Right.

5       Q.   And what you wrote on page 16 of your

6    report right before the conclusion is, "Based on the

7    findings of applicable studies as noted herein and

8    on the basis of sufficient exposure, dose, duration

9    and episodic exposures to Roundup consistent with

10   human exposure durations in the epidemiological

11   studies, it is my opinion, to reasonable scientific

12   and toxicological certainty, Mr. Savory's calculated

13   eight-hour exposure doses of 116 eight-hour days to

14   Roundup over a period of 29 years was a substantial

15   contributing factor to his development and

16   subsequent diagnosis of his large B-cell

17   Non-Hodgkin's lymphoma."

18          Did I read that correctly?

19      A.   Yes.

20      Q.   Did you copy the second paragraph of

21   page 191 of Dr. Sawyer's report and put it into your

22   Savory report?

23      A.   No.  This is exactly how I would state

24   this.  We've talked about sufficient exposure, dose,

25   duration, and episodic exposures to Roundup
```

Ronald D. Kendall, Ph.D.

1  consistent with human exposure durations in the

2  epidemiological studies.  I have -- I have gone

3  through that in great detail.  That is exactly the

4  logic flow.

5          And -- and when I worked up the eight-hour

6  exposure days and compared that to the thresholds

7  that these six epidemiological studies offered, I

8  thought it was fairly compelling.  And -- but that's

9  exactly how we would say it:  Exposure, dose,

10  duration, and so on.  I don't -- I don't know how I

11  could say it clearer.

12     Q.   Okay.  So the fact that Dr. Sawyer and you

13  both use the exact same phraseology, "exposure,

14  dose, duration and episodic exposures to Roundup

15  consistent with human exposure durations," the fact

16  that you use that exact same phraseology is a

17  coincidence?

18     A.   I would say so, because that's -- that's

19  exactly how a toxicologist would communicate that.

20  That is exactly.  I mean, that's -- that's pretty

21  fundamental as to -- I mean, this to me is what I do

22  every day.  Exposure, dose, duration, and then the

23  episodic exposures, because they weren't exposed

24  every day.  It's episodic.

25          "Consistent with the human exposure

1    durations in the epidemiological studies."  That

2    was -- that was the design to compare and to analyze

3    those epidemiological studies with what, say,

4    Mr. Savory had in terms of eight-hour exposure days

5    over more than 29 years.

6        Q.   Okay.  Is it your testimony under oath

7    today that you did not copy either by copy and

8    pasting or by transcribing, you did not copy any of

9    Dr. Sawyer's Schafer report into your report?

10       A.   I read his report.  I did not copy it.  I

11   read his report.  I -- I evaluated his language, and

12   I -- I have my report.

13       Q.   Okay.  And you wrote every word in your

14   report?  That's your testimony?

15       A.   I did.

16            MR. KALAS:  Okay.  I don't have any

17   more questions today.

18            Marc?

19            MR. BRECHER:  No questions.

20            MR. KALAS:  All right.  Thank you very

21   much for your time, Dr. Kendall.  I appreciate it.

22            THE WITNESS:  Thank you.  Thank you.

23            THE VIDEOGRAPHER:  Would you like to

24   go off the record?

25            MR. KALAS:  Off the record.

Ronald D. Kendall, Ph.D.

```
 1                    THE VIDEOGRAPHER:  All right.  We're

 2   off at 3:06 p.m.  This concludes Media No. 4.

 3                    (Deposition concluded at 3:06 p.m.)

 4

 5

 6

 7

 8

 9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

Ronald J. Kendall, Ph.D.

```
 1                UNITED STATES DISTRICT COURT
                NORTHERN DISTRICT OF CALIFORNIA
 2
 3   IN RE:  ROUNDUP PRODUCTS        MDL No. 2741
     LIABILITY LITIGATION
 4   _____
 5   SAVORY V. MONSANTO, CO.,       *
     Case No. 3:20-cv-02403         *
 6                                  *
     -and-                          *
 7                                  *
     THOMAS V. MONSANTO, CO.,       *
 8   Case No. 3:20-cv-08051         *

     _____
 9
                  REPORTER'S CERTIFICATION
10        DEPOSITION OF RONALD J. KENDALL, Ph.D.
                    SEPTEMBER 1, 2021
11
12            I, CHRISTY R. SIEVERT, CSR, RPR, in
13   and for the State of Texas, hereby certify to the
14   following:
15         That the witness, RONALD J. KENDALL,
16   Ph.D., was duly sworn by the officer and that the
17   transcript of the oral deposition is a true record
18   of the testimony given by the witness;
19            I further certify that the signature of
20   the deponent was NOT requested by the deponent or a
21   party;
22            I further certify that I am neither
23   counsel for, related to, nor employed by any of the
24   parties or attorneys in the action in which this
25   proceeding was taken, and further that I am not
```

Ronald D. Kendall, Ph.D.

1    financially or otherwise interested in the outcome

2    of the action.

3           Subscribed and sworn to on this the 7th

4    day of September, 2021.

5

6

7    _____

8           CHRISTY R. SIEVERT, CSR, RPR

            Texas CSR 8172

9           Expiration Date:  4-30-2023

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25