1

**WAPNER, NEWMAN, BRECHER & MILLER, P.C.**
JARAD L. SILVERSTEIN, ESQUIRE

2

jsilverstein@wapnernewman.com
2000 Market Street, Suite 2750

3

Philadelphia, PA  19103
(215) 569-0900

4

Attorney for Plaintiffs

5

6

**IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA**

7

8    IN RE: ROUNDUP PRODUCTS           )
     LIABILITY LITIGATION              )    MDL No. 2741
                                       )
9    ————————————————                  )    Case No. 3:16-md-02741-VC
                                       )
10   This document relates to:         )    **PLAINTIFFS' RESPONSE IN**
                                       )    **OPPOSITION TO MONSANTO'S**
11   *Savory v. Monsanto Co., 3:20-cv-02403*  )    **MOTION TO EXCLUDE**
                                       )    **TESTIMONY OF PLAINTIFFS'**
12                                     )    **EXPERT DR. RONALD**
                                       )    **KENDALL ON RULE 702**
13                                     )    **GROUNDS**
                                       )
14   ————————————————                  )

15

16

17

18

19

20

21

22

23

24

25

26

27

28

i

# **TABLE OF CONTENTS**

I.      INTRODUCTION...................................................................................................1

II.     LEGAL STANDARD.............................................................................................2

III.    ARGUMENT..........................................................................................................3

      A.      Dr. Kendall's Methodology is Generally Accepted and His Opinions are Well-Founded and Reliable...................................................................................3

            1.     Dr. Kendall is Immensely Qualified to Opine in the Roundup Litigation............3

            2.     Dr. Kendall Employed a Reliable Methodology for Arriving at His Opinions......4

            3.     Dr. Kendall's Reliance on Dr. Sawyer's Report Does Not Render His Testimony Inadmissible .................................................................................6

      C.      Dr. Kendall Need Not Rule Out All Potential Alternative Risk Factors ......................8

      D.      This Court Has Already Ruled that Plaintiffs' Experts Properly Ruled in Roundup as the Cause of Plaintiffs' Non-Hodgkin's Lymphoma...................................................9

IV.     CONCLUSION.......................................................................................................9

# TABLE OF AUTHORITIES

**Cases:**

*Cook v. Rockwell Int'l Corp.*, 580 F. Supp. 2d 1071 (2006)……………………………………....2

*Cooper v. Takeda Pharmaceuticals America, Inc.*, 239 Cal. App. 4th 555 (2014)…………..……………8

*Daubert v. Merrell Dow Pharm., Inc.*, 509 U.S. 579 (1993)...…………………………………2, 3, 8

*GWTP Invs., L.P. v. SES Americom, Inc.*, 2006 U.S. Dist. LEXIS 102438 (N.D. Texas Apr. 14, 2006)………………………………………………………………………………………………6

*In re Roundup Prod. Liab. Litig.*, 390 F. Supp. 3d 1102 (N.D. Cal. 2018)……………………………2, 3

*Legier & Materne v. Great Plains Software, Inc.*, 2004 U.S. Dist. LEXIS 12361 (E. D. La. Jun. 30, 2004)………………………………………………………………………………………………6

*Legier & Materne v. Great Plains Software, Inc.*, 2005 U.S. Dist. LEXIS 17686 (E. D. La. Aug. 3, 2005)………………………………………………………………………………………………6

*Messick v. Novartis Pharm. Corp.*, 747 F.3d 1193 (9th Cir. 2014)…………………………………2

*Milward v. Acuity Specialty Products Group, Inc.*, 639 F.3d 11, 13 (1st Cir. 2011)………………………2

*Sarti v. Salt Creek Ltd*, 167 Cal. App. 4th 1187 (2008)……………………………………………...8

*SEC v. Todd*, 642 F.3d 1207 (9th Cir. 2011)……………………………………………………...6

*Wendell v. GlaxoSmithKline, LLC*, 858 F.3d 1227 (9th Cir. 2017)……………………………....2, 6, 8

**Other Authorities:**

Federal Rule of Evidence §702……………………………………………………………………2

## I.   **INTRODUCTION**

Plaintiffs, in support of their claims of specific causation, have designated Ronald Kendall, PhD as an expert on their behalf. He is an environmental toxicologist specializing in toxic substances and their effects on environmental and human health, making him eminently qualified to testify in this matter.

