**WAPNER, NEWMAN, BRECHER & MILLER, P.C.**
JARAD L. SILVERSTEIN, ESQUIRE
jsilverstein@wapnernewman.com
2000 Market Street, Suite 2750
Philadelphia, PA  19103
(215) 569-0900
Attorney for Plaintiffs

**IN THE UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF CALIFORNIA**

| | |
|---|---|
| IN RE: ROUNDUP PRODUCTS LIABILITY LITIGATION | MDL No. 2741 |
| | Case No. 3:16-md-02741-VC |
| This document relates to: | **PLAINTIFFS' RESPONSE IN OPPOSITION TO MONSANTO'S MOTION TO EXCLUDE TESTIMONY OF PLAINTIFFS' EXPERT DR. MARC BRAUNSTEIN ON RULE 702 GROUNDS** |
| *Savory v. Monsanto Co., 3:20-cv-02403* | |

## **TABLE OF CONTENTS**

I. INTRODUCTION..................................................................................................1

II. LEGAL STANDARD............................................................................................2

III. ARGUMENT..........................................................................................................3

    A. Dr. Braunstein's Methodology is Generally Accepted and His Opinions are Well-Founded and Reliable...............................................................................................3

        1. Dr. Braunstein's opinions in both his report and his deposition were offered, appropriately, within a reasonable degree of medical certainty......................3

    B. Dr. Braunstein Need Not Rule Out All Potential Alternative Risk Factors...................9

    C. This Court Has Already Ruled that Plaintiffs' Experts Properly Ruled in Roundup as the Cause of Plaintiffs' Non-Hodgkin's Lymphoma........................................................10

IV. CONCLUSION......................................................................................................10

# TABLE OF AUTHORITIES

**Cases:**

*Cook v. Rockwell Int'l Corp.*, 580 F. Supp. 2d 1071 (2006)..................................................2

*Cooper v. Takeda Pharmaceuticals America, Inc.*, 239 Cal. App. 4th 555 (2014).............................9

*Daubert v. Merrell Dow Pharm., Inc.*, 509 U.S. 579 (1993)...................................................2, 3

*In re Roundup Prod. Liab. Litig.*, 390 F. Supp. 3d 1102 (N.D. Cal. 2018)................................2, 3

*Messick v. Novartis Pharm. Corp.*, 747 F.3d 1193 (9th Cir. 2014)..............................................2

*Milward v. Acuity Specialty Products Group, Inc.*, 639 F.3d 11, 13 (1st Cir. 2011).........................3

*Sarti v. Salt Creek Ltd*, 167 Cal. App. 4th 1187 (2008).........................................................9

*Wendell v. GlaxoSmithKline, LLC*, 858 F.3d 1227 (9th Cir. 2017).......................................2, 3, 9

**Other Authorities:**

Federal Rule of Evidence §702...........................................................................................2

## I. INTRODUCTION

Plaintiffs, in support of their claims of specific causation, have designated Marc Braunstein, M.D. as an expert on their behalf. He is a board-certified hematologist/oncologist specializing in hematologic malignancies like NHL, and exquisitely qualified to testify in this matter.

Dr. Braunstein, as designated in Plaintiffs' Rule 26 Expert Disclosure, will testify that Mr. Savory's "exposure to glyphosate and/or glyphosate-based formulated products" was a "substantial factor" contributing to her developing non-Hodgkins' lymphoma (NHL). *See* Silverstein Decl, Ex. 1 (Rule 26 Expert Disclosure). Dr. Braunstein is an Assistant Professor of Medicine at NYU Langone Hospital – Long Island, where he also serves as the Program Director of the hematology/oncology fellowship program. *See* Silverstein Decl., Ex. 2 (Braunstein CV). He is triple board certified by the American Board of Internal Medicine. He actively speaks, presents and writes on B-cell malignancies, which is a main focus of his clinical practice and his research. *See* Monsanto's Ex. 8 (Braunstein *Savory* Report). He diagnoses and treats patients with NHL like Mr. Savory. *Id.*

