# EXHIBIT "3"

Marc J. Braunstein, M.D.

1  UNITED STATES DISTRICT COURT
   NORTHERN DISTRICT OF CALIFORNIA
2  ------------------------------------------X
   This document relates to:
3
   Troy Wilson Thomas and Josephine
4  Ventura, husband and wife,
   v. Monsanto Company
5  Case No. 3:20-cv-08051-VC
6                                      .
   ------------------------------------------X
7
8
9            TUESDAY, AUGUST 17, 2021
10        VIDEOTAPED DEPOSITION of Marc J.
11  Braunstein, M.D., conducted at the Inn at
12  Great Neck, 30 Cutter Mill Road, Great Neck,
13  New York, commencing at 9:05 a.m., on the
14  above date, before Nicole Veltri, Registered
15  Professional Reporter and Certified Realtime
16  Reporter.
17
18
19
20
21
22
23
24

Marc J. Braunstein, M.D.

1  things in the environment.  So it may be
2  multifactorial.  Again, age is just a
3  number; but there may be other things to
4  essentially associate with things that are
5  risk factors.
6      Q.   As on oncologist, do you consider
7  yourself to be an expert in risk factors for
8  non-Hodgkin's lymphoma?
9      A.   Yes.  I think.  I mean, I think
10 it's something that I understand.
11     Q.   So to go back to the word causes,
12 understanding that there's some overlap
13 between causes and risk factors, but let's
14 focus on causes for a moment.  What do you
15 understand to be the causes of non-Hodgkin's
16 lymphoma that are well accepted by the
17 medical and oncology community?
18          MR. SILVERSTEIN:  Object to the
19      form.  You can answer.
20     A.   So when we're talking about
21 causes, sometimes the cause is unknown.
22 Sometimes we can find risk factors; and I
23 know I'm using the word risk factor, not
24 cause.  But sometimes we can identify risk

1  form.
2      A.  Well, reading his report, he
3  provides expertise in dose estimates in
4  toxicology that -- or even the landscape,
5  you know, that I did not go into great depth
6  in my report and don't claim to be an expert
7  in; so I would rely on that information,
8  yes.
9      Q.  So you didn't perform any
10 estimates of the dose of glyphosate received
11 by Mr. Thomas; is that right?
12     A.  Well, I focused more on the
13 duration of exposure than the dose.
14     Q.  You focused on the length of time
15 in which he says he used the product?
16     A.  I agree with that, yes, correct.
17     Q.  You have no information about how
18 much actual dermatologic exposure he had,
19 correct?
20     A.  By dermatologic exposure, you mean
21 the quantitative dose or just over how much
22 time or --
23     Q.  I'm talking about how much he got
24 on his skin over the course of time he used

1            Were you provided by counsel with
2    specific medical literature regarding these
3    issues?
4       A.   I was not provided with primary
5    literature.  That was entirely done by
6    myself.
7       Q.   So as I understand, you haven't
8    heard about this alleged relationship
9    between Roundup and NHL previous to your
10   retention, right?
11      A.   I was not familiar with the
12   intricacies of the literature, no.
13      Q.   Well, I think you said you never
14   read anything about it.
15      A.   Right.  So I wasn't familiar
16   myself.
17      Q.   How did you go about educating
18   yourself about the relationship between
19   glyphosate and non-Hodgkin's lymphoma?
20      A.   So I looked at the literature like
21   I would do for anything in a patient's
22   medical history and reviewed -- I started
23   with some review papers just reviewing the
24   topic.  I looked at some of the references,

1  you know, most of the references listed in
2  my reports that are not specific to general
3  things about non-Hodgkin's lymphoma; and I
4  read, you know, some of the primary studies
5  examining the pretty broad literature on
6  examining this very topic.
7       Q.   So when you said you looked at
8  some review papers, do you know what you
9  looked at first?
10      A.   Well, first I looked into
11 literature on, you know, what is glyphosate.
12 What is, you know, what is Roundup and why
13 are the two associated with one another just
14 to orient myself.
15      Q.   Before getting involved in this
16 litigation, had you ever even heard of
17 Roundup?
18      A.   I did, yes.
19      Q.   In what context?
20      A.   Well, it's been in the popular
21 press of recent times.
22      Q.   I see.
23      A.   But not in a way that's, you know,
24 professional.  Just hearing about it.

```
 1        Q.   All right.
 2             And so you educated yourself about
 3   what glyphosate is and what Roundup is?
 4        A.   At a basic level, yes.
 5        Q.   And then what did you do after
 6   that?
 7        A.   Then I -- well, then I read the
 8   cases, you know, I read the cases at that
 9   time; and then I looked at the literature to
10   support or refute the association with
11   non-Hodgkin's lymphoma.
12        Q.   So when you say you read the
13   cases, you were referring to the plaintiff's
14   medical records?
15        A.   Yes.  Not necessarily in that
16   order.  I think I looked at the records
17   first; and then to make the leap to
18   understand the interpretation of the
19   association of glyphosate and NHL, I turned
20   to the literature.
21        Q.   And with respect to the literature
22   on glyphosate and NHL, how did you approach
23   that?  Did you do a Medline search as a
24   first step?
```

1    A.    Yes.  I used PubMed to look at the various studies.  There's thousands and thousands of papers.  I looked at various elements of the literature, whether it's the epidemiology, whether it's the, you know, animal studies, et cetera; and I also looked at papers that took an opinion one way or the other and saw what their viewpoints were.  And some of those I listed in my reports.

11   Q.    So are -- and I want to come back to this more systematically later.

13   A.    Of course.

14   Q.    But I think we've already talked about materials that you looked at either prior to your report or since your report with respect to other experts' opinions, right?

19   A.    Yes.  That's correct.

20   Q.    The ones that you looked at for form, and then the ones you looked at since giving your report?

23   A.    Yes.

24   Q.    And then separately, you've looked

1    So your understanding of what was
2 different from what the EPA looked at versus
3 IARC came from reading the Portier paper?
4    A.   Well, in part, the Portier and
5 there were others like the Benbrook studies
6 review as well.
7    Q.   Okay.
8         And based on the review of the
9 Portier and Benbrook papers, what's your
10 understanding of the difference between
11 IARC's review and EPA's review?
12   A.   Sure.  So the IARC reviewed only
13 published literature is one of my
14 understanding elements.  They relied, again,
15 as I mentioned before, on genotoxicity
16 studies a little bit more heavily, slightly
17 different genotoxicity studies, different
18 models; and they -- those were the main
19 differences.  And the EPA also relied on
20 unpublished industry-sponsored papers as
21 well whereas the IARC used only the
22 literature that was published.
23   Q.   And because the EPA relied on
24 unpublished industry sponsored studies, do

1  you believe that was entitled to less
2  weight?
3      A.   Entitled to less weight by the
4  EPA.
5      Q.   No.
6      A.   Oh, by my analysis.
7      Q.   By you.
8      A.   I believe that there were
9  different approaches; and, therefore, I
10 relied more on the IARC Monograph to
11 formulate my conclusions.
12     Q.   Do you understand the difference
13 in what the IARC undertook to do and what
14 the EPA undertook to do in terms of their
15 objective?
16          MR. SILVERSTEIN:  Objection to
17     form.
18     A.   Their objective as I understood
19 it, is to assess the carcinogenicity of
20 various pesticides including glyphosate
21 which was the focus of my review.  That's my
22 understanding of the difference of what
23 their intentions were.  What individuals
24 were involved that I don't know the