**WAPNER, NEWMAN, BRECHER & MILLER, P.C.**
JARAD L. SILVERSTEIN, ESQUIRE
jsilverstein@wapnernewman.com
2000 Market Street, Suite 2750
Philadelphia, PA  19103
(215) 569-0900
Attorney for Plaintiffs

## IN THE UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| IN RE: ROUNDUP PRODUCTS LIABILITY LITIGATION | MDL No. 2741 |
| | Case No. 3:16-md-02741-VC |
| This document relates to: *Spector v. Monsanto Co., 3:20-cv-05532* | **PLAINTIFFS' RESPONSE IN OPPOSITION TO MONSANTO'S MOTION TO EXCLUDE TESTIMONY OF PLAINTIFFS' SPECIFIC CAUSE EXPERTS DR. MARC BRAUNSTEIN AND DR. RONALD KENDALL ON RULE 702 GROUNDS** |

i

# **TABLE OF CONTENTS**

I. INTRODUCTION……………………………………………………………………...1

II. LEGAL STANDARD…………………………………………………………………..3

III. ARGUMENT……………………………………………………………………….....4

    A. Dr. Braunstein's Methodology is Generally Accepted and His Opinions are Well-Founded and Reliable…………..…………………………………………………..…5

        1. Dr. Braunstein's opinions in both his report and his deposition were offered, appropriately, within a reasonable degree of medical certainty…………………..4

    B. Dr. Kendall's Methodology is Generally Accepted and His Opinions are Well-Founded and Reliable ………………………………………………………...……………….8

        1. Dr. Kendall is Immensely Qualified to Opine in the Roundup Litigation…………..8

        2. Dr. Kendall Employed a Reliable Methodology for Arriving at His Opinions…...9

        3. Dr. Kendall's Reliance on Dr. Sawyer's Report Does Not Render His Testimony Inadmissible ……………………………………………………………………..11

    C. Neither Dr. Braunstein nor Dr. Kendall Need to Rule Out All Potential Alternative Risk Factors………………………………………………………………………………13

    D. This Court Has Already Ruled that Plaintiffs' Experts Properly Ruled in Roundup as the Cause of Plaintiffs' Non-Hodgkin's Lymphoma…………………………………...15

IV. CONCLUSION………………………………………………………………………..16

## **TABLE OF AUTHORITIES**

**Cases:**

*Cook v. Rockwell Int'l Corp.*, 580 F. Supp. 2d 1071 (2006)..................................................3

*Cooper v. Takeda Pharmaceuticals America, Inc.*, 239 Cal. App. 4th 555 (2014)............................13

*Daubert v. Merrell Dow Pharm., Inc.*, 509 U.S. 579 (1993)........................................3, 4, 6, 13, 14

*GWTP Invs., L.P. v. SES Americom, Inc.*, 2006 U.S. Dist. LEXIS 102438 (N.D. Texas Apr. 14, 2006)..................................................................................................................12

*In re Roundup Prod. Liab. Litig.*, 390 F. Supp. 3d 1102 (N.D. Cal. 2018)................................3, 4

*Legier & Materne v. Great Plains Software, Inc.*, 2004 U.S. Dist. LEXIS 12361 (E. D. La. Jun. 30, 2004)..................................................................................................................12

*Legier & Materne v. Great Plains Software, Inc.*, 2005 U.S. Dist. LEXIS 17686 (E. D. La. Aug. 3, 2005)..................................................................................................................11, 12

*Messick v. Novartis Pharm. Corp.*, 747 F.3d 1193 (9th Cir. 2014)..............................................3

*Milward v. Acuity Specialty Products Group, Inc.*, 639 F.3d 11, 13 (1st Cir. 2011).........................3

*Sarti v. Salt Creek Ltd*, 167 Cal. App. 4th 1187 (2008).......................................................10

*SEC v. Todd*, 642 F.3d 1207 (9th Cir. 2011).....................................................................14

*Wendell v. GlaxoSmithKline, LLC*, 858 F.3d 1227 (9th Cir. 2017)..........................................3, 13

**Other Authorities:**

Federal Rule of Evidence §702..............................................................................3, 4, 16

## I.  INTRODUCTION

Plaintiffs, in support of their claims of specific causation, have designated Marc Braunstein, M.D. and Ronald Kendall, PhD as experts on their behalf. Both are supremely qualified experts in their respective fields: the former a board-certified hematologist/oncologist specializing in hematologic malignancies like NHL, and the latter an environmental toxicologist specializing in toxic substances and their effects on environmental and human health.

