**WILKINSON STEKLOFF LLP**
Brian L. Stekloff (*pro hac vice*)
(bstekloff@wilkinsonstekloff.com)
Rakesh Kilaru (*pro hac vice*)
(rkilaru@wilkinsonstekloff.com)
2001 M St. NW
10th Floor
Washington, DC 20036
Tel:    202-847-4030
Fax:    202-847-4005

**HOLLINGSWORTH LLP**
Eric G. Lasker (*pro hac vice*)
(elasker@hollingsworthllp.com)
1350 I St. NW
Washington, DC 20005
Tel: 202-898-5843
Fax: 202-682-1639

**COVINGTON & BURLING LLP**
Michael X. Imbroscio (*pro hac vice*)
(mimbroscio@cov.com)
One City Center
850 10th St. NW
Washington, DC 20001
Tel: 202-662-6000

**BRYAN CAVE LEIGHTON PAISNER LLP**
K. Lee Marshall (CA Bar No. 277092)
(klmarshall@bclplaw.com)
Three Embarcadero Center, 7th Floor
San Francisco, CA 94111
Tel: 415-675-3400
Fax: 415-675-3434

Jed P. White (CA Bar No. 232339)
(jed.white@bclplaw.com)
120 Broadway, Suite 300
Santa Monica, CA 90401
Tel:  310-576-2100
Fax: 310 -576-2200

*Attorneys for Defendant Monsanto Company*

# UNITED STATES DISTRICT COURT

# NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| IN RE: ROUNDUP PRODUCTS LIABILITY LITIGATION,<br><br>*Seidl v. Monsanto Co.*, 3:17-cv-00519-VC | MDL No. 2741<br><br>Case No.: 3:16-md-02741-VC<br><br>**DEFENDANT MONSANTO COMPANY'S MOTION TO EXCLUDE TESTIMONY OF DR. WILLIAM SAWYER**<br><br>Hearing date: TBD<br>Time: TBD |

**TO THE COURT, ALL PARTIES, AND THEIR ATTORNEYS OF RECORD:**

**PLEASE TAKE NOTICE THAT** beginning on a date to be determined, in Courtroom 4 of the United States District Court, Northern District of California, located at 450 Golden Gate Avenue, San Francisco, CA 94102, or as ordered by the Court, Defendant Monsanto Company ("Monsanto") will present its Motion to Exclude Testimony of Dr. William Sawyer.  Monsanto seeks an order excluding opinions of this witness under Federal Rule of Evidence 702.

Dated:  October 5, 2021				Respectfully submitted,


					/s/ *Jed P. White*_____
					Jed P. White
					Attorneys for Defendant Monsanto Company

**TABLE OF CONTENTS**

Page

INTRODUCTION ........................................................................................................................... 1

BACKGROUND ............................................................................................................................. 2

LEGAL STANDARD ..................................................................................................................... 5

ARGUMENT .................................................................................................................................. 5

I. The Court Should Exclude Dr. Sawyer's General Causation Opinions. .................... 5

II. The Court Should Exclude Dr. Sawyer's Specific Causation Opinions. ................... 7

    A. Dr. Sawyer's Opinion that Roundup Is a "Substantial Contributing Factor" to Plaintiff's NHL Is Not the Proper Subject of Toxicology Expert Testimony. ............................................................................................... 7

        1. Dr. Sawyer is Not Qualified to Draw Conclusions on Causation from the Epidemiology Studies. ................................................................ 7

        2. Dr. Sawyer's Comparisons of Plaintiff's Alleged Exposure Doses to "Exposure Thresholds" in Various Epidemiological Studies Do Not Support His Opinions on Specific Causation. ........................................... 8

        3. The Epidemiology Data on Which Dr. Sawyer Relies is Unreliable. ............... 9

        4. None of the Epidemiology Studies on which Dr. Sawyer Relies Supports His Opinion that Roundup Caused Plaintiff Seidl's Follicular Lymphoma. ........................................................................ 10

    B. Dr. Sawyer Did Not Consider Other Potential Causes of Plaintiff's NHL. ............... 10

III. The Court Should Exclude Dr. Sawyer's Opinions Regarding the George Study. ................ 11

IV. The Court Should Exclude Dr. Sawyer's Opinions Regarding Trace Chemicals. .................. 12

V. Dr. Sawyer Should Not Be Permitted to Opine on Monsanto Company Documents and Regulatory Duties. ................................................................. 13

CONCLUSION ............................................................................................................................. 14

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Apple, Inc. v. Samsung Electronics Co., Ltd.*,
    2013 WL 5955666 (N.D. Cal. Nov. 6, 2013) ................................................................................ 5

*City of New York v. FedEx Ground Package Sys., Inc.*,
    No. 13 Civ. 9173 (ER), 2018 WL 2941455 (S.D.N.Y. Oct. 10, 2018) ....................................... 13

*Cooper v. Brown*,
    510 F.3d 870 (9th Cir. 2007) ....................................................................................................... 5

*Daubert v. Merrell Dow Pharm., Inc.*,
    509 U.S. 579 (1993) ..................................................................................................................... 5

*Dura Auto. Sys. of Ind., Inc. v. CTS Corp.*,
    285 F.3d 609 (7th Cir. 2002) ....................................................................................................... 8

*Gen. Elec. Co. v. Joiner*,
    522 U.S. 136 (1997) ............................................................................................................... 6, 12

