**WILKINSON STEKLOFF LLP**
Brian L. Stekloff (*pro hac vice*)
(bstekloff@wilkinsonstekloff.com)
Rakesh Kilaru (*pro hac vice*)
(rkilaru@wilkinsonstekloff.com)
2001 M St. NW
10th Floor
Washington, DC 20036
Tel:    202-847-4030
Fax:    202-847-4005

**HOLLINGSWORTH LLP**
Eric G. Lasker (*pro hac vice*)
(elasker@hollingsworthllp.com)
1350 I St. NW
Washington, DC 20005
Tel: 202-898-5843
Fax: 202-682-1639

**COVINGTON & BURLING LLP**
Michael X. Imbroscio (*pro hac vice*)
(mimbroscio@cov.com)
One City Center
850 10th St. NW
Washington, DC 20001
Tel: 202-662-6000

**BRYAN CAVE LEIGHTON PAISNER LLP**
K. Lee Marshall (CA Bar No. 277092)
(klmarshall@bclplaw.com)
Three Embarcadero Center, 7th Floor
San Francisco, CA 94111
Tel: 415-675-3400
Fax: 415-675-3434

Jed P. White (CA Bar No. )
(jed.white@bclplaw.com)
120 Broadway, Suite 300
Santa Monica, CA 90401
Tel:  310-576-2100
Fax: 310 -576-2200

*Attorneys for Defendant Monsanto Company*

**UNITED STATES DISTRICT COURT**

**NORTHERN DISTRICT OF CALIFORNIA**

| | |
|---|---|
| IN RE: ROUNDUP PRODUCTS LIABILITY LITIGATION, | MDL No. 2741<br><br>Case No.: 3:16-md-02741-VC |
| *Seidl v. Monsanto Co.*, 3:17-cv-00519-VC | **DECLARATION OF JED P. WHITE IN SUPPORT OF DEFENDANT MONSANTO COMPANY'S MOTION TO EXCLUDE TESTIMONY OF DR. WILLIAM SAWYER**<br><br>Hearing date: TBD<br>Time: TBD |

**DECLARATION OF JED P. WHITE**

I,      Jed P. White, declare and state as follows:

1.      I am a partner at the law firm of Bryan Cave Leighton Paisner LLP, counsel for defendant Monsanto Company ("Monsanto").  I make this declaration in support of Monsanto's Motion to Exclude Testimony of Dr. William Sawyer.

2.      Annexed hereto as Exhibit 1 is a true and correct copy of the Expert Report of Dr. William Sawyer, dated August 13, 2020, for *Seidl v. Monsanto Company*, Northern District of California Case No. 3:19-cv-00519-VC.

3.      Annexed hereto as Exhibit 2 is a true and correct copy of Plaintiff's Specific Causation Expert Disclosures, dated January 22, 2021, in *Seidl v. Monsanto Co.*, Northern District of California Case No. 3:17-cv-00519-VC.

4.      Annexed hereto as Exhibit 3 is a true and correct copy of the transcript of the Deposition of Dr. Sawyer, taken February 16, 2021, in *Schafer v. Monsanto Co.*, Northern District of California Case No. 3:19-cv-02169.

5.      Annexed hereto as Exhibit 4 is a true and correct copy of the transcript of the Deposition of Dr. Sawyer, taken March 8, 2021, in *Seidl v. Monsanto Co.*, Northern District of California Case No. 3:17-cv-00519-VC.

6.      Annexed hereto as Exhibit 5 is a true and correct copy of George, J., et al., *Studies on glyphosate-induced carcinogenicity in mouse skin: A proteomic approach*, 73 Journal of Proteomics 951 (2010).

7.      Annexed hereto as Exhibit 6 is a true and correct copy of EPA Office of Pesticide Programs, *Revised Glyphosate Issue Paper: Evaluation of Carcinogenic Potential* (Dec. 12, 2017).

8.      Annexed hereto as Exhibit 7 is a true and correct copy of IARC, *Glyphosate in Some Organophosphate Insecticides and Herbicides: Diazinon, Glyphosate, Malathion, Parathion, and Tetrachlorvinphos, Monograph Vol. 112 on the Evaluation of Carcinogenic Risks to Humans* (2015).

9.      Annexed hereto as Exhibit 8 is a true and correct copy of excerpts of the Reference Manual on Scientific Evidence.

10.     Annexed hereto as Exhibit 9 is a true and correct copy of A. Bradford Hill, *The Environment and Disease: Association or Causation?*, 58 Proc. R. Soc. Med. 295, 295 (1965).

11.     Annexed hereto as Exhibit 10 is a true and correct copy of excerpts of the April 3, 2019, trial transcript from *Pilliod, et al. v. Monsanto Company, et al.* Alameda Superior Court Case No.: RG17862702.

12.     Annexed hereto as Exhibit 11 is a true and correct copy of the transcript of the Deposition of Dr. Sawyer, taken February 16, 2021, in *Cervantes v. Monsanto Co.*, Northern District of California Case No. 3:19-cv-03015-VC.

13.     Annexed hereto as Exhibit 12 is a true and correct copy of excerpts of the transcript of the Deposition of Dr. William Sawyer, taken September 15, 2019, for *Giglio v. Monsanto Company*, Northern District of California Case No. 3:16-cv-05658-VC.

14.     Annexed hereto as Exhibit 13 is a true and correct copy of EPA, *Memorandum: Glyphosate: Epidemiology Review of Zhang et al. (2019) and Leon et al. (2019) publications for Response to Comments on the Proposed Interim Decision* (Jan. 6, 2020).

15.     Annexed hereto as Exhibit 14 is a true and correct copy of BAuA, Proposal for Harmonized Classification and Labeling: N (phosphonomethyl)glycine; Glyphosate (ISO), CLH Report for Glyphosate (2016).

16.     Annexed hereto as Exhibit 15 is a true and correct copy of excerpts of the transcript of the Deposition of Dr. Christopher J. Portier, taken February 21, 2019, for *In re: Roundup Products Liability Litigation*, Northern District of California Case No. 16-md-02741-VC.

17.     Annexed hereto as Exhibit 16 is a true and correct copy of excerpts of EPA, Proposed Interim Registration Review Decision Case No. 0178 (April 2019).

18.     Annexed hereto as Exhibit 17 is a true and correct copy of excerpts of the transcript of the Deposition of Dr. Charles Benbrook, taken May 23, 2018, for *Hall, et al. v. Monsanto Company*, St. Louis City Case No. 1622-CC01071.

19.     Annexed hereto as Exhibit 18 is a true and correct copy of excerpts of the transcript of the Deposition of Dr. William Sawyer, taken July 22, 2019, for *Lamb v. Monsanto Company*, St. Louis County Case No. 17SL-CC03681.

WHITE DECLARATION - MOTION TO EXCLUDE TESTIMONY OF DR. SAWYER

20.     Annexed hereto as Exhibit 19 is a true and correct copy of excerpts of the April 11, 2019, trial transcript from *Pilliod, et al. v. Monsanto Company,* Alameda Superior Court Case No.: RG17862702

21.     Annexed hereto as Exhibit 20 is a true and correct copy of excerpts of the transcript of the Deposition of Dr. William Sawyer, taken February 6, 2019, for *Pilliod, et al. v. Monsanto Company*, Superior Court of California, County of Alameda Case No. RG17862702

I declare under penalty of perjury under the laws of the United States that the foregoing is true and correct.  Executed this 5th Day of October, in Santa Monica, California.

_____

Jed P. White

WHITE DECLARATION - MOTION TO EXCLUDE TESTIMONY OF DR. SAWYER

**CERTIFICATE OF SERVICE**

I HEREBY CERTIFY that on this 5th day of October, 2021, a copy of the foregoing was filed with the Clerk of the Court through the CM/ECF system which sent notice of the filing to all appearing parties of record.

*/s/ Jed P. White*
Jed P. White

# EXHIBIT 1

*TCAS*

**Toxicology Consultants & Assessment Specialists, LLC**

6450 Pine Avenue, Sanibel, FL 33957
29 Fennell Street, Skaneateles, NY  13152
(239) 472-2436 [FL]  (315) 685-2345 [NY]  (800) 308-0080 U.S./CA
E-mail: drsawyer@experttoxicologist.com & Website: experttoxicologist.com

Toxic Exposures · Environmental Testing · Risk Assessment · Forensic Toxicology · Causation Evaluation

August 13, 2020

John Tomlinson, Esq.
Beasley Allen Law
218 Commerce Street
Montgomery, AL  36103

**Re: Seidl v. Monsanto**

Dear Attorney Tomlinson:

Per your request with regard to this matter, I have reviewed the complete list of pertinent documents as compiled in Appendix A. Based upon the information provided and the application of generally-accepted toxicological methodology and referenced sources as cited herein, I have stated my opinions in this matter to reasonable toxicological certainty.

Randall Dean Seidl v. Monsanto
August 13, 2020
Page 2

## Contents

1. Introduction ..................................................................................................................... 4
   Overview of Toxicological Methodology .......................................................................... 4
   Objectives ........................................................................................................................ 4
2. Plaintiff Background Summary ....................................................................................... 6
   NHL Diagnosis and Pathology ........................................................................................ 6
   Family Medical History .................................................................................................... 7
   History of Tobacco, Alcohol and Drug Use ..................................................................... 8
   Employment History ........................................................................................................ 8
   Exposure Factors ............................................................................................................ 9
      Residential Applications ............................................................................................. 9
      Personal Protective Equipment (PPE) ..................................................................... 13
      Deposition of Laurinda Seidl dated December 11, 2019 .......................................... 14
      Interview of Randall Seidl, January 30, 2020 .......................................................... 15
      Potential Confounding Exposures ............................................................................ 18
      Scope of Exposures and Exposure-Day Calculations .............................................. 22
      NHL Latency Interval ................................................................................................ 23
   Glyphosate Human NHL Studies ................................................................................... 24
      Summary of Epidemiological Studies ....................................................................... 29
      Comparisons of Exposure Days to Human Epidemiological Studies ........................ 30
   Personal Protective Equipment (PPE) and Measured Dermal Exposure Levels ........... 30
      Penetration of Glyphosate through Clothing ............................................................ 31
      Lack of Personal Protective Equipment (PPE) ........................................................ 32
      Dermal Exposure of Glyphosate Applicators ........................................................... 34
      Example of Roundup Exposure of 1,4-dioxane (no gloves, short sleeves) .............. 35
      Omission of PPE Labeling Recommendations by Monsanto ................................... 37
      Key Points Pertaining to Exposed Body Parts ......................................................... 39
3. Glyphosate Exposure & Toxicity .................................................................................. 40
   Monsanto's Glyphosate Biomonitoring and Dose Measurement Reliability .................. 40
   Glyphosate (Roundup) History and Use ........................................................................ 42
      Contaminants within Roundup (Surfactants, Adjuvants and Co-formulants) ........... 43
   Carcinogenic Substances in Roundup ........................................................................... 46
      Cancer or Tumor Promotion ..................................................................................... 49
   Roundup and Glyphosate Genotoxicity ......................................................................... 56
      Genotoxic Agents, Promotors and Inadequately Studied Chemicals ....................... 56
      Studies Demonstrating Genotoxicity and Mutagenic Effects of Glyphosate ............ 57
      Further Evidence of Genotoxic Effects ..................................................................... 60
      Prasad Study: Chromosomal Aberrations and Micronuclei in Bone Marrow Cells ... 68
      Genotoxicity of Roundup, Glyphosate and POEA/Tallowamine (POEA) in Fish: ...... 71
      Recent Genotoxic Study of Pesticides (2019) .......................................................... 73
      Modes of Action and Safety Considerations ............................................................ 74
   Glyphosate (Roundup) Formulations: Chemical and Physical Information .................... 76
   Toxicological Considerations of Exposure and Dose .................................................... 80
      Systemic Dose .......................................................................................................... 80
      Routes of Exposure .................................................................................................. 81
      Ingestion ................................................................................................................... 81
      Inhalation .................................................................................................................. 81
      Dermal Absorption .................................................................................................... 82
      Mechanisms of Absorption ....................................................................................... 83
         The Dermal Barrier ............................................................................................... 83
         Percutaneous Absorption of Glyphosate .............................................................. 86
         Percutaneous Absorption Models ......................................................................... 87

Randall Dean Seidl v. Monsanto
August 13, 2020
Page 3

Dermal Absorption *In Vivo* Measurement Methods ........................................................................ 88
Dermal Absorption *In Vitro* Measurement Methods ....................................................................... 88
Other Measurement Models and Methods ....................................................................................... 89
Dosing Techniques and Measurement Considerations ..................................................................... 90
*In Vitro* Dermal Absorption of Herbicides through Rat versus Human Skin ................................... 91
"Triple Pack" Methodology ................................................................................................................ 91
Dermal Absorption Correspondence Between Monsanto and DTL Laboratory ................................ 93
DTL Laboratory Human Epidermis Preparation Methods ................................................................. 93
Dermal Absorption and Pharmacokinetic Studies of Glyphosate ..................................................... 95
Models Used to Measure Glyphosate Dermal Absorption ............................................................ 95
Maibach Study (1983) .................................................................................................................... 95
Wester, et al., Study (1991) ........................................................................................................... 97
Concern of Cross-Contamination in the Wester, et al., Study (1991) .......................................... 101
Review of Monsanto Studies ............................................................................................................. 103
Monsanto *in Vitro* Absorption Study of Glyphosate by DTL (2010) - (MON 79545) 450 g/L
Glyphosate SL Formulation (MON 79545) .................................................................................... 103
Tape Stripping ........................................................................................................................... 105
Monsanto *in Vitro* Absorption Study of Glyphosate by DTL (2010) - (MON 52276) ................... 106
Monsanto *in Vitro* Absorption Study of Glyphosate by DTL (2010) - (MON 79351) ................... 107
Monsanto *in Vitro* Absorption Study of Glyphosate by DTL (2015) - (MON 76829) 72 g/L
Glyphosate Gel Formulation ......................................................................................................... 107
Monsanto *in Vitro* Absorption Study of Glyphosate by DTL (2015) - (MON 76258) 7.2g/L
Glyphosate Gel Formulation ......................................................................................................... 109
Monsanto *in Vitro* Absorption Study of Glyphosate by DTL (2016) - (MON 76952) 500 g/L
Glyphosate SL Formulation ........................................................................................................... 111
Monsanto *in Vitro* Absorption Study of Glyphosate by DTL (2015) - (MON 76879) 360 g/L
Glyphosate SL Formulation ........................................................................................................... 112
Effects of Temperature on Skin Used in Laboratory Experiments ..................................................... 115
Studies, Reviews & Articles Impacted by Wester and Maibach Studies ............................................ 122
Regulatory Guidance on Dermal Absorption and Recovery ............................................................... 126
Monsanto Communications with Respect to Pharmacokinetics ........................................................ 127
Factors Intensifying Dermal Absorption of Glyphosate .................................................................... 131
Co-Formulants ............................................................................................................................... 132
Surfactants ..................................................................................................................................... 133
Indirect Disclosures of Surfactant and Co-Formulant Toxicity ..................................................... 135
Examples of Surfactant and Co-Formulant Toxicity ...................................................................... 136
Regulatory Considerations Based on Surfactant and Co-Formulant Toxicity ............................... 137
Monsanto TNO Dermal Penetration Study with Co-Formulant Cocoamine ................................. 138
Humectants ................................................................................................................................. 142
Adjuvants .................................................................................................................................... 143
Enhanced Absorption Due to Skin Damage ............................................................................... 143
Glyphosate's Role in Skin Damage ............................................................................................ 144
Other Factors Increasing Dermal Absorption ............................................................................ 144

4. Toxicological Assessment of Glyphosate Exposures ......................................................................... 146
Non-Hodgkin's Lymphoma Latency Estimates ................................................................................. 146
Summary of Objective Toxicological Factors .................................................................................... 148
Evidential Considerations .............................................................................................................. 149
Summary and Conclusions ................................................................................................................ 152

Appendix A: Documents ......................................................................................................................... 153
Previously Disclosed Documents (Whitby deposition and prior) ....................................................... 153
New Materials Reviewed Specific to Seidl ........................................................................................ 176

Randall Dean Seidl v. Monsanto
August 13, 2020
Page 4

# 1. Introduction

This section of the report assesses historical exposures by the plaintiff in the current matter, Mr. Randall Dean Seidl, to Monsanto's Roundup® product. Mr. Seidl was diagnosed with follicular grade III lymphoma (non-Hodgkin's lymphoma) allegedly as a result of repeated exposures to this product. This section also assesses specific causation as well as differential diagnoses of potential chemical, pharmaceutical and radiological exposures and other potential confounding toxic etiological factors.

### Overview of Toxicological Methodology

Throughout this assessment, I have applied the generally-accepted Bradford Hill and weight-of-evidence (WOE) methodology using peer-reviewed toxicological studies. Frequency and duration of exposure, circumstances of application, personal protective equipment (PPE), environmental considerations and other pertinent factors have been compiled and referenced to human toxicological and epidemiological studies. Potential exposures to other chemical and/or radiological substances (including use of pesticides, paint, paint solvents, other home gardening/landscape chemicals, occupational exposures, etc.) have also been assessed as potential confounding factors with respect to NHL causation. Smoking history (pack-years and cessation duration, if any), family medical history, alcohol consumption, drugs-of-abuse, prior diagnoses with respect to any immuno-suppressive diseases, prior malignancies (if any) and any prior pharmacological intervention which may present increased toxicological risks of NHL (such as cyclophosphamide) have also been assessed. Additionally, the NHL diagnosis and pathology records have been referenced with respect to subtypes or other significant findings. Supporting toxicological studies, literature citations, footnote references to testimony and other references relied on are itemized in Appendix A and footnoted throughout as appropriate.

### Objectives

One of the primary objectives of this toxicological assessment is to arrive at a scientifically accurate and reliable time-weighted exposure dose for Mr. Seidl based on 8-hour time-weighted exposure days (for comparison with the human epidemiological studies of applicators). My toxicological assessment is also designed to evaluate and weigh all other potential contributing toxicological factors and assess the latency period from initial exposure to the time of Mr. Seidl's diagnosis. Additionally, based on the available objective evidence and state-of-the-art scientific literature, I will determine whether or not

Randall Dean Seidl v. Monsanto
August 13, 2020
Page 5

the alleged Roundup cumulative dosage was a substantial contributing factor to the development of Mr. Seidl's NHL.

Mr. Seidl's exposures have been assessed based on historical information received through review of deposition testimony, personal fact sheets, photographs and direct interview pertaining to his exposure events, circumstances and details. From this information, a cumulative time-weighted dose for Mr. Seidl has been calculated using simple additive mathematical methodology in units of 8-hour time-weighted "exposure days" for comparison to the threshold values in the human epidemiological studies of applicators that revealed statistically-significant elevated odds ratios (ORs).

Although specific calculations were not performed, the generally-accepted predicted operator exposure model (POEM) has also been assessed with respect to dose and exposure factors such as gloves vs. no gloves, type of nozzle (aerosol vs. CDA[1]), professional applicator exposures vs. home users, etc. It should be noted that dose measurements assessed using the POEM methodology in units of mg/kg/day are of limited use and can only be gauged against the "acceptable operator exposure limit" (AOEL) which is designed for protection against **non-cancer endpoints** (*i.e.*, reproductive toxicity among rodents; it does not assess human cancer risk).

The POEM methodology has been peer-reviewed, generally-accepted, used internationally and tested with a known rate of error as published within the seven studies footnoted below.[2]

---

[1] Controlled droplet application.

[2] Abukari, Wumbei, "Pesticides Applicator Exposure Assessment: A Comparison between Modeling and Actual Measurement," 2015, Journal of Environment and Earth Science ISSN 2224-3216 (Paper) ISSN 2225-0948 (Online) Vol.5, No.11.

U.K. Health and Safety Executive, HSE, "Operator Exposure," 2016, Data requirements handbook, Retrieved from: http://www.hse.gov.uk/pesticides/topics/pesticide-approvals/pesticides-registration/data-requirements-handbook/operator-exposure.htm

"Operator exposure assessment for MON 2139 UK – Case" MONGLY06509236

"UK POEM calculations in preparation of meeting Spanish competent authorities." MONGLY01275627

Lawson, A., et al., "Three Methods to Assess Levels of Farmers' Exposure to Pesticides in the Urban and Peri-urban Areas of Northern Benin," 2017, Tunisian Plant Protection Journal, Vol.12, pp. 91–108.

Illyassou, K., et al., "Risk Assessment for Small Farmers Exposed to Plant Protection Products in the Niger River Valley," 2017, Comm. Appl. Biol. Sci.

EPA, "Risk Assessment Methodology for Hazardous Substances: How to assess the risk, cost and benefit of new hazardous substances for use in New Zealand," 2018, Environmental Protection Authority.

Randall Dean Seidl v. Monsanto
August 13, 2020
Page 6

Hence, this toxicological assessment has four fundamental objectives: (1) to arrive at a scientifically-reliable exposure dose estimation for Mr. Seidl (*in units of 8-hour time-weighted exposure days*) based upon the available objective evidence, (2) to assess the potential of confounding risk factors contributing to his NHL onset, (3) to provide a general causation assessment of personal protective gear (PPE), product formulation, toxicological factors such as absorption, distribution, metabolism and excretion (ADME) and mechanism of action of Roundup and (4) to render a scientifically-supported and reliable opinion as to whether Mr. Seidl's Roundup exposures (dose) were sufficiently above the thresholds within the peer-reviewed studies to substantially contribute to the development of his NHL.

## 2.  Plaintiff Background Summary

Sixty-three year-old Randall Dean Seidl was born on ███████████████, in Wichita, Kansas. He graduated from high school in 1975 and attended Cowley County Community College for one year, then Friends University in Wichita from which he earned a B.S. in business administration and agribusiness in 1979. He lived in Kansas until June 1997 when he moved to Johannesburg, South Africa. He returned to the U.S., settling in San Antonio, Texas, in September 2004 where he lived for about six years before moving to Charlotte, North Carolina. He has two daughters, Jordan, age 30, and Mackenzie, age 28.[3]

Mr. Seidl applied Roundup® regularly in San Antonio, Texas, from approximately 2005 to 2010, and in Charlotte, North Carolina, from approximately 2010 through 2014. He was subsequently diagnosed with follicular lymphoma (a type of non-Hodgkin's lymphoma) in Charlotte, North Carolina, on or about November 19, 2014.[4]

**NHL Diagnosis and Pathology**

In September 2014, Mr. Seidl presented to his physician with a non-tender mass in his neck which he discovered while shaving. He had no other symptoms, but the mass had increased in size during the intervening period (approximately one month).

An ultrasound on September 29, 2014, disclosed a 4.3 cm mass anterior to the common carotid bifurcation. A CT scan on October 2, 2014, showed a solitary pathologically enlarged node with no additional adenopathy. On October 7, 2014, a fine needle

---

[3]  Third Amended Plaintiff Fact Sheet of Randall Seidl, 12/11/2019.

[4]  Exhibit #9, "Case 3:17-cv-00519-VC Document 1 Filed 11/07/16," page 2 of 57.

Randall Dean Seidl v. Monsanto
August 13, 2020
Page 7

aspiration revealed atypical lymphoid cells suspicious for lymphoma. The pathology from an October 27th excisional biopsy of the right cervical lymph node disclosed follicular lymphoma (grade 3 of 3). By immunohistochemistry, the large atypical lymphoid cells were positive for C020, BCL-2, BCL 6, C010, CD5 and showed an approximate 60% proliferation rate by Ki-67 tumor cells, negative for cyclin 01 and p53.

A PET scan on November 17, 2014, revealed a large, hyper-metabolic, right level II cervical mass and a few hyper-metabolic mediastinal, left axillary and peri-portal lymph nodes consistent with the clinical diagnosis of lymphoma. There were also a couple of hyper-metabolic lytic osseous lesions suspicious for lymphoma. There was nonspecific uptake in the gastric body and fundus and in the left adrenal gland.[5]

Mr. Seidl's subsequent NHL diagnosis was reported as "Follicular Grade III Lymphoma Stage IV." Following his diagnosis, he completed six cycles of R-CHOP chemotherapy between December 3, 2014, and March 18, 2015. A follow-up PET/CT scan on March 27, 2015, failed to reveal any metabolically-active lymph nodes.[6]

**Family Medical History**

Mr. Seidl's paternal grandparents died from old age. His maternal grandmother died at age 60 from brain cancer. His mother died in 1986 at age 60 after having been diagnosed with breast cancer (she had been a smoker).[7] His father died from Lewy Body Disease (LBD, a type of dementia) at approximately age 85. He has no other direct family history of cancer (his mother's half-brother died from colon cancer). He has a sister who is currently age 65 and has never had cancer. No one in his family has ever had a hematopoietic malignancy. Neither of his two daughters have any significant health problems.[8]

Mr. Seidl had never before been diagnosed with cancer. He was never diagnosed with a serious health condition as a child, teenager or young adult. He does not have AIDS, lupus, colitis, Crohn's disease, rheumatoid arthritis, celiac disease, ulcers, eczema or psoriasis. He has not had diabetes, Epstein Barr, Hepatitis B or C. He has never had an

---

[5]  Levine Cancer Inst South Tryon, Office/Clinic Visit Notes, 6/19/2015.

[6]  Id., page 3 of 438.

[7]  Deposition of Randall Seidl, dated 12/11/2019, pages 221-223.

[8]  Id., pages 223-225.

Randall Dean Seidl v. Monsanto
August 13, 2020
Page 8

organ or stem cell transplant or taken immunosuppressive pharmaceuticals. Hypertension was his only prevalent medical condition.[9]

On March 21, 2016, Mr. Seidl's height and weight were 5'11" and 87.1 kg (192 pounds), respectively[10] (the most he has ever weighed is 194 pounds). He is not allergic to any medications nor has he ever had an adverse reaction to a vaccine. He was hospitalized overnight at age 30 when he had a fever with unknown etiology.[11] He had his tonsils removed at age three. He is presently taking telmisartan for hypertension and has been doing so for some 20 years. He had a vasectomy after his second daughter was born.[12]

**History of Tobacco, Alcohol and Drug Use**

Mr. Seidl is a lifetime non-smoker.[13]  He does not smoke cigars or engage in vaping nor has he ever chewed tobacco. He characterizes his alcohol intake as minimal, on average *"five drinks a week or something."*[14] He tried marijuana long ago while in college but his experimentation ended at graduation. He testified in deposition that he does not use illegal drugs or abuse pharmaceuticals.[15]

**Employment History**

Mr. Seidl has previously worked in farming/agriculture; he worked at a co-op. He has woodworking experience from when he served as a trim carpenter's assistant. He worked for the Anthony Kansas Farmers co-op one summer; his responsibilities included shoveling grain from the back of a truck, loading feed into customers' trucks and pumping gasoline for cars at the gas station (for one summer).[16] He worked cutting pine boards for a trim carpenter for three months in 1979.[17]

---

[9]  Id., pages 220-221.

[10]  Id., pages 16, 438.

[11]  Id., pages 188-189, 219.

[12]  Deposition of Laurinda Seidl dated 12/11/2019, page 46.

[13]  Id., page 6 of 438.

[14]  Deposition of Randall Seidl dated 12/11/2019, page 215.

[15]  Id., page 217.

[16]  Id., pages 12-13.

[17]  Id., page 90.

Randall Dean Seidl v. Monsanto
August 13, 2020
Page 9

In 1980, he began working for Southwestern Bell Corporation which later became AT&T. He has continuously worked for AT&T with the exception of a two-and-a-half year period wherein he worked as a stock broker for Prudential Bache in Wichita.[18]

It is significant to note that Mr. Seidl was never required to use chemicals, herbicides, pesticides, rodenticides or insecticides at any of his workplaces.[19] In those cases where exposures were of concern, he was required to wear personal protective gear. For example, he worked from 1979 to 1980 as a purchasing agent in a corporate setting for a chemical company. This was a chlorinated solvent plant and when he went outside (which was rare), he was required to wear a hard hat and goggles as well as carry a respirator in case of emergency. In the (approximately) 20 times he had ventured outdoors to the main facility, he never needed the respirator.[20]

## Exposure Factors

Mr. Seidl began using Roundup® in May 2005 to control weeds on his personal property in San Antonio, Texas. He hand-sprayed Roundup® Weed & Grass Killer residentially one to two times per week from 2005-2010. He sprayed Roundup® Weed & Grass Killer Extended Control on his residential property in Charlotte, NC, from 2011-2014. He sprayed mainly in the summer. once per week, with occasional winter applications.

## Residential Applications

Since 2010, Mr. Seidl has lived with his wife, Laurinda, at his current address (█████ ███████████████████████████████). He briefly lived in an apartment prior to this but did not apply Roundup® at that location.[21] He applied Roundup® over a period of 24 years (1990 through 2014) at various residences.[22] His primary exposures occurred at two residences as noted in **Table 1** which summarizes Mr. Seidl's residential history.

---

[18] Id., pages 14-15.

[19] Id., page 106.

[20] Id., pages 107-108.

[21] Id., page 7.

[22] Id., page 47.

Randall Dean Seidl v. Monsanto
August 13, 2020
Page 10

**Table 1**

**Residential History of Mr. Randall Seidl**

| Dates | Address | Roundup® Application Frequency [23] |
|---|---|---|
| 2011 - present | Charlotte, NC | At least weekly through 2014 |
| 09/2004 – 10/2010 | San Antonio, TX | At least weekly |
| 06/1997 – 09/2004 | Johannesburg, South Africa | None |
| 02/1995 to 06/1997 | Overland Park, KS | Once per month |
| 01/1990 to 02/1995 | Olathe, KS | Once per month |

- ████████████████████████████████████. This residence consists of a 0.18-acre lot. Mr. Seidl applied Roundup® here from 2011 through 2014.[24] He applied Roundup® ready-to-use at this residence approximately once per week. He recalled in deposition that he sprayed the weeds growing through the bricks about once per month. He normally purchased one container about once per month. The largest container he purchased was a one-gallon size.[25]

Mr. Seidl presented a duplicate receipt from Ace Hardware (Charlotte) to verify his purchase of Roundup® Extended Control Pump/Go on 5/04/2014. He retains the empty bottle[26] at his residence. It appears to be a 24-ounce bottle of ready-to-use Roundup®.

Mr. Seidl applied Roundup® along the edge of his driveway and in the brick courtyard in the backyard of his Charlotte property.[27] The times of day he applied Roundup® varied at this property according to weather and circumstances.[28]

- ████████████████████████████. He purchased Roundup® for this residence primarily from Home Depot. He testified that he purchased both Roundup® Weed and Grass Killer 64-ounce Concentrate Plus and Roundup® 35.2-ounce Weed and Grass

---

[23] Per deposition of Randall Seidl, various pages.

[24] Deposition of Randall Seidl dated 12/11/2019, page 43.

[25] Id., page 133.

[26] Id., page 27. He poured the remaining contents into a paint can and disposed of it as hazardous waste.

[27] Id., pages 158-160.

[28] Id., pages 168-169.

Randall Dean Seidl v. Monsanto
August 13, 2020
Page 11

Killer Concentrate. He estimated that he bought four bottles of concentrated Roundup® per year.[29] He applied Roundup® for six years at this 0.5 acre property.

Mr. Seidl applied Roundup® on all areas of the property except where he had grass in the front yard and in an area right behind the house.[30] He applied Roundup® to edge around the grass areas, around the house and the beds. He did some targeted spraying for weeds that popped up in the beds.[31] He testified that he mowed his lawn twice per week; usually on Wednesdays and Saturdays. He spent a minimum of five hours doing yard work on Saturdays; at least one hour was spraying Roundup®. On the Wednesdays[32] that he worked in the yard, he spent approximately 2-1/2 hours working of which approximately one hour was spent spraying.

During the 2005 season, he spent more time spraying Roundup® on Saturdays (approximately two hours), and he did not spray on Wednesdays during that season.[33] Mr. Seidl would mix the Roundup® concentrate with water and spray, then remix if necessary and finish spraying before moving on to his other chores.[34]

During the 2005 season, the lot next to him was overgrown. Mr. Seidl stated that he sprayed Roundup® on that entire lot. He used a 1-gallon, hand-pump sprayer. Once he pumped it up and turned it on, he sprayed continuously using a broad, sweeping motion.[35] *"I was just kind of all over the place as I was walking along, usually along borders, looking for weeds. Would spend extra time where I saw like poison ivy and that kind of thing, just wanted to make sure I knocked that down."*[36] He estimates that during the 2005 season, he used approximately 2.5 gallons of Roundup® per week.

He stated that the weed growing season at this residence was approximately nine months. He typically mixed a 1-gallon batch. He would use one gallon of spray twice per week at a minimum. Weekly during the weed growing season, he would use one or two gallons of spray mixture depending on what he was doing. Then additionally on

---

[29] Id., page 37.

[30] Id., page 53.

[31] Id., pages 58-59.

[32] Wednesday was usually the day he had to mow the grass again.

[33] Deposition of Randall Seidl dated 12/11/2019, pages 59-61.

[34] Id., page 60.

[35] Id., pages 53-55.

[36] Id., page 54.

Randall Dean Seidl v. Monsanto
August 13, 2020
Page 12

some Wednesdays, he would use up to another gallon of the spray.[37] He generally did not spray during the winter months.

For mixing, Mr. Seidl began in the garage where he would read the label for the amount of concentrate required for one gallon of water, measure the concentrate into the red cap and then pour it into the sprayer. He would then take the sprayer to the garden hose outside and fill the sprayer; the pressure from the hose was enough to mix the contents. He would pump up the sprayer and spray continuously until all the mixture was used, re-pumping as necessary. He would mix additional Roundup® if he needed more. He never saved leftover mixture; he used up the entirety that was mixed.[38]

He generally started his Saturday yard work at 8 or 9 am and would always stop by 3 pm and get cleaned up.[39] His usual routine for working in the yard was to spray Roundup® for the first hour, then mow the lawn, and then trim the trees, etc.[40] Mr. Seidl drew a diagram of his San Antonio property indicating where he sprayed Roundup® along the perimeters with hash lines. He sprayed the open area in the backyard without being careful because there was no vegetation there that he worried about killing. He didn't like to spray the whole area of wild grass and plants down to dirt, but he wanted to kill the vines and poison ivy.[41]

Mr. Seidl used his foot to protect the grass from the spray when he edged around the lawn with Roundup®. *"I would use my foot to stand on the grass, and then I would spray from an edging stand point so as not to get it on the grass, and -- and just kind of do that, so I'd get a nice -- nice edge on it."*[42] The spray would splash off the rocks and regularly wet his ankle, leg and shoe.[43]  Mr. Seidl also noted that he did not clean the sprayer between uses.[44]

- **Kansas Residences (2).** Mr. Seidl applied Roundup® while living at two single-family homes in Kansas. He estimates the properties were one-third-acre lots. He used

---

[37] Id., pages 38-39.

[38] Id., pages 142-144.

[39] Id., page 168.

[40] Id., page 145.

[41] Id., page 167.

[42] Id., pages 164-165.

[43] Id., page 165.

[44] Id., page 156.

Randall Dean Seidl v. Monsanto
August 13, 2020
Page 13

ready-to-use Roundup® about once per month.[45] He believes he always applied the same Roundup® product, but he doesn't recall any details about the packaging.[46]

Mr. Seidl testified that he read the Roundup® label regarding the mixing instructions, but he does not recall if he read anything more than that.[47]

Mr. Seidl testified that Roundup® was the only brand of herbicide that he ever purchased. He recalled that the containers always had an opening at the top. The ready-to-use Roundup® products he used in Kansas and North Carolina had squirters rather than wands. When using the concentrate in Texas, he always used a 1-gallon plastic sprayer with a wand. He could not recall the brand of sprayers he used, but they were not Roundup® brand sprayers.[48] He stored Roundup® in his garage.

**Personal Protective Equipment (PPE)**

Mr. Seidl wore safety glasses ("open-air glasses") while working in his yard for protection from tree limbs and debris hitting his eyes.[49] He seldom wore gloves and never wore other protective equipment associated with spray applications.

When spraying at his San Antonio residence, he wore shorts and a short-sleeved shirt (both cotton) while mixing.[50] He testified that sometimes the concentrate splashed onto his skin while he was mixing and he would not wash it off immediately; *"Just keep going."*[51]

Mr. Seidl testified that he typically wore a dedicated pair of tennis or running shoes with no socks while spraying. He never wore a mask while using Roundup®.[52]

On occasion, Mr. Seidl would have to adjust the wand nozzle causing the mixture to get on his hands in the process. Again, he kept going without washing it off.[53] He occasionally wore cloth gloves so he wouldn't cut his hands when he moved sharp rocks to spray underneath. He did not wash the gloves; they were merely left in the garage.[54] *"It was*

---

[45] Id., page 75.

[46] Id., page 131.

[47] Id., pages 64-65.

[48] Id., pages 133-136.

[49] Id., page 154.

[50] Id., page 170.

[51] Id., page 144.

[52] Id., page 170.

[53] Id., page 45.

[54] Id., page 155.

Randall Dean Seidl v. Monsanto
August 13, 2020
Page 14

*very infrequent when I wore gloves. Normally, it was just barehanded."*[55] He also did not
wear gloves during mixing of the concentrate with water.[56]

Mr. Seidl testified that he contacted Roundup® on his skin every time he applied it.
*"Whether it be when I mixed it or when I sprayed it, absolutely. Every time."*[57] He reported
that it regularly came into contact with his hands, arms, legs, feet and ankles.[58] He
testified that this was true for both the San Antonio and Charlotte properties and probably
for his Kansas properties as well (since he used the same practices there) but he doesn't
specifically remember.[59]

Mr. Seidl avoided drift and over-spraying only when spraying around beds. In the vacant
lot next door in Texas, he sprayed whether or not it was windy. He was not concerned
with avoiding drift as he hoped the drift might help him get more coverage.[60]
Consequently, as he wore no personal protective equipment other than eye protection,
he received regular and substantial dermal contact with liquid Roundup®. Mr. Seidl noted
that his clothing was frequently wet. He does not recall ever having separated the clothing
that he wore while using Roundup® from his other clothing for washing.[61]

**Deposition of Laurinda Seidl dated December 11, 2019**

There were no contradictions between Mr. Seidl's deposition testimony and that of his
wife, Laurinda Seidl. Mrs. Seidl corroborated his recollections and deferred to his
testimony when she could not recall specific information.

She recalled seeing her husband use Roundup in San Antonio because it was a "*huge
property*" and "*because it was such a big production.*"[62] Although she doesn't recall him
using a wasp spray or ant killer, she believes that he did because they had wasps and
ants at that property.[63]

---

[55] Id., pages 153-154.

[56] Id., page 154.

[57] Id., page 172.

[58] Id., page 173.

[59] Id., page 172.

[60] Id., page 166.

[61] Id., page 171.

[62] Deposition of Laurinda Seidl dated 12/11/2019, pages 37, 45.

[63] Id., page 45.

Randall Dean Seidl v. Monsanto
August 13, 2020
Page 15

Mrs. Seidl testified that Mr. Seidl was in "*amazing shape*" and his health up until his NHL diagnosis was "unbelievable."[64] She stated that he has consistently exercised throughout the time she has known him.[65] She recalled that his weight had remained steady until he got sick; he "*lost a lot of weight*" and became "*very frail and thin*" after his NHL diagnosis.[66]

**Interview of Randall Seidl, January 30, 2020**

I conducted a telephone interview with Mr. Seidl to collect and verify information regarding his Roundup® exposure intervals, frequency of applications and description of use as well as his prior and family medical histories, other chemical exposures, etc.

Mr. Seidl reported that he has never smoked or used tobacco products. He used marijuana approximately twenty times in college but has never used any other drugs of abuse. He consumes approximately five alcoholic drinks per week and has for the past 15 years. He drank more, about seven drinks per week,[67] while living in South Africa. He has never been diagnosed with obesity; his maximum weight was 194 pounds.

He reported that he has never taken long-term steroids, methotrexate, cyclophosphamide or cyclosporine A prior to his NHL diagnosis. He had never been diagnosed with cancer prior to the NHL and has never had an organ or stem cell transplant. He has never had any bowel disease, rheumatoid arthritis, AIDS, HIV or Hepatitis B or C. He had never had a CT scan prior to his NHL.

Mr. Seidl has never lived near a Superfund or toxic waste site or where a gasoline tank may have been buried underground. He reported no solvent, gasoline, benzene, formaldehyde or petroleum product exposures. He has never welded or done any significant PVC plumbing.

He has never used Sevin, Snake Away, Scotts Weed-n Feed or 2-4, D. He has used Miracle Grow approximately twice, wasp spray occasionally, and ANDRO ant killer for fire ants at his San Antonio property. He sprinkled the granules around the ant mounds. He used a lawn service but does not know what chemicals they used. His grandfather had a farm where Mr. Seidl visited and "*saw cows*" between ages 3 and 15. He was not exposed to any chemicals at the farm.

---

[64] Id., page 46.

[65] Id., page 49.

[66] Id., page 50.

[67] Id., page 52.

Randall Dean Seidl v. Monsanto
August 13, 2020
Page 16

Mr. Seidl worked at a body shop as a "*clean-up guy*" for three months while in high school in 1975. He estimated working about nine hours per week; he never worked in the paint booth. He has painted interior walls in his home, always using latex paint. He has also painted the outside of one house.

In 1979, he worked as a purchasing agent at a chemical plant[68] that manufactured the chlorinated solvent, perchloroethylene, which is used in dry cleaning. He was never exposed to the chemicals as he worked in an office with the majority of his time spent on the phone. His office was in a separate building about ¼ mile from the plant. He carried a respirator with him when he left the office building in case of an emergency involving the chlorine gas.

Mr. Seidl could not recall any chemical exposures other than those discussed above.

Mr. Seidl remembers having watched a Roundup commercial wherein a man holding a Roundup container was standing in his driveway wearing shorts and a short-sleeved shirt with no gloves.

Regarding his Roundup use in Overland Park, Kansas, he reported that he sprayed ready-to-use Roundup® for about 20 minutes at least once per month during a growing season of five to six months. He reported that he had a similar routine when he lived in Olathe, Kansas.

In San Antonio, he used concentrated Roundup® which he mixed in a 1-gallon sprayer. The first season he was there (2005), he used Roundup® in his yard as well as in the "*wild*" empty lot next to his property. He spent two hours mixing and spraying every week. He described that, as he sprayed the vacant lot, he never let go of the trigger and used a carpet spraying motion. He recalled that many of the weeds had stickers and he leaned into them as he moved through the lot, spraying them down well. His calves would become scratched from walking through the sprayed weeds. There was a solid fence in his backyard where poison ivy climbed. As he would spray the Roundup® up and down the vines, it would bounce off the wall onto his skin. He wore shorts and a short-sleeved shirt when he sprayed so he felt the mist on his skin. He especially felt it on his ankles when he used his foot to protect the grass while he sprayed Roundup® "*to get a nice edge.*" He wore "*retired*" mesh running shoes with no socks when he sprayed and did yard work.  He sprayed Roundup® first and continued wearing the same shoes for hours

---

[68] The company was Volcan Materials and later became Oxy Chemical.

Randall Dean Seidl v. Monsanto
August 13, 2020
Page 17

as he finished his yard work. He and his neighbors had a routine to stop yard work by 3 pm on Saturday and then enjoy the weekend. He showered then after having had the Roundup® on his skin for several hours.

Following that first year, from 2006 to October 2010, he only used Roundup® in his own yard. It took him an hour to mix and spray every weekend during the nine month growing season. He also sprayed an additional day every two out of three weeks, usually on a Wednesday, for 45 minutes to an hour. He recalled that he broad-sprayed in a wild area of rocks and weeds in his backyard.

Mr. Seidl recalls the Roundup® container being white with a red cap. He doesn't remember the specific amount of concentrate he mixed with a gallon of water. He stated that he followed the directions and would occasionally err on the heavy versus light side to kill the weeds. He reported that the Roundup® concentrate typically contacted his skin as he poured it from the container into the red measuring cap and from the cap into the sprayer. He also had skin contact with the Roundup® mixture when he adjusted the nozzle on the sprayer wand. Approximately every other week, the sprayer would become "*wonky*" and he would remove the nozzle and tap it on a rock to clear out dirt or other debris. He experienced the Roundup® mixture wetting his hands and running between his fingers; he wiped his hands on his shorts and kept working. He never wore gloves when mixing the Roundup®. He wore light cotton gloves that cinched at the wrist for protection from the sharp rocks he had to move to spray underneath them. If he had to make adjustments to the nozzle while he was spraying under the rocks, he removed the gloves. He never washed the gloves; they were kept in the garage and re-used.  They were not replaced until they had a hole.

Mr. Seidl sprayed ready-to-use Roundup® weekly at his property in Charlotte, NC. He spent between 30 minutes and an hour spraying Roundup® during the March through November season.

Randall Dean Seidl v. Monsanto
August 13, 2020
Page 18

**Potential Confounding Exposures**

Mr. Seidl testified that he has never used Eraser, Buccaneer, Envy, Halex GT, Flexstar GT or Credit 41 Extra.[69] Mr. Seidl doesn't recall ever having used fungicides or being exposed to asbestos, radiation, benzene, diesel, lead or lead paint.[70]

Mr. Seidl testified that he stopped changing his own automobile oil in approximately 1992. He hires out painting and doesn't do any woodworking although in the past, he has cut wood to make shelves.[71] The homeowners' association managing his residence handles lawn care independently, and he is not aware of any of the products they use.[72] He used a separate company called "Kilo" in Charlotte for interior and exterior pest control.[73]

Mr. Seidl used AMDRO Fire & Ant Killer from 2005-2010 three times per year at his home in Texas.[74] He recalled that he only bought one bag, and he would sprinkle out only small amounts onto the ant hills.[75] From 2005-2019, he has used wasp spray about once per year. While residing in San Antonio, he employed a company for pest control of roaches, scorpions and centipede-like insects. He also used a different company to perform some of the fertilizing work at that property.[76] No other potentially confounding exposures were noted in his deposition, plaintiff fact sheet or accompanying documentation.

He has applied wasp spray about once every three years in North Carolina and about once every two years in Texas.[77] He recalls having applied Miracle Grow once in Charlotte.

---

[69] Deposition of Randall Seidl dated 12/11/2019, pages 175-176.

[70] Id., page 180.

[71] Id., page 177.

[72] Id., page 174.

[73] Id., page 172.

[74] 2-5 tablespoons around per mound.

[75] Deposition of Randall Seidl dated 12/11/2019, page 178.

[76] Id., page 175.

[77] Id., 140.

Randall Dean Seidl v. Monsanto
August 13, 2020
Page 19

**Table 2**

**Review of Potential Causative Factors**

| Potential Causative Factor | Yes/No |
|---|---|
| Family medical history[78] | No |
| Significant alcohol consumption history | No |
| Smoking history and pack-year calculations | No |
| Drugs-of-abuse | No |
| Any history of obesity? | No |
| Prior pharmacological regimens | No |
| Any history of hematopoietic malignancies or other cancers? | No |
| Ever been prescribed long-term immunosuppressive pharmaceuticals such as prednisone? | No |
| Ever prescribed cyclophosphamide or any other drugs to treat cancer prior to NHL treatment? | No |
| History of organ transplant? | No |
| Ever been diagnosed with HIV, AIDS? | No |
| Ever been diagnosed with Hepatitis B or C? | No |
| Ever been diagnosed with Crohn's disease? | No |
| Ever been diagnosed with rheumatoid arthritis? | No |
| Ever been diagnosed with ulcerative colitis? | No |
| Significant radiological exposures or CT scans prior to NHL treatment? | No |
| Ever lived near or adjacent to a Superfund site? | No |
| Paint and/or paint solvent exposure? | No (latex) |
| Significant exposures to benzene? | No |
| Exposure to petroleum products? | Yes (one summer)[79] |
| Any unusual or chronic gasoline exposures? | Yes (one summer)[80] |
| Use of solder for pipe welding? | No |

---

[78] Medical genetics deferred to oncologist.

[79] Inconsequential gasoline exposure based on studies of service station attendants (one summer, part-time exposure only to regular gasoline does not produce an elevated risk of NHL).

[80] Inconsequential gasoline exposure based on studies of service station attendants (one summer, part-time exposure only to regular gasoline does not produce an elevated risk of NHL or significant PPM benzene-years).

REDACTED VERSION OF DOCUMENT SOUGHT TO BE SEALED

Randall Dean Seidl v. Monsanto
August 13, 2020
Page 20

| Potential Causative Factor | Yes/No |
|---|---|
| Ever welded pipes? | No |
| Ever used plumbing PVC glue? | No |
| Use of a wasp killer or other insecticide/pesticide? | Yes (see Table 3) |
| Use of herbicide other than Roundup? | No |
| Use of Miracle-Gro? | Yes (see Table 3) |
| Use of AMDRO? | Yes (see Table 3) |
| Ever used 2,4-D? | No |
| Ever used Weed & Feed? | No |
| Ever used Snake-A-Way? | No |
| Ever used Sevin? | No |
| Use of any other home gardening/landscape chemicals? | Yes (see Table 3) |
| Use of latex paint? | Yes |
| Ever farmed or been exposed to livestock? | No |
| Other underlying chemical exposures? | Yes (see Table 3) |

Randall Dean Seidl v. Monsanto
August 13, 2020
Page 21

**Table 3**

**Carcinogenicity of Substances to Which Mr. Seidl Reported Potential Exposure**

| Name | Ingredients (per MSDS) | Known to Cause NHL? | Probable Human Carcinogen? | Comments |
|---|---|---|---|---|
| **Insecticides** | | | | |
| AMDRO Granular Ant Bait | Hydramethylnon 0.73% | No | No | MSDS reports no carcinogens[81] |
| Wasp Spray | Distillates (petroleum), hydrotreated light 90-100% | No | No | MSDS reports no carcinogens.[82] |
| | Carbon dioxide 1-3% | No | No | |
| | Tetramethrin 0.2% | No | No | |
| | d-Phenothrin 0.1% | No | No | |
| **Miscellaneous** | | | | |
| Miracle-Gro | Boric acid 0.1-0.3% | No | No | MSDS reports no carcinogens.[83] |
| Latex paint | Titanium dioxide 10-15% | No | No | MSDS reports titanium dioxide is an IARC Group 2B: possible human carcinogen, however no significant exposure is thought to occur in which titanium dioxide is bound |
| | Limestone 5-10% | No | No | |
| | Ammonia 0.1-0.5% | No | No | |

---

[81] "SDS: AMDRO Granular Ant Bait." BASF Australia Limited, 2015. https://crop-solutions.basf.com.au/preview/f/product/59cb352c8d5c5b7640c83739/Amdro-Granular-Ant-Bait-AU-SDS.pdf

[82] "SDS: Wasp & Hornet Killer Plus." CRC Industries, Inc., 2015. http://docs.crcindustries.com/msds/14010.pdf

[83] "MSDS: Miracle-Gro Water Soluble All Purpose Plant Food." Scotts Miracle-Gro Products, Inc., 2015. https://images.homedepot-static.com/catalog/pdfImages/04/04c34d6a-4aba-42ce-b23d-2738bf715b5c.pdf

Randall Dean Seidl v. Monsanto
August 13, 2020
Page 22

| Name | Ingredients (per MSDS) | Known to Cause NHL? | Probable Human Carcinogen? | Comments |
|------|------------------------|---------------------|----------------------------|----------|
|  |  |  |  | to other materials, such as paint.[84] |
| Motor Oil | Zinc compounds, NBOS 1-5% | No | No | MSDS reports no carcinogens.[85] |

## Scope of Exposures and Exposure-Day Calculations

**Table 4** presents a summary of Mr. Seidl's Roundup® exposure through his residential use of this product. The descriptions of the Roundup® products used, frequency of applications and exposure intervals were obtained from Mr. Seidl's deposition testimony and from a telephone interview conducted on January 30, 2020.

---

[84] "SDS: Benjamin Moore Dry Fall Latex Eggshell White." Benjamin Moore & Co., 2019. https://media.benjaminmoore.com/WebServices/prod/assets/production/datasheets/MSDS_0396/39601_SDS_EN_12-23-2019_.pdf

[85] MSDS: FormulaShell Motor Oil SAE 5W-20." SOPUS Products, 2008. https://ebpaving.com/wp-content/uploads/2013/09/FormulaShell-Motor-Oil-SAE-5W-20.pdf

Randall Dean Seidl v. Monsanto
August 13, 2020
Page 23

**Table 4**

**Calculation of Mr. Seidl's Roundup® Exposure Days**

| Location | Date | Years | Events Per Year | Hours Per Event | | | Total Hours | | | Minimum Exposure Days |
|---|---|---|---|---|---|---|---|---|---|---|
| | | | | Min | Mid | Max | Min | Mid | Max | (8 hours/day) |
| Olathe, KS | 1990-1995 | 5 | 5-6[86] | - | 0.33 | - | 8.25 | 9.13 | 10.0 | 1.0 |
| Overland Park, KS | 1995-1997 | 2.33[87] | 5-6 | - | 0.33 | - | 3.84 | 4.23 | 4.61 | 0.5 |
| San Antonio, TX | 2005 | 1 | 39[88] | - | 2.0 | - | - | 78.0 | - | 9.75 |
| | 2006-2010 | 4.78[89] | 39[90] | - | 1.0 | - | - | 186. | - | 23.3 |
| | 2006-2010 | 4.78 | 26[91] | 0.75 | 0.875 | 1.0 | 93.2 | 109. | 124 | 11.7 |
| Charlotte, NC | 2011-2014 | 4 | 39[92] | 0.50 | 0.75 | 1.0 | 78.0 | 117. | 156. | 9.75 |
| | | | | | | Totals | 447 | 503 | 559 | 56 |

The information compiled in **Table 4** reveals that Mr. Seidl sustained a minimum of **56** minimum exposure-days [447 ÷ 8 hrs/day], a maximum of **70** exposure-days [559 ÷ 8 hrs/day], and a midpoint of **63** exposure-days [503 ÷ 8 hrs/day].

**NHL Latency Interval**

On the basis of his first reported exposure to Roundup®, Mr. Seidl's latency interval to date of diagnosis was approximately **24 years** (1990-2014).

---

[86] Monthly spraying for 5 to 6 months per year.

[87] Spraying 2 months of the 1997 season.

[88] Weekly mixing and spraying on Saturdays from March through November.

[89] Mixing and spraying through September of 2010; 7/9 months.

[90] Weekly mixing and spraying on Saturdays from March through November.

[91] Mixing and spraying on Wednesdays from March through November; 2 out of every 3 weeks.

[92] Weekly from March through November.

Randall Dean Seidl v. Monsanto
August 13, 2020
Page 24

**Glyphosate Human NHL Studies**

My toxicological opinions with respect to dose are based, in part, on six (6) primary epidemiological studies that provide objective data with respect to several prongs of the Bradford Hill criteria. My toxicological opinion is grounded in animal experimental evidence, *in vitro* human studies and human epidemiological studies as summarized within this report and previously provided by Dr. Portier, et al., in the Federal Daubert motion proceedings. Specifically, I have assessed dose response, temporality, latency period, biological plausibility (toxicological mechanisms), coherence (demonstrated by molecular-based studies) and animal studies as well as the strength of association and consistency with the toxicological mechanisms of Roundup formulation ingredients. I have used the six primary epidemiological studies which include Eriksson, et al., 2008,[93] McDuffie, et al., 2001,[94] Andreotti, et al., 2018,[95] Leon, et al., 2019,[96] Zhang, et al., 2019[97] and Pahwa, et al., 2019,[98] primarily with respect to <u>dose assessment</u>.

My toxicological focus on these studies is on study design, statistical power and exposure thresholds at different odds ratios, etc. I am using these study results in my toxicological assessment in conjunction with generally-accepted, peer-reviewed studies on genotoxicity (including direct human studies) mechanisms of action (promotion, etc.) absorption, distribution, metabolism and excretion (ADME), etc. In general, I have relied on studies that have documented the various aspects of the Bradford Hill criteria at or in excess of the 95% confidence threshold. However, I am deferring to the epidemiologist with respect to the internal statistical designs and meta-analysis bio-statistical methodologies employed within each study.

---

[93] Eriksson, M., et al., "Pesticide exposure as risk factor for non-Hodgkin lymphoma including histopathological subgroup analysis," 2008, International Journal Cancer, Vol.123, pp. 1657 – 1663.

[94] McDuffie H., et al., "Non-Hodgkin's lymphoma and specific pesticide exposures in men: Cross-Canada study of pesticides and health," 2001, Cancer Epidemiology, Biomarkers & Prevention, Vol.10, pp. 1155 – 1163.

[95] Andreotti, G., et al., "Glyphosate Use and Cancer Incidence in the Agricultural Health Study," 2018, JNCI J Natl Cancer Inst., Vol.110 (5), doi: 10.1093/jnci/djx233.

[96] Leon, Maria, et al., "Pesticide use and risk of non-Hodgkin lymphoid malignancies in agricultural cohorts from France, Norway and the USA," 2019, International Journal of Epidemiology, pp. 1–17.

[97] Zhang, L., et al., "Exposure to Glyphosate Based Herbicides and Risk for Non-Hodgkin Lymphoma: A Meta-Analysis and Supporting Evidence," July-September 2019, Mutation Research/Reviews in Mutation Research, Volume 781, pp. 186-206. https://doi.org/10.1016/j.mrrev.2019.02.001

[98] Pahwa, M. et al., "Glyphosate use and associations with non-Hodgkin lymphoma major histological sub-types: findings from the North American Pooled Project," 2019 Jun 27, Scand J Work Environ Health. pii: 3830. doi:10.5271/sjweh.3830

Randall Dean Seidl v. Monsanto
August 13, 2020
Page 25

Summaries of these six studies are provided below:

1. **Eriksson, M., et al., 2008 study:**[99]   This is a peer-reviewed, case-control study of exposure to pesticides as a risk factor for non-Hodgkin's lymphoma (NHL) in cases in Sweden between 1999 and 2002. Different exposure levels were classified according to days of exposure.

   In this study, the association of glyphosate exposure with non-Hodgkin's lymphoma followed a dose response pattern with an odds ratio (OR) of 1.69 for 10 days of exposure or less, and 2.36 for greater than 10 days of exposure.

   The human epidemiological studies have demonstrated statistically significant increased rates of NHL associated with glyphosate exposure.  These studies include several different "exposure day" thresholds:  "ever/never," greater than one day and <10 days and greater than 10 days.

2. **McDuffie, H., et al., 2001:**[100]   This is a Canadian case-control study which investigated the association of specific pesticides and non-Hodgkin's lymphoma that created dose-response levels based on days/year of personally mixing or applying herbicides. The study revealed that glyphosate exposures between >0 and ≤ 2 days per year had an NHL odds ratio (OR) of 1.0 while exposures greater than 2 days of exposure per year had a NHL odds ratio of 2.12.

   The published McDuffie, et al., study presented "Table 6" in which glyphosate exposure was stratified according to "unexposed," ">0 and ≤2 days," and ">2 days" of per year exposure. The study documented statistically significant dose-responses: an odds ratio of **2.12** (1.20–3.73) for the ">2 days" per year group which was statistically significant.

3. **Andreotti, G., et al., 2018:**[101] The "Agricultural Health Study" (AHS) is an ongoing cohort study which includes 54,251 licensed pesticide applicators from Iowa and North

---

[99] Eriksson, M., et al., "Pesticide exposure as risk factor for non-Hodgkin lymphoma including histopathological subgroup analysis," 2008, International Journal Cancer, Vol.123, pp. 1657 – 1663.

[100] McDuffie H., et al., "Non-Hodgkin's lymphoma and specific pesticide exposures in men: Cross-Canada study of pesticides and health," 2001, Cancer Epidemiology, Biomarkers & Prevention, Vol.10, pp. 1155 – 1163.

[101] Andreotti, G., et al., "Glyphosate Use and Cancer Incidence in the Agricultural Health Study," 2018, JNCI J Natl Cancer Inst., Vol.110 (5), doi: 10.1093/jnci/djx233.

Randall Dean Seidl v. Monsanto
August 13, 2020
Page 26

Carolina with 82.8% reporting use of glyphosate. The study is funded by the National Cancer Institute and the National Institute of Environmental Health.[102] An updated evaluation of glyphosate and cancer risk was conducted in the AHS[103] and included cancer incidences through 2012 in North Carolina and 2013 in Iowa. The reported lifetime days' frequency of pesticide application is shown in **Table 5**.

**Table 5**

**Demographics of "Agricultural Health Study"[104] Cohort (Applicators n = 54,251)**

| Lifetime days of glyphosate use (Quartiles) | Lifetime days of glyphosate use (Tertiles) |
|---|---|
| 1 – 13.74 | 1 – 19.9 |
| 13.75 – 38.74 | 20 – 61.9 |
| 38.75 – 108.4 | ≥ 62.0 |
| ≥ 108.5 | |

Exposure days can be compared to **Table 5** with the corresponding quartiles or tertiles of the Agricultural Health Study to determine if his exposure was consistent with that of these applicators. The Agricultural Health Study did not find a statistically elevated risk of NHL; however, the study is useful with respect to comparison of other epidemiological studies.

4. **Leon, et al., 2019:**[105] In this analysis combining data from >300,000 farmers or agricultural workers from France, Norway and the USA and accruing more than 3.5 million person-years under risk, the possible association between pesticide use and the risk of lymphoid malignancies was investigated. Specifically, the authors investigated the relationship of the "ever use" of 14 selected pesticide chemical groups and 33 individual active chemical ingredients with non-Hodgkin's lymphoid malignancies (NHL). Pesticide use was derived from self-reported history of crops cultivated combined with crop-exposure matrices (France and Norway) or self-reported lifetime use of active ingredients (USA). Cox regression models were used to estimate cohort specific hazard ratios (HRs) and 95% confidence intervals (CIs) which were combined using random effects meta-analysis to calculate meta-hrs.

---

[102] Id.

[103] Id.

[104] Id.

[105] Leon, Maria, et al., "Pesticide use and risk of non-Hodgkin lymphoid malignancies in agricultural cohorts from France, Norway and the USA," 2019, International Journal of Epidemiology, pp. 1–17.

Randall Dean Seidl v. Monsanto
August 13, 2020
Page 27

During follow-up, 2,430 NHL cases were diagnosed in 316,270 farmers accruing 3,574,815 person-years under risk. Moderately elevated meta-HRs were seen for NHL overall or certain subtypes with use of specific pesticides compared with "<u>never</u>" use of the same pesticides. In particular, elevated hazard ratios of diffuse large B-cell lymphoma (DLBCL) <u>were seen with glyphosate use</u> (1.36, CI: 1.00–1.85). It is noteworthy that although this study found no association between risk of *all types of NHL overall* and ever use of glyphosate, there was a statistically-elevated risk of borderline significance for DLBCL (the most common type of NHL).

5. **Zhang, L., et al., (2019):**[106] The Zhang, et al., study is a meta-analysis design that included the most recent update of the Agricultural Health Study (AHS) cohort published in 2018 along with five case-control studies. The study reported that glyphosate-based herbicide (GBH) exposure is associated with increased risk of NHL in humans. Using the highest exposure groups when available in each study, they further reported that the overall meta-relative risk (meta-RR) of NHL in glyphosate-based herbicide exposed individuals was increased by 41% (meta-RR = 1.41, 95% CI, confidence interval: 1.13‑1.75). For comparison, a secondary meta-analysis using high-exposure groups with the earlier AHS (2005) determined a meta-RR for NHL of 1.45 (95% CI: 1.11‑1.91) which was higher than the meta-RRs reported previously.

6. **Pahwa, M. et al., (2019):**[107] In a 2019 study, the associations between glyphosate use and NHL incidence, overall, and by histological sub-type, were evaluated in a pooled analysis of case-control studies. NHL cases were recruited from cancer registries and hospitals in four states between 1991 and 1994, as well as six Canadian provinces. This analysis included 5,131 controls and 1,690 cases of NHL; 647 diffuse large B-cell lymphoma, 468 follicular lymphoma, 171 small lymphocytic lymphoma and 404 other sub-types. The authors found that subjects who had ever used glyphosate had an excess of NHL overall (OR 1.43, 95% CI 1.11-1.83). After adjustment for other pesticides, the OR for NHL overall with "ever use" was 1.13 (95% CI 0.84-1.51) with a statistically-significant association for handling glyphosate more than two days per year (OR 1.73, 95% CI 1.02-2.94, P-trend=0.2). In pesticide-adjusted NHL sub-type

---

[106] Zhang, L., et al., "Exposure to Glyphosate Based Herbicides and Risk for Non-Hodgkin Lymphoma: A Meta-Analysis and Supporting Evidence," July-September 2019, Mutation Research/Reviews in Mutation Research, Volume 781, pp. 186-206. https://doi.org/10.1016/j.mrrev.2019.02.001.

[107] Pahwa, M. et al., "Glyphosate use and associations with non-Hodgkin lymphoma major histological sub-types: findings from the North American Pooled Project," 2019 Jun 27, Scand J Work Environ Health. pii: 3830. doi:10.5271/sjweh.3830

Randall Dean Seidl v. Monsanto
August 13, 2020
Page 28

analyses, the ordinal measure of lifetime-days was statistically significant (P=0.03) for small lymphocytic lymphoma (SLL) and associations were elevated, but not statistically significant, for "ever years" or "days/year" of use.  The authors also showed that subjects handling glyphosate more than two days per year had an excess of DLBCL (OR 2.14, 95% CI 1.07-4.28).

These findings (as summarized in **Table 6**) are consistent with results reported from prior meta-analyses but show higher risk for NHL due to the focus on the highest exposure groups. The authors caution on the interpretation of the numerical risk estimates because of the heterogeneity between the studies. All the evidence from these studies of glyphosate-exposed mice support this association in humans and mechanistic studies of glyphosate-induced immunosuppression/inflammation, endocrine disruption, genetic alterations and oxidative stress suggest plausible links between GBH exposure and NHL development. The authors conclude "*The overall evidence from human, animal and mechanistic studies presented here supports a compelling link between exposures to GBHs[108] and increased risk for NHL*."

---

[108] Glyphosate-based herbicides.

Randall Dean Seidl v. Monsanto
August 13, 2020
Page 29

## Summary of Epidemiological Studies

**Table 6** shows the various exposure parameters and assessment metrics for the six (6) epidemiological studies noted herein.

**Table 6**

**Exposure Parameters for Six Referenced Epidemiological Studies[109]**

| Study | Type of study | Metrics (dose intervals) | Cut-off between Cases and Controls |
|---|---|---|---|
| | | **Exposure Parameters** | |
| McDuffie, H. et al., 2001 | Case-control study of men in six Canadian provinces. | Unexposed >0 days and ≤2 days >2 days/year | Cases were diagnosed with STS, HD, NHL or MM between 9/1/1991 and 12/31/1994. Controls did not have NHL diagnoses. |
| Eriksson, M., et al., 2008 | Case-control study of men and women in Sweden | ≤ 10 days >10 days | Cases were newly diagnosed NHL patients aged 18-74 years. Controls were randomly selected from the population registry. |
| Andreotti, G., et al., 2018 | Prospective cohort study of pesticide applicators | Never use Quartiles ranging from 1 day to ≥ 108.5 days Tertiles ranging from 1 day to ≥ 62.0 days | Cases reported ever use of glyphosate. Reference subjects may have used any other pesticides. |
| Leon, et al, 2019 | Pooled analysis of three agricultural worker cohorts | Ever use | Cases reported ever use of glyphosate. Reference subjects may have used any other pesticides. |
| Zhang, et al., 2019 | Meta-analysis | Ever use | 6 studies included in primary analysis: one cohort and five case-control. |
| Pahwa, M. et al., 2019 | Case-control study | 2 days/year | Subjects handling glyphosate more than two days/year had an excess of DLBCL (OR 2.14, 95% CI 1.07-4.28. |

---

[109] All studies in the table revealed statistically significant increased rates of some type of NHL, except Andreotti, et al., 2018. Leon, et al., reported a borderline statistic of 1.36, CI: 1.00–1.85.

Randall Dean Seidl v. Monsanto
August 13, 2020
Page 30

**Comparisons of Exposure Days to Human Epidemiological Studies**

The results of the "exposure-day" calculations (based on validated, reported exposure intervals in the above tables) indicate that Mr. Seidl's cumulative exposures were above <u>all</u> of the exposure threshold metric cut-offs. That is, he exceeded the *"ever exposed"* threshold, the *">0 and ˜ 2 days"* threshold, the *">2 days per year"* threshold, *"10 days of exposure or less,"* and *"10 or more hours per year"* exposure thresholds.

Putting this into a dose-metric context, Mr. Seidl's midpoint of ***63 exposure-days*** is greater than the highest tertile of exposure as defined in the Agricultural Health Study of "<u>></u>62 days" and lies within the third highest quartile of exposure defined as "<u>></u>38.75 and ≤108.4 days." (Note that no statistically-significant finding of NHL was reported in the Agricultural Health Study). Thus, Mr. Seidl closely approached the maximum exposure metrics of the cited human epidemiological studies documenting the fact that he was within range of human studies revealing *statistically significant increased NHL cases among glyphosate applicators*.

**Personal Protective Equipment (PPE) and Measured Dermal Exposure Levels**

It is generally recognized that personal protective equipment (PPE) constitutes an essential part of safe preparation, application and handling of potentially hazardous substances. With the exception of eye exposure warnings, the Roundup label has not provided sufficient toxicological warning information or PPE requirements. The WHO established a protocol for field surveys of exposed applicators to "*organophosphorus pesticides*" as well as a summary of the "*protective measures needed to be implemented to ensure safe use*" in 1981.[110] Liquid aerosol from an herbicide such as Roundup can be absorbed by exposed skin and/or by penetrating through clothing which comes into prolonged contact with skin. Such dermal absorption routes have been previously assessed in toxicological dose assessment studies (including studies by Monsanto).

Quantification of these routes of exposure must be based on objective, factual information to determine the dose contributed by each defined route. For example, early studies as cited by Machado-Neto, et al., of knapsack sprayers reveal that hands presented only 10 to 25% and legs 25 to 85% of the total dermal exposure route.[111]

---

[110] World Health Organization, "Field Surveys of Exposure to Pesticides", VBC/82 .1.

[111] Van Hemmen, 1992 *in* Machado-Neto, et al., "Safety of Working Conditions of Glyphosate Applicators on Eucalyptus Forests Using Knapsack and Tractor Powered Sprayers," 2000, Bull. Environ. Contam. Toxicol., Vol. 64, pg. 309-315.

Randall Dean Seidl v. Monsanto
August 13, 2020
Page 31

**Penetration of Glyphosate through Clothing**

Studies using gauze patches on the inside and outside of garments (paired patches) such as pants, shirts, etc., have been conducted to determine the penetration of glyphosate through clothing. Such studies use laboratory analyses to measure glyphosate or surrogate markers on each side of the fabric to determine the percent penetration.

A study of highly-protected glyphosate applicators concluded, "*Nevertheless, average values for all paired patches showed an average of 22.9% of the glyphosate deposited on worker clothing might be expected to penetrate through it.*"[112]

The applicators in this study wore protective clothing that consisted of a protective suit, rubber gloves and boots. Spraying was performed by placing a metal cylindrical shield on the end of the wand (a spray chamber) around each weed and then releasing only about 0.5 ml per spray which targeted the weeds <u>without drift;</u> thus, protecting nearby seedlings. Glyphosate deposition was analyzed from paired glyphosate collection patches on the outside and inside of the clothing worn by workers.

A recent study by Spaan et al.,[113] investigated exposure data, including actual dermal exposure (ADE) and potential dermal exposure (PDE), from three field study databases (BROWSE, ECPA, and BfR agricultural operator exposure model databases) which were analyzed to determine migration of pesticides through protective clothing for a more realistic assessment of occupational exposure to pesticides rather than just based on laboratory tests (which may overestimate the protective factor of garments). Migration was calculated by dividing the ADE and PDE then multiplying by 100 to obtain a migration value (percent). Estimation of migration was based on data from individual body parts and combining PDE and ADE values for all body parts in order to assess performance of garments for individual body parts and whole garments. For individual body parts, it was found that large variability in migration occurred, up to 99%, but in general, a limited level of 2.3% mean migration was observed with 75% of distribution below 9.3%. A higher percent of migration of pesticides was observed in garments that protected the body as compared to gloves. Mean migration through whole garments was 2.6% with 75% of distribution below 7.2%, with variability up to 71%. The results of this study indicate that laboratory tests may overestimate the protective factors of garments compared to field

---

[112] Lavy, T. et al., "Conifer Seedling Nursery Worker Exposure to Glyphosate," 1992, Arch. Environ. Contamin. Toxicolo. Vol.22, pg. 6-13.

[113] Spaan, S., et al., "Performance of a Single Layer of Clothing or Gloves to Prevent Dermal Exposure to Pesticides," 2020, Annals of Work Exposure and Health, pp. 1-20

Randall Dean Seidl v. Monsanto
August 13, 2020
Page 32

studies (real conditions). In both individual body parts and whole garment, more migration occurred during mixing/loading operator tasks as compared to mixing/loading and application together and application alone.

**Lack of Personal Protective Equipment (PPE)**

The presence of systemic glyphosate in humans has been well documented and previously reported.[114] Acquavella, et al., performed biomonitoring of 48 farmers, their spouses and 79 children (4-18 years) for glyphosate in urine the day before as well as one and three days after glyphosate application (tractor and boom). They reported detectable levels of glyphosate in urine on the day of application in sixty percent of the farmers (geometric mean was 3 ppb; the maximum value was 233 ppb and the highest estimated systemic dose was 0.004 mg/kg). The maximum value of 233 µg/L was from a farmer whose teenage son also had the highest urinary concentration of 29 µg/L among children. Farmers who did not use rubber gloves had five times more glyphosate in their urine than those wearing protective gloves.

Various glyphosate-based formulas were used with various surfactants and/or salts. The proportions of participants with detectable urinary glyphosate differed between the two states: 87% detection rate in South Carolina; 36% in Minnesota. The urine concentrations were similarly different: 7.9 µg/L on day of application in South Carolina; 1.4 µg/L on day of application in Minnesota. The proportion of applicators wearing rubber gloves in Minnesota (96%) was much greater than that in South Carolina (43%) suggesting that the use of gloves is responsible for the differences seen. It is interesting to note that a similar proportion of glove-wearing applicators was reported by Alavanja, et al., in 1999: 39% in North Carolina; 76% in Iowa.

A study of farmers' application of pesticides (mostly glyphosate-based formulations) in the Nanumba area documented that a typical farmer's usage of pesticides did not follow safe practices. Of 100 farmers, only 55% indicated that they checked pesticide label information while 42% indicated that they used pesticides without checking labels. Modeled farmer exposure to glyphosate was noted to be 0.3 mg/kg/BW/day on average (0.7 mg/kg-BW/day 95th percentile) when full personal protective equipment (PPE) was used and an average of  **4.2 (8.1 – 95th percentile) mg/kg-bw/day when PPE was not used**. It is noteworthy that 90% of the farmers reported to have never used masks, face

---

[114] Acquavella JF, Alexander BH, Mandel JS, Gustin C, Baker B, et al., "Glyphosate biomonitoring for farmers and their families: results from the Farm Family Exposure Study," 2004, Environ Health Perspect 112, pg. 321-326.

Randall Dean Seidl v. Monsanto
August 13, 2020
Page 33

shields, goggles or full respirators; less than 30% of the farmers reported using impermeable clothing. In terms of pesticide sprayed, farmers' dosing ranged widely including 9% of the farmers applying high doses between 7 and 12 L/ha and 3% of the farmers applying doses as high as 13 - 15 L/ha. These extremely high doses of herbicide were reported by those who use it for both land clearing and weeding.[115]

Dosemeci, et al.,[116] developed two algorithms to estimate long-term pesticide exposures by utilizing an enrollment questionnaire and a take-home questionnaire in the Agricultural Health Study Cohort of 58,000 pesticide applicators. Intensity level was determined based on applicators' exposure factors. In both algorithms, PPE was a major factor. In the detailed algorithm, additional factors were included such as washing pesticide equipment, replacing old gloves, personal hygiene and changing clothes. A total quantitative exposure score was determined by a formula based on intensity level, duration of exposure and frequency of exposure. The take-home questionnaire population (sub-cohort of applicators) represented the enrollment population (entire cohort of applicators) in terms of evaluation of health risk as they both showed similar intensity of exposure and distribution of exposure levels by demographic variables. With PPE being a major exposure factor, reduced or no PPE made a significant difference in the intensity level. Intensity was greater for no or little PPE which reflects more residential users versus occupational users in which PPE is typically used.

According to Wumbei, et al., 2019, human exposure to herbicides can occur due to accidents while mixing, loading or applying pesticides or contact with treated crops during field re-entry. The study notes that the risk of harm to the farmer is greater during mixing than during application. A quote by a farmer states "*Some of us do not care about how close they spray to water bodies. Some of us who farm along streams sometimes spray directly into the streams and still drink from these streams, especially the rice farmers. In fact, people are joking with the pesticides over here. Some people in the process of preparing the spray solution will even put their finger into the solution and put it at the tip of their tongue to know if the solution is strong enough to kill the weeds very well.*"

---

[115] Wumbei, A., et al., "Pesticides use and exposure among yam farmers in the Nanumba traditional area of Ghana," 2019, Environmental Monitoring Assessment, 191:307, DOI: 10.1007/s10661-019-7449-5

[116] Dosemeci, M., et al., "A Quantitative Approach for Estimating Exposure to Pesticides in the Agricultural Health Study," 2002, Ann. Occ. Hyg., Vol. 26 (2), pp. 245-260.

Randall Dean Seidl v. Monsanto
August 13, 2020
Page 34

**Dermal Exposure of Glyphosate Applicators**

The dermal contact exposure of glyphosate applicators was determined by Machado-Neto, et al., 2000.[117] In these studies, applications were conducted under different scenarios, both with and without personnel protective equipment. Potential dermal exposure was measured by the authors by the use of a copper fungicide added to the Roundup spray solution as a surrogate metric. That is, Cu+2 cations were measured in the laboratory from *"Carefree"* female sanitary pads placed on the exterior of the clothing.

These sanitary pads were externally affixed to eight defined areas of each worker's body. These included a) head, face and neck, b) arms and forearms, c) hands, d) thorax front, e) thorax back, f) legs and front thigh, g) legs and back thigh, and h) feet. Personal dermal exposure (PDE) in hands was directly measured by analysis of the cotton gloves used by workers. Total body exposure via the dermal route (in units of mg/day of glyphosate) was established with percentages determined for each of the eight different body areas with and without PPE.

For "knapsack" (i.e., backpack) sprayers using a lever pump sprayer, total dermal exposure measured 1,945.83 mg/day versus 253.90 mg/day with PPE. In calculation of actual dermal exposures, penetration through fabric of the PPE (overalls and hoods) was referenced at penetration values of 20%, 5% for boots, 1% for rubber gloves and 1% for facial masks. Dermal absorption of 2% was then used by Machado-Neto, et al., to calculate dosage.

Absorptions from 70-minute exposure periods were extrapolated to provide values equal to absorption sustained in a theoretical work day. **Table 7** shows the proportion (%) distribution of personal dermal exposure (PDE) for various body regions for glyphosate applicators using a lever-operated knapsack sprayer as published in the 2000 Machado-Neto study.[118]

---

[117] Machado-Neto, et al., "Safety of Working Conditions of Glyphosate Applicators on Eucalyptus Forests Using Knapsack and Tractor Powered Sprayers," 2000, Bull. Environ. Contam. Toxicol. Vol. 64, pg. 309-315.

[118] Id.

Randall Dean Seidl v. Monsanto
August 13, 2020
Page 35

**Table 7**

**Distribution of PDEs in Body Regions of Glyphosate Applicators**

| Type of Sprayer | Glyphosate Concentration | % of Body Regions | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|
| | | A | B | C | D | E | F | G | H |
| Lever-operated Knapsack | 0.48% | 0.1% | 0.5% | 4.3% | 1.6% | 0.1% | 44.6% | 7.7% | 41.1% |

| | |
|---|---|
| A = head + face + neck | E = thorax back |
| B = arms + forearms | F = legs + front thigh |
| C = hands | G = legs + back thigh |
| D = thorax front | H = feet |

These results are significant in the current matter. The table notes that the highest percentages of exposed body regions are (1) legs+front thigh and (2) feet. These areas are very significant in cases where applications reported wearing flip flops, mesh-type tennis shores and shorts while spraying, especially after the initial clearing was completed.

**Table 8** shows the published 2000 Machado-Neto study results of glyphosate dermal exposure (in mg/day) expressed as "Potential" exposure and as "NCDE" (Not Controlled Dermal Exposure). This table is also significant in the current matter as it clearly demonstrates the potential difference in exposure between sprayers wearing personal protective equipment and those not wearing such equipment. Sprayers who did not wear PPE received **7.6 times higher** dermal exposure than those who wore PPE.

**Table 8**

**Potential Dermal Absorption (without any PPE) and Not Controlled Dermal Exposure (NCDE) with Personal Protective Equipment**

| Type of Sprayer | Glyphosate Concentration | Dermal Exposure (mg/day) | |
|---|---|---|---|
| | | Total dermal exposure | Exposure with PPE |
| Lever-operated Knapsack | 0.48% | 1,945.83 | 253.90 |

**Example of Roundup Exposure of 1,4-dioxane (no gloves, short sleeves)**

*Authored by Dr. William Heydens, Monsanto Senior Toxicologist, (Mon# MONGLY00154342 (Volume 1) and MONGLY00154381 (Volume 2)*

Randall Dean Seidl v. Monsanto
August 13, 2020
Page 36

In 1990, Monsanto submitted two reports (risk assessments) in support of glyphosate registration in Canada and the U.S. These assessments were prepared to address concerns that arose when 1,4-dioxane (a contaminant in Roundup which is a substance characterized by IARC as "possibly carcinogenic to humans") was detected in Canada's Roundup (Vision Herbicide) in 1989.

Volume 1 of their assessment, *"Cancer Risk Assessment for Agricultural and Forestry Applications of Herbicide Surfactant Containing 1,4-Dioxane,"* was prepared for and submitted to Health and Welfare Canada and Agriculture Canada. Volume 2 of their assessment, *"Cancer Risk Assessment for Agricultural and Roadside Applications of Herbicide Surfactant Containing 1,4-Dioxane,"* was prepared "to address concerns more specific to California"[119] and was submitted to CDFA.[120]

To determine exposure, Monsanto examined 28 studies in the U.S. Environmental Protection Agency's generic data base for base exposure data (*i.e.* pesticide active ingredient, dermal deposition and inhalation exposure rates). Monsanto utilized the reported *median* values for their assessments claiming they are more reliable estimates of exposure than mean values and, therefore, yield more realistic assessments of risk. Monsanto found that the mean exposure value was 2.8 times higher than the median for workers with gloves and long sleeves and 2.2 times higher for workers without gloves and long sleeves. Thus, only the *mean* values were utilized. Monsanto characterized these results as a "*worst-case*" risk assessment for the U.S. (Volume 2).[121]

It is notable that in Monsanto's *"worst-case"* scenario, the maximum concentration of dioxane in the formulation is 23 ppm. In the Canadian assessment, however, Monsanto reports that, after conducting extensive analyses on retained product samples located at various Monsanto manufacturing and research technology locations, the mean 1,4-dioxane concentration was **160** ± 56 ppm with a range of 56 - 307 ppm.

The reason for this seeming disparity is that just prior to their assessments,[122] Monsanto changed their formulation requirements such that no more than 23 ppm 1,4-dioxane would be contained in the herbicide concentrate. The median exposure values Monsanto

---

[119] Page 004 of 0029.

[120] California Department of Food and Agriculture.

[121] Monsanto noted this to be a "*worst case approach*" although they used a lower dose (23 ppm vs. 300 ppm) of 1,4-dioxane in this assessment.

[122] The time of the requirement change in Canada and/or US is not reported.

Randall Dean Seidl v. Monsanto
August 13, 2020
Page 37

published in their Volume 1 assessment for tractor boom application in both an open cab and closed cab are presented in **Table 9** below.

**Table 9**

**Median Values for Combined Dermal and Inhalation Exposure**

| Protective Clothing Worn | Exposure (Open Loading/Mixing) (µg/pound of active ingredient applied) | Exposure (Closed Loading/Mixing) (µg/pound of active ingredient applied) |
|---|---|---|
| Long sleeves, gloves, long pants | 19.3 | 1.9 |
| Short sleeves, no gloves, and long pants | 75.6 | 7.6 |

As shown in Table 9, the exposure in both cases is approximately **four times greater** for workers wearing short-sleeved shirts without gloves than for workers wearing long sleeves and gloves.

Monsanto's Volume 2 risk assessment results for tractor boom application in an open cab using an open transfer system were based on mean exposure values as given in **Table 10**. The exposure for applicators wearing short sleeves and no gloves is three times greater than the exposure for applicators wearing long sleeves with gloves.

**Table 10**

**Mean Values: Combined Dermal and Inhalation Exposure for "Worst Case Scenario"**[123]

| Protective Clothing Worn | Exposure (µg/pound of active ingredient applied) | Exposure (µg/kg/year) |
|---|---|---|
| Short sleeves, no gloves | 165.7 | 7.79 |
| Long sleeves and gloves | 54.47 | 2.56 |

Again, these factors illustrate the profound difference in exposure between sprayers who wore protective equipment and those who did not.

**Omission of PPE Labeling Recommendations by Monsanto**

Monsanto conducted a formal operator exposure assessment (MON 2139) and evaluated exposure when spraying Roundup under UK conditions. A series of spray volume and dose combinations were presented and assessed. As a consequence of the results, a series of specific label recommendations were set forth in the Monsanto report.

---

[123] Tractor boom application with an open cab and open loading/mixing conditions.

Randall Dean Seidl v. Monsanto
August 13, 2020
Page 38

**Table 11** summarizes the published label recommendations as noted in the <u>Monsanto</u> MON 2139 document and their resulting presence in actual Roundup product label(s):

**Table 11**

**Summary of MON 2139 Label Recommendations and Resulting Label Inclusions**

| Condition | Recommended PPE by <u>Monsanto</u> Scientists | Included in Current Label | Notes |
|---|---|---|---|
| *"When handling or applying the concentrate"* | Protective gloves | Yes | *"When mixing"* |
| | Face protection (face shield) | NO | |
| *"When spraying through ultra-low volume application and mist blower equipment"* | Coveralls | NO | |
| | Protective gloves | Yes | *"When mixing"* |
| | Rubber boots | NO | |
| | Face protection (face shield and dust mask) | NO | |
| *"When using low volume nozzles in <u>knapsack sprayer</u>, handheld rotary CDA sprayers and handheld weed wiper equipment"* | Water-proof jacket | NO | |
| | Water-proof trousers | NO | |
| | Protective gloves | Yes | *"When mixing"* |
| | Rubber boots | NO | |

The Roundup test applications were conducted outdoors in Florida and the results were only for hand-pumped, backpack-type sprayers. Sampling techniques were designed to establish exposure on the basis of inhalation, aerosol deposited on exposed skin and the amount that may deposit on covered skin.

Deposition on skin was estimated by attaching 11 (eleven) 10x10 cm surgical pads at strategic locations on the applicator's body as follows:

| **Exposed Surfaces** | | **Under Clothing** |
|---|---|---|
| Top of head | Back | Right forearm |
| Forehead | Right bicep | Left bicep |
| Chest | Left forearm | Ankle |
| Shoulder | Thigh | |

Randall Dean Seidl v. Monsanto
August 13, 2020
Page 39

Additionally, separate estimations were made for the <u>amount</u> of glyphosate that may contaminate the operator's hands when wearing cotton gloves. It was presumed this technique would yield maximum exposure levels as the gloves would absorb any spills which could be wiped or washed off the hand. The published results are shown in **Figure 1** below.

---

- *Potential exposure (Glyphosate found on operator clothing + unprotected skin)*

Measured exposure ($\mu g/cm^2$) is given for each body part in table 7.

Table 7: MSL-0288 exposure ($\mu g/cm^2$)

| Clothing type | Quantity of Glyphosate found ($\mu g/cm^2$) | | |
|---|---|---|---|
| | Test 1 | Test 2 | Test 3 |
| <u>Gloves</u> | | | |
| Left | 0.014 | 1.98 | 6.56 |
| Right | 0.006 | 2.00 | 3.22 |
| <u>Exposed Gauze pads</u> | | | |
| Head | -- | -- | -- |
| Forehead | -- | 0.033 | 0.012 |
| Shoulder | 0.033 | 0.116 | 0.235 |
| Chest | 0.017 | 0.083 | 0.245 |
| Back * | 6.38 | 5.96 | 3.99 |
| Thigh | 0.96 | 0.18 | 1.39 |
| Right bicep | 0.090 | 0.058 | 0.253 |
| Left forearm | 0.051 | 0.098 | 0.377 |

\* Highest exposure values were observed on this pad. This was expected as the sprayer is resting on this pad allowing pickup of any spillage.

**Figure 1:** *"Table 7"* from Monsanto MON 2139 Study Showing Results of Exposure Tests

## Key Points Pertaining to Exposed Body Parts

- The ug/cm$^2$ exposure to glyphosate reveals significant exposure to nearly all body areas (except forehead and head which were not consistently exposed).

- POEM model includes stated exposure percentages for different parts of the body in peer-reviewed literature for applicators and in Monsanto's own in-house studies.

- Monsanto employees were <u>protected</u> with PPE in all exposed body areas stated during their tests, but consumers are <u>not protected</u> because the product label provides no such instructions (in spite of the fact that Monsanto's own report recommended specific warnings).

Randall Dean Seidl v. Monsanto
August 13, 2020
Page 40

- In earlier reports submitted in the Monsanto litigation matters, Dr. Sullivan (an expert retained by Monsanto) has only calculated leg and hand exposures. More recently, Monsanto's expert Dr. LeBeau (report dated 9-3-2019) also failed to include other body areas. All other exposed areas were ignored. This represents a gross deviation from accepted assessment methodology.

## 3.  Glyphosate Exposure & Toxicity

Exposure models have been developed in the last 20 years that are used to estimate the exposure dose of professional operators to biocides during application. The accuracy of these models' ability to assess actual exposure is primarily determined by the pharmacokinetic studies and assumptions used in developing the model (such as dermal absorption rate and other variables).

PK models (pharmacokinetic models) simulate the absorption, distribution, metabolism and excretion (ADME) within a living system. Biomonitoring and dosimetry data are combined with PK models to reconstruct or estimate the exposure dose. It is, therefore, essential to have a good understanding of the pharmacokinetics to ensure a good estimate of the exposure dose.

**Monsanto's Glyphosate Biomonitoring and Dose Measurement Reliability**

Monsanto has officially postured its glyphosate formulations as *"trade secrets"* (and thus remain unpublished). As a consequence, the general scientific community has had minimal opportunity to assess the toxicity of the various glyphosate product formulations, many of which contain surfactants and other substances.

This is perhaps a peculiar position in which to find the world's most ubiquitous herbicide, but it is nevertheless a fact. It is also a substantial limitation for toxicological assessment.

As a consequence of non-disclosures, there are discrepancies and differences of opinion as to the pharmacokinetics (or ADME) of glyphosate which have not been entirely assessed in the peer-reviewed literature.

However, Monsanto has conducted some limited in-house studies and internal Monsanto communications recognize the limitations of these studies.  As █████████, the head of Monsanto's Regulatory Affairs Unit, wrote:

Randall Dean Seidl v. Monsanto
August 13, 2020
Page 41

> *"ADME has always been the weak link in our argument…we have not got rid of that problem."*[124]

When assumptions in a critical, Monsanto-contracted pharmacokinetics study were questioned by Spanish regulators, Monsanto corporate employee, ███████████, wrote,

> *"Even though we can absorb additional 'uncertainty factors' in our risk assessment based on our biomonitoring results, I feel uncomfortable with this discussion. This approach by Spain sets a precedent and contradicts the fact that we always claimed to fully understand the glyphosate pharmacokinetics."*[125]

Additional information is contained within an unpublished Monsanto study in which the percentage of dermal absorption was shown to be <u>as high as 10%</u> (TNO rat skin study). Since dermal exposure is the most significant route of exposure, a small change in the percentage of dermal exposure can have a great effect on the overall exposure. Monsanto acknowledges this fact directly in a July 2001 draft:

> *"One of the product specific parameters that can make a big difference in the exposure assessment is the dermal uptake factor which is the fraction of the amount of active ingredient on the skin surface that is absorbed by the skin tissue."*[126]

In an August 16, 2011, email regarding dermal absorption, ███████████ wrote:

> *"In Europe, we are getting prepared to submit MON 79991 (720 g/kg) for approval under the new Reg 1107/2009. We ran the UKPOEM model using a dermal penetration value of 3% and do not pass when applying 3.6 kg/ha for the tractor-mounted sprayer. I am aware of the set of studies that you ran on dermal absorption using pure K-salt and IPA-salt and also MON 52276 and MON 79351 which showed dermal absorption values of 1%. Putting 1% in the model, we get a good result, so will need to show that the 1% dermal absorption numbers are equally valid for the MON 79991 formulation."*[127]

---

[124] MONGLY02221147.

[125] MONGLY02155829.

[126] ███████████, July 2001, Confidential draft, "Clustering glyphosate formulations with regard to the testing for dermal uptake."

[127] MONGLY04107779.

Randall Dean Seidl v. Monsanto
August 13, 2020
Page 42

## Glyphosate (Roundup) History and Use

Glyphosate is the active ingredient in various Roundup herbicide formulations. The Monsanto Company discovered the herbicide activity of glyphosate in 1970 and initiated sales and distribution for weed control in 1974. Glyphosate is not selective and is used on food and non-food crops. Over the subsequent four decades, glyphosate use as an herbicide has greatly expanded. It is used in agriculture, forestry, industrial right-of-ways and in residential applications worldwide.

Glyphosate's use in agriculture has been further expanded by the development of genetically-modified plants that are tolerant to glyphosate treatment (Roundup-Ready®).[128] This has significantly increased the use of glyphosate on these crops for weed control with no concern for crop injury.[129]   As a result, genetically-modified crops contain far more glyphosate residue than conventional crops.

The introduction of glyphosate-resistant (GR) crops in 1996 and the expiration of the glyphosate patent have resulted in its ubiquitous use today characterized by a 15-fold global increase since the mid-1990s.[130]

According to glyphosate pesticide registration, in 1993, approximately 13 to 20 million acres of land had been treated with 18.7 million pounds of glyphosate and used mostly on hay/pasture, soybeans and corn.[131]   According to the U.S. Geological Survey, in 2014, 300 million pounds of glyphosate were used on agricultural land in the U.S.  Since 1974, over 3.5 billion pounds of glyphosate have been applied in the US.[132]

---

[128] Williams, G. et al.,  Safety evaluation and risk assessment of the herbicide Roundup and its active ingredient, glyphosate, for humans," 2000,  Regulatory Toxicology and Pharmacology, Vol.31, pg. 117-165.

[129] Duke, S. S., "Encyclopedia of Agrochemicals," 2003, John Wiley & Sons.

[130] Benbrook, C.M., "Trends in glyphosate herbicide use in the United States and globally," 2016 Environmental Sciences Europe. 28:3.

[131] U.S. EPA, "Registration eligibility decision-facts: Glyphosate," 1993 United States Environmental Protection Agency, Prevention, Pesticides and Toxic Substances (7508W), EPA-738-F-93-011.

[132] Benbrook, C.M., "Trends in glyphosate herbicide use in the United States and globally," 2016, Environmental Sciences Europe. 28:3.

Randall Dean Seidl v. Monsanto
August 13, 2020
Page 43

**Contaminants within Roundup (Surfactants, Adjuvants and Co-formulants)**

A 2017 toxicological study[133] by Tarazona, et al., reviewed the scientific basis of glyphosate's carcinogenic classification and offered the following guidance with respect to contaminants in glyphosate and Roundup surfactants, adjuvants and co-formulants:

> "Surfactants are frequently used in herbicide formulations including glyphosate. Polyethoxylated tallowamines are several orders of magnitude more cytotoxic than glyphosate (Mesnage, et al., 2013); the mode of action is cell death with inhibition of the mitochondrial succinate dehydrogenase activity and membrane damage leading to necrosis. This mode of action is different from glyphosate while similar to that observed for glyphosate-based formulations (Benachour and Seralini, 2009). These tallowamines also produce oxidative and DNA damage (Nobels, et al., 2011), and increase the apoptotic potential of glyphosate (Kim, et al., 2013). Other surfactants as well as solvents used in pesticides formulations are cytotoxic and possibly genotoxic (Nobels, et al., 2011)."

It will be seen in the following data tables that a variety of substances have been added to the product to increase or enhance absorption. Unfortunately, it has not been possible to assess the actual constituent components of Roundup surfactants because (in the U.S.) such mixtures are protected as "proprietary" formulations. For example, the label on Roundup Original Max herbicide (which contains a proprietary surfactant) merely states "Other Ingredients: 51.3%."  In other words, more than half of the volume of the product consists of water and unknown substances.

Without good information, substance toxicity cannot be scientifically or toxicologically evaluated with reliance and accuracy. It should be further noted that individual chemical assessment is the recommended worldwide method for carcinogenic substances as highlighted in the previous document:

> The UN and EU guidance recommends carcinogenicity and genotoxicity studies to be conducted on individual chemicals, limiting testing of mixtures/formulations to cases where synergistic effects are expected (United Nations 2015).[134]

**Table 12** lists the various substances in Roundup formulations, depending on years of exposure and type of Roundup product used.

---

[133] Tarazona, et al., "Glyphosate toxicity and carcinogenicity: a review of the scientific basis of the European Union assessment and its differences with IARC," National Institutes of Health, https://www.ncbi.nlm.nih.gov/pmc/articles/PMC5515989/

[134] Id.

Randall Dean Seidl v. Monsanto
August 13, 2020
Page 44

**Table 12**

**List of 22 Chemicals Known to be Present in Roundup Based on Product Labels[135] and Potentially Used by Plaintiff Based on Product and Year**

| Compound/Substance | Years Label Shows Used in Roundup |
|---|---|
| 1-dodecanamine (surfactant) | 1999 |
| Ammonium Sulfate | 2002 |
| Antifoam ("A," "AF," "C") | 1999 |
| Antimicrobial Agent | 1992, 1995, 1998, 2002 |
| Dimethyl polysiloxane | 1995 |
| Dipropylene glycol | 1998, 2002 |
| Glyphosate | 1992, 1995, 1996, 1998, 2002 |
| MON 013962 Technical Solution | 1999 |
| Nonanoic acid | 1998, 2002 |
| Pelargonic acid | 1992, 1995, 2002 |
| Polyoxyethylene alkyl amine | 2002 |
| Polyoxyethylene alkyl phosphate ester (surfactant) | 1999 |
| Polyoxyethylene alkylamine (surfactant) | 1992, 1995, 1999 |
| Potassium hydroxide | 1992, 1995, 1998, 2002 |
| Propylene glycol (co-solvent) | 1999 |
| SAG 10 | 1999 |
| SAG 30 | 1999 |
| Silicone emulsion | 1999 |
| Silicone emulsion (dimethylpolysiloxane) | 1998, 2002 |
| Surfactant Blend (tallowamine, glycerine) | 2002 |
| Surfactant Mon 59112 | 1996, 1998, 1999, 2002 |
| Water | 1992, 1995, 1996, 1998, 2002 |

There are several critical points to note with respect to this formulation chronology:

- The basic product formulation has not changed significantly over the years.

---

[135] Product formulation data provided by Monsanto in response to Interrogatory demand for only certain years. These years correspond to years the products were used by Plaintiffs. No product formulation data was provided for U.S. EPA registration years 1993, 1994, 1997, 1999, 2001 or 2003-2008.

Randall Dean Seidl v. Monsanto
August 13, 2020
Page 45

- Although every product contains surfactants in various forms, the word "surfactant" only appears in selected years. Labels often substituted different POEAs as a specific surfactant. Sometimes a proprietary mixture is presented in abbreviated form.

**Table 13** presents a detailed breakdown of the various Roundup formulations available based on product labels available for assessment.

**Table 13**

**Roundup Formulations potentially used by Plaintiffs - Chemicals within Glyphosate and Roundup Surfactants, Adjuvants and Co-formulants**

| Product Brand Name | Formulation(s) |
|---|---|
| Roundup Ready-To-Use Weed & Grass Killer EPA Reg: 71995-08 (7/13/1992) | Glyphosate - 1%; Polyoxyethylene alkylamine 0.36%; Water - 97.129 %; pelargonic acid 1%; Potassium hydroxide 0.45%; Antimicrobial Agent; 0.1%; |
| ROUNDUP Super Concentrate Weed & Grass Killer 2 (12-3-1999) | MON 013962%Technical Solution (N-phosphonomethylgtycine, IPA salt) CAS# 38641-94-0 Polyoxyethylene alkylamine (surfactant) Polyoxyethylene alkyl phosphate ester (surfactant) Propylene glycol (co-solvent) 1-dodecanamine (surfactant) |
| Roundup Ready-To-Use Weed & Grass Killer [1] EPA Reg: 71995-12 (8/16/1995) | Glyphosate - 1.55%; Polyoxyethylene alkylamine 0.36%; Water - 95.99 %; pelargonic acid 1%; Potassium hydroxide 1.0%; Antimicrobial Agent; 0.1%; Dimethyl polysiloxane - 0.001% |
| Roundup Ready-To-Use Weed & Grass Killer [2] EPA Reg: 71995-13 (11/6/1995) | Glyphosate - 1.55%; Polyoxyethylene alkylamine 0.36%; Water - 97.99 %; Antimicrobial Agent; 0.1%; |
| Roundup Weed & Grass Killer {1} Super Concentrate EPA Reg: 71995-18 (10/17/1996) | Glyphosate - 66.31%; Mon 59112 - 14.5% (TAM 7.25%, Phos Ester 2.93%, PEG 1.49%, DPG 1.38%, Water 1.45%); Water 19.36%; SAG - 0.01% |
| Roundup Weed & Grass Killer [1] Ready- To-Use EPA Reg: 71995-23 (5/20/1998) | Glyphosate 3.1%; Mon 59112 (polyoxyethylene alkyl amine 0.25%, polyoxethylene alkyl phosphate ester 0.1%, Polyethylene glycol, 0.05%, dipropylene glycol 0.05%); Nonanoic acid 2%; Potassium Hydroxide 2.3%; Biocide 0.10%; silicone emulsion (dimethylpolysiloxane) 0.03%; Water 92.02%; |
| Isopropylamine Salt of Glyphosate (MON 0139, 62%) | Silicone Emulsion |
| | SAG 10 SAG 30 |

Randall Dean Seidl v. Monsanto
August 13, 2020
Page 46

**Table 13**

**Roundup Formulations potentially used by Plaintiffs - Chemicals within Glyphosate and Roundup Surfactants, Adjuvants and Co-formulants**

| Product Brand Name | Formulation(s) |
|---|---|
| CAS# 38641-94-0<br>(July 17, 1999) | Antifoam A<br>Antifoam C<br>Antifoam AF |
| | MON 59112 Surfactant |
| Roundup Weed & Grass Killer Ready-To-Use<br>EPA Reg: 71995-32<br>(9/9/2002)<br>(multiple formulations) | Glyphosate 3.23%; Mon 59112 0.5% (polyoxethylene alkyl amine 0.25%, polyoxyethylene alkyl phosphate ester 0.1%, propylene glycol 0.05%, dipropylene glycol 0.05%, water 0.05%); dipropylene glycol 0.05%; Nonanoic acid 2%; Potassium Hydroxide 2.3%; antimicrobial agent 0.10%; silicone emulsion (dimethylpolysiloxane) 0.03%; Water 91.89%; |
| Roundup Ready-to-Use Weed & Grass Killer III<br>EPA Reg: 71995-33<br>(9/9/2002)<br>(multiple formulations) | Glyphosate 3.23%; Mon 59112 0.5% (polyoxethylene alkyl amine 0.25%, polyoxyethylene alkyl phosphate ester 0.1%, propylene glycol 0.05%, dipropylene glycol 0.05%, water 0.05%); dipropylene glycol 0.05%; Potassium Hydroxide 1.94%; Ammonium Sulfate 2%; antimicrobial agent 0.10%; silicone emulsion (dimethylpolysiloxane) 0.03%; Water 90.22%; |
| | Glyphosate 3.23%; Polyoxyethylene alkyl amine 0.75%; antimicrobial agent 0.10%; water 95.92% |
| | Glyphosate 3.23%; Surfactant Blend 0.5% (Ethoxylated tallowamine 70%, glycerine 20%); Pelargonic Acid 2.0%; Potassium Hydroxide 2.3%; Ammonium Sulfate 2%; antimicrobial agent 0.10%; silicone emulsion (dimethylpolysiloxane) 0.03%; Water 89.86%; |

## Carcinogenic Substances in Roundup

Other than glyphosate, there is at least one additional known (confirmed) human carcinogenic substance identified as present in Roundup either as a formulation component or manufacturing reaction product that has been quantitively assessed by Monsanto. This reaction product (formaldehyde) is highly water soluble but also highly volatile with a boiling point of -2.2°F. The partial pressure of formaldehyde over water is 1.2 hPa and 1.3 hPa at 20 °C for 30 % and 50 % formaldehyde in aqueous solution, respectively. Thus, formaldehyde exposure can occur from direct inhalation.

- **Formaldehyde** is classified by IARC as a Class I human carcinogen and a probable human carcinogen (class B1) by the U.S. EPA. National Cancer Institute researchers have concluded that, based on human study data and lab research, exposure to formaldehyde may cause leukemia in humans, particularly myeloid leukemia. Peer-

Randall Dean Seidl v. Monsanto
August 13, 2020
Page 47

reviewed studies have also documented increased rates of NHL among formaldehyde-exposed workers.[136]

- Monsanto previously performed an acute dose calculation in 1985. A document entitled "Potential formaldehyde exposure from wetcake, MON-0139 and Roundup® herbicide" was prepared by J.W. Worley on May 30, 1985.[137] In this study, Dr. Worley refers to the  calculation and states that he used some "*completely arbitrary assumptions*" with only 1% of the formaldehyde assumed as escaping from the drum container when opened over a 15 minute period and "*only 1% of that is assumed to be inhaled by the worker.*" With respect to the Roundup® herbicide, the *"calculated formaldehyde concentration in air was **2.8 PPM**.*" The study stated that the result was "*in the neighborhood of the allowed limits*" but also stated "*the ACGIH threshold limit value (TLV) is a **2 PPM ceiling**, a concentration that should not be exceeded even instantaneously.*" However, the current NIOSH short-term exposure limit is **0.1 PPM**.

- It is also noteworthy that in 1995 a "*glyphosate centrifuge feed*" MSDS was created by Monsanto that revealed "*glyphosate centrifuge feed contains up to 1.3% formaldehyde.*"[138] This is equivalent to 13,000 PPM.

- Formaldehyde (a Class 1 human carcinogen) has been demonstrated within human epidemiological studies to induce NHL.[139] Monsanto's material data safety sheet states, *"Formaldehyde is listed as a substance that 'may reasonably be anticipated to be' carcinogenic by the National Toxicology Program (NTP) in their Seventh Annual Report on Carcinogens. It is classified by the International Agency for Research on Cancer (IARC Monographs, Vol. 29). It is regulated by OSHA as a carcinogen (29 CFR 1910.1048)."* [140] The NIOSH 15-minute exposure ceiling limit is **0.1 PPM**. As stated above, formaldehyde is highly volatile with a boiling point of −2 °F and a vapor pressure < 1 atmosphere.

Simultaneous exposure to glyphosate and formaldehyde are of concern due to additive carcinogenicity. Typically, generally-recognized carcinogens with similar target endpoints (hematopoietic cancers) are, by definition, additive and should be considered in the

---

[136] Wang, et al., "Occupational Exposure to Solvents and Risk of Non-Hodgkin Lymphoma in Connecticut Women," American Journal of Epidemiology, 2009 Jan 15; 169(2): 176–185.

[137] MONGLY04267028-33.

[138] MONGLY00052410-13

[139] Wang, et al., "Occupational Exposure to Solvents and Risk of Non-Hodgkin Lymphoma in Connecticut Women," American Journal of Epidemiology, 2009 Jan 15; 169(2): 176–185.

[140] MONGLY00029022.

Randall Dean Seidl v. Monsanto
August 13, 2020
Page 48

overall carcinogen assessment of a product (such as Roundup).[141] The fact that other confirmed human carcinogenic substances are known to be present in trace amounts in Roundup (as noted in Monsanto's own documents) requires toxicological consideration. However, it is also noteworthy that these substances are not disclosed on the Roundup product label.

The U.S. EPA provides guidance on this issue as noted in the excerpt below from a generally-recognized toxicological U.S. EPA publication:[142]

> Epidemiologic studies, by their nature, are limited in the extent to which they can control for effects due to exposures from other agents. In some cases, the agent can have discernible interactive effects with another agent, making it possible to estimate the contribution of each agent as a risk factor for the effects of the other. For example, competing risks in a study population can limit the observed occurrence of cancer while additive effects may lead to an increase occurrence of cancer.

The U.S. EPA also offers guidance on the manner in which additive effects are required to be assessed:

> There may also be instances where the agent of interest is a risk factor in conjunction with another agent. For instance, interaction as well as effect-measure modification are sometimes construed to be confounding, but they are different than confounding. Interaction is described as a situation in which two or more risk factors modify the effect of each other with regard to the occurrence of a given effect. This phenomenon is sometimes described as effect-measure modification or heterogeneity of effect (Szklo and Nieto, 2000). ... When the effect of the exposure of interest is accentuated by another variable, it is said to be synergistic interaction. Synergistic interaction can be additive (e.g., hepatitis virus B and aflatoxin in hepatic cancer) or multiplicative (e.g., asbestos and smoking in lung cancer).

It is noteworthy that this is not a new or otherwise "novel" methodology. The "Health Effects of Toxic Substances"[143] reflects this view as a standard toxicological method:

> Additive effects imply that exposure to chemical carcinogens are additive over the lifespan of the organism. Carcinogenic substances are subject to the same bioaccumulation, transformation and excretion principles previously discussed. However, if there exists no threshold and a risk is assumed for any absorbed dose, then the probability of cancer induction would be additive.

---

[141] Glyphosate (the primary chemical of concern) is noted to be present in the Roundup product (i.e., 2%) compared to other formulants and impurities such as POEA, formaldehyde and ethylene oxide.

[142] U.S. EPA, "Guidelines for Carcinogen Risk Assessment," U.S. Environmental Protection Agency Washington, DC, March 2005, EPA/630/P-03/001F

[143] M.J. Malachowski, "Health Effects of Toxic Substances," 1999, Second Edition, 0-86587-649-5.

Randall Dean Seidl v. Monsanto
August 13, 2020
Page 49

**Cancer or Tumor Promotion**

Tumor promotion is a process in which carcinogenesis by various substances positively impacts the progeny of a single initiated cell(s) to survive and expand in number and to resist the process of normal cellular aging and death (known as apoptosis) and to continue on undergoing clonal malignant growth (known as tumor progression).

In the carcinogenicity study, George, J., et al., (2010),[144] glyphosate was demonstrated to have strong tumor-promoting activity. The study documented carcinogenic effects of glyphosate using a 2-stage mouse skin carcinogenesis model and proteomic analysis. The commercial formulation of Roundup Original (glyphosate 41%, POEA = 5%, Monsanto Company, St. Louis, MO, USA) was topically applied to the skin of mice with a body weight of 12-15 g. The glyphosate dose was 25 mg/kg body weight and was applied either two or three times per week.[145]

Proteomic analysis showed that 22 spots were differentially expressed (>2-fold) on glyphosate, 7,12-dimethylbrenz[a]anthracene (DMBA), and 12-O-tetradecanoyl-phorbol-1.3-acetate (TPA) application over untreated control. These results suggested that glyphosate has tumor-promoting potential in skin carcinogenesis and its mechanism seems to be similar to TPA.

Comparing the dosing in these mice to a hypothetical applicator at the AOEL of 0.1 mg/kg/day requires the consideration of body surface area, pharmacokinetics and physiological time.

Interspecies allometric scaling for dose conversion from animal-to-human is a method wherein the exchange of drug dose is based on normalization of dose to body surface area. This approach assumes that there are some unique characteristics of the anatomical, physiological and biochemical processes among species. The possible difference in pharmacokinetics/physiological time is accounted for by allometric scaling.

---

[144] George, J., et al., "Studies on glyphosate-induced carcinogenicity in mouse skin: A proteomic approach," 2010, Journal of Proteomics 73, pg. 951 – 64.

[145]  Somewhat similar to that of exposed sprayers mixing Roundup 2-3 times per week with dermal contact.

Randall Dean Seidl v. Monsanto
August 13, 2020
Page 50

This method is frequently used in research for experimental purposes to predict an approximate dose on the basis of data existing in other species. **Table 14** contains an excerpt from Nair and Jacob, 2016, which uses data from FDA guidelines.[146],[147]

**Table 14**

**Human equivalent dose calculation based on body surface area**

| Species | Reference Body Weight (kg) | Working weight range (kg) | Body surface area (m²) | To convert dose in mg/kg to dose in mg/m², multiply by $K_m$ | To convert dose in mg/kg to HED* in mg/kg, either | |
|---|---|---|---|---|---|---|
| | | | | | Divide animal dose by | Multiply animal dose by |
| Human | 60 | | 1.62 | 37 | | |
| Mouse | 0.02 | 0.011-0.034 | 0.007 | 3 | 12.3 | **0.081** |

*HED: human equivalent dose

Applying the HED and 3% dermal absorption results in a reasonably similar dose to that sustained by a hypothetical applicator at the AOEL level of 0.1 mg/kg/day.

"Table 1" in the George, et al., study reveals that of the animals dosed only with the carcinogen 7,12-dimethybenz[a]anthracene (DMBA) at 52 ug/mouse, none of the 20 animals developed tumors. It should be noted that DMBA is a powerful carcinogen also found in cigarette smoke.[148] When also combined with glyphosate and applied to the skin (a single topical application of 50 mg/kg body weight per mouse), 40% of the mice developed tumors with an average of 2.8 tumors per mouse. The study demonstrated, to within 95% certainty, the carcinogenic potential of glyphosate as a powerful promoter in a 2-stage promotion model. The authors concluded in their results section that *"These results clearly indicate significant tumor promoting potential of glyphosate in mouse skin model of carcinogenesis."* It should also be noted that when the dose is factored by applying the human equivalent dose (HED) factor of 0.081 and a 3% dermal absorption factor, the glyphosate dose of 25 mg/kg body weight used in this study decreases to only 0.06 mg/kg human body weight which is less than the current "acceptable operator exposure level" (AOEL) for glyphosate (0.1 mg/kg body weight).

---

[146] USFDA, "Guidance for Industry: Estimating the Maximum Safe Starting Dose in Adult Healthy Volunteers," 2005, Rockville, MD: US Food and Drug Administration.

[147] Nair AB, Jacob S., "A simple practice guide for dose conversion between animals and humans," 2016, J Basic Clin Pharma, Vol. 7, pg. 27-31.

[148] Lee, et al., "Polycyclic aromatic hydrocarbons present in cigarette smoke cause bone loss in an ovariectomized rat model," 2002, Bone, Vol. 30(6), pg. 917-23.

Randall Dean Seidl v. Monsanto
August 13, 2020
Page 51

Monsanto has previously argued that the George study has been *"universally discredited"* and that my opinions are based on *"data that has been universally rejected as unreliable"* and that any demonstration of Roundup as a cancer "promoter" is inconsistent with the *"conclusions of all scientific panels and regulators that have reviewed it."* These are misleading characterizations. As shown below, even Monsanto's own Dr. Heydens stated that "*the surfactant in the formulation will come up in the tumor promotion skin study because we think <u>it played a role there</u>.*"[149]

It is critically important to understand why the George study was not used by IARC, EFSA or EPA in formulating their published findings. The simple reason is that the George study was <u>not a carcinogenesis bioassay</u>. In other words, *the study was appropriately designed to determine whether glyphosate is a carcinogen.*

Defendant's assertion that the study has been *"universally discredited"* is a distortion and a fallacy. Nowhere in the peer-reviewed toxicological literature has this study been criticized on its merits. The George study was specifically designed using a well-known and established tumor promotion study design and it adhered faithfully to the boundaries of its objectives. As a tumor promotion study, it followed the generally-accepted study methodology without any deviations or errors.

The National Toxicology Program (NTP) recognizes the methodology as used in the George, et al., study as a well-known and generally-accepted procedure. The NTP states:[150]

"*Since the B6C3F1 mouse is commonly used in NTP carcinogenesis studies and much is known of its biology and response to chemical carcinogens, known initiators and promoters were used to compare the tumor response sensitivity of B6C3F1 mouse skin to that of two often-used responsive strains, Swiss (CD-1(R)) and SENCAR mice. The combination of 7,12- dimethylbenz(a)anthracene (DMBA) initiation and 12-O-tetra-decanoylphorbol-13- acetate (TPA) promotion was selected because this pair is <u>routinely used</u> to study tumorigenesis.*"

---

[149] Deposition of Dr. William F. Heydens, pages 150-151. Monsanto memos; MONGLY00997830 - MONGLY00997832.

[150] National Toxicology Program, "NTP Comparative Initiation/Promotion Skin Paint Studies of B6C3F1 Mice, Swiss (CD-1(R)) Mice, and SENCAR Mice", 1996, Natl Toxicology Program Tech Rep Ser. 1996 Feb;441:1-201.

Randall Dean Seidl v. Monsanto
August 13, 2020
Page 52

Even Monsanto's own toxicologists discern and differentiate the purpose of a "*tumor promotion study*" versus a "*carcinogenic potential of glyphosate*" study. In a memo[151] dated August 6, 2015, Dr. Heydens (a top Monsanto toxicologist) responded to a memo from Dr. Ashley Roberts (a consultant from Intertek). Dr. Roberts asked Dr. Heydens:

"*He [Dr. ▬▬▬▬▬]*[152] *has asked if we need to give any consideration to exposures of formulants in the commercial product, at least in applicators? I was under the impression these were inert but reading a response this morning in the Ecologist makes it sound like it is the combination that is toxic!!!*"

*Dr. Heydens (Monsanto) responded*:

"*I think the short answer is no. The focus of this is what is the carcinogenic potential of glyphosate. That said, the surfactant in the formulation will come up in the tumor promotion skin study **because we think it played a role there.***"

The statement by IARC is consistent with the fact that the George, et al., study was not the appropriate methodology as used in the <u>standard carcinogenesis animal bioassay</u> methodology for carcinogenesis determination; rather, the methodology was that of generally-accepted tumor promotion methodology using a very low dose of a known carcinogen (DMBA) with and without glyphosate.[153]

The study was also criticized for its short duration of treatment (32 weeks). This is not consistent with standard animal bioassay methods which include dosing and observation for a longer duration. Thus, the shorter study design decreases the ability to detect tumor promotion. This criticism does not weaken the positive findings of the study.

The study was also criticized for "*no solvent control animals.*" While it is standard practice to include a solvent-only treatment group in experimental design, the ethanol/acetone was the solvent and was present in five other treatment groups (100 mice). Those five

---

[151] Monsanto memos; MONGLY00997830 - MONGLY00997832.

[152] Dr. ▬▬▬▬▬ is "He" as per the video deposition of Dr. William Heydens (1-23-2017 at 12:06:17)

[153] "For more than 60 years, the chemical induction of tumors in mouse skin has been used to study mechanisms of epithelial carcinogenesis and evaluate modifying factors. In the traditional two-stage skin carcinogenesis model, initiation is accomplished by the application of a subcarcinogenic dose of a carcinogen. Subsequently, tumor development is elicited by repeated treatment with a tumor promoting agent." DMBA is typically used in such studies. DMBA produces "highly reproducible papilloma burden [which] is expected within 10–20 weeks with progression of a portion of the tumors to squamous cell carcinomas within 20–50 weeks." Abel, et al., "Multi-stage chemical carcinogenesis in mouse skin: Fundamentals and applications", 2009, Nature Protocols, Vol. 4(9): 1350–1362.

Randall Dean Seidl v. Monsanto
August 13, 2020
Page 53

groups did not show any papillomas. Ethanol/acetone compounds are well studied and commonly and generally used in similar study designs and have not been demonstrated to induce papillomas.  Upon careful review of the study design:

❖ Zero of 20 mice in the glyphosate group developed papillomas (the glyphosate in this group was applied using the carrier solvent).

❖ Zero of 20 mice in the glyphosate (s) single application group developed papillomas (the glyphosate (s) in this group was applied using the carrier solvent).

❖ Zero of 20 mice in the glyphosate (t) three times per week application group developed papillomas (the glyphosate (t) in this group was applied using the carrier solvent).

❖ Zero of 20 mice in the DMBA (s) single application group developed papillomas (the DMBA in this group was applied using the carrier solvent).

❖ Zero of 20 mice in the t-phorbol acetate (TPA) group developed papillomas (the t-phorbol acetate (TPA) in this group was applied using the carrier solvent).

Thus, in total, 100 mice that received solvent (ethanol/acetone) - groups II, IV, V, VI, VII - were without any evidence of papillomas. Therefore, the reliability of this study with respect to the "*so called*" missing control group is not at issue.

The George study revealed that the Roundup product (41% glyphosate, POEA 15%) increased the incidence of <u>tumors</u> when combined with DBMA. The study demonstrated that glyphosate is capable of promoting tumors induced by an initiating chemical (DBMA). It is certain that Roundup, at a dose reasonably equivalent to that received by applicators, is a tumor promoter. In the George study, the well-known Group 1 carcinogen DMBA was administered to the mice.

To be clear: The George study was <u>not</u> designed to determine whether glyphosate itself is a carcinogen. This was not the objective of the study design. The George, et al., study was designed to determine whether Roundup <u>promoted</u> tumors.

The George study has been cited in at least 86 related scientific, peer-reviewed articles. There are no editorials or adverse criticisms within the peer-reviewed literature that I have found that are critical of this study as being "*unreliable.*" Defendant's assertions in this regard are not supported by factual evidence.

Randall Dean Seidl v. Monsanto
August 13, 2020
Page 54

The study revealed that when glyphosate was combined with DMBA (a powerful carcinogen found in cigarette smoke[154]) and applied to the skin, 40% of the mice developed tumors with an average of 2.8 tumors per mouse. Conversely, when the mice were dosed only with DMBA, none developed tumors. The study demonstrated, *to 95% statistical certainty*, the carcinogenic potential of glyphosate as a powerful tumor promoter in a 2-stage promotion model.

Thus, Defendant's attempt to criticize this study and my reliance upon it by asserting that determining whether or not glyphosate is a carcinogen was the focal point of the study is not accurate. Also, the criticism that the study was "flawed" due to no solvent group is not accurate and is misleading. There were actually 100 solvent carrier animals without a single papilloma.

Further, my report shows the transformation of the George study mouse dosage to a human equivalent dose (using the generally-recognized and accepted HDE methodology) is reasonable. The HED transformation shows that the dose in the George study was both reasonable and consistent with the documented dosage range of glyphosate applicators (AOEL). The animals received patch coverage of only 2 cm$^2$. Human applicators receive a substantially larger percentage of dermal impact than that of the mice in the George study. It should be noted that this is not the only promotion study I relied on.

Another peer-reviewed promotion study was published by Wang, et al. (2009).[155] The study data reveals that glyphosate elicits a B-cell-specific mutational mechanism of action in promoting carcinogenesis. The experimental evidence supports the epidemiologic finding regarding glyphosate's tissue specificity in carcinogenesis, *i.e.,* only increasing the risk for MM and NHL.

The Wang, et al., (2019) study provides the first in vivo evidence to support that glyphosate induces and promotes the disease progression to MM. The authors also revealed a B cell-specific mutational mechanism for glyphosate exposure that increases MM and NHL risk, providing a molecular basis for human epidemiological findings (Sawyer 10-31-2019 report).

---

[154] Lee, et al., "Polycyclic aromatic hydrocarbons present in cigarette smoke cause bone loss in an ovariectomized rat model," 2002, Bone, Jun.30(6):917-923.

[155] Sawyer report pg. 61., Wang, L., et al., "Glyphosate induces benign monoclonal gammopathy and promotes multiple myeloma   progression in mice," 2019, Journal of Hematology & Oncology, Vol. 12, pp.70.

Randall Dean Seidl v. Monsanto
August 13, 2020
Page 55

Epidemiological studies have implicated glyphosate in the induction of multiple myeloma[156] (MM) via positive and statistically significant associations with glyphosate exposures. The Wang, et al. (2019) study[157] examined the impact of glyphosate in the pathogenesis of multiple myeloma. A distinctive characteristic of MM is that it is consistently preceded by MGUS[158], which is the increased production of the damaging M protein. The authors used specially bred mice[159] that are predisposed to developing a mouse equivalent to human MGUS, which then progresses to MM. This specially bred mouse model recapitulates many biological and clinical features of human MM, including increased serum immunoglobulin G (IgG), bone lesions and kidney damage.

The authors dosed the specially bred mice and normal wild-type mice with 1,000 mg/L glyphosate (~ 15 times the current ADI[160] allowed in the USA) in drinking water.

Following glyphosate dosing, the specially bred mice developed progressive hematological abnormalities and plasma cell neoplasms such as splenomegaly, anemia and high serum IgG[161]. Moreover, glyphosate caused multiple organ dysfunction, including lytic bone lesions and renal damage in these predisposed mice. Glyphosate-treated normal wild mice also developed some of the adverse conditions including benign monoclonal gammopathy with increased serum IgG, anemia and plasma cell presence in the spleen and bone marrow.

As a B-cell genome mutator, the substance called AICD[162] is known as a key pathogenic player in both MM and B-cell NHL. In the current study, glyphosate was found to increase the production of AICD in the spleen and bone marrow of both normal wild mice and the

---

[156] Multiple myeloma is a type of blood cancer, wherein malignant plasma cells accumulate in the bone marrow.  These malignant plasma cells then produce an abnormal antibody called M protein, which offers no benefit to the body and may cause tumors, kidney damage, bone destruction and impaired immune function.  A defining characteristic of multiple myeloma is a high level of M protein in the blood (M spike).

[157] Wang, L., et al., "Glyphosate induces benign monoclonal gammopathy and promotes multiple myeloma   progression in mice," 2019, Journal of Hematology & Oncology, Vol. 12, pg. 70.

[158] Monoclonal gammopathy of undetermined significance (MGUS) is a condition in which an abnormal protein, known as monoclonal protein or M protein, is formed within your bone marrow and secreted into the blood.

[159] Bergsagel and colleagues generated a mouse model of MM (Vk*MYC) under the C57bl/6 genetic background with sporadic c-Myc activation in germinal center B cells, resulting in the development of benign monoclonal gammopathy, a mouse equivalent to MGUS, which then progresses to MM.

[160] The authors based this on the U.S. EPA chronic reference dose for an average adult weighing roughly 80 kg.

[161] The type of MGUS that most commonly leads to myeloma.

[162] Activation-induced cytidine deaminase (AICD)

Randall Dean Seidl v. Monsanto
August 13, 2020
Page 56

specially bred mice. Thus, the glyphosate-induced damage occurred not only in the mice predisposed to MM but also in normal wild mice.

Most importantly, the study data reveals that glyphosate elicits a B-cell-specific mutational mechanism of action in promoting carcinogenesis. The experimental evidence supports the epidemiologic finding regarding glyphosate's tissue specificity in carcinogenesis, *i.e.,* only increasing the risk for MM and NHL.

The Wang, et al., (2019) study provides the first *in vivo* evidence to support that glyphosate induces and promotes the disease progression to MM. The authors also revealed a B cell-specific mutational mechanism for glyphosate exposure that increases MM and NHL risk, providing a molecular basis for human epidemiological findings.

**Roundup and Glyphosate Genotoxicity**

Genotoxicity is the ability of a chemical to cause damage to genetic information, *i.e.*, the DNA in cells, thereby causing genetic mutations that may lead to cancer. *There is strong scientific evidence that glyphosate is genotoxic and that glyphosate-based formulations such as Roundup cause oxidative stress capable of damaging DNA.*

**Genotoxic Agents, Promotors and Inadequately Studied Chemicals**

There are several such candidate substances in Roundup which are (a) unclassified by regulatory agencies and/or (b) substances for which only limited data or no peer-reviewed study data exists.

Such limitations make objective assessment very difficult as there is no single source of authority or regulatory guidance upon which to draw. For example, in a European Food Safety statement,[163] POE-tallowamine caused positive carcinogenic findings in a number of test systems. The consensus was that the likely causative basis was cytotoxicity (note that POEA compounds are banned in Europe and other countries outside the U.S.). There are also inconsistent results (depending on whose data is consulted) which note that an "unidentified" glyphosate-based formulation proved to be cytotoxic in bone marrow. However, tests of other formulations were negative.

Additionally, some substances only become carcinogenic when mixed with (or in the presence of) other substances which include formulation impurities. The interactive

---

[163] "Request for the evaluation of the toxicological assessment of the co-formulant POE-tallowamine," European Food Safety Administration, November, 2015.

Randall Dean Seidl v. Monsanto
August 13, 2020
Page 57

characteristics of such substances are not always clear. For instance, surfactant "C-6330" (an ethoxlylated fatty amine used by Monsanto) is noted as being *"very toxic to aquatic organisms."* The MSDS for this surfactant actually says very little of practical use as its composition is simply noted as "Proprietary." Such obfuscation of labelling chemical components merely serves to confound the assessment process as one does not (and cannot) know what is actually being assessed.

As previously noted, product ingredients can be examined individually when they are identified. However, it is <u>critically important</u> to note that when combined, these ingredients may have very different properties than the individual ingredients alone.

**Studies Demonstrating Genotoxicity and Mutagenic Effects of Glyphosate**

In the Bolognesi, et al., (1997) study,[164]  analytical grade glyphosate (99.9%) and a Roundup formulation containing various surfactants and 30.4% glyphosate were tested in the same battery of assays to investigate and compare genotoxicity measurements. DNA damage was evaluated in terms of single-strand breaks and 8-hydroxydeoxyguanosine (8-OHdG) quantification in the liver and kidney. The chromosomal damage of the two pesticide preparations was evaluated *in vivo* in bone marrow of mice as micronuclei frequency and *in vitro* in human lymphocyte culture as SCE[165] frequency.

The study found significant oxidative damage of DNA. Glyphosate induced "large and significant" increases of 8-OHdG in the liver at 24 hours, but not in the kidney. Conversely, treatment with Roundup resulted in a significant increase of 8-OHdG over the control in the kidney but a nonsignificant increase in the liver.

A dose-dependent increase of cytogenetic damage, measured as SCE frequencies, was found in human lymphocytes treated with glyphosate over the control. Furthermore, a significant increment of the cytogenetic damage was evident in Roundup-treated lymphocytes compared to the glyphosate alone. The higher toxicity of Roundup resulted in the absence of mitotic cells above 0.33 mg/mL (333 PPM) and prevented the testing of higher doses. At the highest concentration of Roundup tested, the SCE/cell ratio was comparable to that obtained with a dose of glyphosate 10 times higher.

---

[164] Bolognesi, Claudia, et al., "Genotoxic activity of glyphosate and its technical formulation," 1997, J. Agric. Food Chem. 45, pg. 1957-1962.

[165] Sister chromatid exchange.

Randall Dean Seidl v. Monsanto
August 13, 2020
Page 58

The *in vivo* bone marrow testing revealed an increase in micronuclei frequencies in all groups of treated mice. In addition, a significant reduction in the PCE/NCE ratio was evident in Roundup-treated mice showing target organ toxicity of the formulation.

The higher activity of Roundup in inducing toxic and genotoxic damage suggests that the co-formulants and/or surface active agents play a role in the potentiation of the effects of glyphosate.

Kang, et al., (2008)[166] found that in certain doses, glyphosate increases the micronucleus rate in the bone marrow cells of mice and causes sperm abnormalities and deformations in the heads of sperm.  Roundup (41% glyphosate isopropylamine salt aqueous solution) was orally administered in doses that were determined by the $LD_{50}$:[167] low (1/8 $LD_{50}$= 580 mg//kg), medium (1/4 $LD_{50}$= 1,160 mg//kg) and high (1/2 $LD_{50}$= 2,320 mg//kg).

Using micronucleus testing,[168] Kang, et al., found that a 2,320 mg/kg dose of Roundup induced a marked increase in the bone marrow micronucleus rate in mice and exhibited a dose-dependent relationship. This shows that glyphosate has a significant mutagenic effect on the production of bone marrow cells in mice.

Also, the sperm abnormality rates in the glyphosate 1,160 and 580 mg/kg dose groups were significantly higher than in the negative control group ($P < 0.01$ , $P < 0.05$). There was a dose-dependent relationship between exposure doses and sperm abnormality rates.

The authors conclude that glyphosate had a definite effect on both sperm counts and on the reproductive organs suggesting that glyphosate is mutagenic to the cells in mammals, damages sperm in mice and has the potential to cause mutations in male reproductive cells.

A study[169] on the role of agrochemicals in genotoxic damage used biomonitoring and environmental monitoring and examined biomarkers and other indicators of genetic damage in 30 pesticide applicators as compared to a reference sample of unexposed

---

[166] Kang, JF, et al., "Study on mutagenesis induced by glyphosate in mice," 2008, Carcinogenesis, Teratogenesis & Mutagenesis, Vol. 20(3), pg. 227-320.

[167] LD stands for "Lethal Dose." LD50 is the amount of a material, given all at once, which causes the death of 50% (one half) of a group of test animals.

[168] Micronucleus testing of polychromatic erythrocytes in the bone marrow of mammals is a method of detecting chromosome damage and mutations in the body and chemical toxicity interfering with cellular mitosis.

[169] Aiassa, D. et al., "Evaluation of genetic damage in pesticides applicators from the province of Cordoba, Agentina," 2019, Environmental Science and Pollution Research, Vol. 26(20), pg. 20981-20988. doi: 10.1007/s11356-019-05344-2. Epub 2019 May 21.

Randall Dean Seidl v. Monsanto
August 13, 2020
Page 59

individuals.  Exposures were noted to occur during the mixing and loading as well as the spraying of pesticide. The scientist behind the study noted that while applicators are known to work with a wide variety of chemicals in different formulations, glyphosate, in Argentine toxicological classification, is considered category IV; the lowest. Glyphosate can, therefore, be sprayed at less than 500 meters from homes and is cleared to be handled by applicators with minimal health protective measures.

The genotoxicity study revealed that, compared to the reference sample, pesticide applicators showed significant increase in DNA fragmentation, micronuclei formation and chromosome aberrations – chromatids and chromosome gaps, acentric fragments, chromosome and chromatids breaks and end reduplications. Further reporting by the applicators noted that 37% suffered from headaches and eye irritation during spraying and afterwards; 27% had respiratory allergies and/or skin reactions; 10% suffered digestive symptoms and 13% reported acute intoxication at least once after work.

Benedetti, et al.,[170] assessed genotoxic effects of pesticide exposure in soybean farm workers by evaluating human biomarkers buccal cells and peripheral leukocytes in the exposed and unexposed groups. Though this study did not exclusively examine effects of glyphosate alone, organophosphates were among the primary pesticides that workers were exposed to and which included glyphosate. The results of the study revealed that in exposed farm workers, there was resulting DNA damage (increased micronuclei, nuclear buds and binucleated cells) and cell death (condensed chromatin, karyorrhectic and karyolitic cells). Only 20% of the exposed farm workers group wore PPE; however, there was no difference in cell damage and cell death between exposed workers who wore PPE and those who did not wear PPE.

A study by Hutter, et al., has provided evidence to support genotoxicity effects in humans from spraying and application of organophosphates, "primarily glyphosate." In this study, pesticide-exposed workers not only sprayed pesticides but prepared and mixed the pesticides themselves and handled its disposal. A majority of the participants did not use PPE and lacked proper hand hygiene during eating and drinking.[171] Buccal cells were analyzed via buccal micronucleus cytome assay (BMCA) which reflects genotoxic effects

---

[170] Benedetti, D., et al., "Genetic Damage in Soybean Workers Exposed to Pesticides: Evaluation with the Comet and Buccal Micronucleus Cytome Assays," 2013, Mutation Research- Genetic Toxicity and Environmental Mutagenesis, Vol 752, pp. 28-33. https://doi.org/10.1016/j.mrgentox.2013.01.001

[171] Hutter, H-P., et al., "Cytotoxic and Genotoxic Effects of Pesticide Exposure in Male coffee Farmworkers of the Jarabacoa Region, Dominican Republic," 2018, International Journal of Environmental Research and Public Health, Vol 15, doi:10.3390/ijerph15081641

Randall Dean Seidl v. Monsanto
August 13, 2020
Page 60

including micronuclei, nuclear buds, broken eggs and binucleated cells as well as cytotoxic effects including condensed chromatin, karyorrhectic cells, karylytic cells and pyknosis. All biomarkers from BMCA revealed statistically-significant increased rates of nuclear anomalies in the pesticide-exposed group compared to the non-exposed group.[172] At 95% confidence interval, odds ratio for micronucleated cells was 3.1 (1.3-7.4) and odds ratio for pyknotic cells was 4.5 (2.5-8.2). The study concludes, "*Our results of the micronucleus cytome assays demonstrate impressively that the exposure to a mixture of agrochemicals may lead to long-term health consequences and suggests that pesticide users might have a higher risk of developing cancer.*"

**Odds Ratio and 95% Confidence Intervals for Nuclear Anomalies in Pesticide-Exposed Workers (all statistically significant)**
(from Hutter et al., 2018)[173]

| Endpoints | OR | 95% CI | $p$-Value |
|---|---|---|---|
| MN cells | 3.098 | 1.297–7.404 | 0.011 |
| Total MNi | 2.524 | 1.219–5.226 | 0.013 |
| Nuclear buds & broken eggs (BUD) | 1.916 | 1.448–2.536 | <0.001 |
| Binucleated cells (BN) | 1.412 | 1.207–1.650 | <0.001 |
| Condensed chromatin (CC) | 1.306 | 1.054–1.618 | 0.015 |
| Karyorrhexis (KR) | 1.212 | 1.030–1.426 | 0.021 |
| Karyolysis (KL) | 1.286 | 1.132–1.462 | <0.001 |
| Pyknosis (PY) | 4.536 | 2.517–8.173 | <0.001 |
| Basal cells | 1.526 | 1.263–1.844 | <0.001 |

**Further Evidence of Genotoxic Effects**

A recent study published in 2019 by Leite, et al., has provided further evidence to support the genotoxic effect of glyphosate (exposure via aerial spraying of organophosphate pesticides) by evaluating human biomarkers within (1) a community surrounded by transgenic soybean crops (such crops are generally bioengineered to allow for glyphosate spraying) and (2) the control group (group of children born and living in a community dedicated to family agriculture with biological control of pests).

The biomarker buccal micronucleus (with other nuclear abnormalities) was measured along with a comet assay analysis in the exposed and unexposed group to determine

---

[172] Id.

[173] Id.

Randall Dean Seidl v. Monsanto
August 13, 2020
Page 61

frequency of genetic (DNA) and cellular damage. The study showed significant differences between exposed and unexposed groups. All the following damages that were analyzed resulted in higher frequency in the exposed groups: micronucleus, increased binucleated, broken egg, karyorrhexis, karyolysis, pkynonsis and condensed chromatin.[174]

The study concluded that a greater and significant genotoxic and cytotoxic effect was observed in children exposed to pesticides compared to children unexposed to pesticides as evidenced by greater DNA damage to the exposed children. This is consistent with results from an earlier study done in Brazil which evaluated human exposure to pesticides in a similar manner in soybean farm workers.[175,176]

Genotoxic anomalies from exposure to pesticides may indicate the potential for cancer as these damages can induce mutations as well as other dangerous effects.

**Figure 2** (from Leite, et al.) shows the increased frequency of cellular and DNA damage in the exposed group compared to the unexposed group.[177] The green highlight indicates exposed and unexposed groups.

---

[174] Leite, S.N., et al., "DNA Damage Induced by Exposure to Pesticides in Children of Rural Areas in Paraguay," 2019, Indian Journal of Medical Research, Vol 150, pp. 290-296. DOI: 10.4103/ijmr.IJMR_1497_17

[175] Id.

[176] Benedetti, D., et al., "Genetic Damage in Soybean Workers Exposed to Pesticides: Evaluation with the Comet and Buccal Micronucleus Cytome Assays," 2013, Mutation Research- Genetic Toxicity and Environmental Mutagenesis, Vol 752, pp. 28-33. https://doi.org/10.1016/j.mrgentox.2013.01.001

[177] Leite, S.N., et al., "DNA Damage Induced by Exposure to Pesticides in Children of Rural Areas in Paraguay," 2019, Indian Journal of Medical Research, Vol 150, pp. 290-296. DOI: 10.4103/ijmr.IJMR_1497_17

Randall Dean Seidl v. Monsanto
August 13, 2020
Page 62



Frequency rate in oral cells per 1000 cells of exposed

**Fig. 1.** Anomaly rate in oral cells per 1000 cells of exposed (E) (n=43) and not exposed (NE) (n=41). P25, 25th percentile; P75, 75th percentile. (shows difference between 75th percentile and max).

Figure 2: Comparison of Anomaly Rate in Oral Cells between exposed and not exposed groups[178]

---

[178] Id.

Randall Dean Seidl v. Monsanto
August 13, 2020
Page 63

A recent study by Wozniak et al.,[179] published in 2018, incubated human peripheral blood mononuclear cells (PBMCs) for 24 hours in the formulation Roundup 360 PLUS, glyphosate and its metabolite aminomethylphosphonic acid (AMPA). The study assessed the impact on DNA damage at concentrations of the tested chemicals ranging from 1 to 1000 µM. The Roundup formulation caused DNA damage (single strand breaks, double strand breaks, ALS formation, DNA lesions) even at concentrations as low as 5 µM and glyphosate and AMPA caused DNA lesions at concentrations of 250 µM and 500 µM, respectively. The amount of DNA damage caused by the chemicals increased from AMPA to glyphosate to Roundup 360 PLUS with Roundup causing DNA damage at concentrations 50 times lower than glyphosate.  The DNA strand breaks induced at 10 µM application of Roundup were not repaired after incubation with PBMCs (incubation with PBMCs were shown to significantly repair DNA damage at 5 µM Roundup, 250 µM glyphosate and 500 µM AMPA). This underlined the point that glyphosate formulations are more toxic than glyphosate itself. The study also proposed that the damage occurred through oxidative reactions.

Published in 2020, Wozniak et al.,[180] further investigated the impact of DNA damage by glyphosate on DNA methylation level within selected gene promotors involved in proliferation, tumorigenesis and apoptosis. They incubated PBMCs for 24 hours in glyphosate at 0.5 µM, 10 µM and 100 µM. Results revealed a significant decrease of global DNA methylation with all glyphosate concentrations. Significant changes of methylation were found within the P21 gene promotor and TP53 tumor suppressor gene at the lowest glyphosate concentration. Significant gene expressions were revealed: decrease of P16 at all glyphosate concentrations, decrease of TP53 and increase of BCL2 at the highest concentration of glyphosate. In summary, there was decreased 5-mC level in PBMCs at all glyphosate concentrations which is comparable to environmental or occupational exposure (at the lowest 0.5 µM concentration). The results agreed with their previous findings in the 2018 study. Significant changes in methylation profiles of promotor genes involved in cellular metabolism were found. The significant upregulation of BCL2 expression could affect apoptosis induction.

---

[179] Wozniak, E., et al., "The mechanism of DNA damage induced by Roundup 360 PLUS, glyphosate and AMPA in human peripheral blood mononuclear cells – genotoxic risk assessment," 2018, Food and Chemical Toxicology, doi: 10.1016/j.fct.2018.07.035

[180] Wozniak, E., et al., "Glyphosate affects methylation in the promoter regions of selected tumor suppressors as well as expression of major cell cycle and apoptosis drivers in PBMCs (*in vitro* study)," 2020, Toxicology in Vitro, Vol. 63

Randall Dean Seidl v. Monsanto
August 13, 2020
Page 64

Continuing their investigation, Wozniak et al.,[181] (published in 2020), further assessed the effects of aminomethylphosphonic acid (AMPA) alone on DNA damage. They incubated PBMCs for 24 hours in AMPA at 0.5, 10, and 250 µM to assess global DNA methylation, methylation in promoter regions of selected tumor suppressor genes and proto-oncogenes and expression profile of the indicated genes. Results revealed statistically-significant reduction of global DNA methylation AMPA concentrations of 10 µM and 250 µM. They demonstrated that, similar to glyphosate, AMPA significantly reduces global DNA methylation level in human PBMCs; however, it does not significantly alter the same gene expressions involved in regulation of cell cycle and apoptosis that glyphosate does. This demonstrates that glyphosate produces more damage than AMPA alone.

Another recent study of Suarez-Larios, et al., (2017) reveals a genotoxic mode of action for glyphosate pesticides. The investigation was undertaken by Suarez-Larios, et al.,[182] to determine whether or not exposure to pesticides would induce double-strand breaks (DSB) in cells (a lesion related to the formation of chromosomal rearrangements and increased leukemia risk).   Of the eight pesticides tested (endosulfan, glyphosate, pentachlorophenol, permethrin, propoxur, AMPA, endosulfan lactone and paraoxon), four showed a significant effect on the number of cells with double-strand breaks. However, glyphosate and paraoxon (both organo-phosphates) showed the <u>greatest increase</u> in the number of cells with double-strand breaks. Further, it was determined that glyphosate and paraoxon reduced the number of viable cells in a <u>dose-dependent manner</u>; specifically, going from 100% cell viability to 70% with glyphosate. Not only did these two pesticides induce greater breakage, they also induced the phosphorylation[183] of KU80, a protein that participates in the c NHEJ recombinational repair pathway which is responsible for repair of the cells when double-stand breaks occur.

It was further noted in the study that these effects occurred at low concentrations in an <u>acute</u> treatment to cells in the laboratory setting.   "*Effects over longer exposure in actual environmental settings are expected to produce cumulative damage if repeated events of recombination take place over time.*"   In other words, the more often a cell is damaged by glyphosate-induced breakage, the less likely the c NHEJ recombinational repair pathway will be able to repair it.  Thus, the linear approach required by the U.S. EPA methodology

---

[181] Wozniak, E., et al., "The selected epigenetic effects of aminomethylphosphonic acid, a primary metabolite of glyphosate on human peripheral blood mononuclear cells (in vitro)," 2020, Toxicology in Vitro, Vol. 66

[182] Suarez-Larios, K., et al., "Screening of pesticides with the potential of inducing DSB and successive recombinational repair," 2017, Journal of Toxicology.

[183] Phosphorylation plays a critical role in the regulation of cellular processes.

Randall Dean Seidl v. Monsanto
August 13, 2020
Page 65

is appropriate as the mode of action proposed by Suarez-Larios, et al., is <u>not a threshold-based genotoxic mechanism</u>.  Other studies indicate that glyphosate can act as an endocrine disruptor[184] and has tumor-promoting activity.[185]

*In vivo* observations of human populations exposed to Roundup have revealed statistically significant outcomes demonstrating genotoxicity at low exposure levels[186] as well as *in vivo* studies of laboratory animals fed Roundup.[187] These studies challenge both animal and human systems providing *in vivo* doses of Roundup with resulting genotoxicity.

Furthermore, the exposure was to the Roundup product itself, not merely the chemical glyphosate. Additionally, these human cell studies present conditions with low dosing and concentrations and are, therefore, in no way extreme cases or otherwise inapplicable.

In Lioi, M.B., et al., (1998),[188] the authors studied the genotoxic activity of glyphosate[189] in *in vivo* cultures of bovine lymphocytes using chromosome aberration (CA) and sister chromosome exchange (SCE) frequencies as genetic endpoints and a variation of the G6PD[190] enzyme activity as a marker of changes in the normal cell redox state. The study found a statistically significant increase of CAs, SCEs and G6PD activity in glyphosate-exposed cultures when compared to controls.

---

[184] Gasnier, C., et al., "Glyphosate-based herbicides are toxic and endocrine disruptors in human cell lines," 2009, Toxicology, Vol. 262, pg. 184 -191.

Thongprakaisang, S., et al., "Glyphosate induces human breast cancer cells growth via estrogen receptors," 2013, Food and Chemical Toxicology, doi: http://dx.doi.org/10.1016/j.fct.2013.05.057

[185] George, J., et al., "Studies on glyphosate-induced carcinogenicity in mouse skin: A proteomic approach," 2010, Journal of Proteomics, Vol. 73, pg. 951 – 964.

[186] Paz-y-Miño, C., et al., "Evaluation of DNA damage in an Ecuadorian population exposed to glyphosate*," 2007,* Genetics and Molecular Biology**,** 30(2).

Bolognesi, C., et al., "Biomonitoring of genotoxic risk in agricultural workers from five Colombian regions: Association to occupational exposure to glyphosate," 2009, Journal of Toxicology and Environmental Health, Part A, Vol. 72, pg. 986 -997.

[187] Peluso, M., et al., "32P-postlabeling detection of DNA adducts in mice treated with herbicide roundup," 1998, Environmental and Molecular Mutagenesis. Vol. 31(1), pp. 55 -59. DOI: 10.1002/(SICI)1098-2280(1998)31:1<55::AID-EM8>3.0.CO;2-A

[188] Lioi, M.B., et al., "Genotoxicity and oxidative stress induced by pesticide exposure in bovine lymphocyte cultures *in vitro*," 1998, Mutation Research, Vol. 403, pg. 13–20.

[189] Vinclozolin and DPX-E9636 were also included in this study.

[190] Glucose 6-phosphate dehydrogenase

Randall Dean Seidl v. Monsanto
August 13, 2020
Page 66

Glyphosate produced a significant increase in the percentage and frequency of aberrant cells (chromatid and isochromatid breaks). This clastogenic effect[191] was accompanied by a dose-dependent decreasing trend in cell proliferation.

In the cytoxicity study by Lioi, et al., (1998),[192] the authors analyzed CAs, SCEs, mitotic index (MI) and G6PD enzyme activity in human peripheral lymphocytes exposed to glyphosate *in vitro*.[193] Glyphosate induced a significant dose-related increase in the percentage and frequency of CAs; an increase of SCE frequency was also observed. A significant enhancement of G6PD enzyme activity was observed in the range of 8.5-51 µM glyphosate concentration. The study reported that the increase in the G6PD activity in the glyphosate-exposed lymphocytic cultures strongly indicated the induction of a pro-oxidant state of the cells as an initial response to exposure.

Duforestel M., et al., 2019,[194] stated that cancer rarely occurs in response to one risk factor. However, the known influence of glyphosate on estrogen-regulated pathway makes it a logical target of investigation in breast cancer research.  The authors reference Thongprakaisang, et al., 2013, which reported that glyphosate induced the proliferation of human breast cancer cells via an impact on estrogen receptors. This observation is supported by several other studies demonstrating that glyphosate can affect the activity of estrogen receptor alpha (ERa) and certain phenotypes of ERa positive cells within breast cancer cell populations (Mesnage et al., 2017; De Almeida et al., 2018; Sritana et al., 2018).

Duforestel, et al., also presents evidence that glyphosate induces global DNA hypomethylation (i.e., overall decrease of 5-methylCytosine (5mC) in the epigenome) in non-neoplastic mammary epithelial MCF10A cells and contributes to tumorigenesis in a "two-hit oncogenic model." Their data also uncovers a specific DNA hypomethylation signature of genes (i.e., local DNA hypomethylation) related to the TET3 pathway that might be used as an epimark of glyphosate exposure.

---

[191] Causing breaks in chromosomes which result in sections of a chromosome being deleted or rearranged.

[192] Lioi, M.B., et al., "Cytogenetic Damage and Induction of Pro-Oxidant State in Human Lymphocytes Exposed *In Vitro* to Glyphosate, Vinclozolin, Atrazine and DPX-E9636," 1998, Environmental and Molecular Mutagenesis, Vol. 32, pg. 39–46.

[193] Vinclozolin, atrazine and DPX-E9636 were also included in this study.

[194] Duforestel M., et al., "Glyphosate Primes Mammary Cells for Tumorigenesis by Reprogramming the Epigenome in a TET3-Dependent Manner," 2019, Front. Genet. 10:885. doi:10.3389/fgene.2019.00885

Randall Dean Seidl v. Monsanto
August 13, 2020
Page 67

Glyphosate also triggered a significant reduction in DNA methylation as shown by the level of 5-methylcytosine DNA. Glyphosate triggered increased activity of ten-eleven translocation (TET). Combining glyphosate with enhanced expression of microRNA (miR) 182-5p associated with breast cancer induced tumor development in 50% of mice.

Culture of primary cells from resected tumors revealed a luminal B (ER+/PR-/HER2-) phenotype in response to glyphosate-miR182-5p exposure with sensitivity to tamoxifen and invasive and migratory potentials. Tumor development could be prevented either by specifically inhibiting miR 182-5p or by treating glyphosate-miR 182-5p-cells with dimethyloxallyl glycine, an inhibitor of TET pathway. Looking for potential epigenetic marks of TET-mediated gene regulation under glyphosate exposure, they identified *MTRNR2L2* and *DUX4* genes, the hypomethylation of which was sustained even after stopping glyphosate exposure for 6 weeks.

The low pressure but sustained DNA hypomethylation occurring *via* the TET pathway primes cells for oncogenic response in the presence of another potential risk factor, such as glyphosate. These results warrant further investigation of glyphosate-mediated breast cancer risk.

A study by Stur, et al., 2019,[195] analyzed the effects of Roundup and AMPA[196] on gene expression in triple negative BC cells. The authors identified gene expression changes in MCF-7 and MDA-MB-468 breast cancer cells after a short exposure time to low concentrations of Roundup Original and AMPA. The results showed that at low concentration (0.05% Roundup) and short exposure (48 hours), both cell lines suffered deregulation of 11 canonical pathways, the most important being cell cycle and DNA damage repair pathways. Enrichment analysis showed similar results except that MDA-MB-468 altered mainly metabolic processes. In contrast, 48 hour 10mM AMPA showed fewer differentially expressed genes but mainly related with metabolic processes indicating that that AMPA is less toxic than Roundup.

Their findings suggest that Roundup affects survival due to cell cycle deregulation and metabolism changes that may alter mitochondrial oxygen consumption, increase ROS levels, induce hypoxia, damage DNA repair, cause mutation accumulation and ultimately cell death. They concluded that both compounds can cause cellular damage at low doses

---

[195] Stur, E., et al., "Glyphosate-based herbicides at low doses affect canonical pathways in estrogen positive and negative breast cancer cell lines," 2019, PLoS One. Vol. 14(7): e0219610. Published online 2019 Jul 11. doi: 10.1371/journal.pone.0219610
[196] AMPA is a metabolite of glyphosate.

Randall Dean Seidl v. Monsanto
August 13, 2020
Page 68

in a relatively short period of time in these two models, mainly affecting cell cycle and DNA repair.

 "…*we can conclude that Roundup, at much lower doses than the ones used in agriculture, was able to deregulate important intracellular pathways in ER+ and triple negative BC cell lines, showing that glyphosate's effect on cells is not exclusive to the ER pathway.*"

A 2018 study by De Almeida, et al.,[197] explored the effects of glyphosate, Roundup and another glyphosate-based herbicide in ER+ and ER- BC cell lines. Their results showed that these compounds can cause DNA damage at low concentrations and short exposure.

In Peixoto's 2005 study,[198] the potential toxicities of glyphosate and Roundup were tested in isolated rat liver mitochondria. The author determined the effects of Roundup and glyphosate on succinate-dependent respiratory indexes RCR and ADP/O of rat liver mitochondria. The data obtained clearly demonstrate the ability of Roundup to impair mitochondrial bio-energetic reactions. It was found that Roundup not only decreases the depolarization and repolarization amplitude induced by ATP, but also lengthens the "lag phase" prior to repolarization. Conversely, glyphosate alone does not show any relevant effect on the mitochondrial bioenergetics. Peixoto concluded that the observed alterations in mitochondrial bio-energetics caused by Roundup cannot be exclusively attributed to the active ingredient but may as well be the result of other chemicals (i.e., POEA) or due to the possible synergy between glyphosate and Roundup formulation products.

**Prasad Study: Chromosomal Aberrations and Micronuclei in Bone Marrow Cells**

Studies by Prasad, et al.,[199] examined the genotoxic effects of glyphosate as formulated in Roundup™ which contains the active ingredient, glyphosate (>41) SL (IPA salt) as purchased from Monsanto India, Ltd.

Chromosomal aberrations and micronuclei in bone marrow cells of Swiss albino mice were measured following a single intraperitoneal (*i.p.*) dose of Roundup™ with glyphosate

---

[197] De Almeida et al., "Moderate levels of glyphosate and its formulations vary in their cytotoxicity and genotoxicity in a whole blood model and in human cell lines with different estrogen receptor status," October 2018, Biotech, Vol. 8(10).

[198] Peixoto, Francisco. "Comparative Effects of the Roundup and Glyphosate on Mitochondrial Oxidative Phosphorylation." Chemosphere, vol. 61, no. 8, 2005, pg. 1115–1122., doi:10.1016/j.chemosphere.2005.03.044.

[199] Prasad, et al., "Clastogenic Effects of Glyphosate in Bone Marrow Cells of Swiss Albino Mice," 2009, Journal of Toxicology, Volume 2009, Article ID 308985, doiaO.l 155/2009/308985.

Randall Dean Seidl v. Monsanto
August 13, 2020
Page 69

doses levels at 25 and 50 mg/kg body weight. A positive control group received a single dose of the mutagenic carcinogen benzo(a)pyrene ((B(a)P) at 100 mg/kg body weight in a 0.2 ml dimethyl sulfoxide (DMSO) vehicle.  Control and experimental animals received the same DMSO (*i.p.*) vehicle dosage.

Sixty (60) animals were divided into four groups of 15 animals each in two sets. The animals in Group I were used as a control group with DMSO only. The animals of Group II served as the positive control receiving the B(a)P.  Animals in Groups III and IV received a single *i.p.* dose of glyphosate (diluted appropriately in DMSO) at either 25 or 50 mg/kg body weight, respectively.

Animals from all the groups were sacrificed at sampling times of 24, 48 and 72 hours and their bone marrow was analyzed for cytogenetic and chromosomal damage.

Glyphosate treatment significantly increased (p<0.05) chromosomal aberrations and micronuclei in bone marrow cells. Both treatments and time were compared with the vehicle control and were significantly different (P<.05). The cytotoxic effects of glyphosate were also evident as observed by a significant decrease in mitotic index (MI).

Review of Table 1 /Figure 2 reveals a consistent dose-response relationship among both the 25 and 50 mg/kg body weight doses at each time interval. It is also noteworthy that in the low (25 mg/kg body weight) dose group 72 hours after dosing, the rate of chromosomal aberrations was increased by a factor of 4.3 (7.76/1.8 = 4.3).

The authors concluded that the results indicate that glyphosate is clastogenic (a mutagenic agent) and cytotoxic to mouse bone marrow. The authors also state, "*For instance, the induction of DNA damage can potentially lead to adverse reproductive outcomes, the induction of cance*r..." With respect to reliability, the study also states *"Arguably, the most reliable genotoxicity evaluation for human health risk is conducted in mammals by the induction of chromosomal aberrations and micronuclei. In this regard, particular attention is focused on chromosomal aberrations because these are considered as early warning signals for neoplastic development."*[200]

A comparison of the dosing in the mice in the above study by Prasad, et al., (2009) to that of Roundup applicators exposed at the AOEL of 0.1 mg/kg body weight can be carried

---

[200] Bonassi, et al., "Are chromosome aberrations in circulating lymphocytes predictive of future cancer onset in humans? Preliminary results of an Italian cohort study," 1995, Cancer Genetics and Cytogenetics, Vol. 79, No. 2, pp. 133-135; Hagmar, et al., "Chromosomal aberrations in lymphocytes predict human cancer: a report from the European study group on cytogenetic biomarkers and health (ESCH)," 1998, Cancer Research, Vol. 58, No. 18, pp. 4117-4121 **in** Prasad, et al., "Clastogenic Effects of Glyphosate in Bone Marrow Cells of Swiss Albino Mice," 2009, Journal of Toxicology, Volume 2009, Article ID 308985, doiaO.l 155/2009/308985.

Randall Dean Seidl v. Monsanto
August 13, 2020
Page 70

out using the generally-accepted Human Equivalent Dose (HED) methodology. This calculation is important in understanding the range of exposure dose in the animal as compared to a reasonable range of what a human may be exposed to. For example, some animal studies employ doses thousands of time higher than that experienced by actual human applicators of glyphosate.

Interspecies allometric scaling for dose conversion from animal-to-human is a method wherein the exchange of drug dose is based on normalization of dose to body surface area. The methodology requires the consideration of body surface area, pharmacokinetics and physiological time.

This approach assumes that there are some unique characteristics of the anatomical, physiological and biochemical processes among species. The possible difference in pharmacokinetics/physiological time is accounted for by allometric scaling.

This method is frequently used in research for experimental purposes to predict an approximate dose on the basis of data existing in other species. **Table 15** contains an excerpt from Nair and Jacob, 2016, which uses data from U.S. FDA guidelines.[201,202]

---

[201] U.S. FDA, "Guidance for Industry: Estimating the Maximum Safe Starting Dose in Adult Healthy Volunteers," 2005, Rockville, MD: US Food and Drug Administration.

[202] Nair AB, Jacob S., "A simple practice guide for dose conversion between animals and humans," 2016, J Basic Clin Pharma, Vol. 7, pg. 27-31.

Randall Dean Seidl v. Monsanto
August 13, 2020
Page 71

**Table 15**
**Human Equivalent Dose Calculation Based on Body Surface Area**

| Species | Reference Body Weight (kg) | Working weight range (kg) | Body surface area (m²) | To convert dose in mg/kg to dose in mg/m², multiply by $K_m$ | To convert dose in mg/kg to HED* in mg/kg, either Divide Multiply animal dose animal dose by |
|---|---|---|---|---|---|
| Human | 60 | | 1.62 | 37 | |
| Mouse | 0.02 | 0.011-0.034 | 0.007 | 3 | 12.3            **0.081** |

*HED: human equivalent dose

Applying the HED results in a dose of 2.0 mg/kg/body weight that is in a reasonable range of human dermal exposure compared to the AOEL of 0.1 mg/kg/body weight.

In the Prasad, et al., (2009) study, animals dosed at only 25 mg/kg body weight revealed a 4.3-fold increase in chromosomal aberrations at the 95% level of confidence ($p < 0.05$).

It should also be noted that the test animals in this study underwent nearly 100% systemic absorption using the *i.p.* route of administration; thus, the application of the HED provides a reasonably accurate human dose estimate. The current acceptable operator exposure level (AOEL) for glyphosate is 0.1 mg/kg body weight. Thus, the Prasad, et al., (2009) study was not conducted at extreme (high) dose levels but rather, at dose levels not too far off from that encountered by glyphosate applicators.

**Genotoxicity of Roundup, Glyphosate and POEA/Tallowamine (POEA) in Fish:**

In a study done on the effects of Polyoxyethylene Amine (POEA) on genotoxic, biochemical and physiological parameters of the freshwater teleost *Prochilodus lineatus*, a comet assay was used to analyze DNA damage in blood cells, indicating the genotoxicity of POEA at all concentration tested. The results of their study showed that POEA can cause effects such as hemolysis, DNA damage and lipid peroxidation, which are directly related to an imbalance in the redox state of the fish. Studies of acute exposure of P. lineatus to Roundup also found liver catalase activity inhibition. This suggests that both formulated Roundup and POEA interfere with the antioxidant defenses in fish. This study concluded that some of the effects observed after the fish were exposed to glyphosate-based herbicides may be related to the addition of POEA. The following

Randall Dean Seidl v. Monsanto
August 13, 2020
Page 72

damages occurred: hemolysis, DNA damage, lipid peroxidation. They concluded exposure to POEA generates a condition of oxidative stress in fish.[203]

In a study by Marques, et al., titled "*Progression of DNA damage induced by a glyphosate-based herbicide in fish (Anguilla anguilla) upon exposure and post-exposure periods — Insights into the mechanisms of genotoxicity and DNA repair*" by Marques, et al., the authors aimed to improve the knowledge on the progression of DNA damage upon short-term exposure and post-exposure to Roundup. They evaluated DNA damage in hepatic cells via comet assays. They found that the liver cells of fish exposed to the lowest concentration of Roundup displayed significantly lower $NSS_{FPG}$ levels[204] compared to the control. After absorbing the herbicide, the fish cells responded by enhancing its DNA repair capacity and/or mobilizing the antioxidant system as a response to ROS over-generation, reducing the cell vulnerability towards oxidative damage that was induced by the glyphosate. The results are evidence of a pro-oxidant status induced by Roundup and its potential to oxidatively damage DNA. In conclusion, they found **DNA <u>repair</u> machinery <u>was shown to be susceptible to inhibitory actions during the exposure period</u>**. The DNA repair enzymes seem to be susceptible to inhibitory actions associated with higher levels of Roundup constituents/metabolites.[205]

In a study conducted on the toxicity ranking and toxic mode of action for commonly used agricultural adjuvants, Ethoxylated tallow alkylamine was the most toxic compound tested.[206] A high toxicity after exposure to POEA had already been reported for several species such as tadpoles and green algae. The results of this study showed membrane damage after exposure to POEA and illustrates severe effects of DNA damage with the induction of bacterial SOS responses indicating possible genotoxicity for POEA.[207]

---

[203] Navarro, Claudia D.C., and Claudia B.R. Martinez. "Effects of the Surfactant Polyoxyethylene Amine (POEA) on Genotoxic, Biochemical and Physiological Parameters of the Freshwater Teleost Prochilodus Lineatus." *Comparative Biochemistry and Physiology Part C: Toxicology & Pharmacology*, vol. 165, June 2014, pg. 83–90., doi:10.1016/j.cbpc.2014.06.003.

[204] Unclear what NSS is; FPG is a DNA-lesion specific endonuclease.

[205] Marques, A., et al., Progression of DNA Damage Induced by a Glyphosate-Based Herbicide in Fish (Anguilla anguilla) Upon Exposure and Post-exposure Periods--Insights into the Mechanisms of Genotoxicity and DNA Repair. Comp Biochem Physiol C Toxicol Pharmacol. 2014 Nov; 166:126-33. doi: 10.1016/j.cbpc.2014.07.009. Epub 2014 Aug 9.

[206] Other compounds tested include AE, tri-EO, EO FA and EO NP, and gamma-butyrolactone.

[207] Nobels, Ingrid, et al. "Toxicity Ranking and Toxic Mode of Action Evaluation of Commonly Used Agricultural Adjuvants on the Basis of Bacterial Gene Expression Profiles." *PLoS ONE*, vol. 6, no. 11, 18 Nov. 2011, doi:10.1371/journal.pone.0024139.
https://journals.plos.org/plosone/article/file?id=10.1371/journal.pone.0024139&type=printable

Randall Dean Seidl v. Monsanto
August 13, 2020
Page 73

In a report done on the effects of surfactants on the toxicity of glyphosate, with specific reference to RODEO, possible mechanisms by which Roundup surfactants might exert biological effects or alter the toxicity of glyphosate included: decreasing surface tension, perturbing membrane permeability or transport function of membranes or other diffusion barriers, and interacting directly with glyphosate to alter its disposition. The authors reference a study analyzing human poisoning cases by Sawanda, et al. (1998). This study indicated that the acute $LD_{50}$ of POEA was "*less than one-third that of roundup and its active ingredient*". Martinez and Brown (1991) indicated that POEA by itself had a $LD_{50}$ of 1-2 g/kg. POEA is more toxic in alkaline water than in acidic water, thus the relative potency of POEA with respect to glyphosate is pH dependent. In conclusion, POEA is substantially more toxic than glyphosate, and there is a lack of evidence on specific mechanisms of interactions between glyphosate and the surfactants.[208]

**Recent Genotoxic Study of Pesticides (2019)**

In Aiassa, D., et al., "Evaluation of genetic damage in pesticides applicators from the province of Cordoba, Argentina," 2019,[209] the authors conducted a descriptive-correlational study to determine if occupational exposure to pesticides constitutes a factor of genotoxic damage.

From the results of the many research studies from around the world that have provided scientific evidence of a positive correlation between exposure time, doses and high frequencies of these biomarkers, the authors found that the most common biomarkers used to evaluate the genotoxic effect in human populations occupationally exposed to pesticides are chromosomal aberrations (CAs), micronuclei (MN), sister chromatid exchanges (SCEs) and DNA fragmentation.

This study consisted of 52 individuals: 30 pesticide applicators and 22 male referents with no significant differences in lifestyle or diet between the two groups.[210]

The active ingredients of the most used pesticides were glyphosate, cypermethrin and chlorpyrifos. It was not possible to determine the damage caused by each individual

---

[208] Diamond, G. et al., "Effects of Surfactants on the Toxicity of Glyphosate, with Specific Reference to RODEO." United States Department of Agriculture, 1997.
https://www.fs.fed.us/foresthealth/pesticide/pdfs/Surfactants.pdf

[209] Aiassa, D. et al., "Evaluation of genetic damage in pesticides applicators from the province of Cordoba, Argentina," 2019, Environmental Science and Pollution Research, Vol. 26(20), pg. 20981-20988. doi: 10.1007/s11356-019-05344-2. Epub 2019 May 21.

[210] Of the six smokers in the exposed group, three smoked 10 cigarettes per day, one smoked 15 per day and two smoked 20 per day. Control group was non-smoking.

Randall Dean Seidl v. Monsanto
August 13, 2020
Page 74

pesticide because the applicators were exposed to complex mixtures of agrochemicals. All applicators used ground-spraying machines. Twenty-three percent of pesticide applicators did not wear any personal protection equipment during spraying and mixing; 17% wore gloves, glasses and masks; 23% wore gloves only; 37% wore gloves and masks.

The genotoxicity tests performed in the pesticide applicators showed a <u>significant increase</u> in the mean of CAs, MN and DNA fragmentation relative to the reference group. The mean values for fragmentation of the DNA in the group of applicators was more than <u>10 times higher</u> than those in the reference group (3,206 vs. 269). CAs, both with and without gaps, exhibited a statistically significant increase in the exposed group compared with the control group. Chromatid breaks and end reduplications were the two aberrations that showed statistically significant differences between the two groups.

The WHO's International Agency for Research on Cancer has re-reviewed glyphosate in their most recently published report and have not changed their opinion on the genotoxicity of glyphosate.  They state:[211]

> *"The classification of glyphosate was supported by strong evidence that (i) glyphosate or glyphosate-based formulations are genotoxic based on studies in human cells in vitro and studies in experimental animals and (ii) glyphosate, glyphosate-based formulations, and major metabolite aminomethylphosphonic acid (AMPA) induce oxidative stress based on studies in experimental animals and studies in human cells in vitro."*

Mechanistic evidence relevant to key characteristics of carcinogens are supported by new studies with experimental animals and in human cells (e.g., Ghisi, et al., 2016; Santovito, et al., 2018, Wozniak et al., 2018).[212]

**Modes of Action and Safety Considerations**

Glyphosate can be applied both as a ground spray and as an aerial spray. It is used to modify plant growth, speed up the ripening of fruit, applied as a ground spray for peanuts

---

[211] International Agency for Research on Cancer. (2019). *Report of the Advisory Group to Recommend Priorities for the IARC Monographs during 2020-2024.* Retrieved from IARC WHO: https://monographs.iarc.fr/wp-content/uploads/2019/10/IARCMonographs-AGReport-Priorities_2020-2024.pdf

[212] Id.

Randall Dean Seidl v. Monsanto
August 13, 2020
Page 75

and an aerial spray for sugarcane.[213]  Glyphosate is also sprayed directly on wheat just prior to harvest as a consequence of a peculiar practice called *"browning"* or *"desiccating."*

Glyphosate is absorbed by the leaves and stems of the plant and readily translocated throughout.  Specifically, glyphosate disrupts the shikimate acid pathway[214] by inhibiting the activity of a key enzyme (EPSP synthase) that is needed to form the essential amino acids.[215,216,217]  The shikimate acid pathway is a crucial process in all higher-order plants. Thus, glyphosate will kill most plants.  Glyphosate-resistant crops use an alternative EPSP enzyme and are, therefore, <u>specifically genetically engineered</u> to withstand extremely high levels of glyphosate without perishing. This metabolic process is also a crucial one in many microorganisms, but it is not utilized directly by animals or humans.

Throughout the years, Monsanto has advertised and promoted the safety of their Roundup products by claiming that the active ingredient, glyphosate, works by targeting an enzyme found in plants but not in people or pets.

However, recent evidence suggests that glyphosate may disrupt the essential shikimate process in bacteria, particularly the beneficial bacteria of the human intestinal tract. Additionally, glyphosate has been shown to sporadically cause potent inhibitions in the xenobiotic-metabolizing enzyme CYP2C9[218] which is responsible for biotransformation, metabolism and elimination of various toxic compounds from the body.[219]

A recent review by Samsel and Seneff (2013) hypothesized that glyphosate's known ability to disrupt the intestinal bacteria flora and to suppress a family of enzymes that play an important role in detoxifying harmful chemicals could be contributing to a rise in

---

[213] Id.

[214] Williams, G. et al., "Safety evaluation and risk assessment of the herbicide Roundup and its active ingredient, glyphosate, for humans," 2000, Regulatory Toxicology and Pharmacology, Vol.31, pg. 117 - 165.

[215] Boocock, M. R., "Kinetics of 5-enolpyruvylshikimate-3-phosphate synthase inhibition by glyphosate," 1983, FEBS Letters 154, pg. 127-133.

[216] Hollander, H., & Amrhein, N., "The site of the inhibition of the shikimate pathway by glyphosate," 1980, Plant Physiol 66(5), pg. 823-829.

[217] Schönbrunn, E. et al., "Interaction of the herbicide glyphosate with its target enzyme 5-enolpyruvylshikimate 3-phosphate synthase in atomic detail," 2001, Proc Natl Acad Sci USA Feb 13; 98(4), pg. 1376–1380.

[218] Abass, K., Turpeinen, M., and Pelkonen, O. "An evaluation of the cytochrome P450 inhibition potential of selected pesticides in human hepatic microsomes," 2009, Journal of Environmental Science and Health Part B, 44(6).

[219] Gueguen, Y. et al., "Cytochromes P450: xenobiotic metabolism, regulation and clinical importance," 2006, Ann Biol Clin (Paris) 64, pg. 535-548.

Randall Dean Seidl v. Monsanto
August 13, 2020
Page 76

modern human diseases worldwide.[220]   Glyphosate has also been demonstrated to be genotoxic and carcinogenic as discussed in detail.

**Glyphosate (Roundup) Formulations: Chemical and Physical Information**

Glyphosate is the declared active ingredient (DAI) in Monsanto's Roundup herbicide products; however, it is only one ingredient in the formulation and *is almost never applied in isolated form*.   Other substances (referred to as co-formulants) are added in order to modify the physicochemical properties, thereby improving the efficacy of the glyphosate-based formulation.[221,222,223]   Examples of co-formulants are spreaders, compatibility agents, anti-foaming agents, drift retardants and surfactants.

The specific identities and the amounts of co-formulants in the herbicide formulations have largely been kept confidential because they are considered by Monsanto as proprietary data.   Often, co-formulants are declared as "inert" as they do not act directly on the intended target, *i.e.,* the weed.   Moreover, they historically have not been included in either toxicity tests of pesticides on mammals for the establishment of their acceptable daily intake (ADI) or in animal carcinogenicity studies.

Most glyphosate-based formulations (GBFs) contain the same three primary ingredients:  (1) glyphosate salt, (2) co-formulants (e.g. surfactants) and (3) inert ingredients (e.g., "water").[224] Formulations differ from one another by the specific salt included in the formulation and the amount and type of surfactants, other co-formulants and inert ingredients.

Glyphosate-based formulation ingredients can be examined individually; however, one must be mindful that the sum of these ingredients may have very different properties than the individual ingredients alone.

---

[220] Samsel, A. and Seneff, S., "Glyphosate's suppression of cytochrome P450 enzymes and amino acid biosynthesis by the gut microbiome: Pathways to modern diseases," 2013, Entropy (15), pg. 1416-1463.

[221] Defarge, N. E., "Co-formulants in glyphosate-based herbicides disrupt aromatase activity in human cells below toxic levels," 2013, Int J Environ Res Public Health. 13(3), pg. 264.

[222] Nobels, I. et al., "Toxicity ranking and toxic mode of action evaluation of commonly used agricultural adjuvants on the basis of bacterial gene expression profiles," 2013, PLoS ONE 6, pg. 264.

[223] Haefs R. et al., "Studies on a new group of biodegradable surfactants for glyphosate," 2002, Pest Manag. Sci. 58, pg. 825–833.

[224] ███████████, Confidential draft.  "Clustering glyphosate formulations with regard to the testing for dermal uptake," 2001. (Tab 15; see also MONGLY01839476 for draft of this document.)

Randall Dean Seidl v. Monsanto
August 13, 2020
Page 77

The salt of glyphosate in a GBF is comprised of an organic base combined with glyphosate.  Glyphosate [N-(phosphonomethyl) glycine] is amphoteric (can act as either an acid or a base) and is practically insoluble in organic solvents.[225]  Glyphosate as a weak acid has a hydrogen ion held to a phosphorous group by a weak electrostatic charge.  By replacing this hydrogen ion with a different cation (organic base), herbicide manufacturers are able to make a more water-soluble glyphosate salt.  Isopropylamine (IPA) is the organic base that is most commonly used in Roundup-formulated products.[226,227]   This cation is also bound by a weak electrostatic charge and may not stay with the glyphosate acid; once it is added to water by the applicator, it can be easily replaced by other positively charged ions from the water.[228]

Thus, the glyphosate that is working in the plant is usually not associated with the original salt.[229] The specific salt used in the formulation may not significantly impact herbicide performance. The glyphosate concentration in the final formulation will depend on the salt used as each salt has a different molecular weight.  A lighter salt will result in a higher glyphosate concentration.[230]

Several salt types have been used to formulate glyphosate products including isopropylamine (IPA), ammonium, sodium and potassium glyphosate salts[231] (see **Table 16**).  Glyphosate isopropylamine salt is the one most commonly used in Roundup-formulated products[232] and commonly used in all glyphosate-based products.[233]

---

[225] Williams, G. et al., "Safety evaluation and risk assessment of the herbicide Roundup and its active ingredient, glyphosate, for humans," 2000, Regulatory Toxicology and Pharmacology, Vol.31, pg. 117 - 165.

[226] Id.

[227] ▉▉▉▉▉▉▉▉▉, Confidential draft.  "Clustering glyphosate formulations with regard to the testing for dermal uptake," 2001. (Tab 15; see also MONGLY01839476 for draft of this document.)

[228] Interactions between glyphosate and calcium salts found in water are the primary reason for adding AMS to the spray tank. (http://www.weeds.iastate.edu/mgmt/2001/glyphosateformulations.htm)

[229] ▉▉▉▉▉▉▉▉▉, Confidential draft.  "Clustering glyphosate formulations with regard to the testing for dermal uptake," 2001. (Tab 15; see also MONGLY01839476 for draft of this document.)

[230] The active ingredient concentration in a GBF is specified as a glyphosate equivalent or an acid equivalent (a.e.) referring to the free form of the acid.  This allows for comparability between formulations.

[231] ▉▉▉▉▉▉▉▉▉, Confidential draft.  "Clustering glyphosate formulations with regard to the testing for dermal uptake." 2001. (Tab 15; see also MONGLY01839476 for draft of this document.)

[232] Giesey, J. P., Dobson, S., & Solomon, K. R., "Ecotoxicological risk assessment for Roundup herbicide," 2000, Rev. Environ. Contam. Toxicol. 167, pg. 35-120.

[233] U.S. EPA, "Registration eligibility decision-Facts: Glyphosate," 1993, United States Environmental Protection Agency, Prevention, Pesticides and Toxic Substances (7508W), EPA-738-F-93-011.

Randall Dean Seidl v. Monsanto
August 13, 2020
Page 78

**Table 16**

**Properties of Glyphosate and Common Salts of Glyphosate in Roundup[234]**

| Herbicidal Agent | Solubility in water (g/L) | MW (g/mol) | Molecular Formula |
|---|---|---|---|
| Glyphosate acid | **pH 1.9:** 10.5 <br> **pH 7.0:** 157 | 169.07 | $C_3H_8NO_5P$  or <br> $HOOCCH_2NHCH_2PO(OH)_2$ |
| Glyphosate  Potassium salt | $900^a$ | 207.16 | $C_3H_7KNO_5P$ |
| Glyphosate Ammonium salt | $300^a$ | 186.11 | $C_3H_{11}N_2O_5P$ |
| Glyphosate Sodium salt | $500^a$ | 191.06 | $C_3H_7NNaO_5P$ |
| Glyphosate  Isopropylamine salt (IPA) | **pH 7.0:** 900 <br> **pH 4.1:** 786 | 228.19 | $C_6H_{17}N_2O_5P$  or <br> $C_3H_9N - C_3H_8NO_5P$ |

[a] From "Managing Glyphosate. Performance of different salts and adjuvants." Grants Research and Development Corporation. GRDC Project code ICN00016.

Aside from the organic base and the salt used, the other major difference between glyphosate-based formulations is the inclusion of <u>co-formulants</u>.  Some co-formulants are "pre-loaded" or included by Monsanto in the GBF while others, called adjuvants, are added by the end user to modify the herbicide to the particular situation in which it is being used.[235]

Adjuvants are not added to the GBF by the manufacturer mainly because different types of crops may require different types of adjuvant, *e.g.,* certain crops are sensitive to oils, some are difficult to wet, etc. Thus, herbicide manufacturers avoid limiting the application of a given herbicide to only one crop or situation.

As an example of adjuvant use, the addition of ammonium sulfate (AMS) and water conditioners have been shown to significantly improve weed control with glyphosate. Water in some regions contains excessive amounts of salts including calcium, magnesium, iron and sodium, and these salts bind to glyphosate and reduce its

---

[234] http://npic.orst.edu/factsheets/archive/glyphotech.html

[235] The terms "co-formulants" and "adjuvants" are sometimes used interchangeably in the literature. A fact sheet form Cornell University states, "A pesticide adjuvant is broadly defined as any substance added to the spray tank, separate from the pesticide formulation that will improve the performance of the pesticide.  Sometimes adjuvants are more narrowly defined as a substance added to a pesticide mixture to improve its physical qualities and, hence, its effectiveness." http://psep.cce.cornell.edu/facts-slides-self/facts/gen-peapp-adjuvants.aspx

Randall Dean Seidl v. Monsanto
August 13, 2020
Page 79

absorption and solubility. The sulfate component of AMS is negatively charged and will bind to positively charged salts so that they cannot reduce the activity of glyphosate. Other commonly used adjuvants include emulsifiers, dispersants, stabilizing agents, compatibility agents, buffering agents, anti-foam agents, spreader-stickers, drift retardants and surfactants.

Some GBFs may contain a greater percentage of co-formulants than glyphosate salt. These are listed simply as "Other Ingredients" on the label. For example, the label on Roundup Original Max herbicide, which contains a proprietary surfactant, reads

**ACTIVE INGREDIENT**

Glyphosate N (phosphonomethyl) glycine,
in the form of its potassium salt ............................................................. 48.7%
OTHER INGREDIENTS ........................................................................ 51.3%

100%

The most commonly pre-loaded co-formulants used in herbicides are surfactants. Surfactants are complex chemicals that facilitate and accentuate the emulsifying, dispersing, spreading, wetting or other surface-modifying properties of aqueous solutions. For example, waxes on plant leaves are lipophilic and chemically non-polar and thus repel water while herbicides such as glyphosate are highly hydrophilic and chemically polar.

Adding surfactants will significantly increase how well glyphosate spreads on and enters leaf surfaces. A surfactant can also reduce the amount of glyphosate washed off of plants by rain. Surfactants in herbicides vary greatly in their nature and concentration and are added to increase the absorption rate of the acid into the plant's leaf and stem tissue. Sometimes a combination of surfactants is used in one glyphosate formulation. The most prevalently used surfactants in herbicides contain POEA (Polyoxyethylene alkylamine).

The co-formulants in a GBF (individually or in combination with one another) can have a profound toxicological effect on a non-target organism. Some of these co-formulants may synergistically attenuate the negative effects of glyphosate, or as in the case of surfactants which can increase dermal absorption, may simply increase glyphosate's systemic exposure. Surfactants, as well as other co-formulants, are particularly important with respect to a risk assessment and are, therefore, discussed in detail later in this report.

Randall Dean Seidl v. Monsanto
August 13, 2020
Page 80

Roundup is offered in dry or aqueous formulations at various concentrations. Glyphosate is commonly formulated with water at 2.13 M (356 g/L free acid) or as an isopropylamine salt 480 g/L.[236] The ethoxylated tallowamine (POEA) surfactant in Roundup Classic is designated by Monsanto as MON 0818[237] with a concentration that is typically reported as approximately 15% of the formulation weight to volume or 150 g/L.[238,239,240,241]

**Toxicological Considerations of Exposure and Dose**

In assessing exposure, toxicologists examine how humans come into contact with chemicals, the amount of the chemical that enters the body (absorbed dose) as a result of contact and how these amounts change over time (pharmacokinetics).  The goal of the exposure assessment is to quantify the amounts over various time periods. The quantitative expression of those amounts is referred to as dose. Thus, dose is the measurement needed to quantify a chemical's risk of toxicity.  Therefore, the first goal of any exposure assessment is to objectively establish dose. With respect to human doses associated with NHL, the human epidemiological studies have used duration of exposure as the dose metric rather than blood or urine samples measuring glyphosate or its metabolite in units of mg/kg body weight.

**Systemic Dose**

When a person is exposed to a chemical such as glyphosate, the dose physically contacting the body is referred to as the "exposure dose." This is different from the "systemic dose" which enters the bloodstream and reaches various organs within the body. (For example, bone marrow where stem cells associated with the development of NHL are located).

---

[236] Williams, G. et al., "Safety evaluation and risk assessment of the herbicide Roundup and its active ingredient, glyphosate, for humans," 2000, Regulatory Toxicology and Pharmacology, Vol.31, pg. 117 - 165.

[237] Monsanto response to the concern of the Slovenian authorities on the composition of the Plant Protection Product MON 79376 (360 g/ 1 glyphosate) and the surfactant MON 59117 (CAS n ° 68478-96-6). MONGLY02817577.

[238] Id.

[239] Diamond, G., Durkin, P., "Effects of surfactants on the toxicity of glyphosate with specific reference to RODEO," 1997, Syracuse Research Corporation, SERA TR 97-206-1b.

[240] Giesey, J. P., Dobson, S., & Solomon, K. R., "Ecotoxicological risk assessment for Roundup herbicide," 2000, Rev. Environ. Contam. Toxicol. 167, pg. 35-120.

[241] Defarge, N. E., "Co-formulants in glyphosate-based herbicides disrupt aromatase activity in human cells below toxic levels, 2016, Int J Environ Res Public Health, Vol. 13(3), pg. 264.

Randall Dean Seidl v. Monsanto
August 13, 2020
Page 81

Systemic dose is typically only a portion of the exposure dose and is identified through pharmacokinetic (PK) or chemical disposition studies that can trace the fate of a chemical after it enters the body.  Pharmacokinetic studies investigate the amount of a chemical absorbed by the body, how the chemical is distributed throughout the body to specific tissues, how the chemical is metabolized and finally, how a compound is excreted from the body.  This is commonly known as ADME (absorption, distribution, metabolism and excretion).

ADME data is applied in conjunction with epidemiological and occupational exposure studies that have included biomonitoring and dosimetry for use in the human health risk assessment process. Thus, pharmacokinetic studies provide a necessary link between estimates of exposure, toxicity studies and estimates of human risk.  It is, therefore, imperative that these studies are designed, conducted and interpreted accurately.

**Routes of Exposure**

The route of exposure controls how a chemical is absorbed into the body.  The primary routes by which potential toxins become absorbed into a person's system are (a) ingestion, (b) inhalation and (c) dermal absorption.

**Ingestion**

Ingestion of herbicides may be intentional (as in suicides and poisonings) or unintentional through the consumption of residue-laden foods.  In the current matter of assessing exposure in operator use, intentional ingestion is not considered since it will contribute negligibly to the overall exposure.

**Inhalation**

Since the vapor pressure of glyphosate is very low ($9.8 \times 10^{-8}$ mm Hg or $1.31 \times 10^{-2}$ mPa at $25°$C),[242] inhalation during mixing and preparation of an herbicide is typically not a significant contributor to exposure <u>unless</u> an aerosol is produced. Thus, inhalation during spray application of the herbicide can be a factor. Such exposure depends mainly on droplet size of the spray and the equipment used for spraying. Different nozzle types (often modified by farmers to increase discharge) will generate different volumetric droplet size distributions.  Lesmes-Fabian, et al., found that for the standard discharge nozzle as used in their study, approximately 5% of the total volume of droplets was smaller than

---

[242] National Toxicology Program, U.S. Department of Health and Human Services.

Randall Dean Seidl v. Monsanto
August 13, 2020
Page 82

100 μm.[243]   In dry climates, droplets less than 100 μm are subject to evaporation and are respirable.

**Dermal Absorption**

For occupational users such as applicators, home garden users and farmers, a key determinant of a person's exposure is how the herbicide is actually handled and/or applied.[244] Dermal exposure will occur throughout the mixing, loading and application of herbicides as well as through re-entry (i.e., handling stems, leaves or soil after herbicide treatment).

Studies have found that workers performing the common farm task of "thinning" are more exposed to pesticides than, for example, workers who are harvesting or pruning.[245,246] One study[247] found a higher level of pesticides in the house and vehicle dust of the thinning workers. Additionally, their children revealed higher urinary pesticide metabolite concentrations which showed evidence of a "take-home pesticide pathway."[248] The same study showed that workers in apple or pear crops had higher pesticide metabolite concentrations than those who worked in peach, cherry or grape crops.[249]

A 1995 Caltrans study[250] set out to verify that worker protection measures were effective in minimizing exposure to herbicides. The study evaluated exposure estimates in Caltrans VCP application employee activities (herbicide mixing, loading and application) by measuring dermal exposure for 18-worker days. The data was then compared to surrogate data produced by the Environmental Impact Report. This study revealed that

---

[243] Lesmes-Fabian, C., Garcia-Santos, G., Leuenberger, F., Nuyttens, D., & Binder, C. R, "Dermal exposure assessment of pesticide use: The case of sprayers in potato farms in the Colombian highlands," 2012, Science of the Total Environment, 430, pg. 202-208.

[244] Curwin, B.D. et al., "Urinary and hand wipe pesticide levels among farmers and non-farmers in Iowa," 2005, Journal of Exposure Analysis and Environmental Epidemiology, Vol. 15, pg. 500–508.

[245] de Cock, J. et al., "Determinants of exposure to captan in fruit growing," 1998, Am Ind Hyg Assoc J 59, 1998a, pp. 166–172 and 1998b, pg. 158-165.

[246] Simcox, N.J. et al., "Farmworker exposure to organophosphorus pesticide residues during apple thinning in central Washington State," 1999, Am Ind Hyg Assoc J 60, pg. 752–761.

[247] Coronado, GD, Thompson, B, Strong, L, Griffith, WC, and Islas, I., "Agricultural task and exposure to organophosphate pesticides among farm workers," 2004, Environ Health Perspect 112, pg.142–147.

[248] The take-home pesticide pathway is the pathway that children and spouses of agricultural workers are exposed through.  (Hyland, C. and Ouahiba Laribi, Q., "Review of take-home pesticide exposure pathway in children living in agricultural areas," 2017, Environmental Research. Volume 156, pg. 559–570.)

[249] Coronado, GD, et al., "Organophosphate pesticide exposure and work in pome fruit: Evidence for the take-home pesticide pathway," 2006, Environ Health Perspect 114 (7), pg. 999-1006.

[250] Edmiston, S., et al., "Exposure of Herbicide Handlers in the Caltrans Vegetation Control Program 1993-1994," 1995, California EPA, California Department of Transportation

Randall Dean Seidl v. Monsanto
August 13, 2020
Page 83

higher, daily absorbed doses of glyphosate occurred from hand-wand application (1.4 mg/kg/day difference) versus a boom application using handgun despite that hand wand application resulted in significantly less handling of material compared to the boom application. The study staff observed that hand wand applicators were less careful about keeping the nozzle close to the ground and often raised the nozzle for difficult to reach areas which exposed the applicator to significant spray drift.

**Mechanisms of Absorption**

Farmers, forestry workers, home gardeners and landscapers are primarily exposed to herbicide chemicals through dermal contact during mixing, loading or application of the glyphosate formulation as well as through re-entry. Therefore, with respect to occupational exposure, the skin is the predominant route by which glyphosate enters the human body.

**The Dermal Barrier**

Human skin is a complex organ consisting essentially of two layers: a thin, outermost layer called the epidermis and a much thicker under-layer called the dermis. It is the outer layer of the epidermis, known as the stratum corneum (SC), that provides the primary protective barrier function of the skin. This barrier is largely responsible for resisting the entry of foreign agents into the human body.

The stratum corneum is primarily composed of non-living cells, or corneocytes, in a brick and mortar type system of lipid matrix. Corneocytes are terminally differentiated keratinocytes that have migrated from the epidermis to the skin's surface. The composition of the stratum corneum lipid matrix is dominated by three lipid classes: (1) cholesterol, (2) free fatty acids and (3) ceramides which are waxy lipid molecules. These lipids adopt a highly ordered, three dimensional structure of stacked, densely packed lipid layers[251]  as shown in **Figure 3** and **Figure 4**.

---

[251] Van Smeden, J. and Bouwstra, J.A., "Stratum corneum lipids: Their role for the skin barrier function in healthy subjects and atopic dermatitis patients," 2016, Curr Prob. Dermatol 49, pg. 8-26.

Randall Dean Seidl v. Monsanto
August 13, 2020
Page 84



**Figure 3:  Epidermal Layers of Human Skin**
Image courtesy of Wiki Journal of Medicine

Randall Dean Seidl v. Monsanto
August 13, 2020
Page 85



**Figure 4: Layers of the epidermis, basal cell layer, stratum spinosum, stratum granulosum and the stratum corneum showing dermal penetration (Abd, 2016)[252]**

---

[252] Abd, et al., "Skin models for testing of transdermal drugs," 2016, Clin Pharmacol, pg. 163–176.

REDACTED VERSION OF DOCUMENT SOUGHT TO BE SEALED

Randall Dean Seidl v. Monsanto
August 13, 2020
Page 86

**Percutaneous Absorption of Glyphosate**

A chemical can enter the stratum corneum directly through the corneocyte cells, through channels between the cells or through follicles, pores and glands. Due to its structure, the stratum corneum is highly lipophilic (lipid loving) and hydrophobic (tending to repel water). Thus, lipid-soluble chemicals are able to penetrate this layer into the circulatory system much more efficiently than water-soluble chemicals.

Since glyphosate is a small hydrophilic molecule, it travels easily through the channels and follicles; however, it cannot easily pass through lipid layers. The stratum corneum is, therefore, the rate-limiting barrier in the absorption of a hydrophilic agent such as glyphosate.  The rate at which glyphosate passes through this outer layer determines the overall absorption rate of the chemical into the body.

Once glyphosate has been absorbed into the stratum corneum, it may pass through into the viable epidermis and then into the dermis where it is transported systemically by the dermal blood supply or lymphatics and circulated to other areas of the body. This passive diffusion process is governed by Fick's law which states that the rate of absorption or flux (J) of any substance across a barrier is proportional to its concentration difference across that barrier.

The stratum corneum is resistant to penetration of weak acids but is much less effective against organic acids and some inorganic chemicals. Organic and alkaline chemicals can soften the keratin cells in the skin and pass through this layer to the dermis where they are able to enter systemic circulation.

The thickness of the skin, as well as its lipophilicity, varies with location on the body. Areas of the body such as the forearms, which may be particularly hairy, are most easily penetrated by chemicals since they can enter the small ducts containing the hair shafts. Chemicals can also enter through cuts, punctures or scrapes of the skin since these are breaks in the protective layer.  Due to the nature of their occupation, the skin of farmers (particularly their hands) typically has a higher percentage of fine cracks and breaks than that of the average person.

Randall Dean Seidl v. Monsanto
August 13, 2020
Page 87

## Percutaneous Absorption Models

The term "percutaneous" refers to any action involving penetration of the skin. Accurate determination of the rate at which agents penetrate the skin is critical for assessing the dose and potential risk from exposure.  Dermal penetration is generally considered to occur by passive diffusion (Fick's law); however, in living organisms, biotransformation of a substance within the deeper viable regions of the skin (via metabolism) can also occur prior to systemic absorption.

The amount of a chemical that is absorbed through the skin is dependent on the properties of both the chemical and the skin.  The most significant properties impacting the absorption of a chemical are its water and lipid solubility, molecular weight, degree of ionization and polarity.[253]  The most important properties of the skin are the number (density) of follicles, the thickness of the stratum corneum and the sebum composition as well as the distance of capillaries to the surface of the skin.

Dermal penetration studies are conducted to measure the absorption or penetration of a substance through the skin barrier and into the skin and determine whether it has the potential to be absorbed into the systemic circulation.  A wide range of experimental protocols exist for the determination of percutaneous absorption; the protocol used in any particular experiment will depend on the penetrant being studied.

Penetration studies may be conducted *in vivo* (in whole living animals) or *in vitro* (outside of a living organism).  In assessing the risk of human exposure to glyphosate, the aim of a dermal absorption study is to measure the amount of glyphosate that passes into and through human skin and into systemic circulation.

Due to greater differences between rodents and humans verses primates and humans, *in vivo* human studies would provide the most accurate dermal penetration models. However, inasmuch as such studies would be both impractical and unethical, animals such as rats, mice, and monkeys are used for *in vivo* studies of the absorption of glyphosate.

---

[253] Van Ravenzwaay, B. and Leibold, E., "A comparison between *in vitro* rat and human and *in vivo* rat skin absorption studies," 2004, Toxicol. *In Vitro.* Vol. 18(2), pg. 219-25.

Randall Dean Seidl v. Monsanto
August 13, 2020
Page 88

**Dermal Absorption *In Vivo* Measurement Methods**

*In vivo* dermal absorption measurement methods include two methods: (1) the indirect method of surface disappearance and surface recovery whereby the dermal absorption is inferred and (2) direct methods of determining dermal absorption which includes measuring glyphosate in the blood, excreta (urine or feces) or stratum corneum or by estimating through biological or pharmacological responses.[254]

Zendzian, 2000,[255] published a method for measuring glyphosate in excreta and in carcasses as well as the quantity remaining in the skin after washing.  The Zendzian study states that the U.S. EPA's Office of Pesticide Programs (OPP) has developed a standard protocol for evaluating the dermal penetration of pesticides in the rat.  This protocol was formalized in 1994 as a guideline for dermal absorption studies of pesticides.

As of the year 2000, in excess of 263 studies on the dermal absorption of over 160 pesticide chemicals had been submitted to OPP as part of the pesticide registration and risk assessment processes. From this standard protocol, it is possible to describe quantitatively (via dose and time) the entrance of a chemical into and penetration through the mammalian epidermis into the systemic circulation as well as the chemical's concentration in blood, the body and its excretion in urine and feces.

**Dermal Absorption *In Vitro* Measurement Methods**

Since *in vivo* studies are complex and expensive, *in vitro* methods are more widely used as a screening method for dermal penetration estimates.  *In vitro* experiments involve the use of a diffusion cell wherein two chambers, donor and receptor, are separated by a membrane (human or animal skin).  There are many variations, but all diffusion cells involve the penetrant passively diffusing from the donor chamber into the receptor chamber where it can be measured.

---

[254] U.S. EPA, "Dermal exposure assessment: A summary of EPA approaches," September 2007. United States Environmental Protection Agency, National Center for Environmental Assessment Office of Research and Development, EPA/600/R-07/040F

[255] Zendzian, R.P., "Dermal absorption of pesticides in the rat," 2000, AIHAJ, Vol. 61(4), pg. 473-83.

Randall Dean Seidl v. Monsanto
August 13, 2020
Page 89

In 2007, the U.S. EPA published "Dermal Exposure Assessment: A Summary of EPA Approaches" which provides a dermal exposure assessment methodology for treated surfaces.[256]  The U.S. EPA and other regulatory agencies accept a wide diversity of *in vitro* protocols, but they caution comparing these studies due to differences in study conditions. These include cell type (*i.e.,* static or flow through), the membrane selected, composition of the receptor fluid and the dosing method (infinite or finite).

**Other Measurement Models and Methods**

In a static diffusion cell, also known as a Franz cell,[257] the penetrant diffuses from the donor chamber through the membrane into a "static" receptor chamber of a fixed volume which is continually stirred. In a flow through cell or Bronaugh[258] cell, *in vivo* conditions are simulated by using a constantly flowing receptor fluid that mimics *in vivo* blood flow beneath the skin membrane.  The skin membrane is bathed below by a flowing solution maintained at 37 degrees C.

When studying the absorption of glyphosate, the membrane separating the chambers is typically human (from cadavers), rat or monkey skin and may be full thickness or dermatomed (sliced).   Dermatomed skin, wherein only the epidermis is used after it has been separated from the dermis, is commonly used because full-thickness skin can be cumbersome in the diffusion apparatus. Since glyphosate is hydrophilic, the main barrier to its diffusion across the skin resides in the stratum corneum and, therefore, the absence of the dermal tissue is generally not of concern.[259]  Ideally, when fresh skin is used, the receptor fluid should allow skin metabolic activity.

Franz did caution that, for compounds that have a slow absorption rate, *in vivo* methods may underestimate total absorption value significantly. Thus, absorption rates of the

---

[256] U.S. EPA, "Dermal exposure assessment: A summary of EPA approaches," September 2007. United States Environmental Protection Agency, National Center for Environmental Assessment Office of Research and Development, EPA/600/R-07/040F

[257] Franz TJ., "Percutaneous absorption. On the relevance of *in vitro* data," 1975, J Invest Dermatol.  Vol. 64, pg. 190–5.

[258] Bronaugh, R., H. Hood, M. Kraeling, and J. Yourick, "Determination of percutaneous absorption by *In Vitro* techniques," 1999, pg. 229-233 in Percutaneous Absorption, 3rd ed., R.L. Bronaugh and H.I. Maibach, eds. New York: Marcel Dekker, Inc.

[259] Williams, A.., "Transdermal and dermal drug delivery: From theory to clinical practice," 2003, London, Pharmaceutical Press.

Randall Dean Seidl v. Monsanto
August 13, 2020
Page 90

compound may considerably affect the total absorption value between *in vitro* and *in vivo* methods.[260]

## Dosing Techniques and Measurement Considerations

The loading (or dosing) of the donor chamber in all diffusion cells is accomplished in one of two ways: (1) infinite dosing or (2) finite dosing.

In the infinite dosing, or flux, technique, a high concentration of glyphosate is installed into the donor chamber (so its concentration does not decrease) while the concentration is measured in the receptor chamber over time until steady state is reached. This allows for the calculation of a permeability coefficient.  The finite dose technique allows the herbicide to be tested under conditions similar to those found *in vivo*.  The donor chamber is loaded with a known amount of herbicide which is depleted due to penetration during the course of the experiment. The concentration of the herbicide in the receptor fluid is measured to determine the percent of the original dose that penetrated the skin per unit area of skin over a period of time.

Loading conditions can greatly impact calculation of percent absorption. As the applied dose becomes <u>greater than the absorbable amount</u>, the excess does not contribute to absorption <u>but it does diminish the observed percent of dose that is absorbed</u>.[261] Therefore, when comparing *in vitro* results of percent absorption, all the dosing conditions should be maintained as finite dose applications rather than flux.[262]

Rat skin is generally (but not always) more permeable than human skin.  In a review of 79 studies which measured absorption of 110 chemicals, four chemicals were found that are less permeable through rat skin than human skin.[263]  Van Ravenzwaay also found that in comparing human *in vitro* skin with *in vivo* rat skin, the penetration of 3 of 12

---

[260] Franz TJ., "Percutaneous absorption. On the relevance of *in vitro* data," 1975, J Invest Dermatol.  Vol. 64, pg. 190–5

[261] Frasch, H.F. et al., "Analysis of finite dose dermal absorption data: Implications for dermal exposure assessment," 2014, J Expo Sci Environ Epidemiol, 24(1), pg. 65–73.

[262] "Guidance Notes on Dermal Absorption," OECD Environment, Health and Safety Publications, Series on Testing and Assessment No. 156. ENV/JM/MONO(2011)36.

[263] Jung, E, and Maibach, H., "Animal models for percutaneous absorption," 2014, in Shah, V., Maibach, H., and Jenner, J. eds. Topical Drug Bioavailability, Bioequivalence, and Penetration, 2nd ed. New York: Springer, pg. 21-40.

Randall Dean Seidl v. Monsanto
August 13, 2020
Page 91

chemicals was greater through human skin than through rat skin.  This held true at 4, 8 and 10 hours after dosing.[264]

A recent study has also questioned the reliability of converting percutaneous absorption data from rats to humans due to the differences in species as the absorption of hazardous substances was studied.[265]

### *In Vitro* Dermal Absorption of Herbicides through Rat versus Human Skin

The use of rat skin in percutaneous absorption models is premised on the theory that rat skin is generally more permeable than human skin; however, there have been some cases which have reported that rat skin is less permeable.[266]

Monsanto attempted to demonstrate (and failed) that the dermal penetration of Propachlor® (2-chloro-N-isopropyl-N-phenylacetamide) through human skin was lower than in rat skin.  Instead, the study revealed:

- Concentrate formulation: The percent penetration with human skin **is equal to** the percent penetration with rat skin.

- Spray dilution: The percent penetration with human skin **is greater than** the percent dermal penetration with rat skin ($p < 0.05$).

- Microautoradiographies clearly revealed **stores** of Propachlor in the epidermis of human skin.[267]

### "Triple Pack" Methodology

The term "Triple Pack" refers to the use of three types of dermal absorption data from:  1) *in vivo* rat; 2) *in vitro* rat and 3) *in vitro* human dermal absorption studies.[268]  This approach is used to refine the estimation of dermal absorption by correcting for differences between *in vitro* and *in vivo* absorption rates in rats as well as for species differences between rats

---

[264] Van Ravenzwaay, B. and Leibold, E., "A comparison between *in vitro* rat and human and *in vivo* rat skin absorption studies," 2004, Toxicol *In Vitro.*, Vol. 18(2), pg. 219-25.

[265] Korinth G, et..al., "Discrepancies between different rat models for the assessment of percutaneous penetration of hazardous substances," 2007a, Archives of Toxicology 81, pg. 833-840.

[266] Hotchkiss, SA, et al., "Percutaneous absorption of 4,4'-methylene-bis (2-chloroaniline) and 4,4'-methylenedianiline through rate and human skin *in vitro*," March, 1993, Toxicology *In Vitro*, Volume 7(2), pg. 141-148.

[267] Monsanto email (Tab 21) from ▮▮▮▮▮▮▮▮▮▮ on 3/29/2002 to ▮▮▮▮▮▮, et al.

[268] U.S. EPA OPP Memorandum June 2, 2010.  "Review of Triple Pack dermal absorption studies for Maxim Quattro."

Randall Dean Seidl v. Monsanto
August 13, 2020
Page 92

and humans.[269]  The "Triple Pack" approach is based on the premise that the absorption difference between humans and rats will show in the same proportion in both *in vitro* and *in vivo* test (which may not be true).  It should also be noted that the "Triple Pack" approach should be used to estimate a dermal absorption value <u>only</u> when the three studies are conducted under the same experimental conditions.[270]

Monsanto has recently (2010 – 2017) contracted with Dermal Technology Laboratories (DTL), Ltd. However, only *in vitro* **human cadaver skin** has been used (although potentially removed from living subjects through surgical reduction procedures). Most importantly, the DTL studies **fail to include** the "Triple Pack" methodology.

It was found by Wester, et al.,[271] that the common practices of freezing skin for storage or heat treatment to separate epidermis from dermis, can destroy skin viability.[272] The authors found that storing dermatomed skin human cadaver skin in a sustaining media[273] can maintain energy viability for up to eight days. They recommend not using skin that has been heat separated or frozen in absorption studies where skin viability and metabolism might be contributing factors to the study.

More <u>accurate</u> measurement models generally include animal or primate *in vivo* measurements since *in vitro* human cadaver skin does not have an intact physiologic and metabolic system present to accommodate active blood capillary transport gradients or metabolism as do the *in vivo* models. This is especially true when skin is first heated to 60ºC (140ºF), dermatomed and then frozen at -20ºC as has been done by DTL.  Studies have shown there are species differences in the absorption of different chemicals; measurements in rats, rabbits or pigs may or may not reflect human absorption.[274]  A more accurate model includes dermal absorption across primate (monkey) skin.  Often,

---

[269] Id.

[270] "Guidance notes on dermal absorption," OECD Environment, Health and Safety Publications, Series on Testing and Assessment No. 156. ENV/JM/MONO(2011) 36.

[271] Ronald C. Wester, Julie Christoffel, Tracy Hartway, Nicholas Poblete, and Howard I. Maibach, James Forsell, "Human Cadaver Skin Viability for In Vitro Percutaneous Absorption: Storage and Detrimental Effects of Heat-Separation and Freezing," Percutaeous Absorption, Drugs-Cosmetics-Mechanisms-Methodology, 4th Edition, Vol. 155, pg. 311-316.

[272] As measured by lactate production from glucose.

[273] Eagles minimum essential media with Earles balanced salt solution

[274] Rozman, KK and Klaassen CD., "Absorption, distribution and excretion of toxicants," <u>in</u> Cassarett & Doull's Toxicology, The Basic Science of Poisons. 5th edition. 1996. McGraw-Hill.

Randall Dean Seidl v. Monsanto
August 13, 2020
Page 93

although not always, *in vivo* monkey skin most accurately resembles percutaneous absorption across human skin.

## Dermal Absorption Correspondence Between Monsanto and DTL Laboratory

DTL's Managing Director, ██████, was head of the *in vitro* percutaneous absorption group at Syngenta Central Toxicology Laboratory.[275] DTL was formed by former Syngenta employees in 2007. Email[276] from ██████ at Syngenta to David Saltmiras at Monsanto on January 20, 2009, reveals a discussion concerning dermal absorption as follows:

> "DTL uses different methods to prepare the skin samples." … "I believe that an *in vitro* dermal absorption study conducted on human epidermis with the concentrate formulation and at least one dilution (Syngenta would normally do 2) would be adequate to meet the EU criteria. With these studies, the amount of dermal absorption is dependent upon the level of surfactants in the formulation. I believe it is in everyone's best interested [sic] **to get as lower a dermal absorption value as possible for the representative use**..."

The message then goes on to say:

> "…so, I have a couple of suggestions regarding dermal absorption The TWG discussed the fact that Monsanto had a biomonitoring study that the Spanish dismissed because of a non-human primate study that showed <u>higher excretion in the feces</u> than in the urine following a dermal exposure. I suggest that the TWG use a metabolism/dermal absorption consultant by the name of ██████ who could critically review the non-human primate dermal study and the <u>likely metabolism (or lack of) of glyphosate</u> following dermal exposure. Hopefully, he could **put a position together on the non-relevance of the findings** in the old non-human primate study. In addition, perhaps a package of dermal absorption studies (rat *in vivo* and human and rat *in vitro*) on the representative formulation may provide more detailed results and the *in vivo* study <u>could be used to show that glyphosate is not metabolized and is mainly excreted in the urine</u> (and the studies could also be used in the U.S. in the future)."

In fact, DTL did use *"a different skin preparation method,"* as described below.

## DTL Laboratory Human Epidermis Preparation Methods

It is generally accepted and required laboratory practice to report the procedures used to prepare the epidermis for use in dermal absorption studies. A group of laboratory reports

---

[275] "A Wealth of Expertise," DTL Laboratory, http://www.dermaltechnology.com/about/
[276] Email from ██████, Syngenta Ltd., January 20, 2009, CC: ██████, Monsanto

Randall Dean Seidl v. Monsanto
August 13, 2020
Page 94

on various glyphosate formulations (*in vitro* absorption through human dermatomed skin) were issued to Monsanto by Dermal Technology Laboratory, Ltd., from 2010 – 2017.

 **Figure 5** describes the epidermis preparation procedure as stated in each *"Materials and Methods"* section in the four laboratory reports dated 2010:

> 3.5.7    **Human epidermis preparation**
>
> Human skin samples were obtained from a tissue bank.  The skin samples were immersed in water at 60 ºC for 40-45 seconds and the epidermis teased away from the dermis.
>
> Each membrane was given an identifying number and stored frozen, at approximately -20 ºC, on aluminium foil until required for use.

**Figure 5: DTL Laboratory Epidermis Preparation Procedure (2010 Reports Only)**

However, in the four subsequent reports (two dated 2015 and two dated 2017), this information was removed and a new (incomplete) preparation method description was included under "Experimental Procedures" as described in **Figure 6**:

> 4.4       **Skin preparation**
>
> 4.4.1    **Human dermatomed skin**
>
> Human skin samples were obtained from the National Disease Research Interchange (NDRI, Philadelphia, Pennsylvania, U.S.A.).  Skin sections were cut at a thickness setting of 400 µm using an electric dermatome.  Individual donor details are presented in Appendix 12.
>
> Each skin sample was given an identifying number and stored frozen, at approximately -20°C, on aluminium foil until required for use.

**Figure 6: DTL Laboratory Epidermis Preparation Procedure (Post-2010 Reports Only)**

Following 2010, no further mention was made in the reports of immersing ("cooking") the skin in water at 140° F (60 degrees C) for 40-45 seconds followed by freezing the skin at -20ºC prior to the subsequent dermal absorption analyses.

Numerous studies have been published using skin from different animal models. However, the knowledge that there is a significant difference in absorption when it comes to different animal species and humans has led to the necessity of a thorough

Randall Dean Seidl v. Monsanto
August 13, 2020
Page 95

interpretation when adapting data from animal studies that are to be used in relation to humans.  Interpretation of the data to refine dermal absorption values can vary between regulatory authorities.[277],[278]

## Dermal Absorption and Pharmacokinetic Studies of Glyphosate

## Models Used to Measure Glyphosate Dermal Absorption

There are four primary models which have been used to measure glyphosate dermal absorption: (1) the Maibach studies of 1983, (2) the Wester et al., studies of 1991, (3) Franz (1983) and (4) TNO (2002). All of these studies were funded by Monsanto. This section reviews these studies and assesses the findings in light of present-day objective science.

### Maibach Study (1983)

Full Title: Maibach, H.I. (1983) "(a) Elimination of [14]C-glyphosate in Rhesus monkeys following a single parenteral dose, (b) Percutaneous absorption of 14C-glyphosate in Roundup formulation in Rhesus monkeys following a single topical dose." Unpublished report No. MA-81-349, dated 1 April 1983, from University of California, School of Medicine; San Francisco, California, USA. Submitted to WHO by Monsanto Int. Services SA, Brussels, Belgium.

This Monsanto-funded study included human *in vitro* testing as well as an *in vivo* primate (monkey) testing.  The test material was a Roundup formulation supplied by Monsanto; the formulation used was the mono isopropylamine salt of glyphosate. No surfactants or other adjuvants were listed as ingredients.

- Part (a): [14]C-Glyphosate (MON 0139; isopropylamine salt) was administered to four Rhesus monkeys through intramuscular (IM) injection. Maibach found that, on average, 89.9% of the injected dose was excreted in the urine.  He did not, however, measure the amount of glyphosate eliminated in the feces.  Maibach reported two distinct phases of urinary excretion:  (1) 0-24 hours $t_{1/2}$ = 6.9 hrs. and (2) 1-7 days $t_{1/2}$ = 35.1 hrs., concluding that "*systemic doses of glyphosate in MON 039 are rapidly eliminated in monkeys, predominantly via the urine.*"

---

[277] "Guidance notes on dermal absorption," OECD Environment, Health and Safety Publications, Series on Testing and Assessment No. 156. ENV/JM/MONO(2011)36.

[278] U.S. EPA OPP Memorandum June 2, 2010.  "Review of Triple Pack dermal absorption studies for Maxim Quattro."

Randall Dean Seidl v. Monsanto
August 13, 2020
Page 96

- Part (b): $^{14}$C-Glyphosate (MON 0139; isopropylamine salt) was dermally applied to Rhesus monkeys at a concentration of 1.13 mg/cm$^2$. The IM data from Part (a) was used to quantify the dermal penetration obtained in this part of the experiment.

There are problems with the findings of this study as explained below.

Since the majority of $^{14}$C-Glyphosate administered by IM injection was excreted rapidly through the urine, Maibach erroneously assumed that 89.9% of the dermal dose would be eliminated in the urine as well. He used this correction factor for incomplete urinary excretion (89.9%) to determine that 1.8% of the applied dermal dose penetrated the skin. This conclusion was errant for several reasons:

1) Two different routes of exposure (IM verses dermal);

2) Two different paths of excretion (urinary and fecal);

3) Failure to measure the $^{14}$C-Glyphosate excreted in the feces.

Additionally, a further error was made by assuming the unrecovered glyphosate was permanently bound in the skin. The skin-washing procedure removed 14.2% (standard deviation of 3.5%) of the applied $^{14}$C-label on the glyphosate. Therefore, only 16% (14.2 + 1.8) of the dermally-applied glyphosate was recovered. The total percent recovery was low (*i.e.*, 16.0%). Although a definitive explanation cannot be offered for the low recovery, previous experience suggests that much of the test material may in some way bind to or in the skin and cannot be removed by washing. This bound material is not apparently available for systemic absorption."[279]

The key point is that this explanation is inconsistent with generally-accepted guidelines. For example, OECD guidelines[280] cite that an adequate mean recovery is in the range of 100 ± 10% (OECD, 2004). If the test material did indeed bind to or in the skin, then it could have been available for absorption and, according to guidelines given by OECD, would have to be included in the amount absorbed.[281]

---

[279] Maibach, H.I., "(a) Elimination of 14C-glyphosate in Rhesus monkeys following a single parenteral dose, (b) Percutaneous absorption of 14C-glyphosate in Roundup formulation in Rhesus monkeys following a single topical dose," 1983, Unpublished report No. MA-81-349, from University of California, School of Medicine, San Francisco, California, USA. Submitted to WHO by Monsanto Int. Services SA, Brussels, Belgium.

[280] Guidelines require that at least 90% of the dose be accounted for compared to just 16% in the Maibach study.

[281] OECD/OCDE 427, "Guidelines for the testing of chemicals. Skin absorption *in vivo* Method," Adopted: 13 April 2004.

Randall Dean Seidl v. Monsanto
August 13, 2020
Page 97

In 1985, the U.S. EPA classified the Maibach, 1983, study as <u>unacceptable</u> since the majority of the dose could not be accounted for. Currently, most authorized agencies calculate by "*absorbed amount + amount remaining in the treated area tissue + (when necessary) amount remaining in the skin tissue after a washing process*" when calculating the absorption amount.[282]

In communications regarding the Maibach study, Richard Dirks, Ph.D., Senior Product Toxicologist at Monsanto, wrote (April 11, 1983):

> *"The total percent recovery (percent label removed by washing plus total percent label contained in urine) was low, i.e., 16.0%. A definitive explanation for the low recovery is not provided in the report, but the author does state that previous experience would suggest that much of the test material may in some way bind to or in the skin and cannot be removed by washing. In support of this, it has been reported (Vickers, 1963) that a "chemical reservoir" is formed in the skin after drug application which is eventually shed without penetration. Thus, it is concluded that the bound material is not apparently available for systemic absorption."* [283]

It is critical to note that the OECD guidelines state that the amount of substance not found in the donor chamber must be considered absorbed and, therefore, potentially available in the systemic circulation. This also accounts for the amount of substance deposited in the skin.[284]

Subsequent experiments have demonstrated that absorption of chemicals temporarily deposited in the skin can continue for up to <u>24 hours</u> or more after exposure has ended. Thus, temporary skin deposition will potentially underestimate the true absorption if assessed in blood or urine immediately following exposure (within 24 hours).[285]

**Wester, et al., Study (1991)**

Full Title: Wester, R. et al., "Glyphosate skin binding, absorption, residual tissue distribution and skin decontamination," 1991, Fundamental and Applied Toxicology 16, pp. 725-732.

---

[282] Jaehwan, S., "Comparison of international guidelines of dermal absorption tests used in Pesticides Exposure Assessment for Operators," 2014, Toxicol Res 4, pg. 251-260.

[283] MONGLY01330783

[284] OECD, "Guidance document for the conduct of skin absorption studies," 2004a, Paris. 28, pg.1-31.

[285] "Dermal absorption of pesticides – evaluation of variability and prevention," 2009, Danish Environmental Protection Agency. Pesticides Research No. 124, 13.1.

Randall Dean Seidl v. Monsanto
August 13, 2020
Page 98

This Monsanto-funded study included human *in vitro* testing as well as *in vivo* primate (monkey) testing.  The test material was a Roundup formulation supplied by Monsanto; it is not stated what glyphosate salt was used in the formulation. The exact formulation was not disclosed, but no surfactants or other adjuvants were listed as ingredients.

*In vitro* human skin absorption:  A finite dose technique was used with human plasma as the receptor fluid in a flow-through diffusion cell.  Dosing concentrations ranged from 2.6 $\mu g/cm^2$ to 154.0 $\mu g/cm^2$ with exposure times of 30 minutes, 4 hours, 8 hours and 16 hours. The greatest absorption (2.2 ± 0.5 %) occurred at the lowest glyphosate dose concentration (2.6 $\mu g/cm^2$) after 8 hours of exposure.  This was more than twice that which was absorbed at any of the other dose concentrations after 8 hours.

The data in this study is highly variable, *i.e.,* it shows no discernable pattern with respect to the dose and time of exposure other than that the highest percentage of absorption occurred at the lowest dermal dose.  The standard deviation of the mean was greater than the mean for 12 of the 20 means reported.  No overall accountability (mass balance) was provided for this part of the study; no data was provided with respect to how much glyphosate was lost.  Thus, it was not possible to compare the percentage lost to that of the *in vivo* dermal study.

*In vivo* rhesus monkeys IV doses:  Three Rhesus monkeys were intravenously dosed with 93 $\mu g$ glyphosate and three were dosed with 9 $\mu g$ glyphosate. The study found that in the six monkeys, 95% - 99% of the IV administered dose was recovered in the urine.  Overall accountability was greater than 96% of the administered doses.  Wester, et al., used these results to make the assumption that all dermally-absorbed glyphosate would similarly be excreted in the urine.  This assumption is invalid according to their data reported in the next part of the study (see below).

*In vivo* rhesus monkeys dermal dosing:  Eight monkeys were dermally dosed with one of two doses as summarized in **Table 17**.

Randall Dean Seidl v. Monsanto
August 13, 2020
Page 99

**Table 17**

**Disposition of Glyphosate Following Topical Administration to Rhesus Monkeys[286]**

| Disposition Site | Percentage of applied dose[*] | |
| --- | --- | --- |
| | Dose C = 5400 µg/20 cm$^2$ | Dose D = 500 µg/20 cm$^2$ |
| Urine | 2.2 ± 1.5 | 0.8 ± 0.6 |
| Feces | 0.7 ± 0.5 | 3.6 ± 1.6 |
| **Urine + Feces** | **2.9 ± 2.0** | **4.4 ± 2.2** |
| Surface Washes | 73.5 ± 6.0 | 77.1 ± 9.2 |
| Contaminated Solids | 0.05 ± 0.1 | 0.3 ± 0.1 |
| **Total** | **76.5 ± 6.7** | **81.8 ± 6.9** |

Topical administration in four Rhesus monkeys per dose:  *Each value is the mean ± SD for 4 monkeys."

The above data reveals several critical findings:

1)  The low topical dose was excreted primarily in the feces. In the monkeys administered Dose D, 3.6 % of the dermally-applied dose was recovered in the feces whereas only 0.8 % was recovered in the urine (**total dermal absorption of 4.4%).** From this data, it is apparent that **urine recovery does not accurately represent the amount of glyphosate that was dermally absorbed**.  In this case, 4.5 times more glyphosate was found in the feces than in the urine.

2)  This study finding is deeply troubling since epidemiology studies rely on urine concentrations to quantify the systemic dose of glyphosate exposure through dermal absorption. The lower dose (Dose D) at 500 µg/20 cm$^2$ corresponds to real world exposures in farmers and applicators. Thus, the exposure studies prepared by Monsanto that have relied on urinary excretion are in error by a factor of 4.5 times the current calculated values.  From the data in this study, the total systemic dose from dermal exposure can be calculated:

$$GLY_{systemic} = GLY_{urine} + GLY_{feces}$$

$$= GLY_{urine} + 4.5 \times GLY_{urine}$$

$$GLY_{systemic} = 5.5 \times GLY_{urine}$$

---

[286] Wester, R. et al., "Glyphosate skin binding, absorption, residual tissue distribution and skin decontamination, 1991, Fundamental and Applied Toxicology 16, pg. 725-732.

Randall Dean Seidl v. Monsanto
August 13, 2020
Page 100

The actual systemic dose in the human epidemiological exposure studies could have been accurately quantified by including the relative amount of glyphosate that would have been excreted in the feces but which <u>was not measured</u>.

3)  The dose of 5,400 µg/20 cm$^2$ is too large to accurately represent the dose/absorption relationship. As previously explained, dosing conditions can have enormous effects on percent absorption. The excessive dosing in this case is approaching infinite dosing and the excess does not contribute to absorption, but it does diminish the calculated percent of dose absorbed.[287] U.S. EPA guidelines for dermal testing recommend a maximum practical dose on the order of 1 mg/cm$^2$; larger doses can exceed saturation of the absorption process.[288]  The resulting error herein is an <u>artificially reduced percent absorption</u>; this high saturation dose resulting in 2.9% absorption is not relevant when looking at percent absorption.

4)  The effect of glyphosate on skin has been shown to depend on the relative concentration of glyphosate. Dermal cells exposed to low levels of glyphosate have been shown to induce a stiffening of the cytoskeleton (the cell's internal structural support) while higher levels of glyphosate cause gross changes in cell shape.[289]  As <u>realistic exposure levels were not used</u>, the findings are automatically suspect.

5)  Only 81.8 % of the applied "Dose D" was recovered. The authors claimed that the remaining 18.2 % was "lost" since it was not detected.  If any of the missing 18.2% remained in the monkey in tissue or fluid that was not tested, the amount absorbed would have been underestimated.  The lost material is beyond the acceptable limit <u>according to OECD guidelines</u> of mass balance. If all of the missing 18.2 % is assumed to have remained in the monkey and is included the amount absorbed, the total % of applied dose absorbed becomes 22.6%. Either way, a casual and unverifiable "claim" that 18.2% of the dose was "lost" can scarcely be regarded as objective and should be added to the amount absorbed (4.4%) to provide an upper limit value of 22.6%.

6)  The impact of surfactants on absorption is still not considered in this study.

---

[287] Frasch, H.F. et al., "Analysis of finite dose dermal absorption data: Implications for dermal exposure assessment," 2014, J Expo Sci Environ Epidemiol, Vol. 24(1), pg. 65–73.

[288] U.S. EPA OPPTS 870.7600, "Health effects test guidelines dermal penetration," August 1998, pg. 4.

[289] Heu, C. et al., "Glyphosate-induced stiffening of HaCaT keratinocytes, a peak force tapping study on living cells," 2012, Journal of Structural Biology, 178, pg. 1-7.

Randall Dean Seidl v. Monsanto
August 13, 2020
Page 101

From Wester, et al., it is reasonable to conclude that dermal absorption at "Dose D" reasonably estimates a dermal absorption dose ranging from **4.4% to 22.6%**.  More importantly, the epidemiological exposure studies underestimate the systemic dose from dermal absorption by a factor of 4.5 due to the failure to consider hepato/fecal elimination at the lower dose levels.

**Concern of Cross-Contamination in the Wester, et al., Study (1991)**

The rhesus monkeys were placed in metabolic chairs for the dosage period (12 hours) of the study, then housed individually in metabolic cages.  A belly plate and apron were positioned on the metabolism chair under the skin-dosing site.  A pan collected urine, feces and other solids such as residual food and hair.  Surface washes collected the residual dose left on the skin.

Only 75-80% of the dermally applied dose was recovered in all the collections.  Wester noted that the missing 20-25% dose was "lost" during the procedure, and he considered this not to be unusual as similar losses had occurred in previous studies.  He attributed the loss to exfoliation of skin which "*will scatter microscopic tissue and bound chemical to the atmosphere, making total accountability impossible to achieve.*"

Wester did not mention any other mechanisms of loss, such as monkeys touching the dosing sites, which would have easily explained the unacceptable 20-25% loss of the dose amount.  Therefore, it is reasonable to conclude that such losses did not occur.

Metabolic chairs come in various configurations as shown in the images below as different types of research will require different restraining needs.  These "chairs" allow for the isolation of body parts with the use of belly plates, restraints, etc.  (See **Figure 7** and **Figure 8**).

Randall Dean Seidl v. Monsanto
August 13, 2020
Page 102

  

**Figure 7: Metabolic chairs for primates[290]**



**Figure 8: Primate chairs used in study testing**

[290] Images retrieved from http://www.oipa.org/international/photo/vivisection_primates.htm and from
https://www.thomasrecording.com/solutions/solution-primate.html

Randall Dean Seidl v. Monsanto
August 13, 2020
Page 103

**Review of Monsanto Studies**

**Monsanto *in Vitro* Absorption Study of Glyphosate by DTL (2010) - (MON 79545)**
**450 g/L Glyphosate SL Formulation (MON 79545)**

In February 2010, the United Kingdom's Dermal Technology Laboratory, Ltd., (DTL) completed their Monsanto-commissioned laboratory study entitled "*In vitro* absorption of glyphosate through human epidermis" (MON 79545) wherein they investigated the absorption and distribution of glyphosate in three different herbicide formulations.  For all three formulations, they concluded that the dermal absorption of glyphosate from exposure to the herbicide would be minimal and <u>far less than 1%</u>. The study specifically concluded that, for the high undiluted dose, "*the mean total amount of absorbed glyphosate was 0.0573 ug/cm$^2$ (**0.012% of applied dose**)*." For the 1 to 15.6 (28.8 g/L) dilution and 1 to 188 (2.4 g/L) dilution (consistent with spray applications), "*the mean total amounts of absorbed glyphosate were 0.379 and 0.021 ug/cm$^2$ (**0.129% and 0.082% of applied dose**), respectively.*" In this study, glyphosate was removed from the surface of the epidermis by washing and then tape stripping. The amount of glyphosate on the epidermis after tape stripping, including that absorbed, was termed "potentially biologically available" and was determined to be 0.**049%, 0.796% and 0.245%** in order of increasing glyphosate formulation concentration.

However, there are serious problems with this study (as well as with other DTL studies) that contribute to inconsistency and, as a consequence, warrant the study's exclusion.

The design of the study included finite dosing of 10 µL/cm$^2$ which was used on a surface of 2.54 cm$^2$; this was left un-occluded for an exposure period of 24 hours with no interim wash.  A static-type glass diffusion cell was used with dermatomed human skin.  Each formulation was applied in three doses: one concentrated dose and two diluted doses.  Thus, the amount of glyphosate in the 25.4 µL volume applied depended on the dilution.  The absorption process was followed by taking samples of the receptor fluid (physiological saline) at recorded intervals throughout the exposure period.

Assessment of the DTL methodology reveals that 4,589 µg glyphosate acid/cm$^2$ was used in the formulation concentrate study and 293 µg glyphosate acid/cm$^2$ was used in the 1 to 15.6 dilution and 25 µg glyphosate acid/cm$^2$ was used in the 1 to 188 dilution study.

U.S. EPA guidelines for dermal testing recommend a maximum practical dose on the order of 1 mg/cm$^2$; larger doses can exceed saturation of the absorption process.[291] Thus,

---

[291] U.S. EPA OPPTS 870.7600, "Health effects test guidelines dermal penetration," August 1998, pg. 4.

Randall Dean Seidl v. Monsanto
August 13, 2020
Page 104

the formulation's concentration dose used *was not in compliance* and exceeded the threshold for maximum practical dose by a factor of 4.6.

DTL failed to properly follow OECD GD 28 (OECD, 2004c) regulations with respect to the definition and methodology that defines absorbed dose:

- The laboratory **did not always include** the glyphosate recovered from the tape stripping as they claimed that it was not biologically available.

- They also **did not always include** the amount of glyphosate recovered from stratum corneum (available for eventual absorption).

The "*In vitro* absorption of glyphosate through human epidermis" study presents itself as a pre-destined design failure. It is completely inconsistent with other previous Monsanto *in vitro* and *in vivo* studies and should be excluded as DTL violated OECD test regulations

Under "OECD guidelines for the testing of chemicals, Skin Absorption: *in vitro* Method 428," adopted April 13, 2004, "*The test substance remaining in the skin should be considered as absorbed unless it can be demonstrated that absorption can be determined from receptor fluid values alone.*" Analysis of the other components (material washed off the skin and remaining within the skin layers) allows for further data evaluation including total test substance disposition and percentage recovery.

OECD GD 28 (OECD, 2004c) notes that, under certain circumstances, *in vivo* skin levels of the test compound need not be considered to be percutaneously absorbed.[292] This is appropriate where it can be demonstrated that test compound in the layers of skin at the end of a study will ultimately remain in the skin or be removed by the surface shedding of the stratum corneum.

However, for *in vitro* studies, OECD GD 28 notes that microcirculation is obliterated and the terminal stratum corneum levels may be elevated compared with *in vivo* levels. For these studies, OECD GD 28 states "…*it is therefore necessary that skin levels of test compound measured at the end of a study be included with the receptor fluid levels to determine total percutaneous absorption. Skin absorption may be expressed using receptor fluid alone provided that this can be justified.*"

---

[292] OECD "Guidance notes on dermal absorption," Draft, October 22, 2010.

Randall Dean Seidl v. Monsanto
August 13, 2020
Page 105

The current approach taken by nearly all regulatory agencies is to determine the dermal absorption value by adding the absorbed dose and the chemical remaining in the application site and surrounding skin following washing. This is appropriate for both *in vivo* and *in vitro* studies <u>unless compelling evidence</u> is presented that demonstrates that at least some portion of the residue in the skin is unlikely to be absorbed. However, there is currently some international disagreement about whether part or all of the test substance should be included in the dermal absorption value that is retained in the stratum corneum and can be removed by tape stripping.

For *in vivo* <u>studies</u>, it is widely accepted that, if absorption can be demonstrated as complete, then all or part of the chemical remaining in the skin may be considered as unavailable for absorption.

For *in vitro* studies, some regulatory authorities have a similar approach as for *in vivo* studies in that some of the amount retained in the skin may be considered as unavailable for systemic absorption.

Others would include all of the test substance retained in the skin following *in vitro* exposure. The following sections provide guidance to assist in the consideration of whether to exclude some portion of the residue in the skin.

### *Tape Stripping*

OECD GD 28 states that skin fractionation may be conducted following exposure either *in vitro* or *in vivo* and notes that tape stripping can be difficult *in vitro* with epidermal membranes, rodent skin, study durations of more than 24 hours or where the test preparation alters the stratum corneum.

Test substance retained in the top few layers of the stratum corneum (*i.e.,* contained in the first few tape strips) may be removed by desquamation and therefore may not be absorbed. This includes substances retained in the top few layers of the stratum corneum as well as material that has not penetrated into the stratum corneum but is protected from wash-off (for example, in hair follicles or sweat ducts).

In the European Union and some other countries, it is the general practice to exclude the amount that was found in the first (upper) <u>two tape strips</u> at study completion both *in vitro* and *in vivo*.

Randall Dean Seidl v. Monsanto
August 13, 2020
Page 106

Test substance in lower layers of the stratum corneum may penetrate into the dermis or may be removed by desquamation. Determination of the potential bioavailability of this test substance should be made on a case-by-case basis.

Dermal absorption is primarily a diffusion-driven process and therefore test substances in the lower layers of the stratum corneum should be assumed to form a reservoir that may become systemically available <u>unless it can be demonstrated</u> *in vivo* that absorption is complete and this test substance will remain in the stratum corneum until exfoliated.

Deviations or lack of documentation within the DTL (2010) studies include:

- Failure to include glyphosate remaining in the stratum corneum

- No documentation as to how the split-thickness skin measurement (typically 200-400 μm thick) is prepared.

- Although tape striping was performed, all of the layers were excluded from the "*mean total amounts of absorbed glyphosate*" at **0.012%**, **0.129%** and **0.082%** as reported.

- Tape stripping has only been discussed in the "Draft" 2010 OECD regulations and is limited to the first two tape strip extractions. Even if it were the official regulation, DTL deviated from the proposed methodology.

In summary, *"The current approach taken by nearly all regulatory agencies is to determine the dermal absorption value by adding the absorbed dose and the chemical remaining in the application site and surrounding skin following washing. This is appropriate for both in vivo and in vitro studies unless compelling evidence is presented that demonstrates that at least some portion of the residue in the skin is unlikely to be absorbed."* (OECD, "Guidance Notes on Dermal Absorption [draft]," October 22, 2010)

It is also critical to note that results of the 1 to 188 spray dilution MON 79545 dermal absorption study (0.082% absorbed) falls approximately 35 times below the prior 3% dermal absorption value established by the U.S. EPA and 54 times less than that of the 4.4% dermal absorption rate measured in primates in the Wester, et al., study (1991).

**Monsanto *in Vitro* Absorption Study of Glyphosate by DTL (2010) - (MON 52276)**

In February 2010, Dermal Technology Laboratory, Ltd., also completed their Monsanto-commissioned lab study entitled "*In vitro* absorption of glyphosate through human epidermis." For MON 52276 concentrate (undiluted dose), "*the mean total amount of absorbed glyphosate was 0.332 ug/cm$^2$ (0.009% of applied dose).*" For the 1 to 12.5

Randall Dean Seidl v. Monsanto
August 13, 2020
Page 107

dilution and 1 to 150 dilution (consistent with spray applications), "*the mean total amounts of absorbed glyphosate were 0.086 and 0.023 ug/cm$^2$ (0.029% and **0.092%** of applied dose), respectively.*" Thus, compared to earlier (non-DTL) studies, results of the above MON 52276 high dose dermal absorption study fell approximately 103 times below the prior 3% dermal absorption value established by the U.S. EPA and 151 times less than that of the 4.4% dermal absorption rate measured in primates in the Wester, et al., study (1991). The MON 52276 diluted dose dermal absorption study fell approximately 33 times below the prior 3% dermal absorption value established by the U.S. EPA and 48 times less than that of the 4.4% dermal absorption rate measured in primates in the Wester, et al., study (1991).

## Monsanto *in Vitro* Absorption Study of Glyphosate by DTL (2010) - (MON 79351)

Studies on MON 79351, also completed in February 2010, reported for the high undiluted dose that "*the mean total amount of absorbed glyphosate was 0.342 ug/cm$^2$ (**0.007%** of applied dose).*" For the 1 to 16.7 dilution (consistent with spray applications), "*the mean total amounts of absorbed glyphosate was 0.553 ug/cm$^2$ (**0.182%** of applied dose).*" Thus, compared to earlier (non-DTL) studies, results of the above MON 79351 high undiluted dose dermal absorption study fell approximately 16 times below the prior 3% dermal absorption value established by the U.S. EPA and 24 times less than that of the 4.4% dermal absorption rate measured in primates in the Wester, et al., study (1991).

The above studies were carried out under the direction of ████████. DTL is managed by ████████ who was previously the head of the *in vitro* percutaneous absorption group at Syngenta Central Toxicology Laboratory. (Syngenta is also a producer of glyphosate and seeds.)

The above DTL studies are vastly inconsistent and discrepant compared to all prior Monsanto glyphosate dermal absorption studies performed by non-DTL laboratories. The inexplicable differences in dermal absorption bioavailability unquestionably renders the study credibility as suspect and, as a consequence, warrants its exclusion.

## Monsanto *in Vitro* Absorption Study of Glyphosate by DTL (2015) - (MON 76829) 72 g/L Glyphosate Gel Formulation

In April 2015, Dermal Technology Laboratory, Ltd., completed their Monsanto-commissioned lab study entitled "72 g/L Glyphosate Gel Formulation (MON 76829) - *In Vitro* Absorption through Human Dermatomed Skin using [$^{14}$C]-Glyphosate."

Randall Dean Seidl v. Monsanto
August 13, 2020
Page 108

Human skin samples were obtained from the National Disease Research Interchange (NDRI, Philadelphia, Pennsylvania). Skin sections were cut at a thickness setting of 400 µm using an electric dermatome. It is not stated in the methodology whether tissues were also separated by heat.

The type of static glass diffusion cell used in this study had an exposed skin surface area of 2.54 cm$^2$ and a receptor volume of approximately 4.5 mL. Discs of approximately 3.3 cm diameter of prepared skin were mounted, dermal side down, in diffusion cells held together with individually numbered clamps and placed in a water bath maintained at 32°C ± 1°C. A nominal application rate of 10 µL/cm$^2$ or 720 µg glyphosate acid/cm$^2$ was reported.

DTL concluded that the highly concentrated gel formulation had a dermal absorption rate of glyphosate from exposure to the herbicide gel at 6, 8 and 10 hours of 0.013 µg/cm$^2$, 0.018 µg/cm$^2$ and 0.014 µg/cm$^2$, respectively. These respective amounts expressed as percentages of the applied dose were 0.002%, 0.003% and 0.002%. The mean amount penetrated over the entire 24 hour experimental period was 0.018 µg/cm$^2$ corresponding to **0.003%** of the applied dose. "*Practically all of the applied glyphosate acid (105%) was washed off the surface of the skin following the six hour exposure with a further 0.048% being removed at the 24 hour wash.*" The proportions of the dose applied that were recovered from the donor chamber, stratum corneum (tape strips 1-5), and remaining skin were 0.042%, 0.003% and 0.009%, respectively. The proportions of the dose applied that were recovered from the donor chamber, stratum corneum (tape strips 1-5), and remaining skin were 0.042%, 0.003% and 0.009%, respectively. The bioavailability of glyphosate acid from this gel formulation was reported to be **0.011%** of the applied dose.

Assessment of the DTL methodology reveals that 720 µg glyphosate acid/cm$^2$ was used in this study. The U.S. EPA guidelines for dermal testing recommend a maximum practical dose on the order of 1 mg/cm$^2$; larger doses can exceed saturation of the absorption process.[293] Thus, the dose used was in compliance, but at the upper range (72% of the threshold).

It is not stated in the methodology whether tissues were also separated by heat and if so, what temperature or duration.  Results of the MON 76829 gel dermal absorption study fall approximately 272 times below the prior 3% dermal absorption value established by

---

[293] U.S. EPA OPPTS 870.7600, "Health effects test guidelines dermal penetration," August 1998, pg. 4.

Randall Dean Seidl v. Monsanto
August 13, 2020
Page 109

the U.S. EPA and 400 times less than that of the 4.4% dermal absorption rate measured in primates in the Wester, et al., study (1991).

Most importantly, this study tested a glyphosate gel and did not include any surfactants which are typically a major component of Roundup formulations and allow for penetration of the formulation.

The study was carried out under the direction of ████████ who worked for Syngenta until 2007.  As mentioned earlier, DTL is managed by ████████ who was previously the head of the *in vitro* percutaneous absorption group at Syngenta Central Toxicology Laboratory. (Syngenta is also a producer of glyphosate and seeds.) This DTL study is vastly inconsistent and discrepant compared to all prior Monsanto glyphosate dermal absorption studies performed by non-DTL laboratories. The inexplicable differences in dermal absorption bioavailability renders the credibility of this study of questionable merit and, as a consequence, warrants its exclusion.

### Monsanto *in Vitro* Absorption Study of Glyphosate by DTL (2015) - (MON 76258) 7.2g/L Glyphosate Gel Formulation

In April 2015, Dermal Technology Laboratory, Ltd., also completed their Monsanto-commissioned lab study entitled "7.2 g/L Glyphosate Gel Formulation (MON 76258) - *In Vitro* Absorption through Human Dermatomed Skin using [$^{14}$C]-Glyphosate"

Human skin samples were obtained from the National Disease Research Interchange (NDRI**,** Philadelphia, Pennsylvania). Skin sections were cut at a thickness setting of 400 μm using an electric dermatome. It is not stated in the methodology whether tissues were also separated by heat.

The type of static glass diffusion cell used in this study had an exposed skin surface area of 2.54 cm$^2$ and a receptor volume of approximately 4.5 mL. Discs of approximately 3.3 cm diameter of prepared skin were mounted, dermal side down, in diffusion cells held together with individually numbered clamps and placed in a water bath maintained at 32°C ± 1°C. A nominal application rate of 10 μL/cm$^2$ or 720 μg glyphosate acid/cm$^2$ was reported.

DTL concluded that the gel formulation had a dermal absorption rate of glyphosate from exposure to the herbicide at 6, 8 and 10 hours of 0.005 μg/cm$^2$. These respective time points can be expressed as percentages of the applied dose; *i.e.,* 0.002%, 0.003% and 0.002%. The mean amount penetrated over the entire 24 hour experimental period was

Randall Dean Seidl v. Monsanto
August 13, 2020
Page 110

0.006 µg/cm$^2$ corresponding to **0.008%** of the applied dose. "*Practically all of the applied glyphosate acid (103%) was washed off the surface of the skin following the six hour exposure with a further 0.211% being removed at the 24 hour wash*." The proportions of the dose applied that were recovered from the donor chamber, stratum corneum (tape strips 1-5), and remaining skin were 0.035%, 0.017% and 0.023%, respectively. The bioavailability of glyphosate acid from this gel formulation was **0.040%** of the applied dose.

Assessment of the DTL methodology reveals that 7.2 µg glyphosate acid/cm$^2$ was used in this study. The U.S. EPA guidelines for dermal testing recommend a maximum practical dose on the order of 1 mg/cm$^2$; larger doses can exceed saturation of the absorption process.[294] Thus, the dose used was in compliance at the upper range (7.2% of the threshold).

It is not stated in the methodology whether tissues were also separated by heat and if so, what temperature or duration.  Results of the MON 76258 gel dermal absorption study fall approximately 75 times below the prior 3% dermal absorption value established by the U.S. EPA and 110 times less than that of the 4.4% dermal absorption rate measured in primates in the Wester, et al., study (1991).

Most importantly, this study tested a glyphosate gel and did not include any surfactants which are typically a major component of Roundup formulations and allow for penetration of the formulation.

As above, the study was carried out under the direction of ▆▆▆▆▆▆▆ who worked for Syngenta up to 2007.  DTL is managed by ▆▆▆▆▆ who was previously the head of the *in vitro* percutaneous absorption group at Syngenta Central Toxicology Laboratory. This DTL study is vastly inconsistent and discrepant compared to all prior Monsanto glyphosate dermal absorption studies performed by non-DTL laboratories. The inexplicable differences in dermal absorption bioavailability renders the credibility of this study of questionable merit and, as a consequence, warrants its exclusion.

---

[294] U.S. EPA OPPTS 870.7600, "Health effects test guidelines dermal penetration," August 1998, pg. 4.

Randall Dean Seidl v. Monsanto
August 13, 2020
Page 111

**Monsanto *in Vitro* Absorption Study of Glyphosate by DTL (2016) - (MON 76952) 500 g/L Glyphosate SL Formulation**

During August 2016, Dermal Technology Laboratory, Ltd., also completed their Monsanto-commissioned lab study entitled "500 g/L Glyphosate SL Formulation (MON 76952) - *In Vitro* Absorption through Human Dermatomed Skin using [$^{14}$C]-Glyphosate"

Human skin samples were obtained from the National Disease Research Interchange (NDRI, Philadelphia, Pennsylvania). Skin sections were cut at a thickness setting of 400 µm using an electric dermatome. It is not stated in the methodology whether tissues were also separated by heat.

The type of static glass diffusion cell used in this study had an exposed skin surface area of 2.54 cm$^2$ and a receptor volume of approximately 4.5 mL. Discs of approximately 3.3 cm diameter of prepared skin were mounted, dermal side down, in diffusion cells held together with individually numbered clamps and placed in a water bath maintained at 32°C ± 1°C. A nominal application rate of 10 µL/cm$^2$ or 720 µg glyphosate acid/cm$^2$ was reported.

DTL concluded that the 500 g/L formulation concentrate had a dermal absorption rate of glyphosate with the mean amount penetrated over the entire 24 hour experimental period of 0.022 µg/cm$^2$ corresponding to 0.022% of the applied dose. The mean amount penetrated over the entire 24 hour experimental period was 0.512 µg/cm$^2$ corresponding to **0.010%** of the applied dose. Bioavailable dose was determined to be 0.088%.

With respect to the 1/500 w/v aqueous spray dilution after a small lag phase of 1 hour, *"practically no glyphosate was absorbed (0.0006 µg/cm$^2$/hour)."* The mean absorption rate of glyphosate acid through human dermatomed skin increased to 0.002 µg/cm$^2$/hour between 1-2 hours. This reduced to 0.0003 µg/cm$^2$/hour between 4-12 hours and 0.0001 µg/cm$^2$/hour between 12-24 hours. Over the 24 hour experimental period the mean absorption rate was 0.0003 µg/cm$^2$/hour.

The amounts of glyphosate acid that were absorbed through human skin at 6, 8 and 10 hours were 0.005 µg/cm$^2$, 0.006 µg/cm$^2$ and 0.006 µg/cm$^2$, respectively. These amounts expressed as percentages of the applied dose were 0.052%, 0.058% and 0.063%. The mean amount penetrated over the entire 24 hour experimental period was 0.008 µg/cm$^2$ corresponding to **0.081%** of the applied dose. Bioavailable dose was determined to be 0.200%.

Randall Dean Seidl v. Monsanto
August 13, 2020
Page 112

Assessment of the DTL methodology reveals that 5,000 µg glyphosate acid/cm$^2$ and 10 µg glyphosate acid/cm$^2$ was used in this study. The U.S. EPA guidelines for dermal testing recommend a maximum practical dose on the order of 1 mg/cm$^2$; larger doses can exceed saturation of the absorption process.[295] Thus, the high dose used exceeded the threshold by five-fold.

It is not stated in the methodology whether tissues were also separated by heat and if so, what temperature or duration.

Results of the 500 g/L MON 76952 concentrate dermal absorption study fell approximately 300 times below the prior 3% dermal absorption value established by the U.S. EPA and 440 times less than that of the 4.4% dermal absorption rate measured in primates in the Wester, et al., study (1991).

Results of the spray dilution MON 76952 dermal absorption study fell approximately 37 times below the prior 3% dermal absorption value established by the U.S. EPA and 54 times less than that of the 4.4% dermal absorption rate measured in primates in the Wester, et al., study (1991).

There is no indication that surfactants are present in this glyphosate formulation.

As before, the study was carried out under the direction of ▮▮▮▮▮▮▮ who worked for Syngenta up to 2007.  DTL is managed by ▮▮▮▮▮ who was previously the Head of the *in vitro* percutaneous absorption group at Syngenta Central Toxicology Laboratory. This DTL study is vastly inconsistent and discrepant compared to all prior Monsanto glyphosate dermal absorption studies performed by non-DTL laboratories. The inexplicable differences in dermal absorption bioavailability renders the credibility of this study of questionable merit and, as a consequence, warrants its exclusion.

### Monsanto *in Vitro* Absorption Study of Glyphosate by DTL (2015) - (MON 76879) 360 g/L Glyphosate SL Formulation

During August 2017, Dermal Technology Laboratory, Ltd., also completed their Monsanto-commissioned lab study entitled "360 g/L Glyphosate SL Formulation (MON 76879) - *In Vitro* Absorption through Human Dermatomed Skin using [$^{14}$C]-Glyphosate"

Human skin samples were obtained from the National Disease Research Interchange (NDRI, Philadelphia, Pennsylvania). Skin sections were cut at a thickness

---

[295] U.S. EPA OPPTS 870.7600, "Health effects test guidelines dermal penetration," August 1998, pg. 4.

Randall Dean Seidl v. Monsanto
August 13, 2020
Page 113

setting of 400 µm using an electric dermatome. It is not stated in the methodology whether tissues were also separated by heat.

The type of static glass diffusion cell used in this study had an exposed skin surface area of 2.54 cm² and a receptor volume of approximately 4.5 ml. Discs of approximately 3.3 cm diameter of prepared skin were mounted, dermal side down, in diffusion cells held together with individually numbered clamps and placed in a water bath maintained at 32°C ± 1°C. A nominal application rate of 10 µL/cm² or 720 µg glyphosate acid/cm² was reported.

DTL concluded that the 360 g/L formulation concentrate had a dermal absorption rate of glyphosate from exposure to the herbicide with the mean amount of 0.791 µg/cm² penetrated over the entire 24 hour experimental period and corresponding to 0.022% of the applied dose.

A 1/267 w/v aqueous spray dilution had a dermal absorption rate of glyphosate absorbed through human skin at 6, 8, 10 and 12 hours at 0.004 µg/cm², 0.004 µg/cm², 0.005 µg/cm² and 0.005 µg/cm², respectively. These amounts expressed as percentages of the applied dose were 0.029%, 0.033%, 0.035% and 0.037%. The mean amount penetrated over the entire 24 hour experimental period was 0.006 µg/cm² corresponding to **0.042%** of the applied dose.

"*Practically all of the applied glyphosate acid (102%) was washed off the surface of the skin following the six hour exposure with a further 0.375% being removed at the 24 hour wash.*" The proportions of the dose applied that were recovered from the donor chamber, stratum corneum and remaining skin were 0.080%, 0.032% and 0.111%, respectively.

The bioavailability of glyphosate acid from the spray dilution is the sum of the receptor fluid dose at 24 hours plus the amount remaining in the skin following tape stripping and tape strips 3-5. This was **0.162%** of the applied dose.

Assessment of the DTL methodology reveals that 3,600 µg Glyphosate acid/cm² and 13.5 µg glyphosate acid/cm² was used in this study. The U.S. EPA guidelines for dermal testing recommend a maximum practical dose on the order of 1 mg/cm²; larger doses can exceed

Randall Dean Seidl v. Monsanto
August 13, 2020
Page 114

saturation of the absorption process.[296] Thus, the high dose used exceeded the threshold by 3.6 fold.

It is not stated in the methodology whether tissues were also separated by heat and if so, what temperature or duration.

Results of the spray dilution MON 76859 dermal absorption study fall approximately 18.5 times below the prior 3% dermal absorption value established by the U.S. EPA and 27.5 times less than that of the 4.4% dermal absorption rate measured in primates in the Wester, et al., study (1991).

This MON 76879 commercial formulation is noted to contain a surfactant called Synergen GD2 at a volume of 4.78% w/w while glyphosate (pure acid and salt) was 60.63% w/w. For comparison, the ethoxylated tallowamine (POEA) surfactant in Roundup Classic is designated by Monsanto as MON 0818[297] and is a concentration that is typically reported as approximately 15% of the formulation weight to volume or 150 g/L.[298,299,300,301]   Per Johan van Burgsteden's "*In vitro* percutaneous absorption study with [14C]-glyphosate using viable rat skin membranes," June 14, 2002, **Unaudited draft report** V4478 (TNO Dermal Penetration Study), MON 35012 is known to constitute glyphosate isopropylamine salt (46% w/w) and surfactant cocoamine (18% w/w), water and minor ingredients (35.5% w/w). In that study, penetration of glyphosate was found to range from 2.6% to 10.3%.

The DTL 2015 (MON 76879) study was carried out under the direction of ████████ who worked for Syngenta up to 2007.  DTL is managed by ████████ who was previously the Head of the *in vitro* percutaneous absorption group at Syngenta Central Toxicology Laboratory. This DTL study is vastly inconsistent and discrepant compared to all prior Monsanto glyphosate dermal absorption studies performed by non-DTL laboratories. The

---

[296] U.S. EPA OPPTS 870.7600, "Health effects test guidelines dermal penetration," August 1998, pg. 4.

[297] Monsanto response to the concern of the Slovenian authorities on the composition of the Plant Protection Product MON 79376 (360 g/ 1 glyphosate) and the surfactant MON 59117 (CAS n ° 68478-96-6). MONGLY02817577

[298] Id.

[299] Diamond, G., Durkin, P., "Effects of surfactants on the toxicity of glyphosate with specific reference to RODEO," 1997, Syracuse Research Corporation, SERA TR 97-206-1b.

[300] Giesey, J. P., Dobson, S., & Solomon, K. R., "Ecotoxicological risk assessment for Roundup herbicide," 2000, Rev. Environ. Contam. Toxicol. 167, pg. 35-120.

[301] Defarge, N. E., "Co-formulants in glyphosate-based herbicides disrupt aromatase activity in human cells below toxic levels, 2016, Int J Environ Res Public Health, Vol. 13(3), pg. 264.

Randall Dean Seidl v. Monsanto
August 13, 2020
Page 115

inexplicable differences in dermal absorption bioavailability renders the credibility of this study of questionable merit and, as a consequence, warrants its exclusion.

**Effects of Temperature on Skin Used in Laboratory Experiments**

A 1998 study[302] by Wester, et al., concluded that:

---

"...human skin will sustain viability for 8 days following donor death in this system. Heat-treated (60°C water for one minute) and heat-separated epidermis and dermis **lose viability**.

**Conclusions:** Human skin viability can be maintained for absorption studies. **It is recommended that** … **heat separation and skin freezing not be used** in absorption studies where skin viability and metabolism might be contributing factors to the study.

"Dermatomed skin was heat-treated at 60°C for one minute to simulate the heat-separation procedure to produce epidermis separated from dermis (but no separation was performed) (Table 2). Lactate production decreased significantly ($p<0.000$; $p<0.04$) for both heat-treated skin samples. Therefore, **heating to separate epidermis from dermis damages viability**.

"In another study [Table 3] lactate production was determined in heat-separated epidermis and dermis. The cumulative lactate production was much less than intact dermatomed skin, again showing the **detrimental effect of heat-separation on skin viability**."

---

These study citations clearly reveal that the outcomes of skin absorption tests can be influenced merely by choosing a particular skin preparation procedure. The profound differences in DTL results provide objective evidence that the laboratory may have engaged in such practices.

---

[302]  Wester, et al., "Human Cadaver Skin Viability for *In Vitro* Percutaneous Absorption: Storage and Detrimental Effects of Heat-Separation and Freezing," 1998, Pharmaceutical Research, Vol. 15, No. 1.

Randall Dean Seidl v. Monsanto
August 13, 2020
Page 116

It is further noteworthy that with regard to changes that occur in skin when subjected to low temperatures, Mesager, et al., noted in a 2003 article[303] that:

> "Skin is complex and may display variable structural and metabolic change '*ex vivo*'. … Frozen samples showed some sign of stratum corneum fragmentation although this was not obvious. LDH activity measured in fresh samples kept at 4 °C was low, but it was stable up to 7 days. Fresh samples kept at 32 °C had a comparable LDH activity to the ones kept in the fridge up to 4 days. Frozen samples, thawed and then kept at 4 °C, showed a stable LDH activity after 24 h of incubation. However, frozen samples incubated at 32 °C demonstrated a high variability in results with up to 800 U/L of LDH activity after 5 days of incubation. … Although the measurement of enzyme activity was easy to perform and gave reproducible results, the use of single-enzyme activity (measuring only one pathway among the many metabolic pathways occurring within a cell) *can be criticized when used on its own*."

**Table 18** summarizes the available glyphosate dermal absorption studies.

**Table 18**

**Glyphosate Dermal Absorption Studies**

| Name/Author | Study Sponsor | Date | Specie | Design | Full Skin | Derma-tomed Skin | Stated % Dermal Absorption | % Absorption Including Unaccounted |
|---|---|---|---|---|---|---|---|---|
| Franz, *"Evaluation of the percutaneous absorption of three formulations of glyphosate"* | Monsanto | 1983 | Human | *in vitro* | Yes | Yes | 0.028% MON0139<br><br>0.063% Roundup<br><br>0.152% Spray Mix | 0.152% (fluid) plus 4.02% ("in epidermis") = 4.17% absorption |
| **Study Notes:** | Study used unfrozen abdominal human skin obtained at autopsy; used radioactive glyphosate as labeled recovery target; failed to include unaccounted dose per OECD regulations; POEA of Roundup caused dermal absorption to increase by a factor of 2.25 due to the formulants in Roundup | | | | | | | |
| Maibach, "Elimination of 14C-glyphosate in Rhesus monkeys…" | Monsanto | 1983 | Primate | *in vivo* | Yes | No | 1.80% | >1.8% |
| **Study Notes:** | U.S. EPA guidelines require *that* at least 90% of dose be accounted for as compared to 16% in the Maibach study. U.S. EPA classified the study as <u>unacceptable</u> since the majority of dose was not correctly accounted for. | | | | | | | |

---

[303]  Messager, et al., "Assessment of skin viability: Is it necessary to use different methodologies?" Skin Research and Technology, December, 2003, Vol. 9, pg. 321–330.

REDACTED VERSION OF DOCUMENT SOUGHT TO BE SEALED

Randall Dean Seidl v. Monsanto
August 13, 2020
Page 117

**Table 18**

**Glyphosate Dermal Absorption Studies**

| Name/Author | Study Sponsor | Date | Specie | Design | Full Skin | Derma-tomed Skin | Stated % Dermal Absorption | % Absorption Including Unaccounted |
|---|---|---|---|---|---|---|---|---|
| Wester, *"Glyphosate skin binding, absorption, residual tissue distribution and skin decontamination."* | Monsanto | 1991 | Human, Primate | *in vitro in vivo* | Yes | No | 4.4% (low dose) 2.9% (high dose) | 22.6% (if bound and unaccounted amount added per OECP regulations) |
| **Study Notes:** Inappropriately large dose exceeded saturation; caused <u>artificial reduction</u> of percentage absorbed in test subjects. Additionally, study underestimates systemic dose from dermal absorption by a factor of 4.5 due to omission of fecal elimination. Authors state 18.2% was "lost." OECD regulations require bound or unaccounted dose to be added. Thus, 4.4% + 18.2% = 22.6%. | | | | | | | | |
| Wester, "*In vitro* human skin absorption." | Monsanto | 1991 | Human | *in vitro* | - | - | 2.2% (± 0.5%) | - |
| **Study Notes:** Internal documents record fact that Monsanto considered study results *"too risky"* to submit. Study discontinued by Monsanto prior to regulatory review; results never published. | | | | | | | | |
| TNO Study: van Burgsteden, *"In vitro percutaneous absorption study [14C]-glyphosate using viable rat skin membranes"* (MON 35012) | Monsanto | 2002 | Rat | *in vitro* | - | - | 2.6% ± 1.4 % (low dose) 10.3% ± 4.2 % (high dose) | Variable recovery Up to 18% absorption |
| **Study Notes:** Maximum penetration of 10.3 % occurred with the higher dose of MON 35012 concentrate which contained the surfactant Cocoamine; one test membrane absorbed approximately 18% of the applied dose. | | | | | | | | |
| TNO Study (MON 0319) (70%) | Monsanto | 2002 | Rat | *in vitro* | - | - | 1.4% ± 2.2 % (low dose) 1.3% ± 1.9 % (high dose) | Variable recovery |
| **Study Notes:** IPA salt of glyphosate only; no surfactant in test formulation. Wide range of statistical variability reported (more than 100%) | | | | | | | | |

Randall Dean Seidl v. Monsanto
August 13, 2020
Page 118

## Table 18

### Glyphosate Dermal Absorption Studies

| Name/Author | Study Sponsor | Date | Specie | Design | Full Skin | Derma-tomed Skin | Stated % Dermal Absorption | % Absorption Including Unaccounted |
|---|---|---|---|---|---|---|---|---|
| DTL, *"450 g/L glyphosate in vitro absorption of glyphosate through human epidermis."* (MON79545) | Monsanto | Feb 2010 | Human | *in vitro* | No | Yes | 0.012% (high dose) 0.129% (med dose) 0.082% (low dose) | 0.049% (high dose) 0.796% (med dose) 0.245% (low dose) |
| **Study Notes:** | Bioavailability (i.e. (absorbed + epidermis after tape striping) was 0.049%, 0.796% and 0.245% in order of increasing glyphosate concentration applied. This would have been higher but the study excluded all glyphosate recovered from the stratum corneum. Study did not state tissue thickness. Manually teased away dermis following 60° emersion for 40-45 seconds. Failed to include stratum corneum quantities in total absorbed dose. | | | | | | | |
| DTL, *"360 g/L glyphosate in vitro absorption of glyphosate through human epidermis."* (MON 52276)" | Monsanto | Feb 2010 | Human | *in vitro* | No | Yes | 0.009% (high dose) 0.029% (med dose) 0.092% (low dose) | 0.064% (high dose) 0.134% (med dose) 0.277% (low dose) |
| **Study Notes:** | Bioavailable percentage would have been higher but the study excluded all glyphosate recovered from the stratum corneum. When compared to earlier (non-DTL studies) high undiluted dose dermal absorption study this fell 333.33 times below the prior 3% dermal absorption value established by the U.S. EPA and 488.89 times less than that of the 4.4% dermal absorption rate measured in primates by Wester, et al. (1991). These inexplicable findings of vastly lower absorption findings fail to note that the glyphosate formulation is essentially unchanged since earlier studies were conducted. | | | | | | | |
| DTL, *"480 g/L glyphosate in vitro absorption of glyphosate through human epidermis"* (MON79351)" | Monsanto | Feb 2010 | Human | *in vitro* | No | Yes | 0.007% (high dose) 0.182% (med dose) 0.048% (low dose) | 0.123% (high dose) 0.262% (med dose) 0.799% (low dose) |
| **Study Notes:** | The bioavailable amount in the low dose dilution was 0.8%, this amount exclude all glyphosate in the stratum corneum, and would have been higher. When compared to earlier (non-DTL studies), high undiluted dose dermal absorption study fell ~16 times below the prior 3% dermal absorption value established by the US EPA and ~24 times less than that of the 4.4% dermal absorption rate measured in primates by Wester, et al. (1991). These inexplicable findings of vastly lower absorption findings fail to note that the glyphosate formulation is essentially unchanged since earlier studies were conducted. | | | | | | | |

Randall Dean Seidl v. Monsanto
August 13, 2020
Page 119

**Table 18**

**Glyphosate Dermal Absorption Studies**

| Name/Author | Study Sponsor | Date | Specie | Design | Full Skin | Derma-tomed Skin | Stated % Dermal Absorption | % Absorption Including Unaccounted |
|---|---|---|---|---|---|---|---|---|
| DTL, *"72 g/L Glyphosate Gel Formulation - In Vitro Absorption through Human Dermatomed Skin using [¹⁴C]-Glyphosate"* (MON 76829) | Monsanto | Apr 2015 | Human | *in vitro* | No | Yes | 0.003% ("applied dose") | 0.011% |
| **Study Notes:** | No surfactants were used in this study which is a typical component that helps with absorption in Roundup formulations. Study fails to state whether tissues were separated by heat and if so what temperature or duration.  Results fall approximately 272 times below the prior 3% dermal absorption value established by the US EPA and 400 times less than that of the 4.4% dermal absorption rate measured in primates in the Wester study (1991). Study is vastly inconsistent and discrepant compared to all prior Monsanto glyphosate dermal absorption studies performed by non-DTL laboratories | | | | | | | |
| DTL, *"72 g/L Glyphosate Gel Formulation (MON 76258) - In vitro Absorption through Human Dermatomed Skin using [¹⁴C]-Glyphosate"* | Monsanto | Apr 2015 | Human | *in vitro* | No | Yes | 0.008% ("applied dose") | 0.04% |
| **Study Notes:** | No surfactants were used in this study which is a typical component that helps with absorption in Roundup formulations. Tissue cut @ 400 μm thickness via electrical dermatome; no implication whether tissue was heated; tissue was stored frozen at -20 ˚C. Complete amounts of recovered glyphosate in stratum corneum were not included. | | | | | | | |
| DTL, *"500 g/L Glyphosate SL Formulation  - In vitro Absorption through Human Dermatomed Skin using [¹⁴C]-Glyphosate,"* (MON 76952) | Monsanto | Aug 2016 | Human | *in vitro* | No | Yes | 0.010% (high dose) 0.081% (diluted dose) | 0.088% (High dose) 0.200% (diluted dose) |

Randall Dean Seidl v. Monsanto
August 13, 2020
Page 120

**Table 18**

**Glyphosate Dermal Absorption Studies**

| Name/Author | Study Sponsor | Date | Specie | Design | Full Skin | Derma-tomed Skin | Stated % Dermal Absorption | % Absorption Including Unaccounted |
|---|---|---|---|---|---|---|---|---|
| **Study Notes:** | 5,000 µg glyphosate acid/cm$^2$ and 10 µg glyphosate acid/cm$^2$ used. U.S. EPA guidelines for dermal testing recommend a maximum practical dose on the order of 1 mg/cm$^2$; larger doses can exceed saturation of the absorption process.  Thus, the high dose used exceeded the threshold by a factor of 5. Tissue cut @ 400 µm thickness via electrical dermatome; no implication whether tissue was heated; tissue was stored frozen at -20℃.  There is no indication that surfactants are present in this glyphosate formulation. | | | | | | | |
| DTL, *"360 g/L Glyphosate SL Formulation (MON 76258) - In vitro Absorption through Human Dermatomed Skin using [$^{14}$C]-Glyphosate"* | Monsanto | Aug 2017 | Human | *in vitro* | No | Yes | 0.022% (high dose) 0.042% (diluted dose) | 0.277% (high dose) 0162% (diluted dose) |
| **Study Notes:** | Study results fall approximately 18.5 times below the prior 3% dermal absorption value established by the US EPA and 27.5 times less than that of the 4.4% dermal absorption rate measured in primates in the Wester study (1991). Tissue cut @ 400 µm thickness via electrical dermatome; no implication whether tissue was heated; tissue was stored frozen at -20℃. Surfactants use is at a percentage lower that typical/classic glyphosate formulations | | | | | | | |

Randall Dean Seidl v. Monsanto
August 13, 2020
Page 121



Figure 9: Historical Dermal Absorption Factors by Study[304]

**Blue = Total % absorbed if unaccounted glyphosate added per OECP regulations**
**Red = Stated Low dose % absorbed**
**Yellow = Stated High dose % absorbed**

The study compilation presented in Table 18 reveals a <u>remarkable finding</u>. As shown in **Figure 9**, something "unexplained" appears to have happened in 2010. Monsanto made no significant alterations in product formulations, yet glyphosate dermal absorption inexplicably **dropped** – *by more than two orders of magnitude.*

This extraordinary event may be explained by the fact that the results for each year (2010, 2015, 2016, 2017) were produced by the same laboratory ("DTL"). As no other evident changes in product formulation occurred, it is evident that procedures and methodology at DTL have impacted the results and as previously noted, DTL failed to apply "Triple Pack" methods to validate their *in vitro* laboratory tests.

---

[304] Wester used Roundup which contained surfactants; Maybach's dermal absorption was radio labeled glyphosate dissolved in Roundup which contained surfactants and water; TNO study formulation also contained surfactants.

Randall Dean Seidl v. Monsanto
August 13, 2020
Page 122

The DTL establishment was contracted by Monsanto and managed by a gentleman who was previously in charge of the *in vitro* percutaneous absorption group at Syngenta Central Toxicology Laboratory – who is also a producer of glyphosate and seeds.

**Studies, Reviews & Articles Impacted by Wester and Maibach Studies**

Inasmuch as there are numerous, highly significant flaws in the two Monsanto-sponsored studies, it is important to understand the impact these have had on other studies, reviews and published articles (some of which were authored by Monsanto consultants).

1. Williams, GM, Kroes, R., and Munro, IC, "Safety evaluation and risk assessment of the herbicide Roundup and its active ingredient, glyphosate, for humans," 2000, Regulatory Toxicology and Pharmacology. Vol. 31, pp. 117–165.

   The Williams, et al., risk assessment article opined that the dermal penetration of glyphosate is very low based on results from studies in Rhesus monkeys and *in vitro* studies with human cadaver samples.  With respect to the Wester studies, Williams failed to acknowledge the documented fecal elimination route and only relied on urinary excretion.  Additionally, Williams, et al., failed to note the difference in fecal verses urinary excretion dependent upon dose level including the extraordinarily high dose level of pure product on the skin of primates within the Wester studies.

   The Williams, et al., review stated,[305] "*Maibach (1983) studied the in vivo dermal absorption of glyphosate when undiluted Roundup herbicide was applied to the skin of monkeys. Penetration was slow as only 0.4 and 1.8% of the applied dose was absorbed over 24 hours and 7 days, respectively. A second study in Rhesus monkeys investigated the absorption of diluted glyphosate (1:29) to simulate a spray solution (Wester, et al., 1991). Dermal penetration was found to be 0.8 and 2.2% at low and high dose (500 or 5,400 mg/cm$^2$, respectively). Wester, et al. (1991) also reported that the in vitro percutaneous absorption of glyphosate through human skin was no more than 2% when applied for up to 16 hours either as concentrated Roundup or as a diluted spray solution.*"

2. Niemann, Lars, et al., "A critical review of glyphosate findings in human urine samples and comparison with the exposure of operators and consumers," 2015, Journal für Verbraucherschutz und Lebensmittelsicherheit, Vol 10, Issue 1, pp 3-12.

---

[305] Williams, pg. 123-124.

Randall Dean Seidl v. Monsanto
August 13, 2020
Page 123

The basic assumption in Niemann, et al., is that dermally absorbed glyphosate is eliminated nearly entirely through urine and that "*measuring of urine levels could be a powerful tool for human biomonitoring*."  The study fails to reference or acknowledge the Wester and Maibach studies and does not consider dermally absorbed glyphosate at low, steady state rates of absorption being metabolized and excreted primarily through the feces.

Niemann, et al., states "*For active substances in plant protection products (PPP) with well-defined urinary elimination, no potential for accumulation and virtually no metabolism, measuring of urine levels could be a powerful tool for human biomonitoring. Such data may provide reliable estimates of actual internal human exposure that can be compared to appropriate reference values such as the 'acceptable daily intake (ADI)' or the 'acceptable operator exposure level (AOEL)'.*"

Based on the Wester (1991) study, the evidence of "*well defined urinary elimination*" has been compromised.  Such an assumption is misleading and potentially dangerous with respect to the human health risk assessment and comparisons to current ADI or the AOEL regulatory levels.  Studies cited by Niemann, et al., include non-dermal dose assessments such as male SD rats receiving oral dosing (Brewster, et al., 1991),[306] oral dosing in feed (Chan & Mahler, 1992)[307] and IV and oral doses in rats (Anadon, et al., 2009).[308]  None of the cited studies involve dermal dosing and **do not** establish "*well defined urinary elimination*" which is simply assumed.  Furthermore, the Brewster study found that urine and feces were equally important routes of elimination and after 7 days, the total body burden (~1%) of the dose administered was mostly in bone. Since dermal glyphosate exposure is the primary route of exposure contributing to systemic exposure in agricultural users, the assumption that distribution, metabolism, and excretion are identical by IV and dermal routes of exposure leads to **egregious errors** in systemic dose calculations.

---

[306] Brewster, D.W., Warren, J., and Hopkins, W.E., "Metabolism of glyphosate in Sprague-Dawley rats: Tissue distribution, identification, and quantitation of glyphosate-derived materials following a single oral dose," July 1991, Fundamental and Applied Toxicology, Volume 17, Issue 1, pg. 43-51.

[307] Chan, P. and Mahler, J., "Glyphosate (CAS No. 1071-83-6) administered in dosed feed to F344/N rats and B6C3F1 mice," 1992, U.S. Department of Health and Human Services. NTP Technical Reports Series No. 16. NIH Publication 92-3135.

[308] Anadón, A. et al., "Toxicokinetics of glyphosate and its metabolite aminomethyl phosphonic acid in rats," 2009, Toxicol Lett 190(1), pg. 91-95.

Randall Dean Seidl v. Monsanto
August 13, 2020
Page 124

3.  Acquavella, J., et al., "Glyphosate biomonitoring for farmers and their families: results from the Farm Family Exposure Study,"2004, Env. Health Perspect 112, pp. 321–326.

    In an internal Monsanto document entitled, "Glyphosate Stewardship, Epidemiology and the Farm Family Exposure Study," Monsanto scientists report the study impetus:

> "We have been working to maintain glyphosate's favorable reputation through a strategy that anticipates challenges and puts appropriate initiatives in place. One of those initiatives is a unique research program called the Farm Family Exposure Study (FFES)." [309]

The report further states:

> "The FFES was developed to fill two data gaps. First, there is (PPE) information about applicator pesticide exposure under "real world" conditions. Second, there is little empirical exposure information for farm children although children's health is a driving force in environmental regulation and a focus of epidemiologic research." [310]

The "FFES" is a biomonitoring study which evaluated urinary glyphosate concentrations for forty-eight farm families (farmers, spouses and their children) the day before, the day of and three days after a glyphosate application.  The authors used the urinary concentrations to estimate systemic doses which they then compared to the U.S. EPA reference dose of 2 mg/kgBW/day.

The main assumption in their analytic method is *"pharmacokinetic research indicates that absorbed glyphosate is excreted unchanged, predominantly in urine* (Williams 2000)."[311] Unfortunately, glyphosate is <u>not</u> excreted predominately through the urine in primates, especially at low doses, as demonstrated by the Wester, 1991, study.

The authors used the 95% urinary recovery that Wester reported using IV dosing to correct their data for complete pharmacokinetic recovery.  This correction factor is not applicable to this data since the farmers and their family members were presumably exposed *dermally* and not through IV dosing.

---

[309] "Glyphosate Stewardship, Epidemiology and the Farm Family Exposure Study," MONGLY00905651.

[310] Id, MONGLY00905652.

[311] Acquavella, J., et al., "Glyphosate biomonitoring for farmers and their families: results from the Farm Family Exposure Study," 2004, Environ Health Perspect, 112, pg. 321–326.

Randall Dean Seidl v. Monsanto
August 13, 2020
Page 125

Monsanto also points out the limited degree of accuracy of their urinary glyphosate measurements in the Acquavella, et al., 2004, biomonitoring study:

> "Monsanto's analytic chemistry expertise was essential to the FFES. However, **our current method is outdated**. It requires relatively large volumes of urine (100 ml, versus 5 ml for the 2,4-D and chlorpyrifos methods) and produces less precise results than methods for other FFES chemicals. Given the likelihood that human health allegations will continue to surface for glyphosate, it seems advisable to invest in modernizing the analytic method to increase analytic flexibility and precision."[312]

4.  Solomon, K., "Glyphosate in the general population and in applicators: a critical review of studies on exposure," 2016, Critical Reviews in Toxicology, 46(1), pp. 21-27.

    In the Solomon, 2016, review, it is again assumed that "*the systemic dose of glyphosate can be estimated from the total amount of glyphosate excreted in the urine over the four or five days following and including the day of application.*" A "*correction for incomplete excretion*" of 95% is made "*based on observations in TK[313] studies in monkeys which showed that 95% of total systemic dose was excreted via urine (Wester, et al., 1991), divided by 0.95.*"[314]  Solomon does not consider dermally absorbed glyphosate at low, steady state rates of absorption being metabolized and excreted primarily through the feces.

5.  Monsanto's Spanish "OPEX" biomonitoring study entitled "MON 78294: An Applicator Exposure Study Conducted in Spain," Autumn 2005.

    This study was conducted in order to estimate a systemic dose for occupational users of glyphosate and determine whether certain uses of the product resulted in unacceptable levels of dermal penetration. Monsanto submitted results of the studies to Spanish regulatory authorities as part of the herbicide registration process.  A report was prepared for submission to the U.S. EPA, but it is unclear if it was ever submitted. In their determination of the systemic dose, they extrapolated the Wester, et al., 1991, study results to their biomonitoring data.  As in the other examples cited above, doing so invalidates their values of the estimated systemic dose.

---

[312] "Glyphosate Stewardship, Epidemiology and the Farm Family Exposure Study", MONGLY00905655.

[313] TK is an abbreviation for toxicokinetic and is used here as a synonym for pharmacokinetic.

[314] Solomon, K., "Glyphosate in the general population and in applicators: a critical review of studies on exposures," 2016, Critical Reviews in Toxicology, 46(1), pg. 21-27.

Randall Dean Seidl v. Monsanto
August 13, 2020
Page 126

**Regulatory Guidance on Dermal Absorption and Recovery**

Either knowingly or unknowingly, Monsanto regularly misstates or understates glyphosate dermal absorption recovery and factors in its communications. It is not the purpose of this toxicological risk assessment to draw conclusions about the intent of such misstatements. However, it is helpful to understand the position of regulatory agencies on these points and to briefly review some key guidelines pertinent to this issue.

---

**OECD:  18-Aug-2011 GUIDANCE NOTES ON DERMAL ABSORPTION Series on Testing and Assessment No. 156**

The current default approach taken by nearly all regulatory agencies is to determine the dermal absorption value by adding the absorbed dose and the <u>chemical remaining in the skin</u>, following washing. This is appropriate for both *in vivo* and *in vitro* studies unless compelling evidence demonstrates that some portion of the residue in the skin is unlikely to be absorbed. OECD TG 427 and 428 (OECD 2004a and 2004b) require a mean mass balance <u>recovery</u> of the test substance of between <u>90–110%</u>.  The OECD GD28 (OECD 2004c) contains the same recommendation with a caveat that for volatile test substances and unlabeled test substances, a range of 80–120% is acceptable. However, with the *in vivo* study design, recoveries outside this range may be acceptable but must be justified.

The criteria to justify mean mass balance recovery values outside the acceptance range can be summarized by the following examples:

1. **Recovery values exceed the recommended range**: If the recoveries exceed the accepted maximum range, the data generated should not be normalized because that would result in potentially underestimated absorption values. <u>If these absorption values are not acceptable when a risk assessment is conducted, then the study should be repeated</u> to address any bias resulting from excessive recoveries.

2. **Recovery values below the recommended range**: Low recoveries raise the concern that the value for absorbed dose could be lower than that which would be achieved from a study where the recoveries were within the guideline range. The reason for low recovery may be attributable to the following factors: (a) incomplete application of dose, (b) loss to the experimental equipment, (c) incomplete extraction from matrices (or incomplete collection of exhaled $CO_2$), (d) evaporation, (e) unlabeled test preparations, metabolism or degradation or (f) insufficiently high analytical LODs/LOQs, in particular where non-labelling analytical methods are applied.

Randall Dean Seidl v. Monsanto
August 13, 2020
Page 127

**Monsanto Communications with Respect to Pharmacokinetics**

During the glyphosate registration process in Spain, the Spanish Ministry of Health advised Monsanto of errors in their "OPEX" study. Faced with denial of Spanish product registration, Monsanto employees communicated concerns regarding pharmacokinetics of glyphosate. The following excerpts summarize some of the Monsanto communications.

A.  Communication of ███████████ (11-4-2008):  Subject:  Pk (Pharmacokinetics) recovery, Wester, et al.

> "The IV data gives *in vivo* disposition of a systemic available dose. This dose could be the result of aggregate systemic exposure (meaning a systemic dose after combined oral, dermal, inhalation exposure). The total accountability of this experiment is high >96% - ~100% and we know exactly the amount that was systemically available. The recovery factor for urine is therefore relevant and reliable." [315]

Notably, the dose was not an "*aggregate systemic exposure*" as stated, but the result of an IV "push" injection. This is clearly stated in the study. Thus, one cannot conclude that the recovery factor from IV dosing is "*relevant and reliable*" to dermal dosing.  It is critical to note that IV administration presents a **tremendously high acute dose** to the liver.  Saturation of the liver as an elimination pathway to the feces would result in spill over to the urinary excretion elimination pathway.  Giving the same (IV) dose quantity over a slow drip period of 24 hours would not expose the liver to potential saturation. The email conversation further states:

> "The *in vivo* dermal absorption experiment yielded variable results and much lower total accountability 77-82% which is normal for this kind of experiment. The authors take the outcome of the IV experiment to justify the use of the urinary excretion results from the topical experiment **only** as an estimate for dermal uptake. 'Since all of the IV administered doses were excreted in urine, the percutaneous absorption of glyphosate is estimated to be 0.8-2.2% of the applied dose' (p 728-729). They did not take the feces into account based on the IV study." [316]

Monsanto employee ███████████ did not take hepatic excretion through the feces into account and relied solely on the IV study. This omission produced **acutely high blood levels** not comparable to those achieved through slow, steady-state dermal absorption.  Additionally, the erroneous urinary recovery assumption that Monsanto used

---

[315] MONGLY02155831.

[316] Id.

Randall Dean Seidl v. Monsanto
August 13, 2020
Page 128

to correct the systemic dose is in grave error by a factor of 4.5 and, therefore, is in no way a *"good estimate."*

B. Communication of ███████████ (11-4-2008, response to ███████): Subject: Pk recovery, Wester, et al.

> "Many thanks for your help which I will try to defend as Monsanto position, but the authorities will decide next week.  That means they are now doing the homework- if our proposed safety evaluation for CAYENNE formulation is compatible with the Acceptable Operating Exposure Level (AOEL) for glyphosate.  I imagine we do not have other studies on the urine/feces excretion after topical applications of glyphosate to support our position. **As it is critical that we have our product accepted in this coming meeting**, I would like to complete my defense with a paragraph like this one:
>
> "Although we believe that the intravenous dose is accepted by toxicology peer reviewers as the best indicator to simulate the systemic presence of glyphosate, in case the Spanish authorities consider that the excretion through the urine should be taken from the **variable data** reported in the topical administration (urine/urine + feces = 75.86% or 18.18%), the average excretion in the urine of 47.02% would mean that our final exposure values should be multiplied by 2.13 resulting in exposure levels which are well below the AOEL of 0.2 mg/kgBW/day." [317]

Several documents and in-house Monsanto studies report that the IV model is the best indicator as to how systemically-administered glyphosate is metabolized and excreted.  This statement is <u>inaccurate</u> since it is the dermal systemic dose that is of primary interest to both toxicologists and regulatory authorities.

There are no reports of applicators intravenously injecting themselves with glyphosate. In the absence of actual primate dermal absorption data, the IV model should have been compared to animal models with urinary and fecal measurements conducted.

However, *it is not an acceptable practice in toxicology* to replace real *in vivo* data with a "model" unless the actual dermal dosing data was faulty. <u>There is no evidence to support this</u>. Monsanto's "variable data" problem has been used to avoid the finding of the alternate fecal elimination pathway. The "high variability" issue has been mis-applied in order to dismiss the primate dermal absorption test results.  Monsanto has

---

[317] MONGLY02155830.

Randall Dean Seidl v. Monsanto
August 13, 2020
Page 129

dismissed the primate data by failing to disclose why the "variable data" was excessive.

The variability of the data (*i.e.*, the percentage of urinary versus fecal elimination) was due to absorption saturation at the high dose as described previously and, therefore, only the low dose is relevant since it is closer to real-world exposure scenarios.  Thus, the exposure values should be multiplied by **5.50,** <u>not</u> 2.13.

C.  Communication of ███████████ (11-5-2008, response to All):  Subject:  Pk recovery, Wester, et al.

> "Even though we can absorb additional 'uncertainty factors' in our risk assessment based on our biomonitoring results, I feel uncomfortable with this discussion. This approach by Spain sets a precedent and **contradicts the fact that we always claimed to fully understand the glyphosate pharmacokinetics**. The Wester IV experiment suggests that almost the entire 'systemically' available dose was excreted in urine. The low dose topical *in vivo* experiment suggests that almost the entire dose (82%) that was absorbed through the skin was excreted in feces (3.6% feces versus 0.8% in urine). We should have a robust and well-documented explanation for this and stick to our original risk assessment or develop additional data to fully understand this matter and adjust our systemic dose calculations accordingly." [318]

D.  Communication of David Saltmiras (11-4-2008, response to ████):  Subject:  Pk recovery, Wester, et al.

> "███, Donna & I have discussed your approach and you are correct. How much below the AOEL are your calculations? ██████████ - by our rough calculations, █████s approach is approximately 50x below the AOEL of 0.2 mg/kgBW/day, Even if we applied the 90[th] percentile for the passive dosimetry numbers, we would be below the AOEL." [319]

The pharmacokinetics assumed to be correct using the IV methodology are contradicted by the primate dermal absorption studies.  ████████████ states *"This approach by Spain sets a precedent and <u>contradicts the fact that we always claimed to fully understand the glyphosate pharmacokinetics</u>."*  He cites the discrepancy in the Wester study and the need to further investigate in order to fully understand the pharmacokinetics (and thereby "adjust" systemic dose calculations).

---

[318] Id.
[319] MONGLY02155829.

Randall Dean Seidl v. Monsanto
August 13, 2020
Page 130

E. Response communication of ▆▆▆▆▆▆ (11-10-2008, response to All):  Subject: Pk recovery, Wester, et al.

> "To fully address this issue would likely require a repeat of the monkey dermal and intravenous studies. We no longer own the custom-designed monkey chairs that prevented exfoliated abdominal skin from contaminating the excreta. Additionally, it is not clear whether similar chairs are used anymore by any researcher or if they would even be allowed. Thus, conducting a new series of monkey studies may not be easy nor inexpensive. Furthermore, it is not clear to me that such a study is necessary and would be **totally without risk**. Should we arrange a conference call to discuss this?"[320]

F. Communication of ▆▆▆▆▆▆ (11-10-2008, response to team):  Subject:  Pk recovery, Wester, et al.

> "To me, all this discussion continues to show that we still need solid data for ADME (Absorption, Distribution, Metabolism and Excretion) arising from dermal exposure.
>
> 1. Our dermal absorption endpoint is based on the literature and, as I recall, we failed to get the original data to support the results.
>
> 2. The movement of glyphosate in the blood flow from dermal contact is different to that through oral or intravenous exposure. The little data we have suggests that the excretion is significantly more through the feces than the urine.
>
> 3. Dermal exposure is the greatest risk of exposure for operators. Therefore, we need to be secure on the ADME of such exposure.
>
> 4. The WHO and EU reviews focus on the IV and oral but not the dermal. My position is, therefore, unchanged. We need to address this properly in the Annex II dossier and, therefore, should be considering a study.[321]

As stated by Mr. ▆▆▆▆, the movement of glyphosate in the blood flow from dermal contact is different to that through oral or intravenous exposure. It is precisely because such differences exist that clinical researchers (and toxicologists) apply published study findings according to the guidance provided.

Mr. ▆▆▆▆ also notes that the study evidence has documented that glyphosate excretion is significantly more through the feces than the urine. This finding is highly

---

[320] MONGLY02155826.
[321] MONGLY02155827.

Randall Dean Seidl v. Monsanto
August 13, 2020
Page 131

significant as it directly contradicts a key assertion found in many of Monsanto's published study results that elimination through urine alone accounts for the majority of recovery. Thus, this assumption can impact the results and accuracy of dermal absorption studies and biomonitoring studies of workers who have their urine tested.

G. Communication of ▮▮▮▮▮▮▮▮ (11-12-2008, response to ▮▮▮▮▮▮▮): Subject: Pk recovery, Wester, et al.

"Monsanto is a company with recurring discussions (which is good!)... You will remember that we discussed this in length with a lot of people before we initiated the Spanish OPEX study... (please see attached). The outcome was that (1) other animal data confirmed the Wester findings; (2) such a study would **be too risky** (potential for finding another mammalian metabolite); and (3) we would wait for the evaluation of Spain. Looking forward to this discussion on the 24th of November. I also recall that David has asked 2 external pharmacologists for an opinion on the Wester study. Would that opinion be available by that time?"[322]

The charge and responsibility of the toxicologist is to determine the ADME (absorption, distribution, metabolism and excretion) as ADME are critical components in the risk assessment process.

It is always of great importance to identify all metabolites since certain chemicals have been known to produce toxic metabolites under high dose levels (such as Tylenol) or carcinogenic metabolites (such as metabolites of benzene). Failing to perform a needed study due to the risk of finding an adverse result that could negatively impact unrelated agendas represents an unacceptable practice in the field of toxicology.

**Factors Intensifying Dermal Absorption of Glyphosate**

Beyond the underestimation of dermal absorption by Monsanto, there are additives within Roundup formulations that further increase dermal absorption of glyphosate and also enhance genotoxicity (for example, POEA derivatives).

There are numerous factors governing the rate and degree of dermal absorption, both intrinsically and potentially. In glyphosate, these include (a) "co-formulants" (ingredients other than the active ingredient such as detergents or anti-foam agents), (b) surfactants (compounds which lower surface tension), (c) humectants (to inhibit moisture loss), (d) adjuvants (chemicals which modify the effect of other agents), (e) absorption enhancement due to skin damage, lesions, cracks and other irregularities, (f) lack of

---

[322] MONGLY02155826.

Randall Dean Seidl v. Monsanto
August 13, 2020
Page 132

personal protective gear and (g) other factors such as penetration enhancers and skin creams. This section reviews and assesses these factors as toxicological considerations.

Generally speaking, with the exception of substances of a proprietary nature or which have not been disclosed by Monsanto, most of the considerations mentioned above tend to intensify absorption rather than reduce it. The following sections review each factor individually given the limited information available at this time.

**Co-Formulants**

The exact identities and amounts of the co-formulants in GBF herbicides are usually unknown as they are kept as confidential trade secrets. In many countries (including the U.S.), manufacturers are only required to identify the declared active ingredient (DCI), *i.e.,* glyphosate. The co-formulants (*i.e.*, all ingredients other than the DCI) have rarely been identified and have often been declared as "inert ingredients."[323]

Herbicide manufacturers frequently take advantage of regulatory agency definitions of "inert ingredients." Despite their name, inert ingredients may be biologically or chemically active and are labeled inert only because of their function in the formulated product. For example, an herbicide ingredient can be considered "inert" if it has no direct effect on the intended target, *i.e.,* the weed. In herbicides, the ingredients added to enhance absorption, increase ionization, prevent foaming or reduce drifting are characterized by the manufacturer as "inert ingredients" since they do not directly kill the weeds. However, they are not necessarily without toxicity to animals or humans.

Independent studies of complete herbicide formulations are not generally possible as specific herbicide formulations are protected. Manufacturers of co-formulants have been historically unwilling to provide them to scientists who wish to assess toxicity. Consequently, most co-formulants have evaded scientific scrutiny and regulation.

In a confidential draft report dated July, 2001, entitled, "Clustering glyphosate formulations with regard to the testing for dermal uptake," Monsanto scientist ███████ ████████ stated:

---

[323] Defarge, N. et al., "Co-formulants in glyphosate-based herbicides disrupt aromatase activity in human cells below toxic levels," 2016, Int J Environ Res Public Health, Vol. 26;13(3), pii: E264.

Randall Dean Seidl v. Monsanto
August 13, 2020
Page 133

> "Glyphosate has a whole series of different formulations. The differences between those formulations are based on:
>
> - The different salt types used to formulate the active ingredient
> - The use of different surfactants
> - The active ingredient/surfactant ratio
> - The concentrations of active ingredient and surfactants
> - The presence or absence of other inert ingredients such as anti-foam agents.

He also added:

> Until today, Monsanto has conducted formulation specific dermal uptake research only on the formulation Roundup (MON2139).  It is clear that because of the compositional differences, the dermal uptake data for Roundup can't be extrapolated as such towards the wide range of formulations.  Every ingredient in a formulation can have a specific influence of dermal uptake. **Scientific experimental evidence is necessary**."

Detergents in herbicides act as mediators which change the absorption by increasing bioavailability[324] or by affecting the skin barrier function.[325,326]  Brand and Mueller (2002) showed dermal penetration of commercially-formulated compounds was significantly greater ($p < 0.05$) than that of pure compounds at the same concentration.[327]

**Surfactants**

Like co-formulants, the exact identities and amounts of surfactants in GBF herbicides are usually unknown as they are kept as confidential trade secrets. The most predominately used surfactants in GBFs are polyoxyethylene alkylamine (POEA) surfactants.[328,329]

---

[324] Sartorelli, et al, 1997.

[325] Treffel, P. & Gabrad, B., "Skin penetration and sun protection factor of ultraviolet filters from two vehicle," 1996, Pharmaceut Res, Vol. 13, pg. 770-774.

[326] Tupker, R. et al., "Susceptibility to irritants: role of barrier function, skin dryness and history of atopic dermatitis," 1990, *BJD.* Volume 123, Issue 2, pg. 199–205.

[327] Brand, R.M. & Mueller, C., "Transdermal penetration of atrazine, alachlor, and trifluralin: effect of formulation," 2002, Toxicol Sci., Vol. 68(1), pg. 18-23.

[328] Williams, G., et al., "Safety evaluation and risk assessment of the herbicide Roundup and its active ingredient, glyphosate, for humans," 2000, Regulatory Toxicology and Pharmacology, Vol.31, pg. 117 - 165.

[329] Diamond, G., Durkin, P., "Effects of surfactants on the toxicity of glyphosate with specific reference to RODEO," 1997, Syracuse Research Corporation, SERA TR 97-206-1b.

Randall Dean Seidl v. Monsanto
August 13, 2020
Page 134

POEA is an acronym, not a specific chemical, which encompasses a wide range of alkyl-amine ethoxylate compounds. Within the group of POEA surfactants, the chemistry is complex and varied.   Ethoxylated tallowamine has been the traditional surfactant component and the most well-known 'inert' ingredient contained in the original Roundup formulation and many others. It is a POEA non-ionic surfactant consisting of beef tallow fatty acid-derived alkyl chains converted to primary amines and ethoxylated with between 10 to 20 ethylene oxide (EO) units.[330] It is often mixed with polyethylene glycol or other surfactants plus other materials to facilitate manufacturing and formulation stability.[331] Roundup's surfactants include 1,4-dioxane (a probable human carcinogen) as an impurity at about 0.03%.[332]

POEA significantly increases penetration in plant cells as well as in animal cells. Richard, et al., found that the addition of surfactants "greatly facilitated" the penetration of glyphosate through animal cell membranes.[333]

It is helpful to understand that, due to corporate secrecy and proprietary concealment, POEA was first recognized as a common ingredient in herbicides in the 1980's when physicians in Japan reported that morbidity and deaths of patients who drank Roundup were due to POEA, not glyphosate.[334]

POEA is an eye irritant, toxic to aquatic organisms, penetrates cell membranes and disrupts their structure and function. Diamond and Durkin made the following observations regarding surfactants in glyphosate-based formulations:

1. **Multiple Formulations**: The formulations are chemical mixtures and must be considered as mixtures in toxicity assessments. In this context, an assessment of the specific surfactants in any of the formulations or generalizations about the toxicology of surfactants as a group may not apply to the formulations. This

---

[330] From an internal Monsanto report, Surfactant Issue Analysis, Issue: Increasing public attention to the POEA (Polyoxyethlene alkylamine) surfactant component of glyphosate formulations in connection with claims of adverse impact to aquatic life (recently, amphibians) and human health (*in vitro* cell culture toxicity tests). MONGLY01700591.

[331] Id.

[332] Monsanto, 1990 in Diamond, G., Durkin, P., "Effects of surfactants on the toxicity of glyphosate with specific reference to RODEO," 1997, Syracuse Research Corporation, SERA TR 97-206-1b.

[333] Richard, S., et al., "Differential effects of glyphosate and Roundup on human placental cells and aromatase," 2005, Environmental Health Perspectives.

[334] Sawada, Y., Nagai, Y., Ueyama, M., and Yamarnoto, I., "Probable toxicity of surface active agent in commercial herbicide containing glyphosate," 1988, Lancet 1 (8580), pg. 29.

Randall Dean Seidl v. Monsanto
August 13, 2020
Page 135

consideration places extreme importance on data regarding the toxicity of the formulations themselves. *The lack of such data will render any predictions about the effects of the formulations on glyphosate highly uncertain*.[335]

2. **Unknown Interactions:** Surfactants can be expected to interact with and perturb the structure, physical properties and function of membranes.[336]

3. **Objective Evidence is Lacking:** For specific mechanisms of interactions between glyphosate and surfactants.[337]

4. **Multiplicity of Potential Reactions:** The structural characteristics of extreme hydrophilicity and hydrophobicity of surfactants may result in very different interactions with hydrophobic and hydrophilic herbicides. Thus, the relatively water-soluble isopropylamine salt of glyphosate may interact differently with surfactants than the less water-soluble parent compound or other more insoluble herbicides.[338]

**Indirect Disclosures of Surfactant and Co-Formulant Toxicity**

In 2013, Mesnage, et al., published their study of nine herbicides containing glyphosate including five different formulations of Roundup. After studying the chemicals' patterns using mass spectrometry, Mesnage and his colleagues determined the identity of co-formulants in Roundup and performed toxicity analyses.  They deduced the chemical structure of additives in six of the nine formulations and showed that each of these supposedly inert ingredients was more toxic than glyphosate alone.[339]

Subsequently, other studies have examined the toxicity of these co-formulants and measured significant enhancement of toxicity. While there occasionally may be performance differences between glyphosate products, these differences are more likely to be caused by the differences in surfactants formulated with the product.

Defarge, et al., 2016, study showed that each of the five co-formulants affected the function of both the mitochondria in human placental cells and aromatase, an enzyme

---

[335] Diamond, G., Durkin, P., "Effects of surfactants on the toxicity of glyphosate with specific reference to RODEO," 1997, Syracuse Research Corporation, SERA TR 97-206-1b.

[336] Id.

[337] Id.

[338] Id.

[339] Mesnage, R., Bernay, B., and Séralini, G.E., "Ethoxylated adjuvants of glyphosate-based herbicides are active principles of human cell toxicity," 2013, Toxicology 313(2-3), pg. 122-8.

Randall Dean Seidl v. Monsanto
August 13, 2020
Page 136

that affects sexual development. Not only did these chemicals, which are not named on herbicide labels, affect biological functions, they did so at levels far below the concentrations used in commercially available products. In fact, POEA, an "inert" ingredient, was between 1,200 and 2,000 times more toxic to cells than glyphosate, the "active" ingredient.  They also reported that six glyphosate formulations similarly decreased aromatase activity in human placental cells at concentrations much lower than glyphosate alone. [340]

In a memorandum regarding risk assessment of "inert ingredients" in pesticide formulations, the U.S. EPA stated that although there are no dermal absorption data on the AAAPD and AAASD surfactants, the agency would expect the dermal absorption to be very low for these compounds.  They base their conclusion on the physicochemical properties of these inert ingredients, including their relatively high molecular weights and water solubility, and on the fact that they are large crosslinked molecules. This conclusion leads them to using 5% dermal absorption as a "likely upper bound, conservative value" in their risk assessment.[341]

The EPA also noted in this memorandum that there is no evidence that these surfactants are carcinogenic. This finding was based solely on a qualitative structural activity relationship (SAR) database (DEREK Version 11) which found no structural alerts. They also stated that there was little concern about any of the postulated metabolites having greater toxicity than the parent compounds.

**Examples of Surfactant and Co-Formulant Toxicity**

There is a general agreement and consensus that co-formulants can be more toxic for animals than glyphosate itself.[342] For example, cytotoxicity of the commercial formulation Roundup to human peripheral mononuclear cells was 30-fold higher ($LC_{50}$ = 56 mg/L) than for the active ingredient ($LC_{50}$=1640 mg/L). Several *in vitro* and *in vivo*

---

[340] Defarge, N. et al., "Co-formulants in glyphosate-based herbicides disrupt aromatase activity in human cells below toxic levels," 2016, Int. J. Environ. Res. Public Health 13, pg. 264.

[341] "Alkyl Alcohol Alkoxylate Phosphate and Sulfate derivatives (AAAPDs and AAASDs – JITF CST Inert Ingredients). Human health risk assessment to support proposed exemption from the requirement of a tolerance when used as inert ingredients in pesticide formulations." Memorandum from Office of Prevention, Pesticides, and Toxic Substances, US EPA, Washington, D.C. June 8, 2009.

[342] Defarge, N. et al., "Co-formulants in glyphosate-based herbicides disrupt aromatase activity in human cells below toxic levels," 2016, Int. J. Environ. Res. Public Health 13, pg. 264.

Randall Dean Seidl v. Monsanto
August 13, 2020
Page 137

studies with parallel testing of glyphosate active ingredient and Roundup showed that only the commercial formulation was genotoxic.[343]

New Zealand registration data revealed Roundup contained POEA.[344]   Other formulations may contain much higher levels, even as high as 60-80% as in the Genamin formulation.[345]   In studies using hepatic (HepG2), embryonic (HEK293) and placental (JEG3) cell lines to compare ten formulations of glyphosate, the most toxic were those that contained POEA.  This surfactant induced necrosis and disrupted the structure and function of cell membranes with negative dose-dependent effects on cellular respiration and membrane integrity between 1 and 3 mg/L.[346]

POEA potentiates the effect of glyphosate facilitating its penetration of cell membranes and bioaccumulation in cells.[347] The bio-concentration factor for glyphosate is also increased in the presence of POEA in the aquatic environment.[348]

## Regulatory Considerations Based on Surfactant and Co-Formulant Toxicity

In the absence of clear, unambiguous information pertaining to a commercial product's chemical composition, some countries take a hardline approach to regulation. For example, due to toxicity concerns, Germany removed glyphosate products containing POEA from their market in 2014[349] and the European Union banned them in 2016.[350] The New Zealand Environmental Protection Agency (NZ EPA) has current approvals for 91 formulations of glyphosate of which 69 contain POEA. The New Zealand EPA

---

[343] Bolognesi, et al., "Biomonitoring of genotoxic risk in agricultural workers from five Colombian regions: Association to occupational exposure to glyphosate," 2009, Journal of Toxicology and Environmental Health Part A, 72, pg. 986—997.

[344] Watts MA, "The poisoning of New Zealand,"1994, AIT Press, Auckland. From Pesticide Action Network (PAN). http://pan-international.org/wp-content/uploads/Glyphosate-monograph.pdf

[345] Mesnage, R. et al., "Ethoxylated adjuvants of glyphosate-based herbicides are active principles of human cell toxicity," 2013.

[346] Id.

[347] Richard, S. et al., "Differential effects of glyphosate and Roundup on human placental cells and aromatase," 2005, Environ Health Perspect 113(6), pg. 716-20.

[348] Annett R, Habibi HR, Hontela A., "Impact of glyphosate and glyphosate-based herbicides on the freshwater environment," 2014, J Appl Toxicol 34(5), pg. 458-479.

[349] Farrer P, & Falck M., "Toxic glyphosate herbicides fly under the EU's regulatory radar," 2014, Pesticides News 96, pg. 1-4.

[350] EC. 2016. Glyphosate. European Commission - Fact Sheet FAQs: Glyphosate. Brussels. June 29th. http://europa.eu/rapid/pressrelease_MEMO-16-2012_en.htm

Randall Dean Seidl v. Monsanto
August 13, 2020
Page 138

refuses to name them "*because the composition of the formulations is commercial-in-confidence information.*"[351]

This situation is typical of many countries. The decree that banned the use of glyphosate formulations containing POEA in Italy named 55 formulations including well-known names such as Roundup, Rodeo® and Touchdown® and brands from Cheminova, Syngenta, Nufarm, Dow AgroSciences, and Arysta as well as Monsanto and some Italian companies.[352]

The key point here is that experimental studies suggest that the toxicity of POEA is greater than the toxicity of glyphosate alone and commercial formulations alone. However, safety evaluations performed by Monsanto have largely been performed on pure glyphosate or without identification of all ingredients.  There is also evidence that glyphosate preparations containing POEA are more toxic than those containing alternative surfactants. Since surfactants contribute to the toxicity of glyphosate formulations, adverse health consequences are not necessarily caused by glyphosate alone but as a consequence of complex and variable mixtures. Even Monsanto has recognized this in correspondence (as cited in this assessment).

**Monsanto TNO Dermal Penetration Study with Co-Formulant Cocoamine**

Monsanto's previously reported dermal absorption studies did not include surfactant co-formulants.  Monsanto did find evidence of the effects of one surfactant**,** cocoamine, on dermal absorption in their TNO dermal penetration studies. These studies were not submitted to the U.S. EPA or to any European regulatory agency.

TNO Study: Johan van Burgsteden, "*In vitro* percutaneous absorption study with [14C]-glyphosate using viable rat skin membranes," June 14, 2002, Unaudited draft report V4478 (Tab 24).

Glyphosate in formulations MON 35012 and MON 0139 (70%) was examined for *in vitro* percutaneous absorption through viable rat skin membranes. Both contain the IPA salt of glyphosate, but MON 35012 also contains the surfactant cocoamine. Both the

---

[351] NZ Parliament. 2016. Written questions 10151, 10153, 10154. Steffan Browning to the Minister for the Environment. New Zealand Parliament Paremata Aotearoa, Wellington. https://www.parliament.nz/en/pb/order-paper-questions/written-questions/?criteria.Keyword=glyphosate

[352] Pesticide Action Network (PAN). http://pan-international.org/wp-content/uploads/Glyphosate-monograph.pdf

Randall Dean Seidl v. Monsanto
August 13, 2020
Page 139

concentrated formulation and the field dilution were tested as shown in **Table 19**.  After eight hours of exposure, the test substance was removed from the application site and samples of the receptor fluid were collected for an additional 40 hours.

**Table 19**
**Formulations and Doses Tested in TNO Dermal Absorption Studies**

| Formulation | Ingredients | Dose (mg gly/cm$^2$) | |
|---|---|---|---|
| | | Concentrate | Field dilution |
| MON 35012 | Glyphosate Isopropylamine salt (46% w/w)<br>Surfactant Cocoamine (18% w/w)<br>Water & minor ingredients (35.5% w/w) | 6.249 | 0.080 |
| MON 0139 70% | Isopropylamine salt (62% w/w)<br>Inert ingredients (38% w/w) | 6.343 | 0.080 |

The investigators in this study used doses outside the range recommendations of the U.S. EPA's 1998 "Health Effects Test Guidelines" for dermal penetration as follows:

> The maximum practical dose is on the order of 1 mg/cm$^2$—larger doses tend to fall off the skin or exceed saturation of the absorption process. When only three doses are given, the highest dose should be on the order of 0.1 mg/cm$^2$.[353]

There are two doses in this study - the higher dose being 6.2 times larger than the recommended maximum dose. Furthermore, the U.S. EPA guidelines state that:

> The maximum dose volume should not exceed 10 μL/cm$^2$. Larger volumes of liquid have been found to flow on the skin and produce uneven distribution on the dosed area.[354]

In this study, 10 μL of the test samples was applied on a 0.64 cm$^2$ skin surface area.  This is the equivalent of 15.6 μL/cm$^2$ which is more than one- and one-half times greater than the recommended maximum (liquid) dose. The excess in both the concentration and the volume of the concentrated doses will contribute to absorption saturation as described by the U.S. EPA:

---

[353] U.S. EPA OPPTS 870.7600, "Health Effects Test Guidelines Dermal Penetration," August 1998, pg. 4.
[354] Id.

Randall Dean Seidl v. Monsanto
August 13, 2020
Page 140

> The amount of chemical coverage on the skin surface can influence the amount of dermal absorption. Chemical coverage of the skin surface may be incomplete where only part of the surface is covered or it may be complete where the entire skin surface is covered. In both cases, only the amount of chemical in contact with the skin surface is available for absorption such that the capacity of the skin to absorb the chemical may be exceeded.[355]

The results of the eight-hour exposures are shown in **Table 20.**

**Table 20**

**Percent Absorption of Glyphosate (percent of dose)**

| Dose | MON 35012 (containing surfactant) | | MON 0319 (70%) (no surfactant) | |
|---|---|---|---|---|
| | Penetration within 48 hrs | Mass balance | Penetration within 48 hrs | Mass balance |
| | % of dose | | % of dose | |
| Low dose | $2.6 \pm 1.4$ % ($2.10$ µg/cm$^2$) | 73.4 % | $1.4 \pm 2.2$ % ($1.13$ µg/cm$^2$) | 82 .6 % |
| High dose | $10.3 \pm 4.2$ % ($646.3$ µg/cm$^2$) | 132.4 % | $1.3 \pm 1.9$ % ($80.8$ µg/cm$^2$) | 128 .2 % |

The following key points emerged from the exposure/absorption tests:

- The maximum penetration of **10.3 %** occurred with the higher dose of MON 35012 concentrate which contained the surfactant Cocoamine.

- Even at the lower glyphosate dose of 0.080 mg/cm$^2$ of MON 35012, the penetration was 2.6 % of the dose which is greater than Monsanto had previously reported.

- The mass balance was found to range from 73 % to 132 %.  This variability is very high as guidelines cite an adequate mean recovery is in the range of 100 ± 10%. (OECD, 2004). This suggests variability in the amount of absorption among the rat skin membrane samples at each dosing.

---

[355] U.S. EPA OPPTS 870.7600, "Health Effects Test Guidelines Dermal Penetration," August 1998, pg. 3.

Randall Dean Seidl v. Monsanto
August 13, 2020
Page 141

- In fact, while the mean penetration of the higher dose in MON 35012 was 646.3 µg/cm$^2$, one membrane absorbed approximately 1,100 µg/cm$^2$, or about **18 %** of the applied dose. The mean penetration of the lower dose of MON 35012 was 2.10 µg/cm$^2$ while the maximum penetration was about 3.5 µg/cm$^2$ or approximately **4.4 %** of the applied dose.

- At the lower dose, using the worst-case scenario, the missing 27% of the dose should be included in the amount absorbed and, therefore, the amount of absorbed glyphosate would be 30% of the applied dose.

The measured 10.3 % dermal absorption of glyphosate through rat skin in the presence of a surfactant was not received well by Monsanto.

In a message from ███████████████ (3-29-02) to ███████████, et al:  Subject: "TNO dermal penetration studies: new issues and topics for the conference call of Tuesday, 2 April (8 A.M STL time)," the following was noted:

"As of today we received preliminary surprising results on *in vitro* dermal penetration of propachlor and glyphosate through rat skin; it is imperative that we work closely together and communicate well on the conduct, the practical difficulties and the results associated with these studies.

Glyphosate:

- The EU rapporteur for glyphosate used a dermal penetration factor of 3% based on several published *in vitro*/ *in vivo* dermal penetration studies

- We launched human and rat *in vitro* dermal penetration studies with MON 35012 with and without surfactant

- Preliminary results with rat skin are not acceptable (see fax); due to very bad reproducibility (sic) that TNO cannot explain, they proposed to repeat the study in parallel with the human skin study. However, we can already conclude that:

a. For the concentrate MON 35012, the % *in vitro* dermal penetration of glyphosate through rat skin is between 5 and 10%

b. For the spray dilution of MON 35012, the % *in vitro* dermal penetration of glyphosate through rat skin will be around 2%

c. The dermal penetration of glyphosate itself in the absence of surfactant is lower than 1.5%."

A follow-up communication from Mr. William Heydens (4-2-02, to Charles Healy): Subject: "TNO dermal penetration studies: new issues and topics for the conf call of Tuesday, 2 April (8 A.M STL time)."

Randall Dean Seidl v. Monsanto
August 13, 2020
Page 142

> "… My primary concern is with the glyphosate in terms of the potential for this work to blow Roundup risk evaluations (getting a much higher dermal penetration than we've ever seen before)."

*Monsanto did not share this study with the public or the scientific community.* Additionally, Monsanto decided <u>not to have it repeated</u>. Some incidental communications on this subject are available for consideration:

██████████████ (4-4-02):

> "Although we agreed to repeat the *in vitro* dermal penetration study with rat skins as proposed by TNO, we came to the conclusion that the penetration of glyphosate would have been [probably] greater than the 3% already imposed by the German authorities.  We decided thus to STOP the study (effective today morning)."

With further explanation, ████████████ (4-5-02):

> "…we initiated the studies from a regulatory angle to help meet the requirements for operator exposure, given that the Annex I endpoint for dermal absorption for glyphosate was set at 3%, …the results of the rat skin studies show levels of absorption for glyphosate of a similar order to the Annex I endpoint; also confirm our expectation that surfactant concentration affects the dermal absorption… therefore, from the regulatory angle, there is no point in pursuing the studies further."

### *Humectants*

In addition to surfactants, Roundup formulations also contain humectants which reduce the loss of moisture.  As Monsanto notes,[356]

> **"Certain co-formulants like humectants that will make it highly likely we will get large amounts penetrating the skin."**

Humectants include chemicals such as ethylene glycol (anti-freeze).  Ethylene glycol is included in most Roundup formulations.  In addition to increasing dermal absorption, ethylene glycol is a toxic chemical in and of itself.[357]  It is uncertain whether Monsanto ever studied the effect of ethylene glycol on glyphosate dermal absorption.[358]

---

[356] MONGLY06653096.

[357] MONGLY01832749. (Toxic to children at 70 cc of Roundup with 5% ethylene glycol.)

[358] MONGLY01745304.

Randall Dean Seidl v. Monsanto
August 13, 2020
Page 143

### Adjuvants

Adjuvants may be added to glyphosate formulations prior to use to improve their efficacy against weeds by enhancing penetration of glyphosate into the target plant. However, many of these may also increase the toxicity of glyphosate to other species.  For example, organosilicone surfactants, described as the most potent of adjuvants and commonly added to glyphosate formulations, are now linked to a decline in honeybees in the U.S.[359] The common adjuvant surfactant TN-20 used in glyphosate formulations caused cell death and mitochondrial damage in rat cells which disrupts the integrity of the cellular barrier to glyphosate and promotes its toxicity.[360]  Martini, et al., (2016) demonstrated that adjuvants other than POEA inhibited proliferation and differentiation of mammalian 3T3-L1 fibroblasts to adipocytes.[361]

### Enhanced Absorption Due to Skin Damage

Skin, by its nature, is often compromised due to cracking and fissures, by cuts, scrapes, chemical damage, water-submersion, burns, sensitivity reactions, eczema and infections. This is particularly true for outdoor workers.  Breaks in the protective lipophilic barrier of the stratum corneum significantly increase absorption of hydrophilic compounds. A compromised protective lipid barrier will allow the hydrophilic glyphosate to pass through into the hydrophilic dermis, thus avoiding slow diffusion through the lipid layer. Percutaneous absorption studies have demonstrated that glyphosate deposition in damaged skin is five times that of healthy skin and penetration through damaged skin is increased 20-fold.[362]  The integrity of the skin also effects the distribution of chemicals within the skin compartments which will have implications in the efficacy of hand-washing after herbicide exposure.[363]

With respect to applicators, the acute quantity of glyphosate entering the skin is low. However, with repeated doses, especially coupled with a failure to wash the skin before

---

[359] Mullin CA, Fine JD, Reynolds RD, Frazier MT, "Toxicological risks of agrochemical spray adjuvants: organosilicone surfactants may not be safe," 2016, Front Public Health, 4:92.

[360] Kim YH, Hong JR, Gil HW, Song HY, Hong SY, "Mixtures of glyphosate and surfactant TN20 accelerate cell death via mitochondrial damage-induced apoptosis and necrosis," 2013, Toxicol In Vitro 27(1), pg.191-197.

[361] Martini, C. et al., "Glyphosate-based herbicides with different adjuvants are more potent inhibitors of 3T3-L1 fibroblast proliferation and differentiation to adipocytes than glyphosate alone," 2016, Comparative Clinical Pathology, Volume 25, Issue 3, pg. 607–613.

[362] Nielsen, J. et al., "Defense against dermal exposures is only skin deep: significantly increased penetration through slightly damaged skin," 2007, Arch Dermatol Res, Vol. 299, pg. 423-431.

[363] Id.

Randall Dean Seidl v. Monsanto
August 13, 2020
Page 144

it can be absorbed, the cumulative dose increases. Studies have documented that glyphosate penetration of skin increases linearly with time. Thus, if the worker is unaware of the exposures, absorption continues.[364]

### Glyphosate's Role in Skin Damage

Evidence of glyphosate interference with mitochondrial function is increasingly emerging in the scientific literature. Mitochondria are the powerhouse bodies within cells which are necessary in the programmed cell death needed to form skin. Impairment of mitochondrial function reduces the transition of dermal to epidermal cells leading to a decrease in the protective epidermis.[365]

Additional studies by Heu, et al., have demonstrated glyphosate-induced structural changes.[366]  In these studies, the control cells show Young's modulus values respectively increasing approximately 4-fold for 6 hours and 3-fold for 18 hours. These increases reflect a significant rise in cell stiffness. Heu, et al., reported that after a gentle cytotoxic treatment (6 h, 15 mm-glyphosate), the topography profile changes.  The cells exhibit a flattened membrane and a different distribution of native protrusions. They also show a complex subcellular filamentous network with numerous membrane junction points.[367] Thus, glyphosate itself has an intrinsic propensity to damage skin.

## Other Factors Increasing Dermal Absorption

Various skin cream compounds applied to the skin prior to handling pesticides have been demonstrated to alter percutaneous absorption as reported in a study by Brand, et al., (2007).[368] In these studies, four commercially available moisturizing creams were tested with respect to their capacity as transdermal penetration enhancers using the herbicide 2,4-dichlorophenoxyacetic acid (2,4-D) as a model compound. Their data demonstrated that pre-treatment with three of the four creams increased the absorption of 2,4-D as evidenced by either an increased cumulative penetration or shorter lag-times.

---

[364] Kezic, S. & Nielsen, J.B, "Absorption of chemicals through compromised skin," 2009, International Archives of Occupational and Environmental Health, Vol. 82(6), pg. *677-88.*

[365] Heu, C., et al., "A step further toward glyphosate-induced epidermal cell death: Involvement of mitochondrial and oxidative mechanisms," 2012, Environmental Toxicology and Pharmacology 34.

[366] Heu C, Berquand A, Elie-Caille C, Nicod L., "Glyphosate induced stiffening of HaCat keratinocytes, a Peak Force Tapping study in living cells," 2012, J Struc Biol 178, pg. 1-7.

[367] Id.

[368] Brand, R. et al., "Transdermal absorption of the herbicide 2,4-dichlorophenoxyacetic acid is enhanced by both ethanol consumption and sunscreen application," 2007, Food and Chemical Toxicology, Volume 45, Issue 1, pg. 93-97.

Randall Dean Seidl v. Monsanto
August 13, 2020
Page 145

Korinth, et al., (2003) reported that skin barrier creams have been demonstrated to enhance the penetration rates of different industrial solvents.  The creams significantly enhanced the penetration rates of solvents from complex mixtures compared with the single solvents.[369]

Water-in-oil emulsions, such as oily creams, retard water loss from the skin thereby increasing hydration but also increasing the permeability of the skin.[370]   Oil-in-water emulsions (water-based creams) may donate water to the skin thereby increasing hydration and also slightly increasing the skin's permeability.[371]

Wester and Maibach (2015)[372] reported on the absorption of a 1% glyphosate solution from cotton cloth into and through human skin. Cotton cloth was dosed with a 1% glyphosate solution and applied to the skin. It was found that 0.7 ± 0.3 % was absorbed compared to 1.4 ± 0.2 % dose absorbed when the solution was dosed directly on the skin. Allowing the cotton cloth to air dry for one day further reduced the absorption to 0.08 ± 0.01 %.  However, after adding water to the dried cotton-glyphosate cloth, the absorption increased to 0.4 ± 0.1 % indicating that water "activated" the glyphosate.  The water was acting as an external solvent and as such, increased the percutaneous absorption.

Ethanol is also well known as a topical penetration enhancer as it is frequently used in transdermal drug delivery systems (patches). Bommannan, et al., (1991)[373] found that, during *in vivo* studies with human skin, ethanol enters the skin and removes measurable quantities of the lipid barrier material from the stratum corneum. This lipid extraction may lower the skin barrier function and render the membrane more permeable which is the most likely explanation for the effect of ethanol as a skin penetration enhancer.

---

[369] Korinth G, Geh S, Schaller KH, Drexler H., "*In vitro* evaluation of the efficacy of skin barrier creams and protective gloves on percutaneous absorption of industrial solvents," 2003, Int Arch Occup Environ Health, Vol. 76(5), pg. 382-6.

[370] Smith, Eric and Maibach, Howard, eds., Percutaneous Penetration Enhancers (Boca Raton, FL:  CRC Press, 2015.

[371] Smith, Eric and Maibach, Howard, eds., Percutaneous Penetration Enhancers (Boca Raton, FL:  CRC Press, 2015.

[372] Wester, R. and Maibach, H. (2015). 'Penetration enhancement by Skin Hydration', in Smith, E. and Maibach, H. (eds.) Percutaneous Penetration Enhancers (Boca Raton, FL) CRC Press, 2015.

[373] Bommannan D, Potts RO, Guy RH, "Examination of the effect of ethanol on human stratum-corneum *in vivo* using infrared-spectroscopy," 1991, J Control Release, Vol. 16, pg. 299–304.

Randall Dean Seidl v. Monsanto
August 13, 2020
Page 146

The mechanism by which ethanol facilitates permeation of a solute, such as glyphosate, is referred to as the "'pull" (or "drag") effect.[374]   Hand sanitizer use has become widespread in the U.S. and typical hand sanitizers contain on average of 62% ethanol.

Thus, the use of creams and lotions to treat dry, cracking skin as well as the use of hand sanitizers potentiate the dermal absorption of glyphosate among occupational applicators.


# 4.  Toxicological Assessment of Glyphosate Exposures

(Systemic Exposure & Mechanism of NHL Induction)

### Non-Hodgkin's Lymphoma Latency Estimates

The term "latency" refers to the interval between initial exposure to a cancer-causing chemical and when a physician initially diagnoses the cancer on the basis of objective clinical evidence.

A chemical's genotoxicity may lead to cancer causing mutations in cells; however, a distinct amount of time elapses during which mutations and DNA damage accumulate in cells before cancer becomes clinically evident. Additionally, a sufficient number of doubling times are required. Latency refers to the time between initial exposure to a cancer-causing chemical and when a physician initially diagnoses the cancer.

There is no single peer-reviewed, generally-recognized latency "threshold" for the more than 60 subtypes of lymphoma (Morton, et al., 2014).[375]   Various sources cite latency intervals ranging as high as 25 years or more. Most estimates are based upon absence of information as opposed to hard evidence.

From the compilation of peer-reviewed latency estimates in **Table 21**, a surmised latency interval of 0.4 to 25 years falls within the general estimates of the studies cited therein. Although no single study is conclusive and future studies will undoubtedly clarify this issue, the weight of evidence suggests that this range offers an acceptable degree of scientific evidence.

---

[374] Heard CM, Kung D, Thomas CP, "Skin penetration enhancement of mefenamic acid by ethanol and 1,8-cineole can be explained by the "pull" effect," 2006, Int J Pharm., Vol. 321, pg. 167–170.

[375] Morton, et al., "Etiologic heterogeneity among non-Hodgkin lymphoma subtypes: the Inter-Lymph Non-Hodgkin Lymphoma Subtypes Project," August 2014, J Natl Cancer Inst Monogr. (48), pg. 130-44.

Randall Dean Seidl v. Monsanto
August 13, 2020
Page 147

**Table 21**
**Compilation of Peer-Reviewed NHL Latency Estimates**

| Study/Source | Summary of Findings | Latency |
|---|---|---|
| USEPA Glyphosate Issue Paper: 57, 2016[376] | "Some have argued that the follow-up period (median=7 years) De Roos, et al. (2005) is not sufficiently long to account for the latency of NHL (Portier, et al., 2016); however, the latency period for NHL following environmental exposures is relatively unknown and estimates have ranged from 1-25 years (Fontana et al., 1998; Kato et al., 2005; Weisenburger, 1992)." *All of the preceding references are in USEPA Glyphosate Issue Paper as cited.* | 1 to 25 yrs |
| USEPA Glyphosate Issue Paper: September, 2016 | "Eriksson, et al., (2008) evaluated the impact of time since first exposure. This study found an increased effect estimate for subjects with more than 10 years of glyphosate exposure prior to diagnosis of NHL. This finding suggests a potential for a longer latency for NHL than the follow-up period in De Roos, et al. (2005)." *All of the preceding references are in USEPA Glyphosate Issue Paper as cited.* | 10 yrs |
| USEPA Glyphosate Issue Paper: September, 2016 | "Two case-control studies evaluating the risk of NHL (Eriksson, et al., 2008 and McDuffie, et al., 2001) observed increased effect estimates in the highest exposure categories analyzed. Eriksson, et al. (2008) found a greater effect estimate for subjects with >10 days (based on the median days of exposure among controls) and >10 years of exposure (for latency analysis) when compared to subjects with = 10 days and 1-10 years of exposure, respectively; … however, given the latency analysis of NHL was limited to Eriksson, et al. (2008) and lack of NHL latency understanding in general, further studies are needed to determine the true latency of NHL. McDuffie, et al. (2001), stratifying based on the average number of days per year of exposure, observed similar effect estimates in the lower exposure category (>0 and = 2 days/year) while a greater effect estimate was observed in the highest exposure category (>2 days/year)." | 10 yrs |
| 9-11 Monitoring and Treatment, World Trade Center Health Program[377] | "A minimum latency period of 2 years has been reported for non-Hodgkin lymphoma (Bennett, et al. 1991) following treatment of Hodgkin disease with chemotherapy and radiotherapy which is similar to the latency for secondary acute leukemia (Nadler and Zurbenko 2013; Tucker et al. 1988)." *All of the preceding references are in 9-11 Monitoring report as cited.* | 0.4 to 2 yrs (minimum) |

[376] USEPA, "Glyphosate Issue Paper: Evaluation of Carcinogenic Potential," USEPA's Office of Pesticide Programs, September 12, 2016, https://www.epa.gov/sites/production/files/2016-09/documents/glyphosate_issue_paper_evaluation_of_carcincogenic_potential.pdf

[377] "Minimum Latency & Types or Categories of Cancer," World Trade Center Health Program, Revised: January 6, 2015, https://www.cdc.gov/wtc/pdfs/WTCHP-Minimum-Cancer-Latency-PP-01062015.pdf

Randall Dean Seidl v. Monsanto
August 13, 2020
Page 148

**Summary of Objective Toxicological Factors**

The generally-accepted, peer-reviewed toxicological literature is not based on unsubstantiated, subjective opinions, but rather statistically significant data at the 95% level of confidence. The various 8 prongs of the Braford Hill criteria have been evaluated in my assessment by considering the strength of various associations within genotoxicity and other mechanistic studies, the specificity of the adverse effect(s) as well as their consistencies among different studies.

Additionally, dose-responsiveness has been evaluated among the various genotoxicity and other mechanistic studies as referenced within this report (in some cases using human equivalent dosing (HED methodology). Also, coherence of studies among different study designs has been considered along with latency (temporality) and experimental studies in which animal dose equivalency comparisons to human dosage were assessed.

Expert opinions must always be based on objective, reliable evidence without deviation from the generally accepted methodology. Using the weight-of-evidence methodology of significant findings within the human epidemiological studies that employ dose-metrics, coupled with a scientific understanding of the genotoxic mechanisms, bone distribution/ADME and the mechanisms in which the Roundup mixtures are absorbed, distributed to bone marrow and other locations, retention time in such tissues prior to metabolism and excretion, reliable toxicological opinions are provided.

The evidence of glyphosate potency when applied as a chemical mixture has also been evaluated from both mechanistic findings and dose-response evidence. Mr. Seidl's exposure histories have been compared to the dose-metrics in human epidemiological studies with respect to determining whether 8-hour time-weighted exposure day thresholds were exceeded.

Randall Dean Seidl v. Monsanto
August 13, 2020
Page 149

## Evidential Considerations

The following evidential factors are useful in formulating an objective toxicological assessment of Mr. Seidl with regard to his Roundup® exposures and subsequent diagnosis of non-Hodgkin's lymphoma B cell subtypes:

- **Diagnosis:** Mr. Seidl's pathology report provides a diagnosis of follicular grade III lymphoma (non-Hodgkin's lymphoma).

- **Prolonged Acute Exposure and Absorption**: Mr. Seidl testified that he contacted Roundup® on his skin every time he applied it. *"Whether it be when I mixed it or when I sprayed it, absolutely. Every time."*[378] He reported that it regularly came into contact with his hands, arms, legs, feet and ankles.[379] He never wore a mask while using Roundup®.[380] He used concentrated Roundup® which he mixed in a 1-gallon sprayer. He never wore gloves when mixing Roundup.® He typically wore shorts and a short-sleeve shirt (both cotton) while mixing,[381] during which the concentrate splashed onto his skin and he would not wash it off immediately; *"Just keep going."*[382] His deposition testimony and interview reveal a quantifiable pattern of exposure strongly indicative of prolonged acute dermal exposure and absorption over a period of 24 years.

- **Chronic Glyphosate Exposure:**  Mr. Seidl used very minimal personal protective equipment (PPE) as a matter of standard procedure. He noted in deposition and in interview that he regularly experienced direct dermal exposure to liquid Roundup®, using his *sockless feet to create an "edging" for the spray*. Frequency of liquid contact via aerosol drift of the Roundup coming into contact with the forearms, hands, legs and feet are all important toxicological considerations. Additionally, the time between exposure and bathing with soap is important with respect to continued absorption especially if the applicator wore Roundup-contaminated clothing for extended periods as acute exposure doses periodically left on the skin for prolonged periods further enhance dermal absorption.

- **Dermal Absorption Rates Higher than Presented by Monsanto**:  As previously discussed in great detail, the correct dermal absorption rate for glyphosate ranges between 3% and greater (as opposed to the defective values recently issued by

---

[378] Deposition of Randall Seidl dated 12/11/2019, page 172.

[379] Id., page 173.

[380] Id., page 170.

[381] Id., page 170.

[382] Id., page 144.

Randall Dean Seidl v. Monsanto
August 13, 2020
Page 150

Monsanto's contractor, DTL Laboratory). Additionally, numerous other factors are known to increase skin absorption of glyphosate including (but not limited to) elevated temperatures, continuing to wear herbicide-soaked clothing and gloves, sweating (which contributes to increased skin absorption) and cracked skin as well as the various surfactants formulated in the actual Roundup products (as most of the dermal absorption studies were performed on pure glyphosate without the additives).

- **Lack of Personal Protective Equipment (PPE):** Mr. Seidl was not instructed via the label to where sufficient personal protective equipment such as impermeable pants, boots, mask, *chemically-resistant* gloves, etc. Notably, Monsanto employees (in the previously referenced study) were protected with PPE on all exposed body areas during their own dermal exposure testing procedures, but consumers are not protected because the product label provides no such instructions.[383] (Even though the Monsanto research study and report recommended multiple warnings with respect to PPE.)

- **Mechanism of Carcinogenicity:** Mr. Seidl's exposures are to Roundup® product, not to glyphosate alone. Roundup® and glyphosate have been demonstrated in several studies to repeatedly cause DNA damage with promotion by Roundup® being more damaging than glyphosate alone. Genotoxicity is the <u>first stage</u> in cancer formation. Wozniak, et al.,[384] and other studies as referenced in this report further demonstrated that Roundup, at a higher dose, was even able to impede the natural repair of damaged DNA.

The George, et al., study[385] documented cancer promotion at relatively low dermal exposure doses in mice. The dose levels, when converted to human doses, are reasonably similar to that sustained by applicators (when applying the HED factor and dermal absorption rate of 3%). More importantly, the test model employed DMBA (as found in cigarette smoke/tar). This primary carcinogen was dermally applied at low doses on the shaved skin of mice with no tumors produced unless glyphosate was also applied to the skin in which case 40% of the animals developed tumors (2.8 tumors per animal). The mechanism of glyphosate carcinogenesis is important with respect to tumor promotion among smokers prior to the onset of NHL. The George

---

[383] Some later labels included recommendation of gloves during mixing.

[384] Wozniak, E., et al., "The mechanism of DNA damage induced by Roundup 360 PLUS, glyphosate and AMPA in human peripheral blood mononuclear cells – genotoxic risk assessment," 2018, Food and Chemical Toxicology, doi: 10.1016/j.fct.2018.07.035

[385] George, J., et al., "Studies on glyphosate-induced carcinogenicity in mouse skin: A proteomic approach," 2010, Journal of Proteomics, Vol. 73, pg. 951 - 964

Randall Dean Seidl v. Monsanto
August 13, 2020
Page 151

study reveals substantial promotion (40% of the mice with tumors) with realistic concentrations of glyphosate as compared to that of applicators using HED methodology.

- **Latency of non-Hodgkin's Lymphoma**: The compilation of peer-reviewed latency estimates presented herein (see **Table 21**) demonstrates latency intervals within a typical range of 0.4 to 25 years. Based upon the study findings, the weight of available evidence indicates that a minimum latency interval of 0.4 to 25 years is required and is scientifically reliable. Mr. Seidl's clinical NHL diagnosis and latency is within the expected latency range. It is noteworthy that studies by Eriksson, et al., (2008) found an increased effect estimate for subjects with more than 10 years of glyphosate exposure prior to diagnosis of NHL; thus, favoring a longer NHL latency interval.

- **Scope of Exposure in Comparison to Epidemiological Studies:** Mr. Seidl's exposure doses in units of duration and frequency were compared to the reference doses in six epidemiological studies. The studies included **Eriksson, et al.[386], McDuffie, et al.[387], Leon, et al., 2019,** [388] (study combining data from >300,000 farmers or agricultural workers from France, Norway and the USA), the **Agricultural Health Study** (AHS), **Pahwa, M. et al., 2019** [389] and **Zhang, L., et al., (2019).** [390] The Zhang, et al., study is a meta-analysis design that included the most recent update of the Agricultural Health Study cohort published in 2018 along with five case-control studies. Mr. Seidl's exposure dose (midpoint of **63 *exposure days***) was consistently in excess of threshold exposure doses reported within all of these studies that revealed statistically significant increased rates of NHL.[391]

---

[386] Eriksson, M., et al., "Pesticide exposure as risk factor for non-Hodgkin lymphoma including histopathological subgroup analysis," 2008, International Journal Cancer, Vol.123, pp. 1657 – 1663.

[387] McDuffie H., et al., "Non-Hodgkin's Lymphoma and Specific Pesticide Exposures in Men: Cross-Canada Study of Pesticides and Health," 2001, Cancer Epidemiology, Biomarkers & Prevention, Vol.10, 1155 – 1163.

[388] Leon, Maria, et al., "Pesticide use and risk of non-Hodgkin lymphoid malignancies in agricultural cohorts from France, Norway and the USA," 2019, International Journal of Epidemiology, pp. 1–17.

[389] Pahwa, M. et al., "Glyphosate use and associations with non-Hodgkin lymphoma major histological sub-types: findings from the North American Pooled Project, 2019 Jun 27. Scand J Work Environ Health. pii: 3830. doi:10.5271/sjweh.3830

[390] Zhang et al., "Exposure to Glyphosate-Based Herbicides and Risk for Non-Hodgkin Lymphoma: A Meta- Analysis and Supporting Evidence," 2019, Mutation Research-Reviews in Mutation Research https://doi.org/10.1016/j.mrrev.2019.02.001

[391] The Leon study was of borderline statistical significance (@ 95% confidence interval, but not exceeding it).

Randall Dean Seidl v. Monsanto
August 13, 2020
Page 152

**Summary and Conclusions**

My toxicological assessment of the current matter includes assessment of the human epidemiological studies discussed above, the dose/response (biological gradient), strength of association, consistency and coherence of the six primary studies and the studies of various chemical formulants and additives found in the Roundup product as well as experimental evidence including absorption, distribution (*i.e.,* measurement in bone marrow), metabolism and excretion (ADME) and the various mechanisms of carcinogenesis (including genotoxicity, impairment of DNA repair mechanisms and promotion). Additionally, I have focused on dermal absorption, the manner and degree to which Roundup penetrates the skin, the lack of adequate PPE and additive toxicological effects of POEA and POEA derivatives used in the product. I have carefully examined Mr. Seidl's history for any potential confounding factors and have found none.

Based on the findings of applicable studies as noted herein and on the basis of sufficient exposure, dose, duration and episodic exposures to Roundup® consistent with the human exposure durations in the epidemiological studies, it is my opinion, to reasonable toxicological certainty, that Mr. Seidl's exposure to Roundup® is a substantial contributing factor to his development and subsequent diagnosis of follicular lymphoma.

_____

William R. Sawyer, Ph.D.
Chief Toxicologist

Randall Dean Seidl v. Monsanto
August 13, 2020
Page 153

## Appendix A: Documents

### Previously Disclosed Documents (Whitby deposition and prior)

1. All previous deposition testimony, trial testimony, and reports given by Dr. Sawyer in Johnson v. Monsanto, Hall v. Monsanto, Stevick v. Monsanto, Pilliod v. Monsanto, Cazier v. Monsanto, Lamb/Cohen, et al., v. Monsanto, Adams, et al., v. Monsanto, Winston, et al., v. Monsanto, Gordon v. Monsanto, Giglio v. Monsanto, Caballero v. Monsanto, Dickey, et al., v. Monsanto, Harris/Hernandez v. Monsanto, Wade, et al., v. Monsanto, Alvarez v. Monsanto, Priest v. Monsanto, Bognar, et al., v. Monsanto, Kane, et al., v. Monsanto, Seitz, et al., v. Monsanto, Hardy et al., v. Monsanto and Whitby v. Monsanto.

2. A Wealth of Expertise, DTL Laboratory, http://www.dermaltechnology.com/about/

3. Abass, K., Turpeinen, M., and Pelkonen, O. "An evaluation of the cytochrome P450 inhibition potential of selected pesticides in human hepatic microsomes," 2009, Journal of Environmental Science and Health Part B, Vol. 44(6).

4. Abd, et al., "Skin models for testing of transdermal drugs," 2016, Clin Pharmacol. 2016; Vol. 8, pp. 163-176.

5. Abel, et al., "Multi-stage chemical carcinogenesis in mouse skin: Fundamentals and applications", 2009, Nature Protocols, Vol. 4(9): 1350–1362.

6. Abstracts of the 55th Congress of the European Societies of Toxicology (EUROTOX 2019) Toxicology – Science Providing Solutions. Helsinki, Finland, 8th – 11th of September, 2019

7. Abukari and Wumbei, "Pesticides Applicator Exposure Assessment: A Comparison between Modeling and Actual Measurement," 2015, Journal of Environment and Earth Science, Vol.5, No.11.

8. Acquavella JF, Alexander BH, Mandel JS, Gustin C, Baker B, et al., "Glyphosate biomonitoring for farmers and their families: results from the Farm Family Exposure Study," 2004, Environ Health Perspect 112, pp. 321-326.

9. Acquavella, et al. "Glyphosate epidemiology expert panel review: a weight of evidence systematic review of the relationship between glyphosate exposure and non-Hodgkin's lymphoma or multiple myeloma," September 2016, Critical Rev. Toxicology, Vol. 46 (1), pp. 28-43.

10. Aiassa, D. et al., "Evaluation of genetic damage in pesticides applicators from the province of Cordoba, Agentina," 2019, Environmental Science and Pollution Research, Vol. 26(20), pp. 20981-20988. doi: 10.1007/s11356-019-05344-2. Epub 2019 May 21.

11. Alavanja, M., et al., "The Agricultural Health Study," 1996, Environmental Health Perspectives, Vol. 104 (4), pp.. 362 - 369. Retrieved from: https://aghealth.nih.gov/

12. Alballa N, et al., "Hodgkin's Lymphoma in a Patient on Adalimumab Treatment for Psoriasis." 2018, AME Case Rep, 2:49.

13. Anadón, A. et al., "Toxicokinetics of glyphosate and its metabolite aminomethyl phosphonic acid in rats," 2009, Toxicol Lett 190(1), pp. 91-95.

Randall Dean Seidl v. Monsanto
August 13, 2020
Page 154

14. Andreotti, G., et al., "Glyphosate Use and Cancer Incidence in the Agricultural Health Study," 2018, JNCI J Natl Cancer Inst., Vol. 110(5), doi: 10.1093/jnci/djx233.

15. Annett R, Habibi HR, Hontela A., "Impact of glyphosate and glyphosate-based herbicides on the freshwater environment," 2014, J Appl Toxicol 34(5), pp. 458-479.

16. Barton, H., et al., "Supplemental Guidance for Assessing Susceptibility from Early-Life Exposure to Carcinogens." U.S. Environmental Protection Agency, 2005.

17. Benbrook C. "How did the US EPA and IARC reach diametrically opposed conclusions on the genotoxicity of glyphosate-based herbicides?" Environ Sci Eur (2019) Vol. 31(2).

18. Benbrook, C.M., "Trends in glyphosate herbicide use in the United States and globally," 2016 Environmental Sciences Europe. Vol. 28(3).

19. Benedetti, D., et al., "Genetic Damage in Soybean Workers Exposed to Pesticides: Evaluation with the Comet and Buccal Micronucleus Cytome Assays," 2013, Mutation Research- Genetic Toxicity and Environmental Mutagenesis, Vol 752, pp. 28-33. https://doi.org/10.1016/j.mrgentox.2013.01.001

20. Besson, H., et al., "Smoking and non-Hodgkin's lymphoma - a case control study in the Rhone-Alpes region of France," 2003, Cancer Causes Control, Vol. 14(4), pages 381-398 in Morton, LM, et al., "Cigarette smoking and risk of non-Hodgkin's lymphoma subtypes among women," British Journal of Cancer, Vol. 28, pages 2087-2092.

21. Birnbaum, L., Fenton, S., "Cancer and Developmental Exposure to Endocrine Disruptors." Environmental Health Perspectives, Vol. 111, 2003.

22. Bleeke, M., "MON 78294: An Applicator Exposure Study Conducted in Spain (Autumn 2005) Using Biomonitoring," 2007. Monsanto Company, Charles River Laboratories.

23. Bolognesi, "The use of lymphocyte cytokinesis-block micronucleus assay for monitoring pesticide-exposed populations," Mutation research 770 (2016) pp. 183-203.

24. Bolognesi, C., et al., "Biomonitoring of genotoxic risk in agricultural workers from five Colombian regions: Association to occupational exposure to glyphosate," 2009, Journal of Toxicology and Environmental Health, Part A, Vol. 72, pp. 986 -997.

25. Bolognesi, Claudia, et al., "Genotoxic activity of glyphosate and its technical formulation," 1997, J. Agric. Food Chem. 45, pp. 1957-1962.

26. Bommannan D, Potts RO, Guy RH, "Examination of the effect of ethanol on human stratum-corneum in vivo using infrared-spectroscopy," 1991, J Control Release, Vol. 16, pp. 299-304.

27. Bonassi, S., et al., "Are chromosome aberrations in circulating lymphocytes predictive of future cancer onset in humans? Preliminary results of an Italian cohort study," 1995, Cancer Genet. Cytogenet, Vol. 79(2), pp. 133-135.

28. Bond, C.; Hallman, A.; Buhl, K.; Stone, D. 2016, "Carbaryl General Fact Sheet; National Pesticide Information Center," Oregon State University Extension Services. http://npic.orst.edu/factsheets/carbarylgen.html.

29. Boocock, M. R., "Kinetics of 5-enolpyruvylshikimate-3-phosphate synthase inhibition by glyphosate," 1983, FEBS Letters 154, pg. 127-133.

Randall Dean Seidl v. Monsanto
August 13, 2020
Page 155

30. Brand, R. et al., "Transdermal absorption of the herbicide 2,4-dichlorophenoxyacetic acid is enhanced by both ethanol consumption and sunscreen application," 2007, Food and Chemical Toxicology, Volume 45, Issue 1, pg. 93-97.

31. Brand, R.M. & Mueller, C., "Transdermal penetration of atrazine, alachlor, and trifluralin: effect of formulation," 2002, Toxicol Sci., Vol. 68(1), pg. 18-23.

32. Brewster, D., Warren, J., Hopkins, W., "Metabolism of glyphosate in Sprague Dawley rats:  Tissue distribution, identification and quantitation of glyphosate-derived materials following a single oral dose," 1991, Fundamental and Applied Toxicology, Vol. 17, pg. 43-51.

33. Briefing Note for IARC Scientific and Governing Council members, Prepared by the IARC Director, January 2018

34. Bronaugh, R., H. Hood, M. Kraeling, and J. Yourick, "Determination of percutaneous absorption by In Vitro techniques," 1999, pg. 229-233 in Percutaneous Absorption, 3rd ed., R.L. Bronaugh and H.I. Maibach, eds. New York: Marcel Dekker, Inc.

35. Burnett, P., Borders, J., Kush, J., "Report to Monsanto Company: Two year chronic oral toxicity study with CP-76100 in albino rats: IBT No. 8560-08924," (Unpublished study sent to the U.S. EPA on June 24, 1982, under 524-308); prepared by Industrial Bio-Test Laboratories Inc.

36. Bus, J., "The dose makes the poison: Key implications for mode of action (mechanistic) research in a 21st century toxicology paradigm," 2017, Current Opinion in Toxicology, 10.1016/j.cotox.2017.06.013

37. Cai, W., et al., "Correlation between CYP1A1 polymorphisms and susceptibility to glyphosate-induced reduction of serum cholinesterase: A case-control study of a Chinese population."

38. Cao, L., et al., 2015, "Assessment of potential dermal and inhalation exposure of workers to the insecticide imidacloprid using whole-body dosimetry in China," Journal of Environmental Sciences 27(2015)139-146.

39. Carbaryl, National Pesticide Information Center, 2003. http://npic.orst.edu/factsheets/carbgen.pdf

40. Chan, P. and Mahler, J., "Glyphosate (CAS No. 1071836) administered in dosed feed to F344/N rats and B6C3F1 mice," 1992, U.S. Department of Health and Human Services. NTP Technical Reports Series No. 16. NIH Publication 923135.

41. Chevret, S., "Maximum Tolerable Dose," 2008, Wiley Stats Ref: Statistics Reference Online, DOI: 10.1002/9781118445112.stat07089

42. ████████████, Confidential draft. "Clustering glyphosate formulations with regard to the testing for dermal uptake," 2001, (Tab 15; see also MONGLY01839476 for draft of this document.)

43. Chruscielska, K., et al., "Glyphosate - Evaluation of chronic activity and possible far-reaching effects Pt. 1. Studies on chronic toxicity," 2000 Pestycydy Vol. 3-4 pg 11-20.

44. Cigarette smoking and risk of non-Hodgkin lymphoma subtypes among women, British Journal of Cancer (2003) 89, 2087-2092.

Randall Dean Seidl v. Monsanto
August 13, 2020
Page 156

45. Clements, C., Ralph, S., and Petras, M., "Genotoxicity of select herbicides in Rana catesbeiana tadpoles using the alkaline single-cell gel DNA electrophoresis (Comet) assay," 1997, Environmental and Molecular Mutagenesis, Vol. 29(3), pp. 277-288.

46. Connolly, A. et al., Evaluating Glyphosate Exposure Routes and Their Contribution to Total Body Burden: A Study Among Amenity Horticulturalists, Annals of Work Exposures and Health wxy104 (2019).

47. Connolly, A. et al., Exposure Assessment Using Human Biomonitoring for Glyphosate and Fluroxypyr Users in Amenity Horticulture, 220 Int'l J. Hygiene & Envtl. Health 1064 (2017).

48. Coronado, GD, et al., "Organophosphate pesticide exposure and work in pome fruit: Evidence for the take-home pesticide pathway," 2006, Environ Health Perspect 114 (7), pg. 999-1006.

49. Coronado, GD, Thompson, B, Strong, L, Griffith, WC, and Islas, I., "Agricultural task and exposure to organophosphate pesticides among farm workers," 2004, Environ Health Perspect 112, pg.142-147.

50. Crump, K., "The linearized multi-stage model and the future of quantitative risk assessment," 1996, Hum Exp. Tox, Vol. 15(10), pg. 787 - 798.

51. Curwin, B.D. et al., "Urinary and hand wipe pesticide levels among farmers and non-farmers in Iowa," 2005, Journal of Exposure Analysis and Environmental Epidemiology, Vol. 15, pg. 500-508.

52. Curwin, B.D. et al., "Urinary Pesticide Concentrations Among Children, Mothers and Fathers Living in Farm and Non-Farm Households in Iowa," 2006. Annals of Occupational Hygiene, pg. 1-13.

53. Daruich, J., Zirxitnik, F., and Gimenez, M., "Effect of the herbicide glyphosate on enzymatic activity in pregnant rats and their fetuses," 2001, Environmental Research, Vol. 85 (3), pp. 226-231.

54. De Almeida et al., "Moderate levels of glyphosate and its formulations vary in their cytotoxicity and genotoxicity in a whole blood model and in human cell lines with different estrogen receptor status," October 2018, Biotech, Vol. 8(10).

55. De Cock, J. et al., "Determinants of exposure to captan in fruit growing," 1998, Am Ind Hyg Assoc J 59, 1998a, pg. 166-172 and 1998b, pg. 158-165.

56. De Roos, A., et al., "Cancer Incidence among Glyphosate-Exposed Pesticide Applicators in the Agricultural Health Study," 2005. Environmental Health Perspectives, Vol. 113(1), pg. 49 - 54.

57. De Roos, A., et al., "Integrative assessment of multiple pesticides as risk factors for non-Hodgkin's lymphoma among men," 2003, Occup Environ Med, Vol.60

58. Defarge, N. E., "Co-formulants in glyphosate-based herbicides disrupt aromatase activity in human cells below toxic levels, 2016, Int J Environ Res Public Health, Vol. 13(3, pg. 264.

59. Defense expert depositions (Boyd, Gates, Phalen, Duncavage, Hanson, Mahnken, Monsanto's Disclosure of Expert Testimony that is not Case Specific, Monsanto's Supplemental Disclosure of Expert Testimony, Monsanto's Amended Disclosure of Expert Testimony)

Randall Dean Seidl v. Monsanto
August 13, 2020
Page 157

60.  DEFRA UK Amateur use study 2002 available at
     http://randd.defra.gov.uk/Default.aspx?Menu=Menu&Module=More&Location=None&C
     ompleted=0&ProjectID=9499#Description

61.  Deposition of Dr. William F. Heydens, pages 150-151. Monsanto memos;
     MONGLY00997830 - MONGLY00997832.

62.  Deposition of Robert Fisher, M.D., Ph.D., dated December 17, 2018

63.  Dermal absorption of pesticides - evaluation of variability and prevention, 2009, Danish
     Environmental Protection Agency. Pesticides Research No. 124, 13.1.

64.  Dermal Absorption: Position Papers from the North American Free Trade Agreement
     (NAFTA) Technical Working Group (TWG)

65.  Diamond, G., Durkin, P., "Effects of surfactants on the toxicity of glyphosate with
     specific reference to RODEO," 1997, Syracuse Research Corporation, SERA TR 97-
     206-1b.

66.  Dommasch, E., Gelfand, J., "Is There Truly a Risk of Lymphoma from Biologic
     Therapies?" 2009, Dermatol Ther, Vol. 22(5), pp. 418-430.

67.  Donato, et al., "Exposure to glyphosate and risk of non-Hodgkin lymphoma and
     multiple myeloma: an updated meta-analysis", Med Lav 2020; 111, 1: 63-73.

68.  Dosemeci, M., et al., "A Quantitative Approach for Estimating Exposure to Pesticides in
     the Agricultural Health Study," 2002, Ann. Occ. Hyg., Vol. 26 (2), pp. 245-260

69.  Dose-Response Assessment," n.d., Tox Tutor, U.S. National Library of Medicine,
     National Institute of Health, Retrieved from: https://toxtutor.nlm.nih.gov/06-003.html

70.  Dr. ██████████ is "He" as per the video deposition of Dr. William Heydens (1-23-
     2017 at 12:06:17)

71.  Drexler, Skin protection and percutaneous absorption of chemical hazards. Received:
     15 January 2002 / Accepted: 21 August 2002 / Published online: 22 May 2003.

72.  DTL, "360 g/L glyphosate in vitro absorption of glyphosate through human epidermis."
     (MON 52276)"

73.  DTL, "360 g/L Glyphosate SL Formulation (MON 76258) - In vitro Absorption through
     Human Dermatomed Skin using [14C]-Glyphosate"

74.  DTL, "450 g/L glyphosate in vitro absorption of glyphosate through human epidermis."
     (MON79545)

75.  DTL, "480 g/L glyphosate in vitro absorption of glyphosate through human epidermis"
     (MON79351)"Petition, Missouri Circuuit Court, 21st Judicial Circuit, St. Louis Co.

76.  DTL, "500 g/L Glyphosate SL Formulation - In vitro Absorption through Human
     Dermatomed Skin using [14C]-Glyphosate," (MON 76952)

77.  DTL, "72 g/L Glyphosate Gel Formulation - In Vitro Absorption through Human
     Dermatomed Skin using [14C]-Glyphosate" (MON 76829)

78.  DTL, "72 g/L Glyphosate Gel Formulation (MON 76258) - In vitro Absorption through
     Human Dermatomed Skin using [14C]-Glyphosate"

Randall Dean Seidl v. Monsanto
August 13, 2020
Page 158

79. Duforestel, M., et al., "Glyphosate primes mammary cells for tumorigenesis by reprogramming the epigenome in a TET3-depdendent manner," 2019, Front. Genet., Vol. 10, pg. 885.

80. Duke, S. S., Encyclopedia of Agrochemicals, 2003, John Wiley & Sons.

81. EC. 2016. Glyphosate. European Commission - Fact Sheet FAQs: Glyphosate. Brussels. June 29th. http://europa.eu/rapid/pressrelease_MEMO-16-2012_en.htm

82. Edmiston, S., et al., "Exposure of Herbicide Handlers in the Caltrans Vegetation Control Program 1993-1994," 1995, California EPA, California Department of Transportation

83. Email from ███████ Syngenta Ltd., January 20, 2009, CC: ███████, Monsanto

84. Environmental Health Criteria, 242 Dermal Exposure IOMC Inter-Organization Programme for the Sound Management of Chemicals, EPA-HQ-2016-01043?_0000255-257

85. EPA 40 CFR Ch. I (7–1–11 Edition), § 170.240 "Personal protective equipment."

86. Eriksson, M., et al., "Pesticide exposure as risk factor for non-Hodgkin lymphoma including histopathological subgroup analysis," 2008, International Journal Cancer, Vol.123, pp. 1657 - 1663.

87. Evaluation of carcinogenic potential of the herbicide glyphosate, drawing on tumor incidence data from fourteen chronic/carcinogenicity rodent studies.

88. Evaluation of Glyphosate Use And The Risks Of Non-Hodgkin Lymphoma Major Histological Sub-Types In The North American Pooled Project (Napp).

89. Expression of Concern, Critical Reviews in Toxicology, 2018: DOI: 10.1080/10408444.2018.1522786

90. Farrer P, & Falck M., "Toxic glyphosate herbicides fly under the EU's regulatory radar," 2014, Pesticides News 96, pg. 1-4.

91. Feldmann, et al., Evaluation of Occupational Glyphosate Exposures among Employees Applying Herbicides at a National Park, 2017

92. FIFRA SAP, "A Set of scientific issues being considered by the Environmental Protection Agency regarding: EPA's evaluation of the carcinogenic potential of glyphosate," 2016, FIFRA Scientific Advisory Panel Meeting Minutes and Final Report No. 2017-01.

93. Final Statement of Reasons Title 27, California Code of Regulations Section 25705(B) Specific Regulatory Levels Posing No Significant Risk No Significant Risk Level: Glyphosate

94. Franke, A.C., et al., "Spray drift from knapsack sprayers," January 2010, Plant Research International B.V., Wageningen, Note 658.

95. Franz TJ., "Percutaneous absorption. On the relevance of in vitro data," 1975, J Invest Dermatol. 64, pg. 190-5.

96. Frasch, H.F. et al., "Analysis of finite dose dermal absorption data: Implications for dermal exposure assessment," 2014, J Expo Sci Environ Epidemiol, 24(1), pg. 65-73.

Randall Dean Seidl v. Monsanto
August 13, 2020
Page 159

97. From an internal Monsanto report, Surfactant Issue Analysis, Issue: Increasing public attention to the POEA (Polyoxyethlene alkylamine) surfactant component of glyphosate formulations in connection with claims of adverse impact to aquatic life (recently, amphibians) and human health (in vitro (cell culture) toxicity tests). MONGLY01700591

98. Gasnier, C., et al., "Glyphosate-based herbicides are toxic and endocrine disruptors in human cell lines," 2009, Toxicology, Vol. 262, pg. 184 -191.

99. George, J., et al., "Studies on glyphosate-induced carcinogenicity in mouse skin: A proteomic approach," 2010, Journal of Proteomics, Vol. 73, pg. 951 - 964.

100. Georgia Institute of Technology, "Forest Worker Exposures to glyphosate during directed foliar applications of Roundup herbicide," Draft January 3, 1992, MONGLY00400603.

101. Giesey, J. P., Dobson, S., & Solomon, K. R., "Ecotoxicological risk assessment for Roundup herbicide," 2000, Rev. Environ. Contam. Toxicol. 167, pg. 35-120.

102. Ginsberg, G., "Assessing Cancer Risks from Short-Term Exposures in Children." Risk Analysis, Vol. 23, 2003.

103. Glusczak, L., et al., "Effect of Glyphosate Herbicide on Acetylcholinesterase Activity and Metabolic and Hematological Parameters in Piava (Leporinus obtusidens)," 2005, Ecotoxicology and Environmental Safety, Vol. 65, pg. 237-241.

104. Glyphosate in German adults - Time trend (2001 to 2015) of human exposure to a widely used herbicide; Conrad, International Journal of Hygiene and Environmental Health 220 (2017) S-16

105. Glyphosate Stewardship, Epidemiology, and the Farm Family Exposure Study, MONGLY00905651

106. Glyphosate Technical Fact Sheet, National Pesticide Information Center, http://npic.orst.edu/factsheets/archive/glyphotech.html

107. Greim, H., Saltmiras, D., Mostert, V., Strupp, C., "Evaluation of carcinogenic potential of the herbicide glyphosate drawing on tumor incidence data from fourteen chronic/carcinogenicity rodent studies, et al.," 2015, Critical Reviews in Toxicology, Vol. 45(3), pg. 185 - 208.

108. Gueguen, Y. et al., "Cytochromes P450: xenobiotic metabolism, regulation and clinical importance," 2006, Ann Biol Clin (Paris) 64, pg. 535-548.

109. Guidance document on work-sharing in the northern zone in the authorisation of plant protection products, May 2017 available at https://eng.mst.dk/media/186988/northern-zone-guidance-document-version-6-may-2017_links-updated.pdf

110. Guidance Notes on Dermal Absorption, OECD Environment, Health and Safety Publications, Series on Testing and Assessment No. 156. ENV/JM/MONO(2011)36.

111. Guidance on the assessment of exposure of operators, workers, residents and bystanders in risk assessment for plant protection products2014

112. Gupta, R. et al., 2013, "Agricultural Chemicals", Haschek and Rousseaux's Handbook of Toxicologic Pathology, Third Edition. http://dx.doi.org/10.1016/B978-0-12-415759-0.00042-X

Randall Dean Seidl v. Monsanto
August 13, 2020
Page 160

113. Haefs R. et al., "Studies on a new group of biodegradable surfactants for glyphosate," 2002, Pest Manag. Sci. 58, pg. 825-833.

114. Hagmar, Lars, et al., "Chromosomal aberrations in lymphocytes predict human cancer: A report from the European study group on cytogenetic biomarkers and health (ESCH)," September 15, 1998, Cancer Research Vol. 58, pp. 4117-4121.

115. Hardell, L., et al., "Exposure to Pesticides as Risk Factor for Non-Hodgkin's Lymphoma and Hairy Cell Leukemia: Pooled Analysis of Two Swedish Case-control Studies," 2002, Leukemia and Lymphoma, Vol. 43(5), pp. 1043 - 1049.

116. Heard CM, Kung D, Thomas CP, "Skin penetration enhancement of mefenamic acid by ethanol and 1,8-cineole can be explained by the "pull" effect," 2006, Int J Pharm., Vol. 321, pg. 167-170.

117. Herrinton and Friedman, "Cigarette smoking and risk of non-Hodgkin's lymphoma subtypes," 1998, Cancer Epidemiology Biomarkers, Prev. Vol 7, pages 25-28 and Parker , AS, et al., "Smoking and risk of non-Hodgkin's lymphoma subtypes in a cohort of older women," 2000, Leuk Lymphoma, Vol. 37, pages 341-349 in Morton, LM, et al., "Cigarette smoking and risk of non-Hodgkin's lymphoma subtypes among women," British Journal of Cancer, Vol. 28, pages 2087-2092.

118. Herrinton, L. and Friedman, G., "Cigarette smoking and risk of NHL subtypes," 1998, "Cancer Epidemiology, Biomarkers and Prevention Vol. 7, pp. 25-28.

119. Heu C, Berquand A, Elie-Caille C, Nicod L., "Glyphosate-induced stiffening of HaCat keratinocytes, a Peak Force Tapping study in living cells," 2012, J Struc Biol 178, pg. 1-7.

120. Heu, C., et al., "A step further toward glyphosate-induced epidermal cell death: Involvement of mitochondrial and oxidative mechanisms," 2012, Environmental Toxicology and Pharmacology 34.

121. Heydens, William F. Deposition, pages 150-151. Monsanto memos; MONGLY00997830 - MONGLY00997832

122. Hietanen, E., Linnainmaa, K., and Vainio, H., "Effects of phenoxyherbicides and glyphosate on the hepatic and intestinal biotransformation activities in the rat," 1983, Acta Pharmacologica et Toxicologica, vol. 53, no. 2, pp. 103-112.

123. Hietanen, E., Linnainmaa, K., and Vainio, H., "Effects of phenoxyherbicides and glyphosate on the hepatic and intestinal biotransformation activities in the rat," 1983, Acta Pharmacologica et Toxicologica, vol. 53, no. 2, pp. 103-112.

124. Hollander, H., & Amrhein, N., "The site of the inhibition of the shikimate pathway by glyphosate," 1980, Plant Physiol 66(5), pg. 823-829.

125. Holmgaard, R., Nielsen, JB, "Dermal absorption of pesticides – evaluation of variability and prevention," 2008, Environmental Medicine Institute of Public Health, University of Southern Denmark. No. 124-2009.

126. Hotchkiss, SA, et al., "Percutaneous absorption of 4,4'-methylene-bis (2-chloroaniline) and 4,4'-methylenedianiline through rate and human skin in vitro," March, 1993, Toxicology In Vitro, Volume 7(2), pg. 141-148.

Randall Dean Seidl v. Monsanto
August 13, 2020
Page 161

127. Hu et al., "Comparison of the Inhibition Mechanisms of Adalimumab and Infliximab in Treating Tumor Necrosis Factor α-Associated Disease from a Molecular View." 2013, Journal of Biological Chemistry, Vol. 288, pp. 27059-27067.

128. Hua, et al., Study of the effect of occupational exposure to glyphosate on hepatorenal function. 2017 Jul 6, Vol. 51 (7):615-620. doi: 10.3760/cma.j.issn.0253-9624.2017.07.008.

129. Hutter, H-P., et al., "Cytotoxic and Genotoxic Effects of Pesticide Exposure in Male coffee Farmworkers of the Jarabacoa Region, Dominican Republic," 2018, International Journal of Environmental Research and Public Health, Vol 15, doi:10.3390/ijerph15081641

130. Hyland, C. and Ouahiba Laribi, Q., "Review of take-home pesticide exposure pathway in children living in agricultural areas," 2017, Environmental Research. Volume 156, pg. 559-570.)

131. IARC, "IARC Monographs Volume 112: Evaluation of five organophosphate insecticides and herbicides," 2015, International Agency for research on cancer, World Health organization Retrieved from: https://www.iarc.fr/en/media-centre/iarcnews/pdf/MonographVolume112.pdf

132. Illyassou, K., et al., "Risk Assessment for Small Farmers Exposed to Plant Protection Products in the Niger River Valley," 2017, Comm. Appl. Biol. Sci.

133. Ingaramo, P., et al. "Acute uterine effects and long-term reproductive alterations in postnatally exposed female rats to a mixture of commercial formulations of endosulfan and glyphosate," 2019, Food and Chemical Toxicology, Vol. 134 110832.

134. Initial Statement of Reasons Title 27, California Code of Regulations Proposed Amendment To: Section 25705(B) Specific Regulatory Levels Posing No Significant Risk Glyphosate Safe Drinking Water and Toxic Enforcement Act of 1986 Proposition 65.

135. Interactions between glyphosate and calcium salts found in water are the primary reason for adding AMS to the spray tank. http://www.weeds.iastate.edu/mgmt/2001/glyphosateformulations.htm

136. International Agency for Research on Cancer. (2019). Report of the Advisory Group to Recommend Priorities for the IARC Monographs during 2020-2024. Retrieved from IARC WHO: https://monographs.iarc.fr/wp-content/uploads/2019/10/IARCMonographs-AGReport-Priorities_2020-2024.pdf

137. Jaehwan, S., "Comparison of international guidelines of dermal absorption tests used in Pesticides Exposure Assessment for Operators," 2014, Toxicol Res 4, pg. 251-260.

138. Jaworski, E. G., "Mode of action of N-phosphonomethylglycine. Inhibition of aromatic amino acid biosynthesis," 1972, J. Agric. Food Chem. 20 (6), pg. 1195-1198.

139. Johnson, et al., Operator exposure when applying Amenity herbicides, Ann. Occup. Hyg., Vol. 49, No. 1, pp. 25-32, 2005

140. Jung, E, and Maibach, H., "Animal models for percutaneous absorption," 2014, in Shah, V., Maibach, H., and Jenner, J. eds. Topical Drug Bioavailability, Bioequivalence, and Penetration, 2nd ed. New York: Springer, pg. 21-40.

Randall Dean Seidl v. Monsanto
August 13, 2020
Page 162

141. Kale, P., Petty Jr., B., S. Walker, et al., "Mutagenicity testing of nine herbicides and pesticides currently used in agriculture," 1995, Environmental and Molecular Mutagenesis, Vol. 25(2), pp. 148-153.

142. Kang, JF, et al., "Study on mutagenesis induced by glyphosate in mice," 2008, Carcinogenesis, Teratogenesis & Mutagenesis, Vol. 20(3), pp. 227-320.

143. Karzi, V., et al., "In vivo evaluation of glyphosate genotoxicity," 2019, Toxicology Letters.

144. Kezic, S. & Nielsen, J.B, "Absorption of chemicals through compromised skin," 2009, International Archives of Occupational and Environmental Health, Vol. 82(6), pg. 677-88.

145. Khalade, et al., "Exposure to benzene at work and the risk of leukemia: a systematic review and meta-analysis", 2010, Environmental Health, Volume 9 (31).

146. Kim YH, Hong JR, Gil HW, Song HY, Hong SY, "Mixtures of glyphosate and surfactant TN20 accelerate cell death via mitochondrial damage-induced apoptosis and necrosis," 2013, Toxicol In Vitro 27(1), pg.191-197.

147. Kladt, C., et al., "Evaluation on the reliability of the permeability coefficient (Kp) to assess the percutaneous penetration property of chemicals on the basis of Flynn's dataset," 2018, International Archives of Occupational and Environmental Health. https://doi.org/10.1007/s00420-018-1296-5.

148. Korinth G, Geh S, Schaller KH, Drexler H., "In vitro evaluation of the efficacy of skin barrier creams and protective gloves on percutaneous absorption of industrial solvents," 2003, Int Arch Occup Environ Health, Vol. 76(5), pg. 382-6.

149. Korinth G, Goen T, Schaller KH, & Drexler H., "Discrepancies between different rat models for the assessment of percutaneous penetration of hazardous substances," 2007a, Archives of Toxicology 81, pg. 833-840.

150. Kwiatkowska, M., et al., "The effect of glyphosate, its metabolites and impurities on erythrocyte acetylcholinesterase activity,"2014, Environmental Toxicology and Pharmacology, Vol. 37(3), pp. 1101 -1108. doi: 10.1016/j.etap.2014.04.008

151. Laib, R., et al., "Increased Alkylation of Liver DNA and Cell Turnover in Young Versus Old Rats Exposed to Vinyl Chloride Correlates with Cancer Susceptibility." Toxicology Letters, Vol. 45, pp. 231-239, 1989.

152. Landrigan, P., et al., "Children's Health and the Environment: Public Health Issues and Challenges for Risk Assessment." Environmental Health Perspectives, Vol. 112, 2004.

153. Lankas, G., "A lifetime study of glyphosate in rats," 1981, Report No. 77-2062 prepared by Bio Dynamics, Inc. in U.S. EPA, "Glyphosate issue paper," 2016 and reported in Greim, et al., 2015.

154. Larsen, KE, et al., "The herbicide glyphosate is a weak inhibitor of acetylcholinesterase in rats," 2016, Environmental Toxicology and Pharmacology, doi.org/10.1016/j.etap.2016.05.012.

155. Lavy, et al., 1992, "Conifer Nursery Worker Exposure to Glyphosate," Arch. Environ. Contam. Toxicol. 22, 6-13 (1992).

Randall Dean Seidl v. Monsanto
August 13, 2020
Page 163

156. Lawson, A., et al., "Three Methods to Assess Levels of Farmers' Exposure to Pesticides in the Urban and Peri-urban Areas of Northern Benin," 2017, Tunisian Plant Protection Journal, Vol.12, pp. 91-108.

157. Lebailly, P, et al., "Urine mutagenicity and lymphocyte DNA damage in fruit growers occupationally exposed to the fungicide captan," 2003, Occup Environ Med, Vol. 60, pp.910-917.

158. Lee, et al., "Polycyclic aromatic hydrocarbons present in cigarette smoke cause bone loss in an ovariectomized rat model," 2002, Bone, June 30(6):917-23.

159. Leite, S.N., et al., "DNA Damage Induced by Exposure to Pesticides in Children of Rural Areas in Paraguay," 2019, Indian Journal of Medical Research, Vol 150, pp. 290-296. DOI: 10.4103/ijmr.IJMR_1497_17

160. Leon et al., "Pesticide use and risk of non-Hodgkin lymphoid malignancies in agricultural cohorts from France, Norway and the USA: a pooled analysis from the AGRICOH consortium," International Journal of Epidemiology, 2019, 1-17

161. Lesmes-Fabian, C., Garcia-Santos, G., Leuenberger, F., Nuyttens, D., & Binder, C. R, "Dermal exposure assessment of pesticide use: The case of sprayers in potato farms in the Colombian highlands," 2012, Science of the Total Environment, 430, pg. 202-208.

162. Letter dated December 10, 2019 to Attorney Jerry Kristal regarding Domina, et al., v. Monsanto Company.

163. Lioi, M.B., et al., "Cytogenetic Damage and Induction of Pro-Oxidant State in Human Lymphocytes Exposed In Vitro to Glyphosate, Vinclozolin, Atrazine and DPX-E9636," 1998, Environmental and Molecular Mutagenesis, Vol. 32, pg. 39–46.

164. Lioi, M.B., et al., "Genotoxicity and oxidative stress induced by pesticide exposure in bovine lymphocyte cultures in vitro," 1998, Mutation Research, Vol. 403, pp. 13–20.

165. Long-term animal studies at or near the maximum tolerated dose level (MTD) are used to ensure an adequate power for the detection of carcinogenic activity, in U.S. EPA, "Guidelines for carcinogen risk assessment," EPA/630/R-00/004, September 1986, pp. 5.

166. Lymphoma incidence patterns by WHO subtype in the United States, 1992-2001 Lindsay. M. Morton. From the Division of Cancer Epidemiology and Genetics, National Cancer Institute, National Institutes of Health (NIH), Department of Health and Human Services (DHHS), Rockville, MD; and Department of Pathology and Microbiology, University of Nebraska Medical Center, Omaha.

167. Machado-Neto, J. et al., "Safety of Working Conditions of Glyphosate Applicators on Eucalyptus Forests Using Knapsack and Tractor Powered Sprayers," 64 Bull. Environ. Contam. Toxicol. 309 (2000).

168. Mahajan, Rajeev, et al. "Carbaryl Exposure and Incident Cancer in the Agricultural Health Study," 2007, International Journal of Cancer, Vol. 121, no. 8, pp. 1799–1805, doi:10.1002/ijc.22836.

169. Maibach, H.I., "(a) Elimination of 14C-glyphosate in Rhesus monkeys following a single parenteral dose, (b) Percutaneous absorption of 14C-glyphosate in Roundup formulation in Rhesus monkeys following a single topical dose," 1983, Unpublished

Randall Dean Seidl v. Monsanto
August 13, 2020
Page 164

report No. MA-81-349, from University of California, School of Medicine, San Francisco, California, USA. Submitted to WHO by Monsanto Int. Services SA, Brussels, Belgium.

170. Malachowski, MJ, "Health Effects of Toxic Substances," 1999, Second Edition, 0-86587-649-5.

171. Marques, A., et al., "Progression of DNA damage induced by a glyphosate-based herbicide in fish (Anguilla anguilla) upon exposure and post-exposure periods--insights into the mechanisms of genotoxicity and DNA repair," Comp Biochem Physiol C Toxicol Pharmacol. 2014 Nov; 166:126-33. doi: 10.1016/j.cbpc.2014.07.009. Epub 2014 Aug 9.

172. Martini, C. et al., "Glyphosate-based herbicides with different adjuvants are more potent inhibitors of 3T3-L1 fibroblast proliferation and differentiation to adipocytes than glyphosate alone," 2016, Comparative Clinical Pathology, Volume 25, Issue 3, pg. 607-613.

173. Material Safety Data Sheet: Scott's Liquid Turf Builder Lawn Food. The Scotts Company, 2015. https://www.scottsmsds.com/?product_name=turf+builder&upc=&sku=&regulation_number=&search_submit=Search

174. Material Safety Data Sheet: Sevin Brand 4F Carbaryl Insecticide. Bayer CropScience, 2002.

175. McDuffie H., et al., "Non-Hodgkin's Lymphoma and Specific Pesticide Exposures in Men: Cross-Canada Study of Pesticides and Health," 2001, Cancer Epidemiology, Biomarkers & Prevention, Vol.10, 1155 - 1163.

176. Menendez-Helman, R. et al., "Glyphosate as an Acetylcholinesterase Inhibitor in Cnesterodon decemmaculatus," 2011, Bull Environ Contam Toxicol, Volume 88, pp. 6-9.

177. Mesange, R., et al., 2012, Glyphosate Exposure in a Farmer's Family, Journal of Environmental Protection, 2012, Vol. 3, pp. 1001-1003.

178. Mesnage, R., Bernay, B., and Séralini, G.E., "Ethoxylated adjuvants of glyphosate-based herbicides are active principles of human cell toxicity," 2012, Toxicology 313(2-3), pp. 122-8.

179. Messager, et al., "Assessment of skin viability: Is it necessary to use different methodologies?" Skin Research and Technology, December, 2003, Vol. 9, pp. 321–330.

180. Michel, S., Busato, F., Genuneit, J., Pekkanen, J., Dalphin, J.-C., Riedler, J., et al. (2013). Farm exposure and time trends in early childhood may influence DNA methylation in genes related to asthma and allergy. Allergy 68, pp. 355–364.

181. Milic, M., et al., "Oxidative stress, cholinesterase activity, and DNA damage in the liver, whole blood, and plasma of Wistar rats following a 28-day exposure to glyphosate," 2018, Arh Hig Rada Toksikol, Vol. 69, pp. 154 – 168.

182. Miller, M., et al., "Differences Between Children and Adults: Implications for Risk Assessment at California EPA." International Journal of Toxicology, Vol. 21, pp. 403-418, 2002.

Randall Dean Seidl v. Monsanto
August 13, 2020
Page 165

183. Minimum Latency & Types or Categories of Cancer, World Trade Center Health Program, Revised: January 6, 2015, https://www.cdc.gov/wtc/pdfs/WTCHP-Minimum-Cancer-Latency-PP-01062015.pdf

184. Modesto, K., Martinez, C., et al., "Effects of Roundup Transorb on Fish: Hematology, Antioxidant Defenses and Acetylcholinesterase Activity," 2010, Chemosphere, pg. 781-787.

185. MONGLY00029022.

186. MONGLY00997830 - Memo regarding Surfactant promotion (Intertek).

187. MONGLY04267028-33.

188. Monsanto correspondence dated January 28, 2015 from Heydens, W. to Saltmiras, D. discussing impurities in glyphosate products.

189. Monsanto Document MONGLY00052410

190. Monsanto Document MONGLY00223577

191. Monsanto Document MONGLY00301671

192. Monsanto Document MONGLY00302620

193. Monsanto Document MONGLY00302676

194. Monsanto Document MONGLY00303109

195. Monsanto Document MONGLY00324238

196. Monsanto Document MONGLY00329945

197. Monsanto Document MONGLY00358401

198. Monsanto Document MONGLY00360482

199. Monsanto Document MONGLY00407261

200. Monsanto Document MONGLY00407266

201. Monsanto Document MONGLY00430366

202. Monsanto Document MONGLY00519009

203. Monsanto Document MONGLY00582206

204. Monsanto Document MONGLY00813893

205. Monsanto Document MONGLY00888353

206. Monsanto Document MONGLY00888421

207. Monsanto Document MONGLY00922458

208. Monsanto Document MONGLY00982099

209. Monsanto Document MONGLY00982100

210. Monsanto Document MONGLY00990361

211. Monsanto Document MONGLY01051709

Randall Dean Seidl v. Monsanto
August 13, 2020
Page 166

212. Monsanto Document MONGLY01075506 Glyphosate MON 76473 Document MIII -
Tier II, Summary and hazard assessment, Section 3," 2010, Toxicological studies
(annex III, Point 7), Monsanto Company.

213. Monsanto Document MONGLY01131945

214. Monsanto Document MONGLY01160109

215. Monsanto Document MONGLY01275627

216. Monsanto Document MONGLY01284534

217. Monsanto Document MONGLY01320467

218. Monsanto Document MONGLY01330783

219. Monsanto Document MONGLY01343387

220. Monsanto Document MONGLY01377220

221. Monsanto Document MONGLY01526082

222. Monsanto Document MONGLY01526625

223. Monsanto Document MONGLY01700591

224. Monsanto Document MONGLY01742771

225. Monsanto Document MONGLY01745304

226. Monsanto Document MONGLY01832749

227. Monsanto Document MONGLY01851796

228. Monsanto Document MONGLY01851797

229. Monsanto Document MONGLY02136009

230. Monsanto Document MONGLY02136019

231. Monsanto Document MONGLY02142251

232. Monsanto Document MONGLY02155826

233. Monsanto Document MONGLY02155827

234. Monsanto Document MONGLY02155829

235. Monsanto Document MONGLY02155830

236. Monsanto Document MONGLY02155831

237. Monsanto Document MONGLY02159396

238. Monsanto Document MONGLY02221147

239. Monsanto Document MONGLY02246760

240. Monsanto Document MONGLY02285700

241. Monsanto Document MONGLY02343101

242. Monsanto Document MONGLY02431080

243. Monsanto Document MONGLY02590292

Randall Dean Seidl v. Monsanto
August 13, 2020
Page 167

244. Monsanto Document MONGLY02802216

245. Monsanto Document MONGLY02804480

246. Monsanto Document MONGLY02817577

247. Monsanto Document MONGLY02908721

248. Monsanto Document MONGLY03133015

249. Monsanto Document MONGLY03498538

250. Monsanto Document MONGLY03577254

251. Monsanto Document MONGLY03664157

252. Monsanto Document MONGLY03735338

253. Monsanto Document MONGLY03737014

254. Monsanto Document MONGLY03738295

255. Monsanto Document MONGLY03909609

256. Monsanto Document MONGLY04107779

257. Monsanto Document MONGLY04268319

258. Monsanto Document MONGLY04272196

259. Monsanto Document MONGLY04275275

260. Monsanto Document MONGLY04275303

261. Monsanto Document MONGLY05508247

262. Monsanto Document MONGLY05744041

263. Monsanto Document MONGLY05744080

264. Monsanto Document MONGLY05744120

265. Monsanto Document MONGLY05795088

266. Monsanto Document MONGLY06293737

267. Monsanto Document MONGLY06388557

268. Monsanto Document MONGLY06390127

269. Monsanto Document MONGLY06398326

270. Monsanto Document MONGLY06401072

271. Monsanto Document MONGLY06403283

272. Monsanto Document MONGLY06409924

273. Monsanto Document MONGLY06424476

274. Monsanto Document MONGLY06509236, "Operator exposure assessment for MON 2139 UK - Case"

275. Monsanto Document MONGLY06513290

276. Monsanto Document MONGLY06653096

Randall Dean Seidl v. Monsanto
August 13, 2020
Page 168

277. Monsanto Document MONGLY06722561

278. Monsanto Document MONGLY06722565

279. Monsanto Document MONGLY06731019

280. Monsanto Document MONGLY06758730

281. Monsanto Document MONGLY06878230

282. Monsanto Document MONGLY07080361

283. Monsanto Document MONGLY07617889

284. Monsanto Document MONGLY08857831

285. Monsanto email (Tab 21) from ███████████ on 3/29/2002 to ██████, et al.

286. Monsanto memos; MONGLY00997830 - MONGLY00997832.

287. Monsanto response to the concern of the Slovenian authorities on the composition of the Plant Protection Product MON 79376 (360 g/ 1 glyphosate) and the surfactant MON 59117 (CAS n ° 68478- 96-6). MONGLY02817577

288. Monsanto, 1990 in Diamond, G., Durkin, P., "Effects of surfactants on the toxicity of glyphosate with specific reference to RODEO," 1997, Syracuse Research Corporation, SERA TR 97-206-1b.

289. Morton, et al., "Etiologic heterogeneity among non-Hodgkin lymphoma subtypes: the Inter-Lymph Non-Hodgkin Lymphoma Subtypes Project," August 2014, J Natl Cancer Inst Monogr. (48), pg. 130-44.

290. Morton, LM, et al., "Cigarette smoking and risk of non-Hodgkin's lymphoma subtypes among women," British Journal of Cancer, Vol. 28, pages 2087-2092.

291. Mullin CA, Fine JD, Reynolds RD, Frazier MT, "Toxicological risks of agrochemical spray adjuvants: organosilicone surfactants may not be safe," 2016, Front Public Health, 4:92.

292. Mužinić, V. & D. Želježić, "Effect of glyphosate at low concentrations on chromosome mis-segregation and aneuploidy induction in human peripheral blood lymphocytes in vitro," Poster 06-072, 55th Congress of the European Societies of Toxicology, September 8-11, 2019, Helsinki, Finland.

293. Myers, et al. Concerns over use of glyphosate-based herbicides and risks associated with exposures: a consensus statement. Myers et al. Environmental Health (2016) 1 5:19

294. Nair AB, Jacob S., "A simple practice guide for dose conversion between animals and humans," 2016, J Basic Clin Pharma, Vol. 7, pp. 27-31.

295. National Toxicology Program, "Listing criteria," 2016, Report on Carcinogens, Public Health, U.S. Department of Health and Human Services, Retrieved from: https://ntp.niehs.nih.gov/pubhealth/roc/criteria/index.html

296. National Toxicology Program, "NTP Comparative Initiation/Promotion Skin Paint Studies of B6C3F1 Mice, Swiss (CD-1(R)) Mice, and SENCAR Mice," 1996, Natl Toxicology Program Tech Rep Ser., Vol. 441, pp. 1-201.

Randall Dean Seidl v. Monsanto
August 13, 2020
Page 169

297. Navarro, Claudia D.C. and Claudia B.R. Martinez, "Effects of the Surfactant Polyoxyethylene Amine (POEA) on Genotoxic, Biochemical and Physiological Parameters of the Freshwater Teleost Prochilodus Lineatus." Comparative Biochemistry and Physiology Part C: Toxicology & Pharmacology, vol. 165, June 2014, pp. 83–90., doi:10.1016/j.cbpc.2014.06.003.

298. NCI, "Maximum Tolerated Dose," n.d., NCI Dictionary of Cancer Terms, National Cancer Institute, National Institute of Health. Retrieved July, 6, 2017 from: https://www.cancer.gov/publications/dictionaries/cancer-terms?cdrid=546597

299. Nielsen, J. et al., "Defense against dermal exposures is only skin deep: significantly increased penetration through slightly damaged skin," 2007, Arch Dermatol Res, Vol. 299, pg. 423-431.

300. Nielsen, J., et al., The Usual Suspects - Influence of Physicochemical Properties on Lag Time, Skin Deposition, and Percutaneous Penetration of Nine Model Compounds, 72 Journal of Toxicology and Environmental Health, Part A 315 (2009).

301. Niemann, Lars, et al., "A critical review of glyphosate findings in human urine samples and comparison with the exposure of operators and consumers," 2015, Journal für Verbraucherschutz und Lebensmittelsicherheit, Vol 10, Issue 1, pp 3-12.

302. Nobels, I. et al., "Toxicity ranking and toxic mode of action evaluation of commonly used agricultural adjuvants on the basis of bacterial gene expression profiles," 2013, PLoS ONE 6, pg. 264.

303. Nobels, I., et al., "Toxicity ranking and toxic mode of action evaluation of commonly used agricultural adjuvants on the basis of bacterial gene expression profiles," November 2011, PLos One, Vol. 6(11); e24139. doi:10.1371/journal.pone. 0024139.

304. NZ Parliament. 2016. Written questions 10151, 10153, 10154. Steffan Browning to the Minister for the Environment. New Zealand Parliament Paremata Aotearoa, Wellington. https://www.parliament.nz/en/pb/order-paper-questions/ written-questions/?criteria.Keyword=glyphosate&criteria. Timeframe=&criteria.DateFrom=&criteria.DateTo=&criteria. ParliamentNumber=-1&criteria.ParliamentNumber=-1&criteria. MemberOfParliament=&criteria.Portfolio=Environment

305. OECD Guidance notes on dermal absorption, Draft, October 22, 2010.

306. OECD in Bus, J., "The dose makes the poison: Key implications for mode of action (mechanistic) research in a 21st century toxicology paradigm," 2017, Current Opinion in Toxicology, 10.1016/j.cotox.2017.06.013.

307. OECD, "Guidance document for the conduct of skin absorption studies," 2004a, Paris. 28, pg.1-31.

308. OECD/OCDE 427, "Guidelines for the testing of chemicals. Skin absorption in vivo Method," Adopted: 13 April 2004.

309. OEHHA - Glyphosate General Fact Sheet - https://www.p65warnings.ca.gov/fact-sheets/glyphosate

310. Operator Exposure Guidance for Amateur (Home Garden) Pesticides, available at http://www.hse.gov.uk/pesticides/topics/pesticide-approvals/pesticides-registration/data-requirements-handbook/operator-exposure.htm

Randall Dean Seidl v. Monsanto
August 13, 2020
Page 170

311. Oregon OSHA Technical Manual (circa 1996) unless otherwise stated within the "Chapter Revision Information," located at the beginning of each chapter.

312. Pahwa, M. et al. "Glyphosate use and associations with non-Hodgkin lymphoma major histological sub-types: findings from the North American Pooled Project," Scand J Work Environ Health, 2019 Jun 27. pii: 3830. doi:10.5271/sjweh.3830

313. Pavkov, K., Wyand, "Two year chronic toxicity and oncogenicity dietary study with SC-0224 in mice," 1987, Stauffer Chemical Company.

314. Paz-y-Miño, C., et al., "Evaluation of DNA damage in an Ecuadorian population exposed to glyphosate," 2007, Genetics and Molecular Biology, 30(2).

315. Peixoto, Francisco. "Comparative Effects of the Roundup and Glyphosate on Mitochondrial Oxidative Phosphorylation." Chemosphere, Vol. 61, no. 8, 2005, pp. 1115–1122., doi:10.1016/j.chemosphere.2005.03.044.

316. Peluso, M., et al, "32P-postlabeling detection of DNA adducts in mice treated with herbicide roundup," 1998, Environmental and Molecular Mutagenesis. Vol. 31(1), pp. 55 -59. DOI: 10.1002/(SICI)1098-2280(1998)31:1<55::AID-EM8>3.0.CO;2-A

317. Pesticide Action Network (PAN). http://pan-international.org/wp-content/uploads/Glyphosate-monograph.pdf

318. Pesticide Safety Education Program, "Agricultural Spray Adjuvants," http://psep.cce.cornell.edu/facts-slides-self/facts/gen-peapp-adjuvants.aspx

319. PM and Holly, EA, "Tobacco use and non-Hodgkin's lymphoma:  results from a population-based case control study in the San Francisco Bay area, California," 2005, Cancer Causes and Control, Vol. 16, pp. 333-346.

320. Prasad, S., et al., "Clastogenic effects of glyphosate in bone marrow cells of Swiss albino mice," 2009, Hindawi Publishing Corporation's Journal of Toxicology, Article ID 308985.

321. Product formulation data provided by Monsanto in response to Interrogatory demand; only selected years were received; no product formulation data was provided for EPA registration years 1993, 1994, 1997, 1999, 2001, 2003-2008 or 2010-to present. In re: Roundup Products Liability Litigation, Case No. 16-MD-02741: Defendant Monsanto Company's November 9, 2018 Response to Plaintiffs' Request for Formulation Information for Group One Plaintiffs (Updated November 13, 2018)

322. R. Belle, J. Marc, J. Morales, P. Cormier & 0. Mulner-Lorillon (2012): Letter to the Editor: Toxicity of Roundup and Glyphosate, Journal of Toxicology and Environmental Health, Part B: Critical Reviews, 15:4, 233-237

323. Report of Dr. Phalen

324. Request for the evaluation of the toxicological assessment of the co-formulant POE-tallowamine," European Food Safety Administration, October, 2015.

325. Richard, S. et al., "Differential effects of glyphosate and Roundup on human placental cells and aromatase," 2005, Environ Health Perspect, 113(6), pg. 716-20.

326. Risk Assessment Methodology for Hazardous Substances, New Zealand UK POEM Model 2018-Draft for consultation

Randall Dean Seidl v. Monsanto
August 13, 2020
Page 171

327. Roberts, MS et al, "Factors affecting the formation of a skin reservoir for topically applied solutes," 2004, Skin Pharmacol Physiol, Vol. 17, pp. 3-16.

328. Roundup Pro Concentrate product label, 2006.

329. Roundup® Manufacturer Safety Data Sheet (MSDS)

330. Rozman, KK and Klaassen CD., "Absorption, distribution and excretion of toxicants," in Cassarett & Doull's Toxicology, The Basic Science of Poisons. 5th edition. 1996. McGraw-Hill.

331. Safety Data Sheet: Bayer Advanced Home Pest Control Indoor & Outdoor Insect Killer, Bayer Environmental Science, 2015.

332. Safety Data Sheet: Bio-advanced 24-Hour Grub Killer Plus. SBM Life Science Corp, 2017.

333. Safety Data Sheet: Roundup PRO Concentrate Herbicide, Monsanto Company, 2015.

334. Safety Data Sheet: Roundup Ready-to-Use Extended Control Weed & Grass Killer Plus Weed Preventer II. Monsanto Company, 2015.

335. Safety Data Sheet: Roundup Ready-to-Use Extended Control Weed & Grass Killer Plus Weed Preventer II. Monsanto Company, 2015. https://images.homedepot-static.com/catalog/pdfImages/d4/d4a9d465-5ffe-4833-89ff-c14740061f36.pdf

336. Safety Data Sheet: Roundup Ready-to-Use Weed & Grass Killer III. Monsanto Company, 2015. https://images.homedepot-static.com/catalog/pdfImages/57/57329e78-932a-405e-9fde-526f73dec714.pdf

337. Safety Data Sheet: Sevin Brand 85 S Carbaryl Insecticide. Bayer Environmental Science, 2017.

338. Samsel, A. and Seneff, S., "Glyphosate's suppression of cytochrome P450 enzymes and amino acid biosynthesis by the gut microbiome: Pathways to modern diseases," 2013, Entropy (15), pg. 1416-1463.

339. Sandrini, J., et al., "Effects of glyphosate on cholinesterase activity of the mussel Perna perna and the fish Danio rerio and Jenynsia multidentata: In vitro studies," 2013, Aquatic Toxicology, pp. 171-173.

340. Sartorelli, et al, 1997.

341. Sawada, Y., Nagai, Y., Ueyama, M., and Yamarnoto, I., "Probable toxicity of surface active agent in commercial herbicide containing glyphosate," 1988, Lancet 1 (8580), pp. 29.

342. Schiff, M., et al., "Safety Analyses of Adalimumab (HUMIRA) in Global Clinical Trials and US Postmarketing Surveillance of Patients with Rheumatoid Arthritis." 2006, Ann Rheum Dis, Vol. 65, pp. 889-894.

343. Schönbrunn, E. et al., "Interaction of the herbicide glyphosate with its target enzyme 5-enolpyruvylshikimate 3-phosphate synthase in atomic detail," 2001, Proc Natl Acad Sci USA Feb 13; 98(4), pp. 1376–1380.

344. Shpadaruk, V., et al., "Methotrexate-induced B-cell Lymphoma." 2018, Journal of the American Academy of Dermatology, Vol. 73, pp. AB192.

Randall Dean Seidl v. Monsanto
August 13, 2020
Page 172

345. Simcox, N.J., et al., "Farmworker exposure to organophosphorus pesticide residues during apple thinning in central Washington State," 1999, Am Ind Hyg Assoc J 60, pp. 752-761.

346. Smith et al., "Benzene exposure and risk of non-Hodgkin lymphoma," Cancer Epidemiol Biomarkers Prev. 2007 March, Vol. 16(3), pp. 385-91.

347. Smith, Eric and Maibach, Howard, eds., "Percutaneous Penetration Enhancers," Boca Raton, FL:  CRC Press, 2015.

348. Solomon, K., "Glyphosate in the general population and in applicators: a critical review of studies on exposures," 2016, Critical Reviews in Toxicology, 46(1), pg. 21-27.

349. Soosten, "Excretion pathways and ruminal disappearance of glyphosate and its degradation product aminomethylphosphonic acid in dairy cows," J. Dairy Sco. 99:5318-5324

350. Spaan, S., et al., "Performance of a Single Layer of Clothing or Gloves to Prevent Dermal Exposure to Pesticides," 2020, Annals of Work Exposure and Health, pp. 1-20

351. Sritana, N., Suriyo, T., Kanitwithayanun, J., Somgvasin, B.H., Thiantanawat, A., Satayavivad, J., "Glyphosate induces growth of estrogen receptor alpha positive cholangiocarcinoma cells via non-genomic estrogen receptor/ERK1/2 signaling pathway," Food and Chemical Toxicology (2018), doi: 10.1016/j.fct.2018.06.014.

352. Stagnaro, E., et al., "NHL and type of tobacco smoke," 2004, Cancer Epidemiology, Biomarkers & Prevention, Vol. 13(3), pp. 431-437.

353. Stout, L., Ruecker, P., "Chronic study of glyphosate administered in feed to albino rats," 1990.

354. Stur, E., et al., "Glyphosate-based herbicides at low doses affect canonical pathways in estrogen positive and negative breast cancer cell lines," 2019, PLoS One, Vol. 14(7): e0219610. Published online 2019 Jul 11. doi: 10.1371/journal.pone.0219610

355. Suarez-Larios, K., et al., "Screening of pesticides with the potential of inducing DSB and successive recombinational repair," 2017, Journal of Toxicology. Volume 2017.

356. Sugimoto, K., "Eighteen month oral oncogenicity study in mice," 1997, The Institute of Environmental Toxicology, Tokyo, Japan in "Tier II summaries for glyphosate carcinogenicity studies from Greim, et al., 2015," as Arysta Life Sciences, 1997a.

357. Summary and written calculations (PDF) regarding Prasad, S., et al., "Clastogenic effects of glyphosate in bone marrow cells of Swiss albino mice," 2009.

358. Surfactant Toxicology, ▮▮▮▮▮▮▮▮ Toxicology, Europe/Africa

359. Sweden's Working Hours Act (1982:673) Sweden Working Hours Act link: https://www.government.se/49d4f9/contentassets/1b29fd35b2544f13875137beab80911a/1982673-working-hours-act.pdf

360. Taborelli, M., et al., "The dose response relationship between tobacco smoking and the risk of lymphomas:  a case control study," 2017, BMC Cancer, Vol. 17, pg. 421.

361. Tarazona, et al., "Glyphosate toxicity and carcinogenicity: a review of the scientific basis of the European Union assessment and its differences with IARC," National Institutes of Health, https://www.ncbi.nlm.nih.gov/pmc/articles/PMC5515989/

Randall Dean Seidl v. Monsanto
August 13, 2020
Page 173

362. Thongprakaisang, S., et al., "Glyphosate induces human breast cancer cells growth via estrogen receptors," 2013, Food and Chemical Toxicology, doi: http://dx.doi.org/10.1016/j.fct.2013.05.057

363. Tier II summaries for glyphosate carcinogenicity studies from Greim, et al., 2015 paper," Unpublished data.

364. TNO Study (MON 0319)

365. TNO Study: van Burgsteden, "In vitro percutaneous absorption study [14C]-glyphosate using viable rat skin membranes" (MON 35012)

366. Trainor, Risk assessment for acute toxicity from sheep ectoparasite treatments, including organophosphates (OPs) used in plunge dipping, 2002 available at http://www.hse.gov.uk/research/hsl_pdf/2002/hsl02-26.pdf

367. Treffel, P. & Gabrad, B., "Skin penetration and sun protection factor of ultraviolet filters from two vehicle," 1996, Pharmaceut Res, Vol. 13, pg. 770-774.

368. Tupker, R. et al., "Susceptibility to irritants: role of barrier function, skin dryness and history of atopic dermatitis," 1990, BJD. Volume 123, Issue 2, pg. 199-205.

369. U.K. Health and Safety Executive, HSE, "Operator Exposure,"2016, Data requirements handbook, Retrieved from: http://www.hse.gov.uk/pesticides/topics/pesticide-approvals/pesticides-registration/data-requirements-handbook/operator-exposure.htm

370. U.S. EPA, "Dermal exposure assessment: A summary of EPA approaches," September 2007. United States Environmental Protection Agency, National Center for Environmental Assessment Office of Research and Development, EPA/600/R-07/040F

371. U.S. EPA, "Exposures Factors Handbook: Chapter 8 - Body Weight Studies," 2011, U.S. Environmental Protection Agency.

372. U.S. EPA, "Guidelines for Carcinogen Risk Assessment," 2005, EPA/630/P-03/001F, Risk Assessment Forum, US Environmental Protection Agency, Washington, DC.

373. U.S. EPA, "Recommended use of body weight 3/4 as the default method in derivation of the oral reference dose," 2011, (EPA/100/R11/0001), Office of the Science Advisor, Risk Assessment Forum, US Environmental Protection Agency, Washington, DC.

374. U.S. EPA, "Registration eligibility decision-facts: Glyphosate," 1993 United States Environmental Protection Agency, Prevention, Pesticides and Toxic Substances (7508W), EPA-738-F-93-011.

375. U.S. EPA, "Risk Assessment Methodology for Hazardous Substances: How to assess the risk, cost and benefit of new hazardous substances for use in New Zealand," 2018, Environmental Protection Authority.

376. U.S. EPA, Office of Pesticide Programs, "Glyphosate issue paper: Evaluation of carcinogenic potential," 2016, United States Environmental Protection Agency.

377. U.S. EPA, OPP Memorandum June 2, 2010. "Review of Triple Pack dermal absorption studies for Maxim Quattro."

378. U.S. EPA, OPPTS 870.7600, "Health effects test guidelines dermal penetration," August 1998, pg. 4.

Randall Dean Seidl v. Monsanto
August 13, 2020
Page 174

379. UK POEM calculations in preparation of meeting Spanish competent authorities."
MONGLY01275627

380. US Environmental Protection Agency, "Quick Acting Weed Killer Concentrate
Registration." 2017.

381. US EPA Application for Pesticide: MON 65005 Herbicide. Monsanto Company, 1995.
https://assets.greenbook.net/M65304.pdf

382. USFDA, "Guidance for Industry: Estimating the Maximum Safe Starting Dose in Adult
Healthy Volunteers," 2005, Rockville, MD: US Food and Drug Administration.

383. Van Hemmen, 1992 in Machado-Neto, et al., "Safety of Working Conditions of
Glyphosate Applicators on Eucalyptus Forests Using Knapsack and Tractor Powered
Sprayers," 2000, Bull. Environ. Contam. Toxicol. , Vol. 64, pp. 309-315.

384. Van Ravenzwaay, B. and Leibold, E., "A comparison between in vitro rat and human
and in vivo rat skin absorption studies," 2004, Toxicol In Vitro., Vol. 18(2), pg. 219-25.

385. Van Smeden, J. and Bouwstra, J.A., "Stratum corneum lipids: Their role for the skin
barrier function in healthy subjects and atopic dermatitis patients," 2016, Curr Prob.
Dermatol 49, pg. 8-26.

386. Vazquez, M, et al., "Association between Cancer and Environmental Exposure to
Glyphosate," 2017, International Journal of Clinical Medicine, Vol. 8, pp. 73-85.

387. Vigfusson, N., Vyse, E., "The effect of the pesticides, Dexon, Captan and Roundup on
sister-chromatid exchanges in human lymphocytes in vitro," 1980, Mutat Res, 79, pp.
53–57.

388. Walsh, L., et al., "Roundup Inhibits Steroidogenesis by Disrupting Steroidogenic Acute
Regulatory (StAR) Protein Expression," 2000, Environmental Health Perspectives, Vol.
108(8), pp. 769-776.

389. Wang, et al., "Occupational Exposure to Solvents and Risk of Non-Hodgkin Lymphoma
in Connecticut Women," American Journal of Epidemiology, 2009 Jan 15; 169(2): 176–
185.

390. Wang, L., et al., "Glyphosate induces benign monoclonal gammopathy and promotes
multiple myeloma progression in mice," 2019, Journal of Hematology & Oncology, Vol.
12, pp.70.

391. Watts MA, "The poisoning of New Zealand,"1994, AIT Press, Auckland. From Pesticide
Action Network (PAN). http://pan-international.org/wp-content/uploads/Glyphosate-
monograph.pdf

392. Wester, R. et al., "Glyphosate skin binding, absorption, residual tissue distribution and
skin decontamination, 1991, Fundamental and Applied Toxicology 16, pg. 725-732.

393. Wester, R., et al., "Human Cadaver Skin Viability for In Vitro Percutaneous Absorption:
Storage and Detrimental Effects of Heat-Separation and Freezing heating loses
viability," Pharmaceutical Research, Vol. 15, No. 1, 1998.

394. Wester, R., et al., "In Vitro Percutaneous Absorption of Model Compounds Glyphosate
and Malathion from Cotton Fabric into and through Human Skin," 34 Food and
Chemical Toxicology 731 (1996)

Randall Dean Seidl v. Monsanto
August 13, 2020
Page 175

395. WHO, "Field Surveys of Exposure to Pesticides," 1975, Pesticide Development and Safe Use Unit, Division of Vector Biology and Control, WHO Headquarters, Geneva.

396. Wild, P., Kleinjans, J., "Children and Increased Susceptibility to Environmental Carcinogens: Evidence or Empathy?" 2003, Cancer Epidemiology, Biomarkers & Prevention, Vol. 12, pp. 1389-1394.

397. Williams, A.., "Transdermal and dermal drug delivery: From theory to clinical practice," 2003, London, Pharmaceutical Press.

398. Williams, et al. (2012): "Developmental and Reproductive Outcomes in Humans and Animals After Glyphosate Exposure: A Critical Analysis," Journal of Toxicology and Environmental Health, Part B: Critical Reviews, 15:1, 39-96.

399. Williams, G. et al., "Safety evaluation and risk assessment of the herbicide Roundup and its active ingredient, glyphosate, for humans," 2000, Regulatory Toxicology and Pharmacology, Vol.31, pg. 117-165.

400. Wood, E., Dunster, J., Watson, P., and Brooks, P., (2009a) "Glyphosate technical: Dietary combined chronic toxicity/Carcinogenicity study in the rat," 2009a, Harlan Laboratories Limited, Page 156 of 227 Shardlow Business Park, Shardlow, Derbyshire DE72 2GD, UK. Study No. 2060-012. April, 23, 2009. MRID 49957404. From "Glyphosate issue paper: Evaluation of carcinogenic potential," U.S. EPA's Office of Pesticide Programs, September 12, 2016.

401. Wood, E., Dunster, J., Watson, P., and Brooks, P., (2009b) "Glyphosate technical: Dietary carcinogenicity study in the mouse," 2009b, Harlan Laboratories Limited, Shardlow Business Park, Shardlow, Derbyshire DE72 2GD, UK. Study No. 2060-011. April, 22, 2009. MRID 49957402. From "Glyphosate issue paper: Evaluation of carcinogenic potential," U.S. EPA's Office of Pesticide Programs September 12, 2016.

402. World Health Organization, "Field Surveys of Exposure to Pesticides", VBC/82 .1

403. World Health Organization, "Field Surveys of Exposure to Pesticides", VBC/82 .1

404. Wozniak, E., et al., "The mechanism of DNA damage induced by Roundup 360 PLUS, glyphosate and AMPA in human peripheral blood mononuclear cells - genotoxic risk assessment," 2018, Food and Chemical Toxicology, doi: 10.1016/j.fct.2018.07.035

405. Wozniak, E., et al., "Glyphosate affects methylation in the promoter regions of selected tumor suppressors as well as expression of major cell cycle and apoptosis drivers in PBMCs (in vitro study)," 2020, Toxicology in Vitro, Vol. 63

406. Wozniak, E., et al., "The selected epigenetic effects of aminomethylphosphonic acid, a primary metabolite of glyphosate on human peripheral blood mononuclear cells (in vitro)," 2020, Toxicology in Vitro, Vol. 66

407. Wumbei, A., et al., "Pesticides use and exposure among yam farmers in the Nanumba traditional area of Ghana," 2019, Environmental Monitoring Assessment, 191:307, DOI: 10.1007/s10661-019-7449-5

408. Zendzian, R.P., "Dermal absorption of pesticides in the rat," 2000, AIHAJ, Vol. 61(4), pg. 473-83.

409. Zhang, et al., "Exposure to Glyphosate-Based Herbicides and Risk for Non-Hodgkin Lymphoma: A Meta- Analysis and Supporting Evidence," Mutation Research-Reviews in Mutation Research (2019), https://doi.org/10.1016/j.mrrev.2019.02.001

Randall Dean Seidl v. Monsanto
August 13, 2020
Page 176

**New Materials Reviewed Specific to Seidl**

410. Third Amended Plaintiff Fact Sheet of Randall Seidl dated May 7, 2019

411. Deposition of Randall Seidl with exhibits dated December 11, 2019

412. Deposition of Laurinda Seidl dated December 11, 2019

413. Levine Cancer Institute medical records of Randall Seidl

414. Google earth map of Oxy Chem location

# EXHIBIT 2

Rhon E. Jones (JON093)
rhon.jones@beasleyallen,.com
John E. Tomlinson (TOM014)
john.tomlinson@beasleyallen.com
**BEASLEY, ALLEN, CROW, METHVIN,**
 **PORTIS & MILES, P.C.**
Post Office Box 4160
218 Commerce Street
Montgomery, Alabama 36103
Phone:  (334) 269-2343
Fax:  (334) 954-7555

*Attorneys for Plaintiff*

# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF CALIFORNIA
### SAN FRANCISCO DIVISION

| | |
|---|---|
| IN RE: ROUNDUP PRODUCTS LIABILITY LITIGATION | MDL NO. 2741 |
| | Case No. MDL No. 3:16-md-02741-VC |
| This document relates to: | **PLAINTIFF'S SPECIFIC CAUSATION EXPERT DISCLOSURES** |
| *Randall Dean Seidl v Monsanto Co.,* Case No.  3:17-cv-00519-vc | |

Comes now the Plaintiff, Randall Dean Seidl "Plaintiff", through undersigned counsel, and hereby submits this list of specific causation expert witnesses who may be called to offer opinion testimony on behalf of Plaintiff at the trial of the above-captioned matter, subject to the following reservation of rights:

(1)     The right to supplement or amend this witness list based upon any rulings of the Court or any other court decisions that affect the scope of evidence in this trial;

(2)     The right to withdraw the designation of any expert prior to testimony, and positively aver that such previously designated expert will not be called as a witness at trial;

(3)    The right to amend or supplement expert opinions based on additional discovery including updated medical records, deposition testimony, medical literature, or scientific studies;

(4)    The right to supplement the references considered and/or relied upon by Plaintiff's designated experts in order to address newly available information or literature;

(5)    The right to elicit expert testimony at trial from any qualified person, including Plaintiff's treating health care providers, as permitted under the applicable rules of evidence and procedure;

(6)    Plaintiff's expert witnesses, as identified below, may testify about their skill, knowledge, experience, training and education in their respective fields, the relevant medical and scientific literature; the techniques and methods in their field of practice; and the description and nature of their practice. They may testify about their publications, presentations, research and all matters detailed in their respective curriculum vitae. They may testify based on facts or data perceived by or made known to them at or before trial that have been properly disclosed under the applicable rules of evidence and procedure. They may employ demonstrative and visual aids.

(7)    Plaintiff reserves the right to offer supplemental expert opinions based on updated or new information relative to the litigation. Plaintiff reserves the right for his expert witnesses to update the literature upon which the witnesses rely in support of their opinions.

(8)    Plaintiff incorporates all prior reports, if any, the experts have issued in MDL 2741 or any other state or federal litigation.

(9)    By identifying the expert witnesses named below, Plaintiff does not intend

to waive any objections to deposition testimony, exhibits, or other evidence or argument. Plaintiff reserves the right to call and elicit testimony from any and all of Defendant's current or former employees who have been disclosed as a witness and/or offered testimony and/or have been identified in discovery.

(10)    Plaintiff reserves the right to call and elicit testimony at trial from any and all of Defendant's retained or non-retained expert witnesses.

## PLAINTIFF'S EXPERT DESIGNATIONS – SPECIFIC CAUSATION

**D. BARRY BOYD, M.D., M.S.**
Medilex
69 East 130th Street,
New York, NY 10037

Dr. Boyd is a board-certified internal medicine and medical oncologist.  He is designated and will provide testimony as an expert on specific causation, specifically that Plaintiff's NHL was caused by his Roundup/glyphosate exposure, also in the areas of human cancers, causes of cancer, including exposure to glyphosate and Roundup®, cancer diagnosis, cancer effects, cancer treatments, the clinical practice of medicine generally, Plaintiff's clinical courses and pain and suffering, the reasonableness and necessity of his medical treatment and expenses, and issues relating to his surviving with the consequences of cancer treatment. The substance of the facts and opinions to which Dr. Boyd is expected to testify may be found in more detail in the report being produced herewith. Dr. Boyd's CV with all qualifications, previous testimony, compensation, and a listing of his publications are found in, or attached, to his report. SEE Exhibit 1.

Dr. Boyd charges $8,600 per day for testimony.

**WILLIAM R. SAWYER, Ph.D., D-ABFM**
Toxicology Consultants & Assessment Specialists, LLC
29 Fennell Street
Skaneateles, New York 13152

3

Dr. Sawyer is a toxicologist specializing in occupational and environmental exposures to carcinogens. He is designated and will provide testimony as an expert on specific causation, specifically that Plaintiff's exposure to Roundup® is a substantial contributing factor to his development and subsequent diagnosis of follicular lymphoma, also regarding how glyphosate-based herbicides (GBHs) cause non-Hodgkin Lymphoma, including the mechanism and rate at which GBHs are absorbed into the body and organs, assessment of Plaintiff's historical exposures, the effects of the Plaintiff's failure to wear protective gear based on Monsanto's representations, that the Plaintiff was exposed to a sufficient amount of GBHs to cause his NHL, and how the Roundup® label fails to adequately instruct users of Roundup® in a manner which would minimize exposure and to explain how the spraying equipment used by Plaintiff failed to protect him against Roundup® exposure. The substance of the facts and opinions to which Dr. Sawyer is expected to testify may be found in more detail in the report being produced herewith. Dr. Sawyer's CV with all qualifications, previous testimony, compensation, and a listing of his publications are found in, or attached, to his report. SEE Exhibit 2.

Dr. Sawyer charges $6,500 per day for testimony.

**STEPHEN E. PETTY, P.E., C.I.H.**
1701 E. Atlantic Blvd., Suite 5
Pompano Beach, FL  33060

Mr. Stephen Petty is a Certified Industrial Hygienist, Certified Safety Professional, and Professional Engineer (FL, KY, OH, PA, TX, and WV). He has extensive experience in the area(s) of industrial hygiene, safety, warnings and warning adequacy, professional engineering, worker training, exposure and risk assessment, and environmental health and safety procedures. Mr. Petty is designated and will provide testimony as an expert in the areas of risk and exposure assessment, professional engineering (chemical, environmental, mechanical, civil, and structural), industrial

4

health and safety, industrial hygiene, human factor and product warnings, standard of care, advertising, labeling, marketing research, and safety and regulatory compliance, including the Plaintiff's exposure to Roundup®. The substance of the facts and opinions to which Mr. Petty is expected to testify may be found in more detail in the report being produced herewith. Mr. Petty's CV with all qualifications, previous testimony, compensation, and a listing of his publications are found in, or attached, to his report. SEE Exhibit 3.

For testimony at deposition or trial, Mr. Petty charges a flat rate of $3,000 per half day and $5,000 per day.

**CHARLES M. BENBROOK, PH.D.**
10526 SE Vashon Vista Drive,
Port Orchard, WA 98367

Dr. Benbrook earned a bachelor's degree in economics from Harvard University and an M.A. and a Ph.D. in agricultural economics from the University of Wisconsin – Madison. Dr. Benbrook has worked extensively on pesticide use and risk assessment. He is a research professor at the Center for Sustaining Agriculture and Natural Resources, Washington State University and the program leader of "Measure to Manage: Farm and Food Diagnostics for Sustainability and Health." Dr. Benbrook worked in Washington, D.C. on agricultural policy and regulation for approximately 18 years, during that time serving for two years as the director of the Subcommittee on Department Operations, Research and Foreign Agriculture of the U.S. House of Representatives. From 1984 to 1990, he also directed the National Academy of Sciences' Board on Agriculture. Dr. Benbrook has been designated and will provide testimony in the areas relating to the composition, use, testing, stewardship, risk assessment, applicator exposures, volume of Roundup®-applied, and regulation of glyphosate, Roundup®-brand herbicides (Roundup), and other glyphosate-based herbicides (GBHs). The substance of the facts and opinions to which Dr.

Benbrook is expected to testify may be found in more detail in the report being produced herewith. Dr. Benbrook's CV with all qualifications, previous testimony, compensation, and a listing of his publications are found in, or attached, to his report. SEE Exhibit 4l Dean Seidl.

Dr. Benbrook charges $300 per hour for testimony.

DATED: January 22, 2021

Respectfully submitted,

/s/John E. Tomlinson
John E. Tomlinson (TOM014)
Rhon E. Jones (JON093)
BEASLEY, ALLEN, CROW,
METHVIN, PORTIS & MILES, P.C.
218 Commerce Street
Montgomery, AL 36104
Telephone: (334) 269-2343
Fax: (334) 954-7555
rhon.jones@beasleyallen.com
john.tomlinson@beasleyallen.com

*Attorneys for Plaintiff*

# EXHIBIT 3

```
 1              UNITED STATES DISTRICT COURT

                NORTHERN DISTRICT OF CALIFORNIA

 2

 3   IN RE:  ROUNDUP PRODUCTS      |  MDL No. 2741

                                   |

 4   LIABILITY LITIGATION          |

                                   |

 5   ----------------------------|

     This document relates to:     |

 6                                 |

     John Schafer v. Monsanto Co. |

 7   Case No. 3:19-cv-02169        |

                                   |

 8   ----------------------------|

 9

10                       - - -

11              Tuesday, February 16, 2021

12                       - - -

13

14         This is the Remote Videotaped Deposition of

15   WILLIAM SAWYER, Ph.D., commencing at 8:34 a.m., on

16   the above date, before Susan D. Wasilewski,

17   Registered Professional Reporter, Certified Realtime

18   Reporter, Certified Manager of Reporting Services,

19   Certified Realtime Captioner, and Florida

20   Professional Reporter.

21                       - - -

22              GOLKOW LITIGATION SERVICES

23         877.370.3377 ph | 917.591.5672 fax

24                   deps@golkow.com

25
```

```
 1    APPEARANCES VIA REMOTE COUNSEL/ZOOM TECHNOLOGY:

 2       MOLL LAW GROUP
         BY:  REBECCA FREDONA, ESQUIRE
 3            rfredona@molllawgroup.com
         22 West Washington Street, 15th Floor
 4       Chicago, Illinois 60602
         Phone:  (312) 462-1700
 5       Representing the Plaintiff

 6

 7

 8       NELSON MULLINS RILEY & SCARBOROUGH LLP
         BY:  MICHAEL W. HOGUE, ESQUIRE
 9            michael.hogue@nelsonmullins.com
         1320 Main Street, 17th Floor
10       Columbia, South Carolina 29201
         Phone:  (803) 799-2000
11       Representing Defendant Monsanto Company

12

13

14    ALSO PRESENT VIA REMOTE COUNSEL/ZOOM TECHNOLOGY:

15       CARRIE HOWARD, Videographer

16

17

18

19

20

21

22

23

24

25
```

```
 1                        - - -

 2                   I N D E X

 3                        - - -

 4   Testimony of:  WILLIAM SAWYER, Ph.D.          PAGE

 5        DIRECT EXAMINATION BY MR. HOGUE.............   5

 6        CROSS-EXAMINATION BY MS. FREDONA...........  96

 7        REDIRECT EXAMINATION BY MR. HOGUE..........  98

 8

 9

10                  E X H I B I T S

11             (Attached to transcript)

12    WILLIAM SAWYER, Ph.D., DEPOSITION EXHIBITS      PAGE

13   Exhibit 1   Defendant Monsanto Company's Notice    6

                 of Remote Video Conference Deposition

14               of William Sawyer, Ph.D.

15   Exhibit 2   Invoice #11581                         7

                 Toxicology Consultants & Assessment

16               Specialists, LLC

17   Exhibit 3   Expert Report                          8

                 Toxicology Consultants & Assessment

18               Specialists, LLC

19   Exhibit 4   Curriculum Vitae                       8

                 William R. Sawyer, Ph.D.

20

     Exhibit 5   Trials and Depositions - Past Three    9

21               Years

22

23

24

25
```

```
1                        - - -

2              THE VIDEOGRAPHER:  We are now on the record.

3       My name is Carrie Howard and I am the

4       videographer for Golkow Litigation Services.

5              Today's date is February 16th, 2020, and the

6       time is 8:34 a.m. Eastern.

7              This remote video deposition is being held

8       in the matter of Roundup Products Liability

9       Litigation.  This is for the United States

10      District Court, Northern District of California.

11             The deponent is Dr. William Sawyer.

12             Now, all parties to this deposition are

13      appearing remotely and have agreed to the witness

14      being sworn in remotely.  Due to the nature of

15      remote reporting, please pause briefly before

16      speaking to ensure all parties are heard

17      completely.

18             Now will counsel please identify themselves.

19             MR. HOGUE:  Michael Hogue for Monsanto.

20             MS. FREDONA:  Rebecca Fredona on behalf of

21      the Plaintiff.

22             THE VIDEOGRAPHER:  And the court reporter is

23      Ms. Susan and will now swear in the witness.

24             THE COURT REPORTER:  Would you raise your

25      right hand?
```

```
 1              Do you solemnly swear or affirm the

 2       testimony you're about to give will be the truth,

 3       the whole truth, and nothing but the truth?

 4              THE WITNESS:  Yes, I do.

 5              THE COURT REPORTER:  Thank you.

 6              MR. HOGUE:  I hate to say this, but can I go

 7       off the record a second?  My dad is in the

 8       hospital and he's calling right now.  Just one

 9       second and I'll be right back with you.

10              THE WITNESS:  Certainly.

11              THE VIDEOGRAPHER:  That's okay.  The time is

12       8:35 a.m. and we're off the record.

13              (Recess from 8:35 a.m. until 8:42 a.m.)

14              THE VIDEOGRAPHER:  The time is 8:42 a.m. and

15       we're on the record.

16              WILLIAM SAWYER, PhD, called as a witness by

17       the Defendant, having been duly sworn, testified as

18       follows:

19                     DIRECT EXAMINATION

20       BY MR. HOGUE:

21       Q.   Dr. Sawyer, my name is Michael Hogue.  We --

22       you may not recall.  We met briefly about a year or

23       two ago.  One of my colleagues, I believe Eric

24       Paine, was taking your deposition.  I came down to

25       the Sanibel, Florida area, although I haven't had a
```

1    chance to, you know, ask questions before, but,

2    anyway, I wanted to walk you through the -- kind of

3    the Schafer case and ask some questions about it.

4         We sent a deposition notice and you said

5    yesterday that you had that and we'll mark that as

6    Exhibit 1.

7         (Sawyer Exhibit 1 was marked for

8    identification.)

9    BY MR. HOGUE:

10   Q.   Did you receive that?  Did you look at the

11   document request in the notice of deposition?

12   A.   Yes.

13   Q.   Other than your report and your CV and the

14   materials that were served with your report, your

15   list of materials, your list of testimony, is there

16   anything else that you are relying upon for your

17   opinions?

18   A.   No.

19   Q.   Did you bring any additional materials with

20   you that weren't already served?

21   A.   No.

22   Q.   Okay.  When did you get -- first get

23   involved with the case related to Mr. Schafer?

24   A.   Approximately May of 2020.

25   Q.   Okay.  And how did you become involved?

```
 1       A.   I received a phone call from Attorney Moll.

 2       Q.   And how much time have you spent working on

 3   Mr. Schafer's case?

 4       A.   I did pull out invoices after our deposition

 5   yesterday, so I do have that invoice and I can

 6   e-mail it to you right now if you'd like.

 7       Q.   Okay.  My e-mail is Michael --

 8       A.   Hang on.  Let me just go to the tab, you

 9   know, and then I can click on that and e-mail it.

10       A.   Okay.  Michael, I'm ready.

11       Q.   It's Michael -- M-i-c-h-a-e-l-- .Hogue --

12   H-o-g-u-e --@NelsonMullins -- Mullins is

13   M-u-l-l-i-n-s -- .com.

14       A.   Okay.  It's on its way.

15       Q.   All right.  We're going to mark as Exhibit 2

16   these invoices so that -- and if it's okay, we can

17   either get from me or the witnesses these exhibits

18   and I'll get it to the court reporter after the

19   deposition, but Exhibit 1 will be the notice of

20   deposition, Exhibit 2 will be these invoices.

21            (Sawyer Exhibit 2 was marked for

22   identification.)

23   BY MR. HOGUE:

24       Q.   All right.  Any other documents other than

25   these invoices?
```

```
1      A.   No.

2      Q.   All right.  And we will mark your report as

3   Exhibit 3.

4           (Sawyer Exhibit 3 was marked for

5   identification.)

6   BY MR. HOGUE:

7      Q.   And my question to you, Doctor, is:  Is your

8   -- does your report have the attachments of your CV

9   and materials considered list along with it, or do

10   you want to mark them separately?

11      A.   Well, the MCL is at the end of the report;

12   however, the CV is not.  That would be separate.

13      Q.   So we'll mark your report and matters

14   considered list as Exhibit 3 and your CV as

15   Exhibit 4.  Does that work?

16      A.   Yes.

17           (Sawyer Exhibit 4 was marked for

18   identification.)

19   BY MR. HOGUE:

20      Q.   And in a deposition yesterday there was a --

21   also a listing of the matters where you listed all

22   your testimony for the past, I think, four years; is

23   that right?

24      A.   Three or four years, yes.

25      Q.   Okay.  And you produced that in this case as
```

```
 1    well; is that right?

 2        A.   Yes.

 3        Q.   Okay.  We'll mark that as Exhibit 5.  That's

 4    the testimony list.

 5             (Sawyer Exhibit 5 was marked for

 6    identification.)

 7    BY MR. HOGUE:

 8        Q.   And the only thing that should be updated

 9    from that is I think you updated with something

10    yesterday, and, obviously, yesterday's deposition as

11    well; is that right?

12        A.   The list of trials and depositions was

13    updated, but the copy you received was the update.

14        Q.   Okay.  But then yesterday's deposition was

15    not on there, right?

16        A.   Oh, no, I didn't -- Jenn has not updated the

17    list since yesterday, no.

18        Q.   All right.  And I think that was the -- was

19    that the Peterson case?

20        A.   Yes.

21        Q.   Okay.

22        A.   Unless you were sleeping through it.

23        Q.   No, I was -- no.  There's -- sometimes I get

24    confused.  I'm on the Schafer case.  So I just want

25    to make sure that's what it was.
```

```
 1        A.   I'm just joking with you, because I get
 2    confused equally.  You'll find that out.
 3        Q.   All right.  Let me see if I've gotten this
 4    e-mail now.
 5             There it is.
 6             MR. HOGUE:  Rebecca, do you have this?
 7             MS. FREDONA:  The testimonial history?
 8             MR. HOGUE:  No, his invoice that he just
 9        sent to me.
10             MS. FREDONA:  I do -- let's see if it came
11        through.  I haven't gotten it.
12             THE WITNESS:  I sent it to Michael.
13             MR. HOGUE:  I will forward you what he sent
14        me, Rebecca.  It's -- let's see if it comes up.
15             No.  What's your e-mail, Rebecca?
16             MS. FREDONA:  Rfredona --
17             MR. HOGUE:  Okay, I got it.  It came up.  So
18        I'm just forwarding you his e-mail with the
19        attachment.
20    BY MR. HOGUE:
21        Q.   So, Doctor, looking at your invoice, which
22    is Exhibit 2, you listed some time started in July
23    1, 2020; is that right?
24        A.   Yes.
25        Q.   And what was your total time?  Did you list
```

```
 1    that in total?  32 hours?
 2       A.   Yes.
 3       Q.   All right.  Other than this $15,000 that
 4    you've listed here, is there any other time that
 5    you've spent working on the Schafer case?
 6       A.   No.
 7       Q.   All right.  Are there any other documents
 8    that you brought with you that relate to the notice
 9    of deposition?
10       A.   No.
11       Q.   And I'm excluding things in your report that
12    you've listed, but anything else?
13       A.   No.
14       Q.   All right, Doctor.  You had -- how many --
15    well, did you meet Mr. Schafer in person at any
16    time?
17       A.   No.
18       Q.   Have you had any conversations with
19    Mr. Schafer's other experts?
20       A.   Not -- only an initial call, I think, an
21    initial conference call that might have been -- it
22    should be on the invoice, actually, if there was
23    one.  I'm looking.
24            No, I don't see anything.
25       Q.   Are you relying upon anything that was --
```

William Sawyer, Ph.D.

```
1        A.   Oh, no, hang on.  I'm sorry.  I see a call

2   on December 15th, but that states Attorney Moll

3   only, so I would have to say no.

4        Q.   Okay.  Did you -- so you're not relying upon

5   anything that any other expert told you specifically

6   about Mr. Schafer or his type of cancer; is that

7   right?

8        A.   Correct.  However, I am relying upon prior

9   work of Dr. Portier and Dr. Ritz with respect to the

10  initial general causation work that they performed.

11       Q.   But not specifically about Mr. Schafer?

12       A.   No.

13       Q.   Okay.

14       A.   I should also state Dr. Weisenburger,

15  Dr. Schiff or Dr. Brand, and Dr. Charles Benbrook.

16       Q.   Okay.  But are those -- you're talking about

17  with respect to specifically Mr. Schafer, or general

18  issues?

19       A.   General causation issues.

20       Q.   Okay.  So you haven't had any conversations

21  with Mr. -- excuse me -- with Dr. Weisenburger about

22  Mr. Schafer's specific case; is that right?

23       A.   Correct.

24       Q.   Have you had any in-person meetings with

25  Mr. Schafer?
```

```
 1      A.   No, just two telephone conference

 2   interviews, the initial interview and then a

 3   follow-up.

 4      Q.   And those are listed in your report?

 5      A.   Yes, as well as the invoice, and I should

 6   point out that on one or two of the calls,

 7   Mrs. Schafer was present.

 8      Q.   Okay.  And do you recall anything

 9   specifically that Mrs. Schafer said?

10      A.   Yes.  If I look at my report, I can answer

11   that.

12      Q.   Okay.  Did you make notations in your report

13   that -- for things that Ms. Schafer said?

14      A.   I believe so.  I'd have to check the report,

15   if you would like.

16      Q.   Okay.  Well, I'll go through the report.  If

17   there's something that Ms. Schafer said that's not

18   in your report, you know, I would want to make sure

19   I know what that is.

20      A.   Understood.  It's just difficult for me to

21   recall things unless we start discussing a specific

22   topic.

23      Q.   Okay.

24      A.   For example -- and I think this is in the

25   report -- Mrs. Schafer seemed to have a better
```

 1    recall of addresses, actual house numbers and the

 2    street names, and she also pointed out that she

 3    believed her husband had some memory lapse issues

 4    from his accident, I believe when he fell off a

 5    horse, but I think some of that is covered in my

 6    report, actually.

 7        Q.   Okay.  All right.  So you had the two

 8    conversations with Mr. Schafer; is that right?

 9        A.   Yes.

10        Q.   And, in general, what were those

11    conversations about?

12        A.   Initially, the first interview covered and

13    focused heavily on potential alternative

14    toxicological etiological factors in terms of his

15    general history, in terms of his history, if any, of

16    tobacco, alcohol, drugs of abuse, pharmaceutical

17    regimens, immunosuppressants, other confounding

18    chemicals, radiological exposures; and then I also

19    tested him with respect to his recall of when he

20    sprayed, where, how, personal protective equipment,

21    et cetera.

22            And then during the follow-up interview,

23    that was specific questions where I found I had

24    insufficient information to assess his exposures at

25    specific locations or during certain time intervals;

William Sawyer, Ph.D.

1    and I relied heavily upon his deposition with
2    respect to that information, but when it was not
3    available, I asked questions and included that
4    detail in my report.
5        Q.   Okay.  Did you find there were issues with
6    Mr. Schafer's recollection of how long he was
7    spraying or where he was spraying, those types of
8    details?
9        A.   Well, there were differences at times
10   between his deposition and his plaintiff's fact
11   sheet and his interview and Mrs. Schafer; and
12   wherever possible, I relied on his sworn testimony,
13   and wherever there are differences, I advise you
14   right now, I am not a juror and I'm not going to
15   make a decision on who is right and who is wrong.  I
16   simply put down all the information available, and
17   wherever possible, I rely on his sworn testimony.
18       Q.   Well, you indicated that he had some memory
19   lapse from falling off a horse.  I'm just trying to
20   assess whether you identified areas where he just
21   couldn't recall the type of exposure or not.
22       A.   Yes.  I'll give you a good example.  There
23   was a period of time following his accident and
24   brain trauma in which he stated he did not spray
25   Roundup.  His wife insisted that he did during that

1    time and he just couldn't remember.

2         To be on the conservative side --

3    conservative side of the exposure assessment, I

4    excluded that data in its entirety and assumed that

5    he did not spray, even though there is testimony he

6    did.

7         So I -- in all cases I took a conservative

8    position in terms of his spray locations, dates, and

9    times, wherever problem.

10   Q.   So is it your normal practice to take a

11   conservative view of what exposure a plaintiff has?

12        MS. FREDONA:  Objection; form.

13   A.   I'm not sure I understand that question.

14   Are we talking about -- well, you'll have to ask the

15   question again.  I don't fully understand it.

16   Q.   Well, you said that you analyzed the data

17   conservatively for exposure, and I'm just trying to

18   understand, is that your normal practice when you're

19   analyzing exposure for a case?

20   A.   It is.  I present, wherever possible, a

21   minimum and maximum to provide a reasonable range of

22   error, that is an error rate, and when possible, I

23   do so.

24        Now, there are cases where the testimony in

25   the deposition or the plaintiff interview states, "I

```
 1    used it two hours and I know it was two hours," and
 2    I said, "Well, can you give me a range?" and they
 3    say, "No."
 4          Okay.  So that -- in a case like that, I do
 5    not have a range, because I rely on information that
 6    are in the records as facts in the case.  I do not
 7    try to create facts in the case myself, and if the
 8    information is available, I do provide a range, and
 9    in this case I probably have provided a range, as I
10    recall.
11    Q.   Okay.  Are you familiar with the various
12    subtypes of non-Hodgkin lymphoma?
13    A.   Many of them.  I can't say all 105 or
14    whatever, but yeah.
15    Q.   Well, what type of non-Hodgkin lymphoma did
16    Mr. Schafer have?
17          What I'm -- I'm asking if you have an
18    understanding.  Let me ask it this way.
19    A.   I -- yeah.
20    Q.   What is your understanding of Mr. Schafer's
21    type of non-Hodgkin lymphoma?
22    A.   I believe it was a B-cell lymphoma, what we
23    call a follicular cell origin.  I don't recall --
24    I'd have to look at my report to see if there was
25    any further transformations, but I believe it was
```

```
1    primarily a B-cell follicular architecture.
2        Q.   All right.  We'll go to your report.  I
3    think on page 5 of your report --
4        A.   Okay.
5        Q.   -- that's where you discuss that he was --
6    are you with me?  Do you have your report?
7        A.   I do.
8        Q.   About the -- under the introduction, about
9    the fourth line down, you say:  "Mr. Schafer was
10   diagnosed with a high-grade follicular lymphoma
11   (grade 3), which later transformed to a diffuse
12   large B-cell lymphoma."
13           Do you see that?
14       A.   I do.
15       Q.   And that's your understanding of what he --
16   the type of non-Hodgkin lymphoma Mr. Schafer had; is
17   that right?
18       A.   Yes.
19       Q.   So he first developed a follicular lymphoma,
20   is that your understandings?
21       A.   That's correct.
22       Q.   Okay.  And that follicular lymphoma at some
23   point in time later transformed from that follicular
24   lymphoma to a diffuse large B-cell; is that right?
25       A.   Yes.
```

```
 1        Q.   And you don't have any expertise in

 2   determining what subtype of non-Hodgkin lymphoma a

 3   patient has, do you?

 4        A.   I would not provide that opinion.  I believe

 5   that would be, really, a diagnostic opinion.  I

 6   fully understand it.  I've been through medical

 7   school pathology and I've used pathology throughout

 8   the past 34 years of my training and experience, so

 9   I understand the mechanisms.  I have a degree, a

10   master's in cellular and molecular biology, I

11   understand the transformation process, but I am not

12   the person to make the diagnosis.  I want to make

13   that clear.

14        Q.   And you would defer to a pathologist or an

15   oncologist for actually determining that subtype of

16   non-Hodgkin lymphoma; is that right?

17        A.   Correct.

18        Q.   Okay.  In some of your cases, you cite to

19   certain subgroups of studies that look at various

20   subtypes of non-Hodgkin lymphoma; is that right?

21        A.   Yes.

22        Q.   And do you believe that the different

23   subtypes of non-Hodgkin lymphoma are different types

24   of cancer?

25        A.   I'll -- I'm not sure I understand the
```

```
 1   question.  There's ICD classification codes for
 2   different subtypes of lymphoma.  I'm not sure what
 3   you're asking me.  It's too general.
 4      Q.   Okay.  So have you seen literature
 5   indicating that the different subtypes of
 6   non-Hodgkin lymphoma are really different types of
 7   cancer?
 8           MS. FREDONA:  Objection; form.
 9      A.   They all have different genetical
10   configurations and transformations that
11   differentiate the ultimate ICD code name.  Again,
12   the term "cancer" is so general, I don't understand
13   what you're asking me about different types of
14   cancers.  There's cellular and molecular differences
15   between these subtypes that receive different ICD,
16   international code, names.
17           In terms of different types of cancer, I --
18   if you're asking me about general classes, well,
19   certainly a lymphoma is very different than that of
20   a malignancy of the epithelial glandular cells of
21   the colon.  Those are two different types of cancer,
22   but in terms of subtypes of lymphoma, there are
23   cellular and molecular identification processes
24   which differentiate them, but they all share similar
25   stem cell lineage and so forth.
```

1          So I would be cautious about that general

2     term.  I don't know if this is some kind of term

3     that you made up, or what.  I'm not sure.

4          Q.   Okay.  Do you have an opinion on what caused

5     Mr. Schafer's follicular lymphoma to develop?

6          A.   Well, certainly the rather extensive

7     exposure to Roundup over the years, which resulted

8     in approximately 39 eight-hour time-weighted

9     exposure days certainly contributed or caused his

10    malignancy.  That is clear.

11         Q.   Okay.  What studies do you think are

12    reliable for assessing the risk of follicular

13    lymphoma with the use of Roundup or glyphosate?

14         A.   The studies I have listed in Table 7 of my

15    report on page 38.

16         Q.   Okay.

17         A.   Those are studies that provide exposure

18    metrics, which I relied on.  My role in this case is

19    to determine whether or not -- one of my roles, as I

20    pointed out in my introduction of the report, is to

21    determine whether or not the dose -- and the metric

22    in this case is exposure days -- was sufficient to,

23    within a 95 percent confidence interval rate of

24    error, increase the risk of Mr. Schafer developing

25    NHL, and certainly that dose is consistent with

1    increased risk in the development of his NHL.

2         And I've also made a very thorough analysis

3    in terms of potential contributing confounding

4    factors.

5    Q.   Doctor, you've mentioned Table 7 on page 38.

6    Those are McDuffie, Eriksson, Andreotti, Leon,

7    Zhang, and Pahwa studies; is that right?

8    A.   Yes.

9    Q.   And under Pahwa, you mentioned that the

10   glyphosate handled more than two days per year had

11   an excess of DLBCL and list an odds ratio of 2.14;

12   is that right?

13   A.   Yes.

14   Q.   In your exposure parameters and your

15   discussion here, it doesn't -- you don't

16   specifically call out any, you know, analyses

17   specifically for follicular lymphoma; is that right?

18        MS. FREDONA:  Objection; form.

19   A.   Not exactly.  These studies, in general,

20   with the exception of that statistic there from

21   Pahwa, generally include follicular in the

22   statistical analysis.

23        One thing I should point out is that I have

24   already been deposed by Monsanto in great detail

25   with respect to the issue of follicular lymphoma in

1    the human epidemiologic studies, and specifically

2    these six studies.

3        Q.   Okay.  Well, I guess, for Mr. Schafer's

4    case, would you specifically look for the subgroup

5    analysis of follicular in these six studies?

6        A.   As I've stated in the prior depositions on

7    this issue of follicular lymphoma, there is one

8    study that shows an elevated risk, but it was not

9    statistically significant, and the problem with

10   follicular lymphoma is that it occurs at a much

11   lower frequency than DLBCL, which is the most common

12   type of lymphoma, and the studies lack the

13   statistical power, that is, the what we call a type

14   2 error in biostatistics, to definitively detect the

15   follicular lymphoma because it occurs at such a low

16   background rate.

17       Q.   Okay.  So you wouldn't point to any specific

18   one of these six studies to say that one's the most

19   applicable to follicular lymphoma; is that right?

20       A.   That's correct.

21       Q.   Okay.  You're aware that some follicular

22   lymphomas transform into diffuse large B-cell

23   lymphoma; is that right?

24       A.   Yes.

25       Q.   And what's your understanding of that

```
 1    process?
 2         MS. FREDONA:  Objection; form.
 3    A.   It can occur ultimately from the initial
 4    insult that caused the transformation in the first
 5    place, or it can also occur secondary to
 6    chemotherapy, especially if a heavily mutagenic
 7    agent, such as cyclophosphamide, is used, and there
 8    are some means for the pathologist to actually look
 9    at the biopsy or pathology results and opine upon
10    the transformation process, and in this case I would
11    defer that to a pathologist.
12    Q.   Okay.  So the -- well, Mr. Schafer's diffuse
13    large B-cell came from his follicular lymphoma, is
14    that your understanding?
15         MS. FREDONA:  Objection; form.
16    A.   I'm going to take a look at the report.
17         I see that most of the B-cells are BCL6
18    positive and CD10 positive.  The report also refers
19    to slightly more than 50 percent of neoplastic cells
20    with the ND1 stains, some compatible with follicular
21    lymphoma with a diffuse pattern, cytologically low
22    grade, but discordantly higher proliferative rate;
23    such tumors may behave more like large B-cell
24    lymphoma than low-grade follicular lymphoma; and
25    then following excisional lymph node biopsy on
```

 1    February 2nd, 2018, the pathology showed high-grade

 2    follicular lymphoma (grade 3) with germinal center

 3    immunophenotype.

 4          So I would say that the -- I would have to

 5    defer that to the pathologist.  It's not really

 6    clear.

 7    Q.   Okay.  So you don't know whether his diffuse

 8    large B-cell was caused by his follicular lymphoma

 9    transforming to DLBCL or whether it's -- he had two

10    different cancers at the same time; you just don't

11    know, is that what you're saying?

12          MS. FREDONA:  Objection.

13    A.   Well, it would -- go ahead, I'm sorry.

14          MS. FREDONA:  I objected, but you can go

15      ahead.

16    A.   Okay.  Yeah, well, it would appear it's

17    possible that it was a transformation from the

18    follicular, but I'm not sure of that and I would

19    prefer to defer that to the pathologist, as the

20    pathology report is not crystal clear and I think

21    that you're asking a question that really should be

22    answered by the pathologist.

23    Q.   Okay.  Let me ask it this way.  Do you have

24    any opinion whether there's any evidence that

25    Roundup or glyphosate have any effect on follicular

```
 1    lymphomas transforming to diffuse large B-cell

 2    lymphomas?

 3       A.   I'm not aware of any studies that have been

 4    performed to assess that question.  We know that,

 5    from studies that I've cited in my report, that

 6    certainly Roundup, that is the mixture of the

 7    adjuvants and glyphosate itself, causes mutagenic

 8    transformations in humans, and we know that certain

 9    chemotherapeutic agents, as I said a moment ago, for

10    example, cyclophosphamide is highly mutagenic and

11    can cause transformations.

12            So from a scientific plausibility

13    standpoint, the answer is yes, but I am not opining

14    in this case whether that occurred or not.  I defer

15    that to the pathologist.

16       Q.   Okay.  But you're not specifically -- I

17    think you started off your answer and that's -- I

18    just want to be clear on that, that you're not aware

19    of any study that's looked at patients who had

20    follicular lymphoma, had exposure to Roundup, and

21    determined whether there was any increased risk of

22    them developing diffuse large B-cell lymphoma; is

23    that right?

24            MS. FREDONA:  Objection; form.

25       A.   I don't understand the question.
```

1    Q.   Yeah.  There's no study looking at patients

2    with follicular lymphoma and then looking at those

3    patients with and without exposure to Roundup to see

4    if they have a higher risk of transformation to

5    diffuse large B-cell; is that right?

6    A.   Right.  I answered that earlier.  I'm not

7    familiar with any such studies.

8    Q.   Okay.  So we're going to look at your expert

9    report, Exhibit Number 3, and did you prepare this

10   report yourself?

11   A.   Yes.  Could I also -- I hate to do this --

12   but ask for just a five-minute break as --

13   Q.   Sure.

14   A.   -- there are some workers doing some

15   exterior work here that are waiting to have a

16   question answered, and so I can probably be back in

17   under five minutes.

18   Q.   Yeah, we can take five or 10, whatever you'd

19   like.  I'm flexible.

20   A.   All right.  Thank you.

21   Q.   What time do you want to say?  It's 9:18 on

22   my telephone.  What time --

23   A.   Let's say 9:25.

24   Q.   9:25, I'll see you then.

25   A.   Okay.

```
1              THE VIDEOGRAPHER:  Okay.  The time is
2       9:18 a.m. and we're off the record.
3              (Recess from 9:18 a.m. until 9:26 a.m.)
4              THE VIDEOGRAPHER:  The time is 9:26 a.m. and
5       we are on the record.
6    BY MR. HOGUE:
7       Q.   Doctor, we were just talking about your
8    report, Exhibit 3.  Does it contain all of your
9    opinions in this case?
10      A.   Yes.
11      Q.   It includes your general causation opinions
12   as well as your case-specific opinions related to
13   Mr. Schafer; is that right?
14      A.   Yes.
15      Q.   Did you have all the information you needed
16   to come to your conclusions and your opinions?
17      A.   Yes.
18      Q.   All right.  And I think I asked this, but I
19   want to be clear.  All the materials that you're
20   relying upon are in your report or on your materials
21   reviewed list; is that right?
22      A.   Yes.
23      Q.   There's nothing else that I need to be
24   looking at at this point in time?
25      A.   No.
```

1    Q.   Is there anything you need to add to your

2    CV, which is going to be attached as Exhibit 4?

3    A.   No.

4    Q.   We've talked about who all that you've

5    talked to.  Have you talked with anybody else,

6    Mr. Schafer's friends or family, coworkers, any of

7    his doctors, anything else?

8    A.   No, I haven't.

9    Q.   Okay.  Have you conducted any physical

10   examination of Mr. Schafer?

11   A.   No.  That would be up to the treating

12   physicians.

13   Q.   So what depositions in the case have you

14   read?

15   A.   If you turn to the very last page of my

16   report, I have read Helen Schafer, who is the

17   spouse, the deposition transcript of John Schafer, I

18   believe --

19   Q.   Do you have --

20   A.   I believe that's it.

21   Q.   Okay.  You haven't read any depositions of

22   any treating doctors; is that correct?

23   A.   No, I have not.

24   Q.   Did you review any of Mr. Schafer's medical

25   records?

```
 1      A.   Yes.

 2      Q.   And did -- did you review all of his medical

 3   records?

 4           MS. FREDONA:  Objection; form.

 5      A.   With respect to -- well, not treatment

 6   records.  I have not reviewed treatment records

 7   other than through pathology, and later pathology

 8   records, but I focused upon review of the medical

 9   records with respect to identification of any prior

10   pharmaceutical regimens or other radiological

11   exposures, such as excessive CT scans, that type of

12   thing, and other evidence of consumption of alcohol,

13   tobacco, and toxic exposures, if any; and I have

14   summarized in my report his medical history and as

15   well as the family medical history of

16   first-generation malignancies within the family

17   history.

18      Q.   Did you summarize and write down in your

19   report any medical record that you found to be

20   important?

21      A.   Yeah.  I mean, if you look at page 8 of my

22   report, you'll see Footnote 5, 6, 7, 8, 9, 10, 11,

23   12, 13, 14 -- 14 footnotes, 7 -- Footnote 17 as

24   well, 16.

25           There's probably 17-plus footnotes to the
```

1  medical records, and if you want, I can go through

2  each one of those footnotes with you, if you'd like.

3      Q.   I just wanted to make sure there wasn't

4  something in particular that you wanted to

5  additionally identify as we sit here today as an

6  important medical record.

7      A.   Not beyond what I've already included in the

8  report.

9      Q.   Okay.  Table 1 is a summary of Mr. Schafer's

10  medical history 2010 to 2018.  Did you prepare that?

11      A.   Yes.

12      Q.   And that's from your review of the medical

13  records?

14      A.   Right.

15      Q.   All right.  Let's go to page 5 of your

16  report.  Towards the bottom, under the objectives,

17  it says, "One of the primary objectives of this

18  toxicological assessment is to arrive at a

19  scientifically accurate and reliable time-weighted

20  exposure dose for Mr. Schafer based on an 8-hour

21  time-weighted exposure days," and that's "for

22  comparison with the human epidemiologic studies of

23  applicators"; is that right?

24      A.   That's correct.

25      Q.   And why is one of your primary objectives to

```
 1    arrive at a time-weighted exposure dose for the
 2    plaintiff based on an eight-hour weighted exposure
 3    days?
 4        A.   Well, in causation analyses, I follow the
 5    Bradford Hill and weight of evidence methodologies.
 6    One of the factors, one of the main prongs of the
 7    Bradford Hill analysis, is that of dose-response;
 8    and it is important to assess that, and that's
 9    exactly what I've done.
10        Q.   Okay.  So it's important for your
11    toxicological assessment to be scientifically
12    accurate and reliable in this assessment; is that
13    right?
14        A.   Of course.
15        Q.   And what are the important steps you've used
16    to make an assessment of the scientifically accurate
17    and reliable time-weighted exposure dose for
18    Mr. Schafer?
19        A.   I've reviewed initially the plaintiff fact
20    sheet -- and let me just check the list, but I
21    believe photos -- yeah, the photos of the Roundup
22    product, and the depositions of Mr. and
23    Mrs. Schafer, and the photographs of the Roundup
24    containers, along with a number of -- a pretty large
25    number of deposition exhibits, and I have
```

1    interviewed Mr. Schafer twice, along with his wife,

2    who was also present; and I've documented all the

3    sources of the information that I've gathered in

4    calculating the most accurate but conservative

5    assessment of Mr. Schafer's exposure, keeping in

6    mind that there are areas where I've stated in my

7    report insufficient information and I discontinued

8    completely some of his exposures due to lack of

9    sufficient information to make the calculations.

10        Q.   Okay.  On page 6, you say you calculated a

11   cumulative time-weighted dose for Mr. Schafer using

12   a simple additive mathematical methodology in units

13   of eight-hour time-weighted exposure days; is that

14   right?

15        A.   Yes.

16        Q.   And can you describe your simple additive

17   mathematical methodology?

18        A.   Sure.  If you turn to page 31, Table 4,

19   you'll see the calculation methodology, and I used

20   the eight-hour time-weighted average because one of

21   the studies, that is the Eriksson study, a Swedish

22   study, specifically stated in that study that

23   Eriksson was using the Swedish workday as the

24   definition of a exposure day; and after follow-up

25   with the government of Sweden, I learned at one

1    point in time they used a six-hour workday, but that

2    was only experimental, and during the time of the

3    Eriksson study, they were using an eight-hour

4    workday in Sweden.

5         So if you look at Table 4, you will see

6    columns of information.  For example, two events per

7    year, at

8    1 1/2 to 2 hours per event, gives total hours,

9    additive methodology of 3.0 minimum, 3.5 max -- or

10   4.0 max with a mid point of 3.5.  That is the simple

11   additive methodology that I'm referring to.

12      Q.   So you identify places and times of

13   exposure, number of events of exposure, and then how

14   long those exposures are, multiply them together to

15   get total hours, and then divide by 8 to get a

16   exposure day; is that right?

17      A.   Yes.  In the far right-hand column, you'll

18   see the label "exposure days 8 hours/day."

19      Q.   Okay.  While we're looking at Table 4, one

20   thing I want to make sure we correct is, if you look

21   at 1995 to 1998, you have, in the mid column

22   exposure days, you have 91.5.  And that, based upon

23   the math, should be 9.  Is that an error in your

24   chart?

25      A.   It is; and, fortunately, that was not added

1    in as an error to the final result.

2         Q.   So the 27 hours would be divided by 8 to get

3    to 9 eight-hour days, but that doesn't change your

4    39 total; is that right?

5         A.   Right.

6         Q.   So we should just take out that 91.5 and

7    make it 9, you agree with that, right?

8         A.   I do.

9         Q.   Okay.  So has this simple additive

10   mathematical methodology been used in any

11   epidemiology study?

12        A.   Yes.

13        Q.   What study was that?

14        A.   A good example is Eriksson.

15        Q.   Okay.  Does the Eriksson article describe

16   this simple additive mathematical model?

17        A.   Yes.

18        Q.   Okay.  Do you have the Eriksson study

19   available to you?

20        A.   Yes.

21        Q.   Okay.  And can you show me or tell me where

22   in the Eriksson article it makes reference to this

23   simple additive mathematical model?

24        A.   Yes.  On page 1658, second paragraph from

25   the bottom on the left column, last sentence:  As in

1    our previous lymphoma studies, we used a minimum

2    criteria of one full day exposure to be categorized

3    as exposed.

4            Next, the tables and the method -- the

5    results method and tables show various numbers of

6    these exposure days, such as for glyphosate, less

7    than or equal to 10-day or greater than 10-day, or

8    for phenoxy acids, phenoxyacetic acids, rather, less

9    than or equal to 45 days or greater than 45 days.

10           There's different time intervals that are

11   all based upon that statement of the criterion, a

12   full day of exposure, and I also referenced and

13   reviewed the prior studies by Eriksson, which he

14   referred to, and he uses this additive method of

15   exposure.

16       Q.   Which prior Eriksson studies?

17       A.   The Hardell, Eriksson, and Lenner study from

18   1981 and -- I forget the other one.  Let's see.

19           The other study was the Hardell and Eriksson

20   case-control study from 1999.

21       Q.   Okay.  So you believe that -- well, I mean,

22   let's look at that one statement you focused on in

23   Eriksson, I think 2008.  "As in our previous

24   lymphoma studies, we used a minimum criterion of one

25   full day exposure to be categorized as exposed,"

```
1    that's the sentence you're referring to?

2       A.   Yes.  And, as I said, I researched the

3    definition in Sweden of how many hours in a full day

4    exposure based on the time range of this study being

5    conducted.

6       Q.   Do you know whether that required a -- well,

7    let me -- in Eriksson, were they looking at farmers

8    in the study?

9       A.   I'm sorry.  I didn't understand the

10   question.

11      Q.   What group of people were being studied in

12   the Eriksson study?

13      A.   In which study?

14      Q.   The Eriksson study.

15      A.   The current study that we're --

16      Q.   Yes, 2008.

17      A.   Well, it covered as in materials method

18   section four out of seven health services regions in

19   Sweden associated with the university hospitals in

20   Lund, et cetera, and recruitment of cases and

21   controls.

22      Q.   Okay.

23      A.   It included patients aged 18 to 74 years

24   with newly diagnosed NHL, and --

25      Q.   So -- well, Doctor, let me -- I'm trying to
```

1    go back to explore on this the way they calculated

2    this.  Do you know whether they calculated an hour,

3    you know, for eight different days to make a day, or

4    whether they required at least one day of spraying

5    of a full day of eight hours to be included?

6        MS. FREDONA:  Objection; form.

7    A.    By definition, eight hours of exposure was

8    required to be considered exposed, and that counted

9    as one exposure day, and then the cumulative

10   exposures were compiled by additive methodology.

11   Q.    Okay.  Doctor, let's go to -- back to page 6

12   of your report.  At the bottom of that page, you

13   say:  "The POEM methodology has been peer-reviewed,

14   generally-accepted, used internationally, and tested

15   with a known rate of error as published within the

16   seven studies footnoted below."

17        Do you see that?

18   A.    Yes.

19   Q.    Is that the same thing as the UK POEM model?

20   A.    Yes.

21   Q.    What does the POEM methodology consider that

22   your simple additive mathematical model does not

23   consider?

24   A.    They're apples and oranges.  The Eriksson

25   methodology and the methodology studied in all six

```
1    of the dose metric studies I've referenced are based
2    on days of exposure as opposed to the POEM method,
3    which is calculating the internal systemic dose.
4    And as I've explained in my report, the P-O-E-M
5    method, that is the Predicted Operator Exposure
6    Model method, provides a dosage in units of
7    milligram per kilogram per day, which is designed to
8    be applied against the AOEL, that is the Acceptable
9    Operator Exposure Limit, and the AOEL is not a
10   measure of cancer risk; it's, rather, a measure of
11   reproductive toxicity in rats.
12        So all the POEM method does from a systemic
13   dose basis is it gives me a means to determine if a
14   person had an exposure dosage that was in a
15   reasonable range of the AOEL.  It doesn't provide
16   any information specific to cancer endpoint, because
17   the human studies were not studied -- it did not use
18   the milligram per kilogram per day dose methodology.
19        So, for example, if one of your experts were
20   to calculate Mr. Schafer's dose in milligram per
21   kilogram per day, that expert would have nothing to
22   compare it to other than animals, and it's not
23   acceptable methodology to determine whether a person
24   has a causal link to a chemically induced cancer
25   based only on animal studies.  Human data is needed.
```

```
 1              And I'm sure you agree with that.

 2     Q.   You did not use the POEM methodology in your

 3    assessment of Mr. Schafer; is that right?

 4     A.   Correct, I did not make a milligram per

 5    kilogram per day dose calculation.

 6     Q.   And in previous cases, you have used the

 7    POEM methodology in your assessment; is that right?

 8     A.   I have on occasion, yes.

 9     Q.   And so are you saying it's inappropriate to

10    do so?

11     A.   No, but in cases where it's a simple

12    procedure, for example, a farmer who is using a

13    sprayer of a given application rate, for example, a

14    tractor sprayer, applying a certain application rate

15    over a certain area of acreage with a known number

16    of applications, for example, six times a year, it's

17    very simple to plug in the data into the POEM

18    method.

19              In a case like this, where we have multiple

20    properties, many of which we don't have much

21    information on the number of hectares or acres for

22    each property, and we're uncertain in some of the

23    work here on Mr. Schafer how much product he used on

24    each property, it becomes more difficult to apply

25    the POEM methodology.
```

1          And in this case it would have been a very
2    difficult task and it would not have yielded much
3    information other than the milligram per kilogram
4    per day dose to compare to the AOEL, so I did not
5    pursue it.  This is not a case where a calculation
6    would be reasonably simple.  It would, rather, be
7    very complex and it would be open to tremendous
8    criticism by your team, and I thought that would be
9    a bad idea to go -- to make a calculation in which a
10   lot of uncertainty would be present.  I felt as a
11   scientist, as a toxicologist, that would not be wise
12   and, therefore, did not apply the POEM method in
13   this case.
14   Q.   Does your simple additive mathematical
15   methodology, has it been peer-reviewed?
16   A.   Yes.  I take you back to the six studies
17   that I've used.  All of those studies use days of
18   exposure as the dose metric.
19   Q.   Do you know if they use the same metric by
20   your additive mathematical methodology?
21   A.   It's not my methodology.  It's the
22   methodology used in the studies I've referenced.
23   It's very clear that the studies have used the
24   accumulated exposure days.  Only one study makes it
25   clear that it's an eight-hour time-weighted exposure

1    day.  The other studies appear to be using just any

2    amount of spraying on a given day as an exposure

3    day.

4          So my calculations are ultraconservative in

5    that I'm using an eight-hour time-weighted average,

6    when, in fact, the studies don't necessarily -- some

7    of the studies don't necessarily use a requirement

8    of eight hours of spray time, just, rather, spraying

9    on any given day.

10         So it's not my methodology.  That's really

11   insulting, and I really hope you don't try to

12   convince the court that I have made up some

13   methodology.  That's just very inappropriate and

14   disingenuous on your part.  It's a methodology that

15   has been peer-reviewed and published and it is based

16   upon additive exposure days.

17   Q.    Is there a known error rate in the simple

18   additive mathematical methodology?

19   A.    Yes, there is.

20   Q.    Okay.  And what is that?

21   A.    It's called the 95 percent confidence

22   interval.  All the studies I've cited use the 95

23   percent level of certainty in their confidence

24   interval.

25   Q.    That's looking at the relative risk and the

1    confidence of that relative risk for a specific

2    endpoint like non-Hodgkin lymphoma, right?

3        A.   Correct, but that error rate reflects the

4    amount of variability and error in the overall data

5    set.

6        Q.   But that error rate is not a calculation of

7    whether the exposure reported is accurate or not; is

8    that -- is that correct?

9             MS. FREDONA:   Objection; form.

10       A.   I think you're referring to reporting errors

11   such as recall bias.  That's possible.  There could

12   be some recall bias, and that's something that the

13   epidemiologists and Dr. Ritz have paid special

14   attention to, and I would defer you to Dr. Ritz or

15   Dr. Portier with respect to the internal design of

16   the study and the -- how the questionnaire recall

17   bias could be a factor, but that is something that

18   is covered within each of the epidemiological

19   studies.

20       Q.   Okay.  So, Doctor, whether I refer to it as

21   the simple additive mathematical methodology or

22   yours, I am simply saying the methodology that

23   you're applying.  So I will just say the simple

24   additive mathematical methodology if that's more

25   soothing to you, but that is the one that you're

```
 1    applying; is that right?
 2        A.   Of course.  That is the methodology that has
 3    been used in the six studies that offer dose
 4    metrics.
 5        Q.   Okay.  And in the simple additive
 6    mathematical methodology, it does not consider the
 7    types of equipment a person is using when applying
 8    Roundup; is that right?
 9        A.   That's correct.
10        Q.   And it doesn't consider the type of clothing
11    a person is wearing while applying Roundup; is that
12    right?
13        A.   Yes.
14        Q.   And the simple additive mathematical
15    methodology does not consider the types of personal
16    protective gear a person is using or wearing while
17    applying Roundup, right?
18        A.   Correct.  The studies are limited in those
19    respects, yes.
20        Q.   And the simple additive mathematical
21    methodology does not consider whether a person is
22    spot-spraying or continuously spraying Roundup; is
23    that right?
24        A.   Correct.  And I should state that, as
25    covered in my report, glyphosate is not
```

1    instantaneously fully absorbed through the skin.  It

2    takes hours, many hours, to fully absorb the

3    glyphosate.  So in a case where a homeowner only

4    sprays for two hours on a given day will continue to

5    absorb that exposure over the next 12 to 24 hours.

6         If a person is working eight hours a day,

7    even though they accumulate more exposure, on a

8    relative basis that person who sprayed only two

9    hours is actually continuing to absorb even though

10   that person did not work eight hours.

11        So that is something to be aware of when

12   considering studies that did not require a full

13   eight hours of exposure.

14   Q.   So in the simple additive mathematical

15   methodology, does spot-spraying count the same as

16   continuous spraying?

17   A.   I'm not sure I understand the question.

18   Q.   Well, if I go out in my yard and I

19   spot-spray, I walk around and I spray occasionally

20   when I see a, you know, weed that I want to kill,

21   does that count the same for a one-hour period, if I

22   do that for an hour, as if I'm out spraying

23   continuously for an hour?

24        MS. FREDONA:  Objection; form, incomplete

25        hypothetical.

```
1      A.   I still don't understand.

2      Q.   So you understand spot-spraying, a person

3   goes out and searches for something and sprays and

4   then moves on to the next spot, as opposed to

5   continuously spraying down a fence line or something

6   of that nature?

7           MS. FREDONA:  Same objection.

8      A.   Well, those are two different techniques.

9   Fence line exposures, when holding the wand in a

10  more horizontal position, results in a much higher

11  level of drift below that as opposed to a sprayer

12  that's pointing directly to the ground.

13          There's differential factors in what you're

14  asking me, so I think you would have to be very

15  specific in your question.

16     Q.   Okay.  If a person goes in his yard and

17  sprays one time on a spot every 10 minutes for 60

18  minutes, being six different squirts on something

19  for an hour, does that count the same for -- in your

20  exposure methodology as a person who goes in their

21  backyard and continuously sprays Roundup for an

22  hour?

23          MS. FREDONA:  Objection; form, incomplete

24      hypothetical.

25     A.   I still don't understand the question.
```

1    Q.  So if a person sprays Roundup, hits the

2  trigger six times in an hour versus 60 times in an

3  hour, do they count the same in your exposure model?

4    MS. FREDONA:  Same objection.

5    A.  The studies, for example, Eriksson, do not

6  make such a distinction.  It's simply number of

7  hours of working as a sprayer.  There's no

8  distinction in the human studies as to how many

9  times the trigger is pushed.

10    Q.  Okay.

11    A.  I'm sure that makes, you know, an

12  interesting point for you to use in a Daubert

13  motion, but it's utter nonsense, because the studies

14  do not record how many times the triggers are

15  pushed.  Rather, it's a matter of how many hours in

16  a working day, in the Eriksson study, are used to

17  certify that person as an exposure day.

18    Other studies that I've referenced just use

19  the given exposure-day, that is, it was used on a

20  given day and that is counted as a day.  So these

21  studies are not providing the level of detail you're

22  asking, and then you turn around and say it's my

23  design.  It's not my design.  It's the studies that

24  I am following very closely and assessing

25  Mr. Schafer in comparison to those studies, and the

```
 1    fact that the number of trigger pushes was not

 2    recorded by Mr. Schafer, nor in the studies, is very

 3    misleading.

 4        Q.   Do you recall my question?

 5        A.   I do, and it just doesn't make any sense.

 6        Q.   Okay.  So my question is whether a person

 7    actually sprays Roundup one time, six times, or 60

 8    times over the course of an hour, in your -- well,

 9    in the simple additive mathematical methodology,

10    that hour counts the same; is that correct?

11             MS. FREDONA:  Objection; form, found -- I'm

12        sorry.  Objection; form, incomplete hypothetical.

13        A.   No, I can't answer that the way it was

14    asked.  It's not my methodology.  It's the

15    methodology used by Eriksson, McDuffie, et al., in

16    the studies that I've referenced, all six of them.

17    It's based on days of spraying.  So I really don't

18    know how to answer your question.  It's not

19    consistent with the studies.

20        Q.   If a person tells you in an interview they

21    go out in their yard and they spot-spray for an

22    hour, do you count that as one hour of spraying

23    Roundup?

24             MS. FREDONA:  Objection; incomplete

25        hypothetical.
```

```
1       A.   Yes.

2       Q.   And if a person tells you they go out in the

3   yard and they continuously spray for an hour, do you

4   count that as one hour of spraying Roundup?

5            MS. FREDONA:  Same objection.

6       A.   Yes.

7       Q.   In your assessment of exposure using the

8   simple additive mathematical methodology, does it

9   matter to you whether the person spot-spraying

10  sprays often or doesn't spray often?

11           MS. FREDONA:  Objection; form.

12      A.   I don't understand the question.

13      Q.   When you are assessing the exposure of an

14  individual, do you ask them, when they are spraying,

15  how they -- how they go about spraying Roundup?

16           MS. FREDONA:  Objection; form.

17      A.   Yes.  That's covered in detail in my report.

18      Q.   Okay.  And does that detail in your report

19  about how they spray, does that affect the time that

20  you identify in your time-weighted eight-day average

21  for exposure?

22      A.   Yes, it is, in the sense that my report

23  details the intensity of exposure.  However, the

24  methodology of the studies are strictly based upon

25  exposure days, and in the Eriksson study, an
```

1    eight-hour exposure day.

2         So I used the eight-hour exposure day in my

3    calculations because that is the methodology that is

4    followed and presented in the six studies.  The six

5    studies do not make any calculation differences for

6    the intensity of spraying; however, I do provide in

7    my report an assessment of the intensity of

8    exposure, for example, whether the person wore

9    gloves, whether they had spillage on their back from

10   a backpack, the level of accidents in terms of

11   dermal exposure accidents, washing of hands with

12   soap, the time between spray time and showering or

13   bathing with soap, et cetera.

14        Those are all factors that are important and

15   I reference from studies in the literature; however,

16   the dose metric studies in humans do not include

17   those details.  They're just simply based on

18   exposure days.

19   Q.   So those features about how much Roundup a

20   person actually gets on their skin you describe as

21   intensity of the exposure?

22        MS. FREDONA:  Objection; form.

23   A.   I didn't understand the question.

24   Q.   Okay.  What -- you used the word "intensity"

25   of the exposure.  What is the intensity of exposure,

1    and what do you mean by that?

2    A.    Well, on page 27 in our report, I stated in

3    the first paragraph:  "Mr. Schafer stated that until

4    about 2015-16 he did not wear any personal

5    protective equipment (PPE) during his Roundup

6    applications."

7          Quote, "I didn't wear any protective

8    equipment because the chemicals" -- "commercials,"

9    rather -- "showed all of the people using the

10   product; they were in shorts, they didn't have any

11   protective gloves, any protective gear at all, so I

12   assumed it was safe based on the depiction in the

13   commercial."

14         And then he explains when he began wearing

15   rubber gloves, et cetera.

16         So certainly I inquire and determine what

17   level of protection the individual had, what

18   accidents, if any, occurred, the spray conditions,

19   the type of equipment, whether it was a backpack, if

20   it leaked, if the trigger leaked, if the person had

21   to unscrew the nozzle and unclog it, and whether

22   they blew it out with their mouth.

23         These are all things that I ask about and

24   ascertain to determine the intensity of exposure,

25   but the human studies that have dose metrics don't

 1    delineate that level of detail, and it's --

 2    therefore, I follow the methodology that was used in

 3    the studies that offer dose metric to calculate

 4    exposure days, but I also supplement that in my

 5    report with more specific information as to the

 6    nature of the exposures.

 7         And I don't know why you have a problem with

 8    that.  I really, honestly, don't.  I think

 9    there's -- you're just making up stuff.

10    Q.   So the additive mathematical model doesn't

11    include intensity of exposure in the analysis; is

12    that correct?

13    A.   As I said, it does not include a detailed

14    analysis of the intensity of exposure.  It simply is

15    based upon exposure day.  So the studies are taking

16    an average of people who are exposed, some of which

17    may be fully equipped with PPE, others who are in

18    shorts and sandals.  It's a -- it's -- it does not

19    delineate.  It's simply an average of all of them.

20    Q.   Are the circumstances of how a person

21    applies Roundup important for your assessment of

22    causation?

23    A.   Yes.

24    Q.   Is the intensity of exposure important for

25    your assessment of causation?

```
1        A.    Yes, it is helpful to determine what level
2    of intensity the exposures were, of course.  That
3    holds true for any chemical exposure.
4        Q.    And the calculation of the number of
5    exposure days does not factor in either the
6    intensity or the circumstances of the application;
7    is that right?
8        A.    That is correct.  That's how the studies are
9    designed and it is what it is.  That's what we have
10   to work with.  This nonsense of conveying to the
11   court that it's my -- it's my methodology and my
12   failure to include these things in the design is
13   unfounded.  I am following the study design, the
14   peer-reviewed, generally accepted studies.
15           And I can't go back and change those
16   studies.  It is what it is.  They use an exposure
17   day and the number of exposure days, and those
18   studies are showing a dose-response based upon the
19   number of exposure days.  You know, that's what we
20   have to work with, and I'm still a little confounded
21   why you have a problem with it.
22       Q.    So you say the studies have a dose-response.
23   Are you meaning that the higher the dose or exposure
24   to Roundup, the higher the risk of non-Hodgkin
25   lymphoma?
```

```
 1            MS. FREDONA:  Objection; form.
 2       A.   Yeah.  For example, in the McDuffie study, a
 3   positive dose-response was found for glyphosate.
 4       Q.   So if a person has 39 exposure days, as
 5   you've calculated for Mr. Schafer, does he have less
 6   risk of non-Hodgkin lymphoma than somebody who was
 7   exposed to 100 days of -- full-weighted days of
 8   exposure to Roundup?
 9            MS. FREDONA:  Objection; form.
10       A.   Based upon the studies and general
11   toxicological principles, yes.
12       Q.   And would a person who had 10 exposure days
13   have less risk than somebody who was exposed to 39?
14       A.   Based upon the studies and general
15   toxicological principles, yes.
16       Q.   Have you done anything to assess what the
17   difference in the risk is between a person who is
18   exposed to 5 or 10 or 20 or 40 or 100 exposure days?
19            MS. FREDONA:  Objection; form.
20       A.   Yes.  Yes.  For example, the McDuffie study
21   reveals odds ratios greater than 2 with exposures
22   greater than 10 days; whereas the less than 10-day
23   exposure, I think was about a 1.67 risk level, but
24   I'm going to check that right now to make sure I'm
25   accurate.
```

```
 1              Yes.  On page 1160, bottom of the left-hand

 2    column, last sentence reads:  "Table 9 also shows

 3    the dose-response relationship comparison of

 4    subjects who reported no pesticide exposure and

 5    those who reported using five or more pesticides."

 6              Let me look at Table 9.

 7       Q.   Which study?

 8       A.   I'm looking at McDuffie.

 9              No, that's not the correct table.  I think I

10    should be looking at Eriksson.  Let's see.

11              Yeah, on page -- I'm in Eriksson on page

12    1658, right-hand column, second to last paragraph:

13    "Dose-response analyses regarding herbicides in

14    total and glyphosate yielded an increased odds ratio

15    in the higher exposed group, Table II.  For

16    phenoxyacetic acids, however, no such association

17    was demonstrated."

18              So that's in Table II.  And, yeah, I was

19    actually correct.  It is a -- less or equal to 10

20    days was a 1.69 odds ratio, greater than 10 days was

21    a 2.36 odds ratio, and combination of less than 10

22    days or greater than 10 days was statistically

23    significant, or greater than 10 days by itself was

24    statistically significant.

25       Q.   Okay.  Doctor, so that's what you would
```

1    apply, those odds ratios, for patients who have

2    greater than 10 days of exposure, exposure-days to

3    Roundup, is that what you're saying?

4        A.   Yes, that the control group has an odds

5    ratio of 1.0, less than on or equal to 10 days is a

6    1.69 odds ratio, greater than 10 days is a 2.36 odds

7    ratio.

8            The study -- again, I really don't

9    understand why you're saying that in your last

10   question I  summarized this.  This is what the data

11   shows.  It's objective scientific data.  It's not

12   something I made up; and I know you keep implying

13   that, and it's very irritating.

14       Q.   I'm trying to understand your opinions.  I'm

15   not sure why you keep saying what I am implying.

16   I'm just asking questions about your opinions.  So

17   I'm trying to be as deferential as I can, but I do

18   have questions I need to ask.  So I just want to be

19   straightforward as I can be on that, but...

20           So for your opinions, for people like

21   Mr. Schafer, who have 39 exposure-days, according to

22   your calculation, you would apply the Eriksson study

23   and look at the 2.36, is that what you're saying?

24           MS. FREDONA:  Objection; form.

25       A.   Yes, I would -- I would consider him greater

 1    than 10 days based upon the study design and based

 2    upon his eight-hour time-weighted average of 39

 3    exposure days, yes, I would -- I would include him

 4    in the greater than 10 days exposure group,

 5    certainly.

 6         Q.   And do you know how many patients in the

 7    Eriksson study actually had exposure days that were

 8    100 or more?

 9         A.   No.  The study does not provide that

10    information.

11         Q.   But you would expect that the patients who

12    had 100 or more exposure days to glyphosate to have

13    a higher risk of non-Hodgkin lymphoma than patients

14    like Mr. Schafer, who had 39; is that right?

15              MS. FREDONA:  Objection; form, incomplete

16         hypothetical.

17         A.   I'm not going to make any assumptions on

18    that question.  I need to point out that it would be

19    pretty unusual to have somebody with 800 hours of

20    exposure and it's unlikely there would be a

21    sufficient number of such persons to provide a

22    statistical count.  That's an enormous amount of

23    exposure, and based upon my experience in assessing

24    Roundup exposures, there wouldn't be many people who

25    fit that bill.

```
 1      Q.   Okay.  Doctor, now, Mr. Schafer says that he

 2  sprayed Roundup at his residence where he lived; is

 3  that right?

 4      A.   Yes.

 5      Q.   He didn't spray any Roundup at work, right?

 6      A.   Correct.

 7      Q.   It's --

 8      A.   Especially when he was working with the FBI.

 9      Q.   He didn't spray any Roundup on crops; is

10  that right?

11      A.   Right.  He didn't have any crops.

12      Q.   And he didn't spray Roundup similar to a

13  farmer; is that right?

14           MS. FREDONA:  Objection; form.

15      A.   I would disagree with that.  I have

16  carefully, fully interviewed many farmers who use

17  similar spray equipment as he did, that it's not

18  unusual for a farmer, especially for their home use,

19  to use very simplistic equipment, so --

20      Q.   If you -- if you go to page 14 of your

21  report --

22      A.   Yes.

23      Q.   -- the first full paragraph, last sentence,

24  it says:  "I didn't do" -- this is a quote from his

25  deposition.  "I didn't do a farmer spray.  I just
```

1   walked through and individually sprayed the weeds."

2         Do you see that?

3     A.   Yes, that's what he said, but that's not

4   what you asked me.

5     Q.   Okay.  And so are you saying that

6   Mr. Schafer, despite what he said, did spray similar

7   to the way farmers spray Roundup?

8         MS. FREDONA:  Objection.

9     A.   As I stated, I have assessed numerous

10  farmers, some who have used tractor sprayers with up

11  to 32 sprayer heads, and I've interviewed and I've

12  assessed farmers who also used prepackaged Roundup

13  to spot-spray weeds around their barn and their shed

14  and their -- and even on their own residential

15  property.

16        Not all farmers operate with tractors.  In

17  fact, many farmers use backpack sprayers.  That's

18  very common.  So I think you're just being too broad

19  in general with respect to that question.  Not all

20  farmers only spray with tractor boom sprayers.

21  That's just -- that's just not true.  There's

22  farmers who very often use backpacks or other

23  devices, including a number of different sprayers.

24    Q.   Mr. Schafer didn't spray Roundup as part of

25  being a professional lawn care worker, he didn't do

```
 1    that, right?

 2        A.   Correct.  What he said in his deposition,

 3    which accompanies that quote about "I didn't do a

 4    farmer spray" is he was trying to explain that he

 5    sprayed individual weeds.  He did not perform

 6    broadcast spraying.

 7        Q.   Okay.  Are you aware that farmers had an

 8    increased risk of non-Hodgkin lymphoma before

 9    Roundup existed?

10        A.   Yes.

11        Q.   Do farmers generally have -- well, let me

12    strike that.

13             Over the past 20 or 30 years, have farmers

14    generally had exposure to other chemicals in

15    addition to Roundup?

16             MS. FREDONA:  Objection; form.

17        A.   Historically, prior to Roundup, in the 1950s

18    and '60s, farmers used a product known as 2,4-D,

19    which historically contained a chemical called

20    dioxin, specifically tetrachlorodibenzo-p-dioxin, as

21    a contaminant of the product.

22             So historically, going back many, many

23    years, there was a product out that was known to

24    cause lymphoma, NHL, and that is the 2,4-D; 2,4,5-T

25    product that contained the dioxin contaminant, the
```

1    same contaminant known to be in Agent Orange.

2       Q.   So is it your opinion that 2,4-D increases

3    the risk of non-Hodgkin lymphoma?

4       A.   Certainly did historically, in the 1950s and

5    '60s, when it contained the dioxin contaminant.

6       Q.   Is it -- is it your opinion that malathion

7    increases the risk of non-Hodgkin lymphoma?

8       A.   Yes.  Malathion is a IARC 2A carcinogen.

9    Certainly it does carry risks, based on studies, of

10   causing NHL.

11      Q.   Does diazinon increase the risk of

12   non-Hodgkin lymphoma?

13      A.   In animals, it has shown to have

14   carcinogenic potential.  I believe, with respect to

15   humans, it has not reached the level of a 2A

16   carcinogen.  I believe it's a 2B and it's uncertain

17   whether it causes cancer in humans.

18      Q.   In the studies that you've looked at that

19   looked at glyphosate, have they also looked at these

20   other chemicals, including diazinon, if you recall?

21      A.   I don't recall, and --

22      Q.   Okay.

23      A.   But I can add that it -- diazinon is not a

24   2A carcinogen.

25      Q.   All right.  So, Doctor, have you assessed

1    whether Mr. Schafer, at his residence, was exposed

2    to other chemicals, including diazinon, 2,4-D, and

3    malathion?

4          MS. FREDONA:  Objection.

5     A.   Yes.  Turn to page 28 and 29 in my report,

6    and on page 29, partway down Table 2, you will see

7    "ever used 2,4-D?"  The answer is "no."

8          And I should add, even if he had used it,

9    2,4-D had undergone reformulation in terms of the

10   TCDD dioxin contaminant during the years he used it.

11         I should also add that if you were to look

12   at my report, I have a brief section in my report

13   with respect to the classification of 2,4-D by

14   Monsanto, and the document I referenced in my report

15   from Monsanto states that it is not a carcinogen.

16    Q.   Okay.  But my question is you believe it

17   does cause non-Hodgkin lymphoma, 2,4-D; is that

18   right?

19    A.   As I said, during the early years of

20   production, when it contained the dioxin impurity,

21   it certainly did, but that had long been

22   reformulated before Mr. Schafer had any opportunity

23   to use it, but he stated in my interview that he had

24   never used it, and that's documented on page 28, I

25   believe.

1    Q.   Okay.  And if Mr. Schafer had used diazinon,

2    2,4-D, or malathion, would that have changed your

3    opinions in any way?

4         MS. FREDONA:  Objection; incomplete

5    hypothetical.

6    A.   In your question, you asked for 2,4-D,

7    diazinon, and what was the third thing?

8    Q.   Malathion.

9    A.   If he had used malathion, I would have

10   questioned him further on his type of use,

11   protective equipment, how often he used it, so on.

12   Q.   Okay.  So would you agree that farmers

13   historically have been exposed to diazinon, 2,4-D,

14   and malathion?

15        MS. FREDONA:  Objection; form.

16   A.   During what years are you asking?

17   Q.   The same years the McDuffie and Eriksson

18   studies were being conducted.

19        MS. FREDONA:  Same objection.

20   BY MR. HOGUE:

21   Q.   '80s, '90s.

22   A.   Well, as we already covered, I think

23   yesterday in deposition it was my statement that

24   malathion was considered in the McDuffie study and,

25   in fact, did show a significant association with

```
 1    NHL.

 2            With respect to diazinon, diazinon is simply

 3    not a Class 2A human carcinogen.

 4    Q.   So --

 5    A.   And the third chemical that you asked me

 6    about --

 7    Q.   2,4-D.

 8    A.   -- 2,4-D, according to Monsanto, in a sworn

 9    certified document, it's not a carcinogen anymore;

10    and as I stated, 2,4-D historically, predating the

11    -- by many, many years, or decades -- predating the

12    studies, contained dioxin.

13    Q.   So, Doctor, this is my question:  You agree

14    that farmers have historically been exposed to

15    chemicals that Mr. Schafer himself has not been

16    exposed to, you would agree with that, wouldn't you?

17            MS. FREDONA:  Objection; form.

18    A.   I don't understand the question.

19    Q.   Yeah.  I mean, there are studies that look

20    at exposure of farmers that have exposure to Roundup

21    and other chemicals, including many of these

22    insecticides and herbicides we've been discussing,

23    right?  I mean, you're aware that farmers have been

24    historically exposed to multiple different

25    chemicals, right?
```

```
1              MS. FREDONA:  Objection.

2         A.   Well, that is -- yes.  That is the purpose

3    of, in the McDuffie study or Eriksson study, for

4    example, of ascertaining exposure of many different

5    agricultural pesticides and herbicides.

6         Q.   Great.  And so you're -- and your opinion is

7    Mr. Schafer was not exposed to those types of other

8    chemicals, right?

9              MS. FREDONA:  Objection; form.

10        A.   Yes, that is the purpose of my review of the

11   potential causative factors table, which I recited

12   on page 28 and 29.  I should point out there are

13   some decoy questions in there that are clearly not

14   potential causative factors, such as the use of

15   latex paints or the use of weed -- Miracle-Gro.  So

16   I just want to point that out, that not all of the

17   chemicals that I've listed are associated with NHL.

18        Q.   Okay.  Are you aware of any studies that

19   have analyzed the risk of residential users using

20   Roundup that shows an increased risk of non-Hodgkin

21   lymphoma?

22             MS. FREDONA:  Objection; form.

23        A.   That's a very interesting question.

24             (Telephone interruption.)

25             I'm sorry.  Interrupted here.
```

```
 1              Very interesting question.  There are no
 2    studies that study only residential users.  The
 3    studies that I am relying on use a combination of
 4    residential and agricultural exposures.
 5        Q.   Okay.  Have you seen studies of residential
 6    users or household users of other chemicals that
 7    increase the risk of non-Hodgkin lymphoma in farmers
 8    but have not been found to increase the risk of
 9    non-Hodgkin lymphoma in residential use?
10              MS. FREDONA:  Objection; form.
11        A.   No.
12        Q.   One of the differences you would say between
13    Mr. Schafer and the typical farmer in the '80s and
14    '90s was that Mr. Schafer wasn't exposed to a lot of
15    different chemicals other than Roundup; is that --
16    is that right?
17        A.   Yes.
18        Q.   Okay.  Doctor, let's go to Table 4 of your
19    report.  I think it's around page 30.
20        A.   Okay.
21        Q.   First, on page 30, at the top it says Table
22    33, and that's before Table 4.  Is that supposed to
23    be Table 3, or is that supposed to be Table 33?
24        A.   I'm sorry, I don't -- oh, I see it.  Table
25    33.
```

```
 1          It's Table 3.  A typo.
 2     Q.   Okay.  I just -- that's what I was guessing,
 3   but I don't know for sure.
 4          So in your calculation on Table 4, you come
 5   to an average, or mid, I guess, exposure risk of 39
 6   hours -- 39 exposure days; is that right?
 7     A.   Yes, with a range of 30 to 48 eight-hour
 8   exposure days.
 9     Q.   Okay.  And you cite some of your data comes
10   from the deposition of Mr. Schafer and some of it
11   comes from interviews that you had with Mr. Schafer;
12   is that right?
13     A.   I didn't understand the question.
14     Q.   Well, your chart, if you go to what's
15   Table -- listed as Table 33, on page 30, you have
16   footnotes, and some of the citations as to where you
17   get the amount of spraying and how long he sprayed
18   was from his deposition, and some of it was from
19   interviews with Mr. Schafer; is that right?
20     A.   Yes, and I stated earlier in the deposition
21   the sources that I used.
22     Q.   Okay.  And in your assessment to get to the
23   39 exposure days, you say other than some years,
24   1999 to 2050 and then in 2010, other than those
25   years, you say he had a -- two days a year, one in
```

 1    spring, one in the fall, where he sprayed Roundup

 2    for a -- different periods of hours, somewhere

 3    between 1.5 hours and four hours per day.  That's in

 4    your Chart 4, right?

 5        A.   Yes.  Also, 1986 to '88, only .5 hour per

 6    event twice a year.

 7        Q.   Okay.  And I think that you say in your

 8    report that during -- for those two seasonal sprays,

 9    he used a specific type of Control Extended -- he

10    said Extended and you changed it to -- or I think --

11    let's go to page 13, Footnote 31.

12             So in Footnote 31, you say:  "Mr. Schafer

13    referred to the larger jug of Roundup he used in the

14    spring and fall as 'extended use' in the deposition;

15    however, he clarified during his interview that this

16    was not Extended Control Roundup."

17             Do you see that?

18        A.   That's correct.

19        Q.   Okay.  What type of Roundup do you believe

20    it was?

21        A.   Roundup Weed & Grass Killer.

22        Q.   Okay.  Is that referenced anywhere in your

23    report?  Is that --

24        A.   He did state on page 24.

25        Q.   Okay.

```
 1      A.   And I believe he also stated this for his

 2   period that you're referring to in that footnote,

 3   that he always purchased and applied Roundup

 4   ready-to-use products, and he explained that it was

 5   generally the Weed & Grass Killer product.

 6      Q.   Okay.  I think that's what you say on

 7   page -- the picture on page 25.  Is the

 8   concentration of glyphosate 2 percent in that

 9   product?

10      A.   Yes.  Yes, it is.

11      Q.   And if you look at page 26, I think you

12   indicate that he has spot-sprayed using this other

13   Roundup that has 1 percent glyphosate; is that

14   right?

15      A.   Yes, that has the -- that is the Extended

16   Control product, yes.

17      Q.   So it's your opinion, based upon talking to

18   Mr. Schafer, that he used these two different types

19   of Roundup, the 2 percent, you know, in the spraying

20   in the fall and then the 1 percent for

21   spot-spraying; is that right?

22      A.   No, the spot spraying is 2 percent Roundup

23   Weed & Grass Killer.

24      Q.   Okay.  What did he use the 1 percent on?

25      A.   He used that on certain years, which I think
```

1    I explained earlier in the report, where he only

2    sprayed twice per year, with the exception of

3    Footnote 31.

4        Q.   So when he sprayed twice a year, you believe

5    it was with the 1 percent glyphosate?

6        A.   Yes.  That was the Extended Control.

7        Q.   Okay.

8        A.   It's 1 percent glyphosate, yes.

9        Q.   All right.  So, Doctor, if we look

10   specifically at the time period in Table 4 that

11   relates to the period of 1995 to 1998 --

12       A.   Yes.

13       Q.   Okay.  We've already corrected that the 91.5

14   is supposed to be 9, right?

15       A.   Correct.

16       Q.   All right.  And the way you calculate this

17   is you say he had two seasons.  That was -- even

18   though this is 1995 to 1997, you indicate he sprayed

19   Roundup '95 and '96, because in '97 he had his head

20   injury and said he wasn't spraying; is that right?

21       A.   Right.

22       Q.   Okay.  So you agree that those two years

23   would have been 1995 and 1996; is that right?

24       A.   Yes.

25       Q.   So two seasons.  And so on the top, you have

1    the events, the once in the fall, once in the

2    spring, so that's where you have your two events for

3    2.5 to 3 hours; is that right?

4        A.   Yes.

5        Q.   If I understand your calculation on the

6    bottom part of that, it's two years, and each year

7    you're saying he had 24 times that he sprayed

8    Roundup with spot spray for 1.5 hours; is that

9    right?

10       A.   Yes.

11       Q.   And you believe that information came from

12   an interview with Mr. Schafer and that was not

13   specifically in his deposition; is that right?

14       A.   Correct.

15       Q.   And so when Mr. Schafer was talking to you

16   about this, he was describing that as spot-spraying;

17   is that right?

18       A.   Which?  The two events per year or the 24?

19       Q.   The 24.

20       A.   That was spot spraying, yes.

21       Q.   And he said in his deposition that he was --

22   that he -- twice a year he sprayed and then

23   spot-sprayed it.  So that's the spot-spraying, these

24   24 events per year, right?

25       A.   Yes.

1    Q.  And how did you go about asking how long he

2  did that?  I mean, did you just ask him how long he

3  spot-sprayed?

4    A.  My specific question that I always ask is

5  from -- in cases where there is mixing, I ask, "From

6  the point in time when you began" -- "you opened the

7  container and began to mix, okay, then throughout

8  your spray time until you were done spraying and put

9  the equipment away, how long did that period of time

10  require?"

11    Q.  Okay.  And he -- now, he didn't mix the

12  Roundup, that's -- he always used the ready to be

13  sprayed, right?

14    A.  That's correct, yes.

15    Q.  Okay.  So he told you that he spot-sprayed

16  for an hour and a half each time he spot-sprayed?

17    A.  Yes.

18    Q.  And did he tell you how often?  If you go to

19  page 30, your report discusses the 1995 to 2000 time

20  frame.  It says:  "Then spot-sprayed one of four

21  sections of the property every week, 1.5 hours per

22  section"?

23    A.  That's right.

24    Q.  Okay.

25    A.  And he explained he had to do it by section;

1    he couldn't possibly do it all in one day, it was

2    just too much property.

3        Q.   Okay.  And he had a horse farm on this

4    property, right?

5        A.   Yes.

6        Q.   And you looked at the pictures from his

7    deposition that relate to this piece of property,

8    right?

9        A.   Yes.

10       Q.   And I think in your report you actually

11   refer to Deposition Exhibit -- one of his pictures,

12   I think it was the plaintiff's Deposition

13   Exhibit 5D, page 16, in your report?

14       A.   That's correct.

15       Q.   That's one of the pictures.  Do you know how

16   much of the property, of this 2.5-acre property, was

17   the property where the horses stayed?

18       A.   No.

19       Q.   I mean, did you look at the picture showing

20   that most of the horse area the horses were in was

21   all dirt?

22            MS. FREDONA:  Objection.

23       A.   All I have is the photo in front of me.  I

24   can't make any judgments as to the entire property

25   based on one snapshot of a photo at a given time

```
1    point.
2        Q.   So did you look at his deposition exhibits?
3        A.   Yes.
4        Q.   Okay.  Maybe I can show you on my screen
5    here.
6             Is that showing the horse?
7        A.   Yes, and some type of artifact behind him.
8    Looks like blue ink or something.
9        Q.   Okay.  Yeah, obviously --
10       A.   I don't think they're UFOs, but...
11       Q.   Okay.  So in this picture, a lot of this
12   area, I mean, there's -- you wouldn't be spraying
13   Roundup on this dirt area, would you?
14       A.   I wouldn't, no.
15       Q.   Okay.
16       A.   Now, it's possible that during the various
17   seasons he sprayed weeds and did a good job and
18   they're gone.  I mean, I can't speculate on exactly
19   what happened, but, yeah, I see the dirt.
20       Q.   Okay.  And looking back at your report, the
21   picture that you include in your report, there --
22   you see that this area is a desert-type area.  Do
23   you see that?
24       A.   Yes.  There also appears to be some type of
25   ground cover growth.  I'm not sure what it is,
```

1    whether it's grass or some type of prickly weed, I

2    don't know, but there appears to be something

3    growing there.

4        Q.   Do you know whether Mr. -- when you read his

5    deposition that he described there being not much

6    vegetation because of the desert there?

7        A.   That's what he stated.  I'm not, you know,

8    able to read into that, but that's what he said,

9    yes.

10       Q.   Did you do any assessment of whether 1.5

11   hours of spot-spraying a week was needed in this

12   desert terrain?

13            MS. FREDONA:  Objection; form.

14       A.   Only in the sense that I included the photo

15   of Schafer's 5D exhibit in my report, and if those

16   dark objects in the foreground are weeds and they

17   had covered a significant portion of his property,

18   it would certainly take all of that time to

19   spot-spray those weeds.  That would be a

20   time-consuming process to spray each of those weeds

21   over a large area.

22            So, I mean, I -- that photo certainly

23   indicates the possibility that it would take at

24   least that amount of time, but I don't have

25   photographs of the entire property over different

1    months of the year, so I'm not in a good position to

2    make any judgment with respect to what you have

3    brought to my attention.

4        Q.   Well, this -- on page -- I guess there is a

5    picture -- Figure 4 is in -- you say Deposition

6    Exhibit 5D is one that you put in your report,

7    right?

8        A.   Yes.

9        Q.   And that's a discussion of the property

10   where you're discussing him spraying the property

11   once a week, 24 times a year, for an hour and a

12   half, right?

13       A.   Correct.

14       Q.   And you still believe that is a conservative

15   estimate of his spraying of Roundup in 1995 to 1996?

16       A.   Yes.  I, in fact, didn't include the later

17   two years, which he stated he did not spray and his

18   wife insisted he did.

19       Q.   Okay.  Doctor, if you go to the period of

20   2007 to -- and then 2008 to 2017, those are the same

21   property, right?  That's the Roseville property?

22       A.   2007 through which year?

23       Q.   2017.  It's on page 30, the bottom.

24       A.   I'm on that page.  I see that.

25       Q.   Okay.  And this is what he told you about,

1    this is the first -- 2007 spring and fall being

2    three to four hours, and then after that first year,

3    2.5 to 3 hours each time; is that right?

4        A.   Yes, but I am confused, because I thought

5    you said the same property as 19 --

6        Q.   No, no, I said 2007 is the same as two

7    thousand -- okay.  If you look at Table 4, you break

8    out 2007 as different than 2008 through 2017.  So

9    that's what I was looking at.

10       A.   Oh.

11       Q.   2007 through 2017 was -- his exposure was at

12   his Roseville, Illinois spot -- place, right?

13       A.   Yes, that's correct, no question about it,

14   and there was a reason for the difference.

15       Q.   Okay.

16       A.   And I believe that's in the text of my

17   report.

18       Q.   Correct.  You said the first year it was

19   three to four hours he was spraying, whereas after

20   that it was 2.5 to 3 hours, right?

21       A.   Yes.

22       Q.   Did he explain why there was a difference?

23       A.   Yes, and I think that's in the text of my

24   report.  As I recall, it was -- it was -- I hate to

25   guess.  I'm going to look, because I think what it

1    was was a new property that was -- I thought he used

2    the word "a mess." Let me see if I can find it.

3        Q.   Doctor, that's okay. I don't need to spend

4    more time for you to look to see if there was a

5    difference. Just three to four hours the first

6    year, 2.5 to 3 hours after that.

7            You also indicated that he spot-sprayed

8    twice per month from March through September for two

9    hours; is that right?

10       A.   Yes.

11       Q.   That was in 2007. And then from 2008 to

12   2017, an average of one to two times a month for 30

13   to 60 minutes per event, right? So that's what you

14   based your assessments on?

15       A.   Yes.

16       Q.   Did you assess at all what the growing

17   season for grass or weeds was in Illinois?

18       A.   I asked, yeah, specifically what months he

19   sprayed.

20       Q.   And is it your belief that in March in

21   Illinois you have grass and weeds that are growing?

22       A.   I'm not familiar with Roseville, whether

23   that would be a similar climate to Indiana versus

24   Missouri versus Chicago. I'm not sure.

25       Q.   So that's not a type of assessment that you

1    do to analyze whether your assumptions are

2    conservative or not; is that correct?

3        A.    I mean, I do look for obvious errors that

4    exist.  You know, I grew up and lived right up

5    through 2003 full-time in New York State and spent

6    five years in Indiana, central Indiana, and weeds

7    begin to grow, begin to break through in Indiana

8    certainly, depending on each year, but things start

9    to turn green in Indiana, especially in southern

10   Indiana, in March, where in upstate northern New

11   York State we had snow on the ground until April.

12        I mean, I just -- I can't be much more

13   precise than that.  I'm not an agronomist or a

14   botanical expert. As I -- again, this is a fact in

15   the case in terms of -- I treated it as a fact in

16   the case --

17       Q.    Okay.

18       A.    -- and if there is some question about that,

19   I'm sure you will cross-examine Mr. Schafer, as a

20   well-qualified attorney, and get to the bottom of

21   it, but as a toxicologist, I have done the best I

22   can with it and I really can't rule out March.  I

23   think it's possible, but I just don't have the

24   expertise as a botanist and meteorologist to go any

25   further than I did.

```
1      Q.   Okay.  For your opinions, did you base them
2  on Mr. Schafer never bathing or washing off after he
3  sprayed Roundup?
4           MS. FREDONA:  Objection; form.
5      A.   On page 22, last paragraph, I've provided
6  some information with respect to that question.
7      Q.   You said Mr. Schafer typically bathed in the
8  mornings; is that right?
9      A.   Yes.
10     Q.   So for your opinions, did you ask him
11 whether he ever washed off after he sprayed Roundup?
12     A.   Yes.
13     Q.   And what did he say?
14     A.   That he washed his hands with soap after
15 spraying.
16     Q.   Okay.  Did he tell you anything else about
17 what he washed after he sprayed?
18     A.   That's the only thing he washed.
19     Q.   And did he wash his hands after spraying
20 since the beginning of his use of Roundup?
21     A.   No.
22     Q.   One of the things you say is -- let's see
23 what page.  Well, you said -- maybe it's page 22 --
24 that his wife said -- "At times, his wife even told
25 him that she could smell the Roundup on him."  Is
```

1    that right?

2        A.   Correct.

3        Q.   Is that what he told you?

4        A.   I need to look at that page.

5        Q.   Page 22 of the report -- right? -- where you

6    said Mr. Schafer typically bathed in the morning,

7    the next sentence says:  "At times, his wife even

8    told him that she could smell the Roundup on him."

9        A.   Yeah, that's information I ascertained

10   directly from Mr. Schafer.

11       Q.   And did you ask Mr. Schafer or Mrs. Schafer

12   what Roundup smells like?

13       A.   I don't recall.

14       Q.   Is there a specific smell for Roundup?

15           MS. FREDONA:  Objection.

16       A.   Yes.

17       Q.   Okay.  What is that?  What is the --

18       A.   I would describe it as a pungent, a sweet --

19   well, semisweet pungent odor.

20       Q.   You also say there that Mr. Schafer reported

21   that he typically wore shorts, T-shirt, sandals, and

22   often walked through the weeds as he sprayed, right?

23       A.   Yes.

24       Q.   Did he ever wear any other clothing other

25   than T-shirt, shorts, and sandals?

William Sawyer, Ph.D.

```
 1      A.   Yes.  It depended on where he lived.  When
 2   he was in Illinois, he wore long sleeves and pants
 3   in cold weather.
 4      Q.   Did you write that down in your report?
 5      A.   No.
 6      Q.   Okay.  Is there any reason you didn't write
 7   that down in your report?
 8      A.   It's more of a self-evident thing.  Illinois
 9   weather can get quite cool, and it's just logical,
10   whereas his residence in Arizona or California would
11   be quite different in terms of the conditions.
12      Q.   Okay.  Do you describe what types of long
13   sleeves or long pants he wore in Illinois?
14      A.   No.
15      Q.   Did he describe in what months he wore long
16   sleeves and long pants in Illinois?
17      A.   No.  He just stated that if it were warm
18   weather, he typically would wear the shorts and
19   sandals; if it were cool weather in April or May,
20   for example, he would wear long pants, long sleeves.
21      Q.   Doctor, why don't we take a quick break.  I
22   think we've been going about two-and-a-half hours,
23   maybe a little more, but I just want to make sure I
24   have everything else I need to cover in the next 20
25   to 30 minutes.  Okay?  Now a good time for a break?
```

```
 1       A.   Yeah, but what time?  Let's actually
 2   designate a time so we don't waste -- I don't want
 3   to waste your time or anyone else's.
 4       MR. HOGUE:  Yeah.  Why don't we say we start
 5       back at -- I have 11:08.  If we start back at
 6       11:13, five minutes, I'm fine with that, and I
 7       think probably 20 minutes is what I'll have left,
 8       and I'm pretty sure I have that time, since we've
 9       taken a couple of breaks, including mine that
10       started the day with my dad.  So I apologize for
11       that, but...
12       So about 20 minutes left, is that right,
13   Court Reporter?
14       That's all right.  We can go off and take
15       five minutes.
16       THE WITNESS:  Please take more time if you
17       need to for your dad.
18       MR. HOGUE:  No, I'm good.  I'll finish up
19       with him after the deposition in about 20 or 30
20       minutes.  All right.  Thanks.
21       THE VIDEOGRAPHER:  Okay.  The time is
22       11:09 a.m. and we're off the record.
23       (Recess from 11:09 a.m. until 11:18 a.m.)
24       THE VIDEOGRAPHER:  The time is 11:18 a.m.
25       and we are on the record.
```

```
 1    BY MR. HOGUE:

 2        Q.   Doctor, I want to go to page 33 of your

 3    report, and then to page 34.  You say that these are

 4    the six main studies you looked at for your opinions

 5    related to the exposure and the risk of non-Hodgkin

 6    lymphoma; is that correct?

 7        A.   No, that's not right.

 8        Q.   Okay.

 9        A.   I explained in my report and in deposition

10    these are the six studies that offer a dose metric.

11        Q.   Okay.  And those are the Eriksson study, the

12    McDuffie study, the Andreotti study, the Leon study,

13    the Zhang study, and the Pahwa study, right?

14        A.   Yes.

15        Q.   Okay.  And for the Eriksson study, did it

16    specifically break out the risk of follicular

17    lymphoma?

18        A.   One of the studies did.  Let me take a look.

19             Yes.  If you look at page 1658 of Eriksson,

20    Eriksson states that:  "On the other hand, the group

21    follicular lymphoma was not clearly associated with

22    phenoxyacetic acids, and only nonsignificantly with

23    glyphosate."

24             And that's an important point to consider

25    with the epidemiology in terms of limitations of
```

1    Type 2 error, that is, inability to have a

2    significant level of confidence but yet an increased

3    odds ratio due to the small sample size.

4         In other words, the follicular lymphomas

5    occur at such a less -- a smaller rate that it

6    increases the Type 2 error, that is, the ability to

7    see a change at a statistically significant level

8    due to the small sample size.

9    Q.   Okay.  And did the McDuffie study

10   specifically look at follicular lymphoma?

11   A.   No.  They make no mention of it.

12   Q.   And --

13   A.   I think one of the meta-analyses did examine

14   for follicular and found it was at an increased odds

15   ratio, but not significant.

16   Q.   Okay.  So let's talk about the next one on

17   your list, which was the Andreotti 2018.  Did it

18   specifically discuss follicular subtype of the

19   non-Hodgkin lymphoma with the exposure to Roundup?

20   A.   It did, on page -- the page number -- page 5

21   of 8.

22   Q.   Okay.

23   A.   And it's not significant and nonelevated.

24   Q.   And page -- I guess it's Table -- Table 2

25   they discuss follicular lymphoma with a -- is that

1    what you're talking about?

2        A.   On page -- Table 2 continued, page 5 of 8,

3    yes.

4        Q.   And in -- it had a -- with the highest

5    exposure, it had a 0.85 odds ratio or relative risk

6    for follicular lymphoma with the highest exposure to

7    Roundup, right?

8        A.   Yes.  And, also, if you look at Table 3 on

9    page 6 of 8, you will see follicular lymphoma began

10   not showing a significant increase.  You know, the

11   Quartile 3 exposure group got a 1.06, but it was

12   nonsignificant.

13       Q.   I think the one I'm looking at says 1.03.  I

14   don't know that that's different between -- I'm

15   looking at what was published on page 514, but

16   anyway, you would not say that there is any

17   association between follicular lymphoma and

18   glyphosate shown in the Andreotti study, would you

19   agree with that?

20       A.   Right, it was nonsignificant.  And I'm

21   looking again, just to be clear on the record, I'm

22   looking at page 5 of 8 and page 6 of 8.

23       Q.   Okay.  And does the -- the next study you

24   cite is the Leon study, right?

25       A.   Yes.

```
 1        Q.   And does the Leon study look at follicular

 2   lymphoma?

 3        A.   As I recall, yes.

 4        Q.   I think if you go to --

 5        A.   Page 16 of 24.

 6        Q.   Okay.  And in that, there's a section

 7   talking about follicular lymphoma; is that right?

 8        A.   Yes.

 9        Q.   And there were 214 follicular lymphomas in

10   that study; is that right?

11        A.   Yes.

12        Q.   And in that study, they didn't report an

13   increased risk of follicular lymphoma with the use

14   of glyphosate -- is that right? -- if you look at

15   Table 2?

16        A.   Well, yes, but if you look at Paragraph 3 on

17   page 1525, under "follicular lymphoma," it's

18   reported:  "During follow-up, 214 follicular

19   lymphoma cases were diagnosed.  None of the chemical

20   groups or active ingredients was associated with

21   follicular lymphoma.  Moderately elevated mHRs but

22   with wide CIs" -- that's confidence intervals --

23   "were observed in association with ever use of a few

24   active ingredients, of which the least imprecise

25   estimate corresponds to terbufos," which was, again,
```

```
 1    nonsignificant.

 2           And so, really, they found no significant

 3    associations.

 4           And then if we look at Table 2, yeah, we see

 5    the raw data as well.

 6    Q.    Specifically for glyphosate, the hazard

 7    ratio was 0.79, less than 1, right?

 8    A.    That's right.

 9    Q.    And so in the Leon study, you would not say

10    that glyphosate was associated with follicular

11    lymphoma; is that right?

12    A.    Yes.

13    Q.    All right.  And then the next study you talk

14    about is the -- is it the Pahwa study?  The Zhang

15    study?

16           The Zhang study.  And did the Zhang study

17    look at follicular lymphoma?

18    A.    No, it did not.

19    Q.    Don't see anything either.  All right.

20           And then the last one you cite to is the

21    Pahwa study.  You say that there -- in your

22    analysis, there are 468 follicular lymphomas

23    analyzed, right?

24           Do you see that?  That's what you put in

25    your report.
```

```
 1      A.    Yeah, that's correct, and --

 2      Q.    If you look at the Pahwa study, it also says

 3   468 follicular lymphomas, right?

 4      A.    Right.   That's in Table 1.   Yeah.

 5      Q.    Is Pahwa the largest study of the number of

 6   follicular lymphomas that have been analyzed?

 7      A.    Number-wise, it appears that way, yes.

 8      Q.    And in Table 2, it shows that the follicular

 9   lymphoma odds ratio with glyphosate is 0.69, right?

10      A.    It does; however, the statistic I was

11   speaking of earlier that is important with respect

12   to significance and possible dose-response measure

13   is in Table 4, and that's regarding the frequency of

14   glyphosate handling and associations with

15   non-Hodgkin lymphoma.

16            And for follicular lymphoma, the control

17   group had an odds ratio of 1.0, and then the greater

18   than zero but less than two-year or equal to

19   two-year group was a .81, and the greater than two

20   days exposure was an odds ratio of 2.21, the

21   confidence interval of .99 to 4.93.

22            So that was a nonsignificant confidence

23   interval, but only by a hair.   It just missed

24   confidence at the 95 percent level.   So that -- that

25   included -- and here's the important thing to
```

William Sawyer, Ph.D.

1    recall, is that that included only eight cases, and
2    if you look at the greater than zero and less than
3    two-year exposure, it's only seven cases.
4           So, see, the number of cases is fairly
5    small, so it's -- you have to take in consideration
6    that it's not the most prevalent type of lymphoma,
7    and therefore, the P2 error, that is the error of
8    not -- having a significant effect but only what
9    appears be a slightly increased odds ratio, is what
10   we're dealing with in this case.
11      Q.   Doctor, for follicular lymphoma there,
12   you're looking at the OR with, I guess, superscript
13   A, and then there's an OR with superscript B.  Do
14   you see that?
15      A.   Yes.
16      Q.   And for the superscript B, greater than two
17   days follicular lymphoma, the odds ratio was 1.33
18   with a reference range of 0.55 to 3.23, right?
19      A.   Yes, I see that.
20      Q.   And that's not a significant association for
21   greater than two days of use of glyphosate with
22   follicular lymphoma, right?
23      A.   It is not, no.  And, again, as I state, the
24   number of cases are rather small.
25      Q.   And the difference between the number that

```
 1    you cited and the one -- the one that's the 1.33

 2    that's not significant is that in B they adjusted

 3    for other chemicals, including 2,4-D, dicamba, and

 4    malathion, right?

 5        A.   Yes.

 6        Q.   So after they adjusted for those exposures,

 7    the risk reported was not significant and not close

 8    to significant, right?

 9        A.   If the -- the value was similar in the fact

10    that the confidence interval went all the way to

11    3.23, as low as .55.  It was a very wide confidence

12    interval due to the low number of cases.

13            And this is a good example, again, where the

14    odds ratio of 2.21, which was almost significant at

15    the 95 percent level certainty, is not significantly

16    different from 1.33 based on the range of a .55 to

17    3.23.  You see that the 2.21 odds ratio is within

18    that range, and if you look at the range of the A

19    footnote, that range is .99 to 4.93, and you'll see

20    that the 1.33 falls within that range.

21            So it would be false to state that the odds

22    ratio of A column versus the B column are different.

23    They're not.  They're the same.  Neither of them are

24    different.

25        Q.   Doctor, one more question on this.  If you
```

```
 1    go to page -- it's my page 5, upper left-hand

 2    corner, right under the conclusion of -- where it's

 3    talking about follicular lymphoma, it says -- or

 4    subtypes of lymphoma, it says:  "There are no

 5    association" -- excuse me.

 6          Quote:  "There was no association apparent

 7    for FLB."  Follicular lymphoma.

 8          Do you see that?

 9    A.    That's correct.  As I said, it was not a

10    statistically significant finding.  It was close,

11    but it was not statistically significant.

12    Q.    So you agree with the authors of the study

13    that there was no association apparent between

14    glyphosate and follicular lymphoma in the Pahwa

15    study?

16    A.    At the 95 percent level of certainty, yes.

17    At the 94 percent level of certainty, that wouldn't

18    be true.  It would be significant at the 94 percent

19    level of certainty.  So I agree with that based on

20    the use of the 95 percent confidence interval, yes,

21    I agree.

22    Q.    But if you adjust for these other chemicals

23    and their confounding on the data, it wouldn't be

24    significant at or even close to significant at the

25    95 percent confidence level; is that right?
```

William Sawyer, Ph.D.

```
1        A.    That's true.
2        Q.    All right.  So, Doctor, as far as -- well,
3    let me -- I want to make sure I've covered the rest
4    of your opinions.  You don't have any opinion on
5    Mr. Schafer's prognosis; is that right?
6        A.    I do not.
7        Q.    And you don't have any opinions as to
8    whether his diffuse large B-cell lymphoma will
9    reoccur or not, right?
10        A.    That's correct.
11        Q.    And do you understand that Mr. Schafer is
12    currently in remission?
13        A.    Yes.
14        Q.    And you will not be providing any opinion
15    about whether or what the likelihood of him staying
16    in remission?
17        A.    Correct.
18        Q.    You will defer to the oncologist or other
19    treating doctors and experts on those issues; is
20    that right?
21        A.    Yes.
22        Q.    With respect to the two different types of
23    Roundup that you said Mr. Schafer used, do you know
24    what surfactants were used in those two different
25    types of Roundup?
```

1     A.   Yes.

2     Q.   And what were they?

3     A.   Doctor, are you waiting on me?

4     A.   No, I'm looking at my report.

5     Q.   Okay.

6     A.   I think the easiest way to handle this is

7     turn to page 57, Table 13, and I've identified from

8     periods of time what surfactants were used.  For

9     example, very commonly, from 2002, even to the more

10    current years, tallow amine, t-a-l-l-o-w a-m-i-n-e,

11    was very common, and yet you see in 1999, when

12    Mr. Schafer was using Roundup, there was a number of

13    products that were used.  It varies with time.

14         And on Table 14, the very next page, on the

15    Ready-To-Use Weed & Grass Killer, with EPA

16    registration of July 13th, 1992, we have the

17    polyoxyethylene alkylamine, and as we saw on the jug

18    label that Mr. Schafer had, that showed the

19    pelargonic acid, which the pelargonic acid is not

20    actually -- well, it could have some surfactant

21    actions, but it actually strongly assists in killing

22    the weeds.

23    Q.   So on Table 14, which of the two types of

24    Roundup that Mr. Schafer said he used?  The first

25    one?

```
1      A.   Well, he used the Weed & Grass Killer.

2      Q.   Okay.

3      A.   That one was registered in July 13th, '92.

4           We also have the Weed & Grass Killer

5      Ready-To-Use towards the bottom of that table, on

6      page 58, registered in May 20th, 1998, which

7      contained, again, the polyoxyethylene alkyl

8      phosphate ester.  It also contained polyethylene

9      glycol, dipropylene glycol, which is a little

10     different.

11          And then further down on the table on page

12     59, there is Roundup Weed & Grass Killer

13     Ready-To-Use with a 2002 label.  Again, very

14     similar.  I think maybe the silicone emulsion was

15     added.  No, that was there previously as well.

16     Q.   Was the -- is the extended version that you

17     were talking about for Mr. Schafer, the one he

18     referred to as the extended version of Roundup, is

19     that listed in Table 14?

20     A.   No, I don't have any data on the extended.

21     Q.   Okay.  All right.  I want to make sure that

22     I have covered all the important opinions that you

23     have in your report.  Have I -- is there something

24     else about his exposure or his use of Roundup that

25     is -- that I have not yet covered?
```

```
 1       A.   The only thing I can point out is, still on

 2   Table 14, the very last entry, where it says

 3   "multiple formulations," it's a different EPA

 4   registration number, but it's still for -- it's for

 5   Roundup Ready-To-Use Weed & Grass Killer III.  I

 6   don't know that he used that, but it is -- it is

 7   possible, but it's not real important.

 8       Q.   Okay.  Anything else?  I know you have a lot

 9   of generic opinions that I have not covered, nor do

10   I have time to today, that have been covered in the

11   past, but I'm trying to -- if there is anything else

12   specific to Mr. Schafer or his case, I'd like to

13   make sure I know about it so I can cover it.

14            There's nothing else outside of your report;

15   is that correct?

16       A.   Yes.

17            MR. HOGUE:  All right.  I think that's the

18       questions I have today.

19                      CROSS-EXAMINATION

20   BY MS. FREDONA:

21       Q.   Good morning, Dr. Sawyer.  I only have a

22   couple of questions again.

23            Of all the studies that you've reviewed, is

24   there any indication that Roundup exposure increases

25   the risk of follicular lymphoma?
```

```
 1       A.   Well, follicular lymphoma is a closely
 2   related lymphoma to DLBCL, and studies, the six
 3   epidemiological studies that I've focused on, are
 4   with respect to dose metrics; and with respect to
 5   other studies linking follicular lymphoma to NHL, I
 6   defer to other experts in this case, such as
 7   Dr. Ritz, Dr. Portier, Dr. Weisenburger, as I
 8   focused primarily on the dose aspects as opposed to
 9   the review of the entire body of animal and human
10   epidemiological studies with respect to general
11   causation, and, really, that's the area that has
12   previously been covered by Dr. Portier and Dr. Ritz.
13       Q.   So whether or not Mr. Schafer's diffuse
14   B-cell lymphoma had developed as a result of this
15   follicular lymphoma, that's an issue you would defer
16   to another expert?
17       A.   Yes.  It's very possible that's what
18   happened, but I'm not really the expert to make that
19   decision.
20       Q.   All right.  And in your expert opinion, to a
21   reasonable degree of toxicological certainty, did
22   Mr. Schafer's exposure to Roundup -- was that a
23   significant factor contributing to his development
24   of non-Hodgkin lymphoma, the B-cell?
25            MR. HOGUE:  Objection; leading.
```

```
 1      A.   Yes, based on the dosage and exposure days,
 2   which he exceeded all known dose metrics.  He's
 3   beyond all of the dose metric ranges of the six
 4   studies.  Well, not beyond that of the agricultural
 5   health study, but of the five studies, he exceeds
 6   the ranges, metric ranges associated as with
 7   statistically significant rates of NHL.  It is my
 8   opinion that NHL was certainly a strong contributing
 9   factor to the development of his NHL.
10        MS. FREDONA:  All right.  Thank you very
11     much, Dr. Sawyer.  I have no more questions.
12                    REDIRECT EXAMINATION
13   BY MR. HOGUE:
14      Q.   Doctor, I have one question that I left off,
15   and maybe I did ask it, but I want to -- you don't
16   have any opinions about Mr. Schafer's treatment or
17   additional treatment that he will need; is that
18   correct?
19      A.   That's correct.  That's definitely not my
20   area.  That's for treating oncologists.
21        MR. HOGUE:  All right.  Thanks, Doctor.
22        THE WITNESS:  Okay.  Very good.
23        THE VIDEOGRAPHER:  Okay.  Are we ready to go
24     off record?
25        MR. HOGUE:  Yes.  As far as the exhibits, I
```

```
 1    have written down Exhibits 1 through 5.  I know
 2    we discussed other articles, which we didn't
 3    mark.  I don't know that -- I think they're
 4    pretty easily identifiable.  If Dr. Sawyer wants
 5    to make them additional exhibits, I am fine with
 6    that, but I'm also fine not marking them as
 7    separate exhibits.
 8         Rebecca, do you have any suggestions?
 9         MS. FREDONA:  I have no opinion on the
10    matter.
11         MR. HOGUE:  Dr. Sawyer, I believe I have --
12    I know I have the notice of deposition, your
13    invoices now, your report with your attachments,
14    your CV, and your testimony list, which I can
15    send to the court reporter, as well as your
16    counsel, and I am fine not marking any of the
17    studies that we have discussed by name.  Is that
18    okay with you, or would you rather send to your
19    counsel or me the studies that you were referring
20    to?
21         THE WITNESS:  No, I think we're all set.
22         MR. HOGUE:  Okay.  I will send the court
23    reporter Exhibits 1 through 5 today.  Thank you.
24         THE WITNESS:  Thank you.
25         THE VIDEOGRAPHER:  Okay.  The time is
```

1      11:48 a.m. and we are off the record.

2           (Whereupon, the deposition concluded at

3    11:48 a.m.)

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

```
 1              C E R T I F I C A T E

 2          I, Susan D. Wasilewski, Registered

 3   Professional Reporter, Certified Realtime Reporter,

 4   Certified Manager of Reporting Services, Certified

 5   Realtime Captioner, and Florida Professional

 6   Reporter, hereby certify that the witness named

 7   herein appeared via Remote Counsel/Zoom technology

 8   on Tuesday, February 16, 2021, and was duly sworn.

 9          I FURTHER CERTIFY that I was authorized to

10   and did stenographically report the examination of

11   the witness named herein; that a review of the

12   transcript was not requested; and that the foregoing

13   transcript is a true record of my stenographic

14   notes.

15          I FURTHER CERTIFY that I am not related to

16   or an employee of any of the parties, nor am I

17   related to or an employee of any of the parties'

18   attorneys or counsel connected with this action, nor

19   am I financially interested in the outcome of this

20   action.

21          WITNESS my hand this 17th of February, 2021.

22

23   _____

24   Susan D. Wasilewski, RPR, CRR, CMRS, CRC, FPR

25
```

```
 1                         LAWYER'S NOTES

 2   PAGE   LINE

 3   _____  _____   _____

 4   _____  _____   _____

 5   _____  _____   _____

 6   _____  _____   _____

 7   _____  _____   _____

 8   _____  _____   _____

 9   _____  _____   _____

10   _____  _____   _____

11   _____  _____   _____

12   _____  _____   _____

13   _____  _____   _____

14   _____  _____   _____

15   _____  _____   _____

16   _____  _____   _____

17   _____  _____   _____

18   _____  _____   _____

19   _____  _____   _____

20   _____  _____   _____

21   _____  _____   _____

22   _____  _____   _____

23   _____  _____   _____

24   _____  _____   _____

25
```

# EXHIBIT 4

```
 1              UNITED STATES DISTRICT COURT
 2              NORTHERN DISTRICT OF CALIFORNIA
 3
 4   IN RE:  ROUNDUP PRODUCTS        | MDL No. 2741
                                     |
 5   LIABILITY LITIGATION            |
                                     |
 6   -----------------------------------|
     This document relates to:       |
 7                                   |
     Randall Dean Seidl v. Monsanto Co. |
 8                                   |
     Case No. 3:17-cv-00519         |
 9                                   |
     -----------------------------------|
10
11                      - - -
12              Monday, March 8, 2021
13                      - - -
14
15         This is the Remote Videotaped Deposition of
16   WILLIAM SAWYER, Ph.D., commencing at 9:03 a.m.
17   Eastern Time, on the above date, before Susan D.
18   Wasilewski, Registered Professional Reporter,
19   Certified Realtime Reporter, Certified Manager of
20   Reporting Services, Certified Realtime Captioner,
21   and Florida Professional Reporter.
22                      - - -
23              GOLKOW LITIGATION SERVICES
24         877.370.3377 ph | 917.591.5672 fax
25                  deps@golkow.com
```

```
 1    APPEARANCES VIA REMOTE COUNSEL/ZOOM TECHNOLOGY:

 2

 3       BEASLEY ALLEN LAW FIRM

 4       BY:  WILLIAM SUTTON, ESQUIRE

 5            william.sutton@beasleyallen.com

 6       218 Commerce Street

 7       Montgomery, Alabama 36104

 8       Phone: (334) 269-2343

 9       Representing the Plaintiff

10

11

12       WILKINSON STEKLOFF LLP

13       BY:  CALI COPE-KASTEN, ESQUIRE

14            ccope-kasten@wilkinsonstekloff.com

15            CAITLIN CALLAHAN, ESQUIRE

16            ccallahan@wilkinsonstekloff.com

17       2001 M Street, NW, 10th Floor

18       Washington, DC 20036

19       Phone:  (202) 847-4000

20       Representing Defendant Monsanto Company

21

22

23    ALSO PRESENT VIA REMOTE COUNSEL/ZOOM TECHNOLOGY:

24       GABRIEL ARROWWOOD, Videographer

25
```

William Sawyer, Ph.D.

```
 1                     - - -
 2                  I N D E X
 3                     - - -
 4   Testimony of:  WILLIAM SAWYER, Ph.D.        PAGE
 5        DIRECT EXAMINATION BY MS. COPE-KASTEN.......   5
 6
 7
 8
 9
10                 E X H I B I T S
11              (Attached to transcript)
12
13    WILLIAM SAWYER, Ph.D., DEPOSITION EXHIBITS       PAGE
14   Exhibit 1   Expert Report                          9
                 Toxicology Consultants & Assessment
15               Specialists, LLC
16   Exhibit 2   Invoice - August 30, 2020             10
                 Professional Services - Seidl vs.
17               Monsanto
18   Exhibit 3   Follow-up Interview with Mr. Randall   18
                 Seidl, March 4, 2021
19
     Exhibit 4   Sawyer Notes (3-4-2021)               45
20
     Exhibit 5   Occidental Chemical Corporation, Inc.  46
21               Facility, Wichita, Sedgwick County,
                 Kansas
22               Fact Sheet, June 2018
23
24
25
```

```
 1                      - - -

 2              THE VIDEOGRAPHER:  We are now on the record.

 3      My name is Gabriel Arrowwood.  I'm a videographer

 4      for Golkow Litigation Services.  Today's date is

 5      March 8th, 2021, and the time is 9:03 a.m.

 6              This remote video deposition is being held

 7      in the matter of Roundup, Randall Seidl vs.

 8      Monsanto Company, for the United States District

 9      Court, Northern District of California, MDL

10      Number 2741.

11              The deponent is William Sawyer, Ph.D.

12              All parties to this deposition are appearing

13      remotely and have agreed to the witness being

14      sworn in remotely.  Due to the nature of remote

15      reporting, please pause briefly before speaking

16      to ensure all parties are heard completely.

17              Will counsel please identify themselves.

18              MS. COPE-KASTEN:  Cali Cope-Kasten on behalf

19      of Monsanto.

20              MS. CALLIHAN:  Caitlin Callahan on behalf of

21      Monsanto.

22              MR. SUTTON:  Will Sutton on behalf of the

23      Plaintiff.

24              THE VIDEOGRAPHER:  The court reporter is

25      Susan Wasilewski and will now swear in the
```

William Sawyer, Ph.D.

```
 1        witness.
 2             THE COURT REPORTER:  Would you raise your
 3        right hand?
 4             Do you solemnly swear or affirm the
 5        testimony you're about to give will be the truth,
 6        the whole truth, and nothing but the truth?
 7             THE WITNESS:  I do.
 8             THE COURT REPORTER:  Thank you.
 9             WILLIAM SAWYER, Ph.D., called as a witness
10   by the Defendant, having been duly sworn, testified
11   as follows:
12                  DIRECT EXAMINATION
13   BY MS. COPE-KASTEN:
14        Q.   Good morning, Dr. Sawyer.  Nice to see you
15   again.
16        A.   Yeah, a short interval here, but yes.
17        Q.   Indeed.  I'll just start out by asking is
18   there anything since the last time that you have
19   been deposed in connection with a Roundup case that
20   you want to change or amend from any of your prior
21   testimony?
22        A.   That's -- that's too difficult of a question
23   without reviewing materials.  I don't know.  I mean,
24   I can't even remember all the depositions in the
25   past two weeks.  I mean, there was about six --
```

```
 1        Q.   Fair to say there's nothing -- nothing
 2   sitting here today that comes to mind that you are
 3   thinking that you would like to change right now?
 4        A.   No.
 5        Q.   When did you first become involved in
 6   Mr. Seidl's case?
 7        A.   I will look at my Seidl folder.  It appears
 8   that I received some documents on December 2nd,
 9   2019.
10        Q.   Was your receipt of documents in December
11   2019 the first time that you were aware of
12   Mr. Seidl's case?
13        A.   Approximately, yes.
14        Q.   Who first contacted you about working on
15   Mr. Seidl's case?
16        A.   Attorney Tomlinson.
17        Q.   Did you know Mr. Tomlinson prior to him
18   contacting you in approximately December 2019?
19        A.   Possibly.  I know -- I worked on a case for
20   Beasley Allen law firm in Alabama.  I'm not certain,
21   though, that I worked with Attorney Tomlinson on the
22   prior case.
23        Q.   Did you work with Mr. Sutton on that case?
24        A.   No, I don't believe so.
25        Q.   Let me back up for a second before I get
```

1    into additional questions on substance.  You noted

2    that you were referring to your file for this case.

3    I assume you have with you today the standard file

4    that you normally have with articles and a copy of

5    your report, that kind of thing?

6        A.    Yes.

7        Q.    What materials do you have with you today

8    that are unique for Mr. Seidl's case?

9        A.    Well, I have the Levine Cancer Institute

10   records; Plaintiff Fact Sheet, third amended; I have

11   a study called the "Impact of Glyphosate, Its

12   Metabolites and Impurities," et cetera, by -- the

13   author's name is K-w-i-a-t-k-o-w-s-k-a, et al., from

14   2016; and let's see what else I have in the folder.

15          I have the Robert Jenkins folder, which

16   contains 22 files.  I'm not sure that file belongs

17   in there.  Let's see.  No, I don't even know why

18   that file is in there.  Hmm.  So scratch that.

19       Q.    Is Robert Jenkins a plaintiff in a different

20   matter?

21       A.    Yeah.  The name is familiar and I don't know

22   what the status is on that case.  If that's a Wave 1

23   case, it's gone.  I don't really know.  It's

24   possible something that Attorney Tomlinson sent to

25   me to look at.  I would have to see if I have the

William Sawyer, Ph.D.

```
 1    full file and worked up a report.  It's possible.

 2            Let's see what else.  In that folder I also

 3    have Robert Helms, who is another plaintiff, and

 4    Lloyd Martin.  So I think these are other cases I've

 5    worked up.  Jenkins definitely comes to mind.

 6            And then I have the deposition of Randall

 7    Dean Seidl, and the deposition of Laurinda K. Seidl;

 8    OxyChem location.PDF; Federal scheduling order

 9    revised; a Seidl vs. Monsanto Sawyer report; invoice

10    for professional services, Seidl vs. Monsanto;

11    Randall Seidl deposition testimony; Occidental

12    Chemical Corporation facility, Wichita, Sedgwick

13    County, Kansas, Fact Sheet, June 2018; Oxy

14    groundwater potential VOCs IARC carcinogen

15    classification; and I have IARC carcinogen

16    classification for our US EPA rating; and then

17    follow-up interview of Mr. Seidl from March 4th,

18    2021.

19        Q.   You conducted multiple interviews of

20    Mr. Seidl in connection with this case, right?

21        A.   It looks like two.

22        Q.   The second was on March 4th, 2021?

23        A.   Yes.

24        Q.   Correct?

25        A.   Right.
```

William Sawyer, Ph.D.

```
 1        Q.   When was the first?

 2        A.   I have to look at the report.

 3        Q.   While we're looking, I'm going to go ahead

 4   and mark your report as Exhibit 1 to this case.

 5             (Sawyer Exhibit 1 was marked for

 6   identification.)

 7        A.   The interview was on January 30th, 2020.

 8        Q.   I'm just going to pull this up here so that

 9   I make sure that we've got the right thing.  This

10   is -- this is the report that you are referring to

11   when you say you're looking at your report in this

12   case?

13        A.   Let me check what I have.  I can't check

14   mine because that's taking up the full screen.

15   Maybe I can -- okay.  All right.  Let's try that

16   again, that overlay.

17        Q.   Okay.  One second.

18        A.   All right.  Now, back up to the beginning.

19   The only thing is, I wanted to see side-by-side.

20   I'm trying to reduce the size of the image.  View

21   options, let's try that.  Exit full screen.  Okay.

22   There you go.  Now I can arrange that.

23             All right.  So if I put yours here, and mine

24   next to it, yeah, that's it.

25        Q.   Perfect.  You did not amend or update your
```

William Sawyer, Ph.D.

 1    report after your March 4th, 2021 interview of

 2    Mr. Seidl; is that correct?

 3        A.   No, but I do have some new documents.  I did

 4    a follow-up interview with him.

 5        Q.   Yeah, we'll take a look at the notes that

 6    you made in connection with that and mark those as

 7    an exhibit at some point today.

 8             (Sawyer Exhibit 2 was marked for

 9    identification.)

10    BY MS. COPE-KASTEN:

11        Q.   I'm going to mark as Exhibit 2 to the

12    deposition the invoice that I have received from

13    Mr. Sutton's office in connection with the Seidl

14    matter.  You can see this is from Toxicology

15    Consultants & Assessment Specialists, LLC, invoice

16    dated August 30th, 2020, in connection with Seidl

17    vs. Monsanto.  Are you familiar with this?

18        A.   Yes.

19        Q.   Is this the only invoice that you have

20    submitted to the Beasley Allen firm in connection

21    with your work on the Seidl matter?

22        A.   No.  I have, I think, an invoice submitted

23    for the deposition and I haven't prepared my final

24    invoice for work I did since December 5th -- or not

25    December 5th, whatever the date was.

```
1       Q.   So between August 30th, 2020, and today,
2   March 8th, 2021, you have performed additional work
3   on the Seidl matter that you have not yet invoiced
4   Beasley Allen for?
5       A.   Right.
6       Q.   Do you have an estimate as to how much time
7   you spent during that window?
8       A.   I'm not sure.  Let me look and see.  This
9   invoice, I need to be able to turn pages or open my
10  own version.
11      Q.   Do you have a copy of this with you today in
12  your file?
13      A.   I think so.  I just mentioned one when I
14  looked at it.  Let's see.
15      Q.   Why don't you go ahead and open that one and
16  if it looks materially different to what we just
17  looked at, we'll figure out what to do, but if that
18  looks the same as the date that we were just looking
19  at for this one, feel free to refer to your own
20  copy.
21      A.   All right.  I don't know what's going on.
22  Everything is full screen now and I can't seem to
23  reduce it.  There we go.  I reduced it.  Okay.
24           So go back to the file.  Okay.  And Invoice
25  2/17 -- actually, it's dated February 16th, 2021.
```

William Sawyer, Ph.D.

```
 1    Yeah, that's just for the deposition fee.  Yeah, I
 2    haven't prepared a final invoice yet.
 3        Q.   Even though you have not prepared the final
 4    invoice yet, do you have at least a ballpark of how
 5    much time you've spent between the end of August
 6    2020 and today working on the Seidl matter?
 7        A.   I would have to estimate probably 10 or 12
 8    hours.
 9        Q.   Part of that time was spent talking to
10    Mr. Seidl on March 4th, 2021?
11        A.   Yes.
12        Q.   How long did you spend speaking with him on
13    March 4th?
14        A.   Oh, 10 or 15 minutes, very brief.  I just
15    had a few follow-up questions.
16        Q.   Is any additional time that you've spent
17    working on this matter between the end of August
18    2020 and today, setting aside the deposition fee,
19    work that you are intending to bill at your standard
20    rate?
21        A.   Yes.
22        MS. COPE-KASTEN:  Will, I'm just going to
23        request that whenever Dr. Sawyer does invoice
24        your office for that additional time, that we
25        receive a copy of the invoice, please.
```

```
 1            MR. SUTTON:  Certainly.
 2   BY MS. COPE-KASTEN:
 3      Q.   Have you, Dr. Sawyer, at any point during
 4   your work on the Seidl matter, spoken with Dr. Boyd,
 5   Dr. Barry Boyd in connection with this case?
 6      A.   Yes.
 7      Q.   When did you speak with Dr. Boyd in
 8   connection with the Seidl matter?
 9      A.   Last week.
10      Q.   Was there an attorney present?
11      A.   Unless I'm confusing it with another case.
12   I did speak with him last week and I believe we had
13   some discussions regarding this case.
14      Q.   Do you recall what you talked with Dr. Boyd
15   about?
16      A.   I believe I talked to him about my research
17   and review of the Vulcan site where Mr. Seidl was
18   employed for about a year-and-a-half.  He had some
19   questions and wished to speak with me and so I gave
20   him a call, and I needed to talk to him anyway on
21   another matter.
22      Q.   What was the nature of his questions about
23   the Vulcan site?
24      A.   Well, he asked questions about what type of
25   plant it was, what materials were released, where
```

1    Mr. Seidl was located in the plant.  He had some

2    questions regarding his facility he worked in and

3    whether he was near the production facility, and

4    what chemicals were released by the plant into the

5    environment.

6        Q.   Were you able to answer all of the questions

7    that he had for you?

8        A.   Yes.

9        Q.   Do you recall about how long you spent

10   speaking to him?

11       A.   I think on that call we talked about two

12   different cases, so, no, I can't really distinguish

13   how much of the call was attributed to the Seidl

14   matter versus the other matter.  Total length of the

15   call was probably 20 minutes.

16       Q.   Is that the only time that you've talked to

17   Dr. Boyd in connection with Mr. Seidl's case?

18       A.   Yes.

19       Q.   Have you spoken with Mr. Petty in connection

20   with Mr. Seidl's case?

21       A.   No.

22       Q.   Have you reviewed Mr. Petty's report in the

23   Seidl matter?

24       A.   No.

25       Q.   Have you reviewed Dr. Boyd's report in the

William Sawyer, Ph.D.

```
 1    Seidl matter?
 2      A.   No.
 3      Q.   Have you spoken with any other expert
 4    witness for the plaintiffs other than your
 5    conversation with Dr. Boyd last week in connection
 6    with the Seidl matter?
 7      A.   Not in connection with the Seidl matter, no.
 8      Q.   When you spoke with Dr. Boyd and answered
 9    his questions about the Vulcan site, did you give
10    him your opinion as to how any potential exposures
11    at that site affected or did not affect Mr. Seidl's
12    risk of developing cancer?
13      A.   Yes.  I think I explained to him in summary
14    that there was groundwater plume contamination and I
15    had segregated out what we call the VOCs, that's V
16    as in Victor, OC, meaning volatile organic
17    chemicals, and explained to him that the research
18    data showed that there was a plume; however, the --
19    what we call the permeation and penetration of
20    volatiles inside the building structures occurred at
21    the production area.  There was no evidence of any
22    infiltration of volatiles in the office building up
23    near South Ridge Road, and that the volatile
24    chemicals, I think I may have briefly listed what
25    they were, and I explained that there are also
```

```
 1    nonvolatile or semi-volatiles compounds, such as

 2    2,4-D and 2,6-D, and other chemicals that did not

 3    have the propensity of forming a vapor atmosphere

 4    inside building structures that were, hence, slab

 5    built on groundwater; and I think I may have went as

 6    far as even explaining that VOCs have the propensity

 7    of finding cracks in concrete floors or holes that

 8    are drilled through pipes and so on, and there can

 9    be some release of volatile VOCs, but in this case

10    it's been well studied by the EPA and other

11    contractors that the concern was that of buildings

12    in the production area.

13         I think I also explained that I did a Google

14    map quantitation and that the office building which

15    Mr. Seidl worked was about a quarter mile from the

16    production facility, and also explained that he

17    worked entirely inside the office building, not the

18    production area, and that he estimates he only went

19    outside perhaps 20 times during his year-and-a-half

20    career and those were for very brief moments, and it

21    was the habit of the way his operation worked that

22    if someone came from the production area, they came

23    to his office as opposed to him going to the

24    production area, as his job entailed ordering

25    supplies and handling the paperwork.
```

1     Q.    Did Dr. Boyd express any opinion back to you

2     about the information that you had shared regarding

3     the VOCs in that area?

4     A.    Well, I think we briefly, very briefly

5     talked about what the VOCs in the groundwater were,

6     and I pointed out that there are some in the

7     groundwater associated with NHL, but the exposures

8     in the surrounding office buildings were not

9     considered as at risk by EPA, that the work that was

10    done to prevent VOC intrusion were in the production

11    area and I think EPA had documented that there was

12    still one building in the production area that could

13    have a VOC penetration problem.

14    Q.    When you interviewed --

15    A.    I think I also gave him an example in terms

16    of quantifying dose, and I used the example of

17    benzene, and I stated to him that even if benzene

18    was at the OSHA limit in his office, which there's

19    absolutely no evidence of any benzene in his office,

20    but even if it had been at the OSHA standard of

21    1 ppm, knowing that the literature requires about

22    19 ppm exposure-years, and that Mr. Seidl did not

23    work for 19 years but, rather, only 1.5 years, that

24    his exposure would have to be 10 or 15 times above

25    the OSHA standard to reach that 19 ppm threshold

1    that is associated with a statistically significant

2    increase of hematopoietic malignancies, and I told

3    him based on my assessment, there is no significant

4    risk evident for Mr. Seidl and any such discussions

5    of that would be mere speculation.

6        Q.   Aside from the example you used with

7    Dr. Boyd of benzene, were there any chemicals at the

8    production facility that you felt were present at a

9    high enough level that they could have presented a

10   risk for Mr. Seidl given the duration of his

11   potential exposure, if any?

12       A.   Not in his workplace, no.  If he worked in

13   the production area, then there are increased risks

14   because there is documentation that the VOCs made it

15   inside to the buildings, and then each chemical

16   would have to be assessed, and the potency of these

17   chemicals vary.  Vinyl chloride has a higher potency

18   than benzene, for example.

19           (Sawyer Exhibit 3 was marked for

20   identification.)

21   BY MS. COPE-KASTEN:

22       Q.   I'm going to mark as Exhibit 3 to your

23   deposition your notes from your follow-up

24   conversation with Mr. Seidl on March 4th, 2021.

25       A.   All right.  I have that open.

```
 1        Q.   Okay.  What prompted you to talk to

 2   Mr. Seidl again on March 4th?

 3        A.   I had some questions.  One of my questions

 4   had to deal with whether or not he was on public

 5   water throughout his residency, which dates back to

 6   I think about age 10, or earlier, actually, and also

 7   some other minor questions about his workplace.

 8        Q.   What was the significance to you of whether

 9   he was on public water as opposed to well water?

10              (Telephone ringing.)

11              THE WITNESS:  That should have been put on

12        rollover.

13              To prevent such interruptions, I'm going to

14        take just one minute, if even, and put this on

15        rollover.

16              MS. COPE-KASTEN:  That's fine.  We can go

17        off the record.

18              THE VIDEOGRAPHER:  The time is 9:33 a.m.,

19        off the record.

20              (Recess from 9:33 a.m. until 9:34 a.m.)

21              THE VIDEOGRAPHER:  The time is 9:34 a.m., on

22        the record.

23   BY MS. COPE-KASTEN:

24        Q.   Dr. Sawyer, what was the significance to you

25   of whether Mr. Seidl was on public water versus well
```

1    water when he was living in Kansas?

2        A.   My research indicated that Wichita, the city

3    of Wichita, has a tetrachloroethylene plume

4    underneath it from several dry cleaning operations,

5    and that the public water was free of trichloro --

6    or tetrachloroethylene; however, well water in some

7    cases contained, depending on the depth of the well,

8    low levels of tetrachloroethylene and what I learned

9    was that from age 10, approximately 1966, they were

10   on well water at ███████████████████, and at

11   that time he believes ever since that time he's been

12   on public water.

13       Q.   Could his exposure to whatever chemicals

14   were in well water between the ages of zero and 10

15   have impacted his risk of developing cancer

16   subsequently?

17       A.   There's no evidence of any groundwater

18   contamination between ages zero and 10.

19       Q.   When did the groundwater contamination issue

20   start in this area?

21       A.   Much later.  I don't know the exact year,

22   but much later, from what I read.

23       Q.   You also asked Mr. Seidl about his physical

24   location at the plant that he was working at when he

25   was working for the Occidental Chemical Corporation,

1    right?

2       A.   Yes.  I had previously interviewed him and

3    established where his office was and I used, after

4    that interview, Google's map to locate his office

5    and the production plant area, and I wanted to talk

6    to him about that and lay out some landmarks, for

7    example, how many feet from the road, because what I

8    believe he described to me is the building that is

9    right along South Ridge Road, and he confirmed to me

10   that it is, and he described the parking lot, which

11   also fit the Google Earth image, and he explained

12   walking to the main office, no matter where he

13   parked in the lot, would be under 100 feet away.

14      Q.   What was the importance of that information

15   to your assessment of Mr. Seidl's risk of developing

16   non-Hodgkin's lymphoma?

17      A.   Simply the distance of his office from the

18   production plant.  I wanted to make sure my

19   measurement was accurate.

20      Q.   Why was that measurement important to you?

21      A.   Well, if he worked in the production plant,

22   or if his office was at the production plant, he

23   would have had exposures to volatile organic

24   contaminants.

25      Q.   You noted that Mr. Seidl was not aware of

1    whether the facility was on well water or public

2    water, correct?

3        A.    Yes.   That's what I stated, yes.

4        Q.    Did you attempt to do any further

5    investigation into whether the facility was on well

6    water or public water?

7        A.    Through just general searches I've prepared

8    on the matter, EPA data and so on.  I could not find

9    any information on that.

10       Q.    Would it have mattered to you if Mr. Seidl

11   was on well water at the facility rather than public

12   water?

13       A.    It depends on the concentration of

14   carcinogens within the well water.

15       Q.    Do you know what that concentration was for

16   any well water that would have been in that area?

17       A.    My review showed there was no known potable

18   water wells in that area, just test wells,

19   monitoring wells.  Also, the depth of the wells were

20   critical, too, in terms of if there had been --

21   let's just speculate and say there was a drinking

22   water well.  The depth of that well is critical in

23   determining whether or not it would have picked up

24   any contaminants from the upper aquifer.

25       Q.    Why did you ask Mr. Seidl whether he knew if

1    the facility was on well water and then conduct

2    subsequent searches about whether there were levels

3    of carcinogens in the well water if your belief was

4    that there were no potable wells in the area?

5        A.   Well, because I didn't know that for sure.

6    I asked him questions and then I performed

7    additional research looking for any evidence of

8    potable wells or testing of potable water wells by

9    EPA or other agencies, and there is just no evidence

10   of such.

11           Remember, my job is a toxicologist.  I'm not

12   an advocate as you are.  My job is to find out what

13   he was exposed to and whether or not what he was

14   exposed to had any association with his NHL, and

15   well water can be a source of contamination causing

16   NHL, so I, of course, researched that.

17           MS. COPE-KASTEN:  Move to strike "as you

18       are" from that answer.

19       A.   Well, all attorneys are advocates.

20       Q.   Why --

21           MS. COPE-KASTEN:  Move to strike that as

22       well.

23       Q.   Why did you not include this information

24   when you originally prepared your report for

25   Mr. Seidl's case?

William Sawyer, Ph.D.

```
 1       A.    I performed additional research since that
 2   time.
 3       Q.    What caused you to perform additional
 4   research into this particular topic?
 5       A.    Just looking, digging through EPA websites
 6   trying to characterize -- further characterize the
 7   nature of the Vulcan operation, its history, when it
 8   opened, what chemicals it processed over the years
 9   and so on.
10       Q.    Is that research that you could have done
11   prior to preparing your report in August 2020 for
12   the Seidl case?
13       A.    It's possible.
14       Q.    Why did you begin looking further into
15   information about the Vulcan facility after
16   submitting your final report in this matter to
17   Mr. Tomlinson and the Beasley Allen firm?
18       A.    Well, back in August, when I prepared my
19   report, I was not finding much on the Vulcan plant,
20   and I just continued digging and looking and finding
21   what I could.
22       Q.    But you have not prepared any changes to
23   your report based on that further information that
24   you looked at?
25       A.    That's right.
```

William Sawyer, Ph.D.

```
 1      Q.   When you interviewed Mr. Seidl in January
 2   2020, how long did you speak to him?
 3      A.   If you could call up my invoice, that
 4   probably would show it.
 5      Q.   Give me one moment.
 6           I appreciate your precision.  It looks like
 7   you spent .76 hours speaking with him?
 8      A.   Well -- oh, there it is.  Yes.
 9      Q.   What did you talk with Mr. Seidl about
10   during that occasion?
11      A.   Well, I can try to refresh my memory by
12   opening my report.  Let's see.
13           Well, I remember going through his
14   residential history and determining whether the --
15   well, asking him whether any of the properties were
16   adjacent to gasoline service stations, if he knew if
17   some of -- if there was any knowledge of any tank
18   removals or under -- leaking underground storage
19   tanks, asked him if he lived near any industrial
20   sites, toxic waste sites or Superfund sites.  I --
21      Q.   Did he tell you -- let me stop you just
22   there for one moment.  Did he tell you at that time
23   that he lived near a Superfund site when he was in
24   Kansas?
25      A.   No.  He said he did not live near one.
```

1    Q.   Okay.  Please continue with what else you

2    talked to him about.

3    A.   I discussed with him his history of using

4    any type of tobacco products, smoking.  He admitted

5    he used marijuana in college, and not since; that he

6    drinks around five alcoholic beverages per week for

7    the past 15 years.  I asked him to give me a full

8    alcohol history from college days on forward, and he

9    said he drank a bit more when he was in South

10   Africa, I think seven drinks a week.

11        He's never been diagnosed with obesity.  His

12   maximum weight was 194 pounds.  There are many

13   questions on my Table 2 and I went through those

14   questions with him in detail.  In other words, I

15   don't just ask what is your family medical history.

16   I ask specifically what the medical history is

17   regarding any type of malignancies, especially in

18   the first generation relatives, and, of course, the

19   alcohol history, smoking history, drugs of abuse.

20        I asked him his weight over time, what it

21   was from college days on forward, the maximum

22   weight, to determine if he was obese at any time and

23   for how long.  We spoke about prior pharmacologic

24   regimens, and all of those things on Table 2.

25        And then there are things beyond that I

```
 1   spoke to him about in deposition, such as his use of

 2   products for gardens or lawns or outdoor products

 3   that -- other than Roundup, and he did use

 4   MiracleGro, which is actually a harmless product but

 5   I include it in my list as a dummy question.

 6          And he used Amdro, which is a common ant

 7   killer for fire ants.  He used a lawn service but

 8   does not know what chemicals they used.  His

 9   grandfather had a farm.  I asked if he was exposed

10   to any products, any chemicals, whether or not the

11   farm had a pesticide rope that the animals would

12   walk under releasing pesticide on the back of the

13   animal, and he said he wasn't aware of such and he

14   never worked on the farm but he just visited there.

15          I talked to him about his early days as the

16   body shop cleanup guy, and he gave me some details

17   on that information, and we went forward with his

18   occupational history.  That's where I learned he

19   worked as a purchasing agent for Vulcan in 1979 for

20   about a year-and-a-half, and he stated he was never

21   exposed to the chemicals as he worked in the office

22   with the majority of his time spent on the phone,

23   and that his office building was a quarter mile from

24   the plant.

25          And I questioned him about the respirator
```

```
 1    and I also asked him more about the respirator on

 2    the follow-up interview, and clearly he stated it

 3    was a requirement to have it with you outdoors in

 4    case there had been an excursion, explosion or some

 5    type of release of chlorine gas, which he said never

 6    occurred during his employment.

 7        Q.   Can I ask you a quick question about that?

 8        A.   Yes.

 9        Q.   Would there be any risk at all to him of

10    getting exposure to even low levels of chlorinated

11    chemicals in the air around the plant short of an

12    emergency that would require him to wear a

13    respirator?

14        A.   Well, if the air levels were high enough and

15    he worked for maybe 10, 20, 40 years, but remember,

16    the assessment of carcinogen he -- what I learned in

17    the follow-up interview, one of the questions I

18    asked him, specifically for that reason you're

19    asking me now, he did say he had gone outside about

20    20 times.  So I asked him why did you go outside and

21    for how long, and his time outside was generally

22    five minutes or less.

23            So 20 times 5, that's about 100 minutes

24    total exposure in the entire time he worked there.

25    It would -- again, if you use benzene as an example,
```

1   to reach 19 part per million benzene-years in one

2   hour, that would be an explosive limit of benzene.

3   His air would have had to have been saturated with

4   it.  There is just no evidence of any air emissions

5   in his area of the plant up near Ridge Road that I

6   could find in the EPA assessment.

7        So, again, it would be pure speculation.

8   Q.   When you talked with Mr. Seidl about whether

9   he lived near any Superfund sites, and he told you

10  that he did not live near any that he was aware of,

11  did you know that there were Superfund sites near

12  any of his residences?

13  A.   I was aware that there were Superfund sites

14  around Wichita, but he was very clear that he lived

15  in a residential area, not near any Superfund sites,

16  and, you know, when I was the toxicologist in New

17  York State, in Onondaga County, that's Syracuse, New

18  York, we had 23 Superfund sites in that county.  The

19  county residents in Syracuse numbered about half a

20  million.  That half million people did not have

21  exposure to Superfund sites.

22        I worked on cases in New York State where

23  there were kids riding mini bikes and motorcycles on

24  top of the Superfund site, stirring up the dust

25  containing the PCB's.  Those kids had exposure.

1        So just the near presence of a Superfund

2   site near a city, that does not equal exposure, and

3   if you lived in close proximity to it, I would have

4   carried out a further assessment, but he did not

5   live adjacent to or close by to a Superfund site.

6        Q.   Did you do a separate assessment of whether

7   each of his residences in Overland Park, in Olathe,

8   in San Antonio, and in Charlotte, to determine

9   whether they were near Superfund sites?

10       A.   No, but I did ask Mr. Seidl, Seidl.

11       Q.   Have you spoken with any of Mr. Seidl's

12   family members?

13       A.   I'm looking to see if I have any notes

14   regarding Laurinda being on the call.  I don't

15   believe she was but I'm checking.

16        No, there was -- no, that was the

17   deposition, actually.  I don't recall her being on

18   the call.

19       Q.   So the answer is no, to the best of your

20   recollection, you've not spoken with any of

21   Mr. Seidl's family members in connection with this

22   case?

23       A.   Correct.

24       Q.   Have you spoken with any of Mr. Seidl's

25   treating physicians in connection with his case?

William Sawyer, Ph.D.

```
 1      A.   No.

 2      Q.   Have you reviewed the deposition transcripts

 3   of any of his treating physicians?

 4      A.   No.

 5      Q.   I didn't see them on your Materials

 6   Considered List but I just wanted to confirm.  Did

 7   you say no?

 8      A.   No, I have not.

 9           MS. COPE-KASTEN:  Why don't we go ahead and

10      take about a three-minute break and come back at

11      the top of the hour.

12           THE WITNESS:  Okay.

13           THE VIDEOGRAPHER:  The time is 9:57 a.m.,

14      off the record.

15        (Recess from 9:57 a.m. until 10:02 a.m.)

16           THE VIDEOGRAPHER:  The time is 10:02 a.m.,

17      on the record.

18   BY MS. COPE-KASTEN:

19      Q.   Dr. Sawyer, I want to ask you a couple of

20   questions about some specific pieces of your report.

21   I'm going to put it up on the screen here but you

22   should feel free to go to your own copy if that's

23   easier for you to navigate around.

24           The first question that I want to ask you is

25   on page 7, and I think that this is just a typo but
```

William Sawyer, Ph.D.

1    I want to make sure that we're on the same page.

2         Looking at the top of page 7, the first

3    paragraph, are you there?

4    A.   Yes.

5    Q.   The sentence that starts "By

6    immunohistochemistry," am I correct that that should

7    read:  The large atypical lymphoid cells were

8    positive for CD20, BCL-2, BCL-6, CD10, CD5, and

9    showed an approximate 60 percent proliferation by

10   Ki-67 tumor cells negative for cyclin D1 and p53?

11   A.   Yeah, that should be CD20 and CD20.

12   Q.   And also cyclin D1?

13   A.   Let's see.  Cyclin D1, yes.

14   Q.   On the top of page 15 of your report, you're

15   talking about the deposition transcript of Laurinda

16   Seidl, do you see that?

17   A.   Yes.

18   Q.   One of the things that you report that she

19   indicated was that when Mr. Seidl got his NHL

20   diagnosis, he lost a lot of weight and became very

21   frail and thin.

22        Do you see that?

23   A.   Yes.

24   Q.   Do you intend to convey that information to

25   the jury?

1      A.    No.   My concern was whether or not he was

2    severely obese as a potential risk factor.

3      Q.    We can agree that Mr. Seidl was overweight

4    by virtue of his BMI but was not obese at the time

5    of his diagnosis, correct?

6      A.    That's right.

7      Q.    Do you know that Mr. Seidl had follicular

8    lymphoma specifically as a subtype of non-Hodgkin's

9    lymphoma?

10     A.    Yes.

11     Q.    Are you aware of any study showing a

12   statistically significant association between

13   glyphosate or Roundup and follicular lymphoma

14   specifically?

15     A.    Only to the extent that there is a study

16   that shows an apparent increased risk but it was not

17   statistically significant, and if I were to go to

18   that study, I think I recall that it was close to

19   significance but it didn't make the cutoff at P .05,

20   that it's a 95 percent confidence limit, and I

21   should point out --

22     Q.    Is that --

23     A.    -- point out that follicular lymphoma occurs

24   at a much lower frequency than DLBCL and, thus, the

25   type 2 error within those epidemiological studies is

1     rather high simply because of the lower number of

2     cases in the background population.  There isn't as

3     many cases to statistically analyze and their type 2

4     error is increased.

5          Q.   What's the study that you were referring to

6     just now?

7          A.   Well, one of the studies reported in my

8     report.  I don't remember exactly.  I'd have to open

9     them up if you want to take the time.  It's a study

10    that I've spoken about at least on two other

11    Monsanto depositions, where we went through the

12    study, looked at the odds ratio and the statistical

13    value.  I don't recall.  I think it may have been

14    within possibly one of the meta-analysis studies,

15    but I'm not sure.

16         Q.   Does Pahwa or the North American Pooled

17    Project sound right to you for that?

18         A.   That's what I was thinking, yeah.  Yeah.

19         Q.   I want to ask you about the sprayer that

20    Mr. Seidl used when he was living in San Antonio,

21    Texas.  Is it the one-gallon hand-pump sprayer?

22         A.   That's what he stated, yes.

23         Q.   Have you seen the sprayer or photos of the

24    sprayer that he used?

25         A.   No.

1      Q.   Are you familiar with the type of sprayer

2    that he's talking about, a one-gallon hand-pump

3    sprayer?

4      A.   Not to the degree I can tell you whether it

5    was the circular shape versus the cylindrical.  I

6    don't know.

7      Q.   With a sprayer like that, an individual has

8    to pump up the sprayer and then the pressure that's

9    built up from pumping causes it to discharge

10   whatever is inside the sprayer, right?

11     A.   Yeah, that's the general design.

12     Q.   Does the shape of the sprayer make a

13   difference, whether it is cylindrical or circular,

14   as to how quickly a substance will be discharged

15   from inside the sprayer?

16     A.   I would have to defer that to a hydraulics

17   expert, because a cylinder, a round sphere, as it

18   discharges, may have a higher headspace of air

19   versus liquid volume, versus a cylinder, so I think

20   that requires a physicist or hydraulic engineer

21   expert to answer that.  There could be some minor

22   slight difference as the amount of liquid

23   diminishes, but I can't answer that for sure.

24     Q.   Would you also defer to a hydraulics expert

25   on what the general rate is of discharge from a

William Sawyer, Ph.D.

```
 1    sprayer like that, or are you familiar with that
 2    independently from your own work?
 3       A.    Well, as far as the rate, I can answer that.
 4    As the pressure decreases, as long as you are not
 5    asking the question what if he only pumped it up at
 6    the beginning, which type would last longer, that's
 7    a -- really a hydraulics question, but the way these
 8    things actually work in the real world, as the
 9    pressure decreases, as the spray comes out of the
10    wand at a slower pace, one usually takes a moment
11    and pumps it up again.  In fact, I'm not sure those
12    sprayers can even go all the way to empty without
13    some additional pumping.
14       Q.    When you say that you're not sure that they
15    can go all the way to empty without some additional
16    pumping, are we talking, like, they might need to be
17    pumped up one to two additional times, or they might
18    need to be pumped up 10 additional times for a
19    one-gallon size?
20       A.    Based on my own experience, at least -- at
21    least one or two more times.
22       Q.    How long does it take, if the only stops
23    that you're making are to repump the sprayer, how
24    long does it take to completely discharge a
25    one-gallon spray container spraying continuously?
```

William Sawyer, Ph.D.

```
 1              MR. SUTTON:  Object to form.
 2       A.   It really depends on the nozzle, whether the
 3   nozzle is set for wide dispersion or whether it's a
 4   modified nozzle that shoots more in a straight
 5   liquid line.  There is variabilities.  I can't
 6   really speculate on that time.  It depends on the
 7   pressure.
 8       Q.   If it was a wide --
 9       A.   It depends on the pressure in the unit as
10   well, what pressure it's operating at.
11       Q.   Did you make any attempt to determine what
12   type of nozzle Mr. Seidl was using on the pump
13   sprayer that he had in San Antonio?
14       A.   I don't recall I asked him.  I don't see it
15   in my notes but I usually do ask about the nozzle,
16   whether it leaked, whether it was adjustable,
17   whether it had to be cleaned.  I don't see any
18   information on that.  Let's see.
19              No, I just -- I don't have any information.
20       Q.   Did you ask him any questions about what the
21   pressure was set to for that pump sprayer that he
22   was using?
23       A.   No.  I didn't find it all that relevant
24   because his real problem was walking through sprayed
25   weeds and having direct contact with the liquid onto
```

1    his pants or skin to the degree that his skin felt

2    moist, so I wasn't all that concerned about the

3    nozzle performance per se.

4        Q.   How long after weeds are sprayed is there a

5    risk to individuals from walking through them?

6            MR. SUTTON:  Object to form.

7        Q.   In your opinion?

8        A.   Well, to answer it correctly, I have been

9    through all of the reentry documentation produced by

10   Monsanto, including the submissions to Sweden on

11   reentry, and other countries, that have values

12   within those documents for transfer of deposited

13   Roundup, that is specifically glyphosate, versus the

14   amount of contact one can achieve over time, and I

15   would need to pull up the reentry registration

16   information submitted to the various agencies by

17   Monsanto to give you an exact number, but what might

18   expedite this is if I explain to you that when he

19   reentered, he was in the active process of spraying

20   and the plants that he walked through were still wet

21   with liquid.  It wasn't a type of thing where he

22   went back an hour or two later, but this was during

23   his spraying he was walking through weeds to a

24   degree that he had skin contact with material that

25   was just sprayed onto the weeds.

1        I don't know if that helps any.

2    Q.   If I spray one gallon of Roundup and it

3   takes me one hour to spray that one gallon, is my

4   exposure higher, lower, or the same as if I spray

5   the same amount, one gallon, over the course of two

6   hours?

7    A.   It's highly variable.  It depends on whether

8   you're spot spraying, walking through weeds that

9   were wiping liquid onto your calfs and lower legs as

10   in the current matter.  He wore shorts quite often.

11   He could feel that his skin were -- was wet from

12   contact with plants and from spray drift mist.

13        And if he only operated the trigger every --

14   let's say he used it -- turned the trigger on every

15   five minutes over that period of an hour, he could

16   still obtain the same amount of exposure one would

17   get with the continuous spraying over an hour,

18   depending on the contact of the direct liquid onto

19   the skin.  It's highly variable.  It depends on the

20   wind, depends on the topography, whether there is

21   buildings causing wind funneling, or an example I

22   cited in the past was that of a sugar cane

23   applicator walking between the tall rows of sugar

24   cane and the wind was funneling down through those

25   rows, blowing it back and drenching an operator.

1        So there is just so many variables.  It's

2   not really possible to answer that question without

3   a very specific scenario.

4        Q.   Is it your opinion that the sugar cane

5   operator scenario is analogous to the type of

6   spraying that Mr. Seidl has done with Roundup?

7        A.   No.  His was not sugar cane on each side of

8   him, towering over his head, but, rather, in some

9   cases spraying poison ivy that was not on the ground

10  but rather elevated and having to hold the gun

11  straight out in front of him producing an aerosol at

12  head level; also walking, as I said, through wet

13  weeds.  So no, it's a slightly different scenario.

14       And the scenario -- these application

15  scenarios are highly available depending on the yard

16  and the structures and the height of the weeds,

17  whether they are climbing up fences.  There is many,

18  many variables and that's why it's difficult to

19  answer your general question.

20       Q.   When you say he had to hold the gun out in

21  front of him, are you referring to the wand with

22  which he sprayed Roundup?

23       A.   Yes.  He had a solid fence in his backyard

24  with poison ivy climbing up it.  He sprayed the

25  Roundup up and down the vines.  It would bounce off

1     the wall onto his skin.

2     Q.   Do you know how long it would take poison

3     ivy to regrow after having been sprayed with

4     Roundup?

5     A.   Well, it depends where you are.  If you're

6     in Sanibel Island, Florida, in the jungle in July, I

7     can actually see growth of poison ivy, where I had

8     my other house, I could -- I noted poison ivy growth

9     within a week that had climbed higher.  So it really

10    depends on the amount of moisture, whether you are

11    getting 17 inches of rain a month or one inch of

12    rain a month, and temperature and humidity.  There

13    is a lot of variables with that.

14         So all I can tell you is that poison ivy can

15    grow very quickly in the right environment.  I

16    actually had what I called a poison ivy tree.  It

17    was horrible.  The vines climbed up the palm tree

18    right up to the top of the tree.

19    Q.   Do you know whether San Antonio is a high

20    moisture or low moisture environment?

21    A.   I know seasonally it can be very dry.

22    During hurricane season I think it can be flooded

23    and wet, so it really varies.

24    Q.   One of the things that Mr. Seidl did as an

25    occupation for a summer when he was younger was

William Sawyer, Ph.D.

```
 1    pumping gasoline at a gas station.  Do you recall
 2    that?
 3        A.   Yes.
 4        Q.   Did you include any potential exposure at
 5    that gas station in your assessment of potential
 6    risk factors for developing non-Hodgkin's lymphoma
 7    with respect to Mr. Seidl?
 8        A.   Yes.  In the past I have completed risk
 9    assessment analyses of service station attendants
10    and referenced many studies in the past, and what
11    the studies consistently and coherently show is that
12    a full-time worker with sufficient years, for
13    example, 30 or 40 years of pumping gasoline, can
14    receive some measurable increased risk; however, in
15    this case we're dealing with one summer of part-time
16    exposure, and the studies do not indicate and do not
17    show any AML, that's acute myelogenous leukemia, or
18    other hematopoietic malignancy increases based on
19    one summer of part-time pumping.  It's just an
20    insufficient exposure, and that's based upon these
21    gasoline service station attendant studies which
22    show the air levels of benzene only in the --
23    typically in the 30, 40 part per billion range, and
24    to achieve a, you know, a 19 part per million
25    year-exposure, one would have to be exposed to one
```

1    part per million for 19 consecutive years 40 hours a

2    week.

3         The bottom line is that the studies are very

4    clear that a part-time one-summer exposure would be

5    insufficient of a dose to result in an increased

6    risk of benzene-related hematopoietic malignancy as

7    cited in the peer-reviewed studies.

8    Q.   If Mr. Seidl got gasoline on his skin during

9    the course of his job as a pump operator, would that

10   have changed his exposure level to carcinogenic

11   chemicals in the course of that job?

12   A.   Not in that short time period, and the

13   studies on gasoline service station attendants

14   include both inhalation and dermal exposure, and

15   again, there is no significantly increased rate of

16   cancer in those studies with a one-time part-time

17   exposure.  It's just not there.

18   Q.   I'm just going to ask you a quick clarifying

19   question about a table in your report, which is

20   Table 3 on page 21.  Can you see that?

21   A.   Yes.

22   Q.   Table 3 is listing the carcinogenicity of

23   substances to which Mr. Seidl reported potential

24   exposure, right?

25   A.   Yes.

William Sawyer, Ph.D.

```
 1        Q.   And in this table you have listed the Amdro

 2   ant bait granules that he used, wasp spray,

 3   MiracleGro, latex paint and motor oil, correct?

 4        A.   Yes.

 5        Q.   It is your view that none of those

 6   substances have a known risk of causing

 7   non-Hodgkin's lymphoma?

 8        A.   Yes, that's very clear.

 9        Q.   The same is true with respect to whether

10   they are probable human carcinogens?

11        A.   Correct.

12        Q.   Is there a reason that you didn't list

13   gasoline or the chemicals such as benzene that could

14   be associated with exposure to gasoline in this

15   table?

16        A.   Yes.  I covered that in Footnote 80 in Table

17   2.

18        Q.   So Footnote 80 for Table 2 also applied to

19   Table 3?

20        A.   Yeah, and actually Table -- Footnote 79 and

21   80, yeah.

22        Q.   Another one of the part-time occupations or

23   full-time for a short period of time occupations

24   that Mr. Seidl participated in was cutting pine

25   boards for a trim carpenter.  Do you recall that?
```

1      A.   Yeah, and I'm very familiar with the types

2    of wood with respirable sawdust that cause primarily

3    nasopharyngeal malignancies, and pine is not one of

4    them.

5      Q.   Is that the reason that you don't have pine

6    or wood dust exposure listed in Table 3?

7      A.   That's correct.  It's not the correct type

8    of wood dust.

9      Q.   What would be the right type of wood dust?

10      A.   I don't recall but it's not pine.

11           MS. COPE-KASTEN:  Let's go off the record

12      for a couple minutes.

13           MR. SUTTON:  Okay.

14           THE VIDEOGRAPHER:  The time is 10:28 a.m.,

15      off the record.

16         (Recess from 10:28 a.m. until 10:35 a.m.)

17           THE VIDEOGRAPHER:  The time is 10:35 a.m.,

18      on the record.

19           (Sawyer Exhibit 4 was marked for

20      identification.)

21    BY MS. COPE-KASTEN:

22      Q.   I want to talk just quickly about a list of

23    chemicals that you produced in connection with

24    Mr. Seidl and the Kansas location.  This is

25    Exhibit 4 to your deposition.  These are notes that

William Sawyer, Ph.D.

```
1    you made with respect to potential VOCs at the

2    Vulcan plant in Kansas?

3         A.   Yes.

4              (Sawyer Exhibit 5 was marked for

5    identification.)

6    BY MS. COPE-KASTEN:

7         Q.   I'm going to switch documents very quickly

8    now and mark as Exhibit 5 to your deposition where I

9    think you are pulling those from, which is a report

10   from EPA as to chemicals at the Occidental Chemical

11   Corporation facility.  Do you see that?

12        A.   Yes.

13        Q.   In the copy of this EPA document that we

14   received from Mr. Seidl's office -- or Mr. Sutton's

15   office, on the third page at the top is highlighted

16   a paragraph about groundwater.  Do you see that?

17        A.   I do.

18        Q.   Is that your highlighting?

19        A.   Yes.

20        Q.   Why is groundwater highlighted but not any

21   of the other potentially contaminated areas?

22        A.   Well, groundwater has the propensity of

23   moving further away from the spill site and, thus,

24   soils at the production plant itself, so some are

25   mobile, some aren't.
```

William Sawyer, Ph.D.

```
 1      Q.   Is groundwater the only potential source of
 2   contamination at this site that you thought could
 3   even maybe be a risk to Mr. Seidl?
 4      A.   Yes.
 5      Q.   Looking at the substances that are listed
 6   here, do you have in hard copy paper form in front
 7   of you what I just marked as Exhibit 4, your notes
 8   on the VOCs?
 9      A.   Yes.
10      Q.   The first substance that is listed in this
11   EPA document as a COPC, which the EPA has called
12   chemicals of potential concern, do you see that?
13      A.   Yes.
14      Q.   Is 2,4-D?
15      A.   That's correct.
16      Q.   Are you with me?
17      A.   Yes.
18              (Discussion off the record.)
19      Q.   As to 2,4-D, that's not listed in Exhibit 4,
20   your list of potential VOCs, right?
21      A.   Yeah, it's not a VOC.  It's a semi-volatile.
22   It doesn't have the propensity to produce a
23   measurable air level from soil vapor release carried
24   by groundwater.  It doesn't travel -- it doesn't
25   volatilize out from soil vapor, groundwater soil
```

1    vapor in the same fashion as vinyl chloride or

2    methylene chloride or benzene or other highly

3    volatile substances.  2,4-D has a very different

4    vapor pressure and is not considered a VOC.

5        Q.   If Mr. Seidl drank well water at the

6    facility, and I understand that your opinion is that

7    he likely did not, would 2,4-D present a different

8    risk in the form of drinking water than it would in

9    the form of soil vapor?

10           MR. SUTTON:  Object to form.

11       A.   It could.  What type of risk are you

12   speaking of, a health risk of some type?

13       Q.   A risk of increasing an individual's

14   potential to develop non-Hodgkin's lymphoma or other

15   cancer.

16           MR. SUTTON:  Object to form.

17       A.   How could it do that when my report around

18   page -- well, it's not in this report, actually, but

19   how can it do that when Monsanto has already sworn

20   under oath that it doesn't cause cancer in an

21   interrogatory response?  I don't understand.

22       Q.   You and I have been over this before,

23   Dr. Sawyer, and I'm not going to cover it again

24   today, but do you understand that IARC has

25   classified 2,4-D as a group 2B possible human

1    carcinogen?

2         MR. SUTTON:  Object to form.

3    A.   Correct, but the confusion is when you look

4    at my tables, I list the IARC classification, I have

5    it -- I don't know what exhibit it is but in my

6    table I do list the IARC classifications and I'm

7    well aware and I've testified previously that 2,4-D

8    is a 2B classified possible carcinogen, but my

9    concern is that there is a conflict here with your

10   client who claims it doesn't cause cancer, so there

11   is an element of confusion.

12        MS. COPE-KASTEN:  Move to strike everything

13      after "correct."

14   A.   Okay.

15   Q.   With respect to pentachlorophenol, which is

16   listed in the EPA document that is Exhibit 5 to this

17   deposition, what is the reason that that is not

18   listed in your list of possible VOCs?

19   A.   Well, specifically, pentachlorophenol is not

20   a VOC.  It's a semi-volatile.

21   Q.   Similar situation to 2,4-D in that it can't

22   vaporize in the same way that some of these other

23   chemicals can?

24   A.   It can vaporize but it's classified as a

25   semi-volatile due to its vapor pressure.  Now, if

```
1    you were sitting in a puddle of it, sitting in a
2    chair with your feet out of the water, or sitting
3    literally in pentachlorophenol, yes, then one might
4    reach a vapor pressure of harm, but part per billion
5    level of pentachlorophenol in water, the vapor
6    pressure that is used in the modeling for
7    calculating vapor intrusion requires volatile
8    organic compounds, not semi-volatiles.  They just
9    don't have enough vapor pressure to create a
10   measurable air level in an indoor environment based
11   upon part per billion groundwater levels.
12          Now, that's not true for a compound such as
13   vinyl chloride or trichloroethylene or other
14   volatiles.  They can produce a measurable
15   concentration in indoor air through vapor intrusion,
16   and there is a number of EPA models that are used
17   and the definitions require a certain level of vapor
18   pressure, and that is the definition for a volatile
19   organic chemical versus a semi-volatile, and the
20   2,4-D and pentachlorophenol are semi-volatiles.
21      Q.   Is 2,4,6-trichlorophenol also a
22   semi-volatile?
23      A.   Yes, it is, and has very similar volatility
24   constraints based on its vapor pressure.
25      Q.   Same thing with respect to 3/4-chlorophenol?
```

1     A.    Yes.

2     Q.    Is that also a semi-volatile?

3     A.    It is.

4     Q.    For pentachlorophenol, would there be a

5   different risk of potential carcinogenicity from

6   well water contamination than there would be from

7   potential vaporization from the soil?

8     A.    Yes.  The vaporization from soil would be

9   negligible in an indoor environment; however,

10  drinking it in water would produce a measurable

11  dosage that could be quantitatively assessed.

12    Q.    Same question with respect to

13  2,4,6-trichlorophenol?

14    A.    Same answer.

15    Q.    Same answer with respect to

16  3/4-chlorophenol?

17    A.    Yes.  Also, I should point out in the US EPA

18  methodology, water solubility is also a factor, as

19  well as soil binding.  So there is several aspects

20  in the calculations but, in general, the volatile

21  organic contaminants are amenable to indoor air

22  intrusion and that's why I listed those in my

23  Exhibit something.  I'm not sure what number.

24    Q.    4.

25    A.    Okay.  Thank you.  I'm going to mark that 4

1    so I know.

2        Q.   I'll pull it up here so everybody can see

3    it.

4        A.   Yeah.  Okay.  That's it.

5        Q.   For the substances that are listed in

6    Exhibit 4, did you perform any independent

7    assessment of water solubility with respect to these

8    chemicals?

9        A.   No.  The EPA report indicates that there was

10   no vapor intrusion except at the plant, production

11   plant itself.

12            MS. COPE-KASTEN:  That's all I've got for

13       you today, Dr. Sawyer.  I don't have any further

14       questions at this point.

15            THE WITNESS:  Okay.  Well, thank you for

16       your professionalism, as always, and your smile.

17       I like that.

18            MS. COPE-KASTEN:  Thank you for your time,

19       Dr. Sawyer.

20            THE WITNESS:  You're welcome.

21            MR. SUTTON:  Thanks.  No questions here.

22            THE VIDEOGRAPHER:  All right.  Are we ready

23       to go off record?

24            MS. COPE-KASTEN:  Yes.

25            THE VIDEOGRAPHER:  The time is 10:49 a.m.,

1       off the record.

2              (Whereupon, the deposition concluded at

3       10:49 p.m.)

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

William Sawyer, Ph.D.

```
 1              C E R T I F I C A T E

 2         I, Susan D. Wasilewski, Registered

 3   Professional Reporter, Certified Realtime Reporter,

 4   Certified Manager of Reporting Services, Certified

 5   Realtime Captioner, and Florida Professional

 6   Reporter, hereby certify that the witness named

 7   herein appeared via Remote Counsel/Zoom technology

 8   on Monday, March 8, 2021, and was duly sworn.

 9         I FURTHER CERTIFY that I was authorized to

10   and did stenographically report the examination of

11   the witness named herein; that a review of the

12   transcript was not requested; and that the foregoing

13   transcript is a true record of my stenographic

14   notes.

15         I FURTHER CERTIFY that I am not related to

16   or an employee of any of the parties, nor am I

17   related to or an employee of any of the parties'

18   attorneys or counsel connected with this action, nor

19   am I financially interested in the outcome of this

20   action.

21         WITNESS my hand this 10th of March, 2021.

22

23   _____

24   Susan D. Wasilewski, RPR, CRR, CMRS, CRC, FPR

25
```

```
 1                        LAWYER'S NOTES

 2     PAGE   LINE

 3     _____  _____   _____

 4     _____  _____   _____

 5     _____  _____   _____

 6     _____  _____   _____

 7     _____  _____   _____

 8     _____  _____   _____

 9     _____  _____   _____

10     _____  _____   _____

11     _____  _____   _____

12     _____  _____   _____

13     _____  _____   _____

14     _____  _____   _____

15     _____  _____   _____

16     _____  _____   _____

17     _____  _____   _____

18     _____  _____   _____

19     _____  _____   _____

20     _____  _____   _____

21     _____  _____   _____

22     _____  _____   _____

23     _____  _____   _____

24     _____  _____   _____

25
```

# EXHIBIT 5

JOURNAL OF PROTEOMICS 73 (2010) 951–964



available at www.sciencedirect.com

ScienceDirect

www.elsevier.com/locate/jprot





# Studies on glyphosate-induced carcinogenicity in mouse skin: A proteomic approach

## Jasmine George, Sahdeo Prasad, Zafar Mahmood, Yogeshwer Shukla*

*Proteomics Laboratory, Indian Institute of Toxicology Research (CSIR), Mahatma Gandhi Marg, Lucknow 226001 (U.P.), India*

## ARTICLE INFO

*Article history:*
Received 25 September 2009
Accepted 15 December 2009

*Keywords:*
Glyphosate
TPA
Tumor promotion
Mass spectrometry
Hierarchical cluster analysis
Biomarkers

## ABSTRACT

Glyphosate is a widely used broad spectrum herbicide, reported to induce various toxic effects in non-target species, but its carcinogenic potential is still unknown. Here we showed the carcinogenic effects of glyphosate using 2-stage mouse skin carcinogenesis model and proteomic analysis. Carcinogenicity study revealed that glyphosate has tumor promoting activity. Proteomic analysis using 2-dimensional gel electrophoresis and mass spectrometry showed that 22 spots were differentially expressed (>2 fold) on glyphosate, 7, 12-dimethylbenz[a]anthracene (DMBA) and 12-O-tetradecanoyl-phorbol-13-acetate (TPA) application over untreated control. Among them, 9 proteins (translation elongation factor eEF-1 alpha chain, carbonic anhydrase III, annexin II, calcydin, fab fragment anti-VEGF antibody, peroxiredoxin-2, superoxide dismutase [Cu–Zn], stefin A3, and calgranulin-B) were common and showed similar expression pattern in glyphosate and TPA-treated mouse skin. These proteins are known to be involved in several key processes like apoptosis and growth-inhibition, anti-oxidant responses, etc. The up-regulation of calcyclin, calgranulin-B and down-regulation of superoxide dismutase [Cu–Zn] was further confirmed by immunoblotting, indicating that these proteins can be good candidate biomarkers for skin carcinogenesis induced by glyphosate. Altogether, these results suggested that glyphosate has tumor promoting potential in skin carcinogenesis and its mechanism seems to be similar to TPA.

© 2009 Elsevier B.V. All rights reserved.

## 1. Introduction

Pesticides, used extensively for controlling pest and destroying weeds are ubiquitous contaminants accumulating in environment and hence humans get unavoidably exposed to these pesticides. About 3 billion tons of pesticides are used every year, on agricultural crops worldwide [1]. In some cases, even short-term exposure of the pesticides can make impact on human health. Apart from the other toxic effects, pesticides are reported to cause genotoxicity/carcinogenicity also. Some pesticides have been classified as carcinogens by the United States Environmental Protection Agency (USEPA) [2] and International Agency for Research on Cancer (IARC) [3]. Glyphosate, N-(phosphonomethyl) glycine, commonly sold as a commercial formulation named, Roundup is a widely used herbicide on both cropland and non-cropland areas [4]. The potential activity of glyphosate is through competitive inhibition of the enolpyruvyl-shikimate-phosphate synthase, an enzyme essential to the synthesis of aromatic amino acids in plants [5]. Toxicological profile of glyphosate, showed that it is a comparatively safe herbicide for animals [6]. Glyphosate alone or with its formulation products, such as, surfactants and permeabilizing agents is usually considered to be harmless under both normal usage and chronic exposure [4]. In 1993, USEPA categorized this compound into class E, which means that it is probably not carcinogenic to humans [7]. Despite these reports, some case-control studies suggested an association between glyphosate exposure and the risk of non-

* Corresponding author. Tel.: +91 094151 58430; fax: +91 522 2628227.
  E-mail addresses: yogeshwer_shukla@hotmail.com, yshukla@iitr.res.in (Y. Shukla).

1874-3919/$ – see front matter © 2009 Elsevier B.V. All rights reserved.
doi:10.1016/j.jprot.2009.12.008

Hodgkin's lymphoma [8,9]. In another study, both technical grade glyphosate and Roundup were shown to cause a rapid increase in cell division in human breast cancer cells [10]. Glyphosate has also been shown as a skin irritant [11]. Regarding the genotoxic potential, glyphosate exposure to human lymphocytes *in vitro* resulted in increased sister chromatid exchanges [12], chromosomal aberrations [13], and indicators of oxidative stress [14]. A recent study from our laboratory also showed the clastogenic effects of glyphosate in bone marrow cells of Swiss albino mice [15]. These reports prompted us to investigate its carcinogenic effect in long-term animal bioassay.

To evaluate toxicity/carcinogenicity induced by physical and chemical agents including pesticides, various test systems have been employed in bacteria, rodents and mammalian cells [16–18]. Each of these environmental challenges causes changes in DNA conformation, alterations in the levels of mRNA and protein expression, and post-translational modifications such as phosphorylation and glycosylation of proteins specific to each stressor [19]. In recent years, there has been considerable interest in linking carcinogenic/toxic responses to gene and protein expression. Toxicoproteomics has received a lot of attention as a valuable tool to search reliable early predictive toxicity markers in response to environmental stimuli [20]. Two-dimensional gel electrophoresis (2-DE) coupled with mass spectrometry (MS); a high-throughput technique allows proteins of interest to be identified by their expression and/or modification pattern rather than using the traditional approach of translating gene expression data. Biomarkers can be used to identify causal associations and to make better quantitative estimates of those associations at relevant levels of exposure [21]. Yamamoto et al. [22] have utilized proteomic approach to identify potential biomarker candidates of hepatotoxicant exposure in rat liver.

Skin is the largest organ in the body and dermal contact is one of the most probable routes of human exposure to pesticides, thus, mouse skin model represents a logical experimental choice [23]. As the long-term bioassay for carcinogenicity is expansive, time consuming and involves a large number of animals and ethical issues, development of biomarkers after short-term exposure are needed. The present investigation was carried out to study the carcinogenic potential of glyphosate and to identify differentially expressed proteins, using 2-DE and MS analysis after treatment with glyphosate, a known tumor promoter, 12-o-tetradecanoyl-phorbol-13-acetate (TPA) and tumor initiator, 7, 12-dimethyl-benz[a]anthracene (DMBA) in mouse skin. Altered proteins identified through proteomic approach in our study may be potentially useful as early biomarkers, to detect the adverse effects of glyphosate.

## 2. Materials and methods

### 2.1. Materials

The commercial formulation of the herbicide glyphosate (N-phosphonomethyl-glycine) Roundup Original® (glyphosate 41%, POEA≈15%—Monsanto Company, St. Louis, MO, USA) was used, which contains 360 g/l glyphosate acid equivalent as the isopropylamine salt and was procured from local market. Immobilized pH gradient (IPG) strips and 0.5% pH 3–10 IPG buffer were purchased from Bio-Rad Laboratories (Hercules, CA, USA). DMBA, TPA, CHAPS, DTT, and beta-actin (clone AC-74) antibody were from Sigma-Aldrich (Missouri, USA). DNase/RNase was from Bangalore Genei (Bangalore, India). The rest of the chemicals used in the study were of analytical grade of purity and procured locally.

### 2.2. Animals and treatments

#### 2.2.1. Carcinogenicity study

Male, Swiss albino mice (12–15 g body weight [b.wt]) were taken from Indian Institute of Toxicology Research (IITR) animal breeding colony and acclimatized for 1 week. The ethical approval for the experiment was obtained from institutional ethical committee. The animals were kept under standard laboratory conditions (temperature $23 \pm 2$ °C, relative humidity $55 \pm 5\%$) and were fed with synthetic pellet basal diet (Ashirwad, Chandigarh, India) and tap water *ad libitum*. Animals were randomly divided into 8 groups of 20 animals each. Hair were clipped in the dorsal region with proper care in an area of 2 cm$^2$ using electrical clippers, not lubricated with oil or grease. The long-term treatment was given as described earlier [24]. Briefly,

Group I   Untreated control (No treatment).

Group II   Glyphosate alone (25 mg/kg b.wt, topically 3 times per week).

Group III   DMBA + TPA (Single topical application of DMBA, 52 μg/mouse followed 1 week later by thrice a week application of TPA, 5 μg/mouse).

Group IV   Glyphosate (s) + TPA (Single topical application of glyphosate, 25 mg/kg.wt followed 1 week later by TPA application as in group III).

Group V   Glyphosate (m) + TPA (Thrice a week topical application of glyphosate, 25 mg/kg b.wt for 3 weeks [total of 9 applications], followed 1 week later by TPA application as in group III).

Group VI   DMBA (Single topical application of DMBA, 52 μg/mouse).

Group VII   TPA (Thrice a week topical application of TPA, 5 μg/mouse).

Group VIII   DMBA + glyphosate (Single topical application of DMBA [as in group III], followed 1 week later by topical treatment of glyphosate, 25 mg/kg b.wt thrice per week).

Vehicle for glyphosate, DMBA and TPA were 50% ethanol and acetone respectively.

Animals from all the groups were examined every week for gross morphological changes including body weight changes, development and volume of squamous cell papillomas (tumors) locally on the skin during the entire study period and tumors larger than 1 mm diameter, were included in the total number of tumors. Tumor volume per tumor bearing mouse was calculated in each group using formula $V = D \times d^2 \times \pi/6$ (where $D$ = bigger dimension and $d$ = smaller dimension). All the surviving animals were sacrificed at the end of the study period, i.e. 32 weeks for complete carcinogenic, tumor initiating and promoting studies.

JOURNAL OF PROTEOMICS 73 (2010) 951–964                                    **953**

#### 2.2.2.   Proteomic study

For the proteomic studies, mice of similar sex, age and weight as used for carcinogenicity study were selected. Animals were divided in 4 groups of 4 animals each and treatment was given as described below:

Group I   Untreated controls (No treatment).
Group II   Glyphosate (Single topical application, 50 mg/kg b. wt/mouse).
Group III   DMBA (Single topical application of DMBA, 104 μg/ mouse).
Group IV   TPA (Single topical application of TPA, 10 μg/mouse).

### 2.3.   Sample preparation for 2-DE

After 24 h, the animals were sacrificed humanly, and skin tissues from the treatment site were excised with the help of sharp scissor and transferred into precooled dishes. The hair were removed with sharp scalpel blades, and subcutaneous fat was scrapped off, on ice. Small pieces of cleaned skin tissues of each mouse from all the groups were then homogenized (10% w/v) individually, in 2-DE lysis buffer containing 8 M urea, 4% CHAPS, 10 mM DTT, 0.5% pH 3–10 IPG buffer, 5 mM TBP, DNase/RNase and 1 mM PMSF. The lysed samples were sonicated for 10 s for 3 strokes followed by a centrifugation at 13,000 rpm for 30 min at 4 °C and pooled for the respective group. After quantification of proteins by Lowry's method, the supernatants were stored at −80 °C until use for electrophoresis.

### 2.4.   2-DE for differential protein expression

IEF was carried out using commercially dedicated equipment, Protean IEF Cell (Bio-Rad, Hercules, CA, USA). For the first dimension, 17 cm non-linear IPG (pH 3–10) strips were used as per manufacturer's instructions with minor modifications. Briefly, 250 μg of protein from each pooled sample was diluted to 300 μl with rehydration solution (7 M urea, 2 M thiourea, 4% CHAPS, 65 mM DTT, 0.5% pH 3–10 IPG buffer, and trace bromophenol blue), and applied by passive rehydration on separate IPG strips. IEF was performed for each individual sample to a total of 45.5 kVh. All IEF steps were carried out at 20 °C. After the first-dimensional IEF, focused IPG strips were placed in an equilibration solution (6 M urea, 2% SDS, 20% glycerol, 50 mM Tris-HCl, and 0.01% w/v bromophenol blue) containing 1% DTT for 15 min with shaking in the first step followed by 2.5% w/v IAA in equilibration buffer for an additional 15 min in the second step. The gels were then transferred and placed on a 12% polyacrylamide gel and a 0.5% low melting agarose overlay containing 0.1% SDS and 37.5 mM Tris (pH 8.8), was warmed to its melting point and used to seal the IPG strips to the surface of the gel. Molecular weight markers were placed onto the gel by pipetting 8–10 μl onto a piece of blotting paper which was then loaded onto the gel surface. Separation in the second dimension was carried out using Protean II xi electrophoresis equipment (Bio-Rad, Hercules, CA, USA) and Tris–glycine–SDS (pH 8.3) as the electrode buffer, the gels were run at 15 mA/gel until the bromophenol blue dye marker had reached the bottom of the gel. Each experiment was performed in triplicate to obtain the reproducible results.

### 2.5.   Staining and image analysis

After completion of the second-dimension electrophoresis, the gels were fixed and stained by using a fast silver staining protocol with neutral silver nitrate [25]. Analysis of the gels including background subtraction, spot detection, volume normalization and differences in protein expression levels among samples were analyzed by using PDQuest software Ver. 7.4.0 (Bio-Rad Hercules, CA, USA). To determine the variation, 3 gels were prepared for each sample. The protein spots that varied >2 fold change and were specific for the test groups and the control group were manually labeled and considered for MS analysis.

### 2.6.   Matrix-assisted laser desorption/ ionization time-of-flight (MALDI-TOF/TOF) and liquid chromatography mass spectrometry (LC-MS) for protein identification

Differential protein spots of interest were excised manually by using pipette tips and washed 3 times with de-ionized water. Each spot was placed into a 1.5 ml microtube filled with de-ionized water. In-gel digestion for peptide mass fingerprint (PMF) analysis and mass spectrometric analysis were performed at The Centre for Genomic Applications, New Delhi (India). In brief, trypsinized peptide samples were dissolved and mixed with matrix, namely α-cyano-4-hydroxy cinnamic acid. Following drying, the peptides were spotted on ground steel plate and subjected to Bruker Ultraflex MALDI-TOF/TOF and 2D Nano LC-ESI-Trap (Agilent) for mass spectrometric identification. The MALDI-TOF/TOF was equipped with a pulsed nitrogen laser. System calibration was performed using peptide fragment peaks produced by auto-digestion of trypsin as an internal standard for every peptide sample to ensure high mass accuracy and to control possible variations arose due to protein extraction, trypsinization, reconstitution and suppression of ionization by highly abundant species and incomplete/non-homogeneous crystallization of proteins and peptides during matrix preparation.

Data acquisition and analysis was performed using flex control and flex analysis/biotools version 2.2 software, respectively. Data was acquired in reflectron positive mode using 15–18% laser power. Mass tolerance and monoisotopic values (50 ppm/100 ppm for peptide mass fingerprint and peptide mass tolerance of 2 Da for MS/MS spectra) were used for searching. The missed cleavage sites were allowed up to 1; the fixed modification was selected as carbamidomethylation (cysteine); the variable modification was selected as oxidation (methionine). Probability based MOWSE score was calculated in terms of ion score −10 Log (P), where P is the probability and observed match was considered as a random event. Protein scores were derived from ions as a non-probabilistic basis for ranking protein hits and proteins identified by MALDI-TOF and LC/MS were in the expected size range based on its position in the gel. The datasets of the MS spectra, including peptide sequence information, were searched against the SWISS-PROT (GeneBio, Geneva, Switzerland) and NCBInr database using Mascot Daemon (Matrix Science, London, UK) as a client attached to the Mascot search protocol.

### 2.7. Immunoblot analysis

The differential proteins screened with 2-DE were confirmed by Western blotting. Briefly, skin tissue samples were lysed in lysis buffer (8 M urea, 4% CHAPS, 10 mM DTT, 0.5% pH 3–10 IPG buffer, 5 mM TBP, DNase/RNase and 1 mM PMSF) and resolved on 12–15% polyacrylamide gel, then electro-transferred onto polyvinylidene fluoride membranes (Millipore, USA). After blocking with 5% non-fat dry milk, the membranes were immunoblotted with antibodies of calcyclin (Santa Cruz Biotechnology Inc., Europe), calgranulin-B (Santa Cruz Biotechnology Inc., Europe), superoxide dismutase [Cu-Zn] (SOD 1) (Santa Cruz Biotechnology Inc., Europe) and beta-actin at dilutions recommended by the suppliers. Horse radish conjugated secondary antibodies and chemiluminescence kit (Millipore, USA), were used for detection. Protein expression was visualized by Versa Doc Imaging System (Bio-Rad, Hercules, CA, USA). The intensity was given in terms of relative pixel density for each band normalized to band of beta-actin. The intensity of the bands was measured using software UNSCAN-IT automated digital system version (Orem, USA).

### 2.8. Statistical analysis

The skin tumor incidence was analyzed by one-way analysis of variance (ANOVA) test in untreated control and treated groups, $p < 0.05$ value was considered as significant. Protein expression data for untreated control and treated groups are expressed as the mean ± SD of 3 replicate gels for fold changes of normalized spot volumes. For the statistical analysis of data, Student-t test was used and $p < 0.05$ was considered as significant. Hierarchical clustering analysis using Ward's minimum variance was performed by NCSS software (Kaysville, Utah, USA).

## 3. Results

### 3.1. Carcinogenic potential of glyphosate

Carcinogenic potential of glyphosate was recorded in 2-stage mouse skin tumor initiation–promotion protocol when tested as a tumor promoter, however, glyphosate exposure failed to provoke neoplastic development when tested as tumor initiator or complete carcinogen. In this study, conducted to evaluate tumor promoting potential of glyphosate, onset of tumorigenesis was recorded in the animals of positive control group III i.e. DMBA+TPA after 52 days of promotion. All the animals of this group attained tumorigenesis by the end of 112 days of promotion. However, tumor development started in the animals of group VIII (DMBA+glyphosate) after 130 days of promotion and at the time of termination of experiment i.e. 32 weeks, 40% of the animals developed tumors on the dorsal region of the skin (Fig. 1A, Table 1). The total number of tumors in group III was 156 while in group VIII it was 23. No tumor development was observed in the animals of groups I, II, VI and VII during the entire period of study. Similarly, the average



**Fig. 1** – Tumor promoting effect of glyphosate in 2-stage mouse skin model of carcinogenesis. Tumor data is represented as (A) y-axis showing the percentage of mice with tumors and x-axis showing the weeks of treatment; (B) y-axis showing the total number of tumors and x-axis showing the weeks of treatment; (C) y-axis showing the average no. of tumors/mouse and x-axis showing the treatment; (D) y-axis showing the average volume of tumors per mouse (mm³) and x-axis showing the treatment. The values obtained in (C) and (D) are encountered at the end point of study duration i.e. 32 weeks.

**Table 1** – Role of carcinogenic, tumor initiating and tumor promoting effect of glyphosate in mouse skin model of carcinogenesis.

| Groups | Treatment | Number of animals with tumors | 1st induction of tumor (in days) | % of animals with tumors | Total number of tumors | Avg. no. of tumors/mouse (mean ± SD) | Avg. tumor volume/ tumor bearing mouse (mm³) (mean ± SD) |
|---|---|---|---|---|---|---|---|
| I | Untreated | 0/20 | – | – | – | – | – |
| II | Glyphosate | 0/20 | – | – | – | – | – |
| III | DMBA + TPA* | 20/20 | 52 | 100 | 156 | 7.8±1.1 | 96.4±5.1 |
| IV | Glyphosate (s) + TPA | 0/20 | – | – | – | – | – |
| V | Glyphosate (m) + TPA | 0/20 | – | – | – | – | – |
| VI | DMBA (s) | 0/20 | – | – | – | – | – |
| VII | TPA | 0/20 | – | – | – | – | – |
| VIII | DMBA + glyphosate* | 8/20 | 130 | 40 | 23 | 2.8±0.9 | 26.2±4.8 |

*p<0.05 versus untreated group (ANOVA test). s=single dose, m=multiple dose. Details of treatment are provided in Materials and methods section.

number of tumors was 7.8±1.1 in group III, however, in group VIII, it was 2.8±0.9 (Fig. 1C; Table 1). These tumors were initiated as a minute wart like growth, which progressed during the course of experiment and average tumor volume was 96.4± 5.1 mm³ in group III and 26.2±4.8 mm³ in group VIII (Fig. 1D; Table 1). These results clearly indicate significant tumor promoting potential of glyphosate in mouse skin model of carcinogenesis.

### 3.2. Protein expression profile

Using 2-DE, comparisons of differentially expressed proteins were made in mouse skin following topical treatment with glyphosate (50 mg/kg b.wt/mouse), TPA (10 μg/mouse) and DMBA (104 μg/mouse) with untreated mouse skin individually, using PDQuest 7.4.0 2-D gel analysis software. Representative 2-DE maps are shown in Fig. 2. Image matching derived from 4 groups showed a total of ~2600 spots. Out of these, 22 spots were differentially expressed, exhibiting >2 fold change between values of treated and control animals (Fig. 2). These spots were excised from the gels and analyzed using MALDI-TOF/TOF mass spectrometer. PMF from the proteins was obtained and the resulting spectra were used to identify the proteins with the Mascot search program. Protein spots that appeared more than once, were considered as the same protein and assigned the same number. These identified proteins were categorized according to their molecular functions (Table 2), biological functions and subcellular localization (Fig. 3A and B) as referred to SWISS-PROT database. Protein spot nos. 7 and 18-1, 18-2 were up-regulated and spot no. 13 was down-regulated by glyphosate and TPA treatment (Fig. 4). Related fingerprint mass spectra of calcyclin, calgranulin-B and SOD 1are shown in Fig. 5.

### 3.3. Protein expression profile in glyphosate and TPA-treated mouse skin

Substantially common and differentially expressed protein spots among glyphosate and TPA-treated skin tissues were quantitatively analyzed individually. Comparison between the gels of glyphosate and TPA revealed that 13 specific proteins spots (1, 2, 3, 6-1, 6-2, 7, 8, 11, 12, 13, 15, 18-1, and 18-2) from a total of 22 spots were showing the similar expression pattern. Among the selected and identified proteins with statistically significant altered expression (p<0.05), we focused on the proteins involved in apoptosis and growth-inhibition, anti-oxidation, energy metabolism, angiogenesis, calcium binding and protein biosynthesis processes. These proteins are translation elongation factor eEF-1 alpha chain (eEF1A1), carbonic anhydrase 3 (CA III), annexin II, calcyclin, fab fragment of anti-VEGF antibody, peroxiredoxin-2 (PRX II), superoxide dismutase [Cu–Zn] (SOD 1), stefin A3 and calgranulin-B (Fig. 6, Table 3).

### 3.4. Protein expression profile in glyphosate and DMBA treated mouse skin

Among the 22 differentially expressed protein spots, 4 specific spots (1, 3, 11, and 12) were showing the similar expression pattern between the gels of glyphosate and DMBA treated skin tissues. These proteins are eEF1A1, CA III, fab fragment of anti-VEGF antibody and PRX II (Fig. 6, Table 3).

### 3.5. Cluster analysis of differentially expressed proteins in control, glyphosate, TPA and DMBA treated mouse skin

To understand the carcinogenic activity of glyphosate in mouse skin based on the level of protein expression information generated on 2-DE gels hierarchical cluster analysis was applied. The analysis facilitated the visualization of groupings based on the protein expression changes, potentially showing the relationship between glyphosate and TPA, which further lends support to their tumor promoting activity. A hierarchical clustering map is generated with the differentially expressed protein spots. The analysis showed 2 major clusters, one cluster includes TPA and glyphosate, where majority of the altered protein expression was recorded and the other cluster includes DMBA and control having comparatively low number of altered proteins (Fig. 7). Moreover, calcyclin and calgranulin-B were present only in the cluster of glyphosate and TPA whereas SOD 1 is higher in DMBA and control cluster in comparison to other cluster.



Fig. 2 – Representative 2-DE maps of control and treated groups. A. Untreated control; B. Glyphosate; C. TPA; D. DMBA. The pH gradient is indicated on the top of the gels horizontally, and migration positions of molecular weight markers are indicated on vertical axis. Identified 22 protein spots, selected by quantitative analysis of respective groups are indicated by arrows and labeled as 1 to 19 (details are given in Material and methods section). Repeated spots (albumin and calgranulin-B) identified as same protein are assigned same number.

### 3.6. Immunoblot verification of calcyclin, calgranulin-B and SOD 1

Western blotting showed that the expression of calcyclin and calgranulin-B were significantly increased and that of SOD 1 decreased in the glyphosate and TPA-treated groups only as compared with respective control and DMBA, and the expression patterns of the selected proteins were consistent with the results obtained in 2-DE image analysis (Fig. 8).

## 4.  Discussion

Considering the uses of glyphosate throughout the world, genotoxic/carcinogenic risk associated with its uses needs to be addressed urgently. In the present study, using conventional 2-stage initiation–promotion protocol [24] and proteo-mic application in animal bioassay for carcinogenicity, we attempted to provide insight into whether glyphosate can induce neoplastic changes.

Results of the animal carcinogenicity bioassay showed that topical application of glyphosate was capable of promoting DMBA-initiated mouse skin cells. However, glyphosate failed to provoke tumorigenesis when tested for initiating and complete carcinogenic activity in mouse skin. The tumor promoting property of glyphosate, as observed in the present study, is in consistency with previous reports, where glyphosate is reported to induce cell proliferation and interfere with cell cycle regulation [26,27]. These results confirmed that glyphosate has tumor promoting activity. Since glyphosate possesses only tumor promoting activity, and not tumor initiating, therefore, it failed to induce tumorigenesis when tested for complete carcinogenic activity.

Mammalian skin cells are continuously exposed to a variety of environmental stresses, each of which may result

**Table 2 – Identification of differentially expressed protein spots in treated and control mouse skin by mass spectrometry and database searches.**

| Spot no. | Protein name/function | Gene | Score | Theory/observed [b]Mr (kDa) | [c]pI | Accession no. | No. of matched peptides (% sequence coverage) |
|---|---|---|---|---|---|---|---|
| 1 | Translation elongation factor eEF-1 alpha chain/protein binding, GTP binding | EF-1A | 114 | 50.3/70 | 9.16/8.9 | P10126 | 5 (8) |
| 2 | Ig gamma-2b chain C region/antigen binding | IGHG1 | 53 | 45.0/65.0 | 6.1/8.6 | P01867 | 3 (10) |
| 3 | Carbonic anhydrase III/pH balance | CAIII | 90 | 29.5/50 | 6.97/9.0 | P16015 | 6 (39) |
| 4 | [a]NID | | | | | | |
| 5 | Actin gamma/ATP binding, protein binding | ACTG1 | 98 | 42.2/40.0 | 5.31/5.5 | P63270 | 6 (20) |
| 6-1 | Albumin (fragment)/protein binding, toxin binding | ALB | 146 | 24.2/28.0 | 5.48/5.6 | P07724 | 14 (47) |
| 6-2 | Albumin (fragment)/protein binding, toxin binding | ALB | 108 | 24.2/17.5 | 5.48/5.00 | P07724 | 9 (43) |
| 6-3 | Albumin (fragment)/protein binding, toxin binding | ALB | 61 | 24.2/24.0 | 5.48/6.1 | P07724 | 3 (14) |
| 7 | Calcyclin/calcium ion binding | S100A6 | 75 | 10.1/25 | 5.3/5.2 | P14069 | 5 (30) |
| 8 | Annexin II/calcium ion binding | ANXA2 | 161 | 38.8/17 | 7.53/6.1 | P07356 | 6 (15) |
| 9 | Heterogeneous nuclear ribonucleoprotein M/nucleic-acid binding | HNRPM | 59 | 77.8/10.2 | 8.8/3.0 | Q9EOD1 | 4 (5) |
| 10 | Keratin Kb40/intermediate filament organization | KRT78 | 91 | 86.1/8.0 | 8.66/7.8 | Q5IFT3 | 3 (3) |
| 11 | Fab fragment of anti-VEGF antibody/angiogenesis | VEGF | 195 | 23.5/5.0 | 6.35/8.7 | 1BJ1L | 3 (23) |
| 12 | Peroxiredoxin-2/anti-oxidant activity | PRDX2 | 45 | 21.8/32 | 5.2/5.2 | Q61171 | 3 (13) |
| 13 | Superoxide dismutase [Cu–Zn]/anti-oxidant activity | SOD1 | 65 | 15.9/20 | 6.03/6.9 | P08228 | 3 (28) |
| 14 | Keratin, type II cytoskeletal 6A/intermediate filament organization | KRT6A | 118 | 59.5/5.2 | 8.04/5.5 | P50446 | 2 (3) |
| 15 | Stefin A3 protein/cysteine protease inhibitor | STFA3 | 92 | 11/17 | 6.28/6.3 | Q497/0 | 10 (81) |
| 16 | Rpl30 protein/ribosome structure | RPL30 | 65 | 12.8/5.5 | 9.74/6.2 | Q5PR1 | 1 (13) |
| 17 | [a]NID | | | | | | |
| 18-1 | Calgranulin-B/calcium ion binding | S100A9 | 147 | 13.0/12 | 6.73/7.5 | P31725 | 3 (24) |
| 18-2 | Calgranulin-B/calcium ion binding | S100A9 | 305 | 13.0/12 | 6.73/7.6 | P31725 | 8 (46) |
| 19 | [a]NID | | | | | | |

Proteins with >2 fold changes (either increase or decrease) are included in this table. [a]NID = Not identified, [b]Mr — Theoretical/observed molecular weight in Daltons, and [c]pI — Isoelectric point values were provided with the mass spectrometry data from The Centre for Genomic Application. Observed Mr and pI-values were estimated from the molecular weight marker run with each gel.

in specific compensatory changes in protein expression that can be assessed through proteomic analysis [19]. Recently, toxicoproteomics is being exploited for the discovery of biomarkers and organ specific toxicity/carcinogenicity signatures [20,21]. Here we used, proteomic analysis of mouse skin which offers a unique opportunity to study differentially expressed proteins following topical exposure. Short term topical exposure of DMBA is well reported to form DNA adducts in mouse skin [28]. About ~2600 protein spots were generated in mouse skin among control and different treatment groups. Among them, 22 differentially expressed proteins were exhibiting >2 fold change between treated and



**Fig. 3 – Pie charts showing distribution of the 22 identified proteins in mouse skin according to their (A) subcellular localization and (B) biological process on the basis of information through SWISS-PROT database. Numbers in parentheses are the values of differentially expressed proteins. [a]NID = Not identified.**

JOURNAL OF PROTEOMICS 73 (2010) 951–964



Calcyclin (Spot no. 7)          SOD 1(Spot no. 13)          Calgranulin-B (Spot no. 18-1,18-2)

**Fig. 4 – Zoomed images of 2-DE gel regions showing significantly ($p < 0.05$) up-regulated and down-regulated protein spots 7(calcyclin), 13(SOD 1), 18-1 and 18-2(calgranulin-B) of respective groups (A–D).**

control tissues. Out of these, eEF1A1, CA III, annexin II, calcyclin, fab fragment of anti-VEGF antibody, PRX II, SOD 1, stefin A3 and calgranulin-B appeared to be of particular significance, as they were observed to be similar in terms of expression pattern in glyphosate and TPA-treated skin tissues (Fig 6).

The expression levels of eEF1A1, CA III and fab fragment of anti-VEGF antibody were markedly up-regulated following glyphosate and TPA treatment (Fig. 6). eEF1A1, the cofactor of eukaryotic protein synthesis is responsible for binding aminoacyl-tRNA to the ribosome during polypeptide elongation

and its increased expression is directly proportionate to cellular proliferation [29], oncogenic transformation [30], apoptosis [31], and delayed cell senescence [32]. Increased amount of translation elongation factor-2 following exposure with TPA, a well known tumor promoter is reported [33]. CA III is a cytoplasmic enzyme known to play an important role in the cellular response to oxidative stress which in turn can mediate apoptosis [34]. Overexpression of CA III protects the cells from hydrogen peroxide-induced apoptosis [35]. Spot 11, identified as a fab fragment of anti-VEGF antibody is a breakdown fragment of VEGF, L-chain, and can be correlated

**Fig. 5 – Peptide mass fingerprints of the mixture of tryptic peptides derived from (A) calcyclin, spot 7 and (B) calgranulin-B, spot 18-1 (C) SOD 1, spot 13. Details are given in Materials and methods section.**

(A)
x10^5
Intens. [a.u.]
Relative intensity
1681.904
1877.979
861.128
1166.601
1479.820
2441.300 2784.464
3617.832
m/z
Start –End Observed Sequence
11 -24 841.3900 R.SITTIIDTFHQYSR.K
39 -50 698.8500 R.QMVEAQLATFMK.K
39 -50 06.7800 R.QMVEAQLATFMK.K
39 -51 508.9600 R.QMVEAQLATFMKK.E
39 -51 514.2200 R.QMVEAQLATFMKK
(B)
x10^4
855.120
2183.180
1060.091
1490.983
1801.895
2766.315
Start –End Observed Sequence
4 -23 728.4300 K.AVCVLKGDGPVQGTIHFEQK.A
103 -115 684.4100 R.VISLSGEHSIIGR.T
144 -153 501.3000 R.LACGVIGIAQ
(C)
x10^4
855.091
1066.104
1203.802
1671.942
1455.885
1439.858
1988.080
2343.294
2453.257
2625.552
Start –End Observed Sequence
36 -40 631.2200 K.ELIQK.E
41 -47 746.3700 K.ELTIGSK.L
41 -47 374.4986 K.ELTIGSK.L
41 -47 748.2000 K.ELTIGSK.L
41 -55 823.4136 K.ELTIGSKLQDAEIAR.L
48 -55 916.2400 K.LQDAEIAR.L
56 -62 439.0586 R.LMDDLDR.N
56 -62 878.2800 R.LMDDLDR.N
56 -62 446.6686 R.LMDDLDR.N





**Fig. 6 – Changes in expression levels of the 9 different proteins that were affected by glyphosate, TPA and DMBA. Values are expressed as fold changes of the control or untreated values, indicated by the horizontal control level line. Values represent mean ± SD of 3 sets of experiments. \*: Significantly up-regulated protein ($p < 0.05$). #: Significantly down-regulated protein ($p < 0.05$).**

with the tumor promoting activity of test substances, as VEGF is a highly specific angiogenic factor that has been implicated in the angiogenesis, a prerequisite for neoplastic growth

**Table 3 – Fold changes of differentially expressed proteins get altered by glyphosate, TPA and DMBA with respect to untreated group ($p < 0.05$).**

| Spot no. | Protein name | Fold changes | | |
|---|---|---|---|---|
| | | Glyphosate | TPA | DMBA |
| 1 | Translation elongation factor eEF-1 alpha chain (eEF1A1) | +2.80 | +2.79 | +2.67 |
| 3 | Carbonic anhydrase III (CA III) | +1.62 | +3.72 | +2.81 |
| 7 | Calcyclin | +2.48 | +2.20 | [a]n.d. |
| 8 | Annexin II | +2.38 | +1.72 | [a]n.d. |
| 11 | Fab fragment of anti-VEGF antibody | +3.64 | +3.69 | +5.80 |
| 12 | Peroxiredoxin-2 (PRX II) | +2.73 | +2.74 | +2.20 |
| 13 | Superoxide dismutase [Cu–Zn] (SOD 1) | −4.97 | −4.56 | +1.16 |
| 15 | Stefin A3 | +2.29 | +1.49 | [a]n.d. |
| 18-1 | Calgranulin-B | +9.52 | +7.61 | [a]n.d. |
| 18-2 | Calgranulin-B | +9.34 | +7.43 | [a]n.d. |

Data represents mean ± SD of 3 experiments. (+) indicates up-regulation, whereas (−) indicates down-regulation by respective treatments. [a]n.d. indicates proteins that were not detected. For the clarity of the results here we mentioned calgranulin-B (18-2) separately but it is considered as a single protein.

[36,37]. A number of studies have the role of angiogenesis in tumor growth [38,39].

Stefin A3 is known to play a role in skin growth and can be induced by TPA, leading to keratinocyte differentiation and proliferation [40,41]. Annexin II, a $Ca^{2+}$ and phospholipid-binding protein is induced in various transformed cells and skin disorders [42–44]. Studies also showed up-regulated annexin II in a number of human cancers [45,46]. Thus up-regulation of annexin II by TPA and glyphosate is in consistency with its reported role in skin malignancies. PRX II, a novel group of peroxidases containing high anti-oxidant efficiency and which can also have a role in cell differentiation and apoptosis, was over-expressed in response to TPA, DMBA and glyphosate (Fig. 6, Table 3) [47]. PRX II not only protects the cells from oxidative damage caused by hydrogen peroxide, but can also endow cancer cells with resistance to both hydrogen peroxide and cisplatin towards radio-resistance [48]. Overexpression of PRX II in few cancers suggests that PRX has a proliferative effect and can induce cellular proliferation [49,50].

SOD1 provides a protective response against reactive oxygen intermediates and its over-expression level is accompanied by increased activity of anti-oxidant enzymes, namely, catalase, glutathione reductase, and glutathione. The suppression of skin carcinogen induced apoptosis, suggesting a combinatorial role in protecting skin cells from oxidative stress [51]. Thus down-regulation of SOD1, as observed in response to glyphosate and TPA exposure can potentiate process of tumor promotion (Fig. 6, Table 3).

JOURNAL OF PROTEOMICS 73 (2010) 951–964   **961**



**Fig. 7 – Two-dimensional hierarchical clustering map generated using identified protein expressions patterns induced by control, glyphosate, TPA and DMBA groups. Clusters were generated with normalized volumes of the differentially expressed protein spots. Each column represents an individual protein and each row represents an individual group.**

Interestingly, S100A6 (calcyclin) and S100A9 (calgranulin-B) were expressed only in glyphosate and TPA-treated skin. These proteins are implicated in various key biological processes like cell cycle progression, differentiation, cancer development and metastasis [52]. Calcyclin, one of the two S100 proteins, was up-regulated by glyphosate (2.48-fold) and TPA (2.20-fold) in comparison to controls (Table 3). The S100A6 protein, in particular, is a well-established marker of melanoma cells in which its level correlates with tumor invasiveness and poor prognosis [53]. Several reports showed that S100A6 expression was increased in cancer [54,55]. Similarly, another protein calgranulin-B, was also up-regulated in the skin of glyphosate (9.52-fold) and TPA (7.61-fold) animals as compared to DMBA and untreated skin (Fig. 6, Table 3). In one of the studies, TPA is reported to induce calgranulin's S100A8 and S100A9 expression in mouse skin [56]. The induced expression of calcyclin and calgranulin-B by glyphosate and TPA was further confirmed by results of Western blotting.

Multivariate statistical analysis, such as hierarchical clustering, is one of the most popular methods to analyze large-scale gene expression data. There are few previous reports which have used this analysis for studying protein expres-

sion [22,57]. In this study, we applied 2-dimensional hierarchical clustering analysis to the changes of normalized significant differentially expressed protein spot volumes on respective 2-DE gels. This clustering analysis using 2-DE gel information also confirmed resemblance between tumor promoting activities of glyphosate and TPA. Thus this kind of multivariate statistical analysis using protein pattern expression may become widely applicable for primary screening of carcinogenicity for industrial and environmental pollutants.

Levels of the protein expression provide confirmatory evidence that expression of calcyclin, calgranulin-B and SOD 1 were altered by glyphosate and TPA treatment. Thus, from the reported studies and from our results, showing up-regulation of both calcyclin and calgranulin-B and down-regulation of SOD 1 by single exposure with TPA and glyphosate on mouse skin, it became clear that these proteins are involved in carcinogenesis and can be used as potential early biomarkers for skin carcinogenesis.

In summary, the 22 identified protein spots were expressed in mouse skin within 24 h following exposure to glyphosate, TPA and DMBA as proteomic signatures involved in

JOURNAL OF PROTEOMICS 73 (2010) 951–964



Fig. 8 – (A) Western blots showing expression of calcyclin, calgranulin-B and SOD 1 among control and treated groups. Equal loading of the samples was evaluated by reprobing the membranes with beta-actin antibody. * indicates significant difference, $p < 0.05$. (B) Quantitative fold change, calculated with respect to control on the basis of pixel density measured by UNSCAN-IT software.

carcinogenic process. Out of these 22 proteins, 9 specific selected proteins are functionally related to apoptosis and growth-inhibition, anti-oxidation, energy metabolism, angiogenesis, calcium binding and protein biosynthesis processes with same expression profiles in glyphosate and TPA-treated animals. Among them, calcyclin, calgranulin-B and SOD 1 were identified to be closely associated with tumor promoting activity of glyphosate treatment therefore; their increased levels may be useful as biomarkers for tumor promotion. This study validates and consolidates the results of carcinogenicity data, showing that glyphosate has tumor promoting properties in mouse skin. In addition to providing an important framework, proteomic investigation serves as the starting point to develop a potential biomarker against pesticide induced carcinogenicity.

## Acknowledgments

Authors are thankful to Director Lucknow, of Indian Institute of Toxicology Research, for his keen interest in the study. They would like to thank Ms. Babita Singh, Project Assistant, for her computer assistance in preparation of the manuscript. Authors are also thankful to TCGA, New Delhi for providing the MS analysis. The authors are grateful to Council of Scientific & Industrial Research, New Delhi, India for funding this work from Task Force project NWP-17.

## REFERENCES

[1] Pimentel D. Pesticides and pest control, in: R. Peshin, A.K. Dhawan (Eds.), Integrated Pest Management: Innovation-Development Process, DOI 10.1007/978-1-4020-8992-3 3, Springer Science+Business Media B.V; 2009.

[2] United States Environmental Protection Agency (USEPA. Department of Environmental Protection. Washington, DC: Office of Pesticide Programs; 2002.

[3] International Agency for Research on Cancer (IARC. Monographs on the evaluation of carcinogenic risk to humans occupational exposures in insecticide application, and some pesticides. Lyon: IARC Press; 1991. 9.

[4] Williams GM, Kroes R, Munro IC. Safety evaluation and risk assessment of the herbicide Roundup and its active ingredient, glyphosate, for humans. Regul Toxicol Pharmacol 2000;31:117–65.

[5] Amrhein N, Deus B, Gehrke P, Steinrucken HC. The site of the inhibition of the Shikimate pathway by glyphosate: II. Interference of glyphosate with chorismate formation in vivo and in vitro. Plant Physiol 1980;66:830–4.

[6] Pieniazek D, Bukowska B, Duda W. Glyphosate—a non-toxic pesticide? Med Pr 2003;6:579–83.

[7] United States Environmental Protection Agency (USEPA) U.S. Environmental Protection Agency Reregistration Eligibility Decision (RED) Glyphosate. EPA-738-R-93-014. Washington, DC, 1993.

[8] De Roos AJ, Zahm SH, Cantor KP, Weisenburger DD, Holmes FF, Burmeister LF, et al. Integrative assessment of multiple

pesticides as risk factors for non-Hodgkin's lymphoma among men. Occup Environ Med 2003;60:E11.

[9] Hardell L, Eriksson M, Nordstrom M. Exposure to pesticides as risk factor for non Hodgkin's lymphoma and hairy cell leukemia: pooled analysis of two Swedish case-control studies. Leuk Lymphoma 2002;43:1043–9.

[10] Lin V, Garry V. In vitro studies of cellular and molecular development toxicity of adjuvants, herbicides, and fungicides commonly used in Red River Valley, Minnesota. J Toxicol Environ Health A 2000;60:423–39.

[11] Maibach HI. Irritation, sensitization, photoirradiation and photosensitization assay with a glyphosate herbicide. Contact Dermatitis 1986;15:152–6.

[12] Bolognesi C, Bonatti S, Degan P, Callerani E, Peluso M, Rabboni R, et al. Genotoxic activity of glyphosate and its technical formulation Roundup. J Agric Food Chem 1997;5:1957–62.

[13] Lioi MB, Scarfi MR, Santoro A, Barbieri R, Zeni O, Di Berardino D, et al. Genotoxicity and oxidative stress induced by pesticide exposure in bovine lymphocyte cultures in vitro. Mutat Res 1998;1–2:13–20.

[14] Lioi MB, Scarfi MR, Santoro A, Barbieri R, Zeni O, Salvemini F, et al. Cytogenetic damage and induction of pro-oxidant state in human lymphocytes exposed in vitro to glyphosate, vinclozolin, atrazine, and DPX-E9636. Environ Mol Mutagen 1998;1:39–46.

[15] Prasad S, Srivastava S, Singh M, Shukla Y. Clastogenic effects of glyphosate in bone marrow cells of Swiss albino mice. J. Tox. 2009, Article ID 308985, 6 pages, doi:10.1155/2009/308985.

[16] Moriya M, Ohta T, Watanabe K, Miyazawa T, Kato K, Shirasu Y. Further mutagenicity studies on pesticides in bacterial reversion assay systems. Mutat Res 1983;3–4:185–216.

[17] Palitti FC, Tanzarella R, Cozzi R, Ricondy E, Vitagliana A, Fiori M. Comparison of frequencies of SCEs induced by chemical mutagens in bone-marrow spleen and spermatogoneal cells of mice. Mutat Res 1982;2:191–5.

[18] Çelik M, Ünal F, Yuuzbaşoglu D, Ergun MA, Arslan O, Kasap R. In vitro effect of karathane LC (dinocap) on human lymphocytes. Mutagenesis 2004;2:101–4.

[19] Huang CM, Foster KW, De Silva T, Zhang J, Shi Z, Yusuf N, et al. Comparative proteomic profiling of murine skin. Invest Dermatol 2003;1:51–64.

[20] Wetmore BA, Merrick BA. Toxicoproteomics: proteomics applied to toxicology and pathology. Toxicol Pathol 2004;6:619–42.

[21] Anwar WA. Biomarkers of human exposure to pesticides. Environ Health Perspect 1997;4:801–6.

[22] Yamamoto T, Kikkawa R, Yamada H, Horii I. Investigation of proteomic biomarkers in in vivo hepatotoxicity study of rat liver: toxicity differentiation in hepatotoxicants. J Toxicol Sci 2006;1:49–60.

[23] Lynch D, Svoboda J, Putta S, Hofland HE, Chern WH, Hansen LA. Mouse skin models for carcinogenic hazard identification: utilities and challenges. Toxicol Pathol 2007;7:853–64.

[24] Shukla Y, Arora A, Singh A. Tumourigenic studies on deltamethrin in Swiss albino mice. Toxicology 2001;1:1–9.

[25] Rabilloud T, Vuillard L, Gilly C, Lawrence JJ. Silver-staining of proteins in polyacrylamide gels: a general overview. Cell Mol Biol (Noisyle-grand) 1994;40:57–75.

[26] Ramaswamy O, Guha-Mukherjee S, Sopory SK. Corelation of glyoxalase I activity with cell proliferation in Datura callus culture. Plant Cell Rep 1984;3:121–4.

[27] Marc J, Mulner-Lorillon M, Boulben S, Hureau D, Durand G, Belle R. Pesticide Roundup provokes cell division dysfunction at the level of CDK1/Cyclin B activation. Chem Res Toxicol 2002;15:326–31.

[28] Nigam N, Prasad S, Shukla Y. Preventive effects of lupeol on DMBA induced DNA alkylation damage in mouse skin. Food Chem Toxicol 2007;45:2331–5.

[29] Sanders J, Brandsma M, Janssen GMC, Dijk J, Moller W. Immunofluorescence studies of human fibroblasts demonstrate

[30] Chi K, Jones DV, Frazier ML. Expression of an elongation factor 1 gamma-related sequence in adenocarcinomas of the colon. Gasteroenterology 1992;103:98–102.

[31] Chen E, Proestou G, Bourbeau D, Wang E. Rapid up-regulation of peptide elongation factor EF-1α protein levels in an immediate early event during oxidative stress-induced apoptosis. Exp Cell Res 2000;259:140–8.

[32] Shepherd JCW, Walldorf U, Hug P, Gehring WJ. Fruit flies with additional expression of the elongation factor EF1a live longer. Proc Nat Acad Sci USA 1989;86:7520–1.

[33] Gschwendt M, Kittstein W, Marks F. Effect of tumor promoting phorbol ester TPA on epidermal protein synthesis: stimulation of an elongation factor 2 phosphatase activity by TPA in vivo. Biochem Biophys Res Commun 1988;3:1129–35.

[34] Cotgreave A, Gredes R. Recent trends in glutathione biochemistry–glutathione–protein interactions: a molecular link between oxidative stress and cell proliferation? Biochem Biophys Res Commun 1998;242:1–9.

[35] Raisanen SR, Lehenkari P, Tasanen M, Rahkila P, Harkonen PL, Vaananen HK. Carbonic anhydrase III protects cells from hydrogen peroxide-induced apoptosis. FASEB J 1999;13:513–22.

[36] Dvorak HF, Brown LF, Detmar M, Dvorak AM. Vascular permeability factor/vascular endothelial growth factor, microvascular hyperpermeability and angiogenesis. Am J Pathol 1995;146:1029–39.

[37] Ferrara N. The role of vascular endothelial growth factor in pathological angiogenesis. Breast Cancer Res Treat 1995;36:127–37.

[38] Folkman J. Role of angiogenesis in tumor growth and metastasis. Semin Oncol 2002;6:15–8.

[39] Cavallaro U, Christofori G. Molecular mechanisms of tumor angiogenesis and tumor progression. J Neuro-oncol 2000; 1–2:63–70.

[40] Scott DK, Lord R, Muller HK, Malley RC, Woods GM. Proteomics identifies enhanced expression of stefin A in neonatal murine skin compared with adults: functional implications. Br J Dermatol 2007;6:1156–62.

[41] Dlugosz AA, Yuspa SH. Coordinate changes in gene expression which mark the spinous to granular cell transition in epidermis are regulated by protein kinase C. J Cell Biol 1993;120:217–25.

[42] Ozaki T, Sakiyama S. Molecular cloning of rat calpactin I heavy-chain cDNA whose expression is induced in v-src-transformed rat culture cell lines. Oncogene 1993;8:1707–10.

[43] Karimi-Busheri F, Marcoux Y, Tredget EE, Li L, Zheng J, Ghoreishi M, et al. Expression of a releasable form of annexin II by human keratinocytes. J Cell Biochem 2002;4:737–47.

[44] Bastian BC, van der Piepen U, Römisch J, Paques EP, Bröcker EB. Localization of annexins in normal and diseased human skin. J Dermatol Sci 1993;3:225–34.

[45] Vishwanatha JK, Chiang Y, Kumble KD, Hollingsworth MA, Pour PM. Enhanced expression of annexin II in human pancreatic carcinoma cells and primary pancreatic cancers. Carcinogenesis 1993;14:2575–9.

[46] Reeves SA, Chavez Kappel C, Davis R, Rosenblum M, Israel MA. Developmental regulation of annexin II (Lipocortin 2) in human brain and expression in high grade glioma. Cancer Res 1992;52:6871–6.

[47] Immenschuh S, Baumgart-Vogt E. Peroxiredoxins, oxidative stress, and cell proliferation. Antioxid Redox Signal 2005;5–6:768–77.

[48] Yo YD, Chung YM, Park JK, Ahn CM, Kim SK, Kim HJ. Synergistic effect of peroxiredoxin II antisense on cisplatin induced cell death. Exp Mol Med 2002;34:273–7.

[49] Kim K, Yu M, Han S, Oh I, Choi YJ, Kim S, et al. Expression of human peroxiredoxin isoforms in response to cervical carcinogenesis. Oncol Rep 2009;6:1391–6.

[50] Karihtala P, Mantyniemi A, Kang SW, Kinnula VL, Soini Y. Peroxiredoxins in breast carcinoma. Clin Cancer Res 2003;9:3418–24.

[51] Takahashi H, Hashimoto Y, Aoki N, Kinouchi M, Ishida-Yamamoto A, Iizuka H. Copper, zinc-superoxide dismutase protects from ultraviolet B-induced apoptosis of SV40-transformed human keratinocytes: the protection is associated with the increased levels of antioxidant enzymes. J Dermatol Sci 2000;23:12–21.

[52] Donato R. Functional roles of S100 proteins, calcium binding proteins of the EF-handtype. Biochim Biophys Acta 1999;1450:191–231.

[53] Weterman MA, Stoopen GM, van Muijen GN, Kuz´nicki J, Ruiter DJ, Bloemers HP. Expression of calcyclin in human melanoma cell lines correlates with metastatic behavior in nude mice. Cancer Res 1992;52:1291–6.

[54] Luo X, Sharff KA, Chen J, He TC, Luu HH. S100A6 expression and function in human osteosarcoma. Clin Orthop Relat Res 2008;465:2060–70.

[55] Fullen DR, Garrisi AJ, Sanders D, Thomas D. Expression of S100A6 protein in a broad spectrum of cutaneous tumors using tissue microarrays. J Cutan Pathol 2008;35:28–34.

[56] Gebhardt C, Breitenbach U, Tuckermann JP, Dittrich BT, Richter KH, Angel P. Calgranulins S100A8 and S100A9 are negatively regulated by glucocorticoids in a c-Fos-dependent manner and overexpressed throughout skin carcinogenesis. Oncogene 2002;21:4266–76.

[57] Wang X, Fan P, Song H, Chen X, Li X, Li Y. Comparative proteomic analysis of differentially expressed proteins in shoots of Salicornia europaea under different salinity. J Proteome Res 2009;7:3331–45.

# EXHIBIT 6

# Revised Glyphosate Issue Paper: Evaluation of Carcinogenic Potential

# EPA's Office of Pesticide Programs
# December 12, 2017



DP Barcode: D444689
TXR#: 0057688

**Table of Contents**

List of Acronyms ................................................................................................................ 7

List of Tables ................................................................................................................... 10

1.0   Introduction ............................................................................................................ 12

1.1   Background ............................................................................................................. 12

1.2   Evaluation of Carcinogenic Potential.................................................................... 12

1.3   Overview of "Framework for Incorporating Human Epidemiologic & Incident Data in Health Risk Assessment" ................................................................................................. 14

1.4   Summary of the Exposure Profile in the United States ......................................... 15

1.5   Organization of this Document ............................................................................. 19

2.0   Systematic Review & Data Collection .................................................................. 19

2.1   Data Collection: Methods & Sources ................................................................... 20

2.1.1   Open Literature Search ....................................................................................... 20

2.1.2   Studies Submitted to the Agency ....................................................................... 21

2.2   Evaluation of Relevant Studies ............................................................................. 22

3.0   Data Evaluation of Epidemiology ......................................................................... 23

3.1   Introduction .......................................................................................................... 23

3.2   Considerations for Study Quality Evaluation and Scope of Assessment.............. 23

3.2.1   Study Designs ..................................................................................................... 24

3.2.1.1      Analytical Studies ......................................................................................... 26

3.2.1.2    Descriptive Studies ................................................................ 27

3.2.2    Exposure Measures ................................................................ 28

3.2.3    Outcome Measures ................................................................ 28

3.2.4    Confounding .......................................................................... 28

3.2.5    Statistical Analyses .............................................................. 29

3.2.6    Risk of Bias ........................................................................... 29

3.3    Review of Quality Results ...................................................... 30

3.3.1    "High" Quality Group ........................................................... 31

3.3.2    "Moderate" Quality Group .................................................... 32

3.3.3    "Low" Quality Group ............................................................ 32

3.4    Assessment of Epidemiological Studies for Relevance to Analysis ............................. 44

3.5    Summary of Relevant Epidemiological Studies ................... 45

3.5.1    Solid Tumor Cancer Studies ................................................ 45

3.5.2    Non-Solid Tumor Cancer Studies ....................................... 53

3.6    Discussion............................................................................... 63

4.0    Data Evaluation of Animal Carcinogenicity Studies .......... 69

4.1    Introduction............................................................................ 69

4.2    Consideration of Study Quality for Animal Carcinogenicity Studies....................... 69

4.3    Assessment of Animal Carcinogenicity Studies .................. 71

4.4     Summary of Animal Carcinogenicity Studies ............................................................ 74

4.5     Rat Carcinogenicity Studies with Glyphosate ........................................................ 74

4.5.1   Lankas, 1981 (MRID 00093879) .......................................................................... 74

4.5.2   Stout and Ruecker, 1990 (MRID 41643801) ........................................................ 75

4.5.3   Atkinson *et al.*, 1993a (MRID 49631701) ............................................................ 79

4.5.4   Brammer, 2001 (MRID 49704601) ........................................................................ 80

4.5.5   Pavkov and Wyand 1987 (MRIDs 40214007, 41209905, 41209907) ................. 80

4.5.6   Suresh, 1996 (MRID 49987401) ............................................................................ 81

4.5.7   Enemoto, 1997 (MRID 50017103-50017105) ....................................................... 81

4.5.8   Wood *et al.*, 2009a (MRID 49957404) ................................................................. 81

4.5.9   Summary of Rat Data ............................................................................................. 82

4.6     Mouse Carcinogenicity Studies with Glyphosate ................................................. 85

4.6.1   Reyna and Gordon, 1973 (MRID 00061113) ........................................................ 85

4.6.2   Knezevich and Hogan, 1983 (MRID 00130406) ................................................... 85

4.6.3   Atkinson, 1993b (MRID 49631702) ...................................................................... 87

4.6.4   Wood *et al.*, 2009b (MRID 49957402) ................................................................. 88

4.6.5   Sugimoto, 1997 (MRID 50017108 - 50017109) ................................................... 89

4.6.6   Pavkov and Turnier, 1987 (MRIDs 40214006, 41209907) ................................... 90

4.6.7   Summary of Mouse Data ........................................................................................ 90

**4.7    Absorption, Distribution, Metabolism, Excretion (ADME)** ........................... **93**

**4.8    Discussion** ........................................................................................................ **94**

**5.0    Data Evaluation of Genetic Toxicity** ................................................................ **98**

**5.1    Introduction** ..................................................................................................... **98**

**5.2    Scope of the Assessment Considerations for Study Quality Evaluation** ..................... **99**

**5.3    Tests for Gene Mutations for Glyphosate Technical** .................................... **100**

**5.3.1  Bacterial Mutagenicity Assays** ....................................................................... **100**

**5.3.2  *In vitro* Tests for Gene Mutations in Mammalian Cells** ........................... **106**

**5.4    *In vitro* Tests for Chromosomal Abnormalities** ........................................ **108**

**5.4.1  *In vitro* Mammalian Chromosomal Aberration Test** ............................... **108**

**5.4.2  *In vitro* Mammalian Micronucleus Test** .................................................... **109**

**5.5    *In Vivo* Genetic Toxicology Tests** ............................................................... **114**

**5.5.1  *In Vivo* Assays for Chromosomal Abnormalities** ..................................... **114**

**5.5.1.1    Mammalian Bone Marrow Chromosomal Aberration Assays** .................... **114**

**5.5.1.2    Rodent Dominant Lethal Test** .................................................................... **114**

**5.5.1.3    *In Vivo* Mammalian Erythrocyte Micronucleus Assays** ......................... **115**

**5.6    Additional Genotoxicity Assays Evaluating Primary DNA Damage** ..................... **122**

**5.7    Summary and Discussion** ............................................................................... **129**

**6.0    Data Integration & Weight-of-Evidence Analysis Across Multiple Lines of Evidence**
**        132**

**6.1**    **Background** ................................................................................................ **132**

**6.2**    **Dose-Response and Temporal Concordance** ................................................ **132**

**6.3**    **Strength, Consistency, and Specificity** ...................................................... **133**

**6.4**    **Biological Plausibility and Coherence** ....................................................... **135**

**6.5**    **Uncertainty** ................................................................................................. **136**

**6.6**    **Evaluation of Cancer Classification per the 2005 EPA Guidelines for Carcinogen Risk Assessment** ........................................................................................ **138**

**6.6.1**  **Introduction** ................................................................................................ **138**

**6.6.2**  **Discussion of Evidence to Support Cancer Classification Descriptors** ..................... **141**

**6.7**    **Proposed Conclusions Regarding the Carcinogenic Potential of Glyphosate** .......... **143**

**7.0**    **Collaborative Research Plan for Glyphosate and Glyphosate Formulations** .......... **145**

**8.0**    **References** ................................................................................................... **147**

## List of Acronyms

ADME: Absorption, Distribution, Metabolism, and Excretion
AHS: Agricultural Health Study
AOP: Adverse Outcome Pathway
AMPA: Aminomethylphosphonic Acid
BrdU: Bromodeoxyuridine
CA: Chromosomal Aberration
CARC: Cancer Assessment Review Committee
CBPI: Cytokinesis Block Proliferation Index
CHL: Chinese Hamster Lung
CHO: Chinese Hamster Ovary
CPRC: Carcinogenicity Peer Review Committee
EFSA: European Food Safety Authority
EPSPS: 5-enolpyruvylshikimate-3-phosphate synthase
FAO: Food and Agriculture Organization
FIFRA: Federal Insecticide, Fungicide, and Rodenticide Act
FISH: Fluorescence *in situ* Hybridization
GC-MS: Gas Chromatography-Mass Spectrometry
HL: Hodgkin Lymphoma
HPLC: High-Performance Liquid Chromatography
HPRT: Hypoxanthine-Guanine Phosphoribosyl Transferase
IARC: International Agency for Research on Cancer
JMPR: Joint FAOWHO Meeting on Pesticide Residues
MGUS: Monoclonal Gammopathy of Undetermined Significance
MN: Micronuclei
MOA: Mode of Action
MPCE: Micronucleated Polychromatic Erythrocytes
MRID: Master Record Identifier (a unique number assigned to each study submitted to EPA)
MTD: Maximum Tolerated Dose
NB: Nuclear Bud
NCR: National Research Council
NHL: Non-Hodgkin Lymphoma
NPB: Nucleoplasmic Bridges
NTP: National Toxicology Program
OCSPP: Office of Chemical Safety and Pollution Prevention
OECD: Organization for Economic Cooperation and Development
OPP: Office of Pesticides Program
PCE: Polychromatic Erythrocytes
PK: Pharmacokinetic
PPE: Personal Protective Equipment
PWG: Pathology Work Group
RED: Registration Eligibility Decision
ROS: Reactive Oxygen Species
SAP: Scientific Advisory Panel
SCE: Sister Chromatid Exchange

SCGE: Single Cell Gel Electrophoresis
TAC: Total Antioxidant Capacity
TK: Thymidine Kinase
UDS: Unscheduled DNA Synthesis
USGS: United States Geological Survey
UV: Ultraviolet
WHO: World Health Organization
XPRT: Xanthine-Guanine Phosphoribosyl Transferase

**List of Figures**

Figure 1.1.  Source to outcome pathway (adapted from NRC, 2007)

Figure 1.2.  Glyphosate agricultural usage (pounds applied annually) from 1987- 2014. Boxes indicate years when glyphosate-resistant crops were introduced.  Source: Proprietary Market Research Data (1987 – 2014)

Figure 1.3. Map of estimated agricultural use for glyphosate in 1994 from USGS

Figure 1.4. Map of estimated agricultural use for glyphosate in 2014 from USGS

Figure 3.1.  Study evaluation process for epidemiological studies

Figure 3.2.  Forest plot of effect estimates (denoted as ES for effect sizes) and associated 95% confidence intervals (CI) for non-Hodgkin lymphoma (NHL)

Figure 7.1.  Results of HepG2 exposures following 24 hour incubation using different glyphosate formulations

## List of Tables

Table 3.1 Epidemiology Study Quality Considerations

Table 3.2.  Summary of Study Design Elements Impacting Study Quality Assignment and Overall Ranking

Table 3.3. Summary of Findings: Solid Tumor Cancer Studies

Table 3.4.  Summary of Findings: Non-Solid Tumor Cancer Studies

Table 4.1.  Testicular Interstitial Cell Tumors in Male Sprague-Dawley Rats (Lankas, 1981) Cochran-Armitage Trend Test & Fisher's Exact Test Results

Table 4.2.  Pancreatic Islet Cell Tumors in Male Sprague-Dawley Rats (Stout and Ruecker, 1990) Cochran-Armitage Trend Test & Fisher's Exact Test Results

Table 4.3.  Historical Control Data — Pancreatic Islet Cell Adenomas in Male Sprague-Dawley Rats (MRID No. 41728701)

Table 4.4.  Hepatocellular Tumors in Male Sprague-Dawley Rats (Stout and Ruecker, 1990) Cochran-Armitage Trend Test & Fisher's Exact Test Results

Table 4.5.  Historical Control Data - Hepatocellular Tumors in Male Sprague- Dawley Rats (MRID No. 41728701).

Table 4.6.  Thyroid C-Cell Tumors in Male Sprague-Dawley Rats (Stout and Ruecker, 1990) Cochran-Armitage Trend Test & Fisher's Exact Test Results

Table 4.7.  Thyroid C-Cell Tumors in Female Sprague Dawley Rats Cochran-Armitage Trend Test & Fisher's Exact Test Results (Stout and Ruecker, 1990)

Table 4.8.  Historical Control Data - Thyroid C-Cell Tumors in Female Sprague-Dawley Rats (MRID No. 41728701).

Table 4.9. Thyroid Non-Neoplastic Lesions (Stout and Ruecker, 1990)

Table 4.10.  Liver Adenomas in Male Wistar Rats (Brammer, 2001) Cochran-Armitage Trend Test and Fisher's Exact Test Results

Table 4.11.  Mammary Gland Tumor Incidences in Female Rats (Wood et al., 2009a) Fisher's Exact Test and Cochran-Armitage Trend Test Results

Table 4.12. Summary of Rat Carcinogenicity Studies

Table 4.13.  Renal Tubular Cell Tumors in Male CD-1 Mice (Knezevich and Hogan, 1983) Cochran-Armitage Trend Test & Fisher's Exact Test Results

Table 4.14. Historical Control Data- Kidney tumors in CD-1 Mice (TXR #0007252).

Table 4.15. Kidney Histopathological Alterations in Male CD-1 Mice (Knezevich and Hogan, 1983)

Table 4.16.  Hemangiosarcomas in Male CD-1 Mice (Atkinson, 1993b) Cochran-Armitage Trend Test and Fisher's Exact Test Results

Table 4.17.  Lung Tumors in Male CD-1 Mice (Wood et al., 2009b) Fisher's Exact Test and Cochran-Armitage Trend Test Results

Table 4.18.  Malignant Lymphomas in Male CD-1 Mice (Wood et al., 2009b) Fisher's Exact Test and Cochran-Armitage Trend Test Results

Table 4.19.  Hemangioma Incidences (Sugimoto, 1997) Fisher's Exact Test and Cochran-Armitage Trend Test Results

Table 4.20. Summary of Mouse Carcinogenicity Studies

Table 5.1.  *In vitro* Test for Gene Mutations in Bacteria: Glyphosate Technical

Table 5.2.  *In vitro* Mammalian Gene Mutation Assays: Glyphosate Technical

Table 5.3.  *In vitro* Tests for Chromosome Aberrations in Mammalian Cells- Glyphosate Technical

Table 5.4.  *In vitro* Tests for Micronuclei Induction in Mammalian Cells- Glyphosate Technical

Table 5.5.  *In Vivo* Tests for Chromosomal Aberrations in Mammals- Glyphosate Technical

Table 5.6.  In Vivo Tests for Micronuclei Induction in Mammals- Glyphosate Technical

Table 5.7 Assays for Detecting Primary DNA Damage- Glyphosate Technical

## 1.0    Introduction

### 1.1    Background

Glyphosate is a non-selective, phosphonomethyl amino acid herbicide registered to control weeds in various agricultural and non-agricultural settings.  The herbicide acts by inhibiting the 5-enolpyruvylshikimate-3-phosphate synthase (EPSPS) enzyme, which is not present in mammalian systems.  Glyphosate was initially registered in 1974.  Since then, several human health analyses have been completed for glyphosate.  In 1986, EPA issued the Glyphosate Registration Standard which updated the agency's toxicity database for this compound.  In 1993, EPA issued the registration eligibility decision (RED) that indicated that glyphosate was eligible for re-registration.

Currently, glyphosate is undergoing Registration Review[1], a program where all registered pesticides are reviewed at least every 15 years as mandated by the Federal Insecticide, Fungicide, and Rodenticide Act (FIFRA).  The initial docket opening for glyphosate occurred in 2009 with the publication of the human health scoping document and preliminary work plan[2].  As part of this process, the hazard and exposure of glyphosate are reevaluated to determine its potential risk to human and environmental health.  Risks are assessed using current practices and policies to ensure pesticide products can still be used safely.  Registration Review also allows the agency to incorporate new science.  For human health risk assessment, both non-cancer and cancer effects are evaluated for glyphosate and its metabolites, aminomethylphosphonic acid (AMPA) and *N*-acetyl-glyphosate; however, this document will focus on the cancer effects only.  EPA expects to complete its complete human health risk assessment in 2017 that will include an assessment of risk from anticipated exposures resulting from registered uses of glyphosate in residential and occupational settings.

### 1.2    Evaluation of Carcinogenic Potential

Since its registration, the carcinogenic potential of glyphosate has been evaluated by EPA several times.  In 1985, the initial peer review of glyphosate was conducted in accordance with the Proposed Guidelines for Carcinogen Risk Assessment.  The agency classified glyphosate as a Group C chemical (Possible Human Carcinogen), based on the presence of kidney tumors in male mice.  In 1986, the agency requested that the FIFRA Scientific Advisory Panel (SAP) evaluate the carcinogenic potential of glyphosate.  The panel determined that the data on renal tumors in male mice were equivocal (only an increase in adenomas was observed and the increase did not reach statistical significance).  As a result, the panel recommended a Group D chemical classification (Not Classifiable as to Human Carcinogenicity) for glyphosate and advised the agency to issue a data call-in notice for further studies in rats and/or mice to clarify the unresolved questions (FIFRA SAP Report, 1986)[3].

---

[1] Additional information on the Registration Review process can be found at: https://www.epa.gov/pesticide-reevaluation/registration-review-process

[2] Documents of the Registration Review can be found in the public docket at: EPA-HQ-OPP-2009-0361, accessible at www.regulations.gov.

[3] Review available at: http://www.epa.gov/pesticides/chem_search/cleared_reviews/csr_PC-103601_24-Feb-86_209.pdf

With the submission of two rat carcinogenicity studies following this data call-in, a second peer review was conducted in 1991 by the agency's Carcinogenicity Peer Review Committee (CPRC) to incorporate the new data.  In accordance with the agency's 1986 Draft Guidelines for Carcinogen Risk Assessment, the CPRC classified glyphosate as a Group E Chemical: "Evidence of Non-Carcinogenicity for Humans" based upon lack of evidence for carcinogenicity in mice and rats and the lack of concern for mutagenicity (TXR# 0008897).

Most recently, in September 2015, a third review was done by the Cancer Assessment Review Committee (CARC).  Relevant glyphosate data available to EPA at that time for glyphosate were reevaluated, including studies submitted by the registrant and studies published in the open literature.  The agency performed this evaluation in support of Registration Review in accordance with the 2005 Guidelines for Carcinogen Risk Assessment, classified glyphosate as "Not Likely to be Carcinogenic to Humans" (CARC, 2015; TXR #0057299).

In recent years, several international agencies have evaluated the carcinogenic potential of glyphosate.  In March 2015, the International Agency for Research on Cancer (IARC), a subdivision of the World Health Organization (WHO), determined that glyphosate was a probable carcinogen (group 2A) (IARC, 2015).  Later, in November 2015, the European Food Safety Authority (EFSA) determined that glyphosate was unlikely to pose a carcinogenic hazard to humans (EFSA, 2015).  In May 2016, the Joint Food and Agriculture Organization (FAO)/WHO Meeting on Pesticide Residues (JMPR), another subdivision of the WHO, concluded that glyphosate was unlikely to pose a carcinogenic risk to humans from exposure through the diet (JMPR, 2016).  Some individual countries in Europe (e.g., France, Sweden) have considered banning glyphosate uses based on the IARC decision, while other countries (e.g., Japan, Canada, Australia, New Zealand) have continued to support their conclusion that glyphosate is unlikely to pose a carcinogenic risk to humans.

The recent peer review performed by CARC served as an initial analysis to update the data evaluation for glyphosate at that time.  Based on an evaluation of the studies included in the recent analyses by IARC, JMPR, and EFSA, the agency then became aware of additional relevant studies not available to EPA.  As a result, EPA also requested information from registrants about studies that existed, but had never been submitted to the agency.  The current evaluation incorporates these additional studies. In addition, the agency conducted a systematic review of the open literature and toxicological databases for glyphosate by using a "Framework for Incorporating Human Epidemiologic & Incident Data in Health Risk Assessment".  As such, the current evaluation also provides a more thorough evaluation than the 2015 CARC review.

In December 2016, the FIFRA SAP was convened to evaluate the agency's Issue Paper regarding the human carcinogenic potential of glyphosate.  The panel's report was published in March 2017 and the current document incorporates revisions based on the panel's report (G. Akerman; 12-DEC-2017; TXR#0057689).  Additionally, information from a recently published analysis of glyphosate use and cancer incidence in the Agricultural Health Study (AHS) cohort (Andreotti et al., 2017) with a longer follow-up than the previously published data (De Roos et al., 2005) has been considered in this evaluation.

### 1.3     Overview of "Framework for Incorporating Human Epidemiologic & Incident Data in Health Risk Assessment"

In 2010, the Office of Pesticide Programs (OPP) developed a draft "Framework for Incorporating Human Epidemiologic & Incident Data in Health Risk Assessment" which provides the foundation for evaluating multiple lines of scientific evidence in the context of understanding of the mode of action (MOA)/adverse outcome pathway (AOP) (U.S. EPA, 2010).  The draft framework, which includes two key components, problem formulation and use of the MOA/AOP pathway frameworks, was reviewed favorably by the FIFRA SAP in 2010 (FIFRA SAP, 2010). In 2016, a final version of the framework was published[4], which incorporated improvements based on recommendations from the SAP, public comments, and the experience gained since 2010 conducting assessments on several pesticides for which epidemiological data were available.  Recently, EPA has applied this framework to the evaluation of atrazine and chlorpyrifos[5].

OPP's framework is consistent with updates to the World Health Organization/International Programme on Chemical Safety MOA/human relevance framework, which highlights the importance of problem formulation and the need to integrate information at different levels of biological organization (Meek *et al.*, 2014).  Consistent with recommendations by the National Research Council (NRC) in its 2009 report on *Science and Decisions*, OPP's framework describes the importance of using problem formulation at the beginning of a complex scientific analysis.  The problem formulation stage starts with planning dialogue with risk managers to identify goals for the analysis and possible risk management strategies.  This initial dialogue provides the regulatory context for the scientific analysis and helps define the scope of such an analysis.  The problem formulation stage also involves consideration of the available information regarding the pesticide use/usage, toxicological effects of concern, and exposure pathways and duration along with key gaps in data or scientific information.  Specific to glyphosate, the scoping document prepared for Registration Review (J. Langsdale *et al.*, 2009) along with the review conducted by the CARC (CARC, 2015) represent the problem formulation analyses for the weight-of-evidence evaluation for carcinogenic potential.  A summary of the US exposure profile is provided in Section 1.4 to provide context for interpreting the various lines of evidence.

One of the key components of the agency's framework is the use of the MOA framework/AOP concept (Figure 1.1) as a tool for organizing and integrating information from different sources to inform the causal nature of links observed in both experimental and observational studies. Specifically, the modified Bradford Hill Criteria (Hill, 1965) are used to evaluate strength, consistency, dose response, temporal concordance and biological plausibility of multiple lines of evidence in a weight-of-evidence analysis.

---

[4] https://www3.epa.gov/pesticides/EPA-HQ-OPP-2008-0316-DRAFT-0075.pdf
[5] Chlorpyrifos Revised Human Health Risk Assessment for Registration Review; 29-DEC-2014; D424485.
U.S. EPA 2010 SAP Background White Paper – Re-evaluation of Human Health Effects of Atrazine: Review of Experimental Animal and In Vitro Studies and Drinking Water Monitoring Frequency. EPA-HQ-OPP-2010-0125.
U.S. EPA 2011 SAP Issue Paper – Re-evaluation of Human Health Effects of Atrazine: Review of Cancer Epidemiology, Non-cancer Experimental Animal and In Vitro Studies and Drinking Water Monitoring Frequency. EPA-HQ-OPP-2011-0399.



**Figure 1.1.  Source to outcome pathway (adapted from NRC, 2007).**

## 1.4     Summary of the Exposure Profile in the United States

All pesticide products provide critical information about how to safely and legally handle and use pesticide products.  Pesticide labels are legally enforceable and all carry the statement "it is a violation of Federal law to use this product in a manner inconsistent with its labeling."  In other words, the label is law.  As a result, a key function of the pesticide product label is to manage the potential risk from pesticides.

Labeled uses of glyphosate include over 100 terrestrial food crops as well as other non-agricultural sites, such as greenhouses, aquatic areas, and residential areas.  It is also registered for use on glyphosate-resistant (transgenic) crop varieties such as corn, soybean, canola, cotton, sugar beets, and wheat.  Registered tolerances in the United States include residues of the parent compound glyphosate and *N*-acetyl-glyphosate, a metabolite found in/on glyphosate-tolerant crops[6].

Dietary (food and water) exposures are anticipated from applications to crops.  Since there are registered uses of glyphosate that may be used in residential settings, residential handlers may be exposed to glyphosate during applications.  Exposures may also occur from entering non-occupational areas that have been previously treated with glyphosate.  Occupational/commercial workers may be exposed to glyphosate while handling the pesticide prior to application (mixing and/or loading), during application, or when entering treated sites.  The agency considers all of the anticipated exposure pathways as part of their evaluation for human health.

Oral exposure is considered the primary route of concern for glyphosate.  Oral absorption has been shown to be relatively low for glyphosate (~30% of administered doses) with negligible accumulation in tissues and rapid excretion (primarily unchanged parent) via the urine.  Due to its low vapor pressure, inhalation exposure to glyphosate is expected to be minimal.  Dermal penetration has also been shown to be relatively low for human skin (<1%) indicating dermal exposure will only contribute slightly to a systemic biological dose.  Furthermore, in route-

---

[6] All currently registered tolerances for residues of glyphosate can be found in the Code of Federal Regulations (40 CFR §180.364).

specific inhalation and dermal toxicity studies, no adverse effects were observed.  This all suggests that there is low potential for a sustainable biological dose following glyphosate exposure.

In residential/non-occupational settings, children 1-2 years old are considered the most highly exposed subpopulation with oral exposures from dietary (food and water) ingestion and incidental oral ingestion (e.g., hand-to-mouth activities) in treated areas.  There is also potential for dermal exposures in previously treated areas.  Using OPP's standard exposure assessment methodologies which are based on peer-reviewed and validated exposure data and models[7], a high-end estimate of combined exposure for children 1-2 years old is 0.47 mg/kg/day (see Appendix E).

At the time of initial registration (1974), total use of glyphosate in the United States was approximately 1.4 million pounds (Benbrook, 2016).  In 1995, total use of glyphosate increased to approximately 40 million pounds with agriculture accounting for 70% of use.  With the introduction of transgenic crop varieties in the United States circa 1996, (such as soybean, cotton, and corn) use of glyphosate increased dramatically (Green and Owen, 2011), and in 2000 the total use of glyphosate in the United States was approximately 98.5 million pounds.  By 2014, total annual use of glyphosate was approximately 280-290 million pounds (based on Benbrook, 2016 and industry proprietary data accessible to EPA) with agriculture accounting for 90% of use.  Although glyphosate use has continuously increased up to 2012, the stabilization of glyphosate usage in recent years is due to the increase in a number of glyphosate-resistant weed species, starting with rigid ryegrass identified in California in 1998 and currently totaling 16 different weed species in the United States as of March 2016.  Figure 1.2 below provides a visual representation of the increased agricultural use of glyphosate in the United States using proprietary market research data from 1987-2014.

The increased use of glyphosate may be partly attributed to an increase in the number of farmers using glyphosate; however, it is more likely that individuals already using glyphosate increased their use and subsequent exposure.  With the introduction of transgenic crop varieties, glyphosate use shifted from pre-emergent to a combination of pre- and post-emergent applications.  Additionally, application rates increased in some instances and more applications were allowed per year (2-3 times/year).  Maps from the United States Geological Survey (USGS) displaying glyphosate use in the United States indicate that although use has drastically increased since 1994, areas treated with glyphosate for agricultural purposes appear to be approximately the same over time (Figures 1.3-1.4).  The introduction of transgenic crops in some cases led to a shift in crops grown on individual farms, such that more acreage within the farm would be dedicated to growing the glyphosate-tolerant crops replacing other crops.  In addition, during the 2000s there was also an increase in growing corn for ethanol production, which could also have resulted in increased acreage dedicated glyphosate-tolerant corn.

---

[7] Available: http://www2.epa.gov/pesticide-science-and-assessing-pesticide-risks/standard-operating-procedures-residential-pesticide



**Figure 1.2. Glyphosate agricultural usage (pounds applied annually) from 1987- 2014. Boxes indicate years when glyphosate-resistant crops were introduced. Source: Proprietary Market Research Data (1987 – 2014).**



**Figure 1.3. Map of estimated agricultural use for glyphosate in 1994 from USGS (http://water.usgs.gov/nawqa/pnsp/usage/maps/show_map.php?year=1994&map=GLYPHOSATE&hilo=H)**

Page **17** of **216**



**Figure 1.4. Map of estimated agricultural use for glyphosate in 2014 from USGS (http://water.usgs.gov/nawqa/pnsp/usage/maps/show_map.php?year=2014&map=GLYPHOSATE&hilo=H)**

The potential exposure to occupational handlers is dependent on the formulation, specific task (mixer, loader, and/or applicator), rate of application, and acreage treated.  Using HED's standard occupational exposure assessment methodologies which are based on peer-reviewed and validated exposure data and models[8], mixer/loaders result in the highest potential exposure estimates.  Assuming no personal protective equipment (PPE), exposure estimates for mixer/loaders range from 0.03-7 mg/kg/day using the maximum application rate for high acreage agricultural crops (6 lb ai/acre)[9].  For applicators, exposure would be lower with estimates ranging from 0.02-0.03 mg/kg/day using the same application rate and acreage.

The maximum potential exposures from currently registered uses of glyphosate in residential and occupational settings in the United States are used in the current evaluation to aid in the determination of whether findings in laboratory studies are relevant for human health risk assessment.  In Sections 4.0 and 5.0, descriptions are provided for animal carcinogenicity and genotoxicity studies, respectively.  Results from these studies, particularly those administering high doses, are put into context with the human exposure potential in the United States.

---

[8] Available: https://www.epa.gov/pesticide-science-and-assessing-pesticide-risks/occupational-pesticide-handler-exposure-data
[9] Based on use information provided by the Joint Glyphosate Task Force for the following end-use products: EPA Registration Nos.: 100-1182, 228-713, 524-343, 524-475, 524-537, 524-549, 524-579, 4787-23, and 62719-556.

## 1.5     Organization of this Document

In this analysis of the human carcinogenic potential of the active ingredient glyphosate, the agency has performed a comprehensive analysis of available data from submitted guideline studies and the open literature.  This includes epidemiological, animal carcinogenicity, and genotoxicity studies.  Consistent with the framework described in Section 1.3, the agency has evaluated these multiple lines of evidence and conducted a weight-of-evidence analysis.  Although there are studies available on glyphosate-based pesticide formulations, the agency is soliciting advice from the FIFRA SAP on this evaluation of human carcinogenic potential for the active ingredient glyphosate only at this time.  The remainder of this document is organized by the following:

- *Section 2.0 Systematic Review & Data Collection Methods* provides a description of methods used to compile all relevant studies used in the current evaluation.
- *Section 3.0 Data Evaluation of Epidemiology* describes the available epidemiological studies, evaluates relevant studies for study quality, and discusses reported effect estimates.
- *Section 4.0 Data Evaluation of Animal Carcinogenicity Studies* provides a description and evaluation of the available animal carcinogenicity studies for glyphosate.
- *Section 5.0 Data Evaluation of Genetic Toxicity* summarizes and discusses the various genotoxicity assays that have been tested with glyphosate.
- *Section 6.0 Data Integration & Weight of Evidence Analysis Across Multiple Lines of Evidence* integrates available data discussed in Sections 3.0-5.0 to consider concepts, such as strength, consistency, dose response, temporal concordance and biological plausibility in a weight-of-evidence analysis.  This section also provides discussion of the data in the context of cancer descriptors provided in the 2005 Guidelines for Carcinogen Risk Assessment.
- *Section 7.0 Collaborative Research Plan for Glyphosate and Glyphosate Formulations* provides a discussion of planned research that is intended to evaluate the role of glyphosate in product formulations and the differences in formulation toxicity.

## 2.0     Systematic Review & Data Collection

In recent years, the National Academy of Sciences National Research Council (NRC) has encouraged the agency to move towards systematic review processes to enhance the transparency of scientific literature reviews that support chemical-specific risk assessments to inform regulatory decision making (NRC, 2011).  The NRC defines systematic review as "a scientific investigation that focuses on a specific question and uses explicit, pre-specified scientific methods to identify, select, assess, and summarize the findings of similar but separate studies" (NRC, 2014).  Consistent with NRC's recommendations, EPA's Office of Chemical Safety and Pollution Prevention (OCSPP) is currently developing systematic review policies and procedures.  In short, OCSPP employs "fit for purpose" systematic reviews that rely on standard methods for ***collecting, evaluating, and integrating*** the scientific data supporting the agency's decisions.  The concept of fit for purpose implies that a particular activity or method is suitable for its intended use.  Inherent in this definition is the concept that one size does not fit all

situations and thus flexibility is allowed.  However, it is notable that with flexibility comes the importance of transparency of documented processes; including the importance of transparency and clarity in approaches to data collection, evaluation, and integration.  These are described throughout the document with data collection in Sections 2.1.1-2.1.2, evaluation in Sections 3-5, and integration in Section 6.

As a result, more recent evaluations are starting to reflect this progression in the agency's process.  Similar to the framework for incorporating human epidemiologic and incident data, systematic review begins with a problem formulation to determine the scope and purpose of the search.  Studies are considered based on their relevance to answer specific questions and those studies deemed relevant are then further considered for their usefulness in risk assessment.

The agency strives to use high-quality studies when evaluating the hazard potential of pesticidal chemicals and considers a broad set of data during this process.  This includes registrant generated studies required under FIFRA, as well as peer-reviewed scientific journals and other sources, such as other governments and academia.  A wide range of potential adverse effects are assessed using acute, subchronic, chronic, and route-specific studies; predominately from studies with laboratory animals, in addition to epidemiologic and human incident data.  All studies are thoroughly reviewed to ensure appropriate conduct and methodologies are utilized, and that sufficient data and details are provided.  In this way, hazards are identified and potential risks characterized to ensure that decisions are informed by the best science available.

## 2.1     Data Collection: Methods & Sources

Data were collected by searching the open literature (Section 2.1.1) and other publicly available sources (e.g., recent internal reviews, evaluations by other organizations) (Section 2.1.2).  Internal databases were also searched for submitted studies conducted according to Organization for Economic Cooperation and Development (OECD) test guidelines, OCSPP harmonized test guidelines, and other pesticide test guidelines (OPP guidelines) (Section 2.1.2).

It should be noted that glyphosate is primarily manufactured as various salts with cations, such as isopropylamine, ammonium, or sodium.  These salts are derivatives of the active substance glyphosate and increase the solubility of technical-grade glyphosate acid in water.  All of these forms were considered for the current evaluation.

## 2.1.1   Open Literature Search

As part of the evaluation of the human carcinogenic potential of glyphosate, the literature review described here uses concepts consistent with fit for purpose systematic review, such as detailed tracking of search terms and which literature have been included or excluded.  The primary goal of the literature search was to identify relevant and appropriate open literature studies that had the potential to inform the agency on the human carcinogenic potential of glyphosate.  Therefore, non-mammalian studies were not considered, and several terms were used in the search string in an attempt to exclude non-mammalian studies.

To obtain literature studies, OPP worked with EPA librarians to conduct searches in PubMed, Web of Science, and Science Direct.  A search was conducted on May 6, 2016 in PubMed and Web of Science using the following search string to yield 141 and 225 results, respectively:

> ((glyphosate OR "1071-83-6" OR roundup OR "N-(Phosphonomethyl)glycine") AND (aneuploid* OR chromosom* OR clastogenic* OR "DNA damag*" OR "DNA adduct*" OR genome* OR genotoxic* OR micronucle* OR cancer* OR carcinogen* OR oncogenic* OR mutagen* OR cytotoxic* OR tumor* OR tumour* OR malignanc* OR neoplasm* OR *oma)) NOT (fish* OR frog* OR tadpole* OR insect* OR eco* OR amphibian* OR reptil* OR invertebrate* OR fly OR flies OR aquatic OR bird* OR aqueous OR water OR yeast* OR worm* OR earthworm* OR bacteria* OR lichen OR resist* OR "herbicide resist")

Due to differences with using Science Direct, the search string was slightly changed.  This search was also conducted on May 6, 2016 and yielded 459 results:

> ((glyphosate OR "1071-83-6" OR roundup OR "N-(Phosphonomethyl)glycine") AND (aneuploid* OR chromosom* OR clastogenic* OR (DNA pre/2 (damag* OR adduct*)) OR genome* OR genotoxic* OR micronucle* OR cancer* OR carcinogen* OR oncogenic* OR mutagen* OR cytotoxic* OR tumor* OR tumour* OR malignanc* OR neoplasm* OR *oma)) AND NOT (eco* OR fish* OR frog* OR tadpole* OR invertebrate* OR bird* OR insect* OR fly OR flies OR amphibian* OR reptil* OR yeast* OR aquatic OR aqueous OR water OR worm* OR earthworm* OR bacteria* OR lichen OR resist* OR "herbicide resist")

After cross-referencing the results obtained from the three open literature searches for duplicates, a total of 735 individual articles were obtained (Appendix A) and one additional study (Alvarez-Moya et al., 2014) not identified in the search was added to this list for a total of 736 individual articles.  Three staff members independently evaluated all of the studies and came to consensus on which studies would be considered relevant to the issue of concern (i.e., human carcinogenic potential of glyphosate).  Many of the articles were not considered to be within the scope of the search or not considered relevant in general (657 articles).  Additionally, 27 articles were not appropriate due to the type of article (i.e., correspondence, abstract only, not available in English, retraction).  Of the 52 relevant articles, 42 were used in the current evaluation (31 genotoxicity, 9 epidemiological, and 2 animal carcinogenicity).  Three articles also reported on the potential of glyphosate and its metabolites to be developed into therapeutic drugs for cancer treatment.  The remaining 7 articles evaluated effects on glyphosate or glyphosate formulations on cellular processes, mostly focusing on epidermal cells, and were not considered informative for the current evaluation.

### 2.1.2   Studies Submitted to the Agency

For all pesticides, there are toxicology data requirements that must be submitted to the agency for registration.  These studies, defined under the 40 CFR Part 158 Toxicology Data Requirements, provide information on a wide range of adverse health outcomes, routes of exposure, exposure durations, species, and lifestages.  They typically follow OECD, OCSPP, or OPP accepted protocols and guidelines, which ease comparisons across studies and chemicals.

The toxicological databases for glyphosate[10] were reviewed and all relevant animal, genotoxicity, and metabolism studies were collected for consideration.

Several resources were used to ensure all relevant studies were included in the current evaluation.  The list of studies obtained from the toxicological database and the open literature search were cross-referenced with recent internal reviews (CARC, 2015; S. Recore *et al.*, 2014). This list was also cross-referenced with review articles from the open literature [Chang and Delzell (2016), Greim et al. (2015), Kier and Kirkland (2013), Kier (2015), Mink *et al.* (2012), Schinasi and Leon (2014), and Williams *et al.* (2000)][11].  EPA requested studies from registrants that were not previously available to the EPA.  As a result, numerous studies were subsequently submitted to the agency.  Study reports for one animal carcinogenicity study and 17 genotoxicity studies were not available to the agency and have been noted in the relevant sections below.  For these studies, data and study summaries provided in Greim et al. (2015) and Kier and Kirkland (2013) were relied upon for the current evaluation.

## 2.2     Evaluation of Relevant Studies

Studies submitted to the agency are evaluating based on OECD, OCSPP, or OPP test guideline requirements to determine whether studies are acceptable for use in risk assessment.  In the current evaluation, animal carcinogenicity, genotoxicity, and metabolism studies located in the internal databases with access to full study reports were evaluated in this manner.  Those classified as unacceptable were noted and subsequently excluded from the current evaluation.

In order to evaluate open literature studies, criteria described in the OPP guidance for considering and using open literature toxicity studies to support human health risk assessment was utilized (U.S. EPA, 2012).  This guidance assists OPP scientists in their judgement of the scientific quality of open literature publications.  More specifically, the document discusses how to screen open literature studies for journal articles/publications that are relevant to risk assessment, how to review potentially useful journal articles/publications and categorize them as to their usefulness in risk assessment, and how the studies may be used in the risk assessment. As with submitted studies, those deemed unacceptable were noted and subsequently excluded from the current evaluation.

---

[10] Glyphosate pesticide chemical (PC) codes: 103601, 103603, 103604, 103605, 103607, 103608, 103613, 128501, and 417300.
[11] All review articles, except Schinasi and Leon (2014), were funded and/or linked to Monsanto Co. or other registrants.

## 3.0     Data Evaluation of Epidemiology

## 3.1     Introduction

Epidemiological studies are valuable for risk assessment since they may provide direct evidence on whether human exposure to a chemical may cause cancer.  Studies of high quality and adequate statistical power are preferable and remove the need to account for extrapolation from animals to humans or extrapolation from high to low doses.  Epidemiological studies can also be integrated with experimental evidence when determining or clarifying the carcinogenic potential of a chemical for risk assessment.  The key considerations in evaluating epidemiologic studies are study design, exposure assessment, outcome assessment, confounding control, statistical analyses, and risk of other bias.

OPP routinely evaluates the available epidemiological literature.  As part of Registration Review of glyphosate, an evaluation was initially conducted in 2014 (S. Recore *et al.*, 2014) and subsequently another evaluation was performed in 2015 (CARC, 2015).  The 2015 evaluation began with the epidemiological studies previously identified in the 2014 evaluation and included three additional studies that were not included in the 2014 evaluation.  These studies were identified in review articles, included in the evaluation by IARC (2015), or were published since the 2014 OPP evaluation.  Both the 2014 and 2015 OPP evaluations considered the design and overall quality of the epidemiological studies; however, formal study quality evaluations and rankings were not conducted.  In the current review, all of the studies in the 2015 report, as well as additional epidemiological articles identified from a comprehensive search and cross-referencing with available resources as described under Section 2.0, were considered in the current evaluation.  The following sections provide a description of how epidemiological studies were evaluated for study quality and subsequent overall rankings, a summary of relevant studies, and a discussion of the overall results.

## 3.2     Considerations for Study Quality Evaluation and Scope of Assessment

This section summarizes how specific study characteristics were factored into the determination of a study's overall quality category.  It should be noted that these study quality considerations are specific to the issue of concern (i.e., carcinogenic potential of glyphosate).  These considerations are considered 'fit-for-purpose' under this context and could differ in another regulatory or scientific context.  Although the basic concepts apply broadly, the study quality considerations are tailored specifically to studies investigating the association between glyphosate exposure and cancer outcomes.  As with all research studies, the design elements of an epidemiological study have potential impacts on study quality and relevance to the research question under investigation.  Each study was, therefore, judged to be of high, moderate, or low quality in each of the following six domains affecting study quality: study design, exposure assessment, outcome assessment, confounder control, statistical analysis, and susceptibility to bias (See Section 3.2.1 and Table 3.1 for general considerations under each domain).  A similar approach was recently used by OPP for the evaluation of epidemiological studies for organophosphate pesticides (A. Lowit *et al.,* 2015).

Primary literature and associated meta-analyses evaluating the association between glyphosate exposure and a cancer outcome were the focus of this analysis.  Reviews were only used to identify individual studies that should be considered for study evaluation.  Commentaries, correspondence, and letters to the editor without original data were excluded.  Of the relevant studies identified, studies with the most complete analyses utilizing the greatest number of cases and controls (e.g., pooled case-control studies) were evaluated for ranking (see Appendix B for visual representation of these studies).  If studies did not collect exposure information on glyphosate from individual subjects, did not assess an outcome (e.g., biomonitoring studies), and/or did not provide a quantitative measure of an association between glyphosate and a cancer outcome, then these studies were assigned a low quality ranking and were not further evaluated in detail (see Figure 3.1).  A similar process was used by JMPR for their identification of epidemiological studies for evaluating the carcinogenic potential of glyphosate and two other pesticides (JMPR, 2016).



**Figure 3.1.  Study evaluation process for epidemiological studies.**

## 3.2.1   Study Designs

In judging an individual study's contribution to the strength of evidence in the epidemiologic literature base, the following general hierarchy of observational study designs was considered (from most to least preferred):  prospective cohort study (including nested case-control studies), case-control study, and cross-sectional study.  It is important to note, however, that this hierarchy of study designs reflects the *potential* for the collection of high quality information (related to exposure, outcome, confounders, and effect modifiers) and *potential* for efficient and valid estimation of the true association.  Thus, in deliberating on quality, care has been taken to

consider the circumstances and particulars of each individual study to consider whether the study was well conducted independent of the type of study design.

The study designs used in the epidemiological literature reviewed were analytical and descriptive studies. Cohort and case-control study designs are analytical studies used to evaluate relative incidence of health and disease outcomes by exposure status. Cross-sectional and ecological studies are generally considered descriptive or hypothesis-generating study designs; however, they can also be used to test hypotheses regarding prevalence of health outcomes and, under certain conditions, incidence as well.

| Table 3.1.  Epidemiological Study Quality Considerations[a]. | | | |
|---|---|---|---|
| **Parameter** | **High Score** | **Moderate Score** | **Low Score** |
| Study Design | Cohort | Case-control | Cross-sectional/Ecological |
| Exposure Assessment | Questionnaire and/or interview answered by subjects for chemical-specific exposure | Questionnaire and/or interview for chemical-specific exposure answered by subjects or proxy individuals | Low-quality questionnaire and/or interview; information collected for groups of chemicals rather than chemical-specific; no chemical-specific exposure information collected; ever/never use of pesticides in general evaluated |
| Outcome Assessment | State or National registries, physicians, and/or special surveillance programs with cases verified by histopathological evaluation for tumors; appropriate consideration of prevalent vs. incident cases; analysis by valid method specific for biomarkers | State or National registries, physicians, and/or special surveillance programs without histopathological verification for tumors; analysis by assays that are less specific for biomarkers of interest | No outcome evaluated; unclear/no consideration for whether prevalent or incident cases are appropriate; biomarker methods not validated |
| Confounder Control | Good control for important confounders related to cancer, standard confounders, and known confounders for glyphosate and cancer outcomes (e.g., exposure to multiple pesticides) through study design or analytic control with well measured co-exposures (i.e., cumulative exposure) | Moderately good control for confounders related to cancer; standard variables accounted for and; attempt to control for known confounders via a less efficient measure of co-exposure (e.g., ever/never use) | No adjustments for confounders |
| Statistical Analyses | Appropriate to study question and design, supported by relatively adequate sample size, maximal use of data, reported well | Acceptable methods, lower/questionable study power or sample size | Minimal attention to statistical analyses, sample size evidently low, comparison not performed or described clearly |

| Table 3.1.  Epidemiological Study Quality Considerations[a]. | | | |
|---|---|---|---|
| **Parameter** | **High Score** | **Moderate Score** | **Low Score** |
| Risk of (Other) Bias | Major sources of other potential biases not likely present, present but analyzed, unlikely to influence magnitude and direction of effect estimate, no/low potential of selection bias | Other sources of bias present, acknowledged but not addressed in study, may influence magnitude but not direction of estimate, evidence of potential selection bias with low impact on effect estimate | Major study biases present, unacknowledged or unaddressed in study, cannot exclude other explanation for study findings, evidence of selection bias with high potential to impact effect estimate |

[a] Overall study quality ranking based on comprehensive assessment across the parameters.

### 3.2.1.1 Analytical Studies

#### (1) Cohort Study

In a typical cohort study, such as the AHS, individuals are classified according to exposure status (i.e., presence, absence, or magnitude of exposure) and then followed over time to quantify and compare the development (i.e., incidence) of the health outcome of interest by exposure group. Conceptually, the non-exposed comparison group in a cohort study provides an estimate of the incidence of the outcome among the exposed, had they, counter-to-fact, not been exposed.  Apart from chance variations, a valid cohort study comparing exposed individuals to non-exposed individuals provides an estimate of the relative risk (or rate) of the disease associated with exposure.  Ideally, the exposed and non-exposed groups are exchangeable, in the sense that switching the exposed to non-exposed, and non-exposed to exposed would yield the same measure of association (e.g., relative risk).  If this were the case then, apart from chance, a cohort study would yield a measure of association equivalent to that produced in a corresponding (intervention) study where exposure status was randomly assigned.

The chief advantage of the cohort study design is that it affords the investigator the opportunity to avoid and/or adjust for potential biases (i.e., selection bias, information bias, and confounding); however, these biases may also be avoided in other well-designed study designs, such as a case-control study.  Cohort studies also allow for discernment of the chronological relationship between exposure and outcome, and can be particularly efficient for studying uncommon exposures.  The primary disadvantage of the cohort study design is logistical inefficiency with respect to the necessary time, expense, and other resources needed to conduct them.  Cohort studies are particularly inefficient for evaluating associations with rare outcomes and diseases with long induction or latency periods.  Case-control studies that are nested within a cohort study (nested case-control studies) share the attributes of the cohort study and may be more efficient.  However, when follow-up throughout the study period is incomplete, the potential for selection bias is increased, especially if follow-up rates are related to exposure status.

Two sub-categories of cohort studies – prospective and retrospective – are often applied to distinguish between studies in which the health outcome has occurred (retrospective study), or has not occurred (prospective study) at the time the investigators initiate the study.  This distinction is important primarily as it pertains to the potential differences in the quality (e.g.,

completeness, accuracy, and precision) of information that can be ascertained by the investigators, and also as it relates to potential sources of bias. Although not always true, the prospective study design is considered the preferable of the two, as investigators can potentially have more choices in determining how exposure, outcome, and covariate information is collected. In a retrospective study conducted to evaluate the same hypothesis, by contrast, the investigators would have to rely on exposure information based on self-reporting or historical records. Such reporting is subject to (human) errors in recall, however when such errors are uncorrelated with disease state, there can be a bias towards the null due to random exposure measurement error (information bias) and only when such errors are correlated with the disease state can there be bias away from the null.

*(2) Case-Control Study*

In a typical case-control study, individuals are classified according to their outcome status (i.e., cases who have developed the outcome of interest, and controls who represent the population from which the cases arise). The relative odds of exposure are then compared between cases and controls. The primary advantage of case-control studies is that they are logistically efficient relative to cohort studies, often being conducted at a fraction of the cost and in a fraction of the time as a corresponding cohort study. Case-control studies can be used to examine associations between multiple exposures and a given health outcome. They are particularly efficient for evaluating rare outcomes, but are inefficient for studying uncommon exposures. An important point to evaluate in each case-control study is the potential for selection bias, which arises if the exposure distribution among the control subjects is not representative of the exposure distribution among the population that gave rise to the cases. When participation rates between cases and controls are low or distinctly imbalanced, the potential for selection bias is increased, especially if participation rates are related to exposure status. Case-control studies that rely on self-reported exposure measures are also potentially susceptible to information bias which could result in bias towards the null or away from the null.

## 3.2.1.2 Descriptive Studies

Cross-sectional studies are used to evaluate associations between exposure and outcome prevalence in a population at a single point in (or period of) time. The primary advantage of a cross-sectional study is logistical efficiency. They are relatively quick and inexpensive to conduct, as a long period of follow-up is not required, and exposure and outcome assessments occur simultaneously. Cross-sectional studies have three primary *potential* disadvantages: 1) potential difficulty in discerning the temporal relationships (i.e., whether the exposure precedes the outcome); 2) estimating outcome prevalence rather than incidence of the outcome; and 3) the possible overrepresentation of cases of the outcome with long duration relative to the average in the population, and often with a better prognosis.

Ecological studies are used to evaluate associations between exposures and outcomes using population-level rather than individual-level data. The primary advantages of ecological studies are related to logistical efficiency, as they often rely on pre-existing data sources and require no individual-level exposure, outcome, or covariate assessments. The primary weakness of the ecologic study is the potential for confounding and resultant inappropriate extrapolation of associations observed on the aggregate-level to associations on an individual level. The

discrepancy that associations observed at the population level are not observed at the individual level is referred to as the ecological fallacy. Semi-ecological studies are less susceptible to the ecological fallacy due to incorporation of individual-level data on outcomes and/or confounders. The quality of these studies depends on the ability of the group exposure data to represent individual exposure and the research question of interest.

## 3.2.2   Exposure Measures

As described in Section 3.2 and Figure 3.1, studies assigned a low quality ranking based on an initial evaluation were not further evaluated in detail. In all of the studies included in the analysis that were reviewed and ranked for study quality, exposure information was collected from subjects and/or proxy individuals via questionnaires and/or interviews. These exposure assessments typically include questions to determine the amount of direct pesticide use or to collect information on behaviors and conditions associated with pesticide use (e.g., occupation, tasks). This type of reporting likely misclassifies actual pesticide exposure. If conducted as part of a prospective exposure assessment, these errors are likely to be non-differential with respect to the outcome(s) of interest. In a retrospective assessment, the subject or proxy has knowledge of the outcome; therefore, these errors may be differential or non-differential. Studies that exclusively used subjects rather than including proxy individuals were considered more reliable and given a higher weight given that the subjects would have a more accurate recollection of their own exposure.

## 3.2.3   Outcome Measures

All of the studies evaluated in detail, except one, utilized state or national cancer registries, physicians, and/or special surveillance programs to determine outcome status (i.e., subjects with or without a cancer of interest). In several studies, the cases were also verified by histopathological evaluation. Overall, outcome measures were relatively consistent across studies and these assessments are likely to have minimal errors. The remaining study evaluated in detail (Koureas et al., 2014) assessed oxidative DNA damage rather than a type of cancer. For this evaluation, the oxidation by-product 8-hydroxydeoxyguanosine (8-OHdG) was measured by enzyme immunoassay. This type of assay generally exhibits low specificity. More sensitive quantitative methods are available to analyze genomic DNA for 8-OHdG by high-performance liquid chromatography (HPLC) with electrochemical detection, gas chromatography-mass spectrometry (GC-MS), and HPLC tandem mass spectrometry. Consideration of incident or prevalent cases should also be carried out. By using only incident cases, there is greater confidence that exposures occurred prior to the development of the outcomes. Inclusion of prevalent cases can lead to an over-representation of cases with a long course of disease.

## 3.2.4   Confounding

The degree to which confounders were controlled varied across studies. Some studies adjusted for particular medical variables, while others did not. Some standard variables, such as age, geographical location, and sex, were either adjusted for analytically or by matching in case-control studies. Several studies collected information on potential confounders; however, not all of these variables were evaluated or results of the evaluation were not reported. The direction and magnitude for confounders are, in general, difficult to determine because they are dependent

upon the relationship of each confounding factor with glyphosate and the cancer under investigation. Several studies considered the potential for confounding from co-exposure to other pesticides; however, only a few reported effect estimates between glyphosate exposure and cancer risk adjusted for the use of other pesticides. Given most people in the epidemiological studies who use pesticides occupationally will be exposed to multiple pesticides and, in some instances, those other pesticides were observed to be risk factors for the same cancer, this is a particularly important concern to address in either the study design or in the statistical analyses. Across numerous studies, co-exposures to other pesticides was found to be positively correlated with exposure to glyphosate and exposure to those other pesticides appear to increase the risk of some cancers. As a result, the direction of confounding would be to inflate any true effect of glyphosate in the absence of statistical control. This underlines the importance of adjusting for co-exposures to other pesticides.

For NHL, other potential confounders, such as exposure to diesel exhaust fumes, solvents, ultraviolet radiation, livestock, and viruses, have been identified. Some of these are more plausible than others. For example, occupational exposure to diesel exhaust fumes (e.g., McDuffie et al., 2002; Karunanayake et al. 2008; Baris et al. 2001; Maizlish et al. 1998) and solvents (Wang et al., 2009; Kato et al., 2005; Olsson and Brandt, 1988) are considered likely to increase the risk of NHL. Agricultural workers are exposed to diesel fumes when using agricultural vehicles when applying pesticides, such as glyphosate, and when using heavy equipment during mixing, loading, and/or applying pesticides. Agricultural workers are also exposed to solvents. Solvents are often used in pesticide products to aid the delivery of the active ingredient and enhance efficacy. Solvents are also used for cleaning and maintenance/repair of agricultural equipment used for mixing, loading, and/or applying pesticides. With an association between exposure and outcome of interest, it is reasonable to consider diesel exhaust fumes and solvents as probable confounders; however, neither of these factors were accounted for in any of the studies evaluated in detail. There is also evidence that ultraviolet (UV) radiation may increase the risk of NHL (Karipidis et al., 2007; Zhang et al., 2007). As a result, there is a support that UV radiation is also a potential confounder given the extended amount of time agricultural workers spend outside performing activities, including those associated with pesticide use. Lastly, contact with farm and other animals has been investigated as a suspected risk factor for hematopoietic and lymphoid tumors (McDuffie et al., 2002). Hypothesized mechanisms to explain this association include viral transmissions, chronic antigenic stimulation, and exposure to endotoxins, fungi, and mycotoxins. None of the aforementioned potential confounders were accounted for in the studies evaluated in detail.

## 3.2.5   Statistical Analyses

Statistical analyses that were appropriate to the study question and study design, supported by adequate sample size, maximized the use of available data, and were well characterized in the report were weighted most highly. Acceptable statistical methods, questionable study power or sample size, and analytical choices that resulted in the loss of information were given moderate weight. Reports with only minimal attention paid to the conduct and reporting of the statistical analyses were given the lowest weight.

## 3.2.6   Risk of Bias

The internal validity of the studies reviewed was judged by noting the design strategies and analytic methods used in each study to constrain or eliminate selection bias, information bias, and confounding.  Selection bias can occur when the sampling of the population by the investigator yields a study population that is not representative of the exposure and outcome distributions in the population sampled.  Put simply, selection bias occurs if selection of the study sample yields a different estimate of the measure of association than that which would have been obtained had the entire target population been evaluated.  Although there are numerous sources of selection bias, there are several mechanisms that may have induced selection bias in the studies reviewed: low participation rates of eligible individuals due to non-responsiveness or refusal (self-selection bias); loss to follow-up (i.e., failure to retain all study participants initially enrolled in the study); and, in a case-control study, control selection bias arising because the exposure distribution in the control sample does not represent the exposure distribution of the study base (i.e., the population that gave rise to the cases or more formally, the person-time experience of that population).

Information bias (also referred to as observation bias) arises when study participants are incorrectly categorized with respect to their exposure or outcome status, or when errors arise in the measurement of exposure or outcome, in the case of continuously distributed measures.  Epidemiologists often distinguish between two mechanisms or types of misclassification – those that are non-differential (or random) and those that are differential (non-random).  Non-differential misclassification of exposure (or non-differential exposure measurement error) occurs when the probability or magnitude of error in the classification or measurement of exposure is independent of the outcome status of the study participants.  Non-differential exposure measurement error typically results in a bias towards the null which may obscure any true effect of the exposure of interest.  Similarly, non-differential misclassification of outcome (or outcome measurement error) occurs when the probability or magnitude of error in the assignment of outcome status or level is independent of exposure status.  Non-differential outcome measurement error typically does not cause bias but does decrease the precision of effect estimates and therein inflates the width of confidence intervals.  In contrast, differential exposure misclassification (or measurement error) occurs when the error in the exposure assignment is not independent of the outcome status.  The mechanisms that cause non-differential misclassification in the currently reviewed literature include random errors in exposure recall from subjects or proxy respondents.  The mechanisms that could induce differential misclassification include recall bias and interviewer/observer bias.  Note that mismeasurement of confounders can result in residual confounding of the association of interest, even when adjustment for that confounder has been conducted in the analysis.

Studies in which major sources of potential biases were not likely to be present, studies in which potential sources of bias were present, but effectively addressed and analyzed to maximize the study validity, and studies in which sources of bias were unlikely to influence the magnitude and direction of the effect estimate were given more weight than studies where sources of bias may be present, but not addressed in the study.

## 3.3   Review of Quality Results

Each study was judged to be of high, moderate, or low quality in each of the six domains affecting study quality, as discussed above and in Table 3.1.  The results of the quality

assessment are presented separately for each group below. The quality rankings presented are specific to the current evaluation of the carcinogenic potential of glyphosate. As noted above and in Table 3.2, several studies were not included in the ranking evaluation because they did not represent the most complete analysis. Rather, the subjects were included in a larger analysis (e.g., pooled case-control study) to produce a greater number of cases and controls (see Appendix B for visual representation of these studies). For example, Cantor *et al.* (1992) was not individually evaluated for ranking because the data from this study were pooled with data from other studies in De Roos *et al.* (2003), which was included.

### 3.3.1 "High" Quality Group

Three studies were given a high quality ranking: De Roos *et al.* (2005), Eriksson *et al.* (2008), and Koutros *et al.* (2013).

De Roos *et al.* (2005) was a prospective cohort study that evaluated associations between various pesticide exposures, including glyphosate, and cancer incidence for numerous solid and non-solid tumors in the AHS. The aim of the AHS is to evaluate the role of agricultural exposures in the development of cancer and other diseases in the farming community. AHS recruited 52,934 licensed private pesticide applicators along with 32,345 of their spouses between 1993 and 1997. In the first two phases of the study, the cohort also included 4,916 commercial pesticide applicators from Iowa. As a prospective analysis of the AHS cohort, information was obtained from exposed subjects at enrollment and no proxies were necessary. Exposure was evaluated as ever/never use, cumulative lifetime exposure, and intensity-weighted cumulative exposure. Due to the study design, the potential for many biases were reduced. Additionally, the study adjusted and/or considered numerous factors, including use of other pesticides. Study participants provided detailed pesticide exposure information prior to enrollment in the study and this information has been incorporated into the study evaluation by determining tertile cut points and calculating effect estimates by comparing to the lowest tertile. Additional evaluations with quartiles and quintiles were performed for cancers with elevated effect estimates in the study and for NHL. As noted earlier in this document, an analysis of the AHS cohort was recently published (Andreotti *et al.*, 2017) and the findings were considered as part of this evaluation.

Eriksson *et al.* (2008) was a population-based case-control study that recruited a consecutive series of incident cases of NHL in several regions of Sweden from physicians treating lymphoma within specified health service areas. Cases were verified pathologically and matched to randomly selected controls from the national population registry by age, sex and health service area. Exposure information was collected from exposed individuals (i.e., no use of proxy respondents) using a comprehensive questionnaire including a total work history with in depth questions about exposures to pesticides, solvents, and other chemicals. Interviewers were blinded to case/control status. The study only reported minimal demographic information on subjects (age and sex) and a table with subject characteristics (e.g., smoking status, alcohol intake, physical activity, education) that could potentially be used to adjust effect estimates was not provided. Glyphosate exposure was reported in 29 cases and 18 controls during the study period. Multivariate analyses were adjusted for co-exposure to different agents, including MCPA, "2,4,5-Y and/or 2,4-D", mercurial seed dressing, arsenic, creosote, and tar. An analysis for a potential exposure-response relationship was also conducted; however, it was not clear

whether this analysis adjusted for co-exposure to other pesticides based on the statistical methods description.  The number of cases and controls were also not reported for this analysis.

Koutros *et al.* (2013) was a prospective cohort study within the AHS that evaluated the association between pesticide use and prostate cancer.  Exposure information was collected from exposed subjects (no proxies necessary) through the enrollment questionnaires, as well as in a follow-up questionnaire administered 5 years after enrollment.  This study evaluated the association between glyphosate and prostate cancer diagnoses from enrollment (1993-1997) through 2007 resulting in a longer follow-up time than many of the other case-control studies that utilized AHS subjects.  The study used lifetime cumulative exposure and intensity-weighted cumulative exposure metrics.  Analyses were also conducted using unlagged exposure and 15-year lagged exposure, which excluded the most recent 15 years of exposure for both exposure metrics.  Although the effect estimate reported for glyphosate in this study was not adjusted for co-exposure to other pesticides, additional analyses were not considered necessary since there was no association observed.

### 3.3.2   "Moderate" Quality Group

Twenty-one case-control studies were assigned a moderate quality rating (Table 3.2).  In general, these studies share many study design characteristics.  Exposure information was collected from subjects and/or proxy individuals, the outcome measurement(s) utilized state/national registries and surveillance programs, appropriate statistical analyses were performed, some covariates but maybe not all relevant covariates were evaluated and/or considered, and risks of bias were minimized to some extent.  Sample sizes varied across studies.  Case-control studies investigating solid tumors included study populations in the United States and Canada.  For non-solid tumors, study populations were located in the United States, Canada, Sweden, France, Germany, Italy, Ireland, Spain, and the Czech Republic.  Although several nested case-control studies shared most of the characteristics of the AHS cohort study, these studies were primarily given a moderate quality ranking since co-exposure to other pesticides was not accounted for in the analyses.

### 3.3.3   "Low" Quality Group

Seven case-control and 27 cross-sectional/ecological studies were assigned a low quality ranking.  All of these studies, except one case-control study (Cocco *et al.*, 2013) and one descriptive study (Koureas et al., 2014), were not subjected to a detailed evaluation because they did not report a quantitative measure of an association between glyphosate exposure and a cancer outcome, did not collect information on glyphosate exposure from all subjects, and/or did not evaluate risk to a cancer outcome (Appendix D).  In many instances, effect estimates were reported only for total pesticide exposure.  Additionally, exposure was assumed and glyphosate-specific exposure information was not collected.  In other studies, the aim of the study was to assess exposure methods for epidemiological studies and/or to evaluate the impact of exposure misclassification; therefore, there was no evaluation of a cancer outcome.

It should be noted that some of the studies assigned a low quality ranking in the current evaluation were included in the recent evaluation by IARC.  There were a number of descriptive studies that evaluated the genotoxicity in human populations; however, these studies did not

meet the criteria for inclusion in the ranking as described in Section 3.2 and Figure 3.1. In most instances, these studies reported effect estimates for total pesticide exposure and/or assumed glyphosate exposure without collecting glyphosate-specific exposure information. For case-control studies, Cocco et al. (2013), Dennis et al. (2010) and Ruder et al. (2004) were included in the 2015 IARC evaluation, but were not considered informative in the current evaluation.

Detailed evaluations were not performed in the current evaluation for Dennis et al. (2010) and Ruder et al. (2004) because a quantitative measure of an association between glyphosate and a cancer outcome was not reported. Cocco et al. (2013) received a detailed evaluation and was assigned a low quality ranking. This case-control study, which evaluated lymphoma risk across six European countries, was not considered informative due to a combination of numerous limitations in the study. The sample size of the study was low with only four cases and two controls exposed to glyphosate. Control ascertainment was not consistent across countries, with a mix of hospital- and population-based controls used. The overall participation rate for population-based controls was found to be much lower than the overall participation rates of the cases or hospital-based controls. Lastly, the study was limited to ever/never use of glyphosate and did not adjust for confounders, in particular co-exposure to other pesticides. Although this study was included in the IARC evaluation, IARC also stated that the study had very limited power to assess the effects of glyphosate on risk of NHL.

The other study subjected to a detailed evaluation and assigned a low quality ranking was Koureas *et al*. (2014). This cross-sectional study evaluated the association between glyphosate exposure and oxidative DNA damage in 80 Greek pesticide sprayers. Although the study reported a non-statistically significant effect estimate for glyphosate, it is limited in its ability to contribute to the overall evaluation of the carcinogenic potential of glyphosate. The effect estimate was not adjusted for any standard covariates or potential confounders, including co-exposure to other pesticides. The sample size of the study was questionable. There were 80 subjects, but the number exposed to glyphosate was not reported. The outcome is measured using an immunoassay that is less specific for measuring the biomarker of interest than other available analytical methods. Lastly, the study evaluates primary DNA damage, but does not measure the consequence of genetic damage. An increase in oxidative DNA damage may lead to cell death or initiate DNA repair rather than lead to a mutation.

Due to the limitations in the studies assigned a low quality ranking, they do not provide reliable information to evaluate associations between glyphosate exposure and cancer outcomes. Therefore, the remaining sections of this document do not further discuss these studies except to note when a study is included in meta-analyses.

**Table 3.2.  Summary of Study Design Elements Impacting Study Quality Assignment and Overall Ranking.**

| Journal Article | Study Design | Exposure Assessment | Outcome Assessment | Confounder Control | Statistical Analyses | Risk of (Other) Bias | Overall Ranking |
|---|---|---|---|---|---|---|---|
| Alavanja *et al.* (2003) | This study was not included in the study quality ranking because the data were used in the updated analysis by Koutros *et al.* (2013). | | | | | | |
| Andreotti *et al.* (2009) | Nested Case-control | Questionnaire answered by subjects at study enrollment followed by take-home questionnaire; examined exposure for glyphosate as ever/never, and intensity-weighted cumulative exposure days; spouses either self-administered questionnaire (81%) or telephone interview (19%) | State cancer registries without histopathological verification; exclusion of subjects with prevalent cancer at enrollment; follow-up ~ 9 years | Adjusted for age, smoking, and diabetes for both exposure metrics as well as applicator type forever/never exposure metric<br><br>No adjustment for co-exposure to other pesticides or other potential confounders (e.g., solvents, diesel fumes, UV radiation) | Unconditional logistic regression to obtain OR and 95% CI | Exposure misclassification particularly for spouses, low response rate to take-home questionnaire (40%) but unclear if affected cases and controls differently, insufficient power for pesticide exposure interactions | Moderate |
| Band *et al.* (2011) | Population-based case-control<br><br>Males only | Self-administered questionnaire answered by subjects or proxies for deceased subjects requesting work history and demographic information; use of a job exposure matrix to estimate exposure to pesticides | Cancer registry with histopathological verification; excluded farmers that worked all outside of British Columbia; included prostate cancer cases prior to the PSA era | Adjustment for alcohol consumption, cigarette years, education level, pipe years, and respondent type. Marital status and ethnicity not significant<br><br>No adjustment for co-exposure to other pesticides or other potential confounders (e.g., solvents, diesel fumes, UV radiation) | Conditional logistic regression to obtain ORs and 95% CIs | Recall bias, use of proxy for deceased, exposure misclassification, participation rates cited from another study, use of cancer patients as controls (excluding lung and unknown cancer) | Moderate |
| Brown *et al.* (1990) | Pooled population-based case-control<br><br>Males only | In-person interviews using standardized questionnaire with subjects or proxies for deceased/incapacitated; supplementary questionnaire administered by telephone for Iowa subjects to obtain more | State cancer registry (Iowa) and special surveillance network including hospitals and pathology laboratories (Minnesota); cases ascertained retrospectively and prospectively (2 years after start of study); | Adjusted for vital status, age, state, ever used tobacco daily, close relative with lymphopoietic cancer, nonfarming job related to risk of leukemia in the study, exposure to substances related to risk in this study | Unconditional logistic models to obtain OR and 95% CI; questionable sample size (15 cases) | Recall bias; exposure misclassification, use of proxy respondents | Moderate |

**Table 3.2.  Summary of Study Design Elements Impacting Study Quality Assignment and Overall Ranking.**

| Journal Article | Study Design | Exposure Assessment | Outcome Assessment | Confounder Control | Statistical Analyses | Risk of (Other) Bias | Overall Ranking |
|---|---|---|---|---|---|---|---|
| | | detailed information from those indicating pesticide use | ~26% of cases deceased or too ill when identified and ~15% deceased or too ill at time of interview; histopathological verification by pathologists | (benzene, napthalene, hair dyes)  No adjustment for co-exposure to other pesticides or other potential confounders (e.g., solvents, diesel fumes, UV radiation) | | | |
| Brown *et al.* (1993) | Population-based case-control  Males only | In person interviews with standardized questionnaire to obtain detailed information on farm activities and use of pesticides from subjects or proxies | State cancer registry (Iowa) ascertained retrospectively and prospectively (2 years after start of study); ~26% of cases deceased or too ill when identified and ~15% deceased or too ill at time of interview; histopathological verification by pathologists | Adjusted for vital status and age; smoking and education evaluated and not found to be significant  No adjustment for co-exposure to other pesticides or other potential confounders (e.g., solvents, diesel fumes, UV radiation) | Logistic models to obtain OR and 95% CI; questionable sample size (11 cases) | Recall bias; exposure misclassification, use of proxy respondents | Moderate |
| Cantor *et al.* (1992) | This study was not included in the study quality ranking because the data were used in the pooled analysis conducted by De Roos *et al.* (2003). | | | | | | |
| Carreon *et al.* (2005) | This study was not included in the study quality ranking because the data were used in the pooled analysis conducted by Yiin *et al.* (2012). | | | | | | |
| Cocco *et al.* (2013) | European multi-center case-control  Hospital-based and population-based (mixed for 2 countries, only hospital-based for the rest) | Trained interviewers conducted in person interviews using structured questionnaire answered by subjects; those identified as agricultural worker on questionnaire given subsequent questions about pesticide use, crops, etc. | Surveillance centers, 20% of slides from each center reviewed by pathologist | Adjustment for age, sex, education, and center.  No adjustment for co-exposure to other pesticides or other potential confounders (e.g., solvents, diesel fumes, UV radiation) | Unconditional logistic regression to obtain ORs and 95% CIs; Low sample size (4 cases, 2 controls) | Recall bias, selection bias (low response rate for population-based controls and differed from cases), exposure misclassification, mix of hospital- and population-based controls, | Low |
| De Roos *et al.* (2003) | Population-based case-control  Males only  Pooled analysis of | Interviews with subjects or proxy for deceased subjects.  Different interview techniques across states.  One study collected information on | State cancer registries (one state chose a random sample, other states chose all cases), surveillance programs, and hospitals without | Adjustment for age, study site, and other pesticides.  First degree relative with haematopoietic | Logistic regression and hierarchical regression to obtain ORs and 95% CIs | Recall bias, exposure misclassification, , use of proxy for deceased, , varying quality of questionnaire/interview techniques across studies | Moderate |

**Table 3.2. Summary of Study Design Elements Impacting Study Quality Assignment and Overall Ranking.**

| Journal Article | Study Design | Exposure Assessment | Outcome Assessment | Confounder Control | Statistical Analyses | Risk of (Other) Bias | Overall Ranking |
|---|---|---|---|---|---|---|---|
| | Cantor *et al.*, 1992; Hoar *et al.*, 1986; Zahm *et al.*, 1990 | pesticide use and then followed-up with questions on selected specific pesticides, another study had a direct question about a selected list of specific pesticides, and the last study used an open ended question without prompting for specific pesticides | histopathological verification | cancer, education, and smoking not found to be important confounders.<br><br>No adjustment for other potential confounders (e.g., solvents, diesel fumes, UV radiation) | | | |
| De Roos *et al.* (2005) | Prospective cohort (licensed pesticide applicators) | Questionnaire answered by subjects at enrollment and with subsequent take-home questionnaire; examined exposure as ever/never, cumulative lifetime days, and intensity-weighted cumulative exposure days | State cancer registries without histopathological verification; follow-up ~7 years | Adjustment for state of residence, age, education, smoking history, alcohol consumption, family history of cancer, use of other common pesticides<br><br>No adjustment for other potential confounders (e.g., solvents, diesel fumes, UV radiation) | Poisson regression to obtain RRs and 95% CIs | Major sources of potential biases unlikely, potential exposure misclassification due to any changes in exposure since enrollment, follow-up period may be limited | High |
| Engel *et al.* (2005) | Nested case-control<br><br>Females only | Take-home questionnaire from spouses of enrolled applicators used to obtain farm exposures, general health information, and reproductive health history; Information obtained from applicators used as measure of possible indirect exposure to spouses | State cancer registries identifying malignant breast cancer; ~5 years average follow-up time | Adjusted for age, race and state.<br><br>Evaluated BMI, age at menarche, parity, age at first birth, menopausal status, age at menopause, family history of breast cancer, physical activity, smoking, alcohol consumption, fruit and vegetable consumption and education but none | Poisson regression to obtain RRs and 95% CIs | Exposure misclassification, exposure to other pesticides (however no association observed), lack of information on length of marriage could result in overestimating exposure based on husband | Moderate |

**Table 3.2.  Summary of Study Design Elements Impacting Study Quality Assignment and Overall Ranking.**

| Journal Article | Study Design | Exposure Assessment | Outcome Assessment | Confounder Control | Statistical Analyses | Risk of (Other) Bias | Overall Ranking |
|---|---|---|---|---|---|---|---|
| | | | | found to be significant<br><br>No adjustment for co-exposure to other pesticides or other potential confounders (e.g., solvents, diesel fumes, UV radiation) | | | |
| Eriksson *et al.* (2008) | Population-based case-control | Questionnaire answered by subjects; follow-up by phone if incomplete answers; excluded exposures that occurred during the same calendar year and year before diagnosis (cases) or enrollment (controls); minimal demographic information reported | Physicians treating lymphoma within specified health service areas and verified by pathologists | Adjustment for age, sex, year of diagnosis/enrollment, as well as exposure to other pesticides in multivariate analyses. Not stated what adjustments were made for other pesticides in latency analyses.<br><br>No adjustment other potential confounders (e.g., solvents, diesel fumes, UV radiation) | Unconditional logistic regression and multivariate analyses to obtain ORs and 95% CIs; not clear how multivariate was performed; questionable sample size (29 cases, 18 controls); also included analysis of ≤10 vs. >10 years exposure | Recall bias, exposure misclassification, lack of subject demographics/characteristics (e.g., smoking, alcohol consumption, race, etc) | High |
| Flower *et al.* (2004) | Nested case-control | Questionnaire answered by applicators at enrollment; spouses enrolled through a questionnaire brought home by applicator; females (applicators and spouses) were asked to complete a questionnaire on female and family health that collected information on children born during or after 1975 | State cancer registry to identify childhood cancer cases (diagnosed from birth through 19 yrs of age) for children of parents enrolled; hybrid prospective/retrospective ascertainment; excluded female applicators | Child's age at parent's enrollment was included in model; parental age at child's birth, child's sex, child's birth weight, history of parental smoking, paternal history of cancer, and maternal history of miscarriage were evaluated but not found to be significant and not included in model<br><br>No adjustment for co- | Logistic regression to obtain OR and 95% CI; calculated standardized incidence ratios to compare observed number of childhood cancer cases identified to the expected number; low/questionable sample size (6 parental cases, 13 maternal cases) | Exposure misclassification, lack of timing data to determine if exposure occurred prior to conception or during pregnancy, exposure to other pesticides (however no association observed and lack of power for adjustment) | Moderate |

**Table 3.2.  Summary of Study Design Elements Impacting Study Quality Assignment and Overall Ranking.**

| Journal Article | Study Design | Exposure Assessment | Outcome Assessment | Confounder Control | Statistical Analyses | Risk of (Other) Bias | Overall Ranking |
|---|---|---|---|---|---|---|---|
| | | | | exposure to other pesticides or other potential confounders (e.g., solvents, diesel fumes, UV radiation) | | | |
| Hardell and Eriksson (1999) | This study was not included in the study quality ranking because the data were used in the pooled analysis conducted by Hardell *et al.* (2002). | | | | | | |
| Hardell *et al.* (2002) | Population-based case-control<br><br>Males only<br><br>Pooled analysis of Hardell and Eriksson 1999 and Nordstrom *et al.*, 1998 | Questionnaire answered by subjects or proxy for deceased subjects to obtain complete working history and exposure to different chemicals; follow-up with interview for clarification | Registries with histopathological verification | Adjustment for age, vital status, and county (by matching). Exposure to other pesticides in multivariate analysis.<br><br>No adjustment for other potential confounders (e.g., solvents, diesel fumes, UV radiation) | Conditional logistic regression to obtain OR and 95% CI (univariate and multivariate analyses). Questionable sample size (8 cases/8 controls) | Recall bias, exposure misclassification, use of proxy for deceased | Moderate |
| Hohenadel *et al.* (2011) | This study was not included in the study quality ranking because a more complete analysis was conducted by McDuffie *et al.* (2001). | | | | | | |
| Kachuri *et al.* (2013)<br><br>(extended analysis of Pahwa *et al.* 2012) | Population-based case-control<br><br>Males only | Questionnaire answered by subjects or proxies; pesticide use collected via detailed telephone interview on all participants with 10+ hours of pesticide use during lifetime and 15% random sample of those who did not; exposure based on lifetime exposure to glyphosate | Cancer registries or hospitals in 6 Canadian provinces with histopathological verification for 36.55% of samples | Adjustment for age, province, selected medical conditions, family history of cancer, use of proxy respondent, smoking status<br><br>No adjustment for co-exposure to other pesticides or other potential confounders (e.g., solvents, diesel fumes, UV radiation) | Unconditional logistic regression to obtain OR and 95% CI; trends examined using multiple logistic regression | Recall bias, exposure misclassification, control selection based on three different sources depending on province of residence, low participation rates among controls, use of proxy respondents | Moderate |
| Karunanayake *et al.* (2012) | Population-based case-control<br><br>Males only | Questionnaire answered by subjects; pesticide use collected via detailed telephone interview on all participants with 10+ hours of pesticide use during lifetime and 15% | Cancer registries or hospital in 6 Canadian provinces with histopathological verification for 49% of samples; difficulty recruiting control | Adjusted for age, province of residence, and significant medical history variables<br><br>No adjustment for co- | Conditional logistic regression to obtain OR and 95% CI | Recall bias, exposure misclassification, control selection based on three different sources depending on province of residence, low participation rates among | Moderate |

**Table 3.2.  Summary of Study Design Elements Impacting Study Quality Assignment and Overall Ranking.**

| Journal Article | Study Design | Exposure Assessment | Outcome Assessment | Confounder Control | Statistical Analyses | Risk of (Other) Bias | Overall Ranking |
|---|---|---|---|---|---|---|---|
| | | random sample of those who did not; exposure based on lifetime exposure to glyphosate | participants for older age groups | exposure to other pesticides or other potential confounders (e.g., solvents, diesel fumes, UV radiation) | | controls, unable to evaluate Epstein-barr virus exposure | |
| Koureas *et al.* (2014) | Cross-sectional | Questionnaire answered by pesticide sprayers | Genomic DNA extracted from peripheral blood samples and oxidation by-product 8-hydroxydeoxyguanosine (8-OHdG) was determined by enzyme immunoassay; more specific methods (HPLC, GC-MS) are available for measurement | No adjustments.  In univariate, occupational exposure, sex and alcohol consumption were statistically significant while DAP concentrations and smoking were not. | For univariate, chi-square test used to obtain RR and 95% CI; 8-OHdG levels transformed into binary variables (categorized as high and low using the 75th percentile cut-off); unknown number of exposed and unexposed cases (questionable sample size possible given total number of subjects is only 80) | Recall bias, did not control for risk factors identified as statistically significant for univariate analysis, does not measure the consequence of genetic damage | Low |
| Koutros *et al.* (2013)  Males only | Prospective cohort | Questionnaire answered by subjects at study enrollment; examined exposure as cumulative lifetime days and intensity-weighted cumulative exposure days | State cancer registries with histopathological verification; total and aggressive prostate cancers evaluated | Adjustment for age, state, race, smoking, fruit servings, family history of prostate cancer, and leisure time physical activity in the winter.  No adjustment for co-exposure to other pesticides or other potential confounders (e.g., solvents, diesel fumes, UV radiation) | Poisson regression to obtain RRs and 95% CIs; also included unlagged vs. lagged analysis | Exposure misclassification | High |
| Landgren *et al.* (2009)  Males only | Nested case-control[a]  | Questionnaire answered by subjects at enrollment in AHS cohort and subsequent take-home questionnaire to collect | Venous blood collected from antecubital vein and analyzed for MGUS; same method as used for controls group in | Adjusted for age and education level  Association with other pesticides examined | Logistic regression models to obtain OR and 95% CI comparing to population-based | Exposure misclassification, control group not from geographical area (used control group with | Moderate |

**Table 3.2.  Summary of Study Design Elements Impacting Study Quality Assignment and Overall Ranking.**

| Journal Article | Study Design | Exposure Assessment | Outcome Assessment | Confounder Control | Statistical Analyses | Risk of (Other) Bias | Overall Ranking |
|---|---|---|---|---|---|---|---|
| | | information on 50 pesticides; occupational expoures, medical histories, and lifestyle factors updated with 5-year follow-up interview; subjects with prior history of lymphoproliferative malignancy excluded | Minnesota | and not found to be significant so no adjustment performed  No adjustment for other potential confounders (e.g., solvents, diesel fumes, UV radiation) | screening study in Olmsted County, Minnesota; questionable sample size (27 cases; 11 controls) | similar demographics from Minnesota) | |
| Lee *et al.* (2004a) | This study was not included in the study quality ranking because the data were used in the pooled analysis conducted by De Roos *et al.* (2003). | | | | | | |
| Lee *et al.* (2004b)  White males and females only | Population-based case-control | Subjects or proxies were interviewed by telephone; those living/working on a farm asked for detailed history of pesticide use and farming information | State cancer registry or review of discharge diagnosis and pathology records at 14 hospitals; only newly diagnosed cases with confirmed adenocarcinoma of stomach or esophagus retained; controls randomly selected from a prior study conducted in geographical area | Adjusted for age and sex; evaluated BMI, smoking, alcohol consumption, educational level, family history of stomach or esophageal cancer, respondent type, dietary intake of particular vitamins and minerals, protein, and carbohydrates (included in model if changed value of OR by more than 10%)  No adjustment for co-exposure to other pesticides or other potential confounders (e.g., solvents, diesel fumes, UV radiation) | Unconditional logistic regression to obtain OR and 95% CI; questionable sample size (12 cases for stomach; 12 cases for esophagus) | Recall bias, exposure misclassification, use of proxy respondents, control selection | Moderate |
| Lee *et al.* (2005) | Population-based case-control | Questionnaire and/or interview with subject or proxy individuals to collect information on use of specific pesticides; telephone follow-up for unclear responses | Referral by hospitals or through state cancer registries with histopathological verification; controls selected from a previous study | Adjusted for age and respondent type; evaluated history of head injury, marital status, education level, alcohol consumption, medical history of diabetes mellitus, | Unconditional logistic regression to obtain OR and 95% CI | Recall bias, exposure misclassification, large number of proxy respondents, control selection (historical control group from another cancer evaluation, differences in | Moderate |

**Table 3.2.  Summary of Study Design Elements Impacting Study Quality Assignment and Overall Ranking.**

| Journal Article | Study Design | Exposure Assessment | Outcome Assessment | Confounder Control | Statistical Analyses | Risk of (Other) Bias | Overall Ranking |
|---|---|---|---|---|---|---|---|
| | | | | dietary intake of α- and β-carotene, and dietary fiber (included in model if changed value of OR by more than 10%)<br><br>No adjustment for co-exposure to other pesticides or other potential confounders (e.g., solvents, diesel fumes, UV radiation) | | exposure time period evaluated, needed to add younger controls, exposure information collected for different time periods for cases vs. controls) | |
| Lee *et al.* (2007) | Nested case-control | Questionnaire answered by subjects at enrollment in AHS cohort and subsequent take-home questionnaire to collect information on 50 pesticides | State cancer registries without histopathological verification; follow-up ~ 7 years | Adjustment for age, smoking, state, total days of pesticide application<br><br>No adjustment for co-exposure to other pesticides or other potential confounders (e.g., solvents, diesel fumes, UV radiation) | Unconditional multivariate logistic regression to obtain OR and 95% CI | Exposure misclassification, limited data on dietary factors, NSAID drug use and family cancer history | Moderate |
| McDuffie *et al.*, 2001 | Population based case-control<br><br>Males only | Questionnaire answered by subjects; pesticide use collected via detailed telephone interview on all participants with 10+ hours of pesticide use during lifetime and 15% random sample of those who did not; exposure based on lifetime exposure to glyphosate | Cancer registries or hospital in 6 Canadian provinces with histopathological verification for 84% of samples; ascertainment of cases stopped in each province once target numbers were reached | Adjustment for age, province, and significant medical variables (including history of cancer in study participants and family history).<br><br>No adjustment for co-exposure to other pesticides or other potential confounders (e.g., solvents, diesel fumes, UV radiation) | Conditional logistic regression to obtain OR and 95% CI | Recall bias, exposure misclassification, control selection based on three different sources depending on province of residence, relatively low participation rates | Moderate |
| Nordstrom *et al.*, 1998 | This study was not included in the study quality ranking because the data were used in the pooled analysis conducted by Hardell *et al.* (2002). | | | | | | |
| Orsi *et al.*, 2009 | Hospital-based case-control | Data collection in 2 stages: 1) self- | Hospital catchment area with histopathological/ | Adjustment for age, center, and | Unconditional logistic regression | Recall bias, exposure misclassification, | Moderate |

**Table 3.2.  Summary of Study Design Elements Impacting Study Quality Assignment and Overall Ranking.**

| Journal Article | Study Design | Exposure Assessment | Outcome Assessment | Confounder Control | Statistical Analyses | Risk of (Other) Bias | Overall Ranking |
|---|---|---|---|---|---|---|---|
| | Males only (occupationally exposed) | administered questionnaire on socioeconomic characteristics, family medical history, and lifelong residential and occupational histories and more specific information for each job held for at least 6 months, and 2) face-to-face interview with trained staff (blinded) using standardized questionnaire | cytological verification  Controls were hospital based with no prior history of lymphoid neoplasms, excluding patients with cancer or a disease directly related to occupation, smoking or alcohol abuse (but history of any of these did not prevent selection as a control) | socioeconomic category. Education and housing not found to impact results. Flu immunization, previous history of mononucleosis, skin type, smoking, and drinking did not change results. Evaluated particular crops and animal husbandry as well.  No adjustment for co-exposure to other pesticides or other potential confounders (e.g., solvents, diesel fumes, UV radiation) | to obtain OR and 95% CI. Questionable sample size (12 cases/24 controls) | hospital-based controls | |
| Pahwa *et al*. (2011)  Males only | Population-based case-control  Males only | Questionnaire answered by subjects; pesticide use collected via detailed telephone interview on all participants with 10+ hours of pesticide use during lifetime and 15% random sample of those who did not; exposure based on lifetime exposure to glyphosate | Cancer registries or hospitals in 6 Canadian provinces with histopathological verification for 30% of samples | Adjustment for age group, province of residence, and statistically significant medical history variables  No adjustment for co-exposure to other pesticides or other potential confounders (e.g., solvents, diesel fumes, UV radiation) | Conditional logistic regression to obtain OR and 95% CI; trends examined using multiple logistic regression | Recall bias, exposure misclassification, control selection based on three different sources depending on province of residence, low participation rates among controls | Moderate |
| Pahwa *et al*. (2012)  Males only | Population-based case-control  Males only | Questionnaire answered by subjects; pesticide use collected via detailed telephone interview on all participants with 10+ hours of pesticide use during lifetime and 15% random sample of those | Cancer registries or hospitals in 6 Canadian provinces with histopathological verification for 36.5% of samples | Adjustment for age group, province of residence, and statistically significant medical history variables  No adjustment for co- | Conditional logistic regression to obtain OR and 95% CI; trends examined using multiple logistic regression | Recall bias, exposure misclassification, control selection based on three different sources depending on province of residence, low participation rates among controls | Moderate |

**Table 3.2.  Summary of Study Design Elements Impacting Study Quality Assignment and Overall Ranking.**

| Journal Article | Study Design | Exposure Assessment | Outcome Assessment | Confounder Control | Statistical Analyses | Risk of (Other) Bias | Overall Ranking |
|---|---|---|---|---|---|---|---|
| | | who did not; exposure based on lifetime exposure to glyphosate | | exposure to other pesticides or other potential confounders (e.g., solvents, diesel fumes, UV radiation) | | | |
| Yiin *et al.* (2012) | Population-based case-control<br><br>Pooled analysis of men with women analyzed in Carreon *et al.* (2005) | Questionnaire and/or interview for chemical-specific exposure answered by subjects or proxy individuals | Cases referred by physicians or through state cancer registries with histopathological verification; controls matched within state, but not county of residence | Adjustment for age, education, sex, and , sex, and farm pesticide exposure (yes/no)<br><br>No adjustment for other potential confounders (e.g., solvents, diesel fumes, UV radiation) | Unconditional logistic regression to obtain ORs and 95% CIs | Acknowledge other sources of bias.  Recall bias, exposure misclassification, control selection (low number of deceased controls obtained) | Moderate |

[a] Mixed methods used in the Landgren et al (2009) study, with cross-sectional study design used to calculate prevalence rates comparing the AHS to a reference population MN.
Pesticide risk estimates (including glyphosate) calculated using nested case-control approach, comparing AHS exposed/unexposed (ever/never) study participants.

**3.4      Assessment of Epidemiological Studies for Relevance to Analysis**

Using the criteria summarized in Section 3.2, a total of 63 individual literature studies were identified in the literature review and were judged as high, moderate, or low quality.  The data from 7 of these studies were used in pooled analyses by other studies; therefore, they were not subjected to detailed evaluation. Overall, 3 studies, 19 studies, and 34 studies were assigned high, moderate, or low rankings, respectively.  All of the high and moderate quality studies were considered relevant to the current evaluation.  Additionally, the findings of a recently published analysis of the AHS cohort (Andreotti *et al.*, 2017) have been considered in this evaluation, when appropriate.

The majority of the studies were case-control studies evaluating a wide-range of cancers in the United States and Canada.  There were several case-control studies from Canada that utilized the same study population (Kachuri *et al.*, 2013; Karunanayake *et al.*, 2012; McDuffie *et al.*, 2001; Pahwa *et al.,* 2011; Pahwa *et al.*, 2012).  In a similar fashion, numerous studies in the United States were nested case-control studies, where the AHS cohort served as the source population for selecting cases and controls (Andreotti *et al.*, 2009; Engel *et al.*, 2005; Flower *et al.*, 2004; Landgren *et al.*, 2009; Lee *et al.*, 2007).  In these studies, a subset of the AHS cohort was selected based on their outcome status for a particular cancer and exposure information was used from the AHS enrollment questionnaire and/or during follow-up interviews.  Nested case-control studies allow for testing of hypotheses not anticipated when the cohort was initially assembled. In the AHS prospective cohort studies (De Roos *et al.*, 2005; Koutros *et al.*, 2013; Andreotti *et al.*, 2017), exposure and demographic information were also obtained from the questionnaires at enrollment; however, subjects were enrolled prior to developing cancer outcomes of interest. Subjects were then followed from enrollment to a subsequent time point to determine if subjects developed cancer outcomes of interest.  As such, all available subjects in the cohort are included in the evaluation of whether there was an association between a risk factor (e.g., glyphosate exposure) and outcome.

The moderate studies included a varying degree of control for confounding and biases across studies.  As moderate studies, they encompass a combination of strengths and limitations.  In particular, important factors that impacted the quality assessment for these studies included whether there was adjustment for known confounders, identification of control selection issues, sample size issues, and length of follow-up.  As noted previously, most people in these epidemiological studies used pesticides occupationally and were exposed to multiple pesticides over their working lifetime.  Therefore, exposure to other pesticides is a particularly important factor to adjust for and studies that made this adjustment were given more weight than those that did not.  Similarly, control selection issues were noted in a few studies and were given less weighting than those without control selection issues.  The issues ranged from concerns using hospital-based controls, using different population sources to ascertain controls within the same study, and appropriateness of using controls ascertained for another research question. Numerous studies were limited by small sample sizes, which results in large confidence intervals and reduces the reliability of the results to demonstrate a true association.  Studies demonstrating low or questionable sample size were therefore given less weighting.  Lastly, the length of follow-up time varied across studies.

### 3.5     Summary of Relevant Epidemiological Studies

A summary of the relevant studies evaluating the association between glyphosate exposure and cancer are discussed below.  Results of the studies reporting data on glyphosate exposure and solid tumors (non-lymphohematopoietic) at various anatomical sites are presented in Table 3.3. Results of the studies reporting data on glyphosate exposure and non-solid tumors (lymphohematopoietic) are presented in Table 3.4.  For study details, see Table 3.2 above and Appendix C.

### 3.5.1   Solid Tumor Cancer Studies

#### (1) Cancer at Multiple Sites from the AHS Cohort

De Roos *et al.*, (2005) evaluated associations between glyphosate exposure and cancer incidence of all cancers combined in the AHS cohort study and did not find an association [ever/never use relative risk ratio (RR) =1.0 with 95% confidence interval (CI) of 0.90–1.2) when adjusting for age, demographic and lifestyle factors, and exposure to other pesticides].  In addition, De Roos *et al.*, 2005 evaluated cancer at specific anatomical sites.  Along with several nested case-control studies, no statistical evidence of an association with glyphosate was observed at any specific anatomical site (Table 3.3).  Specifically, AHS researchers reported no evidence of an association between glyphosate use and cancers of the oral cavity (De Roos *et al.*, 2005), colon (De Roos *et al.*, 2005; Lee *et al.*, 2007), rectum (De Roos *et al.*, 2005; Lee *et al.*, 2007), lung (De Roos *et al.*, 2005), kidney (De Roos *et al.*, 2005), bladder (De Roos *et al.*, 2005), pancreas (De Roos *et al.*, 2005; Andreotti *et al.*, 2009), breast (Engel *et al.*, 2005), prostate (De Roos et al., 2005; Koutros *et al.*, 2013) or melanoma (De Roos *et al.*, 2005).  The adjusted RR or odds ratio (OR) and 95% CI for these studies are provided in Table 3.3.

Findings from the recently published analysis of the AHS cohort (Andreotti *et al.*, 2017) with a longer follow-up period than De Roos *et al.* (2005) also did not find associations between glyphosate exposure and incidence of all cancers based on intensity-weighted lifetime days of glyphosate use.  Furthermore, there was no evidence of an association between glyphosate use and cancers of the oral cavity, colon, rectum, pancreas, lung, melanoma, prostate, testes, bladder, or kidney.  Although there was evidence of a significant positive association in one quartile only relative to intensity-weighted lifetime days of glyphosate exposure for pancreatic and lung cancer, there was no evidence of a significant positive association in any other quartile for either cancer type and the exposure-response trends were not statistically significant.  As a result, these isolated findings were not considered suggestive of an association.

#### (2) Prostate Cancer

In a Canadian population-based study (Band *et al.*, 2011), researchers reported non-statistically significant elevated odds of prostate cancer in relation to glyphosate use (OR=1.36; 95% CI=0.83–2.25).  There was no adjustment made for exposure to other pesticides.  This study included prostate cancer cases from 1983-1990, prior to the prostate-specific antigen (PSA) era. Consequently, the study included more advanced tumors before diagnosis.  The AHS related studies (De Roos *et al.*, 2005; Koutros *et al.*, 2013; Andreotti *et al.*, 2017), reflect PSA-era cases

(i.e., cases which are typically identified at an earlier stage in the progression of the disease) and also did not identify an association with prostate cancer.

### (3) Brain (Glioma) Cancer

Lee *et al*. (2005) investigated the association between brain cancer with farming and agricultural pesticide use. Matching for age, sex, vital status, and region, study authors reported a non-significant elevated odds of glioma (OR=1.5; 95% CI=0.7–3.1) in relation to glyphosate use by male farmers; however, the results were significantly different between those who self-reported pesticide use (OR=0.4; 95% CI=0.1–1.6), and for those for whom a proxy respondent was used (OR=3.1; 95% CI=1.2–8.2), indicating recall bias was a potential factor in this study. Furthermore, there was no adjustment for co-exposure to other pesticides and issues noted with control selection.

A population-based case-control study evaluated the risk of brain cancer, specifically, glioma risk, among men and women participating in the Upper Midwest Health Study (Yiin *et al*., 2012). Using a quantitative measure of pesticide exposure (in contrast to an ever-use metric), Yiin *et al*. (2012) observed no statistical evidence of an association with glyphosate with effect estimates roughly equal to the null value following adjustment for age, education, sex, and use of other pesticides (home and garden use: OR=0.98; 95% CI=0.67–1.43; non-farm jobs: OR=0.83; 95% CI=0.39–1.73).

### (4) Stomach and Esophageal Cancer

In a population-based case-control study in eastern Nebraska, Lee *et al*. (2004b) investigated pesticide use and stomach and esophageal adenocarcinomas. There was no association observed between glyphosate exposure and either stomach cancer (OR=0.8; 95% CI=0.4–1.5) or esophageal cancer (OR=0.7; 95% CI=0.3–1.4) after adjustment for age and sex. No adjustment was made for exposure to other pesticides.

### (5) Soft Tissue Sarcoma

A Canadian case-control study (Pahwa *et al*., 2011) examined exposure to pesticides and soft tissue sarcoma and found no relation with the use of glyphosate after adjustment for age, province of residence, and medical history variables (OR=0.90; 95% CI= 0.58–1.40); however, control selection issues were noted, including low response rate and selection from three different sources depending on the province of residence.

### (6) Total Childhood Cancer

Flower *et al*. (2004), a nested case-control study in the AHS cohort, examined the relation between parental pesticide use and all pediatric cancers reported to state registries among children of AHS participants and did not observe a significant association with maternal use exposure to glyphosate (OR=0.61; 95% CI= 0.32–1.16) or paternal (prenatal) exposure to glyphosate (OR=0.84; 95% CI= 0.35–2.54). The models adjusted for the child's age at the time of parents' enrollment. There was no adjustment for exposure to other pesticides.

**Table 3.3. Summary of Findings: Solid Tumor Cancer Studies**

| Study | Study Design | Study Location | Exposure Metric | Adjusted Effect Estimate: RR or OR (95% CI)[a] | Covariate Adjustments in Analyses |
|---|---|---|---|---|---|
| *All Cancers Combined* | | | | | |
| De Roos *et al.* (2005) | Prospective Cohort | USA: Iowa and North Carolina | Ever/never | 1.0 (0.9-1.2) | Age, demographic and lifestyle factors, and other pesticides[b] |
| | | | Cumulative Exposure Days (by tertile cut points): 1-20 21-56 57-2,678 | 1.0 1.0 (0.9-1.1) 1.0 (0.9-1.1) | Age, demographic and lifestyle factors, and other pesticides[b] |
| | | | Intensity-Weighted Cumulative Exposure Days (by tertile cut points): 0.1-79.5 79.6-337.1 337.2-18,241 | 1.0 0.9 (0.8-1.0) 0.9 (0.8-1.1) | Age, demographic and lifestyle factors, and other pesticides[b] |
| *Lung* | | | | | |
| De Roos *et al.* (2005) | Prospective Cohort | USA: Iowa and North Carolina | Ever/never | 0.9 (0.6-1.3) | Age, demographic and lifestyle factors, and other pesticides[b] |
| | | | Cumulative Exposure Days (by tertile cut points): 1-20 21-56 57-2,678 | 1.0 0.9 (0.5-1.5) 0.7 (0.4-1.2) | Age, demographic and lifestyle factors, and other pesticides[b] |
| | | | Intensity-Weighted Cumulative Exposure Days (by tertile cut points): 0.1-79.5 79.6-337.1 337.2-18,241 | 1.0 1.1 (0.7-1.9) 0.6 (0.3-1.0) | Age, demographic and lifestyle factors, and other pesticides[b] |
| *Oral Cavity* | | | | | |
| De Roos *et al.* (2005) | Prospective Cohort | USA: Iowa and North Carolina | Ever/never | 1.0 (0.5-1.8) | Age, demographic and lifestyle factors, and other pesticides[b] |
| | | | Cumulative Exposure Days (by tertile cut points): 1-20 21-56 57-2,678 | 1.0 0.8 (0.4-1.7) 0.8 (0.4-1.7) | Age, demographic and lifestyle factors, and other pesticides[b] |

| Table 3.3. Summary of Findings: Solid Tumor Cancer Studies | | | | | |
|---|---|---|---|---|---|
| **Study** | **Study Design** | **Study Location** | **Exposure Metric** | **Adjusted Effect Estimate: RR or OR (95% CI)[a]** | **Covariate Adjustments in Analyses** |
| | | | Intensity-Weighted Cumulative Exposure Days (by tertile cut points): 0.1-79.5 79.6-337.1 337.2-18,241 | 1.0 1.1 (0.5-2.5) 1.0 (0.5-2.3) | Age, demographic and lifestyle factors, and other pesticides[b] |
| | | | *Kidney* | | |
| De Roos *et al.* (2005) | Prospective Cohort | USA: Iowa and North Carolina | Ever/never | 1.6 (0.7-3.8) | Age, demographic and lifestyle factors, and other pesticides[b] |
| | | | Cumulative Exposure Days (by tertile cut points): 1-20 21-56 57-2,678 | 1.0 0.6 (0.3-1.4) 0.7 (0.3-1.6) | Age, demographic and lifestyle factors, and other pesticides[b] |
| | | | Intensity-Weighted Cumulative Exposure Days (by tertile cut points): 0.1-79.5 79.6-337.1 337.2-18,241 | 1.0 0.3 (0.1-0.7) 0.5 (0.2-1.0) | Age, demographic and lifestyle factors, and other pesticides[b] |
| | | | *Bladder* | | |
| De Roos *et al.* (2005) | Prospective Cohort | USA: Iowa and North Carolina | Ever/never | 1.5 (0.7-3.2) | Age, demographic and lifestyle factors, and other pesticides[b] |
| | | | Cumulative Exposure Days (by tertile cut points): 1-20 21-56 57-2,678 | 1.0 1.0 (0.5-1.9) 1.2 (0.6-2.2) | Age, demographic and lifestyle factors, and other pesticides[b] |
| | | | Intensity-Weighted Cumulative Exposure Days (by tertile cut points): 0.1-79.5 79.6-337.1 337.2-18,241 | 1.0 0.5 (0.2-1.3) 0.8 (0.3-1.8) | Age, demographic and lifestyle factors, and other pesticides[b] |

**Table 3.3. Summary of Findings: Solid Tumor Cancer Studies**

| Study | Study Design | Study Location | Exposure Metric | Adjusted Effect Estimate: RR or OR (95% CI)[a] | Covariate Adjustments in Analyses |
|---|---|---|---|---|---|
| *Melanoma* | | | | | |
| De Roos *et al.* (2005) | Prospective Cohort | USA: Iowa and North Carolina | Ever/never | 1.6 (0.8-3.0) | Age, demographic and lifestyle factors, and other pesticides[b] |
| | | | Cumulative Exposure Days (by tertile cut points): 1-20 21-56 57-2,678 | 1.0 1.2 (0.7-2.3) 0.9 (0.5-1.8) | Age, demographic and lifestyle factors, and other pesticides[b] |
| | | | Intensity-Weighted Cumulative Exposure Days (by tertile cut points): 0.1-79.5 79.6-337.1 337.2-18,241 | 1.0 0.6 (0.3-1.1) 0.7 (0.3-1.2) | Age, demographic and lifestyle factors, and other pesticides[b] |
| *Colon* | | | | | |
| De Roos *et al.* (2005) | Prospective Cohort | USA: Iowa and North Carolina | Ever/never | 1.4 (0.8-2.2) | Age, demographic and lifestyle factors, and other pesticides[b] |
| | | | Cumulative Exposure Days (by tertile cut points): 1-20 21-56 57-2,678 | 1.0 1.4 (0.9-2.4) 0.9 (0.4-1.7) | Age, demographic and lifestyle factors, and other pesticides[b] |
| | | | Intensity-Weighted Cumulative Exposure Days (by tertile cut points): 0.1-79.5 79.6-337.1 337.2-18,241 | 1.0 0.8 (0.5-1.5) 1.4 (0.8-2.5) | Age, demographic and lifestyle factors, and other pesticides[b] |
| Lee *et al.* (2007) | Nested Case-Control | USA: Iowa and North Carolina | Ever/never | 1.0 (0.7-1.5) | Age, smoking, state, total days of pesticide application |
| *Rectum* | | | | | |
| De Roos *et al.* (2005) | Prospective Cohort | USA: Iowa and North Carolina | Ever/never | 1.3 (0.7-2.3) | Age, demographic and lifestyle factors, and other pesticides[b] |
| | | | Cumulative Exposure Days (by tertile cut points): 1-20 21-56 57-2,678 | 1.0 1.3 (0.7-2.5) 1.1 (0.6-2.3) | Age, demographic and lifestyle factors, and other pesticides[b] |

**Table 3.3. Summary of Findings: Solid Tumor Cancer Studies**

| Study | Study Design | Study Location | Exposure Metric | Adjusted Effect Estimate: RR or OR (95% CI)[a] | Covariate Adjustments in Analyses |
|---|---|---|---|---|---|
| | | | Intensity-Weighted Cumulative Exposure Days (by tertile cut points): 0.1-79.5 79.6-337.1 337.2-18,241 | 1.0 1.0 (0.5-2.0) 0.9 (0.5-1.9) | Age, demographic and lifestyle factors, and other pesticides[b] |
| Lee *et al.* (2007) | Nested Case-Control | USA: Iowa and North Carolina | Ever/never | 1.6 (0.9-2.9) | Age, smoking, state, total days of pesticide application |
| *Colorectal* | | | | | |
| Lee *et al.* (2007) | Nested Case-Control | USA: Iowa and North Carolina | Ever/never | 1.2 (0.9-1.6) | Age, smoking, state, total days of pesticide application |
| *Pancreas* | | | | | |
| De Roos *et al.* (2005) | Prospective Cohort | USA: Iowa and North Carolina | Ever/never | 0.7 (0.3-2.0) | Age, demographic and lifestyle factors, and other pesticides[b] |
| | | | Cumulative Exposure Days (by tertile cut points): 1-20 21-56 57-2,678 | 1.0 1.6 (0.6-4.1) 1.3 (0.5-3.6) | Age, demographic and lifestyle factors, and other pesticides[b] |
| | | | Intensity-Weighted Cumulative Exposure Days (by tertile cut points): 0.1-79.5 79.6-337.1 337.2-18,241 | 1.0 2.5 (1.0-6.3) 0.5 (0.1-1.9) | Age, demographic and lifestyle factors, and other pesticides[b] |
| Andreotti *et al.* (2009) | Nested Case-Control | USA: Iowa and North Carolina | Ever/never | 1.1 (0.6-1.7) | Age group, cigarette smoking, diabetes, and applicator type |
| | | | Intensity-Weighted Exposure Days (by control median): ≤184 ≥185 | 1.4 (0.9-3.8) 0.5 (0.2-1.3) | Age group, cigarette smoking, and diabetes |
| *Prostate* | | | | | |
| De Roos *et al.* (2005) | Prospective Cohort | USA: Iowa and North Carolina | Ever/never | 1.1 (0.9-1.3) | Age, demographic and lifestyle factors, and other pesticides[b] |
| | | | Cumulative Exposure Days (by tertile cut points): 1-20 21-56 57-2,678 | 1.0 0.9 (0.7-1.1) 1.1 (0.9-1.3) | Age, demographic and lifestyle factors, and other pesticides[b] |

**Table 3.3. Summary of Findings: Solid Tumor Cancer Studies**

| Study | Study Design | Study Location | Exposure Metric | Adjusted Effect Estimate: RR or OR (95% CI)[a] | Covariate Adjustments in Analyses |
|---|---|---|---|---|---|
| | | | Intensity-Weighted Cumulative Exposure Days (by tertile cut points): 0.1-79.5 79.6-337.1 337.2-18,241 | 1.0 1.0 (0.8-1.2) 1.1 (0.9-1.3) | Age, demographic and lifestyle factors, and other pesticides[b] |
| Koutros *et al.* (2013)[c] | Prospective cohort | USA: Iowa and North Carolina | Intensity-Weighted Cumulative Exposure Days (by quartile): Q1 Q2 Q3 Q4 | Total prostate cancer: 0.91 (0.79-1.06) 0.96 (0.83-1.12) 1.01 (0.87-1.17) 0.99 (0.86-1.15) | Age, state, race, smoking, fruit servings, family history of prostate cancer, and leisure time physical activity in the winter |
| | | | Intensity-Weighted Cumulative Exposure Days (by quartile): Q1 Q2 Q3 Q4 | Aggressive prostate cancer: 0.93 (0.74-1.16) 0.91 (0.73-1.13) 1.01 (0.82-1.25) 0.94 (0.75-1.18) | Age, state, race, smoking, fruit servings, family history of prostate cancer, and leisure time physical activity in the winter |
| Band *et al.* (2011) | Case-Control | Canada: British Columbia | Ever/never | 1.36 (0.83-2.25) | Alcohol consumption, cigarette years, education level, pipe years, and respondent type |
| *Esophagus* | | | | | |
| Lee *et al.* (2004b) | Case-Control | USA: Nebraska | Ever/never | 0.7 (0.3-1.4) | Age and sex |
| *Stomach* | | | | | |
| Lee *et al.* (2004b) | Case-Control | USA: Nebraska | Ever/never | 0.8 (0.4-1.5) | Age and sex |
| *Breast* | | | | | |
| Engel *et al.* (2005) | Nested Case-Control | USA: Iowa and North Carolina | Ever/never | Wives who apply pesticides: 0.9 (0.7-1.1)  Wives who never used pesticides: 1.3 (0.8-1.9) | Age, race, and state of residence |
| *Soft Tissue Sarcoma* | | | | | |
| Pahwa *et al.* (2011) | Case-Control | Canada | Ever/never | 0.90 (0.58-1.40) | Age group, province of residence, and statistically significant medical history variables |

| Table 3.3. Summary of Findings: Solid Tumor Cancer Studies | | | | | |
|---|---|---|---|---|---|
| **Study** | **Study Design** | **Study Location** | **Exposure Metric** | **Adjusted Effect Estimate: RR or OR (95% CI)[a]** | **Covariate Adjustments in Analyses** |
| *Brain (glioma)* | | | | | |
| Lee *et al.* (2005) | Case-Control | USA: Nebraska | Ever/never | Overall: 1.5 (0.7-3.1) <br><br> Self-reported: 0.4 (0.1-1.6) <br><br> Proxy respondents: 3.1 (1.2-8.2) | Age for overall analysis; age and respondent type for other analyses |
| Yiin *et al.* (2012) | Case-Control | USA: Iowa, Michigan, Minnesota, and Wisconsin | Ever/never | House/garden use: 0.98 (0.67-1.43) <br><br> Non-farm jobs: 0.83 (0.39-1.73) | Age, education, sex, and use of other pesticides |
| *Total Childhood* | | | | | |
| Flower *et al.* (2004) | Nested Case-Control | USA: Iowa and North Carolina | Ever/never | Maternal use: 0.61 (0.32-1.16) <br><br> Paternal use: 0.84 (0.35-2.34) | Child's age at enrollment |

[a] Some studies report multiple quantitative risk measurements.  This table reports the most highly adjusted quantitative measurements.
[b] De Roos *et al.* (2005) excluded subjects missing covariate data for demographic and lifestyle factors and exposure to other pesticides; therefore, the number of subjects included in each analysis varies.
[c] Effect estimates for glyphosate reported in the supplemental web material for Koutros *et al.* (2013).

### 3.5.2   Non-Solid Tumor Cancer Studies

*(1) Leukemia*

De Roos *et al*. (2005) reported no association between leukemia and glyphosate-exposed (ever/never used) pesticide applicators in the AHS cohort. For applicators with the full data set (54,315), the RR was 1.1 (95% CI=0.6–2.4) with only adjustment for age. In the fully adjusted model, the RR was similar (RR=1.0; 95% CI=0.5–1.9). The number of participants included in the adjusted analysis was lower (n=40,716) due to the exclusion of subjects with missing covariate data. Effect estimates using cumulative lifetime exposure and intensity-weighted cumulative exposure were also found to be non-statistically significant and did not demonstrate a trend with increasing exposure. In the recently published analysis of the AHS cohort with a longer follow-up period (Andreotti *et al*., 2017), there was no association reported between chronic lymphocytic leukemia/small lymphocytic lymphoma and chronic myeloid leukemia. For acute myeloid leukemia, an elevated but non-statistically significant association was reported in only one quartile relative to glyphosate exposure; however, there was a low number of observed cases in each of the quartiles and the overall trend was not significant. There are no other studies available evaluating acute myeloid leukemia. Given the limitations of the acute myeloid leukemia analysis, the agency will continue to follow the literature regarding the association between glyphosate exposure and risk of acute myeloid leukemia.

In a population-based case-control study in Iowa and Minnesota, Brown *et al*. (1990) did not observe an association with the ever-use of glyphosate (OR=0.9; 95% CI=0.5–1.6). A limitation in the study was the low number of cases exposed to glyphosate (n=15). Adjustments were made for several covariates, including vital status, age, tobacco use, family history of lymphopoietic cancer, high risk occupations, and high risk exposures; however, no adjustment was made for exposure to other pesticides.

Chang and Delzell (2016) conducted a meta-analysis exploring glyphosate exposure and leukemia using 3 studies (De Roos *et al*., 2005; Brown *et al*., 1990; and Kaufman *et al.,* 2009). $I^2$ values were reported, which represented the percentage of the total variance explained by study heterogeneity and measure inconsistency in results. Larger $I^2$ values indicate greater inconsistency. A meta-risk ratio of 1.0 (95% CI=0.6-1.5) was obtained with an $I^2$ value of 0.0%, indicating consistency across the data sets. It should be noted that this analysis included data from Kaufman *et al.* (2009), which is not considered in the current evaluation because it was assigned a low quality ranking because a quantitative measure of an association between glyphosate and a cancer outcome was not reported for that study.

*(2) Multiple Myeloma*

In a follow-up analysis of the study population from Iowa and Minnesota used in Brown *et al.* (1990), Brown *et al.* (1993) investigated whether pesticide use was related to multiple myeloma. Among men in Iowa, the authors observed a non-statistically significant elevated association with glyphosate use (OR=1.7; 95% CI=0.8–3.6; 11 exposed cases); however, no adjustment was made for exposure to other pesticides. The authors cautioned that while the study may lend

support to the role of pesticides in general, the study limitations preclude use of the evidence as a definitive finding for any one compound.

De Roos *et al*. (2005) reported a suggestive association between multiple myeloma and glyphosate-exposed pesticide applicators based on 32 multiple myeloma cases observed in the AHS cohort. For applicators with the full data set, the RR was 1.1 (95% CI=0.5–2.4) with only adjustment for age. In the fully adjusted model excluding subjects with missing covariate data, there was a non-statistically significant elevated risk following adjustment for age, demographic and lifestyle factors, and exposure to other pesticides (RR=2.6; 95% CI=0.7–9.4). The authors postulated that the increased myeloma risk could be due to bias resulting from a selection of subjects in adjusted analyses that differed from subjects included in unadjusted analyses or may be due to a confounder or effect modifier that is prevalent among the subgroup and has not been accounted for in the analyses. When exposure data were also stratified by tertiles with the lowest tertile of exposure as the referent category, trend analyses were not statistically significant. Non-statistically significant elevated RRs of 1.9 (95% CI: 0.6-6.3) and 2.1 (95% CI: 0.6-7.0) were estimated for the highest tertile of both cumulative and intensity-weighted exposure days, respectively. The study authors did note that small sample size precluded precise estimation (n=19 for adjusted analyses). When using never exposed as the referent category, the trend analysis was again non-statistically significant, but the RRs ranged from 2.3 (95% CI: 0.6-8.9) to 4.4 (95% CI: 1.0-20.2) from the lowest tertile to the highest tertile, respectively. When stratified by quartiles, a statistically significant trend is achieved and the RR increased to 6.6 (95% CI: 1.4-30.6); however, the authors noted that the cases were sparsely distributed for these analyses. In the recently published analysis of the AHS cohort with a longer follow-up period and 88 exposed cases (Andreotti *et al*., 2017), there was no association observed between glyphosate exposure and multiple myeloma.

Sorahan (2015)[12] re-analyzed the AHS data reported by De Roos *et al*. (2005) to examine the reason for the disparate findings in relation to the use of a full data set versus the restricted data set. Using Poisson regression, risk ratios were calculated without excluding subjects with missing covariate data. When adjusted for age and sex, the RR for ever-use of glyphosate was 1.12 (95% CI of 0.5–2.49). Additional adjustment for lifestyle factors and use of other pesticides did not have a large impact (RR=1.24; 95% CI=0.52–2.94). The authors concluded that the disparate findings in De Roos *et al*. (2005) could be attributed to the use of a restricted dataset that was unrepresentative.

Landgren *et al*. (2009), within the AHS study population, also investigated the association between pesticide use and prevalence of monoclonal gammopathy of undetermined significance (MGUS). MGUS is considered a pre-clinical marker of multiple myeloma progression. The authors did not observe an association with glyphosate use and MGUS using subjects from the AHS cohort (OR=0.50; 95% CI=0.20–1.0). No adjustment was made for exposure to other pesticides.

In a population-based case-control study (Pahwa *et al*., 2012) among men in six Canadian provinces, a non-statistically significant elevated odds of multiple myeloma was reported in relation to glyphosate use (OR=1.22; 95% CI = 0.77–1.93), based upon 32 glyphosate exposed

---

[12] Funded by Monsanto

multiple myeloma cases and 133 controls.  There was no adjustment for exposure to other pesticides.  In an extended analysis of these data, Kachuri *et al*. (2013), using the same Canadian study population, further explored multiple myeloma in relation to days per year that glyphosate was used.  Adjustment for exposure to other pesticides was also not performed in this study.  For ever-use, there was a slight non-statistically significant increased odds ratio (OR=1.19; 95% CI=0.76–1.87).  For light users (>0 and ≤2 days/year), there was no association (OR=0.72; 95% CI = 0.39–1.32; 15 exposed cases); whereas, for heavy users (>2 days/ year), there was a non-statistically significant increased odds ratio (OR=2.04; 95% CI=0.98–4.23; 12 exposed cases).  Similar results were obtained when proxy respondents were excluded from the analysis.  The low number of cases and controls exposed to glyphosate, particularly when exposed subjects were divided into light and heavy users, was a limitation of the study.  It would be expected that effect estimates would be reduced if adjustment for co-exposure to other pesticides had been performed.

In a hospital-based case-control study conducted by Orsi *et al*. (2009) in France, 56 multiple myleoma cases and 313 age- and sex-matched controls were identified.  A non-statistically significant elevated risk was observed (OR=2.4; 95% CI=0.8–7.3; 5 exposed cases and 18 exposed controls).  The wide CI range can primarily be attributed to the low number of exposed cases, which reduces the reliability of the results to demonstrate a true association.  Additionally, the study did not adjust for exposure to multiple pesticides.

Chang and Delzell (2016) conducted a meta-analysis exploring glyphosate exposure and multiple myeloma using data from the 6 studies described above (Brown *et al.*, 1993; De Roos *et al*., 2005; Sorahan, 2015; Pahwa *et al*., 2012; Kachuri *et al*., 2013; Orsi *et al*., 2009).  Meta-risk ratios were obtained using data from each of the 4 independent study populations, such that if a study population was already represented in the analysis by one study, then the same population analyzed by another study would not be included (e.g., Sorahan, 2015 and De Roos *et al.*, 2005 could not be used simultaneously in a meta-analysis).  The combined meta-risk ratio based on data from prioritized studies (Brown *et al.*, 1993; Kachuri *et al.*, 2013; Orsi *et al.*, 2009; and Sorahan, 2015) was 1.4 (95% CI=1.0-1.9) using random-effects and fixed-effects models and the $I^2$ value = 0.0% indicating consistency across data sets.  There was relatively no impact on the meta-risk ratio and associated 95% CI when secondary analyses were conducted using alternative estimates for a study population (e.g., substituting the data from Sorahan, 2015 for De Roos *et al.,* 2005).

### (3) Hodgkin Lymphoma

In a Canadian case-control study, Karunanayake *et al.,* (2012) evaluated Hodgkin lymphoma (HL) and observed no association with glyphosate exposure following adjustment for age, province of residence, and medical history variables (OR=0.99; 95% CI=0.62-1.56; 38 cases).  No adjustment was made for exposure to other pesticides.

In a hospital-based case-control study conducted by Orsi *et al.* (2009) in France, authors identified 87 HL cases and 265 age-and sex-matched controls.  There was a non-statistically significant elevated odds ratio observed (OR=1.7; 95% CI=0.6–5.0; 6 exposed cases and 15 exposed controls).  The wide CI range can primarily be attributed to the low number of exposed cases.  Also, as noted earlier, this study did not adjust for exposure to multiple pesticides.

Chang and Delzell (2016) conducted a meta-analysis exploring glyphosate exposure and HL using data from both of these studies.  A meta-risk ratio of 1.1 (95% CI=0.7-1.6) was obtained with a $I^2$ value of 0.0%, indicating consistency across the data sets.

HL was also evaluated in the recently published analysis of the AHS cohort (Andreotti *et al.*, 2017) and no association was observed with glyphosate use; however, the number of cases available for this analysis was limited.

### *(4) Non-Hodgkin Lymphoma*

NHL has about 60 subtypes classified by the WHO, which may have etiological differences (Morton *et al.*, 2014).  There are analyses available for particular subtypes of NHL; however, these are particularly limited by the small sample sizes.  As a result, this evaluation only presents results for total NHL with the exception of the recently published analysis of the AHS cohort (Andreotti *et al.,* 2017) where sample sizes were not limited for all subtypes.

There were six studies available that investigated the association between glyphosate exposure and NHL, which was the most for any type of cancer.  As discussed in Section 3.4, these studies encompass a combination of strengths and limitations.  These studies are therefore discussed in more detail in this section as compared to discussions of other cancer types in order to highlight the strengths and identify the limitations for each study.

De Roos *et al.* (2005) was the only prospective cohort study available; therefore, subjects were enrolled prior to developing cancer outcomes.  Disease status was determined through state cancer registries.  Exposure information was obtained from a large number of licensed pesticide applicators and no proxies were used.  Exposure was evaluated as ever/never use, cumulative lifetime exposure, and intensity-weighted cumulative exposure.  Due to the study design, the potential for many biases were reduced.  Additionally, the study adjusted and/or considered numerous factors, including use of other pesticides.  Median follow-up time was approximately 7 years.; however, as discussed in Section 3.3.1, study participants provided exposure information prior to enrollment and this information was incorporated into the cumulative lifetime and intensity-weighted cumulative exposure metrics.  As a result, the amount of time exposed was longer than just the follow-up time since enrollment.  For applicators with the full data set, the RR for ever/never use was 1.2 (95% CI=0.7–1.9; 92 cases) with only adjustment for age.  In the fully adjusted model excluding subjects with missing covariate data, the RR was similar following adjustment for age, demographic and lifestyle factors, and exposure to other pesticides (RR=1.1; 95% CI=0.7-1.9).  Effect estimates obtained using cumulative lifetime exposure and intensity-weighted cumulative exposure were below 1 (RR = 0.6-0.9 when comparing to the lowest tertile).  The recently published analysis of the AHS cohort with a longer follow-up

period of approximately 17.5 years (Andreotti *et al.,* 2017) also reported no association between glyphosate exposure and NHL overall or any of its subtypes.

De Roos *et al.* (2003) used pooled data from three case-controls studies evaluating NHL in white males from Nebraska, Kansas, and in Iowa and Minnesota (Cantor *et al.*, 1992; Hoar *et al.*, 1986; Zahm *et al.,* 1990; Appendix B). Exposure information was obtained from exposed individuals or their next of kin (i.e., proxy respondents) if the subjects were dead or incapacitated; however, techniques varied across the three studies. There is potential for selection bias due to exclusion of observations with missing covariate data, but only if the lack of the covariate data was associated with glyphosate exposure. The effect estimates for the association between glyphosate exposure and NHL was significant (OR=2.1; 95% CI=1.1–4.0) in the logistic regression analyses adjusting for co-exposure to other pesticides. However, utilizing alternative hierarchical regression techniques to adjust for co-exposure to other pesticide exposures, the odds ratio was still elevated, but the increase was not statistically significant (OR=1.6; 95% CI=0.90–2.8).

Eriksson *et al.* (2008) is a Swedish case-control study that used detailed exposure information from exposed individuals (i.e.*,* no use of proxy respondents), but only minimal demographic information was provided on subjects (age and sex) and a table with subject characteristics (e.g., smoking status, alcohol intake, physical activity, education) was not provided. Cases were identified through physicians and verified histopathologically. Glyphosate exposure, which was reported in 29 cases and 18 controls between 1999 and 2003, produced a statistically significant increased OR in the univariate analysis (OR=2.02; 95% CI=1.10–3.71); however, in the multivariate analysis adjustments were conducted for co-exposure to different agents including MCPA, "2,4,5-Y and/or 2,4-D", mercurial seed dressing, arsenic, creosote, and tar and the OR reduced to 1.51 (95% CI=0.77–2.94) and was not statistically significant. Additional analyses were conducted to investigate the impact of various exposure times. When exposure was for more than 10 cumulative days (the median number of days among exposed controls), the OR was 2.36 (95% CI=1.04–5.37; 17 exposed cases) and for exposure less than 10 cumulative days, the OR was 1.69 (95% CI=0.7–4.07; 12 exposed cases). By dividing the exposed cases and controls using this exposure metric, wider CIs were observed due to smaller sample sizes, which reduces the reliability of the results to demonstrate a true association. Additionally, these analyses did not account for co-exposure to other pesticides. Similarly, wider CIs were also observed when exposed cases and controls were divided by a longer exposure metric. ORs of 1.11 (95% CI=0.24-5.08) and 2.26 (95% CI=1.16-4.40) were obtained for 1-10 years and >10 years, respectively. It was not clear whether this analysis adjusted for co-exposure to other pesticides based on the statistical methods description and the subjects for each exposure group were not reported. This finding, while limited to a single study, suggests that cohort studies without sufficient follow-up time or other case-control studies which did not stratify by time since first exposure may be less sensitive in detecting risk.

Hardell *et al.* (2002) used pooled data from two case-control studies in Sweden (Hardell and Eriksson, 1999; Nordstrom *et al.*, 1998; Appendix B) that examined hairy cell leukemia, a subtype of NHL, and NHL (not including hairy cell leukemia). Exposure information was collected from individuals or proxy respondents based on a working history with specific questions on exposures to different chemicals. Cases were identified from regional cancer

registries and verified histopathologically.  In the univariate analysis, risk of NHL associated with glyphosate exposure was found to be significantly increased (OR=3.04; 95% CI=1.08–8.52), but when study site, vital status, and co-exposure to other pesticides were considered in the multivariate analysis, the OR noticeably attenuated and was found to be non-statistically significant (OR=1.85; 95% CI=0.55–6.20).  The wide range of the CI resulting from the small sample size (only 8 glyphosate-exposed cases and 8 glyphosate-controls).

McDuffie *et al.* (2001) is a multicenter population-based study among men of six Canadian provinces.  This case-control study utilized a well-conducted exposure assessment and cases were ascertained from cancer registries or hospitals in six provinces with histopathological verification for 84% of the samples.  There are concerns with control selection.  There was low control participation (48%) and different sources were used for selecting controls depending on the province of residence.  Effect estimates were obtained using a considerable number of exposed cases and controls (51 cases and 133 controls); however, the study did not assess co-exposure to other pesticides.  There was a non-statistically significant increased risk of NHL from glyphosate exposure when adjusting for age and province (OR=1.26; 95% CI=0.87–1.80) and when adjusting for age, province and medical variables (OR=1.20; 95% CI=0.83–1.74).  Medical variables found to be statistically significant included history of measles, mumps, previous cancer, skin-prick allergy tests, allergy desensitization shots, and a positive family history of cancer in a first-degree relative.  It would be expected that effect estimates would attenuate if adjustment for co-exposure to other pesticides had been performed.  Additional analyses were conducted to investigate differences in exposure time.  When exposure was for more than 2 days/year, the OR was 2.12 (95% CI=1.20-3.73; 23 exposed cases and 36 exposed controls) compared to unexposed subjects and for exposure more than 0 and ≤ 2 days/year, the OR was 1.00 (95% CI=0.63–1.57; 28 exposed cases and 97 exposed controls) compared to unexposed subjects.

Orsi *et al.* (2009) is a French hospital-based case-control study that obtained exposure information from subjects (no proxies used) using a detailed questionnaire with lifelong residential and occupational histories followed by a discussion with a trained interviewer who was blinded to case status.  No issues regarding exposure or outcome assessment were identified; however, there is potential for selection bias given the study utilized hospital-based controls (primarily from orthopedic and rhematological departments) that may not be representative of the general population that gave rise to the cases.  The study evaluated several potential confounders; however, it did not assess co-exposure to other pesticides.  There was no association observed between NHL and glyphosate use (OR=1.0; 95% CI=0.5-2.2; 12 exposed cases and 24 exposed controls).  The low number of cases and controls exposed to glyphosate and lack of adjustment for exposure to multiple pesticides were limitations of the study.

Schinasi and Leon (2014) conducted a meta-analysis exploring occupational glyphosate exposure and NHL using data from six of the above mentioned studies (McDuffie *et al.*, 2001; Hardell *et al.*, 2002; De Roos *et al.*, 2003; De Roos *et al.*, 2005; Eriksson *et al.*, 2008; and Orsi *et al.*, 2009).  Since the authors identified a variety of sources of heterogeneity between publications, they decided a priori to calculate meta-risk ratio estimates and 95% CIs using random effect models, allowing between study heterogeneity to contribute to the variance.  $I^2$ values were reported as a measure of inconsistency in results.  For glyphosate, the meta-risk ratio was 1.5

with a 95% CI of 1.1–2.0 and the $I^2$ value was 32.7% indicating relatively low levels of heterogeneity among these studies. This study combined multiple smaller studies that on their own had limitations, including small sample sizes.

The 2015 IARC evaluation noted that fully adjusted effect estimates in two of the Swedish studies (Hardell *et al.*, 2002 and Eriksson *et al.*, 2008) were not used in the analysis conducted by Schinasi and Leon (2014). Consequently, the IARC Working Group conducted a reexamination of the results of these studies (IARC 2015). For an association between glyphosate exposure and NHL, the IARC estimated a meta-risk ratio of 1.3 (95% CI=1.03–1.65, $I^2$=0%; p=0.589 for heterogeneity).

Chang and Delzell (2016) conducted their own meta-analysis exploring glyphosate exposure and NHL using six independent studies (De Roos *et al.,* 2003; De Roos *et al.,* 2005; Eriksson *et al.,* 2008; Hardell *et al.,* 2002; McDuffie *et al.,* 2001; and Orsi *et al.,* 2009). A meta-risk ratio of 1.3 (95% CI=1.0-1.6) was obtained with an $I^2$ value of 0.0%. In a secondary analysis, the De Roos *et al.* (2003) OR using hierarchical regression was replaced by the logistic regression OR. This change had no impact on the meta-risk ratio and associated confidence interval (meta-risk ratio=1.3; 95% CI=1.0-1.6). In another secondary analysis, the OR from McDuffie *et al.* (2001) was replaced by the OR from Hohenadel *et al.* (2011), which evaluated the same study population (minus four previously misclassified NHL cases). This analysis also yielded similar results (meta-risk ratio=1.3; 95% CI=1.0-1.7). A final analysis was performed with the replacements for both secondary analyses [i.e., logistic regression OR from De Roos *et al.* (2003) and OR from Hohenadel *et al.* (2011)]. The results were relatively the same as the other meta-analyses (meta-risk ratio=1.4; 95% CI=1.0-1.8). Chang and Delzell (2016) also tested for publication bias using Egger's linear regression approach to evaluating funnel plot asymmetry, and found no significant asymmetry indicating little evidence of publication bias; however, given the small sample size (n=6), this analysis would lack power and the results are not considered meaningful.

| Table 3.4.  Summary of Findings: Non-Solid Tumor Cancer Studies. | | | | | |
|---|---|---|---|---|---|
| **Study** | **Study Design** | **Study Location** | **Exposure Metric** | **Adjusted Effect Estimate: RR or OR (95% CI)[a]** | **Covariate Adjustments in Analyses** |
| | | | *Leukemia* | | |
| De Roos *et al.* (2005) | Prospective Cohort | USA: Iowa and North Carolina | Ever/never | 1.0 (0.5-1.9) | Age, demographic and lifestyle factors, and other pesticides[b] |
| | | | Cumulative Exposure Days (by tertile cut points): 1-20 21-56 57-2,678 | 1.0 1.9 (0.8-4.5) 1.0 (0.4-2.9) | Age, demographic and lifestyle factors, and other pesticides[b] |
| | | | Intensity-Weighted Cumulative Exposure Days (by tertile cut points): 0.1-79.5 79.6-337.1 337.2-18,241 | 1.0 1.9 (0.8-4.7) 0.7 (0.2-2.1) | Age, demographic and lifestyle factors, and other pesticides[b] |
| Brown *et al.* (1990) | Case-Control | USA: Iowa and Minnesota | Ever/never | 0.9 (0.5-1.6) | Vital status, age, tobacco use, family history of lymphopoietic cancer, high occupations, and high risk exposures |
| | | | *Multiple Myeloma* | | |
| De Roos *et al.* (2005) | Prospective Cohort | USA: Iowa and North Carolina | Ever/never | 2.6 (0.7-9.4) | Age, demographic and lifestyle factors, and other pesticides[b] |
| | | | Cumulative Exposure Days (by tertile cut points): 1-20 21-56 57-2,678 | 1.0 1.1 (0.4-3.5) 1.9 (0.6-6.3) | Age, demographic and lifestyle factors, and other pesticides[b] |
| | | | Intensity-Weighted Cumulative Exposure Days (by tertile cut points): 0.1-79.5 79.6-337.1 337.2-18,241 | 1.0 1.2 (0.4-3.8) 2.1 (0.6-7.0) | Age, demographic and lifestyle factors, and other pesticides[b] |
| Brown *et al.* (1993) | Case-Control | USA: Iowa | Ever/never | 1.7 (0.8-3.6) | Age and vital status |
| Kachuri *et al.* (2013) (extended analysis of Pahwa 2012) | Case-Control | Canada | Ever/never | 1.19 (0.76-1.87) | Age, province of residence, smoking status, selected medical conditions, family history of cancer, and use of a proxy respondent |
| | | | Days per year of use: 0 to ≤2 days/year >2 days/year | 0.72 (0.39-1.32) 2.04 (0.98-4.23) | Age, province of residence, smoking status, selected medical conditions, family history of cancer, and use of a proxy respondent |
| Pahwa *et al.* (2012) | Case-Control | Canada | Ever/never | 1.22 (0.77-1.93) | Age group, province of residence, and statistically significant medical history variables |

**Table 3.4.  Summary of Findings: Non-Solid Tumor Cancer Studies.**

| Study | Study Design | Study Location | Exposure Metric | Adjusted Effect Estimate: RR or OR (95% CI)[a] | Covariate Adjustments in Analyses |
|---|---|---|---|---|---|
| Orsi *et al.* (2009) | Case-Control | France | Ever/never | 2.4 (0.8-7.3) | Age, centre, and socioeconomic category |
| Sorahan (2015) Reanalysis of De Roos *et al.* (2005) | Prospective Cohort | USA: Iowa and North Carolina | Ever/never | 1.12 (0.5-2.49) | Age and sex |
| | | | | 1.24 (0.52-2.94) | Age sex, lifestyle factors, and other pesticides |
| *Monoclonal Gammopathy of Undetermined Significance (MGUS)* | | | | | |
| Landgren *et al.* (2009) | Nested Case-Control | USA: Iowa and North Carolina | Ever/never | 0.5 (0.2-1.0) | Age and education |
| *Hodgkin Lymphoma (HL)* | | | | | |
| Karunanayake *et al.* (2012) | Case-Control | Canada | Ever/never | 0.99 (0.62-1.56) | Age group, province of residence, and statistically significant medical history variables |
| Orsi *et al.* (2009) | Case-Control | France | Ever/never | 1.7 (0.6-5.0) | Age, centre, and socioeconomic category |
| *Non-Hodgkin Lymphoma (NHL)* | | | | | |
| De Roos *et al.* (2005) | Prospective Cohort | USA: Iowa and North Carolina | Ever/never | 1.1 (0.7-1.9) | Age, demographic and lifestyle factors, and other pesticides[b] |
| | | | Cumulative Exposure Days (by tertile cut points): 1-20 21-56 57-2,678 | 1.0 0.7 (0.4-1.4) 0.9 (0.5-1.6) | Age, demographic and lifestyle factors, and other pesticides[b] |
| | | | Intensity-Weighted Cumulative Exposure Days (by tertile cut points): 0.1-79.5 79.6-337.1 337.2-18,241 | 1.0 0.6 (0.3-1.1) 0.8 (0.5-1.4) | Age, demographic and lifestyle factors, and other pesticides[b] |
| De Roos *et al.* (2003) | Case-Control | USA: Iowa, Nebraska, Minnesota, and Kansas | Ever/never | 1.6 (0.9-2.8) | Age, study site, and use of other pesticides |
| Eriksson *et al.* (2008) | Case-Control | Sweden | Ever/never | Multivariate: 1.51 (0.77-2.94) | Age, sex, year of diagnosis or enrollment, and exposure to other pesticides |
| | | | Days per year of use: ≤ 10 days >10 days | 1.69 (0.70-4.07) 2.36 (1.04-5.37) | Age, sex, and year of diagnosis or enrollment |
| | | | Years of use: 1-10 years >10 years | 1.11 (0.24-5.08) 2.26 (1.16-4.40) | Unknown |

**Table 3.4.  Summary of Findings: Non-Solid Tumor Cancer Studies.**

| Study | Study Design | Study Location | Exposure Metric | Adjusted Effect Estimate: RR or OR (95% CI)[a] | Covariate Adjustments in Analyses |
|---|---|---|---|---|---|
| Hardell *et al.* (2002) | Case-Control | Sweden | Ever/never | Multivariate: 1.85 (0.55-6.20) | Study, study area, vital status, and exposure to other pesticides |
| McDuffie *et al.* (2001) | Case-Control | Canada | Ever/never | 1.20 (0.83-1.74) | Age, province of residence, and statistically significant medical variables |
| | | | Days per year of use: >0 and ≤ 2 days >2 days | 1.00 (0.63-1.57) 2.12 (1.20 -3.73) | Age and province of residence |
| Orsi *et al.* (2009) | Case-Control | France | Ever/never | 1.0 (0.5-2.2) | Age, centre, and socioeconomic category |

[a] Some studies report multiple quantitative risk measurements.  This table reports the most highly adjusted quantitative measurements.
[b] De Roos *et al.* (2005) excluded subjects missing covariate data for demographic and lifestyle factors and exposure to other pesticides; therefore, the number of subjects included in each analysis varies.

### 3.6    Discussion

A total of 63 individual studies were identified in the systematic review.  The data from 7 of these studies were used in pooled analyses by other studies; therefore, they were not subjected to detailed evaluation. Overall, 3 studies, 19 studies, and 34 studies were assigned high, moderate, or low rankings, respectively.  All of the high and moderate quality studies were considered informative with regard to the carcinogenic potential of glyphosate.  Additionally, the recently published analysis of the AHS cohort (Andreotti *et al.*, 2017) was also considered as part of this evaluation.

There was no evidence of an association between glyphosate exposure and solid tumors, leukemia, or HL.  These conclusions are consistent with those recently conducted by IARC, EFSA, and JMPR who also concluded there is no evidence of an association for these tumors at this time.  The data should be considered limited though with only one or two studies available for almost all of the cancer types investigated.  The remainder of this discussion focuses on multiple myeloma and NHL.  Study elements for the available studies and their potential to impact effect estimates are examined; however, the discussion is applicable in most cases to all of the epidemiological studies used in this evaluation.

*Multiple Myeloma*

Four studies were available evaluating the association between glyphosate exposure and risk of multiple myeloma in the initial evaluation presented to the SAP in December 2016 (Brown *et al.*, 1993; De Roos *et al.*, 2005; Orsi *et al.*, 2009; Pahwa *et al.*, 2012).  Since that time, a recent analysis of the AHS cohort has been published (Andreotti *et al.*, 2017), which included evaluation of multiple myeloma.  One reanalysis (Sorahan, 2015) and one extended analysis (Kachuri *et al.*, 2013) were also included in the evaluation.  The effect estimates for ever/never use ranged from 1.19 to 2.6 although none were found to be statistically significant.  Only one study (De Roos *et al.*, 2005) adjusted for co-exposures to other pesticides; therefore, potential confounding was not addressed in the other studies.  There was an indication of a possible exposure-response relationship; however, this was the only study that evaluated the exposure-response relationship for multiple myeloma.  Reanalysis of the full dataset by Sorahan (2015) raised concerns about whether the restricted dataset used for these analyses was representative of the whole cohort.  Furthermore, in the recent analysis of the AHS cohort (Andreotti *et al.*, 2017) with a longer follow-up period and almost 5 times more exposed cases, there was no evidence of an association between glyphosate exposure and risk of multiple myeloma.  There was a single study of MGUS, a precursor to multiple myeloma, which showed decreased risk with exposure to glyphosate; however, the study did not adjust for exposure to other pesticides.  Overall, the available evidence does not link glyphosate exposure to multiple myeloma.

*NHL*

Six studies were available evaluating the association between glyphosate exposure and risk of NHL in the initial evaluation presented to the SAP in December 2016.  Since that time, a recent analysis of the AHS cohort has been published (Andreotti *et al.*, 2017), which included evaluation of NHL.  Effect estimates for ever/never use ranged from 1.0-1.85 in adjusted

analyses with none reaching statistical significance (Figure 3.2). Two of these studies did not adjust for co-exposures to other pesticides (McDuffie *et al*., 2001; Orsi *et al*., 2009). Many of the evaluated studies were limited by small sample sizes, which resulted in large confidence intervals and reduced the reliability of the results to demonstrate a true association. Meta-analyses were performed by IARC (2015) and Chang and Delzell (2016) using these results for the ever/never use metric. Both analyses reported similar meta-risk ratios ranging from 1.3-1.5, depending on the effect estimates and studies included in the analyses. Any of the meta-analysis estimates that were statistically significant were all borderline with the lower limit of the 95% CI just slightly over 1. For example, the lower 95% confidence limit reported by IARC (2015) was 1.03 and the lower 95% confidence limit displayed in Figure 3.2 generated by the agency is 1.01. It should also be noted that publication bias may play a role in this evaluation given there is a tendency to only publish positive results and potential concerns regarding glyphosate have only been raised in recent years.

With respect to meta-analyses, caution should be taken when interpreting results. Meta-analyses are a systematic way to combine data from several studies to estimate a summary effect. Analyses were performed with 6 studies, which many would consider small for performing meta-analyses. Rarely will meta-analyses synthesize data from studies with identical study designs and methods. In the meta-analyses performed by IARC (2015) and Chang and Delzell (2016), inclusion was primarily based on whether a study addressed the broader question regarding the association between glyphosate exposure and risk of NHL. For meaningful results, careful consideration of whether studies are similar and should be combined in the analysis. Furthermore, the bias and confounding issues inherent for each individual study are carried over into the meta-analyses. Across the NHL studies, study characteristics varied, such as overall study design (i.e., cohort and case-control), source population, proxy respondent use, covariate adjustments, and confounding control. Even if these differences are not detected statistically, the meta-analysis estimate should be considered in the context of the data that are used to generate it.

Using cumulative lifetime and intensity-weighted cumulative exposure metrics, all effect estimates were less than 1 (OR = 0.6-0.9 when comparing to the lowest tertile) in the AHS cohort (De Roos *et al*., 2005). Similar results were obtained in the recent analysis of the AHS cohort (Andreotti *et al*., 2017). Two case-control studies (Eriksson *et al*., 2008; McDuffie *et al*., 2001) evaluated the association of glyphosate exposure and NHL stratifying exposure by days per year of use. These studies obtained effect estimates greater than 1, which conflicted with the results in the prospective cohort study; however, these estimates from the case-control studies do not appear to be adjusted for co-exposures to other pesticides. By dividing the total number of exposed cases and controls by these exposure metrics in Eriksson *et al*. (2008), wider confidence intervals were observed due to small sample sizes, which reduces the reliability of the results to demonstrate a true association. Furthermore, as mentioned previously (and will be discussed further below), there was clearly strong potential for confounding from exposure to other pesticides. In each instance where a study adjusted for co-exposure to other pesticides, the adjusted effect estimate decreased in magnitude, including other analyses performed in one of these case-control studies. Consequently, lack of adjustment for co-exposure to other pesticides in these analyses could partially explain the conflicting results between the cohort and case-control studies.



**Figure 3.2. Forest plot of effect estimates (denoted as ES for effect sizes) and associated 95% confidence intervals (CI) for non-Hodgkin lymphoma (NHL).**

The possible effect of confounding factors, which are related to both the exposure of interest and the risk of disease, may make it difficult to interpret the results. Control for confounding varied considerably across studies (Table 3.2). Studies primarily adjusted for standard variables, such as age, gender, and residency location. Co-exposure to other pesticides was considered for several of the NHL studies for ever/never use (De Roos *et al.*, 2003; De Roos *et al.*, 2005; Eriksson *et al.*, 2008; Hardell *et al.*, 2002); however, analyses of exposure-response and latency effects did not appear to adjust for these co-exposures. The recent analysis by Andreotti *et al.* (2017) also adjusted for co-exposure to other pesticides.

There is clearly a strong potential for confounding by co-exposures to other pesticides since many are highly correlated and have been reported to be risk factors for NHL. In the studies that did report a quantitative measure adjusted for the use of other pesticides, the risk was always found to be closer to the null than the risk calculated prior to this adjustment. For examples, Eriksson *et al.* (2008) reported unadjusted and adjusted effect estimates of 2.02 (95% CI: 1.10-3.71) and 1.51 (95% CI: 0.77-2.94), respectively. Comparing the magnitude of those effect sizes on the natural log scale, the unadjusted effect was $\beta$=0.70 (95% CI: 0.10, 1.31) while the adjusted effect was $\beta$=0.41 (95% CI: -0.26, 1.08), suggesting a difference compatible with a degree of confounding by those herbicide co-exposures which appeared to have inflated the unadjusted effect upwards by 70% on the natural log scale (or by 46% on the OR scale). This demonstrates the profound effect this adjustment has on effect estimates and the concern for residual confounding by other pesticides that cause NHL themselves. As discussed in Section 3.2.4, other potential confounders have also been identified. With an association between glyphosate exposure and the outcome of interest, occupational exposure to diesel exhaust fumes, solvents, livestock and other farm animals, and UV radiation are highly likely confounders in the

NHL studies; however, none of the studies accounted for these potential confounders. These confounders and/or other unknown factors could explain the increased risk of NHL among farmers, particularly since increased risk of NHL to farmers has been previously documented and existed prior to the introduction of glyphosate.

Recall bias and missing data are also limitations in most of the studies. In epidemiologic studies, the quality of the exposure assessment is a major concern since the validity of the evaluations depends in large part on the ability to correctly quantify and classify an individual's exposure. Variation in the quality of exposure assessment, study design and methods, as well as available information concerning potential confounding variables could also explain discrepancies in study findings. During their lifetime, farmers are typically exposed to multiple pesticides and often several may be used together posing a challenge for identifying specific risk factors. Moreover, there is no direct information on pesticide exposure or absorbed dose because analyses are based on self-reported pesticide use. The studies included in this epidemiology assessment relied primarily on questionnaires and interviews to describe participants' past and/or current exposure to glyphosate. Since the questionnaires are commonly used to account for exposure and capture self-reporting, the results can be subject to misclassification and recall bias.

Furthermore, the use of proxy respondents has the potential to increase recall bias and thus may increase exposure misclassification, especially for proxy respondents not directly involved in farming operations that may be more prone to inaccurate responses than directly interviewed subjects. In some of the NHL studies, the study participants were interviewed directly to assess exposure (De Roos *et al.*, 2005; Eriksson *et al.*, 2008; McDuffie *et al.*, 2001; Orsi *et al.*, 2009), making proxy respondent use a non-issue for these studies. In other studies, however, study participants or proxy respondents were interviewed to assess exposure (Hardell *et al.*, 2002, De Roos *et al.*, 2003). De Roos *et al.* (2003) did not find type of respondent to be statistically significant, but Hardell *et al*. (2002) did not conduct analyses to evaluate the impact of proxy use. In non-NHL studies, proxy analyses were conducted in a small subset (Kachuri *et al.*, 2013; Lee *et al.,* 2004b; Lee *et al.,* 2005; Yiin *et al.*, 2012) and differences in effect estimates were often observed. In a few studies, respondent type was used as an adjustment variable when calculating effect estimates (Band *et al.*, 2011; Kachuri *et al.,* 2013; Lee *et al.*, 2005). As with all study design elements of case-control studies, one concern is whether or not the use of proxy respondents had a differential impact on the cases and controls included in the study because any differential impact may result in differential exposure misclassification. When use of proxy respondents was comparable for cases and controls in the full study population, it could be assumed that there is less concern for potential recall bias from the use of proxy respondents. In Hardell *et al.,* (2002), the percentage of cases and controls with proxy respondents was not fully reported for cases and controls though and this adds a potential source of uncertainty for the study. Moreover, when proxy respondents were used in a study, the percentages were usually reported only for the full study population and were not reported for the specific cases and controls exposed to glyphosate. This lack of information makes it difficult to assess the degree to which recall bias may have occurred due to the use of proxy respondents.

Previously, some have argued that the follow-up period (median = 7 years) in De Roos *et al*. (2005) is not sufficiently long to account for the latency of NHL (Portier *et al*., 2016); however, an analysis of the AHS cohort was recently published (Andreotti *et al*., 2017) with an extended

follow-up of 17.5 years.  This study reported no association between glyphosate exposure and all lymphohematopoietic cancers, NHL, or any of its subtypes across exposure metrics.  No association was observed in unlagged or lagged analyses, after adjustment for pesticides linked to NHL in previous AHS analyses, and after exclusion of multiple myeloma from the NHL grouping.

It was also noted that reference groups differed across studies.  For example, some studies (McDuffie *et al*., 2001; Hardell *et al*., 2002; and Eriksson *et al*., 2008) eliminated cases and controls who had been exposed to certain classes of pesticides, which may have resulted in selection bias and/or recall bias that may ultimately impact the effect estimates obtained in these studies.  In the dose-response analysis by De Roos *et al*. (2005), the lowest exposed tertile was used as the reference group in an effort to reduce the potential for residual confounding by unmeasured covariates due to lack of comparability observed between the never exposed group and the higher exposed groups.  Analyses were also performed using the unexposed group as the reference.  This study consistently found no evidence of an association between glyphosate exposure and NHL using different exposure metrics and reference groups.  Similarly, there was no evidence of an association observed in the recent analysis of the AHS cohort (Andreotti *et al.*, 2017) with a longer follow-up period.

There are conflicting views on how to interpret the overall results for NHL.  Some believe that the data are indicative of a potential association between glyphosate exposure and risk of NHL.  This is primarily based on reported effect estimates across case-control studies and the associated meta-analyses greater than 1.  Additionally, the analysis conducted by Eriksson *et al*. (2008) observed a slightly statistically significant increase for those with more than 10 years of exposure prior to diagnosis.  There were also two case-control studies that investigated the association of glyphosate exposure and NHL by stratifying exposure by days per year of use that reported effect estimates greater than 1 for groups with the highest exposure.

Conversely, others have viewed the effect estimates as relatively small in magnitude and observed associations could be explained by chance and/or bias, particularly since studies have reported farmers develop NHL at excess rates and this risk existed prior to the introduction of glyphosate.  All of the effect estimates for ever/never use were non-statistically significant.  Several studies reported effect estimates approximately equal to the null.  The widest confidence intervals were observed for the highest effect estimates indicating these effect estimate are less reliable.  Sample sizes were limited in several of these case-control studies.  Meta-analyses were based on studies with varying study characteristics.  Given the limitations and concerns discussed above for the individual studies included in this evaluation, chance and/or bias cannot be excluded as an explanation for the relatively small increase observed in the meta-risk ratios.  Meanwhile, analyses performed by De Roos *et al.* (2005) and Andreotti *et al.* (2017) reported effect estimates less than 1 for cumulative lifetime exposure and intensity-weighted cumulative exposure and these extensive analyses did not detect any exposure-response relationship, which conflicts with the two case-control studies that indicate potential for an exposure-response relationship comparing two groups stratified by days per year of use.  Although increased effect estimates were observed in one case-control study (Eriksson *et al*., 2008) for subjects exposed more than 10 years prior to diagnosis and in two case-control studies (McDuffie *et al*., 2001; Eriksson *et al*., 2008) that stratified exposure by days per year of use, none of these analyses

appeared to adjust for exposures to other pesticides, which has been found to be particularly important for these analyses and would be expected to attenuate these estimates towards the null. Furthermore, none of the studies in this evaluation of glyphosate exposure and risk of NHL accounted for other potential confounders, such as diesel exhaust fumes, solvents, animals, and UV radiation.

Based on the weight-of-evidence, the agency cannot exclude chance and/or bias as an explanation for observed associations in the database.  Due to study limitations and contradictory results across studies of at least equal quality, a conclusion regarding the association between glyphosate exposure and risk of NHL cannot be determined based on the available data.  The agency will continue to monitor the literature for studies and any updates to the AHS will be considered when available.

## 4.0     Data Evaluation of Animal Carcinogenicity Studies

## 4.1     Introduction

Cancer bioassays in animals have historically been the primary studies available to evaluate cancer hazard in humans since, until recently, epidemiological evidence was limited. The results of these bioassays, as well as results from screening assays for genotoxicity, are considered in a weight-of-evidence approach to determine the potential of a chemical to induce cancer in humans. Carcinogenicity studies in two rodent species are required for the registration of food use pesticides or when the use of a pesticide is likely to result in repeated human exposure over a considerable portion of the human lifespan (40 CFR Part 158.500). Rodent carcinogenicity studies identified from the data collection phase of the systematic review were evaluated for study quality and acceptable studies were evaluated in the context of the 2005 EPA Guidelines for Carcinogen Risk Assessment as described in Sections 4.2 and 4.3 below, respectively. This included studies using glyphosate salts, which dissociate quickly in aqueous environments to the glyphosate acid and the corresponding cation. The cations would not be expected to impact the toxicity results compared to studies where animals are treated with glyphosate acid alone.

## 4.2     Consideration of Study Quality for Animal Carcinogenicity Studies

The agency has published test guidelines on how to conduct carcinogenicity studies (OCSPP 870.4200) and combined chronic/carcinogenicity studies (OCSPP 870.4300) in rodents which have been harmonized with OECD guidelines (Test Nos. 451 and 453). Test substances are typically administered in animal carcinogenicity studies by the oral route for food use pesticides. The studies are generally conducted in mice and rats with exposure durations of 18-24 months for mice and 24 months for rats, which represent exposures of the majority of the expected lifespan in these animals. Guideline carcinogenicity studies are designed to test three or more doses in both sexes (with at least 50 animals/sex/dose) with adequate dose spacing to characterize tumor dose-response relationships. Key considerations when evaluating carcinogenicity studies for cancer hazard assessment include identification of target organs of carcinogenicity, increased incidence of tumors or proportion of malignant neoplasms, and reduction in the time to appearance of tumors relative to the concurrent control group (OECD TG 451).

There are a number of criteria the agency uses when evaluating the technical adequacy of animal carcinogenicity studies. A primary criterion is the determination of the adequacy of dosing. The 2005 EPA Guidelines for Carcinogen Risk Assessment recommends that the highest dose level selected should elicit signs of toxicity without substantially altering the normal life span due to effects other than tumors; or without inducing inappropriate toxicokinetics (e.g., overwhelming absorption or detoxification mechanisms); however, the high dose need not exceed 1,000 mg/kg/day (i.e., limit dose) (OCSPP 870.4200; OCSPP 870.4300). Additional criteria to judge the technical adequacy and acceptability of animal carcinogenicity studies are provided in the test guidelines as well as other published sources (NTP, 1984; OSTP, 1985; Chhabra *et al.*, 1990). As stated in the 2005 EPA Guidelines for Carcinogen Risk Assessment, studies that are judged to be wholly inadequate in protocol, conduct or results, should be discarded from

analysis. Studies the agency consider acceptable are further evaluated for potential tumor effects.

Following study quality evaluation, a total of 8 chronic/carcinogenicity studies in the rat and 6 carcinogenicity studies in the mouse were considered acceptable for use in the current evaluation for the active ingredient glyphosate and were subsequently evaluated in the context of the 2005 EPA Guidelines for Carcinogen Risk Assessment as described in Section 4.3. A number of studies were judged to be inadequate in protocol, conduct or reporting and were not considered in the analysis of glyphosate. These studies and the justification for not including them in the analysis are listed below:

1. A two-year chronic oral toxicity study in Albino rats by Reyna (1974)[13]. The study was considered inadequate to assess carcinogenicity due to insufficient reporting on the histopathology findings in the control and treatment groups. Approximately 70 animals were unaccounted for across the study.

2. A two-year drinking water study in Wistar rats with a formulated product (13.6% ammonium salt) by Chruscielska *et al.*, (2000). In addition to deficiencies including inadequate reporting of water consumption and body weight data, this study was conducted with a glyphosate formulated product and not the active ingredient glyphosate, which is the focus of this review. Glyphosate formulations contain various components other than glyphosate and it has been hypothesized these components are more toxic than glyphosate alone. The agency is collaborating with NTP to systematically investigate the mechanism(s) of toxicity for glyphosate and glyphosate formulations. This project is discussed in more detail in Section 7.0 of this document.

3. An initiation-promotion study (George *et al.*, 2010) in male Swiss mice that tested a commercial formulation of glyphosate (41%) on the skin. Study deficiencies included small number (20) of animals, tested only males, and lack of histopathological examination.

4. A carcinogenicity study in Swiss albino mice (Kumar, 2001)[14]. This study was not included due to the presence of a viral infection within the colony, which confounded the interpretation of the study findings. Malignant lymphomas were reported in this study in all dose groups. However, lymphomas are one of the most common types of spontaneous neoplastic lesions in aging mice (Brayton *et al*., 2012). Murine leukemia viruses (MuLVs) are also a common cause of lymphoma in many different strains of mice (Ward, 2006). For example, Tadesse-Heath *et al*. (2000) reported 50% lymphoma (mostly B-cell origin) incidence in a colony of Swiss mice infected with MuLVs. Although the lymphoma incidences in Kumar (2001) were within or near normal background variation, it is not clear whether or not the viral infection may have contributed to the lymphoma incidence reported or the lower survival seen at the high dose in this study.

---

[13] MRID 00062507.
[14] MRID 49987403. In Greim *et al.* (2015), the same study is cited as Feinchemie Schwebda (2001).

5. A two year feeding study in Sprague-Dawley rats (Excel, 1997) was not included. The agency does not have access to this study to perform an independent assessment of its conduct and; however, Greim *et al*. (2015) stated that the study "is considered unreliable for carcinogenicity evaluation" and there were "several deviations from the OECD Test Guideline 453".

## 4.3    Assessment of Animal Carcinogenicity Studies

The agency considers many factors when interpreting the results of carcinogenicity studies. The 2005 EPA Guidelines for Carcinogen Risk Assessment are intended as a guidance only and does not provide a checklist for determining whether tumor findings are related to treatment. These guidelines emphasize the importance of weighing multiple lines of evidence in reaching conclusions regarding human carcinogenic potential of chemicals.  Evaluation of observed tumor findings takes into consideration both biological and statistical significance.  There are several factors in the 2005 EPA Guidelines for Carcinogen Risk Assessment used in the weight-of-evidence evaluation of individual studies.  For this evaluation, the interpretation of the evidence related to tumor findings is described below.

### *Dose Selection*
Doses should be selected based on relevant toxicological information.  Caution is taken in administering an excessively high dose that would confound the interpretation of the results to humans.  As mentioned above, the 2005 EPA Guidelines for Carcinogen Risk Assessment recommends that the highest dose level selected should elicit signs of toxicity without substantially altering the normal life span due to effects other than tumors; or without inducing inappropriate toxicokinetics (e.g., overwhelming absorption or detoxification mechanisms); however, the high dose is not recommended to exceed 1,000 mg/kg/day (OCSPP 870.4200; OCSPP 870.4300).  Doses should provide relevant dose-response data for evaluating human hazard for human health risk assessment.  In the case of glyphosate, the low (oral) systemic toxicity and limited pharmacokinetic (PK) data for this chemical make it difficult to define a maximum tolerated dose (MTD) for the cancer bioassays.  A large number of the carcinogenicity studies conducted with glyphosate approach or exceed the limit dose.  The 2005 EPA Guidelines for Carcinogen Risk Assessment state that "weighing of the evidence includes addressing not only the likelihood of human carcinogenic effects of the agent but also the conditions under which such effects may be expressed".  As such, the agency puts less weight on observations of increased incidence of tumors that only occur near or above the limit dose.

### *Statistical analyses to evaluate dose response and tumor incidences*
The main aim of statistical evaluation is to determine whether exposure to the test agent is associated with an increase in tumor development, rather than due to chance alone.  Tumors were selected for statistical analyses in the current evaluation if the study report identified tumors as statistically significant and/or have been identified by the reviewer as potentially biologically significant based on the presence of an increasing monotonic dose-response and/or relative increases from concurrent controls.   For toxicological studies submitted to the agency for pesticide registration, including animal carcinogenicity studies, detailed reviews are performed, which summarize study findings and identify effects, such as tumors, for evaluation.

Statistical analyses should be performed on each tumor type separately. The incidence of benign and malignant lesions of the same cell type, usually within a single tissue or organ, are considered separately, but may be combined when scientifically defensible (McConnell *et al.*, 1986). Trend tests and pairwise comparison tests are the recommended tests for determining whether chance, rather than a treatment-related effect, is a plausible explanation for an apparent increase in tumor incidence. The 2005 Guidelines for Carcinogen Risk Assessment states that:

"A trend test such as the Cochran-Armitage test (Snedecor and Cochran, 1967) asks whether the results in all dose groups together increase as dose increases. A pairwise comparison test such as the Fisher exact test (Fisher, 1950) asks whether an incidence in one dose group is increased over that of the control group. By convention, for both tests a statically significant comparison is one for which $p$ is less than 0.05 that the increased incidence is due to chance. Significance in either kind of test is sufficient to reject the hypothesis that chance accounts for the result."

In the current evaluation, animals sacrificed for interim evaluations or died prior to the interim sacrifices were not included in the statistical evaluations to avoid dilution of a potential carcinogenic effect. Additionally, survival was evaluated across dose groups and no significant mortality differences were observed in any of the studies. As a result, there was no need to incorporate survival adjustments into the analyses (e.g., Peto prevalence test). The Cochran-Armitage Test for Trend (Snedecor and Cochran, 1967; one-sided) was used for trend analysis. For pairwise comparisons, the Fisher Exact Test (Fisher, 1950; one-sided) was used to determine if incidences observed in treated groups were different from concurrent controls. Furthermore, the 2005 EPA Guidelines for Carcinogen Risk Assessment state that "considerations of multiple comparisons should also be taken into account". Multiple comparison methods control the familywise error rate, such that the probability of Type I error (incorrect rejection of the null hypothesis or "false positive") for the pairwise comparisons in the family does not exceed the alpha level. In the current evaluation, the Benjamini-Hochberg correction method was used to adjust for multiple comparisons (Benjamini and Hochberg, 1995).

For the current evaluation, statistical significance observed in either test is judged in the context of all of the available evidence. Statistically significant responses may or may not be biologically significant and vice versa (Hsu and Stedeford, 2010; EPA, 2005). If a trend was found to be statistically significant, a closer examination of the tumor incidence was taken to determine whether the data demonstrate a monotonic dose-response where an increase in tumor incidence is expected with corresponding increase in dose. Therefore, statistically significant results with fluctuating tumor incidence across doses are not weighed as heavily as those displaying a monotonic dose-response. If a pair-wise comparison was found to be statistically significant, a closer examination of the tumor incidence and other lines of evidence was taken to determine whether the response was biologically significant. Factors considered in determining the biological relevance of a response are discussed below.

All statistical analyses were reanalyzed for the purposes of this evaluation to ensure consistent methods were applied (M. Perron; 12-DEC-2017; TXR#0057690).

*Historical Control Data*

As indicated in the 2005 EPA Guidelines for Carcinogen Risk Assessment (Section 2.2.2.1.3), the standard for determining statistical significance of tumor incidence comes from a comparison of tumors in dosed animals with those in concurrent control animals. Additional insight into the statistical and/or biological significance of a response can come from the consideration of historical control data (Tarone, 1982; Haseman, 1995; EPA, 2005). Historical control data can add to the analysis, particularly by enabling identification of uncommon tumor types or high spontaneous incidence of a tumor in a given animal strain. Generally speaking, statistically significant increases in tumors should not be discounted simply because incidence rates in the treated groups are within the range of historical controls or because incidence rates in the concurrent controls are somewhat lower than average.

Historical control data are also useful to determine if concurrent control tumor incidences are consistent with previously reported tumor rates (Haseman, 1995). Historical control data available to the agency from the performing laboratory for the same species and strain for a study were considered in the current evaluation. These data were primarily generated within 3 years and in limited cases within 5 years of the study date. Given the large number of age-related tumor outcomes in long-term rodent bioassays, and thus the large number of potential statistical tests run, caution is taken when interpreting results that have marginal statistical significance or in which incidence rates in concurrent controls are unusually low in comparison with historical controls since there may be an artificial inflation of the differences between concurrent controls and treated groups. Consequently, in the current evaluation, unusually low incidence in concurrent controls was noted when applicable and considered as part of the weight-of-evidence for the tumor findings. Identification of common or uncommon situations prompts further thought about the meaning of the response in the current study in context with other observations in animal studies and with other evidence about the carcinogenic potential of the agent.

*Evidence of supporting preneoplastic lesions or related non-neoplastic lesions*

Carcinogenicity rodent studies are designed to examine the production of tumors as well as preneoplastic lesions and other indications of chronic toxicity that may provide evidence of treatment-related effects and insights into the way the test agent produces tumors (EPA, 2005). As such, the presence or lack of supporting preneoplastic or other related non-neoplastic changes were noted in the current evaluation of each study and considered in the weight-of-evidence to aid in the determination of biological significance since these lesions would not be expected for age-related tumors in carcinogenicity with continuous treatment. In the current evaluation, the agency investigated lesions in organs where tumors were observed and demonstrated biological significance based on the presence of an increasing monotonic dose-response and/or relative increases from concurrent controls.

*Additional Considerations*

Other observations can strengthen or lessen the significance of tumor findings in carcinogenicity studies. Such factors include: uncommon tumor types; tumors at multiple sites; tumors in multiple species, strains, or both sexes; progression of lesions from preneoplastic to benign to malignant; reduced latency of neoplastic lesions (i.e., time to tumor); presence of metastases; unusual magnitude of tumor response; and proportion of malignant tumors (EPA, 2005). The

agency considers all of the above factors when determining the significance of tumor findings in animal carcinogenicity studies.

## 4.4    Summary of Animal Carcinogenicity Studies

A total of 8 chronic toxicity/carcinogenicity studies in the rat[15] and 6 carcinogenicity studies in the mouse were considered acceptable and evaluated in the weight-of-evidence analysis for glyphosate.  This includes all of the studies that were part of the 2015 CARC evaluation plus an additional 4 studies identified from the systematic review.  In the 2015 CARC evaluation, for some of the studies considered, the CARC relied on summary data that was provided in the supplement to the Greim *et al*. (2015) review article.  Due to the ongoing data collection effort and the acquiring of studies not previously submitted, the agency no longer needs to rely on the Greim *et al*. (2015) review article for the study data generated in relevant studies, allowing for a more complete and independent analysis.  It should be noted that studies have been cited differently in this evaluation as compared to Greim *et al*. (2015) so these alternative citations have been noted for applicable studies.

The carcinogenicity studies conducted in the rat and mouse that were considered for the analysis are discussed in Sections 4.5 and 4.6, respectively.  In these sections, short study summaries are presented which include information on the study design (including test material, strain of animal used, and doses and route of administration) as well as study findings including effects on survival, general toxicity observed, relevant non-neoplastic lesions, and the incidence and characterization of any tumor findings.  The characterization of the tumor response(s) is based on the considerations previously discussed in Section 4.3 for interpreting the significance of tumor findings in animal carcinogenicity studies.  The rat and mouse carcinogenicity studies are all summarized in Table 4.11 and Table 4.18, respectively.

## 4.5    Rat Carcinogenicity Studies with Glyphosate

### 4.5.1   Lankas, 1981 (MRID 00093879)[16]

In a chronic toxicity/carcinogenicity study, groups of Sprague-Dawley rats (50/sex/dose) were fed diets containing glyphosate (98.7%, pure) at dietary doses of 0, 3/3, 10/11, and 31/34 mg/kg/day (M/F) for 26 months.

There were no treatment-related effects on survival at any dose level.  The highest dose tested of approximately 31 mg/kg/day was not considered a maximum tolerable dose to assess the carcinogenic potential of glyphosate.  Consequently, a second study (Stout and Ruecker, 1990) was conducted at higher doses, which is summarized in the Section 4.5.3.

A statistically significant trend was reported for the testicular interstitial tumors; however, closer examination of the tumor incidence indicates that the data do not demonstrate a monotonic dose response with greater incidence observed at the low-dose as compared at the mid-dose.  The

---

[15] Note: the original draft of this Issue Paper included 9 studies in rats; however, one study (Burnett, 1979) was removed since the study was conducted with a contaminant of glyphosate, not the active ingredient glyphosate.
[16] In Greim *et al.* (2015), the same study is cited as Monsanto (1981).

incidence at the high dose was found to be statistically significant as compared to the concurrent controls (raw and adjusted p-values).

| Table 4.1.  Testicular Interstitial Cell Tumors in Male Sprague-Dawley Rats (Lankas, 1981) Cochran-Armitage Trend Test & Fisher's Exact Test Results. | | | | |
|---|---|---|---|---|
|  | 0 mg/kg/day | 3.05 mg/kg/day | 10.3 mg/kg/day | 31.49 mg/kg/day |
| Incidence | 0/47[a] | 3/49 | 1/47 | 6/50 |
| (%) | (0) | (6) | (2) | (12) |
| Raw p-value = | 0.011** | 0.129 | 0.500 | 0.016* |
| Adjusted p-value = | 0.032* | 0.172 | 0.500 | 0.032* |

Note: Trend test results denoted at control; * denotes significance at p=0.05; ** denotes significance at p=0.01.
a. Number of tumor-bearing animals/Number of animals examined, excluding those that died or were sacrificed prior to study week 52 (interim sacrifice).

The study report provided historical control information for 5 studies of similar duration (24-29 months) run concurrently within 9 months of the termination of the study in the same laboratory. The historical control range for this tumor type was 3.4%-6.7% (mean = 4.5%) when considering all animals. When only considering animals that survived to terminal sacrifice, the historical control range was 6.2%-27.3% (mean = 9.6%).  These data indicate that the incidence of testicular cell tumors in concurrent controls (0%) appears to be unusually low for this tumor type.  Furthermore, the incidence at all doses, including the high dose, was within the historical control range when evaluating animals at terminal sacrifice.  There were no supporting preneoplastic or other related non-neoplastic changes observed.

### 4.5.2   Stout and Ruecker, 1990 (MRID 41643801)[17]

In a chronic toxicity/carcinogenicity study, groups of Sprague-Dawley rats (60/sex/dose) were fed diets containing glyphosate (96.5%, pure) at dietary doses of 0, 89/113, 362/457 or 940/1183 mg/kg/day M/F) for 24 months. The highest dose tested in this study approaches or exceeds the highest dose recommended in the test guidelines on how to conduct carcinogenicity studies (OCSPP 870.4200 and OCSPP 870.4300).  Tumor findings at these high doses are given less weight.

There was no significant increase in mortality.  Three types of tumors were evaluated in this study: pancreatic cell adenomas, hepatocellular adenomas, and thyroid C-cell adenomas in males.  A discussion of each tumor type by organ is presented below:

1. Pancreas: Tumor incidences of pancreatic islet cell tumors in male rats are presented in Tables 4.2.  The incidence of pancreatic islet cell tumors lacked monotonic dose-responses and trend analyses were not statistically significant.  There was also no statistical significance of the pairwise comparisons.  Historical control data were provided for 7 studies conducted in the same laboratory from 1983-1989 (within 1-4 years of when Stout and Ruecker (1990) was performed).  The historical control range for the adenomas was 1.8%-8.3% (mean = 5.3%). These data are presented in Table 4.3 and indicate that the incidence of adenomas in concurrent controls (2%) was at the lower limit

---

[17] In Greim et al. (2015), the same study is cited as Monsanto (1990).

of the historical range.  There were no supporting preneoplastic or other related non-neoplastic changes observed and no evidence of progression from adenomas to carcinomas.

| **Table 4.2.  Pancreatic Islet Cell Tumors in Male Sprague-Dawley Rats (Stout and Ruecker, 1990) Cochran-Armitage Trend Test & Fisher's Exact Test Results.** | | | | |
|---|---|---|---|---|
| Tumor Type | 0 mg/kg/day | 89 mg/kg/day | 362 mg/kg/day | 940 mg/kg/day |
| Adenoma | | | | |
| Incidence | 1/43[a] | 8/45 | 5/49 | 7/48[b] |
| (%) | (2) | (18) | (10) | (15) |
| Raw p-value = | 0.176 | 0.018* | 0.135 | 0.042* |
| Adjusted p-value = | 0.176 | 0.071 | 0.176 | 0.083 |
| Carcinoma | | | | |
| Incidence | 1/43[c] | 0/45 | 0/49 | 0/48 |
| (%) | (2) | (0) | (0) | (0) |
| Raw p-value = | _[d] | _[d] | _[d] | _[d] |
| Adjusted p-value = | _[d] | _[d] | _[d] | _[d] |
| Combined | | | | |
| Incidence | 2/43 | 8/45 | 5/49 | 7/48 |
| (%) | (5) | (18) | (10) | (15) |
| Raw p-value = | 0.242 | 0.052 | 0.275 | 0.108 |
| Adjusted p-value = | 0.275 | 0.209 | 0.275 | 0.215 |

Note: Trend test results denoted at control; * denotes significance at p=0.05.
a.  Number of tumor-bearing animals/Number of animals examined, excluding those that died or were sacrificed prior to study week 55 (interim sacrifice).
b. First adenoma in the study was observed at week 81 in the 940 mg/kg/day group.
c. First carcinoma in the study was observed at week 105 in the controls.
d. Trend p-value not reported since tumor incidence decreased with increasing dose.

| **Table 4.3.  Historical Control Data — Pancreatic Islet Cell Adenomas in Male Sprague- Dawley Rats (MRID No. 41728701).** | | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| Study No. | 1 | 2 | 3 | 4 | 5 | 6 | 7 | Mean |
| Study Year | 07/83 | 02/85 | 10/85 | 6/85 | 9/88 | 1/89 | 3/89 | - |
| Tumor Incidence | 2/68 | 5/59 | 4/69 | 1/57 | 5/60 | 3/60 | 3/59 | - |
| Percentage (%) | 2.9% | 8.5% | 5.8% | 1.8% | 8.3% | 5.0% | 5.1% | 5.3% |

2. Liver: Tumor incidences of liver tumors in male rats are presented in Tables 4.4.  There was a statistically significant dose trend for liver adenomas; however, the trend was not statistically significant with an adjustment for multiple comparisons.  Closer examination of the incidence indicates a relatively flat response at the low- and mid-dose with only an increase observed at the high-dose (940 mg/kg/day); however, the incidence of liver adenomas at the high-dose was not statistically significant when compared to the concurrent controls (raw or adjusted p-values).  Carcinomas and combined adenomas/carcinomas lacked statistical significance in trend and pairwise comparisons (Table 4.4).  Historical control data were provided for 7 studies conducted in the same laboratory from 1983-1989 (within 1-4 years of when Stout and Ruecker (1990) was performed).  The historical control range was 1.4%-18.3% (mean = 9.2%) for the adenomas and 0%-6.7% for carcinomas (mean = 2.6%).  These data are provided in Table 4.5 and indicate that the observed incidences at all dose levels were within the historical control ranges.  Except for a single animal at the mid-dose late in the study (89

weeks), no hyperplasia, preneoplastic foci or other non-neoplastic lesions were observed. Furthermore, there was no evidence of progression from adenomas to carcinomas.

| Table 4.4. Hepatocellular Tumors in Male Sprague-Dawley Rats (Stout and Ruecker, 1990) Cochran-Armitage Trend Test & Fisher's Exact Test Results | | | | |
|---|---|---|---|---|
| Tumor Type | 0 mg/kg/day | 89 mg/kg/day | 362 mg/kg/day | 940 mg/kg/day |
| Adenoma Incidence (%) Raw p-value = Adjusted p-value = | 2/44[a] (5) 0.022* 0.089 | 2/45 (4) 0.700 0.700 | 3/49 (6) 0.551 0.700 | 7/48[b] (15) 0.101 0.202 |
| Carcinoma Incidence (%) Raw p-value = Adjusted p-value = | 3/44 (7) _[d] _[d] | 2/45 (4) _[d] _[d] | 1/49 (2) _[d] _[d] | 2/48[c] (4) _[d] _[d] |
| Combined Incidence (%) Raw p-value = Adjusted p-value = | 5/44 (11) 0.078 0.312 | 4/45 (9) 0.769 0.808 | 4/49 (8) 0.808 0.808 | 9/48 (19) 0.245 0.489 |

Note: Trend test results denoted at control; * denotes significance at p=0.05.
a. Number of tumor-bearing animals/Number of animals examined, excluding those that died or were sacrificed prior to study week 55 (interim sacrifice).
b. First adenoma in the study was observed at week 88 in the 940 mg/kg/day group.
c. First carcinoma in the study was observed at week 85 in the 940 mg/kg/day group.
d. Trend p-value not reported since tumor incidence decreased with increasing dose.

| Table 4.5. Historical Control Data — Hepatocellular Tumors in Male Sprague- Dawley Rats (MRID No. 41728701). | | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| Study No. | 1 | 2 | 3 | 4 | 5 | 6 | 7 | Mean |
| Study Year | 07/83 | 02/85 | 10/85 | 6/85 | 9/88 | 1/89 | 3/89 | - |
| Adenomas | | | | | | | | |
| Tumor Incidence | 5/60 | 11/68 | 1/70 | 3/59 | 11/60 | 5/60 | 4/60 | - |
| Percentage (%) | 8.3% | 16.2% | 1.4% | 5.1% | 18.3% | 8.3% | 6.7% | 9.2% |
| Carcinomas | | | | | | | | |
| Tumor Incidence | 4/60 | 0/68 | 1/70 | 2/59 | 3/60 | 1/60 | 0/60 | - |
| Percentage (%) | 6.7% | 0% | 1.4% | 3.4% | 5% | 1.7% | 0% | 2.6% |

3. Thyroid: Tumor incidences of thyroid tumors in male and female rats are presented in Tables 4.6 and 4.7, respectively. For males, no statistically significant trends were observed for adenomas, carcinomas, or combined adenomas/carcinomas. For females, a statistically significant trend was observed for adenomas and combined adenomas/carcinomas; however, the trend was not statistically significant with adjustment for multiple comparisons. There was no statistical significance in pairwise analyses. Historical control data were provided for 7 studies conducted in the same laboratory from 1983-1989 (within 1-4 years of when Stout and Ruecker (1990) was performed). The historical control range was 3.3%-10% (mean = 6.1%) for the adenomas and 0%-2.9% for carcinomas (mean = 0.9%). These data are provided in Table 4.8.

Page 77 of 216

Non-neoplastic lesions (thyroid C-cell hyperplasia) were observed; however, there was a lack of a monotonic dose-response for these histopathological findings and no dose-related increase in severity to support tumor findings (Table 4.9).  There was also no evidence of progression from adenomas to carcinomas.

**Table 4.6.  Thyroid C-Cell Tumors in Male Sprague-Dawley Rats (Stout and Ruecker, 1990)**
**Cochran-Armitage Trend Test & Fisher's Exact Test Results**

| Tumor Type | 0 mg/kg/day | 89 mg/kg/day | 362 mg/kg/day | 940 mg/kg/day |
|---|---|---|---|---|
| Adenoma | | | | |
| Incidence | 2/54[a, b] | 4/55 | 8/58 | 7/58 |
| (%) | (4) | (7) | (14) | (12) |
| Raw p-value = | 0.079 | 0.348 | 0.060 | 0.099 |
| Adjusted p-value = | 0.132 | 0.348 | 0.132 | 0.132 |
| Carcinoma | | | | |
| Incidence | 0/54 | 2/55[c] | 0/58 | 1/58 |
| (%) | (0) | (4) | (0) | (2) |
| Raw p-value = | 0.457 | 0.252 | 1.000 | 0.518 |
| Adjusted p-value = | 0.518 | 0.518 | 1.000 | 0.518 |
| Combined | | | | |
| Incidence | 2/54 | 6/55 | 8/58 | 8/58 |
| (%) | (4) | (11) | (14) | (14) |
| Raw p-value = | 0.087 | 0.141 | 0.060 | 0.060 |
| Adjusted p-value = | 0.116 | 0.141 | 0.116 | 0.116 |

Note: Trend test results denoted at <u>control</u>.
a.  Number of tumor-bearing animals/Number of animals examined, excluding those that died or were sacrificed prior to study week 55 (interim sacrifice).
b. First adenoma in the study was observed at week 54 in the controls.
c. First carcinoma in the study was observed at week 93 in the 89 mg/kg/day group.

**Table 4.7.  Thyroid C-Cell Tumors in Female Sprague Dawley Rats**
**Cochran-Armitage Trend Test & Fisher's Exact Test Results (Stout and Ruecker, 1990).**

| Tumor Type | 0 mg/kg/day | 113 mg/kg/day | 457 mg/kg/day | 1183 mg/kg/day |
|---|---|---|---|---|
| Adenoma | | | | |
| Incidence | 2/57[a] | 2/60 | 6/59[b] | 6/55 |
| (%) | (4) | (3) | (10) | (11) |
| Raw p-value = | 0.040* | 0.710 | 0.147 | 0.124 |
| Adjusted p-value = | 0.159 | 0.710 | 0.196 | 0.196 |
| Carcinoma | | | | |
| Incidence | 0/57 | 0/60 | 1/59[c] | 0/55 |
| (%) | (0) | (0) | (2) | (0) |
| Raw p-value = | 0.494 | 1.000 | 0.509 | 1.000 |
| Adjusted p-value = | 0.509 | 1.000 | 0.509 | 1.000 |
| Adenoma/Carcinoma | | | | |
| Incidence | 2/57 | 2/60 | 7/59 | 6/55 |
| (%) | (4) | (3) | (12) | (11) |
| Raw p-value = | 0.042* | 0.710 | 0.090 | 0.124 |
| Adjusted p-value = | 0.166 | 0.710 | 0.166 | 0.166 |

Note: Trend test results denoted at <u>control</u>; * denotes significant at p=0.05.
a. Number of tumor-bearing animals/Number of animals examined, excluding those that died or were sacrificed prior to study week 55 (interim sacrifice).
b. First adenoma in the study was observed at week 72 in the controls.
c. First carcinoma in the study was observed at week 93 in the 457 mg/kg/day group.

**Table 4.8.  Historical Control Data — Thyroid C-Cell Tumors in Female Sprague- Dawley Rats (MRID No. 41728701).**

| Study No. | 1 | 2 | 3 | 4 | 5 | 6 | 7 | Mean |
|---|---|---|---|---|---|---|---|---|
| Study Year | 07/83 | 02/85 | 10/85 | 6/85 | 9/88 | 1/89 | 3/89 | - |
| Adenomas | | | | | | | | |
| Tumor Incidence | 2/60 | 3/69 | 7/70 | 3/59 | 5/59 | 5/60 | 2/60 | - |
| Percentage (%) | 3.3% | 4.3% | 10.0% | 5.1% | 8.5% | 8.3% | 3.3% | 6.1% |
| Carcinomas | | | | | | | | |
| Tumor Incidence | 1/60 | 2/69 | 0/70 | 1/59 | 0/59 | 0/60 | 0/60 | - |
| Percentage (%) | 1.7% | 2.9% | 0% | 1.7% | 0% | 0% | 0% | 0.9% |

**Table 4.9. Thyroid Non-Neoplastic Lesions (Stout and Ruecker, 1990)**

| **Males** | | | | |
|---|---|---|---|---|
| Dose | 0 mg/kg/day | 89 mg/kg/day | 362 mg/kg/day | 940 mg/kg/day |
| Total Incidences of thyroid C-cell hyperplasia and severity scores | 5/60 (8%) <br><br> Diffuse (moderate) – 1 <br> Multi-focal (minimal) – 3 <br> Focal (mild) – 1 | 1/60 (2%) <br><br> Focal (mild) – 1 | 6/60 (10%) <br><br> Focal (minimal) – 4 <br> Multi-focal (minimal) – 1 <br> Multi-Focal (mild) – 1 | 5/60 (8%) <br><br> Focal (minimal) – 2 <br> Focal (mild) – 1 <br> Multi-focal (mild) – 1 <br> Multi-focal (moderate) – 1 |
| **Females** | | | | |
| | 0 mg/kg/day | 113 mg/kg/day | 457 mg/kg/day | 1183 mg/kg/day |
| Thyroid C-cell hyperplasia and severity scores | 10/60 (17%) <br><br> Diffuse (moderate) – 1 <br> Focal (mild) – 1 <br> Focal (minimal) – 1 <br> Focal (mild) – 1 <br> Focal (moderate) – 1 <br> Multi-focal (minimal) – 3 <br> Multi-focal (moderate) – 1 <br> Diffuse (moderate) – 1 | 5/60 (8%) <br><br> Focal (mild) – 3 <br> Focal (minimal) – 1 <br> Multi-focal (minimal) – 1 | 9/60 (15%) <br><br> Focal (minimal) – 4 <br> Multi-focal (minimal) – 2 <br> Multi-focal (mild) – 3 | 5/60 (8%) <br><br> Focal (mild) – 1 <br> Focal (minimal) – 1 <br> Multi-focal (mild) – 2 <br> Diffuse (moderate) – 1 |

*Data taken from pages 1071-2114 of the study report.

### 4.5.3   Atkinson *et al.*, 1993a (MRID 49631701)[18]

In a combined chronic toxicity/carcinogenicity study, glyphosate (98.9% pure) was administered to 50 Sprague-Dawley rats/sex/dose in the diet at doses of 0, 11/12, 112/109, 320/347, and 1147/1134 mg/kg/day for 104 weeks (M/F) for 104 weeks.  An additional 35 rats/sex/dose were included for 1-year interim sacrifice.

---

[18] Note: In Greim *et al.* (2015), the same study is cited as Cheminova (1993a).

No adverse effects on survival were seen in either sex across the doses tested. There were no changes in histopathological findings observed. There were no treatment-related increases in tumor incidences in the study.

### 4.5.4   Brammer, 2001 (MRID 49704601)[19]

In a combined chronic toxicity/carcinogenicity study, glyphosate acid (97.6% pure) was administered to groups of Wistar rats in the diet. Groups of 52 rats/sex received diets containing doses of 0, 121/145, 361/437 or 1214/1498 mg/kg/day for 24 months, in males/females, respectively. The highest dose tested in this study exceeds the highest dose recommended in the test guidelines on how to conduct carcinogenicity studies (OCSPP 870.4200 and OCSPP 870.4300).

A statistically significant higher survival (p=0.02) was observed in males at the highest dose tested at the end of 104 weeks relative to concurrent controls, and a statistically significant trend for improved survival was observed in treated males (p=0.03). The inter-current (early) deaths were 37/52, 36/52, 35/52, and 26/52 for the control, low-, mid-, and high-dose groups, respectively. The terminal deaths were 16/52, 17/52, 18/52, and 26/52 for the control, low-, mid- and high-dose groups, respectively. There were no treatment-related non-neoplastic lesions in any organs of either sex at any dose level tested. As shown in Table 4.10, a statistically significant trend in the incidences of liver adenomas was observed in male rats; however, a monotonic dose-response was not observed upon closer examination of the incidence data. Tumor incidences appear to fluctuate with increases observed at the low- and high-dose and no tumors observed in the control and mid-dose. Statistical significance with raw (unadjusted) p-values was observed for the tumor incidence at the high-dose (1214 mg/kg/day) when compared to concurrent controls; however, it was not statistically significant with an adjustment for multiple comparisons (p= 0.055). The improved survival in the high-dose group may help explain a modestly higher incidence of an age-related background tumor like liver adenomas and this corresponds with the lack of associated lesions observed in the study.

| Table 4.10.  Liver Adenomas in Male Wistar Rats (Brammer, 2001) Cochran-Armitage Trend Test and Fisher's Exact Test Results. | | | | |
|---|---|---|---|---|
| | 0 mg/kg/day | 121 mg/kg/day | 361 mg/kg/day | 1214 mg/kg/day |
| Adenoma Incidence (%) | 0/44[a] (0) | 2/48 (4) | 0/48 (0) | 5/49 (10) |
| Raw p-value = | 0.010* | 0.269 | 1.000 | 0.037* |
| Adjusted p-value = | 0.029* | 0.269 | 1.000 | 0.055 |

Note: Trend test results denoted at <u>control</u>; * denotes significance at p=0.05; ** denotes significance at p=0.01
a. Number of tumor-bearing animals/Number of animals examined, excluding those that died or were sacrificed prior to study week 52 (interim sacrifice).

### 4.5.5   Pavkov and Wyand 1987 (MRIDs 40214007, 41209905, 41209907)

Glyphosate trimesium salt (sulfosate, 56.2% pure) was tested in a 2-year chronic feeding/carcinogenicity study in male and female Sprague-Dawley (Crl:CD[SD]BR) rats. Sixty

---

[19] Note: In Greim *et al.* (2015), the same study is cited as Syngenta (2001).

animals/sex were tested in control group 1 (basal diet, no vehicle), 80/sex were tested in control group 2 (basal diet plus propylene g1ycol at 1% w/w vehicle) and in the low and mid-dose groups, and 90/sex were tested in the high dose group.  The following dose levels were tested: 0, 4.2/5.4, 21.2/27 or 41.8/55.7 mg/kg/day in males and females respectively.

Treatment had no effect on survival.  There were no changes in histopathological findings observed.  There were no treatment-related increases in tumor incidences in the study.

### 4.5.6    Suresh, 1996 (MRID 49987401)[20]

In a combined chronic toxicity/carcinogenicity study, glyphosate (96.0-96.8% pure) was administered to groups of Wistar rats in the diet.  Groups of 50 rats/sex/group received diets containing 0, 6.3/8.6, 59.4/88.5, and 595.2/886 mg/kg/day glyphosate for 24 months in males and females respectively.  The highest dose tested in females in this study approaches the highest dose recommended in the test guidelines on how to conduct carcinogenicity studies (OCSPP 870.4200 and OCSPP 870.4300).

No adverse effects on survival were observed in either sex across the doses tested.  There were no changes in histopathological findings observed.  There were no treatment-related increases in tumor incidence observed in the study.

### 4.5.7    Enemoto, 1997 (MRID 50017103-50017105)[21]

In a combined chronic toxicity and carcinogenicity study, groups of 50 Sprague-Dawley rats/sex/group received daily dietary doses of 0, 104/115, 354/393 and 1127/1247 mg/kg bw/day glyphosate for males and females, respectively.  In addition, 10 rats/sex/group were included for interim sacrifices at 26, 52, and 78 weeks.  The highest dose tested in this study exceeds the highest dose recommended in the test guidelines on how to conduct carcinogenicity studies (OCSPP 870.4200 and OCSPP 870.4300).

There were no changes in mortality at any of the doses tested.  There were no changes in histopathological findings observed.  There were no treatment-related increases in tumor incidence observed in the study.

### 4.5.8    Wood *et al.*, 2009a (MRID 49957404)[22]

In a combined chronic toxicity/carcinogenicity study, glyphosate (95.7% pure) was administered to groups of Wistar rats in the diet. Groups of 51 rats/sex/group received diets containing 0, 95.0, 316.9, and 1229.7 mg/kg/day glyphosate for males and female, respectively.  The highest dose tested in this study exceeds the highest dose recommended in the test guidelines on how to conduct carcinogenicity studies (OCSPP 870.4200 and OCSPP 870.4300).

---

[20] Note: In Greim *et al.* (2015), the study is cited as Feinchemie Schwebda (1996).

[21] Note: In Greim *et al.* (2015), the same study is cited as Arysta Life Sciences (1997b).

[22] Note: In Greim *et al.* (2015), the same study is cited as NuFarm (2009b).

No adverse effects on survival were seen in either sex across the doses tested.  There were no treatment-related preneoplastic or related non-neoplastic lesions in either sex at any dose level.

In female rats, mammary gland tumors were noted.  Tumor incidences for mammary gland adenomas, adenocarcinomas, and combined adenomas/adenocarcinomas in female mice are presented in Table 4.11.  Statistically significant trends were observed for the adenocarcinoma and combined analyses; however, statistical significance was only seen for the combined analyses following adjustment for multiple comparisons.  There was no statistical significance observed in pairwise comparisons.

| Table 4.11 Mammary Gland Tumor Incidences in Female Rats (Wood *et al.*, 2009a) Fisher's Exact Test and Cochran-Armitage Trend Test Results | | | | |
|---|---|---|---|---|
| Tumor Type | 0 mg/kg/day | 95.0 mg/kg/day | 316.9 mg/kg/day | 1229.7 mg/kg/day |
| Adenoma Incidence (%) Raw p-value = Adjusted p-value = | 0/48[a] (0) 0.062 0.124 | 0/51 (0) 1.000 1.000 | 0/50 (0) 1.000 1.000 | 2/50 (4) 0.258 0.258 |
| Adenocarcinoma Incidence (%) Raw p-value = Adjusted p-value = | 2/48 (4) 0.043* 0.172 | 3/51 (6) 0.529 0.705 | 1/50 (2) 0.886 0.886 | 6/50 (12) 0.148 0.296 |
| Combined Incidence (%) Raw p-value = Adjusted p-value = | 2/48 (4) 0.007** 0.028* | 3/51 (6) 0.529 0.705 | 1/50 (2) 0.886 0.886 | 8/50 (16) 0.053 0.105 |

Note: Trend test results denoted at <u>control</u>; * denotes significance at p=0.05; ** denotes significant at p=0.01.
a. Number of tumor-bearing animals/Number of animals examined, excluding those that died or were sacrificed prior to study week 52 (interim sacrifice).

### 4.5.9   Summary of Rat Data

In 4 of the 8 rat studies conducted with glyphosate, no tumors were identified for evaluation.  Of the remaining 4 rat studies, a statistically significant trend was observed for tumor incidences in the testes, liver, or mammary gland following adjustment for multiple comparisons.  A statistically significant pairwise comparison was only observed following adjustment for multiple comparisons for testicular tumors at the highest dose tested (31 mg/kg/day) in one individual study.  In some cases, the tumor incidence across doses did not demonstrate a monotonic dose response.  There was no evidence of corroborating pre-neoplastic or related non-neoplastic lesions or evidence of tumor progression (progression from pre-neoplastic to malignancy) to support biological significance of tumor findings.  In a limited number of cases, the agency considered historical control data to inform the relevance of a tumor increase, which indicated concurrent controls were unusually low or the observed incidences were within the historical control range in most instances.

| Table 4.12. Summary of Rat Carcinogenicity Studies | | | |
|---|---|---|---|
| **Study** | **Dose Range** | **Pre-Neoplastic or Related Non-Neoplastic Lesions** | **Tumors Incidences, Statistical Significance, and Related Comments** |
| **Lankas (1981)**<br><br>Sprague-Dawley rats | 98.7% Technical in diet<br>0, 3/3, 10/11, and 31/34 mg/kg/day [M/F] | None observed | Statistically significant trend observed for testicular interstitial cell tumors; however, did not observe monotonic dose-response with higher incidence at low-dose than mid-dose.  Incidences were 0/47 in controls, 3/49 at low-dose, 1/47 at mid-dose, and 6/50 at high-dose.  Increased incidence at high-dose statistically significant, but unusually low control incidence (based on terminal sacrifice historical control data in study report) inflated increase at high-dose. |
| **Stout and Ruecker (1990)**<br><br>Sprague-Dawley rats | 96.5% Technical in diet<br>0, 89/113, 362/457 and 940/1183 mg/kg/day [M/F] for 24 months | None observed | Pancreatic tumors lacked statistically significant trend.  Tumor incidence for pancreatic adenomas in males were 1/43 in controls, 8/45 at the low-dose, 5/49 at the mid-dose, and 7/48 at the high-dose.  Concurrent control incidence for this tumor type was at the lower bound of the historical control range for performing laboratory. Negative trend observed for carcinomas.  Combined adenoma/carcinoma incidence similar except low-dose was 2/43.  No statistically significant pairwise comparisons, including the highest dose tested which is approaching/exceeding 1,000 mg/kg/day.<br><br>No statistically significant trends or pairwise comparisons for hepatocellular tumors following adjustment for multiple comparisons.  Negative trend observed for carcinomas.  The highest dose tested approached/exceeded 1,000 mg/kg/day.  All incidences within historical control range for performing laboratory.<br><br>No statistically significant trend for thyroid C-cell tumors in males.  For females, statistically significant trend for combined adenomas/carcinomas following adjustment for multiple comparisons.  Incidences for combined adenomas/carcinomas were 2/57 in controls, 2/60 at the low-dose, 7/59 at the mid-dose, and 6/55 at the high-dose.  No statistically significant pairwise comparisons, including the highest dose tested which is approaching/exceeding 1,000 mg/kg/day. |
| **Atkinson *et al.* (1993a)**<br><br>Sprague-Dawley rats | 98.9% Technical in diet<br>0, 11/12, 112/109, 320/347, and 1147/1134 mg/kg/day for 104 weeks (M/F) | None observed | There were no tumors identified for evaluation, including the highest dose tested which exceeded 1,000 mg/kg/day. |

| Table 4.12. Summary of Rat Carcinogenicity Studies | | | |
|---|---|---|---|
| **Study** | **Dose Range** | **Pre-Neoplastic or Related Non-Neoplastic Lesions** | **Tumors Incidences, Statistical Significance, and Related Comments** |
| **Brammer (2001)**<br><br>Wistar rats | 97.6% Technical in diet<br>0, 121/145, 361/437 and 1214/1498 mg/kg/day [M/F] | None observed | Statistically significant trend in liver adenomas in males. Non-monotonic dose-response with incidences at 0/44 in controls, 2/48 at the low-dose, 0/48 at the mid-dose, and 5/49 at the high-dose. No statistically significant pairwise comparisons following adjustment for multiple comparisons, including the highest dose tested which exceeded 1,000 mg/kg/day. |
| **Pavkov and Wyand (1987)**<br><br>Sprague-Dawley rats | 56.2% Technical (Trimesium salt; Sulfosate)<br>0, 4.2/5.4, 21.2/27 and 41.8/55.7 mg/kg/day [M/F] | None observed | There were no tumors identified for evaluation. |
| **Suresh (1996)**<br><br>Wistar rats | 96.0-96.8% Technical in diet<br>0, 6.3/8.6, 59.4/88.5, and 595.2/886 mg/kg/day [M/F] | None observed | There were no tumors identified for evaluation, including the highest dose tested which exceeded 1,000 mg/kg/day. |
| **Enemoto (1997)**<br><br>Sprague-Dawley rats | 94.61-97.56% Technical in diet<br>0, 104/115, 354/393 and 1127/1247 mg/kg/day [M/F] | None observed | There were no tumors identified for evaluation, including the highest dose tested which exceeded 1,000 mg/kg/day. |
| **Wood *et al.* (2009a)**<br><br>Wistar rats | 95.7% Technical in diet<br>0, 86/105, 285/349 or 1077/1382 mg/kg/day [M/F] | None observed | Statistically significant trends were observed for the combined mammary gland adenoma/adenocarcinoma analyses following adjustment for multiple comparisons. Incidences were 2/48 in controls, 3/51 at the low-dose, 1/50 at the mid-dose, and 8/50 at the high-dose. No statistically significant pairwise comparisons, including the highest dose tested which exceed 1,000 mg/kg/day. |

### 4.6    Mouse Carcinogenicity Studies with Glyphosate

#### 4.6.1    Reyna and Gordon, 1973 (MRID 00061113)

In an 18-month carcinogenicity study, groups of 50 Swiss white mice/sex/dose were fed glyphosate at dietary levels of approximately 17 mg/kg/day and 50 mg/kg/day. There was no effect on survival at any of the doses tested. There were no changes in histopathological findings observed. There were no treatment-related increases in tumor incidence observed in the study. Although only ten mice/sex/dose were examined for histopathological changes, there were no statistically significant increases in tumors observed in the study; therefore, this deficiency would not impact the overall conclusion regarding tumor findings.

#### 4.6.2    Knezevich and Hogan, 1983 (MRID 00130406)[23]

Groups of 50 male and female CD-1 mice received glyphosate (99.78%, pure) at dietary doses of 0, 161/195, 835/968, 4945/6069 mg/kg/day for males and females, respectively for 24 months. The highest dose tested in this study far exceeds the highest dose recommended in the test guidelines on how to conduct carcinogenicity studies (OCSPP 870.4200 and OCSPP 870.4300). Furthermore, the mid-dose tested in this study was approaching 1,000 mg/kg/day. Tumor findings at these high doses are given less weight. No effect on survival was observed. A low incidence of renal tubule adenomas, which are considered rare, were noted in males. The incidences of renal tubule adenomas following initial evaluation of the study were reported as follows: 0/49 in the controls; 0/49 at the low-dose; 1/50 at the mid-dose; and 3/50 at the high dose (TXR# 0004370). In 1985, the registrant directed a re-evaluation of the original renal sections by a consulting pathologist. This re-evaluation identified a small renal tubule adenoma in one control male mouse, which was not diagnosed as such in the original pathology report. In 1986, at the request of the agency, additional renal sections (3 sections/kidney/mouse spaced at 150 micron intervals) were evaluated in all control and all glyphosate-treated male mice in order to determine if additional tumors were present. The additional pathological and statistical evaluations concluded that the renal tumors in male mice were not compound-related.

Subsequently, the agency requested a Pathology Work Group (PWG) evaluate the kidney sections. The PWG examined all sections of the kidney, including the additional renal sections, and were blinded to treatment group. The renal tubular-cell lesions diagnosed by the PWG are presented below in Table 4.13 with results from statistical analyses. The PWG noted that because differentiation between tubular-cell adenoma and tubular-cell carcinoma is not always clearly apparent and because both lesions are derived from the same cell type, it is appropriate to combine the incidences from these two tumor types for purposes of evaluation and statistical analysis. The PWG unanimously concluded that these lesions are not compound-related based on the following considerations: 1) renal tubular cell tumors are spontaneous lesions for which there is a paucity of historical control data for this mouse stock; 2) there was no statistical significance in a pairwise comparison of treated groups with the concurrent controls and there was no evidence of a statistically significant linear trend; 3) multiple renal tumors were not found in any

---

[23] Note: In Greim *et al.* (2015), the same study is cited as Monsanto (1983).

animal; and 4) compound-related nephrotoxic lesions, including pre-neoplastic changes, were not present in male mice in this study (TXR# 0005590).

| Table 4.13.  Renal Tubular Cell Tumors in Male CD-1 Mice (Knezevich and Hogan, 1983) Cochran-Armitage Trend Test & Fisher's Exact Test Results. | | | | |
|---|---|---|---|---|
| Tumor Type | 0 mg/kg/day | 161 mg/kg/day | 835 mg/kg/day | 4945 mg/kg/day |
| Adenoma Incidence (%) Raw p-value = Adjusted p-value = | 1/49 (2) 0.442 1.000 | 0/49 (0) 1.000 1.000 | 0/50 (0) 1.000 1.000 | 1/50 (2) 0.758 1.000 |
| Carcinoma Incidence (%) Raw p-value = Adjusted p-value = | 0/49 (0) 0.063 0.190 | 0/49 (0) 1.000 1.000 | 1/50 (2) 0.505 0.505 | 2/50 (4) 0.253 0.379 |
| Combined Incidence (%) Raw p-value = Adjusted p-value = | 1/49 (2) 0.065 0.259 | 0/49 (0) 1.000 1.000 | 1/50 (2) 0.758 1.000 | 3/50 (6) 0.316 0.633 |

Note: Trend test results denoted at <u>control</u>.

Historical control data from 14 studies conducted between 1977 and 1981 (within <1 to 3 years of when Knezevich and Hogan (1983) was performed) at the performing laboratory (Table 4.14) indicated that the mouse renal tubular adenomas ranged from 0 to 3.3% and the incidence in the current study was within the historical control range (TXR# 0007252).

| Table 4.14. Historical Control Data- Kidney tumors in CD-1 Mice (TXR #0007252). | | | | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Study Period | 6/78 - 7/80 | | 12/77- 4/80 | | 12/77- 3/80 | | 10/78- 4/81 | | 11/78- 4/81 | | 11/77- 4/80 | | 10/77- 4/80 | |
| No. Examined | 57 | 54 | 61 | 51 | 53 | 59 | 60 | 60 | 60 | 60 | 60 | 60 | 60 | 60 |
| Tubular Adenoma | 0 | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 2 | 0 | 0 | 0 | 0 |

Histopathological examinations noted chronic interstitial nephritis and tubular epithelial changes (basophilia and hypertrophy) in the kidneys of male rats in the study (Table 4.15). The increased incidence of chronic interstitial nephritis in males lacked a dose-response. The incidence in controls of bilateral interstitial nephritis was higher than low-dose group and approximately the same as the mid-dose group. Unilateral chronic interstitial nephritis was only seen in 1 animal in the low- and high-dose groups. Furthermore, chronic interstitial nephritis is not considered to be a precursor lesion for tubular neoplasms. A monotonic dose-response was not observed for the epithelial basophilia and hypertrophy, such that the incidence fluctuated with dose and the lowest incidence was observed at the highest dose tested. There was no increase in supporting preneoplastic or related non-neoplastic renal tubular lesions (e.g., tubular epithelial necrosis/regeneration, hyperplasia) observed in male mice.

| Table 4.15. Kidney Histopathological Alterations in Male CD-1 Mice (Knezevich and Hogan, 1983) | | | | |
|---|---|---|---|---|
| **Males** | | | | |
| Dose | 0 mg/kg/day | 161 mg/kg/day | 835 mg/kg/day | 4945 mg/kg/day |
| Bilateral Chronic Interstitial Nephritis | 5/49 (10%) | 1/49 (2%) | 7/50 (14%) | 11/50 (22%) |
| Unilateral Chronic Interstitial Nephritis | 0/49 (0%) | 1/49 (2%) | 0/49 (0%) | 1/50 (2%) |
| Proximal Tubule Epithelial Basophilia and Hypertrophy | 15/49 (31%) | 10/49 (20%) | 15/50 (30%) | 7/50 (14%) |

*Data taken from page 305 and 306, and the study pathology report; incidences were moderate diffuse

### 4.6.3    Atkinson, 1993b (MRID 49631702)[24]

In a carcinogenicity study, glyphosate (>97% pure) was administered to groups of 50 CD-1 mice/sex/dose in the diet for 104 weeks at doses of 0, 98/102, 297/298, 988/1000 mg/kg/day for males and females, respectively.  No interim sacrifices were performed.

There was no effect on survival in the study.  There were no preneoplastic lesions or related non-neoplastic lesions observed.  As shown in Table 4.16, hemangiosarcomas were found in 4/45 (9%) of high-dose male mice (1000 mg/kg/day) compared to none in the concurrent controls or other treated groups.  Hemangiosarcomas are commonly observed in mice (generally more common in males for CD-1 strain) as both spontaneous and treatment-related tumors arising from endothelial cells.  As vascular tumors, they can occur at different sites, with liver and spleen tending to be the most common sites in mice.  In the high-dose mice with hemangiosarcomas, one had the tumors present in the liver and spleen, one had the tumor present in the liver only, one had the tumors present in the liver, spleen, and prostate, and one had the tumor present in the spleen only.  A statistically significant trend was observed.  Closer examination of the incidence indicates a relatively flat response at the low- and mid-dose with only an increase observed at the high-dose; however, the incidence of hemangiosarcomas at the high-dose was not statistically significant when compared to the concurrent controls.

| Table 4.16.  Hemangiosarcomas in Male CD-1 Mice (Atkinson, 1993b) Cochran-Armitage Trend Test and Fisher's Exact Test Results. | | | | |
|---|---|---|---|---|
| Dose (mg/kg/day) | 0 | 100 | 300 | 1000 |
| Hemangiosarcoma Incidence (%) Raw p-value = Adjusted p-value = | 0/47[a] (0) 0.003** 0.006** | 0/46 (0) 1.000 1.000 | 0/50 (0) 1.000 1.000 | 4/45 (9) 0.053 0.053 |

Note: Trend test results denoted at <u>control</u>; * denotes significance at p=0.05; ** denotes significance at p=0.01
a= Number of tumor bearing animals/Number of animals examined, excluding those that died before week 52.

---

[24] Note: In Greim *et al.* (2015), the same study is cited as Cheminova (1993b).

### 4.6.4   Wood *et al.*, 2009b (MRID 49957402)[25]

In a feeding study, CD-1 mice (50/sex/dose) received glyphosate (95.7%) for 80 weeks at dietary dose levels of 0, 71.4/97.9, 234.2/299.5, or 810/1081.2 mg/kg/day for males and females, respectively. The highest dose tested in this study approaches or exceeds the highest dose recommended in the test guidelines on how to conduct carcinogenicity studies (OCSPP 870.4200 and OCSPP 870.4300).

There was no effect on survival in the study. In male mice at the high dose, there were increases in the incidences of lung adenocarcinomas and malignant lymphomas. A discussion of each tumor type is presented below:

1. Lung: Tumor incidence for lung adenomas, adenocarcinomas, and combined adenomas/adenocarcinomas are presented in Table 4.17. A statistically significant trend was only noted for the adenocarcinomas; however, the trend was not statistically significant with adjustment for multiple comparisons. Closer examination of the tumor incidence indicates the dose-response was relatively flat at the low- and mid-dose with only an increase observed at the high-dose and the incidence of lung adenocarcinomas at the high-dose (810 mg/kg/day) was not statistically significant when compared to the concurrent controls. There were no treatment-related preneoplastic or related non-neoplastic lesions observed.

2. Malignant lymphoma: Tumor incidence for malignant lymphoma are also presented in Table 4.18. A statistically significant trend was observed and the incidence at the high-dose (810 mg/kg/day) was statistically significantly elevated as compared to concurrent controls with the raw (unadjusted) p-value; however, with an adjustment for multiple comparisons, the increased incidence at the high-dose was not statistically significant (p= 0.059). Historical control data have been submitted (MRIDs 50464501and 50464601) from the same testing laboratory for 10 studies of similar duration. These data were generated within approximately 5 years of the Wood *et al.* (2009b) study. The historical control range was 0%-32% (mean = 8.7%). All observed incidences of this tumor type were within the historical control range.

---

[25] Note: In Greim et al. (2015), the same study is cited as NuFarm (2009a).

**Table 4.17. Lung Tumors in Male CD-1 Mice (Wood *et al.*, 2009b) Fisher's Exact Test and Cochran-Armitage Trend Test Results.**

| Dose (mg/kg/day) | 0 | 71.4 | 234.2 | 810 |
|---|---|---|---|---|
| Lung Adenoma Incidence (%) Raw p-value = Adjusted p-value = | 9/44 (20) _b _b | 7/46 (15) _b _b | 9/48 (19) _b _b | 4/45 (9) _b _b |
| Lung Adenocarcinoma (%) Raw p-value = Adjusted p-value = | 5/44[a] (11) 0.026* 0.103 | 5/46 (11) 0.659 0.659 | 7/48 (15) 0.443 0.590 | 11/45 (24) 0.091 0.182 |
| Lung Combined Incidence (%) Raw p-value = Adjusted p-value = | 14/44 (32) 0.328 0.706 | 12/46 (26) 0.797 0.797 | 16/48 (33) 0.527 0.706 | 15/45 (33) 0.529 0.706 |

Note: Trend test results denoted at <u>control</u>; * denotes significance at p=0.05;** denotes significance at p=0.01
a= Number of tumor bearing animals/Number of animals examined, excluding those that died before week 52 (interim sacrifice).
b = Trend and pairwise p-values not reported since tumor incidence decreased with increasing dose.

**Table 4.18. Malignant Lymphomas in Male CD-1 Mice (Wood *et al.*, 2009b) Fisher's Exact Test and Cochran-Armitage Trend Test Results.**

| Dose (mg/kg/day) | 0 | 71.4 | 234.2 | 810 |
|---|---|---|---|---|
| Malignant Lymphoma Incidence (%) Raw p-value = Adjusted p-value = | 0/44 (0) 0.006** 0.025* | 1/46 (2) 0.511 0.511 | 2/48 (4) 0.269 0.359 | 5/45 (11) 0.029* 0.059 |

Note: Trend test results denoted at <u>control</u>; * denotes significance at p=0.05; ** denotes significance at p=0.01
a= Number of tumor bearing animals/Number of animals examined, excluding those that died before week 52 (interim sacrifice).

### 4.6.5   Sugimoto, 1997 (MRID 50017108 - 50017109)[26]

In a carcinogenicity study, glyphosate (purity 97.56 and 94.61%; two lots) was administered to groups of 50 male and 50 female Specific-Pathogen-Free (SPF) ICR (Crj: CD-1) mice/dose in the diet at dose levels of 0, 165/153.2, 838.1/786.8, or 4348/4116 mg/kg/day for males and females, respectively, for 18 months.  The highest dose tested in this study far exceeds the highest dose recommended in the test guidelines on how to conduct carcinogenicity studies (OCSPP 870.4200 and OCSPP 870.4300).  Furthermore, the mid-dose tested in this study was approaching 1,000 mg/kg/day.  Tumor findings at these high doses are given less weight.

---

[26]Note:  In Greim et al. (2015), the same study is cited as Arysta Life Sciences (1997b)

There were no treatment-related effects on mortality or survival. There were no changes in histopathological findings observed.

Hemangiomas in female mice were found to occur at different sites. The tumor incidences are presented in Table 4.19. A statistically significant trend was observed. Tumor incidence at the high-dose, which was approximately 4 times the recommended high-dose in test guidelines (4116 mg/kg/day), was statistically significant as compared to concurrent controls.

| Table 4.19.  Hemangioma Incidences (Sugimoto, 1997) Fisher's Exact Test and Cochran-Armitage Trend Test Results | | | | |
|---|---|---|---|---|
| Tumor Type | 0 mg/kg/day | 153.2 mg/kg/day | 786.8 mg/kg/day | 4116 mg/kg/day |
| Hemangioma Incidence (%) Raw p-value = Adjusted p-value = | 0/48 (0) 0.002** 0.005** | 0/47 (0) 1.000 1.000 | 2/45 (4) 0.231 0.231 | 5/45 (11) 0.024* 0.035* |

Note: Trend test results denoted at <u>control</u>; * denotes significance at p=0.05; ** denotes significance at p=0.01.
  a= Number of tumor bearing animals/Number of animals examined, excluding those that died before week 52 (interim sacrifice).

### 4.6.6   Pavkov and Turnier, 1987 (MRIDs 40214006, 41209907)

Glyphosate trimesium salt (sulfosate, 56.2% pure) was tested in a 2-year chronic feeding/carcinogenicity study in male and female CD-1 mice. Sixty animals/sex were tested in control group 1 (basal diet, no vehicle), 80/sex were tested in control group 2 (basal diet plus propylene glycol at 1% w/w vehicle) and in the low- and mid-dose groups, and 90/sex were tested in the high-dose group. The following dose levels were tested:  0, 11.7/16, 118/159, and 991/1341 mg/kg/day for males and females, respectively.

No adverse effects on survival were seen in either sex across the doses tested. There were no changes in histopathological findings observed. There were no treatment-related increases in tumor incidence observed in the study.

### 4.6.7   Summary of Mouse Data

No tumors were identified for evaluation in 2 of the 6 mouse carcinogenicity studies. In the remaining 4 mouse studies, 3 observed a statistically significant trend in tumor incidences in the hemangiosarcomas, malignant lymphomas, or hemangiomas following adjustment for multiple comparisons. In one individual study, a statistically significant pairwise comparison was only observed following adjustment for multiple comparisons for hemangiomas at the highest dose tested, which was more than 4X the limit dose. There was no evidence of corroborating pre-neoplastic or related non-neoplastic lesions or evidence of tumor progression (progression from pre-neoplastic to malignancy) to support biological significance of tumor findings. In a limited number of cases, historical control data were available which the observed tumor incidences were within the historical control range.

| Table 4.20. Summary of Mouse Carcinogenicity Studies | | | |
|---|---|---|---|
| **Study** | **Dose Range** | **Pre-Neoplastic or Related Non-Neoplastic Lesions** | **Tumors Incidences, Statistical Significance, and Related Comments** |
| **Reyna and Gordon (1973)**<br><br>Swiss white mice | 0, 17 or 50 mg/kg/day for 18 months | None observed | There were no tumors identified for evaluation. |
| **Knezevich and Hogan (1983)**<br><br>CD-1 mice | 99.78% Technical in diet<br>0, 161/195, 835/968, 4945/6069 mg/kg/day for [M/F] for 24 months. | Chronic interstitial nephritis lacked dose-response and not considered relevant to renal tumors.  Tubular epithelial changes in kidney were approximately the same in controls, low- and mid-doses and then decreased at high-dose. | No statistical significance in trend or pairwise comparisons, including the mid- and high-doses which approached or exceeded 1,000 mg/kg/day.  Incidence of adenomas within historical control range for performing laboratory. |
| **Atkinson *et al.* (1993b).**<br><br>CD-1 mice | 97.5 - 100.2% Technical in diet<br>0, 98/102, 297/298, 988/1000 mg/kg/day for 104 weeks (M/F) | None observed | Statistically significant trend for hemangiosarcomas that were only observed in 4/45 (9%) high-dose male mice.  Increased incidence was not statistically significant from the concurrent controls at all doses, including the highest dose tested which is approximately 1,000 mg/kg/day. |
| **Wood *et al.* (2009b)**<br><br>CD-1 mice | 95.7% Technical in diet<br>0, 71.4/97.9, 234.2/299.5, or 810/1081.2 mg/kg/day [M/F] for 80 weeks | None observed | No statistically significance in trend or pairwise comparisons following adjustment for multiple comparisons.  Negative trend observed for adenomas.<br><br>Statistically significant trend for malignant lymphoma with incidences of 0/44 in controls, 1/46 at the low-dose, 2/48 at the mid-dose, and 5/45 at the high-dose.  No statistically significant pairwise results following adjustment for multiple comparisons, including the highest dose tested which was approaching 1,000 mg/kg/day.  All observed incidences within historical control range for performing laboratory. |

| Table 4.20. Summary of Mouse Carcinogenicity Studies | | | |
|---|---|---|---|
| **Study** | **Dose Range** | **Pre-Neoplastic or Related Non-Neoplastic Lesions** | **Tumors Incidences, Statistical Significance, and Related Comments** |
| **Sugimoto (1997)**<br><br>CD-1 mice | 94.61 – 97.56% Technical in diet 0, 165/153.2, 838.1/786.8, or 4348/4116 mg/kg/day [M/F] for 18 months | None observed | Statistically significant trend for hemangiomas in female mice following adjustment for multiple comparisons with incidences of 0/48 in controls, 0/47 at the low-dose, 2/45 at the mid-dose, and 5/45 at the high-dose. Increased incidence at high-dose statistically significant following adjustment for multiple comparisons.  Highest dose tested was more than 4X the limit dose. |
| **Pavkov and Turnier (1987)**<br><br>CD-1 mice | 56.2% Technical (Trimesium salt; Sulfosate) 0, 11.7/16, 118/159, and 991/1341 mg/kg/day [M/F] for 24 months. | None observed | There were no tumors identified for evaluation, including the highest dose tested which approached/exceeded 1,000 mg/kg/day. |

**4.7 Absorption, Distribution, Metabolism, Excretion (ADME)**

The 2005 EPA Guidelines for Carcinogen Risk Assessment also permit analysis of other key data that may provide valuable insights into the likelihood of human cancer risk from exposure to a chemical, such as information regarding the absorption, distribution, metabolism, and excretion (ADME) of a test chemical. EPA's Harmonized Test Guidelines for pesticides include a series of studies for characterizing a chemical's metabolism and pharmacokinetics. As described in the test guideline (OCSPP 870.7485), testing of the disposition of a test substance is designed to obtain adequate information on its: absorption, distribution, biotransformation (metabolism), and excretion, which can all collectively aid in understanding the chemical's mechanism of toxicity. Basic pharmacokinetic/toxicokinetic parameters determined from these studies can also provide information on the potential for accumulation of the test substance in tissues and/or organs and the potential for induction of biotransformation as a result of exposure to the test substance. These data can be used to assess the adequacy and relevance of the extrapolation of animal toxicity data (particularly chronic toxicity and/or carcinogenicity data) to estimate human risk.

Oral exposure is considered the primary route of concern for glyphosate. The maximum absorption from the GI tract for glyphosate was estimated to be ~30% with one study showing up to 40% based upon radiolabel detected in the urine. In general, the amounts of glyphosate detected in tissues were negligible indicating low tissue retention following dosing. Parent glyphosate is the principal form excreted in urine and feces. The primary route of excretion following oral administration of glyphosate is the feces, as verified by the intravenous dosing and bile cannulation experiments. Within the dose ranges tested, elimination was essentially complete by 24 hours indicating that glyphosate does not bioaccumulate.

Multiple studies examined the pharmacokinetics of a single dose of radiolabeled glyphosate ranging from 5.6 – 400 mg/kg. Across these studies, time to reach peak plasma concentrations ($T_{max}$) appeared to increase with increasing dose; however, the reported range of $T_{max}$ (1-5.5 hours) suggests only a slight shift in absorption kinetics occurs despite large increases in dose. In the one study that tested two doses (NTP, 1992), data graphically show that peak blood levels were only roughly 3-fold with a 10-fold increase between the two doses. Reported area under the curve (AUC) values indicated conflicting results regarding whether linear or non-linear absorption kinetics was occurring at higher doses.

In general, EPA and OECD guideline ADME studies are designed for a different purpose and do not provide the information needed to adequately determine whether linear kinetics is still occurring at high doses of glyphosate. These studies are often limited to one or two doses and do not include time course data. A well-conducted pharmacokinetic study testing multiple doses is needed to conclusively make this determination.

## 4.8     Discussion

Glyphosate has been extensively tested in rodents to evaluate its carcinogenic potential.  A total of 14 rodent carcinogenicity studies were considered to be adequate for this analysis.   Eight studies were conducted in the rat and 6 studies were conducted in the mouse.  When a potential tumor signal was identified in a study, the agency considered several factors.  Consistent with the EPA's 2005 Guidelines for Carcinogen Risk Assessment, the agency evaluated the tumor responses for both statistical and biological significance by considering factors such as historical control data; rarity of tumor types; tumors at multiple sites; tumors in multiple species, strains, or both sexes; progression of lesions from preneoplastic to benign to malignant; reduced latency of neoplastic lesions (i.e., time to tumor); presence of metastases; unusual magnitude of tumor response; proportion of malignant tumors; and dose-related increases.  When these factors were considered together, the agency made a determination of whether or not the observed tumor was related to treatment with glyphosate.  A weight of the evidence approach was used to determine the carcinogenic potential of glyphosate in rodents.

In 4 of the 8 rat studies conducted with glyphosate, no tumors were identified for evaluation.  Of the remaining 4 rat studies, tumor incidences were evaluated in detail for testicular, pancreatic, hepatocellular, thyroid C-cell, and mammary gland tumors.  In 2 of the 6 mouse studies, no tumors were identified for evaluation.  In the remaining 4 mouse studies, tumor incidences were evaluated in detail for hemangiosarcomas, malignant lymphoma, hemangiomas, lung, and kidney tumors.  Below are the weight of evidence evaluations for each tumor type.

*Testicular Tumors*
In Table 4.1, a statistically significant trend was observed for testicular interstitial cell tumors (adjusted p-value = 0.032) and pairwise significance was observed at the highest dose tested of 31 mg/kg/day (adjusted p-value = 0.032) in male Sprague-Dawley rats (Lankas, 1981).  Closer examination of the tumor incidence indicated that the data do not demonstrate a monotonic dose response with greater incidence observed at the low-dose as compared at the mid-dose.  There was a lack of preneoplastic or related non-neoplastic lesions to support a treatment-related effect. It was also noted that the incidence of testicular cell tumors in concurrent controls (0%) appears to be unusually low for this tumor type as compared to historical controls from the performing laboratory.  These data also indicated that the incidence at the highest dose tested was outside the historical control range when all animals were considered, but within the terminal historical control range for the performing laboratory.  Testicular interstitial cell tumors are relatively common in Sprague-Dawley rats and this tumor type is difficult to distinguish from simple hyperplasia.  Testicular tumors were not seen in the other 7 rat studies, many of which tested up to or beyond the limit dose (1000 mg/kg/day).  More specifically, of the 4 other studies performed in Sprague-Dawley rats (Stout and Ruecker, 1990; Atkinson *et al.*, 1993a; Pavkov and Wyand, 1987; Enemoto, 1997), 3 were tested at doses 30X higher or more than the highest dose tested in Lankas (1981) and no testicular tumors were observed.  Furthermore, there were no testicular tumors observed in the 6 mouse bioassays.

*Pancreatic Tumors*
In Table 4.2, no statistically significant trends were observed for pancreatic islet cell tumors in male Sprague-Dawley rats (Stout and Ruecker, 1990).  Raw p-values were statistically

significant for adenomas at the low and high dose for pairwise comparisons; however, these were not statistically significant following adjustment for multiple comparisons. Closer examination of the tumor incidence indicated that the data do not demonstrate a monotonic dose response with greater incidence observed at the low-dose as compared at the mid-dose and high-dose. There was a lack of preneoplastic or related non-neoplastic lesions to support a treatment-related effect. Historical control data from the performing laboratory for pancreatic adenomas indicated that the incidence in concurrent controls was at the lower limit of the historical control range. There was no evidence of progression to malignancy. Notably, carcinomas demonstrated a negative trend with decreasing tumor incidence with increasing dose. Pancreatic tumors were not observed in the other 7 rat studies, including 4 other studies performed in Sprague-Dawley rats (Atkinson *et al.*, 1993a; Pavkov and Wyand, 1987; Enemoto, 1997; Lankas, 1981). Furthermore, pancreatic tumors were not observed in the 6 mouse bioassays.

*Hepatocellular Tumors*
Hepatocellular tumors were evaluated in 2 rat carcinogenicity studies (Stout and Ruecker, 1990; Brammer, 2001). In Table 4.4, the raw p-value for trend was statistically significant for adenomas in male Sprague-Dawley rats (Stout and Ruecker, 1990); however, it was not statistically significant following adjustment for multiple comparisons. There were no statistically significant pairwise comparisons. Historical control data from the performing laboratory indicated that the incidence of hepatocellular tumors was within the historical control range at all doses. Closer examination of the tumor incidence indicated that the data fluctuated with no tumors observed in concurrent controls or the mid-dose and increases seen at the low-dose and high-dose. In Table 4.10, a statistically significant trend was observed for adenomas in male Wistar rats (adjusted p-value = 0.029) (Brammer, 2001). For pairwise comparisons, the raw p-value was statistically significant at the highest dose tested (1214 mg/kg/day); however, it was not statistically significant following adjustment for multiple comparisons. There was a lack of preneoplastic or related non-neoplastic lesions to support a treatment-related effect in both studies. There was no evidence of progression to malignancy. In particular, carcinomas demonstrated a negative trend with decreasing tumor incidence with increasing dose. Hepatocellular tumors were not observed in the other 6 rat studies, including 4 other studies in Sprague-Dawley rats (Atkinson *et al.*, 1993a; Pavkov and Wyand, 1987; Enemoto, 1997; Lankas, 1981) and 2 other studies in Wistar rats (Suresh, 1996; Wood *et al.* 2009a) the same rat strains. Furthermore, hepatocellular tumors were not observed in the 6 mouse bioassays.

*Thyroid Tumors*
In Table 4.6, there were no statistically significant trends or pairwise comparisons were observed for thyroid C-cell tumors in male Sprague-Dawley rats (Stout and Ruecker, 1990). In Table 4.7, a statistically significant trend for adenomas and combined adenomas/carcinomas was observed with raw p-values in female Sprague-Dawley rats (Stout and Ruecker, 1990); however, the trends were not statistically significant with adjustment for multiple comparisons. There were no statistically significant pairwise comparisons observed at any dose. There was a lack of preneoplastic or related non-neoplastic lesions to support a treatment-related effect. There was no evidence of progression to malignancy. Thyroid tumors were not observed in the other 7 rat studies, including 4 other studies performed in Sprague-Dawley rats (Atkinson *et al.*, 1993a; Pavkov and Wyand, 1987; Enemoto, 1997; Lankas, 1981). Furthermore, thyroid tumors were not observed in the 6 mouse bioassays.

*Mammary Gland Tumors*

In Table 4.11, raw trend p-values were statistically significant for mammary gland adenocarcinomas and combined adenomas/adenocarcinomas in female Wistar rats (Wood *et al.*, 2009a); however, only the combined p-value for trend remained statistically significant following adjustment for multiple comparison (adjusted p-value = 0.028).  There were no statistically significant pairwise comparisons.  There was a lack of preneoplastic or related non-neoplastic lesions to support a treatment-related effect.  Mammary gland tumors were not observed in the other 7 rat studies, including 2 other studies performed in Wistar rats (Brammer, 2001; Suresh, 1996).  Furthermore, mammary gland tumors were not observed in the 6 mouse bioassays.

*Kidney Tumors*

In Table 4.13, there were no statistically significant trend observed for renal tubular cell tumors in male CD-1 mice (Knezevich and Hogan, 1983).  This study tested up to almost 5000 mg/kg/day.  Historical control data from the performing laboratory indicated that the incidence of adenomas was within the historical control range.  There was a lack of preneoplastic or related non-neoplastic lesions to support a treatment-related effect.  There was no evidence of progression to malignancy.  Kidney tumors were not observed in the other 5 mouse studies, including 4 other studies performed in CD-1 mice (Atkinson *et al.*, 1993b; Wood *et al.*, 2009b; Sugimoto, 1997; Pavkov and Turnier, 1987).  Furthermore, kidney tumors were not observed in the 8 rat bioassays.

*Hemangiosarcomas*

In Table 4.16, a statistically significant trend was observed for hemangiosarcomas in male CD-1 mice (adjusted p-value = 0.006) (Atkinson *et al.*, 1993b).  There were no statistically significant pairwise comparisons.  There was a lack of preneoplastic or related non-neoplastic lesions to support a treatment-related effect.  There was no evidence of progression to malignancy.  Hemangiosarcomas are commonly observed in mice (generally more common in males for CD-1 strain) as both spontaneous and treatment-related tumors arising from endothelial cells.  Hemangiosarcomas were not observed in the other 5 mouse studies, including 4 other studies performed in CD-1 mice (Knezevich and Hogan, 1983; Wood *et al.*, 2009b; Sugimoto, 1997; Pavkov and Turnier, 1987).  Furthermore, hemangiosarcomas were not observed in the 8 rat bioassays.

*Lung Tumors*

In Table 4.17, the raw p-value for trend was observed for lung adenocarcinomas; however, the trend was not statistically significant following adjustment for multiple comparisons in male CD-1 mice (Wood *et al.*, 2009b).  There were no statistically significant pairwise comparisons.  Tumor incidences at all doses were within the historical control range for the performing laboratory.  There was a lack of preneoplastic or related non-neoplastic lesions to support a treatment-related effect.  Lung tumors were not observed in the other 5 mouse studies, including 4 other studies performed in CD-1 mice (Knezevich and Hogan, 1983; Atkinson *et al.*, 1993b; Sugimoto, 1997; Pavkov and Turnier, 1987).  Furthermore, lung tumors were not observed in the 8 rat bioassays.

*Malignant Lymphoma*
In Table 4.18, statistically significant trend was observed in male CD-1 mice (adjusted p-value = 0.025) (Wood *et al.*, 2009b).  For pairwise comparisons, the raw p-value for the highest dose tested was statistically significant; however, it was not statistically significant following adjustment for multiple comparisons.  Malignant lymphoma was not observed in the other 5 mouse studies, including 4 other studies performed in CD-1 mice (Knezevich and Hogan, 1983; Atkinson *et al.*, 1993b; Sugimoto, 1997; Pavkov and Turnier, 1987).  Furthermore, malignant lymphoma was not observed in the 8 rat bioassays.

*Hemangiomas*
In Table 4.19, a statistically significant trend was observed in female CD-1 mice (adjusted p-value = 0.005) (Sugimoto, 1997).  For pairwise comparisons, the incidence at the highest dose tested was statistically significant (adjusted p-value = 0.035).  The highest dose tested in this study was more than 4X the limit dose.  Hemangiomas were not observed in the other 5 mouse studies, including 4 other studies performed in CD-1 mice (Knezevich and Hogan, 1983; Atkinson *et al.*, 1993b; Wood *et al.*, 2009b; Pavkov and Turnier, 1987).  Furthermore, hemangiomas were not observed in the 8 rat bioassays.


Based on the weight-of-evidence evaluations, the agency has concluded that none of the tumors evaluated in individual rat and mouse carcinogenicity studies are treatment-related due to lack of pairwise statistical significance, lack of a monotonic dose response, absence of preneoplastic or related non-neoplastic lesions, no evidence of tumor progression, and/or historical control information (when available).  Tumors seen in individual rat and mouse studies were also not reproduced in other studies, including those conducted in the same animal species and strain at similar or higher doses.

## 5.0    Data Evaluation of Genetic Toxicity

## 5.1    Introduction

Genotoxicity is a broad term for any damage to the genetic material, whether the damage is transient or permanent.  Transient damage refers to unintended modifications to the structure of DNA, which may or may not undergo successful repair.  Permanent damage refers to heritable changes in the DNA sequence, known as mutations.  Types of mutations include: 1) changes in single base pairs, partial, single or multiple genes, or chromosomes, 2) breaks in chromosomes that result in transmissible deletion, duplication or rearrangement of chromosome segments, and 3) mitotic recombination (OECD, 2015).  In somatic cells, DNA-reactive chemicals can cause cancer if the mutations occur within regulatory genes that control cell growth, cell division and differentiation, such as proto-oncogenes, tumor suppressor genes and/or DNA damage response genes (OECD, 2015).  Additionally, DNA damage may signal the cell to undergo apoptosis (cell death) rather than cell division and, therefore, the damage is not "fixed" as a mutation and is not passed along to daughter cells.

Evaluation of genotoxicity data entails a weight-of-evidence approach that includes consideration of the various types of genetic damage that can occur. Since no single genotoxicity assay evaluates the many types of genetic alterations that can be induced by a chemical, one must employ a battery of genotoxicity tests to adequately cover all the genetic endpoints important for regulatory decisions.  EPA, like other regulatory agencies, considers genotoxicity information as part of the weight of evidence when assessing the potential of a chemical to induce cancer in humans. Under FIFRA, OPP requires genotoxicity tests of the technical grade active ingredient for the registration of both food and non-food use pesticides.  The current genotoxicity test battery (40 CFR Part 158.500) for pesticide registration consists of:

1)  Bacterial reverse mutation test (typically conducted in bacteria strains *Salmonella typhimurium* and *Escherichia coli*),

2)  *in vitro* mammalian (forward) gene mutation *and in vitro* mammalian chromosomal aberration test, and

3)   *in vivo* test for micronucleus induction (mammalian erythrocyte micronucleus test) *or in vivo* chromosomal aberration test (mammalian bone marrow chromosomal aberration test).

In cases where equivocal or inconsistent results are obtained for the same endpoint in different test systems, additional testing may be required.  Test Guidelines on how to conduct the genotoxicity tests have been published by the agency and have been harmonized with the Organization for Economic Cooperation and Development (OECD, 2015; Cimino 2006).  These guidelines identify specific test species, genetic endpoints, test conditions, exposure durations as well information on how to report data and interpret the results.  The test guidelines provide a level of consistency and predictability for regulatory compliance and regulatory decision making.

**5.2      Scope of the Assessment Considerations for Study Quality Evaluation**

Previous genotoxicity assessments conducted as part of the CARC reviews for glyphosate in 1991 and 2015, considered only studies conducted with glyphosate technical and included only studies that provided adequate characterization of the test material (*i.e.* purity information provided).  In the current analysis, a fit-for-purpose systematic review process was conducted to identify relevant genotoxicity data from regulatory studies and published literature from open sources (published and unpublished) for both glyphosate technical and glyphosate-based formulations. Studies conducted with glyphosate formulations that were identified and considered relevant for genotoxicity evaluation are summarized in table form in Appendix F.  As described in Section 7.0 of this document, glyphosate formulations are hypothesized to be more toxic than glyphosate alone.  The agency is collaborating with NTP to systematically investigate the mechanism(s) of toxicity for glyphosate and glyphosate formulations.  However, the focus of this section is the genotoxic potential of glyphosate technical.

As described previously in Section 2.1.3, the list of studies identified in this process were also cross-referenced with genotoxicity review articles for glyphosate from the open literature [Kier and Kirkland (2013), and Williams *et al.* (2000)], as well as recent international evaluations of glyphosate (IARC 2015, EFSA 2015, JMPR 2016).  The current analysis also includes studies conducted by other registrants that were not previously available to the agency. Sixteen studies for glyphosate technical that were included in Kier and Kirkland (2013) were not available to the agency; therefore, data and study summaries provided in the review articles were relied upon in the current review and are identified in the data tables with a footnote. The Kier and Kirkland (2013) article serves as the original publication for these studies and provided relevant information on study design and conditions as well as summary data.  The data set includes *in vitro* and *in vivo* studies conducted in mammalian systems, with the exception of standard bacterial test strains, which have a long history of detecting chemicals that are mutagenic in humans. Studies conducted in non-mammalian species (e.g. worms, fish, reptiles, plants), were excluded because they were considered to be not relevant for informing genotoxic risk in humans.  Several epidemiological studies that evaluated biomarkers for genotoxicity were not included in this evaluation because these studies were assigned a low quality ranking as described in Section 3.3.

When evaluating the quality of the published and unpublished data for inclusion in the analysis, the agency considered the reporting quality (how well a study was reported), the study design and how well the study was conducted.  Critical elements in study design and interpretation for genotoxicity tests are described in the various EPA and OECD test guidelines.  Elements such as test conditions (e.g. solubility, pH, osmolarity, and cytotoxicity) and study design (e.g. number of test organisms, doses selected, use of positive and negative controls; blinded evaluation) were used to evaluate the quality of published and non-published studies.  In cases where inappropriate testing conditions or study design clearly had an impact on the outcome the study, the study was excluded from the analysis.  For example, early studies by Majeska (1982) were excluded from the analysis since it was clearly demonstrated that altered pH by the test chemical can result in false positive responses in several of *in vitro* genotoxicity tests (Majeska, 1985d,e,f).   In other cases, particularly with the published literature studies, where test conditions and/or study design differed from what is generally considered as acceptable

following in the EPA or OECD guidelines, the differences are noted, but the studies were not excluded from analysis unless the condition made the study unreliable.  Summaries of relevant genotoxicity studies can be found in TXR# 0057499.  Studies that were excluded from the analysis are listed in Appendix G.

The studies evaluating the genetic toxicity of the active ingredient glyphosate are presented in the following sections according to the type of genetic endpoints evaluated:  mutations, chromosomal aberrations and other assays evaluating DNA damage.  *In vitro* and *in vivo* assays are discussed separately according to the genetic endpoint.  For the purpose of this analysis, glyphosate and its salts are considered together when evaluating the genotoxic potential of the active ingredient glyphosate.

### 5.3    Tests for Gene Mutations for Glyphosate Technical

#### 5.3.1    Bacterial Mutagenicity Assays

Bacteria have traditionally been employed as a primary test organism for the detection of chemical mutagens.  The bacterial reverse mutation assay is routinely performed in the test strains of *Salmonella typhimurium* and *Escherichia coli.*  These test strains are mutant strains that are deficient for the synthesis of an essential amino acid.  The assay detects mutations that revert the test strains back to wild type for amino acid synthesis and the revertants are identified by their ability to grow in culture medium deficient of the specific amino acid(s).  This mutagenicity test identifies point mutations, which includes base substitutions and deletions and insertions of up to a few base pairs (OECD 471).  The tests are typically conducted in the presence and absence of an exogenous source of metabolic activation (e.g., S9 microsomal fraction of activated liver homogenates) to identify potential mutagenic metabolites.

Glyphosate has been extensively evaluated for its potential to induce mutations in bacteria.  Most of the studies considered consist of the full battery of bacterial strains (*i.e.* the recommend strains in EPA and OECD Test Guidelines) and were evaluated at appropriate test concentrations (up to cytotoxic or assay limit concentrations).

EPA identified 27 studies that tested glyphosate technical in bacterial mutagenicity assays by means of the standard plate incorporation method or the pre-incubation modification of the standard assay. Glyphosate was negative in the presence and absence of metabolic activation in all the studies.  The results of the bacterial reversion mutation assays evaluating glyphosate technical are presented in Table 5.1

**Table 5.1.** *In vitro* **Test for Gene Mutations in Bacteria: Glyphosate Technical.**

| Test/ Endpoint | Test System | Concentrations | Purity | Results | Reference | Comments |
|---|---|---|---|---|---|---|
| Bacterial Reverse Mutation | *S. typhimurium* TA1535, TA1537, TA98 and TA100 and WP *uvrA* ± S9 | 156-5000 µg/plate | 95.68% | Negative ± S9 | Akanuma (1995) [MRID 50017102] | |
| Bacterial Reverse Mutation | *S. typhimurium* TA535, TA1537, TA98 and TA100 and *E. coli* WP2P and WP2P *uvrA* ± S9 | 100-5000 µg/plate in DMSO | 95.6% glyphosate acid | Negative ± S9 | Callander (1996) [MRID 44320617] | |
| Bacterial Reverse Mutation | *S. typhimurium* TA 1535, TA1537, TA98 and TA100 and *E. coli* WP2P and WP2P *uvrA* ± S9 | 100-5000 µg/plate in water | 60% potassium glyphosate salt | Negative ± S9 | Callander (1999)[1] | |
| Bacterial Reverse Mutation | *S. typhimurium* TA97a, TA98, TA100 and TA102, ± S9 | 25-2000 µg in aqueous solution | Not provided | Negative ± S9 | Chruscielska *et al.* (2000) | |
| Bacterial Reverse Mutation | *S. typhimurium* TA98, TA100, TA1535, TA1537 ± S9 | 10-1000 µg/plate | 98.4% | Negative ± S9 | Flowers and Kier (1978) [MRID 00078620] | |
| Bacterial Reverse Mutation | *S. typhimurium* TA98, TA100, TA102, TA1535, TA1537 ± S9 | 31.6-3160 µg/plate | 98.8% | Negative ± S9 | Flügge (2009a)[1] | |
| Bacterial Reverse Mutation | *S. typhimurium* TA98, TA100, TA102, TA1535, TA1537 ± S9 | 31.6-3160 µg/plate | 96.4% technical | Negative ± S9 | Flügge (2010b)[1] | |

**Table 5.1.  *In vitro* Test for Gene Mutations in Bacteria: Glyphosate Technical.**

| Test/ Endpoint | Test System | Concentrations | Purity | Results | Reference | Comments |
|---|---|---|---|---|---|---|
| Bacterial Reverse Mutation | *S. typhimurium* TA1535, TA1537, TA98 and TA100 | 310-5000 µg/plate (+S9); 160-2500 µg/plate (−S9) | 98.6% | Negative ± S9 | Jensen (1991a) [MRID 49961502] | |
| Bacterial Reverse Mutation | *S. typhimurium* TA98, TA100, TA102, TA1535, TA1537 ± S9 | 1-1000 µg/plate | 98.05% | Negative ± S9 | Miyaji (2008)[1] | |
| Bacterial Reverse Mutation | *S. typhimurium* TA98, TA100, TA1535, TA1537, TA1538 ± S9 | 5000 µg/plate | Not reported | Negative ± S9 | Moriya *et al.* (1983) | |
| Bacterial Reverse Mutation | *S. typhimurium* TA1535, TA97, TA98 and TA100 ± S9 | 33-10,000 µg/plate | 99% | Negative ± S9 | NTP (1992) | Hamster and rat S9 |
| Bacterial Reverse Mutation | *S. typhimurium* TA98, TA100, TA1535 and TA97a ± S9 | 1-5000 µg/plate | 61.27 % Glyphosate isopropyl-amine salt | Negative ± S9 | Ranzani (2000)[1] | |
| Bacterial Reverse Mutation | *S. typhimurium* TA98, TA100, TA102, TA1535, TA1537 ± S9 | 648-5000 µg/plate | 98.01% | Negative ± S9 | Ribeiro do Val (2007) [MRID 50000903] | |
| Bacterial Reverse Mutation | *S. typhimurium* TA98, TA100, TA1535, TA1537 and *E. Coli* WP2 *uvrA* ± S9 | 31.6-5000 µg/plate | 96.0% technical | Negative ± S9 | Schreib (2010)[1] | |

**Table 5.1.  *In vitro* Test for Gene Mutations in Bacteria: Glyphosate Technical.**

| Test/Endpoint | Test System | Concentrations | Purity | Results | Reference | Comments |
|---|---|---|---|---|---|---|
| Bacterial Reverse Mutation | *S. typhimurium* TA1535, TA1537, TA1538, TA98, TA100 and *E. coli* WP2 *hcr* ± S9 | 10-5000 µg/plate | 98.4% | Negative ± S9 | Shirasu *et al.* (1978) [MRID 00078619] | Published in Li & Long, 1988 |
| Bacterial Reverse Mutation | *S. typhimurium* TA98, TA100, TA1535, TA1537 and *E. coli* WP *uvrA* ± S9 | 3-5000 µg/plate (plate-incorporation), 33-5000 µg/plate (pre-incubation test) | 95.1% | Negative ± S9 | Sokolowski (2007a) [MRID 49957406] | |
| Bacterial Reverse Mutation | *S. typhimurium* TA98, TA100, TA1535, TA1537 and *E. coli* WP *uvrA* ± S9 | 3-5000 µg/plate (plate–incorporation) 33 – 5000 µg/plate (pre-incubation test) | 97.7% | Negative ± S9 | Sokolowski (2007b) [MRID 49957407] | |
| Bacterial Reverse Mutation | *S. typhimurium* TA98, TA100, TA1535, TA1537 and *E. coli* WP *uvrA* ± S9 | 3-5000 µg/plate (plate–incorporation) 33-5000 µg/plate (pre-incubation test) | 95.0% | Negative ± S9 | Sokolowski (2007c) [MRID 49957408] | |
| Bacterial Reverse Mutation | *S. typhimurium* TA98, TA100, TA1535, TA1537 and *E. coli* WP *uvrA* ± S9 | 3-5000 µg/plate | 96.66% technical | Negative ± S9 | Sokolowski (2009a)[1] | |

**Table 5.1.  *In vitro* Test for Gene Mutations in Bacteria: Glyphosate Technical.**

| Test/Endpoint | Test System | Concentrations | Purity | Results | Reference | Comments |
|---|---|---|---|---|---|---|
| Bacterial Reverse Mutation | *S. typhimurium* TA98, TA100, TA1535, TA1537 and *E. coli* WP2 *uvrA* pKM 101 and WP2 pKM 101 ± S9 | 3-5000 µg/plate | 96.3% glyphosate acid | Negative ± S9 | Sokolowski (2009b) [MRID 49961801] | |
| Bacterial Reverse Mutation | *S. typhimurium* TA98, TA100, TA1535, TA1537 and *E. coli* WP *uvrA* ± S9 | 3-5000 µg/plate | 97.16 % | Negative ± S9 | Sokolowski (2010) [MRID 50000902] | |
| Bacterial Reverse Mutation | *S. typhimurium* TA98, TA100, TA1535, TA1537, TA1538 ± S9 | 1-1000 µg/plate | 96.0% | Negative ± S9 | Suresh (1993a)[1] | |
| Bacterial Reverse Mutation | *S. typhimurium* TA98, TA100, TA1535, TA1537 and *E. coli* WP *uvrA* ± S9 | 0-5000 µg/plate | 95.3% | Negative ± S9 | Thompson (1996) [MRID 49957409] | |
| Bacterial Reverse Mutation | *S. typhimurium* TA98, TA100, TA102, TA1535, TA1537 ± S9 | 31.6-5000 µg/plate | 98.2% | Negative ± S9 | Wallner (2010)[1] | |
| Bacterial Reverse Mutation | *S. typhimurium* TA98 and TA100 ± S9 | 25 µg/plate | Not reported | Negative ± S9 | Wilderman and Nazar (1982) | Rat S9 and plant cell-free homogenates were used for metabolic activation |

**Table 5.1.  *In vitro* Test for Gene Mutations in Bacteria: Glyphosate Technical.**

| Test/ Endpoint | Test System | Concentrations | Purity | Results | Reference | Comments |
|---|---|---|---|---|---|---|
| Bacterial Reverse Mutation | *S. typhimurium* TA1535, TA1537, TA1538, TA98 and TA100 ± S9 | 0.12-10 mg/plate –S9 0.56-15 mg/plate +S9 | 90% glyphosate trimesium salt | Negative ± S9 | Majeska *et al.* (1982a) [MRID 00126612] | |
| Bacterial Reverse Mutation | *S. typhimurium* TA1535, TA1537, TA98 and TA100 ± S9 | 0.005-50 μL/mL | 55.6% glyphosate trimesium salt | Negative ± S9 | Majeska (1985a) [MRID 00155527] | |

[1] Study was cited in Kier and Kirkland (2013).  Supplementary information about the study was provided online including test guideline, test material purity, control chemicals and summary data tables.

### 5.3.2   *In vitro* Tests for Gene Mutations in Mammalian Cells

*In vitro* gene mutation studies in mammalian cells are conducted in cell lines with reporter genes for forward mutations.  The most common reporter genes are the endogenous thymidine kinase (TK) gene, endogenous hypoxanthine-guanine phosphoribosyl transferase (HPRT) gene and the xanthine-guanine phosphoribosyl transferase transgene (XPRT).  Mutations that occur within these reporter genes result in mutant cells that are resistant to the cytotoxic effect of the pyrimidine analogue trifluorothymidine (for TK) or the purine analogue 6-thioguanine (for HPRT and XPRT) (OPPTS 870.5330).  Suitable cell lines for this assay include L5178Y mouse lymphoma cells, Chinese hamster ovary (CHO) cells, hamster AS52 and V79 lung fibroblasts and human TK6 lymphoblastoid cells.  Similar to other *in vitro* assays, chemicals are tested both in the presence and absence of S9 metabolic activation.

A total of four studies were conducted for (forward) mutations in mammalian cells (Table 5.3). Three studies were conducted with a high purity concentration of glyphosate technical ($\geq$95.6%) and the remaining study was performed with glyphosate trimesium salt.  In four of the assays, mouse lymphoma L5178Y TK$^{+/-}$ cells were the target organism and one was conducted in CHO cells with the HPRT endpoint.  Glyphosate technical and the glyphosate trimesium salt were negative in the mouse lymphoma cell assays (Jensen, 1991b; Clay, 1996; Majesak, 1985b) when tested up to the current guideline limit concentration and glyphosate was negative in CHO/HPRT cells when tested up to cytotoxic concentrations (Li, 1983a).

**Table 5.2.** *In vitro* **Mammalian Gene Mutation Assays: Glyphosate Technical.**

| Test/Endpoint | Test System | Concentrations/ Conditions | Test Material Purity | Results | Reference | Comments |
|---|---|---|---|---|---|---|
| Gene Mutations in Mammalian Cells | Mouse lymphoma L5178Y TK$^{+/-}$ cells ± S9 | 296-1000 µg/mL | 95.6% | Negative | Clay (1996)[1] | Relative survival was 90% (-S9) and 57% (+S9) at top concentration |
| Gene Mutations in Mammalian Cells | Mouse lymphoma L5178Y TK$^{+/-}$ cells ± S9 | 520–4200 µg/mL (+S9); 610–5000 µg/mL (-S9) | 98.6% | Negative | Jensen (1991b) [MRID 49961504] | Reported no significant reduction in cloning efficiency at any concentration. |
| Gene Mutations in Mammalian Cells | Chinese hamster ovary (CHO) cells, HPRT locus ± S9 | 500–25000 µg/mL (+S9); 500-22500 µg/mL (-S9) | 98.7% | Negative | Li (1983a); [MRID 00132681] | Tested S9 from 1-10% Cytotoxic at 22.5 mg/mL (-S9, and with 1,2 and 10% S9) and at 17.5 mg/ml (10% S9) |
| Gene Mutations in Mammalian Cells | Mouse lymphoma L5178Y TK$^{+/-}$ cells ± S9 | 1-5 µl/mL | 55.6% *Glyphosate trimesium salt* | Negative | Majeska (1985b) [MRID 00155530] | Negative with pH adjusted |

[1] Study was cited in Kier and Kirkland (2013).  Supplementary information about the study was provided online including test guideline, test material purity, control chemicals and summary data tables.

## 5.4    *In vitro* Tests for Chromosomal Abnormalities

Cytogenetic assays are tests that can detect chemicals that cause structural chromosomal damage (clastogenicity) or affect the segregation of chromosomes during cell division and alter chromosome number (aneuploidy).  Generally, there are two types of *in vitro* cytogenetic assays that identify chemicals inducing chromosomal abnormalities: chromosomal aberration assays and micronucleus assays. Although chromosomal damage observed in these assays are not considered heritable mutations, chemicals that can induce these types of chromosomal damage can also induce transmissible mutations to daughter cells indicating their role in cancer (Yauk *et al.*, 2015; OECD 2015). In addition, assays such as (fluorescence *in situ* hybridization (FISH)) can provide additional mechanistic information on the formation of chromosomal abnormalities. It is important to note that factors such as cytotoxicity, solubility of the test substance, changes in pH or osmolality play a significant role in the outcome of the assay.  Like other *in vitro* assays, compounds are generally tested in the presence or absence of S9 metabolic activation to determine if metabolism affects the genotoxic activity of the parent compound and to determine if potential genotoxic metabolites are formed.

### 5.4.1    *In vitro* Mammalian Chromosomal Aberration Test

Chromosomal aberration assays detect both structural chromosomal and numerical aberrations. Structural chromosomal aberrations are of two types: chromatid and chromosome and include breaks, deletions and rearrangements (OPPTS 870.5375, OECD 2015).  Numerical chromosomal aberrations generally result from the loss of an entire chromosome mostly due to damage in the spindle fiber resulting in aneuploidy. The types of cells that are most commonly used in chromosomal aberration assays include established cell lines such as Chinese hamster lung (CHL) and CHO cells or primary cell cultures such as human or other mammalian peripheral blood lymphocytes.  In this assay, cells are typically sampled at a time equivalent to the length of approximately 1.5 cell cycles from the start of treatment.  Prior to harvesting, cells are treated with Colcemid® or colchicine to arrest cells at the first metaphase stage of the cell cycle following the beginning of exposure to the test article.  Once harvested, the cells are stained and metaphase cells are evaluated microscopically for various types of chromosome aberrations. (OECD TG 473). Data should be presented in a way that indicates the percentage of affected cells in the population of cells scored (e.g., % cells with aberrations or # aberrant cells/100 cells). Gaps should not be included in the analysis; they are scored but gaps alone in the absence of any additional chromosomal aberrations (e.g., a fragment or a ring chromosome) are not sufficient to define a cell as aberrant.

Glyphosate technical was evaluated in eight chromosomal aberrations tests to determine its potential to induce clastogenic effects *in vitro*. The findings are presented in Table 5.3.  Six of the eight studies were negative.  The two positive studies were both from the same laboratory where, Lioi *et al*. reported an increase in chromosomal aberrations at glyphosate concentrations of 8.5µM and above in bovine lymphocytes (Lioi *et al.*, 1998b) and at all concentrations of glyphosate tested (7-170 µM) in human lymphocytes (Lioi *et al.*, 1998a) following a 72-hour exposure period.  No chromosomal aberrations were observed as a result of exposure to glyphosate in one study using CHO cells (Majeska, 1985c) and in two studies with CHL cells

(Matsumoto, 1995; and Wright, 1996).  Sivikova and Dianovsky (2006) reported no statistically significant increases in chromosomal aberrations in bovine lymphocytes treated with glyphosate (62% pure) at concentrations up 1120 μM following 24-hour exposure. (Sivikova and Dianovsky, 2006).  In studies conducted with human lymphocytes treated with glyphosate (≥95%) for 24-96 hours at concentrations, no increase in chromosomal aberrations were seen at concentrations as high as 6000 μM (Fox, 1998; and Manas *et al*., 2009).

### 5.4.2  *In vitro* Mammalian Micronucleus Test

The *in vitro* micronucleus test can detect the induction of micronuclei in the cytoplasm of cells in the interphase stage of the cell cycle.  Micronuclei form from acentric chromosome fragments (i.e., chromosome fragments lacking a centromere) or when whole chromosomes are unable to migrate to the cellular poles during anaphase prior to cell division. (OECD 487).  Thus, the micronucleus assay can detect both structural and numerical chromosomal changes. It should be noted, however, that additional work is required to distinguish whether induced micronuclei have arisen from a clastogenic versus an aneugenic mechanism, *e.g*., staining micronuclei to detect the presence of kinetochore proteins.  The assay is typically performed with cell lines or primary cell cultures of human or rodent origin.  The assay can be conducted with the addition of cytochalasin B which inhibits cytokinesis resulting in the formation of binucleated cells.  The presence of binucleated cells, indicates that cells have undergone one round of mitosis, a necessary prerequisite for micronucleus formation.

Six studies evaluated glyphosate technical for its potential to induce micronuclei *in vitro* (Table 5.4). Four of the six studies were positive and the remaining two studies were equivocal. In a study by Koller *et al*. (2012), TR146 cells (derived from a human neck metastasis of buccal epithelial origin) were treated for 20 minutes with up to 20 mg/L (~0.12 mM) glyphosate (95%), the authors reported a statistically significant increase in binucleated cells with micronuclei at 15 (~0.09 mM) and 20 (~0.12 mM) mg/L, and also indicated significant apoptosis and necrosis at 20 mg/L.  The short exposure period in this study was unusually short (20 minutes) and was conducted in a tumor cell line that had not been well characterized in regards to its degree of chromosomal instability and DNA damage and repair capacity.  In another study, Roustan *et al*. (2014) reported positive findings +S9 only in CHO cells treated with glyphosate (unknown purity) at 10- 100 μg/mL with little evidence of a dose response over that concentration range.

Two other studies evaluated glyphosate technical in human lymphocytes (Mladinic *et al*., 2009a, 2009b).  These studies used an exposure protocol that is different from the OECD recommendations for the *in vitro* micronucleus assay.  OECD recommends that whole blood or isolated lymphocytes are cultured in the presence of a mitogen (e.g. phytohemagglutinin; PHA) prior to exposure of a test chemical in order to detect micronuclei formed via an aneugenic mechanism.  However, in these two studies, blood cells were exposed to glyphosate for 4 hours, washed, and then treated with PHA to stimulate cell division. Both studies reported a statistically significant increase in micronucleated cells at 580 μg/mL (~3.4 mM), but not at lower concentrations, following 4-hour exposures in the presence of S9.  The frequency of micronucleated cells (+S9) ranged from 11.3 to 28.7 in one study (Mladinic *et al*., 2009a) and 33.3 to 65.2 in the other study (Mladinic *et al*., 2009b) over the 1000-fold concentration range. No statistically significant increases in micronucleated cells were seen in either study in the absence of S9 activation.  When cells were evaluated with vital stains, cells treated with 580

µg/mL showed a significant (p<0.05) increase in the percentage of cells undergoing apoptosis and necrosis compared to the negative controls.

Piesova *et al.* (2004, 2005) conducted two *in vitro* micronucleus studies using glyphosate technical (62%) up to 560 µM in bovine lymphocytes.  In the 2004 study, bovine lymphocytes from two donors were treated for 24 or 48 hours without S9 metabolic activation, and for 2 hours (with and without S9 activation) or 48 hours (-S9) in the 2005 study.  Both studies yielded similar results following 48-hour exposure to glyphosate.  In both cases, the authors reported a weak induction of micronuclei in one donor at 280 µM and at 560 µM in the second donor.  The induction was approximately 2-fold (p < 0.05), but with no clear dose response. No effects on micronuclei induction were seen at the 2- or 24-hour time points; however, with these early time points it is unlikely that one cell division has occurred during or after treatment.

**Table 5.3.  *In vitro* Tests for Chromosome Aberrations in Mammalian Cells- Glyphosate Technical**

| Test/Endpoint | Test System | Concentrations/ Conditions | Test Material Purity | Results | Reference | Comments |
|---|---|---|---|---|---|---|
| *In vitro* Chromosomal Aberration | Chinese hamster ovary (CHO) cells | 4-10 µl/mL, ± S9 | 55.6% *Glyphosate trimesium salt* | Negative | Majeska (1985c) [MRID 00155530] | pH adjusted (7.4-7.6) |
| *In vitro* Chromosomal Aberration | Chinese Hamster lung (CHL) cells | ±S9: 0, 250, 500, 1000 and 2000 µg/mL; 24 and 48 h treatment - S9; 6 h treatment ±S9 harvest 24 h | 95.68% | Negative | Matsumoto (1995) [MRID 50017106] | Decline in pH noted at 500 and 1000 µg/mL. |
| *In vitro* Chromosomal Aberration | Chinese hamster lung (CHL) cells | -S9: 24 & 48-hr exposure: 0-1250 µg/mL; +S9: 0-1250 µg/mL | 95.3% | Negative | Wright (1996) [MRID 49957410] | Excessive decrease in pH >1250 µg/mL |
| *In vitro* Chromosomal Aberration | Bovine lymphocytes | -S9 only: 0, 7, 85 and 170 µM; 72 h exposure | ≥98% | Positive (all concs.) | Lioi *et al.* (1998b) | |
| *In vitro* Chromosomal Aberration | Bovine lymphocytes | ±S9: 0, 28, 56, 140, 280, 560 and 1120 µM; 24 h exposure | 62.0% | Negative | Sivikova and Dianovsky (2006) | Decreased MI and PI at ≥ 560 µM |
| *In vitro* Chromosomal Aberration | Human lymphocytes | ±S9: 100-1250 µg/mL cultures analyzed; 68 & 92 h | 95.6% | Negative | Fox (1998) [MRID 49961803] | Excessive decrease in pH >1250 µg/mL |
| *In vitro* Chromosomal Aberration | Human lymphocytes | -S9 only: 0, 5.0, 8.5, 17.0 and 51.1 µM; 72 h exposure | ≥98% | Positive ≥ 8.5 µM | Lioi *et al.* (1998a) | No significant ↓ in MI observed. |
| *In vitro* Chromosomal Aberration | Human lymphocytes | -S9: 0, 200, 1200 and 6000 µM; 48 h exposure | 96.0% | Negative | Manas *et al.* (2009) | No toxicity observed up to 6000 µM |

[1] Study was cited in Kier and Kirkland (2013).  Supplementary information about the study was provided online including test guideline, test material purity, control chemicals and summary data tables.

CA= chromosomal aberrations, MI= mitotic index, PI= proliferation index.

**Table 5.4.  *In vitro* Tests for Micronuclei Induction in Mammalian Cells- Glyphosate Technical**

| Test/ Endpoint | Test System | Concentrations/ Conditions | Test Material Purity | Results | Reference | Comments |
|---|---|---|---|---|---|---|
| *In vitro* Cytokinesis Block Micronucleus Assay (with FISH analysis) | TR146 cells (human-derived buccal carcinoma cell line) | 10, 15 and 20 mg/L; 20-minute exposure. | 95% | Positive  Statistically significant (p<0.05) increase in MN at 15 and 20 mg/L. | Koller *et al.* (2012) | Apoptosis and necrosis reported at 20 mg/L  Also reported ↑ in NB and NPB |
| *In vitro* Cytokinesis Block Micronucleus Test | CHO-K1 cells | 5 - 100 µg/mL, ±S9 | Not stated | Negative –S9 Positive +S9 at 10-100 µg/mL | Roustan *et al.,* (2014) | No clear dose response |
| *In vitro* Cytokinesis Block Micronucleus Test | Bovine lymphocytes (2 donors) | 0, 28, 56, 140, 280 and 560 µM 24 & 48 h exposure | 62% | 24 h: Negative  48 h: Equivocal  ↑ MN at 280 µM only (donor A) ↑ MN at 560 µM only (donor B) | Piesova, 2004 | No dose-response No significant decrease in CBPI observed. |
| *In vitro* Cytokinesis Block Micronucleus Test | Bovine lymphocytes (2 donors) | 0, 28, 56, 140, 280 and 560 µM; 2 h (±S9) and 48 h (-S9) exposure | 62% | 2 h: Negative  48 h: Equivocal  ↑ MN at 280 µM only (donor A) and at 560 µM only (donor B) | Piesova, 2005 | No dose-response; No significant decrease in CBPI observed. Metabolic activation had no effect on MN formation after 2 h exposure. |

**Table 5.4.  *In vitro* Tests for Micronuclei Induction in Mammalian Cells- Glyphosate Technical**

| Test/ Endpoint | Test System | Concentrations/ Conditions | Test Material Purity | Results | Reference | Comments |
|---|---|---|---|---|---|---|
| *In vitro* Cytokinesis Block Micronucleus Assay (with FISH analysis) | Human lymphocytes (treated with cytochalasin B) | 4h treatment ±S9; 0.5, 2.91, 3.50, 92.8 and 580 µg/mL; harvested 72 h | 98.0% | Negative –S9 <br><br> Positive +S9, ↑ MN at 580 µg/mL, but not at 0.5-92.8 µg/mL <br><br> Also observed ↑ in NB at 580 µg/mL (±S9); ↑ NPB at 580 µg/mL (+S9) | Mladinic *et al.* (2009a) | Cells were exposed to glyphosate and washed prior to treatment with PHA. Authors did not report being blind to treatment. |
| *In vitro* Cytokinesis Block Micronucleus Assay (with FISH analysis) | Human lymphocytes (treated with cytochalasin B) | 4h treatment ±S9; 0.5, 2.91, 3.50, 92.8 and 580 µg/mL | 98% | Negative –S9 <br><br> Positive +S9 ↑ MN at 580 µg/mL, but not at 0.5 -92.8 µg/mL <br><br> ↑ apoptosis and necrosis at 580 µg/mL (-S9); ↑ apoptosis at ≥ 2.91 µg/mL and necrosis at 580 µg/mL (+S9) <br><br> ↑ in NB at 580 µg/mL (±S9) and NPB at 580 µg/mL (+S9) | Mladinic *et al.* (2009b) | Cells were exposed to glyphosate and washed prior to treatment with PHA. Authors did not report being blind to treatment. <br><br> . |

CBPI= cytokinesis block proliferation index, FISH= fluorescent in situ hybridization; MN= micronuclei; NB= nuclear buds; NPB= nucleoplasmic bridges.

## 5.5    *In Vivo* Genetic Toxicology Tests

### 5.5.1    *In Vivo* Assays for Chromosomal Abnormalities

#### 5.5.1.1      Mammalian Bone Marrow Chromosomal Aberration Assays

The *in vivo* mammalian bone marrow chromosomal assay detects the ability of a chemical to cause structural chromosomal damage in cells in the bone marrow.  The assay is typically conducted in rodents (mouse or rat) and detects both chromosome-type and chromatid-type aberrations.  Chromatid-type aberrations are expressed when a single chromatid break occurs and/or a reunion between chromatids, and chromosome-type aberrations result from damage expressed in both sister chromatids (OPPTS 870.5385).  In this test, animals are exposed (typically via oral route or intraperitoneal injection) and sacrificed at sequential intervals.  Prior to sacrifice, animals are treated with a spindle inhibitor such as colchicine or Colcemid® to arrest cells at metaphase. Chromosome preparations from the bone marrow are stained and scored for chromosomal aberrations. (OPPTS 870.5385). Generally, the optimal time to detect chromosomal aberrations in the bone marrow is 24 hours after treatment.

Three *in vivo* mammalian bone marrow chromosomal assays were conducted with glyphosate technical for regulatory purposes and all were negative (Table 5.8).  In the first study, Sprague Dawley rats were administered glyphosate (98%) at 0 or 1000 mg/kg and the bone marrow was sampled at 6, 12 or 24 hours after dosing.  No significant increase in bone marrow chromosomal aberrations were observed (Li, 1983b).  In the second study, Swiss albino mice were treated twice by oral gavage (24 hours apart) with 0 or 5000 mg/kg glyphosate technical (96.8%) resulting in no significant increase in bone marrow chromosomal aberrations (Suresh, 1994). In a third study conducted with glyphosate trimesium salt, no increase in chromosomal aberrations were seen in the bone marrow of rats treated by oral gavage with up to 188 mg/kg (Majeska, 1982c).

#### 5.5.1.2      Rodent Dominant Lethal Test

Dominant lethal mutations cause embryonic or fetal death.  The induction of a dominant lethal mutation after exposure to a chemical indicates that the test chemical has affected the germinal tissue (sperm at some point in development, from stem cell to spermatocyte).  Dominant lethal effects are considered to result from chromosomal damage (structural or numerical), but may also reflect gene mutations or systemic toxicity (OPPTS 870.5450, OECD 2016).  In this test, male rodents are treated with the test material and mated with (untreated) virgin females.  The female animals are sacrificed at an appropriate time and the uteri are examined to determine the number of implants, and live and dead embryos.  Two dominant lethal studies were identified.  One study was conducted in the rat (Suresh, 1992) where male rats were dosed by oral gavage with glyphosate up to 5000 mg/kg.  The other study (Rodney, 1980) was conducted in male mice treated with up to 2000 mg/kg glyphosate (98.7%) by oral gavage.  No significant increase in dominant lethal mutations were observed in either study (Table 5.5).

### 5.5.1.3        *In Vivo* Mammalian Erythrocyte Micronucleus Assays

The mammalian micronucleus test is the most commonly conducted *in vivo* test to detect clastogenic or aneugenic chemicals.  The test identifies chemicals that induce micronuclei in proerythrocytes (progenitor cells) by assessing micronucleus frequency in immature erythrocytes (polychromatic erythrocytes, PCEs) sampled from the bone marrow or from the peripheral blood (reticulocytes).  This test is typically conducted in mice or rats.  When bone marrow erythroblasts develop into erythrocytes, the main nucleus is extruded following the final cell division (erythrocytes are the only mammalian cell that does not contain a nucleus). Any micronuclei formed after the final cell division may remain in the cytoplasm following extrusion of the main nucleus.  The visualization of micronuclei is facilitated by the lack of a nucleus in these cells (OPPTS 870.5395, OECD 474).  Micronuclei can originate from acentric chromosomes, lagging chromosome fragments, or whole chromosomes; thus, micronuclei are biomarkers of both altered chromosome structure or chromosome number. The assay is based on an increase in the frequency of micronucleated erythrocytes in treated animals, in either peripheral blood samples or bone marrow samples (OPPTS 870.5395).  Additional mechanistic information on the formation of chromosomal abnormalities can be obtained from the incorporation of centromeric and telomeric fluorescent probes (FISH) assay.   According to EPA test guidelines, a single dose of the test substance may be used in this test if the dose is the maximum tolerated dose (MTD), a dose that produces some indication of bone marrow cytotoxicity (e.g., a reduction in the proportion of immature erythrocytes (PCEs) to total erythrocytes by >50%) or a maximum limit dose of 5000 mg/kg.  The routes of administration for this test are typically oral or intraperitoneal injection and generally involve a single administration.

Glyphosate technical has been extensively evaluated for micronuclei induction in *in vivo* studies.  Fourteen studies were conducted for regulatory purposes, four were identified from the open literature, and one study was conducted by the U.S. National Toxicology Program (NTP).  This included nine studies with administration of glyphosate by the intraperitoneal (i.p.) route and 10 studies by the oral route.  The findings are presented in Table 5.10.  Of the nine i.p. studies, seven (Costa, 2008; Chruscielska *et al.*, 2000; Durward, 2006; Gava, 2000; Marques, 1999; Rank *et al.*, 1993 and Zaccaria, 1996) were negative.  These studies tested doses as high as 2016 mg/kg (single and double administration) with sampling times at 24- and 48-hours post-dose.  Two positive findings were reported when glyphosate technical was administered by i.p.  Bolognesi *et al.* (1997) reported a significant increase in micronuclei in the bone marrow of male Swiss CD mice 24 hours after i.p. treatment with 300 mg/kg glyphosate technical (99.9%).  The dose in this study was administered as ½ dose (150 mg/kg) injections 24 hours apart to 3 male mice.  Manas *et al.* (2009) evaluated glyphosate technical (96%) in BALB/c male and female mice (5/sex/dose) administered 50, 100 or 200 mg/kg by two i.p. injections, 24 hours apart.  The results showed a significant increase in micronucleated erythrocytes at 200 mg/kg, but not at 50 or 100 mg/kg.  It should be noted that doses that resulted in the positive responses in these two studies were above the reported i.p. LD50 value (130 mg/kg) for glyphosate in mice (NTP 1992).

Glyphosate technical was also evaluated in nine micronucleus assays with administration by the oral route in mice and one in the rat.  Eight of the nine oral studies in the mouse were negative for micronuclei induction.  The single positive response was seen in female mice treated with

two 5000 mg/kg doses (limit dose), 24 hours apart with bone marrow sampling at 24-hours post-dose (Suresh, 1993b). No increase was observed at lower doses (50 and 500 mg/kg) in females or at any dose in males. The eight negative oral studies in mice included single dose administrations of 5000 mg/kg and bone marrow analysis at 24, 48, and/or 72 hours (Jensen, 1991c; Fox and Mackay, 1996) and one or two administrations of glyphosate technical with top doses between 30 and 2000 mg/kg (Honarvar, 2005; Honarvar, 2008; Jones, 1999; and Zoriki-Hosmi, 2007). It should be noted that evaluations at 48 and 72 hours post dose may be too late to detect chemically-induced micronucleated PCEs in the bone marrow as these cells may have already migrated into the peripheral blood. No significant increase in micronucleated erythrocytes were seen in male or female mice following 13-weeks of dietary (feed) administration of glyphosate technical at doses up to 3393 mg/kg/day (NTP, 1992). In the single study that evaluated micronuclei induction in rats, glyphosate technical did not induce significant induce micronuclei in CD1 rats treated by oral gavage at doses up to 2000 mg/kg (Flügge, 2009b). When glyphosate trimesium salt was evaluated, no increase in micronuclei induction was seen in mice treated orally up to 1100 and 800 mg/kg in males and females, respectively (Majeska, 1987).

**Table 5.5.** *In Vivo* **Tests for Chromosomal Aberrations in Mammals- Glyphosate Technical.**

| Test/Endpoint | Test System | Route of Administration | Doses | Test Material Purity | Results | Reference | Comments |
|---|---|---|---|---|---|---|---|
| Bone Marrow Chromosomal Aberration Test | Sprague Dawley rats (males and females) | Intraperitoneal injection; sampled at 6, 12 and 24 h after treatment | 0, 1000 mg/kg (6/sex/dose/sampling time) | 98% | Negative | Li (1983b) [MRID 00132683] | No toxicity observed. A separate study using $^{14}C$-glyphosate showed that glyphosate reaches BM 0.5 h after dosing with ½ life elimination at 7.6 h. Peak BM value was 400 ppm, corresponding to 2000 ppm plasma value. |
| Bone Marrow Chromosomal Aberration Test | Sprague Dawley rats (males and females) Vehicle: distilled water | Oral gavage, sampling after 6, 12, 24, 48 h and 5 d | 0, 21, 63 and 188 mg/kg | 58.5% *Glyphosate trimesium salt* | Negative | Majeska (1982c) [MRID 00132176] | |
| Bone Marrow Chromosomal Aberration Test | Swiss Albino mice (males and females) Vehicle: peanut oil | Oral gavage (2 treatments, 24 h apart); sampling after 24 h (last treatment) | 0, 5000 mg/kg (5/sex/dose) | 96.8% | Negative | Suresh (1994) [MRID 49987408] | Significant (p<0.05) decrease in bw of females at high dose. |
| Rodent Dominant Lethal Test | CD-1 mice Each dosed male mated with 2 females/week for 8 weeks | Oral gavage | 0, 200, 800, and 2000 mg/kg | 98.7% | Negative | Rodwell (1980) [MRID 00046364] | |
| Rodent Dominant Lethal Test | Wistar rat Each dosed male mated with 1 female/week for 10 weeks | Oral gavage | 0, 200, 100 and 5000 mg/kg | 96.8% | Negative | Suresh (1992) [MRID 49987404] | |

**Table 5.6.  In Vivo Tests for Micronuclei Induction in Mammals- Glyphosate Technical.**

| Test/Endpoint | Test System | Route of Administration | Doses | Test Material Purity | Results | Reference | Comments |
|---|---|---|---|---|---|---|---|
| Bone Marrow Micronucleus Test | Swiss CD1 mice (males only) | Intraperitoneal injection; 2 injections of half the dosage of 300 mg/kg 24 h apart; sampling at 6 and 24 h | 0, 300 mg/kg (3/dose) | 99.9% | Positive  Stat significant increase in MN at 24 h | Bolognesi *et al.* (1997) | Material and methods indicate 3 animals/dose; however, Table 1 of article indicates 4 animals were evaluated. |
| Bone Marrow Micronucleus Test | Balb C mice (males and females) Vehicle: Saline | Intraperitoneal Injection (two injections, 24 h apart); sampling after 24 h (last treatment) | 0, 50, 100, and 200 mg/kg (5/sex/dose) | 96% | Positive  ↑MN at 200 mg/kg, but not at 50 or 100 mg/kg | Manas *et al.* (2009) | No significant signs of toxicity observed. |
| Bone Marrow Micronucleus Test | C3H mice (males only) Vehicle: water | Intraperitoneal Injection (single treatment); sampling after 24, 48 and 72 h | 0, 300 mg/kg | Not reported | Negative | Chruscielska *et al.* (2000) | |
| Bone Marrow Micronucleus Test | Swiss Albino mice (males and females) Vehicle: corn oil | Intraperitoneal Injection (2 treatments, 24 h apart); sampling after 24 h (last treatment) | 0, 15.62, 31.25, and 62.5 mg/kg (5/sex/dose) | 980 g/kg Glyphosate technical | Negative# | Costa (2008)[1] | OECD guideline 474  #Was not tested up to limit dose and did not demonstrate that compound was tested up to toxic dose.  No mention of BM toxicity or clinical signs. |

**Table 5.6.  In Vivo Tests for Micronuclei Induction in Mammals- Glyphosate Technical.**

| Test/Endpoint | Test System | Route of Administration | Doses | Test Material Purity | Results | Reference | Comments |
|---|---|---|---|---|---|---|---|
| Bone Marrow Micronucleus Test | Crl:CD-1TM(ICR) BR mice (males only[1]) Vehicle: PBS | Intraperitoneal Injection (single treatment); sampling after 24 and 48 h (high dose only) | 0, 150, 300 and 600 mg/kg (7/dose) | 95.7% | Negative | Durward (2006) [MRID 49957411] | Clinical signs reported at ≥ 150 mg/kg. Significant ↓ in %PCEs reported at 24 h in 600 mg/kg group. ↑in MN PCEs observed at 600 mg/kg (1.9± 0.7 vs. 1.0 ± 1.2 control; p<0.05), at 24 h, but not 48 h, within historical control range. |
| Bone Marrow Micronucleus Test | Swiss Albino mice (males and females) Vehicle: water | Intraperitoneal Injection (2 treatments, 24 h apart); sampling after 24 h (last treatment) | 0, 1008, 2016, and 3024 mg/kg 5/sex/dose | 612.7 g/kg (glyphosate technical Nufarm) | Negative | Gava (2000)[1] | LD50 was 4032 mg/kg Mortality observed in 1 animal at high dose (only 4 m/f scored for MPCEs). No effect on PCE/NCE. |
| Bone Marrow Micronucleus Test | Swiss Albino mice (males and females) Vehicle: water | Intraperitoneal Injection (2 treatments, 24 h apart); sampling after 24 h (last treatment) | 0, 187.5, 375 and 562.5 mg/kg 5/sex/dose | 954.9 g/kg (glyphosate technical Nufarm) | Negative | Marques (1999) [MRID 49957412] | LD50 was 750 mg/kg No significant signs of toxicity observed in main study |
| Bone Marrow Micronucleus Test | NMRI-Bom mice | Intraperitoneal Injection (single treatment); sampling after 24 h (all doses) and 48 h (150 and 200 mg/kg) | 0, 150, and 200 mg/kg (5/sex/dose) | glyphosate isopropyla mine (purity not specified) | Negative | Rank *et al.* (1993) | |

**Table 5.6.  In Vivo Tests for Micronuclei Induction in Mammals- Glyphosate Technical.**

| Test/Endpoint | Test System | Route of Administration | Doses | Test Material Purity | Results | Reference | Comments |
|---|---|---|---|---|---|---|---|
| Bone Marrow Micronucleus Test | Swiss albino mice (males and females) | Intraperitoneal Injection (2 treatments, 24 h apart); sampling after 24 h (last treatment) | 0, 68, 137, and 206 mg/kg ( | 360 g/L | Negative | Zaccaria (1996) [MRID 49961501] | Doses selected were reported as corresponding to 25, 50 and 75% $LD_{50}$ |
| Bone Marrow Micronucleus Test | CD-1 mice (males and females) Vehicle: saline | Oral gavage (single treatment); sampling after 24 and 48 h | 0, 5000 mg/kg 5/sex/dose | 95.6% | Negative | Fox and Mackay (1996) [MRID 44320619] | No significant signs of toxicity observed |
| Bone Marrow Micronucleus Test | NMRI mice (males and females) Vehicle: PEG 400 | Oral gavage (single treatment); sampling after 24 and 48 h (high dose only) | 0, 500, 1000, and 2000 mg/kg 5 sex/dose | 97.73% | Negative | Honarvar (2005)[1] | OECD guideline 474 No significant signs of toxicity observed |
| Bone Marrow Micronucleus Test | NMRI mice (males only) Vehicle: 0.5% carboxymethyl-cellulose | Oral gavage (single treatment); sampling after 24 and 48 h (high dose only) | 0, 500, 1000, and 2000 mg/kg (5/dose) | 99.1% | Negative | Honarvar (2008) [MRID 49961802] | No significant signs of toxicity observed |
| Bone Marrow Micronucleus Test | NMRI mice (males and females) Vehicle: 0.5% carboxymethyl-cellulose | Oral gavage (single treatment); sampling after 24, 48 and 72h | 0, 5000 mg/kg; 5/sex/dose | 98.6% | Negative | Jensen (1991c) [MRID 49961503] | No significant signs of toxicity observed |
| Bone Marrow Micronucleus Test | CD-1 mice (males only[1]) Vehicle: water | Oral gavage single treatment); sampling after 24 and 48 h | 0, 2000 mg/kg 5/dose | 59.3% potassium glyphosate salt | Negative | Jones (1999)[1] | OECD guideline 474 No significant signs of toxicity observed |
| Bone Marrow Micronucleus Test | Swiss albino mice; (males and females) Vehicle: peanut oil | Oral gavage (2 treatments, 24 h apart); sampling | 0, 50, 500, 5000 mg/kg 5/sex/dose | 96.8% glyphosate acid | Positive in females at 5000 | Suresh (1993b) [MRID 49987407] | No significant signs of toxicity observed |

**Table 5.6.  In Vivo Tests for Micronuclei Induction in Mammals- Glyphosate Technical.**

| Test/Endpoint | Test System | Route of Administration | Doses | Test Material Purity | Results | Reference | Comments |
|---|---|---|---|---|---|---|---|
| | | after 24 h (last treatment) | | mg/kg only. Negative in males at all doses | | | |
| Bone Marrow Micronucleus Test | Swiss mice (males only) Vehicle: corn oil | Oral gavage (2 treatments, 24 h apart); sampling after 24 h (last treatment) | 0, 8, 15 and 30 mg/kg (6/dose) | 980.1 g/kg | Negative | Zoriki Hosomi (2007) [MRID 50000901] | OECD guideline 474 No significant signs of toxicity observed |
| Bone Marrow Micronucleus Test | CD-1 mice (males and females) Vehicle:  distilled water | Oral gavage, Sampling 24, 48 and 72 h after treatment | Males: 0, 700, 900 and 1100 mg/kg Females: 0, 400, 600 and 800 mg/kg | 55.3% *Glyphosate trimesium salt* | Negative | Majeska (1987) [MRID 40214004] | |
| Bone Marrow Micronucleus Test | B6CF3 Mice (males and females) | Oral (dietary). MN assay conducted following 13-week feed study. | 0, 205/213, 410/421, 811/844, 1678/1690 and 3393/3393 mg/kg (m/f) (10/sex/dose) | 99% | Negative | NTP (1992) | |
| Bone Marrow Micronucleus Test | CD Rats (males and females) Vehicle: 0.8% hydroxypropylmethyl cellulose | Oral gavage (single treatment); sampling after 24 and 48 h (high dose only) | 0, 500, 1000, and 2000 mg/kg (5/sex/dose) | 98.8% | Negative | Flügge (2009b)[1] | OECD guideline 474 No significant signs of toxicity observed |

[1] Study was cited in Kier and Kirkland (2013).  Supplementary information about the study was provided online including test guideline followed, test material purity, control chemicals and summary data tables.

[2] Only males tested; report indicated that there was no difference between sexes seen in range finding study.

CA= chromosomal aberrations, MPCE= micronucleated polychromatic erythrocytes, NCE= normochromatic erythrocytes, PCE=polychromatic erythrocytes.

**5.6      Additional Genotoxicity Assays Evaluating Primary DNA Damage**

There are a number of genotoxicity assays that evaluate primary DNA damage, but do not measure the consequence of the genetic damage (*i.e.,* mutation or chromosomal damage).  As discussed in the Guidance Document on Revisions to OECD Genetic Toxicology Test Guidelines (OECD 2015), the endpoints measured in primary DNA damage tests such as DNA adducts, comet assay, or unscheduled DNA synthesis may lead to cell death or may initiate DNA repair, rather than a mutation.  These types of assays can, however, provide mechanistic information when interpreting positive findings in other genotoxicity tests or when determining whether a chemical is acting through a mutagenic mode of action.  Additionally, indirect mechanisms of DNA damage such as oxidative DNA damage can be detected by these test systems.  Oxidative damage results from oxidative stress, which occurs when there is a disturbance in the balance between the production of reactive oxygen species (ROS) and antioxidant defense systems.  Normal cellular metabolism is a source of endogenous reactive oxygen species that accounts for background levels of oxidative damage in normal cells.   Some types of oxidative damage are repairable while others lead to serious consequences in the cell. (Cooke et al, 2003).  The various assays evaluating primary DNA damage in glyphosate technical are presented in Table 5.7.  Details of the findings are discussed below.

Glyphosate technical is not electrophilic and is not considered to be DNA-reactive.  In a study to evaluate the potential for glyphosate to directly interact with DNA, Peluso *et al.* (1998) reported that glyphosate technical did not form DNA adducts in mice when tested up to 270 mg/kg via i.p. Bolognesi *et al.* (1997) reported an increase in the oxidative damage biomarker 8-hydroxedeoxyguanosine (8-OHdG) in the liver 24 h after i.p. injection of 300 mg/kg in mice. No increase in 8-OHdG was seen in the kidney with glyphosate technical.  The dose in this study was high (300 mg/kg) for an i.p. injection and within the i.p. $LD_{50}$ range (134- 545 mg/kg) that has been reported elsewhere (WHO, 1994).

The comet assay, also known as single cell gel electrophoresis (SCGE), is a sensitive and rapid method to detect DNA strand breaks in individual cells. In this assay, individual cells are embedded in agarose.  The cells are then lysed (which digests the cellular and nuclear membranes) and the DNA is allowed to unwind under alkaline or neutral conditions.  During electrophoresis, chromatin (which is in a supercoiled state) that has undergone steric relaxation due to DNA damage migrates away from the nucleoid (nucleus) toward the anode, yielding images that resemble a comet.  The intensity of the comet tail relative to the comet head reflects the amount of DNA breakage (Tice *et al.*, 2000; Collins *et al.*, 2008).  The comet assay can detect single and double strand breaks resulting from direct interactions with DNA, alkali labile sites, or transient DNA breaks resulting during DNA excision repair. These types of strand breaks may be, (a) repaired with no persistent effect, (b) be lethal to the cell or (c) be fixed as a mutation (OECD TG 489).  DNA strand breaks in the comet assay can be measured by endpoints such as percent tail DNA (also referred to as % tail intensity), tail length, and tail moment. However, % tail DNA is the recommended metric for evaluating and interpreting results using this assay (OECD TG 489).

The five studies that evaluated glyphosate technical using the comet assay are summarized in Table 5.12.  Two of the studies were conducted using tumor cell lines.  Koller *et al.* (2012) reported positive comet effects (increased tail intensity) in a human buccal carcinoma cell line (TR146) following a 20-minute treatment with ≥ 20 mg/L (~0.118 mM) glyphosate. Although no evidence of cytotoxicity was reported in this study, the authors did report an increase in apoptosis and necrosis at the same concentrations (≥ 20 mg/L) when the same cell line was tested for *in vitro* micronuclei induction (discussed previously).  In a study using Hep-2 cells (presumably a HeLa cell derivative), Manas *et al.* (2009) reported a statistically significant increase in mean tail length, and tail intensity at all concentrations (3.0-7.5 mM) tested. In a comet study conducted on human lymphocytes, Alvarez-Moya *et al.* (2014) reported significant increases in tail length only (but not % tail DNA) following treatment with glyphosate concentrations of 0.7-700 µM.  Mladinic *et al.* (2009a) evaluated DNA damage in non-dividing human lymphocytes (±S9) following treatment from 0.5 to 580 µg/mL using the standard alkaline comet method and a modified comet method that detects DNA damage due to oxidative damage (human 8-hydroxyguanidine DNA-glycosylase, hOGG1 comet method).  In this study, the authors reported statistically significant increases in tail intensity at 3.5 µg/mL and higher in the absence of S9, with significance only at 580 µg/mL (~3.4 mM) in the presence of S9 using the alkaline method.  This concentration also resulted in increased apoptosis and necrosis as well as an increase in plasma total antioxidant capacity (TAC) and changes in plasma lipid peroxidation (thiobarbituric reactive substances, TBARs); however, only a dose-related increase in tail length (not % tail DNA) was observed at 580 µg/mL (+S9) using the hOGG1 method. When the Manas *et al.* (2013) evaluated blood and liver cells following a 14-day drinking water study in mice treated with 40 and 400 mg/kg/day glyphosate, significant increases in tail intensity, tail length and tail moment were reported were observed at both doses in both tissues (except for DNA tail intensity in liver at 40 mg/kg); however, there were no substantial effects on oxidative stress measurements suggesting that DNA damage reported may not be due to oxidative damage.

The Unscheduled DNA Synthesis (UDS) test with mammalian liver cells *in vitro* identifies substances that induce DNA repair after excision and removal of a segment of damaged DNA. The test is typically conducted in liver cells, which have relatively few cells in the S-phase of the cell cycle.  The assay measures the incorporation of radiolabeled nucleotide [$^3$H]-thymidine into DNA during the repair process in non-S phase cells. (OPPTS 870.5555). Substances that produce either a statistically significant dose-related increase or statistically significant and reproducible increase in $^3$H-TdR incorporation in at least one test point are considered to be positive in this test. A UDS study that evaluated glyphosate technical in rat primary hepatocytes was negative (Williams, 1978).  Glyphosate technical was also negative in a DNA repair test conducted in bacteria (Rec-A test) (Shirasu, 1978).

In an alkaline elution assay, which detects single strand DNA breaks, Bolognesi *et al.* (1997) reported an increase in single strand breaks (i.e. increased DNA elution rate) in the liver and kidney 4 hours after a single i.p. injection of 300 mg/kg.  The elution rate returned to control levels at 24 hours. Glyphosate technical was also negative in a DNA repair test conducted in *Bacillus subtilis* H17 (rec$^+$) and M45 (rec$^-$) bacterial Rec-A test (Shirasu, 1978).

Finally, the sister chromatid exchange (SCE) test is an assay that can measure the consequence of primary DNA damage.  The mechanism(s) of action for chemical induction of SCE is unclear.  The SCE assay detects the exchange of DNA between two sister chromatid arms within a single chromosome.  The assay can be performed *in vitro* or *in vivo*.  Following exposure, cells/animals are treated with bromodeoxyuridine (BrdU) to allow for the differentiation of the two sister chromatids (harlequin staining) and prior to harvest are treated with a spindle inhibitor to accumulate cells in metaphase.  The chromosome preparations are then stained and analyzed for SCEs (OPPTS 870.5900, 870.5915).  The SCE studies that evaluated glyphosate technical are also presented in Table 12.  Positive SCE findings were reported in all four studies; two evaluating bovine lymphocytes (Lioi, 1988b, Sivikova and Dianovksy, 2006) and two studies evaluating human lymphocytes (Lioi, 1988a; Bolognesi *et al.*, 1997).  In all four studies the induction did not demonstrate a clear dose response.

Additionally, although it is recognized that mechanisms other than genotoxicity may be involved in cell transformation, glyphosate trimesium salt was evaluated in the Balb/3T cell transformation assay (an *in vitro* tumor formation assay) and was negative up to 5.0 mg/ml (Majeska, 1982b).

**Table 5.7 Assays for Detecting Primary DNA Damage- Glyphosate Technical.**

| Test/Endpoint | Test System | Route of Administration | Doses/ Concentrations | Test Material Purity | Results | Reference | Comments |
|---|---|---|---|---|---|---|---|
| DNA Adducts $^{32}$P-postlabeling | Swiss CD1 mice (males and females) Liver and kidney evaluated | Intraperitoneal injection; 24 h exposure | 0, 130 and 270 mg/kg | Not reported | Negative | Peluso *et al.* (1998) | |
| DNA oxidative damage: 8-OHdG formation | Swiss CD-1 mice (males) liver and kidney evaluated | Intraperitoneal injection (single dose); sampling 4 and 24 h after injection | 0, 300 mg/kg (3/dose) | 99.9% | Kidney: negative<br><br>Liver: positive (24 h) | Bolognesi *et al.* (1997) | |
| Single-cell gel electrophoresis (SCGE) assays- Comet assay | TR146 cells (human-derived buccal epithelial cell line). | NA (*in vitro*) | -S9: 10-2000 mg/L; 20-minute exposure. | 95% | Positive<br><br>Increased DNA migration at >20 mg/L | Koller *et al.* (2012) | Also measured multiple cellular integrity parameters to assess cytotoxicity. No clear evidence of cytotoxicity seen except for increase in enzyme activity (indicative of membrane damage) in LDHe (extracellular lactate dehydrogenase) assay at >80 mg/L. No mention of monitoring pH |
| Single-cell gel electrophoresis (SCGE) assays- Comet assay | Hep-2 cells | NA (*in vitro*) | 0, 3, 4.5, 6, 7.5, 9, 12 and 15 mM | 96% | Positive<br><br>Stat. significant increase in mean tail length, and tail intensity at all concs. | Manas *et al.* (2009) | The authors did not report a source for the Hep-2 cells. The agency presumes that this is a HeLa derived cervical carcinoma cell line. |

**Table 5.7 Assays for Detecting Primary DNA Damage- Glyphosate Technical.**

| Test/Endpoint | Test System | Route of Administration | Doses/ Concentrations | Test Material Purity | Results | Reference | Comments |
|---|---|---|---|---|---|---|---|
| Single-cell gel electrophoresis (SCGE) assays- Comet assay | Human lymphocytes | NA (*in vitro*) | 0, 0.7, 7, 70, 700 µM | 96% | Positive at all doses (increase in tail length only) | Alvarez-Moya *et al.*, (2014) | Issues were identified with this study resulting in a low quality ranking. These include: 1) blood was washed with PBS and then held at 4º C for an indeterminate amount of time before exposure to glyphosate. (2) Cells were treated for 20 hours at room temperature. (3) The same amount of damage was reported across 2 orders of magnitude concentration. |
| Single-cell gel electrophoresis (SCGE) assays- Comet assay | Human lymphocytes; ±S9 Alkaline and hOOG1 Comet assays performed | NA (*in vitro*) | 0, 0.5, 2.91, 3.5, 92.8 and 580 µg/mL | 98% | Positive ±S9 | Mladinic *et al.* (2009a) | The alkaline comet assay -S9: ↑ in mean tail length at 580 µg/mL and ↑ in tail intensity at ≥ 3.5 µg/mL). +S9: ↑ DNA tail length at ≥3.5 µg/mL. Tail intensity ↑ only at 580 µg/mL

hOOG1 comet assay: -S9 no effect on tail length, ↑tail intensity only at 3.50 µg/mL +S9: ↑ tail length at 580 µg/mL, no effect on tail intensity compared to controls at any conc. |

**Table 5.7 Assays for Detecting Primary DNA Damage- Glyphosate Technical.**

| Test/Endpoint | Test System | Route of Administration | Doses/ Concentrations | Test Material Purity | Results | Reference | Comments |
|---|---|---|---|---|---|---|---|
| Single-cell gel electrophoresis (SCGE) assays- Comet assay with oxidative stress measures | Balb/C mice; evaluated blood and liver | Drinking water (14 days) | 0, 40, and 400 mg/kg | 96% | Positive<br><br>Blood and liver at both doses | Manas *et al.* (2013) | Only minor effects seen on oxidative stress measurements (TBARs, SOD, CAT) |
| Sister Chromatid Exchange (SCE) | Bovine lymphocytes (3 donors) | NA (*in vitro*) | -S9:  0, 17, 85 and 170 µM; 72 h exposure | ≥98% | Positive Significant (p>0.05) increase in SC/cell at all concentrations | Lioi (1998b) | 1.8-, 2.1-, 1.6-fold increases, respectively |
| Sister Chromatid Exchange (SCE) | Human lymphocytes | NA (*in vitro*) | -S9: 0, 5, 8.5, 17 and 51 µM; 72 h exposure | ≥98% | Positive Significant (p>0.05) increase in SCE/cell at ≥ 8.5 µM | Lioi (1998a) | 1.9-, 2.8-, and 2.6-fold increase at 8.5, 17 and 51 µM, respectively |
| Sister Chromatid Exchange (SCE) | Human lymphocytes | NA (*in vitro*) | -S9: 0, 0.33, 1,3 and 6 mg/mL; 72 h exposure | 99.9% | Positive | Bolognesi *et al.* (1997) | Very limited information was provided on the methods used in this paper.  Authors report a dose –dependent increase in SCE frequency; however, no statistical analysis for dose response was reported.  Data presented graphically with no error bars. |
| Sister Chromatid Exchange (SCE) | Human lymphocytes | NA (*in vitro*) | 28, 56, 140, 280, 560 and 1120 µM; 24 h exposure ±S9 | 62% | Positive | Sivikova and Dianovsky (2006) | The increases in SCEs observed did not show a clear concentration related increase across a 40-fold increase in the concentrations tested |

**Table 5.7 Assays for Detecting Primary DNA Damage- Glyphosate Technical.**

| Test/Endpoint | Test System | Route of Administration | Doses/ Concentrations | Test Material Purity | Results | Reference | Comments |
|---|---|---|---|---|---|---|---|
| Alkaline elution assay- DNA single strand breaks | Swiss CD-1 mice (males) liver and kidney evaluated | Intraperitoneal injection (single dose); sampling 8 and 24 h after injection | 0, 300 mg/kg (3/dose) | 99.9% | Positive (Increased elution rate) at 4 hours in liver and kidney<br><br>At 24 h, elution rate returned to control levels | Bolognesi *et al.* (1997) | Return to control values may indicate DNA repair or reflect rapid elimination of compound |
| DNA Repair Test (Rec-A test) | *B. subtilis* H17 (rec+) and M45 (rec-) | NA (*in vitro*) | 20-2000 µg/disk | 98.4% | Negative | Shirasu (1978) [MRID 00078619] | |
| Unscheduled DNA synthesis (DNA repair) | F-344 rat primary hepatocytes | NA (*in vitro*) | 0, 0.0125, 0.0625, 0.125, 0.6.5, 1.25, 12.5, 125 µg/mL | 98% | Negative | Li and Long (1988) | |
| Cell Transformation Assay | BALB/3T cells | NA (*in vitro*) | 0.313-5.0 mg/mL | 90% *Glyphosate trimesium salt* | Negative | Majeska (1982b) [MRID 00126616] | |

h- hour; CAT= catalase, G6PD= glucose 6-phosphate dehydrogenase, NA= not applicable, hOOG1 = TBARs= thiobarbituric acid reactive substances, SOD= superoxide dismutase

### 5.7     Summary and Discussion

The genotoxic potential of glyphosate has been extensively investigated using a variety of test systems and genetic endpoints. This assessment focuses only on test systems that the agency considered relevant for assessing genotoxic risks in humans. The totality of the genetic toxicology information was evaluated using a weight of evidence approach to determine the genotoxic potential of glyphosate. This involves the integration of *in vitro* and *in vivo* results as well as an overall evaluation of the quality, consistency, reproducibility, magnitude of response, dose-response relationship and relevance of the findings. In the weight of evidence analysis, studies evaluating endpoints that measured gene mutations and chromosomal aberrations (i.e. permanent DNA damage) were given more weight than endpoints reflecting DNA events that may be transient or reversible such as primary DNA damage (*e.g.,* comet assays). *In vivo* studies in mammals were given the greatest weight and more weight was given to doses and routes of administration that were considered relevant for evaluating genotoxic risk based on human exposure to glyphosate. Also, since the molecular mechanisms underlying the observation of SCEs are unclear and thus, the consequences of increased frequencies of SCEs are unclear, the data from this test were given low weight in the overall analysis. A summary of the various lines of evidence of considered in the weight of evidence evaluation for the genotoxic potential of the active ingredient glyphosate is presented below.

Evidence of primary DNA damage

Glyphosate technical is not considered to be electrophilic and did not induce DNA adducts in the liver or kidney at an i.p. dose of 270 mg/kg. However, evidence of DNA strand breaks was reported in a number mammalian cell studies using the comet assay. Additionally, transient increases in alkali labile sites in the liver and kidney of mice and an induction of 8-OHdG in DNA were seen in the livers of mice following i.p. injections with 300 mg/kg glyphosate. These effects were seen at high doses for the i.p. route in mice (LD$_{50}$ for mouse =130 mg/kg; NTP, 1992). However, due to technical limitations identified in a number of these studies (e.g. use of cancer cell lines that have not been well-characterized, atypical exposure protocols and no indication of blind to treatment), caution should be exercised in interpreting the results.

*In vitro* mutations

Glyphosate technical was negative in all 39 studies for mutagenicity in bacteria. In the four studies that tested for gene mutations in mammalian cells *in vitro,* no increase in mutations were observed.

*In vitro* chromosomal alterations

Mixed results were observed in studies evaluating *in vitro* chromosomal alterations with glyphosate treatment. Three SCE studies reported positive findings (Lioi, 1998a, b; Bolognesi *et al.*, 1997) bovine and human lymphocytes. As stated previously, low weight is given to SCE results in the overall analysis given the uncertainty regarding the consequence of increases in the frequencies of SCEs. The SCE responses were weak and not concentration dependent. Eight of the 10 studies measuring *in vitro* chromosomal aberrations were negative. The two positive

findings were reported by Lioi *et al.*, one study was conducted with bovine lymphocytes and the other with human lymphocytes. The authors reported positive findings in these studies at concentrations much lower than four other studies that reported negative results using the same cell types. Additionally, in both studies, Lioi *et al.* used an atypical exposure protocol of 72 hours which is very long for analyzing one round of mitosis. Furthermore, in both studies, nearly the same level effect for aberration frequency and percent of cells with aberrations were observed for the same concentrations of glyphosate and the two other chemicals tested in those experiments.

Four of the six studies evaluating micronuclei induction *in vitro* were positive and two showed equivocal results. Three of the positive responses required S9 activation, two conducted with human lymphocytes and one conducted with CHO cells. The remaining positive micronucleus study was conducted using a TR146 cells which is a tumor cell line derived from human buccal mucosa. The authors state that this cell line had not been previously used for genotoxicity testing. It is difficult to interpret any genotoxicity findings conducted in a tumor cell line that has not been well-characterized regarding its DNA damage response and repair capacity, and its degree of chromosomal instability.

Glyphosate was negative in all three L5178Y mouse lymphoma cell studies which may detect chromosomal damage in addition to mutations.

Mammalian *in vivo* chromosomal alterations

All three *in vivo* mammalian studies evaluating chromosomal aberrations with glyphosate technical were negative. Two studies were conducted in rats (i.p. and oral) and one was conducted in mice (oral). In addition, glyphosate was also negative in a rodent dominant lethal test. Glyphosate was negative in 15 of the 19 bone marrow micronucleus studies evaluated. In two of the positive studies, glyphosate technical was administered by i.p. injection. In these studies, the authors reported positive findings at doses of 200-300 mg/kg. Based on the available ADME data for glyphosate, assuming 30% oral absorption, an oral dose of ~700-1000 mg/kg would be needed to achieve a dose of 200-300 mg/kg in the blood. Seven other i.p. studies in mice reported no increase in micronuclei induction at doses up to 3000 mg/kg. The remaining positive finding was reported in an oral gavage study in mice where an approximately 2-fold increase in micronuclei were reported in females only at a dose of 5000 mg/kg, which is considerably higher than the current guideline recommended limit dose of 2000 mg/kg. The effect was not seen in the 7 other oral gavage studies in mice when glyphosate was tested at similar doses. In addition, glyphosate was negative for micronuclei induction following a 13-week dietary study with a dose up to approximately 3000 mg/kg/day. A negative finding was also reported in the only study that evaluated *in vivo* micronuclei induction in the rat using doses up to 2000 mg/kg.

In a meta-analytic review of micronuclei frequency across mammalian and non-mammalian species (primarily fish, amphibians, reptiles and plants), Ghisi *et al.* (2016), not surprisingly, reported that different responses were observed when comparing mammalian results to phylogenetically distant non-mammalian species for micronuclei induction. Their analyses included most, but not all, of the mammalian studies that the agency evaluated and determined to

be negative for micronuclei induction. The authors reported a statistically significant increase in micronuclei by the i.p. route across the studies in the data set they considered; however, when glyphosate was administered by the oral route (which is the most physiologically relevant route for human exposure to glyphosate), no significant difference was observed.

Conclusion for Glyphosate

The overall weight of evidence indicates that there is no convincing evidence that glyphosate induces mutations *in vivo* via the oral route.  When administered by i.p. injection, the micronucleus studies were predominantly negative.  In the two cases where an increase in micronuclei were reported via this route, the effects occurred above the reported i.p. LD50 for mice and were not observed in other i.p. injection studies at similar or higher doses.  While there is limited evidence genotoxic for effects in some *in vitro* experiments, *in vivo* effects were given more weight than *in vitro* effects particularly when the same genetic endpoint was measured, which is consistent with current OECD guidance.  The only positive findings reported *in vivo* were seen at relatively high doses that are not relevant for human health risk assessment.

**6.0    Data Integration & Weight-of-Evidence Analysis Across Multiple Lines of Evidence**

**6.1    Background**

In 2010, OPP developed a draft "Framework for Incorporating Human Epidemiologic & Incident Data in Health Risk Assessment" which provides the foundation for evaluating multiple lines of scientific evidence (U.S. EPA, 2010).  In 2016, a final version of the framework was published. OPP's framework is consistent with updates to the World Health Organization/International Programme on Chemical Safety MOA/human relevance framework, which highlights the importance of problem formulation and the need to integrate information at different levels of biological organization (Meek et al, 2014).

One of the key components of the agency's framework is the use of modified Bradford Hill Criteria (Hill, 1965) like those described in the 2005 Guidelines for Carcinogen Risk Assessment.  These criteria are used to evaluate the experimental support considers such concepts as strength, consistency, dose response, temporal concordance and biological plausibility in a weight-of-evidence analysis.

**6.2    Dose-Response and Temporal Concordance**

Given the lack of consistent positive findings particularly at doses < 1000 mg/kg/day across the lines of evidence, lack of mechanistic understanding, and lack of biological activity in mammalian systems to the parent compound glyphosate, there are few data to assess key events in the biological pathway and any associated temporal or dose concordance.  Temporal concordance can be assessed using the experimental animal studies and epidemiological studies that evaluated exposure prior to outcomes.  Similarly, dose concordance can be assessed using findings of apical outcomes in experimental animal studies, as well as epidemiological studies that utilize exposure metrics that are stratified by the number of exposure days.

A prospective cohort study is designed to collect exposure information prior to the development of cancer.  As such, exposure is known to occur before the outcome.  In De Roos *et al.* (2005), a prospective cohort study, no association was observed between glyphosate exposure and all cancer outcomes evaluated in the AHS cohort.  Although the median follow-up time following recruitment into the cohort was approximately 7 years in De Roos *et al.* (2005), an updated analysis of the AHS cohort has been recently published (Andreotti *et al.*, 2017), which included an extended follow-up period of 17.5 years and also did not report an association between glyphosate exposure and all cancer outcomes evaluated.

Two case-control studies evaluating the risk of NHL (Eriksson *et al.*, 2008 and McDuffie *et al.*, 2001) observed increased effect estimates in the highest exposure categories analyzed.  Eriksson *et al.* (2008) found a greater effect estimate for subjects with >10 days (based on the median days of exposure among controls) and >10 years of exposure (for latency analysis) when compared to subjects with ≤10 days and 1-10 years of exposure, respectively; however, this analysis did not appear to adjust for co-exposures to other pesticides.  By dividing the total number of exposed cases and controls using these exposure metrics, wider confidence intervals were observed due to smaller sample sizes, which reduces the reliability of the results to demonstrate a true

association. This may indicate that a longer follow-up time is needed to detect the risk for NHL; however, given the latency analysis of NHL was limited to Eriksson *et al.* (2008) and lack of NHL latency understanding in general, further studies are needed to determine the true latency of NHL. McDuffie *et al.* (2001), stratifying based on the average number of days per year of exposure, observed similar effect estimates in the lower exposure category (>0 and ≤2 days/year) while a greater effect estimate was observed in the highest exposure category (>2 days/year). The results from these two case-control studies conflict with the results observed in the cohort study (De Roos *et al.*, 2005; Andreotti *et al.*, 2017), where no dose-response was seen across three exposure categories (stratified by tertiles); however, the case-control studies did not adjust for co-exposure to other pesticides. It is also difficult to make conclusions regarding dose-response with only two exposure categories used for the analyses by Eriksson *et al.* (2008) and McDuffie *et al.* (2001). It should also be noted that these analyses combine all NHL subtypes, which may have etiological differences (Morton *et al.*, 2014). Although some studies did provide effect estimates for subtypes, as stated in Section 3.5.2, these were not considered in the current evaluation due to the limited sample sizes. At this time, there are no data available to evaluate dose-response for NHL subtypes.

With respect to animal carcinogenicity studies, key events in a MOA/AOP are evaluated to confirm that they precede tumor appearance. This temporal concordance evaluation cannot be conducted for glyphosate since a MOA/AOP has not been established. It was noted that no preneoplastic or related non-neoplastic lesions were reported in any of the animal carcinogenicity studies to support any observed tumors. Furthermore, genotoxicity assays did not support a direct mutagenic MOA. While there is limited evidence of genotoxicity in some *in vitro* endpoints, multiple *in vivo* studies do not support a genotoxic risk at relevant human exposure levels.

## 6.3    Strength, Consistency, and Specificity

A large database is available for evaluating the carcinogenicity potential of glyphosate. Across animal carcinogenicity and genotoxicity studies, results were consistent. For epidemiological studies, only one or two studies were available for almost all cancers investigated. The largest number of studies was available investigating NHL; however, there were conflicting results across studies.

In epidemiological studies, there was no evidence of an association between glyphosate exposure and solid tumors, leukemia, and HL. This conclusion is consistent with those recently conducted by IARC, EFSA, and JMPR. Furthermore, the available studies do not link glyphosate exposure to multiple myeloma.

At this time, a conclusion regarding the association between glyphosate exposure and risk of NHL cannot be supported based on the available data due to conflicting results. Chance and/or bias cannot be excluded as an explanation for observed associations. The magnitude of adjusted risk estimates for ever/never use were relatively small ranging from 1.0 (no association) to 1.85 in adjusted analyses, with the widest confidence intervals observed for the highest effect estimates indicating less reliability in these estimates. All of the ever/never estimates were not statistically significant with several effect estimates approximately equal to the null. There were

various limitations identified in Section 3.6 for these studies that could impact calculated effect estimates and explain the weak responses observed. Meta-risk ratios using these studies were also of small magnitude ranging from 1.3-1.5. As discussed in Section 3.6, meta-analyses should be interpreted with caution and are susceptible to the same limitations identified for individual studies.

Although none of the effect estimates were below 1 using the ever/never exposure metric, risk estimates were all below 1 (0.6-0.9) when using cumulative lifetime and intensity-weighted cumulative exposure metrics in the prospective cohort study (De Roos *et al.*, 2005; Andreotti *et al.,* 2017). As discussed in Section 6.2, two case-control studies that investigated an exposure-response relationship conflicted with the extensive analyses conducted for the AHS cohort. This may be due to differences in confounding control, differences associated with study design, limitations from small sample sizes, and/or, as some may suggest, a potentially short follow-up time in the cohort. It should also be noted that publication bias may play a role in this evaluation given there is a tendency to only publish positive results and potential concerns regarding glyphosate have only been raised in recent years.

A total of 14 (8 rat and 6 mouse) animal carcinogenicity studies with glyphosate, glyphosate acid, or glyphosate salts were analyzed for the current evaluation. None of the tumors evaluated were considered to be treatment-related based on weight-of-evidence evaluations. Although statistically significant trends were observed following adjustment for multiple comparisons in a limited number of studies, statistically significant pairwise comparisons were only observed in 2 studies indicating tumor incidences were generally similar to concurrent controls. Additionally, none of the tumor results were reproduced in other studies, including those testing the same animal strain with similar or higher dosing. Furthermore, the tumors lacked a monotonic dose-response and/or corroborating preneoplastic or related non-neoplastic lesions.

Over 80 genotoxicity studies with the active ingredient glyphosate were analyzed for the current evaluation. The overall weight-of-evidence indicates that there is no convincing evidence that glyphosate is genotoxic *in vivo* via the oral route. When administered via i.p. injection the studies were predominantly negative. In the two cases where an increase in micronuclei were reported via this route, the effects were not observed in other i.p. injection studies at similar or higher doses. Technical glyphosate was negative in all gene mutation studies. There was limited evidence of positive findings in studies evaluating primary DNA damage; however, as discussed in Section 5.6, the endpoints measured in these assays are less specific in regards to detecting permanent DNA changes (mutations) and can be attributed to other factors, such as cytotoxicity or cell culture conditions. Although some positive findings were reported for chromosomal alterations *in vitro*, these findings were limited to a few studies and are not supported by the *in vivo* studies that are the most relevant for human risk assessment.

Overall, there is remarkable consistency in the database for glyphosate across multiple lines of evidence. For NHL, observed associations in epidemiological studies were non-statistically significant and were of relatively small magnitude. Chance and/or bias cannot be excluded as an explanation for the observed associations. For all other cancer types, there were no associations found; however, only one or two studies were available for evaluation of most cancer types. Across species, strain, and laboratory, none of the tumors evaluated were considered to be

treatment-related based on weight-of-evidence evaluations.  Statistically significant tumor results seen in individual studies were not reproduced in other studies, including those conducted using the same strain at similar or higher doses.  The genotoxicity studies demonstrate that glyphosate is not directly mutagenic or genotoxic *in vivo*.

## 6.4    Biological Plausibility and Coherence

The Guidelines for Carcinogen Risk Assessment (U.S. EPA, 2005) include the following guidance regarding the criteria of biological plausibility and coherence:

> "*evaluation of the biological plausibility of the associations observed in epidemiologic studies reflects consideration of both exposure-related factors and toxicological evidence relevant to identification of potential modes of action (MOAs). Similarly, consideration of the coherence of health effects associations reported in the epidemiologic literature reflects broad consideration of information pertaining to the nature of the biological markers evaluated in toxicologic and epidemiologic studies.* [p.39]."

The genotoxicity studies demonstrate that glyphosate is not directly mutagenic or genotoxic *in vivo*.  Immunodeficiency is another plausible MOA associated with tumorigenesis (i.e., altered immune surveillance).  Glyphosate was negative in an immunotoxicity study in mice at doses up to 1448 mg/kg/day (MRID 48934207).  Additionally, the toxicology database for glyphosate does not reveal any evidence of immunotoxicity.  Overall, the available data regarding non-cancer endpoints also do not provide any support for a carcinogenic process for glyphosate, and have shown glyphosate has relatively low toxicity.   Laboratory animals generally display non-specific effects (e.g., clinical signs, reduced body weight) following glyphosate exposure at relatively high-doses, and no preneoplastic or related non-neoplastic lesions were observed to corroborate any of the observed tumors in the carcinogenicity studies.

As discussed in Section 4.2, metabolism studies demonstrate low oral absorption and rapid excretion of glyphosate.  The data are not sufficient to determine whether linear kinetics is occurring at high doses where tumors were observed.  In the carcinogenicity test guideline (OCSPP 870.4200) and the 2005 Guidelines for Carcinogen Risk Assessment, inappropriate toxicokinetics (e.g., overwhelming absorption or detoxification mechanisms) should be avoided. A study evaluating the toxicokinetic profile of glyphosate using multiple doses is needed to further investigate the pharmacokinetic properties between low- and high-dose levels.

Although many of the studies included in this document focus on the potential for glyphosate to cause a cancer outcome, the agency is also aware of a limited number of studies in the open literature that have shown glyphosate and its metabolite, AMPA, can inhibit proliferation and promote apoptosis in cancer cells indicating the compounds have potential to be developed into therapeutic drugs for cancer treatment (Li *et al,* 2013; Parajuli *et al.,* 2015; Parajuli *et al.,* 2016). It is unknown if this is due to lack of additional studies that have investigated these compounds for cancer treatment or if this may be due to publication bias.  The bias towards only publishing positive and/or novel results can hamper the ability to evaluate whether there are plausible biological mechanisms for observed outcomes and/or sufficient information to support a cause-and-effect interpretation of an association.  Overall, this further supports the need for

mechanistic data to elucidate the true mammalian MOA/AOP for glyphosate. There is a distinct lack of mechanistic understanding for the toxicity of glyphosate in mammals and the plant MOA is not relevant for mammalian systems.

The agency does not consider any of the tumors observed in the animal carcinogenicity studies to be treatment-related; however, some believe that the increased tumor incidences in various studies at the highest doses tested are treatment-related. In almost all of these studies, the highest dose tested was approximately equal to or greater than the limit dose (1000 mg/kg/day). It is very unlikely for people to be exposed to such large doses of glyphosate via the oral route. Glyphosate is registered for pre- and post-emergence application to a variety of fruit, vegetable, and field crops, as well as desiccant applications to several commodities. The highest dietary exposure value for any population subgroup in an unrefined chronic dietary analysis would be 0.23 mg/kg/day for children (1-2 years old). Since glyphosate also has residential uses, including application to turf, there is also the potential for children at this age to be exposed via incidental oral exposures (e.g., hand to mouth, object to mouth and soil ingestion) from playing on treated lawns. The highest exposure for the incidental oral and dermal exposures would be 0.16 mg/kg/day (from hand-to-mouth behaviors for children) and 0.08 mg/kg/day, respectively. Combining exposures from the dietary and residential exposures for children would, therefore, result in an aggregate exposure of 0.47 mg/kg/day. These calculations use a number of assumptions that have been extensively peer-reviewed[27] and yet the potential oral exposure of glyphosate for the most highly exposed residential population subgroup is more than 2,000 times lower than the highest doses tested in the animal carcinogenicity studies (see Appendix E for more details regarding these calculations). The maximum potential exposure calculated for occupational handlers would be 7 mg/kg/day, which is still significantly lower than the highest doses tested in the animal carcinogenicity studies. As a result, even though increased tumor incidences were observed in some of the animal carcinogenicity studies, the possibility of being exposed to these excessive dietary doses over time is considered implausible based on the currently registered use pattern and not relevant to human health risk assessment.

## 6.5    Uncertainty

When evaluating a database, it is also important to assess the uncertainties associated with the available data. When uncertainty is high there is less confidence in the exposure and effect estimates and, therefore, informs the reliability of results. Understanding the sources of uncertainty within a database can help characterize observed results and aid in developing new research with reduced uncertainty.

In some instances, the agency did not have access to all of the data underlying the studies analyzed for the current evaluation. This includes all of the epidemiological studies, 17 genotoxicity studies, and 1 animal carcinogenicity study. For these studies, the agency had to rely upon information the study authors reported. Without the raw data, statistical analyses could not be replicated or recalculated. On the other hand, studies that include full reports with detailed methodology, analytically measured doses, and individual animal data may provide a

---

[27] Using the 2012 Standard Operating Procedures for Residential Exposure Assessment. Available: http://www2.epa.gov/pesticide-science-and-assessing-pesticide-risks/standard-operating-procedures-residential-pesticide

higher level of confidence.  It also allows the agency to perform its own evaluation of the data using current practices and policies.

Several uncertainties have already been identified throughout this document.  There are numerous metabolism studies available for glyphosate; however, the data are not sufficient to determine whether linear kinetics is occurring at high doses where tumors were observed in animal carcinogenicity studies.  In the carcinogenicity test guideline (OCSPP 870.4200) and the 2005 Guidelines for Carcinogen Risk Assessment, inappropriate toxicokinetics (e.g., overwhelming absorption or detoxification mechanisms) should be avoided.  A study evaluating the toxicokinetic profile of glyphosate using multiple doses is needed to further investigate the pharmacokinetic properties between low- and high-dose levels.

With respect to the epidemiological data, the database is limited for each investigated cancer with only one or two studies available.  Although numerous studies were used in the evaluation of NHL, the results were constrained by the limitations of the individual studies, such as small sample size, missing data, and control selection issues.  The quality of the exposure assessment is a major concern since the validity of the overall study results depend in large part on the ability of the study to correctly quantify and classify a subject's exposure.  There was no direct information on pesticide exposure or absorbed dose because the exposures were self-reported.  All of the studies conducted exposure assessments through questionnaires and interviews that are susceptible to recall bias, which can result in exposure misclassification.  The cohort study (De Roos *et al.*, 2005), which was given a high ranking, did not find an association between glyphosate exposure and NHL; however, it has been noted that the median follow-up time for this study was ~7 years.  Recently, an updated analysis was published (Andreotti *et al.*, 2017) with an extended follow-up period of 17.5 years that addresses concerns regarding follow-up time.  This study reported no association between glyphosate exposure and all lymphohematopoietic cancers, NHL, or any of its subtypes across exposure metrics.  No association was observed in unlagged or lagged analyses, after adjustment for pesticides linked to NHL in previous AHS analyses, and after exclusion of multiple myeloma from the NHL grouping.  Furthermore, with the increased use of glyphosate following the introduction of glyphosate-tolerant crops in 1996, there is a need for more recent studies since a large number of studies were conducted prior to 1996.  As described in Section 1.1, the use pattern changed following the introduction of transgenic crops, which may impact overall effect estimates.

Another consideration is that farmers and other applicators apply formulations, not the active ingredient alone.  It is possible that different formulations were used across and/or within the different epidemiological studies.  Formulations are end-use products that are sold as a mixture of registered pesticidal active ingredients, such as glyphosate, and additional substances that increase the effectiveness of a pesticidal product, which are often referred to as "inert ingredients."  For example, inert ingredients may act as a solvent to allow a pesticide active ingredient to penetrate a plant's outer surface, may facilitate and accentuate the dispersion of the product, or may extend the pesticide product's shelf-life[28].  Inert ingredients and the proportion of these inert ingredients vary across formulations.  It has been hypothesized that glyphosate formulations may be more toxic than glyphosate alone.  Glyphosate has been studied in a multitude of studies and there are studies that have been conducted on numerous formulations

---

[28] https://www.epa.gov/pesticide-registration/inert-ingredients-overview-and-guidance

that contain glyphosate; however, there are relatively few research projects that have attempted to systematically compare glyphosate and the formulations in the same experimental design. Furthermore, there are even less instances of studies comparing toxicity across formulations. This is one aspect of the uncertainty in the database that the agency has been working to address by developing a strategic research plan in collaboration with NTP (see Section 7.0).

It is recognized that these uncertainties exist for the current database; however, the available data are adequate for evaluating the carcinogenic potential of glyphosate and determine the cancer classification using the 2005 Guidelines for Carcinogen Risk Assessment. As discussed in Section 6.3, there are a large number of studies available and the database is remarkably consistent across these studies.

## 6.6    Evaluation of Cancer Classification per the 2005 EPA Guidelines for Carcinogen Risk Assessment

### 6.6.1   Introduction

In the 2005 Guidelines for Carcinogen Risk Assessment, five classification descriptors are provided:
- Carcinogenic to Humans
- Likely to be Carcinogenic to Humans
- Suggestive Evidence of Carcinogenic Potential
- Inadequate Information to Assess Carcinogenic Potential
- Not Likely to be Carcinogenic to Humans

Descriptors are assigned using all available data from the multiple lines of evidence. The following text has been excerpted/summarized from the guidelines regarding these descriptors:

> Choosing a descriptor is a matter of judgment and cannot be reduced to a formula. Each descriptor may be applicable to a wide variety of potential data sets and weights of evidence. The weight-of-evidence, including the selected descriptor, is presented as a narrative laying out the complexity of information that is essential to understanding the hazard and its dependence on the quality, quantity, and type(s) of data available. The descriptors and narratives are intended to permit sufficient flexibility to accommodate new scientific understanding and new testing methods. The descriptors represent points along a continuum of evidence; consequently, there are gradations and borderline cases that are clarified by the full weight-of-evidence narrative. Rather than focusing simply on the descriptor, the entire range of information included in the weight-of-evidence narrative should be considered.

The weight-of-evidence presented in Sections 6.2-6.5 and based on the available epidemiological, animal carcinogenicity, and genotoxicity data for glyphosate was considered for each classification descriptor. For each descriptor, the guidelines provide examples and/or conditions for when the descriptor may be appropriate and the weight-of-evidence for glyphosate is assessed to determine which descriptor is supported by the available data. As stated in the 2005 EPA Guidelines for Carcinogen Risk Assessment, "the entire range of information included

in the weight-of-evidence should be considered". Based on all of the available data, the weight-of-evidence clearly do not support the descriptors "carcinogenic to humans" and "likely to be carcinogenic to humans" at this time. According to the 2005 Cancer Guidelines, "carcinogenic to humans" is appropriate "when there is convincing epidemiologic evidence of a causal association between human exposure and cancer." Similarly, "likely to be carcinogenic to humans" descriptor is appropriate "when the weight of the evidence is adequate to demonstrate carcinogenic potential to humans but does not reach the weight of evidence for the descriptor."

In epidemiological studies, there was no evidence of an association between glyphosate exposure and solid tumors, leukemia, or HL. Furthermore, the available studies do not link glyphosate exposure to multiple myeloma. A conclusion regarding the association between glyphosate exposure and risk of NHL cannot be determined based on the available data due to conflicting results and various limitations identified in studies investigating NHL. In 6 of the 14 animal carcinogenicity studies, no tumors were identified for evaluation. In the remaining 8 studies, the agency has concluded that none of the tumors evaluated in individual rat and mouse carcinogenicity studies are treatment-related due to lack of pairwise statistical significance, lack of a monotonic dose response, absence of preneoplastic or related non-neoplastic lesions, no evidence of tumor progression, and/or historical control information (when available). Tumors seen in individual rat and mouse studies were also not reproduced in other studies, including those conducted in the same animal species and strain at similar or higher doses. The tumor incidence increases in these studies were seen at or exceeding 1,000 mg/kg/day, except the testicular tumors in a single rat study, and these high doses would also not be considered relevant for human health risk assessment. The mammalian MOA/AOP is unknown for glyphosate and precursor events are unknown; however, the genotoxicity data were highly reproducible and consistent with a clear demonstration that glyphosate does not have a mutagenic MOA.

The descriptor "inadequate information to assess carcinogenic potential" is used when available data are judged inadequate for applying one of the other descriptors. Given the extensive size of the glyphosate database, which includes a multitude of well-designed and well-conducted studies, this classification descriptor is not supported. The epidemiological data at this time are limited and study results appear to be inconsistent across some cancer types. However, it is important to note that epidemiological studies are not available for most pesticides. Similarly, for most pesticides, generally, only two animal bioassays are available. EPA routinely evaluates human cancer potential using the small, more typical datasets. As such, for glyphosate, given the significant amount of information across multiple lines of evidence, the agency believes the database is sufficient to designate a cancer classification descriptor for glyphosate and that "inadequate information to assess carcinogenic potential" is not appropriate.

The remaining two cancer classification descriptors (*"Suggestive Evidence of Carcinogenic Potential"* and *"Not Likely to Be Carcinogenic to Humans")* from the 2005 EPA Guidelines for Carcinogen Risk Assessment are described in detail below. Subsequently, these descriptors are discussed in the context of whether the available evidence do or do not support them.

*"Suggestive Evidence of Carcinogenic Potential"*

This descriptor is appropriate when a concern for potential carcinogenic effects in humans is raised, but the data are judged not sufficient for a stronger conclusion. It covers a spectrum of

evidence associated with varying levels of concern for carcinogenicity.  Depending on the extent of the database, additional studies may or may not provide further insights.

Some examples of when this descriptor may be appropriate include the following:

- If a small, and possibly not statistically significant, increase in tumor incidence observed in a single animal or human study that does not reach the weight-of-evidence for the descriptor of "likely to be carcinogenic to humans."  The study generally would not be contradicted by other studies of equal quality in the same population group or experimental system;
- If there is evidence of a positive response in a study whose power, design, or conduct limits the ability to draw a confident conclusion (but does not make the study fatally flawed), but where the carcinogenic potential is strengthened by other lines of evidence;
- If there is a small increase in a tumor with a high background rate in that sex and strain, when there is some but insufficient evidence that the observed tumors may be due to intrinsic factors that cause background tumors and not due to the agent being assessed (when there is a high background rate of a specific tumor in animals of a particular sex and strain, then there may be biological factors operating independently of the agent being assessed that could be responsible for the development of the tumors).  In this case, the reasons for determining that the tumors are not due to the agent are explained; or
- If there is a statistically significant increase at one dose only, but no significant response at the other doses and no overall trend.

*"Not Likely to Be Carcinogenic to Humans"*

This descriptor is appropriate when the available data are considered robust for deciding that there is no basis for human hazard concern.  In some instances, there can be positive results in experimental animals when there is strong, consistent evidence that each MOA in experimental animals does not operate in humans.  In other cases, there can be convincing evidence in both humans and animals that the agent is not carcinogenic.

This descriptor would be appropriate if any of the following was observed:

- Animal evidence demonstrates lack of carcinogenic effects in both sexes in well-designed and well-conducted studies in at least two appropriate animal species in the absence of other animal or human data suggesting a potential for cancer effects, or
- Convincing and extensive experimental evidence showing that the only carcinogenic effects observed in animals are not relevant to humans, or
- Convincing evidence that carcinogenic effects are not likely by a particular exposure route, or
- Convincing evidence that carcinogenic effects are not likely below a defined dose range.

**6.6.2   Discussion of Evidence to Support Cancer Classification Descriptors**

As stated above, the available data and weight-of-evidence clearly do not support the descriptors "carcinogenic to humans", "likely to be carcinogenic to humans", or "inadequate information to assess carcinogenic potential". The following discusses the remaining cancer classification descriptors and how the evidence does or does not support the descriptors.

It could be argued that the "suggestive evidence of carcinogenic potential" descriptor would be appropriate. The evidence to support this includes:

- Non-statistically significant effect estimates greater than the null were reported for NHL across studies and meta-analyses based on ever/never use ranged from 1.3-1.5.
- There was limited evidence of a possible exposure-response relationship between glyphosate exposure and NHL in case-control studies.
- In several animal carcinogenicity studies, a statistically significant trend was observed. In two studies, tumor incidences at the highest doses tested were statistically significant as compared to concurrent controls.
- Positive responses were observed in a limited number of genotoxicity assays evaluating chromosomal and primary DNA damage.

However, according to the 2005 EPA Guidelines for Carcinogen Risk Assessment, in order for the above evidence to support the "suggestive evidence of carcinogenic potential" descriptor, "the study generally would not be contradicted by other studies of equal quality in the same population group or experimental system". Furthermore, the guidelines state that "rather than focusing simply on the descriptor, the entire range of information included in the weight-of-evidence narrative should be considered". For the epidemiological studies evaluating NHL, several studies reported effect estimates approximately equal to the null. The widest confidence intervals were observed for the highest effect estimates indicating these effect estimate are less reliable. All of the effect ever/never estimates were non-statistically significant. There were conflicting results in exposure-response assessments investigating glyphosate exposure and the risk of NHL. Although two-case control studies (McDuffie *et al.*, 2001; Eriksson *et al.*, 2008) reported elevated effect estimates when analyzing for exposure-response relationships across two exposure categories, extensive analyses in a study of equal or higher quality (De Roos *et al.*, 2005) for cumulative lifetime exposure and intensity-weighted cumulative exposure contradicted these results reporting effect estimates less than null (ranging from 0.6-0.9) when analyzing across tertiles and these analyses were further supported by the recent evaluation of the AHS cohort by Andreotti *et al.* (2017). Furthermore, the two-case control studies did not account for co-exposure to other pesticides, which would be expected to cause inflated effect estimates. Various limitations that could impact the calculated effect estimate were identified for these studies and discussed in Section 3.6. The effect estimates greater than the null were not strengthened by other lines of evidence, as described in Sections 6.2-6.5.

In 6 (4 rat and 2 mouse) of the 14 animal carcinogenicity studies conducted with glyphosate, no tumors were identified for evaluation. In the remaining 8 studies, although statistically significant trends following adjustment for multiple comparisons were observed in 6 of these studies for different individual tumor types, almost all of these lacked pairwise significance

following adjustment for multiple comparisons.  Pairwise significance was only observed at the highest dose tested for testicular tumors (Lankas, 1981) and hemangiomas (Sugimoto, 1997).  For testicular tumors, a closer examination of the incidence data across doses did not demonstrate a monotonic dose response and the tumor findings were not reproduced in studies of equal quality, including studies in the same animal species and strain at similar or higher doses.  For hemangiomas, the statistical significance was seen at a dose more than 4X the limit dose, which would not be considered relevant for human health risk assessment.  Furthermore, the tumor findings were not reproduced in studies of equal quality, including studies in the same animal species and strain at similar or higher doses.  In all of the animal carcinogenicity studies, there was no evidence of corroborating pre-neoplastic or related non-neoplastic lesions to support a treatment-related effect, including the testicular tumors.  In a limited number of cases, the agency also considered historical control data to inform the relevance of tumor findings and these data generally indicated that incidence rates in the concurrent controls were unusually low and/or observed tumor incidences were within historical control ranges.

Although positive responses were observed in a limited number of genotoxicity assays evaluating chromosomal and primary DNA damage, the overall weight-of-evidence indicates that there is no convincing evidence that glyphosate induces mutations *in vivo* via the oral route.  When administered via i.p. injection the studies were predominantly negative.  In the two cases where an increase in micronuclei were reported via this route of administration, the results were contradicted by numerous other studies at similar or higher doses using the same assays and route of administration.  Technical glyphosate was negative in all gene mutation studies.  There was limited evidence of positive findings in studies evaluating primary DNA damage; however, the endpoints measured in these assays are less specific in regards to detecting permanent DNA changes (mutations) and can be attributed to other factors, such as cytotoxicity or cell culture conditions.  Although some positive findings were reported for chromosomal alterations *in vitro*, these findings were limited to a few studies and are not supported by the *in vivo* studies that are the most relevant for human risk assessment.

In summary, considering the entire range of information for the weight-of-evidence, the evidence outlined above to potentially support the "suggestive evidence of carcinogenic potential" descriptor are contradicted by other studies of equal or higher quality and, therefore, the data do not support this cancer classification descriptor.

For the "not likely to be carcinogenic to humans" descriptor, one of the considerations is whether there is "convincing evidence that carcinogenic effects are not likely below a defined dose range".  In the case of glyphosate, the agency did not consider any of the tumors observed in the animal carcinogenicity studies to be treatment-related; however, some believe that the increased tumor incidences in various studies at the highest doses tested are treatment-related.  In all of these studies, the highest dose tested was approximately equal to or greater than the limit dose (1000 mg/kg/day), except for the testicular tumors observed in a single study that were not considered treatment-related and were not reproduced in studies of equal quality, including studies in the same animal species and strain at similar or higher doses.  In genotoxicity studies, assays with oral administration were negative except for one instance where an extremely high dose (5,000 mg/kg/day) was administered.

The 2005 EPA Guidelines for Carcinogen Risk Assessment also state that "weighing of the evidence includes addressing not only the likelihood of human carcinogenic effects of the agent but also the conditions under which such effects may be expressed". Increased tumor incidence was typically observed at doses of 1,000 mg/kg/day or greater; however, none of these were considered treatment-related by the agency based on the weight-of-evidence evaluations. Additionally, the only *in vivo* positive assays seen in the genotoxicity studies were administered via i.p. injection at doses of 200 mg/kg/day and 300 mg/kg/day or orally at 5,000 mg/kg/day. These high doses are not considered relevant to human health risk assessment based on the currently registered use pattern for glyphosate. Maximum potential glyphosate exposure in residential and occupational settings have been estimated at 0.47 mg/kg/day and 7 mg/kg/day, respectively, which are well-below the doses necessary to elicit the effects seen in these animal carcinogenicity and genotoxicity studies. Additionally, non-linear kinetics may also be occurring at the high doses. The carcinogenicity test guidelines (OCSPP 870.4200 and OCSPP 870.4300) and the 2005 Guidelines for Carcinogen Risk Assessment state that inappropriate toxicokinetics (e.g., overwhelming absorption or detoxification mechanisms) should be avoided. A well-conducted pharmacokinetic study evaluating the toxicokinetic profile of glyphosate is needed to further investigate the toxicokinetic properties between high and low dose levels to ensure that inappropriate toxicokinetics is avoided.

Overall, there is not strong support for the "suggestive evidence of carcinogenic potential" cancer classification descriptor based on the weight-of-evidence, which includes the fact that even small, non-statistically significant changes observed in animal carcinogenicity and epidemiological studies were contradicted by studies of equal or higher quality. The strongest support is for "not likely to be carcinogenic to humans".

## 6.7     Proposed Conclusions Regarding the Carcinogenic Potential of Glyphosate

Glyphosate is a non-selective, phosphonomethyl amino acid herbicide registered to control weeds in various agricultural and non-agricultural settings. Labeled uses of glyphosate include over 100 terrestrial food crops as well as other non-agricultural sites, such as greenhouses, aquatic areas, and residential areas. Following the introduction of glyphosate-resistant crops in 1996, glyphosate use increased dramatically; however, glyphosate use has stabilized in recent years due to the increasing number of glyphosate-resistant weed species.

Since its registration in 1974, numerous human and environmental health analyses have been completed for glyphosate, which consider all anticipated exposure pathways. Glyphosate is currently undergoing Registration Review. As part of this process, the hazard and exposure of glyphosate are reevaluated to determine its potential risk to human and environmental health using current practices and policies. The human carcinogenic potential of glyphosate has been evaluated by the agency several times. As part of the current evaluation for Registration Review, the agency has performed a comprehensive analysis of available data from submitted guideline studies and the open literature. This includes epidemiological, animal carcinogenicity, and genotoxicity studies.

An extensive database exists for evaluating the carcinogenic potential of glyphosate, including 63 epidemiological studies, 14 animal carcinogenicity studies, and nearly 90 genotoxicity studies for the active ingredient glyphosate.  These studies were evaluated for quality and results were analyzed across studies within each line of evidence.  The modified Bradford Hill criteria were then used to evaluate multiple lines of evidence using such concepts as strength, consistency, dose response, temporal concordance and biological plausibility.  The available data at this time do no support a carcinogenic process for glyphosate.  Overall, animal carcinogenicity and genotoxicity studies were remarkably consistent and did not demonstrate a clear association between glyphosate exposure and outcomes of interest related to carcinogenic potential.  In epidemiological studies, there was no evidence of an association between glyphosate exposure and numerous cancer outcomes; however, due to conflicting results and various limitations identified in studies investigating NHL, a conclusion regarding the association between glyphosate exposure and risk of NHL cannot be determined based on the available data.  Increases in tumor incidence were not considered treatment-related in any of the animal carcinogenicity studies.  In 6 of these studies, no tumors were identified for evaluation.  In the remaining studies, the tumors were not considered treatment-related due to lack of pairwise statistical significance, lack of a monotonic dose response, absence of preneoplastic or related non-neoplastic lesions, no evidence of tumor progression, and/or historical control information (when available).  Additionally, tumor findings seen in individual rat and mouse studies were also not reproduced in other studies, including those conducted in the same animal species and strain at similar or higher doses.  Furthermore, data from epidemiological and animal carcinogenicity studies do not reliably demonstrate expected dose-response relationships.  In genotoxicity studies, there was no convincing evidence that glyphosate is genotoxic *in vivo* via the oral route.

For cancer descriptors, the available data and weight-of-evidence clearly do not support the descriptors "carcinogenic to humans", "likely to be carcinogenic to humans", or "inadequate information to assess carcinogenic potential".  For the "suggestive evidence of carcinogenic potential" descriptor, considerations could be looked at in isolation; however, following a thorough integrative weight-of-evidence evaluation of the available data, the database would not support this cancer descriptor.  The strongest support is for "not likely to be carcinogenic to humans".

This analysis integrating multiple lines of evidence highlights the need for mechanistic studies to elucidate the MOA/AOP of glyphosate, as well as additional epidemiology studies and updates from the AHS cohort study to further investigate the carcinogenic potential of glyphosate in humans.  This evaluation focused on studies on the active ingredient glyphosate; however, additional research could also be performed to determine whether formulation components, such as surfactants, influence the toxicity of glyphosate formulations.  The agency has been working on plans to initiate research given these identified data gaps and these plans are described in Section 7.0.

### 7.0   Collaborative Research Plan for Glyphosate and Glyphosate Formulations

As previously mentioned, some have believed that glyphosate formulations may be more toxic than glyphosate alone.  Glyphosate has been studied in a multitude of studies and there are studies that have been conducted on numerous formulations that contain glyphosate; however, there are relatively few research projects that have attempted to directly compare glyphosate and the formulations in the same experimental design.  Furthermore, there are even less instances of studies comparing toxicity across formulations.

The agency has been collaborating with the NTP Division of the National Institute of Environmental Health Sciences to develop a research plan intended to evaluate the role of glyphosate in product formulations and the differences in formulation toxicity.  Four objectives were identified that laid out how research by NTP might contribute to these research questions: 1) compare the toxicity of glyphosate vs. formulations, as well as compare formulations vs. formulations, 2) provide publicly available toxicology data on cancer-related endpoints, 3) provide publicly available toxicology data on non-cancer endpoints, and 4) investigate the mechanisms of how glyphosate and formulations cause toxic effects.

As part of the first objective, NTP will investigate the differential biological activity of glyphosate, glyphosate formulations, and the individual components of formulations.  The NTP Laboratory Branch generated preliminary data by exposing human hepatoma cells (HepG2) to five different glyphosate products bought off the shelf.  The endpoint in the assay was cell viability, measured by ATP levels.  The data, presented in Figure 7.1, demonstrate at-a-glance that formulations are not equally toxic and that the toxicity is not being driven by the amount of glyphosate in the formulations, at least for the endpoint of cell viability. This observation highlights how informative the data generated from this research can be to the overall research questions.



**Figure 7.1.  Results of HepG2 exposures following 24 hour incubation using different glyphosate formulations.  Note: some of the formulations included other active ingredients besides glyphosate.**

For the second objective, NTP will contribute to the publicly available knowledge-base describing the biological effects of glyphosate and formulations by conducting guideline studies addressing genotoxicity and studies that evaluate the oxidative stress potential.  In order to organize publicly available data on glyphosate and formulations, IARC used 10 key characteristics of carcinogens as a way to help inform their conclusion (Smith *et al.*, 2016).  Their review concluded that data were only available for two of these characteristics (genotoxicity and oxidative stress) and little to no information on the remaining characteristics was available.  However, when members of a NTP workgroup looked at the available data included in the IARC review, the group did not agree with IARC that the data provided strong or clear evidence for either genotoxicity or induction of oxidative stress given protocol deficiencies that could produce questionable results.

Currently, the publicly available information regarding non-cancer endpoints for glyphosate and glyphosate formulations is limited.  To begin to address the third objective, NTP will conduct a screening level analysis of the literature using text mining software, for studies regarding non-cancer endpoints resulting from glyphosate exposure.  The resulting scoping report will describe the evidence base for health outcomes investigated in connection to glyphosate, as well as help identify data gaps.

As discussed in Section 6.0, there is a need for mechanistic studies to elucidate the MOA/AOP of glyphosate.  Although there are data suggesting glyphosate may be genotoxic or cause oxidative stress, there is little mechanistic information to support these observations.  For the last objective, NTP will use *in vitro* screening assays to gain mechanistic information on the effects of glyphosate and different formulations for a variety of endpoints and allow for direct comparisons among them.  The screening approach will also allow for the identification of test substances that would be good candidates for further *in vivo* testing.  Since *in vivo* findings in genetic toxicology testing are generally considered as having a greater relevance to humans than *in vitro* findings, it is valuable to confirm the results seen at the cellular level at the whole animal level.

## 8.0    References

Akanuma, M. (1995).  HR-001: Reverse Mutation Test. Kodaira Laboratories. The Institute of Environmental Toxicology, Tokyo, Japan.  Laboratory Project ID: IET 94-0142. April 3, 1995.  MRID 50017102. Unpublished.

Alvarez-Moya *et al.* (2014) "Comparison of the in vivo and in vitro genotoxicity of glyphosate isopropylamine salt in three different organisms". *Genetics and Molecular Biology*, 37, 1, 105-110

Andreotti, G., Freeman, L.E., Hou, L., Coble, J., Rusiecki, J., Hoppin, J.A., Silverman, D.T., and Alavanja, M.C. (2009). Agricultural pesticide use and pancreatic cancer risk in the Agricultural Health Study Cohort. International Journal of Cancer *124*, 2495-2500.

Andreotti G., Koutros S., Hofmann J.N., Sandler D.P., Lubin J.H., Lynch C.F., Lerro C.C., De Roos A.J., Parks C.G., Alavanja M.C., Silverman D.T., Beane Freeman L.E.  Glyphosate Use and Cancer Incidence in the Agricultural Health Study. J Natl Cancer Inst. 110 (5). Nov. 2017.

Atkinson, C., Strutt, A., Henderson, W., *et al.* (1993a). 104-Week Chronic Feeding/ Oncogenicity study in rats with 52-week interim kill. MRID No. 49631701. Unpublished

Atkinson, C., Martin, T., Hudson, P., and Robb, D. (1993b). Glyphosate: 104 week dietary carcinogenicity study in mice. Inveresk Research International, Tranent, EH33 2NE, Scotland. IRI Project No. 438618. April 7, 1993. MRID 49631702. Unpublished.

Band, P.R., Abanto, Z., Bert, J., Lang, B., Fang, R., Gallagher, R.P., and Le, N.D. (2011). Prostate cancer risk and exposure to pesticides in British Columbia farmers. The Prostate *71*, 168-183.

Baris, D, Garrity, TJ, Telles, JL, Heineman, EF, Olshan, A, Hoar Zahm, S. 2001. American Journal of Industrial Medicine. 39: 463-476.

Benbrook. (2016). Trends in glyphosate herbicide use in the United States and globally. Environmental Sciences Europe. 28(3).

Benjamini, Y and Hochberg, Y. 1995. Controlling the false discovery rate: a practical and powerful approach to multiple testing. Journal of the Royal Statistical Society B. 57: 289-300.

Bolognesi, C., Bonatti, S., Degan, P., Gallerani, E., Peluso, M., Rabboni, R., Roggieri, P., and Abbondandolo, A. (1997). Genotoxic activity of glyphosate and its technical formulation roundup. Journal of Agricultural and Food Chemistry *45*, 1957-1962.

Brammer. (2001). Glyphosate Acid: Two Year Dietary Toxicity and Oncogenicity Study in Wistar Rats. Central Toxicology Laboratory, Alderley Park Macclesfield, Cheshire, UK: Syngenta. MRID 49704601. Unpublished.

Brown, L.M., Blair, A., Gibson, R., Everett, G.D., Cantor, K.P., Schuman, L.M., Burmeister, L.F., Vanlier, S.F., and Dick, F. (1990). Pesticide Exposures and Other Agricultural Risk Factors for Leukemia among Men in Iowa and Minnesota. Cancer Research *50*, 6585-6591.

Brown, L.M., Burmeister, L.F., Everett, G.D., and Blair, A. (1993). Pesticide Exposures and Multiple Myeloma in Iowa Men. Cancer Causes Control *4*, 153-156.

Brayton *et al.*, 2012.  Pathology of aging mice and GEM background strains and experimental design. Vet Path. 49 (1): 85-105.

Burnett, P., Borders, J.; Kush, J. (1979) Report to Monsanto Company: Two Year Chronic Oral Toxicity Study with CP- 76100 in Albino Rats: IBT No. 8560-08924. (Unpublished study received Jun 24, 1982 under 524-308; prepared by Industrial Bio-Test Laboratories, Inc., submitted by Monsanto Co., Washington, DC; CDL:247746-A; 247745; 247747; 247748; 247749; 247750; 247751; 247752)

Collander R.D. (1996).  Glyphosate Acid:  An Evaluation of Mutagenic Potential Using *S. typhimurium* and *E. coli*.  Central Toxicology Laboratory, Cheshire, UK. Laboratory Project ID: CTL/P/4874 Study No. YV3611. February 16, 1996.  MRID 44320617. Unpublished.

Cantor, K.P., Blair, A., Brown, L.M., Burmeister, L.F., and Everett, G. (1993). Pesticides and Other Agricultural Risk Factors for Non-Hodgkin's Lymphoma among Men in Iowa and Minnesota. Cancer Research *53*, 2421-2421.

Carreón, T., Butler, M.A., Ruder, A.M., Waters, M.A., Davis-King, K.E., Calvert, G.M., Schulte, P.A., Connally, B., Ward, E.M., Sanderson, W.T.*, et al.* (2005). Gliomas and Farm Pesticide Exposure in Women: The Upper Midwest Health Study. Environmental Health Perspectives *113*, 546-551.

Cimino, M.C. (2006).  Comparative overview of current international strategies and guidelines for genetic toxicology testing for regulatory purposes. Environmental and Molecular Mutagenesis 47 (9): 362-390.

Chang, E.T., and Delzell, E. (2016). Systematic review and meta-analysis of glyphosate exposure and risk of lymphohematopoietic cancers. Journal of environmental science and health Part B, Pesticides, food contaminants, and agricultural wastes *51*, 402-434.

Chhabra *et al.* (1990). An over view of prechronic and chronic toxicity/carcinogenicity experimental study designs and criteria used by the National Toxicology Program. Environ Health Perspect. 86: 313-321.

Chruscielska *et al.* (2000).  Glyphosate: evaluation of chronic activity and possible far-reaching effects. Part 1. Studies on chronic toxicity. Pestycydy (Warsaw). 3-4: 11-20.

Collins, A.R., Oscoz, A.A., Brunborg, G., Gaivão, I., Giovannelli, L., Kruszewski, M., C.C., Stetina, R. (2008). The Comet assay:  topical issues.  Mutagenesis 23 (3): 143-151.

Cocco, P., Satta, G., Dubois, S., Pili, C., Pilleri, M., Zucca, M., t Mannetje, A.M., Becker, N., Benavente, Y., de Sanjose, S., *et al.* (2013). Lymphoma risk and occupational exposure to pesticides: results of the Epilymph study. Occupational and environmental medicine *70*, 91-98.

Cooke *et al.*, (2003).  Oxidative DNA damage:  mechanisms, mutation, and disease.  FASEB J. 17 (10): 1195-214.

Chruscielska, K. *et al.* 2000.  Glyphosate Evaluation of chronic activity and possible far-reaching effects.  Part 2.  Studies on mutagenic activity.  Pestycydy, 2000, (3-4), 21-25.  Published.

Dennis, L.K., Lynch, C.F., Sandler, D.P., and Alavanja, M.C. (2010). Pesticide use and cutaneous melanoma in pesticide applicators in the agricultural heath study. Environ Health Perspect *118*, 812-817.

De Roos, A.J., Zahm, S.H., Cantor, K.P., Weisenburger, D.D., Holmes, F.F., Burmeister, L.F., and Blair, A. (2003). Integrative assessment of multiple pesticides as risk factors for non-Hodgkin's lymphoma among men. Occupational and environmental medicine *60*. 1-9.

De Roos, A. J., *et al.* (2005). "Cancer incidence among glyphosate-exposed pesticide applicators in the Agricultural Health Study." Environ Health Perspect 113(1): 49-54.

Durward, R. (2006).  Technical Glyphosate: Micronucleus Test in the Mouse. Safepharm Laboratories Limited, Shardlow Business Park, Shardlow, Derbyshire DE72 2GD, UK, Study No. 2060/014. February 8, 2006. MRID 49957411. Unpublished.

Engel, L.S., Hill, D.A., Hoppin, J.A., Lubin, J.H., Lynch, C.F., Pierce, J., Samanic, C., Sandler, D.P., Blair, A., and Alavanja, M.C. (2005). Pesticide use and breast cancer risk among farmers' wives in the agricultural health study. Am J Epidemiol *161*, 121-135.

Enemoto, K. (1997), HR-001: 24-Month Oral Chronic Toxicity and Oncogenicity Study in Rats, Vol. 1. The Institute of Environmental Toxicology, Kodaira-shi, Tokyo, Japan, Arysta Life Sciences, Study No.: IET 94-0150.  MRID 50017104, 50017105, 5001703. Unpublished.

Eriksson, M., Hardell, L., Carlberg, M., and Akerman, M. (2008). Pesticide exposure as risk factor for non-Hodgkin lymphoma including histopathological subgroup analysis. International journal of cancer *123*, 1657-1663.

Excel (1997). Combined chronic toxicity/carcinogenicity study of glyphosate technical in Sprague Dawley rats. Pune, India: Indian Institute of Toxicology.

Fisher, RA. (1950) Statistical methods for research workers. Edinburgh, Scotland: Oliver and Boyd.

Flower, K.B., Hoppin, J.A., Lynch, C.F., Blair, A., Knott, C., Shore, D.L., and Sandler, D.P. (2004). Cancer Risk and Parental Pesticide Application in Children of Agricultural Health Study Participants. Environmental Health Perspectives *112*, 631-635.

Flowers, L.J., and Kier, L.D., Hannah, L.H. (1978) Final Report on Salmonella Mutagenicity Assay of Glyphosate: Test No. LF-78-161. MRID 00078620.  Unpublished.

Fontana et al (1998). Incidence rates of lymphomas and environmental measurements of phenoxy herbicides: ecological analysis and case-control study. Archives of Environmental Health: An International Journal. 53: 384-387.

Fox, V. (1998). Glyphosate acid:  In vitro cytogenetic assay in human lymphocytes. Central Toxicology Laboratory, Cheshire, UK.  Report CTL/P/6050.  October 29, 1998.  MRID 49961803. Unpublished

Fox and Mackay (1996).  Glyphosate acid:  Mouse bone marrow micronucleus test.  Central Toxicology Laboratory, Cheshire, UK. March 21, 1996. MRID 44320619. Unpublished.

Green and Owen, (2011).  Herbicide-resistant crops:  utilities and limitations for herbicide-resisitant week management. J. Agric Food Chem. 59 (11): 5819-29.

Greim, H., *et al.* (2015). "Evaluation of carcinogenic potential of the herbicide glyphosate, drawing on tumor incidence data from fourteen chronic/carcinogenicity rodent studies." Crit Rev Toxicol 45(3): 185-208.

George, J., *et al.* (2010). "Studies on glyphosate-induced carcinogenicity in mouse skin: a proteomic approach." J Proteomics 73(5): 951-964.

Ghisi, N.d.C., de Oliveira, E.C., and Prioli, A.J. (2016). Does exposure to glyphosate lead to an increase in the micronuclei frequency? A systematic and meta-analytic review. Chemosphere *145*, 42-54.

Giknis, M. L. A., and Clifford, C. B. (2005). Spontaneous Neoplastic Lesions in the Crl:CD1 (ICR) Mouse in Control Groups from 18 Month to 2 Year Studies. Charles River. http://www.criver.com/files/pdfs/rms/cd1/rm_rm_r_lesions_crlcd_1_icr_mouse.aspx

Hardell, L., Eriksson, M., and Nordstrom, M. (2002). Exposure to pesticides as risk factor for non-Hodgkin's lymphoma and hairy cell leukemia: Pooled analysis of two Swedish case-control studies. Leukemia & Lymphoma *43*, 1043-1049.

Hardell, L., and Eriksson, M. (1999). A case-control study of non-Hodgkin lymphoma and exposure to pesticides. Cancer *85*, 1353-1360.

Haseman, JK. (1995) Data analysis: Statistical analysis and use of historical control data. Regul Toxicol Pharmacol 21:52–59.

Hill AB (1965). The Environment and Disease: Association or Causation? Proc R Soc Med. May 1965; 58(5): 295–300.

Hoar *et al.* (1986). Agricultural herbicide use and risk of lymphoma and soft-tissue sarcoma. JAMA. 256:1141-1147.

Hohenadel, K., Harris, S.A., McLaughlin, J.R., Spinelli, J.J., Pahwa, P., Dosman, J.A., Demers, P.A., and Blair, A. (2011). Exposure to multiple pesticides and risk of non-Hodgkin lymphoma in men from six Canadian provinces. International journal of environmental research and public health 8, 2320-2330.

Hornarvar, N. (2008).  Technical Glyphosate: Micronucleus Test of the Mouse. RCC, Cytotest Cell Research GmbH (RCC-CCR0, In den Leppsteinswiesen 19, 64380 Rossdorf, Germany, Study No. 1158500. June 9, 2008. MRID 49961802. Unpublished.

Hsu and Stedeford (2010). Cancer Risk Assessment: Chemical Carcinogenesis, Hazard Evaluation, and Risk Quantification. John Wiley & Sons.

Jensen, J.C., 1991a. Mutagenicity test:  Ames Salmonella Assay with Glyphosate, Batch 206-JaK-25-1.  Scantox A/S, Lemvig, Denmark.  Laboratory No. 12323.  October 9, 1991.  MRID 49961502.  Unpublished.

Jensen, J.C. (1991b).  Mutagenicity test:  In vitro mammalian cell gene mutation test with glyphosate, batch 206-JaK-25-1. Scantox A/S, Lemvig, Denmark.  Laboratory No. 12325. October 9, 1991.  MRID 49961504.  Unpublished.

Jensen, JC (1991c).  Mutagenicity test:  Micronucleus test with Glyphosate, batch 206-JAK-25-1.  Scantox A/S, Lemvig, Denmark. Report number 12324. December 9, 1991.  MRID 49961503.

Kachuri, L., Demers, P.A., Blair, A., Spinelli, J.J., Pahwa, M., McLaughlin, J.R., Pahwa, P., Dosman, J.A., and Harris, S.A. (2013). Multiple pesticide exposures and the risk of multiple myeloma in Canadian men. International journal of cancer 133, 1846-1858.

Karipidis et al. 2007. Occupational exposure to ionizing and non-ionizing radiation and risk of non-Hodgkin lymphoma. Int Arch Occup Environ Health. 80: 663-670.
Karunanayake, CP, McDuffie, HH, Dosman, JA, Spinelli, JJ, Pahwa, P. 2008. Occupational exposures and non-Hodgkin's lymphoma: Canadian case-control study. Environmental Health. 7:44.

Karunanayake, C.P., Spinelli, J.J., McLaughlin, J.R., Dosman, J.A., Pahwa, P., and McDuffie, H.H. (2012). Hodgkin lymphoma and pesticides exposure in men: a Canadian case-control study. Journal of agromedicine 17, 30-39.

Kaufman, D.W., Anderson, T.E., and Issaragrisil, S. (2009). Risk factors for leukemia in Thailand. Annals of hematology 88, 1079-1088.

Kato et al. (2005). Personal and occupational exposure to organic solvents and risk of non-Hodgkin's lymphoma (NHL) in women (United States). Cancer Causes & Control. 16:1215-1224.

Kier, L. D. (2015). "Review of genotoxicity biomonitoring studies of glyphosate-based formulations." Crit Rev Toxicol 45(3): 209-218.

Kier and Kirkland (2013). Review of genotoxicity studies of glyphosate and glyphosate-based formulations. Critical Reviews in Toxicology. 43: 283-315.

Knezevich, A.L and Hogan, G. K. (1983). A chronic feeding study of glyphosate in mice. Unpublished report prepared by Bio/Dynamic Inc., dated July 21, 1983. Report No. 77-2011. EPA Accession No. 251007 – 251009, and 251014.  EPA Accession no. 251007-09, 251014. Unpublished.

Koller, V.J., Furhacker, M., Nersesyan, A., Misik, M., Eisenbauer, M., and Knasmueller, S. (2012). Cytotoxic and DNA-damaging properties of glyphosate and Roundup in human-derived buccal epithelial cells. Archives of toxicology *86*, 805-813.

Koureas, M., Tsezou, A., Tsakalof, A., Orfanidou, T., and Hadjichristodoulou, C. (2014). Increased levels of oxidative DNA damage in pesticide sprayers in Thessaly Region (Greece). Implications of pesticide exposure. The Science of the total environment *496*, 358-364.

Koutros, S., Beane Freeman, L.E., Lubin, J.H., Heltshe, S.L., Andreotti, G., Barry, K.H., DellaValle, C.T., Hoppin, J.A., Sandler, D.P., Lynch, C.F.*, et al.* (2013). Risk of total and aggressive prostate cancer and pesticide use in the Agricultural Health Study. Am J Epidemiol *177*, 59-74.

Kumar, D.P.S. (2001), Carcinogenicity Study with Glyphosate Technical in Swiss Albino Mice, Toxicology Department Rallis Research Centre, Rallis India Limited.  Study No. TOXI: 1559.CARCI-M.  MRID 49987403. Unpublished.

Landgren, O., Kyle, R.A., Hoppin, J.A., Beane Freeman, L.E., Cerhan, J.R., Katzmann, J.A., Rajkumar, S.V., and Alavanja, M.C. (2009). Pesticide exposure and risk of monoclonal gammopathy of undetermined significance in the Agricultural Health Study. Blood *113*, 6386-6391.

J. Langsdale *et al.* (2009). Glyphosate. Human Health Assessment Scoping Document in Support of Registration Review. June 3, 2009. D362745.

Lankas, G, P. (1981) A Lifetime Study of Glyphosate in Rats. Report No. 77-2062 prepared by Bio Dynamics, Inc. EPA Accession. No. 247617 – 247621. December 23, 1981.  MRID 00093879.  Unpublished.

Lee, W.J., Cantor, K.P., Berzofsky, J.A., Zahm, S.H., and Blair, A. (2004a). Non-Hodgkin's lymphoma among asthmatics exposed to pesticides. International journal of cancer *111*, 298-302.

Lee, W.J., Lijinsky, W., Heineman, E.F., Markin, R.S., Weisenburger, D.D., and Ward, M.H. (2004b). Agricultural pesticide use and adenocarcinomas of the stomach and oesophagus. Occupational and environmental medicine *61*, 743-749.

Lee, W.J., Colt, J.S., Heineman, E.F., McComb, R., Weisenburger, D.D., Lijinsky, W., and Ward, M.H. (2005). Agricultural pesticide use and risk of glioma in Nebraska, United States. Occupational and environmental medicine *62*, 786-792.

Lee, W.J., Sandler, D.P., Blair, A., Samanic, C., Cross, A.J., and Alavanja, M.C. (2007). Pesticide use and colorectal cancer risk in the Agricultural Health Study. International journal of cancer *121*, 339-346.

Li, A.P. (1983a). CHO/HGPRT gene mutation assay with glyphosate.  Environmental Heath Lab, St. Louis, MO.  Study Number T830044. October 20, 1983.  MRID 00132681. Unpublished.

Li, A.P. (1983b).  In vivo bone marrow cytogenetic study of glyphosate in Sprague Dawley rats. Environmental Health Laboratory, St. Louis, MO.  October 20, 1983.  MRID 00132683. Unpublished.

Li, A. P. and T. J. Long (1988). An evaluation of the genotoxic potential of glyphosate.  Fundam Appl Toxicol 10(3): 537-546.

Lioi M.B., *et al.* (1998a).  Genotoxicity and oxidative stress induced by pesticide exposure in bovine lymphocyte cultures in vitro.  Mutation Research- Fundamental and Molecular Mechanisms of Mutagenesis.  403 (1-2), 13-20.

Lioi M.B., *et al.* (1998b).  Cytogenetic Damage and Induction of Pro-Oxidant State in Human Lymphocytes Exposed In Vitro to Gliphosate, Vinclozolin, Atrazine, and DPX-E9636. Environmental and Molecular Mutagenesis 32: 39-46.

Lioi, M.B., Scarfi, M.R., Santoro, A., Barbieri, R., Zeni, O., Salvemini, F., Di Berardino, D., and Ursini, M.V. (1998a). Cytogenetic damage and induction of pro-oxidant state in human lymphocytes exposed in vitro to gliphosate, vinclozolin, atrazine, and DPX-EP636. Environmental and Molecular Mutagenesis *32*, 39-46.

Lioi, M.B., Scarfi, M.R., Santoro, A., Barbieri, R., Zeni, O., Di Berardino, D., and Ursini, M.V. (1998b). Genotoxicity and oxidative stress induced by pesticide exposure in bovine lymphocyte cultures in vitro. Mutation Research-Fundamental and Molecular Mechanisms of Mutagenesis *403*, 13-20.

Lowit *et al.* (2015). Literature Review on Neurodevelopmental Effects & FQPA Safety Factor Determination for the Organophosphate Pesticides. September 15, 2015. D331251.

Maizlish, N, Beaumont, J, Singleton, J. 1998. Mortality among California highway workers. American Journal of Industrial Medicine. 13: 363-379.

Majeska, J.; Zameck, R.; Matheson, D. (1982a) SC-0224 (Lot No. 7269- 10): Mutagenicity Evaluation in Salmonella typhimurium: Report No. T-10847. MRID 00126612.  Unpublished.

Majeska, J. (1982b) Morphological transformation of Balb/3T3 cells. Report No. T-10884. MRID 00126616. Unpublished.

Majeska, J. (1982c) Mutagenicity evaluation of bone marrow cytogenetic analysis in rats. Report No. T10884. MRID 00132176. Unpublished.

Majeska, J. (1985a) Mutagenicity Evaluation in Salmonella typhimurium: SC-0224: Report No. T-12660. MRID 00155527.  Unpublished.

Majeska, J. (1985b) Mutagenicity Evaluation in Mouse Lymphoma Multiple Endpoint Test Forward Mutation Assay: SC-0224: Report No. T-12661. MRID 00155528.  Unpublished.

Majeska, J. (1985c) Mutagenicity Evaluation in Chinese Hamster Ovary Cytogenetic Assay: SC-0224: Report No. T-12663. MRID 00155530.  Unpublished.

Majeska, J (1987).  Mutagenic evaluation in bone marrow micronucleus.  Environmental Health Center, Farmington, CT.  Study Report No. T12689/SC-0024.  April 23, 1987.  MRID 40214004. Unpublished.

Mañas, F., Peralta, L., Raviolo, J., Ovando, H.G., Weyers, A., Ugnia, L., Cid, M.G., Larripa, I., and Gorla, N. (2009). Genotoxicity of glyphosate assessed by the comet assay and cytogenetic tests. Environmental toxicology and pharmacology 28, 37-41.

Mañas, F., Peralta, L., Ugnia, L., Weyers, A., García Ovando, H., and Gorla, N. (2013). Oxidative stress and comet assay in tissues of mice administered glyphosate and ampa in drinking water for 14 days. BAG Journal of basic and applied genetics 24, 67-75.

Marques, M.F.C. (1999).  A Micronucleus Study in Mice for Glifosate Tecnico Nufarm. Bioagri Laboratarios Ltda.  Study No: RF-G12.79/99.  December 27, 1999. MRID 49957412. Unpublished.

Matsumoto (1995).  HR-001:  In vitro cytogenetics test.  The Institute of Environmental Toxicology, Tokyo, Japan.  Laboratory Project ID: IET 94-0143.  May 29, 1995.  MRID 50017106. Unpublished.

McConnell, EE; Solleveld, HA; Swenberg, JA; et al. (1986) Guidelines for combining neoplasms for evaluation of rodent carcinogenesis studies. J Natl Cancer Inst 76:283–289.

McDuffie, H.H., Pahwa, P., McLaughlin, J.R., Spinelli, J.J., Fincham, S., Dosman, J.A., Robson, D., Skinnider, L.F., and Choi, N.W. (2001). Non-Hodgkin's lymphoma and specific pesticide exposures in men: Cross-Canada study of pesticides and health. Cancer Epidemiol Biomarkers Prev 10, 1155-1163.

McDuffie, HH, Pahwa, P, McLaughlin, JR, Fincham, S, Robson, D, Dosman, JA, Hu, J. 2002. Canadian male farm residents, pesticide safety handling practices, exposure to animals and non-Hodgkin's lymphoma (NHL). American Journal of Industrial Medicine. 42: 54-61.

McDuffie, HH, P Pahwa, JJ Spinelli, JR McLaughlin, S. Fincham, D. Robson, JA Dosman, J. Hu. 2002. Canadian Male Farm Residents, Pesticide Safety Handling Practices, Exposure to Animals, and Non-Hodgkin's Lymphoma. American Journal of Industrial Medicine Supplement 2: 54-61

Meek ME, Boobis A, Cote I, Dellarco V, Fotakis G, Munn S, Seed J, Vickers C.  2014. New developments in the evolution and application of the WHO/IPCS framework on mode of action/species concordance analysis.  *J Appl Toxicol.* 2014 Jan;34(1):1-18.

Mink, P. J., *et al.* (2012). "Epidemiologic studies of glyphosate and cancer: a review." Regul Toxicol Pharmacol 63(3): 440-452.

Mladinic, M., Berend, S., Vrdoljak, A.L., Kopjar, N., Radic, B., and Zeljezic, D. (2009a). Evaluation of genome damage and its relation to oxidative stress induced by glyphosate in human lymphocytes in vitro. Environmental and molecular mutagenesis *50*, 800-807.

Mladinic, M., Perkovic, P., and Zeljezic, D. (2009b). Characterization of chromatin instabilities induced by glyphosate, terbuthylazine and carbofuran using cytome FISH assay. Toxicology letters *189*, 130-137.

Moriya, M. *et al.* 1983.  Further mutagenicity studies on pesticides in bacterial reverse assay systems.  Mutation Research, 116 (1983), 185-216.

Morton *et al.* (2014). Etiologic heterogeneity among non-Hodgkin lymphoma subtypes: the interlymp non-Hodgkin lymphoma subtypes project. J Natl Cancer Inst Monogr 48: 130-144.

Nordstrom, M., Hardell, L., Magnuson, A., Hagberg, H., and Rask-Andersen, A. (1998). Occupational exposures, animal exposure and smoking as risk factors for hairy cell leukaemia evaluated in a case-control study. Br J Cancer *77*, 2048-2052.

NTP (1992). NTP technical report on the toxicity studies of Glyphosate (CAS No. 1071-83-6) Administered In Dosed Feed To F344/N Rats And B6C3F1 Mice. Toxic Rep Ser 16: 1-d3.

OECD (2015).  Guidance Document on Revisions to OECD Genetic Toxicology Test Guidelines. August 31, 2015.

Olsson and Brandt (1988). Risk of non-Hodgkin's lymphoma among men occupationally exposed to organic solvents. Scandinavian Journal of Work, Environment, & Health. 14:246-251.

Orsi, L., Delabre, L., Monnereau, A., Delval, P., Berthou, C., Fenaux, P., Marit, G., Soubeyran, P., Huguet, F., Milpied, N*., et al.* (2009). Occupational exposure to pesticides and lymphoid neoplasms among men: results of a French case-control study. Occupational and environmental medicine *66*, 291-298.

Pahwa, P., Karunanayake, C.P., Dosman, J.A., Spinelli, J.J., McLaughlin, J.R., and Cross-Canada, G. (2011). Soft-tissue sarcoma and pesticides exposure in men: results of a Canadian case-control study. Journal of occupational and environmental medicine / American College of Occupational and Environmental Medicine *53*, 1279-1286.

Pahwa, P., Karunanayake, C.P., Dosman, J.A., Spinelli, J.J., McDuffie, H.H., and McLaughlin, J.R. (2012). Multiple myeloma and exposure to pesticides: a Canadian case-control study. Journal of agromedicine *17*, 40-50.

Parajuli, K. R., *et al.* (2015). "Aminomethylphosphonic acid and methoxyacetic acid induce apoptosis in prostate cancer cells." Int J Mol Sci 16(5): 11750-11765.

Parajuli, K. R., *et al.* (2016). "Aminomethylphosphonic acid inhibits growth and metastasis of human prostate cancer in an orthotopic xenograft mouse model." Oncotarget 7(9): 10616-10626.

Pavkov, K.Ll, Turnier, J.C. (1987) Two-Year Chronic Toxicity and Oncogenecity Dietary Study with SC-0224 in Mice.  Stauffer Chemical Company.  MRID 40214006.  Unpublished.

Pavkov, K.Ll, Wyand, S. (1987) Two-Year Chronic Toxicity and Oncogenecity Dietary Study with SC-0224 in Rats.  Stauffer Chemical Company.  MRID 40214006.  Unpublished.

Peluso M. *et al.* (1998).  32P-Postlabeling detection of DNA adducts in mice treated with herbicide Roundup.  Environ and Mol Mutagen 31:55-59.

Piesova, E. (2004). The influence of different treatment length on the induction of micronuclei in bovine lymphocytes after exposure to glyphosate. Folia Veterinaria *48*, 130-134.

Piesova, E. (2005). The effect of glyphosate on the frequency of micronuclei in bovine lymphocytes in vitro. Acta Veterinaria-Beograd *55*, 101-109.

Portier, C.J., Armstrong, B.K., Baguley, B.C., Baur, X., Belyaev, I., Belle, R., Belpoggi, F., Biggeri, A., Bosland, M.C., Bruzzi, P.*, et al.* (2016). Differences in the carcinogenic evaluation of glyphosate between the International Agency for Research on Cancer (IARC) and the European Food Safety Authority (EFSA). Journal of epidemiology and community health.

Rank, J., *et al.* (1993). "Genotoxicity testing of the herbicide Roundup and its active ingredient glyphosate isopropylamine using the mouse bone marrow micronucleus test, Salmonella mutagenicity test, and Allium anaphase-telophase test." Mutat Res 300(1): 29-36.

Recore *et al.* (2014). Glyphosate: Tier II incident report. February 6, 2014. D417808.

Reyna, M.S. Gordon, D.E. (1973) 18-Month Carcinogenic Study with CP67573 in Swiss White Mice: IBT No. B569. (Unpublished study, including sponsor's validation report dated Feb 1, 1978, received Jun 21, 1978 under 524-308; prepared by Industrial Bio-Test Laboratories, Inc., submitted by Monsanto Co., Washington, D.C.; CDL:234136-G). MRID 00061113. Unpublished.

Reyna, M.S. Richter, W.R. Gordon, D.E. (1974) Two- Year Chronic Oral Toxicity Study with CP67573 in Albino Rats: IBT No. B564. MRID 00062507.  Unpublished.

Ribeiro do Val, R. (2007).  Bacterial reverse mutation test (Ames test) for Glifosato Technico Helm.  TECAM Tecnologia Ambiental Ltda., Sao Paulo, Brasil.  Study Number 3393/2007-2.0AM, Report Number RL3393/2007-2.0 AM-B, December 13, 2007.  MRID 50000903. Unpublished.

Rodney, DE (1980). Dominant lethal study in mice.  International Research and Development Corp. May 23, 1980.  MRID 0004634

Roustan, A., *et al.* (2014). "Genotoxicity of mixtures of glyphosate and atrazine and their environmental transformation products before and after photoactivation." Chemosphere 108: 93-100.

Ruder, A.M., Waters, M.A., Butler, M.A., Carreon, T., Calvert, G.M., Davis-King, K.E., Schulte, P.A., Sanderson, W.T., Ward, E.M., Connally, L.B*., et al.* (2004). Gliomas and farm pesticide exposure in men: the upper midwest health study. Archives of environmental health *59*, 650-657.

Schinasi, L., and Leon, M.E. (2014). Non-Hodgkin lymphoma and occupational exposure to agricultural pesticide chemical groups and active ingredients: a systematic review and meta-analysis. International journal of environmental research and public health *11*, 4449-4527.

Shirasu, Y.; Moriya, M.; Ohta, T. (1978) Microbial Mutagenicity Testing on CP67573 (Glyphosate).  Apr 25, 1979 under 524-308; prepared by Institute of Environ- mental Toxicology, Japan, submitted by Monsanto Co., Washington, D.C.; CDL:238233-A.  MRID 00078619. Unpublished.

Sivikova, K. and J. Dianovsky (2006). "Cytogenetic effect of technical glyphosate on cultivated bovine peripheral lymphocytes." Int J Hyg Environ Health 209(1): 15-20.

Smith *et al.*, (2016). Key characteristics of carcinogens as a basis for organizing data on mechanisms of carcinogenesis. Environmental Health Perspectives. 124: 713.

Snedecor, GW; Cochran, WG. (1967) Statistical methods, 6th ed. Ames, Iowa: Iowa State University Press.

Sokolowski, A. (2007a).  *Salmonella typhimurium* and *Escherichia coli* Reverse Mutation Assay with Glyphosate Technical (NUP-05068).  RCC Cytotest Cell Research GmbH, Rossdorf, Germany. Study Number 1061401. March, 16, 2007.  MRID 49957406. Unpublished.

Sokolowski, A. (2007b).  *Salmonella typhimurium* and *Escherichia coli* Reverse Mutation Assay with Glyphosate Technical (NUP-05070).  RCC Cytotest Cell Research GmbH, Rossdorf, Germany. Study Number 1061402. March, 16, 2007.  MRID 49957407. Unpublished.

Sokolowski, A. (2007c).  *Salmonella typhimurium* and *Escherichia coli* Reverse Mutation Assay with Glyphosate Technical (NUP-05067).  RCC Cytotest Cell Research GmbH, Rossdorf, Germany. Study Number 1061403. March, 16, 2007.  MRID 49957408. Unpublished.

Sokolowski, A. (2009b).  Glyphosate technical- Salmonella Typhimurium and Escherichia Coli reverse mutation assay.  Cytotest Cell Research GmbH (Harlan CCR), Rossdorf, German. Study and Report Number 1264500.  December 18, 2009.  MRID 49961801. Unpublished.

Sokolowski, A. (2010).  *Salmonella typhimurium* and *Escherichia coli* Reverse Mutation Assay with Glyphosate TC spiked with glyphosine.  RCC Cytotest Cell Research GmbH, Rossdorf, Germany. Study Number 1332300. April 7, 2010.  MRID 500000902. Unpublished.

Sorahan, T. (2015). "Multiple Myeloma and Glyphosate Use: A Re-Analysis of US Agricultural Health Study (AHS) Data." Int J Environ Res Public Health 12(2): 1548-1559.

Stout, L. D. and Ruecker, P.A. (1990). Chronic Study of Glyphosate Administered in Feed to Albino Rats. MRID No. 41643801; Historical Controls. MRID 41728700.  Unpublished.

Sugimoto, K. (1997), HR-001: 18-Month Oral Oncogenicity Study in Mice, Vol. 1 and 2. The Institute of Environmental Toxicology, 2-772, Suzuki-cho, Kodaira-shi, Tokyo, 187, Japan, Study No.: IET 94-0151.  MRID 50017108, 50017109. Unpublished.

Suresh, T.P. (1993b). Mutagenicity-Micronucleus Test in Swiss Albino Mice. Rallis India Limited.  Study No: TOXI: 889-MUT.MN.  May 6, 1993. MRID 49987407. Unpublished.

Suresh, T.P. (1994).  Genetic Toxicology- In vivo mammalian bone marrow cytogenetic test-Chromosomal analysis.  Rallis Agrochemical Research Station, Bangalore, India.  January 1, 1994.  MRID 49987408.  Unpublished.

Suresh, T.P. (1996) Combined Chronic Toxicity and Carcinogenicity Study with Glyphosate Technical in Wistar Rats.  Toxicology Department Rallis Research Centre, Rallis India Limited, TOXI-1559, 002/1-GPT-CARCI-M.  MRID 49987401. Unpublished.

Taddesse-Heath, L.; Chattopadhyay, S.K.; Dillehay, D.; L.; Lander, M.R.; Nagashfar, Z.; Morse III, H.C.; Hartley, J.W. (2000): Lymphomas and high-level expression of murine leukemia viruses in CFW mice Journal of Virology 74:6832-6837

Tarone, RE. (1982).  The use of historical control information in testing for a trend in proportions. Biometrics 38:215–220.

Thompson, P.W. (1996).  Technical Glyphosate: Reverse Mutation Assay "Ames Test" using *Salmonella typhimurium* and *Escherichia coli.*  Safepharm Laboratories Limited, Derby, UK. Study Number 434/014.  February 20, 1996.  MRID 49957409. Unpublished.

Wang *et al.* (2009). Occupational exposure to solvents and risk of non-Hodgkin lymphoma in Connecticut women. American Journal of Epidemiology. 169:176-185.

Ward, J. M. (2006).  Lymphomas and leukemias in mice.  Experimental and Toxicologic Pathology, 57 (5-6): 377-381.

Weisenburger, D.D. (1992). Pathological Classsification of Non-Hodgkin's Lymphoma for Epidemiological Studies. Cancer Research *52*, 5456S-5462S.

Wilderman, A.G. and Nazar, R.N. (1982).  Significance of plant metabolism in the mutagenicity and toxicity of pesticides.  Canadian Journal of Genetics and Cytology 24(4): 437-449.

Williams, G. M., *et al.* (2000). "Safety Evaluation and Risk Assessment of the Herbicide Roundup and Its Active Ingredient, Glyphosate, for Humans." Regulatory Toxicology and Pharmacology 31(2): 117-165.

Wood, E., Dunster, J., Watson, P., and Brooks, P. (2009a) Glyphosate Technical:  Dietary Combined Chronic Toxicity/Carcinogenicity Study in the Rat.  Harlan Laboratories Limited, Shardlow Business Park, Shardlow, Derbyshire DE72 2GD, UK.  Study No. 2060-012.  April, 23, 2009.  MRID 49957404. Unpublished.

Wood, E., Dunster, J., Watson, P., and Brooks, P. (2009b) Glyphosate Technical:  Dietary Carcinogenicity Study in the Mouse.  Harlan Laboratories Limited, Shardlow Business Park, Shardlow, Derbyshire DE72 2GD, UK.  Study No. 2060-011.  April, 22, 2009.  MRID 49957402. Unpublished.

Wright, N.P. (1996).  Technical Glyphosate:  Chromosomal aberration test in CHL cells in vitro. Safepharm Laboratories Limited, Derby, UK.  Study Number 434/015. March 13, 1996, MRID 49957410. Unpublished.

Yauk *et al.*, (2015).  Approaches to identifying germ cell mutagens:  Report of the 2013 IWGT workshop on germ cell assays.  Mutat Res Genet Toxicol Environ Mutagen, 783: 36-54.

Yiin, J.H., Ruder, A.M., Stewart, P.A., Waters, M.A., Carreon, T., Butler, M.A., Calvert, G.M., Davis-King, K.E., Schulte, P.A., Mandel, J.S.*, et al.* (2012). The upper midwest health study: a case-control study of pesticide applicators and risk of glioma. Environ Health *11*, 13.

Zaccaria, C.B. (1996). A micronucleus study in mice for the product Glyphosate. BioAgri. Study No: G.1.2 – 06/96.  November 18, 1996. MRID 49961501. Unpublished.

Zahm *et al* (1990). A case-control study of non-Hodgkin's lymphoma and the herbicide 2,4-dichlorophenoxyacetic acid (2,4-D) in Eastern Nebraska. Epidemiology. 1:349-356.

Zhang *et al.* (2007). Ultraviolet radiation exposure and risk of non-Hodgkin's lymphoma. American Journal of Epidemiology. 165: 1255-1264.

Zoriki-Hosmi, (2007).  Hosomi, R. (2007) Mammalian Erythrocyte Micronucleus Test for Glifosato Tecnico Helm. Project Number: RL/3393/2007/3/0MN/B.  MRID 50000901. Unpublished.

## Appendix A. Journal articles obtained from open literature search

| | |
|---|---|
| Abstract Only | Cebollero, L. R., et al. (2011). "Glyphosate based herbicides toxicity, a new approach." Toxicology Letters 205, Supplement: S233. |
| Abstract Only | Monroy, C. M., et al. (2004). "In vitro evaluation of glyphosate-induced DNA damage in fibrosarcoma cells HT1080 and Chinese hamster ovary (CHO) cells." Environ Mol Mutagen 44(3): 216-216. |
| Abstract Only | Ramos-Morales, P., et al. (2008). "Combined use of multiple biomarkers to evaluate the genotoxic activity of the herbicide Glyphosate." Environ Mol Mutagen 49(7): 577-577. |
| Abstract Only/Full article already identified | Sorahan, T. (2015). "Multiple Myeloma and Glyphosate Use: A Re-Analysis of US Agricultural Health Study (AHS) Data." Int J Environ Res Public Health 12(2): 1548-1559. |
| Article not in English | Kwiatkowska, M., et al. (2013). "GLYPHOSATE AND ITS FORMULATIONS - TOXICITY, OCCUPATIONAL AND ENVIRONMENTAL EXPOSURE." Med Pr 64(5): 717-729. |
| Article not in English | Lawson, R. and E. Estrade-Chapellaz (1999). "Intoxication volontaire par le glufosinate (Basta®)." Annales Françaises d'Anesthésie et de Réanimation 18(9): 1025-1026. |
| Article not in English | Mañas, F., et al. (2009). "Aberraciones cromosómicas en trabajadores rurales de la Provincia de Córdoba expuestos a plaguicidas." BAG. Journal of basic and applied genetics 20(1): 0-0. |
| Article not in English | Martinez, A., et al. (2007). "[Cytotoxicity of the herbicide glyphosate in human peripheral blood mononuclear cells]." Biomedica 27(4): 594-604. |
| Article not in English | Monroy, C. M., et al. (2005). "[Cytotoxicity and genotoxicity of human cells exposed in vitro to glyphosate]." Biomedica 25(3): 335-345. |
| Article not in English | Pieniazek, D., et al. (2003). "[Glyphosate--a non-toxic pesticide?]." Med Pr 54(6): 579-583. |
| Article not in English | Saratovskikh, E. A., et al. (2007). "Genotoxicity of the pestiside in Ames test and the possibility to formate the complexeses with DNA." Ekologicheskaya genetika V(3): 46-54. |
| Article not in English | В статье представлены результаты генотоксико логических, аллергологических и иммунологических исследований, проведенных в рамках медико-биологической оценки безопасности генно-инженерно-моди-фицированной кукурузы линии MON 88017, устойчивой к глифосату и жуку Diabrotica spp. Анализ данных, полученных при изучении уровня повреждений ДНК и уровня хромосомных аберраций, тяжести активного анафилактического шока и интенсивности гуморального иммунного ответа, состояния гуморального и клеточного звеньев иммунитета, не выявил какого-либо генотоксического, аллергенного, иммуномодулирующего и сенсибилизирующего действия ГМ-кукурузы линии MON 88017 по сравнению с ее традиционным аналогом. |
| Cancer treatment | Parajuli, K. R., et al. (2015). "Aminomethylphosphonic acid and methoxyacetic acid induce apoptosis in prostate cancer cells." Int J Mol Sci 16(5): 11750-11765. |
| Cancer treatment | Li, Q., et al. (2013). "Glyphosate and AMPA inhibit cancer cell growth through inhibiting intracellular glycine synthesis." Drug Des Devel Ther 7: 635-643. |
| Cancer treatment | Parajuli, K. R., et al. (2016). "Aminomethylphosphonic acid inhibits growth and metastasis of human prostate cancer in an orthotopic xenograft mouse model." Oncotarget 7(9): 10616-10626. |
| Correspondence article | Belle, R., et al. (2012). "LETTER TO THE EDITOR: TOXICITY OF ROUNDUP AND GLYPHOSATE." Journal of Toxicology and Environmental Health-Part B-Critical Reviews 15(4): 233-235. |
| Correspondence article | Carrasco, A. E. (2011). "Reply to the Letter to the Editor Regarding Our Article (Paganelli et al., 2010)." Chem Res Toxicol 24(5): 610-613. |
| Correspondence article | de Souza, L. and L. Macedo Oda (2013). "Letter to the editor." Food and Chemical Toxicology 53: 440. |
| Correspondence article | de Vendomois, J. S., et al. (2010). "Debate on GMOs Health Risks after Statistical Findings in Regulatory Tests." Int J Biol Sci 6(6): 590-598. |
| Correspondence article | Farmer, D. R. (2005). "Glyphosate results revisited." Environ Health Perspect 113(6): A365-A366. |
| Correspondence article | Grunewald, W. and J. Bury (2013). "Comment on "Long term toxicity of a Roundup herbicide and a Roundup-tolerant genetically modified maize" by Seralini et al." Food and Chemical Toxicology 53: 447-448. |
| Correspondence article | Huang, K. and W. Xu (2013). "Reply to letter to the editor." Food and Chemical Toxicology 59: 811-812. |
| Correspondence article | Korsaeth, A., et al. (2015). "Comments on the recently published study: "Compositional differences in soybeans on the market: Glyphosate accumulates in Roundup Ready GM soybeans", by T. Bøhn, M. |

| | |
|---|---|
| | Cuhra, T. Traavik, M. Sanden, J. Fagan and R. Primicerio (Food Chemistry 2014, 153: 207–215)." Food Chemistry 172: 921-923. |
| Correspondence article | Ollivier, L. (2013). "A Comment on "Séralini, G.-E., et al., Long term toxicity of a Roundup herbicide and a Roundup-tolerant genetically modified maize. Food Chem. Toxicol. (2012)," http://dx.doi.org/10.1016/j.fct.2012.08.005." Food and Chemical Toxicology 53: 458. |
| Correspondence article | Portier, C. J., et al. (2016). "Differences in the carcinogenic evaluation of glyphosate between the International Agency for Research on Cancer (IARC) and the European Food Safety Authority (EFSA)." J Epidemiol Community Health. |
| Correspondence article | Roberfroid, M. (2014). "Letter to the editor." Food and Chemical Toxicology 66: 385. |
| Correspondence article | Sanders, D., et al. (2013). "Comment on "Long term toxicity of a Roundup herbicide and a Roundup-tolerant genetically modified maize" by Seralini et al." Food and Chemical Toxicology 53: 450-453. |
| Correspondence article | Schorsch, F. (2013). "Serious inadequacies regarding the pathology data presented in the paper by Séralini et al. (2012)." Food and Chemical Toxicology 53: 465-466. |
| Correspondence article | Wallace Hayes, A. (2014). "Editor in Chief of Food and Chemical Toxicology answers questions on retraction." Food and Chemical Toxicology 65: 394-395. |
| Effects on cellular processes | Benachour, N. and G.-E. Seralini (2009). "Glyphosate Formulations Induce Apoptosis and Necrosis in Human Umbilical, Embryonic, and Placental Cells." Chem Res Toxicol 22(1): 97-105. |
| Effects on cellular processes | Chaufan, G., et al. (2014). "Glyphosate commercial formulation causes cytotoxicity, oxidative effects, and apoptosis on human cells: differences with its active ingredient." Int J Toxicol 33(1): 29-38. |
| Effects on cellular processes | Coalova, I., et al. (2014). "Influence of the spray adjuvant on the toxicity effects of a glyphosate formulation." Toxicology in Vitro 28(7): 1306-1311. |
| Effects on cellular processes | George, J., et al. (2010). "Studies on glyphosate-induced carcinogenicity in mouse skin: a proteomic approach." J Proteomics 73(5): 951-964. |
| Effects on cellular processes | George, J. and Y. Shukla (2013). "Emptying of Intracellular Calcium Pool and Oxidative Stress Imbalance Are Associated with the Glyphosate-Induced Proliferation in Human Skin Keratinocytes HaCaT Cells." ISRN Dermatol 2013: 825180. |
| Effects on cellular processes | Heu, C., et al. (2012). "A step further toward glyphosate-induced epidermal cell death: Involvement of mitochondrial and oxidative mechanisms." Environmental Toxicology and Pharmacology 34(2): 144-153. |
| Effects on cellular processes | Thongprakaisang, S., et al. (2013). "Glyphosate induces human breast cancer cells growth via estrogen receptors." Food Chem Toxicol 59: 129-136. |
| Not Relevant to current fit for purpose review | (1934). "The 1933 meeting of the American society of orthodontists at Oklahoma City." International Journal of Orthodontia and Dentistry for Children 20(1): 102-105. |
| Not Relevant to current fit for purpose review | (1938). "Supplementary report of region III: Reports of state chairmen." The Journal of Pediatrics 12(<HT>6</HT>): 846-850. |
| Not Relevant to current fit for purpose review | (1939). "Meeting of the Executive Board of the American Academy of Pediatrics." The Journal of Pediatrics 15(2): 294-315. |
| Not Relevant to current fit for purpose review | (1939). "Proceedings Meeting of the Executive Board of the American Academy of Pediatrics." The Journal of Pediatrics 14(2): 251-254. |
| Not Relevant to current fit for purpose review | (1967). "AORN Proceedings." AORN Journal 5(1): 82-91. |
| Not Relevant to current fit for purpose review | (1969). "AORN Proceedings." AORN Journal 9(5): 89-96. |
| Not Relevant to current fit for purpose review | (1969). "Nurse Recruitment Program—Stage I Winners." AORN Journal 10(<HT>6</HT>): 71-76. |
| Not Relevant to current fit for purpose review | (1970). "2036. Excretion of heliotrine in urine and bile: Jago, Marjorie, V., Lanigan, G. W., Bingley, J. B., Piercy, D. W. T., Whittem, J. H.&amp; Titchen, D. A. (1969). Excretion of the pyrrolizidine alkaloid heliotrine in the urine and bile of sheep. J. Path. 98, 115." Food and Cosmetics Toxicology 8(5): 607-608. |
| Not Relevant to current fit for purpose review | (1970). "2037. A round-up of fungal toxins: Krogh, P. (1969). The pathology of mycotoxicoses. J. stored Prod. Res. 5, 259." Food and Cosmetics Toxicology 8(5): 608. |
| Not Relevant to current fit for purpose review | (1972). "News and comment." American Journal of Orthodontics 62(3): 319-334. |
| Not Relevant to current fit for purpose review | (1976). "NHI proposals: a wide spectrum." AORN Journal 23(5): 814-818. |

| Not Relevant to current fit for purpose review | (1977). "The SR periodicals miscellany." Serials Review 3(2): 11-19. |
|---|---|
| Not Relevant to current fit for purpose review | (1980). "Appendix F — administrative procedures, facilities and standardization of testing." Survey of Ophthalmology 24, Supplement: 594-597. |
| Not Relevant to current fit for purpose review | (1981). "Calendar." Annals of Emergency Medicine 10(3): 5-6. |
| Not Relevant to current fit for purpose review | (1981). "Reviews of Books." The Lancet 317(8232): 1239-1240. |
| Not Relevant to current fit for purpose review | (1982). "Reviews of Books." The Lancet 320(8307): 1076-1078. |
| Not Relevant to current fit for purpose review | (1983). "Product news." Journal of Molecular Graphics 1(3): 89-91. |
| Not Relevant to current fit for purpose review | (1984). "24–27 October 1984 International meeting on artificial intelligence: Marseilles, France." Computer Compacts 2(3–4): 121-122. |
| Not Relevant to current fit for purpose review | (1985). "Newsview." Journal of Allergy and Clinical Immunology 76(2, Part 1): A36-A41. |
| Not Relevant to current fit for purpose review | (1990). "Regional direct marketing clubs/associations support DM education at local colleges/universities." Journal of Direct Marketing 4(1): 46-52. |
| Not Relevant to current fit for purpose review | (1990). "Subject index." Toxicology 61(3): 313-316. |
| Not Relevant to current fit for purpose review | (1990). "Volume contents." Toxicology 61(3): 319-320. |
| Not Relevant to current fit for purpose review | (1991). "4971677 Fluorescence detection type electrophoresis apparatus: Hideki Kambara, Yoshiko Katayama, Tetsuo Nishikawa, Hachiouji, Japan assigned to Hitachi Ltd." Biotechnology Advances 9(1): 89. |
| Not Relevant to current fit for purpose review | (1991). "4971903 Pyrophosphate-based method and apparatus for sequencing nucleic acids: Edward Hyman." Biotechnology Advances 9(1): 89. |
| Not Relevant to current fit for purpose review | (1991). "4971908 Glyphosate-tolerant 5-enolpyruvyl 3-phosphoshikimate synthase: Ganesh M Kishore, Dilip Shah assigned to Monsanto Company." Biotechnology Advances 9(1): 89. |
| Not Relevant to current fit for purpose review | (1991). "Author Index." Journal of Chromatography A 540: 479-482. |
| Not Relevant to current fit for purpose review | (1991). "Challenge to US computer fraud &amp; abuse act." Computer Fraud & Security Bulletin 1991(3): 5-6. |
| Not Relevant to current fit for purpose review | (1991). "Chemical index for volumes 16–17." Fundamental and Applied Toxicology 17(4): 848-850. |
| Not Relevant to current fit for purpose review | (1991). "Court case round-ups." Computer Fraud & Security Bulletin 1991(3): 5. |
| Not Relevant to current fit for purpose review | (1991). "FAT attacker!" Computer Fraud & Security Bulletin 1991(3): 5. |
| Not Relevant to current fit for purpose review | (1991). "FIGO news." International Journal of Gynecology & Obstetrics 35(3): 265-267. |
| Not Relevant to current fit for purpose review | (1991). "Local direct marketing clubs/associations support undergraduate/graduate level DM education." Journal of Direct Marketing 5(3): 61-65. |
| Not Relevant to current fit for purpose review | (1991). "Manipulation of molluscan haemocytes in vitro: *S.E. Fryer. Department of Zoology, Oregon State University, Corvallis OR 97331, USA." Developmental & Comparative Immunology 15, Supplement 1: S73. |
| Not Relevant to current fit for purpose review | (1991). "Preparation of monoclonal antibodies against hemolymph of the kuruma shrimp Penaeus japonicus (Crustacea: Decapoda): J. Rodriguez, V. Boulo, E. Bachère and E. Mialhe. IFREMER, Unité Pathol. Immunol. Génét. Mol., BP 133, 17390 La Tremblade, France." Developmental & Comparative Immunology 15, Supplement 1: S73. |
| Not Relevant to current fit for purpose review | (1991). "Round-up report from college/university direct marketing centers." Journal of Direct Marketing 5(2): 59-64. |
| Not Relevant to current fit for purpose review | (1992). "Forthcoming papers." Soil Biology and Biochemistry 24(1): 79. |

| Not Relevant to current fit for purpose review | (1992). "Subject index volume 85 (1992)." Plant Science 85(2): 235-237. |
|---|---|
| Not Relevant to current fit for purpose review | (1993). "Media watch." Physiotherapy 79(7): 496-498. |
| Not Relevant to current fit for purpose review | (1993). "Meetings and Notices." Journal of Equine Veterinary Science 13(9): 481-536. |
| Not Relevant to current fit for purpose review | (1993). "Meetings and notices." Journal of Equine Veterinary Science 13(8): 432-476. |
| Not Relevant to current fit for purpose review | (1993). "ROUND-UP Publications." Reproductive Health Matters 1(1): 109-110. |
| Not Relevant to current fit for purpose review | (1994). "Media Watch." Physiotherapy 80(11): 793-795. |
| Not Relevant to current fit for purpose review | (1994). "ROUND-UP Research." Reproductive Health Matters 2(4): 121-122. |
| Not Relevant to current fit for purpose review | (1994). "ROUND-UP Service Delivery." Reproductive Health Matters 2(3): 125-128. |
| Not Relevant to current fit for purpose review | (1995). "ROUND-UP Law and Policy." Reproductive Health Matters 3(<HT>6</HT>): 164-166. |
| Not Relevant to current fit for purpose review | (1995). "ROUND-UP Publications." Reproductive Health Matters 3(5): 146-151. |
| Not Relevant to current fit for purpose review | (1995). "ROUND-UP Service Delivery." Reproductive Health Matters 3(<HT>6</HT>): 167-169. |
| Not Relevant to current fit for purpose review | (1996). "5410871 Emission control device and method: Masters Ben F; Self James M Gastonia, NC, United States Assigned to Unlimited Technologies Inc." Environment International 22(2): XVI-XVII. |
| Not Relevant to current fit for purpose review | (1996). "5411697 Method for processing contaminated plastic waste: McGraw Peter S; Drake John; Hane Thomas H Severna Park, MD, United States Assigned to The United States of America as represented by the Secretary of the Navy." Environment International 22(2): XVII. |
| Not Relevant to current fit for purpose review | (1996). "5411944 Glyphosate-sulfuric acid adduct herbicides and use: Young Donald C Fullerton, CA, United States Assigned to Union Oil Company of California." Environment International 22(2): XVII. |
| Not Relevant to current fit for purpose review | (1996). "5412544 Method of illuminating and providing emergency egress guidance for hazardous areas: Derrick Donald E; Harris Hollis A; Marion Robert H; Tower William A; Towle L Christophe Hanover, NH, United States Assigned to Loctite Luminescent Systems Inc; The MTL Instruments Group." Environment International 22(2): XVII. |
| Not Relevant to current fit for purpose review | (1996). "Animal breeding and infertility: M.J. Meredith (Editor), Blackwell Science, Oxford, 1995, 508 pp., £60.00, ISBN 0-632-04038-6." Animal Reproduction Science 44(2): 135-136. |
| Not Relevant to current fit for purpose review | (1996). "Preliminary program of the ninety-sixth annual session, May 11–15,1996." American Journal of Orthodontics and Dentofacial Orthopedics 109(2): 196-214. |
| Not Relevant to current fit for purpose review | (1996). "Roundup of Federal Regulations on Food and Nutrition Issues." Journal of the American Dietetic Association 96(7): 654. |
| Not Relevant to current fit for purpose review | (1996). "ROUND-UP Research." Reproductive Health Matters 4(8): 149-153. |
| Not Relevant to current fit for purpose review | (1997). "ROUND-UP Conferences." Reproductive Health Matters 5(10): 180. |
| Not Relevant to current fit for purpose review | (1997). "ROUND-UP Research." Reproductive Health Matters 5(10): 162-167. |
| Not Relevant to current fit for purpose review | (1998). "E. coli antiserum." Journal of Equine Veterinary Science 18(8): 507. |
| Not Relevant to current fit for purpose review | (1998). "EIA in wild horses." Journal of Equine Veterinary Science 18(8): 507. |
| Not Relevant to current fit for purpose review | (1998). "Exercise-induced endotoxemia." Journal of Equine Veterinary Science 18(8): 506-507. |
| Not Relevant to current fit for purpose review | (1998). "Flamel Technologies sur les starting-blocks." Biofutur 1998(176): 41. |
| Not Relevant to current fit for purpose review | (1998). "Legislative roundup: protection of human subjects key issue for Congress." J Natl Cancer Inst 90(2): 97-98. |

| Not Relevant to current fit for purpose review | (1998). "ROUND-UP Conferences." Reproductive Health Matters <HT>6</HT>(12): 186. |
|---|---|
| Not Relevant to current fit for purpose review | (1999). "Research poster summaries from the ENA 1999 Annual Meeting." Journal of Emergency Nursing 25(<HT>6</HT>): 446-456. |
| Not Relevant to current fit for purpose review | (1999). "ROUND-UP Publications." Reproductive Health Matters 7(14): 196-201. |
| Not Relevant to current fit for purpose review | (2000). "Genome roundup." Nat Biotechnol 18(1): 9. |
| Not Relevant to current fit for purpose review | (2000). "ROUND-UP Law and Policy." Reproductive Health Matters 8(15): 171-174. |
| Not Relevant to current fit for purpose review | (2000). "ROUND-UP Research." Reproductive Health Matters 8(16): 190-192. |
| Not Relevant to current fit for purpose review | (2000). "Trauma news today." International Journal of Trauma Nursing <HT>6</HT>(3): 105-108. |
| Not Relevant to current fit for purpose review | (2001). "ROUND-UP Research." Reproductive Health Matters 9(18): 196-198. |
| Not Relevant to current fit for purpose review | (2002). "ROUND-UP Research." Reproductive Health Matters 10(19): 209-210. |
| Not Relevant to current fit for purpose review | (2003). "New Web site lights childhood obesity with fun." Journal of the American Dietetic Association 103(<HT>6</HT>): 671-672. |
| Not Relevant to current fit for purpose review | (2003). "ROUND-UP Law and Policy." Reproductive Health Matters 11(22): 199-203. |
| Not Relevant to current fit for purpose review | (2003). "ROUND-UP Research." Reproductive Health Matters 11(21): 201-204. |
| Not Relevant to current fit for purpose review | (2004). "Contemporary issues in women's health." International Journal of Gynecology & Obstetrics 87(2): 111-113. |
| Not Relevant to current fit for purpose review | (2004). "Contents page, CD logo." The Journal of Men's Health & Gender 1(4): 283-284. |
| Not Relevant to current fit for purpose review | (2004). "Editorial Board." European Journal of Oncology Nursing 8(4): i. |
| Not Relevant to current fit for purpose review | (2004). "Editorial Board." European Journal of Oncology Nursing 8(3): i. |
| Not Relevant to current fit for purpose review | (2004). "Editorial Board." European Journal of Oncology Nursing 8, Supplement 1: i. |
| Not Relevant to current fit for purpose review | (2004). "Editorial Board." European Journal of Oncology Nursing 8, Supplement 2: i. |
| Not Relevant to current fit for purpose review | (2004). "Research round-up." Complementary Therapies in Nursing and Midwifery 10(4): 262-263. |
| Not Relevant to current fit for purpose review | (2004). "ROUND-UP Condoms." Reproductive Health Matters 12(23): 176-177. |
| Not Relevant to current fit for purpose review | (2004). "ROUND-UP Publications." Reproductive Health Matters 12(24): 231-236. |
| Not Relevant to current fit for purpose review | (2004). "ROUND-UP Service Delivery." Reproductive Health Matters 12(23): 191-200. |
| Not Relevant to current fit for purpose review | (2004). "Volume Contents Index." The Journal of Men's Health & Gender 1(4): 413-415. |
| Not Relevant to current fit for purpose review | (2004). "WebWatch." The Journal of Men's Health & Gender 1(2–3): 240. |
| Not Relevant to current fit for purpose review | (2004). "You've Been Had! How the Media and Environmentalists Turned America into a Nation of Hypochondriacs: Melvin A. Benarde. Rutgers University Press, 2002. xiv + 308 pp. $28.00. ISBN 0-8135-3050-4." Chemical Health and Safety 11(2): 39-40. |
| Not Relevant to current fit for purpose review | (2005). "Contents page, CD logo." The Journal of Men's Health & Gender 2(4): 387. |
| Not Relevant to current fit for purpose review | (2005). "Contents page, CD logo." The Journal of Men's Health & Gender 2(2): 159-160. |

| Not Relevant to current fit for purpose review | (2005). "Editorial Board." European Journal of Oncology Nursing 9(4): i. |
|---|---|
| Not Relevant to current fit for purpose review | (2005). "Editorial Board." European Journal of Oncology Nursing 9(3): i. |
| Not Relevant to current fit for purpose review | (2005). "Editorial Board." European Journal of Oncology Nursing 9(2): i. |
| Not Relevant to current fit for purpose review | (2005). "Editorial Board." European Journal of Oncology Nursing 9(1): i. |
| Not Relevant to current fit for purpose review | (2005). "JournalWatch." The Journal of Men's Health & Gender 2(3): 353-356. |
| Not Relevant to current fit for purpose review | (2005). "News Round-up." The Journal of Men's Health & Gender 2(3): 360-363. |
| Not Relevant to current fit for purpose review | (2005). "News Round-up." The Journal of Men's Health & Gender 2(1): 116-118. |
| Not Relevant to current fit for purpose review | (2005). "News Round-up for jmhg vol 2 no 4 (Dec 2005)." The Journal of Men's Health & Gender 2(4): 444. |
| Not Relevant to current fit for purpose review | (2005). "Research round-up: a brief summary of research publications in CAM." Complementary Therapies in Clinical Practice 11(2): 139-141. |
| Not Relevant to current fit for purpose review | (2006). "ACFAOM newsletter." The Foot 16(4): 226-227. |
| Not Relevant to current fit for purpose review | (2006). "Aims &amp; Scope/Editorial board." The Journal of Men's Health & Gender 3(1): iii. |
| Not Relevant to current fit for purpose review | (2006). "Contents page, CD logo." The Journal of Men's Health & Gender 3(2): 119-120. |
| Not Relevant to current fit for purpose review | (2006). "Contents page, CD logo." The Journal of Men's Health & Gender 3(4): 315-316. |
| Not Relevant to current fit for purpose review | (2006). "Editorial Board." European Journal of Oncology Nursing 10(5): i. |
| Not Relevant to current fit for purpose review | (2006). "Editorial Board." European Journal of Oncology Nursing 10(4): i. |
| Not Relevant to current fit for purpose review | (2006). "Editorial Board." European Journal of Oncology Nursing 10(3): i. |
| Not Relevant to current fit for purpose review | (2006). "Editorial Board." European Journal of Oncology Nursing 10(2): i. |
| Not Relevant to current fit for purpose review | (2006). "Editorial Board." European Journal of Oncology Nursing 10(1): i. |
| Not Relevant to current fit for purpose review | (2006). "Editorial Board/Publication/Advertising info." Progress in Biophysics and Molecular Biology 92(1): CO2. |
| Not Relevant to current fit for purpose review | (2006). "News Round-up." The Journal of Men's Health & Gender 3(1): 93-96. |
| Not Relevant to current fit for purpose review | (2006). "News Round-up for jmhg vol 3 no 3 (September 2006)." The Journal of Men's Health & Gender 3(3): 304-306. |
| Not Relevant to current fit for purpose review | (2006). "Research." Reproductive Health Matters 14(28): 210-218. |
| Not Relevant to current fit for purpose review | (2006). "Research problems." Discrete Applied Mathematics 154(3): 604-607. |
| Not Relevant to current fit for purpose review | (2006). "Table of Contents." The American Journal of Emergency Medicine 24(4): A3-A4. |
| Not Relevant to current fit for purpose review | (2006). "Volume Contents Index: Volume 3." The Journal of Men's Health & Gender 3(4): 427-431. |
| Not Relevant to current fit for purpose review | (2006). "WebWatch for jmhg vol 3 no 1 (issue 9)." The Journal of Men's Health & Gender 3(1): 88. |
| Not Relevant to current fit for purpose review | (2007). "Art exhibit powered by geothermal energy." Renewable Energy Focus 8(<HT>6</HT>): 14. |

| Not Relevant to current fit for purpose review | (2007). "Contents." The Journal of Men's Health & Gender 4(2): 113-114. |
| --- | --- |
| Not Relevant to current fit for purpose review | (2007). "Contents page." The Journal of Men's Health & Gender 4(1): 1-2. |
| Not Relevant to current fit for purpose review | (2007). "Editorial Board." European Journal of Oncology Nursing 11, Supplement 2: ii. |
| Not Relevant to current fit for purpose review | (2007). "Editorial Board." European Journal of Oncology Nursing 11(5): i. |
| Not Relevant to current fit for purpose review | (2007). "Editorial Board." European Journal of Oncology Nursing 11(4): i. |
| Not Relevant to current fit for purpose review | (2007). "Editorial Board." European Journal of Oncology Nursing 11(3): i. |
| Not Relevant to current fit for purpose review | (2007). "Editorial Board." European Journal of Oncology Nursing 11(2): i. |
| Not Relevant to current fit for purpose review | (2007). "Editorial Board." European Journal of Oncology Nursing 11(1): i. |
| Not Relevant to current fit for purpose review | (2007). "In brief." Renewable Energy Focus 8(<HT>6</HT>): 18-19. |
| Not Relevant to current fit for purpose review | (2007). "North America." Renewable Energy Focus 8(5): 6. |
| Not Relevant to current fit for purpose review | (2007). "US could "eliminate CO2 emissions without nuclear power"." Renewable Energy Focus 8(5): 18. |
| Not Relevant to current fit for purpose review | (2008). "Editorial Board." European Journal of Oncology Nursing 12(5): i. |
| Not Relevant to current fit for purpose review | (2008). "Editorial Board." European Journal of Oncology Nursing 12(1): i. |
| Not Relevant to current fit for purpose review | (2008). "Editorial Board." European Journal of Oncology Nursing 12(4): i. |
| Not Relevant to current fit for purpose review | (2008). "Editorial Board." European Journal of Oncology Nursing 12(3): i. |
| Not Relevant to current fit for purpose review | (2008). "Editorial Board." European Journal of Oncology Nursing 12(2): i. |
| Not Relevant to current fit for purpose review | (2008). "In Brief." Renewable Energy Focus 9(3): 16. |
| Not Relevant to current fit for purpose review | (2008). "In brief – projects." Renewable Energy Focus 9(<HT>6</HT>): 15. |
| Not Relevant to current fit for purpose review | (2008). "Swiss FiT on slippery slope?" Renewable Energy Focus 9(5): 12. |
| Not Relevant to current fit for purpose review | (2008). "US wind heavyweights unite over PTC." Renewable Energy Focus 9(3): 17. |
| Not Relevant to current fit for purpose review | (2008). "Wärtsilä BioPower plant to use brewery spent grain." Renewable Energy Focus 9(2): 12. |
| Not Relevant to current fit for purpose review | (2009). "Acknowledgements." European Journal of Agronomy 31(3): iv. |
| Not Relevant to current fit for purpose review | (2009). "Carbon Trust calls for switch to biomass heating." Renewable Energy Focus 10(2): 15. |
| Not Relevant to current fit for purpose review | (2009). "Editorial Board." European Journal of Oncology Nursing 13(4): i. |
| Not Relevant to current fit for purpose review | (2009). "Editorial Board." European Journal of Oncology Nursing 13(3): i. |
| Not Relevant to current fit for purpose review | (2009). "Editorial Board." European Journal of Oncology Nursing 13(2): i. |
| Not Relevant to current fit for purpose review | (2009). "Editorial Board." European Journal of Oncology Nursing 13(1): i. |

| Not Relevant to current fit for purpose review | (2009). "EU renewables in short." Renewable Energy Focus 9(7): 14. |
|---|---|
| Not Relevant to current fit for purpose review | (2009). "Pickens scraps "mega" wind plans." Renewable Energy Focus 10(5): 18. |
| Not Relevant to current fit for purpose review | (2009). "Policy still needed for solar growth." Renewable Energy Focus 10(<HT>6</HT>): 16. |
| Not Relevant to current fit for purpose review | (2009). "Shell withdraws from wind and solar — focuses on biofuels." Renewable Energy Focus 10(3): 19. |
| Not Relevant to current fit for purpose review | (2010). "Communications orales du 27e congrès de la SFE." Annales d'Endocrinologie 71(5): 340-353. |
| Not Relevant to current fit for purpose review | (2010). "Ten GW US wind in 2009." Renewable Energy Focus 11(1): 13. |
| Not Relevant to current fit for purpose review | (2010). "UK introduces feed-in tariffs." Renewable Energy Focus 11(1): 8. |
| Not Relevant to current fit for purpose review | (2011). "€51 billion offshore wind market." Renewable Energy Focus 12(<HT>6</HT>): 12. |
| Not Relevant to current fit for purpose review | (2011). "December, 2010." The Lancet Neurology 10(3): 209. |
| Not Relevant to current fit for purpose review | (2011). "Directions &amp; Connections." Journal of the American Medical Directors Association 12(8): A14-A15. |
| Not Relevant to current fit for purpose review | (2011). "Directions &amp; Connections." Journal of the American Medical Directors Association 12(7): A14-A15. |
| Not Relevant to current fit for purpose review | (2011). "Directions &amp; Connections." Journal of the American Medical Directors Association 12(9): A10-A11. |
| Not Relevant to current fit for purpose review | (2011). "Editorial Board." Spectrochimica Acta Part A: Molecular and Biomolecular Spectroscopy 78(5): CO2. |
| Not Relevant to current fit for purpose review | (2011). "EU: huge renewables growth if projections met." Renewable Energy Focus 12(<HT>6</HT>): 10. |
| Not Relevant to current fit for purpose review | (2011). "Table of Contents." Regulatory Toxicology and Pharmacology 61(2): iii. |
| Not Relevant to current fit for purpose review | (2011). "Table of Contents." The American Journal of Emergency Medicine 29(4): A5-A7. |
| Not Relevant to current fit for purpose review | (2012). "Contents." The American Journal of Medicine 125(8): A5-A7. |
| Not Relevant to current fit for purpose review | (2012). "Directions &amp; Connections." Journal of the American Medical Directors Association 13(1): A10-A11. |
| Not Relevant to current fit for purpose review | (2012). "Directions &amp; Connections." Journal of the American Medical Directors Association 13(2): A14-A15. |
| Not Relevant to current fit for purpose review | (2012). "Impact sanitaire de la pollution environnementale et solutions pour la dépollution cellulaire." La Revue d'Homéopathie 3(3): 115-117. |
| Not Relevant to current fit for purpose review | (2012). "Revue de presse." La Revue d'Homéopathie 3(4): 159-160. |
| Not Relevant to current fit for purpose review | (2013). "December, 2012." The Lancet Neurology 12(3): 230. |
| Not Relevant to current fit for purpose review | (2015). "60 Seconds." New Scientist 225(3014): 7. |
| Not Relevant to current fit for purpose review | (2015). "60 Seconds." New Scientist 226(3022): 7. |
| Not Relevant to current fit for purpose review | (2015). "GLYPHOSATE UNLIKELY TO CAUSE CANCER, EU AGENCY FINDS." Chemical & Engineering News 93(45): 26-26. |
| Not Relevant to current fit for purpose review | (2016). "EDITORIAL BOARD." NeuroToxicology 52: IFC. |
| Not Relevant to current fit for purpose review | Abdullahi, A. E. (2002). "Cynodon dactylon control with tillage and glyphosate." Crop Protection 21(10): 1093-1100. |

| Not Relevant to current fit for purpose review | Acar, A., et al. (2015). "The Investigation of Genotoxic, Physiological and Anatomical Effects of Paraquat Herbicide on Allium cepa L." Cytologia 80(3): 343-351. |
| --- | --- |
| Not Relevant to current fit for purpose review | Acquavella, J., et al. (1999). "A case-control study of non-Hodgkin lymphoma and exposure to pesticides." Cancer 86(4): 729-731. |
| Not Relevant to current fit for purpose review | Aicher, R. H. (1999). "Vicarious Liability." Aesthetic Surgery Journal 19(4): 341. |
| Not Relevant to current fit for purpose review | Akaza, H. (2007). "Report from the 1st Japanese Urological Association-Japanese Society of Medical Oncology joint conference, 2006: 'A step towards better collaboration between urologists and medical oncologists'." Int J Urol 14(5): 375-383. |
| Not Relevant to current fit for purpose review | Akert, K. (1959). "Morphologue und physiologie des nervensystems: Paul Glees Georg Thieme, Verlag, Stuttgart, 1957, 445 pp. $13.50." Electroencephalography and Clinical Neurophysiology 11(1): 191-192. |
| Not Relevant to current fit for purpose review | Albrecht, B., et al. (1991). "In vivo utilization of N-(phosphonomethyl)-anilines and related substances by Pseudomonas spec. GS." J Basic Microbiol 31(6): 403-411. |
| Not Relevant to current fit for purpose review | Altenhoff, A. M. and C. Dessimoz (2009). "Phylogenetic and functional assessment of orthologs inference projects and methods." PLoS Comput Biol 5(1): e1000262. |
| Not Relevant to current fit for purpose review | Amaro, P. (2012). "O mancozebe é um óptimo exemplo da diversidade de classificação toxicológica dos pesticidas em Portugal." Revista de Ciências Agrárias 35(2): 118-125. |
| Not Relevant to current fit for purpose review | Andersson, K.-E. (2011). "This Month in Investigative Urology." The Journal of Urology 185(4): 1176. |
| Not Relevant to current fit for purpose review | Angelini, C. (2012). "Neuromuscular diseases: advances in therapy and diagnosis." The Lancet Neurology 11(1): 15-17. |
| Not Relevant to current fit for purpose review | Anklam, E. (1999). "The validation of methods based on polymerase chain reaction for the detection of genetically modified organisms in food." Analytica Chimica Acta 393(1–3): 177-179. |
| Not Relevant to current fit for purpose review | Antonini, A. (2012). "Movement disorders: towards new therapies in Parkinson's disease." The Lancet Neurology 11(1): 7-8. |
| Not Relevant to current fit for purpose review | Arjo, G., et al. (2013). "Plurality of opinion, scientific discourse and pseudoscience: an in depth analysis of the Seralini et al. study claiming that Roundup (TM) Ready corn or the herbicide Roundup (TM) cause cancer in rats." Transgenic Res 22(2): 255-267. |
| Not Relevant to current fit for purpose review | Astudillo, O. (2012). "Clinical trials: round-up." The Lancet Oncology 13(10): 976. |
| Not Relevant to current fit for purpose review | Atkinson, S. (2003). "Product developments in biotechnology and medical applications." Membrane Technology 2003(2): 10-11. |
| Not Relevant to current fit for purpose review | Avella, P., et al. (2007). "Metric inequalities and the Network Loading Problem." Discrete Optimization 4(1): 103-114. |
| Not Relevant to current fit for purpose review | Axelrad, J. C., et al. (2002). "Enhanced in vitro toxicity of the herbicide glyphosate to neuroblastoma cells chronically pre-treated with the organophosphate pesticide diazinon." Toxicology 178(1): 62-63. |
| Not Relevant to current fit for purpose review | Axelrad, J. C., et al. (2003). "The effects of acute pesticide exposure on neuroblastoma cells chronically exposed to diazinon." Toxicology 185(1–2): 67-78. |
| Not Relevant to current fit for purpose review | Azevedo, L., et al. (2010). "In Vivo Antimutagenic Properties of Transgenic and Conventional Soybeans." J Med Food 13(6): 1402-1408. |
| Not Relevant to current fit for purpose review | Bababunmi, E. A., et al. (1979). "The uncoupling effect of N-(phosphonomethyl)glycine on isolated rat liver mitochondria." Biochemical Pharmacology 28(<HT>6</HT>): 925-927. |
| Not Relevant to current fit for purpose review | Badr, A., et al. (2013). "Cytophysiological impacts of Metosulam herbicide on Vicia faba plants." Acta Physiologiae Plantarum 35(6): 1933-1941. |
| Not Relevant to current fit for purpose review | Barker, W. F. (1995). "The Western Vascular Society: Its first ten years." Journal of Vascular Surgery 22(4): 505-506. |
| Not Relevant to current fit for purpose review | Baron, R., et al. (2012). "Chronic pain: genes, plasticity, and phenotypes." The Lancet Neurology 11(1): 19-21. |
| Not Relevant to current fit for purpose review | Bar-Or, A. (2016). "Multiple sclerosis and related disorders: evolving pathophysiologic insights." The Lancet Neurology 15(1): 9-11. |
| Not Relevant to current fit for purpose review | Bartelink, H., et al. (1993). "Foreword." Radiotherapy and Oncology 29(2): xi-xii. |
| Not Relevant to current fit for purpose review | Bates, J. A. (2004). "Use of narrative interviewing in everyday information behavior research." Library & Information Science Research 26(1): 15-28. |

| Not Relevant to current fit for purpose review | Begna, S. H., et al. (2001). "Morphology and yield response to weed pressure by corn hybrids differing in canopy architecture." European Journal of Agronomy 14(4): 293-302. |
|---|---|
| Not Relevant to current fit for purpose review | Benachour, N., et al. (2007). "Time- and dose-dependent effects of roundup on human embryonic and placental cells." Arch Environ Contam Toxicol 53(1): 126-133. |
| Not Relevant to current fit for purpose review | Ben-Menachem, E. (2016). "Epilepsy in 2015: the year of collaborations for big data." The Lancet Neurology 15(1): 6-7. |
| Not Relevant to current fit for purpose review | Berdal, K. G. and A. Holst-Jensen (2001). "Roundup Ready (R) soybean event-specific real-time quantitative PCR assay and estimation of the practical detection and quantification limits in GMO analyses." European Food Research and Technology 213(6): 432-438. |
| Not Relevant to current fit for purpose review | Berer, M. (1996). "Men." Reproductive Health Matters 4(7): 7-10. |
| Not Relevant to current fit for purpose review | Berkovic, S. F. (2010). "Epilepsy: insights into causes and treatment dilemmas." The Lancet Neurology 9(1): 9-11. |
| Not Relevant to current fit for purpose review | Bermel, R. A. and J. A. Cohen (2011). "Multiple sclerosis: advances in understanding pathogenesis and emergence of oral treatment options." The Lancet Neurology 10(1): 4-5. |
| Not Relevant to current fit for purpose review | Bertheussen, K., et al. (1997). "A new sensitive cell culture test for tee assessment of pesticide toxicity." Journal of Environmental Science and Health Part B-Pesticides Food Contaminants and Agricultural Wastes 32(2): 195-211. |
| Not Relevant to current fit for purpose review | Bertucci, A., et al. (2015). "Detection of unamplified genomic DNA by a PNA-based microstructured optical fiber (MOF) Bragg-grating optofluidic system." Biosens Bioelectron 63: 248-254. |
| Not Relevant to current fit for purpose review | Bf (1995). "Let's Get Things Moving: Overcoming constipation." Physiotherapy 81(5): 301. |
| Not Relevant to current fit for purpose review | Bjerrum-Bohr, J. J., et al. (2012). "Hydrodynamics of a quark droplet." Nuclear Physics A 882: 90-106. |
| Not Relevant to current fit for purpose review | Blumann, W. and D. Fauth (1993). "Expensive NM standards round-up: Network Management Standards: OSI, SNMP and CMOL Protocols by Ulyses Black. Published by McGraw Hill, 1992, £38.95, 336 pp." Computer Communications 16(7): 449. |
| Not Relevant to current fit for purpose review | Bogler, O. and R. Sawaya (2008). "Foreword." Current Problems in Cancer 32(3): 95-96. |
| Not Relevant to current fit for purpose review | Bonn, D. (2005). "Web round-up: rare-tumour information." The Lancet Oncology <HT>6</HT>(3): 144. |
| Not Relevant to current fit for purpose review | Botha, G. M. and C. D. Viljoen (2009). "South Africa: A case study for voluntary GM labelling." Food Chemistry 112(4): 1060-1064. |
| Not Relevant to current fit for purpose review | Bournat, P. (1997). "Les techniques de transgénèse végétale." Biofutur 1997(172): 3-7. |
| Not Relevant to current fit for purpose review | Boutet, I., et al. (2004). "Molecular identification and expression of two non-P450 enzymes, monoamine oxidase A and flavin-containing monooxygenase 2, involved in phase I of xenobiotic biotransformation in the Pacific oyster, Crassostrea gigas." Biochim Biophys Acta 1679(1): 29-36. |
| Not Relevant to current fit for purpose review | Bowersox, T. W., et al. (1990). "Coppicing success of young Eucalyptus saligna in Hawaii." Biomass 23(2): 137-148. |
| Not Relevant to current fit for purpose review | Bowman, W. C. (1983). "Drugs and anesthesia—Pharmacology for anesthesiologists." Trends in Pharmacological Sciences 4: 358-359. |
| Not Relevant to current fit for purpose review | Brandenberger, L. P., et al. (2005). "Preemergence weed control in direct-seeded watermelon." Weed Technology 19(3): 706-712. |
| Not Relevant to current fit for purpose review | Breaden, A. (1991). "Victoria ASCCN." Confederation of Australian Critical Care Nurses Journal 4(3): 6. |
| Not Relevant to current fit for purpose review | Briscoe, M. and C. P. Wynne (1988). "State Round-Up Tasmanian Branch of A.S.C.C.N." CNSA Journal 1(1): 3-7. |
| Not Relevant to current fit for purpose review | Burkhart, C. G. (1981). "Looking at eyelid lesions--a clinical roundup." Geriatrics 36(8): 91-95. |
| Not Relevant to current fit for purpose review | Burr, T. J., et al. (1995). "SURVIVAL AND TUMORIGENICITY OF AGROBACTERIUM-VITIS IN LIVING AND DECAYING GRAPE ROOTS AND CANES IN SOIL." Plant Disease 79(7): 677-682. |
| Not Relevant to current fit for purpose review | Bushby, K. (2011). "Neuromuscular diseases: milestones in development of treatments." The Lancet Neurology 10(1): 11-13. |

| | |
|---|---|
| Not Relevant to current fit for purpose review | Butler, T. J., et al. (2002). "Broomsedge (Andropogon virginicus) response to herbicides and burning." Weed Technology 16(1): 18-22. |
| Not Relevant to current fit for purpose review | Cai, Z., et al. (2012). "3.102 PERINATAL LPS EXPOSURE INCREASES THE RISK FOR DOPAMINERGIC DISORDERS IN ADULT LIFE." Parkinsonism & Related Disorders 18, Supplement 2: S190. |
| Not Relevant to current fit for purpose review | Caloni, F., et al. (2015). "In vitro effects of glyphosate on cell proliferation and steroid production by bovine granulosa cells." Toxicology Letters 238(2, Supplement): S290. |
| Not Relevant to current fit for purpose review | Campbell, M. H. and A. R. Gilmour (1979). "EFFECT OF TIME AND RATE OF APPLICATION OF HERBICIDES ON SERRATED TUSSOCK (NASSELLA-TRICHOTOMA) AND IMPROVED PASTURE SPECIES .1. GLYPHOSATE AND 2,2-DPA." Australian Journal of Experimental Agriculture 19(99): 472-475. |
| Not Relevant to current fit for purpose review | Cao, G., et al. (2013). "Draft genome sequence of pseudomonas strain p818, isolated from glyphosate-polluted soil." Genome Announc 1(6). |
| Not Relevant to current fit for purpose review | Casorri, L., et al. (2010). "Testing Round-up Ready soybean along processing chain by traditional and innovative methods." Journal of Biotechnology 150, Supplement: 536. |
| Not Relevant to current fit for purpose review | Castillo, M., et al. (2014). "Seedbed Preparation Techniques and Weed Control Strategies for Strip-Planting Rhizoma Peanut into Warm-Season Grass Pastures." Crop Science 54(4): 1868-1875. |
| Not Relevant to current fit for purpose review | Cavusoglu, K., et al. (2011). "Protective effect of Ginkgo biloba L. leaf extract against glyphosate toxicity in Swiss albino mice." J Med Food 14(10): 1263-1272. |
| Not Relevant to current fit for purpose review | Cebeci, O. and H. Budak (2009). "Global Expression Patterns of Three Festuca Species Exposed to Different Doses of Glyphosate Using the Affymetrix GeneChip Wheat Genome Array." Comp Funct Genomics: 505701. |
| Not Relevant to current fit for purpose review | Chang, H. S., et al. (2001). "Allergenicity test of genetically modified soybean in Sprague-Dawley rats." Archives of Pharmacal Research 24(3): 256-261. |
| Not Relevant to current fit for purpose review | Chang, J.-S., et al. (1999). "Transformation of rat fibroblasts by phospholipase C-γ1 overexpression is accompanied by tyrosine dephosphorylation of paxillin." FEBS Letters 460(1): 161-165. |
| Not Relevant to current fit for purpose review | Charles, A. (2011). "Headache: new genes, new mechanisms, and new therapies." The Lancet Neurology 10(1): 13-14. |
| Not Relevant to current fit for purpose review | Charlton, C. G. and G. V. Muthian (2012). "3.101 PRENATAL SENSITIZATION AND POSTNATAL PRECIPITATION IN A MODEL OF PARKINSONISM." Parkinsonism & Related Disorders 18, Supplement 2: S189-S190. |
| Not Relevant to current fit for purpose review | Chee, P. P. and J. L. Slightom (1991). "TRANSFER AND EXPRESSION OF CUCUMBER MOSAIC-VIRUS COAT PROTEIN GENE IN THE GENOME OF CUCUMIS-SATIVUS." Journal of the American Society for Horticultural Science 116(6): 1098-1102. |
| Not Relevant to current fit for purpose review | Chen, L., et al. (2009). "Modeling Multi-typed Structurally Viewed Chemicals with the UMLS Refined Semantic Network." Journal of the American Medical Informatics Association 16(1): 116-131. |
| Not Relevant to current fit for purpose review | Chiò, A. and G. Lauria (2016). "Degenerative neuromuscular diseases: crucial gene and cell machinery discoveries." The Lancet Neurology 15(1): 12-13. |
| Not Relevant to current fit for purpose review | Chorfa, A., et al. (2013). "Specific Pesticide-Dependent Increases in alpha-Synuclein Levels in Human Neuroblastoma (SH-SY5Y) and Melanoma (SK-MEL-2) Cell Lines." Toxicological Sciences 133(2): 289-297. |
| Not Relevant to current fit for purpose review | Cichosz, G. and S. K. Wiackowski (2012). "[Genetically modified food--great unknown]." Pol Merkur Lekarski 33(194): 59-63. |
| Not Relevant to current fit for purpose review | Cooke, R. M. (1997). "Protein NMR extends into new fields of structural biology." Current Opinion in Chemical Biology 1(3): 359-364. |
| Not Relevant to current fit for purpose review | Cornish-Bowden, A. and M. L. Cardenas (2003). "Metabolic analysis in drug design." Comptes Rendus Biologies 326(5): 509-515. |
| Not Relevant to current fit for purpose review | Costa, M. d. D. L. d., et al. (2003). "Alterações de neuroimagem no parkinsonismo: estudo de cinco casos." Arquivos De Neuro-Psiquiatria 61(2B): 381-386. |
| Not Relevant to current fit for purpose review | Costello, J. (2015). "Research roundup." Int J Palliat Nurs 21(8): 410-411. |
| Not Relevant to current fit for purpose review | Coyle, C. (2003). "A Practical Guide to Intensity – Modulated Radiation Therapy." Clinical Oncology 15(8): 507. |

| | |
|---|---|
| Not Relevant to current fit for purpose review | Croft, S. M., et al. (1974). "Inhibition of chloroplast ribosome formation by N,N-bis(phosphonomethyl)glycine." Biochimica et Biophysica Acta (BBA) - Nucleic Acids and Protein Synthesis 335(2): 211-217. |
| Not Relevant to current fit for purpose review | Cross, J. R. (1995). "Modern Chinese Acupuncture - A review of acupuncture techniques as practised in China today." Physiotherapy 81(5): 302. |
| Not Relevant to current fit for purpose review | Cui, J., et al. (2011). "Detecting biological network organization and functional gene orthologs." Bioinformatics 27(20): 2919-2920. |
| Not Relevant to current fit for purpose review | Culbreth, M. E., et al. (2012). "Comparison of chemical-induced changes in proliferation and apoptosis in human and mouse neuroprogenitor cells." NeuroToxicology 33(6): 1499-1510. |
| Not Relevant to current fit for purpose review | Cundiff, J. S., et al. (1997). "A linear programming approach for designing a herbaceous biomass delivery system." Bioresource Technology 59(1): 47-55. |
| Not Relevant to current fit for purpose review | da Costa, M. D. L., et al. (2003). "Neuroimaging abnormalities in parkinsonism: study of five cases." Arquivos De Neuro-Psiquiatria 61(2B): 381-386. |
| Not Relevant to current fit for purpose review | D'Amico, D. B. (1978). "Critics prompt plans to revise health planning guidelines." AORN Journal 27(4): 702-706. |
| Not Relevant to current fit for purpose review | Dan, B. and P. Baxter (2014). "Paediatric neurology: a year of DNA technology." The Lancet Neurology 13(1): 16-18. |
| Not Relevant to current fit for purpose review | Dan, Y. H., et al. (2006). "MicroTom-a high-throughput model transformation system for functional genomics." Plant Cell Rep 25(5): 432-441. |
| Not Relevant to current fit for purpose review | Daniel, R. K., et al. (1986). "Tissue transplants in primates for upper extremity reconstruction: A preliminary report." The Journal of Hand Surgery 11(1): 1-8. |
| Not Relevant to current fit for purpose review | Das, M., et al. (2010). "A composite transcriptional signature differentiates responses towards closely related herbicides in Arabidopsis thaliana and Brassica napus." Plant Mol Biol 72(4-5): 545-556. |
| Not Relevant to current fit for purpose review | Das, M., et al. (2010). "A composite transcriptional signature differentiates responses towards closely related herbicides in Arabidopsis thaliana and Brassica napus." Plant Mol Biol 72(4-5): 545-556. |
| Not Relevant to current fit for purpose review | Datta, R. and H. Daniell (1996). "Transformation of the tobacco chloroplast genome with the arcA gene to confer glyphosate tolerance." Plant Physiol 111(2): 790-790. |
| Not Relevant to current fit for purpose review | Davis, W. M. and I. W. Waters (1999). "A new-drug roundup." Rn 62(4): 54-60; quiz 62. |
| Not Relevant to current fit for purpose review | De Marco, A., et al. (1992). "Importance of the type of soil for the induction of micronuclei and the growth of primary roots of Vicia faba treated with the herbicides atrazine, glyphosate and maleic hydrazide." Mutat Res 279(1): 9-13. |
| Not Relevant to current fit for purpose review | DeAngelis, L. M. (2010). "Neuro-oncology: new hope for patients with gliomas." The Lancet Neurology 9(1): 17-18. |
| Not Relevant to current fit for purpose review | Defarge, N., et al. (2016). "Co-Formulants in Glyphosate-Based Herbicides Disrupt Aromatase Activity in Human Cells below Toxic Levels." Int J Environ Res Public Health 13(3). |
| Not Relevant to current fit for purpose review | Dehghan, R., et al. (2015). "Optimization of overlapping activities in the design phase of construction projects." Automation in Construction 59: 81-95. |
| Not Relevant to current fit for purpose review | DeLuca, T. F., et al. (2006). "Roundup: a multi-genome repository of orthologs and evolutionary distances." Bioinformatics 22(16): 2044-2046. |
| Not Relevant to current fit for purpose review | Demarco, A., et al. (1995). "INFLUENCE OF SOIL CHARACTERISTICS ON THE CLASTOGENIC ACTIVITY OF MALEIC HYDRAZIDE IN ROOT-TIPS OF VICIA-FABA." Mutation Research-Genetic Toxicology 344(1-2): 5-12. |
| Not Relevant to current fit for purpose review | Demarco, A., et al. (1992). "IMPORTANCE OF THE TYPE OF SOIL FOR THE INDUCTION OF MICRONUCLEI AND THE GROWTH OF PRIMARY ROOTS OF VICIA-FABA TREATED WITH THE HERBICIDES ATRAZINE, GLYPHOSATE AND MALEIC HYDRAZIDE." Mutat Res 279(1): 9-13. |
| Not Relevant to current fit for purpose review | Demeke, T. and I. Ratnayaka (2008). "Multiplex qualitative PCR assay for identification of genetically modified canola events and real-time event-specific PCR assay for quantification of the GT73 canola event." Food Control 19(9): 893-897. |
| Not Relevant to current fit for purpose review | Deming, D. (1989). "Application of bottom-hole temperature corrections in geothermal studies." Geothermics 18(5–<HT>6</HT>): 775-786. |
| Not Relevant to current fit for purpose review | Desimone, C., et al. (1992). "GENOTOXIC EFFECT INDUCED BY HERBICIDES ATRAZINE GLYPHOSATE IN PLANTS OF VICIA-FABA GROWN IN DIFFERENT SOILS." Science of the Total Environment 123: 233-240. |

| Not Relevant to current fit for purpose review | Diener, H.-C. (2004). "Important advances in headache." The Lancet Neurology 3(1): 12. |
|---|---|
| Not Relevant to current fit for purpose review | Dong Kyu Kim, M. D., et al. (2015). "The Factors Associated with the Hypotension Development in Acute Glyphosate-surfactant Herbicide Poisoning." Journal of The Korean Society of Emergency Medicine 26(3): 248-255. |
| Not Relevant to current fit for purpose review | Donnan, G. A. (2004). "Stroke: prediction, prevention, and outcome." The Lancet Neurology 3(1): 9. |
| Not Relevant to current fit for purpose review | Dragutinovich, S. (1987). "Stimulus intensity reducers: Are they sensation seekers, extraverts, and strong nervous types?" Personality and Individual Differences 8(5): 693-704. |
| Not Relevant to current fit for purpose review | Druwe, I., et al. (2015). "Sensitivity of neuroprogenitor cells to chemical-induced apoptosis using a multiplexed assay suitable for high-throughput screening." Toxicology 333: 14-24. |
| Not Relevant to current fit for purpose review | Duncan, K., et al. (1984). "The complete amino acid sequence of Escherichia coli 5-enolpyruvylshikimate 3-phosphate synthase." FEBS Letters 170(1): 59-63. |
| Not Relevant to current fit for purpose review | Dunn, S. V. (1999). "Recognising our limits: the murky shores where science meets values and beliefs." Australian Critical Care 12(4): 130. |
| Not Relevant to current fit for purpose review | Ehlert, A., et al. (2008). "Development of a modular system for detection of genetically modified organisms in food based on ligation-dependent probe amplification." European Food Research and Technology 227(3): 805-812. |
| Not Relevant to current fit for purpose review | Elgorashi, E. E., et al. (2004). "Isolation of captan from Cyrtanthus suaveolens: the effect of pesticides on the quality and safety of traditional medicine." South African Journal of Botany 70(4): 512-514. |
| Not Relevant to current fit for purpose review | Elie-Caille, C., et al. (2010). "Morphological damages of a glyphosate-treated human keratinocyte cell line revealed by a micro- to nanoscale microscopic investigation." Cell Biol Toxicol 26(4): 331-339. |
| Not Relevant to current fit for purpose review | Endo, M. and S. Toki (2013). "Creation of herbicide-tolerant crops by gene targeting." Journal of Pesticide Science 38(1-2): 49-59. |
| Not Relevant to current fit for purpose review | Engel, K.-H., et al. (2006). "Quantification of DNA from genetically modified organisms in composite and processed foods." Trends in Food Science & Technology 17(9): 490-497. |
| Not Relevant to current fit for purpose review | Erickson, B. (2015). "GLYPHOSATE LINKED TO CANCER." Chemical & Engineering News 93(13): 5-5. |
| Not Relevant to current fit for purpose review | Ewald, M., et al. (2014). "From surface to intracellular non-invasive nanoscale study of living cells impairments." Nanotechnology 25(29). |
| Not Relevant to current fit for purpose review | Farrington, J. W. (1979). "Newsletters." Serials Review 5(2): 55-57. |
| Not Relevant to current fit for purpose review | Favata, A., et al. (2014). "A nonlinear theory of prestressed elastic stick-and-spring structures." International Journal of Engineering Science 80: 4-20. |
| Not Relevant to current fit for purpose review | Feng, Z., et al. (2005). "The influence of GFP-actin expression on the adhesion dynamics of HepG2 cells on a model extracellular matrix." Biomaterials 26(26): 5348-5358. |
| Not Relevant to current fit for purpose review | Feriotto, G., et al. (2002). "Biosensor technology and surface plasmon resonance for real-time detection of genetically modified Roundup Ready soybean gene sequences." J Agric Food Chem 50(5): 955-962. |
| Not Relevant to current fit for purpose review | Ferrara, G., et al. (2002). "Evaluation of antimutagenic and desmutagenic effects of humic and fulvic acids on root tips of Vicia faba." Environmental Toxicology 15(5): 513-517. |
| Not Relevant to current fit for purpose review | Ferrari, M. D. (2013). "Headache: the changing migraine brain." The Lancet Neurology 12(1): 6-8. |
| Not Relevant to current fit for purpose review | Fiers, T. (2004). "Lab-on-a-Chip. Miniaturised systems for (bio)chemical analysis and synthesis: (E. Oosterbroek, A. van den Berg) Elsevier. ISBN 0-444 51100-8." Clinica Chimica Acta 343(1–2): 245. |
| Not Relevant to current fit for purpose review | Figenschau, Y., et al. (1997). "A sensitive serum-free colorimetric assay for the detection of cytotoxic effects of pesticides." Journal of Environmental Science and Health Part B-Pesticides Food Contaminants and Agricultural Wastes 32(2): 177-194. |
| Not Relevant to current fit for purpose review | Fischer, G., et al. (2016). "Superficial Temporal Artery to Middle Cerebral Artery Bypass via a Minimized Approach: Operative Nuances and Problem-Solving Aspects." World Neurosurgery 88: 97-103. |
| Not Relevant to current fit for purpose review | Flóra, T. and Z. Simon (1982). "Thermische zersetzung des wirkstoffes von herbizid glyphosat." Thermochimica Acta 59(2): 125-132. |
| Not Relevant to current fit for purpose review | Forgacs, A. L., et al. (2012). "BLTK1 murine Leydig cells: a novel steroidogenic model for evaluating the effects of reproductive and developmental toxicants." Toxicol Sci 127(2): 391-402. |

| Not Relevant to current fit for purpose review | Forsyth, R. (2005). "Paediatrics: genetic insights and long-term follow-up." The Lancet Neurology 4(1): 8. |
|---|---|
| Not Relevant to current fit for purpose review | Fox, R. J. and R. A. Rudick (2004). "Multiple sclerosis: disease markers accelerate progress." The Lancet Neurology 3(1): 10. |
| Not Relevant to current fit for purpose review | Fox, S. (1999). "European Roundup - Positive news for Marimastat - British Biotech's drug shows promise against nonoperable gastric cancer." Genetic Engineering News 19(16): 20-+. |
| Not Relevant to current fit for purpose review | Fox, S. (2000). "European roundup - Genome research initiative launches in European union - Networking, training and mobility to be focus of integrated projects." Genetic Engineering News 20(21): 41-+. |
| Not Relevant to current fit for purpose review | Francisco Rossi, L., et al. (2016). "Chaetophractus villosus as a sentinel organism: Baseline values of mitotic index, chromosome aberrations and sister chromatid exchanges." Mutation Research-Genetic Toxicology and Environmental Mutagenesis 796: 40-45. |
| Not Relevant to current fit for purpose review | Fu, G. M., et al. (2016). "Optimization of liquid-state fermentation conditions for the glyphosate-degradation enzyme production of strain Aspergillus oryzae by ultraviolet mutagenesis." Prep Biochem Biotechnol. |
| Not Relevant to current fit for purpose review | Garry, V. F., et al. (2002). "Birth defects, season of conception, and sex of children born to pesticide applicators living in the Red River Valley of Minnesota, USA." Environ Health Perspect 110: 441-449. |
| Not Relevant to current fit for purpose review | Gasnier, C., et al. (2010). "Dig1 protects against cell death provoked by glyphosate-based herbicides in human liver cell lines." J Occup Med Toxicol 5: 29. |
| Not Relevant to current fit for purpose review | Gasnier, C. (2009). "Glyphosate-based herbicides are toxic and endocrine disruptors in human cell lines." Toxicology 262(3): 184-191. |
| Not Relevant to current fit for purpose review | Gatty, A. (1990). "South Australian branch ASCCN." Confederation of Australian Critical Care Nurses Journal 3(3): 10. |
| Not Relevant to current fit for purpose review | Gayen, D., et al. (2013). "Comparative analysis of nutritional compositions of transgenic high iron rice with its non-transgenic counterpart." Food Chemistry 138(2-3): 835-840. |
| Not Relevant to current fit for purpose review | Giakoumaki, E., et al. (2003). "Combination of amplification and post-amplification strategies to improve optical DNA sensing." Biosensors and Bioelectronics 19(4): 337-344. |
| Not Relevant to current fit for purpose review | Giuffrida, M. C., et al. (2015). "Isothermal circular-strand-displacement polymerization of DNA and microRNA in digital microfluidic devices." Anal Bioanal Chem 407(6): 1533-1543. |
| Not Relevant to current fit for purpose review | Goldstein, C. and R. Chervin (2016). "Waking up to sleep research in 2015." The Lancet Neurology 15(1): 15-17. |
| Not Relevant to current fit for purpose review | Gonzalez, F. R. and A. M. Nardillo (1997). "Retention in multistep programmed-temperature gas chromatography and flow control Linear head pressure programs." Journal of Chromatography A 757(1–2): 109-118. |
| Not Relevant to current fit for purpose review | Gonzalez, N. V., et al. (2011). "A combination of the cytokinesis-block micronucleus cytome assay and centromeric identification for evaluation of the genotoxicity of dicamba." Toxicology Letters 207(3): 204-212. |
| Not Relevant to current fit for purpose review | Graus, F. and J. Dalmau (2012). "CNS autoimmunity: new findings and pending issues." The Lancet Neurology 11(1): 17-19. |
| Not Relevant to current fit for purpose review | Graus, F. and A. Tortosa (2006). "Neuro-oncology: setting new standards of management." The Lancet Neurology 5(1): 8-9. |
| Not Relevant to current fit for purpose review | Gregg, J. (1995). "Discipline, control, and the school mathematics tradition." Teaching and Teacher Education 11(<HT>6</HT>): 579-593. |
| Not Relevant to current fit for purpose review | Gress, S., et al. (2015). "Cardiotoxic Electrophysiological Effects of the Herbicide Roundup((R)) in Rat and Rabbit Ventricular Myocardium In Vitro." Cardiovasc Toxicol 15(4): 324-335. |
| Not Relevant to current fit for purpose review | Grosicka-Maciag, E., et al. (2012). "Dithiocarbamate fungicide zineb induces oxidative stress and apoptosis in Chinese hamster lung fibroblasts." Pesticide Biochemistry and Physiology 102(1): 95-101. |
| Not Relevant to current fit for purpose review | Gubbiga, N. G., et al. (1996). "Root/rhizome exudation of nicosulfuron from treated johnsongrass (Sorghum halepense) and possible implications for corn (Zea mays)." Weed Science 44(3): 455-460. |
| Not Relevant to current fit for purpose review | Guchi, T., et al. (2008). "Development of event-specific quantitation method for GA21 maize, which is a GM event without CaMV35S promoter." Journal of the Food Hygienic Society of Japan 49(1): 16-22. |
| Not Relevant to current fit for purpose review | Guo, B., et al. (2015). "Co-expression of G2-EPSPS and glyphosate acetyltransferase GAT genes conferring high tolerance to glyphosate in soybean." Front Plant Sci 6: 847. |
| Not Relevant to current fit for purpose review | Guyton, K. Z., et al. (2015). "Carcinogenicity of tetrachlorvinphos, parathion, malathion, diazinon, and glyphosate." Lancet Oncology 16(5): 490-491. |

| Not Relevant to current fit for purpose review | Hammond, B., et al. (2004). "Results of a 13 week safety assurance study with rats fed grain from glyphosate tolerant corn." Food Chem Toxicol 42(6): 1003-1014. |
|---|---|
| Not Relevant to current fit for purpose review | Hanberry, B. B., et al. (2013). "Small Mammal Responses to Intensively Established Pine Plantations in Coastal Plain Mississippi." Southern Journal of Applied Forestry 37(1): 53-58. |
| Not Relevant to current fit for purpose review | Haritou, M., et al. (2000). "Agents facilitating the electric field-induced fusion of intact rabbit erythrocytes." Bioelectrochemistry 52(2): 229-238. |
| Not Relevant to current fit for purpose review | Harkin, D. G., et al. (2000). "A novel approach to studying the migratory morphology of embryonic mesenchymal cells." Biology of the Cell 92(7): 537-543. |
| Not Relevant to current fit for purpose review | Harlow, S. D. and O. M. R. Campbell (2000). "Menstrual dysfunction: A missed opportunity for improving reproductive health in developing countries." Reproductive Health Matters 8(15): 142-147. |
| Not Relevant to current fit for purpose review | Hassannayebi, E. and S. H. Zegordi "Variable and adaptive neighbourhood search algorithms for rail rapid transit timetabling problem." Computers & Operations Research. |
| Not Relevant to current fit for purpose review | Hatamie, S., et al. (2015). "Curcumin-reduced graphene oxide sheets and their effects on human breast cancer cells." Mater Sci Eng C Mater Biol Appl 55: 482-489. |
| Not Relevant to current fit for purpose review | Haupt, S. E. (2006). "A quadratic empirical model formulation for dynamical systems using a genetic algorithm." Computers & Mathematics with Applications 51(3–4): 431-440. |
| Not Relevant to current fit for purpose review | Healy, C., et al. (2008). "Results of a 13-week safety assurance study with rats fed grain from corn rootworm-protected, glyphosate-tolerant MON 88017 corn." Food and Chemical Toxicology 46(7): 2517-2524. |
| Not Relevant to current fit for purpose review | Heck, G. R., et al. (2005). "Development and characterization of a CP4 EPSPS-Based, glyphosate-tolerant corn event." Crop Science 45(1): 329-339. |
| Not Relevant to current fit for purpose review | Henderson, N., et al. (2016). "PCR-Based Detection and Quantification of a Transgenic Glyphosate-Tolerant Canola Using a Novel Reference Gene System." Food Analytical Methods 9(2): 353-361. |
| Not Relevant to current fit for purpose review | Héraux, F. M. G., et al. (2005). "Combining Trichoderma virens-inoculated compost and a rye cover crop for weed control in transplanted vegetables." Biological Control 34(1): 21-26. |
| Not Relevant to current fit for purpose review | Hernández, A. F., et al. (2006). "Influence of exposure to pesticides on serum components and enzyme activities of cytotoxicity among intensive agriculture farmers." Environmental Research 102(1): 70-76. |
| Not Relevant to current fit for purpose review | Herrmann, K. M. and L. M. Weaver (1999). "The shikimate pathway." Annual Review of Plant Physiology and Plant Molecular Biology 50: 473-503. |
| Not Relevant to current fit for purpose review | Heu, C., et al. (2012). "Glyphosate-induced stiffening of HaCaT keratinocytes, a Peak Force Tapping study on living cells." J Struct Biol 178(1): 1-7. |
| Not Relevant to current fit for purpose review | Hill, H. F. (1962). "Nakajima's Glaucoma Operation." American Journal of Ophthalmology 53(2): 391-392. |
| Not Relevant to current fit for purpose review | Hohzaki, R. (2006). "Search allocation game." European Journal of Operational Research 172(1): 101-119. |
| Not Relevant to current fit for purpose review | Hokanson, R., et al. (2007). "Alteration of estrogen-regulated gene expression in human cells induced by the agricultural and horticultural herbicide glyphosate." Hum Exp Toxicol 26(9): 747-752. |
| Not Relevant to current fit for purpose review | Hothorn, L. A. and R. Oberdoerfer (2006). "Statistical analysis used in the nutritional assessment of novel food using the proof of safety." Regulatory Toxicology and Pharmacology 44(2): 125-135. |
| Not Relevant to current fit for purpose review | Hour, B. T., et al. (2012). "Herbicide Roundup Intoxication: Successful Treatment with Continuous Renal Replacement Therapy." The American Journal of Medicine 125(8): e1-e2. |
| Not Relevant to current fit for purpose review | Hsu, M.-H., et al. (2007). "2-(3-Fluorophenyl)-6-methoxyl-4-oxo-1,4-dihydroquinoline-3-carboxylic acid (YJC-1) induces mitotic phase arrest in A549 cells." European Journal of Pharmacology 559(1): 14-20. |
| Not Relevant to current fit for purpose review | Hu, B.-b., et al. (2014). "Energy efficiency of massive MIMO wireless communication systems with antenna selection." The Journal of China Universities of Posts and Telecommunications 21(<HT>6</HT>): 1-8. |
| Not Relevant to current fit for purpose review | Hu, T., et al. (2011). "Isolation and characterization of a rice glutathione S-transferase gene promoter regulated by herbicides and hormones." Plant Cell Rep 30(4): 539-549. |
| Not Relevant to current fit for purpose review | Huang, C. C., et al. (2004). "Development and application of a nested polymerase chain reaction method for the detection of genetically modified soybean in Chinese traditional fermented soy food-sufu." Journal of Food and Drug Analysis 12(3): 266-272. |
| Not Relevant to current fit for purpose review | Huang, J. L., et al. (2016). "Enhancement of the genotoxicity of benzo[a]pyrene by arecoline through suppression of DNA repair in HEp-2 cells." Toxicology in Vitro 33: 80-87. |

| Not Relevant to current fit for purpose review | Huang, Y.-T., et al. (2014). "The depletion of securin enhances butein-induced apoptosis and tumor inhibition in human colorectal cancer." Chemico-Biological Interactions 220: 41-50. |
| Not Relevant to current fit for purpose review | Hübner, P., et al. (1999). "Quantitative competitive PCR for the detection of genetically modified organisms in food." Food Control 10(<HT>6</HT>): 353-358. |
| Not Relevant to current fit for purpose review | Hubner, P., et al. (2001). "Validation of PCR methods for quantitation of genetically modified plants in food." J AOAC Int 84(6): 1855-1864. |
| Not Relevant to current fit for purpose review | Huisman, W., et al. (1997). "Costs of supply chains of Miscanthus giganteus." Industrial Crops and Products <HT>6</HT>(3–4): 353-366. |
| Not Relevant to current fit for purpose review | Hultberg, M. (2007). "Cysteine turnover in human cell lines is influenced by glyphosate." Environmental Toxicology and Pharmacology 24(1): 19-22. |
| Not Relevant to current fit for purpose review | Huynh, Q. K., et al. (1988). "Site-directed mutagenesis of Petunia hybrida 5-enolpyruvylshikimate-3-phosphate synthase: Lys-23 is essential for substrate binding." J Biol Chem 263(24): 11636-11639. |
| Not Relevant to current fit for purpose review | Jackson, E. (1933). "Progressive Ophthalmology." American Journal of Ophthalmology 16(2): 154-155. |
| Not Relevant to current fit for purpose review | Jacobelli, J., et al. (2004). "New views of the immunological synapse: variations in assembly and function." Current Opinion in Immunology 16(3): 345-352. |
| Not Relevant to current fit for purpose review | Jank, B. and A. Haslberger (2000). "Recombinant DNA insertion into plant retrotransposons." Trends in Biotechnology 18(8): 326-327. |
| Not Relevant to current fit for purpose review | Jankovic, J. (2008). "Parkinson's disease and movement disorders: moving forward." The Lancet Neurology 7(1): 9-11. |
| Not Relevant to current fit for purpose review | Jennings, J. C., et al. (2003). "Determining whether transgenic and endogenous plant DNA and transgenic protein are detectable in muscle from swine fed Roundup Ready soybean meal." J Anim Sci 81(6): 1447-1455. |
| Not Relevant to current fit for purpose review | Jiang, L. X., et al. (2013). "Glyphosate effects on the gene expression of the apical bud in soybean (Glycine max)." Biochem Biophys Res Commun 437(4): 544-549. |
| Not Relevant to current fit for purpose review | Johnson, K. A. (2013). "A century of enzyme kinetic analysis, 1913 to 2013." FEBS Letters 587(17): 2753-2766. |
| Not Relevant to current fit for purpose review | Jones, W. E. (1986). "Genetic recreation of wild horses." Journal of Equine Veterinary Science <HT>6</HT>(5): 246-249. |
| Not Relevant to current fit for purpose review | Kang, M., et al. (1993). "Interactive partitioning criteria set method for multiple objective linear programming." Computers & Operations Research 20(4): 435-446. |
| Not Relevant to current fit for purpose review | Kang, S. (2014). "Research round-up." The Lancet Psychiatry 1(7): 502. |
| Not Relevant to current fit for purpose review | Kang, S. (2014). "Research round-up." The Lancet Psychiatry 1(4): 261. |
| Not Relevant to current fit for purpose review | Kang, S. (2015). "Research round-up." The Lancet Psychiatry 2(1): 17. |
| Not Relevant to current fit for purpose review | Kang, S. (2016). "Research round-up." The Lancet Psychiatry 3(4): 323. |
| Not Relevant to current fit for purpose review | Kang, Y., et al. (2011). "Knockout and pullout recombineering for naturally transformable Burkholderia thailandensis and Burkholderia pseudomallei." Nature Protocols 6(8): 1085-1104. |
| Not Relevant to current fit for purpose review | Keenan, R. J., et al. (2005). "DNA shuffling as a tool for protein crystallization." Proc Natl Acad Sci U S A 102(25): 8887-8892. |
| Not Relevant to current fit for purpose review | Kelly, D. (2003). "Research Round-up." European Journal of Oncology Nursing 7(3): 210-212. |
| Not Relevant to current fit for purpose review | Kiernan, M. C. (2014). "ALS and neuromuscular disease: in search of the Holy Grail." The Lancet Neurology 13(1): 13-14. |
| Not Relevant to current fit for purpose review | Kim, H. J., et al. (2007). "Engineering and characterization of the isolated C-terminal domain of 5-enolpyruvylshikimate-3-phosphate (EPSP) synthase." Journal of Microbiology and Biotechnology 17(8): 1385-1389. |
| Not Relevant to current fit for purpose review | Kim, I., et al. (2012). "Cloud computing for comparative genomics with windows azure platform." Evol Bioinform Online 8: 527-534. |
| Not Relevant to current fit for purpose review | Kim, J.-H., et al. (2015). "Detection of eight genetically modified canola events using two event-specific pentaplex PCR systems." Food Control 51: 183-189. |

| Not Relevant to current fit for purpose review | Kim, J.-H., et al. (2015). "A simplified and accurate detection of the genetically modified wheat MON71800 with one calibrator plasmid." Food Chemistry 176: 1-6. |
|---|---|
| Not Relevant to current fit for purpose review | Kim, Y. H., et al. (2013). "Mixtures of glyphosate and surfactant TN20 accelerate cell death via mitochondrial damage-induced apoptosis and necrosis." Toxicol In Vitro 27(1): 191-197. |
| Not Relevant to current fit for purpose review | Kim, Y. H., et al. (2014). "Heart rate–corrected QT interval predicts mortality in glyphosate-surfactant herbicide–poisoned patients." The American Journal of Emergency Medicine 32(3): 203-207. |
| Not Relevant to current fit for purpose review | Kira, J.-i. (2008). "MS: prevention of neural damage by early intervention." The Lancet Neurology 7(1): 3-5. |
| Not Relevant to current fit for purpose review | Kirkham, F. (2004). "Paediatric neurology: genes and the environment." The Lancet Neurology 3(1): 18. |
| Not Relevant to current fit for purpose review | Klein, E. T. (1977). "J. Lyndon Carman (1905–1977)." American Journal of Orthodontics 72(2): 213-214. |
| Not Relevant to current fit for purpose review | Knopper, L. D. and D. R. S. Lean (2004). "Carcinogenic and genotoxic potential of turf pesticides commonly used on golf courses." Journal of Toxicology and Environmental Health-Part B-Critical Reviews 7(4): 267-279. |
| Not Relevant to current fit for purpose review | Kohn, P. M., et al. (1987). "Relationships between psychometric and experimental measures of arousability." Personality and Individual Differences 8(2): 225-231. |
| Not Relevant to current fit for purpose review | Kordowska, J., et al. (2006). "Phosphorylated l-caldesmon is involved in disassembly of actin stress fibers and postmitotic spreading." Experimental Cell Research 312(2): 95-110. |
| Not Relevant to current fit for purpose review | Kovalic, D., et al. (2012). "The Use of Next Generation Sequencing and Junction Sequence Analysis Bioinformatics to Achieve Molecular Characterization of Crops Improved Through Modern Biotechnology." Plant Genome 5(3): 149-163. |
| Not Relevant to current fit for purpose review | Kresge, K. J. (2005). "Women and HIV. Women's research roundup." Beta 17(4): 30-33. |
| Not Relevant to current fit for purpose review | Kristensen, T. (2004). "Lethal pictures." Network Security 2004(10): 19-20. |
| Not Relevant to current fit for purpose review | Kristensen, T. (2004). "Microsoft leaves Win2000, XPSP1 users in lurch." Network Security 2004(11): 16-17. |
| Not Relevant to current fit for purpose review | Kristensen, T. (2005). "More holes than a phishing net." Network Security 2005(1): 18-19. |
| Not Relevant to current fit for purpose review | Kudtarkar, P., et al. (2010). "Cost-effective cloud computing: a case study using the comparative genomics tool, roundup." Evol Bioinform Online 6: 197-203. |
| Not Relevant to current fit for purpose review | Kulesa, P. M., et al. (2008). "Neural crest invasion is a spatially-ordered progression into the head with higher cell proliferation at the migratory front as revealed by the photoactivatable protein, KikGR." Developmental Biology 316(2): 275-287. |
| Not Relevant to current fit for purpose review | Kuramochi, Y., et al. (2006). "Neuregulin activates erbB2-dependent src/FAK signaling and cytoskeletal remodeling in isolated adult rat cardiac myocytes." Journal of Molecular and Cellular Cardiology 41(2): 228-235. |
| Not Relevant to current fit for purpose review | Kuribara, H., et al. (2002). "Novel reference molecules for quantitation of genetically modified maize and soybean." J AOAC Int 85(5): 1077-1089. |
| Not Relevant to current fit for purpose review | Kutateladze, T., et al. (2007). "Detection of biotechnological crops in Georgia." Journal of Biotechnology 131(2, Supplement): S37-S38. |
| Not Relevant to current fit for purpose review | Kwon, K., et al. (2012). "3.103 PREDICTION AND CHARACTERIZATION OF ARABIDOPSIS THALIANA HOMOLOGS OF PARKINSON DISEASE-ASSOCIATED GENES BASED ON SEQUENCE SIMILARITIES AND MOLECULAR MODELING." Parkinsonism & Related Disorders 18, Supplement 2: S190. |
| Not Relevant to current fit for purpose review | La Mura, M., et al. (2011). "Application of QUIZ for GM quantification in food." Food Chemistry 125(4): 1340-1344. |
| Not Relevant to current fit for purpose review | Lam, S. H. F., et al. "Use of Intravenous Fat Emulsion in the Emergency Department for the Critically Ill Poisoned Patient." The Journal of Emergency Medicine. |
| Not Relevant to current fit for purpose review | Lamb, G. C., et al. (2000). "Prolonging the MGA-prostaglandin F2α interval from 17 to 19 days in an estrus synchronization system for heifers." Theriogenology 53(3): 691-698. |
| Not Relevant to current fit for purpose review | Larkin, M. (2001). "Websites in brief." The Lancet 358(9284): 850. |

| Not Relevant to current fit for purpose review | Larkin, M. (2003). "Technology and Public Health." The Lancet Infectious Diseases 3(5): 314-315. |
|---|---|
| Not Relevant to current fit for purpose review | Larkin, M. (2004). "Sites accelerate global response to HIV." The Lancet Infectious Diseases 4(7): 472-473. |
| Not Relevant to current fit for purpose review | Larsen, R. J. and D. W. Baggs (1986). "Some psychophysical and personality correlates of the Strelau temperament inventory." Personality and Individual Differences 7(4): 561-565. |
| Not Relevant to current fit for purpose review | Larsen, R. J. and M. A. Zarate (1991). "Extending reducer/augmenter theory into the emotion domain: The role of affect in regulating stimulation level." Personality and Individual Differences 12(7): 713-723. |
| Not Relevant to current fit for purpose review | Lee, A. H. (2008). "A pilot intervention for pregnant women in Sichuan, China on passive smoking." Patient Education and Counseling 71(3): 396-401. |
| Not Relevant to current fit for purpose review | Lee, C.-H., et al. (2008). "The early prognostic factors of glyphosate-surfactant intoxication." The American Journal of Emergency Medicine 26(3): 275-281. |
| Not Relevant to current fit for purpose review | Lee, D., et al. (2010). "Quantitation using informative zeros (QUIZ): Application for GMO detection and quantification without recourse to certified reference material." Food Chemistry 118(4): 974-978. |
| Not Relevant to current fit for purpose review | Lee, E.-J., et al. (2004). "G2/M cell cycle arrest and induction of apoptosis by a stilbenoid, 3,4,5-trimethoxy-4′-bromo-cis-stilbene, in human lung cancer cells." Life Sciences 75(23): 2829-2839. |
| Not Relevant to current fit for purpose review | Lee, H. J., et al. (2010). "Cloning and Characterization of a 5-Enolpyruvyl Shikimate 3-Phosphate Synthase (EPSPS) Gene from Korean Lawn Grass (Zoysia japonica)." Korean Journal of Horticultural Science & Technology 28(4): 648-655. |
| Not Relevant to current fit for purpose review | Lee, S. R., et al. (2007). "Neuroprotective effects of kobophenol A against the withdrawal of tropic support, nitrosative stress, and mitochondrial damage in SH-SY5Y neuroblastoma cells." Bioorganic & Medicinal Chemistry Letters 17(7): 1879-1882. |
| Not Relevant to current fit for purpose review | Lees, K. R. (2009). "Stroke: success for extending acute treatment." The Lancet Neurology 8(1): 2-4. |
| Not Relevant to current fit for purpose review | Lerat, S., et al. (2005). "Real-time polymerase chain reaction quantification of the transgenes for roundup ready corn and roundup ready soybean in soil samples." J Agric Food Chem 53(5): 1337-1342. |
| Not Relevant to current fit for purpose review | Leva, A. (2015). "Computing systems and the network as a control education arena." IFAC-PapersOnLine 48(29): 265-276. |
| Not Relevant to current fit for purpose review | Levy, M. L. (2006). "What's in this issue." Primary Care Respiratory Journal 15(<HT>6</HT>): 321-322. |
| Not Relevant to current fit for purpose review | Li, G., et al. (2015). "A genetic algorithm-based decomposition approach to solve an integrated equipment-workforce-service planning problem." Omega 50: 1-17. |
| Not Relevant to current fit for purpose review | Li, H., et al. (2014). "Chaetoglobosins from Chaetomium globosum, an endophytic fungus in Ginkgo biloba, and their phytotoxic and cytotoxic activities." J Agric Food Chem 62(17): 3734-3741. |
| Not Relevant to current fit for purpose review | Li, L., et al. (2015). "A transcriptomic analysis for identifying the unintended effects of introducing a heterologous glyphosate-tolerant EPSP synthase into Escherichia coli." Molecular Biosystems 11(3): 852-858. |
| Not Relevant to current fit for purpose review | Li, R. and R. S. El-Mallakh (2000). "A novel evidence of different mechanisms of lithium and valproate neuroprotective action on human SY5Y neuroblastoma cells: caspase-3 dependency." Neuroscience Letters 294(3): 147-150. |
| Not Relevant to current fit for purpose review | Lian, Y., et al. (2016). "Direct and simultaneous quantification of ATP, ADP and AMP by 1H and 31P Nuclear Magnetic Resonance spectroscopy." Talanta 150: 485-492. |
| Not Relevant to current fit for purpose review | Liang, J., et al. (2009). "The Role of Seminal Vesicle Motion in Target Margin Assessment for Online Image-Guided Radiotherapy for Prostate Cancer." International Journal of Radiation Oncology*Biology*Physics 73(3): 935-943. |
| Not Relevant to current fit for purpose review | Liberatore, M., et al. (2010). "Forensic investigation of peer-to-peer file sharing networks." Digital Investigation 7, Supplement: S95-S103. |
| Not Relevant to current fit for purpose review | Lin, N. and V. F. Garry (2000). "In vitro studies of cellular and molecular developmental toxicity of adjuvants, herbicides, and fungicides commonly used in Red River Valley, Minnesota." J Toxicol Environ Health A 60(6): 423-439. |
| Not Relevant to current fit for purpose review | Lin, Y.-C., et al. (2011). "744 ZOLEDRONIC ACID INDUCES AUTOPHAGIC CELL DEATH IN HUMAN PROSTATE CANCER CELLS." The Journal of Urology 185(4, Supplement): e298-e299. |
| Not Relevant to current fit for purpose review | Lin, Y.-K., et al. (2013). "Multiple-objective heuristics for scheduling unrelated parallel machines." European Journal of Operational Research 227(2): 239-253. |

| Not Relevant to current fit for purpose review | Lipton, R. B. and M. E. Bigal (2005). "Headache: triumphs in translational research." The Lancet Neurology 4(1): 11-12. |
|---|---|
| Not Relevant to current fit for purpose review | Liu, M. (2008). "Stroke: encouragement and disappointment in clinical trials." The Lancet Neurology 7(1): 5-7. |
| Not Relevant to current fit for purpose review | Liu, S., et al. (2003). "A prospective study of the association between APOE genotype and the risk of myocardial infarction among apparently healthy men." Atherosclerosis 166(2): 323-329. |
| Not Relevant to current fit for purpose review | Lluis, M., et al. (2008). "Severe acute poisoning due to a glufosinate containing preparation without mitochondrial involvement." Hum Exp Toxicol 27(6): 519-524. |
| Not Relevant to current fit for purpose review | Lodge, G. M., et al. (1994). "EFFECTS OF GLYPHOSATE, FLUPROPANATE AND 2,2-DPA ON HYPARRHENIA-HIRTA (L) STAPF (COOLATAI GRASS)." Australian Journal of Experimental Agriculture 34(4): 479-485. |
| Not Relevant to current fit for purpose review | Lombardo, M. and G. Lombardo (2010). "Wave aberration of human eyes and new descriptors of image optical quality and visual performance." Journal of Cataract & Refractive Surgery 36(2): 313-331. |
| Not Relevant to current fit for purpose review | Loredano, P., et al. (2010). "CASCAT: The Power of the Combined Protein Engineering Approach: Evolution of A Glycine Oxidase for A Novel Mechanism of Glyphosate Tolerance." Journal of Biotechnology 150: S122-S123. |
| Not Relevant to current fit for purpose review | Lucentini, J. (2008). "Technology roundup." Scientist: 76-82. |
| Not Relevant to current fit for purpose review | Machado, A. F. L., et al. (2008). "Anatomical characterization of the leaf, stem and rhizome of Digitaria insularis." Planta Daninha 26(1): 1-8. |
| Not Relevant to current fit for purpose review | Mahmood, A. (2009). "Renewables in Asia – a roundup." Renewable Energy Focus 9(7): 19. |
| Not Relevant to current fit for purpose review | Main, C. L., et al. (2004). "Sulfentrazone persistence in southern soils: Bioavailable concentration and effect on a rotational cotton crop." Weed Technology 18(2): 346-352. |
| Not Relevant to current fit for purpose review | Makowski, M., et al. (2009). "Oestrogen receptor alpha polymorphisms in women with breast cancer and their clinical significance." Przeglad Menopauzalny 8(1): 40-44. |
| Not Relevant to current fit for purpose review | Malatesta, M., et al. (2008). "Hepatoma tissue culture (HTC) cells as a model for investigating the effects of low concentrations of herbicide on cell structure and function." Toxicol In Vitro 22(8): 1853-1860. |
| Not Relevant to current fit for purpose review | Malecot, M., et al. (2013). "Specific proteomic response of Unio pictorum mussel to a mixture of glyphosate and microcystin-LR." J Proteome Res 12(11): 5281-5292. |
| Not Relevant to current fit for purpose review | Malhotra, R. C., et al. (2010). "Glyphosate–surfactant herbicide-induced reversible encephalopathy." Journal of Clinical Neuroscience 17(11): 1472-1473. |
| Not Relevant to current fit for purpose review | Mariana, A., et al. (2009). "The impact of simultaneous intoxication with agrochemicals on the antioxidant defense system in rat." Pesticide Biochemistry and Physiology 94(2-3): 93-99. |
| Not Relevant to current fit for purpose review | Marques, M. R., et al. (2007). "The inhibition of 5-enolpyruvylshikimate-3-phosphate synthase as a model for development of novel antimicrobials." Current Drug Targets 8(3): 445-457. |
| Not Relevant to current fit for purpose review | Marrelli, M., et al. (2013). "A comparative study of phytochemical composition of genetically and non-genetically modified soybean (Glycine max L.) and evaluation of antitumor activity." Nat Prod Res 27(6): 574-578. |
| Not Relevant to current fit for purpose review | Marriott, G. and J. W. Walker (1999). "Caged peptides and proteins: new probes to study polypeptide function in complex biological systems." Trends in Plant Science 4(8): 330-334. |
| Not Relevant to current fit for purpose review | Mastaglia, F. L. (2005). "Neuromuscular disorders: molecular and therapeutic insights." The Lancet Neurology 4(1): 6-7. |
| Not Relevant to current fit for purpose review | Mavunganidze, Z., et al. (2014). "The impact of tillage system and herbicides on weed density, diversity and yield of cotton (Gossipium hirsutum L.) and maize (Zea mays L.) under the smallholder sector." Crop Protection 58: 25-32. |
| Not Relevant to current fit for purpose review | Mayeux, R. and P. S. G. Hyslop (2008). "Alzheimer's disease: advances in trafficking." The Lancet Neurology 7(1): 2-3. |
| Not Relevant to current fit for purpose review | McAlister, B. G. and J. van Staden (1995). "Effect of artificially induced stress conditions on the growth of the medicinal plant Hypoxis hemerocallidea." South African Journal of Botany 61(2): 85-89. |
| Not Relevant to current fit for purpose review | McClenaghan, J. S. (1994). "The 1993 newspaper science reporter: Contributing, creative, and responsible." The Social Science Journal 31(4): 467-477. |
| Not Relevant to current fit for purpose review | McDowell, L. M., et al. (2004). "Rotational-echo double-resonance NMR-restrained model of the ternary complex of 5-enolpyruvylshikimate-3-phosphate synthase." J Biomol NMR 28(1): 11-29. |

| Not Relevant to current fit for purpose review | McKeone, D. H. (1973). "Liquid crystals for display applications." Optics & Laser Technology 5(1): 39-40. |
|---|---|
| Not Relevant to current fit for purpose review | Meacham, M. (1976). "Development of school libraries around the world." International Library Review 8(4): 453-459. |
| Not Relevant to current fit for purpose review | Merlis, J. K. (1959). "Fundamentals of clinical neurophysiology: Paul O. Chatfield Charles C. Thomas, Springfield, Illinois, 1957, 392 pp. $8.50." Electroencephalography and Clinical Neurophysiology 11(1): 192. |
| Not Relevant to current fit for purpose review | Mesnage, R., et al. (2013). "Ethoxylated adjuvants of glyphosate-based herbicides are active principles of human cell toxicity." Toxicology 313(2-3): 122-128. |
| Not Relevant to current fit for purpose review | Milán, M. and S. M. Cohen (1999). "Notch Signaling Is Not Sufficient to Define the Affinity Boundary between Dorsal and Ventral Compartments." Molecular Cell 4(<HT>6</HT>): 1073-1078. |
| Not Relevant to current fit for purpose review | Miller, J. W., et al. (1991). "Phthalocyanine Photodynamic Therapy of Experimental Iris Neovascularization." Ophthalmology 98(11): 1711-1719. |
| Not Relevant to current fit for purpose review | Miller, S. P. and D. M. Ferriero (2013). "Paediatric neurology: improved care of the developing brain." The Lancet Neurology 12(1): 16-18. |
| Not Relevant to current fit for purpose review | Milligan, A. L., et al. (2003). "A field assessment of the role of selective herbicides in the restoration of British moorland dominated by Molinia." Biological Conservation 109(3): 369-379. |
| Not Relevant to current fit for purpose review | Mink, P. J., et al. (2011). "Epidemiologic studies of glyphosate and non-cancer health outcomes: a review." Regul Toxicol Pharmacol 61(2): 172-184. |
| Not Relevant to current fit for purpose review | Minshull, J., et al. (2005). "Predicting enzyme function from protein sequence." Current Opinion in Chemical Biology 9(2): 202-209. |
| Not Relevant to current fit for purpose review | Mo, Q. and X. Zhuang (2012). "Matrix splitting with symmetry and dyadic framelet filter banks over algebraic number fields." Linear Algebra and its Applications 437(10): 2650-2679. |
| Not Relevant to current fit for purpose review | Monsen, E. R. (1998). "ADA'S Nutrition Campaigns Link Dietitians and the Public's Health." Journal of the American Dietetic Association 98(7): 746. |
| Not Relevant to current fit for purpose review | Monsen, E. R. (1998). "Dietetics Professionals Fight Obesity." Journal of the American Dietetic Association 98(10): 1098. |
| Not Relevant to current fit for purpose review | Monsen, E. R. (1999). "The Past Dietetics Century and the Future Dietetics Century." Journal of the American Dietetic Association 99(12): 1498. |
| Not Relevant to current fit for purpose review | Monsen, E. R. (1999). "What's Fresh in this Month's Journal?" Journal of the American Dietetic Association 99(3): 274. |
| Not Relevant to current fit for purpose review | Moreano, F., et al. (2006). "Ligation-dependent probe amplification for the simultaneous event-specific detection and relative quantification of DNA from two genetically modified organisms." European Food Research and Technology 222(5-6): 479-485. |
| Not Relevant to current fit for purpose review | Morgensztern, D. and R. Govindan (2010). "Best of the month: a roundup of articles published in recent months." J Thorac Oncol 5(8): 1305-1307. |
| Not Relevant to current fit for purpose review | Morgensztern, D. and R. Govindan (2011). "A Roundup of Recently Published Articles Relevant to Thoracic Oncology." Journal of Thoracic Oncology <HT>6</HT>(7): 1295-1297. |
| Not Relevant to current fit for purpose review | Morgensztern, D. and R. Govindan (2011). "A roundup of recently published articles relevant to thoracic oncology." J Thorac Oncol 6(7): 1295-1297. |
| Not Relevant to current fit for purpose review | Morris, R. T., et al. (2011). "RiceRBP: A database of experimentally identified RNA-binding proteins in Oryza sativa L." Plant Science 180(2): 204-211. |
| Not Relevant to current fit for purpose review | Muntoni, F. and J. H. Cross (2015). "Paediatric neurology: from molecular mechanisms to targeted treatments." The Lancet Neurology 14(1): 16-18. |
| Not Relevant to current fit for purpose review | Myllynen, P. and K. Vähäkangas (2013). "Placental transfer and metabolism: An overview of the experimental models utilizing human placental tissue." Toxicology in Vitro 27(1): 507-512. |
| Not Relevant to current fit for purpose review | Nam, H.-J., et al. (2008). "The ERK-RSK1 activation by growth factors at G2 phase delays cell cycle progression and reduces mitotic aberrations." Cellular Signalling 20(7): 1349-1358. |
| Not Relevant to current fit for purpose review | Naydenova, E., et al. (2007). "Synthesis, cytotoxicity and clastogenicity of novel alpha-aminophosphonic acids." Amino Acids 33(4): 695-702. |
| Not Relevant to current fit for purpose review | Naydenova, E. D., et al. (2008). "Novel N-(phosphonomethyl) glycine derivatives: Design, characterization and biological activity." Eur J Med Chem 43(6): 1199-1205. |
| Not Relevant to current fit for purpose review | Neumann, G., et al. (2011). "Assessment of the genetic stability of GMOs with a detailed examination of MON810 using Scorpion probes." European Food Research and Technology 233(1): 19-30. |

| Not Relevant to current fit for purpose review | Newton, F. H. (1962). "Appraising New Techniques." American Journal of Ophthalmology 53(2): 392. |
|---|---|
| Not Relevant to current fit for purpose review | Norrving, B. (2006). "Stroke: the catch-up of underinvestigated topics." The Lancet Neurology 5(1): 10-11. |
| Not Relevant to current fit for purpose review | Novis, P. M., et al. (2009). "Identification and Characterization of Freshwater Algae from a Pollution Gradient Using rbcL Sequencing and Toxicity Testing." Arch Environ Contam Toxicol 57(3): 504-514. |
| Not Relevant to current fit for purpose review | Ocaña, K. A. C. S., et al. (2013). "Designing a parallel cloud based comparative genomics workflow to improve phylogenetic analyses." Future Generation Computer Systems 29(8): 2205-2219. |
| Not Relevant to current fit for purpose review | Oeding, L. and G. Ottaviani (2013). "Eigenvectors of tensors and algorithms for Waring decomposition." Journal of Symbolic Computation 54: 9-35. |
| Not Relevant to current fit for purpose review | Oguchi, T., et al. (2008). "Development of event-specific quantitation method for GA21 maize, which is a gm event without CaMV35S promoter." Shokuhin Eiseigaku Zasshi 49(1): 16-22. |
| Not Relevant to current fit for purpose review | Okamoto, T. (2015). "SecondDEP: Resilient Computing that Prevents Shellcode Execution in Cyber-Attacks." Procedia Computer Science 60: 691-699. |
| Not Relevant to current fit for purpose review | Olanow, C. W. (2006). "Movement disorders: a step in the right direction." The Lancet Neurology 5(1): 3-5. |
| Not Relevant to current fit for purpose review | Omrani, D. (1993). "Doesn't quite live up to expectations: Enterprise-Wide Computing: How to Implement and Manage LANs by Thomas W. Madron. Published by John Wiley, 1991, £25.95, 372 pp." Computer Communications 16(7): 449-450. |
| Not Relevant to current fit for purpose review | Onori, R., et al. (2013). "Traceability of genetically modified Roundup Ready soybean: A case study on sampling and analytical uncertainty along processing chain." Food Control 34(2): 494-501. |
| Not Relevant to current fit for purpose review | O'Rourke, K. (2004). "Genome roundup." J Am Vet Med Assoc 224(4): 491-492. |
| Not Relevant to current fit for purpose review | Ortiz, S., et al. (2006). "Acute cytotoxicity in mammal cells exposed in vitro to a glyphosate-based formulation." Environ Mol Mutagen 47(6): 473-473. |
| Not Relevant to current fit for purpose review | Park, S., et al. (2015). "The effects of nonyl phenoxypolyethoxyl ethanol on cell damage pathway gene expression in SK-N-SH cells." Korean Journal of Internal Medicine 30(6): 873-883. |
| Not Relevant to current fit for purpose review | Pasqualone, A., et al. (2007). "Detection of soft wheat in semolina and durum wheat bread by analysis of DNA microsatellites." J Agric Food Chem 55(9): 3312-3318. |
| Not Relevant to current fit for purpose review | Patterson, P. (1980). "Nurses hold own in federal battle for education funds." AORN Journal 32(1): 116-118. |
| Not Relevant to current fit for purpose review | Patton, M. L. and R. F. Grove (1992). "Statolith hair movements and the regulation of tonic gravity reflexes in the lobster, Homarus americanus." Comparative Biochemistry and Physiology Part A: Physiology 101(2): 259-268. |
| Not Relevant to current fit for purpose review | Perisse, P., et al. (2011). "Seed and seedling morphology of Dicliptera squarrosa Nees (Acanthaceae) as a character identification source, and its relationship with survival structures." Phyton-International Journal of Experimental Botany 80: 73-78. |
| Not Relevant to current fit for purpose review | Perret, R. (2012). "Wanted dead or alive? Western genre items in the 21st century United States library." Library Collections, Acquisitions, and Technical Services 36(1–2): 39-52. |
| Not Relevant to current fit for purpose review | Perumal, L., et al. (2016). "Analysis of thin plates with holes by using exact geometrical representation within XFEM." Journal of Advanced Research 7(3): 445-452. |
| Not Relevant to current fit for purpose review | Pervaiz, S. (2013). "Conference roundup MAC 2011." Mitochondrion 13(3): 153-154. |
| Not Relevant to current fit for purpose review | Petersen, R. C. (2010). "Alzheimer's disease: progress in prediction." The Lancet Neurology 9(1): 4-5. |
| Not Relevant to current fit for purpose review | Pöltl, D., et al. (2012). "3.104 CELL-DEATH PATHWAYS DOWNSTREAM OF MITOCHONDRIA IN HUMAN DOPAMINERGIC NEURON DEGENERATION." Parkinsonism & Related Disorders 18, Supplement 2: S190. |
| Not Relevant to current fit for purpose review | Posch, K. C. and R. Posch (1990). "Approaching encryption at ISDN speed using partial parallel modulus multiplication." Microprocessing and Microprogramming 29(3): 177-184. |
| Not Relevant to current fit for purpose review | Potrebic, O., et al. (2009). "Acute glyphosate-surfactant poisoning with neurological sequels and fatal outcome." Vojnosanitetski Pregled 66(9): 758-762. |
| Not Relevant to current fit for purpose review | Powell, S. L. (2000). "Herbal Supplements: What Works, What Doesn't. 1999. From National Health Video, Inc. 12021 Wilshire Blvd., Suite 550, Los Angeles, CA 90025, 1-800-543-6803, videotape, 15 minutes, $89.00." Journal of Nutrition Education 32(5): 292-293. |

| Not Relevant to current fit for purpose review | Printz, C. (2013). "A roundup of news and information from our community." Clin Transl Sci 6(2): 83-84. |
|---|---|
| Not Relevant to current fit for purpose review | Printz, C. (2014). "In the news: a roundup of news and information from our community." Clin Transl Sci 7(4): 287-288. |
| Not Relevant to current fit for purpose review | Printz, C. (2015). "In the news: a roundup of news and information from our community." Clin Transl Sci 8(1): 1-2. |
| Not Relevant to current fit for purpose review | Qin, F., et al. (2012). "Composition of Transgenic Soybean Seeds with Higher gamma-Linolenic Acid Content Is Equivalent to That of Conventional Control." J Agric Food Chem 60(9): 2200-2204. |
| Not Relevant to current fit for purpose review | Radenski, A. and L. Ehwerhemuepha (2014). "Speeding-up codon analysis on the cloud with local MapReduce aggregation." Information Sciences 263: 175-185. |
| Not Relevant to current fit for purpose review | Radtke, P. J., et al. (2010). "An evaluation of overhead laser scanning to estimate herbage removals in pasture quadrats." Agricultural and Forest Meteorology 150(12): 1523-1528. |
| Not Relevant to current fit for purpose review | Rao, C. D., et al. (2015). "An enzyme-linked immuno focus assay for rapid detection and enumeration, and a newborn mouse model for human non-polio enteroviruses associated with acute diarrhea." Journal of Virological Methods 224: 47-52. |
| Not Relevant to current fit for purpose review | Rappold, P., et al. (2012). "3.106 PARAQUAT NEUROTOXICITY IS MEDIATED BY THE DOPAMINE TRANSPORTER AND ORGANIC CATION TRANSPORTER-3." Parkinsonism & Related Disorders 18, Supplement 2: S190-S191. |
| Not Relevant to current fit for purpose review | Rau, F. J. (1995). "Video review roundup." Adolescent and Pediatric Gynecology 8(3): 165. |
| Not Relevant to current fit for purpose review | Rau, F. J. (1997). "Comprehensive Review of Colposcopy 1996." Journal of Pediatric and Adolescent Gynecology 10(1): 49. |
| Not Relevant to current fit for purpose review | Rau, F. J. and K. M. Mulchahey (1997). "Milner-Fenwick Video Counseling Library: Colposcopy and Treatment of Dysplasia." Journal of Pediatric and Adolescent Gynecology 10(2): 103-104. |
| Not Relevant to current fit for purpose review | Rau, F. J. and E. E. Yordan (1996). "Sexual Assault: The Collection of Evidence for Forensic Analysis." Journal of Pediatric and Adolescent Gynecology 9(3): 169. |
| Not Relevant to current fit for purpose review | Reeve, J. C. (1995). "Core Textbook of Respiratory Care Practice." Physiotherapy 81(5): 301. |
| Not Relevant to current fit for purpose review | Reis, L. F., et al. (2006). "GMOs: building the future on the basis of past experience." An Acad Bras Cienc 78(4): 667-686. |
| Not Relevant to current fit for purpose review | Richard, S., et al. (2005). "Differential effects of glyphosate and roundup on human placental cells and aromatase." Environ Health Perspect 113(6): 716-720. |
| Not Relevant to current fit for purpose review | Richter, L. (1979). "Summary and guideline to the status reports." Euromicro Newsletter 5(3): 111-112. |
| Not Relevant to current fit for purpose review | Ring, M. (2007). "Driven Out by Hitler, a Dental Historian Enriches America: The Story of Curt Proskauer." Alpha Omegan 100(1): 25-29. |
| Not Relevant to current fit for purpose review | Robinson, D. J. (1995). "Study Package." Physiotherapy 81(5): 302. |
| Not Relevant to current fit for purpose review | Rogoli, R. P., et al. (2008). "Resposta de plantas de beterraba (Beta vulgaris) e de cenoura (Daucus carota) à deriva simulada de glyphosate e clomazone." Planta Daninha 26(2): 451-456. |
| Not Relevant to current fit for purpose review | Rosculete, E., et al. (2015). "Detection and quantification of genetically modified soybean in food and feed traded in the Romanian market." Journal of Biotechnology 208, Supplement: S73. |
| Not Relevant to current fit for purpose review | Roskelley, C. D., et al. (1995). "A hierarchy of ECM-mediated signalling regulates tissue-specific gene expression." Current Opinion in Cell Biology 7(5): 736-747. |
| Not Relevant to current fit for purpose review | Rouquié, D., et al. (2010). "Investigation of endogenous soybean food allergens by using a 2-dimensional gel electrophoresis approach." Regulatory Toxicology and Pharmacology 58(3, Supplement): S47-S53. |
| Not Relevant to current fit for purpose review | Ryd, W. and B. Hagmar (1977). "In vitro Effects of Cytochalasin B on TA3 Tumor Cells." Beiträge zur Pathologie 161(2): 131-141. |
| Not Relevant to current fit for purpose review | Sakamoto, Y., et al. (2008). "A 104-week feeding study of genetically modified soybeans in F344 rats." Journal of the Food Hygienic Society of Japan 49(4): 272-282. |
| Not Relevant to current fit for purpose review | Sakr, J., et al. (2014). "First comprehensive GMOs testing in Lebanon: Screening, identification and quantification of GM soybean imports." Food Control 36(1): 146-152. |
| Not Relevant to current fit for purpose review | Sanfilippo, J. S. (1998). ""Get A Life"-My Old Kentucky Home." Journal of Pediatric and Adolescent Gynecology 11(1): 1. |

| | |
|---|---|
| Not Relevant to current fit for purpose review | Sarraj, A. and J. C. Grotta (2014). "Stroke: new horizons in treatment." The Lancet Neurology 13(1): 2-3. |
| Not Relevant to current fit for purpose review | Sauer, N. J., et al. (2016). "Oligonucleotide-mediated genome editing provides precision and function to engineered nucleases and antibiotics in plants." Plant Physiol. |
| Not Relevant to current fit for purpose review | Sbruzzi, F. A., et al. (2013). "Transgenic and conventional Brazilian soybeans don't cause or prevent preneoplastic colon lesions or oxidative stress in a 90-day in vivo study." Revista De Nutricao-Brazilian Journal of Nutrition 26(4): 443-453. |
| Not Relevant to current fit for purpose review | Schapira, A. H. V. (2010). "Movement disorders: advances in cause and treatment." The Lancet Neurology 9(1): 6-7. |
| Not Relevant to current fit for purpose review | Scherlen, A. (2008). "Local to Global: The Importance of State-Level Journals to Library Literature." Serials Review 34(2): 129-136. |
| Not Relevant to current fit for purpose review | Schoenen, J. and G. Coppola (2010). "Headache: spreading from molecules to patients." The Lancet Neurology 9(1): 11-12. |
| Not Relevant to current fit for purpose review | Scotter, E. L. and C. E. Shaw (2013). "Neuromuscular disease: new insights and avenues for therapy." The Lancet Neurology 12(1): 13-15. |
| Not Relevant to current fit for purpose review | Selvapandiyan, A., et al. (1996). "Evidence for the shikimate-3-phosphate interacting site in the N-terminal domain of 5-enolpyruvyl shikimate-3-phosphate synthase of Bacillus subtilis." Biochemistry and Molecular Biology International 40(3): 603-610. |
| Not Relevant to current fit for purpose review | Selvapandiyan, A. and R. K. Bhatnagar (1994). "CLONING OF GENES ENCODING FOR C-P LYASE FROM PSEUDOMONAS ISOLATES PG2982 AND GLC11 - IDENTIFICATION OF A CRYPTIC ALLELE ON THE CHROMOSOME OF PSEUDOMONAS-AERUGINOSA." Current Microbiology 29(5): 255-261. |
| Not Relevant to current fit for purpose review | Selvapandiyan, A., et al. (1995). "Point mutation of a conserved arginine (104) to lysine introduces hypersensitivity to inhibition by glyphosate in the 5-enolpyruvylshikimate-3-phosphate synthase of Bacillus subtilis." FEBS Lett 374(3): 253-256. |
| Not Relevant to current fit for purpose review | Shi, G., et al. (2011). "MultiMSOAR 2.0: an accurate tool to identify ortholog groups among multiple genomes." PLoS One 6(6): e20892. |
| Not Relevant to current fit for purpose review | Shields, R. and K. Pollock (1974). "The adhesion of BHK and PyBHK cells to the substratum." Cell 3(1): 31-38. |
| Not Relevant to current fit for purpose review | Shuttleworth, W. A. and J. N. Evans (1994). "Site-directed mutagenesis and NMR studies of histidine-385 mutants of 5-enolpyruvylshikimate-3-phosphate synthase." Biochemistry 33(23): 7062-7068. |
| Not Relevant to current fit for purpose review | Shuttleworth, W. A. and J. N. Evans (1996). "The H385N mutant of 5-enolpyruvylshikimate-3-phosphate synthase: kinetics, fluorescence, and nuclear magnetic resonance studies." Arch Biochem Biophys 334(1): 37-42. |
| Not Relevant to current fit for purpose review | Shuttleworth, W. A. and J. N. S. Evans (1994). "SITE-DIRECTED MUTAGENESIS AND NMR-STUDIES OF HISTIDINE-385 MUTANTS OF 5-ENOLPYRUVYLSHIKIMATE-3-PHOSPHATE SYNTHASE." Biochemistry 33(23): 7062-7068. |
| Not Relevant to current fit for purpose review | Shuttleworth, W. A. and J. N. S. Evans (1996). "The H385N Mutant of 5-Enolpyruvylshikimate-3-phosphate Synthase: Kinetics, Fluorescence, and Nuclear Magnetic Resonance Studies." Archives of Biochemistry and Biophysics 334(1): 37-42. |
| Not Relevant to current fit for purpose review | Shuttleworth, W. A., et al. (1992). "Over-production of 5-enolpyruvylshikimate-3-phosphate synthase in Escherichia coli: use of the T7 promoter." Protein Eng 5(5): 461-466. |
| Not Relevant to current fit for purpose review | Shuttleworth, W. A., et al. (1999). "Site-directed mutagenesis of putative active site residues of 5-enolpyruvylshikimate-3-phosphate synthase." Biochemistry 38(1): 296-302. |
| Not Relevant to current fit for purpose review | Sienkiewicz, Z. (2007). "Rapporteur report: Roundup, discussion and recommendations." Progress in Biophysics and Molecular Biology 93(1–3): 414-420. |
| Not Relevant to current fit for purpose review | Sikorski, J. A. and K. J. Gruys (1997). "Understanding Glyphosate's molecular mode of action with EPSP synthase: Evidence favoring an allosteric inhibitor model." Accounts of Chemical Research 30(1): 2-8. |
| Not Relevant to current fit for purpose review | Simonetti, E., et al. (2015). "An Interlaboratory Comparative Study on the Quantitative Determination of Glyphosate at Low Levels in Wheat Flour." J AOAC Int 98(6): 1760-1768. |
| Not Relevant to current fit for purpose review | Singh, N. and A. Srivastava (2014). "Biomonitoring of Genotoxic Effect of Glyphosate and Pendimethalin in Vigna mungo Populations." Cytologia 79(2): 173-180. |
| Not Relevant to current fit for purpose review | Singh, S. K. and S. Kumar (2011). "Novel adaptive color space transform and application to image compression." Signal Processing: Image Communication 26(10): 662-672. |

| | |
|---|---|
| Not Relevant to current fit for purpose review | Sinha, R. P., et al. (2003). "Wavelength-dependent induction of a mycosporine-like amino acid in a rice-field cyanobacterium, Nostoc commune: role of inhibitors and salt stress." Photochemical & Photobiological Sciences 2(2): 171-176. |
| Not Relevant to current fit for purpose review | Sliseris, J., et al. (2013). "Optimal Design of GFRP-Plywood Variable Stiffness Plate." Procedia Engineering 57: 1060-1069. |
| Not Relevant to current fit for purpose review | Smith, S. O. (1993). "Magic angle spinning NMR methods for internuclear distance measurements." Current Opinion in Structural Biology 3(5): 755-759. |
| Not Relevant to current fit for purpose review | Smitt, P. S. (2004). "Neuro-oncology: diagnosis in the spotlight." The Lancet Neurology 3(1): 14. |
| Not Relevant to current fit for purpose review | Somasiri, A., et al. (2000). "Phosphatidylinositol 3-Kinase is required for adherens junction-dependent mammary epithelial cell spheroid formation." Differentiation 66(2–3): 116-125. |
| Not Relevant to current fit for purpose review | Sorensen, P. S. (2005). "Multiple sclerosis: pathophysiology revisited." The Lancet Neurology 4(1): 9-10. |
| Not Relevant to current fit for purpose review | Spaeth, S. C. and T. R. Sinclair (1983). "Variation in nitrogen accumulation and distribution among soybean cultivars." Field Crops Research 7: 1-12. |
| Not Relevant to current fit for purpose review | Spector, L. S. (1990). "Not-so-open skies." Space Policy <HT>6</HT>(1): 9-18. |
| Not Relevant to current fit for purpose review | Sperling, R. A. and K. A. Johnson (2012). "Dementia: new criteria but no new treatments." The Lancet Neurology 11(1): 4-5. |
| Not Relevant to current fit for purpose review | Sroka, J., et al. (2002). "Phenotype modulation in non-adherent and adherent sublines of Walker carcinosarcoma cells: the role of cell-substratum contacts and microtubules in controlling cell shape, locomotion and cytoskeletal structure." The International Journal of Biochemistry & Cell Biology 34(7): 882-899. |
| Not Relevant to current fit for purpose review | Stanton, T. L., et al. (1990). "The Effects of Wet on Growing Heifer Brewers Grain Performance." The Professional Animal Scientist <HT>6</HT>(2): 31-34. |
| Not Relevant to current fit for purpose review | Stauffer, M. E., et al. (2001). "Shikimate-3-phosphate binds to the isolated N-terminal domain of 5-enolpyruvylshikimate-3-phosphate synthase." Biochemistry 40(13): 3951-3957. |
| Not Relevant to current fit for purpose review | Stobiecka, M., et al. (2007). "Piezoelectric sensor for determination of genetically modified soybean roundup ready((R)) in samples not amplified by PCR." Sensors 7(8): 1462-1479. |
| Not Relevant to current fit for purpose review | Stoessl, A. J. (2011). "Movement disorders: new insights into Parkinson's disease." The Lancet Neurology 10(1): 5-7. |
| Not Relevant to current fit for purpose review | Stovner, L. J. (2008). "Headache: new concepts, models, and treatments." The Lancet Neurology 7(1): 11-12. |
| Not Relevant to current fit for purpose review | Struyker-Boudier, H. A. J. (1983). "Clinical hypertension and hypotension." Trends in Pharmacological Sciences 4: 359. |
| Not Relevant to current fit for purpose review | Subramanian, J., et al. (2012). "A roundup of articles published in recent months." J Thorac Oncol 7(3): 626-628. |
| Not Relevant to current fit for purpose review | Sutou, S. and H. Shindo (1975). "Concanavalin a induces endoreduplication in cultured mammalian cells." Biochemical and Biophysical Research Communications 67(1): 79-84. |
| Not Relevant to current fit for purpose review | Suzuki, N., et al. (1996). "Purification and characterization of a cytosolic isozyme of 3-Deoxy-D-arabino-heptulosonate 7-phosphate synthase from cultured carrot cells." Journal of Plant Physiology 149(1–2): 19-22. |
| Not Relevant to current fit for purpose review | Swaney, S. (1995). "Spasmodic Torticollis." Physiotherapy 81(5): 301. |
| Not Relevant to current fit for purpose review | Tai, A., et al. (2008). "Estimate of Radiobiologic Parameters from Clinical Data for Biologically Based Treatment Planning for Liver Irradiation." International Journal of Radiation Oncology*Biology*Physics 70(3): 900-907. |
| Not Relevant to current fit for purpose review | Tai, H.-K., et al. (2011). "A one-time inducible transposon for terminating selectable markers in transgenic plants." Botanical Studies 52(4): 375-381. |
| Not Relevant to current fit for purpose review | Takabatake, R., et al. (2010). "Development and evaluation of event-specific quantitative pcr method for genetically modified soybean MON89788." Journal of Biotechnology 150, Supplement: 482-483. |
| Not Relevant to current fit for purpose review | Talbot, K. (2007). "Neuromuscular disorders: therapeutic advances." The Lancet Neurology <HT>6</HT>(1): 18-19. |
| Not Relevant to current fit for purpose review | Tan, A. and G. D. Badhwar (1997). "Detecting the dynamical state of the atmosphere from the orbital decay of the ODERACS spheres." Journal of Atmospheric and Solar-Terrestrial Physics 59(4): 431-437. |

| Not Relevant to current fit for purpose review | Tan, J. H., et al. (2013). "An interactive lung field segmentation scheme with automated capability." Digital Signal Processing 23(3): 1022-1031. |
| Not Relevant to current fit for purpose review | Tan, S., et al. (2006). "Herbicidal inhibitors of amino acid biosynthesis and herbicide-tolerant crops." Amino Acids 30(2): 195-204. |
| Not Relevant to current fit for purpose review | Tardieu, M. (2010). "Paediatric neurology: brain development at an interface between genetics, the environment, and the immune system." The Lancet Neurology 9(1): 13-14. |
| Not Relevant to current fit for purpose review | Taverniers, I., et al. (2004). "Cloned plasmid DNA fragments as calibrators for controlling GMOs: different real-time duplex quantitative PCR methods." Anal Bioanal Chem 378(5): 1198-1207. |
| Not Relevant to current fit for purpose review | Thakur, K. T., et al. (2015). "CNS infections in 2014: guns, germs, and will." The Lancet Neurology 14(1): 20-22. |
| | |
| Not Relevant to current fit for purpose review | Tong, X. H., et al. (2009). "Physiological and molecular mechanisms of glyphosate tolerance in an in vitro selected cotton mutant." Pesticide Biochemistry and Physiology 94(2-3): 100-106. |
| Not Relevant to current fit for purpose review | Tonkin, J. (1991). "South Australia CACCN." Confederation of Australian Critical Care Nurses Journal 4(3): 6. |
| Not Relevant to current fit for purpose review | Toyota, A., et al. (2006). "Quantification of genetically modified soybeans using a combination of a capillary-type real-time PCR system and a plasmid reference standard." Biosci Biotechnol Biochem 70(4): 821-827. |
| Not Relevant to current fit for purpose review | Trojano, M. and C. Tortorella (2015). "MS and related disorders: looking for markers of phenotypes." The Lancet Neurology 14(1): 11-13. |
| Not Relevant to current fit for purpose review | Trusler, C. S., et al. (2007). "Italian ryegrass (Lolium multiflorum) management options in winter wheat in Oklahoma." Weed Technology 21(1): 151-158. |
| Not Relevant to current fit for purpose review | Truta, E., et al. (2011). "Evaluation of Roundup-induced toxicity on genetic material and on length growth of barley seedlings." Acta Biol Hung 62(3): 290-301. |
| Not Relevant to current fit for purpose review | Turk, J. V. and D. L. Snedeker (1986). "Intro public relations texts: A round-up review." Public Relations Review 12(4): 48-55. |
| Not Relevant to current fit for purpose review | Tyshko, N. V., et al. (2008). "Medical and biological safety assessment of genetically modified maize event MON 88017. Report 2. Genotoxicologic, immunologic and allergologic examinations." Voprosy pitaniya 77(5): 13-17. |
| Not Relevant to current fit for purpose review | Ugarte, R. (2014). "Interaction between glyphosate and mitochondrial succinate dehydrogenase." Computational and Theoretical Chemistry 1043: 54-63. |
| Not Relevant to current fit for purpose review | Underwood, M. (1991). "Western Australia ASCCN." Confederation of Australian Critical Care Nurses Journal 4(3): 6. |
| Not Relevant to current fit for purpose review | Uppal, R. K. and M. J. Gooding (2013). "Gibberellin-responsive and -insensitive dwarfing alleles on wheat performance in contrasting tillage systems." Field Crops Research 141: 55-62. |
| Not Relevant to current fit for purpose review | Urda, A., et al. (2012). "Final voluntary assessment for Traumatology and Orthopaedic Surgery medical residents: A report on the results and a look at the future." Revista Española de Cirugía Ortopédica y Traumatología (English Edition) 56(3): 188-196. |
| Not Relevant to current fit for purpose review | Valencia, E., et al. (1999). "Yield and botanical composition of rhizoma peanut-grass swards treated with herbicides." Agronomy Journal 91(6): 956-961. |
| Not Relevant to current fit for purpose review | Van Caneghem, T. (2002). "EARNINGS MANAGEMENT INDUCED BY COGNITIVE REFERENCE POINTS." The British Accounting Review 34(2): 167-178. |
| Not Relevant to current fit for purpose review | van Duijn, G., et al. (1999). "Detection methods for genetically modified crops." Food Control 10(6): 375-378. |
| Not Relevant to current fit for purpose review | van Haselen, R. and R. Jütte (2013). "The placebo effect and its ramifications for clinical practice and research. Villa La Collina at Lake Como, Italy, 4–6 May 2012." Complementary Therapies in Medicine 21(2): 85-93. |
| Not Relevant to current fit for purpose review | Van Kampen, J. and J. D. Hundleby (1994). "An investigation of the associations between augmenting-reducing, reactivity, sensation seeking and body image." Personality and Individual Differences 16(3): 373-377. |
| Not Relevant to current fit for purpose review | Van Loon, A. J. (1991). "Glaciotectonic landforms and structures: J.S. Aber, D.G. Croot and M.M. Fenton. Kluwer Academic Publishers Group, Dordrecht, 1989, ix + 200 pp., Dfl.155.-, US$79.-, £49.-, ISBN 0-7923-0100-5 (hardcover)." Sedimentary Geology 75(1–2): 164-165. |

| | |
|---|---|
| Not Relevant to current fit for purpose review | Venancio, V. P., et al. (2012). "Conventional (MG-BR46 Conquista) and Transgenic (BRS Valiosa RR) Soybeans Have No Mutagenic Effects and May Protect Against Induced-DNA Damage In Vivo." Nutrition and Cancer-an International Journal 64(5): 725-731. |
| Not Relevant to current fit for purpose review | Vyn, T. J., et al. (2002). "Corn response to potassium placement in conservation tillage." Soil and Tillage Research 67(2): 159-169. |
| Not Relevant to current fit for purpose review | Walker, D. C., et al. (2004). "The epitheliome: agent-based modelling of the social behaviour of cells." Biosystems 76(1–3): 89-100. |
| Not Relevant to current fit for purpose review | Wallace, K., et al. (2015). "A multiplexed assay for determination of neurotoxicant effects on spontaneous network activity and viability from microelectrode arrays." NeuroToxicology 49: 79-85. |
| Not Relevant to current fit for purpose review | Wander, J. G. N. and H. J. Bouwmeester (1998). "Effects of nitrogen fertilization on dill (Anethum graveolens L.) seed and carvone production." Industrial Crops and Products 7(2–3): 211-216. |
| Not Relevant to current fit for purpose review | Wang, F., et al. (2008). "The microtubule plus end-binding protein EB1 is involved in Sertoli cell plasticity in testicular seminiferous tubules." Experimental Cell Research 314(1): 213-226. |
| Not Relevant to current fit for purpose review | Wang, G., et al. (2006). "Methyl protodioscin induces G2/M cell cycle arrest and apoptosis in HepG2 liver cancer cells." Cancer Letters 241(1): 102-109. |
| Not Relevant to current fit for purpose review | Wang, G., et al. (2012). "Damage to DNA caused by UV-B radiation in the desert cyanobacterium Scytonema javanicum and the effects of exogenous chemicals on the process." Chemosphere 88(4): 413-417. |
| Not Relevant to current fit for purpose review | Wang, G., et al. (2012). "3.105 GLYPHOSATE INDUCED CELL DEATH THROUGH APOPTOTIC AND AUTOPHAGIC MECHANISMS." Parkinsonism & Related Disorders 18, Supplement 2: S190. |
| Not Relevant to current fit for purpose review | Wang, M., et al. (2015). "Gene editing by co-transformation of TALEN and chimeric RNA/DNA oligonucleotides on the rice OsEPSPS gene and the inheritance of mutations." PLoS One 10(4): e0122755. |
| Not Relevant to current fit for purpose review | Wang, S.-A., et al. (2009). "Heat Shock Protein 90 Is Important for Sp1 Stability during Mitosis." Journal of Molecular Biology 387(5): 1106-1119. |
| Not Relevant to current fit for purpose review | Wang, X., et al. (2005). "Effects of Phe-to-Trp mutation and fluorotryptophan incorporation on the solution structure of cardiac troponin C, and analysis of its suitability as a potential probe for in situ NMR studies." Protein Science 14(9): 2447-2460. |
| Not Relevant to current fit for purpose review | Wang, X., et al. (2011). "Construction of a reference plasmid molecule containing eight targets for the detection of genetically modified crops." Appl Microbiol Biotechnol 90(2): 721-731. |
| Not Relevant to current fit for purpose review | Weng, H., et al. (2005). "Novel reference gene, High-mobility-group protein I/Y, used in qualitative and real-time quantitative polymerase chain reaction detection of transgenic rapeseed cultivars." J AOAC Int 88(2): 577-584. |
| Not Relevant to current fit for purpose review | White, A. K. and W. W. Metcalf (2004). "Two C-P lyase Operons in Pseudomonas stutzeri and their roles in the oxidation of phosphonates, phosphite, and hypophosphite." Journal of Bacteriology 186(14): 4730-4739. |
| Not Relevant to current fit for purpose review | Willenborg, C. J. and E. N. Johnson (2013). "Influence of seeding date and seeding rate on cow cockle, a new medicinal and industrial crop." Industrial Crops and Products 49: 554-560. |
| Not Relevant to current fit for purpose review | Williams, M. J., et al. (2002). "No-till establishment of rhizoma peanut." Agronomy Journal 94(6): 1350-1354. |
| Not Relevant to current fit for purpose review | Williamson, P. R., et al. (2016). "CNS infections in 2015: emerging catastrophic infections and new insights into neuroimmunological host damage." The Lancet Neurology 15(1): 17-19. |
| Not Relevant to current fit for purpose review | Wilson, R. (1970). "AORN RECRUITMENT PROGRAM ROUND-UP." AORN Journal 11(1): 66-68. |
| Not Relevant to current fit for purpose review | Wiznitzer, M. (2006). "Paediatric neurology: clinical advances with low technology." The Lancet Neurology 5(1): 14-15. |
| Not Relevant to current fit for purpose review | Wong, P. K. Y., et al. (1973). "Rapid, selective procedure for isolation of spontaneous temperature-sensitive mutants of Moloney leukemia virus." Virology 51(2): 424-431. |
| Not Relevant to current fit for purpose review | Wood, E. J. (1985). "From cells to atoms: an illustrated introduction to molecular biology: by A. R. Rees and M. J. E. Sternberg, Blackwell, 1984. £6.80 (viii + 94 pages) ISBN 0 632 00888 1." Trends in Biochemical Sciences 10(5): 214-215. |
| Not Relevant to current fit for purpose review | Wood, E. J. (1985). "Lecture notes on biochemistry: by J. K. Candish, Blackwell, 1984. £9.80 (vi + 290 pages) ISBN 0 632 01253 6." Trends in Biochemical Sciences 10(5): 214-215. |
| Not Relevant to current fit for purpose review | Wurz, A., et al. (1999). "Quantitative analysis of genetically modified organisms (GMO) in processed food by PCR-based methods." Food Control 10(<HT>6</HT>): 385-389. |

| | |
|---|---|
| Not Relevant to current fit for purpose review | Xia, J., et al. (2015). "Retraction of a study on genetically modified corn: Expert investigations should speak louder during controversies over safety." Bioscience Trends 9(2): 134-137. |
| Not Relevant to current fit for purpose review | Xu, J., et al. (2002). "Cloning of genomic DNA of rice 5-enolpyruvylshikimate 3-phosphate synthase gene and chromosomal localization of the gene." Sci China C Life Sci 45(3): 251-259. |
| Not Relevant to current fit for purpose review | Xu, J. W., et al. (2002). "Isolation of rice EPSP synthase cDNA and its sequence - Analysis and copy number determination." Acta Botanica Sinica 44(2): 188-192. |
| Not Relevant to current fit for purpose review | Xu, W. T., et al. (2011). "Establishment and evaluation of event-specific qualitative and quantitative PCR method for genetically modified soybean DP-356043-5." European Food Research and Technology 233(4): 685-695. |
| Not Relevant to current fit for purpose review | Yan, H.-Q., et al. (2011). "Novel AroA from Pseudomonas putida Confers Tobacco Plant with High Tolerance to Glyphosate." PLoS One 6(5). |
| Not Relevant to current fit for purpose review | Yang, L. T., et al. (2005). "Screening and construct-specific detection methods of transgenic Huafan No 1 tomato by conventional and real-time PCR." Journal of the Science of Food and Agriculture 85(13): 2159-2166. |
| Not Relevant to current fit for purpose review | Yang, R., et al. (2007). "Event-specific qualitative and quantitative PCR detection of roundup ready event GT73 based on the 3'-integration junction." Plant Cell Rep 26(10): 1821-1831. |
| Not Relevant to current fit for purpose review | Yang, Z. and X. Dong (2015). "Earnings roundup in private and public bank holding companies." Advances in Accounting 31(1): 96-99. |
| Not Relevant to current fit for purpose review | Yao, P., et al. (2015). "Improvement of glycine oxidase by DNA shuffling, and site-saturation mutagenesis of F247 residue." Int J Biol Macromol 79: 965-970. |
| Not Relevant to current fit for purpose review | Yılmaz, R., et al. "Verification of GMO analytical methods: DNA isolation and quantitative detection methods for Roundup Ready soy flour." New Biotechnology 29, Supplement: S196-S197. |
| Not Relevant to current fit for purpose review | You, Y., et al. (2012). "Effect of intravenous fat emulsion therapy on glyphosate-surfactant–induced cardiovascular collapse." The American Journal of Emergency Medicine 30(9): 2097.e2091-2097.e2092. |
| Not Relevant to current fit for purpose review | Yousef, M. I., et al. (1996). "A sensitive sperm-motility test for the assessment of cytotoxic effect of pesticides." Journal of Environmental Science and Health Part B-Pesticides Food Contaminants and Agricultural Wastes 31(1): 99-115. |
| Not Relevant to current fit for purpose review | Zanis, D. A., et al. (1997). "A comparison of three methods of measuring the type and quantity of services provided during substance abuse treatment." Drug and Alcohol Dependence 49(1): 25-32. |
| Not Relevant to current fit for purpose review | Zanoli, L. M., et al. (2013). "Peptide nucleic acid molecular beacons for the detection of PCR amplicons in droplet-based microfluidic devices." Anal Bioanal Chem 405(2-3): 615-624. |
| Not Relevant to current fit for purpose review | Zawahir, S., et al. (2009). "Acute intentional self-poisoning with a herbicide product containing fenoxaprop-P-ethyl, ethoxysulfuron, and isoxadifen ethyl: a prospective observational study." Clinical Toxicology 47(8): 792-797. |
| Not Relevant to current fit for purpose review | Zhan, T., et al. (2013). "Improving Glyphosate Oxidation Activity of Glycine Oxidase from Bacillus cereus by Directed Evolution." PLoS One 8(11). |
| Not Relevant to current fit for purpose review | Zhang, H., et al. (2008). "Development of one novel multiple-target plasmid for duplex quantitative PCR analysis of roundup ready soybean." Journal of Biotechnology 136, Supplement: S250. |
| Not Relevant to current fit for purpose review | Zhang, J., et al. (1998). "A transformation technique from RGB signals to the Munsell system for color analysis of tobacco leaves." Computers and Electronics in Agriculture 19(2): 155-166. |
| Not Relevant to current fit for purpose review | Zhang, M., et al. (2007). "Detection of Roundup Ready soy in highly processed products by triplex nested PCR." Food Control 18(10): 1277-1281. |
| Not Relevant to current fit for purpose review | Zhang, Q., et al. (2014). "Characterization of cytochalasins from the endophytic Xylaria sp. and their biological functions." J Agric Food Chem 62(45): 10962-10969. |
| Not Relevant to current fit for purpose review | Zheng, Q. and D. C. Chang (1991). "High-efficiency gene transfection by in situ electroporation of cultured cells." Biochimica et Biophysica Acta (BBA) - Gene Structure and Expression 1088(1): 104-110. |
| Not Relevant to current fit for purpose review | Zhou, H., et al. (1995). "Glyphosate-tolerant CP4 and GOX genes as a selectable marker in wheat transformation." Plant Cell Rep 15(3-4): 159-163. |
| Not Relevant to current fit for purpose review | Zhu, X., et al. (2012). "A high-throughput fluorescence resonance energy transfer (FRET)-based endothelial cell apoptosis assay and its application for screening vascular disrupting agents." Biochemical and Biophysical Research Communications 418(4): 641-646. |
| Not Relevant to current fit for purpose review | Ziegelberger, G., et al. (2006). "International commission on non-ionizing radiation protection." Progress in Biophysics and Molecular Biology 92(1): 1-3. |

| Not Relevant to current fit for purpose review | Zulet, A., et al. (2015). "Fermentation and alternative oxidase contribute to the action of amino acid biosynthesis-inhibiting herbicides." J Plant Physiol 175: 102-112. |
|---|---|
| Not Relevant to current fit for purpose review | 정원중, et al. (2006). "Prognostic Predictors of Outcome for Poisoning by Glyphosate-containing Herbicides, Based on Initial Findings." Journal of The Korean Society of Emergency Medicine 17(6): 630-636. |
| Not Relevant to current fit for purpose review | Boyle, W. S. and J. O. Evans (1974). "EFFECTS OF GLYPHOSATE AND ETHEPHON ON MEIOTIC CHROMOSOMES OF SECALE-CEREALE L." Journal of Heredity 65(4): 250-250. |
| Not Relevant to current fit for purpose review | Sherwood, M. M. and W. C. Davison (1957). "Correspondence." The Journal of Pediatrics 51(4): 486-487. |
| Not Relevant to current fit for purpose review | Belle, R., et al. (2007). "[Sea urchin embryo, DNA-damaged cell cycle checkpoint and the mechanisms initiating cancer development]." J Soc Biol 201(3): 317-327. |
| Not Relevant to current fit for purpose review | Gehin, A., et al. (2005). "Vitamins C and E reverse effect of herbicide-induced toxicity on human epidermal cells HaCaT: a biochemometric approach." Int J Pharm 288(2): 219-226. |
| Not Relevant to current fit for purpose review | Gehin, A., et al. (2006). "Glyphosate-induced antioxidant imbalance in HaCaT: The protective effect of vitamins C and E." Environmental Toxicology and Pharmacology 22(1): 27-34. |
| Not Relevant to current fit for purpose review | Lueken, A., et al. (2004). "Synergistic DNA damage by oxidative stress (induced by H2O2) and nongenotoxic environmental chemicals in human fibroblasts." Toxicol Lett 147(1): 35-43. |
| Not Relevant to current fit for purpose review | Baurand, P. E., et al. (2015). "Genotoxicity assessment of pesticides on terrestrial snail embryos by analysis of random amplified polymorphic DNA profiles." J Hazard Mater 298: 320-327. |
| Not Relevant to current fit for purpose review | Guilherme, S., et al. (2009). "Tissue specific DNA damage in the European eel (Anguilla anguilla) following a short-term exposure to a glyphosate-based herbicide." Toxicology Letters 189: S212-S212. |
| Not Relevant to current fit for purpose review | Marc, J., et al. (2004). "Glyphosate-based pesticides affect cell cycle regulation." Biol Cell 96(3): 245-249. |
| Not Relevant to current fit for purpose review | Marc, J., et al. (2003). "Embryonic cell cycle for risk assessment of pesticides at the molecular level." Environmental Chemistry Letters 1(1): 8-12. |
| Not Relevant to current fit for purpose review | Nwani, C. D., et al. (2014). "Induction of micronuclei and nuclear lesions in Channa punctatus following exposure to carbosulfan, glyphosate and atrazine." Drug Chem Toxicol 37(4): 370-377. |
| Not Relevant to current fit for purpose review | Owczarek, M., et al. (1999). "Evaluation of toxic and genotoxic activity of some pesticides in a soil-plant system." Human and Environmental Exposure to Xenobiotics: 755-762. |
| Not Relevant to current fit for purpose review | Perez-Iglesias, J. M., et al. (2016). "Effects of glyphosate on hepatic tissue evaluating melanomacrophages and erythrocytes responses in neotropical anuran Leptodactylus latinasus." Environ Sci Pollut Res Int. |
| Not Relevant to current fit for purpose review | Poletta, G. L., et al. (2009). "Genotoxicity of the herbicide formulation Roundup (glyphosate) in broad-snouted caiman (Caiman latirostris) evidenced by the Comet assay and the Micronucleus test." Mutat Res 672(2): 95-102. |
| Not Relevant to current fit for purpose review | Siddiqui, S., et al. (2012). "Glyphosate, alachor and maleic hydrazide have genotoxic effect on Trigonella foenum-graecum L." Bull Environ Contam Toxicol 88(5): 659-665. |
| Not Relevant to current fit for purpose review | Song, H.-Y., et al. (2012). "Cellular Toxicity of Surfactants Used as Herbicide Additives." J Korean Med Sci 27(1): 3-9. |
| Not Relevant to current fit for purpose review | Unver, T., et al. (2010). "Genome-wide profiling and analysis of Festuca arundinacea miRNAs and transcriptomes in response to foliar glyphosate application." Mol Genet Genomics 283(4): 397-413. |
| Relevant- Cancer Epi | Acquavella, J. F., et al. (2006). "Exposure misclassification in studies of agricultural pesticides - Insights from biomonitoring." Epidemiology 17(1): 69-74. |
| Relevant- Cancer Epi | Acquavella, J. F., et al. (2005). "Implications for epidemiologic research on variation by pesticide in studies of farmers and their families." Scandinavian Journal of Work Environment & Health 31: 105-109. |
| Relevant- Cancer Epi | Baker, B. A., et al. (2005). "Farm Family Exposure Study: methods and recruitment practices for a biomonitoring study of pesticide exposure." Journal of Exposure Analysis and Environmental Epidemiology 15(6): 491-499. |
| Relevant- Cancer Epi | Chang, E. T. and E. Delzell (2016). "Systematic review and meta-analysis of glyphosate exposure and risk of lymphohematopoietic cancers." J Environ Sci Health B 51(6): 402-434. |
| Relevant- Cancer Epi | De Roos, A. J., et al. (2005). "Cancer incidence among glyphosate-exposed pesticide applicators in the Agricultural Health Study." Environ Health Perspect 113(1): 49-54. |

| Relevant- Cancer Epi | Firth, H. M., et al. (2007). "Chemical exposure among NZ farmers." International Journal of Environmental Health Research 17(1): 33-43. |
|---|---|
| Relevant- Cancer Epi | Lash, T. L. (2007). "Bias analysis applied to Agricultural Health Study publications to estimate non-random sources of uncertainty." J Occup Med Toxicol 2: 15. |
| Relevant- Cancer Epi | Mink, P. J., et al. (2012). "Epidemiologic studies of glyphosate and cancer: a review." Regul Toxicol Pharmacol 63(3): 440-452. |
| Relevant- Cancer Epi | Sorahan, T. (2012). "Multiple myeloma and glyphosate use: A re-analysis of US Agricultural Health Study data." Toxicology Letters 211, Supplement: S169. |
| Relevant- Carcinogenicity | Greim, H., et al. (2015). "Evaluation of carcinogenic potential of the herbicide glyphosate, drawing on tumor incidence data from fourteen chronic/carcinogenicity rodent studies." Crit Rev Toxicol 45(3): 185-208. |
| Relevant- Carcinogenicity | Williams, G. M., et al. (2000). "Safety Evaluation and Risk Assessment of the Herbicide Roundup and Its Active Ingredient, Glyphosate, for Humans." Regulatory Toxicology and Pharmacology 31(2): 117-165. |
| Relevant- Genotoxicity | Alvarez-Moya et al. (2014) "Comparison of the in vivo and in vitro genotoxicity of glyphosate isopropylamine salt in three different organisms". Genetics and Molecular Biology, 37, 1, 105-110 |
| Relevant- Genotoxicity | Chan, P. and J. Mahler (1992). "NTP technical report on the toxicity studies of Glyphosate (CAS No. 1071-83-6) Administered In Dosed Feed To F344/N Rats And B6C3F1 Mice." Toxic Rep Ser 16: 1-d3. |
| Relevant- Genotoxicity | Bakry, F. A., et al. (2015). "Glyphosate herbicide induces genotoxic effect and physiological disturbances in Bulinus truncatus snails." Pestic Biochem Physiol 123: 24-30. |
| Relevant- Genotoxicity | Bolognesi, C., et al. (1997). "Genotoxic activity of glyphosate and its technical formulation roundup." J Agric Food Chem 45(5): 1957-1962. |
| Relevant- Genotoxicity | Bolognesi, C., et al. (2009). "Biomonitoring of genotoxic risk in agricultural workers from five colombian regions: association to occupational exposure to glyphosate." J Toxicol Environ Health A 72(15-16): 986-997. |
| Relevant- Genotoxicity | Da Silva, F. R., et al. (2014). "Genotoxic assessment in tobacco farmers at different crop times." Science of the Total Environment 490: 334-341. |
| Relevant- Genotoxicity | Dimitrov, B. D., et al. (2006). "Comparative genotoxicity of the herbicides Roundup, Stomp and Reglone in plant and mammalian test systems." Mutagenesis 21(6): 375-382. |
| Relevant- Genotoxicity | El-Shenawy, N. S. (2009). "Oxidative stress responses of rats exposed to Roundup and its active ingredient glyphosate." Environ Toxicol Pharmacol 28(3): 379-385. |
| Relevant- Genotoxicity | Fortes, C., et al. (2016). "Occupational Exposure to Pesticides With Occupational Sun Exposure Increases the Risk for Cutaneous Melanoma." J Occup Environ Med 58(4): 370-375. |
| Relevant- Genotoxicity | Ghisi Nde, C., et al. (2016). "Does exposure to glyphosate lead to an increase in the micronuclei frequency? A systematic and meta-analytic review." Chemosphere 145: 42-54. |
| Relevant- Genotoxicity | Heydens, W. F., et al. (2008). "Genotoxic potential of glyphosate formulations: mode-of-action investigations." J Agric Food Chem 56(4): 1517-1523. |
| Relevant- Genotoxicity | Kale, P. G., et al. (1995). "MUTAGENICITY TESTING OF 9 HERBICIDES AND PESTICIDES CURRENTLY USED IN AGRICULTURE." Environ Mol Mutagen 25(2): 148-153. |
| Relevant- Genotoxicity | Kier, L. D. (2015). "Review of genotoxicity biomonitoring studies of glyphosate-based formulations." Crit Rev Toxicol 45(3): 209-218. |
| Relevant- Genotoxicity | Koller, V. J., et al. (2012). "Cytotoxic and DNA-damaging properties of glyphosate and Roundup in human-derived buccal epithelial cells." Arch Toxicol 86(5): 805-813. |
| Relevant- Genotoxicity | Li, A. P. and T. J. Long (1988). "An evaluation of the genotoxic potential of glyphosate." Fundam Appl Toxicol 10(3): 537-546. |
| Relevant- Genotoxicity | Lioi, M. B., et al. (1998). "Genotoxicity and oxidative stress induced by pesticide exposure in bovine lymphocyte cultures in vitro." Mutat Res 403(1-2): 13-20. |
| Relevant- Genotoxicity | Manas, F., et al. (2009). "Genotoxicity of AMPA, the environmental metabolite of glyphosate, assessed by the Comet assay and cytogenetic tests." Ecotoxicol Environ Saf 72(3): 834-837. |
| Relevant- Genotoxicity | Manas, F., et al. (2009). "Genotoxicity of glyphosate assessed by the comet assay and cytogenetic tests." Environmental Toxicology and Pharmacology 28(1): 37-41. |
| Relevant- Genotoxicity | Mandel, J. S., et al. (2005). "Biomonitoring for farm families in the farm family exposure study." Scandinavian Journal of Work Environment & Health 31: 98-104. |
| Relevant- Genotoxicity | Mladinic, M., et al. (2009). "Evaluation of genome damage and its relation to oxidative stress induced by glyphosate in human lymphocytes in vitro." Environ Mol Mutagen 50(9): 800-807. |

Page 188 of 216

| | |
|---|---|
| Relevant- Genotoxicity | Mladinic, M. and D. Zeljezic (2008). "Assessment of oxidative DNA damage by glyphosate applying hOGG1 modified comet and micronucleus assay." Toxicology Letters 180: S170-S171. |
| Relevant- Genotoxicity | Paz-y-Mino, C., et al. (2011). "Baseline determination in social, health, and genetic areas in communities affected by glyphosate aerial spraying on the northeastern Ecuadorian border." Rev Environ Health 26(1): 45-51. |
| Relevant- Genotoxicity | Paz-y-Mino, C., et al. (2007). "Evaluation of DNA damage in an Ecuadorian population exposed to glyphosate." Genetics and Molecular Biology 30(2): 456-460. |
| Relevant- Genotoxicity | Peluso, M., et al. (1998). "32P-postlabeling detection of DNA adducts in mice treated with the herbicide Roundup." Environ Mol Mutagen 31(1): 55-59. |
| Relevant- Genotoxicity | Piesova, E. (2005). "The effect of glyphosate on the frequency of micronuclei in bovine lymphocytes in vitro." Acta Veterinaria-Beograd 55(2-3): 101-109. |
| Relevant- Genotoxicity | Prasad, S., et al. (2009). "Clastogenic effects of glyphosate in bone marrow cells of swiss albino mice." J Toxicol 2009: 308985. |
| Relevant- Genotoxicity | Rank, J., et al. (1993). "Genotoxicity testing of the herbicide Roundup and its active ingredient glyphosate isopropylamine using the mouse bone marrow micronucleus test, Salmonella mutagenicity test, and Allium anaphase-telophase test." Mutat Res 300(1): 29-36. |
| Relevant- Genotoxicity | Roustan, A., et al. (2014). "Genotoxicity of mixtures of glyphosate and atrazine and their environmental transformation products before and after photoactivation." Chemosphere 108: 93-100. |
| Relevant- Genotoxicity | Silva Kahl, V. F., et al. (2016). "Telomere measurement in individuals occupationally exposed to pesticide mixtures in tobacco fields." Environ Mol Mutagen 57(1): 74-84. |
| Relevant- Genotoxicity | Sivikova, K. and J. Dianovsky (2006). "Cytogenetic effect of technical glyphosate on cultivated bovine peripheral lymphocytes." Int J Hyg Environ Health 209(1): 15-20. |
| Relevant- Genotoxicity | Vigfusson, N. V. and E. R. Vyse (1980). "The effect of the pesticides, Dexon, Captan and Roundup, on sister-chromatid exchanges in human lymphocytes in vitro." Mutat Res 79(1): 53-57. |
| Retracted Article | Séralini, G.-E., et al. (2014). "Retraction notice to "Long term toxicity of a Roundup herbicide and a Roundup-tolerant genetically modified maize" [Food Chem. Toxicol. 50 (2012) 4221–4231]." Food and Chemical Toxicology 63: 244. |

**Appendix B**



**Figure B.1.  Visual representation of studies included in De Roos *et al*. (2003).**



**Figure B.2.  Visual representation of studies included in Hardell *et al*. (2002).**



**Figure B.3.  Visual representation of the association between McDuffie *et al*. (2001) and the follow-up analysis by Hohenadal *et al*. (2011).**



**Figure B.4.  Visual representation of the association between Carreon *et al.* (2005), which investigated gliomas in women only, and Yiin *et al.* (2012), which investigated both sexes.**

# Appendix C

**Table C.1.  Design Characteristics of Epidemiological Studies Evaluated for Study Quality.**

| Study | Location | Study Years | Case Population | Control Population | Total Number of Subjects | Number of Glyphosate Exposed Cases | Proxy Use |
|---|---|---|---|---|---|---|---|
| Alavanja *et al.* (2003) | USA: Iowa and North Carolina | Enrollment (1993-1997) through 2001 | Males enrolled in AHS; licensed private and commercial applicators | Males enrolled in AHS; licensed private and commercial applicators | 566 cases 54,766 controls | not reported | No |
| Andreotti *et al.* (2009) | USA: Iowa and North Carolina | Enrollment (1993-1997) through 2004 | Participants enrolled in AHS; licensed private and commercial applicators and spouses | Participants enrolled in AHS; licensed private and commercial applicators and spouses | 93 cases (64 applicators, 29 spouses)  82,503 controls (52,721 applicators, 29,782 spouses) | 55 cases 48,461 controls | No |
| Band *et al.* (2011) | Canada: British Columbia | 1983-1990 | Male residents in British Columbia identified as cancer patients in British Columbia Cancer Registry (excluding farmers that worked all outside British Columbia) | Male residents in British Columbia identified as cancer patients in British Columbia Cancer Registry (excluding farmers that worked all outside British Columbia) with other cancer sites excluding lung cancer and cancers of unknown primary site | 1,153 cases 3,999 controls | 25 cases 60 controls | Yes (included in adjustment) |
| Brown *et al.* (1990) | USA: Iowa and Minnesota | Iowa: 1981-1983; Minnesota: 1980-1982  Initial interview 1981-1984 and supplemental interviews (Iowa only) in 1987 | White males (30 years or older) residing in Iowa or Minnesota diagnosed with leukemia | White males without lymphatic or hematopoietic cancer selected by random digit dialing (< age 65), Medicare records (age > 65) and state death certificate files (deceased controls) - frequency matched for 5-year age group, vital status, and state of residence | Initial: 578 cases; 1245 controls  Supplemental: 92 cases; 211 controls | 15 cases 49 controls | Yes (not evaluated) |
| Brown *et al.* (1993) | USA: Iowa | Iowa: 1981-1983; Interview 1981-1984 | White males (30 years or older) residing in Iowa diagnosed with multiple myeloma | White males without lymphatic or hematopoietic cancer selected by random digit dialing (< age 65), Medicare records (age > | 173 cases 650 controls | 11 cases 40 controls | Yes (not evaluated) |

| Study | Location | Study Years | Case Population | Control Population | Total Number of Subjects | Number of Glyphosate Exposed Cases | Proxy Use |
|---|---|---|---|---|---|---|---|
| | | | | 65) and state death certificate files (deceased controls) - frequency matched for 5-year age group, vital status, and state of residence | | | |
| Cocco *et al.* (2013) | Czech Republic, France, Germany, Italy, Ireland, and Spain | 1998-2004 | Adult patients first diagnosed with lymphoma residing in the referral area of the participating centers | Controls from Germany and Italy were randomly selected by sampling from the general population, matched to cases on sex, 5-year age-group, and residence area. The rest of the centers used matched hospital controls, with eligibility criteria limited to diagnoses other than cancer, infectious diseases, and immunodeficient diseases | 2,348 cases 2,462 controls | 4 cases 2 controls | No |
| De Roos *et al.* (2003) | USA: Nebraska, Iowa, Minnesota, and Kansas | Nebraska: 1983-1986 Iowa: 1981-1983 Minnesota: 1980-1982 Kansas: 1979-1981 | White males diagnosed with NHL in one of the 4 states (21 years or older in Nebraska and Kansas; 30 years or older in Iowa and Minnesota) | Males living in same geographic area obtained by random digit dialing, Medicare records and state mortality files - frequency matched for race, sex, age, and vital status | 870 cases 2,569 controls | 36 cases 61 controls | Yes (not significant in covariate analysis) |
| De Roos *et al.* (2005) | USA: Iowa and North Carolina | Enrollment (1993-1997) through 2001 | Participants enrolled in AHS; licensed private and commercial applicators and spouses | Participants enrolled in AHS; licensed private and commercial applicators and spouses | 54,315 subjects included in this analysis | All cancers – 358 cases Lung – 26 cases Oral cavity – 10 cases Colon – 15 cases Rectum – 14 cases Pancreas – 7 cases Kidney – 9 cases Bladder – 17 cases Prostate – 145 cases Melanoma – 14 cases All lymphohematopoietic cancers – 36 cases NHL – 17 cases Leukemia – 9 cases | No |

**Table C.1.  Design Characteristics of Epidemiological Studies Evaluated for Study Quality.**

**Table C.1. Design Characteristics of Epidemiological Studies Evaluated for Study Quality.**

| Study | Location | Study Years | Case Population | Control Population | Total Number of Subjects | Number of Glyphosate Exposed Cases | Proxy Use |
|---|---|---|---|---|---|---|---|
| | | | | | | Multiple myeloma – 6 cases (13,280 subjects not exposed to glyphosate used for comparison population) | |
| Engel *et al.* (2005) | USA: Iowa and North Carolina | Enrollment (1993-1997) through 2000 | Wives of applicators enrolled in AHS study with no history of breast cancer | Wives of applicators enrolled in AHS study with no history of breast cancer | 309 cases 30,145 controls | 82 cases; 10,016 controls | No |
| Eriksson *et al.* (2008) | Sweden | 1999-2002 | Patients (18-74 years of age) residing in Sweden and diagnosed with NHL | Swedish residents randomly selected living in same health service regions as cases - frequency matched for age (in 10 years) and sex | 910 cases 1,016 controls | 29 cases 18 controls | No |
| Flower *et al.* (2004) | USA: Iowa | 1993-1997 | Children (born after 1975) of participants enrolled in AHS study who were diagnosed with childhood cancer up to 19 years of age | Children (born after 1975) of participants enrolled in AHS study not diagnosed with childhood cancer up to 19 years of age | 50 cases out of 17,357 total study population | Maternal use: 13 cases of 6075 total exposed Paternal use: 6 cases of 3231 total exposed | No |
| Hardell *et al.* (2002) | Sweden | NHL: 1987-1990 HCL: 1987-1992 | NHL: Male residents of one of four northern or three middle counties in Sweden age 25 years and older diagnosed with NHL; identified from regional cancer registries HCL: Living male residents of Sweden age 25 years and older diagnosed with HCl; identified from the Swedish Cancer Registry | NHL: Two male controls for each case matched by age, year of death if deceased, and county HCL: Four male controls for each case matched by age and county | 515 cases 1,141 controls | 8 cases 8 controls | Yes (not evaluated) |
| Kachuri *et al.* (2013) | Canada: Alberta, British Columbia, Manitoba, Ontario, | 1991–1994 | Men aged ≥ 19 years (≥ 30 years in analysis) - pulled from hospital records in Quebec, | Men aged ≥ 19 years (30 years in analysis) - pulled from provincial health insurance records in | 342 cases 1,357 controls | 32 cases 121 controls | Yes (included in adjustment) |

**Table C.1.  Design Characteristics of Epidemiological Studies Evaluated for Study Quality.**

| Study | Location | Study Years | Case Population | Control Population | Total Number of Subjects | Number of Glyphosate Exposed Cases | Proxy Use |
|---|---|---|---|---|---|---|---|
| | Quebec, and Saskatchewan | | cancer registries in all other provinces | Alberta, Saskatchewan, Manitoba, and Quebec; computerized telephone listings in Ontario; voter lists in British Columbia | | | |
| Karunanayake *et al.* (2012) | Canada: Alberta, British Columbia, Manitoba, Ontario, Quebec, and Saskatchewan | 1991–1994 | Men aged ≥ 19 years - pulled from hospital records in Quebec, cancer registries in all other provinces | Men aged ≥ 19 years - pulled from provincial health insurance records in Alberta, Saskatchewan, Manitoba, and Quebec; computerized telephone listings in Ontario; voter lists in British Columbia | 316 cases 1,506 controls | 38 cases 133 controls | No |
| Koureas *et al.* (2014) | Greece | 2010 | Inhabitants of the city of Larissa; Eligibility criteria for pesticide sprayers were 1) to personally apply pesticides systematically, and 2) to have recently applied pesticides (no longer than 7 days between last application and sampling). | The rural residents group were occupied in administrative services, public order services, health services, education or trade. Inclusion criteria for this group: absence of any involvement in agricultural activities either as a primary or secondary occupation by participant or any member of household. Also recruited urban residents (mainly blood donors) from the city of Larissa. | 80 pesticide sprayers, 85 rural residents, and 121 individuals | Not reported | No |
| Koutros *et al.* (2013) | USA: Iowa and North Carolina | Enrollment (1993-1997) through 2007 | Males enrolled in AHS; licensed private and commercial applicators | Males enrolled in AHS; licensed private and commercial applicators | 1,962 incident cases (including 919 aggressive prostate cancers) among 54,412 applicators | 1464 cases 42,420 controls | No |
| Landgren *et al.* (2009) | USA: Iowa and North Carolina | Exposure information: enrollment (1993-1997) and 5-year follow-up interview | Males enrolled in AHS; licensed private and commercial applicators | Males enrolled in AHS; licensed private and commercial applicators | 678 participants | 27 cases out of 570 total exposed | No |

**Table C.1.  Design Characteristics of Epidemiological Studies Evaluated for Study Quality.**

| Study | Location | Study Years | Case Population | Control Population | Total Number of Subjects | Number of Glyphosate Exposed Cases | Proxy Use |
|---|---|---|---|---|---|---|---|
| | | Blood samples: 2006-2007 (Iowa) and 2008 (North Carolina) | | | | | |
| Lee *et al.* (2004b) | USA: Nebraska | 1988-1993 | White residents of 1 of 66 Nebraska counties age 21 years or older with a newly confirmed case of adenocarcinoma of the stomach or Cases identified from the Nebraska Cancer Registry (1988–1990) or from discharge diagnosis and pathology records from 14 Nebraska hospitals (1991–1993) | Frequency matched by age and sex to the combined distribution of glioma, stomach, and esophageal cancer cases from a control group from a previous study (1986–1987) that selected controls from the general population by random digit dialing for those under 65 years, Health Care Financing Administration Medicare files for those over 65 years, mortality records for deceased and matched by race, sex, vital status (or year of death if deceased) | Stomach: 170 cases<br><br>Esophagus: 137 cases<br><br>502 Controls | 12 cases<br>46 controls | Yes (analysis showed differences) |
| Lee *et al.* (2005) | USA: Nebraska | 1988-1993 | White residents of 1 of 66 Nebraska counties age 21 years or older with confirmed adult glioma. Cases identified from Nebraska Cancer Registry or from participating hospitals in Lincoln and Omaha, Nebraska | Frequency matched by age, sex, and vital status to the combined distribution of glioma, stomach, and esophageal cancer cases from a control group from a previous study (1986–1987) that selected controls from the general population by random digit dialing for those under 65 years, Medicare files for those over 65 years, mortality records for deceased and matched by race, sex, vital status (or year of death if deceased), and 5-year age groups to the overall case distribution. Additional | 251 glioma cases<br>498 controls | 17 cases<br>32 controls | Yes (analysis showed differences, included in adjustment) |

**Table C.1.  Design Characteristics of Epidemiological Studies Evaluated for Study Quality.**

| Study | Location | Study Years | Case Population | Control Population | Total Number of Subjects | Number of Glyphosate Exposed Cases | Proxy Use |
|---|---|---|---|---|---|---|---|
| | | | | younger controls were brought into the study through random digit dialing and from death certificates | | | |
| Lee *et al.* (2007) | USA: Iowa and North Carolina | 1993-97; follow-up to 2002 | Agricultural Health Study participants: private and commercial applicators licensed in Iowa or North Carolina with no history of colorectal cancer at enrollment. Followed through 2002 for incident colorectal cancer | Agricultural Health Study participants: private and commercial applicators licensed in Iowa or North Carolina with no history of colorectal cancer at enrollment. Followed through 2002 for incident colorectal cancer | 56,813 licensed pesticide applicators<br><br>305 incident colorectal cancer cases (212 colon, 93 rectum)<br><br>56,508 controls | Colon - 151 cases; 49 controls<br><br>Rectum - 74 cases; 18 controls<br><br>Colorectal - 225 cases; 67 controls | No |
| McDuffie *et al.* (2001) | Canada: Alberta, British Columbia, Manitoba, Ontario, Quebec, and Saskatchewan | 1991-1994 | Male residents of six Canadian provinces age 19 years and older diagnosed with STS, HD, NHL, or MM; this study only evaluated those with NHL. Cases were identified from Canadian Cancer Registries; in Quebec, hospital ascertainment was used | Random control subject selection using Health Insurance records, computerized telephone listings, and voters' lists; males 19 years and older from same six Canadian provinces as cases matched by age (within 2 years) | 517 cases 1506 controls | Univariate analysis: 51 cases; 133 controls (multivariate analysis also conducted - glyphosate exposed numbers not reported) | No |
| Orsi *et al.* (2009) | France | 2000-2004 | Men aged 20–75 years living in the catchment areas of the main hospitals in Brest, Caen, Nantes, Lille, Toulouse, and Bordeaux, with no history of immunosuppression or taking immunosuppressant drugs.  Cases ascertained from hospital records. | Patients from the same hospital catchment area as the cases.  Patients were hospitalized for orthopedic or rheumatological conditions (89.3%), gastrointestinal or genitourinary tract diseases (4.8%), cardiovascular diseases (1.1%), skin and subcutaneous tissue disease (1.8%), and infections (3.0%), excluding patients admitted for cancer or a disease directly related to | 491 cases 456 controls | NHL: 12 cases 24 controls<br><br>HL: 6 cases 15 controls<br><br>Lymphoproliferative syndromes: 4 cases 18 controls<br><br>Multiple myeloma: 5 cases; 18 controls<br><br>Lymphoid neoplasms: 27 cases; 24 controls | No |

**Table C.1.  Design Characteristics of Epidemiological Studies Evaluated for Study Quality.**

| Study | Location | Study Years | Case Population | Control Population | Total Number of Subjects | Number of Glyphosate Exposed Cases | Proxy Use |
|---|---|---|---|---|---|---|---|
| | | | | occupation, smoking, or alcohol abuse | | | |
| Pahwa *et al.* (2011) | Canada (Alberta, British Columbia, Manitoba, Ontario, Quebec, and Saskatchewan) | 1991-1994 | Men aged ≥ 19 years - pulled from hospital records in Quebec, cancer registries in all other provinces | Men aged ≥ 19 years - pulled from provincial health insurance records in Alberta, Saskatchewan, Manitoba, and Quebec; computerized telephone listings in Ontario; voter lists in British Columbia | 342 cases 1,506 age/resident matched controls | 32 cases 133 controls | No |
| Pahwa *et al.* (2012) | Canada (Alberta, British Columbia, Manitoba, Ontario, Quebec, and Saskatchewan) | 1991-1994 | Men aged ≥ 19 years - pulled from hospital records in Quebec, cancer registries in all other provinces | Men aged ≥ 19 years - pulled from provincial health insurance records in Alberta, Saskatchewan, Manitoba, and Quebec; computerized telephone listings in Ontario; voter lists in British Columbia | 342 cases 1506 age/resident matched controls | 32 cases 133 controls | No |
| Yiin *et al.* (2012) | USA: Upper Midwest Health Study (Iowa, Michigan, Minnesota and Wisconsin) | 1995-1997 | Age 18–80 (at ascertainment or diagnosis in 1995 through January 1997) residing in counties where the largest population center had fewer than 250,000 residents.  Referral by physicians or through state cancer registries with cases verified by histological evaluation. | Controls age 18–64 randomly selected from state driver's license/nondriver ID records, and those age 65–80 were selected from Health Care Financing Administration's (HCFA) Medicare data within 10-year age group strata, with the proportion/stratum determined by the age distribution of glioma cases in that state from 1992 to 1994. Controls were frequency-matched within a state but not by county of residence.  Selected even if they had a self-reported history of cancer other than glioma. | 798 glioma cases; 1,175 controls | 12 cases 19 controls | Yes (analysis showed no differences) |

**Appendix D. List of studies assigned a low quality ranking and not evaluated in detail**

As described in Section 3.2, if studies did not collect exposure information on glyphosate from all subjects, did not assess an outcome (e.g., biomonitoring studies), and/or did not provide a quantitative measure of an association between glyphosate and a cancer outcome, then these studies were assigned a low quality ranking and were not further evaluated in detail.  These studies included the following 32 studies:

Acquavella *et al.* 2006; Andre *et al.*, 2007; Baker *et al.* 2005; Benedetti *et al.*, 2013; Bolognesi *et al.*, 2002; Bolognesi *et al.*, 2004; Bolognesi *et al.* 2009; Bortoli *et al.*, 2009; Costa *et al.*, 2006; Da Silva *et al.* 2014; Dennis *et al.* 2010; Firth *et al.* 2007; Gomez-Arroyo *et al.*, 2013; Gregio D'Arce *et al.*, 2000; El-Zaemey *et al.*, 2013; Fortes *et al.*, 2016; Fritschi *et al.*, 2005; Hernandez *et al.,* 2006; Kaufman *et al.* 2009; Khayat *et al.*, 2013; Lebailly *et al.,* 2003; Mandel *et al.* 2005; Martinez-Valenzuela *et al.*, 2009; Monge *et al.*, 2007; Pastor *et al.*, 2003; Paz-y Mino *et al.,* 2007; Paz-y Mino *et al.* 2011; Ruder *et al.* 2004; Shaham *et al.*, 2001; Silva Kahl *et al.* 2016; Simoniello *et al.*, 2008; Vlastos *et al.,* 2006.

**Appendix E**

*Chronic Dietary Exposure*

The agency uses Dietary Exposure Evaluation Model- Food Consumption Intake Database (DEEM-FCID; version 3.16), which incorporates consumption data from United States Department of Agriculture (USDA) National Health and Nutrition Examination Survey, What We Eat in America (NHANES/WWEIA; 2003-2008) to calculate potential chronic dietary exposures.  In an unrefined chronic dietary analysis, several conservative assumptions are used to generate high end estimates of potential exposure.  These assumptions include tolerance-level residues for all registered commodities, 100% crop treated, and drinking water values from a direct application to water scenario, as well as DEEM default processing factors.  For glyphosate, the highest exposure value for any population subgroup in an unrefined chronic dietary analysis would be 0.23 mg/kg/day for children 1-2 years old (Table E.1; see T. Bloem, 30-NOV-2017, D429229 for DEEM inputs and results).

| Table E.1. Chronic dietary exposure estimates | |
|---|---|
| **Population Subgroup** | **Exposure (mg/kg/day)** |
| General U.S. Population | 0.089771 |
| All Infants (< 1 year old) | 0.138338 |
| **Children 1-2 years old** | **0.228379** |
| Children 3-5 years old | 0.212036 |
| Children 6-12 years old | 0.147749 |
| Youth 13-19 years old | 0.088362 |
| Adults 20-49 years old | 0.074650 |
| Adults 50-99 years old | 0.061258 |
| Females 13-49 years old | 0.069318 |

*Post-application Incidental Oral and Dermal Exposure*

Glyphosate has residential uses, including application to turf, which would result in the highest potential post-application exposures; therefore, there is potential for children to be exposed via incidental oral and dermal routes from playing on treated lawns.  For this assessment, the agency evaluates exposures from hand-to-mouth behavior, object-to-mouth behavior, incidental soil ingestion, and dermal contact using the 2012 Standard Operating Procedures for Residential Pesticide Exposure Assessment[29].  Incidental oral exposures from hand-to-mouth, object-to-mouth, and incidental soil ingestion are considered inter-related and, therefore, not combined.  To calculate high end estimates of exposures, the following is assumed according to the 2012 SOP to be health-protective:  1) maximum label rates are applied to the turf, 2) exposures are assumed to occur every day to the residue values on the day of application (i.e., no dissipation), and 3) individuals engage in post-application activities for the maximum amount of time represented by data for children spending time outdoors and not specifically engaged in activities

[29] Available: http://www2.epa.gov/pesticide-science-and-assessing-pesticide-risks/standard-operating-procedures-residential-pesticide

on turf, when in actuality children do not spend all of their outdoor time on turf. The highest exposure from incidental oral scenarios using the maximum application rate for turf applications would be 0.16 mg/kg/day from hand-to-mouth behaviors by children (1 to <2 years old). Dermal post-application to children 1 to <2 years old would be 0.08 mg/kg/day.

**Table E.2. Post-application Exposure Estimates for Application of Glyphosate to Turf[1].**

| Lifestage | Post-application Exposure Scenario | | Exposure (mg/kg/day) |
|---|---|---|---|
| Children 1 to <2 year old | Turf – sprays | Hand-to-Mouth | 0.16 |
| | | Object-to-Mouth | 0.005 |
| | | Incidental Soil Ingestion | 0.0003 |
| | | Dermal (high contact activities) | 0.08 |

[1] Based on Roundup® Weed & Grass Super Concentrate, EPA Reg. No. 71995-25.

**Appendix F**

*Genotoxicity Studies with Glyphosate Based Formulations*

While the focus of this analysis to determine the genotoxic potential of glyphosate, the agency has identified numerous studies conducted with glyphosate-based formulations that contain various concentrations of the glyphosate as well as other components of the end use products and are presented in Tables F.1-F.5.

**Table F.1.** *In vitro* **Test for Gene Mutations in Bacteria: Glyphosate Formulations.**

| Test/Endpoint | Test System | Concentrations | Test Material/ Concentration | Results | Reference | Comments |
|---|---|---|---|---|---|---|
| Bacterial Reverse Mutation | *S. typhimurium* TA1535, TA1537, TA1538, TA98 and TA100; *E. coli* WP2 *uvrA* pKM101 ± S9 | 1.6-5000 µg/plate ± S9 (plate incorporation) | ICIA 0224 57.6% in water | Negative ± S9 | Callander (1988) | |
| Bacterial Reverse Mutation | *S. typhimurium* TA98, TA100, TA1535, TA1537*; E. coli* WP2P and *uvrA* ± S9 | 100-5000 µg/plate ±S9 plate incorporation & pre-incubation protocols | TMSC (tri-methyl-sulfonium chloride) 95% purity | Negative ± S9 | Callander (1993) | |
| Bacterial Reverse Mutation | *S. typhimurium* TA98, TA100, TA102, TA1535, and TA1537 ± S9 | 26, 43, 72, 120, 200 µg/plate | Glyphosate liquid formulation (480 g/L isopropylamine salt) | Negative ± S9 | Camolesi (2009)[1] | |
| Bacterial Reverse Mutation | *S. typhimurium* TA98, TA100, TA102, TA1535, and TA1537 ± S9 | 26, 43, 72, 120, 200 µg/plate | MON 77280 equivalent of glyphosate acid: 495 g/L | Negative ± S9 | Camolesi (2010) | |
| Bacterial Reverse Mutation | *S. typhimurium* TA98, TA100, TA102, TA1535, and TA1537 ± S9 | 0.2-2000 µg/plate | MON 76190 53.2% glyphosate | Negative ± S9 | Catoyra (2009)[1] | |
| Bacterial Reverse Mutation | *S. typhimurium* TA97a, TA98, TA100 and TA102± S9 | 2 µg/plate (toxic) | Perzocyd 10 SL formulation | Negative ± S9 | Chruscielska *et al.* (2000) | |
| Bacterial Reverse Mutation | *S. typhimurium* TA98, TA100, TA102, | 0.03-3.0 µL/plate | MON 8080 (87.6%) | Negative ± S9 | Flowers (1981) | |

**Table F.1.** *In vitro* **Test for Gene Mutations in Bacteria: Glyphosate Formulations.**

| Test/Endpoint | Test System | Concentrations | Test Material/ Concentration | Results | Reference | Comments |
|---|---|---|---|---|---|---|
| | TA1535, and TA1537 ± S9 | | | | | |
| Bacterial Reverse Mutation | *S. typhimurium* TA98, TA100, TA102, TA1535, and TA1537 ± S9 | 3.16-1000 µg/plate | TROP M (Glyphosate 480); 35.84% purity based on acid, 48.46% pure based on IPA salt | Negative ± S9 | Flügge (2010a)[1] | |
| Bacterial Reverse Mutation | *S. typhimurium* TA98, TA100, TA102, TA1535, and TA1537 ± S9 | 0.316-100 | Glyphosate 757 g/kg granular formulation (76.1% monoammonium glyphosate salt) | Negative ± S9 | Flügge (2010d)[1] | |
| Bacterial Reverse Mutation | *S. typhimurium* TA97a, TA98, TA100, and TA1535 ± S9 | 1-5000 µg/plate | Roundup WG 784 g/kg ammonium salt equivalent | Negative ± S9 | Gava (1998) | |
| Bacterial Reverse Mutation | *S. typhimurium* TA98, TA100, TA1535, TA1537± S9 | 50-5000 µg/plate | Rodeo® (containing IPA salt and water only); 40% glyphosate (acid equivalent) | Negative ± S9 | Kier *et al.*, (1992) | |
| Bacterial Reverse Mutation | *S. typhimurium* TA98, TA100, TA1535, TA1537 ± S9 | 5-500 µg/plate (-S9)/ 15-1500 µg/plate (+S9) | MON 2139 (Roundup®) 31% Glyphosate (acid equivalent) | Negative ± S9 | Kier *et al.*, (1992) | Cytotoxic at top concentrations |
| Bacterial Reverse Mutation | *S. typhimurium* TA98, TA100, TA1535, TA1537 ± S9 | 5-500 µg/plate (-S9)/ 15-1500 µg/plate (+S9) | MON 14445 (Direct®); 75% Glyphosate (acid equivalent) | Negative ± S9 | Kier *et al.*, (1992) | Cytotoxic at the top concentrations, occasionally at lower concentrations |
| Bacterial Reverse Mutation | *S. typhimurium* TA98, TA100, TA1535, TA1537 ± S9 | 0.2-2000 µg/plate | MON 79672 (Roundup Ultramax); 74.7% monoammonium | Negative ± S9 | Lope (2008)[1] | |

**Table F.1.  *In vitro* Test for Gene Mutations in Bacteria: Glyphosate Formulations.**

| Test/Endpoint | Test System | Concentrations | Test Material/ Concentration | Results | Reference | Comments |
|---|---|---|---|---|---|---|
| | | | glyphosate salt; 68.2% glyphosate | | | |
| Bacterial Reverse Mutation | *S. typhimurium* TA1535, TA1537, TA1538, TA98 and TA100 ± S9 | 0.617-50 μL/plate ± S9 | SC-0224, 19.2% purity | Negative ± S9 | Majeska (1982) | |
| Bacterial Reverse Mutation | *S. typhimurium* TA98, TA100, TA1535, TA1537 and *E. coli* WP2 *uvrA* ± S9 | TA strains: 10 - 5000 μg/plate (+S9); 3.33-3330 μg/plate (-S9); E. coli: 33.3-5000 μg/plate (+/- S9) | MON 78239 36.6% glyphosate (44.9% potassium salt of glyphosate) | Negative | Mecchi (2003a) | Increase in revertants seen in TA98 and TA1535 -S9 on first trial, not conc-dep; however no increase in revertants seen in repeat in those strains; overall negative. |
| Bacterial Reverse Mutation | *S. typhimurium* TA98, TA100, TA1535, TA1537 and *E. coli* WP2 *uvrA* ± S9 | TA strains: 3.33-3330 μg/plate (+S9); 1.0-1000 μg/plate (-S9); E. coli: 33.3-5000 μg/plate (+/- S9) | MON 78634 65.2% w/w glyphosate (71.8% w/w as monoammonium salt of glyphosate) | Negative | Mecchi (2003b) | |
| Bacterial Reverse Mutation | *S. typhimurium* TA 98, TA100, TA1535, TA1537 and *E. coli* WP2 *uvrA* ± S9 | 10 - 5000 μg/plate (+/-S9) | MON 79864 38.7% glyphosate acid (wt %) | Negative | Mecchi (2008a) | Inhibited growth seen at ≥2000 -S9 |
| Bacterial Reverse Mutation | *S. typhimurium* TA 98, TA100, TA1535, TA1537 and *E. coli* WP2 *uvrA* ± S9 | 33.3-5000 μg/plate | MON 76313 30.9% glyphosate acid | Negative | Mecchi (2008b) | |

**Table F.1.  *In vitro* Test for Gene Mutations in Bacteria: Glyphosate Formulations.**

| Test/Endpoint | Test System | Concentrations | Test Material/ Concentration | Results | Reference | Comments |
|---|---|---|---|---|---|---|
| Bacterial Reverse Mutation | *S. typhimurium* TA 98, TA100, TA1535, TA1537 and *E. coli* WP2 *uvrA* ± S9 | 10-5000 µg/plate (+/-S9) | MON 76171 31.1% glyphosate | Negative | Mecchi (2008c)[1] | |
| Bacterial Reverse Mutation | *S. typhimurium* TA 98, TA100, TA1535, TA1537 and *E. coli* WP2 *uvrA* ± S9 | 10-5000 µg/plate (+/-S9) | MON 79991 71.6% glyphosate acid | Negative | Mecchi (2009a) | |
| Bacterial Reverse Mutation | *S. typhimurium* TA 98, TA100, TA1535, TA1537 and *E. coli* WP2 *uvrA* ± S9 | 10-5000 µg/plate (+/-S9) | MON 76138 38.5% glyphosate | Negative | Mecchi (2009b)[1] | |
| Bacterial Reverse Mutation | *S. typhimurium* TA97a, TA98, TA100, and TA1535 ± S9 | 1-5000 µg/plate | MON 77280 646.4 g/L salt equivalent | Negative | Perina (1998) | |
| Bacterial Reverse Mutation | *S. typhimurium* TA98 and TA100 ± S9 | 0-1440 µg/plate (calculated as glyphosate IPA salt) | Roundup, 480 g/L glyphosate isopropylamine salt | Negative – S9, Equivocal +S9 | Rank *et al.* (1993) | Stat significant increase at 360 µg/plate for TA98 (-S9) and 720 µg/plate for TA100 (+S9).  Not significant at higher concentrations and were not replicated. Effects occurred at close to toxic levels. |

**Table F.1.** *In vitro* **Test for Gene Mutations in Bacteria: Glyphosate Formulations.**

| Test/Endpoint | Test System | Concentrations | Test Material/ Concentration | Results | Reference | Comments |
|---|---|---|---|---|---|---|
| Bacterial Reverse Mutation | *S. typhimurium* TA98, TA100, TA102, TA1535, and TA1537 ± S9 | 500-5000 µg/plate; | 495 g/L glyphosate isopropylamine salt; 371.0 g/L (equivalent of glyphosate acid) | Negative ± S9 | Silvino (2011) | |
| Bacterial Reverse Mutation | *S. typhimurium* TA98, TA100, TA102, TA1535, and TA1537 ± S9 | 1.5-5000 µg/plate | MON 8709 495 g/L glyphosate isopropylamine salt; 371.0 g/L (equivalent of glyphosate acid) | Negative ± S9 | Silvino (2011) | |
| Bacterial Reverse Mutation | *S. typhimurium* TA98, TA100, TA102, TA1535, and TA1537 ± S9 | 15-5000 µg/plate | MON 76313 468 g/L glyphosate isopropylamine salt (351 g/L glyphosate acid equivalent) | Negative ± S9 | Silvino (2012) | Cytotoxic at 5000 µg/plate for some strains |
| Bacterial Reverse Mutation | *S. typhimurium* TA97a, TA98, TA100 and TA1535 ± S9 | 1-5000 µg/plate | Glifos formulation (glyphosate isopropylammoni um salt, Berol 907 and water) | Negative ± S9 | Vargas (1996) | Cytotoxic at the two upper concentrations |
| Bacterial Reverse Mutation | *S. typhimurium* TA98, TA100, TA102, TA1535, TA1537± S9 | 3.16-316 µg/plate | FSG 3090-H1 360 g/L | Negative ± S9 | Uhde (2004)[1] | |
| Bacterial Reverse Mutation | *S. typhimurium* TA98, TA100 ± S9 | 0.01-100 µg/plate | 64% (glyphosate Isopropylammoni um salt) | Negative ± S9 | Wang *et al.* (1993) | |
| Bacterial Reverse Mutation | *S. typhimurium* TA98, TA100, TA1535, | All strains: 33.3-5000 µg/plate | MON 78910 30.3% glyphosate acid | Negative ± S9 | Xu (2006) | Cytotoxic ≥1000 µg/plate (-S9) |

**Table F.1.  *In vitro* Test for Gene Mutations in Bacteria: Glyphosate Formulations.**

| Test/Endpoint | Test System | Concentrations | Test Material/ Concentration | Results | Reference | Comments |
|---|---|---|---|---|---|---|
| | TA1537 and *E. coli* WP2 *uvrA* ± S9 | (+S9); 10-3330 µg/plate (-S9) | | | | |

[1] Study was cited in Kier and Kirkland (2013).  Supplementary information about the study was provided online including test guideline, test material purity, control chemicals and summary data tables.

**Table F.2.  *In Vitro* Tests for Chromosome Damage in Mammalian Cells- Glyphosate Formulations**

| Test/Endpoint | Test System | Concentrations | Test Material/ Concentration | Results | Reference | Comments |
|---|---|---|---|---|---|---|
| *In vitro* **Chromosomal Aberration using fluorescent in situ hybridization (FISH)** | Bovine lymphocytes (from two 6-8 month old calves) -whole chromosome (1) painting probe | 28-1120 µM  24 h exposure | 62% Isopropylamine salt of glyphosate (38% inert ingredients) | Negative. | Holeckova (2006) | Small but significant increase in polyploidy seen at 56µM No positive control reported. |
| *In vitro* **Cytokinesis Block Micronucleus Assay (with FISH analysis)** | TR146 cells (human-derived buccal epithelial cell line) | 0, 10, 15 and 20 mg/L; 20 minute exposure. | Roundup Ultra Max (450 g/l glyphosate acid) | Positive  Increase in MN at all test concentrations | Koller *et al.* (2012) | No apoptosis observed at any conc.  Necrosis reported at 20 mg/L.  Increase in NB and NPB seen at all concentrations |

MI= mitotic index. FISH= fluorescent in situ hybridization, MN= micronuclei; NB= nuclear buds; NPB= nucleoplasmic bridges.

**Table F.3. *In Vivo* Tests for Chromosomal Aberrations in Mammals- Glyphosate Formulations.**

| Test/Endpoint | Test System | Route of Administration | Doses | Test Material Purity | Results | Reference | Comments |
|---|---|---|---|---|---|---|---|
| Bone Marrow Chromosomal Aberration | Swiss albino mice (males only) Vehicle: DMSO | Intraperitoneal injection; sampling 24, 48 and 72 h | 0, 25 and 50 mg/kg (5/dose) | Roundup (>41% isopropylamine glyphosate) | Positive  Increase in MN at all time points at both doses | Prasad *et al.* (2009) | Significant decrease in mitotic index seen at all doses and time points |
| Bone Marrow Chromosomal Aberration | C57BL mice (males only) Vehicle: water | Oral administration; sampling 6, 24, 48, 72, 96 and 120 h | 0.05, 0.01, 0.5 and 1.0% (8/dose) | Roundup | Negative | Dimitrov *et al.* (2006) | |
| Bone Marrow Chromosomal Aberration | New Zealand white rabbits (males only) Vehicle: | Drinking water for 60 days | 0, 750 ppm (5/dose) | Roundup | Positive | Helal and Moussa (2005) | |

BM= bone marrow, SC= spermatocyte.

**Table F.4.  *In Vivo* Tests for Micronuclei Induction in Mammals- Glyphosate Formulations.**

| Test/Endpoint | Test System | Route of Administration | Doses | Test Material Purity | Results | Reference | Comments |
|---|---|---|---|---|---|---|---|
| **Bone Marrow Micronucleus Test** | Swiss CD1 mice (males only) | Intraperitoneal injection; 2 injections of half the dosage of 135 mg/kg 24 h apart; sampling at 6 and 24 h | 0, 450 mg/kg roundup, equiv. to 135 kg glyphosate (3/dose) | Roundup, 30.4% glyphosate | Positive | Bolognesi *et al.* (1997) | Stat significant increase in MN at 6 and 24 h |
| **Bone Marrow Micronucleus Test** | C3H mice (males only) Vehicle: water | Intraperitoneal Injection (single treatment); sampling after 24, 48 and 72 h | 0, 90 mg/kg | Not reported | Negative | Chruscielska *et al.* (2000) | |
| **Bone Marrow Micronucleus Test** | Swiss mice (males and females) Vehicle: water | Intraperitoneal Injection (2 treatments, 24 h apart); sampling after 24 h (last treatment) | 0, 50, 100 and 200 mg/kg | 480g/L Isopropyla mine salt of glyphosate | Negative | Grisolia (2002) | |
| **Bone Marrow Micronucleus Test** | CD-1 mice (males and females) | Intraperitoneal injection; sampling 24, 48 and 72 h | 0, 140, 280, and 555 mg/kg | Roundup (31% glyphosate salt) | Negative | Kier (1992) | Some deaths observed at high dose (HD), ↓PCE/NCE ratio at HD at 48 h in males. |
| **Bone Marrow Micronucleus Test** | Swiss albino mice (males and females) | Intraperitoneal Injection (2 treatments, 24 h apart); sampling after 24 h (last treatment) | 0, 212.5, 425 and 637.5 mg/kg | MON 77280 646.4 g/L glyphosate salt equivalent | Negative | Monma (1998) | Doses tested corresponded to 25%, 50% and 75% LD50 |

**Table F.4.** *In Vivo* Tests for Micronuclei Induction in Mammals- Glyphosate Formulations.

| Test/Endpoint | Test System | Route of Administration | Doses | Test Material Purity | Results | Reference | Comments |
|---|---|---|---|---|---|---|---|
| **Bone Marrow Micronucleus Test** | NMRI-Bom mice | Intraperitoneal Injection (single treatment); sampling after 24 h | 0, 133 and 200 mg/kg (4/sex/dose) | Roundup, 480 g glyphosate isopropyla mine salt per liter | Negative | Rank *et al.* (1993) | BM toxicity indicated by %PCE decreased at 200 mg/kg |
| **Bone Marrow Micronucleus Test** | Swiss albino mice (males only[2]) Vehicle: water | Oral gavage (two treatments, 24 h apart); sampled at 18 and 24 h after last dose | 0, 2000 mg/kg | MON 8709494.7 g/L salt of isopropyla mine (371.0 glyphosate acid) | Negative | Claro (2011) | OECD 474 Guideline No significant signs of toxicity observed in main study. |
| **Bone Marrow Micronucleus Test** | C57BL mice (males only) Vehicle: water | Oral administration; sampling 6, 24, 48, 72, 96 and 120 h | 0.05, 0.01, 0.5 and 1.0% (1%=1080 mg/kg) (8/dose) | Roundup | Negative | Dimitrov *et al.* (2006) | Toxicity seen in 1.0% dose group |
| **Bone Marrow Micronucleus Test** | Crl:CD-1(ICR) BR mice (males only[2]) Vehicle: water | Oral gavage (single treatment); sampling after 24 and 48 h (high dose only) | 0, 500, 1000, and 2000 (mg/kg) (5/dose) | MON 78239 (36.6% glyphosate) | Negative | Erexson (2003a) | EPA Guideline (84-2) No significant signs of toxicity observed in main study. |
| **Bone Marrow Micronucleus Test** | Crl:CD-1(ICR) BR mice (males only[2]) Vehicle: water | Oral gavage (single treatment); sampling after 24 and 48 h (high dose only) | 0, 500, 1000, and 2000 (mg/kg) (5/dose) | MON 78634 (65.2% glyphosate) | Negative | Erexson (2003b) | EPA Guideline (84-2) No significant signs of toxicity observed in main study. |
| **Bone Marrow Micronucleus Test** | Crl:CD-1(ICR) BR mice (males only[2]) Vehicle: water | Oral gavage (single treatment); sampling after 24 and 48 h (high dose only) | 0, 500, 1000, and 2000 (mg/kg) (5/dose) | MON 78910 (30.3% glyphosate) | Negative | Erexson (2006) | EPA Guideline (84-2) No significant signs of toxicity observed in main study. |

**Table F.4. *In Vivo* Tests for Micronuclei Induction in Mammals- Glyphosate Formulations.**

| Test/Endpoint | Test System | Route of Administration | Doses | Test Material Purity | Results | Reference | Comments |
|---|---|---|---|---|---|---|---|
| **Bone Marrow Micronucleus Test** | NMRI mice (males and females) Vehicle: 0.8% hydroxypropylmethyl cellulose | Oral gavage (single treatment); sampling after 24 and 48 h (high dose only) | 0, 500, 1000, and 2000 mg/kg (5/sex/dose) | TROP M (Glyphosate 480) 358.4 g/L glyphosate acid; 483.6 g/L IPA salt | Negative | Flügge (2010c)[1] | OECD Guideline 474 No significant signs of toxicity observed in main study. |
| **Bone Marrow Micronucleus Test** | Swiss mice (males only[2]) Vehicle: water | Oral gavage (2 treatments, 24 h apart); sampling after 24 h (last treatment) | 0, 2000 mg/kg (6/dose) | A17035A 289.7 g/L glyphosate | Negative | Negro Silva (2009)[1] | OECD Guideline 474 No significant signs of toxicity observed in main study. |
| **Bone Marrow Micronucleus Test** | Swiss mice (males only[2]) Vehicle: water | Oral gavage (2 treatments, 24 h apart); sampling after 24 h (last treatment) | 0, 2000 mg/kg (6/dose) | Glyphosate SL (499.35 g/L glyphosate) | Negative | Negro Silva (2011)[1] | OECD Guideline 474 No significant signs of toxicity observed in main study |
| **Bone Marrow Micronucleus Test** | Hsd:CD-1(ICR) mice (males only[2]) Vehicle: water | Oral gavage (single treatment); sampling after 24 and 48 h (high dose only) | 0, 500, 1000, and 2000 (mg/kg) (5/dose) | MON 79864 (38.7% glyphosate) | Negative # | Xu (2008a) | EPA Guideline (84-2) /OECD 474 No significant signs of toxicity observed in main study. |
| **Bone Marrow Micronucleus Test** | CD-1(ICR)BR mice (males only[2]) Vehicle: water | Oral gavage (single treatment); sampling after 24 and 48 h (high dose only) | 0, 500, 1000, and 2000 (mg/kg) (5/dose) | MON 76171 (31.1% glyphosate) | Negative | Xu (2008b) | EPA Guideline (84-2) /OECD 474 No significant signs of toxicity observed in main study. |
| **Bone Marrow Micronucleus Test** | CD-1(ICR)BR mice (males only[2]) Vehicle: water | Oral gavage (single treatment); sampling after 24 and 48 h (high dose only) | 0, 500, 1000, and 2000 (mg/kg) (5/dose) | MON 79991 (71.6% glyphosate) | Negative | Xu (2009a) | EPA Guideline (84-2) /OECD 474 No significant signs of toxicity observed in main study. |

**Table F.4. *In Vivo* Tests for Micronuclei Induction in Mammals- Glyphosate Formulations.**

| Test/Endpoint | Test System | Route of Administration | Doses | Test Material Purity | Results | Reference | Comments |
|---|---|---|---|---|---|---|---|
| **Bone Marrow Micronucleus Test** | CD-1(ICR)BR mice (males only[2]) Vehicle: water | Oral gavage (single treatment); sampling after 24 and 48 h (high dose only) | 0, 500, 1000, and 2000 (mg/kg) (5/dose) | MON 76138 (38.5% glyphosate) | Negative | Xu (2009b)[1] | EPA Guideline (84-2) /OECD 474 No signs of toxicity observed in main study. |
| **Bone Marrow Micronucleus Test** | Hsd:CD-1(ICR)BR mice (males only[2]) Vehicle: water | Oral gavage (single treatment); sampling after 24 and 48 h (high dose only) | 0, 500, 1000, and 2000 (mg/kg) (5/dose) | MON 76313 (30.9% glyphosate) | Negative | Xu (2009c)[1] | EPA Guideline (84-2) /OECD 474 No significant signs of toxicity observed in main study. |
| **Bone Marrow Micronucleus Test** | CD rats (males and females) Vehicle: 0.8% hydroxypropylmethyl cellulose | Oral gavage (single treatment); sampling after 24 and 48 h (high dose only) | 0, 500, 1000, and 2000 mg/kg (5/sex/dose) | 757 g/kg granular formulation (69.1% glyphosate acid) | Negative | Flügge (2010e)[1] | OECD Guideline 474 No significant signs of toxicity observed in main study |

[1] Study was cited in Kier and Kirkland (2013).  Supplementary information about the study was provided online including test guideline, test material purity, control chemicals and summary data tables.
[2] Only males tested; report indicated that there was no difference between sexes seen in range finding study.
BM= bone marrow, CA= chromosomal aberrations, MN= micronucleated erythrocytes, NCE= normochromatic erythrocytes, PCE=polychromatic erythrocytes.

**Table F.5.  Other Assays for Detecting DNA Damage- Glyphosate Formulations.**

| Test/Endpoint | Test System | Route of Administration | Doses/ Concentrations | Test Material/ Concentration | Results | Reference | Comments |
|---|---|---|---|---|---|---|---|
| **Bacterial SOS Chromotest** | *Escherichia coli* PQ37 strain | NA (*in vitro*) | 0.25μg/sample | Roundup BIO formulation; | Positive | Raipulis *et al.* (2009) | |
| **DNA Adducts ³²P-postlabeling** | Swiss CD1 mice (males and females) Liver and kidney evaluated | Intraperitoneal injection | 0, 400, 500 and 600 mg/kg, corresponding to 122, 152 and 182 mg/kg glyphosate salt | Roundup (30.4% isopropylammonium salt of glyphosate) | Positive (liver and kidney) | Peluso *et al.* (1998) | |
| **DNA oxidative damage: 8-OHdG formation** | Swiss CD-1 mice (males) liver and kidney evaluated | Intraperitoneal injection (single dose); sampling 4 and 24 h after injection | 900 mg/kg corresponding to 270 mg/kg glyphosate (3/dose) | 900 mg/kg corresponding to 270 mg/kg glyphosate | Kidney: positive at 8 and 24 h  Liver: negative | Bolognesi *et al.* (1997) | |
| **Single-cell gel electrophoresis (SCGE) assays-COMET assay** | TR146 cells (human-derived buccal epithelial cell line). Alkaline conditions | NA (*in vitro*) | | Roundup Ultra Max (450 g/l glyphosate acid) | Induced DNA migration at >20 mg/L | Koller *et al.* (2012) | Also measured multiple cellular integrity parameters to assess cytotoxicity. Formulation was more toxic than technical. Significant increase in LDHe at all concentrations tested. Cytotoxic ≥ 60 mg/L |
| **Sister Chromatid Exchange (SCE)** | Bovine lymphocytes | NA (*in vitro*) | 28 - 1112 μM; ±S9; sampling at 24 and 48 h | 62% Isopropylamine salt of glyphosate | Positive | Sivikova & Dianovsky (2006) | |

**Table F.5.  Other Assays for Detecting DNA Damage- Glyphosate Formulations.**

| Test/Endpoint | Test System | Route of Administration | Doses/ Concentrations | Test Material/ Concentration | Results | Reference | Comments |
|---|---|---|---|---|---|---|---|
| **Sister Chromatid Exchange (SCE)** | Human lymphocytes (2 donors) | NA (*in vitro*) | 250, 2500 and 25000 µg/mL | Roundup; Isopropylamine salt of glyphosate (purity not stated) | Stat. significant increase (p<0.001) at 250 µg/mL in both donors, and in one donor at 2500 µg/mL | Vigfusson and Vyse (1980) | No growth seen at highest concentration (25 mg/mL) |
| **Sister Chromatid Exchange (SCE)** | Human lymphocytes | NA (*in vitro*) | -S9: 0, 0.1 and 0.33 mg/mL; 72 h exposure | Roundup, 30.4% glyphosate | Positive | Bolognesi *et al.* (1997) | Stat significant increase in SCE/cell at ≥ 0.1 mg/mL |
| **Alkaline elution assay- DNA single strand breaks** | Swiss CD-1 mice (males) liver and kidney evaluated | Intraperitoneal injection (single dose); sampling 4 and 24 h after injection | 900 mg/kg corresponding to 270 mg/kg glyphosate (3/dose) | 900 mg/kg corresponding to 270 mg/kg glyphosate | Positive (Increased elution rate) at 4 hours in liver and kidney<br><br>At 24 h, returned to control levels | Bolognesi *et al.* (1997) | Return to control values at 24 h may indicate DNA repair or reflect rapid elimination of compound |

h= hour, NA= not applicable, SCE= sister chromatid exchange, LDHe= extracellular lactate dehydrogenase

**Appendix G**

The following studies were considered during the systematic review, but were excluded from the analysis.

Amer S.M. et al (2006).  In vitro and in vivo evaluation of the genotoxicity of the herbicide glyphosate in mice.  Bulletin of the National Research Centre (Cairo) 31 (5): 427-446.

Aboukila, R.S. *et al.* (2014). Cytogenetic Study on the Effect of Bentazon and Glyphosate Herbicide on Mice.  Alexandria Journal of Veterinary Sciences, 41: 95-101.

Majeska (1982d) MRID 00126616

Majeska (1982e) MRID 00126614

Majeska (1982f) MRID 00126615

# EXHIBIT 7

# GLYPHOSATE

## 1.   Exposure Data

## 1.1   Identification of the agent

### 1.1.1  Nomenclature

*Chem. Abstr. Serv. Reg. No.:* 1071-83-6 (acid); also relevant:
38641-94-0 (glyphosate-isopropylamine salt)
40465-66-5 (monoammonium salt)
69254-40-6 (diammonium salt)
34494-03-6 (glyphosate-sodium)
81591-81-3 (glyphosate-trimesium)

*Chem. Abstr. Serv. Name: N*-(phosphono-methyl)glycine

*Preferred IUPAC Name*: *N*-(phosphono-methyl)glycine

*Synonyms:* Gliphosate; glyphosate; glypho-sate hydrochloride; glyphosate [calcium, copper (2+), dilithium, disodium, magne-sium, monoammonium, monopotassium, monosodium, sodium, or zinc] salt

*Trade names:* Glyphosate products have been sold worldwide under numerous trade names, including: Abundit Extra; Credit; Xtreme; Glifonox; Glyphogan; Ground-Up; Rodeo; Roundup; Touchdown; Tragli; Wipe Out; Yerbimat (Farm Chemicals International, 2015).

### 1.1.2  Structural and molecular formulae and relative molecular mass

Molecular formula: $C_3H_8NO_5P$
Relative molecular mass: 169.07
Additional information on chemical struc-ture is also available in the PubChem Compound database (NCBI, 2015).

### 1.1.3  Chemical and physical properties of the pure substance

*Description:* Glyphosate acid is a colour-less, odourless, crystalline solid. It is formulated as a salt consisting of the deprotonated acid of glyphosate and a cation (isopropylamine, ammon-ium, or sodium), with more than one salt in some formulations.

*Solubility:* The acid is of medium solubility at 11.6 g/L in water (at 25 °C) and insoluble in common organic solvents such as acetone, ethanol, and xylene; the alkali-metal and

0.4; 95% CI, 0.1–1.6) and observations for proxy respondents (OR, 3.1; 95% CI, 1.2–8.2). [The study had limited power to detect an effect of glyphosate use, and the inconsistencies for self and proxy respondents made the results difficult to interpret.]

### 2.3.3 Soft tissue sarcoma

Pahwa et al. (2011) reported the results of the soft tissue sarcoma component of the cross-Canada study in relation to specific pesticides, including 357 cases of soft tissue sarcoma and 1506 population controls from 1991–1994. The fully adjusted odds ratio for glyphosate use was 0.90 (95% CI, 0.58–1.40).

### 2.3.4 Cancer of the prostate

Band et al. (2011) report results of a case–control study including 1516 patients with cancer of the prostate (ascertained by the cancer registry of British Columbia, Canada, for 1983–90) and 4994 age-matched controls with cancers at all other cancer sites excluding lung and unknown primary site. Agricultural exposures were assessed by job-exposure matrix. A total of 60 cases were exposed to glyphosate (adjusted OR, 1.36; 95% CI, 0.83–2.25).

### 2.3.5 Childhood cancer

Parental exposure to pesticides, including glyphosate, was assessed in a population-based case–control study of childhood leukaemia in Costa Rica (Monge et al., 2007). However, associations of childhood cancer with glyphosate were reported only for an "other pesticides" category that also included paraquat, chlorothalonil, and other chemicals. [Because glyphosate was not specifically assessed, this study was not evaluated by the Working Group.]

## 2.4. Meta-analyses

Schinasi & Leon (2014) conducted a systematic review and meta-analysis of NHL and occupational exposure to agricultural pesticides, including glyphosate. The meta-analysis for glyphosate included six studies (McDuffie et al., 2001; Hardell et al., 2002; De Roos et al., 2003; 2005a; Eriksson et al., 2008; Orsi et al., 2009) and yielded a meta risk-ratio of 1.5 (95% CI, 1.1–2.0). [The Working Group noted that the most fully adjusted risk estimates from the articles by Hardell et al. (2002) and Eriksson et al. (2008) were not used in this analysis. After considering the adjusted estimates of the two Swedish studies in the meta-analysis, the Working Group estimated a meta risk-ratio of 1.3 (95% CI, 1.03–1.65), $I^2 = 0\%$, $P$ for heterogeneity 0.589.]

# 3. Cancer in Experimental Animals

## 3.1 Mouse

See Table 3.1

### 3.1.1 Dietary administration

Groups of 50 male and 50 female CD-1 mice [age not reported] were given diets containing glyphosate (purity, 99.7%) at a concentration of 0, 1000, 5000, or 30 000 ppm, ad libitum, for 24 months. There was no treatment-related effect on body weight in male and female mice at the lowest or intermediate dose. There was a consistent decrease in body weight in the male and female mice at the highest dose compared with controls. Survival in all dose groups was similar to that of controls. There was a positive trend ($P = 0.016$, trend test; see EPA, 1985b) in the incidence of renal tubule adenoma in dosed male mice: 0/49, 0/49, 1/50 (2%), 3/50 (6%). [The Working Group noted that renal tubule adenoma is a rare tumour in CD-1 mice.] No data on tumours of the kidney

**Table 3.1 Studies of carcinogenicity with glyphosate in mice**

| Species, strain (sex) Duration Reference | Dosing regimen, Animals/group at start | For each target organ: incidence (%) and/or multiplicity of tumours | Significance | Comments |
|---|---|---|---|---|
| Mouse, CD-1 (M, F) 24 mo EPA (1985a, b, 1986, 1991a) | Diet containing glyphosate (technical grade; purity, 99.7%) at concentrations of 0, 1000, 5000, or 30 000 ppm, ad libitum, for 24 mo; 50 M and 50 F/group [age, NR] | *Males* Renal tubule adenoma: 0/49, 0/49, 1/50 (2%), 3/50 (6%) *Females* No data provided on the kidney | *P* for trend = 0.016; see Comments | No information was provided on renal tubule adenomas in female mice, or on statistical analyses of tumour data EPA recommended that additional renal sections be cut and evaluated from all control and treated male mice. The pathology report for these additional sections (EPA, 1985b) showed the same incidence of renal tubule adenomas as originally reported, with no significant difference in incidence when comparing control and treated groups; however, the test for linear trend in proportions resulted in *P* = 0.016 EPA (1986) convened a PWG and requested additional pathological and statistical information on kidney tumours observed in male mice treated with glyphosate |
| | | Report from the PWG of the EPA (1986): *Males* Renal tubule adenoma: 1/49 (2%), 0/49, 0/50, 1/50 (2%) Renal tubule carcinoma: 0/49, 0/49, 1/50 (2%), 2/50 (4%) Renal tubule adenoma or carcinoma (combined): 1/49 (2%), 0/49, 1/50 (2%), 3/50 (6%) | [NS] [*P* = 0.037; Cochran–Armitage trend test] [*P* = 0.034; Cochran–Armitage trend test] | |
| Mouse, CD-1 (M, F) 104 wk JMPR (2006) | Diet containing glyphosate (purity, 98.6%) at doses of 0, 100, 300, 1000 mg/kg bw, ad libitum, for 104 wk; 50 M and 50 F/group [age, NR] | *Males* Haemangiosarcoma: 0/50, 0/50, 0/50, 4/50 (8%) Histiocytic sarcoma in the lymphoreticular/haemopoietic tissue: 0/50, 2/50 (4%), 0/50, 2/50 (4%) *Females* Haemangiosarcoma: 0/50, 2/50 (4%), 0/50, 1/50 (2%) Histiocytic sarcoma in the lymphoreticular/haemopoietic tissue: 0/50, 3/50 (6%), 3/50 (6%), 1/50 (2%) | [*P* < 0.001; Cochran–Armitage trend test] NS NS NS | |

**Table 3.1   (continued)**

| Species, strain (sex) Duration Reference | Dosing regimen, Animals/group at start | For each target organ: incidence (%) and/or multiplicity of tumours | Significance | Comments |
|---|---|---|---|---|
| Mouse, Swiss (M) 32 wk George et al. (2010) | Initiation–promotion study Skin application of glyphosate-based formulation (glyphosate, 41%; POEA, ~15%) (referred to as "glyphosate") dissolved in 50% ethanol; DMBA dissolved in 50% ethanol, and TPA dissolved in 50% acetone, used in the groups described below 20 M/group | Skin tumours [called "papillomas" by the authors, following gross examination only] | | Short duration of treatment, no solvent controls, and lack of any histopathological evaluation Age at start, NR [mice weighed 12–15 g bw] [The Working Group concluded this was an inadequate study for the evaluation of glyphosate] |
| | Group I: untreated control (no treatment) | Group I: 0/20 | | |
| | Group II: glyphosate only: 25 mg/kg bw topically, 3 ×/wk, for 32 wk | Group II: 0/20 | | |
| | Group III: single topical application of DMBA, 52 μg/mouse, followed 1 wk later by TPA, 5 μg/mouse, 3 ×/wk, for 32 wk | Group III: 20/20*, 7.8 ± 1.1 | *P < 0.05 vs groups VI and VII | |
| | Group IV: single topical application of glyphosate, 25 mg/kg bw, followed 1 wk later by TPA, 5 μg/mouse, 3 ×/wk, for 32 wk | Group I: 0/20 | | |
| | Group V: 3 ×/wk topical application of glyphosate, 25 mg/kg bw, for 3 wk, followed 1 wk later by TPA, 5 μg/mouse, 3 ×/wk, for 32 wk | Group V: 0/20 | | |
| | Group VI: single topical application of DMBA, 52 μg/mouse | Group VI: 0/20 | | |
| | Group VII: topical application of TPA, 5 μg/mouse, 3 ×/wk, for 32 wk | Group VII: 0/20 | | |
| | Group VIII: single topical application of DMBA, 52 μg/mouse, followed 1 wk later by topical treatment with glyphosate, 25 mg/kg bw, 3 ×/wk, for 32 wk | Group VIII: 8/20*, 2.8 ± 0.9 | *P < 0.05 vs group VI | |

bw, body weight; DMBA, 7,12-dimethylbenz[a]anthracene; EPA, United States Environmental Protection Agency; F, female; M, male; mo, month; NR, not reported; NS, not significant; POEA, polyethoxylated tallowamine; PWG, pathology working group; TPA, 12-O-tetradecanoyl-phorbol-13-acetate; vs, versus; wk, weeks; yr, year

were provided for female mice. No other tumour sites were identified (EPA, 1985a). Subsequent to its initial report (EPA, 1985a), the United States Environmental Protection Agency (EPA) recommended that additional renal sections be cut and evaluated from all male mice in the control and treated groups. The pathology report for these additional sections (EPA, 1985b) indicated the same incidence of renal tubule adenoma as originally reported, with no significant increase in incidence between the control group and treated groups by pairwise comparison. However, as already reported above, the test for linear trend in proportions resulted in a significance of $P = 0.016$. The EPA (1986) also requested that a pathology working group (PWG) be convened to evaluate the tumours of the kidney observed in male mice treated with glyphosate, including the additional renal sections. In this second evaluation, the PWG reported that the incidence of adenoma of the renal tubule was 1/49 (2%), 0/49, 0/50, 1/50 (2%) [not statistically significant]; the incidence of carcinoma of the renal tubule was 0/49, 0/49, 1/50 (2%), 2/50 (4%) [$P = 0.037$, trend test for carcinoma]; and the incidence of adenoma or carcinoma (combined) of the renal tubule was 1/49 (2%), 0/49, 1/50 (2%), 3/50 (6%) [$P = 0.034$, trend test for combined]. [The Working Group considered that this second evaluation indicated a significant increase in the incidence of rare tumours, with a dose-related trend, which could be attributed to glyphosate. Chandra & Frith (1994) reported that only 1 out of 725 [0.14%] CD-1 male mice in their historical database had developed renal cell tumours (one carcinoma).]

[The Working Group noted the differences in histopathological diagnosis between pathologists. Proliferative lesions of the renal tubules are typically categorized according to published criteria as hyperplasia, adenoma, or carcinoma. The difference is not trivial, because focal hyperplasia, a potentially preneoplastic lesion, should be carefully differentiated from the regenerative changes of the tubular epithelium. There is a morphological continuum in the development and progression of renal neoplasia. Thus larger masses may exhibit greater heterogeneity in histological growth pattern, and cytologically more pleomorphism and atypia than smaller lesions (Eustis *et al.*, 1994). Of note, a renal tumour confirmed by the PWG after re-evaluation of the original slides (EPA, 1986), had not been seen in the re-sectioned kidney slides (EPA, 1985b). This may be related to the growth of tumour that – in contrast to tumours in other organs – is not spherical but elliptical because of the potential expansion in tubules. In addition, the concept of tubular expansion without compression of adjacent parenchyma may be at the basis of the discrepancy between the first (EPA, 1985a, b) and second evaluation (EPA, 1986).]

In another study reported to the Joint FAO/WHO Meeting on Pesticide Residues (JMPR), groups of 50 male and 50 female CD-1 mice [age at start not reported] were given diets containing glyphosate (purity, 98.6%) at a concentration that was adjusted weekly for the first 13 weeks and every 4 weeks thereafter to give doses of 0, 100, 300, or 1000 mg/kg bw, ad libitum, for 104 weeks (JMPR, 2006). There was no treatment-related effect on body weight or survival in any of the dosed groups. There was an increase in the incidence of haemangiosarcoma in males – 0/50, 0/50, 0/50, 4/50 (8%) [$P < 0.001$, Cochran–Armitage trend test], and in females – 0/50, 2/50 (4%), 0/50, 1/50 (2%) [not statistically significant], and an increase in the incidence of histiocytic sarcoma in the lymphoreticular/haemopoietic tissue in males – 0/50, 2/50 (4%), 0/50, 2/50 (4%), and in females – 0/50, 3/50 (6%), 3/50 (6%), 1/50 (2%) [not statistically significant for males or females]. [The Working Group considered that this study was adequately reported.]

### 3.1.2 Initiation–promotion

Groups of 20 male Swiss mice [age at start not reported; body weight, 12–15 g] were given a glyphosate-based formulation (glyphosate, 41%; polyethoxylated tallowamine, ~15%) (referred to as glyphosate in the article) that was dissolved in 50% ethanol and applied onto the shaved back skin (George *et al.*, 2010). Treatment groups were identified as follows:

- Group I – untreated control;
- Group II – glyphosate only (25 mg/kg bw), applied topically three times per week for 32 weeks;
- Group III – single topical application of dimethylbenz[*a*]anthracene (DMBA; in ethanol; 52 µg/mouse), followed 1 week later by 12-*O*-tetradecanoylphorbol-13-acetate (TPA; in acetone; 5 µg/mouse), applied topically three times per week for 32 weeks;
- Group IV – single topical application of glyphosate (25 mg/kg bw) followed 1 week later by TPA (in acetone; 5 µg/mouse), applied topically three times per week for 32 weeks;
- Group V – glyphosate (25 mg/kg bw) applied topically three times per week for 3 weeks (total of nine applications), followed 1 week later by TPA (in acetone; 5 µg/mouse), applied topically three times per week for 32 weeks;
- Group VI – single topical application of DMBA (in ethanol; 52 µg/mouse);
- Group VII –TPA (in acetone; 5 µg/mouse), applied topically three times per week for 32 weeks; and
- Group VIII –single topical application of DMBA (in ethanol; 52 µg/mouse), followed 1 week later by glyphosate (25 mg/kg bw), applied topically three times per week for 32 weeks.

All mice were killed at 32 weeks. Skin tumours were observed only in group III (positive control, DMBA + TPA, 20/20) and group VIII (DMBA + glyphosate, 8/20; $P < 0.05$ versus group VI [DMBA only, 0/20]). No microscopic examination was conducted and tumours were observed "as a minute wart like growth [that the authors called squamous cell papillomas], which progressed during the course of experiment." [The glyphosate formulation tested appeared to be a tumour promoter in this study. The design of the study was poor, with short duration of treatment, no solvent controls, small number of animals, and lack of histopathological examination. The Working Group concluded that this was an inadequate study for the evaluation of glyphosate.]

### 3.1.3 Review articles

Greim *et al.* (2015) have published a review article containing information on five long-term bioassay feeding studies in mice. Of these studies, one had been submitted for review to the EPA (EPA, 1985a, b, 1986, 1991a), and one to the JMPR (JMPR, 2006); these studies are discussed in Section 3.1.1. The review article reported on an additional three long-term bioassay studies in mice that had not been previously available in the open literature, but had been submitted to various organizations for registration purposes. The review article provided a brief summary of each study and referred to an online data supplement containing the original data on tumour incidence from study reports. The three additional long-term bioassay studies in mice are summarized below. [The Working Group was unable to evaluate these studies, which are not included in Table 3.1 and Section 5.3, because the information provided in the review article and its supplement was insufficient (e.g. information was lacking on statistical methods, choice of doses, body-weight gain, survival data, details of histopathological examination, and/or stability of dosed feed mixture).]

In the first study (identified as Study 12, 1997a), groups of 50 male and 50 female CD-1

# EXHIBIT 8

# Reference Manual on Scientific Evidence

*Third Edition*

Committee on the Development of the Third Edition of the
Reference Manual on Scientific Evidence

Committee on Science, Technology, and Law
Policy and Global Affairs

FEDERAL JUDICIAL CENTER

NATIONAL RESEARCH COUNCIL
*OF THE NATIONAL ACADEMIES*

THE NATIONAL ACADEMIES PRESS
Washington, D.C.
**www.nap.edu**

[harm] when the harm would not have occurred absent the conduct."[136] This is equivalent to describing the conduct as a necessary link in a chain of events that results in the particular event.[137] Epidemiologists use causation to mean that an increase in the incidence of disease among the exposed subjects would not have occurred had they not been exposed to the agent.[138] Thus, exposure is a necessary condition for the increase in the incidence of disease among those exposed.[139] The relationship between the epidemiologic concept of cause and the legal question of whether exposure to an agent caused an individual's disease is addressed in Section VII.

As mentioned in Section I, epidemiology cannot prove causation; rather, causation is a judgment for epidemiologists and others interpreting the epidemiologic data.[140] Moreover, scientific determinations of causation are inherently tentative. The scientific enterprise must always remain open to reassessing the validity of past judgments as new evidence develops.

In assessing causation, researchers first look for alternative explanations for the association, such as bias or confounding factors, which are discussed in Section IV, *supra*. Once this process is completed, researchers consider how guidelines for inferring causation from an association apply to the available evidence. We emphasize that these guidelines are employed only *after* a study finds an association

136. Restatement (Third) of Torts: Liability for Physical and Emotional Harm § 26 (2010); *see also* Dan B. Dobbs, The Law of Torts § 168, at 409–11 (2000). When multiple causes are each operating and capable of causing an event, the but-for, or necessary-condition, concept for causation is problematic. This is the familiar "two-fires" scenario in which two independent fires simultaneously burn down a house and is sometimes referred to as overdetermined outcomes. Neither fire is a but-for, or necessary condition, for the destruction of the house, because either fire would have destroyed the house. *See* Restatement (Third) of Torts: Liability for Physical and Emotional Harm § 28 (2010). This two-fires situation is analogous to an individual being exposed to two agents, each of which is capable of causing the disease contracted by the individual. *See* Basko v. Sterling Drug, Inc., 416 F.2d 417 (2d Cir. 1969). A difference between the disease scenario and the fire scenario is that, in the former, one will have no more than a probabilistic assessment of whether each of the exposures would have caused the disease in the individual.

137. *See supra* note 7; *see also* Restatement (Third) of Torts: Liability for Physical and Emotional Harm § 26 cmt. c (2010) (employing a "causal set" model to explain multiple elements, each of which is required for an outcome).

138. "The imputed causal association is at the group level, and does not indicate the cause of disease in individual subjects." Bruce G. Charlton, *Attribution of Causation in Epidemiology: Chain or Mosaic?* 49 J. Clin. Epidemiology 105, 105 (1999).

139. *See* Rothman et al., *supra* note 61, at 8 ("We can define a cause of a specific disease event as an antecedent event, condition, or characteristic that was necessary for the occurrence of the disease at the moment it occurred, given that other conditions are fixed."); Allen v. United States, 588 F. Supp. 247, 405 (D. Utah 1984) (quoting a physician on the meaning of the statement that radiation causes cancer), *rev'd on other grounds,* 816 F.2d 1417 (10th Cir. 1987).

140. Restatement (Third) of Torts: Liability for Physical and Emotional Harm § 28 cmt. c (2010) ("[A]n evaluation of data and scientific evidence to determine whether an inference of causation is appropriate requires judgment and interpretation.").

Reference Guide on Epidemiology

to determine whether that association reflects a true causal relationship.[141] These guidelines consist of several key inquiries that assist researchers in making a judgment about causation.[142] Generally, researchers are conservative when it comes to assessing causal relationships, often calling for stronger evidence and more research before a conclusion of causation is drawn.[143]

The factors that guide epidemiologists in making judgments about causation (and there is no threshold number that must exist) are[144]

141. In a number of cases, experts attempted to use these guidelines to support the existence of causation in the absence of any epidemiologic studies finding an association. *See, e.g.,* Rains v. PPG Indus., Inc., 361 F. Supp. 2d 829, 836–37 (S.D. Ill. 2004) (explaining Hill criteria and proceeding to apply them even though there was no epidemiologic study that found an association); Soldo v. Sandoz Pharms. Corp., 244 F. Supp. 2d 434, 460–61 (W.D. Pa. 2003). There may be some logic to that effort, but it does not reflect accepted epidemiologic methodology. *See In re* Fosamax Prods. Liab. Litig., 645 F. Supp. 2d 164, 187–88 (S.D.N.Y. 2009); Dunn v. Sandoz Pharms. Corp., 275 F. Supp. 2d 672, 678–79 (M.D.N.C. 2003) ("The greater weight of authority supports Sandoz' assertion that [use of] the Bradford Hill criteria is a method for determining whether the results of an epidemiologic study can be said to demonstrate causation and not a method for testing an unproven hypothesis."); *Soldo,* 244 F. Supp. 2d at 514 (the Hill criteria "were developed as a mean[s] of interpreting an established association based on a body of epidemiologic research for the purpose of trying to judge whether the observed association reflects a causal relation between an exposure and disease." (quoting report of court-appointed expert)).

142. *See* Mervyn Susser, Causal Thinking in the Health Sciences: Concepts and Strategies in Epidemiology (1973); Gannon v. United States, 571 F. Supp. 2d 615, 624 (E.D. Pa. 2007) (quoting expert who testified that the Hill criteria are "'well-recognized' and widely used in the science community to assess general causation"); Chapin v. A & L Parts, Inc., 732 N.W.2d 578, 584 (Mich. Ct. App. 2007) (expert testified that Hill criteria are the most well-utilized method for determining if an association is causal).

143. Berry v. CSX Transp., Inc., 709 So. 2d 552, 568 n.12 (Fla. Dist. Ct. App. 1998) ("Almost all genres of research articles in the medical and behavioral sciences conclude their discussion with qualifying statements such as 'there is still much to be learned.' This is not, as might be assumed, an expression of ignorance, but rather an expression that all scientific fields are open-ended and can progress from their present state. . . ."); Hall v. Baxter Healthcare Corp., 947 F. Supp. 1387 app. B. at 1446–51 (D. Or. 1996) (report of Merwyn R. Greenlick, court-appointed epidemiologist). In *Cadarian v. Merrell Dow Pharmaceuticals, Inc.,* 745 F. Supp. 409 (E.D. Mich. 1989), the court refused to permit an expert to rely on a study that the authors had concluded should not be used to support an inference of causation in the absence of independent confirmatory studies. The court did not address the question whether the degree of certainty used by epidemiologists before making a conclusion of cause was consistent with the legal standard. *See* DeLuca v. Merrell Dow Pharms., Inc., 911 F.2d 941, 957 (3d Cir. 1990) (standard of proof for scientific community is not necessarily appropriate standard for expert opinion in civil litigation); Wells v. Ortho Pharm. Corp., 788 F.2d 741, 745 (11th Cir. 1986).

144. *See* Cook v. Rockwell Int'l Corp., 580 F. Supp. 2d 1071, 1098 (D. Colo. 2006) ("Defendants cite no authority, scientific or legal, that compliance with all, or even one, of these factors is required. . . . The scientific consensus is, in fact, to the contrary. It identifies Defendants' list of factors as some of the nine factors or lenses that guide epidemiologists in making judgments about causation. . . . These factors are not tests for determining the reliability of any study or the causal inferences drawn from it.").

# EXHIBIT 9

*Meeting January 14 1965*

# President's Address

## The Environment and Disease: Association or Causation?

by Sir Austin Bradford Hill CBE DSC FRCP(hon) FRS
(*Professor Emeritus of Medical Statistics,
University of London*)

Amongst the objects of this newly-founded Section of Occupational Medicine are firstly 'to provide a means, not readily afforded elsewhere, whereby physicians and surgeons with a special knowledge of the relationship between sickness and injury and conditions of work may discuss their problems, not only with each other, but also with colleagues in other fields, by holding joint meetings with other Sections of the Society'; and, secondly, 'to make available information about the physical, chemical and psychological hazards of occupation, and in particular about those that are rare or not easily recognized'.

At this first meeting of the Section and before, with however laudable intentions, we set about instructing our colleagues in other fields, it will be proper to consider a problem fundamental to our own. How in the first place do we detect these relationships between sickness, injury and conditions of work? How do we determine what are physical, chemical and psychological hazards of occupation, and in particular those that are rare and not easily recognized?

There are, of course, instances in which we can reasonably answer these questions from the general body of medical knowledge. A particular, and perhaps extreme, physical environment cannot fail to be harmful; a particular chemical is known to be toxic to man and therefore suspect on the factory floor. Sometimes, alternatively, we may be able to consider what *might* a particular environment do to man, and then see whether such consequences are indeed to be found. But more often than not we have no such guidance, no such means of proceeding; more often than not we are dependent upon our observation and enumeration of defined events for which we then seek antecedents. In other words we see that the event B is associated with the environmental feature A, that, to take a specific example, some form of respiratory illness is associated with a dust in the environment. In what circumstances can we pass from this observed *association* to a verdict of *causation*? Upon what basis should we proceed to do so?

I have no wish, nor the skill, to embark upon a philosophical discussion of the meaning of 'causation'. The 'cause' of illness may be immediate and direct, it may be remote and indirect underlying the observed association. But with the aims of occupational, and almost synonymously preventive, medicine in mind the decisive question is whether the frequency of the undesirable event B will be influenced by a change in the environmental feature A. *How* such a change exerts that influence may call for a great deal of research. However, before deducing 'causation' and taking action we shall not invariably have to sit around awaiting the results of that research. The whole chain may have to be unravelled or a few links may suffice. It will depend upon circumstances.

Disregarding then any such problem in semantics we have this situation. Our observations reveal an association between two variables, perfectly clear-cut and beyond what we would care to attribute to the play of chance. What aspects of that association should we especially consider before deciding that the most likely interpretation of it is causation?

(1) *Strength*. First upon my list I would put the strength of the association. To take a very old example, by comparing the occupations of patients with scrotal cancer with the occupations of patients presenting with other diseases, Percival Pott could reach a correct conclusion because of the *enormous* increase of scrotal cancer in the chimney sweeps. 'Even as late as the second decade of the twentieth century', writes Richard Doll (1964), 'the mortality of chimney sweeps from scrotal cancer was some 200 times that of workers who were not specially exposed to tar or mineral oils and in the eighteenth century the relative difference is likely to have been much greater.'

To take a more modern and more general example upon which I have now reflected for over fifteen years, prospective inquiries into smoking have shown that the death rate from cancer of the lung in cigarette smokers is nine to ten times the rate in non-smokers and the rate in heavy cigarette smokers is twenty to thirty times

as great. On the other hand the death rate from coronary thrombosis in smokers is no more than twice, possibly less, the death rate in non-smokers. Though there is good evidence to support causation it is surely much easier in this case to think of some features of life that may go hand-in-hand with smoking – features that might conceivably be the real underlying cause or, at the least, an important contributor, whether it be lack of exercise, nature of diet or other factors. But to explain the pronounced excess in cancer of the lung in any other environmental terms requires some feature of life so intimately linked with cigarette smoking and with the amount of smoking that ·such a feature should be easily detectable. If we cannot detect it or reasonably infer a specific one, then in such circumstances I think we are reasonably entitled to reject the vague contention of the armchair critic 'you can't prove it, there *may* be such a feature'.

Certainly in this situation I would reject the argument sometimes advanced that what matters is the absolute difference between the death rates of our various groups and not the ratio of one to other. That depends upon what we want to know. If we want to know how many extra deaths from cancer of the lung will take place through smoking (i.e. presuming causation), then obviously we must use the absolute differences between the death rates – 0·07 per 1,000 per year in non-smoking doctors, 0·57 in those smoking 1–14 cigarettes daily, 1·39 for 15–24 cigarettes daily and 2·27 for 25 or more daily. But it does not follow here, or in more specifically occupational problems, that this best measure of the effect upon mortality is also the best measure in relation to ætiology. In this respect the ratios of 8, 20 and 32 to 1 are far more informative. It does not, of course, follow that the differences revealed by ratios are of any practical importance. Maybe they are, maybe they are not; but that is another point altogether.

We may recall John Snow's classic analysis of the opening weeks of the cholera epidemic of 1854 (Snow 1855). The death rate that he recorded in the customers supplied with the grossly polluted water of the Southwark and Vauxhall Company was in truth quite low – 71 deaths in each 10,000 houses. What stands out vividly is the fact that the small rate is 14 times the figure of 5 deaths per 10,000 houses supplied with the sewage-free water of the rival Lambeth Company.

In thus putting emphasis upon the strength of an association we must, nevertheless, look at the obverse of the coin. We must not be too ready to dismiss a cause-and-effect hypothesis merely on

the grounds that the observed association appears to be slight. There are many occasions in medicine when this is in truth so. Relatively few persons harbouring the meningococcus fall sick of meningococcal meningitis. Relatively few persons occupationally exposed to rat's urine contract Weil's disease.

(2) *Consistency:* Next on my list of features to be specially considered I would place the *consistency* of the observed association. Has it been repeatedly observed by different persons, in different places, circumstances and times?

This requirement may be of special importance for those rare hazards singled out in the Section's terms of reference. With many alert minds at work in industry today many an environmental association may be thrown up. Some of them on the customary tests of statistical significance will appear to be unlikely to be due to chance. Nevertheless whether chance is the explanation or whether a true hazard has been revealed may sometimes be answered only by a repetition of the circumstances and the observations.

Returning to my more general example, the Advisory Committee to the Surgeon-General of the United States Public Health Service found the association of smoking with cancer of the lung in 29 retrospective and 7 prospective inquiries (US Department of Health, Education & Welfare 1964). The lesson here is that broadly the same answer has been reached in quite a wide variety of situations and techniques. In other words we can justifiably infer that the association is not due to some constant error or fallacy that permeates every inquiry. And we have indeed to be on our guard against that.

Take, for instance, an example given by Heady (1958). Patients admitted to hospital for operation for peptic ulcer are questioned about recent domestic anxieties or crises that may have precipitated the acute illness. As controls, patients admitted for operation for a simple hernia are similarly quizzed. But, as Heady points out, the two groups may not be *in pari materia*. If your wife ran off with the lodger last week you still have to take your perforated ulcer to hospital without delay. But with a hernia you might prefer to stay at home for a while – to mourn (or celebrate) the event. No number of exact repetitions would remove or necessarily reveal that fallacy.

We have, therefore, the somewhat paradoxical position that the different results of a different inquiry certainly cannot be held to refute the

original evidence; yet the same results from precisely the same form of inquiry will not invariably greatly strengthen the original evidence. I would myself put a good deal of weight upon similar results reached in quite different ways, e.g. prospectively and retrospectively.

Once again looking at the obverse of the coin there will be occasions when repetition is absent or impossible and yet we should not hesitate to draw conclusions. The experience of the nickel refiners of South Wales is an outstanding example. I quote from the Alfred Watson Memorial Lecture that I gave in 1962 to the Institute of Actuaries:

'The population at risk, workers and pensioners, numbered about one thousand. During the ten years 1929 to 1938, sixteen of them had died from cancer of the lung, eleven of them had died from cancer of the nasal sinuses. At the age specific death rates of England and Wales at that time, one might have anticipated one death from cancer of the lung (to compare with the 16), and a fraction of a death from cancer of the nose (to compare with the 11). In all other bodily sites cancer had appeared on the death certificate 11 times and one would have expected it to do so 10–11 times. There had been 67 deaths from all other causes of mortality and over the ten years' period 72 would have been expected at the national death rates. Finally division of the population at risk in relation to their jobs showed that the excess of cancer of the lung and nose had fallen wholly upon the workers employed in the chemical processes.

'More recently my colleague, Dr Richard Doll, has brought this story a stage further. In the nine years 1948 to 1956 there had been, he found, 48 deaths from cancer of the lung and 13 deaths from cancer of the nose. He assessed the numbers expected at normal rates of mortality as, respectively 10 and 0·1.

'In 1923, long before any special hazard had been recognized, certain changes in the refinery took place. No case of cancer of the nose has been observed in any man who first entered the works after that year, and in these men there has been no excess of cancer of the lung. In other words, the excess in both sites is uniquely a feature in men who entered the refinery in, roughly, the first 23 years of the present century.

'No causal agent of these neoplasms has been identified. Until recently no animal experimentation had given any clue or any support to this wholly statistical evidence. Yet I wonder if any of us would hesitate to accept it as proof of a grave industrial hazard?' (Hill 1962).

In relation to my present discussion I know of no parallel investigation. We have (or certainly had) to make up our minds on a unique event; and there is no difficulty in doing so.

(3) *Specificity:* One reason, needless to say, is the specificity of the association, the third characteristic which invariably we must consider. If, as here, the association is limited to specific workers and to particular sites and types of disease and there is no association between the work and other modes of dying, then clearly that is a strong argument in favour of causation.

We must not, however, over-emphasize the importance of the characteristic. Even in my present example there is a cause and effect relationship with two different sites of cancer – the lung and the nose. Milk as a carrier of infection and, in that sense, the cause of disease can produce such a disparate galaxy as scarlet fever, diphtheria, tuberculosis, undulant fever, sore throat, dysentery and typhoid fever. Before the discovery of the underlying factor, the bacterial origin of disease, harm would have been done by pushing too firmly the need for specificity as a necessary feature before convicting the dairy.

Coming to modern times the prospective investigations of smoking and cancer of the lung have been criticized for not showing specificity – in other words the death rate of smokers is higher than the death rate of non-smokers from many causes of death (though in fact the results of Doll & Hill, 1964, do not show that). But here surely one must return to my first characteristic, the strength of the association. If other causes of death are raised 10, 20 or even 50% in smokers whereas cancer of the lung is raised 900–1,000% we have specificity – a specificity in the magnitude of the association.

We must also keep in mind that diseases may have more than one cause. It has always been possible to acquire a cancer of the scrotum without sweeping chimneys or taking to mule-spinning in Lancashire. One-to-one relationships are not frequent. Indeed I believe that multi-causation is generally more likely than single causation though possibly if we knew all the answers we might get back to a single factor.

In short, if specificity exists we may be able to draw conclusions without hesitation; if it is not apparent, we are not thereby necessarily left sitting irresolutely on the fence.

(4) *Temporality:* My fourth characteristic is the temporal relationship of the association – which is the cart and which the horse? This is a question which might be particularly relevant with diseases of slow development. Does a particular diet lead to disease or do the early stages of the disease lead to those peculiar dietetic habits? Does a

particular occupation or occupational environ-ment promote infection by the tubercle bacillus or are the men and women who select that kind of work more liable to contract tuberculosis whatever the environment – or, indeed, have they already contracted it? This temporal problem may not arise often but it certainly needs to be remembered, particularly with selective factors at work in industry.

(5) *Biological gradient:* Fifthly, if the association is one which can reveal a biological gradient, or dose-response curve, then we should look most carefully for such evidence. For instance, the fact that the death rate from cancer of the lung rises linearly with the number of cigarettes smoked daily, adds a very great deal to the simpler evidence that cigarette smokers have a higher death rate than non-smokers. That com-parison would be weakened, though not neces-sarily destroyed, if it depended upon, say, a much heavier death rate in light smokers and a lower rate in heavier smokers. We should then need to envisage some much more complex relationship to satisfy the cause-and-effect hypothesis. The clear dose-response curve admits of a simple explanation and obviously puts the case in a clearer light.

The same would clearly be true of an alleged dust hazard in industry. The dustier the environ-ment the greater the incidence of disease we would expect to see. Often the difficulty is to secure some satisfactory quantitative measure of the environment which will permit us to explore this dose-response. But we should invariably seek it.

(6) *Plausibility:* It will be helpful if the causation we suspect is biologically plausible. But this is a feature I am convinced we cannot demand. What is biologically plausible depends upon the bio-logical knowledge of the day.

To quote again from my Alfred Watson Memorial Lecture (Hill 1962), there was

'. . . no biological knowledge to support (or to refute) Pott's observation in the 18th century of the excess of cancer in chimney sweeps. It was lack of biological knowledge in the 19th that led a prize essayist writing on the value and the fallacy of statistics to conclude, amongst other "absurd" associations, that "it could be no more ridiculous for the stranger who passed the night in the steerage of an emigrant ship to ascribe the typhus, which he there contracted, to the vermin with which bodies of the sick might be infected". And coming to nearer times, in the 20th century there was no biological knowledge to support the evidence against rubella.'

In short, the association we observe may be one new to science or medicine and we must not dismiss it too light-heartedly as just too odd. As Sherlock Holmes advised Dr Watson, 'when you have eliminated the impossible, whatever remains, *however improbable*, must be the truth.'

(7) *Coherence:* On the other hand the cause-and-effect interpretation of our data should not seriously conflict with the generally known facts of the natural history and biology of the disease – in the expression of the Advisory Committee to the Surgeon-General it should have coherence.

Thus in the discussion of lung cancer the Committee finds its association with cigarette smoking coherent with the temporal rise that has taken place in the two variables over the last generation and with the sex difference in mortality – features that might well apply in an occupational problem. The known urban/rural ratio of lung cancer mortality does not detract from coherence, nor the restriction of the effect to the lung.

Personally, I regard as greatly contributing to coherence the histopathological evidence from the bronchial epithelium of smokers and the isolation from cigarette smoke of factors car-cinogenic for the skin of laboratory animals. Nevertheless, while such laboratory evidence can enormously strengthen the hypothesis and, indeed, may determine the actual causative agent, the lack of such evidence cannot nullify the epidemiological observations in man. Arsenic can undoubtedly cause cancer of the skin in man but it has never been possible to demonstrate such an effect on any other animal. In a wider field John Snow's epidemiological observations on the conveyance of cholera by the water from the Broad Street pump would have been put almost beyond dispute if Robert Koch had been then around to isolate the vibrio from the baby's nappies, the well itself and the gentleman in delicate health from Brighton. Yet the fact that Koch's work was to be awaited another thirty years did not really weaken the epidemiological case though it made it more difficult to establish against the criticisms of the day – both just and unjust.

(8) *Experiment:* Occasionally it is possible to appeal to experimental, or semi-experimental, evidence. For example, because of an observed association some preventive action is taken. Does it in fact prevent? The dust in the workshop is reduced, lubricating oils are changed, persons stop smoking cigarettes. Is the frequency of the associated events affected? Here the strongest

support for the causation hypothesis may be revealed.

(9) *Analogy:* In some circumstances it would be fair to judge by analogy. With the effects of thalidomide and rubella before us we would surely be ready to accept slighter but similar evidence with another drug or another viral disease in pregnancy.

Here then are nine different viewpoints from all of which we should study association before we cry causation. What I do not believe – and this has been suggested – is that we can usefully lay down some hard-and-fast rules of evidence that *must* be obeyed before we accept cause and effect. None of my nine viewpoints can bring indisputable evidence for or against the cause-and-effect hypothesis and none can be required as a *sine qua non*. What they can do, with greater or less strength, is to help us to make up our minds on the fundamental question – is there any other way of explaining the set of facts before us, is there any other answer equally, or more, likely than cause and effect?

*Tests of Significance*
No formal tests of significance can answer those questions. Such tests can, and should, remind us of the effects that the play of chance can create, and they will instruct us in the likely magnitude of those effects. Beyond that they contribute nothing to the 'proof' of our hypothesis.

Nearly forty years ago, amongst the studies of occupational health that I made for the Industrial Health Research Board of the Medical Research Council was one that concerned the workers in the cotton-spinning mills of Lancashire (Hill 1930). The question that I had to answer, by the use of the National Health Insurance records of that time, was this: Do the workers in the cardroom of the spinning mill, who tend the machines that clean the raw cotton, have a sickness experience in any way different from that of other operatives in the same mills who are relatively unexposed to the dust and fibre that were features of the cardroom? The answer was an unqualified 'Yes'. From age 30 to age 60 the cardroom workers suffered over three times as much from respiratory causes of illness whereas from non-respiratory causes their experience was not different from that of the other workers. This pronounced difference with the respiratory causes was derived not from abnormally long periods of sickness but rather from an excessive number of repeated absences from work of the cardroom workers.

All this has rightly passed into the limbo of forgotten things. What interests me today is this: My results were set out for men and women separately and for half a dozen age groups in 36 tables. So there were plenty of sums. Yet I cannot find that anywhere I thought it necessary to use a test of significance. The evidence was so clear-cut, the differences between the groups were mainly so large, the contrast between respiratory and non-respiratory causes of illness so specific, that no formal tests could really contribute anything of value to the argument. So why use them?

Would we think or act that way today? I rather doubt it. Between the two world wars there was a strong case for emphasizing to the clinician and other research workers the importance of not overlooking the effects of the play of chance upon their data. Perhaps too often generalities were based upon two men and a laboratory dog while the treatment of choice was deduced from a difference between two bedfuls of patients and might easily have no true meaning. It was therefore a useful corrective for statisticians to stress, and to teach the need for, tests of significance merely to serve as guides to caution before drawing a conclusion, before inflating the particular to the general.

I wonder whether the pendulum has not swung too far – not only with the attentive pupils but even with the statisticians themselves. To decline to draw conclusions without standard errors can surely be just as silly? Fortunately I believe we have not yet gone so far as our friends in the USA where, I am told, some editors of journals will return an article because tests of significance have not been applied. Yet there are innumerable situations in which they are totally unnecessary – because the difference is grotesquely obvious, because it is negligible, or because, whether it be formally significant or not, it is too small to be of any practical importance. What is worse the glitter of the *t* table diverts attention from the inadequacies of the fare. Only a tithe, and an unknown tithe, of the factory personnel volunteer for some procedure or interview, 20% of patients treated in some particular way are lost to sight, 30% of a randomly-drawn sample are never contacted. The sample may, indeed, be akin to that of the man who, according to Swift, 'had a mind to sell his house and carried a piece of brick in his pocket, which he showed as a pattern to encourage purchasers'. The writer, the editor and the reader are unmoved. The magic formulæ are there.

Of course I exaggerate. Yet too often I suspect we waste a deal of time, we grasp the shadow and

lose the substance, we weaken our capacity to interpret data and to take reasonable decisions whatever the value of P. And far too often we deduce 'no difference' from 'no significant difference'. Like fire, the $\chi^2$ test is an excellent servant and a bad master.

*The Case for Action*
Finally, in passing from association to causation I believe in 'real life' we shall have to consider what flows from that decision. On scientific grounds we should do no such thing. The evidence is there to be judged on its merits and the judgment (in that sense) should be utterly independent of what hangs upon it – or who hangs because of it. But in another and more practical sense we may surely ask what is involved in our decision. In occupational medicine our object is usually to take action. If this be operative cause and that be deleterious effect, then we shall wish to intervene to abolish or reduce death or disease.

While that is a commendable ambition it almost inevitably leads us to introduce differential standards before we convict. Thus on relatively slight evidence we might decide to restrict the use of a drug for early-morning sickness in pregnant women. If we are wrong in deducing causation from association no great harm will be done. The good lady and the pharmaceutical industry will doubtless survive.

On fair evidence we might take action on what appears to be an occupational hazard, e.g. we might change from a probably carcinogenic oil to a non-carcinogenic oil in a limited environment and without too much injustice if we are wrong. But we should need very strong evidence before we made people burn a fuel in their homes that they do not like or stop smoking the cigarettes and eating the fats and sugar that they do like. In asking for very strong evidence I would, however, repeat emphatically that this does not imply crossing every 't', and swords with every critic, before we act.

All scientific work is incomplete – whether it be observational or experimental. All scientific work is liable to be upset or modified by advancing knowledge. That does not confer upon us a freedom to ignore the knowledge we already have, or to postpone the action that it appears to demand at a given time.

Who knows, asked Robert Browning, but the world may end tonight? True, but on available evidence most of us make ready to commute on the 8.30 next day.

REFERENCES
Doll R (1964) In: Medical Surveys and Clinical Trials. Ed. L J Witts. 2nd ed. London; p 333
Doll R & Hill A B (1964) *Brit. med. J.* i, 1399, 1460
Heady J A (1958) *Med. World, Lond.* 89, 305
Hill A B (1930) Sickness amongst Operatives in Lancashire Spinning Mills. Industrial Health Research Board Report No. 59. HMSO, London (1962) *J. Inst. Actu.* 88, 178
Snow J (1855) On the Mode of Communication of Cholera. 2nd ed. London (Reprinted 1936, New York)
US Department of Health, Education & Welfare (1964) Smoking and Health. Public Health Service Publication No. 1103. Washington

# EXHIBIT 10

1            SUPERIOR COURT OF CALIFORNIA

2                 COUNTY OF ALAMEDA

3    BEFORE THE HONORABLE WINIFRED Y. SMITH, JUDGE PRESIDING

4                 DEPARTMENT NUMBER 21

5                    ---oOo---

6    COORDINATION PROCEEDING          )
     SPECIAL TITLE (RULE 3.550)       )
7                                     )
     ROUNDUP PRODUCTS CASE            )   **JCCP No. 4953**
8                                     )
     _____ )
9                                     )
     THIS TRANSCRIPT RELATES TO:      )
10                                    )
     Pilliod, et al.                  )   **Case No.  RG17862702**
11            vs.                     )
     Monsanto Company, et al.         )   **Pages 1834 - 2073**
12   _____ )   **Volume 13**

13

14

15        <u>**Reporter's Transcript of Proceedings**</u>

16            Wednesday, April 3, 2019

17

18
     Reported by: Lori Stokes, CSR No. 12732, RPR
19            Court Reporter

20

21

22

23

24

25

                                                   1834

1    **APPEARANCES OF COUNSEL:**

2

3    For Plaintiffs:

4        THE MILLER FIRM, LLC
         108 Railroad Avenue
5        Orange, Virgina  22960
         (540)672-4224
6        BY:  **MICHAEL J. MILLER, ATTORNEY AT LAW**
              mmiller@millerfirmllc.com
7             **SHAYNE HODGE, ATTORNEY AT LAW**
              shodge@millerfirmllc.com
8

9        BAUM HEDLUND ARISTEI & GOLDMAN PC
         10940 Wilshire Boulevard, 17th Floor
10       Los Angeles, California 90024
         (310) 207-3233
11       BY:  **R. BRENT WISNER, ATTORNEY AT LAW**
              rbwisner@baumhedlundlaw.com
12            **PEDRAM ESFANDIARY, ATTORNEY AT LAW**
              pesfandiary@baumhedlundlaw.com
13

14       AUDET & PARTNERS, LLP
         221 Main Street, Suite 1460
15       San Francisco, California  94105
         (415)568-2555
16       BY:  **MARK BURTON, ATTORNEY AT LAW**
              mburton@audetlaw.com
17

18

19           **(APPEARANCES CONTINUED ON FOLLOWING PAGE)**

20

21

22

23

24

25

                                                      1835

1    **APPEARANCES**:   (CONTINUED)

2    For Defendants:

3         EVANS FEARS & SCHUTTERT LLP
          2300 W. Sahara Ave, Suite 950
4         Las Vegas, Nevada  89102
          (702) 805-0290
5         **BY:  KELLY A. EVANS, ATTORNEY AT LAW**
               kevans@efstriallaw.com
6
          HINSHAW
7         One California Street, 18th Floor
          San Francisco, California  94111
8         (415) 362-6000
          **BY:  EUGENE BROWN JR., ATTORNEY AT LAW**
9              ebrown@hinshawlaw.com

10        GOLDMAN ISMAIL TOMASELLI BRENNAN & BAUM LLP
          564 West Randolph Street, Suite 400
11        Chicago, Illinois 60661
          (312) 681-6000
12        **BY:  TAREK ISMAIL, ATTORNEY AT LAW**
               tismail@goldmanismail.com
13

14

15   (Multiple other counsel present as reflected in the
     minutes.)
16

17

18

19

20

21

22

23

24

25

                                                        1836

1                              **I N D E X**

2
        Wednesday, April 3, 2019
3
        <u>**PLAINTIFFS' WITNESSES**</u>                          <u>**PAGE**</u> <u>**VOL.**</u>
4

5       <u>**Portier, Christopher (Resumed)**</u>

6       Direct Examination resumed by Mr. Wisner    1854  13
        Cross-Examination by Mr. Ismail             1882  13
7       Redirect Examination by Mr. Wisner          2064  13

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

                                                              1837

1          But that's not what you always have.  You
2    always have human data.
3          Q.   And so in terms of the human data we have in
4    this case, you agree that you cannot make a firm
5    statement that Roundup causes NHL from the epidemiology
6    data alone, true?
7          A.   Correct.  I can't do it from the epidemiology
8    data alone.
9          Q.   Now, you went through with Mr. Wisner -- you
10   had a long discussion of -- let me back up.
11         You agree, sir, that there are scientists who
12   disagree with the views you've offered to the jury in
13   this case?
14         A.   Yes.
15         Q.   And you talked with Mr. Wisner about one group
16   of scientists at the EPA who have concluded differently
17   than what you've given opinions about to this jury,
18   true?
19         A.   That's true.
20         Q.   And you would recognize that there are
21   scientists at regulatory bodies around the world who
22   have assessed the data and have come to conclusions
23   different than yours, true?
24         A.   Well, I would first question the statement
25   "have assessed the data."  But certainly they have

                                                      1893

# EXHIBIT 11

```
 1                UNITED STATES DISTRICT COURT

                NORTHERN DISTRICT OF CALIFORNIA

 2

 3   IN RE:  ROUNDUP PRODUCTS          |MDL No. 2741

                                       |

 4   LIABILITY LITIGATION              |

                                       |

 5   --------------------------------|

     This document relates to:        |

 6                                     |

     Gerard Cervantes v. Monsanto Co. |

 7   Case No. 3:19-cv-03015           |

                                       |

 8   --------------------------------|

 9

10                    - - -

11             Tuesday, February 16, 2021

12                    - - -

13

14        This is the Remote Videotaped Deposition of

15   WILLIAM SAWYER, Ph.D., commencing at 1:33 p.m., on

16   the above date, before Susan D. Wasilewski,

17   Registered Professional Reporter, Certified Realtime

18   Reporter, Certified Manager of Reporting Services,

19   Certified Realtime Captioner, and Florida

20   Professional Reporter.

21                    - - -

22             GOLKOW LITIGATION SERVICES

23         877.370.3377 ph | 917.591.5672 fax

24                 deps@golkow.com

25
```

```
 1    APPEARANCES VIA REMOTE COUNSEL/ZOOM TECHNOLOGY:
 2      MOLL LAW GROUP
        BY:  REBECCA FREDONA, ESQUIRE
 3           rfredona@molllawgroup.com
             FATIMA ABUZERR, ESQUIRE
 4           fabuzerr@molllgroup.com
        22 West Washington Street, 15th Floor
 5      Chicago, Illinois 60602
        Phone: (312) 462-1700
 6      Representing the Plaintiff
 7
 8
 9      NELSON MULLINS RILEY & SCARBOROUGH LLP
        BY:  ERIC A. PAINE, ESQUIRE
10           eric.paine@nelsonmullins.com
        1320 Main Street, 17th Floor
11      Columbia, South Carolina 29201
        Phone:  (803) 799-2000
12      Representing Defendant Monsanto Company
13
14
15    ALSO PRESENT VIA REMOTE COUNSEL/ZOOM TECHNOLOGY:
16      MELISSA JAMES, Videographer
17
18
19
20
21
22
23
24
25
```

```
 1                      - - -

 2                   I N D E X

 3                      - - -

 4   Testimony of:  WILLIAM SAWYER, Ph.D.            PAGE

 5       DIRECT EXAMINATION BY MR. PAINE.............   6

 6       CROSS-EXAMINATION BY MS. FREDONA...........  106

 7

 8

 9

10                  E X H I B I T S

11      (Attached to transcript except where noted)

12   WILLIAM SAWYER, Ph.D., DEPOSITION EXHIBITS       PAGE

13   Exhibit 1    Expert Report                        8

                  Toxicology Consultants & Assessment

14                Specialists, LLC

15   Exhibit 2    Invoice                             12

                  * To be provided by Plaintiff's

16                counsel

17   Exhibit 3    Materials Considered List           14

                  * To be provided by Plaintiff's

18                counsel

19   Exhibit 4    Pathology Report                    16

                  * To be provided by Plaintiff's

20                counsel

21   Exhibit 5    Body Mass Index Calculator Page     26

22   Exhibit 6    Article - Body mass index and risk  33

                  of non-Hodgkin's and Hodgkin's

23                lymphoma: A meta-analysis of

                  prospective studies

24                Susanna C. Larsson, et al.

25
```

```
 1                  E X H I B I T S
 2         (Attached to transcript except where noted)
 3     WILLIAM SAWYER, Ph.D., DEPOSITION EXHIBITS        PAGE
 4   Exhibit 7    IARC Monograph - Welding, Molybdenum    49
                  Trioxide, and Indium Tin Oxide
 5                Volume 118
 6   Exhibit 8    Article - Occupation and Rick of        53
                  Non-Hodgkin's Lymphoma and Chronic
 7                Lymphocytic Leukemia
                  Tongzhang Zheng, et al.
 8
     Exhibit 9    Article - Exposure to benzene at        70
 9                work and the risk of leukemia: A
                  systematic review and meta-analysis
10                Abdul Khalade, et al.
11   Exhibit 10   Article - Occupational Exposure to      72
                  Benzene and Non-Hodgkin Lymphoma in
12                a Population-Based Cohort: The
                  Shanghai Women's Health Study
13                Bryan A. Bassig, et al.
14
15
16
17
18
19
20
21
22
23
24
25
```

```
1                        - - -

2              THE VIDEOGRAPHER:  We are now on the record.

3        My name is Melissa James.  I'm a videographer for

4        Golkow Litigation Services.  Today's date is

5        February 16th, 2021, and the time is 1:33 p.m.

6              This remote video deposition is being held

7        in the matter of In Regard:  Roundup Products

8        Liability Litigation, Number MDL Number 2741,

9        Gerard Cervantes vs. Monsanto Company, Case

10       Number 3:19-cv-03015, for the court United States

11       District Court, Northern District of California.

12             The deponent is Dr. William Sawyer.

13             All parties to this deposition are appearing

14       remotely and have agreed to the witness being

15       sworn in remotely.  Due to the nature of remote

16       reporting, please pause briefly before speaking

17       to ensure all parties are heard completely.

18             Will counsel please identify themselves.

19             MS. FREDONA:  Rebecca Fredona and Fatima

20       Abuzerr on behalf of Plaintiff.

21             MR. PAINE:  I am Eric Paine with Nelson

22       Mullins Riley & Scarborough on behalf of

23       Monsanto.

24             THE VIDEOGRAPHER:  The court reporter is

25       Susan Wasilewski and will now swear in the
```

```
 1    witness.

 2         THE COURT REPORTER:  Would you raise your

 3    right hand?

 4         Do you solemnly swear or affirm the

 5    testimony you're about to give will be the truth,

 6    the whole truth, and nothing but the truth?

 7         THE WITNESS:  Yes, I do.

 8         THE COURT REPORTER:  Thank you.

 9         WILLIAM SAWYER, PhD, called as a witness by

10    the Defendant, having been duly sworn, testified as

11    follows:

12                   DIRECT EXAMINATION

13    BY MR. PAINE:

14    Q.   Doctor Sawyer, would you give us your full

15    name for the record, please?

16    A.   William Robert Sawyer.

17    Q.   Dr. Sawyer, we know each other, we've done

18    this a few times before but this is our first time

19    doing it in a remote environment, virtual

20    environment.  So I know you know the rules of

21    depositions, but just to refresh since it has been a

22    little while, it's even more important than normal

23    for us to make sure we don't speak over one another

24    and that Susan has a chance to get everything down

25    on a clean record.  So, as they said, if you would
```

1    give me a pause before you begin answering my
2    question, I'm going to try and do the same courtesy
3    and pause before I ask you the next question unless
4    you've given an answer.  Okay?
5         A.   Yeah.  That's a very good point regarding
6    the pause.
7         Q.   All right.  Also, since you and I aren't
8    here together, there are some natural limitations --
9    or we aren't in the same room together, there are
10   some limitations with exchanging exhibits and
11   likewise.  If you are looking at a document or
12   you're looking at something on your screen, I do not
13   know what that is just given -- given our current
14   virtual environment.  So if something like
15   that happens, would you please identify for me what
16   you're referring to or what you're looking to when
17   you're consulting something.  Okay?
18        A.   I'll do that.
19        Q.   All right.  And then finally, if you would
20   agree with me, please don't communicate with anyone
21   else while we're on the record, including text
22   messages, e-mails, phone calls, anything like that.
23   If you need to take a break, we can certainly do
24   that, but if you would refrain from other
25   communications while we're on the record, I'd

```
 1    appreciate that too.

 2      A.   Yes.

 3      Q.   All right.  Is there anyone else in the room

 4    with you, Doctor?

 5      A.   Yes.

 6      Q.   Who is with you, please?

 7      A.   We have -- I have to disclose this.

 8           THE WITNESS:  Come on.  Expose yourself.

 9      A.   It's a golden retriever.

10      Q.   Okay.  We can stipulate the golden retriever

11    will stay, and the other dog too.

12      A.   And a little Shetland, but they'll be quiet.

13    They actually are better in my office.  They zone

14    out and dream about not working.

15      Q.   It sounds like a pretty good life.

16      A.   Yeah.

17      Q.   Any other humans in the room with you?

18      A.   None.

19      Q.   All right.  Very good.  Dr. Sawyer, I'm

20    going to move through this as efficiently as

21    possible.  Again, you and I have done this a number

22    of times before, so let me introduce the first

23    exhibit to your deposition.

24           (Sawyer Exhibit 1 was marked for

25    identification.)
```

```
 1    BY MR. PAINE:

 2        Q.   Are you able to access the shared exhibit

 3    folder on Golkow?

 4        A.   Yes.

 5        Q.   Okay.  Very good.  If you would just give

 6    that a second, I've marked as Exhibit 1 to your

 7    deposition a copy of your report for the Cervantes

 8    case.  Are you able to see that?

 9        A.   I think I need to click on one item.  We are

10    set up for it and we've used it already.  I'm just

11    trying to remember how to activate it.

12        Q.   If there is any trouble, I can share my

13    screen with you and move through the document, but

14    it should be available momentarily in the shared

15    exhibits folder.

16        A.   Oh, I know.  I'm just trying to remember how

17    to call that folder up.

18             THE COURT REPORTER:   He needs the link to

19        the exhibit folder.

20        A.   It's just I forget how to click onto that.

21        Q.   Yeah.  I think that was sent through the

22    court reporter yesterday.

23             MS. FREDONA:  I think I need the link as

24        well.

25        A.   Okay.  Here's the link.  You know what?  I
```

```
 1   didn't click on it.  It's right here.  Link to
 2   provide to witness, marked exhibits.  There we go.
 3   Download all files.
 4       Q.   Okay.  I think there was an e-mail from the
 5   court reporter yesterday that had that link in
 6   there.  I don't know that I have it right now.
 7       A.   I have the e-mail I can send around.
 8       Q.   Okay.  Yeah, if you wouldn't mind doing that
 9   and then --
10       A.   What I'll do is I'll just do -- right now it
11   has John Kalas, of course, Eric, James Meredith, Ken
12   Moll, so I'll need to add additional.  Who else
13   would like that?
14           MS. FREDONA:  Me.
15           THE WITNESS:  Okay.  Rebecca, what is -- let
16       me see if your e-mail comes up.  No.  What are
17       the first three letters of your e-mail?
18               (Discussion off the record.)
19   BY MR. PAINE:
20       Q.   Okay.  While that's coming through, Doctor,
21   are you able to see Exhibit 1 in your folder?
22       A.   Yes.
23       Q.   Okay.  Very good.  And that's the first page
24   at least.  That's your report for the Cervantes
25   case?
```

```
1      A.   It is.

2      Q.   And does that report, to the best of your

3    ability, contain the opinions you intend to give at

4    trial in this case?

5      A.   Yes.

6      Q.   All right.  Did you have access to all the

7    information you felt that you needed in order to

8    reach your opinions in the Cervantes case when you

9    prepared this report?

10          Doctor, did you understand my question?

11     A.   Yeah, I'm just looking over my report.

12          Yes.  I mean, the only thing I can -- it's

13   rather picky, but the only thing I wish I had and I

14   still don't have but I've been trying to get it for

15   years is a formulation of the surfactants and the

16   so-called inert ingredients for the different

17   products, and in my report, on one of the tables, I

18   have a compilation of what I've accumulated thus far

19   from review of Monsanto confidential or internal

20   documents, but I don't really have the --

21   necessarily the full printout of product ingredients

22   for the products used by Mr. Cervantes.

23     Q.   Okay.  Did you have all -- aside from that,

24   did you have the information you felt you needed

25   regarding Mr. Cervantes's case to reach the opinions
```

1    that you've discussed in your report?

2        A.   Yeah.  Like I say, the Roundup Pro and the

3    Roundup Grass and Weed Killer used, there is

4    different -- I have some of the years of the EPA

5    registry data, but not necessarily all of it.  I

6    beyond that I have everything, yeah.

7        Q.   Okay.  Have you submitted any invoices for

8    your work in the Cervantes case to Plaintiff's

9    counsel?

10       A.   Yes.  I just submitted one.  I do have a PDF

11   of it I could provide.

12       Q.   Yeah.  If you would provide that, we'll mark

13   that as Exhibit 2 and we'll provide that to the

14   court reporter later, but if you can provide that to

15   Rebecca and she can just send it on to me, that'd be

16   great.

17            (Sawyer Exhibit 2 was marked for

18   identification.)

19   BY MR. PAINE:

20       Q.   As to that, for the moment, just in the

21   interest of moving on quickly, do you recall how

22   much your invoice was for regarding your work on the

23   Cervantes case?

24       A.   Somewhere in the proximity of around

25   $12,000.

```
 1           MS. FREDONA:  We don't want you to guess,
 2      Doctor.
 3      A.    Yeah.  Well, plus the initial retainer, so,
 4      yeah, I don't -- I don't know exactly without
 5      looking.  I could look now.  I mean, it's easiest
 6      enough to do.
 7      Q.    That's okay.  Let's -- we'll let the invoice
 8      speak for itself, but could you estimate for me
 9      roughly how much time you've spent on the Cervantes
10      case up to the point we began today's deposition,
11      please?
12      A.    I really need to look at the invoice to be
13      accurate.
14            Are you waiting for me?
15      Q.    Yes.
16      A.    Oh, okay.  Well, I'll look at the invoice
17      then.
18            Okay.  A total of 29.9 hours and the invoice
19      amount that went out was $13,470.64, and plus the
20      initial retainer was $9,000.
21      Q.    Okay.  And then from the date of that
22      invoice, whatever it is, up until the time we began
23      this deposition today, can you estimate how much any
24      additional time you've spent on the Cervantes case?
25      A.    Okay.  I'm going to look at my sheet to see
```

 1    if there are any hours logged.

 2          None.

 3      Q.   All right.  Doctor, on your report, one of

 4    the last entries on the very last page talks about

 5    new materials reviewed specific to Gerald Francis

 6    Cervantes' case, one of which is Number 456, a

 7    medical summary.

 8          Was that provided to you by Plaintiff's

 9    counsel?

10      A.   It was; however, I did not rely on it.  I

11    went through all the medical records and

12    specifically included the diagnoses and pathology

13    findings and history of any adverse pharmaceuticals,

14    drugs, alcohol, et cetera, directly from the medical

15    records.

16      Q.   Okay.  I have seen the medical summary

17    that's Item Number 456 on your Materials Considered

18    List, so I'm going to ask that to be produced and

19    we're going to mark that in absentia as Exhibit 3 to

20    your deposition.

21          MR. PAINE:  Would you make sure that gets to

22      me, Ms. Fredona?

23          MS. FREDONA:  Yes.

24          MR. PAINE:  Thank you.

25          (Sawyer Exhibit 3 was marked for

```
 1   identification.)

 2       A.   Just to be clear, I think the exhibit for

 3   the invoice, is that going to be Exhibit 2?

 4       Q.   Yes, sir.

 5       A.   Okay.

 6       Q.   Yep.  So Exhibit 3 will be the medical

 7   summary that's Item Number 456.

 8            And then let me ask you, too, Item Number

 9   452 on your list in your report is Pathology, and it

10   says:  (New 11/30/20)

11            What is that, please?

12       A.   Additional records are received on November

13   30th of 2020.

14       Q.   Okay.  Did you receive the original liver

15   biopsy results for Mr. Cervantes?

16       A.   You mean prior to November?

17       Q.   Have you at any time seen the liver biopsy

18   results from when Mr. Cervantes was originally

19   diagnosed with non-Hodgkin lymphoma back in 2004?

20       A.   Oh, you mean from the needle biopsy.  Yes.

21       Q.   You have seen that report?

22       A.   That gave a final pathology confirmation of

23   DLBCL?  I believe so.  That's out of -- I'm looking

24   now on the report.  It's on page 10, actually, in my

25   report, from Advocate Medical Group.
```

```
1      Q.   All right.  So I have not seen that myself.
2   Would you please produce that through Ms. Fredona as
3   Exhibit 4 to your deposition?
4      A.   Yeah.  Let me make a note here.
5      Q.   Okay.
6           (Sawyer Exhibit 4 was marked for
7   identification.)
8      A.   Okay.
9      Q.   Okay.  All right.  I understand that you
10  have spoken with Mr. Cervantes at some point; is
11  that correct?
12     A.   Yes.
13     Q.   All right.  When did you speak with him,
14  please?
15     A.   January 7th, 2021.
16     Q.   And consistent with our earlier agreement,
17  what exactly are you looking at to confirm the date
18  when you spoke with him, please?
19     A.   My report.
20     Q.   Okay.
21     A.   And specifically page -- oh, where'd it go?
22     Q.   That's okay.  I just -- I just needed to
23  know generally the document.
24          How long was your discussion with
25  Mr. Cervantes?
```

```
 1      A.   Well, I can answer that easily because I
 2   have the invoice on the screen, which I'm looking
 3   at.  On January 7th, the interview was 1.09 hours.
 4      Q.   Have you spoken with Mr. Cervantes at any
 5   other point in time?
 6      A.   I'm looking at the report.  No.
 7      Q.   Okay.  And were there any recordings made of
 8   that conversation with Mr. Cervantes?
 9      A.   No.
10      Q.   Did you take any notes from those
11   conversations other than what has been incorporated
12   into your report?
13      A.   No.
14      Q.   Did you review Mr. Cervantes' deposition?
15      A.   Yes.
16      Q.   Were there any inconsistencies between what
17   Mr. Cervantes told you in your conversation with him
18   and what he testified about in his deposition?
19      A.   Let me check the report.  I'm not finding
20   anything that was conflicting with respect to the
21   information I relied on.
22      Q.   Is there anything that you recall that
23   conflicted with his deposition in terms of any other
24   information, whether you relied on it or not?
25      A.   I wouldn't know because I -- it wouldn't be
```

1    in my report.  If it was something to do with his

2    income or the tax return or something of that sort,

3    or money spent on this or that, I don't pay any

4    attention to that, really, so if there was

5    something -- you know, there's nothing in my report

6    that I am finding that is conflicting.

7        Q.   Have you read any other depositions in this

8    case other than Mr. Cervantes' deposition?

9        A.   No.

10       Q.   Did you conduct any kind of a site visit or

11   inspection of any of the places where Mr. Cervantes

12   worked or was exposed to Roundup?

13       A.   No.

14       Q.   Did you investigate any of the equipment

15   that Mr. Cervantes used to apply Roundup?

16       A.   I'm looking at the exhibits.  I don't think

17   there was much there other than the labels.  As far

18   as equipment, I don't have any photos or other means

19   of examining the equipment.

20       Q.   Do you know the brand name or model number

21   of any -- the backpack sprayer that Mr. Cervantes

22   used to apply Roundup?

23       A.   No.  He did not specify, and I am looking at

24   my report.  I asked questions regarding the backpack

25   and all I am finding is that he used it about a year

William Sawyer, Ph.D.

```
 1    into his business, is when he went primarily to

 2    using the backpack.  He switched the backpack after

 3    one year of occupational use.  So, no, I do not have

 4    any specifics on the backpack or backpacks that he

 5    used.

 6       Q.   Have you reviewed any of the expert reports

 7    from any of the defense experts that were served

 8    last week?

 9       A.   No, I have not received any.

10       Q.   Now, switching a little more specifically

11    and away from kind of the housekeeping to

12    Mr. Cervantes, do you agree that he was diagnosed

13    with diffuse large B-cell lymphoma?

14       A.   Yes.

15       Q.   And to your knowledge, is that one of, if

16    not the most, common form of non-Hodgkin lymphoma?

17       A.   Yes.

18       Q.   Did you make an independent diagnosis of

19    DLBCL in his case or are you relying on his medical

20    records for that?

21       A.   I fully reviewed the pathology results, of

22    course, and have some underlying expertise in

23    pathology, in medical school pathology and I used

24    pathology as a toxicologist for many years.  I also

25    have a master's in cellular and molecular biology
```

```
 1   and I have some understanding of the classification

 2   systems based on the genetics for lymphoma.

 3          However, I don't make diagnoses as a

 4   toxicologist.  I refer to the pathologist with

 5   respect to diagnoses, and in this case I have

 6   reviewed the results and everything is very

 7   consistent with DLBCL.  I don't have any reason to

 8   doubt the diagnosis.

 9   Q.   Now, are you intending to tell the jury in

10   this case that you have ruled out all other possible

11   causes of Mr. Cervantes' DLBCL other than Roundup

12   use?

13          MS. FREDONA:  Objection; form.

14   A.   Are you asking that in terms as a primary

15   contributing factor, or are you asking was there any

16   possible exacerbation from any other exposure?

17   Q.   Let me ask it two ways.  That's a good

18   point.  Are you going to tell the jury that you have

19   ruled out all other causes of Mr. Cervantes' DLBCL

20   other than Roundup?  Let me ask you that first.

21          MS. FREDONA:  Objection.

22   A.   From a toxicological standpoint, yes.

23   Q.   Are you going to tell the jury that you have

24   ruled out all other potential substantial

25   contributing factors other than Roundup to
```

```
 1    Mr. Cervantes' DLBCL?

 2         MS. FREDONA:  Objection; form.

 3    A.   Did you use the word -- or just read back if

 4    you wish -- significant contributing factors or

 5    possible contributing factors?

 6    Q.   I said significant or substantial, I'm not

 7    sure which, but not -- I did not say possible.  So I

 8    can ask it again.

 9    A.   No, no.  I can answer it now that you said

10    that.

11    Q.   Okay.

12    A.   The answer to that question, yes, I have,

13    and I say that with respect to acknowledging, as in

14    my report at page 18, or it might be page 17, the

15    family medical history is positive for a single

16    first-generation family history relative with

17    cancer, and I also made a footnote on Table 1 that

18    medical genetics will be deferred to the oncologist.

19    I am not going to provide an opinion on medical

20    genetics, but with respect to chemical and

21    toxicological or radiological pharmaceutical causes,

22    I have ruled out any substantial contributing

23    factors.

24    Q.   Now, are you going to tell the jury that

25    Roundup was the only substance that Mr. Cervantes
```

1  ever encountered or was exposed to that might have

2  caused or contributed to his non-Hodgkin lymphoma?

3       MS. FREDONA:  Object to form.

4  A.   With respect -- I'm sorry.  I should have

5  waited.

6       MS. FREDONA:  No, go ahead.

7  A.   With respect to agents, there are non --

8  known to cause NHL in humans, yes.  Now, if you want

9  to back off a bit and talk about animal studies or

10 something else that's a remote possibility, I'd have

11 to think through that further, but as far as any

12 agents that are known in humans to cause NHL, yeah,

13 that I have carefully reviewed and have found none.

14 Q.   Let's talk for a moment about his family

15 history.  You mentioned in your report that

16 Mr. Cervantes' mother had non-Hodgkin lymphoma,

17 right?

18 A.   Yes.  I did say a moment ago there was one

19 relative, a first-generation relative with cancer.

20 Q.   Correct.  And in your report you also

21 mentioned that she had never used Roundup, right?

22 A.   Yes.

23 Q.   Okay.  So Mr. Cervantes has a first-degree

24 family relative, his mother, that had non-Hodgkin's

25 lymphoma that developed having nothing to do

1   whatsoever with any Roundup exposure, correct?

2       A.   That's right.

3            MS. FREDONA:  Objection.

4       A.   Well, I don't -- I disagree with the

5   question in the way it was phrased, but I agree that

6   the etiology was unknown, but I don't know that we

7   can confirm that it had nothing to do with Roundup

8   possibly from a dietary cause.  I haven't looked at

9   that, so I want to be careful on that in terms of

10  agreeing with that blanket statement.

11      Q.   Well, let me be very precise.  You can't say

12  to a reasonable degree of scientific certainty that

13  Roundup, glyphosate, had anything whatsoever to do

14  with the development of non-Hodgkin lymphoma in

15  Mr. Cervantes' mother, can you?

16      A.   Correct.  And I also footnoted that I would

17  leave the medical genetics to the oncologist to

18  opine upon.

19      Q.   Sure.  But based on your own reading,

20  experience, training, and work as a toxicologist, do

21  you agree that having a first-degree relative with

22  non-Hodgkin lymphoma independently increases the

23  risk for having non-Hodgkin lymphoma in

24  Mr. Cervantes himself?

25      A.   Yes, and that's why if you look at my report

```
 1    on Table 1, out of all those categories I

 2    investigated, you will see a yes regarding family

 3    medical history.

 4        Q.   Dr. Sawyer, can you think of any

 5    scientifically validated test or method or procedure

 6    that could eliminate Mr. Cervantes' family history

 7    of non-Hodgkin lymphoma as a cause or a substantial

 8    contributing factor to his non-Hodgkin lymphoma?

 9            MS. FREDONA:  Objection; form.

10        A.   Possibly.  I was thinking about this a

11    moment ago.  I could have, I suppose, to investigate

12    that further, determined if his mother had any

13    significant pharmacological regimens that cause

14    immunosuppression and/or are linked to NHL, or if

15    she had been prescribed long-term immunosuppressant

16    drugs, such as prednisone systemically on a

17    long-term basis, or if she received cyclophosphamide

18    treatment for rheumatoid arthritis, or if she has

19    AIDS, if she received cyclosporin treatment for

20    AIDS.  I can go on and on.  There are possibilities

21    that I have investigated in this case, even such

22    things as -- as in Table 1 of my report.  It's

23    possible there are -- there could be a cause for her

24    NHL that has not been investigated.

25            So I think it's incorrect to just assume and
```

1    to mislead the jury by indicating that it's genetic

2    when we don't really know that.  You know, I

3    wouldn't do that in this case.  With Mr. Cervantes,

4    I carefully explored to see if I could find any

5    other possible cause for his NHL and I was not able

6    to find one, and so before we make a blanket

7    conclusion that the mother had NHL due to some

8    genetic cause that was passed on to the son, I think

9    one would have to go through and do a full workup.

10       Q.    You haven't actually done that to eliminate

11   any other potential causes in Mr. Cervantes' mother

12   other than saying she was not exposed to Roundup,

13   correct?

14       A.    Correct.

15       Q.    Now, in your report -- you referred to

16   Table 1 a couple of times.  In your report on

17   Table 1 there is a line for any history of obesity

18   and you said no.  Is that your understanding?

19   Page 17.

20       A.    Yes.

21       Q.    And also in your report on page 15 you noted

22   that Mr. Cervantes was 5' 11" and was 215 to 220

23   pounds during his forties, correct?

24       A.    Yes, but he -- for most of his life he was

25   below a BMI of 30, and that's why I have not

1    included him as an obesity factor.

2         Q.   Well, let's get there.  Obesity is defined

3    as a BMI of 30 or higher, correct?

4         A.   Yes.

5         Q.   And at 5' 11" and 215 pounds or higher,

6    Mr. Cervantes had a BMI that was 30 or higher,

7    didn't he?

8              MS. FREDONA:  Objection.

9         A.   For a period of time.  Hang on one sec.  I

10   want to pull out my BMI chart.  Since you made that

11   statement, I want to see if it is accurate.

12        Q.   Doctor, let me see if I can save you some

13   time.  I'm going to mark as Exhibit -- this will be

14   5 to your deposition, a BMI calculation done based

15   on the parameters you gave for Mr. Cervantes in your

16   report.

17             MR. PAINE:  For the record, I think this is

18        going to show up in the folder as Exhibit 2.  I

19        was not able to change the manual or the --

20        (garbled audio) -- manually, but Madam Court

21        Reporter, if you could make sure this correctly

22        reflects that the Cervantes BMI calculation that

23        I've just marked is Exhibit 5 to the deposition.

24             (Sawyer Exhibit 5 was marked for

25   identification.)

```
1    BY MR. PAINE:

2        Q.   Dr. Sawyer, are you able to -- are you able

3    to see that yet?  If not, I can share my screen with

4    you.

5            MS. FREDONA:  We're going to object to the

6        exhibit on foundation.

7        Q.   Dr. Sawyer, I've just shared my screen.  Are

8    you able to see what I've marked as Exhibit 5 to

9    your deposition?

10       A.   I'm looking at the screen and it's showing

11   my report.  It didn't change.  Maybe it's because

12   I'm looking at the wrong thing.  Hang on.

13       Q.   Sure.

14       A.   Oh, I see.  I -- yeah, I have it now.  Yeah.

15   Okay.

16       Q.   Okay.  And so this was something I took off

17   the National Heart, Lung and Blood Institute,

18   Calculate Your BMI, standard BMI calculator.  You

19   can see that at the height of 5' 11" and a weight of

20   215 pounds, the calculated BMI is 30.0, correct?

21       A.   Yeah, that's correct.  You know, I use the

22   same -- I have a printout chart rather than a

23   calculator but it's still from NIH and that is

24   correct, but my point is if you look-- I did a

25   weight history with him over the phone and if you
```

 1    actually follow his weight history, for most of --

 2    more than most of his life he was borderline BMI or

 3    under.

 4        Q.   So you said, as you've indicated in your

 5    report, that in his forties he was between 215 and

 6    220 pounds, and he was 215 pounds at diagnosis of

 7    NHL, right?

 8        A.   Right.

 9        Q.   So how old was he when he was diagnosed with

10    NHL, 44, 45, somewhere in there?

11        A.   Yes, and so he was really only borderline

12    BMI of 30 for a short time.  Most of his life, the

13    vast majority of his life, he was under the 30

14    number -- and as they had a threshold of BMI of 30.

15         So, really, I think it's a bit of an

16    exaggeration to use his BMI of 30 as representative

17    of his first 30 or so years of life.

18        Q.   But you do agree, as you've stated in your

19    report, that a BMI of 30 or higher, which is obese,

20    increases a person's chances for developing

21    non-Hodgkin lymphoma, right?

22        A.   Well, it does, and then that -- one has to

23    consider the science in terms of what the studies

24    shows in terms of risk level, and I added some new

25    studies to my report, I'm sure you're aware of, but

```
 1    one of those -- actually, two of those actually show
 2    that the amount of increased risk from a BMI over
 3    30, although it is statistically significant, it's
 4    of a very minor amount compared to the risk of NHL
 5    from glyphosate.
 6         And I can refer you to the study in my
 7    report.
 8    Q.   Well, I've got it and I'm familiar with the
 9    one you cited, so let me ask you a few other things.
10         In your report you also cited that same
11    study for the proposition that a BMI of 30 or higher
12    is specifically associated with an even further
13    increased risk of DLBCL, which is exactly the same
14    type of NHL that Mr. Cervantes had, correct?
15    A.   Right, but it's only like a 13 percent
16    increased risks as opposed to over a 200 percent
17    increase.  I mean, the relative risk ratio with
18    respect to the subtype of DLBCL is only 1.13.  It's
19    statistically significant but a very low level risk.
20    So I think it's only fair, and for someone at your
21    caliber, who I respect, I think you'll appreciate
22    that one has to compare that risk level of the
23    glyphosate versus the marginal obesity, and it's --
24    it's just, you know, a factor almost on the order of
25    a magnitude lower.
```

```
 1        Q.    Doctor --

 2        A.    Not an order of magnitude.  About five or

 3   seven times lower.

 4        Q.    Okay.  You've just referred me to a study or

 5   studies on glyphosate that have found odds ratios of

 6   relative risk around 2, correct?

 7        A.    I couldn't hear your last word.

 8        Q.    Sure.  You just referred in your answer to

 9   some studies on Roundup or glyphosate that have

10   referred to or found odds ratios of relative risks

11   around 2, but there are also a number of

12   epidemiologic studies that have found no increased

13   risk, no statistically significant increased risk

14   for glyphosate or Roundup use, correct?

15        A.    Yes.

16              MS. FREDONA:  Objection; form,

17        argumentative.

18        Q.    And there are some studies on Roundup or

19   glyphosate, epidemiologic studies, that have found

20   relative risks or odds ratios that are on the same

21   order, even if statistically significant, as the

22   relative risks or odds ratios for obesity that

23   you've cited from this study in your report,

24   correct, around 1.07 or 1.13?

25              MS. FREDONA:  Same objection.
```

 1      A.   Correct, but those were, for example, at the

 2   very lowest end of glyphosate exposure of, for

 3   example, one day or equal or less than two-day.  The

 4   greater than 10-day exposure days of glyphosate then

 5   peaked above the risk level of 2.

 6      Q.   Now, Doctor, take a look at page 173 of your

 7   report, which is where you discuss the study by

 8   Larsson and Wolk about obesity and BMI as a

 9   potential risk factor for NHL.  Let me know -- let

10   me know when you get there, please.

11      A.   I'm there.

12      Q.   Okay.  And what you're describing there as

13   that study's result is that there is a seven percent

14   increased risk of NHL for each five kilogram per

15   meter square increment of BMI, correct?

16      A.   Right.

17      Q.   Okay.  And for DLBCL it's a 13 percent

18   increase per five kilogram per meter square

19   increment of BMI, also correct, right?

20      A.   Right, but he's at the threshold already, so

21   there is no additional increment.

22      Q.   Well, that was my next question.  It is five

23   kilogram per meter square increase compared to what?

24      A.   Compared to 30.

25      Q.   To 30?

1      A.   Yes.

2      Q.   You're confident that's that -- that's what

3   the Larsson study tells you?

4      A.   Well, that's, yeah, the definition of

5   obesity.  In other words, the control group is the

6   nonobese group.  The experimental group is the obese

7   group, and the cut-off is 30.

8      Q.   And what was, according to Larsson, the

9   weight -- the average or median weight of the

10   control group, please?

11      A.   I don't know.  I'm interested in BMI, not

12   weight.

13      Q.   Sure.  Okay.  Let me ask it that way.  What

14   was the average or median BMI for the control group

15   in the Larsson study?

16      A.   I don't recall.

17      Q.   For each increment of five kilograms per

18   meter square above obesity, which is where you say

19   the risk starts, that would correspond to an

20   additional seven percent increased risk for

21   non-Hodgkin and an additional 13 percent increased

22   risk per increment for DLBCL, right?

23      A.   No, because he was at a BMI of 30 for a

24   short period of time and --

25      Q.   Right.  I'm not speaking necessarily of

William Sawyer, Ph.D.

1    Mr. Cervantes.  If you had someone who was a 31 BMI,

2    they would have an additional seven percent

3    increased risk over the 30 BMI's seven percent,

4    right?

5           MS. FREDONA:  Objection; incomplete

6      hypothetical.

7      Q.   If they were 32, it would increase another

8    increment of seven percent.  If they were 33, it

9    would increase yet another increment of seven

10   percent, correct?

11          MS. FREDONA:  Same objection.

12     A.   I don't think so.

13     Q.   Tell me where the logic is wrong according

14   to how you've described the Larsson study results,

15   please.

16     A.   Well, I'm going to have to open the Larsson

17   study itself.

18     Q.   Okay.  I tell you what, I'll mark it as an

19   exhibit.

20          (Sawyer Exhibit 6 was marked for

21   identification.)

22   BY MR. PAINE:

23     Q.   And, Doctor, this should show up in a moment

24   in the exhibit folder as Exhibit 3.  Although,

25   again, I can't change the numerical tag for the

1    exhibit, this should actually be Exhibit 6, so if

2    the court reporter would make that change.

3            This is the Larsson study, 2011, that you've

4    cited.  Let me know -- here.  I'll share my screen

5    just to move this along.

6        A.   I have the study opened already now.

7        Q.   Okay.  Well, I'm going to -- I'm going to

8    share my screen anyway just so we're all literally

9    on the same page.  This is the study you cited on

10   page 173 of your report?

11       A.   Yes.

12       Q.   Okay.  The abstract says:  The summary

13   relative risks for a five kilogram per meter square

14   increase in BMI were 1.07, 95 confidence intervals,

15   1.04 to 1.01, for NHL incidence.

16           Right?

17       A.   That's what it reads.

18       Q.   Okay.  And then it goes on and says:  BMI

19   was significant positively associated with risk of

20   diffuse large cell lymphoma, 1.13, confidence

21   interval, 1.02 to 1.26.

22           Right?

23       A.   Yes.

24       Q.   So as you're looking at the Larsson study

25   now, do you agree that those are incremental changes

1    with each increment of -- I'm sorry.

2         Do you agree that those are incremental

3    changes in risk with each increasing increment of

4    weight?

5    A.   Not necessarily.  It depends on the BMI that

6    has a relative risk of 1, and on page 2427 of the

7    study, for example, there is a summation of the

8    different studies that have been conducted and

9    results from those studies, and there is a line

10   drawn vertically up and down on that page, on the

11   table, which has a 1 under it.  That's -- it

12   means that that's the comparative point, that's

13   the -- if you take all the studies as a whole, that

14   shows where the risk is.

15        And then we see under the diffuse large

16   B-cell lymphoma category, about -- one, two, three,

17   four, five, six, seven, eight -- about eight studies

18   with the relative risk percentages provided.  Now,

19   it doesn't tell us really what -- at what starting

20   point 1 would be.

21   Q.   Okay.  You've told me that you think the

22   starting point is 30 for obesity, right?

23   A.   Well, by definition, yeah, I think so, but

24   it really -- I really can't -- the study doesn't

25   seem clear on that point.

```
 1      Q.   Okay.  Well, let's go to my more immediate

 2   question, which is down here.  You're looking at

 3   Figure 2, right?  And the overall risk for DLBCL,

 4   which is at the top third of that column, is a

 5   relative risk of 1.13, right?  That's what that

 6   diamond shows?

 7      A.   That's right, overall, it's 1.13, yeah.

 8      Q.   And underneath it says:  Figure 2 - Relative

 9   risks of non-Hodgkin lymphoma incidence per five

10   kilograms per meter square increase in body mass

11   index stratified by subtype.  Right?

12      A.   Right, but if a person weighed 90 pounds and

13   was 6 feet tall, that 5 kilogram per meter increase

14   would not put them at risk.  One would have to be

15   above ideal weight, above a level in which the risk

16   levels begin.  The risk levels begin in this table

17   at what's marked 1.  That's neutral.  Below 1 means

18   less risk of cancer, greater than 1 means increased

19   risk of cancer.

20      Q.   Right.  My question is about the increment.

21   So let's assume you're right, that the incremental

22   risk starts at obesity of BMI equals 30.  Now, let's

23   assume a person is -- has a BMI of 31 and another

24   person has a BMI of 32.  The person at 30, according

25   to this chart, has a risk -- relative risk for DLBCL
```

1    from their obesity of 1.13, right?

2        A.   No.  I think the way this works is a five

3    kilogram per meter increase, and you said one.

4        Q.   So what's the change in risk for each

5    increment of weight or BMI above 30 for DLBCL

6    according to this chart?  Do you know?

7        A.   Well, a five milligram -- or I mean a five

8    kilogram per meter square increase.

9        Q.   Sure.  Do you know how a five kilogram per

10   meter squared increase translates to a change in

11   BMI?  It's one point, isn't it?  Dr. Sawyer?

12       A.   I'm thinking.  The relative risk of NHL

13   mortality associated with a five kilogram per meter

14   increase in BMI was 1.14.  But, see, that is giving

15   us a risk ratio, that's an RR, initially of 1.07,

16   but if we take someone and increase them by five

17   kilogram per meter squared in terms of BMI, then

18   what we see is a 14 percent or a 1.14 risk ratio.

19       Q.   You're talking about mortality.  I didn't

20   ask you about mortality.

21       A.   Oh.

22       Q.   Let me ask it this way, Doctor.  I'll try

23   and cut to the chase.

24            If a person with a BMI of 30 has a relative

25   risk of 1.13 for DLBCL according to this chart, does

1    a person who has a BMI of 40 have exactly the same

2    increased risk according to this data?

3            MS. FREDONA:  Objection; form, speculation.

4        A.   No.  No, no, no.  That person would have

5    been at an elevated -- more elevated risk.  It would

6    be a higher risk than the seven percent risk,

7    obviously.

8        Q.   Or 13, according to this, for DLBCL, right?

9        A.   Yes.

10       Q.   Okay.  Excess weight is something that a

11   person carries with him or her every single day, day

12   in and day out, 365 days a year, so long as they are

13   overweight or obese, right?

14           MS. FREDONA:  Objection.

15       A.   I'm not sure I understand the question.

16       Q.   Sure.  It's -- you don't -- weight doesn't

17   have half-life, does it, excess weight?  You either

18   are overweight or obese, or you're not, right?

19           MS. FREDONA:  Objection; form.

20       Q.   It's an ongoing continuous exposure so long

21   as the person is obese, correct?

22           MS. FREDONA:  Objection.

23       A.   It is; however, I made an assessment of

24   Mr. Cervantes, of what he weighed over time.  If I

25   recall, I even talked with him about his high school

1    weight and what sports he played, and he explained

2    what his weight was over time, and he reached the

3    BMI of 30 not too long before the NHL, but most of

4    his life he was -- the vast portion of his life

5    before the NHL he was under a BMI of 30.

6          So I think it's -- I think if we're kind of

7    pushing the study here a little to try to show that

8    this is a substantial contributing factor.  I think

9    that based on the statistics in the study, if at

10   all, it's a very -- if there even was an increased

11   risk from his weight, it's very small, in the seven

12   to 14 percent range at the highest.

13   Q.   Doctor, are you able to cite for me any

14   study in the peer-reviewed medical or scientific

15   literature about the duration or requiring a certain

16   length of time for obesity to become a risk factor

17   for a patient for non-Hodgkin lymphoma?

18   A.   No.

19   Q.   Is there any scientifically validated test

20   or method or procedure that you can identify that

21   allows you to assess the degree to which any

22   particular risk factor contributed to a given

23   person's non-Hodgkin lymphoma?

24        MS. FREDONA:  Objection; form.

25   A.   Yes, and I have applied the methodology of

```
 1    risk ratios and odd ratios in this case based upon
 2    the peer-reviewed generally accepted studies that
 3    I've referenced in my report, which I've used for
 4    dose comparisons, and I even included this in the
 5    obesity BMI meta-analysis for that purpose, to
 6    determine comparatively the risk level of his
 7    borderline obesity in his later years of his life to
 8    that of the glyphosate, and the glyphosate in this
 9    case increased his risk of NHL by more than twofold.
10    Whereas, the borderline obesity was a much, much
11    lower risk ratio comparatively.  The elephant in the
12    living room is the NH -- is the glyphosate, not the
13    borderline obesity.
14        Q.   So, Doctor, is there anything else to the
15    methodology, any other factor that goes into this
16    methodology other than comparing the relative sizes
17    or risks from various epidemiologic studies in order
18    for you to determine whether or not any given factor
19    was a substantial contributing factor to a patient's
20    NHL?
21        A.   Well, toxicologists rely primarily on risk
22    ratios and odd ratios in any of the tests, even in a
23    bioassay.  This is a standard practice, a generally
24    accepted practice.  I'm not sure what other avenues
25    you're referring to.  There really -- from
```

```
 1    mathematical standpoints, this is what we use.

 2        Q.   So what's the threshold whether a factor, in

 3    your opinion, is considered just a contributing

 4    factor versus a substantial contributing factor?  Is

 5    there such a threshold?

 6        A.   Yes.  If the risk of the agent, in this case

 7    Roundup, glyphosate, is greater than the other

 8    background factors, certainly that would be a

 9    substantial contributing factor as opposed to a

10    minor contributing factor.

11        Q.   So is there anything else other than the

12    relative size of the risk or any -- sorry.  That's a

13    terrible question.

14             Is there any other factor you take into

15    account other than size of the risk in determining

16    whether something is or is not a substantial

17    contributing factor to a patient's NHL?

18             MS. FREDONA:  Objection; form.

19        A.   I don't understand the question.

20        Q.   Sure.  You just told me that what you took

21    into account was the size of the relative risk of

22    the odds ratio and you gave me an example of

23    glyphosate.  I think that you compared that to

24    others, and for instance, in this case you said the

25    glyphosate odds ratio relative risk was 2, and then
```

1    that was larger than the risk for, say, obesity,

2    right?

3        A.   By a wide a margin.

4        Q.   Right.  So what I want to know is is there

5    any other factor that you take into account in

6    deciding whether a given factor is a substantial

7    contributing factor other than the comparative size

8    of the relative risks?

9            MS. FREDONA:  Same objection.

10       A.   Well, duration of exposure is important but

11   that would be a factor that would ultimately result

12   in the measurement of the odds ratio or risk ratio.

13       Q.   All right.  Let's turn to page 8 of your

14   report, Doctor.  You talked about Mr. Cervantes

15   being a certified pipeline welder.  Tell me, did he

16   give you any details about what his training

17   involved for him to become a welder?

18       A.   I'm moving some files.  I have too many

19   files open.

20           Okay.  I interviewed him and asked quite a

21   few questions regarding his occupational history.

22       Q.   Okay.  My specific question is did you ask

23   him any questions or did he provide you any

24   additional details about what training he undertook

25   to become a welder?

William Sawyer, Ph.D.

```
 1      A.   No.  I didn't ask him about the training,
 2   no.
 3      Q.   Do you know how long his training took to
 4   become a welder?
 5      A.   No.
 6      Q.   Do you know what types of welding he was
 7   trained on?
 8      A.   Yes, that I did specifically discuss with
 9   him.  I asked him a series of questions.  The only
10   thing he welded was steel pipage, and I asked him
11   specifically if ever brazed, if he ever soldered, if
12   he ever cut with a torch into a freon line running
13   air conditioning systems.  I also talked to him
14   about what type of welding rod he used.  He made it
15   very clear the only thing he ever welded was steel
16   and that the pipage that they used was steel pipage.
17      Q.   Okay.  I'm asking more specifically about
18   during his training.  Do you know if he received any
19   training on any other type of welding other than oxy
20   acetylene welding?
21      A.   I don't know.
22      Q.   But you don't know if he was ever trained on
23   TIG welding, do you?
24      A.   No.
25      Q.   You don't know if he was ever trained on MIG
```

 1    welding, do you?

 2        A.   No, but I know he didn't perform those

 3    duties, so I think it's irrelevant.

 4        Q.   Right.  My question, Doctor, is you don't

 5    really know how long or how much or what type of

 6    additional training he underwent to become a welder

 7    in the first place, do you?

 8        A.   No, but more importantly, I know that he

 9    only welded steel occupationally, and if he had a

10    couple of weeks' training on another type of

11    welding, I don't find that relevant.

12        Q.   You're assuming it was a couple weeks,

13    right?  You don't really know how long his training

14    was, do you?

15            MS. FREDONA:  Objection.

16        A.   I know he was trained to weld to work on

17    steel pipage.  That's -- he made it clear to me

18    that's all the gas company used.  I questioned him

19    on copper and different materials and different

20    fluids inside pipes and gases.  The only thing he

21    worked on was steel pipage for the company.

22        Q.   Let me be very clear.  Did you ask him

23    anything about the training he underwent to become a

24    welder?

25        A.   No, I did not ask him about training, but I

```
 1    asked him what he welded, and I think you're trying

 2    to blow up a nonrelevant area.

 3        Q.   Well, that's interesting because my son is

 4    training to be a welder, so I'm trying to figure out

 5    if Mr. Cervantes underwent the kind of extensive

 6    training my son is undergoing.  So if you don't

 7    know, that's fine.

 8             Let me ask you this.

 9             MS. FREDONA:  Objection; argumentative.

10        Q.   Do you know what certification involved for

11    him to become certified as a pipeline welder?

12        A.   What was the first two words?

13        Q.   Do you know anything about what the

14    certification involved for him to become a certified

15    pipeline welder?

16        A.   No, I didn't ask him about that.

17        Q.   Do you know if he had to show proficiency in

18    other types of welding other than welding steel pipe

19    in order to become a certified pipeline welder?

20        A.   No.

21        Q.   Do you know if he had to undergo any

22    recertification for his job as a certified pipeline

23    welder?

24        A.   No.

25        Q.   You didn't ask him that, right?
```

```
 1              MS. FREDONA:  Objection; asked and answered.

 2       Q.   You can answer, Doctor.

 3       A.   No.

 4       Q.   Do you know the total amount of time that

 5  Mr. Cervantes spent welding during his adult

 6  lifetime?

 7       A.   No.

 8       Q.   Do you know how much time in total

 9  Mr. Cervantes spent around others who were doing

10  welding in his proximity during his adult lifetime?

11       A.   No.  All I know is he welded steel and it is

12  irrelevant to causing NHL.

13       Q.   You mentioned a moment ago that

14  Mr. Cervantes told you something about the welding

15  rods that he used.  What did he tell you about that?

16       A.   All I recall is he said it was for welding

17  steel.

18       Q.   That he used rods to help draw a bead to

19  weld steel together?

20       A.   I believe so.

21       Q.   Do you know what type of rods those were?

22       A.   No.

23       Q.   Do you know what the constituents of those

24  rods were?

25       A.   No.
```

1    Q.   Do you know what byproducts welding of those

2    rods might give off, either gaseous or particulate?

3    A.   No, I do not.

4    Q.   When he was using the oxygen acetylene gas

5    welding, do you know what mixture of gases he used?

6    And I'm talking about proportions of the gases he

7    used.

8         MS. FREDONA:  Objection; foundation.

9    A.   I don't understand the question.  Are you

10   asking me is it -- if he had a -- some means of

11   measuring the oxy to acetylene ratio while using the

12   torch?

13   Q.   Very good.  That's exactly what I'm asking.

14   A.   I didn't ask him that, no.

15   Q.   Doctor, I'm sorry, there's a banging going

16   on in the background.  I'm not sure where it's from.

17   It's a little bit distracting.  Is that on your end,

18   Dr. Sawyer?  Do you know where it's coming from?

19   A.   I know exactly what it is.

20   Q.   Is that the dogs?

21   A.   Oh, no.  They're sleeping.  It's coming

22   from -- it's coming from my roof.

23   Q.   I was going to say, you and I have had a

24   history of being in rooms where construction is

25   going on nearby.  I don't know if it's you or me or

```
 1    just bad karma.
 2        A.   Well, in Florida, in hurricane zone coast,
 3    the insurance companies recently -- the laws
 4    changed, that if your roof is more than 20 years old
 5    and asphalt, your insurance is canceled, terminated.
 6    So I've been trying to get the roofer here for about
 7    three months to install a new aluminum roof, and
 8    wouldn't you know they showed up during our
 9    deposition.  Well, during the deposition this
10    morning they showed up.  It's just terrible timing.
11        Q.   Darn the luck.  Well, I can get through.
12    It's just a little distracting.  If we have to use
13    this for the record at any point, we might want to
14    explain that to whoever is watching, but --
15        A.   I think it will --
16        Q.   -- other than you or me, we might be able to
17    shut it off, but that's okay.  We'll soldier on.
18        A.   I think it will diminish soon.  I think the
19    section of roof right over my office is complete.
20    It kind of sounds like they're moving on, so
21    hopefully it will get better.
22        Q.   All right.  No problem at all.  Like I said,
23    I was just asking to see if we could eliminate it,
24    but maybe it will take care of itself.
25        A.   At least they're not welding up there.
```

```
 1      Q.   They're not welding up there.  That might
 2   have been quieter.
 3           So, Doctor, let me mark as -- a new exhibit
 4   to your deposition.  This is going to show up in the
 5   record as Exhibit 4.  It will actually be, I think,
 6   Exhibit 7.
 7           MR. PAINE:   Is that correct, Ms. Court
 8      Reporter?
 9           THE COURT REPORTER:  (Indicating.)
10           MR. PAINE:  7, okay.  We got the hand signal
11      for 7.
12      Q.   Doctor, I'm marking it as what will be
13   Exhibit 7 to your December, the IARC Monograph
14   Number 118?
15           (Sawyer Exhibit 7 was marked for
16   identification.)
17   BY MR. PAINE:
18      Q.   And this may take a little bit of time to
19   load just because it's rather large, so I'm going to
20   share my screen with you and we can look at this
21   together.
22           Doctor, are you familiar with this monograph
23   from IARC on welding?
24           MS. FREDONA:  Object to the exhibit and
25      foundation.
```

1    Q.   Go ahead, Doctor.  You can answer that.

2    A.   I need to flip the page down and look at the

3    date.

4    Q.   Sure.  Here, I'll scroll through it.  It

5    should be in your exhibit folder any second now, but

6    I'll scroll and stop on anything you want, but it

7    looks like here it says L?on, France, 2018.

8    A.   That -- I reviewed a summary document which

9    included the molybdenum trioxide and indium tin

10   oxide, but I don't remember seeing a full monograph.

11   I know there was a summary document that I reviewed

12   recently but this is not it.  How many pages is

13   this?

14   Q.   It's pretty big.

15   A.   Yeah, that's what I gather.

16   Q.   As you know from prior experience with IARC

17   documents, they tend to be rather lengthy.  It looks

18   like it's about 320 pages.

19   A.   Yeah.  So the answer is no.

20   Q.   Okay.  So you have not reviewed this in

21   detail at any prior point in time, correct?

22   A.   Right.

23   Q.   Okay.  Let's just cut to the chase.  I'm

24   going to skip down here to their summary, which is

25   on page 33, General Remarks.  Right here, do you see

1   what I've highlighted in that first paragraph under

2   General Remarks on page 33?

3       A.   Yes.

4       Q.   Welding fumes were classified as

5   carcinogenic to humans, Group 1, by the Working

6   Group, an upgrade from the earlier classification of

7   fumes as possibly carcinogenic to humans, Group 2B,

8   in 1989, (IARC, 1990).

9            Did I read that correctly?

10      A.   Yes.

11      Q.   So IARC classifies welding fumes as class 1

12  known human carcinogens according to this monograph,

13  correct?

14      A.   Yes.

15      Q.   Do you have any reason to disagree with IARC

16  that welding fumes are carcinogenic to humans?

17      A.   No.  It depends what's being welding, but

18  no.

19      Q.   And as opposed to glyphosate, which is a

20  class 2 probable human carcinogen, according to

21  IARC, this is a higher, more definitive

22  classification for welding fumes, correct?

23           MS. FREDONA:  Objection; argumentative,

24      form.

25      Q.   You can answer, Doctor.

1      A.   Yes.

2      Q.   Did you do any calculation of Mr. Cervantes'

3    exposure to welding fumes when you prepared your

4    opinions in this case?

5      A.   Only that I assessed what he was welding and

6    he was welding nothing that emitted carcinogenic

7    fumes.

8      Q.   I'm sorry.  That broke up a little bit.  I

9    had trouble hearing the -- sort of the last couple

10   sentences there.

11     A.   He was welding steel and no other

12   substances, and welding steel does not release

13   carcinogenic material.

14     Q.   What's your basis for that, please?  Can you

15   point me to any published article, peer-reviewed

16   information, data or otherwise?

17          MS. FREDONA:  Objection.

18     Q.   You can answer, Doctor.

19     A.   The studies I'm familiar with, which have

20   documented primarily pulmonary malignancies with

21   welding, or those few studies that have shown NHL

22   with welding, are specific to the substance being

23   welded and certain releases of particulate matter

24   and/or certain heavy metals or organic substances,

25   such as fluorinated and chlorinated hydrocarbons and

1    dioxins that form in the pyrolysis of the materials

2    inside the pipes.

3        Q.   Would you agree that over Mr. Cervantes'

4    career as a welder and as a supervisor of welders,

5    he was likely exposed to a substantial amount of

6    welding fumes?

7            MS. FREDONA:  Objection; form.

8        Q.   You can answer, Doctor.

9        A.   Yes.  However, again, he was welding steel

10   only, not substances or materials inside pipage that

11   can cause NHL.

12           (Sawyer Exhibit 8 was marked for

13   identification.)

14   BY MR. PAINE:

15       Q.   Doctor, I'm going to mark as Exhibit 8 to

16   your deposition -- this will show up as Exhibit 5

17   but just chronologically or in numerical order we're

18   marking this to be Exhibit Number 8.  It should show

19   up in your folder any moment, but I'm going to share

20   my screen to get us moving here.

21           Doctor, what I've marked as Exhibit 8 to

22   your deposition is an article entitled Occupation

23   and Risk of Non-Hodgkin's Lymphoma and Chronic

24   Lymphocytic Leukemia published in the Journal of

25   Occupational and Environmental Medicine in May of

1    2002 by Dr. Zheng and colleagues.  Do you see that

2    on my screen now?

3        A.   I do.

4        Q.   All right.  And I'm just going to ask you a

5    few questions about the abstract here.  Do you see

6    that this was a study that was designed and

7    investigated the association between non-Hodgkin

8    lymphoma and various occupational exposures?

9        A.   Yes.

10       Q.   All right.  And if you look down here, do

11   you see the results that I'm about to highlight:

12   The results of this study found that welders and

13   solderers had an odds ratio of 2.9 that was

14   statistically significant.

15       A.   Correct.

16       Q.   All right.  Do you have any reason to

17   disagree with that, what the authors found here?

18       A.   No; however, it's not specific to the

19   welding that Mr. Cervantes performed.  What you're

20   doing would be the same as if I took a general study

21   that showed that agricultural workers have an

22   increased rate of NHL; therefore, it's the

23   glyphosate.

24            You know, there are specific studies that

25   show what type of fumes and chemicals induce NHL or

William Sawyer, Ph.D.

1    upper respiratory malignancies or small cell lung

2    cancer and so forth, and this study is a very

3    general study.  It doesn't mean that Mr. Cervantes

4    fits into that study because that study includes all

5    types of welding and cutting of different materials,

6    and Mr. Cervantes was not involved with the welding

7    of any carcinogens or products with -- inside the

8    pipage.

9       Q.   Have you reviewed this study before?

10      A.   No, but obviously it's not a specific

11   investigation of different types of welding.  It's

12   simply a grouping of IC -- of codes and Dr. Blair

13   has performed a lot of work in the past using the

14   methodology of work -- occupational coding which

15   does not discriminate what chemicals or carcinogens

16   were specifically released.  This is not a study

17   where someone went out in the field and -- with air

18   monitors and did testing to determine what was

19   exposed.

20      Q.   Let's look and see what else this study

21   says.  I'm going to go down here to Table 2.  Do you

22   see that this says:  Risk of NHL and CLL by

23   histologic subtype for select industries and

24   occupations among men in Kansas and Nebraska?

25      A.   Right, and this is exactly what I just said.

1    This is by industry CIC code.  That is a code for

2    different types of work.  It doesn't have any

3    information specifically as to -- I mean, we could

4    look up agricultural production crops or we could

5    look up pesticide applicators as a code.  It doesn't

6    tell us specifically what pesticide was used.

7        Q.   So, Doctor, when Mr. Cervantes worked as a

8    welder for -- (garbled audio) -- would he have fit

9    into one of the SIC or SOC codes that were described

10   and studied in this paper by Dr. Zheng and

11   colleagues?

12       A.   I'm not sure I understand the question.

13       Q.   Sure.  You told me, you know, this doesn't

14   account for the specific types of welding and that

15   these were classified only by looking at SIC and SOC

16   codes, right?

17       A.   Yes.

18       Q.   Okay.  So my question to you is during the

19   times that Mr. Cervantes worked as a welder, would

20   he have fit one of the SIC or SOC codes that were

21   used in this study?

22       A.   He would; however, this is a general code

23   classification of all different types of welding and

24   soldering.

25       Q.   Doctor, let's look at what they say about

```
 1    welders and solderers.  Do you see here -- I'm
 2    trying to highlight just this bottom line of Table
 3    2, are his welders and solderers, and under diffuse
 4    NHL it has an odds ratio of 3.14 that's
 5    statistically significant, correct?
 6       A.   Yes.
 7       Q.   And Mr. Cervantes had a form of diffuse
 8    non-Hodgkin lymphoma, correct?
 9       A.   Yes.
10       Q.   But you would still argue that this data
11    doesn't apply to him, I take it?
12       A.   That's not what I said.  That's --
13       Q.   Okay.
14       A.   I said that this data does not specify what
15    type of welding and chemicals cause the disease.  It
16    just shows that as a group, which includes some very
17    hazardous types of emissions from welding certain
18    materials and certain metals and certain processes,
19    results in NHL.
20            I mean, this is -- it's exactly -- what
21    you're doing would be -- again, it would be me like
22    looking at this study and looking at the SOC code
23    for a pesticide applicator and then using that by
24    itself and claiming and purporting that it caused
25    Mr. Cervantes' cancer.  That's not how it works.
```

```
 1    You have to have specific studies that determine
 2    what chemical and at what dose and follow the
 3    Bradford Hill criteria with coherence of the
 4    studies, consistency of the studies, and a
 5    dose-response relationship, and animal control
 6    studies, to show causation.
 7            This does not do all of that.  This simply
 8    shows that if you take all of the welders and
 9    solderers there are and you group them all together,
10    there is definitely a risk of NHL, but it doesn't
11    speciate what type of welding or what chemicals are
12    involved.
13       Q.   So, Doctor, let me ask you this.  Do you
14    consider yourself a fair, impartial and unbiased
15    investigator when you approach a case and are asked
16    to offer opinions like in Mr. Cervantes' case?
17       A.   Yes.
18       Q.   And do you agree that a fair and impartial
19    investigator would consider all possible exposures
20    that could have caused or contributed to a person's
21    cancer --
22       A.   Yes.
23       Q.   -- like Mr. Cervantes?
24            Do you agree that failure to consider
25    exposures to other known carcinogens would be a
```

```
 1    deviation of the impartial toxicologist's duty to

 2    consider all of the evidence fairly?

 3         MS. FREDONA:  Objection.

 4    A.   I'm not sure what you mean.

 5    Q.   Sure.  Is it consistent with the duties of

 6    an impartial investigator to fail to consider

 7    exposure to all known carcinogens that a patient may

 8    have encountered?

 9         MS. FREDONA:  Objection; form.

10    A.   Yes; however, the study you're showing me is

11    being used in an improper way.

12    Q.   Well, you told me that you hadn't reviewed

13    this study before I showed it to you, right?

14    A.   This is a --

15    Q.   Sorry.  It's yes or no.  You hadn't reviewed

16    this study before I showed it to you, right?

17    A.   Not this particular study, but certainly I

18    have reviewed many studies on different types of

19    welding, and this particular study does not even

20    remotely resemble specifically any one type of

21    welding and materials and/or contents of pipes that

22    form pyrolysis products that are dangerous and cause

23    cancer.

24    Q.   You hadn't reviewed the IARC Monograph 118

25    on welding before I showed it to you, correct?
```

1      A.    That's correct.

2      Q.    And is there any study on welding or welding

3   exposures that you've cited on your Materials

4   Considered List for this case?

5      A.    No.

6      Q.    Doctor, do you agree that failure to

7   consider exposure to other known carcinogens would

8   mean that the toxicology expert failed to adhere to

9   a reliable methodology?

10         MS. FREDONA:  Objection; form,

11      argumentative.

12      A.    If intentional, yes.  As you can see in my

13   Table Number 8, I think it was, I had listed welding

14   and soldering on my list to investigate, and I have

15   investigated that and questioned Mr. Cervantes

16   specifically with what he was welding and what was

17   in the pipes to assess whether any carcinogenic

18   products from pyrolysis were formed, and as to

19   whether he used differential materials that are

20   known to release carcinogenic fumes, and he did not.

21      Q.    Dr. Sawyer, are you going to tell the jury

22   that you ruled out exposure to welding fumes as a

23   cause of Mr. Cervantes' non-Hodgkin lymphoma?

24         I'm sorry.  Dr. Sawyer?

25      A.    I think that the --

1    Q.   Sorry.  I think your microphone was off.

2  I'm not sure if you started your answer.  It sounded

3  like you picked up in the middle of a word, so let

4  me reask my question and then if you could, tell me

5  your answer.

6       Are you going to tell the jury that you can

7  rule out exposure to welding fumes as a cause of

8  Mr. Cervantes' non-Hodgkin lymphoma?

9    A.   The question is not right.  I can rule out

10  his welding fumes but not welding fumes in general.

11  There are welding fumes that are highly

12  carcinogenic, but he wasn't exposed to any

13  carcinogenic welding fumes in the process he used.

14    Q.   That's based on what you know about his

15  occupational exposures, right?

16    A.   Yes.

17    Q.   Are you going to tell the jury that you

18  excluded benzene as causing or contributing to

19  Mr. Cervantes' non-Hodgkin lymphoma?

20    A.   I have.  I questioned him thoroughly on the

21  material he used and it is a material that does not

22  contain benzene.

23    Q.   So is there any question in your mind about

24  whether or not Mr. Cervantes was exposed to benzene

25  in his occupation?

1    A.   Based on the research I've performed, he was

2    not.

3    Q.   So you intend to tell the jury that

4    Mr. Cervantes was not, in fact, occupationally

5    exposed to benzene, is that -- do I have that right?

6         MS. FREDONA:   Objection.

7    A.   Well, I should add to that at part per

8    million-years -- that's hyphenated, PPM-years --

9    associated with leukemia.  He definitely was not

10   exposed to 20 part per million-years in his work as

11   -- if any benzene was released, it would have been

12   hundreds or thousands of times lower than 20 part

13   per million-years.

14   Q.   And how do you reach that conclusion?

15   A.   Based on air levels measured in microgram

16   per cubic meter as opposed to PPM from impurities in

17   benzene -- impurity of products containing benzene.

18   Since the Benzene Reformulation Act, products such

19   as paint, paint thinners, and other

20   hydrocarbon-based products generally have benzene

21   contaminant levels less than .1 percent.

22   Q.   So when was the Benzene Reform Act you've

23   just mentioned enacted?

24   A.   I think it was around 1980, approximately.

25   Q.   And do you know when it was fully

1    implemented for all products?

2        A.   I'm not sure.

3        Q.   I'm sorry.  Did you say "not sure"?

4        A.   Not sure.

5        Q.   Do you have any actual air quality

6    measurements, any air measurements whatsoever of any

7    of the air around any of the work sites where

8    Mr. Cervantes did his job as far as benzene goes?

9    Sorry, terrible question.

10            Do you have any actual air measurements for

11   content of benzene for any of the work sites where

12   Mr. Cervantes worked?

13       A.   No.

14       Q.   You've seen Mr. Cervantes' medical records

15   and understand that there are numerous mentions of

16   benzene exposure in his medical records, right?

17       A.   Yes.

18            MS. FREDONA:  Objection; form.

19       Q.   So are you saying all of those medical

20   records are wrong?

21            MS. FREDONA:  Same objection.

22       A.   They are not related to any specific item to

23   be evaluated.

24       Q.   Do you know where the information about

25   benzene exposure in his medical records came from?

```
 1      A.   I would believe -- I have to believe from
 2   the patient; however, I think at some point I read
 3   that Mr. Cervantes denied making those statements.
 4   I believe that was in his deposition.
 5      Q.   And so what specifically did Mr. Cervantes
 6   tell you about whether or not he had been exposed to
 7   benzene?
 8      A.   Let me check the report.
 9      Q.   I think what you're looking for may be on
10   page 18, if that helps, 18 or 19.
11           Sorry, Dr. Sawyer, you're on mute.  I'm not
12   sure if you've got an answer for me or you're still
13   looking.
14      A.   Still looking.
15           Yes, what he stated was that it was the
16   assumption that benzene arose from the use of
17   cold-tar, c-o-l-d-tar, coating.
18      Q.   Did you ask him why he made the assumption
19   that he now tells you is incorrect, that the
20   cold-tar contained benzene?
21      A.   No, he -- I don't recall any answer on that.
22      Q.   In your opinion, Doctor, does benzene cause
23   non-Hodgkin lymphoma?
24      A.   There are studies that make that association
25   at a statistically significant level; however, what
```

1    is generally accepted is that benzene causes acute

2    myeloid leukemia, known as AML.

3        Q.   That's a different question than what I

4    asked.

5             Doctor, in your opinion, does benzene cause

6    non-Hodgkin lymphoma?

7        A.   I would have to review the current human

8    epidemiological studies to be certain of that.  My

9    opinion is going to be based upon the weight of

10   evidence of the study evidence, not an off-the-cuff

11   opinion, and certainly AML is strongly associated

12   with benzene exposures exceeding approximately 20

13   part per million-years.

14       Q.   And so as we sit here today, you don't have

15   a firm opinion on whether or not benzene exposure

16   causes non-Hodgkin lymphoma, am I understanding that

17   correctly?

18       A.   I would assess it the same way I assessed

19   glyphosate in this matter.  I would review carefully

20   the available studies and then decide.  If I were to

21   do that and found that there was sufficient evidence

22   of studies in linking NHL with benzene, I would be

23   at odds with what's generally accepted by a number

24   of agencies.  So I would -- I would want to look

25   very carefully.

1    Q.   So as we sit here today, you don't have an

2    opinion to a reasonable degree of scientific

3    certainty whether or not benzene causes non-Hodgkin

4    lymphoma, correct?

5    A.   As I said, there are -- there are some human

6    studies that make that association but I would want

7    to further review the literature before making that

8    determination.

9    Q.   Okay.  So again, my simple question is as we

10   sit here today, you have not formed an opinion to a

11   reasonable degree of scientific certainty that

12   William Sawyer thinks benzene exposure does or does

13   not cause non-Hodgkin lymphoma, correct?

14        MS. FREDONA:  Objection; asked and answered.

15   A.   Again, I would follow the scientific

16   methodology as I have in this case regarding

17   glyphosate and then make that decision.

18   Q.   Okay.

19   A.   I'm not comfortable just making an

20   off-the-cuff decision.

21   Q.   Okay.  But we've got a case here in front of

22   us, Mr. Cervantes, whose medical records talk about

23   benzene exposure, right?

24   A.   Yes; however, there is no evidence of

25   benzene exposure.  There's no quantitative evidence

1    either, and even if there was quantitative evidence,

2    it would require being at the OSHA limit of one PPM

3    for 40 consecutive years, and he only worked with

4    benzene -- or benzene -- with welding with that

5    cold-tar about three times a week.  It's in an

6    outdoor environment.  Reaching a 1 PPM air level of

7    benzene for 40 consecutive years, 40 hours per week,

8    is not reasonable from a person who works outside

9    only three times a week welding, especially when

10   benzene is not a significant emission from welding.

11            There are no studies that show welding fumes

12   with benzene exceeding the OSHA limit, unless there

13   is another agent involved that converts to benzene.

14   Q.   I wasn't asking about welding fumes.  You

15   don't have any PPM levels or any benzene exposure

16   for Mr. Cervantes at all, do you?

17   A.   No, and neither do you.  There aren't any.

18   Q.   I didn't say I did, but I'm not the one

19   offering opinions.

20            So my question is simply what data do you

21   have, if any, about the actual levels of benzene

22   exposure in or around where Mr. Cervantes worked?

23            MS. FREDONA:  Objection.

24   A.   I do in the sense that if I speculate and I

25   assume that he was exposed at the OSHA limit of one

1   part per million, he would have to be exposed at

2   that level 40 hours a week for 40 years to sustain a

3   level consistent with benzene-related hematopoietic

4   malignancy.

5       Q.   So you're relying on a reference dose from

6   OSHA to determine whether or not he had sufficient

7   exposure to benzene?

8           MS. FREDONA:  Objection.

9       A.   No.  I said if I speculated and assume he

10  was exposed at the OSHA standard, which is not

11  feasible in an outdoor environment working only

12  three -- doing it three times a week, when the human

13  epidemiologic studies clearly show that the 20 to 40

14  PPM years are required to induce a benzene

15  hematopoietic malignancy.

16          Now, how could a person who is working only

17  three days a week outdoors for a short period of

18  time -- not 40 years, but far less than 40 years --

19  could reach that level?  It's just not feasible.

20      Q.   Well, that wasn't my question, Doctor, with

21  all respect.  My question is whether you would look

22  to, as you've just told me, the OSHA reference dose

23  to determine whether someone's exposure was or was

24  not related to their cancer for benzene, right?

25      A.   No, I would not use the OSHA occupational

1    standard for causation purposes.  What I said was

2    I'm very familiar with the benzene studies that have

3    shown hematopoietic malignancies and they require 20

4    to 40 PMM-years of exposure, and it's just

5    unreasonable to imagine how somebody could be

6    exposed to that level in an outdoor environment only

7    working occasionally three times a week welding.

8        Q.   But again, your reference was to an OSHA

9    reference dose, right, as part of your answer, or

10   did I imagine it?

11           MS. FREDONA:  Objection.

12       Q.   We'll move on.

13           Doctor, the body metabolizes benzene, right?

14       A.   Yes.

15       Q.   And benzene metabolites are themselves

16   carcinogenic, right?

17       A.   Yes.  The theory -- and again, even with

18   benzene, the mechanism is still not absolutely

19   confirmed, but there is an intermediate metabolite

20   which has oxidative properties and mutagenic

21   properties that is thought to cause the

22   hematopoietic malignancies.

23       Q.   Doctor, you cited one article in your report

24   by Khalade, K-h-a-l-a-d-e, with respect to

25   occupational exposure to benzene and hematopoietic

```
 1    cancers, right?
 2        A.   Yes.  I'm going to open the study.  Okay.
 3        Q.   Okay.  And I'll mark that as well.  This
 4    should show up as Exhibit Number 9.  It's going to
 5    be marked as 6 but, again, we're going to change
 6    that to correct the numbers.
 7             (Sawyer Exhibit 9 was marked for
 8    identification.)
 9    BY MR. PAINE:
10        Q.   And I'm going to put this up on my screen
11    so everybody can see it.
12             Is this the Khalade study that you cited in
13    your report, Doctor?
14        A.   Yes, and in the results you will see where I
15    used the 40 PPM-years as the lower dose that is
16    statistically and significantly associated with AML.
17    That's the type of -- a type of hematopoietic
18    malignancy.
19        Q.   Okay.  And, Doctor, this article is entitled
20    "Exposure to benzene at work and the risk of
21    leukemia:  a systematic review of meta-analysis."
22    Right?
23        A.   Yes.  Yes.  This is a very wide ranging
24    meta-analysis that includes a lot of data.
25        Q.   Okay.  But it's primarily concerned with
```

1  leukemia, right?

2     A.   Yes.  As I said, leukemia is the malignancy

3  that has been generally accepted as being causally

4  linked to benzene.

5     Q.   Okay.  This article does not discuss

6  non-Hodgkin lymphoma, specifically DLBCL, does it?

7     A.   No.

8     Q.   And Mr. Cervantes did not have leukemia, did

9  he?

10    A.   Correct.

11    Q.   And in your report this was the only article

12  that you cited about benzene exposure and leukemia

13  or lymphoma, correct?

14    A.   Yes.  This study is the appropriate study as

15  AML is the most sensitive malignancy in the

16  literature that shows up in the highest frequency

17  with the greatest sensitivity to benzene.

18    Q.   Did you search for or cite any studies in

19  the peer-reviewed published medical or scientific

20  literature on benzene exposure and a possible

21  increased risk of NHL specifically?

22    A.   I have in great detail in the past but not

23  recently.

24    Q.   Did you site any of those articles in your

25  reference list in this case?

```
 1      A.   No, since it's not conceivable that Mr. --
 2   could have -- it's not possible to reach a 40 PPM
 3   exposure limit, a 40 PPM-year dosage, I should say,
 4   in the case of Mr. Cervantes simply because he's
 5   working only three times a week for a short period
 6   of time in an outdoor environment welding, and there
 7   are no studies that show welding of steel in an
 8   outdoor environment for that few hours a week could
 9   possibly result in a 40 PPM-years of benzene
10   exposure.  It's just not conceivable.
11           (Sawyer Exhibit 10 was marked for
12   identification.)
13   BY MR. PAINE:
14      Q.   Doctor, I'm going to mark as Exhibit 10 to
15   your deposition an article by Bassig that was
16   published in 2015.  This will be Exhibit 10 by my
17   reckoning.  It will show up for the moment as
18   Exhibit 7 in your folder, but again, I'm going to
19   share my screen with you so we can look upon this
20   together.
21           So, Doctor, are you able to see the article
22   that I've marked here as Exhibit 10?  This is
23   entitled "Occupational Exposure to Benzene and
24   Non-Hodgkin Lymphoma in a Population-Based Cohort:
25   The Shanghai Women's Health Study."
```

```
 1      A.   Yes.
 2      Q.   Okay.  And I take it you haven't seen this
 3   article before, correct?
 4      A.   No.
 5      Q.   All right.  Let's look just here at the
 6   Results section of this article.  I'm going to
 7   highlight just this section here.  The results were
 8   that:  Women ever exposed to benzene had a
 9   significantly higher risk of NHL, hazard ratio 1.87,
10   95 percent confidence interval, 1.19 to 2.96.
11           Did I read that correctly?
12      A.   Yes.
13      Q.   So these authors, these investigators, found
14   that any exposure, ever exposure, to benzene was
15   significantly associated with an increased risk of
16   NHL, correct?
17      A.   Yes.
18      Q.   Do you have any reason to disagree with this
19   article's conclusions?
20      A.   I would have to review the article to --
21           MS. FREDONA:  Let me object to the
22      introduction of the exhibit.  Go on.
23           MR. PAINE:  On what basis?
24           MS. FREDONA:  Well, number one, you're
25      showing our expert three paragraphs of it and he
```

1    hasn't gotten a chance to read it all.

2           MR. PAINE:  Okay.

3       Q.  Well, let's take a break.  If you want to

4    read it, Doctor, be my guest.

5       A.  I'll do that on the clock.  I'm not going to

6    take a break --

7       Q.  No, we're not going to go off -- we're not

8    going to go off the clock.  I've got limited time.

9       A.  Well, I'm certainly not going to take a

10   break while you take a break and I'm working.  I've

11   been going at it all day.  I --

12      Q.  Okay.  We'll keep going.  You haven't

13   reviewed this or any other similar article finding

14   an increased risk of NHL for people who have ever

15   been exposed to benzene, correct?

16          MS. FREDONA:  Objection; form.

17      A.  I don't understand the question.

18      Q.  Sure.  We'll move on.

19          Do you agree that an impartial investigator

20   would have, in fact, considered data like this study

21   as part of a thorough investigation before reaching

22   an opinion that benzene does not cause or does cause

23   non-Hodgkin lymphoma?

24          MS. FREDONA:  Objection; form.

25      A.  Well, certainly I did in that I assumed

1    hypothetically that NHL is caused by benzene, and I

2    assessed his benzene exposure in my report and

3    determined that it was just not possible under the

4    circumstances based upon the welding or the product

5    that he used outdoors only three times a week.

6        Q.   Let's take a look at -- you said that he

7    knocked tar coating off the pipes that he ultimately

8    welded, right?  Page 15 in your report.

9        A.   Page 15?  I don't see that on 15.

10        Q.   Sorry.  My mistake.  16, it's on 16, the

11    first paragraph:  The tar coating on the pipe had to

12    be knocked off.

13        So the question to you, Doctor, is how did

14    he knock that off and did it create any dust or

15    particulates when he did that?

16        MS. FREDONA:  Objection; form and

17        speculation.

18        A.   There is insufficient information to

19    speculate a significant exposure.

20        Q.   So you don't know?

21        A.   Well, tar coating is generally sticky and

22    doesn't form dust.

23        Q.   Do you know what the product was that he was

24    knocking off?

25        A.   Yes.  He called it cold-tar hot wrap, which

```
 1    I researched, c-o-l-d -tar hot wrap.
 2        Q.   So let me ask you this, Doctor.  You said he
 3    was knocking off tar coating on the pipe, right?  So
 4    it was already in place when he got there, right?
 5        A.   Yes.
 6        Q.   So do you or Mr. Cervantes know what that
 7    product was that was originally applied that he
 8    knocked off?
 9        A.   He told me it was called cold-tar wrap or
10    cold-tar hot wrap.  He said that's -- that's what
11    they -- that's what the gas company used.
12        Q.   Okay.  You're assuming it's the same product
13    that he reapplied later on; is that correct?
14        A.   That's what he stated.
15        Q.   But you didn't ask him or ascertain whether
16    that knocking off of the existing coal tar from the
17    pipes created any dust or particulate matter,
18    correct?
19        A.   No.  I asked him how -- what he did and he
20    explained it to me.
21        Q.   What did he say other than "I knocked it
22    off"?
23        A.   That he removed it before welding the pipe.
24        Q.   So how did he knock it off?
25        A.   I don't recall.
```

1    Q.   So you don't know if he sanded it off, if he

2    knocked it off with a hammer, if he used a wire

3    brush or anything like that, do you?

4    A.   I don't recall if he -- I think he scraped

5    it but I'm not sure.

6    Q.   And again, you don't have any quantitation

7    of how much of that knocked off tar coating created

8    in terms of particulate matter or dust or anything

9    like that, right?

10   A.   No quantitative; however, the material that

11   he used is not a carcinogenic material, and it was

12   nonfriable, meaning it was a material that did not

13   produce significant dust.

14   Q.   Okay.  So are you talking about what you've

15   identified in Footnote 36 on page 19 of your report

16   as Perma-Patch Black Cold Patch?

17   A.   That's one of them, yes.

18   Q.   Okay.  What were the others?

19   A.   The same product, different manufacturer.

20   Q.   So how do you know if it's the same -- I

21   guess I don't understand.  You said "for example" in

22   your footnote.  What were the other products?  What

23   were their names?  Who were their manufacturers?

24   A.   A similar product containing similar

25   ingredient.

William Sawyer, Ph.D.

```
1      Q.   Which product?  Which manufacturer?

2      A.   I don't know.  I didn't -- I didn't include

3   it.

4      Q.   So do you have your files with anything else

5   you researched besides Perma-Patch Black Cold Patch?

6      A.   No, but they contain the same ingredients, a

7   mixture primarily of asphalt with a certain amount

8   of binder without any benzene.

9      Q.   And specifically what did you look up for

10  Perma-Patch Black Cold Patch?  Was it the safety

11  data sheet or some other source?

12     A.   I looked at the ingredients on the product.

13     Q.   And what was the source?

14     A.   I don't understand about the source.

15     Q.   You said you looked at the ingredients.  Did

16  you actually look at the product itself?

17     A.   No, I looked at the ingredients of the

18  product.

19     Q.   Where did you find them?

20     A.   Granger sells it.  Granger is a very large

21  commercial supplier of contractor products used in

22  construction.

23     Q.   Sure.  I'm familiar with Granger.  My

24  question to you is did you look at the safety data

25  sheet, the SDS, for this product?
```

1      A.   I believe so but there was nothing

2   hazardous, there was nothing listed on the SDS of

3   any value.  It was blank.

4      Q.   Did you look up the historical ingredients

5   for Perma-Patch Black Cold Patch back to the 1980s

6   or earlier, when Mr. Cervantes would have

7   encountered it?

8      A.   No.  I looked up the product that he told me

9   was used and used for many years by his company.

10     Q.   So he hasn't worked there since 2009, right?

11     A.   Right.

12     Q.   And you don't know what the ingredients in

13  that product were at or near the times that

14  Mr. Cervantes used it, you only know what's in the

15  ingredients currently listed on the Granger catalog,

16  right?

17          MS. FREDONA:  Objection.

18     A.   Or other similar products.  They all contain

19  the same ingredient.

20     Q.   What was your sources for the ingredients in

21  those products?  Was that the Granger catalog too?

22     A.   No.

23     Q.   What else did you look at?

24     A.   I searched using Google.

25     Q.   And did you search those products

1   historically or did you search more current

2   formulations for those products?

3       A.   Everything I could find.

4       Q.   I ask you again, sir, do you have any

5   documents, any records of these searches to share

6   with us, share with me, to show you -- show me what

7   you looked at?

8       A.   I included one in my footnote where I wrote

9   "for example," and I provided the source.

10      Q.   Right.  And my question is you didn't

11  preserve any of your records, any of your searches,

12  didn't print anything out about these other products

13  by other manufacturers that you're telling me were

14  similar to the current formulation for Perma-Patch

15  Black Cold Patch?

16      A.   No, because I could --

17           MS. FREDONA:  Objection.

18      A.   -- I could not find any with benzene or any

19  other carcinogenic materials other than silica.

20      Q.   How far back --

21      A.   Silica was listed; however, silica is --

22  there's no reasonable way to generate significant

23  silica inhalation, and even if it were inhaled,

24  silica causes lung cancer, not NHL.

25      Q.   I'm just asking you, Doctor, if you've got

1    any documents, search records, anything like that

2    that you can share with me to share what you looked

3    up for these other similar products?

4        A.   No, I didn't save any or print any of that

5    because it was all negative.  There was no

6    carcinogens present other than silica.

7        Q.   Doctor, what's a cold primer?

8        A.   A cold primer?

9        Q.   Yep.  That's the next sentence in your

10   report on page 16:  A cold primer was painted on the

11   pipe before the new fitting was welded.

12          What's a cold primer?

13          Sorry, Doctor, are you consulting something?

14       A.   No, I'm just reading, trying to recall.  I

15   don't recall.

16       Q.   What were the ingredients in this cold

17   primer Mr. Cervantes used?

18       A.   I don't recall.

19       Q.   Did you look it up?

20       A.   No.

21       Q.   Do you know what the product was called

22   beyond cold primer, the manufacturer's name or the

23   name of the product itself?

24       A.   No.

25       Q.   Did you do any investigation at all into

```
 1    this cold primer?

 2       A.   No.

 3       Q.   So you don't know if it was petroleum-based

 4    or latex-based or something else, right?

 5            MS. FREDONA:  Objection.

 6       A.   (Nodding head.)

 7       Q.   I'm sorry.  I didn't hear your answer,

 8    Doctor?

 9       A.   Correct.

10       Q.   Do you know if the cold primer gave off any

11    fumes, any solvent odors, anything like that?

12       A.   No.

13       Q.   Did it contain solvents?

14       A.   I don't -- again, I don't know what the

15    product cold --

16       Q.   I take it you don't have any air

17    measurements or levels of particulate matter, fumes

18    or volatiles coming off this cold primer in the

19    proximity of Mr. Cervantes when he was applying this

20    or when he was around this applying, right, being

21    applied?

22       A.   No, but I do know that products sold during

23    his era of working, which was, I think, about 1983

24    to '87, which was the era of time, those four years

25    or so, he was welding, I don't believe there were
```

```
 1    products on the market that were loaded with

 2    benzene.  If it's a trace level, no amounts of

 3    benzene were in products, no different than painting

 4    with an oil-based paint or using turpentine or

 5    lacquer thinner, there is trace quantities of

 6    benzene present.

 7            So it's highly unlikely that this cold

 8    primer would have contained benzene at levels to

 9    reach a 40 part per million-year exposure via

10    inhalation.

11    Q.   You don't know what the ingredients were and

12    you don't know what the air quality measurements

13    were in or around the area where it was being

14    applied while Mr. Cervantes was there, correct?

15    A.   No, but I do know that products made during

16    that era of time were largely benzene free, and the

17    speculation one would have to make is unreasonable.

18    It would be -- it's unreasonable for me to speculate

19    that this cold primer contained enough benzene to

20    create a chronic exposure to the level associated

21    with NHL or --

22    Q.   Doctor, I'm not just -- I'm not just asking

23    about benzene.  You don't know what was in it, do

24    you?

25    A.    No.  I said I do not know what the cold
```

1    primer was; some type of product that was painted on

2    the pipe before the fitting was welded but I -- no,

3    I don't know what it was.

4        Q.   Dr. Sawyer, did Mr. Cervantes read the

5    Roundup labels for the products that he used?

6        A.   He testified that he did not do so as, one,

7    there was no label wording to that effect; and he,

8    number two, "always talked to the person that I

9    signed the contract with and said, you know, it's

10   not going to go in the lawn, in the grass, and we

11   didn't use it, like, on rainy days where it is not

12   going to be effective and blow off, and we didn't

13   use it on very windy days just for safety reasons."

14       Q.   So, sorry, Doctor, I'm not sure how that

15   relates to my question.  Did Mr. Cervantes read the

16   Roundup label for the products that he used?

17       A.   Well, again, on page 15, it's an

18   implication.  He states:  Mr. Cervantes was asked

19   whether after reading the product label he felt it

20   was necessary to post warnings.

21            With respect to that statement, which is

22   from his deposition, I believe, it implies he did,

23   but I'd prefer not to offer any opinion on that

24   because it's not clear.

25       Q.   Do you recall if Mr. Cervantes testified

1    that he was not aware of ever getting any Roundup on

2    his clothes?  Or if you'd like, we can look at his

3    deposition.  It's at page 130, line 8 through line

4    10.

5         Are you with me, Doctor?

6    A.   No, I don't -- I don't have that open yet.

7    Q.   Here, I'll share my screen.  Doctor, I'm

8    sharing with you page 130 from Mr. Cervantes'

9    deposition.  Do you see here at line 8:  Did you

10   ever get material Roundup concentrate on you or your

11   clothes?

12        Answer:  On my clothes, not that I'm aware

13   of.

14   A.   Okay, but he also said in deposition about

15   his skin.  The question in the deposition that I

16   referenced reads:  Did you ever feel Roundup spray

17   or spill on your exposed skin when you applied it?

18        Answer:  There were times when I'm using the

19   sprayer that it felt, my hand, wet and stuff, so I

20   don't know if the trigger was leaking or something

21   was leaking there.

22   Q.   Right, and I'm going to get to that, but --

23   and you're right, so let me ask you this.  Did

24   Mr. Cervantes ever tell you he got Roundup anywhere

25   on his skin except on his hands?

```
 1              I'm asking you, Doctor, what he told you.
 2        A.   Yes.
 3        Q.   So what did he tell you about getting
 4   Roundup on his skin in places other than his hands,
 5   if that's what he told you?
 6        A.   Well, on page 16, the last three lines:
 7   When he came in contact with Roundup on his hands,
 8   he would usually just wipe them off as he didn't
 9   have access to soap and water.  He recalled that the
10   residential -- or the residue in the hand sprayer
11   leaked and the trigger leaked Roundup onto his
12   fingers and both his hands.  The nozzle also leaked
13   and he also recalled that he used to put Teflon tape
14   on it to reduce the leakage.
15        Q.   Okay.  Dr. Sawyer, my question is really
16   simple.  Did Mr. Cervantes ever tell you he got
17   Roundup on his body anywhere other than on his
18   hands?
19        A.   Not that I have recorded.
20        Q.   Do you recall him saying that he would pump
21   the Roundup container with one hand and spray with
22   the other?
23        A.   Yes.
24        Q.   So when he was spraying Roundup, if the lawn
25   or trigger or what have you was leaking, he would
```

1    have only gotten Roundup on the spraying hand while

2    applying, right?

3         MS. FREDONA:  Objection; hypothetical.

4    A.   Well, if you've ever used Roundup and

5    carried the container around, or even used the

6    backpack sprayer, you find that pumping the sprayer

7    causes fatigue.  Most people who use it use --

8    rotate and use both hands.

9    Q.   So what did Mr. Cervantes do?  Did he ever

10   tell you that while spraying he got Roundup on more

11   than one hand?  Again, my question is specifically

12   about spraying.  I understand you're telling me some

13   people get fatigue and sometimes they switch hands.

14        What I want to know is did Mr. Cervantes

15   tell you that he ever got Roundup on his nonspraying

16   hand while applying Roundup?

17   A.   No.  I didn't ask him that specific

18   question.

19   Q.   Did he tell you how much of his hand got wet

20   while he was applying Roundup?

21   A.   Yes.

22   Q.   How much of his hand got wet while he was

23   applying Roundup, according to what he told you?

24   A.   He specifically told me that when he

25   unscrewed the nozzle and worked on the nozzle, that

William Sawyer, Ph.D.

1    it would drip between his fingers onto his hand.

2        Q.   And was that the extent of his exposure on

3    his hand to Roundup when he was applying it,

4    according to what he told you?

5        A.   Yes, with respect of the exposure which he

6    was aware of, yes.

7        Q.   Are you aware of any additional exposure

8    beyond what he told you while applying Roundup?

9        A.   Yes.

10        Q.   And what was that?

11        A.   I can turn you to different areas in my

12    report that show actual measurements using gauze

13    pads on different areas of the body, and when

14    spraying, how much material binds to the test pads

15    tested by the laboratory, and just because a person

16    feels that they only had exposure on their hands

17    doesn't negate the exposure to the rest of the body

18    that they're not aware of.

19        Q.   But I want to know what he told you.

20    According to what he told you, the extent of him

21    getting Roundup on his hands was between the fingers

22    and onto his hands when he unscrewed it during the

23    application process, right?

24        A.   And, actually, he also explained that his

25    fingers and hand would get wet from the trigger

```
 1    area.

 2        Q.   That's on the spraying hand, right?

 3        A.   Yes, and I did not ask him if he only

 4    handled the wand with his left hand or right hand.

 5    I did not ask him that but it is reasonable that a

 6    person spraying as much as he did would have some

 7    level of fatigue from pumping and occasionally

 8    switch hands.

 9        Q.   Did you ask him if he ever switched hands?

10        A.   No.

11             MS. FREDONA:  Objection; asked and answered.

12        Q.   If Mr. Cervantes washes his hands shortly

13    after or immediately after spilling or getting any

14    Roundup on them, that would reduce his exposure,

15    right?

16             MS. FREDONA:  Objection; hypothetical.

17             MR. PAINE:  He's an expert.  I can ask him

18        hypotheticals.

19        Q.   Go ahead, Doctor.

20             MS. FREDONA:  It's an incomplete

21        hypothetical.

22        A.   Really, I don't understand the full

23    question.

24        Q.   Sure.  If he washed his hands shortly after

25    getting Roundup on them, that would reduce his
```

1    exposure to Roundup, right?

2            MS. FREDONA:  Same objection.

3      A.   That's very vague.  What do you mean by

4    shortly and do you include soap?

5      Q.   Let's say it's 10 minutes, within 10 minutes

6    of exposure and, fine, with soap.

7            MS. FREDONA:  Same objection.

8      A.   And the question is would that reduce

9    exposure or completely negate exposure?

10     Q.   Reduce.

11     A.   Certainly it would reduce it, yes.

12     Q.   Would it be reduced if he just used water to

13   clean his hands within a few minutes of getting

14   Roundup on him?

15     A.   To a much lesser extent.

16           MS. FREDONA:  Objection; incomplete

17       hypothetical.

18     A.   To a much lesser extent, yes.

19     Q.   Now, Mr. Cervantes testified that he wore

20   gloves during the spring and fall when he was

21   applying Roundup, right?

22     A.   Not exactly.  He testified and he explained

23   to me that they were cloth gloves and that the

24   gloves would become wet.

25     Q.   Did Mr. Cervantes ever tell you if his

1   gloves got soaked through with Roundup?

2       A.   I never asked him about soaked through.

3   What he told me was that from the leakage they would

4   become wet.

5       Q.   Even cotton gloves provide some protection

6   against Roundup contacting the skin or hands, don't

7   they?

8       A.   Only if it's a quantity of Roundup that does

9   not saturate the cotton.  Saturated cotton has the

10  same concentration of Roundup on the outside as it

11  does on the inside if the cotton is saturated, so it

12  really depends on how wet the cotton is.

13          In the studies that I've included in my

14  report, the gloves are not sopping wet.  They are

15  not -- and the pants in the studies that I use, and

16  the shirts, are not soaking wet but, rather, have a

17  measurable amount of Roundup on the outside and

18  typically about a 20 percent or so concentration on

19  the inside of the fabric.  So it does cause a

20  certain level of protection but not complete by any

21  means.

22      Q.   Did Mr. Cervantes ever tell you how many

23  times, if any, that his gloves became saturated with

24  Roundup?

25      A.   I don't know where that came from.  He

1    didn't tell me that his clothing became saturated

2    from Roundup.  Where did you come up with that?

3        Q.   Well, you used the term saturated, so I just

4    asked you if he ever told you that his clothes or

5    his gloves became saturated with Roundup.

6        A.   No.  He just said wet.

7        Q.   Okay.  Did he tell you how many times his

8    gloves became wet with Roundup?

9        A.   No.

10       Q.   Did Mr. Cervantes ever tell you he ever

11   experienced any skin damage or skin irritation in

12   connection with using Roundup?

13       A.   No, and, actually, in response to the prior

14   question, he told me he only wore the gloves in

15   colder weather.

16       Q.   What did Mr. Cervantes tell you about any

17   dermal contact he may have received during mixing

18   Roundup?  Up to this point we've been talking about

19   applying, so I want to ask you about dermal contact

20   during mixing.  What did he tell you about dermal

21   contact during mixing Roundup?

22       A.   That he mixed the concentrated Roundup on

23   site where he was working and he poured it, the

24   solution, into a backpack sprayer by hand, and he

25   occasionally contacted Roundup on his hands, and

William Sawyer, Ph.D.

```
 1   would sometimes rinse but only if possible or

 2   practical; otherwise, he would merely wipe off the

 3   concentrate solution and continue on to the next

 4   task, and I referenced his deposition for that

 5   information.

 6        Q.   And was that dermal contact while mixing

 7   Roundup concentrate confined to his hands, as you

 8   understand it?

 9        A.   That's what the deposition on page 142 to

10   143 indicates.

11        Q.   Do you agree that Mr. Cervantes was

12   reasonably careful and meticulous in his mixing and

13   application of Roundup?

14        A.   Define meticulous.

15        Q.   Well, that's a term you -- I think you used

16   in your report, so I'm just asking you.  Is that

17   your impression, that he was reasonably careful and

18   meticulous in his mixing and application of Roundup?

19        A.   He told me that but I have no means of going

20   back in history and observing, but that's what he

21   told me.

22        Q.   Now, Dr. Sawyer, you have not done any

23   calculation of an absorbed dose of Roundup or

24   glyphosate for Mr. Cervantes, did you?

25        A.   No.
```

1    Q.   In this case you -- and in your report here

2   you talk about Mr. Cervantes having what you've

3   described as a minimum exposure dose of 126 exposure

4   days, right?

5    A.   Yes.

6    Q.   Okay.  And just for reference, I'm looking

7   at page 22 or your report.  You've got a table

8   there, Table 2, which provides calculations for

9   minimum and maximum exposure days that run from 126

10   minimum to a maximum of 248 eight-hour exposure

11   days.  Do I understand that correctly?

12    A.   Yes.

13    Q.   All right.  And that represents the

14   cumulative time in days that Mr. Cervantes was

15   mixing or using Roundup, in your opinion, right?

16    A.   No, it's not my opinion.  It's the

17   mathematical additivity of the amount of time he

18   testified and stated in the interview that he used

19   the product.

20    Q.   Okay.  But, in other words, you've reached

21   an opinion that he has 126 to 248 exposure days,

22   eight-hour days of Roundup, including mixing and

23   application, and that's what you're going to tell

24   the jury in this case, right?

25    A.   Yes.

1    Q.   Okay.   Exposure days are different than

2    exposure dose, correct?

3    A.   If you're referring to a dose in milligram

4    per kilogram per body weight, yes; however, many

5    toxicological agents are measured in units of

6    exposure time, such as benzene is not measured in

7    milligram per kilogram per day dose, but, rather,

8    it's measured in benzene PPM exposure years, and

9    that's because the studies were run that way.  At a

10   given air level of ventilation for a given amount of

11   time, 40 hours per week, and the number of years at

12   that level required to produce the toxicological end

13   effect, which is leukemia.

14        And the same holds true in this study

15   design.  In these six studies that offered exposure

16   metrics, those studies did not provide milligram per

17   kilogram body weight per day measurements, but,

18   rather, the Ericsson study used eight-hour Swedish

19   working days, and the other studies used exposure

20   days as a day when the product was used, not

21   necessarily for eight hours.

22        So I'm following the generally accepted

23   methodology for calculating dose using exposure

24   days.  That still represents a dose, just as benzene

25   exposure years is a dose.  A dose does not have to

```
 1   be only in milligram per kilogram per day, and it
 2   would be useless to make that measurement unless one
 3   were to apply it and compare it to the AOEL level
 4   for an applicator, because the studies, the human
 5   studies, provide no information on milligram per
 6   kilogram per day exposure dose.
 7       Q.   So, Doctor, again, my question is very
 8   simple.  You calculated exposure days rather than
 9   exposure dose for Mr. Cervantes, right?
10       A.   Yes, in keeping and being consistent with
11   the methodology used in the human studies, that's
12   exactly what I did.
13       Q.   So, Doctor, if you go to page 87 of your
14   report, do you see the section entitled "Systemic
15   Dose"?
16       A.   Yes.
17       Q.   Okay.  What you say there under Systemic
18   Dose is, quote:  When a person is exposed to a
19   chemical such as glyphosate, the dose physically
20   contacting the body is referred to as the exposure
21   dose.  This is different from the systemic dose
22   which enters the bloodstream and reaches various
23   organs within the body.  End quote.
24           Did I read that correctly?
25       A.   Yes, and that's what I said a few moments
```

```
 1    ago, if you look back at the transcript.  I talked
 2    about systemic dose in milligram per kilogram per
 3    day.
 4        Q.   So to be clear, Doctor, there can be
 5    exposure in the sense of use of Roundup which may or
 6    may not result in Roundup contacting the skin,
 7    right?
 8        A.   Yes, that is theoretically possible;
 9    however, there is a wealth of studies, including
10    considerable in-house Monsanto data, showing the
11    exposure dose for a typical applicator, and there
12    are also studies published that I've referenced that
13    show how much of this actually reaches the
14    bloodstream through dermal absorption.
15         So --
16        Q.   Sorry.  I didn't mean to cut you off.
17        A.   Okay.  So this has been well studied with
18    respect to glyphosate and Roundup, and we know that
19    applicators sustain a measurable dose, a systemic
20    dose, through the exposure dose application of the
21    product.  I mean, that's well established.  It's not
22    reasonable to try to trick a jury and tell them that
23    a person can go out there and spray with a backpack
24    sprayer and not experience a systemic dose.  It's
25    not possible.
```

 1      Q.   Now, you agree that exposure in that sense

 2   is an opportunity for the product to contact the

 3   person's skin, right?

 4        MS. FREDONA:  Objection; form.

 5      A.   Yes, and this fellow was using a backpack

 6   sprayer with a standard dispersal aerosol sprayer

 7   which produces a drift which contacts the lower

 8   legs, primarily, and the rest of the body, as per

 9   the studies have documented, and I have documented a

10   number of studies that quantitatively show what this

11   exposure dose is versus the systemic dose, that is

12   how much actually mixes with the skin.

13      Q.   Right.  And my point is you didn't calculate

14   either an exposure dose or a systemic dose for

15   Mr. Cervantes, did you?

16      A.   No.  That would be an improper methodology

17   in trying to compare it to the human dose metric

18   studies which are based on exposure days.

19   Calculating the milligram per kilogram body weight

20   per day systemic dose would not be something I could

21   use to compare to the human epidemiological studies.

22      Q.   So, Doctor, exposure dose requires you to

23   assess how much glyphosate actually contacted a

24   person's body, right?

25      A.   Right.

1    Q.   And systemic dose then requires you to take

2    an additional step and figure out from the exposure

3    dose how much penetrated the skin to get into the

4    bloodstream's -- into the bloodstream, right?

5    A.   Yes, and I have documented that in my report

6    and will explain the process to the jury.

7    Q.   And you would agree that Roundup or any of

8    its ingredients are not harmful to a person unless

9    they actually get into the person's body, correct?

10        MS. FREDONA:   Objection; form.

11   A.   Can you repeat that?  I don't follow.

12   Q.   Sure.  Roundup is not harmful unless it

13   actually gets into a person's body, right?

14        MS. FREDONA:   Same objection.

15   A.   Correct.  It's harmful if it gets on the

16   body, actually, because we know what the dermal

17   absorption rates are.  So I have to correct that.  I

18   disagree.  It is harmful if it make its way onto the

19   body.

20   Q.   Once it gets onto the body, it then has to

21   be absorbed, right?

22   A.   Yes, but that's not a mystery.  We know that

23   that does occur.

24   Q.   Right.  But if you get glyphosate on your

25   body and immediately wash it off, right, the amount

1    penetrating the skin is negligible, if any, correct?

2        A.    If washed quickly with soap and water, it

3    greatly diminishes the dermal absorbed dose, yes.

4        Q.    Now, Doctor, would you go to page 176 of

5    your report?  There is a bullet point -- the second

6    bullet point there is "Prolonged Acute Exposure and

7    Absorption," right?

8        A.    Yes.

9        Q.    And there you say:  Mr. Cervantes testified

10   that he regularly contacted Roundup on his skin.

11           And then at the end you say:  The deposition

12   testimony and interview reveal a quantifiable

13   pattern of exposure indicative of episodic,

14   prolonged, acute dermal exposure and absorption over

15   a period of approximately 22 years.

16           Is that what you intend to tell the jury?

17       A.    Well, I read the portion you read on

18   prolonged acute exposure.  His deposition testimony

19   and interview reveal a quant -- 22 years.  Let me

20   check that.

21           Yeah, 22 years is correct.  Yeah.

22       Q.    But, once again, when it comes to absorption

23   and exposed dose, you never actually calculated

24   those for Mr. Cervantes specifically, did you?

25       A.    That's already been calculated and generally

1    accepted in the literature.

2       Q.   It's not specific --

3       A.   It's inconceivable he could have it on his

4    hands, not washing his hands because of availability

5    of no water, wiping his hands on his clothing or

6    other surfaces, and not absorb it.  I mean, we know

7    what the absorption rates are.  We know from other

8    studies how much aerosol reaches the legs and the

9    torso.  In fact, we even know from Monsanto's

10   in-house study how much is deposited on the skin on

11   the back from leakage of the backpack sprayers.

12          This has all been published and documented,

13   so it's not necessary to specifically measure his

14   blood level while he's spraying, before and after

15   his spray time.  Enough studies have already been

16   published on the dermal absorption rates and time,

17   and the deposition onto the clothing and the

18   penetration through the clothing, to result in a

19   significant exposure.

20          And more importantly, the human

21   epidemiologic studies are not based upon milligram

22   per kilogram per day dose.

23      Q.   Doctor, what did Mr. Cervantes tell you

24   about why he stopped using Roundup?

25          Doctor, can you answer my question, please?

 1    A.   I'm looking in the report because I don't

 2   want to mix him up with someone else.

 3    Q.   Doctor, can you answer my question?  You've

 4   been looking for about three -- three, four minutes

 5   now.

 6    A.   That's right.  I don't remember but I am

 7   just checking to see if I made a note in my report.

 8   Hmm.

 9    Q.   I think you've answered the question.  If

10   you don't remember anything else other than what you

11   put in your report, that's fine.

12    A.   Okay.

13    Q.   Doctor, when did the first malignant cell

14   appear in Mr. Cervantes' body?

15    A.   Yeah, we went through this before in I think

16   it might have been your deposition.

17    Q.   It probably was.  So when did the first

18   malignant cell appear in Mr. Cervantes' body?

19    A.   This is like some kind of old-fashioned

20   parlor game.

21    Q.   Can you just answer the question, Doctor.

22   Do you know?

23    A.   No one knows.

24    Q.   Do you know how long any malignant cells

25   were present before Mr. Cervantes was diagnosed with

1    DLBCL?

2        A.   No.

3        Q.   According to your report and what

4    Mr. Cervantes told you, he used Roundup between

5    April and November each year that he used it; is

6    that correct?  And if you need a reference, it's on

7    page 16 of your report.

8        A.   Yes.  And on page 13 he also stated that he

9    purchased Roundup concentrate weekly from April

10   through November, typically two to three containers

11   per week.

12       Q.   Okay.  So do you have any different

13   information to suggest that Mr. Cervantes used

14   Roundup at all during the period December, January,

15   February, or March of the years in which he used it?

16       A.   No.

17       Q.   So approximately five months a year he was

18   not using Roundup, right?

19       A.   That's correct.

20       Q.   Can you say to a reasonable degree of

21   scientific certainty that any amount of Roundup, any

22   ingredient from Roundup, was still present in

23   Mr. Cervantes' body when a malignant cell first

24   appeared?

25       A.   No.

1    Q.   Can you say to a reasonable degree of

2    scientific certainty that any amount of glyphosate

3    or any ingredient from Roundup whatsoever was

4    actually present in Mr. Cervantes' body when a

5    premalignant lesion first appeared in his body?

6    A.   No.  That's an unreasonable question.

7    Q.   Mr. Cervantes' non-Hodgkin lymphoma has been

8    successfully treated, hasn't it?

9    A.   I will defer that to the treating

10   physicians.

11   Q.   Now, people in this country are diagnosed

12   with non-Hodgkin lymphoma, including DLBCL, every

13   day whether they've used Roundup or not, correct?

14   A.   Correct.

15        MS. FREDONA:  Objection, argumentative.

16   A.   And the correct -- it's correct but in this

17   case we're dealing with someone with more than a

18   twofold risk that they never bought into and were

19   unaware of when that person bought the product.

20   Q.   Doctor, is there any way you or anyone else

21   you can think of can say that Mr. Cervantes would

22   have avoided non-Hodgkin lymphoma altogether if he

23   had simply never used Roundup?

24        MS. FREDONA:  Objection; speculation,

25        incomplete hypothetical, form.

1    A.   No.  In fact, what we know is that if he had

2    not used the product, his risk level would have been

3    twofold or more less likely to contract the

4    malignancy.

5    Q.   As we've established, Doctor, people develop

6    non-Hodgkin lymphoma and DLBCL without ever having

7    been exposed to Roundup, right?

8    A.   Yes, that is what the studies use as a

9    control or background rate.

10   Q.   So it's not possible for you to say that

11   Mr. Cervantes would have avoided non-Hodgkin

12   lymphoma if he simply had never used Roundup, is it?

13   He may have developed it anyway, right?

14        MS. FREDONA:  Objection.

15   A.   Correct, except he was in the extreme upper

16   quartile or tertiles of exposure in the studies and

17   his risk level was greatly enhanced, so it's more

18   likely than not and more probable that he would have

19   contracted the non-Hodgkin's lymphoma.

20   Q.   Dr. Sawyer, bear with me just a second.  I

21   think I'm done with my questions.  I'm just looking

22   back through my notes to make sure I covered what I

23   needed to.

24        Dr. Sawyer, I think those are all the

25   questions I've got today.  Thanks again for joining

```
 1    with me and I appreciate you bearing with me and

 2    answering my questions today.  Have you understood

 3    my questions or asked me to repeat it if you didn't?

 4        A.   Yes.

 5             MR. PAINE:  All right.  I think we're done,

 6        unless I have some additional questions if

 7        Plaintiff's counsel has any questions for you.

 8             MS. FREDONA:  I only have a couple.

 9                      CROSS-EXAMINATION

10    BY MS. FREDONA:

11        Q.   Good afternoon, Dr. Sawyer.  How are you

12    again?

13        A.   Tired out.  This is the second deposition

14    today, so...

15        Q.   Oh, me too.  I had three yesterday, so...

16        A.   You don't sleep.

17        Q.   Yeah, I don't sleep anymore.

18        A.   I have three on Thursday.  I have one at

19    8:00 a.m.

20        Q.   And that is all with the Moll Law Group?

21        A.   No.

22        Q.   Okay.  Cool.

23             All right.  So, Dr. Sawyer, can you tell me,

24    does body mass index distinguish between body fat

25    and muscle?
```

```
 1      A.    No, it really doesn't.  There is a
 2  variation, especially with athletes or body builders
 3  versus the sedentary person.  That is quite
 4  variable.
 5      Q.    Okay.  And does muscle weigh more than fat?
 6      A.    Yes, considerably.
 7      Q.    Okay.  So a BMI of 30, does that
 8  definitively mean that somebody is obese?
 9            MR. PAINE:  Objection.
10      A.    No.  No.  That's a very good point in this
11  case, because for those several years that
12  Mr. Cervantes was near the BMI of 30, he was also
13  very active and he told me he was of a muscular
14  build, which makes sense because he's very active in
15  his occupation.
16      Q.    And he's a laborer?
17      A.    Yes.
18      Q.    All right.  One more question:  In your
19  expert opinion, to a reasonable degree of
20  toxicological certainty, was Roundup a significant
21  factor contributing to Mr. Cervantes' development of
22  non-Hodgkin's lymphoma?
23      A.    Yes.  His exposure, eight-hour time-weighted
24  exposure day measurement, was off scale, was very
25  high, beyond anything I have ever come across in the
```

```
 1   reported literature, so clearly he met the

 2   requirement of exceeding the thresholds of the human

 3   epidemiological studies that show a more than

 4   doubling increase of risk of non-Hodgkin's lymphoma.

 5           MS. FREDONA:  I have no more questions.

 6           MR. PAINE:  Nope, we're done.

 7           THE VIDEOGRAPHER:  Okay.  Everyone, please

 8       stand by for just a moment.

 9           This concludes the deposition of Dr. William

10       Sawyer.  We are going off the record 4:21 p.m.

11           (Whereupon, the deposition concluded at

12       4:21 p.m.)

13

14

15

16

17

18

19

20

21

22

23

24

25
```

```
 1              C E R T I F I C A T E

 2         I, Susan D. Wasilewski, Registered

 3    Professional Reporter, Certified Realtime Reporter,

 4    Certified Manager of Reporting Services, Certified

 5    Realtime Captioner, and Florida Professional

 6    Reporter, hereby certify that the witness named

 7    herein appeared via Remote Counsel/Zoom technology

 8    on Tuesday, February 16, 2021, and was duly sworn.

 9         I FURTHER CERTIFY that I was authorized to

10    and did stenographically report the examination of

11    the witness named herein; that a review of the

12    transcript was not requested; and that the foregoing

13    transcript is a true record of my stenographic

14    notes.

15         I FURTHER CERTIFY that I am not related to

16    or an employee of any of the parties, nor am I

17    related to or an employee of any of the parties'

18    attorneys or counsel connected with this action, nor

19    am I financially interested in the outcome of this

20    action.

21         WITNESS my hand this 17th of February, 2021.

22

23    _____

24    Susan D. Wasilewski, RPR, CRR, CMRS, CRC, FPR

25
```

```
 1                          LAWYER'S NOTES

 2     PAGE    LINE

 3     _____   _____   _____

 4     _____   _____   _____

 5     _____   _____   _____

 6     _____   _____   _____

 7     _____   _____   _____

 8     _____   _____   _____

 9     _____   _____   _____

10     _____   _____   _____

11     _____   _____   _____

12     _____   _____   _____

13     _____   _____   _____

14     _____   _____   _____

15     _____   _____   _____

16     _____   _____   _____

17     _____   _____   _____

18     _____   _____   _____

19     _____   _____   _____

20     _____   _____   _____

21     _____   _____   _____

22     _____   _____   _____

23     _____   _____   _____

24     _____   _____   _____

25
```

# EXHIBIT 12



**CONFIDENTIAL - PURSUANT TO PROTECTIVE ORDERS**

# Transcript of William Sawyer, Ph.D.

**Date:** September 15, 2019
**Case:** Roundup Products Liability Litigation, In Re

**Planet Depos**
**Phone:** 888.433.3767
**Email::** transcripts@planetdepos.com
**www.planetdepos.com**

WORLDWIDE COURT REPORTING & LITIGATION TECHNOLOGY

CONFIDENTIAL - PURSUANT TO PROTECTIVE ORDERS
Transcript of William Sawyer, Ph.D.
Conducted on September 15, 2019

1 (1 to 4)

---

**Page 1**

```
 1            UNITED STATES DISTRICT COURT

 2           NORTHERN DISTRICT OF CALIFORNIA

 3                 MDL No. 2741
                Case No. 3:16-md-02741-VC
 4

 5   IN RE:  ROUNDUP PRODUCTS LIABILITY
     LITIGATION
 6   ----------------------------------
     This document relates to:
 7   Giglio v. Monsanto Co., et al.
     Case No. 3:16-cv-05658-VC
 8   ----------------------------------/

 9

10     CONFIDENTIAL - PURSUANT TO PROTECTIVE ORDERS

11          VIDEOTAPED DEPOSITION OF:

12           WILLIAM SAWYER, Ph.D.

13             Pages 1 to 177

14          Sunday, September 15, 2019

15            7:39 a.m. - 11:55 a.m.

16
          Sanibel Harbour Marriott Resort and Spa
17             17260 Harbour Pointe Drive
                Jasmine Conference Room
18              Fort Myers, Florida 33908

19

20          STENOGRAPHICALLY REPORTED BY:
21       NANCY E. PAULSEN, CRR, CRC, RPR, FPR, RSA

22

23

24

25
```

---

**Page 2**

```
 1              APPEARANCES:

 2
     On Behalf of the Plaintiff
 3
         JESSICA T. SIZEMORE-WETZEL, ESQUIRE
 4       Gomez Trial Attorneys
         655 West Broadway
 5       Suite 1700
         San Diego, California  92101
 6       619-237-3490
         Jessica@thegomezfirm.com
 7

 8

 9   On Behalf of the Defendants

10       JOHN M. KALAS, ESQUIRE
         GRANT W. HOLLINGSWORTH, ESQUIRE
11       Hollingsworth, LLP
         1350 I Street, NW
12       Washington, DC  20005
         202-898-5800
13       Jkalas@hollingsworthllp.com
         Ghollingsworth@hollingsworthllp.com
14

15

16   Also Present:

17       Dolores Sherman, Videographer

18

19

20

21

22

23

24

25
```

---

**Page 3**

```
 1                 I N D E X

 2   Deponent                                    Page

 3   William Sawyer, Ph.D.

 4   DIRECT EXAMINATION BY MR. KALAS                6

 5   CROSS-EXAMINATION BY MS. SIZEMORE-WETZEL     163

 6   REDIRECT EXAMINATION BY MR. KALAS            168

 7

 8   CERTIFICATE OF REPORTER                      176

 9   CERTIFICATE OF OATH                          177

10

11             E X H I B I T S

12   No.      Description                         Page

13   Exhibit 1   Notice of Deposition...............    7

14   Exhibit 2   Opposition in Response to the        7

15               Notice............................

16   Exhibit 3   Updated CV........................    7

17   Exhibit 4   Sawyer's file.....................    8

18   Exhibit 5   Report from August 20.............    8

19   Exhibit 6   Study.............................   66

20   Exhibit 7   Hand drawn table..................   69

21   Exhibit 8   Eriksson study....................   78

22   Exhibit 9   McDuffie study....................   85

23   Exhibit 10  Transcript of Giglio from August   91

24               29................................

25   Exhibit 11  Giglio's deposition from March 22...   98
```

---

**Page 4**

```
 1   Exhibit 12  Giglio deposition of March 21........  103

 2   Exhibit 13  Roundup label........................  106

 3   Exhibit 14  Roundup label........................  110

 4   Exhibit 15  Global Syn-Turf website image........  123

 5   Exhibit 16  Letter from EPA to Registrant........  128

 6   Exhibit 17  Press release........................  136

 7   Exhibit 18  Label recommendations................  148

 8   Exhibit 19  Study................................  157

 9   Exhibit 20  Cancer Risk Assessment from..........  159

10               June 20, 1990

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

Case 3:16-md-02741-VC  Document 13914  Filed 10/05/21  Page 719 of 802

CONFIDENTIAL - PURSUANT TO PROTECTIVE ORDERS
Transcript of William Sawyer, Ph.D.                    17 (65 to 68)
Conducted on September 15, 2019

---

**65**

1  Eriksson, and Andreotti.  Are you looking at those in
2  the table?
3     **A.  Okay.**
4     Q.  Those are the only three studies that you're
5  aware of that look at dose metrics in the
6  epidemiological literature; right?
7     **A.  Well, I can't toss out the ever/never use**
8  **studies.  That still is of some significance.**
9     Q.  Okay.  But you haven't looked at all the
10 ever/never use studies; right?
11    **A.  I'm sorry?**
12    Q.  You haven't looked at all of the ever/never
13 use studies; correct?
14    **A.  Well, I have looked at another one, which**
15 **looking here in my document list, it's another newer**
16 **study that came out.**
17    Q.  Pahwa?
18    **A.  I'm sorry.**
19    Q.  Pahwa?
20    **A.  Hmm.**
21    Q.  P-A-H-W-A?
22    **A.  Not the one that I was thinking of, but --**
23    Q.  Okay.  So what's the one you're thinking of,
24 sir?
25    **A.  Well, it's the newest pooled study.**

---

**66**

1     Q.  Okay.  So it's, again, a study of studies;
2  right?
3     **A.  Yeah, but it had one other group that was**
4  **different.**
5     Q.  But am I correct that the three primary
6  studies that you're relying on to talk about
7  Mr. Giglio's dose and compare his dose to the
8  epidemiological studies are McDuffie, Eriksson, and
9  Andreotti?
10    **A.  Yes.**
11    Q.  Okay.  So let's look at Andreotti first.
12    MS. SIZEMORE-WETZEL:  Thank you.
13    MR. KALAS:  Um-hum (affirmative).
14    (Marked Deposition Exhibit 6.)
15 BY MR. KALAS:
16    Q.  We've marked it as Exhibit 6.
17    And we've looked at this study before; right,
18 sir?
19    **A.  Oh, yes.**
20    Q.  Okay.  And you state on page 46 of your
21 report -- let's find the quote -- that Mr. Giglio fits
22 into the second quartile of the Andreotti study; right?
23 That's Table 8?
24    **A.  Yeah.**
25    Q.  Okay.  That's lifetime days of glyphosate use,

---

**67**

1  and for him 13.75 to 38.74; right?
2     **A.  Yes.**
3     Q.  Okay.  And that's from all of his residential
4  and occupational use from 1990 through 2015; right?
5     **A.  Yes.**
6     Q.  Okay.  So let's go to supplemental Table 1,
7  and let's -- this is the second page of the supplemental
8  tables.  And let's look at the figure for NHL in the
9  second quartile of days of use.  Let me know when you're
10 there.
11    NHL is on the second page of that table, sir.
12    **A.  Okay.**
13    Q.  Do you see that second entry?
14    **A.  Yes.**
15    Q.  Okay.  And for quartile two, it says there is
16 117 cases, and it has an odds ratio -- or excuse me,
17 relative risk, since this is a cohort study.  It has a
18 relative risk of .87 with a confidence interval of .66
19 to 1.14; right?
20    **A.  Yes.**
21    Q.  Okay.  And Mr. Giglio fits into that
22 population as far as exposure days go; right?
23    **A.  Yes.**
24    Q.  Okay.  And that number .87 is lower than 1;
25 right?

---

**68**

1     **A.  Yes.**
2     Q.  That means that they found more NHL in people
3  who didn't use glyphosate as opposed to people with the
4  similar number of exposure days to Mr. Giglio in this
5  study; right?
6     **A.  No.  It means that statistically, the**
7  **confidence interval ranged from .66 to 1.14.**
8     Q.  Okay.  But the actual point estimate, the
9  actual data that they had showed that there was 87
10 percent -- well, excuse me.  There was .87 cases of NHL
11 in people who used glyphosate for as many days as
12 Mr. Giglio as for every one case in people who did not
13 use it, glyphosate; correct?
14    **A.  No.**
15    Q.  That's not what the actual data showed here?
16    **A.  No.  It shows that there was no significant**
17 **change from the expected value of 1.**
18    Q.  Okay.  So what does that mean to have no
19 significant change?
20    **A.  That, in this case, in this particular study,**
21 **there was no indication of increased NHL above that**
22 **expected as seen in the control population.**
23    Q.  Okay.  So I'm going to mark as Exhibit 7 --
24 I'm going to just put this on a piece of paper here so
25 we can follow it.

Case 3:16-md-02741-VC   Document 13914   Filed 10/05/21   Page 720 of 802
CONFIDENTIAL - PURSUANT TO PROTECTIVE ORDERS
Transcript of William Sawyer, Ph.D.                    20  (77 to 80)
Conducted on September 15, 2019

**77**

1  figures here, okay? And then maybe we'll clean it up in
2  time for trial. I'm going to mark -- leave Exhibit 7
3  right here.
4       It's true, isn't it, that for non-Hodgkin's
5  lymphoma B-cell figure, the group that Mr. Giglio would
6  fall in here, he would be between .76 and .88 for his
7  point estimate with a confidence interval range of .55
8  to 1.21; right?
9       A. Correct, but it would be inappropriate to show
10  that to the jury when we have the actual, more
11  descriptive large -- diffuse large B-cell lymphoma data
12  available.
13       Q. Okay. And we're getting there next. It's
14  true that for diffuse large B-cell lymphoma, his figure
15  that he fits into would be somewhere between .94 and
16  1.13 with a confidence interval range of .49 to 2.17;
17  right?
18       A. That's right.
19       Q. Okay. Now, were any of the figures we just
20  talked about in the Andreotti study statistically
21  significant?
22       A. No. But I would make the point if you are
23  going to show this to the jury, I think you need to
24  include the DLBCL on your chart.
25       Q. Sure.

**78**

1       And you stated in your report that the
2  Agricultural Health Study did not find a statistically
3  elevated risk of NHL; right?
4       A. That's correct.
5       Q. Okay. And you agree with that, that this
6  study does not show a significantly elevated risk for
7  people with the same exposure characteristics as
8  Mr. Giglio?
9       MS. SIZEMORE-WETZEL: Object to form.
10       THE WITNESS: As I've testified in the past 11
11  deposition sessions and two trials, yes.
12  BY MR. KALAS:
13       Q. Okay. Let's move to the Eriksson study. Now,
14  we've gone over this many times. Mark it as Exhibit 8.
15       (Marked Deposition Exhibit 8.)
16  BY MR. KALAS:
17       Q. But you believe Mr. Giglio also fits within
18  the exposure or dose profile in this study; right?
19       MS. SIZEMORE-WETZEL: Thank you.
20       THE WITNESS: Yes.
21  BY MR. KALAS:
22       Q. Okay. And this study, which we've marked as
23  Exhibit 8, you agree again with me this study in its
24  dose evaluation does not control for exposures to other
25  pesticides; right?

**79**

1       A. Correct.
2       Q. Okay. But the Andreotti study does in its
3  dose evaluations; correct?
4       A. Yes.
5       Q. Okay. Now, there is only one figure regarding
6  dose that Mr. Giglio fits in here; right? And that's
7  the greater than ten days of use?
8       MS. SIZEMORE-WETZEL: I'll object to the form
9       of the question.
10  BY MR. KALAS:
11       Q. And I'm -- if you want to see what you wrote
12  about it, sir, it's on page 45 of your report.
13       A. Well, to answer your question, he fits into
14  two different dose schemes. He's -- obviously fits into
15  the ten days of exposure or less, and also, greater than
16  ten days. Two different criterias.
17       Q. Okay. But you wouldn't -- you wouldn't, when
18  you're designing an epidemiology study, put somebody in
19  both? You're separating them between people who are
20  exposed to ten days or less or greater than ten days;
21  right?
22       A. Correct. But he reaches -- exceeds the
23  threshold of both of those parameters.
24       Q. I understand what you're saying. I understand
25  why you're trying to be very precise here.

**80**

1       It's true that if Mr. Giglio were somebody who
2  was included in the Eriksson study as a case, he would
3  fall into the greater than ten days group? Right?
4       A. Yes. And you would have to mark that as -- on
5  your little chart thingy that his odds ratio was 2.36,
6  with the correct confidence interval.
7       Q. Right. And we're going -- I'm going there.
8  Okay?
9       So he would fall into the group that's 2.36
10  with the 1.04 to 5.37 confidence interval; right?
11       That's in Table 2.
12       A. Yes.
13       Q. Okay. And that's statistically significant;
14  right?
15       A. Yes.
16       Q. Okay. Not controlled for other pesticides,
17  but statistically significant; true?
18       A. Yes.
19       Q. Okay. And I know you pointed out that where
20  we have subtype data, we should look at it, so let's
21  look at Table 3 real quick. This is not dose data, this
22  is just ever/never data; right?
23       A. Yes.
24       Q. But for B-cell generally, the odds ratio is
25  1.87; right?

# EXHIBIT 13



**UNITED STATES ENVIRONMENTAL PROTECTION AGENCY**
**WASHINGTON, D.C. 20460**

**OFFICE OF CHEMICAL SAFETY AND**
**POLLUTION PREVENTION**

## MEMORANDUM

**DATE:**     January 6, 2020

**SUBJECT:**     **Glyphosate**: Epidemiology Review of Zhang et al. (2019) and Leon et al. (2019)
publications for Response to Comments on the Proposed Interim Decision

**PC Code:** 417300; 103601; 103603; 103604; 103605; 103607; 103608; 103613           **DP Barcode:** D455531

**Decision No.:** 558081                                    **Registration No.:** NA
**Petition No.:** NA                                        **Regulatory Action:** Registration Review
**Risk Assessment Type:** NA                               **Case No.:** 178
**TXR No.:** NA                                             **CAS Nos.:** 1071-83-6; 38641-94-0; 70393-85-0; 114370-14-8; 40465-76-7; 69254-40-6; 34494-04-7; 70901-12-1
**MRID No.:** NA                                           **40 CFR:** §180.364

**FROM:**     David J. Miller, Acting Chief
Toxicology and Epidemiology Branch
Health Effects Division (7509P)

**TO:**     Christine Olinger, Chief
Risk Assessment Branch I
Health Effects Division (7509P)

Glyphosate is currently undergoing Registration Review.  As part of the public comment period on the preliminary interim decision (PID) to support Registration Review, open literature studies were identified for the Agency's consideration.  Of these, HED's RAB I has requested that TEB review and evaluate two recent review articles involving meta-analyses that were recently published in the scientific literature in 2019.  These are:

- **Zhang et al. (2019). Exposure to glyphosate-based herbicides and risk for non-Hodgkin lymphoma: a meta-analysis and supporting evidence.** *Mutation Research/Reviews in Mutation Research* **781:186-206. doi: 10.1016/j.mrrev.2019.02.001.**

- **Leon et al. (2019).  Pesticide use and risk of non-Hodgkin lymphoid malignancies in agricultural cohorts from France, Norway, and the USA: a pooled analysis from the AGRICOH consortium.** *Int J. Epidemiol.* **48(5):1519-1535. doi: 10.1093/ije/dyz017.**

These summary articles, importantly, both incorporate a recent update on glyphosate and non-Hodgkin's Lymphoma (NHL) published as part of the Agricultural Health Study (AHS) (Andreotti, G., Koutros, S., Hofmann, J.N., Sandler, D.P., Lubin, J.H., Lynch, C.F., Lerro, C.C., De Roos, A.J., Parks, C.G., Alavanja, M.C., Silverman, D.T. 2018. Glyphosate use and cancer incidence in the Agricultural Health Study. *JNCI: Journal of the National Cancer Institute*. doi:10.1093/ jnci/djx233).  This 2018 AHS publication was previously reviewed by TEB under separate cover (A. Aldridge, DP Barcode D444727, 12/12/2017)[1].

This memorandum provides review and comments on the above two referenced summary review articles to ensure that these are appropriately considered as part of Registration Review for glyphosate.  The memorandum is divided into two parts, the first of which covers Zhang et al. (2019) and the second which covers Leon et al. (2019).

## *PART I.  Review of Zhang et al. (2019)*

*Zhang et al. (2019). Exposure to glyphosate-based herbicides and risk for non-Hodgkin lymphoma: a meta-analysis and supporting evidence. Mutation Research/Reviews in Mutation Research.*
https://doi.org/10.1016/j.mrrev.2019.02.001

This review article summarizes epidemiologic studies published through 2018[2] on the association between exposure to glyphosate and NHL.  The authors conducted meta-analyses for the epidemiological studies using an *a priori* hypothesis that the highest exposures to glyphosate-based herbicides (GBHs) will lead to increased risk of NHL in humans. Here, higher exposures corresponded to higher levels, longer durations, and sufficient lags/latencies.  Additionally, the article provides a summary of lymphoma prevalence in laboratory animals and cites possible mechanisms, including as immunosuppression, endocrine disruption, genetic alterations, and oxidative stress.  This memorandum considers only the epidemiological and meta-analysis content of the Zhang et al (2019) publication and does not review or otherwise evaluate the cited putative mechanisms.

The authors began by conducting their own literature search and identified a total of 909 articles using PRISMA guidelines[3], with 857 of the articles identified through PubMed and 52 through review of the (previously published) US EPA, International Agency for Research on Cancer (IARC), and Joint Meeting on Pesticide Residues (JMPR) reviews and reports.  After removing duplicates (n=43) and excluding 850 studies which were either not relevant (animal, para-occupational, or mechanistic studies) or were otherwise inappropriate (generally reports, correspondence, reviews, or documents that did not include the exposure or outcome of interest), a total of 16 full-text articles were assessed. Of these 16, a total of 10 were excluded due to the lack of a risk estimate (n=3), it being an overlapping study (n=6), or containing an uncertain NHL diagnosis (n=1), leaving a total of 6 studies to be included in the meta-analysis.  These six studies were the same as the six studies included in the Agency's evaluation of the human carcinogenic potential of glyphosate that was presented to the Federal Insecticide, Fungicide, and Rodenticide Act (FIFRA) Scientific Advisory Panel (SAP) in 2016.[4] These six articles are listed below:

---

[1] Review available at https://beta regulations.gov/document/EPA-HQ-OPP-2009-0361-0074
[2] The article does not indicate when the search years began, but indicated the literature search was done initially in November 2017 and then updated in March 2018 and then again in August 2018.
[3] D. Moher, A. Liberati, J. Tetzlaf, D.G. Altman, and P. Group. *Preferred reporting items for systematic review and meta-analysis, the PRISMA Statement*, 2009. *PLoS Med* **6** e10000097.
[4] See https://www.epa.gov/sap/meeting-materials-december-13-16-2016-scientific-advisory-panel

(1) McDuffie, H.H., Pahwa, P., McLaughlin, J.R., Spinelli, J.J., Fincham, S., Dosman, J.A., Robson, D., Skinnider, L.F., and Choi, N.W. (2001). Non-Hodgkin's lymphoma and specific pesticide exposures in men: Cross-Canada study of pesticides and health. *Cancer Epidemiol. Biomarkers Prev* 10(11): 1155-1163.

(2) Hardell, L., Eriksson, M., and Nordstrom, M. (2002). Exposure to pesticides as risk factor for non-Hodgkin's lymphoma and hairy cell leukemia: pooled analysis of two Swedish case-control studies. *Leuk Lymphoma.* 2002 May;43(5):1043-1049.

(3) De Roos, A.J., Zahm, S.H., Cantor, K.P., Weisenburger, D.D., Holmes, F.F., Burmeister, L.F., and Blair, A. (2003). Integrative assessment of multiple pesticides as risk factors for non- Hodgkin's lymphoma among men. *Occupational and environmental medicine* 60(9): 1-9. doi: 10.1136/oem.60.9.e11.

(4) De Roos, A.J., Blair, A., Rusiecki, J.A., Hoppin, J.A., Svec, M., Dosemeci M., SandlerD.P., Alavanja, M.C. (2005). Cancer incidence among glyphosate-exposed pesticide applicators in the Agricultural Health Study. *Environ Health Perspect* 113(1): 49-54.

(5) Eriksson, M., Hardell, L., Carlberg, M., and Akerman, M. (2008). Pesticide exposure as risk factor for non-Hodgkin lymphoma including histopathological subgroup analysis. *International journal of cancer* 123(7):1657-1663. doi: 10.1002/ijc.23589.

(6) Orsi, L., Delabre, L., Monnereau, A., Delval, P., Berthou, C., Fenaux, P., Marit, G., Soubeyran, P., Huguet, F., Milpied, N., Leporrier, M., Hemon, D., Troussard, X., and Clavel, J. (2009). Occupational exposure to pesticides and lymphoid neoplasms among men: results of a French case-control study. *Occupational and environmental medicine* 66(5): 291-298.

In addition, the Zhang et al. (2019) authors identified a (then) recent publication on the AHS with updated cohort data for glyphosate and NHL (Andreotti et al., 2018):

> **Andreotti, G., et al. (2018). Glyphosate use and cancer incidence in the Agricultural Health Study. *JNCI: Journal of the National Cancer Institute* 110(5): 509–516. doi:10.1093/jnci/djx233**

An earlier AHS publication (De Roos et al., 2005) was considered in the 2016 SAP evaluation and followed that AHS cohort from enrollment in 1993-1997 to December 31, 2001. Andreotti et al. (2018) provides a (post-2016 SAP) AHS update to this publication with an extended follow-up period through 2012/2013 and adds a much larger number of cases. Specifically, the Andreotti et al. (2018) publication updates and supersedes the 2005 De Roos AHS publication and adds 11-12 additional years of follow-up data and considered over five times as many NHL cases (n=575 rather than n=92). TEB prepared an independent review of this AHS study after the 2016 SAP when this publication appeared summarizing the findings (A. Aldridge, DP Barcode D444727, 12/12/2017)[5]. In addition, Andreotti et al. (2018) was also included and addressed in EPA's Revised Glyphosate Issue Paper: Evaluation of Carcinogenic Potential (DP Barcode D444689, TXR# 0057688, 12/12/2017)[6] which updated the issue paper presented to the FIFRA SAP in 2016. Specifically, the EPA's Revised Glyphosate Issue Paper addressed comments raised by the SAP and incorporated the aforementioned TEB review of Andreotti et al. (2018). <u>Thus, all the data/information summarized and re-interpreted by the Zhang et al. (2019) article have been previously considered by EPA.</u>

---

The six retained studies retained by the Zhang et al (2019) authors were evaluated, along with the recent AHS updated by Andreotti et al (2018), by quality scores using the Newcastle-Ottawa Scale (NOS)[7] with the two highest scoring studies (7 or 8 points) being the prospective cohort AHS studies (Andreotti et al. (2018) and its progenitor study DeRoos et al. (2005)) and Eriksson et al. (2008), a case-control study.  The remaining studies scored either 6 points or 2 points by the NOS, with this latter low score applying only to a case-control study by Orsi et al. (2009).  These ratings coincide with the rankings given by EPA in our December 2017 Revised Glyphosate Issue Paper, which ranked De Roos et al. (2005) and Eriksson et al. (2008) as high quality and the remaining four as moderate quality.

Zhang et al (2019) concluded based on their current meta-analysis of human epidemiological studies, using their *a priori* hypothesis that those with higher exposures to GBH will show increased risks of NHL, that GBH exposure was associated with increased risk of NHL in humans. Using the highest cumulative exposures reported, they emphasized in their review article a meta-risk ratio (mRR) of 1.41 (95% CI: 1.13-1.75) using a fixed effect model which included the most recent (Andreotti, 2018) AHS study. They compared this to a mRR estimate of 1.45 (95% CI: 1.11, 1.91) for the fixed effect model using the earlier AHS study (DeRoos et al., 2005) study in place of Andreotti (2019). They reported that a number of sensitivity analyses performed did not reveal substantively different results and concluded that "our current meta-analysis of human epidemiological studies suggests a compelling link between exposures to GBHs and increased risk for NHL."

### *TEB Evaluation of Zhang et al (2019) Review*

TEB was asked to provide an evaluation of the epidemiological summary and meta-analysis performed by Zhang et al (2019) and to update the prior meta-analysis done for our EPA December 2017 Revised Glyphosate Issue Paper.  We do this below in two parts: (i) a commentary on the Zhang et al. (2019) review and (ii) a re-analysis/update of the high and moderate quality studies investigating NHL selected by EPA previously, substituting the more recent Andreotti et al. (2018) AHS results for the earlier De Roos et al (2005) results.

### (i)    *TEB Commentary on Zhang et al (2019) Review*

As stated above, Zhang et al (2019) performed a meta-analysis of human epidemiological studies to evaluate the *a priori* hypothesis that higher and longer cumulative GBH exposure are likely to yield higher NHL risk estimates than lower and shorter exposures. They reported, depending on the model used, that exposure to glyphosate is associated with a roughly 40 to 60% increase in the incidence of NHL.  TEB offers the following points with respect to their analysis:

- Zhang et al (2019) focused their conclusions on the results from a fixed effect meta-analysis on the highest exposure categories presented in each article, including Andreotti et al. (2018). They state that the use of the fixed effect inverse variance method assigns weights to each study that are directly proportional to the study precision which (they appear to believe) is superior to a random effects model where weights are "based on a complex mix of study precision, relative risk (RR), and meta-analysis size." They continue, stating that

  "One benefit of the random effects model is the ability to incorporate between study variance into the summary variance estimate and confidence intervals which may help prevent artificially narrow confidence intervals resulting from use of the fixed effects model in the presence of between study heterogeneity. However, a feature of the random effects model is that study weighting is not directly

---

[7] G. Wells, B. Shea, D. O'Connell, J. Peterson, V. Welch, M. Losos, P. Tugwell.  The Newcastle-Ottawa Scale (NOS) for Assessing the Quality of Non-randomized Studies in Meta-Analysis.  Ottawa Hospital Research Institute. Ottawa (ON 2009). Available  March 2016.

proportional to study precision, and greater relative weight is given to smaller studies which may result in summary estimates that are less conservative than the fixed effects model"

The use of a fixed effect meta-analysis (instead of random) for this kind of data is unusual and the rationale used by the Zhang et al. (2019) authors to justify this use is incorrect.  The authors did present the results from the correct (random effects) model but indicated in their publication that they were not emphasizing them.[8]  While the results of the random effects model are not substantively different from the fixed effects model (they reported a mRR of 1.56 (95% CI: 1.12, 2.16) using a random effects model incorporating the Andreotti et al (2018) AHS study results), the arguments advanced by the Zhang et al. (2019) authors in support of the fixed effect model contain methodological and logical flaws.[9] The correct meta-analysis method here is a random effects analysis (which tends to give wider and more appropriate confidence intervals).

- The Zhang et al. (2019) authors critiqued Andreotti et al. (2018) for using multiple imputation to account for missing data (Andreotti et al. (2018) had a response rate of only about 63% so 37% of the data needed to be imputed) which Zhang et al. (2019) describe as an "exposure simulation" and provide some technical details about why they have concerns about this.  Multiple imputation for missing data is a state-of-the-science practice for dealing with missing data; nevertheless, the Zhang et al. (2019) authors correctly point out that Andreotti et al. (2018) should have included the *outcome* information into the process of imputing missing exposure values.  Since the missing data of glyphosate exposure of subjects who did not complete the follow-up questionnaire were imputed based on the available information for factors that related to pesticide use such as demographic, medical history, other farm characteristics, and reported pesticide use at enrollment, it would be expected that the impact of failing to include the NHL information would not be substantial.  Importantly, Andreotti et al. (2018) conducted a number of sensitivity analyses that suggest the results of the data analysis of imputed data were reasonable and close to that of data analysis which would have resulted using only complete data. For example:  for the association between glyphosate exposure and NHL, an estimated risk ratio for quartile 4 ($RR_{Quartile\ 4}$) = 0.90 (95% CI=0.63 to 1.27) was obtained from the sensitivity analysis using the data of only subjects with complete data vs. an estimated $RR_{Quartile\ 4}$ = 0.87 (95% CI=0.64 to 1.20) from the analysis where the missing data were imputed.[10] Given these minor differences,  TEB believes that the Andreotti et al. (2018) analysis is adequate and represents a sufficiently reliable risk ratio (RR) for incorporation into a meta-analysis.

- Zhang et al (2019) also correctly pointed out another difference between the earlier De Roos et al. (2005) AHS study and the updated Andreotti et al. (2018) AHS study with respect to the reference group selected. Specifically, the De Roos et al. (2005) article selected the lowest quartile as the reference group while the later Andreotti et al. (2018) article selected the unexposed as the reference group.  Both studies appeared to show differences between the groups

---

[8] Zhang et al. (2019) reported mRR 1.56 (95% CI: 1.12, 2.16) using a random effects model and the Andreotti et al (2018) data in addition to the fixed mRR estimate of 1.45 (95% CI: 1.11, 1.91) using the earlier AHS study (DeRoos, 2005) study in place of Andreotti (2019).

[9] See, e.g., various sections in Borenstein, Michael. *Common Mistakes in Meta-analysis and How to Avoid Them*. (Biostat, Inc: Englewood, NJ) 2019.  e.g., §8.5 p. 59-63) and Borenstein, M. Larry V. Hedges, Julian P.T. Higgins, and Hannah R. Rothstein. *Introduction to Meta-Analysis* (John Wiley and Sons: London) 2008. See also Borenstein, M. Larry V. Hedges, Julian P.T. Higgins, and Hannah R. Rothstein. 2010. A basic introduction to fixed effect and random effects models for meta-analysis. *Res. Syn. Meth.* 1:97-111.

[10] $RR_{Quartile\ 4}$ = 0.90 (95% CI: 0.63,1.27) is listed on page 4 of the publication.  $RR_{Quartile\ 4}$ = 0.87 (95% CI: 0.64, 1.20) is listed in Table 2 of the publication.

that used glyphosate and those that did not[11] which could mean that the potential exists for residual confounding[12].  It is not clear why Andreotti et al. (2018) did not use the lowest exposed quartile as the reference group, at least as part of a sensitivity analysis, and this appears to be a legitimate critique by Zhang et al (2019). Nevertheless, the (statistically significant) baseline differences between the exposed and unexposed do not appear to be substantive and in, any case, were adjusted for in the Poisson regressions that were performed by both (originally) De Roos et al. (2005) and (subsequently) by Andreotti et al. (2018).

The authors stated that their analyses differ from several earlier meta-analyses by focusing on an *a priori* hypothesis targeting biologically-relevant exposure magnitude and including newly updated AHS information from Andreotti et al (2018). More specifically, the Zhang et al (2019) authors elected with their *a priori* hypothesis to focus on the effect sizes which were associated with and characteristic of high-end exposures to GBHs (where "high" was defined as of greater intensity/magnitude, of longer duration, or of some cumulative combination of the two). For at least Andreotti et al. (2018) -- the largest study and of the highest quality -- this hypothesis does not appear to be supported by initial examination of categorized exposures since there are not statistically significant results, no trend is observed (nor monotonicity), and the confidence interval (CI) around each effect size estimate by categorized exposure overlap considerably.  In other words, there is no readily apparent indication of a trend toward higher odds ratios with higher exposures in Andreotti et al (2018) so there appears to be little evidence supporting the authors' stated *a priori* hypothesis.  The table below is an excerpt from Andreotti et al. (2018) and it was the RR and its associated 95% CI of 1.12 (95% CI: 0.83, 1.51) from quartile 4 (Q4) and the 20-year lag that was used by the Zhang et al. (2019) authors as part of their meta-analysis (because this reflects the category with the highest exposure/longest lag (Q4, 20-y lag) and thus most likely to display the largest RR if there was indeed an association).

---

[11] Specifically, De Roos et al. (2005) state that "We compared certain baseline characteristics among the three types of pesticide applicators… [*and* ]… the purpose of the comparison  was to identify potential confounders of the glyphosate exposure-disease associations for the various analyses we conducted. Differences between the exposure groups were tested using the chi-square statistics and associated p-values." They continue, indicating that "significant differences (p<0.05) existed between never exposed and lowest exposed subjects for all of the *[baseline]* characteristics in Table 1. Lowest- and higher- exposures subjects (p<0.05) also differed on several factors, the most notable being that higher -exposed subjects were more likely to be commercial applicators, to have consumed greater amounts of alcohol in the past year, and to have used other specific pesticides.  However, lowest- and higher-exposed subjects were similar to each other (p>0.05) in characteristics including smoking and family history of cancer in a first degree relative.  In addition, lowest and higher- exposed subjects were more similar to each other than to their never-exposed counterparts (by qualitative comparison of percentages only) in factors including NC residence, education beyond high school, and use of other pesticides. Because of relative similarities between lowest- and higher-exposed in factors associated with socioeconomic status and other exposures, we decided to conduct some analyses using lowest-exposed rather than never-exposed applicators as the reference group, in order to avoid residual confounding by unmeasured covariates.".

[12] Specifically, if there are systematic differences in observed variables between farmers/applicators that use glyphosate vs. those that don't, these can be adjusted for (i.e., accounted or corrected for) in the statistical modeling.  Nevertheless, such differences in observed characteristics between users and non-users of glyphosate may be symptomatic of other (unmeasured) systematic /characteristic differences that *aren't* measured in the study. To the extent that these might affect exposure or disease probabilities, such differences would be 'hidden' from the analysis and be unable to be adjusted for by the analysis and potentially lead to incorrect inferences.  Hence, if there are differences between unexposed (e.g., non-users) and exposed (e.g., users) individuals, it can be desirable to use the lowest category of exposure (as opposed to the unexposed) as the reference category.

**Table 3.** Cancer incidence in relation to lagged intensity weighted lifetime days of glyphosate use in the Agricultural Health Study

| Cancer sites* | Glyphosate use† | 5-y lag | | | 20-y lag | | |
|---|---|---|---|---|---|---|---|
| | | No. of cases | RR (95% CI)‡ | P_trend‡ | No. of cases | RR (95% CI)‡ | P_trend‡ |
| Non-Hodgkin lymphoma | | | | | | | |
| | None | 150 | 1.00 (reference) | | 354 | 1.00 (reference) | |
| | Q1 | 113 | 0.92 (0.66 to 1.28) | | 63 | 1.22 (0.91 to 1.64) | |
| | Q2 | 92 | 0.79 (0.59 to 1.06) | | 55 | 1.15 (0.86 to 1.55) | |
| | Q3 | 119 | 1.03 (0.75 to 1.41) | | 48 | 0.98 (0.71 to 1.36) | |
| | Q4 | 101 | 0.87 (0.64 to 1.17) | .76 | 55 | 1.12 (0.83 to 1.51) | .62 |

Excerpt copied directly from p. 514 of Andreotti et al (2018)

It seems apparent from the above excerpt, however, that (i) there is no suggestion of a trend toward higher RRs at higher exposures ($p_{trend}$=0.62), with the Q4 value in fact being only the third highest of the four quartiles value (i.e., one up from the bottom); (ii) none of the RRs associated with any of the quartiles is significant or appear to come close to it; and (iii) all the RRs seem roughly similar at the null RR≅1. Given that, it doesn't appear that extracting only the Q4 value from the RRs here and choosing to move forward with only that selection is necessarily well-supported or justified, particularly since this considerably lowers the sample size (by about two-fold for this 20 year lag and eight-fold compared to an ever/never analysis). This is of particular importance because Andreotti et al. (2018) is a prospective cohort study that is the highest-quality of all the studies selected for meta-analysis.   Thus, it seems there is little justification for any *a priori* hypothesis that there is a dose-response phenomenon with higher doses (exposures) leading to increased risks of NHL here and that there is no clear rationale for Zhang et al. (2019) to choose to use only a small subset of the Andreotti et al (2018) data for their meta-analysis.[13]

---

[13] The subset – as indicated in the text- - was the Q4/20 y lag subset which represents the "high end" exposure to GBHs offered Andreotti et al. (2018) and this RR of 1.12 (95% CI: 0.83, 1.51) was used by Zhang et al. (2018) in place of the earlier De Roos at al. (2005) ever-never estimate of 1.10 (95% CI: 0.7, 1.9). Separate high-end estimates were also provided by Eriksson et al (2008) and McDuffie et al. (2001) representing >10 days/yr (vs.≤10 days/ yr.) and   > 2 days/yr. vs. (vs.≤2 days/yr.), respectively; Zhang et al. (2001) similarly used the high end estimates of 2.36 (95% CI: 1.04, 5.37) and 2.12 (95% CI: 1.20, 3.73), respectively, from these two studies in place of those studies' ever/never estimates.   TEB notes two things regarding this substitution:

1) the Eriksson et al. (2008)-substituted value of 2.36 (95% CI: 1.04, 5.37) from their Table II was based on only 17 cases and 9 controls and was an *unadjusted* effect size because no adjusted effect sizes were provided in the article for the >10 days high end exposure estimate. Table VII in Eriksson et al (2008) suggests that adjustment for age, sex and year of diagnosis/enrolment would bring about a meaningful decrease in the odds ratio for glyphosate had that statistical adjustment been made; this in turn suggests that the > 10 days/yr odds ratio from Ericksson et al (2008) used by Zhang et al. (2018) likely over-estimated any true relationship.

2)  McDuffie et al. (2001) reports an odds ratio of 1.00 (95% CI: 1.63, 1.57) and 2.12 (95% CI: 1.20,3.73) for >0 to ≤2 days/yr and >2 days/yr., respectively. Zhang et al uses the odd ratio 2.12 (95% CI: 1.20,3.73) representing the high end (>2 days/yr) exposure estimate in place of the 1.20 (95% CI: 0.83, 1.74) odds ratio value associated with the ever/never estimate. Due to recall bias in case-control studies and its tendency to introduce differential misclassification away from the null, this estimate of 2.12 (95% CI: 1.20,3.73) for the odds ratio is likely to overestimate the true relationship. Support for this is provided in McDuffie et al. (2001) Table 5 wherein it can be seen that substantially higher odds ratios are seen for all nine odds ratios in that table associated with higher end days/yr. exposures.  For example, there is no reasonable expectation of any relationship between application of sulfur and NHL, yet Table 5 in McDuffie et al. (2001) suggests that applying sulfur ≥ 1 day per year (vs. 0 days per year) more than doubles the risk of NHL (OR=2.12 (95% CI: 1.20, 3.73). Similar increases are seen for 2,4-D, mecoprop, dicamba, malathion, DDT, captan, and carbon tetrachloride.  These are all likely reflective of recall bias, or the tendency of cases (here NHL) to mistakenly overestimate exposures and would consequently lead to odds ratios that likely overestimate true effect sizes. Thus, Zhang et al.'s substitution of the McDuffie et al (2001) odds ratio of 2.12 (95% CI: 1.20,3.73) for glyphosate application of >2 d/yr is likely to overestimate any potential true effect.

As stated earlier, one of the consequences of this choice is that only a small proportion of the results from the largest, most comprehensive, and best designed study among all those examined gets used (specifically, only the 55 exposed cases in Q4 of the 20 year lag analysis vs. 440 exposed cases in all the quartiles for an ever-use analysis). In fact, there is greater justification for combining Q1-Q4 from the 20-year lag analysis into a single 20 year lagged ever/never category for a meta-analysis. Using a fixed effect (aka "common effect") inverse variance meta-analysis a RR close to the null value of 1 (RR = 1.12; 95% CI = 0.96, 1.30) would be obtained that is not statistically significant (p-value =0.14), as shown in Figure 1:

### Figure 1
#### Common Effect Inverse Variance Analysis of 20-year Lag Data from Andreotti et al. (2018)

| Study | exp(θ) with 95% CI | Weight (%) |
|-------|--------------------|------------|
| Quartile 1 | 1.22 [ 0.91, 1.64] | 26.39 |
| Quartile 2 | 1.15 [ 0.86, 1.54] | 26.38 |
| Quartile 3 | 0.98 [ 0.71, 1.36] | 21.67 |
| Quartile 4 | 1.12 [ 0.83, 1.51] | 25.56 |
| **Overall** | 1.12 [ 0.96, 1.30] | |
| Test of θ = 0: z = 1.48, p = 0.14 | | |

Common-effect inverse-variance model
notes:
1. CI may differ slightly from that reported in original study due to rounding
2. θ = ln(Rate Ratio)

*(ii)      CEB Update of Revised Estimate:*

The EPA's December 2017 Revised Glyphosate Issue Paper used single summary measures (i.e., ever/never effect sizes) from the original six NHL studies identified. The results from Andreotti et al. (2018), which was published online at the time, were not incorporated into the EPA analysis at that time. The meta-estimate of 1.27 (95% CI: 1.01, 1.59) based on this analysis was statistically significant, with the lower limit of the 95% CI just slightly over 1. Figure 2 is the forest plot displaying the meta-analysis results excerpted from the December 2017 EPA Revised Glyphosate Issue Paper.

Figure 2. Forest Plot and Meta-analysis for NHL from EPA's December 2017

Revised Glyphosate Issue Paper



The Andreotti et al. (2018) AHS study updated the De Roos et al (2005) AHS study to include (as indicated above) more recent AHS data: this added 11-12 additional years of follow-up data to De Roos et al (2005) and increased by five-fold the number of NHL cases (n=575 rather than n=92)[14]. TEB has been requested to update its previous meta-analysis (illustrated in Figure 2 above from the EPA Revised Glyphosate Issue Paper) by replacing the earlier AHS data from DeRoos et al (2005) with the updated AHS data from Andreotti et al (2018).

Unlike De Roos et al. (2005) and the other five studies included in the previous EPA meta-analysis, Andreotti et al. (2018) provided risk estimates by exposure *quartile* and did **not** report risk estimates on an ever/never basis as did the earlier De Roos et al. (2005) study and other publications.[15] In order to incorporate the Andreotti et al. (2018) data into the meta-analysis, the ever/never risk estimates were

---

[14] HED prepared an independent review of this AHS study after the 2016 SAP (A. Aldridge, DP Barcode D444727, 12/12/2017). See https://beta.regulations.gov/document/EPA-HQ-OPP-2009-0361-0074.

[15] This may be because the Andreotti et al. (2018) exposed counts were larger than the other studies and thus the authors were able to break this out on a quartile basis. NHL counts for Q1 through Q4 in Andreotti et al. (2018) were 102, 93, 106, and 103, respectively.

calculated from the data expressed in exposure quartiles by Andreotti et al (2018). Specifically, this was done using a fixed effect (aka "common effect") meta-analysis technique which is appropriate when attempting to combine effect size estimates from a *single* study.[16]  The resulting estimate for Andreotti et al. (2018) on a comparable ever/never basis is a rate ratio (RR) of 0.85 (95% CI: 0.73, 1.00) as illustrated below in Figure 3.

### Figure 3

Ever-Never Re-analysis of Andreotti et al. (2018) Using Common Effect Inverse Variance Method

| Study | | exp($\theta$) with 95% CI | Weight (%) |
|---|---|---|---|
| Quartile 1 | | 0.83 [ 0.59, 1.17] | 20.70 |
| Quartile 2 | | 0.83 [ 0.61, 1.12] | 26.94 |
| Quartile 3 | | 0.88 [ 0.65, 1.19] | 27.19 |
| Quartile 4 | | 0.87 [ 0.64, 1.19] | 25.17 |
| **Overall** | | 0.85 [ 0.73, 1.00] | |
| Test of $\theta$ = 0: z = -1.97, p = 0.05 | | | |

0.59                    1.19

Common-effect inverse-variance model
notes:
1. CIs may differ slightly from  hat reported in original study due to rounding
2. $\theta$ = ln(Rate Ratio)

Using this updated risk estimate and substituting out the (earlier) AHS risk estimate from De Roos et al. (2005) of OR = 1.1 (95% CI: 0.7, 1.9) produces the following set of effect sizes for use in a new meta-analysis that incorporates the newest (updated) AHS NHL study results from Andreotti et al (2018).

| Study | Risk Estimate (OR or RR) | Lower bound of CI | Upper bound of CI |
|---|---|---|---|
| De Roos et al. (2003) | 1.60 | 0.90 | 2.80 |
| Andreotti et al. (2018)[a] | 0.85 | 0.73 | 1.00 |
| Eriksson et al. (2008) | 1.51 | 0.77 | 2.94 |
| Hardell et al. (2002) | 1.85 | 0.55 | 6.20 |
| McDuffie et al. (2001) | 1.20 | 0.83 | 1.74 |
| Orsi et al.  (2009) | 1.00 | 0.50 | 2.20 |

[a]Andreotti et al (2018) substitutes for the earlier De Roos et al. (2005) estimates of 1.1 (95% CI: 0.7, 1.9)

---

[16]  For this type of analysis, a fixed effect model *is* appropriate. See, e.g., various sections in Borenstein, Michael. *Common Mistakes in Meta-analysis and How to Avoid Them.* (Biostat, Inc: Englewood, NJ) 2019 and Borenstein, M. Larry V. Hedges, Julian P.T. Higgins, and Hannah R. Rothstein. *Introduction to Meta-Analysis* (John Wiley and Sons: London) 2008.

Using these data to update the meta-analysis that was originally performed for the December 2017 EPA Revised Glyphosate Issue Paper produces the following forest plot in Figure 4 with a meta-estimate of the effect size of 1.14 (95% CI: 0.87, 1.50).



**Figure 4**
Updated EPA Meta-analysis Incorporating Andreotti et al. (2018)

| Study | | Effect Size with 95% CI | Weight (%) |
|---|---|---|---|
| De Roos et al. (2003) | | 1.60 [ 0.91, 2.82] | 14.79 |
| Andreotti et al. (2018) | | 0.85 [ 0.73, 0.99] | 35.36 |
| Er ksson et al. (2008) | | 1.51 [ 0.77, 2.95] | 11.85 |
| Hardell et al. (2002) | | 1.85 [ 0.55, 6.21] | 4.57 |
| McDuffie et al. (2001) | | 1.20 [ 0.83, 1.74] | 23.19 |
| Orsi et al. (2009) | | 1.00 [ 0.48, 2.10] | 10.25 |
| **Overall** | | 1.14 [ 0.87, 1.50] | |

Heterogeneity: $\tau^2 = 0.05$, $I^2 = 48.45\%$, $H^2 = 1.94$
Test of $\theta_i = \theta_j$: Q(5) = 9.70, p = 0.08
Test of $\theta = 0$: z = 0.94, p = 0.35

1/2    1    2    4

Random-effects DerSimonian-Laird model
notes:
1. CIs may differ slightly from that reported in original study due to rounding
2. $\theta = \ln$(Effect Size)

As expected, the larger sample size and tighter 95% CI from Andreotti et al. (2018) increased the weight of the AHS cohort study to 35.36% (from 20.95% when using the smaller De Roos et al. (2005) study). The authors of the Zhang et al (2019) review article did not perform this ever-never meta-analysis presumably because Andreotti et al. (2018) reported estimates by quartile and did not provide the ever/never estimates present in and comparable to the original six studies. This updated meta-estimate of 1.14 (95% CI: 0.87, 1.50) compares to EPA's earlier (December 2017) estimate of 1.27 (95% CI: 1.01, 1.59) when the AHS data from De Roos (2005) was included. Therefore, incorporation of the study results from Andreotti et al (2018) yielded a smaller effect size, which is no longer statistically significant.

Finally, there has been some interest in the past in performing these analyses after separating the high and moderate quality studies and seeing how they compare. Per the Revised Glyphosate Issue Paper, the following quality ratings were assigned:

| Study | Quality Ranking |
|---|---|
| De Roos et al. (2003) | Moderate |
| De Roos et al. (2005) | High |
| Eriksson et al. (2008) | High |
| Hardell et al. (2002) | Moderate |
| McDuffie et al. (2001) | Moderate |
| Orsi et al. (2009) | Moderate |

These are the same ratings assigned (independently) by the Zhang et al. (2019) study authors. Substituting the newer (and similarly high ranked) Andreotti et al. (2018) study for the earlier De Roos et al. (2005) high-ranked AHS study produces the following forest plot/meta-analysis (Figure 5):

### Figure 5
Updated EPA Meta-analysis Incorporating Andreotti et al. (2018), by Quality Rating

| Study | | Effect Size with 95% CI | Weight (%) |
|---|---|---|---|
| **High Quality** | | | |
| Andreotti et al. (2018) | | 0.85 [ 0.73, 0.99] | 35.36 |
| Eriksson et al. (2008) | | 1.51 [ 0.77, 2.95] | 11.85 |
| Heterogeneity: $\tau^2 = 0.10$, $I^2 = 62.67\%$, $H^2 = 2.68$ | | 1.03 [ 0.61, 1.75] | |
| Test of $\theta_i = \theta_j$: Q(1) = 2.68, p = 0.10 | | | |
| | | | |
| **Moderate Quality** | | | |
| De Roos et al. (2003) | | 1.60 [ 0.91, 2.82] | 14.79 |
| Hardell et al. (2002) | | 1.85 [ 0.55, 6.21] | 4.57 |
| McDuffie et al. (2001) | | 1.20 [ 0.83, 1.74] | 23.19 |
| Orsi et al.  (2009) | | 1.00 [ 0.48, 2.10] | 10.25 |
| Heterogeneity: $\tau^2 = 0.00$, $I^2 = 0.00\%$, $H^2 = 1.00$ | | 1.28 [ 0.97, 1.69] | |
| Test of $\theta_i = \theta_j$: Q(3) = 1.49, p = 0.68 | | | |
| | | | |
| **Overall** | | 1.14 [ 0.87, 1.50] | |
| Heterogeneity: $\tau^2 = 0.05$, $I^2 = 48.45\%$, $H^2 = 1.94$ | | | |
| Test of $\theta_i = \theta_j$: Q(5) = 9.70, p = 0.08 | | | |
| Test of group differences: $Q_b(1) = 0.52$, p = 0.47 | | | |

1/2   1   2   4

Random-effects DerSimonian-Laird model
notes:
1.CI may differ slightly from that reported in original study due to rounding
2. θ = ln(Effect Size)

As can be seen, the two high-ranked studies also produce a non-statistically significant meta-estimate of 1.03 (95% CI: 0.61, 1.75) and the four moderately ranked studies produce a similarly non-significant meta-estimate of 1.28 (95% CI: 0.97, 1.69) for the effect size. As expected, the overall meta-estimate of 1.14 in Figure 5 and its confidence interval are the same as shown earlier in Figure 4.

### Summary and Conclusions for Zhang et al. (2019):

Overall, HED does not believe Zhang et al. (2019) used appropriate methods to perform their meta-analyses.  The supplemental analyses presented here indicates that lower and non-statistically significant meta-estimates would be obtained if the Andreotti et al. (2018) study is more properly incorporated into the meta-analysis done previously and appearing in the EPA 2017 Revised Glyphosate Issue. Specifically, the Andreotti (2018)-updated meta-estimate is 1.14 (95% CI: 0.87, 1.50) and is no longer statistically significant. This meta-analysis represents an update to the one appearing in the December 2017 EPA Revised Glyphosate Issue Paper in which a statistically significant meta-estimate of the effect size of 1.27 (95% CI: 1.01, 1.59) was reported. As expected in the updated random effect meta-analysis presented here, the larger sample size and tighter confidence interval in Andreotti (2018) means that the

weight of this AHS study increases to 35.36% (from 20.95% when the earlier – and smaller - DeRoos (2005) AHS study was used in a similar random effects analysis). The Zhang et al. (2019) authors did not perform this analysis because Andreotti et al. (2018) did not include an ever/never estimate in their AHS update but instead provided estimates by quartile (and also by lagged quartile). The analysis presented here by EPA in the memorandum used a fixed effect (aka "common effect") inverse variance model to combine the Andreotti-generated quartile-based estimates and create an ever-never estimate.

The Zhang et al. (2019) authors conducted their own literature search and used the same six studies that EPA used in its evaluation.  Two studies were from the U.S., one was from Canada, two studies were from Sweden, and one study was from France.  One of these was a prospective cohort study, with the remainder being case-control.  Quality scorings of these studies were performed by Zhang et al. (2019) based on the Newcastle-Ottawa Scale (NOS) with the two highest scoring studies (7 or 8 points) being Andreotti et al. (2018)/DeRoos (2005), the prospective AHS studies, and Ericksson, a case control study.  The remaining studies scored either 6 points or 2 points by the NOS, with this latter low score applying only to Orsi et al. (2009).  These ratings match the rankings given by EPA in its 2017 Revised Glyphosate Report which ranked DeRoos et al. (2005) and Ericksson et al. (2008) as high and the remainder moderate.

Further regarding the Zhang et al. (2019) publication, the authors state that this study differs from several earlier meta-analyses by focusing on an *a priori* hypothesis targeting biologically-relevant exposure magnitude (using only the risk estimate of the highest exposure and the longest duration of exposure group) and including newly updated AHS information from Andreotti et al (2018). This hypothesis does not appear to be well supported by initial looks at the Andreotti et al. (2018)-categorized 20 year lag rate ratio estimates since there are no statistically significant results, no trend in rate ratios (nor monotonicity), and the confidence intervals around each categorized exposure overlap considerably and cover the null value of 1 for all exposure quartiles. In addition, the authors focused on the results from a fixed effect meta-analysis performed on the effect sizes estimated for highest exposure categories. The use of a fixed effect meta-analyses (instead of random effects) for this kind of data is incorrect.  The authors did, nevertheless, perform a random effects analysis and present these results but indicated that they did not emphasize them.

In summary, the *a priori* hypothesis that higher/longer exposures produce larger effect sizes advanced by Zhang et al. (2019) in their analysis does not appear to be supported by the new AHS data from Andreotti et al. (2018) which is the largest, best-designed high quality study examined.  EPA has used this Andreotti et al. (2018) AHS data to update its December 2017 meta-analysis by replacing the De Roos et al. (2005) AHS results and revised/updated our meta-estimate to a non-statistically significant 1.14 (95% CI: 0.87, 1.50). This revised estimate incorporates the most recent AHS data from Andreotti et al. (2018) and does not impact the conclusions presented in the EPA Revised Glyphosate Issue Paper which concludes that the strongest support based on the weight-of-evidence is for glyphosate being categorized as "not likely to be carcinogenic to humans".

### PART II.  EPA Review of Leon et al. (2019)

Leon et al. (2019) published a summary review/meta-analysis investigating pesticide use and the risk of NHL in cohorts from France (Agriculture and Cancer, **AGRICAN**), Norway (Cancer in the Norwegian Agricultural Population, **CNAP**) and the USA (**AHS**) as part of the international AGRICOH consortium (see https://agricoh.iarc.fr).  The Leon et al. authors used data from these three large cohort studies to explore the relationship between the use of selected pesticide chemical groups as well as various individual pesticide chemicals -- including glyphosate -- and the risk of NHL overall and four major NHL subtypes; this was done in a combined population of nearly 320,0000 farmers and farmworkers totaling

3.5 million person-years of exposure. The four major NHL subtypes investigated were: (i) Chronic lymphocytic leukemia/small lymphocytic lymphoma (CLL/SLL); (ii) diffuse large B-cell lymphoma (DLBC); (iii) follicular lymphoma (FL); and (iv) multiple myeloma/plasma-cell leukemia (MM). More specifically, the **French AGRICAN study** component enrolled 181,747 men in 2005-2007 who met various inclusion criteria including being (i) $\geq$ 18 y.o.; (ii) affiliated with the national health insurance system of agricultural workers; and (iii) residing in 2005 in one of 11 departments in France covered by population-based cancer registries.  The cohort investigated here consisted of active and retired farm owners and farm workers. Members were enrolled after returning self-administered questionnaires that covered historical use information on 13 crops and 5 animal species (first and last year of production) and performance of pesticide treatment tasks (first and last year performed, per crop or animal species). For this study, AGRICAN cohort members were linked with cancer and mortality registries and the French National Death Index through December 2009. The **Norwegian CNAP study** considered owners and non-owners using a farm ("farm holders") and their families that were included in at least one of five national agricultural and horticultural censuses performed during 1969, 1974, 1979, 1985, and 1989 by Statistics Norway (n=147,134). The **US AHS study** has been described previously; briefly, it consisted of 52,394 private pesticide applicators (farmers) and 4916 commercial pesticide applicators registered to apply restricted use pesticides in Iowa and North Carolina.  Members of the AHS cohort were enrolled during 1993-97 and completed questionnaires on agricultural practices, crops and livestock and the use of more than 50 individual pesticide active ingredients, including glyphosate. Applicators completed a second questionnaire approximately five years later that provided details on pesticide use since enrollment.  Cohort members have been routinely and regularly linked to the Iowa and North Carolina cancer and mortality registries and the National Death Index through 31 December 2011 for Iowa participants and 31 December 2010 for North Carolina participants. The summary review/meta-analysis performed here by the Leon et al. (2019) study authors considered only farmers (and not commercial applicators) from the US AHS.  After additional adjustments[17] , a total of n= 127,282, 137,821, and 51,167 individuals were available for use from the AGRICAN, CNAP, and AHS studies, respectively. Combined, this represents 316,270 individuals and 3,574,815 person-years of follow-up from January 1993 through December 2011, with a median follow-up period of 16 years.  During this follow-up a total of 2545 first incident NHL cases were observed (to include both Hodgkins lymphoma and NHL) of which 95.4% were NHL with a median age at diagnosis of 69 years. AGRICAN, CNAP, and AHS contributed 18.1%, 61.6%, and 20.3% of cases to this analysis, respectively.

Study population demographic and other characteristics differed by cohort: for example, AHS cohort members at the start of follow-up were younger than those in CNAP and AGRICAN (median age of 46 years in AHS vs. 51 and 67 years for CNAP and AGRICAN respectively). Half of the AGRICAN cohort consisted of retired farm owners or workers and 44% were female compared with 16% in CNAP and 3% in AHS. Nearly all AHS cohort members (99%) used pesticides (in general, not specifically glyphosate) while only 68% and 63%, respectively did in AGRICAN and CNAP, and of the combined cohort, 63% were classified as ever having been exposed to at least one of the investigated pesticides. Glyphosate in particular was classified as used by 36%, 38%, and 83% of the farmers or farmworkers in the AGRICAN, CNAP, and AHS study cohort populations, respectively.

For the AGRICAN and CNAP studies, data were crossed with country-specific crop-exposure matrices (CEMs) to estimate ever-use of glyphosate and represent *potential* use while for AHS cohort members, self-reported ever-application was used to assess exposure.  For AGRICAN, the French PESTIMAT matrix was used to obtain historical use information which incorporated information on the first and last year in which glyphosate was authorized and recommended for use in France on a given crop; potential

---

[17] Additional adjustments included accounting for emigration or loss to follow-up, prevalent cancer at the start of cancer follow-up, or for being nonfarmers (for AGRICAN), dying before the start of cancer follow-up (for CNAP), and being commercial applicators (for AHS).

exposure in the French AGRICAN was assumed if an individual cultivated a given crop, marked the study questionnaire as having treated the crop with (any) pesticide, and glyphosate was authorized and recommended for use in a given year.  In CNAP, matrices were constructed considering in part the first and last year in Norway that glyphosate was authorized for use on each of the selected crops. The French and Norwegian CEMs extended from 1950 until the last year of cancer follow-up.  Potential exposure to glyphosate in the Norwegian CNAP was assumed if a farm holder reported cultivating a given crop, owned spraying equipment or spent money on pesticides, and glyphosate was sold in Norway and registered for use on the crop in a given year. As stated before, the AHS cohort members self-reported use of glyphosate and thus no CEM or assumptions regarding potential exposure were needed.

Cox proportional hazards (PH) analysis was done separately for each of the three study cohorts and used to estimate both fully-adjusted and minimally-adjusted hazard ratios (HRs) and their 95% CIs for incident NHL for ever-use of glyphosate assuming time-independence of covariates.  The endpoint was the first incident NHL during follow-up, with follow-up beginning on 01 January 1993 corresponding to the date of enrollment for AGRICAN and AHS and (also) 01 January 1993 for CNAP, the earliest year of follow up in the AHS.  Follow-up time for the PH assessment was calculated from the start of follow up to the first date of any of the following: (i) first incident cancer (except non- melanoma skin cancer); loss to follow-up or migration out of the cancer registry area; (iii) death: or (v) end of follow-up.  Multiple imputation was used for missing data in AGRICAN and AHS for crop, pesticide treatment task, period of production and period of pesticide treatment task for the former survey and for pesticides applied for the latter; no imputation was required for CNAP since exposure data were derived from compulsory agricultural censuses and the information from farm-holders was thus complete. The reference category for the PH analysis consisted of individuals classified as never exposed to glyphosate. All models initially used age at the date of censoring as the time scale and were adjusted for sex and animal production.   For AGRICAN, additional covariates included retirement status while for AHS this included state of residence (either Iowa or North Carolina). Subsequently, fully adjusted models were separately constructed for each study cohort. For AGRICAN, adjustment for the number of crops personally treated with pesticides was added as an ordinal variable to approximate increasing opportunity for pesticide exposure. For CNAP, adjustment for pesticide was used instead since similar information was not available. For CNAP and AHS, adjustment was made using a cohort-specific set of active ingredients.

PH models were run first individually for each cohort, with the resulting estimates combined using random effects meta-analysis based on the adjusted results from the three international cohorts.  The authors reported no observed association between ever use of glyphosate and NHL (HR=0.95 (95% CI: 0.77,1.18), n=1131 exposed cases) with some evidence of heterogeneity among cohorts ($I^2$=57%, $p_{heterog}$ = 0.10).

The authors also investigated four NHL subtypes associated with glyphosate and only one – DLBCL at a mHR of 1.36 –was elevated (although not significantly (95% CI: 1.00, 1.85), with n=221). as follows:

- Chronic lymphocytic leukemia/small lymphocytic leukemia (CLL/SLL): HR=0.92 (95% CI: 0.69, 1.24), n= 252;
- Diffuse large β-cell lymphoma (DLBCL): HR=1.36 (95% CI: 1.00, 1.85), n= 221[18,19];

---

[18] The Leon et al (2019) authors state that there was no evidence of heterogeneity among the three cohorts for DLBCL, that cohort-specific CIs were wide, and only the CNAP cohort --accounting for 45% of exposed cases – excluded the null value. Adjusting the CNAP value for ever use of other pesticides (linuron, aldicarb, mancozeb, DDT, lindane, and deltamethrin), the authors state, generated a fully-adjusted HR of ever-use of glyphosate of 1.67 (95% CI: 1.05, 2.65), higher than the minimally adjusted estimate of 1.26 (95% CI; 0.97-1.65) which was driven primarily by adjustment for animal production and DDT use.

[19] For DLBCL, Andreotti et al. (2018) reported ever-never RRs by quartile ranging from 0.94 to 1.13 (n=22-30), and none being statistically significant and a p-for- trend-value of 0.83. The ever-never HR value reported here by Leon et al. (2019) for DLBCL

- Follicular lymphoma (FL): HR=0.79 (95% CI: 0.52, 1.21), n= 105; and
- Multiple Myeloma/plasma-cell leukemia (MM): HR=0.87 (95% CI: 0.66, 1.15), n=240.

Considered individually, only the Norwegian CNAP study excluded the null value for the DLBCL NHL subtype with HR=1.67 (95% CI: 1.05, 2.65) based on 100 cases, with the AHS showing a HR for DLBCL of 1.2 (95% CI: 0.72, 1.98) based on 93 exposed cases and the AGRICAN study showing a HR of 1.06 (95% CI: 0.51, 2.19) with 28 cases.

**Summary and Conclusions for Leon et al. (2019):**

The Leon et al. (2019) review article used data from three international cohorts – the French AGRICAN study, the Norwegian CNAP study and the US AHS study -- to investigate the putative relationship between a number of pesticides, including glyphosate, and NHL; this was performed for both NHL overall (total) and by NHL broken down into four major subtypes.  The study harmonized available exposure data from the three independent agricultural cohorts, thereby increasing the numbers of NHL cases (and exposed cases, particularly) which increases the ability of the combined study to detect associations.  In sum, the study cumulated more than 300,000 farmers/farmworkers from France, Norway, and the US which represent more than 3.5 million person-years of exposure follow-up time from 1993 through 2011 with a median follow-up time of 16 years.  For glyphosate, no significantly increased risks of NHL overall or of three subtypes were observed; for the DLBCL subtype, a somewhat elevated but non-significant relationship was seen (HR=1.36 (95%CI: 1.00, 1.85; n=221 exposed cases). The corresponding HR for the Leon et al. (2019) analysis of AHS for this NHL subtype is smaller, at HR=1.2 (95% CI: 0.72, 1.98) based on 93 exposed cases and for the AGRICAN study smaller still (HR = 1.06 (95% CI: 0.51, 2.19) with 28 cases).

The Leon et al. (2019) review has a number of strengths.  It brings together and combines three very large international prospective cohort studies which increases its ability to detect epidemiological associations. There are, however, also a number of limitations.  For example, only one of the two cohorts, the AHS cohort, uses actual exposure information collected by individuals through self-administered questionnaires; the French AGRICAN study and the Norwegian CNAP study instead rely on information from CEMs to derive estimates of ever-exposure to glyphosate (among other pesticides). No actual pesticide exposure measurements were made in in the AGRICAN or CNAP studies nor were specific questions about specific pesticide applications or application practices asked; instead, a variety of very general and very generic assumptions were made which likely lead to what might be a substantial degree of exposure misclassification.  In addition, the study protocol was such that exposure misclassifications may have been exacerbated since analysis of the combined cohort did not consider re-entry tasks through which contact with previously applied pesticides may have occurred and which may equal or exceed pesticide exposure through application.  An additional complication was that such re-entry work was not evenly distributed through the cohort. For example, 73% of the males and 56% of the females in AGRICAN reported performing re-entry work in vineyards which is a rarely reported crop in the US AHS

---

is 1.36 (95% CI: 1.00, 1.85).  Cohort specific HRs for ever use of glyphosate and DLBCL are as follows: AGRICAN: 1.06 (95% CI: 0.51, 2.19) with n=28 exposed cases; CNAP: 1.67 (95% CI 1.05, 2.65) with n=100 exposed cases; and AHS: 1.20 (95% CI: 0.72, 1.98) with n=93 exposed cases.  Leon et al. (2019) reported a number of exposed cases that is lower than that reported by Andreotti (2018) for the AHS study (see p. 513, Table 2 in Andreotti); some reasons for this difference (as reported by the Leon et al. authors) include the fact that that the AHS study included 4619 commercial applicators that were excluded from the Leon et al (2019) analysis and excluded 1620 private users with information on ever use of glyphosate but did not report frequency of use. In addition, the follow up time was longer in the Andreotti et al. (2018) publication (through 2012 and 2013) and thus contained more DLBCL cases (130 vs. 113 cases). Finally, the statistical adjustments that were made were different between the US AHS study and the AGRICOH study examined here: The AGRICOH study did not adjust for cigarette smoking, alcohol intake, or family history of cancer but *did* adjust for animal production and for different pesticide active ingredients from those adjusted for and published in the US AHS study.

(1%) -- and consisted itself of 97% male farmers.  In addition, the cohorts also differed in fundamental ways.  For example, AHS cohort members were younger at start of follow-up (median age = 46 years) as compared to those in CNAP (median =51 years) or AGRICAN (median=67 years) with in fact about half of the AGRICAN cohort consisting of retired farm owners and farm workers. Further, 44% of AGRICAN participants were female compared to only 16% in CNAP and 3% in AHS. In the AHS, 99% of participants used pesticides (in general); in AGRICAN and CNAP, the percentages were respectively only 68% and 63%.  Further, different statistical adjustments were made depending on what covariates were measured in each of the individual cohorts: The AGRICAN study did not adjust for cigarette smoking, alcohol intake, or family history of cancer as the US AHS did, but did adjust for animal production and for different pesticide active ingredients from those adjusted for and published in the US AHS study. The Leon et al (2019) authors do state that improvements are planned, specifically indicating that the specificity of the exposure assignments will be improved by incorporating the probability of pesticide use and adding parameters reflecting duration, frequency, and use intensity.

In sum, AGRICOH combined three cohorts – one from France (AGRICAN), one from Norway (CNAP) and one from the US (AHS) and did not find a statistically significant relationship between ever-exposure to glyphosate and NHL overall (HR=0.95 (95% CI: 0.77,1.18), n=1131 exposed cases). A somewhat elevated HR was found for one NHL subtype (DLBCL) at a mHR of 1.36, but the 95% confidence interval for this included 1.0.  While the AGRICOH analysis benefited from a combined cohort of more than 300,000 farmers and farmworkers from France, Norway, and the USA representing more than 3.5 million person-years of exposure, only one of the three international cohorts used actual measurement instruments (self-administered questionnaire) for glyphosate exposure. Too, the nature and characteristics of the three cohorts differed in substantive ways and is not clear that the statistical adjustment made were necessarily adequate to account for these differences.   We conclude that this additional information provided in Leon et al (2019) combining the AGRICAN, CNAP and AHS studies does not impact the conclusions presented in the EPA Revised Glyphosate Issue Paper which itself concludes that the strongest support based on the weight-of-evidence is for glyphosate being categorized as "not likely to be carcinogenic to humans".

## CITATIONS

Andreotti, G., Koutros, S., Hofmann, J.N., Sandler, D.P., Lubin, J.H., Lynch, C.F., Lerro, C.C., De Roos, A.J., Parks, C.G., Alavanja, M.C., and Silverman, D.T. (2018). Glyphosate use and cancer incidence in the Agricultural Health Study. *JNCI: Journal of the National Cancer Institute*. 110(5): 509–516. doi:10.1093/ jnci/djx233.  https://academic.oup.com/jnci/article/110/5/509/4590280

Borenstein, Michael. *Common Mistakes in Meta-analysis and How to Avoid Them*. (2019) Biostat, Inc: Englewood, NJ.

Borenstein, M., Hedges, L. V., Higgins, J.P., and Rothstein, H.R. (2008). *Introduction to Meta-Analysis*. John Wiley and Sons: London.

Borenstein, M., Hedges, L. V., Higgins, J.P., and Rothstein, H.R. (2010). A basic introduction to fixed effect and random effects models for meta-analysis. *Res. Syn. Meth*. 1(2):97-111. doi: 10.1002/jrsm.12. Epub 2010 Nov 21.

De Roos, A.J., Zahm, S.H., Cantor, K.P., Weisenburger, D.D., Holmes, F.F., Burmeister, L.F., and Blair, A. (2003). Integrative assessment of multiple pesticides as risk factors for non- Hodgkin's lymphoma among men. *Occupational and environmental medicine* 60(9): 1-9. doi: 10.1136/oem.60.9.e11.

De Roos, A.J., Blair, A., Rusiecki, J.A., Hoppin, J.A., Svec, M., Dosemeci M., SandlerD.P., Alavanja, M.C. (2005). Cancer incidence among glyphosate-exposed pesticide applicators in the Agricultural Health Study. *Environ Health Perspect* 113(1): 49-54.

Eriksson, M., Hardell, L., Carlberg, M., and Akerman, M. (2008). Pesticide exposure as risk factor for non-Hodgkin lymphoma including histopathological subgroup analysis. *International journal of cancer* 123(7):1657-1663. doi: 10.1002/ijc.23589.

Hardell, L., Eriksson, M., and Nordstrom, M. (2002). Exposure to pesticides as risk factor for non-Hodgkin's lymphoma and hairy cell leukemia: pooled analysis of two Swedish case-control studies. *Leuk Lymphoma.* 2002 May;43(5):1043-1049.

Leon, M.E., Schinasi, L.H, Lebailly, P., Beane Freeman, L.E. , Nordby, K.C., Ferro, G., Monnereau, A., Brouwer, M., Tual, S., Baldi, I.,  Kjaerheim, K., Hofmann, J.N., Kristensen, P., Koutros, S., Straif, K., Kromhout, H. and Schuz, J.(2019).  Pesticide use and risk of non-Hodgkin lymphoid malignancies in agricultural cohorts from France, Norway, and the USA: a pooled analysis from the AGRICOH consortium. *Int J Epidemiol.* 48(5):1519-1535. doi: 10.1093/ije/dyz017.

McDuffie, H.H., Pahwa, P., McLaughlin, J.R., Spinelli, J.J., Fincham, S., Dosman, J.A., Robson, D., Skinnider, L.F., and Choi, N.W. (2001). Non-Hodgkin's lymphoma and specific pesticide exposures in men: Cross-Canada study of pesticides and health. *Cancer Epidemiol. Biomarkers Prev* 10(11): 1155-1163.

Moher, D., Liberati, A., Tetzlaf, J., Altman, D.G., and Group, P. (2009). Preferred reporting items for systematic review and meta-analysis, the PRISMA Statement.  *PLoS Med* 6 e10000097. doi: 10.1371/journal.pmed.1000097. Epub 2009 Jul 21.

Orsi, L., Delabre, L., Monnereau, A., Delval, P., Berthou, C., Fenaux, P., Marit, G., Soubeyran, P., Huguet, F., Milpied, N., Leporrier, M., Hemon, D., Troussard, X., and Clavel, J. (2009). Occupational exposure to pesticides and lymphoid neoplasms among men: results of a French case-control study. *Occupational and environmental medicine* 66(5): 291-298.

Wells, G., Shea, B., O'Connell, D., Peterson, J., Welch, V., Losos, M., and Tugwell, P. (2009). The Newcastle-Ottawa Scale (NOS) for Assessing the Quality of Non-randomized Studies in Meta-Analysis. Ottawa Hospital Research Institute. Ottawa (ON 2009). Available March 2016.

Zhang, L., Rana, I., Shaffer, R.M., Taioli, E., and Sheppard, L. (2019). Exposure to glyphosate-based herbicides and risk for non-Hodgkin lymphoma: a meta-analysis and supporting evidence. *Mutation Research/Reviews in Mutation Research.* 781:186-206. doi: 10.1016/j.mrrev.2019.02.001. Epub 2019 Feb 10.

# EXHIBIT 14

# CLH report

# Proposal for Harmonised Classification and Labelling

### Based on Regulation (EC) No 1272/2008 (CLP Regulation), Annex VI, Part 2

# Substance Name: N-(phosphonomethyl)glycine; Glyphosate (ISO)

**EC Number:**    **213-997-4**

**CAS Number:**    **1071-83-6**

**Index Number:**    **607-315-00-8**

**Contact details for dossier submitter:**

    **BAuA**
    Federal Institute for Occupational Safety and Health
    Federal Office for Chemicals
    Friedrich-Henkel-Weg 1-25
    44149 Dortmund, Germany

**Version:**    **2.0 (Post Accordance Check)**

**Date:**    **May 2016**

# CONTENTS

# Part A.

1  PROPOSAL FOR HARMONISED CLASSIFICATION AND LABELLING ...........................................4

1.1  SUBSTANCE ........................................................................................................................................... 4
1.2  HARMONISED CLASSIFICATION AND LABELLING PROPOSAL ................................................................ 5
1.3  PROPOSED HARMONISED CLASSIFICATION AND LABELLING BASED ON CLP REGULATION ................... 6

2  BACKGROUND TO THE CLH PROPOSAL .......................................................................................8

2.1  HISTORY OF THE PREVIOUS CLASSIFICATION AND LABELLING ............................................................ 8
2.2  SHORT SUMMARY OF THE SCIENTIFIC JUSTIFICATION FOR THE CLH PROPOSAL ................................. 8
2.3  CURRENT HARMONISED CLASSIFICATION AND LABELLING .................................................................. 8

3  JUSTIFICATION THAT ACTION IS NEEDED AT COMMUNITY LEVEL ....................................8

# Part B.

SCIENTIFIC EVALUATION OF THE DATA ..................................................................................................... 10

1  IDENTITY OF THE SUBSTANCE .................................................................................................... 10

1.1  NAME AND OTHER IDENTIFIERS OF THE SUBSTANCE........................................................................... 10
1.2  COMPOSITION OF THE SUBSTANCE .................................................................................................... 11
   1.2.1  Composition of test material ................................................................................................... 12
1.3  PHYSICO-CHEMICAL PROPERTIES ...................................................................................................... 12

2  MANUFACTURE AND USES ........................................................................................................... 13

3  SUBSTANCECLASSIFICATION FOR PHYSICO-CHEMICAL PROPERTIES ............................ 13

4  HUMAN HEALTH HAZARD ASSESSMENT ................................................................................. 13

4.1  TOXICOKINETICS (ABSORPTION, METABOLISM, DISTRIBUTION AND ELIMINATION) .......................... 14
   4.1.1  Non-human data ...................................................................................................................... 14
   4.1.2  Human data.............................................................................................................................. 18
4.2  ACUTE TOXICITY .............................................................................................................................. 18
   4.2.1  Non-human information .......................................................................................................... 18
   4.2.2  Human data.............................................................................................................................. 25
4.3  SPECIFIC TARGET ORGAN TOXICITY – SINGLE EXPOSURE (STOT SE)............................................. 26
   4.3.1  Non-human information .......................................................................................................... 26
   4.3.2  Human data.............................................................................................................................. 26
4.4  IRRITATION ....................................................................................................................................... 26
   4.4.1  Skin irritation.......................................................................................................................... 26
   4.4.2  Eye irritation........................................................................................................................... 27
   4.4.3  Respiratory tract irritation .................................................................................................... 30
4.5  CORROSIVITY ................................................................................................................................... 30
4.6  SENSITISATION ................................................................................................................................. 30
   4.6.1  Skin sensitisation.................................................................................................................... 30
   4.6.2  Respiratory sensitisation ....................................................................................................... 32
4.7  SPECIFIC TARGET ORGAN TOXICITY (CLP REGULATION) – REPEATED EXPOSURE (STOT RE)........... 32
   4.7.1  Non-human information .......................................................................................................... 32
   4.7.2  Human information .................................................................................................................. 41
   4.7.3  Other relevant information ..................................................................................................... 41
   4.7.4  Summary and discussion ......................................................................................................... 41
   4.7.5  Summary and discussion of repeated dose toxicity findings relevant for classification as STOT RE
   according to CLP Regulation. ............................................................................................................ 41
   4.7.6  Comparison with criteria of repeated dose toxicity findings relevant for classification as STOT RE ...... 41
   4.7.7  Conclusions on classification and labelling of repeated dose toxicity findings relevant for classification
   as STOT RE ...................................................................................................................................... 42
4.8  GERM CELL MUTAGENICITY (MUTAGENICITY)................................................................................. 43
   4.8.1  Non-human information ........................................................................................................... 43

4.8.1.1 *In vitro* data ....................................................................................................45
4.8.1.2 *In vivo* data ......................................................................................................49
*4.8.2 Human information* ...............................................................................................57
*4.8.3 Other relevant information* ...................................................................................57
*4.8.4 Summary and discussion of mutagenicity* ...........................................................58
*4.8.5 Comparison with criteria* .....................................................................................58
*4.8.6 Conclusions on classification and labelling* ........................................................59
4.9 CARCINOGENICITY ............................................................................................................59
*4.9.1 Non-human information* ........................................................................................59
*4.9.2 Human information* ...............................................................................................80
*4.9.3 Other relevant information* ...................................................................................93
*4.9.4 Summary and discussion of carcinogenicity* .......................................................93
*4.9.5 Comparison with criteria* .....................................................................................94
*4.9.6 Conclusions on classification and labelling* ........................................................98
4.10 TOXICITY FOR REPRODUCTION ..........................................................................................98
*4.10.1 Effects on fertility* ................................................................................................98
4.10.1.1 Non-human information ......................................................................................98
4.10.1.2 Human information ...........................................................................................100
*4.10.2 Developmental toxicity* ......................................................................................101
4.10.2.1 Non-human information ....................................................................................101
4.10.2.2 Human information ...........................................................................................109
*4.10.3 Other relevant information* .................................................................................110
*4.10.4 Summary and discussion of reproductive toxicity* ............................................111
*4.10.5 Comparison with criteria* ...................................................................................112
4.10.5.1 Effects on fertility ............................................................................................112
4.10.5.2 Developmental toxicity ....................................................................................112
*4.10.6 Conclusions on classification and labelling* ......................................................114

5   ENVIRONMENTAL HAZARD ASSESSMENT ...............................................................115

5.1 DEGRADATION .................................................................................................................115
*5.1.1 Stability* ..............................................................................................................115
*5.1.2 Biodegradation* ...................................................................................................116
5.1.2.1 Biodegradation estimation ...............................................................................116
5.1.2.2 Screening tests ..................................................................................................116
5.1.2.3 Simulation tests ................................................................................................116
*5.1.3 Summary and discussion of degradation* ...........................................................116
5.2 ENVIRONMENTAL DISTRIBUTION ......................................................................................117
5.3 AQUATIC BIOACCUMULATION ..........................................................................................117
*5.3.1 Aquatic bioaccumulation* ...................................................................................117
5.3.1.1 Bioaccumulation estimation .............................................................................117
5.3.1.2 Measured bioaccumulation data .......................................................................117
5.4 AQUATIC TOXICITY .........................................................................................................118
*5.4.1 Fish* ....................................................................................................................119
5.4.1.1 Short-term toxicity to fish ................................................................................119
5.4.1.2 Long-term toxicity to fish .................................................................................121
*5.4.2 Aquatic invertebrates* .........................................................................................123
5.4.2.1 Short-term toxicity to aquatic invertebrates .....................................................123
5.4.2.2 Long-term toxicity to aquatic invertebrates .....................................................125
*5.4.3 Algae and aquatic plants* ....................................................................................127
*5.4.4 Other aquatic organisms (including sediment)* ..................................................133
5.5 COMPARISON WITH CRITERIA FOR ENVIRONMENTAL HAZARDS (SECTIONS 5.1 – 5.4) ............134
5.6 CONCLUSIONS ON CLASSIFICATION AND LABELLING FOR ENVIRONMENTAL HAZARDS (SECTIONS 5.1 – 5.4) ..... 134

6   OTHER INFORMATION ....................................................................................................135

7   REFERENCES .....................................................................................................................135

8   ANNEXES ............................................................................................................................169

CLH REPORT FOR GLYPHOSATE

was only marginally above the historical control range. Reliability of this information could not be verified and, even if correct, this explanation would not be convincing. However, and more important, no increase in testicular tumours was observed in any other long-term study with glyphosate in rats even though much higher doses were administered.

**Studies in mice**

In total, five long-term studies are available that may be considered valid according to current standards and were performed in compliance with OECD TG 451. They are summarised in Table 30. As in rats, chronic toxicity was confined to high dose levels in all the studies but some differences became apparent in what was actually observed. For more information, the reader is referred to the attached RAR (Volume 1, 2.6.6.2, Volume 3, B.6.5.2).

The DS is aware of two further long-term studies in mice which have been very briefly reported in an older EU evaluation report (Germany, 1998, ASB2010-10302). These studies by Vereczkey and Csanyi (1982, TOX9650154) and by Bhide (1988, TOX9551831) did not comply with current standards. In both of them, the top dose level was 300 ppm and, thus, much too low for meaningful evaluation. No increase in any tumour type had been reported but these studies are not suitable for the purpose of classification and labelling. The same holds true for a published study on skin tumour promotion (George et al., 2010, ASB2012-11829). This experiment was performed with a commercial product that most likely contains irritating co-formulants. It cannot contribute to a decision on the classification of glyphosate. Furthermore, the up- and down-regulation of protein expression is not sufficient to prove a carcinogenic effect. Apart from that, there are no published studies on carcinogenicity in mice.

Thus, evaluation of a carcinogenic potential of glyphosate in mice is based on the five available, guideline-compliant studies. In line with the approach taken for the rat studies, the main effects as summarised in this table were statistically significant and either dose-related or observed at the top dose level only. This approach implies that these findings were not necessarily all noted at the LOAEL.

Table 30:    Long-term feeding studies with glyphosate in mice

| Reference; Study identifi-cation; purity; Owner | Study type, strain, duration, route | Dietary dose levels and corresponding mean daily intake | NOAEL | LOAEL | Targets / Main effects |
|---|---|---|---|---|---|
| Wood et al., 2009, ASB2012-11492; 95.7%; Nufarm | Carcinogenicity (OECD TG 451); 18 mo; CD-1 (ICR), feeding | 0, 500, 1500, 5000 ppm (71/98; 234/299; 810/1081 mg/kg bw/d in m/f) | 810 mg/kg bw/d | Not established | No effects observed |
| Kumar, 2001, ASB2012-11491; >95.14%; ADAMA | Carcinogenicity (OECD TG 451); 18 mo, Swiss albino | 0, 100, 1000, 10000 ppm (15; 151; 1460 mg/kg bw/d, sexes combined since values were similar) | 151 mg/kg bw/d | 1460 mg/kg bw/d | Higher incidence of malignant lymphoma at top dose level (outside historical control range for males); cystic glands in stomach in m↑ (equivocal toxicological relevance) |
| Sugimoto, 1997, ASB2012-11493; 97.56% or 94.61% (2 lots | Carcinogenicity (OECD TG 451); 18 mo; CD-1 (ICR) | 0, 1600, 8000, 40000 ppm (165/153; 838/787; 4348/4116 mg/kg bw/d in m/f) | 153 mg/kg bw/d | 787 mg/kg bw/d | Bw gain, food consumption and efficiency↓, loose stool, caecum distended and |

CLH REPORT FOR GLYPHOSATE

| Reference; Study identification; purity; Owner | Study type, strain, duration, route | Dietary dose levels and corresponding mean daily intake | NOAEL | LOAEL | Targets / Main effects |
|---|---|---|---|---|---|
| used); Arysta | | | | | organ wt↑, prolapse and ulceration of anus in m |
| Atkinson et al., 1993; TOX9552382; 98.6%; Cheminova | Carcinogenicity (OECD TG 451); 2 yr, CD-1 | 0, 100, 300, 1000 mg/kg bw/d (dietary levels regularly adjusted) | 1000 mg/kg bw/d | Not established | Equivocal evidence of enlarged/firm thymus and increase in mineral deposition in the brain, not regarded as adverse |
| Knezevich and Hogan, 1983; TOX9552381; 99.7%; Monsanto | Carcinogenicity with chronic toxicity elements (OECD TG 451/453); 2 yr, CD-1 | 0, 1000, 5000, 30000 ppm 157/190; 814/955; 4841/5874 mg/kg bw/d in m/f) | 157 mg/kg bw/d | 814 mg/kg bw/d | Bw (gain) ↓ in high dose males, histological findings in liver (centrolobular hypertrophy), kidney (histological changes) and bladder (epithelial hyperplasia) in males |

In these studies, there was evidence of increases in three types of tumours, all in males: malignant lymphoma, renal tumours, and haemangiosarcoma, however, there was no consistency between the studies. In the following, all these three types are addressed in detail. That means also that the statistical calculations were repeated. In the original study reports, mostly pairwise comparisons had been made. In the 2015 IARC evaluation, in contrast, trend tests were the preferred statistical tool. The DS re-calculated the statistical significance of the observed tumour incidences by taking both approaches.

Malignant lymphoma

The total numbers of affected animals in the various mouse studies are given in Table 31.

Table 31:     Total incidence of malignant lymphoma in long-term studies with glyphosate in different mouse strains and appropriate historical control (HC) data from the performing laboratory if available

| Study, Strain | | Males | | | | Females | | | |
|---|---|---|---|---|---|---|---|---|---|
| Wood et al, 2009, ASB2012-11492 Crl:CD-1 (ICR) BR | Dose (ppm) | 0 | 500 | 1500 | 5000 | 0 | 500 | 1500 | 5000 |
| | Affected | 0/51 | 1/51 | 2/51 | 5/51 | 11/51 | 8/51 | 10/51 | 11/51 |
| Kumar, 2001, ASB2012-11491 HsdOLA:MF1 (Swiss albino) | Dose (ppm) | 0 | 100 | 1000 | 10000 | 0 | 100 | 1000 | 10000 |
| | Affected | 10/50 | 15/50 | 16/50 | 19/50* | 18/50 | 20/50 | 19/50 | 25/50* |
| | HC | Study range: 6–30% Study mean: 18.4% Basis: 250 male mice in 5 studies (1996-1999 covering the in-life phase of the actual study) | | | | Study range: 14–58% Study mean: 41.6% Basis: 250 female mice in 5 studies (1996-1999) | | | |

CLH REPORT FOR GLYPHOSATE

| Study, Strain | | Males | | | | Females | | | |
|---|---|---|---|---|---|---|---|---|---|
| Sugimoto, 1997, ASB2012-11493 Crj:CD-1 (ICR) | Dose (ppm) | 0 | 1600 | 8000 | 40000 | 0 | 1600 | 8000 | 40000 |
| | Affected | 2/50 | 2/50 | 0/50 | 6/50 | 6/50 | 4/50 | 8/50 | 7/50 |
| | HC | Study range: 3.85–19.23% Study mean: 6.33% Basis: 458 male mice in 12 studies (1993-1998) | | | | Study range: 7.84–26.92% Study mean: 15.03% Basis: 459 female mice in 12 studies (1993-1998) | | | |
| Atkinson et al., 1993, TOX9552382, CD-1 (not further specified) | Dose (mg/kg bw/d) | 0 | 100 | 300 | 1000 | 0 | 100 | 300 | 1000 |
| | Affected# | 4/50 | 2/50 | 1/50 | 6/50 | 14/50 | 12/50 | 9/50 | 13/50 |

* increase statistically significant according to original study report, for females based on percentage and not on total number of affected mice
# based on histological examination of lymph nodes with macroscopic changes

Obviously, the carcinogenicity study in Swiss albino mice by Kumar (2001, ASB2012-11491) revealed an increase in malignant lymphoma incidence over the control at the top dose level of around 1460 mg/kg bw/day in both sexes but the background (control) incidence was also quite high. In fact, at least in males, the number of affected animals in the control groups was markedly higher in this strain than in three studies in CD-1 mice. It must be emphasised that this tumour is quite common in ageing mice and that Swiss mice are frequently affected (for details, see below). In this study, malignant lymphoma accounted for 54.6% of the total number of tumours when all groups are considered together.

In the most recent study in CD-1 mice by Wood et al. (2009, ASB2012-11490), there was a higher incidence of the same tumour type in high dose males (5/51 vs. 0/51 in the control group). Likewise, in the study by Sugimoto (1997, ASB2012-11493), there were a higher number of male mice affected at the exaggerated dose level of 40000 ppm (approx. 4350 mg/kg bw/day) than in the control group (6/50 vs. 2/50). In the study by Atkinson et al. (1993, TOX9552382), in contrast, there was no dose response and the incidence in the control group was similar to that at the top dose level.

In the earliest study in CD-1 mice by Knezevich and Hogan (1983, TOX9552381), malignant lymphoma was not mentioned as a separate entity but malignant lymphoblastic tumours of the lymphoreticular system in male mice did not show an increase with dose (Table 33) even though the maximum mean daily dose of 4841 mg/kg bw/day was higher than in any other study.

Table 32:     Lymphoreticular neoplasia in male CD-1 mice in the study by Knezevich and Hogan (1983, TOX9552381)

| Tumour type / dose (ppm | Males | | | |
|---|---|---|---|---|
| | 0 | 1000 | 5000 | 30000 |
| Lymphoblastic lymphosarcoma with leukaemia | 1 | 4 | 3 | 2 |
| Lymphoblastic lymphosarcoma without leukaemia | 0 | 1 | 0 | 0 |
| Composite lymphosarcoma | 1 | 0 | 1 | 0 |

| Tumour type / dose (ppm | Males | | | |
|---|---|---|---|---|
| Lymphoreticular neoplasms (total) | 2 / 48 | 5 / 59 | 4 / 50 | 2 / 49 |

If a more recent histopathological nomenclature would have been used, malignant lymphoma was covered by this data.

The data on malignant lymphoma became subject to statistical re-evaluation by means of different methods. It must be emphasised that in the first evaluation by the DS in 2013 only the statistical evaluation by the study authors according to the original study plans had been taken into account resulting in a weak but significant increase in this tumour type in high dose males and females in the study in Swiss mice but not in CD-1 mice as given in Table 31.

- For the study by Kumar (2001, ASB2012-11491), a significantly increased incidence of malignant lymphoma in males and females of the high dose group was mentioned in the study report. For analysis, the Z-test had been employed revealing a significance level of 0.002. Interestingly, when the more usual Fisher's exact test had been used, p-values of 0.077 or even 0.225 would have been obtained and the significance lost in both sexes. The trend test also provided a p-value above the significance level of 0.05, most probably because of the high control incidence (see Table 33).

Table 33:    Malignant lymphoma in Swiss albino mice (Kumar, 2001, ASB2012-11491). Fisher's exact test was used to pairwise compare each treatment group to the respective control group, with p-values reported in brackets. For each sex, a Cochran-Armitage trend test was performed, with p-values reported in a separate row.

| Dose (mg/kg bw/day) | Males on study | Males with malignant lymphoma | Females on study | Females with malignant lymphoma |
|---|---|---|---|---|
| 0 | 50 | 10 | 50 | 18 |
| 15 | 50 | 15 (0.356) | 50 | 20 (0.837) |
| 151 | 50 | 16 (0.254) | 50 | 19 (1.000) |
| 1460 | 50 | 19 (0.077)* | 50 | 25 (0.225)* |
| Trend test (p-value) | | 0.0655 | | 0.068 |

* The original study report indicated a statistically significant increase (p<0.05), using the Z-test.

- In contrast, re-analysis of the studies by Wood et al. (2009, ASB2012-11490) and Sugimoto (1997, ASB2012-11493) showed statistically significant increases with dose for male CD-1 mice in the trend test (Table 34 and Table 35) but a rather low or even "zero" incidence in the control groups might be behind this finding. For the data from the Wood et al. (2009, ASB2012-11490) study, a first pairwise comparison by Fisher's exact test suggested a borderline increase at the top dose level but statistical significance was not achieved (p = 0.056). This result was confirmed by the chi-square test. Also for this comparison, the very low control incidence (0/51) should be taken into consideration. No evidence of an increase in malignant lymphoma was found in females.

CLH REPORT FOR GLYPHOSATE

Table 34:    Malignant lymphoma in CD-1 mice (Wood et al., 2009, ASB2012-11490). Chi square test was used to compare each treatment group to the respective control group, with p-values reported in brackets. For each sex, a Cochran-Armitage trend test was performed, with p-values reported in a separate row.

| Dose (mg/kg bw/day) | Males on study | Males with malignant lymphoma | Females on study | Females with malignant lymphoma |
|---|---|---|---|---|
| 0 | 51 | 0 | 51 | 11 |
| 71 | 51 | 1 (1.000) | 51 | 8 (0.611) |
| 234 | 51 | 2 (0.475) | 51 | 10 (1.000) |
| 810 | 51 | 5 (0.067)[#] | 51 | 11 (1.000) |
| Trend test (p-value) | | 0.0037 | | 0.3590 |

[#] Chi –square test was chosen in accordance to the recommendations of the statistics package used. Using Fisher's exact test, a p-value of 0.056 (two-sided) was calculated. Depending on the tool used for calculation, the two-tailed Z-test produced p-values of 0.0220, 0.0219 and 0.067.

Table 35:    Malignant lymphoma in CD-1 mice (Sugimoto, 1997, ASB2012-11493). Fisher's exact test was used to compare each treatment group to the respective control group, with p-values reported in brackets. For each sex, a Cochran-Armitage trend test was performed, with p-values reported in a separate row.

| Dose (mg/kg bw/day) | Males on study | Males with malignant lymphoma | Females on study | Females with malignant lymphoma |
|---|---|---|---|---|
| 0 | 50 | 2 | 50 | 6 |
| 165 | 50 | 2 (1.000) | 50 | 4 (0.741) |
| 838 | 50 | 0 (0.495) | 50 | 8 (0.774) |
| 4348 | 50 | 6 (0.269) | 50 | 7 (1.000) |
| Trend test (p-value) | | 0.0085 | | 0.2971 |

No evidence of an increase in malignant lymphoma was obtained upon statistical re-evaluation for the study by Atkinson et al. (1993, TOX9552382) confirming the prior assumption (Table 36).

Table 36:    Malignant lymphoma in CD-1 mice (Atkinson et al., 1993, TOX9552382). Fisher's exact test was used to compare each treatment group to the respective control group, with p-values reported in brackets. For each sex, a Cochran-Armitage trend test was performed, with p-values reported in a separate row.

| Dose (mg/kg bw/day) | Males on study | Males with malignant lymphoma | Females on study | Females with malignant lymphoma |
|---|---|---|---|---|
| 0 | 50 | 4 | 50 | 14 |
| 100 | 50 | 2 (0.678) | 50 | 12 (0.657) |
| 300 | 50 | 1 (0.362) | 50 | 9 (0.342) |
| 1000 | 50 | 6 (0.741) | 50 | 13 (1.000) |
| Trend test (p-value) | | 0.0760 | | 0.4831 |

CLH REPORT FOR GLYPHOSATE

It may be concluded that the statistical significance of the suspected increase in malignant lymphoma in the various studies depends very much on the statistical method that is used for data analysis. When the trend test is applied, the studies by Wood et al. (2009, ASB2012-11490) and Sugimoto (1997, ASB2012-11493) provide evidence of an effect which was not the case when pairwise comparison was performed. In contrast, the increase in the study of Kumar (2001, ASB2012-11491) was not confirmed neither by the trend test nor by a different pairwise test than the Z-test that had been used first.

According to OECD criteria (OECD 116), significance in either kind of test (i.e., trend test or pairwise comparison) was sufficient to reject the hypothesis of a chance event. However, statistical significance is not the only criteria to decide whether or not an increase in a certain tumour type should be assumed as treatment-related. For a firm conclusion on the likeliness of an increase in malignant lymphoma in mice due to glyphosate exposure, the biological significance of a numerically higher tumour rate, the whole database in the species and the respective strains (i.e., historical control data on the background incidence of a given tumour type) and more aspects such as dose selection and dose response must be taken into consideration.

At first, dose selection and dose response in the individual studies might be of importance. In the studies by Wood et al. (2009, ASB2012-11490) and by Atkinson et al. (1993, TOX9552382) in CD-1 mice, comparable top doses of 810 or 1000 mg/kg bw/day were administered and a similar incidence of malignant lymphoma was noted in high dose males (5/51 or 6/50, respectively). However, the control group incidences were clearly different (0/51 vs. 4/50) resulting in a positive trend test in the study by Wood et al. (2009, ASB2012-11490) only. A dose of 4348 mg/kg bw/day was actually applied in the study by Sugimoto (1997, ASB2012-11493) as a maximum. The study was also performed in CD-1 mice and the malignant lymphoma incidence of 6/50 at the top dose level was similar to what was seen in the two studies mentioned before even though the applied dose was by four to five times higher. This is surprising since a further increase would be expected if it was a treatment-related effect. These doubts are further supported by the long-term study by Knezevich and Hogan (1983, TOX9552381) in which an even still higher dose of 4841 mg/kg bw/day was fed without an increase in lymphoreticular tumours in general. Unfortunately, malignant lymphoma was not mentioned as a particular pathological entity but it can be reasonably assumed that such tumours have been reported as "lymphoreticular neoplasia".Thus, if all four studies in CD-1 mice are taken together, there is no consistent dose response.

Then, the huge variability of spontaneous incidences of malignant lymphoma in mice as suggested by historical control data must be taken into consideration. This holds true for both Swiss and CD-1 mice as well as for other strains (Wogan and Pattengale, 1984, ASB2016-889). Unfortunately, reliable historical control data on malignant lymphoma incidence from the performing laboratories are available only for two of the glyphosate studies (Sugimoto, 1997, ASB2012-11493, and Kumar, 2001, ASB2012-11491). Therefore, it is necessary to use also data from the open literature or from industry databases even though such information is usually considered less relevant.

In the study in Swiss mice by Kumar (2001, ASB2012-11491), the historical control incidence from the performing laboratory was in a very wide range from 6 to 30% in male mice (study mean 18.4%) and from 14 to 58% in females (study mean 41.6%). Thus, the actual malignant lymphoma incidence in this study of 38% in males and 50% in females was above the mean values of the (relatively small) historical control and, for males, outside the historical control range. Of course, the relevance of this data is questionable since it was based on observations in only five studies employing in total 250 untreated control animals per sex. Nonetheless, it seems well in line with information that was found in the literature providing confirmation that Swiss mice are prone to developing lymphoreticular tumours. According to older articles, control incidences in male mice of

CLH REPORT FOR GLYPHOSATE

Swiss or Swiss-derived strains may reach 18–27.5% and exceed 36% in females (Sher, 1974, Z22020; Roe and Tucker, 1974, ASB2015-2534; Tucker, 1979, Z83266). In a more recent publication, Tadesse-Heath et al. (2000, ASB2015-2535) even mentioned a nearly 50% lymphoma (mostly of B cell origin) incidence in a colony of CFW Swiss mice but also emphasised the contribution of widespread infections with murine oncogenic viruses to the high but remarkably variable incidence of tumours of the lymphoreticular system in this species. This problem is known for long and was often addressed in the past in textbooks of virology or mouse pathology. Already more than 30 years ago, Wogan and Pattengale (1984, ASB2016-889) described the contradictory situation as follows: "The role of oncogenic viruses in many hematopoietic tumours in mice is well established. Virtually all spontaneous or induced lymphomas which have been studied in mice contain oncogenic viruses. It is also recognized that oncogenic viruses and chemicals can act synergistically on cells in vitro and in vivo to cause tumour formation. This can be manifested by either increased incidence, decreased latency, or both. This raises the important issue as to whether a chemical which induces lymphoma in mice requires the presence of a murine oncogenic virus. If so, perhaps the induction of this tumour in mice would not be relevant to human carcinogenic risk. However, since it is possible that many other species, including man, carry undetected oncogenic virus which may act with chemicals to increase tumour burdens, considerations of viral carcinogenesis do not totally resolve the questions concerning the significance of mouse lymphoma in safety testing, except to point out that the prevalence of oncogenic viruses in mice may make them highly susceptible to the induction of lymphoma, leukaemia, and perhaps other neoplasms." No information is available on possible abundance of oncogenic viruses in the mouse colonies from which the animals used in the glyphosate studies were obtained. During a teleconference (TC 117) on carcinogenicity of glyphosate hold by EFSA (EFSA, 2015, ASB2015-12200), it was mentioned by an U.S. EPA observer that the Kumar (2001, ASB2012-11491) study had been excluded from U.S. EPA evaluation due to the occurrence of viral infection that could influence survival as well as tumour incidences, especially those of lymphomas. However, in the study report itself, there was no evidence of health deterioration due to suspected viral infection and, thus, the actual basis of EPA's decision is not known.

On request of the DS, reliable historical control data was provided by the Japanese laboratory in which the study by Sugimoto (1997, ASB2012-11493) had been run. In male Crj:CD-1 (ICR) mice, incidence of malignant lymphoma in this laboratory varied very much. It ranged from 3.85% to 19.23% in the control groups from 12 studies that had been performed between 1992 and 1998 (Kitazawa, 2013, ASB2014-9146). Thus, the 12% incidence at the top dose level in the study with glyphosate was well covered by the range even though it was above the mean value of 6.33%. (In females, control incidences in the comparison studies ranged from 7.84 to 26.92% with a mean of 15.03%.)

Unfortunately, for the study of Wood et al. (2009, ASB2012-11492), the submitted historical control data was not particularly useful for the assessment. In fact, control data from a total of nine studies were submitted (Wood, 2015, ASB2015-2531) but were of not much use because incidences in male and female mice were not reported separately and since the data were apparently from the same contract research organisation but not from the same test facility. However, the mentioned study incidences ranging from 0% up to 32% (both sexes combined) show the large variability of malignant lymphoma frequency and would, theoretically, cover all male and female groups in the studies in CD-1 mice. This assumption is supported by further historical control data for CD-1 mice collected from industry databases (Giknis and Clifford, 2005, ASB2007-5200; Anonym, 2015, ASB2015-2532) or open literature (Son and Gopinath, 2004, ASB2015-2533). According to these data collections, malignant lymphoma is quite common in CD-1 mice but the reported incidences in different CD-1 strains and among the laboratories were extremely variable. Mostly, they were higher in females than in males but even in males may reach rates between 10% and 20%. The

Charles River database (Giknis and Clifford, 2005, ASB2007-5200) includes data obtained in a total of 59 studies (duration 78 to 104 weeks) in CD-1 mice. The animals were bred in four different Charles River facilities in the United States and the studies were performed in 11 laboratories in North America and Europe between 1987 and 2000. The diagnosis "malignant lymphoma" was used in 42 studies revealing study incidences ranging from a minimum of 1.45 up to a maximum of 21.67% with a total mean in all untreated animals of 4.5%. The malignant lymphoma incidences in male mice receiving the highest doses in the studies by Atkinson et al. (1993, TOX9552382), Sugimoto (1997, ASB2012-11493), and Wood et al. (2009, ASB2012-11490) accounted for not more than 12% and would fit into this range even though the mean was exceeded.

On balance, based on uncertainties with regard to partly contradictory study outcomes depending on the statistical method applied, inconsistent dose response in the individual studies, and a highly variable tumour incidence as suggested by historical control data, it is not likely that glyphosate has induced malignant lymphoma in mice. A possible role of oncogenic viruses should not be ignored. Moreover, human relevance of such an effect, if occurring only as a high-dose phenomenon as it was the case here, is considered equivocal.

Renal tumours in male mice

In the IARC evaluation (IARC, 2015, ASB2015-8421), a positive trend for renal (tubular) adenoma and carcinoma in males in the study by Knezevich & Hogan (1983, TOX9552381) was highlighted. This increase had been subject to discussion already in the 1980s when this study was evaluated for the first time by U.S. EPA. At that time, re-evaluation of the histopathological findings by a "Pathology working group (PWG)" had been requested and was performed. By the DS, the positive trend can be confirmed (Table 37) even though a pairwise comparison did not indicate a statistically significant difference to the control, neither for the adenoma nor for the carcinoma or both combined.

Table 37:      Renal adenoma and carcinoma in male CD-1 mice (Knezevich and Hogan 1983, TOX9552381), based on originally reported data and re-evaluation by PWG. Fisher's exact test was used to compare each treatment group to the respective control group, with p-values reported in brackets. For each endpoint a Cochran-Armitage trend test was performed, with p-values reported in a separate row.

| Dose (mg/kg bw/day) | N | Original report | Re-evaluation by PWG | | |
|---|---|---|---|---|---|
| | | Adenoma | Adenoma | Carcinoma | Combined |
| 0 | 49 | 0 | 1 | 0 | 1 |
| 157 | 49 | 0 (1.000) | 0 (1.000) | 0 (1.000) | 0 (1.000) |
| 814 | 50 | 1 (1.000) | 0 (0.495) | 1 (1.000) | 1 (1.000) |
| 4841 | 50 | 3 (0.242) | 1 (1.000) | 2 (0.495) | 3 (0.617) |
| Trend test (p-value) | | 0.0080 | 0.2473 | 0.0370 | 0.0339 |

For a more comprehensive assessment and to provide a broader view, the incidence of renal tumours in all long-term studies in male CD-1 mice was considered (Table 38). From this overview, it becomes clear that such tumours are rare but still may also occur in untreated animals. A numerically higher incidence in adenoma was seen in the study by Sugimoto (1997, ASB2012-11493) and, again, this increase was confined to male mice receiving the highest dose. Thus, there

CLH REPORT FOR GLYPHOSATE

was an increase in renal tumour incidence over the overall control level in the two studies in which extremely high dose levels of 4841 or 4348 mg/kg bw/day) had been administered. The top dose levels in the studies by Wood et al. (2009, ASB2012-11490) and by Atkinson et al. (1993, TOX9552382) were much lower and no increase in renal tumours was seen. However, it must be emphasised that the same number of animals was affected in the study by Atkinson et al. (1993, TOX9552382) in the control and low dose groups as in the study by Sugimoto (1997, ASB2012-11493) at the top dose level and that the difference to 3/50 affected mice in the study by Knezevich and Hogan (1983, TOX9552381) was only marginal. Even though no historical control data from the performing laboratories was provided, a simple comparison of the control groups in the individual studies with glyphosate suggests that renal tumours may occur in untreated control males at a similar incidence than in the groups receiving very high doses.

Table 38:       Incidences of renal tubule tumours in the four available glyphosate studies in male CD-1 mice

| Study | Knezevich and Hogan, 1983, TOX9552381 | Atkinson et al., 1993, TOX9552382 | Sugimoto, 1997, ASB2012-11493 | Wood et al., 2009, ASB2012-11490 |
|---|---|---|---|---|
| Dose levels | 0, 1000, 5000, 30000 ppm | 0, 100, 300, 1000 mg/kg bw/d | 0, 1600, 8000, 40000 ppm | 0, 500, 1500, 5000 ppm |
| Control | 1 / 49 | 2[#] / 50 | 0 / 50 | 0 / 51 |
| Low dose | 0 / 49 | 2[#] / 50 | 0 / 50 | 0 / 51 |
| Mid dose | 1[#] / 50 | 0 / 50 | 0 / 50 | 0 / 51 |
| High dose | 3[##] / 50 | 0 / 50 | 2 / 50 | 0 / 51 |

[#] including one carcinoma; [##] including two carcinomas

With regard to malignancy, carcinoma were reported by the PWG when re-evaluating the study by Knezevich and Hogan (1983, TOX9552381) and also by Atkinson et al. (1993, TOX9552382). In contrast, both renal tumours found by Sugimoto (1997, ASB2012-11493) were benign. It should be kept in mind that it is difficult to discriminate between benign and malignant renal tubule tumours and, thus, combined incidence might provide the most appropriate figure.

No renal tubule tumours were seen in female mice in any of these studies.

In order to provide a complete picture, renal tumour incidences in male mice in the study by Kumar (2001, ASB2012-11491) in Swiss mice are given in Table 39 even though this study is not being considered further since another strain was employed. In total, 3 renal tumours (described as adenoma) were observed, affecting both the mid and high dose groups. According to the original study report, all neoplasia were assessed for statistical significance by means of the Z-test which was apparently negative. A Cochran-Armitage test for trend and a Peto test were also mentioned by the study author, however, it is not clear if trend analysis has been actually performed. When the renal tumours were re-analysed by the DS, there was a positive linear trend whereas Fisher's exact test failed to indicate a significant difference. No renal tumours were seen in female Swiss albino mice and there was no evidence of concomitant kidney pathology neither in males nor in females.

Table 39:       Renal tubular tumours adenoma in male Swiss mice (Kumar 2001, ASB2012-11491). Fisher's exact test was used to compare each treatment group to the

CLH REPORT FOR GLYPHOSATE

respective control group, with p-values reported in brackets. A Cochran-Armitage trend test was performed, with p-values reported in a separate row.

| Dose (mg/kg bw/day) | Males on study | Adenoma |
|---|---|---|
| 0 | 50 | 0 |
| 15 | 50 | 0 (1.000) |
| 151 | 50 | 1 (1.000) |
| 1460 | 50 | 2 (0.495) |
| Trend test (p-value) | | 0.0390 |

Even if not fully comparable because of the strain differences, it should be remembered that the top dose incidence of 2/50 in this study was the same as seen in CD-1 mice in the study by Atkinson et al. (1993, TOX9552382) in the control and low dose groups.

With respect to CD-1 mice, the finding in the study by Sugimoto (1997, ASB2012-11493) was also subject to statistical re-evaluation for trend by the DS revealing a positive result (Table 40), most probably due to the "zero" incidence in the control group. As to be expected because of the low number of affected mice at the top dose level, the pairwise comparison (as performed also according to the original report) did not indicate a statistically significant difference.

Table 40:    Renal tubular tumours adenoma in CD-1 mice (Sugimoto, 1997, ASB2012-11493). Fisher's exact test was used to compare each treatment group to the respective control group, with p-values reported in brackets. A Cochran-Armitage trend test was performed, with p-values reported in a separate row.

| Dose (mg/kg bw/day) | Males on study | Adenoma |
|---|---|---|
| 0 | 50 | 0 |
| 165 | 50 | 0 (1.000) |
| 838 | 50 | 0 (1.000) |
| 4348 | 50 | 2 (0.495) |
| Trend test (p-value) | | 0.0078 |

On the basis of this data, it cannot be clearly distinguished whether the small increase in a rare renal tumour in mice at exaggerated dose levels that have been applied for 2 years or at least 18 months could be attributed to glyphosate itself and its toxicity, was due to long-lasting renal excretion of large amounts of an otherwise more or less inert substance or rather a chance event. The whole database, quantitative (dose) and mechanistic considerations as well as historical control data should be taken into account.

It must be emphasised that a higher number of male CD-1 mice bearing renal tumours as compared to the concurrent controls were only seen in the studies by Sugimoto et al. (1997, ASB2012-11493) and by Knezevich and Hogan (1983, TOX9552381) at the maximum doses of 4348 or even 4841 mg/kg bw/day and, therefore, cannot be either supported or contravened by the other studies in which lower maximum doses of up to 1000 mg/kg bw/day had been applied, i.e., those of Atkinson et al. (1993, TOX9552382) and Wood et al. (2009, ASB2012-11490). For the study in Swiss mice, there is no other study to match it. If increased tumour incidences are found only at the highest dose levels in a lifetime study, the occurrence of a confounding effect of excessive toxicity

should be regarded very critically. Dose levels of >4000 mg/kg bw per day were well in excess of the limit dose for carcinogenicity testing (1000 mg/kg bw per day) as recommended by OECD guidance document 116. The OECD test guideline 451 for carcinogenicity studies does not give a precise recommendation but states that the highest dose level should elicit signs of minimal toxicity, with depression of body weight gain of less than 10%. However, in the studies by Sugimoto et al. (1997, ASB2012-11493) and by Knezevich and Hogan (1983, TOX9552381), however, the body weight gain in high dose males was decreased by more than 15% compared to controls. Mean terminal body weight of top dose males in the Knezevich and Hogan (1983, TOX9552381) study was by 11% lower than in the controls. In addition, there were gastrointestinal signs and lesions in the first and a significant increase in central lobular hepatocyte hypertrophy and central lobular hepatocyte necrosis suggesting some liver toxicity in the second study (see Table 30). Of particular interest was the observation of some kidney pathology in the study by Knezevich and Hogan (1983, TOX9552381). There was a positive trend for chronic interstitial necrosis in males with 12/50 affected in the high dose group versus 5/49 in the control. In females, there was a dose-related increase in proximal tubule epithelial basophilia and hypertrophy which were not seen among untreated control animals at all. Another finding in the urogenital tract in the same study was slight to mild urothelial hyperplasia in the bladder in mid and high dose males. The percentage of affected animals accounted for 6% in both the control and low dose groups but for 20% in the mid dose and for 16% in the high dose group. Even though there was no clear dose response, it may be assumed that glyphosate (acid) when administered at high doses might produce mucosal irritation. To conclude, there is some evidence that the MTD was exceeded in both studies at the highest dose level at which the number of tumour-bearing mice was slightly increased.

As outlined above in the section on mutagenicity, a genotoxic mode of action is unlikely. Occurrence of non-neoplastic lesions in the kidney was confined to an exaggerated dose level in the study by Knezevich and Hogan (1983, TOX9552381) in mice (see paragraph above) and papillary necrosis in a long-term study in male Wistar rats receiving more than 1200 mg/kg bw/day (Brammer, 2001, ASB2012-11488). On the other hand, the orally absorbed amount of ingested glyphosate is virtually completely and chemically unchanged eliminated in the urine (see section on toxicokinetics and metabolism above) and glyphosate acid is a known irritant to the eyes (see section above). However, it is questionable if irritation would sufficiently explain tumour formation in the kidney.

Historical control data from the Charles River Laboratories is available for Crl:CD1 (ICR) mice, based on 52 studies of at least 78 weeks duration that were performed between 1987 und 2000. From this data, it becomes clear that renal tumours are quite rare since adenoma were seen in five and carcinoma in four studies only. The maximum incidence for adenoma was 4% and for carcinoma 2% (Giknis and Clifford, 2005, ASB2007-5200). The top dose finding of 2/50 in the study by Sugimoto (1997, ASB2012-11493) is at the upper edge of adenoma frequency. In the study by Knezevich and Hogan (1983, TOX9552381) which is not actually covered by the timeframe of the historical database, the adenoma incidence (2%) at the top dose level would be inside the historical range whereas a carcinoma incidence of 4% was above. However, it is very difficult to distinguish between malign and benign kidney tumours and progression is frequent.

CLH REPORT FOR GLYPHOSATE

To conclude, it is not likely that the renal tumours in male mice are treatment-related for the following considerations:

- Even the incidences of affected animals at exaggerated doses exceeding the OECD-recommended limit of 1000 mg/kg bw/day and also the MTD were not statistically significantly increased when compared with the concurrent controls.

- If the whole database is taken into account, it becomes apparent that the top dose incidences in the studies by Sugimoto (1997, ASB2012-11493) and by Kumar (2001, ASB2012-11491) are the same as in the study by Atkinson et al. (1993, TOX9552382) in both the control and low dose groups and the number of affected males in the study by Knezevich and Hogan (1983, TOX9552381) was only slightly higher (3 vs. 2).

- Even the incidences at exaggerated doses are covered by the historical control range.

- No pre-neoplastic kidney lesions have been observed in treated animals.

- There is no plausible mechanism.

Haemangiosarcoma in male mice

Another tumour type was observed by Atkinson et al. (1993, TOX9552382) and highlighted by IARC. Again, the trend test was positive even though a pairwise comparison failed to indicate statistical significance. This holds true also for the study by Sugimoto (1997, ASB2012-11493) when re-evaluated by the DS (Table 41).

Table 41:     Haemangiosarcoma in male CD-1 mice (Atkinson et al., 1993, TOX9552382; Sugimoto, 1997, ASB2012-11493). Fisher's exact test was used to compare each treatment group to the respective control group, with p-values reported in brackets. A Cochran-Armitage trend test was performed, with p-values reported in a separate row.

| Dose (mg/kg bw/day) | N | Haemangiosarcoma | Dose (mg/kg bw/day) | N | Haemangiosarcoma |
|---|---|---|---|---|---|
| Atkinson et al. (1993, TOX9552382) | | | Sugimoto (1997, ASB2012-11493) | | |
| 0 | 50 | 0 | 0 | 50 | 0 |
| 100 | 50 | 0 (1.000) | 165 | 50 | 0 (1.000) |
| 300 | 50 | 0 (1.000) | 838 | 50 | 0 (1.000) |
| 1000 | 50 | 4 (0.059) | 4348 | 50 | 2 (0.495) |
| Trend test (p-value) | | 0.0004 | | | 0.0078 |

With regard to the other studies in CD1 mice, there were no haemangiosarcoma in the study by Wood et al. (2009, ASB2012-11490) in the vascular system up to the highest dose level of approx. 810 mg/kg bw/day. However, if also tumours of this type in the liver and/or kidney were taken into account, the incidence was 2/51 (control), 1/51 (71 mg/kg bw/day), 2/51 (234 mg/kg bw/day), and, again, 1/51 at the top dose level of 810 mg/kg bw/day. In the earliest study by Knezevich and Hogan (1983, TOX9552381), haemangiosarcoma was not listed as a particular histopathological entity but was observed in the spleen of one mid-dose male animal (1/50). Incidence in females, in all studies in CD-1 mice, varied between 0 and 2 but there was no dose response and the tumour occurred also in the controls (1/51 in the study by Wood et al., 2009, ASB2012-11490).

CLH REPORT FOR GLYPHOSATE

In the study by Kumar (2001, ASB2012-11491) in Swiss mice, there was no evidence of a treatment-related increase in haemangiosarcoma. This tumour type was found in one mid dose male and one control female only. Thus, this study in another strain does not need to be considered in this context.

Despite the positive trend test in two studies in CD-1 mice, this finding is not considered treatment related. According to Atkinson et al. (1993, TOX9552382), the historical control incidence in the performing laboratory ranged from 0/50 to 4/50 and, thus, would cover the incidence at the top dose level. This historical data was based on a total of six 2-year studies in CD-1 mice from the same laboratory and had been accepted by the JMPR in its 2004 evaluation of glyphosate although it was not mentioned in the study report when these studies had been performed. For the other studies with glyphosate, no historical data on haemangiosarcoma incidence in the performing laboratories is available.

Historical control data provided by Charles River indicate a very variable incidence of haemangiosarcoma. On different sites of the body, tumours of this type were seen in untreated control animals in 8 of 52 studies. The incidence varied between 1.67 and 12% (Giknis and Clifford, 2005, ASB2007-5200) covering the top dose findings in the glyphosate studies. .in mice

Furthermore, since Sugimoto (1997, ASB2012-11493) employed a more than four times higher top dose than Atkinson et al. (1993, TOX9552382), a markedly higher haemangiosarcoma incidence would have been expected if this tumour was in fact treatment-related.

Thus, there is not sufficient and convincing evidence to consider haemangiosarcoma in male mice treatment-related and sufficient for classification.

In Table 42, incidences of the three tumour types under discussion in male CD-1 mice in the four glyphosate studies are summarised with regard to dose response. This compilation allows a comparative view on all four studies in male CD-1 mice. It becomes apparent that all these tumours were present over the whole dose spectrum and in were observed in the control groups as well. No consistent increase was seen. If historical control data from the Charles River Laboratories is taken into account, all tumour incidences in all control and treated groups were below the maxima of the historical control data even though the mean values were always exceeded and, with regard to renal tumours, the top dose incidence in the study by Knezevich and Hogan (1983, TOX9552381) was at the upper boundary of the range when adenoma and carcinoma were combined.

The highest incidences were observed in groups receiving very high doses of glyphosate, i.e., 4841 mg/kg bw/day in case of renal tumours, 1000 and 4348 mg/kg bw/day in case of malignant lymphoma and 1000 mg/kg bw/day with regard to haemangiosarcoma. These dose levels were at or far above the recommended limit for testing of 1000 mg/kg bw/day. It is noteworthy that no similar or stronger increase of the latter two tumour types was seen in concurrent studies in which similar or even higher doses were administered. Concerning renal tumours, it should be acknowledged that in fact 3/50 animals were affected at a dose level of 4841 mg/kg bw/day but the number of cases in untreated controls or at a dose level of ca 100 mg/kg bw was 2/50 in another study suggesting that this tumour, even if rare, is not uncommon in male CD-1 mice. To conclude, over a wide dose range, there is no evidence of a consistent increase in any tumour type in male CD-1 mice.

CLH REPORT FOR GLYPHOSATE

Table 42:     Summary of selected tumour incidences in male CD-1 mice from four studies with glyphosate and historical control data.

| Dose (mg/kg bw per day) | HC, Maximum % found | 0 | 0 | 0 | 0 | 71 | 100 | 157 | 165 | 234 | 300 | 810 | 814 | 838 | 1000 | 4348 | 4841 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Study | | A | B | C | D | D | B | A | C | D | B | D | A | C | B | C | A |
| Study duration (months) | | 24 | 24 | 18 | 18 | 18 | 24 | 24 | 18 | 18 | 24 | 18 | 24 | 18 | 24 | 18 | 24 |
| Survival | | 20/50 | 26/50 | 26/50 | 39/51 | 41/51 | 25/50 | 16/50 | 34/50 | 39/51 | 29/50 | 35/51 | 17/50 | 27/50 | 25/50 | 29/50 | 26/50 |
| Renal tumours[#] | 4 (adenoma) 2 (carcinoma) | 1/49 | 2/50 | 0/50 | 0/51 | 0/51 | 2/50 | 0/49 | 0/50 | 0/51 | 0/50 | 0/51 | 1/50 | 0/50 | 0/50 | 2/50 | 3/50 |
| Malignant lymphoma* | 21.7 | 2/48 | 4/50 | 2/50 | 0/51 | 1/51 | 2/50 | 5/49 | 2/50 | 2/51 | 1/50 | 5/51 | 4/50 | 0/50 | 6/50 | 6/50 | 2/49 |
| Haemangiosarcoma** | 12.0 | 0/48 | 0/50 | 0/50 | 2/51 | 1/51 | 0/50 | 0/49 | 0/50 | 2/51 | 0/50 | 1/51 | 1/50 | 0/50 | 4/50 | 2/50 | 0/49 |

Study: A = Knezevich and Hogan (1983, TOX9552381), PWG re-evaluation; B = Atkinson et al. (1993, TOX9552382); C = Sugimoto (1997, ASB2012-11493); D = Wood et al. (2009, ASB2012-11492).

# Renal tumours: combined incidence of adenoma and carcinoma given for individual studies.

* Study A: Malign lymphoblastic tumours (3 categories) instead of malignant lymphoma which was not mentioned as a pathological entity.

** Whole body/multiple organ.
Highlighted in grey – dosage exceeded the OECD-recommended limit dose of 1000 mg/kg bw/day and the MTD.
HC: Historical control data for Crl:CD-1 (ICR) mice from Charles River Laboratories (Giknis and Clifford, 2005, ASB2007-5200)

79

# EXHIBIT 15

Confidential - Pursuant to Protective Order

1          UNITED STATES DISTRICT COURT

          NORTHERN DISTRICT OF CALIFORNIA

2

3   IN RE: ROUNDUP           )

    PRODUCTS LIABILITY       )   MDL No. 2741

4   LITIGATION               )

    _____  )   Case No.

5   THIS DOCUMENT RELATES    )   16-md-02741-VC

    TO ALL CASES             )

6

7          THURSDAY, FEBRUARY 21, 2019

8   CONFIDENTIAL - PURSUANT TO PROTECTIVE ORDER

9                   - - -

10          Videotaped deposition of

11   Christopher J. Portier, Ph.D., held at the

12   Crowne Plaza Melbourne, 1-5 Spencer Street,

13   Melbourne, Australia, commencing at

14   8:10 a.m., on the above date, before Carrie

15   A. Campbell, Registered Diplomate Reporter,

16   Certified Realtime Reporter, Illinois,

17   California & Texas Certified Shorthand

18   Reporter, Missouri & Kansas Certified Court

19   Reporter.

20                   - - -

21

          GOLKOW LITIGATION SERVICES

22       877.370.3377 ph | 917.591.5672 fax

               deps@golkow.com

23

24

25

Confidential - Pursuant to Protective Order

```
 1              A P P E A R A N C E S :
 2
        BAUM HEDLUND ARISTEI & GOLDMAN, P.C.
 3      BY:  R. BRENT WISNER, ESQUIRE
                rbwisner@baumhedlund.com
 4      12100 Wilshire Boulevard, Suite 950
        Los Angeles, California 90025
 5      (310) 207-3233
 6      and
 7      BY:  MICHAEL L. BAUM, ESQUIRE
                (VIA TELECONFERENCE)
 8          mbaum@baumhedlund.com
        12100 Wilshire Boulevard, Suite 950
 9      Los Angeles, California 90025
        (310) 207-3233
10
11      WEITZ & LUXENBERG, P.C.
        BY:  ROBIN L. GREENWALD, ESQUIRE
12          rgreenwald@weitzlux.com
        700 Broadway
13      New York, New York 10003
        (212) 558-5547
14
15      ANDRUS WAGSTAFF, PC
        BY:  AIMEE H. WAGSTAFF, ESQUIRE
16          aimee.wagstaff@andruswagstaff.com
            DAVID J. WOOL, ESQUIRE
17          david.wool@andruswagstaff.com
                (VIA TELECONFERENCE)
18      7171 West Alaska Drive
        Lakewood, Colorado  80226
19      (303) 376-6360
20
        LUNDY, LUNDY, SOILEAU & SOUTH, LLP
21      BY:  BERNARD THEUNISSEN, ESQUIRE
                btheunissen@lundylawllp.com
22              (VIA TELECONFERENCE)
        501 Broad Street
23      Lake Charles, Louisiana 70601
        (337) 439-0707
24      Counsel for Plaintiffs
25
```

Confidential - Pursuant to Protective Order

```
 1      COVINGTON & BURLING LLP
        BY:  PAUL W. SCHMIDT, ESQUIRE
 2           pschmidt@cov.com
             MICHAEL X. IMBROSCIO, ESQUIRE
 3           mimbroscio@cov.com
        850 Tenth Street, NW
 4      Washington, D.C. 20001-4956
        (202) 662-5694
 5
 6      WILKINSON WALSH + ESKOVITZ
        BY:  CALI COPE-KASTEN, ESQUIRE
 7           ccope-kasten@wilkinsonwalsh.com
        2001 M Street, NW, 10th Floor
 8      Washington, DC 20036
        (202) 847-4000
 9
10      HOLLINGSWORTH LLP
        BY:  JOHN M. KALAS, ESQUIRE
11           jkalas@hollingsworthllp.com
        1350 I Street, N.W.
12      Washington, D.C. 20005
        (202) 898-5800
13      Counsel for Defendant Monsanto
14
15   ALSO PRESENT:
        BRIAN BEAM, Baum Hedlund
16      JIM SOTO
17
     V I D E O G R A P H E R S:
18      DAN LAWLOR & VINCENT ROSICA,
        Golkow Litigation Services
19
                      - - -
20
21
22
23
24
25
```

Confidential - Pursuant to Protective Order

1                          INDEX

2                                          PAGE

3    APPEARANCES.................................    2

4    EXAMINATIONS

5      BY MR. WISNER.............................    6

6

7

8    CERTIFICATE................................255

9    ACKNOWLEDGMENT OF DEPONENT.................257

10     ERRATA....................................258

11     LAWYER'S NOTES............................259

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Confidential - Pursuant to Protective Order

1    through chemical exposures.

2         Q.    Okay.  So --

3         A.    And when that oxygen, that free

4    oxygen, is running around and not bound to

5    things it should bind to, it binds to things

6    it shouldn't bind to, like DNA.  And when it

7    binds to DNA or parts of the -- to the

8    machinery that works with DNA, it can affect

9    the whole system and mess it up.

10        Q.    Okay.  We're going to talk a

11   lot more about oxidative stress and DNA

12   damage later, but for now, how does this

13   relate to that -- where we started,

14   initiation and promotion studies?

15        A.    So that's what I wanted to get

16   to.  In toxicology chemical parlance, if a

17   chemical causes an increase in mutations,

18   it's called an initiator.  So it is starting

19   the chemical process.  It's ini -- the cancer

20   process.  It is initiating the process.

21             If the chemical comes in and

22   enhances the process, so it takes something

23   that's already started and makes it go

24   faster, then it's called a promoter.  It's

25   promoting something that's already going on.

Confidential - Pursuant to Protective Order

1            So an initiator causes this

2    mutation.  A promoter enhances that mutation

3    and makes it even come out more later to get

4    more cancers.

5            So an initiation/promotion

6    study is one where you take a chemical that's

7    an initiator, you give it to the animal for a

8    short period of time, hopefully causing

9    startup mutations in the animals, and then

10   you come with another chemical, a promoter,

11   and you give it for a longer period of time,

12   and that enhances that mutation and you begin

13   to see the cancer.

14            So a classical

15   initiation/promoter study is used to try to

16   understand some basic mechanisms of chemicals

17   in causing cancer.  If I have a chemical that

18   I think might be an initiator, then I do a

19   study where I give the animal that chemical

20   for a short period of time, and then I --

21   there are known promoters that we already

22   know exist, and so then I give those same

23   animals a promoter for a period of time and

24   look to see if I see more cancers.

25            If I do, then this was probably

Confidential - Pursuant to Protective Order

1    an initiator, the chemical I'm looking at.

2    If I don't, then it's probably not an

3    initiator.  In this system at least.

4              If I think the chemical is a

5    promoter, then I give a classic initiator,

6    something I already know will cause

7    mutations, and then I follow it with this new

8    chemical for a period of time and look to see

9    if I see cancers.

10             Okay.  If you don't know

11   anything about the chemical, you do both.

12   You give it as an initiator with a classic

13   promoter, you give it as a promoter with a

14   classic initiator, and you see what happens.

15             The George study, the one

16   remaining study, is an initiation/promotion

17   study with glyphosate.

18        Q.    Okay.  Stop right there.  Let

19   me ask you some questions.

20        A.    Okay.

21        Q.    All right.  Let's talk about

22   the George study.  If you turn to your binder

23   to 559.

24        A.    Okay.

25        Q.    Is that a fair and accurate

Confidential - Pursuant to Protective Order

```
 1    copy of the George study?

 2         A.    Yes, it is.

 3         Q.    Okay.  Great.

 4               So now it's up on the screen,

 5    and I just want to walk through a little bit

 6    what this says and ask you what it means.

 7               So the title of the document is

 8    "Studies on Glyphosate-Induced

 9    Carcinogenicity in Mouse Skin:  A Proteomic

10    Approach."

11               What does that mean?

12         A.    It's proteomic.

13         Q.    Okay.

14         A.    So the key words here, it's

15    glyphosate.  They're looking for

16    carcinogenicity.  The study is not being done

17    like the ones we looked at.  This is done on

18    mouse skin.  So instead of the mouse eating

19    the glyphosate, it's painted onto their skin.

20               A proteomic approach means that

21    they're going to look at changes in proteins

22    in the skin at the end of the study.

23         Q.    Okay.  Great.

24               And in this study it reads,

25    "Glyphosate is a widely used, broad spectrum
```

Confidential - Pursuant to Protective Order

1  herbicide reported to induce various toxic

2  effects in nontarget species, but its

3  carcinogenic potential is still unknown.

4  Here we showed the carcinogenic effects of

5  glyphosate using two-stage mouse skin

6  carcinogenesis model and proteomic analysis.

7  Carcinogenicity study revealed that

8  glyphosate has a tumor-promoting activity."

9         Can you translate what I just

10  read into English?

11     A.    The first sentence is obvious

12  in their opinion.

13         The second sentence deals with

14  what they call a two-stage mouse skin

15  carcinogenesis model.  That is

16  initiation/promotion.  First stage is

17  initiation.

18     Q.    I see.

19     A.    Second stage is promotion.

20  It's in the mouse skin, so they call that a

21  two-stage mouse carcinogenicity study.

22         Proteomic analysis is --

23     Q.    The protein?

24     A.    -- much more complicated.

25     Q.    Okay.  And then it says,

Confidential - Pursuant to Protective Order

1    "Carcinogenicity study revealed that

2    glyphosate has tumor-promoting activity."

3              What does that mean?

4        A.    It means in this two-stage

5    model where you give a known initiator and

6    follow it with glyphosate for a fixed period

7    of time, you see more skin tumors -- in this

8    case they are skin papillomas -- than you

9    would normally see, and so the glyphosate is

10   promoting out the tumors that were started

11   with the initiator.

12       Q.    All right.  Now, I just want to

13   turn to the second page here.  This is -- it

14   says, "Materials and Methods."

15             Do you see that?

16       A.    Yes.

17       Q.    It says, "The commercial

18   formulation of the herbicide glyphosate,

19   Roundup original, copyright glyphosate

20   41 percent, POEA, 15 percent, Monsanto

21   Company, St. Louis, Missouri, was used."

22             Is that your understanding in

23   this study?

24       A.    Yes, that's -- that's the

25   compound that was being painted on the

Confidential - Pursuant to Protective Order

1    animals.

2         Q.    So this -- is this different

3    than pure technical glyphosate?

4         A.    Yes, this is different than

5    pure technical glyphosate.

6         Q.    They're actually using the

7    stuff that you can buy in a hardware store?

8              MR. SCHMIDT:  Objection.

9         Leading.

10             THE WITNESS:  I would guess

11        that's what that means.

12   QUESTIONS BY MR. WISNER:

13        Q.    Okay.  And then we have here

14   all these different treatment groups.  And I

15   don't want to spend too much time on it, but

16   you see Group 1, Group 2, Group 3.

17             Do you see that?

18        A.    Yes.

19        Q.    And the one that I'm interested

20   in is this Group 7 -- or Group 8, I'm sorry.

21   It says, "DMBA plus glyphosate.  Single

22   topical application of DMBA followed one week

23   later by topical treatment of glyphosate."

24             Do you see that?

25        A.    Correct.

Confidential - Pursuant to Protective Order

1      Q.     What is that referring to?

2      A.     DMBA is a chemical.  It's a

3    known initiator.  So they're initiating the

4    skin with DMBA and following it with

5    glyphosate applications three times per week,

6    25 milligrams per kilogram body weight on the

7    backs of the mice.

8      Q.     And if we go to the results,

9    it's on Table 1.  And we see here that that

10   group, Group 8, the DMBA plus glyphosate,

11   what percentage of the animals had tumors on

12   their skin?

13     A.     8 out of 20 animals had

14   papillomas on their backs.

15     Q.     And what percentage is that?

16     A.     Let's see.  40 percent.

17     Q.     Okay.  And if you look at the

18   rest of the results, the only other one that

19   had tumors in the skin was Group 3.

20            What does that reflect?

21            MR. SCHMIDT:  Objection.

22       Leading.

23            THE WITNESS:  Group 3 is the --

24       what's called a positive control in

25       this study.  DMBA, the same initiator

Confidential - Pursuant to Protective Order

1           as they used with glyphosate, plus

2           TPA.  TPA is a known promoter, very

3           strong promoter, so that you would

4           expect to see lots of tumors.  And

5           there they're seeing tumors in all the

6           animals.

7    QUESTIONS BY MR. WISNER:

8           Q.    Okay.  And if you look down

9    here, there's an asterisk on the Group 8, the

10   glyphosate group.

11          Do you see that?

12          A.    Yes.

13          Q.    And then it says, "P value less

14   than .5."

15          Do you see that?

16          A.    Yes.

17          Q.    "Versus untreated group"?

18          A.    Yes.

19          Q.    You mentioned P values earlier.

20   And in as simple terms as you can, what is a

21   P value?

22          A.    It's the probability that the

23   observation you're seeing agrees with no

24   effect.  So in this case it's the probability

25   that there's no increase in tumors from

Confidential - Pursuant to Protective Order

1   glyphosate being used as a promoter in this

2   study.

3              If that probability is very

4   small, you reject the hypothesis that there's

5   no increase in favor of an alternative that

6   there in fact is an increase.

7        Q.    So with this being a

8   statistically significant result, what does

9   that show you as a scientist?

10       A.    That it's possible glyphosate

11  is a promoter of carcinogenesis.

12       Q.    And in this context we're

13  talking about commercial Roundup?

14       A.    Correct.

15             MR. SCHMIDT:  Objection.

16  Leading.

17  QUESTIONS BY MR. WISNER:

18       Q.    All right.  So let's -- let's

19  go back -- well, let's go back to this rat

20  study, if you go back to the document camera.

21             You know, in this rat study we

22  have these repeated findings of skin tumors.

23             Do you see that?

24       A.    Yes.

25             MR. SCHMIDT:  Objection.

Confidential - Pursuant to Protective Order

1    Leading.

2    QUESTIONS BY MR. WISNER:

3        Q.    What, if anything, does this

4    indicate to you as a scientist?

5        A.    In terms of the relationship to

6    the skin painting study that was done, it

7    would be far too speculative for me to go

8    there.

9        Q.    Okay.

10       A.    In one case they're papillomas.

11   These are skin keratoacanthomas.  They're

12   different mouse strains.  The other study is

13   very tailored for -- the initiation/promotion

14   study is very tailored for a very fixed

15   result.

16            It would be too speculative for

17   me to say they're related in any way.

18       Q.    Okay.  Well, then let me ask

19   you this question.  The George study, this

20   positive finding there, what -- what -- is

21   that consistent with what you're seeing in

22   the rodent data for glyphosate?

23       A.    Partially.  Obviously it's --

24   it's addressing the question of promotion,

25   which means that you already have these

Confidential - Pursuant to Protective Order

1    initiated cells.  Living can cause mutations

2    to occur.  And so it's conceivable that

3    glyphosate, all of these tumor findings we

4    are seeing here, are glyphosate promoting out

5    already effects.  I don't think it's likely,

6    but it's conceivable that's the case.

7              The initiation/promotion study

8    is simply showing you that in one system, the

9    skin, glyphosate has this ability to promote

10   out cancer.  That's all it really means.

11        Q.    Well, let's -- hypothetically

12   speaking, let's say an individual has a

13   mutated cell caused by, like you said, life,

14   or like a viral infection or something.  Does

15   the George study -- I don't know.  You tell

16   me.  Does it have any influence on whether or

17   not it could promote a mutation to lead to

18   cancer?

19        A.    It certainly increases the

20   chances that that might be the case because

21   now you have evidence to suggest glyphosate

22   can do that -- this.  But I'd want to see a

23   lot more evidence before I'd go there and

24   start thinking about that.

25              There are initiation/promotion

Confidential - Pursuant to Protective Order

1    studies you can do in the liver.  There are

2    initiation/promotion studies you can do in

3    the brain.  I'd like to see a little more

4    work along those lines.

5              And then looking at the other

6    mechanistic evidence, I'd have to conclude

7    that even though it wasn't an initiator in

8    the skin, I'd want to look more closely at

9    why it didn't come out as an initiator in the

10   skin because theoretically it probably should

11   have.

12        Q.    Okay.  You mentioned that you'd

13   like to see more initiation and promotion

14   studies in other sort of organs.

15             Have any of those been done?

16        A.    Not that I'm aware of.  I would

17   have hopefully picked them up in my search of

18   the literature, and I haven't seen any.

19        Q.    Okay.  All right.  So going

20   back to our causation stool here, we spent

21   some time on animal studies.  And we talked

22   about the initiation and promotion study, and

23   that kind of got us into this next section,

24   which is the mechanism studies.

25             What do you mean by mechanism?

# EXHIBIT 16

Docket Number EPA-HQ-OPP-2009-0361
www.regulations.gov



# Glyphosate

# Proposed Interim Registration Review Decision
# Case Number 0178

# April 2019

Approved by: _____

Charles "Billy" Smith
Acting Director
Pesticide Re-evaluation Division

Date: _____4/23/19_____

Docket Number EPA-HQ-OPP-2009-0361
www.regulations.gov

**Table of Contents**

I.     INTRODUCTION .............................................................................................................3

  A.    Summary of Glyphosate's Registration Review ...........................................................4

  B.    Updates Since the Issuance of the Glyphosate Risk Assessments ...............................6

  C.    Summary of Public Comments on the Draft Risk Assessments and Agency Responses..............6

II.    USE AND USAGE ..........................................................................................................18

III.   SCIENTIFIC ASSESSMENTS.......................................................................................19

  A.    Human Health Risks......................................................................................................19

     1.    Risk Summary .......................................................................................................19

     2.    Human Incidents and Epidemiological Analysis ..................................................23

     3.    Tolerances .............................................................................................................24

     4.    Human Health Data Needs ....................................................................................25

  B.    Ecological Risks.............................................................................................................25

     1.    Risk Summary .......................................................................................................25

     2.    Ecological Incidents .............................................................................................30

     3.    Ecological and Environmental Fate Data Needs ..................................................32

  C.    Risk Characterization ....................................................................................................32

  D.    Benefits Assessment......................................................................................................34

IV.   PROPOSED INTERIM REGISTRATION REVIEW DECISION...................................35

  A.    Proposed Risk Mitigation and Regulatory Rationale ...................................................35

     1.    Spray Drift Management.......................................................................................35

     2.    Herbicide Resistance Management .......................................................................37

     3.    Non-target Organism Advisory Statement ...........................................................37

     4.    Label Consistency Measures.................................................................................38

  B.    Tolerance Actions .........................................................................................................40

  C.    Proposed Interim Registration Review Decision .........................................................40

  D.    Data Requirements ........................................................................................................40

V.    NEXT STEPS AND TIMELINE ....................................................................................40

  A.    Proposed Interim Registration Review Decision .........................................................40

  B.    Implementation of Mitigation Measures ......................................................................41

  Appendix A: Summary of Proposed Actions for Glyphosate.................................................42

  Appendix B: Proposed Labeling Changes for Glyphosate Products ......................................43

  Appendix C. Proposed Maximum Application Rates for Glyphosate Ground and Aerial Application 48

  Appendix D: Endangered Species Assessment.......................................................................53

  Appendix E: Endocrine Disruptor Screening Program...........................................................54

Docket Number EPA-HQ-OPP-2009-0361
www.regulations.gov

concentration, a 10 kg child would have to consumer approximately 385 liters of orange juice every day to reach the chronic reference dose of 1 mg/kg/day (the maximum acceptable oral dose that is the threshold of concern).

EPA evaluated dietary exposure to all population subgroups, including children, infants, and women of child-bearing age. There were no dietary risks of concern for glyphosate using an unrefined analysis, which (1) assumes that all food commodities contain maximum legal residues (*i.e.*, tolerance-level residues) and all registered food crops have been treated with glyphosate, and (2) uses high-end estimates of glyphosate in drinking water.

Commenters point to the use of glyphosate as a pre-harvest desiccant for wheat as a source of glyphosate residues in cereal products. The wheat desiccant use was considered in the agency's dietary risk assessment; EPA assumed maximum legal residues in wheat and other cereal grains. Taking exposures from those residues into consideration in its most recent human health risk assessment, EPA's estimation of risk from aggregate exposure to glyphosate, even including residues from pre-harvest desiccant use on wheat, is below the agency's level of concern. However, the agency has received a petition from the Environmental Working Group concerning the tolerance for oats and pre-harvest use on oats for which the agency is taking public comment. Additional information is described in section I.B of this document.

## Comments on Formulations Toxicity:

Many commenters expressed concerns that glyphosate formulations are more toxic than glyphosate alone and questioned the toxicity of inert ingredients and the lack of transparency for inert ingredients and other contaminants in pesticide products.

**The EPA Response:** Most pesticide products contain substances in addition to the active ingredient (known as inert ingredients) which aid in the performance and effectiveness of the pesticide product. All active and inert ingredients must be approved by the agency when a pesticide product is first registered, including for glyphosate products. Since there are over 500 glyphosate products registered at different times in the US, the agency has assessed new inert ingredients at multiple points over the years for different formulations of glyphosate. The EPA evaluates the active and inert ingredients' hazard potential (*i.e.,* toxicity) with a battery of toxicity data. Any contaminants or impurities associated with formulation components must be reported to the agency and evaluated on a case-by-case basis. The agency reviews the amount in the formulation, the manufacturing information, and information on what steps are taken to limit or remove impurities. EPA can require that any inert ingredients of toxicological concern be listed in the ingredients statement of the label if determined to pose a hazard to humans or the environment (CFR § 156.10(g)(7)).

Glyphosate has been studied in a multitude of studies, including on multiple formulations that contain glyphosate. All studies of adequate scientific caliber that the Agency was aware of were incorporated into the risk assessment. For the glyphosate ecological risk assessment, ecotoxicity data on glyphosate formulations were reviewed in addition to data on glyphosate alone and relevant studies were summarized in the *Registration Review – Preliminary Ecological Risk Assessment for Glyphosate and its Salts*.

10

Docket Number EPA-HQ-OPP-2009-0361
www.regulations.gov

For human health risk assessment, the EPA searched the open literature to find glyphosate formulations toxicity data but there are few research projects that have attempted to directly compare technical grade glyphosate to the formulations under the same experimental design. Furthermore, there are even fewer instances of studies comparing toxicity across formulations. Most studies using commercial formulations identified as part of EPA's review were *in vitro* studies, which are difficult to translate into *in vivo* effects where metabolism and clearance would play a large role in potential toxicity. EPA gave *in vivo* studies greater weight, however none of the *in vivo* studies with commercial formulations were found to be of adequate quality for use in human risk assessment. Common limitations observed in *in vivo* formulations studies include: lack of test material information, exposure conditions not adequately described/documented, data were presented only as graphs and measures of variability were not included, samples sizes were too small or not reported, only one dose was tested, age/health of study animals were not reported, and a mode of action/adverse outcome pathway was not established.

The EPA has been collaborating with the National Toxicology Program (NTP) of the National Institute of Environmental Health Sciences to develop research intended to evaluate the role of glyphosate in product formulations and the differences in formulation toxicity. The results of this research will be considered when available. Additional information on the NTP research plan for glyphosate is available online: https://ntp.niehs.nih.gov/results/areas/glyphosate/index.html.

If at any time, information becomes available that indicates adverse human health effects of concern for exposure to glyphosate or its formulations, the EPA intends to review it and determine the appropriate regulatory action.

### Comments About the Monarch Butterfly:

Many commenters such as the Center for Food Safety, Center for Biological Diversity, Natural Resource Defense Council, and Beyond Pesticides expressed concerns that the EPA's risk assessment is not protective of monarch butterflies and plant resources for monarchs, such as milkweed. In general, commenters asserted that the EPA has not done enough to protect monarch butterflies when monarch populations have been in decline in recent decades. Commenters urged the EPA to restrict or ban glyphosate on the grounds that it is killing milkweed, a key resource for monarch butterfly larvae.

**The EPA Response:** Monarch butterfly conservation is an important issue for the agency. While herbicides like glyphosate have been implicated in the decline of the monarch butterfly population, it is not known to what extent pesticides in general may play a role. It is important to note that threats to the monarch butterfly population are multi-pronged and include loss of breeding habitat, loss of overwintering habitat in Mexico,[2] changes in weather patterns (including winter storms), disease, and other factors.[3]

---

[2] Vidal, O., Lopez-Garcia, J., and Rendon-Salinas, E. (2014), Trends in Deforestation and Forest Degradation after a Decade of Monitoring in the Monarch Butterfly Biosphere Reserve in Mexico. *Conservation Biology*, 28: 177-186.
[3] Agrawal, A. and Inamine, H. (2018), Mechanisms behind the monarch's decline. *Science*, 22: vol. 360, Issue 6395, pp.1294-1296.

11

# EXHIBIT 17



## ** CONFIDENTIAL **

## Deposition of
## Charles Benbrook, Ph.D.

**Date:** May 23, 2018

**Case:** Ronald Peterson and Jeff Hall v. Monsanto Company, et al.

**No.** 1622-CC01071

**Court Reporter:**  Patsy D. Jacoy, CCR

Paszkiewicz Court Reporting
Phone:  618-307-9320
Toll-Free:  855-595-3577
Fax:  618-855-9513
Email:  sarah@spreporting.com

Page 1

IN THE CIRCUIT COURT OF THE CITY OF ST. LOUIS

STATE OF MISSOURI

_____

RONALD PETERSON and JEFF HALL,      )
                                    )
                Plaintiff(s),       )
                                    )
        vs.                         )    1622-CC01071
                                    )
MONSANTO COMPANY; OSBORN &          )
BARR COMMUNICATIONS, INC.;          )
OSBORN & BARR HOLDINGS, INC.,       )
                                    )
                Defendant(s).       )
_____

VIDEOTAPED DEPOSITION UPON ORAL EXAMINATION OF

CHARLES BENBROOK, Ph.D.

**CONFIDENTIAL**

_____

8:30 A.M.

MAY 23, 2018

QUALITY INN & SUITES CONFERENCE CENTER

700 PORT DRIVE

CLARKSTON, WASHINGTON

REPORTED BY:  PATSY D. JACOY, CCR 2348

HIGHLY                 Charles Benbrook, Ph.D.                HIGHLY
CONFIDENTIAL              May 23, 2018                     CONFIDENTIAL

---

Page 2

```
 1        A P P E A R A N C E S
 2
 3   FOR THE PLAINTIFFS:
 4      TIMOTHY LITZENBURG
        The Miller Firm LLC
 5      The Sherman Building
        108 Railroad Avenue
 6      Orange, VA 22960
        540.672.4224
 7      tlitzenburg@millerfirmllc.com
 8
 9   FOR THE DEFENDANT MONSANTO:

        GRANT W. HOLLINGSWORTH
10      Hollingsworth LLP
        1350 I Street N.W.
11      Washington, DC 20005
        202.898.5800
12      ghollingsworth@hollingsworthllp.com
13      SARAH A. KRAJEWSKI
        Winston & Strawn
14      35 W. Wacker Drive
        Chicago, IL 60601
15      312.558.8132
        skrajewski@winston.com
16
17   FOR THE DEFENDANTS OSBORN & BARR:
18      JENNIFER E. HOEKEL
        Armstrong Teasdale LLP
19      7700 Forsyth Blvd., Suite 1800
        St. Louis, MO 63105
20      314.621.5070
        jhoekel@armstrongteasdale.com
21
22   ALSO PRESENT:  STEPHAN ANDREYCHUK, Video Operator
23
24
25
```

---

Page 3

```
 1            I N D E X
 2
 3   EXAMINATION BY:            PAGE(S)
 4      BY MR. HOLLINGSWORTH        11
 5      BY MS. HOEKEL:            325
 6      BY MR. HOLLINGSWORTH:     338
 7      BY MR. LITZENBURG         417
 8
 9
10   EXHIBITS FOR IDENTIFICATION      PAGE
11   Exhibit 1   12/12/17 EPA Memorandum,    93
12   Exhibit 2   Code of Federal         95
13         Regulations, Subpart F -
14         Tocology
15   Exhibit 3   158.400 Product performance   112
16         data requirements table
17   Exhibit 4   EFSA Statement regarding    141
18         the EU assessment of
19         glyphosate and the
20         so-called "Monsanto papers"
21   Exhibit 5   EPA Risk Assessment      173
22         Guidelines of 1986
23   Exhibit 6   April 1996 Proposed      174
24         Guidelines For Carcinogen
25         Risk Assessment
```

---

Page 4

```
 1   Exhibit 7   March 2005 Guidelines For    175
 2         Carcinogen Risk Assessment
 3   Exhibit 8   1996 Food Quality Protection  188
 4         Act Implementation Plan
 5   Exhibit 9   Pesticide residue tolerance  194
 6         decision with respect to
 7         alkyl amine polyalkoxylates
 8   Exhibit 10  PRN 97-1: Agency Actions    198
 9         under the Requirements of
10         the Food Quality Protection
11         Act
12   Exhibit 11  EPA 40 CFR Part 180       201
13   Exhibit 12  Article entitled Is it time   217
14         to reassess current safety
15         standards for
16         glyphosate-based herbicides?
17   Exhibit 13  July 22, 1996 EPA memo     233
18         regarding good laboratory
19         practice standards
20         inspection on
21         September 14 through 17,
22         1993, MONGLY00158466-158508
23   Exhibit 14  Parry report from August 18,  237
24         1999
25
```

---

Page 5

```
 1   Exhibit 15  Study titled, Genotoxic    243
 2         Potential of Glyphosate
 3         Formulations:
 4         Mode-of-Action
 5         Investigations,
 6         MONGLY02413658-2413664
 7   Exhibit 16  Evaluation of the potential  249
 8         genotoxicity of Glyphosate,
 9         Glyphosate mixtures and
10         component surfactants by
11         James Parry,
12         MONGLY01314233-1314267
13   Exhibit 17  A Study of the Short-Term   258
14         Effects of MON 35050 in Male
15         CD-1 Mice,
16         MONGLY00204822-00204868
17   Exhibit 18  The Salmonella typhimurium   265
18         reverse mutation by MON
19         77280,
20         MONGLY02638195-2638235
21   Exhibit 19  Revised Glyphosate Issue    268
22         Paper: Evaluation of
23         Carcinogenic Potential,
24         EPA's Office of Pesticide
25         Programs, December 12, 2017
```

2 (Pages 2 to 5)

HIGHLY                    Charles Benbrook, Ph.D.                    HIGHLY
CONFIDENTIAL                   May 23, 2018                     CONFIDENTIAL

---

Page 274

1    Q. (BY MR. HOLLINGSWORTH) Sir, you mentioned
2    impurities in your report, the impurities that results
3    from the glyphosate manufacturing process. Do you
4    recall that?
5        A. Uh-huh.
6        Q. Okay.
7        A. A short, very short section.
8        Q. Sure. And you specifically mention NNG and
9    formaldehyde, correct?
10       A. Correct.
11       Q. Every aspect of the -- first of all,
12   impurities are monitored by EPA and for the -- for
13   formaldehyde and NNG they're modified -- they're
14   monitored to make sure that they are below specified
15   limits, correct?
16       A. Well, yeah, when the agency is aware of their
17   presence and especially if they have a toxicological
18   concern about them, impurities can get a lot of
19   attention in the regulatory process. For example,
20   dioxin in some of the phenoxy herbicides was the
21   primary basis of concern about the toxicity of those
22   products.
23       Q. EPA's position, the detection -- is -- let me
24   restate that.
25          To be clear, it is EPA's position that the

---

Page 275

1    detections of impurities below regulatory limits are
2    not carcinogenic concerns, correct?
3        A. Well, yes, in general, they would -- they
4    would assess the levels and risk associated with the
5    impurities in essentially the same way they would the
6    active ingredient. They would apply kind of the same
7    standards, yeah.
8        Q. And when testing the active ingredient, they
9    can, in fact, test the impurities in the active
10   ingredient, correct?
11       A. Well, EPA doesn't -- doesn't do those tests
12   really. It's the -- they require the companies to do,
13   you know, environmental fate studies and residue
14   metabolism studies. That's where they would pick up
15   the impurities is in the residue database as part of
16   the tolerance-setting process.
17       Q. EPA monitors the company's data on
18   glyphosate-based herbicides and determines whether the
19   impurities are below specified limits, correct?
20       A. When -- yes, when they become aware that
21   there's a -- a potential for impurities in one of the
22   manufacturing processes, they'll take that into account
23   in making a decision on the tolerances.
24       Q. Do you claim that Monsanto's glyphosate-based
25   herbicides ever had impurities that existed in amounts

---

Page 276

1    above the EPA certified limits?
2        MR. LITZENBURG: Object to form.
3        A. You know, I -- EPA became aware of the -- the
4    NNG impurity and formaldehyde, and then there was an
5    impurity in one of the surfactants quite early in the
6    regulatory history, and they required Monsanto to
7    submit data to them that established the levels, and
8    they -- in fact, many batches of -- of -- of
9    manufactured and formulated product from different
10   plants I remember there was actually quite extensive
11   data collected by Monsanto and submitted to the agency,
12   and they did a toxicological evaluation and they did
13   reach a judgment that the levels of the impurities
14   were -- did not exceed their level of concern. And --
15   and they -- there really was -- has been relatively
16   little focus for the last 30 years of -- of regulation
17   of glyphosate-based herbicides on those impurities.
18       Q. (BY MR. HOLLINGSWORTH) So it's
19   certainly not your opinion that Monsanto's
20   glyphosate-based herbicides ever had impurities that
21   existed in amounts above the EPA's certified limits,
22   correct?
23       A. Correct.
24       Q. Do you claim that Monsanto's glyphosate-based
25   herbicides ever specifically had formaldehyde at levels

---

Page 277

1    above EPA certified limits?
2        A. I -- I wouldn't be surprised if I went back
3    and carefully reviewed this part of the record, which
4    is -- again, it's very old. There probably wasn't an
5    EPA certified limit. I mean, for one thing, don't
6    forget, the EPA had only been in existence a couple of
7    years when these first actions were -- on glyphosate
8    were being done. They became aware of the NNG and the
9    formaldehyde and later on this dioxane contaminant and,
10   you know, they -- they asked questions about the levels
11   and I -- I think -- I vaguely remember that some other
12   part of EPA had a regulatory level, and they assessed
13   that, or maybe it was an international level, I don't
14   really recall the details, but there -- you know, I
15   think the -- the record shows that there was a -- a --
16   an assessment of these impurities and a judgment was
17   reached that they were -- they did not trigger EPA's
18   level of concern, so yeah, that's my understanding of
19   the record.
20       Q. Whether it's formaldehyde, NNG, dioxane or any
21   other glyphosate-based herbicides, EPA has always
22   determined that those impurities are below specified
23   limits as far as you know, correct?
24       A. As far as I know, correct.
25       Q. Is it your opinion that impurities found in

---

70 (Pages 274 to 277)

Charles Benbrook, Ph.D.
May 23, 2018

Page 278

1    glyphosate-based herbicides at levels below EPA
2    certified limits can cause non-Hodgkin's lymphoma?
3        **A.  I -- I have no -- no reason to believe that,**
4    **and I would -- would find that unlikely, but, you know,**
5    **it's -- it's possible I suppose.**
6        Q.  You don't have the expertise to determine
7    whether impurities found in glyphosate-based herbicides
8    at levels below EPA certified limits can cause NHL,
9    correct?
10       **A.  I'm -- I certainly don't have a crystal ball**
11   **that could make that determination, and I -- I doubt**
12   **that anybody has -- has done the kind of in-depth work**
13   **that would be required to definitively judge that, and**
14   **I know that Monsanto actually did commission a two-year**
15   **feeding study on NNG in the early days, but it -- the**
16   **study was terminated because of excessive mortality in**
17   **one of the treatment groups and it wasn't repeated**
18   **and -- but, you know, the levels are -- the levels that**
19   **have been consistently reported were very low and it**
20   **was a -- it has been the judgment of EPA all along that**
21   **they didn't -- they didn't feel that the level of risk**
22   **was high enough to warrant any further assessment.**
23       Q.  Right.  And you don't hold the opinion that
24   impurities in glyphosate-based herbicides at the level
25   in which they actually exist are causing NHL, correct?

Page 279

1        **A.  Correct.**
2        Q.  I want to move on to some other parts of the
3    globe, Dr. Benbrook.  Sir, you testified in April of
4    2015 right after the IARC classification of glyphosate
5    that the currently standing judgment of the EPA is that
6    glyphosate is not a carcinogen.  Do you recall that?
7        **A.  Yes.**
8        Q.  You testified that glyphosate-based herbicides
9    are under active review by the US -- in the US by EPA
10   and also in Europe by the European community, correct?
11       **A.  At that time, yes.**
12       Q.  You testified that with the IARC judgment
13   being published there's going to be intense scrutiny on
14   the oncogenicity of both glyphosate technical material
15   and formulated Roundup herbicides, correct?
16       **A.  Correct.**
17       Q.  That intense scrutiny of glyphosate-based
18   herbicides post IARC classification of glyphosate
19   referred, in part, to intense scrutiny by worldwide
20   regulators, correct?
21       **A.  Of course, that was part of it.**
22       Q.  Sir, IARC itself does not regulate the
23   substance it -- substances it classifies, correct?
24       **A.  Correct.**
25       Q.  IARC leaves the regulation of those substances

Page 280

1    to national governments, correct?
2        **A.  Yes.**
3        Q.  And when we say IARC leaves that to national
4    governments, what that means -- or one thing that means
5    is that the applicable -- it leaves it to the
6    applicable regulatory agencies, correct?
7        **A.  Yeah, operating under the statutes and laws of**
8    **the countries in which they operate.**
9        Q.  Such as --
10       **A.  Which differ.**
11       Q.  And such as EPA, Health Canada, EFSA, you're
12   familiar with all of those, correct?
13       **A.  Correct.**
14       Q.  And Australia, New Zealand, every country for
15   the most part has a regulatory agency that is
16   regulating the use of pesticides in that country,
17   correct?
18       **A.  Correct.**
19       Q.  In major countries the health regulators have
20   scientific staffs with expert toxicologists,
21   epidemiologists, pathologists and other specialists,
22   correct?
23       **A.  Yes.**
24       Q.  They're qualified to evaluate and spend a lot
25   of time evaluating the safety of various substances

Page 281

1    including herbicides, correct?
2        **A.  Well, it -- it varies, but certainly several**
3    **countries conduct the same -- same sort of evaluation**
4    **that the US EPA does, but certainly some other**
5    **countries sort of follow the lead of the US or EFSA or**
6    **other developed countries that have the scientific**
7    **expertise and the resources to do the detailed kind of**
8    **work that's required to render these kinds of**
9    **judgments.**
10       Q.  You've commented in your expert report and
11   deposition about the ongoing scientific discussion
12   about the standards that should be used in assessing
13   carcinogenicity including that of Roundup, correct?
14       **A.  Yes, I did testify to that.**
15       Q.  And, of course, the scientific evaluations
16   made by EPA and other worldwide regulators are part of
17   that ongoing discussion, correct?
18       **A.  Yes.**
19       Q.  There are articles and letters to the editor
20   and discussions at conferences and so on debating about
21   the decisions made by regulators, the standards they
22   employ and the evidence they consider, correct?
23       **A.  Yes.**
24       Q.  In reaching your opinions, you certainly
25   considered the evaluations of EPA, EFSA and other

71 (Pages 278 to 281)

# EXHIBIT 18

```
 1              IN THE TWENTY-FIRST JUDICIAL CIRCUIT COURT
                    OF THE COUNTY OF ST. LOUIS
 2                       STATE OF MISSOURI
 3
 4
     ----------------------------)
 5   BURRELL LAMB, et al.         )
                                  )
 6       Plaintiffs,              )
                                  )
 7                                )
     v.                           ) Cause No. 17SL-CC03681
 8                                )
                                  )
 9   MONSANTO COMPANY,            )
                                  )
10       Defendant.               )
                                  )
11   ----------------------------)
12
13
                     MONDAY, JULY 22, 2019
14
15   Videotaped Deposition of WILLIAM R. SAWYER, Ph.D., Expert
16   Witness on behalf of Plaintiffs, held at Sanibel Harbour
17   Marriott, 17260 Harbour Pointe Drive, Fort Myers, Florida,
18   33908, Jasmine Conference Room, commencing at 9:18 a.m., on
19   the above date, before Dianne Sarkisian, CSR/RPR, Certified
20   Shorthand Reporter, Registered Professional Reporter, and
21   Notary Public of the State of Florida.
22
23
24
25
```

William R. Sawyer, Ph.D.

```
 1        applying that methodology to consider carcinogens from

 2        other sources, in this case those beyond what is

 3        contained in Roundup?

 4   A.   Yes, and I have done that.

 5   Q.   Have you quantitated any other carcinogenic exposure

 6        for either Mr. Lamb or Mr. Cohen other than the

 7        glyphosate form Roundup?

 8              MS. SIZEMORE:  Object to form.

 9   A.   Yes.

10   BY MR. PAINE:

11   Q.   What have you quantitated as far as other carcinogens

12        outside of Roundup for either Mr. Lamb or Mr. Cohen?

13   A.   Well, as I said earlier, for example with the quartz,

14        crystalline silica, there was no exposure

15        systemically.  At best, it could have impacted his

16        lung, but that particular chemical strictly impacts

17        the respiratory tract.  It doesn't make it into

18        systemic circulation and it has no impact on NHL.

19              And many other compounds I've assessed as

20        well in terms of the weight of evidence of the

21        potential carcinogen and as to whether an animal

22        carcinogen or a known human carcinogen and whether it

23        could make its way to the target organ, which is bone

24        marrow in this case.  And if so, the next step is to

25        quantitate exposure.
```

William R. Sawyer, Ph.D.

```
1    Q.   So did you quantitate how much formaldehyde added or
2         represented in Mr. Cohen's case from Roundup?
3    A.   Yes.  And it is clearly a trace contaminant.  It's not
4         a primary contaminant that substantially caused the
5         disease.  Glyphosate is.  And you can't quantitate a
6         trace level contaminant.
7    Q.   Did you quantitate Mr. Lamb or Mr. Cohen's expose to
8         n-nitroso compounds from Roundup?
9    A.   No.  I treated it as described, as a trace
10        contaminant, that under the generally-accepted
11        methodology is additive to the primary carcinogen.
12   Q.   Did you quantitate either Mr. Lamb or Mr. Cohen's
13        exposure to ethylene oxide from Roundup?
14   A.   No.  I only considered ethylene oxide as an additive
15        trace contaminant, which as described by Monsanto is
16        true, and that under the generally-accepted
17        methodology is additive to the primary carcinogen,
18        glyphosate, and it should be considered and described
19        as simply as a additive trace contaminant.
20   Q.   So I take it from what you're telling me, in the
21        absence of quantitation, you're not going to tell the
22        jury that either formaldehyde, n-nitroso compounds or
23        ethylene oxide from Roundup, that either Mr. Lamb or
24        Mr. Cohen received from Roundup exposure, were
25        themselves substantial contributing factors to either
```

William R. Sawyer, Ph.D.

1        gentleman's NHL; is that correct?

2                MS. SIZEMORE:  Object to the form.

3   A.   Yes.  I'm going to say that they're simply additive

4        trace level contaminants that are not in themselves

5        the substantially contributing factors of his NHL.

6   BY MR. PAINE:

7   Q.   Doctor, let's switch gears a little bit.

8                You understand that the United States

9        Environmental Protection Agency is the federal agency

10       that has the sole authority to approve pesticide

11       registrations here in the United States, right?

12  A.   Yes.

13  Q.   And you understand that EPA has the authority to

14       suspend or cancel registration of any pesticide at any

15       time, if it has information indicating that continued

16       use would pose unreasonable risks to human -- humans

17       or the environment, right?

18  A.   Yes.

19  Q.   And you understand that EPA has the sole authority to

20       approve the labeling or product label for pesticides

21       such as Roundup here in the United States, right?

22  A.   Yes, I do.

23  Q.   And you understand that there are specific EPA

24       regulatory requirements for what goes into and may be

25       printed on the label of pesticides, like herbicides

William R. Sawyer, Ph.D.

```
 1          like Roundup, right?

 2    A.    I didn't comprehend the question.

 3    Q.    Sure.  There are specific EPA regulatory requirements

 4          for what may be stated in the labels of products like

 5          Roundup here in the United States?

 6    A.    I'd have to defer that to Dr. Benbrook.  I'm not sure.

 7    Q.    Have you reviewed any of the code of federal

 8          regulations divisions regarding information to be

 9          placed on herbicide labels such as on Roundup?

10    A.    No.  I'll defer that to Dr. Benbrook.  I'm not

11          prepared to go into labeling.  I didn't understand

12          that was my role in this case actually.

13    Q.    You understand that federal law requires EPA to

14          continuously review the scientific data for all

15          pesticides and herbicides sold in the United States;

16          is that right?

17    A.    I'm going to defer that to Dr. Benbrook.  I'm not

18          prepared to answer that.

19                    MR. PAINE:  Number 10.

20                    (DEFENDANT'S EXHIBIT 10, GLYPHOSATE:

21                    PROPOSED INTERIM REGISTRATION REVIEW

22                    DECISION, CASE NUMBER 0178 WAS MARKED

23                    IDENTIFICATION.)

24                    THE WITNESS:  Just as a note, I am rather

25          burned out.  Probably not going to go much longer.
```

William R. Sawyer, Ph.D.

1      the required data conducting the new risk assessment

2      and completing registration review case.

3              Did I read that correctly?

4  A.   Yes.

5  Q.   So you understand that the EPA has the power to

6      require any or all of those things to be submitted in

7      a review of a pesticide like glyphosate, right?

8              MS. SIZEMORE:  Object to form.

9  A.   No.  I'm really not prepared to answer that.  I defer

10     that to Dr. Benbrook.

11  BY MR. PAINE:

12  Q.   Were you aware that the EPA did require some labeling

13     changes or suggest some labeling changes in this

14     proposed interim decision?

15  A.   No.

16  Q.   Were you aware that none of the labeling changes had

17     anything to do with human health risks?

18              MS. SIZEMORE:  Object to form.

19  A.   I have no opinion.  I defer that to Dr. Benbrook.

20              Before you get into a new subject, I'm

21     pretty well shot.

22  BY MR. PAINE:

23  Q.   Okay.  Let's...  Let's do this, I'm probably pretty

24     close to a decent stopping point, anyway.  If you can

25     give me a couple minutes to consult with my

# EXHIBIT 19

SUPERIOR COURT OF CALIFORNIA

COUNTY OF ALAMEDA

BEFORE THE HONORABLE WINIFRED Y. SMITH, JUDGE PRESIDING

DEPARTMENT NUMBER 21

---oOo---

| | |
|---|---|
| COORDINATION PROCEEDING ) | |
| SPECIAL TITLE (RULE 3.550) ) | |
| ) | |
| ROUNDUP PRODUCTS CASE ) | **JCCP No. 4953** |
| ) | |
| _____ ) | |
| ) | |
| THIS TRANSCRIPT RELATES TO: ) | |
| ) | |
| Pilliod, et al. ) | **Case No.  RG17862702** |
| vs. ) | |
| Monsanto Company, et al. ) | **Pages 3075 - 3301** |
| _____) | **Volume 19** |

**Reporter's Transcript of Proceedings**

Thursday, April 11, 2019

Reported by: Kelly L. Shainline, CSR No. 13476, RPR, CRR
Lori Stokes, CSR No. 12732, RPR
Stenographic Court Reporters

**BARS**

**BAY AREA REPORTING**
S O L U T I O N S

888.526.8243
www.BayAreaReportingSolutions.com

3075

1    **APPEARANCES OF COUNSEL:**

2

3    For Plaintiffs:

4        THE MILLER FIRM, LLC
         108 Railroad Avenue
5        Orange, Virgina  22960
         (540)672-4224
6        BY:  **MICHAEL J. MILLER, ATTORNEY AT LAW**
              mmiller@millerfirmllc.com
7

8        BAUM HEDLUND ARISTEI & GOLDMAN PC
         10940 Wilshire Boulevard, 17th Floor
9        Los Angeles, California 90024
         (310) 207-3233
10       BY:  **R. BRENT WISNER, ATTORNEY AT LAW**
              rbwisner@baumhedlundlaw.com
11            **PEDRAM ESFANDIARY, ATTORNEY AT LAW**
              pesfandiary@baumhedlundlaw.com
12

13

14            **(APPEARANCES CONTINUED ON FOLLOWING PAGE)**

15

16

17

18

19

20

21

22

23

24

25

                                                          3076

1           Is the actual stuff that's in this bottle,

2    does that actually contain formaldehyde?

3        **A.**   Yes.

4        **Q.**   Okay.  All right.  So what's the other

5    contaminant?

6        **A.**   The next one in terms of significance is

7    ethylene oxide.

8        **Q.**   How do you spell that out?

9        **A.**   E-T-H-Y-L-E-N-E oxide.

10       **Q.**   What is ethylene oxide, sir?

11       **A.**   It's a sterilization gas.  It kills every type

12   of biological life on earth.  It is an extremely

13   powerful sterilizing gas.  But it's also extremely

14   mutagenic and a class A human carcinogen.

15          It's also very volatile.  It boils at a

16   subzero boiling point.  So when it's in a solution, it

17   has a tremendous tendency to come out of that solution

18   into what we call the head space of a container.

19          So if I had this zero head space bottle of

20   water, it wouldn't be a problem.  But if I had a little

21   air in the bottle, as one of our jurors has sitting

22   there, that over time that air in the bottle, the

23   ethylene oxide would accumulate in that air space.

24       **Q.**   So this bottle here has been sealed for a

25   couple of years.  In your opinion -- well, let me back

3131

1    up.

2              Is this stuff in the Roundup?

3         A.   Yes.

4         Q.   And you said it accumulates in the head space.

5    So this actually has Roundup that's been sitting in here

6    for a while.  If I were to open up this cap, what would

7    happen?

8         A.   There would be ethylene oxide escaping from

9    that head space.

10             Now I want to point out the ethylene oxide in

11   Roundup presents no harm, no problem when you're out

12   spraying.  It's too dilute.  The only problem is what

13   can accumulate in that head space in the bottle.

14        Q.   So if it's been stored for a while, that's

15   when it becomes dangerous?

16        A.   Yes.

17        Q.   Okay.  All right.  What's the other

18   contaminant?

19        A.   Well, probably in terms of significance,

20   1,4-dioxane.  It's "1 comma 4 hyphen dioxane,"

21   D-I-O-X-A-N-E.

22             And, again, all of these are reactants.

23   They're not in any way deliberately put into the

24   product.  They form when the product is made, in crude

25   form, so it's part of the production process.

3132

# EXHIBIT 20

Confidential - Subject to Further Confidentiality Review

```
 1              SUPERIOR COURT OF THE STATE OF CALIFORNIA
                    FOR THE COUNTY OF ALAMEDA
 2
      --------------------------------?
 3   COORDINATION PROCEEDING          ? JCCP NO. 4953
     SPECIAL TITLE (Rule 3.550)       ?
 4                                    ?
                                      ?
 5   ROUNDUP PRODUCTS CASES           ? Case No. RG17862702
     _____ ?
 6                                    ?
                                      ?
 7   THIS DOCUMENT RELATES TO:        ?
                                      ?
 8   Alva Pilliod, et al. v. Monsanto ?
     Company, Case No. RG17862702     ?
 9                                    ?
      ------------------------------- ?
10     - - -
11
12                         - - -
13            WEDNESDAY, FEBRUARY 6, 2019
14                         - - -
15         CONFIDENTIAL - SUBJECT TO FURTHER
                 CONFIDENTIALITY REVIEW
16
                           - - -
17
18
           Videotaped deposition of WILLIAM R. SAWYER,
19      PhD, held at Sanibel Island Beach Resort,
        1231 Middle Gulf Drive, Sanibel, Florida,
20      commencing at 8:09 a.m., on the above date,
        before Kelly J. Lawton, Registered Professional
21      Reporter, Licensed Court Reporter, and Certified
        Court Reporter.
22
                           - - -
23
                 GOLKOW LITIGATION SERVICES
24         877.370.3377 ph | 917.591.5672 fax
                    deps@golkow.com
25
```

Confidential - Subject to Further Confidentiality Review

1    to consumers?

2        A.    Not an herbicide, but the principles are all

3    outlined in the registry to follow.  And as a

4    toxicologist, I am intimately familiar with the

5    chemical properties and toxicological effects of

6    glyphosate.

7        Q.    When is the last time you wrote a product

8    label for an herbicide?

9        A.    I've never written a product label for an

10   herbicide, but I have for other chemical products for

11   our industry.

12       Q.    When is last time you drew pictures or

13   approved pictures that appeared on an herbicide

14   label?

15       A.    I didn't catch a few of your words.

16       Q.    When was the last time you drew pictures or

17   approved pictures that appeared on an herbicide label

18   for how to apply the herbicide?

19       A.    I already said I have not worked on herbicide

20   labels or material safety data sheets specific to

21   herbicides.

22       Q.    Has the EPA asked you to review herbicide

23   labels?

24       A.    Have I worked specifically for EPA?

25       Q.    Yeah.  Has EPA asked you to review herbicide

Confidential - Subject to Further Confidentiality Review

1    labels?

2        A.   No.  I have done work for corporations.

3        Q.   Has the EPA asked you to review herbicide

4    MSDSs?

5        A.   Again, I have never worked on any work for

6    EPA.

7        Q.   Have you ever been -- well, strike that.

8             If you go to Image 2 on this label, first

9    bullet point -- do you see the first bullet point?

10       A.   I do.

11       Q.   Okay.  Can you read that into the record,

12   please.

13       A.   Paint sprayer away from body.

14       Q.   It says point sprayer away from body,

15   correct?

16       A.   Okay.  It looked like paint, but you're

17   right; it's point.  There's a --

18       Q.   And that --

19       A.   -- white line under the letter.  Okay.

20       Q.   And that statement's on this label that the

21   Pilliods produced in this litigation, correct?

22       A.   Yes.

23       Q.   Okay.  And you mentioned that the individuals

24   who used this were told to adjust the nozzle after

25   spraying.