J. Marshall Jones, Jr.
Jones & Odom, LLP
2124 Fairfield Avenue
Shreveport, Louisiana 71104
Telephone: (318) 221-1600
Facsimile: (318) 425-1256
Marshall.jones@jodplaw.com

Curtis R. Joseph, Jr.
Winchell & Joseph, LLC
2124 Fairfield Avenue
Shreveport, Louisiana 71104
Telephone: (318) 221-1600
Facsimile: (318) 425-1256
curtis@wjlawfirm.net

# UNITED STATES DISTRICT COURT
# NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| IN RE: ROUNDUP PRODUCTS LIABILITY LITIGATION | ) <br> ) MDL No. 2741 <br> ) <br> ) <br> ) Case No. 3:16-md-02741-VC <br> ) |
| This document relates to: <br><br> *Joseph Blair, et al vs. Monsanto Co.,* <br> Case No. 3:19-cv-07984-VC | ) <br> )**PLAINTIFF'S RESPONSE IN** <br> )**OPPOSITION TO MONSANTO'S** <br> )**MOTION TO EXCLUDE TESTIMONY** <br> )**OF PLAINTIFF'S EXPERT DR.** <br> )**SANFORD KATZ ON RULE 702** <br> )**GROUNDS** |

# TABLE OF CONTENTS

I.   INTRODUCTION .................................................................................................1

II.  ARGUMENT .......................................................................................................2

III. LEGAL STANDARD ..........................................................................................5

IV.  CONCLUSION ....................................................................................................9

# TABLE OF AUTHORITIES

**Cases:**

*Cook v. Rockwell Int'l Corp.*, 580 F. Supp. 2d 1071 (2006) ..............................................5

*Cooper v. Takeda Pharmaceuticals America, Inc.*, 239 Cal. App. 4th 555 (2014) ...................7

*Daubert v. Merrell Dow Pharm, Inc.*, 509 U.S. 579 (1993) ........................4, 5, 6, 7, 8, 9, 10

*In re Roundup Prod. Liab. Litig.*, 390 F. Supp. 3d 1102 (N.D. Cal. 2018) .....................5, 6, 9

*Messick v. Novartis Pharm. Corp.*, 747 F. 3d 1193 (9th Circ. 2014) ...............................5, 8

*Milward v. Acuity Specialty Products Group, Inc.*, 639 F.3d 11, 13 (1st Cir. 2011) ................6

*Sarti v. Salt Creek Ltd.*, 167 Cal. App. 4th 1187 (2008) .................................................7

*Wendell v. GlaxoSmithKline, LLC*, 858 F.3d 1227 (9th Cir. 2017) ...........................6, 7, 8, 9

**Other Authorities:**

Federal Rule of Evidence §702 .....................................................................................5, 6

I.  **INTRODUCTION**

At the time of his diagnosis with diffuse large B-cell lymphoma, Plaintiff, Joseph Blair, was twenty-two (22) years old. He originally presented to Dr. Glen Watkins on October 30, 2018, complaining of a throat mass. [Exhibit 1, Dr. Watkins' medical records]. A tonsillectomy was scheduled for November 7, 2018. Thereafter, on November 9, 2018, biopsies were performed, which confirmed large B-cell lymphoma in Mr. Blair's right tonsil. He was referred to Dr. Sanford Katz and Dr. Nihar Patel. [Exhibit 2, Dr. Katz's medical records and Exhibit 3, Dr. Patel's medical records].

The undisputed evidence shows that he did not present with any of the typical risk factors associated with such a diagnosis. In fact, all things being equal, he was extremely young as it relates to the typical non-Hodgkin's patient. Dr. Patel testified that he'd treated approximately 500 patients over the course of his career with non-Hodgkin's lymphoma as a diagnosis. Further, he testified that approximately 45 percent of his non-Hodgkin's patients have diffuse large B-cell lymphomas. Lastly, he's treated approximately 200 patients with diffuse large B-cell lymphomas. [Exhibit 4, Patel deposition, p. 18 and p. 62]. moreover, his treating radiation oncologist, Dr. Sanford Katz, and his treating hematologist, Dr. Nihar Patel, both found it noteworthy that Mr. Blair sprayed Roundup as part of his job duties. [Exhibit 4, Patel deposition, pp. 63-64) and Exhibit 13, Katz deposition of 7/7/21, pp. 72-81]. [Please also see the Plaintiff's attached medical records, which are labeled Exhibits 1-3, respectively, and made a part hereof by reference thereto.]

