# EXHIBIT 13

1           UNITED STATES DISTRICT COURT

2          NORTHERN DISTRICT OF CALIFORNIA

3

4    IN RE: ROUNDUP PRODUCTS          CASE NO. MDL NO.

     LIABILITY LITIGATION             3:16-MD-02741-VC

5

6    BLAIR, ET AL                     MDL NO. 2741

7    VERSUS                           CASE NO.

                                      3:19-CV-07984-VC

8    MONSANTO COMPANY

9

10            Videoconference videotaped deposition of

11    SANFORD R. KATZ, M.D., taken on Wednesday, the 7th

12    day of July 2021 commencing at 1:06 p.m.

13

14

15

16

17

18

19

20

21

22    REPORTED BY:

23        SHARI PECK

          CERTIFIED COURT REPORTER

24

25

```
 1    APPEARANCES OF COUNSEL:

 2

 3    FOR THE PLAINTIFF, JOSEPH BLAIR:

 4        WINCHELL & JOSEPH

 5        (BY:  CURTIS RAY JOSEPH, JR., ESQUIRE)

 6        2124 FAIRFIELD AVENUE

 7        SHREVEPORT, LOUISIANA  71104

 8        CURTIS@WJLAWFIRM.NET

 9

10

11    FOR THE DEFENDANT, ROUNDUP:

12        THE PIORKOWSKI LAW FIRM, PC

13        (BY:  JOSEPH D. PIORKOWSKI, JR., ESQUIRE)

14        1800 K STREET, NW  SUITE 1000

15        WASHINGTON, DC  20006

16        JPIORKOWSKI@LAWDOC1.COM

17

18

19

20        ALSO PRESENT:

21        ANNE HOVIR-THE PIORKOWSKI LAW FIRM

22

23

24

25
```

```
1                    I N D E X

2                                        PAGE

3

4    Title..............................1

5    Appearances........................2

6    Index..............................3

7    Stipulation........................4

8

9    EXAMINATION BY MR. PIORKOWSKI............5

10

11                  EXHIBITS

12   EXHIBIT 1 (NOD)..........................

13   EXHIBIT 2 (KATZ DOCS.)....................34

14   EXHIBIT 3 (Initial Consult doc.)..........54

15   EXHIBIT 4 (Follow-up doc.)................54

16   EXHIBIT 5 (Affidavit)....................54

17   EXHIBIT 6 (Report).......................54

18   EXHIBIT 7 (invoice)......................54

19   EXHIBIT 8 (records)......................56

20   EXHIBIT 9 ...............................78

21   EXHIBIT 10 (Castille paper)..............86

22   EXHIBIT 11 (LETTER)......................94

23

24

25
```

Case 3:16-md-02741-VC Document 13930-13 Filed 10/06/21 Page 5 of 126
Case 3:16-md-02741-VC Document 13790-2 Filed 09/23/21 Page 5 of 126
Sanford R. Katz, M.D.

```
 1              S T I P U L A T I O N

 2         IT IS STIPULATED AND AGREED by and between

 3    counsel the videotaped deposition of SANFORD R.

 4    KATZ, M.D., is hereby being taken under the Federal

 5    Rules of Civil Procedure 30 for all purposes

 6    permitted under the law.

 7         That the formalities of reading and signing are

 8    specifically not waived;

 9         That the formalities of sealing, certification

10    and filing are hereby waived; the party responsible

11    for services of the discovery material shall retain

12    the original;

13         That all objections, except those as to the form

14    of the questions and/or the responsiveness of the

15    answers, are hereby reserved until the time as this

16    deposition, or any part thereof, may be used or

17    sought to be used in evidence.

18

19

20                   *   *   *   *   *

21

22         SHARI PECK, Certified Court Reporter, in and for

23    the State of Louisiana, officiated in administering

24    the oath to the witness.

25
```

Sanford R. Katz, M.D.

```
 1                 SANFORD R. KATZ, M.D.

 2                   2600 Kings Highway

 3               Shreveport, Louisiana   71103,

 4    after having been first duly sworn by the

 5    above-mentioned Court Reporter, did testify as

 6    follows:

 7              THE VIDEOGRAPHER:

 8              We are now on the record.  My name is

 9    Meghan Etines.  I'm the videographer for Golkow

10    Litigation Services.  Today's date is July 7th,

11    2021.  And the time is 1:06 p.m.  This remote

12    deposition is being held in the matter of the

13    Roundup Liability Litigation for the United

14    States District Court Northern District of

15    California.  The deponent is Dr. Sanford Katz.

16    All parties to the deposition are appearing

17    remotely and have agreed to witness being sworn

18    in remotely.  Due to the nature of remote

19    reporting, please pause briefly before speaking

20    to make sure all parties are heard completely.

21    Will counsel please identify yourselves for the

22    record.

23              MR. PIORKOWSKI:

24              My name is Joseph Piorkowski.  I'm counsel

25    for Roundup.
```

Case 3:16-md-02741-VC   Document 13930-13   Filed 10/06/21   Page 7 of 126
Case 3:16-md-02741-VC   Document 13790-2   Filed 09/28/21   Page 7 of 126
Sanford R. Katz, M.D.

```
 1          MS. HOVIS:

 2          I'm Ann Hovis.  I'm counsel in the

 3     Piorkowski Law Firm.

 4          MR. JOSEPH:

 5          Curtis Joseph, counsel for Joseph Blair.

 6          THE VIDEOGRAPHER:

 7          The court reporter is Shari Peck.

 8          Will you now swear in the witness.

 9                    (Whereupon, the witness was

10                    sworn in.)

11     EXAMINATION BY MR. PIORKOWSKI:

12          Q    Good morning, Dr. Katz, how are you?

13          A    Good morning.

14          Q    Before we get started, I understand you

15     have a hard time limit today; is that right?

16          A    Yes.  I'm blocked out until 4:00 this

17     afternoon.

18          Q    We'll try to get done what we can get

19     done.  I'm not 100 percent sure we will be able to

20     finish today with all the things about your record

21     but we'll make our best effort.  Will you introduce

22     yourself.  Since this videotape could potentially be

23     played to a jury, could you just briefly introduce

24     yourself to the ladies and gentlemen of the jury?

25          A    Yes.  I'm Dr. Sanford Katz.  I'm a
```

Banfield R. Katz, M.D.

```
 1   radiation oncologist, and I was the treating

 2   physician to Mr. Joseph Blair, one of his

 3   physicians.

 4        Q     What's your business address, Dr. Katz?

 5        A     It's Wills-Knighton Cancer Center

 6   Department of Radiation Oncology, 2600 Kings Highway

 7   Shreveport, Louisiana 71103.

 8        Q     And you understand we're doing this

 9   deposition today by Zoom?  I'm in Washington DC.

10   Where are you, Dr. Katz?

11        A     I'm in Shreveport, Louisiana.

12        Q     Okay.  And we'll do our best.  There's --

13   depositions by Zoom have some challenges related to

14   exchanging documents and disconnects from the

15   Internet and things like that, but we'll do our best

16   to try to get through, all right?

17        A     Okay.

18        Q     You're aware that plaintiff Joseph Blair

19   was diagnosed with non-Hodgkin lymphoma, correct?

20        A     Yes.

21        Q     In the lawsuit, he alleges that Roundup

22   caused his non-Hodgkin lymphoma?

23        A     Yes.

24        Q     And we're here today to ask you about your

25   care and treatment of Mr. Blair.  Do you understand
```

Case 3:16-md-02741-VC   Document 13930-13   Filed 10/06/21   Page 9 of 126
Case 3:16-md-02741-VC   Document 13790-2   Filed 09/23/21   Page 9 of 126
Banfield R. Katz, M.D.

1    that Mr. Blair has not alleged that you did anything

2    wrong or inappropriate with respect to the care that

3    you provided to him?

4       A    Yes, that's my understanding.

5       Q    And you understand that you are neither a

6    plaintiff or a defendant in this lawsuit, right?

7       A    Yes, that's my understanding.

8       Q    And you are being deposed as a witness to

9    discuss the care and treatment that you provided to

10    one of your patients; is that your understanding?

11       A    Yes, that's my understanding.

12       Q    And we've never met or spoken before

13    today; is that right?

14       A    No, sir.

15       Q    And you've never had any conversations

16    with any lawyers representing Bayer or Monsanto

17    Company before today, right?

18       A    That's correct.

19       Q    Have you ever been deposed before?

20       A    I have.

21       Q    On how many occasions?

22       A    Three.

23       Q    And were those depositions in a capacity

24    as a fact witness or as an expert witness or were

25    they unrelated to -- first of all, were they medical

Case 3:16-md-02741-VC   Document 13930-13   Filed 10/06/21   Page 10 of 126
Case 3:16-md-02741-VC   Document 13790-2   Filed 09/22/21   Page 10 of 126
Sanford R. Katz, M.D.

```
 1   cases or non-medical cases?

 2        A    They were medical cases and they were --

 3   can you define a fact witness?

 4        Q    A fact witness is somebody who provided

 5   care and treatment to the plaintiff but is not being

 6   specifically retained as an expert witness?

 7        A    Right.  Those were all fact witnesses.

 8        Q    Okay.  And have you ever served as an

 9   expert witness in a case?

10        A    I have not.

11        Q    Okay.  Have you ever given testimony in

12   court in a case?

13        A    I have.

14        Q    And was that also in one of those three

15   cases that we just alluded to where you gave

16   depositions?

17        A    Correct.

18        Q    Okay.  Can you just briefly tell me what

19   you can remember about those cases?  I don't need to

20   know details.  Did any of them involve non-Hodgkin

21   lymphoma?

22        A    No.

23        Q    Did any of them involve any claim of

24   exposure to pesticides or Roundup or glyphosate?

25        A    No.
```

Case 3:16-md-02741-VC   Document 13790-2   Filed 09/22/21   Page 11 of 126
Sanford R. Katz, M.D.

```
 1       Q     Did any of those cases in your review have

 2   any relationship or bearing to the issues in this

 3   case?

 4       A     No.

 5       Q     Were they all cases that were based in

 6   Louisiana?

 7       A     Yes.

 8       Q     And on how many occasions did you testify

 9   in court?

10       A     One.

11       Q     And do you remember the name of the

12   plaintiff in that case?

13       A     I don't.

14       Q     No.  How long ago was that?

15       A     More than 15 years ago.

16       Q     And were these other cases more than

17   15 years ago or some of them more recently?

18       A     I think they were more than ten years ago.

19       Q     They were all more than ten years old?

20       A     Yes.

21       Q     So since it's been awhile since you've

22   given a deposition, let me just go over some ground

23   rules so -- to make this flow more easily,

24   hopefully.  It's especially important since we're on

25   the Zoom and there's volume issues with voices and
```

```
 1   so forth, that if for some reason you don't hear my

 2   question or you don't understand my question, would

 3   you ask me to repeat it or rephrase it?

 4        A    Okay.

 5        Q    And if you do, I'll assume you understood

 6   my question; is that fair?

 7        A    Fair.

 8        Q    Secondly, and I think you've been doing a

 9   pretty good job of this so far, we need to make an

10   effort not to talk over each other, so there's a lot

11   of circumstances where you may know where you think

12   I'm going with a question and kind of jump in with

13   the answer.  I want you to -- because a written

14   transcript is being kept, it's -- we need to keep

15   our court reporter happy, and we can only do that if

16   we're only talking one person at a time, okay?

17        A    Fair enough.

18        Q    And separately, although in normal

19   conversation it's often normal to say "uh-huh" or

20   "uh-uh" or nods of the head and that sort of thing,

21   it is important to have a verbal "yes" or "no" kind

22   of answer to the questions just so the record is

23   clear, all right?

24        A    Okay.

25        Q    If you don't know the answer to a question
```

Sanford R. Katz, M.D.

```
 1    I ask or you can't remember the information, just

 2    please let me know.  I don't want you to speculate

 3    about anything.  That is not advanceable for

 4    anybody, okay?

 5         A    Okay.

 6         Q    And you understand that you're testifying

 7    under oath today?

 8         A    Yes.

 9         Q    Is there any reason you're unable to give

10    true and accurate testimony?

11         A    No.

12         Q    Are you taking any medications that could

13    interfere with your memory or ability to

14    concentrate?

15         A    Not that I would -- not that I would think

16    so.

17         Q    Have you ever been involved in any

18    capacity in a lawsuit as a plaintiff or a defendant

19    in the past?

20         A    I'm currently a plaintiff -- plaintiff --

21    defendant in a lawsuit.

22         Q    Is that a medical malpractice?

23         A    It is.

24         Q    In your capacity as a radiation

25    oncologist?
```

Sanford R. Katz, M.D.

```
 1      A    It is.

 2      Q    Does that case involve any issue with

 3  non-Hodgkin lymphoma?

 4      A    No, it does not.

 5      Q    Are you represented by counsel in the

 6  case?

 7      A    I am.

 8      Q    Who's your counsel?

 9      A    Bobby -- shoot -- I'm trying to remember

10  his last name.  I always call him Bobby.  Can I get

11  back to you on that?

12      Q    Yes.

13           MR. JOSEPH:

14           Could I interject on that, Counsel?

15           MR. PIORKOWSKI:

16           Yes.

17           MR. JOSEPH:

18           Could it be Bobby Pugh?

19           THE WITNESS:

20           That's it.

21           MR. PIORKOWSKI:

22           Thank you.  Curtis, I appreciate it.

23           MR. JOSEPH:

24           I know him from being a defense lawyer

25      around here.
```

Case 3:16-md-02741-VC   Document 13930-13   Filed 10/06/21   Page 15 of 126
Case 3:16-md-02741-VC   Document 13790-2   Filed 09/23/21   Page 15 of 126
Sanford R. Katz, M.D.

```
 1              MR. PIORKOWSKI:

 2              Got it.

 3    BY MR. PIORKOWSKI:

 4         Q    And is -- are you the only defendant in

 5    this case or are there multiple defendants?

 6         A    There're multiple defendants.

 7         Q    And is the institution a defendant as

 8    well?

 9         A    It is not.

10         Q    Are you an employee of your institution or

11    are you an independent contractor?

12         A    I'm independent.

13         Q    So you're a medical doctor, correct?

14         A    Correct.

15         Q    Your speciality is radiation oncology; is

16    that correct?

17         A    Correct.

18         Q    And in your specialty, you use radiation

19    as a therapeutic tool to treat a variety of types of

20    cancer; is that right?

21         A    Correct.

22         Q    And in some cases you use radiation to try

23    to shrink the tumor; is that fair?

24         A    That's true.

25         Q    And in other cases, you use radiation to
```

Case 3:16-md-02741-VC   Document 13930-13   Filed 10/06/21   Page 16 of 126
Case 3:16-md-02741-VC   Document 13790-2   Filed 09/23/21   Page 16 of 126
Sanford R. Katz, M.D.

```
 1   eliminate the cancer all together?

 2        A    Correct.

 3        Q    How long have you been practicing

 4   medicine?

 5        A    Twenty-one years following my completion

 6   of residency, and I have been an M.D. for twenty-six

 7   years.

 8        Q    And you've been -- you've practice

 9   radiation oncology throughout the entire time?

10        A    I have.

11        Q    Have you ever practiced any other

12   specialty?

13        A    I have not.

14        Q    And you're now affiliated with the

15   Willis-Knighton Hospital?  Is it called hospital or

16   medical --

17        A    Health System.

18        Q    Health System, okay.  And are you

19   affiliated with any other hospitals or institutions?

20        A    I have faculty appointments at the LSU

21   University Hospital here.

22        Q    And what's your faculty appointments,

23   clinical faculty?

24        A    Yes, I am gratis assistant professor in

25   the department of otolaryngology-head and neck
```

Case 3:16-md-02741-VC   Document 13930-13   Filed 10/06/21   Page 17 of 126
Case 3:16-md-02741-VC   Document 13790-2   Filed 09/22/21   Page 17 of 126
Sanford R. Katz, M.D.

1    surgery, as well as the department of oral and

2    maxillofacial surgery, as well as the department of

3    radiology.

4        Q    And are you -- do you give didactic

5    lectures or is it limited to clinical teaching?

6        A    I give didactic lectures.  I attend tumor

7    boards.  I participate in training of the residents

8    and fellows and medical students, and I do rotations

9    in my department here, as well as running various

10   conferences over there at the institution.  As I

11   mentioned, I participate in research as well.  So

12   it's a rather comprehensive participation.

13       Q    So I'm clear, when you say you're on the

14   faculty at LSU, is that -- is there a clinical

15   aspect to that at LSU?  I know you said that

16   students rotate through your practice.

17       A    Right.

18       Q    But do you practice independently at LSU

19   in addition to Willis-Knighton?

