**LABLETTA & WALTERS LLC**
**Christian P. LaBletta, Esquire**
**200 Barr Harbor Drive, Suite 400**
**Conshohocken, PA 19428**
**Telephone:  (610) 828-3339**
**Facsimile:  (610) 828-3347**
**clabletta@lablettawalters.com**


## IN THE UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| IN RE: ROUNDUP® PRODUCTS LIABILITY LITIGATION | MDL No. 2741 |
| | Case No.: 3:16-md-02741-VC |
| *Vosper v. Monsanto Co.,* 3:19-cv-05525-VC | **PLAINTIFFS, IRA VOSPER AND ANDREA VOSPER'S, OPPOSITION TO DEFENDANT, MONSANTO COMPANY'S, MOTION TO EXCLUDE TESTIMONY OF DR. WILLIAM SAWYER UNDER RULE 702** |
| | Hearing date:  December 13, 2021 Time:  TBD |

i

## TABLE OF CONTENTS

I.      INTRODUCTION………………………………………...………………………1

II.     LEGAL STANDARD……………………………………………………………..3

III.    ARGUMENT………………………………………………...……………………5

    A.      Previously Raised Arguments by Monsanto……………………………………...5

    B.      Dr. Sawyer Is Not Offering Any General Causation Opinions…………………...5

    C.      Dr. Sawyer's Specific Case Opinions Are Reliable And Admissible……………6

        1.  Dr. Sawyer Used Proper Methodology in Assessing Specific Causation…….6

        2.  Dr. Sawyer Makes Proper Use of Epidemiology Studies to Form His
            Opinions……………………………………………………………………8

        3.  Dr. Sawyer's Dose Calculation is Sufficiently Reliable………………….….9

    D.      Dr. Sawyer Did Consider Other Potential Causes of Each Plaintiff's NHL…….10

    E.      Dr. Sawyer May Rely on the George Study……………………………………..11

    F.      Dr. Sawyer's Testimony Regarding Other Carcinogens in Roundup is
        Admissible……………………………………………………………………….12

    G.      Dr. Sawyer May Rely On and Explain Technical Details Contained in Internal
        Monsanto Documents………………………………………………………....13

IV.     CONCLUSION.....................................................................................................15

# TABLE OF AUTHORITIES

*Asad v. Cont'l Airlines, Inc.*, (N.D. Ohio 2004) 314 F. Supp. 2d 726, 741……………………....4, 8

*Avila v. Willits Envtl. Remediation Tr.,* 633 F.3d 828, 836 (9th Cir. 2011)………….…..6

*Beck v. Koppers, Inc*., (N.D. Miss. Feb. 2, 2006) No. 3:03 CV 60 PD, 2006 WL 270260, at *10…………………………………………………………………………………………....4, 9

*DePaepe v. General Motors Corp.*, 141 F.3d 715, 720 (7th Cir. 1998)…………………..…..14

*Fleming v. Nicholls-Wilcox, Inc.*, No. 02-1- 7632-42, 2005 WL 5419258 (Ga. Super., May 10, 2005)……………………………………………………………………………………………..…..1

*Hernandez v. Amcord, Inc*., 215 Cal. App. 4th 659, 675 (2013)…………………………………..4

*In re Seroquel Prod. Liab. Litig.*, (M.D. Fla. July 20, 2009) No. 6:06-MD-1769-ORL-22D, 2009 WL 3806436, at *4……………………………………………………………………………..…..13

*In re Roundup Products Liability Litigation* (N.D. Cal., July 12, 2019, No. 16-CV-0525-VC) 2019 WL 3219360, at *1…………….…………………………………………………………....2

*In re Roundup Products Liability Litigation*, 390 F. Supp.3d 1102, 1152 (N.D. Cal. 2018)……..4

*In re Roundup Products Liability Litigation*, 358 F.Supp.3d 956, 959 (N.D. Cal. 2019)………...4

*In re Roundup Products Liability Litigation*, No. 16-MD-02741-VC, 2018 WL 3368534, at *5 (N.D. Cal. July 10, 2018)………………………………………………………………………….…..5

*In re Yasmin & YAZ (Drospirenone) Mtkg., Sales Practices & Prod. Liab. Litig*., 2011 WL 6302287, at *18 (S.D. Ill. Dec. 16, 2011)……………………………………………………..…14

*Johnson v Monsanto Co.*, 2018 WL 2324413 (Cal.Super. May 17, 2018)………………….....…1

