# Exhibit 3

```
1                SUPERIOR COURT OF CALIFORNIA
2                     COUNTY OF ALAMEDA
3    BEFORE THE HONORABLE WINIFRED Y. SMITH, JUDGE PRESIDING
4                     DEPARTMENT NUMBER 21
5                         ---oOo---
6    COORDINATION PROCEEDING        )
     SPECIAL TITLE (RULE 3.550)     )
7                                   )
     ROUNDUP PRODUCTS CASE          )  JCCP No. 4953
8                                   )
     _____ )
9                                   )
     THIS TRANSCRIPT RELATES TO:    )
10                                  )
     Pilliod, et al.                )  Case No.  RG17862702
11        vs.                       )
     Monsanto Company, et al.       )  Pages 3075 - 3301
12                                  )  Volume 19
     _____ )
```

**Reporter's Transcript of Proceedings**

Thursday, April 11, 2019

Reported by: Kelly L. Shainline, CSR No. 13476, RPR, CRR
             Lori Stokes, CSR No. 12732, RPR
             Stenographic Court Reporters

BARS

BAY AREA REPORTING
SOLUTIONS

888.526.8243
www.BayAreaReportingSolutions.com

3075

```
1    Thursday, April 11, 2019                         8:53 a.m.
2              (Proceedings commenced in open court out of
3    the presence of the jury:)
4              THE COURT:  Good morning, Counsel.
5              ALL:  Good morning, Your Honor.
6              THE COURT:  What's happening?
7              MR. BROWN:  Initially, Your Honor, I, out of
8    an abundance of caution, shared our expert disclosures
9    with plaintiffs and with other members of my firm.  We
10   have offices in New York and Chicago and Miami and of
11   course in San Francisco.  And this morning I got a
12   message back from one of the partners indicating that he
13   may -- he had hired an expert from Florida who is a
14   witness in this case, Dr. Sawyer.
15             THE COURT:  I'm sorry, I didn't hear that.
16             MR. BROWN:  Dr. Sawyer.  In a case he had that
17   involved a death, and I think it was Italy and the case
18   was venued, I believe, in Wisconsin.
19             THE COURT:  Okay.
20             MR. BROWN:  In any case, I asked Mr. Wisner
21   and Mr. Miller, I told them about that.  And I indicated
22   that I would like for their witness to be instructed not
23   to blurt out or to testify that he been retained by
24   another partner in my firm involving a case of a
25   drowning of a college student who got drunk and went off
```

1     and got in a fight with some Italian folks over there.
2               And they indicated that we should bring that
3     up with the Court. And I'm asking the Court to exclude
4     that testimony under 352. And simply because Dr. Sawyer
5     was retained by someone else in a completely unrelated
6     matter has no relevance here, and it's just unduly
7     prejudicial.
8               **THE COURT:** Okay. So --
9               **MR. WISNER:** So, Your Honor, the only way that
10    would come up is if on cross-examination they try to
11    establish or suggest that Dr. Sawyer is a hired gun for
12    plaintiffs' lawyers. And then I think he would probably
13    say, "Well, no, I do a lot of work for defense lawyers.
14    In fact I've done work for that man's firm right there."
15              That's the only way it would come up. If they
16    don't want to go there, then it's no problem. We have
17    no problem. We're not going to solicit it in direct,
18    for what it's worth. But it is a fact. I mean, for
19    what it's worth, the partner who's actually --
20              **THE COURT:** Well, let me just say this. If
21    it's established that he works for both sides, that's
22    sufficient because that often comes up: Do you work for
23    plaintiffs' firms? Or do you work for plaintiffs and
24    defendants or one or the other?
25              So if it's established that, in fact, he has

1  expansive.  They didn't move to exclude him talking
2  about the label.  That's not correct.  They actually did
3  move to exclude that, but you didn't exclude that.  You
4  excluded the ultimate question, which we understand.
5        In fact, they've moved repeatedly and said:
6  Hey, no one can offer the opinion about what Monsanto
7  knew and what Monsanto should have done.  That is
8  ultimately the question for the jury.  And so of course
9  we're not going to have an expert say that.  But we have
10 every right to lay the foundations of what the Monsanto
11 studies said, how you interpret them, what they mean,
12 how they relate to exposure.
13       **THE COURT:**  Okay.
14       **MR. MILLER:**  And then so here's the Monsanto
15 label that Mr. and Mrs. Pilliod had access to, and what
16 does it say about protective gear?  And, yeah, sure, the
17 dots are easy to connect between what they knew, as we
18 can establish in the facts, and what the label says,
19 absolutely.  But he's not going to offer the opinion
20 that Monsanto should have warned.  He's not going to say
21 that.
22       **THE COURT:**  So to the extent that the label is
23 an issue, it's that it did not tell them to wear
24 protective gear and they didn't wear protective gear.
25       **MR. WISNER:**  Precisely.

