# EXHIBIT 2

Barry Boyd, M.D.

1    UNITED STATED DISTRICT COURT

2    NORTHERN DISTRICT OF CALIFORNIA

3    _____

4     IN RE: ROUNDUP PRODUCTS       )   MDL No. 2741

5     LIABILITY LITIGATION          )

6                                   )

7      _____  )

8     This document relates to:     )

9                                   )

10    Vosper v. Monsanto, Co.,      )

11    Case No. 3:19-cv-05525        )

12    _____

13

14         This is the Videotaped Deposition of

15                 BARRY BOYD, M.D.

16        taken on Friday, September 3, 2021,

17       held REMOTELY via Webex, commencing at

18        2:04 p.m., concluding at 4:45 p.m.,

19        taken before Christine S. Reynolds,

20       Court Reporter and Notary Public in and

21               for the State of New York.

22

23

24

25

Barry Boyd, M.D.

```
 1   APPEARANCES:

 2

 3        LaBLETTA & WALTERS LLC

 4        Attorneys for Plaintiff

 5             200 Barr Harbor Drive

 6             Suite 400

 7             Conshohocken, Pennsylvania  19428

 8        BY:  CHRISTIAN P. LaBLETTA  ESQ.

 9

10        HOLLINGSWORTH LLP

11        Attorneys for Defendant

12             1350 I Street NW

13             Washington, DC  20005

14        BY:  JOHN M. KALAS, ESQ.

15

16        Also Present:

17             Danny Ortega, Videographer

18

19

20

21

22

23

24

25
```

Barry Boyd, M.D.

```
 1   INDEX:

 2

 3   WITNESS                                        PAGE

 4

 5   Barry Boyd, M.D.

 6              Examination by Mr. Kalas          8

 7

 8

 9

10   INDEX TO EXHIBITS:

11

12   NUMBER          DESCRIPTION                   PAGE

13

14    1             Vosper expert disclosure        7

15    2             Dr. Boyd's expert report in

16                  the Vosper matter               7

17    3             Notice of videotaped

18                  deposition                      7

19    4             Medilex invoice - 4/19/21       7

20    5             Medilex invoice - 4/28/21       7

21    6             Medilex invoice - 6/10/21       7

22    7             Medilex invoice - 6/26/21       7

23    8             Medilex invoice - 8/19/21       7

24    9             Dr. Boyd's deposition fee

25                  schedule                        7
```

```
1   INDEX TO EXHIBITS:

2

3   NUMBER          DESCRIPTION                    PAGE

4    10             Deposition invoice                7

5    11             Deposition invoice                7

6    12             Dr. William Sawyer's deposition  57

7    13             2018 Andreotti study             60

8    14             2001 McDuffie study              70

9    15             2019 Pawha study                 73

10   16             Revised Glyphosate Issue

11                  Paper: Evaluation of

12                  Carcinogenic Potential

13                  EPA OPP - 12/12/17               97

14   17             American Cancer Society

15                  Website document                104

16   18             "Risk Assessment of Glyphosate

17                  Exposures from Pilot Study

18                  With Simulated Heavy Residential

19                  Consumer Application of

20                  Roundup using a Margin of Safety

21                  Approach" - Kougias paper       110

22

23

24

25
```

Barry Boyd, M.D.

```
 1   FEDERAL STIPULATIONS:

 2

 3        IT IS HEREBY STIPULATED AND AGREED by and

 4   between the attorneys for the respective parties

 5   hereto that this deposition may be taken by Counsel

 6   for Defendants at this time;

 7        IT IS FURTHER STIPULATED, that all objections

 8   except as to the form of the questions and

 9   responsiveness of the answers be reserved until the

10   time of the trial;

11        IT IS FURTHER STIPULATED, that pursuant to

12   Federal Rules of Civil Procedure 30(3)(1) the

13   witness requests to review the transcript and make

14   any corrections to same before any Notary Public;

15        IT IS FURTHER STIPULATED, that if the original

16   deposition has not been duly signed by the witness

17   and returned to the attorney taking the deposition

18   by the time of trial or any hearing in this cause, a

19   certified transcript of the deposition may be used

20   as though it were the original;

21        IT IS FURTHER STIPULATED, that the attorneys

22   for the parties are individually responsible for

23   their certified transcript charges, including any

24   expedite or other related production charges.

25
```

```
 1   REMOTE DEPOSITION STIPULATIONS:

 2

 3        IT IS HEREBY STIPULATED, by and between the

 4   attorneys for the respective parties hereto, that

 5   pursuant to Rule 3113(d) of the CPLR, this

 6   deposition will be conducted by remote

 7   videoconference with a stenographer administering

 8   the oath remotely and creating an accurate written

 9   record.

10        IT IS FURTHER STIPULATED AND AGREED that no

11   attorney, party or witness, shall capture any still

12   photographs or record by audio or video any part of

13   these deposition proceedings.  Each attorney agrees

14   to instruct their witness that there is to be no

15   communication with anyone outside of the identified

16   and participating group by chat, text, email or

17   other means during the deposition and there shall be

18   no other person in the room with the witness during

19   their deposition.

20        IT IS FURTHER STIPULATED AND AGREED that any

21   phone or electronic device in the room with a

22   witness shall be identified and not read, referred

23   to or otherwise used during the witness' deposition,

24   unless agreed to by all counsel on the record.

25
```

```
 1                (Exhibit Numbers 1 through 18 were
 2           marked for identification.)
 3                THE VIDEOGRAPHER:  We're on the
 4           record.  My name is Daniel Ortega, and
 5           I'm the legal videographer for Golkow
 6           Litigation Services.
 7                Today's date is September 3, 2021,
 8           and the time is 2:04 p.m.
 9                This video deposition is being held
10           in the matter of Roundup, Vosper versus
11           Monsanto Company, for the United States
12           District Court, Northern District of
13           California.
14                The witness today is Dr. Barry
15           Boyd.
16                Counsel, please identify yourselves
17           for the record.
18                MR. LaBLETTA:  Christian LaBletta
19           on behalf of the plaintiffs.
20                MR. KALAS:  John Kalas on behalf of
21           Monsanto Company.
22                THE VIDEOGRAPHER:  The court
23           reporter today is Christine Reynolds who
24           will now swear the witness.
25
```

Barry Boyd, M.D.

```
 1              B A R R Y   B O Y D, M.D.,
 2          having been first duly sworn by a Notary
 3          Public within and for the State of New York,
 4          was examined and testified as follows:
 5    EXAMINATION
 6    BY MR. KALAS:
 7          Q.  Good afternoon, Dr. Boyd.
 8          A.  Good afternoon.
 9          Q.  So I know it's Friday before Labor Day
10    Weekend.  I appreciate that I probably am the only
11    thing standing in your way between now and Labor Day
12    Weekend --
13          A.  You're not.
14          Q.  -- so I will try to be as economic as
15    possible.
16          A.  You're not.  I actually have two patients
17    waiting for very hard discussions after I finish
18    about end-of-life care, so --
19          Q.  Okay.  All right.
20          A.  Actually, I saved that for last.
21          Q.  Well, then I'll try to --
22          A.  I will try to keep my phone off, I
23    apologize --
24          Q.  Sure.
25          A.  -- so I don't get bothered, because they
```

Barry Boyd, M.D.

1    constantly get me.  Go ahead.

2        Q.  Well, I'll still try to get through

3    economically, so you can get to your patients.

4            It's nice to meet you.  I have never met

5    you before.  I know you have been deposed before in

6    the litigation, but if you need a break at any time,

7    please let me know and we'll take a break.

8        A.  Will do.

9        Q.  So I have marked in the exhibit link 11

10   exhibits to start with.  And the first three are the

11   expert disclosures in this matter, your report in

12   this matter, and then your notice of deposition.  I

13   just wanted to start with those real quick.

14           So if you could open Exhibits 1 and 2,

15   please, and just take a look at them briefly.

16       A.  How do I do that?

17       Q.  So I -- so the exhibit link that was sent

18   earlier today that has Golkow Remote in it, if you

19   want to click on that.  If you don't have it, no

20   problem, I can resend it to you here real quick in

21   the chat function.

22       A.  I was born much too early for this.

23       Q.  Give me a moment.

24       A.  I still write with pen and ink.

25       Q.  Well, I still do that.  I'll -- I -- my

Barry Boyd, M.D.

1   outline is not typed up.  It's in pen and ink as

2   well.

3        A.  Good.  There you go.

4        Q.  All right.  I just sent you the exhibit

5   link so hopefully you got that.  That's in -- that's

6   not in your email, it's in the chat function.

7        A.  Oh, okay.  Sorry.

8        Q.  No worries.

9        A.  Go out of this.  Here we go.  Oh, okay.

10  Got it.

11       Q.  So you if click on that, you should see 11

12  exhibits there.

13       A.  Let me make that small.  Hold on.  I have

14  got to make it smaller so I can still stay on the --

15  it doesn't want to do that.

16           Yep.  I see them.

17       Q.  Okay.  And if you could just briefly take a

18  look at Exhibits 1 and 2, please.

19       A.  Yep.

20       Q.  Okay.  And Exhibit 1 are -- is the expert

21  disclosures that are case specific for plaintiffs in

22  this matter.  Have you seen Exhibit 1 before?

23       A.  Let me see that again.

24           Yep.

25       Q.  Okay.  And does Exhibit 1 summarize the

Barry Boyd, M.D.

1    main areas upon which you intend to opine in this

2    case?

3        A.  Yeah.  That is correct.  I want to make

4    sure I have it.  I went to the wrong part of the --

5    the document, correct.

6        Q.  Oh, okay.  All right.  Okay.  So -- so the

7    area underneath your name summarizes the main

8    areas --

9        A.  Exactly.

10       Q.  -- you intend to opine.

11           Okay.  And Exhibit 2 is the expert report

12   referenced in Exhibit 1, and is this a true and

13   correct copy of your expert report in this matter,

14   sir?

15       A.  Indeed, it is.

16       Q.  Okay.  And Exhibit 2 contains a list of

17   prior testimony in it, near the bottom on page 36,

18   in an addendum and let me know when you get there.

19       A.  All right.

20       Q.  Okay.  And in Exhibit -- or on page 36, you

21   have a list of nine cases that you have testified in

22   to your recollection in the past four years.  And

23   since you have put together that list, have you

24   testified in any other cases?

25       A.  I am -- no.  I see the Stephens case there.

Barry Boyd, M.D.

1    No.  The answer is no.

2        Q.  Okay.  And I actually have some good news

3    for you, the notes you have there at the bottom,

4    Bognar and Marshall actually were the same docket

5    numbers.  They were a multi-plaintiff case, so I can

6    clear that up for you.

7        A.  Oh, okay.

8        Q.  But beyond that, you also have a copy in

9    here, a copy of your CV.  Is that a current copy of

10   your CV?

11       A.  Yeah.  Yes.

12       Q.  Okay.  And then you have on here a list of

13   references, on pages 37 to 43.  Do you see that?

14       A.  Yep.  Yes, I do.

15       Q.  And -- I'm sorry.

16       A.  I do, yep.

17       Q.  Okay.  And does that contain all of the

18   materials you have reviewed in reaching your opinion

19   in this matter?

20       A.  Just making sure I'm not missing anything.

21       Q.  Sure.  That's why I ask.

22       A.  Yes.  Yes.

23       Q.  Okay.  So are there any other materials

24   you've reviewed since you serviced the report on

25   June 28th that you will be testifying about in the

Barry Boyd, M.D.

1    Vosper matter?

2         A.  Well, I did review the -- the Monsanto

3    experts' reports.

4         Q.  Okay.

5         A.  I'll probably be referencing at least them

6    or at least their concerns in their discussion.

7         Q.  Okay.  So let's start there.  Well, let me

8    ask, before we get to Monsanto's experts, anything

9    else that you can think of?

10        A.  Not at all.

11        Q.  Okay.  Do you have any opinions about

12   Monsanto's expert reports that you intend to offer

13   at trial in the Vosper matter?

14        A.  The oncologist who I looked at, he made a

15   few factual areas that were concerning.  He

16   referenced the -- and this is relevant to this case

17   -- the family history.

18             He didn't speak about the patient's aunt

19   with leukemia who turned out to be the patient's

20   mother.  I don't know if you know that.

21             Did you see that?

22        Q.  You're talking about Dr. -- Dr. Navarro's

23   report?

24        A.  Yeah.  His report.  He just -- he did

25   mention and, you know, it's just an error, but it

Barry Boyd, M.D.

1    makes you worry and concerned.

2         Q.  Okay.

3         A.  And he did mention, in addition, there was

4    no -- none of the studies showed any correlation

5    with marginal zone lymphoma but that's an inaccurate

6    reading of some of the studies which actually have

7    shown some increased odds ratio.  And with the

8    Monsanto -- or the Roundup exposures, some of the

9    epidemiology, and they do specify --

10        Q.  Specifically regarding --

11        A.  Marginal cell lymphoma.

12        Q.  Specifically regard MZL, okay.

13        A.  Yes, they do.  No, that's not MCL.

14   Remember MCL is --

15        Q.  MZL?

16        A.  -- mantle cell.  Mantle cell.  MZL.

17        Q.  No, I said Z.  Yeah, I said Z.

18        A.  Because I actually just am treating someone

19   with MCL right now downstairs --

20        Q.  Oh.

21        A.  -- and I'm hoping they don't call me.

22        Q.  Okay.  So made an error regarding mother

23   versus aunt, believe some of the studies show an

24   increased risk for marginal zone lymphoma?  Anything

25   else you say --

Barry Boyd, M.D.

```
 1        A.  Well, I'm thinking of your report, the

 2   report on the genetics, which was a very compulsive

 3   extensive analysis of the genetics of ████████

 4   ████████  reported that the ████████ had familial

 5   ████████  and I don't think that that is actually an

 6   accurate way of describing it, because he's already

 7   assuming that and saying that's what she had.

 8        Q.  Okay.

 9        A.  And I don't think anybody can say that.

10            Number two, you know, I don't know if you

11   want me to go through the errors in this, but --

12        Q.  I do.  I want to know what your opinions

13   are.

14        A.  The patient did not have multiple

15   ████████  He had a classic example -- yes, he had

16   ████████  at a very young age, but he presented with

17   a large cell lymphoma that had a very small kappa of

18   light chain restricted B-cell population within the

19   bone marrow as well as features when he had the

20   incisional lymph node biopsy that suggested an

21   underlying lower-grade B-cell lymphoma, which is

22   very not uncommon, suggesting that he had

23   transformed into a large cell lymphoma, and his

24   recurrences were really recurrences not new

25   lymphoma.  Right.
```

Barry Boyd, M.D.

```
1            So it would be wrong to say he had, you

2   know, multiple -- four lymphomas.  He had one

3   lymphoma with an underlying low-grade component,

4   that subsequently relapsed three times in similar

5   areas by the way.  So you can't have those as three

6   lymphomas or four lymphomas.

7            Number two, you can't connect ████████

8   history of ████████████████  his ███████ and his

9   ████████  and then also argue that he has a -- he has a

10  familial predisposition to ████████  when it was not

11  on that same lineage unless they're, unbeknownst to

12  us, interrelated.

13           It was his paternal ████████████ had

14  ████████████  So to, sort of, again, you know, that's

15  really compounding errors to try to presume.  You

16  can't draw the two together.  He inherited both from

17  his paternal and maternal side.

18       Q.  Okay.  Anything -- anything else that you

19  would say in regards to that?

20       A.  No, I mean, you'd have to -- I guess you

21  could draw out some of my conclusions about that.

22       Q.  Okay.

23       A.  Or should I do that?

24       Q.  I'm getting a little feedback.  Are you --

25  are you hearing that feedback?
```

Barry Boyd, M.D.

```
 1                  MR. LaBLETTA:  I'm getting an echo
 2           as well, John.
 3                  There might be a delay, I think
 4           that's why, at times, you guys are maybe
 5           talking over each other.  There's a
 6           slight delay, at least on my part.
 7                  MR. KALAS:  Okay.  Let -- I'll try
 8           to watch that.
 9   BY MR. KALAS:
10       Q.  All right.  You said -- you said -- you
11   mentioned your conclusions about that.  I think your
12   conclusion -- one of your conclusions is that the
13   expert report of Monsanto's experts have not changed
14   your opinion at all?
15       A.  Correct.
16       Q.  Okay.  Anything -- any other conclusions
17   that you would intend to offer about Monsanto's
18   experts?
19       A.  I might as well tell you now.
20       Q.  Okay.
21                  MR. KALAS:  I'll object to the
22           form.  I'll object to the form.
23                  You can answer.
24       A.  Yeah.  There is a presumption, and this was
25   one that was based on a paper by Vogelstein and
```

Barry Boyd, M.D.

```
 1    Tomasetti, whom I know very well, they stated that
 2    cancers are bad luck, genetic or inherited --
 3    inherited I should say -- or external, tobacco,
 4    ultraviolet light, infection.  They said the
 5    majority of cancers are bad luck.
 6            Since that time, by the way, there has been
 7    a number of reviews that have actually disagreed,
 8    based on the epidemiology of cancer in general, so
 9    I'm not going to testify specifically about that,
10    but I do want to mention this.  In that paper, he
11    talks about mechanisms of familial or hereditary
12    cancer syndromes, and he specifically talks about
13    the bracket.  He uses that as an example, BRCA gene
14    related cancers, colonobrass -- colo- -- I mean,
15    brasino and the brasinovary syndrome.  It's very
16    important to know this.
17            The presumption is there's a fixed risk in
18    the lifetime of an individual who is a carrier.
19    That's called penetration.  And it penetrates.  And
20    we know that modern women who are carriers of BRCA
21    gene, the likelihood of getting breast cancer in
22    their lifetime up through the 70s is in the range of
23    70 percent.  Right.  And there's not much you can do
24    with mastectomies or do other things to prevent
25    that.  It's, sort of, a fixed risk, which is the
```

Barry Boyd, M.D.

