**WILKINSON STEKLOFF LLP**
Brian L. Stekloff (*pro hac vice*)
(bstekloff@wilkinsonstekloff.com)
Rakesh Kilaru (*pro hac vice*)
(rkilaru@wilkinsonstekloff.com)
2001 M St. NW
10th Floor
Washington, DC 20036
Tel:    202-847-4030
Fax:   202-847-4005

**HOLLINGSWORTH LLP**
Eric G. Lasker (*pro hac vice*)
(elasker@hollingsworthllp.com)
1350 I St. NW
Washington, DC 20005
Tel: 202-898-5843
Fax: 202-682-1639

*Attorneys for Defendant*
*MONSANTO COMPANY*

**COVINGTON & BURLING LLP**
Michael X. Imbroscio (*pro hac vice*)
(mimbroscio@cov.com)
One City Center
850 10th St. NW
Washington, DC 20001
Tel: 202-662-6000

**BRYAN CAVE LEIGHTON PAISNER LLP**
K. Lee Marshall (CA Bar No. 277092)
(klmarshall@bclplaw.com)
Three Embarcadero Center, 7th Floor
San Francisco, CA 94111
Tel:  415-675-3400
Fax: 415-675-3434

**THE PIORKOWSKI LAW FIRM, PC**
Joseph D. Piorkowski, Jr.
(jpiorkowski@lawdoc1.com)
1800 K Street, NW, Suite 1000
Washington, DC 20006
Tel:  202-257-7662

# UNITED STATES DISTRICT COURT

# NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| IN RE: ROUNDUP PRODUCTS LIABILITY LITIGATION<br><br>*Carl and Karen Savory, husband and wife* v. Monsanto Company<br>Case No. 3:20-cv-02403 | MDL No. 2741<br><br>Case No.: 3:16-md-02741-VC<br><br>**DEFENDANT MONSANTO COMPANY'S REPLY IN SUPPORT OF ITS MOTION TO EXCLUDE TESTIMONY OF PLAINTIFFS' EXPERT ARIEL TEITEL ON RULE 702 GROUNDS**<br><br>Hearing date: December 13, 2021<br>Time: TBD |

# INTRODUCTION

Wave 3 Plaintiff Carl Savory has designated a new specific causation expert, Dr. Ariel Teitel, who does not meet the requirements of Federal Rule of Evidence 702 or the standards this Court imposed in Pre-Trial Order 85 ("PTO 85"). In response to Monsanto's *Daubert* motion pointing out the many reasons why Dr. Teitel's testimony should be excluded, Plaintiff's counsel has now changed tactics. Although Dr. Teitel's report contains an opinion that glyphosate was "the main cause" of Plaintiff Carl Savory's non-Hodgkin lymphoma ("NHL"), Plaintiff's Opposition asserts that Dr. Teitel's opinion is limited to the relationship between rheumatoid arthritis ("RA") and Mr. Savory's NHL. Based on these representations by Plaintiff, any and all opinions by Dr. Teitel in his report regarding glyphosate, Roundup, and/or glyphosate-based formulations should be stricken and, at a minimum, Monsanto's motion should be granted to this extent.

In addition, Dr. Teitel's opinions ruling out RA as a cause of Mr. Savory's NHL are not based on reliable methodology. He cites medical literature showing that all patients with RA are at increased risk of NHL, that RA doubles a person's risk of NHL, and that the greater the severity of the RA, the greater the increased risk.[1] He also admits that Mr. Savory was diagnosed with RA in 2004, that he received intermittent treatment through 2014, that his RA was "severe" in 2014, and that he was still being treated for RA in 2019 when he was diagnosed with NHL. Those facts make it impossible to rule out RA as a cause.

