# EXHIBIT 9

Ariel D. Teitel, M.D.

```
 1              UNITED STATES DISTRICT COURT
 2             NORTHERN DISTRICT OF CALIFORNIA
 3
       -----------------------------
 4   IN RE:  ROUNDUP PRODUCTS      :MDL No. 2741
     LIABILITY LITIGATION          :
 5   -----------------------------  Case No. MDL No.
     THIS DOCUMENT RELATES TO:     :3:16-md-02741-VC
 6                                 :
     SAVORY, ET AL v. MONSANTO     :
 7   COMPANY                       :
     CASE NO. 3:20-cv-02403-VC     :
 8   -----------------------------
 9
                       — — —
10                 AUGUST 10, 2021
11                     — — —
12
13            Oral sworn videotaped deposition of
14        ARIEL D. TEITEL, M.D., held via Zoom, at
15        the location of the witness, before
16        Margaret M. Reihl, RPR, CCR, CRR and
17        Notary Public, on the above date,
18        commencing at 9:15 a.m.
19
20
21          GOLKOW LITIGATION SERVICES
         877.370.3377  ph/917.591.5672 fax
22              deps@golkow.com
23
24
25
```

Ariel D. Teitel, M.D.

```
1    A P P E A R A N C E S VIA ZOOM:

2

     WAPNER NEWMAN WIGRIZER
3    BRECHER & MILLER, P.C.
     BY:  MARC G. BRECHER, ESQUIRE
4    2000 Market Street, Suite 2750
     Philadelphia, Pennsylvania  19103
5    (215) 569-0900
     brecherm@wnwlaw.com
6    Counsel for Plaintiff

7

     THE PIORKOWSKI LAW FIRM, P.C.
8    BY:  JOSEPH D. PIORKOWSKI, JR., ESQUIRE
     1800 K Street, NW
9    Suite 1000
     Washington, DC  20006
10   (202) 257-7662
     jpiorkowski@piorkowskilaw.com
11   Counsel for Defendant

12

13

14   Also present:  Ingrid Rodriguez,
                     Videographer
15

16

17

18

19

20

21

22

23

24

25
```

```
 1                     I N D E X
 2
    WITNESS:                              PAGE
 3
    ARIEL D. TEITEL, M.D.
 4
            By Mr. Piorkowski            ^
 5
 6                     _ _ _
 7                 E X H I B I T S
 8  NO.        DESCRIPTION               PAGE
 9  1          Expert Report of Ariel D.
               Teitel, MC 6/21/21          12
10
    2          Curriculum Vitae of
11             Dr. Teitel                  13
12  3          Notice to take Deposition   41
13  4          Rheumatology Associates records
               Confidential-CSavory-RheumaA-
14             000059 to 122               45
15  5          Computer notes of Dr. Teitel
               from reviewing records      58
16
    6          Dr. Moidel records
17             Confidential-CSavory-RheumaA-
               000009 to 000031            93
18
    7          Research Article, "Incidence
19             of malignancy in adult patients
               with rheumatoid arthritis:
20             a meta-analysis"           120
21  8          Extended Report, "Incidence of
               lymphoma in a large primary care
22             derived cohort of cases of
               inflammatory polyarthritis"  127
23
    9          Original Investigation,
24             "Hematologic Malignant
               Neoplasms After Drug Exposure
25             in Rheumatoid Arthritis"    132
```

Ariel D. Teitel, M.D.

1   NO.         DESCRIPTION                         PAGE

2   10          Transcript of deposition of
                Carl Savory 6/22/20              136

3

    11          Review Article, "Glyphosate
4               toxicity and carcinogenicity:
                a review of the scientific
5               basis of the European Union
                assessment and its differences
6               with IARC"                       165

7

8                           — — —

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

```
 1              THE VIDEOGRAPHER:  We are now on
 2         the record.  My name is Ingrid Rodriguez,
 3         I'm a videographer for Golkow Litigation
 4         Services.  Today's date is August 10th,
 5         2021, and the time is 9:15 a.m.  This
 6         video deposition is being held at Arnold
 7         and Porter LLP, New York, New York in the
 8         matter of Carl and Karen Savory versus
 9         Monsanto Company for the United States
10         District Court, Northern District of
11         California.  The deponent is Dr. Ariel D.
12         Teitel.
13              Will counsel please state your
14         appearances for the record.
15              MR. BRECHER:  Mark Brecher for Carl
16         Savory.
17              MR. PIORKOWSKI:  Joseph Piorkowski
18         for Monsanto.
19              THE VIDEOGRAPHER:  The court
20         reporter is Peg Reihl and will now swear
21         in the witness.
22              ARIEL D. TEITEL, M.D., having been
23         duly sworn as a witness, was examined and
24         testified as follows:
25    BY MR. PIORKOWSKI:
```

```
 1              Q.      Doctor, would you state your full

 2      name for the record, please.

 3              A.      Ariel Dan Teitel.

 4              Q.      And what's your address, Dr.

 5      Teitel?

 6              A.      Home address or work?

 7              Q.      Either is fine.

 8              A.      Work is 333 West 57th Street, Suite

 9      104, that's New York, New York, 10019.

10              Q.      And you're here today in your role

11      as an expert witness on behalf of plaintiff Carl

12      Savory; is that right?

13              A.      Yes.

14              Q.      Are you being compensated by the

15      plaintiff for your time?

16              A.      Yes.

17              Q.      At what rate?

18              A.      350 an hour and 4,000 for the day

19      of deposition.

20              Q.      I wanted to go over with you just

21      briefly some of the rules about testifying under

22      oath.  I understand from your report that you have

23      not given any testimony in the last four years; is

24      that right?

25              A.      Yeah, probably ten.
```

Ariel D. Teitel, M.D.

```
1              Q.     Okay.  But so you kind of know from
2     past experience the ground rules?
3              A.     Yeah.
4              Q.     Yeah.  Let me just go over a couple
5     things to make sure they're clear.
6                     If I ask a question and you don't
7     understand my question, will you ask me to clarify
8     it?
9              A.     Certainly.
10             Q.     And if you go ahead and answer my
11    question, I'll assume that you understood it; is
12    that fair?
13             A.     Yes.
14             Q.     Okay.  It's important to give
15    verbal answers.  We all tend to say uh-huh and
16    uh-uh and things like that, but it's important to
17    have yes and no just because our court reporter is
18    making a written transcript, okay?
19             A.     Yes.
20             Q.     Separately, there's also a tendency
21    in conversation to talk over one another, and so
22    if you think you know where my question is going,
23    you may start to chime in before I finish my
24    question or vice versa.  So let's make an effort,
25    I'll try to let you finish your answers, try to
```

Ariel D. Teitel, M.D.

1    let me finish my questions, okay?

2          A.    Yes.

3          Q.    There may be objections.  Counsel

4    may object to the form of a question.  That's

5    something to preserve the record, but, you know,

6    you go ahead and answer the question, all right.

7               Similarly, there could be an

8    objection where I think if your answer is not

9    responsive, I can make a nonresponsiveness

10   objection.  That's just, again, to preserve the

11   record, all right?

12         A.    Yes.

13         Q.    This is not an endurance contest.

14   So if you need a break at some point, you know,

15   let me know and we'll take a break.

16               Regrettably, because of the COVID

17   situation, we don't have coffee, but we do have

18   water here, and there may be a way to order out if

19   we need some coffee, all right.

20               Okay, just a couple preliminaries.

21   You have not examined Mr. Savory; is that correct?

22         A.    Correct.

23         Q.    And you are not his doctor and

24   never been his doctor, correct?

25         A.    Correct.

Ariel D. Teitel, M.D.

```
 1              Q.     Have you ever spoken to Mr. Savory?

 2              A.     Never.

 3              Q.     And do you have any plans to speak

 4    to Mr. Savory?

 5              A.     No.

 6              Q.     Have you ever spoken to Dr. Moidel?

 7              A.     No.

 8              Q.     Have you ever spoken to any of

 9    Mr. Savory's other treating physicians?

10              A.     Never.

11              Q.     Have you ever spoken to anyone from

12    Monsanto or Bayer about anything having to do with

13    glyphosate or Roundup?

14              A.     No.

15              Q.     Have you discussed this case with

16    any of your colleagues?

17              A.     No.

18              Q.     Have you discussed your opinions in

19    this case with any other person who is serving as

20    an expert witness in this case?

21              A.     No.

22              Q.     Is there any other person with whom

23    you've discussed this case other than counsel for

24    plaintiff?

25              A.     Counsel.
```

Ariel D. Teitel, M.D.

1          Q.     What is your medical specialty,

2    Doctor?

3          A.     Rheumatology.

4          Q.     Okay.  And I have your CV coming.

5    We'll mark it as an exhibit in a minute, but can

6    you explain what a rheumatologist does?

7          A.     Sure.  Well, I'm also a board

8    certified internist and rheumatologist, so any of

9    the medical subspecialties require that you do

10   internal medicine first, and then if you do a

11   subspecialty, that's in addition.  So rheumatology

12   is a specialized fellowship, I do that and I

13   completed that, I'm board certified in that, and I

14   can tell you what it pertains to, but it certainly

15   pertains to rheumatoid arthritis and other forms

16   of inflammatory arthritis and autoimmune diseases.

17         Q.     Okay.  So my question was just what

18   does a rheumatologist do generally?  What are the

19   kinds of diseases that a rheumatologist takes care

20   of?

21         A.     Sure.  Well, everything from aches

22   and pains to why are those aches and pains to do

23   those aches and pains relate to an inflammatory

24   disorder or a simple strain, and that can be -- so

25   it can be a simple strain kind of sports

Ariel D. Teitel, M.D.

1    medicineish, or it could be rheumatoid arthritis,

2    vasculitis or other autoimmune diseases, and we

3    manage those.  So we diagnose and manage those.

4           Q.     So what percentage of your patient

5    care represents taking care of patients who have

6    joint pain and/or inflammation of one type or

7    another?

8           A.     Joint pain, 80%.

9           Q.     80%.

10          You mentioned earlier internal

11   medicine?

12          A.     Mm-hmm.

13          Q.     And I assume that in the course of

14   taking care of rheumatological patients, there are

15   other sort of more generic -- general internal

16   medicine issues that arise; is that fair?

17          A.     Sure, they arise, yes.

18          Q.     Right.  But do you have a portion

19   of your practice that's dedicated to internal

20   medicine that is not rheumatology?

21          A.     No.  I only do consultative

22   rheumatology.

23          Q.     And what does that mean,

24   consultative rheumatology?

25          A.     Patients and physicians -- the

Ariel D. Teitel, M.D.

1   patients either refer themselves to me with prior

2   diagnoses or because they know we're the

3   specialist in musculoskeletal and autoimmune

4   diseases, and/or referring practitioners send me

5   patients for evaluation.

6          Q.      Are autoimmune diseases part of the

7   purview of a rheumatologist?

8          A.      By definition, absolutely.

9          Q.      And is it all autoimmune diseases

10  or just some autoimmune diseases?

11         A.      Well, some become the purview, say,

12  of allergy, immunology.  There can be a turf war

13  there a little bit.  Some are more taken care of

14  by dermatologists, some by ophthalmologists,

15  there's overlap, there's overlap.  So I couldn't

16  tell you that all auto -- every single autoimmune

17  disease is only managed or diagnosed by a

18  rheumatologist, but it gets complicated, you know.

19                (Document marked for identification

20         as Teitel Deposition Exhibit No. 1.)

21  BY MR. PIORKOWSKI:

22         Q.      I'm going to hand you what I've

23  marked as Exhibit 1.  Would you identify that for

24  the record, please.

25         A.      Expert report of mine dated

Ariel D. Teitel, M.D.

1    June 21st, 2021.

2         Q.     Is that the expert report that you

3    submitted in this case?

4         A.     Yes.

5         Q.     Okay.  And I'm also going to hand

6    you what I've just marked as Exhibit 2.

7                (Document marked for identification

8         as Teitel Deposition Exhibit No. 2.)

9    BY MR. PIORKOWSKI:

10        Q.     Can you identify that?

11        A.     Looks like my resume, yes.

12        Q.     Okay.  Is Exhibit 2 up to date?

13        A.     Yes.

14        Q.     Are there any changes that need to

15   be made or corrections that need to be made?

16        A.     No.

17        Q.     How much of your practice is

18   inpatient versus outpatient?

19        A.     Only 10% or so is inpatient.

20        Q.     And is inpatient part of your

21   practice consultative, or do you admit your own

22   patients from time to time?

23        A.     I almost never admit my own

24   patients.  It's consultative.

25        Q.     Are you a full-time employee of

Ariel D. Teitel, M.D.

1    NYU?

2         A.    No.

3         Q.    So can you explain, are you in a

4    private practice?

5         A.    Yeah, I have my own practice, and

6    I'm a teaching attending there.

7         Q.    Okay.  So what's your relationship

8    with NYU exactly?

9         A.    Well, there's like about 40

10   rheumatologists there, something like that, and we

11   take turns being on call.  I'm in the call group,

12   and I also am attending of the rheumatology

13   service at Tisch Hospital, which is the main NYU

14   hospital for -- it's something like three to five

15   weeks every year, so we do that.

16        Q.    What does that involve?

17        A.    That involves seeing all the

18   rheumatology consults that are called in the

19   hospital, along with the fellows, residents and

20   whatever students are on the rheumatology service

21   at that time.

22        Q.    Okay.  Is that a paid position?

23        A.    No.  I can bill the patients, but

24   it is not paid.

25        Q.    Okay.  And are you the only

Ariel D. Teitel, M.D.

```
 1   rheumatologist in your practice currently?

 2          A.     I sublet -- yes, my own practice,

 3   yes.  There's another rheumatologist that I sublet

 4   office space from, but I'm not financially

 5   connected to them other than that.

 6          Q.     You don't share patients?

 7          A.     We do not share patients, no.

 8          Q.     Did you complete a fellowship in

 9   oncology?

10          A.     No.

11          Q.     Are you board certified in

12   oncology?

13          A.     No.

14          Q.     Do you consider yourself to be an

15   expert in oncology?

16          A.     No.

17          Q.     Did you complete a fellowship in

18   hematology?

19          A.     No.

20          Q.     Are you board certified in

21   hematology?

22          A.     No.

23          Q.     Do you consider yourself to be an

24   expert in hematology?

25          A.     No.
```

Ariel D. Teitel, M.D.

```
1              Q.     Did you complete a fellowship in
2     gastroenterology?
3              A.     No.
4              Q.     Are you board certified in
5     gastroenterology?
6              A.     No.
7              Q.     Do you consider yourself to be an
8     expert in gastroenterology?
9              A.     No.
10             Q.     Did you complete a fellowship in
11    hepatology?
12             A.     No.
13             Q.     Are you board certified in
14    hepatology?
15             A.     No.
16             Q.     Do you consider yourself to be an
17    expert in hepatology?
18             A.     No.
19             Q.     You did not do a residency in
20    dermatology; is that correct?
21             A.     Correct.
22             Q.     And you're not board certified in
23    dermatology?
24             A.     Correct.
25             Q.     Do you consider yourself to be an
```

Ariel D. Teitel, M.D.

```
 1   expert in dermatology?

 2          A.      No.

 3          Q.      Do you have any advanced -- I see

 4   you have --

 5          A.      I mean, can I qualify those

 6   statements?

 7          Q.      Sure.

 8          A.      I mean, expert compared to a layman

 9   or expert as a professional like hepatologist,

10   gastroenterologist, dermatologist.  In other

11   words, I certainly would not consider myself a

12   gastroenterologist on the same level but compared

13   to a layperson or even compared to many other

14   medical professionals, I'm quite knowledgeable in

15   many of those areas as a consequence of my

16   practice and internal medicine and rheumatology

17   training, but I certainly would not qualify myself

18   nor do I hold myself out to be any of those

19   specialists, you know, but I know quite a bit

20   about those domains.

21          Q.      Okay.  Do you have an MBA?

22          A.      Yes.

23          Q.      When did you earn your MBA?

24          A.      I think 2003.

25          Q.      From what institution?
```

Ariel D. Teitel, M.D.

```
1              A.      Baruch CUNY, Zicklin.

2              Q.      And you did a Master's degree at

3    Georgetown University?

4              A.      Yes.

5              Q.      Was that before med school?

6              A.      Yes.

7              Q.      You went to Columbia undergraduate,

8    did a Master's degree at Georgetown and went to

9    George Washington for medical school?

10             A.      Correct.

11             Q.      Do you have any advanced degrees in

12   epidemiology or toxicology?

13             A.      No.

14             Q.      Is rheumatoid arthritis one of the

15   diagnoses that a rheumatologist sees on a regular

16   basis?

17             A.      Absolutely.

18             Q.      What percentage of your patients

19   have rheumatoid arthritis?

20             A.      About ten.

21             Q.      Have you ever published on the

22   diagnosis of rheumatoid arthritis?

23             A.      On the diagnosis, not

24   necessarily -- I mean, on the topic of rheumatoid

25   arthritis or on how to make a diagnosis?
```

Ariel D. Teitel, M.D.

 1          Q.     Well, you tell me what you've

 2   published on rheumatoid arthritis.

 3          A.     Let me see.  Let's see.  I can't

 4   remember really.  I've published something on

 5   outcomes, an outcomes thing, but it wasn't about

 6   diagnosis.  Let me see.  Patterns.  Yeah, so on

 7   page 5 of my CV, I did an outcome study that

 8   related to rheumatoid patients, but it was about

 9   their hospitalizations and so on.  It was an

10   outcome study and similarly did another outcome

11   study there that was related to complications

12   after surgery in rheumatoids versus

13   non-rheumatoids, so it wasn't about diagnosis, but

14   that presumed that they already had rheumatoid

15   arthritis.

16          Q.     So the first paper to which you're

17   referring is the second one on page 5?

18          A.     No, the top one, the first one.

19          Q.     Bhambhani?

20          A.     That one, yeah.

21          Q.     "Hospitalization of RA patients

22   with fever in New York state"?

23          A.     Yep.

24          Q.     Was that looking at TNF inhibitor

25   treatment for rheumatoid arthritis specifically?

Ariel D. Teitel, M.D.

```
1              A.      It was looking at trends, and we
2     were able to analyze whether the patients had been
3     on TNFs, I believe, and looking at using a
4     database.  Yes, I was looking at trends in
5     hospitalizations.
6              Q.      And is the second paper the other
7     one you were referring to?
8              A.      Yes.
9              Q.      Also Bhambhani?
10             A.      Yes, similar.
11             Q.      And that looked at cardiovascular
12    complications after knee and hip replacement
13    surgery?
14             A.      Yes.
15             Q.      Comparing RA patients with non-RA
16    patients?
17             A.      Yeah.
18             Q.      And the reason for looking at
19    cardiovascular complications is because rheumatoid
20    arthritis can have an effect of accelerating
21    atherosclerotic disease; is that the idea?
22             A.      Yes.
23             Q.      Did you find more cardiovascular
24    complications in RA patients in that study?
25             A.      I don't remember.  It's been so
```

Ariel D. Teitel, M.D.

```
 1  long.  I believe so, but I don't remember.
 2        Q.    Have you published on rheumatoid
 3  arthritis as a risk factor for non-Hodgkin
 4  lymphoma?
 5        A.    No.
 6        Q.    Have you ever diagnosed non-Hodgkin
 7  lymphoma in a patient?
 8        A.    Myself diagnosed non-Hodgkin's
 9  lymphoma?
10        Q.    Yes.
11        A.    Well, I mean, I would just say
12  practice is collaborative, so I've had patients
13  where I've suspected it and then it was confirmed
14  by biopsy through oncology workup and so on, so,
15  yes, to that regard, but I haven't, you know,
16  solely and single-handedly done that, but it's
17  collaborative.
18        Q.    And on how many occasions have you
19  suspected a patient of having non-Hodgkin
20  lymphoma?
21              And let me start over.
22              On how many occasions have you
23  suspected a rheumatoid arthritis patient of having
24  non-Hodgkin lymphoma and then ultimately had that
25  diagnosis confirmed through your collaboration
```

Ariel D. Teitel, M.D.

```
 1   with an oncologist?

 2          A.    Once for sure, possibly twice.

 3   Once for sure.

 4          Q.    Have you had any patients with

 5   non-Hodgkin's lymphoma who have had other

 6   rheumatoid diagnoses other than rheumatoid

 7   arthritis?

 8          A.    I've had patients that have a prior

 9   history of non-Hodgkin's lymphoma where they've

10   been cured of it that, certainly have other

11   autoimmune conditions and what-not for sure.

12          Q.    Any patients who developed

13   non-Hodgkin's lymphoma while you were treating

14   them for another rheumatic disease other than

15   rheumatoid arthritis?

16          A.    Not particularly.  I mean,

17   non-Hodgkin's -- not that I can recall

18   particularly.  It may well be, but I don't recall

19   specifically.

20          Q.    The one case you can remember, do

21   you remember what type of non-Hodgkin's lymphoma

22   it was?  Was it --

23          A.    No, I could look up the chart, but

24   I don't remember.  Sorry, I don't remember.

25          Q.    Have you ever had primary
```

Ariel D. Teitel, M.D.

```
 1    responsibility for treating a patient with NHL for

 2    their cancer?

 3           A.     Certainly not.

 4           Q.     Before becoming involved in this

 5    litigation, was there any time in your

 6    professional career when you were asked to

 7    determine the cause of a patient's non-Hodgkin

 8    lymphoma?

 9           A.     No.

10           Q.     Have you published any articles on

11    non-Hodgkin's lymphoma?

12           A.     No.

13           Q.     Have you written any articles about

14    risk factors or causes of non-Hodgkin lymphoma?

15           A.     No.

16           Q.     Have you ever published any article

17    about any aspect of the diagnosis, treatment or

18    causes of non-Hodgkin's lymphoma?

19           A.     No.

20           Q.     Am I correct that you've never

21    conducted any epidemiologic studies on Roundup or

22    glyphosate?

23           A.     That is correct.

24           Q.     And you've never conducted any

25    epidemiological studies on any pesticide, right?
```

Ariel D. Teitel, M.D.

```
1              A.      That is correct.

2              Q.      Have you ever conducted any animal

3       studies on Roundup or glyphosate or any other

4       pesticide?

5              A.      No.

6              Q.      Have you ever conducted

7       genotoxicity studies on Roundup, glyphosate or any

8       other pesticide?

9              A.      No.

10             Q.      Have you ever personally used

11      Roundup?

12             A.      Yes.

13             Q.      For what period of time?

14             A.      I might have used it twice a summer

15      for about four years on the tiny deck that I have,

16      something like that, two or three times a summer.

17             Q.      Did you use the premixed product or

18      concentrate; do you recall?

19             A.      It was liquid, no powder.

20             Q.      Do you consider yourself to be an

21      expert in the causes of non-Hodgkin lymphoma?

22             A.      Not on the level of an oncologist

23      certainly, no, no.

24             Q.      To the best of your knowledge, how

25      many patients who have used Roundup have you
```

Ariel D. Teitel, M.D.

```
 1    evaluated in your professional career?
 2           A.     Well, I don't -- I don't ask
 3    them -- I don't ask them that per se, so I have no
 4    idea.
 5           Q.     So unless they told you, you would
 6    really have no way to know?
 7           A.     I don't know.
 8           Q.     Have you ever told a patient that
 9    their non-Hodgkin lymphoma was due to Roundup?
10    I'm assuming not, based --
11           A.     Never, that's never happened.
12           Q.     Other than the reading you've done
13    in this case, do you have any other experience,
14    education or expertise in the carcinogenicity of
15    glyphosate or Roundup?
16           A.     No.
17           Q.     Do you have any experience,
18    education or expertise in the carcinogenicity of
19    any pesticide?
20           A.     No.
21           Q.     When is the first time you heard
22    about a possible association between Roundup and
23    non-Hodgkin lymphoma?
24           A.     Some kind of news media reports in
25    the past few years, I don't recall.
```

Ariel D. Teitel, M.D.

