# EXHIBIT 7

Sanford R. Katz, M.D.

```
 1                  UNITED STATES DISTRICT COURT

 2                NORTHERN DISTRICT OF CALIFORNIA

 3   IN RE:  ROUNDUP PRODUCTS    *    MDL NO: 2741
     LIABILITY LITIGATION

 4                               *    CASE NO: 3:16-MD-02741-VC

 5   *  *  *  *  *  *  *  *  *   *    *  *  *  *  *  *  *  *  *
     This document relates to:

 6                               *
     BLAIR, ET AL,

 7                               *    CASE NO: 3:19-CV-07984-VC
     VS.

 8                               *
     MONSANTO COMPANY.

 9                               *

10

11

12

13            REMOTE VIDEO-RECORDED DEPOSITION OF

14                   Sanford R. Katz, M.D.

15

16             Taken on September 2, 2021
                    Beginning at 1:22 p.m.

17
                    And September 17, 2021

18                  Beginning at 9:07 a.m.

19

20

21

22

23

24

25   REPORTED BY:  Meredith Hoffpauir, RPR, CCR, CSR
```

Sanford R. Katz, M.D.

```
 1    APPEARANCES:

 2    FOR JOSEPH BLAIR:

 3                    WINCHELL & JOSEPH

                      2124 Fairfield Avenue

 4                    Shreveport, LA 71104

                      BY:  Curtis R. Joseph Jr.

 5                    318-221-1600

                      Curtis@wjlawfirm.net

 6

 7

 8    FOR MONSANTO COMPANY:

 9                    THE PIORKOWSKI LAW FIRM

                      1800 K. Street, NW

10                    Suite 1000

                      Washington, DC 20006

11                    BY:  Joseph D. Piorkowski, Jr.

                      And Anne Hovis

12                    202-223-5535

                      Jpiorkowski@lawdoc1.com

13

14

15    REPORTED BY:  Meredith Hoffpauir, RPR, CCR, CSR

16    VIDEOGRAPHER:  Jonathan Pempleton (for 9/2/21)

17                    Colin Coughenour (for 9/17/21)

18

19

20

21

22

23

24

25
```

Sanford R. Katz, M.D.

```
 1                    STIPULATIONS
 2       It is hereby stipulated by and between counsel for
 3  the parties that the remote video-recorded deposition of
 4  Dr. Sanford Katz was taken pursuant to notice and in
 5  accordance with the Federal Rules of Civil Procedure as
 6  provided by law on September 2, 2021 and .
 7       The parties hereby waive all formalities in
 8  connection with the taking of the deposition with the
 9  exception of the swearing of the witness and the
10  reduction of the questions and answers to typewriting.
11  Further, the deponent and/or party did request to read
12  and sign a completed transcript of the testimony.
13       Counsel for all parties reserve all objections
14  except as to the form of the question and responsiveness
15  of the answer at the time of taking of said deposition,
16  and they also reserve the right to make objections at
17  the time that taking of said deposition or any part
18  thereof may be offered into evidence, with the same
19  rights as if the testimony had been given in open court.
20       Meredith Hoffpauir, RPR, CCR, CSR, officiated in
21  administering the oath to the witness.
22
23
24
25
```

```
 1                        INDEX
 2  9/2/21 EXAMINATION BY:                      PAGE NO.
 3  Mr. Piorkowski                                  9
 4  9/17/21 EXAMINATION BY:
 5  Mr. Piorkowski                                101
 6  Mr. Joseph                                    224
 7
 8                  EXHIBITS FROM 9/2/21
 9  NO.   DESCRIPTION                          PAGE NO.
10   1    Dr. Katz' Report - 7/18/21              12
     2    Dr. Katz' List of Documents Reviewed in the   28
          Scientific Literature
11
     3    Second Amended Notice of Deposition     28
12
     4    Dr. Katz' Invoice 1 - 5/29/19           29
13
     5    Dr. Katz' Invoice 2 - 12/18/19          30
14
     6    Dr. Katz' Invoice 3 - 7/19/21           30
15
     7    Dr. Katz' CV - 9/1/21                   38
16
     8    IARC Monographs, Volume 112, Some       56
17        Organophosphate Insecticides and Herbicides
18   9    Memorandum:  Updated Review of          58
          Glyphosate(103601) Incident Reports -
19        2/26/2009 By Monica Hawkins and Jessie
          Cordova
20
    10    Revised Glyphosate Issue Paper:  Evaluation   61
21        of Carcinogenic Potential.  EPA's Office of
          Pesticide Programs - 12/12/17
22
    11    Exposure to Glyphosate and Risk of      63
23        Non-Hodgkin Lymphoma and Multiple Myeloma:
          An Updated Meta-Analysis By Francesca
24        Donato, et al
```

Sanford R. Katz, M.D.

| 1 | 12 | Exposure to Glyphosate-Based Herbicides and Risk For Non-Hodgkin Lymphoma:  A Meta-Analysis and Supporting Evidence By Luoping Zhang, et al - 2019 | 63 |
| 2 | | | |
| 3 | | | |
| | 13 | Systematic Review and Meta-Analysis of Glyphosate Exposure and Risk of Lymphohematopoietic Cancers By Ellen Chang and Elizabeth Delzell - 11/28/2013 | 64 |
| 4 | | | |
| 5 | | | |
| 6 | 14 | Pesticide Use and Risk of Non-Hodgkin Lymphoid Malignancies in Agricultural Cohorts From France, Norway and the USA:  A Pooled Analysis From the AGRICOH Consortium By Maria Leon, et al - 3/18/19 | 64 |
| 7 | | | |
| 8 | | | |
| 9 | 15 | Pesticide Use and Risk of Non-Hodgkin Lymphoid Malignancies in Agricultural Cohorts From France, Norway and the USA:  A Pooled Analysis From the AGRICOH Consortium By Maria Leon, et al - 3/18/19 | 64 |
| 10 | | | |
| 11 | | | |
| 12 | 16 | Non-Hodgkin Lymphoma and Occupational Exposure to Agricultural Pesticide Chemical Groups and Active Ingredients:  A Systematic Review and Meta-Analysis by Leah Schinasi and Maria Leon - 4/23/14 | 65 |
| 13 | | | |
| 14 | | | |
| 15 | 17 | Glyphosate Use and Cancer Incidence in the Agricultural Health Study By Gabriella Andreotti, et al - 11/9/17 | 65 |
| 16 | | | |
| 17 | 18 | Evaluation of DNA Damage in an Ecuadorian Population Exposed to Glyphosate By César Paz-y-Miño, et al - 11/7/2006 | 67 |
| 18 | | | |
| 19 | 19 | Weeding Out Inaccurate Information on Glyphosate-Based Herbicides and Risk of Non-Hodgkin Lymphoma By Iemaan Rana, Emanuela Taioli, Luoping Zhang | 69 |
| 20 | | | |
| 21 | | | |
| | 20 | How Did the US EPA and IARC Reach Diametrically Opposed Conclusions on the Genotoxicity of Glyphosate-Based Herbicides? By Charles Benbook | 69 |
| 22 | | | |
| 23 | | | |
| 24 | 21 | Major Pesticides Are More Toxic to Human Cells Than Their Declared Active Principles By Robin Mesnage, et al - 2/26/14 | 70 |
| 25 | | | |

Sanford R. Katz, M.D.

| | 22 | Glyphosate Use and Associations With Non-Hodgkin Lymphoma Major Histological Sub-Types:  Findings from the North American Pooled Project By Manisha Pahwa, et al | 80 |
|---|---|---|---|
| | 23 | EPA Guidelines for Carcinogen Risk Assessment - 3/2005 | 82 |
| | 24 | EPA Guidelines for Mutagenicity Risk Assessment - 9/24/86 | 83 |
| | 25 | EPA Guidelines for Exposure Assessment - 5/29/92 | 83 |
| | 26 | EPA Memorandum:  Glyphosate:  Epidemiology Review of Zhang et al (2019) and Leon et al (2019) Publications for Response to Comments on the Proposed Interim Decision By David Miller -  1/6/2020 | 85 |
| | 27 | Expert Report of Brentley S. Olive - 8/4/21 | 95 |
| | | EXHIBITS FROM 9/17/21 | |
| | 28 | IARC Monographs, Volume 112, Some Organophosphate Insecticides and Herbicides, Glyphosate (pgs 321-399) | 102 |
| | 29 | Dr. Katz' Report - 7/18/21 (no letterhead) | 105 |
| | 30 | Dr. Katz' Handwritten Notes | 106 |
| | 31 | Supplemental Document Review List - 9/14/21 | 109 |
| | 32 | A Multi-Institutional Experience of Proton Beam Therapy for Sinonasal Tumors By Nathan Yu, Sanford Katz MD, et al - 7/8/19 | 115 |
| | 33 | Louisiana State Medical Society Policy Manual - Revised 2/2020 | 128 |
| | 34 | American Medical Association, Chapter 9: Opinions on Professional Self-Regulation | 132 |
| | 35 | Dollars for Docs:  Talk with your Doctor | 167 |

| 36 | Dollars for Docs - Dr. Katz' 2014 Payment Breakdown | 168 |
| 37 | Dollars for Docs - Dr. Katz' 2015 Payment Breakdown | 173 |
| 38 | Dollars for Docs - Dr. Katz' 2016 Payment Breakdown | 177 |
| 39 | Dollars for Docs - Dr. Katz' 2017 Payment Breakdown | 179 |
| 40 | Dollars for Docs - Dr. Katz' 2018 Payment Breakdown | 181 |
| 41 | Department of Justice, Opioid Manufacturer Insys Therapeutics Agrees to Enter $225 Million Global Resolution of Criminal and Civil Investigations - 6/5/19 | 182 |
| 42 | EPA Memorandum: Glyphosate: Epidemiology Review of Zhang et al (2019) and Leon et al (2019) Publications for Response to Comments on the Proposed Interim Decision By David Miller - 1/6/2020 | 183 |
| 43 | Obesity is Associated with Increased Relative Risk of Diffuse Large B-Cell Lymphoma: A meta-Analysis of Observational Studies By Jorge Castillo, et al - 4/2014 | 211 |
| 44 | Obesity and Risk of Non-Hodgkin's Lymphoma: A Meta-Analysis By Susanna Larsson and Alicja Wolk - 4/2007 | 211 |
| 45 | Dr. Katz' Notes - (Currently not provided to Court Reporter) | 238 |
| 46 | IARC Monographs, Volume 112, Some Organophosphate Insecticides and Herbicides, Glyphosate. Pgs 321-399 with Dr. Katz' highlights/notations - (Currently not provided to Court Reporter) | 238 |
| 47 | Dr. Katz' Invoice 4 - (Currently not provided to Court Reporter) | 238 |
| 48 | Dr. Katz' Radiation Oncology Initial Consultation for Joseph Blair - 11/15/18 | 240 |

```
 1    PROCEEDINGS:

 2                    THE VIDEOGRAPHER:  Okay.  We are now on

 3              the record.  My name is Jonathan Pempleton.

 4              I'm a videographer for Golkow Litigation

 5              Services.  Today's date is September 2nd,

 6              2021.  And the time now is 1:22 p.m.

 7                    This remote deposition is being held in

 8              the matter of Blair and others versus Monsanto

 9              Company.  The deponent is Sanford R. Katz,

10              M.D.

11                    All parties to this deposition are

12              appearing remotely and have agreed to the

13              witness being sworn in remotely.  Due to the

14              nature of this remote reporting, please pause

15              briefly before speaking to ensure all parties

16              are heard completely.

17                    Will the counsel please identify

18              themselves and state any agreements for the

19              record.  After, the court reporter, Meredith

20              Hoffpauir, will swear in the witness.

21                    MR. PIORKOWSKI:  This is Joseph

22              Piorkowski representing Monsanto, and I agree

23              with the remote video.

24                    MR. JOSEPH:  Curtis Joseph appearing on

25              behalf of Joseph Blair, and I likewise agree
```

Sanford R. Katz, M.D.

```
 1              with remote video.
 2                   DR. SANFORD KATZ,
 3      the witness hereinbefore named, after being first
 4      duly cautioned and sworn to tell the truth, the whole
 5      truth, and nothing but the truth, testified under
 6      oath as follows:
 7      EXAMINATION BY MR. PIORKOWSKI:
 8      Q.   State your full name, Dr. Katz.
 9      A.   Sanford Roy Katz.
10      Q.   And what's your address?
11      A.   2817 Tuscany Circle, Shreveport, Louisiana 71106.
12      Q.   And you previously gave a deposition in your
13           capacity as a treating radiation oncologist for
14           Mr. Blair; is that correct?
15                   MR. JOSEPH:  Objection.  Objection.
16                   MR. PIORKOWSKI:  What's the basis of the
17              objection?
18                   MR. JOSEPH:  At the time you took --
19              well, objection to form.  At the time you took
20              the deposition you guys were aware that we
21              were listing him as our expert.  We just
22              hadn't given you all the documents that you
23              were requesting at that time.
24                   And as I appreciate it, when we
25              terminated the deposition previously, it was
```

Case 3:16-md-02741-VC   Document 14068-2   Filed 10/20/21   Page 11 of 249


Sanford R. Katz, M.D.

```
 1              with the understanding that we would resume

 2              the deposition once we had given you guys

 3              those reports and the documents upon which

 4              they were based.  That's my understanding as

 5              we're going forward today.

 6                   MR. PIORKOWSKI:  Okay.  My understanding

 7              is that the last deposition, even when I asked

 8              Dr. Katz at the last deposition, he did not

 9              identify himself as an expert witness in this

10              case.  You had made some overtures that you

11              were thinking about identifying him, and we

12              didn't get any expert report until

13              July 28th -- until July 18th.

14                   And the focus of the last deposition was

15              in his capacity as a treating oncologist.  We

16              didn't have all the records.  That deposition

17              was left open.  So my understanding is that

18              that was a deposition in his capacity as a

19              treating radiation oncologist.

20                   Today we're here in another capacity as

21              an expert witness who's been designated on

22              behalf of the plaintiffs.  If you disagree

23              with that, we just have to agree to disagree I

24              suppose.

25                   MR. JOSEPH:  That's no problem.
```

Sanford R. Katz, M.D.

```
 1                  MR. PIORKOWSKI:  Okay.

 2   BY MR. PIORKOWSKI:

 3   Q.   In any event, Dr. Katz, your last deposition was

 4        taken on July 7th; is that correct?

 5   A.   Yes.

 6   Q.   And have you reviewed that deposition?

 7   A.   I have.

 8   Q.   Okay.  And when did you last review that

 9        deposition?

10   A.   Shortly after I received it.

11   Q.   Which was when?

12   A.   I couldn't give you the date.

13   Q.   I mean, I don't know whether that was last week or

14        two.

15   A.   No.  I'm sorry.  It would have been within the

16        last, let's say, the last week or two.

17   Q.   Okay.  Were any of the answers that you gave in the

18        deposition, do any of them need to be corrected or

19        is the testimony still true today?

20   A.   You mean in terms of where my answers -- just so I

21        understand the question.  The -- what I received

22        looked as though those are the things that I said.

23             Are you asking me whether there may have been

24        some ambiguity or if I wanted to clarify my answers

25        or if those were the words that I used?
```

Sanford R. Katz, M.D.

```
 1   Q.   No.  I'm asking you whether the testimony that you
 2        gave then is still correct and accurate today?
 3   A.   Yes.
 4   Q.   Okay.  And you are, regardless of what our
 5        agreement or disagreement is about your previous
 6        deposition, you understand that your role that
 7        you're here in today is in your capacity as a
 8        retained expert witness; correct?
 9   A.   Yes.
10   Q.   Yes?  Okay.
11   A.   That's my understanding.
12   Q.   Okay.  You issued a report on July 18th; is that
13        correct?
14   A.   Yes.
15   Q.   Okay.  And can everybody access what I believe says
16        Dr. Katz's report on the remote?  Are you able to
17        access that, Dr. Katz?
18   A.   Yes.
19             MR. PIORKOWSKI:  Okay.  And can we --
20        Meredith, can we mark that as Exhibit 1.
21        (Exhibit No. 1 was marked for
22        identification and attached hereto.)
23             THE COURT REPORTER:  Yes, sir.
24             MR. PIORKOWSKI:  I'm sorry.  I couldn't
25        hear you.
```

Sanford R. Katz, M.D.

```
1                    THE COURT REPORTER:  Yes, sir.
2    BY MR. PIORKOWSKI:
3    Q.   And is the document that I marked as Exhibit 1 your
4         report that you prepared, Dr. Katz?
5    A.   It is.
6    Q.   Okay.  Now, was it your understanding on July 7th
7         that you had already been retained as an expert
8         witness at that time?
9    A.   That was my understanding that I was being asked my
10        opinion, yes.
11   Q.   So when did you become -- well, at some point you
12        were simply Mr. Blair's treating physician;
13        correct?
14   A.   Yes.
15   Q.   You had not been yet retained as an expert.  I
16        understand we talked last time about an affidavit
17        that you prepared in connection with a workers'
18        comp claim.  That was a discreet matter; correct?
19   A.   Yes.
20   Q.   So for purposes of this litigation, when were you
21        asked to serve as an expert witness?
22   A.   I'm really not certain in terms -- as to the
23        distinctions.  My role, you know, I understand it
24        changed in some capacity -- in a capacity.  But I'm
25        not really certain as to the distinctions legally
```

```
 1           as to when I was a treating physician and when I

 2           was an expert.

 3    Q.     Well, you're always a treating physician.  I guess

 4           my question is when were you asked to serve as an

 5           expert?  And by "served as an expert," that means

 6           you're going to be paid for your time.  You have an

 7           expectation that you're going to be paid for your

 8           time.  That means you're agreeing to serve as an

 9           expert and to abide by the Court's rules, which

10           involve giving a deposition, issuing a report, and

11           other things.

12    A.     Right.

13    Q.     That's the distinction I'm trying to make.

14    A.     I understand.  I thought that when I first wrote my

15           affidavit for Mr. Blair in the previous case that I

16           was being asked my opinion as to whether it was --

17           you know, things were more likely than not and in

18           that way giving my opinion based upon my

19           professional expertise.

20                And then for the last deposition it seemed to

21           me I was being asked questions in terms of my --

22           the questions I was being asked were basically my

23           interpretation of literature, reports, and things

24           of that sort that are outside the scope of just a

25           treating physician.
```

Sanford R. Katz, M.D.

```
 1              So it was my understanding during the last
 2         deposition that I was in fact being -- my
 3         deposition was in fact was as an expert.
 4    Q.   But that's not what -- at the last deposition when
 5         I asked you what things you'd reviewed, you hadn't
 6         reviewed anything since the time you prepared the
 7         affidavit in terms of general medical literature;
 8         is that correct?
 9    A.   Right.  I had -- I had prepared my affidavit.  I
10         reviewed literature for that affidavit.  And then
11         at the time of the last deposition, I had not
12         updated my -- it had been some time; so I had not
13         updated anything, my physician paper and any more
14         recent literature at that time.
15    Q.   Right.  But you had not looked at anything in
16         preparation for your deposition.  You had not
17         looked at any medical literature in preparation for
18         your deposition on July 7th; correct?
19    A.   I looked over my affidavit.  I looked over the IRC.
20         Those were the main things that I looked at prior
21         to that deposition.
22    Q.   Okay.  You understand that as an expert witness
23         that you're -- well, have you agreed to be an
24         expert witness in this case?
25    A.   Yes.
```

Sanford R. Katz, M.D.

```
 1   Q.   You understand that as an expert witness that you
 2        have an obligation to abide by the scheduling order
 3        that the Court has put into place?
 4   A.   No.
 5   Q.   Okay.  Well, has Mr. -- and I don't want to get
 6        into any communications between you and Mr. Joseph.
 7        But are you aware that there are deadlines by which
 8        your deposition has to be completed according to
 9        the Court's scheduling order?
10   A.   I'm not -- I've learned that there's been a time
11        crunch in the last couple weeks.
12   Q.   Okay.  Are you willing to make yourself available
13        to complete your deposition prior to the deadline
14        that the Court has set for completion of expert
15        depositions?
16   A.   And what is that date?
17   Q.   September 8th?
18   A.   I would have to -- I would have to look at my
19        schedule.  But I can't say yes or no without
20        looking at my schedule.  I know that I've made a
21        number of days available over the last week or two
22        that I understand there was some conflicts with
23        other people, but I certainly feel like I've
24        provided a number of days where I was available.
25        And this was the only day that I guess worked for
```

Sanford R. Katz, M.D.

```
 1      everybody.

 2  Q.  This is the only day that was offered to me period,

 3      and it's been on the calendar for weeks; so I don't

 4      know -- I have no knowledge of what you're talking

 5      about there.

 6              MR. JOSEPH:  I would disagree with that

 7          assessment, Joe.  A lot of what goes on in

 8          this case and a big part of the problem that I

 9          have is that I'm here dealing with you on a

10          deposition but I never talked to you.  All my

11          communications were with Anthony Martinez.

12              And so when Anthony reached out to me for

13          additional dates, we communicated those dates

14          to the doctor, and we're here now to take his

15          deposition.  So today is --

16              MR. PIORKOWSKI:  But this date has been

17          set --

18              MR. JOSEPH:  Today is Thursday the 2nd of

19          September.  Tomorrow is a holiday weekend.

20          He's not going to be sitting here taking a

21          deposition.  No one -- none of the people on

22          this call right here, not even the court

23          reporter, the videographer, hopefully yourself

24          is interested in taking depositions on the

25          weekend of a holiday weekend.
```

Sanford R. Katz, M.D.

```
 1                    So, I mean, we're here now, and we're
 2              prepared to proceed with the deposition.  The
 3              doctor has set the time aside.
 4                    You know, we've gone through waiting, the
 5              delays on getting the exhibits together.
 6              We're prepared to proceed at this point.
 7                    MR. PIORKOWSKI:  Well, I respectfully
 8              disagree.
 9      BY MR. PIORKOWSKI:
10      Q.   You understand, Doctor, that you're testifying
11           under oath?
12      A.   Yes.
13      Q.   If you don't understand any of my questions, you'll
14           ask me to clarify them?
15      A.   Yes.
16      Q.   If you go ahead and answer them, I'll assume that
17           you understood them; is that fair?
18      A.   Okay.  Yes.
19      Q.   Remember that we need to do verbal answers.
20      A.   Yes.
21      Q.   Try not to talk over other each other; all right?
22      A.   Yes.
23      Q.   There may be objections, I think you remember from
24           last time.  But unless you're instructed not to
25           answer, you go ahead and answer the question even
```

Sanford R. Katz, M.D.

```
 1        if there's an objection; understand?
 2   A.   Yes.
 3   Q.   If we need to take a break, just let me know and we
 4        can take a break.  All right.
 5             I want you to take a look, you can see in the
 6        exhibit folder, and we don't need to mark it, but
 7        there was a document that is marked as rule 702.
 8                  MR. PIORKOWSKI:  Is everybody able to
 9             access that?
10   BY MR. PIORKOWSKI:
11   Q.   Are you able to access that, Dr. Katz?
12   A.   I'm working on it.  Okay.  I see it.  I lost you
13        though.  One second.  Okay.  Yes, I can see it.
14   Q.   Okay.  And I'm going to represent to you that this
15        is Rule 702 of the Federal Rules of Evidence.
16             The reason I'm showing this to you is I am
17        going to ask you some questions that use some of
18        the language that's in here.  So I may ask you, for
19        example, whether you have -- do you see at the top
20        it talks about an expert who is qualified by
21        knowledge, skill, experience, training, or
22        education?
23   A.   Yes.
24   Q.   So I may specifically ask you about your knowledge,
25        skill, experience, training or education.  And
```

Sanford R. Katz, M.D.

```
 1        that's why I'm using those terms of art.  Okay?
 2   A.   Okay.
 3   Q.   And, similarly, I may ask you if you have
 4        scientific technical or other specialized knowledge
 5        in a particular area.  That's part A of the rule.
 6        Do you see that?
 7   A.   Okay.
 8   Q.   And I may ask you what facts or data, particular
 9        opinions that you are offering are based on.
10        That's also part of this rule.  Do you see that?
11   A.   Yes.
12   Q.   Okay.  All right.  And I'm going to do my best to
13        not replow things that we did last time, but
14        there's a couple things I need to update and make
15        sure that we update and lockdown.
16             You have not spoken with any current or former
17        employees of Monsanto or Bayer about any issues
18        related to this case; right?
19   A.   No.
20   Q.   You've not been provided with any internal Monsanto
21        documents that have been produced in connection
22        with the litigation?
23   A.   No.
24   Q.   And you've not read the deposition testimony or
25        trial testimony of any Monsanto scientists; is that
```

Sanford R. Katz, M.D.

```
 1        correct?

 2   A.   Correct.

 3   Q.   Have you -- do you have any education or experience

 4        in the marketing of pesticides?

 5   A.   No.

 6   Q.   Are you offering any opinion in this case

 7        criticizing the matter in which Monsanto marketed

 8        Roundup for residential use?

 9   A.   No.

10   Q.   Are you offering any opinions in this case

11        criticizing any aspect of Monsanto's conduct?

12   A.   No.

13   Q.   Are you offering the opinion that Roundup should be

14        taken off the market?

15   A.   No.

16   Q.   You understand that there have been -- that this is

17        one of many cases and that there have been a number

18        of cases that have gone to trial previously and

19        even currently.  Do you understand that?

20   A.   Yes.

21   Q.   And this question really pertains not to this case

22        but to Roundup litigation in general.  Have you

23        reviewed the reports of other experts who've been

24        designated by plaintiffs in the Roundup litigation?

25   A.   I have.
```

Sanford R. Katz, M.D.

```
 1   Q.   You have.  Which experts?

 2   A.   Dr. Portier, Dr. Weisenburger, and Ritz --

 3        Dr. Ritz.

 4   Q.   And when did you review those?

 5   A.   Yesterday.

 6   Q.   And why did you review those?

 7   A.   Mr. Joseph suggested that I review those prior to

 8        the deposition.

 9   Q.   And are you relying on any of those -- well, you

10        hadn't reviewed any of those at the time you

11        formulated your opinion; correct?

12   A.   That's correct.

13   Q.   Okay.  Are you relying on any of those -- let me

14        back up.  What exactly did you review?  Did you

15        review a report?  Did you review a deposition

16        transcript?  Did you review trial testimony?

17   A.   I reviewed the reports.

18   Q.   Okay.  And do you know with respect to -- do you

19        have the reports handy that you reviewed?

20   A.   I do.  I read them -- I read them on my computer.

21   Q.   Okay.  Can you tell me the dates of the reports?

22        Because some of those people issued multiple

23        reports.

24   A.   I mean, I have them physically also.  I printed

25        them out.  I can show you.
```

Sanford R. Katz, M.D.

```
 1   Q.   All I'm asking is what are the dates of the

 2        respective reports?

 3   A.   I can't -- I can't recall.  I would have to pull

 4        them up to tell you.

 5   Q.   Okay.  Are you relying on those reports as support

 6        for any of your opinions?

 7   A.   I agree with their opinions.  And I reviewed them,

 8        and I formulated my opinions prior.  And reading

 9        their opinions just basically confirmed my opinion.

10        So I basically agreed with their opinions.  My

11        opinions were consistent with theirs.

12   Q.   But you're not relying on them?  You're not going

13        to testify that it's so because Dr. Portier says

14        it's so?

15   A.   No. No.  My opinion was independent of reading

16        theirs.  But I read theirs, and they were just

17        consistent with mine.

18   Q.   Okay.  And have you reviewed any deposition or

19        trial testimony of any witness who's been

20        designated as an expert by plaintiffs?

21   A.   Any expert?  I don't -- no.

22   Q.   And have you spoken with anyone who has served as

23        an expert for the plaintiff in the Roundup

24        litigation?

25   A.   No.
```

Sanford R. Katz, M.D.

```
 1   Q.   Now, have you reviewed the reports of any experts
 2        who have been designated by Monsanto in the Roundup
 3        litigations?
 4   A.   I have not.
 5   Q.   So Mr. Joseph simply gave you -- gave you the one
 6        -- the reports from one side experts?
 7   A.   Actually, let me correct that.  Let me correct
 8        that.  I did read one report.  I don't recall the
 9        person, but they were arguing about statistics that
10        were used in one of the reports.  I can't remember
11        the specifics, but it was an argument over the
12        appropriateness of the statistics used.
13             I think it might have been Dr. Portier's
14        paper -- statement that was being criticized.  And
15        then he responded back that in fact these
16        statistics were -- were appropriate.  So I in fact
17        did read a retort.
18   Q.   Is this something that was in the published
19        literature or this was a report?
20   A.   No.  This was part of the documents that I was
21        provided.
22   Q.   And what expert was that?
23   A.   I would have to get back to you.  I didn't record
24        the name.  It was part of the file.
25                  MR. PIORKOWSKI:  Mr. Joseph, can you shed
```

Sanford R. Katz, M.D.

```
 1              any light on who that is?
 2                   MR. JOSEPH:  I'm not sure, but we can
 3              stipulate that no Monsanto expert is going to
 4              say that Roundup causes cancer.
 5                   MR. PIORKOWSKI:  What does that have to
 6              do with my question?  I'm asking what you
 7              showed him.
 8                   MR. JOSEPH:  You're asking me whether --
 9              are asking him whether or not I sent him
10              documentation from Monsanto experts?  That
11              would be an exercise in futility, counsel.
12                   MR. PIORKOWSKI:  No.  I'm asking you
13              whether you showed him -- gave him both sides
14              of the story or one side of the story.  And
15              I'm just asking you which specific expert you
16              showed him.  He identified an expert.  He said
17              he can't -- this should have all been produced
18              to us frankly, Curtis.
19                   I mean, this is not a hide-the-ball
20              situation.  You're supposed to put the cards
21              on the table and tell us exactly what he's
22              looked at, when he's looked at it, what the
23              dates of the reports are.  I shouldn't have to
24              spend time chasing down.
25                   MR. JOSEPH:  Do you have those document
```

Sanford R. Katz, M.D.

```
1              reports?
2                  MR. PIORKOWSKI:  I don't -- his
3              material's considered list doesn't have any
4              reports on it, and you haven't supplemented
5              anything or sent me an email saying he's also
6              looked at the following things.
7                  So I don't know which reports he's looked
8              at from Portier.  I don't know which reports
9              he's looked at from Weisenburger or Ritz.  And
10             I don't know the name of the other person
11             whose report you gave him.
12                 MR. JOSEPH:  It would have been, as he
13             indicated, in Portier's report.  Let's see
14             here.  I can tell you.  One second.  It looks
15             like Weisenburger's is April the 14th of '17.
16             Portier's is loading.
17                 MR. PIORKOWSKI:  Why don't I do this.
18             I'm just going to ask that whatever reports
19             have been provided to him be promptly -- that
20             we be promptly notified of which reports they
21             are and what the dates of the reports are.
22                 MR. JOSEPH:  I can do that.
23                 MR. PIORKOWSKI:  Okay.
24  BY MR. PIORKOWSKI:
25  Q.   Other than this one unidentified person who
```

Sanford R. Katz, M.D.

```
 1        responded to Portier's statistics, is there anybody
 2        else who gave a report on behalf of Monsanto whose
 3        report you've read, Dr. Katz?
 4   A.   No.
 5   Q.   Have you read any deposition or trial testimony of
 6        anyone who's been designated as an expert by
 7        Monsanto in the Roundup litigation?
 8   A.   No.
 9   Q.   Have you ever spoken to anybody who's an expert on
10        behalf of Monsanto in the Roundup litigation?
11   A.   No.
12   Q.   Have you discussed this case with any of your
13        colleagues?
14   A.   No.
15   Q.   Have you discussed your opinions with any person
16        who is serving as an expert witness in this case?
17   A.   No.
18   Q.   Is there any person you've talked to about this
19        case other than counsel for plaintiff?
20   A.   My partner knows I'm doing the deposition.
21   Q.   But no substantive discussion?
22   A.   No.
23   Q.   Okay.  If we go to the remote, there's a document
24        called -- actually, hang on one second.  You see
25        there's a document that I've entitled Katz MCL,
```

Sanford R. Katz, M.D.

```
 1        Dr. Katz?
 2   A.   Yes.
 3   Q.   And that's a list of materials considered; is that
 4        correct?
 5   A.   Let me pull it up.  Yes.
 6   Q.   And that's something that was prepared by you?
 7   A.   Yes.
 8   Q.   And let's mark that as Exhibit 2.
 9             (Exhibit No. 2 was marked for
10             identification and attached hereto.)
11   BY MR. PIORKOWSKI:
12   Q.   And then the document that says Blair (MDL wave
13        III) Second Amended Notice of Deposition.  I want
14        to mark that as Exhibit 3.
15             (Exhibit No. 3 was marked for
16             identification and attached hereto.)
17   BY MR. PIORKOWSKI:
18   Q.   Can you open that document, Dr. Katz?
19   A.   Yes.
20   Q.   And do you see on page 3 -- I think it's page 3.
21        There's a section that says "requests for
22        production."
23   A.   Let me find where page 3 is.  How do I -- I'm
24        looking for page 3.
25   Q.   Do you see where it says Exhibit A?
```

```
 1   A.    Okay.  Yeah.  I see it now.  "Request for
 2         Production," yes.
 3   Q.    All right.  So I want to go through this with you.
 4         Did you bring with you documents sufficient to show
 5         the total amount that you billed in connection with
 6         your work in the Roundup litigation including but
 7         not limited to your work in this case?
 8   A.    I've provided those to Mr. Joseph.  And Mr. Joseph
 9         -- some of that was provided last time at the last
10         deposition.  And Mr. Joseph has received all of
11         those, including most recent invoices.
12               MR. JOSEPH:  We have an updated invoice
13            that I can email you, Joe.
14               MR. PIORKOWSKI:  Yeah.  So let me just
15            see what we have.  I've received three things
16            that I'll mark as -- the document that says
17            Katz Marshall Jones Invoice 1, May 29th, 2019,
18            was in documents that were produced by
19            Mr. Joseph.  And we'll mark that as Exhibit 4.
20            (Exhibit No. 4 was marked for
21            identification and attached hereto.)
22               MR. PIORKOWSKI:  The one that is titled
23            Katz Marshall Jones Invoice 2 dated December
24            18th, 2019 will --
25               MR. JOSEPH:  I'm emailing you three now.
```

Sanford R. Katz, M.D.

```
 1                  MR. PIORKOWSKI:  Okay.  Let me finish
 2            what I'm saying.  And then there's one that
 3            says -- I'm going to highlight all three of
 4            these.  Then there's one that says Marshall
 5            Jones Invoice 3.  So those are the three
 6            invoices that have been produced so far.  Now,
 7            are there additional invoices in addition to
 8            those?
 9                  MR. JOSEPH:  What date do you show on
10            invoice No. 3?
11                  MR. PIORKOWSKI:  You should be able to
12            call it up, Curtis.  It's July 19th, 2021.
13                  MR. JOSEPH:  That's one we have.
14                  MR. PIORKOWSKI:  Okay.  So, Meredith, I'm
15            going to mark these as exhibits 4, 5, and 6
16            respectively.
17            (Exhibit No. 5 was marked for
18            identification and attached hereto.)
19            (Exhibit No. 6 was marked for
20            identification and attached hereto.)
21   BY MR. PIORKOWSKI,
22   Q.   And, Dr. Katz, are exhibits 4, 5, and 6 the only
23        invoices that you've issued to date for your work
24        as an expert in this case?
25   A.   I don't have those in front of me.
```

Sanford R. Katz, M.D.

```
1   Q.   Well, you should be able to access them from the

2        same shared document thing.

3   A.   Oh, I see what you're saying.  I'm sorry.  Yes,

4        those are the three.

5   Q.   Okay.

6             MR. JOSEPH:  If I may, Joe.

7             MR. PIORKOWSKI:  Yes.

8             MR. JOSEPH:  I apologize.  He's also

9        invoiced you guys for the deposition; is that

10       correct?

11            THE WITNESS:  He -- I'm not sure who that

12       would have went to.  I haven't seen it.

13            MR. JOSEPH:  Yes.  I think -- Did

14       Martinez pay, Dr. Katz?

15            THE WITNESS:  Yes.

16            MR. JOSEPH:  Yes, I think Martinez

17       provided first payment for the deposition.  I

18       think they also provided advanced payment for

19       today's deposition.  I believe that's correct.

20            MR. PIORKOWSKI:  Okay.  All right.  I'll

21       make note of those.

22  BY MR. PIORKOWSKI:

23  Q.   Are these the only exhibits -- are these three

24       exhibits, 3, 4 -- I'm sorry.  Exhibits 4, 5, and 6,

25       are these the only invoices you've issued to
```

Sanford R. Katz, M.D.

