**WILKINSON STEKLOFF LLP**
Brian L. Stekloff (*pro hac vice*)
(bstekloff@wilkinsonstekloff.com)
Rakesh Kilaru (*pro hac vice*)
(rkilaru@wilkinsonstekloff.com)
2001 M St. NW
10th Floor
Washington, DC 20036
Tel:   202-847-4030
Fax:   202-847-4005

**HOLLINGSWORTH LLP**
Eric G. Lasker (*pro hac vice*)
(elasker@hollingsworthllp.com)
1350 I St. NW
Washington, DC 20005
Tel: 202-898-5843
Fax: 202-682-1639

*Attorneys for Defendant*
*MONSANTO COMPANY*

**COVINGTON & BURLING LLP**
Michael X. Imbroscio (*pro hac vice*)
(mimbroscio@cov.com)
One City Center
850 10th St. NW
Washington, DC 20001
Tel: 202-662-6000

**BRYAN CAVE LEIGHTON PAISNER LLP**
K. Lee Marshall (CA Bar No. 277092)
(klmarshall@bclplaw.com)
Three Embarcadero Center, 7th Floor
San Francisco, CA 94111
Tel:  415-675-3400
Fax: 415-675-3434

**THE PIORKOWSKI LAW FIRM, PC**
Joseph D. Piorkowski, Jr.
(jpiorkowski@lawdoc1.com)
1800 K Street, NW, Suite 1000
Washington, DC 20006
Tel:  202-257-7662

# UNITED STATES DISTRICT COURT

# NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| IN RE: ROUNDUP PRODUCTS LIABILITY LITIGATION<br><br>*Beth Spector and Chuck Spector, wife and husband v. Monsanto Company*<br>Case No. 3:20-cv-05532 | MDL No. 2741<br><br>Case No.: 3:16-md-02741-VC<br><br>**DEFENDANT MONSANTO'S REPLY IN SUPPORT OF MOTION TO EXCLUDE TESTIMONY OF PLAINTIFFS' EXPERT RONALD KENDALL ON RULE 702 GROUNDS**<br><br>Hearing date: December 13, 2021<br>Time: TBD |

**INTRODUCTION**

Wave 3 Plaintiff Beth Spector has designated a new specific causation expert who does not meet the requirements of Federal Rule of Evidence 702 or the standards this Court imposed in Pre-Trial Order 85 ("PTO 85"). Monsanto moved to exclude the testimony of Dr. Kendall for a number of reasons, one of which was that he copied word-for-word a substantial portion of his report from a long-time plaintiffs' expert in a prior Roundup case, Dr. William Sawyer, and attempted to hide that fact at deposition.

Dr. Kendall's denial that he copied Dr. Sawyer's report is false as evidenced by over 40 pages of deposition transcript establishing that key portions of Dr. Kendall's report language was identical to that of Dr. Sawyer's report (or in some places identical with perhaps a word changed here and there). At the risk of stating the obvious, copying huge portions of the report of another expert witness is not a reliable methodology for reaching a scientific opinion. Courts have held that such behavior makes an expert's report unreliable, his opinion not his own, and is cause to exclude his testimony. *See, e.g., Spiral Direct Inc. v. Basic Sports Apparel Inc.*, 2017 U.S. Dist. LEXIS 225205 (USDC MDFL 2017).

Additionally, Monsanto moved to exclude the testimony of Dr. Kendall for his unreliable methodology and his unreliable application of those methods to the facts of the case. Despite statements in the Opposition regarding Dr. Kendall's credentials and his theory of biological variability, the Opposition fails to address the fact that the conclusions he reaches with respect to Ms. Spector's NHL are inconsistent with his deposition testimony. Dr. Kendall admits that Roundup <u>might not</u> be a direct cause of NHL. He also testified that neither glyphosate nor the surfactants used in Roundup are carcinogenic. Nonetheless, he opines that Roundup was a substantial contributing factor in the development of Ms. Spector's NHL based on "plausibility" and his suspicions. Further, he not only concedes that an internal dose – not just exposure – is required to cause an increased risk of NHL, he also admits that it has not yet been determined what level of internal dose of Roundup is required to cause that increased risk. Accordingly, Dr. Kendall's conclusion that Roundup was a substantial contributing factor requires numerous scientific leaps of faith over several hurdles, including that there is no information confirming that Ms. Spector ever received an internal dose.

