EXHIBIT 19

Ronald J. Kendall, Ph.D.

```
 1              UNITED STATES DISTRICT COURT
                NORTHERN DISTRICT OF CALIFORNIA
 2
 3   IN RE:  ROUNDUP PRODUCTS      MDL No. 2741
     LIABILITY LITIGATION
 4   _____
 5   SAVORY V. MONSANTO, CO.,       *
     Case No. 3:20-cv-02403         *
 6                                  *
     -and-                          *
 7                                  *
     THOMAS V. MONSANTO, CO.,       *
 8   Case No. 3:20-cv-08051         *
     _____
 9
10   ****************************************************
11            REMOTE VIDEOTAPED DEPOSITION OF
                 RONALD J. KENDALL, Ph.D.
12                  SEPTEMBER 1, 2021
13   ****************************************************
14
15
16            DEPOSITION of RONALD J. KENDALL,
17   Ph.D., produced as a witness at the instance of the
18   Defendant, and duly sworn, was taken in the
19   above-styled and numbered cause on the 1st day of
20   September, 2021, from 8:28 a.m. to 3:06 p.m., before
21   Christy R. Sievert, CSR, RPR, in and for the State
22   of Texas, reported remotely by machine shorthand,
23   pursuant to the Federal Rules of Civil Procedure and
24   the provisions stated on the record or attached
25   hereto.
```

Ronald U. Kendall, Ph.D.

```
 1                  A P P E A R A N C E S
 2                    (Appearing remotely)
 3
 4    FOR THE PLAINTIFF:
 5      MR. MARC G. BRECHER
        Wapner Newman
 6      2000 Market Street, Suite 2750
        Philadelphia, Pennsylvania  19103
 7      Phone:     267-281-5128
        E-mail:    mbrecher@wapnernewman.com
 8
 9    FOR THE DEFENDANT:
10      MR. JOHN M. KALAS
        MS. DEVARATI DAS
11      Hollingsworth, LLP
        1350 I Street, NW
12      Washington, DC 20005
        Phone:     202-898-5800
13      E-mail:    jkalas@hollingsworthllp.com
                   ddas@hollingsworthllp.com
14
15    ALSO PRESENT:
16      RICHARD REINSTRA, Videographer
17
18
19
20
21
22
23
24
25
```

1        A.    I tried to give you some background of why

2   I was going to answer it the way I did.

3        Q.    No, no, no, I -- I appreciate it.

4              Let me follow up a little bit on the back

5   end of that answer.  So you said that synergistic

6   effects cannot be excluded.  And -- and I guess what

7   I'm not -- what I'm interested in is not hypotheses.

8   What I'm interested in are conclusions that you have

9   to a reasonable degree of toxicological certainty.

10  And so I understand that it's your opinion

11  synergistic effects cannot be excluded.

12             But to that end, sir, and this is my

13  question, how specifically -- or do you have an

14  opinion specifically how a substance glyphosate that

15  is not listed as carcinogenic and a substance or

16  substances, surfactants that are not listed as

17  carcinogenic can combine in a formulation of

18  glyphosate-based herbicide to cause a carcinogenic

19  effect?  How mechanistically is that happening?  Do

20  you have an opinion on that, or is it an open

21  question in your mind?

22        A.    As I mentioned to you, I think that

23  biological plausibility exists because of the

24  biochemistry of these substances, glyphosate and the

25  formulation, that there -- there could be an

Ronald J. Kendall, Ph.D.

```
 1        Q.   The authors of this article never allege
 2   that glyphosate acting as an amino acid analog of
 3   glycine somehow causes lymphoma via that mechanism,
 4   right?
 5        A.   They -- they did not discuss lymphoma, but,
 6   still, the mechanism of chronic disease with these
 7   kind of interactions.  And that's -- that's my
 8   point.
 9        Q.   Okay.
10        A.   You know, it's a pretty compelling article.
11   And it is chronic kidney disease, but it's still a
12   pathology that has its -- its routes argued in the
13   context of synergism.  And that's -- that's just my
14   point.
15        Q.   Okay.
16        A.   And, you know, again, as you, you know,
17   challenged me earlier on to address how in the world
18   could glyphosate as a substance in a formulation
19   have any potential to act as -- as a threat in the
20   development of, say, a blood cancer, you know,
21   that's how we got onto this topic.  And my answer,
22   again, is it may not have the direct effects.  It
23   may.  We don't -- we still don't know exactly, but
24   it can -- it can act synergistically with either
25   risk factors or other substances.
```

1    when acting individually they cannot?

2        A.   Can you please ask that question again?

3        Q.   Sure.  Is there a mechanism you've

4    identified where glyphosate and surfactants acting

5    in concert can cause lymphoma, when acting

6    individually they cannot?

7        A.   I'm suspicious of it, but not 100 percent

8    confirmed as to the mechanism.

9        Q.   Okay.  Now, you mentioned a few other

10   things in -- in some of the answers we just had.  I

11   just want to follow up on them.

12       A.   Okay.

13       Q.   You mentioned that NHL is a multifactorial

14   process, right?  Do you remember saying that?

15       A.   I think -- I think so.

16       Q.   Okay.  For all three plaintiffs:  Spector,

17   Savory, Thomas, you would agree with me that you are

18   not saying Roundup is the only cause of their

19   lymphoma.  Is that fair?

20       A.   I'm saying that I think within a reasonable

21   degree of scientific certainty, that glyphosate was

22   a significant contributor to the ultimate

23   development of NHL in those three clients based on

24   my evaluation of their very limited exposure to any

25   other toxic substances, if any, and -- and their

Ronald J. Kendall, Ph.D.

1    was a significant contributing factor to his

2    ultimate development of NHL.

3        Q.   Okay.  Returning to Ms. Spector for a

4    moment.  Could Ms. Spector have manifested NHL via

5    her increased risk of NHL from a first degree

6    relative with cancer independent of other causes?

7        A.   It's possible.  We can't rule that out.

8        Q.   Okay.  Could Mr. Savory have manifested NHL

9    via his increased risk from having rheumatoid

10   arthritis independent of other causes?

11       A.   It's possible, but we can't rule that out.

12   But on the other side, that inflammation could have

13   made him more sensitive to this from -- from

14   long-term chemical exposure.  I don't know.  We

15   can't rule it out.

16       Q.   Okay.  Let's go to Mr. Thomas.  In the case

17   of Mr. Thomas, do you intend to tell the jury that

18   Mr. Thomas had a genetic predisposition to NHL that

19   was exacerbated by his Roundup use?

20       A.   No.

21       Q.   Do you intend to tell the jury that

22   Mr. Thomas had any predisposition to NHL from any

23   other factor that was exacerbated by his Roundup

24   use?

25       A.   I don't think we can rule anything out.

1    either. . .

2        A.    Okay.  Okay.

3        Q.    Okay.  Do you have it open, sir?

4        A.    I do.

5        Q.    Okay.  And is this the expert report

6    that -- by Dr. Sawyer that you reviewed in reaching

7    your opinions in this matter?

