# EXHIBIT 21

1              UNITED STATES DISTRICT COURT
              NORTHERN DISTRICT OF CALIFORNIA
2
3    IN RE:  ROUNDUP PRODUCTS      MDL No. 2741
     LIABILITY LITIGATION
4    _____
5    SPECTOR V. MONSANTO, CO.,      *
     Case no. 3:20-cv-05532         *
6    _____
7
     ****************************************************
8
              REMOTE VIDEOTAPED DEPOSITION OF
9                 RONALD J. KENDALL, Ph.D.
                     AUGUST 26, 2021
10
     ****************************************************
11
12
13
14
15
16             DEPOSITION of RONALD J. KENDALL,
17   Ph.D., produced as a witness at the instance of the
18   Defendant, and duly sworn, was taken in the
19   above-styled and numbered cause on the 26th day of
20   August, 2021, from 9:02 a.m. to 3:52 p.m., before
21   Christy R. Sievert, CSR, RPR, in and for the State
22   of Texas, reported remotely by machine shorthand,
23   pursuant to the Federal Rules of Civil Procedure and
24   the provisions stated on the record or attached
25   hereto.

Ronald U. Kendall, Ph.D.

```
 1              A P P E A R A N C E S
 2              (Appearing remotely)
 3
 4   FOR THE PLAINTIFF:
 5     MR. MARC G. BRECHER
       Wapner Newman
 6     2000 Market Street, Suite 2750
       Philadelphia, Pennsylvania  19103
 7     Phone:    267-281-5128
       E-mail:   mbrecher@wapnernewman.com
 8
 9   FOR THE DEFENDANT:
10     MR. JOHN M. KALAS
       MS. DEVARATI DAS
11     Hollingsworth, LLP
       1350 I Street, NW
12     Washington, DC 20005
       Phone:    202-898-5800
13     E-mail:   jkalas@hollingsworthllp.com
                 ddas@hollingsworthllp.com
14
15   ALSO PRESENT:
16     COLIN COUGHENOUR, Videographer
17
18
19
20
21
22
23
24
25
```

Ronald J. Kendall, Ph.D.

1                    I N D E X

                                              PAGE
2

    Appearances................................. 2
3

    Exhibits.................................... 4
4

    Proceedings................................ 5
5

    RONALD J. KENDALL, Ph.D.:
6

        Examination by Mr. Kalas................... 7
7

8   Reporter's Certification................ 240-241

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

```
 1                    E X H I B I T S
 2    NUMBER          DESCRIPTION                 PAGE
 3    Exhibit 1       Plaintiffs' R. 26 Specific    18
                      Causation Expert Disclosures
 4
      Exhibit 2       Notice of Deposition          25
 5
      Exhibit 3       Amended Notice of Deposition  25
 6
      Exhibit 4       Expert Report                 26
 7
      Exhibit 5       Curriculum Vitae              26
 8
      Exhibit 6       2021 Curriculum Vitae        152
 9
      Exhibit 7       Invoices                     152
10
      Exhibit 8       Testimony history            152
11
      Exhibit 9       Revised Glyphosate Issue     158
12                    Paper: Evaluation of Carcinogenic
                      Potential, EPA's Office of
13                    Pesticide Programs
                      December 12, 2017
14
      Exhibit 10      Charles M. Benbrook, How did 162
15                    the US EPA and IARC
                      reach diametrically opposed
16                    conclusions on the genotoxicity
                      of glyphosate-based herbicides?
17
      Exhibit 11      Health Canada, Re-evaluation 187
18                    Decision
19    Exhibit 12      Glyphosate Use and Cancer    195
                      Incidence in the Agricultural
20                    Health Study
21    Exhibit 13      Exposure to Glyphosate and   212
                      Risk of Non-Hodgkin Lymphoma
22                    and Multiple Myeloma: An
                      Updated Meta-Analysis
23
      Exhibit 14      On Recent Meta-Analyses of   216
24                    Exposure to Glyphosate and Risk
                      of Non-Hodgkin Lymphoma in Humans
25
```

Ronald J. Kendall, Ph.D.

1                     E X H I B I T S
                        (continued)

2

    NUMBER          DESCRIPTION                    PAGE

3

    Exhibit 15   Risk Assessment of Glyphosate   220

4                Exposures from Pilot Study with

                 Simulated Heavy Residential

5                Consumer Application of Roundup

                 using a Margin of Safety (MOS) Approach

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Ronald J. Kendall, Ph.D.

```
 1              P R O C E E D I N G S

 2              THE VIDEOGRAPHER:  We are now on the

 3   record.  My name is Colin Coughenour.  I'm a

 4   videographer for Golkow Litigation Services.

 5              Today's date is 8-26-21.  The time is 9:02

 6   a.m.

 7              This remote video deposition is being held

 8   in the matter of Roundup, Spector v. Monsanto

 9   Company, for the United States District Court,

10   Northern District of California.

11              The deponent is Ronald J. Kendall, Ph.D.

12              All parties to this deposition are

13   appearing remotely and have agreed to the witness

14   being sworn in remotely.  Due to the nature of

15   remote reporting, please pause before speaking to

16   ensure all parties are heard completely.

17              Will the counsel please identify

18   themselves.

19                  MR. BRECHER:  I'm Marc Brecher for the

20   Spectors.

21                  MR. KALAS:  John Kalas on behalf of

22   Monsanto Company.

23                  Devarati.

24                  MS. DAS:  Sorry, my mute was stuck.

25              Devarati Das on behalf on Monsanto
```

Ronald J. Kendall, Ph.D.

1    Company.

2              THE VIDEOGRAPHER:  The court reporter

3    is Christy Sievert, who will please now swear in the

4    witness.

5                    RONALD J. KENDALL, Ph.D.,

6                having been first duly sworn,

7                  testified as follows:

8                      EXAMINATION

9    BY MR. KALAS:

10      Q.   Good morning, Dr. Kendall.  How are you?

11      A.   I'm fine, sir.  Thank you.  I hope you're

12   well too.

13      Q.   I am.  I am.  Thank you for agreeing to do

14   this remotely.  I know we were supposed to be in

15   person, but circumstances being what they are, I

16   appreciate it.

17      A.   I understand totally.  Thank you.

18      Q.   So, first of all, while we were waiting to

19   start, I see a lot of pictures of you with fish

20   behind you.  Are you a fisherman, sir?

21      A.   I am.  I am, sir.  I'm an avid fly

22   fisherman.

23      Q.   Okay.  Very cool.  Very cool.  I've done

24   it.  Fishing is a bit slow for me.  But I hear that

25   if I tried fly fishing, I would like it more.

Ronald U. Kendall, Ph.D.

1        A.   You would.  It's an art form.  I enjoy it
2   very much.
3        Q.   Great.
4             Have you been deposed before, sir?
5        A.   Yes, sir.
6        Q.   Okay.  When was the last time you were
7   deposed?
8        A.   Maybe a month ago.
9        Q.   Okay.  So you're familiar with the process?
10        A.   Yes, sir, I am.
11        Q.   Okay.  If you ever need to take a break
12   today at any time or for any reason, just let me
13   know.  As long as we're not in the middle of a
14   question, we'll go off the record and take that
15   break.
16        A.   I appreciate that.  Thank you.
17        Q.   Okay.  Now, I've marked -- do you have the
18   link to the exhibits that I sent yesterday to your
19   counsel?
20        A.   I don't.
21        Q.   Okay.  So I am going to put that into the
22   chat function.  Do you see there how to get to the
23   chat function, the link?
24        A.   I don't.
25        Q.   Okay.  Well, then let's get that worked

Ronald J. Kendall, Ph.D.

1    out.  I was looking for the e-mail I sent Jarad

2    yesterday.  Give me a moment.

3        A.   If you want to e-mail that to me, my e-mail

4    address is ███████████████

5        Q.   ████████████████      Okay.

6        A.   Yes, sir.  I have a second computer here.

7    I can look at it while being deposed by you.

8        Q.   Sure.  Okay.  I just sent that to the AOL

9    address.  And I'll put it in the chat feature now?

10            MR. KALAS:  And, Marc, it's there for

11   you as well if you want to follow along.

12            MR. BRECHER:  Yeah, I got it.

13   BY MR. KALAS:

14       Q.   Okay.  So as you're getting that,

15   Dr. Kendall, essentially, what's going to happen is

16   there's going to be exhibits that I mark, and

17   they'll be made available in that site.  So you may

18   need to refresh as I mark a new exhibit.

19       A.   Okay.

20       Q.   But you'll see I've premarked five exhibits

21   there, when you get that open.

22       A.   Okay.  I actually don't have it yet,

23   but. . .

24       Q.   Okay.  The other thing you could do is if

25   you put your mouse down on the bottom of your screen

Ronald J. Kendall, Ph.D.

1   here, there will be, like, a bar that pops up where

2   it says "Participants," "Chat," "Share Screen."  Do

3   you see that?

4       A.   Yeah, I'm on my iPad, so I don't have a

5   mouse.

6       Q.   Got it.  Okay.

7            Well, while we're waiting for that to pop

8   up, let me -- let me ask you a few -- a few

9   questions.

10           So, first of all, can you just tell me a

11  little bit about your background, where you were

12  educated, what you've done in your career?

13      A.   Okay.  I grew up in South Carolina and

14  attended McClenaghan High School in Florence, South

15  Carolina.  I wanted to pursue a career, and I had a

16  lot of interest in environmental toxicology.  While

17  in high school and early college, I had the great

18  fortune of working with a world-renowned insect

19  toxicologist on chemicals and control of cotton

20  insects.  So I had sophisticated laboratory

21  experience even in late high school and early

22  college.

23           I went to the University of South

24  Carolina.  I majored in biology with a minor in

25  chemistry.  My field had not been founded yet.  I

1    took a lot of chemistry and so on, preparing myself

2    for what would be a future in toxicology.

3            I subsequently was accepted at Clemson

4    University.  I was put on a Belle Baruch fellowship

5    and pursued my master's.  My master's was in

6    toxicology.  The area of research was pesticides and

7    effects on Bobwhite quail.  So it got me into

8    warmblooded vertebrates and their response to

9    chemicals.

10           I graduated from Clemson University and

11   was recruited to Virginia Polytechnic Institute and

12   State University in Blacksburg, Virginia.  It was a

13   national research university.  I was brought into a

14   program that allowed me to meld biology, wildlife

15   toxicology, biochemistry toxicology all together

16   into a very unique experience.  I went on to

17   graduate from Virginia Tech.

18           I was 26 years old.  I was immediately

19   selected by the United States Environmental

20   Protection Agency right at graduation to -- to be

21   sent to MIT for -- for advanced training in

22   toxicology, to be one of the future leaders in

23   toxicology in the country.  I was very excited to

24   get that opportunity.

25           I went to MIT for what they called an EPA

Ronald J. Kendall, Ph.D.

1    traineeship.  I was there.  I had -- I had highly

2    sophisticated interactions with the MIT professors

3    as well as the School of Public Health over at

4    Harvard.  And that was in the summer of 1980.

5            I then was recruited to Western Washington

6    University out in Bellingham, Washington.  It was an

7    exciting experience on the -- in the Pacific

8    Northwest.  There I started a professorship in

9    environmental toxicology in 1980.  I was 27.  And I

10   rapidly grew my research program dealing with

11   chemicals in the environment.  I ultimately

12   developed one of the leading academic programs in

13   the West dealing with environmental toxicology.  We

14   developed a graduate program there interacting with

15   the University of Washington.  And I also had an

16   appointment at the Washington State University.  So

17   it was almost a statewide interaction.

18           My environmental toxicology program was

19   ultimately identified by the Western Interstate

20   Commission on Higher Education as being one of

21   uniqueness, such that in the 17 western states

22   represented by WICHE, my program could receive

23   students from across the West to be -- to receive

24   training in environmental toxicology with an instate

25   tuition.

Ronald J. Kendall, Ph.D.

```
 1              In the late '80s, approximately 1989 -- I
 2    went on to be promoted to associate professor and
 3    full professor very quickly at Western Washington
 4    and had a large research program with dozens of
 5    people.  Substantial funding.
 6              I was recruited to Clemson University in
 7    1989 to -- to found and develop an institute called
 8    The Institute of Wildlife and Environmental
 9    Toxicology.  I subsequently founded the Department
10    of Environmental Toxicology at Clemson.  We grew
11    rapidly with a -- with a graduate program offering
12    the Ph.D. and master's degree in environmental
13    toxicology.
14              This is congruent with my development in
15    the Society of Environmental Toxicology and
16    Chemistry where I became a charter member in 1980.
17    And by '92, while I was at Clemson, I was elected
18    president of the global Society of Environmental
19    Toxicology and Chemistry.
20              So at Clemson, I was -- I was there and we
21    built a very robust and comprehensive environmental
22    toxicology graduate program with Ph.D. and master's
23    students mainly.
24              I was there until 1997.  Texas Tech
25    recruited me and my program heavily to come to
```

Ronald J. Kendall, Ph.D.

1  Texas.  I had not planned that in my career, but I

2  agreed to come to Texas Tech University in 1997.

3  When I left Clemson, 45 scientists left with me.

4  There were a cadre of professors, many doctoral

5  students and staff.

6          We -- I was the founding director of the

7  Institute of Environmental and Human Health at Texas

8  Tech.  I also founded the Department of

9  Environmental Toxicology, which now has awarded

10  hundreds of Ph.D. and master's degrees in

11  environmental toxicology.

12          I went on to be director and chair for

13  15 years and developed the program to one of high

14  recognition, whereupon, the State of Texas through

15  the Texas Commission on Environmental Quality and

16  the Office of the Governor gave us an environmental

17  excellence award and recognized the university as

18  being among the top education programs in the area

19  of the environment in the state of Texas.  That was

20  a significant event in my career.

21          I now operate (audio drop) for associate

22  editor of the journal of Environmental Toxicology

23  and Chemistry now going on 32 years.

24  Q.   Dr. Kendall, can I just stop you there?

25  A.   Yeah.

Ronald J. Kendall, Ph.D.

1        Q.    You got off after you discussed your award

2    for top environmental program in Texas.

3        A.    Well, okay.

4              Our program, the Institute of

5    Environmental and Human Health was recognized by

6    (audio drop) and the Office of the Governor.  They

7    give out environmental awards.  We were recognized

8    for our excellence in education.  We were invited to

9    the governor's office and to a special program held

10   to recognize our university and my program.  It was

11   a very significant event on the emergence of our

12   program as one of excellence, of academic

13   excellence.

14             I think I -- I said, I don't know if you

15   heard it, but I have served as editor or associate

16   editor of the scientific journal, Environmental

17   Toxicology and Chemistry, for over 32 years now.

18   I'm a very highly published scientist.  I have

19   hundreds of scientific publications, several

20   patents, 13 textbooks, and have led to graduation

21   over 44 graduate students with their doctorate and

22   master's.  And I still -- I have still others to

23   this day.

24             So my career has been an exciting one that

25   has taken me all over the world in working on

```
 1   environmental issues involving human health and the
 2   environment.
 3           I have done environmental consulting for
 4   close to 40 years now, various cases spanning the
 5   country.  And that's been another exciting part of
 6   my career.  I operate my environmental consulting
 7   completely separate from my university appointment.
 8   My environmental consulting is done through a Texas
 9   company called Ronald J. Kendall & Associates, Inc.,
10   and that's who I represent today on this case.
11           Nevertheless, my career in environmental
12   toxicology has been an exciting one, as I mentioned.
13   It has taken me around the world.  I could go on and
14   on.  But, again, I also balance some of my
15   scientific and academic publication work with a
16   limited amount of environmental consulting on cases
17   that I deem appropriate and worthwhile to handle.
18           Thank you.
19      Q.   Thank you.
20           So going back to the environmental
21   consulting there for a moment, it's -- you said you
22   operate it via a company called Ronald J. Kendall &
23   Associates?
24      A.   Yes, sir.
25      Q.   Okay.  Did it ever go by another name?  Did
```

Ronald J. Kendall, Ph.D.

```
 1   you hear my question?  I'm sorry.
 2       A.   No, I didn't.  You froze for. . .
 3       Q.   Yeah.  And if that happens, we should just
 4   let each other know today.
 5            Did your consulting firm ever go by
 6   another name, or was it always Ronald J. Kendall &
 7   Associates?
 8       A.   It's been -- through Clemson and Texas
 9   Tech.  I moved my South Carolina company and merged
10   it into Clemson -- I mean, to the Texas corporation
11   when I moved to Texas in '97.  When I started this
12   in the -- in the early '80s, it was Environmental
13   Toxicology Services.
14       Q.   Okay.  And did -- has Ronald J. Kendall &
15   Associates or Environmental Toxicology Services
16   acted as a subcontractor for any other environmental
17   consulting firms?
18       A.   It has some years ago.  It doesn't now.
19   I've interacted with other organizations, companies,
20   and so on.  Sometimes in subcontract business
21   sometimes leading the efforts.  Currently now, and
22   at least for the last decade, it (audio drop)
23   cases like this one.
24            THE STENOGRAPHER:  You cut out again.
25   The last sentence I have is, "Currently now, and at
```

Ronald J. Kendall, Ph.D.

1    least for the last decade, it cases like this one."

2    Something dropped.

3        A.   Okay.  For probably the last decade, I've

4    been the prime on all the cases and projects that

5    I've handled, pretty close to that last, say, ten

6    years or so, approximately.

7    BY MR. KALAS:

8        Q.   Okay.  Did you -- were you able to open

9    that link on your other computer?

10       A.   Let me -- okay.  It's opening now.  Okay.

11   I've got it.

12                (Exhibit No. 1 identified.)

13   BY MR. KALAS:

14       Q.   Okay.  So I've premarked five exhibits

15   there.  And, first of all, if you could open

16   Exhibit 1, please, sir.

17       A.   I've got it.

18       Q.   Okay.  That's the expert disclosure in this

19   matter.  Have you seen this document before?

20       A.   (Audio drop).

21       Q.   I missed your answer there.

22            Have you seen that document before?

23       A.   Yes, I have.

24       Q.   Okay.  And it says here on page 4 of this

25   document that you will testify on issues of specific

Ronald J. Kendall, Ph.D.

1   causation and will testify regarding forensic

2   toxicology and environmental risk assessment of

3   Roundup usage, evaluation of the chronicity, and

4   amount of Roundup exposure, how personal protective

5   gear affects the amount of exposure, and

6   epidemiological factors.  Did I read that correctly?

7       A.   Yeah.  I'm getting to that point.  I'm not

8   sure -- I'm looking here on page 3, and it's got

9   Dr. Braunstein's hourly rate, and that's not me.

10      Q.   No, no, you're the next page.  Page 4.

11      A.   Okay.  I'm on page 4.  Okay.

12      Q.   Okay.  And so I just read in the first

13  sentence of the disclosure for you there underneath

14  your name.  Does -- does that first sentence

15  accurately describe the -- in broad strokes, the

16  areas you intend to testify on?

17      A.   Yes, that's -- that's approximately

18  correct.

19      Q.   Okay.  What is forensic toxicology?

20      A.   That's the evaluation of toxic chemical

21  exposures to determine their potential or actual

22  impact in causing health concerns for -- for, say,

23  human exposure or environmental wildlife exposure.

24      Q.   Okay.  What --

25      A.   And it could -- and it could lead to legal

1    implications if the product is in commerce and is

2    being utilized to make money by some organization.

3        Q.   What formal training do you have in

4    forensic toxicology as opposed to toxicology in

5    general?

6        A.   I have -- I have a career in training in

7    dealing with a number of cases over the years.

8    Basically, when you get into these kind of cases,

9    it's forensic toxicology.  So I have handled a

10   number of these cases over the years.

11           Plus, you know, when the textbook,

12   Toxicology:  The Basic Science of Poisons, I've -- I

13   have had a chapter in there before.  It's the bible

14   of toxicology.  It has a chapter in forensic

15   toxicology, which I have utilized in classroom

16   experiences in the past.

17           So it's how you frame your thinking.  It's

18   how one crafts strategies, including hypotheses,

19   evaluation of data to address hypotheses, and how

20   one can defend the analysis of data both using

21   instruments as well as intellectual analysis to

22   determine plausibility for the potential impacts on

23   health -- health concerns.

24       Q.   Okay.  I heard a few things in there.  I

25   just want to break it down.

Ronald J. Kendall, Ph.D.

1         So my initial question was what formal

2    training do you have in forensic toxicology, and the

3    first thing you pointed me to was the fact that you

4    have worked on a lot of cases over the years.

5    Right?

6         A.   Absolutely.

7         Q.   Okay.  And that's not formal training; you

8    would agree with me on that?  That is actually

9    working on cases?

10        A.   You can -- if you -- you could interpret it

11   that way.  Even going back to my MIT and Harvard

12   experience, we got into -- why EPA sent me there was

13   to look at strategies and toxicological research

14   that could have implications in supporting

15   environmental policy one day.

16        Q.   Okay.

17        A.   Okay.

18        Q.   Okay.  Again, I'm not trying to argue with

19   you.  When I say "formal training," I mean classes,

20   I mean, you know, a degree, education on the process

21   of conducting forensic toxicology.

22        Would you agree with me, handling a case

23   is not a class on forensic toxicology?

24        A.   It's more than a class.

25        Q.   Okay.  But it's not a class; you agree with

Ronald J. Kendall, Ph.D.

1    that?

2       A.    It's not a class.  And I've taught many

3    classes in toxicology over the years.  But the

4    experience, drawing upon my knowledge of

5    environmental policy and environmental regulations

6    supporting legal implications is vast.  I am the

7    past chairman of the Federal Insecticide, Fungicide

8    and Rodenticide Act, FIFRA, Science Advisory Panel,

9    for the Environmental Protection Agency.  I was

10   chairman for three years and on the panel other

11   years.

12          The point is, we had to look at forensic

13   toxicology to evaluate the nation's environmental

14   laws being upheld by EPA and could they be defended

15   from a forensic's point of view if challenged in the

16   courts by, say, registrants of chemicals that are

17   registered by the EPA.

18      Q.    Where -- what EPA guidelines can you point

19   me to on forensic toxicology specifically?

20      A.    The laws.  FIFRA.  We had to -- we had to

21   look at a number of issues dealing with pesticide

22   regulation, disinfectant regulation, and so on

23   that -- that had to do with how we managed our

24   nation's chemicals.  That is literally forensics.

25   Because we're looking at human health concerns,

Ronald J. Kendall, Ph.D.

1   cancer, looking at a possibility of environmental

2   damage and so on.  And the Agency would come to the

3   Science Advisory Panel with their proposed

4   strategies to be able to -- to defend those

5   environmental laws in court based upon good science

6   and forensics.

7       Q.   Is there an EPA regulation --

8       A.   (Audio drop) to scientific discussions that

9   could lead and support the agency in terms of (audio

10  drop) those laws.

11              THE STENOGRAPHER:  I'm sorry.

12      A.   And when I concluded my service as chairman

13  of the FIFRA Science Advisory Panel, I received a

14  gold plaque, award of appreciation for my

15  leadership.  And I could send you a copy of it.

16  Because they didn't do that for chairs of committees

17  (audio drop).

18              THE STENOGRAPHER:  Counsel, should we

19  go off the record to address this.

20      A.   (Audio drop) with environmental policy

21  supported by good toxicological work in forensics.

22              MR. KALAS:  Doctor, we are losing

23  parts of your answer as you go on.  I suggest we go

24  off the record and have you log off and log back in.

25              THE WITNESS:  If that's what you want,

Ronald J. Kendall, Ph.D.

```
 1   sir.

 2                   MR. KALAS:  Okay.  Let's go off the

 3   record.

 4                   THE VIDEOGRAPHER:  The time is

 5   9:27 a.m., and we are off the record.

 6                   (Break taken, 9:27 a.m. to 9:39 a.m.)

 7                   THE VIDEOGRAPHER:  The time is now

 8   9:39 a.m., and we are on the record.

 9   BY MR. KALAS:

10       Q.   Is there a FIFRA guideline entitled,

11   "Guidelines for Forensic Toxicology"?

12       A.   You cut out right at the first half of that

13   sentence.  I'm sorry.

14       Q.   Is there a FIFRA regulation or an EPA

15   guideline entitled, "Guidelines for Forensic

16   Toxicology"?

17       A.   No.

18       Q.   Is there an EPA guideline or FIFRA

19   regulation that contains guidelines for forensic

20   toxicology?

21       A.   Not specifically listed that way.  But

22   listen, that's what we dealt with, essentially, for

23   years, dealing with environmental regulations and

24   the science to support them.  That is forensic

25   toxicology, technically speaking.
```

1     Q.   Okay.  Now, you've mentioned a textbook

2   that you called the "bible of toxicology," and

3   that's Casarett & Doull?

4     A.   Yeah, "Toxicology:  The Basic Science of

5   Poisons."

6     Q.   Right.  And you mentioned a chapter on

7   forensic toxicology in that book.  I assume you have

8   taught that chapter to other people?

9     A.   Yeah, earlier in my career.

10    Q.   Okay.  You didn't write that chapter,

11  right?

12    A.   I didn't write it.

13    Q.   Okay.

14    A.   I wrote a different chapter.

15    Q.   Okay.  And so when you said you wrote a

16  chapter in that textbook, just to be clear, it

17  wasn't the chapter on forensic toxicology?

18    A.   No, it wasn't.

19           (Exhibit Nos. 2 - 3 identified.)

20  BY MR. KALAS:

21    Q.   Okay.  Now, I marked as Exhibit 2 the

22  notice of deposition in this case.  Take a look at

23  that for a second, please.

24    A.   Okay.

25    Q.   And then I marked as Exhibit 3 the amended

1    notice of deposition in this case, and the amended

2    notice was just changing this from an in-person

3    deposition to a remote deposition.

4        A.   Yes, sir.

5        Q.   Now, have you seen either of these

6    documents before, or both of them?

7        A.   I have.

8        Q.   Okay.  And if you look at the -- well, when

9    did you first see them?

10       A.   I don't know, a couple of weeks ago.  I

11   don't recall.  I just -- I received them and put

12   them in -- in my file to prepare for today.

13       Q.   Sure.  Okay.  And if you go to the amended

14   notice, which is Exhibit 3, there was a request for

15   production.  Did you see that?

16       A.   Yes.

17       Q.   Okay.  And you produced an expert report in

18   this case, right?

19       A.   Yes, I did.

20            (Exhibit Nos. 4 - 5 identified.)

21   BY MR. KALAS:

22       Q.   Okay.  And is a true and correct copy of

23   your expert report marked as Exhibit 4?

24       A.   Let me look.

25            Yes, that looks correct.

Ronald J. Kendall, Ph.D.

```
1        Q.   Okay.  And then you produced a CV in this
2   case, correct?
3        A.   Yes.
4        Q.   Okay.  And is a true and correct copy of
5   that CV marked as Exhibit 5?
6        A.   It is.
7        Q.   Okay.  And --
8        A.   It has been updated since then.
9        Q.   Okay.  Do you have an updated CV?
10       A.   Yes, I sent it to Jarad Silverstein
11  yesterday.
12            MR. KALAS:  Okay.  Marc, we have not
13  received that updated CV, nor have we received any
14  responsive documents to our notice, say, for the
15  report and this older CV.  Are there documents you
16  intend to produce?
17            MR. BRECHER:  I think the documents
18  are set forth in his report and his -- and his
19  bibliography and what he cites.  Those are all the
20  documents that, I think, he's going to be referring
21  to.
22            MR. KALAS:  Well, if he has an updated
23  CV that was sent to you, I believe we asked for a
24  current CV.
25            MR. BRECHER:  I will get that to you
```

Ronald J. Kendall, Ph.D.

1    promptly.

2    BY MR. KALAS:

3        Q.   Okay.  Another thing we asked you for,

4    Dr. Kendall, are invoices.  Have you submitted

5    invoices for the Spector matter to counsel for

6    plaintiff?

7                MR. BRECHER:  Yeah, and we did -- we

8    did supply that yesterday in an e-mail that Jarad

9    sent you.

10               MR. KALAS:  I don't have it.

11               MR. BRECHER:  I will get Jarad to

12   re- -- but I remember him telling me that he sent --

13   he sent the updated CV.  He sent the -- everything

14   responsive to what you want in an e-mail to you, but

15   I will just -- I'll e-mail him right now to tell

16   him.

17               MR. KALAS:  Yeah, I'm searching my

18   e-mails.  I don't have it.  I mean -- so if you

19   could resend it, please, I would appreciate that.

20               MR. BRECHER:  So you want him to

21   resend the updated CV?

22               MR. KALAS:  Just resend whatever he

23   sent yesterday.  I assume there were objections to

24   the notice there, the CV and invoices.  So whatever

25   he thought was responsive yesterday, if he can

Ronald J. Kendall, Ph.D.

1    resend that, please, because I do not have it.

2                 MR. BRECHER:  Okay.  Well, I'm

3    e-mailing now as we speak.

4    BY MR. KALAS:

5        Q.   Okay.  Now, Doctor, I read your report, and

6    I just want to understand what you're going to opine

7    on in this -- in this case after reading it.

8            First of all, are all the opinions you

9    intend to offer at trial affirmatively contained in

10   your report, Exhibit 4?

11       A.   Well, like I said, I provided opinions in

12   my report.  But as more information becomes

13   available, I may expand on my opinions.  So I would

14   say, for the most part, yes, my opinions are stated.

15   But as more information becomes available and as I

16   evaluate data and information, which I'm continuing

17   to do, I may expand somewhat on my opinions.

18                 MR. BRECHER:  Yeah, and I think we

19   also reserved that if we -- I don't think we've

20   deposed your toxicology expert yet, and he

21   certainly -- we certainly reserve the right to file

22   a supplemental report if Dr. Kendall believes it is

23   appropriate based upon that testimony, which we

24   haven't received yet.

25                 MR. KALAS:  Okay.  Well, then, you

Ronald J. Kendall, Ph.D.

1  know, we'll take that up and -- and deal with that

2  when it comes.

3  BY MR. KALAS:

4     Q.   Let me get back, though, to your answer

5  there, Dr. Kendall, which is you -- you stated that

6  you continue to review materials.  Are there

7  materials pertinent to Roundup generally or to the

8  Spector case specifically you have reviewed since

9  you served your report in this case?

10     A.   Yeah, I've done some -- some computer work,

11  as an example, and just thinking about it and -- and

12  just -- just kind of reflecting on the development

13  of my thinking and ideas on this subject.

14          Listen, I'm an academic scientist.  This

15  whole -- this whole area of toxicology continues to

16  move forward.  So it's a process.  And my report is

17  a snapshot in time as to the development of my

18  academic process of thinking about data and

19  interpretation.

20     Q.   Did you consider those materials in

21  preparation for today's deposition, the materials

22  you have reviewed since your report was served?

23     A.   I considered the materials I used and

24  referenced in my report in the bibliography as the

25  predominant information that I considered related to

Ronald J. Kendall, Ph.D.

1    my thinking at this point in time.

2         Q.   Okay.  All right.  So now -- now I think

3    we're clear.

