Scott M. Hendler, Esq.
shendler@hendlerlaw.com
HENDLER FLORES LAW, PLLC
901 S. MoPac Expwy, Bldg. 1, Ste. 300
Austin, Texas 78746
Telephone: (512) 439-3202
*Attorney for Plaintiff*

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| In re: ROUNDUP PRODUCTS LIABILITY LITIGATION<br><br>THIS DOCUMENT RELATES TO:<br>Bradley Koen<br><br>    v.<br><br>Monsanto, Co. | MDL NO. 2741<br>Master Docket Case No. 16-md-02741-VC<br>Honorable Vince Chhabria<br>Case No. 3:20-cv-03074-VC<br><br>PLAINTIFF BRADLEY KOEN'S RESPONSE IN OPPOSITION TO DEFENDANT MONSANTO COMPANY'S MOTION TO EXCLUDE TESTIMONY OF PLAINTIFF EXPERTS MICHAEL FREEMAN AND MICHAEL SCOLA UNDER RULE 702<br><br>Hearing date: 12/13/21<br>Time: 9:00 A.M. |

## INTRODUCTION

After Plaintiff Bradley Koen experienced "substantial exposure" to Roundup, a pesticide containing the active ingredient glyphosate, he "develop[ed] an atypically aggressive form of follicular [non-Hodgkin's lymphoma] at a younger age." Declaration of Eric Lasker ("Lasker Decl.") at Def. Ex. 4, Expert Report of Dr. Michael Scola ("Scola Rpt.") at 6. To establish a causal connection between his exposure to Roundup and non-Hodgkin's lymphoma ("NHL"), Mr. Koen intends to call two expert witnesses: Dr. Michael Freeman and Dr. Michael Scola. Dr. Freeman will opine on both general causation—"that glyphosate can cause NHL at exposure levels people realistically may have experienced"—and specific causation—that Mr. Koen's "NHL was caused by glyphosate, rather than some other factor." *Hardeman v. Monsanto Co.*, 997 F.3d 941, 963, 965 (9th Cir. 2021). Dr. Scola will opine on specific causation alone.

Plaintiff's Opposition to Motion to Exclude Testimony of Dr. Michael Freeman and Dr. Michael Scola Under Rule 702 – 3:20-cv-03074-VC and 3:16-md-02741-VC

1

Defendant Monsanto Company seeks to exclude both experts under Fed. R. Evid. 702 and *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993). ECF No. 19 ("Def. Mot."). In doing so, however, Defendant recycles many arguments the Ninth Circuit and this Court have already rejected in the bellwether litigation. *See Hardeman*, 997 F.3d at 960-67; *In re Roundup Prods. Liab. Litig.*, 390 F. Supp. 3d 1102, 1131 (N.D. Cal. 2018) (Pretrial Order No. 45 denying Defendant's motion to exclude certain experts opining about general causation); *In re Roundup Prods. Liab. Litig.*, 358 F. Supp. 3d 956 (N.D. Cal. 2019) (Pretrial Order No. 85 denying Defendant's motion for summary judgment on specific causation).

To the extent that Defendant raises new arguments, its motion is still not persuasive. "'[T]he rejection of expert testimony is the exception rather than the rule.'" *Lipitor (Atorvastatin Calcium) Mktg. v. Pfizer, Inc.*, 892 F.3d 624, 631 (4th Cir. 2018) (quoting *United States v. Stanley*, 533 F. App'x 325, 327 (4th Cir. 2013) (per curiam)). Here, there are no grounds for the Court to make such an exception: Dr. Freeman and Dr. Scola are both qualified to opine on causation given their knowledge, skill, experience, training, and education, and both experts deploy "principles and methodology . . . grounded in the methods of science." *Clausen v. M/V New Carissa*, 339 F.3d 1049, 1056 (9th Cir. 2003). While Defendant can probe both experts' opinions "at trial, through cross-examination or testimony by opposing experts." *In re Roundup Prods. Liab. Litig.*, 390 F. Supp. 3d at 1109, excluding their testimony is unwarranted. This Court should deny the motion.

## Factual Background

Mr. Koen has noticed two experts to prove causation in his case. First, he intends to call Dr. Michael Freeman to prove general and specific causation. Dr. Freeman holds a Doctor of Medicine degree (Med. Dr.) from Sweden, a Doctor of Philosophy (Ph.D.) in public health/epidemiology, a Master of Public Health degree (MPH) in epidemiology and biostatistics, and a master's degree in forensic medical science (MScFMS) from the United Kingdom. Ex. 1, Expert Report of Dr. Michael Freeman ("Fr. Rpt.") at 2. He has testified as an expert in about 400 civil and criminal trials in courts throughout the United States, Canada, Australia, and Europe. Ex. 2, Deposition of Dr. Michael Freeman ("Freeman Dep. 1") at 12:16-20; Ex. 1, Fr. Rpt. at 2.

