# EXHIBIT 2

```
 1              UNITED STATES DISTRICT COURT

 2            NORTHERN DISTRICT OF CALIFORNIA

 3

 4   IN RE:  ROUNDUP PRODUCTS        ) MDL No. 2741

     LIABILITY LITIGATION            )

 5                                   )

                                     )

 6   BRADLEY KOEN,                   )

            Plaintiff,               )

 7                                   )

     VS.                             )NO. 3:20-cv-03074-VC

 8                                   )

     MONSANTO COMPANY,               )

 9         Defendant.                )

10

       VIDEOCONFERENCE DEPOSITION OF MICHAEL D. FREEMAN,

11                      MedDr., Ph.D.,

12                        VOLUME I

13             TAKEN ON BEHALF OF DEFENDANT

14                        * * *

15        BE IT REMEMBERED THAT, pursuant to the Federal

16   Rules of Civil Procedure, the video deposition of

17   MICHAEL D. FREEMAN, MedDr., Ph.D., was taken before

18   Paula D. Tieger, a Registered Professional Reporter and

19   Oregon Certified Shorthand Reporter, on August 17, 2021,

20   commencing at the hour of 9:06 a.m.; the witness

21   responding to questions by videoconference from Salem,

22   Oregon; the questions being propounded from Washington,

23   DC; and proceedings reported remotely via videoconference

24   from Portland, Oregon.

25                        * * *
```

```
 1                    APPEARANCES:
 2      Hendler Flores Law
             By:  Clare Nolan (Via Videoconference)
 3                 Attorney at Law
                   901 S. MoPac Expressway, Building 1,
 4                 Suite 300
                   Austin, Texas 78746
 5                 512-439-3200
                   cnolan@hendlerlaw.com
 6                     Counsel for the Plaintiff
 7
        Hollingsworth LLP
 8           By:  John M. Kalas (Via Videoconference)
                   Attorney at Law
 9                 1350 I Street, NW
                   Washington, DC 20005
10                 202-898-5843
                   jkalas@hollingsworthllp.com
11                     Counsel for the Defendant
12
        Also Present:  Anna Kinard - Paralegal for Hendler
13                      Flores Law PLLC - (Via
                        Videoconference)
14
                        Mark Ancalade - Videographer (Via
15                      Videoconference)
16
17
18                          *  *  *
19
20
21
22
23
24
25
```

Michael D. Freeman, MedDr., Ph.D.

```
1   Q     Okay.

2   A     So, to the extent I cover it my report, which is to

3   say there is animal evidence, I don't really go into any

4   depth.

5   Q     Okay.  Do you intend to offer opinions in this case

6   regarding mechanistic studies regarding Roundup or

7   glyphosate; specifically, genetic toxicology and/or

8   oxidative stress studies?

9   A     Only to the extent that it's just mentioned in my

10  report that that literature exists; and generally what it

11  says.

12        But not as an expert in those topics, no.

13  Q     Okay.  Do you intend to offer opinions regarding

14  human exposure or internal dose data regarding glyphosate

15  or Roundup?

16  A     To the extent it's in my report, as far as dose data

17  on frequency of exposure and how that was used for dose

18  response analysis, yes.  As far as how many micrograms

19  per deciliter are found in the urine or -- of exposed

20  people and that sort of thing, no.  I mean, I know

21  something about it, but it's not -- I don't consider

22  myself to be the expert to be talking about that sort of

23  thing in any great deal.

24  Q     Okay.  Do you intend to offer any opinions regarding

25  a differential diagnosis or differential etiology in this
```

1    case?

2    A    Well, you talk about a differential etiology, but

3    it's not a differential diagnosis.  In other words --

4    Q    Okay.

5    A    -- is the variate of non-Hodgkin lymphoma that was

6    diagnosed in Mr. Koen accurate or should it be something

7    else will not be something I'll get into.  That's more of

8    a clinical medical question.  As far as differential

9    etiology, that would be the nature of the causal

10   analysis.

11        So, yes, that would be part of what I'm talking

12   about.

