**David J. Diamond (AZ 010842)**
**DIAMOND LAW, PLLC**
**1700 E. River Road, #65237**
**Tucson, AZ 85728**
**P: (520) 497-2672**
**F: (520) 448-4466**
**ddiamond@diamondlawusa.com**
**khampton@diamondlawusa.com**

# UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| IN RE: ROUNDUP PRODUCTS LIABILITY LITIGATION | MDL No. 2741 |
| | Master Docket Case No. 16-md-02741-VC |
| **THIS DOCUMENT RELATES TO:** | Honorable Vince Chhabria |
| Otis Lindell Chapman | Case No. 3:20-cv-01277 |
| v. | |
| Monsanto Company | |

### Plaintiff Chapman's Motion for Partial Summary Judgment on the Application of Issue Preclusion/Collateral Estoppel to the Issue of General Causation

"The doctrine of issue preclusion bars successive litigation of an issue of fact or law actually litigated and resolved in a valid court determination essential to a prior judgment." *In Re. E.I. Dupont De Nemours & Company C -8 Pers. Inj. Litig.*, No. CV 2:13- MD-2433, 2019 WL 6310731, at *3 (S.D. Ohio Nov. 25, 2019), citing *Parklane Hosiery Co. v. Shore*, 439 U.S. 322, 326 (1979). Because general causation has been fully litigated in this MDL against Monsanto, issue preclusion/collateral estoppel is appropriate. "By 'preclud[ing] parties from contesting matters that they have had a full and fair opportunity to litigate,'" collateral estoppel protects against "the expense and vexation attending multiple lawsuits, conserve[es] judicial resources, and foste[rs] reliance on judicial action by minimizing the

possibility of inconsistent decisions." *Taylor v. Sturgell*, 553 U.S. 880, 892 (2008) (alterations in original) quoting *Montana v. United States*, 440 U.S. 147, 153-54 (1979)." *In Re. E.I. Dupont De Nemours & Company C-8 Personal Injury Litigation, supra.*

I.   **Background.**

The court noted in its 6/22/21 Order (MDL DKT. No. 13192), that after this MDL litigation began,

> [the] **first big responsibility was to litigate the question of "general causation," which involved presenting expert testimony and legal argument about whether a reasonable jury could conclude that Roundup is capable of causing NHL at exposure levels that people currently experience. If the plaintiffs were to lose on that threshold question, every single case in the MDL would be dismissed**. This phase necessitated a tremendous amount of fact discovery and expert discovery. Each side hired numerous experts, and many of those experts testified at an evidentiary hearing that lasted over a week. . . . Ultimately, the Court concluded that several of the expert opinions put forward by the plaintiffs were admissible, which meant that Monsanto's motion for summary judgment on the issue of general causation was denied.

> Next, the parties and the Court identified three cases in the MDL that would serve as "bellwethers"—cases to be tried in the hope of educating both sides about their prospects in future cases, which in turn could facilitate settlement. Additional discovery took place, primarily focused on specific causation—that is, whether a reasonable jury could conclude that Roundup caused the NHL of the bellwether plaintiffs. The Court again heard extensive testimony from the experts on specific causation. Monsanto sought summary judgment in all three cases, arguing that no reasonable jury could conclude that Roundup caused NHL for these three particular plaintiffs. Monsanto also made a legal argument that affected all cases in the MDL: it contended that the plaintiffs' claims—which were based on California law—were preempted by federal law. The Court denied Monsanto's motion.

> Meanwhile, a plaintiff in California state court, Dewayne Johnson, managed to get his case tried on an expedited basis. This was the first trial ever about whether Roundup caused someone's NHL. . . .   A jury found in his favor, awarding him $289 million in compensatory and punitive damages. The trial court reduced both compensatory and punitive damages, and the court of appeal reduced those damages even further, leaving a total recovery of more than $20.5 million.

> The following year, the first of the three federal bellwether cases went to trial in this Court. The plaintiff was Edwin Hardeman. . . . The jury awarded Hardeman roughly $5 million in compensatory damages and $75 million in punitive damages. This Court reduced the

---

**Plaintiff Chapman's Motion for Partial Summary Judgment on the Application of Issue Preclusion/Collateral Estoppel to the Issue of General Causation**

punitive damages award to $20 million, leaving Hardeman with a total award of roughly $25 million.

