# EXHIBIT 3



AlaFile E-Notice

20-CV-2020-900237.00

Judge: KYLE W BROWN

To: HALRON WAITES TURNER
hwt@tokh.com

# NOTICE OF ELECTRONIC FILING

IN THE CIRCUIT COURT OF COLBERT COUNTY, ALABAMA

MICHAEL RANDY HAYES ET AL V. MONSANTO COMPANY CORPORATION ET AL
20-CV-2020-900237.00

The following matter was FILED on 11/4/2020 1:02:08 PM

**D001 MONSANTO COMPANY CORPORATION**

NOTICE OF FILING NOTICE OF REMOVAL

[Filer: TURNER HALRON WAITES]

Notice Date:     11/4/2020 1:02:08 PM

MARK R. EADY
CIRCUIT COURT CLERK
COLBERT COUNTY, ALABAMA
P.O. BOX 740370
TUSCUMBIA, AL, 35674

256-386-8511
mark.eady@alacourt.gov

ELECTRONICALLY FILED
11/4/2020 1:02 PM
20-CV-2020-900237.00
CIRCUIT COURT OF
COLBERT COUNTY, ALABAMA
MARK R. EADY, CLERK

# STATE OF ALABAMA

**Unified Judicial System**

Revised 3/5/08

20-COLBERT

☐ District Court  ☑ Circuit Court

CV2

**Cas**

---

MICHAEL RANDY HAYES ET AL V. MONSANTO COMPANY CORPORATION ET AL

## CIVIL MOTION COVER SHEET

*Name of Filing Party:* D001 - MONSANTO COMPANY CORPORATION

---

*Name, Address, and Telephone No. of Attorney or Party. If Not Represented.*

HALRON WAITES TURNER

POST OFFICE DRAWER 1389

CHATOM, AL 36518

*Attorney Bar No.:* TUR012

☐ Oral Arguments Requested

---

## TYPE OF MOTION

| Motions Requiring Fee | Motions Not Requiring Fee |
|---|---|
| ☐ Default Judgment ($50.00) | ☐ Add Party |
| ☐ Joinder in Other Party's Dispositive Motion (i.e.Summary Judgment, Judgment on the Pleadings, orother Dispositive Motion not pursuant to Rule 12(b)) ($50.00) | ☐ Amend |
| | ☐ Change of Venue/Transfer |
| | ☐ Compel |
| ☐ Judgment on the Pleadings ($50.00) | ☐ Consolidation |
| ☐ Motion to Dismiss, or in the Alternative SummaryJudgment($50.00) | ☐ Continue |
| | ☐ Deposition |
| ☐ Renewed Dispositive Motion(Summary Judgment,Judgment on the Pleadings, or other DispositiveMotion not pursuant to Rule 12(b)) ($50.00) | ☐ Designate a Mediator |
| | ☐ Judgment as a Matter of Law (during Trial) |
| ☐ Summary Judgment pursuant to Rule 56($50.00) | ☐ Disburse Funds |
| ☐ Motion to Intervene ($297.00) | ☐ Extension of Time |
| ☐ Other _____ | ☐ In Limine |
| pursuant to Rule _____ ($50.00) | ☐ Joinder |
| | ☐ More Definite Statement |
| *Motion fees are enumerated in §12-19-71(a). Fees pursuant to Local Act are not included. Please contact the Clerk of the Court regarding applicable local fees. | ☐ Motion to Dismiss pursuant to Rule 12(b) |
| | ☐ New Trial |
| | ☐ Objection of Exemptions Claimed |
| ☐ Local Court Costs $ 0 | ☐ Pendente Lite |
| | ☐ Plaintiff's Motion to Dismiss |
| | ☐ Preliminary Injunction |
| | ☐ Protective Order |
| | ☐ Quash |
| | ☐ Release from Stay of Execution |
| | ☐ Sanctions |
| | ☐ Sever |
| | ☐ Special Practice in Alabama |
| | ☐ Stay |
| | ☐ Strike |
| | ☐ Supplement to Pending Motion |
| | ☐ Vacate or Modify |
| | ☐ Withdraw |
| | ☑ Other    Notice of Filing Notice of Removal |
| | pursuant to Rule 28 U.S.C. § 1446(d)   (Subject to Filing Fee) |

---

Check here if you have filed  or are filing contemporaneously with this motion an Affidavit of Substantial Hardship or if you are filing on behalf of an agency or department of the State, county, or municipal government. (Pursuant to §6-5-1 Code of Alabama (1975), governmental entities are exempt from prepayment of filing fees)  ☐

Date:
11/4/2020 12:57:19 PM

Signature of Attorney or Party
/s/ HALRON WAITES TURNER

---

*This Cover Sheet must be completed and submitted to the Clerk of Court upon the filing of any motion. Each motion should contain a separate Cover Sheet.

**Motions titled 'Motion to Dismiss' that are not pursuant to Rule 12(b) and are in fact Motions for Summary Judgments are subject to filing fee.

ELECTRONICALLY FILED
11/4/2020 1:02 PM
20-CV-2020-900237.00
CIRCUIT COURT OF
COLBERT COUNTY, ALABAMA
MARK R. EADY, CLERK

**IN THE CIRCUIT COURT OF COLBERT COUNTY, ALABAMA**

MICHAEL RANDY HAYES and wife,    :
KATRINA HAYES,

                                :

      Plaintiffs,

                                :

v.                                         20-CV-2020-900237

                                :

MONSANTO COMPANY CORPORATION;
*et al.*,                             :

      Defendants.          :

                              :   :   :

## NOTICE OF FILING NOTICE OF REMOVAL

**PLEASE TAKE NOTICE** that on November 4, 2020, Defendant

Monsanto Company, erroneously named in the Complaint as

"Monsanto Company Corporation," by and through its undersigned

counsel, filed the attached Notice of Removal in the United

States District Court for the Northern District of Alabama,

Northwestern Division (Florence), thereby removing this case to

that Court pursuant to 28 U.S.C. §§ 1332, 1441, and 1446.

Pursuant to 28 U.S.C. § 1446(d), a true and correct copy of the

Notice of Removal is attached hereto.  This Court may proceed no

further with this action unless or until the case is remanded by

the District Court.

Dated:  November 4, 2020

Respectfully submitted,

/s/ Halron W. Turner
_____
HALRON W. TURNER (TUR012)
Turner, Onderdonk, Kimbrough,
  Howell, Huggins & Bradley, PA
13212 West Central Avenue
Post Office Drawer 1389
Chatom, Alabama 36518
Telephone:  (251) 847-2237
Facsimile:  (251) 847-3115
Email:  hwt@tokh.com

**Attorneys for Defendant
MONSANTO COMPANY**

## CERTIFICATE OF SERVICE

I hereby certify that on November 4, 2020, I electronically
filed the foregoing document with the Clerk of the Court
utilizing the AlaFile system, which will send notification of
such filing to all registered counsel of record as listed below.

/s/ Halron W. Turner
_____
HALRON W. TURNER
Counsel for Defendant

**Counsel of Record:**

Trey J. Malbrough, Esq. (trey@tmbfirm.com)
Bennett L. Pugh, Esq. (pughbennett@gmail.com)
Steve A. Baccus, Esq. (ambwllc@yahoo.com)
R. Keith Worsham, Esq. (rkwllll1l@yahoo.com)

DOCUMENT 34
Case 3:16-cv-02741736-CLB Document 14817-1 Filed 02/26/21 Page 6 of 93

ELECTRONICALLY FILED
11/4/2020 1:02 PM
20-CV-2020-900237.00
CIRCUIT COURT OF
COLBERT COUNTY, ALABAMA
MARK R. EADY, CLERK

## IN THE UNITED STATES DISTRICT COURT FOR
## THE NORTHERN DISTRICT OF ALABAMA
## NORTHWESTERN DIVISION

|  |  |
|---|---|
| MICHAEL RANDY HAYES and KATRINA HAYES, | |
| Plaintiffs, | Case No. _____ |
| v. | |
| MONSANTO COMPANY; RED RIVER SPECIALTIES, INC.; RED RIVER SPECIALTIES, LLC; SHEFFIELD LIGHT & POWER; SHEFFIELD UTILITIES; and FICTITIOUS DEFENDANTS 1-210, | |
| Defendants. | |

## DEFENDANT MONSANTO COMPANY'S NOTICE OF REMOVAL

Pursuant to 28 U.S.C. §§ 1332, 1441, and 1446 (and any other applicable laws), Defendant Monsanto Company ("Monsanto"), erroneously named in the Complaint as Monsanto Company Corporation, hereby gives notice of removal of this action, captioned *Michael Randy Hayes, et al. v. Monsanto Company Corporation, et al.*, bearing Case Number 20-CV-2020-900237.00, from the Circuit Court of Colbert County, Alabama to this Court. Pursuant to 28 U.S.C. § 1446(a), Monsanto provides the following statement of grounds for removal.

## INTRODUCTION

1.      In this products liability lawsuit, Plaintiffs Michael and Katrina Hayes sue Monsanto (and other defendants) for injuries and damages allegedly caused by Monsanto's Roundup®-branded herbicides, which have glyphosate as their active ingredient. For decades, farmers have used glyphosate-based herbicides to increase crop yields, and home-owners, landscaping companies, and local government agencies have used these herbicides for highly

effective weed control.  Glyphosate is one of the most thoroughly studied herbicides in the world, and glyphosate-based herbicides have received regulatory approval in more than 160 countries.  Since 1974, when Monsanto first introduced a Roundup®-branded herbicide to the marketplace, the United States Environmental Protection Agency repeatedly has concluded that glyphosate does not cause cancer – including as recently as January 2020.  Nevertheless, Plaintiffs allege that Mr. Hayes developed cancer – specifically, non-Hodgkin's lymphoma ("NHL") – caused by exposure to Monsanto's Roundup®-branded, glyphosate-based herbicides.

2.     As the Eleventh Circuit has stated repeatedly, "[t]he removal process was created by Congress to protect defendants.  Congress did not extend such protection with one hand, and with the other give plaintiffs a bag of tricks to overcome it."  *Legg v. Wyeth*, 428 F.3d 1317, 1325 (11th Cir. 2005) (quotation marks omitted); *see Pretka v. Kolter City Plaza II, Inc.*, 608 F.3d 744, 766 (11th Cir. 2010) (quoting *Legg*, 428 F.3d at 1325).  Recognizing what the "Supreme Court long ago admonished," the Eleventh Circuit also has explained that "'the Federal courts should not sanction devices intended to prevent a removal to a Federal court where one has that right, and should be equally vigilant to protect the right to proceed in the Federal court.'"  *Legg*, 428 F.3d at 1325 (quoting *Wecker v. Nat'l Enameling & Stamping Co.*, 204 U.S. 176, 186 (1907)).

3.     In this case, Plaintiffs (two Alabama citizens) fraudulently joined two entities – Sheffield Light & Power and Sheffield Utilities, which allegedly are Alabama corporations and allegedly employed Mr. Hayes – in an attempt to deprive Monsanto of its important right to remove this lawsuit to federal court.  However, as discussed in more detail below, Sheffield Light & Power and Sheffield Utilities never employed Mr. Hayes; are not separate legal entities in their own right; and do not have the capacity to be sued under Alabama law.

4. When the claims asserted against Sheffield Light & Power or Sheffield Utilities are disregarded as required by the "fraudulent joinder" doctrine, this Court has subject matter jurisdiction based on diversity of citizenship. Plaintiffs are Alabama citizens, and the other defendants are not Alabama citizens for purposes of federal diversity jurisdiction. Thus, complete diversity of citizenship exists here as required by 28 U.S.C. § 1332. The jurisdictional-amount-in-controversy requirement is also satisfied because Plaintiffs seek damages for cancer (NHL) allegedly caused by exposure to Monsanto's Roundup®-branded, glyphosate-based herbicides.

## BACKGROUND AND PROCEDURAL HISTORY

5. In September 2020, Plaintiffs commenced this action in the Circuit Court of Colbert County, Alabama by filing a Complaint, captioned *Michael Randy Hayes, et al. v. Monsanto Company Corporation, et al.*, Case Number 20-CV-2020-900237.00 (the "State Court Action").

6. Pursuant to 28 U.S.C. § 1446(a), true and correct copies of the Summons and Complaint served upon Monsanto in the State Court Action are attached as **Exhibit 1**. Plaintiffs seek compensatory and punitive damages for NHL allegedly caused by exposure to Monsanto's Roundup®-branded, glyphosate-based herbicides. *See, e.g.*, Complaint ¶¶ 2, 18-21, 132-33, 149, 178-80, Count IX, Prayer for Relief.

## BASIS FOR REMOVAL – DIVERSITY JURISDICTION

**I.       Complete Diversity Of Citizenship Exists In This Lawsuit.**

7. Plaintiffs are, and were at the time the State Court Action was filed, residents and citizens of the State of Alabama. Complaint ¶¶ 18-20, 31, 39, 132, Count IX (¶ 101).

8.     Monsanto is, and was at the time the State Court Action was filed, a corporation incorporated under the laws of the State of Delaware, with its principal place of business in the State of Missouri.  Complaint ¶ 7.  Thus, Monsanto is deemed to be a citizen of Delaware and Missouri, for purposes of federal diversity jurisdiction.

9.     On December 31, 2016, Red River Specialties, Inc. formally converted from a corporation to a limited liability company, Red River Specialties, LLC.  Consent to Removal (attached as **Exhibit 2**).  Before that conversion, Red River Specialties, Inc. was a corporation incorporated under the laws of the State of Louisiana and had its principal place of business in the State of Louisiana.  *Id*.  Red River Specialties, LLC is, and was at the time the State Court Action was filed, a limited liability company.  *Id*.  The sole member of Red River Specialties, LLC is, and was at the time the State Court Action was filed, Azelis Americas, LLC.  *Id*.  Azelis Americas, LLC is, and was at the time the State Court Action was filed, a limited liability company.  *Id*.  The sole member of Azelis Americas, LLC is, and was at the time the State Court Action was filed, Azelis US Holding, Inc.  *Id*.  Azelis US Holding, Inc. is, and was at the time the State Court Action was filed, a corporation incorporated under the laws of the State of Delaware, with its principal place of business in the State of Connecticut.  *Id*.  Thus, Red River Specialties, LLC, formerly known as Red River Specialties, Inc. (collectively, "Red River Specialties"), is deemed to be a citizen of Delaware and Connecticut, for purposes of federal diversity jurisdiction.

10.     As discussed below, the only other named defendants – Sheffield Light & Power and Sheffield Utilities (both allegedly Alabama corporations) – must be disregarded because Plaintiffs fraudulently joined those defendants.

11.     Although the general rule is that complete diversity of citizenship is required for a federal court to have diversity-based subject matter jurisdiction, when a plaintiff has fraudulently joined a non-diverse defendant, "the district court must ignore the presence of the non-diverse defendant and deny any motion to remand the matter back to state court." *Jackson v. Bank of America, N.A.*, 578 F. App'x 856, 858 (11th Cir. 2014) (quotation marks omitted); *see also, e.g.*, *Sellers v. Foremost Ins. Co.*, 924 F. Supp. 1116, 1117 (M.D. Ala. 1996) ("The citizenship of a resident defendant fraudulently joined should not be considered by a court for the purpose of determining diversity jurisdiction.").  Fraudulent joinder also renders the so-called "forum defendant rule" inapplicable because that statutory provision applies only to "properly joined" defendants.  28 U.S.C. § 1441(b)(2).

12.     One way to establish fraudulent joinder is for the removing defendant to show that there is not "any reasonable possibility" that the plaintiff has a cause of action against the non-diverse defendant, *Legg*, 428 F.3d at 1324, and "[t]he potential for legal liability must be reasonable, not merely theoretical," *id*. at 1325 n.5 (quotation marks omitted); *see Jackson*, 578 F. App'x at 859 (citing *Legg*, 428 F.3d at 1324-25 n.5); *De Varona v. Discount Auto Parts, LLC*, 860 F. Supp. 2d 1344, 1346 (S.D. Fla. 2012) ("A defendant is fraudulently joined where there is no 'reasonable basis' for a claim against it." (citing, *inter alia*, *Legg*, 428 F.3d at 1325 n.5)).  In determining whether a defendant has been fraudulently, a court is not limited to considering the pleadings at the time of removal but is also required to consider other evidence submitted by the parties, including affidavits.  *See, e.g.*, *Legg*, 428 F.3d at 1322-24.

13.     Here, Plaintiffs sued Sheffield Light & Power and Sheffield Utilities in the hope that adding claims against those purported Alabama defendants would prevent removal due to lack of diversity jurisdiction and/or due to the forum defendant rule.

