**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF CALIFORNIA**

| | |
|---|---|
| **IN RE: ROUNDUP PRODUCTS LIABILITY LITIGATION** _____ THIS DOCUMENT RELATES TO: HAYLEE ANN McCLELLAN as Personal Representative for the Estate of *Michael V. McClellan, v. Monsanto Co.*, 2:19-cv-00818, U.S. District Court, District of Utah, | MDL No. 2741 Case No. 3:16-md-02741 – VC |

PROPOSED AMENDED COMPLAINT

**COMES NOW**, Haylee Ann McClellan (now known as Haylee Ann McClellan), in her capacity as the Personal Representative of the Estate of Michael V. McClellan (hereinafter referred to as "Plaintiff"), by and through undersigned counsel, and for Plaintiff's cause of action against Defendant Monsanto Company, and John Does 1-100, states and alleges as follows:

1.      Plaintiff Michael V. McClellan, was a resident of Spanish Fork City, County of Utah, State of Utah and passed away on July 22, 2021.  (Exhibit A) Haylee Ann McClellan (now known as Haylee Ann McClellan Maybe) was appointed as the Personal Representative for the Estate of Michael V. McClellan in the Fourth Judicial District Court, Utah County, State of Utah, Probate Number 213400620 on July 28, 2021. (Exhibit B)

2.      Monsanto Company is a Delaware corporation, with a principal place of business located at 800 North Lindbergh Blvd., St. Louis, Missouri.

3.      John Does 1-50 are  subsidiaries, partners, or other entities that were involved in the design, development, manufacture, testing, packaging, promoting, marketing, advertising, distribution, labeling, and/or sale of the herbicide Roundup, containing the active ingredient glyphosate.   The identities of JOHN DOES 1-50 are unknown to Plaintiff at this time.   Plaintiff will move the Court to specifically name JOHN DOES 1- 50 as their identities becomes known to Plaintiff through discovery.

4.      Defendant MONSANTO COMPANY and JOHN DOES 1-50 are collectively referred to as "Monsanto Defendants" or "Defendants."

5.      Defendants advertise and sell goods, specifically Roundup in Utah County, State of Utah.

## NATURE OF THE CASE

6.      This is an action for damages suffered by Deceased Plaintiff as a direct and proximate result of Defendants' negligent and wrongful conduct in connection with the design, development, manufacture, testing, packaging, promoting, marketing, advertising, distribution, labeling, and/or sale of the herbicide Roundup®, containing the active ingredient glyphosate.

7.      Plaintiff maintains that Roundup® and/or glyphosate is defective, dangerous to human health, unfit and unsuitable to be marketed and sold in commerce, and lacked proper warnings and directions as to the dangers associated with its use.

8.      Plaintiff's injuries, like those striking thousands of similarly situated victims across the country, were avoidable.

## JURISDICTION AND VENUE

9.      This Court has jurisdiction over Defendants and this action pursuant to 28 U.S.C. § 1332 because there is complete diversity of citizenship between Plaintiff and Defendants.  Defendants are all either incorporated and/or have their principal place of business outside of the state in which the Plaintiff resides.

10.     The  amount  in controversy between Plaintiff and Defendants exceeds $75,000, exclusive of interest and cost.

11.     The Court also has supplemental jurisdiction pursuant to 28 U.S.C. § 1367.

12.     Venue is proper within this district pursuant to 28 U.S.C. § 1391 in that Defendants conduct business here and are subject to personal jurisdiction in this district. Furthermore, Defendants sell, market, and/or distribute Roundup® within the District of Utah. Additionally, a substantial part of the acts and/or omissions giving rise to these claims occurred within this district.

## PARTIES

13.     Deceased Plaintiff, Michael V. McClellan, was a natural person and at all relevant times a resident and citizen of Utah County, Utah.  Plaintiff brings this action for personal injuries sustained, and eventual death from exposure to  Roundup® ("Roundup") containing the  active  ingredient glyphosate  and  the surfactant  polyethoxylated tallow amine (POEA).  As a direct and proximate result of being exposed to Roundup, Plaintiff sustained Chronic Myelogenous Lukemia from which he died.

14.     "Roundup" refers to all formulations of Defendants' roundup products, including, but not limited to, Roundup Concentrate Poison Ivy and Tough Brush Killer 1,

Roundup Custom Herbicide, Roundup D-Pak herbicide, Roundup Dry Concentrate, Roundup Export Herbicide, Roundup Fence & Hard Edger 1, Roundup Garden Foam Weed & Grass Killer, Roundup Grass and Weed Killer, Roundup Herbicide, Roundup Original 2k herbicide, Roundup Original II Herbicide, Roundup Pro Concentrate, Roundup Prodry  Herbicide, Roundup Promax,  Roundup  Quik Stik Grass and  Weed Killer, Roundup Quikpro Herbicide, Roundup Rainfast Concentrate Weed & Grass Killer, Roundup Rainfast Super Concentrate Weed & Grass Killer, Roundup Ready-to-Use Extended Control Weed & Grass Killer 1 Plus Weed Preventer, Roundup Ready-to-Use Weed & Grass Killer, Roundup Ready-to- Use Weed and Grass Killer 2, Roundup Ultra Dry, Roundup Ultra Herbicide, Roundup Ultramax, Roundup VM Herbicide, Roundup Weed & Grass Killer Concentrate, Roundup Weed & Grass Killer Concentrate Plus, Roundup Weed & Grass killer Ready-to-Use Plus, Roundup Weed & Grass Killer Super Concentrate, Roundup Weed & Grass Killer1 Ready-to-Use, Roundup WSD Water Soluble Dry Herbicide Deploy Dry Herbicide, or any other formulation of containing the active ingredient glyphosate.

15. Plaintiff purchased and used Roundup and/or other Monsanto glyphosate-containing products (hereinafter "Roundup") for over fifteen years in the state of Utah, and was diagnosed with NonHodgkin's Lymphoma. Plaintiff is still under physician's care for this disease.

## BACKGROUND

16.     This is an action for damages and death suffered by Plaintiff as a direct and proximate result of Defendant's negligent and wrongful conduct in connection with the design, development, manufacture, testing, packaging, promoting, marketing, advertising, distribution, labeling, and/or sale of the herbicide Roundup®, containing the active ingredient glyphosate.

17.     Plaintiff maintains that Roundup® and/or glyphosate is a defective product, that is dangerous to human health, unfit and unsuitable to be marketed and sold in commerce and lacked proper warnings and directions as to the dangers associated with its use.

18.     Plaintiff's injuries, like tens of thousands of similarly situated victims across the country, were avoidable.

19.     Upon information and belief, Defendants purposefully availed themselves of the privilege of conducting activities with the State of Utah, thus invoking the benefits and protections of its laws.

20.     Upon information and belief, Defendant did design, sell, advertise, manufacture and/or distribute Roundup, with full knowledge of its dangerous and defective nature.

21.     The expiration of any applicable statute of limitations is equitably tolled by reason of Monsanto's fraudulent misrepresentations and fraudulent concealment, detailed more fully below.

## BACKGROUND AND FACTUAL ALLEGATIONS

22.     At all relevant times, Defendants were in the business of, and did, design, research, manufacture, test, advertise, promote, market, sell, distribute, and/or have acquired and are responsible for Defendants who have designed, researched, manufactured, tested, advertised, promoted, marketed, sold, and distributed the commercial herbicide Roundup.

22.     Monsanto is a multinational agricultural biotechnology corporation based in St. Louis, Missouri.  It is the world's leading producer of glyphosate.

23.     In 1970, Defendant Monsanto Company, Inc. discovered the herbicidal properties of glyphosate and began marketing it in products in 1974 under the brand name Roundup®.

24.     Glyphosate is the active ingredient in Roundup.

25.     Glyphosate is a broad-spectrum herbicide used to kill weeds and grasses known to compete with commercial crops grown around the globe.

26.     Glyphosate is a "non-selective" herbicide, meaning it kills indiscriminately based only on whether a given organism produces a specific enzyme, 5-enolpyruvylshikimic acid-3-phosphate synthase, known as EPSP synthase.

27.     Glyphosate inhibits the enzyme 5-enolpyruvylshikimic acid-3-phosphate synthase that interferes with the shikimic pathway in plants, resulting in the accumulation of shikimic acid in plant tissue and ultimately plant death.

28.     Sprayed as a liquid, plants absorb glyphosate directly through their leaves, stems, and roots, and detectable quantities accumulate in the plant tissues.

29.     Each year, approximately 250 million pounds of glyphosate are sprayed on crops, commercial nurseries, suburban lawns, parks, and golf courses.  This increase in use has been driven largely by the proliferation of genetically engineered crops, crops specifically tailored to resist the activity of glyphosate.

30.     Defendants are intimately involved in the development, design, manufacture, marketing, sale, and/or distribution of genetically modified ("GMO") crops, many of which are marketed as being resistant to Roundup *i.e.,* "Roundup Ready®."  As of 2009, Defendants were the world's leading producer of seeds designed to be Roundup Ready®.  In 2010, an estimated 70% of corn and cotton, and 90% of soybean fields in the United States contained Roundup Ready® seeds.

