GILLIAN L. WADE (State Bar No. 229124)
SARA D. AVILA (State Bar No. 263213)
MARC A. CASTANEDA (State Bar No. 299001)
Milstein, Jackson Fairchild & Wade, LLP
gwade@mjfwlaw.com
mcastaneda@mjfwlaw.com
10990 Wilshire Blvd., 8th Floor
Los Angeles, CA 90024
Tel: (310) 396-9600
Fax: (310) 396-9635

JOEL OSTER
Law Offices of Howard Rubinstein
joel@osterlaw.com
22052 W. 66th St. #192
Shawnee, Kansas 66226

*Attorneys for Plaintiffs and the Proposed Settlement Class*

# UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| SCOTT GILMORE, et al., | MDL No. 2741 |
| Plaintiffs, | Case No. 3:21-cv-08159 |
| vs. | **NOTICE OF MOTION AND MOTION FOR PRELIMINARY APPROVAL OF CLASS ACTION SETTLEMENT AND CERTIFICATION OF CLASS FOR PURPOSES OF SETTLEMENT** |
| MONSANTO COMPANY, | |
| Defendant. | Date:   April 14, 2022<br>Time:   10:00 a.m.<br>Place:   Via Zoom Webinar<br>Judge:  Hon. Vince G. Chhabria |

## NOTICE OF MOTION AND MOTION

**PLEASE TAKE NOTICE THAT** on April 14, 2022, at 10:00 a.m., via Zoom Webinar ID: 161 285 7657, Password: 547298, Plaintiffs Scott Gilmore, James Weeks, Paul Taylor, Sherry Hanna, Amanda Boyette, Julio Ezcurra, Anthony Jewell, and Kristy Williams ("Plaintiffs") jointly move this Court for an order preliminarily approving a proposed class action settlement and provisionally certifying the Settlement Class. The Motion will be based on this Notice and Motion, the Memorandum of Points and Authorities below, declarations and evidence filed concurrently herewith, and the [Proposed] Order submitted herewith.

Dated: January 20, 2022

By:     /s/ Gillian L. Wade

GILLIAN L. WADE
MARC A. CASTANEDA
Milstein, Jackson Fairchild & Wade, LLP
gwade@mjfwlaw.com
mcastaneda@mjfwlaw.com
10990 Wilshire Blvd., 8th Floor
Los Angeles, CA 90024

*Counsel for Plaintiffs*

## TABLE OF CONTENTS

TABLE OF AUTHORITIES ................................................................................................ ii

INTRODUCTION ............................................................................................................... 1

FACTS ................................................................................................................................. 2

    I.     BACKGROUND AND PROCEDURAL HISTORY ................................................ 2

         A.    Allegations in the Actions ........................................................................ 2

         B.    The *Ezcurra* Action ................................................................................ 2

         C.    The Other Related Actions ....................................................................... 4

         D.    This Action ............................................................................................... 4

         E.    Mediation and Settlement Negotiations .................................................. 5

         F.    The *Tomlinson* Action ............................................................................ 6

    II.    THE KEY TERMS OF THE SETTLEMENT ....................................................... 7

         A.    The Settlement Class ................................................................................ 7

         B.    Relief to Class Members: Up to $45 Million Cash Consideration ......... 8

         C.    Class Notice and Administration Costs .................................................... 8

         D.    Payment of Class Members' Claims ...................................................... 10

         E.    The Release ............................................................................................. 11

         F.    Procedures for Opting Out or Objecting ................................................ 11

         G.    Service Awards and Attorneys' Fees and Cost ...................................... 12

    III.    PROPOSED OBJECTIONS AND AMENDMENTS TO SETTLEMENT ............. 12

LEGAL STANDARDS ..................................................................................................... 12

ARGUMENT ..................................................................................................................... 13

I.    THE PROPOSED NATIONWIDE SETTLEMENT SATISFIES THE REQUIREMENTS
    OF RULE 23(A) ........................................................................................................ 13

A.   The Numerosity Requirement of Rule 23(a)(1) Is Satisfied ...........................................13

B.   The Commonality Requirement of Rule 23(a)(2) Is Satisfied .....................................13

C.   The Typicality Requirement of Rule 23(a)(3) Is Satisfied...........................................14

D.   The Adequacy Requirement of Rule 23(a)(4) Is Satisfied...........................................14

II.   THE PROPOSED NATIONWIDE SETTLEMENT SATISFIES THE REQUIREMENTS OF RULE 23(B)................................................................................................................15

A.   Common Questions of Law and Fact Predominate ....................................................15

B.   Settlement Is the Superior Method for Resolving This Controversy ..........................16

III.   THE SETTLEMENT SHOULD BE PRELIMINARILY APPROVED ............................17

A.   The Proposed Settlement is Fair, Reasonable, and Adequate.......................................18

1.   The Settlement is fair considering the strength of Plaintiffs' case and risks of continued litigation..................................................................19

a.   Plaintiffs acknowledge that they face risks on the merits .............................19

b.   The parties dispute the measure and amount of damages............................23

c.   Plaintiffs recognize that certification of a litigation class is uncertain ..........25

d.   Continued litigation would be time-consuming and expensive....................26

2.   The amount of the Settlement weighs in favor of approval................................27

3.   The extent of discovery and stage of proceedings weigh in favor of approval ....31

4.   The experience and views of counsel weigh in favor of settlement ...................32

5.   The lack of a governmental participant at this stage is neutral............................32

6.   The reaction of the class members to the proposed settlement is neutral at this stage and should be evaluated at final approval...............................................33

B.   The Settlement Is Not Collusive ................................................................................33

1.   The Settlement lacks indicia of collusion ...........................................................33

2.   Other circumstances show a lack of collusion.....................................................36

     3.    Accusations of "reverse auction" are baseless .........................................................37

IV.   THE SETTLEMENT MERITS PRELIMINARY APPROVAL UNDER THIS DISTRICT'S GUIDANCE ...............................................................................................38

V.   THE NOTICES AND NOTICE PLAN SHOULD BE APPROVED...................................43

CONCLUSION..............................................................................................................................44

## <u>TABLE OF AUTHORITIES</u>

**Cases**                                                                                                  ***Page***

*Akaosugi v. Benihana Nat. Corp.* (N.D. Cal. Jan. 24, 2013)
   2013 WL 269083 ............................................................................................22

*Amchem Prod., Inc. v. Windsor* (1997)
   521 U.S. 591 ..................................................................................................15

*Astiana v. Kashi Co.* (S.D. Cal. 2013)
   291 F.R.D. 493...............................................................................................14

*Bayol et al. v. Health-Ade LLC* (N.D. Cal.)
   No. 3:18-cv-01462 ..........................................................................................40

*Bezdek v. Vibram USA, Inc.* (1st Cir. 2015)
   809 F.3d 78 ....................................................................................................28

*Boeing Co. v. Van Gemert* (1980)
   444 U.S. 472 ..................................................................................................34

*Broomfield v. Craft Brew All., Inc.* (N.D. Cal. Feb. 5, 2020)
   2020 WL 1972505 ..........................................................................................28

*Byrne v. Santa Barbara Hosp. Servs., Inc.* (C.D. Cal. Oct. 30, 2017)
   2017 WL 5035366 ..........................................................................................32

*Burgos v. Sunvalleytek Int'l, Inc.* (N.D. Cal. Dec. 11, 2020)
   2020 WL 7319354 ..........................................................................................19

*Campbell v. Facebook, Inc.* (9th Cir. 2020)
   951 F.3d 1106.........................................................................................18, 27

*Carson v. Monsanto Co.* (S.D. Ga. 2020)
   508 F. Supp. 3d 1369 ......................................................................................22

*Churchill Vill., L.L.C. v. Gen. Elec.* (9th Cir. 2004)
   361 F.3d 566 ..................................................................................................44

*Clark v. Monsanto Co.* (Cal. Super. Ct., Los Angeles Cnty., Oct. 5, 2021)
   No. 20STCV46616 ..........................................................................................20

*Collins v. Cargill Meat Sols. Corp.* (E.D. Cal. 2011)
   274 F.R.D. 294.........................................................................................13, 14

*Cotter v. Lyft, Inc.* (N.D. Cal. 2016)
    193 F. Supp. 3d 1030 ...................................................................................17

*Craft v. Cty. of San Bernardino* (C.D. Cal. 2008)
    624 F. Supp. 2d 1113 ...................................................................................34

*Cunha v. Chico Produce, Inc.* (N.D. Cal. Feb. 16, 2021)
    2021 WL 3410327 .........................................................................................18

*Eddings v. DS Servs. of Am., Inc.* (N.D. Cal. May 20, 2016)
    2016 WL 3390477 .........................................................................................30

*Ezcurra v. Monsanto Co.* (S.D. Fla. Aug. 7, 2020)
    2020 WL 5491428 ..............................................................2, 3, 20, 21, 31, 37

*Ezcurra v. Monsanto Co.* (11th Cir. Sept. 3, 2021)
    No. 20-13341-X ...............................................................................................3

*Ferrell v. Buckingham Prop. Mgmt.* (E.D. Cal. Jan. 21, 2020)
    2020 WL 291042 ...........................................................................................28

*Fulcher v. Olan Mills, Inc.* (N.D. Cal. Dec. 28, 2011)
    2011 WL 13243724 .......................................................................................33

*Gallucci v. Gonzalez* (9th Cir. 2015)
    604 F. App'x 533 ...........................................................................................37

*Garibay v. Archstone Cmtys. LLC* (9th Cir. 2013)
    539 F. App'x 763 ...........................................................................................34

*Hanlon v. Chrysler Corp.* (9th Cir. 1998)
    150 F.3d 1011 ..........................................................................................15, 17

*Hanna v. Walmart Inc.* (C.D. Cal. Nov. 4, 2020)
    2020 WL 7345680 ...............................................................................6, 20, 22

*Hardeman v. Monsanto Co.* (9th Cir. 2021)
    997 F.3d 941 ..................................................................................................22

*Harnish v. Widener Univ. Sch. of L.* (3d Cir. 2016)
    833 F.3d 298 ..................................................................................................23

*Hesse v. Sprint Corp.* (9th Cir. 2010)
    598 F.3d 581 ..................................................................................................28

*In re Apple Inc. Device Performance Litig.* (N.D. Cal. Mar. 17, 2021)
2021 WL 1022867 ...................................................................................27, 29

*In re Baby Prod. Antitrust Litig.* (3d Cir. 2013)
708 F.3d 163 ..................................................................................................34

*In re Bluetooth Headset Prods. Liab. Litig.* (9th Cir. 2011)
654 F.3d 935 ..................................................................................................33

*In re Budeprion XL Mktg. & Sales Litig.* (E.D. Pa. July 2, 2012)
2012 WL 2527021 .........................................................................................36

*In re Citric Acid Antitrust Litig.* (N.D. Cal. 2001)
145 F. Supp. 2d 1152 ....................................................................................39

*In re Comcast Corp. Set-Top Cable Television Box Antitrust Litig.* (E.D. Pa. 2019)
333 F.R.D. 364 ..............................................................................................34

*In re Google Inc. Street View Elec. Commc'ns Litig.* (9th Cir. Dec. 27, 2021)
2021 WL 6111383 .........................................................................................41

*In re Hyundai* (9th Cir. 2019)
926 F.3d 539 ..................................................................................................16

*In re Johnson & Johnson Talcum Powder Prod. Mktg., Sales Pracs. & Liab. Litig.* (3d Cir. 2018)
903 F.3d 278 ....................................................................................................5

*In re Lumber Liquidators Mktg. Sales Pracs. Litig.* (E.D. Va. Oct. 9, 2018)
2018 WL 11203065 .......................................................................................28

*In re Mego Fin. Corp. Sec. Litig.* (9th Cir. 2000)
213 F.3d 454 ............................................................................................14, 31

*In re Omnivision Techs., Inc.* (N.D. Cal. 2008)
559 F.Supp.2d 1036 ......................................................................................28

*In re Online DVD-Rental Antitrust Litig.* (9th Cir. 2015)
779 F.3d 934 ..................................................................................................30

*In re Pac. Enters. Sec. Litig.* (9th Cir.1995)
47 F.3d 373 ....................................................................................................32

*In re Polyurethane Foam Antitrust Litig.* (N.D. Ohio 2016)
168 F. Supp. 3d 985 ......................................................................................28

*In re POM Wonderful LLC* (C.D. Cal. Mar. 25, 2014)
 2014 WL 1225184 ..................................................................................................24

*In re Pool Prods. Distrib. Mkt. Antitrust Litig.* (E.D. La. July 27, 2015)
 2015 WL 4528880 ..................................................................................................28

*In re Tableware Antitrust Litig.* (N.D. Cal. 2007)
 484 F. Supp. 2d 1078 ...........................................................................................17

*In re Toys R Us–Delaware, Inc. – Fair and Accurate Credit Transaction Act (FACTA) Litig.*
(C.D. Cal. 2014)
 295 F.R.D. 438.......................................................................................................29

*In re TracFone Unlimited Serv. Plan Litig.* (N.D. Cal. 2015)
 112 F. Supp. 3d 993 ...............................................................................19, 26, 30

*In re Uber FCRA Litig.* (N.D. Cal. June 29, 2017)
 2017 WL 2806698 ..................................................................................................30

*In re Volkswagen & Audi Warranty Extension Litig.* (D. Mass. 2011)
 273 F.R.D. 349.......................................................................................................17

*In re Volkswagen "Clean Diesel" Mktg., Sales Pracs., & Prod. Liab. Litig.* (N.D. Cal. Oct. 25, 2016)
 2016 WL 6248426 ...........................................................................................31, 32

*Jabbari v. Farmer* (9th Cir. 2020)
 965 F.3d 1001 .............................................................................................15, 16, 35

*Jones v. Monsanto Co.* (W.D. Mo. May 13, 2021)
 2021 WL 2426126 ..............................................................................9, 30, 38, 40, 41

*Kerr v. Vatterott Educ. Ctrs. Inc.* (Mo. Ct. App. 2014)
 439 S.W.3d 802......................................................................................................24

*Kim v. Allison* (9th Cir. 2021)
 8 F.4th 1170 ...........................................................................................................18

*Lane v. Facebook, Inc.* (9th Cir. 2012)
 696 F.3d 811 .....................................................................................................25, 30

*Lerwill v. Inflight Motion Pictures, Inc.* (9th Cir. 1978)
 582 F.2d 507 ...........................................................................................................17

*Lilly v. Jamba Juice Co.* (N.D. Cal. May 4, 2015)
 2015 WL 2062858 ..................................................................................................19

*Mazza v. Am. Honda Motor Co.* (9th Cir. 2012)
    666 F.3d 581 ................................................................................................25

*McDonough v. Toys R Us, Inc.* (E.D. Pa. 2015)
    80 F. Supp. 3d 626 ......................................................................................28

*Miguel-Sanchez v. Mesa Packing, LLC* (N.D. Cal. May 3, 2021)
    2021 WL 1736807 ..............................................................17, 33, 35, 43

*Miller v. Ghirardelli Chocolate Co.* (N.D. Cal. Feb. 20, 2015)
    2015 WL 758094 .........................................................................................40

*Mirzaie v. Monsanto Co.* (C.D. Cal. Jan. 12, 2016)
    2016 WL 146421 .........................................................................................22

*Moore v. Verizon Comms. Inc.* (N.D. Cal. Aug. 28, 2013)
    2013 WL 4610764 ......................................................................................25

*Moreno v. Cap. Bldg. Maint. & Cleaning Servs., Inc.* (N.D. Cal. May 5, 2021)
    2021 WL 1788447 ..........................................................................19, 22, 33

*Nat'l Ass'n of Wheat Growers v. Becerra* (E.D. Cal. 2020)
    468 F. Supp. 3d 1247 ............................................................................20, 22

*Navarrete v. Sprint United Mgmt. Co.* (C.D. Cal. Mar. 2, 2021)
    2021 WL 4352903 ......................................................................................33

*Newton v. Am. Debt Servs., Inc.* (N.D. Cal. Jan. 15, 2016)
    2016 WL 7743686 ......................................................................................33

