## UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| SCOTT GILMORE, et al.,<br><br>Plaintiffs,<br><br>vs.<br><br>MONSANTO COMPANY,<br><br>Defendant. | MDL No. 2741<br><br>Case No. 3:21-cv-08159<br><br>**DECLARATION OF JOHN J. ROSENTHAL IN SUPPORT OF PLAINTIFFS' MOTION FOR PRELIMINARY APPROVAL OF CLASS ACTION SETTLEMENT AND CERTIFICATION OF CLASS FOR PURPOSES OF SETTLEMENT** |

I, John J. Rosenthal, hereby declare:

1. I am a partner of the firm Winston & Strawn LLP and counsel for Defendant Monsanto Company. I submit this declaration in support of Plaintiffs' concurrently-filed Motion for Preliminary Approval of Class Action Settlement and Certification of Class For Purposes of Settlement.

2. My practice focuses on complex litigation matters in state and federal courts across the country, including complex commercial, antitrust, and false advertising cases. I have litigated many class-action cases in state and federal courts across the country on behalf of numerous clients, including several on behalf of my client, Monsanto Company, concerning its consumer Roundup® herbicide products. I have negotiated numerous class-action settlements that have been approved by state and federal courts. I also regularly lecture and teach on issues of federal practice and procedure to both practicing lawyers and members of the federal and state judiciary.

3. My partner Jeff Wilkerson of Winston & Strawn LLP is also highly experienced in class-action litigation and has worked on many consumer class actions in state and federal courts.

1

Jeff has worked on numerous class-action cases that have resulted in settlements approved by federal courts, including such cases on behalf of Monsanto related to its Roundup® herbicide products.

4.  Plaintiffs' counsel in this case is also well versed in consumer class-action litigation.  Prior to the parties reaching agreement on the terms of the proposed settlement in this case, Plaintiffs' counsel initiated a number of actions in state and federal courts related to Monsanto's Roundup® herbicide products against both Monsanto and major retailers of its products.  With respect to the retailer actions, Plaintiffs' counsel indicated on several occasions to Monsanto's counsel that these actions were intended to pressure Monsanto by subjecting its most significant customers to lawsuits and potential reputational damage.  Although Monsanto believed, and continues to believe, that there are strong defenses to this and the related actions against retailers, the related actions also created significant monetary exposure for Monsanto, as it had obligations to indemnify each of the retailers named in these actions for defense costs and for any liability that the retailers may have incurred.  For this reason, Monsanto could not achieve global resolution of the claims at issue in this action if the release in any settlement did not also release retailers and others in the commercial chain, who could assert either contractual or common-law indemnity claims against either Monsanto (or parties who would in turn claim against Monsanto).  Monsanto would not agree to any settlement, therefore, that did not include such a release, and that it views that release as an essential part of the consideration it receives from the proposed settlement in this action.

5.  Ryan Tomlinson and Carol Richardson, plaintiffs in the *Tomlinson v. Monsanto Co.* action pending in the Circuit court of Jackson County, Missouri at Kansas City (Case no. 1916-

CV22788) have repeatedly suggested in prior filings in this action (and in the *Tomlinson* action) that there was "collusion" between Monsanto and Plaintiffs in negotiating the proposed settlement in this matter, and that there was a "reverse auction." These accusations are categorically and unequivocally false. I was involved in every aspect of Monsanto's negotiations with Plaintiffs that resulted in the settlement, and those negotiations were uniformly carried out at arms' length. Simply put, there was no collusion between the parties and there was no reverse auction, attempted or otherwise.

6.  Prior to the mediation with Judge Welsh, the parties exchanged mediation statements and exhibits with their respective positions on liability, defenses, and damages and had some preliminary discussions regarding settlement. All of those submissions and discussions occurred in good faith, at arms' length, and with both parties advocating on behalf of their clients. Likewise, at the mediation, both parties engaged in advocacy and negotiation on behalf of their clients on all aspects of the proposed settlement.