Dr. Kendall, as designated in Plaintiffs' Rule 26 Expert Disclosure, will testify on issues "of specific causation and will testify regarding forensic toxicology and environmental risk assessment of Roundup usage, evaluation of the chronicity and amount of Roundup exposure, how personal protective gear affects the amount of exposure, and epidemiological factors." *See* Silverstein Decl., Ex. 1 (Rule 26 Expert Disclosure). For over 4 decades, Dr. Kendall has been one of our nation's leading environmental toxicologists. He completed an EPA Post-Doctoral Traineeship in Toxicology at M.I.T. *See* Monsanto's Ex. 2 (Kendall CV). He served on the EPA's Science Advisory Panel as a representative in environmental toxicology for implementation of the Federal Insecticide, Fungicide and Rodenticide Control Act ("FIFRA"), and was Chair of that Panel from 1999-2002. *Id.* at 7. He has consulted with the EPA on several other matters related to environmental toxicology and human exposure to chemicals. He has been awarded over $53 million in grants as principal investigator. *Id.* at 32. He is an editor and/or reviewer for 13 scientific journals and has authored than 400 publications in the field of environmental toxicology, with a sharp focus on chemical exposure and its effects on humans and the environment. *Id.* at 36, 38-58.

Dr. Kendall evaluated general causation evidence, including epidemiological, genotoxicity and other data and literature. He evaluated the plaintiff's case-specific records, including depositions, Plaintiff Fact Sheets and various medical records. He utilized his highly extensive professional experience, tying in the general causation evidence and the associated bodies of literature, to make their specific causation opinions. This methodology has been approved time and time again by the Ninth Circuit, and this Court in this particular MDL.

1

Under *Daubert*, Monsanto's arguments for excluding the testimony of Dr. Kendall are not meritorious of a determination of inadmissibility as a matter of law; rather, they go to the credibility and weight of their opinions before a jury.

## II.   LEGAL STANDARD

Under Federal Rule of Evidence §702 and the standard elucidated in *Daubert* and its progeny, the Court is authorized to act as a gatekeeper to ensure that proffered expert testimony is relevant and based upon reliable methods. *See Daubert v. Merrell Dow Pharm., Inc.*, 509 U.S. 579, 589 (1993). However, "[a] review of the caselaw after *Daubert* shows that the rejection of expert testimony is the exception rather than the rule." Fed. R. Evid. 702 advisory committee note (2000); *see also Cook v. Rockwell Int'l Corp.*, 580 F. Supp. 2d 1071, 1083 (2006). In fact, "[t]he Ninth Circuit has placed great emphasis on *Daubert's* admonition that a district court should conduct [the admissibility] analysis "with a 'liberal thrust' favoring admission." *In re Roundup Prod. Liab. Litig.*, 390 F. Supp. 3d 1102, 1112 (N.D. Cal. 2018) (Chhabria, J.) (quoting *Messick v. Novartis Pharm. Corp.*, 747 F.3d 1193, 1196 (9th Cir. 2014)).

*Daubert* provided some factors a court can consider to determine the admissibility of expert testimony, including: (1) whether the theory or technique in question can be and has been tested; (2) whether it has been subjected to peer review and publication; (3) its known or potential error rate; (4)the existence and maintenance of standards controlling its operation; and (5) whether it has attracted widespread acceptance within a relevant scientific community. *Daubert*, 509 U.S. at 593-94. Yet this list is non-exhaustive, and the courts have flexibility and broad discretion in its inquiry. *See Wendell v. GlaxoSmithKline, LLC*, 858 F.3d 1227, 1237 (9th Cir. 2017).