Dr. Braunstein applied the same methodology in arriving at a differential diagnosis as he does in his clinical practice. *See* Silverstein Decl., Ex. 3 at 125:20-128:10 (Braunstein Deposition). Further, he identified glyphosate as a risk factor through his diligent and extensive epidemiological research and "published research articles, textbooks, prior expert reviews related to glyphosate as referenced, as well as my background and experience in hematology, medical oncology, and molecular and cellular biology." *See* Monsanto's Ex. 8 (Braunstein *Savory* Report).

Dr. Braunstein evaluated general causation evidence, including epidemiological, genotoxicity and other data and literature. He evaluated the plaintiff's case-specific records, including depositions, Plaintiff Fact Sheets and various medical records. He used his highly extensive professional experience, tying in the general causation evidence and the associated bodies of literature, to make his specific causation

1

opinions. This methodology has been approved time and time again by the Ninth Circuit, and this Court in this particular MDL.

Under *Daubert*, Monsanto's arguments for excluding the testimony of Dr. Braunstein are not meritorious of a determination of inadmissibility as a matter of law; rather, they go to the credibility and weight of their opinions before a jury. He is not spewing "junk science" – but instead is offering reasoned, logical opinions held to a reasonable degree of certainty in his field.

## II. LEGAL STANDARD

Under Federal Rule of Evidence §702 and the standard elucidated in *Daubert* and its progeny, the Court is authorized to act as a gatekeeper to ensure that proffered expert testimony is relevant and based upon reliable methods. *See Daubert v. Merrell Dow Pharm., Inc.*, 509 U.S. 579, 589 (1993). However, "[a] review of the caselaw after *Daubert* shows that the rejection of expert testimony is the exception rather than the rule." Fed. R. Evid. 702 advisory committee note (2000); *see also Cook v. Rockwell Int'l Corp.*, 580 F. Supp. 2d 1071, 1083 (2006). In fact, "[t]he Ninth Circuit has placed great emphasis on *Daubert's* admonition that a district court should conduct [the admissibility] analysis "with a 'liberal thrust' favoring admission." *In re Roundup Prod. Liab. Litig.*, 390 F. Supp. 3d 1102, 1112 (N.D. Cal. 2018) (Chhabria, J.) (quoting *Messick v. Novartis Pharm. Corp.*, 747 F.3d 1193, 1196 (9th Cir. 2014)).

*Daubert* provided some factors a court can consider to determine the admissibility of expert testimony, including: (1) whether the theory or technique in question can be and has been tested; (2) whether it has been subjected to peer review and publication; (3) its known or potential error rate; (4) the existence and maintenance of standards controlling its operation; and (5) whether it has attracted widespread acceptance within a relevant scientific community. *Daubert*, 509 U.S. at 593-94. Yet this list is non-exhaustive, and the courts have flexibility and broad discretion in its inquiry. *See Wendell v. GlaxoSmithKline, LLC*, 858 F.3d 1227, 1237 (9th Cir. 2017).

Expert testimony should only be excluded if it is the product of irrelevant or unreliable "junk science." *Id.* Otherwise, the expert's testimony must be admitted for a jury's consideration. *See Milward v. Acuity Specialty Products Group, Inc.*, 639 F.3d 11, 13 (1st Cir. 2011) ("So long as an expert's scientific testimony rests upon 'good grounds, based on what is known,' it should be tested by the adversarial process, rather than excluded for fear that jurors will not be able to handle the scientific complexities.") (quoting *Daubert*, 509 U.S. at 590, 596)).

As noted above, the Court's role in a *Daubert* inquiry is that of "gatekeeper" – and does not replace the adversary system. *In re Roundup Prod. Liab. Litig.*, 390 F. Supp. 3d at 1111-13. "Vigorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof are the traditional means of attacking shaky but admissible evidence." *Id.*

### III. ARGUMENT

#### A. Dr. Braunstein's Methodology is Generally Accepted and His Opinions are Well-Founded and Reliable.

##### 1. Dr. Braunstein's opinions in both his report and his deposition were offered, appropriately, within a reasonable degree of medical certainty.