Marc Braunstein, M.D., as designated in Plaintiffs' Rule 26 Expert Disclosure, will testify that Mrs. Spector's "exposure to glyphosate and/or glyphosate-based formulated products" was a "substantial factor" contributing to her developing non-Hodgkins' lymphoma (NHL). *See* Silverstein Decl, Ex. 1 (Rule 26 Expert Disclosure). Dr. Braunstein is an Assistant Professor of Medicine at NYU Langone Hospital – Long Island, where he also serves as the Program Director of the hematology/oncology fellowship program. *See* Silverstein Decl., Ex. 2 (Braunstein CV). He is triple board certified by the American Board of Internal Medicine. He actively speaks, presents and writes on B-cell malignancies, which is a main focus of his clinical practice and his research. *See* Monsanto's Ex. 8 (Braunstein *Spector* Report). He diagnoses and treats patients with the same histologic subtype of NHL as Mrs. Spector has (marginal zone lymphoma or MZL). *Id.*

Dr. Braunstein applied the same methodology in arriving at a differential diagnosis as he does in his clinical practice. *See* Silverstein Decl., Ex. 3 at 125:20-128:10 (Braunstein Deposition). Further, he identified glyphosate as a risk factor through his diligent and extensive epidemiological research and "published research articles, textbooks, prior expert reviews related to glyphosate as referenced, as well as my background and experience in hematology, medical oncology, and molecular and cellular biology." *See* Monsanto's Ex. 8 (Braunstein *Spector* Report).

Ronald Kendall, PhD., as designated in Plaintiffs' Rule 26 Expert Disclosure, will testify on issues "of specific causation and will testify regarding forensic toxicology and environmental risk assessment of

1

Roundup usage, evaluation of the chronicity and amount of Roundup exposure, how personal protective gear affects the amount of exposure, and epidemiological factors." *See* Silverstein Decl., Ex. 1 (Rule 26 Expert Disclosure). For over 4 decades, Dr. Kendall has been one of our nation's leading environmental toxicologists. He completed an EPA Post-Doctoral Traineeship in Toxicology at M.I.T. *See* Monsanto's Ex. 3 (Kendall CV). He served on the EPA's Science Advisory Panel as a representative in environmental toxicology for implementation of the Federal Insecticide, Fungicide and Rodenticide Control Act ("FIFRA"), and was Chair of that Panel from 1999-2002. *Id.* at 7. He has consulted with the EPA on several other matters related to environmental toxicology and human exposure to chemicals. He has been awarded over $53 million in grants as principal investigator. *Id.* at 32. He is an editor and/or reviewer for 13 scientific journals and has authored than 400 publications in the field of environmental toxicology, with a sharp focus on chemical exposure and its effects on humans and the environment. *Id.* at 36, 38-58.

Both Dr. Braunstein and Dr. Kendall evaluated general causation evidence, including epidemiological, genotoxicity and other data and literature. They evaluated the plaintiff's case-specific records, including depositions, Plaintiff Fact Sheets and various medical records. They utilized their highly extensive professional experience, tying in the general causation evidence and the associated bodies of literature, to make their specific causation opinions. This methodology has been approved time and time again by the Ninth Circuit, and this Court in this particular MDL.

Under *Daubert*, Monsanto's arguments for excluding the testimony of Dr. Braunstein and Dr. Kendall are not meritorious of a determination of inadmissibility as a matter of law; rather, they go to the credibility and weight of their opinions before a jury. These experts are not spewing "junk science" – but instead are offering reasoned, logical opinions held to a reasonable degree of certainty in their respective fields.

## II. LEGAL STANDARD

Under Federal Rule of Evidence §702 and the standard elucidated in *Daubert* and its progeny, the Court is authorized to act as a gatekeeper to ensure that proffered expert testimony is relevant and based upon reliable methods. *See Daubert v. Merrell Dow Pharm., Inc.*, 509 U.S. 579, 589 (1993). However, "[a] review of the caselaw after *Daubert* shows that the rejection of expert testimony is the exception rather than the rule." Fed. R. Evid. 702 advisory committee note (2000); *see also Cook v. Rockwell Int'l Corp.*, 580 F. Supp. 2d 1071, 1083 (2006). In fact, "[t]he Ninth Circuit has placed great emphasis on *Daubert's* admonition that a district court should conduct [the admissibility] analysis "with a 'liberal thrust' favoring admission." *In re Roundup Prod. Liab. Litig.*, 390 F. Supp. 3d 1102, 1112 (N.D. Cal. 2018) (Chhabria, J.) (quoting *Messick v. Novartis Pharm. Corp.*, 747 F.3d 1193, 1196 (9th Cir. 2014)).