*Guidroz-Brault v. Missouri Pacific R. Co.*,
    254 F.3d 825 (9th Cir. 2001) ..................................................................................................... 13

*Marmo v. Tyson Fresh Meats, Inc.*,
    457 F.3d 748 (8th Cir. 2006) .............................................................................................. 6, 7, 11

*Oracle America Inc., et al. v. Hewlett Packard Enterprise Co.*,
    No. 16-cv-01393-JST, 2018 WL 6511146 (N.D. Cal. Dec. 11, 2018) ................................. 13, 14

*In re: Roundup Prods. Liab. Litig.*,
    390 F. Supp. 3d 1102 (N.D. Cal. 2018) ............................................................................. 3, 8, 9

*Sanchez v. Boston Sci. Corp.*,
    No. 2:12-CV-05762, 2014 WL 4851989 (S.D. W. Va. Sept. 29, 2014) ..................................... 13

*White v. Ford Motor Co.*,
    312 F.3d 998 (9th Cir. 2002) ....................................................................................................... 5

- ii -
MONSANTO'S MOTION TO EXCLUDE TESTIMONY OF DR. WILLIAM SAWYER

# INTRODUCTION

Plaintiff Randall Seidl has designated Dr. William Sawyer to provide testimony regarding his alleged levels of exposure to various Roundup®-branded herbicides ("Roundup"). Dr. Sawyer *also* seeks to offer opinions regarding "general causation" and "specific causation." For the reasons below, Dr. Sawyer's opinions do not meet the requirements for expert admissibility under Federal Rule of Evidence 702 and should be excluded.

***First***, with respect to Dr. Sawyer's purported "general causation" opinions, in Wave 1, the plaintiffs admitted that Dr. Sawyer would "not offer an opinion on general causation." *See* Dkt. 9141, Amended Pretrial Order No. 201. Thus, the Court found this portion of Monsanto's motion to be moot. *Id.* Nevertheless, here, Dr. Sawyer again purports to offer "general causation" opinions in his report pertaining to Plaintiff Seidl. *See, e.g.,* White Decl., Ex. 1, Sawyer *Seidl* Rpt. at 6; 30-147. To the extent Dr. Sawyer seeks to offer the opinion that Roundup generally is capable of causing non-Hodgkin's lymphoma ("NHL"), that opinion should be excluded because it does not follow any valid or recognizable methodology. Dr. Sawyer's "opinions" regarding general causation merely parrot other experts and should be excluded.

***Second***, with respect to Dr. Sawyer's specific causation opinions, the Wave 1 plaintiffs conceded that Dr. Sawyer would not "offer a differential diagnosis opinion as to any individual plaintiff." *See.* Dkt. 9141, Amended Pretrial Order No. 201. Accordingly, the Court found that "[Dr. Sawyer] may not opine that a plaintiff's 'exposure to Roundup was sufficient to cause NHL.'" *Id.* Despite the Court's ruling, Dr. Sawyer attempts to assert that very opinion with respect to Plaintiff Seidl, opining in his report that Plaintiff's exposures to Roundup were sufficient "to substantially contribute to the development of his NHL." *See* White Decl., Ex. 1, Sawyer *Seidl* Rpt. at 5-6; 152.

These opinions should be excluded because Dr. Sawyer did not follow a valid methodology in reaching them. Rather, he concludes that Roundup was a potential cause of Plaintiff's NHL based purely on extrapolations from cherry-picked epidemiology studies, notwithstanding his lack of training in epidemiology and his consistent admissions in this and other Roundup cases that he has not actually analyzed the epidemiological details of any of the studies from which he plucks individual, exposure-related data points. And he did not reliably analyze or rule out many other possible causes of Plaintiff's

NHL. Moreover, with respect to Plaintiff's specific subtype of NHL—follicular lymphoma—Dr. Sawyer admitted that he is not aware of any study or data that shows a statistically significant increased risk for that subtype associated with glyphosate use. Dr. Sawyer's conclusion that Roundup was a "substantial contributing factor to" the development of Plaintiff's cancer is therefore based on nothing more than impermissible *ipse dixit* and is not helpful to the jury.

**Third**, Dr. Sawyer's opinions are based on data that is universally considered to be inadequate for scientific analysis. Specifically, Dr. Sawyer's reliance on the George mouse study to demonstrate that Roundup is a cancer "promoter" is inconsistent with the conclusions of all scientific panels and regulators that have reviewed that study, including both the EPA (which has concluded on multiple occasions that Roundup is not a human carcinogen) and IARC. Indeed, IARC concluded that the George study is "inadequate" for the evaluation of glyphosate. Nevertheless, Dr. Sawyer attempts to offer opinions based primarily on the George study that even Plaintiff's general causation expert, Dr. Portier, previously admitted that he would not be willing to offer.

**Fourth**, Dr. Sawyer's opinion that trace chemicals in Roundup caused or contributed to Plaintiff's cancer is based merely on assertions that those chemicals have been associated with cancer *at much higher doses*. There is no scientific causation evidence linking them to NHL at doses remotely comparable to those at issue here, nor is there any scientific evidence suggesting that exposure to Roundup is a cancer risk because of these trace chemicals. Indeed, Dr. Sawyer does not even calculate the doses of these chemicals to which Plaintiff was allegedly exposed.

**Fifth**, Dr. Sawyer seeks to offer opinions regarding Monsanto company documents and regulatory duties, which are beyond his area of expertise and the realm of proper expert testimony.