Although Monsanto's attorneys have attempted to muddy the water as it relates to causation by asserting that Mr. Blair's body mass index (BMI) may have played some role in his diagnosis, Mr. Blair's treating physicians disputed said notion and have, instead, noted that Mr. Blair's

1

habitus was a muscular one because he engaged in body building. By that, his BMI was not a result of adipose accumulation. [Exhibit 4, Patel deposition, p. 67, and Exhibit 13, Katz deposition, pp. 87-90].

Undersigned respectfully submits that there has been absolutely no dispute that Mr. Blair used concentrated Roundup Pro (i.e., glyphosate-based product) in massive quantities insofar as his job duties with his employer, Edko, LLC, entailed spraying the product along utility easements. In that regard, it is undisputed that Mr. Blair sprayed concentrated Roundup Pro through a hose as he stood on the back of a skidder. Mr. Blair's testimony is that he sprayed thousands of gallons of Roundup Pro, daily for approximately two (2) years. [Exhibit 5, Blair deposition, pp. 54-105]. Further, it was Mr. Blair's testimony that the concentration of the product was such that it felled fully-grown trees. [Exhibit 6, Blair affidavit]. Again, these facts are undisputed.

**ARGUMENT**

The matter is now before this honorable court to exclude the testimony of plaintiff's treating oncologist, Dr. Sanford Katz, who has opined that it is more probable than not that Mr. Blair's diagnosis is attributable to his extensive exposure to Roundup. To that point, Dr. Katz has opined that the glyphosate and surfactant mixture that comprises the Roundup product is the most likely cause of Mr. Blair having developed Diffuse Large B-cell lymphoma. Dr. Katz further opined that, given the location of Mr. Blair's lymphoma (in his tonsil area), it is more probable than not that Mr. Blair's cancer was the result of the product "raining down on him", while he inhaled it. In other words, unlike the plaintiffs before this court who typically sprayed the product in a downward fashion, Mr. Blair's job duties necessitated that he spray the product from a hose, upward to the treetops. [Exhibit 14, Katz deposition, pp. 196-210 and pp. 230-237]. In the process, as noted above, the concentrated Roundup Pro "rained down" on him, for hours during a typical

8–10-hour day, for nine months out of the year, over a two (2) year period. Again, these facts are not in dispute.

Mr. Blair further testified that his exposure to Concentrated Roundup Pro occurred during the mixing process as well as during those times in which hoses or other spraying equipment would require routine maintenance to repair leaks. [Exhibit 5, Blair deposition, pp. 54-105]. Consequently, in addition to the manner of use described herein above, Mr. Blair's exposure to concentrated Roundup Pro occurred precisely as detailed by causation expert, Charles M. Benbrook, PhD on page 141 of 155 in document #13641-3, which was filed on 08/31/21 in the pending MDL. Specifically, Dr. Benbrook noted:

> "Moreover, I have reviewed multiple depositions of plaintiffs in this litigation to learn more about how they were exposed to Roundup. *In every case, the vast bulk of the exposure episodes recounted by plaintiffs occurred during the mixing-loading and application of Roundup, or when fixing or maintaining application equipment used to spray Roundup.*"

In addition to the General Causation experts previously delineated in the pending multi-district litigation (MDL) (i.e., Dr. Christopher Portier, PhD; Dr. Beate Ritz, MD, PhD; Dr. Dennis Weisenburer, MD; and Charles M. Benbrook, PhD, among others), plaintiff herein specifically noted in his Notice of Service of Expert Disclosures that he "incorporated by reference the general causation and other expert reports served by lead counsel in connection with Waves 1, 2, and 3, and, further, Plaintiff reserved the right to call the author of any such report as an expert witness at trial." [Please see the attached Notice of Service of Expert Disclosures, Exhibit 7].

Dr. Katz evaluated general causation evidence, including epidemiological, genotoxicity and other data and literature. He is well-versed in the plaintiff's case-specific medical records insofar as he personally treated Mr. Blair and, further, employed a team approach with Dr. Glen Watkins and Dr. Nihar Patel, who also treated the plaintiff within the same facility as that of Dr.

3

Katz. Additionally, Dr. Katz reviewed Mr. Blair's deposition in detail. He used his highly extensive professional experience, tying in the general causation evidence and the associated bodies of literature, to make his specific causation opinions. This methodology has been approved time and time again by the Ninth Circuit, and this Court in particular MDL. [Exhibit 8, PTO #85].