20       A    Right.  There was a period of time when I

21   did practice clinically at LSU a number of years

22   ago.  And now I don't practice there anymore

23   clinically.  I practice here.  But we share

24   patients.  I will treat patients in conjunction with

25   the physicians at LSU and the other departments like

Sanford R. Katz, M.D.

```
 1    otolaryngology, oral max four, oral maxillofacial

 2    surgery, and medical oncology.  But since our

 3    facility is far more advanced than their's, I

 4    elected to limit my practice clinically at this

 5    facility because the care was superior.

 6         Q    Did you bring with you a CV or a resumé?

 7         A    I have one that I can send to you, if you

 8    would like.

 9         Q    Okay, that will be great.

10         A    Would you like me to do that now or save

11    it to the end?

12         Q    We can do that on a break.  There may be

13    some things I want to ask you about on your CV.

14         A    That's fine.

15         Q    You went to the University of Maryland

16    Medical School; is that right?

17         A    I did.

18         Q    Did you grow up in the Northeast or where

19    did you grow up?

20         A    I grew up in New York until I was 15, and

21    then moved to the DC subs of Maryland.

22         Q    So you got your MD from Maryland in what

23    year?

24         A    1995.

25         Q    I'm trying to piece this together from
```

Sanford Kane, M.D.

```
 1    what I can find on the website, but it looks like

 2    you did a residency at some combination of

 3    Georgetown and Greater Baltimore Medical Center?

 4         A    That's correct.  I did a year of internal

 5    medicine at Greater Baltimore Medical Center, and

 6    then I went on to my residency in radiation oncology

 7    at Georgetown.

 8         Q    And was Georgetown the institution at that

 9    time or was it MedStar?

10         A    No, it was the institution.  It was not

11    yet MedStar.

12         Q    What years was that?

13         A    So I was there from 1996 to 2000.

14         Q    In the years I represented Georgetown.

15    Did you do any fellowship training after residency?

16         A    I did not.

17         Q    Are you board certified by the American

18    College of Radiology?

19         A    The American Board of Radiology.

20         Q    And the American Board of Radiology has

21    different board certifications; is that right?

22         A    Generally it's broken down to diagnostic

23    radiology and therapeutic radiology.

24         Q    And what are you board certified in?

25         A    Therapeutic radiology.
```

Samantha R. Kautz, M.D.

```
 1        Q     Okay.  And can you briefly explain to the
 2   jury what it means to be board certified?
 3        A     Yes.  So basically you have to
 4   successfully complete a residency and demonstrate
 5   proficiency in your specialty through a series of
 6   written exams, as well as oral exams.  And in the
 7   case of radiation oncology, you have to complete
 8   board written examinations showing proficiency in
 9   radiation and nuclear physics, radiation biology and
10   clinical oncology as well as specifics of radiation
11   oncology as a subspecialty.  And following
12   completion of that, successful passing of that
13   written exam, you go on to take an oral examination
14   which is a full day -- it's a full-day examination
15   where you have eight subsections in each -- in
16   various subsites of cancers with individual
17   examiners running through cases and you have to pass
18   all eight of those subsections and at that point
19   you'd be board certified.  And then to maintain that
20   board certification, you would have to successfully
21   complete a certain amount of continuing medical
22   education each year practicing improvement projects
23   and things of that sort and going on.  And then
24   there is -- at ten years, there was a
25   recertification exam that you -- that I had to pass,
```

Sanford R. Katz, M.D.

```
 1    and I continued to maintain the continuing medical

 2    education component.

 3          Q      What year were you first board certified?

 4          A      2000.

 5          Q      And then did you have to do it again in

 6    2010 you're saying?

 7          A      In 2010.  And then once again -- and then

 8    I was recertified again in 2020.

 9          Q      Okay.  All right.  You are not board

10    certified in internal medicine, correct?

11          A      I am not.

12          Q      Or boarded in hematology?

13          A      No, sir.

14          Q      In your practice, do you prescribe

15    chemotherapy for cancer patients?

16          A      I do not.

17          Q      Are you credentialed at any institutions

18    who prescribe chemotherapy?

19          A      I am not.

20          Q      And that's the role of the primary medical

21    oncologist; is that right?

22          A      That's correct.

23          Q      And with respect to Mr. Blair, that would

24    be Dr. Patel?

25          A      That is correct.
```

Sanford R. Katz, M.D.

```
 1        Q     Is Dr. Patel also associated with your

 2   same institution?

 3        A     He is.

 4        Q     You don't prescribe or perform subcell

 5   transplants or CAR T-cell therapy, correct?

 6        A     Correct.

 7        Q     Is it fair to say that cancer doctors try

 8   to use a team approach in terms of providing care to

 9   cancer patients?

10        A     Yes, I'd say that's fair to say.

11        Q     And radiation oncologists are part of that

12   team; is that fair?

13        A     Correct.

14        Q     Can you explain the relationship between

15   the medical oncologist and radiation oncologist?

16        A     So we coordinate care depending upon the

17   disease site and the extent of disease and the type

18   of cancer.  Our specialty -- care is multi-specialty

19   depending upon those factors.  In this particular

20   case, Mr. Blair's case, following his diagnosis, his

21   treatment, standard of care was for him to receive

22   both systemic therapy and radiation therapy.  When

23   he was seen, we discussed the case and we come up

24   with a treatment plan and then we work

25   collaboratively.
```

Case 3:16-md-02741-VC   Document 13930-13   Filed 10/06/21   Page 23 of 126
Case 3:16-md-02741-VC   Document 13790-2   Filed 09/23/21   Page 23 of 126
Samford R. Katz, M.D.

```
 1        Q      By "we," you mean you and Dr. Patel?

 2        A      That's correct.

 3        Q      Anybody else on the team besides the two

 4   of you?

 5        A      Yes, there was.  Dr. Glen Lee Watkins made

 6   the diagnosis and he is the ENT.

 7        Q      Are you a member of any professional

 8   organizations?

 9        A      I am.  I am a member of the ASTRO,

10   American Society of Therapeutic Radiation Oncology,

11   and I'm also a member of ACRO, American College of

12   Radiation Oncology.

13        Q      Are you a member of the Louisiana State

14   Medical Society?

15        A      I am.  Actually, I'm a member of the

16   Shreveport Medical Society, and I'm also a member of

17   the American Society of Clinical Oncology.

18        Q      You're a member of the American Medical

19   Association?

20        A      I am not.

21        Q      Have you had any leadership rolls in the

22   organizations that you belong to?

23        A      I'm sorry, could you repeat the question?

24        Q      Have you had any leadership rolls in the

25   organizations that you belong to?
```

1     A    No.  But I have been recognized and

2   awarded as a fellow of the American College of

3   Radiation Oncology.

4     Q    Okay.  Now from your website, it looks

5   like the biggest percentage of your practice is

6   comprised of breast, prostate, and in your case lung

7   cancer, and cancer of the head and neck, correct?

8     A    Yes.  I don't really know what my website

9   says.  It's an institutional website but my practice

10  is composed primarily of cancers of the upper area

11  digestive tract which includes primarily head and

12  neck cancers but as well as esophageal cancers and

13  lung cancers.  I do see breast cancers and prostate

14  cancers as well as previous palliative cases as

15  well.  But I would say that the majority of my cases

16  are cancers of the head and neck.

17    Q    Okay.  So you're counting like esophageal

18  adenocarcinoma as cancer of the head and neck?

19    A    I'm sorry, repeat the question.

20    Q    Like esophageal adenocarcinoma, would you

21  consider that a cancer of the head and neck?  Would

22  you consider that a cancer of the head and neck or

23  that's too low?

24    A    No, sir, that would not be head and neck.

25  So head and neck would be -- would essentially be up

Case 3:16-md-02741-VC   Document 13930-13   Filed 10/06/21   Page 25 of 126
Case 3:16-md-02741-VC   Document 13790-2   Filed 09/23/21   Page 25 of 126
Sanford R. Katz, M.D.

```
 1    to the level or I should say down to the level of
 2    the esophagus.
 3         Q      Sure.  So oropharynx, larynx, sinuses,
 4    salivary glands?
 5         A      Correct.
 6         Q      That would be within?
 7         A      Correct.  Right.  So that would be oral
 8    cavity, nasopharynx, nasal cavity, paranasal
 9    sinuses, hypopharynx, larynx, as well as skin
10    cancers.
11         Q      Okay.  And what -- I know it is sometimes
12    difficult to ballpark these things but what
13    percentage of your overall practice is lung cancer?
14         A      Currently, I would say it represents about
15    15 percent.
16         Q      15?
17         A      15.
18         Q      And what about prostate?
19         A      I would say also about maybe 10 to
20    15 percent.
21         Q      And what about breast cancer?
22         A      Probably 10 percent.
23         Q      And so the remainder -- or that list of
24    cancers that we just talked about would be head and
25    neck?
```

```
 1      A     That's correct.

 2      Q     Okay.  Do you -- apart from breast,

 3   prostate, lung, and head and neck, do you -- are you

 4   involved in radiation therapy to any other part of

 5   the body, like do you get involved in GI cancer,

 6   brain cancer, or anything of that nature?

 7      A     So on occasion, I may have a patient who I

 8   have to treat a metastatic focus to let's say the

 9   spine, to the bone, but it's an occasional part of

10   my practice.

11      Q     In terms of your typical work week, do you

12   do the same thing every day -- or if you take a

13   surgeon, for example, they have two days in the OR,

14   and one day they are doing pre-opt.  Do you have

15   kind of a systematic schedule that repeats itself

16   week after week or do you do the same thing every

17   day?  What's your schedule like?

18      A     My schedule is dependent upon the day.   I

19   do different things on different days.  On some

20   days, I do the same thing depending on what the task

21   is.

22      Q     So do you have certain days set aside to

23   do consults or that can happen on any day?

24      A     Yes.  So a typical workweek for me is on

25   Mondays I will see each of my patients who are
```

```
 1    currently on treatment since my patients are treated

 2    every day and they need to be seen at least once a

 3    week to assess how well they are tolerating

 4    treatment and to manage side effects.  Tuesdays, I

 5    typically will see follow-up patients.  I generally

 6    follow my patients every three to six months for

 7    five years.  And on Wednesdays, the bulk of my time

 8    is seeing new consults.  Thursdays are also days

 9    that I will see follow-up patients.  And Fridays is

10    seeing new consults as well.  Depending upon how

11    busy we are and the urgency in which consults need

12    to be seen, I may see consults on any of the days

13    during the week even on the days that I'm seeing

14    primarily follow-ups.  And then of course there's

15    always patients that are in the hospital that need

16    to be seen on a more urgent basis.  And then I'll

17    see those after hours in addition to whatever else

18    I'm doing that day.  And then I have some

19    non-clinical work as far as non-direct patient care

20    work related to radiation treatment planning and

21    electronic medical records and things of that sort

22    that I also do in between when I have time.

23        Q    So do you actually administer radiation

24    therapy to patients yourself?

25        A    I do not.  I evaluate the patient.  I
```

1    determine the appropriate treatment, whether that

2    involves radiation or not.  I determine what kind of

3    radiation they would need.  I coordinate with any

4    other physicians that may be involved with their

5    care.  I'm involved in the radiation treatment

6    planning, overseeing the process, determining what

7    needs to be treated, how much needs to be treated

8    and the schedule.  And I oversee the quality of

9    insurance on a daily basis verifying that the

10   treatments being delivered on the machines by the

11   technologist is appropriate.  And then as I said, I

12   see the patients on a weekly basis just to follow

13   their response.

14        Q    When you're talking about the patients

15   you're seeing on Mondays, are those hospitalized

16   patients or are those outpatients?

17        A    No, they're all the patients.  So any

18   patient that's being treated is typically seen once

19   a week.  Most of the time, that's on Mondays.

20        Q    So who does give the radiation therapy?

21        A    Certified techs.

22        Q    And do you spell out all the details so

23   they know exactly where the radiation is supposed to

24   go and not go?

25        A    Right.  So there's a process where we

Case 3:16-md-02741-VC   Document 13930-13   Filed 10/06/21   Page 29 of 126
Case 3:16-md-02741-VC   Document 13790-2   Filed 09/22/21   Page 29 of 126
Sanford R. Katz, M.D.

1    start off with a CT scan with some form of

2    immobilization.  We use that to generate a

3    three-dimensional model of the patients anatomy in

4    our computers.  I direct that process at which point

5    then it moves on where I have a team of what's

6    called dosimetrist.  They use those images.  They

7    bring in any other clinical images like PET scans or

8    other CAT scans.  We do fusions and I use that

9    information to delineate target structures and

10   critical sensitive structures to be avoided, and

11   then basically assign specific radiation doses to

12   these various structures.  And then a team of

13   dosimetrist use a treatment planning system to

14   generate a treatment plan.  It then goes to a team

15   of physicists.  We have five physicists in our

16   department, and they verify that the delivery is

17   appropriate prior to the patient's treatment by

18   using what we call basically phantoms but they are

19   essentially fake patients.  They maintain all of the

20   quality and control and they maintain the machines.

21   And then we have certified technicians who deliver

22   the treatment each day.  And on their first day of

23   treatment, I verify that once again that everything

24   is appropriate.  And then each day images are taken.

25   Generally CT scans are generated from the treatment

Sanford R. Katz, M.D.

```
 1    machines themselves immediately prior to the
 2    treatment, and I review those scans each day
 3    comparing them to the initial scan that was used for
 4    planning to verify that the appropriate area is
 5    treated.
 6         Q    And you mentioned earlier where we were
 7    talking about that part of your practice involves
 8    clinical research.  Did I understand you correctly?
 9         A    So not -- part of my practice does involve
10    clinical research.  I do not perform clinical
11    research with LSU.  The research that I have done
12    with LSU has been primarily academic retrospective
13    chart reviews and things of that sort, but it has
14    not been patient related clinical research where LSU
15    patients were treated in our department.  Let me
16    correct that for just a moment.  I believe that
17    there may have been a couple of instances where
18    there was an interesting case that was treated in
19    our department and a resident wrote that case up as
20    a case report because it was unusual.
21         Q    Fair enough.  You have alluded to clinical
22    research.  So can you explain what clinical research
23    you do if it is not associated with LSU?
24         A    Yes.  So the clinical research that we do
25    that involves treating the patients and over the
```

1    years we've had quite a number of studies either

2    specifically radiation related or perhaps related to

3    a medication or a protective agent to decrease side

4    effects.  And we've had an active research program

5    now for well over 10 years.

6         Q    And is your research industry sponsored?

7         A    I'm sorry, could you repeat the question?

8         Q    Is your research industry sponsored?

9         A    Some of it is industry sponsored, and some

10   of it is a cooperative group.  What I mean by that

11   is that we participate in a research consortium with

12   other academic centers, both nationally and

13   internationally, looking at various treatment

14   modalities, so we may a study that compares one type

15   of radiation with another type of radiation and

16   recording outcomes.  And we do that in collaboration

17   with these other institutions.  We have other

18   studies that may be looking at just outcomes,

19   finding outcomes from a particular treatment let's

20   say proton therapy.  We have studies that are

21   industry sponsored where we may be participating in

22   a particular evaluation of a drug or a therapy.

23   We -- I've been particularly active looking at

24   protective agents to reduce toxicity from radiation

25   both with respect to skin and also the mucosa or the

Case 3:16-md-02741-VC   Document 13930-13   Filed 10/06/21   Page 32 of 126

Case 3:16-md-02741-VC   Document 13790-2   Filed 09/23/21   Page 32 of 126
Samford R. Katz, M.D.

1      lining of the head and neck.

2           Q      What industry sponsors have you done

3      research for in terms of companies?

4           A      The companies, I would have to refer to my

5      CV because I don't want to leave any out.   It's

6      extensive, so I would prefer to just send you my CV

7      and they are all listed there.

8           Q      It's clearly indicated who you've done

9      research for on your CV?

10          A      Yes.   Yes, sorry.

11          Q      So what percentage of your practice is

12     comprised of treating patients with non-Hodgkin's

13     lymphoma?

14          A      I would say about five percent.

15          Q      And do you have any estimate of how many

16     NHL patients you treat in a year, a ballpark?

17          A      I would say -- let's say in the order of

18     about 20 patients a year, maybe 25 patients a year.

19     It's been entirely dependent upon the size of our

20     practice.   Our practice has increased in size.   Back

21     during the first 10, 12 years of my practice, there

22     were only two of us.   And then we gradually

23     increased three firm reviews, and then four, and

24     then more recent five doctors.   So over the last few

25     years, some of the older physicians, myself

Case 3:16-md-02741-VC   Document 13930-13   Filed 10/06/21   Page 33 of 126

Case 3:16-md-02741-VC   Document 13790-2   Filed 09/23/21   Page 33 of 126
Sanford R. Katz, M.D.

1    included, has slowed down our practice a little bit

2    so that we see fewer patients than we have.  So I

3    would say -- I would say in the first 12 years to

4    15 years of my practice I probably saw on the outer

5    of about 40 patients a year with non-Hodgkin's

6    lymphoma, and now it is probably down to about 20 to

7    25.  We have since kind of redistributed some of our

8    volume.