*Johnson v Monsanto Co.*, 2018 WL 5246323 (Cal.Super. Oct. 22, 2018)………………….…...1

See *Johnson v. Monsanto*, Memorandum of Points and Authorities in Support of Defendant Monsanto Company's Motion for New Trial, 2018 WL 4904750, at *15 (Cal.Super., Sept. 18, 2018); 2018 WL 4904751, at *7 (Cal.Super., Sept. 18, 2018)…………………………………..11

*Messick v. Novartis Pharmaceuticals Corp*., 747 F.3d 1193, 1196 (9th Cir. 2014)……………..4

*Nw. Coal. for Alternatives to Pesticides (NCAP) v. U.S. E.P.A*., 544 F.3d 1043, 1048–49 (9th Cir. 2008)…………………………………………………………………………………………..…9

*People v. Campos*, (1995) 32 Cal. App. 4th 304, 308…………………………………………….4

*Pilliod v. Monsanto Co.*, 2019 WL 2158266 (Cal.Super. Mar. 18, 2019)……………………..1, 2

*Primiano v. Cook*, 598 F.3d 558, 563 (9th Cir. 2010) *as amended* (Apr. 27, 2010) …………….3

*Pulse Med. Instruments, Inc. v. Drug Impairment Detection Servs., LLC*, (D. Md. 2012) 858 F. Supp. 2d 505, 512………………………………………………………………………...…4, 9

*Pyramid Technologies, Inc. v. Hartford Cas. Ins. Co*., 752 F.3d 807,816 (9th Cir. 2014)………3

*United Food & Teikoku Pharma USA* (N.D. Cal. Nov. 3, 2017) 2017 WL 5068533, at \*25..…14

*Whitlock   v.   Pepsi   Americas*,   527   Fed.   Appx.   660,   661-662   (9th   Cir. 2013)……………………………………………………………………………….……..2, 3

## I.     INTRODUCTION

William Sawyer, Ph.D. "is a highly qualified toxicologist - currently chief toxicologist of

Toxicology Consultants and Assessment in New York. He is Board Certified in forensic medicine,

toxicology and pharmacology and is well published." *Fleming v. Nicholls-Wilcox, Inc.*, No. 02-

1- 7632-42, 2005 WL 5419258 (Ga. Super., May 10, 2005). Dr. Sawyer has more than 31 years

of experience in public health and forensic toxicology including five years of governmental

service. *See* LaBletta Decl., Ex. 1, Dr. Sawyer's CV.  He has a Ph.D. in toxicology and a Master's

degree in cellular and molecular biology and has consulted for numerous governmental agencies

including "the United States Attorney's Office, US Navy, various prosecutors, Attorney State

General of Montana, New York, New Jersey and other states." *See* LaBletta Decl., Ex. 2, Johnson

v. Monsanto Trial Transcript ("Johnson Tr.") at 3586-3588.  In fact, Dr. Sawyer has previously

served as an expert witness for law firms representing Monsanto.  *See* LaBletta Decl., Ex. 3, Pilliod

v. Monsanto Trial Transcript ("Pilliod Tr.") at 3079:7-3080:19.

To date, Dr. Sawyer has given countless hours of testimony in the Roundup litigation in

both depositions and in the *Johnson* and *Pilliod* trials. He has spent hundreds of hours reviewing

published studies, medical records and internal documents written by Monsanto scientists.

Monsanto has repeatedly tried and failed to exclude or strike Dr. Sawyer's opinions. *See Pilliod*

*v. Monsanto Co.*, 2019 WL 2158266 (Cal.Super. Mar. 18, 2019); *Johnson v Monsanto Co.*, 2018

WL 2324413 (Cal.Super. May 17, 2018) (denying pre-trial preclusion); *Johnson v Monsanto Co.*,

2018 WL 5246323 (Cal.Super. Oct. 22, 2018) (denying Monsanto's post-trial motion to set aside

the verdict).

Dr. Sawyer will offer testimony as to the effect of various types of clothing, protective gear

and equipment on increasing or decreasing exposure to Roundup, and how the instructions on the

1

Roundup label affect the exposure of Plaintiff. *See* Monsanto's Motion to Exclude Sawyer Ex. 1 (Sawyer Vosper Report) at 7.