3093

1    **THE COURT:** And therefore they were exposed to
2    the Roundup when they were spraying and they absorbed
3    here, there, and other --
4    **MR. WISNER:** And it gets more involved because
5    part of his assessment is whether or not he believes in
6    fact -- thinks that in fact they didn't wear protective
7    gear for his calculations.  The fact that the label
8    didn't say that lends support to that assumption that in
9    fact this is their actual exposure.  So it's part of his
10   calculation.  I mean, if the label had said wear
11   protective gear, he would have had a different
12   calculation.
13   **THE COURT:** The label, whether it said
14   protective gear wouldn't have had anything to do with
15   their exposure because what they wore had to do with
16   their exposure.  Right?
17   **MR. WISNER:** Well, no, because --
18   **THE COURT:** But if the label didn't tell them
19   to wear anything, then that's one thing, which I think
20   is a fair point to make.  But I guess I'm saying that if
21   they -- whatever they did or didn't have on is going to
22   be the factual predicate for what their exposure was.
23   And I don't know how this is going to come out.  I don't
24   know if he's going to talk about what they wore over
25   time or whether or not there's some assumption -- basic

1    assumption in his calculation that a certain percentage
2    of their skin was exposed.
3              **MR. WISNER:**  Well, the entire model that it's
4    built on --
5              **THE COURT:**  Right.
6              **MR. WISNER:**  -- assumes compliance with the
7    labeling.  And that model assigns different levels of
8    exposure based upon the fact that lawn and garden users
9    don't wear protective gear where occupational users do.
10   This is Monsanto's model.  And it's in his report at
11   length.
12             So that's why it's really relevant to why it's
13   part of his opinion.  And all of these are obviously on
14   his reliance list.  It's not like these are undisclosed
15   ideas.  They've cross-examined him about it repeatedly.
16             So this is all within the ambit of what I
17   understand the Court has allowed Dr. Sawyer to testify
18   about.
19             **THE COURT:**  Okay.  All right.  So we're going
20   to go ahead and start with Dr. Sawyer.  And I'm going to
21   go back and look at my *Sargon* order, but I don't think
22   that based on what you're telling me, if it's just a
23   correlation of what they wore with respect to what the
24   label suggested they wore, I mean, the label is going to
25   be coming -- an issue.  What they thought they were

3095

```
1    supposed to do and what they did is clearly going to be
2    an issue.  So...
3            MR. EVANS:  But here's the other -- here's the
4    other factual predicate issue.  The Pilliods both
5    testified that they read the label early on in like the
6    early '80s and didn't go back and revisit it going
7    forward.
8            So the concept that, gee, the label said, or
9    this has this at points in time over 35 years, what's
10   the relevance?
11           The exposure calculation that this witness
12   did, he does an exposure calculation based upon the POEM
13   formula, whatever you want to call it.  But then he
14   ultimately says:  I just have to look at the days that
15   these folks are exposed to, and that's where I compare
16   it to the epidemiology and that's how I get to an
17   increased risk, et cetera.
18           THE COURT:  Right.
19           MR. EVANS:  But all of that is not based upon:
20   The label said X at some point in time.  Because the
21   Pilliods didn't testify that in, you know, the year
22   1995 -- I'm sorry, go ahead.
23           THE COURT:  If the label -- if it's
24   established that the label never, over the 35-year
25   period, warned to wear protective gear, then isn't that
```

```
1    kind of just it?
2             MR. WISNER:  Yeah.  That's literally it.
3             And I just want to -- I mean, if you don't
4    want me to publish them, that's fine.  It seems kind of
5    silly.  It's clearly an admission it's Monsanto's label.
6    But I just have four labels that span different time
7    periods starting in 1978 moving through the present.
8             THE COURT:  Right.
9             MR. WISNER:  And I'm going to quickly go
10   through them, very quickly, and say:
11                Does it make any mention of
12                protective gear here?
13                No, it doesn't.
14            Once that foundation is laid, we'll come back
15   to that later as part of his modeling, but that's it.  I
16   mean, it's not:  Should they have put that warning on
17   there?  I'm not going to ask that question.
18            THE COURT:  All right.  Well, stay away from
19   warnings.  That -- get into my *Sargon* order.
20            But you know what, the issue of whether or not
21   Monsanto warned or when they warned is kind of a
22   non-issue because they never warned.  So I don't think
23   that's an issue -- I don't think that's a fact that's
24   going to not be disclosed to the jury.
25            I mean, I'm not sure what you're concerned
```

```
1    about in the sense that if they didn't in '78 or '85 or
2    '92 or whatever point they did, it's pretty much the
3    same label.
4              MR. EVANS:  Well, that issue -- I'm not saying
5    there was a warning at X point in time.
6              THE COURT:  Sure.
7              MR. EVANS:  What I am saying, though, is that
8    for him to say, okay, here's a label in '78, that's what
9    they used when they started using it.  And here's one in
10   '95, and here's one -- again, the Pilliods testified
11   they didn't look at the label after they initially
12   started using it, period.  So what's the relevance to
13   it?
14             They dressed the way they dressed going
15   forward for 30 years because that's what they did.
16   That's the factual predicate for the exposure opinion
17   which is at the core of this expert's opinion.
18             So if he wants to use a calculation based upon
19   the POEM model and come up with that, that's what his
20   testimony is going to be.  Okay.  But you can't -- you
21   can't base that upon here's what Monsanto told them
22   because, again, they weren't relying upon what Monsanto
23   told them over the course of 30 years.
24             THE COURT:  Well, that sounds like
25   cross-examination or your own expert.  I mean, I think
```