1   assumption of all of the things he writes about

2   genetic risk factors.

3           But it's purely bad luck.  And with a

4   hereditary risk it's going to happen, and there's

5   nothing you can do.  You know, it simply is a

6   high-risk.

7           Well, it turns out that's profoundly

8   incorrect.  That patients who have defects in repair

9   mechanisms or genetics of repairing chromosomal or

10  gene abnormalities are simply the loss of ability to

11  repair mutations or changes in chromosomes that

12  occur because of outside influences.  Let me explain

13  why this is true.

14          There was a study published in the Journal

15  of the National Cancer Institute.  Now, I don't know

16  if I can say it here, because I'll send this as

17  another link for you so you have this data.  On

18  BRCA2-found mutations in Iceland.  Women with the

19  BRCA2 mutation, but they asked a very simple

20  question, which was also asked by Mary King, who had

21  done the original of the BRCA1 in Ashkenazi Jewish

22  women.  He asked a very simple question.  Has the

23  risk always been the same?  And they have great,

24  great statistics because these women don't go

25  anywhere.  They're all in Iceland.  Right.

Barry Boyd, M.D.

 1              And it's a little under, I think, 1 to 1

 2    percent of women carry this gene.  It's called a

 3    founder gene.  Women born in 1950, through the age

 4    of 70, had a risk of over 70 percent in breast

 5    cancer.  They went back and said, what about women

 6    born in 1920.  Their risk was not 70 to 75 percent.

 7    Their risk was only 18 percent through the end of

 8    life.  Their whole statistic.

 9              They then reviewed the general population

10    and the risk for women with breast cancer went up

11    the same order of magnitude, four times greater risk

12    over those years.  The fundamental argument is, we

13    call it the penetrate has gone up, but what it means

14    is the environment has played a substantial role in

15    changing the risk of high-risk hereditary cancer,

16    and it's important to understand that that is true

17    for all hereditary syndrome.

18              Even if one were to speculate that he

19    carried a gene, the probability of him getting the

20    disease, the penetrate, is going to be dramatically

21    accelerated if he's exposed to anything that can

22    enhance the risk of that disease.  Maybe more so

23    which makes me worry about it, maybe more so.

24         Q.  Okay.  So I want to make sure I understand

25    that opinion you just offered there.

Barry Boyd, M.D.

```
 1       A.  Okay.

 2       Q.  Is that opinion in response to the

 3  geneticist or is it in response to Dr. Tomasetti

 4  who's disclosed as a general causation expert in the

 5  MDL or both?

 6       A.  No, no.  That's simply in response to the

 7  geneticist who wrote the report as well as --

 8       Q.  Okay.

 9       A.  -- the oncologist who talked about it being

10  a hereditary cancer, not environment.

11       Q.  Got it.  Okay.

12       A.  You said Tomasetti is one of your experts?

13       Q.  Yeah.  He's an -- he's a general causation

14  expert for Monsanto.

15       A.  Okay.

16       Q.  Yeah.  Okay.  Okay.  So going back to your

17  report, Exhibit 2, you have not calculated an

18  internal dose of glyphosate absorption for

19  Mr. Vosper, right?

20       A.  No, no.

21       Q.  Okay.  And you didn't see in Dr. Sawyer's,

22  report that he had calculated an internal dose of

23  glyphosate exposure -- or glyphosate for Mr. Vosper,

24  right?

25       A.  He's basically calculating the dermal
```

Barry Boyd, M.D.

1    absorption based on extent of and duration of

2    exposures, but not an internal, what's in his body,

3    right?

4        Q.  Right.  An internal dose would be the

5    toxicologically active dose that's in the body,

6    right?

7        A.  Yeah.

8        Q.  Okay.  And an exposure would be just how

9    many days he was around Roundup when using it,

10   right?

11       A.  Correct.

12       Q.  Okay.  And when I go to the gas station,

13   I'm exposed to benzene.  I have a day of exposure to

14   benzene, right?

15       A.  Right.

16       Q.  But --

17       A.  What -- what is --

18       Q.  -- when a petroleum --

19       A.  Let me in -- and this is -- this is an

20   observation I have made that needs really to be

21   assessed.

22           I have seen a number of patients whose

23   exposures were much higher in the area which they

24   were exposed, arms, right.  His lymphoma was in the

25   arm and the shoulder and not in -- you know, as well

Barry Boyd, M.D.

 1   as in the legs, areas of higher exposure than the

 2   chest.

 3          His lymphoma was not central.  This is not

 4   the first case where I have seen a possibility that

 5   the exposure to the involved draining lymph node of

 6   dermal exposures can be much higher than internally

 7   in the blood.  And so this is often a mistake that

 8   we have made all along is that in the same way --

 9   that his exposed skin, by the way, would be

10   expected, perhaps higher for him, to have skin

11   cancers because of ultraviolet light, even if you

12   talk about him having a genetic risk for skin

13   cancers, he clearly had very high levels of sun

14   exposure from the time he was a little boy, age 9.

15   He would go out and work on the farm without a

16   shirt.

17          So what I'm arguing is, not only the sun

18   exposure to explain the squamous cancer in situ, the

19   melanomas, but also the local exposure, highly in

20   the arms.  He never did anything to protect himself,

21   you know.  He just sprayed when he was young and

22   when he was older working on his own properties as

23   well as his occupation.

24          One could argue, is there a connection?

25   That's speculative to say the least, but it's ironic

Barry Boyd, M.D.

1    that these lymphomas are occurring in the drainage

2    set regions of sun -- skin exposure.

3         Q.  Just returning back to what I was asking

4    you about.  When I go to a gas station and fill up

5    my car, I have a day of exposure to benzene, right?

6         A.  Right.

7         Q.  But a petroleum worker having a day of

8    exposure to benzene would likely have a much higher

9    internal dose than I would in that -- in a day --

10        A.  Correct.

11        Q.  -- fair?

12        A.  Right.

13        Q.  Okay.  And so -- and so an exposure day is

14   a proved metric of dose at best.

15        A.  Yes.  And, of course, to be fair, the

16   exposure of the average high user of Roundup at

17   home, and we have seen many, don't just have a

18   little bit of exposure.  They often use it at high

19   levels, they don't wear anything to protect

20   themselves.  That's very different than pumping gas

21   for 10 seconds.  Very, very different.

22             They all admit they get it on their skin.

23   They get it on their arms.  They all get it exposed.

24             By the way, you might pass onto Monsanto

25   that they really should --

Barry Boyd, M.D.

```
1          Q.  I lost your answer there.
2               THE COURT REPORTER:  I didn't get
3          it.
4          A.  Maybe I won't say that.  But what I'm
5     saying is, it's a very different calculation than
6     pumping gas every two weeks for 10 -- for 15 to
7     20 seconds versus spraying twice a week.  But I see
8     your point.
9          Q.  Yeah.  Yeah.  My point is just that
10    exposure days are a crude metric of dose.  You agree
11    with that?
12         A.  Right, right.
13         Q.  Now, I have marked Exhibits 4 through 11,
14    and these are some invoices that were produced to us
15    prior to the deposition.  And if you could take a
16    moment to take a look at 4 through 11 and let me
17    know what you're done.
18         A.  Okay.  Okay.  Yep, I see them.
19         Q.  Okay.  And are these all the invoices
20    you've submitted in this matter to Mr. LaBletta?
21              MR. LaBLETTA:  Objection to the
22         form.
23         A.  Yeah.  And I will explain.  The lawyer I
24    work with who does a lot of the organizing, you
25    know, he submits it.  I get a portion of that, not
```

Barry Boyd, M.D.

```
 1   the whole thing.  So those are the bills he
 2   submitted for my work.
 3       Q.  Okay.  So those are -- those are the bills
 4   that have been submitted for your work in this
 5   matter?
 6       A.  Right.
 7       Q.  In the Vosper matter?
 8       A.  Correct.
 9       Q.  Okay.  And just looking at the totals here,
10   when I added them up, I got to about $46,000 for the
11   invoices.  Does that number seem fair?
12       A.  Probably not, actually.  It doesn't cover
13   the amount of time I have spent away from my
14   practice and family.  So it probably doesn't really
15   cover my expenses, sorry.  And also, I only --
16       Q.  I --
17       A.  -- get a portion of that.  I only get a
18   portion of that, so that's fair.
19       Q.  Okay.  The numbers seeming fair is probably
20   poor --
21       A.  That's all.
22       Q.  -- terminology --
23       A.  Yeah.
24       Q.  -- a phraseology I should not have used.
25           Does 46,000 sound right to you for the
```

Barry Boyd, M.D.

```
1    amount of money --

2         A.   Yes.

3         Q.   -- invoiced so far in this proceeding?

4         A.   Yes, that's right.

5              And by the way, it wouldn't sound fair to

6    the most average person who makes much less.

7         Q.   Exhibit 8, on the invoices, states "Revised

8    invoice, replaces invoice of August 19, 2021."

9              Do you see that on Exhibit 8?

10        A.   I do.

11        Q.   Do you know why the August 19th invoice was

12   replaced?

13        A.   To be fair, no.

14        Q.   Okay.  Going to Exhibits 9 through 11.

15   These are deposition fee invoices, correct?

16        A.   Right.

17        Q.   Okay.  And Exhibit 9 seems to be almost a

18   fee sheet.  And then 10 and 11 are the actual

19   invoices, right?

20        A.   Yeah.  9 is -- 9 is, if I'm not mistaken,

21   let me go back, is based on the payment, if I -- if

22   I have to defer patients, you know, at cost to the

23   business, the office, and so --

24        Q.   Got it.

25        A.   So the longer -- the closer I am to the
```

Barry Boyd, M.D.

```
1   date of deposition without it being canceled, there
2   is a rolling increase of fee to cover the fact I
3   can't make up for the lost business.
4        Q.  Okay.  And so just so I'm not double
5   counting, Exhibits 9, 10, and 11, in total for
6   today's deposition, in preparation time and in your
7   lost professional time appearing here, you have
8   invoiced $8,290, right?
9        A.  Right.  Right.
10       Q.  Okay.  And so adding up all of the invoices
11  in preparing your report, and -- and preparing your
12  opinion after your report, and then your deposition
13  invoices, your total amount invoiced in this matter
14  is about $54,000 at this point?
15       A.  I would have to get a calculator out, but I
16  -- I take your additions.
17       Q.  Okay.  Just returning to some testimony you
18  gave previously this year.  Last time I saw, you had
19  estimated -- you had estimated you had invoiced
20  about $300,000, and that was over the summer, in
21  Roundup litigation.
22            With this additional invoicing in the
23  Vosper matter, is it fair to say you have invoiced
24  approximately $350,000 in Roundup litigation?
25       A.  This summer?
```

Barry Boyd, M.D.

1        Q.  Yeah.  This summer I think you testified

2   you'd invoiced about $300,000 so far in Roundup

3   litigation --

4        A.  Not this summer.

5        Q.  -- am I wrong about that?

6        A.  That's total.  That's over several years, I

7   think.

8        Q.  Yes, sir.  That's what I mean.  That was --

9        A.  Yeah, yeah, yeah, yeah.

10        Q.  -- you said that this summer --

11        A.  Yes.  That sounds great, but it's been

12   several years.

13        Q.  Okay.  So with the Vosper matter, would it

14   be fair to say you have invoiced, overall, over the

15   past several years, $350,000 in Roundup litigation?

16        A.  Right.  Yes.

17        Q.  Okay.  And are there -- have you invoiced

18   any more than $350,000 by your estimate or is that a

19   good total?

20        A.  No, that's -- that's approximate.  I have

21   to go back and check with the lawyer who I work with

22   who has -- prepares all the bills.  As I said,

23   again, that's not what I do.

24        Q.  Okay.  Okay.  Now, you were retained in

25   this matter earlier this year, the Vosper matter?

Barry Boyd, M.D.

```
 1        A.   Correct.

 2        Q.   Okay.  And do you know if you were

 3   recommend by Dr. Sawyer or anything like that?

 4        A.   I don't believe so.

 5        Q.   Okay.  Are you aware Dr. Sawyer has been

 6   recommending you to plaintiff's counsel in other

 7   litigation?

 8        A.   In some cases, yes, but not all.

 9        Q.   You and Dr. Sawyer actually discussed

10   litigation -- Roundup litigation, right?

11        A.   We sometimes do, yeah.

12        Q.   Okay.  When did you first meet Dr. Sawyer

13   in your life, just generally.

14        A.   I think several years ago when we were

15   working on this, but we share other interests in

16   terms of understanding cancer causation, et cetera,

17   so we discuss the scientific issues.

18        Q.   Okay.  So you first met Dr. Sawyer working

19   on Roundup litigation?

20        A.   Correct.

21        Q.   Okay.  And are you working with Dr. Sawyer

22   in any other litigations?

23        A.   No.  No, I don't believe so --

24        Q.   So you're --

25        A.   -- not at this point.
```

Barry Boyd, M.D.

```
 1          Q.  You're not working with him on Chlorpyrifos
 2    litigation?
 3          A.  No.
 4          Q.  Okay.  Do you ever talk with Dr. Benbrook
 5    about Roundup litigation?
 6          A.  No.
 7          Q.  How about Dr. Portier?
 8          A.  Nope.
 9          Q.  Okay.  So other than doctors --
10          A.  Yeah.  I don't speak to them.
11          Q.  Okay.  Other than Dr. Sawyer, he's the only
12    expert for plaintiffs in Roundup litigation you're
13    aware of that you have discussed the litigation
14    with?
15          A.  Correct.  Yes.
16          Q.  Okay.  And when was the last time you
17    discussed Roundup litigation with Dr. Sawyer?
18          A.  We discussed -- we talked last night about
19    a case in California unrelated to this --
20          Q.  Okay.
21          A.  -- that we're both -- we're both involved
22    in.  In terms of --
23          Q.  The Stephens court matter?
24          A.  Yeah.  Not -- not about our own feeling
25    about the validity of the case, but about the issues
```

Barry Boyd, M.D.