Nonetheless, Dr. Teitel rules out the well-accepted risk factor of RA, with the only basis being that Mr. Savory's RA "seems to have been" at a low level for many years (between 2005 and 2014), even though Dr. Teitel agrees that Mr. Savory received intermittent treatment during this period. Even if this is true, Dr. Teitel acknowledges that Mr. Savory had severe RA in 2014 and was still being treated for RA with immunosuppressive drugs in 2019. He does not address Mr. Savory's active RA during the five years preceding his NHL diagnosis. He provides no medical literature or other basis to negate the clearly increased risk of NHL for all RA patients, much less ones who had severe RA. Moreover, as set forth in the very quotes provided by Plaintiff's counsel in its Opposition,

---

[1] Notably, a doubling of the risk of NHL attributed to RA is greater than the increased risk even Plaintiff's experts attribute to glyphosate.

Dr. Teitel only "postulates" that "perhaps" Mr. Savory did not suffer from chronic severe rheumatoid arthritis, based solely on a period of time (prior to 2014) during which it appears to Dr. Teitel that Mr. Savory did not seek treatment for his RA – completely failing to account for the fact that Mr. Savory, according to his own testimony, was forced to stop working due to his RA about a decade earlier, that he received social security permanent disability benefits due to his RA during this period, and that Mr. Savory had difficulty affording some medications that he would have otherwise used. This is not scientific methodology based on years of training and experience, nor scientific premises provided in medical literature, but simply outcome-based speculation that Mr. Savory's most obvious and well-recognized risk factor somehow was not a cause of Mr. Savory's NHL. Dr. Teitel's speculative and unfounded opinions, that "perhaps" Mr. Savory's RA was not chronic and thus could be ruled out as the cause of his NHL, should be excluded.

### I. Monsanto's Motion Should be Granted to the Extent that Plaintiff's Now Concede the Very Narrow Scope of Dr. Teitel's Opinions.

In the conclusion of his expert report, Dr. Teitel opined that "in Mr. Savory's case specifically it is clear that his chronic and frequent exposure to glyphosate in Roundup over a three decade period was a substantial factor and, in my opinion, the main cause of his development of NHL." *See* Declaration of Eric Lasker (October 20, 2021) ("Lasker Decl."), Ex. 8, Teitel *Savory* Rep. at 4 (hereinafter, "Teitel *Savory* Rep.*"*). After deposing Dr. Teitel, Monsanto moved for the exclusion of Dr. Teitel's opinions based on, among other things, his lack of experience, expertise, training or specialized knowledge related to glyphosate and glyphosate-based formulations and their potential association with NHL, his insufficient review (of approximately two hours total) of the medical literature, his lack of familiarity with the medical literature and inability to name a single study that he had reviewed prior to writing his report, his reliance on the report of Plaintiff's *exposure* expert for his general and specific causation opinions regarding Roundup and glyphosate and their association with NHL, and his failure to address and rule out Mr. Savory's many other risk factors for NHL.

In response to Monsanto's motion, Plaintiff's counsel shifted gears. Plaintiff's Opposition states that Dr. Teitel's "opinion is narrow – simply, Dr. Teitel will opine that Mr. Savory did not and

does not have persistent, "severe" rheumatoid arthritis," that "despite being a risk for [NHL], Mr. Savory's increased risk [from RA] was marginalized because of the "palindromic" nature of his disease, marked by long periods of dormancy," and that "Mr. Savory's rheumatoid arthritis was not a substantial contributing factor in the development of Mr. Savory's NHL." Pls.' Resp. in Opp'n to Monsanto's Mot. to Exclude Test. of Pls.' Expert Dr. Ariel Teitel, ECF No. 13899 at 1 ("Pls.' Opp'n"). The Plaintiff's specifically note that Dr. Teitel "will not be commenting at trial on the increased risk that glyphosate and glyphosate-based formulations in Roundup played in Mr. Savory's development of NHL." Pls.' Opp'n at 1. This is clearly a departure from the opinions contained in Dr. Teitel's report and the opinions that he offered at his deposition.

Based on these new representations regarding the very narrow nature of Dr. Teitel's opinions, (1) any language in Dr. Teitel's report regarding glyphosate, Roundup, and/or glyphosate-based formulations and/or their association with NHL should be stricken and (2) Monsanto's motion should be granted to the full extent of the representations contained in Plaintiff's Opposition.