1          Q.      Have you ever -- before becoming

2     involved in this litigation, had you ever read in

3     a medical journal or heard a presentation at a

4     medical meeting in which the author or speaker

5     stated that glyphosate or Roundup causes

6     non-Hodgkin's lymphoma?

7          A.      No, never.

8          Q.      Do you know of any other licensed

9     physician in the world who is not a expert witness

10    in litigation who believes that Roundup causes

11    non-Hodgkin's lymphoma?

12         A.      Do I know of any physician now at

13    this point after reviewing different articles and

14    so on?

15         Q.      Any physician who is not an expert

16    witness in litigation, yeah.

17         A.      Well, I think the one -- well, I

18    believe that the ones that have written some of

19    these articles are expert witnesses, so I don't

20    know, but, I mean, some of the articles that I've

21    read seem to suggest that, but I believe some of

22    those authors may be expert witnesses.

23         Q.      But I mean you personally don't

24    know any doctor?

25         A.      Oh, personally, no, no, I don't

Ariel D. Teitel, M.D.

```
 1    know them at all.  I've never met them.

 2            Q.     You don't know any doctor that

 3    believes that Roundup causes non-Hodgkin lymphoma,

 4    to the best of their knowledge?

 5            A.     Personally, neither as a colleague

 6    nor friend, no, zero.

 7            Q.     Now, the report that we've marked

 8    as Exhibit 1, is that -- did you attempt to

 9    include all the opinions you intend to offer at

10    the time of trial in this report?

11            A.     Yes, except that I reserve the

12    right to amend and add things, and I recently

13    received Dr. Fisher's report and Dr. Moidel's

14    deposition, so those prompted some more

15    reflection, so other than that, yes.

16            Q.     You recently received Dr. Moidel's

17    deposition?

18            A.     Yes.

19            Q.     Did you get that after you

20    submitted your report?

21            A.     Yes.

22            Q.     When did you receive that?

23            A.     I can check my e-mail, but not too

24    long ago, in the past week, I believe.

25            Q.     Had you asked whether he had been
```

1  deposed previously?

2       A.     No.

3       Q.     So putting aside the new things

4  that you've come across, these questions are

5  directed at the time that you completed your

6  report, which was June 21st, 2021.

7       A.     Mm-hmm.

8       Q.     As of that time, had you attempted

9  to include all the opinions you intend to offer at

10 the time of trial?

11      A.     Certainly.

12      Q.     And you're prepared to offer all

13 those opinions under oath at the time of trial?

14      A.     Yes.

15      Q.     Did you also attempt to include in

16 your report an explanation of the bases for the

17 opinion you intend to offer?

18      A.     Yes, qualified by the fact that I

19 don't hold myself out to be a toxicologist, you

20 know, and so on.

21      Q.     Are you waiting -- awaiting any

22 additional information right now?

23      A.     No.

24      Q.     As we sit here today, with the

25 exception of Dr. Fisher's report and Dr. Moidel's

Ariel D. Teitel, M.D.

```
1   report, is your report complete?
2         A.     Yes.
3         Q.     When is the last time you reviewed
4   your report?
5         A.     This morning, last night.
6         Q.     When you reviewed it, did you see
7   anything that needed to be changed or corrected to
8   make it accurate?
9         A.     No.
10        Q.     So as you sit here today, you
11  believe your report is accurate?
12        A.     Yes.
13        Q.     Have any of the opinions in your
14  report been peer reviewed?
15        A.     Have my opinions been peer
16  reviewed?
17        Q.     Yes, yes.
18        A.     I'm not sure what you mean by that.
19        Q.     What is the process of peer review,
20  typically?
21        A.     Well, when an article is published
22  in a journal, there's an editorial board and
23  there's a process whereby, you know, some articles
24  are accepted for publication by peer review and
25  some are rejected and so on or modified after
```

Arnel D. Teitel, M.D.

1    advice.

2           Q.     And do you have any plans to submit

3    your report for publication?

4           A.     No.

5           Q.     Okay.  Did you write this report?

6           A.     Yes.

7           Q.     Did you have anyone else assist you

8    in the preparation of the report?

9           A.     It was reviewed with counsel.

10          Q.     Apart from that?

11          A.     No.

12          Q.     By whom were you first contacted

13   about this case?

14          A.     It's a referral service.  I think

15   it's called Expert IQ, something like that.

16          Q.     And is that a -- how did Expert IQ

17   have your name?

18          A.     I'm on a panel of potential expert

19   witnesses, rheumatology expert witnesses.

20          Q.     So is Expert IQ an expert witness

21   consulting service?

22          A.     Yes.

23          Q.     And you had an agreement with them

24   that you would consider reviewing individual

25   cases?

Ariel D. Teitel, M.D.

```
1              A.      Yes.

2              Q.      Okay.  Have you reviewed other

3    cases for them in the past?

4              A.      Yes.

5              Q.      Okay.  And for how long have you

6    been reviewing cases for them?

7              A.      Not sure but something like five to

8    seven years probably, a few years, five years

9    maybe.

10             Q.      But you haven't testified, you

11   said, in ten years; is that right?

12             A.      Yeah, I haven't testified in over

13   ten years.  It's mostly been record reviews, that

14   kind of thing, advice on that.

15             Q.      All right.  And was the first

16   person with whom you spoke about the case somebody

17   from Expert IQ?

18             A.      Yes.

19             Q.      And who is the first person -- what

20   were you asked, just whether you would be willing

21   to take a look at the case?

22             A.      Yeah, they send you a plausibility

23   thing.  They send you like a one paragraph and

24   then they say is this in your domain, do you have

25   conflicts of interest, do you want to speak, do
```

Ariel D. Teitel, M.D.

1    you want to proceed?

2         Q.    When was the first time you had

3    contact with plaintiff's counsel?

4         A.    I'd have to log into the dashboard

5    and see.  I don't know.  Not that long ago.  This

6    one has been pretty quick.  I think the spring,

7    this spring.  February, March, April.

8         Q.    What's your best estimate of when

9    you first --

10        A.    Maybe April.

11        Q.    April.  And who was the first

12   person you spoke with?

13        A.    Well, they have some kind of

14   administrators there I spoke to briefly, and then

15   you get on a conference call with the attorney, I

16   believe Jarad was on, Jarad Silverstein was on the

17   conference call.  You have a brief conference

18   call, see if it's a good fit, and then we

19   proceeded from there.

20        Q.    And when did you agree to serve as

21   an expert in the case after that first call?

22        A.    Yes.

23        Q.    Okay.  When did you start looking

24   at -- when did you start working on the case?

25        A.    I can check, but I think May.

Ariel D. Teitel, M.D.

1          Q.     Okay.  So I understand that you did

2    not -- have you not issued any invoices so far to

3    date?

4          A.     I have, I have, and I can get that

5    to you.  I have.

6          Q.     Okay.  Do you know how much time

7    you spent working on the case up to the time of

8    your initial report?

9          A.     Yes, it's in the thing we gave you

10   today, the minutes are tabulated, that was what I

11   put on there and so at the very end --

12         Q.     So --

13         A.     But I got a couple of interim

14   payments, so I think it's somewhere in the 10-to

15   15-hour range.

16         Q.     Let me -- I have not yet had a

17   chance to copy what was provided to us, which is,

18   I understand, your notes?

19         A.     Those are notes on all the records

20   that I received, all the documents I received.

21         Q.     So let me just hand those to you,

22   and if that helps you to answer the previous

23   question about how much time you spent as of the

24   time of your report.

25         A.     I would have to add it up because

Ariel D. Teitel, M.D.

1    I'm -- I did bill on an interim basis, and I can

2    tell you very accurately if I -- but I would have

3    to tabulate it because I know I got, I think, two

4    or three separate payments, yeah.

5            Q.    Okay.  Is that something you have

6    on your computer, which you have in front of you?

7            A.    I'd have it by e-mail.  Yes, I can

8    find it for you in two minutes, I guess if I look

9    up my e-mails to Jarad.  Would you like me to do

10   that?

11           Q.    Yes, please, thanks.

12           A.    Okay, one moment.

13                 Like I thought, so basically they

14   hired me on May 3rd, just FYI, it sounds like.

15           Q.    May 3rd?

16           A.    Yeah, and then I believe shortly

17   thereafter they gave me a retainer I believe for

18   three hours, which was 1,050, I believe, so that's

19   my recollection.  One minute.

20           Q.    And the retainer was something

21   against which you billed your time?

22           A.    Three hours, yep, that was for the

23   first three hours, yep.  Oh, I know what I should

24   look at.  Let me look at what I sent him.  That

25   would be better because --

Ariel D. Teitel, M.D.

```
 1                    MR. PIORKOWSKI:  And, counsel, we
 2           will get copies of these, I assume, hard
 3           copies of the invoices when they become
 4           available?
 5                    MR. BRECHER:  Yeah, sure.
 6                    THE WITNESS:  I mean, if I recall,
 7           I think I just e-mailed him.  So in his
 8           case, sometimes I have sent invoices.  I
 9           don't think I did with Jarad because it
10           was informal and simple.  He just asked me
11           how much.
12  BY MR. PIORKOWSKI:
13           Q.     In any event, though --
14           A.     They were e-mails, I believe.
15           Q.     That's fine.  It's still an
16  e-mailed invoice.
17           A.     Let me see.  Testimony list.  I
18  sent him the -- what we had revised -- by the time
19  the expert report was like June 17th, it was sent
20  to him.  So I did -- I do believe I finished the
21  review of all the documents by the end of May,
22  which was what they wanted, and that is what
23  happened, yeah.  I got hired at the beginning of
24  May, and I finished the review of all the
25  documents by the end of May.
```

Ariel D. Teitel, M.D.

1          Q.     So you spent three hours against

2    the original retainer, and then what were your

3    subsequent billings?

4          A.     Yeah, that's what I'm looking for.

5    One moment.  Let's see.  Let me look at what I

6    sent him.  That could find it easier.  Changes, I

7    sent that was before -- huh.  Oh, here, it's

8    probably on this.  Yeah, okay, I e-mailed him on

9    Monday, May 31st.  This is perfect, I can forward

10   you this e-mail.  Do you want -- I'll send it to

11   you, whatever you want.

12         Q.     We'll do it through counsel.

13         A.     Okay.  I have e-mail that I sent

14   him on Monday, May 31st, where I say I finished

15   reviewing the documents.  Total has been 306

16   minutes, which is five hours.  Total is 1,785,

17   retainer of 1,050, balance due is 735, so that's

18   what was paid as of May 31st.  That was the total

19   including the retainer was 1,785 for reviewing the

20   documents.

21         Q.     So slightly over five hours as of

22   May 31st?

23         A.     Yep, 306 minutes.

24         Q.     And then what about as of the time

25   you completed your report?

Ariel D. Teitel, M.D.

1         A.      Then I have to see what did I write

2    for that?  Hold on one second.

3              Okay.  Then on Wednesday,

4    June 16th, there were -- I spent 122 minutes on

5    the draft of the report, so that calculated out to

6    another $712.  That's what I e-mailed him on

7    June 16th.

8         Q.      And so the 122 -- that's slightly

9    more than two hours?

10        A.      Yeah.

11        Q.      And that was all spent drafting a

12   report or was that --

13        A.      Drafting, revising, discussing,

14   yep.

15        Q.      Okay.  Did that include any looking

16   at new documents or anything of that nature?

17        A.      Well, I did some -- yeah, I did

18   some research for that, yeah.

19        Q.      In that two hours?

20        A.      Yes.

21        Q.      And then so --

22        A.      And then on the 19th, I sent --

23   again, there were ten more minutes, so it was

24   another $58, I don't know, we spoke, I mean, you

25   know, that was ten minutes I communicated to him

Ariel D. Teitel, M.D.

 1   by e-mail on June 19th.

 2          Q.     So, let's see, so basically 7.3

 3   hours as of the time you did your report?

 4          A.     Whatever -- those are the amounts,

 5   yep, and I believe those -- and I believe that's

 6   the last one as of now, I believe.

 7          Q.     And that included drafting your

 8   report?

 9          A.     Yes.

10          Q.     Okay.  Now, if we look at Exhibit

11   1, am I correct that your report does not include

12   any opinion concerning the warnings contained on

13   any of the Roundup product labels?

14          A.     On any of the Roundup products,

15   correct.

16          Q.     And you don't intend to offer any

17   opinions on that issue at the time of trial?

18          A.     Correct.

19          Q.     And, similarly, your report does

20   not contain any opinions about Monsanto's conduct

21   and the marketing of Roundup, correct?

22          A.     Correct.

23          Q.     You don't intend to offer any

24   opinions on that issue at the time of trial?

25          A.     Correct.

Ariel D. Teitel, M.D.

```
1              Q.      Your report does not contain any
2    opinions about any aspect of Monsanto's conduct,
3    correct?
4              A.      Correct.
5              Q.      And you don't intend to offer any
6    opinions about any aspect of Monsanto's conduct at
7    the time of trial, right?
8              A.      Correct.
9              Q.      Your report does not contain any
10   opinions about the accuracy of Mr. Savory's
11   diagnosis of DLBCL or non-Hodgkin's lymphoma; is
12   that correct?
13             A.      Correct.
14             Q.      In other words, you don't dispute
15   the accuracy of that diagnosis?
16             A.      No.
17             Q.      And, similarly, your report does
18   not contain any opinions concerning the
19   appropriateness of any of the medical treatment or
20   medical care that Mr. Savory received, correct?
21             A.      Correct.
22             Q.      And am I correct that you don't
23   intend to offer any criticisms of any of the care
24   that Mr. Savory received at the time of trial?
25             A.      Correct.
```

Ariel D. Teitel, M.D.

1        Q.      Okay.  Did you take issue with any

2   of the diagnoses or treatments that were utilized

3   in Mr. Savory's case by his treating physicians?

4        A.      Take issue meaning?

5        Q.      You believe the diagnosis is wrong,

6   for example.

7        A.      No.  I was curious to see about

8   psoriasis being mentioned and so on, but just kind

9   of out of intellectual and kind of practical

10  curiosity, but, no.

11       Q.      There was a diagnosis in

12  Mr. Savory's records of psoriatic arthritis,

13  correct?

14       A.      I believe I saw that, yes.

15       Q.      And you don't take issue with that

16  diagnosis, correct?

17       A.      It's hard to dispute it.  You know,

18  I've never examined him, and I have not seen his

19  skin, so I can't dispute it.

20       Q.      And your report also doesn't

21  include any opinions with respect to Mr. Savory's

22  prognosis either with respect to his non-Hodgkin's

23  lymphoma or with respect to his rheumatoid

24  arthritis, correct?

25       A.      Correct.

Ariel D. Teitel, M.D.

1        Q.     And you're not offering any

2   opinions at the time of trial on those issues,

3   correct?

4        A.     Correct.

5               (Document marked for identification

6        as Teitel Deposition Exhibit No. 3.)

7   BY MR. PIORKOWSKI:

8        Q.     I'm going to hand you what I've

9   marked as Exhibit 3, which is the Notice of

10  Deposition.

11       A.     Mm-hmm.

12       Q.     Have you seen this before?

13       A.     Yes.

14       Q.     And this is a Notice of Deposition

15  for today for your deposition here, and I want to

16  go through with you on page -- on the third page

17  under Exhibit A, it says Request for Production.

18  Number 1 says documents sufficient to show the

19  total amount of time -- excuse me one second.

20              Number 1 says, documents sufficient

21  to show the total amount of time Dr. Teitel has

22  billed in connection with his work as an expert in

23  litigation involving Roundup, including but not

24  limited to his work regarding plaintiff in this

25  case, correct?

Ariel D. Teitel, M.D.

```
1              A.     Yes.

2              Q.     And my understanding is this is the

3   only Roundup case you've worked on, right?

4              A.     Correct.

5              Q.     Okay.  And we've talked about -- we

6   don't have any invoices here today, right?

7              A.     Yeah, there were no invoices.  They

8   were e-mails.

9                     MR. PIORKOWSKI:  Okay.  And but we

10             do have an agreement, counsel, that those

11             will be provided, right?

12                    MR. BRECHER:  Yeah.

13                    THE WITNESS:  I can forward them to

14             you or forward them to counsel.  I mean,

15             Jarad has them because they were all

16             e-mailed to him, but I can reforward.

17                    MR. PIORKOWSKI:  Just through

18             counsel is fine.

19                    THE WITNESS:  Yes, perfect, yes.

20   BY MR. PIORKOWSKI:

21             Q.     With respect to time, let's stop

22   and talk for a minute.

23                    So we talked about the fact that it

24   was something like 6.3 -- I'm sorry -- 7.3 hours

25   up through the time of your completion of your
```

Ariel D. Teitel, M.D.

```
1    report.
2                Did you spend any additional time
3    working on the case in June or July after
4    completing your report?
5         A.    I don't think so.
6         Q.    When is the next --
7         A.    I don't think so.
8         Q.    When is the next time you spent any
9    time on this matter?
10        A.    Definitely in the last two weeks.
11   What is it?  Yesterday I had a conference with
12   Jarad Silverstein, and I think that was about it.
13   Yeah, I think within the past week or two.  I
14   don't think there was much else since the report,
15   yeah.
16        Q.    Okay.  And how long was the
17   conference with Mr. Silverstein?
18        A.    Yesterday I believe was 68 minutes.
19        Q.    Pretty exacting.
20        A.    You know, what can I say.
21        Q.    That's not a bad thing.
22   Sixty-eight minutes give or take 20 seconds.
23        A.    Exactly.
24              MR. BRECHER:  Well, you round off.
25              After 30 seconds you round off to 69 or
```

Ariel D. Teitel, M.D.

```
 1          maybe not.
 2   BY MR. PIORKOWSKI:
 3          Q.     All right.  So in addition to the
 4   work prior to your report and in addition to your
 5   conversation with Mr. Silverstein yesterday, you
 6   just mentioned earlier today seeing Dr. Moidel's
 7   deposition?
 8          A.     Yes.
 9          Q.     When did you see that for the first
10   time?
11          A.     I believe I just saw in my e-mails,
12   I believe it was sent to me August 4.
13          Q.     August 4.  And did you read that?
14          A.     Yes.
15          Q.     And how much time did you spend
16   reading that?
17          A.     I believe that reading that and
18   Fisher's I believe and so on was 30 minutes total,
19   something like that.
20          Q.     Thirty minutes total?
21          A.     For both Fisher's and for
22   Dr. Moidel, something like that, yeah.
23          Q.     Did Dr. Moidel's deposition -- did
24   reading Dr. Moidel's deposition -- let me start
25   over.
```

Ariel D. Teitel, M.D.