1          plaintiff; correct?

2    A.    Correct.

3    Q.    And so as I understand, this Exhibit 4 is --

4          relates to work that you did in connection with the

5          affidavit for the workers' comp case; correct?

6    A.    Okay.  Exhibit 4 is?  What's the title?

7    Q.    It's May 29th, 2019.

8                   MR. JOSEPH:  That'll be invoice one.

9    BY MR. PIORKOWSKI:

10   Q.    Yeah, invoice one.

11   A.    That's correct.

12   Q.    So this relates only to the work you did with

13         relation to the affidavit; correct?

14   A.    That's correct.

15   Q.    Okay.  And then invoice two in the amount of 375,

16         which we've marked as Exhibit 5, that relates to

17         work you did looking at the National Cooperative

18         Care Guidelines before you prepared a letter;

19         correct?

20   A.    Correct.

21   Q.    And this wasn't related to this litigation, per se;

22         right?

23   A.    That's correct.

24   Q.    Okay.  And then invoice three is work that you've

25         done since the last deposition on July the 7th;

Sanford R. Katz, M.D.

```
 1        correct?

 2   A.   That's correct.

 3   Q.   Okay.  And on -- was this issued on July 19th?

 4        This invoice?

 5   A.   Yes.

 6   Q.   Okay.  And you've obviously, based on what you were

 7        saying, done additional work since July 19th; is

 8        that correct?

 9   A.   Yes.

10   Q.   So what additional work have you done since

11        July 19th?

12   A.   I read those three physician papers that I

13        referenced earlier.

14   Q.   The three plaintiff expert reports?

15   A.   That's correct.

16   Q.   Okay.  And anything else?

17   A.   That's it.

18   Q.   Have you -- have you reviewed any of the defense

19        expert reports that were issued in this case?

20   A.   I'm sorry.  Let me clarify one thing.  I've also

21        reviewed Mr. Blair's deposition as well.

22   Q.   Okay.  I was going to ask you that.  You hadn't

23        done that before your last deposition; correct?

24   A.   I had not.

25   Q.   Yeah.  And is there any other specific things
```

Sanford K. Katz, M.D.

```
 1        related to Mr. Blair or Mr. Blair's -- well, what
 2        I'm trying to differentiate is on the list of
 3        materials considered that we marked as Exhibit 2,
 4        all of that is general scientific or regulatory
 5        information; correct?  None of it's specific to
 6        Mr. Blair?
 7   A.   Exhibit 2, again, is which one?
 8   Q.   Is your materials considered list.
 9   A.   Yes.  That's general.
10   Q.   So that's all general.  So in terms of other
11        specific things that you looked at, other than
12        Mr. Blair's deposition, is there anything specific
13        to Mr. Blair that you've looked at since July 7th?
14   A.   No.
15   Q.   So you spent a total of nine hours of time; is that
16        right?
17   A.   Since our last deposition plus three hours
18        yesterday.
19   Q.   Okay.  Let me -- so other than this invoice for
20        nine hours --
21   A.   Actually, it was four hours.
22   Q.   Four hours reading the physician papers?
23   A.   The physician papers and Mr. Blair's deposition.
24   Q.   Okay.  Had you read Mr. Blair's deposition before
25        you issued your report or no?
```

Sanford R. Katz, M.D.

```
 1   A.   I did not, no.

 2   Q.   Okay.  And anything else -- have you had meetings

 3        with counsel?

 4   A.   Telephone conversation regarding, you know, reading

 5        these three, you know, physician papers.

 6   Q.   Okay.  And other than that, you haven't had any

 7        meetings or anything of that nature?

 8   A.   No formal meetings, no.

 9   Q.   So if you were going to issue an invoice for the

10        time since July 19th, you would issue it for four

11        hours?

12   A.   Yes.

13   Q.   Okay.  Now I want to ask you about this -- how the

14        time you spent.  You have a total of nine hours.

15        And I assume part of that nine hours is actually

16        writing your report; is that right?

17   A.   Yes.

18   Q.   How much of the nine hours was spent writing the

19        report?

20   A.   Maybe an hour and a half to two hours.

21   Q.   Okay.  And how did you spend the rest of the time?

22   A.   Reading the -- reading those papers, reading those

23        documents.

24   Q.   The documents that are listed in your materials

25        considered list?
```

Sanford R. Katz, M.D.

```
1   A.   That's correct.

2   Q.   Okay.  All right.  So let's go back to -- we were

3        talking about the Notice of Deposition.  We had

4        gone over invoices, which was No. 1 and No. 2.

5        No. 3 is -- asks for all documents reflecting

6        information about the concentration, potency, and

7        dose of Roundup to which Mr. Blair was exposed.

8             Are there any other separate documents besides

9        the medical records that indicate anything with

10       respect to those matters?

11  A.   Only the deposition where he described it.

12  Q.   All right.  Just his general description at the

13       deposition of his usage is what you're referring

14       to; is that right?

15  A.   Yes.

16  Q.   Okay.  Sorry, the sound.

17  A.   No worries.

18  Q.   So did you perform any calculations concerning

19       concentration, potency, or dose to which he was

20       exposed?

21  A.   I did -- I did this morning, yes.

22  Q.   You did this morning?

23  A.   This morning, yeah.  I wrote down some notes when I

24       read the deposition in terms of number of gallons

25       that he stated would be sprayed on him, splashed on
```

Sanford R. Katz, M.D.

1      him that he would get exposed to.

2          So I kind of wrote down how many gallons that

3      might average a day and then differentiated between

4      whether those gallons were -- those volumes were

5      concentrated or if they were diluted.

6   Q.  And how did you determine whether they were

7      concentrated or diluted?

8   A.  He answered the question that when he was mixing

9      that it would be concentrated sprayed and the other

10     times it would be diluted.

11  Q.  So today was the first time you did a calculation

12     of this type?

13  A.  Today was the first day I did the calculation

14     because yesterday was the first day that I had a

15     general sense of exactly how many gallons we were

16     referring to.  I based -- my previous impressions

17     were based upon information that he had given me,

18     but they weren't quite as detailed in terms of

19     number of gallons with respect to specific

20     activities and whether they were concentrated or

21     diluted.

22  Q.  I'm sorry.  I'm missing something.  What

23     information did you get yesterday about the number

24     of gallons he used on a daily basis?

25  A.  It was from his deposition.

Sanford R. Katz, M.D.

```
 1   Q.   I see.  So because you hadn't read his deposition

 2        before, you didn't know the number of gallons is

 3        what you're saying?

 4   A.   Correct.

 5   Q.   Okay.  But all of the information that you are

 6        basing your calculation on is information that's

 7        contained in his deposition?

 8   A.   Correct.

 9   Q.   Okay.  All right.  Does your materials considered

10        list include all of the documents that you have

11        reviewed or are going to be relying on to support

12        your opinions in this case?

13   A.   It includes -- yes.  It includes those.

14   Q.   Okay.  Now, you said you provided a current

15        curriculum vitae.  And I haven't had a chance to go

16        through the new one.  Yet.  Actually, let's mark

17        the September 1st, 2021, CV as Exhibit 7.

18             (Exhibit No. 7 was marked for

19              identification and attached hereto.)

20   BY MR. PIORKOWSKI:

21   Q.   Now, to save us a little bit of time, were there

22        updates to Exhibit 7 other than -- let me rephrase

23        the question.  Were there changes to Exhibit 7

24        other than updating your CV with things that have

25        been published or added since it was last updated?
```

Sanford R. Katz, M.D.

```
 1   A.   Yes.  I checked to see if some of my memberships
 2        were active or up to date.  And so the ones that I
 3        couldn't verify that they were up to date, I
 4        deleted them because I couldn't confirm that they
 5        were or they were not.
 6   Q.   Okay.  And do you remember which ones you deleted?
 7   A.   I could tell you if I pull up the old one.
 8   Q.   Was --
 9   A.   It was basically organizations.  So I think it may
10        have been the Radiologic Association of North
11        America.
12   Q.   Okay.
13   A.   The Southern Medical Association.
14   Q.   Okay.  Are you still a member of the Louisiana
15        State Medical Association?
16   A.   I'm not certain.  I know I'm a member of the
17        Shreveport Medical Society.  I received just two
18        days ago a bill from the Louisiana State Medical
19        Society.  So I think I'm no longer current.
20   Q.   Okay.  Is that --
21   A.   So I removed that from my CV.  And -- yeah.
22   Q.   Are you planning to discontinue your membership, or
23        you just deleted it out of an abundance of caution?
24   A.   I'm planning on renewing my membership, but I don't
25        believe I'm necessarily a member in good standing
```

Sanford R. Katz, M.D.

```
 1        at this time so I deleted it.
 2   Q.   I see.  All right.  So other than updating to make
 3        sure your memberships were current, were there
 4        publications that you've had since your last CV?
 5   A.   There were no publications.  There were some new
 6        studies that I'm a primary investigator for, and I
 7        added those.
 8   Q.   Okay.
 9   A.   There was also -- there was something else I
10        removed as well.  Oh, I also removed my District of
11        Columbia controlled substances license.  That was
12        outdated and hadn't been accurate for some time.
13        It was an oversight.
14   Q.   You still maintain a current District of Columbia
15        medical license?
16   A.   I don't.
17   Q.   Do you have your CV handy?
18   A.   Yeah.  Let me -- yes.
19   Q.   Okay.  I just want to go over a couple of things
20        with you.  Because if you recall at the last
21        deposition you emailed it to me I think towards the
22        end, but we didn't really have a chance to go
23        through this.
24   A.   Okay.
25   Q.   So publications, I know you have one that's listed
```

Sanford R. Katz, M.D.

```
1         as in progress.  Does this include all of your

2         publications within the last ten years?

3    A.   Yes.  Yes, as far as I can recall.

4    Q.   To your knowledge, does this include all of your

5         publications going back to -- I guess the first one

6         is 1988?

7    A.   To the best of my knowledge.

8    Q.   All right.  You have a section that says "research

9         principal investigator."  Does this section cover

10        all of the research you've done as a principal

11        investigator?

12   A.   Yes.

13   Q.   Dating back to -- I don't see dates on any of

14        these; so it's hard to tell.

15   A.   Yeah.  There aren't dates; you're right.

16   Q.   Okay.  All right.  Now, you have a section here

17        called current clinical research.  Do you see that?

18   A.   Yes.

19   Q.   Okay.  So how does current clinical research differ

20        from research principal investigator?  Are they

21        overlapping?  Are they discreet?

22   A.   Yeah.  So the current clinical research is research

23        that I'm participating in currently.  Which I may

24        --  yeah, that I'm currently participating in.  I

25        may or may not be the primary investigator, but I
```

Sanford R. Katz, M.D.

```
 1          am a participant at my facility.
 2    Q.    So in the current clinical research, you could
 3          either be an investigator or the principal
 4          investigator?  Is that what you're saying?
 5    A.    That's correct.  I could be a sub-I or a PI.
 6    Q.    Okay.  And are there any of these that are listed
 7          in both sections, or is the current clinical
 8          research is sort of the trump card, if you will?
 9          Do you follow what I'm asking?
10    A.    I follow what you're asking.  I think there are
11          maybe two overlaps.  Maybe three overlaps.  I
12          believe there are three overlaps.  Yeah, three
13          overlaps.
14    Q.    And does the current clinical research section of
15          your CV that we've marked as Exhibit 7 reflect, to
16          the best of your knowledge, all of the current
17          clinical research you have going on?
18    A.    I believe that this reflects the current clinical
19          research going on in my department to the best of
20          my knowledge.
21    Q.    Is there other research -- you added a caveat, "in
22          my department."  Is there other current clinical
23          research you're involved with that's not in your
24          department?
25    A.    No.
```

Sanford R. Katz, M.D.

```
 1   Q.   All right.  You have a section called consulting.

 2        Is this consulting with device companies and pharma

 3        companies and that sort of thing?

 4   A.   That's correct.

 5   Q.   And what does that involve?  Just giving them your

 6        opinion or things of that nature?

 7   A.   It depends on the particular company.  My

 8        relationship varies from project to project.

 9   Q.   And does this section in your CV on consulting

10        reflect all the consulting that you've done in the

11        last -- since July of 2008?

12   A.   That's correct.

13   Q.   And then there's a section on presentations?

14   A.   Yes.

15   Q.   And are these presentations that you give in

16        various capacities as a physician, professional

17        presentations?

18   A.   Yes.

19   Q.   So they range from things like Grand Round to

20        presentations at professional meetings; is that

21        correct?

22   A.   That's correct.

23   Q.   Okay.  And this dates back to 2001 -- roughly 2001;

24        right?

25   A.   That's correct.
```

Sanford R. Katz, M.D.

```
 1    Q.   Do all of the presentations that you've given since
 2         2001, are they reflected in your CV that we've
 3         marked as Exhibit 7?
 4    A.   No.
 5    Q.   No?
 6    A.   No.
 7    Q.   What else is --
 8    A.   I have not been very diligent about updating my CV
 9         every time I give a talk here.  You know, I just
10         haven't.  There's a number of talks I've given that
11         I've just never recorded, and I can't recall where
12         they were or when they were.  So it was just not
13         something I emphasized unfortunately.
14    Q.   Okay.  Is there anything you can think of offhand?
15    A.   Not specifically.  I'll give a Grand Rounds or I'll
16         give a talk to -- in a department at Los Angeles
17         ENT or oral and maxillofacial surgery.  I do talks
18         as part of my academic position, my faculty
19         position.  But like I said, I don't always write it
20         down.
21    Q.   Okay.
22    A.   Usually it's of the same nature.
23    Q.   And what is media?  What does that section refer
24         to?
25    A.   This one is also not updated.  I guess for the last
```

Sanford R. Katz, M.D.

```
 1          seven years or so I am a host of a radio program.
 2          A live call-in one-hour radio program about health
 3          and health-related issues on our local public radio
 4          station.
 5               So typically once every three weeks or once
 6          every month and a half I'll have physicians,
 7          medical experts on, and we'll discuss a particular
 8          topic and we'll take callers.  And I'm the
 9          moderator of that show.  And that hasn't been
10          updated either.
11   Q.    Okay.  And then the last section is community or
12          volunteer service.  All right.  I believe we talked
13          last time and you said you had not testified as an
14          expert in the last four years.  And that's still
15          correct; right?
16   A.    That's right.
17   Q.    And you had a case pending against -- where you
18          were a defendant; is that correct?
19   A.    That's right.
20   Q.    Has there been any development in that since your
21          last deposition?
22   A.    It was dropped.
23   Q.    The case was dropped?
24   A.    Correct.
25   Q.    Was it dismissed or was it settled?
```

Sanford R. Katz, M.D.

```
 1   A.   They just dropped my -- dropped the case against

 2        me.

 3   Q.   Okay.

 4   A.   When you say "dismissed" -- I don't know what you

 5        mean by dismissed.

 6   Q.   Well, the difference is, you know, if there's a

 7        case that's filed it -- dismissed means there's no

 8        payment and they just decided to give up and drop

 9        the case.  Settled means, you know, you made a

10        payment or somebody made a payment on your behalf,

11        and then subsequent to the payment the case was

12        dismissed by the parties.

13   A.   It was dismissed and no payment was made.

14   Q.   Okay.  All right.  And No. 10 talks about other

15        communications, but you said you haven't had any of

16        those.

17             All right.  Have you -- I don't think we

18        talked last time -- I know you said you hadn't done

19        any testifying.  But have you done any case reviews

20        as an expert --

21   A.   No.

22   Q.   -- on behalf of anyone?  No?

23   A.   No.

24   Q.   Okay.  I want to turn to your list of materials

25        considered that we marked as Exhibit 2.  Now, did
```

Sanford R. Katz, M.D.

```
 1         you prepare this list?

 2    A.   I did.

 3    Q.   Okay.  And are there any articles that you reviewed

 4         in the process of, you know, conducting your review

 5         that you considered but chose not to include on the

 6         list?

 7    A.   No.

 8    Q.   Okay.  And there's a total of 13 documents listed

 9         here; is that right?

10    A.   Yes.

11    Q.   Okay.  And at your deposition on July 7th, I

12         believe you testified that you had read the IARC

13         Monograph, but you couldn't recall specifically

14         anything else that you had read; is that correct?

15    A.   That's correct.  Just to clarify, I had reviewed

16         some other things but I didn't -- I reviewed them

17         online.  I didn't print them out.  I didn't have

18         authorship; so I couldn't specifically site them.

19              So what you had asked me to do was to go back

20         and try to recall exactly what it was that I had

21         read if I could reconstruct my literature search

22         and compile those papers.  So that's what I did is

23         I compiled the papers that I had reviewed

24         previously, and I also added some additional ones

25         that were new that I read subsequently.
```

Sanford R. Katz, M.D.

```
 1   Q.   All right.  Well, when I asked you the last time
 2        you said there was no way that you could
 3        reconstruct the list; right?
 4   A.   I don't know if I said there was no way, but I said
 5        it was difficult.  And so I went and I was able to
 6        do it.  Because when you do a PubMed search, it can
 7        show you what you've already looked at, you know.
 8   Q.   All right.  So did you do a PubMed search?  Was
 9        that the first step in the process here?
10   A.   Yes.  I went back and did a PubMed search looking
11        for the ones that I had looked at previously.  And
12        I was able to see -- I can't say that every single
13        one that I looked at previously was necessarily
14        included, but I was able to see by a different
15        highlighted color which ones had been previously
16        reviewed.  And I was then able to reconstruct to
17        some degree a list.  And then I added additional
18        ones.
19   Q.   Okay.  So can you -- do you have the list of
20        materials considered in front of you?
21   A.   I do.
22   Q.   Can you tell me which ones you had reviewed
23        previously?
24   A.   I wouldn't be able to distinguish.  I didn't
25        specify.  I can tell you that the ones that were
```

Sanford R. Katz, M.D.

```
 1        published following my last position paper were

 2        ones that I had not reviewed previously.

 3   Q.   Okay.  When you say you did a PubMed search, does

 4        PubMed highlight things you've looked at

 5        previously?

 6   A.   It typically does.  You can kind of see what was

 7        highlighted, previously reviewed.

 8   Q.   Okay.  Now, did you -- since July 7th, did you

 9        re-review the IARC Monograph or any part of it?

10   A.   No.

11   Q.   So the only review you did was prior to your

12        previous deposition?

13   A.   Oh, okay.  I guess I misunderstood the question.  I

14        reviewed it prior to preparing my most recent

15        position paper.

16   Q.   Okay.  You reviewed it -- let's just make the

17        record clear.  You reviewed it prior to preparing

18        your affidavit previously; right?

19   A.   Correct.

20   Q.   You looked at it again previous to your July 7th

21        deposition?

22   A.   Correct.

23   Q.   And then you looked at it again prior to the

24        preparation of your report on July 18th; right?

25   A.   That's correct.
```

Sanford R. Katz, M.D.

```
 1   Q.   Okay.  And of the nine hours that you spent between

 2        July 7th and July 18th, how much time of that was

 3        devoted to reviewing the IARC 112 Monograph?

 4   A.   I don't recall specifically.

 5   Q.   Your best approximation?

 6   A.   Probably 30 minutes.

 7   Q.   Did you read it from cover to cover, or did you

 8        just look at the conclusions in certain sections?

 9   A.   I looked at areas that I had highlighted

10        previously.  And the other thing that I did was I

11        also went to primary sources.

12             Whereas previously I reviewed the IARC

13        Monograph.  And when I prepared my more recent

14        deposition paper, in some cases I may have gone

15        back and looked for the specific reference pulling

16        up the papers cited and then reading those papers

17        -- the original papers in greater detail.

18   Q.   So are the original papers cited here on this list?

19   A.   Yes.

20   Q.   Okay.  So what original papers are you referring to

21        specifically?

22   A.   I don't recall.  I mean, I think all the ones that

23        predated -- I shouldn't say all.  Many or perhaps

24        most of the papers cited were probably listed in

25        the monograph but not all of them.
```

Sanford R. Katz, M.D.

1    Q.    Well, actually, there's only two -- three

2          references on here that predate the monograph it

3          looks like.

4    A.    Okay.

5    Q.    Well, maybe four.  So the Andreotti study hadn't

6          been published yet; right?

7    A.    If it predated --

8    Q.    Post-dated.

9    A.    -- post-dated the monograph then, no.

10   Q.    Okay.  Are there any original papers that you went

11         back and looked at that aren't listed on this list

12         of materials considered?

13   A.    No.

14   Q.    Okay.  When you looked at the IARC Monograph --

15         hang on one second.  When you looked at the IARC

16         Monograph, you're aware that during that meeting

17         that IARC had in 2015, they evaluated five

18         different pesticides.  You're aware of that?

19   A.    Yes.

20   Q.    Okay.  Did you just look at the section on

21         glyphosate?

22   A.    Primarily, yes.

23   Q.    When you say "primarily," did you secondarily look

24         at other things?

25   A.    No.  I mean, it may have been included in some

Sanford R. Katz, M.D.

```
1        sections where they may have included reference to
2        another herbicide or pesticide and it was part of
3        the same sentence.  So, you know, I didn't exclude
4        that information, but my interest was in
5        glyphosate.
6    Q.  Okay.  And did you by chance look at the section --
7        review the section at all on malathion?
8    A.  I did not.
9    Q.  Now, am I correct that as of July 7th, at the time
10       of your last deposition you had already made up
11       your mind that glyphosate causes non-Hodgkin's
12       lymphoma and that in your opinion glyphosate more
13       likely than not caused Mr. Blair's lymphoma; is
14       that correct?
15   A.  Your statement was not correct.
16   Q.  What's not correct about it?
17   A.  I think my opinion was that it more likely than not
18       caused Mr. Blair's lymphoma.  But I wouldn't say
19       that necessarily the first statement is correct.
20       Can you repeat the first part of your statement?
21   Q.  Well, yeah.  Glyphosate could not have caused
22       Mr. Blair's lymphoma unless glyphosate causes
23       non-Hodgkin's lymphoma; right.
24   A.  Okay.  I think we're splitting hairs but I think,
25       fine, yes.
```

Sanford R. Katz, M.D.

```
 1   Q.   Well, let me rephrase it because I don't want you
 2        to agree to something that you don't want to agree
 3        with.  You had already reached the opinion as of
 4        July 7th that glyphosate more likely than not
 5        caused Mr. Blair's non-Hodgkin's lymphoma; correct?
 6   A.   His, yes.
 7   Q.   Okay.  And his glyphosate could not have caused his
 8        lymphoma unless glyphosate at least can potentially
 9        cause non-Hodgkin's lymphoma; correct?
10   A.   Yes.  And that's -- I think that's the distinction.
11        I think it can, yes.
12   Q.   It can.  It doesn't in all cases?
13   A.   Exactly.  That's my opinion.
14   Q.   In fact, it doesn't in most cases; right?
15   A.   I don't know about that.  I can't -- I mean, I
16        think the question was -- as I understood it -- was
17        Mr. Blair's cancer more likely than not caused by
18        Roundup, and I believe that that's a true
19        statement.
20   Q.   Do you know scientifically whether it's true that
21        in the vast, vast majority of people who are
22        exposed to glyphosate that they do not develop
23        non-Hodgkin's lymphoma?  Do any of the scientific
24        --
25   A.   I would agree that that's a correct statement.
```

Sanford R. Katz, M.D.

```
 1   Q.   Okay.  Now, there are two EPA documents on your

 2        list; correct?

 3   A.   Yes.

 4   Q.   One is an EPA review of glyphosate from 2017; is

 5        that right?  Actually, you know what I want to do.

 6        I need to -- for some reason it's not letting me

 7        move my documents and introduce them.  And I want

 8        to give you the benefit of being able to look at

 9        things that we're talking about.  So do you want to

10        take five minutes bathroom break?

11                  THE WITNESS:  Okay.

12                  THE VIDEOGRAPHER:  Give me one second.

13             Let me go off the record.

14                  MR. PIORKOWSKI:  Is that okay with you,

15             Curtis?

16                  MR. JOSEPH:  Yes.  I could use a break

17             myself.

18                  THE VIDEOGRAPHER:  Okay.  It is 2:24 p.m.

19             and we are now off the record.

20             (A short recess was taken.)

21                  THE VIDEOGRAPHER:  Okay.  It is

22             2:39 p.m., and we are now on the record.

23   BY MR. PIORKOWSKI:

24   Q.   All right.  Doctor, we were talking about the IARC

25        monograph.
```

Sanford R. Katz, M.D.

```
 1                MR. PIORKOWSKI:  Is that -- can people
 2          see that or not?
 3                MR. JOSEPH:  I'm still looking at the
 4          list of materials considered.
 5                THE WITNESS:  No, there's nothing there.
 6                MR. PIORKOWSKI:  Oh, man.  Let me see if
 7          I can do this a different way.  The access --
 8          can you guys see Katz MCL articles or not?
 9                MR. JOSEPH:  They're in the folder?
10                MR. PIORKOWSKI:  Yeah.  Are they in the
11          folder?  Can you guys access them?
12                MR. JOSEPH:  Not yet.  I see MCL.  The
13          last thing I have is (inaudible) 2019.
14                MR. PIORKOWSKI:  All right.  Let me try
15          this.  Exhibit 8.
16                MS. HOVIS:  There's still only ten
17          documents.  So there's no new documents in
18          there yet.
19                MR. PIORKOWSKI:  All right.  Is that
20          showing Exhibit 8 as IARC Monograph?  It says
21          successful introduced.
22                MS. HOVIS:  Yes, there's now 11 files.
23                MR. PIORKOWSKI:  Can you see the IARC
24          Monograph?
25                MS. HOVIS:  Yeah.  Exhibit 8.  It says
```

```
 1              Exhibit 8.
 2                   MR. JOSEPH:  Yes.  Got it.
 3                   MS. HOVIS:  Yes.  IARC monograph when you
 4          open it.
 5                   MR. JOSEPH:  464 pages?
 6                   MR. PIORKOWSKI:  Yeah.
 7   BY MR. PIORKOWSKI:
 8   Q.  So Doctor, just for the record --
 9                   MR. PIORKOWSKI:  I'm sorry.  Are we back
10          on the record yes or no?
11                   THE VIDEOGRAPHER:  Yes, sir.  We are back
12          on the record.
13   BY MR. PIORKOWSKI:
14   Q.  So Doctor, Exhibit 8 is the IARC Monograph that we
15          were eluding to before; is that right?
16   A.  I'm looking for that.
17               (Exhibit No. 8 was marked for
18                identification and attached hereto.)
19   A.  I see.  Okay.  I have it.
20   BY MR. PIORKOWSKI:
21   Q.  And I just want to confirm that that's the 112
22          Monograph that we were talking about before; is
23          that right?
24   A.  It is.
25   Q.  And let me just ask you, with respect to Hawkins,
```

Sanford R. Katz, M.D.

```
 1        do you have these papers on your own computer or

 2        no?

 3   A.   The ones that are on my list?

 4   Q.   The ones that are on your list, yeah.

 5   A.   They're in a box.

 6   Q.   Do you have it there with you?

 7   A.   Yes.

 8   Q.   Okay.  Let me just -- I'm having trouble to get

 9        this share function to work.  So maybe if you can

10        just access them, we can talk about them.  I want

11        to ask you about the two EPA documents that you

12        have.

13   A.   Okay.

14   Q.   One is a 2017 review.

15   A.   Do you want me to try to go find them in my box?

16   Q.   What do you mean?  Do you have a box right there?

17   A.   When you asked me if I have them, you mean do I

18        have them on the screen in front of me?

19   Q.   Well, do you have access to them?

20   A.   I have a box where I have papers that I have

21        reviewed.

22   Q.   Right there in your office or?

23   A.   I can check to see if I do.

24   Q.   Okay.  Yeah.  This is why remote was a bad idea.

25        All right.  Yeah.  Go ahead and please check.
```

```
 1   A.    To make things easier, can you tell me the --

 2   Q.    Well, I actually want to go through all of the

 3         things on your list.  So if you have a box with

 4         those things in it, we can just go through them

 5         together.

 6   A.    Okay.  Which one do you want to start with?

 7   Q.    I want to start with the two EPA documents.  We

 8         already talked about IARC.  That's one of the

 9         documents; right?

10   A.    Okay.  Is there an author?

11   Q.    There are two documents.  One of them, the author

12         is Hawkins it says.

13   A.    This one that's on here?

14   Q.    Let me see.

15   A.    It says Hawkins; that's correct.  Monica Hawkins.

16   Q.    Right.  And it's entitled -- that's the first thing

17         on your list -- Updated Review of Glyphosate; is

18         that right?

19   A.    Yes.

20   Q.    Incident Reports.  Okay.  So we're going to mark

21         that as Exhibit 9.

22              (Exhibit No. 9 was marked for

23              identification and attached hereto.)

24   BY MR. PIORKOWSKI:

25   Q.    And my question is did you review that?
```

Sanford R. Katz, M.D.

```
 1   A.   Yes.

 2   Q.   And what's the relevance of that to whether

 3        glyphosate can cause cancer or non-Hodgkins

 4        lymphoma?

 5   A.   I think the basis was that there are potential side

 6        effects that are reported but may not be considered

 7        formally when the EPA puts out a position.  But

 8        they do in fact record other things that, you

 9        know -- that not be -- may never be stated in their

10        report or in the literature.

11   Q.   I'm not sure what -- what does that have to do with

12        whether it can or can't cause cancer?

13   A.   Well, it just kind of -- I guess it's just a sense

14        of the reliability -- not reliability but perhaps

15        the -- when looking at the EPA's reports or

16        conclusions, you know, since they conflict with

17        some of the other conclusions that other

18        investigators or other agencies have reported, that

19        I think it was relevant to me that -- to see what

20        other information that the EPA has at their

21        disposal that may or may not be included when they

22        issue a report.

23   Q.   Well, that's just -- are you familiar with adverse

24        event reports?

25   A.   Yes.
```

Sanford R. Katz, M.D.

```
 1   Q.   Medications.  Basically what Exhibit 9 is, is it's
 2        a bunch of adverse event reports on glyphosate;
 3        correct?
 4   A.   Yes.
 5   Q.   And adverse event reports are reported without any
 6        relationship to whether there is or isn't a cause
 7        and effect relationship; correct?
 8   A.   I understand that.
 9   Q.   And so does the Hawkins paper have any bearing on
10        whether glyphosate does or doesn't cause cancer or
11        cause NHL?
12   A.   No.  But I looked at it; so I included it on my
13        list.
14   Q.   Okay.  And I appreciate that.  I'm just trying to
15        determine whether there's something in that paper
16        that you believe supports your conclusion?
17   A.   No, I don't believe it supports the conclusion.
18   Q.   Okay.
19   A.   It's just something I looked at; so I wrote it
20        down.
21   Q.   Okay.  You just made the statement that EPA's
22        conclusion was different than other agencies.  Did
23        I hear you right?
24   A.   I shouldn't have used the term agency.
25        Organizations perhaps is a better term.
```

Sanford R. Katz, M.D.

```
 1   Q.   What other organizations?

 2   A.   The World Health Organization for example.

 3   Q.   Well, so first of all, is there any other -- you

 4        said organizations.  Is there any other

 5        organization besides IARC that you're aware of that

 6        has made the determination that glyphosate can

 7        cause cancer?

 8   A.   Not that I'm aware.  I'll rephrase that to say

 9        organization.

10   Q.   Okay.  And you know there's actually a

11        determination by another group at WHO that

12        glyphosate does not cause cancer?  Did you see

13        that?

14   A.   I'm not familiar with that.

15   Q.   Okay.  All right.  So let's turn to the other

16        document on your list that is -- I think it's at

17        the top of the second page.  It's called Revised

18        Glyphosate Issue Paper dated September 12th, 2017.

19        There's no particular author on it.

20             MR. PIORKOWSKI:  And, Meredith, I want to

21           mark that as Exhibit 10.

22           (Exhibit No. 10 was marked for

23           identification and attached hereto.)

24   A.   I don't see it.  I'm sorry.  I don't see it here in

25        my file.  It's possible that that may not have
```

Sanford R. Katz, M.D.

```
 1        gotten printed out and it may have just been viewed

 2        online.

 3                    MR. PIORKOWSKI:  Can everybody see

 4             Exhibit 10 that I just marked?

 5                    MS. HOVIS:  I can see that.

 6                    MR. JOSEPH:  216-page EPA report?

 7                    MR. PIORKOWSKI:  Yes.

 8   BY MR. PIORKOWSKI:

 9   Q.   Can you see that, Dr. Katz?

10   A.   I can see it.

11   Q.   Okay.  That's the document that you're referring to

12        on your materials considered list; correct?

13   A.   That's correct.

14   Q.   And as -- when you -- we were talking about the

15        nine hours you spent.  Approximately how much time

16        did you spend reviewing this document?

17   A.   I don't recall.

18   Q.   What's your best estimate?

19   A.   I wouldn't want to speculate.  I really don't

20        recall.

21   Q.   Okay.  Now, included in your -- also included in

22        your materials considered list are five

23        meta-analyses; correct?

24   A.   Yes.

25   Q.   And those included a meta-analysis by Donato; is
```

Sanford R. Katz, M.D.

```
1        that right?

2   A.   Yes.

3   Q.   And I've marked that as Exhibit 11.

4             (Exhibit No. 11 was marked for

5             identification and attached hereto.)

6   BY MR. PIORKOWSKI:

7   Q.   Do you have that?

8   A.   I do.

9   Q.   And I just want to make sure that the exhibit that

10       I marked is the same paper that exhibit -- the same

11       paper that you reviewed; that's correct; right?

12  A.   Let me just confirm that.  Let me see.  Yes.

13       That's the same one.

14  Q.   Okay.  And there's another meta-analysis by Zhang

15       that I've marked as Exhibit 12.

16            (Exhibit No. 12 was marked for

17            identification and attached hereto.)

18  BY MR. PIORKOWSKI:

19  Q.   Is that the same one to which you were referring?

20  A.   It looks a little different on the front, but it

21       may have been printed in a different format.  It

22       looks like the same one, but it's printed slightly

23       differently, but I believe that's the same.

24  Q.   If you have a hard copy, do you want to take a

25       second and double-check to make sure it's the same
```

Sanford R. Katz, M.D.