Finally, Dr. Kendall failed to meet the requirements of a specific causation expert under Ninth Circuit precedent and PTO 85. He failed to consider Ms. Spector's other risk factors and failed to address that which he admitted he cannot rule out. By definition, this inability to rule out a potential contributing factor means that Dr. Kendall cannot testify that Roundup was the cause of Ms. Spector's NHL under a differential diagnosis. Plaintiff's position that its specific causation experts do not need to rule out other risk factors is wrong on the law and ignores the provisions of PTO 85. Dr. Kendall does not meet the requirements of a specific causation expert and his opinions should be excluded for this reason as well.

**I.   Dr. Kendall Opinions Are Not Reliable Because They Were Directly Copied from an Expert in Another Roundup Case and He Continues to Deny that He Copied Them.**

Much of Dr. Kendall's expert report[1] is copied from a report of Dr. Sawyer, a long-time general causation expert in Roundup cases, who was not disclosed as either a general or specific causation expert in this case. *See* Declaration of Eric Lasker (October 20, 2021) ("Lasker Decl."), Ex. 15, Kendall *Spector* Report (hereinafter, "Kendall *Spector* Rep."); Lasker Decl., Ex. 16, Sawyer *Schafer* Report (hereinafter, "Sawyer *Schafer* Rep."); Lasker Decl., Ex. 17, Plaintiff's Expert Disclosures General Causation; Lasker Decl., Ex. 18, Plaintiff's R.26 Specific Causation Expert Disclosures. Monsanto does not dispute that "[p]lagiarism in an expert report does not automatically render the expert's testimony inadmissible." *Spiral Direct Inc. v. Basic Sports Apparel Inc.*, 2017 U.S. Dist. LEXIS 225205 at *5 (USDC MDFL 2017).

But the court in *Spiral Direct* <u>excluded</u> an expert's plagiarized opinion in circumstances remarkably similar to that of Dr. Kendall (where the expert plagiarized "large sections of another expert's report, which she did not acknowledge until confronted in her deposition"), finding that the circumstances rendered the opinion unreliable. *Id.* at *8. The factors that the Court took into account

---

[1] To put the amount of copying in context, out of 17 pages of content, approximately 12 pages include Dr. Kendall's qualifications, Ms. Spector's history, and photographs. Of the remaining 5 pages, Dr. Kendall copied Dr. Sawyer's discussions on Glyphosate Human NHL Studies, Mechanism of Carcinogenicity, Latency of NHL, much of the Scope of Exposure in Comparison to Epidemiological Studies, half of Comparisons of Exposure Days to Human Epidemiological Studies and the entire table of the Summary of Epidemiological Studies, as well as borrowing liberally from Dr. Sawyer's report in the Evidential Considerations.

included that (1) the expert did not reference the other expert's report in her report, (2) the expert's report "provided no hint whatsoever" that she relied on another expert's report, (3) the expert did not "provide any citation or attribution" to the other expert's report, and (4) the expert "did not show a willingness to reveal her plagiarism to anyone in the case until [counsel] confronted her about it near the end of her deposition." *Id.* at *5-7. Due to the expert's "attempt to appropriate the opinions of" another expert and "play them off as her own," the Court found that the expert's report was unreliable and must be excluded. *Id.* at *7.[2]

The instant case has all of the elements present in *Spiral Direct* except for one: despite admitting a large amount of material is identical to Dr. Sawyer's report, Dr. Kendall continues to deny that he copied Dr. Sawyer's report. Under oath during deposition, Dr. Kendall attempted to hide his reliance on Dr. Sawyer's report and repeatedly refused to admit that he copied Dr. Sawyer's report, despite acknowledging that many portions of the two reports were identical. He claims that the analysis is his, that he briefly read Dr. Sawyer's report, and that he just happened to come up with identical paragraphs and tables for his own report because that that is how toxicologists think. Now, apparently, Dr. Kendall has doubled-down on his denials by signing an October 4, 2021 affidavit swearing to this Court under oath that he "did not *intentionally* copy or plagiarize another expert's report," but that several pages' worth of the exact words of Dr. Sawyer's report simply came out of his mouth during dictation. Pls.' Resp. in Opp'n to Monsanto's Mot. to Exclude Test. of Pls.' Expert Dr. Ronald Kendall, ECF No. 13901 at 1 ("Pls.' Opp'n"); Pls.' Opp'n at Silverstein Decl. Ex 9, Kendall affidavit at 1 (emphasis added). A small fraction of the lengthy deposition testimony regarding Dr. Kendall's copying tells the true story:

---

[2] *See also Moore v. BASF Corp.*, Civ. Action No. 11-1001, 2012 U.S. Dist. LEXIS 170411, 2012 WL 6002831, at *7 (E.D. La. Nov. 30, 2012) (emphasis added) ("Dr. Kura's use of Dr. Kopstein's work is particularly problematic in that Dr. Kura first testified that the report he proffered was his original drafting and that he had not reviewed other expert reports. When asked to explain why many of his sentences were nearly identical to Dr. Kopstein's, he later conceded that he saw Dr. Kopstein's report and at the very least took notes. The likelihood that substantial portions of Dr. Kura's report do not reflect his original work is yet another reason the Court finds that Dr. Kura's opinions in general are unreliable.").

> "Q. Okay. Dr. Kendall, did you copy the top paragraph on page 33 in Dr. Sawyer's report -- let me finish my question -- into your report and switch around the words?
>
> A. Not really. I -- I read -- you know what? I probably read his report in 20 -- 15 minutes, 20 minutes. And --
>
> Q. Okay.
>
> A. -- I just, I read it, and I had a whole bunch of them I was reading that day. And so I read it. I gave it some thought, and I just started knocking -- I just let -- just went -- that's how I do things. I read things, I don't take notes, and I just knock things out. And this just all came to me because this is the logical way -- this is exactly the way I'm thinking. This is exactly the way I've communicated to you in my deposition. I could do it blindfolded. You know, that's -- that's exactly how I'm thinking. And I stand by everything in that report because that's how -- that's how I put things together, and -- and that's how I want to communicate it because that's how I see it. And I think that will be clearly reflected in the record of how I've communicated this in my depositions, both today and last Thursday.
>
> Q. Dr. Kendall, you answered my question with, "Not really." So I just -- I just want to understand your process. Did you copy the first paragraph on page 33 from the Sawyer report into your report and switch around the words?
>
> A. Not copy. I read it. And I -- and I generated what I saw as the logic profile, which was very similar to mine. I -- that's how I was thinking.
>
> Q. So you didn't -- so you did not copy and paste that paragraph –
>
> A. No. No, no, no. No.
>
> Q. -- into your report and switch around the words?
>
> A. I did not."

See Lasker Decl., Ex. 19, Kendall (*Savory/Thomas*) Dep. at 194:13-196:4 (hereinafter, "Kendall (*Savory/Thomas*) Dep.")

> "Q. Okay. And you have in your report, "genotoxicity (including direct human studies), mechanisms of action (promotion, et cetera)." You have the exact same phraseology in your report, the exact same parentheses, true?
>
> A. Well, it makes absolute sense – … And I stand behind it 100 percent.
>
> Q. And you stated it in your report exactly how Dr. Sawyer stated in his report, true? [Objection omitted]
>
> A. It is maybe close. It's maybe close. But if he's a toxicologist, we -- we talk the same language. I don't know him."

Kendall (*Savory/Thomas*) Dep. at 200:7-201:14.

> "Q. …I asked if you could find one difference in the verbiage in any of the language between Table 7 in Dr. Sawyer's Schafer report and Table 3 in your Savory report. Is there any difference in the language anywhere?
>
> A. I don't know.
>
> Q. Or is it exactly the same?
>
> A. I don't --
>
> Q. Go ahead and compare. Go ahead and compare. Take a moment.
>
> A. (Reviews document.) It looks very close if not extremely close. …"

Kendall (*Savory/Thomas*) Dep. at 207:2-15.

> "Q. You said they were pretty close to very close. They are identical, aren't they, sir?
>
> **A.** Yeah, it looks like it to me."

Kendall (*Savory/Thomas*) Dep. at 208:2-4.