8        A.    I considered it, yes.  I reviewed it.

9        Q.    Explain to me how you used this when you

10   were considering your opinions.

11       A.    Well, I'm a toxicologist, and I was working

12   my way through the toxicologies of this whole --

13   whole issue, and I -- the -- the line of thinking as

14   I was reading all these materials was to bring

15   together exposure aspects of absorption,

16   distribution, excretion, the evidence which I was

17   aware was of the epidemiological studies that could

18   provide some evidence as to the potential

19   relationship between epidemiological statistics and

20   the correlation and association between glyphosate

21   and NHL; although, there's some differences in the

22   outcomes of those cases, control studies.

23             And then I worked my way through estimates

24   of the exposure duration of Mr. Savory, Ms. Spector

25   and Mr. Thomas, and also what were their potential

Ronald J. Kendall, Ph.D.

1  toxicological confounding the variables, and there

2  were really very little to none of the toxicological

3  confounding.

4         And then I went on to consider the

5  ultimate demonstration of NHL as an outcome and --

6  and what was associated with that based on the

7  literature, particularly looking at the animal

8  toxicological data and what evidence we had and what

9  was in my knowledge base related to the genetic

10  toxicity.

11         And that was, you know, a lot going into

12  the toxicological literature, such as Casarett &

13  Doull's, "Toxicology:  The Basic Science of

14  Poisons."  And as I mentioned to you before, when

15  our friend got -- got lymphoma and had used a lot of

16  glyphosate associated with the cotton business,

17  cotton, I became a lot more interested in this.  And

18  so I had done a good bit of reading over the last

19  couple of years.  So that was -- that whole process

20  and logic that I went through, I evaluated what that

21  report went through.

22         I know one thing is that in terms of my

23  report, I stand by everything that I say, and I --

24  I -- that is exactly the way I'm thinking about it.

25  And I had no idea who this individual is, nor the

Ronald U. Kendall, Ph.D.

```
 1   Sawyer case, I had no idea.  I just was going

 2   through the lit- -- the information I had access to

 3   and what I had read in the past and what I had read

 4   currently as I was putting all this together to come

 5   to my opinion and conclusions.  So that's kind of

 6   the process I went through.

 7          And then -- and it's literally -- you

 8   know, it's literally what I do every day.  I mean,

 9   it's -- it's just what I do.  And so I -- you know,

10   I just go through that -- that kind of process and

11   trying to think through do we have biological

12   plausibility here or not.  And that's kind of where

13   I came out -- came out the end of the thinking

14   process to get to.  So that's -- that's my thought

15   process.

16       Q.   And that -- fair.  And so I think -- I

17   think what you said there in that answer, I'm going

18   to make sure, you know, your report are your

19   opinions, right?

20       A.   Absolutely.

21       Q.   It is your opinions?

22       A.   Absolutely.  I stand 100 percent behind,

23   you know, my -- my thinking process and where I

24   ended up in my thinking process with my opinions

25   I've given you today.
```

Ronald J. Kendall, Ph.D.

1        Q.   Okay.  And so even though you read a report

2   of another toxicologist who's not on those

3   disclosures we looked at on Exhibits 19 and 20,

4   named William Sawyer, even though you looked at his

5   report, the opinions you offered in your report are

6   not Dr. Sawyer's opinions, they're your opinions?

7        A.   Absolutely not.  They're my opinions,

8   100 percent.

9        Q.   Okay.  Let's -- let's look at Exhibit 21.

10  And if you could, go to page 33 of Exhibit 21,

11  please.  It's entitled, "Glyphosate Human NHL

12  Studies."

13            MR. BRECHER:  What page are you on,

14  John?

15            MR. KALAS:  33 of Exhibit 21.

16            MR. BRECHER:  Okay.

17  BY MR. KALAS:

18       Q.   Are you there, sir?

19       A.   I am.

20       Q.   Okay.  And then I'm also looking at your

21  expert report in Savory.  I'm at page 11.  So if you

22  could have that document open in front of you as

23  well, please.

24       A.   What -- what page where?

25       Q.   Page 11 of your report in the Savory case.

Ronald J. Kendall, Ph.D.

1    So I'm looking at page 33 of Dr. Sawyer's report,

2    page 11 of your report.

3         A.   Okay.

4         Q.   Okay.  And if you look at the top of

5    page 33 of Dr. Sawyer's report in Schafer, it says,

6    "Glyphosate Human NHL Studies," right?

7         A.   Right.

8         Q.   And the top of your -- in the middle of

9    page 11 of your report, it says, "Glyphosate Human

10   NHL Studies," right?

11        A.   That's what we were talking about,

12   that's -- glyphosate human NHL studies.

13        Q.   Okay.  And Dr. Sawyer wrote in the first

14   paragraph of his report, "My toxicological opinions

15   with respect to dose are based, in part, on six

16   primary epidemiology" -- "epidemiological studies

17   that provide objective data with respect to several

18   prongs of the Bradford Hill criteria."

19             Did I read that correctly?

20        A.   That's exactly it.  And that's the six

21   studies I had, and I've used the Bradford Hill

22   criteria for 20 years.

23        Q.   Okay.  And what you wrote in your first

24   sentence -- I'm just asking if I'm reading things

25   correctly here, sir.  So just -- just bear with me.

Ronald J. Kendall, Ph.D.

1           What you wrote in the first sentence of

2    page 11, paragraph 6 here is, "Toxicological

3    evaluations and expert opinions with respect to

4    dose, Roundup exposure to humans causing NHL are

5    based, in part, on six primary epidemiology studies

6    that provide objective data of causation based on

7    Bradford Hill criteria."

8           Did I read that correctly?

9       A.   That is 100 percent accurate for me.

10   That's exactly how I think --

11      Q.   Okay.  And then Dr. Sawyer wrote -- I'm

12   sorry, I'm not trying to cut you off.

13      A.   That's fine.  But that's exactly -- I mean,

14   I could not say it more clearly.  And, like I said,

15   I've used the Bradford Hill criteria -- we have used

16   that in many papers we have written over the last --

17   since the '90s.  So that's just how I think and how

18   I interpret things.

19      Q.   Okay.

20      A.   So I'm trying to bring together

21   associations for biological plausibility that

22   chemicals can have certain effects and certain

23   target organs or target systems, humans, wildlife.

24   So that is exactly what I'm talking about.

25           And these are the six primary studies that

Ronald U. Kendall, Ph.D.

1   have been invoked, what -- what I -- what I had

2   started already looking at related to this whole

3   with subject.  So -- so, again, these studies are

4   being reevaluated, as we talked the other day with

5   new meta-analysis and so on, but, historically,

6   these have been six of the foundational studies that

7   have been used, particularly up to date, related to

8   looking at the human evidence for a relationship

9   between glyphosate and human carcinogenicity.