4              So all of the opinions at this point in

5    time you intend to offer on glyphosate, Roundup

6    and/or Ms. Spector's exposure to glyphosate and/or

7    Roundup are contained in your report?

8         A.   Yes.

9         Q.   Okay.

10        A.   For the most part.

11        Q.   Okay.  Now, "for the most part" is the

12   problem there.  What is the part that I don't know

13   about?

14        A.   Well, it's a -- it's a little difficult to

15   tease out of my brain every piece of information and

16   thinking I've developed to the report as well as

17   continuing to think about this.  So, like I said,

18   for the most.  That's -- I told you, the

19   bibliography identified is the preponderances of

20   information that I utilized to -- to opine onto my

21   opinions on this case.

22        Q.   So if trial were today, if you were sitting

23   in a courtroom today and you were asked to put on a

24   direct examination from plaintiff's counsel, are

25   there any opinions that you would tell the jury

Ronald J. Kendall, Ph.D.

1    about that are not contained in your report?

2        A.    Probably not at this -- at this point.

3        Q.    Okay.  Am I correct that you intend to

4    offer affirmative expert opinions on the

5    epidemiology surrounding glyphosate and/or Roundup

6    exposure and NHL?

7        A.    Yes.

8        Q.    Okay.  Am I correct that you intend to

9    offer opinions on the animal toxicology data

10   involving glyphosate and/or Roundup and -- well,

11   strike that.  Let me ask it better.

12            Are you intending to offer opinions on the

13   animal toxicology data surrounding glyphosate and/or

14   Roundup?

15       A.    Yes.

16       Q.    Are you intending to offer opinions

17   surrounding the mechanistic data surrounding

18   glyphosate and/or Roundup?

19       A.    Yes.

20       Q.    Are you intending to offer opinions

21   surrounding the human exposure and/or dose data

22   surrounding glyphosate and/or Roundup?

23       A.    Yes.

24       Q.    Are you intending to offer opinions

25   surrounding absorption, distribution, metabolism and

Ronald J. Kendall, Ph.D.

1   excretion data surrounding glyphosate and/or

2   Roundup?

3       A.   Yes.

4       Q.   Are you intending to offer opinions that

5   you have developed a safer alternative design for

6   glyphosate-based herbicides that is less of a hazard

7   to human health but is as efficacious in killing

8   weeds?

9       A.   No.

10      Q.   Are you intending to offer opinions on the

11  specific cause of Ms. Spector's NHL?

12      A.   (Audio drop).

13           MR. KALAS:  Marc, I mean, we may have

14  to table this today if this keeps happening.

15           MR. BRECHER:  Understood.  Let's -- I

16  guess if we had trekked to Dallas, this wouldn't

17  have been a problem.

18           MR. KALAS:  I guess so.  But it would

19  have been next week on the -- on the other two.  So

20  we would have to get it worked out anyway.

21           MR. BRECHER:  It made my wife so happy

22  when I didn't have to go to Dallas.

23           THE VIDEOGRAPHER:  Do you want to go

24  off the record, sir?

25           MR. KALAS:  Yes, let's go off the

Ronald J. Kendall, Ph.D.

```
 1    record.

 2                    THE VIDEOGRAPHER:  The time is 9:50

 3    a.m., and we are off the record.

 4                    (Break taken, 9:50 a.m. to 11:02 a.m.)

 5                    THE VIDEOGRAPHER:  The time is

 6    11:02 a.m., and we are on the record.

 7    BY MR. KALAS:

 8        Q.   Dr. Kendall, are you going to be offering

 9    an opinion on the specific cause of Ms. Spector's

10    NHL?

11        A.   I am going to be offering the opinion

12    (audio drop).

13                    MR. KALAS:  Let's go off the record

14    again.

15                    THE VIDEOGRAPHER:  I apologize.  The

16    time is 10:03 a.m., and we are off the record.

17                    (Break taken, 10:03 a.m. to 10:03 a.m.)

18                    THE VIDEOGRAPHER:  The time is 10:03,

19    and we are on the record.

20    BY MR. KALAS:

21        Q.   Dr. Kendall, are you going to be offering

22    an opinion on the specific cause of Ms. Spector's

23    NHL?

24        A.   I am going to be offering an opinion of

25    what I think within a reasonable degree of
```

1   scientific and toxicological certainty what was a

2   substantial part of the cause.

3       Q.   Okay.  Have you ever heard of the term

4   "differential etiology"?

5       A.   Yes.

6       Q.   Okay.  What does that mean to you?

7       A.   Well, among the studies of etiology

8   disease, it -- it evalu- -- you are evaluating the

9   development of the disease from a perspective of

10  what is biologically plausible for causing that

11  disease.  "Differential etiology" may be able to

12  look at a disease that may have multiple components

13  that could ultimately result in that -- in that

14  disease causation.  And one would have to

15  differentially evaluate that using Bradford Hill

16  criteria as an example to look at what has maybe the

17  strongest association in terms of being the most

18  probable causative factor.

19      Q.   Have you conducted a differential etiology

20  for Ms. Spector ruling out other potential causes of

21  her NHL?

22      A.   To a degree, yes, because I considered

23  potential confounding factors and I considered her

24  life's history and her -- her role and utilization

25  of -- of -- of products that -- or occupational

Ronald J. Kendall, Ph.D.

1    exposure that could be a part of a differential

2    etiology.  So, yes, I have but not specifically in

3    writing, but I've done it in my mind.

4        Q.    Okay.  So you haven't disclosed it in your

5    expert report, but you've done it in your mind.  So

6    do you intend to testify --

7        A.    Yes.

8        Q.    -- as to a differential etiology at trial?

9        A.    Probably not.

10       Q.    Okay.  Are you an expert on corporate

11   ethics?

12       A.    I wouldn't classify myself -- I would

13   classify myself having -- having been associated

14   with a substantial amount of corporate ethics

15   through cases over many years.  Am I trained

16   specifically in corporate ethics?  No.  Do I have

17   experience in dealing with corporate ethics related

18   to the use of commercial chemicals?  The answer is

19   yes.

20            That's the reason I was so successful in

21   guiding the EPA in dealing with a lot of these very

22   complex subjects, dealing with chemical evaluation

23   and registration and advising the agency what kind

24   of additional work and/or research may be needed

25   from registrants to provide safety data and the best

1   possible information so that we could get the -- the

2   highest value and benefit from a product while

3   minimizing the risk.

4       Q.   Are you going to be opining on the

5   corporate ethics of Monsanto in this case?

6       A.   I don't -- I don't plan to, no.

7       Q.   Are you going to opine on the corporate

8   conduct of Monsanto in this case?

9       A.   I don't intend to.

10      Q.   Okay.  Are you going to opine on Roundup

11  advertising in this case?

12      A.   I don't intend to opine on it except I've

13  had experience with it with my own knowledge and

14  awareness of -- of the advertising.

15      Q.   Are you going to offer an expert opinion as

16  to the advertising that was utilized for Roundup

17  products in this case?

18      A.   Only -- only in the perspective that

19  Ms. Spector thought by virtue of what she heard,

20  saw, read, she thought the product was totally safe,

21  as safe as table salt, for instance, and there was

22  no worry as to how it could -- could be handled

23  and/or utilized.  So that's in her testimony, and I

24  state that in my expert report, that she thought the

25  product was safe by virtue of what she read and was

1   told.

2        Q.   Have you cited any advertising in your

3   expert report?

4        A.   No.

5        Q.   Have you seen in your personal experience

6   any advertising put out by Monsanto that says

7   glyphosate is safer than table salt?

8        A.   No, but I'm aware of it.  I've -- I've used

9   it for 20 -- I've used it many years ago.

10       Q.   Okay.

11       A.   And --

12       Q.   I wasn't asking about your personal use,

13   sir.  I was asking whether you've seen any

14   advertising that says glyphosate is safer than table

15   salt, in your personal experience?

16       A.   I haven't seen that.

17       Q.   Okay.  Are you going to be opining on

18   labeling, Roundup labeling in this matter?

19       A.   I didn't get into that in my expert report,

20   and I don't intend to, but I'm extremely aware of

21   labeling by virtue of my extensive experience with

22   the EPA in evaluating labels consistent with

23   chemical safety issues.

24       Q.   Okay.  But you don't intend to offer an

25   expert opinion on labeling in this case; is that

Ronald J. Kendall, Ph.D.

```
 1   fair?

 2       A.   No.  Yes.

 3       Q.   Okay.  Are you going to opine glyphosate

 4   and/or Roundup should be banned?

 5       A.   No.

 6       Q.   Okay.  When did you first hear of

 7   glyphosate?

 8       A.   Over 20 years ago.

 9       Q.   And you had mentioned earlier in a previous

10   answer there that you had used glyphosate-based

11   herbicides?

12       A.   I have.

13       Q.   Okay.  When did you first use

14   glyphosate-based herbicides?

15       A.   Over 20 years ago.

16       Q.   Okay.  And for what purpose did you use

17   them?

18       A.   Weed management.

19       Q.   When was the last time you used

20   glyphosate-based herbicides?

21       A.   Years ago.  A few years ago.

22       Q.   Okay.  And was that before or after the

23   IARC Monograph came out?

24       A.   Probably pretty close to that.

25       Q.   Okay.  And when you used glyphosate-based
```

1    herbicides, what personal protective equipment did

2    you wear, if any?

3        A.   Long-sleeve shirt.  Listen, my -- my

4    perspective on the product was that even as a

5    toxicologist, it was very safe and -- based on what

6    I heard about it.  So I would use long pants, my

7    field boots, long-sleeve shirt and so on.  And

8    I'm -- I'm -- I'm very aware of chemicals and

9    chemical exposure.  So I was extremely careful in

10   how wind direction and use was consistent with

11   either low wind or being sure I was not going to get

12   back spray.  So -- so that's, basically, what was --

13   I'd used my leather gloves, my -- my work gloves.

14       Q.   All right.  That answer was a bit

15   scattered.  I want to make sure I understand it.

16            When you use Roundup -- when you use

17   glyphosate-based herbicides, you would wear long

18   pants, true?

19       A.   Yes.

20       Q.   You would wear a long-sleeve shirt, true?

21       A.   Yes.

22       Q.   You would wear gloves, true?

23       A.   Leather gloves.

24       Q.   And you would wear your field boots, true?

25       A.   Yes .

Ronald J. Kendall, Ph.D.

1      Q.   Okay.  You did not wear a Tyvek suit,

2   right?

3      A.   No.

4      Q.   Okay.  And when you used the Roundup

5   products, you would try to follow the instructions

6   on the label, fair?

7      A.   Yeah, fair.

8      Q.   Okay.  And one of the things that labels

9   call for when using Roundup products is to not spray

10  on a windy day.  That's something you alluded to?

11     A.   Yeah.  I'm very aware of that, but

12  uninformed citizens may not be as aware of it.

13     Q.   Okay.  But that's your speculation.  You

14  don't know if the quintessential "uninformed

15  citizen" you just mentioned read the label or not,

16  right?

17     A.   I've been involved with chemical and

18  chemical evaluation pesticide studies for years.

19  What I have come to realize over those years is that

20  uninformed citizens, the average citizen, sometimes

21  they don't read the label clearly, and, secondly,

22  they don't understand about exposure, and -- and

23  particularly on a windy day and/or how you're

24  handling the product.  So, you know, this is what I

25  have been doing for over 40 years.

Ronald J. Kendall, Ph.D.

```
 1          Q.   Are you an expert on human factors?

 2          A.   I'm an expert on -- on pesticide

 3   application and both commercial and -- and

 4   residential use because I've done -- I've done a lot

 5   of this.  I've evaluated sites, exposures, dead

 6   birds, all kinds of things over the years.  I could

 7   go -- I could spend the whole day talking about

 8   evaluation of pesticide exposure to both the

 9   environment and human health.

10          And as far as human factors, if you're

11   implying about exactly how people think when they're

12   using this, no, except I know that everybody doesn't

13   use it, a product consistent with the label.  And --

14   and that's just -- that's just how it is.

15          Q.   Okay.  I want to make sure I understand

16   that.  You agree with me that you aren't -- or

17   strike that.

18          You agree with me that you are not an

19   expert on how individuals interpret labeling, but

20   it's your experience that individuals do not always

21   follow the label.  That's what you're trying to say?

22          A.   Yes.

23          Q.   Okay.  Now, you're not an oncologist, true?

24          A.   Correct.

25          Q.   You're not a hematologist, right?
```

Ronald J. Kendall, Ph.D.

```
 1        A.   I didn't hear that.

 2        Q.   You're not a hematologist, right?  Not a

 3   hematologist?

 4        A.   No.

 5        Q.   Okay.  You're not a medical doctor?

 6        A.   No, sir.

 7        Q.   You don't diagnose cancer, correct?

 8        A.   That's correct.

 9        Q.   Okay.  You don't treat cancer, correct?

10        A.   Correct.

11        Q.   You don't examine patients, correct?

12        A.   Correct.

13        Q.   You're not a pathologist, true?

14        A.   I'm -- I've evaluated a lot of pathology

15   data.  Technically, I'm not a pathologist, but I've

16   evaluated, as far as research and cases, a lot of

17   pathology data over many years.

18        Q.   Okay.

19        A.   So, no, I'm not a pathologist.

20        Q.   Okay.  Outside the context of litigation,

21   you don't offer opinions professionally about the

22   specific causes of individuals' cancers; is that

23   fair?

24        A.   Please ask that question again.

25        Q.   Sure.  Outside the context of litigation,
```

1    you don't offer expert opinions about the specific

2    causes of individuals' cancers, true?

3        A.   That's kind of true, because in the context

4    of teaching, working with students, utilizing and

5    being a part of textbooks, we're talking about the

6    factors that result in disease and disease states

7    that can lead to pathology.  And so this -- this is

8    part of -- it's just part of the process of what I

9    do as a toxicologist.

10            So -- so the comment that I only would do

11   this as part of an expert opinion on a legal case is

12   incorrect.  I do this as part of working with

13   students that will go on to be future toxicologists

14   and help them critically think and evaluate how

15   do -- how do we rule out or identify factors that

16   that -- that lead to development of disease that is

17   particularly related to chemicals and their

18   chemistries.  So that's something I do a lot.

19   Almost on a daily basis.

20       Q.   All right.  But my question was a little

21   bit different.  It wasn't about teaching about

22   potential risk factors.  It was about specifically

23   identifying the cause of cancers in individuals.

24   Okay.  Do you understand -- do you understand what

25   I'm getting at there, a person, an individual?  Do

1    you understand that part of my question?

2        A.    About 50 percent understand it.

3        Q.    Okay.  Let's say I got cancer.  Okay?

4        A.    Okay.

5        Q.    Outside of litigation, would you opine as

6    to the cause of my specific cancer in me?

7        A.    It would be -- probably not.  It would be

8    probably more the mechanisms that could generate

9    that disease outcome as a function of chemical

10   exposure.  Sometimes we get into the issues of, you

11   know, individuals that are people we know and/or are

12   having pathological consequences from potential

13   chemical exposure.  But -- but, generally, it would

14   be the mechanistic processes that result in a

15   chemical, for instance, damaging the DNA of certain

16   cells that cause them to mutate and replicate

17   inappropriately that can lead to a cancerous cell

18   that ultimately could lead to a tumor.  So the --

19   the mechanisms would be my predominant place of

20   interest from my background perspective.

21       Q.    You've never worked at Monsanto, true?

22       A.    No, I've never worked at Monsanto.

23       Q.    Never worked at Bayer, right?

24       A.    No.

25       Q.    Okay.  Are you going to opine on the --

Ronald J. Kendall, Ph.D.

1    well, let me back up.

2            Is it your opinion that glyphosate in and

3    of itself is a carcinogenic substance?

4        A.   Glyphosate -- in my opinion,

5    glyphosate-based formulations, glyphosate-based

6    herbicides have carcinogenic potential based on some

7    human data, very strong mechanistic data, and

8    compelling animal experimental data.  Glyphosate

9    alone is not what people are exposed to.  They're

10   exposed to a formulation, and that formulation has

11   surfactants and so in it.  And there is evidence

12   that the formulation in itself can be a promoter of

13   tumors when a carcinogen exposes a tissue in an

14   experimental animal, mice.  So I think glyphosate

15   individually is much less potential to act as a

16   carcinogen as -- as is the formulation based on the

17   current experimental data.

18       Q.   Okay.  I don't know if you answered my

19   question.  I am going to get to glyphosate-based

20   herbicides, sir, but I was asking about glyphosate

21   individually.

22            Are you going to offer an opinion to the

23   jury that glyphosate in and of itself is

24   carcinogenic to humans?

25       A.   I am going to offer an opinion that

Ronald J. Kendall, Ph.D.

```
 1   glyphosate has a role in cell damage,

 2   particularly -- particularly effects on the DNA;

 3   however, I will not speak to glyphosate individually

 4   as carcinogen as I will speak to glyphosate-based

 5   herbicides.

 6        Q.   Okay.  So if I understand correctly, tell

 7   me if I'm wrong because I'm trying to make sure I

 8   understand, you will tell the jury glyphosate-based

 9   herbicides are a carcinogenic as a mixture, but you

10   will not tell the jury glyphosate by itself is

11   carcinogenic individually; is that fair?

12        A.   Yes.

13        Q.   Okay.  Will you tell the jury the

14   surfactants used in glyphosate in and of

15   themselves -- excuse me.  Let me rephrase that.

16   Strike the question.

17             Will you tell the jury the surfactants

18   used glyphosate-based herbicides in and of

19   themselves are carcinogenic?

20        A.   No.

21        Q.   Okay.  Have you published a peer reviewed

22   article on the purported toxic effects of inert

23   herbicide ingredients?

24        A.   No, but I've considered it professionally

25   for 40 years.  I've been doing pesticide studies
```

Ronald J. Kendall, Ph.D.

1   since the early '80s, back to '81, related to

2   chemical formulations and their actual application.

3   I'm not talking about theoretical.  I'm talking

4   about literally working with the formulation,

5   working with the applicators and measuring the

6   response of organisms subsequent to exposure.

7        Q.   It is true that EPA regulates both the

8   accurate ingredient -- or strike that.

9             It is true EPA regulates the active

10  ingredient, the inert ingredients, and the

11  formulated products in pesticides sold in America,

12  correct?

13       A.   They mainly regulate the active ingredient.

14       Q.   Okay.  That wasn't my question.  It wasn't

15  my question, sir.  I'll break up the question.

16       A.   Okay.

17       Q.   EPA regulates the active ingredients of

18  pesticides sold in America, true?

19       A.   True.

20       Q.   EPA regulates inert ingredients in

21  pesticides sold in America, true?

22       A.   In terms of our evaluations on the

23  Scientific Advisory Panel, we were generally working

24  with -- with the active ingredient.  The label --

25  the label will -- the label, which is the legal

1  contract of the company with the consumer is

2  governed under FIFRA, the Federal Insecticide,

3  Fungicide and Rodenticide Act, and that includes the

4  entire formulation.  So, yes, but when we -- but

5  when products are being looked at, it's generally

6  the active ingredient that -- that precedes the

7  formulation.

8      Q.   Okay.  I'm not sure if you answered my

9  question.  I think there was something in there that

10  may have been responsive.

11          It is true, EPA regulates inert

12  ingredients contained in pesticide products sold in

13  America, right?

14      A.   Yes.

15      Q.   Okay.  And it is true, EPA regulates the

16  formulated products of pesticide products sold in

17  America?

18      A.   Yes.

19      Q.   Okay.  And they collect data on all of

20  that, right, the active ingredient, the inert

21  ingredients and the formulated products?  True?

22      A.   True.

23      Q.   Okay.  Now, you've mentioned that you've

24  testified in lawsuits before.  Can you -- and one

25  thing we did not receive as part of your expert

Ronald J. Kendall, Ph.D.

1   report is -- unless I missed it, and I very well may

2   have -- is a list of pesticide active ingredients in

3   the -- strike that.  I got distracted.

4         One thing -- one thing that you didn't

5   mention in the expert report is the -- is a list of

6   previous testimony in the past four years.  Do you

7   have a list of previous testimony in your past four

8   years?

9       A.   Yes.  I -- Jarad Silverstein has that.

10      Q.   Okay.  And let me just see if I've got that

11  from Jarad.  Give me a moment.

12      A.   Okay.

13      Q.   So I received invoices, a CV, and that's

14  it.  But that's fine.  I'll look and see if I have

15  it anywhere else.

16         But let me just ask you generally, have

17  you -- have you testified in the past four years in

18  pesticide cases?

19      A.   Not -- not to my recollection, as I sit

20  here today.

21      Q.   Okay.  And in your career -- in your

22  career, have you testified in pesticide cases?

23      A.   Yes, I have.

24      Q.   Okay.  And did you testify on behalf of the

25  plaintiffs or the defense?

Ronald J. Kendall, Ph.D.

```
 1        A.    Both.

 2        Q.    Okay.  Have you ever testified on behalf of

 3   Monsanto?

 4        A.    Never.

 5        Q.    Have you ever testified on behalf of Bayer?

 6        A.    Never.

 7        Q.    Okay.  You have testified on behalf of

 8   Syngenta, true?

 9        A.    I did research for Syngenta, but I don't --

10   I don't recall testifying for them.

11        Q.    Okay.  About how many cases would you

12   estimate you've testified in over the past -- over

13   your career?

14        A.    I don't know.  I've probably had over

15   40 cases.  Probably done 25 or so depositions, maybe

16   testified a dozen times in court.

17        Q.    Okay.

18        A.    That's a rough -- that's really rough

19   estimates, but that's -- that's in the ballpark.

20        Q.    Okay.  And what percentage of those cases

21   have been on behalf of the plaintiffs?

22        A.    I don't know.  Rough estimate, 60 percent

23   plaintiffs, 40 percent defendants.

24        Q.    Okay.  And how many of those were personal

25   injury cases in the ones you've testified in?
```

Ronald J. Kendall, Ph.D.

```
 1        A.    In the last four years or my entire career?

 2        Q.    Entire career.

 3        A.    I don't know, a half dozen personal injury

 4   cases.

 5        Q.    Okay.  And in those half dozen personal

 6   injury cases, how many were for plaintiffs and how

 7   many were for defendants?

 8        A.    About 50/50, 60/40.

 9        Q.    Okay.  And do you advertise your consulting

10   services on any of these expert, like, sourcing

11   websites, like, AOM Experts or that sort of thing?

12        A.    I really haven't advertised in 41 years or

13   doing -- 40 years of doing this.  Didn't have to.  I

14   did -- the Expert Institute did reach out to me a

15   few years ago, and I do -- I do interact with them.

16   So that's -- you know, I -- you know, they reach out

17   to me on a case, I'll consider it.  Sometimes I get

18   back to them, sometimes I don't.

19             And -- but, generally, I -- that's --

20   that's kind of the -- it -- I don't really call them

21   web-based.  They are a very professional operation

22   and their people do a lot of research and vetting of

23   potential scientists that can contribute to a case.

24   So I have always -- I have always found them very

25   professional.  But otherwise, I don't advertise.
```

1          Q.    What is the Expert Institute?

2          A.    It's just an organization that

3     identifies -- they reach out to you and ask -- and

4     ask you questions.  They get your CV and they try to

5     match you up with potential cases based on your

6     background and based on what their knowledge is of

7     the cases.  And so that would kind of be, like, you

8     know -- I don't know if that's advertising or not,

9     but it's -- it's been -- it's been very

10    professional.  They've been -- they've been terrific

11    and a very good group to work with.

12          So other than that, I usually just get a

13    phone call or an e-mail because of my academic

14    reputation and -- and just ask am I interested by

15    potential clients and so on.

16          And, like I said, I don't do this full

17    time.  I take only cases I think are relevant, I can

18    contribute to and would interest me.  So, again, I

19    have found it a challenging part of my career and

20    invigorating opportunities to use my academic

21    background to assist in case issues.

22          Q.    Is there a fee that the Expert Institute

23    receives for this matchmaking, to your knowledge?

24          A.    To my knowledge, they don't get any of my

25    fees.  I think there is a, like -- I don't really

1    know.  I think there is some fee where organizations

2    reach out to them and say I need a toxicologist and

3    I've got this kind of case.  So I think there might

4    be a fee there.  I don't even know what it is.

5        Q.   All right.

6        A.   The only thing I know is the Expert

7    Institute will set up a phone interaction and

8    will -- and at the close of that -- that one phone

9    conversation, maybe 15 minutes, I may not ever hear

10   from them again on that particular case.  So it's --

11   it's -- they do the background work and the

12   evaluation of what might be a good -- a good match

13   for certain cases and certain scientists.

14        And, so like I said, that's -- that's just

15   a professional interaction that I felt comfortable

16   with because they had been so professional with me,

17   the Expert Institute.

18        Q.   Okay.  And, to your knowledge, did you get

19   associated with the Wapner Newman firm through the

20   Expert Institute?

21        A.   Yes, I did.

22        Q.   Okay.  Now, one thing you have relied on in

23   your pesticide suits over the years and in your

24   career is EPA data and analyses, right?

25        A.   Yes.

Ronald J. Kendall, Ph.D.

```
 1      Q.   Okay.

 2      A.   That's part of it.  That's not all of it.

 3      Q.   That's why I said "one thing."  That's why

 4  I said "one thing."

 5      A.   Okay.  Very good.

 6      Q.   Yeah.

 7           Have you found the EPA analyses you have

 8  relied on in your career to be reliable?

 9      A.   Yes and no.  And that's -- and that's --

10  that was the role I played with the Scientific

11  Advisory Panel, was to look at their science and

12  interpretation and determine in the broader area.

13  And I handled consultants to the committee from all

14  over the world, and I -- I was very active over

15  those years of leadership of looking at the quality

16  of their science, how they interpret data, and did

17  it make sense in the general academic spectrum that

18  we could defend in court.

19           And so a lot of times, I didn't agree with

20  them.  And a lot of times I did.  But I always tried

21  to help them improve their science.  And the award

22  of appreciation I got was that I did that to their

23  satisfaction, was provided leadership on very

24  complex subjects of very complex science, and I led

25  with distinguished leadership that brought acclaim
```

1    to the agency, acclaim.  And that's in the writing

2    on a gold plaque on my wall.  And I'm really proud

3    of that, because I was trying to help the

4    Environmental Protection Agency do the best job

5    possible at regulating pesticides.

6         Q.   EPA's mission is to protect public health,

7    true?

8         A.   That's part of their mission, yes.

9         Q.   And have you found that the scientists

10   there do their best to protect public health?

11        A.   Yes, but there are also interpretations and

12   issues that we dealt with over the years both when I

13   was at the Science Advisory Panel and when I was

14   with other organizations dealing with the agency

15   where interpretation was not as clear, was not as

16   precise, and we would bring to bear science and

17   facts and data that would be very compelling to them

18   to look at another side of the -- of the equation,

19   so to speak.

20        Q.   So --

21        A.   So, again, they aren't perfect.  And so I

22   know that intimately because I dealt with it.

23   And -- and you've got to understand, the EPA is

24   trying to do their best job, but they're working

25   under very tight situations.  They don't necessarily

Ronald J. Kendall, Ph.D.

1    get to go to all the academic meetings.  They don't

2    have a lot of time to review the literature.  And so

3    sometimes they get behind the science, not at the

4    cutting edge of the science.

5            And that was the role of the Scientific

6    Advisory Panel, is to try to make sure we could tune

7    up those interpretations and regulations to be

8    closer to the cutting edge of the science as the

9    science unfolds, as we're looking at -- particularly

10   in chemical issues, the -- the science is exploding

11   now related to the role of chemicals and the health

12   of people and the environment.

13      Q.   Dr. Kendall, you said something in there

14   that I think was, again, responsive, but I'm not

15   sure.  So I just want to be clear here for the

16   record.

17           Do you agree that EPA scientists are

18   trying to do their best job to be protective of

19   public health?

20      A.   I'll agree.

21      Q.   Okay.  In the course of your career

22   interacting with scientists at EPA, have you found

23   them to be competent?

24      A.   To be honest with you, some are more

25   competent than others.

Ronald J. Kendall, Ph.D.

1      Q.   Fair.

2           Have you found the scientists at EPA to be

3    honest?

4      A.   Generally, yes.

5      Q.   Okay.  You would agree with me that there

6    are a lot of good scientists at the USEPA?

7      A.   Good, yes.  Cutting edge, not many.

8      Q.   Okay.  Now, you mentioned a few times

9    talking about your CV and just now about EPA SAPs.

10   And those are scientific advisory panels, right?

11     A.   Correct.

12     Q.   And for EPA evaluations of, what I'll call

13   big ticket issues, issues that have a lot of

14   visibility or are going to impact a lot of people,

15   the EPA SAP will take a second look at an EPA

16   interim evaluation to offer their opinion, right?

17     A.   Correct.

18     Q.   Okay.  And EPA SAPs, those aren't

19   monoliths, right?  It's made up of multiple

20   scientists with differing backgrounds and

21   viewpoints, right?

22     A.   Right.

23     Q.   Okay.  And the EPA SAP may disagree within

24   themselves on an evaluation of an EPA interim

25   decision, right?

Ronald J. Kendall, Ph.D.

```
 1        A.    Yes.

 2        Q.    Okay.  And do you recall situations like

 3   that?

 4        A.    I do.

 5        Q.    Okay.  And EPA, when faced with that sort

 6   of issue where the SAP disagree within itself, has

 7   to pick one side or the other in their regulatory

 8   evaluation, right?

 9        A.    Yes.  But oftentimes they would identify a

10   minority opinion.

11        Q.    Okay.  It is not incorrect for EPA to agree

12   with one half of an SAP in -- in opposition to the

13   other half of an SAP in and of itself?

14        A.    That's -- it's very -- it's very possible.

15   Under my leadership, we didn't have much of that

16   because we vetted the issues very thoroughly and

17   generally reached consensus.  However, the previous

18   SAP activity before I took over as chair was -- was

19   very divided.

20              So I don't know how it's going right now,

21   but, generally speaking, the leadership is critical.

22   And oftentimes, there can be division, and there

23   will be a majority opinion and there will also be a

24   minority opinion.  So -- so, again, that is

25   possible, and EPA has to deal with that.
```

1      Q.    Okay.  Now, going back to your report, you
2  have a list of about, I would say, 20, 25 documents
3  there at the end that you relied upon.  I'm looking
4  right now at pages 20 to 21.
5      A.    Okay.
6      Q.    Okay.  And then you also have a list of
7  materials reviewed at pages 24 to -- yeah, 24 to 25.
8  And I think that just combines 20 to 21.
9      A.    Yes.
10      Q.    Okay.  How did you go about selecting the
11  reports -- or excuse me -- the documents that appear
12  on pages 20 to 21 and 24 to 25?
13      A.    Some of the materials were provided to me
14  by Jarad Silverstein, which were welcome.  The other
15  materials, particularly the scientific papers, I did
16  a thorough review of the literature and tried to
17  identify the ones that were highly relevant,
18  appeared to be good science, were in reputable
19  journals, and that were interpretable.
20           So -- and I -- generally, in these kind of
21  reports, I try to choose prominent papers that I
22  think convey and identify critical issues related to
23  the thinking that I'm doing in the formulation of my
24  opinions.  So there's a -- there's a review process
25  I go through to bring all of this information

Ronald J. Kendall, Ph.D.

1   together and to construct, first in my mind, and

2   then, on paper, my opinions supported by the data

3   that are being conveyed by these scientists.