Second, Mr. Koen will rely on the testimony of Dr. Michael Scola to opine on specific causation. Dr. Scola is a full-time clinician at Morristown Medical Center in New Jersey Ex. 4, Deposition of Dr. Michael Scola, at 6:24-7:6, 19:19, 82:8-11 ("Scola Dep"). He is board certified in hematology and oncology. Ex. 4, Scola Dep. at 81:10-13, 83:2-8. He has a "pretty mature, established practice," of which 10 to 15% of his patients have NHL. Ex. 4, Scola Dep. at 83:24-84:2, 85:7-16. Beyond his clinical activity, he teaches at the hospital and is involved in the hospital's "rich clinical trial program for hematologic malignancies." Ex. 4, Scola Dep. at 87:6-24, 89:7-9.

LEGAL STANDARD

Mr. Koen's case is part of the multi-district litigation ("MDL") alleging that the carcinogenic qualities of the glyphosate-based herbicide Roundup caused NHL. In this MDL, the Court has held that "for questions of federal law, such as the admissibility of expert testimony under *Daubert*, Ninth Circuit law will govern regardless of where a case originated." *In re Roundup Prods. Liab. Litig.*, MDL No. 2741, 2019 U.S. Dist. LEXIS 114855, at *66 (N.D. Cal. July 10, 2019) (Pretrial Order No. 158: *Daubert* Choice of Law). Consistent with this pretrial order, Mr. Koen focuses his response on relevant Ninth Circuit precedent. *See id.* at *69.

In the Ninth Circuit (and throughout the federal courts), Federal Rule of Evidence 702 supplies the standard for the admissibility of scientific evidence. *See Clausen*, 339 F.3d at 1055. And in *Daubert*, the Supreme Court charged district courts with a gatekeeping role to ensure that such scientific evidence is relevant and reliable. *See id.* The inquiry under Rule 702 and *Daubert* "is flexible and should be applied with a liberal thrust favoring admission." *Hardeman*, 997 F.3d at 960 (cleaned up). Ultimately, "the interests of justice favor leaving difficult issues in the hands of the jury and relying on the safeguards of the adversary system . . . to 'attack[] shaky but admissible evidence.'" *Wendell v. GlaxoSmithKline LLC*, 858 F.3d 1227, 1237 (9th Cir. 2017) (quoting *Daubert*, 509 U.S. at 596 (alteration in original)).

ARGUMENT

## I.    The Court should admit Dr. Freeman's testimony.

Plaintiff's Opposition to Motion to Exclude Testimony of Dr. Michael Freeman and Dr. Michael Scola Under Rule 702 – 3:20-cv-03074-VC and 3:16-md-02741-VC

3

Turning to Dr. Freeman, Defendant seeks to exclude as unreliable his opinions on both general causation (Def. Mot. at 7-9) and specific causation (Def. Mot. at 9-11). Defendant does not challenge Dr. Freeman's qualifications. Defendant's arguments do no withstand scrutiny.

### A.    Dr. Freeman's opinions on general causation are admissible.

Dr. Freeman used valid methodology in reaching his conclusions on general causation. As he explained in his export report, he follows "systematic methods for assessing questions of injury causation in a medicolegal setting that have been described extensively in peer-reviewed literature." Ex. 1, Fr. Rpt. at 9. These methods are "based on a distillation and application of the principles enumerated in the [Bradford] Hill criteria," Ex. 1, Fr. Rpt. at 9, which are "nine factors generally accepted as relevant to assessing causation." *Hardeman*, 997 F.3d at 953 n.2. Additionally, Dr. Freeman engages in "differential etiology," an approach the Ninth Circuit has explained is appropriate in the context of Roundup litigation. Ex. 2, Freeman Dep. 1 at 9:24-10:12; *see Hardeman*, 997 F.3d at 964.

Given Dr. Freeman's sound scientific methods, a sister court recently found his distillation of the Bradford Hill criteria and his use of differential diagnosis were "sufficiently reliable to withstand a *Daubert* challenge." *Carreon v. Gamez*, No. 5:19-cv-124, 2021 U.S. Dist. LEXIS 75116, at *9 (S.D. Tex. March 24, 2021). In so ruling, the court joined many others concluding that Dr. Freeman's methodology satisfies *Daubert*. *See, e.g.*, *Jimenez v. United States*, No. SA-5:13-CV-096-OLG, 2014 U.S. Dist. LEXIS 112996, at *6 (W.D. Tex. July 25, 2014) ("[A] review of the pleadings reflects Dr. Freeman's underlying methodologies do meet the *Daubert* standard[.]"); *Alves v. Riverside Cnty.*, No. EDCV 19-2083 JCB (SHKx), 2021 U.S. Dist. LEXIS 169354, at *19 (C.D. Cal. Aug. 5, 2021) (in a case in which Dr. Freeman's methods involved "forensic epidemiology and the Bradford-Hill criteria," "[t]he court finds Dr. Freeman qualified and his opinions adequately supported by the relevant standards."); *Rollins v. Calderon*, No. B:17-cv-244, 2019 U.S. Dist. LEXIS 166111, at *12, *14 (S.D. Tex. May 13, 2019) (listing cases in which "other Courts have rejected <u>Daubert</u> challenges to Dr. Freeman's testimony"; noting that "[t]he principles and methodology of Dr. Freeman's process meet the <u>Daubert</u> standard.").