13   Q    Okay.  Do you intend to offer any opinions on

14   warnings or labeling in this case?

15   A    No.

16   Q    Okay.  Now, you live in Oregon; correct?

17   A    I do.

18   Q    Okay.  And you're not a licensed medical physician;

19   correct?

20   A    That's correct.

21   Q    You don't render medical treatment in Oregon?

22   A    That is correct, or anywhere else.

23   Q    And you're not a clinician?

24   A    That is correct.

25   Q    Okay.  And your medical degree from Sweden would not

Michael D. Freeman, MedDr., Ph.D.

```
 1    glyphosate; right?

 2    A    I have not.

 3    Q    You've never published anything on Roundup; correct?

 4    A    I have not.

 5    Q    Okay.  Now, a large part of your job is providing

 6    consulting services to legal clients; correct?

 7    A    About 70 percent of my time.  That's correct.

 8    Q    Okay.  And you've testified in many cases over your

 9    career; correct?

10    A    I have.

11    Q    Now, I read that, as of 2015, you estimated that

12    you've given 700 depositions.

13         About how many would you estimate you've given

14    today, in total?

15    A    Oh.  It's well over 900 now.

16    Q    Okay.  And, likewise, in 2015, I read that you had

17    appeared in 250 to 300 court appearances.

18         How many would you estimate you've appeared in

19    today?

20    A    Probably more than 400.

21    Q    Okay.  And is it still a breakdown of about

22    85 percent of testimony in civil litigation for

23    plaintiffs and 15 percent for defendants?

24    A    Not testimony but case breakdown.

25    Q    Okay.  Do you agree that a potential problem with
```

1    A    So, the -- what you'll see on page 20 of my report --

2    Q    Okay.  Going down to it.

3          Is that the section called Conclusions?

4    A    Yes.

5    Q    Okay.

6    A    I state that the most probable -- more than

7    50 percent -- known cause of non-Hodgkin lymphoma in

8    Bradley Koen's history through Roundup exposure; and,

9    thus, it was a substantial factor in causing his cancer.

10   That really is the conclusion.

11          I don't go through the process of trying to

12   calculate a comparative risk ratio because we have the

13   meta-analyzed values.  We have multiple studies that I

14   talk about previously under Plausibility showing that

15   there is a more than doubling of risk in a number of

16   studies; and reliable, less than doubling of risk but

17   still increased risk in other studies.

18   Q    So, let me table -- I know what you're saying, and

19   I'm going to get to it here in my questions.

20          But you did not calculate a comparative risk

21   ratio, as you've outlined in previous published

22   literature that you've authored, for this case?

23   A    I just characterized this in terms of probability of

24   causation and meeting or exceeding a certain threshold.

25   Q    Okay.

Michael D. Freeman, MedDr., Ph.D.

```
 1   A     So, it's a similar sort of thing.  If you read

 2   through how you'd come up with a comparative risk

 3   ratio -- it's in the textbook -- you will see that it can

 4   be derived from an odds ratio or a relative risk.

 5   Q     Okay.  But I can't look at your report and see that

 6   the number that you're relying on for that comparative

 7   risk here, as far as the ratio, because you didn't

 8   calculate one?

 9   A     Only the body of evidence.  That's correct.

10   Q     Okay.  And, likewise, you didn't calculate an

11   attributable probability or anything like that in this

12   case, because you're relying on the assay that you say

13   caused -- shows a doubling of the risk?

14   A     I did give you the more than 50 percent.  That's --

15   Q     Okay.

16   A     -- an attributable risk calculation.  It's the exact

17   same thing as a probability of cause.

18         So, that actually is the same thing.  But --

19   Q     Okay.

20   A     -- I don't state it in terms of meeting or exceeding

21   a threshold.

22   Q     Got it.  And that's what I'm getting to next.  Well,

23   maybe not.  Hold on.  Let me ask a different question.

24         You've also used a probability of causation test;

25   right?
```