In the aftermath of this trial, the Court determined that pressing ahead immediately with the other two bellwether trials would not be the best way to manage the MDL. Monsanto had suffered resounding defeats in two trials, and a third trial was set to proceed in California state court in the coming months. Thus, Monsanto and its opponents would soon have the benefit of three bellwethers. Furthermore, **the *Hardeman* trial was structured in a manner that could not have been more fair to Monsanto. Among other things, the trial was bifurcated between a causation phase and a damages phase**. **This meant that the jury was asked to render a verdict on the scientific evidence relating to causation before it was presented with a good deal of damning evidence against Monsanto—** evidence which suggested that Monsanto never seemed to care whether its product harms people. **The fact that the jury found causation despite this trial structure, and the fact that the jury decided to award $80 million despite the fact that Hardeman had recovered from his NHL, suggested that Monsanto's prospects in future trials were exceedingly dim and that there would not be much more to learn from another trial**. The Court thus vacated the trial date for the next federal bellwether and began focusing on pretrial proceedings for the remaining cases in the MDL, so that those cases could be transferred back to their "home districts" for trial. . . .

The next trial in California state court took place shortly thereafter. The plaintiffs were a husband and wife named Alva and Alberta Pilliod. . . . It was not bifurcated. The trial went even worse for Monsanto than the first two—the jury awarded each plaintiff $1 billion in punitive damages, to go along with $55 million in compensatory damages. The trial court ultimately reduced the total award to roughly $87 million.

*Id*., Doc. 13192 (bold added).

General causation has been successfully litigated against Monsanto. As the court noted in Document 13190, "[t]he fact that the jury found [general] causation despite this [bifurcated] trial structure, and the fact that the jury decided to award $80 million despite the fact that Hardeman had recovered from his NHL, suggested that Monsanto's prospects in future trials were exceedingly dim and that there would not be much more to learn from another trial."

II. **Analysis**.

   A. **Summary Judgment**.

---

**Plaintiff Chapman's Motion for Partial Summary Judgment on the Application of Issue Preclusion/Collateral Estoppel to the Issue of General Causation**

1
2

Summary judgment is appropriate "if the movant shows that there is no genuine issue as to any material fact and the movant is entitled to judgment as a matter of law." FedR.Civ.P 56(a).

3

### B.    Collateral Estoppel.

4
5
6
7
8

Federal preclusion law "'bars successive litigation of an issue of fact or law actually litigated and resolved in a valid court determination essential to the prior judgment,' even if the issue recurs in the context of a different claim. *Taylor v. Sturgell*, 553 U.S. 880, 891-9 (2008), *New Hampshire v. Maine*, 532 U.S. 742, 748-49 (2001)).

9
10
11
12
13
14

Offensive collateral estoppel is defined as "estoppel asserted by a plaintiff to prevent a defendant from relitigating an issue previously decided against the defendant." Black's Law Dictionary. Offensive collateral estoppel has been recognized as constitutional in civil cases. *Parklane Hosiery Co. v. Shore*, 439 U.S. 322, 331 (1979) (holding that in federal civil actions trial courts have broad discretion in allowing offensive collateral estoppel).

15
16
17
18
19
20
21
22
23
24

The Ninth Circuit in *United States v. Romeo*, 114 F.3d 141, 143 (9th Cir. 1997) explained the elements necessary for a prior decision to have preclusive effect: First, "[a]n identification of the issues in the two actions" must be made in "determining whether the issues are sufficiently similar and sufficiently material in both actions to justify invoking the doctrine. *Id*., 114 F.3d at 143. Second, the record of the first proceeding must be examined to determine whether the issue was fully litigated in the first proceeding. *Id*. Third, the court must determine, through examining the record, *"whether the issue was necessarily decided in the first case." Id.* (noting a process of determining "whether a rational jury could have grounded its verdict upon an issue other than that which the defendant seeks to foreclose from consideration," as discussed in Ashe v. Swenson, 397 U.S. 436, 444 (1970)).

25
26
27
28

---

**Plaintiff Chapman's Motion for Partial Summary Judgment on the Application of Issue Preclusion/Collateral Estoppel to the Issue of General Causation**

In the instant case, the precise general causation at issue *was* raised and fully[1] litigated in the prior proceedings. Moreover, the general causation issue litigated in the MDL was necessary to the outcome of the prior proceeding as without its resolution the case could not have moved on to the specific causation phase. In short, Monsanto's had a full and fair opportunity to litigate the general causation issue in the prior proceeding, and the litigation of the issue resulted in a final judgment on the merits against Monsanto.