14.     However, Sheffield Light & Power and Sheffield Utilities never employed Mr. Hayes; are not separate legal entities in their own right; and do not have the capacity to be sued under Alabama law.  As established by the Affidavit of Chris White, Mr. Hayes was employed by the City of Sheffield from June 2, 1980 to March 1, 2015, when he retired.  Affidavit of Chris White ("White Affidavit") ¶ 3.  Mr. Hayes has not worked for the City of Sheffield since he retired.  *Id*.  Sheffield Utilities and Sheffield Light & Power are not separate corporate legal entities in their own right and never employed Mr. Hayes.  *Id*. ¶ 4.  Sheffield Utilities and Sheffield Light & Power are part of the City of Sheffield.  *Id*.  The only legal entity that employed Mr. Hayes during the period discussed above was the City of Sheffield.  *Id*.  Sheffield Light & Power and Sheffield Utilities cannot be sued in this case because, "[u]nder Alabama law, only a municipality itself has the capacity to sue and be sued, as opposed to agencies, departments or divisions of the municipality."  *Clay-Brown v. City of Decatur, Alabama*, No. CV 12-J-3988-NE, 2013 WL 832315, at *2 (N.D. Ala. Feb. 28, 2013) (relying on *Ex parte Dixon*, 55 So.3d 1171, 1172 n.1 (Ala. 2010)); *see Dixon*, 55 So.3d at 1172 n.1 (stating that "the departments and subordinate entities of municipalities, counties, and towns that are not separate legal entities or bodies do not have the capacity to sue or be sued in the absence of specific statutory authority" (quotation marks omitted)); *King v. Colbert Cnty.*, 620 So.2d 623, 626 (Ala. 1993) (affirming summary judgment ruling and holding that "one cannot maintain an action" against a defendant that "is not a legal entity"); *Franklin v. City of Athens*, No. 5:17-cv-01506-AKK, 2018 WL 1761686, at *3 (N.D. Ala. Apr. 12, 2018) (relying on *Dixon*, 55 So.3d at 1172 n.1, and dismissing a city's public works department because that defendant lacked the capacity to be sued under Alabama law); *Hardin v. City of Troy Public Works Dep't*, No. 2:10-cv-663-MEF, 2013 WL 5231872, at *7 (M.D. Ala. Sept. 16, 2013) (dismissing a city's public works

department; holding that it lacked the capacity to be sued under Alabama law because it was operated by, and not a separate entity from, the city).

15.     In sum, Plaintiffs have fraudulently joined Sheffield Light & Power and Sheffield Utilities because there is "no reasonable possibility," *Legg*, 428 F.3d at 1324, that Plaintiffs can establish a cause of action against either of those defendants.  It is clear that Plaintiffs do not have any viable claims against Sheffield Light & Power or Sheffield Utilities, so this Court should disregard the citizenship of those fraudulently joined defendants and hold that the requirement of complete diversity of citizenship is satisfied because no properly joined defendant is an Alabama citizen.[1]

## II.     The Jurisdictional-Amount-In-Controversy Requirement Is Satisfied Here.

16.     The Complaint seeks compensatory and punitive damages based on the allegation that Monsanto's Roundup®-branded herbicides caused Mr. Hayes to develop cancer (NHL). Therefore, it is plausible from the face of the Complaint that Plaintiffs seek damages in excess of $75,000, exclusive of interest and costs, which satisfies the jurisdictional amount-in-controversy requirement.  28 U.S.C. § 1332(a); *see Dart Cherokee Basin Operating Co. v. Owens*, 574 U.S. 81, 89 (2014) ("[A] defendant's notice of removal need include only a plausible allegation that the amount in controversy exceeds the jurisdictional threshold."); *see also Ross v. First Family Fin. Servs., Inc.*, No. 2:01CV218-P-B, 2002 WL 31059582, at *8 (N.D. Miss. Aug. 29, 2002) ("[U]nspecified claims for punitive damage sufficiently serve to bring the amount in controversy over the requisite jurisdictional threshold set out in 28 U.S.C. § 1332.").  In fact, other lawsuits seeking damages for NHL allegedly caused by glyphosate-based herbicides have been filed

---

[1] The citizenship of fictitious defendants must be disregarded when determining whether this lawsuit is removable based on § 1332(a).  *See* 28 U.S.C. § 1441(b)(1).

against Monsanto in other federal courts asserting jurisdiction under Section 1332(a) and alleging damages in excess of $75,000, exclusive of interest and costs.

17.     In sum, this Court has original subject matter jurisdiction over this action based on Section 1332(a) because there is complete diversity of citizenship between Plaintiffs and Defendants (disregarding the two fraudulently joined defendants) and because the amount in controversy exceeds $75,000, exclusive of interest and costs.

## PROCEDURAL REQUIREMENTS

18.     The Circuit Court of Colbert County, Alabama is located within the United States District Court for the Northern District of Alabama.  Therefore, removal to this Court satisfies the venue requirements of 28 U.S.C. § 1446(a).

19.     This Notice of Removal is timely.  When the State Court Action was commenced, the "case stated by the initial pleading [was] not removable," 28 U.S.C § 1446(b)(3), because the Complaint included claims against two defendants – Sheffield Light & Power and Sheffield Utilities – that allegedly are Alabama corporations.  Thus, based on the face of the Complaint, this lawsuit was not removable due to lack of diversity of citizenship and due to the forum defendant rule, 28 U.S.C. § 1441(b)(2).  The White Affidavit (dated November 3, 2020) is the "other paper from which it may first be ascertained that [this] case is one which is or has become removable."  § 1446(b)(3).  This Notice of Removal is timely because Monsanto is filing it within 30 days of November 3, 2020.

20.     Red River Specialties collectively consent to this removal.  Consent to Removal (Exhibit 2).

21.     Consent to removal by Sheffield Light & Power or Sheffield Utilities is not required because: (a) Plaintiffs fraudulently joined those purported defendants, so they have not

been "properly joined," 28 U.S.C. § 1446(b)(2)(A); and (b) they are not legal entities, so they do not have the legal capacity to consent to removal.

22.     The written notice required by 28 U.S.C. § 1446(d) will be promptly filed in the Circuit Court of Colbert County, Alabama and will be promptly served on Plaintiffs.

23.     Monsanto does not waive any legal defenses and expressly reserves its right to raise any and all legal defenses in subsequent proceedings.

24.     If any question arises as to the propriety of this removal, Monsanto requests the opportunity to present written and oral argument in support of removal.

## **CONCLUSION**

For the foregoing reasons, Monsanto removes this lawsuit to this Court pursuant to 28 U.S.C. §§ 1332, 1441, and 1446 (and any other applicable laws).

Dated:  November 4, 2020

Respectfully submitted,

      /s/ Halron W. Turner
HALRON W. TURNER (ASB-9339-T62H)
Turner, Onderdonk, Kimbrough,
  Howell, Huggins & Bradley, PA
13212 West Central Avenue
Post Office Drawer 1389
Chatom, Alabama 36518
Telephone:  (251) 847-2237
Facsimile:  (251) 847-3115
Email:  hwt@tokh.com

*Attorneys for Defendant*
*MONSANTO COMPANY (Erroneously Named*
*As Monsanto Company Corporation)*

## CERTIFICATE OF SERVICE

I hereby certify that on November 4, 2020, I electronically filed the foregoing document with the Clerk of the Court utilizing the CM/ECF system, which will send notification of such filing to all registered counsel of record as listed below.


_____/s/ Halron W. Turner_____
HALRON W. TURNER
**_Counsel for Defendant_**

**Counsel of Record**:

Trey J. Malbrough, Esq. (trey@tmbfirm.com)
Bennett L. Pugh, Esq. (pughbennett@gmail.com)
Steve A. Baccus, Esq. (ambwllc@yahoo.com)
R. Keith Worsham, Esq. (rkw11111@yahoo.com)

ELECTRONICALLY FILED
11/4/2020 1:02 PM
20-CV-2020-900237.00
CIRCUIT COURT OF
COLBERT COUNTY, ALABAMA
MARK R. EADY, CLERK

# Exhibit 1



AlaFile E-Notice

20-CV-2020-900237.00

To: MONSANTO COMPANY CORPORATION
C/O CORP. SERVICE CO. INC
641 SOUTH LAWRENCE STREET
MONTGOMERY, AL, 36104

# NOTICE OF ELECTRONIC FILING

IN THE CIRCUIT COURT OF COLBERT COUNTY, ALABAMA

MICHAEL RANDY HAYES ET AL V. MONSANTO COMPANY CORPORATION ET AL
20-CV-2020-900237.00

The following complaint was FILED on 9/24/2020 5:45:06 PM

Notice Date:     9/24/2020 5:45:06 PM

MARK R. EADY
CIRCUIT COURT CLERK
COLBERT COUNTY, ALABAMA
P.O. BOX 740370
TUSCUMBIA, AL, 35674

256-386-8511
mark.eady@alacourt.gov

| State of Alabama<br>Unified Judicial System<br>Form C-34  Rev. 4/2017 | **SUMMONS**<br>**- CIVIL -** | **Court Case Number**<br>20-CV-2020-900237.00 |
|---|---|---|

**IN THE CIRCUIT COURT OF COLBERT COUNTY, ALABAMA**
**MICHAEL RANDY HAYES ET AL V. MONSANTO COMPANY CORPORATION ET AL**

**NOTICE TO:** MONSANTO COMPANY CORPORATION, C/O CORP. SERVICE CO. INC 641 SOUTH LAWRENCE STREET, MONTGOMERY, AL 36104

*(Name and Address of Defendant)*

THE COMPLAINT OR OTHER DOCUMENT WHICH IS ATTACHED TO THIS SUMMONS IS IMPORTANT, AND YOU MUST TAKE IMMEDIATE ACTION TO PROTECT YOUR RIGHTS. YOU OR YOUR ATTORNEY ARE REQUIRED TO FILE THE ORIGINAL OF YOUR WRITTEN ANSWER, EITHER ADMITTING OR DENYING EACH ALLEGATION IN THE COMPLAINT OR OTHER DOCUMENT, WITH THE CLERK OF THIS COURT. A COPY OF YOUR ANSWER MUST BE MAILED OR HAND DELIVERED BY YOU OR YOUR ATTORNEY TO THE PLAINTIFF(S) OR ATTORNEY(S) OF THE PLAINTIFF(S), TREY JOSEPH MALBROUGH

*[Name(s) of Attorney(s)]*

WHOSE ADDRESS(ES) IS/ARE: P.O. BOX 531383, BIRMINGHAM, AL 35253

*[Address(es) of Plaintiff(s) or Attorney(s)]*

THE ANSWER MUST BE MAILED OR DELIVERED WITHIN 30 DAYS AFTER THIS SUMMONS AND COMPLAINT OR OTHER DOCUMENT WERE SERVED ON YOU OR A JUDGMENT BY DEFAULT MAY BE RENDERED AGAINST YOU FOR THE MONEY OR OTHER THINGS DEMANDED IN THE COMPLAINT OR OTHER DOCUMENT.

**TO ANY SHERIFF OR ANY PERSON AUTHORIZED BY THE ALABAMA RULES OF CIVIL PROCEDURE TO SERVE PROCESS:**

☐ You are hereby commanded to serve this Summons and a copy of the Complaint or other document in this action upon the above-named Defendant.

☑ Service by certified mail of this Summons is initiated upon the written request of MICHAEL RANDY HAYES
pursuant to the Alabama Rules of the Civil Procedure.                    *[Name(s)]*

| 09/24/2020 | /s/ MARK R. EADY | By: |
|---|---|---|
| *(Date)* | *(Signature of Clerk)* | *(Name)* |

☑ Certified Mail is hereby requested.        /s/ TREY JOSEPH MALBROUGH

*(Plaintiff's/Attorney's Signature)*

### RETURN ON SERVICE

☐ Return receipt of certified mail received in this office on _____.

*(Date)*

☐ I certify that I personally delivered a copy of this Summons and Complaint or other document to _____

_____ in _____ County,
*(Name of Person Served)*          *(Name of County)*

Alabama on _____.
*(Date)*

| | | |
|---|---|---|
| | | *(Address of Server)* |
| *(Type of Process Server)* | *(Server's Signature)* | |
| | *(Server's Printed Name)* | *(Phone Number of Server)* |

**20-CV-2020-900237.00**
MICHAEL RANDY HAYES ET AL V. MONSANTO COMPANY CORPORATION ET AL

| C001 - MICHAEL RANDY HAYES | v. | D001 - MONSANTO COMPANY CORPORATION |
|---|---|---|
| *(Plaintiff)* | | *(Defendant)* |



**SERVICE RETURN COPY**


ELECTRONICALLY FILED
9/24/2020 5:45 PM
20-CV-2020-900237.00
CIRCUIT COURT OF
COLBERT COUNTY, ALABAMA
MARK R. EADY, CLERK

## IN THE CIRCUIT COURT OF COLBERT COUNTY, ALABAMA

MICHAEL RANDY HAYES and wife,  }
KATRINA HAYES,  }
      }
     Plaintiffs,       }
      }
v.              }     Case No: CV 2020 -
      }
MONSANTO COMPANY  }     JURY TRIAL DEMANDED
CORPORATION, a corporation;  }
RED RIVER SPECIALTIES,  }
INC., a corporation;  }
RED RIVER SPECIALTIES,  }
LLC, a limited liability corporation;  }
SHEFFIELD LIGHT & POWER,  }
a corporation,  }
SHEFFIELD UTILITIES, a corporation, }

Fictitious Defendants 1-10, intending thereby to designate the person, firm or corporation who manufactured and/or sold and/or distributed and/or designed and/or assembled and/or placed in the stream of commerce glyphosate-based pesticides, including Roundup®, which was involved in Michael Randy Hayes' injury and/or any products whose condition caused and/or contributed to the occurrence and/or injury described in the complaint; Fictitious Defendants 11-20, intending thereby to designate the person, firm or corporation who acted negligently and/or wantonly on the occasion of the occurrence and/or injury referred to in the complaint; Fictitious Defendants 21-30, intending thereby to designate those persons, firm, or corporation who were the employers, principals, joint venturers, partners, and/or otherwise entities vicariously responsible for the conduct of the named defendants and/or other persons liable and responsible for the occurrence and injuries and damages of plaintiffs; Fictitious Defendants 31-40, intending thereby to designate the person, firm or corporation whose negligence and/or wantonness caused and/or contributed to the occurrence and/or injury described in the complaint; Fictitious Defendants 41- 50, intending thereby to designate the persons who were the successors to Monsanto Company Corporation, Red River Specialties, Inc., Red River Specialties, LLC, Sheffield Light & Power, and/or Sheffield Utilities and/or to the manufacturers, sellers, distributors, designers, assemblers and/or the companies who placed into the stream of commerce glyphosate-based pesticides, including Roundup®, which Michael Randy Hayes was working with on or about 1979-2014 and thereafter; Fictitious Defendants 51- 60, intending thereby to designate the persons who, whether singular or plural, that entity or those entities who or which designed the glyphosate-based pesticides, including Roundup®, also known as Roundup®, involved in the occurrence made the basis of this lawsuit, or any component part thereof; Fictitious Defendants 61-70, intending thereby to designate the persons who, whether singular or plural, that entity or those entities who or which manufactured or assembled the glyphosate-based pesticides, including Roundup®, also known as Roundup®, involved in the occurrence made the basis of this lawsuit, or any

component part thereof; Fictitious Defendants 71-80, intending thereby to designate the persons who, whether singular or plural, that entity or those entities who or which had any role in the distributive chain regarding the glyphosate-based pesticides, including Roundup®, also known as Roundup®, involved in the occurrence made the basis of this lawsuit or any component part thereof; Fictitious Defendants 81-90, intending thereby to designate the persons who, whether singular or plural, that entity or those entities who or which, prior to the occurrence made the basis of this lawsuit, altered the glyphosate-based pesticides, including Roundup®, also known as Roundup®, involved in said occurrence or any component part thereof; Fictitious Defendants 91-100, intending thereby to designate the persons who, whether singular or plural, that entity or those entities who or which failed to warn or issued inadequate warnings or instructions regarding the use or operation of the glyphosate-based pesticides, including Roundup®, also known as Roundup®, involved in the occurrence made the basis of this lawsuit or any component part thereof; Fictitious Defendants 101-110, intending thereby to designate the persons who, whether singular or plural, that entity or those entities which provided product liability and/or general liability insurance coverage for the manufacturer and/or distributor of the glyphosate-based pesticides, including Roundup®, also known as Roundup®, involved in the occurrence made the basis of this lawsuit at the time of said occurrence or at any time prior thereto; Fictitious Defendants 111-120, intending thereby to designate the persons who, whether singular or plural, that entity or those entities, who or which tested, inspected, approved or issued any approval of the glyphosate-based pesticides, including Roundup®, also known as Roundup®, involved in the occurrence made the basis of this lawsuit, or any component part thereof; Fictitious Defendants 121-130, intending thereby to designate the persons who, whether singular or plural, that entity or those entities who or which conducted safety inspections or analyses of or with reference to the glyphosate-based pesticides, including Roundup®, also known as Roundup®, involved in the occurrence made the basis of this lawsuit, or any component part thereof, and/or the design or manufacturing process of each such product, including but not limited to the products liability insurance carrier for the manufacturer or distributor of any of the aforesaid products; Fictitious Defendants 131-140, intending thereby to designate the persons who, whether singular or plural, that entity or those entities who or which was responsible for the defective condition of the glyphosate-based pesticides, including Roundup®, also known as Roundup®, involved in the occurrence made the basis of this lawsuit on the date of said occurrence or any component part thereof; Fictitious Defendants 141-150, intending thereby to designate the persons who, whether singular or plural, that entity or those entities who allowed or placed the glyphosate-based pesticides, including Roundup®, also known as Roundup®, involved in the occurrence made the basis of this lawsuit into the stream of commerce in a defective and hence unreasonably dangerous condition; Fictitious Defendants 151-160, intending thereby to designate the persons who, whether singular or plural, that entity or those entities, other than those entities described above, whose breach of contract or warranty contributed to cause the occurrence made the basis of this lawsuit; Fictitious Defendants 161-170, intending thereby to designate the persons who, whether singular or plural, that entity or those entities who or which issued, or had a duty to issue, warnings or instructions regarding the use or operation of the glyphosate-based pesticides, including Roundup®, also known as Roundup®, involved in the occurrence made the basis of this lawsuit, any component part thereof, or any attendant equipment used or available

- 2 -

for use therewith; Fictitious Defendants 171-180, intending thereby to designate the persons who caused and/or failed to correct dangerous conditions within this glyphosate-based pesticides, including Roundup®, also known as Roundup®; Fictitious Defendants 181-190, intending thereby to designate the persons who, whether singular or plural, that entity or those entities other than those entities described above, which was the predecessor corporation and/or successor corporation of any of the entities described above; Fictitious Defendants 191-200, intending thereby to designate the persons who were vicariously responsible for the conduct of the named defendants and/or other persons or entities whose negligence caused and/or contributed to Michael Randy Hayes' injury; Fictitious Defendants 201-210, intending thereby to designate the persons who committed acts of negligence, wantonness, willfulness, violations of duties under the Alabama Extended Manufacturers Liability Doctrine, breach of warranty or contract concerning this glyphosate-based pesticides, including Roundup®, also known as Roundup®, which caused and/or contributed to Michael Randy Hayes' injuries. The names of said Fictitious Defendants, whose legal identities are otherwise unknown to the plaintiffs at this time, will be substituted by amendment when ascertained separately and severally.