31.     The original Roundup, containing the active ingredient glyphosate, was introduced in 1974.  Today, glyphosate products are among the worlds' most widely used

herbicides.   Monsanto's glyphosate products are registered in more than 130 countries and are approved for weed control in more than 100 crops.   No other herbicide active ingredient compares in terms of number of approved uses.[1]

32.     This chemical is ubiquitous in the environment.   Numerous studies confirm that glyphosate is found in rivers, streams, and groundwater in agricultural areas where Roundup® is used.   It has been found in food, in the urine of agricultural workers, and even in the urine of urban dwellers who are not in direct contact with glyphosate.

33.     On March 20, 2015, the International Agency for Research on Cancer ("IARC"), an agency of the World Health Organization ("WHO"), issued an evaluation of several herbicides, including glyphosate.   That evaluation was based, in part, on studies of exposures to glyphosate in several countries around the world, and it traces the health implications from exposure to glyphosate since 2001.

34.     On July 29, 2015, IARC issued the formal monograph relating to glyphosate.   In that monograph, the IARC Working Group provides a thorough review of the numerous studies and data relating to glyphosate exposure in humans.

35.     The IARC Working Group classified glyphosate as a Group 2A herbicide, which means that it is probably carcinogenic to humans.   The IARC Working Group concluded that the cancers most associated with glyphosate exposure are Non-Hodgkin's lymphoma and other haematopoietic cancers, including lymphocytic lymphoma/chronic lymphocytic leukemia, B-cell lymphoma, and multiple myeloma.

---

[1] *Backgrounder*, History of Monsanto's Glyphosate Herbicides, June 2005.

36.     The IARC evaluation is significant.  It confirms what has been believed for years: that glyphosate is toxic to humans.

37.     Nevertheless, Monsanto, since it began selling Roundup, has represented it as safe to humans and the environment.  Indeed, Monsanto has repeatedly proclaimed and continues to proclaim to the world, and particularly to United States consumers, that glyphosate-based herbicides, including Roundup, create no unreasonable risks to human health or to the environment.

## REGISTRATION OF HERBICIDES UNDER FEDERAL LAW

39     The manufacture, formulation and distribution of herbicides, such as Roundup, are regulated under the Federal Insecticide, Fungicide, and Rodenticide Act ("FIFRA"), 7 U.S.C. § 136 *et seq*.  FIFRA requires that all pesticides be registered with the Environmental Protection Agency ("EPA") prior to their distribution, sale, or use, except as described by FIFRA 7 U.S.C. 136a(a).

40.     The EPA requires as part of the registration process, among other requirements, a variety of tests to evaluate the potential for exposure to pesticides, toxicity to people and other potential non-target organisms, and other adverse effects on the environment.  Registration by the EPA, however, is not an assurance or finding of safety.  The determination the EPA makes in registering or re-registering a product is not that the product is "safe," but rather that use of the product in accordance with its label directions "will not generally cause unreasonable adverse effects on the environment." 7 U.S.C. § 136(a)(c)(5)(D).

41.     FIFRA defines "unreasonable adverse effects on the environment" to mean "any unreasonable risk to man or the environment, taking into account the economic, social, and environmental costs and benefits of the use of any pesticide." 7 U.S.C. § 136(bb).  FIFRA thus requires the EPA to make a risk/benefit analysis in determining whether a registration should be granted or allowed to continue to be sold in commerce.

42.     The EPA and the State of Utah registered Roundup for distribution, sale, and manufacture in the United States and the State of Utah.

43.     FIFRA generally requires that the registrant, Monsanto, conduct health and safety testing of pesticide products. The government is not required, nor is it able, to perform the product tests that are required of the manufacturer.

44.     The evaluation of each pesticide product distributed, sold, or manufactured is completed at the time the product is initially registered.  The data necessary for registration of a pesticide has changed over time.  The EPA is now in the process of re-evaluating all pesticide products through a Congressionally-mandated process called "re-registration." 7 U.S.C. § 136a-1.  In order to reevaluate these pesticides, the EPA demands the completion of additional tests and the submission of data for the EPA's review and evaluation.

45.     In the case of glyphosate and Roundup, the EPA had planned on releasing its preliminary risk assessment – in relation to the registration process – no later than July 2015. The EPA completed its review of glyphosate in early 2015, but delayed releasing the assessment pending further review in light of the World Health Organization's findings.

**MONSANTO'S FALSE REPRESENTATIONS REGARDING THE SAFETY OF ROUNDUP®**

46.    In 1996, the New York Attorney General ("NYAG") filed a lawsuit against Monsanto based on its false and misleading advertising of Roundup products. Specifically, the lawsuit challenged Monsanto's general representations that its spray-on glyphosate-based herbicides, including Roundup, were "safer **than table salt**" and "practically **non-toxic**" to mammals, birds, and fish. Among the representations the NYAG found deceptive and misleading about the human and environmental safety of Roundup are the following:

> a) Remember that environmentally friendly Roundup herbicide is biodegradable. It won't build up in the soil so you can use Roundup with confidence along customers' driveways, sidewalks and fences ...

> b) And remember that Roundup is biodegradable and won't build up in the soil. That will give you the environmental confidence you need to use Roundup everywhere you've got a weed, brush, edging or trimming problem.

> b)   Roundup biodegrades into naturally occurring elements.

> d) Remember that versatile Roundup herbicide stays where you put it. That means there's no washing or leaching to harm customers' shrubs or other desirable vegetation.

> e) This non-residual herbicide will not wash or leach in the soil. It ... stays where you apply it.

> f) You can apply Accord with " confidence because it will stay where you put it" it bonds tightly to soil particles, preventing leaching. Then, soon after application, soil micro-organisms biodegrade Accord into natural products.

> g) Glyphosate is less toxic to rats than table salt following acute oral ingestion.

> h) Glyphosate's safety margin is much greater than required. It has over a 1,000-fold safety margin in food and over a 700-fold safety margin for workers who manufacture it or use it.

i) You can feel good about using herbicides by Monsanto. They carry a toxicity category rating of "practically non-toxic" as it pertains to mammals, birds and fish.

j) "Roundup can be used where kids and pets will play and breaks down into natural material." This ad depicts a person with his head in the ground and a pet dog standing in an area which has been treated with Roundup.[2]

47.     On November 19, 1996, Monsanto entered into an Assurance of Discontinuance with NYAG, in which Monsanto agreed, among other things, "to cease and desist from publishing or broadcasting any advertisements [in New York] that represent, directly or by implication" that:

a)  its glyphosate-containing pesticide products or any component thereof are safe, non-toxic, harmless or free from risk.

b)  its glyphosate-containing pesticide products or any component thereof manufactured, formulated, distributed or sold by Monsanto are biodegradable.

c)  its glyphosate-containing pesticide products or any component thereof stay where they are applied under all circumstances and will not move through the environment by any means.

d)  its glyphosate-containing pesticide products or any component thereof are "good" for the environment or are "known for their environmental characteristics."

e)  glyphosate-containing pesticide products or any component thereof are safer or less toxic than common consumer products other than herbicides;

f)  its glyphosate-containing products or any component thereof might be classified as "practically non-toxic."

48.     Monsanto did not alter its advertising in the same manner in any state other than New York, and on information and belief still has not done so today.

---

[2] Attorney General of the State of New York.  In the Matter of Monsanto Company Assurance of Discontinuance Pursuant to Executive Law § 63(15)(Nov. 1996).

49.     In 2009, France's highest court ruled that Monsanto had not told the truth about the safety of Roundup.  The French court affirmed an earlier judgment that Monsanto had falsely advertised its herbicide Roundup as "biodegradable" and that it "left the soil clean."[3]

## EVIDENCE OF CARCINOGENICITY IN ROUNDUP

50.     As early as the 1980's Monsanto was aware of glyphosate's carcinogenic properties.

51.     On March 4, 1985, a group of the Environmental Protection Agency's ("EPA") Toxicology Branch published a memorandum classifying glyphosate as a Category C oncogene.[4]  Category C oncogenes are possible human carcinogens with limited evidence of carcinogenicity.

52.     In 1986, the EPA issued a Registration Standard for glyphosate (NTIS PB87-103214).  The Registration standard required additional phytotoxicity, environmental fate, toxicology, product chemistry, and residue chemistry studies.  All of the data required was submitted and reviewed and/or waived.[5]

53.     In October 1991 the EPA published a Memorandum entitled "Second Peer Review of Glyphosate."  The memorandum changed glyphosate's classification to Group E (evidence of non-carcinogenicity for humans).  Two peer review committee members did not concur with the conclusions of the committee and one member refused to sign.[6]

---

[3] *Monsanto Guilty in 'False Ad' Row,* BBC, Oct. 15, 2009, *available at* http://news.bbc.co.uk/2/hi/europe/8308903.stm.

[4] Consensus Review of Glyphosate, Casewell No. 661A. March 4, 1985. United States Environmental Protection Agency.

[5] http://www.epa.gov/oppsrrd1/reregistration/REDs/factsheets/0178fact.pdf .

[6] Second Peer Review of Glyphosate, CAS No. 1071-83-6. October 30, 1881. United States Environmental Protection Agency.

54.     In addition to the toxicity of the active molecule, many studies support the hypothesis that glyphosate formulations found in Defendants' Roundup products are more dangerous and toxic than glyphosate alone.[7]  As early as 1991 evidence existed demonstrating that glyphosate formulations were significantly more toxic than glyphosate alone.[8]

55.     In 2002, Julie Marc published a study entitled "Pesticide Roundup Provokes Cell Division Dysfunction at the Level of CDK1/Cyclin B Activation."