*O'Bryant v. ABC Phones of N.C., Inc.* (W.D. Tenn. Dec. 22, 2020)
    2020 WL 7634780 ......................................................................................37

*O'Connor v. Uber Techs., Inc.* (N.D. Cal. Mar. 29, 2019)
    2019 U.S. Dist. LEXIS 54608 ...................................................................42

*Officers for Just. v. Civ. Serv. Comm'n of City & Cty. of San Francisco* (9th Cir. 1982)
    688 F.2d 615 ...............................................................................................23

*Ogg v. Mediacom, LLC* (Mo. Ct. App. 2012)
    382 S.W.3d 108 ..........................................................................................26

*Ontiveros v. Zamora* (E.D. Cal. 2014)
    303 F.R.D. 356 ...........................................................................................31

*Palacios v. Penny Newman Grain, Inc.* (E.D. Cal. July 6, 2015)
    2015 WL 4078135 ................................................................................31, 36

*Pettit v. Proctor & Gamble* (N.D. Cal.)
　　No. 3:15-cv-02150 ................................................................................................40

*Rael v. Children's Place, Inc.* (S.D. Cal. Jan. 28, 2020)
　　2020 WL 434482 ...............................................................................................30

*Rawa v. Monsanto Co.* (8th Cir. 2019)
　　934 F.3d 862 ..................................................................................................38, 40

*Rodriguez v. West Publishing Corp.* (9th Cir. 2009)
　　563 F.3d 948 .............................................................................................29, 33, 36

*Roes, 1-2 v. SFBSC Mgmt., LLC* (9th Cir. 2019)
　　944 F.3d 1035 ...................................................................................................43

*Scott v. ZST Digital Networks, Inc.* (C.D. Cal. Aug. 5, 2013)
　　2013 WL 12126744 .............................................................................................36

*Scoy v. Kasal* (Del. Super. Ct. Apr. 9, 1999)
　　1999 WL 463552 ...............................................................................................24

*Silvis v. Ambit Energy L.P.* (E.D. Pa. 2018)
　　326 F.R.D. 419 ..................................................................................................36

*Smith v. CRST Van Expedited, Inc.* (S.D. Cal. Nov. 20, 2012)
　　2012 WL 5873701 ...............................................................................................38

*Stearns v. Ticketmaster Corp.* (9th Cir. 2011)
　　655 F.3d 1013 ...................................................................................................26

*Stephens v. Monsanto Co.* (Cal. Super. Ct., Alameda Cnty.)
　　No. CIVSB2104801 .............................................................................................20

*Swinton v. SquareTrade, Inc.* (8th Cir. 2020)
　　960 F.3d 1001 ...................................................................................................38

*Taylor v. Costco Wholesale Corp.* (E.D. Cal. Oct. 8, 2020)
　　2020 WL 5982090 ...........................................................................................6, 20

*Tomlinson v. Monsanto* (Mo. Cir. Ct., Jackson Cnty. filed Aug. 19, 2019)
　　No. 1916-CV22788.............................................................6, 7, 23, 24, 26, 30, 37, 38

*Toolajian v. Air Methods Corp.* (N.D. Cal. Apr. 24, 2020)
　　2020 WL 8674094 ...............................................................................................27

*United States v. Oregon* (9th Cir. 1990)
    913 F.2d 576 .................................................................................................27

*Victorino v. FCA US LLC* (S.D. Cal. 2017)
    322 F.R.D. 403 ..............................................................................................14

*Wal-Mart Stores, Inc. v. Dukes* (2011)
    564 U.S. 338 ..................................................................................................13

*Walsh v. Al W. Chrysler, Inc.* (Mo. Ct. App. 2007)
    211 S.W.3d 673..............................................................................................24

*Weeks v. Home Depot U.S.A., Inc.* (C.D. Cal. Dec. 16, 2020)
    No. 2:19-cv-06780-JWH-AS ...............................................................4, 6, 20, 22

*Wolin v. Jaguar Land Rover N. Am., LLC* (9th Cir. 2010)
    617 F.3d 1168 ...........................................................................................14, 16

*Yokoyama v. Midland Nat'l Life Ins. Co.* (9th Cir. 2010)
    594 F.3d 1087 ................................................................................................16

*Zepeda v. PayPal, Inc.* (N.D. Cal. Mar. 24, 2017)
    2017 WL 1113293 ..........................................................................................25

## Rules

28 U.S.C. § 1715.................................................................................................43

FED. R. CIV. P. 23 ....................................................................................... *passim*

Fla. Stat. § 501.212(1)....................................................................................3, 21

## INTRODUCTION

Plaintiffs allege Monsanto illegally marketed, advertised, and sold Roundup® Products[1] without disclosing their risks of cancer and other health effects. Monsanto denies Plaintiffs' allegations. The proposed Second Amended Settlement Agreement ("Settlement")[2] seeks to resolve on a nationwide basis this action and other cases brought in federal and state courts around the country (the "Related Actions") against Monsanto and retailers of the Products. It releases only false advertising, consumer fraud, breach of warranty, and other economic-loss claims arising from Class Members' purchases; it does *not* release or resolve any personal-injury claims (including alleged economic losses, punitive damages, or attorney's fees arising from personal injury) or medical-monitoring claims. It establishes a fund between $23 million (the "Floor Amount") and $45 million (the "Ceiling Amount") against which Class Members can claim approximately 20% of the average retail price of the Products they purchased.

The Settlement is fair and reasonable and provides the Settlement Class with an outstanding result. Class Members stand to receive two-thirds of Plaintiffs' estimate of best-case damages—and many times more than Monsanto's expert's estimate of damages—and the fund is sufficient to pay those amounts under anticipated claims rates. For the reasons set forth below, the Settlement meets Federal Rule of Civil Procedure 23(e)'s requirements and the Ninth Circuit's standards for fairness, reasonableness, and adequacy. This Court should grant preliminary approval.

---

[1] The Settlement is being filed as Exhibit 1 to the Declaration of Gillian Wade filed concurrently herewith. The Settlement addresses Lawn & Garden Roundup® Products marketed and sold for consumer use. The Settlement Class does not include purchasers of Roundup® products marketed and sold for agricultural ("AG") or industrial and professional ("I&P") applications.

[2] The Settlement is attached to the Declaration of Gillian L. Wade filed herewith. Unless otherwise specified, all capitalized terms herein have the meanings specified in the Settlement.

## FACTS

### I.   BACKGROUND AND PROCEDURAL HISTORY

This action is similar to more than a dozen other actions (the "Related Actions") that Class Counsel, Plaintiffs' Counsel, and their associates have prosecuted against both Monsanto and retailers in courts around the country since July 2019.

#### A.   Allegations in the Actions

This action and the Related Actions include various federal and state class actions against Monsanto and retailers, as well as individual state actions against retailers. All allege economic loss arising from misleading marketing and labeling of the Products, and in particular alleged omissions regarding the Products' known potential health risks, including the ongoing dispute as to whether the Products are capable of causing cancer. *See, e.g.*, Second Amended Complaint ("SAC"), Dkt. No. 22 ¶ 6 ("Despite Monsanto's knowledge of Roundup®'s potential carcinogenicity, Monsanto has failed to convey this information to consumers in its promotion, marketing, advertising, distribution, labeling, and sale of Roundup®."); *see also id.* ¶¶ 161, 170. Monsanto and the retailer-defendants have defended by pointing to scientific studies and regulatory findings they contend show glyphosate is not carcinogenic and does not pose any unreasonable risks to human health, and by arguing that cancer warnings on the Products are unwarranted and/or improper. The retailer-defendants have further argued they are not responsible for Monsanto's disclosures one way or the other, and if Monsanto is not required to warn, then they cannot be required to warn. The defendants have also asserted preemption defenses because the Products and their labels were registered by EPA.

#### B.   The *Ezcurra* Action

One Related Action was particularly significant. *Ezcurra* was filed in Florida state court in February 2020 and ultimately removed to the Southern District of Florida. Ezcurra sought to represent a class of Florida purchasers of the Products. Second Am. Compl. ¶¶ 116-19, *Ezcurra v. Monsanto Co.*, No. 9:20-cv-80524 (S.D. Fla.), Dkt. No. 30. Monsanto moved to dismiss the initial

complaint in April 2020, leading to several amendments to the pleadings and several months of motion practice. With Monsanto's motion still pending, in May 2020, the Parties conducted a Rule 26(f) conference, filed a Joint Discovery Plan, and commenced discovery.

The Parties exchanged written discovery between May and July 2020. Monsanto responded to interrogatories, requests for admission, and requests for production, and it produced thousands of pages of documents, including sales data and final product labeling. The Parties also served notices of deposition and began negotiating the scope of those depositions.

Expert discovery also began. Class Counsel retained D.C. Sharp, Ph.D., an economic expert and formerly tenured Associate Professor of Economics and Business Advisory Council Research Professor at the University of Southern Mississippi. Wade Decl. ¶ 7, Ex. 2 ("Sharp Report") ¶¶ 4-5.[3] Dr. Sharp prepared a hedonic-regression analysis estimating the impact of the alleged failure to warn of Roundup's cancer risk. *Id.* App. B. Dr. Sharp concluded that consumers had paid a price premium of 31% more than what they would have been willing to pay for a similar product that disclosed a carcinogenic active ingredient. *Id.* ¶¶ 28-31.

Shortly before Monsanto's expert disclosures were due, the court granted Monsanto's motion to dismiss on the ground that Florida's safe-harbor provision[4] barred Ezcurra's claims (without addressing the merits of Monsanto's other arguments). *Ezcurra v. Monsanto Co.*, No. 9:20-cv-80524, 2020 WL 5491428, at *1 & n.1, *66 (S.D. Fla. Aug. 7, 2020). Ezcurra appealed. That appeal has been fully briefed but was stayed by the Eleventh Circuit pending approval

---

[3] References herein to "Wade Decl." refer to the declaration of Gillian Wade filed concurrently herewith. Likewise, references to "Rosenthal Decl." and "Schwartz Decl." refer, respectively, to the declarations of John Rosenthal and Brandon Schwartz filed concurrently herewith. References to "Gilmore Decl.," "Weeks Decl.," "Taylor Decl.," "Hanna Decl.," "Boyette Decl.," "Ezcurra Decl.," "Jewell Decl.," and "Williams Decl." refer to the concurrently-filed declarations of the respective Plaintiffs.

[4] *See* Fla. Stat. § 501.212(1) (providing that the Florida Deceptive and Unfair Trade Practices Act does not apply to "any act or practice required or specifically permitted by federal law.")

proceedings in this action. *See* Order, *Ezcurra v. Monsanto Co.*, No. 20-13341-X (11th Cir. Sept. 3, 2021).

**C.      The Other Related Actions**

For purposes of brevity, this memorandum does not detail the procedural histories of the other Related Actions. Instead, attached hereto as **Appendix A** is a chart summarizing each case's procedural history. Suffice it to say that Class Counsel pursued these cases through multiple rounds of dispositive briefing, sought discovery where possible and, in the case of the retailer actions, placed significant financial and reputational pressure on Monsanto by pursuing cases against its largest customers in the residential market based on the same facts asserted against Monsanto. *See* Rosenthal Decl. ¶ 4. This was the result of a coordinated litigation strategy, and work in the Related Actions contributed significantly to the Settlement. For example, in *Weeks v. Home Depot*, the parties briefed three motions to dismiss,[5] participated in a Rule 26(f) conference, jointly filed a Rule 26(f) report (after which the court entered a scheduling order), and engaged in substantial discovery, exchanging over 17,000 pages of documents and data. The Parties also briefed motions to dismiss in several other Related Actions.

**D.      This Action**

Gilmore filed the initial Complaint in this matter in August 2020,[6] on behalf of himself and a putative class of "[a]ll persons who purchased at least one Product in the United States since August 19, 2017." Dkt. No. 1 ¶ 111. He averred that Monsanto violated the Delaware Consumer

---

[5] Weeks prevailed on certain issues on Home Depot's second motion to dismiss, with the court finding the case was not expressly or impliedly preempted and that a retailer could be liable under the Unfair Competition Law for knowingly selling a dangerous product without informing consumers of the dangers. *Weeks v. Home Depot U.S.A., Inc.*, No. CV 19-6780 FMO (ASX), 2020 U.S. Dist. LEXIS 188369, at *5-21 (C.D. Cal. Sept. 18, 2020) (allowing Weeks to "conduct discovery with respect to the scope and extent of defendant's knowledge regarding the health risks to consumers posed by Roundup").

[6] Gilmore originally filed a complaint asserting a similar claim against Monsanto in the District of Oregon in July 2019 (Case No. 3:19-cv-01123-BR).

Fraud Act ("DCFA") by promoting, marketing, advertising, distributing, labeling, and selling Roundup® Products without disclosing that they may cause cancer. *Id.* ¶¶ 131-32. Gilmore sought certification of a nationwide class under Rule 23(b). *Id.* ¶¶ 111, 139, 140, 142.

On December 3, 2020, Monsanto moved to dismiss Gilmore's initial Complaint on several bases. *See* Dkt. No. 10, 11. Among other things, Monsanto argued that Gilmore's claim was foreclosed by *In re Johnson & Johnson Talcum Powder Prod. Mktg., Sales Pracs. & Liab. Litig.*, 903 F.3d 278, 283, 285 (3d Cir. 2018) (plaintiff must plead facts permitting a determination "that the economic benefit she received in purchasing the [product at issue] was worth less than the economic benefit for which she bargained"). *See* Dkt. No. 11 at 7-9.

Gilmore responded by filing his First Amended Complaint ("FAC") on January 12, 2021. *See* Dkt. No. 14. Recognizing *Johnson & Johnson*, Gilmore alleged that he and the members of the putative class "paid a price premium for the [Roundup®] Product" and that, "but for Defendant's omissions, the actual price Plaintiff and Class Members paid would have, and should have, been less." Dkt. No. 14 ¶¶ 109, 110.

Monsanto moved to dismiss the FAC on January 26, 2021. Dkt. Nos. 15, 16. That motion was fully briefed, but had not been decided, when the Parties reached the Settlement. On June 10, 2021, Plaintiffs filed a Second Amended Complaint, which added seven additional named plaintiffs (each of whom was a plaintiff in one or more of the Related Actions) and asserted claims both under the DCFA and for breach of warranty. Dkt. No. 21-1.

### E.    Mediation and Settlement Negotiations

In February 2021, with Monsanto's motion to dismiss the FAC still pending, the Parties mediated before former United State Magistrate Judge Diane M. Welsh.[7]

---

[7] Counsel had previously designated Judge Welsh as a mediator in *Ezcurra* in May 2020 pursuant to the that court's local rules and Pretrial Scheduling Order and indicated that they anticipated the Parties would try to resolve all Related Actions in a mediation with Judge Welsh. *Ezcurra* Dkt. No. 25.

In the meantime, Class Counsel continued prosecuting the Related Actions and appealed *Ezcurra* to the Eleventh Circuit. Although Class Counsel continue to believe the merits of the Related Actions were strong, Plaintiffs encountered several roadblocks after this case was filed. Between September 2020 and January 2021, courts dismissed, with leave to amend, complaints in three Related Actions: *Weeks v. Home Depot*, *Taylor v. Costco*, and *Hanna v. Walmart*. And, in December 2020, the court dismissed Weeks' claim with prejudice.[8] Order Granting Def.'s Mot. to Dismiss Pltfs.' Second Am. Compl. (Dkt. No. 77), *Weeks v. Home Depot U.S.A., Inc.*, No. 2:19-cv-06780-JWH-AS (C.D. Cal. Dec. 16, 2020) ("*Weeks* Dismissal Order").