7.  The mediation took approximately 14 hours, with the parties only reaching an agreement in principle at the end of the mediation and, at many points during the mediation, I believed that the parties were unlikely to reach an agreement. <u>All</u> communications between Monsanto and Plaintiffs during the course of the mediation occurred with the mediator present— any "collusion" would thus have been apparent to Judge Welsh. Likewise, the parties' negotiations and disagreements at the mediation, which Judge Welsh oversaw, were all sincere.

8.  The *Tomlinson* Plaintiffs suggestion that was a "reverse auction" is unsupported and completely untrue. At no point did Monsanto ever state, suggest, or signal to Plaintiffs that they could or should "underbid" any competing settlement offer from the *Tomlinson* Plaintiffs, nor

suggest that there was such an offer to "underbid" in the first place. Likewise, once an agreement in principle had been reached, Monsanto never sought to use that agreement to force the *Tomlinson* Plaintiffs to the negotiating table or to seek a competing offer from the *Tomlinson* Plaintiffs. There simply was <u>nothing</u> in the way of a "reverse auction" in the parties' negotiations in this case. Monsanto's decision not to involve the *Tomlinson* Plaintiffs' counsel in the negotiations with Plaintiffs' counsel was largely predicated on two factors: (i) the confidentiality obligations inherent in mediation; and (ii) avoiding any later suggestion that, by negotiating with counsel from multiple cases, Monsanto was engaged in an improper reverse auction.

9. In addition, the *Tomlinson* action was not a suitable case for any effort to negotiate a nationwide settlement, because it was brought in state court based on a state-law claim and a single-state class, and because the *Tomlinson* Plaintiffs have asserted claims not just based on consumer products, but also based on agricultural and industrial products—products which appear to be largely excluded from the coverage of Missouri's consumer-protection statute. *See* Mo. Rev. Stat. 407.025.1(1) (limiting claims to purchases "primarily for personal, family, or household purposes"). The clear purpose of adding these agricultural and industrial products was to attempt to expand the volume of sales at issue for litigation purposes and, thus, to attempt to increase leverage over Monsanto. The *Tomlinson* Plaintiffs have an unrealistic view of the amount of such sales that would qualify under the Missouri statute. Given these issues, the *Tomlinson* Plaintiffs were never considered serious negotiating candidates for settlement purposes.

10. Attached hereto as **Exhibit A**, for the Court's convenience, is a true and correct copy of the declaration of Kristina Shampanier, Ph.D., with attachment, which was submitted in

4

support of the motion for preliminary approval filed in this case prior to transfer to this Court. This document can also be found at Dkt. No. 30.

11. Following the parties' preliminary agreement on the terms of the proposed settlement, my firm sought and received proposals from three prominent settlement administration firms outlining proposed noticed programs and claims processes. Postlethwaite & Netterville ("P&N") was one of those firms. In consultation with Plaintiffs, we ultimately selected P&N as the settlement administrator because it had prior experience with settlements related to Roundup® products and because its pricing was the most competitive, while still incorporating the same primary elements as the other proposals received.

12. Monsanto estimates that as of February 2021, the total retail sales of the Products (as defined in the proposed settlement) during the Class Period (again, as defined in the proposed settlement) amounted to approximately 108.55 million units and $2.66 billion. These numbers are necessarily estimates because Monsanto does not have, and is not aware of any way to obtain, data reporting *all* retail sales of the products.[1] However, these estimates are well-informed, based on Monsanto's data on the number of units shipped to retailers and distributors and the available data on retail sales (so-called point-of-sale data) to which Monsanto (and Plaintiffs) has access. The point-of-sale data does not record individual purchases, and does not include any information on the identity of end purchasers, but it does provide a significant dataset that can be used in combination with shipment data to estimate average retail sales prices.[2] The Default Payment

---

[1] Monsanto also does not know the identity of, let alone have contact information for, the vast majority of individuals who purchased its products from retailers.

[2] Notably, similar data for Missouri sales of consumer Roundup® products was produced by Monsanto to the *Tomlinson* Plaintiffs.