Expert testimony should only be excluded if it is the product of irrelevant or unreliable "junk science." *Id.* Otherwise, the expert's testimony must be admitted for a jury's consideration. *See Milward v. Acuity Specialty Products Group, Inc.*, 639 F.3d 11, 13 (1st Cir. 2011) ("So long as an expert's scientific

2

testimony rests upon 'good grounds, based on what is known,' it should be tested by the adversarial process, rather than excluded for fear that jurors will not be able to handle the scientific complexities.") (quoting *Daubert*, 509 U.S. at 590, 596)).

As noted above, the Court's role in a *Daubert* inquiry is that of "gatekeeper" – and does not replace the adversary system. *In re Roundup Prod. Liab. Litig.*, 390 F. Supp. 3d at 1111-13. "Vigorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof are the traditional means of attacking shaky but admissible evidence." *Id.*

## III.   ARGUMENT

### A.   Dr. Kendall's Methodology is Generally Accepted and His Opinions are Well-Founded and Reliable

#### 1.   Dr. Kendall is Immensely Qualified to Opine in the Roundup Litigation.

Dr. Kendall's illustrious credentials speak for themselves.  His 112-page *curriculum vitae* highlights his breadth of experience that qualifies him to opine on the area of exposure in this MDL. Currently, he is a Professor of Environmental Toxicology at Texas Tech University, and is the Director *Emeritus* of Texas Tech's Institute of Environmental and Human Health. *See* Monsanto's Ex. 2, p. 4.  He completed an EPA Post-Doctoral Traineeship in Toxicology at M.I.T. in 1980. *Id.*  From 1995-2002, Dr. Kendall served on the EPA's Science Advisory Panel as a representative in environmental toxicology for implementation of the Federal Insecticide, Fungicide and Rodenticide Control Act ("FIFRA"), and was Chair of that Panel from 1999-2002. *Id.* at 7.  He has worked as a consultant to the EPA on several other matters related to environmental toxicology and human exposure to chemicals.  He has been awarded over $53 million in grants as principal investigator. *Id.* at 32.  He is an editor and/or reviewer for 13 scientific journals. *Id.* at 36.  He is an author of more than 400 publications, including 13 textbooks and 175 peer-reviewed articles. *Id.* at 38-58.

**2.     Dr. Kendall Employed a Reliable Methodology for Arriving at His Opinions.**

In arriving at his opinions in the *Savory* matter, Dr. Kendall discussed his methodology in his expert report:

> Specifically, I have assessed dose response, latency period, biological plausibility (toxicological mechanisms), temporality, coherence (demonstrated by molecular-based studies), and animal studies as well as the strength of association and consistency with the toxicological mechanisms of Roundup® formulation ingredients, including glyphosate. I have used the six epidemiological studies which include McDuffie et al 2001, Eriksson et al 2008, Andreotti et al 2018, Leon et al 2019, Zhang et al 2019, and Pahwa et al 2019, primarily with respect to dose assessment. … My basic toxicological focus on these studies is on study design, exposure, and statistical power. I am using these study results in my toxicological assessment in conjunction with generally accepted, peer-reviewed studies on genotoxicity (including direct human studies), mechanisms of action (promotion, etc.), absorption, distribution, metabolism, and excretion, etc. In general, I have relied on studies that have documented the various aspects of the Bradford Hill criteria at or in excess of the 95% confidence threshold.

*See* Monsanto's Ex. 10 at p. 14 (Kendall *Savory* Report).

In his deposition testimony, Dr. Kendall expanded on his methodology.  In great detail he described his expert analysis of the available literature on glyphosate (and GBF) exposure and its connection to NHL.