Dr. Braunstein's expert testimony is wholly appropriate as it will "assist the trier of fact to understand the evidence or to determine a fact in issue." Fed. R. Evid. 702. Dr. Braunstein is an eminently-qualified oncologist specializing in diagnosis and treatment of B-cell malignancies and other lymphomas. He completed his residency at Hofstra North Shore-LIJ and his hematology/oncology fellowship at NYU Langone Medical Center. *See* Silverstein Decl., Ex. 2 (Braunstein CV). He is a board-certified oncologist who is currently an Assistant Professor of Medicine at NYU Langone on Long Island, and has authored many peer-reviewed articles. *See id.* He is a practicing clinical oncologist, specifically tailored to hematologic malignancies, with an emphasis on B-cell malignancies. *See* Silverstein Decl., Ex. 2 (Braunstein CV); Monsanto Ex. 8 (Braunstein *Savory* Report).

3

Dr. Braunstein offers the opinion that Mr. Savory's chronic use of and exposure to Roundup (glyphosate) was a substantial factor in his development of NHL. *See* Monsanto's Ex. 8 (Braunstein *Savory* Report). In coming to his well-reasoned causation opinions in this matter, *just like all of Monsanto's specific causation experts did*, Dr. Braunstein utilized a standard approach. He:

> reviewed the substantial medical literature ... examining the association between exposure to Roundup [and NHL].... In reaching my opinions, I employed my background in interpretation of scientific literature, scientific methodology, as well as understand[ing] of medical history taking and medical decision making, hematologic malignancies, and molecular and cellular biology.

*See* Monsanto's Ex. 8 (Braunstein *Savory* Report). He further described his methodology and approach as synonymous with how he approaches his own lymphoma patients. He pertinently testified in his discovery deposition:

> So I looked at the literature *like I would do for anything in a patient's medical history* and reviewed – I started with some review papers just reviewing the topic. I looked at some of the references you know, most of the references listed in my report that are not specific to general things about non-Hodgkin's lymphoma; and I read, you know, some of the primary studies examining the pretty broad literature on examining this very topic.
> \* \* \* \*
> I looked at the records first; and then to make the leap to understand the interpretation of the association of glyphosate and NHL, I turned to the literature.... I used PubMed to look at the various studies. There's thousands and thousands of papers. I looked at various elements of the literature, whether it's the epidemiology, whether it's the, you know, animal studies, et cetera; and I also looked at papers that took an opinion one way or the other and saw what their viewpoints were. And some of those I listed in my reports.

*See* Silverstein Decl., Ex. 3 at 125:20-128:10 (Braunstein Deposition) (emphasis added). He further utilized his significant clinical experience in diagnosing and treating patients with hematologic malignancies, primarily those with B-cell malignancies (like Mr. Savory) to arrive at his opinions.

In its Motion however Monsanto, conveniently, ignores all of this. Rather, Monsanto's argument is an unsupported, arbitrary conclusion that his testimony is "inconsistent" with an opinion of causation

to reasonable degree of medical certainty.[1]  Monsanto chose to cherry-pick a few quotes from two consecutive pages of Dr. Braunstein's two *days* of deposition testimony – and completely mischaracterizes them.  The three quotes Monsanto cites from pages 180 and 181 of Dr. Braunstein's deposition[2] do not disqualify Dr. Braunstein under *Daubert;* rather, they are honest acknowledgements of precisely what this case and every other like it usually comes down to at this stage of litigation: a battle of the experts.  In other words, Dr. Braunstein recognizes the experts and the literature are split on the carcinogenicity of glyphosate.  This is a true statement.  Why else would have other cases within this MDL and outside of it gone to trial?  The Court must not look at Dr. Braunstein's testimony on pages 180 and 181 of Monsanto's Ex. 1 as fatal "concessions" or "admissions" in a *Daubert* vacuum, but rather they must be taken in consideration with the entirety of Dr. Braunstein's opinions and testimony, the overwhelming majority of which Monsanto conveniently leaves out of its Motion to Bar.