*Daubert* provided some factors a court can consider to determine the admissibility of expert testimony, including: (1) whether the theory or technique in question can be and has been tested; (2) whether it has been subjected to peer review and publication; (3) its known or potential error rate; (4) the existence and maintenance of standards controlling its operation; and (5) whether it has attracted widespread acceptance within a relevant scientific community. *Daubert*, 509 U.S. at 593-94. Yet this list is non-exhaustive, and the courts have flexibility and broad discretion in its inquiry. *See Wendell v. GlaxoSmithKline, LLC*, 858 F.3d 1227, 1237 (9th Cir. 2017).

Expert testimony should only be excluded if it is the product of irrelevant or unreliable "junk science." *Id.* Otherwise, the expert's testimony must be admitted for a jury's consideration. *See Milward v. Acuity Specialty Products Group, Inc.*, 639 F.3d 11, 13 (1st Cir. 2011) ("So long as an expert's scientific testimony rests upon 'good grounds, based on what is known,' it should be tested by the adversarial process, rather than excluded for fear that jurors will not be able to handle the scientific complexities.") (quoting *Daubert*, 509 U.S. at 590, 596)).

As noted above, the Court's role in a *Daubert* inquiry is that of "gatekeeper" – and does not replace the adversary system. *In re Roundup Prod. Liab. Litig.*, 390 F. Supp. 3d at 1111-13. "Vigorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof are the traditional means of attacking shaky but admissible evidence." *Id.*

## III. ARGUMENT

### A. Dr. Braunstein's Methodology is Generally Accepted and His Opinions are Well-Founded and Reliable.

#### 1. Dr. Braunstein's opinions in both his report and his deposition were offered, appropriately, within a reasonable degree of medical certainty.

Dr. Braunstein's expert testimony is wholly appropriate as it will "assist the trier of fact to understand the evidence or to determine a fact in issue." Fed. R. Evid. 702. Dr. Braunstein is an eminently-qualified oncologist specializing in diagnosis and treatment of B-cell malignancies and other lymphomas. He completed his residency at Hofstra North Shore-LIJ and his hematology/oncology fellowship at NYU Langone Medical Center. *See* Silverstein Decl., Ex. 2 (Braunstein CV). He is a board-certified oncologist who is currently an Assistant Professor of Medicine at NYU Langone on Long Island, and has authored many peer-reviewed articles. *See id.* He is a practicing clinical oncologist, specifically tailored to hematologic malignancies, with an emphasis on B-cell malignancies. *See* Silverstein Decl., Ex. 2 (Braunstein CV); Monsanto Ex. 8 (Braunstein *Spector* Report).

Dr. Braunstein offers the opinion that Mrs. Spector's chronic use of and exposure to Roundup (glyphosate) was a substantial factor in her development of MZL. *See* Monsanto's Ex. 8 (Braunstein *Spector* Report). In coming to his well-reasoned causation opinions in this matter, *just like all of Monsanto's specific causation experts did*, Dr. Braunstein utilized a standard approach. He:

> reviewed the substantial medical literature … examining the association between exposure to Roundup [and NHL].… In reaching my opinions, I employed my background in interpretation of scientific literature, scientific methodology, as well as understand[ing] of medical history taking and

4

medical decision making, hematologic malignancies, and molecular and cellular biology.

*See* Monsanto's Ex. 8 (Braunstein *Spector* Report). He further described his methodology and approach as synonymous with how he approaches his own lymphoma patients. He pertinently testified in his discovery deposition:

> So I looked at the literature *like I would do for anything in a patient's medical history* and reviewed – I started with some review papers just reviewing the topic. I looked at some of the references you know, most of the references listed in my report that are not specific to general things about non-Hodgkin's lymphoma; and I read, you know, some of the primary studies examining the pretty broad literature on examining this very topic.
>
> \* \* \* \*
>
> I looked at the records first; and then to make the leap to understand the interpretation of the association of glyphosate and NHL, I turned to the literature.... I used PubMed to look at the various studies. There's thousands and thousands of papers. I looked at various elements of the literature, whether it's the epidemiology, whether it's the, you know, animal studies, et cetera; and I also looked at papers that took an opinion one way or the other and saw what their viewpoints were. And some of those I listed in my reports.

*See* Silverstein Decl., Ex. 3 at 125:20-128:10 (Braunstein Deposition) (emphasis added). He further utilized his significant clinical experience in diagnosing and treating patients with hematologic malignancies, primarily those with B-cell malignancies (like Mrs. Spector) to arrive at his opinions.