## BACKGROUND

Plaintiff has designated Dr. Sawyer as an expert. *See, e.g.,* White Decl., Ex. 2, Plaintiff's Specific Causation Expert Disclosures in *Seidl*. Among other topics, Dr. Sawyer's report sets forth opinions on what he characterizes as "general causation" and "specific causation." *See* White Decl., Ex. 1, Sawyer *Seidl* Rpt. at 4-6. Dr. Sawyer seeks to opine that Plaintiff's alleged exposure to Roundup was "a substantial contributing factor to the development of" his NHL. *Id.* at 5-6. In addition, Dr. Sawyer also purports to offer an unsupported opinion that Roundup is a cancer promoter, based on the

George study, and that various trace chemicals in Roundup contributed to Plaintiff's development of NHL.  Finally, Dr. Sawyer purports to offer opinions regarding various EPA regulations and Monsanto's corporate state of mind.

General and Specific Causation

Three types of evidence are used to evaluate whether an agent is capable of causing a particular outcome at human-relevant exposure levels: epidemiological, animal, and mechanistic evidence.  *See In re: Roundup Prods. Liab. Litig.*, 390 F. Supp. 3d 1102, 1115-1130 (N.D. Cal. 2018).  Epidemiology, which studies the incidence and etiology of disease in human populations, is "central to the general causation inquiry, and where such evidence exists, it must be addressed." *Id.* at 1116.  Dr. Sawyer, however, has conceded repeatedly that he has not evaluated the merits of any of the epidemiology studies for purposes of determining causation, and instead is "deferring" to other experts on that subject.  *See, e.g.,* White Decl., Ex. 1, Sawyer *Seidl* Rpt. at 24; Ex. 3, Sawyer *Schafer* Dep. at 21:17-22:1; 96:23-97:12.  The general causation portions of Dr. Sawyer's report instead discuss glyphosate's history; the ingredients in various Roundup formulations; the routes of potential exposure to glyphosate; and various factors purportedly affecting dermal absorption.  *See* White Decl., Ex. 1, Sawyer *Seidl* Rpt. at 30-147.  In other words, Dr. Sawyer's "general causation" opinion is merely a discussion of the properties of Roundup, not an analysis of whether Roundup can cause NHL in humans when used in accordance with label instructions.

Dr. Sawyer's report also purports to address specific causation—whether Roundup caused Plaintiff's cancer specifically—but does so only by attempting to determine whether Plaintiff's exposures were similar to those sustained by applicators in various epidemiology studies.  White Decl., Ex. 1, Sawyer *Seidl* Rpt. at 4-6; 22-30; 151-52.  As Dr. Sawyer admits, however, he has not calculated any actual absorption dose of Roundup for Plaintiff.  *See* White Decl., Ex. 1, Sawyer *Seidl* Rpt. at 5.  Instead, he merely compares the number of days Plaintiff alleges he was exposed to Roundup to data in certain epidemiological studies whose quality and methodology he did not evaluate.  Specifically, Dr. Sawyer describes Plaintiff's alleged use of Roundup, which he based on "historical information received through review of deposition testimony, personal fact sheets, photographs and direct interview pertaining to [Plaintiff's] exposure events, circumstances and details."  White Decl., Ex. 1, Sawyer

*Seidl* Rpt. at 5. Dr. Sawyer's analysis consists of comparing the total number of days on which Plaintiff allegedly used Roundup to various "exposure day" levels mentioned in six epidemiology studies. White Decl., Ex. 1, Sawyer *Seidl* Rpt. at 4-6; 22-30; 151-52.

Importantly, Dr. Sawyer's "specific causation" opinion does not reliably account for other possible causes of Plaintiff's NHL, including Plaintiff's other occupational and environmental exposures. *See* White Decl., Ex. 4, Sawyer *Seidl* Dep. at 15:8-17:13; 19:24-20:22; 21:25-23:16; 24:22-25; 29:8-30:10; 47:10-52:11. In other words, unlike other specific causation experts in the litigation, Dr. Sawyer does not conduct a true differential diagnosis. Moreover, Dr. Sawyer did not account for Plaintiff's NHL subtype in reaching his conclusions on specific cause.

Promotion

The George study is a small mouse study in which various combinations of (1) a known carcinogen, (2) a known tumor promotor, (3) Roundup, (4) 2- dimethylbenz[a]anthracene ("DMBA"), and (5) 7, 12-O-tetradecanoyl-phorbol-13-acetate ("TPA") were painted on the skins of the subject animals. White Decl., Ex. 5, George, J., et al., *Studies on glyphosate-induced carcinogenicity in mouse skin: A proteomic approach*, 73 Journal of Proteomics 951 (2010) ("George 2010") at 953. While it purported to find that Roundup facilitated the growth of cancer, *id.*, due to multiple flaws in the study design—including that it omitted histopathology (the standard scientific confirmation of cancer)—the George study has been rejected as evidence of promotion (or carcinogenicity), including by both IARC and EPA. *See*, *e.g.*, White Decl., Ex. 6, EPA Office of Pesticide Programs, *Revised Glyphosate Issue Paper: Evaluation of Carcinogenic Potential* (Dec. 12, 2017) at 70; Ex. 7, IARC, *Glyphosate in Some Organophosphate Insecticides and Herbicides: Diazinon, Glyphosate, Malathion, Parathion, and Tetrachlorvinphos, Monograph Vol. 112 on the Evaluation of Carcinogenic Risks to Humans* (2015) at 32. Notwithstanding this uniform disapproval of the George study, Dr. Sawyer relies on the study to support his conclusion that Roundup can promote cancer in Plaintiff. *See, e.g.,* White Decl., Ex. 1, Sawyer *Seidl* Rpt. at 49-54; 150-51.