Under *Daubert*, Monsanto's arguments for excluding the testimony of Dr. Katz are not meritorious of a determination of inadmissibility as a matter of law; rather, they go to the credibility and weight of their opinions before a jury. He is not spewing "junk science" – but instead is offering reasoned, logical opinions held to a reasonable degree of certainty in his field.

### The Court Previously Considered and Rejected Monsanto's Claim that Specific Causation Experts Should be Excluded if They Rely on General Causation Experts' Opinions, Do Not Consider Every Possible Risk Factor, and/or Do Not Rule Out "Idiopathy"

In the instant MOTION, Monsanto essentially mimics the arguments it raised against the Bellwether Plaintiffs' specific causation experts. Monsanto does not dispute that the Plaintiffs' experts may use the differential etiology method upheld by the Ninth Circuit and this Court as the basis for their opinions (PTO 85 at p. 2) or argue that the experts misuse the studies. Instead, Monsanto argues that the experts' opinions should be excluded because: (1) they "rely on the same flawed studies the general causation experts rely on …," (2) [f]or the most part, these experts made no attempt at all to address idiopathy in their expert reports," and (3) they "fail to reliably consider and rule out other potential causes of NHL…," *See, e.g.,* Monsanto Motion at p. 1. This Court's prior rulings quickly dispense with each of these arguments.

a. **Reliance on General Causation Experts**

This Court, in PTO 85, rejected Monsanto's claim that it is entitled to prevail on its motion because the specific causation experts rely on the same studies as the general causation experts, calling Monsanto's argument "off point" because "at trial, [Plaintiffs' specific causation experts]

4

basis for ruling in glyphosate will be the general causation opinions." PTO 85 at pp. 2-3. For the same reasons the Court denied Monsanto's motion regarding the Bellwether Plaintiffs, Monsanto's instant motion should be denied. Monsanto's position regarding the studies upon which the general causation experts rely is a rehash of a failed argument already rejected by this Court. Dr. Katz, has, in fact, also relied on the MDL Plaintiffs' general causation experts. [Exhibit 14, Katz deposition of 9/2/21, pp. 21-22].

## II.  **LEGAL STANDARD**

Under Federal Rules of Evidence §702 and the standard elucidated in *Daubert* and its progeny, the Court is authorized to act as a gatekeeper to ensure that proffered expert testimony is relevant and based upon reliable methods. *See Daubert v. Merrell Dow Pharm., Inc.*, 509 U.S. 579, 589 (1993). However, "[a] review of the caselaw after *Daubert* shows that the rejection of expert testimony is the exception rather than the rule." Fed.R.Evid. 702 advisory committee note (2000); *see also Cook v. Rockwell Int'l Corp.*, 580 F. Supp. 2d 1071, 1083 (2006). In fact, "[t]he Ninth Circuit has placed great emphasis on *Daubert's* admonition that a district court should conduct [the admissibility] analysis "with a 'liberal thrust' favoring admission". *In re Roundup Prod. Liab. Litig.*, 390 F. Supp.3d 1102, 1112 (N.D. Cal. 2018) (Chhabria, J.) (quoting *Messick v. Novartis Pharm. Corp.*, 747 F.3d 1193, 1196 (9th Circ. 2014).

*Daubert* provided some factors a court can consider to determine the admissibility of expert testimony, including: (1) whether the theory or technique in question can be and has been tested; (2) whether it has been subjected to peer review and publication; (3) its known or potential error rate; (4) the existence and maintenance of standards controlling its operation ; and (5) whether it has attracted widespread acceptance within a relevant scientific community. *Daubert*, 509 U.S. at

593-94. Yet this list is non-exhaustive, and the courts have flexibility and broad discretion in its inquiry. *See Wendell v. GlaxoSmithKline, LLC*, 858 F. 3d 1227, 1237 (9th Cir. 2017).

Expert testimony should only be excluded if it is the product of irrelevant or unreliable "junk science" *Id.* Otherwise, the expert's testimony must be admitted for a jury's consideration. *See Milward v. Acuity Specialty Products Group, Inc.*, 639 F.3d 11, 13 (1st Cir. 2011) ("So long as an expert's scientific testimony rests upon 'good grounds, based on what is known,' it should be tested by the adversarial process, rather than excluded for fear that jurors will not be able to handle the scientific complexities.") (quoting *Daubert*, 509 U.S. at 590, 596)).