9         Q    And I assume that the context in which you

10   are including them is in the context of head and

11   neck cancers primarily; is that right?

12        A    In my situation, yes, primarily it's

13   patients with head and neck.

14        Q    It's fair to say that the vast majority of

15   non-Hodgkin lymphoma patients do not receive

16   radiation therapy, right?

17        A    Actually, I want to clarify the previous

18   answer, not just head and neck but lot of these

19   lymphomas occur in the chest, so it would be --

20   generally, typically, it would be above the

21   diaphram, so that would also include in the lung and

22   what we call the mediastinum which is in the center

23   part of the chest.

24        Q    Primary would be B-Cell lymphomas?

25        A    Not necessarily primary B-Cell lymphomas.

Case 3:16-md-02741-VC   Document 13930-13   Filed 10/06/21   Page 34 of 126

Case 3:16-md-02741-VC   Document 13790-2   Filed 09/22/21   Page 34 of 126
Samford R. Kauz, M.D.

1    It would be any type of lymphomas non-Hodgkin's or

2    Hodgkin's.  But many of them present, if not in the

3    head and neck, in the chest area.  Some of them

4    occur in the abdomen in the pelvis but the majority

5    of the ones that I see are above the diaphram.

6         Q    Okay.  Is it fair to say that the vast

7    majority of NHL patients do not receive radiation

8    therapy?

9         A    I would say that's a fair statement.  Let

10   me qualify that statement for a moment, please.

11        Q    Sure.

12        A    But the treatment paradigm for

13   non-Hodgkin's lymphoma has also changed over the

14   last 20 years and so there has been less of a role

15   for radiation therapy I would say over the last 5 to

16   10 years than they had been in the previous decade.

17        Q    Right.  But the main go-to is either the

18   protoxin lab or chemotherapy for most NHL patients;

19   is that right?

20        A    That's correct.

21        Q    Are you involved in any studies?  I know

22   there has been some research into looking at earlier

23   follicular cell cancer and radiation therapy, are

24   you involved in any research of that nature?

25        A    When you say "early follicular," can you

1    clarify that?

2        Q    Early -- oncology -- early stage

3    follicular meaning there aren't very many early

4    stage folliculars because folliculars usually -- but

5    to the extent that there are early stages diagnosed,

6    my understanding is that radiotherapy has been

7    showing some promise.  Are you familiar with that?

8        A    Yes.  Yes.  So I wouldn't say that that is

9    research, however, though.  It is pretty standard

10   for early stage lymphomas, particularly low-grade

11   lymphomas, inflicted lymphomas to treat primarily

12   with radiation, so there are some sites -- some

13   classes of lymphomas that we would treat without the

14   use of chemotherapy.  And I have done that

15   clinically since I've started my practice and it's

16   rather routine.  I've not been involved specifically

17   with research in that as much as it's just standard

18   medical practice.

19       Q    Okay.  Fair enough.  You see in the

20   exhibits that I sent you in your e-mail, do you see

21   Exhibit 2?

22       A    Exhibit 2?  Yes.

23       Q    And I'll represent to you that Exhibit 2

24   is a Medline search that we conducted using your

25   name.  And the challenge here is that there is more

Case 3:16-md-02741-VC   Document 13930-13   Filed 10/06/21   Page 36 of 126
Case 3:16-md-02741-VC   Document 13790-2   Filed 09/23/21   Page 36 of 126
Sanford R. Katz, M.D.

```
 1    than a few S. Katz's in the database.  So I want to

 2    make sure, first of all, that the articles published

 3    here on Exhibit 2 are in fact your articles?  I

 4    think they probably are.

 5         A    (Views document.)  Yes.

 6         Q    Yes, these are all of the articles that

 7    you were either the author of or coauthor of?

 8         A    Yes, that I participated in the research.

 9         Q    And the flip side of the question then,

10    since I don't have your CV yet, are there additional

11    articles that you published in the peer review

12    literature besides these?

13         A    Yes.

14         Q    And are all of those listed on your CV?

15         A    They're listed on my CV.

16         Q    When was your CV last updated?

17         A    I think about two months ago.

18         Q    Okay.  And have you ever done any research

19    that's focused on the treatment of non-Hodgkin

20    lymphoma specifically?

21         A    I have not.

22         Q    Have you ever published papers on the

23    cause of non-Hodgkin's lymphoma?

24         A    I have not.

25         Q    Have you ever made any presentation at a
```

1    professional meeting on the causes and treatment of

2    non-Hodgkin's lymphoma?

3        A    I have not.

4        Q    I just want to run through some questions.

5    Have you ever designed, conducted, or published any

6    epidemiological study on Roundup or glyphosate?

7        A    I have not.

8        Q    Have you ever designed, conducted, or

9    published any epidemiological for any pesticides?

10       A    I have not.

11       Q    Have you ever designed, conducted, or

12   published any animal studies looking at any aspect

13   of the toxicity of Roundup or glyphosate?

14       A    I have not.

15       Q    Same answer for any other pesticide?

16       A    Same answer.

17       Q    Have you ever designed, conducted, or

18   published any study evaluating the mutagenicity or

19   genotoxicity of Roundup or glyphosate?

20       A    I have not.

21       Q    Or any other pesticide?

22       A    I have not.

23       Q    Have you ever designed, conducted, or

24   published any research evaluating the potential for

25   glyphosate or Roundup to cause oxidated stress?

1        A      I have not.

2        Q      And same answer for any other pesticide?

3        A      Correct.

4        Q      Okay.  Have you ever published any

5   professional articles concerning any aspect of the

6   potential cariogenicity of glyphosate or Roundup?

7        A      I have not.

8        Q      Have you ever published any professional

9   article concerning any aspect of a potential

10  carcinogenicity of any pesticide?

11       A      I have not.

12       Q      Do you serve as a reviewer for any medical

13  journals?

14       A      I don't.

15       Q      Have you in the past?

16       A      No, sir.

17       Q      Are there medical journals that you review

18  on a regular basis?

19       A      Can you explain what you mean by "review"?

20       Q      I mean you look at them to determine

21  whether there are any articles of interest to your

22  practice and --

23       A      Yes, sir.

24       Q      And if so, reading the articles that you

25  have identified that are of interest?

Sanford R. Katz, M.D.

```
 1        A      Yes, sir.

 2        Q      So using that definition, are there peer

 3   review medical journals that you review on a regular

 4   basis?

 5        A      Yes, sir.

 6        Q      What are those?

 7        A      The International Journal of Radiation

 8   Oncology, Radiology Oncology Biology and Physics.

 9   The Journal of Clinical Oncology, Practical

10   Radiation Oncology are probably the primary ones.

11   Occasionally, the New England Journal of Medicine.

12   Occasionally, JAMA, the Journal of the American

13   Medical Association.

14        Q      So three of those are radiation journals

15   that are primarily focused on radiation oncology?

16        A      There's other ones too.  There's

17   brachytherapy.  There's other minor journals that I

18   periodically will take a look at.  Seminars in

19   radiation oncology.  Oncology itself.  There's a

20   journal called Oncology.  But as far as on a monthly

21   basis, the main ones are the ones that I gave you.

22        Q      About your review, do you get an e-mail

23   blast like the New England Journal sends an email

24   once a week that tells you what's on their agenda?

25   How do you stay on top of it?
```

```
 1        A    Yes.  So I review hard journals, the
 2   actual bound journals.  I get -- each issue comes to
 3   my office, the ones that are primarily oncology.
 4   The best journals for our field are the Journal of
 5   Clinical Oncology and the International Journal of
 6   Radiation Oncology.  Those are the two big ones for
 7   us.  And so I receive those.  I review those and the
 8   articles to my interest are the ones that I review.
 9   I also get e-mail blasts from experts in the field
10   who compile a list of relevant papers that they
11   think would be of interest.  And so they send that
12   out.  There is usually some summaries of various
13   topics with links to those journal articles and
14   critiques.  And I'll review that and often times
15   that will direct me to the primary source which
16   could be a European journal, could be another
17   journal that I don't frequently look at.  So I would
18   say that I could potentially be looking at 20
19   different journals in the course of a month
20   depending upon the e-mails that I get or sometimes a
21   colleague will say, hey, look at this interesting
22   paper published in this other journal that normally
23   I wouldn't look at, so.  There are also -- as you
24   said, there are also e-mail blasts from our society
25   pointing out certain physician papers and citing
```

Sanford R. Katz, M.D.

```
1    references, so there's a number of sources.
2         Q    The service that you alluded to that sends
3    you periodic survey results of literature, is that a
4    service that you prescribe to?
5         A    Yes.  It's basically -- it's not a paid
6    subscription.  It's a free -- it's basically a free
7    subscription.
8         Q    Okay.  What's the name of the service?
9         A    It's Editorials in Radiation Oncology.
10        Q    All right.  Do you have any specialized
11   education or advanced degree in epidemiology or
12   biostatistics like a master's in public health or a
13   master's degree in clinical research?
14        A    I don't, other than what I was taught in
15   medical school and residency.
16        Q    And you consider yourself to be an expert
17   in epidemiology or biostatistics?
18        A    I do not.
19        Q    Do you hold any kind of certification in
20   medical toxicology?
21        A    I do not.
22        Q    Do you have any specialized education or
23   training in toxicology?
24        A    I do not.
25        Q    Do you consider yourself to be an expert
```

Case 3:16-md-02741-VC   Document 13930-13   Filed 10/06/21   Page 42 of 126
Case 3:16-md-02741-VC   Document 13790-2   Filed 09/23/21   Page 42 of 126
Sanford R. Kautz, M.D.

```
 1    in toxicology?

 2         A    I do not.

 3         Q    What did you do to prepare for the

 4    deposition today?

 5         A    I reviewed Mr. Blair's clinical chart.  I

 6    reviewed a previous affidavit that I produced, and I

 7    also reviewed the IARC Monograph Volume 112 from I

 8    believe it was 2015.  It's entitled Organophosphate

 9    and Insecticides and Herbicides.

10         Q    Okay.  And when you are saying you

11    reviewed it, did you read the entire section on

12    glyphosate or did you read selective sections?

13         A    I read through the section on glyphosate,

14    specifically with respect to the epidemiology of the

15    epidemiological studies relating to glyphosate and

16    risks of cancers.

17         Q    Did you look at the sections on animal

18    studies or genotoxicity?

19         A    Yes, I reviewed that previously prior to

20    my affidavit.  But I did not review the animal

21    studies in preparation for this deposition.

22         Q    Did you look at any of the underlying

23    studies that they reference in the IARC library?

24         A    Not in preparation for this deposition.  I

25    did review them previously prior to generating my
```

Case 3:16-md-02741-VC   Document 13930-13   Filed 10/06/21   Page 43 of 126

Case 3:16-md-02741-VC   Document 13790-2   Filed 09/22/21   Page 43 of 126
Sanford R. Katz, M.D.

1   affidavit.

2        Q    We will look at that in a minute.  And any

3   other materials that you looked at in terms of

4   preparing for your deposition?

5        A    No, sir.

6        Q    And how much time did you spend reviewing

7   those things?

8        A    Well, previously, I had spent probably

9   somewhere in the order of 4 to 6 hours reviewing the

10   monograph and reviewing some of the primary sources

11   and generating the affidavit.  And so I think as I

12   mentioned in an e-mail to Mr. Martinez that

13   typically I would estimate about four hours of

14   preparation for the deposition.  But in this case

15   since I had previously reviewed all of this

16   information and generated an affidavit previously,

17   at the time I spent about two hours since I had

18   already generated my conclusions based upon

19   previous -- prior review.

20        Q    I appreciate that.  And how much time is

21   divided up between looking at the IARC Monograph and

22   looking at Mr. Blair's records?

23        A    I'm sorry, can you repeat that?  I missed

24   some of it.

25        Q    Yes.  So I think what you said earlier is

Sanford R. Katz, M.D.

1    that you reviewed his medical records, right, and

2    your entries in his medical records and you also

3    reviewed the IARC Monogram 112, right?

4         A    That's right.

5         Q    And you said you spent about a total of

6    two hours doing that in preparation for the

7    deposition, right?

8         A    That's correct.

9         Q    I'm just asking how was that divided up?

10   How much time did you spend on Mr. Blair's records

11   versus the IARC Monograph?

12        A    I would you say I spent about 30 minutes

13   looking at his records and an hour and a half

14   reviewing the monograph that I previously read with

15   highlighted sections that I had previously

16   annotated.

17        Q    And do you have a version of the IARC

18   Monogram that you previously highlighted?

19        A    This one right here.

20        Q    We may ask to have the court reporter make

21   a copy of that so that we can see what you included

22   in the concept.  Did you talk to Mr. Blair or any

23   member of his family in preparation for the

24   deposition?

25        A    I did not.

1      Q    When's the last time you had any contact

2  with Mr. Blair?

3      A    It looks as though the last time I saw him

4  according to his medical record was on

5  September 22nd, 2020.

6      Q    That's correct.  My question is a little

7  bit different which is when's the last time you

8  spoke to him?  Was that the last time you spoke to

9  him?

10     A    I believe that's the last time I had any

11  interaction with him.

12     Q    Okay.  Correct.  And the same answer with

13  his family members?

14     A    That's correct.

15     Q    Did you talk to Dr. Patel at all about

16  Mr. Blair in preparation for the deposition?

17     A    I asked -- what did I ask him?  I think we

18  were talking about another patient, and I mentioned

19  to him that I had another deposition.

20     Q    And what, if anything, else was part of

21  that conversation?

22     A    I asked him how much he charged.

23     Q    For what?

24     A    For the deposition.

25     Q    For the deposition?

Sanford R. Katz, M.D.

```
1        A     For the deposition.

2        Q     What did he say?

3        A     He said he charged $2,000.

4        Q     And have you had any discussion with

5    Dr. Patel about any aspect of Mr. Blair's care since

6    he was discharged as a patient?

7        A     Well, I don't think I discharged him as a

8    patient.  I believe that I continued to see him as a

9    patient.  So I have had discussion with Dr. Patel

10   regarding his case in terms of coordinating what we

11   think would be an appropriate followup for him

12   because his case is a bit exceptional.  And so our

13   coordinated followup with him is going to be -- is

14   going be more intensive than what we would typically

15   do for somebody who had non-Hodgkin lymphoma who did

16   not have exposure to glyphosate, so we have

17   discussed his case in the last number of months.

18       Q     So you said you last talked to him on

19   September 20th, right, or since September 2020 was

20   the last time you --

21       A     You're referring to -- yes, Mr. Blair,

22   yes, as far as I recall, that seems to be the last

23   time I had spoke with him.

24       Q     So we're now in July of 2021, right?

25       A     That's correct.
```

Sanford R. Katz, M.D.

1       Q      Okay.  And I think you said earlier that

2   you see your follow-up patients every three months;

3   is that right?

4       A      That's right.

5       Q      So why has 10 months passed since --

6       A      Yes.  I would have to check with my nurse,

7   but I think he's missed appointments.  And my

8   understanding that some of it was perhaps related to

9   lack of insurance or a payment source.  And so these

10  patients are scheduled, and then they appear on my

11  schedule if they are here.  And if they are not

12  here, then I'm not seeing them.  But I'm not

13  necessarily aware that a patient of mine didn't keep

14  an appointment or needed a reschedule appointment.

15  So in this particular instance, my last follow-up

16  appointment, I said for six months, which would have

17  been in March.  It's quite possible because of Covid

18  he wasn't seen because we had canceled all of our

19  non-essential appointments including follow-up

20  appointments.  So it's I think very likely in that

21  his situation particularly because I would do what's

22  called nasopharyngoscopy which is an invasive

23  procedure to the nose that I was not doing during

24  the covid period, that his follow-up appointments

25  got pushed back because of that.  I can't tell you

Sanford R. Katz, M.D.

1    specifically in his case why I didn't see him last

2    week or the week before.

3         Q    Is somebody -- and I'm sure you're not the

4    person but is somebody responsible to ensure that

5    patients or whose appointments are canceled are

6    rescheduled at some point in time?

7         A    That's correct.  That would be my nurse.

8         Q    And who's that?

9         A    Her name is Lisa Cary.

10        Q    Is it like that Lisa would know what the

11   facts were surrounding why he hasn't been seen since

12   September 2020?

13        A    She would be the person who would have the

14   most information in our department.

15        Q    Have you had discussions with -- we talked

16   about your conversations with Dr. Patel.  Have you

17   had any conversations with Dr. Patel since September

18   2020 --

19        A    Yes.

20        Q    -- about Mr. Blair?

21        A    Yes.

22        Q    And when were those conversations?

23        A    As I said, I spoke with him earlier today.

24        Q    You spoke with him earlier today.  But I

25   thought you told me earlier today you only asked him

Samford R. Katz, M.D.

1    how much he charged for his deposition and you said

2    $2,000?