Dr. Sawyer is also offering case specific opinion for Mr. Vosper. Dr. Sawyer is being offered to testify regarding Plaintiff's total exposure to Roundup, including the comparability of Plaintiff's exposure with the exposure data from applicators in studies on glyphosate-based formulations. For those opinions, he relies either on the exposure calculations of other experts or his own calculations. The calculations of Roundup exposure he relies on allows Dr. Sawyer to compare the specific Plaintiff's days of Roundup use to the epidemiological data showing an increased risk of non-Hodgkin's Lymphoma (NHL). *In re Roundup Products Liability Litigation* (N.D. Cal., July 12, 2019, No. 16-CV-0525-VC) 2019 WL 3219360, at *1 (Dr. Weisenburger's testimony admissible where he testified that Hardeman's ". . . exposure levels still far exceeded the threshold used in most of the epidemiological literature, and specifically the McDuffie and Eriksson studies."). Dr. Sawyer also explains how each Plaintiff is exposed to Roundup based on the manner in which they spray and the personal protective gear they wear.

Critically, Dr. Sawyer's same type of testimony was deemed admissible in *Johnson*, *Pilliod* and deemed admissible by the Ninth Circuit. In *Whitlock*, the Court held:

> The district court exceeded its gatekeeping function in excluding Dr. Sawyer's testimony that the alleged TCE and chromium exposure levels were 'within [a] reasonable range of that known [from several studies] to induce' the alleged injuries. Plaintiffs' alleged exposures were not so low that the occupational studies were irrelevant. Dr. Sawyer's consideration of the heightened sensitivity of children and Plaintiffs' probable ingestion of TCE-contaminated groundwater does not render his opinion inadmissible. Furthermore, Appendix G to the 2004 Public Health Assessment states that 'hexavalent chromium releases from 1975–1995[ ] were likely orders of magnitude higher than estimates produced by the air model.' Finally, the district court rested its decision in part on an erroneous interpretation of Dr. Sawyer's deposition testimony: He identified

2

> 50 μg/m 3, not 300 μg/m 3, as a threshold TCE exposure associated
> with the effects observed in the Byers study. Because Dr. Sawyer's
> opinion 'rests on a reliable foundation and is relevant to the task at
> hand,' *Daubert*, 509 U.S. at 597, 113 S.Ct. 2786, it is admissible.
> Whether it proves causation is not a question of admissibility. *See*
> *Primiano*, 598 F.3d at 564 ("Shaky but admissible evidence is to be
> attacked by cross examination, contrary evidence, and attention to
> the burden of proof, not exclusion.").

*Whitlock v. Pepsi Americas*, 527 Fed. Appx. 660, 661-662 (9th Cir. 2013).

Likewise, here, Dr. Sawyer's opinion that Roundup exposure was sufficient to cause Plaintiff's cancer may not satisfy Plaintiff's burden of proof (in the absence of a full differential etiology), but it is admissible and helpful testimony, particularly where their other experts that have also reviewed Plaintiff's medical records.

Accordingly, Monsanto's motion should be denied in full, and the jury should be allowed to consider Dr. Sawyer's testimony before reaching its conclusions, as have juries in other Roundup trials. *See, e.g., Johnson*, 2018 WL 5246323 at *1 (noting that "this case required the jury to resolve the complex scientific question of whether Plaintiff's exposure to GBHs caused his NHL," which it did with the help of "Dr. Sawyer, a toxicologist, [who] testif[ied] about various aspects of the science underlying GBHs.").

## II.    LEGAL STANDARD

Under Rule 702, reliable expert opinion testimony has to "'assist the trier of fact' either 'to understand the evidence' or 'to determine a fact in issue"; and "the witness has to be sufficiently qualified to render the opinion." *Primiano v. Cook*, 598 F.3d 558, 563 (9th Cir. 2010) *as amended* (Apr. 27, 2010). However, "Reliable expert testimony need only be relevant, and need not establish every element that the plaintiff must prove, in order to be admissible." Id.; *Pyramid Technologies, Inc. v. Hartford Cas. Ins. Co*., 752 F.3d 807,816 (9th Cir. 2014); *Whitlock v. Pepsi*

3

*Americas*, 527 Fed. Appx. 660, 661-662 (9th Cir. 2013) ("Because Dr. [William] Sawyer's opinion rests on a reliable foundation and is relevant to the task at hand it is admissible.  Whether it proves causation is not a question of admissibility.").