1     that's really the issue here.  Because I don't think
2     that there's really any prejudice to them -- to the jury
3     seeing four labels, none of which has a warning because
4     they're -- what they will know and that they already
5     seem to know is that Monsanto didn't warn.  I mean, for
6     whatever that means in the case --
7            **MR. EVANS:**  But not from this witness because
8     of your *Sargon* order.  I think this is a backdoor way of
9     labeling.
10                   (Simultaneous colloquy.)
11           **THE COURT:**  I'm not sure that I feel there's,
12    A, prejudice, and, 2, let's just see.  If he says -- you
13    can interpose an objection at any time if you feel that
14    it crosses *Sargon*.  But from what I'm hearing, if
15    Mr. Wisner's representation about where he's going is
16    correct that this an issue of disclosing or just
17    publishing four labels and you say he's basing his
18    opinion on that, then you can attack the credibility of
19    his opinion because he may not -- he may know that he's
20    doing that knowing that the Pilliods didn't read the
21    label after '85 or whenever they did.  But that's one
22    thing.
23           But I'm not sure that just the publication
24    itself is prejudicial, to be honest with you.
25           **MR. EVANS:**  I understand your ruling,

```
1    Your Honor.
2              What about this screenshot?
3              Well, and again --
4              THE COURT: Mr. Wisner, are you posing a
5    hypothetical based on the Pilliods' actual testimony
6    about what they wore?
7              MR. WISNER: Yeah.  She wore flip-flops,
8    shorts, and tank tops.
9              THE COURT: So why don't we stick with that in
10   terms of him basing on his opinion on the fact of what
11   they wore.
12             MR. WISNER: That's fine.
13             THE COURT: I mean, I don't -- honestly I'm
14   not sure that that in and of itself is helpful one way
15   or the other just because that's not Mrs. Pilliod.  I
16   don't know if Mr. Pilliod dressed like that.  No, I
17   mean, you understand what I'm saying.
18             MR. WISNER: That's fine.
19             THE COURT: I honestly think that basing it on
20   a hypothetical more closely related to what they
21   actually did or didn't wear makes sense to me.  I'm not
22   sure that's prejudicial, but at the same time I don't
23   think it's relevant either.
24             MR. WISNER: We can deal with it next week
25   when we get to the Pilliods and actually show what they
```


```
1    actually saw.
2         THE COURT:  But you understand what I'm
3    saying --
4         MR. WISNER:  Sure.
5         THE COURT:  -- the basis of his opinion, if
6    it's based on what they did --
7         MR. WISNER:  Yeah.
8         THE COURT:  -- and based on what they actually
9    did and what they wore.  But it sounds like they may be
10   similarly dressed, but I'm not sure that this image
11   would clearly -- would represent either of the Pilliods
12   is necessarily relevant to that.
13        MR. WISNER:  All right.
14        THE COURT:  I mean, you can certainly get in
15   what you need to get in.
16        MR. WISNER:  That's fine, Your Honor.  We
17   won't use it.  No problem.
18        I'm going to read two admissions prior to
19   Dr. Sawyer, but he's ready to go and we're ready to go.
20        MR. EVANS:  Just to be clear, the label --
21   it's to the time they stopped using, not to the present?
22        THE COURT:  Right.
23        MR. EVANS:  Right?
24        MR. WISNER:  The label that existed today is
25   the same label that existed in 2015, '16, and '17.
```

```
1              THE COURT:  So whatever you're showing, make
2    sure it was the label at the time.  Whether it's the
3    same label or not, make sure it's a label that was
4    published before they stopped using.  Even if it's the
5    same, it's the same, but you need to assure me that
6    that's what it is.
7              MR. EVANS:  I'm sorry.  I'm just -- again, the
8    post-usage period is not relevant.  So to say it's the
9    same relevant -- same label today, I don't think is