1   around the court about timing, and, you know, I went

2   out there to California, spent three days there, and

3   never got deposed, had to fly back after spending

4   three days in a hotel waiting to go to the trial.

5   You know, three days out of the office, that was a

6   big issue for my office and my family.  It's kind of

7   a waste of my time, because I never went.  I never

8   went to --

9       Q.  Gotcha.

10      A.  And it was really more about the judge and

11  how he -- sort of, the procedural issues.

12      Q.  Okay.  So it was about the judge and

13  procedural issues.  So you and Dr. Sawyer were, I

14  guess, I don't want to put words in your mouth, but

15  you were just getting on the same page about the

16  judge's procedural issues in the Stephens matter?

17  That was --

18      A.  Not getting on the same page, just

19  understanding, you know, the difficulties.  You

20  know, his -- his issues are different than mine in

21  terms of what materials he's allowed to present, et

22  cetera.  It was really more like, you know -- you

23  know, what I'm going to have to be up against if I

24  go out there, or do -- do a call and are they going

25  to -- how is he going to proceed with the judge.

Barry Boyd, M.D.

```
 1    What's the -- not even material things related to

 2    the case.  Just the stumbling blocks in terms of

 3    just getting it done.

 4              And also the time, is going to be another

 5    case where -- can you see me?

 6                   MR. KALAS:  Yeah.  We can see you.

 7                   We can't hear you, Christine.

 8                   MR. LaBLETTA:  Yeah, Christine.

 9                   THE WITNESS:  Was she having

10              trouble hearing what I'm saying?

11                   MR. KALAS:  I think when you leaned

12              in, she lost the audio.

13                   THE WITNESS:  Oh, okay.

14                   MR. KALAS:  Yeah.  So where you're

15              sitting is good.

16                   THE WITNESS:  Fair enough.

17    BY MR. KALAS:

18        Q.  So did you and Dr. Sawyer coordinate over

19    what articles each of you were going to discuss in

20    -- in Roundup litigation?

21        A.  Not at all.  No.

22        Q.  Okay.  Okay.  Do you consider Dr. Sawyer a

23    friend?

24        A.  Only professionally.

25        Q.  Okay.
```

Barry Boyd, M.D.

1     A.  We have actually never met --

2     Q.  Now --

3     A.  -- except by phone.

4     Q.  Okay.  Now, do you defer to other experts

5  like Dr. Sawyer or -- or other experts disclosed by

6  plaintiffs in general causation, do you defer to

7  them on any matters in this litigation?

8     A.  Only on -- in reference to their expertise,

9  which is exposures related to exposure days and

10  their calculations.  It's best not for me to

11  calculate, but that's information that is of value

12  and understanding in specific causation in the

13  individual that I'm reviewing --

14     Q.  Okay.

15     A.  -- but not to causality.

16     Q.  Okay.  And you mentioned the geneticist

17  earlier.  And just to be clear for the record, you

18  don't hold yourself out as a geneticist, as a

19  professional, right?

20     A.  No.  Not at all.

21     Q.  Okay.  And when it's necessary to do

22  genetic analysis, do you send a case that you're

23  looking at to an expert on genetics?

24     A.  Yeah.  Now, there are -- there are two

25  different things here.  And this is -- I lecture at

Barry Boyd, M.D.

1    Yale by the way, and I do talk about cancer

2    causation in my lectures there.  So that's one of

3    the things I will say I have to know, because I

4    lecture to the second-year medical student about the

5    origins of cancer and cancer causation.

6            One of the issues is this:  Those genetics

7    that is familial, those are inherited risk factors,

8    and there is the fundamental nature of cancer, which

9    is a genetic disease at base, and those analyses we

10   call genomics.

11           So I had a woman recently who had cancer

12   that was BRCA2, the cancer cell.  We went back and

13   analyzed her saliva, and she was a BRCA2 carrier.

14   So that was the genetic analysis of her saliva that

15   shows her -- what she carries in all of her genes.

16   That's genetic analysis.

17           And the genomic analysis of the tumor,

18   which reflects the expression of changes over time

19   and the genetics of a malignancy, and that's -- very

20   often, when doctors talk about the genetic origins

21   of cancer and even lymphoma, they focus a lot on the

22   genomics of the tumor and what are typical for

23   cancers likes lymphoma.  The genetic -- the genomic

24   changes -- I want to say genetic, but it's really

25   genomic changes in genes, in chromosomes that are

Barry Boyd, M.D.

1    correlated with that cancer can be predictive of

2    risk and outcome, but they're within the lymphoma

3    itself.

4           That's very different than the patient's

5    own other cells, those somatic cells.

6       Q.  Right.  And in regards to something called

7    -- did you get that?

8           Sorry.  I got feedback again.  There's also

9    something called germline cells, right, and those

10   are what --

11      A.  Well, that's what we're talking about.

12   Germline is what's in the, what we call somatic

13   cells, not the -- but you get it from the germline.

14   So your mother and your father --

15      Q.  Right.

16      A.  -- each contribute their chromosomes.  When

17   you grow up, as your cells and tissues divide and

18   grow, they all carry the genes from both your mom

19   and dad.  Right.

20      Q.  Right.  Right.  And then --

21      A.  So we would call those germline changes

22   that came through there, but it's a little more

23   complicated.  You can go back ask Tomasetti about

24   this.

25          There is a thing called somatic mutations

Barry Boyd, M.D.

1    in normal tissues that develop over time, because as

2    tissues are growing, they acquire mutations.

3        Q.  Right.  We have thousands of replication

4    errors a day?

5        A.  Right.

6        Q.  Right.  That's what Tomasetti is talking

7    about, right?

8        A.  Correct.

9        Q.  Okay.  And happily, our body has repair

10   mechanisms that take care of the vast majority of

11   those replication errors, whether it's programmed

12   cell death or natural killer cells going after them

13   or what have you.

14       A.  Right.  But the BRCA, a good example of

15   that's a repair mechanism.

16       Q.  Right.

17       A.  And yet, you know, the risk, assuming it's

18   still working the same way, has -- the risk for

19   carrier's has gone up over time, despite the earlier

20   onset of those diseases, it was much less 50 years

21   ago than it is now.

22           So even when defective repair mechanisms,

23   years ago the risk was much smaller than it is

24   today, so it shows you how much more complicated

25   risk is than the presumption.

Barry Boyd, M.D.

 1        Q.  Now, in the case of Mr. Vosper, there was

 2   no genetic testing done on potential germline

 3   mutations in Mr. Vosper, true?

 4        A.  Right.  Correct.

 5        Q.  Okay.

 6        A.  Which is my argument about the geneticist

 7   making that assumption.  He never was tested.

 8        Q.  Okay.

 9        A.  Right.

10        Q.  Right.  Do you think he should have been

11   tested given his family history?

12        A.  I -- I might have because I'm his -- if I

13   was his treating oncologist.  Now, to be fair, I

14   just happened to have a different perspective than

15   most oncologists.  I don't simply want to know what

16   is BCL2, BCL6, you know, his mutation pattern is,

17   related to his immediate prognosis and the choice

18   for the best regiments, which is also what we do.

19   I'm really also interested in -- in the issue of

20   exposures.

21           And I had a patient two days ago, came to

22   me with large cell lymphoma of the hypopharynx

23   cervical node.  Sound familiar?  But she, herself,

24   had high exposures to glyphosate years ago.  I

25   didn't tell her anything about what I do.  I just

Barry Boyd, M.D.

1    said, well, we don't know.  There may be -- there

2    may be a correlation, but that's not for me here.

3    We're going to talk about how we treat you.

4           But I'm always interested in origins.  And

5    I also wanted to look at other potential causes.

6    I'm always looking for causation, because despite

7    doctors just treating the disease, patients want to

8    know that.  That's why --

9        Q.  Sure.

10       A.  -- we're focused on causation.

11       Q.  And in the case of Mr. Vosper, given the

12   history of his ███████████████████████████

13   ██████████████████  you would have been suspicious

14   that there might have been a familial link there,

15   right?

16              MR. LaBLETTA:  Objection to the

17          form.

18       A.  You know, I would have been suspicious that

19   there's shared risk factors.  Whether or not it's a

20   genetic or environmental is another question,

21   because as it turns out, from what I understand,

22   they also had high levels of glyphosate.

23          Second --

24       Q.  We're going to get to that.

25       A.  Yeah.  The second part of that is I don't

Barry Boyd, M.D.

1    know anything about the brother -- the uncle, but

2    ███████████████████ is a -- is specific to certain

3    viral causations, et cetera, that may not be

4    familial at all.  It's a very different tumor.

5         Number two, ███████████████ and ███████████████

6    ██████████████████████████████████████.

7         Q.  Right.  Right.  Yes.  █████████████████████████

8    ███████████████████████ correct?

9         A.  That's correct.  So we say ████████████████

10   number one, and then unfortunately █████████████████

11   ████████████████████████████ which you sometimes

12   find.

13        Q.  Okay.  But getting back -- getting back to

14   the question I -- I asked previously.  Given the

15   fact that he had ████████████████████████████████████

16   ████████████████████████████████████████

17   █████████████████████████████████████████████████

18   ████████ on the other side of the family, would you

19   have been interested in determining whether or not

20   he had a genetic susceptibility to NHL?

21        A.  Usually what I would do is have a better

22   pedigree.  In other words, really look at.  Because,

23   you know, the uncle is a second-degree relative,

24   right?

25        Q.  Right.

Barry Boyd, M.D.

```
 1        A.   Grandfather is a second-degree relative.
 2   Mother is the only first-degree relative.
 3             The other thing is that, you know, shared
 4   causation is not always genetic.
 5        Q.   Sure.  Fair.  And --
 6        A.   -- environmental factors, right.
 7        Q.   I get you look at the environment
 8        A.   I'm not arguing against it.  I'm saying
 9   it's part of how you assess a patient.
10        Q.   Okay.  Now, another question before we
11   launch into more specifically to Mr. Vosper's
12   exposure and diagnosis.  In your opinion, and I was
13   reading your report here, and, you know, it's
14   obviously comprehensive.  In your opinion, when was
15   the evidence strong enough to determine
16   glyphosate-based herbicides cause NHL?
17        A.   It's cumulative evidence over time, and as
18   we look at it -- I mean, clearly, there is
19   significant data about Roundup.  Right.  That's one
20   of the bigger issues.  But I think because of its
21   independence, the fact many people involved in that
22   did not have an axe to grind, they were simply
23   looking at the data, that started to, I think,
24   consolidate the data more closely about this despite
25   regulatory agencies that have two masters, the
```

Barry Boyd, M.D.

1   politicians, regulators as well as the scientists.

2         And I could, as an aside mention something

3   very quick.  The EPA, and this is not -- one of my

4   concerns, I work in environmental health at Yale.

5   The EPA's scientists came out with a preliminary

6   report that -- that Roundup causes at least

7   significant dangers to threatened and endangered

8   species, the majority:  Mammals, birds, reptiles,

9   invertebrates, and fish.

10        Now, I'm just arguing that that is

11  something that really represents another side of it.

12  And interestingly, it wasn't due to glyphosate.  It

13  was largely due to the formulas that are in

14  glyphosate, which is what concerns me.  Because are

15  we -- are we focusing on glyphosate when, in fact,

16  it's the Roundup product and all of the other,

17  quote, entered ingredients.  We know that's been a

18  big issue.

19        So I'm just arguing that this is an

20  expanding issue that is of concern.

21   Q.  Okay.  I'm not sure if you answered my

22  question, so I just want to make sure I understand

23  if you did or not.  Is it your opinion that the

24  evidence was strong enough in 2015 when IARC came to

25  their conclusion to -- well, let me strike that and

Barry Boyd, M.D.

1    ask it better.

2            Is it your opinion that it was not until

3    2015 when IARC reached their conclusion -- strike

4    that.  I don't want to mess up your answer.

5            Let me ask it this way:  Up until IARC's

6    conclusion in the 2015, was there sufficient

7    evidence to argue glyphosate-based herbicides were

8    causative of NHL?

9        A.  I would have to answer it differently.

10       Q.  Okay.

11       A.  I wasn't involved then.  So you're asking

12   me --

13       Q.  Well, I understand.

14       A.  Yes, so you're asking me to retrospectively

15   analyze pre-IARC how I would have judged that.

16       Q.  Well, I'm not actually.  I'm not --

17       A.  In fairness, you asked what my opinion was,

18   was it before or after.  And I would say that the

19   evidence was accumulating.  You know, debatable.

20   But I think putting it together, looking at both the

21   animal studies, the in vitro studies, which was more

22   -- more of their focus as well as the epidemiology

23   studies, which there's a lot of debate, I would say

24   that together, there is a cause for concern that

25   it's a caustic agent.

Barry Boyd, M.D.

1            Number two, the people I see don't get a

2    little Roundup exposure.  Going to the service

3    station to pump gas once every three weeks, they're

4    getting exposed at high levels frequently, and

5    that's what concerns me.  The EPA and the European

6    thing -- FISA and the other agencies, focus a lot on

7    exposures in food but not single high-level exposure

8    in people who don't use any protective clothing.

9            So what is the protective clothing used by

10   Monsanto workers when they're studying it in the

11   fields?  Boots, goggles, complete hand-to-foot

12   protective equipment.  So --

13       Q.  You haven't reviewed -- you haven't

14   reviewed those studies, sir.  How do you know?  I

15   know those studies.  They're not on your materials

16   considered list.

17       A.  I have read that.  No.  I have read about

18   that.

19       Q.  Where?  Where did you read it?

20       A.  I read it --

21       Q.  Where did you read it?  Tell me.

22       A.  You know, by the way, I have read

23   Dr. Sawyer's reports, and they're in there --

24       Q.  Oh.

25       A.  -- and he --

Barry Boyd, M.D.

```
1          Q.  Okay.

2          A.  -- he's making it up, but it's not --

3          Q.  You read it and --

4              MR. LaBLETTA:  I would just ask

5          that we not speak over each other.  Just

6          let --

7              MR. KALAS:  Counsel -- counsel, I'm

8          talking, please.

9              MR. LaBLETTA:  Especially with the

10         delay and the feedback.

11   BY MR. KALAS:

12         Q.  Okay.  Let's go back to my question.  The

13   earliest epidemiology study you have here in your

14   report is from 2001, that's the McDuffie study,

15   right?

16         A.  Right.

17         Q.  Okay.  Was the evidence sufficient -- well,

18   let me ask a more foundational question.

19             Would you opine a chemical or chemical

20   mixture causes cancer in people without a

21   well-conducted epidemiology study?

22         A.  No.

23         Q.  Okay.  So in 2001, when McDuffie came out,

24   was the evidence sufficient to argue glyphosate --

25   well, back up.  Let me strike that.
```

Barry Boyd, M.D.

1          Prior to 2001 when McDuffie came out, was

2    the evidence sufficient to conclude glyphosate-based

3    herbicides cause NHL?

4               MR. LaBLETTA:  Objection to the

5           form.

6       A.  Not sufficient from the epidemiology.

7    Right.

8       Q.  I'm sorry.  I missed your answer because of

9    the objection.  What did you say?

10      A.  Not sufficient at the time from the

11   epidemiology.

12      Q.  In 2001, when McDuffie came out, was the

13   evidence then sufficient to conclude that

14   glyphosate-based herbicides cause NHL in people?