**II. Dr. Teitel's Opinions Ruling Out RA as a Cause for Mr. Savory's NHL Are Not Based on a Reliable Methodology and Contradict the Medical Literature Cited in His Own Report.**

In his expert report, Dr. Teitel acknowledges that RA, and particularly severe RA, increases the risk of NHL. He cites medical literature to establish that (1) "It is known that patients with RA are at increased risk of malignancies, including NHL;" (2) "The risk is approximately two fold that of age and risk matched controls;" and (3) "The risk of lymphoma for RA patients is correlated with the level of disease activity. More severe RA confers higher risk." Teitel *Savory* Rep. at 3. During deposition, he acknowledged that RA is "definitely thought of and accepted" as a risk factor for NHL. Lasker Decl., Ex. 9, Teitel *Savory* Dep. at 130:18-24 (hereinafter, "Teitel *Savory* Dep."). In addition, Dr. Teitel agrees that:

- Mr. Savory was diagnosed with RA in 2004, a diagnosis with which Dr. Teitel agrees. Teitel *Savory* Rep. at 2; Teitel *Savory* Dep. at 150:3-10.
- Mr. Savory "received intermittent treatment until 2014, when he received prednisone and sulfasalazine from Dr. Moidel a rheumatologist." Teitel *Savory* Rep. at 2.

- Mr. Savory "was on Xeljanz [to treat his RA] in 2019." Teitel *Savory* Rep. at 2.
- At least during <u>the six months</u> that Mr. Savory was being treated by Dr. Moidel (during June through December 2014), the RA was "severe." Teitel *Savory* Dep. at 116:6-10.
- Mr. Savory's RA diagnosis was confirmed by a cyclic citrullinated peptide (CCP) test, that the level of CCP antibodies are "prognostic for worse disease," and that Mr. Savory's CCP results were high in 2014. *Id*. at 98:9-22, 101:14-16, 105:16-20.

Despite all of the foregoing (including Mr. Savory's severe RA in 2014 and continued treatment through 2019 when diagnosed with NHL), Dr. Teitel dismisses Mr. Savory's increased risk of NHL caused by his RA because his RA "seems to have been at a low level for many years" (between 2005 and 2014) and "[h]e did not require remittive therapy until 2014." Teitel *Savory* Rep. at 3.

Dr. Teitel has provided no reliable methodology to rule out RA as a cause for Mr. Savory's NHL. His "ruling out" is contradictory to the very scientific literature upon which he relies and the acknowledged facts that Mr. Savory has had RA since at least 2004 and that Dr. Teitel agreed that his RA was properly characterized as severe by 2014. *See., e.g.*, Teitel *Savory* Dep. at 97:9-18, 108:24-109:5, 110:14-24, 113:25-114:6.

It is undisputed that all RA patients have an increased risk of NHL (approximately two-fold) and doctors believe that, the more severe the disease, the higher the increased risk of NHL. Teitel *Savory* Rep. at 3. It is also undisputed that Mr. Savory was diagnosed with RA in 2004, was treated (at least intermittently) from 2005-2014, was confirmed to have RA (both clinically and by lab work), that his RA was severe at times (including at least six months in 2014), and that he was still being treated for RA in 2019 when he was diagnosed with NHL. *See, e.g.*, Teitel *Savory* Rep. at 2; Teitel *Savory* Dep. at 98:9-22, 101:14-16, 105:16-20, 150:3-10. There is no evidence that Mr. Savory's RA of 2004 went into remission, as he continued to be completely disabled and unable to work from the time of his disability to the present. Lasker Decl., Ex. 10, Savory Discovery Dep. at 25:14-16, 163:16-23 (hereinafter, "Savory Discovery Dep.") (and see discussion below). Even if such evidence existed, Dr. Teitel cites no literature that supports the proposition that an RA patient whose disease subsided or went into remission would no longer be at an increased risk of NHL. In addition, Dr. Teitel focuses on the 2005-2014 time period, ignoring that Mr. Savory suffered from severe RA in 2014 and was

still being treated for his RA with immunosuppressive drugs in 2019. He provides no support for the contention that Mr. Savory's increased risk of NHL disappeared or was diminished because his RA may not have been at the "severe" level for the entire 15 years during which he suffered with it and was disabled from it prior to his NHL diagnosis.