1             I assume that among the medical

2    records that you reviewed, you reviewed

3    Dr. Moidel's medical records, correct?

4          A.     Yes.

5          Q.     As a part of your initial review?

6          A.     Yes.

7          Q.     Okay.  And Dr. Moidel's office had

8    records from 2014 forward, correct?

9          A.     Yes.

10         Q.     But then at his deposition, they

11   also became aware that he had been seen by

12   Dr. Moidel as a patient as early as 1998 or 1999,

13   correct?

14         A.     Yes.

15         Q.     Okay.  Had you reviewed at the time

16   of your initial report, the earlier records from

17   Dr. Moidel's office from 1998, 1999 and 2000?

18         A.      No.  But I will say that in the

19   family practice, I think Dr. Vasta's, I believe,

20   records, it's noted there that he had had earlier

21   visits.  It doesn't say Moidel per se, I don't

22   think, but it's kind of noted in there.  So that's

23   my answer to that.

24                 (Document marked for identification

25          as Teitel Deposition Exhibit No. 4.)

Ariel D. Teitel, M.D.

```
1    BY MR. PIORKOWSKI:
2         Q.    I'm going to hand you a document
3    that I've marked as Exhibit 4.  I'll represent to
4    you that this contains records from Dr. Moidel's
5    office dating back to, I guess, 1999.
6         A.    Okay.
7         Q.    Have you -- take a minute to flip
8    through that, if you would.
9         A.    I know for sure I haven't seen
10   this, because I haven't seen any handwritten
11   records like this from him.
12        Q.    So this is not -- in formulating
13   your opinions, this is not a document you've seen,
14   or these are records you haven't seen?
15        A.    I have not seen this.
16        Q.    Okay.  Did reviewing Dr. Moidel's
17   deposition change any of the opinions that you
18   expressed in your original report?
19        A.    No.
20        Q.    Did Dr. Moidel's deposition provide
21   you with any additional information that you
22   didn't have before when you just based your review
23   on Dr. Moidel's office records and on the PCP's
24   office records?
25        A.    Not really information, no, other
```

Ariel D. Teitel, M.D.

1  than, as you say, the fact that he realized

2  himself that he had seen him earlier, but I knew

3  from the other records that somebody had seen him

4  earlier and postulated whatever they postulated.

5          Q.     And is there any reason, based on

6  Dr. Moidel's deposition, that you would need to

7  amend or supplement your report?

8          A.     No, I don't think so.

9          Q.     Other than the -- you did say 30

10  minutes, right, you spent reading Dr. Moidel's

11  deposition and Dr. Fisher's report?

12          A.     Yes.

13          Q.     Other than the 30 minutes you spent

14  reading those records and the 68 minutes you spent

15  speaking with Mr. Silverstein, did you do anything

16  else since completion of your original report up

17  to today?

18          A.     I did a little more internet, you

19  know, kind of journal searching, researching,

20  right I think before and possibly even after

21  discussing with Jarad in the last two couple of

22  days.

23          Q.     You did some internet searching?

24          A.     Well, through NYU medical library,

25  yeah, online database, yeah.

Ariel D. Teitel, M.D.

1          Q.     And how much time did you spend

2    doing that?

3          A.     It was only about five minutes,

4    five, ten minutes.

5          Q.     And what internet searching did you

6    do?

7          A.     I looked for -- it was actually

8    what prompted it was reading Fisher's deposition,

9    that prompted it.  So I wanted to reclarify some

10   things for myself, so I did another search, and

11   then I got several more articles related to

12   glyphosate and so on and lymphoma.

13         Q.     Okay.  When you say you got several

14   more articles, what do you mean you got them?

15         A.     I downloaded them.

16         Q.     You downloaded them?

17         A.     Yes.

18         Q.     Okay.  Are they articles you had

19   not seen before?

20         A.     Yes, I believe so.

21         Q.     You had not seen them before?

22         A.     Yes, correct.

23         Q.     Okay.  And do you have a record of

24   what those articles were?

25         A.     Yes, I sent them to counsel

Ariel D. Teitel, M.D.

1    yesterday, I believe.

2          Q.     Okay.

3                 MR. PIORKOWSKI:  And do we have --

4                 MR. BRECHER:  I don't have them.

5                 THE WITNESS:  They were in an

6          e-mail to Jarad.  I can forward it to

7          whoever you want whenever you want.

8                 MR. BRECHER:  You can forward it to

9          me and I'll --

10                THE WITNESS:  I can send them to

11         you right now, if you like.

12                MR. BRECHER:  Okay.

13                THE WITNESS:  I don't know if I

14         have your e-mail.

15                MR. BRECHER:  It's

16         MBrecher@WapnerNewman.com.

17                THE WITNESS:  Yeah, let me find

18         Jarad's.  I just sent it to him a couple

19         days ago, I believe, one minute.  Time

20         flies when having so much fun.  Here they

21         are, forward.  Got it down here.  It was

22         yesterday.  So say again, Mark.

23                MR. BRECHER:  MBR --

24                THE WITNESS:  I have it.  Okay,

25         just sent it to you.

Ariel D. Teitel, M.D.

```
1    BY MR. PIORKOWSKI:

2         Q.    So you said you spent five to ten

3    minutes doing that?

4         A.    Looking it up was quite quick, yes.

5         Q.    Did you also read those articles?

6         A.    I surveyed them quickly, whatever

7    you call it, glanced at them.

8         Q.    Was that all part of the five to

9    ten minutes?

10        A.    Yes, maybe 15.

11        Q.    Can you -- and Mr. Brecher will

12   forward that information, but can you tell me what

13   the names of those articles were?

14        A.    One was "Glyphosate in food and

15   supplements," that's from like a nutrition thing.

16              The other one was "Exposure to

17   Glyphosate and Risk of Non-Hodgkin Lymphoma: An

18   Updated Meta-analysis."

19        Q.    Who is the author of that?

20        A.    Paolo Boffetta.

21        Q.    Okay.

22        A.    The next one was "A review and

23   update of perspective of herbicide Roundup as a

24   cause of non-Hodgkin's," by Dennis Weisenburger,

25   who is an expert, or I've been told is an expert
```

Ariel D. Teitel, M.D.

1    often in this.

2              And then another one from 2017,

3    "Glyphosate toxicity and carcinogenicity:  A

4    review of the scientific basis of the European

5    Union assessment and differences with IARC."  Jose

6    Tarazona was the principal author there.

7         Q.    And this may have been clear

8    before, but I just want to make sure, so those

9    four articles are articles that had not seen

10   previously, correct?

11        A.    Correct.

12        Q.    And were those articles that were

13   on Dr. Fisher's list of materials considered?

14        A.    I don't believe so.  I don't know,

15   but I don't believe so.  I found them myself, so I

16   have no idea.  I doubt it.

17        Q.    What search did you do that brought

18   up those articles?

19        A.    I use a PubMed search through NYU,

20   and you're able to get full text articles super

21   quickly when you have NYU faculty authorization.

22        Q.    And what search term did you use?

23        A.    Glyphosate and I think lymphoma.

24        Q.    Okay.  All right.  So let's go

25   back.

Ariel D. Teitel, M.D.

1            So I want to sort of bring this

2    time thing to a conclusion.  So we had 7.3 hours

3    up to the time of your report all totaled.  We had

4    30 minutes reading Dr. Fisher's report and

5    Dr. Moidel's deposition.  We had 68 minutes

6    speaking with Mr. Silverstein.  We had, let's say,

7    five to ten minutes doing an internet search and

8    glancing at those articles.

9            Any other time that we haven't

10   discussed that you've spent on this case?

11        A.    No, I don't believe so.

12        Q.    Number 2 refers to invoices.  We've

13   already talked about that.

14            Number 3 asks for all documents

15   that you consider in support of your deposition

16   testimony.  And let me just ask, I know oftentimes

17   witnesses will include something called a list of

18   materials considered, and I asked Mr. Silverstein

19   about this, I wanted to make sure I didn't miss

20   something.

21            Did you include a separate list of

22   materials considered with your report?

23        A.    I didn't, but I put, you know, some

24   of the pertinent references in the report, so I

25   don't believe I sent to him anything else that was

Ariel D. Teitel, M.D.

1    a list of things considered.

2         Q.    So the references in your report,

3    in particular, you had references to three

4    articles that concerned rheumatoid arthritis by

5    Simon, Franklin and Bernatsky respectively; is

6    that right?

7         A.    Yes.

8         Q.    Those are the only published

9    articles that you referred to in your report,

10   though, right?

11        A.    That I referred to in the report,

12   yes.

13        Q.    Okay.  Now, are there other

14   published articles on rheumatoid arthritis and NHL

15   risk that you considered that you didn't indicate

16   in your report?

17        A.    Well, when I did a search, and I

18   used Up-To-Date, just like Moidel did, he

19   mentioned, I mean, multiple articles and their

20   summaries come up because -- and I glanced at

21   those, but then I only chose as a salient as ones

22   that I felt were most pertinent, you know, the

23   ones that I listed in the report.  So I may

24   well -- I definitely did an Up-To-Date look, just

25   to refresh myself about rheumatoid and lymphoma,

Ariel D. Teitel, M.D.

1    and I glanced at it, but I did not -- did I

2    consider it?  Not particularly because I'm aware

3    of it, not really.

4            Q.     So when you did an Up-To-Date

5    search, the search terms you used were rheumatoid

6    arthritis and lymphoma?

7            A.     Yes.

8            Q.     And these were the three articles

9    that you considered to be most salient of the

10   articles that were available in the literature?

11           A.     Yes, I mean, you know, there's

12   many.  One could put 20 down, but, yes.

13           Q.     And are there any other articles

14   that you intend to rely on at the time of trial

15   that you didn't list specifically?

16           A.     Well, these new ones that I give,

17   the four new ones that I just gave yesterday,

18   perhaps.

19           Q.     Well, do you know whether you're

20   going to rely on them or not?

21           A.     I may well.  I might.

22           Q.     You might not?

23           A.     Well, I would say those, again -- I

24   mean, those are a little bit out of -- I'm not an

25   expert on glyphosate per se, right.  I'm not an

Ariel D. Teitel, M.D.

1  environmental toxicologist, and I'm not an

2  oncologist.

3           Within my specialty, it's still of

4  interest to me, certainly, and that's why I looked

5  it up, prompted by Fisher's deposition, and I

6  believe it supports my general view; however, I do

7  not claim to be, you know, beyond what I am.

8       Q.    By Fisher's deposition, you are

9  referring to Fisher's report?

10      A.    Yes.

11      Q.    Okay.  Let me reframe my earlier

12  question, because I might have not been clear.

13           With respect to the issue of the

14  relationship between rheumatoid arthritis and

15  non-Hodgkin's lymphoma, are there any articles

16  that you intend to rely on at the time of trial,

17  other than the three articles that you cited

18  specifically?

19      A.    No.

20      Q.    Okay.  Now, to go back to -- I just

21  want to be clear on what things you looked at and

22  didn't look at as a part of your initial review

23  here.

24           So I think we've talked about

25  Mr. Savory's medical records, correct?

Ariel D. Teitel, M.D.

```
 1              A.     A little bit.
 2              Q.     And, to your knowledge, you
 3    reviewed all of the available records with respect
 4    to Mr. Savory with the exception of Exhibit 4,
 5    which I just handed you; is that correct?
 6              A.     Correct.
 7              Q.     And do you know out of your
 8    original five hours how much time it took for you
 9    to review his medical records?
10              A.     Well, that was reviewing his
11    medical records, that was the time.
12              Q.     Well, let me back up a minute.
13              So, for example, when you just
14    talked about these articles on rheumatoid
15    arthritis, right, that you found doing the
16    Up-To-Date search --
17              A.     Yeah.
18              Q.     -- that was part of your 306
19    minutes, right?
20              A.     No, I don't think it was, no.
21              Q.     It wasn't?
22              A.     No, that was the report.  That was
23    doing the report.
24              Q.     So that was part of the 122
25    minutes?
```

Ariel D. Teitel, M.D.

```
 1           A.     Yes.
 2           Q.     Okay.  So the 306 minutes was spent
 3     entirely looking at Mr. Savory's records?
 4           A.     Yes.
 5           Q.     Okay.  And as a part of that, were
 6     you provided with something called a Plaintiff
 7     Fact Sheet?
 8           A.     No, I don't believe so.
 9           Q.     Okay.
10           A.     I don't believe so.  What is that?
11           Q.     A Plaintiff Fact Sheet, yeah, for
12     your benefit is it's a document that the plaintiff
13     submits in connection with litigation that
14     provides answers to certain questions such as
15     other medical history, exposure, you know, these
16     sorts of things?
17           A.     I'm not 100% sure.  I'm not 100%
18     sure.
19           Q.     Okay.  It doesn't sound familiar?
20           A.     It's possible.  I don't -- I would
21     have enumerated it in the -- I write before -- I
22     know it sounds like I'm obsessive, I'm not really,
23     but in the detailing of my billing, in order to
24     keep myself organized, I realize I have to do
25     these things, I write what I'm reviewing and how
```

Ariel D. Teitel, M.D.

1    many minutes each.  So if I did have that, it

2    would be in there, because I don't recall.  I

3    don't think so.

4         Q.    Okay.

5              MR. PIORKOWSKI:  And, Peg, we

6         didn't mark the notes yet; is that right?

7              MR. BRECHER:  I thought we did,

8         maybe not.

9              (Document marked for identification

10        as Teitel Deposition Exhibit No. 5.)

11   BY MR. PIORKOWSKI:

12        Q.    So I'm handing you what I've marked

13   as Exhibit 5, and is that what you were just

14   referring to a second ago when you were talking

15   about your notes?

16        A.    Yes.

17        Q.    Okay.  And these are -- just to

18   identify Exhibit 5 and make sure the record is

19   clear, Exhibit 5 are computer notes that you made

20   while reviewing records?

21        A.    Yes.

22        Q.    Okay.  And were they all made on

23   the same day, or were they made on different days?

24        A.    Over multiple days.

25        Q.    Okay.  And so, for example, when

Ariel D. Teitel, M.D.

```
 1   you have -- when you have 60 minutes, 8/21, that
 2   means on August 8th you spent 60 minutes reviewing
 3   something, or what does that mean?
 4          A.     I know this is not paginated.  Can
 5   you -- which page of this is that?  Sorry.
 6          Q.     That's a good question.
 7          A.     Oh, I see, 60 minutes, 8/8/21.
 8   Yeah, I must have done that to -- I must have done
 9   that then on that day, yeah.  If I write the date,
10   then that's the date, yeah.
11          Q.     So are these in the right order?
12   This is the order they were handed to me.
13          A.     No, it doesn't look like it,
14   doesn't look like it, sorry.  It came out of my
15   printer.  No, they're not, and it's not paginated.
16          Q.     Can we -- would you mind just
17   taking a second to put these in chronological
18   order.  Maybe you can just tell us what's at the
19   top of page 1.
20          A.     Yeah, it looks like it's backwards.
21   So it's simple in the sense it came out of the
22   printer, at least what I have.  So it looks like
23   it's last page first here, basically.
24          Q.     So Savory 10/10/54 would be page 1?
25          A.     Yes, looks like it, yeah.
```

1          Q.     And the page that starts 11/19/19

2     would be page 2?

3          A.     Yes.

4          Q.     And the page that starts "Savory

5     deposition" would be page 3?

6          A.     Yes.

7          Q.     And the page that starts

8     "Hightower" would be page 4?

9          A.     Yes.

10         Q.     And the page that says "12/14 RA"

11    is page 5?

12         A.     Yes.

13         Q.     And so page 1 is what you looked at

14    when you started looking at records, right?

15         A.     Yes.

16         Q.     And everything on page 1 appears to

17    be review of some sort of medical records; is that

18    right?

19         A.     Yeah, see, for example, Vasta

20    Family Practice, so those are review -- what's

21    below that is the record review from Vasta Family

22    Practice.  So to organize myself, I do it that

23    way; otherwise, I would have no way of knowing

24    what's from where.

25                So then when you go to the next

1    page, when it changes to a document, it says,

2    "Magdalinski-cancer."  So what's below that is

3    him, and then below that then Moidel records, so

4    it's, you know, it's understandable that way.

5           Q.     Okay.  So all of 1 and all of page

6    2 are all Mr. Savory's treating physician records,

7    right?

8           A.     Yes, from the Vasta Family

9    Practice.

10          Q.     Okay.  And then on page 3 it says

11   Savory deposition; is that right?

12          A.     Yes.

13          Q.     And you read his deposition?

14          A.     Yes.

15          Q.     And how much time did you spend

16   reading his deposition; can you tell?

17          A.     I'd have to go back and see, but it

18   looks like 140 minutes there right before the

19   civil complaint, so I don't know.  I'd have to go

20   back -- you would have to go back to the last

21   timekeeping looks like on the prior page.  It's

22   like a running total, so I don't know.  You would

23   have to -- we would have to look.

24          Q.     So I see, so, for example, if we go

25   to page 2, it says 37 plus 56 equals 93.

Ariel D. Teitel, M.D.

1          A.     Yeah.

2          Q.     And then the next entry says 93

3    plus 15, so that means between those two entries

4    you spent 15 minutes?

5          A.     Yes.

6          Q.     And the running total is 108?

7          A.     Yes.

8          Q.     So by the time we get down to -- by

9    the time we get down to Savory deposition, you're

10   at 140 plus 180 comes to 248?

11         A.     Yep.

12         Q.     And that means you would have spent

13   108 minutes reading his deposition?

14         A.     I guess so, if the 140 was from

15   before, yes.

16         Q.     All right.  I understand.

17                So now we're back to this original

18   306 minutes, we'll call it.  You said that was all

19   reviewing Mr. Savory's records.  That also

20   includes his deposition, right?

21         A.     Yes.

22         Q.     Okay.  And it says civil complaint.

23   Did that also include reviewing the civil

24   complaint?

25         A.     I guess so, yes.

1          Q.     Do you see it on page 3 there?

2          A.     Yeah, I see it there, yeah.

3          Q.     Do you know what the -- was there a

4    purpose, or that was just for context?

5          A.     Beats me.  All I know is this was

6    among files I received from Mr. Silverstein, so I

7    reviewed it.

8          Q.     Okay.  And then it also has Kendall

9    report here?

10         A.     Yes.

11         Q.     So did you review Dr. Kendall's

12   entire report?

13         A.     Yes.

14         Q.     From front to back?

15         A.     I read it.

16         Q.     Okay.  And how long did you spend

17   reviewing his report?

18         A.     You'd have to look from there, I

19   would say 58 plus 248, so whenever the -- but that

20   could include -- that could include, you know, the

21   other thing.  So it looks like 240 -- so it looks

22   like the civil complaint, the ortho, Hightower and

23   the Kendall report were all 58 minutes.

24         Q.     Okay.

25         A.     All of that was in the 58 minutes.

Ariel D. Teitel, M.D.

```
1              Q.     Got it, okay.

2              So as of the 306, you had not

3     looked at any medical articles on rheumatoid

4     arthritis, correct?

5              A.     Yeah.

6              Q.     As a part of that 306 minutes?

7              A.     Yeah, that's correct.

8              Q.     And you hadn't looked at any

9     medical literature with respect to glyphosate as a

10    part of that either, right?

11             A.     Yeah, I think so.  I think that's

12    correct.

13             Q.     Okay.  And had you looked at any

14    medical literature on any other question?

15             A.     Related to this case, no, I don't

16    think so.

17             Q.     Okay.

18             MR. PIORKOWSKI:  Counsel, we've

19         been going about 1:15, you want to take a

20         quick break?

21             MR. BRECHER:  Want to stretch?

22             THE WITNESS:  Have a little walk.

23             MR. PIORKOWSKI:  Why don't we go

24         off the record.

25             THE VIDEOGRAPHER:  The time right
```

```
1              now is 10:23 a.m., and we're off the

2              record.

3                   (Brief recess.)

4                   THE VIDEOGRAPHER:  The time right

5              now is 10:31 a.m., and we're back on the

6              record.

7    BY MR. PIORKOWSKI:

8         Q.    Doctor, one more thing, say your

9    name, I don't want to mispronounce.

10        A.    Teitel.

11        Q.    Teitel.

12        A.    Teitel is fine, thank you.

13        Q.    So, Dr. Teitel, in your report,

14   Exhibit 1, you say, "I have reviewed the medical

15   literature regarding GBF and lymphoma."

16              Do you see that?

17        A.    Yes.

18        Q.    GBF stands for glyphosate-based

19   formulations, right?

20        A.    Yes.

21        Q.    So how much time did you spend

22   reviewing the literature on GBF and lymphoma; is

23   that contained in your notes?

24        A.    Not much time, not that much time.

25   That was part of this time.
```

Ariel D. Teitel, M.D.

1          Q.      That was part of the 122 minutes of

2    preparing your report?

3          A.      Yes, yes.

4          Q.      Okay.  And so in that 122 minutes

5    you identified glyphosate literature.  You

6    identified rheumatoid arthritis literature, and

7    you also wrote up your report itself; is that

8    right?

9          A.      Yes.

10         Q.      Okay.  So what medical literature

11   did you review?

12         A.      For the glyphosate you say?

13         Q.      When you say in your report, "I

14   have reviewed the medical literature regarding GBF

15   and lymphoma," what medical literature are you

16   referring to?