1      paper?

2  A.   Yeah, it is.

3  Q.   It is.  Okay.  And then I've marked Leon as -- I'm

4       sorry.  I marked Chang as Exhibit 13; is that

5       right?

6            (Exhibit No. 13 was marked for

7            identification and attached hereto.)

8  BY MR. PIORKOWSKI:

9  Q.   Can you access that?

10 A.   Yes.  Same one.

11 Q.   I've marked Schinasi I believe as Exhibit 14.

12           (Exhibit No. 14 was marked for

13           identification and attached hereto.)

14           MR. PIORKOWSKI:  I believe; is that

15           right.

16           MR. JOSEPH:  I think you are on 15.

17           MS. HOVIS:  Leon is -- Leon is 14.

18           Schinasi would be the second name on that.

19           MR. PIORKOWSKI:  Leon is 14?  Okay.

20           (A discussion was held off the record.)

21           MR. PIORKOWSKI:  Zhang was 12.

22           MR. JOSEPH:  It's Zhang and then a Chang.

23           Leon is 14.  I think we're on 15.

24           (Exhibit No. 15 was marked for

25           identification and attached hereto.)

Sanford R. Katz, M.D.

```
 1                 MR. PIORKOWSKI:  Yeah.  Let's make sure
 2          it's clear, Meredith.  Donato should be 11.
 3          Zhang with a "Z" should be 12.  Chang with a
 4          "C" should be 13.
 5                 THE COURT REPORTER:  Oh, okay.
 6                 MR. PIORKOWSKI:  And Leon should be 14.
 7  BY MR. PIORKOWSKI:
 8  Q.   All right.  It was going along pretty well here.
 9       So in any event, we'll agree that the next one is
10       supposed to be Schinasi, which we'll make 16.
11              (Exhibit No. 16 was marked for
12              identification and attached hereto.)
13  BY MR. PIORKOWSKI:
14  Q.   So I just want to go back and make sure we got
15       everything, Doctor.  So we talked about IARC.  We
16       talked about two different EPA papers.  We talked
17       about five different meta-analyses; correct?
18  A.   Yes.
19  Q.   And then there's one epidemiologic study by
20       Andreotti; correct?
21  A.   Yes.
22  Q.   Which we'll plan to mark as 17.
23              (Exhibit No. 17 was marked for
24              identification and attached hereto.)
25  BY MR. PIORKOWSKI:
```

Sanford R. Katz, M.D.

1   Q.   There's one genotox study by Paz-y-Miño; correct?

2        The second page I think.  "Evaluation of DNA Damage

3        in an Ecuadorian Population."

4   A.   I'm looking for that.  What's the name, again, of

5        the author?

6   Q.   It's P-a-z-y-m-i-n-o.

7                 MR. JOSEPH:  Have you put that one in,

8            Joe?

9                 MR. PIORKOWSKI:  I'm sorry?

10                MR. JOSEPH:  Have you put that one in?

11                MR. PIORKOWSKI:  I didn't.

12  A.   That may have been one that I looked online and

13       didn't print out.

14                MR. PIORKOWSKI:  So that's going to be

15           18.

16                Go ahead.  Curtis, did you have something

17           to say?

18                MR. JOSEPH:  I'm missing 16.  So 15 is a

19           duplicate Leon; right?

20                MR. PIORKOWSKI:  15 is a duplicate Leon.

21           16 is Schinasi.

22                MR. JOSEPH:  I don't see those.

23                MR. PIORKOWSKI:  Yeah.  I'm having a hard

24           time just getting it to come up.  Let me try

25           this again.  Paz-y-Miño we're going to make

Sanford R. Katz, M.D.

```
 1              18.
 2              (Exhibit No. 18 was marked for
 3              identification and attached hereto.)
 4    BY MR. PIORKOWSKI:
 5    Q.   So that should come up, Doctor.  And I just want to
 6         confirm that that's the same one you looked at?
 7    A.   Which one would you like me to look at?
 8    Q.   Paz-y-Miño is 18.
 9    A.   Is that the one that you asked me about that I said
10         that I think I looked at?
11    Q.   Okay.  You think you looked at.  And I want to make
12         sure that Exhibit 18 is the same one you looked at.
13    A.   Okay.  I'm looking for Exhibit 18.  I have to
14         refresh --
15    Q.   That's fine.
16    A.   -- because I have exhibits up through 15.
17              MR. PIORKOWSKI:  That's fine.
18              MR. JOSEPH:  Yeah.  I don't have them.
19         Okay.  I've got them now.
20    A.   Okay.  18, yes.  Yeah.
21    BY MR. PIORKOWSKI:
22    Q.   That's the same one you looked at; correct?
23    A.   Yes.
24              MR. JOSEPH:  Let me be sure we're on the
25              same page, Joe.  So I don't see 16 in the
```

Sanford R. Katz, M.D.

```
1              queue.  I see 15 then 17 then 18.  Is 17

2              Andreotti.

3                   MR. PIORKOWSKI:  Yes.  Why don't you

4              refresh Curtis, and just double-check.

5                   MR. JOSEPH:  Yeah.  I just did.  Okay.  I

6              have 18 but I don't have -- okay.  Wait.

7              There's 16.  Schinasi.  I have that.  And now

8              you said 18.

9                   MR. PIORKOWSKI:  18 was Paz-y-Miño.

10                  MR. JOSEPH:  Got it.  Okay.

11    BY MR. PIORKOWSKI:

12    Q.   And so I let me -- I want to keep the record clear,

13         Doctor, since this has been a little fragmented.

14         So 16 is the Schinasi and Leon meta-analysis that

15         you looked at; correct?

16    A.   Did I already confirm that?

17    Q.   I think you did, but because we've had some issues

18         with the numbers I want to be clear about it.

19    A.   Okay.  Yes, it is.

20    Q.   Okay.  And 17, again, is Andreotti the agriculture

21         health study.  That's the version you looked at

22         from 2018; correct?

23    A.   Yes.

24                  MR. PIORKOWSKI:  And I just marked 19.

25              19 is --
```

Sanford R. Katz, M.D.

```
 1                    MS. HOVIS:  18 was Paz-y-Miño.

 2                    MR. PIORKOWSKI:  I'm sorry.  I think we

 3            did that.  But just for the record, Paz-y-Miño

 4            is 18.

 5   BY MR. PIORKOWSKI:

 6   Q.   That's the study you looked at that's the genotoxic

 7        study; correct?

 8   A.   Right.

 9                    MR. PIORKOWSKI:  Okay.  19 I've marked.

10            (Exhibit No. 19 was marked for

11            identification and attached hereto.)

12   BY MR. PIORKOWSKI:

13   Q.   That's an article by Rana, who is one of the

14        co-authors on the Zhang meta analysis.  And this

15        paper tries to explain the difference between the

16        Zhang and the Donato meta-analyses; correct?

17   A.   Correct.

18   Q.   20 I've marked is Benbrook; correct?

19            (Exhibit No. 20 was marked for

20            identification and attached hereto.)

21   A.   Yes.

22   BY MR. PIORKOWSKI:

23   Q.   And Benbrook is offering his opinion about why the

24        EPA and the IARC reached different results;

25        correct?
```

Sanford R. Katz, M.D.

```
 1    A.    Correct.

 2    Q.    And then 21 is an article by Mesnage that discusses

 3          the toxicity of glyphosate and glyphosate

 4          formulations; correct?

 5                (Exhibit No. 21 was marked for

 6                 identification and attached hereto.)

 7    A.    Yes.

 8    BY MR. PIORKOWSKI:

 9    Q.    Okay.  And have I identified everything that you've

10          reviewed?

11    A.    If you've gone through the list of everything I

12          listed, then that would be correct.  Hold on.  Do

13          you have a Paolo Boffetta.

14    Q.    Do I have what?

15    A.    Do you have -- do you have this?

16    Q.    I can't see what you are showing me.  Can you read

17          the author?  -

18    A.    The author is Paolo, P-a-o-l-o B-o-f-f-e-t-t-a.  Is

19          it on the list?

20    Q.    It's not on your list.  I don't see it anywhere.

21          Do you see it on your list?

22    A.    It's not on my list.  But looking at it, it wasn't

23          one that was -- that I used.  It was one that I

24          looked at but it wasn't -- I mean, we can include

25          it.  I didn't do a whole lot with it.  But in
```

Sanford R. Katz, M.D.

```
 1        retrospect, it is a negative -- well, it's not a

 2        negative.  It wasn't included on my list, but it

 3        was very minimal.  It wasn't something like -- I

 4        probably should have included it.

 5   Q.   Okay.

 6   A.   It was something that I read and I looked at.

 7   Q.   Okay.  And so then in addition to these materials,

 8        you just identified that there were three expert

 9        reports from Portier, Ritz, and Weisenburger that

10        you reviewed.

11             And so is that everything that you've looked

12        at that deals with the subject of glyphosate or

13        glyphosate-based formulations and their

14        relationship to non-Hodgkins lymphoma?

15   A.   Let me confirm that.  Yes.

16   Q.   Okay.  Now, as you were selecting articles to

17        include, did you look at the authorship of the

18        article to determine whether the author had any

19        interest or bias?

20   A.   I did not.

21   Q.   Do you know as you sit here today whether any of

22        the authors of these papers have any interest or

23        bias?  The papers that we've discussed that are on

24        your list.

25   A.   I don't.
```

Sanford R. Katz, M.D.

```
 1    Q.    Do you know whether any of these individuals are
 2          actively serving as expert witnesses in the
 3          glyphosate litigation?
 4    A.    I don't.
 5    Q.    Is that something that would be important for you
 6          to know in terms of assessing the credibility of
 7          these papers?
 8    A.    I don't know -- I don't know the relevance.  I need
 9          to answer that question a little bit more in detail
10          than a yes or no.
11    Q.    Okay.
12    A.    I think that if somebody does good research, writes
13          good peer-reviewed papers, formulates an opinion,
14          and then is asked to appear as an expert witness
15          and is paid to do so, I don't think that that
16          prejudices the work that they've done or the
17          conclusions that they've come to.
18    Q.    So your scenario is if they did scientific research
19          and thereafter they're enlisted to serve as an
20          expert, that wouldn't have affected the work that
21          they did?  That's what you're saying?
22    A.    I think that it would not -- it would not lead me
23          to exclude their work from my review.
24    Q.    Okay.  So how much weight did you give to the
25          Benbrook paper?
```

Sanford R. Katz, M.D.

```
 1   A.   I'm sorry.  I don't have all of these memorized; so

 2        I would have to actually pull the paper up.

 3   Q.   That's fine.  I think we said it was Exhibit 20.

 4              MR. JOSEPH:  Is that the one on the EPA

 5           versus --

 6              MR. PIORKOWSKI:  Yes, sir.

 7   A.   That one was one that impressed me.

 8   BY MR. PIORKOWSKI:

 9   Q.   It impressed you?

10   A.   It impressed me in terms of -- let's see.

11        Benbrook, yes.  Yes.  This one -- yeah.  I gave

12        some weight to this paper.

13   Q.   For what reason?

14   A.   It directs specifically the controversy that arise

15        -- arose from the fact that the two organizations

16        came to different conclusions.  I thought that was

17        pertinent in forming a decision.

18   Q.   And did you identify in the literature any other

19        papers that addressed that very same subject, why

20        IARC and, you know, regulatory agencies reached

21        different conclusions?

22   A.   I can't specifically say whether I read anything

23        else.  I read all of these over the course of a

24        weekend, compiled by summary, and I couldn't tell

25        you, you know, what I read from what paper.  If
```

Sanford R. Katz, M.D.

```
 1            they commented in other papers or if this was the

 2            only paper that I read that addressed, you know,

 3            the difference in opinion.

 4     Q.     Are you aware that Dr. Benbrook doesn't have any

 5            scientific degree?

 6     A.     I did not know that.

 7     Q.     Are you aware that Dr. Benbrook had been serving as

 8            an expert witness on behalf of plaintiffs in the

 9            litigation for at least two years prior to the time

10            this paper was published?

11     A.     No.

12     Q.     Did you know that Dr. Benbrook has, by his own

13            estimate at his testimony last week, made

14            approximately $800,000 for his work as an expert

15            witness in the Roundup litigation?

16     A.     I didn't know that.

17     Q.     Do any of those facts -- well, when we go back to

18            this piece, this piece is essentially an opinion

19            piece; correct?

20     A.     Yes.

21     Q.     Okay.  And if somebody is serving actively as an

22            expert witness, how do you -- how does that affect

23            the way you interpret an opinion piece?

24     A.     Well, I think that if they can make good arguments,

25            and whether they're being paid or not, I think
```

Sanford R. Katz, M.D.

```
 1          their arguments might still be valid.  I don't
 2          think you can discount their arguments because
 3          they're being paid to have them.
 4     Q.   Well, do you think you should be somewhat skeptical
 5          in the manner in which they're pitching their
 6          arguments?
 7     A.   I try to take things at face value.
 8     Q.   Okay.  Now, you did not look at any original animal
 9          studies; is that correct?
10     A.   That's correct.
11     Q.   And you have no experience designing, conducting or
12          interpreting animal studies on carcinogenicities;
13          correct?
14     A.   That's correct.
15     Q.   And other than restating conclusions that IARC or
16          EPA reached about animal studies, you're not
17          offering any original expert opinions on that
18          topic; is that correct?
19     A.   That's correct.
20     Q.   Do you know who Dr. Kenny Crump is?
21     A.   I don't recall that name.
22     Q.   Okay.  Are you aware that there was a -- I think we
23          talked about this briefly last time, but that EPA
24          had an independent scientific advisory panel do an
25          external peer review on their proposed findings?
```

Sanford R. Katz, M.D.

```
 1   A.   No.

 2   Q.   And Dr. Crump is one of the members of the 2016

 3        scientific advisory panel.  Did you review a 2020

 4        article concerning some basic statistical mistakes

 5        that IARC made in interpreting the animal data that

 6        was authored by Dr. Crump?

 7   A.   I don't recall.

 8   Q.   Do you have the Zhang -- can you access the Zhang

 9        article -- Zhang with a "Z" that we marked as

10        Exhibit 12?

11   A.   Okay.

12   Q.   And do you see -- can you turn to table 4 in the

13        Zhang?

14   A.   Okay.

15   Q.   Do you see under case control there's a number of

16        case control studies that are listed that are

17        included in her meta-analysis including DeRoos

18        2003; Eriksson, 2008; Hardell, 2008; McDuffie,

19        2001?

20   A.   Yes.

21   Q.   Orsi, 2009.  Do you see those?

22   A.   Yes, I do.

23   Q.   And you didn't look at any of those underlying

24        studies; correct?

25   A.   I did not.  Do you mean as a primary source?
```

Sanford R. Katz, M.D.

```
1   Q.   Yes.  As a primary source, yes.

2   A.   No.

3   Q.   Did you review a paper -- a case control study by

4        Coco?

5   A.   I don't recall that name.

6   Q.   Okay.  And I'll represent to you that these -- the

7        five studies that are listed in table 4 plus Coco

8        is the total of the case control studies that are

9        reviewed by IARC in there --

10                MR. JOSEPH:  Object to the form but go

11            ahead.

12                MR. PIORKOWSKI:  Object to the form that

13            I'm making a representation?

14                MR. JOSEPH:  Yeah.  Go ahead and pose the

15            question, but I'll preserve the record with my

16            objection.

17  BY MR. PIORKOWSKI:

18  Q.   Yeah.  I'm making a representation that table 2.2

19       in the IRAC Monograph makes reference to a number

20       of case control studies that include the five that

21       are listed in table 4 of the Zhang article plus

22       Coco.  With respect to --

23  A.   Can you tell me where that is?  I would like to

24       look at that.

25  Q.   Yeah.  You have access to the IARC Monograph.
```

Sanford R. Katz, M.D.

```
1    A.    Okay.  2.2.  Case control studies with leukemia and
2          exposer to glyphosate.  Table 2.2.
3    Q.    What page are you on?
4    A.    I'm on page 337.  I think that may be -- I think
5          that's the same one.  Actually, it has a lot more.
6          I don't know if that's the same one.
7    Q.    Hold on one second.  Do you remember what my
8          question was?
9    A.    Well, you said that there were only five or six
10         case control studies included in the IARC
11         Monograph.  And so I just wanted to confirm that --
12   Q.    That's not what I said.
13   A.    Okay.  I'm sorry.  Can you repeat what you said?
14   Q.    Yeah.  I said with respect specifically to NHL.
15   A.    Okay.
16   Q.    I said that there were six specific studies that
17         they reviewed and that they include the studies
18         that were reviewed by McDuffie on table 4 plus a
19         study by Coco.
20   A.    I understand.  Okay.  I misunderstood.  I thought
21         that they were listed on a table in the IARC
22         Monograph.
23   Q.    They are listed on table 2.2.  Each of those
24         studies is listed.
25   A.    Okay.
```

```
1   Q.   There's some other studies that deal with other

2        endpoints like multiple myeloma and Hodgkins

3        lymphoma and other things.

4   A.   Okay.  And that makes sense because it said

5        leukemia in there as well.  Okay.

6   Q.   So I'm just trying to establish that those studies

7        -- because we may want to talk about them -- that

8        the studies that are listed in table 4 of Zhang

9        plus this other study, Coco, are the studies when

10       IARC made their findings based on case control

11       studies.  Those are the studies in which they were

12       talking?

13  A.   Okay.

14  Q.   Is that fair?

15  A.   Fair.

16  Q.   Okay.  All right.  Now, there was also -- there was

17       a follow-up study done by Honatle (phonetic).  I'm

18       assuming you didn't look at that.  That's not on

19       your list.  It was kind of a follow-up to the

20       McDuffie paper?

21  A.   I didn't.

22  Q.   Okay.  And were you aware that there was a pooled

23       analysis that was done in 2019 looking at -- it was

24       called the North American Pool Project.  Pahwa was

25       the first author.  That's not a paper that you saw
```

Sanford R. Katz, M.D.

```
1        either?

2   A.   Let me double check.  Was it "Exposure to

3        Glyphosate and Risk of Non-Hodgkin's Lymphoma to

4        Updated Meta-Analysis" by Pahwa Potheda.

5   Q.   It was -- let me see.

6   A.   Was that the one that I mentioned that I did look

7        at but I didn't put it on my list?

8   Q.   This is called -- the title of this is "Glyphosate

9        use in Associations with Non-Hodgkins Lymphoma,

10       Major Histological Subtypes Findings From North

11       American Pooled Project."

12  A.   You said that the author was who?

13  Q.   Pahwa, P-a-h-w-a.  Let me actually introduce this

14       and then we can take a look at it.

15            MR. PIORKOWSKI:  What are we up to?  I

16         don't want to screw up our numbering system.

17            MR. JOSEPH:  The next one is 22.

18            BY MR. PIORKOWSKI:  22.  Okay.

19         (Exhibit No. 22 was marked for

20            identification and attached hereto.)

21  A.   No, I did not review that.

22  BY MR. PIORKOWSKI:

23  Q.   Okay.  I think you had said last time you had never

24       been an employee or a consultant at the EPA;

25       correct?
```

Sanford R. Katz, M.D.

```
 1   A.   That's correct.

 2   Q.   Have you ever had any personal communications with

 3        anyone who works at EPA about glyphosate?

 4   A.   No.

 5   Q.   Have you ever had any personal communications with

 6        anyone who works at EPA about anything?

 7   A.   No.

 8   Q.   Before becoming involved in this case had you ever

 9        read an EPA review concerning the safety of

10        glyphosate or Roundup?

11   A.   No.

12   Q.   Have you ever read an EPA review on any subject

13        that you can recall?

14   A.   I can't recall.

15   Q.   Now, one thing you did not review was the EPA's

16        proposed interim registration review decision from

17        April of 2019; is that right?

18   A.   Correct.

19   Q.   Do you have -- remember before I was showing you

20        the rule, the Federal Rule of Evidence.  Do you

21        have any scientific, technical, or other

22        specialized knowledge concerning the methodology

23        the EPA uses to conduct its assessment of

24        carcinogenicity?

25   A.   Can you repeat the question.
```

Sanford R. Katz, M.D.

```
 1   Q.   Do you have any scientific, technical, or other

 2        specialized knowledge concerning the methodology

 3        that EPA uses to conduct its assessment of

 4        carcinogenicity?

 5   A.   No.

 6   Q.   Do you see the exhibit that I've marked as 23?

 7             (Exhibit No. 23 was marked for

 8             identification and attached hereto.)

 9   A.   Yes.

10   BY MR. PIORKOWSKI:

11   Q.   Okay.  It's entitled EPAs Guidelines for Carcinogen

12        Risk Assessment from 2005; correct?

13   A.   Yes.

14   Q.   Have you ever read that document?

15   A.   This specific document, I have not read.

16   Q.   Okay.  Have you ever consulted it or read a section

17        of it?

18   A.   No.

19   Q.   Okay.  And before my mentioning it today, were you

20        aware that EPA had a written guideline concerning

21        the methodology that it used to conduct

22        carcinogenicity risk assessments?

23   A.   No.  But the material looks familiar, and it's been

24        referenced in other papers that I've read but may

25        not have specifically been attributed to the EPA
```

Sanford R. Katz, M.D.

```
 1          guidelines.

 2     Q.   And are you going to be offering any opinion on the

 3          methodology of EPA's risk assessment of glyphosate

 4          at trial?

 5     A.   No.

 6     Q.   What about -- I've marked as exhibit -- let me back

 7          up.  Do you see what I've marked as Exhibit 24?

 8               (Exhibit No. 24 was marked for

 9               identification and attached hereto.)

10     A.   Yes.

11     BY MR. PIORKOWSKI:

12     Q.   It's titled EPA's Guidelines For Mutagenicity Risk

13          Assessment; is that right?

14     A.   Yes.

15     Q.   Have you ever read that document?

16     A.   No.

17     Q.   Have you ever referred to it or read a section of

18          it?

19     A.   No.

20     Q.   Are you planning to offer any opinions about the

21          methodology that EPA uses for mutagenicity

22          assessments with respect to glyphosate?

23     A.   No.

24     Q.   Do you see what I've marked as Exhibit 25?

25               (Exhibit No. 25 was marked for
```

```
 1                  identification and attached hereto.)
 2   A.   Yes.
 3   BY MR. PIORKOWSKI:
 4   Q.   It's entitled EPA's Guidelines For Exposure
 5        Assessment, 1992; correct?
 6   A.   Correct.
 7   Q.   Have you ever read that document?
 8   A.   No.
 9   Q.   Have you ever consulted or read a section of it?
10   A.   No.
11   Q.   Do you have any understanding of what methodology
12        the EPA uses to conduct exposure assessments?
13   A.   Can you repeat the question?
14   Q.   Let me rephrase it.  Do you have any understanding
15        of the methodology that EPA used to conduct
16        exposure assessments with respect to glyphosate in
17        any of its reviews?
18   A.   No.  I think to answer the question is I think that
19        they looked at cell culture studies, bacterial
20        studies, animal studies, human population studies.
21        I mean, I think they looked at all of these things
22        to formulate their position.  Is that what you're
23        asking me?
24   Q.   No.  I'm talking about exposure assessments
25        specifically.
```

Sanford R. Katz, M.D.

```
 1   A.    No.

 2   Q.    Exposure assessment.

 3   A.    No. My answer is no.

 4   BY MR. PIORKOWSKI:

 5   Q.    Are you aware that EPA published a critical review

 6         of the Zhang and Leon articles, two of the

 7         meta-analyses upon which you rely?

 8   A.    No.

 9   Q.    Do you see what I've marked as Exhibit 26?

10             (Exhibit No. 26 was marked for

11             identification and attached hereto.)

12   A.    Yes.

13   BY MR. PIORKOWSKI:

14   Q.    Okay.  You've not reviewed that before; is that

15         right?

16   A.    I have not.

17   Q.    Do you have any scientific or technical knowledge

18         about the process that EPA follows for approving

19         registration of a pesticide product?

20   A.    No.

21   Q.    You mentioned at your previous deposition that you

22         thought that governmental agencies such as the EPA

23         were more subject to political influences than

24         organizations like IARC; is that correct?

25   A.    I do.
```

Sanford K. Katz, M.D.

```
1    Q.    Do you have any facts or data to show that any of
2          EPA's determinations with respect to the
3          carcinogenicity of glyphosate were the result of
4          political influence?
5    A.    No.
6    Q.    Have you looked at any of the statements or review
7          from Health Canada relating to the carcinogenicity
8          of glyphosate?
9    A.    No.
10   Q.    Have you looked at any of the statements or
11         scientific reviews conducted by any other
12         regulatory authority anywhere in the world other
13         than in the United States?
14   A.    No.
15   Q.    Going back to the list of materials considered, you
16         reviewed the Paz-y-Miño study.  Do you see that?  I
17         think it was Exhibit 18.
18   A.    Yes.  Okay.
19   Q.    How did you select -- well, do you know how many
20         genotoxicity studies were performed on glyphosate?
21   A.    I don't.
22   Q.    Do you have any idea whether it was 10, 100, 200?
23   A.    No.
24   Q.    How is it that you picked this particular study?
25   A.    It was referenced in some of the other papers that
```

Sanford R. Katz, M.D.

```
 1         I had read.
 2   Q.    Okay.  Let me turn to your report, which I think we
 3         marked it as Exhibit 1.  I noticed that your report
 4         is written on Willis-Knighton Health Systems
 5         letterhead; is that correct?
 6   A.    Yeah.  I think in retrospect that was a bad idea.
 7   Q.    Okay.  So for clarification, you're not submitting
 8         this report on behalf of Willis-Knighton Health
 9         Systems?
10   A.    I'm not.  That was actually -- that was an
11         unfortunate oversight.
12   Q.    Okay.  Do you know whether anyone from
13         Willis-Knighton receives funding from Bayer for
14         clinical research?
15   A.    No.  I'm not aware of any.
16   Q.    Did you search to look, or you're just not aware of
17         any off the top of your head?
18   A.    I'm not aware of any, and this was a regrettable
19         oversight.
20   Q.    Okay.
21   A.    Willis-Knighton is entirely independent of anything
22         that I've done outside my capacity as a radiation
23         oncologist.  And if I have an opportunity to
24         reprint this not using their -- my letterhead, I
25         would appreciate the opportunity to do so.
```

Sanford R. Katz, M.D.

```
 1   Q.   Fair enough.  Now, does this report, did you

 2        attempt to include all of the opinions you intend

 3        to offer at the time of trial?

 4   A.   I may -- I may have an opinion when asked a

 5        question that may not be included in this position

 6        paper.

 7   Q.   Okay.  That's a little different than the question

 8        I was asking you though.

 9   A.   I understand.

10   Q.   Yeah.  At the time you completed this report, did

11        this report contain all the opinions that you

12        intended to offer at the time of trial?

13   A.   I believe so, yes.

14   Q.   Okay.  And did you also attempt, in your report, to

15        provide an explanation of the basis of the opinions

16        you intended to offer?

17   A.   Yes.

18   Q.   You're prepared to offer all these opinions under

19        oath at the time of trial; correct?

20   A.   Yes.

21   Q.   Are you waiting for any additional information at

22        this point?

23   A.   No.

24   Q.   So as we sit here today, your report is complete?

25   A.   Yes.
```

Sanford R. Katz, M.D.

```
 1   Q.   You're not planning to amend your report based on

 2        having reviewed Dr. Portier, Dr. Weisenburger, or

 3        Dr. Ritz's report; correct?

 4   A.   Correct.

 5   Q.   When's the last time you read over your report?

 6   A.   Last night.

 7   Q.   Okay.  And as we sit here today, are there any

 8        corrections or modifications that need to be made

 9        to make the report accurate?

10   A.   Other than to reprint it on different -- blank

11        paper, no.

12   Q.   Okay.  So as we sit here today, the substance of

13        your report is accurate in your view; right?

14   A.   Yes.

15   Q.   Have you submitted any of these opinions anywhere

16        for peer review?

17   A.   No.

18   Q.   Do you plan to publish any of the opinions you're

19        putting in this report?

20   A.   No.

21   Q.   Was this prepared completely between July 7th and

22        July 18th?  This report?

23   A.   Yes.

24   Q.   Did anyone assist you with your research?

25   A.   No.
```

Sanford R. Katz, M.D.

```
1    Q.    Were any of the -- apart from the three expert

2          reports that I believe you said were provided to

3          you by Mr. Joseph, were any of the other articles

4          or documents that are listed on Exhibit 2, your

5          materials considered list, provided by Mr. Joseph?

6    A.    No.

7    Q.    Did you write the report?

8    A.    Yes.

9    Q.    So let me just -- let's go off the record for one

10         second here.

11              THE VIDEOGRAPHER:  Does everybody agree

12         to go off the record?

13              MR. JOSEPH:  Yes.

14              THE VIDEOGRAPHER:  We are now off the

15         record at 3:40 p.m.

16         (Off the record.)

17              THE VIDEOGRAPHER:  Okay.  It is 3:45 p.m.

18         And we are now on the record.

19   BY MR. PIORKOWSKI:

20   Q.    So, Dr. Katz, are you a licensed pesticide

21         applicator?

22   A.    No.

23   Q.    Have you ever been a licensed pesticide applicator?

24   A.    No.

25   Q.    Have you ever done research concerning health
```

Sanford R. Katz, M.D.

```
 1        outcomes and licensed pesticide applicators?

 2   A.   No.

 3   Q.   Have you ever conducted exposure assessments for

 4        any chemical in licensed pesticide applicators?

 5   A.   No.

 6   Q.   Do you know anyone who's a licensed pesticide

 7        applicator?

 8   A.   Other than the person who treats my lawn.

 9   Q.   Is that person a licensed pesticide applicator?

10   A.   I would hope so.  My assumption is he's licensed.

11        I believe he's licensed.

12   Q.   Okay.  Do you have any first-hand knowledge of the

13        working conditions in which licensed pesticide

14        applicators work?

15   A.   No.

16   Q.   Do you have any knowledge greater than a layperson

17        about how much exposure to pesticides licensed

18        pesticide applicators have?

19   A.   No.

20   Q.   In your report, which is Exhibit 1 at page 6, you

21        say "In estimating the potential of this risk of

22        elevated risk association to have specifically

23        resulted in Mr. Blair developing his lymphoma, it

24        is important to consider the following factors."

25            And then you go on to say "the concentration,
```

Sanford R. Katz, M.D.

```
 1         potency, and dose of agent; duration; frequency;

 2         number of exposures over a specific period;

 3         confounding effects which could have intensified or

 4         increased exposure such as being confined in a

 5         poorly ventilated space or whether conditions such

 6         as wind that may have resulted in added exposure;

 7         along with the use or lack of use of safety gear

 8         such as respirators, gloves, face shield, hazmat

 9         suits, post-applicator showers; as well as policies

10         and procedures which potentially could have helped

11         continued exposure after work."  Did I read that

12         correctly?

13    A.   Yes.

14    Q.   I think your high school English teacher would have

15         cringed at the length of that sentence.

16              MR. JOSEPH:  Hey, Hey.  You're a lawyer,

17         Joe.  You live for run-on sentences.

18    BY MR. PIORKOWSKI:

19    Q.   All right.  Let me go back to sort of the core of

20         it, which is you say "It is important to consider

21         that the following" -- "it is important to consider

22         the following factors"; correct?

23    A.   Yes.

24    Q.   And this, by the way, this language is language

25         that you took -- this right out of your previous
```

Sanford R. Katz, M.D.

```
 1        affidavit; right?  This is also language that was

 2        in your affidavit as I recall?

 3   A.   I believe so, yes.

 4   Q.   Okay.  So let's start with the first factor that

 5        you say is important to consider.  What is the

 6        concentration of glyphosate in milligrams per cc of

 7        solution that Mr. Blair was applying during his

 8        work?

 9   A.   I don't have that information.

10   Q.   Did you determine what specific Roundup product

11        Mr. Blair was using?

12   A.   I believe that he was using a pro version.

13   Q.   Roundup Pro?

14   A.   That's my understanding.

15   Q.   Okay.  And do you know what percentage of

16        glyphosate acid by weight is contained in Roundup

17        pro?

18   A.   I don't.

19   Q.   You don't?

20   A.   I don't.

21   Q.   Okay.  Have you done any calculations or performed

22        any estimates concerning the actual concentration

23        of glyphosate in the solution that Mr. Blair was

24        using?

25   A.   No.
```

Sanford R. Katz, M.D.

```
 1   Q.   Do you have any information based on calculations
 2        or scientific estimates concerning the average
 3        daily dose in terms of milligrams per kilogram of
 4        glyphosate for Mr. Blair?
 5   A.   I don't.
 6   Q.   Do you have any information based on calculations
 7        for scientific estimates concerning the maximum
 8        daily dose of glyphosate for Mr. Blair?
 9   A.   I don't.
10   Q.   Do you have any information based on calculations
11        or scientific estimates concerning the absorbed
12        dose of glyphosate for Mr. Blair?
13   A.   I don't.
14   Q.   Do you have any information based on calculations
15        or scientific estimates concerning the internal
16        dose of glyphosate for Mr. Blair?
17   A.   I don't.
18   Q.   Do you have any knowledge, skill, experience, or
19        education or training in industrial hygiene?
20   A.   No.
21   Q.   Have you ever in your professional capacity had the
22        experience of calculating or estimating the dose of
23        an individual exposure to a chemical of any kind?
24   A.   No.
25   Q.   To your knowledge, has any expert -- I'm sorry.
```

Sanford R. Katz, M.D.