> "Q. Okay. Is it your testimony under oath today that you did not copy either by copy and pasting or by transcribing, you did not copy any of Dr. Sawyer's Schafer report into your report?
>
> A. I read his report. I did not copy it. I read his report. I -- I evaluated his language, and I -- I have my report.
>
> Q. Okay. And you wrote every word in your report? That's your testimony?
>
> A. I did." …"

Kendall *Savory/Thomas* Dep. at 225:6-15.  This line of questioning goes on for over 40 transcript pages, with Dr. Kendall doing a line-by-line comparison of large parts of his report and that of Dr. Sawyer, acknowledging that the text was identical or identical with perhaps a word changed, and denying that he copied the large amount of identical language directly from Dr. Sawyer's report.[3]

*See, e.g.*, Sawyer *Schafer* Rep., at 33, 38–39, 188–91; Lasker Dec., Ex. 20, Kendall *Savory* Rep., at

---

[3] Note that while the referenced deposition compared Dr. Kendall's report in the *Monsanto v. Savory* case, all of the material covered at the deposition was also identical to Dr. Kendall's report in this case and, in fact, he used even more material from Dr. Sawyer's report in his report for Ms. Spector.

12–16; Kendall *Savory/Thomas* Dep. at 183:5–225:15. His claim that he reviewed Dr. Sawyer's report for 15-20 minutes and then simply came up with identical paragraphs on his own is not credible.

The Opposition's focus on Dr. Kendall's belated addition of Dr. Sawyer's report (and several other document references) to his amended materials considered list and its insistence that Dr. Kendall was "confused" are red herrings. Adding an expert report to a 33-item list of materials considered does not constitute citation or attribution to Dr. Sawyer's report. Regardless of what Dr. Kendall listed in an invoice or put on a materials considered list, the facts are the same as in the *Spiral Direct* case: (1) A large portion of Dr. Kendall's report was taken from the report of Dr. Sawyer in a prior case, (2) Dr. Kendall did not reference Dr. Sawyer's expert's report in his report, (3) his expert's report "provided no hint whatsoever" that he relied on Dr. Sawyer's report, (4) he did not "provide any citation or attribution" to Dr. Sawyer's expert report, and (5) he – to this day -- "did not show a willingness to reveal [his] plagiarism, even after being confronted by counsel about it at length during his deposition." "When an expert witness attempts to mislead the court on an issue as fundamental as the origin of his expert opinion, I assess his credibility as so severely compromised as to preclude reliance upon his opinion and testimony." *Raymo v. Sec'y of Health & Human Servs.*, No. 11-0654V, 2014 U.S. Claims LEXIS 162, 2014 WL 1092274, at *13 (Fed. Cl. Feb. 24, 2014).

Dr. Kendall's prolonged and continued attempt to mislead this Court as to the origins of his report so severely compromise his credibility that his opinion and testimony must be struck.

**II.  Dr. Kendall Does Not Have A Reliable Methodology and Does Not Reliably Apply Principles and Methods.**

Plaintiff's Opposition does not address Monsanto's specific allegations related to the unreliability of Dr. Kendall's methodology and his application of principles and methods. Dr. Kendall's deposition testimony is internally inconsistent with his conclusion, to a reasonable degree of scientific certainty, that Ms. Spector's exposure to glyphosate or glyphosate-based formulations

1  ("GBFs") was a "substantial contributing factor" to her development of NHL. Kendall *Spector* Rep.
2  at 18.

3  Dr. Kendall does not consider either glyphosate or the surfactants used in GBFs to be
4  carcinogenic. *See* Lasker Decl., Ex. 21, Kendall *Spector* Dep. at 47:6-23; 185:19-186:14, 194:8-12,
5  219:11-17 (hereinafter, "Kendall*(Spector* Dep."). To meet the reliability tests of Federal Rule of
6  Evidence 702, there must be some reliable steps to move from those facts to a conclusion that a
7  specific combination of such non-carcinogenic ingredients became carcinogenic and were a
8  substantial contributing factor in the development of this particular plaintiff's NHL. Dr. Kendall has
9  not articulate any such steps, much less reliable ones. The Opposition's long paragraphs about his
10 methodological approach in general do not provide any bridge for this cavernous gap. Pls.' Opp'n at
11 4-6.