10          And, in fact, the International Agency for

11  Cancer Research heavily relied on these studies as

12  EPA did not.  And so I -- again, going back to the

13  IARC document, this is right front and center of the

14  component of that working group looking at, although

15  limited human evidence, there is evidence as being

16  additionally evaluated.  I respect that.  But --

17  but, again, this is pretty foundational.

18      Q.   Doctor, I'm really just asking if I'm

19  reading things correctly.  I appreciate the answer,

20  but I --

21      A.   Okay.  All right.  I'm just trying to

22  explain my logic.

23      Q.   Okay.  The next sentence of Dr. Sawyer's

24  report states at page 33, second sentence, top

25  paragraph, "My toxicological opinion is grounded in

Ronald D. Kendall, Ph.D.

1   animal experimental evidence, in vitro human

2   studies, and human epidemiological studies as

3   summarized within this report and previously

4   provided by Dr. Portier, et al., in the federal

5   Daubert motion proceedings."

6          Did I read that correctly?

7      A.   Yes.

8      Q.   Okay.

9      A.   Yeah.

10     Q.   Your second sentence of that paragraph

11  states, "Toxicological evaluation and ultimately

12  opinion is supported in animal experimental

13  evidence, in vitro human studies, and human

14  epidemiological studies as summarized within this

15  report."

16         Did I read that correctly?

17     A.   Yes.  And that's exactly what I've been

18  talking about with two depositions with you.  That's

19  exactly, precisely what -- you know, I have been

20  trying to tell you is it's not just one thing.  It's

21  that whole suite of evidence we've called the

22  weight-of-the-evidence based on those components of

23  toxicological evaluation.  There's no other way to

24  say it.  I mean, it's just -- that's just -- that's

25  just how it is.  That's what I do.  That's what I

Ronald U. Kendall, Ph.D.

1    think trying to put together, do we have biological

2    and toxicological plausibility for exposure that

3    might result in an effect.

4        Q.    Doctor, let's go to the third sentence of

5    Dr. Sawyer's top paragraph on page 3.  The third

6    sentence of the top paragraph on page 33 states,

7    "Specifically, I have assessed dose response,

8    temporality, latency period, biological plausibility

9    (toxicological mechanisms), coherence (demonstrated

10   by molecular-based studies) and animal studies as

11   well as the strength of association and consistent

12   with the toxicological mechanisms of Roundup

13   formulation ingredients."

14           Did I read that correctly?

15       A.    Yes.

16       Q.    The third sentence of your paragraph,

17   middle of page 11, states, "Specifically, I have

18   assessed dose response, latency period, biological

19   plausibility (toxicological mechanisms),

20   temporality, coherence (demonstrated by

21   molecular-based studies) and animal studies as well

22   as the strength of association and consistency with

23   the toxicological mechanisms of Roundup formulation

24   ingredients including glyphosate."

25           Did I read that correctly?

Ronald G. Kendall, Ph.D.

1    A.   Yes, that's exactly what I told you all
2    through today.  We've talked about -- we've gone
3    through the dose response in both the cell studies
4    and the animal studies.  I've really talked about
5    the latency period of 20 years, studies that -- the
6    animal experimental evidence, particularly with the
7    mice and rat studies, that we talked about the
8    unique tumors, the in vitro human studies with --
9    with cell micronuclei, chromosomal breaks, the six
10   original human epidemiological studies, as well as
11   the meta-analyses.
12        So, I mean, that is the foundation of
13   everything -- the process of everything I'm thinking
14   as what I've conveyed to you today and last Thursday
15   related to how a toxicologist would approach these
16   issues.  And this is pretty fundamental -- pretty
17   fundamental toxicology.
18   Q.   Okay.  Let's look at the fourth sentence of
19   the paragraph at the top of page 33 in Dr. Sawyer's
20   report.  This is the last sentence of the top
21   paragraph on page 33.
22        Dr. Sawyer states, "I have used the six
23   primary epidemiological studies, which include
24   Eriksson, et al., 2008, McDuffie, et al., 2001,
25   Andreotti, et al., 2018, Leon, et al., 2019, Zhang,

Ronald G. Kendall, Ph.D.

1    et al., 2019 and Pahwa, et al., 2019, primarily with

2    respect to dose assessment."

3           Did I read that correctly?

4    A.   You did.

5    Q.   Okay.  And what you wrote in the last -- or

6    the last sentence of the paragraph in the middle of

7    page 11 is, "I have used the six epidemiology

8    studies, which include McDuffie, et al., 2001,

9    Eriksson, et al., 2008, Andreotti, et al., 2018,

10   Leon, et al., 2019, Zhang, et al., 2019, and Pahwa,

11   et al., 2019, primarily with respect to dose

12   assessment."

13          Did I read that correctly?

14   A.   That's correct.  And that makes total logic

15   sense.  I started with McDuffie back in 2010.  And

16   we got -- I got the current studies from -- I worked

17   my way up from Eriksson in 2008, Andreotti, 2018, on

18   to Pahwa, 2019.  And we were looking at the amount

19   of exposure, the dose response.  That's what this

20   was -- that was driving this.  How many days -- how

21   many eight-hour days of exposure were occurring over

22   what length of time.

23          And that's -- that's how I came up with

24   Mr. Savory as well as Mr. Thomas and Ms. Spector,

25   were they in those thresholds or not.  I mean, that

Ronald G. Kendall, Ph.D.

```
1   seemed -- that seemed to be about as logical as I
2   could get it when you are thinking about evaluating
3   somebody exposed for 20 to 30 years.
4         So, I mean, to me, this is about as
5   straightforward, fundamental as I could -- this is
6   exactly how I'm thinking.  This is precisely what
7   I've communicated to you in this deposition.  And I
8   could do it off the top of my head.  This is what I
9   do.  And so that -- anyway, that's -- that's how
10  I --
11       Q.   Did I read it -- did I read it correctly?
12       A.   Yeah.
13       Q.   Okay.  Dr. Kendall, did you copy the top
14  paragraph on page 33 in Dr. Sawyer's report -- let
15  me finish my question -- into your report and switch
16  around the words?
17       A.   Not really.  I -- I read -- you know what?
18  I probably read his report in 20 -- 15 minutes,
19  20 minutes.  And --
20       Q.   Okay.
21       A.   -- I just, I read it, and I had a whole
22  bunch of them I was reading that day.  And so I read
23  it.  I gave it some thought, and I just started
24  knocking -- I just let -- just went -- that's how I
25  do things.  I read things, I don't take notes, and I
```

Ronald U. Kendall, Ph.D.

1    just knock things out.  And this just all came to me

2    because this is the logical way -- this is exactly

3    the way I'm thinking.  This is exactly the way I've

4    communicated to you in my deposition.  I could do it

5    blindfolded.  You know, that's -- that's exactly how

6    I'm thinking.

7            And I stand by everything in that report

8    because that's how -- that's how I put things

9    together, and -- and that's how I want to

10   communicate it because that's how I see it.  And I

11   think that will be clearly reflected in the record

12   of how I've communicated this in my depositions,

13   both today and last Thursday.