4        Q.   Okay.

5        A.   And I -- and I will admit, I looked -- this

6   is what I do, I'm an editor.  I'm a journal editor.

7   I told you earlier I've been an editor and/or

8   associate editor for 32 years.  Every day I'm

9   looking at scientific papers.  I'm the gatekeeper to

10  the science.  If you don't get it by me, you're not

11  getting published in environmental toxicology and

12  chemistry.

13        So -- so I'm looking at experimental

14  design, hypotheses, experimental design to get data

15  development and to come to some conclusions.  So

16  this is what I do every day, and I do that -- I did

17  that and tried to develop some scientific literature

18  that would be valuable for this -- for this case as

19  far as -- as my evaluation of the toxicology of it.

20             MR. KALAS:  Okay.  Can we go off the

21  record for a second, please?

22             THE VIDEOGRAPHER:  The time is

23  10:45 a.m., and we are off the record.

24             (Break taken, 10:45 a.m. to 10:57 a.m.)

25             THE VIDEOGRAPHER:  The time is 10:57,

1    and we are on the record.

2    BY MR. KALAS:

3        Q.    Dr. Kendall, before we went on a break

4    there -- and I appreciate everybody humoring me -- I

5    was asking you a bit about your materials considered

6    and materials reviewed list and how you went about

7    selecting the documents.  If I understood you

8    correctly, one way you selected these documents is

9    you were sent some documents by counsel for

10   plaintiffs, true?

11       A.    True.

12       Q.    Okay.  Another way you selected these

13   documents is you conducted a literature search; is

14   that fair?

15       A.    Yes.

16       Q.    Okay.  And is there any other way besides

17   those two ways that you got these documents listed

18   here that you collected these documents?

19       A.    Just my -- just my knowledge in the field,

20   like, the Casarett & Doull's toxicology, a very

21   comprehensive textbook related to toxicological

22   principles and so on.  So just -- you know, that's

23   just -- that's just part of what I do.  That's all I

24   can say.  It's kind of hard to -- yeah, I did the

25   literature review.  I studied the papers.  I

1    evaluated the quality of the science.  But it's kind

2    of hard to pinpoint every part of that when you've

3    done this for 40, 41 years as a professor.

4        Q.    Sure.

5        A.    So, you know, you understand.

6        Q.    Yeah.  So let me ask you -- let me ask you

7    a few other questions about these.

8             I assume the medical records that are

9    listed here were sent to you by plaintiff's counsel.

10   Fair?

11       A.    Yes, sir.

12       Q.    Okay.  And another thing I assume was sent

13   to you by plaintiff's counsel are things like the

14   complaint, the plaintiff fact sheet, and the

15   depositions.  True?

16       A.    Yes, sir.

17       Q.    Okay.  Casarett & Doull is a textbook that

18   you had in your personal library that you have

19   relied upon over the years.  Fair?

20       A.    Yes.

21       Q.    Okay.  How about the expert reports of

22   Dr. Jameson and Dr. Ritz, how were -- how did you

23   gain access to those?

24       A.    They were sent to me by plaintiff's

25   counsel.

Ronald J. Kendall, Ph.D.

```
 1        Q.   Okay.  Do you -- do you know who Dr. Ritz
 2   is?
 3        A.   I've heard of him before.  I don't know him
 4   personally.
 5        Q.   It's a woman.  So --
 6        A.   Yeah.
 7        Q.   -- first of all.
 8        A.   Right.
 9        Q.   Have you ever relied on any of Dr. Ritz's
10   work before this case?
11        A.   No.
12        Q.   Okay.  How about Dr. Jameson, do you know
13   who Dr. Jameson is?
14        A.   No.
15        Q.   Okay.  Do you have any sense whatsoever of
16   the quality of either Dr. Ritz's or Dr. Jameson's
17   scientific work?
18        A.   Mainly review the quality of their reports
19   and their interpretation of the science in those
20   reports.  Specifically, as to peer reviewing their
21   individual scientific records and their own labs,
22   no.
23        Q.   Okay.  How are you using Dr. Ritz's and
24   Dr. Jameson's reports to inform your expert opinion?
25        A.   Just -- just as part of -- of the
```

1    background information.

2         Q.   Okay.  And so all of the opinions you're

3    offering at trial are your personal opinions and

4    you're not regurgitating the opinions of Dr. Ritz or

5    Dr. Jameson?

6         A.   No, they're -- they're my opinions, yes.

7         Q.   Okay.  Now, you saw in Dr. Jameson's

8    report, I assume, that he had seen internal rodent

9    carcinogenicity studies on Roundup.  Did you see

10   that?

11        A.   Yes.

12        Q.   Okay.  And you -- you know from working on

13   the EPA SAP that those types of regulatory studies

14   are the studies that are sent to groups like the EPA

15   for their evaluation, right?

16        A.   Right.

17        Q.   Okay.  You have not reviewed those rodent

18   toxicology studies in this case, true?

19        A.   True.

20        Q.   Okay.  Why not?

21        A.   I felt the EPA evaluation was -- was

22   adequately reasonable.  And it just gets down to

23   time and time spent.  So I thought I reviewed and

24   communicated highly relevant information.

25        Q.   Now, you said you thought the EPA

1  evaluation was adequately reasonable.  If I look at

2  this list of documents you rely upon and considered,

3  I don't see any EPA evaluations.  Which EPA

4  evaluation are you referring to?

5      A.   I -- I reviewed some of the SAP

6  deliberation on this subject.

7      Q.   Okay.

8      A.   I also -- I also reviewed the International

9  Agency for Research on Cancer review process, and I

10  considered, you know, the different perspectives

11  reached based on that review process and the data

12  they were using.  So -- so, yeah, I -- I went

13  through that process.  I didn't -- I didn't cite

14  everything that I thought about in my report.  I

15  didn't think I needed to.  That -- that's part of my

16  professional opinion.

17      Q.   Okay.  So there are materials, then -- it

18  sounds like, and tell me if I'm wrong, there are

19  materials like the EPA SAP deliberation, the IARC

20  Monograph, perhaps others, that you reviewed and

21  considered but did not list here in your report.  Is

22  that fair?

23      A.   At that point.

24      Q.   Okay.  At that point.  What do you mean

25  by --

Ronald J. Kendall, Ph.D.

1        A.    I reviewed and considered -- I reviewed and

2    thought about all of that, but what I was trying to

3    do in my report is just be as concise as I could and

4    to the point as I could based on the most relevant

5    information that I interpreted.

6        Q.    Okay.  So there are things that you

7    considered in forming your opinions in this case

8    that you did not find highly relevant, and, thus,

9    did not list in your references; is that fair?

10       A.    Maybe not as relevant.  All of it's

11   relevant.  All of it's information.  There's a --

12   there's a volume of information, there's a body of

13   knowledge, and how one ranks that is based on

14   professional opinion and -- and -- an analysis.

15   That's what I do.

16       Q.    Okay.  So just -- I just want to make sure

17   I understand here.  Part of the facts of data

18   considered by you in forming your opinions are these

19   things like the EPA SAP deliberation, the IARC

20   Monograph, et cetera.  You considered those things

21   in forming your opinions but did not list them

22   because you did not consider them relevant to your

23   ultimate opinions; is that fair?

24       A.    I considered them as overarching issues.

25       Q.    Sure.

1      A.   And -- and they were just part of the body

2   of knowledge that I was evaluating.

3              MR. KALAS:  Okay.  So I'll just note

4   for the record now that under Rule 26(a)2(b),

5   subpart 2, Dr. Kendall's reliance and materials

6   considered list appears to be incomplete.  We would

7   ask plaintiff's counsel to supplement that in

8   accordance with the federal rules and reserve all

9   available relief based on that.

10  BY MR. KALAS:

11     Q.   Doctor, going back to your reliance list

12  here, the reliance list lists one mechanistic study,

13  right, Wozniak?

14     A.   Yes.

15     Q.   Okay.  And you're aware from working on the

16  EPA SAP, that registrants have to submit mechanistic

17  data on their active ingredients and their

18  formulated products, right?

19     A.   Yes.

20     Q.   Okay.  And you're aware the EPA evaluated

21  dozens of mechanistic studies on the active

22  ingredient in glyphosate -- or excuse me -- the

23  active ingredient in Roundup products, the

24  surfactants in Roundup products, and the formulated

25  products, right?

1       A.    Right.

2       Q.    Okay.  Did you ask plaintiff's counsel to

3   send you those mechanistic studies so you could

4   independently evaluate them?

5       A.    I was generally aware of them, but, no, I

6   didn't.

7       Q.    Why didn't you ask to see them?

8       A.    Because the Wozniak study was very

9   compelling to me.  Extremely well done piece of

10  science.

11      Q.    Is it an OECD guideline study?

12      A.    Yes.

13      Q.    It is?  Okay.  Which OECD guideline?

14      A.    It was a European study in a very reputable

15  journal, Food & Chemical Toxicology.  Technically,

16  it wasn't an OECD study.  It was a European study

17  under European rules.

18      Q.    Which -- which --

19      A.    It was extremely well done.

20      Q.    Okay.  Let me -- let me back up here.  And

21  if we need to look at Wozniak, we can.  But I want

22  to first make clear, because your two answers there

23  contradicted each other.

24          Wozniak was not an OECD guideline study,

25  true?

1     A.   Right.  I was thinking when I responded

2  about a European study and misspoke when I said it

3  was an OECD guideline study.

4     Q.   Okay.  And what -- what are OECD

5  guidelines?

6     A.   Well, they're consistent with, you know,

7  our EPA guidelines, say, under FIFRA.  They have --

8  they have rules and regulations for European

9  products just like we do.

10     Q.   Okay.  And OECD guideline studies or OPPTS

11  guideline studies, these are studies that are

12  required to be submitted to the agency on the

13  mechanistic data involving active ingredients in

14  formulated products, true?

15     A.   True.

16     Q.   Okay.  Why does the agency have guidelines

17  for how studies should be done for mechanistic

18  studies?

19     A.   To get data that could be relatively

20  comparable among products, to evaluate products from

21  a risk/benefit analysis.

22     Q.   And so what EPA wants, what the European

23  regulators want is a consistent methodology in order

24  to evaluate the data that is submitted to them in a

25  similar way across products, right?

```
 1       A.   Generally speaking.

 2       Q.   Have you found that OECD or OPPTS guideline

 3  studies are relevant to the mechanistic evaluation

 4  of pesticides?

 5       A.   They're relevant but not necessarily the

 6  cutting edge science.  It's very basic.

 7       Q.   Okay.

 8       A.   Very basic work.

 9       Q.   One of the -- one of the -- one of the

10  guideline studies required by regulators is

11  something called an Ames test, right?

12       A.   Yes.

13       Q.   What is an Ames test?

14            MR. KALAS:  That's A-m-e-s, Christy.

15       A.   I know what it is.

16  BY MR. KALAS:

17       Q.   No, no, it's --

18       A.   An Ames test --

19       Q.   It was for Christy, not for you.

20       A.   Oh, sorry.

21       Q.   No.  No, you're fine.

22       A.   I thought you were insulting me.

23       Q.   No, sir.

24       A.   Okay.  No, an Ames test is a -- it's

25  basically a bacterial test to look at the ability of
```

1    chemicals to interact and impact the DNA and to

2    cause mutations.  It's a very broad-based mutation

3    assay to demonstrate if a chemical has the ability

4    to mutate the DNA of an organism, Salmonella.

5         Q.   Okay.  And is studying whether a chemical

6    has the ability to mutate the DNA of an organism

7    relevant to carcinogenesis?

8         A.   It can be.  It can be.

9         Q.   And you evaluated --

10        A.   It's not -- in other words -- in other

11   words, just because you get a positive Ames assay

12   doesn't mean you have a carcinogen.  Okay.  That's

13   what I'm trying to say.

14        Q.   Right.  And so you evaluated zero Ames

15   tests in this expert report, right?

16        A.   Right.

17        Q.   Okay.  And are you aware that there are

18   dozens of Ames tests that have been -- have been

19   submitted to EPA and have been provided to

20   plaintiff's counsel in this litigation?

21        A.   I'm aware of -- of a volume of Ames tests

22   with glyphosate.  And, yes, so the answer is yes.

23        Q.   Okay.  Another type of regulatory

24   mechanistic test that's conducted is a chromosomal

25   aberration test, right?

```
 1       A.    Right.

 2       Q.    Okay.  And what is that?

 3       A.    Are you going to spell it for Christy

 4  first?

 5       Q.    No, that one -- that one, I think, is going

 6  to be a standard spelling.  Ames could have been

 7  A-i-m-s, which I have seen some transcripts do, or

 8  A-m-e-s.

 9       A.    Okay.  I've got it.  I've got it.

10             The chromosomal aberration test is another

11  test to assess the ability of a toxicant, usually an

12  active ingredient, to cause aberrations or effects

13  to the chromosome and -- and cells.  So -- so it's

14  another useful tool to look at potential mutagens

15  and ultimately carcinogens.  Because if a substance

16  can interact with the DNA or cause aberrations in

17  the chromosome, it can affect the ability of that

18  cell, potentially, to replicate in the wrong way; in

19  other words, to a cancer cell.

20       Q.    Okay.  And are you aware that there have

21  been dozens of chromosomal aberration tests

22  submitted to EPA on glyphosate and/or formulations?

23       A.    Yes.

24       Q.    Okay.  And are you aware those have been

25  made available to plaintiff's counsel?
```

Ronald J. Kendall, Ph.D.

1          A.   I was generally aware.

2          Q.   Okay.  And you have not looked at any of

3      those tests as well, correct?

4          A.   No, but I'm aware of them.

5          Q.   Okay.  How about micronuclei tests, what

6      are those?

7          A.   Again, that's a -- that's a test to

8      evaluate the ability of a -- of a cell to effect the

9      nuclei of -- of human tissue cells in cultures.

10     It's in vitro.  And to cause damage to the nucleus.

11         Q.   Okay.  And are those also EPA and OECD

12     guideline tests?

13         A.   I know they're EPA guideline tests.

14         Q.   Okay.  And are you aware that multiple

15     micronuclei tests have been submitted to EPA on both

16     glyphosate and the formulated product?

17         A.   Yes.

18         Q.   Okay.  And, again, you haven't reviewed any

19     of those for the purposes of your report?

20         A.   Not -- not directly.  I'm very aware of

21     them, though.

22         Q.   Okay.  And you're also generally aware

23     those have been made available to plaintiff's

24     counsel?

25         A.   Yes.

Ronald J. Kendall, Ph.D.

```
1        Q.   Okay.  Now, going back to your materials
2   considered list again, and your -- excuse me -- your
3   references reviewed and considered list, the only
4   animal study I see on here is the George study.
5   Correct?
6        A.   Correct.
7        Q.   Okay.  And the George study is a skin
8   promotion study, right?
9        A.   Correct.
10       Q.   Okay.  And beyond the George study, you
11  have not reviewed any of the animal -- well, strike
12  that.
13            Beyond the George study, you have not
14  reviewed any of the primary animal carcinogenicity
15  data on glyphosate and/or Roundup?  And when I say
16  "primary," not summarized in somebody else's review.
17       A.   Well, true.  Some of the deliberations of
18  the SAP at EPA as well as some of the deliberations
19  of the International Agency for Research on Cancer,
20  yeah, I looked at some of those data but not direct
21  studies.  Not the -- not the direct studies.
22       Q.   That's what I was trying to get at.  Okay.
23       A.   Okay.
24       Q.   And then -- and then beyond that, just
25  looking at your references reviewed and considered,
```

1  you have one, two -- five epidemiology studies,

2  correct:  The Andreotti, Eriksson, McDuffie, Pahwa,

3  and Zhang studies; is that right?

4      A.   Yes.

5      Q.   Okay.  And how did you go about selecting

6  these epidemiology studies?  Were they sent to you,

7  or did you find them in your literature review?

8      A.   Okay.  They would be the McDuffie, 2001;

9  the Eriksson 2008, Eriksson, et al.; the Andreotti,

10 2018; the Leon, et al., 2019; the Zhang, et al.,

11 2019; and the Pahwa, et al., 2019.

12     Q.   Okay.  I apologize for not listing Leon.

13 It wasn't in the list, but I do see it in the body

14 of your report.  So sorry about that.  Okay.

15     A.   That's fine.  But I went through a review

16 of the literature looking at data and pretty --

17 pretty compelling epidemiological studies related to

18 the actual use of glyphosate-based herbicides and

19 particularly exposed populations.  These were five

20 case-controlled studies and one meta-analysis.

21          But I -- I evaluated the papers in terms

22 of the precision of what was occurring from 2001 to

23 2019 and how they somewhat built on each other

24 and -- and looked at how the studies were put

25 together, the case -- case controls.

1            I was particularly interested in farm

2    worker exposure, particularly, if you were being

3    exposed with mixing and/or application.  And -- and

4    these all fell into that category.  And I looked at

5    the scientific platform in which they identified

6    hypotheses tests.  They looked at confounding

7    variables.  I evaluated their scientific results.

8    And I also evaluated how compelling some of these

9    data were.

10            Although these are just six studies, they

11   do represent a body of work that I thought was

12   highly -- highly -- it gave high perspective on

13   maybe the role of agricultural chemicals and

14   disease.  And as one proceeded through 2001 to 2019,

15   and particularly you considered higher levels of

16   exposure, say, to glyphosate-based herbicides as

17   well as others, as one teased out those statistical

18   analyses, the results became stronger as to the

19   outcome.

20            I also looked at the -- the author's

21   identifying limitations for the interpretation of

22   the data and how they evaluated both the -- the

23   strong points and some of the weaker points with the

24   data analysis.  So I thought these six reports met

25   those criteria and I thought were relevant in the

1    case of us considering biological plausibility of

2    glyphosate-based herbicides in the role of

3    Non-Hodgkin's lymphoma.

4        Q.   Okay.  I think -- I actually think, though,

5    that was an answer that provided me a lot of

6    information.  I actually don't think it answered my

7    question.

8            So I just want to get back to the

9    question, which is, how did you go about selecting

10   those six epidemiology studies in particular as

11   opposed to the rest of the epidemiology studies that

12   are out there?  Were they sent to you?  Did you find

13   them on PubMed?  How did you find them?

14       A.   I did work on PubMed.  I did work in the

15   literature.  I do a lot of my work on my computer.

16   I just don't -- I don't write a lot of notes down.

17   I do it in my head.  I do it on the computer.  I

18   came -- came up with these studies and the

19   perspective that they met the criteria I was looking

20   for in terms of experimental design, quality.  They

21   were cited in a number of places.  Some of the

22   places, like I mentioned, PubMed was useful.

23           So it's just hard for me to say -- you

24   know, did I get it all from PubMed?  No.  I was

25   looking at citations, what studies were being cited.

1    For instance, the Zhang study, you know, built on
2    the Andreotti study, and so on.
3            So, again, it was just a process of review
4    and consideration of the quality of these papers.
5    And I think these were very high quality papers.
6        Q.   Okay.  So these studies are studies you
7    personally found, then?  They weren't sent to you?
8        A.   Yeah, I found them.
9        Q.   Okay.  Great.
10           Did you interview Ms. Spector?
11       A.   I feel like I know her.  The answer is, no,
12   but I feel like I know her.  And I studied her
13   medical records and all, but I did -- I read her
14   deposition, and -- and I feel like I do know her,
15   but I have not interviewed her.
16       Q.   Did you inspect the Meadowbrook property
17   where she applied Roundup?
18       A.   I reviewed the videos provided to me
19   multiple times.  And it's a very impressive
20   vegetation rich and diverse property, and she took a
21   lot of pride -- pride in it because she hated weeds.
22   And that -- I really got that.  She didn't like
23   weeds.  And so -- but it's a very impressive
24   property.  I didn't step foot on the property
25   because I didn't think I needed to.  The videos I

Ronald J. Kendall, Ph.D.

1    was provided was -- were very graphic and very well

2    done.

3        Q.   Okay.  So let me -- let me ask you about

4    that.  I'm looking at your materials reviewed and

5    your references reviewed and considered.  I don't

6    see videos on there.  What videos were provided to

7    you?

8        A.   A video of her property.

9        Q.   Okay.  A video of her property of somebody

10   walking around taking a video of her property?

11       A.   Yes.

12       Q.   When was that provided to you?

13       A.   It was provided when I received the medical

14   records from plaintiff's counsel, and there was a

15   video in there.  We had had a conversation, he said

16   he had a video, and I said I would like to have

17   that.

18       Q.   Okay.  And I don't want to know about your

19   conversations with plaintiff's counsel.  I'm not

20   allowed to know about those things.

21            MR. KALAS:  But I'll just note for the

22   record, again, we would like a copy of that video to

23   the extent it hasn't been provided.

24            MR. BRECHER:  I believe it has been

25   provided, but I will check with my office.  And if

Ronald J. Kendall, Ph.D.

```
 1   it hasn't, we will provide that.
 2               MR. KALAS:  Okay.
 3   BY MR. KALAS:
 4       Q.   Did you inspect the equipment Ms. Spector
 5   used to apply Roundup?
 6       A.   No, but I'm real aware of what she used.
 7   Mainly a hand sprayer, as I've used them in the
 8   past, and I'm very aware of it.  So I knew exactly
 9   what she -- I knew exactly the kind.  She mainly
10   used a hand sprayer.  Sometimes her husband would
11   mix up larger amounts in a canister sprayer and
12   maybe refill a bottle for her.  But, generally, she
13   used a hand sprayer, and it was purchased by her
14   husband, Chuck Spector, at a local, say, Target
15   department store.
16       Q.   Right.  So let's be clear there about
17   exactly what she used.  She used something that
18   looked like a Windex bottle, right, or a Fantastic
19   bottle?
20       A.   Yeah, that's close enough.
21       Q.   Okay.  And usually it would be premixed,
22   but sometimes her husband would mix up concentrated
23   Roundup in a larger sprayer and pour it into the
24   Windex sprayer for her, right?
25       A.   Yes.
```

1     Q.   Okay.  Ms. Spector did not mix or load

2  Roundup, true?

3     A.   No, I don't think she did.

4     Q.   Okay.  Did you inspect the PPE that

5  Ms. Spector wore?

6     A.   No.

7     Q.   Okay.

8     A.   I read in her deposition -- I read in her

9  deposition what her PPE was.

10     Q.   Okay.  Are you offering an expert opinion

11  that a change in the warnings on the Roundup label

12  either as to the potential carcinogenicity of

13  Roundup and/or the PPE to be worn when applying

14  Roundup would have changed Ms. Spector's use of

15  Roundup?

16     A.   Are you -- ask that -- ask that question

17  again, please.

18     Q.   I'm just asking if you're offering an

19  expert opinion -- I'll break up the question so it's

20  not compound.

21     A.   Okay.

22     Q.   Are you offering an expert opinion that a

23  warning as to the potential carcinogenicity of

24  Roundup would have changed anything about

25  Ms. Spector's use of Roundup?

Ronald J. Kendall, Ph.D.

1      A.   Yes.

2      Q.   Okay.  What are you basing your expert

3  opinion on that you know she would have changed her

4  behavior?

5      A.   Well, she thought the product was safe.

6  Extremely safe.  And I did, too, when I first

7  started using it for many years.  I can remember

8  literally using it thinking, you know, this product

9  is probably one of the safest products we have ever

10  had to utilize as far as an herbicide.  I think -- I

11  think she would have been aware if stronger

12  language, more -- more bolder presented would have

13  been present.

14      Q.   Okay.

15      A.   I think she would have been more careful.

16      Q.   Are you an expert on Ms. Spector's state of

17  mind?

18      A.   No.

19      Q.   Okay.  Are you a psychologist?

20      A.   No.

21      Q.   Okay.  Have you -- you've never spoken to

22  her, yet you know what she would have done; is that

23  fair?

24      A.   Based on her deposition.

25      Q.   Okay.  Okay.  So you're basing your expert

Ronald J. Kendall, Ph.D.

1   opinion based on what she testified to at

2   deposition?

3       A.   Well, she was under oath.  I'm assuming --

4   assuming she was telling the truth.

5       Q.   Okay.  What training do you have in

6   determining whether people would act on a warning as

7   to carcinogenicity, generally?

8       A.   We didn't agree what the language was that

9   I may necessarily recommend.  The only thing I said

10  was that I think if there were bolder language of

11  potential danger in this product, be absolutely sure

12  that you have appropriate PPE, I think somebody like

13  her -- she was an educated, very responsible lady.

14  She raised a family, took care of the home,

15  participated in a business.  I don't know, seemed

16  like a good citizen to me.  And she didn't want a

17  problem with this.  She just didn't like weeds.

18      Q.   Do you have a special talent or a special

19  training for interpreting what people are thinking?

20              MR. BRECHER:  Well, I'm just going to

21  object to the form.  I think that's really an

22  inappropriate question as phrased.  You're going to

23  have to rephrase it.

24              MR. KALAS:  I'm not going to rephrase

25  it because it's a ridiculous expert opinion, Marc.

1           MR. BRECHER:  That's your opinion.  I

2    don't -- I don't -- I don't see it that way.  I

3    mean, I think the question -- the question is an

4    improper question.

5    BY MR. KALAS:

6        Q.   I'll ask it again.  Do you have a special

7    talent or special training at interpreting what

8    people are thinking?

9           MR. BRECHER:  Again, I'm just going to

10   object to the form of the question.

11          You can answer.

12       A.   Okay.  I read her deposition.  I have -- I

13   have an opportunity to express a professional

14   opinion as to what I thought she was evaluating and

15   thinking about related to the problem, and she said

16   in her deposition that she thought it was safe.

17   That's all I'm saying.

18   BY MR. KALAS:

19       Q.   Okay.  In your expert opinion, when was

20   there sufficient evidence to conclude

21   glyphosate-based herbicides caused NHL?

22       A.   Say that one more time, please.

23       Q.   In your expert opinion -- in your expert

24   opinion, when was there sufficient evidence to

25   conclude glyphosate-based herbicides caused NHL?

Ronald J. Kendall, Ph.D.

```
 1      A.   You're asking when I had an epiphany to
 2  determine this?  Is that what you're asking me?
 3      Q.   No, sir.
 4      A.   At what point in time?
 5      Q.   No, sir, that's not what I'm asking you.
 6      A.   Okay.
 7      Q.   So what I'm asking you is, you have
 8  reviewed the data on glyphosate-based herbicides.
 9  When was there sufficient evidence in the
10  literature, either published or unpublished, based
11  on what you have reviewed to determine
12  glyphosate-based herbicides cause NHL?
13      A.   Based on some of the human studies I have
14  reported to you, some of the mechanistic studies
15  that you have alluded to and I have -- I have
16  referenced in my report, in addition to unique
17  experimental animal data resulting in unique
18  carcinoma, particularly in the -- the kidney tubals
19  of mice, unique cancer in addition to a tumor in the
20  circulatory system, when you amalgamate those data
21  into a weight-of-the-evidence, as I have to do on a
22  daily basis and I did for years at the Science
23  Advisory Panel at EPA, and as I concluded in my
24  report, there is reasonable scientific and
25  toxicological certainty that long-term chronic
```

Ronald J. Kendall, Ph.D.

1    exposure to glyphosate-based herbicides present a

2    significant contributing factor to the development

3    of non-Hodgkin lymphoma.  That's what I said.

4        Q.   Are you done with your answer?

5        A.   Yeah.  And I said that it was a

6    contributing factor.  That's what I said.

7                  MR. KALAS:  Okay.  Motion to strike as

8    nonresponsive.

9    BY MR. KALAS:

10       Q.   My question was different, sir.  My

11   question is not focused on what your ultimate

12   opinion is.  My question is when the data was

13   sufficient to reach that opinion.

14            Based on your review of the literature,

15   when was the data in the literature sufficient in

16   order to determine Roundup or glyphosate-based

17   herbicides cause NHL in people?  And please feel

18   free to refer to your report, your materials

19   considered list, whatever you need to, to answer

20   that question.

21       A.   In my opinion, I say in probably the area

22   of 2020 to '21, right in there, building on all the

23   reviews done, all the -- the data coming out, the

24   most recent epidemiological studies, approximately

25   2020.

Ronald J. Kendall, Ph.D.

1      Q.   Okay.  Have you spoken to any other experts

2   for plaintiffs in this case?  And if you need to

3   look at Exhibit 1, please take a look at it.  I

4   think they are Dr. Braunstein, Dr. Metersky,

5   Ms. Parisi, Mr. Staller.

6      A.   I read their reports.

7      Q.   You have read the reports of those four

8   experts?

9      A.   Just --

10      Q.   I want to -- I want to make sure you're

11   sure of that.

12      A.   Okay.  Just -- just a minute, please.

13      Q.   Sure.

14      A.   I read the expert report of Dr. Jameson.  I

15   read the expert report of Dr. Ritz.

16      Q.   Right.  That wasn't what I was asking

17   about, sir.

18      A.   Okay.

19      Q.   I'm going to Exhibit 1.

20      A.   Okay.  Let me go back to Exhibit 1.

21      Q.   Okay.

22      A.   Okay.  Okay.  Where are you?

23      Q.   So starting on page 3, and the first expert

24   listed for plaintiffs is a Mark Braunstein.  Do you

25   see that?

Ronald J. Kendall, Ph.D.

```
1         A.    Yes.

2         Q.    Okay.  Have you ever spoken to

3    Dr. Braunstein?

4         A.    I have not spoken to him.

5         Q.    Okay.  Have you reviewed Dr. Braunstein's

6    report in this case?

7         A.    Just one second.

8         Q.    Sure.

9         A.    No, I haven't.

10        Q.    Okay.  Same question applies -- if you go

11   here to the other experts.  The same question

12   applies to Dr. Metersky, M-e-t-e-r-s-k-y, have you

13   ever spoken to Dr. Metersky?

14        A.    No.

15        Q.    Okay.  And have you ever reviewed

16   Dr. Metersky's report in this case?

17        A.    No.

18        Q.    Ms. Parisi, have you spoken to Ms. Parisi?

19        A.    No.

20        Q.    Have you reviewed her report in this case?

21        A.    No.

22        Q.    Okay.  Have you spoken to Mr. Staller?

23        A.    No.

24        Q.    Have you reviewed his report in this case?

25        A.    No.
```

1      Q.   Okay.  Now, turning IARC, IARC classifies

2   what they believe to be carcinogenic hazards,

3   correct?

4      A.   Yes.

5      Q.   Okay.  And there's a difference between

6   hazard and risk, true?

7      A.   Yes.

8      Q.   Okay.  Hazard looks at whether a substance

9   might cause cancer at a hypothetical dose, whether

10  or not that dose is realistic, fair?

11     A.   Yeah, that's -- that's one way to look at

12  it.

13     Q.   Okay.  And risk looks at the chance a

14  substance might cause cancer in a hypothetical

15  individual given the dose, true?

16     A.   True.

17     Q.   Okay.  And meanwhile, causation is

18  concerned with whether a substance caused or

19  substantially contributed to the development of a

20  particular outcome in a particular person, right?

21     A.   That's -- yeah, that's fair.

22     Q.   Okay.  Would you agree with me that you

23  cannot have a risk without having a hazard?