Plaintiff's Opposition to Motion to Exclude Testimony of Dr. Michael Freeman and Dr. Michael Scola Under Rule 702 – 3:20-cv-03074-VC and 3:16-md-02741-VC

4

Still, Defendant challenges Dr. Freeman's opinion on general causation in this case. Def. Mot. at 7-9. Preliminarily, Defendant criticizes Dr. Freeman's overall methodology of "forensic epidemiology" as fabricated or nonexistent. To the contrary, the scientific community and courts recognize it as an established field explained in foundational texts. *See Eisenbise v. Crown Equip. Corp.*, 260 F. Supp. 3d 1250, 1264 (S.D. Cal. 2017) (noting in other litigation that Dr. Freeman "applied methods 'consistent with those outlined in the Reference Guide on Epidemiology, from the Reference Manual on Scientific Evidence, published by the Federal Judicial Center . . . as well as in the text Forensic Epidemiology: Principles and Practice[.]"); *Jimenez*, 2014 U.S. Dist. LEXIS 112996, at *5, *7 ("Dr. Freeman's experience and education qualify him as an expert in the field of forensic epidemiology" and noting that "his knowledge on forensic epidemiology" is grounded in "methodologies" that "are both peer-reviewed and published."); *Boykin v. Western Express, Inc.*, No. 12-cv-7428 (NSR) (JCM), 2015 U.S. Dist. LEXIS 15297, at *10-*11 (S.D.N.Y. Feb. 6, 2015) ("Dr. Freeman has expertise in the fields of . . . forensic epidemiology"; "The Court finds that Dr. Freeman is qualified in the areas of . . . forensic epidemiology. . . .").

While Defendant relies on a Pennsylvania court that excluded Dr. Freeman's testimony as persuasive authority, that case is inapposite. *See Porter v. SmithKline Beecham Corp.*, No. 03275, 2015 WL 5970639 (Pa.Com.Pl. Oct. 5, 2015). The Pennsylvania court explained it was not applying the *Daubert* standard pertinent here. Instead, it was applying the test from *Frye v. United States*, 293 F. 1013 (D.C. Cir. 1923), which it noted produces "dramatic" differences from *Daubert*. *See Porter*, 2015 WL 5970639 at *5. Moreover, the criticism the Pennsylvania court had—that Dr. Freeman employs methods and reaches conclusion that vary from jurisdiction to jurisdiction, Def. Mot. at 8—is notably absent here. Dr. Freeman made clear that he uses "the same scientific standard . . . no matter what jurisdiction [he is] in." Ex. 2, Freeman Dep. 1 at 56:25-57:23. He "would never say, for a different jurisdiction, I'm going to use a 90 percent confidence interval versus as 95 percent confidence interval." Ex. 2, Freeman Dep. 1 at 57:13-15. The concerns of the Pennsylvania court, then, have no place here.

Defendant also contends that Dr. Freeman improperly uses 50% as the appropriate statistical benchmark, rather than the accepted 95% confidence interval. Def. Mot. at 8. Here again, Defendant misreads the record. Dr. Freeman made clear that he relies on a 95% confidence interval with rare exceptions (i.e., when the standard in the literature calls for a different confidence interval). Ex. 2, Freeman Dep. 1 at 50:11-18. While Dr. Freeman discussed the concept of 50% (a preponderance of the evidence), he did so in the context of "talking about [his] understanding of legal requirements for meeting causation." Ex. 2, Freeman Dep. 1 at 57:15-17. He clarified that regardless of the legal standard for causation in a particular jurisdiction (preponderance or substantial factor), his opinions must always have "the same degree [of] reliability of the evidence." Ex. 2, Freeman Dep. 1 at 57:21-23. Thus, Defendant conflates the legal question at issue (causation) with the statistical question at issue ("a measure of confidence that a trend observed in a dataset is not random," *Lipitor*, 892 F.3d at 641). Dr. Freeman, on the other hand, understands they are two independent questions and properly employs well-established statistical methods.