Michael D. Freeman, MedDr., Ph.D.

```
1    lower levels of application are; two days a year, 10 days

2    a year.  We have certain thresholds.

3            So, we can look at Mr. Koen's history and say,

4    "Well, he's got, what, 25, 26 years of pretty high

5    application levels, exposures."  He's -- we know his

6    exposure is in the upper end of what's described in the

7    literature.

8    Q    So, my question was directed at something a little

9    bit different.  It wasn't about the exposure portion of

10   that question; it was about the percent contribution to

11   somebody's cancer.  In other words, how much of a

12   contribution -- in other words, is 10 percent more likely

13   that they are going to get cancer enough of a

14   contribution for it to be a substantial contributing

15   factor, in your mind?  Is 50 percent?  Is 100 percent?

16           What threshold do you operate under for something

17   to be a substantial contributing factor to somebody's

18   cancer?

19   A    I see what you're saying.  I'm sorry.  I did give you

20   the wrong answer.  I -- you said -- I thought you said

21   exposure, and that's what threw me off.

22   Q    Yeah.

23   A    So, proportionally, how much increased risk would you

24   have.  And I feel okay saying we have a doubling of risk

25   based on the epidemiologic data.  I think I make that
```

Michael D. Freeman, MedDr., Ph.D.

```
 1   only because it draws some scrutiny to, "Okay.  These
 2   guys here paid you to get this result.  And now you're
 3   not doing things the way everybody does it all the time."
 4        It still may be correct to do it that way, but I
 5   think that just because we're -- it's -- it is --
 6   evidence is going to be given in an adversarial setting,
 7   it's -- I would be more comfortable writing about it in a
 8   paper and letting the peer reviewers have at it, if that
 9   makes sense, so that I don't appear to have dog in the
10   fight.
11   Q    So, it's your methodology in litigation to try to
12   rely on 95 percent confidence intervals and look for
13   statistical significance in those where possible?
14   A    Yes, with rare exceptions; like, for example, if it's
15   a standard in the literature for the particular topic.
16   There are some analyses that rely on a 90 percent
17   confidence interval, but that's relatively few and far
18   between, in my experience.  But this is a controversial
19   topic in science.  Say, why is it one in 20?  You know,
20   what's this 95 percent confidence thing?  I mean, why is
21   that?  And, of course, it goes back to Carl Popper and,
22   you know, the 19-teens and '20s of philosophical
23   arguments about this whole counterfactual causation
24   approach, not to get into the philosophical aspects of
25   it.
```

1    Q    Okay.  Do you agree with his statement that it must

2    be determined whether the observed results in the

3    epidemiology studies are due to a real association or

4    merely the result of chance?

5    A    Yes, of course.

6    Q    Do you agree with his statement that appropriate

7    scientific studies must be analyzed for the possibility

8    that the apparent associations were the result of chance,

9    confounding, or bias?

10   A    Of course.

11   Q    And do you agree with his statement that it must also

12   be considered whether the results have been replicated?

13   A    That should always be considered, to look for

14   consistency, yeah.

15   Q    All right.  Do you agree with his statement that

16   generally accepted epidemiologic methodology considers

17   statistically significant replication of study results in

18   different populations because apparent associations may

19   reflect flaws in methodologies?

20   A    Yeah.  That's standard epidemiology.

21   Q    Okay.

22              MS. NOLAN:  Can you -- although I'm not the

23   court reporter, but can you slow down just a little bit?

24              MR. KALAS:  Sorry.  Yes.

25   Q    BY MR. KALAS:  Last question on this, and we'll move

1    on.  The judge criticized you in that case -- from my

2    reading at least -- for professing to apply a

3    jurisdictionally-based standard to causation.  And we

4    touched on this a little bit earlier.

5            Do you apply the same scientific standard to your

6    preponderance of evidence or substantial factor test no

7    matter what jurisdiction you're in, or --

8    A    Yeah.

9    Q    -- does the test change?

10   A    No.  No.  That's a completely incorrect or complete

11   garbling of anything I would have testified to.