It is expected that Monsanto will argue that applying nonmutual offensive collateral estoppel to bellwether trials—especially in mass tort cases—violates the constitutional rights of American businesses. Such a radical effort to burden access to the courts—federal and state courts—is contrary to both the

---

[1]     The United States Supreme Court cautions that there are two situations in which it may be unfair to apply offensive issue preclusion: "where the defendant in the first action had little incentive to defend vigorously, particularly if future suits were not foreseeable; and (2) where the second action "affords the defendant procedural opportunities unavailable in the first action that could readily cause a different result." *Parklane Hosiery Co.,* 439 U.S. at 330-31. Neither of these situations are even arguably present here. Monsanto had every incentive to vigorously defend the first three trials, knowing that there were thousands of cases that would be impacted by the outcomes of those trials, and obviously future suits were foreseeable in that there were thousands of cases in this MDL. Moreover, this court has confirmed that its general causation pretrial and trial rulings bind the MDL. In short, there is no question that Monsanto had strong motivation to defend vigorously and that it fully understood that future suits were not only foreseeable, but likely. Further, Monsanto has made clear in various pleadings and news releases that there was potential liability well into the future. Finally, the remaining cases do not afford the parties any procedural opportunities that were unavailable in the first three trials that could readily cause a different result. Moreover, since the inception of this MDL, the pretrial motion practice was aggressively litigated by competent counsel on both sides.  The time and costs to pursue the trials and litigation have been huge. Given the caliber and number of counsel, the length of this action, various settlements totaling in the Billions, a fully briefed and argued appeal before the Ninth Circuit, it is respectfully submitted that the time has come to conserve judicial resources as well as those of the parties.

---

**Plaintiff Chapman's Motion for Partial Summary Judgment on the Application of Issue Preclusion/Collateral Estoppel to the Issue of General Causation**

historical foundation of the due process guarantee and to public policy imperatives that are vital to the administration of justice.

>     1.    **Nonmutual collateral estoppel serves important public policy, especially in mass tort litigation.**

Collateral estoppel serves an important public policy imperative: One litigant must not waste the court's time and resources, and those of other litigants, by demanding to be allowed to relitigate an issue that has already been decided. *In re E. I. du Pont,* 2019 WL 6310731, at *29. The first Justice Harlan declared:

> This general rule is demanded by the very object for which civil courts have been established, which is to secure the peace and repose of society by the settlement of matters capable of judicial determination. Its enforcement is essential to the maintenance of social order.

*Southern Pac. R. Co. v. United States,* 168 U.S. 1, 49 (1897). *See also Fayerweather v. Ritch*, 195 U.S. 276, 299 (1904) ("Private right and public welfare unite in demanding that a question once adjudicated by a court of competent jurisdiction . . . be considered as finally settled and conclusive upon the parties.").

Clearly the societal necessity for the prompt and efficient administration of justice is greatest in the context of mass tort litigation. A prime example is the floodtide of claims brought by victims of asbestos. Thirty years ago the Judicial Conference called the backlog of cases "a disaster of major proportions" that was "getting worse." Judicial Conference of the U.S., Report of the Proceedings of the Judicial Conference of the United States: Ad Hoc Committee on Asbestos Litigation 2 (1991). One cause of increasing transaction costs, the report stated, was that collateral estoppel did not prevent defendants from relitigating the question of general causation in every case, despite the "overwhelming medical evidence" that asbestos caused the types of injuries involved in the massive litigation. *Id*. at 33. It was the

---

**Plaintiff Chapman's Motion for Partial Summary Judgment on the Application of Issue Preclusion/Collateral Estoppel to the Issue of General Causation**

recommendation of the Judicial Conference that Congress authorize a determination of general causation that would be binding in all asbestos cases. *Id*. at 33-34.

A blanket disallowing of offensive collateral estoppel in mass tort litigation would force courts facing such mass tort challenges to squander resources in order to allow defendants to relitigate the same common issues over and over for no discernible purpose other than to make access to justice costlier for those with meritorious claims.

> ### 2. Because collateral estoppel was widely accepted at common law when the Due Process Clause was adopted, it satisfies the guarantee of due process of law.