## COMPLAINT

1.      Plaintiffs, Michael Randy Hayes and wife, Katrina Hayes, (hereinafter "Plaintiff" / "Plaintiffs") by and through undersigned counsel, hereby brings this Complaint for damages against Defendant Monsanto Company Corporation, Defendant Red River Specialties, Inc., Defendant Red River Specialties, LLC, Defendant Sheffield Light & Power, and Defendant Sheffield Utilities, and in support thereof allege the following:

## NATURE OF THE ACTION

2.      This action seeks to recover damages for the injuries sustained by Plaintiff as the direct and proximate result of the wrongful conduct and negligence of the Defendants in connection with the defective design, development, manufacture, testing, packaging, promotion, marketing, advertising, distribution, labeling, and selling of glyphosate-based products, including the herbicide Roundup®, and herbicides containing the active ingredient glyphosate.

3.      Plaintiff maintains that Defendants Monsanto, Red River Specialties, Inc., and Defendant Red River Specialties, LLC's glyphosate-based products, including Roundup®, are and were defective, are and were dangerous to human health, unfit and unsustainable to be marketed

and sold in commerce and lacked proper warnings and directions as to the dangers associated with its use.

4. Plaintiff maintains that Defendants Red River Specialties, Inc. and/or Defendant Red River Specialties, LLC were negligent and breached warranties and duties to the Plaintiff as set out herein.

5. Plaintiff maintains that Defendant Sheffield Light & Power and/or Defendant Sheffield Utilities were negligent and/or breached its/their duty to provide a safe work environment to Plaintiff, and breached warranties and duties to the Plaintiff as set out herein.

6. Plaintiff's injuries, like those striking thousands of similarly situated victims across Alabama and the country, were unavoidable and not warned against by Defendants.

## INTRODUCTION

7. Monsanto is a multinational agricultural biotechnology corporation based in St. Louis, Missouri, and incorporated in Delaware. It is the world's leading producer of glyphosate.

8. In 1970, Monsanto discovered the herbicidal properties of glyphosate and began marketing it in products in 1974, distributing it through wholesalers, distributors, and commercially under the brand name Roundup®. Roundup® is a non-selective herbicide used to kill weeds that commonly compete with the growing of crops. In addition to the active ingredient glyphosate, Roundup® contains the surfactant Polyethoxylated tallow amine ("POEA") and/or adjuvants and other so-called "inert" ingredients.

9. In 2001, glyphosate was the most widely used active ingredient in herbicides used in American agriculture, with 85–90 millions of pounds used annually. That number grew to 185 million pounds by 2007. As of 2013, glyphosate was the world's most widely used herbicide.

- 4 -

10. Monsanto distributed, and distributes, glyphosate-based products, including Roundup®, in the business to business market through distributors, independent retailers and dealers, and agricultural cooperatives.

11. As of 2009, Monsanto was the world's leading producer of seeds, accounting for 27% of the world seed market. The majority of these seeds are of the "Roundup Ready®" brand. The stated advantage of Roundup Ready® crops is that they substantially improve a farmer's ability to control weeds, since glyphosate can be sprayed in the fields during the growing season without harming the crops. In 2010, an estimated 70% of corn and cotton, and 90% of soybean fields in the United States were Roundup Ready®.

12. Monsanto's glyphosate-based products, including Roundup®, are registered in 130 countries and approved for use on over 100 different crops. They are ubiquitous in the environment. Numerous studies confirm that glyphosate is found in rivers, streams and groundwater in agricultural areas where glyphosate-based products, including Roundup®, is used. It has been found in food, in the urine of agricultural workers and even in the urine of urban dwellers who are not in direct contact with glyphosate.

13. On March 20, 2015, the International Agency for Research on Cancer ("IARC"), an agency of the World Health Organization ("WHO"), issued an evaluation of several herbicides, including glyphosate. That evaluation was based, in part, on studies of exposures to glyphosate in several countries around the world, and it traces the health implications from exposure to glyphosate since 2001.

14. On July 29, 2015, IARC issued the formal monograph relating to glyphosate. In that monograph, the IARC Working Group provides a thorough review of the numerous studies and data relating to glyphosate exposure in humans.

- 5 -

15.     The IARC Working Group classified glyphosate as a Group 2A herbicide, which means that it is *probably carcinogenic to humans*. The IARC Working Group concluded that the cancers most associated with glyphosate exposure are Non-Hodgkin's Lymphoma ("NHL") and other Hematopoietic cancers, including Lymphocytic Lymphoma, Chronic Lymphocytic Leukemia, B-cell Lymphoma and Multiple Myeloma.

16.     The IARC evaluation is significant. It confirms what has been believed for years: that glyphosate is toxic to humans.

17.     Nevertheless, Monsanto, since it began selling glyphosate-based herbicides, including Roundup®, has represented it as safe to humans and the environment. Indeed, Defendant have repeatedly proclaimed and continues to proclaim to the world, and particularly to United States consumers, that glyphosate-based herbicides, including Roundup®, do not create unreasonable risks to human health or to the environment.

## THE PARTIES

18.     Michael Randy Hayes ("Plaintiff") is a natural person over the age of nineteen, is a citizen of the State of Alabama, and is a resident of Sheffield, Alabama, and brings this action for personal injuries sustained by his exposure to Defendant Monsanto's glyphosate-based product(s), including Roundup®, which contained the active ingredient glyphosate and the surfactant polyethoxylated tallow amine ("POEA").

19.     Katrina Hayes is the spouse of Plaintiff and resides with him. Katrina Hayes brings a claim for loss of consortium.

20.     Plaintiff used and/or was exposed to Monsanto's glyphosate-based product(s), including Roundup®, in Alabama, from approximately 1979 to approximately 2014, while working for Defendant Sheffield Utilities, and thereafter.

21.     As a direct and proximate result of being exposed to Defendant's glyphosate-based product(s), including Roundup®, Plaintiff developed Non-Hodgkin's Lymphoma and was diagnosed on or about April 15, 2019 and is currently still being treated.

22.     Defendant Monsanto Company Corporation ("Monsanto") is a Delaware corporation with its headquarters and principal place of business in St. Louis, Missouri. Monsanto was the entity that discovered the herbicidal properties of glyphosate and the manufacturer of glyphosate-based product(s), including Roundup®, which contains the active ingredient glyphosate and the surfactant POEA, as well as adjuvants and other "inert" ingredients.

23.     Defendant Red River Specialties, Inc. is a Louisiana corporation with a business location in Shelby County, Alabama. At all pertinent times herein, Red River Specialties, Inc. was registered with the Secretary of State of Alabama and doing business in Colbert County, Alabama.

24.     Defendant Red River Specialties, LLC is the present name of Red River Specialties, Inc. On or about December 11, 2018, Red River Specialties, Inc. filed an amendment of foreign entity filing type with the Secretary of State of Alabama, changing its registration with the State of Alabama to "Red River Specialties, LLC." Red River Specialties, LLC is presently registered with the Secretary of State of Alabama and does business in Colbert County, Alabama.

25.     For ease of reference herein, Red River Specialties, Inc. and Red River Specialties, LLC are collectively referred to as "Red River Specialties." At all relevant times herein, Red River Specialties distributed and caused to be sold and/or used by Plaintiff, Monsanto's glyphosate-based product(s), including Roundup®.

26.     Defendant Sheffield Light & Power is a public utility company which operates in Colbert County, Alabama, and has as its principal place of business at 300 N. Nashville Avenue,

Sheffield, Alabama, 35660 and was doing business in Colbert County, Alabama at all pertinent times herein.

27.     Defendant Sheffield Utilities is a public utility company which operates in Colbert County, Alabama, and has as its principal place of business at 300 N. Nashville Avenue, Sheffield, Alabama, 35660 and was doing business in Colbert County, Alabama at all pertinent times herein.

28.     At all times pertinent herein, Defendant Sheffield Utilities and/or Defendant Sheffield Light & Power, and/or, or as, the Electric Department of Sheffield Utilities, was serving Colbert County, Alabama and the City of Sheffield, Alabama as a public power utility. The company has about 18,500 business and residential customers and maintains about 1,650 miles of transmission line.

29.     "Roundup®" refers to any and all formulations of Defendant Monsanto's Roundup® products that contain the active ingredient glyphosate.

30.     "Glyphosate-based product(s)" refers to any and all formulations of Defendant Monsanto's products containing the active ingredient glyphosate.

## JURISDICTION & VENUE

31.     This Court has jurisdiction over this matter as Plaintiff's use of and exposure to the subject glyphosate-based herbicide products, including Roundup® products, took place in Colbert County, Alabama.

32.     This Court has personal jurisdiction over Monsanto because Monsanto transacts business in Colbert County, Alabama and did so at all times relevant herein. Monsanto knew or should have known that its glyphosate-based product(s), including Roundup® products, are and were sold in Colbert County, Alabama, and, more specifically, caused glyphosate-based

- 8 -

product(s), including Roundup®, to be sold to and/or used by Plaintiff in Colbert County, Alabama.

33. Monsanto maintains sufficient contacts with the State of Alabama and particularly with Colbert County, Alabama that this Court's exercise of personal jurisdiction over it does not offend traditional notions of fair play and substantial justice.

34. This Court has personal jurisdiction over Red River Specialties because Red River Specialties transacts business in Colbert County, Alabama and did so at all times relevant herein. Red River Specialties knew or should have known that glyphosate-based product(s), including Roundup® products, are and were sold in Colbert County, Alabama, and, more specifically, distributed glyphosate-based product(s), including Roundup®, and caused them to be sold to and/or used by Plaintiff in Colbert County, Alabama.

35. Defendant Red River Specialties maintains sufficient contacts with the State of Alabama and particularly with Colbert County, Alabama that this Court's exercise of personal jurisdiction over it does not offend traditional notions of fair play and substantial justice.

36. Defendant Sheffield Light & Power is a public utility company which operates in Colbert County, Alabama, and has as its principal place of business at 300 N. Nashville Avenue, Sheffield, Alabama, 35660 and was doing business in Colbert County, Alabama at all pertinent times herein.

37. Defendant Sheffield Utilities is a public utility company which operates in Colbert County, Alabama, and has as its principal place of business at 300 N. Nashville Avenue, Sheffield, Alabama, 35660 and was doing business in Colbert County, Alabama at all pertinent times herein.

38. At all times pertinent herein, Defendant Sheffield Utilities and/or Defendant Sheffield Light & Power, and/or, or as, the Electric Department of Sheffield Utilities, was serving

- 9 -

Colbert County, Alabama and the City of Sheffield, Alabama as a public power utility. The company has about 18,500 business and residential customers and maintains about 1,650 miles of transmission line.

39.    Venue is proper within this Court because the purchase of, and exposure to, the glyphosate-based product(s), including Roundup®, complained of herein took place in Colbert County, Alabama. Plaintiffs reside in Colbert County; Plaintiffs' harms, losses, and damages occurred in Colbert County; Defendants do substantial business in the State of Alabama and in Colbert County; and at all times relevant hereto, Defendants developed, manufactured, promoted, marketed, distributed, warranted, and/or sold glyphosate-based products and Roundup® in interstate commerce. Further, Defendants, as corporate entities, are deemed to reside where they are subject to personal jurisdiction.

## STATEMENT OF THE FACTS

40.    At all times relevant to this Complaint, Monsanto was the manufacturer of glyphosate-based product(s), including Roundup®, which contains the active ingredient glyphosate and the surfactant POEA, as well as adjuvants and other "inert" ingredients.

41.    Glyphosate is a broad-spectrum, non-selective herbicide used in a wide variety of herbicidal products around the world.

42.    Plants treated with glyphosate translocate the systemic herbicide to their roots, shoot regions, and fruit, where it interferes with the plant's ability to form aromatic amino acids necessary for protein synthesis. Treated plants generally die within two to three days. Because plants absorb glyphosate, it cannot be completely removed by washing or peeling produce, or by milling, baking, or brewing grains.

- 10 -

43.     For nearly 40 years, farmers, homeowners and others across the world have used glyphosate-based products, including Roundup®, without knowledge of the dangers its use poses. That is because when Monsanto first introduced Roundup®, it touted glyphosate as a technological breakthrough: it could kill almost every weed without causing harm either to people or to the environment. Of course, history has shown that not to be true. According to the WHO, the main chemical ingredient of Roundup® - glyphosate – is a probable cause of cancer. Monsanto assured the public that Roundup® was harmless. In order to prove this, Monsanto has championed falsified data and has attacked legitimate studies that revealed the dangers of glyphosate-based product(s), including Roundup®. Monsanto has led a prolonged campaign of misinformation to convince government agencies, farmers and the general population that glyphosate-based product(s), including Roundup® are safe.

## THE DISCOVERY OF GLYPHOSATE AND DEVELOPMENT OF ROUNDUP®

44.     The herbicidal properties of glyphosate were discovered in 1970 by a Monsanto chemist, John Franz.  The first glyphosate-based herbicide was introduced to the market in the mid-1970's under the brand name Roundup®. From the outset, Defendant marketed glyphosate-based product(s), including Roundup®, as "safe" general-purpose herbicide for widespread commercial and consumer use. It still markets and advertises glyphosate-based product(s), including Roundup®, as safe today.

45.     In addition to the active ingredient glyphosate, Defendants' glyphosate-based product(s), including Roundup®, also contain adjuvants and other chemicals, such as the surfactant POEA, which are considered "inert" and therefore protected as "trade secrets" in manufacturing. Growing evidence suggests that these adjuvants and additional components of

- 11 -

glyphosate-based product(s), including Roundup®, are not, in fact, inert and are toxic in their own right, and that may be toxic by formulation

## REGISTRATION OF HERBICIDES UNDER FEDERAL LAW

46.     The manufacture, formulation and distribution of herbicides, such as glyphosate-based product(s), including Roundup®, are regulated under the Federal Insecticide, Fungicide and Rodenticide Act ("FIFRA" or "Act"), 7 U.S.C. § 136 *et seq.* FIFRA requires that all pesticides be registered with the Environmental Protection Agency ("EPA" or "Agency") prior to their distribution, sale or use, except as described by the Act. 7 U.S.C. § 136a(a).

47.     Because pesticides are toxic to plants, animals and humans, at least to some degree, the EPA requires as part of the registration process, a variety of tests to evaluate the potential for exposure to pesticides, toxicity to people and other potential non-target organisms and other adverse effects on the environment. Registration by the EPA, however, is not an assurance or finding of safety. The determination the Agency must make in registering or re- registering a product is not that the product is "safe," but rather that use of the product in accordance with its label directions "will not generally cause unreasonable adverse effects on the environment." 7 U.S.C. § 136a(c)(5)(D).

48.     FIFRA defines "unreasonable adverse effects on the environment" to mean "any unreasonable risk to man or the environment, taking into account the economic, social and environmental costs and benefits of the use of any pesticide." 7 U.S.C. § 136(bb). FIFRA thus requires the EPA to make a risk/benefit analysis in determining whether a registration should be granted or allowed to continue to be sold in commerce.

49.     The EPA and the State of Alabama registered Roundup® for distribution, sale and manufacture in the United States and the State of Alabama.