50.     The study found that Defendants' Roundup caused delays in the cell cycles of sea urchins, while the same concentrations of glyphosate alone proved ineffective and did not alter cell cycles.

51.     In 2004, Julie Marc published a study entitled "Glyphosate-based pesticides affect cell cycle regulation."  The study demonstrated a molecular link between glyphosate-based products and cell cycle dysregulation.

52.     The study noted that "cell-cycle dysregulation is a hallmark of tumor cells and human cancer.  Failure in the cell-cycle checkpoints leads to genomic instability and subsequent development of cancers from the initial affected cell."  Further, "[s]ince cell cycle disorders such as cancer result from dysfunction of unique cell, it was of interest to evaluate the threshold dose of glyphosate affecting cells."[9]

53.     In 2005, Francisco Peixoto published a study showing that Roundup's effects on rat liver mitochondria are much more toxic and harmful than the same concentrations of glyphosate alone.

---

[7] Martinez et al. 2007; Benachour 2009; Gasnier *et al*. 2010; Peixoto 2005; Marc 2004
[8] Martinez et al 1991.
[9] Molinari, 2000; Stewart et al., 2003

54.     The Peixoto study suggested that the harmful effects of Roundup on mitochondrial bioenergetics could not be  exclusively  attributed to glyphosate  and could be  the result of  other chemicals, namely the surfactant POEA, or alternatively due to the possible synergy between glyphosate and Roundup formulation products.

55.     In 2009, Nora Benachour and Gilles-Eric Seralini  published a study examining  the effects of Roundup and glyphosate on human umbilical, embryonic, and placental cells.

56.     The study used dilution levels of Roundup and glyphosate far below agricultural recommendations, corresponding with low levels of residues in food.  The study concluded that supposed "inert" ingredients, and possibly POEA, change human cell permeability and amplify toxicity of glyphosate alone.  The study further suggested that determinations of glyphosate toxicity should take into account the presence of adjuvants, or those chemicals used in the formulation of the complete pesticide. The study confirmed that the adjuvants in Roundup are not inert and that Roundup is always more toxic than its active ingredient glyphosate.

57.     The results of these studies were confirmed in recently published peer-reviewed studies and were at all times available and/or known to Defendants.

58.     Defendants  knew  or  should  have  known  that  Roundup  is  more  toxic  than glyphosate  alone  and  that  safety  studies  on  Roundup,  Roundup's  adjuvants  and  "inert" ingredients, and/or the surfactant POEA were necessary to protect Plaintiff from Roundup.

59.     Defendants  knew or should  have  known  that tests limited to Roundup's active ingredient glyphosate were insufficient to prove the safety of Roundup.

60.     Defendants  failed  to  appropriately  and  adequately  test  Roundup,  Roundup's adjuvants and "inert" ingredients, and/or the surfactant POEA to protect Plaintiff from Roundup.

61.     Rather than performing appropriate tests, Defendants relied upon flawed industry-supported studies designed to protect Defendants' economic interests rather than Plaintiff and the consuming public.

62.     Despite their knowledge that Roundup was considerably more dangerous than glyphosate alone, Defendants continued to promote Roundup as safe.

## IARC CLASSIFICATION OF GLYPHOSATE

63.     The International Agency for Research on Cancer ("IARC") is the specialized intergovernmental cancer agency the World Health Organization ("WHO") of the United Nations tasked with conducting and coordinating research into the causes of cancer.

64.     An IARC Advisory Group to Recommend Priorities for IARC Monographs during 2015–2019 met in April 2014.  Though nominations for the review were solicited, a substance must meet two criteria to be eligible for review by the IARC Monographs: there must already be some evidence of carcinogenicity of the substance, and there must be evidence that humans are exposed to the substance.

65.     IARC set glyphosate for review in 2015-2016.  IARC uses five criteria for determining priority in reviewing chemicals.  The substance must have a potential for direct impact on public health scientific literature to support suspicion of carcinogenicity; evidence of significant human exposure; high public interest and/or potential to bring clarity to a controversial area and/or reduce public anxiety or concern; related agents similar to one given high priority by the above considerations.  Data reviewed is sourced preferably from publicly accessible, peer-reviewed data.

66.     On March 24, 2015, after its cumulative review of human, animal, and DNA studies for more than one (1) year, many of which have been in Defendants' possession since as early as 1985, the IARC's working group published its conclusion that the glyphosate contained in Defendants' Roundup herbicide, is a Class 2A "probable carcinogen" as demonstrated by the mechanistic evidence of carcinogenicity in humans and sufficient evidence of carcinogenicity in animals.

67.     The IARC's full Monograph was published on July 29, 2015 and established glyphosate as a class 2A *probable* carcinogen to humans. According to the authors glyphosate demonstrated sufficient mechanistic evidence (genotoxicity and oxidative stress) to warrant a 2A classification based on evidence of carcinogenicity in humans and animals.

68.     The IARC Working Group found an increased risk between exposure to glyphosate and non-Hodgkin's lymphoma ("NHL") and several subtypes of NHL, and the increased risk continued after adjustment for other pesticides.

69.     The IARC also found that glyphosate caused DNA and chromosomal damage in human cells.

**EARLIER EVIDENCE OF GLYPHOSATE'S DANGER**

70.     Despite the new classification by the IARC, Defendants have had ample evidence of glyphosate and Roundup's genotoxic properties for decades.

71.     Genotoxicity refers to chemical agents that are capable of damaging the DNA within a cell through genetic mutations, which is a process that is believed to lead to cancer.

72.     In 1997, Chris Clements published "Genotoxicity of select herbicides in *Rana catesbeiana* tadpoles using the alkaline single-cell gel DNA electrophoresis (comet) assay."

73.     The study found that tadpoles exposed to Roundup showed significant DNA damage when compared with unexposed control animals.

74.     Both human and animal studies have shown that glyphosate and glyphosate-based formulations such as Roundup can induce oxidative stress.

75.     Oxidative stress and associated chronic inflammation are believed to be involved in carcinogenesis.

76.     The IARC Monograph notes that "[s]trong evidence exists that glyphosate, AMPA and glyphosate-based formulations can induce oxidative stress."

77.     In 2006 César Paz-y-Miño published a study examining DNA damage in human subjects exposed to glyphosate.

78.     The study produced evidence of chromosomal damage in blood cells showing significantly greater damage after exposure to glyphosate than before in the same individuals, suggesting that the glyphosate formulation used during aerial spraying had a genotoxic effect on exposed individuals.

79.     The IARC Monograph reflects the volume of evidence of glyphosate pesticides' genotoxicity noting "[t]he evidence for genotoxicity caused by glyphosate-based formulations is strong."

80.     Despite knowledge to the contrary, Defendants maintain that there is no evidence that Roundup is genotoxic, that regulatory authorities and independent experts are in agreement that Roundup is not genotoxic, and that there is no evidence that Roundup is genotoxic.

81.     In addition to glyphosate and Roundup's genotoxic properties, Defendants have long been aware of glyphosate's carcinogenic properties.

82.     Glyphosate and Roundup in particular have long been associated with carcinogenicity and the development of numerous forms of cancer, including, but not limited to, non-Hodgkin's lymphoma, Hodgkin's lymphoma, multiple myeloma, and soft tissue sarcoma.

83.     Defendants have known of this association since the early to mid-1980s and numerous human and animal studies have evidenced the carcinogenicity of glyphosate and/or Roundup.

84.     In 1985 the EPA studied the effects of glyphosate in mice finding a dose related response in male mice linked to renal tubal adenomas, a rare tumor. The study concluded the glyphosate was oncogenic.

85.     In 2003 Lennart Hardell and Mikael Eriksson published the results of two case controlled studies on pesticides as a risk factor for NHL and hairy cell leukemia.

86.     The study concluded that glyphosate had the most significant relationship to NHL among all herbicides studies with an increased odds ratio of 3.11.

87.     In 2003 AJ De Roos published a study examining the pooled data of mid-western farmers, examining pesticides and herbicides as risk factors for NHL.

88.     The study, which controlled for potential confounders, found a relationship between increased NHL incidence and glyphosate.

89.     In 2008 Mikael Eriksson published a study a population based case-control study of exposure to various pesticides as a risk factor for NHL.

90.     This strengthened previous associations between glyphosate and NHL.

91.     In spite of this knowledge, Defendants continued to issue broad and sweeping statements suggesting that Roundup was, and is, safer than ordinary household items such as

table salt, despite a lack of scientific support for the accuracy and validity of these statements and, in fact, voluminous evidence to the contrary.

92.    Upon information and belief, these statements and representations have been made with the intent of inducing Plaintiff, the agricultural community, and the public at large to purchase, and increase the use of, Defendants' Roundup for Defendants' pecuniary gain, and in fact did induce Plaintiff to use Roundup.

93.    Defendants made these statements with complete disregard and reckless indifference to the safety of Plaintiff and the general public.

94.    Notwithstanding Defendants' representations, scientific evidence has established a clear association between glyphosate and genotoxicity, inflammation, and an increased risk of many cancers, including, but not limited to, NHL, Multiple Myeloma, and soft tissue sarcoma.

95.    Defendants knew or should have known that glyphosate is associated with an increased risk of developing cancer, including, but not limited to, NHL, Multiple Myeloma, and soft tissue sarcomas.