Prior to mediation, Gilmore and Monsanto each separately prepared lengthy mediation statements, including hundreds of pages of exhibits, setting forth their respective views of the strengths and weaknesses of their cases on the merits, the likelihood of class certification, and estimates of damages should Plaintiffs succeed. Wade Decl. Ex. 3 (Welsh Decl. (Dkt. No. 27)) ¶ 5-6. Both Parties also prepared confidential statements for Judge Welsh's eyes only. *Id.* To facilitate settlement discussions, Monsanto produced nationwide sales data for its Roundup® Products to Gilmore's counsel. Wade Decl. ¶ 13. The mediation took place before Judge Welsh via videoconference on February 16, 2021. Negotiations lasted more than *14 hours* and involved multiple rounds of shuttle diplomacy by Judge Welsh and face-to-face negotiations among counsel. Wade Decl. Ex. 3 (Welsh Decl. (Dkt. No. 27)) ¶¶ 6-8. Shortly after midnight, the Parties reached an agreement in principle. *Id.* ¶ 9. After further negotiations regarding the details of the agreement, the Parties executed the initial Settlement Agreement on June 10, 2021. *See* Dkt. No. 26-1.

F.    The *Tomlinson* Action

In addition to the Related Actions discussed above, *Tomlinson v. Monsanto*, No. 1916-CV22788 (Mo. Cir. Ct., Jackson Cnty. filed Aug. 19, 2019) asserts claims on behalf of

---

[8] *Weeks* is on appeal in the Ninth Circuit. Plaintiff filed his opening brief on May 14, 2021, and briefing has since been suspended pending the outcome of approval proceedings in this action.

Missouri purchasers of Roundup® products.[9] While limited to Missouri purchasers, the *Tomlinson* Plaintiffs pursue claims based not only on the consumer products at issue in this case, but also for agricultural ("AG") and industrial and professional ("I&P") Roundup® Products.[10] Notably, the statute on which the *Tomlinson* Plaintiffs are proceeding, the Missouri Merchandising Practices Act ("MMPA"), permits recovery only for purchase made "primarily for personal, family, or household purposes." Mo. Rev. Stat. 407.025). Although the record in *Tomlinson* reflects that the *Tomlinson* Plaintiffs provided no expert reports showing how they would prove this "primary purpose" element with class-wide evidence, the state court certified a class on March 22, 2021, noting that the *Tomlinson* Plaintiffs could attempt to prove the "primary purpose" element through affidavits from class members. *See* Mar. 22, 2021 Order at 3-4, 7. The Missouri state court has stayed *Tomlinson* pending approval proceedings in this action. *See* July 20, 2021 Order, *Tomlinson*, No. 1916-CV22788.

## II.    THE KEY TERMS OF THE SETTLEMENT

### A.    The Settlement Class

The Settlement[11] agrees to seek conditional certification of a Settlement Class consisting of all persons in the United States who, during the Class Period,[12] purchased the Products in the

---

[9] Like the Related Actions, the *Tomlinson* complaint alleges that Monsanto sold Roundup®-brand glyphosate-containing products without disclosing that "Roundup is a known carcinogen," *Tomlinson* Am. Pet. ¶¶ 3, 73, 93, 94.

[10] Missouri purchasers are included in the Settlement Class in this action only if they purchased the "Products" as defined in the Settlement (i.e., Lawn & Garden products).

[11] The Parties have made minor amendments to the initial Settlement Agreement since it was initially executed on June 10, 2021, both to clarify the scope of the release and, more recently, to address the transfer of this case to this Court. To the extent those clarifications are relevant to the discussion, they will be identified.

[12] The Class Period is separately defined for each state or territory by reference to the applicable statute of limitations for false-advertising or breach-of-warranty claims (whichever is longer) in that state or territory (accounting for any potential tolling) in effect at the time the Parties reached agreement. Settlement § A.20 & Ex. B.

United States for purposes other than for resale or distribution.[13] Settlement §§ A(51), B(1), B(3)-(4). "Products" is defined by reference to a list of Lawn & Garden glyphosate-containing products.[14] *Id.* § A(44).

**B.      Relief to Class Members: Up to $45 Million Cash Consideration**

Monsanto will pay total cash consideration in the amount of no less than $23 million (the "Floor Amount") and no greater than $45 million (the "Ceiling Amount"). *Id.* § D. Cash consideration includes all amounts Monsanto agrees to pay in settlement of the Released Claims, including all costs of Class Notice, Claims Administration Expenses, Class Member Claims, Class Representative service awards, Class Counsel's Expenses, and Class Counsel's fees. *Id.* § D(1).

**C.      Class Notice and Administration Costs**

Postlethwaite & Netterville ("P&N") will serve as the Claims Administrator. *Id.* § G. P&N will execute the Notice Plan agreed to by the Parties and approved by the Court; answer written inquiries from Class Members and/or forward those inquiries to Class Counsel as appropriate; receive and maintain opt-out forms; establish a Settlement Website and toll-free informational telephone number; receive and process Claims Forms; and otherwise assist settlement administration as required. *Id.* Upon final approval of the Settlement (and the expiration and/or rejection of any appeals), P&N will issue payments to Approved Claimants.

---

[13] Excluded from the Settlement Class are (i) judicial officers and associated court staff assigned to this case, and their immediate family members; (ii) past and present (as of the Effective Date) officers, directors, and employees of Monsanto; and (iii) all Class Members who timely and properly exclude themselves from the Settlement Class in the manner approved by the Court and set forth in the Class Notice. *See id.* § A(51).

[14] The Products include certain Ace® and HDX® brand glyphosate products that were manufactured by Monsanto and sold by its agent.

P&N is highly experienced in notice-plan design and settlement administration.[15] Schwartz Decl. ¶¶ 1-5. P&N has designed an extensive Notice Program, a detailed description of which is included in the declaration of P&N's Director of Notice, Brandon Schwartz, filed concurrently herewith. *See id.* ¶¶ 18-48. Indeed, the Notice Plan employs a combination of (1) direct notice via email to millions of likely purchasers, (2) print media, (3) online display, (4) social media, (5) online video, (6) television advertising, (7) digital newsletters, (8) search advertising, (9) third-party class action websites, (10) a national press release, (11) a toll-free settlement hotline, and (12) a Settlement Website. *Id.* The Notice Plan is estimated to have a measurable reach of *at least* 80% of the Settlement Class, with Class Members being exposed to notice, on average, 2.52 times. *Id.* ¶ 18.[16]

P&N was selected as the settlement administrator after proposals from three prominent settlement administrators, each of which outlined multifaceted notice programs and claims processes. *See* Rosenthal Decl. ¶ 11. The Parties ultimately selected P&N because of its experience with Roundup® products and because its pricing was the most competitive while still incorporating the same primary elements of the other proposals. Monsanto will formally retain P&N and pay all Class Notice and Claims Administration Expenses, which are estimated to exceed no more than $1.24 million. Settlement §§ D(2), G; Schwartz Decl. ¶ 13. This cost is lower than both the estimates received from other potential administrators and the costs of roughly $1.8 million that were recently approved in *Jones. See* 2021 WL 2426126, at *3. It represents approximately 3-5% of the settlement fund.

### D.    Payment of Class Members' Claims

---

[15] P&N designed a notice program in another settlement involving Roundup® products, which was ultimately approved by the district court. *See generally Jones v. Monsanto Co.*, No. 19-0102-CV-W-BP, 2021 WL 2426126 (W.D. Mo. May 13, 2021).

[16] This estimate is conservative, because it does not include impressions resulting from the third-party class action website, direct notice via email, or the national press release, which are expected to meaningfully strengthen both the reach and the frequency of the Notice Plan, but the effects of which are not measurable. *Id.*

Class Members can claim funds from the Settlement by submitting a simple Claim Form to the Claims Administrator. Settlement § I. Recognizing that many consumers will not have receipts or will not wish to go through the effort of locating them, proof of purchase will not be required to claim up to one Product for each year of the Class Period, except for the largest and highest-priced concentrated Products, which will require valid proof of purchase.[17] *Id.* § I(6). If a Class Member provides valid proof of purchase, he or she may claim an unlimited number of units purchased during the Class Period. *Id.* § I(7).

If the Ceiling Amount is sufficient after payment of all other amounts set out in the Agreement, Monsanto will pay Authorized Claimants approximately 20% of the average retail price for each Product claimed, rounded to the nearest 50 cents. Depending on the Product purchased, this will amount to between $0.50 and $33.00 per unit. *Id.* § E(1). If, after accounting for the other amounts Monsanto is required to pay, the Floor Amount is not reached, then payments to Authorized Claimants will be adjusted upward on a pro rata basis until the Floor Amount is reached. *Id* § E(3). If, on the other hand, the Ceiling Amount is insufficient to allow payments in the contemplated amounts to all Authorized Claimants, then the payments to Authorized Claimants will be adjusted downward on a pro rata basis.[18] *Id* § E(2).

---

[17] For example, a Class Member who purchased a 1.33-gallon Roundup® Ready-to-Use Max Control 365 in California each year since 2015 could claim $49.00 without proof of purchase.

[18] The Settlement Agreement also includes a detailed provision for the disposition of funds in unclaimed, uncashed, or otherwise unredeemed checks. Settlement §§ E.4-5. In short, under no circumstances will the total cash consideration be less than the Floor Amount. To the extent that unclaimed, uncashed, or otherwise unredeemed checks would cause the total cash consideration to fall below the Floor Amount, those amounts will be distributed to Class Members pro rata unless the amounts are so low that such distributions are not economically feasible, in which case they will be donated to the National Consumer Law Center ("NCLC"). *Id.*

### E.        The Release

Class Members will release Monsanto, retailers, and related entities from Claims—with the express exception of Personal Injury Claims and Medical Monitoring Claims[19]—arising from the facts alleged in the complaint, i.e., from allegedly false, misleading, incomplete, or inaccurate statements or omissions regarding the alleged health effects of the Roundup® Products, as more fully specified in the Agreement. *Id.* § L(1)-(3). Personal Injury Claims and Medical Monitoring Claims are defined, respectively and in relevant part, as "Claims that assert a right to recover damages for the actual physical injury or illness … [or] compensatory, punitive, or exemplary damages, or attorney's fees, allegedly resulting or arising from the actual physical injury or illness" and "Claims that seek to require, or recover damages amounting to the costs of, medical monitoring or screening for potential physical injury or illness of a natural person." *Id.* §§ A(32), A(41), L(1).

### F.        Procedures for Opting Out or Objecting

Class Members who wish to opt out of the Settlement may submit an Opt-Out Form available on the Settlement Website or through a request to the Settlement Administrator by the deadline set forth in the Agreement. *Id.* § J. The process to opt out is simple and involves completing, signing, and submitting a simple form. *Id.* Class Members who wish to object must file and serve a written objection by the deadline using the procedure set forth in the Agreement.[20] *Id.* § K. Submitting an objection is simple, requiring only a caption identifying the action and that the document is an objection, information sufficient to identify and contact the objector and their attorney, and a concise statement of the basis for the objection. *Id.* Class Members may make a claim even if they object.

---

[19] Plaintiffs understand that other pending class actions are asserting medical-monitoring claims and that Monsanto contests those claims.

[20] In accordance with this Court's Standing Order, the notices submitted herewith make clear that the Court will require only substantial compliance with the requirement of a written objection and that compliance may be excused upon a showing of good cause.

G.      **Service Awards and Attorneys' Fees and Costs**

Class Counsel and Class Representatives will apply for an order awarding attorneys' fees and costs, and service awards of $5,000 to each Class Representative, to be paid from the settlement fund. Settlement § G(1). Monsanto will not contest the requested service awards or a request for attorneys' fees that does not exceed 25% of the Ceiling Amount, but whether to award the requested amounts is in the Court's discretion and does not impact the validity of the Settlement. Settlement § F(1).

**III.      PROPOSED OBJECTIONS AND AMENDMENTS TO SETTLEMENT**

After the proposed Settlement was filed with the transferor court, the *Tomlinson* plaintiffs ("*Tomlinson* Plaintiffs") sought to intervene and object to its preliminary approval. Dkt. No. 39. In addition, Jason Rinehart—the named plaintiff in a class action pending in Missouri state court—filed a purported opposition to preliminary approval, asserting that the proposed Settlement improperly released medical-monitoring claims. Dkt. No. 37. On July 14, 2021, Monsanto submitted a letter to the transferor court noting, *inter alia*, that the proposed Settlement was not intended to release medical-monitoring claims. Dkt. No. 49. On August 19, 2021, the Parties executed the amended Settlement, which makes clearer that the release excludes Medical Monitoring Claims and Personal Injury Claims. Dkt. No. 59-1.[21] None of the proposed objections or motions to intervene were decided prior to transfer of this action to this Court. The Second Amended Settlement filed concurrently herewith includes only minor changes to fix typographical errors and conform with the transfer of this action to this Court.

## **LEGAL STANDARDS**

Rules 23(a) and (b) govern class certification and Rule 23(e) governs settlement fairness. Under Rule 23(e), courts must first determine whether to preliminarily approve the settlement.

---

[21] Patricia Godsey and Gary Brown also moved to intervene on September 21, 2021 (Dkt. Nos. 60, 61), but sought to do so only for the limited purpose of opposing the joint motion to stay related cases, which the parties have now agreed to withdraw for reasons set forth in prior filings. The Parties, of course, reserve their rights to renew that motion should circumstances change.

Preliminary approval is appropriate when a court is likely to (i) certify the settlement class after the final approval hearing and (ii) the proposed settlement as fair, reasonable, and adequate under Rule 23(e)(2). *See* Fed. R. Civ. P. 23(e)(1)(B). If it grants preliminary approval, the court must direct notice to the proposed settlement class and provide class members an opportunity to object or opt out. *See* Fed. R. Civ. P. 23(c)(2)(B), (e)(1), (e)(5). After the notice period and a hearing, the court may grant final approval of the proposed settlement, and finally certify a settlement class, if the settlement is fair, reasonable, and adequate. Fed. R. Civ. P. 23(e)(2). In this Court, a movant's submission should also include the information called for under this District's Procedural Guidance for Class Action Settlements and this Court's Standing Order for Civil Cases.

## ARGUMENT

## I.   THE PROPOSED NATIONWIDE SETTLEMENT SATISFIES THE REQUIREMENTS OF RULE 23(A).

### A.   The Numerosity Requirement of Rule 23(a)(1) Is Satisfied.

Rule 23(a)(1) requires that the class be "so numerous that joinder of all members is impracticable." Fed. R. Civ. P. 23(a)(1). Although the precise number is unknown, the Parties estimate that there were millions of purchasers of the Products during the Class Period. Wade Decl. ¶ 19. The proposed Settlement Class therefore satisfies the numerosity requirement.

### B.   The Commonality Requirement of Rule 23(a)(2) Is Satisfied.

Rule 23(a) demands "questions of law or fact common to the class." Fed. R. Civ. P. 23(a)(2). "[C]ommonality requires that the class members' claims depend upon a common contention." *Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 350 (2011). "[P]laintiffs need only point to a single issue common to the class." *Collins v. Cargill Meat Sols. Corp.*, 274 F.R.D. 294, 300 (E.D. Cal. 2011). This can be "either a common legal issue stemming from divergent factual predicates or a common nucleus of facts resulting in divergent legal theories." *Id.* Here, all Class Members' claims assert that they suffered economic injury when they purchased the Products because Monsanto misrepresented the Products' alleged health risks. "[A]ll class members were

exposed to such representations and purchased [Roundup] products, creating a common core of salient facts." *Astiana v. Kashi Co.*, 291 F.R.D. 493, 501-02 (S.D. Cal. 2013) (citations omitted). "Courts routinely find commonality in false advertising cases that are materially indistinguishable from this matter." *Id*. The commonality requirement is therefore satisfied.

### C.   The Typicality Requirement of Rule 23(a)(3) Is Satisfied.

Typicality requires the plaintiff to show that "the claims or defenses of the representative parties are typical of the claims or defenses of the class." Fed. R. Civ. P. 23(a)(3). "Typicality is satisfied if the representatives' claims arise from the same course of conduct as the class claims and are based on the same legal theory." *Collins*, 274 F.R.D. at 301. The claims of named plaintiffs and class members need not be identical and can have "different factual circumstances." *Wolin v. Jaguar Land Rover N. Am., LLC*, 617 F.3d 1168, 1175 (9th Cir. 2010). Here, the Class Representatives claim Monsanto misrepresented Products sold to consumers by failing to include warnings about their health risks, and they seek money damages related to their purchases of the Products. They seek to certify a nationwide Settlement Class on behalf of other purchasers of the Products, whom they assert were harmed in the same way and are entitled to the same type of damages. Their claims are therefore typical of those of Class Members.