Amounts set forth in the proposed settlement amount to approximately 20 percent of the estimated average retail price for each product listed therein, rounded to the nearest 50 cents.

Executed this 20th day of January, 2022, in Washington, D.C.

*John Rosenthal*
John J. Rosenthal

# **EXHIBIT A**

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| SCOTT GILMORE,<br><br>　　　　　Plaintiff,<br>　v.<br><br>MONSANTO COMPANY,<br><br>　　　　　Defendant. | Case No. 1:20-cv-01085-UNA |

**DECLARATION OF KRISTINA SHAMPANIER IN SUPPORT OF PRELIMINARY
APPROVAL OF THE NATIONWIDE CLASS-ACTION SETTLEMENT**

　　　1.　　　I am an affiliate of Analysis Group, Inc. I worked for Analysis Group, Inc. as a full time employee from 2007 to 2020 in various positions, including as Vice President between 2016 and 2020.

　　　2.　　　I received a Ph.D. in Business and Management Science (with specialization in Marketing) from the MIT Sloan School of Management in 2007. Prior to that, I received a Master's degree in Mathematics from Moscow State University in 2001 and a Master's degree in Economics from the New Economic School (Moscow) in 2002, both cum laude. While at MIT, I conducted research on judgment, decision making, and consumer behavior.

　　　3.　　　I have supported experts and/or served as an expert in patent, trademark, and trade dress infringement; false advertising; consumer safety; and antitrust cases. I have designed, conducted, and analyzed numerous laboratory, online, and field studies, including in survey and experimental formats. I have extensive experience in survey development and administration, and analysis of data on consumer behavior in consulting and litigation settings. I have also taught outside audiences on survey design and published in academic and practitioner venues. A copy of my CV is enclosed as Exhibit A.

4. At the direction of counsel for Monsanto Company, and to assist them in preparing for a mediation of this case, I conducted choice-based conjoint surveys of potential and actual customers of herbicides based on best practices for survey design, administration, and analysis. Conjoint analysis is a survey-based technique that allows researchers to determine how individuals value different product attributes. There are a wide variety of limitations on damages measures calculated using a choice-based conjoint analysis, and I do not opine here that conjoint analysis is an appropriate method to evaluate damages on a class-wide basis. However, I conducted conjoint studies here because they are commonly used by plaintiffs in class action lawsuits to measure price premiums.[1]

5. Each survey was designed to test the potential price premium associated with the lack of a given warning statement on the rear label of the consumer Roundup® products at issue in this matter. The two warning statements I tested were:

- "This product contains an ingredient that has been classified as a probable carcinogen by IARC (the International Agency for Research on Cancer). The U.S. EPA has disagreed, finding that this ingredient is unlikely to be a human carcinogen and there are no risks of concern to human health when this ingredient is used in accordance with the current product label" (the "Long Warning Statement"), and

- "This product contains an ingredient that has been classified as a probable carcinogen by IARC (the International Agency for Research on Cancer)" (the "Short Warning Statement").

6. The relevant population for the choice-based conjoint analysis surveys were actual and potential purchasers of herbicides. The demographics of the survey respondents are generally representative of customer demographics for Roundup® purchasers I was provided.

---

[1] Jonah M. Kobler and Joshua Kipness, March 1, 2019, "Conjoint Analysis: No Silver Bullet for Calculating Class-Wide Damages," available at https://www.pbwt.com/misbranded/conjoint-analysis-no-silver-bullet-for-calculating-class-wide-damages. Jonathan Tomlin and Robert Zeithammer, November 1, 2018, "Product Labeling Class Actions—Identifying the 'Con' in Conjoint Surveys," available at https://news.bloomberglaw.com/class-action/insight-product-labeling-class-actionsidentifying-the-con-in-conjoint-surveys.

7. To administer the surveys, I worked with Dynata, a leading provider of first-party data and services. Dynata recruited respondents using its online panel of U.S. residents and ensured that the incoming sample was balanced in terms of gender, age, and region in a manner that was representative of the U.S. adult population (based on the Census Bureau 2018 American Community Survey 1-year estimates).