> …I did a thorough review of the literature and tried to identify the ones that were highly relevant, appeared to be good science, were in reputable journals, and that were interpretable. … [T]here's a review process I go through to bring all of this information together and to construct, first in my mind, and then, on paper, my opinions supported by the data that are being conveyed by these scientists.

*See* Silverstein Decl., Ex. 2 at 60:15-61:3.  He flushed out his approach further:

> Based on some of these human studies I have reported to you, some of the mechanistic studies that you have alluded to and I have – I have referenced in my report, in addition to unique experimental animal data resulting in unique carcinoma, particularly in the – the kidney tubals of mice, unique cancer in addition to a tumor in the circulatory system, when you amalgamate those data into a weight-of-the-evidence, as I have to do on a

> daily basis and I did for years at the Science Advisory Panel at EPA, and as I concluded in my report, there is reasonable scientific and toxicological certainty that long-term chronic exposure to glyphosate-based herbicides present a significant contributing factor to the development of non-Hodgkin lymphoma.

*Id.* at 86:13-87:3.

He also explained how the theory of biological variability (or the variability we observe across biological units, such as individuals, within a population) played a critical role in his determination that to a reasonable degree of scientific certainty, Mr. Savory's exposure to glyphosate was a significant contributing factor to her development of NHL. To illustrate, Dr. Kendall testified:

> [i]t's – it's the – the predisposition, your immune system, your genetics, your handling of it, the duration of the handling, the latency between initial exposure and effects, all of those factors play into this. And I think that's – that's fair when looking – when – when you've asked me to consider this in the context of how could we get from a point of just the chemical and the formulation ultimately to being a part of the etiology of a disease that may demonstrate itself as NHL.

*Id.* at 77:3-13. To put it in layman's terms, he analogized the effect GBFs have on individuals varies like the varying effect of alcohol consumption.

> And you know, I'm a toxicologist. I teach this every day. And when we look at biology, all of us are very different. And what I mean by that, if you take a Y axis and an X axis, we may have zero exposure and no effects of a chemical here. But as exposure goes up on the Y axis, we may start to see increased effects of increased internal dose.
> And there's a lot of variability oftentimes as we look at that curve because as we increase dose, certain people may be more highly exposed, they might have more absorption than others, and others may respond differently.
> And I – I take the point of alcohol consumption. Some people can drink one beer and literally lay down and go to sleep. Some people can drink beer all day and not go to sleep. ...
> And so the point I want to make is, generally, the half life may be around six to eight hours in the average body. But that doesn't count the fact that some people may retain it longer, they may absorb more, and they may be more sensitive to biologically respond because of the – of the cell and physiological development within their own bodies.

*Id.* at 98:3-99:7.

Moreover, Dr. Kendall took information about duration and frequency of exposure and risk factors and from the individual plaintiff and interfaced that information with other information he gleaned from the general causation discussion. *See* Monsanto's Ex. 11 at 65:3-11.

Dr. Kendall's methodological approach is similar to what this Court has already approved. *See* PTO 85.[1] Any challenges to same should go to the weight of his opinions – not their admissibility.

### 3.     Dr. Kendall's Reliance on Dr. Sawyer's Report Does Not Render His Testimony Inadmissible.

As a general rule, assessing expert witness credibility should be within the province of a jury. *SEC v. Todd*, 642 F. 3d 1207, 1217 (9th Cir. 2011). Plagiarism does not (and should not) automatically render an expert's testimony inadmissible. *See Legier & Materne v. Great Plains Software, Inc.*, 2005 U.S. Dist. LEXIS 17686, *4, *12 (E.D. La. Aug. 3, 2005) (stating that plagiarism was not a basis for exclusion but rather a credibility determination for the jury). "An expert may rely upon figures calculated by another expert so long as he conducts an independent investigation of those figures." *GWTP Invs., L.P. v. SES Americom, Inc.*, 2006 U.S. Dist. LEXIS 102438, *13 (N.D. Texas Apr. 14, 2006) (citing *Legier & Materne*, 2004 U.S. Dist. LEXIS 12361, *3 (E.D. La. Jun. 30, 2004).[2]