For example, not mentioned in Monsanto's motion is Dr. Braunstein's testimony as to why he afforded greater weight to IARC's Monograph 112 than to the EPA's glyphosate review:

> A:   … So the IARC reviewed only published literature is one of my understanding elements.  They relied, again, as I mentioned before, on genotoxicity studies a little bit more heavily, slightly different genotoxicity studies, different models; and they – those were the main differences [as compared to EPA's review].  And the EPA also relied on unpublished industry-sponsored papers as well whereas the IARC used only the literature that was published.
>
> Q:   And because the EPA relied on unpublished industry sponsored studies, do you believe that was entitled to less weight?
>
> A:   Entitled to less weight by the EPA?
>
> Q:   No.
>
> A:   Oh, by my analysis.

---

[1] Monsanto fails to define what "reasonable degree of medical certainty" means yet nonetheless somehow asks the Court to conclude that Dr. Braunstein does not meet this threshold.

[2] See Page 5 of Monsanto's Motion.

> Q: By you.
>
> A: I believe that there were different approaches; and, therefore, I relied more on the IARC Monograph to formulate my conclusions.

See Silverstein Decl., Ex. 3 at 163:12-164:11.

Monsanto also purposely ignores most of Dr. Braunstein's expert report in which, *inter alia*, he methodically discusses exposures and risk factors that can lead to the development of NHL. Specifically, he acknowledges that:

> [r]ecognized risk factors for the development of NHL include age over 65, male gender, white ethnicity, obesity, geographic location, inherited or acquired immunodeficiency, certain autoimmune disorders, specific infections (e.g. HIV), prior chemotherapy, certain medications such as immunosuppressants, occupational or environmental exposures, such as benzene, tobacco smoke, and a family history of hematologic malignancy.

See Monsanto Ex. 8 (Braunstein *Savory* Report). Dr. Braunstein then goes on to identify general risk factors and those risk factors Mr. Savory had (e.g., history of smoking, obesity, history of Hepatitis C, rheumatoid arthritis) and why they are not substantial contributing factors to his development of NHL.

Dr. Braunstein stated as follows in regard to Mr. Savory's history of smoking:

> Considering that cigarette smoking contributes to many cancers, such as lung and pancreatic cancer, one might instinctively attribute tobacco smoking to the development of NHL, however cigarette smoking appears to have little to no strong association with B-cell NHL. A meta-analysis of 50 studies reported that smoking was potentially associated with a higher risk NHL, primarily T-cell NHL. In addition, while second-hand exposure to tobacco smoke is not associated with NHL overall, in one study it was associated with a lower risk of DLBCL.

*Id.* at p. 9.

Dr. Braunstein then stated as follows in regard to Mr. Savory's history of obesity:

> Nearly all the evidence linking obesity to cancer risk comes from large cohort investigations, which are observational studies. Obesity is associated with chronic, low-grade inflammation, and specific immune modulations including changes in inflammation that may predispose to NHL. Several

studies have found a significant positive association between obesity and NHL risk, whereas others reported no association with increased body mass index or central obesity. Excess risk of DLBCL was linked to morbid obesity with BMI over 40 (relative risk 1.2-1.4), much higher than Mr. Savory whose BMI was between 30-33.

*Id.* at p. 9.

Dr. Braunstein then went on to address Mr. Savory's history of Hepatitis C:

Active hepatitis C has a known association with certain NHL, primarily indolent lymphomas such as marginal zone lymphomas, though it can be associated with transformed DLBCL that originates from lower grade, indolent lymphomas. Hepatitis C-positive DLBCL tends to present with extranodal manifestations. Given that Mr. Savory's hepatitis C was treated decades prior to his DLBCL diagnosis, that his viral load was undetectable per Dr. Burke's notes, and that Mr. Savory had no extranodal involvement, it is my opinion that this the remote history of hepatitis C was not a substantial factor to the development of, and to a reasonable degree of medical certainty, not a cause of his lymphoma.