In its Motion however Monsanto, conveniently, ignores all of this. Rather, Monsanto's argument is an unsupported, arbitrary conclusion that his testimony is "inconsistent with an opinion of causation to reasonable degree of medical certainty."[1] Monsanto chose to cherry-pick a few quotes from two consecutive pages of Dr. Braunstein's two *days* of deposition testimony – and completely mischaracterizes them. The three quotes Monsanto cites from pages 180 and 181 of Dr. Braunstein's deposition[2] do not

---

[1] Monsanto fails to define what "reasonable degree of medical certainty" means yet nonetheless somehow asks the Court to conclude that Dr. Braunstein does not meet this threshold.

[2] See Page 5 of Monsanto's Motion.

disqualify Dr. Braunstein under *Daubert;* rather, they are honest acknowledgements of precisely what this case and every other like it usually comes down to at this stage of litigation: a battle of the experts. In other words, Dr. Braunstein recognizes the experts and the literature are split on the carcinogenicity of glyphosate. This is a true statement. Why else would have other cases within this MDL and outside of it gone to trial? The Court must not look at Dr. Braunstein's testimony on pages 180 and 181 of Monsanto's Ex. 1 as fatal "concessions" or "admissions" in a *Daubert* vacuum, but rather they must be taken in consideration with the entirety of Dr. Braunstein's opinions and testimony, the overwhelming majority of which Monsanto conveniently leaves out of its Motion to Bar.

For example, not mentioned in Monsanto's motion is Dr. Braunstein's testimony as to why he afforded greater weight to IARC's Monograph 112 than to the EPA's glyphosate review:

> A: ... So the IARC reviewed only published literature is one of my understanding elements. They relied, again, as I mentioned before, on genotoxicity studies a little bit more heavily, slightly different genotoxicity studies, different models; and they – those were the main differences [as compared to EPA's review]. And the EPA also relied on unpublished industry-sponsored papers as well whereas the IARC used only the literature that was published.
>
> Q: And because the EPA relied on unpublished industry sponsored studies, do you believe that was entitled to less weight?
>
> A: Entitled to less weight by the EPA?
>
> Q: No.
>
> A: Oh, by my analysis.
>
> Q: By you.
>
> A: I believe that there were different approaches; and, therefore, I relied more on the IARC Monograph to formulate my conclusions.

*See* Silverstein Decl., Ex. 3 at 163:12-164:11.

Monsanto also purposely ignores most of Dr. Braunstein's expert report in which, *inter alia*, he methodically discusses exposures and risk factors that can lead to the development of NHL. Specifically, he acknowledges that

> [r]ecognized risk factors for the development of NHL include age over 65, male gender, white ethnicity, obesity, geographic location, inherited or acquired immunodeficiency, certain autoimmune disorders, specific infections (e.g. HIV), prior chemotherapy, certain medications such as immunosuppressants, occupational or environmental exposures, such as benzene, tobacco smoke, and a family history of hematologic malignancy.

*See* Monsanto Ex. 8 (Braunstein *Spector* Report). Dr. Braunstein then goes on to identify general risk factors and those risk factors Mrs. Spector had (e.g., history of smoking) and why they are not substantial contributing factors to her development of NHL.

Monsanto also disingenuously attempts to infer that because Dr. Braunstein's knowledge base on glyphosate carcinogenicity was accumulated only after retention by Plaintiffs in this case, his opinions cannot be considered reliable. They do this *despite the fact that their own oncology expert, Ran Reshef, M.D., too, had no prior knowledge of the relationship between glyphosate and NHL prior to being contacted by Monsanto's counsel in this MDL.* Dr. Reshef testified he was not aware of any related literature or epidemiological study prior to his retention in the Roundup cases, and candidly stated that the relationship between glyphosate and NHL had "not been on my radar." *See* Silverstein Decl., Ex. 4 (Reshef Dep. at 18:3-12).

Notwithstanding same, Dr. Braunstein testified that he is an expert in risk factors for NHL. *See* Silverstein Decl., Ex. 3 at 66:6-10. He clearly identifies glyphosate as a risk factor for the development of NHL and supports that opinion through his analysis of multiple epidemiological studies and other peer-reviewed literature. *See* Monsanto Ex. 8 (Braunstein *Spector* Report – List of Materials Considered). In terms of glyphosate exposure, in order to arrive at his opinions, he focused "more on the duration of exposure than the dose." *See* Silverstein Decl., Ex. 3 at 105:12-13. This has been a common theme in

7

other plaintiffs' experts' commentaries through the first three "waves" of this MDL. He also referenced and discussed the Bradford Hill criteria to support his opinions.