Trace Chemicals

Roundup, like all herbicides, contains certain trace chemicals as byproducts of the manufacturing process. Dr. Sawyer seeks to testify that various trace chemicals in Roundup are

carcinogens, and thus caused or contributed to Plaintiff's NHL.  Dr. Sawyer provides no science linking any of the trace chemicals to NHL at any dose remotely approximating the minuscule amounts to which Plaintiff could have been exposed, and none attributing NHL in people exposed to Roundup to the presence of those trace chemicals.  Dr. Sawyer never even calculates a dose of these trace chemicals to which Plaintiff allegedly was exposed.

<u>EPA Regulations and Corporate State of Mind</u>

Finally, Dr. Sawyer seeks to offer improper opinion testimony regarding the relevant EPA regulations, Monsanto's corporate state of mind, and the sufficiency of the Roundup label.  Dr. Sawyer is unqualified to discuss these topics, which are plainly outside the scope of his expertise.

## LEGAL STANDARD

A proposed expert witness must possess "knowledge, skill, experience, training, or education" sufficient to qualify him as an expert on the subject to which his testimony relates.  Fed. R. Evid. 702. When an expert's field of expertise is not related to the subject on which he seeks to offer testimony, such testimony is inadmissible.  *See White v. Ford Motor Co.*, 312 F.3d 998, 1008-09 (9th Cir. 2002). Apart from qualifications, expert testimony must be (1) based upon sufficient facts or data, (2) the product of reliable principles and methods, and (3) the result of applying those principles and methods reliably to the facts of the case.  Fed. R. Evid. 702.  The trial judge is charged with the responsibility of acting as a gatekeeper to "ensure that any and all scientific testimony … is not only relevant, but reliable."  *Daubert v. Merrell Dow Pharm., Inc.*, 509 U.S. 579, 589 (1993).  The proponent of the expert bears the burden of proving that the expert's proffered testimony is admissible.  *See, e.g.*, *Cooper v. Brown*, 510 F.3d 870, 942 (9th Cir. 2007).

## ARGUMENT

**I.     The Court Should Exclude Dr. Sawyer's General Causation Opinions.**

Dr. Sawyer should not be allowed to offer an opinion on general causation—*i.e.,* that Roundup is generally capable of causing NHL in humans—because he has not followed any valid methodology to reach such an opinion.  As an initial matter, courts have repeatedly held that an expert may not testify on matters outside his specific subject matter of expertise, *Apple, Inc. v. Samsung Electronics Co., Ltd.*, 2013 WL 5955666, at *2 (N.D. Cal. Nov. 6, 2013).  In the context of toxicologists specifically, courts

have noted that although "a toxicologist may testify that exposure to a chemical caused a person's symptoms and injuries," there is no "blanket rule that toxicologists are qualified to render an opinion on causation." *Marmo v. Tyson Fresh Meats, Inc.*, 457 F.3d 748, 758 (8th Cir. 2006). Dr. Sawyer's report in this case does not adequately set forth an acceptable methodology for reaching a general causation opinion. Moreover, to the extent Dr. Sawyer attempts to apply the Bradford Hill criteria (a method for assessing causation)—which he only briefly mentions in his report in this case—he has not reliably applied that methodology.

The Bradford Hill criteria can be applied only *after* epidemiology data demonstrates an association. *See* White Decl., Ex. 8, Reference Manual on Scientific Evidence at 598–99; *see also* White Decl., Ex. 9, A. Bradford Hill, *The Environment and Disease: Association or Causation?*, 58 Proc. R. Soc. Med. 295, 295 (1965). Critically, Dr. Sawyer has admitted that he has not evaluated the epidemiological studies for purposes of determining causation. *See, e.g.,* White Decl., Ex. 1, Sawyer *Seidl* Rpt. at 24 (admitting that he looked at the six epidemiology studies referenced in his report "primarily with respect to dose assessment."); Ex. 3, Sawyer *Schafer* Dep. at 21:17-22:1; 97:5-12. Rather, he has deferred the detailed analysis of the epidemiology studies to other experts. *See, e.g.,* White Decl., Ex. 1, Sawyer *Seidl* Rpt. at 24; Ex. 3, Sawyer *Schafer* Dep. at 43:10-19. Because Dr. Sawyer has not analyzed the epidemiology evidence to determine whether there is an association between Roundup and NHL, he cannot properly reach any general causation opinion.

Nor can Dr. Sawyer testify about animal or mechanism studies without explaining how such evidence can be properly extrapolated to humans. *See, e.g.*, *Gen. Elec. Co. v. Joiner*, 522 U.S. 136, 145 (1997) (excluding animal data where expert failed to adequately extrapolate to humans). Here, although Dr. Sawyer describes certain animal and genotoxicity studies in his report, he admits he did not fully analyze them for purposes of determining causation and offers no explanation for how the results of those studies can be extrapolated to reach a conclusion that Roundup can cause NHL in humans. *See, e.g.,* White Decl., Ex. 3, Sawyer *Schafer* Dep. at 97:5-12 ("I defer to other experts in this case . . . as I focused primarily on the dose aspects as opposed to the review of the entire body of animal and human epidemiological studies with respect to general causation.").