As noted above, the Court's role in a *Daubert* inquiry is that of "gatekeeper" – and does not replace the adversary system. *In re Roundup Prod. Liab. Litig.*, 390 F. Supp. 3d at 1111-13. "Vigorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof are the traditional means of attacking shaky but admissible evidence." *Id.*

Dr. Katz's expert testimony is wholly appropriate as it will "assist the trier of fact to understand the evidence or to determine a fact in issue." Fed. R. Evid. 702. Dr. Katz is an eminently qualified oncologist specializing in diagnosis and treatment of B-cell malignancies and other lymphomas. He completed his residency at Georgetown (Resident Physician, Department of Medicine (1995-1996), Department of Radiation Medicine (1996-1999), and Chief Resident, Department of Radiation Medicine (1999-2000). He is a board-certified oncologist who is currently a clinical Instructor, Department of Radiation Oncology, Tulane University, an Assistant Director of Willis-Knighton's Department of Radiation Oncology, an Assistant Professor, Department of Radiology, LSU Shreveport, among other teaching credentials detailed in his CV. He is a practicing clinical oncologist, specializing in cancers of the head and neck. [Exhibit 9, Katz CV].

Specifically, Dr. Katz offers the opinion that Mr. Blair's chronic and exorbitant specific manner of use of and exposure to concentrated Roundup, a glyphosate-based product, along with the routine mixing and repair of hoses and other equipment used to spray Roundup, was a substantial factor in his development of NHL. In addition to the General Causation experts previously recognized by this honorable court, Dr. Katz noted that he placed great weight upon the heavily upon the IARC's Monograph 112 as opposed to the EPA's glyphosate review. [Exhibit 10, Katz Affidavit; Exhibit 11, Katz opinion of 7/18/21; Exhibit 12, List of Documents Reviewed; Exhibit 13, Katz deposition of 7/7/21, pp. 91-115; Exhibit 14, Katz deposition of 9/2/21 and 9/17/21].

**Dr. Katz Need Not Rule Out All Potential Alternative Risk Factors**

Dr. Katz, like all other experts, need not analyze every conceivable risk factor to satisfy *Daubert*. The Court in *Wendell v. GlaxoSmithKline, LLC*, 858 F. 3d 1127 (9th Circ. 2017) held as follows:

> We do not require experts to eliminate all other possible causes of a condition for the expert's testimony to be reliable. It is enough that the proposed cause "be a substantial causative factor". This is true in patients with multiple risk factors, and analogously, in cases where there is a high rate of idiopathy.

*Id.* at 1237. Moreover, in *Cooper vs. Takeda Pharmaceuticals America, Inc.*, 239 Cal. App. 4th 555 (2014), the Court instructed:

> Thus, because California has rejected the notion that a plaintiff must definitively "exclude all 'possibilities'" other than the defendant's conduct or product as the cause of the plaintiff's harm, clearly an expert, in reaching a specific causation opinion, need not exclude all other possibilities before he or she can express an opinion that the defendant's conduct or product caused the plaintiff's harm.

*Id.* at 580 (citing *Sarti v. Salt Creek Ltd*, 167 Cal. App. 4th 1187, 1210 (2008)).

This Court, in PTO 85, has also addressed the issue. Pertinently, this Court noted:

7

> Under Ninth Circuit caselaw, doctors enjoy wide latitude in how they practice their art when offering causation opinions. *See Wendell*, 858 F. 3d at 1237 ("Where, as here, two doctors who stand at or near the top of their field and have extensive clinical experience with rare disease or class of disease at issue, are prepared to give expert opinions supporting causation, we conclude that *Daubert* poses no bar on their principles and methodology")

*See* PTO 85 at p. 5.

In this matter, Dr. Katz did analyze other risk factors which he acknowledged could increase one's risk for developing NHL and discussed in detail Mr. Blair's alleged risk factors and, nevertheless, maintained his opinion that, from a more probable than not standpoint, Mr. Blair's previously described exposures to concentrated Roundup Pro was a substantial contributing factor to the development of Mr. Blair's NHL. Succinctly put, Dr. Katz relates causation relative to Mr. Blair's NHL to his particularized exposure to concentrated Roundup Pro.

### a. Plaintiffs' Experts Need Not Exclude Idiopathy

Monsanto's "idiopathy" argument is similarly a rehash of the argument this Court also rejected in PTO 85. The Court wrote:

> Recognizing that "[m]edicine partakes of art as well as science," the Ninth Circuit's recent decisions reflect a view that district courts should typically admit specific causation opinions that lean strongly toward the "art" side of the spectrum. *Messick*, 747 F.3d at 1198; *see also Wendell*, 858 F. 3d at 1237 ("The first several victims of a new toxic tort should not be barred from having their day in court simply because the medical literature, which will eventually show the connection between the victims' condition and the toxic substance, has not yet been completed." (*quoting Clausen*, 339 F.3d at 1060)).