3         A    That's correct.

4         Q    Let me rephrase the question to make it

5    clear.  When was the last time you had a substantive

6    discussion about Mr. Blair's case with Dr. Patel?

7         A    The last time we had -- I guess today

8    during that conversation I think I did mention to

9    him that my plan for him was that I was going to

10   continue to see him ongoing and essentially

11   indefinitely.

12        Q    You mentioned that to Dr. Patel?

13        A    Yes, that basically -- normally we would

14   follow patients for five years and they would get

15   blood work primarily.  But in his particular case,

16   we agreed that he needed to be followed indefinitely

17   with regular blood work.

18        Q    What's the basis for needing to follow him

19   indefinitely?

20        A    So his risk of secondary malignancy is

21   very high.  Based upon our interpretation of the

22   literature, he's at risk for secondary malignancies

23   because of his exposure and that would be lifelong.

24   And those include not only additional lymphomas but

25   perhaps multiple myeloma and he's also at risk for

Sanford R. Katz, M.D.

```
 1    secondary malignancies related to his treatment,

 2    whether that would be some bone marrow disorders,

 3    leucemias, myelodysplastic syndromes, other

 4    chemo-related side effects, late side effects that

 5    you can see in any patient receiving chemotherapy

 6    and for that matter also cancers that are caused

 7    from radiation therapy that you might see in many

 8    patients.  The vast majority of our patients that we

 9    treat are older and so that risk is -- the risk is

10    the same but the likelihood of them developing a

11    secondary malignancy during the remainder of their

12    life as an absolute number is much less.  But since

13    Mr. Blair is young, his risk is lifelong.  And then

14    at the same time his risk is presumably higher

15    because of what we understand to be a very high

16    exposure to what we believe to be a carcinogen.  So

17    based upon our assessment, we think that he needs to

18    be followed lifelong.  And then the last thing is

19    given his age.  A young person is much more

20    sensitive to the damaging effects of the therapy and

21    are at greater risk for developing secondary

22    malignancies relating to the treatment.  So that's

23    why we decided that in his particular case he

24    requires lifelong followup.

25         Q    For a patient that is young that's
```

1    underdone the therapy he's undergone, he would have

2    an increased risk of secondary malignancies

3    regardless of his glyphosate use simply because of

4    his age, correct?

5        A    That is correct.

6        Q    Okay.  Is there anything in the medical

7    literature that you can point me to that says that

8    patients who have been previously diagnosed with

9    non-Hodgkin lymphoma have a greater risk of

10   recurrence for a secondary malignancy compared with

11   patients who have not been exposed to glyphosate?

12       A    No.  I would say that -- when I say -- use

13   the term "secondary malignancy," what I'm talking

14   about is a treatment related malignancy.  That is a

15   cancer that occurs because of the radiation or

16   because of the chemotherapy.  That's a secondary

17   malignancy.  That's how we use that term.  However,

18   with my understanding of the monograph is that there

19   is increased risk of malignancies other than

20   non-Hodgkin's lymphoma.  And particularly, I think

21   multiple myelomas was one of them, and so my sense

22   is that risk would be lifelong.  In addition, he has

23   other issues that would require lifelong followup

24   relating to his treatment which include let's say

25   dental complications related from his head-neck

1   radiation, hypothyroidism, things of that sort, so

2   those themselves also require a long-term followup.

3       Q     Those things are related to the fact that

4   he received radiation for his head and neck?

5       A     That is correct.

6       Q     Those would be potential complications or

7   things that would need to be followed up on

8   regardless of glyphosate exposure, correct?

9       A     That is correct.

10      Q     Okay.  Is there any substantive

11  conversation you had with Dr. Patel other than that

12  one we just averted to concerning Mr. Blair?

13      A     Not recently.  Typically, we would discuss

14  his case prior to his treatment and we would discuss

15  his case during his treatment.  We may discuss his

16  case after his treatment to coordinate our follow-up

17  care so we alternate our appointments appropriately.

18  I might call him and say, Dr. Patel, I saw Mr. Blair

19  today, I was going to order some labs for him -- I

20  was going to order him this, that, and whatever and

21  is there anything in particular else that you might

22  like while I have him in the lab.  It might be that

23  sort.  But those conversations are not documented.

24      Q     And the conversation about needing to

25  continue to monitor him lifelong, that also is not

Sanford R. Kadey, M.D.

```
 1    documented, correct?

 2         A     That is correct.

 3         Q     Are there any other physicians with whom

 4    you might discuss Mr. Blair's case?

 5         A     Not that I recall.

 6         Q     Did you talk with any attorneys either in

 7    person or by phone in preparation for the deposition

 8    today?

 9         A     I'm sorry, can you say that question

10    again?

11         Q     Sure.  Did you talk with any attorneys

12    either in person or by phone in preparation for the

13    deposition today?

14         A     I did not talk to any attorneys by phone

15    or in person.

16         Q     So you had no conversations with counsel

17    for Mr. Blair?

18         A     I did not have --

19         Q     In preparation for your deposition?

20         A     Not phone conversations.  There was some

21    e-mail correspondence where Mr. Joseph sent me

22    copies of previous documents that I've submitted.

23         Q     Are the copies that he sent you the -- we

24    will mark everything in a second.  But basically,

25    your records, your affidavit, your letter to him,
```

Sanford R. Katz, M.D.

```
 1    and your invoice are the records we are talking

 2    about?

 3         A    That's correct.

 4         Q    Anything in addition to that?

 5         A    No, sir.

 6         Q    And that was just as a courtesy to let you

 7    know here are your things before the deposition?

 8         A    That's correct.  I think as I mentioned to

 9    Mr. Martinez I had been out of town a week prior

10    when all of these was being arranged, and so I

11    believe Mr. Joseph as a courtesy forwarded these

12    things to me so that I could review them in part

13    when I was out of the office.

14         Q    Okay.  Have you at any point spoken with

15    anyone who works at Monsanto or worked with Monsanto

16    in the past about issues with glyphosate?

17         A    No, sir.

18         Q    Have you spoken to anyone from a

19    regulatory agency like the Environmental Protection

20    Agency or any other agency?

21         A    No, sir.

22         Q    Have you spoken to anyone who worked as an

23    expert witness in connection with any of the Roundup

24    litigation?

25         A    No, sir.
```

```
 1        Q     Is there any third party that I didn't
 2   specifically ask you about with whom you've spoken
 3   about Mr. Blair's case?
 4        A     No, sir.
 5        Q     I would like to have you take a look at
 6   Exhibits 3, 4, 5, 6, and 7 for a minute.
 7        A     Okay.
 8        Q     So -- first of all, I think this is the
 9   same documents we just referred to that you
10   referred.  Are these documents all documents that
11   you prepared yourself?
12        A     Yes.
13        Q     And am I correct that Exhibit 3 reflects
14   an initial radiation oncology visit on
15   November 15th, 2018, correct?
16        A     That is correct.
17        Q     And that's the first time you ever saw
18   Mr. Blair as a patient?
19        A     Correct.
20        Q     You didn't know him before that visit; is
21   that right?
22        A     I did not.
23        Q     At the time he came to see you, he had
24   already been diagnosed with diffuse large B-Cell
25   lymphoma; correct?
```

Sandford R. Katz, M.D.

```
 1        A      That is correct.
 2        Q      Okay.  And then -- and I just really want
 3   to go through this to identify what the documents
 4   are and I will circle back, and we will talk about
 5   them a little more.  Exhibit 4 reflects another
 6   follow-up visit on February 7th, 2019, correct?
 7        A      That is correct.
 8        Q      And that's also one of your records,
 9   right?
10        A      That is correct.
11        Q      And Exhibit 3 and 4 are part of
12   Mr. Blair's medical record from Willis-Knight,
13   correct?
14        A      That's correct.
15        Q      Now Exhibit 5 is an affidavit that you
16   signed on August 20th, 2019, correct?
17        A      Yes.
18        Q      And that affidavit was in connection with
19   a Workers' Comp claim that Mr. Blair was filing with
20   the State of Louisiana, right?
21        A      That's correct.
22        Q      Again, we are going to come back and talk
23   about it in more detail.  But I want to clarify,
24   exhibit 5 is not a part of Mr. Blair's formal
25   medical record; is that right?
```

Sanford R. Katz, M.D.

```
 1        A     That is correct.
 2        Q     And Exhibit 6 similarly is a letter from
 3   you to Mr. Blair's attorneys dated December 18th,
 4   2019; is that right?
 5        A     That's correct.
 6        Q     And Exhibit 7 is an invoice for your time
 7   related to the preparation of Exhibit 6, right?
 8        A     Yes.
 9        Q     And also, just so the record is clear,
10   Exhibit 6 and 7 are not part of Mr. Blair's medical
11   record, correct?
12        A     That is correct.
13        Q     Now -- so here's where I get confused and
14   I need your help.  Are there other medical records
15   that you're aware of that reflect your notes for
16   your care and treatment of Mr. Blair that are not
17   included in Exhibit 3 and 4?
18        A     I have his chart in front of me, so I'm
19   just looking to see what's in his chart.
20        Q     If it's helpful, we didn't talk about
21   Exhibit 8 yet.  Exhibit 8, it's a larger document.
22   It's a copy of his Willis-Knight records generally
23   which I think includes 3 and 4 in there.
24        A     Okay.  If you give me a moment, I want to
25   review this for just a second, please.
```

Case 3:16-md-02741-VC   Document 13930-13   Filed 10/06/21   Page 58 of 126
Case 3:16-md-02741-VC   Document 13790-2   Filed 09/22/21   Page 58 of 126
Samford R. Katz, M.D.

```
 1        Q    Certainly.  Yes.

 2        A    Okay.  So I have a follow-up record in his

 3   chart from June the 5th, 2019 that I don't see,

 4   unless it's in No. 8 which may be a very big

 5   document.

 6        Q    I don't think I saw it in No. 8 either.

 7   Is it similar to Exhibit 4?

 8        A    Let's see Exhibit 4 being a follow-up

 9   note, that is correct.

10        Q    Has the same format typically?

11        A    It does.  So that would be June the 5th,

12   2019.  There was also what's called an End of

13   Treatment Summary which basically describes the

14   treatment that he received, the dates that he

15   received it, the dose, and just a very brief

16   clinical summary of how well he tolerated the

17   treatment.  That was dated March 28th, 2019.  There

18   are additional clinical records in his chart that

19   are -- there are additional records in his chart

20   that are related to his treatment in terms of

21   operative notes from other physicians, pathology

22   notes, and various radiation records, specifics,

23   calculations, dose -- he has a reasonably thick

24   chart that, obviously, it is not more than what you

25   presented me here.  It also contains Dr. Patel's
```

Sanford R. Kaetz, M.D.

```
 1    notes and things like that, radiology reports, nurse
 2    intakes.
 3              MR. PIORKOWSKI:
 4              Curtis, I don't think some of these things
 5         were produced as a part the plaintiff produced
 6         records.
 7              MR. JOSEPH:
 8              I'm just making myself a note to request.
 9         I do not.  I have what you have there, 8, and
10         so I request the opportunity to supplement the
11         record with those.
12              THE WITNESS:
13              Let me add that I believe when records are
14         requested what's generally requested is a copy
15         of clinic notes, consultations, and followups,
16         and things of that sort and that's what we
17         provide.  If you want a full record of all the
18         physics, some of which I don't even understand
19         myself, that's certainly available too.
20    BY MR. PIORKOWSKI:
21         Q    So you should not admit that under oath.
22         A    Admit that.
23         Q    No, I said you should not admit that under
24    oath.
25         A    Admit what, that I don't understand?
```

Case 3:16-md-02741-VC    Document 13790-2    Filed 09/22/21    Page 60 of 126
Sanford R. Katz, M.D.

```
 1        Q    Yes.

 2        A    It was kind of a joke.  I'm sorry, I was

 3   being funny.

 4        Q    I was trying to be as well.

 5        A    I won't be funny.

 6        Q    So let me -- I want to make sure we can

 7   get this.

 8             MR. PIORKOWSKI:

 9             Meghan, are you in a position to make a

10        copy of the record that he's talking about?

11             THE VIDEOGRAPHER:

12             Did you say am I in a position?

13             MR. PIORKOWSKI:

14             Yes.  I was under the impression that you

15        were physically there with him.

16             MR. JOSEPH:

17             We're all over the place, man.

18             MR. PIORKOWSKI:

19             That's the problem.  I was under the

20        understanding that I thought you were there

21        which some of my questions didn't make sense.

22             Curtis, what do you want to do here?  We

23        want a copy of all of the physics and stuff and

24        all of the stuff he has.

25             MR. JOSEPH:
```

Case 3:16-md-02741-VC   Document 13930-13   Filed 10/06/21   Page 61 of 126
Case 3:16-md-02741-VC   Document 13790-2   Filed 09/23/21   Page 61 of 126
Sanford R. Kautz, M.D.

```
 1            And the CV as well.
 2            MR. PIORKOWSKI:
 3            The CV can be e-mailed in the meantime.
 4            THE WITNESS:
 5            So the problem is that, so we have his
 6       clinical chart, and you know, I was making a
 7       joke about the physics stuff but there's a
 8       tremendous amount of information that goes into
 9       treatment planning.  And we have PhD physicists
10       who have their own role in how the treatment is
11       done.  And they are board certified in medical
12       physics.  I'm not board certified in medical
13       physics and so because we have -- it's a
14       collaborative job between everyone who has
15       their specific specialties, there's stuff
16       that's not included in his clinical chart
17       that's in electronic medical records.  So when
18       I say I don't understand, it's because it's
19       outside my purview of specialization but that's
20       because that's their particular area of
21       expertise and we work collaboratively.  So it's
22       available but it's -- I don't think it's
23       anything that you are going to be able to
24       interpret.  You can have it.
25            MR. JOSEPH:
```

Sanford R. Katz, M.D.

```
 1                  I'm sure Joe's got some people who can
 2        sift through that.
 3                  MR. PIORKOWSKI:
 4                  It's just important to have a
 5        comprehensive set of the records.  We can't
 6        sort of preemptively say in the front end that
 7        it's not important and --
 8                  THE WITNESS:
 9                  I understand.
10     BY MR. PIORKOWSKI:
11        Q    And separately, even with respect to you,
12     I mean, one of my questions, and I think you
13     actually answered part of it already is it looked
14     like in February that you prescribed certain
15     radiation therapy to him but then my question was so
16     when did he get it and there was nothing in the
17     record that I could see to reflect that he actually
18     got it.
19        A    I'm sorry, I don't mean to talk over you.
20     In that respect, you're missing some of those
21     records.
22        Q    Right.  And I don't have your note from
23     June 5th, which we need also.  So I think what we
24     should do is get the whole record, and then we'll be
25     able to piece this together in another way.  Now,
```

Sanford R. Katz, M.D.

1   earlier though you had said you saw him in September

2   2020 last, right?

3       A    That's correct.

4       Q    Do you have a note or a follow-up that

5   reflects the September 2020 visit?

6       A    I do.

7       Q    What's the date of that?

8       A    I'm sorry, September 22nd, 2020.

9       Q    22nd.  Okay.  And that's similar to

10  Exhibit 4, it's just kind of a dictated follow-up

11  note?

12      A    That's correct.

13      Q    Now between -- we've talked about November

14  2018.  Exhibit 4 talks about February 2019 and you

15  just alluded to June 2019 and then it jumps to

16  September 2020.  Were there any other visits between

17  June 5th, 2019 and September 22nd, 2020?

18      A    Can you give me those dates again?

19      Q    Right.  And I'm just doing this off of

20  what you gave me, but you said there was one on

21  June 5th, 2019, right?

22      A    That's correct.

23      Q    And I think you said the last time you saw

24  him was September 22nd, 2020?

25      A    That's correct.  And I'm just going to

Case 3:16-md-02741-VC   Document 13930-13   Filed 10/06/21   Page 64 of 126
Case 3:16-md-02741-VC   Document 13790-2   Filed 09/23/21   Page 64 of 126
Samuel L. Katz, M.D.

```
 1    check one other source to make sure that this record
 2    is complete because what has happened since this
 3    time we've moved to electronic and this is a -- this
 4    is a physical chart, and so I just want to make sure
 5    that things weren't taken out and scanned and
 6    digitized that might not be reflected here, so let
 7    me see.  Yes, those are the only encounters that I
 8    see.  There are additional -- there's a few
 9    additional notes from when he was on treatment when
10    I saw him weekly and just made note of how he was
11    doing and I don't know if you have those notes.
12        Q    I don't.  Basically, what I sent you is
13    everything I have that has your name on it other
14    than something you were copied on.
15        A    I understand.
16        Q    So are there other documents --
17             MR. PIORKOWSKI:
18             So, Curtis, can we agree -- is your office
19        in a position to perhaps pick a copy up from
20        Dr. Katz's facility?
21             MR. JOSEPH:
22             Do you mean today?
23             MR. PIORKOWSKI:
24             No, I don't mean today.  I mean sometime
25        in the near future here.
```

```
1              MR. JOSEPH:

2              Absolutely, yes.

3              MR. PIORKOWSKI:

4              And you can circulate it?

5              MR. JOSEPH:

6              I can scan it and e-mail to you.  I know I

7      have Anthony's information.  I was expecting to

8      see him.  I think I have got at least one

9      e-mail from you today.

10             MR. PIORKOWSKI:

11             Yes, you did.

12             MR. JOSEPH:

13             So I have a valid address.

14             MS. HOVIS:

15             Is there part of the medical record that

16     is electronic and part then is written?  I

17     think that's what it sounded like and I don't

18     know if Joe --

19             THE WITNESS:

20             That's correct.

21  BY MR. PIORKOWSKI:

22      Q    So the hard copy you just eluded to is not

23  the entirety, there may be more you're saying?

24      A    Yes, there's physics related stuff that is

25  electronic that's not in the physical -- so the
```

Sanford R. Katz, M.D.