"The relevancy bar is low, demanding only that the evidence 'logically advances a material aspect of the proposing party's case." *Messick v. Novartis Pharmaceuticals Corp*., 747 F.3d 1193, 1196 (9th Cir. 2014); *In re Roundup Products Liability Litigation*, 390 F. Supp.3d 1102, 1152 (N.D. Cal. 2018) ("…opinions may be bolstered by Dr. Jameson's narrower opinions regarding glyphosate's ability to cause cancer in animals.")  Under California law, one expert is not required to "expressly link together the evidence of substantial factor causation." *Hernandez v. Amcord, Inc*., 215 Cal. App. 4th 659, 675 (2013).

It is entirely proper for an expert witness to rely on reports and opinions of other experts particularly experts as qualified as Dr. Ritz, Dr. Weisenburger and Dr. Portier.  *In re Roundup Products Liability Litigation*, 358 F.Supp.3d 956, 959 (N.D. Cal. 2019) (". . . the important point is that these experts will not be repeating the analysis of the general causation experts, but rather relying on them to rule in glyphosate."); *Beck v. Koppers, Inc*., (N.D. Miss. Feb. 2, 2006) No. 3:03 CV 60 PD, 2006 WL 270260, at \*10 ("[Dr. William] Sawyer's dosage and risk assessment testimony (as long as the latter is based on Dahlgren's general causation testimony) meets the threshold requirements of Rule 702.  It is undisputed that Sawyer is qualified by his knowledge and education to render his dosage and risk assessment testimony."); *People v. Campos*, (1995) 32 Cal. App. 4th 304, 308, ("the expert witness may state the reasons for his or her opinion, and testify that reports prepared by other experts were a basis for that opinion."); *Asad v. Cont'l Airlines, Inc.*, (N.D. Ohio 2004) 314 F. Supp. 2d 726, 741 ("an expert's testimony may be formulated by the use of the facts, data and conclusions of other experts."); *Pulse Med.*

4

*Instruments, Inc. v. Drug Impairment Detection Servs., LLC*, (D. Md. 2012) 858 F. Supp. 2d 505, 512 ("Courts in this circuit and across the country have consistently held that an expert may rely on the work of others when preparing an expert report, particularly when it is the sort of work that is reasonably relied upon by experts in the relevant area of expertise.").

## III.   ARGUMENT

### A.  Previously Raised Arguments by Monsanto

Monsanto repeats the same general arguments that it has previously raised concerning Dr. Sawyer's testimony in other cases.  Consistent with this Court's repeated instructions not to relitigate issues previously ruled upon, Plaintiff hereby incorporates the following filings to the extent that those documents address the issues raised herein that were filed on the MDL docket: (1) Plaintiffs' response to Motion to Exclude Testimony of Dr. William Sawyer on *Daubert* Grounds (ECF #8342); (2) Plaintiffs' response to Motion to Exclude Testimony of Dr. William Sawyer on *Daubert* Grounds (ECF #8692); (3) Plaintiffs' response to Motion to Exclude Testimony of Dr. William Sawyer on *Daubert* Grounds (ECF # 12874).

### B.   Dr. Sawyer Is Not Offering Any General Causation Opinions

During the general causation phase of this litigation the Court held that "plaintiffs need not establish any particular level of exposure."  *See e.g. In re Roundup Products Liability Litigation*, No. 16-MD-02741-VC, 2018 WL 3368534, at *5 (N.D. Cal. July 10, 2018).  Now that plaintiffs have gotten past the general causation phase, it will be helpful for the jury to understand how various factors such as lack of protective gear, the spraying equipment and the type of surfactant in the Plaintiff's specific formulation affect the exposure routes of glyphosate into the body.

Even without a general causation opinion, Dr. Sawyer's exposure testimony is proper.  Rule 702 "provides that expert testimony is admissible '[i]f scientific, technical,

5

or other specialized knowledge' will assist the trier of fact to understand the evidence or to determine a fact in issue." *Avila v. Willits Envtl. Remediation Tr.,* 633 F.3d 828, 836 (9th Cir. 2011). The absorption of glyphosate is a fact in issue. Dr. Sawyer will assist the jury in understanding how GBFs are absorbed through the skin; how much glyphosate is absorbed through the skin; how protective clothing can help limit the exposure to GBFs; and how different equipment can affect exposure. *See* Monsanto's Motion to Exclude Sawyer at Ex. 1 (Sawyer Vosper Report) at p. 44; *See also* Monsanto's Motion at Ex. 3 (Sawyer Deposition) at p. 12:10-24. Dr. Sawyer goes over these factors as they apply to Plaintiff in great detail in his report. *See* Monsanto's Motion at Ex. 1 (Sawyer Vosper Report) at p. 46 ("Farmers who did not use rubber gloves had five times more glyphosate in their urine than those wearing protective gloves."). All of this information is helpful for the jury to determine how GBFs actually get into the body and how exposure can increase or decrease based on various factors.