10   relevant.
11             THE COURT:  No.  What I'm saying is that the
12   label that he uses should be a label in time, and it's
13   not relevant to say that it's the label they use today
14   because that's post-usage.  And I think Mr. Wisner
15   understands.
16             MR. WISNER:  I just want to make sure
17   Dr. Sawyer knows the contours of the rulings.
18             THE COURT:  Well, you can have a chat with him
19   because we have to get the jurors.  So we'll be about
20   another five minutes before we get them out.
21             Thank you.
22                  (Recess taken at 9:17 a.m.)
23             (Proceedings resumed in the presence of the
24   jury at 9:24 a.m.)
25             THE COURT:  Good morning, everybody.
```

```
1                ALL:  Good morning, Your Honor.
2                THE COURT:  Welcome back.
3                We're going to continue with the plaintiffs'
4       case.  And Mr. Wisner is going to call the plaintiffs'
5       next witness.
6                MR. WISNER:  Your Honor, before we call the
7       witness, we're going to read one admission into the
8       record.
9                THE COURT:  Yes.
10               MR. WISNER:  Admission number 30.
11               Request:  Admit that POEA is now banned in
12      Europe.
13               Response:  Monsanto admits that the European
14      Commission recommended that member states ban a
15      co-formulant called POEA-Tallowamine from
16      glyphosate-based products.  And there's a URL.  Accessed
17      December 12th, 2018.
18               The European Commission noted that "It is
19      primarily the responsibility of member states to decide
20      upon and enforce such measures."
21               And with that, Your Honor, we call Dr. William
22      Sawyer to the stand.
23               THE COURT:  Dr. Sawyer.  Could you stand and
24      be sworn.
25      ///
```

```
 1                    WILLIAM SAWYER,
 2    called as a witness for the plaintiffs, having been duly
 3    sworn, testified as follows:
 4              THE WITNESS:  Yes, I do.
 5              THE CLERK:  Thank you.  Please be seated.
 6              And would you please state and spell your name
 7    for the record.
 8              THE WITNESS:  William Robert Sawyer,
 9    S-A-W-Y-E-R.
10              THE COURT:  Let me just grab these things from
11    yesterday.
12              MR. WISNER:  Your Honor, I have binders for
13    the witness and yourself.
14              THE COURT:  Thank you.
15              MR. WISNER:  May I proceed?
16              THE COURT:  Yes, you may.
17              MR. WISNER:  Thank you.
18                    DIRECT EXAMINATION
19    BY MR. WISNER:
20         Q.   Good morning, sir.  How are you?
21         A.   Very good.
22         Q.   Could you please introduce yourself to the
23    jury by telling them your name, where you're from, and
24    where you currently live.
25         A.   Certainly.  I live -- well, my name is
```

3104

```
1        Q.   All right.
2        A.   And that's been measured at I think 73 part
3   per billion.  It's not, in my opinion, high enough that
4   when you're actually using the product to cause harm.
5   However, the rule is in toxicology and even under EPA
6   policy, that regardless of the concentration of the
7   carcinogen, they are all additive in terms of their
8   effect.
9        Q.   So these are piling on top of the potential
10  carcinogenic effect of glyphosate?
11       A.   Yes.
12       Q.   The potential carcinogenic effect of the POEA?
13       A.   Right.
14       Q.   Okay.  And I guess my question is 1,4-dioxane,
15  is that actually a carcinogen, a known carcinogen?
16       A.   Yes.  Yeah, that's rated as a probable human
17  carcinogen.
18       Q.   Okay.  And is there any more?
19       A.   Wait a minute.  Let me think.
20            No.  Dioxane may be a -- I think is actually
21  regulated as a -- it could be either -- it could be a
22  possible carcinogen classification.  I don't remember if
23  it's probable or possible.
24       Q.   Okay.  Is there any more contaminants that I
25  should put on this board or --
```

3133