15      A.  Not yet.  No.

16      Q.  Okay.  Your next study is Hardell, 2002.

17   In 2002 when Hardell came out, you then had Hardell

18   and McDuffie.  Was the evidence then sufficient to

19   conclude glyphosate-based herbicides cause NHL in

20   people?

21      A.  Not yet.

22      Q.  Okay.  The next study is De Roos 2003.  You

23   now had McDuffie 2001, Hardell 2002, De Roos 2003.

24   Was the evidence then sufficient to conclude

25   glyphosate-based herbicides cause NHL in people?

 1      A.  Probably still cumulative but not enough.

 2      Q.  Okay.  Following that we have De Roos 2005,

 3  which was the first iteration of the Agricultural --

 4      A.  Again, they're showing -- they're showing

 5  hazard ratios of either not adequate, insignificant

 6  or in the range of, right, 1.42.  Those are low odds

 7  ratios, lower odds ratios.

 8      Q.  Okay.  Your next study is De Roos, 2005,

 9  which is the first iteration of the Agricultural

10  Health Study.

11          At that point, when you had McDuffie 2011,

12  Hardell 2002, De Roos 2003, De Roos 2005, was the

13  evidence sufficient to determine glyphosate-based

14  herbicides was causing NHL in people?

15      A.  At that point, no, but there was support

16  for possible connection with myeloma --

17      Q.  Okay.

18      A.  -- in that study.

19      Q.  And Mr. Vosper -- Mr. Vosper doesn't have

20  myeloma, right?

21      A.  No.

22      Q.  Okay.  The next study you refer to in your

23  report is the Eriksson study in 2008.  And the

24  Eriksson study in 2008 would be the fifth study we

25  have.  So at that point we have McDuffie 2001,

Barry Boyd, M.D.

1    Hardell 2002, De Roos 2003, De Roos 2005, Eriksson

2    2008.

3              At that point, was the evidence sufficient

4    to argue glyphosate-based herbicides cause NHL in

5    people?

6         A.   It was beginning to look questionable.

7    That's the study that showed an increased hazard

8    ratio for marginal cell, and there was, again, this

9    low-level increase in risk.

10             Again, when you put them together, they

11   show some increase but not as an individual

12   standalone study.

13        Q.   Well, okay.  I'm not -- I'm not asking

14   about a standalone study.  I'm asking about the

15   cumulative evidence.  And at that point, you had

16   five epidemiology studies cumulatively.  I'll list

17   them again.  McDuffie '01, Hardell '02, De Roos '03,

18   De Roos '05, Eriksson '08.

19             At that point, was there sufficient

20   evidence to opine glyphosate-based herbicides cause

21   NHL in people?

22        A.   I'm going to go back to IARC and say it was

23   suggestive but not definitive evidence in the

24   epidemiology, but there was odds ratios -- they

25   weren't always for diffuse large cell.  There were

Barry Boyd, M.D.

1  various.  It was hairy cell.  There was CLL, small

2  lymphocytic leukemia, but each one showed some small

3  of increased odds ratio.

4      Q.  Well, okay.  So you went -- you went back

5  to IARC and stated that it was suggestive at that

6  point.

7      A.  Not enough from epidemiology.

8      Q.  Okay.  Not enough from the epidemiology.

9  So when was there enough human evidence in the

10  epidemiology to determine glyphosate-based -- sorry.

11  I'll start over.

12          When was there enough evidence in the

13  epidemiology to determine glyphosate-based

14  herbicides cause NHL in people?

15      A.  I think it became more convincing as I

16  analyzed the carcinogenesis data and the Zhang

17  paper, which also was, to me, very important,

18  because what she did was look at the extent of risk.

19  She obviously did both a meta-hazard ratio,

20  meta-analysis, and she included the AHS cohort study

21  and then she went back and added the previous AHS

22  study.

23          And, overall, the heavier -- the highest

24  exposure were patients who had a, I think, a hazard

25  ratio of 4. -- 1.14, and she also included the data

Barry Boyd, M.D.

```
 1    on carcinogenesis to argue that there really wasn't

 2    a real effect, and that's what, to me, was really

 3    important.

 4         Q.  Okay.  And so if I understand -- if I

 5    understand your answer correctly, at the time, up --

 6    well, strike that.

 7              If I understand your answer correctly, in

 8    2019, when the Zhang article was published was when

 9    the evidence was sufficient to conclude

10    glyphosate-based herbicides cause NHL in people in

11    your opinion?

12         A.  Yes.

13         Q.  Okay.  Now, Mr. Vosper, ███████████ right?

14         A.  Correct.

15         Q.  Okay.  And he was diagnosed with NHL in

16    ███████████████████ true?

17         A.  Correct.

18         Q.  Okay.  And he was diagnosed with a subtype

19    called DLBCL, right?

20         A.  Right.

21         Q.  And ███████████ were diagnosed with NHL

22    prior to the introduction of glyphosate in 1974,

23    right?

24         A.  Correct.

25         Q.  Okay.  And ███████████ even today, are
```

Barry Boyd, M.D.

1   diagnosed with NHL who have never used Roundup in

2   their life, right?

3       A.  Correct.

4       Q.  And just because Mr. Vosper used Roundup

5   and was diagnosed with NHL doesn't mean in and of

6   itself Roundup use caused his NHL, true?

7                   MR. LaBLETTA:  Objection to the

8            form.

9       A.  When you look at the extent of his exposure

10  -- so the other issue that I write about and I put

11  in my report -- in my report, and they all talk

12  about it is time.  Okay.

13          So the classic carcinogenesis data on

14  tobacco, way back in the '50s, showed that the

15  earlier you start to smoke, the earlier the risk

16  goes up.  Duration of exposure as well as dose makes

17  a big difference.  If he had started being exposed

18  simply in 2005 or 2006, and then being diagnosed

19  five years later, but he really was exposed at a

20  very young age which we know, okay, beginning when

21  he was a young boy at the age of 9.  So his duration

22  of exposure, likely, was much longer, and it would

23  be longer than typical for the average home worker

24  who used his Roundup who might start as a young

25  adult and get it 15 or 20 years, potentially, has a

Barry Boyd, M.D.

1   15-year window of risk, plus he had significant

2   exposure.

3           So I think you need to understand that,

4   now, even if he had a genetic risk, you don't want

5   to push that with extremely high exposures.  By the

6   way he described it as a young boy, he was using

7   large amounts.  He continued to use it in his work

8   when he was older.

9           He continued to use it, of course, after he

10  was diagnosed.  And if there is, within the formula,

11  2R promoters independent of genotoxic levels that

12  can enhance the progression of disease, we don't

13  know if that, potentially, may have adversely

14  affected the rapidity of progression.

15          I believe because of the early onset of

16  exposure, with or without a genetic predisposition,

17  that would make me -- seriously, if I were a

18  high-risk for melanoma, I wouldn't go out and spend

19  all day in the sun without a shirt on because that's

20  going to trigger melanoma.

21          So, yes, the genetic risk increases it, but

22  the sun exposure is the carcinogen.  If I have a

23  risk for lymphoma, and I start getting exposed to

24  high levels of glyphosate at the age of 9, and I

25  continue through my -- through that period on the

Barry Boyd, M.D.

1    farms and then I go on to use it at work through my

2    work exposures and then at home, that's a lot of

3    exposure, even with a genetic predisposition,

4    because I think there's enough genotoxic and

5    promotional studies to indicate how inflammatory

6    oxidative stress-immediate effects, genotoxic

7    effects in people who are exposed, even in the --

8    with the formula, not the -- the glyphosate itself.

9         Q.  My question is a little bit different, and

10   it goes in some ways right to your methodology.  You

11   wouldn't say, as a scientist, as a medical doctor,

12   you wouldn't say just because somebody had exposure

13   to Roundup and they got NHL, their NHL was due to

14   Roundup exposure.  You would want to look at their

15   exposure history.  You would want to look at their

16   other risk factors, all of those things.  Right?

17        A.  Of course.  Of course.  Yeah, and I do that

18   with my patients.

19        Q.  Okay.  Okay.  That was -- that was all I

20   was asking there.

21        A.  Yeah.  I just wanted to be comprehensive.

22        Q.  Sure.  Understand.

23             Now, you had an interview with Mr. Vosper,

24   right?

25        A.  Yeah.  I'm trying to remember if I

Barry Boyd, M.D.

```
 1   interviewed.  I don't believe I did.  I'm sorry.
 2       Q.  Okay.  Your report says that you had a
 3   telephone interview with him, right?
 4       A.  I'm sorry.  Yeah.  Yeah.
 5       Q.  Okay.  Do you recall when that was?
 6       A.  I don't.  Can I look at my -- is it in
 7   there, my list?
 8       Q.  It just says telephone interview.  That's
 9   fine.  It's not -- if you don't recall, you don't
10   recall.
11       A.  Yeah.
12       Q.  Let me ask you this:  What -- you didn't
13   record that interview, you know, via tape recorder
14   or video recorder, right?
15       A.  Never, no.  I don't -- I don't record
16   those.
17       Q.  Okay.  And who was on the call besides you
18   and Mr. Vosper?
19       A.  I think it was -- if I'm not mistaken, it
20   was just the two of us.
21       Q.  Okay.  And anything pertinent you learned
22   in that interview, you would have included in your
23   report, right?
24       A.  Right.  Yes.
25       Q.  Okay.  Is there anything you learned in
```

Barry Boyd, M.D.

1    that interview that you included in your report?  I

2    didn't really see -- the way Dr. Sawyer does it, I

3    didn't see you say, "In my telephone interview, I

4    learned X, Y, Z."

5         A.  No, it just reinforced what -- what we

6    already knew from the fact sheet, the information.

7         Q.  Okay.  So just to be clear --

8         A.  It didn't add to that.

9         Q.  Okay.  So just to be clear, you didn't

10   learn anything knew in the interview.  It just was

11   confirmatory?

12        A.  Right.

13        Q.  Okay.  And Mr. Vosper, you -- well,

14   actually, we have been going about an hour here.  Do

15   you need a break or do you want to keep going?

16        A.  How about you?

17        Q.  I'm good.

18        A.  Maybe two -- two-minute break?

19        Q.  Sure.

20        A.  Because my office called me, as you know.

21   I want to make sure my patients are not rebelling.

22        Q.  Sure.  We can take a two-minute break.  No

23   problem.

24        A.  Great.  Okay.  Thank you.

25                  THE VIDEOGRAPHER:  The time is now

Barry Boyd, M.D.

```
 1                    3:05 p.m.  We're off the record.
 2                    (Recess taken.)
 3                    THE VIDEOGRAPHER:  The time is now
 4             3:16 p.m.  We're back on the record.
 5    BY MR. KALAS:
 6         Q.  Doctor, are you -- you are deferring to
 7    Dr. Sawyer on the exposure day metric, right?
 8         A.  Yes.  Yes.
 9         Q.  Okay.  But you read his report in this
10    matter when reaching your conclusions, right, for
11    that issue?
12         A.  Correct.  Yes.
13         Q.  Did you check his work at all?
14         A.  You mean, did I do the calculations myself?
15         Q.  No.  I mean, did you look at his report and
16    make sure that, yeah, he had done his math
17    correctly?
18         A.  I think looking at the -- you know, the way
19    he does it, I did.
20         Q.  Okay.  Are you --
21         A.  He probably -- because of the difficulties
22    in calculating data when he was young, he focused
23    more on that area where he could give accurate data
24    on exposures.
25         Q.  All right.  I take it you didn't read his
```

Barry Boyd, M.D.

1   transcript of his deposition earlier this week?

2         A.  No, I didn't.  I don't have access to that.

3         Q.  Okay.  I take it you have no awareness that

4   he discovered an error in his report and another --

5   well, actually two errors on his exposure day

6   calculations and revised his numbers down?

7         A.  No, I didn't.

8         Q.  So I'll mark his deposition this week as

9   Exhibit 12.  Give me a moment.  You'll need to

10  refresh the link once I have it marked so you can

11  see it.

12              (Exhibit Number 12 was marked for

13               identification.)

14        Q.  It's the document that says "WS083021."

15        A.  Right.

16        Q.  Just let me know when you get that open.

17        A.  It's open.  Which page?

18        Q.  So give me a moment.

19             So you if you go to page 58 -- or 57,

20  starting at 57 and carrying through 59.  And just

21  take a moment, if you can, to read from the bottom

22  of page 57, at line 23, through 59, 12.  And then

23  I'll just ask you a few questions.

24             Dr. Boyd, I don't want to hurry you at all,

25  but a number of minutes have passed.  Have you been

Barry Boyd, M.D.

1  able to read 57 to 59?

2       A.  Yeah.  I'm reading through now, carefully.

3       Q.  Okay.  Well, let me know when you're ready

4  for me to ask you questions.

5       A.  I'm almost done.  Yep.  I'm just going

6  through now the calculations, all right, that you

7  asked him about.

8       Q.  Okay.  Are you looking at his expert

9  report?

10      A.  I'm looking right here.  I'm on page 58.

11      Q.  Okay.  All right.  If you need to look at

12  his expert report, I'll mark his report as well so

13  you can see the table being asked about.  Just let

14  me know.

15      A.  I see what you're saying.  He was including

16  data after diagnosis.

17      Q.  Yes, sir.

18      A.  Yeah.  I see that.

19      Q.  Right.  And so my first question is, do you

20  have any reason not to defer to Dr. Sawyer on his

21  reduction of exposure days prediagnosis from 57 to

22  44?

23      A.  No.

24      Q.  Okay.  And do you agree that exposure days

25  after diagnosis of NHL would not be appropriate to

Barry Boyd, M.D.

```
 1    include under the temporality prong of Bradford

 2    Hill?

 3         A.  For primary causation.  It may play a role

 4    in later effects on promoting recurrence and

 5    progression but that's different, not a primary

 6    causation.

 7         Q.  Okay.  Then, sir, if I could direct your

 8    attention, please, to pages 61, line 16, through 63,

 9    line 11.  And if you could just read those to

10    yourself, please.

11         A.  61, line 16?

12         Q.  16, to 63, line 11.

13         A.  You wanted 62 or 63?

14         Q.  63, line 11, sir.

15         A.  Got it, okay.  Got it.

16         Q.  And do you see there that Dr. Sawyer

17    reduced his exposure day calculation again from 44

18    to 32 days because of a mathematical error, right?

19         A.  Right.

20         Q.  Okay.  And do you have any reason not to

21    defer to Dr. Sawyer -- strike that.

22             Do you have any reason not to defer to

23    Dr. Sawyer's newly-revised exposure day figure of 32

24    lifetime days --

25         A.  No.
```

Barry Boyd, M.D.

1      Q.   -- for Mr. Vosper?

2           Okay.  And when you're reading Dr. Sawyer's

3      report, and specifically focusing on the exposure

4      day section, did you notice he had made a

5      mathematical error?

6      A.   No.

7      Q.   How long did you spend reading Dr. Sawyer's

8      report in this matter?

9      A.   Probably two hours.

10     Q.   Okay.  I'm going to mark as Exhibit 13 the

11     Andreotti 2018 study.

12               (Exhibit Number 13 was marked for

13                identification.)

14     A.   The cohort study?

15     Q.   Yes.

16     A.   Yes, sir.  It's not up yet.

17     Q.   Okay.  Let me know when it is.

18     A.   Yep.

19     Q.   Okay.  And the cohort study both have

20     intensity-weighting metric for lifetime days and

21     just a lifetime days analysis, right?

22     A.   Correct.

23     Q.   Okay.  And I take it you have not gone

24     through the exercise of figuring out where in the

25     intensity-weighting metric Mr. Vosper would fall,

Barry Boyd, M.D.

1    fair?

2         A.   Correct.

3         Q.   Okay.  And -- and you didn't see that

4    Dr. Sawyer had done that either on the

5    intensity-weighting metric, right?