Even assuming *arguendo* that there was any literature or other basis at all supporting Dr. Teitel's conclusion the risk factor posed by RA in the development of Mr. Savory's NHL was diminished, he still faces two other methodological hurdles. First, the fact that Mr. Savory's increased risk of NHL may (or may not) be lower than the increased risk of a patient with chronically severe RA does not negate the fact that Mr. Savory still had an increased risk of NHL attributable to his RA. Dr. Teitel conceded during deposition that he is ***not*** able to quantify the extent to which Mr. Savory's risk of NHL was increased on account of his RA. Teitel *Savory* Dep. 159:16-19. There is thus no scientific basis on which to "rule out" RA as a cause of Mr. Savory's RA.

Second, the premise upon which Dr. Teitel bases his "ruling out" of RA is based purely on speculation and is directly at odds with the testimony of the Plaintiff himself. Even the quotes contained in Plaintiff's Opposition show the speculative nature of Dr. Teitel's conclusions: "*It is **also possible** that since he presented with palindromic expression presentation that **perhaps** that's even really kind of what he had…But yeah, perhaps he resolved. I have to **postulate** that it must not have continued to be severe.*" Pls.' Opp'n at 4 (emphasis added). He agreed at deposition that he was "making the assumption" that Mr. Savory did not have severe RA from 2005 to 2014. Teitel *Savory* Dep. at 158:7-11. Making unwarranted assumptions based on possible postulations is not a reliable methodology.

Dr. Teitel's postulations are likewise contradicted by Plaintiff's own testimony in this case. Plaintiff's Opposition quotes Dr. Teitel as defending his speculation because a patient with severe RA "would have sought medical attention" and that, for those patients who do not treat their severe chronic rheumatoid arthritis, "Bad things happen to them…Which did not happen to him." Pls.' Opp'n at 4. However, Mr. Savory testified that he was not treated with medication earlier because he could not afford the $3,000 per month cost of the medication. Savory Discovery Dep. at 23:4-15. He testified that five or six years prior to his deposition, his dermatologist got him RA medicine at no

cost and that the medicine has helped his symptoms. *Id*. at 23:21-24:7. Dr. Teitel simply assumes that if Mr. Savory was not on medication, it was because of a lack of symptoms and not an inability to afford the medication.

Dr. Teitel also ignored the evidence that Mr. Savory's severe rheumatoid arthritis caused him to stop working, to seek permanent disability benefits in 2005, and to remain on permanent disability on a continuous basis since 2005. *Id*. at 25:14-16, 163:16-23. Mr. Savory testified that he worked full-time prior to his RA and that he stopped working as a carpenter because of his RA. *Id*. 22:15-17, 26:16-23. He said that he waited a few years prior to applying for social security disability benefits due to his "disbelief that [he] could never go back to work again." *Id*. at 24:22-25:5. Dr. Teitel's opinion ignores that Mr. Savory's RA cost him his ability to earn his livelihood and means of support. His opinion should be excluded because they are not based on a reliable methodology and are contrary to the medical literature cited in his own report and to the evidence presented by Mr. Savory.

## CONCLUSION

For the foregoing reasons, the Court should grant Monsanto's motion to exclude the specific causation testimony of Dr. Teitel on Rule 702 and *Daubert* grounds.

Dated: October 20, 2021

By:   /s/ *Eric G. Lasker*

Eric G. Lasker (*pro hac vice*)
(elasker@hollingsworthllp.com)
Hollingsworth LLP
1350 I St. NW
Washington, DC 20005
Tel: 202-898-5843

Attorney for Defendant Monsanto Company

**CERTIFICATE OF SERVICE**

I HEREBY CERTIFY that on this 20th day of October, 2021, a copy of the foregoing was filed with the Clerk of the Court through the CM/ECF system which sent notice of the filing to all appearing parties of record.

                                                                  */s/ Eric G. Lasker*