17         A.      Well, I more read Kendall's report,

18   and, similarly, I'm pretty sure I did a -- I did

19   probably a literature search and glanced at some

20   things in conjunction when I looked at -- when I

21   read Kendall's report.

22         Q.      Can you identify any specific study

23   that you reviewed?

24         A.      No, I really can't.

25         Q.      Do you remember the search terms

Ariel D. Teitel, M.D.

```
 1    you used when you did your literature search?

 2         A.    Probably did glyphosate, and I

 3    might have done both lymphoma and non-Hodgkin's

 4    lymphoma, I don't recall.

 5         Q.    You don't have a printout of the

 6    search you did or anything of that nature?

 7         A.    No, definitely not, no.

 8         Q.    Are you -- did you review something

 9    called the IARC monograph.

10              Do you know what that is?

11         A.    I don't know if I reviewed it.  I

12    may have seen the abstract.  I've definitely -- I

13    may have seen the abstract quickly that there was

14    a revise -- I don't know, I may well have seen it

15    and literally glanced at it.

16         Q.    As you sit here today, you can't

17    remember?

18         A.    I think it's quite possible that I

19    glanced at it as an abstract.

20         Q.    Is that something you're relying on

21    for purposes of your opinions?

22         A.    In part, it's one aspect.

23         Q.    And for what purpose are you

24    relying on it?

25         A.    For the question of glyphosate
```

Ariel D. Teitel, M.D.

```
1    association with lymphoma causation.
2            Q.      Do you know what IARC's conclusion
3    was?
4            A.      I believe they revised it.   I
5    believe the conclusion was that there was an
6    increased risk.
7            Q.      That there was a definite increased
8    risk or that there was a probable?
9            A.      That there may be -- that there
10   could be a probable increased risk.
11           Q.      There could be a probable increased
12   risk?
13           A.      There could be an increased risk
14   due to it in humans, yeah.
15           Q.      Do you know what their finding was
16   with respect to human studies?
17           A.      No, no.
18           Q.      Did you look at any regulatory
19   reviews?
20           A.      No.   The EPA thing, for example?
21           Q.      Well, yeah.   Are you aware -- let
22   me back up.
23                   Were you aware that numerous
24   regulatory agencies, such as the EPA, have looked
25   at the safety of glyphosate, including
```

Ariel D. Teitel, M.D.

1  specifically whether glyphosate is carcinogenic?

2       A.    I'm aware based on what I read in

3  Kendall and I may have seen that it was referred

4  to, and I may have seen an abstract or not, I

5  don't recall, but definitely from Kendall, yes.

6       Q.    So for what purposes are you

7  relying on Dr. Kendall?

8       A.    Well, especially for his

9  quantification of the amount of exposure that the

10  patient had, where I wrote in my report that he

11  quantified something like 111 eight-hour days that

12  according to his calculation that was the toxicity

13  or that was the exposure that the patient

14  experienced over the amount of time in question.

15      Q.    Okay.  Apart from that?

16      A.    And then Kendall's discussion about

17  the toxicity of it and the carcinogenicity of

18  glyphosate.

19      Q.    So do you know whether the theory

20  that glyphosate causes non-Hodgkin's lymphoma is

21  controversial within the medical community?

22      A.    Yes, I know that there's some data

23  supporting that, some not.

24      Q.    Do you know broadly what the

25  conclusions of the regulatory agencies have been?

Ariel D. Teitel, M.D.

```
1              A.     They vary.

2              Q.     In what respect?

3              A.     I think in the European Union, it's

4      not allowed at all, for example, and that's not

5      the United States, but I believe that they don't

6      allow glyphosate pesticides at all in the European

7      Union.  I believe that was written in something I

8      read.  So that's a regulatory agency.  And the

9      IARC had changed their opinion, I believe, so I

10     believe -- as far as I read, there's mixed

11     opinions, especially like the EU one is more

12     stringent.  California has a lower amount of how

13     much of it can be present in foods, for example,

14     as opposed to nationally, shall we say, as opposed

15     to the EPA, California is more stringent.

16             Q.     First of all, you understand that

17     IARC is not a regulatory agency?

18             A.     Yeah, they're advisory.

19             Q.     So by regulatory agencies --

20             A.     You mean EPA?

21             Q.     Right -- I'm referring to EPA,

22     Health Canada, other agencies that have a

23     responsibility for determining whether a product

24     is safe to be on the market.

25             A.     Yeah, okay.
```

Ariel D. Teitel, M.D.

1          Q.      All right.  Are you aware of any

2   regulatory agency that has determined that

3   glyphosate or Roundup is carcinogenic in humans?

4          A.      I'm not sure, but the EU was

5   concerned enough to not allow it to be used in

6   pesticides.

7          Q.      What's your understanding -- what's

8   that based on?

9          A.      Their assessment of the science,

10  their assessment of the risks.

11         Q.      What's your source of that

12  information?

13         A.      Several.  That was in the four

14  articles that I gave to counsel yesterday, so you

15  can have those.  That was a review in a

16  particular -- it's a supplement related to foods.

17  It was documented there, I read that.  And I think

18  I also read it in other articles looking at the

19  topic generally.

20         Q.      And can you tell me what other

21  articles?

22         A.      Well, there's one that's also in

23  the four that I just gave, the review by

24  Weisenburger, I believe.  I can't remember if it's

25  that one that said it or whatever.

Ariel D. Teitel, M.D.

1          Q.     So you mentioned that

2    Dr. Weisenburger is an expert in litigation?

3          A.     I was advise -- I didn't know that

4    when I got the article.  I was advised of that.

5          Q.     Do you know that he testified that

6    his piece is biased?

7          A.     I have no knowledge of that.

8          Q.     Okay.  Have you been provided any

9    testimony of Dr. Weisenburger?

10         A.     Never.

11         Q.     Do you recognize that his piece is

12   what you would refer to as an opinion piece as

13   opposed to an original piece of research?

14         A.     Well, it's his opinion as of kind

15   of a meta-analysis.  It's in a -- what seemed to

16   be an important journal relevant to this issue, in

17   a lymphoma journal.  So one can speculate, but I

18   felt that, hopefully, it's legitimate but, you

19   know, it's one of several opinions and several

20   things in the literature, several reviews, you

21   know.

22         Q.     Have you reviewed any -- you

23   mentioned Dr. Kendall.

24                Other than Dr. Kendall, have you

25   reviewed any additional reports of experts who

Ariel D. Teitel, M.D.

1    have been designated on behalf of plaintiffs?

2           A.     No.

3           Q.     Have you reviewed any transcripts

4    of depositions of any experts designated by

5    plaintiffs in Roundup litigation?

6           A.     No.

7           Q.     Have you reviewed any transcript of

8    trial testimony of any expert designated by

9    plaintiffs?

10          A.     Never.

11          Q.     You mentioned you reviewed

12   Dr. Fisher's report.

13                 Have you reviewed any other reports

14   of any other defense experts in this case or in

15   Roundup litigation?

16          A.     Only what was provided to me.

17          Q.     Which was Dr. Fisher's report?

18          A.     Yes.

19          Q.     Have you reviewed the depositions

20   of any defense experts?

21          A.     No.

22          Q.     Have you reviewed the trial

23   transcripts of any defense experts?

24          A.     No.

25          Q.     Did you look at all at the medical

Ariel D. Teitel, M.D.

```
1   literature -- let me strike that.  Start over.
2                 Did you do a medical literature
3   search with respect to hepatitis C in
4   non-Hodgkin's lymphoma?
5        A.    No.
6        Q.    Did you read any articles or look
7   at any textbooks with respect to hepatitis C in
8   non-Hodgkin's lymphoma?
9        A.    Per se, no.
10       Q.    Are you aware that Mr. Savory had
11  hepatitis C, right?
12       A.    Yes.
13       Q.    In fact, you mention his history of
14  hepatitis C in your past medical history section
15  of your report, right?
16       A.    Yes.
17       Q.    And your report does not include
18  any opinions concerning hepatitis C, correct?
19       A.    Correct.
20       Q.    Are you familiar with a class of
21  drugs referred to as NSAIDS?
22       A.    Certainly.
23       Q.    NSAIDS is an acronym for
24  nonsteroidal anti-inflammatory drugs; is that
25  right?
```

Ariel D. Teitel, M.D.

```
 1              A.      Yes.

 2              Q.      And that includes medications like

 3      ibuprofen?

 4              A.      Yes.

 5              Q.      Did you do a medical literature

 6      search with respect to the use of NSAIDS and the

 7      risk of non-Hodgkin's lymphoma?

 8              A.      No.

 9              Q.      Did you consult any articles or

10      textbooks about the risk of non-Hodgkin's lymphoma

11      related to NSAIDS?

12              A.      No.

13              Q.      Did Mr. Savory use NSAIDS?

14              A.      I believe so, yes.

15              Q.      Do you remember which ones?

16              A.      I believe he used ibuprofen.  I'm

17      not 100%, yeah.

18              Q.      Okay.  And did he use ibuprofen for

19      an extended period of time?

20              A.      I'd have to glance at my notes.

21      Probably.

22              Q.      And what was the purpose of his

23      using ibuprofen, to your understanding?

24              A.      Pain relief.

25              Q.      Okay.  Is ibuprofen or -- let me
```

1    start over.

2              Are NSAIDS a medication that you

3    use in your armamentarium when you take care of

4    patients with joint pain, generally?

5         A.    Yes.

6         Q.    Your report doesn't include any

7    opinions about the role of NSAIDS in Mr. Savory's

8    NHL, correct?

9         A.    Correct.

10        Q.    What kind of medication is Xeljanz?

11        A.    It's called a JAK inhibitor.

12        Q.    It's called a what?

13        A.    JAK inhibitor, J-A-K, JAK

14   inhibitor.  It's a biologic or JAK inhibitor,

15   basically.

16        Q.    How does Xeljanz work?

17        A.    It downregulates certain

18   inflammatory cytokines, basically.

19        Q.    So the idea is that when there's

20   inflammation, there are substances released called

21   cytokines?

22        A.    Some of which are inflammatory,

23   some are not, yes.

24        Q.    And the idea of Xeljanz is to

25   decrease the release of inflammatory cytokines?

Ariel D. Teitel, M.D.

```
 1            A.      Yes.

 2            Q.      That's the objective?

 3            A.      Yes.

 4            Q.      Did you conduct a literature search

 5      on Xeljanz and NHL?

 6            A.      No, not at this time, no, not

 7      related to this case, no.

 8            Q.      Does Xeljanz have a black box

 9      warning about NHL?

10            A.      It has a black box warning, I

11      think, generally for cancer and heart issues.

12            Q.      Did you look at any specific -- I'm

13      sorry?

14            A.      And thrombosis.

15            Q.      Okay.  Did you look at any specific

16      medical literature on Xeljanz in connection with

17      your opinions in this case?

18            A.      No.

19            Q.      Your report doesn't set forth any

20      opinions about Xeljanz, correct?

21            A.      Correct.

22            Q.      So are there any other materials

23      that you considered or reviewed in preparing your

24      original report that you have not identified or

25      that we have not discussed?
```

Ariel D. Teitel, M.D.

```
1              A.      No.

2              Q.      You worked in the past in other

3   matters as an expert witness; is that right?

4              A.      Yes.

5              Q.      Approximately how many occasions?

6              A.      Well, can I ask expert witness

7   includes reviewing records as opposed to

8   testifying?

9              Q.      That's a fair question.  That's a

10  fair question.

11             A.      Yeah.

12             Q.      So let me ask you about --

13             A.      As an expert whatever.

14             Q.      Let me ask you about testimony

15  first, okay, meaning situations where you either

16  gave a deposition, testified at trial, testified

17  at hearing, something like that.

18                     Were there -- have there been prior

19  occasions when you've testified as an expert?

20             A.      Yeah, I think it's been like 15

21  years ago.  It's been some time.

22             Q.      And were those in medical

23  malpractice cases?

24             A.      No.  They were in -- I think they

25  were both kind of -- one was a disability.  They
```

Ariel D. Teitel, M.D.

1   were both damages for injury, disability, and one

2   was a divorce where the one spouse was going to

3   claim permanent disability related to a condition,

4   and they wanted me to opine as to the permanence

5   of the disability.

6          Q.     And so in both cases, your

7   testimony related to the disability of the

8   patient?

9          A.     Yes.

10         Q.     Was the patient your patient in

11   those cases?

12         A.     In one case, yes, and one case, no.

13         Q.     And did either case involve

14   disability related to rheumatoid arthritis or

15   alleged --

16         A.     No.  One was like fibromyalgia.

17   The other was -- she may have had rheumatoid, but

18   the damage she got was traumatic, as I recall.  So

19   the issue was that she had had multiple fractures

20   from a trauma.

21         Q.     So the issue wasn't whether she was

22   disabled.  The issue was whether the disability

23   was related to rheumatoid arthritis or trauma?

24         A.     It was how permanently and how

25   completely she was going to be disabled, something

Ariel D. Teitel, M.D.

1    like that.  I think she did have rheumatoid also,

2    so it was like progno -- it was part of a

3    prognostication.

4            Q.     What is apremilast?

5            A.     It's a brand name is Otezla.  It's

6    used -- it's FDA approved for psoriasis, psoriatic

7    arthritis and Behcet's syndrome.  It's kind of

8    a -- it's not really a biologic, but it kind of

9    is.  It's like that, it's a newer biotech drug.

10           Q.     How does it work mechanistically;

11   do you know?

12           A.     Yeah, it's a phosphodiesterase

13   inhibitor, and it also kind of downregulates an

14   inflammatory intracellular mediators.  It's an

15   unusual drug.

16           Q.     It's an unusual drug?

17           A.     Yes, in its mechanism.  Although, I

18   mean, it's used regularly, but it's interesting.

19   Mechanistically it's unusual.

20           Q.     Okay.  Let's turn to your report

21   for a minute.  So under history of present

22   illness, you describe Mr. Savory's diagnosis, is

23   that right, a diagnosis of DLBCL?

24           A.     Yes.

25           Q.     And when we go into past medical

Ariel D. Teitel, M.D.

1    history, it says he "was diagnosed with

2    seropositive rheumatoid arthritis in 2004."

3                The second paragraph after that

4    says, "In 2003 Mr. Savory had hepatitis treated

5    with a year of Interferon."

6         A.    Yeah.

7         Q.    So I want to ask you, and if you

8    need to consult with your notes, which are Exhibit

9    5, please, feel free to do that.

10               So am I correct that Mr. Savory

11   presented in about 2002 or 2003 with

12   polyarthritis.  Is that the right term?

13        A.    Yeah, possible -- let me see.  I

14   wrote -- there were extensive notes on that I

15   believe that I took.

16        Q.    And if you don't mind, tell me

17   which page you are talking about if you are

18   referring to your notes.

19        A.    Yes.  Well, I guess it was both.

20   Sorry, which -- which things show what again?

21   Which notes about him showing the hep C or when

22   his arthritis was --

23        Q.    Yeah.  So tell me what symptoms he

24   had starting in 1998.

25        A.    Yeah, I have to --

Ariel D. Teitel, M.D.

```
 1          Q.      What's your understanding, and feel
 2   free to consult with the notes or records or
 3   whatever you need to.
 4          A.      Yeah, I don't remember where that
 5   was written -- yeah, okay, so he saw -- in 1998,
 6   1999, according to Fisher's report, I remember
 7   seeing that somewhere on my last page here on my
 8   notes on Fisher's report, he notes migratory
 9   arthritis, negative rheumatoid factor, and
10   palindromic rheumatism was diagnosed, and he may
11   have gotten that from the old Moidel notes, which
12   I did not yet review, but I believe that there was
13   some comment about that in something that I did
14   see.  So that's not really new to me particularly,
15   yeah.
16          Q.      So did Dr. Moidel discuss that in
17   his deposition, the --
18          A.      All I can say in his deposition,
19   I'm not sure.  So, here, I found on page 1 of my
20   notes, now I see it, in the notes from Vasta, from
21   the Vasta Family Medical Practice, I wrote that,
22   yes, that he had migratory arthritis in 1998, that
23   he was zero negative.  I wrote that.  Did Moidel
24   discuss it?  I don't think he did.  I have to look
25   at his transcript or the notes on his transcript.
```

Ariel D. Teitel, M.D.

```
 1   One minute.  I don't think he remembered that
 2   until he was -- yeah, he did.  Well, he was either
 3   prompted or whatever he says in 1998, symptoms
 4   migratory, yep, rheumatoid factor negative, and it
 5   resolved until 2002, yes, that's what he said in
 6   his deposition in April.
 7        Q.    Okay.  So is it your
 8   understanding -- and what I'm after is your best
 9   understanding of the facts, whether it's based on
10   Moidel's or Vasta, Moidel's testimony, whichever.
11        A.    Together.
12        Q.    Is it your understanding that
13   Mr. Savory had arthritic symptoms in 1998 --
14   sorry.
15             Is it your understanding that
16   Mr. Savory had arthritic symptoms beginning in
17   1998?
18        A.    Yes, some kind of arthritic
19   symptoms, yes.
20        Q.    Okay.  And at that time in 1998,
21   his rheumatoid factor tests were negative; is that
22   correct?
23        A.    Yes.
24        Q.    And the term that Dr. Moidel used
25   to describe his condition back in 1998, 1999 was
```

Ariel D. Teitel, M.D.

1    palindromic rheumatism, correct?

2          A.     Yep.

3          Q.     What is palindromic rheumatism?

4          A.     Basically, it means episodic

5    inflammatory arthritis.

6          Q.     Does the term palindromic

7    rheumatism tell you anything about the cause of

8    the arthropathy?

9          A.     Well, generally speaking, if you

10   know the cause, you would say it, as opposed to

11   saying palindromic rheumatism, you use that when

12   you don't -- when it's idiopathic itself.

13         Q.     What does the word idiopathic mean?

14         A.     Of unknown cause, whatever.

15         Q.     And it means that, at least based

16   on the information available, doctors aren't able

17   to determine what the cause is; is that fair?

18         A.     Correct.

19         Q.     Okay.  Then in 2002 Mr. Savory

20   developed a positive rheumatoid factor, correct?

21         A.     Yes.

22         Q.     And he continued to have

23   significant polyarthralgias; is that fair?

24         A.     Yes.

25         Q.     And what was -- let me start over.

Ariel D. Teitel, M.D.

```
1                    One of the things that was

2    identified was that Mr. Savory had hepatitis C,

3    correct?

4         A.    Yes.

5         Q.    And hepatitis C infection can

6    result in polyarthralgias, true?

7         A.    Yes.

8         Q.    And what Dr. Moidel's -- well, let

9    me back up again.

10                   There's also a test that was done

11   called -- test for cryoglobulins; is that right?

12        A.    Yes.

13        Q.    What are cryoglobulins?

14        A.    They're inflammatory proteins that

15   are released with many causes that can cause their

16   release.

17        Q.    Okay.  And at this time Mr. Savory

18   had positive cryoglobulins, right?

19        A.    Yes.

20        Q.    Dr. Moidel at this time -- let me

21   back up.

22                   A positive rheumatoid factor

23   doesn't necessarily mean that a patient has

24   rheumatoid arthritis, correct?

25        A.    Correct.
```

1    Q.    And one of the things that can
2  cause a rheumatoid factor to be positive is a
3  hepatitis C infection, correct?
4    A.    Yes.
5    Q.    Dr. Moidel in explaining what
6  happened back in 2002, 2003 explained that because
7  of the positive rheumatoid factor and the positive
8  cryoglobulins and the polyarthralgia, it was not
9  clear whether the problem was hepatitis C or some
10 combination of hepatitis C and rheumatoid
11 arthritis; is that fair?
12   A.    Well, the flavor I got from it was
13 that he felt that that episode was from hepatitis
14 C because it responded to treatment of the
15 hepatitis C.
16   Q.    Okay.  Well, fair enough.  At the
17 time on the front end, he didn't know that answer,
18 right?
19   A.    Yeah, I guess not.
20   Q.    I mean, when he was talking in his
21 deposition about it, he wasn't sure at the outset,
22 and what you're saying now is his cryoglobulins
23 went away, right?
24   A.    Mm-hmm.
25   Q.    Yes?

Ariel D. Teitel, M.D.

1          A.     Yes, that's what he said, yes.

2          Q.     And because the cryoglobulins

3  became negative, that suggests that the hepatitis

4  C was implicated in the original polyarthralgias

5  in 2002, right?

6          A.     Yes.

7          Q.     Now, at the time what was

8  Mr. Savory treated with with respect to his

9  hepatitis C?

10         A.     Peginterferon for a year.

11         Q.     Okay.  And that's not as effective

12 as the treatments that they have available today,

13 right?

14         A.     Correct.

15         Q.     Okay.  But for many patients back

16 then, that was sufficient to cure them of

17 hepatitis C, correct?

18         A.     Yes.

19         Q.     Okay.  And we don't have -- we

20 don't have hepatitis C titers that confirm that he

21 was negative after treatment, but we do have

22 improvements in symptomatology, at least

23 temporarily, as well as resolution of the

24 cryoglobins, right?

25         A.     I know that that came up possibly

Ariel D. Teitel, M.D.