1      Did somebody say something?  To your knowledge, has

2      any expert on behalf of the plaintiff performed any

3      calculation about the concentration or dose of

4      glyphosate to which Mr. Blair was exposed?

5   A.  I don't have that information.

6   Q.  So as you sit here, you're not aware of any expert

7      on behalf of plaintiff doing such a calculation;

8      right?

9   A.  No.

10  Q.  To your knowledge, has any expert on behalf of

11     Monsanto conducted an assessment of the dose to

12     which Mr. Blair was exposed?

13  A.  No.

14  Q.  Have you been provided with the report of

15     Dr. Olive?

16  A.  No.

17          MR. PIORKOWSKI:  Meredith, is our next

18       Exhibit 27?  Is that right?

19          MR. JOSEPH:  Yes.

20          THE COURT REPORTER:  Yes, sir.

21       (Exhibit No. 27 was marked for

22       identification and attached hereto.)

23  A.

24  BY MR. PIORKOWSKI:

25  Q.  Doctor, do you have access to 27?

Sanford R. Katz, M.D.

```
 1   A.   I do.

 2   Q.   And I assume based on your previous testimony that

 3        you haven't reviewed this report previously?

 4   A.   That's correct.

 5   Q.   Can you turn to page 30?

 6   A.   Okay.

 7   Q.   Do you see the section that says "plaintiff

 8        exposure description"?

 9   A.   Yes.

10   Q.   It says "Mr. Blair reports spilling or spraying

11        Roundup on his skin," quote, "almost every day,"

12        end quote.  "He mentioned spills during mixing and

13        having spray drift back on him when the wind would

14        shift (daily).

15             "He cited times when a hose would break

16        (approximately once per week) and he would be

17        sprayed in the face and get his clothing wet.  He

18        noted skin irritation on his face that occurred on

19        one occasion, which he attributed to exposure

20        following a hose break incident.

21             "He testified to splashes to his face and

22        chest during tank mixing activities"; is that

23        correct?  Is that what it says?

24   A.   Yes.

25   Q.   Is that description of Mr. Blair's exposure to
```

Sanford R. Katz, M.D.

```
1        Roundup consistent with your understanding of his
2        exposure to Roundup?
3   A.   Yes.
4             MR. JOSEPH:  I would like to -- if you
5        don't mind, Joe.  This is a 54-page report.  I
6        would like the doctor to have the opportunity
7        to review it.
8             MR. PIORKOWSKI:  That's fine.
9             THE WITNESS:  You want me to review 54
10        pages right now?
11             MR. PIORKOWSKI:  I don't think he means
12        right now.
13             MR. JOSEPH:  That was going to be my next
14        question.  These exhibits, how long are they
15        available for us to access?  This link?
16             MR. PIORKOWSKI:  I don't know the answer,
17        but I'm happy to send them all to you, Curtis,
18        if there's any question about it.
19             MR. JOSEPH:  Okay.  Thank you.
20             MR. PIORKOWSKI:  I think they should be
21        accessible.  We're pushing up on 4:00 here.
22        So do we want to suspend this and agree to
23        resume it on another day, Curtis?
24             MR. JOSEPH:  Yes.  We'll make him and
25        ourselves available as promptly as possible.
```

Sanford R. Katz, M.D.

```
 1              And if you would shoot me those, I would
 2              appreciate it.  And I've got something I need
 3              to shoot to you.
 4                   MR. PIORKOWSKI:  Okay.  I would like to
 5              get -- while we're on the record I still
 6              haven't received the marked-up version of the
 7              IARC Monograph.
 8                   MR. JOSEPH:  Yeah.  I'm going to get that
 9              from the doctor's office, and I'll get that to
10              you ASAP.
11                   MR. PIORKOWSKI:  Okay.  And separately I
12              would like to get the calculation notes that
13              he was talking about that he did this morning.
14              And then the names and dates of the reports
15              that he was provided just because with respect
16              to Ritz and Portier and Weisenburger, I think
17              he gave me the date for Weisenburger.  But
18              many of these guys have had multiple reports;
19              so...
20    BY MR. PIORKOWSKI:
21    Q.   All right.  Doctor, before we go off the record,
22         have you understood my questions today?
23    A.   Yes.
24    Q.   Okay.  Is there anything before we go off the
25         record based on the answers you gave that you need
```

Sanford R. Katz, M.D.

```
 1        to change or correct?

 2  A.    No.

 3              MR. PIORKOWSKI:  Okay.  By agreement

 4         we're going to suspend this deposition till a

 5         mutually agreeable time in the future.

 6              MR. JOSEPH:  Yes, sir.

 7              MR. PIORKOWSKI:  Thank you, Curtis.

 8         Everybody have a nice holiday.

 9              THE VIDEOGRAPHER:  It is 3:58 p.m., and

10         we are now off the record.

11              THE COURT REPORTER:  Mr. Curtis, are you

12         going to want a copy of this portion of the

13         transcript?

14              MR. JOSEPH:  Yes, electronic only is

15         fine.

16         (The deposition suspended at 3:58 p.m.)

17

18

19

20

21

22

23

24

25
```

Sanford R. Katz, M.D.

```
 1                  (The deposition in this matter resumed

 2                  on 9/17/2021.  All the same parties were

 3                  present via remote videoconference.)

 4    PROCEEDINGS:

 5                       THE VIDEOGRAPHER:  We are now on the

 6                  record.  My name is Colin Coughenour.  I'm the

 7                  videographer for Golkow Litigation Services.

 8                  Today's date is 9/17/21.  The time is

 9                  9:07 a.m.

10                       This remote video deposition is being

11                  held in the matter of Roundup Blaire et al.

12                  vs. Monsanto Company et al., for the United

13                  States District Court, Northern District of

14                  California.  The deponent is Sanford R Katz,

15                  M.D.

16                       All parties of this deposition are

17                  appearing remotely and have agreed to the

18                  witness being sworn in remotely.  Due to the

19                  nature of remote reporting, please pause

20                  briefly before speaking to ensure all parties

21                  are heard completely.  Will the counsel please

22                  identify themselves.

23                       MR. PIORKOWSKI:  This is Joseph

24                  Piorkowski on behalf of Monsanto.

25                       MR. JOSEPH:  Curtis Joseph on behalf of
```

Sanford R. Katz, M.D.

```
 1                    plaintiffs Mr. and Ms. Blair.

 2                        MR. PIORKOWSKI:  And, Curtis, I assume

 3                    that we're going to agree that this is a

 4                    continuation of the deposition so we'll have

 5                    it be just that, a continuation as opposed to

 6                    a separate transcript.  And we'll pick up with

 7                    exhibits where we left off if that's

 8                    acceptable?

 9                        MR. JOSEPH:  That's fair.

10                        THE VIDEOGRAPHER:  The court reporter is

11                    Meredith Hoffpauir.  Will you please swear in

12                    the witness?

13                        DR. SANFORD KATZ,

14       the witness hereinbefore named, after being first

15       duly cautioned and sworn to tell the truth, the whole

16       truth, and nothing but the truth, testified under

17       oath as follows:

18   EXAMINATION BY MR. PIORKOWSKI:

19   Q.   Dr. Katz, good morning.  Did you have a nice

20        vacation?

21   A.   Well, I don't know if it was vacation; but, yes, I

22        had a pleasant weekend.

23   Q.   Okay.  I'll represent to you that there have been

24        three documents that have been sent to us.  The

25        first one, which I've marked as Exhibit 28 is what
```

Sanford R. Katz, M.D.

```
 1        I understand to be your copy of the IARC Monograph

 2        with your mark-ups.

 3               (Exhibit No. 28 was marked for

 4               identification and attached hereto.)

 5   BY MR. PIORKOWSKI:

 6   Q.   Could you take a look at that and verify that

 7        that's correct, please?

 8   A.   All right.  How am I supposed to get that?

 9               MR. JOSEPH:  Hold on.  He just sent

10               something.  Hold on.

11               MR. PIORKOWSKI:  Yeah, I sent it earlier.

12               MR. JOSEPH:  I'm forwarding it to him

13               now.

14               MR. PIORKOWSKI:  Okay.

15               MR. JOSEPH:  I just emailed it to you,

16               Dr. Katz.

17               MS. HOVIS:  Can we have the link in the

18               chat box like last time?

19               MR. PIORKOWSKI:  What's that?

20               MS. HOVIS:  Don't we have a link in the

21               chat box like last time?

22               MR. PIORKOWSKI:  I sent it to Curtis, the

23               link of the exhibit.

24               MS. HOVIS:  Oh, Okay.

25               MR. PIORKOWSKI:  I didn't send it to
```

Sanford R. Katz, M.D.

```
 1                Dr. Katz because I thought you should be the
 2                one to do that.
 3                    MR. JOSEPH:  Yeah, I got it.  Do you have
 4                it, Dr. Katz?
 5                    THE WITNESS:  Clicking on it right now.
 6                Okay.  Got it.
 7   BY MR. PIORKOWSKI:
 8   Q.   Okay.  So the question is do you see what's been
 9        marked as Exhibit 28?
10   A.   Yeah.  I'm pulling it up.  Oh, it's upside down.
11        It's upside down.
12   Q.   Well, I represent to you that that is the form in
13        which it was sent to me.
14                    MR. JOSEPH:  I scanned it that way
15                because there was something -- and I didn't
16                know how to flip it.  But there was something
17                that wouldn't allow it feed.
18                (A discussion was held off the record.)
19   BY MR. PIORKOWSKI:
20   Q.   So the question is, is this your marked up copy of
21        the IARC Monograph?
22   A.   I'll look for one of the places that I highlighted
23        and see if it's highlighted on here.  How's that?
24   Q.   That's good enough.
25   A.   I don't see the highlights on here.  I have it on
```

Sanford R. Katz, M.D.

```
1          my copy, but the highlight is not on here.  Maybe

2          it didn't scan.

3                    MR. JOSEPH:  Maybe it didn't scan the

4               highlights.  Dang it.

5     BY MR. PIORKOWSKI:

6     Q.   All right.  Well, if that's the case, then we would

7          ask you to use it in some version with the

8          highlight.

9                    MR. JOSEPH:  I could send it to a copy

10              service, Joe, and then supplement it to you.

11                   MR. PIORKOWSKI:  That's fine.

12                   MR. JOSEPH:  I guess our scanner didn't

13              do that.

14                   MR. PIORKOWSKI:  That's fine.

15    BY MR. PIORKOWSKI:

16    Q.   Do you know, Dr. Katz, approximately how many pages

17         you have highlighted on?

18    A.   Let's see.  I have highlighted on 325, 331, 335,

19         336, 346, 347, 348, 353, 355, 356, 365, 366.  The

20         rest of these are like charts and things; so I

21         didn't highlight charts.

22              So basically let's see -- 387.  In between

23         it's mostly all charts.  387, 388, 389, 390, 391,

24         393, 396, 397.  That's it.

25    Q.   Okay.  And how did you decide when you went through
```

Sanford R. Katz, M.D.

```
 1      this what things to highlight?

 2  A.  I think -- thought things that were relevant.

 3      Things that were relevant to me.

 4  Q.  All right.  Do you see what I've marked as

 5      Exhibit 29?

 6          (Exhibit No. 29 was marked for

 7          identification and attached hereto.)

 8  A.  I do.

 9  BY MR. PIORKOWSKI:

10  Q.  Is that a version of your report without the

11      letterhead?

12  A.  It is.

13  Q.  Are there any changes between the previous version

14      of your report and this version of your report

15      except for the omission of the letterhead?

16  A.  No.

17  Q.  Okay.  And then do you see what I've marked as

18      Exhibit 30?

19  A.  It's not pulling up.

20          MR. PIORKOWSKI:  Curtis, are you pulling

21      it up?

22          MR. JOSEPH:  I'm trying now.

23          MS. HOVIS:  Mine is not.  It's just

24      buffering.

25          MR. JOSEPH:  That's probably going to be
```

Sanford R. Katz, M.D.

```
 1                  a large file if it's was those notes.

 2                       MR. PIORKOWSKI:  Well, it's literally one

 3                  page of handwritten calculations.

 4                       MR. JOSEPH:  That's what I mean.  If it

 5                  was done as a photo it's going to take a

 6                  while.

 7                       MR. PIORKOWSKI:  Okay.  We're going to

 8                  mark as 30 that photo of the handwritten

 9                  calculation that you provided to me, Curtis.

10                  (Exhibit No. 30 was marked for

11                  identification and attached hereto.)

12                       MR. JOSEPH:  Yes.

13   BY MR. PIORKOWSKI:

14   Q.   And I assume, Dr. Katz, that those were the only

15        calculations you had that we were referring to last

16        time; is that correct?

17   A.   That's correct.

18   Q.   Okay.

19   A.   I'll make a statement.  I sent one version of it

20        that was more legible than another to Mr. Joseph,

21        and I instructed him not to send the first one but

22        send the second one because it just wouldn't have

23        made any sense.

24   Q.   Okay.

25   A.   It was just scribble.
```

Sanford R. Katz, M.D.

```
 1   Q.   Okay.

 2   A.   I can't see the one that you have here.

 3   Q.   All right.  We'll circle back.  I assume it's the

 4        same one you provided to Mr. Joseph.

 5             MR. JOSEPH:  It's the one that I sent

 6        you.

 7             MR. PIORKOWSKI:  Yeah.  All right.

 8   BY MR. PIORKOWSKI:

 9   Q.   Have you -- since September 2nd, have you issued

10        any additional invoices to Mr. Joseph for your work

11        in this case?

12   A.   Not yet.

13   Q.   What other work have you done in this case since

14        your deposition on September 2nd?

15   A.   I read the expert report that was provided to me by

16        Dr. Olive.  And subsequent to that, I found some of

17        what I thought was some inaccuracies.  And so I

18        searched down some of the inaccuracies further to

19        understand the basis for her conclusions, looking

20        at some of the sources that she cited.  And then

21        basically I'm using that information, read some

22        other sources to support my conclusion that her

23        findings were not relevant.

24   Q.   So your opinion is her findings are not relevant?

25   A.   I don't think that they're -- let's put it this
```

Sanford R. Katz, M.D.

```
1         way:  I don't think that they're complete.  I think
2         that her conclusions are incomplete.
3    Q.   Okay.  We'll talk about that, but you yourself
4         didn't do any calculations of dose or potency or
5         concentration at any point during this litigation;
6         correct?
7    A.   I did not other than to try to estimate based upon
8         Mr. Blair's deposition how much end product he may
9         have been exposed to in his -- specifically in his
10        face.
11   Q.   Okay.  And you saw -- well, we'll come back and go
12        over Dr. Olive's deposition in a minute.  So other
13        than reading Dr. Olive's report -- and what
14        additional sources did you look at to determine --
15        when you said you determined there was inaccuracies
16        what sources of information did you look at to
17        determine that?
18   A.   I believe you should have a supplemental list of
19        the things that I looked at.
20   Q.   Since the last deposition?
21   A.   That's right.  I provided a supplemental list.
22             MR. PIORKOWSKI:  Okay.  I haven't
23          received that.  Curtis?
24             MR. JOSEPH:  You didn't get that?  Yeah,
25          I thought I emailed that yesterday.  Hold on.
```

Sanford R. Katz, M.D.

```
1              I'll send it now.

2                   THE WITNESS:  If it's okay I would like

3              to print it out if we're going to talk about

4              it, I would like to print it out on my end so

5              I have it.  Is that okay?

6                   MR. PIORKOWSKI:  What's that?

7                   THE WITNESS:  The supplemental.

8                   MR. PIORKOWSKI:  Yes.  I had actually

9              asked Mr. Curtis to have you print out all the

10             things we're going to be talking about so,

11             yes, I'm fine with that.

12                  MR. JOSEPH:  One second, Joe.  Yeah.  I

13             sent it to you guys at 5-something yesterday.

14             You should have that in a few seconds.  Did it

15             come through?

16                  MR. PIORKOWSKI:  Yes.  I got it.  All

17             right.  So I just marked Exhibit 31.

18             (Exhibit No. 31 was marked for

19             identification and attached hereto.)

20                  MR. PIORKOWSKI:  Is that the supplemental

21             document review list?

22                  MR. JOSEPH:  I'm trying to pull it up.  I

23             don't have 31 yet.

24                  THE WITNESS:  I can't load that picture,

25             so I think I'm just going to close that out.
```

```
 1                    MR. PIORKOWSKI:  That's fine.
 2  A.   31, yes.  That's the supplemental list that I
 3       provided.
 4  BY MR. PIORKOWSKI:
 5  Q.   Okay.  So was all of this research on the
 6       supplemental list, these are all things that you've
 7       looked at since your original report; correct?
 8  A.   That's correct.  Just to clarify, a couple of these
 9       may have been referred to in some of the other
10       papers that I read.  Particularly, some of the
11       reviews may have made reference to some of these,
12       but I actually referred to the -- aspects of the
13       portions of the primary source since September 2nd.
14  Q.   Okay.  And what prompted you to do this additional
15       research that yielded these additional materials?
16  A.   Well, the main thing was that I found that
17       Dr. Olive's report was focused seemingly, you know,
18       mostly on skin absorption.
19  Q.   Uh-huh.
20  A.   And I think my contention was that his cancer was
21       not because of skin absorption but it was because
22       of direct inhalation of the agent.  So while her
23       findings were that skin absorption was relatively
24       low and within acceptable limits, I didn't see
25       where she really addressed the mode of -- you know,
```

Sanford R. Katz, M.D.

```
 1        in which that he was exposed.

 2             And so she did make a statement that because

 3        the Roundup was nonvolatile that that wasn't really

 4        relevant or significant.  And so I kind of took

 5        issue with that.

 6             Because of the way that Mr. Blair was using

 7        the agent and spraying it, I wanted to explore

 8        further if that was actually true or if there was

 9        specific information about aerosolized Roundup that

10        she may have missed or omitted.  And so then I went

11        and specifically looked more about that, looked

12        into it.

13   Q.   And did you find that there's data about

14        inhalational exposure to Roundup?

15   A.   Not directly relevant to Mr. Blair.

16   Q.   Okay.  Do any of these papers that are listed in

17        Exhibit 31 change any of the opinions you

18        previously claimed to offer?

19   A.   No.  I think they reinforced it.

20   Q.   Which ones in particular reinforced it?

21   A.   Well, let's see.

22   Q.   Let me make one correction because I do think one

23        of these studies -- the one by Paz-y-Miño is

24        actually already marked as an exhibit and was on

25        your previous list as Exhibit 18.
```

Sanford R. Katz, M.D.

```
1   A.   Okay.  Fair enough.

2   Q.   I don't think any of the other ones are?

3   A.   Okay.  Fair enough.

4   Q.   So I'm sorry.

5              MR. JOSEPH:  Basically what studies were

6         reinforced.

7              (The court reporter read back a portion

8         of the testimony.)

9   BY MR. PIORKOWSKI:

10  Q.   Okay.

11  A.   Okay.  So a number of these basically I looked at

12       that have been referenced -- I'll just answer the

13       question this way.  The number of studies that I

14       list there or sources that I list there have been

15       referenced with respect to inhalation.  But I think

16       that they're flawed, they're faulty.  And so I

17       included that.

18            And then the ones that I found I felt

19       supported it had to do more specifically with

20       airborne droplets and inhalation of aerosol.  And

21       those are listed in there.  I can see which ones

22       and specifically mention them.  And then -- let's

23       see.

24  Q.   Let me reframe the question.  Which ones

25       specifically support your views about the
```

Sanford R. Katz, M.D.

```
 1        inhalation pathway?
 2   A.   The Transmission of the COVID-19 Virus By Droplets.
 3        Airborne Transmission of Respiratory Viruses, I
 4        think The Fundamental of Weed Science, Natural
 5        Ventilation For Infection Control in Healthcare
 6        Settings, Water Vapor Transport and Its Effects on
 7        The Deposition of Hygroscopic Droplets in a Human
 8        Upper Airway Model.  Those were the ones that
 9        supported the mechanism, basically I think the
10        inhalation specifically.
11   Q.   Does the article by Mahesh Jayaweera about
12        transmission of COVID-19 have anything whatsoever
13        to do with glyphosate or Roundup?
14   A.   No.
15   Q.   Does the article by Chia Wang on Airborne
16        Transmission of Respiratory Viruses have anything
17        to do with glyphosate or Roundup?
18   A.   No.
19   Q.   How much time have you spent since the last
20        deposition doing research and reviewing Dr. Olive's
21        report and looking at additional articles?
22   A.   I would say about seven to -- I would say about
23        seven hours.
24   Q.   That's your best estimate?  Seven hours?
25   A.   That would be my best estimate.
```

Sanford R. Katz, M.D.

```
 1   Q.   Okay.  Is there anything else you've done work on

 2        this case since your last deposition?

 3   A.   Can you be more specific?

 4   Q.   Anything you've done related to your work on this

 5        case, whether it's a meeting, phone calls,

 6        research.

 7   A.   I had a meeting with Mr. Joseph.

 8   Q.   Okay.  Is that included in the seven hours, or is

 9        that an addition?

10   A.   That would be an addition.  Probably an extra hour

11        or so.

12   Q.   Okay.  When was that meeting?

13   A.   Let me think.  I believe that was Wednesday.

14   Q.   Okay.  Two days ago?

15   A.   Yeah.

16   Q.   All right.  Did you review the transcript of your

17        previous deposition?

18   A.   I did.

19   Q.   As you sit here, are there any corrections that

20        need to be made to any of the answers you gave to

21        -- corrections or modifications to make them

22        correct?

23   A.   When you're referring to my previous deposition,

24        are you referring to the first one or the second

25        one?
```

```
 1   Q.   That's a good clarification.  Either.

 2   A.   I looked at the first one.  I saw there was, like,

 3        a word or two that was not correct.  It wasn't --

 4        it wasn't substantive.  I didn't -- if you want me

 5        to have a word or two changed, I can certainly do

 6        that, but it didn't seem to change the general

 7        substance of the question or the answer.

 8   Q.   Okay.  And you will have an opportunity, if you

 9        haven't already, to make any kind of corrections,

10        you know, to the transcript.  What about with

11        respect to the deposition on September 2nd?  Have

12        you looked at that transcript?

13   A.   I have not received it.

14   Q.   Okay.  And as you sit here today, reflecting back

15        on your answers, is there anything that you believe

16        needs to be corrected, you know, from your previous

17        testimony?

18   A.   Not that I recall.

19   Q.   Okay.

20   A.   But without the benefit of seeing it, obviously

21        that answer may change.

22   Q.   Okay.  Do you see the article that I've marked as

23        Exhibit 32?

24            (Exhibit No. 32 was marked for

25             identification and attached hereto.)
```

Sanford R. Katz, M.D.

```
 1   A.   I do.

 2   BY MR. PIORKOWSKI:

 3   Q.   Okay.  And this is an article, the first author's

 4        name is Nathan Yu; is that right?

 5   A.   It is.

 6   Q.   It's published in 2019; correct?

 7   A.   Yes.

 8   Q.   And you are listed as a co-author on this article;

 9        is that right?

10   A.   That's correct.

11   Q.   What was your role in this research?

12   A.   I provided patients and reviewed the manuscript.

13   Q.   Okay.  Were you actively involved in analyzing the

14        overall data as opposed to data from your site?

15   A.   In terms of the statistics and what not?

16   Q.   Yes.

17   A.   No.

18   Q.   Were you actually involved in the writing of the

19        paper?

20   A.   No.

21   Q.   You said --

22   A.   Other than providing -- I mean, I received a copy

23        of the, you know, initial first draft of the

24        manuscript.  And I believe I offered some

25        additions, deletions, grammatical changes, things
```

Sanford R. Katz, M.D.

```
 1        of that sort.  I'm sure it was something
 2        substantial.
 3   Q.   You're sure it was something substantial?
 4   A.   I can't remember but I can tell you I'm sure it was
 5        more than just, hey, put a comma here; put a period
 6        here.
 7   Q.   Okay.
 8   A.   I mean, I can't remember exactly, but typically
 9        when I review manuscripts I usually have a comment
10        or say something of significance with respect to
11        contributing toward the publication.
12   Q.   Okay.  Who is Gary Larson?
13   A.   He's one of the physicians on the study.
14   Q.   Do you know him?
15   A.   Not personally.
16   Q.   And what is Gary Larson's financial interest since
17        he's an equity holder in Procure Proton Therapy
18        Center?  Do you know what that center is and what
19        relation that has to the study?
20   A.   I don't know specifically what his financial
21        interest is.  I can tell you that it is not unusual
22        for physicians to have ownership interest in their
23        facility or to have ownership interest in their
24        equipment.
25   Q.   Okay.
```

Sanford R. Katz, M.D.

```
 1    A.    That's actually relatively standard, and it's not

 2          unusual in our specialty.

 3    Q.    Okay.  Does the fact of Gary's Larson's involvement

 4          in this paper lead you to question the validity of

 5          the results?

 6    A.    I have no reason to believe that.

 7    Q.    Okay.  Does his involvement lead you to question

 8          the scientific integrity of the study?

 9    A.    Again, I have no information to support that.

10    Q.    Okay.  Apart from your responses to Dr. Olive, I

11          assume you have no new opinions in this case since

12          your last deposition; is that right?

13    A.    That's correct.

14    Q.    Okay.

15    A.    Well, let me ask you, could you clarify that?  When

16          you say "new opinions," do you mean new

17          conclusions?

18    Q.    Well, I mean, new opinions.  Under the federal

19          rules, you know, parties are required to give us

20          notice of opinions that they're planning to offer

21          at the time of trial on behalf of their experts.

22          And I haven't seen anything new.  We haven't

23          received any -- I'll represent we haven't received

24          any kind of supplemental disclosure or any kind

25          disclosure indicating that you have new opinions
```

Sanford R. Katz, M.D.

```
 1          that you didn't have previously.  So I'm just

 2          trying to verify that there are no new opinions?

 3   A.     I can offer one.

 4   Q.     I'm not trying to solicit any.  I'm trying to

 5          confirm that you don't have any.  I'm not inviting

 6          you to give them.

 7   A.     I guess I don't understand the question in order to

 8          answer it truthfully as to what constitutes an

 9          opinion.  I mean, I have my opinion about

10          Dr. Olive's expert opinion.  I have my opinion of

11          her opinion.

12   Q.     Okay.

13   A.     You asked me the question if there were any

14          documents -- I think you asked me regarding

15          exposure.  I have an opinion as to how thorough

16          some of these studies or agency documents were in

17          evaluating aerosolized exposure.  I mean, I have

18          opinions regarding that.

19   Q.     Okay.  Why don't you tell me -- list for me what

20          your new opinions are specifically?

21   A.     Well, my opinion is that these agencies didn't

22          specifically really adequately look at the type of

23          exposure that Mr. Blair had.  The studies weren't

24          applicable.  And I think to a large extent when I

25          looked at the EPA stuff and some of the other
```

Sanford R. Katz, M.D.

```
 1        government evaluations, they just acknowledge that

 2        there just wasn't much regarding inhalation

 3        exposure.  And so I feel -- my new opinion is that

 4        it just really wasn't evaluated sufficiently.

 5             And my other opinion is that some of the

 6        studies that were cited as being perhaps reflective

 7        of inhalation exposure were flawed.  I think that

 8        they had conflicts of interest, which I know is of

 9        particular interest to you.  I believe that the

10        ones that were referred to commonly had strong

11        conflicts of interest and that they, from a

12        methodological standpoint, were very faulty and

13        flawed.  So, I mean --

14   Q.   Okay.  Well, what studies --

15             MR. JOSEPH:  Wait.  Wait.  Joe, can he

16        please finish?

17   A.   Yeah.  So, I mean, and I think that the other

18        opinion is that most of the stuff that I've been

19        reading doesn't apply because all of these studies

20        and conclusions about glyphosate, they're really

21        not studies and conclusions about Roundup.

22             Roundup, from my understanding, from the

23        documents I received about Roundup Pro

24        specifically, it looks like it's about 59 percent

25        agitant.  And so I don't really have a lot of
```

Sanford R. Katz, M.D.

```
 1        information.  Glyphosate is just the active

 2        ingredient.  And, to me, a lot of all this is

 3        irrelevant because I do see data that suggests the

 4        end product, the glyphosate-based herbicide itself,

 5        is more toxic than glyphosate alone.

 6             And so all this stuff I've been reading, I

 7        just don't think it's relevant.  Plus none of the

 8        stuff I've been reading is applicable in terms of

 9        how he was applying.  So that's an opinion that's

10        only gotten stronger the more I read.

11   BY MR. PIORKOWSKI:

12   Q.   You done?

13   A.   Yes.

14   Q.   When you say "these agencies" in your answer, what

15        agencies are you talking about?

16   A.   Okay.  So let me pull up the document review list.

17        Let's see.  The U.S. EPA in their 2003 Registration

18        Eligibility Registration.  The EPA's Office of

19        Pesticides issue paper.

20   Q.   Dated when?

21   A.   That one was dated 2016.  I've got one from the

22        U.S. Department of Health and Human Services, which

23        is the agency for toxic substances and disease

24        register from the Public Health Service from 2020.

25             And then even the -- there was one EFSA, the
```

Sanford R. Katz, M.D.

```
 1          European Food Safety Authority.  You know, they

 2          published something in 2017 essentially saying that

 3          their opinions -- previous opinions about

 4          glyphosate are specific to glyphosate and

 5          essentially that the end product with the -- you

 6          know, the end product with the mixtures is not

 7          specifically something that they looked at.

 8              And they acknowledged that -- and I'm

 9          paraphrasing.  You'll have to excuse me.  But

10          essentially they're saying that, hey, they can't

11          say one way or the other whether it's applicable to

12          the finished product or the end product.

13              So that, you know, suggests to me that their

14          initial conclusions and reports may not be

15          applicable.  But these are at least I think three

16          government agencies, I think.

17   Q.     Okay.  So EPA, U.S. Department of Health and Human

18          Services, and the European Food Safety

19          Administration?  Those are the three agencies

20          you're referring to?

21   A.     Yes, I believe that's correct.

22   Q.     And the document on your supplemental list that

23          says "EFSA explains risk assessment:  Glyphosate,"

24          that is the basis about your statement about the

25          EFSA; is that right?
```

Sanford R. Katz, M.D.

```
 1    A.   Yes.

 2    Q.   Now, you said studies reflective of inhalation

 3         exposure were flawed and conflicted.  Did I get

 4         that right?

 5    A.   The ones that -- two of the studies that I believe

 6         Dr. Olive referred to I think are flawed and not

 7         applicable to Mr. Blair's situation.

 8    Q.   And which studies are those?

 9    A.   She mentioned the -- I believe she mentioned the

10         Pierce paper.  The Pierce paper, which was issued

11         by Cardno ChemRisk as well as the Acquavella.  How

12         do you say that?

13    Q.   Acquavella.

14    A.   Acquavella.

15    Q.   So were those the papers on your materials

16         considered list by Acquavella and Pierce

17         respectively?

18    A.   That's correct.

19    Q.   And the Pierce paper you're referring to is by

20         Jennifer Pierce, the Studies That Evaluated

21         Inhalation and Dermal Glyphosate Exposure Resulting

22         From Simulated Heavy Residential Consumer

23         Application of Roundup?

24    A.   That's correct.

25    Q.   Okay.  And what's your basis for saying those --
```

Sanford R. Katz, M.D.