12 In fact, when asked at deposition whether he had an opinion on how two noncarcinogenic
13 materials could have become carcinogenic, he could reply only that he was relying on "plausibility."
14 Kendall *Savory/Thomas* Dep. at 44:12-24. When asked whether he had identified a mechanism to
15 explain his theory, he answered that "I'm suspicious of it." *Id.* at 56:3-8. At one point, he clearly
16 conceded his uncertainty that Roundup increased the risk of NHL at all, saying that GBFs "may not
17 have the direct effects. It may. We don't – we still don't know exactly." *Id.* at 53:16-25.

18 Additionally, Dr. Kendall conceded that an internal dose of Roundup, rather than just
19 exposure, is required to cause cancer. Kendall (*Spector*) Dep. at 95:16-19. He also testified that the
20 threshold internal dose at which someone is at risk of NHL from GBF exposure "hasn't been
21 determined yet," and that "we haven't really determined yet in the whole area of *theory* as what –
22 what are the threshold levels for carcinogenic response. What are they? We don't know." Kendall
23 (*Spector*) Dep. at 219:18-21, 232:24-233:2 (emphasis added). To meet Rule 702's reliability
24 requirements, Dr. Kendall would have to demonstrate Ms. Spector's internal dose, establish that such
25 dose was sufficient to increase the risk of NHL, and show that such internal dose was a substantial
26 contributing factor to a reasonable degree of scientific certainty. He has failed at each step.[4]

---

[4] The recitation in the Opposition about "biological variability" and the example of alcoholic drinks does not support Dr. Kendall's conclusions, but instead supports the argument that his

Dr. Kendall's reliance on plausibility, suspicion, theory, debatable principles, and absolutely no scientific data does not rise to the level of a reliable methodology. There is no reliable application of principles or methodology in his huge leap from (a) noncarcinogenic ingredients, (b) uncertainty that GBFs actually increase the risk of NHL, (c) lack of evidence regarding Ms. Spector's internal dose, and (d) uncertainty regarding the levels of internal dose required to increase the risk of NHL to a conclusion that a combination of such ingredients in Roundup were, to a reasonable degree of scientific certainty, a substantial contributing factor in Ms. Spector's NHL. Dr. Kendall's testimony also should be excluded for being unreliable for these reasons.

### III. Dr. Kendall Failed to Adequately Assess Potential Alternative Causes of Plaintiff's NHL.

In defending Dr. Kendall's general methodological approach in this case, the Opposition represents that Dr. Kendall considered "information about … [Ms. Spector's] risk factors." Pls.' Opp'n at 11. A mere two pages later, though, the Plaintiff's Opposition defends Dr. Kendall's failure to meet the requirements for a specific causation expert by claiming that he "need not analyze every conceivable risk factor to satisfy Daubert." Pls.' Opp'n at 13. This overstatement shows Plaintiff's fundamental misunderstanding of the Court's prior ruling and the relevant precedent. Ninth Circuit law is clear that the first step of a reliable differential diagnosis requires an expert to "compile a comprehensive list" of possible causes. *Clausen v. M/V New Carissa*, 339 F. 3d 1049, 1057-58 (9th Cir. 2003) (expert must first "rule[] in *all* of the potential hypotheses that might explain a patient's symptoms") (emphasis added). Indeed, an expert's list must include even "rare" possible causes to ensure that, when the expert evaluates and "rules out" potential causes on the list during the second step of the differential diagnosis, rare – but nonetheless possible – causes "are not overlooked." *Id*. This case law is also reflected in PTO 85 ("The next question is whether the experts adequately assessed all of the potential causes of the plaintiffs' NHL, and properly ruled out factors other than

---

methods and application are not reliable. Pls.' Opp'n at 5. The Opposition provides no evidence that Dr. Kendall was able to determine the biological variations that apply specifically to Ms. Spector (as opposed to some other person) and how she would react to a GBF exposure if, in fact, GBFs were carcinogenic.

glyphosate, while at the same time declining to rule out glyphosate itself.").

Resisting this conclusion, Plaintiff suggests that *Wendall v. GlaxoSmithKline LLC*, 858 F. 3d 1227, 1237 (9th Cir. 2017), stands for the proposition that an expert need not consider every potential risk factor for their opinions to be admissible. Pls.' Opp'n at 8. But *Wendall* affirms that, at the first step of the differential diagnosis, an expert must "assume[] the pertinence of *all* potential causes." *Wendall*, 858 F. 3d at 1234 (emphasis added). The passage quoted by the Plaintiff concerns the *second step* of a reliable differential diagnosis, when an expert examines each potential cause. At that second step, an expert need not definitively "rule out" all potential causes but one, so long as the expert has a sound basis for concluding that one particular cause is "the most likely." *Id.*, see also *Cooper v. Takeda Pharm. Am.*, 239 Cal. App. 4th 555, 577 (2015).