14       Q.   Dr. Kendall, you answered my question with,

15   "Not really."  So I just -- I just want to

16   understand your process.

17           Did you copy the first paragraph on

18   page 33 from the Sawyer report into your report and

19   switch around the words?

20       A.   Not copy.  I read it.  And I -- and I

21   generated what I saw as the logic profile, which was

22   very similar to mine.  I -- that's how I was

23   thinking.

24       Q.   So you didn't -- so you did not copy and

25   paste that paragraph --

Ronald G. Kendall, Ph.D.

```
1        A.    No.  No, no, no.  No.

2        Q.    -- into your report and switch around the

3   words?

4        A.    I did not.

5        Q.    Okay.  Let's go to the next paragraph.

6              The next paragraph of Dr. Sawyer's report

7   on page 33 states, "My toxicological focus on these

8   studies is on study design, statistical power and

9   exposure thresholds at different odds ratios, et

10  cetera."

11             Did I read that correctly?

12       A.    Yeah.  And that's exactly what we've talked

13  about, study design, exposure and statistical power.

14       Q.    Sir, I'm just asking if I read Dr. Sawyer's

15  report correct.

16       A.    Yes.

17       Q.    Dr. Sawyer's first sentence in the second

18  paragraph says, "My toxico-" -- are you looking at

19  Dr. Sawyer's report or your report?

20       A.    No, I'm looking over here.  I'm looking at

21  both.

22       Q.    Dr. Sawyer's report states, "My

23  toxicological focus on these studies is on study

24  design, statistical power and exposure thresholds at

25  different odds ratios, et cetera."
```

Ronald U. Kendall, Ph.D.

```
 1              Did I read that correctly?

 2      A.    Yes.

 3      Q.    Okay.  Your first sentence of the next

 4  paragraph on paragraph -- on page 11 states, "My

 5  basic toxicological focus on these studies is on

 6  study design, exposure and statistical pattern."

 7              Did I read that correctly?

 8      A.    That's it.  That's exactly what I said all

 9  day.

10      Q.    Okay.  So Dr. Sawyer's report says, "study

11  design, statistical power and exposure thresholds."

12  Your report says, "study design, exposure and

13  statistical power," right?

14      A.    Exactly.

15      Q.    Did you copy that sentence into your report

16  to switch around the words?

17      A.    No, because that's exactly what we have

18  talked about, the study design, the exposure, how

19  long these people were exposed, and then the

20  statistics used to interpret that data and the power

21  of those statistics.  In other words, the

22  probability levels and the confidence zones.

23      Q.    Okay.  Let's go to the next sentence of

24  Dr. Sawyer's report that was on your reliance list.

25  The next sentence says --
```

Ronald D. Kendall, Ph.D.

1       A.    Which one are you on?

2       Q.    Page 33, second paragraph, second sentence.

3       A.    Okay.

4       Q.    Dr. Sawyer says, "I am using these study

5    results in my toxicological assessment in

6    conjunction with generally accepted peer reviewed

7    studies on genotoxicity (including direct human

8    studies), mechanisms of action (promotion, et

9    cetera,) absorption, distribution, metabolism, and

10   excretion, ADME, et cetera."

11          Did I read that correctly?

12      A.    Yeah, that's correct.

13      Q.    Your second sentence on page 11 at the

14   bottom paragraph states, "I am using these results

15   in my toxicological assessment in conjunction with

16   generally accepted peer reviewed studies on

17   genotoxicity (including direct human studies),

18   mechanisms of action (promotion, et cetera),

19   absorption, distribution, metabolism and excretion,

20   et cetera."

21          Did I read that correctly?

22      A.    Yes.

23      Q.    Okay.  Dr. Sawyer wrote "genotoxicity

24   (including direct human studies), mechanisms of

25   action (promotion, et cetera)."

Ronald C. Kendall, Ph.D.

```
 1              Is that correct?

 2    A.   That's --

 3    Q.   Dr. Sawyer wrote that?

 4    A.   That's exactly what I've --

 5    Q.   And you wrote --

 6    A.   -- been saying for the last two

 7  depositions, is the genotoxicity, we were looking at

 8  direct human studies, particularly if you go into

 9  the IARC report with people exposed aerially with

10  treatment, they had chromosomal breaks.  The

11  mechanisms of action.  We've talked about promotion

12  considerably and the George study.

13              So this is exactly my logic process.

14  We've talked a lot about absorption through the

15  skin, inhalation, and ingestion.  We have agreed

16  that the skin appears to be the predominant.

17  Distribution in the body is through the blood.

18  We -- we have agreed that it does reside in the

19  blood.  The metabolism is low in the body, and its

20  excretion is generally through the iron.

21              So, I mean, this is exactly the thought

22  process as I assimilated how I was going to address

23  this question.  It's -- it's the toxicology.  It's

24  how a toxicologist approaches this.

25    Q.   Doctor, my question was only, Dr. Sawyer
```

Ronald U. Kendall, Ph.D.

1  has a portion of that sentence that says,

2  "Genotoxicity (including direct humans studies),

3  mechanisms of action (promotion, et cetera),"

4  correct, Dr. Sawyer has that?

5      A.   Yes.  And that's exactly what we're talking

6  about here.

7      Q.   Okay.  And you have in your report,

8  "genotoxicity (including direct human studies),

9  mechanisms of action (promotion, et cetera)."  You

10  have the exact same phraseology in your report, the

11  exact same parentheses, true?

12      A.   Well, it makes absolute sense --

13      Q.   Is that true?

14      A.   -- because we were -- genotoxicity

15  generally implies the in vitro mechanisms with

16  various -- like salmonella and so on.  But the

17  direct human studies were incredibly valuable

18  because they showed humans could be exposed and have

19  actually genotoxicity effects.

20          The mechanism of action is critical

21  because it -- it appears that promotion is a

22  significant part of -- of how this chemical may act.

23  I don't -- I don't know what level compared to

24  direct action with genetic mechanisms, but promotion

25  is -- is right there.

Ronald U. Kendall, Ph.D.

```
 1              So it's -- it's -- to me -- we went
 2     through absorption, distribution, metabolism and
 3     excretion.  I've gone through all of that with you
 4     in my deposition as to my line of thinking as to why
 5     I state in this process right here in my report
 6     exactly like I stated it.  And I stand behind it
 7     100 percent.
 8         Q.   And you stated it in your report exactly
 9     how Dr. Sawyer stated in his report, true?
10              MR. BRECHER:  Object to the form of
11     the question.
12         A.   It is maybe close.  It's maybe close.  But
13     if he's a toxicologist, we -- we talk the same
14     language.  I don't know him.
15     BY MR. KALAS:
16         Q.   All right.  Let's go to his --
17         A.   I don't know him.
18         Q.   All right.  Let's go -- let's go to the
19     next sentence on page 33 of Dr. Sawyer's report.
20     The next sentence in that last paragraph, third
21     sentence.  It starts, "In genera. . ."
22              Dr. Sawyer wrote, "In general, I have
23     relied on studies that have documented the various
24     aspects of the Bradford Hill criteria at or in
25     excess of the 95 percent of confidence threshold."
```

Ronald G. Kendall, Ph.D.