24     A.   Yeah, it seems that's reasonable.

25     Q.   Okay.  But you would agree with me as well

Ronald J. Kendall, Ph.D.

1   that you can have a hazard without having a risk,

2   right?

3        A.   You could look at it that way.

4        Q.   Okay.

5        A.   There's a lot of ways to interpret these

6   data.

7        Q.   For instance, I live not too far from the

8   ocean.  A great white shark in the ocean is a

9   hazard, right?

10       A.   Yes.

11       Q.   But if I happen to be on a mountaintop in

12  Colorado, I'm not at much risk of getting bitten by

13  that great white shark, true?

14       A.   True.

15       Q.   Okay.  And do you agree with me that you

16  can have a risk without having causation?  Right?

17       A.   Possible.

18       Q.   Okay.  For instance, I could go into the

19  ocean and I would be at risk of getting bitten by

20  that great white shark, right?

21       A.   Right.

22       Q.   But if it doesn't bite me, it didn't cause

23  a bite injury, fair?

24       A.   Fair.

25       Q.   Okay.  At bottom, you would agree with me

Ronald J. Kendall, Ph.D.

1    causation requires a higher degree of evidence than

2    risk, right?

3        A.    Yeah.

4        Q.    And risk requires a higher degree of

5    evidence than hazard, right?

6        A.    I would say, yeah.

7        Q.    Okay.  It's entirely possible that a hazard

8    characterization could have no relevance in the real

9    world; is that true?

10       A.    I guess it's possible, yeah.

11       Q.    Okay.  And IARC conducts hazard evaluations

12   only, right?

13       A.    Yeah, but they do it very robustly and very

14   impressive.

15       Q.    And EPA and EFSA and the Australian

16   regulators and what have you are tasked with

17   conducting both hazard and risk evaluations, right?

18       A.    Right.

19       Q.    Now, glyphosate is considered to have a

20   small molecular weight, true?

21       A.    True.

22       Q.    Its molar mass is about 169 grams per mole?

23       A.    Right.

24       Q.    Okay.  And when it's formulated as an

25   isoprophylamine salt --

```
 1              MR. KALAS:  And, Christy, I will give

 2    you that spelling when we go off the record.

 3    BY MR. KALAS:

 4        Q.   But it's about 228 grams per mole, right?

 5        A.   That sounds good, yeah.  That -- yeah.

 6        Q.   Okay.  And IARC considers glyphosate to be

 7    a nonvolatile compound, right?

 8        A.   Yes.

 9        Q.   And regulatory agencies do as well, right?

10        A.   Right.

11        Q.   And what that means is that glyphosate

12    generally rests where it's applied, right?

13        A.   Yeah, assuming you don't inhale the spray.

14        Q.   Right.  And it doesn't easily become an

15    aerosol or vapor like other compounds, such as

16    dicamba?

17        A.   That's correct.  Unless you're using a

18    handheld application and you get a blow-back from

19    wind into your face.

20        Q.   Right.  But even then, it's not an

21    easily -- let me -- let me back up.

22             The inherent chemical properties of

23    glyphosate means that it doesn't easily become a

24    vapor.  Is that a fair statement?

25        A.   That's fair.
```

1     Q.   Okay.  And you agree with IARC and EPA, the

2  main route of occupational exposure or residential

3  exposure is dermal, right?

4     A.   I agree depending on how it's being used.

5  Because, number one, untrained people handling this,

6  they might say they don't spray it on a windy day

7  but they probably do, and they probably get it

8  back -- a backwash in their face.

9          Secondly, dermal, I would say is the

10 predominant, but if you're talking -- or if you've

11 got your mouth open and you get a blow back, you're

12 going to get it in your mouth.

13         And so I look -- I look at this very

14 critically because I -- I am very experienced with

15 this -- these kind of materials.  And still, again,

16 you've got to be real careful when applying these

17 products.

18    Q.   If you get blow back in your mouth, that

19 would be an oral ingestion, true?

20    A.   True.

21    Q.   And there are human ADME studies that

22 suggests that only 1 percent of orally ingested

23 glyphosate is absorbed, true?

24    A.   It's -- it's pretty low absorption.

25    Q.   Okay.  And let's talk for a second about

Ronald J. Kendall, Ph.D.

1    that since we're going into that question.

2            What is exposure?

3    A.    Exposure is when one comes into contact

4    with a substance, that that substance can either

5    contaminate you, enter your body, or exert toxic

6    effects.

7    Q.    Okay.  And is exposure different than

8    internal dose?

9    A.    Yes.

10   Q.    What is an internal dose?

11   A.    An internal dose is the transfer of a

12   substance internally into the organism of interest

13   such that that substance can exert toxic effects on

14   certain target receptors, such as the liver, the

15   lung, or the blood.

16   Q.    Okay.  And so in order for a compound to

17   cause cancer, for instance, you need an internal

18   dose of that compound, not just an exposure, fair?

19   A.    Fair.

20   Q.    Okay.  Now, turning back to the dermal

21   point for a moment.  Have you ever heard of

22   something called the stratum corneum?

23   A.    Yes.

24   Q.    What is the stratum corneum?

25   A.    It's a component of your skin.  It's the --

1    it's the stratum of your skin below the epidermis.

2         Q.   Okay.  And is that a lipid rich protective

3    area of the skin?

4         A.   Yes.

5         Q.   Okay.  Do you agree that hydrophilic

6    compounds are repelled by the stratum corneum?

7         A.   To -- to a large degree, but not totally.

8         Q.   Right.  And glyphosate is a hydrophilic

9    compound, right?

10        A.   Yes.

11        Q.   Okay.  Do you agree that dermally

12   absorbed -- well, strike that.  It doesn't need to

13   be dermal.

14             Do you agree that absorbed glyphosate is

15   mainly excreted via the urine?

16        A.   That's what the data says.  However,

17   there's data that it's in your blood too.

18        Q.   Well, right, it's in your blood.  So -- go

19   ahead.  Go ahead and finish your answer.  I

20   understand what you're saying.  Go ahead.

21        A.   So here's my point.  Exposure does occur.

22   We have data.  Excretion is predominantly the urine,

23   90 plus percent.  But it can get in your blood.  And

24   particularly with applicators or people mixing this,

25   it can be fairly significant levels in the blood.

Ronald J. Kendall, Ph.D.

1          So, again, it's not like -- it's not like

2    no exposure occurs or no internal dose occurs

3    because it does.  There is exposure, and there is

4    some internal dose.  And I will agree, excretion is

5    predominantly through the urine, but it can get into

6    through your blood, which means it can go to other

7    target organs.

8      Q.    Right.  I think -- I think we're going to

9    agree on all of this, then.  So glyphosate's main

10   route of absorption is -- is dermal, though, there

11   may be other minor routes such as ingestion or

12   inhalation, fair?

13     A.    Yes.

14     Q.    Okay.  Glyphosate is poorly metabolized in

15   the body.  Agree with that?

16     A.    Yes.

17     Q.    Okay.  Glyphosate -- absorbed glyphosate is

18   distributed throughout the body via the bloodstream.

19   Do you agree with that?

20     A.    It can be.

21     Q.    Okay.  And the half life of absorbed

22   glyphosate is approximately six hours in humans.  Do

23   you agree with that?

24     A.    It depends on the individual.  And I just

25   want to -- I want to expand on that.  It depends on

Ronald J. Kendall, Ph.D.

1    the individual.

2        Q.   Sure.

3        A.   And, you know, I'm a toxicologist.  I teach

4    this every day.  And when we look at biology, all of

5    us are very different.  And what I mean by that, if

6    you take a Y axis and an X axis, we may have zero

7    exposure and no effects of a chemical here.  But as

8    exposure goes up on the Y axis, we may start to see

9    increased effects of increased internal dose.

10           And there's a lot of variability

11   oftentimes as we look at that curve because as we

12   increase dose, certain people may be more highly

13   exposed, they might have more absorption than

14   others, and others may respond differently.

15           And I -- I take the point of alcohol

16   consumption.  Some people can drink one beer and

17   literally lay down and go to sleep.  Some people can

18   drink beer all day and not go to sleep.  Some people

19   can drink liquor all day and not go to sleep.

20           But biological variability and how we

21   absorb as well as metabolize and excrete alcohol is

22   incredibly variable in our society, okay, because of

23   biological variability of human beings from one to

24   another to another.

25           And so the point I want to make is,

Ronald J. Kendall, Ph.D.

1    generally, the half life may be around six to eight

2    hours in the average body.  But that doesn't count

3    the fact that some people may retain it longer, they

4    may absorb more, and they may be more sensitive to

5    biologically respond because of the -- of the cell

6    and physiological development within their own

7    bodies.

8              So I just want to make sure I'm real clear

9    on the record.  I'm trying to work with you and

10   answer your questions, but, again, toxicology is a

11   highly variable science because of the biological

12   variability of us as human beings.  And that goes

13   all the way from smoking to alcohol ingestion, to

14   illicit drugs, to even the standard pharmaceuticals

15   that we take to reduce pain or whatever.

16             So, again, I'm trying to answer your

17   questions, but I want to make sure that on the

18   record it states that these are in general -- in

19   general six hours is an approximation of maybe an

20   average half life.  But it's not the total,

21   100 percent, concrete answer.

22        Q.   Sure.  And I appreciate that.

23        A.   And thank you.

24        Q.   Yeah, I appreciate that answer.  What

25   you're getting at is biologic variation, right?

Ronald J. Kendall, Ph.D.

1      A.   Yes.  Yes, I am.

2      Q.   Okay.  You would agree with me that the

3   geometric mean for the half life of absorbed

4   glyphosate is approximately six hours in humans?

5      A.   That's an approximate geometric mean.

6      Q.   Okay.  And you would agree with me that

7   after -- well, strike that.

8           Now, Dr. Kendall, have you heard of the

9   term "replication" as it's used in science?

10     A.   Absolutely.

11     Q.   Okay.  And could we agree, "replication"

12   means that if one scientific investigator makes a

13   set of observations, another investigator can make a

14   similar set of observations when faced with similar

15   experimental conditions?

16     A.   It -- what do you want me to answer there?

17   I mean. . .

18     Q.   I just want to -- I just want to understand

19   if you agree with that definition of "replication."

20   So I'll say it again just so we can agree.

21     A.   Please.

22     Q.   Would you agree, "replication" could be

23   defined as having one scientific investigator who

24   makes a set of observations and then another

25   investigator can make a similar set of observations

Ronald J. Kendall, Ph.D.

1    when faced with similar experimental conditions?

2        A.   Yeah, that would be an example of

3    replication.

4        Q.   Okay.  And replication should be very easy

5    to demonstrate in a simple experiment.  For

6    instance, if I poured vinegar on pennies, which are

7    copper, it will pretty much always turn green,

8    right?

9        A.   Yeah.

10       Q.   Okay.  But then if you get to more complex

11   studies, it can be a little harder to replicate

12   findings; is that fair?

13       A.   Yes.

14       Q.   Okay.  And that's because in those types of

15   studies you try to control for confounders, and the

16   more complex the study gets, the more confounding

17   you may have?

18       A.   Yes.

19       Q.   Okay.  And even though good scientists try

20   to control for these confounders, you can't control

21   for everything, and there will be latent confounding

22   in any complex scientific study, true?

23       A.   Please state that again.

24       Q.   Okay.  Even though good scientists try to

25   control for confounders, they know that in complex

Ronald J. Kendall, Ph.D.

1   studies you can't control for everything and there

2   will be latent confounding?

3       A.   There could be.  That's not guaranteed.

4   There could be.

5       Q.   Okay.

6       A.   Yeah, the more complex the study, the more

7   potential a confounding factor can influence the

8   study.

9       Q.   But even in these complex systems, the

10  reason we have the guidelines we talked about

11  before, the OECD guidelines, the OPPTS guidelines is

12  to try to control for these cofounders so we can see

13  replicated findings if we have a true effect from

14  the compound, fair?

15      A.   Yes.  At least for the more simpler

16  endpoints.  But as the studies progressively become

17  more focused on what scientific needs are, they may

18  evolve past just the guidelines studies.  We

19  did that -- we did that, both as a scientist, me

20  personally, working with industry in developing

21  products or registration of EPA or at the Science

22  Advisory Panel and evaluating scientific data.

23          So the guidelines cover the opportunity to

24  provide as much replication and validation as

25  possible, but there were -- there were many times

Ronald J. Kendall, Ph.D.

1    when we exceeded the guidelines with studies that

2    needed to be designed to answer certain questions.

3    So the guidelines don't govern every -- literally

4    everything that's ever turned in.

5        Q.    Fair.

6        A.    Okay.

7        Q.    As a scientist, and especially as a

8    toxicologist, is seeing replicated results important

9    to you?

10       A.    Yes.

11       Q.    Why?

12       A.    Because it gives more value to the --

13   the -- the repeatability of the data.  In other

14   words, it strengthens the weight-of-the-evidence.

15       Q.    And anomalous results can occur in a single

16   experiment, but if you see those results happen

17   again and, again in multiple experiments, you're

18   more confident you're seeing a real effect, fair?

19       A.    Fair.

20       Q.    Okay.  And if results are not replicated,

21   on the other hand, those results need to be

22   downgraded in your weight-of-the-evidence

23   evaluation, fair?

24       A.    Yeah, but it -- it depends on how

25   compelling the science is because they may be into a

1    discovery mode that may be so unique, nobody else

2    has been able to replicate it yet if they're on the

3    cutting edge.  So it's -- that comes down to

4    professional evaluation, and that comes down to

5    cutting edge scientific papers that I will push

6    forward that may not have been replicated because

7    they are on the cutting edge.

8        Q.    Well -- right.

9        A.    So it just -- it depends on the situation.

10        Q.    And there was an assumption imbedded in

11    that question that -- that I don't think was

12    enunciated.  So let's -- let's make it clear.

13        A.    Okay.

14        Q.    For studies where there are multiple

15    studies in the literature under the same test design

16    with the same endpoint, if one of those studies show

17    a result that's not replicated in the other studies,

18    then that single positive or negative study should

19    be downgraded in the weight of evidence evaluation;

20    is that fair?

21        A.    It's -- it's possible.  Depending on the

22    quality of the design.  And I've seen -- I've seen

23    studies where we've seen these kinds of outcomes,

24    and the other studies, although appear replicated,

25    they were not really getting to the essence of the

1  science that needed to be done and was being proven.

2  So it varies.  It varies depending on the situation.

3          Generally speaking, I would say that a

4  study comes up with a result inconsistent with other

5  studies with similar experimental design, I would be

6  more suspect as to that outcome because it is

7  different than what has been repeated by others, but

8  I don't just completely discount it until I look at

9  it thoroughly because it could be providing cutting

10  edge science that nobody else has discovered.

11  That's all I'm trying to say.

12      Q.   That's fair.

13      A.   Okay.

14      Q.   Now, for your work on EPA SAPs, you

15  evaluated compounds that you had judged to be

16  carcinogenic or probably carcinogenic, right?

17      A.   Yes.

18      Q.   Okay.  And when those carcinogens were

19  evaluated in rodent bioassays, was their

20  carcinogenic effects site specific?  In other words,

21  did it act on the same organ across bioassays?

22      A.   That's a real broad question.

23      Q.   Okay.  So --

24      A.   There --

25      Q.   So answer it the best you can, and I'll try

Ronald J. Kendall, Ph.D.

1    to narrow it.

2        A.    Please ask it again.

3        Q.    Okay.  When you were dealing with a

4    compound -- and let's talk about a specific

5    compound.  Can you recall a compound that you had

6    judged to be carcinogenic or probably carcinogenic

7    while working on an SAP?

8        A.    We -- we handle hundreds.  I mean, it's --

9    hundreds.  Just -- just give me the general -- just

10   try to ask your question again, and I'll try to

11   answer.

12       Q.    Sure.  When you're dealing with a compound

13   that is carcinogenic as a toxicologist --

14       A.    Okay.  Okay.

15       Q.    -- and you're looking at bioassay data on

16   that compound, is the site where it causes an effect

17   replicated across bioassays?  In other words, does

18   the compound through its pharmacokinetics act on the

19   same site from study to study?

20       A.    A lot of times, yes.  Sometimes no.  For

21   instance, rat outcomes, like Sprague Dawley rat

22   studies or Wistar rats can be different or mice

23   studies.  So sometimes it varies as to where tumors

24   form and the pathology in tissue.  So it's not

25   100 percent -- generally, it's not 100 percent the

Ronald J. Kendall, Ph.D.

1    same in every experimental animal.

2        Q.    Okay.

3        A.    That's why they use rat studies and mice

4    studies and sometimes beagle dog studies in the

5    past, monkeys, rhesus monkeys.  So -- because those

6    outcomes were varied at times.

7        Q.    You know, that's a great point, and it's

8    actually forcing me to ask a better question.  So I

9    appreciate that.

10       A.    Okay.  Okay.

11       Q.    Within species and strain, is the site of

12   effect consistent across studies?  So if you had

13   four or five bioassays in a Sprague Dawley rat and

14   you were dealing with a carcinogen, would it always

15   act on the same organ, or would it act on different

16   organs across studies within the Sprague Dawley rat?

17       A.    Generally, I would say it would be mostly

18   on the same organ, but it could be different,

19   depending on the stress level that could occur, the

20   sex of the animal, the nutrition you were giving it,

21   the housing conditions.  So all of -- all of those

22   things -- stress plays a big role in how an animal

23   responds to a toxic chemical.

24            And so, again, it -- if you can

25   standardize it 100 percent with the same food, same

Ronald J. Kendall, Ph.D.

1    like conditions, same housing arrangement, same

2    care, same strain, et cetera, generally speaking, I

3    would say the outcome should be relatively

4    consistent with the same chemical test looking at a

5    target organ tumor.

6            However, as I mentioned to you, it's

7    really hard to do that.  And, again, we're

8    dealing -- even when we try to match these

9    strains -- that's why they created certain strains

10   of genetically managed test organisms like rats and

11   mice and so on.  We still get variability even

12   there.  And it's -- that's why good science is

13   complex, and it's hard to predict.

14           That's why we haven't solved all the

15   cancers.  That's why we haven't solved Parkinson's.

16   That's why we haven't solved a lot of these newer

17   degenerative diseases.  We -- just -- because if the

18   outcome was 100 percent consistent with every test

19   we would do, we -- I think we could get these

20   answers faster.  But this is what challenges us so

21   bad.

22           And having designed and implemented so

23   many animal experiments, it's -- sometimes it's --

24   it really is challenging to get exactly the same

25   outcome every time so we have 100 percent certainty

Ronald J. Kendall, Ph.D.

1    on our prediction or our hypothesis that a tumor

2    would occur in the liver with that dose with that

3    duration and so on.

4              MR. KALAS:  You know, now is probably

5    a good time to take a break because I'm switching to

6    another topic.  I don't normally eat lunch, but I

7    don't know if other folks want to eat their lunch.

8    If they do, that's fine.  We can take, like, half an

9    hour or something.  Otherwise, just given the delays

10   we have had, otherwise, I'm fine to start quicker.

11   But I defer to others.

12             THE VIDEOGRAPHER:  We can go off the

13   real quick.

14             The time is 12:03 p.m., and we are off the

15   record.

16             (Break taken, 12:03 p.m. to 12:32 p.m.)

17             THE VIDEOGRAPHER:  The time is 12:32

18   p.m., and we are on the record.

19   BY MR. KALAS:

20       Q.   Dr. Kendall, I just want to follow up on a

21   couple of things we talked about before break.  One

22   of the things that we were talking about is

23   materials you've looked at.  Have you reviewed at

24   all the expert reports of Monsanto's experts in this

25   case?

1      A.    I have.

2      Q.    Okay.  Whose reports have you reviewed?

3      A.    The report of Robert Phalen, the report of

4   Joshua Schaefer, the report of Carol Mallory Smith,

5   and the report of Earl Creech, the report of Kassim

6   Al-Khatib, and the report of John Murphy.

7      Q.    Okay.  And I'll ask you about the experts

8   designated in the Thomas case and the Savory case

9   when we get to those depositions.  But focusing on

10   the experts who had opinions in the Spector matter,

11   do you have any opinions on their reports based on

12   your review of their reports that you intend to

13   offer at trial?

14          MR. BRECHER:  Well, I think due to the

15   proximity of just getting these reports, I mean, I

16   think that the doctor can try to answer this as best

17   he can now.  But if -- we certainly reserve the

18   right that at -- that on further reflection or

19   review of your expert deposition transcripts, if he

20   wants to supplement these answers with an additional

21   report, we reserve that right.

22          MR. KALAS:  Well, you can reserve that

23   right.

24   BY MR. KALAS:

25      Q.    Do you see when those reports in the

1   Spector case are dated, Doctor?

2       A.   They're pretty recent.  I'm trying to get

3   to the signature page because they don't have a date

4   on the cover.

5              MR. BRECHER:  I believe they were

6   received mid August.

7   BY MR. KALAS:

8       Q.   August --

9       A.   Yeah, they --

10  BY MR. KALAS:

11      Q.   August -- August 6th, right?  August 6th?

12             MR. BRECHER:  That's maybe when they

13  were dated.  It's not necessarily when they were

14  received in our office.  I'll have to check with --

15             MR. KALAS:  Well, Mr. Brecher or

16  Brecher -- I don't want to mispronounce your name on

17  the record.

18             MR. BRECHER:  Brecher.

19             MR. KALAS:  Mr. Brecher, they were

20  served on August 6th on plaintiff's counsel, both

21  the PSC and specifically Mr. Silverstein.  I know

22  because I participated in that.

23             MR. BRECHER:  Okay.  That's still less

24  than 30 days.  So I --

25             MR. KALAS:  Okay.

```
1                    MR. BRECHER:  As I said, we're still

2      going to reserve the right.  He can verbally talk

3      about this to the extent that he can.  He can

4      reserve the right to comment later.  But you've

5      got to -- need an expert to have more time to

6      reflect.  And, also, I think we should have the

7      opportunity to review your expert's deposition

8      testimony, see if there's anything that -- that we

9      need to respond to.

10                    MR. KALAS:  Well, I'm not going to use

11     any more of my time, you know, in a dispute over,

12     you know, who gets to say what when.

13     BY MR. KALAS:

14         Q.   But let me ask you this, Doctor:  When did

15     you receive these reports from plaintiff's counsel?

16         A.   A couple -- generally, I think, a couple

17     weeks ago.

18         Q.   A couple of weeks ago?

19         A.   It was two or three weeks ago.  I don't

20     recall exactly.  It's been a couple weeks ago, two

21     or three weeks.

22         Q.   Okay.  And have you read them?

23         A.   I did.

24         Q.   Do you have any opinions you intend to

25     offer at trial regarding these?
```

1        A.    Well, regarding the report of Dr. Kassim

2    Al-Khatib, he presented a lot of information related

3    to the use of glyphosate in agriculture, and, you

4    know, it seems reasonable to me.  Herbicides are

5    useful and have helped us produce more food and --

6    and control weeds in the case of herbicides.  So --

7    so as far as I'm concerned, I couldn't disagree with

8    what he said.  It seemed reasonable.

9             The report by John Murphy went into a lot

10    of detail trying to give some perspective on

11    exposure, and a lot of analyses were done in the

12    case of Ms. Spector where upon she was asked to

13    circle areas that she thought she sprayed and, you

14    know, the time spent spraying and so on.

15             As I mentioned earlier in my testimony,

16    she had a very large -- about a 1.25 acre lot with a

17    complex vegetation assembly on there.  And -- and

18    what she liked to do, what she did a lot of is -- is

19    kill weeds when she had the time to do it.

20             So Murphy went through -- Dr. Murphy went

21    through some theoretical analyses as to what her

22    exposure may be.  And -- and my point is, she was

23    exposed.  She was handling the product.  And -- and

24    so as far as disagreeing with him, I don't disagree

25    with him except he can argue there wasn't a lot of

Ronald J. Kendall, Ph.D.

```
 1    exposure, and I can argue you don't have to have a
 2    lot of exposure with carcinogens.  So -- so probably
 3    we can -- we will disagree on that point.  But on
 4    the other side, I saw nothing else that I cared to
 5    comment on at this point.
 6           And I appreciate the fact that I've
 7    recently gotten these in the midst of everything
 8    else going on.  I've read them one time.  And I will
 9    reflect on them more thoroughly as -- as I move
10    forward with all of this.  But, again, I don't
11    disagree that herbicides can be useful.  They just
12    don't need to harm you.
13           And, secondly, if you're handling these
14    materials, particularly if you're inexperienced,
15    it's hard not to get sun exposure, and we're not
16    sure what level of exposure is required to have
17    certain effects.
18           And that's been the point of this -- a lot
19    of the discussion we have had today.  With some of
20    these materials and products, you may not need as
21    much exposure if you're the right biology to respond
22    in terms of what -- what you are as a human being
23    and your physiology and biology.  You may respond
24    more robustly to some of these materials, such as
25    glyphosate, than -- than others.
```

1          So, again, that's -- that's how I look at

2     these reports.  And I will reflect on them further.

3     But here are -- here are the two reports.

4          Q.   Fair enough.  Fair enough, sir.

5          A.   Yes, sir.

6          Q.   Turning -- turning back to just a couple of

7     things you said there.  It's your recollection you

8     received those reports two to three weeks ago,

9     something like that?

10         A.   I don't -- approximately.

11         Q.   Okay.

12         A.   What's -- what's the date?

13         Q.   Today's the 26th.

14         A.   The 26th.  So I would say probably -- let's

15    say three weeks.

16         Q.   Okay.  And --

17         A.   Or so.

18         Q.   -- in those three weeks, you have not moved

19    to supplement your materials considered list to

20    reflect that you've reviewed those reports, correct?

21         A.   No.

22         Q.   Okay.  And you talked about the fact that

23    with Dr. Murphy's report, you -- I think you would

24    you agree with Dr. Murphy, that Ms. Spector was

25    exposed to Roundup, right?  She was exposed?

1    A.   Right.

2    Q.   And the question that you may disagree on

3  based on your reading of his report, is whether the

4  levels of exposure that she had may have led to a

5  health risk, right?

6    A.   Right.

7    Q.   Okay.  And you said that even if it was low

8  exposure, certain people may have the type of

9  biology that would be susceptible to that low

10  exposure, right?

11    A.   That's what I've seen in 41 years of doing

12  this.

13    Q.   What about --

14    A.   Yes.  The answer is yes.

15    Q.   Okay.  What opinion are you going to offer

16  to a reasonable degree of scientific certainty -- or

17  do you have an opinion to a reasonable degree of

18  scientific certainty that Ms. Spector is one of the

19  these highly susceptible people to Roundup exposure?

20    A.   The only thing I can say, based on her

21  medical records, this is a relatively healthy person

22  up until years leading up to this diagnosis in 2007.

23  So it was a fairly rapid decline in health.  So,

24  again, as -- as to trying to answer your question,

25  do I think Ms. Spector is highly susceptible

Ronald J. Kendall, Ph.D.

```
 1   biologically to respond to Roundup?  I don't know if
 2   she is or if she isn't.
 3           The question is, she developed
 4   Non-Hodgkin's lymphoma.  That's a fact.  And from
 5   there, I considered all the compounding factors.  I
 6   had data to look at.  And I considered her history
 7   of employment.  She worked mainly in the home.  And
 8   the only chemical she ever handled was Roundup,
 9   according to her deposition, and she used it
10   routinely and over many years.  That's -- that's one
11   of the things that I determined from her deposition.
12           So looking at all of that, you know, I
13   have the right to have a professional scientific
14   opinion with -- with reasonable certainty that there
15   was a relationship association.  I mean, she wasn't
16   handling really anything else except maybe in the
17   kitchen frying up chicken or something.
18           So this was a housewife that ultimately
19   worked from the home with this company JetSpring.
20   You know, her -- her ultimate exposure to other
21   chemicals, in my opinion, was relatively minor to
22   none.  So that's some of my prospectus on her and
23   where she is in life.
24           And she's not too healthy right now.  The
25   last -- since 2007 she's been through an
```

1    unbelievable medical experience in trying to help

2    her to not only live a better life but -- but to

3    address and try to resolve, at least put in

4    remission Non-Hodgkin's lymphoma.

5         Q.   Thank you.

6              Would you agree with me, correlation does

7    not equal causation?

8         A.   Correlation integrated with scientific

9    studies provides a weight-of-the-evidence approach

10   that strengthens the ability to interpret maybe not

11   from a causation -- 100 percent causation level, but

12   to a more highly predictable level of relating

13   exposure to some outcome because of all the

14   background, the data that we've accumulated now.  As

15   I mentioned, up until just recently, data is still

16   coming in.

17             So my point is, correlation does not equal

18   causation, but there's a lot of in between

19   scientific weight-of-the-evidence evaluation.

20        Q.   Okay.  I understand that you need -- I

21   think we're in agreement, then.  You would agree

22   something more is needed more than just correlation

23   to prove causation?

24        A.   Yes.

25        Q.   Okay.  There are people -- well, let me ask

1    a really basic question.  NHL, Non-Hodgkin's

2    lymphoma existed before Roundup was introduced to

3    the market, true?

4        A.    True.

5        Q.    There are people who've never used Roundup

6    a day in their life who get Non-Hodgkin's lymphoma,

7    true?

8        A.    True.

9        Q.    There are people who've used Roundup in

10   their life, like yourself, who don't get

11   Non-Hodgkin's lymphoma, true?

12       A.    That is true.  That -- this goes back to

13   the whole biological variability of the alcohol

14   situation.  I told you.  And that -- so, again,

15   that's what makes the science and interpretation of

16   science so difficult.  One person can drink one beer

17   and pass out.  Somebody else can drink 30 in a day

18   and not even act like they're intoxicated.  That is

19   the biological variability we're talking about, just

20   with the example, but it exists with all chemical

21   exposures.  I have seen it for a lifetime of

22   experience in toxicology.

23       Q.    Okay.  And, in fact, there are about 60

24   separate diseases that make up Non-Hodgkin's

25   lymphoma, true?

1        A.    Yeah.

2        Q.    Each of those diseases have separate

3    genetic translocations associated with the diseases,

4    right?

5        A.    When you get down to the -- to the DNA

6    level, yeah, that's pretty close.

7        Q.    Okay.  Each of those diseases have their

8    own pathological fingerprint when you look at them

9    under a microscope, right?

10       A.    Yeah, you can fingerprint them

11   pathologically under a microscope.

12       Q.    Okay.  And each of those diseases have

13   their own separate etiological risk factors, true?

14       A.    We don't know how to tease those apart yet.

15       Q.    Okay.

16       A.    Some we have a better idea than others, but

17   that is not clear -- clearly defined yet.  That's

18   why this is such an elusive disease to manage and to

19   predict.

20       Q.    Well, for instance, HIV is associated with

21   certain types of Non-Hodgkin's lymphoma, right?

22       A.    Uh-huh, yes.

23       Q.    But not others, right?

24       A.    It can be, yeah.

25       Q.    Okay.  And do you know what some types of

Ronald J. Kendall, Ph.D.

1   NHL are associated with glyphosate-based herbicide

2   exposures?

3       A.   Large -- large B-cell differentiated

4   lymphomas.  Some of the -- that's -- that's one of

5   the big ones.  I think soft tissue sarcomas.  One

6   second.  Small lymphocyte, lymphocytic lymphomas.