Next, Defendant asserts that much of the data Dr. Freeman relies on to formulate his opinions on general causation are unreliable because they are not statistically significant, not adjusted for confounders, or no longer significant when adjusted. Def. Mot. at 8. Defendant is mistaken: the Ninth Circuit and this Court have already dispatched similar arguments in the bellwether litigation. Like the experts who withstood *Daubert* challenges in the bellwether cases, Dr. Freeman properly relied on the DeRoos (2003) study, Ex. 3, Freeman Dep. 2 at 189:18-190:14; Ex. 1, Fr. Rpt. at 15, which "reduced the risk of confounding by adjusting for many other pesticides." *Hardeman*, 997 F.3d at 965; *see also In re Roundup Prods. Liab. Litig.*, 390 F. Supp. 3d at 1118, 114-41 ("The [DeRoos] authors sought to isolate the effect of each pesticide by controlling for the use of all 46 other pesticides, in addition to age and study site, in their models assessing association."; "both regressions performed in DeRoos (2003) adjusted for use of many other pesticides."). Beyond DeRoos, Dr. Freeman identified "other papers" he relied on that "have stratified by pesticide use." Ex. 2, Freeman Dep. 1 at 166:19-20.

Plaintiff's Opposition to Motion to Exclude Testimony of Dr. Michael Freeman and Dr. Michael Scola Under Rule 702 – 3:20-cv-03074-VC and 3:16-md-02741-VC

6

Moreover, for those studies that did not use adjusted data, Dr. Freeman persuasively explained why it was unsurprising that they were no longer statistically significant once adjusted. Once one controls for other pesticides, one would expect the confidence intervals to go from statistically significant to not statistically significant because "[y]ou cut down your numbers drastically by elucidating various agents." Ex. 2, Freeman Dep. 1 at 173:9-10. In his view, that result simply "tell[s] you that if you break these data into too many small pieces it loses meaning." Ex. 2, Freeman Dep. 1 at 173:13-14.

In any event, based on his epidemiological knowledge and training, Dr. Freeman appropriately determined that even if some data he relied on were not statistically significant, they were still meaningful and "helpful" because they showed "good consistency." Ex. 2, Freeman Dep. 1 at 78:11-13. The Supreme Court, the Ninth Circuit, and this Court have recognized that very principle. *Matrixx Initiatives v. Siracusano*, 563 U.S. 27, 40 (2011) ("A lack of statistically significant data does not mean that medical experts have no reliable basis for inferring a causal link between a drug and adverse events."); *Hardeman*, 997 F.3d at 965 ("even where adjustment for other pesticides resulted in loss of statistical significance, the results still showed a positive association between glyphosate and NHL."); *In re Roundup Prods. Liab. Litig.*, 390 F. Supp. 3d at 1133 ("data may well be informative even in the absence of statistical significance[.]").

Finally, Defendant charges Dr. Freeman with "selectively focusing on studies that support his analysis" while being "unable to explain why the Donato meta-analysis . . . should be discounted or given less weight." Def. Mot. at 9. Not so. Dr. Freeman stressed that it would "be absolutely improper" for him to omit papers or studies that were contrary to his opinion. Ex. 3, Freeman Dep. 2 at 248:8-13. That would "just be cherry picking," while he "tried to give a relatively fair review of what's out there in the literature." Ex. 3, Freeman Dep. 2 at 248:18-20.

Likewise, Dr. Freeman provided a convincing rationale for discounting the Donato study—it relied heavily on the Andreotti study, which, in turn, "came up with a result that was impossible," namely, that glyphosate use has a health-promoting effect. Ex. 2, Freeman Dep. 1 at 135-36, 151-55, Ex. 3, Freeman Dep. 2 at 288-89, 326-27. As Dr. Freeman explained, "you don't expect to find

Plaintiff's Opposition to Motion to Exclude Testimony of Dr. Michael Freeman and Dr. Michael Scola Under Rule 702 – 3:20-cv-03074-VC and 3:16-md-02741-VC

7

less cancer amongst people who are exposed to a toxin than people who are not exposed to it." Ex. 2, Freeman Dep. 1 at 151:21-25. This unexpected, nonsensical result "ma[de] [Dr. Freeman] really wonder and be concerned about what's going on" with the Andreotti study and any studies, like Donato, that relied on Andreotti. Ex. 2, Freeman Dep. 1 at 151:21-25. "An expert operating 'within the range of accepted standards governing how scientists conduct their research and reach their conclusions' could thus place less weight on the [Donato] study[.]" *In re Roundup Prods. Liab. Litig.*, 390 F. Supp. 3d at 1126 (quoting *Daubert v. Merrell Dow Pharms.*, 43 F.3d 1311, 1317 (9th Cir. 1995)).

**B.      Dr. Freeman's opinions on specific causation are admissible.**

Defendant's critiques of Dr. Freeman's opinions on specific causation fare no better. Def. Mot. at 9-11. As a first pass, Defendant insists Dr. Freeman's method in Mr. Koen's case is unreliable because he departed from his usual method of calculating a comparative risk ratio or a probability of cause. Def. Mot at 9. The record, however, reflects that Dr. Freeman's usual methodology is more expansive.

As he states in the "Methods" section of his report, his regular practice proceeds as follows:

> If the injury risk from the exposure is greater than the injury risk in the absence of the exposure, then the exposure is the cause of the injury on a more probable than not basis (>50% probability). The conclusion can be presented as either exceeding or failing to exceed the 50% threshold, or f the risks can be accurately quantified it can be quantified as a risk ratio, which can be converted to a Probability of Causation.