12   Q    Okay.

13   A    I would never say, for a different jurisdiction, I'm

14   going to use a 90 percent confidence interval versus a

15   95 percent confidence interval or whatever.  I'm talking

16   about my understanding of legal requirements for meeting

17   causation.  When it comes to substantial factor versus

18   preponderance of evidence, which you and I have talked

19   about at some length already, and say that that's some

20   different scientific level, that's simply not true.

21           They all have to show -- they all have to have

22   the same degree reliability of the evidence, whatever

23   standard you're testifying to.

24   Q    Understood.  Let's turn to IARC for a moment.

25           IARC classifies what it believes to be

Michael D. Freeman, MedDr., Ph.D.

```
 1   going to be important, and it's going to be basically

 2   asking for pooling of the data or meta-analysis of data

 3   to strengthen the conclusion that -- that's going to tell

 4   me, you know, probably, if I put all these together, if

 5   we just had few more people in the study, we'd probably

 6   reach statistical significance, as opposed to seeing it

 7   kind of all over the map and then say, "Oh.  You know

 8   what?  I'm not going to make the effort because nothing's

 9   pushing me that direction."

10        So, generally, the answer to your question is

11   yes, with a little asterisk of "but if I'm seeing real

12   good consistency, that also might be helpful and give me

13   additional evidence."  It's just not going to be -- I'll

14   have not ruled out the effect of chance to the same

15   degree with the data that don't have statistical

16   significance.

17   Q    Okay.  You mentioned the dose response and the data

18   is important to you.

19        Now, it's true, isn't it, that both the McDuffie

20   and the Eriksson studies, which you discuss in your

21   report -- and we can mark them if you need to see them.

22   But those are not looking at response; those are looking

23   at exposure response; true?

24   A    Exposure is dose.  It's just dose in terms of time.

25   Q    Okay.  So, let's unpack that for a minute, because
```

Michael D. Freeman, MedDr., Ph.D.

```
 1              I don't know if that's appropriate to do that.  I
 2    have to look at it.
 3    Q     Andreotti has 440 exposed cases of NHL in it, doesn't
 4    it?
 5    A     Again, that's -- I'm going to have to defer to your
 6    notes or what you have in front of me.
 7              That's not something I can tell you off the top
 8    of my head.
 9    Q     That's just up here.  When EPA ran their own
10    meta-analysis, including the case control studies you
11    cite and the Andreotti study, the result they found in
12    Figure 4 in this EPA document, Exhibit 15, is a null
13    finding, not statistically significant; true?
14    A     True.  Not surprising.
15    Q     Okay.  Not surprising.  But this finding, 1.14, with
16    a confidence interval of .87 to 1.5 would not establish
17    general causation if that was the only number we had;
18    right?
19    A     No.  According to this document, what I'm seeing is
20    that you should take Roundup to decrease your risk of
21    NHL, because Andreotti says that it's protective; that
22    there is a 15-percent reduction; and that somehow, if you
23    get more exposure to Roundup, contrary to what everybody
24    else says and what -- the mechanistic studies and all the
25    other studies out there, that if you have increased
```

Michael D. Freeman, MedDr., Ph.D.

1    exposure, you have decreased risk.

2         Until I am able to understand how they come up

3    with a positive effect on health by being exposed to

4    something that's described as a toxin, I can't understand

5    this study.  And I certainly can't understand mixing

6    those results in with the other results in the

7    meta-analysis.

8         Again --

9    Q    Okay.

10   A    -- I have to read the whole thing to be able to

11   answer that question.  But right now, that stands out to

12   my eye.  It's the kind of the thing I look at and say,

13   "Well, wait a minute.  I mean, glyphosate isn't" -- "this

14   isn't an ingredient in a health drink.  This is something

15   that either it's bad for you or it's neutral.  But it

16   can't make you better."

17        So, that's the thing I would want to understand

18   first.

19   Q    Okay.  Well, we'll get to some individual studies

20   probably next time.  I do want to ask you about one other

21   paper, though, before we probably call it a day.  Well,

22   maybe we'll get through few more.  You know what?  Let's

23   go to Andreotti.  Let's start with that, since we've been

24   talking about it.  Working Andreotti is Exhibit 16.