Due process is not measured by judges' subjective notions of fairness, in the manner of the maligned "Chancellor's foot." *Grupo Mexicano de Desarrollo, S.A. v. All. Bond Fund, Inc*., 527 U.S. 308, 332-33 (1999) (Scalia, J.) (quoting Joseph Story, 1 Commentaries on Equity Jurisprudence § 19). Rather, the guarantee of due process of law refers "to those settled usages and modes of proceeding existing in the common and statute law" when the constitutional guarantee was adopted. *Murray's Lessee v. Hoboken Land & Improvement Co*., 59 U.S. (18 How.) 272, 276- 77 (1856). That is, "a process of law, which is not otherwise forbidden [by the constitution], must be taken to be due process of law, if it can show the sanction of settled usage both in England and in this country." *Hurtado v. People of State of Cal*., 110 U.S. 516, 528 (1884). A rule "that dates back to the adoption of [the Due Process Clause] and is still generally observed unquestionably meets that standard" of "traditional notions of fair play and substantial justice." *Burnham v. Superior Court of Cal*., 495 U.S. 604, 622 (1990) (plurality opinion) (quotation and citation marks omitted).

For example, the Court in *Pacific Mut. Life Ins. Co. v. Haslip*, 499 U.S. 1 (1991), determined that the traditional procedure giving broad discretion in awarding punitive damages to properly instructed

---

**Plaintiff Chapman's Motion for Partial Summary Judgment on the Application of Issue Preclusion/Collateral Estoppel to the Issue of General Causation**

7

juries does not offend procedural due process. "[T]he common-law method for assessing punitive damages was well established before the Fourteenth Amendment was enacted." *Haslip*, 499 U.S. at 17. Despite complaints from businesses that this method of awarding punitive damages was unfair to businesses, it "is not for Members of this Court to decide from time to time whether a process approved by the legal traditions of our people is 'due' process." *Id*. at 28 (Scalia, J., concurring).

The rule "that parties should not be permitted to relitigate issues that have been resolved by courts of competent jurisdiction—predates the Republic." *San Remo Hotel, L.P. v. City & Cnty. of San Francisco*, 545 U.S. 323, 336 (2005). Collateral estoppel is most frequently traced to the decision in *The Duchess of Kingston's Case*, 20 Howell's State Trials 538 (House of Lords 1776). *See* Note, *Collateral Estoppel by Judgment*, 52 Colum. L. Rev. 647, 660 (1952); Comment, *Res Judicata and Estoppel*, 13 Yale L.J. 245, 246 (1904). The rule as stated in that case was "universally adopted in England and America." J.C. Wells, *A Treatise on the Doctrines of Res Adjudicata and Stare Decicis,* 173 (1878). The Supreme Court very early took note of the "general rule, that a fact which has been directly tried, and decided by a Court of competent jurisdiction, cannot be contested again between the same parties." *Hopkins v. Lee*, 19 U.S. 109, 113 (1821).

### 3.     The mutuality requirement is not essential to due process.

That "same parties" qualification, of course, reflected the traditional requirement of mutuality:

> No party is as a general rule bound in a subsequent proceeding by a judgment, unless the adverse party now seeking to secure the benefit of the former adjudication would have been prejudiced by it if it had been determined the other way. The operation of estoppels must be mutual.

*Meeker v. Mettler*, 97 P. 507, 509 (Wash. 1908) (quoting Freeman on Judgments § 159 (4th Ed. 1892) (internal quotation marks omitted). It is the elimination of this mutuality requirement that Monsanto is

---

**Plaintiff Chapman's Motion for Partial Summary Judgment on the Application of Issue Preclusion/Collateral Estoppel to the Issue of General Causation**

1 expected to argue is a violation of the due process rights of businesses in mass tort litigation. But, although

2 courts at one time insisted upon mutuality as a limitation on the application of collateral estoppel, it did

3 not appear to serve any useful purpose in assuring fairness to the party precluded. As early as 1827, jurist

4 and philosopher Jeremy Bentham ridiculed the rule as more appropriate for the gaming tables than for the

5 courts. 7 Bentham's Works 171 (Bowring's ed. 1843). *See also* 3 John H. Wigmore, Evidence § 1388 (2d

6 ed. 1923) (quoting Bentham and condemning the mutuality requirement as "fallacious").

7

8 As the Supreme Court has made clear, the constitutional guarantee of due process "does not compel

9 state courts or legislatures to adopt any particular rule for establishing the conclusiveness of judgments."