- 12 -

50.     FIFRA generally requires that the registrant - Defendant Monsanto in the case of glyphosate-based product(s), including Roundup®, conduct the health and safety testing of pesticide products. The EPA has protocols governing the conduct of tests required for registration and the laboratory practices that must be followed in conducting these tests. The data produced by the registrant must be submitted to the EPA for review and evaluation. The government is not required, nor is it able to perform the product tests that are required of the manufacturer.

51.     The evaluation of each pesticide product distributed, sold or manufactured is completed at the time the product is initially registered. The data necessary for registration of a pesticide has changed over time. The EPA is now in the process of re-evaluating all pesticide products through a Congressionally mandated process called "re-registration." 7 U.S.C. § 136a-1. In order to reevaluate these pesticides, the EPA is demanding the completion of additional tests and the submission of data for the EPA's review and evaluation.

52.     In the case of glyphosate, and therefore glyphosate-based product(s), including Roundup®, the EPA had planned on releasing its preliminary risk assessment in relation to the re-registration process no later than July 2015. The EPA completed its review of glyphosate in early 2015, but it delayed releasing the risk assessment pending further review in light of the World Health Organization's health- related findings.

## SCIENTIFIC FRAUD UNDERLYING THE MARKETING AND SALE OF GLYPHOSATE/ ROUNDUP®

53.     Based on early studies that glyphosate could cause cancer in laboratory animals, the EPA originally classified glyphosate as *possibly carcinogenic to humans* (Group C) in 1985. After pressure from Defendant, including contrary studies it provided to the EPA, the EPA

- 13 -

changed its classification to *evidence of non-carcinogenicity in humans* (Group E) in 1991. In so classifying glyphosate, however, the EPA made clear that the designation did not mean the chemical does not cause cancer: "[i]t should be emphasized, however, that designation of an agent in Group E is based on the available evidence at the time of evaluation and should not be interpreted as a definitive conclusion that the agent will not be a carcinogen under any circumstances."

54.     On two occasions, the EPA found that the laboratories hired by Defendant to test the toxicity of its Roundup® products for registration purposes committed fraud.

55.     In the first instance, Defendant, in seeking initial registration of Roundup® by the EPA, hired Industrial Bio-Test Laboratories ("IBT") to perform and evaluate pesticide toxicology studies relating to Roundup®. IBT performed about thirty (30) tests on glyphosate and glyphosate-containing products, including nine (9) of the fifteen (15) residue studies needed to register Roundup® .

56.     In 1976, the United States Food and Drug Administration ("FDA") performed an inspection of Industrial Bio-Test Industries ("IBT") that revealed discrepancies between the raw data and the final report relating to the toxicological impacts of glyphosate. The EPA subsequently audited IBT; it too found the toxicology studies conducted for the Roundup® herbicide to be invalid. An EPA reviewer stated, after finding "routine falsification of data" at IBT, that it was "hard to believe the scientific integrity of the studies when they said they took specimens of the uterus from male rabbits."

57.     Three top executives of IBT were convicted of fraud in 1983.

58.     In the second incident of data falsification, Defendant hired Craven Laboratories in 1991 to perform pesticide and herbicide studies, including for Roundup®. In that same year, the

owner of Craven Laboratories and three of its employees were indicted, and later convicted, of fraudulent laboratory practices in the testing of pesticides and herbicides.

### THE IMPORTANCE OF ROUNDUP® TO DEFENDANT'S DOMINANCE PROFITS

59.     Despite the falsity of the tests that underlie its registration, within a few years of its launch, Roundup® was being marketed in 115 countries.

60.     The success of Roundup® was key to Monsanto's continued reputation and dominance in the marketplace. Largely due to the success of Roundup® sales, Monsanto's agriculture division was out-performing its chemicals division's operating income, and that gap increased yearly. But with its patent for glyphosate expiring in the United States in the year 2000, Defendant needed a strategy to maintain its Roundup® market dominance and to ward off impending competition.

61.     In response, Monsanto began the development and sale of genetically engineered Roundup Ready® seeds in 1996. Since Roundup Ready® crops are resistant to glyphosate, farmers can spray Roundup® onto their fields during the growing season without harming the crop. This allowed Defendant to expand its market for Roundup® even further. By 2000, Monsanto's biotechnology seeds were planted on more than 80 million acres worldwide and nearly 70% of American soybeans were planted from Roundup Ready® seeds. It also secured Monsanto's dominant share of the glyphosate/Roundup market through a marketing strategy that coupled proprietary Roundup Ready® seeds with continued sales of its Roundup® herbicide.

62.     Through a three-pronged strategy of increased production, decreased prices and by coupling with Roundup Ready® seeds, Roundup® became Monsanto's most profitable product. In 2000, Roundup® accounted for almost $2.8 billion in sales, outselling other herbicides by a

margin of five to one, and accounting for close to half of Monsanto's revenue. Today, glyphosate remains one of the world's largest herbicides by sales volume.

## DEFENDANT HAS KNOWN FOR DECADES THAT IT FALSELY ADVERTISED THE SAFETY OF ROUNDUP®

63.    In 1996, the New York Attorney General ("NYAG") filed a lawsuit against Monsanto based on its false and misleading advertising of Roundup® products. Specifically, the lawsuit challenged Monsanto's general representations that its spray-on, glyphosate-based herbicides, including Roundup®, were **"safer than table salt"** and **"practically non-toxic"** to mammals, birds and fish. Among the representations the NYAG found deceptive and misleading about the human and environmental safety of Roundup® are the following:

a) "Remember that environmentally friendly Roundup herbicide is biodegradable. It won't build up in the soil so you can use Roundup with confidence along customers' driveways, sidewalks and fences..."
   And remember that Roundup is biodegradable and won't build up in the soil. That will give you the environmental confidence you need to use Roundup everywhere you've got a weed, brush, edging or trimming problem."

b) "Roundup biodegrades into naturally occurring elements."

c) "Remember that versatile Roundup herbicide stays where you put it. That means there's no washing or leaching to harm customers' shrubs or other desirable vegetation."

d) "This non-residual herbicide will not wash or leach in the soil. It ... stays where you apply it."

e) "Glyphosate is less toxic to rats than table salt following acute oral ingestion."

- 16 -

f) "Glyphosate's safety margin is much greater than required. It has over a 1,000- fold safety margin in food and over a 700-fold safety margin for workers who manufacture it or use it."

g) "You can feel good about using herbicides by Defendant. They carry a toxicity category rating of 'practically non- toxic' as it pertains to mammals, birds and fish."

h) "Roundup can be used where kids and pets will play and breaks down into natural material." This ad depicts a person with his head in the ground and a pet dog standing in an area which has been treated with Roundup.

64.     On November 19, 1996, Monsanto entered into an Assurance of Discontinuance with the NYAG, in which Defendant agreed, among other things, "to cease and desist from publishing or broadcasting any advertisements [in New York] that represent, directly or by implication" that:

a) Its glyphosate-containing pesticide products or any component thereof are safe, non-toxic, harmless or free from risk.

b) Its glyphosate-containing pesticide products or any component thereof manufactured, formulated, distributed or sold by Monsanto are biodegradable...

c) Its glyphosate-containing pesticide products or any component thereof stay where they are applied under all circumstances and will not move through the environment by any means.

d) Its glyphosate-containing pesticide products or any component thereof are "good" for the environment or are "known for their environmental characteristics."

e) Glyphosate-containing pesticide products or any component thereof are safer or less toxic than common consumer products other than herbicides.

- 17 -

f) Its glyphosate-containing products or any component thereof might be classified as "practically non-toxic."

65.     Monsanto did not alter its advertising in the same manner in any state other than New York, and on information and belief still has not done so today.

66.     In 2009, France's highest court ruled that Monsanto had not told the truth about the safety of Roundup®. The French court affirmed an earlier judgement that Monsanto had falsely advertised its herbicide Roundup® as "biodegradable" and that it "left the soil clean."

## CLASSIFICATIONS AND ASSESSMENTS OF GLYPHOSATE

67.     The IARC process for the classification of glyphosate followed the IARC's stringent procedures for the evaluation of a chemical agent. Over time, the IARC Monograph program has reviewed 980 agents. Of those reviewed, it has determined 116 agents to be Group 1 (Known Human Carcinogens); 73 agents to be Group 2A (Probable Human Carcinogens); 287 agents to be Group 2B (Possible Human Carcinogens); 503 agents to be Group 3 (Not Classified); and one agent to be Probably Not Carcinogenic.

68.     The established procedure for the IARC Monograph evaluations is described in the IARC Programme's Preamble. Evaluations are performed by panels of international experts, selected on the basis of their expertise and the absence of actual or apparent conflicts of interest.

69.     One year before the Monograph meeting, the meeting is announced and there is a call both for data and for experts. Eight (8) months before the Monograph meeting, the Working Group membership is selected, and the sections of the Monograph are developed by the Working Group members. One (1) month prior to the Monograph meeting, the call for data is closed and the various draft sections are distributed among Working Group members for review and comment. Finally, at the Monograph meeting, the Working Group finalizes review of all literature,

- 18 -

evaluates the evidence in each category, and completes the overall evaluation. Within two (2) weeks after the Monograph meeting, the summary of the Working Group findings is published in *The Lancet Oncology*, and within one (1) year after the meeting, the finalized Monograph is published.

70.     In assessing an agent, the IARC Working Group reviews the following information: (a) human, experimental and mechanistic data; (b) all pertinent epidemiological studies and cancer bioassays; and (c) representative mechanistic data. The studies must be publicly available and have sufficient detail for meaningful review and reviewers cannot be associated with the underlying studies.

71.     In March 2015, IARC reassessed glyphosate. The summary published in *The Lancet Oncology* reported that glyphosate is a Group 2A agent and probably carcinogenic in humans.

72.     On July 29, 2015, the IARC issued its Monograph for glyphosate, Monograph Volume 112. For Volume 112, the volume that assessed glyphosate, a Working Group of 17 experts from 11 countries met at the IARC from March 3–10, 2015, to assess the carcinogenicity of certain herbicides, including glyphosate. The March meeting culminated nearly a one-year review and preparation by the IARC Secretariat and the Working Group, including a comprehensive review of the latest available scientific evidence. According to published procedures, the Working Group considered "reports that have been published or accepted for publication in the openly available scientific literature" as well as "data from governmental reports that are publicly available."

73.     The studies considered the following exposure groups: (a) occupational exposure of farmers and tree nursery workers in the United States, forestry workers in Canada and Finland

- 19 -

and municipal weed-control workers in the United Kingdom; and (b) para-occupational exposure in farming families.

74.      Glyphosate was identified as the second-most used household herbicide in the United States for weed control between 2001 and 2007, and the most heavily used herbicide in the world in 2012.

75.      Exposure pathways are identified as air (especially during spraying), water and food. Community exposure to glyphosate is widespread and found in soil, air, surface water and groundwater, as well as in food.

76.      The assessment of the IARC Working Group identified several case control studies of occupational exposure in the United States, Canada and Sweden. These studies show a human health concern from agricultural and other work-related exposure to glyphosate.

77.      The IARC Working Group found an increased risk between exposure to glyphosate and NHL and several subtypes of NHL, and the increased risk persisted after adjustment for other pesticides.

78.      The IARC Working Group also found that glyphosate caused DNA and chromosomal damage in human cells. One study in community residents reported increases in blood markers of chromosomal damage (micronuclei) after glyphosate formulations were sprayed.

79.      In male CD-1 mice, glyphosate induced a positive trend in the incidence of a rare tumor: renal tubule carcinoma. A second study reported a positive trend for haemangiosarcoma in male mice. Glyphosate increased pancreatic islet-cell adenoma in male rats in two studies. A glyphosate formulation promoted skin tumors in an initiation-promotion study in mice.

80.      The IARC Working Group also noted that glyphosate has been detected in the urine of agricultural workers, indicating absorption. Soil microbes degrade glyphosate to

aminomethylphosphoric acid ("AMPA"). Blood AMPA detection after exposure suggests intestinal microbial metabolism in humans.

81.     The IARC Working Group further found that glyphosate and glyphosate formulations induced DNA and chromosomal damage in mammals, and in human and animal cells in utero.

82.     The IARC Working Group also noted genotoxic, hormonal and enzymatic effects in mammals exposed to glyphosate. Essentially, glyphosate inhibits the biosynthesis of aromatic amino acids, which leads to several metabolic disturbances, including the inhibition of protein and secondary product biosynthesis and general metabolic disruption.

83.     The IARC Working Group also reviewed an Agricultural Health Study, consisting of a prospective cohort of 57,311 licensed pesticide applicators in Iowa and North Carolina. While this study differed from others in that it was based on a self-administered questionnaire, the results support an association between glyphosate exposure and multiple myeloma, hairy cell leukemia ("HCL") and chronic lymphocytic leukemia ("CLL"), in addition to several other cancers.

## OTHER EARLIER FINDINGS ABOUT
## GLYPHOSATE'S DANGERS TO HUMAN HEALTH

84.     The EPA has a technical fact sheet, as part of its Drinking Water and Health, National Primary Drinking Water Regulations publication, relating to glyphosate. This technical fact sheet predates the IARC March 20, 2015, evaluation. The fact sheet describes the release patterns for glyphosate as follows:

### RELEASE PATTERNS

Glyphosate is released to the environment in its use as a herbicide for controlling woody and herbaceous weeds on forestry, right-of-way, cropped and non-cropped sites. These

sites may be around water and in wetlands. It may also be released to the environment during its manufacture, formulation, transport, storage, disposal and cleanup, and from spills. Since glyphosate is not a listed chemical in the Toxics Release Inventory, data on releases during its manufacture and handling are not available. Occupational workers and home gardeners may be exposed to glyphosate by inhalation and dermal contact during spraying, mixing, and cleanup. They may also be exposed by touching soil and plants to which glyphosate was applied. Occupational exposure may also occur during glyphosate's manufacture, transport, storage, and disposal.

85.     In 1995, the Northwest Coalition for Alternatives to Pesticides reported that in California, the state with the most comprehensive program for reporting of pesticide-caused illness, glyphosate was the third most commonly-reported cause of pesticide illness among agricultural workers.

### THE TOXICITY OF OTHER INGREDIENTS IN ROUNDUP®

86.     In addition to the toxicity of the active ingredient, glyphosate, several studies support the hypothesis that the glyphosate-based formulation in Monsanto's Roundup® products is more dangerous and toxic than glyphosate alone. Indeed, as early as 1991, available evidence demonstrated that glyphosate formulations were significantly more toxic than glyphosate alone.

87.     In 2002, a study by Julie Marc, entitled "Pesticide Roundup® Provokes Cell Division Dysfunction at the Level of CDK1/Cyclin B Activation", revealed that Roundup® causes delays in the cell cycles of sea urchins but that the same concentrations of glyphosate alone were ineffective and did not alter cell cycles.

88.     A 2004 study by Marc and others, entitled "Glyphosate-based Pesticides Affect Cell Cycle Regulation," demonstrated a molecular link between glyphosate-based products and

- 22 -

cell cycle dysregulation. The researchers noted that "cell-cycle dysregulation is a hallmark of tumor cells and human cancer. Failure in the cell-cycle checkpoints leads to genomic instability and subsequent development of cancers from the initial affected cell." Further, "[s]ince cell cycle disorders such as cancer result from dysfunction of a unique cell, it was of interest to evaluate the threshold dose of glyphosate affecting the cells."

89.     In 2005, a study by Francisco Peixoto, entitled "Comparative Effects of the Roundup® and Glyphosate on Mitochondrial Oxidative Phosphorylation," demonstrated that Roundup's effects on rat liver mitochondria are far more toxic than equal concentrations of glyphosate alone. The Peixoto Study further suggested that the harmful effects of Roundup® on mitochondrial bioenergetics could not be exclusively attributed to glyphosate but could be the result of other chemicals, such as the surfactant POEA, or in the alternative, due to the potential synergistic effect between glyphosate and other ingredients in the Roundup® formulation.

90.     In 2009, Nora Benachour and Gilles-Eric Seralini published a study examining the effects of Roundup® and glyphosate on human umbilical, embryonic and placental cells. The study tested dilution levels of Roundup and glyphosate that were far below agricultural recommendations, corresponding with low levels of residue in food. The researchers ultimately concluded that supposed "inert" ingredients, and possibly POEA, alter human cell permeability and amplify toxicity of glyphosate alone. The researchers further suggested that assessments of glyphosate toxicity should account for the presence of adjuvants or additional chemicals used in the formulation of the complete pesticide. The Benachour/Seralini Study confirmed that the adjuvants present in Roundup are not, in fact, inert and that Roundup is potentially far more toxic than its active ingredient glyphosate alone.

91.    The results of these studies were at all times available to Monsanto. Monsanto thus knew or should have known that Roundup is more toxic than glyphosate alone and that safety studies of Roundup, Roundup's adjuvants and "inert" ingredients, and/or the surfactant POEA were necessary to protect Randy Hayes s from Roundup® products.

92.    Despite its knowledge that Roundup® is considerably more dangerous than glyphosate alone, Monsanto continued to promote Roundup® as safe.