96.    Defendants failed to appropriately and adequately inform and warn Plaintiff of the serious and dangerous risks associated with the use of and exposure to glyphosate and/or Roundup, including, but not limited to, the risk of developing NHL, as well as other severe and personal injuries, which are permanent and/or long-lasting in nature, cause significant physical pain and mental anguish, diminished enjoyment of life, and the need for medical treatment, monitoring and/or medications.

97.    Despite the IARC's classification of glyphosate as a class 2A probable carcinogen, Defendants continue to maintain that glyphosate and/or Roundup is safe, non- carcinogenic, non- genotoxic, and falsely warrant to users and the general public that

19

independent experts and regulatory agencies agree that there is no evidence of carcinogenicity or genotoxicity in glyphosate and Roundup.

98.    Defendants have claimed and continue to claim that Roundup is safe, non-carcinogenic, and non-genotoxic.

99.    Monsanto claims on its website that "[r]egulatory authorities and independent experts around the world have reviewed numerous long-term/carcinogenicity and genotoxicity studies and agree that there is no evidence that glyphosate, the active ingredient in Roundup brand herbicides and other glyphosate-based herbicides, causes cancer, even at very high doses, and that it is not genotoxic".[10]

100.   Ironically, the primary source for this statement is a 1986 report by the WHO, the same organization that now considers glyphosate to be a probable carcinogen.

101.   Glyphosate, and Defendants' Roundup products in particular, have long been associated with serious side effects and many regulatory agencies around the globe have banned or are currently banning the use of glyphosate herbicide products.

102.   Defendants' statements proclaiming the safety of Roundup and disregarding its dangers misled Plaintiff.

103.   Despite Defendants' knowledge that Roundup was associated with an elevated risk of developing cancer, Defendants' promotional campaigns focused on Roundup's purported "safety profile."

104.   Defendants' failure to adequately warn Plaintiff resulted in (1) Plaintiff using and being exposed to glyphosate instead of using another acceptable and safe method of

---

[10] Backgrounder - Glyphosate: No Evidence of Carcinogenicity. Updated November 2014. (downloaded October 9 2019)

controlling unwanted weeds and pests; and (2) scientists and physicians failing to warn and instruct consumers about the risk of cancer, including NHL, and other injuries associated with Roundup.

105.    Defendants failed to seek modification of the labeling of Roundup to include relevant information regarding the risks and dangers associated with Roundup exposure.

106.    The failure of Defendants to appropriately warn and inform the EPA has resulted in inadequate warnings in safety information presented directly to users and consumers.

107.    The failure of Defendants to appropriately warn and inform the EPA has resulted in the absence of warning or caution statements that are adequate to protect health and the environment.

108.    The failure of Defendants to appropriately warn and inform the EPA has resulted in the directions for use that are not adequate to protect health and the environment.

109.    By reason of the foregoing acts and omissions, Plaintiff seeks compensatory damages as a result of Plaintiff's use of, and exposure to, Roundup which caused or was a substantial contributing factor in causing Plaintiff to suffer from cancer, specifically NHL, and Plaintiff suffered severe and personal injuries which are permanent and lasting in nature, physical pain and mental anguish, including diminished enjoyment of life.

110.    By reason of the foregoing, Plaintiff is severely and permanently injured.

111.    By reason of the foregoing acts and omissions, Plaintiff has endured and, in some categories continues to suffer, emotional and mental anguish, medical expenses, and other economic and non-economic damages, as a result of the actions and inactions of the Defendants.

112.    Based on early studies that glyphosate could cause cancer in laboratory animals, the EPA originally classified glyphosate as possibly carcinogenic to humans (Group C) in 1985.

113.    After pressure from Monsanto, including contrary studies it provided to the EPA, the EPA changed its classification to evidence of non-carcinogenicity in humans (Group E) in 1991.

114.    In so classifying glyphosate, however, the EPA made clear that the designation did not mean the chemical does not cause cancer:  "It should be emphasized, however, that designation of an agent in Group E is based on the available evidence at the time of evaluation and should not be interpreted as a definitive conclusion that the agent will not be a carcinogen under any circumstances."

115.    On two occasions, the EPA found that the laboratories hired by Monsanto to test the toxicity of its Roundup products for registration purposes committed fraud.

116.    In the first instance, Monsanto, in seeking initial registration of Roundup by EPA, hired Industrial Bio-Test Laboratories ("IBT") to perform and evaluate pesticide toxicology studies relating to Roundup.  IBT performed about 30 tests on glyphosate and glyphosate-containing products, including nine of the 15 residue studies needed to register Roundup.

117.    In 1976, the United States Food and Drug Administration ("FDA") performed an inspection of Industrial Bio-Test Industries ("IBT") that revealed discrepancies between the raw data and the final report relating to the toxicological impacts of glyphosate.  The EPA subsequently audited IBT; it too found the toxicology studies conducted for the Roundup herbicide to be invalid.  An EPA reviewer stated, after finding "routine falsification of data" at IBT, that it was "hard to believe the scientific integrity of the studies when they said they took specimens of the uterus from male rabbits."

118.    Three top executives of IBT were convicted of fraud in 1983.  In the second incident of data falsification, Monsanto hired Craven Laboratories in 1991 to perform pesticide

and herbicide studies, including for Roundup.  In that same year, the owner of Craven

Laboratories and three of its employees were indicted, and later convicted, of fraudulent

laboratory practices in the testing of pesticides and herbicides.

119.    Despite the falsity of the tests that underlie its registration, within a few years of

its launch, Monsanto was marketing Roundup in 115 countries.

120.    Multiple studies have been ghostwritten in part and/or published by Monsanto

through companies such as Intertek and Exponent, Inc. from 2000-present which minimize any

safety concerns about the use of glyphosate; are used to convince regulators to allow the sale of

Roundup and are used to convince customers to use Roundup.  Such studies include but are not

limited to Williams (2000); Williams (2012); Kier & Kirkland (2013); Kier (2015); Bus (2016);

Chang (2016); and the Intertek Expert Panel Manuscripts.

121.    All of these studies have been submitted to and relied upon the public and the

EPA in assessing the safety of glyphosate.  Through these means Monsanto has fraudulently

represented that independent scientists have concluded that Glyphosate is safe.  In fact, these

independent experts have been paid by Monsanto and have failed to disclose the significant role

Monsanto had in creating the manuscripts.

122.    Monsanto has further ghostwritten editorials for scientists such as Robert Tarone

and Henry Miller to advocate for the safety of glyphosate in Newspapers and Magazines.

Monsanto has also ghostwritten letters by supposed independent scientists submitted to

regulatory agencies who are reviewing the safety of glyphosate.

123.    Monsanto has also violated federal regulations in holding secret *ex parte* meetings

and conversations with certain EPA employees to collude in a strategy to re-register glyphosate

and to quash investigations into the carcinogenicity of glyphosate by other federal agencies such

as the Agency for Toxic Substances and Disease Registry. Monsanto's close connection with the EPA arises in part from its offering of lucrative consulting positions to retiring EPA officials.

124.    In March 2015, The Joint Glyphosate Task Force at Monsanto's behest issued a press release sharply criticizing IARC, stating that IARC's conclusion was "baffling" and falsely claiming that IARC did not consider any new or unique research findings when making its decision.  It appears that only by deciding to exclude certain available scientific information and by adopting a different approach to interpreting the studies was this possible.

125.    Beginning in 2011, the Federal Institute for Risk Assessment (BfR) in Germany began preparing a study on the safety of glyphosate.  Through the Glyphosate Task Force, Defendant was able to co-opt this study becoming the sole providers of data and ultimately wrote the report which was rubber-stamped by the BfR.  The Glyphosate Task Force was solely responsible for preparing and submitting summary of studies relied upon by the by the BfR. Defendant has used this report, which it wrote, to falsely proclaim the safety of glyphosate.

126.    In October 2015, the Defendant, as a member of the Joint Glyphosate Task Force, wrote to the state of California to try to stop California from warning the public about the carcinogenicity of glyphosate arguing that the IARC classification is mistaken.  In January of 2016 Monsanto filed a lawsuit to stop California from warning the public about the carcinogenicity of glyphosate.  The Importance of Roundup® to Monsanto's Market Dominance Profits.

127.    The success of Roundup was key to Monsanto's continued reputation and dominance in the marketplace.  Largely due to the success of Roundup sales, Monsanto's agriculture division was out-performing its chemicals division's operating income, and that gap increased yearly.  But with its patent for glyphosate expiring in the United States in the year

2000, Monsanto needed a strategy to maintain its Roundup market dominance and to ward off impending competition.

128.    In response, Monsanto began the development and sale of genetically engineered Roundup Ready seeds in 1996.  Since Roundup Ready crops are resistant to glyphosate; farmers can spray Roundup onto their fields during the growing season without harming the crop.  This allowed Monsanto to expand its market for Roundup even further; by 2000, Monsanto's biotechnology seeds were planted on more than 80 million acres worldwide and nearly 70% of American soybeans were planted from Roundup Ready seeds.  It also secured Monsanto's dominant share of the glyphosate/Roundup market through a marketing strategy that coupled proprietary Roundup Ready seeds with continued sales of its Roundup herbicide.

129.    Through a three-pronged strategy of increased production, decreased prices and by coupling with Roundup Ready seeds, Roundup became Monsanto's most profitable product. In 2000, Roundup accounted for almost $2.8 billion in sales, outselling other herbicides by a margin of five to one, and accounting for close to half of Monsanto's revenue. Today, glyphosate remains one of the world's largest herbicides by sales volume. Monsanto has known for decades that it falsely advertises the safety of Roundup®.