### D.   The Adequacy Requirement of Rule 23(a)(4) Is Satisfied.

Rule 23(a)(4) requires class representatives to "fairly and adequately protect the interests of the class." Fed. R. Civ. P. 23(a)(4). This "requires that two questions be addressed: (a) do the named plaintiffs and their counsel have any conflicts of interest with other class members and (b) will the named plaintiffs and their counsel prosecute the action vigorously on behalf of the class?" *In re Mego Fin. Corp. Sec. Litig.*, 213 F.3d 454, 462 (9th Cir. 2000). "The adequacy of counsel is also considered under Rule 23(g)," including "(i) the work counsel has done in identifying or investigating potential claims in the action; (ii) counsel's experience in handling class actions, other complex litigation, and the types of claims asserted in the action; (iii) counsel's

14

knowledge of the applicable law; and (iv) the resources that counsel will commit to representing the class." *Victorino v. FCA US LLC*, 322 F.R.D. 403, 406 (S.D. Cal. 2017).

Plaintiffs have no conflicts of interest, are committed to the vigorous prosecution of this action, and have retained competent counsel with significant experience with consumer class actions to represent them and the Settlement Class. Wade Decl. ¶¶ 22, 25-34; Gilmore Decl. ¶ 7-9; Ezcurra Decl. ¶¶ 8-10; Williams Decl. ¶¶ 7-9; Taylor Decl. ¶¶ 7-9; Boyette Decl. ¶¶ 7-9; Jewell Decl. ¶¶ 7-9; Hanna Decl. ¶¶ 7-9; Weeks ¶¶ 9-11. Plaintiffs also consulted with Class Counsel concerning the proposed settlement to ensure that it was in Class Members' best interests. Wade Decl. ¶ 23. Class Counsel have pursued this matter on several fronts for over two years and negotiated vigorously on their clients' behalf, eventually reaching an excellent result for the Settlement Class. *Id.* ¶ 24. Moreover, as discussed in more detail *infra* Section III.B, the Parties negotiated at arm's length and with the assistance of a skilled mediator. *See* Wade Decl. ¶ 35, Ex. 3 (Welsh Decl. (Dkt. No. 27)) ¶ 9. Therefore, Class Counsel should be appointed to represent the interests of the Class Members.

## II.     THE PROPOSED NATIONWIDE SETTLEMENT SATISFIES THE REQUIREMENTS OF RULE 23(B).

### A.     Common Questions of Law and Fact Predominate.

A class action may be maintained if "the court finds that the questions of law or fact common to class members predominate over any questions affecting only individual members." Fed. R. Civ. P. 23(b)(3). Predominance "tests whether proposed classes are sufficiently cohesive to warrant adjudication by representation." *Amchem Prod., Inc. v. Windsor*, 521 U.S. 591, 594 (1997). Predominance can be found when one or more "common questions present a significant aspect of the case" and "can be resolved for all members of the class in a single adjudication." *Hanlon v. Chrysler Corp.*, 150 F.3d 1011, 1022 (9th Cir. 1998).

"[P]redominance is easier to satisfy in the settlement context." *Jabbari v. Farmer*, 965 F.3d 1001, 1006 (9th Cir. 2020). "Settlement may 'obviate the need to litigate individual issues that would make a trial unmanageable,' making common questions more important in the relative

analysis." *Id.* at 1005-06 (quoting *In re Hyundai*, 926 F.3d 539, 558 (9th Cir. 2019)). In the settlement context, courts therefore need not "conduct[] a choice-of-law analysis, despite variations in state law," or "assess the importance of every claim a class might make before holding that a class satisfies Rule 23(b)(3)'s predominance." *Id.* at 1007-08 ("For purposes of a settlement class, differences in state law do not necessarily, or even often, make a class unmanageable.").

Plaintiffs allege that all Class Members are harmed in the same way and by the same conduct. There are thus sufficient common questions of law and fact to support a settlement class. For example, whether the Products should have a cancer warning and whether omitting that warning caused Plaintiffs any economic loss are common questions that can be resolved in a single action. Because the validity of each Class Member's claims "turn[s] on [Monsanto's] common course of conduct," predominance is satisfied for the purpose of settlement. *Hyundai*, 926 F.3d at 563. And although the specific extent of damages for each individual Class Member involves individual questions (e.g., the number and types of products each Class Member purchased), this is accounted for by the proposed Settlement's claims process and does not defeat predominance. *See Jabbari*, 965 F.3d at 1005-08; *Yokoyama v. Midland Nat'l Life Ins. Co.*, 594 F.3d 1087, 1091 (9th Cir. 2010) (where a class suffered damages traceable to the same injurious conduct, variations in "damages calculations alone cannot defeat certification"). Finally, for purposes of certifying the Settlement Class, Monsanto does not contest predominance.

### B.   Settlement Is the Superior Method for Resolving This Controversy.

Rule 23(b)(3)'s superiority requirement asks whether "a class action is superior to other available methods for fairly and efficiently adjudicating the controversy." Fed. R. Civ. P. 23(b)(3). This "requires the court to determine whether maintenance of this litigation as a class action is efficient and whether it is fair." *Wolin*, 617 F.3d at 1175-76. Courts assessing superiority consider four nonexclusive factors: "(1) the class members' interests in individually controlling the prosecution or defense of separate actions; (2) the extent and nature of any litigation concerning the controversy already commenced by or against the class; (3) the desirability of concentrating

the litigation of the controversy in the particular forum; and (4) the difficulties likely to be encountered in managing a class action." *Id.* Like the predominance requirement, this inquiry is easier to satisfy in the settlement context. *See, e.g.*, *In re Volkswagen & Audi Warranty Extension Litig.*, 273 F.R.D. 349, 354 (D. Mass. 2011).

Here, class proceedings are superior because the Settlement would avoid individualized claims by purchasers—which, if pursued, could result in thousands of cases at great expense to both parties and the courts. *See Lerwill v. Inflight Motion Pictures, Inc.*, 582 F.2d 507, 512 (9th Cir. 1978) ("Numerous individual actions would be expensive and time-consuming and would create the danger of conflicting decisions as to persons similarly situated."). Moreover, "the damages at issue likely are not great enough for individual putative class members to want to litigate separate actions," so "[p]ermitting this case to proceed as a single class action is an efficient use of the Court's and the parties' resources and the most expeditious way to resolve common questions." *Miguel-Sanchez v. Mesa Packing, LLC*, No. 20-cv-00823-VKD, 2021 WL 1736807, at *6 (N.D. Cal. May 3, 2021). The Settlement Class should therefore be certified under Rule 23(b)(3).

## III. THE SETTLEMENT SHOULD BE PRELIMINARILY APPROVED.

To approve a proposed class settlement, a court must find that it is both procedurally and substantively "fair, reasonable, and adequate." Fed. R. Civ. P. 23(e)(2). "[I]f the proposed settlement appears to be the product of serious, informed, non-collusive negotiations, has no obvious deficiencies, does not improperly grant preferential treatment to class representatives or segments of the class, and falls within the range of possible approval, then the court should direct that the notice be given to the class members of a formal fairness hearing." *In re Tableware Antitrust Litig.*, 484 F. Supp. 2d 1078, 1079 (N.D. Cal. 2007). "At the initial stage, the inquiry should be whether the settlement is 'fair, reasonable, and adequate,' based on any information the district court receives from the parties or can obtain through its own research." *Cotter v. Lyft, Inc.*,

193 F. Supp. 3d 1030, 1037 (N.D. Cal. 2016) (Chhabria, J.). This Court's inquiry is as rigorous at the preliminary approval stage as at final approval. *Id.*; *see also* Standing Order at 14.

### A.      The Proposed Settlement is Fair, Reasonable, and Adequate.

Rule 23(e)(2) permits a court to approve a Rule 23(b)(3) class settlement upon a finding that the settlement is "fair, reasonable, and adequate."[22] To assess this, the Ninth Circuit considers eight non-exhaustive "*Churchill* factors":

> [1] the strength of the plaintiffs' case; [2] the risk, expense, complexity, and likely duration of further litigation; [3] the risk of maintaining class action status throughout the trial; [4] the amount offered in settlement; [5] the extent of discovery completed and the stage of the proceedings; [6] the experience and views of counsel; [7] the presence of a governmental participant; and [8] the reaction of the class members to the proposed settlement.

*Campbell v. Facebook, Inc.*, 951 F.3d 1106, 1121 (9th Cir. 2020) (quoting *Hanlon*, 150 F.3d at 1026) (alterations in original) (quotation marks omitted); *see also Kim v. Allison*, 8 F.4th 1170, 1178 (9th Cir. 2021); *Cunha v. Chico Produce, Inc.*, No. 17-cv-00597-JST, 2021 WL 3410327, at *4-5 & n.6 (N.D. Cal. Feb. 16, 2021) (applying *Churchill* factors, which are "substantially similar to those articulated in the 2018 amendments to Rule 23(e)"). Ultimately, a court's goal in reviewing a class settlement is to "ensure[] that unnamed class members are protected 'from unjust or unfair settlements affecting their rights.'" *Campbell*, 951 F.3d at 1121 (quoting *Hyundai*, 926 F.3d at 556, 568) (alteration in original). With that said, the Court's analysis must reflect "the 'strong judicial policy that favors settlement'" in complex class litigation. *Id.* (internal quotation marks omitted).

Even applying the more rigorous scrutiny that most courts reserve for the final approval stage, the Settlement is fair, reasonable, and adequate. Without releasing any claims for personal injury or medical monitoring, the Settlement would provide Class Members with direct cash payments of approximately *two-thirds* of their estimated best-case damages were they to succeed

---

[22] Although the rule was amended in 2018 to identify the certain criteria to guide district courts, those criteria were not intended to displace the factors traditionally used by circuit courts. *Campbell v. Facebook, Inc.*, 951 F.3d 1106, 1121 & n.10 (9th Cir. 2020).

18

at trial. Given the fact-intensive nature of Plaintiffs' claims, Monsanto's and retailers' success in several Related Actions, and the other risks, costs, and uncertainties of litigating those claims on a classwide basis through trial, the Settlement is an excellent result for the Settlement Class and should be approved.

> ### 1. The Settlement is fair considering the strength of Plaintiffs' case and risks of continued litigation.

The first three *Churchill* factors are often "addressed together and require the court to assess the plaintiff's likelihood of success on the merits and the range of possible recovery versus the risks of continued litigation and maintaining class action status through the duration of the trial." *Moreno v. Cap. Bldg. Maint. & Cleaning Servs., Inc.*, No. 19-cv-07087-DMR, 2021 WL 1788447, at *5 (N.D. Cal. May 5, 2021) (citations and internal quotation marks omitted). "Approval of a class settlement is appropriate when plaintiffs must overcome significant barriers to make their case" or face other "difficulties and risks in litigating" their claims. *Burgos v. Sunvalleytek Int'l, Inc.*, No. 18-cv-06910-HSG, 2020 WL 7319354, at *6 (N.D. Cal. Dec. 11, 2020). The first three "factors weigh in favor of approving the settlement when the defendant has 'plausible defenses that could have ultimately left class members with a reduced or non-existent recovery.'" *Moreno*, 2021 WL 1788447, at *5 (quoting *In re TracFone Unlimited Serv. Plan Litig.*, 112 F. Supp. 3d 993, 999 (N.D. Cal. 2015)).

> #### a. Plaintiffs acknowledge that they face risks on the merits.

First, although Plaintiffs believe in their claims, they recognize that success on the merits is not guaranteed. Courts in this district "routinely recognize that 'fact-intensive inquiries and developing case law present significant risks to Plaintiffs' claims and potential recovery.'" *Burgos*, 2020 WL 7319354, at *6 (quoting *Lilly v. Jamba Juice Co.*, No. 13-cv-02998-JST, 2015 WL 2062858, at *3 (N.D. Cal. May 4, 2015)).

Plaintiffs allege that Monsanto violated the Delaware Consumer Fraud Act (DCFA) by promoting, labelling, marketing, advertising and selling the Products without disclosing the Products' potential to cause cancer, on the label or in any other manner. *See, e.g.*, SAC ¶¶ 8, 148-

63. As the Court knows, Monsanto disputes those allegations. And while Plaintiffs believe the evidence favors their position, and three plaintiffs have had success at trials on this issue in the failure to warn context, this issue is not without significant risk and remains in dispute, both in the Courts and in the scientific literature. Monsanto recently obtained defense verdicts in two separate personal-injury cases alleging that Roundup® Products caused the plaintiffs' cancer. *See* Verdict Form, *Clark v. Monsanto Co.*, No. 20STCV46616 (Cal. Super. Ct., Los Angeles Cnty., Oct. 5, 2021) (finding that the plaintiff's exposure to Roundup was not a substantial factor in causing his cancer); Verdict Form, *Stephens v. Monsanto Co.*, No. CIVSB2104801 (Cal. Super. Ct., Alameda Cnty.) (finding, in part, Monsanto was not negligent in designing Roundup and did not know or should not have known Roundup was dangerous). This Court has previously concluded it is "a very close question" whether the scientific evidence that glyphosate causes cancer even passes the *Daubert* standard, and that the evidence is "too equivocal to support any firm conclusion that glyphosate causes NHL." Pretrial Order No. 45, Dkt. No. 1596, *In re Roundup*, MDL No. 2741. And another court held that "the weight of authority show[s] that glyphosate was not known to cause cancer and did not cause cancer" in permanently enjoining California from enforcing its Proposition 65 warning requirement for glyphosate. *Nat'l Ass'n of Wheat Growers v. Becerra*, 468 F. Supp. 3d 1247, 1259 (E.D. Cal. 2020). Additionally, as a practical matter, Plaintiffs acknowledge that, unlike the personal-injury plaintiffs, they are not contending Roundup caused them to develop cancer, and are seeking recovery related only to the purchase price of the Products. In short, it is clear to Plaintiffs that whether Roundup® does or can cause cancer remains a contested and controversial issue, which complicates the merits of the claims they are bringing here.

Monsanto and retailers have also had success on motions to dismiss in Related Actions.[23] Although Plaintiffs disagree with the decision and have filed their opening brief on appeal, the

---

[23] *See Weeks* Dismissal Order; *Hanna v. Walmart Inc.*, No. 5:20-cv-01075-MCS-SHK, 2020 WL 7345680 (C.D. Cal. Nov. 4, 2020); *Taylor v. Costco Wholesale Corp.*, No. 2:20-cv-00655-KJM-DMC, 2020 WL 5982090 (E.D. Cal. Oct. 8, 2020); *Ezcurra v. Monsanto Co.*, No. 9:20-cv-80524, 2020 WL 5491428 (S.D. Fla. Aug. 7, 2020).

dismissal in *Weeks* is illustrative of the challenges presented in continued litigation. There, the court dismissed a Related Action after finding Plaintiff Weeks' theory, premised on Home Depot's alleged unfair conduct in selling Roundup® without informing consumers of the formulation's potential carcinogenicity, lacked "scientific support" and "stretches the limit of what constitutes unfair business dealings" under California's Unfair Competition Law ("UCL"). *Weeks* Dismissal Order at 7, 8. Plaintiffs also recognize Monsanto would continue to defend itself by arguing its labeling is accurate and taking the position that it would be deceptive to include any kind of warning regarding a cancer risk because EPA has approved product labels without cancer warnings, while repeatedly concluding the Products do not pose any unreasonable risks to human health.[24] Plaintiffs obviously disagree with EPA's conclusions and the weight Monsanto places on them, but acknowledge these facts present legal and factual challenges that are not guaranteed to be decided in their favor.