8. After screening, respondents were told to imagine that they were shopping for herbicides and to approach the choice tasks as if they were purchasing herbicides in store or online. Respondents were told that they would be "presented with a 'shelf' of three 24 oz. ready-to-use herbicides / weed killers and their corresponding price" and that some of the products they saw onscreen would "be different from what you see in stores or online."

9. Respondents were then presented with twelve tasks, each involving two screens. In the first screen of each task, respondents were presented with images of three hypothetical liquid herbicide products (showing both the front and back of the herbicide bottle) with a range of different features and prices, and asked which product they would prefer. Showing the front and back of the bottle for each product is a very conservative design choice, as it guarantees that respondents will be exposed to the Warning Statement, which appears on the back of the bottle. I varied certain attributes of the products shown in the first screen of each choice task.[2] In the second screen of each task, respondents were asked whether they would actually buy their preferred product. The only difference between the Long Warning Statement Survey and the Short Warning Statement Survey was the text of the warning statement that appeared on the back label.

---

[2] Those attributes were brand (Roundup®, Ortho, and Eliminator), retail price ($3.99, $4.99, $5.99, $6.99, $7.99), claims about the timing of visible results (3 hours versus 6 hours), claims about the timing to become rainproof (10 minutes versus 60 minutes), and the presence or absence of the Warning Statement.

10. In my market simulations analysis, I used my choice-based conjoint survey results to estimate the market equilibrium price for a set of products. In particular, I estimated the market equilibrium price under two scenarios: the "actual world" and the "but-for world." The "but-for world" scenario is the same as the "actual word" scenario except that the Roundup® product has either the Long or Short Warning Statement.

11. Based on the results of my surveys, estimation of consumer preferences using the survey data, and simulation of the marketplace for glyphosate-based herbicides, I determined that there was no *statistically significant* price difference between a Roundup® product that does not include the Long Warning Statement and one that does, nor between a Roundup® product that does not include the Short Warning Statement and one that does. I found that the average estimated price premium (difference in price) for a Roundup® product that does not include the Long Warning Statement relative to a Roundup® product that includes the Long Warning Statement is 1.5%, but this price difference was not statistically significantly different from a zero price premium at a 95 percent level of confidence. I found that the average estimated price premium for a Roundup® product that does not include the Short Warning Statement relative to a Roundup® product that includes the Short Warning Statement is -0.7%. As with the Long Warning Statement, this price difference was not statistically significantly different from a zero price premium at a 95 percent level of confidence. Stated another way, the results of my surveys suggest that the addition of the Warning Statements would not impact the price purchasers would have paid for the product.

12. I was also asked, in order to assist Monsanto in preparing for mediation, to assess the expert report of Dr. D.C. Sharp. Based on a hedonic regression analysis, Dr. Sharp concludes that the "product prices would have been approximately 31% lower but for the defendant's alleged

omissions."[3]  I find that there are a number of major flaws with Dr. Sharp's methodology, including, but not limited to the following two.  Dr. Sharp does not actually test whether and how the absence of warning statements on the at-issue product label affects price. For Dr. Sharp's approach to do so it would require several assumptions that he did not test, including that consumers are well-informed of EPA classifications regarding carcinogenicity. Further, his hedonic regression specification is not robust and, if changed even slightly, would lead to dramatically different results to the point that the price premium he purportedly calculated would change direction.

13.    Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and correct. Executed this 11th day of June, 2021, in Los Angeles, California.

_____
Kristina S. Shampanier, Ph.D.

---

[3] Expert Report of D.C. Sharp, Ph.D., July 31, 2020, ¶ 13.