At the outset, it is clear that some of the language in the two reports are similar, if not identical, in some areas. However, Dr. Kendall did not appropriate Dr. Sawyer's opinions and play them off as his own. Despite some similarities with Sawyer's report in *Schafer*, Dr. Kendall consistently testified that the

---

[1] This Court wrote: "It is sufficient for a qualified expert, in reliance on his clinical experience, review of a plaintiff's medical records, and evaluation of the general causation evidence, to conclude that an 'obvious and known risk factor[]' is the cause of that plaintiff's disease. *See Wendell*, 858 F.3d at 1235." *See* PTO 85 at p. 5.

[2] Plaintiffs must point out that the *Spiral Direct* (Middle District of Florida), *Moore v. BASF* (Eastern District of Louisiana) and *Raymo* (U.S. Court of Federal Claims) cases cited by Monsanto are not binding precedent on this Court.

opinions he offered were his own. *See* Monsanto's Ex. 11, at 185:16-25 (when affirming his report was his opinions he stated: "I stand 100 percent behind ... my thinking process and where I ended up in my thinking process with my opinions I've given you today."); 225:6-15 (acknowledging he read Sawyer's report, evaluated it, but did not copy it; rather, he wrote every word in his report). He read the peer-reviewed literature, assessed the weight of the evidence, evaluated Plaintiffs' case-specific materials, relied upon his four decades of experience in the field of environmental toxicology, and offered intelligible and well-supported opinions.

Moreover, there is no indication of any intent to deceive, mislead or misappropriate another expert's work as his own. Dr. Kendall did review Dr. Sawyer's report and billed for that review in his initial invoice to Plaintiffs' counsel's law firm; it is clear he was confused at his deposition when he referred to it as prepared by "Moll."[3]  Importantly, Dr. Kendall often testified to agreeing with the "logic" utilized by Dr. Sawyer, and acknowledged that Dr. Sawyer "couldn't say it any clearer" than he could. He never hid the fact that Dr. Sawyer's opinions held significance to him. *See* Monsanto's Ex. 11 at, e.g., 188:13-14; 193:14-15; 195:20-23; 213:20-21.   Unfortunately, Dr. Kendall's initial List of Materials Considered (LMC) was incomplete and left out multiple sources of information for which he considered (including IARC Monograph 112). He did, however, prior to Day 2 of his discovery deposition, provide an amended LMC in which he included the Sawyer report at issue (as well as IARC Monograph 112). *See* Monsanto's Ex. 14. Plaintiffs submit this was an honest oversight. Additionally, Dr. Kendall has provided an Affidavit in which he affirms, under oath, that the opinions he is offering in this case are his own, and that he did not intentionally plagiarize or copy the opinions of another. *See* Silverstein Decl., Ex. 3 (Kendall Affidavit). Plaintiffs ask that a jury be able to judge Dr. Kendall's credibility rather than this Court denying Mr. Savory – through no fault of his own – that opportunity as a matter of law.

---

[3] Moll is the name of the attorney to whom Dr. Sawyer directed his report in the *Schafer* matter. *See* Monsanto's Ex. 9.

Excluding the areas of his report which Monsanto's counsel highlighted as the same or similar as Dr. Sawyer's, Dr. Kendall testified *ad nauseum* over two full days of testimony about the independent basis for his opinions – which were clearly not extricated from anyone else. *See, e.g.,* discussion in subparagraph B.2., *supra*. Taken as a whole, Dr. Kendall – Plaintiffs' lone exposure expert – while certainly ripe for scrutiny under cross-examination – should not be barred from testifying altogether.