*Id.* at p. 10.

Finally, Dr. Braunstein addressed rheumatoid arthritis:

The overall incidence of malignancy in patients with rheumatoid arthritis is similar to that of the general population, with a risk of 5-10%. While studies suggest a 2-fold increase in the risk of lymphoma with rheumatoid arthritis, the prevalence of autoimmune disease in DLBCL remains unclear. Data have been inconsistent between studies and it is not clear if this is an effect of differences in study designs, study population characteristics, or the definitions and inclusion criteria that have been used. Mr. Savory's rheumatoid arthritis was controlled with anti-inflammatory agents, not requiring immunomodulatory biologic agents or major changes in his treatment regimen for progressive arthritis, and in my opinion was not a substantial factor to the development of, and to a reasonable degree of medical certainty, not a contributor to his lymphomagenesis.

*Id.* at p. 10.

Monsanto also disingenuously attempts to infer that because Dr. Braunstein's knowledge base on glyphosate carcinogenicity was accumulated only after retention by Plaintiffs in this case, his opinions cannot be considered reliable. They do this *despite the fact that their own oncology expert, Ran Reshef,*

*M.D., too, had no prior knowledge of the relationship between glyphosate and NHL prior to being contacted by Monsanto's counsel in this MDL.* Dr. Reshef testified he was not aware of any related literature or epidemiological study prior to his retention in the Roundup cases, and candidly stated that the relationship between glyphosate and NHL had "not been on my radar." *See* Silverstein Decl., Ex. 4 (Reshef Dep. at 18:3-12).

Notwithstanding same, Dr. Braunstein testified that he is an expert in risk factors for NHL. *See* Silverstein Decl., Ex. 3 at 66:6-10. He clearly identifies glyphosate as a risk factor for the development of NHL and supports that opinion through his analysis of multiple epidemiological studies and other peer-reviewed literature. *See* Monsanto Ex. 8 (Braunstein *Savory* Report – List of Materials Considered). In terms of glyphosate exposure, in order to arrive at his opinions, he focused "more on the duration of exposure than the dose." *See* Silverstein Decl., Ex. 3 at 105:12-13. This has been a common theme in other plaintiffs' experts' commentaries through the first three "waves" of this MDL. He also referenced and discussed the Bradford Hill criteria to support his opinions.

In sum, Dr. Braunstein used his clinical judgment, his extensive knowledge about risk factors for NHL, his consideration of Mr. Savory's risk factors in particular, and his thorough review of the peer-reviewed literature – and still found Roundup to be a substantial contributing factor to Mr. Savory's disease. Soundly, Dr. Braunstein concludes his report as follows:

> in this case, Mr. Savory's other potential alternative risk factors for DLBCL, such as autoimmune disease, are weakly linked to the development of his DLBCL nearly 30 years from diagnosis. This evaluation provides coherent and compelling evidence that glyphosate and GBFs are more likely than not to be a cause of NHL in humans exposed to these agents. In this case of Mr. Savory, he had a long-standing exposure to Roundup over a 29 year period between 1990-2019, and developed an aggressive DLBCL, stage IVA, detected on work up for bone pain, and diagnosed in 2019 at age 65. Based on the above report, I conclude to a reasonable degree of medical certainty that Mr. Savory's aggressive NHL was caused by his Roundup exposure.

*See* Monsanto's Ex. 8 (Braunstein *Savory* Report). His methodology is reliable, and he is aptly qualified to offer his opinions. As such, when he affirms that his opinions are all offered to a reasonable degree of medical certainty, he deserves to have that statement taken at face value.