In sum, Dr. Braunstein used his clinical judgment, his extensive knowledge about risk factors for NHL, his consideration of Mrs. Spector's risk factors in particular, and his thorough review of the peer-reviewed literature – and still found Roundup to be a substantial contributing factor to Mrs. Spector's disease. Soundly, Dr. Braunstein concludes his report as follows:

> in this case, Mrs. Spector had no alternative risk factors for the development of her unusual extranodal MZL, was younger than the average age for diagnosis, and had multi-focal disease which is also atypical. This evaluation provides coherent and compelling evidence that glyphosate and GBFs are more likely than not to be a cause of NHL in humans exposed to these agents. In the case of Mrs. Spector, she had a long-standing exposure to Roundup over a 38 year period between 1980-2018 in spray form, and then developed an unusual NHL in the lungs that typically results following a latency period of many years. Based on the above report, I conclude to a reasonable degree of medical certainty that Mrs. Spectors NHL was caused by her Roundup exposure.

See Monsanto's Ex. 8 (Braunstein *Spector* Report). His methodology is reliable, and he is aptly qualified to offer his opinions. As such, when he affirms that his opinions are all offered to a reasonable degree of medical certainty, he deserves to have that statement taken at face value.

**B.    Dr. Kendall's Methodology is Generally Accepted and His Opinions are Well-Founded and Reliable**

**1.    Dr. Kendall is Immensely Qualified to Opine in the Roundup Litigation.**

Dr. Kendall's illustrious credentials speak for themselves. His 112-page *curriculum vitae* highlights his breadth of experience that qualifies him to opine on the area of exposure in this MDL. Currently, he is a Professor of Environmental Toxicology at Texas Tech University, and is the Director *Emeritus* of Texas Tech's Institute of Environmental and Human Health. See Monsanto's Ex. 3, p. 4. He completed an EPA Post-Doctoral Traineeship in Toxicology at M.I.T. in 1980. *Id.* From 1995-2002, Dr. Kendall served on the EPA's Science Advisory Panel as a representative in environmental toxicology for

8

implementation of the Federal Insecticide, Fungicide and Rodenticide Control Act ("FIFRA"), and was Chair of that Panel from 1999-2002. *Id.* at 7. He has worked as a consultant to the EPA on several other matters related to environmental toxicology and human exposure to chemicals. He has been awarded over $53 million in grants as principal investigator. *Id.* at 32. He is an editor and/or reviewer for 13 scientific journals. *Id.* at 36. He is an author of more than 400 publications, including 13 textbooks and 175 peer-reviewed articles. *Id.* at 38-58.

### 2. Dr. Kendall Employed a Reliable Methodology for Arriving at His Opinions.

In arriving at his opinions in the *Spector* matter, Dr. Kendall discussed his methodology in his expert report:

> Specifically, I have assessed dose response, latency period, biological plausibility (toxicological mechanisms), temporality, coherence (demonstrated by molecular-based studies), and animal studies as well as the strength of association and consistency with the toxicological mechanisms of Roundup® formulation ingredients, including glyphosate. I have used the six epidemiological studies which include McDuffie et al 2001, Eriksson et al 2008, Andreotti et al 2018, Leon et al 2019, Zhang et al 2019, and Pahwa et al 2019, primarily with respect to dose assessment. … My basic toxicological focus on these studies is on study design, exposure, and statistical power. I am using these study results in my toxicological assessment in conjunction with generally accepted, peer-reviewed studies on genotoxicity (including direct human studies), mechanisms of action (promotion, etc.), absorption, distribution, metabolism, and excretion, etc. In general, I have relied on studies that have documented the various aspects of the Bradford Hill criteria at or in excess of the 95% confidence threshold.

*See* Monsanto's Ex. 10 at p. 14 (Kendall *Spector* Report).

In his deposition testimony, Dr. Kendall expanded on his methodology. In great detail he described his expert analysis of the available literature on glyphosate (and GBF) exposure and its connection to NHL.

> …I did a thorough review of the literature and tried to identify the ones that were highly relevant, appeared to be good science, were in reputable journals, and that were interpretable. … [T]here's a review process I go

9

> through to bring all of this information together and to construct, first in my mind, and then, on paper, my opinions supported by the data that are being conveyed by these scientists.