## II. The Court Should Exclude Dr. Sawyer's Specific Causation Opinions.

Dr. Sawyer likewise did not use a reliable methodology to reach his specific causation opinions, which should be excluded. Dr. Sawyer did not perform a true differential diagnosis in this case. Nevertheless, he seeks to opine that Roundup was "a substantial contributing factor to" the development of Plaintiff's cancer. *E.g.,* White Decl., Ex. 1, Sawyer *Seidl* Rpt. at 5-6, 152. This opinion should be excluded because Dr. Sawyer has not followed any valid methodology. *See, e.g.*, *Marmo*, 457 F.3d at 758. Dr. Sawyer apparently concludes that Roundup is "a substantial contributing factor" for Plaintiff's NHL based primarily on exposure-related data extracted from epidemiology studies, which, as explained above, he has not fully evaluated for purposes of determining causation. Moreover, there is nothing "specific" about such a causation analysis—it would deem Roundup to be a "substantial contributing factor" for *any individual anywhere in the world* who alleges exposure to Dr. Sawyer's hypothetical threshold amount of glyphosate. As if to confirm the point, Dr. Sawyer did not attempt to analyze many of Plaintiff's other potential risk factors or Plaintiff's specific subtype of NHL, instead deferring those analyses to other experts or simply ignoring it altogether. Dr. Sawyer's results-driven process is not a valid specific causation analysis and should be excluded.

### A. Dr. Sawyer's Opinion that Roundup Is a "Substantial Contributing Factor" to Plaintiff's NHL Is Not the Proper Subject of Toxicology Expert Testimony.

The purported foundation for Dr. Sawyer's "specific causation" opinion is his comparison of the number of days Plaintiff allegedly used Roundup to thresholds from six epidemiology studies, which, according to him, demonstrate that a person with a certain level of exposure, calculated by Dr. Sawyer in "exposure days," is always at an increased risk of developing NHL. White Decl., Ex. 1, Sawyer *Seidl* Rpt. at 4-6; 22-30; 151-52. Dr. Sawyer should be prohibited from offering his "specific causation" opinions for multiple reasons.

#### 1. Dr. Sawyer is Not Qualified to Draw Conclusions on Causation from the Epidemiology Studies.

Dr. Sawyer is not an epidemiologist, does not consider himself an epidemiology expert and has specifically disclaimed any attempt to evaluate or interpret the relevant epidemiology studies for purposes of determining causation. *See* White Decl., Ex. 1, Sawyer *Seidl* Rpt. at 24; Ex. 3, Sawyer *Schafer* Dep. at 21:17-25. Indeed, Dr. Sawyer consistently testifies that he defers to epidemiologists

on virtually every aspect of the epidemiology studies, from big-picture questions about the sufficiency of human data to show a connection between Roundup and NHL, to other matters such as epidemiological study design, statistical analysis of data, and the validity of epidemiological studies. *See, e.g.,* White Decl., Ex. 1, Sawyer *Seidl* Rpt. at 24; Ex. 3, Sawyer *Schafer* Dep. at 43:10-19; 96:23-97:19. The Court should not allow Dr. Sawyer to opine on topics that exceed his expertise, including extracting alleged thresholds from studies he is not qualified to evaluate. *See Dura Auto. Sys. of Ind., Inc. v. CTS Corp.*, 285 F.3d 609, 614 (7th Cir. 2002).

       2.   <u>Dr. Sawyer's Comparisons of Plaintiff's Alleged Exposure Doses to "Exposure Thresholds" in Various Epidemiological Studies Do Not Support His Opinions on Specific Causation.</u>

Even if Dr. Sawyer were qualified to analyze the epidemiology data on which he based his opinions, that analysis could not justify his conclusion that Roundup caused a *particular plaintiff's* cancer. Dr. Sawyer has repeatedly confirmed that under his counting-of-days "analysis," all of the following are deemed irrelevant: the actual amount of Roundup allegedly absorbed in Plaintiff's body, the intensity of any exposure, the type of equipment Plaintiff used to apply Roundup, Plaintiff's use of any personal protective equipment, and Plaintiff's efforts to clean Roundup off of his skin after exposure events. *See, e.g.,* White Decl., Ex. 3, Sawyer *Schafer* Dep. at 44:5-24; 47:1-9; 50:2-18; 52:10-53:8; Ex. 1, Sawyer *Seidl* Rpt. at 5; *see also* White Decl., Ex. 4, Sawyer *Seidl* Dep. at 34:23-38:3 (admitting he has not analyzed Mr. Seidl's spraying equipment). Instead, the sole determining factor for his "analysis" is the number of "exposure days" Plaintiff allegedly experienced and whether that number exceeds thresholds from Dr. Sawyer's handpicked epidemiology studies. However, even *general* causation cannot be established with epidemiology alone, as Plaintiff's experts concede and as this Court has previously determined. *See* White Decl., Ex. 10, Tr. of Proceedings, Testimony of Dr. Christopher J. Portier, *Pilliod v. Monsanto Co.,* No. RG-170862702 (Cal. Sup. Ct. Alameda Cnty. Apr. 3, 2019) at 1893:3–8; *see also In re: Roundup*, 390 F. Supp. 3d at 1116 ("[w]hether [an] agent *causes* the outcome, however, cannot be proven by epidemiological studies alone"). Without question, it cannot establish specific causation. But that is what Dr. Sawyer has done: he has concluded that Roundup caused Plaintiff's cancer merely because Plaintiff was exposed to Roundup for a number of days that exceeds the minimal "exposure days" threshold presented by certain epidemiological data

points from studies he has not fully analyzed.  *See* White Decl., Ex. 1, Sawyer *Seidl* Rpt. at 4-6; 22-30; 151-52.