\* \* \*

> Under Ninth Circuit caselaw, doctors enjoy wide latitude in how they practice their art when offering causation opinions. *See Wendell*, 858 F.3d at 1237 ("Where, as here, to doctors who stand at or near the top of their field and have extensive clinical experience with the rate disease or class of disease at issue, are prepared to give expert opinions supporting causation, we conclude that *Daubert* poses no bar based on their principles and methodology.") It is sufficient for a qualified expert, in reliance on his clinical experience, review of a plaintiffs' medical records, and evaluation of the general causation evidence, to conclude that an "obvious and

8

known risk factor[]" is the cause of that plaintiff's disease. *See Wendell*, 858 F.3d at 1235. Here, the specific causation experts did that. Relying on the plaintiff's admissible general causation opinions - which assert a robust connection between glyphosate and NHL – the experts concluded that glyphosate was a substantial factor in causing the plaintiffs' NHL.

Moreover, the experts relied heavily on the plaintiffs' exposure levels in drawing their conclusions. All three experts noted the plaintiffs' extensive Roundup usage, and further explained – as did the plaintiffs' general causation opinions – that both the McDuffie (2001) and Eriksson (2008) studies showed a dose-response relationship between glyphosate and NHL. *See generally In re Roundup Products Liability Litigation*, 2018 WL 3368534, at *9-10. Thus, consistent with Ninth Circuit caselaw, the experts provided a basis for their conclusion that these plaintiffs fall into the category of Roundup users who developed NHL. The Court may be skeptical of their conclusions, and in particular of the assumption built into their opinions from the general causation phase about the strength of the epidemiological evidence. But their core opinions – that the plaintiffs had no other significant risk factors and were exposed to enough glyphosate to conclude that it was a substantial risk factor in causing their NHL – are admissible.

PTO 85 at pp. 5-6 (footnotes omitted).

Thus, because the experts here followed the same methodology as those previously addressed by the Plaintiffs' Bellwether experts, Monsanto's Motion should be denied.

## This Court Has Already Ruled That Plaintiffs' Experts Properly Ruled in Roundup as the Cause of Plaintiffs' Non-Hodgkin's Lymphoma

Monsanto's overarching theme in these *Daubert* motions is to rehash previously failed arguments in this regard. *See* PTO 85 at p. 2 (rejecting this argument as "off point"); *see also* PTO 45. As such, consistent with the Court's direction not to relitigate issues previously ruled upon by this Court, but in order to fully preserve the appellate record, Plaintiffs hereby incorporate the following pleadings that addressed this issue:

- Plaintiffs' Response in Opposition to Monsanto's Specific Causation *Daubert* and Summary Judgment Motion and *Daubert* Motion to Strike Certain Opinions of Monsanto Company's Expert Witnesses (ECF #2478)

9

...

- Plaintiffs' Response in Opposition to Monsanto's Motion for Judgment as a Matter of Law and for a New Trial (ECF #4135).

### III. CONCLUSION

For the foregoing reasons, the Court should deny Monsanto's *Daubert* Motion to Exclude Dr. Katz, together with such other relief as the Court deems just and proper.

Respectfully submitted;

Date: October 6, 2021

By: *J. Marshall Jones, Jr.*
J. Marshall Jones, Jr.
Jones & Odom, LLP
2124 Fairfield Avenue
Shreveport, Louisiana 71104
LA State Bar No. 7488
Telephone: (318) 221-1600
Facsimile: (318) 425-1256
Marshall.jones@jodplaw.com

By: *Curtis R. Joseph, Jr.*
Curtis R. Joseph, Jr.
Winchell & Joseph, LLC
2124 Fairfield Avenue
Shreveport, Louisiana 71104
La. State Bar No. 26944
Telephone: (318) 221-1600
Facsimile: (318) 425-1256
curtis@wjlawfirm.net

Attorney for Plaintiffs

### CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on this 6th day of October 2021, a copy of the foregoing was filed with the Clerk of the Court through the CM/ECF system which sent notice of the filing to all appearing parties of record.

*J. Marshall Jones, Jr.*
J. Marshall Jones, Jr.
Jones & Odom, LLP