1    physical chart is basically for the clinician.  So

2    what's in the physical chart is all the things that

3    are clinically relevant to the physician or for that

4    matter, any other physician who might request

5    records.  Since this time, we really moved away from

6    the physical charts and moved more and more into the

7    digital charts.  And so the physical charts being

8    just for the clinician, there's additional

9    information.  As I said, there's physics things and

10   other things that are not relevant -- if I'm talking

11   to a patient or not relevant when I'm talking to to

12   another physician.  Or for that matter, if a

13   physician request records, this all the stuff that's

14   relevant that they would need.

15        Q    So one of things you're saying though is

16   because he's young in light of the dose that he

17   received, in part he needs ongoing monitoring.  So

18   part of what factors into that equation is the dose

19   that he received, correct?

20        A    That's correct.

21        Q    So if I asked the question this way, what

22   we need to do to get everything which would include

23   the hard copy that you have available and the

24   digital stuff?

25        A    I can get that.  I just need to ask

1    somebody.  I think what happens is when the request

2    for records comes what they provide is the clinical

3    record, and they don't provide all of the numbers

4    and mathematics and digital outputs from our

5    computer treatment planning system.  It is certainly

6    there.  But it's usually not provided because it's

7    non-interpretable from everyone unless you're -- you

8    know, like I said, unless you have -- so if you

9    would like all that stuff, I'm happy to have it

10   provided to you.

11        Q    Yes, I think we would like to do that and

12   we'll -- I think rather than marking it as an

13   exhibit I think we will agree to have you produce

14   those two things and separately a copy of your

15   marked up IARC Monograph, and we can arrange to have

16   Curtis' shop I guess pick up from your office at a

17   convenient time sometime in the next few days,

18   hopefully.

19        A    That would not be a problem.

20             MR. PIORKOWSKI:

21             Curtis, are you okay with that?

22             MR. JOSEPH:

23             Absolutely.

24   BY MR. PIORKOWSKI:

25        Q    All right.  Let me ask you, separate and

Case 3:16-md-02741-VC   Document 13930-13   Filed 10/06/21   Page 68 of 126

Case 3:16-md-02741-VC   Document 13790-2   Filed 09/22/21   Page 68 of 126
Sanford R. Katz, M.D.

1  apart from the medical records that we talked about,

2  some of which I haven't seen yet, do you have any

3  other personal notes or files or memos that concern

4  Mr. Blair or any aspect of his glyphosate use that

5  are not part of his medical records other than

6  Exhibit 5, 6, and 7?

7       A    I don't have any notes.  I think that -- I

8  don't have any additional notes, no.

9       Q    You don't have a file on his case that's

10  not part of the medical record other than you just

11  eluded to the IARC Monograph that you have?

12       A    Yes, that's not part of the medical

13  record.  It is part of the -- you know, from my

14  affidavit which I didn't include that in his medical

15  record.

16       Q    Right.  But do you have any notes that you

17  used in preparing the affidavit on his case?

18       A    Yes, I have that monograph and I have some

19  of the primary papers.

20       Q    Right.  But I'm not talking about medical

21  literature.  I'm talking about notes that reflect

22  facts about his use of glyphosate.

23       A    I don't.  I recall conversations that he

24  and I had regarding the specific nature of his work.

25  You know, I didn't necessary dictate those specifics

1    at the time of the consultation.

2        Q    Do you have a recollection right now about

3    the details of that conversation?

4        A    I do.  I remember what he described to me.

5        Q    So why don't you tell me in as much detail

6    as you can what he described to you based on your

7    recollection?

8        A    Based on my recollection, he described

9    sitting on the back of a truck and driving around

10   various structures on sides of roads where he would

11   spray -- he would spray the glyphosate at various

12   vegetation and he described it as a concentrate and

13   high pressure hose out in the air, that he did not

14   wear any protective gear, was not issued protective

15   gear, was not offered protective gear.  I think he

16   even eluded to asking about protective gear and that

17   he felt it was dismissed.  When I gave him

18   additional -- when I asked him specific questions

19   about his clothing, if he wore specific clothing and

20   then changed his clothes after work, I believe he

21   said he wore his street clothes and he said that he

22   would be often times covered in the material that he

23   was spraying, you know, all over himself because

24   there was wind and breeze and some of it would blow

25   back onto him and that he would do this for many

Case 3:16-md-02741-VC   Document 13930-13   Filed 10/06/21   Page 70 of 126
Case 3:16-md-02741-VC   Document 13790-2   Filed 09/23/21   Page 70 of 126
Samuel R. Kalled, M.D.

```
 1    hours during the day.  And I don't recall for how

 2    long he did this job.  I didn't specify that in the

 3    medical record because it wasn't -- I didn't think

 4    it was directly related to his diagnosis or his

 5    treatment.

 6         Q    You didn't think what was directly related

 7    to his --

 8         A    At the time, all those specifics I didn't

 9    think was directly related to his treatment at the

10    time.  Much of that information I kind of gathered

11    over the course of his -- our weekly visits and

12    things of that sort, so I got more and more

13    information as time went on during our weekly visits

14    and during our conversations.

15         Q    So what else can you remember about what

16    he told you prior to your completing the affidavit?

17         A    Related to his exposure?

18         Q    Yes.

19         A    I think that was the gist of it.

20         Q    When you say that as time has gone on you

21    have learned more, is the additional information you

22    have learned let's say since the time you completed

23    the affidavit, is that documented in his medical

24    record?

25         A    I did not learn any additional information
```

Sanford R. Kautz, M.D.

```
 1    since completing the affidavit.

 2         Q    About his exposure?

 3         A    No.

 4         Q    Okay.

 5         A    The information I have was prior to the

 6    affidavit.  It was during the course of our clinical

 7    visits.

 8         Q    Okay.  I understand.  So since the

 9    affidavit, you have no new information about his

10    exposure that you didn't have at the time you filled

11    out the affidavit?

12         A    That's correct.

13         Q    Let me just ask you in general about

14    medical records.  As part of your practice as a

15    treating clinician, I assume you keep medical

16    records on all of your patients, correct?

17         A    That's correct.

18         Q    And what's the purpose of keeping medical

19    records?

20         A    The purpose is for me to review, or any

21    clinician in my practice, to review his treatment

22    plan and to have reference from which to continue to

23    provide care so we have a record of what his

24    previous care was and current situation and history

25    was.  And it was to provide any information to
```

Sanford R. Katz, M.D.

1    anyone who might follow if I was to let's say leave

2    my practice and someone was to take on his care that

3    they would have relevant information, if he was to

4    see another practitioner that needed information,

5    where his radiation was relevant, that that

6    information would be there.  It's -- I suppose it's

7    important for medical legal reasons as well,

8    obviously.

9        Q    Just logistically, looking back at

10   Mr. Blair's record like take Exhibit 3, for example,

11   is that something you took it in, do you dictate it,

12   do you write it in longhand and somebody transcribes

13   it?  How does it get from your brain onto the paper?

14       A    I dictate that.

15       Q    You dictate it.  Okay.  And you do that

16   contemporaneous with the visit or after the visit is

17   over?

18       A    I generally do it contemporaneously.

19       Q    All right.  In judging from Exhibit 3, it

20   looks like the kinds of details you include are the

21   symptoms that the patient reported; is that right?

22       A    That's correct.

23       Q    Patient's past medical history?

24       A    That's correct.

25       Q    Findings from your own physical exam?

Sanford R. Katz, M.D.

```
 1        A    Correct.

 2        Q    The results of any tests that might have

 3   been conducted?

 4        A    Yes.

 5        Q    Diagnoses?

 6        A    Yes.

 7        Q    A treatment plan?

 8        A    Yes.

 9        Q    Documentation of your conversations with

10   the patients?

11        A    Yes.

12        Q    And I assume you don't record every detail

13   in your records, but is it fair to say that you try

14   to record anything that's of importance in your

15   medical record entries?

16        A    That's correct.

17        Q    And I assume you try to be honest and

18   accurate when you're making your medical record

19   entries, correct?

20        A    That's correct.

21        Q    So looking back at Exhibit 3, your initial

22   visit with Mr. Blair, that's when you first became

23   aware that he had been exposed to Roundup; is that

24   right?

25        A    That's correct.
```

Sanford R. Kauss, M.D.

```
 1        Q    And you made a note in Exhibit 3 that says
 2   he worked for vegetation management applying Roundup
 3   around power lines, correct?
 4        A    That's correct.
 5        Q    Now, did he bring that up or is that
 6   something you asked him about?
 7        A    So we generally ask employment, what
 8   people do for a living because it may be relevant to
 9   their diagnosis and certainly relevant to their
10   ability to continue doing that job, whether that job
11   is no longer appropriate for them, whether it's
12   something they can continue during treatment,
13   whether it's something they can do after treatment,
14   so it's relevant.
15        Q    And are you -- so you asked him about his
16   occupation, is that what I'm gathering?
17        A    That's correct.
18        Q    And he said -- what I'm asking is who
19   brought up Roundup?  Was that you that brought it up
20   or him that brought it up?
21        A    No, sir.  The way that our consults are
22   done is the patient is first interviewed by our
23   nurse and the nurse gets most of the history.  And
24   she has a note in here as well, or she might.  I
25   have to look through.  And so she gets the history
```

```
 1   and that's generally written down.  So I think -- we

 2   wouldn't specifically ask somebody what agent they

 3   would use.  If he said he works in vegetation

 4   management, I don't think we would directly ask if

 5   he uses Roundup or what agent he used, so that

 6   information was provided to my nurse.  And I wasn't

 7   there, so I don't know if she specifically asked

 8   about Roundup or if that was something that he

 9   volunteered.

10        Q     Right.  Is it your practice when you're

11   taking a patient's history -- up to that time, was

12   it your practice to ask about Roundup or glyphosate

13   exposure?

14        A     No, sir.

15        Q     Is it your practice today?

16        A     No, sir.

17        Q     Prior to Mr. Blair becoming your patient,

18   did you have any experience with any other patient

19   with non-Hodgkin lymphoma who had been exposed to

20   Roundup or glyphosate?

21        A     I wouldn't know the answer to that

22   question because I don't know the capacity in which

23   they might be exposed, let's say in terms of buying

24   the commercial product and use it around their home,

25   so I can't say how much exposure a patient of mine
```

```
 1    might have had or not.  I don't specifically ask
 2    about Roundup exposure.  We ask about occupation.
 3    And so in this particular case, it was relevant
 4    because he brought it up and he would have thought
 5    it was relevant.
 6          Q    Let me rephrase the question to make it a
 7    little more clear.  Prior to Mr. Blair becoming your
 8    patient, to the best of your knowledge, did any of
 9    your previous patients who had MHL have a history of
10    exposure to Roundup or glyphosate?
11          A    I don't know the answer to that question.
12          Q    So to the best of your knowledge, you're
13    not aware of anybody who had exposure, is that what
14    you're saying?
15          A    It's not something I specifically ask
16    about.  And once again, I don't know what exposure
17    people have in their personal lives to Roundup since
18    I understand it's a commercial product that you can
19    buy at hardware stores.
20          Q    Prior to Mr. Blair becoming your patient,
21    did have any experience determining whether Roundup
22    or glyphosate caused or contributed to non-Hodgkin's
23    lymphoma?
24          A    I did not.
25          Q    Prior to Mr. Blair, had you ever told any
```

1    patient that Roundup or glyphosate caused or

2    contributed in any way to their cancer?

3         A    I can say that there are certain

4    occupations that are associated with increased risks

5    of non-Hodgkin lymphomas.  The general consensus is

6    that from my experience, I'm sorry, is that that is

7    related to exposure to various pesticides.  I have

8    had patients who were farmers and work in the

9    agricultural field who have had non-Hodgkin's

10   lymphoma and in the past, I may have had discussions

11   saying that -- when they asked me how did I get

12   this, I may have had conversations saying --

13   explaining that it is more common in people who work

14   in agriculture and that it's thought that it is

15   possible that it is related to pesticides and

16   herbicides.

17        Q    Okay.  So my question, though, is you

18   never told a patient before Mr. Blair -- let me

19   rephrase.  Before Mr. Blair came to you as a

20   patient, you've never told a patient that Roundup or

21   glyphosate was the cause of their non-Hodgkin

22   lymphoma or any other cancer, is that right?

23        A    That's correct.

24        Q    Okay.  And what you just described,

25   actually, there are studies going back probably

1   30 years showing that farmers occupationally have an

2   increased risk of non-Hodgkin lymphoma vis-a-vis

3   from the rest of the population, is that what you're

4   eluding to?

5        A     That's my understanding.  I seem to recall

6   learning that in medical school.

7        Q     And whether that's do to pesticides or

8   herbicides or insecticides or something else has not

9   really been definitively determined; is that fair?

10       A     I believe that the -- what I had learned

11  was that organophosphates specifically increased

12  risk of development of non-Hodgkin's lymphoma.

13       Q     You learned that where?

14       A     In medical school.

15       Q     In what course was that taught?

16       A     I couldn't tell you.  I don't recall

17  specifically.  It may also have been in residency in

18  some related materials and textbooks.  But it's too

19  long ago.  I can't tell you the specific source.

20       Q     Fair enough.  Prior to Mr. Blair becoming

21  your patient, were you aware of lawsuits that have

22  alleged that Roundup caused or contributed to

23  non-Hodgkin lymphoma?

24       A     I was aware, yes.

25       Q     How did you become aware of those?

Sanford R. Kauz, M.D.

```
 1        A    I think it was just probably in the lay
 2   press and in the general news and things of that
 3   sort.
 4        Q    I just want to send you something else.
 5   Are you doing okay?  You need a break?
 6        A    No, I'm fine.
 7        Q    So I just sent you a couple of additional
 8   exhibits.  Let me know when that comes up.
 9        A    I can send you my CV.  It's already loaded
10   up, if you want me to hit send and send it to you.
11        Q    That would be great.
12        A    And this was as of May.
13        Q    Okay.
14        A    I haven't received anything from you yet.
15        Q    Let me know when that shows up.
16        A    It just showed up.  Okay.
17        Q    Okay.  So I would like you to take a look
18   at the first -- have you read Mr. Blair's deposition
19   in this case?
20        A    I'm sorry?
21        Q    You understand that Mr. Blair gave a
22   deposition?
23        A    I'm seeing that now, yes.
24        Q    And I have included a couple of pages from
25   his deposition transcript --
```

Sanford R. Katz, M.D.

```
 1        A    Okay.

 2        Q    -- that I just wanted to ask you about.

 3   And if you see there at the bottom --

 4             MR. PIORKOWSKI:

 5             And Curtis, I sent you a copy of this.

 6        I'm reading from page 126 and 127.

 7   BY MR. PIORKOWSKI:

 8        Q    So I'm just going to read it into the

 9   record.  It says -- starting on-line 17, it says,

10   "What told you what the causes of your lymphoma

11   were?"  And he says, "Both of my doctors did and

12   didn't just come out and say it.  They, you know,

13   kind of hinted to me.  They asked what I did for a

14   living because they were curious because I was so

15   young.  And then they said they've never seen

16   anybody with this type of cancer before.  And I told

17   them when I found out that I, you know, did, I

18   sprayed weed killers onto trees and they told me

19   that if it was him he would go see a lawyer.  And

20   the then other one told me have you heard about the

21   lawsuit that was going on and he said I can't say

22   nothing because of legal reasons he said, but you

23   get my drift, you know."

24        A    Okay.  Let me look at this --

25        Q    Let me just finish it.
```

Case 3:16-md-02741-VC   Document 13930-13   Filed 10/06/21   Page 81 of 126

Case 3:16-md-02741-VC   Document 13790-2   Filed 09/22/21   Page 81 of 126
Sanford R. Katz, M.D.

1    A    Okay.  Fine.

2    Q    And then we can -- "So you said both of

3    your doctors hinted at it.  Which of the two doctors

4    are you referring to?"  He said, "Katz and Patel."