### C.    Dr. Sawyer's Case Specific Opinions on Plaintiff are Reliable and Admissible
#### 1.    Dr. Sawyer Used Proper Methodology in Assessing Specific Causation

It is anticipated that Dr. Sawyer's opinion will generally follow the testimony elicited at both the *Johnson* and *Pilliod* trials. Dr. Sawyer's testimony will bolster the testimony of the causation experts by explaining how Roundup makes it from the bottle through the skin, into the body, and ultimately is distributed through the blood and into the bone where malignant lymphocytes form. *See e.g.*, *In re Roundup Products Liability Litigation* (N.D. Cal. 2018) 390 F.Supp.3d 1102, 1152 (Drs. Ritz, Portier and Weisenburger's "opinions may be bolstered by Dr. Jameson's narrower opinions regarding glyphosate's ability to cause cancer in animals"). A jury's understanding of how certain factors increase or decrease exposure to Roundup is relevant to their

6

consideration of whether or not Roundup caused a plaintiff's cancer and whether Monsanto was responsible for that increased exposure. *See e.g In re Roundup Products Liability Litigation* (N.D. Cal., Nov. 19, 2019) 2019 WL 6133745, at *1 ("...a state court might find that 3M Cattle's provision of a defective sprayer foreseeably caused Trosclair's cancer by increasing the amount of Roundup he absorbed through his skin."). It will be helpful for jurors to understand how Roundup is capable of penetrating the skin and circulating to lymphocyte cells in order for them to decide whether Roundup can cause NHL.

Monsanto faults Dr. Sawyer for allegedly failing to perform a differential diagnosis. This argument misses the mark. The words "differential diagnosis" are not magic words. *Clausen v. M/V NEW CARISSA*, 339 F.3d 1049, 1057 (9th Cir. 2003), *as amended on denial of reh'g* (Sept. 25, 2003). What is important is the scientific technique used to form an opinion. *Id.* at 1058. While Dr. Sawyer did not use the words "differential diagnosis" in his report, a review of his report makes abundantly clear that Dr. Sawyer performed a differential diagnosis. *See* Monsanto's Ex. 1 (Sawyer Vosper Report) at 180-182.

Dr. Sawyer catalogues Mr. Vosper's heavy exposure to Roundup in both a residential and occupational setting. *See* Monsanto's Ex. 1 (Sawyer Vosper Report) at 14-26. Dr. Sawyer also identifies over 30 potential causative factors besides Roundup, and notes whether such factors are present with respect to Mr. Vosper. *See* Monsanto's Ex. 1 (Sawyer Vosper Report) at p. 26-27. Further, Dr. Sawyer's report includes an entire section assessing the toxicological assessment of exposure factors besides Roundup. Further still, Dr. Sawyer carefully analyzes and considers multiple NHL risk factors besides Roundup, including obesity and BMI, smoking, and the carcinogenicity of herbicides and pesticides. *See* Monsanto's Motion Ex. 1 (Sawyer Vosper Report) at 180-182. Based on these

7

differential diagnoses, Dr. Sawyer opines that Plaintiff's exposure to Roundup was sufficient to create an NHL risk. *See* Monsanto's Motion Ex. 1 (Sawyer Vosper Report) at 187; Monsanto's Motion at Ex. 25 (Supplemental Vosper Report) at p. 1-2.

It is also critical to note that Dr. Sawyer's specific causation opinion is well founded. In addition to the technical literature discussed at length in his report, his report and opinion are based on a review of Mr. Vosper's relevant medical records, fact sheet, an interview with Mr. Vosper, and the depositions of Mr. Vosper, Mrs. Vosper, and Mr. Vosper's treating physician. *See* Monsanto's Motion Ex. 1 (Sawyer Vosper Report) at 212-213. In short, Dr. Sawyer's methodology is proper.