6         A.   Right.

7         Q.   Okay.  And one of the good things about the

8    intensity-weighting metric that they do in this

9    study is the intensity-weighting metric takes into

10   account some of the things you talked about before,

11   like personal protective equipment, method of

12   application, what have you, right?

13        A.   Right.

14        Q.   Okay.

15        A.   Days plus intensity.  Right.

16        Q.   Go ahead.

17        A.   Days plus intensity.

18        Q.   Right.  And -- and that is a better -- or

19   strike that.

20             That is a more precise metric of potential

21   internal dose than just days, right?

22        A.   Right.

23        Q.   Okay.  And none of the other epidemiology

24   studies that you reviewed used an

25   intensity-weighting metric, right?

Barry Boyd, M.D.

```
 1        A.  Yes.
 2        Q.  Okay.  The applicators in this study,
 3   they're farmers and licensed pesticide applicators,
 4   right?
 5        A.  Correct.
 6        Q.  Okay.  And whether they were using PPE or
 7   not wearing PPE, most of the applicators in this
 8   study would apply much more active ingredient of
 9   glyphosate by weight than a home user, right?
10        A.  Presumptively.  Depends on --
11        Q.  Okay.  And that's --
12        A.  Depending on the intensity of the home use.
13        Q.  Right.  And that's because the farmers,
14   licensed pesticide applicators, apply pesticide as
15   part of their job, and thus, are exposed, at least
16   in the environment to more of the active ingredients
17   than a home user, right?
18        A.  Correct.
19        Q.  Okay.  And --
20        A.  You know, given the differences in PPE,
21   that makes a big difference.
22        Q.  Right.  And you have seen -- or maybe you
23   haven't seen.  Have you seen the validation studies
24   for the intensity-weighting metric in the
25   Agricultural Health Study?
```

Barry Boyd, M.D.

```
 1        A.   No.

 2        Q.   Okay.  Are you aware that there are,

 3   depending on the method of application, somewhere

 4   between 20 percent and 50 percent of applicators,

 5   for instance, who didn't wear rubber gloves?

 6        A.   15 to -- what was the percent?

 7        Q.   I said 20 to 50, depending on the method of

 8   application.

 9        A.   20 to 50.  Okay.

10        Q.   Yeah.  Who did not wear rubber gloves.  Do

11   you have any awareness to that?

12        A.   No.

13        Q.   And -- and you're not saying, when you talk

14   about farmers and pesticide applicators wearing more

15   PPE, you're not saying that every single one of them

16   wears more PPE than a home user, right?

17        A.   No, not at all.

18        Q.   Okay.  There's some farmers who will not

19   wear rubber gloves or will not wear long pants,

20   right?

21        A.   Right.  You have got a control for that --

22        Q.   Okay.

23        A.   -- so that they --

24        Q.   And they do -- I'm sorry.

25        A.   That's what you're saying they do here.
```

Barry Boyd, M.D.

```
 1        Q.  Right.  And you agree with me?

 2        A.  It needs to be controlled for.  But I'd

 3   like to see the data.

 4        Q.  No.  I'm asking you.  You agree --

 5             MR. LaBLETTA:  Object to the form.

 6             Can you ask the question again?

 7             MR. KALAS:  Yeah.  I want to make

 8         sure he agreed with what I'm asking.

 9             MR. LaBLETTA:  Right.

10   BY MR. KALAS:

11        Q.  You agree with me that in the

12   intensity-weighting metric, they're trying to

13   control for that?

14        A.  Yes.

15        Q.  Okay.  So because Dr. Sawyer didn't

16   calculate an intensity-weighted lifetime dose for

17   Mr. Vosper, I'd like to look at Supplemental Table 1

18   in this study, which is the lifetime days of use.

19   And those are on -- those tables are on pages 9 and

20   10.

21        A.  Now, again, they didn't have data on almost

22   40 percent, all right, so they imputed that from

23   this.

24        Q.  Okay.  And, in fact, we can talk about that

25   in a minute if you want.  But let's -- can we just
```

Barry Boyd, M.D.

1   look at pages 9 and 10, and then we can talk about

2   the imputation issue?

3        A.  No, of course.  Absolutely.

4        Q.  Okay.

5        A.  Which supplementary table because it

6   doesn't give me pages here.

7        Q.  It's Supplementary Table 1, sir.

8        A.  Okay.  Got it.

9        Q.  Okay.  And so if you look at pages 9 and

10  10, they have a key at the bottom of page 10 that

11  tells you how they've divvied up their exposure

12  days.  Do you see that?

13       A.  Are you referring to quartiles?

14       Q.  Yes, sir.

15       A.  Fine.

16       Q.  Okay.  And Quartile 1 is 1 to 13.74.

17       A.  Right.

18       Q.  Quartile 2 is 13.75 to 38.74 and so on and

19  so forth, right?

20       A.  Right.

21       Q.  And just to be clear, individuals in the

22  high-exposed group in the Eriksson study referenced

23  in your report, that's the greater-than-10-day

24  group, can still be in the lowest-exposed group in

25  the Andreotti study, right?

Barry Boyd, M.D.

```
1          A.   Correct.

2          Q.   Okay.  And if we go up to NHL here -- well,

3    first of all, let me ask a more basic question.

4    Based on Dr. Sawyer's revised exposure date figure,

5    do you agree Mr. Vosper would fall into Quartile 2

6    in this study?

7          A.   Yes.

8          Q.   So if we go up to the NHL in this table.

9    For Quartile 2, we have a relative risk of .87 with

10   a confidence interval of .66 to 1.14.

11          Do you see that?

12          A.   Yes.  Yep.

13          Q.   Okay.  And so for individuals with a

14   similar exposure day profile to Mr. Vosper, the

15   Agricultural Health Study did not see a relationship

16   between NHL and their glyphosate use, right?

17          A.   Right.

18          Q.   Okay.

19          A.   They did -- whether or not it's adequate

20   data, they do show in Quartile 2 of 1.24 for diffuse

21   large cell B-cell in the Quartile 2.

22          Q.   Okay.  And I do see that.  So let's talk

23   about that real quick.  For diffuse large B-cell

24   lymphoma, they had a hazard -- or a relative risk,

25   not a hazard ratio, it's a relative risk, of 1.24
```

Barry Boyd, M.D.

```
1    with a confidence interval of .7 to 2.2, right?

2        A.  Yeah.  It's a wide --

3        Q.  And that is a null finding, right?  That's

4    how you describe that because the confidence

5    interval crossed 1?

6        A.  Yep.

7        Q.  And for marginal zone lymphoma, which you

8    mentioned earlier, he would fall into Median 1,

9    correct?  If you go down to the key.

10       A.  Yep.

11       Q.  And for Median 1, they had a relative risk

12   of .32 with a confidence interval of .07 to 1.52,

13   right?

14       A.  Right.

15       Q.  Okay.  And that relative risk, I mean, that

16   looks really low.  That means essentially they had

17   one case for every three controls, right?

18       A.  Yeah.

19       Q.  But -- but you wouldn't say that proves

20   that glyphosate is protective of MZL because the

21   confidence interval crosses 1, right?

22       A.  Correct.

23       Q.  And that's the same way you wouldn't say

24   the 1.24 figure for diffuse large B-cell lymphoma

25   proves glyphosate causes DLBCL because the
```

Barry Boyd, M.D.

```
 1    confidence interval crosses 1, right?

 2        A.  Right.

 3        Q.  Okay.  Now, you mentioned the imputed data.

 4    And are you aware that the -- there were scientists

 5    who raised some concerns about the imputed data in

 6    the literature?

 7        A.  I know they talked about it.  I didn't

 8    review it in great detail.

 9        Q.  Okay.

10             THE VIDEOGRAPHER:  Do you mind just

11          backing up a little.  I'm just having a

12          tough time hearing you when you're that

13          close.

14             THE WITNESS:  Sorry.

15             THE VIDEOGRAPHER:  I can't hear

16          your response.

17             THE WITNESS:  Yeah.

18             THE VIDEOGRAPHER:  Thank you.

19             THE WITNESS:  Sorry.

20    BY MR. KALAS:

21        Q.  Okay.  So I'll ask the questions again,

22    just to make sure the record is clear.

23             Were you aware that questions were raised

24    in the literature about using imputed data?

25        A.  Correct.  Yes.
```

Barry Boyd, M.D.

1        Q.   And are you aware that the authors of the

2   Agricultural Health Study actually responded to

3   those concerns?

4        A.   Yeah.

5        Q.   Okay.  And are you aware when they

6   responded to those concerns about the imputed data

7   they showed that whether they used imputed data or

8   not, the relative risks were essentially the same?

9        A.   Yes.  Yeah.

10       Q.   And what that means is that the use of

11   imputed data did not introduce bias into their

12   result.  Do you agree with that?

13       A.   Yes, but there's a presumption that the

14   data that was missing was similar in that if there

15   was a significant difference -- I mean, I can't go

16   back and analyze the way they analyzed imputed data,

17   but, you know, there is -- there are possibilities

18   and this happens a lot in studies, where the data

19   that's not in there is different, somewhat

20   different.

21       Q.   Right.  Are you offering an expert

22   opinion --

23       A.   In their analysis -- you know, what you're

24   saying about their analysis.

25       Q.   Okay.  Are you offering an expert opinion

Barry Boyd, M.D.

1    that the missing data was somehow differential in

2    such a way that it would bias their results?

3         A.  No, no.

4         Q.  Okay.  Now, Mr. Vosper used Roundup for

5    23 years, right?

6         A.  Right.

7         Q.  Okay.  And if he had 32 exposure days, that

8    means, on average, he had about 1.4 days a year of

9    use, right?

10        A.  Yeah.  I mean, if you did --

11        Q.  Okay.

12        A.  Correct.

13        Q.  Marked as Exhibit 14 -- well, I need to

14   rename it, but I have marked as Exhibit 14 the

15   McDuffie study.

16              (Exhibit Number 14 was marked for

17               identification.)

18        Q.  The McDuffie study is a study you've looked

19   at in the past, right?

20        A.  Right.

21        Q.  Okay.  And for individuals -- you discuss,

22   actually, the greater-than-two-day figure in this

23   study in -- in your report, right?

24        A.  Right.

25        Q.  Okay.  And you have been quite candid in

Barry Boyd, M.D.

1    the past, you agree that greater-than-two-day figure

2    is not controlled for other pesticide exposures in

3    this study, right?

4         A.  Right.  Right.

5         Q.  And if you go to Table 8 of this study,

6    which is on the eighth page, for individuals with

7    zero to two or less than two days of exposure, the

8    authors found an odds ratio of 1 with a confidence

9    interval of .63 to 1.57, while for individuals with

10   greater than two days of exposure, the authors found

11   an odds ratio of 2.12 with a confidence interval of

12   1.20 to 3.73.

13        Do you see that?

14        A.  Yeah.

15        Q.  Okay.  So for individuals like Mr. Vosper,

16   the McDuffie -- McDuffie authors did not find any

17   increased risk of NHL; is that fair?

18        A.  You mean based on the recalculations of --

19        Q.  Yeah.  We're having trouble hearing you

20   but, yes, I do mean --

21        A.  -- the exposure data of Sawyer?

22        Q.  Yes, sir.  Yes, sir.

23        A.  Based on that, yes, I see that.

24        Q.  Okay.  Now, the authors in McDuffie,

25   though, did find in Table 1 an increased risk,

Barry Boyd, M.D.

1   statistically significant, for a family history of

2   cancer in any first-degree relative, right?

3           That is the last entry in Table 1.

4       A.  I see that, 1.31.

5       Q.  Right.  And that's statistically

6   significant, right?  1.05 to 1.62?

7       A.  Right.

8       Q.  Okay.  And what that means is that to a

9   95 percent degree of confidence, individuals in the

10  McDuffie study who had a first-degree relative with

11  cancer had an increased risk for NHL as opposed to

12  those who did not, fair?

13      A.  Yes.

14      Q.  Okay.  And do you agree that Mr. Vosper had

15  an increased risk for NHL based on having a

16  first-degree relative of cancer as opposed to

17  someone who would not -- who did not have that

18  first-degree relative?

19      A.  Yes.

20      Q.  Okay.  Another study you talk about is the

21  Pahwa study, and the Pahwa study contains the

22  McDuffie data and the De Roos 2003 data, right?

23      A.  Correct.

24      Q.  Okay.  And so I'm going to mark that as

25  Exhibit 15 real quick.

Barry Boyd, M.D.

```
 1                    (Exhibit Number 15 was marked for
 2             identification.)
 3        A.  I see it.  Oh, yeah, it's on top.
 4        Q.  Yep.  And if you could just open that up
 5   real quick, please.
 6        A.  I went back.  Hold on.  Let me do it again.
 7   All right.  That's better.
 8        Q.  Okay.  And if you go to Table 1 in this
 9   study, they looked at -- instead of just a
10   first-degree relative with cancer, they looked at a
11   first-degree relative with lymphatic or
12   hematopoietic cancer.
13             Do you see that in Table 1?
14        A.  Yes.  Yeah.  2.1 --
15        Q.  Okay.  And you agree -- you agree looking
16   at a first-degree relative with lympathic or
17   hematopoietic cancer is more relevant to potential
18   risks than just looking at whether they had any
19   cancer, right?
20        A.  Yes.
21        Q.  Okay.  And why is that?  Why is it more
22   relevant?
23        A.  Well, the linkage between similar cancers
24   from a genetic standpoint might be greater than
25   dissimilar cancers because they have different
```

Barry Boyd, M.D.

1    pathways, different etiologies.

2        Q.  Okay.  And if you look here for the

3    lymphatic or hematopoietic cancer in a first-degree

4    relative, the authors of the Pahwa study found an

5    odds ratio here -- yeah, it is an odds ratio.  They

6    found an odds ratio here of 2.3 with a confidence

7    interval of 1.69 to 2.67.

8        Do you see that?

9        A.  Yeah.

10       Q.  That shows more than doubling of risk of

11   NHL in individuals in their study population who had

12   a first-degree relative with a

13   lymphatic/hematopoietic cancer, right?

14       A.  Yes.

15       Q.  Okay.  Would you agree Mr. Vosper was at a

16   more than doubled risk of getting NHL by dint of

17   having a first-degree relative with a hematopoietic

18   cancer as opposed to somebody who was not -- did not

19   have that history?

20       A.  Yes.

21       Q.  Okay.  Now, your report -- you told me

22   earlier that the evidence really was strong enough

23   to argue glyphosate-based herbicides caused NHL when

24   the Zhang article came out.  And the Zhang article,

25   just going to your report, at page 26, showed a

Barry Boyd, M.D.

1    meta-relative risk for NHL based on glyphosate-based

2    herbicide use of 41 percent.

3           Do you see that, the meta increased risk?

4    It's on page 26 of your report?

5       A.  Which table are you on?

6       Q.  So I'm looking at your report on page 26

7    where you discuss the Zhang study.

8       A.  Right.  Right.  Okay.

9       Q.  And you talk about the fact that

10   individuals who used glyphosate in the highest

11   exposure groups had an overall meta-relative risk

12   for NHL of 41 percent, right?

13      A.  Yes.

14      Q.  Okay.  And that was based off of

15   meta-relative risk of 1.41, right?

16      A.  Correct.

17      Q.  Okay.  And unlike what we just saw in the

18   Pahwa study with hematopoietic cancer, that is not a

19   doubling of the risk, right?

20      A.  Right.

21      Q.  And in fact, if I understand correctly,

22   your methodology here in determining Roundup caused

23   or substantially contributed to Mr. Vosper's NHL,

24   your methodology was based on conducting what's

25   called a differential etiology; is that true?