1    in Fisher's deposition or statement, whatever, but

2    I wrote in my notes that there was a negative

3    test, and I can tell you --

4            Q.     For cryoglobulins?

5            A.     For hep C.  In reviewing -- I know

6    that that was stated by someone, possibly Fisher

7    that I recall, and then I saw this in my notes,

8    which we can find.  I can tell you where I saw

9    it --

10           Q.     Yeah, take a minute, because if you

11   had a -- I'd like to know --

12           A.     I believe that I wrote that down --

13           Q.     Sure.

14           A.     -- and I will tell you where I saw

15   it.  Hopefully, I didn't misread the record.

16                  Yeah, let me see.  Let's go back

17   from there.

18           Q.     And I don't want to interrupt you,

19   but if it's helpful, on page 5 you have a note

20   that says 6/04, GI thought he was cured.  I don't

21   know if that was what you were looking for.

22                  MR. BRECHER:  Is that the new page

23           5 or the old page 5.

24                  THE WITNESS:  Right there, that's

25           it.  So this would be from page -- what

Ariel D. Teitel, M.D.

```
1              was I reviewing?  This is -- yeah, so from
2              the -- maybe they were wrong.  So this is
3              from the Vasta notes, if you go to -- no,
4              sorry, incorrect, sorry, sorry.  I guess
5              from the Moidel deposition, from the
6              Moidel deposition, that's why it's recent.
7              From the Moidel deposition I read that in
8              12/14 his hep CRNA was negative, and I saw
9              that on page 91 of that, I guess.
10  BY MR. PIORKOWSKI:
11          Q.     That's correct, yeah.
12          A.     Right, so I did see that.
13          Q.     But that was ten years later?
14          A.     Yeah, but it eventually was
15  documented that it was gone.
16          Q.     Right.  But that was because
17  Dr. Moidel wanted to give him medications that
18  could have an adverse effect on the liver and
19  wanted to ensure that the hepatitis C had been
20  cured?
21          A.     Right, yeah.
22          Q.     Okay.  But back in 2003 --
23          A.     Yeah, it wasn't done.  I saw that,
24  yes.
25          Q.     Okay.  There was no documentation
```

Ariel D. Teitel, M.D.

1    that would definitively say the hepatitis C was

2    cured back in 2003 or 2004, right?

3         A.    That could be.  I don't recall if I

4    have -- I don't think I had GI records, and that

5    could be that that was the only reference to that

6    being negative.  So, yeah, I don't think I had any

7    GI records.  He did see, I believe, GI people, and

8    I don't believe I had those records.  So, yeah,

9    that is correct.  If it was done, I didn't have

10   the record.

11        Q.    Okay.  So let's go back to where we

12   were?

13        A.    No, I did get GI records.  Hold on.

14   I did get it.

15        Q.    Okay.

16        A.    It was negative as far back as 2011

17   in the Burke GI records, which I have here on my

18   notes, page 2.  They documented a negative hep C

19   PCR on September 28th, 2011, and that's on page 4

20   of the Burke doc GI notes.

21        Q.    In the time frame, though, of 2004,

22   2005, 2006 --

23        A.    Yeah.

24        Q.    -- we had no documentation that he

25   was hepatitis C negative, correct?

Ariel D. Teitel, M.D.

1          A.     Yeah, I don't see it if there was,

2    that's correct.

3          Q.     Okay.  And in the wake of his

4    hepatitis C treatment, his cryoglobulin levels

5    returned to normal, right?

6          A.     Yes.

7          Q.     But he had continued problems with

8    polyarthralgias, correct?

9          A.     Yes.

10         Q.     Okay.  And he continued to have

11   even after his hepatitis C was presumably

12   successfully treated, high rheumatoid factors,

13   correct?

14         A.     Yes.

15         Q.     And if the hepatitis C was

16   successfully treated, it wouldn't be causing

17   polyarthralgias and high rheumatoid factors,

18   correct?

19         A.     Correct.

20         Q.     Okay.  Now, we do know that -- we

21   also know that back in that time frame, he had

22   high erythrocyte sedimentation rates, correct?

23         A.     On several occasions, correct, yes.

24         Q.     And erythrocyte sedimentation rates

25   are of some importance because they're one of the

Ariel D. Teitel, M.D.

1    markers for the severity of rheumatoid arthritis,

2    correct?

3            A.     Yes, but they're nonspecific.

4            Q.     Right.  So they can be related to

5    another source of inflammation, but in a patient

6    who is -- let me back up.

7                   In a patient who is being followed

8    for rheumatoid arthritis, that's one of the

9    markers you would look at to track the severity of

10   their rheumatoid arthritis; fair enough?

11           A.     Yes.

12           Q.     Now, is it your understanding that

13   in this time frame 2004, 2005, based on

14   Mr. Savory's testimony, that he continued to have

15   severe joint pain, particularly in his hands?

16           A.     Yes, I believe so, yes.

17           Q.     And is it also your understanding

18   that he ended up applying for and being given

19   complete disability by Social Security?

20           A.     I believe so.

21           Q.     And is it your understanding that

22   the basis of that disability was his rheumatoid

23   arthritis?

24           A.     That I don't know for sure.

25           Q.     Based on his testimony, is that

1   what his understanding was of the reason for his

2   disability?

3           A.      Could be, yes.

4           Q.      Social Security disability,

5   complete Social Security disability is only

6   granted when somebody has -- is unable to work

7   because of their disease; is that correct?

8           A.      Correct.

9           Q.      And is it your understanding that

10  he's been on complete Social Security disability

11  since 2005 up to the present?

12          A.      That's what he said.  That's what I

13  understand, yes.

14          Q.      Okay.  We don't have a lot of

15  information about Mr. Savory's condition between

16  2005, 2006 -- well, let me rephrase the question.

17                  We don't have a lot of information

18  about Mr. Savory's rheumatoid arthritis between

19  2005, 2006 and 2014; is that correct?

20          A.      Yes.

21          Q.      All we know is that he continued to

22  be on disability during that time, right?

23          A.      Correct.

24                  (Document marked for identification

25          as Teitel Deposition Exhibit No. 6.)

Ariel D. Teitel, M.D.

```
 1   BY MR. PIORKOWSKI:
 2        Q.     I'm going to hand you what I've
 3   marked as Exhibit 6.  Actually, let me have that
 4   back.  I might have marked the wrong.
 5               I'm going to hand you what I've
 6   marked as Exhibit 6, and I'll represent to you
 7   these are excerpts from Dr. Moidel's medical
 8   records from the 2014 time frame, and to save
 9   paper, I've identified just the patient visit
10   notes from those records, but I wanted to walk
11   through this with you, if we could.
12        A.     Mm-hmm.
13        Q.     And as was true in the case of your
14   notes, this is in kind of reverse chronological
15   order.  So if you see at the bottom, these are
16   Bates stamped CSavory-RheumataA-00009 through 31.
17        A.     Okay.
18        Q.     You see that?
19        A.     Yes.
20        Q.     And if we go actually back to page
21   27, page 27 has the visit from June 30th of 2014,
22   correct?
23        A.     Mm-hmm.
24        Q.     You just need to say yes.
25        A.     Yes, yes.
```

1    Q.    Okay.  So his complaint when he

2    gets there is that he had intermittent pain and

3    swelling in both hands and both knees, ankles and

4    feet for five to six months, but worse in the past

5    two to three months, correct?

6    A.    Yes.

7    Q.    Okay.  And it kind of goes over

8    some of this old history that we talked about.  In

9    1998 he developed migratory attacks of arthritis

10   involving both hands, wrists, shoulders, knees,

11   elbows and feet.  His RF and ANA were negative.

12   This resolved within a year.  He was then

13   diagnosed with hepatitis C.

14             In 2002 he developed migratory

15   polyarthralgias.  His rheumatoid factor and

16   cryoglobulins were positive.  He was treated with

17   peginterferon times one year, but he developed

18   synovitis in his hands, wrists, shoulders and

19   ankles.

20             And then in 2004 his cryoglobulins

21   were negative, and rheumatoid factor was equal to

22   494 with an erythrocyte sedimentation rate equal

23   to 74, and then it says he was treated

24   unsuccessfully with ibuprofen.

25             So that's kind of the same history

Ariel D. Teitel, M.D.

1    that we reviewed previously, right?

2          A.    Yes.

3          Q.    Okay.  And at the time he's coming

4    in, what medications is he on?  It's on the same

5    page, I think, down there under current

6    medications.

7          A.    Sorry, yeah, the ibuprofen 800 and

8    the Nexium and the prostate medication.

9          Q.    Okay.  So with respect to the

10   ibuprofen, 800 milligrams twice a day, is that a

11   large dose?

12         A.    High moderate, the maximum is 2400,

13   so it's high, but not very high.  It's moderate

14   high.

15         Q.    And do we know how long he had been

16   on that?

17         A.    I do not.

18         Q.    Okay.  And he's on Nexium.  Do you

19   know the reason he's on Nexium?

20         A.    That's to protect the stomach from,

21   you know, ulcers from the ibuprofen.

22         Q.    And, in other words, ibuprofen can

23   have erosive effects on the gastric lining; is

24   that right?

25         A.    Yes, yes.

Ariel D. Teitel, M.D.

```
 1              Q.    And Nexium helps to protect against
 2    that happening?
 3              A.    Yes.
 4              Q.    So for patients that are taking
 5    large amounts of NSAIDS like ibuprofen, Nexium is
 6    a prophylactic medication to help allow them to
 7    keep taking the medication; is that right?
 8              A.    Correct.
 9              Q.    And you see under assessment on
10    page 30, his assessment is severe rheumatoid
11    arthritis which is inadequately controlled --
12              A.    Yes.
13              Q.    -- involving the hands, shoulders
14    and right foot?
15              A.    Yes.
16              Q.    And you agree that that diagnosis
17    is justified, right?
18              A.    Yes.
19              Q.    Okay.  The next thing down, there's
20    something that says patient VAS, physician VAS.
21                    What does that refer to?
22              A.    Visual analogue scale.
23              Q.    And what does five and six means?
24              A.    It's zero to ten or one to ten, and
25    it's just your own and patient and physician
```

Ariel D. Teitel, M.D.

```
1    statement of how you're overall doing, there's
2    pain and overall feeling, whatever.
3           Q.    Okay.  Is that a tool that's
4    commonly used in rheumatology practice to --
5           A.    It's used.
6           Q.    -- to help track patient's progress
7    over time?
8           A.    Yes.
9           Q.    One of the -- under plan it says
10   "cyclic citrullinated peptide (CCP) antibody
11   (IGG)."
12               Do you see that?
13          A.    Yes.
14          Q.    We talked before about rheumatoid
15   factor not being specific to rheumatoid arthritis.
16               Is CCP something that's specific to
17   rheumatoid arthritis?
18          A.    Yes.
19          Q.    Okay.  And in Mr. Savory's case,
20   was his -- did his CCP test confirm that he had
21   rheumatoid arthritis?
22          A.    Yes.
23          Q.    And then Dr. Moidel also, if we
24   compare the medications and the plan to the
25   medications in the current medications list, he
```

Ariel D. Teitel, M.D.

1   also has two additional medications that he's

2   adding to the armamentarium; is that right?

3            A.     Yes.

4            Q.     And what are those medications?

5            A.     Prednisone, 5 milligrams, twice a

6   day and sulfasalazine, 500 milligrams, twice a

7   day.

8            Q.     And what does Prednisone do?

9            A.     It's an anti -- well, it reduces

10  inflammation.  It's used sometimes in rheumatoid

11  arthritis.

12           Q.     And is it used for acute

13  exacerbations, is it used chronically or both?

14           A.     Both.

15           Q.     Do you have an understanding of how

16  he was using it in this case?

17           A.     I believe that he probably wanted

18  it kind of as bridging therapy.  In other words,

19  use it for some time and then likely reduce it.  I

20  think he says that in another part of the record.

21           Q.     Bridging?

22           A.     Yeah, to bridge someone from one

23  period of time to another.

24           Q.     So is the idea to get him off of

25  the nonsteroidal anti-inflammatories on to

Ariel D. Teitel, M.D.

1    something else, or bridging between what and what?

2        A.    Well, generally when you add

3    sulfasalazine, until that works, until that really

4    works, takes strong effect.

5        Q.    All right.  And that's my next

6    question is what is sulfasalazine?

7        A.    Well, it has multiple uses, but

8    it's been used for rheumatoid arthritis for many

9    years.  It's an old DMAR, disease modifying

10   anti-rheumatic aid drug, whatever.  It's a

11   moderately strong, it's an old-fashioned drug, but

12   it still has some effect.  It's still used for

13   rheumatoid arthritis.

14       Q.    And you used that term a couple of

15   times, disease modifying anti-rheumatic drug, what

16   does that mean exactly?  What does disease

17   modifying mean as opposed to just something that

18   you would give for treatment?

19       A.    Right.  So like a nonsteroidal does

20   not modify the disease.  It would only modify the

21   pain.  Whereas something like sulfasalazine, the

22   hope is that it would bring the disease to lower

23   activity, perhaps even remission.

24       Q.    How does it do that?

25       A.    Well, people aren't really sure,

Ariel D. Teitel, M.D.

1   but it decreases inflammatory mediators, decreases

2   a lot of inflammatory mediators.

3          Q.     And what is the normal progression

4   for rheumatoid arthritis left unchecked?

5          A.     Left unchecked, of course it's

6   variable, but left unchecked it can be very

7   disabling, progressive, mutilating.

8          Q.     What's the role -- you referred

9   earlier to autoantibodies or autoimmune diseases.

10          What role do autoimmune -- what

11   role does autoimmunity play in the progression of

12   rheumatoid arthritis?

13          A.     Well, I mean, every disease is

14   different.  I don't know.  The antibodies or

15   the -- so, for example, the level of the CCP

16   antibodies are prognostic for worse disease.  So

17   that's a feature of autoimmunity that's been

18   validated prognostically.

19          Q.     Are the CCP antibodies, antibodies

20   that actually are involved directly with the

21   progression of the disease?

22          A.     Somewhat.

23          Q.     Do they attack joint tissue?

24          A.     No, per se they don't, no.

25          Q.     Okay.  Let's go to the next visit,

Ariel D. Teitel, M.D.

1  which is on page 00022 dated 7/15/2014.

2              Do you see that?

3       A.    Yes.

4       Q.    And this is about two weeks or

5  about two weeks after his last visit, right?

6       A.    Mm-hmm.

7       Q.    And it says under history of

8  present illness, "Arthritis symptoms are the same

9  since the last visit.  He did not stop ibuprofen."

10 Right?

11      A.    Mm-hmm.

12      Q.    So he is actually continuing to

13 take ibuprofen and Nexium, as well as taking

14 Prednisone and sulfasalazine, correct?

15      A.    Yes.

16      Q.    And the other drug that's there you

17 said is a prostate drug; is that what you said?

18      A.    Tamsulosin, before, yes, that's

19 prostate.

20      Q.    Okay.  All right.  And if we --

21      A.    But then he does say, "symptoms

22 controlled on current medication."  And no pain or

23 swelling in the finger joints.

24      Q.    Yeah, he says that in the history

25 of present illness, and then if you turn over to

Ariel D. Teitel, M.D.

1    the examination of the musculoskeletal system.

2         A.    Yeah.

3         Q.    What does that say there?

4         A.    Let me see.

5         Q.    On page 23.

6         A.    There he does document swelling of

7    multiple joints, so that could be that it was an

8    autoimmune -- there was a record glitch or who

9    knows what.  It's true that he does document some

10   swelling.

11        Q.    And so when it says "swelling of

12   the thumb at the MCP joint," what does the MCP

13   joint mean?

14        A.    This joint here at the base of the

15   thumb.

16        Q.    And what does MCP stand for?

17        A.    Metacarpophalangeal.

18        Q.    Do you have MCP joints all across

19   your hand?

20        A.    Yes.

21        Q.    And then it also says swelling of

22   index finger PIP joint.

23              What is the PIP joint?

24        A.    Proximal interphalangeal joint,

25   this one.

Ariel D. Teitel, M.D.

```
 1              Q.     Okay.  All right.  And then it
 2    talks about "Tenderness on palpation of the thumb
 3    MCP joint.  Tenderness on palpation of the middle
 4    finger PIP joint.  Tenderness on palpation of the
 5    ring finger PIP joint.  Tenderness on palpation of
 6    the little finger PIP joint."  Correct?
 7              A.     Yes.
 8              Q.     Now, is -- that's on the right hand
 9    that we were just talking about, right?
10              A.     And then right below that's left
11    hand, yes.
12              Q.     And then he has similar -- I think
13    similar findings with respect to the left hand,
14    right?
15              A.     Yes.
16              Q.     What is -- swelling and tenderness
17    are noted separately; is that right?
18              A.     Yes.
19              Q.     And why is that?
20              A.     It's just a way of tabulating for
21    indices, more for research trials and so on, but
22    just to objectify things.
23              Q.     What does swelling refer to?
24              A.     The actual -- it's called
25    synovitis, the actual swelling of the joint lining
```

Ariel D. Teitel, M.D.

1    that will come out to the surface.

2          Q.     And what do you see when you see

3    swelling in a PIP joint or an MCP joint?

4          A.     There will be swelling on top of

5    the bone, and you can feel it and see it.

6          Q.     Is it red typically or not?

7          A.     It can be, not always.

8          Q.     Okay.  And then when it refers to

9    tenderness, how do you evaluate tenderness of a

10   joint?

11         A.     You just squeeze it, touch it,

12   press it.

13         Q.     And if it elicits pain, it's

14   considered tender?

15         A.     Yes.

16         Q.     And then on the next page 25, it

17   talks about the results of the CCP test, correct?

18         A.     Yes.

19         Q.     And it was, in fact, high, correct?

20         A.     Yes.

21         Q.     And then it also talks about

22   C-reactive protein being 2.71, which is also

23   listed as high, correct?

24         A.     Yes.

25         Q.     Okay.  C-reactive protein is

Ariel D. Teitel, M.D.

```
 1    another -- it's another test that's nonspecific,
 2    correct?
 3            A.      Correct.
 4            Q.      It identifies that there's
 5    inflammation, but it doesn't necessarily tell you
 6    where the inflammation is coming from?
 7            A.      Correct.
 8            Q.      And then the assessment is severe
 9    rheumatoid arthritis, which is improving but
10    inadequately controlled, correct?
11            A.      Correct.
12            Q.      And you agree that based on the
13    examination, that's a correct assessment, right?
14            A.      Yes.
15            Q.      And the therapy then is really to
16    continue Prednisone, hopefully stop ibuprofen and
17    increase medication, it says sulfasalazine to
18    1,000 milligrams BID?
19            A.      Yes.
20            Q.      Is that higher than it was
21    previously?
22            A.      Yes, I believe it was 500 BID
23    before.
24            Q.      Okay.  And with sulfasalazine, you
25    made a statement earlier when you were talking
```

Ariel D. Teitel, M.D.

1    about bridging, how long does it typically take

2    sulfasalazine to become effective in a patient?  I

3    realize there's, obviously, a range, but is there

4    a kind of understood window of time?

5           A.    Well, three months.  You ramp up

6    the dose, at least three months, at least three

7    months.

8           Q.    Do you start small and then you

9    gradually increase; is that the way you use it?

10          A.    Pretty much, yes.

11          Q.    And after three months, you're

12   saying you should expect to see some positive

13   effects by that time?

14          A.    Well, certainly, some significant

15   effect by three months, and in the three to six

16   month window you would want to see a lot of

17   effect.

18          Q.    And if you don't see an effect,

19   would then you consider prescribing a different

20   medication; is that the idea?

21          A.    Yes.

22          Q.    Is sulfasalazine less toxic than

23   some of the other disease modifying drugs?

24          A.    Well, because he had a prior

25   history of hep C, he didn't want to give him

1  methotrexate.  That would have been kind of a

2  standard thing that could be given so -- but he

3  noted that somewhere I read, which was

4  appropriate.  So your question was is it what?  Is

5  sulfasalazine --

6          Q.      Is it more toxic than other

7  medications that you might give a patient for

8  rheumatoid arthritis?

9          A.      Not really, no.  It has its own

10 particular toxicities, not really.

11         Q.      And then if we go to the next visit

12 is on 8/26/2014, which is on page 18, correct?

13         A.      Yeah.

14         Q.      It looks like he is still taking

15 ibuprofen in addition to Prednisone and

16 sulfasalazine, right?

17         A.      Yes.

18         Q.      And if we go to page 19 and look at

19 the musculoskeletal examination of the fingers, we

20 see continued documentation of swelling and

21 tenderness in a variety of the joints of the hand,

22 right?