1       that there was conflicts of interest in those

2       studies?

3   A.  Well, so the Acquavella one I believe he was a

4       scientist working for Roundup.  I'm sorry, not

5       Roundup.  Monsanto.  And that Monsanto financially

6       supported that study.

7           And then Jennifer Pierce was working for a

8       private independent consulting firm assigned to the

9       consulting firm that is, you know, paid to do these

10      studies and generally works for pharmaceutical,

11      chemical companies, and what not.

12          And I understand also that there's some -- I

13      think perhaps the founder of that company may have

14      some negative publicity from some previous things

15      that he worked on.

16  Q.  Can you -- I mean, rather than sort of doing a

17      drive-by shooting with some general --

18  A.  Yeah.  I understand.  I believe that -- I'm just

19      trying to remember.  Shoot.  There was some

20      question about their company paying a scientist to

21      -- it was suggested that he may have paid a

22      scientist to change their opinion on a previous

23      case.  There was some stuff that I came across.

24          There was another one.  Was it with -- I don't

25      know.  There was just some things regarding the

Sanford R. Katz, M.D.

```
 1         company that they had gotten some negative press

 2         for.  I didn't explore it very far.  That wasn't

 3         really so much the basis other than, you know, my

 4         general sense that companies that are being paid by

 5         -- I'm sorry.  Independent consultant firms that do

 6         scientific research that are being paid by industry

 7         are subject to bias.

 8              And that was basically the gist of it.  I

 9         didn't really get into his -- I mean, you referred

10         to drive-by shootings.  I mean, when I researched a

11         little bit, that kind of popped up and got my

12         interest.  But I didn't really search that down so

13         much.  As much as it was just generally this was --

14         they were hired to do this study.  That was the

15         gist of it.

16    Q.   When I asked you the last time about Dr. Benbrook

17         and the fact that he had made $800,000 as an expert

18         in the Roundup litigation at the time that he

19         published the paper that you relied on, you told me

20         that you don't really consider that and you really

21         like to give people the benefit of the doubt.

22              So does that only go for papers that are

23         authored by people who support the plaintiff's

24         position, or is that an approach you use generally?

25    A.   Yeah.  I think it's a little different because if
```

Sanford R. Katz, M.D.

```
 1          you're paid to do the study, you know, the design,

 2          the measures, how you interpret the data, how

 3          critical you are of the studies weaknesses and

 4          flaws, you know, you're paid moving forward to look

 5          at a particular issue and get results.  And it's

 6          certainly possible for you to be influenced, you

 7          know, moving forward.

 8              As far as an expert witness who is reviewing,

 9          you know, has an opinion and then is being paid to

10          express that opinion.  If they form that opinion

11          before they are paid, I think that if there's a big

12          litigation case and they're asked to do a lot of

13          work and then appear a lot at trials and

14          depositions and then at the end they make a lot of

15          money, I think that's because they're doing a lot

16          of work.  They weren't necessarily paid to have the

17          opinion up front.  So that's why I give him the

18          benefit of the doubt.

19              I can speak from my own experience that I've

20          actually done a lot more work than I expected.  I'm

21          billing more than I ever anticipated.  I'm going to

22          make more money than I expected, but it

23          certainly -- my opinion was established before I

24          received a single penny.  So I hope people give me

25          the benefit of the doubt.
```

Sanford R. Katz, M.D.

```
 1   Q.   Well, that's not Dr. Benbrook's story.

 2        Dr. Benbrook published a paper in 2019.  He was an

 3        expert starting in 2017.  So the review paper was

 4        not formed -- the review paper was not published

 5        prior to the time he was retained as an expert.  In

 6        fact, there's a disclosure in the paper that he's

 7        actively serving as an expert.  Does that change

 8        the analysis?

 9   A.   Well, again, if he formed the opinion before he was

10        a paid expert and his opinion is the same after

11        being paid as an expert, again, I would like to

12        assume that his integrity was not compromised.

13   Q.   Okay.  Since the last deposition have you paid your

14        dues for the Louisiana State Medical Society?

15   A.   I don't -- I don't believe.  No, not that I'm aware

16        of.

17   Q.   Do you see what I've marked as --

18   A.   And I don't believe it's my intention to pay those

19        dues.

20   Q.   I thought you said last time it was?

21   A.   No.  I've since spoken with some of my partners,

22        and they're not -- I mean, as a whole we're

23        generally feeling that we're not going to continue.

24   Q.   For what reason?

25   A.   We don't feel it necessarily represents our
```

Sanford R. Katz, M.D.

```
 1          interests as radiation oncologists.

 2   Q.    Okay.  Do you see what I've marked as Exhibit 33?

 3          (Exhibit No. 33 was marked for

 4          identification and attached hereto.)

 5   A.    By the way, we are -- at least I'm planning to

 6          maintain my membership in the Shreveport Medical

 7          Society.

 8          Your question is?  Could you please repeat the

 9          question?

10   BY MR. PIORKOWSKI:

11   Q.    The question is do you see what I've marked as

12          Exhibit 33?

13   A.    Yes.

14   Q.    Okay.  And I'll represent to you that this is a

15          section of the Louisiana State Medical Society's

16          Policy Manual that talks about, among other things,

17          medical expert testimony.  And if you could turn to

18          page 46.

19   A.    Okay.

20   Q.    Do you recall at your first deposition when we were

21          talking about the affidavit that you did a couple

22          years ago?  I asked you whether that was venturing

23          into the -- into being an expert witness and

24          whether there were ethical guidelines that were

25          implicated when you served as an expert witness?
```

Sanford R. Katz, M.D.

```
1         Do you remember that?
2    A.   Yes.
3    Q.   And you said that there were; correct?  Or your
4         understanding was there were?
5    A.   I assumed that there were.
6    Q.   Okay.  And at least at the time you did your
7         affidavit you were a member of this Louisiana State
8         Medical Society; right?
9    A.   I can't confirm that I was active at that time.
10   Q.   Okay.  Well, regardless, do you see that there's a
11        section in 232.01 that says that "Advocacy and
12        partisanship should be discouraged, although a
13        physician may advocate a position which is support
14        by collateral sources of information after
15        reviewing the available medical literature and
16        scientific evidence, the physician should avoid
17        taking on the role of the third party and
18        advocating positions not supported in the medical
19        literature or the available records."
20             And apart from whether you are or aren't a
21        member of the Louisiana State Medical Society, you
22        believe that that is an appropriate ethical
23        guideline for expert witnesses to follow?
24   A.   I don't believe that I'm either an advocate nor am
25        I partisan.
```

Sanford R. Katz, M.D.

```
1    Q.    That's not what I asked.  I didn't ask that.  I
2          asked whether you believe that to be an appropriate
3          ethical guideline?
4                MR. JOSEPH:  To the extent you asked him
5                that question, you framed it -- you read all
6                the stuff from the particular section and you
7                framed it that way.  He's entitled to answer
8                the question --
9                MR. PIORKOWSKI:  No.  It's for the jury
10               to decide whether he's an advocate or whether
11               he's partisan.  My question is just whether he
12               considers that to be an appropriate ethical
13               guideline.
14               MR. JOSEPH:  Within the bounds of the
15               terms that are used?
16               MR. PIORKOWSKI:  He can answer the
17               question how he wants.
18               MR. JOSEPH:  Yeah.
19               THE WITNESS:  Let me read it again.
20               MR. JOSEPH:  Yeah.  Read the entire
21               section, Dr. Katz.  I think there's more to it
22               than the way he's phrased the question.
23               With all due respect, Joe.
24               THE WITNESS:  The whole section?  From
25               the beginning?  The LSMS?
```

Sanford R. Katz, M.D.

```
 1                MR. PIORKOWSKI:  Objection.  Curtis,
 2           you're coaching him.
 3                MR. JOSEPH:  No.  You're giving him
 4           something that he hasn't read, first of all.
 5           And then you're piecemeal reading it to him,
 6           Joe, and asking him out of context and then
 7           asking him to provide a response.  There's
 8           more to the section.  There's more to the
 9           language here.
10                MR. PIORKOWSKI:  Object to the
11           commentary.  Go ahead.  Read what you want to
12           read.
13                MR. JOSEPH:  Object to the form of the
14           question.
15    A.   I don't think I'm comfortable answering the
16         question without really analyzing this and
17         considering this further because I need to really
18         read it in the context.
19    BY MR. PIORKOWSKI:
20    Q.   All right.  Well, let me ask you this:  Do you
21         think it's appropriate for an expert witness to be
22         an advocate for one side or another regardless of
23         what it says here?
24    A.   Yes.  I think you should not be an advocate for one
25         side or another, yeah.
```

Sanford R. Katz, M.D.

```
 1   Q.   And do you think it's -- do you think an expert

 2        witness has a responsibility to review the

 3        scientific evidence in a manner that is objective

 4        and unbiased?

 5   A.   Yes.

 6   Q.   Okay.  Do you see in the Louisiana State Medical

 7        Society that they actually talk about the fact --

 8        if you look at 232.03 -- that the "Louisiana

 9        statutes provide immunity from civil and criminal

10        liability for all physicians who provide expert

11        testimony according to the ethical guidelines of

12        the American Medical Association and the Louisiana

13        State Medical Society"?

14              MR. JOSEPH:  And does it say that they do

15           or that they should?

16              MR. PIORKOWSKI:  It says that they

17           should.

18   A.   I see that.

19   BY MR. PIORKOWSKI:

20   Q.   Okay.  Are you familiar with the American Medical

21        Association's Guidelines with respect to testimony?

22   A.   I'm not.

23   Q.   Can you look at what I've marked as Exhibit 34,

24        please?

25              (Exhibit No. 34 was marked for
```

Sanford R. Katz, M.D.

1                identification and attached hereto.)

2    A.   Okay.

3    BY MR. PIORKOWSKI:

4    Q.   And I'll represent to you that this is Chapter 9 of

5         the American Medical Association.  It's a section

6         on ethics.  And if you look at chapter 9.7.1 on

7         page 22.  It has the AMA's guidelines for providing

8         medical testimony.  Do you see that?

9                MR. JOSEPH:  What page?

10               MR. PIORKOWSKI:  22.

11               MR. JOSEPH:  Thank you.

12   A.   Okay.  I'm sorry.  Where am I looking on page 22?

13   BY MR. PIORKOWSKI:

14   Q.   Under section 9.7.1, medical testimony.

15   A.   Yes.

16   Q.   Okay.  And I'm not asking you specifically about

17        this document, but I'm using this as a springboard

18        for the questions.  The document says "Whenever

19        physicians serve as witnesses they must, A,

20        accurately represent their qualifications."  Do you

21        agree with that?

22   A.   Yes.  I believe that -- I agree.

23   Q.   Okay.  And it says that "Physicians must testify

24        honestly."  Do you agree with that?

25   A.   Yes.

Sanford R. Katz, M.D.

```
1    Q.   Okay.  Do you see on the next page 23 it says
2         "Physicians who testify as expert witnesses must:"?
3    A.   Yes.
4    Q.   Okay.  And first it says "Testify only in areas in
5         which they have appropriate training and recent
6         substantive experience and knowledge."  Do you
7         agree with that?
8    A.   Yes.
9    Q.   It says that "Physicians must evaluate cases
10        objectively and provide an independent opinion."
11        Do you agree with that?
12   A.   Yes.
13   Q.   "The physicians who testify as expert witnesses
14        must ensure that their testimony, one, reflects
15        current scientific thought and standards of care
16        that have gained acceptance among peers in the
17        relevant field and also appropriately characterizes
18        the theory in which the testimony is based if the
19        theory is not widely accepted in the profession."
20        Do you agree with that?
21   A.   Is that one, two, or three?  I missed it.
22   Q.   It's one and two.  Let me break the question down.
23        Let me withdraw the question and I'll break it down
24        into two questions to make it clear.
25                  MR. JOSEPH:  To the extent, Joe, that
```

Sanford R. Katz, M.D.

```
 1                you're asking him to testify about documents

 2                that he's not read, I would like him to have

 3                the opportunity to read them.

 4                     MR. PIORKOWSKI:  I'm not asking him.  I'm

 5                not asking him.  I made that clear at the

 6                beginning, Curtis.

 7                     MR. JOSEPH:  Then why is he looking at

 8                it, Joe?

 9                     MR. PIORKOWSKI:  Because I want him to

10                know what the AMA says.  But I'm asking him a

11                question about what his opinion about his own

12                ethical duty is as an expert witness, that's

13                all.

14   A.   I'm not a member of the AMA by the way.

15   BY MR. PIORKOWSKI:

16   Q.   It doesn't matter.

17   A.   I think that there's a problem with this.  So as

18        it's written -- okay.  Let's see.  So what if

19        there's no information?  What if there is no data

20        relevant to the case in question like in

21        Mr. Blair's case?

22             I've been told that I am appropriately able to

23        give an opinion as an expert.  So, I mean, based

24        upon what I understand the legal qualifications to

25        be an expert, I've been instructed that I am, you
```

Sanford R. Katz, M.D.

```
1         know, qualified to be an expert.

2              I've found that in my research there is not

3         data for a lot of what is relevant to Mr. Blair's

4         case.  And so for that reason, I give my honest

5         opinion.

6              But I don't know that I can say that

7         everything -- my opinion is based exclusively on

8         things that are peer-reviewed and widely accepted

9         by experts because I think we're venturing into an

10        area that wasn't considered.  And a lot of the

11        aspects of this case are not considered in the

12        scientific literature; so I have to give my

13        opinion.

14             And so that's why I have a problem with all of

15        this.  Because I'm giving my opinion.  I mean, I'm

16        not just restating everyone else's opinion.  I'm

17        reading other people's opinion.  And that's why I

18        included some of the stuff on -- yes, it was about

19        COVID, but it dealt with respiratory inhalation of

20        droplets.  And based upon all these things it all

21        supports my initial opinion.

22             So I don't think this necessary qualifies.  I

23        can't say yes to this because I don't think it

24        fully considers the situation that we're in.

25   Q.   So you don't think it's -- you don't think you have
```

Sanford R. Katz, M.D.

```
 1          an obligation to appropriately characterize the

 2          theory on which your testimony is based?

 3   A.     Oh, no.  I agree.  I can appropriately characterize

 4          the theory.

 5   Q.     Okay.

 6   A.     But -- yeah, I can do that.

 7   Q.     Okay.  Well, that was my question.  And it says in

 8          particular "if the theory is not widely accepted in

 9          the profession"?

10   A.     Yes.  I can do that.

11   Q.     Okay.  All right.  So --

12   A.     But the first part reflects current scientific

13          thought and standards of care.  But the current

14          scientific thought does not address this issue.

15          That's the problem I have with number one.  And

16          it's not accepted among peers necessarily.  So I

17          don't know that I can have a peer in this situation

18          because it hadn't really be adequately addressed.

19   Q.     So your opinion is there is not -- that there are

20          no data that have evaluated the potential

21          carcinogenicity of glyphosate with respect to

22          inhalational exposure?  Is that your opinion?

23   A.     My opinion is there is inadequate data supporting

24          the effects of inhalation of Roundup in the

25          scientific literature.
```

Sanford R. Katz, M.D.

1    Q.   Inadequate data supporting?

2             (The court reporter read back a portion

3             of the testimony.)

4    A.   By humans.

5    BY MR. PIORKOWSKI:

6    Q.   And when you say "There is inadequate data

7         supporting the effect," what you mean is there are

8         no data showing that there's a risk, and there are

9         no data showing that there is not a risk; correct?

10   A.   That's correct.

11   Q.   Okay.  And --

12   A.   And let me qualify that statement.  To the extent

13        that I could find it, I'm not excluding the

14        possibility that there may have been studies that I

15        am not aware of that I haven't found.

16   Q.   But as you sit here today, you have not identified

17        any data that specifically addresses whether or not

18        Roundup causes non-Hodgkins lymphoma based on an

19        inhalational route?  Is that a fair statement?

20   A.   That's a correct statement.

21   Q.   Okay.  Let me go back to another question.  We were

22        talking about having a recent substantive

23        experience and knowledge in an area.  Do you have

24        recent substantive experience and knowledge in the

25        conduct and interpretation of genotoxicity studies?

```
 1   A.   No.  I'm sorry can you repeat the question?

 2             (The court reporter read a portion of

 3             the testimony back.)

 4   BY MR. PIORKOWSKI:

 5   Q.   Let me correct it.  Do you have recent substantive

 6        experience and knowledge in the conduct and

 7        interpretation of genotoxicity studies?

 8   A.   I've read about the genotoxicity studies.  I've

 9        read the conclusions of those studies.  I've read a

10        bit about how they were performed, but I can't say

11        that I have expertise in that area.

12   Q.   Well, prior to getting involved in this case, did

13        you have any recent substantive experience and

14        knowledge in the conduct and interpretation of

15        genotoxicity studies?

16   A.   No.

17   Q.   Okay.  Am I correct that you have not done a

18        comprehensive review of the literature with respect

19        to the genotoxicity of glyphosate; is that correct?

20   A.   That's correct.

21   Q.   Okay.  And are you planning in this case to offer

22        an expert opinion about the genotoxicity of

23        glyphosate or Roundup?

24   A.   No.

25   Q.   And what about with respect to -- do you have
```

Sanford R. Katz, M.D.

```
 1          recent substantive experience and knowledge in

 2          conducting or interpreting animal carcinogenicity

 3          studies?

 4   A.     No.

 5   Q.     And am I correct that you have not done a

 6          comprehensive review of the literature with respect

 7          to animal carcinogenicity studies on glyphosate or

 8          Roundup; is that correct?

 9   A.     Can you define comprehensive?

10   Q.     Yeah.  Have you looked at all the studies?

11   A.     I have not looked at each individual study.  I have

12          looked at reviews where they refer to the studies.

13          I mean, there's quite an extensive list.  There's a

14          lot of studies on glyphosate, and it would be

15          exhaustive.  And I'm a clinician.  I'm not an

16          academic researcher who has unlimited time to

17          review every single paper.

18              So I didn't believe that that was my role nor

19          was that expected of me to do a comprehensive

20          review of all the animal studies, but more to

21          render my opinion based on my understanding of the

22          literature as it pertains to Mr. Blair in my

23          opinion.

24              Again, as I stated earlier, the studies on

25          glyphosate specifically I don't believe necessarily
```

Sanford R. Katz, M.D.

```
 1         are entirely applicable to the product Roundup

 2         because Roundup again contains considerably more

 3         than just glyphosate.

 4              So when I look at those references, I

 5         interpret them accordingly.  That's not to say --

 6         the way I look at it is if there is animal studies

 7         supporting toxicity from glyphosate, then, okay,

 8         that supports it.

 9              But at the same time, I mean, again, that's

10         the main active ingredient that I understand.  But

11         Roundup is a lot more than glyphosate.

12    Q.   Okay.  Object to the nonresponsive portion.  Are

13         you planning in this case to offer any expert

14         opinions about the animal carcinogenicity studies

15         with respect to glyphosate or Roundup?

16    A.   Can you repeat the question, please?

17              (The court reporter read back a portion

18              of the testimony.)

19    A.   Does that include referring to them or mentioning

20         them?

21    BY MR. PIORKOWSKI:

22    Q.   Are you offering any opinions about them apart from

23         reciting what IARC found or reciting what some

24         other expert found?  Are you independently offering

25         any opinions about what the animal studies on
```

Sanford R. Katz, M.D.

```
1       glyphosate and Roundup showed?

2   A.  No.

3   Q.  Okay.  One of the papers -- are you doing all

4       right, Dr. Katz?

5   A.  I would like a break if you don't mind.

6   Q.  Okay.  Why don't we take -- is five minutes okay?

7       Five?  Ten?

8   A.  Ten would be good.

9   Q.  Okay.  Let's take ten minutes.

10              THE VIDEOGRAPHER:  The time is

11          10:11 a.m., and we are off the record.

12          (A short recess was taken.)

13              THE VIDEOGRAPHER:  The time is

14          10:26 a.m., and we are on the record.

15  BY MR. PIORKOWSKI:

16  Q.  So I want to go back to when I was asking about

17      your opinions.  You made a comment about the

18      applicability of studies looking at glyphosate

19      versus Roundup.  Do you remember that general

20      comment?

21  A.  Yes.

22  Q.  Okay.  And what studies is it that you contend are

23      not applicable because they looked at glyphosate as

24      opposed to Roundup?

25  A.  I mean, there's a lot of animal studies.  There's a
```

Sanford R. Katz, M.D.

```
 1         lot of human studies.  I mean, I know -- it's my
 2         understanding that the EFSA looked specifically at
 3         glyphosate in issuing their opinion but then
 4         subsequently acknowledged that, you know, Roundup
 5         is not just glyphosate.  So, I mean, they stated it
 6         in their own subsequent risk assessment paper that
 7         they put out.
 8              I mean, there's a considerable amount of
 9         research.  Probably the majority of the research is
10         on glyphosate, not on Roundup.  There are some
11         animal studies, there are some in vitro studies
12         that I understand that looked at Roundup as opposed
13         to glyphosate and found either increased toxicity
14         as they described it with the glyphosate-based
15         herbicide that they found perhaps some different
16         effects, genetic effects on the DNA.
17              And also the IARC I believe considered more
18         studies that looked at glyphosate-based herbicides
19         than perhaps some of the other agencies.
20   Q.    What's your basis for saying that?
21   A.    So the things that I read in some of the articles.
22   Q.    Dr. Benbrook's paper?
23   A.    I don't specifically recall which paper.  I read it
24         in quite a number of places.  Like I said, the EFSA
25         themselves said it.
```

Sanford R. Katz, M.D.

1    Q.    So first of all, you're only referring to

2          genotoxicity studies and animal studies when you

3          make that comment; right?  In other words, this

4          isn't applicable to the epidemiological studies?

5    A.    No.  The epidemiological studies I think also there

6          was some that looked at the end product, the

7          glyphosate-based herbicides I seem to recall.

8               There was a very interesting study that looked

9          at an Ecuadorian population who were exposed to

10         three days worth of aerial spraying.  And then over

11         the course -- and then they did blood samples on

12         them and performed some evaluations and found

13         epigenetic changes to lymphocytes going out as far

14         as a number of weeks.  I think that was a very

15         interesting paper.

16   Q.    Okay.

17   A.    And that specifically was not spraying glyphosate

18         but was spraying an end product.

19   Q.    Okay.  I don't think that had anything to do with

20         my question that I asked.  My question that I asked

21         is all of the epidemiological studies, what you're

22         describing is the Paz-y-Miño study, which is on

23         your list; correct?

24   A.    Yes.

25   Q.    The one you just eluded to with the Ecuador; right?

Sanford R. Katz, M.D.

```
 1   A.   Yes.

 2   Q.   That's not an epidemiological study.  That's a

 3        toxicity study; right?

 4   A.   Yes; that's correct.

 5   Q.   So my question has to do with the epidemiological

 6        studies.  All of the epidemiologic studies looked

 7        at glyphosate formulated product.  They didn't just

 8        look at technical glyphosate; correct?

 9   A.   I believe that is a true statement.

10   Q.   Okay.  With respect to the Paz-y-Miño study, did

11        you look at the follow-up study that was done by

12        Paz-y-Miño on the same population?

13   A.   I did not see that.

14   Q.   Okay.  Do you know whether the changes -- do you

15        remember -- I know you read the EPA's 2017 review,

16        which has a section in it on genotoxicity.  Do you

17        recall, just as a general matter, that they talked

18        about genotoxicity as being divided into transient

19        changes and permanent changes?

20   A.   I don't recall.

21   Q.   Okay.  Is it your understanding that -- what is

22        your understanding of what genotoxicity means?

23   A.   That there are alterations in the genes of the cell

24        that can be identified.

25   Q.   Alterations --
```

Sanford R. Katz, M.D.

```
 1   A.   Well, changes in methylation, specific changes in

 2        the structure of DNA, evidence of oxidative stress,

 3        changes -- you know, changes in methylation.

 4        Various changes that can occur at the cellular

 5        level.

 6   Q.   So what's the difference between genotoxicity and

 7        mutagenicity?

 8   A.   My understanding is -- and I'm certainly not an

 9        expert on that subject, but my understanding is

10        that genotoxicity shows changes in the DNA whereas

11        mutagenicity demonstrates that that translates into

12        the development of tumors.

13   Q.   Okay.

14   A.   Or cancers.  But, you know, one shows an effect on

15        the DNA; the other doesn't.  But it doesn't

16        necessarily demonstrate that in fact it's

17        carcinogenic.

18   Q.   Well, is everything that's genotoxic mutagenic?

19   A.   Not necessarily, that's my understanding.

20   Q.   Okay.  And you can have changes -- anything that

21        damages DNA it's genotoxic?  Is that your

22        understanding?

23   A.   Yes.

24   Q.   Okay.  And you can have damage to DNA that does not

25        result in mutations; correct?
```

```
1   A.    It's my understanding that you can, and at the same
2         time it may not be necessarily, you know, occur all
3         the time.
4   Q.    Right.  But not everything that's genotoxic is
5         mutagenic; is that correct?
6   A.    No.  But I think it demonstrates that there is a
7         negative impact on sensitive cells; so there's
8         certainly the potential.
9   Q.    Okay.  One of the studies that you referenced in
10        your materials considered list is the Zhang paper,
11        which has been marked as Exhibit 12.  Do you have
12        that handy?
13  A.    Yes.
14  Q.    Okay.  And this paper came out in 2019; is that
15        right?
16  A.    That's correct.
17  Q.    Okay.  And if you turn to page 196, Table 4, am I
18        correct that Zhang looked at two different versions
19        of the agricultural --
20  A.    I'm sorry.  Can you give me a moment, please?
21              MR. JOSEPH:  Which number is that, Joe?
22              MR. PIORKOWSKI:  12.
23              MR. JOSEPH:  Thank you.
24  A.    Okay.  I see it.
25  BY MR. PIORKOWSKI:
```

Sanford R. Katz, M.D.

1    Q.    Okay.  So this -- what Zhang did was a

2          meta-analysis; correct?

3    A.    Yes.

4    Q.    And a meta-analysis is when you combine together a

5          bunch of different studies and try to see how it

6          comes out when you sort of mix the data all

7          together.  Is that a fair characterization?

8    A.    Yes.

9    Q.    Now, Zhang looked at two versions of the

10         agricultural health study.  She looked at the

11         Andreotti 2018 paper, and she also looked at the

12         DeRoos 2005 paper; correct?

13   A.    Yes.

14   Q.    Okay.  And then separately from that she looked at

15         five case control studies including DeRoos 2003,

16         Eriksson 2008, Hardell 2008, McDuffie 2001, and

17         Orsi 2009; correct?

18   A.    Right.  Correct.

19   Q.    And as a part of her analysis, she conducted an

20         assessment of the quality of the studies that she

21         looked at; is that right?

22   A.    Let me see.  Where is that in the paper?

23   Q.    Actually, I'll come back to that.  Let me ask you

24         to turn to page 199.  And did you see under AHS

25         that's the cohort study?

Sanford R. Katz, M.D.

```
 1    A.    Yes.

 2    Q.    Okay.  It says "In general, cohort studies are

 3          considered the gold standard among observational

 4          studies because of their ability to estimate

 5          exposure before disease occurrence, which allows

 6          for clarity of temporality and can minimize recall

 7          bias, to estimate incidence and examine multiple

 8          outcomes, and for some target populations to study

 9          a large number of exposed subjects"; correct?

10    A.    Yes.

11    Q.    Do you agree with that generally, that principle?

12    A.    I do.

13    Q.    Okay.  And then it goes on to say "Our current

14          meta-analysis is the first to include the AHS 2018

15          update, which is the largest, newest, and most

16          heavily weighted study"; correct?

17    A.    Yes.

18    Q.    Okay.  Now, that study that she's referring to is

19          Andreotti 2018; correct?

20    A.    Yes.

21    Q.    Which is Exhibit 17 I believe?

22    A.    Yes.

23    Q.    And that's a study that you looked at; correct?

24    A.    Yes.  What page are we on before again?  I'm sorry.

25    Q.    When I was reading from Zhang you mean?
```

Sanford R. Katz, M.D.

```
 1                    MR. JOSEPH:  199.

 2   BY MR. PIORKOWSKI:

 3   Q.   Yeah.  199.

 4   A.   Okay.

 5   Q.   You with me?

 6   A.   Just about.  Yes.

 7   Q.   Okay.  So Andreotti is a paper that you considered

 8        at the time you issued your original report;

 9        correct?

10   A.   Yes.

11   Q.   Okay.  And the original paper was published in

12        2018; is that correct?

13   A.   Which one?  The Andreotti study?

14   Q.   Yes.

15   A.   No.  2017.

16   Q.   Well, look at the top it was submitted and accepted

17        in 2017.  It was published in 2018.  Do you see the

18        top right?

19   A.   Yes.  I see that.  That's correct.  Oh, no.  Wait a

20        second.  It says it was published.  I'm looking at

21        The Journal of National Cancer Institute -- I

22        clicked to the actual abstract and it says

23        published 9, November, 2017.

24   Q.   Online.  Okay.  Regardless, the date of the

25        publication and the Journal of the National Cancer
```

Sanford R. Katz, M.D.

```
1          Institute is dated as 2018; right?

2   A.     Yes, it is.

3   Q.     Okay.

4   A.     But I don't understand if it says it was published

5          in November of 2017, what's the discrepancy between

6          those two?

7   Q.     I think the dates -- I think the difference is it

8          says published first online in November 2017 and

9          then the hard copy journals often come out some

10         time later.

11  A.     So that means it was available online to read

12         before it came out in print?

13  Q.     That's my understanding.

14  A.     Okay.

15  Q.     Regardless, whether it's 2017 or 2018, we can agree

16         that the Andreotti study was not available when

17         IARC wrote its monograph; is that right?

18  A.     Yes.

19  Q.     Okay.  Now, the Andreotti study is a prospective

20         study; correct?

21  A.     Let me double-check.  Yes.

22  Q.     There's a cohort study; correct?

23  A.     Yes.

24  Q.     It was funded by the National Institutes of Health,

25         the National Cancer Institute, the National
```

Sanford R. Katz, M.D.

```
 1          Institute of Environmental Health Science, and the
 2          Iowa Cancer Registry and Iowa's Holden
 3          Comprehensive Cancer Center; is that right?
 4    A.    Yes.
 5    Q.    Okay.  Which are all federal or state governmental
 6          agencies; right?
 7    A.    Yes.
 8    Q.    Okay.  Any -- do you have any knowledge that
 9          there's any funding of the study by Monsanto?
10    A.    I have no knowledge of that.
11    Q.    Okay.  Any knowledge that there's any funding by
12          any industry or commercial entity?
13    A.    I have no knowledge of that.
14    Q.    Okay.  Any knowledge of the authors of the study
15          having any financial conflicts of interest?
16    A.    I'm not aware of that.
17    Q.    Now if we turn to page 511?
18    A.    Hold on a second.  I've got to go back to -- let's
19          see.  511 on which paper are you referring to?
20    Q.    Same paper, Andreotti.
21    A.    Okay.  I want to make sure I have the right paper.
22          I pulled up two different papers.  Okay.  511.
23    Q.    Suddenly we have a lot of static.
24    A.    I'm reading it online, and it's not giving me the
25          page numbers.  Let me pull it up in PDF.  No. That
```

Sanford R. Katz, M.D.

```
 1        won't work.  Is that an exhibit?

 2   Q.   Yes.  It's Exhibit 17.

 3             THE COURT REPORTER:  I'm sorry.  Can we

 4        off the record for a second?

 5             MR. PIORKOWSKI:  Sure.

 6             THE VIDEOGRAPHER:  The time is

 7        approximately 10:42 a.m. and we are off the

 8        record.

 9        (Off the record.)

10             THE VIDEOGRAPHER:  The time is

11        approximately 10:45 a.m. and we are on the

12        record.

13             MR. PIORKOWSKI:  I'm sorry.  Was there a

14        question pending, Meredith, or are we in

15        between questions?

16        (The court reporter read back a portion

17        of the testimony.)

18   A.   I am not familiar with that.

19   Q.   Is that no?

20   A.   That's a no.  I have no knowledge of that.

21   BY MR. PIORKOWSKI:

22   Q.   Okay.  Let me know when you're on page 511,

23        Dr. Katz.

24   A.   Okay.

25   Q.   All right.  Do you see on page 511 there were under
```

Sanford R. Katz, M.D.

```
 1          the results it says "among 54,251 participants in

 2          the study"?

 3    A.    Yes.

 4    Q.    And that's your understanding of the number of

 5          overall participants in the Andreotti paper; is

 6          that right?

 7    A.    Yes.

 8    Q.    And of those, 44,932 or 82.8 percent had reported

 9          using glyphosate; correct?

10    A.    Yes.

11    Q.    Okay.  And is it your understanding that Andreotti

12          is the largest observational study that has ever

13          been published looking at the relationship between

14          glyphosate and non-Hodgkins lymphoma?

15    A.    I don't recall specifically that.

16    Q.    As you sit here today, are you able to name any

17          study that has any larger numbers?

18    A.    In terms of prospective study?

19    Q.    In terms of any study.

20    A.    I mean, meta-analysis certainly would include more

21          studies.

22    Q.    Well, I'm talking about a study, meaning either a

23          case control study or a cohort study, not a

24          meta-analysis.

25    A.    No.
```

Sanford R. Katz, M.D.

```
 1   Q.   Okay.  And the median number of lifetime years of
 2        glyphosate use was 8.5 years; is that right?  At
 3        the outset.
 4   A.   Yes.
 5   Q.   And it's correct that Andreotti included three
 6        different metrics for assessment of exposure;
 7        correct?  On page 510.
 8   A.   Which paragraph are you referring to?
 9   Q.   Under exposure assessment in the middle of that
10        paragraph it says "Using this information, three
11        metrics of cumulative lifetime exposure were
12        created for each pesticide:  Ever/never use,
13        lifetime days of use, and intensity-weighted
14        lifetime days."
15   A.   I'm not seeing where that is.  I'm sorry.  Under
16        exposure assessment.
17   Q.   Fifth line down on the right-hand side.
18   A.   Okay.  Yes.  I see it.
19   Q.   Okay.  So is it your understanding that they used
20        three different metrics for assessment of the
21        exposure in the Andreotti paper?
22   A.   Yes.
23   Q.   Okay.  Are you aware of any other study in the
24        medical literature that has looked at glyphosate or
25        Roundup and non-Hodgkins lymphoma that has had an
```

Sanford R. Katz, M.D.

```
 1        exposure of assessment with that level of

 2        granularity?

 3    A.  I can't recall one way or the another specifically.

 4    Q.  Okay.  As you sit here right now, you can't name

 5        one?

 6    A.  I can't name one.

 7    Q.  Okay.  Now can we go back to the Zhang paper for a

 8        second?  Which was --

 9    A.  One thing about this paper, I mean, if I'm reading

10        it correctly, didn't they find an association with

11        non-Hodgkins lymphoma among the people with the

12        highest levels of use?  Is that this study?

13    Q.  We'll come back and talk about that in a second.

14    A.  Okay.

15    Q.  I think the answer is no.

16    A.  Okay.  Are you sure?  I thought I saw that in here.

17    Q.  Okay.  Well, we'll come back and look at it in a

18        second.

19    A.  All right.  Okay.  Where's the Zhang paper?

20    Q.  Okay.  The Zhang paper was No. 12.  Exhibit 12.

21    A.  Shoot.  I think in the process of restarting I may

22        have -- oh, I have to go back.  Okay.  Never mind.

23        Exhibit 12.  Okay.

24    Q.  Let me know when you have it.

25    A.  I have it.
```

Sanford R. Katz, M.D.