Dr. Kendall failed both steps of a reliable differential diagnosis. He did not start with a comprehensive list of all possible causes, and he did not examine and weigh all potential causes to determine which cause was most likely. Ms. Spector's medical records strongly support that she had a primary immunodeficiency, which left her susceptible to repeated pulmonary infections (including but not limited to non-tuberculous mycobacterium), with these repeated infections leading to progressive destruction of her lung tissue, a condition known as bronchiectasis. *See* Lasker Decl., Ex. 22, Reshef *Spector* Rep. at 6. Ms. Spector's immunodeficiency and the resulting infections probably contributed to the development of her marginal zone lymphoma. Additionally, Ms. Spector had a first-degree family history of cancer. *See* Lasker Decl., Ex. 23, Spector Dep. at 228: 1-5.

Dr. Kendall concludes that Ms. Spector's use of Roundup was a substantial contributing factor to her development of NHL without substantively addressing *any of* Plaintiff's other risk factors. Kendall *Spector* Rep. at 18. His report did not address her primary immunodeficiency or the infections caused thereby. Kendall *Spector* Rep. It was only when asked about these risk factors during deposition that he revealed that he could not, in fact, rule out at least one of them. When asked if Ms. Spector's NHL could have been due to her increased risk from having a first degree relative with cancer, independent of other causes, Dr. Kendall stated, "It's possible. We can't rule that out." Kendall *Savory/Thomas* Dep. at 117:3-7.

Dr. Kendall similarly failed to comply with the second step of a differential diagnosis. He has provided no basis for ignoring Ms. Spector's primary immunodeficiency or the risk factor that he admittedly cannot exclude (first-degree relative with cancer) in favor of Roundup as the cause of Ms. Spector's NHL. An expert conducting a differential diagnosis "must provide reasons for rejecting alternative hypotheses 'using scientific methods and procedures' and the elimination of those hypotheses must be founded on more than 'subjective beliefs or unsupported speculation.'" *Clausen*, 339 F.3d at 1058 (quoting *Claar v. Burlington N. R.R. Co.*, 29 F.3d 499, 502 (9th Cir. 1994)). Dr. Kendall failed to conduct an analysis that complies with PTO 85 and other applicable law. His methodology is unreliable and his opinion should be excluded.

### IV. The Court Has Not Ruled That The Experts In This Case Have Properly Ruled in Roundup as the Cause of This Plaintiff's NHL.

The Plaintiff's Opposition includes a heading entitled "This Court Has Already Ruled that Plaintiffs' Experts Properly Ruled in Roundup as the Cause of Plaintiffs' Non-Hodgkin's Lymphoma." Pls.' Opp'n at 15. While the Opposition did not substantively address this point whatsoever, there is no legal basis for the assertion because one expert survived a *Daubert* challenge, then all other experts on a similar issue must also survive such a challenge. Indeed, the specific cause issue is necessarily one that is case specific with variables unique to each plaintiff, such as the particular plaintiff's type of cancer and level and type of exposure, among other variables. Dr. Kendall, who has never previously served as a disclosed expert in any Roundup case, is subject to challenge if his opinions are inconsistent with Rule 702's requirements as they are here.

### CONCLUSION

For the foregoing reasons, the Court should grant Monsanto's motion to exclude this specific causation expert on Rule 702 and *Daubert* grounds.

Dated: October 20, 2021

By:   */s/ Eric G. Lasker*
Eric G. Lasker (*pro hac vice*)
(elasker@hollingsworthllp.com)
Hollingsworth LLP
1350 I St. NW
Washington, DC 20005
Tel: 202-898-5843

Attorney for Defendant Monsanto Company

# CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on this 20th day of October, 2021, a copy of the foregoing was filed with the Clerk of the Court through the CM/ECF system which sent notice of the filing to all appearing parties of record.

*/s/ Eric G. Lasker*