1           Did I read that correctly?

2     A.    That's exactly what I did.  And what --

3     Q.    Okay.  I didn't ask --

4     A.    Yes, you read it correctly.

5     Q.    -- what you did.  Okay.

6     A.    Yes, you read it --

7     Q.    You wrote in your --

8     A.    -- correctly.

9           THE STENOGRAPHER:  One at a time.

10          MR. KALAS:  Okay.

11    BY MR. KALAS:

12    Q.    You wrote in your third sentence, "In

13    general, I have relied on studies that have

14    documented the various aspects of the Bradford Hill

15    criteria at or in excess of the 95 percent

16    confidence threshold."

17          Did I read that correctly?

18    A.    Yes.  And I do that all the time.  That is

19    exactly the -- that is exactly the methodology I

20    follow.

21    Q.    Did you copy the first three sentences of

22    the second paragraph of page 33 of Dr. Sawyer's

23    Schafer report into your report?

24    A.    No.

25    Q.    Okay.  Let's --

Ronald O. Kendall, Ph.D.

1       A.   I read his -- I read his, and I will admit,

2    it was -- it was very clear.  I -- I sat down and

3    started knocking all of this out, and -- and, again,

4    this is -- this is -- this -- what I'm -- what I'm saying is,

5    every -- everything we've talked about here, the

6    whole level of thinking we've just gone through is

7    exactly what I've discussed with you the whole day

8    here as to a line of thinking and why I've reached

9    certain conclusions as a function of -- of all the

10   aspects of the toxicology of this substance,

11   including the human epidemiological studies, the --

12   the animal testing evidence, as well as -- as well

13   as the genetic toxicity and the oxidative stress as

14   to the mechanistic toxicology.

15       It all -- it all comes together in a very

16   logical format for me.  And so the way I look at it,

17   what -- what I've got is exactly -- in my report is

18   it exactly consistent with how I'm thinking and how

19   I've communicated it with you and how I intend to

20   communicate it to wherever I need to.  I could do it

21   blindfolded.

22       Q.   Go to -- please go to page 38 of

23   Dr. Sawyer's Schafer report.

24       A.   Okay.

25       Q.   Do you see Table 7?

Ronald G. Kendall, Ph.D.

```
 1        A.   Yes.

 2        Q.   "Exposure Parameters for Six Referenced

 3   Epidemiological Studies"?

 4        A.   Yes.

 5        Q.   Okay.  And you have Table 3 on page 12 of

 6   your report, "Summary of Epidemiological Studies."

 7   Do you see that?

 8        A.   Yes.

 9        Q.   And Dr. Sawyer, in his Schafer report, has

10   a summary of the data in the epidemiological studies

11   where he lists the "Study," the "Type of Study,"

12   "Metrics (Dose Intervals)," "Cutoff Between Cases

13   and Controls."  Those are his four headers in the

14   Schafer report?

15        A.   That (audio drop).

16             THE STENOGRAPHER:  He dropped.

17             MR. KALAS:  Yeah, we lost his answer.

18        A.   (Audio drop) metrics, the dose involved.

19   That gives us exposure.  And then --

20   BY MR. KALAS:

21        Q.   Dr. Kendall, I don't want to cut you --

22   Dr. Kendall, we lost the front of your answer.  So I

23   am going to just ask it again, and you can answer.

24   You froze.

25             The four headers on Table 7 of
```

1    Dr. Sawyer's report in Schafer are "Study," "Type of

2    Study," "Metrics (Dose Intervals)" and "Cutoff

3    Between Cases and Controls."

4        A.   I can't --

5        Q.   Did I read that correctly?

6        A.   I can't hear.

7        Q.   Okay.  I'll start over.

8             The four headers on the top of Table 7 in

9    Dr. Sawyer's report are, "Study," "Type of Study,"

10   "Metric (Dose Intervals)" and "Cutoff Between Cases

11   and Controls."

12            Are those the four headers on his table?

13       A.   Yes.  And that's exactly logical, because

14   as we looked at all of these -- these studies, we

15   looked at the study, we've talked about the type of

16   study, case control, cohort, whatever, the metrics

17   where the dose -- the dose -- the dose interval, the

18   days exposed.  That was all laid out in the -- in

19   the reports as well as the cutoff between cases and

20   controls.  That's -- that's how we provided some

21   interpretation here related to the outcomes, the

22   diagnoses.

23       Q.   Okay.  You agree with me that the -- the

24   headers -- the four headers in Table 3 of your

25   report and the headers in Table 7 of Dr. Sawyer's

Ronald L. Kendall, Ph.D.

1    Schafer report are identical, right?

2        A.    Yeah.  And why not?  You know, that's --

3    it's the study, type of study, the metric, the dose

4    interval, and the cutoff between cases in control.

5    That is exactly how I would say this.  Exactly.

6        Q.    Okay.  And for the six studies here,

7    McDuffie, Eriksson, Andreotti, Leon, Zhang and

8    Pahwa, and then the information put in in the rows

9    for each study, I cannot find one difference between

10   your table and Dr. Sawyer's table.  Can you find a

11   difference for me sitting here?

12       A.    I don't -- I don't -- I looked -- I looked

13   at his information.  I went back to the studies, and

14   it just made -- it was very clear, it's exactly -- I

15   don't see how it could be more precise.  Going to

16   McDuffie, case control of men in six Canadian

17   provinces.  It had unexposed zero days to less than

18   two days and greater than two days a year.  Those

19   were the dose metrics.  And then cutoff between

20   cases and control, you know, the cases were

21   diagnosed with -- with these subgroups of NHL.

22            So I don't know, I just -- I can't get --

23   I could not get it any clearer than it -- it's laid

24   out here to give me a road -- to have a roadmap as

25   how I can walk through and explain these projects

1    and what were the outcomes.  It's very clear.

2        Q.    Okay.  Dr. Kendall, I had a different

3    question than whether or not it was clear.  I asked

4    if you could find one difference in the verbiage in

5    any of the language between Table 7 in Dr. Sawyer's

6    Schafer report and Table 3 in your Savory report.

7    Is there any difference in the language anywhere?

8        A.    I don't know.

9        Q.    Or is it exactly the same?

10       A.    I don't --

11       Q.    Go ahead and compare.  Go ahead and

12   compare.  Take a moment.

13       A.    (Reviews document.)

14            It looks very close if not extremely

15   close.  On the other side, this was the most

16   pertinent extraction of information that could be

17   summarized for these individual studies that you

18   could get.  That's exactly -- it laid out whether

19   there was a meta-analysis in the case of Zhang to a

20   case control in the case of the McDuffie, the dose

21   intervals, and how the cases were reported.