7   Chronic lymphocytic leukemia.  So there are a number

8   of subtypes --

9       Q.   Can you just -- I'm sorry, go ahead.

10      A.   -- that can be classified.  You have to do

11   it under the microscope.

12      Q.   Can you just let the record reflect what

13   you've been looking at there?  I know you grabbed

14   some papers.

15      A.   Yeah, just -- just the papers I've -- I've

16   been referring to.

17      Q.   Can you -- which names of the papers were

18   you looking at there, please?

19      A.   Susan Slager, et al., Medical History,

20   Lifestyle, Family History and Occupational Risk

21   Factors for Chronic Lymphocytic Leukemia/Small

22   Lymphocytic Lymphoma:  The Inter Non-Hodgkin's

23   Lymphoma Subtypes Project.

24      Q.   Okay.  Anything -- anything else you were

25   looking at there, or is that that one --

```
1        A.    No, that's the one.

2        Q.    Okay.  Is the paper you just pulled out of

3   your files and referred to there on your materials

4   considered list or reviewed list?

5        A.    No.  No, I just -- I found this just

6   recently.

7        Q.    Did you move to supplement your materials

8   considered or reviewed --

9        A.    No yet.  I just --

10       Q.    -- list when you found that?

11       A.    I just found it --

12       Q.    Okay.

13       A.    -- in preparation.  The last day or two,

14  couple days.  But I had intended to add it, but I

15  just -- we were in process.

16       Q.    Any other papers you intend to add sitting

17  here today?

18       A.    One second.  The paper by Benbrook, it's an

19  Environmental Sciences Europe, "How Did the USEPA

20  and IARC," IARC, "Reach the Diametrically Opposed

21  Conclusions on the Genotoxicity of Glyphosate-Based

22  Herbicides?"

23       Q.    When did you --

24       A.    That's right there.

25       Q.    When did you first read the Benbrook paper?
```

```
 1        A.    A couple of days ago.

 2        Q.    How did you locate the Benbrook paper?

 3        A.    On -- on my computer.

 4        Q.    Okay.  Anything else you intend to add

 5   today?

 6        A.    No, sir.

 7        Q.    Okay.

 8        A.    That's why I had -- I printed these out so

 9   I could show them during this deposition.

10        Q.    Okay.

11        A.    So these are. . .

12        Q.    Now, you would agree with me, most cases of

13   NHL have no known cause; is that fair?

14        A.    I'd say yes.

15        Q.    Okay.  Do you believe there are other

16   environmental causes of NHL besides glyphosate-based

17   herbicide exposure?

18        A.    There could -- there could be, yes.  Yes.

19   There's data to prove it.  Some insecticides and so

20   on.  So there is -- there are data to show there are

21   environmental chemicals that have a high association

22   with NHL.  Okay.

23        Q.    Do you agree with IARC that benzene is a

24   potential causative agent of NHL?

25        A.    Yes, I think -- think it could be.
```

Ronald J. Kendall, Ph.D.

```
 1        Q.   Do you agree with IARC that 1,3-butadiene
 2   is a potential causative agent for NHL?
 3        A.   I don't -- I don't disagree, but I don't --
 4   I'm not as strong on that one as I am benzene --
 5        Q.   Okay.
 6        A.   -- on -- on butadiene.
 7        Q.   Do you agree with IARC that
 8   pentachlorophenol is a potential causative agent of
 9   NHL?
10        A.   Yes.
11        Q.   Do you agree with IARC that DDT exposure is
12   a potential causative agent of NHL?
13        A.   I don't know.  I don't know about that.
14   That one, I'm --
15        Q.   Do you agree with --
16        A.   -- I'm -- I agree with pentachlorophenol,
17   but DDT is a more complex discussion.
18        Q.   Do you agree with IARC that diazinon is a
19   potential causative agent of NHL?
20        A.   I don't disagree, but I don't agree.
21        Q.   Do you agree with IARC that malathion is a
22   potential causative agent of NHL?
23        A.   No.
24        Q.   Okay.  Why?
25        A.   I don't -- I don't -- I don't strongly
```

1    disagree, and I don't strongly agree.  Malathion is

2    an organophosphate pesticide.  It's metabolized

3    fairly quickly in the body, and we don't have

4    evidence that it has interaction with the DNA enough

5    to cause DNA chromosomal breaks or genetic damage.

6    That's -- that's the reason.

7            But, again, I was very impressed with the

8    International Agency for Cancer Research with

9    their -- their deliberation process, their selecting

10   in the case of glyphosate 17 experts from over ten

11   countries, 11 countries.  And it's not easy to

12   manage Europeans in that complex of a setting.  Plus

13   they had U.S. scientists on that team, too.

14           So, again, I guess, one, I'm probably less

15   committed to is maybe what they recommended would be

16   malathion, but they -- they moved through a whole

17   scale, and some of those ones I strongly agree with,

18   like benzene and pentachlorophenol.

19       Q.   Okay.  Have you consulted on malathion

20   issues at all over your career?

21       A.   I've dealt with so many chemicals.  I --

22   I -- see, we -- a lot of our field studies, at times

23   there would be multiple chemicals used and we would

24   have to do analyses on multiple ones.  And,

25   technically, like, on a specific registrant request

Ronald J. Kendall, Ph.D.

1    for studies on malathion, no.  But in field-related

2    activity to assess exposure, yes.

3        Q.   Have you consulted --

4        A.   For instance --

5        Q.   Go ahead.

6        A.   For instance, over my career, I have done a

7    good bit of studies for the pesticide industry to

8    assist them in regulatory needs, and we've developed

9    data.  And as I mentioned to you earlier, some of

10   that was guideline data.  Oftentimes, it was custom

11   designed studies to assist them in addressing EPA

12   regulatory questions.  So -- so that affirms why I

13   answered that all studies turned in to the EPA

14   aren't necessarily under guidelines.  The same in

15   Europe.  I have done work for the European companies

16   and -- and assisted them with data that would go to

17   OECD.

18           And I will say this, I've never had any

19   research -- I've never had any chemical-specific

20   research with Monsanto or Bayer.  Okay.  I want to

21   put that on the record.

22       Q.   Well, let's go back to your CV real quick,

23   because I have a few -- a few questions about that,

24   based on what we just talked about.

25       A.   Sure.  Sure.

1     Q.   One of your references is a gentleman by

2   the name of Dr. Bibek Sharma.  Who's Dr. Sharma?

3     A.   Dr. Sharma is a past doctoral student

4   graduate of -- of our program here at Texas Tech

5   University.  He got his doctorate in environmental

6   toxicology here.

7     Q.   Okay.  And he works for a company named FMC

8   Corporation?

9     A.   Yes.

10     Q.   They make pesticides?

11     A.   They do.

12     Q.   They make malathion, don't they?

13     A.   You know, I really don't know.  I haven't

14   dealt with him on that.  I don't know.

15     Q.   Do you -- do you deal on a consulting

16   relationship with FMC Corporation?

17     A.   In the past I have.  Nothing to do with

18   malathion.

19     Q.   Were you -- were you compensated by FMC

20   Corporation as part of that consulting arrangement?

21     A.   Yes.

22     Q.   Okay.  Going down to "Technical Reports,"

23   "Editor and/or Reviewer," it's page 37.

24     A.   Okay.  Give me just a second.  Okay.  What

25   page do you want?

```
 1        Q.    Page 37, sir.

 2        A.    Okay.  All right.

 3        Q.    Now, "Technical Reports," what is that

 4   section meant to, I guess, convey?

 5        A.    Well, these are technical book chapters,

 6   you know, on page 37.

 7        Q.    Right.  So you're on page 36.  And it's,

 8   "Editor and/Or Reviewer for Scientific Journals,

 9   Books, Technical Reports and Projects," and then it

10   has -- section C is "Technical Reports."  What are

11   technical reports?

12        A.    They're just reports that may go to -- to

13   industry for -- and so on.

14        Q.    Okay.  But how are they generated?  Are

15   they generated by industry studies?  Are they

16   generated by your lab?  How are technical reports

17   generated?

18        A.    Generated by our lab.

19        Q.    Okay.  And so your lab is hired to put

20   together technical reports, and these are the list

21   of clients you've worked for?

22        A.    Yes, we've done that over the years.  We

23   have done -- we have done -- it varies.  We may

24   produce a technical report if we do studies for a

25   company, or we may be asked just to proceed to a
```

Ronald J. Kendall, Ph.D.

```
1    scientific publication.  It varies.
2         Q.   Okay.  And one of the companies you've done
3    technical reports for is FMC, right?
4         A.   Yeah, what are you -- what page are you --
5    maybe -- maybe I've got the -- I've got a July 8,
6    2021 CV, and maybe you've got the March one.
7         Q.   I'm looking at the March one -- the March
8    one, which is from March 2020.
9         A.   Okay.
10        Q.   So you can -- you can --
11        A.   Can you -- can you tell me the section
12   you're in --
13        Q.   Yes, sir.
14        A.   -- so I can get to the section.
15        Q.   I'm in the section where you're "Editor
16   and/Or Reviewer."  This is right after your
17   references.
18        A.   Okay.  On page 33?
19        Q.   Well, it may be 33 in the newer one, but it
20   was 37 in the one we've marked.  So. . .
21        A.   Okay.  Let me -- let me look.  Okay.  I'm
22   looking.  "Editor and/or Reviewer," yes, "scientist
23   journal, books, technical reports. . ."
24        Q.   Right.  And so on the technical reports,
25   you have FMC listed there, right?
```

1        A.    Yes.

2        Q.    Okay.  And so what would have happened

3    there is you would have been hired or your lab would

4    have been hired by FMC to put together a technical

5    report, and then you would have sent it to them?

6        A.    Yeah, that was years ago.  That was on a

7    study -- I'm pretty sure it was Albacar and all, and

8    that was a technical report we sent to FMC.  And I

9    bet that was over 25, 30 years ago.

10       Q.    Okay.  The next company listed there is

11   Monsanto, right?

12       A.    Yes.

13       Q.    Okay.  So now you've told me earlier you

14   had not done consulting for Monsanto.  But it

15   appears here you have, doesn't it?

16       A.    Well, the only -- you know, I can't recall

17   any -- any -- I cannot recall any technical reports

18   that I have produced for Monsanto.  The only

19   interaction that I really have had with Monsanto,

20   that I recall, was in 1991.  I -- to my recollection

21   right now, I don't know.  I may -- I may have given

22   them -- I may have done a little consulting with

23   them 34 years ago.  I don't remember.  It hasn't

24   been in the last 25 years.

25             But the only interaction I have had is I

Ronald J. Kendall, Ph.D.

 1    was working in golf and the environment in the early

 2    '90s, and some -- a couple of Monsanto guys heard

 3    about my work at Kiawah Island in South Carolina.

 4    And I was working on a -- on the ocean course that

 5    was -- would become a world renowned golf course.

 6    It was under development, and I was interacting with

 7    the course with the blessing of Kiawah Island to

 8    develop it as an environmentally sound golf course.

 9    And it was being prepared for the Ryder Cup.

10         And so a couple of these Monsanto guys

11    came down and just wanted to see what I was doing

12    with golf and the environment.  And we -- we had a

13    visit.  And they told me that the president of

14    Monsanto would like -- would very much like to come

15    to the Ryder Cup and see this golf and the

16    environment work.  He was very interested in golf,

17    and they were very interested in golf and the

18    environment.

19         And so -- and so I said, "Well, I'm open

20    to that."  I was a professor at Clemson University,

21    and I said, "I'm open to that."

22         And they said, "Boy, he would be real

23    interested and would probably be willing to host

24    that."

25         So -- so I did.  And that was in 1991.

Ronald J. Kendall, Ph.D.

```
 1    And I, actually, was looking in my -- my desk, and I
 2    found this.  It was the badge to the Ryder Cup in
 3    1991.  And you see it says "Radio/TV."  Well, the
 4    people at Kiawah Island loved our work.  We
 5    subsequently got national press for our work with
 6    golf in the environment at Kiawah Island.  CNN did a
 7    very big story on us.
 8         Nevertheless, the president of Monsanto
 9    came down with his husband -- with his wife, and I
10    hosted them for a day at the Ryder Cup.  They were
11    able to drive onto the island, like -- people had a
12    hard time getting on the island.  And they were able
13    to park at the press tent where I was able to host
14    them in a cart for the day.  And he was a very nice
15    man.  And he and his wife loved it.  And we -- we
16    saw a lot of the golfers and -- and so on.
17         At the end of that day, he said, "I'd like
18    to provide a research gift to your research program
19    to help you with your golf and the environment
20    work."
21         And it wasn't chemical specific.  It was
22    all about working with endangered species, water
23    recycling, fertilizer management, all kinds of
24    stuff.  And so he did give me a research grant gift
25    that went into the foundation supporting my -- my
```

1    work.  And it had no deliverable except he wanted to

2    support my work.  And that was in September of 1991.

3          So as far as anything on the -- on the

4    university side that I can recall, that's it.  And

5    I've never had specific projects with Monsanto.

6    I've had specific projects with FMC in the past,

7    with -- with CIBA-GEIGY, with Syngenta, with

8    American Cyanamid Company, but not Monsanto.  I

9    never did -- because I can't remember doing any

10   projects for them where I could remember a chemical

11   that we worked on to help them.

12         And that's generally how we worked with

13   industry, was they would have an issue with a

14   chemical -- they were developing a chemical and they

15   needed data to turn into the Agency.  We would -- we

16   would a lot of times develop data for them.  And I

17   enjoyed working with industry.  And I worked with

18   the gamut of research sponsors.

19         So, again, that's -- that's to the best of

20   my recollection with -- with that interaction.  And

21   I still remember him.  But it's almost 30 years to

22   the day.  On September 24th, it will be 30 years

23   ago.  So, again, that's it.  That's -- that's why I

24   put Monsanto in research grants.  That's -- because

25   it was -- it was a grant, but it didn't have any

1    deliverables.  It was a gift.  It was a gift grant.

2    And we do get those.  They are tax deductible to the

3    university to support basic work and basic research.

4        Q.    So Monsanto supported your basic work and

5    basic research on ecotoxicological effects of

6    pesticides, right?

7        A.    Well, kind of.  Because we weren't just

8    looking at pesticides.  We -- I was really involved

9    with this whole golf -- I'm not a golfer.  I don't

10   like golf.  But I've been involved with golf course

11   development and research for many years, and I

12   became a world expert on it.

13          And so the point is, we learned a lot

14   about the greening of golf courses to make them more

15   environmentally friendly.  And so the work at Kiawah

16   Island became a real gold standard because if you're

17   a golfer, you need to play Kiawah Island, the ocean

18   course.  It is the best.  It's right on the water.

19   And they've got Loggerhead sea turtles nesting right

20   on the island.  It's an endangered species.

21          So, again, he -- Monsanto, through that

22   present, that was his decision.  I didn't have to go

23   before any board or any review.  He made a decision

24   to make this award just to support, in general, what

25   we were doing.

 1          And it had to do -- we were really proud

 2   of our water recycling, the management of

 3   fertilizers, chemical management, selection of

 4   chemicals, the kind of vegetation that we were

 5   using.  There were alligators on the golf course.

 6   There were all kinds of birds.  It was unbelievable,

 7   the biological diversity.

 8          So it was not to look at the ecotoxicology

 9   of pesticide, that award from the president back

10   then.  It was just to support my program and my --

11   the interest in developing golf in the environment,

12   which became after that a very big issue as we

13   rolled into the '90s.

14          The PGA of America sponsored me.  The

15   United States Golf Association.  It became a big

16   deal.  And now golf courses across the country

17   take -- take a whole different look at developing

18   and managing their courses to be more

19   environmentally sensitive and environmentally

20   friendly.

21          So I would like to feel I was a little bit

22   of a part of that.  But, again, that's how that

23   president, through his company, supported me in

24   1991.  I was a professor at Clemson.

25      Q.   They were using in their mix of pesticides

Ronald J. Kendall, Ph.D.

1    in addition to chlorpyrifos and paraquat, they were

2    using glyphosate at the ocean course, weren't they?

3        A.   I think they were.  To be honest with you,

4    they were using -- we were carefully working with

5    them on that, but, you know, once we got through the

6    research and, you know, the recycling of the

7    water -- the water wasn't going into the ground

8    water; it was being recycled and all.  So

9    everything -- it was a fairly contained system.

10           And so we tried at that time -- it was

11   30 years ago.  We tried at that time to assist them

12   in chemical management that would be as

13   environmentally responsible as possible at that

14   time.  So they may have been -- I don't -- I --

15   glyphosate Roundup was around 30 years ago, yeah.

16   It came out in the '70s.  I remember it.

17           But once you got through -- once we got

18   through with the research and putting that whole

19   thing together and the Ryder Cup came, we pretty

20   much moved out of there and their management

21   people -- their management people took over.

22       Q.   When I looked at your -- when I googled

23   just now that work, it seemed that the pesticide you

24   were focused on for ecotoxicological effects was not

25   glyphosate, but instead was chlorpyrifos, right?

1        A.    That was -- that was one.

2        Q.    Okay.  And, in fact, when you talked to the

3    president of Monsanto in 1991, did you tell him you

4    had concerns about the toxicological effects of

5    glyphosate?

6        A.    No.  No.

7        Q.    How about when you presented at the

8    Monsanto campus in 1994 on your golf course

9    research, did you tell them then you had concerns

10   about glyphosate?

11       A.    No, I -- I -- that -- no, I didn't.

12       Q.    Okay.  Let's go back to malathion really

13   quickly, because I -- I think you said earlier you

14   didn't think you agreed with IARC on malathion

15   because there wasn't good evidence of genetic

16   damage.  Did I hear you right when you said that?

17       A.    That's to the best of my recollection.  I

18   haven't really reflected on that.  I didn't really

19   think about that at all prior to this.  So this

20   would -- my response to you was off the top of my

21   head based on just readings from a long time ago.  I

22   haven't dealt with malathion for decades.  And I

23   just haven't dealt with it.  I don't -- we -- our

24   research program, we don't deal with many of the

25   organophosphates anymore.  They -- many of them --

Ronald J. Kendall, Ph.D.

1    most of them have been phased out.

2        Q.    You're aware IARC reviewed malathion, the

3    same working group reviewed malathion that reviewed

4    glyphosate.  Are you aware of that?

5        A.    I am.

6        Q.    Okay.  And you're aware that same working

7    group classified malathion as a 2A probable

8    carcinogen just like glyphosate?

9        A.    Well, like I said, I haven't studied and

10   reflected on that.  So I -- I take no opinion.  I

11   tried to answer it.  I don't disagree and I don't

12   agree --

13       Q.    Okay.

14       A.    -- because I haven't thought about it.

15       Q.    Okay.

16       A.    And I haven't studied the monograph.  You

17   know, again, you know, we're -- we're tapping into

18   41 years here plus ten years of graduate school.

19       Q.    Are there other pesticides that you believe

20   have been implicated in the causation of NHL in the

21   literature beyond Roundup?

22       A.    There have been several in the studies I

23   referenced.

24       Q.    Okay.  Now, IARC looks at three lines of

25   evidence, correct?

1      A.    Yes.

2      Q.    They look at something called epidemiology,

3   right?

4      A.    Human studies through epidemiology.  Human

5   exposure through epidemiology.

6      Q.    Okay.  And epidemiology is the study of

7   disease and health outcomes in human populations,

8   right?

9      A.    Yes, using statistical approaches.

10     Q.    Okay.  And one of the benefits of using

11   epidemiology is it looks at what happens to people

12   who have real world exposures to mixtures of

13   pesticide products.  So the -- the formulated

14   product as opposed to the active ingredient.  And it

15   looks at what happens to them at real world doses,

16   right?

17     A.    Right.

18     Q.    Okay.  And then IARC also looks at

19   something called toxicology, right?

20     A.    They look at animal experimental data

21   toxicology.

22     Q.    Okay.  And animal experimental data

23   toxicology is the study of the potential adverse

24   effects of chemicals on living systems, right?

25     A.    Yes.

1    Q.   Okay.  And one difference between

2    epidemiology and toxicology is epidemiology is

3    usually carried out out in the real world while

4    toxicology is carried out in a lab, right?

5    A.   For the most part.  Some of the toxicology

6    can be site based in the field, but, yeah, most --

7    most of the experimental studies, say, for cancer

8    research would be a laboratory toxicology study.

9    Q.   Okay.  And you agree there are important

10   biological differences between rodents and people?

11   A.   Yes.  But a lot of what we have learned

12   about carcinogenesis in humans, it had been through

13   laboratory rodent data.

14   Q.   Right.  I've heard it said rodents are not

15   little people.  Do you agree with that statement?

16   A.   I do.  But they provide signals in a

17   weight-of-the-evidence approach.

18   Q.   Okay.  And are you -- one thing I didn't

19   ask you here, you mentioned it really early in the

20   depo and then we kind of moved on, is, are you

21   familiar with a rubric called the Bradford Hill

22   criteria?

23   A.   Totally.

24   Q.   Okay.  And are you applying the Bradford

25   Hill criteria in reaching your causation opinion in

1    this case?

2        A.   Yes.

3        Q.   Okay.  And so are you using mechanistic and

4    animal toxicology data solely for the purpose of

5    biologic plausibility within that criteria?

6        A.   No.  I'm using -- I'm, in addition, using

7    the epidemiological human exposure studies.

8        Q.   Well, I know you're using the epidemiology

9    human exposure studies.  But there are nine criteria

10   in Bradford Hill, correct?

11       A.   Right.

12       Q.   And prong one criteria, there is biological

13   plausibility?

14       A.   Correct.

15       Q.   And what I'm trying to understand is, is

16   your use of the mechanistic and animal toxicology

17   data solely focused on that biologic plausibility

18   prong, or are you also applying those two sets of

19   data to other prongs?

20       A.   Mainly to the biological plausibility.

21       Q.   Okay.  And biologic plausibility is

22   essentially an inquiry as to whether or not it is --

23   it is logical that this compound could cause this

24   effect in a human population, right?

25       A.   Yes.

Ronald J. Kendall, Ph.D.

```
 1        Q.   Okay.

 2        A.   Through the integration of mechanistic

 3   data, animal experimental data with human exposure

 4   data.

 5        Q.   Okay.  And we use the animal toxicology and

 6   mechanistic data to -- to satisfy that logic prong;

 7   those two sets of data in and of themselves cannot

 8   fulfill the Bradford Hill criteria, right?  In other

 9   words -- in other words -- if you're confused, in

10   other words, you would need epidemiology data that

11   is, you know, of sufficient quality to fulfill the

12   Bradford Hill criteria?

13        A.   Yes, to show -- to strongly show the

14   association.

15        Q.   Okay.  And, in fact, there are examples of

16   compounds that have tested positive for

17   carcinogenicity in rodents that have not been found

18   to be carcinogenic in people, right?

19        A.   Yes.

20        Q.   One example of that is acetaminophen,

21   right?

22        A.   I believe so.  I haven't looked at that

23   data for a long time, but I believe you're right.

24        Q.   And acetaminophen, that -- that's Tylenol,

25   right?
```

1    A.    Yes.

2    Q.    Okay.  Now, the mechanistic prong of what

3  IARC looks at is the third prong, right, this

4  mechanistic data?

5    A.    Yes.

6    Q.    Okay.  And that's sort of a catchall for a

7  lot of different types of studies.  One of the

8  studies IARC -- one of the types of studies IARC

9  looks at are things called genotoxicity studies,

10  right?

11    A.    Correct.

12    Q.    And these genotoxicity studies are

13  essentially -- a subset of those are those

14  chromosomal aberration micronuclei --

15    A.    Micronuclei.

16    Q.    -- studies we talked about earlier, right?

17    A.    Yes.

18    Q.    And then there are some nonguideline

19  studies that might be included like that common

20  assays, right?

21    A.    Right.

22    Q.    Okay.  And then another thing they would

23  look at is mutagenicity studies, correct?

24    A.    Yes.

25    Q.    Okay.  And a mutagenicity study is like

Ronald J. Kendall, Ph.D.

1    that Ames test we talked about earlier, right?

2        A.   Right.

3        Q.   Okay.  And then they might look at studies

4    on oxidative stress, right?

5        A.   Correct.

6        Q.   On endocrine disruption, true?

7        A.   Yes.

8        Q.   And on immunotoxicity, true?

9        A.   Yes.

10       Q.   Okay.  And those studies, they can be done

11   in vitro or in vivo, right?

12       A.   Right.

13       Q.   Okay.  What is the difference between an in

14   vitro and in vivo study?

15       A.   An in vivo study is in -- in a whole live

16   animal, from a human down to a rat.  In vitro is

17   maybe in a test tube or in a petri dish such that

18   it's not within the entire body of an organism; it's

19   within a controlled environment, such as a petri

20   dish or an auger plate or a test tube.

21       Q.   And one of the things we lose in an in

22   vitro study is the body's cellular repair

23   mechanisms, right?

24       A.   Right.

25       Q.   Okay.  And would you agree with me that an

1  in vivo study will more closely replicate what

2  happens inside the human body than an in vitro

3  study, all other things being equal?

4      A.   Generally, I would agree.  I mean, I'm sure

5  we can find examples that it's not.  But, generally,

6  I would agree.

7      Q.   Okay.  Now, what these mechanistic studies

8  are designed to do, if I understand correctly, is

9  they're designed to detect cellular damage and

10 mechanisms of damage, right?

11     A.   Fairly said.

12     Q.   Okay.  And cellular damage can be the first

13 step towards a cancer, right?

14     A.   Particularly cellular damage to the DNA.

15     Q.   Okay.  But there's a lot more things that

16 need to happen before cancer develops, right?

17     A.   Theoretically, yes.

18     Q.   Okay.  For instance, that cellular damage

19 to the DNA, which I'll call genotoxic damage, if

20 that's okay, needs to lead to a mutation, right?

21     A.   That is what we think.

22     Q.   Okay.  And it can't just be a mutation.  It

23 needs to be a mutation that either inhibits cell

24 apoptosis or increases cell replication to lead to

25 cancer, fair?

1     A.   That's fair.

2     Q.   Okay.  And even then, if that happens, the

3  body has lots of systems, like our immune system, to

4  fight off the replication of those cancer cells,

5  right?

6     A.   That's what we're trying to do.  That's why

7  everybody doesn't get cancer from every mutation

8  that's -- that's caused in our body.

9     Q.   We, you, I, Marc, Devarati, we all have

10 thousands of random genetic damage incidences each

11 and every day, right?

12    A.   It's possible.  But, you know, I -- you

13 know, it varies per person and how they are exposed,

14 how they metabolize, and how they handle these

15 toxicants.  So the -- it's more than one, I'll say

16 that.  And there are repair mechanisms that are

17 attempting to the immune system, as well as cellular

18 repair mechanisms, to repair the damaged DNA.

19    Q.   And, in fact, much of that damage happens

20 without any exposure, right?  It just happens

21 spontaneously due to natural replication errors?

22    A.   It's possible.

23    Q.   Okay.  And so just because you have genetic

24 damage either from an external substance or

25 internally from a replication error, that doesn't

Ronald J. Kendall, Ph.D.

1   mean you're going to get cancer, right?

2       A.   Yeah, but that's a first -- that's an

3   important first step in the carcinogenic process.

4       Q.   Okay.  And there's actually plenty of

5   substances out there that have found to be genotoxic

6   where it has not been established that they're

7   carcinogenic, right?

8       A.   Yeah.  If you look at the Ames assay, it's

9   very generalized.  It will -- if there's any

10  mutagenic potential in a substance, you'll probably

11  pick it up in that assay.  So in that context, I

12  would agree with you.  But once you get into the

13  chromosomal aberration tests and whatever, they

14  become more sophisticated in showing the damage to

15  the DNA that can occur, which is -- and, again, is a

16  critical early step, and that cell is potentially

17  transforming into a carcinogenic response.

18      Q.   Now, you mentioned those chromosomal

19  aberration assays.  And just to -- just to be clear,

20  those measure genetic damage, and then some of them

21  can detect mutagenicity as well if they follow up

22  long enough for repair, right?

23      A.   Yes.

24      Q.   Okay.  And those studies would have to show

25  mutagenicity for you to say that that genetic damage

1    is replicated, fair?

2        A.   I would like for you to rephrase the

3    question, please, or re-ask it.

4        Q.   No, let's keep moving because I am getting

5    low on time already.

6            You agree if a compound is -- well, strike

7    that.

8            Okay.  What is in the mechanism, in your

9    opinion, by which glyphosate can cause NHL in

10   people?

11       A.   First of all, when you look at -- when you

12   look at the weight-of-the-evidence, we have study --

13   studies using epidemiological approaches that shows

14   actually in some cases pretty strong association

15   with exposure to glyphosate and the ultimate

16   development of Non-Hodgkin's lymphoma.  This was

17   particularly true in some of the more recent studies

18   when you looked at the higher exposure levels on the

19   dose response curve.  In other words, when you were

20   exposed to higher levels, there seemed to be an even

21   stronger association when you looked at the odds

22   ratio.

23           But, again, that -- that whole process and

24   statistical evaluation is a process to evaluate

25   data, and -- and by looking at the upper levels of

 1    the dose response curve, the higher exposure levels

 2    with the higher incidence of disease, it -- it gives

 3    you a stronger potential to find effects if they do

 4    exist.

 5             In addition, there are animal studies,

 6    animal experimental data showing -- particularly in

 7    mice, a unique tubal cancer in the kidney.  And in

 8    addition, there was a circulatory system lymph- --

 9    tumorigenic effect as well.

10             What, in addition, is very important to me

11    is glyphosate, particularly glyphosate-based

12    herbicide formulation has the ability to have

13    genotoxic effects and oxidative stress effects which

14    result in inflammation.

15             So there are examples -- Wozniak in his

16    study showed that just glyphosate alone concomitant

17    with exposure of a known carcinogen, like cigarette

18    tar, do not induce a strong tumorigenic effect.  But

19    when you added the formulation, they had a very

20    strong tumorigenic effect.  So it suggests that

21    there may be some association with promotion of

22    cancer as well as -- as a direct carcinogen.

23             The -- the possibilities exist for

24    exposure.  We know that.  We have data in urine and

25    in the blood.  It's not like people don't get it in

1    their bodies.  I'll agree, absorption is low,

2    particularly in the intestines.  But dermally, we do

3    get exposure.  We can confirm exposure.  And,

4    therefore, we have access, particularly to the

5    lymphatic system.

6         And the lymphatic system is a frontline of

7    defense trying to protect our bodies through white

8    blood cells, to protect our bodies from foreign

9    proteins, foreign chemicals and disease states.  So,

10   in other words, access can occur to those in

11   critical areas of defense in the body, in the

12   lymphatic system.  And we do have the basic building

13   blocks for carcinogenic potential through the

14   genetic effects, mechanistic effects.  I mentioned

15   oxidative stress and effects at the DNA level.  It

16   doesn't even have to be adducts.  It just can be

17   impairment or destruction of cellular repair

18   mechanisms.  But, again, we do know there's

19   genotoxic effects.

20        And then we have supporting data that

21   particularly farmers -- farmers consistently show up

22   with stronger response to -- to Non-Hodgkin's

23   lymphoma with the use of chemicals.  And there

24   appears to be in these case studies that I have

25   looked at some very compelling evidence that

1    glyphosate is one of those associations that can

2    occur.