Ex. 1, Fr. Rpt. at 10 (emphasis added). In other words, Dr. Freeman regularly relies on both a comparative risk ratio/probability of cause and a 50% threshold.

In Mr. Koen's case, Dr. Freeman chose to characterize his opinion using the latter method because "we have the meta-analyzed values . . . showing that there is a more than doubling of risk in a number of studies; and reliable, less than doubling of risk but still increased risk in other studies." Ex. 2, Freeman Dep. 1 at 42:11-17; see also Ex. 2, Freeman Dep. 1 at 43:5-9 (opted not to use a comparative risk ratio because he relied on "the body of evidence."). Contrary to

Defendant's claim, then, Dr. Freeman "appl[ied]" one of "the methodology[ies] that he usually employs to develop his opinion in this case" and justified his choice. Def. Mot. at 9. In so doing, Dr. Freeman "employ[ed] in the courtroom the same level of intellectual rigor that characterizes the practice of an expert in the field." *Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 152 (1999).

Lastly, Defendant's claim that Dr. Freeman failed to rule out other possible causes of Mr. Koen's NHL and engaged in an "always Roundup" methodology is baseless. Def. Mot. at 10-11. Dr. Freeman explained that NHL is "unusual" and "rare," so "you have to put everything together" for an individual to contract it. Ex. 3, Freeman Dep. 2 at 263:20-21. That is, NHL is a multi-factorial disease, and thus there were "a lot of risk factors that went into causing Mr. Koen's non-Hodgkin[s] lymphoma." Ex. 3, Freeman Dep. 2 at 313:18-20. Given the multi-factorial nature of NHL in general and Mr. Koen's NHL in particular, science did not permit Dr. Freeman to pinpoint a sole cause. Still, Dr. Freeman could still opine that for Mr. Koen, adding in his glyphosate exposure to the mix increased his risk of contracting NHL in a non-trivial way. Ex. 3, Freeman Dep. 2 at 315: 12-17. That opinion is all the law requires. *See Messick*, 747 F.3d at 1199 ("[W]e do not require that an expert be able to identify the sole cause of a medical condition for his or her testimony to be reliable.").

Moreover, contrary to Defendant's characterization, Dr. Freeman's opinion does not mean glyphosate will always be the cause of a person's NHL. Rather, Dr. Freeman dedicated an entire section of his report to considering—and ultimately ruling out—alternative explanations. Ex. 1, Fr. Rpt., at 18. And in reaching his conclusion, he considered Mr. Koen's constellation of unique circumstances, including the particular type of NHL Mr. Koen first presented with (follicular); his young age at onset; and his substantial exposure for "the 26 years preceding his NHL diagnosis." Ex. 1, Fr. Rpt., at 20; see also Ex. 2, Freeman Dep. 1 at 47:3-7 and Ex. 3, Freeman Dep. 2, 314:12-13. Thus, Dr. Freeman "ha[d] a way to differentiate" Mr. Koen "from Roundup users who would have developed NHL regardless" of glyphosate exposure. *In re Roundup Prods. Liab. Litig.*, 358 F. Supp. 3d at 959.

## II.    The Court should admit Dr. Scola's testimony.

Plaintiff's Opposition to Motion to Exclude Testimony of Dr. Michael Freeman and Dr. Michael Scola Under Rule 702 – 3:20-cv-03074-VC and 3:16-md-02741-VC

9

In opposing Dr. Scola's expert testimony, Defendant makes two arguments: (1) he is not qualified to offer an opinion on the etiology of Mr. Koen's NHL, Def. Mot. at 5; and (2) the Court should exclude his opinions on specific causation as unreliable, Def. Mot. at 5-7. Neither argument has merit.

### A. Dr. Scola is qualified to opine on specific causation.

While acknowledging Dr. Scola "is an experienced clinician," Defendant contends his background and knowledge of the relevant literature are insufficient to qualify him as an expert on specific causation. Def. Mot. at 5. Defendant is wrong.

Under Rule 702, a testifying expert may be qualified by virtue of their "knowledge, skill, experience, training, or education." Fed. R. Evid. 702. The rule "contemplates a broad conception of expert qualifications"; the advisory committee notes likewise "embrace more than a narrow definition of qualified expert." *Thomas v. Newton Int'l Enters.*, 42 F.3d 1266, 1269 (9th Cir. 1994). Indeed, "[a]n unduly restrictive review of the relevant expertise of a physician is incompatible with what [courts] have characterized as a liberal standard of relevance." *Pages-Ramirez v. Ramirez-Gonzalez*, 605 F.3d 109, 115 (1st Cir. 2010). Defendant advances such an unduly restrictive view of Dr. Scola's expert qualifications.