25        This is an article entitled Glyphosate Use and

Michael D. Freeman, MedDr., Ph.D.

1    group.

2         And all of that was null findings; right?  All

3    the crossed ones just didn't show a relationship one way

4    or another; true?

5    A    The ones you pointed out, that's certainly true.

6    Q    Okay.  And just to be clear, so the record's clear,

7    you would totally expect to see data like this if no

8    relationship existed between Roundup and NHL?

9    A    That's true.

10   Q    Okay.

11   A    If that conclusion was true, if I knew that was true,

12   then I would expect to find the things that you've

13   pointed out.  Absolutely.

14   Q    Okay.  So, begs the question.  In your weight of

15   evidence analysis that you conducted here, why do you

16   think that the case control studies should be elevated

17   above this study, the Andreotti study?

18   A    Well, there is this big problem with this kind of

19   protective effect overall coming from this study.  I

20   don't know what is -- if something systematically is

21   wrong, but you don't expect to find less cancer amongst

22   people who are exposed to a toxin than people who are not

23   exposed to it.  So, that makes me really wonder and be

24   concerned about what's going on within this study that

25   may be biasing their results.

Michael D. Freeman, MedDr., Ph.D.

```
 1            That's something I really want to look at, and
 2    look at it carefully, in order to answer your question.
 3    Q    Well, haven't you looked at it carefully when you put
 4    together your report?  I mean, you know, you put together
 5    a report.  You're offering opinions in this case.
 6            Don't -- haven't you dug into that question?
 7    A    I would dig into it further to be able to answer your
 8    question.
 9    Q    Okay.  Do you know what replacement pesticides are
10    substituted for glyphosate when farmers can't use
11    glyphosate for whatever reason?
12    A    No, I can't say I do.
13    Q    Okay.  Do you know if those pesticides are risk
14    factors for NHL?
15    A    Since I don't know what they are, I couldn't possibly
16    answer that question.
17    Q    Could one explanation for the protective effect, as
18    you characterize it, in the data be that the other
19    pesticides being substituted for glyphosate in the
20    nonusers are greater risk for NHL than glyphosate
21    potentially could be?
22    A    No.  That would be, then, a pretty big error rate in
23    this whole study.  Because if we have a bunch of
24    pesticides being used and we're not accounting for them,
25    then now you're creating the problems that there is some
```

Michael D. Freeman, MedDr., Ph.D.

 1   criticisms of the case control studies for, for not

 2   actually looking at other pesticide use.

 3   Q    Right.

 4   A    So, is that possible?  Sure.

 5        That is not something I've examined this data

 6   for.

 7   Q    Okay.  So, confounding's a big problem, in your

 8   mind --

 9   A    Con --

10   Q    -- just generally?

11   A    What is a big problem is glyphosate is not -- should

12   not convey protection against non-Hodgkin lymphoma.

13        And according to this study, it does.

14   Q    Where do the authors say in this study -- I'll give

15   you as long as you need to read it -- that glyphosate is

16   protective of NHL?

17        Take a look at it.

18   A    Well, it's not going to be what they said.

19        It's going to be what they reported.

20   Q    Where is the odds ratio that they report a

21   statistically significant negative finding for NHL?  I'm

22   looking at it right here, Table 2.

23        These are all null findings, aren't they?

24   A    Yeah.  Let's go back to the exhibit before this one

25   where the EPA did a meta-analysis.

Michael D. Freeman, MedDr., Ph.D.

1  Q   Right.

2  A   The weight that they gave to Andreotti was a .85 of

3  the statistically significant confidence interval around

4  that in their meta-analysis.

5  Q   Okay.  So, my question is this study, though.  I'm

6  not asking about the EPA meta-analysis.

7         Where in this study do they report a protective

8  effect in any of these odds ratios or relevant risks?

9  A   Well, if you want me to look within this study and

10  find out where the EPA rebuttal to Zhang came up within

11  their meta-analysis and be able to say "Here's where they

12  report .85" or "Here's where they got the data for that

13  .85 value," I have to go back and look at both documents

14  to be able to do that.