10 *Hansberry v. Lee*, 311 U.S. 32, 42 (1940). By the early twentieth century, state courts decisions were

11 beginning "to establish the rule, that one who has had his day in court and has lost, cannot reopen identical

12 issues by merely switching adversaries." Comment, *Privity and Mutuality in the Doctrine of Res Judicata*,

13 35 Yale L.J. 607, 610 (1926). In what has become the leading state court decision, California Chief Justice

14 Roger Traynor stated, "No satisfactory rationalization has been advanced for the requirement of

15 mutuality." *Bernhard v. Bank of Am. Nat. Trust & Sav. Ass'n*, 122 P.2d 892, 895 (Cal. 1942). The "courts

16 of most jurisdictions" had already discarded the mutuality requirement or had "accomplished the same

17 result by recognizing a broad exception to the requirements of mutuality and privity." *Bernhard*, 122 P.2d

18 at 895. By 1967, the New York Court of Appeals could declare: "[T]he 'doctrine of mutuality' is a dead

19 letter." *B. R. DeWitt, Inc. v. Hall*, 225 N.E.2d 195, 198 (N.Y. 1967).

20

21 The mutuality requirement seems to have survived as long as it did simply on a vague good-for-

22 the-gander notion of fairness that the Supreme Court has firmly rejected. Due process looks for "the

23 achievement of substantial justice rather than symmetry." *Blonder-Tongue Labs., Inc. v. Univ. of Illinois

24 Found.*, 402 U.S. 313, 325 (1971). The requirement that "the party against whom an estoppel is asserted

**Plaintiff Chapman's Motion for Partial Summary Judgment on the Application of Issue Preclusion/Collateral Estoppel to the Issue of General Causation**

had a full and fair opportunity to litigate" is itself the "most significant safeguard" of fundamental fairness. *Parklane Hosiery*, 439 U.S. at 328 (quoting *Blonder- Tongue Labs*., 402 U.S. at 329). But due process is not an entitlement to unlimited do-overs.

Businesses on occasion seek to invoke nonmutual defensive collateral estoppel, which bars a plaintiff from relitigating a question they lost in a prior action against a different defendant. *E.g., Otworth v. Fifth Third Bank, No*. 20-1286, 2020 WL 9211025, at *3 (6th Cir. Oct. 27, 2020). The Supreme Court upheld collateral estoppel in that situation, regardless of the absence of mutuality. *See Blonder- Tongue Labs*., 402 U.S. at 325 ("[N]o unfairness results here from estoppel which is not mutual."). Adoption of the novel view that mutuality is mandated by the Due Process Clause would require overturning both *Blonder- Tongue* and *Parklane Hosiery*, at least in mass tort litigation, and allowing both plaintiffs and defendants to relitigate decided questions—in precisely the circumstance where efficient use of judicial resources is most needed.

Clearly the requirement of mutuality of estoppel is not the valuable and essential safeguard of fundamental fairness. It was never satisfactorily justified, it has long been the object of widespread criticism, and it has been cast aside by most federal and state courts, including the Supreme Court of the United States. In the words of Professor Currie,

> I trust it is abundantly clear that in this Article I have come, like the California Supreme Court [in Bernhard], to bury the [mutuality] requirement, not to praise it. . . . [A]s a principle of justice it has been shown to be a tinkling cymbal, an empty and fatuous formula productive of more harm than good.

Brainerd Currie, *Mutuality of Collateral Estoppel: Limits of the Bernhard Doctrine*, 9 Stan. L. Rev. 281, 322 (1957).

    **4.**    **Nonmutual offensive collateral estoppel does not violate the right to trial by jury.**

---

**Plaintiff Chapman's Motion for Partial Summary Judgment on the Application of Issue Preclusion/Collateral Estoppel to the Issue of General Causation**

10

For similar reasons, offensive collateral does not violate the Seventh Amendment, which exists "to preserve the substance of the common-law [jury trial] right as it existed in 1791." *Google LLC v. Oracle Am., Inc*., 141 S. Ct. 1183, 1200 (2021) (quoting *Markman v. Westview Instruments, Inc*., 517 U.S. 370, 376 (1996)).

As with due process, the mutuality requirement is not an essential feature of the right to trial by jury. Collateral estoppel as it existed in 1791 served to preclude a defendant from repeatedly relitigating a question that he had previously litigated and lost. Mutuality was not essential to that purpose. As the *Parklane Hosiery* Court pointed out, an estopped defendant is "deprived of a jury trial whether he is estopped from relitigating the factual issues against the same party or a new party." 439 U.S. at 335. Because the bar against such relitigation was accepted at common law in 1791, there is no Seventh Amendment violation.