## THE EPA'S REVIEW OF GLYPHOSATE

93.    On September 12, 2016, EPA's OPP submitted a report on the carcinogenic potential of glyphosate, wherein it issued a "proposed conclusion" that glyphosate is "'not likely to be carcinogenic to humans at doses relevant to human health risk assessment. There are no authors listed on this issue paper, which reiterates and adopts the conclusions of the October 2015 leaked assessment. The issue paper is based upon a review of industry-sponsored articles and studies. The OPP acknowledged that it rejected all studies that considered Roundup®—the formulated product—instead of studies that isolated glyphosate because "[g]lyphosate formulations contain various components other than glyphosate and it has been hypothesized these components are more toxic than glyphosate alone.

94.    Thus, the OPP notes dozens of studies considered by IARC were not reviewed by the OPP because the OPP's "evaluation focused on studies on the active ingredient glyphosate" and "additional research could also be performed to determine whether formulation components, such as surfactants, influence the toxicity of glyphosate formulations.

95.    From December 13 to 16, 2016, the EPA held FIFRA Scientific Advisory Panel ("SAP") meetings to consider issues raised by the OPP's evaluation of glyphosate. Again, OPP only allowed the SAP to consider studies of glyphosate alone, and not any study of the formulated

product. In its Charge to the FIFRA SAP, the OPP noted that "[a]lthough there are studies available on glyphosate-based pesticide formulations, the agency is soliciting advice from the FIFRA Scientific Advisory Panel ("SAP") on this evaluation of human carcinogenic potential for the active ingredient glyphosate only at this time.

96.     The OPP draft assessment therefore does not actually consider the product at issue in this litigation or, more importantly, how glyphosate, in conjunction with surfactants and other chemicals, affects carcinogenicity.

97.     On March 16, 2017, the final SAP meeting minutes and report were released, revealing disagreement and lack of consensus among the scientists on whether there was a positive association between glyphosate exposure and NHL.

## RECENT WORLDWIDE BANS ON ROUNDUP®/GLYPHOSATE

98.     Several countries around the world have instituted bans on the sale of Roundup® and other glyphosate-containing herbicides, both before and since the IARC first announced its assessment for glyphosate in March 2015, and more countries undoubtedly will follow suit as the dangers of the use of Roundup® become more widely known. The Netherlands issued a ban on all glyphosate-based herbicides in April 2014, including Roundup®, which took effect at the end of 2015. In issuing the ban, the Dutch Parliament member who introduced the successful legislation stated: "Agricultural pesticides in user-friendly packaging are sold in abundance to private persons. In garden centers, Roundup® is promoted as harmless, but unsuspecting customers have no idea what the risks of this product are. Especially children are sensitive to toxic substances and should therefore not be exposed to it."

99.     The Brazilian Public Prosecutor in the Federal District requested that the Brazilian Justice Department suspend the use of glyphosate.

100.    France banned the private sale of Roundup® and glyphosate following the IARC assessment for glyphosate.

101.    Bermuda banned both the private and commercial sale of glyphosate, including Roundup® The Bermuda government explained its ban as follows: "[f]ollowing a recent scientific study carried out by a leading cancer agency, the importation of weed spray 'Roundup' has been suspended."

102.    The Sri Lankan government banned the private and commercial use of glyphosates, particularly out of concern that glyphosate has been linked to fatal kidney disease in agricultural workers.

103.    The government of Columbia announced its ban on using Roundup® and glyphosate to destroy illegal plantations of coca, the raw ingredient for cocaine, because of the WHO's finding that glyphosate is probably carcinogenic.

## EFSA REPORT ON GLYPHOSATE

104.    On November 12, 2015, the European Food Safety Authority ("EFSA"), the European Union's ("EU") primary agency for food safety, reported on its evaluation of the Renewal Assessment Report ("RAR") on glyphosate. The Rapporteur Member State assigned to glyphosate, the German Federal Institute for Risk Assessment ("BfR"), had produced the RAR as part of the renewal process for glyphosate in the EU.

105.    The BfR sent its draft RAR to the EFSA and the RAR underwent a peer review process by the EFSA, other member states and industry groups. As part of the on-going peer review of Germany's re-evaluation of glyphosate, the EFSA had also received a second mandate from the

European Commission to consider the IARC's findings regarding the potential carcinogenicity of glyphosate and glyphosate-containing products.

106. Based on a review of the RAR, which included data from industry-submitted, unpublished studies, the EFSA sent its own report ("Conclusion") to the European Commission, finding that "glyphosate is unlikely to pose a carcinogenic hazard to humans and the evidence does not support classification with regard to its carcinogenic potential according to Regulation ("EC") No. 1272/2008." The EFSA therefore disagreed with the IARC: glyphosate was not genotoxic and did not present a carcinogenic threat to humans.

107. In explaining why its results departed from the IARC's conclusion, the EFSA drew a distinction between the EU and the IARC approaches to the study and classification of chemicals. Although the IARC examined "both glyphosate—an active substance—and glyphosate-based formulations, grouping all formulations regardless of their composition," the EFSA explained that it considered only glyphosate and that its assessment focuses on "each individual chemical, and each marketed mixture separately." The IARC, on the other hand, "assesses generic agents, including groups of related chemicals, as well as occupational or environmental exposure, and cultural or behavioral practices." The EFSA accorded greater weight to studies conducted with glyphosate alone than studies of formulated products.

108. The EFSA went further and noted:

Although some studies suggest that certain glyphosate -based formulations may be genotoxic (i.e. damaging to DNA), others that look solely at the active substance glyphosate do not show this effect. It is likely, therefore, that *the genotoxic effects observed in some glyphosate-based formulations are related to the other constituents or "co-formulants"*. Similarly, certain glyphosate-based formulations display higher toxicity

- 27 -

than that of the active ingredient, presumably because of the presence of co-formulants, In its assessment, *EFSA proposes that the toxicity of each pesticide formulation and in particular its genotoxic potential should be further considered and addressed by Member State authorities* while they reassess uses of glyphosate-based formulations in their own territories.*(Emphasis added.)*

109.   Notwithstanding its conclusion, the EFSA did set exposure levels for glyphosate. Specifically, the EFSA proposed an acceptable daily intake ("ADI") of 0.5 mg/kg of body weight per day; an acute reference dose ("ARfD") of 0.5 mg/kg of body weight; and an acceptable operator exposure level ("AOEL") of 0.1 mg/kg of body weight per day.

## LEADING SCIENTISTS DISPUTE EFSA'S CONCLUSION

110.   On November 27, 2015, 96 independent academic and governmental scientists from around the world submitted an open letter to the EU health commissioner, Vytenis Andriukaitis. The scientists expressed their strong concerns and urged the commissioner to disregard the "flawed" EFSA report, arguing that "the BfR decision is not credible because it is not supported by the evidence and it was not reached in an open and transparent manner."

111.   Signatories to the letter included Dr. Christopher J. Portier, Ph.D., and other renowned international experts, some of whom were part of the IARC Working Group assigned to glyphosate.

112.   In an exhaustive and careful examination, the scientists scrutinized the EFSA's conclusions and outlined why the IARC Working Group decision was "by far the more credible":

The IARC WG decision was reached relying on open and transparent procedures by independent scientists who completed thorough conflict-of- interest statements and were

- 28 -

not affiliated or financially supported in any way by the chemical manufacturing industry. It is fully referenced and depends entirely on reports published in the open, peer-reviewed biomedical literature. It is part of a long tradition of deeply researched and highly credible reports on the carcinogenicity of hundreds of chemicals issued over the past four decades by IARC and used today by international agencies and regulatory bodies around the world as a basis for risk assessment, regulation and public health policy.

113.    With respect to human data, the scientists pointed out that the EFSA agreed with the IARC that there was "*limited evidence* of carcinogenicity for NHL, but the EFSA nonetheless dismissed an association between glyphosate exposure and carcinogenicity. The IARC applies three (3) levels of evidence in its analyses of human data, including sufficient evidence and limited evidence. The EFSA's ultimate conclusion that "there was no unequivocal evidence for a clear and strong association of NHL with glyphosate" was misleading because it was tantamount to IARC's highest level of evidence: "sufficient evidence," which means that a causal relationship has been established. However, the scientists argued, "[l]egitimate public health concerns arise when 'causality is credible,' i.e., when there is *limited evidence.*"

114.    Among its many other deficiencies, the EFSA's conclusions regarding animal carcinogenicity data were "scientifically unacceptable," particularly in BfR's use of historical control data and in its trend analysis. Indeed, BfR's analysis directly contradicted the Organization for Economic Co-operation and Development ("OECD") testing guidelines while citing and purporting to follow those same guidelines. For instance, the EFSA report dismisses observed trends in tumor incidence "because there are no individual treatment groups that are significantly different from controls and because the maximum observed response is reportedly within the range of the historical control data." However, according to the scientists, concurrent controls are

recommended over historical controls in all guidelines, scientific reports and publications, and, if it is employed, historical control data "should be from studies in the same timeframe, for the same exact animal strain, preferably from the same laboratory or the same supplier and preferably reviewed by the same pathologist." BfR's use of historical control data violated the precautions: "only a single study used the same mouse strain as the historical controls but was reported more than 10 years after the historical control dataset was developed." Further deviating from sound scientific practices, the data used by the BfR came from studies in seven different laboratories. The scientists concluded:

> BfR reported seven positive mouse studies with three studies showing increases in renal tumors, two with positive findings for hemangiosarcomas, and two with positive findings for malignant lymphomas. BfR additionally reported two positive findings for tumors in rats. Eliminating the inappropriate use of historical data, the unequivocal conclusion is that these are not negative studies, but in fact document the carcinogenicity of glyphosate in laboratory animals.

115.    The letter also critiqued the EFSA report's lack of transparency and the opacity surrounding the data cited in the report: "citations for almost all of the references, even those from the open scientific literature, have been redacted from the document" and "there are no authors or contributors listed for either document, a requirement for publication in virtually all scientific journals." Because the BfR relied on unpublished, confidential industry-provided studies, it is "impossible for any scientist not associated with the BfR to review this conclusion with scientific confidence."

116.    On March 3, 2016, the letter was published in the *Journal of Epidemiology & Community Health.*

- 30 -

## STATEMENT OF CONCERN REGARDING GLYPHOSATE-BASED HERBICIDES

117. On February 17, 2016, a consensus statement published in the journal *Environmental Health*, entitled "Concerns Over Use of Glyphosate-based Herbicides and Risks Associated with Exposures: a Consensus Statement," assessed the safety of glyphosate-based herbicides ("GBHs"). The paper's focus was "on the unanticipated effects arising from the worldwide increase in use of GBHs, coupled with recent discoveries about the toxicity and human health risks stemming from use of GBHs." The researchers drew seven factual conclusions about GBHs:

1. GBHs are the most heavily applied herbicide in the world and usage continues to rise;

2. Worldwide, GBHs often contaminate drinking water sources, precipitation and air, especially in agricultural regions;

3. The half-life of glyphosate in water and soil is longer than previously recognized;

4. Glyphosate and its metabolites are widely present in the global soybean supply;

5. Human exposures to GBHs are rising;

6. Glyphosate is now authoritatively classified as a probable human carcinogen; and

7. Regulatory estimates of tolerable daily intakes for glyphosate in the United States and EU are based on outdated science.

118. The researchers noted that GBH use has increased approximately 100-fold since the 1970s. Further, far from posing a limited hazard to vertebrates, as previously believed, two-decades of evidence demonstrated that "several vertebrate pathways are likely targets of action, including hepatorenal damage, effects on nutrient balance through glyphosate chelating action and endocrine disruption."

- 31 -

119.    The paper attributes uncertainties in current assessments of glyphosate formulations to the fact that "[t]he full list of chemicals in most commercial GBHs is protected as 'commercial business information,' despite the universally accepted relevance of such information to scientists hoping to conduct an accurate risk assessment of these herbicide formulations." Further, the researchers argue, "[t]he distinction in regulatory review and decision processes between 'active' and 'inert' ingredients has no toxicological justification, given increasing evidence that several so- called 'inert' adjuvants are toxic in their own right."

120.    Among various implications, the researchers conclude that "existing toxicological data and risk assessments are not sufficient to infer that GBHs, as currently used, are safe." Further, "GBH-product formulations are more potent, or toxic, than glyphosate alone to a wide array of non-target organisms including mammals, aquatic insects, and fish." Accordingly, "risk assessments of GBHs that are based on studies quantifying the impacts of glyphosate alone underestimate both toxicity and exposure, and thus risk." The paper concludes that this "shortcoming has repeatedly led regulators to set inappropriately high exposure thresholds."

121.    The researchers also critique the current practice of regulators who largely rely on "unpublished, non-peer reviewed data generated by the registrants" but ignore "published research because it often uses standards and procedures to assess quality that are different from those codified in regulatory agency data requirements, which largely focus on avoiding fraud." In the researchers' view, "[s]cientists independent of the registrants should conduct regulatory tests of GBHs that include glyphosate alone, as well as GBH-product formulations."

122.    The researchers also call for greater inclusion of GBHs in government-led toxicology testing programs:

A fresh and independent examination of GBH toxicity should be undertaken, and . . . this re-examination be accompanied by systematic efforts by relevant agencies to monitor GBH levels in people and in the food supply, none of which are occurring today. The U.S. National Toxicology Program should prioritize a thorough toxicological assessment of the multiple pathways now identified as potentially vulnerable to GBHs.

123.   The researchers suggest that, in order to fill the gap created by an absence of government funds to support research on GBHs, regulators could adopt a system through which manufacturers fund the registration process and the necessary testing:

[W]e recommend that a system be put in place through which manufacturers of GBHs provide funds to the appropriate regulatory body as part of routine registration actions and fees. Such funds should then be transferred to appropriate government research institutes, or to an agency experienced in the award of competitive grants. In either case, funds would be made available to independent scientists to conduct the appropriate long-term (minimum 2 years) safety studies in recognized animal model systems. A thorough and modern assessment of GBH toxicity will encompass potential endocrine disruption, impacts on the gut microbiome, carcinogenicity and multigenerational effects looking at reproductive capability and frequency of birth defects.

### EUROPEAN UNION VOTE ON GLYPHOSATE RENEWAL

124.   The license for glyphosate in the EU was set to expire on June 30, 2016.

125.   Without an extension of the license, Defendant's Roundup® and other glyphosate-based herbicides faced a general phase out in EU markets." In the months leading up to the license expiration date, protracted meetings and votes among national experts from the 28 EU Member States failed to produce agreement on an extension.

- 33 -

126. For instance, on March 4, 2016, The Guardian reported that France, the Netherlands, and Sweden did not support EFSA's assessment that glyphosate was harmless. The paper quoted the Swedish environment minister, Asa Romson, as stating: "[w]e won't take risks with glyphosate and we don't think that the analysis done so far is good enough. We will propose that no decision is taken until further analysis has been done and the EFSA's scientists have been more transparent about their considerations.

127. The Netherlands argued that relicensing should be placed on hold until after a separate evaluation of glyphosate's toxicity can be conducted. Leading up to the vote, Italy joined the other EU states in opposing the license renewal, citing health concerns.

128. On June 6, 2016, Member States voted but failed to reach a qualified majority in favor or against the re-authorization of glyphosate.

129. On June 29, 2016, the EU Commission extended the European license for glyphosate for 18 months to allow the European Chemical Agency to rule on the safety of the chemical, which is expected by the end of 2017. Growing public awareness and concern over the chemical "led 1.4 million people to sign a petition against glyphosate in the biggest online campaign since neonicotinoid pesticides were banned during the last commission."

130. On July 11, 2016, the EU voted in favor of a proposal to restrict the conditions of use of glyphosate in the EU, including a ban on common co-formulant POE-tallowamine ("POEA") from all glyphosate-based herbicides, including Roundup®.

131. These restrictions, which are non-binding on the EU states, are expected to apply until the European Chemicals Agency issues an opinion on the chemical's safety.

- 34 -

## PLAINTIFF MICHAEL RANDY HAYES'S EXPOSURE TO MONSANTO'S GLYPHOSATE-BASED PRODUCTS AND "ROUNDUP®"

132.    Plaintiff Randy Hayes is fifty-nine (59) years old. From 1979 to 2014, he was employed by the Electric Utility Department of Sheffield Utilities. For a substantial period of his employment, Plaintiff worked on the "tree crew," clearing rights-of-way and managing vegetation through use of chemical pesticides.

133.    Plaintiff used Monsanto's glyphosate-based product(s), including Roundup®, regularly during the entire time employed by Sheffield Utilities, and thereafter, when Plaintiff used Roundup® regularly for personal use.

134.    Because Monsanto held the exclusive patent on glyphosate through the year 2000, the glyphosate-based product(s), including Roundup®, to which Plaintiff was exposed between 1979 and 2000 could only have been manufactured and distributed by, or on behalf of, Monsanto. Thereafter,

135.    Specifically, Plaintiff mixed and applied Monsanto's glyphosate-based product(s), including Roundup®, on the Sheffield Utilities property and rights-of-way located in Colbert County, Alabama by and through the direction and assistance of Red River Specialties.