## PLAINTIFF'S EXPOSURE TO ROUNDUP

130.    Plaintiff incorporates by reference paragraphs 1-129 as if set forth in full particularity herein.

131.    Plaintiff Michael V. McClellan used Roundup beginning in 1994 and continued use the product through 2018.

132.    Plaintiff Michael McClellan, while following all safety and precautionary warnings and instructions contained on the Roundup product, used Roundup on a regular basis numerous times a year.

133.    Plaintiff Michael McClellan was subsequently diagnosed with a form of Non-Hodgkin's lymphoma, Chronic Myelogenous Lukemia in 2019.  The development of Plaintiff's lukemia was proximately and actually caused by exposure to Defendant's Roundup products.

134.    As a result of these injuries, Plaintiff has incurred significant economic and noneconomic damages, and has been hospitalized, lost wages, and suffered hedonic damages.

## FIRST CLAIM FOR RELIEF

135.    Plaintiff incorporates by reference paragraphs 1-134 as if set forth in full particularity herein.

136.    Plaintiff contends that Defendant had a duty to exercise reasonable care in the designing, researching, testing, manufacturing, marketing, supplying, promoting, packaging, sale, and/or distribution of Roundup into the stream of commerce, including a duty to assure that the product would not cause users to suffer unreasonable, dangerous side effects.

137.    Plaintiff alleges that Defendant failed to exercise ordinary care in the designing, researching, testing, manufacturing, marketing, supplying, promoting, packaging, sale, testing, quality assurance, quality control, and/or distribution of Roundup into interstate commerce in that Defendant knew or should have known that using Roundup created a high risk of unreasonable, dangerous side effects, including, but not limited to, the development of NHL, as well as other severe and personal injuries which are permanent and lasting in nature, physical pain and mental anguish, including diminished enjoyment of life, as well as need for lifelong medical treatment, monitoring, and/or medications.

138.    Plaintiff asserts that the negligence by the Defendant, its agents, servants, and/or employees, included but was not limited to the following acts and/or omissions: a. Manufacturing, producing, promoting, formulating, creating, and/or designing Roundup without thoroughly testing it; b. Failing to test Roundup and/or failing to adequately, sufficiently, and properly test Roundup; c. Not conducting sufficient testing programs to determine whether or not Roundup was safe for use; in that Defendant herein knew or should have known that Roundup was unsafe and unfit for use by reason of the dangers to its users; d. Not conducting sufficient testing programs and studies to determine Roundup's carcinogenic properties even after Defendant had knowledge that Roundup is, was, or could be carcinogenic; e. Failing to conduct sufficient testing programs to determine the safety of "inert" ingredients and/or adjuvants contained within Roundup, and the propensity of these ingredients to render Roundup toxic, increase the toxicity of Roundup, whether these ingredients are carcinogenic, magnify the carcinogenic properties of Roundup, and whether or not "inert" ingredients and/or adjuvants were safe for use; f. Negligently failing to adequately and correctly warn the Plaintiff, the public, the medical and agricultural professions, and the EPA of the dangers of Roundup; g. Negligently failing to petition the EPA to strengthen the warnings associated with Roundup; h. Failing to provide adequate cautions and warnings to protect the health of users, handlers, applicators, and persons who would reasonably and foreseeably come into contact with Roundup; i. Negligently marketing, advertising, and recommending the use of Roundup without sufficient knowledge as to its dangerous propensities; j. Negligently representing that Roundup was safe for use for its intended purpose, and/or that Roundup was safer than ordinary and common items such as table salt, when, in fact, it was unsafe; k. Negligently representing that Roundup had equivalent safety and efficacy as other forms of herbicides; l. Negligently designing Roundup in a manner, which

was dangerous to its users; m. Negligently manufacturing Roundup in a manner, which was dangerous to its users; n. Negligently producing Roundup in a manner, which was dangerous to its users; o. Negligently formulating Roundup in a manner, which was dangerous to its users; p. Concealing information from the Plaintiff while knowing that Roundup was unsafe, dangerous, and/or non-conforming with EPA regulations; and q. Improperly concealing and/or misrepresenting information from the Plaintiff, scientific and medical professionals, and/or the EPA, concerning the severity of risks and dangers of Roundup compared to other forms of herbicides; and, r. Negligently selling Roundup with a false and misleading label.

139. Plaintiff alleges that Defendant under-reported, underestimated, and downplayed the serious dangers of Roundup.

140. Plaintiff contends that Defendant negligently and deceptively compared the safety risks and/or dangers of Roundup with common everyday foods such as table salt, and other forms of herbicides.

141. Plaintiff asserts that Defendant was negligent and/or violated state law in the designing, researching, supplying, manufacturing, promoting, packaging, distributing, testing, advertising, warning, marketing, and selling of Roundup in that Defendant: a. Failed to use ordinary care in designing and manufacturing Roundup so as to avoid the aforementioned risks to individuals when Roundup was used as an herbicide; b. Failed to accompany its product with proper and/or accurate warnings regarding all possible adverse side effects associated with the use of Roundup; c. Failed to accompany its product with proper warnings regarding all possible adverse side effects concerning the failure and/or malfunction of Roundup; d. Failed to accompany its product with accurate warnings regarding the risks of all possible adverse side effects concerning Roundup; e. Failed to warn Plaintiff of the severity and duration of such

28

adverse effects, as the warnings given did not accurately reflect the symptoms, or severity of the side effects including, but not limited to, the development of NHL; f. Failed to conduct adequate testing, clinical testing and post-marketing surveillance to determine the safety of Roundup; g. Failed to conduct adequate testing, clinical testing, and post-marketing surveillance to determine the safety of Roundup's "inert" ingredients and/or adjuvants; h. Negligently misrepresented the evidence of Roundup's genotoxicity and carcinogenicity; i. Was otherwise careless and/or negligent.

142.    Plaintiff asserts that despite the fact that Defendant knew or should have known that Roundup caused, or could cause, unreasonably dangerous side effects, Defendant continued and continues to market, manufacture, distribute, and/or sell Roundup to consumers, including the Plaintiff.

143.    Plaintiff alleges that Defendant knew or should have known that consumers such as the Plaintiff would foreseeably suffer injury as a result of Defendant's failure to exercise ordinary care, as set forth above.

144.    Plaintiff alleges that as a direct and proximate result of the foregoing acts and omissions, the Plaintiff suffered from serious and dangerous side effects including, but not limited to, NHL, Chronic Myelogenous Lukemia as well as other severe personal injuries which were permanent and lasting in nature, physical pain and mental anguish, diminished enjoyment of life, and financial expenses for hospitalization and medical care.  Further, Plaintiff suffered death after suffering life-threatening NHI,, and severe personal injuries, which are permanent and lasting in nature, physical pain and mental anguish, including diminished enjoyment of life.

**WHEREFORE**, Plaintiff respectfully requests that this Court enter judgment in Plaintiff's favor for compensatory damages, together with interest, costs herein incurred,

attorneys' fees and all relief as this Court deems just and proper.  Additionally, Plaintiff demands

a jury trial on all issues contained herein.

## SECOND CLAIM FOR RELIEF

145.    Plaintiff incorporates by reference paragraphs 1-144 as if set forth in full

particularity herein.

146.    Plaintiff alleges that Monsanto had a duty to exercise reasonable care in the

design, research, manufacture, marketing, testing, advertisement, supply, promotion, packaging,

sale, and distribution of Roundup including the duty to take all reasonable steps necessary to

manufacture and sell a product that was not defective and unreasonably dangerous to consumers

and users of the product.

147.    Plaintiff asserts that Monsanto failed to exercise reasonable care in the design,

formulation, manufacture, sale, testing, quality assurance, quality control, labeling, marketing,

promotions, and distribution of Roundup because Monsanto knew, or should have known, that

exposure to Roundup was linked to Non-Hodgkin's lymphoma, and was therefore not safe for

use by consumers.

148.    Monsanto failed to exercise due care in the labeling of Roundup and failed to

issue to purchasers and users adequate warnings as to the risk of serious bodily injury, including

Non-Hodgkin's lymphoma, resulting from its use.

149.    Plaintiff contends that Monsanto continued to manufacture and market its product

despite the knowledge, whether direct or ascertained with reasonable care, that Roundup posed a

serious risk of bodily harm to consumers, NHL being a potentially deadly cancer.

150.    Plaintiff allege that Monsanto knew, or should have known, that consumers such

as Plaintiff would foreseeably suffer injury as a result of Monsanto's failure to exercise ordinary

care, and, that the characteristic of the product that renders it unreasonably dangerous, the cancer causing glyphosate content, existed at the time the product left the control of Monsanto.

151.    Plaintiff asserts that the defective condition rendered the product unreasonably dangerous to the user or consumer, and the defective and unreasonably dangerous condition of the product proximately caused the damages for which recovery is sought.

152.    Plaintiff alleges that at the time the product left the control of the manufacturer or seller, the manufacturer, or seller, knew or in light of reasonably available knowledge should have known about the danger that caused the damage for which recovery is sought and that the ordinary user or consumer would not realize its dangerous condition.