Plaintiffs understand that Monsanto would also raise other defenses argued in Related Actions. In *Ezcurra*, for example, the district court dismissed very similar claims under the Florida Deceptive and Unfair Trade Practices Act's ("FDUTPA") safe harbor provision that bars FDUTPA claims when the alleged conduct is "[a]n act or practice required or specifically permitted by federal or state law." Fla. Stat. § 501.212(1); *Ezcurra*, 2020 WL 5491428, at *2-5. Many other states similarly exempt acts or practices that are regulated by federal or state law from their consumer protection and unfair or deceptive trade practices laws (*see* Dee Pridgen et al., Consumer Protection and the Law § 4:32 (2020-2021)), and Monsanto would likely rely on those safe-harbor provisions if Plaintiffs asserted claims under other states' consumer-fraud laws. Courts in Related Actions have also held (albeit with leave to amend) that nearly identical UCL claims brought against retailers were barred by California Proposition 65's pre-suit notice requirements. *Hanna*,

---

[24] *See, e.g.*, Dkt. No. 12-1, Ex. F (August 2019 letter from EPA to glyphosate registrants concluding that, "[g]iven EPA's determination that glyphosate is 'not likely to be carcinogenic to humans,' EPA considers [California's] Proposition 65 warning based on the chemical glyphosate to constitute a false and misleading statement").

2020 WL 7345680, at *3; *Weeks v. Home Depot U.S.A., Inc.*, No. CV 19-6780 FMO (ASx), 2020 WL 5947811, at *8 (C.D. Cal. Sept. 18, 2020). Moreover, because enforcement of the Proposition 65 warning requirement has been enjoined, Plaintiffs could likely not effect notice and successfully replead their California claims under Proposition 65. *See Wheat Growers*, 468 F. Supp. 3d at 1266. Even if they could, Monsanto would also likely argue, as it did successfully in *National Association of Wheat Growers v. Becerra*, that California's state-law label warning requirement under Proposition 65 would impermissibly compel false, misleading, or factually controversial speech in violation of the First Amendment. *Id.* at 1265.

Finally, Plaintiffs anticipate that Monsanto would continue to assert FIFRA preemption defenses. Though it has lost that issue several times, Monsanto has succeeded in some other cases involving Roundup® product labeling and advertising. *See, e.g.*, *Carson v. Monsanto Co.*, 508 F. Supp. 3d 1369, 1376 (S.D. Ga. 2020); *Mirzaie v. Monsanto Co.*, No. CV 15-04361 DDP, 2016 WL 146421, at *2 (C.D. Cal. Jan. 12, 2016). The Ninth Circuit affirmed this Court's ruling that a personal injury plaintiff's failure-to-warn claims were not preempted by FIFRA. *Hardeman v. Monsanto Co.*, 997 F.3d 941 (9th Cir. 2021). But Monsanto has asked the Supreme Court to review the Ninth Circuit's decision, and the Supreme Court has asked for the Solicitor General's views on whether it should take the issue up. *See Monsanto Co. v. Hardeman*, No. 21-241, 2021 WL 5869399 (U.S. Dec. 13, 2021). And even if certiorari is not granted, Monsanto continues to assert those defenses in other jurisdictions—including before the transferor court in this action (*see* Dkt. No. 16 at 17-24) and before the Eleventh Circuit (*see Carson v. Monsanto Co.*, No. 21-10994 (11th Cir. Mar. 26, 2021)). A favorable decision for Monsanto from the Supreme Court in *Hardeman* (or in a subsequent case) could eliminate Plaintiffs' claims entirely. That risk weighs in favor of approval. *See, e.g.*, *Moreno v. Cap. Bldg. Maint. & Cleaning Servs., Inc.*, No. 19-cv-07087-DMR, 2021 WL 1788447, at *5 (N.D. Cal. May 5, 2021) (holding that preemption defense supported approval where courts had "taken somewhat divergent approaches in applying" defense in other cases); *Akaosugi v. Benihana Nat. Corp.*, No. C 11–01272 WHA, 2013 WL 269083, at *3 (N.D. Cal. Jan. 24, 2013) ("If defendant's ERISA defense and preemption argument were accepted, it

could establish a complete bar to recovery. This uncertainty, as well as the high amount of recovery, weighs in favor of approval.").

b.    <u>The Parties dispute the measure and amount of damages.</u>

The Parties also dispute damages. As discussed above, both parties retained damages experts. Those experts produced sharply different views of the value of Plaintiffs' case even assuming liability were established. Plaintiffs' expert, Dr. D.C. Sharp's, hedonic-regression analysis concluded that consumers had paid a 31% price premium.[25] Sharp Expert Report ¶¶ 4-5, 28-31. Monsanto, however, disputes Dr. Sharp's methodology and, based on its own expert's work, contends there is no statistically significant price premium associated with the absence of warning language about a potential risk of cancer on Roundup® product labels. Rosenthal Decl. Ex. A ¶ 11. This dispute underscores the "uncertainty of outcome in litigation" that makes the settlement appropriate. *Officers for Just. v. Civ. Serv. Comm'n of City & Cty. of San Francisco*, 688 F.2d 615, 625 (9th Cir. 1982). Continued litigation would necessarily mean additional expenditure and uncertainty in resolving the proper calculation of damages, including the risk that Monsanto's damages estimate would prevail—resulting in a small or nonexistent recovery.

Importantly, these damages estimates "fit" Plaintiffs' claims. The *Tomlinson* Plaintiffs have previously argued that Plaintiffs' price-premium damages estimate fails to account for the possibility of "full-refund" or "full purchase price" damages. But Plaintiffs did not plead full-refund damages or calculate potential damages under that theory because that is not the measure of damages applicable to Plaintiffs' claims. *See Harnish v. Widener Univ. Sch. of L.*, 833 F.3d 298, 307 (3d Cir. 2016) (explaining that measures of damages under DCFA are "benefit of the bargain"

---

[25] The *Tomlinson* Plaintiffs have previously argued that this report should be disregarded because it focused on Florida purchasers. Dkt. No. 91 at 5. However, the methodology employed by Dr. Sharp, while based on sales data from Florida for the most common Roundup® consumer product, Roundup® Weed & Grass Killer III Ready-to-Use, was based upon the same underlying theory asserted in this litigation—it estimated the price impact of failing to disclose Roundup®'s health risks. Wade Decl., Ex. 2 ("Sharp Report") ¶¶ 12-13. The suggestion that Dr. Sharp's report could not provide Plaintiffs with a principled basis to estimate potential damages is thus baseless.

23

or "out of pocket" damages, in which damages are the difference between either represented value or price paid and actual value of product); *Scoy v. Kasal*, No. 98A-05-018-CG, 1999 WL 463552, at *5 (Del. Super. Ct. Apr. 9, 1999) (similar for breach of warranty). The same is true for most other states' consumer-fraud laws and warranty statutes, *including Missouri's*, which likewise recognize a benefit-of-the-bargain measure, under which damages could only amount to a full refund if the product was worthless.[26] *See* Dee Pridgen et al., Consumer Protection and the Law § 6:4 (2021-2021) (describing typical consumer-fraud damages measure as "the difference between the value of the item as represented and what the item purchased was actually worth"); 67A Am. Jur. 2d Sales § 1104 (Aug. 2021 Update) (similar "difference in value" measure for breach of warranty).

For similar reasons, another district court has rejected the argument that another Roundup® Lawn & Garden class settlement should have accounted for full-refund damages. *Jones*, 2021 WL 2426126, at *6 & n.10 (noting that "class members' recovery was never going to be 100% of the purchase price" and that "full refunds would constitute a windfall"). The same reasoning applies here. Neither Missouri Class Members nor Class Members from other states could reasonably expect to recover damages equal to 100% of the purchase price. The Settlement's failure to provide for such damages is not unreasonable.

Nor is there any merit to the *Tomlinson* Plaintiffs' argument in previous briefing that the Settlement should include provision for punitive damages they seek in Missouri.[27] Even if there

---

[26] *See Kerr v. Vatterott Educ. Ctrs. Inc.*, 439 S.W.3d 802, 814 (Mo. Ct. App. 2014) (holding "refund" damages are available only when plaintiff "rescinds and returns the property received or whe[n] he received nothing of value"); *see also In re POM Wonderful LLC*, No. ML 10-02199 DDP (RZx), 2014 WL 1225184, at *3 (C.D. Cal. Mar. 25, 2014) ("[T]he Full Refund model depends upon the assumption that not a single consumer received a single benefit…."). It would be extraordinarily difficult to establish that the Roundup® products have *no* value. Plaintiffs do not allege, for example, that the Products were ineffective at killing weeds or otherwise did not perform their intended function.

[27] The *Tomlinson* court has not ruled on the plaintiffs' request for punitive damages. And the bar for punitive damages under the MMPA is high. *See Walsh v. Al W. Chrysler, Inc.*, 211 S.W.3d 673, 676 (Mo. Ct. App. 2007).

were a meaningful likelihood of punitive damages in a consumer class-action with no claim of personal injury (and Class Counsel does not believe there is), a nationwide settlement need not account for the speculative possibility that a fraction of class members could potentially recover punitive damages under certain states' laws. *See Moore v. Verizon Comms. Inc.*, No. C 09-1823 SBA, 2013 WL 4610764, at *9 (N.D. Cal. Aug. 28, 2013) (a settlement need not provide for punitive damages and such awards are "inherently speculative and discretionary"); *Zepeda v. PayPal, Inc.*, No. C 10-2500 SBA, 2017 WL 1113293, at *12 (N.D. Cal. Mar. 24, 2017) ("[Objector's] ancillary contention that Plaintiffs should have taken into account Defendants' potential exposure to punitive damages has likewise been rejected by this Circuit.").

"It is an inherent feature of the class-action device that individual class members will often claim differing amounts of damages—that is why due process requires that individual members of a class certified under Rule 23(b)(3) be given an opportunity to opt out of the settlement class to pursue their claims separately." *Lane v. Facebook, Inc.*, 696 F.3d 811, 825 (9th Cir. 2012). If the *Tomlinson* Plaintiffs believe they can secure punitive damages in Missouri, they can opt out, but a settlement that provides Class Members with two-thirds of their best-case compensatory damages without the risks, delay, and expense of trial is not unreasonable or unfair.

c.  Plaintiffs recognize that certification of a litigation class is
uncertain.

Finally, Plaintiffs recognize that they face risks to obtaining and maintaining class certification through trial. Monsanto would argue Plaintiffs' proposed class cannot be certified because (among other arguments) it contains many individuals whose claims are not subject to the DCFA or Delaware warranty law. *See* Dkt. No. 16 at 24-26. While Plaintiffs disagree with this argument, they acknowledge that courts in the Ninth Circuit have declined to certify nationwide classes on the ground that choice-of-law principles require the court to apply the law of the state where each class member's purchases were made. *See Mazza v. Am. Honda Motor Co.*, 666 F.3d 581, 594 (9th Cir. 2012).

With that said, Plaintiffs' decision to file suit in the District of Delaware—where Monsanto is subject to general personal jurisdiction—was a strategic one that is understandable given the current uncertainty in the law of personal jurisdiction as applied to nationwide class-actions. More important, lest it be suggested that this risk was of Plaintiffs' own making,[28] it is unlikely that Plaintiffs could have avoided this risk by filing elsewhere, or by asserting claims under the laws of every state on behalf of sub-classes. Monsanto would surely argue that a putative nationwide class based on the consumer-fraud or warranty laws of each state (or sub-classes for each state) would cause individualized questions to predominate and defeat class certification—an argument many courts have accepted. *See, e.g.*, *TracFone*, 112 F. Supp. 3d at 1000-01 (applying "laws of all fifty states" would "eviscerate[e] predominance and manageability"). Additionally, many states' consumer-fraud laws require proof of elements such as reliance or causation that can present serious obstacles to class certification. *See, e.g.*, *Stearns v. Ticketmaster Corp.*, 655 F.3d 1013, 1022-23 (9th Cir. 2011). There are thus serious risks to seeking to certify (and maintain) a litigation class in *any forum*.

> d.   <u>Continued litigation would be time-consuming and expensive.</u>

The costs of continued litigation would also be significant. For over two years and across more than a dozen Related Actions, Monsanto has raised multiple legal and factual defenses that, barring a settlement, will require additional discovery, depositions, briefing, and other costly and time-consuming pretrial efforts. Moving to trial would involve significant additional expert discovery and motion practice, implicating a decades-long scientific and regulatory record spanning hundreds of studies and millions of pages. There would likely be a vigorous dispute over

---

[28] *Tomlinson* Plaintiffs have previously made this argument. They have also suggested that certification of a Missouri class in *Tomlinson* shows that obtaining certification of a litigation class is possible and undermines the adequacy of this settlement. But class certification in Missouri is preliminary and subject to modification or decertification. *Ogg v. Mediacom, LLC*, 382 S.W.3d 108, 116 (Mo. Ct. App. 2012) ("Missouri courts consistently recognize a certified class may subsequently be modified or decertified later before a decision on the merits."); Mo. R. Civ. P. 52.08(c)(1).

class certification and potentially interlocutory appeals. It is also quite clear that there would be extensive disputes over the existence and amount of any price premium. And, because there is every reason to believe Monsanto would continue to vigorously defend against Plaintiffs' claims, a long and costly trial on the merits, followed by appeals, could ensue. This risk of costly, complex, and time-consuming litigation also weighs in favor of approval.

## 2. The amount of the Settlement weighs in favor of approval.

The fairness and adequacy of the Settlement is even more evident when the strength of Plaintiffs' claims and risks of continued litigation are compared to the substantial and direct value provided to Class Members by the Settlement Agreement. The relief provided to the class should not be "assessed in a vacuum," but instead "must be considered by comparison to what the class actually gave up by settling." *Campbell*, 951 F.3d at 1123. With that said, courts are "not expected 'to convert settlement agreement hearings into trials on the merits.'" *In re Apple Inc. Device Performance Litig.*, Case No. 5:18-md-02827-EJD, 2021 WL 1022867, at *14 (N.D. Cal. Mar. 17, 2021) (quoting *United States v. Oregon*, 913 F.2d 576, 582 (9th Cir. 1990)). "[A] proposed settlement may be acceptable even though it amounts only to a fraction of the potential recovery that might be available to class members at trial." *Toolajian v. Air Methods Corp.*, No. 18-cv-06722-AGT, 2020 WL 8674094, at *10 (N.D. Cal. Apr. 24, 2020) (citations omitted); William B. Rubenstein, *Newberg on Class Actions* § 11.58.

Here, however, claimants are likely to receive a significant portion of their potential recovery, while avoiding the uncertainty and delay of continued litigation—and with a simple claims process. Each Authorized Claimant is eligible to receive cash payments equal to approximately 20% of the average retail price for each unit purchased. Settlement § E(1). As explained above, this amounts to roughly *two-thirds* of Plaintiffs' estimated best-case damages at trial and is well in excess of Monsanto's estimate of damages (no more than 1.5%, with even that

figure lacking statistical significance). Courts routinely approve settlements that provide for payments comprising much smaller percentages of class members' best-case recoveries.[29]

In exchange for these substantial payments, Class Members would *not* release any claims for personal injury or medical monitoring. Settlements § L(1). They would release only economic-loss claims based on the alleged misrepresentations and omissions at issue, expressly excluding economic losses resulting from personal injury. *Id.* The scope of this release weighs in favor of approval. *See Hesse v. Sprint Corp.*, 598 F.3d 581, 590 (9th Cir. 2010); *Cotter*, 193 F. Supp. 3d at 1038.[30] Given the risks and uncertainties involved in continued litigation, immediate, direct cash payments to Class Members of roughly two-thirds of their best-case damages at trial are fair and reasonable. *See Moreno*, 2021 WL 1788447, at *8 ("[S]ome of Defendant's arguments (if successful) could leave the class with little to no recovery. Under such circumstances, a settlement that accounts for over a third of the total possible recovery is reasonable.").