Case 3:16-cv-02741-VC   Document 1486   Filed 06/14/21   Page 1 of 7

# EXHIBIT A

# KRISTINA S. SHAMPANIER, PH.D.
**Consultant**

Office: 213 896 4636  
Cell: 617 372 4928  
kristina.shampanier@analysisgroup.com  

333 South Hope Street  
27th Floor  
Los Angeles, CA 90071

Dr. Shampanier is an expert in applying marketing research methods to litigation. She has designed and evaluated surveys and online, lab, and field experiments, as well as conducted data analyses for class certification, liability, and damages phases of litigation. She has supported experts and served as an expert in patent, trademark, and trade dress infringement; false advertising; consumer safety; and antitrust cases. In a false advertising class action matter, Dr. Shampanier used a conjoint analysis survey and market simulations to evaluate the price premium associated with the challenged claim. In a banking service false advertising class action matter, she conducted a survey/experiment to evaluate whether an allegedly misleading omission affected consumer choice. In a consumer electronics case, she submitted three expert reports to the National Advertising Division of the Council of Better Business Bureaus, opining on the merits of a product test. In an employment litigation, she evaluated the possibility of interviewing class members on behalf of the defendant, a fast-food chain, and reviewed the opposing expert's approach. In a health care case, Dr. Shampanier opined on a survey-like study in a rebuttal report and was deposed. Additionally, in two trademark infringement matters considered by the Trademark Trial and Appeal Board of the US Patent and Trademark Office, she designed and fielded confusion surveys and filed an expert report in one of the cases. Dr. Shampanier has published in the fields of behavioral and experimental economics and mathematics.

## EDUCATION

| | |
|---|---|
| 2007 | Ph.D., marketing (management science), MIT Sloan School of Management  *Dissertation*: "Essays in Behavioral Decision Making" |
| 2002 | M.A., economics (*cum laude)*, New Economic School, Moscow, Russia  *Thesis*: "Branding" |
| 2001 | M.S., mathematics (*cum laude*), Moscow State University  *Specialization*: Algebra  *Thesis*: "Ranks of Subalgebras of Free Non-Associative Algebras" |

## EXPERIENCE

| | |
|---|---|
| 2005–Present | Analysis Group Inc.  *Consultant (2020–Present)*  *Vice President (2016–2020)*  *Manager (2009–2015)*  *Associate (2007–2009)*  *Intern Associate (2005)* |

Case 3:16-cv-02741-VC Document 1486-6 Filed 01/20/23 Page 15 of 19
Case 3:16-md-02741-VC Document 14486 Filed 01/20/23 Page 16 of 19

*Kristina Shampanier, Ph.D., Page 2 of 6*

| | |
|---|---|
| 2003–2007 | MIT Sloan School of Management<br>*Research Assistant, Professor Dan Ariely (2003–2007)*<br>*Teaching Assistant, Consumer Behavior, Professor Yehoshua Tsal (2005–2006)*<br>*Teaching Assistant, Managerial Psychology Laboratory, Professors Tom Allen and Dan Ariely (2003–2005)* |
| 2002 | New Economic School, Moscow, Russia<br>*Teaching Assistant, Econometrics III, Professor Stanislav Anatoliev* |

**SELECTED EXPERT CASEWORK**

- **Beauty products trademark infringement**
  Designed an experiment/survey to test for consumer confusion in a trademark infringement matter involving a beauty product for the defendant (applicant) before the Trademark Trial and Appeal Board of the US Patent and Trademark Office. Filed an expert report, after which the opposer withdrew all oppositions.

- **Banking false advertising class action**
  Conducted an online survey in the choice experiment format on behalf of the defendant to evaluate whether the allegedly misleading omission had an impact on consumer purchase decisions.

- **Fast food employment litigation**
  Evaluated the possibility of interviewing class members and reviewed the opposing expert's approach on behalf of the defendant, a fast-food chain.

- *A.R., by and through Her Next Friend, Susan Root, et al., v. Elizabeth Dudek, in Her Official Capacity as Secretary of the Agency for Health Care Administration, et al.* **and** *United States of America v. The State of Florida*
  US District Court, Southern District of Florida
  Evaluated on behalf of the defendant a set of unscripted interviews conducted by the plaintiffs' expert in a health care case involving preferences of patients' families. Submitted rebuttal expert report and was deposed.