## C.    Dr. Kendall Need Not Rule Out All Potential Alternative Risk Factors

Dr. Kendall, like all other experts, need not analyze every conceivable risk factor to satisfy *Daubert*. The Court in *Wendell v. GlaxoSmithKline, LLC*, 858 F.3d 1127 (9th Cir. 2017) held as follows:

> We do not require experts to eliminate all other possible causes of a condition for the expert's testimony to be reliable. It is enough that the proposed cause "be a substantial causative factor." This is true in patients with multiple risk factors, and analogously, in cases where there is a high rate of idiopathy.

*Id.* at 1237. Moreover, in *Cooper v. Takeda Pharmaceuticals America, Inc.*, 239 Cal. App. 4th 555 (2014), the Court instructed:

> Thus, because California has rejected the notion that a plaintiff must definitively "exclude all 'possibilities'" other than the defendant's conduct or product as the cause of the plaintiff's harm, clearly an expert, in reaching a specific causation opinion, need not exclude all other possibilities before he or she can express an opinion that the defendant's conduct or product caused the plaintiff's harm.

*Id.* at 580 (citing *Sarti v. Salt Creek Ltd*, 167 Cal. App. 4th 1187, 1210 (2008)).

This Court, in PTO 85, has also addressed the issue. Pertinently, this Court noted:

> Under Ninth Circuit caselaw, doctors enjoy wide latitude in how they practice their art when offering causation opinions. *See Wendell*, 858 F.3d at 1237 ("Where, as here, two doctors who stand at or near the top of their field and have extensive clinical experience with the rare disease or class of disease at issue, are prepared to give expert opinions supporting causation, we conclude that *Daubert* poses no bar on their principles and methodology.").

*See* PTO 85 at p. 5.

8

In any event, Dr. Kendall is not a medical doctor.  He is an environmental toxicologist.  He does not have medical patients.  He does not make medical diagnoses.  He does not craft a differential medical diagnoses.  Monsanto's argument that Dr. Kendall must be disqualified for failing to rule out all potential medically-induced causes of Mr. Savory's NHL[4] is inappropriate and must be outright rejected.

**D.     This Court Has Already Ruled that Plaintiffs' Experts Properly Ruled in Roundup as the Cause of Plaintiffs' Non-Hodgkin's Lymphoma**

Monsanto's overarching theme in these *Daubert* motions is to rehash previously failed arguments in this regard.  *See* PTO 85 at p. 2 (rejecting this argument as "off point"); *see also* PTO 45.  As such, consistent with the Court's direction not to relitigate issues previously ruled upon by this Court, but in order to fully preserve the appellate record, Plaintiffs hereby incorporate the following pleadings that addressed this issue:

- Plaintiffs' Response in Opposition to Monsanto's Specific Causation *Daubert* and Summary Judgment Motion and *Daubert* Motion to Strike Certain Opinions of Monsanto Company's Expert Witnesses (ECF # 2478)

- Plaintiffs' Response in Opposition to Monsanto's Motion for Judgment as a Matter of Law and for a New Trial (ECF # 4135).

**IV.     CONCLUSION**

For the foregoing reasons, the Court should deny Monsanto's *Daubert* Motion to Exclude Dr. Kendall, together with such other relief as the Court deems just and proper.

---

[4] Besides Roundup, Mr. Savory was never exposed to any other toxic substance that an exposure expert like Dr. Kendall would have to consider.

9

DATED:  October 6, 2021

Respectfully submitted,

By:  /s/  *Jarad L. Silverstein, Esquire*
**WAPNER, NEWMAN, BRECHER & MILLER, P.C.**
JARAD L. SILVERSTEIN, ESQUIRE
jsilverstein@wapnernewman.com
2000 Market Street, Suite 2750
Philadelphia, PA  19103
(215) 569-0900
Attorney for Plaintiffs

**CERTIFICATE OF SERVICE**

I HEREBY CERTIFY that on this 6th day of October, 2021, a copy of the foregoing was filed with the Clerk of the Court through the CM/ECF system which sent notice of the filing to all appearing parties of record.

*/s/  Jarad L. Silverstein*