### B. Dr. Braunstein Need Not Rule Out All Potential Alternative Risk Factors

Dr. Braunstein, like all other experts, need not analyze every conceivable risk factor to satisfy *Daubert*. The Court in *Wendell v. GlaxoSmithKline, LLC*, 858 F.3d 1127 (9th Cir. 2017) held as follows:

> We do not require experts to eliminate all other possible causes of a condition for the expert's testimony to be reliable. It is enough that the proposed cause "be a substantial causative factor." This is true in patients with multiple risk factors, and analogously, in cases where there is a high rate of idiopathy.

*Id.* at 1237. Moreover, in *Cooper v. Takeda Pharmaceuticals America, Inc.*, 239 Cal. App. 4th 555 (2014), the Court instructed:

> Thus, because California has rejected the notion that a plaintiff must definitively "exclude all 'possibilities'" other than the defendant's conduct or product as the cause of the plaintiff's harm, clearly an expert, in reaching a specific causation opinion, need not exclude all other possibilities before he or she can express an opinion that the defendant's conduct or product caused the plaintiff's harm.

*Id.* at 580 (citing *Sarti v. Salt Creek Ltd*, 167 Cal. App. 4th 1187, 1210 (2008)).

This Court, in PTO 85, has also addressed the issue. Pertinently, this Court noted:

> Under Ninth Circuit caselaw, doctors enjoy wide latitude in how they practice their art when offering causation opinions. *See Wendell*, 858 F.3d at 1237 ("Where, as here, two doctors who stand at or near the top of their field and have extensive clinical experience with the rare disease or class of disease at issue, are prepared to give expert opinions supporting causation, we conclude that *Daubert* poses no bar on their principles and methodology.").

*See* PTO 85 at p. 5.

In this matter, Dr. Braunstein did analyze other risk factors which he acknowledged could increase one's risk for developing NHL, and in particular, discussed in detail Mr. Savory's alleged risk factors and

ruled each one out as a substantial contributing factor to the development of Mr. Savory's NHL. *See* Monsanto's Ex. 8 at 9-10, as discussed in detail, *infra*.

### C. This Court Has Already Ruled that Plaintiffs' Experts Properly Ruled in Roundup as the Cause of Plaintiffs' Non-Hodgkin's Lymphoma

Monsanto's overarching theme in these *Daubert* motions is to rehash previously failed arguments in this regard. *See* PTO 85 at p. 2 (rejecting this argument as "off point"); *see also* PTO 45. As such, consistent with the Court's direction not to relitigate issues previously ruled upon by this Court, but in order to fully preserve the appellate record, Plaintiffs hereby incorporate the following pleadings that addressed this issue:

- Plaintiffs' Response in Opposition to Monsanto's Specific Causation *Daubert* and Summary Judgment Motion and *Daubert* Motion to Strike Certain Opinions of Monsanto Company's Expert Witnesses (ECF # 2478)

- Plaintiffs' Response in Opposition to Monsanto's Motion for Judgment as a Matter of Law and for a New Trial (ECF # 4135).

## IV. CONCLUSION

For the foregoing reasons, the Court should deny Monsanto's *Daubert* Motion to Exclude Dr. Braunstein, together with such other relief as the Court deems just and proper.

DATED: October 6, 2021

                                        Respectfully submitted,

By:   /s/ *Jarad L. Silverstein, Esquire*
       **WAPNER, NEWMAN, BRECHER & MILLER, P.C.**
       JARAD L. SILVERSTEIN, ESQUIRE
       jsilverstein@wapnernewman.com
       2000 Market Street, Suite 2750
       Philadelphia, PA  19103
       (215) 569-0900
       Attorney for Plaintiffs

## **CERTIFICATE OF SERVICE**

I HEREBY CERTIFY that on this 6th day of October, 2021, a copy of the foregoing was filed with the Clerk of the Court through the CM/ECF system which sent notice of the filing to all appearing parties of record.

/s/ *Jarad L. Silverstein*