*See* Silverstein Decl., Ex. 5 at 60:15-61:3. He flushed out his approach further:

> Based on some of these human studies I have reported to you, some of the mechanistic studies that you have alluded to and I have – I have referenced in my report, in addition to unique experimental animal data resulting in unique carcinoma, particularly in the – the kidney tubals of mice, unique cancer in addition to a tumor in the circulatory system, when you amalgamate those data into a weight-of-the-evidence, as I have to do on a daily basis and I did for years at the Science Advisory Panel at EPA, and as I concluded in my report, there is reasonable scientific and toxicological certainty that long-term chronic exposure to glyphosate-based herbicides present a significant contributing factor to the development of non-Hodgkin lymphoma.

*Id.* at 86:13-87:3.

He also explained how the theory of biological variability (or the variability we observe across biological units, such as individuals, within a population) played a critical role in his determination that to a reasonable degree of scientific certainty, Mrs. Spector's exposure to glyphosate was a significant contributing factor to her development of NHL. To illustrate, Dr. Kendall testified:

> [i]t's – it's the – the predisposition, your immune system, your genetics, your handling of it, the duration of the handling, the latency between initial exposure and effects, all of those factors play into this. And I think that's – that's fair when looking – when – when you've asked me to consider this in the context of how could we get from a point of just the chemical and the formulation ultimately to being a part of the etiology of a disease that may demonstrate itself as NHL.

*Id.* at 77:3-13. To put it in layman's terms, he analogized the effect GBFs have on individuals varies like the varying effect of alcohol consumption.

> And you know, I'm a toxicologist. I teach this every day. And when we look at biology, all of us are very different. And what I mean by that, if you take a Y axis and an X axis, we may have zero exposure and no effects of a chemical here. But as exposure goes up on the Y axis, we may start to see increased effects of increased internal dose.

> And there's a lot of variability oftentimes as we look at that curve because as we increase dose, certain people may be more highly exposed, they might have more absorption than others, and others may respond differently.
> And I – I take the point of alcohol consumption. Some people can drink one beer and literally lay down and go to sleep. Some people can drink beer all day and not go to sleep. ...
> And so the point I want to make is, generally, the half life may be around six to eight hours in the average body. But that doesn't count the fact that some people may retain it longer, they may absorb more, and they may be more sensitive to biologically respond because of the – of the cell and physiological development within their own bodies.

*Id.* at 98:3-99:7.

Moreover, Dr. Kendall took information about duration and frequency of exposure and risk factors and from the individual plaintiff and interfaced that information with other information he gleaned from the general causation discussion. *See* Silverstein Decl., Ex. 6 at 65:3-11. (Kendall *Savory/Thomas* Deposition).

Dr. Kendall's methodological approach, as well as that of Dr. Braunstein's, is similar to what this Court has already approved. *See* PTO 85.[3] Any challenges to same should go to the weight of their opinions – not their admissibility.

### 3. Dr. Kendall's Reliance on Dr. Sawyer's Report Does Not Render His Testimony Inadmissible.

As a general rule, assessing expert witness credibility should be within the province of a jury. *SEC v. Todd*, 642 F. 3d 1207, 1217 (9th Cir. 2011). Plagiarism does not (and should not) automatically render an expert's testimony inadmissible. *See Legier & Materne v. Great Plains Software, Inc.*, 2005 U.S. Dist. LEXIS 17686, *4, *12 (E.D. La. Aug. 3, 2005) (stating that plagiarism was not a basis for exclusion but rather a credibility determination for the jury). "An expert may rely upon figures calculated by another

---

[3] This Court wrote: "It is sufficient for a qualified expert, in reliance on his clinical experience, review of a plaintiff's medical records, and evaluation of the general causation evidence, to conclude that an 'obvious and known risk factor[]' is the cause of that plaintiff's disease. *See Wendell*, 858 F.3d at 1235." *See* PTO 85 at p. 5.

11

expert so long as he conducts an independent investigation of those figures." *GWTP Invs., L.P. v. SES Americom, Inc.*, 2006 U.S. Dist. LEXIS 102438, *13 (N.D. Texas Apr. 14, 2006) (citing *Legier & Materne*, 2004 U.S. Dist. LEXIS 12361, *3 (E.D. La. Jun. 30, 2004).[4]

At the outset, it is clear that some of the language in the two reports are similar, if not identical, in some areas. However, Dr. Kendall did not appropriate Dr. Sawyer's opinions and play them off as his own. Despite some similarities with Sawyer's report in *Schafer*, Dr. Kendall consistently testified that the opinions he offered were his own. *See* Monsanto's Ex. 11, at 185:16-25 (when affirming his report was his opinions he stated: "I stand 100 percent behind ... my thinking process and where I ended up in my thinking process with my opinions I've given you today."); 225:6-15 (acknowledging he read Sawyer's report, evaluated it, but did not copy it; rather, he wrote every word in his report). He read the peer-reviewed literature, assessed the weight of the evidence, evaluated Plaintiffs' case-specific materials, relied upon his four decades of experience in the field of environmental toxicology, and offered intelligible and well-supported opinions.