Moreover, as Dr. Sawyer has expressly acknowledged in other MDL cases, exposure and absorption are not equivalent concepts.  *See, e.g.,* White Decl., Ex. 11, Sawyer *Cervantes* Dep. at 93:22-25; 94:1-99:23.  Dr. Sawyer admits that Roundup exposure can be harmful, even under his flawed theory, only if it is absorbed into the body.  *Id*. at 98:13-100:3.  Yet he concedes that he did not determine the amount of Roundup that Plaintiff allegedly *absorbed*.  *See* White Decl., Ex. 1, Sawyer *Seidl* Rpt. at 5.  Thus, Dr. Sawyer cannot draw conclusions on specific causation based on his calculated "exposure days," which say nothing about the amount of Roundup that was actually absorbed by Plaintiff.

### 3. The Epidemiology Data on Which Dr. Sawyer Relies is Unreliable.

Additionally, most of the epidemiology data on which Dr. Sawyer relies for his specific causation opinions is unreliable because it was not adjusted for the use of other pesticides.  Although his report focuses on six epidemiology studies, Dr. Sawyer has stated in this MDL that the "three primary studies" on which he relies for his specific causation opinions are McDuffie, Eriksson, and Andreotti.  White Decl., Ex. 12, Sawyer *Giglio* Dep. at 66:5-10.[1]  Dr. Sawyer concedes that Andreotti, which is part of the Agricultural Health Study, "did not find a statistically elevated risk of NHL" (White Decl., Ex. 1, Sawyer *Seidl* Rpt. at 26), so that study does not support his conclusions on specific causation.  Dr. Sawyer also relies on Eriksson and McDuffie, which he states reported odds ratios of 2.36 and 2.12, respectively, for those with greater than ten days per lifetime of exposure (in Eriksson) and greater than two days per year of exposure (in McDuffie).  White Decl., Ex. 1, Sawyer *Seidl* Rpt. at 25.  However, those studies did not adjust for exposure to other pesticides.  *See* White Decl., Ex. 12, Sawyer *Giglio* Dep. at 78:13-80:18; *see also In re Roundup Prods., Liab., Lit.*, 390 F. Supp. 3d at 1119–

---

[1] The other three studies on which Dr. Sawyer relies—Leon, Zhang, and Pahwa—are not "principal" studies. Rather, they are meta-analyses or pooled analyses that combine data from *other* principal studies like McDuffie, Eriksson, and Andreotti.  *See* White Decl., Ex. 1, Sawyer *Seidl* Rpt. at 26-28.  Furthermore, Leon found no association between risk of NHL overall and use of glyphosate. White Decl., Ex. 1, Sawyer *Seidl* Rpt. at 26-27; *see also* White Decl., Ex. 13, EPA, *Memorandum: Glyphosate: Epidemiology Review of Zhang et al. (2019) and Leon et al. (2019) publications for Response to Comments on the Proposed Interim Decision* (Jan. 6, 2020) at 13-17.  Thus, that study does not support Dr. Sawyer's conclusions.  And Zhang has been sharply criticized for its faulty methodologies and flawed conclusions.  *See id.* at 2-13.

20. As this Court has already determined, "[f]ailing to take account of likely confounders by presenting and relying upon only unadjusted (or minimally adjusted) estimates is a serious methodological concern." *Id.* at 1140. Dr. Sawyer's reliance on unreliable data from studies that did not adjust for other pesticide exposure provides another basis for exclusion of his specific causation opinions.

    4. <u>None of the Epidemiology Studies on which Dr. Sawyer Relies Supports His Opinion that Roundup Caused Plaintiff Seidl's Follicular Lymphoma</u>

Plaintiff has a subtype of NHL known as follicular lymphoma. White Decl., Ex. 4, Sawyer *Seidl* Dep. at 33:7-10. Follicular lymphoma is a distinct subtype of NHL with unique risk factors and causes. As Dr. Sawyer has admitted, he is not aware of any study showing a statistically significant association between follicular lymphoma and glyphosate. White Decl., Ex. 4, Sawyer *Seidl* Dep. at 33:11-34:18; Ex. 3, Sawyer *Schafer* Dep. at 84:11-23; 85:9-23; 88:9-18; 92:12-16. Thus, because Dr. Sawyer's opinions on specific causation are based on epidemiology studies that he admits do not show a statistically significant increased risk of follicular lymphoma associated with glyphosate use, Dr. Sawyer's specific causation opinions as to Plaintiff's follicular lymphoma are fundamentally unreliable and should be excluded for this reason as well.