5    "And then which ones said if it was him he would go

6    see a lawyer?"  "Patel."  "Okay, and which one said

7    have you heard about a lawsuit I can't say anything

8    because of legal reasons?"  "Dr. Katz."  And my

9    question is just do you recall a conversation along

10   those lines with Mr. Blair?

11   A    I would like an opportunity to just look

12   at this.

13   Q    Sure.

14   A    I'm having a little trouble following this

15   but what was your question?

16   Q    Do you have a recollection of a

17   conversation along those lines with Mr. Blair?

18   A    I remember having a conversation with him

19   asking more in detail what he did for a living

20   because, yes, in fact, he was so young and his tumor

21   I recall was rather impressively bulky and it was a

22   very bulky presentation of a non-Hodgkin's lymphoma

23   that we often don't see, especially not in somebody

24   his age.  And so given that, and you're always kind

25   of curious about things, you know, what is the

Case 3:16-md-02741-VC   Document 13930-13   Filed 10/06/21   Page 82 of 126
Case 3:16-md-02741-VC   Document 13790-2   Filed 09/23/21   Page 82 of 126
Santos-Silva, Kade, M.D.

```
 1    explanation for why we're seeing something unusual.
 2    And so I personally did inquire wanting to know more
 3    about what he did for a living.  And given my
 4    understanding that herbicides can be a cause of
 5    non-Hodgkin's lymphoma, I was very interested in the
 6    nature of his work and the details of his work.  And
 7    it sounds as though from what he's describing is
 8    that Dr. Patel was as interested.  In terms of
 9    getting a lawyer, I mean, it's generally my practice
10    not to get involved, you know, recommending to
11    patients that they get lawyers.  And so if a patient
12    tells me that they are not working and their company
13    fired them because they got sick, regardless -- I
14    may say to them, I said, Well, you may want to
15    explore that further, see what your legal rights
16    are.  Especially if you're going to lose your
17    insurance, you may want to explore things but only
18    in a general sense.  I never -- it's not my practice
19    to give legal advice to patients or to tell them to
20    seek legal counsel certainly to sue pharmaceutical
21    companies or chemical companies.  So I think what
22    he's saying here, if I'm reading it correctly, is
23    that nobody came out and said anything to him
24    specifically, in terms of getting -- at least not me
25    telling him to get a lawyer or specifically about,
```

```
 1   hey, there's a lawsuit that you need to get involved

 2   with, if I'm reading this correctly.

 3       Q    Do you have any recollection of saying

 4   anything along the lines of "I can't say anything

 5   because of legal reasons?"

 6       A    I don't know what that means.

 7       Q    I don't know what that means either.

 8       A    I'm not certain what that means, "I can't

 9   say anything because of legal reason."

10       Q    It may have got lost in translation and

11   that's why I'm asking you, so.

12       A    I don't really understand what that's

13   referring to, so I don't specifically recall saying

14   that.

15       Q    Did you advise Mr. Blair to go see an

16   attorney?

17       A    I don't recall that.

18       Q    Have you ever worked with Mr. Jones or his

19   partner Marshal Jones on cases in the past?

20       A    I have not worked with either of them in

21   this capacity.

22       Q    Have you worked with them in some other

23   capacity?

24       A    Yes.

25       Q    What capacity?
```

Case 3:16-md-02741-VC   Document 13930-13   Filed 10/06/21   Page 84 of 126
Case 3:16-md-02741-VC   Document 13790-2   Filed 09/23/21   Page 84 of 126
Sanford A. Katz, M.D.

```
 1          A     Mr. Joseph wrote a letter on my behalf to

 2     a company who I was having some difficulty with over

 3     some problems with some pool equipment.

 4          Q     Mr. Joseph, was he at the Jones & Odom Law

 5     Firm?

 6          A     I believe he was at the time.

 7          Q     And was that something where you retained

 8     them or they did something as a favor?

 9          A     I retained him.

10          Q     All right.  Going back to Exhibit 3, which

11     is in -- your first visit, he came to the visit

12     accompanied by his mother, correct?

13          A     Let me go back to that one.

14          Q     Yep.

15          A     Yes, I made note that his mother was

16     there.

17          Q     And you have in your notes you kind of

18     discussed that both his and her questions were

19     answered, right?

20          A     That's correct.

21          Q     And we already established at that time he

22     had already been diagnosed here and he had a

23     tonsillectomy about a week earlier; is that right?

24          A     Yes.

25          Q     What was your recommendation at that time
```

Case 3:16-md-02741-VC   Document 13930-13   Filed 10/06/21   Page 85 of 126

Case 3:16-md-02741-VC   Document 13790-2   Filed 09/23/21   Page 85 of 126
Samuel R. Katz, M.D.

1    and what was the basis for the recommendation?

2        A    So my recommendation was a combination of

3    chemotherapy upfront followed by radiation therapy.

4    The basis for that was national guidelines for the

5    treatment of this condition at this particular

6    stage.

7        Q    By "this condition," you're referring to

8    DLBCL?

9        A    The Stage 1A diffuse large B-cell

10   lymphoma.

11       Q    And is that recommendation specific to the

12   location?  In other words, is the treatment

13   recommendation you just outlined related

14   specifically to the location of the DLBCL?

15       A    No.

16       Q    So that would be the recommendation for

17   DLBCL at that stage anywhere in the body?

18       A    Generally, unless let's say it was like it

19   originated in the intestine, let's say, or in the

20   abdomen.

21       Q    Does radiation come into play because it's

22   an early stage?  What's the rational for the

23   radiation?

24       A    The rational is that you want to minimize

25   toxicity while maintaining efficacy.  So since both

1    modalities have toxicity by combining reduced dose

2    chemotherapy, reduced dose radiation, there is

3    synergy between them and by using them both to a

4    lesser degree than if you use one alone, you reduce

5    the potential for acute and long-term toxicity from

6    both the chemotherapy and the radiation.

7         Q    Is it inappropriate to include in your

8    note a discussion of any other potentially relevant

9    risks factors to non-Hodgkin lymphoma?

10        A    Could you explain your question a little

11   bit more?

12        Q    Yes, when you're evaluating your patient

13   that has non-Hodgkin lymphoma, there's a lot of

14   potential risks for non-Hodgkin lymphoma, right?

15        A    Okay.

16        Q    You agree with me there?

17        A    Well, you mean the risks in terms of just

18   having it or related to the treatment?

19        Q    No, I'm talking about the risk of

20   developing it in the first place.

21        A    I'm sorry, I don't follow your question.

22        Q    Well, if he had a history of rheumatoid

23   arthritis or hepatitis C, would you have written

24   that into the record?

25        A    Yes.

Case 3:16-md-02741-VC  Document 13930-13  Filed 10/06/21  Page 87 of 126
Case 3:16-md-02741-VC  Document 13790-2  Filed 09/23/21  Page 87 of 126
Sanford R. Katz, M.D.

```
 1        Q     Why?

 2        A     Because it may be relevant to his

 3   treatment, his risks of side effects, you know

 4   his -- which particular medications that might be

 5   safe to administer.

 6        Q     Are you aware of clinical studies that

 7   show that obesity is -- that there is a

 8   statistically significant increased risk of job

 9   generally and DLBCL specifically with increasing

10   BMI?

11        A     I'm not.

12        Q     The next exhibit that I sent you is an

13   exhibit by somebody named Larson from 2007 which is

14   a med analysis of the number of studies that looked

15   at excess body weight and DLBCL and non-Hodgkin's

16   lymphoma.  Is that a paper that you're familiar

17   with?

18        A     It's not.

19        Q     I also sent you Exhibit 10 which is a

20   paper by Castille that is separately in other med

21   analysis that found an increased BMI is associated

22   with a higher relevant risk of DLBCL.  Are you

23   familiar with that?

24        A     I'm not.

25        Q     I noticed you don't have in your record --
```

Case 3:16-md-02741-VC   Document 13790-2   Filed 09/22/21   Page 88 of 126
Sanford R. Kates, M.D.

1    and it's probably in some other record that I don't

2    have, but I don't see anything with his height and

3    weight.  But I will represent to you in his

4    deposition he testified that at the time of his

5    diagnosis he was five-eleven and he weighed

6    260 pounds.  Do you know where that puts him in the

7    spectrum of overweight obese?

8        A    Yes, I mean, that would put him in the

9    obese category.  I can also tell you that I weigh

10   225 pounds and I'm five-foot-eight-and-a-half.  I

11   would fall under the obesity category as well, but I

12   assure you I'm far from obese, so the BMI does not

13   take it into account body habitus, you know, whether

14   someone has a muscular frame.  So I think it's

15   flawed in that respect.  So I can say as a physician

16   I'm certainly not obese, and I can't find a

17   physician who would say that I'm obese clinically

18   but the BMI states that I am.

19       Q    All right.  Well, when people do studies

20   they have to rely on the information they have and

21   usually the information they have is BMI, right?

22       A    Yes, I understand but I think you made

23   reference to obesity.

24       Q    I did make reference to obesity.  But

25   obesity is categorized according to BMI, right?

```
 1        A     Okay.  All right.  I'm not going to argue.

 2   I understand where you're going.

 3        Q     And I'm not arguing about your own body

 4   mass index or your own situation, I'm asking about

 5   the patient here.

 6        A     I understand.  The reason why -- and this

 7   is a tangent I don't think we need to go over.  But

 8   there is a clinical obesity that when we see a

 9   patient we assess their nutritional status and

10   obesity.  So, you know, if I'm going to classify a

11   patient as being obese, I'm going to take it into

12   account their body habitus, not their BMI.  Now I

13   understand that for the purpose of epidemiological

14   studies they use BMI.  But I think BMI is a

15   surrogate on how fat somebody is and it doesn't take

16   into account whether they are muscular and whether

17   they work out and things of that sort and I think

18   that's clinically relevant.  But it's very hard to

19   tease that out from just BMI.  So they use BMI,

20   because for the vast majority of people, high BMIs

21   are to their fat content.  So I don't know that that

22   necessarily reflects everybody with a BMI who weighs

23   232 pounds, so I just want to put that on record

24   because I think it is relevant in this case.

25        Q     Well, he went from about 180 pounds in
```

Case 3:16-md-02741-VC   Document 13930-13   Filed 10/06/21   Page 90 of 126
Case 3:16-md-02741-VC   Document 13790-2   Filed 09/22/21   Page 90 of 126
Santora, R. Katie, M.D.

```
 1   2016 to 260 pounds in 2018.  That wasn't building up
 2   muscle mass over that two years, would you agree?
 3          MR. JOSEPH:
 4          I would object.  You have no bases for
 5       that, Counsel.  Zero bases for that.  All do
 6       respect.
 7   BY MR. PIORKOWSKI:
 8       Q    Do you have an opinion?  Do you have an
 9   opinion about whether Mr. Blair was clinically obese
10   at the time you saw him in November of 2018?
11       A    I'm looking at his -- I'm looking at my
12   records.  I said he was well-developed and
13   well-nourished.  I didn't make reference to the fact
14   that he was obese when I saw him.  I have a record
15   in, let's see, on March 25th, 2019 that he was
16   232 pounds and I would look to see.  There may be
17   additional records here that state -- here we go --
18   looking for it here.  Yes, when I saw him initially
19   on November 15th, 2019, he was 230 pounds six feet
20   tall with a BMI of 31.2, yes, and I have -- Oh, and
21   I also have listed under his social history that for
22   exercise activity that he does weight training.  So
23   it appears since he mentioned weight training and
24   from my recollection that he was not specifically
25   clinically obese and I said he was well-developed
```

Case 3:16-md-02741-VC   Document 13930-13   Filed 10/06/21   Page 91 of 126
Case 3:16-md-02741-VC   Document 13790-2   Filed 09/23/21   Page 91 of 126
Sanford R. Katz, M.D.

```
 1   and well-nourished, my impression would be that much

 2   of that weight was related to his weight training

 3   and that fact that he was young at 22 and had

 4   greater muscular mass than perhaps a BMI of 31.2

 5   reflecting him being obese because of increased

 6   adiposity.

 7        Q    Let's look at Exhibit 5 which is the

 8   affidavit.

 9        A    (Views document.)  I'm sorry, I had a few

10   e-mails sent in between the ones that you sent me,

11   so I'm having to constantly go back and find so it

12   is taking me a minute.

13        Q    Sure.  Take your time.

14        A    I'm looking for Exhibit 5.  Okay.

15        Q    So can you explain how did this affidavit

16   come about?

17        A    Yes.  I was -- at the request of

18   Mr. Blair's attorneys, I was asked to give my

19   opinion regarding -- basically.  I was asked to

20   provide my personal opinion about the potential role

21   that his exposure to Roundup may have had with

22   respect to his development of his cancer.

23        Q    When you say "his attorney," who are you

24   talking about?

25        A    Marshal Jones.
```

Sanford R. Katz, M.D.

1    Q    So they were also representing him in the

2    Workers' Comp action?

3    A    Yes, that was a Workmen's Comp related

4    issue.

5    Q    And did Marshal Jones ask you to rate the

6    affidavit?

7    A    Yes, I was asked to rate the affidavit.

8    Q    Now, am I correct that there is nowhere in

9    Mr. Blair's medical record anywhere where you

10   specially state that Roundup caused or contributed

11   to the development of his non-Hodgkin lymphoma; is

12   that correct?

13   A    That's correct.

14   Q    Do you know how Mr. Jones knew that you

15   would be willing to sign an affidavit to that

16   affect?

17   A    I think I was asked -- I think I was

18   specially asked about his care and my records were

19   requested.  I was asked specifically about the care

20   that I delivered and I was asked if I thought that

21   his exposure to Roundup could potentially have been

22   a cause or contributed to the development of his

23   cancer.  And based upon what I knew, I said that,

24   yes, I think it was a potential contributor.  And so

25   based upon that, I was asked to write an affidavit

Sanford R. Katz, M.D.

```
 1    and I said I would.

 2         Q    So the words you just used were you

 3    thought it was potential contributor, is that what

 4    you said?

 5         A    I thought it was very likely a cause of

 6    his cancer, and the reason I use the term "potential

 7    contributor" rather than "cause" is because I think

 8    not everybody who uses Roundup or any type of

 9    carcinogen will necessarily get a cancer.  There are

10    host factors and then there are also carcinogens and

11    that's true for smoking as well.  I say it was a

12    contributor or potential cause.

13         Q    Did you write the affidavit?

14         A    I wrote -- let's see what I wrote -- I

15    will tell you what I wrote.  I'm sorry, I'm looking

16    for it right now.  I basically wrote what was in the

17    affidavit, and it was then transcribed into I guess

18    legal form.

19         Q    What do you mean, like you wrote it on

20    another separate document?

21         A    In other words, I wrote it as a letter and

22    then the letter was transcribed into this legal

23    document with the ones and the twos and the three

24    subsections I guess for legal purposes.  And then I

25    signed it.
```

Case 3:16-md-02741-VC   Document 13930-13   Filed 10/06/21   Page 94 of 126

Case 3:16-md-02741-VC   Document 13790-2   Filed 09/22/21   Page 94 of 126
Sandford R. Katz, M.D.

```
 1        Q     Okay.  Was the substance of the affidavit
 2   any different than the substance of your letter that
 3   you sent?
 4        A     What do you mean by "substance"?
 5        Q     The opinions that you expressed, the facts
 6   that you stated.
 7        A     Yes.
 8        Q     It was different?
 9        A     I'm sorry, are you saying was it
10   different?
11        Q     Yes.  Let me start over again.  Were there
12   any differences between the letter that you wrote to
13   Mr. Jones and the affidavit in terms of the language
14   that's included?
15        A     Yes.  Let me look -- I think there was a
16   slight difference, if you give me a moment.  (Views
17   document.)  Yes, there were a couple of differences
18   like, for example, I wrote for additional specifics
19   with respect to my training and other
20   qualifications, "Please reference my CV which is
21   enclosed."  That was omitted.
22        Q     Can I ask you, are you looking at the
23   original letter that you sent?
24        A     Yes, sir.
25        Q     Do you have a copy of that?
```

```
 1         A     I do.
 2         Q     Can we mark that as an exhibit?
 3               MR. PIORKOWSKI:
 4               Curtis, can we agree to just mark it as an
 5         exhibit and he can provide it to you when you
 6         pick up the rest of the records?  Is that all
 7         right?
 8               MR. JOSEPH:
 9               Yes.  No objection.
10    BY MR. PIORKOWSKI:
11         Q     I'm sorry to interrupt you.
12         A     Yes.  And like I said, there were some
13    sentences that I suppose were not relevant.  I wrote
14    it in the letter form and then it was placed as an
15    affidavit form, so I can't say word for word it was
16    exactly the same but the substance of it was the
17    same in terms of -- I gave an opinion and it was
18    then written as an affidavit for the pertinent
19    things that I put in my opinion, and I signed the
20    affidavit as reflecting my opinion.
21         Q     Okay.  Were you compensated for preparing
22    the affidavit?
23         A     I was.
24         Q     How much were you compensated?
25         A     I don't recall.
```

Sanford R. Kater, M.D.