## 2.    Dr. Sawyer Makes Proper Use of Epidemiology Studies to Form His Opinions

Dr. Sawyer has been trained in epidemiology and he uses epidemiology in his every day practice. *See* LaBletta Decl. Ex. 1 (Sawyer CV). In addition, Dr. Sawyer has been qualified to offer epidemiology opinions in the *Johnson* case and other cases. As noted by Judge Karnow in allowing Dr. Sawyer to testify, "Dr. Sawyer's conclusion was based on Johnson's exposure to glyphosate, the absence of other risk factors in his medical history, animal studies pertaining to glyphosate, and **human epidemiological studies pertaining to glyphosate**." *Johnson v Monsanto Co.*, No. CGC-16-550128, 2018 WL 2324413, at *15 (Cal.Super. May 17, 2018)) (emphasis added). However, here, Dr. Sawyer will only make use of the epidemiology studies as a means of comparing Plaintiff's dose to the dose in the epidemiology studies. *See* Monsanto Ex. 1 at 33. He will be deferring detailed opinions on the epidemiology studies to epidemiologists. *Id.*

It is entirely proper for an expert witness to rely on reports and opinions of other experts, particularly experts as qualified as Dr. Ritz and Dr. Portier. *See Asad v. Cont'l Airlines, Inc*., 314

F. Supp. 2d 726, 741 (N.D. Ohio 2004) ("an expert's testimony may be formulated by the use of the facts, data and conclusions of other experts."). *Beck v. Koppers, Inc.,* No. 3:03 CV 60 P D, 2006 WL 270260, at \*10 (N.D. Miss. Feb. 2, 2006) ("[Dr. William] Sawyer's dosage and risk assessment testimony (as long as the latter is based on Dahlgren's general causation testimony) meets the threshold requirements of Rule 702."); *Pulse Med. Instruments, Inc. v. Drug Impairment Detection Servs., LLC*, 858 F. Supp. 2d 505, 512 (D. Md. 2012) ("Courts in this circuit and across the country have consistently held that an expert may rely on the work of others when preparing an expert report"). *See also* Amended Pretrial Order 201.

### 3.     Dr. Sawyer's Dose Calculation is Sufficiently Reliable

Dr. Sawyer will base his dose calculation at trial on a generally accepted pesticide modeling technique, the UK Predictive Operator Exposure Model (UK POEM). Defendant fails to present any evidence that this model does not yield reliable data. *See e.g. Nw. Coal. for Alternatives to Pesticides (NCAP) v. U.S. E.P.A*., 544 F.3d 1043, 1048–49 (9th Cir. 2008) (Rejecting argument that pesticide exposure modeling [a different model than the UK POEM] is unreliable where "Petitioners have presented no evidence that modeling does not yield reliable data. There is nothing inherently unreliable about the use of models . . . .").

Dr. Sawyer notes that the UK POEM has been peer-reviewed, generally-accepted, used internationally and tested with a known rate of error. *See* Monsanto's Ex. 1 (Sawyer Vosper Report) at 7.   In fact, in the latest evaluation of glyphosate by EFSA in 2015 (upon which Monsanto relies) the UK POEM is used to estimate operator exposure to glyphosate.  In the 2015 Greim article written by Monsanto employee David Saltmiras cites the UK POEM stating "Systemic exposure of operators, as assessed for the EU reapproval of glyphosate, is predicted to

be between 0.0034 (German BBA model, tractor-mounted ground-boom sprayer) and **0.226 mg/kg bw/day (UK POEM, hand-held-spraying to low targets, data not shown).**"

In arriving at this absorption range, Dr. Sawyer correctly applies generally accepted guidelines from the OECD that "[t]he current default approach taken by nearly all regulatory agencies is to determine the dermal absorption value by adding the absorbed dose and the chemical remaining in the skin, following washing" *See* Monsanto's Ex. 1 (Sawyer Vosper Report) at 154.

Finally, Dr. Sawyer uses the UK POEM, not to establish a threshold dose for cancer causation, but simply to compare whether Plaintiff's exposure to glyphosate is similar to that of professional users. Under the UK POEM based on studies examining real professional and amateur applicator, the empirical evidence demonstrates that home users generally have a higher rate of exposure than professional users due to the equipment used and lack of protective gear. *See* Monsanto's Ex. 1 (Sawyer Vosper Report) at 6.

### D. Dr. Sawyer Did Consider Other Potential Causes of Each Plaintiff's NHL

With respect to other carcinogens, Dr. Sawyer properly "ruled in" and "ruled out" these factors. As noted above, Dr. Sawyer conducted a thorough review of the Plaintiff's family history, age, prior work history, operational hazards, home hazards, alcohol, tobacco, and drug history, and medical history, among other things. *See* Monsanto Ex. 1 (Sawyer Vosper Report) at 8-30. Furthermore, Dr. Sawyer reviewed all relevant medical records. *Id*. Dr. Sawyer also conducted two, extensive phone interviews with Mr. Vosper, which are disclosed in his report, to get details on his exposure to Roundup and other carcinogens. *Id.* at 29. Additionally, Dr. Sawyer reviewed Mr. Vosper's deposition testimony that occurred on March 17, 2021. *Id*. Dr. Sawyer compared Mr. Vosper's exposure to GBFs to the exposure of subjects in epidemiological studies of

glyphosate and calculated that Mr. Vosper's dose approached the maximum exposure metrics. *See* Monsanto's Ex. 25.