Barry Boyd, M.D.

```
 1       A.   Correct.

 2       Q.   Okay.  And so what you did there is you

 3  ruled in possible causes of his NHL, and then you

 4  ruled out all of those causes except for Roundup,

 5  right?

 6       A.   Correct.

 7       Q.   Okay.  Tell me your methodology by which

 8  you ruled out having a first-degree relative

 9  with hematopoietic NHL -- or, excuse me.  Strike

10  that.

11            Tell me your methodology by which you ruled

12  out having a first-degree relative with a

13  ███████████████████  as an independent cause of his

14  NHL?

15       A.   The point I was making, I mentioned this

16  before, is that a family history coupled with a now

17  I'm having to take the new exposure data, which I

18  was not exposed to, if you excuse the pun, now.  So

19  that is, you know, difficult for me because you just

20  presented me different exposure data.

21            But based on the described exposure data,

22  particularly with very high early childhood

23  exposure, makes me concerned that that is

24  superimposed on the genetic risk, or the risk of

25  having a family member with a hereditary -- not even
```

Barry Boyd, M.D.

1   hereditary, but with a hematopoietic disease,

2   malignancy, superimposing that risk on him when you

3   add the high level of exposure may make him much

4   more vulnerable to that.

5          Now, again, the high level of exposure now

6   over years, which is essentially just one day as

7   your stating in the new calculations, is not my

8   understanding how he was exposed when he was very

9   young.

10     Q.  All right.  If we go to Dr. Sawyer's

11  report, and -- and we can mark it if you want, are

12  you arguing that there is any day where he was

13  exposed to two days of exposure, according to

14  Dr. Sawyer, when he was young?

15     A.  You mean any year?

16     Q.  Yeah.

17     A.  I don't know if he felt safe saying that

18  that -- he described, personally, that they used a

19  lot of Roundup when he was first working on the farm

20  with his father at the age of 9.  Now, that's --

21  that's different than, you know, going to the store,

22  buying Roundup and using it on your -- on your

23  residence, right?  That's a very different issue.

24  We're using it in his work.

25          So I don't know how we calculate that, and

Barry Boyd, M.D.

```
 1    that's one of the dilemmas.  But that seems to be --
 2    at higher levels when you're young, they have higher
 3    risk.  I think we're really all stymied by how do we
 4    calculate that exposure in his first couple years.
 5    It was the first two years that they spent clearing
 6    that farm at least by his history.
 7         Q.  Well, let me -- let me ask you this -- give
 8    me a moment.
 9         Dr. Sawyer calculated that, at most,
10    Mr. Vosper would have had 14 exposure events at one
11    hour per event for less -- so that would be 14 total
12    hours, which is less than two days, in those first
13    two years at Jones Lane.
14         Any reason to disagree with that figure?
15         A.  No, no.
16         Q.  Okay.  You mentioned before, with the new
17    exposure data -- you reached your opinion with the
18    old exposure data.  With the new exposure days
19    number of 32 that Dr. Sawyer has testified to and
20    which you're relying on, do you have any reason to
21    amend your opinion?
22         A.  No.
23         Q.  Okay.  So let me go back --
24         A.  I have to really --
25         Q.  Let me go --
```

Barry Boyd, M.D.

 1      A.  I'll be honest, you know, you actually

 2  presented me with brand-new exposure data.  Right.

 3  I understand how you did that.  I reviewed how

 4  you're doing it.  It does -- it's just concerning

 5  that it's changed the -- all the calculations.  I

 6  want to make sure that there's nothing there I'm

 7  missing.

 8          I don't want to spend all day doing that,

 9  because, you know, I have to -- you know, I'm not --

10  I'm not a toxicologist.  I do rely on toxicologists

11  to look at that and I'll, you know -- in fairness, I

12  want to reanalyze it based on what you're saying and

13  the new data you provided to me from the adjusted

14  exposure date.

15      Q.  Well, sir, did -- I guess, let me ask a

16  really basic question.  Given that I presented you

17  with a new opinion from Dr. Sawyer today, can you

18  still say, sitting here today, until you review what

19  Dr. Sawyer has done, can you still state to a

20  reasonable degree of scientific certainty that

21  Roundup caused Mr. Vosper's NHL?

22              MR. LaBLETTA:  Objection to the

23          form of the question, that Dr. Sawyer's

24          opinions changed.  And I believe that

25          question's been asked and answered, but

Barry Boyd, M.D.

 1              you can answer it again.

 2       A.  I said that I just -- really, I don't want

 3  to suddenly change my opinion based on everything

 4  you have presented.  I want to have a chance to

 5  review that.  I understand -- I appreciate that, if

 6  that's true, yes, it could, potentially.

 7       Q.  Okay.  Let me -- let me come back to a

 8  question I asked a little bit ago.

 9              We have a more than doubling of the risk

10  based off of the Pahwa study in having a

11  first-degree relative with hematopoietic.  We have a

12  meta-relative risk based on the Zhang study in

13  highest-exposed individuals of a 41 percent

14  increased risk, not more than doubling of the risk.

15              Based on those two figures, can you say

16  that Mr. Vosper's Roundup exposure was the strongest

17  contributing factor to his NHL?

18       A.  Not necessarily the strongest, but --

19       Q.  Okay.

20       A.  -- likely may have contributed.  Not the

21  strongest.

22       Q.  Okay.  And based on that, if Mr. Vosper had

23  never touched Roundup, never been exposed to Roundup

24  in his life, yet still had the family history of a

25  first-degree relative with ███████████  would you

Barry Boyd, M.D.

1    be able to say that he never would have gotten NHL?

2                    MR. LaBLETTA:  Objection to the

3            form.

4        A.  Excuse me.

5        Q.  Yep.

6                    MR. LaBLETTA:  Objection.  Calls

7            for speculation.  Calls for speculation.

8        Q.  I'll re-ask the question because he was

9    interrupted, and I'll -- I'll ask it -- I'll ask

10   again.

11           If everything was the same about

12   Mr. Vosper, except he had never been exposed to

13   Roundup in his life.  Same family history, same

14   comorbidities, what have you.  Could you state to a

15   reasonable degree of scientific certainty that he

16   never would have gotten NHL?

17       A.  No.

18                   MR. LaBLETTA:  Same objection.

19       A.  I couldn't.

20       Q.  Sorry.  I missed the answer there.

21       A.  No.  I couldn't say but I believe it would

22   have been less.

23       Q.  Okay.  Same question except slightly

24   different.  If everything were the same about

25   Mr. Vosper, except he never used Roundup, so same

Barry Boyd, M.D.

1  family history, same comorbidities, could you state

2  to a reasonable degree of scientific certainty that

3  he would not have manifested NHL at the same time

4  and in the same intensity?

5            MR. LaBLETTA:  Objection.

6       A.  One more time.  Repeat that.

7       Q.  If everything were the same about

8  Mr. Vosper except for his Roundup exposure, could

9  you state to a reasonable degree of scientific

10 certainty that he would not have manifested NHL at

11 the same time and at the same severity?

12            MR. LaBLETTA:  Objection.

13      A.  That's pure speculation.  I would say --

14            MR. LaBLETTA:  Right.

15      A.  That's speculation.  I can't -- there's too

16 many --

17      Q.  Okay.

18      A.  Really.

19      Q.  Okay.  Now, going back to your report here,

20 you talked about cellular and animal studies at

21 pages 23 and 24, right?

22      A.  Yeah.

23      Q.  Okay.  And there's citations, I think, if I

24 were getting -- getting it right, the citations that

25 you have in this section are Citations 20 through 37

Barry Boyd, M.D.

1   in your records list; is that true?

2       A.  Yes.

3       Q.  Okay.  And these are mostly -- 20 to 37,

4   these are mostly what are known as genotoxic or

5   mechanistic studies, right?

6       A.  Correct.

7       Q.  Okay.  And the whole point of these studies

8   is they look at the potential mechanism of cancer

9   causation, right?

10      A.  Yes.

11      Q.  Okay.  A positive genotoxicity study in and

12  of itself can't prove a substance causes cancer in

13  people, right?

14      A.  Correct.

15      Q.  And design is important in these

16  genotoxicity studies.  Do you agree with that?

17      A.  Yes.

18      Q.  One of the things you would want to look

19  out for is cytotoxicity, right?

20      A.  Correct.

21      Q.  If you do a mechanistic study at a

22  cytotoxic dose, you'll see genetic damage, but it

23  would not be as a result of a carcinogenic process,

24  it would be a result of the cell dying, true?

25      A.  Correct.

Barry Boyd, M.D.

1      Q.   And another thing you'll look at in this

2  study like -- strike that.  Another thing you'll

3  look at in a mechanistic study is whether they're

4  conducted in vitro or in vivo, right?

5      A.   Yes.

6      Q.   Okay.  And one of the benefits of an in

7  vivo study that's in a living system is that we see

8  the cellular repair mechanism, while we cannot see

9  that in an in vitro study, true?

10      A.   Yeah.

11      Q.   Okay.  And another thing you're looking at

12  in these studies is whether they're done on

13  glyphosate or formulated product, right?

14      A.   Correct.

15      Q.   And -- and you mentioned before that

16  formulated products may be causing increased risk as

17  opposed to glyphosate alone, right?

18      A.   Correct.

19      Q.   Okay.  And another thing you look at in

20  these studies is test design, right, whether it's an

21  OECD or EPA guideline study or whether it's not a

22  guideline study, right?

23      A.   Yes.  Right.

24      Q.   Okay.  And those guidelines that are put

25  out by the OEPC, by the EPA, those established

Barry Boyd, M.D.

1    designs are fit for purposes and ensure

2    replicability, true?

3         A.  Correct.

4         Q.  Okay.  Another thing you'll look for is

5    what the test animal is, right?  Is it in a mammal

6    or nonmammal, right?

7         A.  Right.

8         Q.  Okay.  Why -- why do you care whether it's

9    a mammal or nonmammal?

10        A.  The closer to humans you get, potentially

11   the greater applicability.  It's not absolute.  But

12   mammalian studies are better than studies in fish,

13   which are better than studies -- certainly, you

14   don't want to study cancer in plants.  It's not

15   relevant.

16        Q.  I deposed an expert the other day who had

17   studied cancer in fungi.  I don't know how you feel

18   about fungi, but we'll leave that aside.  That's not

19   a question.

20        A.  There's a difference between cancer in

21   fungi and genotoxic effects in fungi cells because

22   eukaryotic cells generally carry similar process.

23   You may not realize how closely related we all are

24   to fungi.  Sorry.  That's the best --

25        Q.  I -- I can think -- I can think of a few

Barry Boyd, M.D.

```
 1   people I compare to fungi, so --

 2        A.   -- a fungus.

 3        Q.   Going back to page 38 of your report.  Page

 4   38, starting at entry 20.

 5        A.   Do I get to look at my report?

 6        Q.   Absolutely.  It's marked as Exhibit 2, sir.

 7        A.   Yep.  I've got it.  I was just asking if I

 8   can open it up and look at it.

 9        Q.   Anything I have marked, you can open up.

10        A.   Okay.

11        Q.   It's fair game.

12        A.   You want me to go to page?

13        Q.   Page -- so I'm looking at page 38, and I'm

14   looking at citation 20.

15        A.   Right.

16        Q.   Okay.  And that's a study in tadpoles,

17   right?

18        A.   What is the lead author?

19        Q.   It's Clements.  C-L-E-M-E-N-T-S.

20        A.   Our numbers are not the same.  Sorry.

21   That's the problem with the references, there's a

22   change in the numbering.  So let me go to Clements.

23   Let me find that.  Yeah.  Got it.  Genotoxicity

24   in --

25        Q.   So are you looking at the report -- are you
```

Barry Boyd, M.D.

1    looking at the report I have marked as Exhibit 2 in

2    the link, or are you looking at something else?

3         A.  I'm looking at my report, Exhibit 2.

4         Q.  Okay.  And you don't have --

5         A.  I have Clements, "Genotoxicity of select

6    herbicides in Rana catesbeiana."

7         Q.  Is that not citation 20 in your report?

8         A.  Oh, it is.  I'm sorry.  Yeah.  For some

9    reason -- yeah, that's citation 20.

10        Q.  Okay.  And so the Clements study is a study

11   in tadpoles, right?

12        A.  Yes.

13        Q.  Okay.  Those are not mammals, true?

14        A.  Correct.

15        Q.  How close genetically are tadpoles to

16   people?

17        A.  In the evolutionary ladder, probably fairly

18   different, but we're still both vertebrates, so that

19   makes us a little closer.

20             Now, I'm not sure that you're asking me

21   that it's irrelevant to see genotoxicity in a

22   vertebrate compared -- that's not a mammalian

23   species, because I think that that's not always

24   correct.  There are similar -- you know, there are

25   similar genotoxic effects on the genes in multiple

Barry Boyd, M.D.

1   vertebrate species that may have overlap with

2   humans.

3       Q.  You know, sometimes I think experts think

4   there's an implication in my question --

5       A.  Yes.

6       Q.  -- and there isn't.

7           So my question, and I think you answered

8   it, is that tadpoles are relatively distant on the

9   evolutionary scale from people, though we're both

10  vertebrates, fair?

11      A.  You know, you're speaking to somebody

12  trained in biology.  Sorry.

13              MR. LaBLETTA:  Objection to the

14          form.

15      A.  And I tend to not see them as far away as

16  you'd think.  I think if you look at evolution in

17  general, they are far closer that we appreciate, but

18  there are --

19      Q.  I'm --

20      A.  -- different orders.  They're amphibia, but

21  they're all -- but they're vertebrates.  They are --

22  you know, we tend to think of them as more distant

23  because of our, you know, unique human view of the

24  world.  But I do think that they're -- they are, not

25  closely related, they're not primates, they're

Barry Boyd, M.D.

```
 1   certainly not anthropoid apes.  So they're further
 2   down the chain, if you will.
 3          So I would say I agree but I wouldn't put
 4   them as evolutionary distant.  They're not.
 5      Q.  Well, I thought I was using your words from
 6   the previous answer.  So -- so I want to make sure
 7   we agree.  I had asked you two questions ago how
 8   close genetically are tadpoles to people.
 9              MR. LaBLETTA:  Object.  I'm sorry.
10      Q.  And I was just trying to understand your
11   answer, because you sort of answered a few different
12   things there.
13          So -- so let me ask this:  Are tadpoles as
14   close genetically to people as mammals?
15      A.  Of course not.
16      Q.  Are tadpoles as close genetically to people
17   as -- well, strike that.
18          Do tadpoles get cancer?
19              MR. LaBLETTA:  Object to the form.
20           I'll just object to the question,
21            relevance.
22      A.  Do tadpoles get cancer?
23      Q.  Yeah.
24      A.  The answer is probably, and they get
25   altered developmental abnormalities with exposures.
```

Barry Boyd, M.D.

```
 1    They become hermaphrodites.  I don't know if you've

 2    ever heard of that expression.  But there's great

 3    work out of Berkeley that another herbicide causes

 4    now -- dramatically changes their ability to mature,

 5    so they are affected -- they are affected by our

 6    exposures.

 7         Q.  That's Dr. Hayes' work?

 8         A.  Yes.  Right.  Exactly.

 9         Q.  Okay.  And that's on atrazine, correct?

10         A.  Correct.  That's exactly right.

11         Q.  And that has to do with sexual development

12    and gender, right?

13         A.  Correct, not cancer.

14         Q.  Right.  So my question was different, which

15    is, are you aware of tadpoles getting cancer?

16         A.  No, but I'll find that answer for you at

17    some point if you want.

18         Q.  Okay.  Now numbers 21 through 24 --

19         A.  Excuse me.  I'm not a tadpole oncologist,

20    so that's part of the problem.

21         Q.  Okay.  21 through 24, Cavas, Cavalcante,

22    Poletta, Moreno, right?

23         A.  Yes.

24         Q.  Okay.  Those are studies in fish?  All four

25    of those, right?
```