23         A.      Yes.

24         Q.      And then the assessment at the end

25 is severe rheumatoid arthritis, which is improving

Ariel D. Teitel, M.D.

```
1    but inadequately controlled, correct?

2            A.      Yes.

3            Q.      And you agree with that assessment,

4    right?

5            A.      Yes.

6            Q.      And the next visit is on

7    10/16/2014, which is on page 14, correct?

8            A.      Yes.

9            Q.      And it says, "arthritis symptoms

10   are the same since last visit," right?

11           A.      Yes, yes, I see that, yes.

12           Q.      And it looks like he is still

13   taking ibuprofen in addition to Prednisone and

14   sulfasalazine; is that right?

15           A.      Yes.  Well, it says he is taking it

16   as needed, PRN.  So, yes, but --

17           Q.      Okay.  All right.  Where does it

18   say PRN?

19           A.      Right there after history of

20   present illness.

21           Q.      Okay.

22           A.      Ibuprofen PRN.

23           Q.      Oh, I see, okay.

24           A.      Whereas, yes, below it says twice

25   daily, yeah.
```

Ariel D. Teitel, M.D.

```
1              Q.    So PRN just means --
2              A.    As needed.
3              Q.    On an as-needed basis.  So if
4    you're feeling okay, then you don't need to take
5    it then?
6              A.    Yes.
7              Q.    Okay.  And then, again, on page 15,
8    we have documentation of swelling and tenderness
9    in the fingers, correct?
10             A.    Yes.
11             Q.    As well as just limited motion of
12   the hand, inability to make a fist it says, right?
13             A.    Yes.
14             Q.    And, again, the assessment is
15   "severe rheumatoid arthritis, which is improving
16   but inadequately controlled," correct?  That's on
17   page --
18                   MR. BRECHER:  Sixteen.
19   BY MR. PIORKOWSKI:
20             Q.    Sixteen.
21             A.    Yes.
22             Q.    And you agree with that assessment,
23   right?
24             A.    Yeah, I'll agree, I guess.
25             Q.    Okay.  And then on 12/16/2014 on
```

1    page 9, that's the last of these patient visit

2    notes, correct?

3              A.     Yes.

4              Q.     At least on this record?

5              A.     Yes.

6              Q.     So we're now -- we're now out about

7    six months from when we started, right?

8              A.     Mm-hmm.

9              Q.     And at this point we should start

10   seeing some effect from the sulfasalazine, right?

11             A.     Yes.

12             Q.     Okay.  And he says symptoms --

13   "overall feeling is good.  Symptoms controlled on

14   current medication:  Sulfasalazine 1,000

15   milligrams BID and ibuprofen 400 milligrams PRN."

16   And it says "he stopped Prednisone after the last

17   visit," right?

18             A.     Right.

19             Q.     Now, was that stopping of

20   Prednisone something that Dr. Moidel had

21   recommended, or is that something the patient did?

22             A.     I don't recall.  I don't recall.  I

23   do remember kind of seeing that, and it might be

24   that he did it on his own.  I don't recall.  Yes,

25   I don't know.

Ariel D. Teitel, M.D.

```
 1            Q.      You're not sure, okay, that's fine.

 2                    Under smoking history it says

 3    "current everyday smoker."

 4            A.      Mm-hmm.

 5            Q.      What effect does smoking have on

 6    rheumatoid arthritis?

 7            A.      It does make it harder to control.

 8            Q.      Why is that?

 9            A.      It just has been documented to make

10    you more resis -- make the disease more active and

11    more refractory to medications.

12            Q.      Okay.  And if we go to page 10,

13    again, we have the musculoskeletal exam of the

14    fingers, which documents swelling and tenderness

15    of a lot of the joints of the fingers and thumbs,

16    correct?

17            A.      Yes.

18            Q.      And then under hands, he again has

19    inability to make a fist; is that right?

20            A.      Yes.

21            Q.      And then there's another result of

22    a C-reactive protein test that's again high,

23    correct?

24            A.      Yes.

25            Q.      And the conclusion is severe
```

 1  rheumatoid arthritis which is inadequately

 2  controlled, correct?

 3          A.     Yes.

 4          Q.     You agree with that diagnosis,

 5  correct?

 6          A.     Yes.

 7          Q.     And then the plan is to have an

 8  appointment follow-up in eight weeks and also to

 9  continue the sulfasalazine at 1,000 milligrams,

10  twice a day.

11              And is there any record of the --

12  do you have any record of any follow-up

13  appointments with Dr. Moidel at eight weeks or at

14  any point after that?

15          A.     I believe not.  I believe there was

16  not.  Yeah, there was not.

17              MR. PIORKOWSKI:  Can we take a

18          quick bio break, about an hour and change

19          here.

20              MR. BRECHER:  Sure.

21              THE VIDEOGRAPHER:  Time right now

22          is 11:34 a.m., and we're off the record.

23              (Brief recess).

24              THE VIDEOGRAPHER:  The time right

25          now is 11:51 a.m., and we're back on the

1          record.

2     BY MR. PIORKOWSKI:

3          Q.     So, Doctor, since the record we

4     looked at in 2014 from Dr. Moidel, what's your

5     understanding of Mr. Savory's condition with

6     respect to his rheumatoid arthritis?

7          A.     Well, until today you mean or what

8     happened between --

9          Q.     Any information post 2014.

10         A.     Well, that's the thing, it's

11    unclear.  There's a note that in 2019 he was on

12    Xeljanz briefly, and then that's it, and then he

13    then re-presented with his joint pains which were

14    found to be lymphoma.

15         Q.     So do you have any -- do you have

16    any reason to believe that his -- you know, within

17    two months or three months or six months of his

18    last visit with Dr. Moidel that his rheumatoid

19    arthritis would have resolved or gone into

20    spontaneous remission?

21         A.     Well, here's the thing, it's

22    possible.  It's also possible that since he

23    presented with a palindromic presentation that

24    perhaps that's even really kind of what he had, in

25    other words, that he had intermittent attacks,

Ariel D. Teitel, M.D.

1   although he did have the six months where it was

2   sustained.  But, yeah, perhaps he resolved.  I

3   have to postulate that it must not have continued

4   to be severe because he would have sought

5   attention.

6        Q.    Well, he could have self-medicated

7   with ibuprofen, like he had been doing for a

8   number of years, right?

9        A.    He could have, but I would say that

10  if you have severe, active rheumatoid arthritis

11  only treated with that, bad things happen.

12       Q.    Do you know what his own testimony

13  was with respect to that period of time?

14       A.    No.  I would have to see what I

15  wrote.  I would have to look at my notes, if it's

16  included in that.  If I have a quick look there, I

17  might know what he said.  Let me see.

18             Yeah, his deposition -- yeah, I

19  don't think he said much between 2014 and 2019.  I

20  mean, he said he stopped playing the bass in July

21  of 2019, and, you know, he said that, but as to --

22  like you say, as to after 2014, the deposition was

23  more what I saw about him, you know, about his

24  Roundup exposure was very, very detailed about all

25  of that, the frequency and so on, and he didn't

Ariel D. Teitel, M.D.

1    say much other than that that I noted.

2         Q.    Right.  So we agree that Mr. Savory

3    at least at some point had rheumatoid arthritis,

4    correct?

5         A.    Yes.

6         Q.    And we agree that at least for the

7    six months that he was being seen by Dr. Moidel,

8    it was appropriately characterized as severe

9    rheumatoid arthritis?

10        A.    At that time.

11        Q.    Okay.  And we don't know whether he

12   had severe rheumatoid arthritis predating that

13   June 30th episode or for how long, true?

14        A.    Well, I would say that kind of

15   sometimes we know by the absence of certain things

16   that something must not have been happening,

17   that's the thing.  To me people with chronic,

18   active, severe rheumatoid arthritis undertreated

19   or not treated have a lot of complications.  Bad

20   things happen to them.

21        Q.    Well, if we go back to --

22        A.    Which didn't happen to him.

23        Q.    If we go back to Dr. Moidel's

24   June 30th note that we looked at earlier.

25        A.    Okay, this is in the Moidel --

Ariel D. Teitel, M.D.

```
 1            Q.      This is in Exhibit 6.
 2            A.      Yes.
 3            Q.      His symptoms had been going on for
 4     six months, five to six months before he showed
 5     up, right?
 6            A.      Yes.
 7            Q.      And they had been significantly
 8     worse in the last two to three months, right?
 9            A.      Yes.
10            Q.      Okay.  And as I said before, we
11     know that he was on disability starting in 2005?
12            A.      Yes.
13            Q.      And his disability was based on the
14     fact that he could not work at all because of his
15     arthritis, right?
16            A.      Well, I would have to know -- could
17     be osteoarthritis.  He was obese and he was in
18     manual labor.  It's quite possible that some of
19     it, if not a large extent of it, was
20     osteoarthritic, which is a world of difference.
21            Q.      Did anybody ever diagnose him with
22     osteoarthritis, to your knowledge?
23            A.      That I would not know.  I don't
24     know.
25            Q.      I mean, did you see anywhere in the
```

Ariel D. Teitel, M.D.

1    records where anybody diagnosed him with

2    osteoarthritis?

3          A.    I'd have to look very carefully at

4    that.  Did Moidel?  I mean, it's normal to have

5    osteoarthritis north of 40 years old, it's

6    completely normal, you know.  It would be

7    surprising not to have it, so ...

8          Q.    But it's not normal to have

9    osteoarthritis so bad that you're completely

10   disabled from work?

11         A.    I have a lot of patients that are.

12         Q.    But he's never been diagnosed with

13   that, I mean, that's --

14         A.    I didn't see his -- what got him

15   disabled, and I will say that sometimes whether

16   the criteria were easier to get disability back in

17   the day, you know, if you just wrote down

18   rheumatoid arthritis, sometimes you could get

19   disability, now it's harder, so I don't know.

20         Q.    We do know that he had a positive

21   rheumatoid factor during this period of time when

22   he applied for disability, right?

23         A.    Yes, I'm sure.

24         Q.    Okay.  You said he was obese.

25   What's your understanding of -- what's your basis

Ariel D. Teitel, M.D.

1    for that, and what are you basing that on, and

2    during what period of time?

3            A.    Well, I think in the notes it was

4    documented a few times, and his body mass index, I

5    believe, was over 30 on at least one occasion

6    documented in the chart.

7            Q.    And was that for a sustained period

8    of time, or was that for just an isolated event?

9            A.    I didn't pay close attention to

10   that, so I'd have to look at each.  I would have

11   to look at each time and see, but it is documented

12   in December it was, you know.

13           Q.    Your point is for patients who have

14   a high BMI have a greater risk of osteoarthritis;

15   is that the point?

16           A.    They do.

17           Q.    Okay.  Patients who have a high BMI

18   also have -- tend to have greater exacerbation of

19   symptoms from rheumatoid arthritis as well; is

20   that true?

21           A.    Yes.

22           Q.    Okay.  Did you look, by the way, to

23   see whether there's any relationship between

24   obesity and risk of non-Hodgkin lymphoma?

25           A.    I did not look that up per se.

Ariel D. Teitel, M.D.

```
 1              Q.     Okay.  So going back to Mr. Savory,
 2    I want to talk to you about a couple of the
 3    articles that you cited in your report.
 4                     (Document marked for identification
 5              as Teitel Deposition Exhibit No. 7.)
 6    BY MR. PIORKOWSKI:
 7              Q.     I've handed you what I've marked as
 8    Exhibit 7.  And this is a paper by Teresa Simon
 9    that's from 2015; is that correct?
10              A.     Yes.
11              Q.     And this paper conducts a
12    meta-analysis of the incidence of malignancy in
13    adult patients with rheumatoid arthritis, correct?
14              A.     Yes.
15              Q.     And it looks at the rates of a
16    variety of different kinds of malignancies in
17    rheumatoid arthritis patients based on this
18    meta-analysis, correct?
19              A.     Yes.
20              Q.     And the -- the yard stick that it
21    uses, for lack of a better term, is something
22    called SIR, right?
23              A.     Yes.
24              Q.     And SIR is, essentially, the
25    incidence of the disease in the -- well, let me
```

Ariel D. Teitel, M.D.

```
1    back up.

2               SIR stands for standardized

3    incidence ratio, correct?

4         A.    Yes.

5         Q.    And what that means is what's the

6    risk to patients who have rheumatoid arthritis

7    relative to the risk in the general population,

8    right?

9         A.    Yes.

10        Q.    Okay.  And this looks at a number

11   of different kinds of cancer -- let's see here.

12   But they find that patients with rheumatoid

13   arthritis are at increased risk of lung and

14   lymphoma malignancies compared to the general

15   population, correct?

16        A.    Yes.

17        Q.    And what with respect to -- they

18   look at a number of different studies that have --

19   let's see here.  They do these first plot figures,

20   for example, Figure 3, correct?

21        A.    Yes.

22        Q.    And Figure 3 provides us with

23   information about studies in -- studies of

24   malignant lymphoma in rheumatoid arthritis

25   patients compared to the general population,
```

Ariel D. Teitel, M.D.

1   right?

2          A.     Yes.

3          Q.     Okay.  And the data-points, there's

4   a little diamond that provides a point estimate,

5   right?

6          A.     Yes.

7          Q.     And then there are -- there's a

8   line and the line represents the confidence

9   intervals, right?

10          A.     Yes.

11          Q.     Okay.  And so -- and when the

12   confidence intervals overlap one, that means that

13   in that particular study the result was not

14   statistically significant, correct?

15          A.     Yes.

16          Q.     But when the confidence intervals

17   are consistently above one, that means that the

18   results are statistically significant, correct?

19          A.     Yes.

20          Q.     And in Table 3 they have some, I

21   guess, older studies and some newer studies that

22   they divided it up into, correct?

23          A.     Figure 3?

24          Q.     Figure 3.

25          A.     Yes, yes.

Ariel D. Teitel, M.D.

```
1              Q.     And with respect to the older

2      studies, they report on nine studies, correct?

3              A.     Actually, is it Figure 5 that you

4      mean, relative risk of non-Hodgkin's lymphoma, or

5      do you mean Figure 3?  There's a non-Hodgkin's

6      Figure 5.  Figure 3.

7              Q.     So I guess malignant lymphoma

8      includes Hodgkin's and non-Hodgkin's, right?

9              A.     Yes, up to you.

10             Q.     So, okay, yeah, let's turn to

11     Figure 5.

12                    So Figure 5 reports on a total of

13     nine studies, right?

14             A.     Yes.

15             Q.     That are not new studies, correct?

16             A.     Mm-hmm.

17             Q.     Okay.  And of those nine studies,

18     seven of them show a statistically significant

19     increased risk of NHL in rheumatoid arthritis

20     patients, correct?

21             A.     Of the older ones.

22             Q.     Of the older studies, correct?

23             A.     Yes.

24             Q.     And the -- for the studies that are

25     statistically significant the point estimates
```

Ariel D. Teitel, M.D.

1    range from 1.7 to as high as 5.4, correct?

2            A.      Yes.

3            Q.      And what that means is that, to put

4    it in numerical terms, like 1.7 would mean for

5    every hundred people in the general population

6    that would develop NHL, there would be 170

7    rheumatoid arthritis patients; is that correct?

8            A.      Usually it's age matched, so not

9    just general population, but age and whatever sex

10   match, whatever, yeah, would be compared.

11           Q.      Well, do you know whether this is

12   age and sex matched, or this is just general

13   population?

14           A.      That's usually how they do it.  It

15   would say.  I mean, that's how they make those

16   analysis.

17           Q.      In any event, seven out of nine

18   studies of the older studies show a statistically

19   significant increased risk of rheumatoid

20   arthritis, true, significantly --

21           A.      Yes.  Can I quantify that?

22           Q.      Let me restate.

23                   MR. BRECHER:  I object to the form.

24           You're saying significant and putting

25           words in his mouth.

Ariel D. Teitel, M.D.

1          MR. PIORKOWSKI:  Well, he can

2     clarify.

3  BY MR. PIORKOWSKI:

4          Q.    Let me ask the question again, and

5  then you can answer it the way you see

6  appropriate.

7          A.    Okay.

8          Q.    Am I correct that in Figure 5 in

9  the Simon paper, it demonstrates that of the nine

10 old studies that are depicted, seven of the nine

11 show a statistically significant increased risk of

12 non-Hodgkin's lymphoma in rheumatoid arthritis

13 patients?

14         A.    Yes.

15         Q.    And am I also correct that of

16 the -- of the six new studies that are reported,

17 four of them show an increased risk of

18 non-Hodgkin's lymphoma that is statistically

19 significant in males?

20         A.    Yes.

21         Q.    Okay.  Now, the Simon paper also

22 says on page 7 that the risk of both lymphoma and

23 lung cancer has been hypothesized to be dependent

24 on the level of disease activity experienced by

25 the patient.

Ariel D. Teitel, M.D.

```
 1                    Do you see that?

 2          A.       I'm looking for --

 3          Q.       On the right side, page 7.

 4          A.       On the right-hand side?

 5          Q.       Yes, sir.

 6          A.       On page 7.  Yes.

 7          Q.       Okay.  And when it says has been

 8  hypothesized -- well, first of all, what does it

 9  mean by the level of disease activity experienced

10  by the patient?

11          A.       How active the inflammation and the

12  rheumatoid arthritis is, how active it is.

13          Q.       Does that refer to the severity of

14  the disease?

15          A.       Yes.

16          Q.       And when it says it has been

17  hypothesized to be dependent, that means that --

18  the word hypothesized means that's theoretically

19  what doctors think to be the case?

20          A.       Yes.

21          Q.       Okay.

22          A.       So -- well, yes.  In other words,

23  they probably have done in these articles, and I

24  don't have it, but a subset analysis of who it is

25  that those people that did get the lymphoma that
```

Ariel D. Teitel, M.D.

```
1    had rheumatoid were the ones that had the

2    highest -- were in the highest quartiles, say, of

3    disease activities and so on like that, yes.

4                    (Document marked for identification

5           as Teitel Deposition Exhibit No. 8.)

6    BY MR. PIORKOWSKI:

7           Q.    I've also marked as Exhibit 8 an

8    article by Franklin.

9                    Do you see that?

10          A.    Yes.

11          Q.    And Franklin found a doubling in

12   the risk of lymphoma in new onset cases of

13   inflammatory polyarthritis, right?

14          A.    Yes.

15          Q.    Is it your understanding that as a

16   rheumatologist, that rheumatoid arthritis is a

17   cause of non-Hodgkin's lymphoma?

18          A.    Well, yes, it can be.  It can be

19   one of -- it can be an aspect in the pathogenesis,

20   yes.

21          Q.    And can you explain briefly why

22   that is?  What I'm asking is there's a difference

23   between something that's -- well, you've heard the

24   expression there's a difference between

25   correlation and causation, right?
```

Ariel D. Teitel, M.D.

1          A.      Sure.

2          Q.      And what that means is you can have

3    the study that shows a statistically significant

4    relationship but there needs to be some mechanism

5    that makes sense as to how that could happen,

6    right?

7          A.      Yes.

8          Q.      Okay.  And so what I'm asking you

9    as a rheumatologist is is there an understanding

10   about the mechanism through which that can happen?

11         A.      Yes, I believe so.  I would say

12   that it's known that there's a number of immune

13   irregularities in people that have rheumatoid

14   arthritis, and there's chronic immune stimulation,

15   and there's abnormal antibody formation, and those

16   things on a chronic basis can be associated with a

17   higher risk, of course, of evolution to a

18   malignant clonality developing.  So if your immune

19   system is hyperactive in that way, in a disturbed

20   way with abnormal antibodies and lymphoid

21   hyperproliferation and so on, over time that lends

22   to the possible growth of clonality, malignant

23   clonality and so on, lymphoma possibly.

24         Q.      So is chronic antigenic

25   stimulation, is that the linchpin, if you will?

Ariel D. Teitel, M.D.

1      A.     Yes, kind of, chronic immune

2  activity, hyperactivity stimulation, whatever,

3  yes.

4      Q.     Okay.  Now, let me ask you, are

5  there -- are there other autoimmune conditions

6  besides rheumatoid arthritis that in your

7  understanding have been associated with an

8  increased risk or even a cause of non-Hodgkin's

9  lymphoma?

10      A.     Yes, I'm pretty sure, so the

11  problem, some of the studies can be tricky because

12  the medications can be part of it, the medications

13  that are used for those diseases.  So sometimes,

14  unless you do really good studies, it's hard to

15  sort it out, but, yes, yes, there are several, I

16  believe.

17      Q.     What other -- what other conditions

18  are known to be either causes or risk factors for

19  non-Hodgkin's lymphoma that are diseases that

20  would be in the purview of a rheumatologist?

21      A.     Well, I think many of the chronic

22  inflammatory diseases have that in the same

23  mechanistic -- for the same mechanistic reason.

24  So I think if you survive certain forms of

25  vasculitis, I believe you have an increased

Ariel D. Teitel, M.D.

```
 1   incidence, and I'm not sure, I think it has been
 2   teased out to be irrespective of the medications
 3   used.  So like, you know, what used to be called
 4   Wegener's, now it's GPA, I believe that has a
 5   slight incidence of, not sure, lymphoma but
 6   probably non-Hodgkin's and leukemia, if I had to
 7   say.
 8                   Yeah, I mean, there can be
 9   something there for psoriatic arthritis, perhaps,
10   not sure how strong that evidence is, and it's
11   possible that it's been documented for a few other
12   things, it's possible that myositis, for example,
13   there could be some slight -- oh, yeah, Sjogren's
14   would be the typical example.  So that would be
15   the classic one.  That's definitely associated
16   with non-Hodgkin's lymphoma increase, Sjogren's,
17   yes, that would be the typical one.
18          Q.    So when you say there can be
19   something there for psoriatic arthritis, is
20   psoriatic arthritis accepted as a risk factor for
21   NHL?
22          A.    I don't know.  I'd have to review
23   that to be -- I think it's so -- the rheumatoid
24   one is definitely thought of and accepted.
25                   Psoriatic, perhaps.  I'd have to
```

Ariel D. Teitel, M.D.

1    look at it, and I'm not, you know, an expert in

2    that particular sub area.

3             Q.    That's not something you looked at

4    in connection with this case?