1    Q.    Okay.  So do you see on page 194 there's a

2          section 2.5.2 called Study Quality Evaluation?

3    A.    2. -- yes.

4    Q.    Okay.  And what Zhang did here was she assessed

5          using objective criteria using the Newcastle Ottawa

6          Scale.  The quality of each of the cohort and case

7          control studies that were in her meta-analyses; is

8          that correct?

9    A.    Yes, it appears so.

10   Q.    Okay.  And her specific assessments of those

11         findings are set forth in Table 2 and Table 3 on

12         page 195; correct?

13   A.    Yes.  I need to rotate that though.

14   Q.    I'm sorry.  I had asked Mr. Joseph to have you

15         print out these papers so you wouldn't have to be

16         flipping back and forth but --

17              MR. JOSEPH:  When you sent that, as I

18            indicated, I was out of the office yesterday

19            for Yom Kippur.  So I wasn't really tracking

20            my emails yesterday.

21   A.    Okay.  I think I see Table 2.  Yes, I see it.

22   BY MR. PIORKOWSKI:

23   Q.    And that's where her individual assessments of

24         these studies are set forth; correct?

25   A.    Yes.

```
 1   Q.   And she breaks it down by objective criteria for

 2        selection, comparability, and outcome assessments

 3        and then gives an overall score; correct?

 4   A.   Yes.

 5   Q.   And so the overall score for Andreotti was eight;

 6        correct?

 7   A.   Yes.

 8   Q.   And if we go back to page 194, she says the quality

 9        --

10   A.   Hold on.  I need to rotate again.  I'm sorry.

11        Okay.  Go ahead.

12   Q.   It says according to our quality assessment, Tables

13        2 and 3 --

14   A.   I'm sorry.  I have to go back and find this again.

15        Which section?

16   Q.   We're in the section called Study Quality

17        Assessments.

18   A.   Is that at 2.5 something?

19   Q.   Yeah.  It's the same one we were just reading.

20        2.5.2.

21   A.   Okay.  I got it.

22             MR. JOSEPH:  Quality Evaluation.

23   A.   I got it.

24   BY MR. PIORKOWSKI:

25   Q.   Yeah.  And it says, quote, "According to our
```

Sanford R. Katz, M.D.

```
 1        quality assessments, Tables 2 and 3, the highest

 2        quality study in either design category was the AHS

 3        2018 cohort"; correct?

 4   A.   Yes.

 5   Q.   Okay.  Now, in your review of the literature that

 6        you looked at on glyphosate and non-Hodgkins

 7        lymphoma, is there any single study that you

 8        identified that you believe was of higher quality

 9        than the AHS 2018?

10   A.   No.  I believe that that was certainly the largest

11        -- I believe that was the most impactful.

12   Q.   Okay.  And if you were to rate the quality of the

13        AHS 2018 study on a scale of one to ten, how would

14        you rate it?

15   A.   I don't think I'm qualified to do that.

16   Q.   Okay.  And that's because I think you had said

17        originally you're not an expert in epidemiology or

18        biostatistics?

19   A.   That's correct.

20   Q.   All right.  I want to ask you some questions about

21        the results.  So let's turn back to Andreotti

22        again, which is Exhibit 17.

23   A.   Just give me a second.  Okay.

24   Q.   Okay.  Now, do you recall from reading this paper

25        that they divided the participants into quartiles
```

Sanford R. Katz, M.D.

```
 1        based on their level -- their intensity weighted

 2        level of use?

 3   A.   Would you mind terribly -- I have these printed

 4        out, and I think it would be much easier if I could

 5        grab the ones since I have them somewhere.

 6   Q.   I agree.

 7   A.   Can I grab them real quick?

 8   Q.   Absolutely.

 9   A.   Okay.  Now, tell me again which paper you want.

10        You want the?

11   Q.   Andreotti, Glyphosate Use and Cancer Incidence in

12        the Agricultural Health Study.

13   A.   Okay.  Got it.

14   Q.   Okay.  So in the Andreotti paper -- let me go back

15        and rephrase my question.  Do you recall that they

16        divided the participants into quartiles based on

17        their intensity weighted days of glyphosate use?

18   A.   Yes.  Yeah.  I'm looking for that.  Can you remind

19        me how they define those?

20   Q.   Well, look at Table 2.

21   A.   Okay.  Yes.  I see that.  I mean, in terms of --

22        can you tell the reference in terms of how they

23        define level of use?

24   Q.   Well, the exposure metrics that they looked at is

25        on 510 that we just reviewed earlier.
```

Sanford R. Katz, M.D.

```
 1   A.   Okay.  On 510.  I'm sorry.

 2   Q.   Where it says "exposure assessment."

 3   A.   Oh, okay.  The question is -- to answer your

 4        question -- since I didn't specifically review this

 5        paper immediately beforehand, I can't distinguish

 6        and remember all the details of this paper relative

 7        to other papers.

 8             So I just want to be able to answer your

 9        questions completely.  So can we just review the --

10        I mean, the quartiles, I mean, I see where they say

11        "exposed highest quartile used compared with never

12        users."  Okay.  All right.  Fair enough.  But

13        they're using a mathematical formula to define

14        their quartiles.

15   Q.   Correct.

16   A.   Okay.  Fair enough.

17   Q.   But the quartiles are -- the title of Table 2

18        indicates they're based on intensity weighted

19        lifetime days of glyphosate use; correct?

20             In other words, there are three exposure

21        metrics.  The one they are using to divide the

22        quartiles is lifetime -- intensity weighted

23        lifetime days of glyphosate use?

24   A.   I think none of these are applicable to Mr. Blair

25        though.
```

Sanford R. Katz, M.D.

```
 1   Q.   Okay.  Well, that's fine, but I want to cover some
 2        things.
 3   A.   Fair enough.  Let's go ahead.
 4   Q.   And I'm not actually asking the details of the
 5        definition.  I'm really just trying to establish
 6        that they divided the participant population of
 7        glyphosate exposed patients into quartiles based on
 8        some measure of their exposure.  Is that fair?
 9   A.   I understand you're not asking me to critique the
10        paper.
11   Q.   Yes.
12   A.   Okay.
13   Q.   So where it has "none" in these categories, that
14        refers to people who were not exposed to
15        glyphosate?
16   A.   That's correct.
17   Q.   Okay.  So first question is that in the
18        agricultural health study, this is not just a study
19        of non-Hodgkins lymphoma.  This is a study of
20        cancer instance overall; correct?
21   A.   Yes.
22   Q.   And Andreotti found no increased risk of cancer
23        overall in people who used glyphosate; is that
24        correct?  If you look at Table 2 there's --
25   A.   Except for AML.
```

Sanford R. Katz, M.D.

```
 1    Q.    Okay.  But that's not my question.  My question is
 2          all cancers.  Cancer risk overall.
 3    A.    That's correct.
 4    Q.    Okay.  Now -- and that includes they looked at, for
 5          example, colon cancer, rectal cancer, pancreatic
 6          cancer, lung caner, melanoma, prostate cancer,
 7          testicular cancer, and bladder cancer among others;
 8          correct?
 9    A.    Correct.
10    Q.    Okay.  One of the types of cancer that they looked
11          at was non-Hodgkins lymphoma; correct?
12    A.    That's correct.
13    Q.    Okay.  And if we look at the data that's listed
14          under non-Hodgkins lymphoma, we see that there's
15          the quartile risks.  There's 113 patients who were
16          in the first quartile who developed non-Hodgkins
17          lymphoma, 104 patients in the second quartile, 112
18          patients in the third quartile, and 111 patients in
19          the fourth quartile; correct?
20    A.    Correct.
21    Q.    Okay.  And 135 patients in the unexposed group;
22          right?
23    A.    Where is unexposed?
24    Q.    Where it "says none" at the top.
25    A.    Oh, I see what you're saying.  Yeah; correct.
```

Sanford R. Katz, M.D.

```
1    Q.   Okay.  So if we add the exposed group together, 113

2         plus 104 plus 112 plus 111, that comes out to a

3         total of 440; is that right?

4    A.   Okay.  Yes.

5    Q.   And if we compare 440 to the number of

6         glyphosate-exposed individuals, which was 44,932,

7         that would come out to a little less than

8         1 percent; correct?

9    A.   Okay.

10   Q.   Do you agree with that?

11   A.   Sure.  Yes.

12   Q.   So in other words, more than 99 percent of the

13        participants who used glyphosate and were followed

14        for almost 20 years did not develop non-Hodgkins

15        lymphoma; right?

16   A.   Correct.  In this study, yes.

17   Q.   And when you compare patients who were exposed to

18        glyphosate to the participants who were not, the

19        risk was about the same; is that right?

20   A.   Yes.

21   Q.   Now, you had eluded earlier to saying you thought

22        that there was an increase risk with increased

23        exposure in this study in non-Hodgkins lymphoma.

24        Did I understand you correctly?

25   A.   I think that was another study.  I don't see that
```

Sanford R. Katz, M.D.

```
 1        in here.
 2  Q.    Okay.  You would agree with me that this study does
 3        not show any indication of a dose responsive
 4        relationship in terms of the risk of non-Hodgkins
 5        lymphoma and exposure to glyphosate; is that true?
 6  A.    Correct.
 7  Q.    All right.  I want to ask you, by the way, when we
 8        were talking earlier about the Pierce study and you
 9        had mentioned that it was funded by industry and
10        that gave you some skepticism.  Do you remember
11        that discussion?
12  A.    Yes.
13  Q.    When I asked you last time about your own work, you
14        told me that there were -- you did numerous studies
15        that were sponsored by industry; is that true?
16  A.    Correct.
17  Q.    In fact, I think you said you couldn't remember off
18        the top of your head because you had done so many
19        industry studies; is that correct?
20  A.    Yes.
21  Q.    What are some of the companies for which you have
22        done industry sponsored studies?
23  A.    Okay.  Let me pull up my CV.  Let me find that
24        section.  Currently involved with one for Monopar,
25        I did one with Lutris, Soligenix, Oragenics,
```

Sanford R. Katz, M.D.

```
 1       Cellceutix, Sucampo, Reata, SciClone, Protherics,
 2       Endo Pharmaceuticals.  Those I think are -- I think
 3       that's it.
 4   Q.  Are those -- I know Endo is a pharmaceutical
 5       company.  Are the others medical device companies?
 6   A.  No.  They're all pharmaceutical companies.
 7   Q.  Okay.  Now, would it be fair for people to look
 8       skeptically at the research you did for those
 9       companies because those studies were industry
10       funded?
11   A.  I think that certainly could be -- certainly could
12       be something that could be considered, yeah,
13       because they're industry funded.
14   Q.  What's your role in these studies?  Are you
15       principal investigator or co-investigator?
16   A.  Yeah.  I'm a primary investigator for my site.
17   Q.  Okay.  Are you involved in the study design?
18   A.  I was not.
19   Q.  Are you for any of these papers?  I should say, any
20       of these research projects?
21   A.  Let me see.  No.
22   Q.  Okay.  Would you ever allow an industry sponsor to
23       influence the way you present the results of the
24       study data?
25   A.  I wouldn't.
```

Sanford R. Katz, M.D.

1    Q.    Okay.  Have you ever been asked by an industry

2          sponsor to alter the results of study data --

3    A.    No.

4    Q.    -- to make it look more favorable?

5    A.    No.

6    Q.    All right.  I want to ask you a couple questions

7          about some of your consultancies.  And do you see

8          what I've marked as Exhibit 35?

9                (Exhibit No. 35 was marked for

10               identification and attached hereto.)

11   A.    Okay.

12   BY MR. PIORKOWSKI:

13   Q.    Okay.  Is this a website that you're familiar with?

14   A.    Peripherally.  I've heard of ProPublica.

15   Q.    Okay.  So if you look at it, it talks about

16         basically the fact where it says about this

17         information.  The information that appears here

18         comes directly from the federal government.

19               And above that it says "The disclosure of

20         these payments is required under the Physician

21         Payments Sunshine Act and provision of the

22         Affordable Care Act."  Do you see that?

23   A.    Okay.

24   Q.    So I just wanted to give you some context for a

25         couple documents that I'm going to show you here.

Sanford R. Katz, M.D.

```
1          Do you see what I've marked Exhibit 36?
2              (Exhibit No. 36 was marked for
3              identification and attached hereto.)
4    A.   Okay.
5    BY MR. PIORKOWSKI:
6    Q.   And this is a -- purports to be a report of you.
7         That's from 2014.  Do you see that?
8    A.   I see that.
9    Q.   Okay.  Is that your name?  Sanford R. Katz
10        radiation oncology, Shreveport, Louisiana?
11   A.   Yes.
12   Q.   Any reason to believe that's not you?
13   A.   No.
14   Q.   Okay.  And I wanted to just ask you if you turn to
15        the second page, it talks about first entry relates
16        to a product called Fentora.  Do you see that?
17   A.   Yes.
18   Q.   That's made by Teva Pharmaceuticals; right?
19   A.   Right.
20   Q.   And on November 15th there's an indication that you
21        received two honoraria for --
22   A.   Give me the dates again.  I'm sorry.
23   Q.   November 15th.
24   A.   Okay.
25   Q.   And were those honoraria that you received?
```

Sanford R. Katz, M.D.

```
 1   A.   I mean, that was seven years ago.  I don't recall
 2        specifically.
 3   Q.   Okay.  Do you remember ever doing work or making
 4        presentations on behalf of Teva?
 5   A.   I don't specifically recall a presentation.  I
 6        don't know why it's listed twice.  So that would be
 7        a little unusual to have two payments for the same
 8        amount listed twice.  So I don't know if that's
 9        accurate.  It's quite possible that what is
10        described as honoraria may in fact be payment for
11        travel to a meeting and lodging.  They can list
12        that as honoraria.  It doesn't necessarily mean
13        that I gave a talk or presentation.
14   Q.   Do you know as you sit here today or are you
15        guessing?
16   A.   I just don't recall the specifics.
17   Q.   Okay.
18   A.   As to, you know, what I got and why.
19   Q.   Okay.  If you look at the first page they do have
20        it listed as two separate honoraria with the total
21        value of 2,400; correct?
22   A.   Okay.  Fair enough.
23   Q.   Okay.  And what is Fentora?
24   A.   Fentora is a drug.  If I recall correctly, it's a
25        pain -- it's a narcotic analgesic.
```

Sanford R. Katz, M.D.

```
 1   Q.   Okay.  Is that a drug you ever prescribed?

 2   A.   I have prescribed it in the past many years ago.

 3        It's not one that I prescribe.

 4   Q.   Okay.  And then if you go down under the Fentora

 5        entries starting on March 19th, 2014, there are a

 6        series of food and beverage entries on a variety of

 7        different dates, March 19th, April 3rd, April 3rd,

 8        April 23, and so forth, related to a medication

 9        called Subsys.  Do you see that?

10   A.   That's correct.

11   Q.   Okay.  And then they continue on October 3rd,

12        October 16th, October 21st, October 24th,

13        November 6th, December 4th, December 15th.  What

14        are those -- well, let me back up.

15             I'm familiar that sometimes when you attend an

16        educational lecture and you accept their lunch or

17        whatever they're providing that that gets listed --

18        the companies have to list that as a food and

19        beverage credit.  Is that your understanding also?

20   A.   Yes.

21   Q.   So do these all represent educational events that

22        you attended?

23   A.   I don't recall.  You know, like I said, it's 2014,

24        and I don't recall specifically what I did on those

25        dates.
```

Sanford R. Katz, M.D.

```
 1   Q.   Okay.

 2   A.   Whether it be for Fentora or for Subsys.

 3   Q.   Does it make sense to you that you would have gone

 4        to, you know, ten different educational lectures on

 5        the same medication?

 6   A.   No.  No.  I mean, some of this could have been a

 7        rep came and brought me lunch.  I know the rep used

 8        to come and bring lunch.  And so I would -- and he

 9        would come to my office.

10   Q.   Okay.

11   A.   So it looks to me that more likely than not I'm

12        pretty darn certain if I recall back in 2014 to the

13        best of my recollection that this probably -- these

14        were probably lunches.

15   Q.   Okay.  And what is Subsys?

16   A.   It's a sublingual -- a sublingual narcotic.

17   Q.   And what is it used for?

18   A.   Pain.  Cancer pain.

19   Q.   Cancer pain.  And is it a medication that you have

20        prescribed in the past?

21   A.   Yes.

22   Q.   Did you prescribe it before you had attended these

23        educational lectures?

24   A.   Well, I think that I -- it seems to me that I would

25        have probably -- let's see.  You know, I don't
```

Sanford R. Katz, M.D.

```
 1        recall if I started prescribing before I got the

 2        educational lectures or if I got the educational

 3        lectures and then I started prescribing.  I can't

 4        say.

 5   Q.   Okay.

 6   A.   I don't remember.

 7   Q.   All right.  And, you know, to approximately how

 8        many patients did you prescribe Subsys on an annual

 9        basis?

10   A.   Only a few dozen.  I would say probably on an

11        annual basis it could have been 30.

12   Q.   Okay.  That's your best estimate?

13   A.   I just don't recall.  I mean, I subscribed them to

14        a couple patients with bone metastasis, you know,

15        bad pain.  But the majority of patients that I

16        prescribed it for were head and neck cancer

17        patients.  And I just would use it.

18             And it was definitely part of my arsenal of

19        medications that I would use on a regular basis.  I

20        just can't recall exactly how many patients I used

21        it for during the course of a year.  I can tell you

22        that I had a very good experience with it.  It was

23        -- I mean, I think it really helped my patients a

24        lot.

25   Q.   Okay.  Look at what I've marked as Exhibit 37.
```

Sanford R. Katz, M.D.

```
 1              (Exhibit No. 37 was marked for
 2              identification and attached hereto.)
 3   A.   Okay.
 4   BY MR. PIORKOWSKI:
 5   Q.   Okay.  And Exhibit 37 goes over calendar year 2015;
 6        is that right?
 7   A.   Yes.
 8   Q.   So in 2015 you also had a couple food and beverage
 9        charges.  But then on June 25th you have a $3,000
10        payment that's listed as for promotional speaking
11        and other.  Do you see that?
12   A.   That's correct.
13   Q.   And what does that relate to?
14   A.   I spoke about the drug at a meeting.
15   Q.   But do you remember what meeting?
16   A.   Oh, it wasn't a national meeting.  It was a --
17        probably a dinner meeting that was sponsored by the
18        company.
19   Q.   Okay.
20   A.   To which, you know, healthcare providers would
21        attend and I would give a presentation on pain
22        management and oncology settings and various
23        different immediate release transoral preparations
24        for the treatment of -- I'm sorry -- submucosal
25        medications for the treatment of pain.
```

Sanford R. Katz, M.D.

```
 1   Q.   Okay.  And what's the approximate size of the

 2        audience?  Are we talking about 10 or 20 people or

 3        a hundred people?

 4   A.   I mean, it would vary.  There were times, I mean, I

 5        could have as few as four, and there were times I

 6        would have as many as 12 to 15.

 7   Q.   And were these all local in Shreveport?

 8   A.   No.

 9   Q.   Where were they held?

10   A.   I believe a number of them were held in Shreveport.

11        I believe I went to San Antonio.  I think it was

12        San Antonio.  I think I gave a talk in Texarkana.

13        Like I said, it's 2015.  I can't recall.  But I do

14        recall traveling for two, maybe three of these

15        talks.

16   Q.   Okay.  And San Antonio is one of the destinations?

17   A.   I think so or maybe it was San Marco or an area

18        outside of San Antonio.  Does that sound familiar?

19        If I recall San Marco is a town out there.  I don't

20        remember.

21   Q.   Okay.  And then in 2015, then in October 22nd they

22        have another entry for a promotional speaking

23        engagement for Subsys.  So you would have earned a

24        total of $6,000 that year from speaking

25        engagements?
```

Sanford R. Katz, M.D.

```
1    A.   Yeah.  That's what's listed.

2    Q.   Okay.  And then under November 2013 --

3    A.   But is that just for Subsys, or does that include

4         any others that I spoke for?

5    Q.   You have the same thing that I have.

6    A.   Okay.  Let's see.  I just want to make sure that's

7         accurate.

8    Q.   Well, the 6,000 is what I'm reading is just from

9         Subsys.

10   A.   Okay.  Fair enough.

11   Q.   There's other entries for other companies, but I

12        did not include those.

13   A.   That's fine.

14   Q.   And then there's an entry on November 13th for

15        $1,055 for Subsys for consulting.  What does that

16        relate to?

17   A.   I don't recall.

18   Q.   Did you ever -- separately from your talks, did you

19        ever serve as a consultant for Subsys or to Insys

20        rather?

21   A.   I don't recall that.  It could have been a

22        speaker's bureau meeting.  So I think I recall in

23        my -- and, again, I don't remember when it was.

24        There was perhaps two speaker's bureau meetings

25        where they -- the speakers would be sent to some
```

Sanford R. Katz, M.D.

```
 1         city, and they would go over the appropriate way of

 2         speaking about the medication in a way that met

 3         federal guidelines that was legal and how to only

 4         use the materials that were -- that they provided

 5         that were approved by the government that not to go

 6         off message and to, you know, present it in a fair

 7         and unbiased way.  And so we had training meetings

 8         and I believe that we were given some sort of an

 9         honoraria for attending.

10    Q.   Did -- let me just -- you mentioned not going off

11         message.  Did they give you a slide set that you

12         were required to use for your presentations?

13    A.   They did.

14    Q.   And you were required to use that for the

15         presentation?

16    A.   That's correct.

17    Q.   Were you discouraged from sharing any of your own

18         experiences?

19    A.   No, we were not.

20    Q.   So you were at liberty to talk about your own

21         experience with the product even if it wasn't on

22         the slide presentation?

23    A.   At the end of the talk once our talk was completed

24         if somebody approached us outside of the talk, and,

25         you know, came over to us once the formal talk was
```

Sanford R. Katz, M.D.

1        over and they wanted to ask a specific question as

2        to my experience, I was able to do that.

3   Q.   Okay.  And then Exhibit 38 is 2016.

4             (Exhibit No. 38 was marked for

5             identification and attached hereto.)

6   BY MR. PIORKOWSKI:

7   Q.   Which indicates on --

8   A.   Wait.  38?

9   Q.   Yes, sir.

10  A.   Okay.

11  Q.   The 2016, there are two promotion speaking payments

12       for 2,550 and 5,100?

13  A.   Were there specific dates or just in general?

14  Q.   Yeah.  May 6th.

15  A.   Yes.  Okay.  May 5th and 6th.  Yes.  I see that,

16       yes.

17  Q.   Okay.  And do those relate to the same speaking

18       engagement or were they different?

19  A.   No.  They were different ones.  I believe that was

20       the one that was in San Marco.  I did two talks on

21       that day.  I did a talk in the morning, or it may

22       have been a lunchtime talk actually.  And then I

23       did an evening talk.

24             And they were -- yes, the discrepancy is that

25       if you spent more time away you got paid

Sanford R. Katz, M.D.

```
 1        additionally for your second talk because there was

 2        additional time.

 3   Q.   Okay.

 4   A.   So you were being paid not only for the talk, but

 5        you were being paid for your time between the

 6        talks.

 7   Q.   Okay.

 8   A.   Since it was out of town.

 9   Q.   Okay.  On June 16th there's another payment of

10        3,000 for promotional speaking; is that right?

11   A.   Yes.

12   Q.   On August 6th there was $4,600 for consulting?

13   A.   Yes.

14   Q.   Okay.  And then on August 6th there was also $1,519

15        for travel and lodging?

16   A.   Okay.

17   Q.   Do you know where you were traveling to or where

18        you were lodged?

19   A.   I don't.  It could -- I really don't know.  Let's

20        see.  August 6th.  If I was doing -- I don't

21        remember where I was.  That was obviously one of

22        the out of town trips.

23   Q.   Okay.

24   A.   I mean, my memory from five years ago on these

25        talks is just -- you know, I can't say where I was.
```

Sanford R. Katz, M.D.

```
 1   Q.   Okay.

 2   A.   But presumably I was out of town if there was

 3        travel and lodging.

 4   Q.   Okay.  And then there's another entry on

 5        October 10th, 2016, for Subsys consulting for

 6        $2,270?

 7   A.   Yes.

 8   Q.   Okay.  So in 2016, altogether you had compensation

 9        amounting to over 19,000 from Insys; is that right?

10   A.   Yes.

11   Q.   Okay.  And then look at Exhibit 39.

12             (Exhibit No. 39 was marked for

13             identification and attached hereto.)

14   A.   Okay.

15   BY MR. PIORKOWSKI:

16   Q.   Okay.  So Exhibit 39 has payment of 5,400 on

17        August 28th; correct?

18   A.   No.  Wait.  Do I have the right exhibit?  Give it

19        to me again, please.

20   Q.   2017.

21   A.   No.  Which exhibit again, please?

22   Q.   I think it's 39.

23   A.   Okay.  Wait.  This is another one of those

24        ProPublica?

25   Q.   Yes.  They're all from that source.
```

Sanford R. Katz, M.D.

```
1   A.   Okay.

2   Q.   So there are two payments of 5,500 on April 28th

3        and June 22nd from Insys; correct?

4   A.   Okay.

5   Q.   And then there's also one payment from Insys of

6        4,552 for Subsys and Syndros; correct?

7   A.   Okay.

8   Q.   Which is consulting?

9   A.   Yeah.

10  Q.   What is Syndros?

11  A.   I don't recall.  Was that their marijuana product?

12       It might have been their marijuana product.

13  Q.   Okay.

14  A.   I never spoke on it though.

15  Q.   You never spoke on Syndros?

16  A.   Never.

17  Q.   Okay.  And then you had a-- on August 29th there

18       was 3,150 for --

19  A.   Actually, no.  This wasn't a speaking engagement.

20       I think this was one of those speaker's bureau

21       meetings because of the travel and lodging.  And

22       they I think presented data on Syndros, but I never

23       spoke on it.

24  Q.   Okay.  So that was a consulting as opposed to a

25       speaking?
```

Sanford R. Katz, M.D.

```
1   A.   I don't consider it consulting.  I mean, they
2        brought us to -- they may have considered it
3        consulting.  I looked at it as a training session
4        to make sure that we were staying within
5        guidelines, you know, federal laws when we gave our
6        talks.  So I don't know.  They call it consulting;
7        I call it training, but fair enough.
8   Q.   Okay.  March 30th there's a payment of 1,703 from
9        Insys also marked as consulting; correct?
10  A.   March -- I see April.  Okay.  March 30th, yes.
11  Q.   Okay.  So in 2017 you made a total of 22,830 from
12       Insys; is that right?
13  A.   Okay.
14  Q.   Is that about right?
15  A.   Yes.
16  Q.   Okay.  And then if you look at Exhibit 40.
17            (Exhibit No. 40 was marked for
18            identification and attached hereto.)
19  BY MR. PIORKOWSKI:
20  Q.   In Exhibit 40 that has your total compensation from
21       consulting and speaking activities for 2018.  And
22       it's a total of $221; correct?
23  A.   Correct.
24  Q.   Okay.  So did you stop speaking -- stop giving
25       talks on behalf of Subsys in 2018?
```

Sanford R. Katz, M.D.

```
 1   A.   Insys.

 2   Q.   Well, Insys for the drug Subsys?

 3   A.   That's correct.

 4   Q.   And what was the reason that you stopped giving

 5        talks in 2018?

 6   A.   They stopped their speakers' program.

 7   Q.   Okay.  And the reason they stopped their speakers'

 8        program was because they were charged by the

 9        federal government with a series of civil and

10        criminal penalties; is that right?

11   A.   That's correct.

12   Q.   And specifically what I've marked as exhibit -- do

13        you see what I've marked as Exhibit 41?

14             (Exhibit No. 41 was marked for

15             identification and attached hereto.)

16   A.   Yes.

17   BY MR. PIORKOWSKI:

18   Q.   The statement from the Department of Justice

19        talking about a resolution of criminal and civil

20        investigation into Insys.  Do you see that?

21   A.   Yes.

22   Q.   And one of the primary issues with -- that the

23        government took with Insys had to do with their --

24        well, first of all, this all related to the drug

25        Subsys; is that your understanding?
```

Sanford R. Katz, M.D.

```
 1   A.   Yes.

 2   Q.   And it had to do with alleged fraud with respect to

 3        their promotional speakers' program; right?

 4   A.   Yes.  That was very unfortunate.

 5   Q.   Were you ever interviewed by the FBI or the DEA in

 6        connection with that?

 7   A.   I was not.

 8   Q.   All right.  Let's turn back to the Zhang paper for

 9        a minute.

10   A.   Which exhibit was that?

11   Q.   I think it's 12.

12   A.   Okay.

13   Q.   So did you look at --

14   A.   Let me look at my copy.  Is this on the old list or

15        the new list?  Do you recall?

16   Q.   I'm sorry.  I don't understand the question.

17   A.   I have two piles.  I'll just look at another pile.

18        Okay.  I'll use yours.  Go ahead.

19   Q.   Okay.  So do you see the document that I've marked

20        as Exhibit 42?

21             (Exhibit No. 42 was marked for

22             identification and attached hereto.)

23   A.   Yes.

24   BY MR. PIORKOWSKI:

25   Q.   And I'll identify it as a document from the United
```