22            I don't know, I just -- to me, it's --

23   it's very clear and it's -- it's communicated in a

24   way that you can -- you can get what was said with

25   those studies in terms of data generation in a very

1    precise manner.

2        Q.    You said they were pretty close to very

3    close.  They are identical, aren't they, sir?

4        A.    Yeah, it looks like it to me.

5        Q.    Okay.  Did you --

6        A.    But why not?

7        Q.    -- copy and paste Table --

8        A.    Actually --

9        Q.    Did you copy and paste Table 7?

10       A.    I actually worked it all up, and I -- I put

11   it all together, and I -- I did look back at that,

12   his table.  But this table is -- this table is this

13   table.  It's just -- it reflects a database.  That's

14   it.  It's not an interpretation.

15       Q.    Did you --

16       A.    It's extracted.  It's a database that was

17   extracted from these studies.  And --

18       Q.    Dr. Kendall --

19       A.    -- he had an opportunity to communicate

20   that, and I did too.  And this is where I ended up,

21   and I think it's -- I've been talking about this

22   for -- for two days with you.

23       Q.    Well, I understand, Dr. Kendall.  I'm

24   trying to ask a very simple question here, which is,

25   did you copy Table 7 from Dr. Sawyer's report into

1   your report and mark it as Table 3?

2      A.   I wouldn't say that.  I said -- I would say

3   I generated a table.  I had -- I had an opportunity

4   to -- to look at his.  But I generated a table.  I

5   thought through how I wanted to communicate that

6   table, and I can -- I can communicate this off the

7   top of my head because I -- I embodied that data and

8   information in a way in which I wanted to

9   communicate it in my expert report.

10     Q.   And the way you chose to communicate it in

11  your expert report was using every single word the

12  same as Dr. Sawyer used in Table 7 of his expert

13  report, fair?

14     A.   Well, it -- it looked -- it's about as

15  clean as you can get it as to what the essence of

16  the datasets were and the best way and the -- and

17  the cleanest way to communicate it.  That's -- this

18  is exactly what we have talked about.  So, again, it

19  was -- to me, it's exactly my thinking and how I

20  wanted to relate that data and information as I

21  would ultimately reach a conclusion.

22     Q.   All right.  Let's go to page 39 of

23  Dr. Sawyer's report in Schafer.  Dr. Sawyer has a

24  header on page 39 called, "Comparisons of Exposure

25  Days to Human Epidemiological Studies."

Ronald G. Kendall, Ph.D.

1          Did I read that correctly?

2     A.   Just a minute.  I'm trying to find that

3 page.

4     Q.   It's the one right after the table.

5     A.   Okay.  Yes.

6     Q.   Okay.  You have a header on the bottom of

7 page 12 underneath your table that also says,

8 "Comparisons of Exposure Days to Human

9 Epidemiological Studies."

10    A.   That's what --

11    Q.   Did I read that correctly?

12    A.   -- it is.  It's human exposure days.

13 That's exactly what these studies were -- were

14 reporting, and we compared them.  That is exactly

15 what we did.

16    Q.   Okay.  So I'm just asking if I read it

17 correctly.  Did I read it correctly?

18    A.   Yes.  That's exactly what we did,

19 comparison of exposure days to human epidemiological

20 studies.

21    Q.   Go back to page 39 of Dr. Sawyer's report.

22 Dr. Sawyer says, "The results of the 'exposure-day'

23 calculations (based on validated, reported exposure

24 intervals in the above tables) indicate that

25 Mr. Schafer's cumulative exposures were above all

Ronald G. Kendall, Ph.D.

1    the exposure threshold metric cutoffs.  That is, he

2    exceeded the 'ever use' threshold, the 'zero to two

3    days' threshold, the 'two days per year' threshold,

4    the 'greater than one day less than ten days'

5    threshold, and the 'greater than ten days' total

6    exposure threshold."

7         Did I read that correctly?

8    A.   Yes.

9    Q.   Okay.  Your report states at the bottom of

10   page 12, "The results of the 'exposure-day'

11   calculations (based on estimated exposure Mr. Savory

12   experienced while treating his property with

13   Roundup) indicate that Mr. Savory's cumulative

14   exposures were above all of the exposure threshold

15   metric cutoffs.  That is, he exceeded the 'ever use'

16   threshold, the 'greater than zero less than two

17   days' threshold, and the 'greater than two days per

18   year' threshold, the 'greater than one day less than

19   ten days' total threshold, and the 'greater than ten

20   days' total threshold exposed."

21        Did I read that correctly?

22   A.   Yes.  And he did, he exceeded those

23   thresholds.

24   Q.   Okay.  Did you copy the top paragraph of

25   page 39 in Dr. Sawyer's report into your report and

Ronald G. Kendall, Ph.D.

1    substitute Mr. Savory for Mr. Schafer?

2        A.    No, because Mr. Savory, as I went through

3    that analysis with him, when you look at the metrics

4    of exposure, when I evaluated these epidemiological

5    studies, he exceeded them all.  And I state that

6    very clear, he -- he exceeded all of these

7    thresholds, assuming that his treatment was

8    consistent with what he said in his deposition.  So,

9    I mean, I don't -- I don't see how that can be any

10   clearer said.

11       Q.    Please go to page 188 of Dr. Sawyer's

12   report.

13       A.    That's going to take me a. . .

14       Q.    Sure.  We'll wait a moment.

15       A.    188?

16       Q.    Yes, sir.

17       A.    Okay.

18       Q.    Do you see Dr. Sawyer has a heading listed,

19   "Evidential Consideration"?

20       A.    The evidence, yes.

21       Q.    Okay.  He has a header that says,

22   "Evidential Considerations," right?

23       A.    Correct.

24       Q.    Okay.  And you, on page 13, also have a

25   header that says, "Evidential Considerations,"

Ronald U. Kendall, Ph.D.

1  right?

2      A.    That's -- that's exactly how I would say

3  it.  It's the evidence, evidential considerations.

4      Q.    Okay.  And Dr. Sawyer's first sentence

5  under "Evidential Considerations" on page 188 says,

6  "The following evidential factors are useful in

7  formulating an objective toxicological assessment of

8  Mr. Schafer with regards to his Roundup exposures

9  and subsequent NHL diagnosis."

10         Did I read that correctly in Dr. Sawyer's

11  report?

12     A.    Yes.

13     Q.    Okay.  And the first sentence of your

14  report at page 13 states, "The following evidential

15  factors are useful in formulating an objective

16  toxicological assessment of Mr. Savory with regards

17  to his Roundup exposures and subsequent NHL

18  diagnosis."

19         Did I read that correctly?

20     A.    Yeah, I don't know how you could say it any

21  clearer.  I don't know how I could say it any

22  clearer.

23     Q.    Other -- other than switching "Schafer"

24  with "Savory," is every single word exactly the same

25  between Dr. Sawyer's first sentence there and your

Ronald O. Kendall, Ph.D.

1    first sentence here?