3            So as far as the exact mechanism, I've

4    given you a weight-of-the-evidence as to a plausible

5    biological mechanism.  The exact mechanism is not

6    known, and -- and I think the research and

7    investigation will continue to evaluate this as we

8    look into a lot of diseases.

9            I'm very interested in Parkinson's and the

10   relationship of chemicals to Parkinson's.  My father

11   died of Parkinson's.  So, again, I -- I all of this

12   science is evolving, and we're trying to understand

13   causality, building on the blocks of association,

14   mechanisms, and biological plausibility when we

15   tie -- tie together the experimental toxicology

16   work.

17           So you asked me a very tough question, and

18   I tried to give you as good a comprehensive answer

19   as I could, because biological plausibility does

20   exist.

21   Q.    That was a comprehensive answer, I would

22   agree with that.

23           I don't know -- I think I caught it in

24   there, but I'm not sure.  I want to make sure I

25   understand.  You understand when I ask about

1  mechanism of action causing carcinogenesis, I'm

2  asking about what the exact injury is to the cell

3  that can lead to carcinogenesis that you're going to

4  opine about.  Do you understand that?

5      A.   Basically, what we know, the damage to the

6  cell will be at least through oxidative stress and

7  through genetic impacts to the DNA and genotoxic

8  effects to the DNA.

9             MR. KALAS:  All right.  With that, I

10  think it's a good time to take a brief break, if

11  that's okay for everybody.

12             THE WITNESS:  That will be great.  Can

13  you tell me how much time we're going to take?

14             THE VIDEOGRAPHER:  Let me go off the

15  record, sir.

16         The time is 1:35 p.m., and we are off the

17  record.

18             (Break taken, 1:35 p.m. to 1:43 p.m.)

19             THE VIDEOGRAPHER:   The time is 1:43,

20  and we are on the record.

21             (Exhibit Nos. 6 - 8 identified.)

22  BY MR. KALAS:

23      Q.   Dr. Kendall, I've marked as Exhibit 6

24  through 8 some documents that were provided to us by

25  plaintiff's counsel.

Ronald J. Kendall, Ph.D.

1              Starting with Exhibit 6 that I have

2    marked, is that a true and correct copy of your CV

3    as it stands today?

4        A.    It's loading now.

5        Q.    Yeah.

6        A.    Yes, that's the latest updated copy.

7    July 8th, 2021.

8        Q.    Okay.  And then Exhibit 7, does that

9    reflect all the invoices you've submitted in this

10   matter?

11       A.    Yes, sir, it does.

12       Q.    Okay.  I was just looking at it on the

13   break.  If you go to the entry for March 26, 2021 --

14   let me know when you get there.

15       A.    Okay.

16       Q.    It says here on March 26, 2021, "Phone

17   conference with Jarad Silverstein, .3 hours."  And

18   then, "Review complaints of Thomas, Dooley, Savory,

19   Wiley, and Spector clients.  Reviewed toxicology

20   report by W.R. Sawyer in regard to Schaefer v.

21   Monsanto, three hours."

22              Did I read that correctly?

23       A.    Yes, sir.

24       Q.    Okay.  What is Schafer v. Monsanto?

25       A.    I need to look.  Give me a minute.

Ronald J. Kendall, Ph.D.

```
 1        Q.   Sure.

 2        A.   That was the report by Moll on the Schafer

 3   vs. Monsanto case.

 4        Q.   Okay.  Can you hold that up, what you're

 5   looking at there?

 6        A.   Yeah.

 7        Q.   Okay.  How did you get that report?

 8        A.   Just one second.

 9        Q.   Sure.

10        A.   I believe that was sent to me by Jarad

11   Silverstein.

12        Q.   Okay.  And do you see that it says it's a

13   toxicology report by W.R. Sawyer?  I'm looking at

14   your -- I'm looking at your invoice, sir.

15        A.   Yeah, that's -- that's -- that's just --

16   that's just a typo.

17        Q.   That's a typo?  It's not a toxicology

18   report by William Sawyer?

19        A.   No.

20        Q.   I recognize the letterhead.  The company's

21   name is TCAS, Toxicology Consultants and

22   Specialists, or something like that?

23        A.   Yeah.  Schafer was the -- was the client --

24        Q.   Right.

25        A.   -- the individual that was being evaluated.
```

1      Q.   Right.  And the report is a report by an

2   expert witness in the Schafer matter, correct?

3      A.   Right.

4      Q.   Okay.  Now, you're not an expert on the

5   Schafer case, right?

6      A.   No, it's just -- just -- I was just

7   provided some information materials.  I looked --

8   you can see I didn't spend a lot of time it.

9      Q.   Sure.

10      A.   I went through those materials.  I was

11   looking at reports, going through the literature,

12   you know, to the best of my ability.

13      Q.   But you billed for reviewing the toxicology

14   report by Dr. Sawyer in the course of your work on

15   this case; is that true?

16      A.   Not much, because I've spent the time on

17   the Thomas, Dooley, Savory -- I was working on

18   those -- those in the Spector client reports.

19   That's what I was really working on.

20      Q.   All right.  Well, the invoice will speak

21   for itself.

22           Let me ask you this:  Did the report from

23   Dr. Sawyer make its way to your materials considered

24   list?

25      A.   I don't see it here.

1       Q.   Okay.   For what purpose would you review an

2   expert report of an expert in another case in the

3   course of reaching your opinions in this case?

4              MR. BRECHER:   Well, object to the form

5   of the question.   I don't know that it has anything

6   to do with reaching opinions in this case, something

7   that he read.   But that doesn't -- you're assuming

8   something that -- that that's really a little bit

9   unfair under the circumstances.   He could have read

10  it and it had nothing to do with his opinions, or he

11  could have read it, disagreed with it.   And --

12  that's all I'm going to say.   And it's three hours

13  and it includes not just reading that report but

14  many other things in that three-hour block.

15             MR. KALAS:   All right.   Well, while

16  we're making statements on the record, I think this

17  is about the fourth time today in this deposition

18  we've talked about materials that have been

19  considered by Dr. Kendall, in whole or in part, that

20  are not disclosed.   And at this point, we're getting

21  to the point where I'm going to feel like I need to

22  come back after I get a full materials considered

23  list and complete this deposition; otherwise, I'm

24  going to have to go potentially for relief to the

25  Court, because the Rule 26 obligations have not been

Ronald J. Kendall, Ph.D.

1    met with this witness and things are being hidden

2    that he has reviewed.

3              MR. BRECHER:  You're saying it's

4    something that he considered in drafting his opinion

5    and his report.  He may not have considered this at

6    all in drafting his opinion and report.  This is an

7    opinion of somebody else.

8              MR. KALAS:  This is facts and data

9    provided to him by counsel, which are called for in

10   Rule 26.  So you can characterize it however you

11   like, Mr. Brecher, but at the end of the day, it's

12   my position the Rule 26 disclosure requirements have

13   not been met.

14             MR. BRECHER:  I understand that's your

15   position.

16   BY MR. KALAS:

17        Q.   Okay.  Let me ask the question again,

18   Dr. Kendall.

19             For what purpose did you review the report

20   of another expert in another Roundup case that you

21   are not involved in in forming your opinions in this

22   case?

23        A.   It was just information for me.  It's just

24   information.  I reviewed a lot of reports.  I

25   reviewed defendant's expert reports.  I reviewed a

1    lot of different reports.  That's the point.  And I

2    came to some conclusions, which I expressed in my

3    conclusionary statement in my expert report.  And

4    I'm willing to tell you how I reached those

5    conclusions, and that's what I've been trying to do

6    today.

7             MR. KALAS:  All right.  I am going to

8    mark a document as Exhibit 9.

9    BY MR. KALAS:

10       Q.   Well, actually, before I do that, I've

11   marked Exhibit 8.  Is that a true and correct copy

12   of your testimonial history that you provided to

13   plaintiff's counsel?

14       A.   It's -- it's loading.

15       Q.   Okay.

16       A.   What was the question, now?

17       Q.   Is Exhibit 8 a true and correct copy of

18   your testimonial history that you provided to

19   plaintiff's counsel?

20       A.   It looks like it, yes.

21             (Exhibit No. 9 identified.)

22   BY MR. KALAS:

23       Q.   Okay.  Now, I've marked as Exhibit 9 an EPA

24   document.  And if you can, just take a look at that

25   when you get a moment.

1      A.    Okay.  I'm looking at it.

2      Q.    Okay.  Have you seen this document before?

3      A.    I have.  I didn't read it totally

4  thoroughly, but I did -- I did look over it.

5      Q.    You did look over this document.  Does this

6  document appear on your materials considered list?

7      A.    I did not even really look hard at this

8  document enough.  I spent very little time on this

9  in terms of -- I was looking at some of the SAP

10  materials, and I did it on my computer, and I

11  just -- I just really quickly looked over it.  I

12  didn't -- I spent very little time on it.

13      Q.    Did the SAP materials that you looked at

14  appear on your materials considered list?

15      A.    That was just recently, the last few days

16  in preparation for the deposition.  I had not looked

17  at this material before.

18      Q.    Have you supplemented your materials -- or

19  have you requested to supplement your materials

20  considered list in any way to account for the

21  materials you reviewed in preparation for this

22  deposition?

23      A.    I didn't understand your question.

24      Q.    Have you requested to supplement your

25  materials considered list in any way to account for

1    the materials you looked at in preparing for this

2    deposition?

3        A.   Well, I was planning on it.  I didn't think

4    I had to do it before -- I was trying to get my

5    materials together.  Like I said, if I spent a good

6    bit of time on something, I might have copied this

7    document and had it -- had it in my possession.  But

8    I didn't.  I spent very little time on it.

9        Q.   Okay.  Well, let's take a look at this

10   document.

11       A.   And the main -- the main documents I told

12   you about earlier was -- that I relied upon was the

13   analysis of the international agency -- the cancer

14   research versus the EPA's findings, and I -- and I

15   showed you that document, and I intended to cite

16   that document.

17       Q.   That was the Benbrook article?

18       A.   Yeah, the Benbrook article.

19       Q.   Okay.  And that's -- that's a document that

20   you intended to cite that you had --

21       A.   Yes.

22       Q.   -- not yet disclosed?

23       A.   Yes.

24       Q.   And Benbrook, just so we're clear, he's a

25   retained expert -- expert for plaintiffs in Roundup

1    litigation, right?

2         A.   I don't know that.

3         Q.   All right.  Well, go ahead and take a look

4    at the disclosure on that document real quick.

5         A.   I don't see a disclosure on this paper.

6         Q.   Okay.  Give me a moment, then.  I wasn't

7    prepared to ask you about this document until just

8    today.  So I don't have it preloaded.  Give me a

9    moment.

10        A.   And, like I said, I only -- I only had this

11   document a few days.  And -- and I thought it

12   provided a pretty nice summary of -- of the

13   consideration by the EPA and the consideration by

14   the International Agency for Research on Cancer.

15   And I didn't -- I didn't know that this person was

16   retained by anybody.  I thought it was a very good

17   summary as to the differences and similarities and

18   why different conclusions were reached.

19        Q.   Do you see the -- do you see the section

20   called "Authors' Contributions"?

21        A.   I don't -- I don't.

22        Q.   It's after the references, sir.

23        A.   Okay.  Let me look.

24        Q.   Excuse me, right before the references, I

25   believe.

1       A.   Yeah, I -- I don't know.  Maybe --

2       Q.   Here, I'll call -- you know what?  I was

3   able to find a copy while you were looking.  So I'll

4   just leave it here, and I'll move it to Exhibit 10.

5   We'll take a look at it real quick.

6                (Exhibit No. 10 identified.)

7   BY MR. KALAS:

8       Q.   All right.  So the document I've just named

9   as Exhibit 10, Benbrook, is that the article you

10  intended to supplement your MCL with today?

11      A.   It hasn't loaded yet.

12      Q.   Okay.  Has it loaded yet, sir?

13      A.   Yeah, it just loaded.  Okay.

14      Q.   So I am going to call that up real quick

15  here.  I am going to share my screen so you can see

16  exactly where I'm looking.  Can you see my screen,

17  sir?

18      A.   Yes.

19      Q.   Do you see "Competing Interests"?

20      A.   I do.

21      Q.   Do you see, "CB has served since

22  September 2016 as an expert witness for plaintiffs

23  in U.S. litigation involving the impact of

24  glyphosate-based herbicides on Non-Hodgkin

25  lymphoma"?

```
 1        A.   I see that.

 2        Q.   Okay.  So do you now have an understanding

 3   that Mr. Benbrook is -- or Dr. Benbrook is an expert

 4   for plaintiffs in glyphosate litigation?

 5        A.   Yes.

 6        Q.   Were you aware --

 7        A.   I guess --

 8        Q.   Go ahead.

 9        A.   Well, I guess when I printed this, the

10   printout it gave me, it didn't -- it did not -- I

11   don't have that.  I'll show you.  It did not give me

12   that before the references.  So I don't have that.

13   So I didn't see it, but I read it there and I do

14   realize that.  But in reading this paper, I had no

15   idea that there were competing interests.

16        Q.   Okay.  You agree, Dr. Benbrook has a

17   conflict of interest that is financial?

18        A.   Related to what?

19        Q.   Related to Roundup and glyphosate-based

20   herbicides if he's served as an expert witness for

21   plaintiffs?

22        A.   He has a conflict of interest relative to

23   developing this report; is that what you mean?

24        Q.   Yes, sir.

25        A.   It would appear so.  On the other side, I
```

1    thought it was an excellent report.  I really did.

2    I had no idea he was -- represented anybody.  It was

3    very informative.

4        Q.   Were you aware he's made hundreds of

5    thousands of dollars in Roundup litigation

6    testifying on behalf of plaintiffs?

7        A.   I have -- I had no idea.  I do not know.

8        Q.   Okay.  You don't consider an expert witness

9    for plaintiffs, like Dr. Benbrook, to be an unbiased

10   source of information, do you?

11            MR. BRECHER:  Well, object to the

12   form.  I mean, I'm not sure if that's how to define

13   an expert witness, what their role is.

14            But, Doctor, you can answer.

15       A.   Well, to be honest with you, when I read

16   his report, I thought it was pretty balanced.  I --

17   I didn't detect any bias.  He just reported the data

18   that were looked at both from the international

19   agency for cancer research versus -- in Europe,

20   which was compared to what was done with the EPA,

21   and I thought they were excellent points.

22   BY MR. KALAS:

23       Q.   Why did -- I'm sorry, go ahead.

24       A.   So I -- I -- you know, I didn't -- I didn't

25   read bias into it like it was one side or the other.

Ronald J. Kendall, Ph.D.

```
 1    I just read it as an informative document because it
 2    made sense.
 3       Q.   Why instead of -- instead of reading the
 4    IARC Monograph on glyphosate in the context of
 5    forming your opinions did you read a review article
 6    by an expert for plaintiffs in Roundup litigation
 7    about the IARC Monograph?
 8              MR. BRECHER:  Object to the form of
 9    the question.
10       A.   Ask that -- ask that question again,
11    please.
12    BY MR. KALAS:
13       Q.   Why in the course of forming your opinions
14    on the carcinogenicity of glyphosate did you review
15    a review article by an expert for plaintiffs in
16    glyphosate litigation regarding the IARC Monograph
17    instead of the IARC Monograph itself?
18              MR. BRECHER:  That's -- object to the
19    form.  You're assuming -- he just told you he did
20    not know the guy's -- the doctor's connection to
21    litigation.  So you're assuming in your question
22    facts that he just said that he didn't do.  I mean,
23    you've got to rephrase the question to be consistent
24    with his testimony.
25              MR. KALAS:  I don't have to because
```

Ronald J. Kendall, Ph.D.

1    it's --

2                    MR. BRECHER:  Well, you're putting

3    words -- you're putting words in his mouth that he

4    never testified to.

5                    MR. KALAS:  You can -- you can make as

6    many speaking objections as you want to,

7    Mr. Brecher.  The point is, it is an article written

8    by a plaintiff's expert in glyphosate litigation.

9    There's nothing that I mischaracterized in that

10   question.

11                   MR. BRECHER:  You're saying that he

12   knew.  You're assuming he knew.

13                   MR. KALAS:  I didn't -- I didn't

14   assume he knew.  The question doesn't say that.  I

15   will say the question again.

16                   MR. BRECHER:  Please.

17   BY MR. KALAS:

18        Q.    Please listen closely.  Why did you review

19   a review article written by a plaintiff's expert in

20   glyphosate litigation regarding the IARC Monograph

21   instead of the IARC Monograph itself in reaching

22   your opinions?

23                   MR. BRECHER:  Again, I object to the

24   form of the question.

25        A.    First of all, I didn't know the article was

1   written by a member of the plaintiff's legal team.

2   I had no idea.  Number two, this was a relatively

3   recent article, and I -- I started looking through

4   it and it looked like a balanced analysis, which

5   I -- I appreciated.

6          I went to the International Agency for

7   Cancer Research website.  I looked at their --

8   their -- how they do their monographs.  I -- I, of

9   course, know what EPA does with their reviews.  And

10  I thought -- I welcomed a -- an individual that

11  could, you know, kind of look at that from a -- I

12  was trying to this past week get ready for the

13  deposition, looking at materials.  So I thought this

14  was a useful analysis.

15         And, again, I didn't read bias into it.

16  Like I said, I had no idea there was any involvement

17  with glyphosate litigation from this individual.

18  BY MR. KALAS:

19    Q.   You know, my question was directed at

20  something different.  I apologize if it wasn't

21  clear.

22         When I look at your expert report and the

23  materials on your expert report, I don't see the

24  IARC Monograph in the materials considered or

25  reviewed.  Is that true, the IARC Monograph on

Ronald J. Kendall, Ph.D.

1    glyphosate is not listed there?

2         A.    It's not listed because I wasn't -- like I

3    said, I've done a lot more thinking as -- as I've

4    moved through this process, particularly this last

5    week, and -- and I had -- I reserve the right to --

6    to increase my evaluation and robustness of my

7    thinking as a function of materials that I was -- I

8    was looking at.  So, again, my mind is not in a

9    static process, it's in a dynamic process of looking

10   through these materials and thinking about them.

11   So, again --

12        Q.    I just want to make sure I understand --

13        A.    -- as I mentioned to -- as I mentioned to

14   you, this was just some -- some computer overview

15   work where I was just getting -- seeing what the --

16   what the current thinking was, any new -- news

17   releases, or whatever, what was coming out of -- out

18   of those programs.

19        Q.    I just want to make sure I understand your

20   testimony here.  You were -- I don't have your

21   retention letter, but your first bill is from early

22   March 2021.  Right?

23        A.    Right.

24        Q.    Okay.  And you submitted your expert report

25   for service in late June 2021, right?

Ronald J. Kendall, Ph.D.

1        A.   It was the 29th date of April 2021.

2        Q.   Okay.  So you submitted it the 29th day of

3   April in 2021 in this case?

4        A.   Right.

5        Q.   So it was -- it was a month that you

6   reviewed data in the -- in the -- excuse me -- in

7   the Spector matter, fair?

8        A.   Probably a little longer than that.  Maybe

9   six weeks.

10       Q.   Okay.  And so over that course of six

11  weeks, in forming your opinion on the potential

12  carcinogenicity of glyphosate, you did not consider

13  the IARC Monograph on glyphosate, fair?

14       A.   At that time, I knew that the compound --

15  the molecule was considered a probable human

16  carcinogen through there.  I had heard about that.

17  I was knowledgeable about that.  I had not read the

18  monograph.  I was thinking about, you know, that --

19  that process of designation and how -- and what did

20  the current literature say as related to the

21  integration of -- I looked at this, as I told you

22  earlier on, in a weight-of-the-evidence approach.

23  So I think like -- I think like that with human

24  exposure, experimental toxicology data and evidence

25  of mechanisms when it comes to carcinogens.  So --

Ronald J. Kendall, Ph.D.

1      Q.   And in the -- go ahead.

2      A.   So that's why -- and although at the SAP

3   and EPA, we generally looked at the active

4   ingredient.  That's how these materials are

5   reviewed.  In this -- this case I felt the

6   formulation was -- was more important and -- because

7   of the surfactants that were in the formulation.

8      Q.   Okay.  We're --

9      A.   So, again, I could -- I could really

10  relate.  I knew their process.  But, again, I draw

11  on a lot of history here of my experience with the

12  EPA.  We worked a lot with the Europeans.  They

13  would be on my panels.  I've done a lot of work in

14  Europe with organizations over there.  So it all

15  somewhat merges to me, although the approaches are

16  different when you look at the European model as

17  well as the International Agency of Cancer Research

18  model as well as the EPA model.

19     Q.   All right.  And I'm just trying to

20  understand the timeline here, sir.

21          So I think I understood your answer is in

22  those six weeks or so where you worked on your

23  report in the Spector matter, you did not consider

24  the IARC Monograph.  Fair?

25     A.   Not in the depth I've considered it in the

1    last week.

2        Q.   Okay.  In the last week, you've considered

3    the IARC Monograph itself and not just

4    Dr. Benbrook's summary of the IARC Monograph; is

5    that your testimony?

6        A.   Yeah, I haven't read every word.  I've

7    read -- like I said, I've worked on the computer

8    with it some.  You know, I've just tried to

9    familiarize myself with what they've come up with

10   versus what EPA has come up with.  And that's --

11   that's pretty much it.

12       Q.   Okay.  Do you intend to offer expert

13   opinions at trial regarding the IARC's evaluation of

14   glyphosate?

15       A.   I reserve the right to do so considering

16   I -- I thought through further their data handling

17   strategy and how they came up with interpretation.

18       Q.   Okay.  Again, I have --

19       A.   I don't specific- -- I'm not sitting here

20   specifically thinking right this second I'm going to

21   do it, but I reserve the right to do so.

22       Q.   The IARC Monograph has been out since 2015,

23   right?

24       A.   Right.

25            MR. KALAS:  Okay.  So, again, I'm just

1    going to note for the record this is yet another

2    undisclosed material he has considered in the course

3    of his opinion.

4        A.   Like I said, I don't -- I don't

5    specifically plan to do that.  That's all I could

6    say, is I -- you know, I reserve the right to

7    consider it, but I don't plan to do it.  And that's

8    why I --

9    BY MR. KALAS:

10       Q.   All right.  Well but you do plan to talk

11   about the Benbrook article.  You told me that.  And

12   my question --

13       A.   Yes.

14       Q.   And the question that I had initially is,

15   why rely on an article summarizing the IARC

16   Monograph as opposed to relying on the actual

17   monograph itself?  That's what I don't understand.

18   Why in your process --

19       A.   Well, because -- because I was very

20   interested in the contrast to the SAP and EPA.  I

21   was very interested in that.  And that was useful

22   because I -- I felt like it was -- have you read the

23   Benbrook article?

24       Q.   Yes, sir.  Many times.

25       A.   Okay.  So, you know, I just didn't detect

1    bias in it.  I thought it was a good article.  It

2    was well written, well balanced, peer reviewed.  And

3    I don't know, I -- I just think it was -- it was

4    useful to me and --

5        Q.   All right.

6        A.   -- within the time frames I've got to work

7    with this.

8        Q.   Let's go to the EPA document I have marked

9    as Exhibit 9.

10       A.   Okay.

11       Q.   Now, this is a document put out by the EPA

12   in December 2017.  It's entitled, "Revised

13   Glyphosate Issue Paper:  Evaluation of Carcinogenic

14   Potential."  Do you see that?

15       A.   Yeah, just a minute.  I'm trying to get

16   back to it.

17       Q.   Sure.

18       A.   Okay.

19       Q.   All right.  And one of the things you've

20   told me time and time again today is that you're

21   really interested in the formulations, right?

22       A.   Yes.

23       Q.   Okay.  And the two-year rodent

24   carcinogenicity bioassays that are discussed in this

25   paper do not look at formulations; they look at

1    glyphosate alone, right?

2         A.    Right.

3         Q.    Okay.  And glyphosate alone -- testing on

4    the active ingredient alone in the two-year

5    bioassays, that's what's required by the agency,

6    right?

7         A.    Yes.

8         Q.    Okay.  And you're not aware of any

9    pesticide product registered in the United States

10   where they've conducted a two-year bioassay on the

11   formulated product as opposed to the active

12   ingredient, right?

13        A.    I'm not aware of it, not off the top of my

14   head.

15        Q.    All right.  Now, you mentioned these

16   formulated product studies.  And I just want to go

17   down here to pages 203 through 216.  Or, excuse me,

18   215.

19        A.    Okay.  You want me to go to page 203?

20        Q.    Yes, sir, to 215 is where I'm going to

21   focus here to start.

22        A.    Okay.

23        Q.    Just let me know when you're there.  I'm

24   going to throw it up on the screen, too, just so we

25   can all be following along at the same place.  Are

1    you there, sir?

2        A.   I'm not.  I'm having to scroll with my

3    finger.

4        Q.   Well, you can also look at your main

5    screen.  I've got it up here.

6        A.   Okay.  All right.  I'm on my -- you shifted

7    me earlier to my -- I'm looking at my exhibits on my

8    iPad.  It doesn't load as fast my laptop.

9        Q.   I understand.

10       A.   What do you want me to do?  What do you

11   want me to do?  I've got -- I've got it to page 67.

12       Q.   Do you see here on page -- and I'm at

13   page 203, Table F.1, EPA has multiple in vitro tests

14   for gene mutations in bacteria with glyphosate

15   formulations.  Do you see that?

16       A.   Yes.

17       Q.   And these are studies on formulated product

18   as opposed to the active ingredient or the

19   surfactants alone, right?

20       A.   Right.

21       Q.   And these would be more relevant to your

22   opinions in this case than studies on the active

23   ingredient or surfactants alone, right?

24       A.   Right.

25       Q.   Okay.  And do you see here in Table F.1 for

Ronald J. Kendall, Ph.D.

1    these in vitro tests for gene mutations -- in vitro

2    tests for gene mutations are the Ames tests we were

3    talking about, right?

4        A.    Right.

5        Q.    Okay.  Do you see EPA has one, two, three,

6    four, five, six -- seven tests on this first page?

7    Do you see that?

8        A.    Yes.

9        Q.    Okay.  And then going to the second page

10   there are one, two, three, four, five, six -- seven

11   tests on the second page, 204.

12       A.    Yes.

13       Q.    Okay.  And then going to the third page,

14   there are one, two, three, four -- five tests on the

15   third page, page 205, right?

16       A.    Right.

17       Q.    Okay.  And then going to the fourth page

18   there are one, two, three, four -- five tests on the

19   fourth page, page 206, right?

20       A.    Right.

21       Q.    And then going to the fifth page, there are

22   one, two, three, four, five, six -- seven tests on

23   page 207, right?

24       A.    That's what it looks like.

25       Q.    Okay.  And then that's it for the Table

1    F.1, in vitro tests for gene mutations and bacteria.

2    And so that is a total of 7 plus 7 plus 5 plus 5, 31

3    tests that EPA has on formulated product in the Ames

4    test, right?

5        A.   Right.

6        Q.   Okay.  And all of those have been

7    characterized by EPA as negative, right?

8        A.   That's what it looks like.

9        Q.   And you don't disagree with that conclusion

10   because you haven't looked at those tests, right?

11       A.   I -- I -- I don't disagree with it for --

12       Q.   Okay.

13       A.   -- this particular dataset.

14       Q.   Okay.  And you don't know if plaintiff's

15   counsel has access to those tests, right?

16       A.   I don't know.

17       Q.   Okay.  Are those tests you would have liked

18   to have seen in reaching your expert opinion since

19   they are on the formulated product if plaintiff's

20   counsel had access to them?

21       A.   It would have been useful.

22       Q.   Okay.  Let's go down to Table F.4 for a

23   moment here.  Now, these are bone marrow micronuclei

24   tests, right?

25       A.   Just a minute, I'm -- yeah, I'm on my --

Ronald J. Kendall, Ph.D.

```
 1   I've got -- I'm to the point now --

 2       Q.    Perfect.

 3       A.    -- on my computer.

 4       Q.    Okay.  And this is at page 210 is where it

 5   starts.

 6       A.    Right.

 7       Q.    Okay.  And these are -- these are, again,

 8   in vivo tests for micronuclei injection in mammals?

 9       A.    Yes.

10       Q.    Okay.  And we talked earlier, these are --

11   these are tests actually in live animals as opposed

12   to in the petri test or test tube, right?

13       A.    Right.

14       Q.    Okay.  And these micronuclei tests, these

15   are guideline studies, correct?

16       A.    They are.

17       Q.    Okay.  And they are relevant to

18   understanding genotoxicity and/or mutations, right?

19       A.    Yes.

20       Q.    Okay.  And, again, these are in -- I may

21   have already asked you, I can't recall.  But these

22   are in formulated product as opposed to glyphosate

23   alone or surfactants, right?

24       A.    Right.

25       Q.    Okay.  And if we look here on page 1, we
```

1    have one, two, three, four -- five tests.  And this

2    is page 210 of the document.

3        A.   Okay.

4        Q.   Okay.  And then on page 2, which is

5    page 211 of the document, we have one, two, three,

6    four, five -- six tests, correct?

7        A.   Yes.

8        Q.   Okay.  And then on page 3, which is

9    page 212 of the document, we have one, two, three,

10   four, five -- six tests, correct?

11       A.   Yes.

12       Q.   Okay.  And then on page 4, which is

13   page 213 of the document, we have one, two -- three

14   tests, right?

15       A.   Yes.

16       Q.   Okay.  So putting those all together, we

17   have 3 plus 6, that's 9, 10, 11, 12, 13, 14, 15, 16,

18   17, 18, 19 -- 20 tests in Table F.4, fair?

19       A.   I'm counting them.

20       Q.   Sure.

21       A.   Yes.

22       Q.   Twenty tests on Table F.4, and 19 of them

23   are reported as not showing an effect, one test is

24   reported as showing an effect.  Do you see that?

25       A.   I do.

1      Q.    Okay.  And you haven't reviewed any of

2    these tests, right?

3      A.    Correct, not in the micronucleus.

4      Q.    Okay.  And, again, because they're on

5    formulated product and living systems, they would be

6    relevant to your opinions, right?

7      A.    They would be relevant to a piece of my

8    opinion.

9      Q.    Okay.  And these are tests you would have

10   like to have seen if they were available to

11   plaintiff's counsel, fair?

12     A.    Yes.

13     Q.    Okay.  And you don't know if they're

14   available to plaintiff's counsel, right?

15     A.    I don't know.

16     Q.    Okay.  And because you haven't reviewed

17   these tests, you cannot disagree with EPA's

18   conclusions regarding these tests; is that fair?

19     A.    I don't disagree.

20     Q.    Okay.

21     A.    But they're just a piece -- they're just a

22   piece of the large puzzle of the

23   weight-of-the-evidence.

24     Q.    Okay.  If 19 out of 20 tests show that

25   there is no in vivo micronuclei induction in mammals

1   using glyphosate formulations, does that suggest

2   that glyphosate is not genotoxic via the micronuclei

3   induction mechanism?  Or excuse me, glyphosate-based

4   herbicides I should have said.  But if you need to

5   repeat that, I can.