To begin, Defendant claims Dr. Scola's background as a clinician who treats patients with NHL is ill-suited to opining on the etiology of Mr. Koen's NHL. Defendant, however, ignores much of Dr. Scola's experience and skill when it comes to etiology. While treating a disease is different than identifying the cause(s) of a disease, that does not "mean[] that physicians may not testify to etiology[.]" *Tamraz v. Lincoln Elec. Co.*, 620 F.3d 665, 673 (6th Cir. 2010). It just means "courts must apply the *Daubert* principles carefully" in considering a physician's training in and experience with etiology. *Id.*

Dr. Scola's clinical experience routinely involves determining the etiology of his patients' NHL. He explained it was "always a part of . . . [his] initial assessment of a patient to ascertain exposure history, to learn a little bit about family history, and to try to understand the pathological basis of the individual's lymphoma." Ex. 4, Scola Dep. at 99:13-19 (emphasis added). He considers

Plaintiff's Opposition to Motion to Exclude Testimony of Dr. Michael Freeman and Dr. Michael Scola Under Rule 702 – 3:20-cv-03074-VC and 3:16-md-02741-VC

10

1   "fully understand[ing] . . . the origins of the disease" to be "an important part" of his clinical

2   practice. Ex. 4, Scola Dep. at 99:4-7; see also Ex. 4, Scola Dep. at 110:16-111:22 (he "tr[ies] to

3   formulate an opinion" on causation with each patient and "think[s] it's important for understanding

4   the individual and trying to understand the origins of his or her malignancy[.]").

5       Dr. Scola's direct, clinical experience with etiology makes him well-qualified to offer

6   specific causation testimony in Mr. Koen's case. *See Payton v. Abbott Labs*, 780 F.2d 147, 155-56

7   (1st Cir. 1985) (rejecting argument that "two doctors are clinicians and not research scientists" and

8   therefore lack "specialized knowledge of the research-type causation question at issue");

9   *McCullock v. H.B. Fuller Co.*, 61 F.3d 1038, 1043 (2d Cir. 1995) ("Fagelson is an experienced

10  medical doctor, who is certified by the American Board of Otolaryngology and has practiced in

11  the specialty of ears, nose, and throat since 1966. We find his background sufficient to permit his

12  expert testimony on a throat ailment and its causes.").

13      This result does not change simply because Dr. Scola is not an epidemiologist. *See United*

14  *States v. Garcia*, 7 F.3d 885, 890 (9th Cir. 1993) ("lack of particularized expertise goes to the

15  weight accorded [a witness's] testimony, not to the admissibility of her opinion as an expert."); *see*

16  *also Gaydar v. Sociedad Instituto Gineco-Quirurgico y Planificacion Familiar*, 345 F.3d 15, 24

17  (1st Cir. 2003) ("The proffered physician need not be a specialist in a particular medical discipline

18  to render expert testimony relating to that discipline."). What matters is that Dr. Scola "spend[s] a

19  lot of time reading journal articles" and analyzing epidemiological studies as part of his clinical

20  practice. Ex. 4, Scola Dep. at 51:5-7. Thus, he is "pretty savvy in going through the medical

21  literature." Ex. 4, Scola Dep. at 187:20-24; see *In re Roundup Prods. Liab. Litig.*, 390 F. Supp. 3d

22  at 1131 (finding Dr. Portier "qualified to examine the epidemiology literature to see whether an

23  association exists" although "epidemiology is not his core area" because "he has reviewed

24  epidemiology studies throughout his career and has published in the field.").

25      Beyond his experience, training, and skill, Dr. Scola is also qualified through the

26  knowledge he obtained from review of the relevant medical literature. Defendant has recognized

27  that "examination of medical literature" is an established means for acquiring expert knowledge.

28

Plaintiff's Opposition to Motion to Exclude Testimony of Dr. Michael Freeman and Dr. Michael Scola Under Rule 702 – 3:20-cv-03074-VC and 3:16-md-02741-VC

11

1  *Hardeman*, 997 F.3d at 963. Even so, in this case, Defendant seeks to exclude Dr. Scola because

2  he reviewed the relevant literature in an abbreviated time span. But Rule 702 sets no temporal

3  threshold for how long a witness must review the literature before qualifying as an expert.

4  Dr. Scola made clear that despite his time constraints, he still thoroughly "digest[ed], th[ought]

5  about, and incorporate[ed] the contemporary literature" on the association between glyphosate and

6  NHL. Ex. 4, Scola Dep. at 188:2-5. That is enough to satisfy "the minimal foundation of

7  knowledge, skill, and experience required in order to give 'expert' testimony . . . ." *Thomas*, 42

8  F.3d at 1269.

9       Similarly, according to Defendant, Dr. Scola's literature review is flawed because he never

10  looked at any of the data underlying the articles he studied. Def. Mot. at 5. In making this point,

11  Defendant misstates the record. Dr. Scola explained that he reviewed "a summary of the case-

12  control studies that define[] the population and the conclusion" in the meta-analyses, but he "did

13  not pull the primary studies." Ex. 4, Scola Dep. at 202:6-14. The law, however, does not require

14  Dr. Scola to consult the primary data. *See Southland Sod Farms v. Stover Seed Co.*, 108 F.3d 1134,

15  1142 (9th Cir. 1997) ("The fact that Engelke's opinions are based on data collected by others is

16  immaterial[]"). It is enough that "the studies underlying his opinion were in large part published

17  in peer-reviewed journals." *In re Roundup Prods. Liab. Litig.*, 390 F. Supp. 3d at 1138.