15  Q   But that's not what I'm asking you to do.  What I'm

16  asking you is:  Where do the authors report a

17  statistically significant protective effect for

18  glyphosate from NHL in an odds ratio in this study?  Or

19  excuse me, a relevant risk?

20  A   Same answer I just gave you, which is, I've got to

21  find out why the EPA says that they did.  The EPA says

22  that Andreotti reported a protective effect for NHL, .85.

23  Statistically significant.

24         I just -- I would just need to go and find out

25  where they got that from in the paper.

Michael D. Freeman, MedDr., Ph.D.

```
 1   Q    Do you know -- or do you have an opinion, sitting

 2   here today, that there is a specific systemic error you

 3   can point to in the Andreotti study?

 4   A    I can point to a result of --

 5   Q    A result that you don't believe.

 6        But where is the error?

 7   A    I can provide -- I can present -- I can point to a

 8   result which is not predicted by any hypothesis.  This

 9   hypothesis -- the hypothesis behind the study was

10   glyphosate might be a cause of cancer and, therefore,

11   we're going to try to see if people who were exposed to

12   glyphosate over a period of time get cancer more often.

13        In no place is the a priori hypothesis -- or,

14   also, we're going to see if it's protective.  So, that's

15   not -- so, if you get a result where it's contradicted by

16   your hypothesis and it's contrary to a lot of the biology

17   that's out there and a lot of the publications and, you

18   know, IARC, what IARC says, then you have to look back at

19   your methods and say, "Is there an error that we made?"

20        I'm not telling you what that error is.  What I'm

21   telling you is a result that is so inconsistent with the

22   a priori hypothesis that you have to step back and say,

23   "Geez, did we do something wrong?"

24        That's what I'm putting out there.

25   Q    It sounds to me like you are suggesting something may
```

```
 1   Q     And is glyphosate use correlated with dicamba use?

 2                THE REPORTER:  I'm sorry.  With what use?  I

 3   missed that.  Dicamba.  There it is.  Thank you.

 4                THE WITNESS:  I can't tell you the answer to

 5   that.

 6   Q     BY MR. KALAS:  Is glyphosate use correlated with

 7   mecoprop use?

 8   A     I can't tell you the answer to that.

 9   Q     Okay.  Mecoprop had two statistically significant

10   odds ratios; right?

11   A     Yes.

12   Q     Okay.  If glyphosate use is correlated with mecoprop

13   use, we could be counting the mecoprop-increased risk in

14   the glyphosate thena (ph); right?

15   A     It's possible.  I'd have to think about it a bit

16   to -- I mean, if you -- in order to answer that question,

17   I'd have to spend some time with the paper; look at it

18   and try to understand the relationship of these values

19   compared to what I know from other papers that have

20   stratified by pesticide use, if you -- to specifically

21   answer the question you just asked me.

22   Q     Is there a multivariate -- so, let me be very precise

23   there.

24          Is there a dose response relationship you've

25   observed in the epidemiology data that remains
```

Michael D. Freeman, MedDr., Ph.D.

```
 1   Q    Okay.

 2   A    Got it.

 3   Q    And when they controlled for other pesticides, it

 4   went from 2.02 to 1.51; right?

 5   A    Yeah.

 6   Q    Okay.  And it -- the confidence interval went from

 7   statistically significant to being not statistically

 8   significant; right?

 9   A    Right.  You cut down your numbers drastically by

10   elucidating various agents.

11   Q    This is a null finding in the multivariate analysis;

12   right?

13   A    Well, it tells you that if you break these data into

14   too many small pieces it looses meaning.

15        That's certainly true.

16   Q    That wasn't my question, though.

17        Is .77 to 2.94 a null finding?

18   A    It is not a statistically significant finding

19   attached to the point estimate.

20   Q    Okay.  And, in fact, every single one of these odds

21   ratios went down; right?

22   A    Right.  Unsurprisingly.

23   Q    Okay.  Do you think mercurial seed dressing causes

24   NHL?

25   A    I have not examined the issue --
```