### 5.    The Supreme Court has upheld nonmutual offensive collateral estoppel.

In *Parklane Hosiery*, the Supreme Court explicitly stated it was not categorically banning nonmutual estoppel, even in mass tort cases:

> We have concluded that the preferable approach for dealing with these problems in the federal courts is not to preclude the use of offensive collateral estoppel, but to grant trial courts broad discretion to determine when it should be applied. The general rule should be that in cases where . . . the application of offensive estoppel would be unfair to a defendant, a trial judge should not allow the use of offensive collateral estoppel.

*Parklane Hosiery*, 439 U.S. at 331.

Parklane Hosiery was itself a shareholder class action. *See id*. at 324. "The nub of the holding [of Parklane Hosiery] however, was that the decision whether or not to apply collateral estoppel was left to

---

**Plaintiff Chapman's Motion for Partial Summary Judgment on the Application of Issue Preclusion/Collateral Estoppel to the Issue of General Causation**

the broad discretion of the district judge under the applicable circumstances." *City of Cleveland v. Cleveland Elec. Illuminating Co.*, 734 F.2d 1157, 1165 (6th Cir. 1984) (emphasis in original).

> **6.      District courts apply nonmutual offensive collateral estoppel in mass tort litigation where appropriate.**

The application of nonmutual offensive collateral estoppel has been applied in the context of mass torts. In asbestos litigation, for example, "considerations of judicial economy in deciding mass torts, persuade this Court to rule in favor of the offensive use of collateral estoppel" based on prior jury verdicts. *Mooney v. Fibreboard Corp.*, 485 F. Supp. 242, 248 (E.D. Tex. 1980); *see also Flatt v. Johns Manville Sales Corp.*, 488 F. Supp. 836, 841 (E.D. Tex. 1980) (manufacturers of cement pipes containing asbestos were collaterally estopped from relitigating whether products containing asbestos lacked warnings and were unreasonably dangerous to users); *Raytech Corp. v. White*, 54 F.3d 187, 189 (3d Cir. 1995) (Raytech was collaterally estopped "from relitigating the issue of its successor liability for Raymark [Industries]'s asbestos liabilities.").

In a mass tort litigation by residents and businesses alleging chemical contamination of their water supply, a district court ruled that after a defendant has "lost on a claim to an individual plaintiff, subsequent plaintiffs could use offensive collateral estoppel to prevent [that defendant] from litigating the issue." *Good v. Am. Water Works Co., Inc.*, 310 F.R.D. 274, 297 (S.D.W.V. 2015).

District courts have also applied collateral estoppel in the MDL context. One commentator has ventured that the "value of allowing bellwether trials to have *Parklane* issue preclusive effect is best illustrated by" the MTBE multi-district litigation. Zachary B. Savage, *Scaling Up: Implementing Issue Preclusion in Mass Tort Litigation Through Bellwether Trials*, 88 N.Y.U. L. Rev. 439, 457 (2013). In that case, cities, municipal corporations, and water providers brought suit against various gasoline refiners,

**Plaintiff Chapman's Motion for Partial Summary Judgment on the Application of Issue Preclusion/Collateral Estoppel to the Issue of General Causation**

12

**1**
**2**
**3**
**4**
**5**
**6**
**7**
**8**
**9**
**10**
**11**
**12**
**13**
**14**
**15**
**16**
**17**
**18**
**19**
**20**
**21**
**22**
**23**
**24**
**25**
**26**
**27**
**28**

distributors, and retailers alleging that defendants' improper handling of MBTE, a gasoline additive, contaminated drinking water. The MDL Panel consolidated the claims before the southern district court, and ten bellwether cases were selected for trial in the transferee court. *In re Methyl Tertiary Butyl Ether ("MTBE") Prods.*, No. 1:00-1898, 2007 WL 1791258, at *1 (S.D.N.Y. June 15, 2007).

On plaintiffs' motion to proceed with the trials, the court ruled that the jury in the representative cases will be asked to respond on special verdict forms to questions regarding whether there were feasible alternatives to MBTE, whether defendants knew of the dangers, whether they provided adequate warnings, and whether water contamination was foreseeable. "The jury's findings on general liability will . . . have preclusive effect in subsequent trials." MTBE Prods., 2007 WL 1791258, at *4.

Nonmutual offensive collateral estoppel was also applied in the Chinese Drywall mass tort multi-district litigation. *See In re Chinese-Manufactured Drywall Prods. Liab. Litig.*, MDL No. 2047, 2014 WL 4809520, at *12-13 (E.D. La. Sept. 24, 2014). In none of these cases have the adverse consequences argued by defendants came to pass.