136.    Specifically, Plaintiff mixed and applied Monsanto's glyphosate-based product(s), including Roundup®, on the Sheffield Utilities property and rights-of-way located in Colbert County, Alabama by and through the direction and assistance of Sheffield Utilities.

137.    Sheffield Utilities purchased Monsanto's glyphosate-based product(s), including Roundup®, from Red River Specialties.

- 35 -

138.    Red River Specialties provided Plaintiff instructions and assisted Plaintiff with the usage, handling, mixing, applying, and spreading of Roundup® and in doing so provided Plaintiff assurances of the safety of glyphosate-based product(s), including Roundup®,

139.    Red River Specialties along with Monsanto never provided any warning that glyphosate-based product(s), including Roundup®, provided to Plaintiff which included the ingredient glyphosate were injurious to Plaintiff's health, did not recommend safety gear, did not provide nor sell to Plaintiff or his employer protective gear and did not provide, recommend or sell to Plaintiff or his employer applicators, sprayers or other equipment or products which would have provided less exposure to Plaintiff to glyphosate.

140.    Red River Specialties undertook to select for Sheffield Utilities and for Hayes the product(s) to be used. This Defendant had the opportunity to inspect and the superior knowledge of the product to that of Hayes. The subject product was not displayed or sold in such a way to notify Hayes that the glyphosate-based product(s), including Roundup® were carcinogenic and hazardous substances that could and more than likely would lead to lymphoma, from which Hayes now suffers, and its future effects.  Hayes has Non-Hodgkin's Lymphoma due to his exposure to glyphosate-based product(s), including Roundup® as manufactured, designed, advertised, sold, distributed and provided by these Defendants.

141.    At all relevant times herein, Plaintiff was required, pursuant to Ala. Code § 2-27-1, et seq., and Alabama Administrative Code Chapter 80-1-13, to obtain and maintain a certification for to purposes of applying pesticides.

142.    At all relevant times herein, Sheffield Utilities knew, or reasonably should have known, that Plaintiff was required, pursuant to Ala. Code § 2-27-1, et seq., and Alabama

- 36 -

Administrative Code Chapter 80-1-13, to obtain and maintain a certification for to purposes of applying pesticides.

143. At all relevant times herein, Sheffield Utilities did not require Plaintiff, pursuant to Ala. Code § 2-27-1, et seq., and Alabama Administrative Code Chapter 80-1-13, to obtain and maintain a certification for to purposes of applying pesticides.

144. At all relevant times herein, Sheffield Light & Power and/or Sheffield Utilities knew that the requirements under the Alabama Code and Alabama Administrative Code related to the use of pesticides existed for the provision of a safe work environment, to protect the health and safety of employees, and for the protection of employees, Plaintiff specifically.

145. Sheffield Utilities provided Plaintiff instructions and assisted Plaintiff with the usage, handling, mixing, applying, and spreading of Roundup® and in doing so provided Plaintiff assurances of the safety of Roundup®. Sheffield Utilities, never provided any warning to Plaintiff regarding the labels on the Roundup® products which cautioned that the ingredients therein were injurious to Plaintiff's health, did not recommend safety gear, did not provide nor sell to Plaintiff protective gear and did not provide, recommend or sale to Plaintiff applicators, sprayers or other equipment or products which would have provided less exposure to Plaintiff to glyphosate.

146. All of these Defendants' knowledge of the fact the product caused cancer of the type now debilitating Hayes's life was far superior to that of Hayes and despite their knowledge did not revealed these crucial facts to Hayes. These Defendants worked together all for their own betterment. They were all financially rewarded by the selling of the glyphosate-based product(s), including Roundup® and all had vested interest in it being sold without warning of its hazardous components.

147. All of these Defendants worked in concert with each other.

148.     All of these Defendants worked together to promote the sale and distribution of the Roundup® product and to conceal the fact that it was a true carcinogenic.

149.     On or about April 15, 2019, Plaintiff was diagnosed with Non-Hodgkin's Lymphoma and is currently being treated.  His prognosis includes a high risk of likelihood of cancer relapse / recurrence.  Plaintiff has suffered the effects attendant thereto, as a direct and proximate result of the unreasonably dangerous and defective nature of glyphosate-based product(s), including Roundup®  and Defendant's wrongful and negligent conduct in the research, development, testing, manufacture, production, promotion, distribution, marketing, advertising and sale of Roundup®.

150.     During the entire time that Plaintiff was exposed to glyphosate-based product(s), including Roundup® he did not know that exposure was injurious to his health or the health of others.

## TOLLING OF THE STATUTE OF LIMITATIONS

### Discovery Rule Tolling

151.     Plaintiff had no way of knowing about the risk of serious illness associated with the use of and/or exposure to glyphosate-based product(s), including Roundup® until well after IARC released its formal assessment of glyphosate in July 2015. This is the quintessential case for tolling.

152.     Within the time period of any applicable statutes of limitations, Plaintiff did not know and could not have discovered, through the exercise of reasonable diligence, that exposure to glyphosate-based product(s), including Roundup® is injurious to human health.

153.     Plaintiff did not discover and did not know of facts that would cause a reasonable person to suspect, the risks associated with the use of and/or exposure glyphosate-based product(s),

- 38 -

including Roundup®; nor would a reasonable and diligent investigation by her have disclosed that glyphosate-based product(s), including Roundup® would cause his illness.

154. For these reasons, all applicable statutes of limitations have been tolled by operation of the discovery rule with respect to Plaintiff's claims.

## FRAUDULENT CONCEALMENT TOLLING

155. All applicable statutes of limitations have also been tolled by Defendants' knowing and active fraudulent concealment and denial of the facts alleged herein throughout the time period relevant to this action.

156. Instead of disclosing critical safety information about Roundup® and glyphosate, Defendants have consistently and falsely represented the safety of glyphosate-based product(s), including Roundup®.

## ESTOPPEL

157. Defendants were under a continuous duty to disclose to consumers, users and other persons coming into contact with its products, including Plaintiff, accurate safety information concerning its products and the risks associated with the use of and/or exposure to Roundup® and glyphosate.

158. Instead, Defendants knowingly, affirmatively, and actively concealed safety information concerning Roundup® and glyphosate and the serious risks associated with the use of and/or exposure to its products.

159. Defendants each worked in concert with the other to promote the sale and distribution of the Roundup® and to downplay, hide and disguise the cancer-causing component contained therein.

160.    Based on the foregoing, Defendants are estopped from relying on any statutes of limitations in defense of this action.

161.    Red River Specialties sold the subject Roundup used by Plaintiff and by Plaintiff's employer during the period of Plaintiff's employment with Sheffield Utilities.    Red River Specialties is an agricultural specialist which held knowledge of the Roundup® product, its ingredients, its proper usage, the fact it was a carcinogenic, and like the other Defendants failed to reveal their full source of information as set forth above.

162.    Defendants all had significantly greater knowledge of the product than did the consuming public, including Plaintiff, by virtue of the fact that these defendants worked in the agricultural industry and/or were aware of related safety statutes and regulations.  In fact, all of the Defendants in concert together, all with advanced levels of education on the product, worked to conceal the carcinogenic nature of the Roundup® product and to promote it above others despite alternatives being available in order to effectuate a financial gain for them all. All to the detriment of Plaintiff who now faces a fatal diagnosis of Non-Hodgkin's Lymphoma. All of the Defendants knew or reasonably should have known because of their knowledge and information that the Roundup® sold would cause injury to persons such as Plaintiff and death to a large number of consumers, including Plaintiff. These Defendants have been educated in and are aware of the carcinogenic nature of Roundup® for many years, thus giving these Defendants superior knowledge of these facts by virtue of the knowledge, experience and training of their employees. They knew consumers, such as Plaintiff, would likely contract Non-Hodgkin's Lymphoma and similar cancers and would likely die as a result. Defendant Red River Specialties, Inc.'s position with Monsanto and their own resources provided them with superior knowledge to that of  the

- 40 -

average consumer as it relates to the use of and the dangers and hazards involved in the use of Roundup.

163.    Red River Specialties worked together with Monsanto to promote the sale and distribution of Roundup®, a product that when used as intended will likely injury and very likely kill the consumer, such as Plaintiff. All Defendants knew that their actions would result in the continued use of the product and enhanced sales of the product that would likely result in injury or death. The Defendants have gone to great lengths to conceal from the public the true carcinogenic nature of Roundup®. Their motivation for doing so was a desire to gather in new customers and to increase the use of this dangerous product among farmers in particular. They all had an intent to keep from the public the carcinogenic nature of Roundup®, as well as the intent to keep from the general public the extreme hazard of Roundup®. The Defendants worked in concert with or individually with knowledge and ratification in such a way to control and manipulate the sales of the Roundup® product and to quieten any concern about its carcinogenic nature.

164.    Plaintiff has suffered and continues to suffer tremendous physical pain as a result of his cancer and suffered and continues to suffer mental anguish and emotional distress as a result of his cancer.

165.    Defendants all had an opportunity to inspect the Roundup® that is superior to Plaintiff. Moreover, Defendants had more knowledge of the product that is superior to that of the Plaintiff. These Defendants concealed information about risks of Roundup® and aggressively marketed the herbicide as safe for humans and the environment. The Defendants championed falsified data while attacking legitimate research linking Roundup® to cancer. Defendants made a conscious decision not to redesign or withdraw from the market Roundup® so that it was less dangerous to humans and the environment. Defendants knew or should have known that Roundup®

caused cancer but failed to adequately warn. Defendants also failed to adequately monitor Roundup® after bringing it to the market.

166.    Defendants undertook a concerted effort to disguise the information they had concerning Roundup® being a carcinogenic, the actions they undertook were done negligently, wantonly and with reckless disregard for the lives and safety of the public and with knowledge that serious injury and death would likely result from continued use of Roundup® by the public including Plaintiff.

## COUNT I

### Product Liability
### (Against Monsanto and Red River Specialties)

167.    Plaintiff incorporates by reference each preceding and succeeding paragraph as though set forth fully at length herein.

168.    At all times relevant to this litigation, Defendant engaged in the business of testing, developing, designing, manufacturing, marketing, selling, distributing, advertising and promoting Roundup® products, which are defective and unreasonably dangerous to consumers, including the Plaintiff, thereby placing Roundup® products into the stream of commerce. These actions were under the ultimate control and supervision of Defendant. At all times relevant to this litigation, Defendant designed, researched, developed, manufactured, produced, tested, assembled, labeled, advertised, promoted, marketed, sold, and distributed the Roundup® products used by Plaintiff, as described above.

169.    At all times relevant to this litigation, Defendant's Roundup® products were defectively designed by causing an increased risk of cancer and by containing additives that, when combined with glyphosate, significantly increased the risk of developing cancer.

170.    These design defects rendered Roundup® unreasonably dangerous.

- 42 -

171.    The dangers posed by Roundup® go beyond that which would be contemplated by the ordinary consumer with ordinary knowledge common to the community as to its characteristics.

172.    Additionally, the benefits of the Roundup® design are outweighed by the design's inherent risk of danger in causing cancer.

173.    At all times relevant to this litigation, Roundup® products reached the intended consumers, handlers, and users or other persons coming into contact with these products in the State of Alabama and throughout the United States, including Plaintiff, without substantial change in their condition as designed, manufactured, sold, distributed, labeled, and marketed by Defendant.

174.    At all times relevant to this action, Defendant knew or had reason to know that its Roundup® products were defective and were inherently dangerous and unsafe when used in the manner instructed and provided by Defendant.

175.    Defendant could have employed a safer alternative design to render Roundup® safe or, in the alternative, provided proper instructions for use on how to limit the potential risk associated with Roundup's defective design. Defendant's Roundup® products were and are more dangerous than alternative products and Defendant could have designed its Roundup® products to make them less dangerous. At the time Defendant designed its Roundup® products, the state of the industry's scientific knowledge was such that a less risky design or formulation was attainable. Thus, at the time Roundup® products left Defendant's control, there was a practical, technically feasible and safer alternative design that would have prevented the harm without substantially impairing the reasonably anticipated or intended function of Defendant's herbicides.

176.    At all times relevant to this litigation, Plaintiff used and/or was exposed to the use of Defendant's Roundup® products in an intended or reasonably foreseeable manner, without knowledge of the products' dangerous characteristics.

177.    Plaintiff could not reasonably have discovered the defects and risks associated with Roundup® or glyphosate-containing products before or at the time of exposure due to Defendant's suppression of scientific information linking glyphosate to cancer.

178.    The defects in Defendant's Roundup® products were substantial and contributing factors in causing Plaintiff's injuries, and, but for Defendant's misconduct and omissions, Plaintiff would not have sustained said injuries. Defendant's defective design of its Roundup products was willful, wanton, fraudulent, malicious, and conducted with reckless disregard for the health and safety of users of the Roundup products, including Plaintiff herein.

179.    Defendant's conduct, as described above, was reckless. Defendant risked the lives of consumers and users of its products, including Plaintiff, with knowledge of the safety problems associated with Roundup® and glyphosate-containing products, and suppressed this knowledge from the general public. Defendant made conscious decisions not to redesign, warn or inform the unsuspecting public. Defendant's reckless conduct warrants an award of punitive damages.

180.    As a direct and proximate result of Defendants' fraudulent and deceitful conduct, advertisements, and representations, Plaintiff suffered grave and severe personal injuries, economic and noneconomic damages, harms, and losses, including, but not limited to: past medical expenses, future medical expenses, mental anguish; severe emotional distress; physical and mental pain and suffering, and discomfort; and loss and impairment of the quality and enjoyment of life.

- 44 -

**WHEREFORE, premises considered,** Plaintiff claims that the named and fictitious party Defendants are jointly, separately and severally liable to him as a result of the combining and concurring wrongful conduct of each of them as set out above. Plaintiff demands judgment of said Defendants, separately, and severally, for all injuries and damages including but not limited to: pain, suffering, personal injury, permanent disability and disfigurement, medical expenses and loss of enjoyment of life. Plaintiff demands compensatory and punitive damages in such type and quantity as a jury may find appropriate under the circumstances of this case and the purposes allowed by law, including but not limited to the preservation of human life, the protection of the public by deterring these Defendants and other from doing such wrong in the future, and as exemplary damages. Plaintiff further requests any other, further or different relief as to which he may be entitled.

## COUNT II
### INADEQUATE WARNING
### (Against All Defendants)

181. Plaintiffs incorporate by reference each preceding and succeeding paragraph as though set forth fully at length herein.

182. At all times relevant to this litigation, Defendant engaged in the business of testing, developing, designing, manufacturing, marketing, selling, distributing, and promoting Roundup® products, which are defective and unreasonably dangerous to consumers, including Plaintiff specifically, because they do not contain adequate warnings or instructions concerning the dangerous characteristics of Roundup® and specifically, the active ingredient glyphosate. These actions were under the ultimate control and supervision of Defendant.

183. Defendant researched, developed, designed, tested, manufactured, inspected, labeled, distributed, marketed, promoted, sold, and otherwise released into the stream of commerce

- 45 -

its Roundup® products, and in the course of same, directly advertised or marketed the products to consumers and end users, including Plaintiffs, and therefore had a duty to warn of the risks associated with the use of Roundup® and glyphosate-containing products.

184.    At all times relevant to this litigation, Defendant had a duty to properly test, develop, design, manufacture, inspect, package, label, market, promote, sell, distribute, maintain, supply, provide proper warnings, and take such steps as necessary to ensure its Roundup® products did not cause users and consumers to suffer from unreasonable and dangerous risks. Defendant had a continuing duty to warn Plaintiff of the dangers associated with Roundup® use and exposure. Defendant, as manufacturer, seller, or distributor of chemical herbicides is held to the knowledge of an expert in the field.

185.    At the time of manufacture, Defendant could have provided the warnings or instructions regarding the full and complete risks of Roundup® and glyphosate-containing products because it knew or should have known of the unreasonable risks of harm associated with the use of and/or exposure to such products. Such warnings could have been disclosed in circumstances not limited to the Roundup® labeling.

186.    At all times relevant to this litigation, Defendant failed to investigate, study, test, or promote the safety or to minimize the dangers to users and consumers of its product and to those who would foreseeably use or be harmed by Defendant's herbicides, including Plaintiff.

187.    Despite the fact that Defendant knew or should have known that Roundup® posed a grave risk of harm, it failed to exercise reasonable care to warn of the dangerous risks associated with use and exposure. The dangerous propensities of its products and the carcinogenic characteristics of glyphosate, as described above, were known to Defendant, or scientifically knowable to Defendant through appropriate research and testing by known methods, at the time it

distributed, supplied or sold the product, and not known to end users and consumers, such as Plaintiff.

188. Defendant knew or should have known that its products created significant risks of serious bodily harm to consumers, as alleged herein, and Defendant failed to adequately warn consumers, i.e., the reasonably foreseeable users, of the risks of exposure to its products. Defendant has wrongfully concealed information concerning the dangerous nature of Roundup® and its active ingredient glyphosate, and further made false and/or misleading statements concerning the safety of Roundup® and glyphosate.