153.    Plaintiff alleges that as a direct and proximate consequence of Monsanto's negligence, Plaintiff sustained serious personal injuries and related losses including, but not limited to, the following: a. Plaintiff required and will continue to require healthcare and services; b. Plaintiff incurred and will continue to incur medical and related expenses; and c. Plaintiff suffered and will continue to suffer mental anguish, physical pain and suffering, diminished capacity for the enjoyment of life, a diminished quality of life, and other losses and damages, including Punitive Damages.

**WHEREFORE**, Plaintiff demands judgment against Defendant, and requests compensatory damages for past, present, and future pain and suffering, medical costs and expenses, lost wages; prejudgment and post judgment interest as allowed by law, costs of suit and attorneys' fees, as allowed by law, and any and all such other relief as the Court deems just and proper; and further, demands a trial by jury of all issues so triable.

## THIRD CLAIM FOR RELIEF

154.     Plaintiff repeats, reiterates, incorporates, and re-alleges each and every allegation contained in this Complaint with the same force and effect as if fully set forth herein.

155.     Plaintiff alleges that Plaintiff Monsanto designed, researched, developed, manufactured, tested, labeled, advertised, promoted, marketed, sold, supplied, and/or distributed Roundup.

156.     Plaintiff alleges that Roundup was expected to, and did, reach the intended consumers, handlers, and persons coming in contact with the product with no substantial change in the condition in which the product was designed, produced, manufactured, sold, distributed, labeled, and marketed by Monsanto.

157.     Plaintiff asserts that Roundup was manufactured, designed, marketed, labeled and sold in a defective condition, for use by Plaintiff and all other consumers of the product, making the product unreasonably dangerous.

158.     Plaintiff contends that Roundup, as designed, researched, manufactured, tested, advertised, promoted, marketed, sold, and distributed by Monsanto was defective in design and formulation in that when it left the hands of the manufacturers, suppliers, and distributors, the foreseeable risks of harm caused by the product exceeded the claimed benefits of the product.

159.     Plaintiff alleges that Roundup, as designed, researched, manufactured, tested, advertised, promoted, marketed, sold, and distributed by Monsanto was defective in design and formulation because when it left the hands of Monsanto, the product was unreasonably dangerous and was also more dangerous than expected by the ordinary consumer.

160.     Plaintiff asserts that at all times relevant to this action, Monsanto knew and had reason to know that Roundup was inherently defective and unreasonably dangerous as designed,

formulated, and manufactured by Monsanto, and when used and administered in the form manufactured and distributed by Monsanto, and in the manner instructed by Monsanto to be used by Plaintiff and other consumers.

161.    Plaintiff alleges that he used Roundup for the purpose intended by Monsanto, and in a manner normally intended to be used.

162.    Plaintiff asserts that Monsanto had a duty to design, create, and manufacture products that were reasonably safe and not unreasonably dangerous for their normal, common, and intended use.  Further, that Monsanto's product was not reasonably fit, suitable, or safe for its anticipated use, and safer, reasonable alternative designs existed and could have been utilized. Reasonably prudent manufacturers would not have placed the product in the stream of commerce with knowledge of these design flaws.

163.    Plaintiff alleges that Monsanto designed, developed, researched, manufactured, tested, advertised, promoted, marketed, sold, and distributed a defective product that created an unreasonable risk of serious harm to the health, safety, and well-being of Plaintiff and other consumers, and that as a result thereof, Monsanto is therefore liable for Plaintiff's injuries and damages sustained proximately caused by Plaintiff's use of the product, as Monsanto's product unreasonably dangerous, and all damage arose from the reasonably anticipated use of the product by the Plaintiff.

164.    At all times herein mentioned, Roundup was in a defective condition and unsafe, and Defendants knew or had reason to know that said product was defective and unsafe, especially when used in the form and manner as provided by the Defendants.  In particular, Defendants' Roundup was defective in the following ways:

a. When placed in the stream of commerce, Defendants' Roundup Products were defective in design and formulation and, consequently, dangerous to an extent beyond that which an ordinary consumer would anticipate.

b. When placed in the stream of commerce, Defendants' Roundup products were unreasonably dangerous in that they were hazardous and posed a grave risk of cancer and other serious illnesses when used in a reasonably anticipated manner.

c. When placed in the stream of commerce, Defendants' Roundup products contained unreasonably dangerous design defects and were not reasonably safe when used in a reasonably anticipated manner.

d. Defendants did not sufficiently test, investigate, or study its Roundup products.

e. Exposure to Roundup presents a risk of harmful side effects that outweigh any potential utility stemming from the use of the herbicide.

f. Defendants knew or should have known at the time of marketing its Roundup products that exposure to Roundup and could result in cancer and other severe illnesses and injuries.

g. Defendants did not conduct adequate post-marketing surveillance of its Roundup products.

165.     Defendants knew, or should have known that at all times herein mentioned its Roundup was in a defective condition, and was and is inherently dangerous and unsafe.

166.     Plaintiff was exposed to Defendants' Roundup in the course of his personal use without knowledge of Roundup's dangerous characteristics.

167.    At the time of the Plaintiff's use of and exposure to Roundup, Roundup was being used for the purposes and in a manner normally intended, as a broad-spectrum herbicide.

168.    Defendants with this knowledge voluntarily designed its Roundup with a dangerous condition for use by the public, and in particular the Plaintiff.

169.    Defendants had a duty to create a product that was not unreasonably dangerous for its normal, intended use.

170.    Defendants created a product that was and is unreasonably dangerous for its normal, intended use.

171.    Defendants marketed and promoted a product in such a manner so as to make it inherently defective, as the product downplayed its suspected, probable, and established health risks inherent with its normal, intended use.

172.    The Roundup designed, researched, manufactured, tested, advertised, promoted, marketed, sold, and distributed by Defendants was manufactured defectively in that Roundup left the hands of Defendants in a defective condition and was unreasonably dangerous to its intended users.

173.    The Roundup designed, researched, manufactured, tested, advertised, promoted, marketed, sold, and distributed by Defendants reached their intended users in the same defective and unreasonably dangerous condition in which the Defendants' Roundup was manufactured.

174.    Defendants designed, researched, manufactured, tested, advertised, promoted, marketed, sold, and distributed a defective product, which created an unreasonable risk to the health of consumers and to the Plaintiff in particular, and Defendants are therefore strictly liable for the injuries sustained by the Plaintiff.

175.    The Plaintiff could not, by the exercise of reasonable care, have discovered Roundup's defects herein mentioned or perceived its danger.

176.    By reason of the foregoing, the Defendants have become strictly liable to the Plaintiff for the manufacturing, marketing, promoting, distribution, and selling of a defective product, Roundup.

177.    Defendants' defective design, of Roundup amounts to willful, wanton, and/or reckless conduct by Defendants.

178.    Defects in Defendants' Roundup were the cause or a substantial factor in causing Plaintiff's injuries.

179.    As a result of the foregoing acts and omission, the Plaintiff developed Non-Hodgkin's Lymphoma, and suffered severe and personal injuries, which are permanent and lasting in nature, physical pain and mental anguish, including diminished enjoyment of life, and financial expenses for hospitalization and medical care.

180.    Plaintiff contends that he could not, by the exercise of reasonable care, discover the defective condition of Monsanto's product and/or perceive its defective dangers prior to its use.

181.    Plaintiff contends that Roundup was a substantial, proximate, and contributing factor in causing Plaintiff s injuries.

182.    As a proximate result of Monsanto's acts and omissions and Plaintiff's use of Monsanto's defective product, Plaintiff suffered serious physical injuries and incurred substantial medical costs and expenses to treat and care for his injuries described in this Complaint, including, but not limited to, the following: a. Plaintiff required and will continue to require healthcare and services; b. Plaintiff incurred medical and related expenses; and c. Plaintiff

suffered mental anguish, physical pain and suffering, diminished capacity for the enjoyment of life, a diminished quality of life, and death.

WHEREFORE, Plaintiff demands judgment against Defendant, and requests compensatory damages for past, present, and future pain and suffering, medical costs and expenses, lost wages; prejudgment and post judgment interest as allowed by law, costs of litigation, and attorneys' fees, as allowed by law, punitive damages and any and all such other relief as the Court deems just and proper; and further, demands a trial by jury of all issues so triable.

## FOURTH CLAIM FOR RELIEF

183.    Plaintiff incorporates by reference paragraphs 1-182 as if set forth in full particularity herein.

184.    Plaintiff contends that Monsanto designed, researched, developed, manufactured, tested, labeled, advertised, promoted, marketed, sold, supplied, and/or distributed Roundup.

185.    Roundup was expected to, and did, reach the intended consumers, handlers, and persons coming in contact with the product with no substantial change in the condition in which the product was designed, produced, manufactured, sold, distributed, labeled, and marketed by Roundup.

186.    Plaintiff alleges that Roundup was manufactured, designed, marketed, labeled and sold in a defective condition, for use by Plaintiff and all other consumers of the product, making the product unreasonably dangerous.

187.    Monsanto researched, developed, designed, tested, manufactured, inspected, labeled, distributed, marketed, promoted, sold, and otherwise released into the stream of commerce Roundup and in the course of same, directly advertised or marketed the product to

consumers or persons responsible for consumers, and therefore had a duty to warn of the risks associated with the use of its product.

188.     Plaintiff alleges that Roundup, as designed, researched, developed, manufactured, tested, advertised, promoted, marketed, sold, labeled, and distributed by Monsanto, was defective due to the product's inadequate warnings and instructions.