---

[29] *See, e.g.*, *Ferrell v. Buckingham Prop. Mgmt.*, No. 1:19 -cv-00332-LJO-SAB, 2020 WL 291042, at *19 n.20 (E.D. Cal. Jan. 21, 2020), *report and recommendation adopted*, 2020 WL 4364647 (E.D. Cal. July 30, 2020) (collecting cases approving settlements in which payments comprised between 0.75 and 16% of total estimated liability); *In re Omnivision Techs., Inc.*, 559 F.Supp.2d 1036, 1042 (N.D. Cal. 2008) (approving settlement with payments of roughly 6% of potential damages); *see also Bezdek v. Vibram USA, Inc.*, 809 F.3d 78, 83 (1st Cir. 2015) (finding payment of less than 9% of retail price fair and reasonable); *In re Lumber Liquidators Mktg. Sales Pracs. Litig.*, No. 1:15-md-2627 (AJT/TRJ), 2018 WL 11203065, at *2 (E.D. Va. Oct. 9, 2018) (approving settlement with cash payments of "approximately 5.5 percent of the[] purchase price"); *In re Polyurethane Foam Antitrust Litig.*, 168 F. Supp. 3d 985, 992 (N.D. Ohio 2016) (approving settlement in which "claimants will ultimately receive less than 20% (maybe less than 10%) of their claim value"); *McDonough v. Toys R Us, Inc.*, 80 F. Supp. 3d 626, 647 n.20 (E.D. Pa. 2015) (approving settlement with payments of approximately 6% of purchase price); *In re Pool Prods. Distrib. Mkt. Antitrust Litig.*, MDL No. 2328, 2015 WL 4528880, at *7 (E.D. La. July 27, 2015) (approving settlement providing "up to the alleged 4.97 percent overcharge" on eligible purchases); *Broomfield v. Craft Brew All., Inc.*, No. 17-cv-01027-BLF, 2020 WL 1972505, at *9 (N.D. Cal. Feb. 5, 2020) (approving settlement where relief equaled "a 12.7% price premium per-product").

[30] To the extent Class Members have or may assert both Personal Injury Claims and/or Medical Monitoring Claims in an action that also asserts Released Claims, those Personal Injury or Medical Monitoring Claims would not be released. *Id.* In other words, the Settlement Agreement has *no effect* on glyphosate personal injury claims.

The *Tomlinson* Plaintiffs have argued in prior briefing that the Court should discount the benefits of the Settlement for each claimant, and instead only compare the amount of the settlement fund to the potential *aggregate* damages at trial. To be clear, the Ninth Circuit has "never prescribed a particular formula by which that outcome [the expected recovery if the case were fully litigated] must be tested." *Rodriguez*, 563 F.3d at 965. And special focus on potential aggregate damages makes little sense in this case, because the claims rate will not be known until the claims period concludes. *See, e.g.*, *In re Toys R Us–Delaware, Inc. – Fair and Accurate Credit Transaction Act (FACTA) Litig.*, 295 F.R.D. 438, 454 (C.D. Cal. 2014) (evaluating amount of settlement "from the perspective of each class member" where precise number of class members and valid claimants was unknown); *Apple*, 2021 WL 1022867, at *9-10, 14 (approving settlement with per-unit payments of 54% of class members' best-case damages per product).

But in any event, the Settlement amount is more than adequate as a percentage of potential aggregate liability. Estimated retail sales of the Products during the Class Period are approximately $2.66 billion. Rosenthal Decl. ¶ 12. Plaintiffs thus project that aggregate damages at trial (assuming liability were established) would range from approximately $40 million to approximately $825 million (approximately 1.5% and 31% of $2.66 billion, respectively). Thus, under Plaintiffs' 31% price-premium model—representing *best-case* damages at trial—the $23 million Floor Amount of the Settlement would constitute approximately 2.8% of aggregate damages and the $45 million Ceiling Amount would constitute approximately 5.5%. On the other hand, applying the highest price premium estimated by Monsanto's expert, the Floor Amount would constitute approximately 57.5% of aggregate damages, and the Ceiling Amount would constitute 112.5% of those damages.

Aggregate payments to Class Members contemplated by the Settlement thus range from approximately 2.8% to 112.5% of estimated aggregate damages, depending upon which party's model is used and the claims rate. Even using Plaintiffs' best-case damages scenario and assuming that only the Floor Amount is expended, this is within the range of recoveries found reasonable by courts in this Circuit. *Ferrell*, 2020 WL 291042, at *19 n.20 (collecting cases approving

settlements with payments as low as 0.75% of total estimated liability); *In re Uber FCRA Litig.*, No. 14-cv-05200-EMC, 2017 WL 2806698, at *5 (N.D. Cal. June 29, 2017) (approving settlement with payments as low as 0.75% of aggregate liability).

There is also no merit to the *Tomlinson* Plaintiffs' arguments in prior briefing that the Ceiling Amount is unlikely to be sufficient to compensate Class Members at the 20%-per-product level contemplated by the Settlement. Claims rates in consumer class actions (as *Tomlinson* counsel have themselves recognized repeatedly in filings in connection with their own settlements) rarely exceed single digits. *See, e.g.*, *In re Online DVD-Rental Antitrust Litig.*, 779 F.3d 934, 944-45 (9th Cir. 2015) (affirming approval of settlement with claims rate of less than 3.4%); *Rael v. Children's Place, Inc.*, No.: 3:16-cv-00370-GPC-LL, 2020 WL 434482, at *9 (S.D. Cal. Jan. 28, 2020) ("[C]onsumer class actions tend to result in claims rates in the low single digits."). Recent experience bears this out. In *Jones*, another Roundup® case, the court granted final approval after the Parties completed "detailed and extensive" notice efforts and achieved a claims rate between 2 and 3%. *Jones*, 2021 WL 2426126, at *2-3 & n.4. The court also found that "further efforts to … increase the claims rate [were] not feasible." *Id.* at *5. Here, even assuming an attorneys' fee award of 25% of the fund, and after accounting for administrative fees, the Ceiling Amount will cover a claims rate on the high end of likely claims.

A district court's role is "to ensure the settlement is 'fundamentally fair within the meaning of Rule 23(e).'" *TracFone*, 112 F. Supp. 3d at 1004-05 (quoting *Lane*, 696 F.3d at 819). This Settlement is fundamentally fair, regardless of whether the payments are evaluated from the perspective of individual Class Members or as a percentage of total estimated liability. Plaintiffs have demonstrated the adequacy of those payments by "show[ing] their work" through a "careful analysis of the claims and … potential defenses." *Eddings v. DS Servs. of Am., Inc.*, No. 15-cv-02576-VC, 2016 WL 3390477, at *1 (N.D. Cal. May 20, 2016) (Chhabria, J.).

### 3.     The extent of discovery and stage of proceedings weigh in favor of approval.

"[I]n the context of class action settlements, 'formal discovery is not a necessary ticket to the bargaining table' where the parties have sufficient information to make an informed decision about settlement." *In re Mego Fin. Corp. Sec. Litig.*, 213 F.3d 454, 459 (9th Cir. 2000) (citation omitted). Courts instead "look for indications 'the parties carefully investigated the claims before reaching a resolution.'" *In re Volkswagen "Clean Diesel" Mktg., Sales Pracs., & Prod. Liab. Litig.*, MDL No. 2672 CRB (JSC), 2016 WL 6248426, at *13 (N.D. Cal. Oct. 25, 2016), *aff'd* 895 F.3d 597 (9th Cir. 2018), *and* 741 F. App'x 367 (9th Cir. 2018) (quoting *Ontiveros v. Zamora*, 303 F.R.D. 356, 371 (E.D. Cal. 2014)) (holding that factor weighed in favor of approval where parties settled in early stages of litigation prior to "dispositive motion practice," but plaintiffs had served written discovery, "analyzed economic damages (and retained experts concerning those issues)," and done "careful investigation of their claims before they filed their Complaint").

Class Counsel have aggressively pressed claims substantially similar to the claims here for more than two years across more than a dozen Related Actions. The Parties have engaged in formal discovery in the related *Ezcurra* and *Weeks* matters and informal discovery before mediation. That includes Plaintiffs' preparation of an expert report, responses to dozens of interrogatories, and Monsanto's production of thousands of pages of documents. Class Counsel also conducted a "careful investigation of their claims" prior to filing suit, including reviewing extensive information and documentation from the personal-injury litigation and the regulatory record that is available online.[31] The Settlement Agreement was reached only after dispositive motion practice in this and Related Actions. Thus, Class Counsel were well versed in the strengths and weaknesses of Plaintiffs' claims, when the Settlement Agreement was negotiated. *See Palacios v. Penny Newman Grain, Inc.*, No. 1:14–cv–01804–KJM, 2015 WL 4078135, at *8 (E.D. Cal. July 6, 2015)

---

[31]   *See* Baum Hedlund, *Monsanto Papers*, https://www.baumhedlundlaw.com/toxic-tort-law/monsanto-roundup-lawsuit/monsanto-secret-documents/ (last visited October 20, 2021); *see also* Environmental Protection Agency, *Glyphosate Registration Review Docket*, https://www.regulations.gov/docket/EPA-HQ-OPP-2009-0361 (last visited October 20, 2021).

("The information defendants provided allowed plaintiffs to conduct other investigations and to conclude that the settlement amount is 'extremely favorable'").

### 4. The experience and views of counsel weigh in favor of settlement.

"[P]arties represented by competent counsel are better positioned than courts to produce a settlement that fairly reflects each party's expected outcome in litigation." *Rodriguez*, 563 F.3d at 967 (quoting *In re Pac. Enters. Sec. Litig.*, 47 F.3d 373, 378 (9th Cir.1995)) (internal quotation marks omitted). Courts thus "afford 'great weight to the recommendation of counsel.'" *Volkswagen*, 2016 WL 6248426, at *14 (citation omitted).

Class Counsel has significant experience with consumer class actions and other complex litigation, including being appointed as lead or co-lead class counsel in several cases in this Court and other state and federal courts and to plaintiffs' executive committees in several multidistrict class-action litigations. Wade Decl. ¶¶ 22, 25-34; Oster Decl. ¶¶ 10-13. The Settlement was reached only after hard-fought, arms' length negotiations between competent and well-informed counsel that were facilitated by an experienced mediator. Wade Decl. ¶¶ 15, 35-36; Oster Decl. ¶¶ 14-15. For all the reasons expressed herein, Class Counsel believes the Settlement constitutes an excellent recovery for Class Members and is fair, reasonable, and adequate. Wade Decl. ¶¶ 35-36; Oster Decl. ¶¶ 14-15. This factor thus weighs in favor of approval.

### 5. The lack of a governmental participant at this stage is neutral.

Certain factors "cannot be fully assessed" "[a]t the preliminary approval stage." *Byrne v. Santa Barbara Hosp. Servs., Inc.*, No. EDCV 17–527 JGB (KKx), 2017 WL 5035366, at *8 (C.D. Cal. Oct. 30, 2017) (citations omitted). Where, as here, there is no government participant in the action, the presence-of-a-governmental-participant "factor does not weigh in the Court's analysis."

*Fulcher v. Olan Mills, Inc.*, No. 3:11-cv-01821-EDL, 2011 WL 13243724, at *4 (N.D. Cal. Dec. 28, 2011).

> **6.    The reaction of the class members to the proposed settlement is neutral at this stage and should be evaluated at final approval.**

Because notice has not yet been issued, the Court cannot fully assess the reaction of Class Members to the Settlement. Instead, "[t]he reaction of the class members is best assessed at the final approval hearing since the court can look at how many class members submitted claim forms and objections." *Moreno*, 2021 WL 1788447, at *10 (citing *Rodriguez*, 563 F.3d at 967). Although the Parties anticipate that the *Tomlinson* Plaintiffs will object to preliminary approval, their incentives are dramatically different than those of other Class Members. In any event, this factor should be considered neutral at the preliminary-approval stage. *See Newton v. Am. Debt Servs., Inc.*, No. 3:11-cv-03228 EMC, 2016 WL 7743686, at *6 (N.D. Cal. Jan. 15, 2016) ("[T]he Class has not yet been notified of the settlement; therefore it is too early to evaluate the class's reaction to the settlement, and this factor is neutral.").

> **B.    The Settlement Is Not Collusive.**
>
> **1.    The Settlement lacks indicia of collusion.**

In the Ninth Circuit, when "'a settlement agreement is negotiated prior to formal class certification,' the Court must satisfy itself that 'the settlement is not [ ] the product of collusion among the negotiating parties.'" *Navarrete v. Sprint United Mgmt. Co.*, No. 8:19-cv-00794-JLS-ADS, 2021 WL 4352903, at *7 (C.D. Cal. Mar. 2, 2021) (quoting *In re Bluetooth Headset Prods. Liab. Litig.*, 654 F.3d 935, 946 (9th Cir. 2011)). The question for courts is whether "class counsel have allowed pursuit of their own self-interests and that of certain class members to infect the negotiations." *Miguel-Sanchez*, 2021 WL 1736807, at *8 (citations omitted). Signs of this include "(1) class counsel's receipt of a disproportionate distribution of the settlement, (2) a 'clear sailing' agreement 'providing for the payment of attorneys' fees *separate and apart from class funds*, which carries the potential of enabling a defendant to pay class counsel excessive fees and costs

in exchange for counsel accepting an unfair settlement on behalf of the class'; and (3) an arrangement whereby fees that are not awarded are reverted to the defendants, rather than added to the class fund." *Id.* (citations omitted) (emphasis added).

These indicia are not present here. Class Counsel has not yet filed its fee application, but does not intend to seek more than 25% of the total benefit available to the Settlement Class. Twenty-five percent is the "the 'benchmark' level for reasonable attorney's fees in class action cases." *Garibay v. Archstone Cmtys. LLC*, 539 F. App'x 763, 764 (9th Cir. 2013). And seeking fees as a percentage of the fund ensures that class counsels' incentive is to negotiate the largest possible benefit for the class. *See Craft v. Cty. of San Bernardino*, 624 F. Supp. 2d 1113, 1123 (C.D. Cal. 2008) (percentage of the fund "aligns the interests of counsel and the class by allowing class counsel to directly benefit from increasing the size of the class fund.") (citations omitted). Negotiating a substantial fund and seeking no more than the benchmark percentage in fees does not indicate collusion.

Plaintiffs anticipate the *Tomlinson* Plaintiffs will argue that 25% of the *available* fund may be more than 25% of the *actual* fund if the claims rate is low. It is true that Class Counsel cannot yet know the claims rate, but as discussed above, they negotiated a substantial per-unit payment, along with a settlement fund they believe is adequate to pay the contemplated amounts to claimants even at the high end of claims rates in similar cases. *See, e.g.*, *In re Baby Prod. Antitrust Litig.*, 708 F.3d 163, 178 (3d Cir. 2013) ("Class counsel should not be penalized for these or other legitimate reasons [for a low claims rate] unrelated to the quality of representation they provided.").[32] In any event, the claims rate cannot be known without moving forward with notice.

---

[32] *See also Boeing Co. v. Van Gemert*, 444 U.S. 472, 478, 480 (1980) ("[A] lawyer who recovers a common fund for the benefit of [a class] is entitled to a reasonable attorney's fee from the fund as a whole," even if part reverts to the defendant); *In re Comcast Corp. Set-Top Cable Television Box Antitrust Litig.*, 333 F.R.D. 364, 385-87 (E.D. Pa. 2019) ("[I]t is now known that only 20,262 individuals filed claims for a total of $211,255.00 in cash payments … [however] the low level of distribution of benefits to the Class does not reflect a failure of Class Counsel to adequately represent the interests of the Class.").

If indeed the claims rate is such that the amount due to Class Members is less than the available fund, that can be addressed at that time.

If anything, the circumstances here show a lack of collusion. Plaintiffs did not negotiate a standard claims-made fund, in which unclaimed funds would revert to the defendant or to *cy pres*, but instead negotiated a Floor Amount to *ensure* that a substantial portion of the available fund will go to Class Members even in the event of a lower claims rate. Thus, even if only the Floor Amount is reached, and even if Class Counsel moved for and received 25% of the Ceiling Amount, that would still constitute less than half of the actual fund, while the rest (less the costs of settlement administration) will go to Class Members (and each claimant's recovery could increase to an amount higher than a 20% refund). In other words, despite an uncertain claims rate, Class Counsel will never receive an "outsized" distribution.