- **Hospitality business trademark infringement**
  Designed and fielded an "Eveready" experiment/survey to test for consumer confusion in a trademark infringement matter in the hospitality business for the defendant (registrant) before the Trademark Trial and Appeal Board of the US Patent and Trademark Office.

- **Electronics false advertising**
  Submitted three reports on behalf of the challenged party in a case considered by the National Advertising Division of the Council of Better Business Bureaus. Opined on the merits of the design of a consumer electronics product test conducted for advertising claims.

**SELECTED CONSULTING EXPERIENCE**

**Intellectual Property**

- **Trademark and trade dress infringement matters**
  Developed numerous online experimental design surveys in the "Eveready" and "Squirt" format and rebuttal analyses of "Eveready" surveys testing consumer perception and confusion with respect to

Case 3:16-cv-10852-MLW Document 144-36 Filed 06/14/21 Page 16 of 19
Case 3:10-cv-10851-MLW Document 144-36 Filed 06/14/21 Page 16 of 19

*Kristina Shampanier, Ph.D., Page 3 of 6*

wordmarks, design marks, trade dress, and an advertising slogan in a variety of cases, including in clothing, compliance, food, fashion, auto, luxury goods, entertainment, outdoor activities, and music industries. Addressed issues of materiality (via a choice experiment survey and open-ended purchase driver survey), dilution, and secondary meaning. Assisted experts in survey design, implementation, and analysis of surveys, as well as in drafting reports and preparations for depositions. Assisted counsels with preparation for depositions of opposing experts. Such cases include:

- *Denimafia Inc. v. New Balance Athletic Shoe, Inc. et al.* and *New Balance Athletic Shoe, Inc. v. Denimafia Inc.*
  *US District Court, Southern District of New York*
  Supported Professor Joel Steckel, who was retained by New Balance, the defendant and counter-claimant in a trademark infringement mater involving the "less is more" <=> symbol used on New Balance Minimus footwear. Assisted Professor Steckel in designing, fielding, and analyzing an "Eveready" survey/experiment testing for reverse confusion (i.e., confusion with respect to the source, sponsorship, or affiliation of Denimafia products), drafting report, and preparation for deposition. In its summary judgment in favor of New Balance, the court credited Professor Steckel's survey with showing "a zero percent rate of reverse confusion with respect to the source of jeans bearing the <=> mark" and discounted Denimafia's objections to the survey design. Denimafia appealed the summary judgment decision, but ultimately did not pursue the appeal and the appellate court dismissed it.

- **Luxury goods trademark infringement and dilution matter**
  Developed an online experimental design survey to test whether consumers noticed and how they perceived a logo briefly appearing in a TV commercial. Evaluated opposing expert's survey. Assisted expert in survey design, implementation, and analysis of survey; developing rebuttal points for opposing expert's survey; drafting reports; and preparation for depositions; assisted counsel in preparation for deposition of opposing expert.

- **Smartphone and tablet patent infringement matters**
Assisted experts in survey design, report drafting, and preparation for deposition and trial testimony. Evaluated opposing expert's surveys (including a conjoint-style survey) aimed at isolating the value to consumers of the patented features in smartphones. Assisted counsel with preparation for and at depositions of opposing expert and data witnesses. Assisted at trial.

- *Hitachi Maxell, Ltd. v. ZTE Corp. and ZTE USA Inc.*
  *US District Court, Eastern District of Texas, Texarkana Division*
  Supported Tülin Erdem, Professor of Business and Marketing at the NYU Stern School of Business, from case inception to trial on behalf of Maxell and Mayer Brown. Assisted in designing and implementing a survey of smartphone and tablet owners to assess the awareness and relative importance of a feature disclosed in one of the asserted patents: automatic GPS map orientation. The damages expert used the survey results to inform her analysis of reasonable royalty damages. The jury found that the asserted patents were valid and infringed by ZTE, and awarded Maxell damages of $43.3 million.