Moreover, there is no indication of any intent to deceive, mislead or misappropriate another expert's work as his own. Dr. Kendall did review Dr. Sawyer's report and billed for that review in his initial invoice to Plaintiffs' counsel's law firm; it is clear he was confused at his deposition when he referred to it as prepared by "Moll."[5] Importantly, Dr. Kendall often testified to agreeing with the "logic" utilized by Dr. Sawyer, and acknowledged that Dr. Sawyer "couldn't say it any clearer" than he could. He never hid the fact that Dr. Sawyer's opinions held significance to him. *See* Monsanto's Ex. 11 at, e.g., 188:13-14; 193:14-15; 195:20-23; 213:20-21. Unfortunately, Dr. Kendall's initial List of Materials

---

[4] Plaintiffs must point out that the *Spiral Direct* (Middle District of Florida), *Moore v. BASF* (Eastern District of Louisiana) and *Raymo* (U.S. Court of Federal Claims) cases cited by Monsanto are not binding precedent on this Court.

[5] Moll is the name of the attorney to whom Dr. Sawyer directed his report in the *Schafer* matter. *See* Monsanto's Ex. 9.

12

Considered (LMC) was incomplete and left out multiple sources of information for which he considered (including IARC Monograph 112). He did, however, prior to Day 2 of his discovery deposition, provide an amended LMC in which he included the Sawyer report at issue (as well as IARC Monograph 112). *See* Monsanto's Ex. 14. Plaintiffs submit this was an honest oversight. Additionally, Dr. Kendall has provided an Affidavit in which he affirms, under oath, that the opinions he is offering in this case are his own, and that he did not intentionally plagiarize or copy the opinions of another. *See* Silverstein Decl., Ex. 9 (Kendall Affidavit). Plaintiffs ask that a jury be able to judge Dr. Kendall's credibility rather than this Court denying Mrs. Spector – through no fault of her own – that opportunity as a matter of law.

Excluding the areas of his report which Monsanto's counsel highlighted as the same or similar as Dr. Sawyer's, Dr. Kendall testified *ad nauseum* over two full days of testimony about the independent basis for his opinions – which were clearly not extricated from anyone else. *See, e.g.,* discussion in subparagraph B.2., *supra*. Taken as a whole, Dr. Kendall – Plaintiffs' lone exposure expert – while certainly ripe for scrutiny under cross-examination – should not be barred from testifying altogether.

### C. Neither Dr. Braunstein nor Dr. Kendall Need to Rule Out All Potential Alternative Risk Factors

Dr. Braunstein and Dr. Kendall, like all other experts, need not analyze every conceivable risk factor to satisfy *Daubert*. The Court in *Wendell v. GlaxoSmithKline, LLC*, 858 F.3d 1127 (9th Cir. 2017) held as follows:

> We do not require experts to eliminate all other possible causes of a condition for the expert's testimony to be reliable. It is enough that the proposed cause "be a substantial causative factor." This is true in patients with multiple risk factors, and analogously, in cases where there is a high rate of idiopathy.

*Id.* at 1237. Moreover, in *Cooper v. Takeda Pharmaceuticals America, Inc.*, 239 Cal. App. 4th 555 (2014), the Court instructed:

13

> Thus, because California has rejected the notion that a plaintiff must definitively "exclude all 'possibilities'" other than the defendant's conduct or product as the cause of the plaintiff's harm, clearly an expert, in reaching a specific causation opinion, need not exclude all other possibilities before he or she can express an opinion that the defendant's conduct or product caused the plaintiff's harm.

*Id.* at 580 (citing *Sarti v. Salt Creek Ltd*, 167 Cal. App. 4th 1187, 1210 (2008)).

This Court, in PTO 85, has also addressed the issue. Pertinently, this Court noted:

> Under Ninth Circuit caselaw, doctors enjoy wide latitude in how they practice their art when offering causation opinions. *See Wendell*, 858 F.3d at 1237 ("Where, as here, two doctors who stand at or near the top of their field and have extensive clinical experience with the rare disease or class of disease at issue, are prepared to give expert opinions supporting causation, we conclude that *Daubert* poses no bar on their principles and methodology.").