    **B.**    **Dr. Sawyer Did Not Consider Other Potential Causes of Plaintiff's NHL.**

Dr. Sawyer's failure to consider other possible causes of Plaintiff's NHL confirms that his "specific causation" opinion is not, in fact, a reliable opinion on *specific* causation. In his report, Dr. Sawyer claims that he performed "differential diagnoses," White Decl., Ex. 1, Sawyer *Seidl* Rpt. at 4, yet he paradoxically admits that he deferred the analysis of genetic predisposition to other experts, *id.* at 19 n. 78. Moreover, during his deposition, Dr. Sawyer admitted that he simply ignored some of Plaintiff's other occupational and environmental exposures that may have contributed to his NHL. White Decl., Ex. 4, Sawyer *Seidl* Dep. at 15:8-17:13; 19:24-20:22; 21:25-23:16; 24:22-25; 29:8-30:10; 47:10-52:11 (ignoring Mr. Seidl's other occupational and environmental exposures). These represent just some of the many examples of Dr. Sawyer's failure to properly consider, analyze, rule out, and testify about other potential causes of a Plaintiff's NHL. By omitting a fulsome analysis of Plaintiff's potential risk factors or deferring such an analysis to other experts, Dr. Sawyer relinquished any basis to offer a specific causation opinion. He cannot properly reach such an opinion without considering

Plaintiff's individual circumstances, such as whether his cancer might be attributable to some factor other than Roundup.  *See, e.g., Marmo*, 457 F.3d at 758 (affirming district court's exclusion of toxicologist where toxicologist "did not exclude confounding factors, which 'leaves open the possibility of competing causes of the disease' and raises questions about the competency of expert testimony.").

In sum, there is nothing "specific" about Dr. Sawyer's specific causation opinion.  His methodology consists of simply counting days of exposure and seeing if they exceed exposure-days plucked from hand-selected epidemiology studies he is not qualified to analyze, with only a cursory and incomplete examination of Plaintiff's unique circumstances.  Thus, any specific causation opinion he attempted to offer would be based on nothing more than his say-so, and should be excluded.

### III.    The Court Should Exclude Dr. Sawyer's Opinions Regarding the George Study.

Based primarily on the George study, Dr. Sawyer seeks to opine that Roundup "promoted" cancer in Plaintiff.  This opinion should be excluded because the George study has been rejected as inadequate for scientific analysis.  The George study was a small study that, in relevant part, was designed to determine if glyphosate *initiated* tumors or if it *promoted* tumors generated by a known tumor initiator.  It concluded that glyphosate "*failed* to provoke neoplastic development when tested as tumor initiator or complete carcinogen," but did show "carcinogenic potential" as a tumor promotor.  White Decl., Ex. 5, George 2010 at 954 (emphasis added).  The George study was evaluated by several major national and international agencies—including EPA and IARC—and the study was uniformly found by them to be inadequate for scientific purposes:

- White Decl., Ex. 6, EPA, Office of Pesticide Programs, *Revised Glyphosate Issue Paper: Evaluation of Carcinogenic Potential* (Dec. 12, 2017) at 70 ("A number of studies were **judged to be inadequate in protocol, conduct or reporting** and were not considered in the analysis of glyphosate . . . An initiation-promotion study (George et al., 2010) in male Swiss mice that tested a commercial formulation of glyphosate (41%) on the skin.  Study deficiencies included small number (20) of animals, tested only males, and lack of histopathological examination." (emphasis added)).

- White Decl., Ex. 7, IARC, *Glyphosate in Some Organophosphate Insecticides and Herbicides: Diazinon, Glyphosate, Malathion, Parathion, and Tetrachlorvinphos, Monograph Vol. 112 on the Evaluation of Carcinogenic Risks to Humans* (2015) at 32 ("Short duration of treatment, no solvent controls, and lack of any histopathological evaluation, Age at start, NR (mice weighed 12–15 g bw) The Working Group concluded **this was an inadequate study for the evaluation of glyphosate**." (emphasis added)).

- White Decl., Ex. 14, BAuA[2], Proposal for Harmonized Classification and Labeling: N phosphonomethyl)glycine; Glyphosate (ISO), CLH Report for Glyphosate (2016) at 66 ("**[George] cannot contribute to a decision on the classification of glyphosate**." (emphasis added)).

Despite this consensus view rejecting the George study as inadequate and unreliable, Dr. Sawyer strays far into the realm of speculation by opining that Roundup can promote cancer in humans and did promote cancer in Plaintiff, based primarily on his interpretation of this study.  Moreover, Dr. Sawyer makes an unsupported leap by inferring from a study of chemicals painted on mouse skin that Roundup specifically can promote *NHL* in *humans*.  See, e.g., *Joiner*, 522 U.S. at 145.  Even Plaintiff's general causation expert, Dr. Portier, has testified that he *cannot* conclude that glyphosate is a cancer promoter based solely on the George study.  See White Decl., Ex. 15, Portier *Hardeman* Dep. at 157:19-158:18 (Dr. Portier admitting that he would "want to see a lot more evidence" in addition to the George study before affirmatively concluding that glyphosate/Roundup is a cancer promoter).  Yet that is effectively what Dr. Sawyer seeks to do, warranting exclusion of such opinion.