1      Q      Did you say earlier that you spent

2  approximately six hours reviewing documents and

3  literature at the time?

4      A      I believe that that was the case, yes.

5      Q      Would you have billed for six hours of

6  time at your regular rate?

7      A      I think that was an estimation, so I can't

8  say that specifically how many hours I billed for it

9  and what my rate was at the time.  I believe that

10  Mr. Joseph may have those records and I don't know

11  that I can produce them.

12      Q      Do you still have a copy of your invoice

13  from back then?

14      A      I would have to look for it.  I don't know

15  for certain that I could find it.

16          MR. JOSEPH:

17          I will see if we can find it and get that

18      to you, Joe.

19          MR. PIORKOWSKI:

20          All right.  I appreciate it.

21  BY MR. PIORKOWSKI:

22      Q      So when you are preparing an affidavit for

23  a legal proceeding, you realize that you're getting

24  into the realm of becoming an expert witness; is

25  that right?

Case 3:16-md-02741-VC   Document 13930-13   Filed 10/06/21   Page 97 of 126

Case 3:16-md-02741-VC   Document 13790-2   Filed 09/22/21   Page 97 of 126
Sanford R. Katz, M.D.

1      A    I do.

2      Q    Are you aware that there are certain

3  ethical guidelines for physicians who serve as

4  expert witnesses?

5      A    I would assume there would be, yes.

6      Q    Let me ask you, I want to turn to --

7  before you were talking about the opinions that you

8  looked at, and I just want to kind of figure out how

9  this searched happened.  You said with IARC

10  Monograph 112 and all these questions are related to

11  at the time you originally were preparing your

12  affidavit.  I assume that was over the course of a

13  couple of weeks, am I right?

14      A    I would assume so.  I don't remember the

15  specifics of the timeframe.

16      Q    So it was IARC Monograph 112, was that

17  your starting point?

18      A    I believe it was.

19      Q    Is that the first thing that you looked

20  at?

21      A    I can't recall the first thing.  I know

22  that it was a major component of what I read, and I

23  know that there were other sources as well.  I can't

24  tell you the first thing that I looked at.

25      Q    So can you just describe for me how you

Case 3:16-md-02741-VC   Document 13930-13   Filed 10/06/21   Page 98 of 126
Case 3:16-md-02741-VC   Document 13790-2   Filed 09/23/21   Page 98 of 126
Sanford R. Kaur, M.D.

```
 1    approached your task of looking at the literature?
 2         A    I believe -- what I typically do is I use
 3    PubMed.  Do I need to explain what PubMed is?
 4         Q    No.
 5         A    So I would have done a PubMed search and
 6    reviewed various articles, both review articles and
 7    primary sources, and I may have reviewed abstracts
 8    or some of them.  I may have looked at the entirety
 9    of the article and then eventually would have
10    narrowed it down to some primary sources that are
11    relevant and certainly this monograph is very
12    complete and represents I think a comprehensive
13    review from the World Health Organization with
14    experts from around the world looking at all the
15    available data and so that certainly was a primary
16    source.
17         Q    When you said you did a PubMed search, did
18    you save a copy of those search results?
19         A    I did not.
20         Q    Do you know what search terms you used?
21         A    I do not recall.
22         Q    I know you said you had a copy of the
23    printout of the IARC Monograph, correct?
24         A    I do.
25         Q    Did you also print out certain articles
```

Samford R. Katz, M.D.

```
 1   that you thought were relevant?

 2        A    I believe I did.

 3        Q    Do you still have copies of those?

 4        A    I don't believe I do.  I've since moved

 5   and I don't know that those articles necessarily

 6   moved with me.

 7        Q    Is there any way to reconstruct what

 8   things you looked at?  Let me ask you this, does the

 9   IARC Monograph margin notes reflect -- the IARC

10   Monograph does discuss individual studies, correct?

11        A    Yes.  I think very likely what I probably

12   did was reviewed articles on my computer rather than

13   printing out.  So in that situation, I would have

14   read the article and not necessarily printed it out,

15   so I wouldn't have a permanent record of it.  And

16   so, you know, when I wrote my affidavit, I think I

17   made reference to the monograph but I don't know

18   whether I made reference to other specific papers.

19   So at the time I didn't see that it would be

20   relevant for me to print out all of the papers that

21   I looked at and read and keep records of them.  I

22   didn't anticipate that to be necessary.

23        Q    So as you sit here today, though, there is

24   no way to reconstruct what articles you specifically

25   looked at; is that fair?
```

Daniel R. Katz, M.D.

```
 1        A     I don't think that would be possible.
 2        Q     Did you look at any materials from any
 3    regulatory agencies?
 4        A     I don't recall.
 5        Q     Are you aware that the EPA has conducted
 6    several comprehensive assessments about the safety
 7    of glyphosate?
 8        A     I'm aware -- yes, I'm aware of some
 9    information to that affect, yes.
10        Q     Did you consider that information at the
11    time you prepared your affidavit?
12        A     I did.
13        Q     Do you remember what the EPA's conclusion
14    was?
15        A     The EPA's conclusion was not nearly as
16    strong as those of the World Health Organization
17    with respect to glyphosates being a carcinogen.
18        Q     Not nearly as strong as in they concluded
19    it was not a carcinogen, right?
20        A     Correct.
21        Q     Did you look at any other regulatory
22    agencies' review such as Health Canada or any of the
23    European regulators?
24        A     Yes, I recall looking at some of those as
25    well.
```

Case 3:16-md-02741-VC   Document 13790-2   Filed 09/22/21   Page 101 of 126

Samuel R. Katz, M.D.

```
 1        Q    Do you recall what those conclusions were?

 2        A    To answer your question, there was a

 3  paragraph in the letter that I wrote to Marshal

 4  Jones that was not included in the affidavit, and I

 5  would like an opportunity to read that because I

 6  think it does reflect the fact that I did read some

 7  sources that conflicted with the conclusions of the

 8  IARC.  Can I read that?

 9        Q    Certainly.

10        A    "I have reviewed much of the relevant body

11  of scientific literature investigating the

12  carcinogenic potential of herbicides with particular

13  emphasis on glyphosate and non-Hodgkin's lymphoma,

14  specifically.  When combining the inherent

15  challenges specific to epidemiological studies and

16  the difficulties associated with toxicology research

17  in general, the publication of a body of research

18  with sometimes conflicting results does not

19  effectively support the conclusion that such a

20  relationship does not exhibit but merely there is

21  some controversy.  It is important to understand

22  that in failing to approve an association, a study

23  does not prove the lack of one.  Furthermore, the

24  failure of a study that demonstrates sufficient

25  statistical significance in support of a causal
```

Case 3:16-md-02741-VC   Document 13930-13   Filed 10/06/21   Page 102 of 126
Case 3:16-md-02741-VC   Document 13790-2   Filed 09/22/21   Page 102 of 126
Samuel S. R. Kalra, M.D.

```
 1    relationship does prove a lack of an association but

 2    rather may merely demonstrate the inherent

 3    weaknesses of the study, its methods, the design and

 4    argue in favor of conducting further research

 5    incorporating different studies, altering methods,

 6    and attempting to minimize the impact of cofounders

 7    which may serve to obscure otherwise positive

 8    results."

 9         Q    So what you were trying to communicate in

10    the paragraph didn't make it's way into the

11    affidavit per se?

12         A    It doesn't appear to have.

13         Q    And you would agree that the information

14    set forth in that paragraph is still true today?

15         A    Yes, I do.  It's still my opinion.

16         Q    And it's fair to say that I think you used

17    the word "controversial" or "controversy" that

18    whether glyphosate and Roundup do or do not cause

19    cancer is the subject of significant scientific

20    controversy, would you agree with that?

21         A    I would agree that it is the subject of

22    controversy.  I don't know how significant that

23    controversy is, but I would say certainly is

24    controversial.

25         Q    Well, if every regulatory agency on the
```

Case 3:16-md-02741-VC   Document 13930-13   Filed 10/06/21   Page 103 of 126

Case 3:16-md-02741-VC   Document 13790-2   Filed 09/22/21   Page 103 of 126
Samuel O. R. Katz, M.D.

```
 1    planet that has looked at the question has

 2    determined that glyphosate is not carcinogenic --

 3              MR. JOSEPH:

 4              Objection to the form.

 5    BY MR. PIORKOWSKI:

 6       Q    -- or has been to be carcinogenic and on

 7    the other side you have IARC saying that it is

 8    carcinogenic, would you consider that to be

 9    controversy?

10              MR. JOSEPH:

11              I would object to form.

12              But go ahead.

13              THE WITNESS:

14              Do I need to answer the question?

15              MR. JOSEPH:

16              Answer the question.

17              THE WITNESS:

18              I would say that is significant

19        controversy.

20    BY MR. PIORKOWSKI:

21       Q    And what you were trying to do in that

22    paragraph is in fairness acknowledge that there is

23    significant controversy and this is not a settled

24    scientific question, right?

25       A    What I was trying to say in that statement
```

Case 3:16-md-02741-VC   Document 13930-13   Filed 10/06/21   Page 104 of 126
Case 3:16-md-02741-VC   Document 13780-2   Filed 09/22/21   Page 104 of 126
Gamble & R. Katez, M.D.

1   was that negative results or results that fail to

2   prove the association do not prove that there is not

3   an association and that the nature of

4   epidemiological studies is often flawed and requires

5   a large body of research to be looked at

6   holistically in order to tease out associations that

7   may not be apparent when you look at smaller studies

8   or more limited studies from one country or from

9   another country.  And so the strength of the IARC is

10  that they looked at multiple countries, and I don't

11  know the degree to which the EPA has done that as

12  comprehensively as the AIRC -- I'm sorry, the IARC.

13       Q    All right.  We can take a look at that

14  next time, I guess.  Let me just ask you a couple of

15  things.  I want to make sure we're -- excuse me one

16  second.

17       A    I would add that these regulatory agencies

18  are political.  I think they are governmental.  They

19  are subject to political influences, and I think the

20  World Health Organization is a more independent

21  organization that is perhaps less subject to

22  political or other influences.

23       Q    What's your basis for saying that?

24       A    My basis for saying that is, you know, I

25  think using the example of climate change.  Yes, I

1    think it's certainly there is significant

2    controversy on climate change, although I think the

3    vast majority of countries acknowledge climate

4    change to a greater degree than the United States

5    does.  So I think that -- I think that looking at --

6    when you look at the world as a whole and not just

7    experts from your own country, I think that it adds

8    to the conversation to have a more holistic view of

9    things and so I'm not discounting the EPA by any

10   means.  I certainly acknowledge that the EPA is an

11   expert organization.  But I do hold the World Health

12   Organization in pretty high regard.

13        Q    Let me ask you this, I mean -- and I think

14   your point is well taken that it's important to see

15   not just what the U.S. regulator agency says but

16   what regulators around the world say, correct,

17   that's what you're pointing out?

18        A    I don't know about regulators.  I'm

19   talking in terms of scientific literature, not

20   specifically regulators.  Sir, I live in Louisiana

21   and there's lot of things that are regulated and not

22   regulated in Louisiana with respect to water and

23   toxicology and things of that nature.  So, I mean, I

24   like to refer to scientific literature and

25   scientists as more of a source than regulators.

Case 3:16-md-02741-VC   Document 13780-2   Filed 09/22/21   Page 106 of 126

Sanford R. Katz, M.D.

```
 1      Q     Okay.  You understand the difference in

 2   the process between -- let's say the process that

 3   EPA uses to make a conclusion in the process that

 4   IARC uses to make a conclusion?

 5      A     No, sir.

 6      Q     Are you familiar with the term "Notice In

 7   Comment" what that means?

 8      A     No, sir.

 9      Q     Have you had any involvement at any point

10   with FTA or any kind of regulatory agency in

11   Washington DC?

12      A     I have worked for the FDA.

13      Q     You worked for the FDA.  Okay, so you have

14   never come across Notice In Comment?

15      A     I didn't work in that capacity.  I worked

16   in primary research for the FDA.

17      Q     When did you work for the FDA?

18      A     I worked in a lab.  Probably I must have

19   been 1987 through 1988, '89 at the National

20   Institute of Health.

21      Q     Is that on your CV?

22      A     It may not have been.  Let me double

23   check.  Yes, sir, it is.

24      Q     It is, okay.  Did you look at what the FDA

25   had to say about glyphosate --
```

1    A    I did not.

2    Q    So to go back to this Notice In Comment,

3  when the EPA or the FDA or any United States

4  regulatory agency is issuing findings that are

5  preliminary findings that are issued followed by a

6  period of Notice In Comment where the public or

7  anybody, scientists, industry people, regulators,

8  special interests groups, whatever, have an

9  opportunity to basically make comments on the

10  preliminary findings.  Okay.  And it's not until

11  those comments have all been considered and

12  addressed that an agency issues its financial

13  report.  Now, do you know whether IARC has anything

14  similar to that where before they issue a final

15  report there's an opportunity for basically

16  transparency in the decision by allowing people to

17  comment on what the findings are?

18    A    I do not.

19    Q    Let me just ask you some things about IARC

20  here and about their conclusion.  You're

21  understanding is that IARC is not a regulatory

22  agency, right?

23    A    That's my understanding.

24    Q    And that they don't have authority or

25  responsibility for regulating any product or proving

```
 1    any product, anything of that nature, right?

 2         A    That's my understanding.

 3         Q    Let me see if I can share something here

 4    on the screen.  So would you agree with me that when

 5    you look at a finding that IARC makes, it's always

 6    important to understand the context to appreciate

 7    the context of a finding?  Is that a fair statement?

 8         A    Okay, I will agree with that.

 9         Q    So let me see if I can share.  Can you see

10    that on the screen?

11         A    Yes.

12         Q    Okay.  So what do you see on the screen?

13         A    I see some people holding up beverages.

14         Q    What do the beverages appear to be?

15         A    I don't know what the beverages are.  I

16    know that the glasses that they are using are

17    typically used for wine but that doesn't necessarily

18    mean that there is wine in those glasses.

19         Q    Okay.  All right.  So, basically, I'll

20    represent to you that this depicts a few friends

21    sitting around a fireplace and having a glass of

22    wine; is that fair?

23         A    I suppose -- that's the premise, yes.

24         Q    Okay.  That's the premise.  Now, if we

25    sort of look at that picture with IARC glasses on,
```

```
 1    we would see two people who are ingesting a

 2    Category 1 known carcinogen being the alcohol and

 3    needlessly exposing themselves to fumes from burning

 4    wood which according to IARC is Category 2A probably

 5    carcinogenic the same as glyphosate.  I mean, those

 6    are -- do have an understanding about those findings

 7    from IARC?

 8        A    I think that -- my understanding is, is

 9    that there are carcinogens that are generated from

10    burning wood and that consuming alcohol can increase

11    your risk for developing certain types of cancer and

12    that the risks is often related to the intensity,

13    the amount, and the duration of the exposure.

14        Q    We'll get to that in a second.  And if

15    these people just before they sat down in front of

16    the fire had a nice steak dinner before they moved

17    to the fireplace, they would have exposed themselves

18    to red meat which is also probably carcinogenic

19    Category 2A, right?

20        A    I think that's reasonable.

21        Q    Okay.  Now, you wouldn't conclude even if

22    we stipulated that that's wine in the glasses based

23    on these facts that these people were to develop

24    cancer just because they're enjoying some red wine

25    in front of a cozy fire, right?
```

Case 3:16-md-02741-VC   Document 13930-13   Filed 10/06/21   Page 110 of 126

Case 3:16-md-02741-VC   Document 18780-2   Filed 09/22/21   Page 110 of 126
Gamble, P. Kate, M.D.

```
1        A     That's correct.
2        Q     And the reason is because you have some
3    context for what IARC means when it makes these
4    findings, right?
5        A     Could you restate that, please?
6        Q     Sure.  Well, let me back up and ask you
7    this theory.  What IARC does, right, its own
8    admission, if you read the monograph, not just this
9    monograph but any monograph is IARC performs the
10   identification, not risk assessment, is that a
11   difference you are familiar with?
12       A     Identification meaning?
13       Q     This is IARC's own characterization.  They
14   identify hazards.  They don't assess risks.
15       A     Okay.
16       Q     Let me see.  I want to make sure this is
17   your understanding, that I'm not --
18       A     But the studies that they site do use
19   risks.  They do use assessments of risks.  So the
20   actual studies when you look at them do talk about
21   relative risks and so IARC's conclusion is maybe one
22   thing.  But when I look at these studies
23   individually and I look at the relative risks, I see
24   a trend certainly that suggest increased risks.
25   Whether IARC says it, it is the individual studies
```

Case 3:16-md-02741-VC   Document 13930-13   Filed 10/06/21   Page 111 of 126
Case 3:16-md-02741-VC   Document 13780-2   Filed 09/22/21   Page 111 of 126
Samford R. Kaltz, M.D.

```
 1    to me that are actually evaluating risks.

 2         Q    What studies -- the problem here -- let's

 3    just talk about IARC generally for a second because

 4    I want to make sure we are understanding.  We can

 5    talk about your understanding of what IARC said.

 6    But when IARC makes a determination, is the

 7    determination they make is can this compound cause

 8    cancer in some circumstances, right?

 9         A    Yes.

10         Q    They don't -- and their choices are

11    definitely, probably, possibly, or definitely not,

12    right?

13         A    Right.

14         Q    And for context, you know, over the years

15    IARC has looked at thousands of -- over a thousand

16    chemicals and compounds, do you know how many times

17    they have concluded an exposure does not cause

18    cancer?

19         A    No.

20         Q    Once is the answer.  So hopefully that

21    provides --

22              MR. JOSEPH:

23              Objection.  But go ahead.

24    BY MR. PIORKOWSKI:

25         Q    In any event, but a conclusion that is
```

Case 3:16-md-02741-VC   Document 13930-13   Filed 10/06/21   Page 112 of 126

Case 3:16-md-02741-VC   Document 13790-2   Filed 09/22/21   Page 112 of 126
Same Bre 7 R. Katz, M.D.