Dr. Sawyer considered Mr. Vosper's other potential chemical, environmental, and occupational exposures, as well as various other factors that may have contributed to his cancer and considered them without merit. *See* Monsanto's Ex. 1 (Sawyer Vosper Report) at 180, 186. These supposed "failure[s] to properly consider, analyze, rule out, and testify about other potential causes of a . . . NHL" show quite the opposite what Monsanto contends. Rather, it shows that Dr. Sawyer extensively considered the other potential chemical, environmental, and occupational exposures, as well as various other factors that may have contributed to Mr. Vosper's NHL.

###        E.        Dr. Sawyer May Rely on the George Study

Monsanto additionally argues that Dr. Sawyer should be precluded from testifying about the George tumor promotion study. *See* Monsanto's Brief at 13; *see also* Monsanto's Ex. 7, George, J., et al. "Studies on glyphosate induced carcinogenicity in mouse skin: A proteomic approach," 2010, Journal of Proteomics, Vol. 73, pg. 951 - 964. Monsanto made identical arguments in *Johnson* when seeking to overturn the jury's verdict and secure a new trial, to no avail. *See Johnson v. Monsanto*, Memorandum of Points and Authorities in Support of Defendant Monsanto Company's Motion for New Trial, 2018 WL 4904750, at *15 (Cal.Super., Sept. 18, 2018); 2018 WL 4904751, at *7 (Cal.Super., Sept. 18, 2018) (both citing the plaintiff's reliance on the George study as a basis for disturbing the jury's finding, which the court ultimately rejected

when upholding the verdict).[1]

Since this argument has been raised and rejected previously, Dr. Sawyer properly rely on the George Study.

**F.    Dr. Sawyer's Testimony Regarding Other Carcinogens in Roundup is Admissible**

Monsanto asks this Court to preclude Dr. Sawyer from testifying that Roundup contained "trace" chemicals that may have contributed to Plaintiff's NHL.   However, Dr. Sawyer's consideration of Roundup and other GBHs' entire chemical makeup is not only appropriate, but necessary in evaluating whether Plaintiff was exposed to known or suspected carcinogens.   Such an analysis may also explain whether Plaintiff was exposed to known or suspected carcinogens. Such an analysis may also explain the greater carcinogenicity shown in studies of the completed Roundup product than in studies of glyphosate alone.   To that end, Dr. Sawyer lists and describes the chemicals known to be present in Roundup in various years of use.   *See* Monsanto's Ex. 1 (Sawyer Vosper Report) at 58.   Additionally, with Plaintiff's here, the exposure from when he was

---

[1] Dr. Sawyer's report explains the relevance of the George study in detail, specifically:

> In the carcinogenicity study, George, J., et al., (2010), glyphosate was demonstrated to have strong tumor-promoting activity. The study documented carcinogenic effects of glyphosate using a 2-stage mouse skin carcinogenesis model and proteomic analysis. The commercial formulation of Roundup Original (glyphosate 41%, POEA = 5%, Monsanto Company, St. Louis, MO, USA) was topically applied to the skin of mice with a body weight of 12-15 g. The glyphosate dose was 25 mg/kg body weight and was applied either two or three times per week . . . .
>
> The study demonstrated, to within 95% certainty, the carcinogenic potential of glyphosate as a powerful promoter in a 2-stage promotion model. The authors concluded in their results section that '*These results clearly indicate significant tumor promoting potential of glyphosate in mouse skin model of carcinogenesis.*'

*See* Monsanto's Ex. 1 (Sawyer Vosper Report) at 63-64.   Dr. Sawyer goes on to apply an allometric scaling method to convert the dose from the animals studies in George to humans.   *Id.*

12

a youth is also a factor as Dr. Sawyer noted, because exposure started at nine years and in light of multiple studies and the EPA document on early-life exposures. *See* Monsanto's Ex. 3 (Sawyer Dep) at 80:11-23.  Dr. Sawyer will testify that while these carcinogens may not be sufficient alone to cause cancer, "the rule in toxicology and even under the EPA policy that regardless of the concentration of the carcinogen, they are all additive in terms of their effect." *See* LaBletta Decl. at Ex. 3, Pilliod Tr. at 3133:3-11.