Barry Boyd, M.D.

```
 1        A.  Correct.

 2        Q.  Okay.  You might want to back away again,

 3   we're hearing you but we're losing you.

 4        A.  Oh, yeah.  I'm sorry.  Yeah.

 5        Q.  And fish are not mammals, right?

 6        A.  They are not, yes.

 7        Q.  Okay.  How close genetically are fish to

 8   people?

 9             MR. LaBLETTA:  Objection.

10        A.  They're further away than amphibians.  You

11   may recall --

12        Q.  They're further away than tadpoles?

13        A.  Yeah.  You may recall that in the evolution

14   of mammals, mammals evolved out of amphibious

15   organisms that were equivalent to frogs that came

16   from, you know -- and I don't want to go back into

17   the evolutionary tree, but fish were further back.

18        Q.  Okay.

19        A.  I never thought I would be talking about

20   this.

21        Q.  Have you ever heard -- have you ever heard

22   of a fish getting cancer?

23        A.  Yes, absolutely.

24        Q.  What cancers do fish get?

25        A.  Listen, seriously --
```

Barry Boyd, M.D.

```
 1                   MR. LaBLETTA:  I'll object.
 2        A.  I don't mean to -- I mean, really?  You're
 3   really asking me that?
 4        Q.  Yeah.  Yeah.  I am really asking.
 5             Have you ever heard of a fish getting
 6   cancer?
 7        A.  The answer to that is yes, but I haven't
 8   recently reviewed that.
 9        Q.  So what -- what cancer did the fish get?
10             You said yes, which cancer?  What types of
11   cancer?
12        A.  You know, please, you're asking -- you're
13   really pushing.
14                   MR. LaBLETTA:  This is kind of far
15              out there and beyond his area of
16              expertise, fish cancer.
17        A.  Yeah.  Yes.  Seriously.  I mean, we do fish
18   tests when a patient has cancer but you're being --
19   I actually feel this is --
20                   MR. LaBLETTA:  Really far out
21              there.
22                   MR. KALAS:  You all are welcome to
23              object.  I'm going to ask the question
24              because I think these studies are
25              completely irrelevant to Mr. Vosper.
```

Barry Boyd, M.D.

```
 1   BY MR. KALAS:
 2       Q.  So my question is, do fish get cancer?
 3            MR. LaBLETTA:  Continuing
 4        objection.
 5       A.  Unfortunately --
 6            MR. LaBLETTA:  Continuing
 7        objection.
 8       A.  -- sharks get tumors that are treatable.
 9   Bonefish get infiltrated papillomas.  Coy fish get
10   sarcomas.  The answer to that question is
11   absolutely, they get cancer.
12       Q.  Okay.  And are you reading from anything
13   there or do you just know that --
14       A.  Well, you actually forced me to because
15   this was not a question I ever anticipated, and I
16   won't --
17       Q.  What are you reading from?
18       A.  From Veterinary News.
19       Q.  Veterinary News, is that a --
20       A.  We will set --
21       Q.  Is that a peer-reviewed journal?
22       A.  No.
23       Q.  Is that --
24            MR. LaBLETTA:  Doctor, just -- you
25        don't need to do any research.
```

Barry Boyd, M.D.

```
 1              Whatever's in your head.  If you know,
 2              you can simply say you know.  If you
 3              don't know with respective to fish
 4              cancer.
 5        A.   The answer, I had to look it up, but I
 6   would be glad to provide peer-reviewed data on fish
 7   not being immune to cancer.  I know that from my
 8   research on immunoSpots, that it's not isolated to
 9   mammals or human.  Absolutely.
10        Q.   Do fish get lymphoma?
11        A.   I don't know off the top of my head, but
12   they get cancers.
13        Q.   Okay.  Now, entries 31 through 34 are
14   studies by Julie Marc, right?
15        A.   Yeah.
16        Q.   Okay.  And it's not in the title of the
17   study so I can mark them if you need me to, but all
18   four of her studies are in sea urchins, right?
19        A.   Right.
20        Q.   What are sea urchins?
21        A.   Sea urchins are a form of mollusk that
22   contain spikes so that they -- but they're
23   invertebrates.
24        Q.   Okay.  So, again, to be clear, they're not
25   mammals, right?
```

Barry Boyd, M.D.

```
 1        A.   Correct.

 2        Q.   Okay.  And how close genetically are sea

 3   urchins to people?

 4             MR. LaBLETTA:  Objection.  Same

 5              objection as before.

 6        A.   They're farther away.  Of course they are.

 7        Q.   Are you aware of sea urchins getting

 8   cancer?

 9        A.   I can't answer that but should we go down

10   the species here and check which ones I know get

11   cancer so I can be prepared?

12        Q.   Well --

13        A.   I don't -- you know, I would ask a simple

14   question.  None of the biologists who study

15   genotoxic effects using invertebrate models assume

16   that it could only be important because the species

17   themselves get cancer.

18             They see them as models for the effect of

19   exogenous carcinogens on the effect on DNA and, you

20   know, replication, et cetera.  So I think, you know

21   -- I appreciate it, but it almost seems like it's

22   tongue and cheek here now.  Sorry.

23        Q.   None of these 18 studies you have listed as

24   mechanistic studies from entries 20 to 37 are

25   guideline studies, true?
```

Barry Boyd, M.D.

```
1         A.   Of course not.  Of course not.

2         Q.   None of those studies were conducted on

3  formulated product for the purposes of regulatory

4  approval of Roundup, right?

5         A.   Correct.

6         Q.   Are you aware Monsanto has submitted, and

7  other registrants, have submitted dozens of

8  guideline studies on formulated product?

9         A.   Yes.  I'm not sure, you know -- I'd have to

10  go back and see which ones you're referring to.

11         Q.   Well, we may do that, but are you aware

12  that those studies have been produced in litigation

13  to counsel like Mr. LaBletta?

14         A.   Yes.

15         Q.   Okay.  Have you asked to see those studies?

16         A.   No.

17         Q.   Why not?

18         A.   I have reviewed a lot of studies.  I mean,

19  the -- I have not gotten anything from the Monsanto,

20  you know, research, to be fair, other than what's in

21  the published peer-reviewed literature.

22         Q.   Well -- and I understand you haven't gotten

23  anything because I -- I did see -- I did look over

24  the materials considered list looking for that.

25              My question is, why haven't you asked for
```

Barry Boyd, M.D.

1    it?

2        A.   Frankly, I wasn't -- I didn't know I could

3    get information from Monsanto.

4        Q.   Okay.

5        A.   Just based on experience.  That's all.

6        Q.   Okay.  So I'm going to mark as Exhibit 16 a

7    document that was put out by the US EPA at the end

8    of 2017.  Let me know when you have that open.

9             (Exhibit Number 16 was marked for

10            identification.)

11       A.   Let me just take a look.

12       Q.   Sure.

13       A.   Hold on one second here.  Sorry.  My fault.

14   Okay.

15       Q.   Okay.  So I am looking at Table F.4 in this

16   document.  So that's near the end, I believe it's

17   page 205.  Strike that.  It is page 210.

18       A.   Is it down there?  Still moving.

19       Q.   Sure.

20       A.   Yep.

21            Table --

22       Q.   And you see Table, I'm sorry, F.4?

23       A.   Which?

24       Q.   Table F.4 on page 210.

25       A.   Nope.  I don't --

Barry Boyd, M.D.

1        Q.  Exhibit 16?

2        A.  I see on page 110, there's no table.

3        Q.  210.  210.

4        A.  Oh, 210.  I see F.

5        Q.  Okay.  We're in Appendix F.4.  Do you see

6   here that EPA is evaluating in vivo tests for

7   micronuclei induction in mammals - glyphosate

8   formulation.

9            Do you see that?

10       A.  Yep.

11       Q.  Okay.  And what is an in vivo test for

12  micronuclei induction in mammals?

13       A.  It's not within the organism, it's in

14  culture.

15       Q.  In vivo.  V-I-V-O?

16       A.  Oh, I'm sorry.  In vivo is in the animal.

17  I'm sorry.  In vitro is --

18       Q.  Okay.  So this is a study in the live

19  animal where we can have cellular repair, right?

20       A.  Right.

21       Q.  Okay.  And what is micronuclei induction in

22  mammals?  What are you testing for there?

23       A.  Is looking for changes within the cells

24  that kill these ultra nuclei that reflect toxic

25  damage, so it reflects chromosomal abnormalities as

Barry Boyd, M.D.

```
 1   micronuclei.
 2        Q.  Is that an endpoint from a mechanistic
 3   point of view that you would find relevant?
 4        A.  Well, it's part of the whole database on
 5   what it may do.
 6        Q.  Okay.  So -- so is that a yes?
 7        A.  That's a yes.
 8        Q.  Okay.  And this is done in formulated
 9   product, right?
10        A.  Correct.
11        Q.  Okay.  And so that captures the effect, if
12   there is, any of the surfactants, the glyphosate,
13   and of the two of them in conjunction?
14        A.  Right.
15        Q.  And, again, that's the sort of data you
16   would want to see, right?
17        A.  Right.
18        Q.  Okay.  And there are 20 tests listed here
19   in this table, and if you want to take a moment just
20   to look through all 20 tests -- or just make sure
21   I'm counting right and see that there's 20 tests
22   here.  And the table goes on four pages.
23        A.  Right.  Right.  I see.
24        Q.  Okay.  And those 20 tests on those four --
25   on those four pages, those are all tests that were
```

Barry Boyd, M.D.

```
 1    reviewed by EPA that you have not reviewed, right?
 2    I didn't seen any of them --
 3         A.   Right.
 4         Q.   -- on your materials considered.
 5         A.   Right.
 6         Q.   And they're OBCD guideline tests, right,
 7    these bone marrow micronuclei tests?
 8         A.   Right.
 9         Q.   And 19 of the 20 tests listed here are
10    negative, right?
11         A.   Yes.  That's right.
12         Q.   And what it means to be negative in a study
13    like this is that the formulated Roundup did not
14    induce micronuclei in the living system of mammals,
15    right?
16         A.   Correct.
17         Q.   Okay.  And what does that say to you as
18    somebody who looks at mechanistic studies?  I mean,
19    the fact that the formulated product was incapable
20    of inducing this?
21         A.   Well, in these assays, it looks like they
22    said they don't see any evidence of that.
23              THE COURT REPORTER:  Doctor, can
24              you back up a little bit?  I need you to
25              repeat.
```

Barry Boyd, M.D.

```
 1              THE WITNESS:  I'll move away, I'm
 2         sorry about that.  I apologize.  Yeah.
 3         A.  Well, but there are other assays that do.
 4    You know, that's one of the dilemmas about the
 5    debate that's at issue.  You know, on the next page
 6    you have sister chromatid exchanges appear to be
 7    increased.
 8         Q.  Right.  And the sister chromatid exchanges
 9    were on the next page that you mention.  I can go
10    there real quick.  That's in Table F.3, I believe --
11    no.
12         A.  F.5.
13         Q.  I don't even see where you're reading.
14    F.5, okay.
15         A.  F.5.
16         Q.  The sister chromatid exchanges were in
17    vitro studies, were they not?
18         A.  Correct.
19         Q.  Okay.  And so when you're looking at living
20    systems, were there studies in living systems that
21    showed glyphosate formulations causing genetic
22    damage that you have seen, or were they just in
23    vitro?
24         A.  Well, let me -- so the micronuclei tests
25    were negative, right?
```

Barry Boyd, M.D.

1        Q.  19 of 20 of them, sir.

2        A.  Right.  For chromosomal aberrations on

3    Table F.3, there are a lot fewer, but two out of

4    three were positive.

5        Q.  Right.  And you haven't reviewed those

6    tests either, right?

7        A.  No, no.  I'm just looking at this.  You're

8    asking me to look at this.

9        Q.  No.  What I asked you -- I asked you what

10   you have seen, right?

11       A.  Right.

12       Q.  And so my question was, were there studies

13   in living systems that you have seen in this EPA

14   document that showed increased genetic damage?

15       A.  The answer in that -- in those micronuclei

16   tests, the answers is no.

17       Q.  Do you know if your opinion would change

18   regarding the mechanistic -- your mechanistic

19   opinions on glyphosate or glyphosate-based

20   formulations if you saw all the data EPA has seen?

21       A.  I would like to see all of the data, not

22   just what EPA looked at.

23       Q.  Okay.  But my question was in the context

24   of EPA, so I can keep asking.

25       A.  Yeah, I would want to see --

Barry Boyd, M.D.

1                MR. LaBLETTA:  Objection.  Asked

2           and answered.  Yeah.  Asked and

3           answered.

4      Q.  Can you back up a little?  You're -- we're

5 losing the answer.

6      A.  I'm sorry.  Yeah.  Obviously, within this

7 context, I would look seriously at it.

8      Q.  Right.  But my question was different, can

9 you say that your opinion regarding the mechanism of

10 cancer causation from glyphosate based formulations

11 would be the same if you saw all the data EPA has

12 seen?

13                MR. LaBLETTA:  Objection.  Asked

14           and answered.  Yeah.

15      A.  The answer is, that as I said before, I

16 would look at all of the data that EPA saw and

17 others to be sure.

18      Q.  Well, right.  And you have looked at data

19 that others have seen, right?

20      A.  Yeah.

21      Q.  You did a literature review?

22      A.  Correct.

23      Q.  And that's in your report at entries 20 to

24 37 for mechanistic data, right?

25      A.  Right.

Barry Boyd, M.D.

1      Q.  And we established there's lots of the

2  stuff in Table F.4 here and lots of stuff in this

3  EPA document that you have not seen, right?

4      A.  Right.

5      Q.  And you don't know if your opinion would

6  change if you saw that data, fair?

7      A.  Yes.

8              MR. LaBLETTA:  Objection.

9      Q.  Okay.  Now, just a few more questions and I

10  think we'll be done for the day.

11          Entry 15 on your materials considered list

12  is, I believe, an American Cancer Society document.

13  Is that -- is that right?

14      A.  Did I look at that?  Was that in my report,

15  right?  I believe that's --

16      Q.  Yeah, entry 15.  Just let me know when

17  you're there.

18      A.  Yeah, the website.

19      Q.  Okay.  And I just want to make sure that I

20  am looking at the same page that you're referencing

21  there.  Give me a moment.

22              (Exhibit Number 17 was marked for

23            identification.)

24      Q.  What I have marked as Exhibit 17, which is

25  what I believe is that website page.  Let me know

Barry Boyd, M.D.

1   when you have -- let me know when you have taken a

2   look at that.

3        A.  Okay.  I think I have seen this a few other

4   times already.

5        Q.  Okay.  And --

6        A.  Go ahead.

7        Q.  My question was --

8        A.  Go ahead.

9        Q.  My question was literally going to be, is

10  this, what I marked as Exhibit 17, what you are

11  referring to there in --

12       A.  Yes.

13       Q.  -- in your report?

14       A.  Correct.

15       Q.  Okay.  That was my only question.

16            All right.  What internal dose of

17  glyphosate increases somebody's risk for NHL,

18  internal dose?

19       A.  We don't know.

20       Q.  Okay.  Are you aware that regulatory bodies

21  have established -- I guess they have used lots of

22  different names -- but reference doses or no

23  significant risk levels or what have you for

24  glyphosate exposure?

25       A.  Yes.  And usually, they -- all of these

Barry Boyd, M.D.

1   agencies are focused, to a large degree, on

2   population exposure -- you, me, not applicators --

3   because the general population is their real

4   concern, and oral exposures, and what that would

5   mean to body levels of oral exposure to plants or

6   foods contaminated with glyphosate.