5             A.    No, no, I did not at all.

6             Q.    Do you know whether there are data

7    that patients who have multiple autoimmune

8    diseases at the same time have a heightened risk

9    above the additive risk of each disease

10   individually?

11            A.    For lymphoma you're saying?

12            Q.    For non-Hodgkin's lymphoma.

13            A.    No, I don't -- I haven't seen data

14   like that, and I'm not aware of it.

15            Q.    The Franklin paper actually looks

16   at a category of patients that's a little broader

17   than rheumatoid arthritis patients, correct?

18            A.    Right.

19            Q.    And it characterizes them as,

20   quote, unquote, inflammatory polyarthritis

21   patients, right?

22            A.    Yes.  I mean, I'm a little bit

23   surprised this would have been done by in a

24   primary care cohort, so I would be -- although

25   there it's the Norfolk Arthritis Register.  I

Ariel D. Teitel, M.D.

1    don't know.  I'm not -- I glanced at this,

2    whatever, but I'm not so familiar with the paper

3    other than reading what the conclusion was and so

4    on.

5            Q.    Okay.  Were there any -- the third

6    paper you cite is a paper by Dr. Bernatsky?

7            A.    Yes.

8                  (Document marked for identification

9            as Teitel Deposition Exhibit No. 9.)

10   BY MR. PIORKOWSKI:

11           Q.    Marked a copy of that as Exhibit 9.

12   Is there -- was there a purpose in citing this

13   paper or something for which you rely upon?

14           A.    Well, I don't know if at the time

15   that I got this that I had -- you know,

16   chronologically if I had reviewed everything or

17   whatever, and so I may not have known when I

18   initially did what medicines he had at whatever

19   point and whatever, and since I knew that was part

20   of the risks, certainly, in a rheumatoid patient

21   for lymphoma, I just included it because I thought

22   it would be relevant.  It could be relevant,

23   although I didn't think it was particularly

24   relevant for him, the document.

25           Q.    Now, I wanted to just touch a

1    second, this particular paper Bernatsky actually

2    talks about -- you made a reference earlier to not

3    knowing whether things are sometimes due to the

4    disease or the treatment, right?

5            A.    Yes.

6            Q.    And that's actually one of the

7    things that they look at in this paper, correct?

8            A.    Seems so, yes.

9            Q.    Yeah.  And what you mean by that is

10   that if you have a patient who because of their

11   underlying disease is at an increased risk of some

12   outcome, that when you start to give patients a

13   medication that's particularly for that disease,

14   you can end up getting what's called confounding

15   by indication, right?

16           A.    Yes.

17           Q.    And that means that you might start

18   to see an effect that people think is attributable

19   to the drug, but it's actually not.  It's actually

20   attributable to the underlying disease; is that

21   right?

22           A.    Yes.

23           Q.    Now, in your report you -- at the

24   top of page 3, you have a section where you talk

25   about Mr. Savory's Roundup exposure, correct?

Ariel D. Teitel, M.D.

```
 1              A.      Yes.
 2              Q.      And this is based -- did you do any
 3    of these calculations, or are you largely reciting
 4    what Dr. Kendall said here?
 5              A.      Dr. Kendall and perhaps and the
 6    statements that Savory made, but mostly Kendall's
 7    report.
 8              Q.      Okay.  And it talks about how often
 9    he used the product in terms of number of times
10    per week and months per year, that sort of thing,
11    right?
12              A.      Yes.
13              Q.      And what they calculate here is a
14    number of exposure hours and then hour days; is
15    that correct?
16              A.      Yes.
17              Q.      Okay.  Now, what these numbers
18    represent is literally the time that he spent
19    handling a Roundup container and spraying Roundup,
20    correct?
21              A.      Yes.
22              Q.      It doesn't tell us anything about
23    the extent of exposure that he actually had,
24    correct?
25              A.      That information by itself, no.
```

Ariel D. Teitel, M.D.

1    Q.    Okay.  And based on what you've

2  reviewed concerning glyphosate, is it -- do you

3  actually need to be exposed to the glyphosate in

4  order to develop non-Hodgkin's lymphoma, or is it

5  enough to just hold a Roundup container and spray?

6    A.    I'm not -- I don't feel qualified

7  to answer that.

8    Q.    Well, as a scientist, do you think

9  there's any way that any chemical could have an

10 effect if you didn't actually get exposed to it?

11   A.    Well, yeah, it requires some kind

12 of exposure, whether by contact, aerosol or

13 whatever, some kind of contact, some exposure,

14 yeah.

15   Q.    Because if there's no contact, if

16 there's not some internal dose, then it can't have

17 any effect on the body, right?

18   A.    If it's not in contact where it can

19 permeate through clothing or shoes or whatever or

20 skin, air, whatever, if it can't permeate or get

21 into you or breathe it or whatever, then, no, if

22 there's no contact.

23   Q.    Okay.  Now, did you evaluate and

24 with respect to Mr. Savory, his actual exposure

25 putting aside, you know, these calculations that

Ariel D. Teitel, M.D.

1  Dr. Kendall did about how many hours he was

2  spraying glyphosate or holding a glyphosate

3  container?

4        A.    I saw Savory's comments on how

5  often he did it, how big was his property.  I saw

6  the photos of the property and so on.  I saw the

7  document that had all that in there.

8             (Document marked for identification

9        as Teitel Deposition Exhibit No. 10.)

10 BY MR. PIORKOWSKI:

11       Q.    Let me mark as Exhibit 10 a copy of

12 Mr. Savory's deposition.

13       A.    Looks plump.

14       Q.    It is.  I'm sorry for the paper.

15             So did you see in general when you

16 read Mr. Savory's deposition that he used

17 tremendous care in his use of Roundup?

18       A.    He did not seem to have used

19 tremendous care, from what I saw.

20       Q.    He did not seem to have used

21 tremendous care?

22       A.    Right.

23       Q.    Okay.

24       A.    I think it was documented that he

25 usually didn't use a respirator or mask, sometimes

Ariel D. Teitel, M.D.

```
 1   not gloves, and he didn't use protective clothing.
 2        Q.     Are you aware of any evidence that
 3   a respirator or a mask is necessary or that
 4   absorption happens through inhalation and such?
 5        A.     I don't know.  That I do not know.
 6        Q.     Let me ask you if you looked at the
 7   following pieces of information.
 8               Can you turn to page 94 for a
 9   second.
10        A.     Mm-hmm.  One sec.  Okay.
11        Q.     And do you see -- do you see
12   starting -- there's a question about -- he's being
13   asked about his use during mixing, and he says,
14   quote, this is starting on line 4, "Understand
15   that I had a procedure.  What's the word I want to
16   use?  It's, like, contamination.  You're handling
17   contaminated product.  You got to be very careful
18   how you use it.  It just wasn't spill, splash,
19   splash.  No.  It's -- sort of handled like working
20   in a bio lab.  It has to be handled correctly.
21               Question:  And that's the way you
22   handled the Roundup concentrate?
23               Answer:  Yes."
24               And did you consider that as part
25   of your evaluation of his exposure?
```

Ariel D. Teitel, M.D.

```
 1            A.      Yes.
 2            Q.      Okay.  And then he goes on to say,
 3    you know, "And that's the way you handled Roundup
 4    concentrate?"
 5                    And then on page -- same page, 94,
 6    line 15, he's asked, "Describe the procedure that
 7    you would go through to make sure you were
 8    appropriately handling the Roundup concentrate
 9    when you were mixing it?"
10                    He says, "Remove the cap, pour it
11    into the measuring cup.  If there's any drip on
12    the bottle, that gets wiped off."
13                    And then he goes on -- and then
14    line 25 it says, "What would you wipe off the
15    bottle with if there was any kind of drip?
16                    Answer:  Paper towel.  Actually, I
17    used a couple paper towels so it don't soak
18    through to me.
19                    Question:  So you did everything
20    you could to keep the Roundup concentrate from
21    getting on your hands and other parts of your
22    body, right?"
23                    And he says, yep, and on the ground
24    and over the sprayer.
25                    You're familiar with that
```

Ariel D. Teitel, M.D.

1    testimony, right?

2           A.     Yes, he said that, yes.

3           Q.     And then on page 93, he's asked, so

4    after you were done mixing the Roundup -- this is

5    starting on line 6.

6                  "So after you were done mixing the

7    Roundup and putting it in two-and-a-half gallon

8    sprayer, would you wash your hands with soap and

9    water?

10                 Answer:  I wash my hands off with

11   water.  Cold water is always recommended.

12                 Question:  Do you ever recall a

13   situation when you spilled Roundup concentrate on

14   yourself while you were mixing it?

15                 Answer:  No.

16                 Do you ever recall any situation

17   where Roundup concentrate splashed on any part of

18   your body, on your skin while you were mixing it?

19                 Answer:  No."

20                 Now, you are familiar with those

21   pieces of his testimony, right?

22          A.     Yes, I saw it.

23          Q.     And you have no reason to believe

24   he's not being truthful in it, right?

25          A.     Well, this is about when he mixed

```
1    it.

2            Q.      Yes.

3            A.      Yeah, I have no reason to dispute

4    that, yeah.

5            Q.      And so based on -- and I want to

6    sort of take these up separately, but based on

7    when he mixed it, based on his testimony, there's

8    zero evidence that he had any exposure to

9    glyphosate during the mixing process, correct?

10              MR. BRECHER:  I'm objecting to the

11          form of the question.

12              THE WITNESS:  I wouldn't know if

13          respiratory wise he had some exposure, and

14          as he says, he washes his hands.  So, you

15          know, if he had ungloved hands and there

16          was some on the bottle and he used a paper

17          towel, it could have gotten on his hands.

18    BY MR. PIORKOWSKI:

19            Q.      Well, you're speculating, right?

20            A.      Well, he says he washed a drip with

21    the paper towel.

22            Q.      He said he washed his hands?

23            A.      If there was a drip, then he

24    cleaned it with a paper towel.

25            Q.      So he wouldn't get --
```

Ariel D. Teitel, M.D.

```
 1                A.      And he doesn't say that he gloved

 2       his hands.

 3                Q.      No, he says he cleaned it with a

 4       paper towel so he wouldn't get any on him?

 5                A.      Yes, but that he might have touched

 6       the paper towel and so on.

 7                Q.      All right.  Are you comfortable

 8       with that level of exposure being sufficient to

 9       cause non-Hodgkin's lymphoma in a patient based on

10       what you've reviewed?

11                A.      Well, I don't know, and I don't

12       know what, say, the air concentration could be

13       there and how often he does that and so on.  It

14       could be contributory, I don't know.

15                Q.      You don't know one way or the

16       other?

17                A.      I don't know.

18                Q.      Okay.  Do you know what internal

19       dose is necessary to cause non-Hodgkin's lymphoma?

20                A.      No, I do not.

21                Q.      Do you know what dermal exposure

22       dose is necessary?

23                A.      No.

24                Q.      Did you calculate any internal

25       dose?
```

Ariel D. Teitel, M.D.

```
1              A.      No.

2              Q.      If we turn to page 68, if you look

3    at --

4                      MR. BRECHER:  Sixty-eight?

5                      MR. PIORKOWSKI:  I'm sorry.  Hold

6         on one second.

7    BY MR. PIORKOWSKI:

8              Q.      Yeah, page 68, he is now starting

9    on page 9, and this is about his use, not about

10   his mixing, I'll represent.

11                     "Did you wear any kind of

12   protective clothing when you used it the first

13   time?

14                     Answer:  Always.

15                     What did you wear?

16                     Long pants, boots, long-sleeve

17   shirt, a hat.

18                     Question:  When you say long pants,

19   like if we're talking about the fabric, are we

20   talking about jeans?"

21                     He says, "Dungarees.

22                     What type of boots?

23                     Work boots.

24                     Does that mean leather boots?

25                     Yes.  The 12-inch high.
```

Ariel D. Teitel, M.D.

```
 1                    What kind of fabric was the long
 2  sleeve shirt?
 3                    Flannel.
 4                    Like a baseball cap or another
 5  type?
 6                    Ball cap, yes."
 7                    That's his description of what he
 8  was wearing, correct?
 9          A.    Yes.
10          Q.    And if you turn to page 140, on
11  line 15, he's asked, "do you remember any times
12  that your clothes got wet from spraying Roundup?"
13                    His answer is, "Wet?  No."
14                    "Any of these times that you got
15  Roundup on your skin, do you recall having any
16  kind of a skin irritation?"
17                    No, I didn't recognize it.
18                    And then he's asked -- if you go to
19  page 135, he's asked, "Would you avoid certain
20  type of weather when you were spraying?
21                    Answer:  Rain, wind.
22                    Question:  Why did you avoid rain?
23                    Washes it away, useless.
24                    Why did you avoid the wind?
25                    To keep it from blowing back on me.
```

1          So you did your best to only

2    spray" -- I'll start over.

3          A.     Where are you now?

4          Q.     I'm on page 136.

5          A.     Okay, yeah.

6          Q.     "Calm days is when you spray.  And

7    even then, you get a thermal, and it will just

8    whoop up, so you might get some in your face,

9    which has happened to me a couple times.

10          But, generally speaking, you would

11   spray on calm days so that you hit your targets

12   but then not get it on yourself?

13          The idea of a calm day is not to

14   have it blow on me or anywhere else.

15          Do you recall any times in which

16   you were spraying and some Roundup got on your

17   skin?

18          Answer:  Yes, a few times.

19          And if you turn to page 137, line

20   17, it says, "And where do you recall getting it

21   on your skin?

22          Answer:  In the face.  I even got

23   to taste it once.

24          Question:  And that was just one

25   time?

Arlen D. Meyer, M.D.

```
 1                    Answer:  Yeah, I got to taste it

 2    once.  That was it."

 3                    And then you go to page 138, line

 4    4, did you stop and get a drink or do anything or

 5    just keep working?

 6                    Oh, I set it down, went and washed

 7    my mouth out, washed my mouth out, washed my mouth

 8    out, washed my face, washed my face.  Yeah, I

 9    didn't like it.

10                    Did you wash your face with soap

11    and water?

12                    Cold water.

13                    And the other times that you got it

14    on your face, did you stop right then and wash it

15    off as well?

16                    Oh, yes, you can't wait for it to

17    soak in.  You got to get it off right away,

18    immediately.

19                    And then on page 139 it says, if

20    you got it on your hands, would you stop right

21    then and go wash it off?

22                    Answer:  Oh, yeah, you have to.

23    You can't let it soak in.

24                    Question:  Right.  So you'd wash

25    with cold water either on your face, your hands
```

Ariel D. Teitel, M.D.

 1    until you didn't feel it on your skin any longer?

 2               Answer:  I had a garden hose out

 3    there, and I keep that energized for emergency or

 4    getting splashed.

 5               How did it feel when you got it on

 6    your hands and face a few times?

 7               Wet.

 8               Now, for someone who washed his

 9    skin off immediately when he got any Roundup spray

10    on him and never had an experience of having his

11    clothes be wet, are you prepared to testify that

12    that level of exposure is enough to cause

13    non-Hodgkin's lymphoma?

14         A.    I'm not an expert toxicologist.

15    I'll defer to the toxicologist.

16         Q.    Is that outside of your area of

17    expertise?

18         A.    I believe so.

19         Q.    To your knowledge, are there any

20    unique features -- well, let me back up.

21               If we were to accept the premise

22    that Roundup or glyphosate was capable of causing

23    non-Hodgkin's lymphoma for the sake of discussion,

24    are there any features of the non-Hodgkin's

25    lymphoma that implicate glyphosate as being the

Ariel D. Teitel, M.D.

```
 1   cause, to your knowledge?

 2          A.     I don't think so.  I looked at

 3   that.  I don't think so.

 4          Q.     So there's nothing on pathology or

 5   there's no lab test you can run to say this was

 6   related to glyphosate; is that right?

 7          A.     Yeah, I don't think so.

 8          Q.     Is that also true, by the way, for

 9   rheumatoid arthritis, is there any way to rule in

10   or rule out rheumatoid arthritis as a cause of

11   non-Hodgkin lymphoma on the basis of a lab test?

12          A.     No.

13          Q.     You mentioned that you reviewed

14   Dr. Fisher's report?

15          A.     Yes.

16          Q.     Do you know Dr. Fisher?

17          A.     No.

18          Q.     Do you know of Dr. Fisher?

19          A.     No.

20          Q.     And you made some notes on Exhibit

21   5 concerning his report; is that right?

22          A.     Yes.

23          Q.     Where are those?

24          A.     Yeah, you gave it to me.  Yep, I

25   have it here.
```

Ariel D. Teitel, M.D.

```
1            Q.      Okay.  And this is on page 5 of
2    Exhibit 5?
3            A.      Yes.
4            Q.      Okay.  Where it says Fisher report?
5            A.      Yes.
6            Q.      Okay.  So it says 2003 hep C test;
7    is that what that means?
8            A.      Treatment.  TX, treatment, for me,
9    yeah.
10           Q.      And that's something you agree
11   with, right?
12           A.      Yes.
13           Q.      And it says, "no 2004 hep C viral
14   load test."
15                   That's something you also agree
16   with, right?
17           A.      Yes.
18           Q.      "2005 on disability from RA."
19                   You agree with that?
20           A.      Mm-hmm.  Although I don't know if,
21   in fact, it was only RA.  It's possible it was OA
22   and RA or even only OA.  I don't know.
23           Q.      Okay.  No question he was on
24   disability, right?
25           A.      Yep.
```

Ariel D. Teitel, M.D.

```
1              Q.    No question it was from some type
2    of arthritis?
3              A.    Yes.
4              Q.    And no question he had a positive
5    rheumatoid factor at the time?
6              A.    Yes.
7              Q.    Okay.  "Joint pain since 1998."
8                    You agree with that, right?
9              A.    Yes.
10             Q.    "1999 migratory --
11             A.    Arthritis.
12             Q.    Go ahead.  Could you just tell me
13   what that says.
14             A.    "Negative rheumatoid factor" and
15   "palindromic rheumatism was diagnosed."
16             Q.    And you agree with that?
17             A.    Yes.
18             Q.    And what's the next line say?
19             A.    In April of '02 the rheumatoid
20   factor was positive.  Hep C infection was
21   suspected.  The chronic globulins were positive,
22   and in June of '04 GI thought he was cured of the
23   hep C.
24             Q.    And you agreed with that as well,
25   right?
```

Ariel D. Teitel, M.D.

1        A.      Yes.

2        Q.      And then what about 2004?

3        A.      Yeah, but then in 2004, one and a

4   half months after stopping the hep C therapy,

5   which was the Interferon, pain and joint swelling

6   occurred, and then the rheumatoid factor resumed

7   high positivity but cryos were negative this time,

8   and rheumatoid arthritis was diagnosed.

9        Q.      And you agree with all that too,

10  right?

11       A.      Yes.

12       Q.      And then what does SDAI mean?

13       A.      The disease activity index,

14  Standardized Disease Activity Index, that was

15  documented by Moidel, yeah.

16       Q.      It says, "same two months later."

17               You agree with that, right?

18       A.      Yes, yes.

19       Q.      What does the next line say?

20       A.      That there was no follow-up with

21  Moidel after 2014.

22       Q.      Okay.  And you agree with that as

23  well?

24       A.      Yes.

25       Q.      And then it says, "2019 on Xeljanz

Ariel D. Teitel, M.D.

```
1    until lymphoma diagnosis?"

2            A.      Yes, for some time, apparently.

3            Q.      And that's true as well, right?

4            A.      Yes.

5            Q.      Then what does the next line say?

6            A.      Apparently, there was a diagnosis

7    of psoriasis by dermatology seen on February 13th

8    and March 14th of 2019, there's that, and then

9    there's this other note from Vasta, the general

10   doctor, the family doctor on December 31st of

11   '15 that says that he was on apremilast, which is

12   otherwise known as Otezla.

13           Q.      And is that something you had noted

14   in your record?

15           A.      I believe so, yes, I did note it.

16           Q.      What does Otezla do?

17           A.      It's a cytokine inhibitor.  It's a

18   phosphodiesterase inhibitor that downregulates an

19   enzyme which downregulates --

20           Q.      We talked about that under another

21   name?

22           A.      Otezla and apremilast.

23           Q.      I see.

24           A.      Otezla, apremilast, same thing.

25           Q.      And the next line says?
```

Ariel D. Teitel, M.D.

1        A.      This is Fisher's report, noting

2    that both rheumatoid arthritis and psoriasis

3    increased the relative risk for lymphoma, and he

4    wrote 1.56 relative risk for psoriasis lymphoma,

5    writing 1.35% prevalence of lymphoma I believe he

6    meant in rheumatoids.

7        Q.      Okay.  You agree with that?

8        A.      I think there's probably a mix of

9    data with that.  I'll agree if he has that in one

10   of his studies, which I think he noted, yeah, I

11   would agree with, I guess.

12       Q.      And then it says -- what does the

13   next line say?

14       A.      He wrote that IR said there was

15   limited evidence of carcinogenicity for glyphosate

16   on page 6 of his report and that the EPA had said

17   that it was not likely the carcinogenic, but I

18   know that there's a mix of that, and then the

19   cohort study showing that glyphosate doesn't cause

20   non-Hodgkin's.  This is all his report.

21       Q.      Okay.  So do you know -- you said

22   you don't remember whether IARC did find limited

23   evidence for carcinogenicity in humans, right?