Sanford R. Katz, M.D.

```
1        States Environmental Protection Agency dated

2        January 6th, 2020, which is a memorandum that

3        reviews glyphosate epidemiology review of Zhang et

4        al. 2019 and Leon et al. 2019 publications for

5        response to comments on the proposed interim

6        decision.

7    A.  Okay.

8    Q.  Do you see that?

9    A.  Yes.

10   Q.  Have you reviewed this document previously?

11   A.  I have not.

12   Q.  Okay.  With respect to the Zhang paper -- and part

13       of this is I just kind of have to get a sense of

14       what you're going to be opining about and what

15       you're not.  Because if you're not going to be

16       opining about certain things, then a lot of this

17       can be abbreviated.

18            MR. JOSEPH:  Can I ask you, Joe, if

19            you're going to ask him questions about this

20            document?

21            MR. PIORKOWSKI:  Sorry?

22            MR. JOSEPH:  Are you about to ask him

23            questions about this document?  Exhibit No.

24            42?

25            MR. PIORKOWSKI:  Not yet.
```

```
 1                    MR. JOSEPH:  Can he look at it?
 2                    MR. PIORKOWSKI:  I just asked him if he
 3              saw it.  And I wanted to put it in the record,
 4              and I don't want to take up the time and have
 5              him look at it if I'm not going to ask any
 6              questions.  Whether I ask any questions
 7              depends on what he has to say.  If I ask him
 8              any questions about it, I'll give him a chance
 9              to look at it.
10                    MR. JOSEPH:  Good deal.
11    BY MR. PIORKOWSKI:
12    Q.   Okay.  So if we go back to Table 4 in Zhang, we
13         talked about the fact that it lists a number of
14         studies, both a couple of AHS cohort studies and
15         some case control studies; correct?
16    A.   I have to go back again.  What exhibit was that,
17         again?
18    Q.   12.
19    A.   Okay.  And which tables now?
20    Q.   Table 4.
21    A.   Okay.
22    Q.   So the first question I have is when you reviewed
23         the Zhang study, did you take a critical look at
24         the manner in which she did this meta-analysis, or
25         is that beyond the scope of your expertise?
```

Sanford R. Katz, M.D.

```
 1   A.   Let me rotate it back.  I apologize.  What I looked
 2        at -- I've looked at the risk -- what impressed me
 3        was the risk estimates for the studies that looked
 4        at the heavier users defined of either greater than
 5        two days a year or greater than ten days a year.
 6             And, you know, these other risk estimate ratio
 7        was rather -- it was pretty supportive of a dose
 8        response in terms of -- or at least in terms of
 9        frequency.  I shouldn't say dose response, but
10        rather a response secondary to frequency of use.
11   Q.   Okay.  My question though is did you critically
12        analyze this paper when you reviewed it, or did you
13        just look at the conclusion and find it to be
14        interesting?
15   A.   I looked at the table, and I found -- I looked at
16        that.  And I looked at the results as they
17        described it, and then I looked at the conclusion.
18   Q.   Okay.  So what's your understanding of what Zhang's
19        a priori hypothesis was?
20   A.   I would have to go back and look at it again,
21        familiarize myself with it since I read so many
22        papers.
23   Q.   Okay.
24   A.   Okay.  I recall.  Whether there was high cumulative
25        exposures to glyphosate-based herbicide and
```

Sanford R. Katz, M.D.

```
 1          increased risk of non-Hodgkins lymphoma.  Okay.  I
 2          remember now.  And performing a new meta-analysis
 3          that included the updated agricultural study that
 4          we were talking about before.
 5    Q.    Okay.  But what was her a priori hypothesis?
 6    A.    Let me look.
 7    Q.    It's on page 188.
 8    A.    Oh, okay.  That there would be an increase in risk
 9          of non-Hodgkins lymphoma in humans with higher
10          exposure, longer durations, higher levels.
11    Q.    Okay.  So her hypothesis was to sort of put in the
12          more user friendly terms that there's a dose
13          response relationship in that people who were
14          exposed to higher amounts of glyphosate would have
15          higher rates of NHL compared to people who were
16          exposed to lower amounts of glyphosate; is that
17          fair?
18    A.    Fair.
19    Q.    Now, if you're going to test a hypothesis where
20          you're comparing -- where you're trying to
21          determine -- test your hypothesis concerning people
22          with high exposures and people with low exposures,
23          then you need to include studies where the study
24          included people with both high exposures and low
25          exposures that were differentiated; correct?
```

Sanford R. Katz, M.D.

```
 1   A.   Within the same study?

 2   Q.   Well, for example, in the McDuffie paper they broke

 3        out people that had greater than two days of use;

 4        correct?

 5   A.   Correct.

 6   Q.   Okay.  So that study had -- that study segregated

 7        patients who had higher exposure from patients who

 8        had lower exposure, at least using one metric;

 9        right?

10   A.   Yes.

11   Q.   Okay.  In the Eriksson paper, they have data

12        concerning greater than ten days of use and less

13        than ten days of use; correct?

14   A.   Correct.

15   Q.   So that study sorted out people that had higher

16        exposures and people that had lower exposures;

17        right?

18   A.   Correct.

19   Q.   Okay.  If you have a study, however, that doesn't

20        have any data about the risks in high exposed

21        people versus low exposed people, then that study

22        doesn't provide any data to help test the

23        hypothesis; correct?

24   A.   Well, I don't know.  I mean, if you include -- I

25        think you can still support the hypothesis if you
```

Sanford R. Katz, M.D.

```
 1        look at studies where they -- where it reports
 2        exposure, any form of exposure, high or low, to
 3        establish a baseline of is there an increased risk?
 4        Can you demonstrate increased risk at baseline?
 5        And then just with any exposure and then see if
 6        that risk is higher if you just specifically look
 7        at those that have the higher level of exposure.
 8        So it might support your statistics if you can at
 9        least, you know, demonstrate a baseline increased
10        risk.
11   Q.   So is what you're saying that you could use a study
12        that doesn't differentiate high exposed people from
13        low exposed people to represent a baseline against
14        which to measure your findings?  Is that what
15        you're saying?
16   A.   I would think that may be reasonable, yeah.
17   Q.   Okay.  But if you have a study that has no data
18        that allows you to distinguish people with high
19        exposure versus people with low exposure, then that
20        study cannot contribute to testing the hypothesis
21        that patients with or people with higher exposure
22        have a greater risk than people with lower
23        exposure; correct?
24   A.   I don't know if I agree with that statement.
25   Q.   How can that possibly be relevant other than as a
```

Sanford R. Katz, M.D.

```
1        baseline data point?  If you're designing a test,
2        you're trying to find out if high exposed people
3        are at greater risk than low exposed people.  How
4        does a study that doesn't distinguish between high
5        exposed people and low exposed people provide any
6        information to help you test that hypothesis?
7    A.  I'm not an epidemiologist.  Like I said, I don't
8        know.  It may be useful as a baseline.  But whether
9        they include high versus low in that study which
10       serves as a baseline, I can't speak to whether it's
11       of value to include in a meta-analysis or not.  I'm
12       not an epidemiologist.
13   Q.  Okay.  Does it makes sense to you as somebody --
14       you know, if you're studying sixth grade science
15       that if you're going to study a particular outcome,
16       you have to actually have data that addresses the
17       outcome that you're studying; right?
18   A.  I don't know.  You know, when I see a paper from
19       Berkeley, University of Washington, and then I have
20       biostatistics and Mt. Sinai and it's published in a
21       peer review journal, I typically say, "Hey, this
22       paper is reasonable and their statistics were
23       appropriate and their conclusion of the study was
24       appropriate based upon experts in this area and
25       those peers that reviewed it for publication."
```

Sanford R. Katz, M.D.

```
1              So I accept this at its face value since I am
2        not an expert in epidemiology.
3   Q.   Okay.  And is that true for all of the
4        epidemiologic papers in the literature that you
5        accept them at face value and you don't have any
6        particular criticisms that you're offering of them?
7   A.   Well, so again the criticisms that I have are also
8        that if you can't show an association, it doesn't
9        necessarily mean that there's not an association.
10       It just means that the methodology may not have
11       shown it.
12             So you can't prove a negative.  And so even in
13       my own field in oncology, we have negative studies
14       published all the time.  But then when you look at
15       the methodology you say, well, it may be
16       underpowered.  They may not have asked the right
17       questions.  There's just -- you can't necessarily
18       say that there's no benefit.
19             And then at the same time, you have studies
20       that are contradictory in my own field where one
21       study will show a benefit and another one won't.
22       And then you ask the questions, well, three
23       positive studies, one negative study.  Does the
24       negative study disprove the positive study?  No.
25       So I don't know if that answers your question.
```

Sanford R. Katz, M.D.

```
1   Q.   No.  My question doesn't have to do with what you
2        think about the studies.  My question has to do
3        with what you're going to be offering an opinion
4        about when you get into court.  Because what I need
5        to try to figure out right now is whether we need
6        to drill down on some of the details of the
7        studies.
8             On one hand if you're planning to offer
9        opinions about them and about the study design and
10       about what they mean or if you're saying, "I just
11       take it at face value," then we don't need to spend
12       that much time and I can just ask you some selected
13       questions.
14            So I'm just trying to make sure that I'm doing
15       my job to make sure I understand what your opinions
16       are with respect to the studies.  Do you
17       understand?
18   A.   I take them at face value.
19   Q.   So, for example, are you able to identify, so if
20       that group that's up there in the Zhang paper, the
21       group of case control studies in Table 4, do you
22       see that?
23   A.   Okay.
24   Q.   So there's five different studies listed there;
25       right?
```

Sanford R. Katz, M.D.

```
 1   A.   Yes.  Hold on a second.  Five different studies.

 2        Let's see.  She reported DeRoos twice.

 3   Q.   No, she didn't.

 4   A.   I'm sorry.  I see DeRoos, oh, case controls, yes.

 5        Under case controls, yes, I see five.

 6   Q.   Okay.  Do you know whether any of those case

 7        control studies had an unequivocal finding that

 8        there was an increased risk of non-Hodgkins

 9        lymphoma in glyphosate users?

10   A.   I don't know.  I have to go back and check their

11        conclusions.

12   Q.   Okay.  As you sit here today, in terms of original

13        studies as opposed to meta-analyses, are you aware

14        of any study that made a finding where the

15        conclusion was that glyphosate causes non-Hodgkins

16        lymphoma?

17   A.   By "cause" do you mean increased risk?

18   Q.   Either one.

19   A.   My impression was that from the -- certainly from

20        the meta-analysis and from -- and I know the

21        meta-analysis I read were supportive of it.  You're

22        talking about human studies?

23   Q.   I'm talking about human.  I'm not talking about

24        meta-analyses.  These studies that were listed in

25        Table 4, these were all the basic original research
```

Sanford R. Katz, M.D.

```
 1        that's been done.  And I'll represent there's
 2        another study that's been done called the North
 3        American Pool Project, which we marked at the last
 4        deposition that combines the DeRoos and McDuffie
 5        data and does a further analysis of it.
 6             So my question is not meta-analyses, but with
 7        underlying studies are there any underlying cohort
 8        or case control studies where there was a clear
 9        unequivocal finding of an increased risk of
10        glyphosate use -- of NHL in glyphosate users?
11   A.   Give me one second to answer that question, please.
12        I'm looking to see.  Did Leon --
13   Q.   Leon is a meta-analysis.
14   A.   It was all meta-analysis.  It's all meta-analysis.
15   Q.   So is the answer to my question no?
16   A.   No.
17   Q.   I'm sorry?
18   A.   The answer to your question is no.
19   Q.   Okay.  Do you have Zhang still in front of you?
20        Exhibit 12.
21   A.   I do.
22   Q.   Do you see on page 196 there's a paragraph that
23        starts with "although there are different
24        perspectives"?
25                    MR. JOSEPH:  You said 196?
```

```
 1              MR. PIORKOWSKI:  Yes.

 2              MR. JOSEPH:  Thank you.

 3   A.   All right.  Do you want me to read that?

 4   BY MR. PIORKOWSKI:

 5   Q.   I'll read it and you can tell me if I read it

 6        correctly.  "Although there are different

 7        perspectives on the best way to account for other

 8        pesticide exposures, we selected relative risk

 9        estimates that adjusted for other pesticide use

10        over their unadjusted counterparts to mitigate

11        potentially substantial confounding"; correct?

12   A.   Okay.

13   Q.   Okay.  I read it correctly; yes?

14   A.   Yes.

15   Q.   Do you have an understanding of what she's talking

16        about when she makes reference to potentially

17        substantial confounding?

18   A.   Yes.

19   Q.   What's your understanding?

20   A.   Well, if people are exposed to pesticides, that

21        they're not necessarily just exposed to one

22        pesticide but they may be exposed to multiple

23        pesticides, and you need to consider that they may

24        not have been contributing to the risk.

25   Q.   So if you have one pesticide that actually is not
```

Sanford R. Katz, M.D.

```
 1        associated with non-Hodgkins lymphoma and another
 2        one that is, and those two are studied together
 3        with that adjustment, the pesticide that's not
 4        actually exposed could appear to be exposed --
 5        could appear to be an increased risk; is that fair?
 6   A.   That's fair.
 7   Q.   So you would agree that when you're doing these
 8        kind of studies that it's important to make sure
 9        that appropriate adjustments are made for potential
10        confounding related to other pesticide use;
11        correct?
12   A.   Yes.  To the extent possible, sure.
13   Q.   Okay.  Now, do you know whether -- Zhang says here
14        in her paper that they selected risk estimates that
15        adjusted over other pesticide use.  Do you know
16        whether she actually did that?
17   A.   I don't recall specifically.  I would have to look
18        at the paper.
19   Q.   Okay.
20   A.   And read it more critically.
21   Q.   Okay.  What is the opinion you plan to offer with
22        respect to the risk of non-Hodgkins lymphoma
23        related to glyphosate use or Roundup use?
24   A.   My opinion is looking at primarily the
25        meta-analysis as pointed out that there appears to
```

Sanford R. Katz, M.D.

```
 1        be an association in increased risk that has been
 2        shown associated with glyphosate-based herbicides
 3        that is seen primarily in people with higher level
 4        of exposure.
 5              And that along with the type of exposure that
 6        Mr. Blair got, especially the way that he was
 7        applying the product, which is different than what
 8        the vast majority of the people in these studies
 9        were doing, that -- and the way that he was perhaps
10        exposed supports the possibility that his lymphoma
11        may have been caused by the glyphosate-based
12        herbicide.
13   Q.   You said, "There appears to be an association"?
14        Was that your words?
15   A.   The data supports the possible association of
16        higher exposure to glyphosate-based herbicides and
17        the development of non-Hodgkins lymphoma as
18        suggested in some of the meta-analysis.
19   Q.   Does that -- is that risk in your opinion for all
20        subtypes of non-Hodgkins lymphoma or just for
21        certain subtypes?
22   A.   I believe it was specifically, I believe, it was
23        diffuse large B-cell.
24   Q.   And what studies in particular are you relying on
25        for that?
```

Sanford R. Katz, M.D.

```
 1   A.   Okay.  I would have to pull out the -- I think you

 2        may have my initial -- which one is my initial

 3        statement?  I think I may have stated it in there.

 4   Q.   Exhibit 2?  Your original report or your original

 5        list of --

 6   A.   My original report.

 7   Q.   It's Exhibit 1.

 8   A.   No.  Exhibit 1 looks like a paper.  Is it on here?

 9   Q.   It should be in there.

10   A.   Oh, it says Dr. Katz' report.  Okay.

11             MR. JOSEPH:  For the record, we

12          supplemented that with No. 29.

13             MR. PIORKOWSKI:  Yeah.  Well, he asked me

14          which --

15             MR. JOSEPH:  I understand.  I would

16          rather read 29.  I prefer that version.

17   A.   Okay.  So the -- I mentioned meta-analysis by

18        Schinasi and Leon.  They found the statistics

19        positive association between glyphosate exposure

20        and non-Hodgkins lymphoma risk, and specifically I

21        should say B-cell non-Hodgkins lymphoma.

22             So let me correct what my previous statement

23        was when I said diffuse large B-cell lymphoma.  Let

24        me correct that to say B-cell non-Hodgkins

25        lymphoma.
```

Sanford R. Katz, M.D.

1            Chang, positive association between any versus

2       no use.  Let's see.  You're talking about the

3       epidemiologic studies specifically?

4  BY MR. PIORKOWSKI:

5  Q.   I'm asking you the question generally.

6  A.   A Pooled Analysis from the AGRICOH Consortium in

7       2019.

8  Q.   This is Leon?

9  A.   That's a meta-analysis, yeah.  And then the Zhang

10      paper, I believe they also showed an association.

11      Is there no study?  Yeah.  So the Zhang, Donato.  I

12      think that was -- and the IARC paper.

13 Q.   Did the IARC paper specify a particular type of

14      lymphoma?

15 A.   I don't recall.

16 Q.   Okay.  Let's come back to this in a minute.  I want

17      to talk to you about...

18 A.   Is this a good time for a break?

19 Q.   Sure.

20            THE VIDEOGRAPHER:  The time is 12:00 p.m.

21        and we are off the record.

22        (A short recess was taken.)

23            THE VIDEOGRAPHER:  The time is 2:13 p.m.

24        and we are on the record.  Excuse me,

25        12:13 p.m. and we are on the record.

Sanford R. Katz, M.D.

```
 1    BY MR. PIORKOWSKI:

 2    Q.   So, Dr. Katz, you told me earlier on that you had

 3         some criticisms about Dr. Olive's reports and

 4         things in Dr. Olive's report that you thought were

 5         inaccurate.

 6    A.   Yes.

 7    Q.   And I told you we would come back to that.  So

 8         that's what I would like to go back to.  I believe

 9         that we marked Dr. Olive's report as an exhibit at

10         the last deposition.  I believe it was Exhibit 27.

11         So I would just ask you to tell me what specific

12         things that Dr. Olive says that you disagree with

13         and the basis for your disagreement?

14    A.   Okay.  So I'm just going to refer to some notes

15         that I have here.

16    Q.   Are these notes that you made since last time?

17    A.   These are notes that I made yesterday.

18    Q.   Okay.  Well, I would also separately ask for a copy

19         of your notes.

20    A.   You're welcome to them.  Okay.  So I already

21         mentioned that it really focused on skin, didn't

22         address, you know, inhalation as a route.  You

23         know, he received a fair amount sprayed to his face

24         and his mouth.  And he said from his deposition it

25         got him in his mouth and his nose when he was
```

Sanford R. Katz, M.D.

1        mixing and making repairs when the hose broke.

2              Dr. Olive claimed that inhalation as a route

3        of entry was low because Roundup has a lower

4        volatility than water, meaning it would stay in

5        solution and that the water would have evaporated

6        to the air before the chemical would leaving the

7        chemical behind.

8              She cited two studies, the Jennifer Pierce

9        study from Cardno ChemRisk where they attempted to

10       simulate heavy residential for having 24 people

11       sprayed for 100 minutes, gave half of them a mask

12       and measured glyphosate levels in urine.

13             And the problem with that was that, first off,

14       again it doesn't represent what Mr. Blair was

15       doing, which is spraying it up into the air, not

16       down onto the ground, which is what people would do

17       if they were using it at home in residential use

18       spraying weeds.  So that was a problem for me.

19             The other thing was is that, you know, she

20       says it's not going to evaporate.  But in his

21       particular case, he sprays this up into the air.

22       Water will evaporate first leaving the glyphosate.

23       And as it comes down, it would be that much more

24       concentrated.  When you consider water droplets

25       going up into the air, there being some

Sanford R. Katz, M.D.

```
1      evaporation, and then it comes down.  The water

2      evaporates the -- based upon what she's saying, the

3      glyphosate would stay in solution and then it could

4      be a smaller droplet coming down that he could

5      inhale.  She didn't really address that.

6            And the other thing is that if that was the

7      case, if he was inhaling it in his mouth and these

8      are large enough droplets, these droplets, they

9      would be excreted primarily through the GI tract

10     because they wouldn't necessarily be getting into

11     his lungs if the droplets were large enough.

12           And then, you know, she states that 25 to

13     30 percent of orally is excreted in -- I'm sorry --

14     is absorbed.  So that would mean 70 to 80 percent

15     would not be found in the urine.  So that's a

16     problem.

17           The Acquavella study, 48 farmers, single

18     application.  The problem with that study is

19     they're farmers, so 60 percent of those farmers

20     were inside of a cab.  They have these boons which

21     are very low to the ground and spraying.

22           The droplet size is such that probably that it

23     seems from what I've read, would minimize the

24     amount that came up in the air.  So that's not

25     really applicable either because they're not
```

Sanford R. Katz, M.D.

```
1        spraying up in the air being exposed and then

2        inhaling it.  So that doesn't really answer the

3        question in terms of inhalation.

4            And then there was some problems with that

5        study.  You know, one of the potential faults of

6        that study is they required the farmers I believe

7        to collect their urine for 72 hours.  But in order

8        to know whether they were giving all their urine,

9        you would need to have creatinine clearance studies

10       done.  You know, estimated creatinine clearance

11       beforehand and then a measured creatinine clearance

12       in the collected urine to know that they would

13       coincide to know that they were giving you

14       appropriate bond of urine.

15           When they reported, you know, the fact that

16       they had good quality control and that they

17       believed that they were getting the correct amount

18       of urine samples for most of them, they didn't

19       report the average creatinine clearance from these

20       farmers.  They reported serum creatinine levels,

21       and that's not relevant to quality assurance.

22       Serum creatinine levels as they reported it is

23       irrelevant when it comes to determining whether or

24       not they gave you all their urine.

25           So that was a methodological problem, and so
```

Sanford R. Katz, M.D.

```
 1          the quality of that was questionable to me.  That

 2          study also with Monsanto.  And then the thing about

 3          that study is -- oh, and by the way, the spraying

 4          as I said was done with the low volume boons.

 5               But they didn't study stool either, by the

 6          way, which would have been I think important.

 7               But they make a statement in that paper and

 8          I've copied it down and I would like to read it.

 9          They said, "A number of limitations need to be

10          considered when interpreting our results.  First,

11          we evaluated only one application per family; so

12          our results may not encompass the variation and

13          exposure over season or over years of application.

14          This potential limitation can only be addressed by

15          repeated sampling of farm families.

16               "Second, a tractor and boon sprayer were used

17          for all the glyphosate applications; so our results

18          may not be representative of other application

19          procedures."

20               So based upon -- you know, those are the two

21          that seem to be most frequently cited, if any are

22          cited at all.  And I think they both have problems.

23          Again, they're not representative of what Mr. Blair

24          was doing.

25    Q.    Any other criticisms of Dr. Olive's report?
```

```
 1   A.   No.  Those were the main ones.

 2   Q.   So are you saying that in the Acquavella study that

 3        the participants might have been lying and not

 4        giving their full amount of urine?  Is that what

 5        you're suggesting?

 6   A.   I don't think lying is fair.  I mean, you're asking

 7        somebody to collect all their urine over 72 hours.

 8   Q.   Uh-huh.

 9   A.   I mean, they're farmers.  What if they're out

10        working the farm and they didn't have their jug and

11        they decided to, you know, urinate on the farm and

12        they missed a few, you know, who's to say.  I think

13        though that they could have accounted for that.

14             And you know they may have by using the

15        creatinine clearance as a guide, but what they

16        reported was not the measured creatinine clearance

17        to verify, you know, normal levels for those

18        people.  But, rather, they reported average serum

19        creatinine, which is not relevant.

20             So I'm just saying that what they reported as

21        their quality people measured being serum

22        creatinine doesn't really tell you anything

23        regarding the quality of the compliance of the

24        farmers.  I'm not saying anyone was lying.  I'm

25        just saying that as stated in their paper, they
```

Sanford R. Katz, M.D.

```
 1        have a mistake.  That's just -- that to me, I don't

 2        understand how serum creatinine is relevant to

 3        proving that the farmers, you know, collected all

 4        their urine.

 5   Q.   Have you ever personally done any kind of

 6        metabolism or excretion study on glyphosate?

 7   A.   No.

 8   Q.   Have you ever done a metabolism or excretion study

 9        on any chemical?

10   A.   No.

11   Q.   Are you aware of any other study that's been done

12        in the literature other than these two studies that

13        has assessed this endpoint?

14   A.   Those were the two that I see most commonly cited

15        as basically evidence that inhalation is not a

16        significant mechanism of absorption.

17   Q.   So if I understand what you're saying, you are

18        critical of those two studies, but there's no other

19        study that you have that provides data to the

20        contrary; is that right?

21   A.   There was no other study that -- what I'm saying is

22        that those are the relevant studies for which I've

23        seen reference from specific agencies and

24        Dr. Olive.  And I don't think that those are

25        relevant in this case.
```

Sanford R. Katz, M.D.

```
 1                   Now, I think there's another study, I can't
 2           remember if it's by Club or Shub, but it's not
 3           cited by any of the agencies.  I don't see it cited
 4           anywhere.  So, you know, in terms of it being the
 5           basis for experts saying that inhalation is not a
 6           significant mechanism, these two studies I don't
 7           think answer that question.
 8    Q.     Okay.  But do you have any study that you're
 9           relying on to show that inhalation is a significant
10           pathway for glyphosate ingestion?
11    A.     What I have is I have -- what I've looked at are
12           studies looking specifically at aerosol droplets,
13           which has been reported extensively now with COVID.
14           And I've also looked at other things that are
15           unrelated to COVID where they've looked
16           specifically at the vapor, the mechanics of
17           inhalation of aerosols, and water -- liquid
18           droplets, sizes, and where they're deposited.
19                   And so from a mechanistic standpoint, to me, I
20           think that those certainly support the notion that
21           spraying a liquid up into the air into the wind,
22           using the wind, spraying it at treetops, having it
23           fall down like rain on your head, and in the
24           process it's not just rain.
25                   What's coming down is also droplets that are
```

Sanford R. Katz, M.D.

```
 1          appropriate size that you could inhale and inhale

 2          and specifically have them concentrated and

 3          deposited into the nasopharynx and oropharynx in

 4          the area that he had his tumor -- that he had his

 5          cancer.

 6               And so that's my point.  There are no studies

 7          that specifically looked at somebody that sprays up

 8          in the air, has it rain down, creates all this

 9          aerosol and droplet sizes that are subsequently

10          inhaled.

11               And so the studies that I do have are general

12          with respect to inhalation of droplets, since there

13          are no studies that I can find that represents what

14          was happening with Mr. Blair.

15     Q.   So what your studies that you're relying on show is

16          that inhalation of aerosol droplets is a pathway by

17          which glyphosate can be absorbed?  Is that your

18          premise?

19     A.   No.  They didn't specifically look at glyphosate.

20          My premise is that since glyphosate is nonvolatile

21          and it is being sprayed in water, which is more

22          volatile, that there is evaporation taking place up

23          in the air where they are spraying it.  So then

24          what comes down is apparently a combination from

25          what he says is raining down on him as well as
```

Sanford R. Katz, M.D.

```
 1          smaller droplets that he is subsequently inhaling.
 2               Also, that very likely may have occurred
 3          during the mixing process where he says he gets it
 4          into his mouth as well.  And that could be not
 5          necessarily inhalation.  But my point being is
 6          these studies are mechanistic.  They're not
 7          specific to glyphosate.
 8     Q.   Mechanistic meaning that you can inhale droplets of
 9          a chemical, that's the point you're making; right?
10     A.   Yes.
11     Q.   Okay.  But those studies tell you nothing
12          specifically about glyphosate; correct?
13     A.   That's correct.
14     Q.   And they don't tell you anything about how much
15          glyphosate would be absorbed under any particular
16          set of circumstances; correct?
17     A.   Well, they're telling you where those droplets
18          would be deposited based upon the size of the
19          droplets.  And based upon Dr. Olive's report, she's
20          basically saying that the glyphosate, the Roundup
21          would stay in solution.  The water would evaporate
22          but the glyphosate would not.
23               And so essentially when it evaporates, it
24          seems to me that as it comes down the water
25          evaporates, the concentration increases, and it
```

Sanford R. Katz, M.D.

```
 1        ends up in water droplets that are appropriate size
 2        for him to inhale.  And depending upon their size,
 3        they're not necessarily ending up in the lungs,
 4        they're ending up in the nasopharynx and in the
 5        oropharynx and in the lower pharynx.
 6   Q.   What is an antigen?
 7   A.   An antigen is basically, typically a protein that
 8        the body is able to amount a new response to.
 9   Q.   An antigen is something that elicits an immune
10        response; is that fair?
11   A.   Yes.
12   Q.   Do you have any data that glyphosate is antigenic?
13   A.   No.
14   Q.   What does the term latency mean?
15   A.   Period of time between an exposure and when
16        something occurs.
17   Q.   As a part of your review of this case, did you look
18        at any of the data regarding the latency of this
19        alleged relationship between glyphosate exposure
20        and non-Hodgkins lymphoma?
21   A.   Yes.
22   Q.   What is the latency period between the exposure and
23        development of non-Hodgkins lymphoma?
24   A.   Typically more than ten years.
25   Q.   And in Mr. Blair's case, it was slightly more than
```

Sanford R. Katz, M.D.

1          two years; is that right?

2    A.    That's correct.

3    Q.    What is -- we had talked -- let me just back up to

4          a couple of exhibits here.  Do you remember at your

5          first deposition we had talked about a couple of

6          papers that looked at the relationship between BMI

7          and risk of non-Hodgkins lymphoma?

8    A.    I recall, yes.

9    Q.    And what is your understanding when I asked you

10         about -- I think I asked you some questions about

11         obesity, and you kind of pushed back and said you

12         weren't sure whether Mr. Blair was actually obese.

13         Do you remember that discussion?

14   A.    That's right.

15   Q.    Okay.  I just marked as Exhibit 43 the Castillo

16         paper, which is one of the ones that we had briefly

17         looked at previously.

18              (Exhibit No. 43 was marked for

19              identification and attached hereto.)

20              MR. PIORKOWSKI:  And I'm trying to mark

21              the Larsson paper here, which I'm having a

22              hard time doing.

23              (Exhibit No. 44 was marked for

24              identification and attached hereto.)