2       A.    Yeah, and that's exactly how I state -- how

3    I would state it.  Exactly.  If you asked me

4    blindfolded, I would say the same thing.  The

5    evidence factors are useful in formulating an

6    objective toxicological (audio drop).

7               THE STENOGRAPHER:  He muted himself.

8    BY MR. KALAS:

9       Q.    You muted yourself.  You muted yourself.

10   You're still muted.

11              THE VIDEOGRAPHER:  If you put your

12   cursor on the bottom left of your screen, you'll see

13   a microphone with a red dash through it.  Just click

14   it.

15              THE WITNESS:  Okay.  Can you hear me

16   now?

17   BY MR. KALAS:

18      Q.    All right.  Yeah, I'll ask the question

19   again so you can give your full answer.

20      A.    Okay.

21      Q.    The first sentence under "Evidential

22   Considerations" in Dr. Sawyer's report and your

23   report are exactly the same, save for switching the

24   name "Schafer" for "Savory," true?

25      A.    Yes.  But this is exactly how I would say

Ronald G. Kendall, Ph.D.

1    it.  This is exactly.  The following evidential

2    factors are useful in formulating (audio drop).

3              THE STENOGRAPHER:  He froze.

4         A.  (Audio drop) and subsequent NHL diagnosis.

5         Q.  We lost you -- we lost you after

6    "formulating."  You said, "This is exactly how I

7    would say it."

8         A.  This is exactly (audio drop) --

9         Q.  Oh, my God.

10        A.  -- the evidential factors and -- and

11   formulate an objective toxicological assessment with

12   regards to his Roundup exposure and subsequent NHL

13   diagnosis.  I mean, that -- that -- that is exactly

14   my thinking and how I would communicate that.

15        Q.  All right.  Did you copy the first sentence

16   out of page 188 of Dr. Sawyer's report and put it

17   into your report?

18        A.  No.  That's exactly how I would say it

19   right now.  That's how a toxicologist would say

20   that.

21        Q.  Okay.  And Dr. Sawyer has five bullet

22   points, right?  "Diagnosis," "Prolonged Acute

23   Exposure and Absorption," "Chronic Glyphosate

24   Exposure," "Dermal Absorption Rates Higher Than

25   Presented By Monsanto," and "Lack of Personal

Ronald U. Kendall, Ph.D.

1    Protective Equipment."  Do you see those first five

2    bullet points he has?

3        A.   Yes.

4        Q.   Okay.  You have five bullet points as well.

5    "Diagnosis," "Prolonged Acute Exposure and

6    Absorption," "Chronic Glyphosate Exposure," "Dermal

7    Absorption Rates Higher Than Presented By Monsanto,"

8    "Lack of Personal Protective Equipment," correct?

9    And that's on pages 13 to 14 of your report.

10       A.   Correct.  And that's exactly how I was

11   considering it.  The diagnosis, his acute exposure

12   and absorption, the chronic exposure.  And I've

13   emphasized the importance of that.  The dermal

14   absorption.  We've debated that.  And the personal

15   protective equipment.  That is exactly what I've

16   told you today.  That's exactly how the logic I

17   followed.  That's how a toxicologist would look at

18   this.

19       Q.   Okay.  So it is just a -- by chance that

20   Dr. Sawyer used the phrasing, "Dermal Absorption

21   Rates Higher Than Presented By Monsanto," and you,

22   as well, used the exact phrasing, "Dermal

23   Absorptions Rate Higher Than Presented By Monsanto";

24   that's just chance?

25       A.   I -- based on my reading, I thought there

Ronald U. Kendall, Ph.D.

```
 1   was some debate on that as far as was it 2 percent,

 2   3 percent, whatever.  It seemed reasonable.  And --

 3        Q.   Dr. Kendall, I don't --

 4        A.   So, again --

 5        Q.   -- mean to cut you off --

 6        A.   -- as I --

 7        Q.   -- but you're missing the question.

 8        A.   Okay.

 9        Q.   You're missing my question, sir.  It's not

10   about the data here.

11        A.   Okay.

12        Q.   It's about the phraseology.

13             Is it just by chance that Dr. Sawyer said,

14   quote/unquote, "Dermal Absorptions Rates Higher Than

15   Presented By Monsanto," and you, too, said, "Dermal

16   Absorption Rates Higher Than Presented By Monsanto"?

17   Is that just by chance?

18        A.   Probably when I read his document, that

19   was -- that was a useful perspective, because I

20   believe that, and I -- and I probably related to

21   that because I believed it.  And -- because I think

22   there's -- that's -- there's still some debate about

23   what is the actual dermal exposure rate.

24             And so, like I said, when I went through

25   his material, it -- I could highly relate to it.
```

Ronald U. Kendall, Ph.D.

1  Because it -- he's a toxicologist.  I don't know

2  him.  He's a toxicologist, and this all --

3  particularly this dermal absorption issue, that had

4  been very intriguing to me.  The George study did

5  indicate absorption, what had to occur or we

6  wouldn't have gotten tumors.

7          So, again, as I relate all to this, I

8  think I've been very clear today of my logic and

9  thinking and how I worked my way through these

10  questions.

11      Q.   All right.  After that section, Dr. Sawyer

12  has a section called, "Mechanism of

13  Carcinogenicity," right, on page 189?

14      A.   You have been asking about that all day

15  with me, and I've told you what my thoughts were.

16      Q.   I'm not asking -- does Dr. Sawyer have a

17  section right after those first five things we just

18  listed called, "Mechanism of Carcinogenicity"?

19      A.   What page are you on?

20      Q.   Page 189, sir.

21      A.   189.  Yeah.  Yes.  Okay.

22      Q.   Okay.  And -- and you, too, right after

23  those first five points, have a section called

24  "Mechanism of Carcinogenicity," right?

25      A.   Yeah.  That was the exact -- that's exactly

Ronald G. Kendall, Ph.D.

1    what you would be thinking once we've gone through

2    the evidence of exposure, absorption and so on.

3    That's what we're thinking.  That was -- that's the

4    whole essence of where we're working ourselves to.

5         Q.   All right.  And we're not -- we're not

6    going to belabor all this, because it goes on quite

7    a bit of pages, but in this paragraph, Dr. Sawyer

8    states, "Mr. Schaefer's exposures are to the Roundup

9    product, not to glyphosate alone.  Roundup and

10   glyphosate have been demonstrated in several studies

11   to repeatedly cause DNA damage with promotion by

12   Roundup being more damaging than glyphosate alone.

13   Genotoxicity is the first stage in cancer formation.

14   Wozniak, et al., and other studies as referenced in

15   this report further demonstrate that Roundup at a

16   higher dose was even able to impede the natural

17   repair of damaged DNA."

18           Did I read that correctly from

19   Dr. Sawyer's report?

20        A.   Yes.  Yes.

21        Q.   Okay.  Your report underneath "Mechanism of

22   Carcinogenicity" states, "Mr. Savory's exposures are

23   to Roundup product, not to glyphosate alone.