6        A.   Restate that, please.

7        Q.   Sure.  If 19 out of 20 tests are negative

8   in the in vivo micronuclei induction methodology,

9   does that suggest glyphosate-based herbicides are

10   not genotoxic via the micronuclei induction

11   mechanism?

12        A.   It would appear so.  But we do have one

13   positive test.

14        Q.   Okay.

15        A.   And so, again, that -- that's what I'm

16   talking about, why is that positive?

17        Q.   Sure.  Sure.  And Bolognesi, actually, is

18   in the published literature.  Did you know that?

19        A.   I'm sure it's -- I'm sure it's recoverable.

20        Q.   Okay.  And were you aware that the

21   Bolognesi study -- well, if you haven't reviewed it,

22   you're probably not aware.  But the Bolognesi study

23   did not analyze for something called "cytotoxicity."

24   Do you know what the word cytotoxicity mean?

25        A.   Absolutely.

Ronald J. Kendall, Ph.D.

```
 1        Q.   What does "cytotoxicity" mean, sir?

 2        A.   That means that a substance can result in

 3   cell toxicity or cell death.

 4        Q.   Okay.  And when a substance is cytotoxic,

 5   you can see genetic damage that is not a result of a

 6   carcinogenic process but is instead a result of the

 7   cell death from the toxic effect, right?

 8        A.   Yeah, that's it.

 9        Q.   Okay.  And -- and just to be clear,

10   terminology-wise, the word "toxic" does not equal

11   the word "carcinogenic," right?  They're different

12   things?

13        A.   They are different.

14        Q.   Okay.  And so an important thing in any

15   mechanistic study is an analysis for cytotoxicity,

16   right?

17        A.   Right.

18        Q.   Okay.  And EPA looks at cytotoxicity when

19   they're evaluating mechanistic studies, don't they?

20        A.   That's a part of it, yeah.

21        Q.   And that's appropriate to do, isn't it?

22        A.   Of course it is.

23        Q.   Okay.  And, likewise, in the animal

24   toxicology study, EPA looks at whether or not the

25   dose exceeds the maximum tolerated dose, right?
```

1      A.    Yeah.

2      Q.    And that's also known as the "limit dose,"

3   true?

4      A.    That's one way to describe it.

5      Q.    Okay.  And that's completely appropriate as

6   well, right?

7      A.    Yes.

8      Q.    Okay.  And another thing EPA looks for in

9   both these mechanistics studies and in the animal

10  studies is something calmed "dose response," right?

11     A.    Right.

12     Q.    And dose response is when you look for the

13  effect of the compound causing increasing effects as

14  the dose goes up, right?

15     A.    Right.

16     Q.    And without that, you don't know if what

17  you're seeing is noise in the data or an actual

18  compound-related event, true?

19     A.    It's possible.

20     Q.    Okay.  And, in fact, when I say "noise in

21  the data," speaking specifically about animal

22  carcinogenicity studies, every rodent bioassay has

23  cancer in their control groups; in other words, the

24  groups that are not dosed with the compound, right?

25     A.    I don't know about everyone, but it does

1    occur.

2         Q.   Right.   And that's because mice and rats

3    get cancer naturally, right?

4         A.   We think they do.

5         Q.   Okay.   Now, I just want go up to page 143

6    of this document.   And I've highlighted a section I

7    want to ask you about here.

8         A.   All right.   I'm getting there.

9         Q.   Okay.

10        A.   I'm at 143.

11        Q.   Okay.   The EPA says right about 6. -- right

12   above 6.7, "Overall, there's not strong support for

13   the suggestive evidence of carcinogenic potential

14   classification" -- "cancer classification descriptor

15   based on the weight-of-the-evidence, which includes

16   the fact that even small, nonstatistically

17   significant changes observed in animal

18   carcinogenicity and epidemiological studies were

19   contradicted by studies of equal or higher quality.

20   The strongest support is for, 'not likely to be

21   carcinogenic in humans.'"

22             Did I read that correctly?

23        A.   You did.

24        Q.   Do you disagree with EPA that the strongest

25   support under their guidelines is not likely to be

Ronald J. Kendall, Ph.D.

1    carcinogenic to humans?

2         A.    "Not likely to be carcinogenic in humans"

3    does not say it is not carcinogenic in humans.  It

4    is not likely, which is a far different conclusion

5    than saying it is not carcinogenic in humans.  So I

6    don't disagree with what they say because I know why

7    they say it, because there's still some question

8    about this.  That's why they use "not likely."

9         Q.    Is there any classification below "not

10   likely" where EPA can say "not carcinogenic in

11   humans"?  Is there that classification in the regs?

12        A.    They say "not carcinogenic."

13        Q.    Okay.  Okay.  If that's your position on

14   the regulations, that's fine.

15             How about this, EPA elsewhere in this

16   document -- and we can find it if you need to, but

17   in some ways -- anyway, we can find it if we need

18   to.

19             EPA elsewhere in that document talks about

20   the fact that glyphosate is not genotoxic.  Do you

21   disagree with that statement?

22        A.    I think there's a lot of controversy on

23   that subject because there -- okay.  Glyphosate and

24   then glyphosate formulation.  Okay.  Glyphosate,

25   based on what I've seen, is not as genotoxic as the

1   formulation in terms of the ability to induce

2   oxidative stress, particularly, or to induce any

3   genetic damage.  So the formulation is more potent

4   in that -- in that particular context.

5           So I -- I -- I'll leave it at that.

6       Q.   I'm not sure if you answered my question

7   now.  So I just want to make sure I understand your

8   position on this.

9           Do you disagree with EPA when they state

10  glyphosate is not genotoxic?

11      A.   I think that's a debatable answer based on

12  where we are today.  And in terms of -- it's

13  according to how we classify genetic toxicity as far

14  as potency.  And I think it's debatable.

15      Q.   Okay.  Now, you mentioned formulated

16  products.  I'm going to mark as exhibit -- well, let

17  me ask you this, can you go through one more

18  document, or do you need a break?  We've gone

19  50 minutes or so.

20      A.   Either way.

21      Q.   Okay.

22      A.   You know, five minutes would be great, or

23  we can go through another document.

24      Q.   Sure.  Yeah, I think I can do this one in

25  five minutes.  Give me one second.

1      A.   Oh, okay.

2      Q.   So I'll mark as -- I'm sorry, were you

3   saying five minutes would be great right now?  I

4   think that's what you were saying.  Let's take --

5      A.   Yeah, I could -- I could -- if you want to

6   proceed, I'll proceed.

7      Q.   No, no, no.

8           MR. KALAS:  Let's take five minutes.

9   Take your five.  Let's get back on at 2:40 your

10  time.

11          THE VIDEOGRAPHER:  The time is 2:34

12  p.m., and we are off the record.

13          (Break taken, 2:34 p.m. to 2:41 p.m.)

14          THE VIDEOGRAPHER:  The time is 2:41

15  p.m., and we are on the record.

16          (Exhibit No. 11 identified.)

17  BY MR. KALAS:

18     Q.   Dr. Kendall, I've marked as Exhibit 11 a

19  regulatory document from Health Canada.  If you

20  could, take a look at that real quick.

21     A.   Okay.  I'm just loading now.

22     Q.   Sure.

23     A.   Okay.

24     Q.   This is a document that is not on your

25  consideration list.  Have you seen this document

```
 1   before?

 2       A.   I have not.

 3       Q.   Okay.  And it's a reevaluation decision for

 4   glyphosate.  Do you see that?

 5       A.   Yes.

 6       Q.   Okay.  And it's put out by a group called

 7   the Pest Management Regulatory Agency in Canada.  Do

 8   you see that at the bottom of the first page?

 9       A.   Yes.

10       Q.   Okay.  What is the PMRA?

11       A.   That would be the group that regulates

12   pesticides in Canada.

13       Q.   Okay.  And one of the things you talked

14   about was formulated products.  And if you go here

15   to the third page of the document, the page is

16   listed is page 3, but it's page 8 of the PDF.  At

17   the top of that page, it says, "In 2010, Health

18   Canada published a reevaluation work plan for

19   glyphosate outlining the focus of this reevaluation

20   and indicating that the PMRA is working

21   cooperatively with the United States Environmental

22   Protection Agency.  As part of this reevaluation,

23   the effect of polyethoxylated" -- that's

24   p-o-l-y-e-t-h-o-x-y-l-a-t-e-d, "tallow amines, POEA,

25   and metabolite and transformation product
```

1    aminomethylphosphonic" -- that's

2    a-m-i-n-o-m-e-t-h-y-l-p-h-o-s-p-h-o-n-i-c -- "acid

3    (AMPA) are also included."

4         Did I read that correctly?

5    A.   I listened to it.  I'm -- that is not on

6    the top of my page 8.

7    Q.   All right.  So let's -- let's share it

8    here.  So I'm looking at page 3 of the document.

9    A.   Okay.

10   Q.   See that?  And it's page 8, PDF-wise.

11   A.   Okay.

12   Q.   Just take a moment to read that to

13   yourself, the part I have highlighted.  It's right

14   above, "What is Glyphosate?"

15   A.   Okay.  I read it.

16   Q.   Okay.  And so the Canadian regulators were

17   reviewing the effect of something called POEA in

18   addition to glyphosate, right?

19   A.   Correct.

20   Q.   Okay.  And POEA is the surfactant or the

21   main surfactant that was in Roundup original, right?

22   A.   Right.

23   Q.   Okay.  And so the Canadian regulators, if

24   you go down to page 5, they talk about here

25   occupational risks from handling glyphosate.  Do you

1   see that?

2       A.   Yes.

3       Q.   Okay.  And Ms. Spector handled glyphosate,

4   right?

5       A.   Yes.

6       Q.   Okay.  And going down here to the section

7   on POEA, it says, "POEA is a family of several

8   compounds that are used as surfactants in many

9   glyphosate products registered in Canada.  No human

10  health risks of concern were identified for these

11  end use products provided that they contain no more

12  than 20 percent POEA by weight.  All the currently

13  registered glyphosate end use products in Canada

14  meet this limit."

15          Did I read that correctly?

16      A.   You did.

17      Q.   Okay.  Do you disagree with Health Canada

18  that there are no human health risks of concern in

19  end use products containing 20 percent POEA by

20  weight or less?

21      A.   Well, you could look at it from several

22  ways.  Number one, POEA may be present at 20 percent

23  or less, but the issue is do the -- is the presence

24  of the surfactants going to facilitate a more rapid

25  absorption of the active ingredient glyphosate

1    perhaps across the surface of the skin in an exposed

2    human.  So it's not maybe the issue of the health

3    risk or the health issues directly of the POEA but

4    the interaction of the POEA with -- with glyphosate

5    in the formulation.

6        Q.   Are you done with your answer?

7        A.   I am.

8        Q.   Do you disagree with the statement by

9    Health Canada that no human health risks of concern

10   are identified for end use products -- that's

11   formulated Roundup products -- provided they contain

12   no more than 20 percent POEA by weight?

13       A.   I don't agree or disagree with it.

14       Q.   Okay.  Now, you mentioned there more

15   absorption using the formulated products as opposed

16   to glyphosate alone.  You talked about facilitating

17   transport across the skin, right?

18       A.   Yes.

19       Q.   Okay.  Have you reviewed any of the journal

20   absorption studies conducted by Monsanto or by

21   outside investigators on formulated products?

22       A.   The formulated product on the George study

23   have significantly higher potential to penetrate the

24   skin and facilitate tumorigenic activity than just

25   the glyphosate alone when in combination of exposure

1    with a known carcinogen.

2        Q.   All right.  I'm very familiar with the

3    George study, and I don't remember a dermal

4    absorption arm in that study.  I can mark it --

5        A.   Well, it was --

6        Q.   I can mark it right now.  But was the end

7    point dermal absorption?

8        A.   No, the end point was tumors.

9        Q.   Okay.  So I'm asking about dermal

10   absorption.  Do you understand that part of my

11   question?

12       A.   I do.

13       Q.   Okay.  Have you reviewed any dermal

14   absorption studies on either glyphosate or the

15   formulated products that were conducted by Monsanto

16   or by outside investigators?

17       A.   I have not reviewed Monsanto dermal

18   absorption studies.

19       Q.   Okay.  I also asked about outside

20   investigators.  Have you reviewed any of the studies

21   done by nonMonsanto investigators on dermal

22   absorption?

23       A.   Generally -- generally, absorption is

24   estimated to be 3 percent or less through the skin.

25       Q.   And that includes with formulated products,

Ronald J. Kendall, Ph.D.

```
 1   right?

 2      A.   Yes.

 3      Q.   And you -- and are you aware that the

 4   studies on dermal absorption have shown that the

 5   absorption from formulated products is similar

 6   and/or the same as the absorption from "neat"

 7   glyphosate without surfactants?  Are you aware of

 8   that fact?

 9      A.   I would expect it would be fairly similar,

10   but it could be dissimilar in certain situations.

11   But probably pretty similar.

12      Q.   Okay.  Now, turning -- well, let me ask you

13   this before we move on to a different topic.

14           Are you aware -- well, Health Canada --

15   and we can go back to the document -- has classified

16   glyphosate as noncarcinogenic.  Would you disagree

17   with that classification?

18      A.   I wouldn't agree with it or disagree with

19   it.

20      Q.   Okay.

21      A.   Because it's just the active ingredient.

22   It's not formulations.

23      Q.   Okay.  And, likewise, there have been

24   classifications on the carcinogenicity of glyphosate

25   by the Australians, the New Zealanders, the
```

1    Japanese, the EFSA, the European Chemicals Agency,

2    and the JMPR.  Are you aware there have been

3    evaluations by those agencies?

4         A.   I am.

5         Q.   Okay.  Are you aware all of those agencies

6    have classified glyphosate as not carcinogenic?

7         A.   I'm aware of some of them, yes.

8         Q.   Okay.  And assuming all those agencies have

9    classified glyphosate as not carcinogenic, I take it

10   you would not agree or disagree with those agencies

11   as well?

12        A.   I think it's a debatable issue.

13        Q.   Okay.  And, again, you have not reviewed,

14   to your knowledge, all of the material that those

15   agencies have reviewed in reaching their decisions,

16   right?

17        A.   I suspect all of those agencies haven't

18   reviewed all the other materials of the other

19   agencies in reaching those decisions either.  So the

20   answer is no.

21        Q.   Okay.  Is there an agency on earth,

22   including the IARC, that has classified

23   glyphosate-based herbicides, in other words, the

24   formulated product, as carcinogenic?

25        A.   No.

1    Q.   Okay.  Is there an agency on earth that has

2    classified the inert products, i.e., the surfactants

3    like POEA, used in glyphosate-based herbicides as

4    carcinogenic?

5    A.   Not that I'm aware of.

6    Q.   Okay.  There's a study on your considered

7    reliance list called Andreotti 2018.  I just want to

8    take a look at that study real quick.

9              MR. KALAS:  I am going to mark that as

10   Exhibit 12, I believe is where we're at.

11             (Exhibit No. 12 identified.)

12   BY MR. KALAS:

13   Q.   Let me know when you get that open.

14   A.   Okay.

15   Q.   Okay.  And this is a study you reviewed,

16   right?

17   A.   Right.

18   Q.   Okay.  And when you reviewed this study,

19   did you review the supplemental tables that are

20   attached here on pages 9 through 14 as well?

21   A.   Yes.

22   Q.   Okay.  And this study, if we go back to

23   page 1, is written by about 12 authors, right?

24   A.   Right.

25   Q.   Okay.  And those authors work at -- or many

1    of those authors work at something called the

2    National Cancer Institute, correct?

3        A.    Correct.

4        Q.    What is the National Cancer Institute?

5        A.    It's a national organization dedicated to

6    the cancer research.

7        Q.    And it's the U.S. government's cancer

8    research arm, right?

9        A.    Correct.

10       Q.    There are good scientists that work at the

11   National Cancer Institute?

12       A.    I'm sure there are.

13       Q.    And they're not financed in their research

14   by Monsanto, right?  They're financed by our tax

15   dollars?

16       A.    Right.

17       Q.    Okay.  And then the other authors here on

18   this study are from a place called the National

19   Institute of Environmental Health Sciences.  Do you

20   see that?

21       A.    Yes.

22       Q.    And that's also -- I guess abbreviated is

23   NIEHS, right?

24       A.    Right.

25       Q.    Okay.  And what is NIEHS?

Ronald J. Kendall, Ph.D.

 1      A.   The National Institute of Environmental

 2   Health Sciences.  They do health-related work,

 3   particularly on chemicals related to human health

 4   issues in the United States.

 5      Q.   Are there good scientists at NIEHS, in your

 6   opinion?

 7      A.   Yes.  I know many of them.

 8      Q.   Okay.  And then the last two authors are

 9   from the University of Iowa and Drexel University,

10   right?

11      A.   That's what it says.

12      Q.   Okay.  And so none of the authors here are

13   employed by Monsanto, right?

14      A.   Right.

15      Q.   Okay.  And this is an epidemiology study

16   that appeared in the journal called the Journal of

17   the National Cancer Institute, right?

18      A.   Right.

19      Q.   It's a peer reviewed journal?

20      A.   I'm sure it is.  I've never published in

21   it.

22      Q.   Okay.  And this is what is known as a

23   prospective cohort study, right?

24      A.   Right.

25      Q.   Okay.  What is a prospective cohort study?

Ronald J. Kendall, Ph.D.

1      A.   It's a -- it's a cohort, for instance,

2    pesticide applicators that you're looking at

3    long-term exposure and prospecting as to what their

4    development of cancer or some disease may -- may --

5    may be through statistical analyses.

6      Q.   And how does a cohort study differ from a

7    case control study?

8      A.   Case control is -- the case you may

9    identify it as farmers and farmers that have used

10   chemicals for X number of years.  The control, as

11   you designate it in your experimental design, may be

12   just standard citizens, they may be people that have

13   never used the pesticide before, however you want to

14   set up that control.  So it's a little different.

15     Q.   And as I understand it, case control study

16   is usually retrospective.  Right?

17     A.   Right.

18     Q.   Okay.  And retrospective means looking

19   back, right?

20     A.   Right.

21     Q.   And so what you do in a case control study

22   is you find a bunch of people with the disease

23   you're interested in and you ask them whether or not

24   they were exposed to a laundry list of chemicals, if

25   that's what you're interested in, right?

1     A.   That's -- that's a possibility, if that's

2   what you're interested in.

3     Q.   Okay.  And on the other hand, in a

4   prospective cohort study, you pull together a bunch

5   of people in the same industry, for instance, here

6   in the AHS study, Andreotti study we have pesticide

7   applicators, and you get information on what they're

8   exposed to and then you follow up with them over the

9   course of many years to see what happens to them,

10  right?

11    A.   Right.

12    Q.   Okay.  And one advantage of a prospective

13  study as opposed to a retrospective study is a

14  prospective study isn't dealing with something

15  called "recall bias," right?

16    A.   Right.

17    Q.   What is recall bias?

18    A.   Well, as you -- in a retrospective study,

19  you have to think back, your -- your times of use of

20  a chemical, when you were potentially using it and

21  were exposed.  You have to remember that.  And that

22  can be a factor in terms of --

23    Q.   What -- go ahead.

24    A.   -- of how good you remember it.

25    Q.   What they found in simulation studies is

Ronald J. Kendall, Ph.D.

```
1    that people who have the disease of interest are

2    more likely to remember exposures to chemicals than

3    people who don't have a disease, right?

4         A.   I don't know about that.

5         Q.   Okay.  So you -- you are not -- that's

6    fine.  If you don't know about that, that's fine.

7         A.   Well, I mean, I -- you know, I haven't read

8    the paper on that --

9         Q.   Okay.  Well, I mean --

10        A.   -- as far as --

11        Q.   -- is that a -- is that a thing, though, is

12   that people with the disease are more likely to

13   search their memory for exposures than people

14   without the disease?  Is that something you have

15   heard of?

16        A.   I've heard of it, but I haven't read the

17   papers on it.  I don't know the scientific logic for

18   how to prove that or not.

19        Q.   And --

20        A.   So I --

21        Q.   That's fair.

22        A.   -- would just say that is -- would be

23   something that would be considered.

24        Q.   Okay.  That's fair.

25             You're not an expert on the design of
```

1   epidemiology studies.  You defer to Dr. Ritz on

2   that?

3        A.   Yes.

4        Q.   Okay.

5        A.   I've evaluated epidemiological data.  I've

6   looked at approaches to evaluate the data.  But I

7   don't design epidemiology studies.

8        Q.   Okay.  Going back to the Andreotti study,

9   which we have marked as Exhibit 12, that study is

10  the largest epidemiology study you've reviewed,

11  right?

12       A.   Yes.

13       Q.   Okay.  And it's a study in individuals who

14  are the most highly exposed to glyphosate in the

15  populations you have reviewed, right?

16       A.   Theoretically, because they were

17  applicators.

18       Q.   Okay.  And this includes people like

19  farmers in it, right?

20       A.   Right.

21       Q.   And when they apply glyphosate -- go ahead.

22  I'm sorry.

23       A.   They have a pesticide -- they have

24  pesticide applicator licenses.

25       Q.   Right.  So the farmers, for instance, when

1    they apply glyphosate on GMO crops, they're going to

2    apply potentially hundreds of pounds in one day to

3    those GMO crops, right?

4         A.    It's possible.

5         Q.    Okay.  And a residential user like

6    Ms. Spector is not going to do that, right?  She's

7    going to apply ounces a day, at most?

8         A.    It depends on the day and how long you want

9    to apply the chemical.  The difference --

10        Q.    Okay.  Well, I said like Ms. Spector -- go

11   ahead.

12        A.    The difference is most agricultural

13   applications will be in a closed-cab canopy with a

14   tractor as an example versus somebody holding it

15   maybe with a cotton glove on or with your hand.

16   That's -- that's the difference.

17        Q.    Okay.  Let's back up there, though, because

18   I did ask about Ms. Spector, and I said like

19   Ms. Spector.  So let's make it more specific.

20             Ms. Spector applied ounces in a day, not

21   pounds of glyphosate, right?

22        A.    Right.

23        Q.    Okay.  And you mentioned the closed cab

24   point.  And, in fact, the agricultural health study

25   actually got information in their intensity

Ronald J. Kendall, Ph.D.

```
 1    weighting metric on how applicators applied, right?

 2        A.   It did.

 3        Q.   Okay.  And so one of the things they found

 4    out about is whether they used a tractor, right?

 5        A.   Yeah, and the exposures.

 6        Q.   Right.  And they found out about whether or

 7    not they had a closed cab on that tractor, right?

 8        A.   Yeah.

 9        Q.   And they found out about whether they wore

10    Tyvek, right?

11        A.   They did.

12        Q.   And they found out about whether they wore

13    chemically resistant gloves, right?

14        A.   Right.

15        Q.   And they found out about where they used a

16    knapsack or a backpack sprayer versus a vehicle,

17    right, or a boom sprayer?

18        A.   Correct.

19        Q.   Okay.  And so there were individuals in

20    this study who did apply in a closed cab with boom

21    sprayers, and there are individuals in this study

22    who applied with a backpack sprayer not wearing

23    gloves, right?  It ran -- ran the gamut?

24        A.   Right.

25        Q.   Okay.  Okay.  And if we go down to -- well,
```

Ronald J. Kendall, Ph.D.

1    let me back up to Ms. -- Ms. Spector for a moment.

2           When I was reviewing your expert report --

3    let me just -- you can go back to -- when I was

4    reviewing your expert report, you stated that, "At a

5    minimum, Ms. Spector sprayed Roundup once a week for

6    four months each year over 27 years."  Do you recall

7    writing that?

8        A.   Yeah, that's what she said in her

9    deposition.

10       Q.   Okay.  And so once a week for four months

11   each year is 18 days a year, right?  Because some

12   months have four weeks, some months have five?

13       A.   Yeah, I would say four weeks a month would

14   be a good estimate.

15       Q.   Okay.  Four weeks a month would be a good

16   estimate.  So -- so 16, then.  And then 27 years,

17   that's 432 days of exposure, right?  16 times 27?

18       A.   Right.

19       Q.   Okay.  So the agricultural health study

20   actually measured days of exposure and cancer

21   incidents, right?  And this is --

22       A.   Yes.

23       Q.   -- supplementary Table 1 that I'm looking

24   at.

25       A.   Okay.

```
1          Q.    And if you look at supplementary Table 1

2    and you go down to the second page of supplementary

3    Table 1, they have a key for their quartiles.  Do

4    you see that?

5          A.    Yes.  What page are you on again?

6          Q.    I'm on page 10 now of the PDF.

7          A.    Okay.  Which supplementary table are you

8    on?

9          Q.    I'm on supplementary Table 10, sir.

10         A.    Okay.  I've got it now.  Mine's not -- my

11   iPad is not showing a page number.

12         Q.    No worries.

13               And so on supplementary Table 1, we have a

14   key at the bottom of that table where they list

15   their quartiles, right?

16         A.    Right.

17         Q.    And quartile 4 is greater than 108.5 days.

18   Do you see that?

19         A.    Right.

20         Q.    Okay.  And so if we go back up to

21   Non-Hodgkin lymphoma, for quartile 4 -- we're still

22   on the same page.  For quartile 4, there were 116

23   individuals in quartile 4 and their relative risk

24   for cancer was .8 with a confidence interval of .6

25   to .106.  Do you see that?
```

Ronald J. Kendall, Ph.D.

1       A.   Right.

2       Q.   Okay.  And so for individuals who applied

3    same or -- well, strike that.

4            For individuals who applied the number of

5    days that -- strike that.  Let me ask this question

6    better.

7            You agree Ms. Spector by applying 432 days

8    would fit into quartile 4 if we were doing a

9    lifetime day analysis of her?

10      A.   Yes, approximately.

11      Q.   Okay.  And so for individuals like

12   Ms. Spector with greater than 108.5 days of

13   exposure, they did not find any relationship between

14   that exposure and NHL in the Andreotti study, true?

15      A.   In the Andreotti study, true.

16      Q.   Okay.  And, likewise, for diffuse large

17   B-cell lymphoma, if we go down that page a bit --

18      A.   Right.

19      Q.   -- that is the type of lymphoma she had,

20   right?  Or she has?

21      A.   She did.

22      Q.   Okay.  And the relative risk for that is

23   .97 in the quartile 4 group, right?

24      A.   Correct.

25      Q.   With a confidence interval of .52 to 1.81,

```
 1   right?
 2        A.   Right.
 3        Q.   Okay.  And, again, that would suggest no
 4   relationship between individuals who've applied a
 5   similar number of days as Ms. Spector and NHL, DLBCL
 6   specific, right?
 7        A.   Right.
 8        Q.   Okay.  And then the type of lymphoma she
 9   had was actually marginal zone lymphoma, right?
10        A.   Right.
11        Q.   And they analyzed that as well here in
12   the -- in the table right below DLBCL.  Do you see
13   that?
14        A.   Yes.
15        Q.   Okay.  And for, I guess, they call it
16   median group 2, which is the group she falls into if
17   you go down to the key, they found a relative risk
18   of .5 with a confidence interval of .12 to 2.08,
19   right?
20        A.   Right.
21        Q.   And, again, that's a null finding, right?
22        A.   For this particular end point and study,
23   yes.
24        Q.   Okay.  And, again, for individuals like
25   Ms. Spector who applied for, in this case, because
```

1    it's a median analysis, greater than 38.75 days, who

2    had marginal zone lymphoma, they did not find a

3    relationship between Roundup exposure and NHL,

4    right?

5        A.   In this study.

6        Q.   Okay.  And just to be clear -- just to be

7    clear for anybody who comes back and reads this

8    transcript, this is a study of individuals who are

9    applying formulated products and not glyphosate

10   alone, right?

11       A.   Right.

12       Q.   Okay.  Now, on your materials considered

13   list and reliance list, you list, I think -- well,

14   if we go back -- let me go back to your report.

15   We've talked about six epidemiology studies you have

16   listed, right?

17       A.   Correct.

18       Q.   Okay.  And one of those studies is the

19   McDuffie study, right?

20       A.   Correct.

21       Q.   And the McDuffie study actually was pooled

22   into the Pahwa study, was it not?

23       A.   It was.

24       Q.   Okay.  And so if you're analyzing the

25   McDuffie study and the Pahwa study, you're actually

1    looking at the same data twice, aren't you?

2        A.   Yeah, they've just analyzed it a little

3    differently.

4        Q.   Okay.  And so we'll look at both of them

5    either today or next time we get together.  But I

6    just want to make sure we're on the same page there.

7             Another study you looked at the Eriksson

8    study, right?

9        A.   Right.

10       Q.   Okay.  And that is a case control study of

11   a population in Sweden, right?

12       A.   Correct.

13       Q.   Okay.  And then you looked at a study

14   called the Leon study, right?

15       A.   Yes.

16       Q.   Okay.  And the Leon study is a pooled study

17   that you report looking at three agricultural worker

18   cohorts, right?

19       A.   Yes.

20       Q.   Okay.  And that's one in the United States

21   and two over in Europe, right?

22       A.   Correct.

23       Q.   Okay.  And lastly, you looked at something

24   called the Zhang study, right?  Z-h-a-n-g.

25       A.   Z-h-a-n-g, yeah, Zhang.

Ronald J. Kendall, Ph.D.

```
 1       Q.   Okay.  And the Zhang study is something
 2   called a meta-analysis, right?
 3       A.   Okay.
 4       Q.   Okay.  And when you're dealing with
 5   meta-analysis, what you're essentially doing is
 6   putting together a bunch of individual studies into
 7   one grand analysis, right?
 8       A.   That's what they did.
 9       Q.   Okay.  And any methodological issues that
10   are inherent in those underlying studies are going
11   to be carried over into your meta-analysis unless
12   you control for them in some way, fair?
13       A.   Yes.
14       Q.   Okay.  So if you go to -- well, let me ask
15   you this:  Has there been any meta-analyses in the
16   literature since the Zhang study, that you know of?
17       A.   I'm not sure.
18       Q.   Okay.  Did you ever see a study called
19   Donato 2020 that was a meta-analysis of glyphosate
20   data?
21       A.   I believe I did see that.
22       Q.   When did you see that?
23       A.   Just recently.
24       Q.   Okay.  You're aware that --
25       A.   Last few -- last few days.  Just. . .
```

```
1        Q.   Okay.  Did you ever see a meta-analysis on
2   glyphosate-based herbicides conducted by the USEPA
3   in early 2020?
4        A.   No.
5        Q.   Okay.  Did you ever see a meta-analysis
6   conducted by a researcher named Geoffrey Kabat in
7   2020?
8        A.   No.
9        Q.   Did you ever see a meta-analysis conducted
10  by Paolo Boffetta in 2021 on glyphosate?
11       A.   No.
12       Q.   Okay.  And so you are aware there was a
13  meta-analysis that followed up Zhang called Donato
14  that you saw recently.  Do you know what the outcome
15  of that meta-analysis was?
16       A.   I just lost you visually, but it's coming
17  back.  Can you hear me?
18       Q.   Yeah.  And we can see you.
19       A.   Okay.  Okay.
20       Q.   Do you want me to repeat my question, or do
21  you remember it?
22       A.   Yeah, please.
23       Q.   Do you know what the outcome of the Donato
24  meta-analysis was?
25       A.   Off the top of my head, I think that
```

1    meta-analysis did demonstrate a relationship between

2    glyphosate and Non-Hodgkin's lymphoma and

3    association.