18       In short, "[w]here, as here," a doctor with "extensive clinical experience with the . . . class

19  of disease at issue, [is] prepared to give expert opinions supporting causation, . . . *Daubert* poses

20  no bar . . . ." *Wendell*, 858 F.3d at 1237.

21  **B.    Dr. Scola's opinions on specific causation are reliable.**

22       Besides disputing Dr. Scola's qualifications, Defendant challenges his methodology as

23  unreliable. Def. Mot. at 5-7. Defendant's arguments, however, conflict with the record and the law.

24       At the outset, Defendant seeks to fault Dr. Scola for two of his statements: "there's no way

25  I can conclude that Roundup caused [Mr. Koen's] lymphoma," Ex. 4, Scola. Dep. at 166:10-12,

26  and "there was no scientific method that [I] followed to reach [my] opinion." Ex. 4, Scola Dep. at

27  166:22-167:1. In Defendant's view, these statements mean Dr. Scola impermissibly speculated and

28

Plaintiff's Opposition to Motion to Exclude Testimony of Dr. Michael Freeman and Dr. Michael Scola Under Rule
702 – 3:20-cv-03074-VC and 3:16-md-02741-VC

failed to apply an established methodology to arrive at his opinion. "In reaching this conclusion," however, "Defendant "relie[s] heavily on . . . isolated comment[s] . . . rather than . . . a fair reading of [Dr. Scola's] entire [statement]." *Ambrosini v. Labarraque*, 101 F.3d 129, 137 (D.C. Cir. 1996) (cleaned up; fourth alteration in original).

Preceding these isolated comments, Dr. Scola acknowledged there were no lab values, test results, clinical features, histological subtypes, or pathological or genetic markers to pinpoint glyphosate exposure as the cause of Mr. Koen's NHL. Ex. 4, Scola Dep. at 164-66. Against this backdrop, when Dr. Scola said, "there's no way that I can conclude that Roundup caused [Mr. Koen's] lymphoma," Ex. 4, Scola. Dep. at 166:10-12, and that he was not following a "scientific method," Ex. 4, Scola Dep. at 166:23, he was simply acknowledging scientific reality: there were no available biomarkers, so he could not identify glyphosate exposure as a cause with 100% certainty.

But "for a qualified expert" like Dr. Scola, "[l]ack of certainty is not . . . the same thing as guesswork." *Primiano v. Cook*, 598 F.3d 558, 565 (9th Cir. 2010). Scientific and medical expert testimony "need not be conclusive because 'medical knowledge is often uncertain.'" *Id.* (quoting *United States v. Sandoval-Mendoza*, 472 F.3d 645, 655 (9th Cir. 2006)); *Messick v. Novartis Pharms. Corp.*, 747 F.3d 1193, 1198 (9th Cir. 2014) ("[W]e have consistently recognized the difficulties in establishing certainty in the medical sciences."). In *Daubert* itself, the Supreme Court stressed that "it would be unreasonable to conclude that the subject of scientific testimony must be 'known' to a certainty; arguably, there are no certainties in science." 509 U.S. at 590. Dr. Scola's inability to give his opinion with absolute certainty, then, does not render his testimony inadmissible.

Rather, for purposes of *Daubert* and Rule 702, it is enough that Dr. Scola's opinions were rooted in sound methodology, namely, a differential diagnosis—"the framework for identifying the most probable cause of a disease." *In re Roundup Prods. Liab. Litig.*, 358 F. Supp. 3d at 957-58. Dr. Scola reviewed literature on all sides of the debate (contrary to Defendant's characterization of a one-sided review, Def. Motion at 6, n.3). Ex. 5, Scola Rpt. at 4 (noting "[t]he

Plaintiff's Opposition to Motion to Exclude Testimony of Dr. Michael Freeman and Dr. Michael Scola Under Rule 702 – 3:20-cv-03074-VC and 3:16-md-02741-VC

13

safety and potential carcinogenicity [of glyphosate] has been extensively evaluated for decades by both US and international investigators and scientists, as well as independent Commission and State-sponsored regulatory entities..."); Ex. 4, Scola Dep. at 205:18-207:3, 212:9-24 (reviewed summaries of EPA's position on and classification of glyphosate as non-carcinogenic).