### 7.      Nonmutual collateral estoppel does not force defendants to settle.

It is simply not enough to raise the tort reformers' familiar battle-cry that making it less expensive for wrongfully harmed plaintiffs to seek legal redress "forces defendants to settle." Without doubt, every company that is potentially liable to a large number of people due to its conduct toward them may feel intense pressure to settle. But compromise resolution for certainty, but less than full redress, is the essence of dispute resolution in our civil justice system. As this Court has repeatedly stated, "Public policy strongly favors settlement of disputes without litigation." *Borror Prop. Mgmt., LLC v. Oro Karric N., LLC*, 979 F.3d 491, 496 (6th Cir. 2020) (quoting *Aro Corp. v. Allied Witan Co.*, 531 F.2d 1368, 1372 (6th Cir. 1976)).

---

**Plaintiff Chapman's Motion for Partial Summary Judgment on the Application of Issue Preclusion/Collateral Estoppel to the Issue of General Causation**

If a defendant who may have wrongfully harmed many people can deal with each on a one-at-a-time basis and in isolation, fewer cases will be economically feasible to pursue, resulting in far fewer cases to settle. Allowing courts and litigants to resolve large numbers of similar, sometimes small claims more efficiently does not give claimants an unfair advantage. It helps open the courthouse doors. "The fact is," the Ninth Circuit has noted, Congress has put to rest the "sociological merits" of allowing small claimants access to federal courts by authorizing Rule 23(b)(3). *In re Sugar Antitrust Litig.*, 559 F.2d 481, 484 n.1 (9th Cir. 1977). Nonmutual offensive collateral estoppel brings the same policy advantages.

The Ninth Circuit also added that "the soundness of the [pressure-to-settle] argument has been disputed on empirical grounds." *In re Sugar*, 559 F.2d at 484 n.1. Although there is much for researchers to learn concerning class action settlements, it is well known that "the assertion that the risks of class actions are so great that they force defendants to settle non-meritorious claims—so called 'blackmail settlements'—rest[s] on empirical assumptions . . . which have also gone largely untested." Deborah R. Hensler, *Happy 50th Anniversary, Rule 23! Shouldn't We Know You Better After All This Time*?, 165 U. Pa. L. Rev. 1599, 1604 (2017).

In fact, "the most striking finding" from a survey of empirical studies of federal class actions was the relatively low percentage of class actions that settle after receiving the green light of certification, contradicting "conventional wisdom" that certification "forces the defendant to settle." Thomas E. Willging & Emery G. Lee III, *Class Certification and Class Settlement: Findings from Federal Question Cases*, 2003-2007, 80 U. Cin. L. Rev. 315, 324 (2011). Professor Charles Silver points out that a study by the Federal Judicial Center found that about 73 percent of certified class actions ended in settlement, which is about the same rate at which individual tort cases settle. Charles Silver, "*We're Scared to Death": Class Certification and Blackmail*, 78 N.Y.U. L. Rev. 1357, 1399-1402 (2003).

---

**Plaintiff Chapman's Motion for Partial Summary Judgment on the Application of Issue Preclusion/Collateral Estoppel to the Issue of General Causation**

That most cases settle, including cases where a single loss would result in large damages, is hardly problematic. Every plaintiff's offer to settle for less than the complaint's demand is not a ransom note; it is an invitation to take a realistic look at the strength of one's case. As Professor Silver points out, fear of an adverse verdict at trial "is a reason for thinking that a defendant is right to settle, not for thinking that a defendant is coerced." *Id*. at 1366. This is confirmed by an earlier study, again conducted for the Federal Judicial Center. It found that more than two- thirds of certified class actions had rulings on dispositive defense motions to dismiss or for summary judgment, which "greatly diminishes the likelihood that the certification decision itself, as opposed to the merits of the underlying claims, coerced settlements." Thomas E. Willging et al., *Empirical Study of Class Actions in Four Federal District Courts: Final Report To the Advisory Committee on Civil Rules*, Federal Judicial Center 61 (1996).