189. At all times relevant to this litigation, Defendant's Roundup® products reached the intended consumers, handlers, and users or other persons coming into contact with these products in the State of Alabama and throughout the United States, including Plaintiff, without substantial change in their condition as designed, manufactured, sold, distributed, labeled, and marketed by Defendant.

190. Plaintiff Michael Randy Hayes was exposed to Defendant's Roundup® products in the course of using the product during his employment on and about his property, as described above, without knowledge of their dangerous characteristics.

191. At all times relevant to this litigation, Plaintiff used and/or was exposed to the use of Roundup® products while using them for their intended or reasonably foreseeable purposes without knowledge of their dangerous characteristics.

192. Plaintiff could not have reasonably discovered the defects and risks associated with Roundup® or glyphosate-containing products prior to or at the time of exposure. Plaintiff relied upon the skill, superior knowledge, and judgment of Defendant to know about and disclose serious health risks associated with using the products.

- 47 -

193.    Defendant knew or should have known that the minimal warnings disseminated with its Roundup® products were inadequate, failed to communicate adequate information on the dangers and safe use/exposure, and failed to communicate warnings and instructions that were appropriate and adequate to render the products safe for their ordinary, intended and reasonably foreseeable uses, including agricultural and horticultural applications.

194.    This alleged failure to warn is not limited to the information contained on Roundup's labeling. Defendant was able to disclose the known risks associated with Roundup® through other non-labeling mediums, i.e., promotion, advertisements, public service announcements, and/or public information sources. Defendant, however, did not disclose these known risks through any medium.

195.    To this day, Defendant have failed to adequately and accurately warn of the risks of cancer associated with the use of and exposure to Roundup® and its active ingredient glyphosate.

196.    As a result of their inadequate warnings, Defendant's Roundup® products were defective and unreasonably dangerous when they left the possession and/or control of Defendant, were distributed by Defendant, and used by Plaintiff as described herein.

197.    Defendant is liable to Plaintiff for his injuries caused by its negligent or willful failure, as described above, to provide adequate warnings or other clinically relevant information and data regarding the appropriate use of its products and the risks associated with the use of or exposure to Roundup® and glyphosate. Had Defendant provided adequate warnings and instructions and properly disclosed and disseminated the risks associated with its Roundup® products, Plaintiff could have obtained or used alternative herbicides and avoided the risk of developing the injuries set forth herein.

- 48 -

198.     As a direct and proximate result of the Defendant's overt unlawful acts regarding the nature of the Roundup® products, including, but not limited to, placing its defective Roundup® products into the stream of commerce, Plaintiff developed cancer, suffered grave injuries, physical pain and suffering, mental anguish, including diminished enjoyment of life, as well as economic loss, including financial expenses for medical care and treatment.

**WHEREFORE, premises considered,** Plaintiff claims that the named and fictitious party Defendants are jointly, separately and severally liable to him as a result of the combining and concurring wrongful conduct of each of them as set out above. Plaintiff demands judgment of said Defendants, separately, and severally, for all injuries and damages including but not limited to: pain, suffering, personal injury, permanent disability and disfigurement, medical expenses and loss of enjoyment of life. Plaintiff demands compensatory and punitive damages in such type and quantity as a jury may find appropriate under the circumstances of this case and the purposes allowed by law, including but not limited to the preservation of human life, the protection of the public by deterring these Defendants and other from doing such wrong in the future, and as exemplary damages. Plaintiff further requests any other, further or different relief as to which he may be entitled.

### COUNT III
### NEGLIGENCE
### (Against All Defendants)

199.     Plaintiff incorporates by reference each preceding and succeeding paragraph as though set forth fully at length herein.

200.     At all times relevant to this litigation, Defendants Monsanto and Red River Specialties had a duty to exercise reasonable care in the design, research, manufacture, marketing, advertisement, supply, promotion, packaging, sale, and distribution of glyphosate-based

- 49 -

product(s), including Roundup®, including the duty to take all reasonable steps necessary to manufacture, promote, advertise, and/or sell a product that was not unreasonably dangerous to consumers and users of the product.

201.  At all times relevant to this litigation, Defendants Monsanto and Red River Specialties had a duty to exercise reasonable care in the marketing, advertisement, and sale of the glyphosate-based product(s), including Roundup®. Defendant's duty of care owed to consumers and the general public included providing accurate, true, and correct information concerning the risks of using and appropriate, complete, and accurate warnings concerning the potential adverse effects of exposure to Roundup®, and, in particular, its active ingredient glyphosate.

202.  At all times relevant to this litigation, Defendants knew or, in the exercise of reasonable care, should have known of the hazards and dangers of Roundup® and specifically, the carcinogenic properties of the chemical glyphosate.

203.  Accordingly, at all times relevant to this litigation, Defendants knew or, in the exercise of reasonable care, should have known that use of or exposure to glyphosate-based product(s), including Roundup®, could cause or be associated with Plaintiff's injuries and thus, created a dangerous and unreasonable risk of injury to the users of these products, including Plaintiff specifically.

204.  Defendant also knew or, in the exercise of reasonable care, should have known that users and consumers of glyphosate-based product(s), including Roundup®, were unaware of the risks and the magnitude of the risks associated with use of and/or exposure to Roundup® and glyphosate-containing products.

205.  As such, Defendant breached its duty of reasonable care and failed to exercise ordinary care in the design, research, development, manufacture, testing, marketing, supply,

promotion, advertisement, packaging, sale, and distribution of its Roundup® products, in that Defendant manufactured and produced defective herbicides containing the chemical glyphosate, knew or had reason to know of the defects inherent in its products, knew or had reason to know that a user's or consumer's exposure to the products created a significant risk of harm and unreasonably dangerous side effects, and failed to prevent or adequately warn of these risks and injuries.

206.    Defendant was negligent in its promotion of Roundup®, outside of the labeling context, by failing to disclose material risk information as part of its promotion and marketing of Roundup®, including the internet, television, print advertisements, etc. Nothing prevented Defendant from being honest in its promotional activities, and in fact, Defendant had a duty to disclose the truth about the risks associated with Roundup® in its promotional efforts, outside of the of the context of labeling.

207.    Defendant had and has the ability and means to investigate, study, and test its products and to provide adequate warnings, Defendant has failed to do so. Indeed, Defendant has wrongfully concealed information and has further made false and/or misleading statements concerning the safety and/or exposure to Roundup® and glyphosate.

208.    Defendant's negligence included:

a.  Manufacturing, producing, promoting, formulating, creating, developing, designing, selling, advertising and/or distributing its Roundup products without thorough and adequate pre- and post-market testing;

b.  Manufacturing, producing, promoting, formulating, creating, developing, designing, selling, advertising and/or distributing Roundup® while negligently and/or intentionally concealing and failing to disclose the results of trials, tests, and studies of exposure to

- 51 -

glyphosate, and, consequently, the risk of serious harm associated with human use of and exposure to Roundup®;

c. Failing to undertake sufficient studies and conduct necessary tests to determine whether or not Roundup products and glyphosate-containing products were safe for their intended use in agriculture and horticulture;

d. Failing to use reasonable and prudent care in the design, research, manufacture, and development of Roundup® products so as to avoid the risk of serious harm associated with the prevalent use of Roundup® /glyphosate as an herbicide;

e. Failing to design and manufacture Roundup® products so as to ensure they were at least as safe and effective as other herbicides on the market;

f. Failing to provide adequate instructions, guidelines, and safety precautions to those persons Defendant could reasonably foresee would use and be exposed to its Roundup® products;

g. Failing to disclose to Plaintiff, users/consumers, and the general public that use of and exposure to Roundup® presented severe risks of cancer and other grave illnesses;

h. Failing to warn Plaintiffs, users/consumers, and the general public that the product's risk of harm was unreasonable and that there were safer and effective alternative herbicides available to Plaintiffs and other consumers;

i. Systematically suppressing or downplaying contrary evidence about the risks, incidence, and prevalence of the side effects of Roundup® and glyphosate- containing products;

j. Representing that its Roundup® products were safe for their intended use when, in fact, Defendant knew or should have known the products were not safe for their intended purpose;

- 52 -

k.   Declining to make or propose any changes to Roundup® products' labeling or other promotional materials that would alert consumers and the general public of the risks of Roundup® and glyphosate;

l.   Advertising, marketing, and recommending the use of the Roundup® products, while concealing and failing to disclose or warn of the dangers known by Defendant to be associated with or caused by the use of or exposure to Roundup® and glyphosate;

m.  Continuing to disseminate information to its consumers, which indicate or imply that Defendant Roundup® products are safe for use in the agricultural and horticultural industries; and

n.   Continuing the manufacture and sale of its products with the knowledge that the products were unreasonably unsafe and dangerous.

209.    Defendants knew and/or should have known that it was foreseeable consumers such as Plaintiff would suffer injuries as a result of Defendants' failure to exercise ordinary care in the manufacturing, marketing, labeling, distribution, and sale of Roundup® .

210.    Plaintiff did not know the nature and extent of the injuries that could result from the intended use of and/or exposure to Roundup® or its active ingredient glyphosate. Defendant's negligence was the proximate cause of injuries, i.e., absent Defendant's negligence, Plaintiff would not have developed cancer.

211.    Defendant's conduct, as described above, was negligent, wanton and reckless. Defendant regularly risks the lives of consumers and users of its products, including Plaintiffs, with full knowledge of the dangers of its products. Defendant has made conscious decisions not to redesign, re-label, warn, or inform the unsuspecting public, including Plaintiff specifically. Defendant's reckless conduct therefore warrants an award of punitive damages.

- 53 -

212.     As a direct and proximate result of Defendants' fraudulent and deceitful conduct, advertisements, and representations, Plaintiff suffered grave and severe personal injuries, economic and noneconomic damages, harms, and losses, including, but not limited to: past medical expenses, future medical expenses, mental anguish; severe emotional distress; physical and mental pain and suffering, and discomfort; and loss and impairment of the quality and enjoyment of life.

**WHEREFORE, premises considered,** Plaintiff claims that the named and fictitious party Defendants are jointly, separately and severally liable to him as a result of the combining and concurring wrongful conduct of each of them as set out above.  Plaintiff demands judgment of said Defendants, separately, and severally, for all injuries and damages including but not limited to: pain, suffering, personal injury, permanent disability and disfigurement, medical expenses and loss of enjoyment of life.  Plaintiff demands compensatory and punitive damages in such type and quantity as a jury may find appropriate under the circumstances of this case and the purposes allowed by law, including but not limited to the preservation of human life, the protection of the public by deterring these Defendants and other from doing such wrong in the future, and as exemplary damages.  Plaintiff further requests any other, further or different relief as to which he may be entitled.

**COUNT IV**
**FRAUD**
**(Against Monsanto)**

213.     Plaintiff incorporates by reference each preceding and succeeding paragraph as though set forth fully at length herein.

214.     Defendant has defrauded the agricultural and gardening communities in general and Plaintiff in particular by misrepresenting the true safety of Roundup® and by failing to disclose known risks of cancer.

- 54 -

215. Defendant misrepresented and/or failed to disclose, inter alia, that: glyphosate and its major metabolite aminomethylphosphonic acid ("AMPA") could cause cancer; glyphosate and AMPA are known to be genotoxic in humans and laboratory animals because exposure is known to cause DNA strand breaks (a precursor to cancer); glyphosate and AMPA are known to induce oxidative stress in humans and laboratory animals (a precursor to cancer); glyphosate and AMPA interfere with the aromatic amino acids within the human gut, leading to downstream health conditions including cancer; exposure to glyphosate and AMPA is causally associated with NHL; and the laboratory tests attesting to the safety of glyphosate were flawed and/or fraudulent.

216. Due to these misrepresentations and omissions, at all times relevant to this litigation, Roundup® was misbranded under 7 U.S.C. § 136(g) and its distribution within the State of Alabama and around the United States was a violation of 7 U.S.C. § 136(j) and 40 C.F.R. § 156.10(a)(5).

217. When Plaintiff used Roundup® from approximately the 1979 through 2014 while working for Sheffield utilities and thereafter, for personal use, neither the labeling on the product nor Defendant general promotion warned or disclosed the true safety risks of Roundup® or that the product could cause cancer, as described above. Since the true risk information was known to Defendant and was not reasonably knowable to reasonable consumers, Plaintiff were unaware of these material facts and/or omissions prior to using the product.

218. Plaintiff relied on Defendants' misrepresentations and/or material omissions regarding the safety of Roundup® and products containing its active ingredient glyphosate in deciding whether to use the product. Plaintiff did not know, nor could they reasonably have known, of the misrepresentations and/or material omissions by Defendants concerning Roundup® and its active ingredient glyphosate.

- 55 -

219.    The misrepresentations and/or material omissions that form the basis of this fraud claim is not limited to statements made on the Roundup® labeling, as defined under federal law, but also involve Defendant's representations and omissions made as part of its promotion and marketing of Roundup®, including on the internet, television, in print advertisements, etc. Nothing prevented Defendant from disclosing the truth about the risks associated with Roundup® in its promotional efforts outside of the labeling context, using the forms of media and promotion Defendant traditionally used to promote the product's efficacy and benefits.

220.    When Defendant made the misrepresentations and/or omissions as alleged in this pleading, it did so with the intent of defrauding and deceiving the public in general and with the intent of inducing the public to purchase and use Roundup®.

221.    Defendant made these misrepresentations and/or material omissions with malicious, fraudulent, and/or oppressive intent toward Plaintiff and the public generally. Defendant's conduct was willful, wanton, and/or reckless. Defendant deliberately manufactured, produced, marketed, sold, distributed, merchandised, packaged, promoted and advertised the dangerous and defective herbicide Roundup®. This constitutes an utter, wanton, and conscious disregard of the rights and safety of a large segment of the public including Plaintiff, and by reason thereof, Defendant, are liable for reckless, willful, and wanton acts and omissions which evidence a total and conscious disregard for the safety of Plaintiff and others which proximately caused the injuries as set forth herein.

222.    As a direct and proximate result of Defendants' fraudulent and deceitful conduct, advertisements, and representations, Plaintiff suffered grave and severe personal injuries, economic and noneconomic damages, harms, and losses, including, but not limited to: past medical

expenses, future medical expenses, mental anguish; severe emotional distress; physical and mental pain and suffering, and discomfort; and loss and impairment of the quality and enjoyment of life.

**WHEREFORE, premises considered**, Plaintiff claims that the named and fictitious party Defendants are jointly, separately and severally liable to him as a result of the combining and concurring wrongful conduct of each of them as set out above. Plaintiff demands judgment of said Defendants, separately, and severally, for all injuries and damages including but not limited to: pain, suffering, personal injury, permanent disability and disfigurement, medical expenses and loss of enjoyment of life. Plaintiff demands compensatory and punitive damages in such type and quantity as a jury may find appropriate under the circumstances of this case and the purposes allowed by law, including but not limited to the preservation of human life, the protection of the public by deterring these Defendants and other from doing such wrong in the future, and as exemplary damages. Plaintiff further requests any other, further or different relief as to which he may be entitled.

## COUNT V
### Breach of Express Warranty
### (Against Monsanto and Red River Specialties)

223. Plaintiff incorporates by reference each preceding and succeeding paragraph as though set forth fully at length herein.

224. Defendants expressly warranted that Roundup® was safe and accepted by consumers.

225. Roundup® does not conform to these express representations, because Roundup® is not safe and carries with it an increased risk of cancer by containing additives that, when combined with glyphosate, significantly increased the risk of developing cancer.

226.    Plaintiff relied on Defendants' express warranties. Furthermore, the express warranties represented by Defendants were relied on by Plaintiff and a part of the basis for Plaintiff deciding to use Roundup®.

227.    At the time of the making of express warranties, Defendant had knowledge of the purpose for which Roundup® was to be used, and warranted same to be in all respects safe, effective, and proper for such use.

228.    Defendant expressly represented to Plaintiff that Roundup® was safe and fit for use for the purposes intended, that it was of merchantable quality, that it did not produce any dangerous side effects in excess of those risks associated with other herbicides, that the side effects it did produce were accurately reflected in the warnings, and that it was adequately tested and fit for its intended use.

229.    Defendant knew or should have known that, in fact, their representations and warranties were false, misleading, and untrue in that Roundup® was not safe and fit for the use intended, and, in fact, Roundup® produced serious injuries to the users that were not accurately identified and represented by Defendant.

230.    As a result of the foregoing acts and omissions and breach of express warranty, Defendants caused Plaintiff to suffer serious and dangerous side effects, severe and personal injuries, including economic and noneconomic damages, harms, and losses, including, but not limited to: past medical expenses; past and future loss of earnings; mental anguish; severe emotional distress; physical and mental pain and suffering, and discomfort; and loss and impairment of the quality and enjoyment of life.

**WHEREFORE, premises considered**, Plaintiff claims that the named and fictitious party Defendants are jointly, separately and severally liable to him as a result of the combining and

concurring wrongful conduct of each of them as set out above. Plaintiff demands judgment of said Defendants, separately, and severally, for all injuries and damages including but not limited to: pain, suffering, personal injury, permanent disability and disfigurement, medical expenses and loss of enjoyment of life. Plaintiff demands compensatory and punitive damages in such type and quantity as a jury may find appropriate under the circumstances of this case and the purposes allowed by law, including but not limited to the preservation of human life, the protection of the public by deterring these Defendants and other from doing such wrong in the future, and as exemplary damages. Plaintiff further requests any other, further or different relief as to which he may be entitled.