189.     Plaintiff contends that Monsanto knew, or should have known, and adequately warned that its product created a risk of serious and dangerous side effects, including but not limited to, Non-Hodgkin's lymphoma and Chronic Myelogenous Lukemia.

190.     Plaintiff alleges that the product was under the exclusive control of Monsanto and was unaccompanied by appropriate and adequate warnings regarding the risk of severe and permanent injuries associated with its use, including, but not limited to, the risk of developing Non-Hodgkin's lymphoma.

191.     Plaintiff asserts that the warnings given did not accurately reflect the risk, incidence, symptoms, scope or severity of such injuries to the consumer.

192.     Plaintiff alleges that notwithstanding Monsanto's knowledge of the defective condition of its product, Monsanto failed to adequately warn the medical community and consumers of the product, including Plaintiff and his healthcare providers, of the dangers and risk of harm associated with the use of Roundup.

193.     Plaintiff alleges that Monsanto downplayed the serious and dangerous side effects of its product to encourage sales of the product, particularly without the use of protective equipment; consequently, Monsanto placed its profits above its customers' safety.

194.     Plaintiff asserts that the product was defective when it left the possession of Monsanto in that it contained insufficient warnings to alert Plaintiff to the dangerous risks

associated with it, including the risk of Non-Hodgkin's lymphoma and Chronic Myelogenous Lukemia.

195.    Plaintiff asserts that even though Monsanto knew or should have known of the risks and reactions associated with their product, it still failed to provide warnings that accurately reflected the signs, symptoms, incident, scope, or severity of the risks associated with the product.

196.    Plaintiff alleges that he used Roundup as intended, or in a reasonably foreseeable manner, in compliance with all recommendations, instructions and precautions.

197.    Plaintiff asserts that Monsanto, as a manufacturer of agricultural products, is held to the level of knowledge of an expert in the field and, further, Monsanto had knowledge of the dangerous risks and side effects of its product.

198.    Plaintiff did not have the same knowledge as Monsanto and no adequate warning was communicated to Plaintiff or any other consumers.

199.    Plaintiff asserts that Monsanto had a continuing duty to warn consumers, including Plaintiff, of the dangers associated with its product, and by negligently and/or wantonly failing to adequately warn of the dangers of the use of its product, Monsanto breached its duty.

200.    Plaintiff contends that although Monsanto knew, or should have known, of the defective nature of Roundup it continued and continues to design, manufacture, market, and sell its product without providing adequate warnings and instructions concerning the use of its product so as to maximize sales and profits at the expense of the public health and safety, in knowing, conscious, and deliberate disregard of the foreseeable harm caused by Roundup.

201.    Plaintiff alleges as a direct and proximate result of Monsanto's failure to adequately warn or other acts and omissions of Monsanto described herein, Plaintiff suffered severe and permanent injuries, pain, and mental anguish, including diminished enjoyment of life.

202.    Plaintiff asserts that Monsanto's failure to warn extended beyond the product's label and into other media available to Monsanto, including but not limited to advertisements, person-to-person sales calls, medical journal articles, and medical conference presentations.

203.    Plaintiff asserts that Roundup, upon information and belief, as manufactured by Monsanto, was further defective due to inadequate post-market warnings or instructions because after Monsanto knew, or should have known, of the risk of serious bodily harm from the use of Roundup, Monsanto failed to provide adequate warnings to consumers about the product, knowing the product could cause serious injury.

204.    Plaintiff alleges that Roundup, upon information and belief, as manufactured and supplied by Monsanto, was unreasonably dangerous because an adequate warning about the product was not been provided if, as at the time the product left Monsanto's control, the product possessed the aforementioned characteristics that may cause damage users such as Plaintiff, and Monsanto failed to use reasonable care to provide an adequate warning of such characteristic and its danger to users and handlers of the product.

205.    Plaintiff alleges that after Monsanto had started shipping product that had left its control, Monsanto acquired knowledge of characteristics of the product that might cause damage and the danger of such characteristic, and is liable for damage caused by a subsequent failure to use reasonable care to provide an adequate warning of such characteristic and its danger to users and handlers of the product since that knowledge of the characteristics and its danger to users was acquired.

206.    Plaintiff contends that a reasonably prudent manufacturer would have warned of these characteristics and its danger to users, and Monsanto's failure to do so renders it liable for all damages caused by its subsequent failure to use reasonable care to provide adequate warning of the danger to Plaintiff and other users of the product.

207.    Plaintiff asserts that an adequate product warning or instruction is one that a reasonably prudent person in the same or similar circumstances would have provided with respect to the danger and that communicates sufficient information on the dangers and safe use of the product, taking into account the characteristics of, and the ordinary knowledge common to an ordinary consumer who purchases the product.

208.    Plaintiff alleges that as a proximate result of Monsanto's acts and omissions and Plaintiff's use of Roundup, Monsanto's defective product, Plaintiff suffered serious physical injuries and incurred substantial medical costs and expenses as set forth in this Complaint, including, but not limited to, the following: a. Plaintiff required and will continue to require healthcare and services; b. Plaintiff incurred and will continue to incur medical and related expenses; and c. Plaintiff suffered and will continue to suffer mental anguish, physical pain and suffering, diminished capacity for the enjoyment of life, a diminished quality of life, and other losses and damages.

**WHEREFORE**, Plaintiff demands judgment against the Defendant, and requests compensatory damages for past, present, and future pain and suffering, medical costs and expenses, lost wages; prejudgment and post judgment interest as allowed by law, costs of suit and attorneys' fees, as allowed by law, punitive damages and any and all such other relief as the Court deems just and proper; and further, demands a trial by jury of all issues so triable.

## FIFTH CLAIM FOR RELIEF

209.    Plaintiff incorporates by reference paragraphs 1-208 as if set forth in full particularity herein.

210.    Monsanto, through its officers, directors, agents, representatives, written literature and packaging, and written and media advertisements, expressly warranted that Roundup was safe and effective for use by consumers, was of merchantable quality, did not create the risk of or produce dangerous side effects, including, but not limited to, Non-Hodgkin's lymphoma and Chronic Myelogenous Lukemia ("Roundup is a safe as table salt") and was adequately tested and fit for its intended use.

211.    Specifically, Monsanto made the representations as set forth above, as well as many others, via advertising, product labels, and information given to the public.

212.    At the time of making such express warranties, Monsanto knew and/or should have known that Roundup did not conform to the express warranties and representations and that, in fact, its product was not safe and had numerous serious side effects, including the possibility of Non-Hodgkin's lymphoma and Chronic Myelogenous Lukemia, of which Monsanto had full knowledge and did not accurately or adequately warn.

213.    Plaintiff alleges that Roundup, as manufactured and sold by Monsanto, did not conform to these representations because it caused serious injury, including Non-Hodgkin's lymphoma and Chronic Myelogenous Lukemia, to consumers such as Plaintiff, when used as directed by the product label.

214.    Plaintiff asserts that Monsanto breached its express warranties because its product was and is defective for its intended purpose.

215.    Plaintiff alleges that he did rely on Monsanto's express warranties regarding the safety and efficacy of their product in purchasing and using the product, and induced Plaintiff to use the product, and Plaintiff's damages were proximately caused by the untruthfulness of the express warranty.

216.    Plaintiff alleges that as a foreseeable, direct, and proximate result of the breach of the express warranties, Plaintiff suffered severe and permanent personal injuries, harm, and economic loss.

**WHEREFORE**, Plaintiff respectfully request that this Court enter judgment in Plaintiff's favor for compensatory damages, together with interest, costs herein incurred, attorneys' fees and all relief as this Court deems just and proper.  Additionally, Plaintiff demands a jury trial on all issues contained herein.

## SIXTH CLAIM FOR RELIEF

217.    Plaintiff incorporates by reference each and every allegation set forth in the preceding paragraphs as if fully stated herein.

218.    Plaintiff assets that Defendant fraudulently, intentionally, and/or negligently misrepresented to the public, and to the Plaintiff, both directly and by and through the media, the scientific literature and purported "community outreach" programs, the safety of Roundup products, and/or fraudulently, intentionally, and/or negligently concealed, suppressed, or omitted material, adverse information regarding the safety of Roundup.

219.    Plaintiff contends the intentional and/or negligent misrepresentations and omissions of Defendant regarding the safety of Roundup products was communicated to Plaintiff directly through ghostwritten articles, editorials, national and regional advertising, marketing and promotion efforts, as well as the packaging and sales aids.  The safety of Roundup products was

also intentionally and/or negligently misrepresented to Plaintiff and the public with the intent that

such misrepresentations would cause Plaintiff and other potential consumers to purchase and use

or continue to purchase and use Roundup products.

220.     Plaintiff asserts that Defendant either knew or should have known of the material

representations it was making regarding the safety and relative utility of Roundup products.

221.     Plaintiff alleges Defendant fraudulently, intentionally, and/or negligently made

the misrepresentations and/or actively concealed, suppressed, or omitted this material

information with the specific desire to induce Plaintiff, and the consuming public to purchase and

use Roundup products.

222.     Plaintiff asserts that Defendant fraudulently, intentionally, and/or negligently,

knew or should have known that Plaintiff and the consuming public would rely on such material

misrepresentations and/or omissions in selecting and applying Roundup products.

223.     Plaintiff alleges that Defendant knew or should have known that Plaintiff would

rely on their false representations and omissions.