Monsanto's agreement not to oppose fees up to the 25% benchmark also does not suggest collusion. This is not an arrangement in which Monsanto agreed to a payment of fees "separate and apart from class funds." *Miguel-Sanchez v*, 2021 WL 1736807, at *8. Instead, Class Counsel's fee request is directly tied to the amount available to the Settlement Class and will be paid from the overall settlement fund. More importantly, the Settlement Agreement expressly provides—a term that Monsanto insisted upon and that Class Counsel did not oppose—that it is valid and binding *regardless* of whether Class Counsel's request for fees is approved or reduced. *See* Settlement § F(1); Wade Decl. ¶ 39. This, again, demonstrates a lack of collusion.

There is also no reversion of unawarded attorneys' fees to Monsanto. The Settlement provides up to $45 million from which both Authorized Claimants and Class Counsels' fees are to be paid. *Id.* § D(1). If the requested fees are reduced, the amount available to Class Members increases. There is no provision automatically reverting unawarded fees to Monsanto such that the Parties are negotiating a separate fee award that might be inflated relative to the class benefit. In short, the Settlement structure aligns Class Counsels' interests with those of the class and "exhibit[s] none of the telltale signs of collusion." *Jabbari v. Farmer*, 813 F. App'x 259, 260 (9th Cir. 2020).

### 2.   Other circumstances show a lack of collusion.

The Settlement exhibits several other signs of good-faith negotiation. "[T]he negotiation process was 'fair and full of adversarial vigor,' reflecting an arm's length negotiation." *Criswell*, 2021 WL 4461640, at *4 (citations omitted); *Rodriguez v. West Publishing Corp.*, 563 F.3d 948, 965 (9th Cir. 2009) ("We put a good deal of stock in the product of an arms-length, non-collusive, negotiated resolution."). Both Plaintiffs and Monsanto are represented by well-regarded counsel[33] with significant experience in class actions. *See Scott v. ZST Digital Networks, Inc.*, No. CV 11-3531 GAF (JCx), 2013 WL 12126744, at *6 (C.D. Cal. Aug. 5, 2013) (finding no collusion because, inter alia, case was "litigated by experienced and well-respected counsel on both sides"). And, as discussed, the Parties have litigated these issues for years.

Participation in mediation also "tends to support the conclusion that the settlement process was not collusive." *Palacios*, 2015 WL 4078135, at *8; *Armstrong Flooring*, 2020 WL 11271958, at *7. Here, the Parties participated in a 14-hour mediation session before retired Judge Welsh, an experienced class-action mediator. *See Silvis v. Ambit Energy L.P.*, 326 F.R.D. 419, 426, 37 (E.D. Pa. 2018) (proposed settlement agreement was "arrived at in good faith following extensive arm's length negotiations" after full-day mediation session before Judge Welsh); *In re Budeprion XL Mktg. & Sales Litig.*, MDL No. 2107, 2012 WL 2527021, at *12, *22 (E.D. Pa. July 2, 2012) (initial presumption in favor of settlement applied because of arm's length negotiation after 11-hour mediation session before Judge Welsh). Judge Welsh has submitted a declaration swearing that "the parties engaged in extensive adversarial negotiations on virtually every issue in the cases"; that she "observed nothing that suggested any collusion or untoward behavior by counsel for either party"; and that, in her opinion, "the outcome of the mediated negotiations is the result of a fair, thorough, and fully informed arms-length process between highly capable, experienced, and informed parties and counsel." Wade Decl. Ex. 3 (Welsh Decl. (Dkt. No. 27)) ¶¶ 9-10; Rosenthal Decl. ¶¶ 5-8 (describing mediation and negotiations). In short, the record shows no collusion occurred.

---

[33] There are no "side-agreements" made in connection with the Settlement. Wade Decl. ¶ 44.

The *Tomlinson* Plaintiffs have previously argued that the absence of formal discovery in this action is indicative of collusion. That is baseless. Plaintiffs have access to the discovery in *Ezcurra* and *Weeks*, including Ezcurra's expert's work on damages. And, as discussed above, the Parties engaged in informal discovery in this case, where Monsanto produced nationwide sales data for its Roundup® Products to facilitate settlement discussions. Plaintiffs also relied on extensive publicly-available information from the personal-injury litigation, the *Wheatgrowers* case, and the regulatory record. Wade Decl. ¶ 13.

### 3.  Accusations of "reverse auction" are baseless

In prior filings, the *Tomlinson* Plaintiffs have accused the Parties of engaging in a "reverse auction" because Monsanto negotiated with Class Counsel instead of them. The incentive for *Tomlinson*'s counsel to raise such arguments is obvious—they stand to lose potential attorneys' fees if this Settlement is approved. But the *Tomlinson* Plaintiffs have offered nothing to substantiate such accusations, even though such allegations must be supported by "concrete evidence of collusion, such as a bidding war." *O'Bryant v. ABC Phones of N.C., Inc.*, No. 19-cv-02378-SHM-tmp, 2020 WL 7634780, at *10 (W.D. Tenn. Dec. 22, 2020) (citations omitted); *Gallucci v. Gonzalez*, 604 F. App'x 533, 535 (9th Cir. 2015) (a bidding war is the primary marker of a reverse auction). The *Tomlinson* Plaintiffs certainly do not point to any "bidding war," and the suggestion that Monsanto's failure to negotiate with them means that it colluded with Class Counsel is illogical.

There are far more plausible explanations. Most notably, and as Monsanto noted in prior filings before the transferor court, Plaintiffs were pursuing an action in federal court in Monsanto's state of incorporation that could serve as a vehicle for a nationwide settlement capable of providing global peace. The *Tomlinson* Plaintiffs, on the other hand, are proceeding with a state class in state court, so they could not even be "bidders" in any supposed reverse auction for a nationwide settlement. *See* Rosenthal Decl. ¶ 9. Regardless, it is not evidence of a reverse auction that objecting counsel were not included in the negotiations or believe they were better positioned for

settlement. *See Swinton v. SquareTrade, Inc.*, 960 F.3d 1001, 1005-06 (8th Cir. 2020). Nor is it evidence of a reverse auction that the *Tomlinson* Plaintiffs are "unhappy that [their class] was not the class [Monsanto] chose to settle with." *Smith v. CRST Van Expedited, Inc.*, No. 10–CV–1116–IEG (WMC), 2012 WL 5873701, at *4 (S.D. Cal. Nov. 20, 2012). Public policy favors settlement and the Parties were surely entitled to negotiate a nationwide resolution after litigating these issues for years.

The *Tomlinson* Plaintiffs have also argued that there must have been collusion because, in their view, the mediation resulted in a "substantially discounted" settlement. As discussed at length above, the Settlement amount is fair and reasonable, and Class Members are expected to receive payments amounting to a substantial portion of Plaintiffs' estimate of best-case damages. It also favorably compares to two nationwide settlements related to alleged false advertising of Roundup® Lawn & Garden products recently approved by federal courts. *See Rawa v. Monsanto Co.*, No. 4:17-CV-01252-AGF, 2018 WL 2389040 (E.D. Mo. May 25, 2018) (approving $21.5 million nationwide settlement of consumer protection claims related to Roundup® Lawn & Garden products), *aff'd*, 934 F.3d 862 (8th Cir. 2019); *Jones*, 2021 WL 2426126 (approving $39.5 million nationwide settlement of false-advertising complaint related to Roundup® Lawn & Garden products). The *Tomlinson* Plaintiffs' dissatisfaction with the terms of the Settlement is not evidence of collusion.

## IV.    THE SETTLEMENT MERITS PRELIMINARY APPROVAL UNDER THIS DISTRICT'S GUIDANCE.

The Settlement also merits preliminary approval under this District's Procedural Guidance for Class Action Settlements (the "Guidance").

*First*, the Settlement Class and Released Claims are consistent with the factual allegations in the complaint. *See* Guidance §§ 1(a) and (c). Settlement § A(52); SAC ¶ 137. The Settlement's definition of "Products" differs from the complaint only in that it identifies the specific products. *See* Settlement § A(45); SAC ¶ 23. And as discussed above, Class Members who do not opt out

will release only claims for economic loss arising from the same factual predicate as the claims pleaded in the complaint. Settlement § L(1); *see* Standing Order at 14.

*Second*, Class Members' anticipated recovery under the Settlement compares favorably to their potential recovery in litigation. *See* Guidance § 1(e). As described in detail above (*supra* Section III.A.), Class Members who submit valid claims will receive direct cash payments equal to approximately two-thirds of their *best-case* damages at trial. In light of the risks of continued litigation discussed above, the immediate, direct payments of approximately two-thirds of Class Members' best-case recovery represent an excellent result for the class.

*Third*, the allocation plan is fair, reasonable, and adequate. *See* Guidance § 1(f); Standing Order at 16. "A plan of allocation that reimburses class members based on the type and extent of their injuries is generally reasonable." *In re Citric Acid Antitrust Litig.*, 145 F. Supp. 2d 1152, 1154 (N.D. Cal. 2001). To that end, courts recognize that "some sort of claims process is necessary" in many settlements to distribute payments to class members. *Hyundai*, 926 F.3d at 568; *see also Broomfield*, 2020 WL 1972505, at *9 ("And while monetary relief was available to only those class members who submitted [valid] claims, the use of a claims process is not inherently suspect.") (citations omitted). That is particularly true in consumer settlements, where "it is unlikely that the defendant has any record of who the purchasers of the product are, much less a current address for distribution of the recovery." Newberg on Class Actions § 12:18.

That is true in this case. Monsanto does not know the identity of, let alone have contact information for, the vast majority of purchasers who bought the Products over the course of many years. Rosenthal Decl. ¶ 12 n.1. Plaintiffs have negotiated a simple, intuitive claims process, requiring only contact information, the quantity and type of Product purchased, and the retailer, location, and approximate date of purchase. *See* Settlement § I(4)(a)-(d). The Claim Form may be submitted online or by mail and need not include proof of purchase up to specified limits. *See id.* §§ I(4), I(6). And Class Members can claim an *unlimited* number of units of any Product with valid proof of purchase. *Id.* § I(7). Authorized Claimants will be paid for each validly claimed Product equal to roughly 20% of average retail price and ranging from 50 cents to $33.00 per Product, with

the possibility of upward pro rata adjustments. *Id.* §§ E(1), E(3). To the extent funds remain in unclaimed, uncashed, or otherwise unredeemed checks and would cause total cash consideration to fall below the Floor Amount, those amounts will either also be distributed to Authorized Claimants pro rata or, *only* if the remaining amounts are so small that further distributions to claimants are not economically feasible, donated to the National Consumer Law Center ("NCLC").[34] *Id.* § E(4)-(5). Authorized Claimants' payments will be adjusted downward only if the Ceiling Amount is insufficient to allow payments to all Authorized Claimants. *Id.* § E(2). The claims process is fair and reasonable.

*Fourth*, the Parties and Claims Administrator expect Class Members to submit claims at levels consistent with other consumer class-action settlements and recent settlements concerning Roundup® Lawn & Garden products. *See* Guidance § 1(g). Specifically—although the Claims Administrator and Parties hope to stimulate more claims and have designed a robust notice program toward that end—they estimate based on the claims rate in other consumer class-action cases, and based on past experience, that well under 10 percent of Class Members will submit claims. *See, e.g.*, *Bayol et al. v. Health-Ade LLC*, No. 3:18-cv-01462 (N.D. Cal. Feb. 21, 2020) (Dkt. No. 61) (1.08% estimated claims rate); *Pettit v. Proctor & Gamble*, No. 3:15-cv-02150 (N.D.

---

[34] Guidance § 8 requires certain information concerning proposed *cy pres* recipients. NCLC is not a *cy pres* recipient in the typical sense—it will receive funds only in very limited circumstances and even then only in a minimal amount, since unclaimed funds must be paid to claimants unless doing so is economically infeasible. Nonetheless, we provide further information on NCLC in abundance of caution. NCLC "advocates on behalf of consumers, providing legal services and aid, and representing them on matters of interest before Congress and state legislatures and by filing amicus briefs in courts" and "provides help to litigation counsel representing persons with incomes below 200% of the federal poverty line in matters involving consumer sales and services." *Rawa*, 2018 WL 2389040, at *11 n.5 (quoting *Miller v. Ghirardelli Chocolate Co.*, No. 12-cv-04936-LB, 2015 WL 758094, at *8 (N.D. Cal. Feb. 20, 2015)). "Numerous courts have approved *cy pres* awards to the NCLC in nationwide consumer class actions claiming false advertising," including two courts approving other consumer-fraud settlements involving Monsanto and its Roundup® products. *Id.* at *11; *Jones*, 2021 WL 2426126, at *2, 8-9. Beyond NCLC's designation as a *cy pres* recipient in those matters, the Parties are not aware of any relationship between the Parties in this case and their counsel with NCLC.

Cal. July 17, 2019) (Dkt. No. 139) (4.84% estimated claims rate); *Jones*, 2021 WL 2426126, at *3 (2-3% estimated claims rate).

*Fifth*, the Settlement Agreement does not contain a reversionary provision. *See* Guidance § 1(h). Instead, the Parties have negotiated a claims-made fund with a floor to ensure that the class receives a minimum payout even if the claims rate is lower than expected. *See supra* Section III.A.2. This structure is not only fair, ensuring a significant monetary fund regardless of claims rate, but is readily understandable in the current legal landscape, where common-fund agreements providing for *cy pres* payments of unclaimed funds have faced significant challenges from organized and committed objectors even when it is undisputed that the amount of the settlement and the notice and claims process are fair and adequate. Such challenges, even when unsuccessful, can cause years of litigation and delay payments to class members. *See Jones*, 2021 WL 2426126, at *5-8 (discussing objection based on *cy pres* award of unclaimed funds despite lack of challenge to notice, settlement amount, or per-unit payments), *on appeal* at No. 21-2292 (8th Cir.); *see also In re Google Inc. Street View Elec. Commc'ns Litig.*, --- F.4th ----, 2021 WL 6111383, at *16-18 (9th Cir. Dec. 27, 2021) (Bade, J., concurring) (discussing challenges to *cy pres* awards").

*Sixth*, Plaintiffs have provided declarations supporting the incentive awards they intend to seek in light of their contribution to the ultimate resolution of this case. *See* Guidance § 7. Plaintiffs have paid close attention to this action and, to the extent applicable, their respective actions against the retailer-defendants, and have reviewed court filings and communicated with counsel on numerous occasions to assist in the prosecution of these actions. *See* Gilmore Decl. ¶ 6; Weeks Decl. ¶ 7; Taylor Decl. ¶ 6; Hanna Decl. ¶ 6; Boyette Decl. ¶ 6; Ezcurra Decl. ¶ 6; Jewell Decl. ¶ 6; Williams Decl. ¶ 6. Plaintiff Ezcurra, in his action against Monsanto in Florida, responded to written discovery requests and prepared for a deposition. *See* Ezcurra Decl. ¶ 6. Plaintiff Weeks, in his action against Home Depot U.S.A., Inc., also responded to written discovery. Weeks Decl. ¶ 7. Plaintiffs have always been willing and remain willing to do the work necessary to see the case to a resolution, whether through the Settlement or continued litigation, up to and through trial. *See* Gilmore Decl. ¶ 9; Weeks Decl. ¶ 11; Taylor Decl. ¶ 9; Hanna Decl. ¶ 9; Boyette Decl. ¶ 9;

Ezcurra Decl. ¶ 10; Jewell Decl. ¶ 9; Williams Decl. ¶ 9. Plaintiffs acknowledge their request for a service award is within the Court's discretion, and they were not promised any compensation in connection with this lawsuit or any other Related Action. *See* Gilmore Decl. ¶ 8; Weeks Decl. ¶ 10; Taylor Decl. ¶ 8; Hanna Decl. ¶ 8; Boyette Decl. ¶ 8; Ezcurra Decl. ¶ 9; Jewell Decl. ¶ 8; Williams Decl. ¶ 8. Plaintiffs, however, note that "[a]n incentive award of $5,000 is considered presumptively reasonable in this District." *O'Connor v. Uber Techs., Inc*., No. 13-CV-03826-EMC, 2019 U.S. Dist. LEXIS 54608, at *44 (N.D. Cal. Mar. 29, 2019) (citations and quotations omitted).