**False Advertising**

- ***Kenneth Hobbs v. Brother International Corporation***
  *US District Court, Central District of California*
  Supported Professor Joel Steckel of New York University Stern School of Business in conducting

two surveys on behalf of Brother International Corporation, the defendant in a consumer class action false advertising case. The plaintiff claimed that the printers at issue did not scan complete pages, causing the edges of images to be truncated. One survey evaluated consumer awareness of a printer's alleged malfunctioning. The other, a survey/experiment, addressed the materiality of this limitation to consumers. In its order denying class certification, the court cited the experiment involving more than 450 people who had purchased or planned to purchase a printer close to the time of the survey, which found that "consumers chose the Brother printer with nearly identical frequency regardless of whether they were made aware of the unscannable margin at the time of their selection." The plaintiff agreed to dismiss his case with prejudice and waive his right to appeal. Assisted Professor Steckel with design, implementation, and analysis of the studies; drafting reports and declarations; and preparation for deposition.

- **E-Retailer false advertising matter**
Supported Professor Joel Steckel in conducting two experiments on behalf of a major e-retailer accused of using misleading reference price terms (e.g., "Compare at"). In the first study, groups of consumers visiting the defendant's website were randomly assigned to view the reference price labels as either "MSRP" (manufacturer's suggested retail price) or "Compare" throughout their shopping session and subsequent website visits. No difference in the sales conversion rate was found. Further, a survey of consumers who made purchases during the study period showed no difference in recall of the product price, the reference price, or the term used with the reference price. The second study, conducted with an online consumer panel, found that consumers' understanding of reference prices did not depend on the label used (e.g., "was," "compare at," "compare," and "MSRP"). Assisted in design, implementation, and analysis of both studies, and in preparation of deposition and trial testimony.

- **Online services false advertising matter**
Evaluated opposing experts' surveys testing consumer perception of charges for an online service. Assisted in drafting report and counsel's briefs, as well as in preparation for depositions. Assisted counsel in preparation for depositions of opposing experts.

- **Cigarette false advertising matter**
Evaluated opposing counsel's survey-like methodology to evaluate consumer perception of cigarette packaging. Assisted expert in drafting declarations and report.

**Corporate Acquisitions**

- **AT&T's acquisition of DIRECTV – survey of consumer preferences**
Supported Professor Ravi Dhar of the Yale School of Management in developing, conducting, and analyzing a survey examining consumer attitudes toward bundled Internet and television services, in a case widely covered by the media. AT&T and DIRECTV cited the outcome of the study in their applications to the Federal Communications Commission (FCC), pointing to the benefit to consumers when Internet and television services are delivered by the same provider. The FCC and the Department of Justice approved the acquisition. Assisted Professor Dhar in survey design, implementation, and analysis, as well as report drafting.

**Antitrust**

- **Microsoft antitrust matters**
    - *Jim Hood, Attorney General ex rel. State of Mississippi v. Microsoft Corporation*
      Chancery Court of Hinds County, Mississippi
    - *Pro-Sys Consultants Ltd. and Neil Godfrey v. Microsoft Corporation and Microsoft Canada Co./Microsoft Canada CIE*
      Supreme Court of British Columbia

  Developed affirmative damages analysis and rebuttals of the plaintiffs' damages analysis and class certification arguments in the cases involving allegations of Microsoft's overcharging consumers for its operating systems, word processors, and spreadsheet products.

- **Credit cards antitrust matter**
  Developed an online experimental design survey to expose issues with opposing expert's survey testing consumer reaction to retailers' potential credit card policies. Assisted expert in survey design, implementation, and analysis preparation of report; and in preparation for and at deposition. Assisted counsel in preparation for deposition of opposing expert.

- **High tech antitrust matters, including** *Advanced Micro Devices, Inc. v. Intel*
  US District Court, District of Delaware
  Analyzed incremental costs for price/cost analysis. Assisted in data production and analysis, drafting reports, deposition preparation, and at deposition.

## PUBLICATIONS

"Choice Experiments," with Rebecca Kirk Fair, Joel Steckel, and Anne Cai in *Legal Applications of Marketing Theory*, Cambridge University Press, eds. Jacob Gersen and Joel Steckel, 2021, forthcoming.