*See* PTO 85 at p. 5.

In this matter, Dr. Braunstein did analyze other risk factors which he acknowledged could increase one's risk for developing NHL. He discussed them in his report and was confronted with same at his deposition. Monsanto takes umbrage with Dr. Braunstein not taking into consideration what it deems Mrs. Spector's "primary immunodeficiency, which left her susceptible to repeated pulmonary infections…" *See* Monsanto's Motion at p. 12. This is the basis of Monsanto's causation defense in this case therefore clearly why Monsanto highlighted it. The fact is, however, that (a) Plaintiffs dispute she had a primary immunodeficiency that was a substantial contributing factor to her NHL; and (b) notwithstanding same, Plaintiffs designated Mark Metersky, M.D., Chief of Pulmonary and Critical Care Medicine at the University of Connecticut and Director of its Center for Bronchiectasis Care, as expert to discuss the cause of Mrs. Spector's recurrent pulmonary infections, which she has experienced consistently since her MZL diagnosis in 2007.[6] Plaintiffs shall put forward its causation case to the jury

---

[6] Dr. Metersky offers the opinion that "within a reasonable degree of medical certainty, that Mrs. Spector's bronchiectasis was a direct consequence of her pulmonary lymphoma." *See* Silverstein Decl., Ex. 7 at p. 4. (Metersky *Spector* Report). In his rebuttal report, he further opined that "neither

14

calling *both* Dr. Braunstein and Dr. Metersky to discuss medical risk factors – with Dr. Metersky – the pulmonary expert – discussing Mrs. Spector's pulmonary affliction. Dr. Braunstein, as the *Wendell* Court instructs, need not take into account all of the potential risk factors to conclude that the one at issue in this litigation (exposure to glyphosate and GBFs) is a substantial contributing factor.

Dr. Kendall, on the other hand, is not a medical doctor. He is an environmental toxicologist. He does not have medical patients. He does not make medical diagnoses. He does not craft a differential medical diagnoses. Monsanto's argument that Dr. Kendall must be disqualified for failing to rule out all potential medically-induced causes of Mrs. Spector's NHL[7] is inappropriate and must be outright rejected.

### D. This Court Has Already Ruled that Plaintiffs' Experts Properly Ruled in Roundup as the Cause of Plaintiffs' Non-Hodgkin's Lymphoma

Monsanto's overarching theme in these *Daubert* motions is to rehash previously failed arguments in this regard. *See* PTO 85 at p. 2 (rejecting this argument as "off point"); *see also* PTO 45. As such, consistent with the Court's direction not to relitigate issues previously ruled upon by this Court, but in order to fully preserve the appellate record, Plaintiffs hereby incorporate the following pleadings that addressed this issue:

- Plaintiffs' Response in Opposition to Monsanto's Specific Causation *Daubert* and Summary Judgment Motion and *Daubert* Motion to Strike Certain Opinions of Monsanto Company's Expert Witnesses (ECF # 2478)

- Plaintiffs' Response in Opposition to Monsanto's Motion for Judgment as a Matter of Law and for a New Trial (ECF # 4135).

---

preexisting immunodeficiency nor MAC infection was the cause of Mrs. Spector's bronchiectasis. Rather, the MAC almost surely was a consequence of the bronchiectasis." *See* Silverstein Decl., Ex. 8 at p. 3 (Metersky *Spector* Rebuttal Report).

[7] Besides Roundup, Mrs. Spector was never exposed to any other toxic substance that an exposure expert like Dr. Kendall would have to consider.

## IV. CONCLUSION

These experts' opinions are not the "junk science" Rule 702 was meant to exclude. For the foregoing reasons, the Court should deny Monsanto's *Daubert* Motion to Exclude Dr. Braunstein and Dr. Kendall, together with such other relief as the Court deems just and proper.

DATED: October 6, 2021

                                            Respectfully submitted,

By:   /s/ *Jarad L. Silverstein, Esquire*
       **WAPNER, NEWMAN, BRECHER & MILLER, P.C.**
       JARAD L. SILVERSTEIN, ESQUIRE
       jsilverstein@wapnernewman.com
       2000 Market Street, Suite 2750
       Philadelphia, PA  19103
       (215) 569-0900
       Attorney for Plaintiffs

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on this 6th day of October, 2021, a copy of the foregoing was filed with the Clerk of the Court through the CM/ECF system which sent notice of the filing to all appearing parties of record.

/s/ *Jarad L. Silverstein*

17