**IV.    The Court Should Exclude Dr. Sawyer's Opinions Regarding Trace Chemicals.**

Like most pesticides, Roundup contains trace amounts of certain chemicals in addition to its active ingredient.  EPA considers these chemical "impurities" to be safe because they are present at extremely low (i.e. "trace") levels.  *See*, *e.g.*, White Decl., Ex. 16, EPA, Proposed Interim Registration Review Decision Case No. 0178 (April 2019), at 10 (finding that glyphosate is not likely to be carcinogenic to humans despite noting that "[m]ost pesticide products contain substances in addition to the active ingredient . . . .").[3]  There is no scientific evidence of causation linking these trace chemicals to NHL at doses remotely comparable to those at issue here; indeed, Dr. Sawyer does not even calculate the dose of these chemicals to which Plaintiff was allegedly exposed.  And Dr. Sawyer has pointed to no scientific evidence suggesting that exposure to Roundup is a cancer risk *because of these trace chemicals*.  See White Decl., Ex. 18, Sawyer *Lamb/Cohen* Dep. at 176:20-177:5.

Dr. Sawyer nevertheless intends to offer unsupported testimony that trace levels of these

---

[2] The BAuA is Germany's Federal Institute for Occupational Safety and Health.

[3] *See also* White Decl., Ex. 17, Tr. of the Dep. of Charles Benbrook, *Hall, et al. v. Monsanto Co.*, No. 1622-CC01071 (Mo. Cir. Ct. St. Louis Cty. May 23, 2018) at 277:20-278:4 (admitting that he has no reason to believe that the "impurities" in Roundup can cause NHL).

chemicals (assuming they were even present in the particular bottles of Roundup allegedly used by Plaintiff) are carcinogenic *and* that they caused or contributed to Plaintiff's cancer. *See* White Decl., Ex. 1, Sawyer *Seidl* Rpt. at 46-48. This testimony is designed solely as a sideshow to distract, confuse, and provoke fear in the jury. At the most recent Roundup trial, Dr. Sawyer dramatically implied, without any scientific evidence, that trace ingredients in Roundup could kill a person upon opening the Roundup bottle. White Decl., Ex. 19, Tr. of Proceedings, Testimony of Dr. William R. Sawyer, *Pilliod v. Monsanto Co.*, No. RG-170862702 (Cal. Sup. Ct. Alameda Cnty. Apr. 11, 2019) at 3131:6-3132:16 ("A: [Ethylene oxide] is a sterilization gas. It kills every type of biological life on earth . . . if I had a little air in the bottle, as one of our jurors has sitting there, that over time that air in the bottle, the ethylene oxide would accumulate in that air space. Q: . . . So this actually has Roundup that's been sitting in here for a while. If I were to open up this cap, what would happen? A: There would be ethylene oxide escaping from that head space."). Dr. Sawyer's unsupported comments on these trace chemicals are speculative, inappropriate, and inadmissible. *See Guidroz-Brault v. Missouri Pacific R. Co.*, 254 F.3d 825, 829 (9th Cir. 2001). They should be excluded.

### V. Dr. Sawyer Should Not Be Permitted to Opine on Monsanto Company Documents and Regulatory Duties.

If permitted, Dr. Sawyer also intends to offer inadmissible expert testimony on Monsanto company documents and Monsanto's regulatory duties. This proffered testimony is beyond Dr. Sawyer's area of expertise and beyond the realm of proper expert testimony. Having an expert narrate company documents, under the guise of explaining terminology, is improper expert testimony because it invades the province of the jury. *See Sanchez v. Boston Sci. Corp.*, No. 2:12-CV-05762, 2014 WL 4851989, at *32 (S.D. W. Va. Sept. 29, 2014); *City of New York v. FedEx Ground Package Sys., Inc.*, No. 13 Civ. 9173 (ER), 2018 WL 2941455, at *4 (S.D.N.Y. Oct. 10, 2018). Moreover, even a properly qualified expert may not opine as to the intent, motive, or state of mind of a corporation or its officers, because that would substitute the expert's judgment for the jury's. *See, e.g., Oracle America Inc., et al. v. Hewlett Packard Enterprise Co.*, No. 16-cv-01393-JST, 2018 WL 6511146, at *3 (N.D. Cal. Dec. 11, 2018). Accordingly, Dr. Sawyer should be precluded from offering opinions related to Monsanto company documents or Monsanto's supposed state of mind.

Relatedly, Dr. Sawyer is not qualified to opine on the ultimate issue of the adequacy of Roundup's EPA-regulated labeling. He has never drafted the labeling for an herbicide. *See* White Decl., Ex. 20, Sawyer *Pilliod* Dep. at 337:7-11. He has never been asked by EPA or any other regulator to opine on the contents of a label for an herbicide. *Id.* at 337:22-338:2. And he has never been invited by EPA to advise on labeling. *Id.* at 338:3-6. In fact, in the past, Dr. Sawyer has specifically deferred to other experts on these topics and has refused to answer questions about them. *See, e.g.,* White Decl., Ex. 18, Sawyer *Lamb/Cohen* Dep. at 177:23-178:18; 191:5-19. Dr. Sawyer is unqualified to offer any opinions about Monsanto's compliance with EPA regulatory requirements, and accordingly, any such opinions should be excluded.

## CONCLUSION

For the reasons set forth above, the Court should grant Monsanto's Motion to Exclude Testimony of Dr. William Sawyer.

Dated: October 5, 2021               Respectfully submitted,

/s/ *Jed P. White*
Jed P. White
Attorneys for Defendant Monsanto Company

**CERTIFICATE OF SERVICE**

I HEREBY CERTIFY that on this 5th day of October, 2021, a copy of the foregoing was filed with the Clerk of the Court through the CM/ECF system which sent notice of the filing to all appearing parties of record.

/s/ Jed P. White
Jed P. White