1    substance can cause cancer can be based on limited

2    evidence in humans, true?

3         A    Limited in terms of the ability to measure

4    it conclusively like you can let's say in animals.

5    It's much harder.

6         Q    When IARC says something can cause cancer

7    or probably cause cancer, they provide no indication

8    about the duration of years of exposure that would

9    be required to cause a person to --

10             MR. JOSEPH:

11             Objection.  Objection, Counsel.  I don't

12        know that you are necessary testifying to

13        IARC's conclusions and things of that nature.

14        I think you are here to ask the doctor

15        questions.

16             MR. PIORKOWSKI:

17             I'm asking him questions.

18             MR. JOSEPH:

19             I think we are getting beyond the pale,

20        and I have been kind of tolerant because I want

21        this to go so we can get on to the next one.

22        But I think you are getting well beyond asking

23        him questions.  You are testifying.  You are

24        testifying.

25             MR. PIORKOWSKI:

Daniel T. R. Katez, M.D.

```
1              He has said he is basing his conclusion in

2        large part on --

3              MR. JOSEPH:

4              Right, you can ask him questions about

5        that.  You are not necessarily -- I mean,

6        you're an officer of the court as I am but

7        you're not sworn as a witness to testify here.

8              MR. PIORKOWSKI:

9              These are all in the form of questions,

10       Curtis.

11             MR. JOSEPH:

12             They are direct statements.  You are

13       testifying, Joe.

14             MR. PIORKOWSKI:

15             They all have question marks at the end.

16             MR. JOSEPH:

17             You have to ask him questions.  You are

18       testifying about -- you can ask him questions.

19       He's answering your questions.  You've been

20       testifying for 30 minutes.

21  BY MR. PIORKOWSKI:

22       Q    When IARC reaches a conclusion, they

23  provide no indication about the duration of years of

24  exposure that would be required to cause a person to

25  development cancer, true or not?
```

Case 3:16-md-02741-VC   Document 13930-13   Filed 10/06/21   Page 114 of 126
Case 3:16-md-02741-VC   Document 13780-2   Filed 09/22/21   Page 114 of 126
Samford R. Katz, M.D.

```
 1      A    I don't know the answer to that question.

 2      Q    Do you know whether IARC makes any

 3   findings about quantitative information like the

 4   dose that would be required to produce cancer?

 5      A    I'm not able to answer that question

 6   because I don't know the ends and outs of IARC

 7   specifically.  What I read was a review of various

 8   studies that were performed which I then used as a

 9   jumping point as part of my review of the literature

10   and then went and look at some of those studies

11   specifically to get additional information regarding

12   their conclusions, and so I used that to form my

13   general opinion that it is more likely than not that

14   the Roundup contributed significantly to the

15   development in this non-Hodgkin's lymphoma in this

16   gentleman that presented at an atypical age to --

17   with a very bulky disease with unusually high

18   exposures that I believe are foreign in excess of

19   what was studied in any of those studies since many

20   of those studies used farmers and part -- one of

21   them the assessment is did you have more than

22   ten days or less than ten days of exposure.  And I

23   believe that Mr. Blair, the exposure that he had,

24   was off the charts relative to anything any of those

25   people studied in any of the studies whether it had
```

Case 3:16-md-02741-VC   Document 13930-13   Filed 10/06/21   Page 115 of 126

Case 3:16-md-02741-VC   Document 13790-2   Filed 09/22/21   Page 115 of 126
Samuel R. Katz, M.D.

1    been anything that was IARC or probably anything

2    that EPA studied because his exposure was so

3    unusual.  It wasn't even as a farmer.  And so --

4    that's what I used.  I didn't use the conclusion of

5    IARC as something.  None of these studies -- you

6    specifically talk about the duration, the amount of

7    exposure.  I mean, my understanding is the

8    concentration he was exposed to, the amount he was

9    exposed to, the duration that he was exposed to, all

10   those things are far in excess of anything that they

11   looked at in any of those studies.  And so since

12   many of those studies do show an increased risk in

13   people who had much less exposure than he, I think

14   it is more likely than not that the Roundup

15   contributed to, if not the cause, to his cancer.  So

16   I -- if he had some red meat after having gone to

17   work and didn't wash his hands and the combination

18   of the red meat that he cooked over a fire after

19   spending a day with Roundup, you know, I mean, you

20   can say, hey, it could have been the red meat, but I

21   think it more likely than not that it was the

22   excessive extraordinary exposure to Roundup that

23   caused this unusual cancer in somebody his age.

24        Q    Your opinion is predicated on the fact

25   that there is a dose relationship, right?

Case 3:16-md-02741-VC   Document 13930-13   Filed 10/06/21   Page 116 of 126

Case 3:16-md-02741-VC   Document 13780-2   Filed 09/22/21   Page 116 of 126
Danielle R. Katz, M.D.

```
 1        A    There is generally a dose response
 2   relationship to everything that is related to
 3   cancer.  I mean, if I have one cigarette my risk of
 4   developing cancer is much less than if I have a
 5   million cigarettes.  I mean, in my -- radiation
 6   exposure can cause cancer but it -- certainly the
 7   dose and the amount and the duration in which you
 8   are getting exposed to the radiation, which I know
 9   something about radiation, it's definitely a
10   carcinogen.  But it's exposure, the age at which you
11   are exposed to it, the duration, the total dose, I
12   mean, most carcinogens, those are the things that
13   are important.  It's not like, oh, you got exposed
14   to a little bit, you're going to get cancer.  So I
15   think it is relevant in this case.
16        Q    We are coming up at 1:00 and we will
17   continue this and let's make sure we have everything
18   we need in terms of documents and so forth.  So the
19   way we've left it is, Dr. Katz, you're going to
20   provide the hard copy of the records you have
21   available to Mr. Jones' office.  You're going to
22   provide some digital version of the records that are
23   digitized also whether that's on a flash drive or
24   something, correct?
25        A    Yes.
```

Case 3:16-md-02741-VC   Document 13930-13   Filed 10/06/21   Page 117 of 126
Case 3:16-md-02741-VC   Document 13790-2   Filed 09/22/21   Page 117 of 126
Garretson R. Katz, M.D.

```
 1        Q    You're going to provide a copy of your
 2   highlighted version or notated version of the IARC
 3   monograph and --
 4        A    I'm sorry, what was that last one?
 5        Q    You said you have a version of the IARC
 6   Monograph that has highlights and notes?
 7        A    That's correct.
 8        Q    So you're going to provide a copy of that
 9   that has the highlights and notes on it?
10        A    Yes.
11        Q    And then you're going to provide us with
12   the copy of the letter that you originally sent that
13   later became Exhibit 5, correct?
14        A    Yes.  Yes.
15        Q    And with respect to --
16             MR. PIORKOWSKI:
17             Curtis, we should have a discussion off
18        the record about a couple of things.  We don't
19        need to do it now for the next go round.
20   BY MR. PIORKOWSKI:
21        Q    Let me ask you quickly, Exhibit 6 and 7, 6
22   is a letter you sent also to Mr. Jones; is that
23   right?
24        A    That's correct.
25        Q    And what prompted that letter to be sent?
```

Case 3:16-md-02741-VC   Document 13930-13   Filed 10/06/21   Page 118 of 126
Case 3:16-md-02741-VC   Document 13790-2   Filed 09/22/21   Page 118 of 126
Daniel E. R. Katz, M.D.

```
 1        A     My recollection is that this was requested

 2   because the case with Workmen's Comp kind of trying

 3   to determine how much care, medical care Mr. Blair

 4   would require going forward.  And so I provided what

 5   I felt was appropriate future follow up for him and

 6   some of the risks factors and -- which is why I

 7   think it may or may not be part of his medical

 8   record.  But anyway, it was certainly relevant to

 9   his particular medical care as opposed to anything

10   related to the Roundup.

11        Q     In the NCCN guidelines, those are accepted

12   national guidelines?

13        A     I would say so, yes.

14        Q     And the invoice for 375, which is

15   Exhibit 7, that was billed to the law firm for the

16   preparation of the letter?

17        A     Let me look at that.  Yes.

18        Q     And have you been asked to serve as a

19   testifying expert by Mr. Jones on behalf of

20   Mr. Blair for this case?

21        A     I think I was informed that because of my

22   participation in this -- in the Workmen's Comp that

23   I would end up being involved with future cases

24   moving forward, that committing myself to this

25   effectively meant my participation moving forward.
```

Case 3:16-md-02741-VC   Document 13930-13   Filed 10/06/21   Page 119 of 126

Case 3:16-md-02741-VC   Document 13790-2   Filed 09/22/21   Page 119 of 126
Samuel B. Katz, M.D.

```
 1              MR. PIORKOWSKI:

 2              Curtis, are you able to clarify on the

 3      record under Rule 26 is he --

 4              MR. JOSEPH:

 5              I spoke with Anthony last week and we will

 6      be providing y'all with the information

 7      required on that form, yes.

 8              MR. PIORKOWSKI:

 9              Well, I guess my question is, is he going

10      to issue a report or how is this going to

11      proceed?

12              MR. JOSEPH:

13              I think he's already issued a report.  He

14      issued an opinion, and I provided you with his

15      medical records, and he's testifying right now.

16              MR. PIORKOWSKI:

17              But the report he issued doesn't satisfy

18      Rule 26 for a retained expert.  It's up to you.

19      I'm not pressing you one way or the other.  We

20      don't have to have this conversation on the

21      record.  We can talk about this afterwards.

22              MR. JOSEPH:

23              Yes.  But we will have him and likely he

24      will.  We toyed with that because he is in a

25      dual capacity as far as he's the treating
```

Case 3:16-md-02741-VC   Document 13930-13   Filed 10/06/21   Page 120 of 126

Case 3:16-md-02741-VC   Document 13790-2   Filed 09/22/21   Page 120 of 126
Sanford R. Katz, M.D.

```
 1        physician.

 2              MR. PIORKOWSKI:

 3              I understand that.

 4              MR. JOSEPH:

 5              Right, so I think we decided and I told

 6        Anthony this when I talked to him on Friday,

 7        Thursday or Friday that we would be

 8        supplementing with Rule 26 information, yes.

 9              MR. PIORKOWSKI:

10              Okay.  All right.

11  BY MR. PIORKOWSKI:

12        Q    So, Doctor, thank you for your time.  Do

13  you have any questions?  Did you understand my

14  questions today?

15        A    Yes, I did.

16        Q    Were you able to answer honestly and I

17  treated you courteously?

18        A    You did and I won't make jokes next time.

19        Q    And tried to make a joke back at you.

20        A    You did.  Yes, it was fine.  You were very

21  courteous.

22              MS. HOVIS:

23              And one last thing, Mr. Joseph, was going

24        to also going give you a copy of the invoice

25        from the original affidavit.  That's on the
```

Samuel B. Katz, M.D.

```
 1        list as well.
 2              MR. JOSEPH:
 3              I have that written down.  And I also
 4        would like to be sure we have it on the record
 5        that I would reserve my right to ask questions
 6        when we resume this deal.
 7              MR. PIORKOWSKI:
 8              Yes.  Certainly.  So we are going to
 9        suspend the deposition for now.  And I assume
10        at some point they will probably give you a
11        chance to read it, Doctor, at least part one
12        and we will figure out a time to resume at a
13        convenient time for you.
14              THE WITNESS:
15              Did you say read it?
16              MR. JOSEPH:
17              She will give us a transcript.
18              MR. PIORKOWSKI:
19              Since it is sworn testimony, you have an
20        opportunity to read over to make sure that the
21        words were transcribed right or you didn't say
22        whether and it came out weather.  There are
23        dual spellings of words or ambiguities and that
24        kind of stuff, so, anyway, you'll have a chance
25        to read and review your transcript.
```

Sanford R. Kaee, M.D.

```
 1              THE WITNESS:

 2              Very good.

 3              MR. PIORKOWSKI:

 4              So we are suspending your deposition

 5         today.

 6              THE VIDEOGRAPHER:

 7              We are off the record at 4:01.

 8                        (Whereupon, the deposition was

 9                        concluded at 4:01 p.m.)

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

1                        REPORTER'S PAGE

2          I, Shari Peck, Certified Court Reporter

3    in and for the State of Louisiana, the officer, as

4    defined in Rule 28 of the Federal Rules of Civil

5    Procedure and/or Article 1434(B) of the Louisiana

6    Code of Civil Procedure, before whom this proceeding

7    was taken, do hereby state on the Record:

8               That due to the interaction in the

9    spontaneous discourse of this proceeding, dashes

10   (--)have been used to indicate pauses, changes in

11   thought, and/or talkovers; that same is the proper

12   method for a Court Reporter's transcription of

13   proceeding, and that the dashes (--) do not indicate

14   that words or phrases have been left out

15   of this transcript;

16              That any words and/or names which could

17   not be verified through reference material have been

18   denoted with the phrase "(spelled phonetically)."

19

20                         _____

21                         Shari Peck

22

23

24

25

```
 1              REPORTER'S CERTIFICATE
 2         This certification is valid only for a
    transcript accompanied by my original signature
 3  and original required seal on this page.
 4         I, Shari Peck, Certified Court Reporter in
    and for the State of Louisiana, as the officer
 5  before whom this testimony was administered, do
    hereby certify that SANFORD KATZ, M.D., after having
 6  been  duly sworn by me upon authority of R.S.
    37:2554, did testify as hereinbefore set forth in
 7  the foregoing 125 pages;
 8         That this testimony was reported by me in
    the stenotype reporting method; was prepared and
 9  transcribed by me or under my personal direction
    and supervision, and is a true and correct
10  transcript to the best of my ability and
    understanding;
11         That the foregoing transcript has been
    prepared in compliance with transcript format
12  guidelines required by statute or by the Rules
    of the Louisiana Certified Shorthand Reporter
13  Board; and that I am informed about the complete
    arrangement, financial or otherwise, with the
14  person or entity making arrangement for deposition
    services; that I have acted in  compliance with the
15  prohibition on contractual relationships, as defined
    by the Louisiana Code    of Civil Procedure Article
16  1434 and in rules and advisory opinions of the
    board;
17         That I have no actual knowledge of any
    prohibited employment or contractual
18  relationship, direct or indirect, between a
    court reporting firm and any party litigant in
19  this matter, nor is there any such relationship
    between myself and a party litigant in this
20  matter;
           That I am not of counsel, not related to
21  counsel or the parties herein, nor am I otherwise
    interested in the outcome of this matter.
22
23                    _____
24                    SHARI PECK
                      CERTIFIED SHORTHAND REPORTER
25
```

Sanford R. Katz, M.D.

```
 1                WITNESS' CERTIFICATE

 2

 3           I, SANFORD KATZ, M.D., the undersigned, do

 4      hereby certify that I have read the foregoing

 5      deposition and it contains a true and correct

 6      transcript of the testimony given by me:

 7

 8

 9           (  )Without corrections.

10           (  )With corrections as reflected

11                the errata sheet(s) prepared by

12                me and made a part hereof.

13

14

15

16           _____

17           SANFORD KATZ, M.D.

18

19

20           _____

21           DATE

22

23

24

25
```

Sanford R. Kratz, M.D.

```
 1                    CORRECTION SHEET

 2    PAGE      LINE                    DESCRIPTION

 3    _____     _____        _____

 4    _____     _____        _____

 5    _____     _____        _____

 6    _____     _____        _____

 7    _____     _____        _____

 8    _____     _____        _____

 9    _____     _____        _____

10    _____     _____        _____

11    _____     _____        _____

12    _____     _____        _____

13    _____     _____        _____

14    _____     _____        _____

15    _____     _____        _____

16

17

18

19

20

21

22

23

24

25
```