"[G]enerally recognized carcinogens with similar target endpoints (hematopoietic cancers) are, by definition, additive and should be considered in the overall carcinogen assessment of a product." *See* Monsanto's Ex. 1 (Sawyer Vosper Report) at 61-62.  The presence of known carcinogens in Roundup – despite Monsanto's failure to list these substances in its labeling - "*requires* toxicological consideration." *Id.* (emphasis added). Dr. Sawyer's consideration of trace chemicals follows the EPA's guidance on the manner in which additive effects are required to be assessed, which, far from being a "novel" theory, falls well within a standard toxicological method. *Id.*

Dr. Sawyer's analysis is thus relevant, reliable, and will assist the jury in evaluating causation.

## G. <u>Dr. Sawyer May Rely On and Explain Technical Details Contained in Internal Monsanto Documents</u>

Dr. Sawyer will not testify about the intent or state of mind of Monsanto, but Dr. Sawyer will rely upon and discuss the scientific findings, opinions and date contained in internal Monsanto documents.  Experts may rely and discuss corporate documents if the documents are relevant to their opinions. *In re Seroquel Prod. Liab. Litig.*, (M.D. Fla. July 20, 2009) No. 6:06-MD-1769-ORL-22D, 2009 WL 3806436, at \*4 ("The Court determines that [experts] may appropriately rely

13

on and discuss AstraZeneca's internal corporate documents for the specific purposes identified by Plaintiffs in their response to the motion."). Also, there is "nothing particularly unusual, or incorrect, in a procedure of letting a witness relate pertinent information in a narrative form as long as it stays within the bounds of pertinency and materiality." *In re Yasmin & YAZ (Drospirenone) Mtkg., Sales Practices & Prod. Liab. Litig*., 2011 WL 6302287, at \*18 (S.D. Ill. Dec. 16, 2011) (rejecting argument that regulatory experts review of corporate emails "does not require the "specialized knowledge" contemplated by Rule 702, but rather is mere advocacy on plaintiff's behalf."). As Monsanto has a corporate policy not to publish or publicize unfavorable data or scientific opinions on glyphosate, much of the scientific data and opinions of Monsanto scientists and consultants are contained only in internal Monsanto documents and emails. It is also entirely proper to apply one's expertise in a field to provide proper context to corporate emails and memoranda. *DePaepe v. General Motors Corp.*, 141 F.3d 715, 720 (7th Cir. 1998); *See e.g*., *United Food & Teikoku Pharma USA* (N.D. Cal. Nov. 3, 2017) 2017 WL 5068533, at \*25 (expert could opine as to what a reasonable company in the defendant's position would have done based on his understanding of the facts and in light of the record evidence he reviewed.).

The emails cited by Dr. Sawyer are filled with technical knowledge that would not easily be comprehended by a lay juror. *See* Monsanto Ex. 1 (Sawyer Vosper Report) p. 157. Furthermore, Dr. Sawyer will not be offering regulatory opinions or opine about the labeling requirements. However, he can testify how the instructions on the label for protective gear increase or decrease exposure. *See* LaBletta Decl. Ex 3, Pilliod Tr. at 3093-3104. As noted by Judge Smith, Dr. Sawyer's reference to the Roundup label was relevant and admissible because "to the extent that the label is an issue, it's that it did not tell them to wear protective gear and they

didn't wear protective gear . . . And therefore they were exposed to the Roundup when they were spraying and they absorbed here, there, and other . . . ." *Id.* at 3093-3094.

Accordingly, Dr. Sawyer should be able to testify to Monsanto's internal corporate, technical documents.

## IV.   **CONCLUSION**

For the aforementioned reasons, Monsanto's Motion to Exclude Dr. Sawyer should be denied and the jury should be permitted to hear his critical testimony as have other juries in cases against Monsanto.

Respectfully submitted,

**LABLETTA & WALTERS LLC**

*/s/ Christian P. LaBletta*
**CHRISTIAN P. LABLETTA, ESQ.**
**MARK J. WALTERS, ESQ.**
Attorneys for Plaintiffs
200 Barr Harbor Drive, Suite 400
Conshohocken, PA 19428
(610) 828-3339

Dated:  October 6, 2021

15