7        Q.  Okay.  What -- I'm sorry.  So let me make

8   sure I understand that answer.  Those regulatory

9   agencies that set these levels, they look at all

10  endpoints in the toxicological studies, right?

11       A.  Right.

12       Q.  So they look at cancer.  They look at

13  repro.  They look at acute toxicity, right?

14       A.  Correct.

15       Q.  And then they set a tolerable risk level or

16  a tolerable -- strike that.

17            They set an exposure level a maximum --

18  yeah, maximum exposure level based on the

19  lowest-observed effect in those toxicology studies,

20  and then a protection factor that's put in for

21  species difference and susceptibility difference,

22  correct?

23       A.  Yes.

24       Q.  Okay.  And so the US EPA has set a risk

25  level of 1 milligram per kilogram per day, right?

Barry Boyd, M.D.

1          A.   Right.

2          Q.   And the Europeans, I think, have set

3     .5 milligrams per kilogram per day, right?

4          A.   Correct.   Right.

5          Q.   And the lowest level I have seen set by

6     anybody is by the State of California with their no

7     significant risk level.   Have you seen that level?

8          A.   Yeah.   They tend to be much more

9     conservative in terms of levels that allow

10    exposures.   I understand that.

11         Q.   And the level they set is not a milligram

12    per kilogram level, just a milligram level, right?

13    It's 1100 micrograms or 1.1 milligrams, right?

14         A.   Right.

15         Q.   Okay.   Are you aware of any biomonitoring

16    study -- well, let me back up.

17              What is a biomonitoring study?

18         A.   It's evaluating the rate or the

19    abnormalities and findings in a population who have

20    been exposed to Roundup.   So you monitor the levels

21    in the patients for any changes in the patient.

22    There are a number of those.

23         Q.   Yeah, so I actually had -- I had a

24    different definition in mind, so I'm happy I asked

25    you what it is.

Barry Boyd, M.D.

1           Have you ever heard of biomonitoring

2    studies being studies that look at urine levels of

3    the compound in applicators?

4           A.  Yes.

5           Q.  You agree with that definition?

6           A.  Yes.

7           Q.  Okay.  And you agree urine is the

8    appropriate media to examine glyphosate exposures,

9    based on the pharmacokinetic data you have reviewed,

10   fair?

11          A.  Yeah.  Although there's been debate about

12   whether some of it is actually excreted in the stool

13   rather than the urine.  That's a whole other issue

14   in terms of metabolism.

15          Q.  Do you have an expert opinion that

16   glyphosate is metabolized in the body?

17          A.  It is.  I believe it is.

18          Q.  It is.

19          A.  I believe by the urine, in the gut.

20          Q.  Okay.  Orally-absorbed glyphosate is

21   metabolized into AMPA at about 1 percent, right?

22          A.  Right.

23          Q.  So about 99 percent of orally-absorbed

24   glyphosate is either absorbed via the gut and passes

25   out via the urine or passed out via the feces,

Barry Boyd, M.D.

1   right?

2       A.  Right.

3       Q.  And dermally-absorbed glyphosate would have

4   to get into the gut for metabolism, right?

5       A.  Correct.

6       Q.  And dermally-absorbed glyphosate mainly

7   passes unchanged and out via the urine, right?

8       A.  Right.

9       Q.  Okay.  You would agree that urine is the

10  appropriate media to look to for occupational

11  exposures to glyphosate?

12      A.  Yes.

13      Q.  Okay.  Are you aware of a urinalysis study

14  that has ever observed an internal dose of

15  glyphosate of 1100 micrograms in any applicator?

16      A.  And internal dose reflecting -- when you

17  say "internal dose," not the urine.  We're not

18  talking about urine, right?

19      Q.  Yeah.  We're talking about --

20      A.  -- that in the urine?

21      Q.  Yes.  Has anybody ever measured an internal

22  dose --

23      A.  At that level?

24      Q.  -- based on your analysis of 1100

25  micrograms?

Barry Boyd, M.D.

1       A.  I don't recall.

2       Q.  Okay.

3       A.  I'm sure you have a study to show me.

4       Q.  Well, only because you asked.  I was going

5  to --

6       A.  I'm curious.

7       Q.  Actually --

8       A.  Are you ready?

9       Q.  Well, I haven't put it on yet.  Hold on.

10      A.  By the way, do you see that?

11      Q.  Yes, sir.

12      A.  That's extra gray hair today.

13      Q.  I'm sorry I'm keeping you from your

14  patients.  I'm probably 10 minutes from being done.

15      A.  I have family that's going crazy I don't

16  know what to do, so I have got -- I'm very fearful

17  for that patient.  I have got to -- I'm here.  I'm

18  paying attention now so I won't focus on that until

19  I'm done.

20      Q.  Yes, sir.  10 more minutes.  I have marked

21  a study as Exhibit 18 written by an author named

22  Kougias.

23              (Exhibit Number 18 was marked for

24          identification.)

25      Q.  Let me know when you have it open.

Barry Boyd, M.D.

```
 1          A.  Got it.

 2          Q.  Okay.  And this is a study entitled "Risk

 3   Assessment of Glyphosate Exposure From Pilot Study

 4   with Simulated Heavy Residential Consumer

 5   Application of Roundup Using a Margin of Safety

 6   Approach."

 7               Did I read that correctly?

 8          A.  Yes.

 9          Q.  Okay.  And it's in a journal called Risk

10   Analysis.

11               Do you see that?

12          A.  Yep.

13          Q.  And that's a peer-reviewed journal?

14          A.  Yep.

15          Q.  Okay.  And if you go down here to the

16   methods section, and this is on the third page, they

17   talk about doing an experiment with individuals

18   divided into two exposure groups.  I'm on the bottom

19   left-hand column of the third page.  One designed to

20   assess only dermal exposure, and the other to assess

21   only inhalation exposure.

22               Do you see that?

23          A.  Yep.  I got it.

24          Q.  Okay.  And if you go to the top right

25   column, in the dermal exposure group, they had
```

Barry Boyd, M.D.

1    applicators wearing shorts, t-shirts, athletic

2    shoes, and half-faced respirators.

3            Do you see that?

4        A.  Correct.  Yeah.  Why respirators but no

5    gloves?

6        Q.  Well, we're going to get to that.  So

7    that's a dermal exposure group; is it not?

8        A.  Yeah.  I got it.  I understand.

9        Q.  Okay.  Okay.  And so Mr. Vosper wore a

10   similar set of clothing, right?  He wore shorts, he

11   would sometimes wear a tank top, sometimes no shirt,

12   he'd wear tennis shoes, and no gloves, right?

13       A.  Correct.

14       Q.  Okay.  Now, they also have an inhalation

15   group wearing Tyvek suits, chemically-resistant

16   gloves but no respirator.

17           Do you see that?

18       A.  Uh-huh.

19       Q.  Okay.  And so the idea there is to separate

20   out your inhalation exposures from your dermal

21   exposures, right?

22       A.  Correct.

23       Q.  Okay.  And if you go down, sir, to the next

24   paragraph, they talk about the fact that the

25   applicators mixed, and using a backpack sprayer

Barry Boyd, M.D.

```
 1   applied a commercially-available

 2   glyphosate-contained herbicides.

 3            Do you see that?

 4        A.  Yep.

 5        Q.  And mixing, right, that's when you take the

 6   concentrated product and you dilute it with water,

 7   correct?

 8        A.  Right.

 9        Q.  And that is a high-exposure event, right?

10   You have seen that in the literature?

11        A.  Yeah.  Uh-huh.

12        Q.  Individuals who don't mix concentrate, like

13   Mr. Vosper who didn't mix concentrate, will have

14   lower exposures on average than individuals who do

15   mix, right?

16        A.  Correct.

17        Q.  Okay.  Moving down, they state that

18   10 fluid ounces of the concentrate containing 50.2

19   percent glyphosate was added to the backpack sprayer

20   with 4 gallons of water to create a .96

21   glyphosate-containing solution.

22            Do you see that?

23        A.  Yeah.

24        Q.  Okay.  And it says, product was

25   continuously sprayed until the backpack sprayer was
```

Barry Boyd, M.D.

1    empty -- this is reading down that paragraph --

2    after which it was refilled, and the process was

3    repeated for a total of four mixing and spraying

4    events per applicator, corresponded to a total of

5    100 minutes with roughly 3 to 5 minutes and 20 to 22

6    for each mixing and spray event respectively.

7         A.   Right.

8         Q.   Do you see that?

9         A.   Yep.

10        Q.   And spraying 4-gallon backpack sprayers

11   four times is 16 gallons of spraying, right?

12        A.   Right.  A lot of spray.

13        Q.   You haven't come across a plaintiff in this

14   litigation that you have worked with, at least, who

15   sprayed 16 gallons in a single day, right?

16        A.   No.

17        Q.   Okay.  So these are highly-exposed

18   individuals in this study, fair?

19        A.   Correct.

20        Q.   Okay.  Moving down to their results.  They

21   conducted an internal dose calculation, I'm at 3.5,

22   which is on pages 8 and 9.

23        A.   Yep.

24        Q.   So let me know when you're at 3.5?

25        A.   I am.  I'm looking at it now.

Barry Boyd, M.D.

```
 1        Q.   Okay.  And what they did was -- and this is
 2   the last paragraph on page 8 -- to aid in
 3   representing a worst-case scenario, the highest body
 4   weight adjusted internal dose from each exposure
 5   group was summed, resulting in a maximum internal
 6   dose of 4.347 micrograms per kilogram.
 7             Do you see that?
 8        A.   Where are you now?
 9        Q.   I'm at the bottom of page 8 --
10        A.   I got it.  Yeah, yeah.  You went all the
11   way down.  Right.
12        Q.   Right.  So what they did was they took
13   their highest person in the inhalation group, their
14   highest person in the dermal group, they put them
15   together and they got a maximum internal dose of
16   4.347 micrograms per kilogram, fair?
17        A.   Yep.
18        Q.   Okay.  And 4.347 micrograms per kilogram in
19   a 100 kilogram operator, to make the math easy,
20   would be .00434 milligrams per kilogram, right?
21        A.   Right.
22        Q.   And that number would be below the
23   California NSRL, right?
24        A.   Uh-huh.
25        Q.   And it would also be below any of the other
```

Barry Boyd, M.D.

```
1    regulatory values we have talked about, right?

2         A.  Uh-huh.

3         Q.  Okay.  And so you would agree with me based

4    on this article at least, in an individual applying

5    much, much more than Mr. Vosper, or indeed any

6    plaintiff you have seen in this litigation, the

7    internal doses, as measured by your analysis, still

8    do not exceed regulatory limits, fair?

9         A.  Yeah.

10             MR. LaBLETTA:  Objection to the

11          form.

12        Q.  I missed your answer, Doctor.

13        A.  Yeah.  Based on this study.

14        Q.  Okay.

15        A.  I'd have to look at it.  I mean, it really

16   is -- it's a very complex study, 21-page -- 20 --

17   X-number of pages long.  I'd love to take time but I

18   haven't had a chance to look at it really other than

19   you pointing out those specific points that reflect,

20   you know, extent of exposure and how they measured

21   it and the levels that were obtained.

22        Q.  Right.  And you're not aware of another

23   study with internal doses measured by urinalysis

24   higher than this, right?

25        A.  No.
```

Barry Boyd, M.D.

```
 1              MR. KALAS:  With that, I don't have
 2        any more questions today.  Thank you for
 3        your time, and defer to Mr. LaBletta if
 4        he has anything.
 5              MR. LaBLETTA:  Just give me one
 6        second here.  I'd like to look at my
 7        notes.
 8              I don't think I have any questions.
 9              MR. KALAS:  Okay.  Dr. Boyd, thank
10        you for your time.  Sorry to keep you
11        from your patients so long, but I
12        appreciate your willingness to work with
13        me today.
14              THE WITNESS:  Let me just -- let me
15        just get out of this.  I was saving that
16        document, because I want to look at it.
17              MR. KALAS:  Okay.
18              THE WITNESS:  I'm interested in
19        looking at your documents.  Thank you.
20              THE VIDEOGRAPHER:  Are we going off
21        the record?
22              MR. LaBLETTA:  Yeah, we're off the
23        record.
24              THE VIDEOGRAPHER:  Time right now
25        is 4:45 p.m.  We're off the record.
```

Barry Boyd, M.D.

```
 1                    (Deposition concluded.)

 2                    THE COURT REPORTER:  Mr. LaBletta,

 3          do you need a copy of the transcript?

 4                    MR. LaBLETTA:  Copy of the

 5          transcript, yes, please.

 6                    THE COURT REPORTER:  PDF, hard

 7          copy, or both?

 8                    MR. LaBLETTA:  PDF is fine.

 9                    MR. KALAS:  Christine, can I get an

10          immediate rough, please.

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

Barry Boyd, M.D.

```
 1   AFFIDAVIT:

 2

 3   STATE OF NEW YORK

 4   COUNTY OF _____

 5

 6

 7          I have read my deposition, and the

 8       same is true and accurate, save and except

 9       for changes and/or corrections, if any,

10       as indicated by me on the correction sheet

11       attached hereto.

12

13                    _____

14                      BARRY BOYD, M.D.

15

16

17          SUBSCRIBED AND SWORN TO before me this

18       _____ day of _____, 20_____.

19

20

21                    _____

22                      NOTARY PUBLIC

23

24   My commission expires on _____.

25
```

Barry Boyd, M.D.

```
 1    ERRATA SHEET:

 2    Case:       Roundup - Vosper v. Monsanto

 3    Witness:   Barry Boyd, M.D.

 4

 5    Page   Line   Correction and Reason

 6    _____  _____  _____

 7    _____  _____  _____

 8    _____  _____  _____

 9    _____  _____  _____

10    _____  _____  _____

11    _____  _____  _____

12    _____  _____  _____

13    _____  _____  _____

14    _____  _____  _____

15    _____  _____  _____

16    _____  _____  _____

17    _____  _____  _____

18    _____  _____  _____

19    _____  _____  _____

20    _____  _____  _____

21    _____  _____  _____

22    _____  _____  _____

23    _____  _____  _____

24    _____  _____  _____

25    _____  _____  _____
```

Barry Boyd, M.D.

```
1    ERRATA SHEET (continued):

2

3    Page  Line      Correction and reason

4    _____  _____  _____

5    _____  _____  _____

6    _____  _____  _____

7    _____  _____  _____

8    _____  _____  _____

9    _____  _____  _____

10   _____  _____  _____

11   _____  _____  _____

12   _____  _____  _____

13   _____  _____  _____

14   _____  _____  _____

15   _____  _____  _____

16   _____  _____  _____

17   _____  _____  _____

18   _____  _____  _____

19   _____  _____  _____

20   _____  _____  _____

21   _____  _____  _____

22   _____  _____  _____

23   _____  _____  _____

24   _____  _____  _____

25   _____  _____  _____
```

Barry Boyd, M.D.

```
 1   CERTIFICATION:

 2   STATE OF NEW YORK

 3   COUNTY OF CHEMUNG

 4        I, CHRISTINE S. REYNOLDS, the officer before

 5   whom the foregoing deposition was taken, do hereby

 6   certify that the witness whose testimony appears in

 7   the foregoing deposition was duly sworn by me.

 8        I further certify that the testimony of said

 9   witness was taken by me in Stenotype and thereafter

10   reduced to typewriting under my supervision.

11        I further certify that the said deposition

12   constitutes a true record of the testimony given by

13   said witness to the best of my ability.

14        I further certify that the said deposition was

15   taken before me at the time and place specified in

16   the notice.

17        I further certify that I am neither counsel

18   for, related to, nor employed by any of the parties

19   to the action in which this deposition was taken,

20   nor financially or otherwise interested in the

21   outcome of the action.

22

23   _____

24        CHRISTINE S. REYNOLDS, Notary Public

25
```