24       A.      IARC did find some evidence of

25   certainly in rodents and I believe in humans, and

1  I think they backtracked a little and so on.  I

2  believe IARC did find some evidence of

3  carcinogenicity in humans at a certain point.  It

4  may have been -- I'm not positive what changed

5  with that.

6          Q.     Well, yeah, so you understand that

7  IARC made three sort of different determinations,

8  one based on animal studies, one based on

9  mechanistic studies and one based on human

10  studies?

11          A.     I guess so.

12          Q.     And there's an overall

13  determination that they made, right, but with

14  respect to the human studies, do you understand

15  that the conclusion was that there was limited

16  evidence?

17          A.     I'd have to see the report, but I

18  would believe it if that's so, I would have to see

19  that report.

20          Q.     Okay.  Is there anything in

21  Dr. Fisher's report with which you disagree?

22          A.     Well, yes.  Let me look at his

23  report.  I disagree -- I have it here -- with the

24  general characterization that -- let me just see

25  if he kind of states it.  One minute I need to

Ariel D. Teitel, M.D.

```
1    make it a little bigger to see it.  Yeah, here we
2    go.  Yeah.  Let me see how he states it.  One
3    minute.  He's got a lot of stuff here.  Hold on,
4    his report is long.  One minute.
5                   MR. BRECHER:  You want to see it?
6                   THE WITNESS:  I have it.  Thank
7           you.  One minute.  Okay.  One sec, I'm
8           going through.  I'm aware of this thing.
9           Okay, got it.  Okay.  This is what -- this
10          is what I would have an objection to,
11          which is page 7 of the 29 -- of his
12          29-page report, the summary and
13          conclusions, right there, where he says,
14          "In summary, he has rheumatoid arthritis
15          that was active and severe for many years.
16                   That is a question mark in my mind.
17          That's the whole question mark for me.
18                   Yes, at a couple of snapshot days
19          where he was seen, it was active at times
20          and severe perhaps for the six months that
21          he saw Moidel and intermittently, but I
22          don't know and I would doubt that it was
23          severe for say -- from 2014 to 2019,
24          because I think the absence -- as I
25          mentioned before, the absence of certain
```

Ariel D. Teitel, M.D.

1           complications and the absence of him

2           seeking care other than perhaps

3           self-medicating speaks to the fact that it

4           probably was not sustained severe.

5    BY MR. PIORKOWSKI:

6           Q.     And the articles that you've cited,

7    though, don't give us any threshold amount of time

8    for which it has to be severe to represent an

9    increased risk of NHL, right?

10          A.     Yes, but when they say "severe,"

11   I'm quite sure that if I went and I looked at

12   those patients and how they stratify them and some

13   of that data was probably in the prebiologic age

14   when more patients were severe chronically and out

15   of control and not well-controlled, I treat -- I

16   have some patients like that, and I know what it

17   is.  It exists.

18              So what I'm saying is I'm sure

19   those were the patients that they're talking about

20   where you have months and months, you know, years

21   of for whatever reason either prebiologic or

22   insurance issues or noncompliance or refractory

23   disease.  Those are the severe refractory patients

24   that do exist, and I'm not convinced that Savory

25   would be one of those.  I'm not.

Ariel D. Teitel, M.D.

1        Q.     So if I can -- you agree with

2    Dr. Fisher that Savory had rheumatoid arthritis?

3        A.     Definitely, certainly.

4        Q.     And you agree with him that at

5    least at some point in time, he had severe

6    rheumatoid arthritis?

7        A.     He had active, I don't know severe,

8    he had definitely very active.  For me severe, I

9    mean, is not just that rating scale.  For me

10   severe implies some of those other complications,

11   in my mind, would be extraarticular

12   manifestations.  That's what people with severe

13   rheumatoid arthritis get.  They get extraarticular

14   manifestations.

15       Q.     So the articles that you've pointed

16   out, the articles that you've referenced, they

17   suggest that there is a higher risk of

18   non-Hodgkin's lymphoma in rheumatoid arthritis

19   patients who have more severe disease, right?

20       A.     Yes.

21       Q.     But even patients who don't have

22   severe disease who are rheumatoid arthritis

23   patients have an increased risk of non-Hodgkin's

24   lymphoma compared to patients who don't have

25   rheumatoid arthritis, based on those studies,

Ariel D. Teitel, M.D.

1    right?

2           A.      No, because that study, that's an

3    aggregate calculation, and the increase could be

4    solely in those people with highly active disease.

5    So you would have to -- that's what those studies

6    show.  So you would have to -- you would have to

7    tease those patients out to know that, and I can

8    tell you that now with good control, there's very

9    little being seen within the biologic area and so

10   on.

11          Q.      What other -- so if I can go back,

12   what you're disagreeing with Dr. Fisher about is

13   your definition of severe --

14          A.      Right, and severe for many years.

15   Severe for many years.

16          Q.      Let me finish my question.

17          A.      I wouldn't dispute that.

18          Q.      Let me finish my question.

19                  So Dr. Moidel used the term severe,

20   right?

21          A.      On several visits, yes.

22          Q.      And you said you didn't disagree

23   with that?

24          A.      I don't disagree with that on a --

25   on that day; however, in the way I kind of

Ariel D. Teitel, M.D.

1    categorize patients and think of it longer -- so

2    rheumatoid, you can think of it short term and

3    long term.  I would not think of somebody like

4    that as severe, no, I wouldn't.

5              Q.    So you're making --

6              A.    Severe.

7              Q.    You're making the assumption that

8    he did not have severe rheumatoid arthritis during

9    the whole period of time that he was on disability

10   from 2005 up to 2014; is that right?

11             A.    Yeah, quite possibly.  I would say

12   moderate.  Again, you know, I would expect more

13   damage, more complications with uncontrolled

14   sustained severe activity.  You can be severe at a

15   certain time, just like he did have palindromic,

16   but when you have refractory, severe issues, and

17   I've had many of these patients, bad things happen

18   that are obvious and they're quantified, and they

19   get complications.

20             Q.    And you're also assuming that he

21   did not have severe rheumatoid arthritis between

22   the time he stopped seeing Dr. Moidel and 2019,

23   correct?

24             A.    Well, I mean, in my experience, he

25   had five years there.  In my experience, if you

1    have a patient that has severe rheumatoid

2    arthritis, you know, untreated, if they're just

3    gobbling nonsteroidal, those are patients that are

4    going to show up with eye inflammation, with a

5    heart problem, with fluid in their lungs, with

6    vasculitis, with mutilation and destruction of

7    their joints, that's when -- nodules, which I

8    think was not documented in him.  I don't think

9    that was documented in him.  So those are all

10   features of severe refractory and active

11   rheumatoid arthritis.

12          Q.    So what's your -- if you were to --

13   we were talking earlier about SIR risks.

14                Do you remember that?

15          A.    Yes.

16          Q.    What's your best determination of

17   the SIR risk that would be applicable to

18   Mr. Savory based on his rheumatoid arthritis?

19          A.    I don't know.  I'd have to take a

20   very close look, and I'm not an epidemiologist.

21   It's very tricky, and it all depends on all the

22   studies that are done, which have different

23   populations and so on, and as you said, there's

24   confounding variables in between other issues,

25   weight, smoking, whatever else.  So I don't know

Ariel D. Teitel, M.D.

```
 1    exactly.  I don't know.

 2          Q.    I mean, is it less than two?

 3          A.    I would think it would be less than

 4    whatever they say is the average increase, the

 5    bulk of which those patients would be people with

 6    chronic refractory severe disease.  So I would

 7    think, yes, at his rate that he would have been

 8    much on the lower end of that spectrum.

 9          Q.    But you'd agree that it would be

10    greater than one?

11          A.    It could be, but I'd have to see.

12    It could be, but I'd have to see the data and see.

13    It could well be.

14                MR. PIORKOWSKI:  Can we go off the

15          record for a minute.

16                MR. BRECHER:  Sure.  How much

17          longer do you think you have?

18                THE VIDEOGRAPHER:  The time right

19          now is 12:55 p.m., and we're off the

20          record.

21                (Brief recess.)

22                THE VIDEOGRAPHER:  The time right

23          now is 1:07 p.m., and we're back on the

24          record.

25    BY MR. PIORKOWSKI:
```

Ariel D. Teitel, M.D.

1          Q.     So I want to come back to a

2     question and make sure I got a complete answer.

3                So I had asked you, you were

4     talking about Dr. Fisher's report, and I asked you

5     whether there were anything you disagreed with,

6     and you told me you disagreed with him with

7     respect to the duration of her severe rheumatoid

8     arthritis, if I understood you correctly?

9          A.     Yes.

10         Q.     Is that right?

11                Are there other things in

12    Dr. Fisher's report that you disagreed with?

13         A.     Well, I wasn't sure what to make of

14    his review of glyphosate and lymphoma.  That's

15    what prompted me to do my own looking for these

16    articles at the last minute.  I know that he has

17    like an MPH or something like that, so he is

18    somewhat qualified, but his denial of that link

19    prompted me to look into it more.

20         Q.     And did your -- did the four

21    studies that you spent five or ten minutes looking

22    at convince you that there was, in fact, an

23    association between glyphosate and non-Hodgkin's

24    lymphoma?

25         A.     It suggested to me that experts

Ariel D. Teitel, M.D.

```
 1    that are certainly much more knowledgeable than me

 2    thought that there certainly could be, and so I

 3    certainly would not feel that it could be

 4    discounted by the way Dr. Fisher simply discounted

 5    it.

 6         Q.     There's a big difference saying

 7    that there could be and that there is, right?

 8         A.     Yep.

 9         Q.     Are you saying that there is, or

10    are you saying that there could be?

11         A.     I'm not the toxicologist, so I'm

12    not going to opine.  In my view, there could be to

13    the extent that more qualified professionals think

14    that there is.  I'm certainly open to the

15    toxicologists' and epidemiologists' interpretation

16    of data that suggests that there may well be.

17         Q.     Well, I ask this because you say in

18    your report that his clear and frequent exposure

19    to glyphosate and Roundup over a three-decade

20    period was a substantial factor and, in your

21    opinion, the main cause of his development of NHL.

22                Are you prepared to say that under

23    oath?

24         A.     Yes, I think so.  I think that

25    there was more likely to be much more causative
```

1    than his rheumatoid.

2           Q.     Well, but you just told me you

3    don't even know for sure that there is a link?

4           A.     I think there probably is, but I'm

5    not an epidemiologist.  I think there is.  There

6    is evidence, substantial evidence in the

7    literature, though it is mixed, there is some

8    evidence saying yes, and there's animal evidence,

9    as we know, and there's mechanistic evidence

10   showing that it could be oncogenic, carcinogenic

11   and so on.  So there's --

12          Q.     What's your basis for saying that?

13          A.     It's listed in the articles of what

14   it does to lymphocytes that then I just was

15   reading that.  It's listed in the -- it's

16   documented in the articles.

17          Q.     Which articles, the four that you

18   alluded to before?

19          A.     Yes, yes, and the one that I'm

20   now -- I think I just glanced at the Boffetta one,

21   I think, mentions that as the mechanistic thing,

22   yeah.

23          Q.     Okay.  Any other opinions of

24   Dr. Fisher's that you disagree with?

25          A.     No, those were the main things, not

Ariel D. Teitel, M.D.

1    really.

2         Q.    Okay.  You have the Franklin

3    article that you -- I can't remember what we

4    marked it as.

5         A.    Franklin was one of the -- this

6    one.

7         Q.    What exhibit is that?

8         A.    Eight.

9         Q.    Eight, okay.

10        A.    Exhibit 8, yeah.

11        Q.    All right.  And do you see in

12   Franklin if you turn to page 621, this is in the

13   discussion section of the paper --

14        A.    Yes.

15        Q.    -- towards the end.  Do you see at

16   the very bottom of page 621 on the left-hand side

17   it says, quote, thus it is not necessary to have

18   severe disease to demonstrate an increased risk,

19   although in the NOAR, as in other cohorts,

20   severity was a marker for even greater risk?

21        A.    Right, but I'd have to see with

22   more detail what that says.  I don't know what the

23   NOAR cohort.

24        Q.    The NOAR is the database that this

25   is referring to, the registry, right?

Ariel D. Teitel, M.D.

1        A.      Yes.

2        Q.      The Norfolk Arthritis Register?

3        A.      Yeah, but I would also say that

4   quite -- I mean if they use these different

5   studies, some are quite old, unclear of the

6   methodology, that's the problem.  So I don't know.

7   I don't know how accurate that is.  That's their

8   opinion.

9        Q.      But this is a paper that you cited

10   in support for your opinion, right?

11       A.      Yeah, I put that down saying that

12   there was -- there certainly is evidence for an

13   increased risk with active rheumatoid and more,

14   according to severity.  As to that one point that

15   they're making there, I don't know if that's

16   substantiated.

17       Q.      That's what the authors assert,

18   though?

19       A.      Okay, they can assert, yeah.

20               (Document marked for identification

21       as Teitel Deposition Exhibit No. 11.)

22   BY MR. PIORKOWSKI:

23       Q.      I'm going to hand you what I've

24   marked as Exhibit 11.

25       A.      Yep.

Ariel D. Teitel, M.D.

```
1              Q.     Is this one of the papers you were
2    talking about?
3              A.     Yes.
4              Q.     And did you conclude somehow from
5    this paper that the European authorities had
6    decided that glyphosate was carcinogenic?
7              A.     No, it wasn't this one.  I didn't
8    conclude, what did I -- I saw it written in
9    something else.  Yeah, here we go.  I saw it in
10   something else.  So I wouldn't say that it was
11   from this, no.
12             Q.     Okay.  So this paper talks about
13   their assessment of glyphosate toxicology and
14   carcinogenicity?
15             A.     Yes.
16             Q.     And it talks about the European
17   Union's assessment and how it differs from IARC's
18   assessment, right?
19             A.     Yes.
20             Q.     And it talks about the fact that --
21   I mean, it says in the first full paragraph,
22   quote, this review presents the scientific basis
23   of the glyphosate health assessment conducted
24   within the European Union renewal process, and
25   explains the differences in the carcinogenicity
```

Ariel D. Teitel, M.D.

```
1   assessment with IARC, correct?

2       A.    Yes.

3       Q.    That's what you understood when you

4   read the article, right?

5       A.    You know, I just glanced at this.

6   I didn't read the whole thing.

7       Q.    Okay.  And it says, The EU

8   assessment did not identify a carcinogenicity

9   hazard, revised the toxicology profile and

10  conducted a risk assessment for some

11  representative uses, right?

12      A.    Yeah.

13      Q.    Do you see on page 2727, under the

14  discussion section of human evidence, it talks

15  about IARC, and it says, IARC 2015 offered the

16  most up-to-date review of human epidemiological

17  studies on glyphosate, positive evidence regarding

18  an association between exposure to glyphosate and

19  non-Hodgkin lymphoma observed in some case control

20  studies but not confirmed by cohort studies was

21  considered by IARC to conclude on, quote, limited

22  evidence in humans, correct?

23      A.    Yep.

24      Q.    And that's what we referred to

25  earlier, right?
```

Ariel D. Teitel, M.D.

1          A.      Yes.

2          Q.      And that's what you mentioned that

3    Dr. Fisher referred to in his report, right?

4          A.      He said that limited was not, so he

5    either misinterpreted, but in the next statement

6    limited evidence is defined as a positive

7    association.

8          Q.      Yeah, but finish the sentence.  It

9    says limited evidence is a positive association --

10         A.      Yes.

11         Q.      -- observed between exposure to the

12   agent and cancer for which a causal interpretation

13   is considered to be credible, but chance, bias or

14   confounding could not be ruled out with reasonable

15   confidence.

16         A.      Right.  But Fisher wrote that it

17   was ruled out by IARC.  He says he basically

18   thought it was not -- oh, there, he did put in the

19   whole thing, okay, yeah, that's fine.  I'm sorry.

20   I didn't realize he put the whole thing in, yeah.

21         Q.      Okay.  Turn to page 2743 under

22   conclusions.

23         A.      One moment.  Forty-three for me is

24   like the footnote is the last page.

25         Q.      Let me see.  I'm sorry, 38, look at

Ariel D. Teitel, M.D.

1    38.

2         A.    Yeah, okay.

3         Q.    So you see where it says evidence

4    in humans under the conclusion section?

5         A.    Yes.

6         Q.    And then if you go down three, four

7    sentences in, it says, quote, the same weak

8    evidence in humans for the carcinogenicity of

9    glyphosate was interpreted differently by IARC and

10   EFSA, correct?

11        A.    Yep.

12        Q.    It says, IARC considered the

13   association between exposure to glyphosate and

14   non-Hodgkin lymphoma as, quote, limited evidence

15   in humans, end quote.  While in the EU assessment,

16   most experts considered the evidence as very

17   limited and insufficient for triggering the

18   classification, correct?

19        A.    Yes.

20        Q.    So in this review, the European

21   food safety administration, their conclusion was

22   that glyphosate was not carcinogenic, correct?

23        A.    Yes.

24        Q.    Do you know what European

25   regulatory agency it is that you think determined

1    that glyphosate is carcinogenic?

2            A.      No, I may have misspoken there.

3    One minute, I'm looking at something.

4                    Yeah, no, what I saw was that the

5    European food and safety authority, even though

6    they say it's not carcinogenic, they set the

7    maximum acceptable daily intake at one-third of

8    what it is in the United States set by the EPA.

9    That's in the supplement article I gave you.

10   That's what I saw.

11           Q.      What's in what supplement article?

12           A.      The one that's called glyphosate in

13   food and supplements.

14           Q.      Okay.  Do you know whether that had

15   anything to do with carcinogenicity?

16           A.      Well, the European Food Safety

17   thought that it did not.

18           Q.      Right.  What I'm saying is you can

19   set limits that are related to toxicology that

20   have nothing to do with carcinogenicity, right?

21           A.      Sure.

22           Q.      And do you know whether that limit

23   that you just alluded to had anything to do with

24   carcinogenicity?

25           A.      I don't know why they chose it.  I

1    don't know.

2            Q.      So to go back to your report, I

3    know you said you reserve the right to supplement

4    or amend.  Are you planning to supplement or amend

5    your report at this point?

6            A.      That's up to discussion with

7    counsel.  I don't know.

8            Q.      I mean, do you feel like you need

9    to for purposes of making your opinions clear, or

10   do you think your opinions have been made clear

11   either in your report or what you've clarified

12   here at the deposition today?

13           A.      I think they've been made clear.

14           Q.      Okay.  Are there any opinions you

15   plan to offer at the time of trial that aren't in

16   your report, as we sit here today, or that we

17   discussed today?

18           A.      Nothing that we haven't -- that I,

19   you know, that wouldn't be in the articles perhaps

20   something further, you know, from the article,

21   but, no, nothing else.

22           Q.      Are you aware that there was a

23   large prospective cohort study conducted on the

24   relationship between glyphosate and non-Hodgkin's

25   lymphoma that was sponsored in part by National

```
 1   Cancer Institute and NIH that found no increased

 2   risk of non-Hodgkin's lymphoma with glyphosate or

 3   any subtype of NHL?

 4        A.    I'm not aware.

 5        Q.    That's not a paper you've looked at

 6   or reviewed?

 7        A.    I don't think so.  I would have to

 8   see the title of it.  I don't think so.

 9             MR. PIORKOWSKI:  Give me two

10        minutes, I think I'm done.

11             THE VIDEOGRAPHER:  You want to go

12        off the record?

13             MR. PIORKOWSKI:  Yeah, let's go off

14        the record.

15             THE VIDEOGRAPHER:  The time right

16        now is 1:22 p.m., and we're off the

17        record.

18             (Pause.)

19             THE VIDEOGRAPHER:  The time right

20        now its 1:23 p.m., and we're back on the

21        record.

22             MR. PIORKOWSKI:  That's all the

23        questions I have for you today, Doctor.

24        Would you like for him to have an

25        opportunity to read and sign?
```

Ariel D. Teitel, M.D.

```
 1                MR. BRECHER:  Yes, I've already
 2        asked her.
 3                MR. PIORKOWSKI:  Thank you.
 4                THE WITNESS:  Thank you.
 5                THE VIDEOGRAPHER:  The time right
 6        now is 1:24 p.m., and we're off the
 7        record.
 8                (Witness excused.)
 9                        - - -
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

Ariel D. Teitel, M.D.

```
  1            C E R T I F I C A T I O N
  2                 I, MARGARET M. REIHL, a
  3        Registered Professional Reporter,
  4        Certified Realtime Reporter, Certified
  5        Shorthand Reporter, Certified LiveNote
  6        Reporter and Notary Public, do hereby
  7        certify that the foregoing is a true and
  8        accurate transcript of the testimony as
  9        taken stenographically via Zoom by and
 10        before me at the time and on the date
 11        hereinbefore set forth.
 12                 I DO FURTHER CERTIFY that I am
 13        neither a relative nor employee nor
 14        attorney nor counsel of any of the parties
 15        to this action, and that I am neither a
 16        relative nor employee of such attorney or
 17        counsel, and that I am not financially
 18        interested in the action.
 19
 20
 21        ---------------------------------------------
           Margaret M. Reihl, RPR, CRR, CCR-NJ
 22        CCR License #XI01497
           NCRA License #047425
 23
 24
 25
```