25   A.    I'm sorry.  Which exhibit was that, sir?

Sanford R. Katz, M.D.

```
 1   BY MR. PIORKOWSKI:

 2   Q.   I believe it's 43.

 3   A.   Okay.

 4   Q.   So do you see that's one of the papers we talked

 5        about last time?

 6   A.   Yes.

 7   Q.   Previously.  So my question is this:  Did you --

 8        have you since that first deposition when we talked

 9        about your work as a treating physician, have you

10        gone back and made an assessment of what

11        Mr. Blair's BMI was?

12   A.   I did not.

13   Q.   Do you have an opinion about what Mr. Blair's BMI

14        was during the time frame when he used Roundup?

15   A.   I do recall mentioning that -- I said that he was

16        well nourished.  I didn't state that he was obese.

17        I did note that he was a weight lifter.  And that,

18        you know, I recall him having a weight lifters

19        build -- a weight lifters build.  And I don't make

20        any other notes of him being obese.  But, I mean,

21        he looked to me like a stocky guy who was, you

22        know, consistent with his -- him being a weight

23        lifter.

24   Q.   Okay.  My question is do you have an opinion about

25        what his BMI was around the time of his diagnosis
```

Sanford R. Katz, M.D.

```
 1        of non-Hodgkins lymphoma?
 2   A.   I have more than an opinion.  I have a record that
 3        I can refer to if you would like.  I have a record
 4        from the medical oncologist.
 5   Q.   Okay.
 6   A.   His BMI was calculated -- let me see.  They have it
 7        listed as 34.  34.1.  That's what they have it
 8        calculated as.
 9   Q.   Okay.  Do you take issue with that?
10   A.   That was on January 18th, 2019.  Like I said, I
11        don't know that that is a good --  necessarily is a
12        good measure of obesity because it doesn't take
13        into account body habitus and, you know, percent
14        body fat versus muscle.
15            So I don't necessarily mean that it -- I mean,
16        I understand that they use it to say obesity.  But
17        from my perspective, obesity is a clinical
18        impression.
19   Q.   Okay.  My question has nothing to do with obesity,
20        and I didn't use the word obesity.  My question has
21        to do with BMI.
22   A.   Yes.  That was his BMI.
23   Q.   Okay.  And the studies looked at -- the two studies
24        that I provided you with were both meta-analyses of
25        numerous observational studies that looked at the
```

Sanford R. Katz, M.D.

```
 1         relationship between BMI and the risk of

 2         non-Hodgkins lymphoma; correct?

 3    A.   That's correct.  But, again, I don't know what

 4         percentage of those people were weight lifters.

 5    Q.   You don't know what percentage weren't.  I mean,

 6         there's a mix.  They don't divide it into -- they

 7         don't say footnote "but these findings may not be

 8         applicable to somebody who's a weight lifter," do

 9         they?

10    A.   I think that's fair.  And since the majority of

11         people are not weight lifters like he was, I would

12         have to assume that the majority of the people in

13         these studies were not weight lifters.

14    Q.   Okay.  So do you -- here's my question.  I've shown

15         you two papers, both of which show that an

16         increased BMI is associated with a higher risk of

17         non-Hodgkins lymphoma generally as well as DLBCL

18         specifically with a relationship that seems to be

19         linear.

20              So my question is how are you able to exclude

21         the -- his BMI as a risk factor or a substantial

22         contributor to his development of non-Hodgkins

23         lymphoma?

24    A.   I can't exclude it.

25    Q.   Okay.
```

Sanford R. Katz, M.D.

```
1    A.    But I thought the question is do I believe that

2          it's more likely than not that, you know, it was a

3          cause.  And I think that's a fair statement.  But I

4          can't exclude BMI based upon this meta-analysis as

5          well as the other one.

6    Q.    Okay.

7                MR. PIORKOWSKI:  Curtis, I'm not done,

8            but as a courtesy, I'll allow you to ask some

9            questions.  I'm just going to reserve my

10           rights.  So if you want to ask some questions,

11           go ahead.

12               MR. JOSEPH:  Well, no I don't want this

13           to be a problem down the road.  You know,

14           we've been at this for some hours.  This is

15           the third time.  Go ahead and ask your

16           questions.

17               MR. PIORKOWSKI:  Okay.

18               MR. JOSEPH:  I mean, I really don't have

19           very many, but go ahead.

20               MR. PIORKOWSKI:  Okay.  That's fine.

21   BY MR. PIORKOWSKI:

22   Q.    The Leon study that you took a look at, which was

23         the one with AGRICOH and CNAP and some AHS data, do

24         you recall that study?

25   A.    Yeah.
```

Sanford R. Katz, M.D.

```
 1   Q.   Do you have an understanding of the other two
 2        studies that Leon looked at other than the
 3        agricultural health study?  If it helps, I think
 4        Leon is -- actually it was marked twice, both 14
 5        and 15.
 6   A.   You're talking about the AGRICOH and CNAP.
 7   Q.   Exactly.
 8   A.   I'm sorry.  What was your question?
 9   Q.   Do you have an understanding of the design of those
10        studies?  The basic design of those studies.
11   A.   I don't recall, them.  Not the specifics.  I mean,
12        I'm familiarizing myself again with them, you know,
13        as he has it stated in the paper.  If that's your
14        question.
15   Q.   Okay.  So the conclusion that Leon reaches in the
16        abstract is, quote, "Associations with pesticides
17        with non-Hodgkins lymphoma appear to be subtype and
18        chemical specific.  Nondifferential exposure
19        misclassification was an important limitation
20        showing the need for refinement of exposure
21        estimates and exposure-response analyses."
22   A.   Can you show me where you're reading that, please,
23        sir?
24   Q.   From the bottom of the abstract conclusion section.
25   A.   Okay.  Can you read that again, please?
```

Sanford R. Katz, M.D.

```
 1    Q.    "Associations of pesticides with non-Hodgkins
 2          lymphoma appear to be subtype and chemical
 3          specific.  Nondifferential exposure
 4          misclassification was an important limitation
 5          showing the need for refinement of exposure
 6          estimates and exposure-response analyses; correct."
 7    A.    Okay.
 8    Q.    Do you understand what nondifferential exposure
 9          misclassification means?
10    A.    No.
11    Q.    Okay.  Are you aware that in the AGRICOH study that
12          we don't know whether a single patient who had
13          non-Hodgkins lymphoma actually had exposure to
14          glyphosate?  Are you aware of that?
15    A.    No.
16    Q.    Are you familiar with the way they set up these
17          crop exposure matrices that they used as the basis
18          for the study?
19    A.    I don't recall.  I read this paper some time ago.
20          I can't remember the specifics and this particular,
21          you know, how they put up the matrix.
22    Q.    Okay.
23    A.    I mean, I'm looking at it in Figure 1.  Is that
24          what you're referring to?
25    Q.    Let me see.  Well, I'm referring to the methodology
```

```
 1          overall, but that's fine.  But you understand that
 2          their methodology here that they used was to ask
 3          individuals what crops they grew and then to make
 4          some assessments of potential exposure that they
 5          would have had to different pesticides on the basis
 6          of the crops that they grew?
 7     A.   Yes.  Okay.
 8     Q.   Okay.  Do you see where it says on page 1522 "crop
 9          exposure matrices"?
10     A.   Yes.
11     Q.   Okay.  And it discusses basically the procedure
12          that was used for that.  And so you could have been
13          classified as a glyphosate user based on the crops
14          that you grew even if you never had any glyphosate
15          exposure whatsoever.  Do you understand that?
16     A.   Well, since -- it's my understanding that if
17          they're using seeds that are specifically
18          engineered to be glyphosate resistant and then, you
19          know, I think you're then inferring that they
20          sprayed glyphosate because that was the whole point
21          of getting the glyphosate resistant seed.  Then I
22          think that would be a reasonable inference.
23     Q.   And do you see anything in here about them dividing
24          up seeds based on glyphosate resistance?
25     A.   I don't.  I don't see that here.
```

Sanford R. Katz, M.D.

```
 1   Q.   Okay.

 2   A.   But that's the whole point though; right?

 3        Glyphosate in the farming field I thought.  The

 4        whole advantage in farming was that with glyphosate

 5        resistant crops, you can spray glyphosate to select

 6        out the weeds and not the crop.

 7   Q.   What's your basis for that?

 8   A.   That was just my understanding of why glyphosate

 9        was so useful in farming.

10   Q.   And what's the basis of the understanding?

11   A.   You know, I can't tell you.  That's just my

12        understanding.

13   Q.   Okay.  Can you turn to Exhibit 13, which is the

14        Chang study.

15   A.   Okay.

16   Q.   And am I correct that this is one of the

17        meta-analyses that you looked at; correct?

18   A.   Yes.  Let me pull mine though.  I would rather look

19        at mine.  Okay.  Go ahead.

20   Q.   Do you see where it says -- this is at the bottom

21        of the abstract.  It says "Meta-analysis is

22        constrained by few studies and a crude exposure

23        metric, while the overall body of literature is

24        methodologically limited and findings are not

25        strong or consistent."
```

Sanford R. Katz, M.D.

```
 1   A.   I don't see this.  I'm sorry.  It's at the bottom

 2        of the abstract?

 3   Q.   The bottom of the abstract.

 4   A.   Okay.  I see now.  Yes.  Go ahead.

 5   Q.   "Meta-analysis is constrained by few studies and a

 6        crude exposure metric, while the overall body of

 7        literature is methodologically limited and findings

 8        are not strong or consistent.  Thus a causal

 9        relationship has not been established between

10        glyphosate exposure and risk of any type of LHN."

11        Which is lymphohematopoietic cancer; correct?

12   A.   That's their conclusion, but what they said also

13        was that it was marginally statistically

14        significant association.  So, I mean, they kind of

15        say it both ways.

16   Q.   And statistically significant -- a finding is not

17        statistically significant if it includes the number

18        1.0; right?

19   A.   Correct.

20   Q.   And the finding that you are alluding to includes

21        the number 1.0; right?

22   A.   Yes.

23   Q.   Okay.  I want to ask you about --

24   A.   But I will say that if it's 1.0 to 1.9 or 1.0 to

25        1.6 but you don't have anything less than 1.0,
```

Sanford R. Katz, M.D.

```
 1        which you might expect just statistically, then you
 2        can certainly see trends.
 3             I think it's not unreasonable to say that this
 4        may have shown a trend, if not statistical
 5        significance.
 6   Q.   Okay.  Move to strike the nonresponsive portion.
 7        There's an article by a Mesnage that's on your
 8        listed materials considered.
 9   A.   I'm sorry.  Say that last part again?
10   Q.   It's called Mesnage.  I think it was Exhibit 21.
11   A.   Yes.  Okay.
12   Q.   By the way, is it your understanding that the IRAC
13        working group 112 considered all the relevant
14        studies in the published literature that were
15        potentially relevant to glyphosate and cancer when
16        they did their review in 2015?
17   A.   Well, I mean, you know, I think that's -- the way
18        you strayed the question is a little bit difficult
19        to answer because, I mean, I think that there were
20        certainly studies on it, you know, that they
21        omitted and studies that they included that may be
22        different from other studies that were done that
23        reached different conclusions.
24             So I think from their standpoint -- and I'm
25        not them so I can only infer what my belief is, is
```

Sanford R. Katz, M.D.

```
 1        that when the IARC reviewed the literature that

 2        they included what they felt was significant and

 3        relevant.

 4   Q.   Okay.  And part of what they say they reviewed is

 5        all the published literature that had anything

 6        relevant to do with the subject; right?

 7   A.   That's my understanding.

 8   Q.   And so this paper by Mesnage would have been in the

 9        literature at the time IARC 112 did its working

10        group; correct?

11   A.   Yes.

12   Q.   Okay.  Now, how did you find this study by Mesnage

13        entitled "Major Pesticides Are More Toxic to Human

14        Cells Than Their Declared Active Principles"?

15   A.   I looked in the published literature on a PubMed

16        search.

17   Q.   And what were you looking for at the time?

18   A.   I couldn't tell you.  I can't recall exactly what

19        my search was or what I was looking for at the

20        time.

21   Q.   Okay.  And what is your understanding of what this

22        study means?

23   A.   My understanding was that, you know, you look at

24        the formulation with additives that may be more

25        toxic and oftentimes is more toxic than just the
```

Sanford R. Katz, M.D.

```
 1         active ingredient.

 2   Q.    Okay.  And what do you mean by "more toxic"?

 3   A.    Well, it depends.  It could cause -- it could be

 4         fatality.  It could be cytotoxicity.  It could be

 5         epigenetic stuff.  I don't recall specifically the

 6         endpoints that they used.

 7   Q.    Well, the endpoint -- I'm sorry.  Go ahead.

 8   A.    No.  I'm done.

 9   Q.    The endpoint of this study was not DNA damage, was

10         it?

11   A.    Let's see.  I think they looked at cytotoxicity.

12         They looked at apoptotic cell deaths.  But I don't

13         see where they specifically looked at epigenetic.

14         I think they looked at cell death.

15   Q.    Which is cytotoxicity; right?

16   A.    Correct.

17   Q.    Okay.  They didn't look at DNA damage or

18         genotoxicity; correct?

19   A.    Correct.

20   Q.    And this study has nothing to do with the

21         carcinogenicity of glyphosate, does it?  Or Roundup

22         for that matter?

23   A.    Not specifically, no.

24   Q.    And are you aware that this study is not even

25         mentioned in the IARC 112 working group monograph?
```

Sanford R. Katz, M.D.

```
 1   A.   I don't recall if it is or if it isn't.

 2   Q.   Okay.  So let's go off the record for just a

 3        second.

 4             THE VIDEOGRAPHER:  The time is 12:53

 5        p.m., and we are off the record.

 6        (Off the record.)

 7             THE VIDEOGRAPHER:  All right.  The time

 8        is 12:54 p.m., and we are on the record.

 9   EXAMINATION BY MR. JOSEPH:

10   Q.   Dr. Katz, you provided your CV previously; is that

11        correct?

12   A.   Yes.

13   Q.   As I recall you also provided an updated version;

14        is that correct?

15   A.   Yes.

16   Q.   Are you a board-certified oncologist?

17   A.   I am.

18   Q.   And how long have you been a board-certified

19        oncologist?

20   A.   21, 22 years.

21   Q.   Has that board certification ever been suspended or

22        revoked?

23   A.   No.

24   Q.   Can you please describe briefly for the jury what

25        your particular specialty entails?
```

Sanford R. Katz, M.D.

```
 1    A.    Evaluating people with various forms of cancer,

 2          coordinating with other physicians sometimes to

 3          determine the best course of treatment.  Sometimes

 4          that involves primary radiation, sometimes it

 5          doesn't.  Sometimes it involves chemotherapy and

 6          radiation, sometimes surgery and radiation,

 7          sometimes all three.

 8                So the first part is workup, evaluation,

 9          ordering appropriate tests, staging the patient,

10          and then coming up with a treatment plan, executing

11          it, and using -- in my particular case, using

12          radiation therapy as part of that treatment plan.

13    Q.    Is radiation itself potentially -- is radiation a

14          carcinogen?

15    A.    Yes.

16    Q.    In that regard, do you have to have a working

17          understanding and specialized knowledge as it

18          relates to exposure to radiation?

19    A.    Yes.

20    Q.    Is it necessary for you to minimize your patients'

21          exposure to radiation?

22    A.    Always.

23    Q.    Why is that?

24    A.    Because of risks of key toxicity, late toxicity,

25          which includes development of secondary
```

Sanford R. Katz, M.D.

```
1        malignancies from the radiation.

2   Q.   Did you treat Joseph Blair?

3   A.   I did.

4   Q.   Were those potential secondary effects concerns of

5        yours as it related to him?

6   A.   Yes.

7   Q.   How so?

8   A.   Well, he's a young person, which means that young

9        people typically are much more sensitive to the

10       late effects of the radiation, including secondary

11       malignancies.  When we're treating lymphomas we

12       worry about that, especially in this age group.

13            You know, there's a lot of data particularly

14       from the Hodgkins lymphoma group where we often

15       would radiate people not just to their neck but to

16       their upper torso, which in females would include

17       portions of their breasts.

18            And there are studies that women who are

19       radiated in such a way that included the upper

20       portion on their chest or breast tissue at all,

21       increase risk of that may be 20 times higher than

22       baseline.

23            And I think that a woman -- I mean, 20 times

24       more than baseline is very, very high.  Much more

25       than the average person.  And that's only in women
```

Sanford R. Katz, M.D.

```
1        under the age of 30.  Once you get above the age of
2        30 they don't seem to have a higher risk.
3            And we also noticed from children treated for
4        other reasons too, but that's probably the best
5        example of how radiation in a younger person is
6        more likely to cause secondary malignancies.  Plus
7        the person has a longer life expectancy.
8            So for that reason when treating somebody with
9        a young age, we typically counsel them as to the
10       potential for developing a cancer from the
11       treatment.  And we use every measure possible to
12       minimize the volume and the doses to the areas that
13       don't need it.
14  Q.   Okay.  With regard to treatment of Mr. Blair, is it
15       true that he was also exposed to potential issues
16       with respect to his dental health as a consequence
17       of the radiation?
18  A.   Yes.  Because the radiation treated his jaw.  It
19       puts him at risk for osteonecrosis of the mandible.
20       He has decreased saliva because his salivary glands
21       were treated, and they're particularly sensitive to
22       the radiation.
23           And then he's also at risk for developing
24       secondary malignancies involving his jaw and his
25       soft tissue and his skin as well as potentially the
```

Sanford R. Katz, M.D.

```
 1          bone marrow that was radiated as well.  So those

 2          are all areas of concern.  You've got to follow

 3          them lifelong.

 4                    MR. PIORKOWSKI:  Curtis, before you go

 5               on, I'm going to just object to this as an

 6               undisclosed expert opinion.  Anyway, you can

 7               proceed.

 8                    MR. JOSEPH:  I'm pretty sure we provided

 9               that, and I think it's all in the medical

10               records.  And I think it was in the various

11               opinions that he's rendered.

12                    MR. PIORKOWSKI:  Well, not in his

13               capacity as an expert, but in any event.

14                    MR. JOSEPH:  I'm struggling to

15               differentiate the two.

16     BY MR. JOSEPH:

17     Q.   Here, Dr. Katz, what is your particular specialty

18          with regard to radiation oncology?

19     A.   Cancer of the head and neck.

20     Q.   And is that where Mr. Blair's particular cancer

21          was?

22     A.   Yes.

23     Q.   Will you please describe some of the effects that

24          the radiation has on one person?  Like how people

25          typically respond to receiving radiation treatment?
```

Sanford K. Katz, M.D.

```
 1                    MR. PIORKOWSKI:  Object to form.

 2                    THE WITNESS:  Can I answer the question?

 3                    MR. PIORKOWSKI:  Yes.

 4    BY MR. JOSEPH:

 5    Q.   Yes.

 6    A.   Well, it depends on what you're treating.  Are we

 7         talking specifically about the head and neck?

 8    Q.   How about Mr. Blair?  How did he respond?

 9    A.   Typically when we treat the head and neck because

10         skin reactions, skin redness, sometimes peeling,

11         you get alterations in sense of taste that can

12         persist up into a year, and sometimes with that it

13         doesn't fully return.

14              You can get mucositis, which is breakdown of

15         the mucosal lining in the mouth.  And, like I said,

16         you get long-term xerostomia, which is dry mouth.

17         You can get late effects of the soft tissue where

18         your muscles get tighter.

19    Q.   Tell me briefly is it true that there are certain

20         tissues in the body that are more sensitive to the

21         negative effects of chemotherapy and radiation than

22         others?

23    A.   Well, sperm is very -- sperm generating cells are

24         very sensitive.  White blood cells like

25         lymphocytes, bone marrow like red blood cell
```

Sanford R. Katz, M.D.

```
 1        progenitors and platelets, mucosal linings,

 2        salivary gland tissue.  Those are particularly

 3        sensitive.

 4   Q.   Okay.  In addition to your day-to-day clinical

 5        treatment of cancer, do you actively hold any

 6        faculty positions?

 7   A.   I do.  I'm on the faculty of the department of

 8        otolaryngology head and neck surgery at LSU as well

 9        as the department of oral and maxillofacial surgery

10        as well as the department of radiology.

11   Q.   Now, you provided written opinions as it relates to

12        Mr. Blair's pending claim; is that correct?

13   A.   I'm sorry.  Say that again.

14   Q.   You provided written opinions as it relates to

15        Mr. Blair's pending claim; is that correct?

16   A.   Yes.

17   Q.   Were those opinions based on your particular

18        acquired knowledge and skill?

19   A.   Yes.

20   Q.   Were you accurate and truthful?

21   A.   Yes.

22   Q.   I'm trying to skip over some things right quick.

23        Now, where was Mr. Blair's particular cancer

24        located?

25   A.   It was in his mouth and in his tonsil and in the
```

Sanford R. Katz, M.D.

```
 1         lymphoid tissue in the back of his throat leading

 2         up to the nasopharynx region.

 3    Q.   Are those areas particularly sensitive?  Sensitive

 4         types of tissues?

 5    A.   Lymphoid tissues are sensitive to radiation, and

 6         the mucosis is sensitive to radiation.

 7    Q.   Okay.  How is it that Mr. Blair became your

 8         patient?

 9    A.   He was referred to me by I believe Dr. Watkins.

10    Q.   For what reason?

11    A.   To evaluate and treat his cancer.

12    Q.   And what cancer was he diagnosed with?

13    A.   Diffuse large B-cell lymphoma.

14    Q.   Do you have access to your medical record of

15         November 15th, 2019?  I believe that would be your

16         first visit.

17    A.   Yes.

18    Q.   Okay.  And at that time will you please again state

19         what his diagnosis was?

20    A.   Diffuse large B-cell lymphoma of the oropharynx.

21    Q.   Go ahead.

22    A.   Which essentially for him -- I say oropharynx, it

23         was the tonsil, but it was also involving some of

24         the tissues around it, which lymphoid tissue up

25         into the nasopharynx and the posterior pharyngeal
```

Sanford R. Katz, M.D.

```
 1       wall.
 2  Q.   Will you break that down simply for the jury?
 3  A.   It was in the back of his throat.
 4  Q.   Okay.  And what is your first note and your office
 5       visit detail in terms of the history of his present
 6       illness?
 7  A.   I'm sorry.  Say again.
 8  Q.   On your first office note of November 15, 2018,
 9       what do you have indicated there as his history of
10       present illness?
11  A.   His -- well, it basically said how he presented.
12       He had right tonsil swelling.  Went to his ENT.
13       They did a CAT scan, and it showed that he had the
14       swelling in the area that I described and narrowing
15       of his airway, some prominent lymph nodes and then
16       he had bilateral tonsillectomies, which identified
17       the diffuse large B-cell lymphoma to his right
18       tonsil.  And then he was referred to me.
19  Q.   Okay.  So after Dr. Watkins removed his tonsil, he
20       still had the issue and he brought him to you?
21  A.   Well, yeah.  That was essentially a biopsy.  It
22       wasn't extruded.
23  Q.   Got it.  And that biopsy revealed the cancer that
24       you referenced earlier; is that correct?
25  A.   Yes.
```

Sanford R. Katz, M.D.

1    Q.    On that same note, that office visit, does it

2          indicate anything particularly noteworthy regarding

3          his employment?

4    A.    Yeah.  It says that he works in vegetation

5          management applying Roundup around power lines.

6    Q.    Why is that employment particular to note?

7                    MR. PIORKOWSKI:  Object to form.

8    BY MR. JOSEPH:

9    Q.    Do you find that his employment was of particular

10         note, Dr. Katz?

11   A.    Well, again, as I stated in my first deposition, it

12         was my understanding that before seeing the patient

13         that exposure to organophosphate increase the risk

14         of developing lymphoma and that we saw higher rates

15         of lymphoma in people who work in that sort of

16         agricultural industry.

17   Q.    Okay.  Will you state again your particular

18         understanding of how Mr. Blair was using the

19         Roundup products?

20   A.    As I said earlier, he was spraying it up in the air

21         at the top of trees and using the wind to get it up

22         into the top of the canopy and then have it come

23         down the tree.  And then he was doing this on a

24         back of a truck, and sometimes he would get off the

25         truck and spray it around.

Sanford R. Katz, M.D.

```
1   Q.   Do you have an understanding of what he was
2        spraying the Roundup product through?
3   A.   You mean like a hose?  Well, I thought it was a
4        hose or some sort of sprayer.
5   Q.   Okay.  Would you differentiate that from, say, what
6        your homeowner might typically use at his or her
7        house?
8              MR. PIORKOWSKI:  Object to form.
9   A.   Yeah.  I mean, you have a little hand sprayer that
10       you pump and it produces a small aerosol that you
11       focus down on the ground on your weeds.  Yeah.
12       This is different.
13  BY MR. JOSEPH:
14  Q.   Did you have an understanding of the amount in
15       terms of gallons concentrate of Roundup Pro that
16       Mr. Blair indicated that he sprayed on a daily
17       basis?
18             MR. PIORKOWSKI:  Object to form.
19  A.   I looked at his deposition and I did a calculation
20       that he -- I don't know how much he was exposed to,
21       but he talked about how much would, like, spray
22       back on him when he mixed it and how much would
23       fall on him and how much he would get when the hose
24       broke.
25             And the calculation I made when you considered
```

Sanford R. Katz, M.D.

```
 1          concentrated amount that might have been in the

 2          mixing process versus what he was getting that it

 3          could have been anywhere from -- rough estimate

 4          could have been anywhere from 10 to 20 gallons a

 5          day that he was exposed to according to him coming

 6          down in his face.

 7                    MR. PIORKOWSKI:  Object to form.

 8   BY MR. JOSEPH:

 9   Q.    For a period of over two years; is that correct?

10   A.    That's my understanding.

11   Q.    Now, was the location of his non-Hodgkins lymphoma

12          cancer particular to your assessment?

13   A.    As it relates to what?

14   Q.    The manner in which he was using the product.

15   A.    As I mentioned before, it was raining down on him

16          and you get small droplets coming down.  And he's

17          got wind blowing in his face and blowing these

18          droplets into his face for him to inhale.

19               Because the way he described it, not only with

20          the wind blowing it around but the wind would be on

21          him, and on the back of the truck you get various

22          currents.  So the way I understood it, it would

23          spray back on his face and he would breathe it in.

24   Q.    Now, you testified earlier, have you seen any

25          studies that detail a volume as asserted by
```

Sanford R. Katz, M.D.

```
 1          Mr. Blair or the quantity and what not in terms of

 2          the usage?

 3    A.    No.

 4    Q.    Okay.  How would you distinguish what you saw in

 5          terms of the studies that you reviewed and the way

 6          in which Mr. Blair indicated that he was using the

 7          product?

 8                    MR. PIORKOWSKI:  Object to form.

 9                    Go ahead.

10    A.    I see no reference to anyone who uses Roundup like

11          that.  Everything else was these farmers on boons

12          that they were using or residential use or, you

13          know, ever used or two days or ten days, a year.  I

14          never saw anything that comes close to what he

15          described to me and what I saw in his deposition.

16    BY MR. JOSEPH:

17    Q.    Would you qualify Mr. Blair's use in that regard as

18          an outlier?

19                    MR. PIORKOWSKI:  Object to form.

20    A.    It seems to me.

21    BY MR. JOSEPH:

22    Q.    Based upon the rationale that you just testified

23          to?

24    A.    I'm sorry?

25    Q.    Based upon the rationale that you just testified
```

Sanford R. Katz, M.D.

```
 1      to?

 2   A.   Yes.

 3   Q.   Is it common to see someone of Mr. Blair's age with

 4        this diagnosis?

 5   A.   I haven't seen many his age.  He's one of the few

 6        that I've seen of a young age.

 7   Q.   Okay.  And approximately how many individuals with

 8        this particular cancer would you say you've treated

 9        in the 20 plus years since you've been practicing

10        as a radiation oncologist?

11   A.   I mean, maybe 200.

12   Q.   Okay.  And is your opinion more probably than not

13        that Mr. Blair's cancer is a consequence of the

14        Roundup product he was using?

15             MR. PIORKOWSKI:  Object to form.

16   A.   Yes.

17   BY MR. JOSEPH:

18   Q.   Would that be the testimony you'll call to testify

19        at trial?

20   A.   Yes.

21   Q.   Has anything that counsel asked you earlier during

22        the numerous hours that you've been deposed led you

23        to change that opinion in any way?

24   A.   No.

25             MR. JOSEPH:  Okay.  Those are all the
```

Sanford R. Katz, M.D.

1          questions I have, Joe.

2                MR. PIORKOWSKI:  Okay.  So I guess we

3          need to let you go, Doctor.  We'll reserve our

4          rights for the record.

5                Two things I think we need to resolve on

6          the record are first the doctor mentioned that

7          he had notes, which I haven't seen.  I would

8          like those to be marked as Exhibit 45.

9          (Exhibit No. 45 was marked for

10          identification and attached hereto.)

11                MR. JOSEPH:  Okay.  I'll get that to you.

12                MR. PIORKOWSKI:  So if he can provide

13          that to Mr. Joseph.  Let's keep 45 as his

14          notes.  46 I want to mark as -- we still don't

15          have his IARC marked up monograph.  So we'll

16          make that 46.

17          (Exhibit No. 46 was marked for

18          identification and attached hereto.)

19                MR. PIORKOWSKI:  And then if you have a

20          new invoice, we'll make that 47.

21          (Exhibit No. 47 was marked for

22          identification and attached hereto.)

23                MR. JOSEPH:  Can you check and let me

24          know, Madam Reporter, if we have Dr. Katz's

25          medical records.  I have a cryptic note here.

Sanford R. Katz, M.D.

```
1              I was writing fast and writing in my lap
2         sometimes here.  Is it number 2?  Do we have
3         his --
4              MR. PIORKOWSKI:  What are you asking,
5         Curtis?
6              MR. JOSEPH:  If we have Dr. Katz's
7         treatment records.
8              MR. PIORKOWSKI:  His treatment records
9         were not part of his expert deposition.  And,
10        in fact, they haven't been part of any
11        deposition because all we marked at the first
12        treating physician deposition was what we had,
13        and then we became aware that there was a lot
14        of other stuff that we didn't have at that
15        time.
16             MR. JOSEPH:  Well, I would like to
17        introduce his notes.
18             MR. PIORKOWSKI:  Well, at this point
19        there's no foundation unless you're going to
20        go back.
21             THE WITNESS:  I'm sorry, is my attendance
22        still required?
23             MR. PIORKOWSKI:  Not by me but, Curtis,
24        it's your call.
25             MR. JOSEPH:  Yeah.  That's fine.  Thank
```

Sanford R. Katz, M.D.

```
1              you very much, Doctor.

2                   THE WITNESS:  You're welcome.  Bye now.

3                   THE VIDEOGRAPHER:  Ready to go off the

4              record, sir?

5                   MR. PIORKOWSKI:  Yes.

6                   MR. JOSEPH:  He was just being questioned

7              about the notes he read from.

8                   THE VIDEOGRAPHER:  The time is

9              approximately 1:13 p.m., and we are off the

10             record.

11             (Off the record.)

12                  MR. JOSEPH:  Okay.  To the extent that

13             Dr. Katz referred to his initial note of

14             November -- it would be his initial

15             consultation of November 15th of 2018.  I

16             would like to attach it as Exhibit 47.

17                  THE COURT REPORTER:  Okay.  Are we clear

18             on the exhibits?

19                  MR. PIORKOWSKI:  I think so.

20                  MS. HOVIS:  Actually, 47 was reserved for

21             a new invoice if there was a new invoice.

22                  MR. JOSEPH:  So 48.  I apologize.

23             Exhibit 48.

24             (Exhibit No. 48 was marked for

25                  identification and attached hereto.)
```

Sanford R. Katz, M.D.

```
 1              THE COURT REPORTER:  Mr, Joseph, did you

 2         want a copy of the transcript?

 3              MR. JOSEPH:  Yes.  I don't need the video

 4         though.

 5         (The deposition concluded at 1:16 p.m.)

 6                        -  -  -  -

 7

 8

 9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

Sanford R. Katz, M.D.

```
 1                      REPORTER'S PAGE

 2            I, Meredith Hoffpauir, Certified Court

 3   Reporter in and for the State of Louisiana, the officer,

 4   as defined in Rule 28 of the Federal Rules of Civil

 5   Procedure and/or the Article 1434 (B) of the Louisiana

 6   Code of Civil Procedure, before whom this proceeding was

 7   taken, do hereby state on the record:

 8            That due to the spontaneous nature of the

 9   interaction and discourse of the proceeding,

10   double-dashes (--) have been used to indicate pauses,

11   changes of thought, and/or talkovers; that such is the

12   universally accepted method for a court reporter's

13   transcription of a proceeding; that double-dashes (--)

14   do not indicate that words or phrases have been left out

15   of the transcript;

16            And that the spelling of any words and/or

17   names which could not be verified through reference

18   resources have been denoted with the parenthetical

19   phrase "(phonetic)."

20

21

22

23

24

25
```

Sanford R. Katz, M.D.

```
1              C E R T I F I C A T I O N

2           This certification is valid only for a

3    transcript accompanied by my original signature and

4    original seal on this page.

5           I, Meredith Hoffpauir, Certified Court

6    Reporter in and for the for the state of Louisiana, as

7    the officer before whom this testimony was taken, hereby

8    certify that Dr. Sanford Katz after having been duly

9    sworn by me upon authority of R.S. 37:2554, testified as

10   set forth in these 248 pages, that this testimony was

11   reported by me in the stenotype reporting method, was

12   prepared and transcribed by me or under my personal

13   direction and supervision, and is a true and correct

14   transcript to the best of my ability and understanding.

15          The transcript has been prepared in compliance

16   with transcript format guidelines required by statute or

17   by rules of the board.  I am informed about the complete

18   arrangement, financial or otherwise, with the person or

19   entity making arrangements for deposition services; that

20   I have acted in compliance with the prohibition on

21   contractual relationships, as defined by Louisiana Code

22   of Civil Procedure Article 1434 and in rules and

23   advisory opinions of the board.

24          I have no actual knowledge of any prohibited

25   employment or contractual relationship, direct or
```

Sanford R. Katz, M.D.

```
1    indirect, between a reporting firm and any party

2    litigant in this matter, nor is there any such

3    relationship between myself and party litigants in this

4    matter.  I have no interest, financial or otherwise, in

5    the outcome of this matter.

6              This certification is valid only for a

7    transcript accompanied by my original signature and

8    original seal on this page.

9

10             Signed on September 19, 2021.

11

12

13

14

15

16             _____

17             Meredith Hoffpauir, RPR, CCR, CSR

               RPR CERT NO. 971010

18             LA CCR NO. 2018002

               TX CSR NO. 11955

19

20

21

22

23

24

25
```

```
1                      ERRATA SHEET

2                   (Dr. Sanford Katz)

3   CASE CAPTION:  Blair, et al VS. Monsanto Company

4   DEPOSITION DATE:  September 2, 2021

5   PAGE    LINE      CORRECTION      REASON

6   _____   _____   _____   _____

7   _____   _____   _____   _____

8   _____   _____   _____   _____

9   _____   _____   _____   _____

10  _____   _____   _____   _____

11  _____   _____   _____   _____

12  _____   _____   _____   _____

13  _____   _____   _____   _____

14  _____   _____   _____   _____

15  _____   _____   _____   _____

16  _____   _____   _____   _____

17  _____   _____   _____   _____

18  _____   _____   _____   _____

19  _____   _____   _____   _____

20  _____   _____   _____   _____

21  _____   _____   _____   _____

22  _____   _____   _____   _____

23  _____   _____   _____   _____

24

25
```

Sanford R. Katz, M.D.

```
 1   PAGE    LINE     CORRECTION      REASON

 2   _____   _____    _____    _____

 3   _____   _____    _____    _____

 4   _____   _____    _____    _____

 5   _____   _____    _____    _____

 6   _____   _____    _____    _____

 7   _____   _____    _____    _____

 8   _____   _____    _____    _____

 9   _____   _____    _____    _____

10   _____   _____    _____    _____

11   _____   _____    _____    _____

12   _____   _____    _____    _____

13   _____   _____    _____    _____

14   _____   _____    _____    _____

15   _____   _____    _____    _____

16   _____   _____    _____    _____

17   _____   _____    _____    _____

18   _____   _____    _____    _____

19   _____   _____    _____    _____

20   _____         _____

     Date             Signature of Dr. Sanford Katz

21

22

23

24

25
```

Sanford R. Katz, M.D.

```
 1                  WITNESS CERTIFICATE

 2

 3        I, Dr. Sanford Katz, deponent in the foregoing

 4    deposition, do hereby certify that the same was

 5    submitted to me for examination; that I have read the

 6    deposition and find it to be a true and correct

 7    transcription of the testimony as given by me on

 8    September 2, 2021 in the matter of Blair, et al vs.

 9    Monsanto Company before Meredith Hoffpauir, CCR, RPR,

10    with the exception of any corrections noted on the

11    attached errata sheet.

12

13        ( ) No Corrections

14        ( ) Corrections

15

16    _____          _____

      Date                Dr. Sanford Katz

17

18

19

20

21

22

23

24

25
```

Sanford R. Katz, M.D.

1              REPORTER'S READ AND SIGN CERTIFICATE

2

3        I, Meredith Hoffpauir, CCR, RPR, having duly

4   prepared this transcript and forwarded a copy to the

5   witness, Dr. Sanford Katz.

6        After 30 days had elapsed, I was not notified of

7   any changes.

8        Now, therefore, in accordance with CCP Article

9   1445, I have signed the transcript.

10

11

12

13                    _____

                      Meredith Hoffpauir, CCR, RPR

14                    Louisiana Certificate No. 2018002

15

16

17

18

19

20

21

22

23

24

25