24   Roundup and glyphosate have been demonstrated in

25   several studies to repeatedly cause DNA damage with

Ronald C. Kendall, Ph.D.

1   promotion by Roundup being more damaging than

2   glyphosate alone.  Genotoxicity is the first stage

3   of cancer formation.  Wozniak, et al., 2018, and

4   other studies as referenced in this report further

5   demonstrate that Roundup at a higher dose was even

6   able to impede the natural repair of damaged DNA,

7   Casarett & Doull, 2018."

8           Did I read that correctly?

9       A.   That's exactly what I've told you in my

10  deposition.

11      Q.   Okay.

12      A.   Yes.

13      Q.   Did you copy -- did you copy the paragraph

14  after "Mechanism of Carcinogenicity" from

15  Dr. Sawyer's report and put it into your report?

16      A.   No.  That's exactly the way I've told you

17  in my deposition and how I've communicated it here.

18  And we've talked about the mechanisms of

19  carcinogenicity and the genotoxicity, as I've told

20  you, is the first stage in cancer formation.  We

21  discussed the Wozniak report.

22          And what's important here is that if we

23  can impede the natural repair mechanisms for damaged

24  DNA, as discussed in Casarett & Doull, 2018, that

25  makes this thing even more serious.  So that's

Ronald U. Kendall, Ph.D.

1   exactly what I have been saying and what I have been

2   communicating.

3       Q.   Okay.  Again, not going to belabor it.  The

4   next bullet point for Dr. Sawyer on page 190 is,

5   "Latency of Non-Hodgkin's Lymphoma," right?

6       A.   Yes.  And I've discussed that with you,

7   too.

8       Q.   Okay.  Then the next bolded area in your

9   report on page 15 is, "Latency of Non-Hodgkin's

10  Lymphoma," right?

11      A.   I've talked about that extensively about

12  over 20 years.

13      Q.   Sir, my question was whether that was the

14  next bolded area of your report, "Latency of

15  Non-Hodgkin's Lymphoma"?

16      A.   Yes.  Yes, that's a logical flow.

17      Q.   The next bullet point in Dr. Sawyer's

18  report is, "Scope of Exposure in Comparison to

19  Epidemiological Studies."  That's on page 190,

20  right, of Dr. Sawyer?

21      A.   That's -- that's what we're talking --

22  we've talked about the scope of exposure compared to

23  those -- when those of -- of dose that occurred in

24  those six epidemiological studies.  That's exactly

25  what I've talked about.

Ronald G. Kendall, Ph.D.

```
1        Q.   And the next bold area in your report is,
2    "Scope of Exposure in Comparison to Epidemiological
3    Studies," right?
4        A.   That's what we -- yeah.  That's -- that was
5    the foundation that gave us some limited human
6    evidence.
7        Q.   Okay.  And Dr. Sawyer's next header is,
8    "Summary and Conclusions."  That's on page 191,
9    right?
10       A.   Yes, on 191.
11       Q.   Okay.  And your next header on page 15 is,
12   "Summary and Conclusions," right?
13       A.   Right.
14       Q.   Okay.  And just going to the last paragraph
15   in Dr. Sawyer's report on page 191, it says, "Based
16   on the findings of applicable studies as noted
17   herein and on the basis of sufficient exposure,
18   dose, duration and episodic exposures to Roundup
19   consistent with the human exposure durations in the
20   epidemiological studies, it is my opinion, to
21   reasonable toxicological certainty, that
22   Mr. Schafer's calculated eight-hour time-weighted
23   midpoint exposure dose of 39 days to Roundup was a
24   substantial contributing factor to his development
25   and subsequent diagnosis of his diffuse large B-cell
```

Ronald J. Kendall, Ph.D.

```
 1   lymphoma."

 2          That's what Dr. Sawyer wrote on page 191,

 3   right?

 4      A.   Right.

 5      Q.   And what you wrote on page 16 of your

 6   report right before the conclusion is, "Based on the

 7   findings of applicable studies as noted herein and

 8   on the basis of sufficient exposure, dose, duration

 9   and episodic exposures to Roundup consistent with

10   human exposure durations in the epidemiological

11   studies, it is my opinion, to reasonable scientific

12   and toxicological certainty, Mr. Savory's calculated

13   eight-hour exposure doses of 116 eight-hour days to

14   Roundup over a period of 29 years was a substantial

15   contributing factor to his development and

16   subsequent diagnosis of his large B-cell

17   Non-Hodgkin's lymphoma."

18          Did I read that correctly?

19      A.   Yes.

20      Q.   Did you copy the second paragraph of

21   page 191 of Dr. Sawyer's report and put it into your

22   Savory report?

23      A.   No.  This is exactly how I would state

24   this.  We've talked about sufficient exposure, dose,

25   duration, and episodic exposures to Roundup
```

Ronald U. Kendall, Ph.D.

1  consistent with human exposure durations in the

2  epidemiological studies.  I have -- I have gone

3  through that in great detail.  That is exactly the

4  logic flow.

5       And -- and when I worked up the eight-hour

6  exposure days and compared that to the thresholds

7  that these six epidemiological studies offered, I

8  thought it was fairly compelling.  And -- but that's

9  exactly how we would say it:  Exposure, dose,

10  duration, and so on.  I don't -- I don't know how I

11  could say it clearer.

12    Q.  Okay.  So the fact that Dr. Sawyer and you

13  both use the exact same phraseology, "exposure,

14  dose, duration and episodic exposures to Roundup

15  consistent with human exposure durations," the fact

16  that you use that exact same phraseology is a

17  coincidence?

18    A.  I would say so, because that's -- that's

19  exactly how a toxicologist would communicate that.

20  That is exactly.  I mean, that's -- that's pretty

21  fundamental as to -- I mean, this to me is what I do

22  every day.  Exposure, dose, duration, and then the

23  episodic exposures, because they weren't exposed

24  every day.  It's episodic.

25       "Consistent with the human exposure

1    durations in the epidemiological studies."  That

2    was -- that was the design to compare and to analyze

3    those epidemiological studies with what, say,

4    Mr. Savory had in terms of eight-hour exposure days

5    over more than 29 years.

6        Q.   Okay.  Is it your testimony under oath

7    today that you did not copy either by copy and

8    pasting or by transcribing, you did not copy any of

9    Dr. Sawyer's Schafer report into your report?

10       A.   I read his report.  I did not copy it.  I

11   read his report.  I -- I evaluated his language, and

12   I -- I have my report.

13       Q.   Okay.  And you wrote every word in your

14   report?  That's your testimony?

15       A.   I did.

16            MR. KALAS:  Okay.  I don't have any

17   more questions today.

18            Marc?

19            MR. BRECHER:  No questions.

20            MR. KALAS:  All right.  Thank you very

21   much for your time, Dr. Kendall.  I appreciate it.

22            THE WITNESS:  Thank you.  Thank you.

23            THE VIDEOGRAPHER:  Would you like to

24   go off the record?

25            MR. KALAS:  Off the record.