4                MR. KALAS:   Okay.  Mark the Donato

5    analysis as Exhibit 13.

6                (Exhibit No. 13 identified.)

7    BY MR. KALAS:

8        Q.   Let me know when you've had a chance to

9    open that, sir.

10       A.   Okay I've opened it.

11       Q.   Okay.  And the title of this article is,

12   "Exposure to Glyphosate and Risk of Non-Hodgkin

13   Lymphoma and Multiple Myeloma:  An Updated

14   Meta-Analysis."  Right?

15       A.   Right.

16       Q.   Okay.  And you see this is conducted by

17   some academics in Italy and the USA, right?

18       A.   Yes.  And I have not seen this article.

19       Q.   You have not seen this article?  Okay.

20       A.   No, I have not.  No, I have not.

21       Q.   Okay.  So let's -- let's just take a look

22   at it real quick here.  If you go to page 69 of the

23   article and let me know when you're there.

24       A.   I'm -- I'm there.

25       Q.   Okay.  And do you see here that they

1    conducted a meta-analysis on the studies on

2    glyphosate exposure and the risk of NHL in Figure 2?

3         A.   Yes.

4         Q.   Okay.  And they included the McDuffie

5    study, right?

6         A.   Yes.

7         Q.   Okay.  And they included the De Roos 2003

8    study, right?

9         A.   Right.

10        Q.   And the McDuffie and De Roos 2003 studies

11   are the two studies that underlie the Pahwa study

12   that's on your -- that's in your report, right?

13   Those are the two that were pooled?

14        A.   Right.

15        Q.   Okay.  And then they include the Eriksson

16   study, right?  And that's in your report as well,

17   right?

18        A.   Right.

19        Q.   Okay.  And then they include the Leon

20   study, right?  And that's in your report as well,

21   right?

22        A.   Right.

23        Q.   And the Leon study includes the Andreotti

24   data within it, right?

25        A.   Correct.

```
 1        Q.   Okay.  And so all the primary studies that

 2   are listed in your report are included in this

 3   meta-analysis, correct?

 4        A.   Correct.

 5        Q.   Okay.  And in addition, they include two

 6   other -- or three other studies that aren't included

 7   in your report.  Two, Hardell 2002 and Cocco 2013,

 8   which show a -- or an odds ratio that is greater

 9   than one, right?

10        A.   Right.

11        Q.   Okay.  And then the last one is Orsi, 2009,

12   which shows an odds ratio of right at one, right?

13        A.   Right.

14        Q.   Okay.  And so the inclusion of those three

15   studies that you did not put in your report would

16   only serve to make the meta-analysis higher in the

17   relative risk as opposed to lowering it, right?

18        A.   Yes.

19        Q.   Okay.  And when they did the meta-analysis

20   here and put all that data together, what they found

21   was a relative risk of 1.30, right?

22        A.   Yes.

23        Q.   And a confidence interval of .86 to 1.21,

24   true?

25        A.   True.
```

Ronald J. Kendall, Ph.D.

1      Q.   Okay.  And that relative risk and

2   confidence interval is a null finding; is that true?

3      A.   Right at it.

4      Q.   Okay.  And when I say "a null finding," I

5   mean it's not a statistically significant result and

6   the across is one, correct?

7      A.   Right.

8      Q.   Right.  And so what that means is when you

9   have a null finding, you cannot say there is an

10   association or a causal association between the

11   compound and the outcome, true?

12      A.   True.

13      Q.   Okay.  And so what the Donato meta-analysis

14   suggests, based on the way they ran their data, is

15   there is not a causal association between glyphosate

16   and NHL; is that fair?

17      A.   That's -- that's what these data say.

18      Q.   Okay.  And one thing that the Donato

19   meta-analysis did that the Zhang meta-analysis did

20   not do is the Donato meta-analysis included all the

21   Leon data, right?  Zhang didn't have that?

22      A.   That's the way I read the Zhang study, who

23   also participated in the FIFRA SAP at EPA.  So she

24   was -- she was very knowledgeable of that process at

25   EPA.

Ronald J. Kendall, Ph.D.

```
 1        Q.   All right.  And I'm not -- I'm not

 2   suggesting anything about Dr. Zhang personally.  But

 3   she did not have the Leon data in her meta-analysis,

 4   right?

 5        A.   That's correct.

 6        Q.   And that's data that you found important

 7   enough to include in your report; isn't that true?

 8        A.   That's true.

 9        Q.   Okay.  And going back to Dr. Zhang, are you

10   aware that subsequent to the SAP, she, too, became

11   an expert for plaintiffs in glyphosate litigation?

12        A.   I was not aware of that.

13             MR. KALAS:  Okay.  Let's look at

14   another meta-analysis here real quick that I don't

15   know if you've had the opportunity to see.  Okay.

16   And I have marked it as Exhibit 14.  It's the Kabat

17   meta-analysis I was referring to earlier.

18             (Exhibit No. 14 identified.)

19   BY MR. KALAS:

20        Q.   All right.  And have you seen this before,

21   sir?

22        A.   I just saw it recently, last couple of

23   days.

24        Q.   Okay.  So this is the one you're

25   remembering from the last couple of days, right?
```

Ronald J. Kendall, Ph.D.

```
 1       A.   Yes.  Yes.

 2       Q.   Okay.  And it appeared in a journal called,

 3   "Cancer Causes and Control," right?

 4       A.   Correct.

 5       Q.   And that's a peer reviewed journal, right?

 6       A.   Right.

 7       Q.   Okay.  And they're discussing the Zhang

 8   meta-analysis here and conducting their own

 9   meta-analysis, right?

10       A.   Right.

11       Q.   Okay.  And what they found, if you go to

12   the third page of this document, and they talk about

13   it here in the left-hand column that starts, "the

14   updated meta-analysis. . ."  Do you see that?

15       A.   It's not showing me page numbers on this

16   iPad.  It's very strange.

17       Q.   All right.  It's up on -- it's up on my

18   screen, sir, if that will help.

19       A.   Okay.  Let me just get the -- okay.  All

20   right.  I'm -- is that your page 3 with --

21       Q.   Yes, sir.

22       A.   -- with Figure 1?  Okay.  I'm on page 3,

23   then.

24       Q.   Okay.  And so on page 3 in the left-hand

25   column here, it says, "In the meta-analysis
```

Ronald J. Kendall, Ph.D.

1    including all five studies, the summary relative

2    risk was 1.05, 95 percent confidence interval .78 to

3    1.28."

4           Do you see that?

5    A.    Yes.

6    Q.    Okay.  And what they found, when they

7    combined the studies in their meta-analysis, they

8    found that there was no association between -- or

9    strike that.

10          They found a null finding for a causal

11   association between glyphosate exposure and NHL,

12   right?

13   A.    That's what it says.

14   Q.    Okay.  And based on that, no causal

15   association using the Bradford Hill criteria could

16   be drawn between glyphosate-based herbicide exposure

17   and NHL.  Would you agree with that?

18   A.    Based on this study, this one study, yes.

19   Q.    Okay.  So let me stop you here and ask,

20   since you have not reviewed in reaching your expert

21   opinion the Kabat and the Donato study, at least in

22   any detail until we sat down here today, can you

23   state to a reasonable degree of scientific certainty

24   that the Zhang study is superior to those two

25   studies?

1     A.   I thought the Zhang study was very well

2   done, and it was a strong analysis.  And what they

3   really said, which made a lot of sense, was that as

4   you work your way up the dose response curve to the

5   more exposed individuals, the statistical

6   significance became stronger.  And that seems to

7   make sense because when you get to the lower dose

8   levels, it's much more difficult to detect effects,

9   that they occurred because sometimes the subtlety of

10   the response at low dose levels.

11        So that seemed to make sense to me as they

12   presented that data, which I thought was very well

13   presented.  So, again, it's -- there's a lot of

14   debate in all of this and -- and, of course, these

15   studies do reflect different outcomes, which is not

16   surprising because of the -- the very complex issues

17   we're talking about here.

18     Q.   What is the threshold internal dose at

19   which somebody is at risk of NHL from glyphosate

20   exposure?

21     A.   That hasn't been determined yet.

22     Q.   Okay.  Now, you brought up dose there.  And

23   I just want to get a sense, if we can, of what dose

24   Ms. Spector may have been exposed to when she was

25   applying Roundup.

```
 1              MR. KALAS:  So I am going to mark as
 2    Exhibit 15, an article entitled, "Kougias 2020."
 3    Just give me a moment to move it.
 4              (Exhibit No. 15 identified.)
 5    BY MR. KALAS:
 6       Q.   Okay.  It should be in your folder.
 7       A.   Okay.  It is.
 8       Q.   Okay.  And this is a study entitled, "Risk
 9    Assessment of Glyphosate Exposures From Pilot Study
10    With Simulated Heavy Residential Consumer
11    Application of Roundup Using a Margin of Safety
12    Approach."
13              Did I read that correctly?
14       A.   Yes.
15       Q.   And it appeared in a peer reviewed journal
16    called Risk Analysis, right?
17       A.   Yes.
18       Q.   Okay.  And if you go down to I think the
19    third page of this document -- and, again I'll put
20    it up on my screen to just help you out here because
21    I know you're on the iPad -- they talked about
22    experimental design in part 2.1.  Do you see that?
23       A.   Yes.
24       Q.   Okay.  And they talked about an IRB
25    approved biomonitoring study involving the
```

Ronald J. Kendall, Ph.D.

1    collection of individual urinary void spot samples

2    was completed and previously reported.  And then

3    they talked about the design of that study.  Do you

4    see that?

5        A.   I do.

6        Q.   Okay.  And so what a biomonitoring study

7    collecting urinary samples is designed to do with a

8    pesticide is to see how much of the pesticide got

9    into the body of the applicator, right?

10       A.   Right.

11       Q.   Okay.  And if you keep going down this

12   paragraph, it says they divide them into two

13   exposure groups, one to assess dermal exposure and

14   the other to assess inhalation exposure.  Do you see

15   that?

16       A.   I do.

17       Q.   Okay.  And you agree with me that though we

18   talked about earlier dermal being the main route of

19   exposure, inhalation exposure, like in that blow

20   back situation you talked to about me, is also of

21   concern with somebody applying Roundup, right?

22       A.   Right.

23       Q.   And one thing that you're concerned about

24   when you have inhalation exposure is if the

25   compound -- if the droplets are a small enough

1    micron size, they'll enter the deep lung and be

2    100 percent bioavailable, right?

3        A.    Right.

4        Q.    And, otherwise, they're going to go down

5    the oral pathway if the micron is too big, right?

6        A.    Correct.

7        Q.    Okay.  And so they had an exposure group --

8    if you go to the top right-hand column here, the

9    dermal exposure group wearing shorts, T-shirts,

10   athletic shoes and half face respirators.  Do you

11   see that?

12       A.    I do.

13       Q.    Okay.  And I think you told me earlier that

14   Ms. Spector would wear more clothing than shorts,

15   T-shirts and athletic shoes, right?  She would

16   sometimes wear leather gloves?

17       A.    That's what -- that's what she said in her

18   deposition.  I'm not sure if leather gloves, but

19   some gloves.  It sounded like on occasion maybe

20   cotton, maybe -- maybe noncotton.

21       Q.    And she'd wear -- yeah, and she talked

22   about wearing a long sleeve shirt and long pants,

23   right?

24       A.    Right.  And sneakers.

25       Q.    Right.  And the long sleeve shirt and long

1    pants, whatever material it is, would reduce

2    exposure to the pesticide, specifically glyphosate,

3    as opposed to shorts and T-shirts, right?

4        A.   Yes, you would think so.

5        Q.   Okay.  And then they also talk about their

6    inhalation exposure group here where the applicators

7    wore Tyvek suits and chemically resistant gloves but

8    no respirator.  Do you see that?

9        A.   Yes.

10       Q.   Okay.  And does that design of these two

11   groups make sense to you as a toxicologist if you

12   want to get all your dermal exposure in one group

13   and all your inhalation exposure in another group?

14       A.   It appears.

15       Q.   Okay.

16       A.   The sample size is pretty limited.

17       Q.   Okay.

18       A.   But it appears.

19       Q.   Okay.  If we go down here to the

20   applicators and how they mixed and loaded, it talks

21   about the fact that they mixed and used a backpack

22   sprayer using a commercially available

23   glyphosate-containing herbicide.  Do you see that?

24       A.   Yeah, I'm reading it.

25       Q.   Okay.  Okay.  And that mixing and loading,

Ronald J. Kendall, Ph.D.

1    that's an exposure event, right?

2        A.    It can be, yes.

3        Q.    Okay.  And in pesticide biomonitoring that

4    you've reviewed in the course of your career, mixing

5    and loading can actually be one of the highest

6    exposure events there are, right?

7        A.    It can be.

8        Q.    Okay.  And so the fact that Ms. Spector did

9    not mix and load concentrated glyphosate products

10   would actually have reduced her exposure as compared

11   to the folks in this study, right?

12       A.    Theoretically.

13       Q.    Okay.  And if we keep going down, it talks

14   about the fact that ten fluid ounces of Roundup

15   concentrate containing 50.2 percent glyphosate was

16   added to the backpack sprayer with 4 gallons of

17   water to create a .96 percent glyphosate containing

18   solution.  Do you see that?

19       A.    I do.

20       Q.    Okay.  And that 1 percent solution, that is

21   similar to the mixture that her husband made for her

22   using the concentrated product, right?

23       A.    That sounds accurate.

24       Q.    Okay.  And it's also similar to the

25   premixed product concentration that she would buy

Ronald J. Kendall, Ph.D.

1    for the squirt sprayer, right?

2        A.    Yes.

3        Q.    Okay.  Continuing on, it says, "Product was

4    continuously sprayed until the backpack sprayer was

5    empty, after which, it was refilled, and the process

6    was repeated for a total of mixing and spraying

7    events per applicator.  This corresponded to a total

8    of 100 minutes with roughly three to five minutes

9    and 20 to 22 minutes for each mixing and spraying

10   event respectively."

11           Did I read that correctly?

12       A.    You did.

13       Q.    Okay.  And so they were adding the

14   glyphosate to a 4-gallon backpack, and they had four

15   mixing and spraying events.  So they would spray in

16   this experiment 16 gallons of diluted Roundup, fair?

17       A.    That's what it says.

18       Q.    Okay.  And that's far, far more than

19   Ms. Spector ever sprayed in a single day, true?

20       A.    True.

21       Q.    Okay.  And, again, spraying for 100 minutes

22   is far, far longer than Ms. Spector ever testified

23   to spraying in a single day, right?

24       A.    That's what she said in her deposition.

25       Q.    Okay.  And if we keep going down here, they

Ronald J. Kendall, Ph.D.

```
 1   talk about their internal doses and margins of

 2   safety.  This is Section 3.5.  Let me know when

 3   you're there.

 4        A.   Okay.

 5        Q.   And 3.5 --

 6        A.   I'm --

 7        Q.   Go ahead, I'm sorry.

 8        A.   3.5.  Okay.  I'm there.

 9        Q.   Yeah.  And we're at 3.5.1.  And it says

10   here that they calculated mean internal doses

11   calculated on a per kilogram body weight basis for

12   the applicators in the inhalation and dermal groups.

13   Do you see that?

14        A.   I do.

15        Q.   Okay.  And the maximum, if you look at the

16   range there for the inhalation group, was .615

17   micrograms per kilogram, right?

18        A.   Yes.

19        Q.   Okay.  And the maximum for the dermal

20   group, if you look there, was 3.732 micrograms per

21   kilogram, right?

22        A.   Yeah, I'm just. . .

23        Q.   Right here, sir.

24        A.   Okay.  All right.  Let me read that real

25   quick.
```

```
 1        Q.   Sure.   Take your time.

 2        A.   That's the range.   Yeah, that's correct.

 3   That's the range.   All right.

 4        Q.   Right.   That's the maximum.

 5        A.   Right.

 6        Q.   And so what they did is they put those two

 7   things together to represent a worst case scenario,

 8   and what they found was the highest dose when

 9   combining their 16-gallon applicator with dermal and

10   their 16-gallon applicator with inhalation, the

11   highest dose they had was 4.347 micrograms per

12   kilogram.   Do you see that?

13        A.   Yes.

14        Q.   Okay.   And they calculated it a second way

15   as well on page 11.   It's approach 2.   You can just

16   look at that real quick, 3.5.2.

17        A.   Okay.   All right.

18        Q.   But the worst case dose they calculated

19   there, when combining their inhalation and their

20   dermal arm, was 5.901 micrograms per kilogram,

21   right?

22        A.   Right.

23        Q.   Okay.   Now, 5.901 micrograms per kilogram

24   is also equivalent to .006 milligrams per kilogram,

25   right?
```

Ronald J. Kendall, Ph.D.

```
 1       A.    Yeah.

 2       Q.    Okay.  Ms. -- going back to Ms. Spector,

 3  assuming she had a dose similar to the 16-gallon

 4  applicators, .006 milligrams per kilogram normalized

 5  to her weight, which I think was 120 pounds or

 6  thereabout, would have been about .04 milligrams.

 7  Right?

 8       A.    That sounds about right.

 9       Q.    Okay.  And -- and, likewise, that would

10  have been about 40 micrograms, right?  .04

11  milligrams.

12       A.    It would be 40 micrograms per kilogram.

13       Q.    Okay.  Now, if she applied 18 days a

14  year -- and I don't know if you have a calculator

15  there, but I do.  So I can hold it up on the screen

16  if you would like.  But if she had 40 micrograms

17  times 18 days a year times 27 years, I come up with

18  19,440 micrograms.  Is that what you come up with?

19       A.    Yes.

20       Q.    Okay.  And that's equivalent to

21  19.44 milligrams as a lifetime dose, right?

22       A.    Yes.

23       Q.    Okay.  And she was 55 years old when she

24  was diagnosed with NHL, true?

25       A.    True.
```

1      Q.   Okay.  And so 55 years times 365 days is

2  20,075 lifetime days.  Do you agree with that?

3      A.   That sounds right.

4      Q.   Okay.  And so 19,440 micrograms divided by

5  20,075 days is a daily dose over the course of her

6  life from applying Roundup of .97 micrograms a day.

7  Is that fair?

8      A.   That sounds right.  I hadn't had time to

9  calculate that, but that sounds about right.

10      Q.   Okay.  Now, .97 micrograms per day is far

11  below any regulatory value that has ever been set

12  for glyphosate exposure; is that true?

13      A.   At least with current -- yeah, current

14  thinking.

15      Q.   Okay.  EPA guidelines is 1 milligram per

16  kilogram per day, right?

17      A.   That -- that's -- I recall that, yes.

18      Q.   Okay.  And so Ms. Spector's daily dose was

19  thousands of times below that even if she had as

20  high a dose as applicators in Kougias; is that fair?

21      A.   Theoretically.  But it wasn't evenly

22  distributed.  It was -- it was -- the distribution

23  was focused on specific -- specific application

24  times upon which exposure could occur and absorption

25  occurred.

Ronald J. Kendall, Ph.D.

```
 1       Q.   So let's go to that next --
 2       A.   Analyzing this on a per day basis is not
 3  representative of how she was being exposed to the
 4  chemical and could be responding to the chemical.
 5       Q.   That's fair, sir.  We'll go back to the at
 6  maximum day.  The maximum day we talked about was
 7  40 micrograms, right, based on her weight?
 8       A.   Say that -- say that one more time.
 9       Q.   The maximum day we talked about was
10  40 micrograms based on her weight.  Do you recall
11  that?
12       A.   Yeah, absolutely.
13       Q.   Okay.  40 micrograms is .04 milligrams,
14  right?
15       A.   Yes.
16       Q.   Okay.  .04 milligrams is 25 times -- well,
17  strike that.
18            That's .04 milligrams, not milligram per
19  kilogram.
20            But .04 milligrams is far below the EPA
21  dose of 1 milligram per kilogram per day, true?
22       A.   Okay.  .04 milligrams, we hadn't assigned
23  it to kilogram dosage.
24       Q.   Right.  So we can go back to the Kougias
25  study.  The Kougias study, then, where somebody
```

1    applied 16 gallons in a day wearing shorts, T-shirt,

2    tennis shoes and accounting for inhalation, the

3    highest dose they saw was .006 milligrams per

4    kilogram, right?

5        A.   Right.

6        Q.   Okay.  That's far below the EPA reference

7    dose of 1 milligram per kilogram per day, true?

8        A.   Yes.

9        Q.   That's far below the EFSA dose of

10   .6 milligrams per kilogram per day, true?  If you

11   recall.  If you don't recall, that's fine.

12       A.   We didn't discuss the EFSA dose.

13       Q.   Okay.  Is there any regulatory level set on

14   earth that the Kougias dose of .006 milligrams per

15   kilogram per day exceeds?

16       A.   Ask that question again, please.

17       Q.    Is there any regulatory value on earth that

18   the Kougias dose of .006 milligrams per kilogram

19   exceeds?

20       A.    Not that I'm aware of.  But, again, we're

21   talking about a chronic, long-term exposure, not

22   just one or two days.  We're talking about

23   biological variability in the population.  We're

24   talking about someone that's exposed irregularly but

25   on a -- on a weekly basis .  So it's not -- it's not

Ronald J. Kendall, Ph.D.

1    like a very, very small amount over -- over seven

2    days or over a month daily.  It's about irregular

3    exposures that are occurring in a chronic scenario

4    over not days and months but years and decades.

5        Q.   Okay.  Is there any regulatory -- go ahead.

6        A.   If you put all of that together, it's much

7    more difficult to evaluate that chronicity when

8    you're looking at the subtleties of how some of

9    these chemicals behave.

10            And as -- as we -- as I discussed earlier,

11   there are various epidemiological studies that show

12   no association between Non-Hodgkin's lymphoma and

13   glyphosate, yet there are others that do show

14   associations.  And this is exactly what I'm talking

15   about based on the people you're measuring, the

16   types of measurements being taken, how the data are

17   being analyzed, how studies are being applied to --

18   to looking at these questions.

19            And so as I look at the whole spectrum of

20   the weight-of-the-evidence, we can -- we can discuss

21   these numbers and these -- these dose levels, but at

22   the same time we're talking about something that

23   poses, in my opinion, biological plausibility for a

24   carcinogenic response.  And we haven't really

25   defined yet in that whole area of theory as what --

Ronald J. Kendall, Ph.D.

1    what are the threshold levels for carcinogenic

2    response.  What are they?  We don't know.

3          That's -- that evolves with the person

4    involved, the stress factor, any immune system

5    impairment, any factors that could be involved,

6    whether you're pregnant or not or whether you're

7    having confounding factors like smoking.  So I could

8    go on and on.

9          So from my perspective, one has to look at

10   Ms. Spector's exposure in the context of the case,

11   her health, what are the confounding factors and so

12   on.

13      Q.   Okay.  Thank you for that answer.

14          Returning to I think what I was asking

15   about, is there any regulatory value on earth that

16   would suggest that somebody exposed to

17   .006 milligrams per kilogram in a given day is at a

18   human health risk?

19      A.   I'm not aware of it.

20      Q.   Okay.  And just to be clear, because you

21   mentioned about these acute exposures, glyphosate

22   does not bioaccumulate the way a substance like

23   perfluorinated chemicals might?

24      A.   It -- it does not in the human body.

25      Q.   Okay.

Ronald J. Kendall, Ph.D.

```
 1      A.   Not -- not compared to perfluorinated

 2 compounds, correct.

 3      Q.   Okay.  So -- so if I went and sprayed

 4 glyphosate two weeks ago, there wouldn't be -- well,

 5 I won't say there would be zero.  There would be a

 6 negligible amount, at most, still in my body if I

 7 had dermal absorption, fair?

 8      A.   I would predict that, but you never know

 9 when it gets down to the individual case.

10      Q.   Sure.

11      A.   You never know.

12      Q.   Okay.  And now you can't state to a

13 reasonable degree of scientific certainty

14 Ms. Spector had an internal dose of glyphosate on

15 any given day that put her at an increased risk of

16 NHL, fair?

17      A.   What did you -- I --

18      Q.   The look you gave me there was kind of

19 funny.

20      A.   Just say that slowly again because I'm

21 trying to really understand your point.

22      Q.   You can't say to a reasonable degree of

23 scientific certainty Ms. Spector had an internal

24 dose on any given day that put her at an increased

25 risk for NHL, true?
```

Ronald J. Kendall, Ph.D.

1        A.   We don't know that.

2        Q.   Okay.  Now, just a few more things, and

3   then I think we'll be through Ms. Spector.

4             It's true that Ms. Spector estimated that

5   she used one Windex-size spray bottle of Roundup

6   every two weeks, right?

7        A.   I recall that's pretty close to what she

8   said in her deposition.

9        Q.   Okay.  And it's true that she testified --

10  and I understand you may disagree that people don't

11  act like this in real life.  But she testified that

12  she was careful to spray in calm, nonwindy

13  conditions, right?

14       A.   She -- she -- she said that.  But with

15  unprofessional people in dealing with these types of

16  materials, I mean, she -- she's just a citizen that

17  uses a product.  And, you know, my awareness of

18  those type situations is they don't really evaluate

19  the conditions very well.  It's just a citizen, just

20  going out and trying to spray some weeds.  That's

21  how I look at it.

22       Q.   And it's true that Ms. Spector had a first

23  degree relative, her sister, with cancer, right?

24  Melanoma?

25       A.   Yes, melanoma.

1      Q.   Okay.  And you have seen in the peer

2   reviewed literature that you reviewed that having a

3   first degree relative with cancer places one at a

4   statistically significant increased risk for NHL,

5   fair?

6      A.   Yeah, that's fair.

7      Q.   Okay.  And you can't say to a reasonable

8   degree --

9      A.   They are --

10     Q.   Go ahead.

11     A.   I want to add to that.  There are a

12   spectrum of risk factors that can be associated with

13   increased risk for NHL.  And right at the top of

14   that list is an impaired immune system, particularly

15   if you've had an organ transplant and a suppressed

16   immune system to not reject that organ.  So the

17   immune system is critical.  But it's just the top.

18   But to have a first degree relative with cancer,

19   although, it was melanoma, skin cancer, it is a risk

20   factor, at least in terms of what we know about

21   Non-Hodgkin's lymphoma.

22     Q.   You stated that the immune system is

23   critical.  Do you agree with IARC and with EPA that

24   glyphosate -- glyphosate has not been shown to be

25   immunotoxic?

Ronald J. Kendall, Ph.D.

```
1        A.   I know there's interest in it now,

2   immunotoxicity, but I don't -- I don't recall EPA or

3   International Agency for Cancer Research saying it

4   was an immune system toxicant.  I don't recall it.

5        Q.   Okay.  And have you reviewed the HAAS,

6   H-A-A-S, 28-day bioassay conducted by Monsanto on

7   the immunotoxicity of glyphosate?

8        A.   No.

9        Q.   Are you aware it's negative?  It didn't

10  show an effect?

11       A.   I wasn't -- I wasn't aware.

12       Q.   Okay.  Do you have any reason --

13       A.   But, again, where I was coming from, I

14  wasn't saying earlier that glyphosate impaired the

15  immune system of humans.  I was saying that if you

16  look at risk factors associated with the development

17  of Non-Hodgkin's lymphoma, right at the top of the

18  list would be suppression or effect -- an effect on

19  the immune system, whatever it could impair or

20  suppress the immune system.

21            So I wasn't saying glyphosate was causing

22  that.  I was saying that if the immune system was

23  impaired, that is right at the top of the risk

24  factors associated with Non-Hodgkin's lymphoma.

25       Q.   Understood.
```

Ronald J. Kendall, Ph.D.

```
1              Going back to the first degree relative
2    point.  You can't say to a reasonable degree of
3    scientific certainty that Ms. Spector would not have
4    gotten NHL had she never used Roundup but still had
5    a relative with cancer, fair?
6        A.   I don't know that because we're not talking
7    about a tumor.  We're talking about melanoma, a
8    surface cancer.  And so I don't -- I don't know.  I
9    don't know.  So. . .
10       Q.   Well, sadly, that melanoma -- you know, her
11   sister passed from that melanoma, right?
12       A.   I know.  I know.  I know.  I was thinking
13   about tumorigenic effects and -- again, I would like
14   for you to ask me that question again and -- and
15   just slowly articulate it.
16       Q.   Absolutely.
17            You can't say to a reasonable degree of
18   scientific certainty that Ms. Spector would not have
19   gotten NHL had she never used Roundup but still had
20   a relative with first degree cancer?
21       A.   Can you break that question down?
22       Q.   Sure.  What I'm getting at is something, I
23   hope, simple, but maybe it's not.
24            What I'm trying to understand is if
25   everything had been the same about Ms. Spector
```

```
 1   other than her using Roundup, do you have an opinion

 2   to a reasonable degree of scientific certainty that

 3   she would not have gotten NHL?

 4        A.   No.

 5             MR. KALAS:  Okay.  With that, I am

 6   going to reserve my time.

 7             Marc, I don't know if you have anything

 8   you want to do.

 9             MR. BRECHER:  No, I have no questions.

10             MR. KALAS:  Then with that, I will see

11   you next week, Dr. Kendall.  Thank you for your time

12   today.

13             THE WITNESS:  Thank you, sir.

14             MR. BRECHER:  Thanks, Dr. Kendall.

15             THE WITNESS:  Thank you, sir.

16             THE VIDEOGRAPHER:  The time is

17   approximately 3:52 p.m., and we are off the record.

18             (Deposition concluded at 3:52 p.m.)

19

20

21

22

23

24

25
```

Ronald J. Kendall, Ph.D.

```
1                UNITED STATES DISTRICT COURT

                NORTHERN DISTRICT OF CALIFORNIA

2

3    IN RE:  ROUNDUP PRODUCTS       MDL No. 2741

     LIABILITY LITIGATION

4    _____

5    SPECTOR V. MONSANTO, CO.,     *

     Case no. 3:20-cv-05532        *

6    _____

7              REPORTER'S CERTIFICATION

          DEPOSITION OF RONALD J. KENDALL, Ph.D.

8                  AUGUST 26, 2021

9              I, CHRISTY R. SIEVERT, CSR, RPR, in

10   and for the State of Texas, hereby certify to the

11   following:

12          That the witness, RONALD J. KENDALL,

13   Ph.D., was duly sworn by the officer and that the

14   transcript of the oral deposition is a true record

15   of the testimony given by the witness;

16          I further certify that the signature of

17   the deponent was NOT requested by the deponent or a

18   party;

19          I further certify that I am neither

20   counsel for, related to, nor employed by any of the

21   parties or attorneys in the action in which this

22   proceeding was taken, and further that I am not

23   financially or otherwise interested in the outcome

24   of the action.

25          Subscribed and sworn to on this the 30th
```

Ronald J. Kendall, Ph.D.

1   day of August, 2021.

2

3

4   _____

5                           CHRISTY R. SIEVERT, CSR, RPR

                            Texas CSR 8172

6                           Expiration Date:  4-30-2023

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25