After a comprehensive literature review, he then "rule[d] in all of the potential hypotheses that might explain" Mr. Koen's NHL diagnosis. *Clausen*, 339 F.3d at 1058. He did this by reviewing Mr. Koen's "pretty extensive" medical records totaling roughly 6,000 pages. Ex. 4, Scola Dep. at 27:22-28:3, 29:4-5, 27-28, 37:18-38:2, 52:21-54:3. Those records, in turn, showed Mr. Koen's lifestyle factors, risk factors in his medical history, and his family history of cancer. Ex. 5, Scola Rpt. at 2, Ex. 4-Exh. 3, Scola Dep. Exh. 3 at 3/78. Scola also considered Mr. Koen's younger age at the time of his NHL diagnosis, Ex. 4, Scola Dep. at 106: 19, 163:24-164:5, 301:3-23, and his "atypically aggressive form of follicular lymphoma." Ex. 5, Scola Rpt. at 6; see also Ex. 4, Scola Dep. at 106:18-19, 126:24-127:2, 161:4-6, 302:17-303:12.

After considering these various potential causes, Dr. Scola "engage[d] in a process of elimination, eliminating hypotheses on the basis of a continuing examination of the evidence so as to reach" his opinion on specific causation. *Clausen*, 339 F.3d at 1058. Several risk factors Dr. Scola identified were not present in Mr. Koen's case. As for the other potential risk factors, he ultimately ruled them out based on "the contemporary literature," which "is compelling" and "suggestive that glyphosate can be a variable in promoting the development of non-Hodgkin's lymphoma," especially "given the unique aspects of Mr. Koen's case, his exposure history, the nature of his malignancy, his younger age, very dramatic exposure history." Ex. 4, Scola Dep. at 105:23-106:23; see also Ex. 4, Scola Dep. at 143:3-9; Ex. 5, Scola Rpt. at 6. In other words, after identifying salient causal factors in the literature, Dr. Scola ruled out causes other than glyphosate given Mr. Koen's young age at the onset of his NHL, the more aggressive nature of his malignancy, and his extensive glyphosate exposure. This is not a case, then, where an expert failed to "ma[k]e any effort to rule out other possible causes." Contrast with *Claar v. Burlington N. R.R.*, 29 F.3d 499, 502 (9th Cir. 1994).

Plaintiff's Opposition to Motion to Exclude Testimony of Dr. Michael Freeman and Dr. Michael Scola Under Rule 702 – 3:20-cv-03074-VC and 3:16-md-02741-VC

14

That Dr. Scola could not completely rule out other causes is not fatal to his testimony. The Ninth Circuit "do[es] not require experts to eliminate all other possible causes of a condition," including idiopathy, "for the expert's testimony to be reliable." *Wendell*, 858 F.3d at 1237. "It is enough that the proposed cause 'be a substantial causative factor.'" *Id.* (quoting *Messick*, 747 F.3d at 1199). This remains true in case in which a plaintiff "has multiple risk factors." *Messick*, 747 F.3d at 1199.

Dr. Scola thus properly engaged in a sound differential diagnosis. Still, Defendant insists he did not. Def. Mot. at 6. To make this claim, though, Defendant capitalizes on the equivocal meanings of "differential diagnosis." This Court has previously recognized that the term "differential diagnosis" has been used "to describe two separate tasks: identifying a plaintiff's disease and identifying the cause of that disease." *In re Roundup Prods. Liab. Litig.*, 358 F. Supp. 3d at 958, n.2. In his deposition, Dr. Scola was referring to the former task of disease identification when he stated he did not perform a differential diagnosis. Ex. 4, Scola Dep. at 167:14-168:18. He explained that he did not identify the "different possible causes for [Mr. Koen's] presenting symptoms and signs." Ex. 4, Scola Dep. at 167:17-19. Rather, that was "something that the original [treating] physician who assessed Mr. Koen would do." Ex. 4, Scola Dep. at 167:22-168:4. Defendant conflates the two meanings of "differential diagnosis" to make it seem like Dr. Scola's methodology was not sound, but, as explained above, it was. The Court should thus admit Dr. Scola's testimony.

## CONCLUSION

For these reasons, this Court should deny Defendant's motion to exclude the testimony of Dr. Scola and Dr. Freeman.

DATED: October 20, 2021                              Respectfully submitted,

                                                     /s/ Scott M. Hendler
                                                     Scott M. Hendler
                                                     Texas Bar No. 09445500
                                                     901 S. MoPac Expwy, Bldg. 1, Suite #300
                                                     Austin, Texas 78746
                                                     *Attorney for Plaintiff Bradley Koen*

Plaintiff's Opposition to Motion to Exclude Testimony of Dr. Michael Freeman and Dr. Michael Scola Under Rule 702 – 3:20-cv-03074-VC and 3:16-md-02741-VC

15

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

<u>CERTIFICATE OF SERVICE</u>

I hereby certify that on October 20, 2021, I electronically filed the foregoing document with the Clerk of Court using the CM/ECF system which will send notification of such filing to the CM/ECF participants registered to receive service in this MDL.

<u>/s/ Scott M. Hendler</u>

Scott M. Hendler