The "blackmail" argument holds even less water in the collateral estoppel context. The issues actually litigated and decided in F1, which the defendant is precluded from relitigating in F2, are necessarily common issues. For example, in this case, the parties litigated general causation before moving to specific causation. An adverse decision does not expose the defendant to catastrophic damages if that question cannot be relitigated in subsequent actions. Even armed with a favorable decision on this issue, follow-on plaintiffs must still persuade the finder of fact on issues of specific causation and damages in individual cases. Each of those individual actions presents the defendant with the same settlement calculus. Collateral estoppel does not put a defendant in the position of staking the company on the outcome of a single trial.

Professor Silver pointedly concludes, "Given the sad state of the duress theory, judges hardly are justified in using it at all, let alone in employing incendiary phrases like legalized blackmail." Silver, *supra* at 1430.

---

**Plaintiff Chapman's Motion for Partial Summary Judgment on the Application of Issue Preclusion/Collateral Estoppel to the Issue of General Causation**

**8.      The application of nonmutual collateral estoppel is appropriate in mass tort cases.**

As noted above, MDL courts currently apply collateral estoppel to common issues decided by bellwether trials. Additionally, even when purely informational, bellwether trials "are often exponentially more expensive for the litigants and attorneys than a normal trial. . . . as coordinating counsel often pull out all the stops." Judge Eldon E. Fallon et al., *Bellwether Trials in Multidistrict Litigation*, 82 Tul. L. Rev. 2323, 2366 (2008). "[G]iven the potentially enormous implications of bellwether trials on settlement negotiations, parties tend to heavily litigate all motions in the bellwether trial, making them highly expensive and time consuming for all of the parties and the court." 4 *Newberg on Class Actions* § 11:12 (5th ed.). For that reason, "structuring litigation to make issue preclusion possible seems unlikely to significantly alter defendants' calculus in mass tort cases, as their incentive is already to litigate these trials as vigorously as possible. *Savage*, supra at 460-61.

Finally, application of offensive collateral estoppel in the MDL context affords defendants more-than-adequate safeguards of their due process rights. Due process demands only that a party who is precluded in F2 on the basis of the decision in F1 be afforded "notice and opportunity to be heard" in both litigations. *Hansberry*, 311 U.S. at 40 (1940). Typically, the F2 court makes a determination whether the decision in F1 meets the requirements for issue preclusion and, invoking the discretion allowed by *Parklane Hosiery*, whether estoppel in that circumstance would be unfair. By contrast, in an MDL, the F1 court (the transferee court or the bellwether trial court) can also determine the preclusive effect that will attach. That court can precisely define the issues that will be actually litigated and decided in F1, providing more than adequate notice and minimizing the chance that the defendant will fail to devote the appropriate

---

**Plaintiff Chapman's Motion for Partial Summary Judgment on the Application of Issue Preclusion/Collateral Estoppel to the Issue of General Causation**

16

effort to litigating that issue. Conversely, some issues might be stipulated for trial purposes and not actually litigated, thus precluding collateral estoppel as to those issues.

In short, the lack of mutuality does not render the long settled and accepted common law rule of collateral estoppel categorically unfair to business defendants, such as Monsanto, in mass tort litigation. A broad prohibition would require courts and litigants to squander time, effort and resources. Nor does nonmutual offensive collateral estoppel impose undue settlement pressure. Prohibition is particularly uncalled-for in multi-district litigation, which offers sufficient notice and opportunity for defendants to be heard and to safeguard against any unfair issue preclusion.

## III.      Conclusion.

Monsanto has had a full and fair opportunity to litigate, and has litigated, general causation. Based upon the foregoing, it is respectfully requested that the Court grant plaintiff Chapman's motion regarding issue preclusion/collateral estoppel.

Dated this 28th day of October, 2021.

Respectfully Submitted,

*/s/ David J. Diamond*
David J. Diamond (AZ 010842)
DIAMOND LAW, PLLC
1700 E. River Road, #65237
Tucson, AZ 85728
P: (520) 497-2672
F: (520) 448-4466
ddiamond@diamondlawusa.com

*Attorney for Plaintiffs*

---

**Plaintiff Chapman's Motion for Partial Summary Judgment on the Application of Issue Preclusion/Collateral Estoppel to the Issue of General Causation**

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**CERTIFICATE OF SERVICE**

I, David J. Diamond, hereby certify that on October 28, 2021, the foregoing document was filed via the Court's CM/ECF system, which will automatically serve and send email notification of such filing to all registered attorneys of record.

*/s/ David J. Diamond*
David J. Diamond

---

**Plaintiff Chapman's Motion for Partial Summary Judgment on the Application of Issue Preclusion/Collateral Estoppel to the Issue of General Causation**