## COUNT VI
## BREACH OF IMPLIED WARRANTY OF MERCHANTABILITY
### (Against Monsanto and Red River Specialties)

231. Plaintiff incorporates by reference each preceding and succeeding paragraph as though set forth fully at length herein.

232. At the time Defendant manufactured, marketed, labeled, promoted, distributed and/or sold Roundup® products, Defendant knew of the uses for which the Roundup® products were intended, and impliedly warranted the Roundup® products were merchantable and fit for the ordinary purposes for which they were intended.

233. Members of the consuming public, including consumers such as Plaintiff, were intended third-party beneficiaries of the warranty.

234. The Roundup® products were not merchantable or fit for their ordinary purposes, because they had a propensity to lead to the serious personal injuries described herein.

235. Plaintiff reasonably relied on Defendant's representations that Roundup® products were safe and free of defects.

- 59 -

236.    Defendant's breach of the implied warranty of merchantability was the direct and proximate cause of Plaintiff's injuries.

237.    Defendant's conduct, as described above, was extreme and outrageous. Defendant risked the lives of the consumers and users of their Roundup® products, including Plaintiff with knowledge of the safety and efficacy problems, and suppressed this knowledge from Plaintiff and the general public. Defendant made conscious decisions not to redesign, relabel, warn or inform Plaintiff or the unsuspecting consuming public.

238.    As a direct and proximate result of Defendant's implied warranties of merchantability concerning the Roundup® products, as described herein, Plaintiff Michael Randy Hayes developed cancer, suffered grave injuries, physical pain and suffering, mental anguish, including diminished enjoyment of life, as well as economic loss, including financial expenses for medical care and treatment.

**WHEREFORE, premises considered,** Plaintiff claims that the named and fictitious party Defendants are jointly, separately and severally liable to him as a result of the combining and concurring wrongful conduct of each of them as set out above. Plaintiff demands judgment of said Defendants, separately, and severally, for all injuries and damages including but not limited to: pain, suffering, personal injury, permanent disability and disfigurement, medical expenses and loss of enjoyment of life. Plaintiff demands compensatory and punitive damages in such type and quantity as a jury may find appropriate under the circumstances of this case and the purposes allowed by law, including but not limited to the preservation of human life, the protection of the public by deterring these Defendants and other from doing such wrong in the future, and as exemplary damages. Plaintiff further requests any other, further or different relief as to which he may be entitled.

## COUNT VII
### BREACH OF IMPLIED WARRANTY OF FITNESS FOR A PARTICULAR PURPOSE
### (Against Monsanto and Red River Specialties)

239.    Plaintiff incorporates by reference each preceding and succeeding paragraph as though set forth fully at length herein.

240.    Defendant manufactured, supplied and sold Roundup® products with an implied warranty that they were fit for the particular purpose for which they were warranted.

241.    Members of the consuming public, including Plaintiff specifically, were the intended third-party beneficiaries of the warranty.

242.    The Roundup® products were not fit for the particular purpose for which they were warranted without serious risk of personal injury, which risk is much higher than other products designed to perform the same function.

243.    Plaintiff reasonably relied on Defendant's representations that the Roundup® products were safe and effective for use.

244.    Defendant's breach of the implied warranty of fitness for a particular purpose was the direct and proximate cause of Plaintiff's injuries and damages.

245.    Defendants' conduct, as described above, was extreme and outrageous. Defendants risked the lives of the consumers and users of their Roundup® products, including Plaintiff, by having knowledge of the safety and efficacy problems associated with the Roundup® products, but suppressing this knowledge from the public. Defendants made a conscious decision not to redesign, relabel, warn or inform the unsuspecting consuming public. Defendants' outrageous conduct warrants an award of punitive damages.

- 61 -

246.     As a direct and proximate result of Defendants' conduct with regard to implied warranties of fitness concerning Roundup® products, Plaintiff was directly or indirectly caused to suffer the injuries and damages as set out herein.

**WHEREFORE, premises considered**, Plaintiff claims that the named and fictitious party Defendants are jointly, separately and severally liable to him as a result of the combining and concurring wrongful conduct of each of them as set out above.  Plaintiff demands judgment of said Defendants, separately, and severally, for all injuries and damages including but not limited to: pain, suffering, personal injury, permanent disability and disfigurement, medical expenses and loss of enjoyment of life.  Plaintiff demands compensatory and punitive damages in such type and quantity as a jury may find appropriate under the circumstances of this case and the purposes allowed by law, including but not limited to the preservation of human life, the protection of the public by deterring these Defendants and other from doing such wrong in the future, and as exemplary damages.  Plaintiff further requests any other, further or different relief as to which he may be entitled.

### COUNT VIII
### FAILURE TO PROVIDE A SAFE WORK ENVIRONMENT
#### (Against Sheffield Light & Power and Sheffield Utilities)

247.     Plaintiff incorporates by reference each preceding and succeeding paragraph as though set forth fully at length herein.

248.     Sheffield Light & Power and Sheffield Utilities and its Electric Division had a duty to provide a safe work environment for Plaintiff.

249.     Plaintiff's injuries were caused by the negligence and/or wantonness of Sheffield Light & Power and Sheffield Utilities and its Electric Division in that these named and fictitious Defendants failed to adequately warn of the hazards associated with the use of pesticides, failing

to enforce and require certification of pesticide applicators, failed to provide literature and training aids and to train Plaintiff relating to the hazards associated with the use of pesticides, and failed to provide a safe work environment for Plaintiff.

250.     Sheffield Light & Power and Sheffield Utilities and its Electric Division ordered and/or directed Plaintiff to use pesticides when Sheffield Light & Power and Sheffield Utilities and its Electric Division , knew or should have known the pesticides were in a defective condition or knew or should have known such were harmful, knew or should have known that failure to require certification in pesticide spraying/application would likely lead to injury and Plaintiff was bound to conform and did conform to said orders or directions and Plaintiff's injuries resulted from his having so conformed.

**WHEREFORE, premises considered,** Plaintiff claims that Sheffield Light & Power and Sheffield Utilities and its Electric Division and fictitious party Defendants related to these defendants are jointly, separately and severally liable to him as a result of the combining and concurring wrongful conduct of each of them as set out above.  Plaintiff demands judgment of said named and fictitious Defendants, separately, and severally, for all injuries and damages including but not limited to: pain, suffering, personal injury, permanent disability and disfigurement, medical expenses and loss of enjoyment of life.  Plaintiff demands compensatory and punitive damages in such type and quantity as a jury may find appropriate under the circumstances of this case and the purposes allowed by law, including but not limited to the preservation of human life, the protection of the public by deterring these Defendants and other from doing such wrong in the future, and as exemplary damages.  Plaintiff further requests any other, further or different relief as to which he may be entitled.

## COUNT IX
## LOSS OF CONSORTIUM
### (Against All Defendants)

100.    Plaintiffs adopt and incorporate by reference all the foregoing language of this Complaint as if fully set forth herein and further state as follows.

101.    Plaintiff Katrina Hayes is the spouse of Plaintiff Michael Randy Hayes and as such, lives and cohabitates with him.

102.    By reason of the foregoing, Plaintiff's spouse has necessarily paid and has become liable to pay for medical aid, treatment, attendance, and for medications, and will necessarily incur further expenses of a similar nature in the future.

103.    By reason of the foregoing, Plaintiff's spouse has been caused, presently and in the future, the loss of Plaintiff's companionship, service and society.

104.    As a foreseeable, direct and proximate result of the wrongful acts and omissions of Defendant, Plaintiffs were caused to suffer economic damages, including medical and hospital expenses, severe and possible permanent injuries, pain, suffering and emotional distress.

**WHEREFORE, PREMISES CONSIDERED,** Plaintiffs demand judgment against the Defendants, each of them individually, jointly and severally, and compensatory and punitive damages against the named and fictitious-party Defendants in an amount to be determined by the trier-of-fact, including interest, costs, attorney's fees, and any such other, further and different relief this Court deems appropriate.

- 64 -

## COUNT X
## COMBINED AND CONCURRING CONDUCT
### (Against All Defendants)

251.    Plaintiff incorporates by reference each preceding and succeeding paragraph as though set forth fully at length herein.

252.    The tortious conduct of all Defendants as described in the foregoing paragraphs combined and concurred to cause the injuries sustained by Plaintiff. Moreover, the Defendants worked in concert to achieve financial gain to each of their own benefits.

**WHEREFORE, premises considered,** Plaintiff claims that the named and fictitious party Defendants are jointly, separately and severally liable to him as a result of the combining and concurring wrongful conduct of each of them as set out above.  Plaintiff demands judgment of said Defendants, separately, and severally, for all injuries and damages including but not limited to: pain, suffering, personal injury, permanent disability and disfigurement, medical expenses and loss of enjoyment of life.  Plaintiff demands compensatory and punitive damages in such type and quantity as a jury may find appropriate under the circumstances of this case and the purposes allowed by law, including but not limited to the preservation of human life, the protection of the public by deterring these Defendants and other from doing such wrong in the future, and as exemplary damages.  Plaintiff further requests any other, further or different relief as to which he may be entitled.

## PUNITIVE DAMAGES ALLEGATIONS

253.    Plaintiffs incorporate by reference each preceding and succeeding paragraph as though set forth fully at length herein.

254.    Defendants' conduct as alleged herein was done with oppression, fraud, and malice. Defendants were fully aware of Roundup's safety risks. Nonetheless, Defendants deliberately crafted the label, marketing, and promotion pf to mislead farmers and consumers.

255.    This was not done by accident or through some justifiable negligence. Rather, Defendants knew that it could turn a profit by convincing the agricultural industry and the general population that glyphosate-based products, including Roundup®, was harmless to humans, and that full disclosure of the true risks would limit the amount of money Defendants would make selling glyphosate-based products, including Roundup®, in the State of Alabama. This was accomplished not only through its misleading, deceptive, fraudulent and unfair labeling, but also through a comprehensive scheme of selective fraudulent research and testing, misleading advertising, and deceptive omissions as more fully alleged throughout this pleading. Plaintiff was robbed of their right to make an informed decision about whether to use an herbicide, knowing the full risks attendant to that use. Such conduct was done with conscious disregard of Plaintiff's rights.

256.    There is no indication that Defendants swill stop deceptive, unfair, fraudulent, misleading and unlawful marketing practices unless it is punished and deterred. Accordingly, Plaintiffs request punitive damages against Defendants for the harms caused to Plaintiffs.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiffs requests that the Court enter judgment in his favor and against Defendant, awarding:

a)  Consequential damages and ascertainable losses in such amount to be determined at trial and as provided by applicable law;

b)  Exemplary and punitive damages sufficient to punish and deter Defendant and others from future deceptive, fraudulent, unfair, misleading, illegal and fraudulent practices;

c)  Pre-judgment and post-judgment interest;

- 66 -

d) Costs including reasonable attorneys' fees and costs, court costs, and other litigation expenses; and

e) Any other relief the Court may deem just and proper.

<u>**JURY TRIAL DEMAND**</u>

Plaintiffs demand a trial by jury on all of the triable issues within this pleading.

Dated: September 24, 2020

<u>/s/Trey J. Malbrough</u>
**Trey J. Malbrough (MAL037)**
The Malbrough Firm LLC
Age Herald Building
2107 Fifth Avenue North, Suite 301
Birmingham, Alabama 35203
Telephone:  (205) 701-0707
Facsimile:  (205) 820-0123
Email:  trey@tmbfirm.com

<u>/s/ Bennett L. Pugh</u>
**Bennett L. Pugh (PUG004)**
300 N. Montgomery Ave.
Sheffield, AL 35660
Telephone: (205) 901-1116
Email:  pughbennett@gmail.com

*Attorneys for Plaintiffs*

**Please serve Defendants by Certified Mail, return receipt requested, to the following addresses:**

      Corporation Service Company Inc
      As R/A Monsanto Company Corporation
      641 South Lawrence Street
      Montgomery, AL 36104

      Ct Corporation System
      As R/A Red River Specialties, LLC
      2 North Jackson Street, Ste. 605
      Montgomery, AL 36104

      Red River Specialties, Inc.
      1324 N. Hearne Ave, Ste. 120
      Shreveport, LA 71107

      Sheffield Light & Power
      300 N. Nashville Ave.
      Sheffield, AL 35660

      Sheffield Utilities
      300 N. Nashville Ave.
      Sheffield, AL 35660



PLACE STICKER AT TOP OF ENVELOPE TO THE RIGHT
OF THE RETURN ADDRESS, FOLD AT DOTTED LINE

**CERTIFIED MAIL**®

7020 0640 0001 1320 7841

Mark R. Eady
Circuit Clerk
Colbert County Courthouse
P.O. Box 74474
Tuscumbia, AL 35674



NEOPOST                    FIRST-CLASS MAIL

09/25/2020
US POSTAGE $009.60⁰

ZIP 35674
041M11452353



ELECTRONICALLY FILED
11/4/2020 1:02 PM
20-CV-2020-900237.00
CIRCUIT COURT OF
COLBERT COUNTY, ALABAMA
MARK R. EADY, CLERK

# Exhibit 2

# UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ALABAMA
## NORTHWESTERN DIVISION

MICHAEL RANDY HAYES and KATRINA
HAYES,

        Plaintiffs,

    v.

MONSANTO COMPANY, *et al.*,

        Defendants.

Case No. _____

## CONSENT TO REMOVAL

Red River Specialties, LLC, formerly known as Red River Specialties, Inc., hereby
collectively consent to removal by Monsanto Company of this lawsuit from the Circuit Court of
Colbert County, Alabama to this Court.

On December 31, 2016, Red River Specialties, Inc. formally converted from a
corporation to a limited liability company, Red River Specialties, LLC. Before that conversion,
Red River Specialties, Inc. was a corporation incorporated under the laws of the State of
Louisiana and had its principal place of business in the State of Louisiana.

Red River Specialties, LLC is, and was when this lawsuit was filed in the Circuit Court of
Colbert County, Alabama, a limited liability company. The sole member of Red River
Specialties, LLC is, and was when this lawsuit was filed in the Circuit Court of Colbert County,
Alabama, Azelis Americas, LLC. Azelis Americas, LLC is, and was when this lawsuit was filed
in the Circuit Court of Colbert County, Alabama, a limited liability company. The sole member
of Azelis Americas, LLC is, and was when this lawsuit was filed in the Circuit Court of Colbert
County, Alabama, Azelis US Holding, Inc. Azelis US Holding, Inc. is, and was when this

lawsuit was filed in the Circuit Court of Colbert County, Alabama, a corporation incorporated

under the laws of the State of Delaware, with its principal place of business in the State of

Connecticut.

Dated: November __3__, 2020

_____

Albert P. Etre III
Chief Financial Officer and Treasurer

ELECTRONICALLY FILED
11/4/2020 1:02 PM
20-CV-2020-900237.00
CIRCUIT COURT OF
COLBERT COUNTY, ALABAMA
MARK R. EADY, CLERK

# Exhibit 3

**UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF ALABAMA**
**NORTHWESTERN DIVISION**

|  |  |
|---|---|
| MICHAEL RANDY HAYES and KATRINA HAYES, | |
| Plaintiffs, | Case No. _____ |
| v. | |
| MONSANTO COMPANY, *et al.*, | |
| Defendants. | |

## AFFIDAVIT OF CHRIS WHITE

1. My name is Chris White. I am over the age of 19 years and am a resident of Sheffield, Alabama. I am competent to make this Affidavit. The statements set forth below are based on my personal knowledge and records of the City of Sheffield, a municipal corporation d/b/a Sheffield Utilities (hereinafter, "City of Sheffield"). In addition, I have reviewed the Complaint filed by plaintiffs in the *Hayes v. Monsanto Company Corporation, et al.* lawsuit.

2. I am employed as Human Resources and Safety Director by the City of Sheffield. I have held that position approximately twenty years. In the course of my employment by the City of Sheffield, I have interacted with Michael Randy Hayes.

3. Mr. Hayes was employed by the City of Sheffield from June 2, 1980 to March 1, 2015, when he retired. Mr. Hayes has not worked for the City of Sheffield since he retired.

4. Sheffield Utilities and Sheffield Light & Power are not separate corporate legal entities in their own right and never employed Mr. Hayes. Sheffield Utilities and Sheffield Light

& Power are part of the City of Sheffield. The only legal entity that employed Mr. Hayes during the period discussed above was the City of Sheffield.


FURTHER THE AFFIANT SAITH NAUGHT


_____
Chris White

**STATE OF ALABAMA** )
)
**COLBERT COUNTY** )


Before me, a notary public, in and for said county and state, personally appeared Chris White and after being first duly sworn, did state that he had read the above and foregoing, and executed the same of his own free will.

Sworn to and subscribed this 3rd day of November, 2020

_____
Notary Public

R. KEITH WORSHAM
Notary Public
STATE OF ALABAMA

My commission expires 5/15/2023


2