224.     Plaintiff asserts that Defendant made these misrepresentations and actively

concealed adverse information including the risk of Non-Hodgkin's lymphoma and Chronic

Myelogenous Lukemia, at a time when, their agents and/or employees knew or should have

known, the product had defects, dangers, and characteristics that were other than what was

represented to the consuming public.

225.     Despite the fact that Defendant knew or should have known of reports of severe

risks including Non-Hodgkin's lymphoma and Chronic Myelogenous Lukemia, with Roundup

use and exposure, this information was strategically minimized, understated, or omitted in order

to create the impression that the human dangers of Roundup were nonexistent, particularly in light of its purported utility.

226.    Plaintiff asserts that the fraudulent, intentional and/or negligent material misrepresentations and/or active concealment, suppression, and omissions by Defendant were perpetuated directly and/or indirectly through the advertisements, packaging, sales aids, furtive public relations efforts, and other marketing and promotional pieces authored, analyzed, created, compiled, designed, drafted, disseminated, distributed, edited, evaluated, marketed, published, and supplied.

227.    Plaintiff alleges that had he known the true facts concerning the risks associated with Roundup exposure, Plaintiff would have used a safer alternative.

228.    Plaintiff's reliance upon the material misrepresentations and omissions was justified, among other reasons, because said misrepresentations and omissions were made by individuals and entities who were in a position to know the true facts concerning Roundup while Plaintiff was not in a position to know the true facts because Defendant overstated the benefits and safety of Roundup and downplayed the risk of lymphoma, thereby inducing Plaintiff to use the herbicide rather than safer alternatives.

229.    Plaintiff asserts that as a direct and proximate result of Defendant's actions and inactions, Plaintiff was exposed to Roundup and suffered and will continue to suffer injuries and damages, as set forth herein.

**WHEREFORE**, Plaintiff respectfully request that this Court enter judgment in Plaintiff's favor for compensatory damages, together with interest, costs herein incurred, attorneys' fees and all relief as this Court deems just and proper.  Additionally, Plaintiff demands a jury trial on all issues contained herein.

## SEVENTH CLAIM FOR RELIEF

230.     Plaintiff incorporates by reference each and every allegation set forth in the preceding paragraphs as if fully stated herein.

231.     Plaintiff alleges that Defendant fraudulently, intentionally, negligently, and/or innocently misrepresented to the public, and to the Plaintiff, both directly and by and through the media and purported "community outreach" programs, the safety of Roundup products, and/or fraudulently, intentionally, negligently and/or innocently concealed, suppressed, or omitted material, adverse information regarding the safety of Roundup. This deception caused injury to Plaintiff in violation of Utah's Unfair Practices Act (Utah Code Annotated 13-5-1, *et seq*.).

232.     The intentional, negligent, and/or innocent misrepresentations and omissions of Defendant regarding the safety of Roundup products were communicated to Plaintiff directly through national and regional advertising, marketing and promotion efforts, as well as the packaging and sales aids.  The safety of Roundup products was also intentionally, negligently, and/or innocently misrepresented to Plaintiff and the public with the intent that such misrepresentations would cause Plaintiff and other potential consumers to purchase and use or continue to purchase and use Roundup products.

233.     Plaintiff asserts that Defendant either knew or should have known of the material representations it was making regarding the safety and relative utility of Roundup products.

234.     Plaintiff alleges that Defendant fraudulently, intentionally, negligently, and/or innocently made the misrepresentations and/or actively concealed, suppressed, or omitted this material information with the specific desire to induce Plaintiff, and the consuming public to purchase and use Roundup products.

235.    Plaintiff contends that Defendants fraudulently, intentionally, negligently, and/or innocently, knew or should have known that Plaintiff and the consuming public would rely on such material misrepresentations and/or omissions in selecting and applying Roundup products. Furthermore, Defendant knew or should have known that Plaintiff would rely on their false representations and omissions.

236.    Plaintiff alleges that Defendant made these misrepresentations and actively concealed adverse information including the risk of Non-Hodgkin's lymphoma and Chronic Myelogenous Lukemia, at a time when, their agents and/or employees knew or should have known, the product had defects, dangers, and characteristics that were other than what was represented to the consuming public. Specifically, Defendant misrepresented and actively concealed, suppressed, and omitted that there had been inadequate testing of the safety and efficacy of Roundup, and that prior studies, research, reports, and/or testing had been conducted linking the use of the drug with serious health events, including Non-Hodgkin's lymphoma and Chronic Myelogenous Lukemia.

237.    Despite the fact that Defendant knew or should have known of reports of severe risks including Non-Hodgkin's lymphoma and Chronic Myelogenous Lukemia, with Roundup use and exposure, this information was strategically minimized, understated, or omitted in order to create the impression that the human dangers of Roundup were nonexistent, particularly in light of its purported utility.

238.    Plaintiff asserts that the fraudulent, intentional, negligent and/or innocent material misrepresentations and/or active concealment, suppression, and omissions by Defendant were perpetuated directly and/or indirectly through the advertisements, packaging, sales aids, furtive public relations efforts, and other marketing and promotional pieces authored, analyzed, created,

compiled, designed, drafted, disseminated, distributed, edited, evaluated, marketed, published, and supplied by Defendant.

239.    Plaintiff alleges that had he known the true facts concerning the risks associated with Roundup exposure, Plaintiff would have used a safer alternative.

240.    Plaintiff's reliance upon the material misrepresentations and omissions was justified, among other reasons, because said misrepresentations and omissions were made by individuals and entities who were in a position to know the true facts concerning Roundup while Plaintiff was not in a position to know the true facts because Defendant overstated the benefits and safety of Roundup and downplayed the risk of lymphoma, thereby inducing Plaintiff to use the herbicide rather than safer alternatives.

241.    Plaintiff alleges that Federal law and the EPA do not authorize and specifically prohibit the deceptions, misrepresentations and omissions made by Defendant.

242.    Plaintiff asserts that as a direct and proximate result of Defendant's actions and inactions, Plaintiff was exposed to Roundup and suffered and will continue to suffer injuries and damages, as set forth herein.

**WHEREFORE**, Plaintiff respectfully requests that this Court enter judgment in Plaintiff's favor for compensatory damages, together with interest, costs herein incurred, attorneys' fees and all relief as this Court deems just and proper.  Additionally, Plaintiff demands a jury trial on all issues contained herein.


## EIGHTH CLAIM FOR RELIEF

243.    Plaintiff incorporates by reference each and every allegation set forth in the preceding paragraphs as if fully stated herein

244.    Plaintiff asserts that Defendants actions, and failure to notify Plaintiff when Defendants knew of the danger, constituted wanton, will misconduct and intention tort, for which exemplary/punitive damages are warranted.

245.    Plaintiff alleges that Defendants made billions of dollars on the sale of it defective product and that punitive damages should be awarded, as Monsanto's actions, as described in the preceding paragraphs, will be substantiated in the trial of this matter, and Plaintiff will prove by clear and convincing evidence that the defendant Monsanto acted with actual malice, gross negligence which evidences a willful, wanton or reckless disregard for the safety of others, and includes the commission of actual fraud.

**WHEREFORE**, Plaintiff respectfully requests that this Court enter judgment in Plaintiff's favor for compensatory damages, together with interest, costs herein incurred, attorneys' fees and punitive damages of One Billion dollars, along with all relief as this Court deems just and proper.

## PRAYER FOR RELIEF

 **WHEREFORE**, Plaintiff demands judgment against the Defendant on each of the above referenced claims and causes of action and as follows:

1. Awarding compensatory damages in excess of the jurisdictional amount, including, but not limited to pain, suffering, emotional distress, loss of enjoyment of life, and other noneconomic damages in an amount to be determined at trial of this action;

2. Awarding compensatory damages to Plaintiff for past and future damages, including, but not limited to, Plaintiff's pain and suffering and for severe and permanent personal injuries sustained by Plaintiff including health care costs and economic loss;

3. Awarding economic damages in the form of medical expenses, out of pocket expenses, lost earnings and other economic damages in an amount to be determine at trial of this action;

4. Pre judgment interest;

5. Post judgment interest;

6. Awarding Plaintiff's reasonable attorneys' fees;

7. Awarding Plaintiff the costs of these proceedings; and Punitive Damages for the willful, wanton and reckless disregard for the safety of others and for fraud;

9. Such other and further relief as this Court deems just and proper.

## DEMAND FOR JURY TRIAL

Plaintiff hereby demands trial by jury as to all issues.

DATED January 6, 2022.

Christensen Young & Associates, PLLC

___/s/ Steven A. Christensen___.
Steven A. Christensen
Cameron S. Christensen
Christensen Young & Associates, PLLC
9980 So. 300 West, #200
Sandy, Utah, 84070
(801) 676-6447
steven@christensenyounglaw.com
cameron@christensenyounglaw.com
Facsimile: (888) 569-2786
Attorneys for Plaintiff

**CERTIFICATE OF SERVICE**

I, Steven A. Christensen, hereby certify that on January 6, 2022, the foregoing document was filed via the Court's CM/ECF system, which will automatically serve and send email notification of such filing to all registered attorneys of record.

*/s/Steven A. Christensen*

**CERTIFICATE OF CONFERENCE**

This is to certify that counsel for Plaintiff conferred with counsel for Defendants regarding all matters set forth in this Motion on January 6, 2022 and that counsel for Defendants are unopposed to the relief of such filing to all registered attorneys of record.

*/s/Steven A. Christensen*