      *Seventh*, Plaintiffs concurrently submit herewith the Declaration of Gillian L. Wade, which provides information about the attorneys' fees Plaintiffs intend to request and their lodestar calculation. *See* Guidance § 6; Wade Decl. ¶¶ 37-42. Class Counsel intend to request attorneys' fees of no more than 25% of the $45 million "Ceiling Amount." Settlement § F(1); Wade Decl. ¶ 37. The Settlement Agreement recognizes that it will resolve 18 other matters that were pursued by Class Counsel and Plaintiff's Counsel (the "Related Actions"), and the role the prosecution of those matters played in reaching the Settlement. Settlement § A(46), F(2) ("The Parties recognize [] that litigation pursued in the Related Actions contributed significantly to bringing about the mediation in this matter"). Accordingly, Class Counsel intend to seek the costs and attorneys' fees incurred in this action as well as in the Related Actions. Wade Decl. ¶ 38. To date, Class Counsel and Plaintiff's Counsel's combined lodestar for work performed in this case and the Related Actions is approximately $7,694,358.75. *See* Wade Decl. at ¶ 40 (summarizing Lodestar per case and firm). Twenty-five percent of the Ceiling Amount is $11.25 million, which, if the full amount of fees are ultimately sought, represents a multiplier of 1.46. Wade Decl. ¶ 41. Given the structure of the Settlement, however, Class Counsel has not yet determined whether they will seek a multiplier. *Id.*

      The Settlement Agreement also permits Class Counsel to seek reimbursement of costs incurred in addition to attorneys' fees. Settlement § F(1). The costs incurred in this action and the Related Actions for which Class Counsel intend to seek reimbursement are approximately

$207,618.41. *See* Wade Decl. at ¶ 42 (summarizing costs per case). The majority of these costs, $188,561.50, are expert fees. *Id.* at ¶ 43.

*Finally*, the substantive provisions of the Class Action Fairness Act ("CAFA") are not implicated here. *See* Guidance § 10. Monsanto served notice of the Settlement on federal and state officials within ten calendar days after the Settlement was filed with the transferor court pursuant to 28 U.S.C. § 1715 and will serve updated CAFA notice shortly after this motion is filed.[35]

## V.     THE NOTICES AND NOTICE PLAN SHOULD BE APPROVED.

Rule 23 requires parties to provide the class with the best notice of the proposed settlement practicable under the circumstances. Fed. R. Civ. P. 23(c)(2)(B). "[T]he method of providing notice 'must be such as [a person] desirous of actually informing the absentee might reasonably adopt to accomplish it.'" *Miguel-Sanchez*, 2021 WL 4893394, at *4 (citing *Roes, 1-2 v. SFBSC Mgmt., LLC*, 944 F.3d 1035, 1045-46, 1046 n.7 (9th Cir. 2019)).

The Notice Plan is the best notice practicable because it was designed to target Class Members and reach at least 80% of them an average of 2.52 times each. *See generally* Schwartz Decl. The proposed Notice Plan includes multifaceted methods of notice, including (1) direct notice via email to millions of likely purchasers of the Products; (2) print media; (3) online display; (4) social media; (5) online video; (6) television; (7) digital newsletters; (8) search advertising; (9) third-party class-action websites; (10) a national press release; (11) a toll-free settlement hotline; and (12) a Settlement Website. *Id.* ¶ 13.[36] The Publication Notice (a short-form notice) and Class Action Settlement Notice (a long-form notice) (collectively, the "Notices") are designed to be noticed by and inform Class Members about the Settlement, are presented in plain language, and conform to the standards set forth in the Federal Judicial Center's 2010 *Judges Class Action*

---

[35] Guidance § 2 regarding the selection of the Settlement Administrator is addressed *supra* pages 8-9. Guidance §§ 3-5 regarding notice, and the corresponding portions of this Court's Standing Order, are addressed *infra* Section V.

[36] Class Counsel considered the ways to increase notice listed in this Court's Procedural Guidance and they were incorporated into the notice program to the extent practicable. *See* Guidance ¶ 3; Wade Decl. ¶ 45.

*Notice and Claim Process Checklist and Plain Language Guide. Id.* ¶¶ 10-12 & Exs. C-D. All told, the Notice Plan is estimated to result in *hundreds of millions* of notice "impressions" served to likely Class Members. *See id.* ¶¶ 18-48.

The proposed Notices also comport with this Court's Guidance as they are designed to be easily understandable and they include the following information: (1) contact information for Class Counsel and the Claims Administrator to answer questions; (2) the address for a website, maintained by the Claims Administrator, that has links to the notice, motions for approval and for attorneys' fees and any other important documents in the case; and (3) instructions on how to access the case docket via PACER or in person at any of the court's locations. Guidance ¶ 3; Schwartz Decl. Ex. C, Ex. D at 9. They also "state the date of the final approval hearing and clearly state that the date may change without further notice to the class" and advise Class Members "to check the settlement website or the Court's PACER site to confirm that the date has not been changed." Guidance ¶ 3; Schwartz Decl. Ex. C, Ex. D at 8-9.[37]

In sum, the proposed "Notice is satisfactory [because] it generally describes the terms of the settlement in sufficient detail to alert those with adverse viewpoints to investigate and to come forward and be heard." *Churchill Vill., L.L.C. v. Gen. Elec.*, 361 F.3d 566, 575 (9th Cir. 2004) (citation omitted). The proposed Notices and Notice Plan should therefore be approved.

## <u>CONCLUSION</u>

With the consent of Defendant Monsanto, Plaintiffs respectfully request that the Court issue an Order substantially in the form of the Proposed Order submitted herewith (1) preliminarily

---

[37] The proposed Notices further comply with this Court's Guidance by instructing "class members who wish to opt out of the settlement to send a letter … to the settlement administrator and/or the person or entity designated to receive opt outs." Guidance ¶ 4; Schwartz Decl. Ex. C, Ex. D at 5-7. The Notices clearly advise Class Members of the deadline, methods to opt out, and the consequences of opting out. Guidance ¶ 4; Schwartz Decl. Ex. C, Ex. D at 5-7. Moreover, the Notices "to send their written objections only to the court," explain "that the court can only approve or deny the settlement and cannot change the terms of the settlement," and "advise class members of the deadline for submission of any objections." Guidance ¶ 5; Schwartz Decl. Ex. C, Ex. D at 5, 7. They also are clear that the "Court will require only substantial compliance with the requirements for submitting an objection." Standing Order at 15; Schwartz Decl. Ex. D at 7.

certifying the Settlement Class and appointing the named Plaintiffs and their counsel as Class Representatives and Class Counsel, respectively; (2) preliminarily approving the proposed Settlement; (3) approving the Class Notice and Notice Plan, and directing that Class Notice be disseminated pursuant to the Notice Plan; and (4) setting a fairness hearing and other necessary dates in connection with Final Approval of the Settlement.

Dated: January 20, 2022                    */s/ Gillian L. Wade*

GILLIAN L. WADE
SARA D. AVILA
MARC A. CASTANEDA
Milstein, Jackson Fairchild & Wade, LLP
gwade@mjfwlaw.com
mcastaneda@mjfwlaw.com
10990 Wilshire Blvd., 8th Floor
Los Angeles, CA 90024
Tel: (310) 396-9600
Fax: (310) 396-9635

JOEL OSTER
The Law Offices of Howard Rubinstein
joel@osterlaw.com
22052 W. 66th St. #192
Shawnee, Kansas 66226

*Counsel for Plaintiffs and the Proposed Class*

45

*Appendix A – Related Actions*

| Case Caption | Date Filed | Date Dismissed | Notes |
|---|---|---|---|
| *Cases Pending in Federal Court* | | | |
| *Ezcurra v. Monsanto*, No. 9:20-cv-80524 (S.D. Fla.) | Feb. 19, 2020 | Pending on appeal | Monsanto removed to federal court on March 27, 2020, and the parties commenced discovery on May 4, 2020. The parties exchanged written discovery during the summer. On August 6, 2020, the court granted Monsanto's motion to dismiss.  Plaintiff has appealed to the U.S. Court of Appeals for the Eleventh Circuit, where it has been fully briefed. On September 3, 2021, the matter was stayed pending approval proceedings in this action. |
| *Weeks v. Home Depot*, No. 2:19-cv-6780 (C.D. Cal.) | Aug. 5, 2019 | Pending on appeal | Following a comprehensive meet and confer as required by C.D. Cal. LR-7.3, but prior to any motion practice from Home Depot, plaintiffs filed an amended complaint on November 22, 2019, which Home Depot moved to dismiss on December 12, 2019. Plaintiffs filed an opposition on January 9, 2020 and the court denied Home Depot's motion to dismiss without prejudice on January 21. Home Depot then filed a renewed motion to dismiss on February 3, 2020, which the court granted in part with leave to amend, and denied in part, with prejudice, on September 18, 2020. Following this ruling, the case was transferred to a new judge. Plaintiffs filed a second amended complaint on October 2, 2020, and Home Depot moved to dismiss two weeks later on October 16.  On December 17, 2020 the court |

*Appendix A – Related Actions*

| | | | |
|---|---|---|---|
| | | | granted Home Depot's motion and dismissed the case. Plaintiffs appealed to the U.S. Court of Appeals for the Ninth Circuit on January 12, 2021. The matter is presently administratively closed pending approval proceedings in this action. |
| **Cases Pending in State Court** | | | |
| *Lamerson v. Walmart Stores, Inc.*, No. 50-2019-CC-009139 (Cty. Ct. 15th Cir. In and for Palm Beach Cty., Fla.) | July 15, 2019 | Pending | Walmart removed to federal court on August 16, 2019. The court immediately undertook a *sua sponte* review of the record and ordered remand on August 23, 2019. Walmart sought reconsideration, which the court denied on March 5, 2020. |
| *Shelly v. Target Corp.*, No. 50-2019-CC-010718 (Cty. Ct. 15th Cir. In and for Palm Beach Cty., Fla.) | Aug. 14, 2019 | Pending | Target removed to federal court on September 5, 2019, and plaintiffs moved to remand on the same day. The parties filed responsive briefing and on September 24, 2019, the court granted remand. No subsequent motion practice has occurred. |
| *Biddle v. Lowe's Home Centers LLC*, No. 50-2019-CC-011405 (Cty. Ct. 15th Cir. In and for Palm Beach Cty., Fla.) | Aug. 27, 2019 | Pending | Lowe's removed to federal court on September 9, 2019 and plaintiff moved for remand on October 3, 2019. The next day, Lowe's filed its answer to the complaint. On October 31, 2019, the court remanded the case to state court. No subsequent motion practice has occurred. |
| *Morley v. Ace Hardware Corp.*, No. CONO-19-010648 (Cty. Ct. 17th Cir. In and for Broward Cty., Fla.) | Sept. 6, 2019 | Pending | Ace removed to federal court on October 12, 2019, and plaintiffs moved for remand on October 15. On November 8, 2019, the court remanded the case to state court. No subsequent motion practice has occurred. |

*Appendix A – Related Actions*

| Dismissed Cases | | | |
|---|---|---|---|
| *Fagundes v. The Home Depot*, No. 0:20-cv-61035 (S.D. Fla.) | Mar. 21, 2020 | July 28, 2020 | Complaint initially filed in Florida state court, and Home Depot removed to the Southern District of Florida on May 26, 2020.  The parties briefed removal and remand arguments in June of 2020.  Prior to the issuance of an order on the issue of remand, Home Depot filed its motion to dismiss the complaint on June 30, 2020.  Plaintiff voluntarily dismissed the case on July 28. |
| *Weeks et al v. Lowe's Home Centers, LLC*, No. 2:19-cv-06828 (C.D. Cal.) | Aug. 6, 2019 | Sept. 19, 2019 | Plaintiffs voluntarily dismissed the case on September 19, 2019. |
| *Jewell et al v. Walmart, Inc.*, No. 4:19-cv-04088 (W.D. Ark.) | Aug. 12, 2019 | May 27, 2020 | Walmart filed its motion to dismiss the complaint on February 10, 2020.  Two weeks later, plaintiffs sought and received leave to file a Second Amended Complaint, which it filed on April 27, 2020.  Walmart moved to dismiss the Second Amended Complaint on May 8, 2020.  Plaintiffs moved for voluntary dismissal, which was granted on May 27, 2020. |
| *Boyette et al v. Lowe's Companies, Inc.*, No. 4:19-cv-04119 (W.D. Ark.) | Sept. 13, 2019 | May 20, 2020 | Lowe's filed its answer on December 30, 2019.  Plaintiffs subsequently amended the complaint on January 17, 2020.  On May 19, 2020, plaintiffs voluntarily dismissed the amended complaint. |
| *Taylor et al v. Costco Wholesale Corp.*, No. 20-cv-00655 (E.D. Cal.) | Mar. 27, 2020 | Mar. 2, 2021 | Costco moved to dismiss the complaint on May 21, 2020, which was granted with leave to amend.  Plaintiffs then filed an amended complaint that Costco again moved to dismiss.  Plaintiffs voluntarily dismissed the case on March 1, |

*Appendix A – Related Actions*

| | | | |
|---|---|---|---|
| | | | 2021, shortly after the parties' mediation and while the final terms of the settlement were being negotiated. |
| *Hanna et al v. Walmart Inc.*, No. 5:20-cv-01075 (C.D. Cal.) | May 22, 2020 | Jan. 8, 2021 | Plaintiffs filed an amended complaint prior to any significant motion practice from Walmart. Walmart filed a motion to dismiss on July 29, 2020 that the court granted on November 5, 2020 with leave to amend. Plaintiffs filed a second amended complaint on November 25, 2020 that Walmart moved to dismiss on December 9, 2020. On January 8, plaintiffs voluntarily dismissed the case and re-filed in state court in January 2021. |
| *Williams et al v. Lowe's Home Centers, LLC*, No. 5:20-cv-01356 (C.D. Cal.) | July 6, 2020 | Feb. 19, 2021 | Lowe's moved to dismiss plaintiff's complaint on October 29, 2020. Prior to the court's ruling on Lowes' motion, plaintiffs filed an amended complaint on November 19, 2020, that Lowe's moved to dismiss on December 3, 2020. Plaintiffs filed an opposition to Lowes' motion to dismiss on February 1, 2021, Lowe's opposed on February 8, then voluntarily dismissed the case on February 19, 2021, shortly after the parties' mediation and while the final terms of the settlement were being negotiated. |
| *Waters v. Home Depot USA, Inc.*, No. 50-2019-CC-009140 (Cty. Ct. 15th Cir. In and for Palm Beach Cty., Fla.) | July 15, 2019 | Nov. 7, 2019 | Home Depot removed the case to federal court on August 19, 2019 and Plaintiffs moved for remand on August 27, 2019. While the briefing on remand was under consideration before the court, Home Depot filed a motion to dismiss on October |

*Appendix A – Related Actions*

| | | | |
|---|---|---|---|
| | | | 25, 2019.  Plaintiffs voluntarily dismissed the case on November 7, 2019. |
| *Hanna et al v. Walmart, Inc.*, CIV SB 2100789 (Sup. Ct. Cal. for San Bernardino) (filed Jan. 12, 2021) | Jan. 12, 2021 | April 14, 2021 | Plaintiffs filed the complaint on January 12, 2021.  No subsequent motion practice occurred, and the complaint was voluntarily dismissed April 14, 2021, shortly after the parties' mediation and while the final terms of the settlement were being negotiated.. |
| *Gregorio et al v. Home Depot U.S.A., Inc*., No. CACE-21-002428 (Cty. Ct. 17th Cir. In and for Broward Cty., Fla.) | Feb. 4, 2021 | March 2, 2021 | Plaintiffs filed on February 4, 2021 and served Home Depot on February 10.  Plaintiffs voluntarily dismissed the case after it was removed to federal court.. |