"Patient Quality of Life and Benefits of Leptin Replacement Therapy (LRT) in Generalized and Partial Lipodystrophy (GL, PL)," with Omer Ali, Keziah Cook, Edward Tuttle, Charles Gerrits, and Rebecca Brown, *Diabetes*, Vol. 61, Supplement 1, 1331-P, 2018

"How To Interpret A Contract? Ask Those Who'd Sign It," with Omri Ben-Shahar, Lior Strahilevitz, Duo Jiang, and Rebecca Kirk Fair, *Law360*, March 21, 2018

"Survey And Real-World Data: A Winning Combination," with Peter Simon, Riddhima Sharma, and Rebecca Kirk Fair, *Law360*, July 2017

"What Consumers Really Think about Reference Price Labels," with Rebecca Kirk Fair, Laura O'Laughlin, Jesse Shea, and Joel Steckel, *Law360*, March 2017

"Probabilistic Price Promotions – When Retailing and Las Vegas Meet," with Dan Ariely and Nina Mazar, *Management Science,* Vol. 63, No. 1, pp. 250-266, 2016

"Zero as a Special Price. The True Value of Free Products," with Dan Ariely and Nina Mazar, *Marketing Science*, Vol. 26, No. 6, pp. 742-757 (lead article), 2007

"How Small Is Zero Price? The True Value of Free Products," *Advances in Consumer Research,* Vol. 33, pp. 254-255, 2006

Case 3:16-cv-02741-VC   Document 14-86   Filed 06/14/21   Page 10 of 24
Case 3:16-cv-10852-MJJ   Document 1486-6   Filed 06/14/21   Page 16 of 19   PageID #: 52457

*Kristina Shampanier, Ph.D., Page 6 of 6*

"Algorithms Realizing Rank and Primitivity of Systems of Elements of Free Non-Associative Algebras," *Fundamental and Applied Mathematics*, Vol. 6, No. 4, pp. 1229-1238, 2000

**SELECTED PRESENTATIONS, POSTERS, AND SPEAKING ENGAGEMENTS**

"Discrete Choice and SF-36 Estimates of Patient Quality of Life and Benefits of Leptin Replacement Therapy (LRT) in Generalized and Partial Lipodystrophy (GL, PL)," poster with Omer Ali, Keziah Cook, Don Lee, and Edward Tuttle, 21st European Congress of Endocrinology, Lyon, France, May 2019

"Surveying the Truth: False Advertising and Trademark Litigation," with August Horvath and Joel Steckel, first webinar in the series, *Deceit and Denial: The Role Surveys Play in False Advertising and Trademark Litigation*, American Bar Association's Section of Antitrust Law Advertising Disputes & Litigation Committee, February 2016

"Listening to Customers – How to Ask the Right Question, Surveys in Litigation," recurrent lecture at Professors Jiwoong Shin and Aniko Oery's M.B.A. classes, *Listening to the Customer*, Yale School of Management, 2012, 2013, 2015, and 2016

"How Small is Zero Price? The True Value of Free Products," Association for Consumer Research, North American Conference, San Antonio, TX, and London Business School, 2005

**PROFESSIONAL ASSOCIATIONS AND MEMBERSHIPS**

- American Marketing Association
- *Marketing Science* "Ambassador" (2016–2018)

**ACADEMIC HONORS**

| | |
|---|---|
| 2005–2006 | The Zannetos Fund Fellow, Massachusetts Institute of Technology |
| 2005–2006 | The Stuart Fund Fellow, Massachusetts Institute of Technology |
| 2006 | AMA-Sheth Foundation Doctoral Consortium Fellow |
| 2004–2005 | MasterCard Fellow, Massachusetts Institute of Technology |
| 2003 | The Russell Sage Summer Institute, Trento, Italy |
| 2002–2003 | DuPont Fellow, Massachusetts Institute of Technology |

**LANGUAGES**

Russian (native), French (intermediate)