# Exhibit D

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF KANSAS**

|  |  |
|---|---|
| **IN RE SYNGENTA AG MIR162 CORN LITIGATION** | **Master File No. 2:14-MD-02591-JWL-JPO** |
| **THIS DOCUMENT RELATES TO ALL CASES EXCEPT:** | **MDL No. 2591** |
| *Louis Dreyfus Company Grains Merchandising LLC v. Syngenta AG, et al., No. 16-2788-JWL-JPO* | |
| *Trans Coastal Supply Company, Inc. v. Syngenta AG, et al., No. 2:14-cv-02637-JWL-JPO* | |
| *The Delong Co., Inc. v. Syngenta AG, et al., No. 2:17-cv-02614-JWL-JPO* | |
| *Agribase International Inc. v. Syngenta AG, et al., No. 2:15-cv-02279-JWL-JPO* | |

**PLAINTIFFS' REPLY MEMORANDUM OF LAW IN FURTHER**
**SUPPORT OF THEIR MOTION FOR PRELIMINARY APPROVAL**
**OF SETTLEMENT, PROVISIONAL CERTIFICATION OF**
**SETTLEMENT CLASS AND SUBCLASSES, AND OTHER RELIEF**

## TABLE OF CONTENTS

**Page**

INTRODUCTION ....................................................................................................... 1

ARGUMENT ............................................................................................................... 3

I.     Coffman and Toups Sidestep the Applicable Standards for Preliminary
Approval ....................................................................................................... 3

II.    The Proposed Settlement Does Not Violate the September 2017 Settlement
Term Sheet ................................................................................................... 5

III.   Coffman and Toups' Jurisdictional Objection Is Unavailing ................................. 8

IV.   A Choice of Law Analysis Is Unnecessary............................................................. 14

V.    "Individual Plaintiffs" Are Not Placed at Any Disadvantage................................ 20

VI.   Arguments About Attorney's Fees Are Premature................................................. 21

VII.  Coffman and Toups Misapprehend the Settlement Claims Process ..................... 23

VIII. The Opt-Out Requirements Are Not Onerous ....................................................... 24

IX.   Coffman and Toups' First Amendment Challenge Is Specious............................. 27

CONCLUSION................................................................................................................ 30

## <u>TABLE OF AUTHORITIES</u>

<u>Cases</u>

*20 Atl. Ave. Corp. v. Allied Waste Indus., Inc.*,
    482 F. Supp. 2d 60 (D. Mass. 2007) ........................................................................ 7

*Allapattah Servs., Inc. v. Exxon Corp.*,
    454 F. Supp. 2d 1185 (S.D. Fla. 2006) ............................................................ 22, 23

*Amchem Prods., Inc. v. Windsor*,
    521 U.S. 591 (1997) ............................................................................................... 19

*Armstrong v. NFL*,
    137 S. Ct. 607 (2016) ............................................................................................. 21

*Auto. Parts Antitrust Litig.*,
    No. 2:12-CV-00203, 2017 WL 3525415 (E.D. Mich. July 10, 2017) ............... 22, 23

*Cheverez v. Plains all Am. Pipeline, LP*,
    No. CV15-4113 PSG (JEMX), 2016 WL 861107 (C.D. Cal. Mar. 3, 2016) ............ 28

*Dare v. Knox County*,
    457 F. Supp. 2d 52 (D. Me. 2006) .......................................................................... 11

*Dare v. Knox Cty.*,
    465 F. Supp. 2d 14 (D. Me. 2006) .......................................................................... 13

*In re Elec. Carbon Prods.*,
    447 F. Supp. 2d 389 (D.N.J. 2006) ......................................................................... 12

*Fairbrook Leasing, Inc. v. Mesaba Aviation, Inc.*,
    408 F.3d 460 (8th Cir. 2005) .................................................................................... 7

*Finberg v. Sullivan*,
    634 F.2d 50 (3d Cir. 1980) ...................................................................................... 16

*Georgine v. Amchem Prods., Inc.*,
    160 F.R.D. 478 (E.D. Penn. 1995) .............................................................. 11, 12, 28

*Gomez v. Rossi Concrete, Inc.*,
    270 F.R.D. 579 (S.D. Cal. 2010) ............................................................................ 16

*Good v. Am. Water Works Co.*,
    No. CV 2:14-01374, 2016 WL 5746347 n.3 (S.D. W. Va. Sept. 30, 2016) ............ 26

*Gottstein v. Nat'l Ass'n for the Self Employed*,
    186 F.R.D. 654 (D. Kan. 1999) ............................................................................... 30

*Gulf Oil Co. v. Bernard*,
    452 U.S. 89 (1981) .................................................................................................. 30

*Hallie v. Wells Fargo Bank, N.A.*,
    No. 2:12-CV-00235-PPS, 2015 WL 1914864 (N.D. Ind. Apr. 27, 2015) ............... 26

*Hanlon v. Chrysler Corp.*,
   150 F.3d 1011 (9th Cir. 1998) ......................................................................... 14, 15

*Hinds Cty., Miss. v. Wachovia Bank N.A.*,
   790 F. Supp. 2d 125 (S.D.N.Y. 2011)...................................................................... 28

*Hofstetter v. Chase Home Fin., LLC*,
   No. C 10-01313 WHA, 2011 WL 5415073 (N.D. Cal. Nov. 8, 2011) ..................................... 13

*Humphrey v. Int'l Paper*,
   No. 02 C 4147, 2003 WL 22111093 (N.D. Ill. Sept. 11, 2003)................................. 16

*In re Agent Orange Prods. Liab. Litig.*,
   689 F. Supp. 1250 (E.D.N.Y. 1988) .................................................................... 10

*In re Corrugated Container Antitrust Litig.*,
   No. MDL 310, 1981 WL 2093 (S.D. Tex. June 4, 1981) ........................................ 12

*In re Currency Conversion Fee Antitrust Litig.*,
   361 F. Supp. 2d 237 (S.D.N.Y. 2005)......................................................... 27, 28, 29

*In re Deepwater Horizon*,
   739 F.3d 790 (5th Cir. 2014) ............................................................................. 26

*In re Diet Drugs*,
   282 F.3d 220 (3d Cir. 2002).............................................................................. 26

*In re Elec. Weld Steel Tubing Antitrust Litig.*,
   No. 79-4628, 1982 WL 1873 (E.D. Pa. June 30, 1982)........................................... 12

*In re Enron Corp. Sec., Derivative & ERISA Litig.*,
   586 F. Supp. 2d 732 (S.D. Tex. 2008) ................................................................. 22

*In re Gen. Motors Corp.*,
   No. MDL 04-1600, 2005 WL 1924354 (W.D. Okla. Aug. 8, 2005) ......................... 16

*In re Hyundai and Kia Fuel Economy Litigation*,
   881 F.3d 679 (9th Cir. 2018) ..................................................................... 14, 15, 19

*In re Linerboard Antitrust Litig.*,
   No. 98-5055, 2004 WL 1221350 (E.D. Pa. June 2, 2004)....................................... 22

*In re McKesson HBOC, Inc. Secs. Litig.*,
   126 F. Supp. 2d 1239 (N.D. Cal. 2000) ................................................................. 28

*In re Motor Fuel Temperature Sales Practices Litig.*,
   No. 07-MD-1840-KHV, 2014 WL 5431133 (D. Kan. Oct. 27, 2014) ..................... 23

*In re Motor Fuel Temperature Sales Practices Litig.*,
   258 F.R.D. 671 (D. Kan. 2009)............................................................................. 4

*In re NFL Players' Concussion Injury Litig*ation,
   307 F.R.D. 351 (E.D. Pa. 2015).......................................................................... 21

*In re Oil Spill by Oil Rig Deepwater Horizon in Gulf of Mexico, on Apr. 20, 2010*,
   910 F. Supp. 2d 891 (E.D. La. 2012) ..................................................................... 26

*In re Prudential Ins. Co. of Am. Sales Practice Litig.*,
   261 F.3d 355 (3d Cir. 2001) ................................................................................... 17

*In re Rite Aid Corp. Secs. Litig.*,
   396 F.3d 294 (3d Cir. 2005) ................................................................................... 22

*In re Sch. Asbestos Litig.*,
   842 F.2d 671 (3d Cir. 1988) ............................................................................. 27, 28

*In re Syngenta Litig.*,
   No. 27-CF-15-3785 (Minn. Dist. Ct., 4th Jud. Dist., Hennepin Cty. Apr. 7, 2016) ................ 17

*In re Syngenta Litig.*,
   No. 27-CF-15-3785 (Minn. Dist. Ct., 4th Jud. Dist., Hennepin Cty. Nov. 3, 2016) ............... 13

*In re Synthroid Mktg. Litig.*,
   264 F.3d 712 (7th Cir. 2001) ................................................................................. 22

*In re Telectronics Pacing Sys., Inc.*,
   172 F.R.D. 271 (S.D. Ohio 1997) ............................................................................ 18

*In re Urethane Antitrust Litig.*,
   No. 04-1616-JWL, 2016 WL 4060156 (D. Kan. July 29, 2016) ........................................ 22, 23

*In re Urethane Antitrust Litig.*,
   No. MDL 1616, 2008 WL 5215980 (D. Kan. Dec. 12, 2008) .............................................. 12

*In re Volkswagen & Audi Warranty Extension Litig.*,
   273 F.R.D. 349 (D. Mass. 2011) .............................................................................. 19

*In re Warfarin Sodium Antitrust Litig.*,
   391 F.3d 516 (3d Cir. 2004) ................................................................................... 19

*In re Wire Harnesses*,
   No. 17-1967, 2017 WL 5664917 (6th Cir. Sept. 15, 2017) ............................................... 23

*Kleiner v. First Nat'l Bank of Atlanta*,
   751 F.2d 1193 (11th Cir. 1985) ........................................................................... 27, 29

*Kreiss v. McCown DeLeeuw & Co.*,
   37 F. Supp. 2d 294 (S.D.N.Y. 1999) .......................................................................... 6

*Lafarge N. Am., Inc. v. Matraco Colo., Inc.*,
   No. 07-80112-CIV, 2008 WL 2277503 (S.D. Fla. May 30, 2008) .......................................... 6

*McWilliams v. Advanced Recovery Sys., Inc.*,
   176 F. Supp. 3d 635 (S.D. Miss. 2016) ....................................................................... 28

*Midland Funding, LLC v. Brent*,
   No. 3:08 CV 1434, 2011 WL 1882507 (N.D. Ill. May 17, 2011) .......................................... 29

*Miller v. Mackey Int'l, Inc.*,
   452 F.2d 424 (5th Cir. 1971) ................................................................................. 16

*Moulton v. U.S. Steel Corp.*,
   581 F.3d 344 (6th Cir. 2009) ................................................................................. 26

*Nieberding v. Barrette Outdoor Living, Inc.*,
    No. 12-CV-2353-DDC-TJJ, 2015 WL 1645798 (D. Kan. Apr. 14, 2015) ............................ 4, 6

*Nilsen v. York Cty.*,
    228 F.R.D. 60 (D. Maine 2005) ...................................................................................... 10, 11

*Phillips Petroleum Co. v. Shutts*,
    472 U.S. 797 (1985) ............................................................................................................. 8

*Pinnacle Performance Inc. v. Garbis*,
    No. 12 C 1136, 2013 WL 655202 (N.D. Ill. Feb. 21, 2013) ...................................................... 7

*Prudential Ins. Co. of Am. v. Hilton Hotels Corp.*,
    No. 95 Civ. 5575 (KMW), 1996 WL 340002 (S.D.N.Y. June 19, 1996) .................................. 6

*Tripp v. Rabin*,
    No. 14-CV-2646-DDC-GEB, 2016 WL 3615572 (D. Kan. July 6, 2016) ................................ 4

## **Statutes**

7 U.S.C. § 8791(b)(4)(C) ............................................................................................................. 24

Minn. Stat. § 325D.13 ................................................................................................................... 17

Minn. Stat. § 325D.15 ................................................................................................................... 17

Minn. Stat. § 325D.44 ................................................................................................................... 17

Minn. Stat. § 325F.69 ................................................................................................................... 17

## **Rules**

Fed. R. Civ. P. 23 ................................................................................................................. *passim*

## **Other Authorities**

*Annotated Manual for Complex Litigation (Fourth)* § 21.611 (rev. ed. 2016)............................ 12

## INTRODUCTION

Plaintiffs[1] respectfully submit this reply memorandum in further support of their motion for preliminary approval of the proposed Settlement submitted on March 12, 2018 (ECF Nos. 3506, 3507-2). The only opposition to that motion comes from Coffman and Toups (ECF No. 3514) ("Opp."), who also filed purely-derivative oppositions to the ancillary joint motion to file the walk-away agreement under seal (ECF No. 3508) and to stay Class Members' prosecution of related claims pending final approval (ECF No. 3512). *See* ECF Nos. 3515, 3519; *see also* ECF No. 3516 (reply in support of motion to delay preliminary approval). As with Coffman and Toups' motion to delay preliminary approval, the so-called Hossley-Embry Plaintiffs filed piggyback joinders to Coffman and Toups' various submissions (ECF Nos. 3517-18, 3520-21).

Coffman and Toups make scattershot attacks, none of which have any merit. Much of their opposition memorandum centers on the settlement negotiation process – a matter that is not only irrelevant but moot at this point. They cite no precedent, and offer no legal authority, for their suggestion that the Court can or should reject preliminary approval because the Settlement Agreement departs from an otherwise unenforceable, and earlier, term sheet, which was non-binding and by its express terms was superseded by the binding Settlement Agreement. Rather, their arguments exalt form over substance insofar as Coffman and Toups mostly deride the confidential nature of those sensitive talks, while also making false accusations about the Special Master's conduct.

Coffman and Toups' "jurisdictional" objection, predicated on the non-binding (and now-superseded) Term Sheet, is similarly unavailing. This Court has jurisdiction over all Class

---

[1] This reply memorandum adopts the shorthand definitions employed in Plaintiffs' opening memorandum in support of their motion for preliminary approval (ECF No. 3507), as well as their memorandum in opposition to Coffman and Toups' motion to delay preliminary approval, expand the PNC to include someone from their ranks, and take discovery of the PNC (ECF No. 3510).

Members consistent with its statutory and constitutional authority, and it is reasonable and proper to afford notice and a second opt-out right both to members of the existing litigation classes and those who had opted out of them.  Nor is a choice-of-law analysis needed here.  The recent Ninth Circuit decision upon which Coffman and Toups rely is not only not binding here, but also readily distinguishable because, in that case, the litigation classes had failed to satisfy Rule 23, which is plainly not the case here.  Just as critically, the nationwide Settlement Class here asserts claims under federal law and under a single state's law (Minnesota's), so state law differences are immaterial.  Besides, Coffman and Toups do not point to any material state-law differences, and the litigation of Plaintiffs' negligence claims in this MDL demonstrated that common questions relating to those claims predominate over any individual issues.

The few criticisms of the Settlement Agreement itself that Coffman and Toups muster are quite shallow and weak.  As the Court previously found with respect to the litigation classes, it is not unduly burdensome to require that Class Members sign their own opt-out requests; such a requirement is quite proper – indeed, increasingly commonplace – as a means of confirming that opt-out requests reflect Class Members' intentions, not the litigation strategy of individual lawyers.  Nor was there any obligation to award more compensation to some Class Members merely because they had to fill out a Fact Sheet or because they hired their own lawyers.  Additionally, matters concerning a potential attorney's fees request are premature at this stage.  In any event, the Court should reject the argument that the so-called "mega-fund" doctrine should apply to any fee request.  This and other courts have rejected the application of that doctrine on the reasoning that to do so would discourage class counsel from pursuing the largest possible recovery.

Coffman and Toups' complaints about the proposed claims process not only reveal a misunderstanding of it (in that a handwritten signature on Claim Forms is not obligatory), but also an irrational desire to make the streamlined process that Plaintiffs have proposed (which relieves producer Class Members from having to gather supporting paperwork) making it *more* cumbersome for Class Members to submit claims.   Lastly, Coffman and Toups' First Amendment challenge to the provision whereby Settlement Class Counsel may seek the taking down or modification of websites communicating false information about the Settlement is not ripe at this point in time because no such request has yet been made.

For all these reasons, Coffman and Toups' challenge to preliminary approval fails.

## ARGUMENT

### THE COURT SHOULD GRANT PRELIMINARY APPROVAL TO THE PROPOSED SETTLEMENT

**I.**     **Coffman and Toups Sidestep the Applicable Standards for Preliminary Approval**

The principal focus of Coffman and Toups' opposition to preliminary approval is two-fold:  they continue to complain about alleged contraventions of the Court's August 2017 Order appointing the PNC (ECF No. 3366), and additionally assert alleged violations (if there can even be such a thing) of the September 2017 Term Sheet (discussed in Section II, below).  *See* Opp. at 3-8.

Plaintiffs have already addressed the former in their opposition to Coffman and Toups' motion to delay preliminary approval (ECF No. 3510), and will not rehash that issue here save in one respect – to note that Coffman and Toups' continued dwelling on the "secret" nature of the PNC's negotiations with Syngenta is predicated on false or unsupported statements.  They offer no evidence that Special Master Reisman had directed PNC members not to speak with them (*see* Opp. at 3-4), and Plaintiffs have already refuted their earlier assertion that Special Master

Reisman was uncommunicative and failed to report to the Court. *See* ECF Nos. 3510 (at 5-6), 3510-1 (at ¶¶ 16-18), 3510-7, 3510-8, 3510-9. One would ordinarily *expect* that sensitive settlement discussions aimed at achieving a global settlement of sprawling litigation would, in fact, be conducted confidentially, until the negotiating committee had reached terms that it intended to actually recommend to the Plaintiffs. Indeed, Coffman and Toups' arguments are circular, in that they – at their core – seek to enforce a preliminary term sheet that was specifically *not* communicated to them or their clients *precisely* because it did not reflect the final and potentially binding terms on which Syngenta agreed to resolve these claims. Coffman and Toups' arguments are simply a smokescreen that poorly masks their failure to identify any genuine shortcomings to the Settlement that would call the amenability of the Settlement to preliminary approval and dissemination of notice of the Settlement to the Class into question.

Coffman and Toups' continued protests about the conduct of the negotiations simply sidestep the pertinent narrow inquiry on the instant motion. As it has repeatedly noted, at the preliminary approval stage, the Court makes only "a preliminary evaluation of the fairness of the proposed settlement and determines whether it has any reason to not notify the class members of the proposed settlement or to not hold a fairness hearing." *In re Motor Fuel Temperature Sales Practices Litig.*, 258 F.R.D. 671, 675 (D. Kan. 2009). The Court is to "'undertake *some* review of the settlement at preliminary approval, but perhaps just enough to ensure that sending notice to the class is not a complete waste of time,'" and "'[t]he general rule is that a court will grant preliminary approval where the proposed settlement is neither illegal nor collusive[.]'" *Tripp v. Rabin*, No. 14-CV-2646-DDC-GEB, 2016 WL 3615572, at *2 (D. Kan. July 6, 2016) (quoting treatise; emphasis in original); *Nieberding v. Barrette Outdoor Living, Inc.*, No. 12-CV-2353-DDC-TJJ, 2015 WL 1645798, at *4 (D. Kan. Apr. 14, 2015) (same).

Other than the alleged failure to comply with the September 2017 Term Sheet (ECF No. 3514-1), which Plaintiffs address below, Coffman and Toups cannot point to any illegality.  As for collusion, its absence is not only presumed but, for the reasons that Plaintiffs have already explained in opposition to Coffman and Toups' demand for discovery, the vigorous, arm's-length, Special Master-supervised and court-involved nature of the negotiations and the advanced stage of the case at which the Settlement was reached, as well as the spirited litigation of the case leading up to that point, easily dispel even the remotest doubt that this $1.51 billion Settlement is above-board.  *See* ECF No. 3510, at 7-9.

In any event, Coffman and Toups' arguments are beside the point because, at the end of the day, if their clients really do not like the Settlement – which would be hard to imagine, given that Coffman and Toups themselves specifically *do not* take issue with the suffciency of the $1.51 billion settlement consideration or any other substantive term, *see* Opp. at 2 n.2 – they are free to opt out or to object.  The absence of any substantive objection leaves naked Coffman and Toups' objection nothing more than a complaint about the form of the settlement.

## II.  The Proposed Settlement Does Not Violate the September 2017 Settlement Term Sheet

Besides their persistent assertions about alleged violations of the Court's PNC appointment Order, Coffman and Toups spill a good deal of ink arguing that the Settlement fails *ab initio* because it is at odds with the Term Sheet entered into between the PNC and Syngenta in September 2017 – in particular, the Term Sheet's contemplated two-track approach (*see* ECF No. 3514-1, at 8-10) of separate Class Plaintiff and Individual Plaintiff settlement structures.  *See* Opp. at 4-7.  That objection is unavailing.

The Term Sheet expressly provided that it "*must* be superseded by more definitive settlement agreements, . . . *which shall control over, supersede, and replace* th[e] Term Sheet."

ECF No. 3514-1, at 2 (§ 1.a) (emphasis added).  Indeed, the parties agreed to "negotiate in good faith" those subsequent agreements.  *Id*. at 8 (§ 4.a).  Moreover, the Term Sheet stated that "[f]inal settlement [wa]s contingent upon agreement *on all terms and conditions in, and execution of, [such] Agreements*."  *Id*. (emphasis added).  *Id*. at 2 (§ 1.a) (emphasis added).  Nor could the Term Sheet be binding inasmuch as it provided that the still-to-be-negotiated agreements would *themselves* not be binding "unless and until" the Class Plaintiff Settlement Agreement received judicial approval.  *Id*. at 8 (§ 4.c); *see also* Settlement Agreement § 9.24.1 (ECF No. 3507-2, at 74) (integration clause, declaring that "[t]his Agreement, including its exhibits and the Parties' side agreement referenced in Section 8.3.1 above that is to be filed with the Court under seal, contains an entire, complete, and integrated statement of the terms agreed to by and between the Parties, *and supersedes all prior proposals, negotiations, agreements, and understandings* relating to the subject matter of this Agreement") (emphasis added).[2]

Given such unambiguous language, the Term Sheet plainly did not create a binding settlement structure, such that Coffman and Toups can credibly claim there was some violation thereof.  *See Kreiss v. McCown DeLeeuw & Co.*, 37 F. Supp. 2d 294, 301 (S.D.N.Y. 1999) (term sheet not binding because it stated that parties' legal obligations were to arise solely from subsequent formal agreements); *Lafarge N. Am., Inc. v. Matraco Colo., Inc.*, No. 07-80112-CIV, 2008 WL 2277503, at *5 (S.D. Fla. May 30, 2008) ("The letter of intent and attached term sheet make clear that the parties contemplated future negotiations leading to a formal written contract."); *Prudential Ins. Co. of Am. v. Hilton Hotels Corp.*, No. 95 Civ. 5575

---

[2]   The Term Sheet also provides that "either Party has the option to terminate this [the Term Sheet] settlement" in "the event the Parties are unable to timely agree to settlement agreements [*i.e.*, the Class Plaintiff Settlement Agreement and the Individual Plaintiff Settlement Agreement] that are satisfactory to Defendant and the Plaintiffs' Negotiating Committee."  Term Sheet § 4.b (ECF No. 3514-1, at 8).  Thus, the parties to the Term Sheet plainly did not intend to bind themselves from further negotiations.

(KMW), 1996 WL 340002, at *7 (S.D.N.Y. June 19, 1996) ("While the Memorandum of Understanding states that it 'is binding upon the parties,' other portions of the agreement indicate a clear intention not to be bound to substantive portions of the document absent the execution of future binding agreements.") (internal citation omitted); *cf. Pinnacle Performance Inc. v. Garbis*, No. 12 C 1136, 2013 WL 655202, at *4 (N.D. Ill. Feb. 21, 2013) (term sheet binding where "[t]here [wa]s no indication that the parties intended to make the drafting of another document a condition precedent to reaching an agreement").[3]

Furthermore, a simple perusal of the ten-page Term Sheet shows that it was not at all detailed, and numerous crucial points still remained for further negotiation, including the terms of the release to be given Syngenta; Syngenta's walk-away rights; objection and opt-out rights; an allocation methodology[4]; a claims process; and attorney's fees. *See 20 Atl. Ave. Corp. v. Allied Waste Indus., Inc.*, 482 F. Supp. 2d 60, 76 (D. Mass. 2007) ("It is not enough if parties negotiating have agreed upon certain important terms if there has been no agreement on other essential elements of the undertaking.") (citing cases; internal quotation marks omitted); *cf. Fairbrook Leasing, Inc. v. Mesaba Aviation, Inc.*, 408 F.3d 460, 465 (8th Cir. 2005) (district court noted that Term Sheet's "length, detail, formality, and completeness" supported finding that it defined parties' obligations, and was "not a mere invitation for them to continue to negotiate"). Indeed, that the Term Sheet merely provided a rough *internal* roadmap for the

---

[3]   Coffman and Toups make much ado about the morphing of previously envisioned separate Class Plaintiff and Individual Plaintiff tracks (*see* Term Sheet §§ 2.r, 2.ff, 4.b, 4.d [ECF No. 3514-1, at 4, 6, 8-11]) into a unitary class structure in the final agreement that emerged from the parties' negotiations. *See* Opp. at 4-7. The explanation for that, however, is simple and innocuous: once the members of the PNC agreed that all claimants (in their respective producer and non-producer categories) would be treated the same in any settlement allocation, there was no reason to have a more cumbersome two-tier structure. *See also infra* at 10 n.6 (noting reduced administrative burdens of single class structure).

[4]   The absence of such an allocation methodology in the Term Sheet, including how the $1.5 billion would be divided between the various subclasses, is further evidence that the Term Sheet did not include all material terms needed to create a binding agreement between its signatories.

7

parties to proceed to a follow-up negotiation track to work out a superseding comprehensive settlement agreement and was not intended to vest any rights in absent class members is further reflected by the fact that the Term Sheet was to remain "strictly confidential."  ECF No. 3514-1, at 2 (§1.b).

**III.**     **Coffman and Toups' Jurisdictional Objection Is Unavailing**

Relying on the Term Sheet, Coffman and Toups argue that, as of September 25, 2017 (the date that the Term Sheet was signed), this Court does not have "jurisdiction" over so-called "Individual Plaintiffs."  Opp. at 9-10.  That argument fails for a number reasons.  To the extent that Coffman and Toups challenge personal jurisdiction, the Supreme Court has made clear that by providing a right to opt out, as the Settlement Agreement here does, personal jurisdiction over absent class members is proper.  *Phillips Petroleum Co. v. Shutts*, 472 U.S. 797, 812 (1985) (personal jurisdiction is proper where absent class members are "provided with an opportunity to remove himself from the class by executing and returning an 'opt out' or 'request for exclusion' form to the court.").

As for the far-fetched suggestion that the Term Sheet somehow divested this Court of jurisdiction, the Term Sheet (to which Coffman and Toups were not even parties) was not the source of any court's jurisdiction and, for the reasons explained in Section II above, it never constituted a binding contract anyway.  The Term Sheet made clear that it would be – in fact, "must be" – superseded by more definitive written settlement agreements that would control over, supersede, and replace the Term Sheet.  *See* ECF 3514-1, at 2 (Term Sheet § 1(a)).

As this Court is aware, on February 26, 2018, after months of hard-fought negotiations, the Proposed Settlement Class Counsel, Proposed Subclass Counsel, the Court-appointed PNC, MDL Co-Lead and Litigation Class Counsel, Minnesota Co-Lead Class Counsel and Syngenta executed that definitive written Settlement Agreement. *See* ECF No. 3507-2.  By the very terms

of the Term Sheet on which Coffman and Toups anchor their argument, the Settlement Agreement controls, supersedes, and replaces the Term Sheet.

Pursuant to the Fourth Amended Complaint (*see* ECF No. 3505, at 6 [¶¶ 1-2]), this Court has jurisdiction over the Settlement Agreement approval process and, to the extent that they do not timely opt out, all potential Settlement Class and Subclass Members.  *See also* Settlement Agreement § 9.18.1 (ECF No. 3507-2, at 68-69).  Furthermore, the Settlement Agreement makes clear that an individual or entity that seeks to avoid the Settlement's terms and conditions is free to do so by timely opting out.  *See id.* §§ 4.3.1-4.3.6 (ECF No. 3507-2, at 44-46).  Assuming that they follow the proper procedure for timely opting out of the Settlement, those individuals or entities will not be subject to the Court's subsequent judgment and release related to the proposed Settlement Agreement.

Perhaps anticipating that response, Coffman and Toups next take issue with the very fact that the Settlement Agreement allows Class Members to participate in the Settlement, even if they had previously opted out of a litigation class.  As an initial matter, the litigation classes and the Settlement Class are not co-extensive.  The latter is broader in that it includes producers who purchased and planted Agrisure Viptera or Duracade corn seed and it includes those previously excluded from the definition of the litigation class.  *See infra* at 13.  Moreover, it should be noted that while Coffman and Toups claim to represent "over 9,000" Class Members, they, in fact, opted only 3,529 Class Members out of the litigation classes.  They fail to explain this discrepancy.[5]

---

[5] Similarly, the Hossley-Embry firm claims to represent approximately 650 producer plaintiffs (ECF No. 3500, at 2), but only 329 of its clients excluded themselves from the litigation classes according to the litigation class notice administrator.

In any event, there is nothing inappropriate about affording producers who may have opted out of a litigation class the chance to participate in the settlement.  Indeed, Coffman and Toups do not even argue that their clients want to reject the substantive terms of the settlement.  Nor do they raise a substantive concern about, or allege prejudice with respect to, the Settlement.  Rather, they raise a naked claim that they do not want their claims to be processed through this Court.[6]

Contrary to Coffman and Toups' argument, no one is being "forcibly shoehorned" back into the Settlement Class.  *See* Opp. at 11.  The Settlement Class, however, did not exist previously and does not exist until it is certified by the Court.  Instead, the Settlement provides *all* potential Class Members an opportunity to participate and to make an informed decision regarding their settlement participation with full information.  This is fully consistent with precedent.  *See Nilsen v. York Cty.*, 228 F.R.D. 60, 61-62 (D. Maine 2005) (ordering that second opportunity to request exclusion be provided in class action involving a previously-certified class because "elements of the proposed settlement here counsel a new opportunity to request exclusion"); *see also In re Agent Orange Prods. Liab. Litig.,* 689 F. Supp. 1250, 1261-63 (E.D.N.Y. 1988) (stating that court – on its own motion – would require inclusion of previous opt-out plaintiffs who lost on summary judgment in subsequent settlement unless they timely

---

[6]  The closest that they come to arguing any prejudice is their assertion that if individual plaintiffs were not being "shoehorned" into the class, their individual claims would not be subjected to the fairness inquiry under Rule 23(e) and, therefore, might be paid sooner.  But they fail to show that Syngenta would be willing to settle with them without the assurance of a class-wide release and, concomitantly, global peace.  Even under the two-settlement structure described in the Term Sheet, approval of the class settlement was a pre-condition to either settlement becoming effective.  *See* Term Sheet § 4(d)(xv) (ECF No. 3514-1, at 10).  As a result, collapsing that structure into a single settlement only reduces the administrative burden of processing the settlement by eliminating the need for lawyers to submit a "Registration List" and by eliminating the need to consume the additional judicial resources of another court.

opted out again).  If any potential Class Member does not want to be included in the Settlement, the process for opting out is simple.

Rule 23(e)(4) recognizes the importance of a second opt-out opportunity for settlements that occur after the litigation opt out process, providing that "[i]f the class action was previously certified under Rule 23(b)(3), the Court may refuse to approve a settlement unless it affords a new opportunity to request exclusion to individual class members who had an earlier opportunity to request exclusion but did not do so."  Fed. R. Civ. P. 23(e)(4).  That decision is left to the Court's discretion, *see Dare v. Knox County*, 457 F. Supp. 2d 52, 53 (D. Me. 2006), and although many factors may govern a Court's decision, a key factor is that information available to class members has changed.  *Id.*; *accord Nilsen*, 228 F.R.D. at 61.  Here, the information available to potential Class Members to allow an informed decision is vastly different than when putative class members were given the opportunity to opt out of the litigation class.  For example, the Court has ruled on summary judgment, evaluated experts under *Daubert*, issued motions *in limine*, and there has been one partial jury trial, and one full jury trial and verdict.  Moreover, concerns that might have animated many of the prior opt outs — such as producers believing, based on lawyer solicitation, that they might fare better with an individual lawsuit — are also different, given that Syngenta is offering the same settlement to all producers.

Coffman and Toups suggest that this provision does not apply to individuals who already opted out of the earlier litigation classes in the MDL and Minnesota MDL.  But the committee notes to the Rule 23(e)(4), like the cases, make no such distinction, instead observing that "[a] decision to remain in the class is likely to be more carefully considered and is better informed when the settlement terms are known."  Fed. R. Civ. P. 23(e)(3), 2003 advisory committee note; *see also Georgine v. Amchem Prods., Inc.*, 160 F.R.D. 478, 508 (E.D. Penn. 1995) (ordering

second opportunity to opt out of settlement class where misleading communications were provided prior to first opt-out period, and noting that if class members had already opted out, they would be free to do so again).[7]  Additionally, the committee notes recognize that among the factors that a court might consider in deciding whether to allow a new exclusion opportunity "are changes in the information available to class members since expiration of the first opportunity to request exclusion, and the nature of the individual class member's claims." *Id.*

The *Manual for Complex Litigation* also recognizes the wisdom of a subsequent opt-out procedure where a case settles after a litigation certification:

> When a Rule 23(b)(3) class is certified for trial, the decision whether to opt out might have to be made well before the nature and scope of liability and damages are understood.  Settlement may be reached only after the opportunity to request exclusion has expired and after changes in class members' circumstances and other aspect of the litigation have occurred. Rule 23(e)(3) permits the court to refuse to approve a settlement unless it affords a new opportunity to request exclusion at a time when class members can make an informed decision based on the proposed settlement terms.
>
> This second opt-out opportunity helps to provide the supervising court the "structural assurance of fairness," called for in *Amchem Products Inc.*

David F. Herr, *Annotated Manual for Complex Litigation (Fourth)* § 21.611, at 427 (rev. ed. 2016) (footnote omitted).[8]

---

[7]  Fed. R. Civ. P. 23(e)(4) was previously codified at Fed. R. Civ. P. 23(e)(3).

[8]  Additionally, courts have repeatedly allowed putative class members to rejoin a class at the settlement stage.  *E.g.*, *In re Elec. Carbon Prods.*, 447 F. Supp. 2d 389, 396-97 (D.N.J. 2006); *In re Urethane Antitrust Litig.*, No. MDL 1616, 2008 WL 5215980, at *3 (D. Kan. Dec. 12, 2008); *In re Elec. Weld Steel Tubing Antitrust Litig.*, No. 79-4628, 1982 WL 1873, at *3 (E.D. Pa. June 30, 1982); *In re Corrugated Container Antitrust Litig.*, No. MDL 310, 1981 WL 2093, at *14 (S.D. Tex. June 4, 1981), *aff'd*, 659 F.2d 1322 (5th Cir. 1981). These courts have reasoned that, if a plaintiff who previously opted out "is permitted back into the settlement class, the remaining members will receive no less than what they would have received had [that plaintiff] never opted out."  *In re Elec. Weld Steel Tubing*, 1982 WL 1873 at *3.

Moreover, the second opt-out right that the PNC negotiated with Syngenta is a benefit to *most* of Toups and Coffman's clients.  If such a provision had not been negotiated, then the nearly 60% of Coffman and Toups' purported clients who did *not* opt out of the litigation classes would be bound by the Settlement even if they wanted to opt out.

Here, a comprehensive, nationwide Settlement Agreement has been proposed that would permit maximum participation. *See Hofstetter v. Chase Home Fin., LLC*, No. C 10-01313 WHA, 2011 WL 5415073, at *2 (N.D. Cal. Nov. 8, 2011) (noting, in context of challenge to settlement agreement, that "class counsel negotiated a second opt-out opportunity to protect class members"); *see also Dare v. Knox Cty.*, 465 F. Supp. 2d 14, 15 (D. Me. 2006) (settlement agreement provided second opportunity for class members to request exclusion).  The Settling Parties negotiated a second opt-out as a material term of the Settlement and no rule prohibits it.  This material term should be respected and implemented because it allows all potential Class Members an opportunity to participate in the $1.51 billion Settlement or opt out of the Settlement Class based on an informed decision possessing all relevant and current information.

As noted above, the Settlement Class is broader than the previously-certified litigation classes.  This Court originally certified a nationwide Lanham Act class and eight statewide classes, all of which excluded purchasers of Viptera or Duracade corn seed.  *See* ECF No. 2547, at 30-33 (Sept. 26, 2016).  The Minnesota Court also certified a statewide litigation class that excluded those same corn producers.  *See In re Syngenta Litig.*, No. 27-CF-15-3785, Order at 1 (Minn. Dist. Ct., 4th Jud. Dist., Hennepin Cty. Nov. 3, 2016) ("Minn. Class Order"), attached as Exhibit 1.  Moreover, neither court previously certified litigation classes of Grain Handling Facilities or Ethanol Processing Facilities, and the litigation classes that this Court had certified included those producers who priced corn for sale after November 18, 2013, whereas the

Settlement Class encompasses those who owned an interest in corn priced for sale after September 15, 2013. *See* Settlement Agreement § 2.13 (ECF No. 3507-2, at 11) (defining the Class Period).

Courts have recognized that the decision to participate or opt out of a settlement is an individual one and should not be usurped by others. *See Hanlon v. Chrysler Corp.*, 150 F.3d 1011, 1024 (9th Cir. 1998) (citing *Newberg on Class Actions* treatise). This logic applies equally to Coffman and Toups as counsel for their clients. Coffman and Toups' approach would deprive their clients of the right to make an informed decision about participating in the current Settlement whereas mandating a second, Settlement-related opt-out in no way forces those clients to participate if they do not wish to do so. This Court should reject Coffman and Toups' suggestion that their clients be denied an opportunity to participate in this $1.51 billion settlement after a decision fully informed by Class Notice and the Rule 23(e) approval process.

## IV.    A Choice of Law Analysis Is Unnecessary

Coffman and Toups further maintain that a nationwide settlement class is impermissible, based solely on a recent, distinguishable decision from the Ninth Circuit, *In re Hyundai and Kia Fuel Economy Litigation*, 881 F.3d 679 (9th Cir. 2018), *pet. for reh'g en banc filed*, No. 15-56014 (Mar. 8, 2018) ("*Kia*"). Opp. at 12-13. In *Kia*, the district court had denied certification of a nationwide consumer-fraud litigation class after the defendant had submitted an "appendix of variations in state law [that] 'unquestionably demonstrates that there are material differences as between the various states' laws that would 'make a difference in this litigation.'" 881 F.3d at 696. The parties subsequently entered into a global settlement, and the district court certified a nationwide settlement class over the objection by certain class members with competing claims. A divided panel of the Ninth Circuit reversed, holding that the district court did not adequately consider potential factual differences implicated by the variation in state laws. *Id.* at 703.

At the same time, however, the panel majority in *Kia* also noted that "[v]ariations in state law do not necessarily preclude a 23(b)(3) action.  For instance, even when some class members 'possess slightly differing remedies based on state statute or common law,' there may still be 'sufficient common issues to warrant a class action.'"  *Id.* at 691 (quoting *Hanlon v. Chrysler Corp.*, 150 F.3d 1011, 1022-23 (9th Cir. 1998)).   *Kia*, however, involved consumer-fraud claims, and it construed Ninth Circuit precedent as establishing that there were material, substantive differences between such claims that warranted greater scrutiny by the district court.

There are at least four reasons why the analysis in *Kia* does not apply here, even if the Ninth Circuit ultimately upholds its reasoning in *Kia* (a petition for rehearing en banc, supported by numerous plaintiff- and defense-oriented *amici curiae* is pending) and even assuming that the Tenth Circuit would embrace the *Kia* panel majority's reasoning.

*First*, this case involves a *federal* cause of action, under the Lanham Act, that applies to *all* members of the Settlement Class.  *See* Fourth Am. Compl., ECF No. 3505, at 108 (¶ 417). And this Court previously held that each element of Rule 23(a) and (b)(3) were satisfied with respect to this claim.  *See* Mem. & Order, ECF No., 2547 at 30-31.

Coffman and Toups do not challenge nationwide certification of this federal-law claim. Thus, the choice-of-law analysis in *Kia* necessarily has no application to such a claim.  Indeed, no doubt mindful that Plaintiffs have long pleaded claims under the federal Lanham Act and that this Court had already certified a nationwide class asserting such claims, Coffman and Toups feebly try to sidestep that salient fact by asserting, in a footnote and without citing any authority, that "the proposed national settlement class is not certifiable as a matter of law" because the Lanham Act claim "has been dismissed."  Opp. at 5, 7 n.6.

That argument borders on the frivolous.  The Lanham Act claim was not "dismissed." Rather, after full discovery, the Court granted Syngenta summary judgment on that claim.  Mem. & Order, ECF No. 3051, at 6-7 (Apr. 5, 2017).  Critically, the Court granted summary judgment *on a class-wide basis*, which only further demonstrates the amenability of the Lanham Act claim to class-wide adjudication.  Coffman and Toups do not offer any authority to support the suggestion that an adverse judgment precludes a class-wide settlement.  Plaintiffs would have appealed that adverse ruling, and it is axiomatic that the parties can settle a claim pending appeal. At any rate, courts have long recognized that whether a cause of action is legally viable is *irrelevant* to its amenability to class treatment.  *See Finberg v. Sullivan*, 634 F.2d 50, 64 (3d Cir. 1980) (en banc) ("[T]he certification of a class does not depend upon whether the substantive claims have any merit.") (citing cases); *Miller v. Mackey Int'l, Inc.*, 452 F.2d 424, 427 (5th Cir. 1971) ("'A suit may be a proper class action . . . and still be dismissed for failure to state a cause of action.'") (quoting *Kahan v. Rosenstiel*, 424 F.2d 161, 169 (3d Cir. 1970)); *Gomez v. Rossi Concrete, Inc.*, 270 F.R.D. 579, 585 (S.D. Cal. 2010) (on a motion for class certification, "[r]ather than deciding whether the claims have any merit, the [court's] inquiry instead focuses on the nature and range of proof necessary to establish those allegations") (citation and internal quotation marks omitted); *In re Gen. Motors Corp.*, No. MDL 04-1600, 2005 WL 1924354, at *2 n.7 (W.D. Okla. Aug. 8, 2005) ("A determination of the viability of the class claims, prior to certification of the class or consideration of the certification issue, is premature."); *Humphrey v. Int'l Paper*, No. 02 C 4147, 2003 WL 22111093, at *3 (N.D. Ill. Sept. 11, 2003) ("A meritorious claim may be denied class certification if it does not satisfy Rule 23; and, conversely, non-meritorious claims may be resolved adversely to the plaintiffs after a court certifies a Rule 23 class[.]").

That aside, it is a well-accepted feature of class settlements that the parties can settle claims broader than those that justified class treatment in the first instance.  *In re Prudential Ins. Co. of Am. Sales Practice Litig.*, 261 F.3d 355, 366 (3d Cir. 2001).  Indeed, "[i]t is now settled that a judgment pursuant to a class settlement can bar later claims based on the allegations underlying the claims in the settled class action," including even claims that "could not have been presented[] in the class action itself."  *Id.* (collecting cases).  Thus, although the proposed Settlement would resolve both the Lanham Act and all other claims encompassed by the release (including the negligence, tortious interference, and unfair trade practices claims) that fact has no bearing on whether the requirements of Rule 23(a) and (b)(3) were satisfied for purposes of settlement.  As the above case demonstrates, not every released claim in a settlement has to be amenable to class certification.  Here, the Court has already determined that certification of the Lanham Act claim is proper, a fact unchallenged by Coffman and Toups, and that alone is sufficient to distinguish *Kia*.

*Second*, Plaintiffs have also pleaded another claim on behalf of the entire nationwide class:  under Minnesota's Unfair Trade Practices Act and Consumer Fraud Act, Minn. Stat. §§ 325D.13, 325D.15, 325D.44 and 325F.69.  *See* Fourth Am. Compl. ¶¶ 436-63 (ECF No. 3505, at 112-18).  To be sure, this Court previously held that those statutes could not apply to the claims of non-Minnesota resident plaintiffs (ECF No. 1016, at 101-05), but, as is the case with the summary judgment ruling on the Lanham Act claim, Plaintiffs would have appealed that ruling and would have been to rely on the Minnesota MDL court having reached a different conclusion as to extraterritorial application of those statutes.  *See In re Syngenta Litig.*, No. 27-CF-15-3785, Order at 40-44 (Minn. Dist. Ct., 4th Jud. Dist., Hennepin Cty. Apr. 7, 2016), attached as Exhibit 2.

*Third*, even if those two claims themselves do not support certification for settlement purposes, the negligence claims at issue here do not present the same variations in state law existent in the consumer-fraud claims in *Kia*.  All states recognize a negligence cause of action.  Moreover, unlike the elemental differences in consumer-fraud claims, all of the negligence claims here require proof of the same black-letter elements: duty, breach, causation, and damages.  *See In re Telectronics Pacing Sys., Inc.*, 172 F.R.D. 271, 291 (S.D. Ohio 1997) ("all states use the same elements to define a cause of action for negligence").

Here, the Court determined during the litigation phase of the case that Syngenta owed a duty of care to Plaintiffs under generally-applicable principles.  *See* Mem. & Order, ECF No. 1016, at 13 (Sept. 11, 2015).  It also held, under generally-applicable principles, that Plaintiffs had adequately pled the element of causation.  *Id.* at 22.  The course of this litigation – which, unlike *Kia*, reached an advanced stage, including two class-wide trials – further showed that any variations in state law were immaterial to the predominance determination of Rule 23(b)(3).  Between this MDL and the cognate Minnesota MDL, Plaintiffs sought certification of nine state-law classes asserting the claim of negligence and obtained certification of *all* nine state-law classes.  *See* Mem. & Order, ECF No. 2547 (Sept. 2016); Minn. Class Order at 1.  There is no record here of a single variation that would materially affect that analysis.

The successful Kansas Class trial, of which this Court is well aware, reflects the degree to which common factual issues, applied to generally-applicable negligence principles, predominate in this litigation:  the vast majority of the trial testimony, and the parties' arguments, related to Syngenta's conduct in commercializing the Agrisure Viptera and Duracade corn seeds, its awareness of the resulting risk to the U.S. corn market, and China's conduct in reviewing

Syngenta's application for import approval of Syngenta's traits.[9]   There are no plausible variations in state law that could even potentially undermine the centrality of these issues, and every Class Member's negligence claim – irrespective of that Member's state – would require the jury to adjudicate these predominating facts to show breach, cause, and damages.   Tellingly, Coffman and Toups make no showing (or even an attempt at a showing) that state negligence laws differ in any respect material to class certification under the relevant allegations in this litigation.   Their argument is, therefore, devoid of substance.

   *Fourth*, certification of a nationwide settlement class in *Kia* followed the district court's own determination that a nationwide litigation class was not proper, and it was supported by the defendants' own arguments that there were material variations in state law that preclude class certification.   This was a motivating factor in the panel majority's determination to remand.   *See Kia*, 881 F.3d at 702-03 ("Because the district court made clear that it would be unlikely to certify the same class for litigation purposes, the class representatives were well aware that they would be unlikely to succeed in any efforts to certify a nationwide litigation class.").   In contrast,

---

   [9]   Coffman and Toups contend that Plaintiffs' decision to certify "discreet [sic] single state classes" for the state law claims is an implicit concession "that no nationwide litigation class could be obtained."   Opp. at 13.   That is an unproven and unfounded assumption.   There are strategic reasons in a case this large and complex why Plaintiffs might have wanted to create distinct classes for purposes of trial – namely, to avoid putting all of their eggs into one trial basket.   Moreover, given the sheer size of the nationwide class, there are reasons related to manageability that could warrant distinct classes for trial – concerns that are inapplicable in the settlement class context.   *See, e.g., Amchem Prods., Inc. v. Windsor*, 521 U.S. 591, 620 (1997) ("Confronted with a request for settlement-only class certification, a district court need not inquire whether the case, if tried, would present intractable management problems."); *In re Warfarin Sodium Antitrust Litig.*, 391 F.3d 516, 537 (3d Cir. 2004) ("Although Appellants' concerns about the manageability of a multistate class of consumers and TPPs, as we discussed above, did not pose a problem for the certification of a settlement class, there is a significant risk that such a class would create intractable management problems if it were to become a litigation class, and therefore be decertified."); *In re Volkswagen & Audi Warranty Extension Litig.*, 273 F.R.D. 349, 354 (D. Mass. 2011) ("In view of the fact that this court need not deal with intractable management problems presented by trial, the large size of the Class, the complexity of the litigation, the cost of the litigation, and similar issues, the superiority requirement is satisfied.").   Thus, one cannot draw the inference that, because Plaintiffs did not attempt to certify a single litigation class on their negligence claims, they have conceded that such a claim cannot be certified for settlement purposes.

there is no record here of material state-law variations, either by Syngenta or anyone else, and this Court and the state court in the related Minnesota proceedings, certified a number of litigation classes, including a nationwide class.[10]

## V.   "Individual Plaintiffs" Are Not Placed at Any Disadvantage

Coffman and Toups further maintain that the Settlement places "individual" plaintiff corn producers at a disadvantage.  Opp. at 14.  Not so.  Within each of the four proposed subclasses, the Settlement's allocation formula is the same for all members.  *See* Settlement Agreement § 3.7.2 (ECF No. 3507-2, at 29-30).  There is no reason to award some corn producers more compensation simply because they had to complete a Plaintiff Fact Sheet.  Completing a Fact Sheet was hardly onerous, and this Court, the Minnesota Court, and the Illinois Federal Court ordered plaintiffs to complete them.  *See* Scheduling Order No. 1, § 1.h (ECF No. 123, at 11) (Feb. 4, 2015).

To the extent that Coffman and Toups are grumbling that some Class Members who hired individual counsel will also have to pay attorney's fees over and above what will be withheld from the Settlement Fund to pay fees in accordance with the Settlement Agreement's provisions, resulting in those Members receiving less of a net recovery than Class Members who do not have individual counsel, any discussion of individual lawyers' fees is premature at this point given that the Court will address attorney's fees at a later time.  *See* Settlement Agreement § 7.2 (ECF No. 3507-2, at 57-60).  Even if Coffman and Toups were correct about such Class Members receiving a smaller net recovery, that does no call the Settlement into question; it would merely be the consequence of those Class Members' conscious litigation decision and the information

---

[10]   Plaintiffs also anticipated that the state-law claims of an additional twelve statewide classes, representing the vast majority of corn producers, would be certified.  Their motion was pending at the time of settlement.  *See* Producer Pls.' Second-Phase Mot. for Class Cert., ECF No. 3431 (Sept. 15, 2017).

they were provided by their attorney.  No principle of class action jurisprudence suggests that settlements must subsidize such litigation choices and award more to Class Members simply because they hired their own lawyers.  What that complaint reveals is that Coffman and Toups are really concerned about *their own* pecuniary interests, not those of their clients – who may well decide that they no longer need individual counsel in order to secure compensation under the Settlement.[11]

## VI.  Arguments About Attorney's Fees Are Premature

Next, Coffman and Toups contend that preliminary approval should be denied because a potential one-third award of the settlement fund for attorney's fees[12] is "exorbitant" in a "mega-fund" settlement such as this and that a much smaller percentage must be awarded.  Opp. at 14-15.  This argument fails for three reasons.  *First*, it is not ripe.  There is no fee application before the Court at this time, and it will be up to the Court, on a more complete record, to make the ultimate determination as to what percentage of the settlement fund to award as attorney's fees.

---

[11]  Coffman and Toups' sniping at the settlement in *In re NFL Players' Concussion Injury Litigation*, 307 F.R.D. 351 (E.D. Pa. 2015), *aff'd*, 821 F.3d 410 (3d Cir. 2016), is not surprising.  *See* Opp. at 14 n.11.  They doggedly sought to scuttle that billion-dollar settlement, all the way up the Supreme Court.  *See Armstrong v. NFL*, 137 S. Ct. 607 (2016) (No. 16-413) (denying cert. petition filed by Coffman and Toups).  Far from being "eerily similar," the *NFL Concussion* settlement differs in many key respects, not least of which is that it has a 65-year lifespan, *see* 307 F.R.D. at 364, 376, and monetary relief under that settlement requires class members to demonstrate one of a defined category of Qualifying Diagnoses of neurocognitive impairments upon examination by a designated physician, *id.* at 366, so the claims process there is inherently more multifaceted than that here.  As for the attorney's lien disputes that Coffman and Toups allude to, the countless petitions by discharged individual lawyers to establish attorney's liens led the district court to appoint Prof. William B. Rubenstein, a noted authority on class action litigation, as an expert to advise it on whether it should impose a cap on individual retainers given the minimal work that many lawyers performed.  *See In re NFL Players' Concussion Injury Litig.*, No. 2:12-md-02323-AB (E.D. Pa. Order filed Sept. 14, 2017) (ECF No. 8376).  Prof. Rubenstein has recommended a cap of 22% on such retainers.  *See id.* (Reply of Prof. William B. Rubenstein to Responses to Expert Report, filed Jan. 19, 2018, at 3) (ECF No. 9571).

[12]  The proposed Class Notice informs Class Members that Settlement Class Counsel will seek up to one-third of the settlement fund for attorney's fees.  ECF No. 3707-5, at 18.

*Second*, the so-called "mega-fund" or sliding scale doctrine that Coffman and Toups urge (Opp. at 15) – by which the percentage of the recovery to be awarded as fees for settlements yielding nine-figure and greater recoveries should decrease as the common fund increases – is one that a plethora of courts (including this one and, most emphatically, the Seventh Circuit), have roundly criticized "because it would eliminate [class] counsel's incentive to press for more . . . from the defendants." *In re Synthroid Mktg. Litig.*, 264 F.3d 712, 718 (7th Cir. 2001); *accord In re Enron Corp. Sec., Derivative & ERISA Litig.*, 586 F. Supp. 2d 732, 754 (S.D. Tex. 2008) ("[T]he megafund rule is contrary to the Fifth Circuit's approach that the district court scrutinize each case for the particular facts that will determine what constitutes a reasonable fee award."); *Allapattah Servs., Inc. v. Exxon Corp.*, 454 F. Supp. 2d 1185, 1213 (S.D. Fla. 2006) ("Put simply, if courts were to hold that the percentage should decline sharply after, say, the $100 million threshold was passed, then plaintiff's counsel in a case such as this would have had little incentive to hold out for nine long years for the $1.2 billion recovery that it obtained."); *In re Urethane Antitrust Litig.*, No. 04-1616-JWL, 2016 WL 4060156, at *6 (D. Kan. July 29, 2016) ("[T]he court agrees with those courts who have noted that such a diminishing scale can fail to provide the proper incentive for counsel."); *In re Linerboard Antitrust Litig.*, No. 98-5055, 2004 WL 1221350, at *16-17 (E.D. Pa. June 2, 2004) ("The Court rejects [the sliding scale] in this case because the highly favorable settlement was attributable to the petitioners' skill and it is inappropriate to penalize them for their success. Moreover, the sliding scale approach is economically unsound."); *see also In re Rite Aid Corp. Secs. Litig.*, 396 F.3d 294, 303 (3d Cir. 2005) ("[T]here is no rule that a district court must apply a declining percentage reduction in every settlement involving a sizable fund."); *In re Auto. Parts Antitrust Litig.*, No. 2:12-CV-00203, 2017 WL 3525415, at *2 (E.D. Mich. July 10, 2017) ("[T]here is no requirement that the

Court necessarily apply a declining fee percentage based on the absolute dollar amount of any of the settlements at issue."), *appeal dismissed sub nom. In re Wire Harnesses*, No. 17-1967, 2017 WL 5664917 (6th Cir. Sept. 15, 2017).

*Third*, contrary to Coffman and Toups' assertion, as this Court is well aware, courts have routinely awarded fees above 25%, even in so-called "mega-fund" cases. *See Allapattah Servs.*, 454 F. Supp. 2d at 1210 (citing expert reports); *In re Auto. Parts Antitrust Litig.*, 2017 WL 3525415, at *2 (collecting cases); *In re Urethane Antitrust Litig.*, 2016 WL 4060156, at *6 (noting that class counsel's expert had identified 34 cases involving settlements of at least $100 million in which the court awarded fees of 30% or more).   This is particularly so when a settlement follows complete discovery, a jury trial, and a favorable class-wide verdict.   *In re Urethane Antitrust Litig.*, 2016 WL 4060156, at *6-7.

At any rate, the question of what percentage of the recovery should be awarded as fees should be taken up at a later time, not on preliminary approval, where the limited question is whether the proposed settlement "falls within the range of possible approval."   *In re Motor Fuel Temperature Sales Practices Litig.*, No. 07-MD-1840-KHV, 2014 WL 5431133, at *4 (D. Kan. Oct. 27, 2014).

## VII.   Coffman and Toups Misapprehend the Settlement Claims Process

Coffman and Toups incorrectly assert that Class Members must provide a "wet ink" signature on their Claim Forms.  Opp. at 15.  Not so.  Class Members can provide *either* a wet-ink signature, a .pdf or image signature, or an electronic signature.  Settlement Agreement § 2.62 (ECF No. 3507-2, at 23).   As for Coffman and Toups' cavil that Class Members should be permitted to submit their FSA-578 forms with their claims packages (Opp. at 16), that would be *more* burdensome and time-consuming than the streamlined process that the PNC consciously negotiated so as to *relieve* Class Members from having to gather supporting paperwork – which

includes within the Claim Form itself a consent to permit the Claims Administrator to obtain the

FSA-578 data in electronic format directly from the USDA. *See id.* § 3.7.3.1 (ECF No. 3507-2,

at 30) & Ex. 2 (Claim Form, at 1-2) (ECF No. 3507-4, at 2-3). This is vastly superior, in terms

of cost and accuracy, than requiring producers to obtain such forms, submit them to the Claims

Administrator, and then have the data manually input into database.[13]   Coffman and Toups'

concerns about potential inaccuracy and cost are also without basis.[14]   At any rate, Coffman and

Toups' preference for having a more arduous option for submission of claims surely does not

demonstrate that the Settlement is outside the range of possible approval.

## VIII.   The Opt-Out Requirements Are Not Onerous

Equally without merit is Coffman and Toups' conclusory contention that the opt-out

procedure is "too onerous." Opp. at 16. With one exception, they provide no explanation of

what requirement precisely it is that they find onerous.[15]

---

[13]   Coffman and Toups provide no support for their request that lawyers be permitted to sign a Claim Form. Nor do they directly challenge the reasonable provision that the Settlement requires a Class Member to attest under penalty of perjury that they are Class Members and that the information they have provided on the Claim Form, such as whether they purchased and planted Agrisure Viptera or Duracade and the amount of corn producers did not market, but fed on farm, is accurate. Although Coffman and Toups contend that they have obtained some FSA 578-Forms, not all of the information required by the Claim Form, including the fed-on-farm information, is contained in the FSA-578. Finally, as Coffman and Toups must be aware, the USDA will not accept a consent for release of the FSA 578 data signed by attorney because of the requirements of 7 U.S.C. § 8791(b)(4)(C).

[14]   Coffman and Toups' insistence is no doubt driven by the inaccurate information they have been giving their clients. Despite claiming to be in the dark about the negotiations leading up to the Settlement Agreement, they have been incorrectly advising their clients that "[c]orn producers will be required to submit their Forms 578 as part of their claims" in a settlement since at least September 26, 2017. https://corncasesettlement.com/syngenta-corn-case-settled-1-5-billion/. Their decision to disseminate inaccurate information before the terms of the Settlement were announced does not impugn the administratively feasible claims process that the Settling Parties designed.

[15]   Coffman and Toups' assertion that the proposed Class Notice imposes additional requirements beyond the Settlement Agreement itself (Opp. at 17) is baseless. *Compare* Settlement Agreement § 4.3.2 (ECF No. 3507-2, at 45-46) *with* Class Notice § 20 (ECF No. 3507-5, at 15-16).

The only complaint that Coffman and Toups actually discuss is the preclusion of counsel from submitting opt-out requests on behalf of their clients.  Opp. at 17-18.  That objection, however, fails.  This Court previously rejected a similar argument, over Coffman and Toups' objection, in approving the Class Notice issued to the litigation classes, finding that it was reasonable to require Class Members' personal signatures on opt-out requests because "economic incentives exist[ed] for counsel who are not part of the leadership to procure opt outs in order to pursue a course in which those counsel might be better situated to earn a fee," and noting that "[m]uch information ha[d] been disseminated to putative class members in an effort to influence their decisions, some of which [wa]s at least arguably inaccurate, which reflect[ed] those counsel's zeal."  ECF No. 2703, at 2 (Nov. 23, 2016).  The Court held that "[t]o ensure that those who actually may possess a potential claim are in fact the decision makers, it is more than reasonable to require that they take the very minimal effort required to sign and mail an opt out."  *Id*.  The same rationale holds true now.[16]

Nor was this Court's reasoning an outlier.  Many courts have recognized that it is entirely proper and reasonable to prevent attorney-driven tactics by barring counsel from filing *en masse*

---

[16] Toups and Coffman continued to engage in "arguably misleading" communications after this Order. For example, they attempted to solicit opt-outs from the litigation class by telling producers that "[f]or the most part, you will have to assemble the same types of documents and information to participate in any Syngenta corn lawsuit class action recovery—assuming there is one—that you must assemble to file an individual case. So why not file an individual Syngenta corn lawsuit case right here, right now, and put yourself in the best possible position to maximize your recovery?." https://corncasesettlement.com/syngenta-corn-litigation-u-s-corn-farmers-must-decide-whether-stay-class-action-opt-file-individual-case-april-1-2017/ (last accessed Apr. 2, 2018). In truth, no absent Class Member has ever been asked to assemble documents.  Likewise, it was "at least arguably misleading" when Coffman and Toups, after summary judgment was entered on the Lanham Act claim, told producers that, unless they were part of one of the eight bellwether classes, "the only way [producers] can participate in the Syngenta corn lawsuit and share in any recovery is to hire a lawyer and file an individual case." https://corncasesettlement.com/syngenta-corn-lawsuit-game-changer/ last accessed Apr. 2, 2018).  As counsel in the MDL, Coffman and Toups would have been aware that there were additional statewide putative classes pled, but that Plaintiffs had not yet been required to file a class certification motion with respect to those classes.  These are just some examples as to why it remains imperative that individual producers, not their lawyers, control the ultimate decision to participate in the Settlement.

opt-outs. *E.g.*, *Moulton v. U.S. Steel Corp.*, 581 F.3d 344, 355 (6th Cir. 2009) ("Given the real

risk that the attorney-signed opt-out forms did not reflect the wishes of class members, the

district court appropriately exercised its power by requiring individually signed opt-out forms

(and rejecting the attorney-signed forms)") (citing cases); *In re Diet Drugs*, 282 F.3d 220, 241

(3d Cir. 2002) ("[I]t was clearly within the [district] court's discretion to turn away attempts by

lawyers to opt out class members en masse[.]"); *Good v. Am. Water Works Co.*, No. CV 2:14-

01374, 2016 WL 5746347, at *3 n.3 (S.D. W. Va. Sept. 30, 2016) ("[T]he court observes that

requiring individual signatures [in opt-out requests] is standard practice in many class actions

and in fact serves to protect the due process rights of absent class members."); *see also In re Oil*

*Spill by Oil Rig Deepwater Horizon in Gulf of Mexico, on Apr. 20, 2010*, 910 F. Supp. 2d 891,

939 (E.D. La. 2012) ("[T]he mass unsigned opt outs are highly indicative of a conclusion that

such counsel did not spend very much time evaluating the merits of whether or not to opt-out in

light of the individual circumstances of each of their clients and in consultation with them."),

*aff'd sub nom. In re Deepwater Horizon*, 739 F.3d 790 (5th Cir. 2014); *Hallie v. Wells Fargo*

*Bank, N.A.*, No. 2:12-CV-00235-PPS, 2015 WL 1914864, at *4 (N.D. Ind. Apr. 27, 2015) ("The

personal signature requirement also seems to be a standard requirement in class actions, and it's

not onerous.") (citing cases).

Stated simply, both the Court and the Settling Parties are entitled to know that opt-out

requests reflect the informed wishes of the putative Class Members themselves, not the self-

interest of their lawyers. Coffman and Toups' desire to have the Court allow counsel to file *en*

*masse* opt-outs — when fewer than half of their purported clients actually filed valid opt-outs to

the litigation classes — says much about their agenda.

26

## IX.   <u>Coffman and Toups' First Amendment Challenge Is Specious</u>

Finally, Coffman and Toups object (Opp. at 18) to the provision in the Settlement Agreement, whereby Settlement Class Counsel commit to seeking an order "directing that all websites that seek to attract, advise, inform or otherwise provide information or solicitation of any Class Member shall be taken down or modified to conform exactly to the information contained in the Court-approved Notice Plan and shall link to the Court-approved website at www.CornSeedSettlement.com."   Settlement Agreement § 3.13.2 (ECF No. 3507-2, at 41).

Contrary to Coffman and Toups' hyperbole, Settlement Class Counsel do not seek "unilateral power" to control other lawyers' websites.  *See* Opp. at 18.  Indeed, Settlement Class Counsel have not requested anything of the sort in the proposed Preliminary Approval Order submitted to the Court.  The Settlement Agreement provision at issue merely commits Settlement Class Counsel to seek an appropriate order from the Court to deal with misleading websites designed to lure Class Members into opting out.

Coffman and Toups' attempt to find refuge in the First Amendment is unavailing.  As a general matter, communications directed to members of a class to encourage them to opt out are plainly commercial speech, grounded in the "economic interests of the speaker and the audience," and therefore they enjoy only limited First Amendment protection, and "untruthful or misleading speech has no claim on first amendment immunity."  *Kleiner v. First Nat'l Bank of Atlanta*, 751 F.2d 1193, 1203-04 & n.22 (11th Cir. 1985) (citing cases).

In particular, communications that seek to undermine class members' choices are subject to judicial supervision.  *In re Currency Conversion Fee Antitrust Litig.*, 361 F. Supp. 2d 237, 252 (S.D.N.Y. 2005); *accord In re Sch. Asbestos Litig.*, 842 F.2d 671, 683 (3d Cir. 1988) (noting "district court's duty and authority under Rule 23(d)" to deal with "communications that mislead or otherwise threaten to create confusion and to influence the threshold decision whether to

remain in the class," although court's duty and authority is not limited to such communications); *id.* at 680 ("Misleading communications to class members concerning the litigation pose a serious threat to the fairness of the litigation process, the adequacy of representation and the administration of justice generally."); *Hinds Cty., Miss. v. Wachovia Bank N.A.*, 790 F. Supp. 2d 125, 134 (S.D.N.Y. 2011) (court may supervise communications with absent class members to ensure they "receive accurate and impartial information"); *In re Currency Conversion Fee Antitrust Litig.*, 361 F. Supp. 2d 237, 252 (S.D.N.Y. 2005) ("One policy of Rule 23 is the protection of class members from misleading communications from the parties or their counsel. That same policy concern applies where a party misleads class members by omitting critical information from its communications.") *Cheverez v. Plains all Am. Pipeline, LP*, No. CV15-4113 PSG (JEMX), 2016 WL 861107, at *2 (C.D. Cal. Mar. 3, 2016) ("[A] court may take action to cure the mis-communication and to prevent similar problems in the future where potential class members have received inaccurate, confusing or misleading communications. The court's responsibility to monitor communications is heightened where potential class members are unrepresented by their own counsel.") (citations and internal quotation marks omitted); *see also McWilliams v. Advanced Recovery Sys., Inc.*, 176 F. Supp. 3d 635, 640, 644-45 (S.D. Miss. 2016) (prohibiting counsel who made improper solicitations to class members "from further oral or written communications with members of the certified class"); *In re McKesson HBOC, Inc. Secs. Litig.*, 126 F. Supp. 2d 1239, 1241-47 (N.D. Cal. 2000) (granting lead counsel's application to enjoin solicitation of shareholders for purpose of mounting non-class claims); *Georgine*, 160 F.R.D. at 516 (ordering corrective notice to class where, "[g]iven the susceptibility of nonparty class members to letters from counsel sent on official letterhead and expressing their professional judgment that class members should opt out of the

class, these misleading communications likely were very effective"); *Midland Funding, LLC v. Brent*, No. 3:08 CV 1434, 2011 WL 1882507, at *6 (N.D. Ill. May 17, 2011) (enjoining attorneys who had sent claim forms to settlement class members with opt-out box on form preselected).

Misleading statements targeted at absent Class Members, designed to lure them into opting out of the Class by dangling illusory assurances that they will secure a greater recovery under the Settlement by hiring the sponsoring law firm, or will secure a greater recovery for their market price losses by excluding themselves from the Settlement altogether and hiring the sponsoring law firm to pursue individual litigation, have the potential to cause widespread harm. *See Kleiner*, 751 F.2d at 1203 ("Unsupervised, unilateral communications with the plaintiff class sabotage the goal of informed consent by urging exclusion on the basis of a one-sided presentation of the facts, without opportunity for rebuttal.  The damage from misstatements could well be irreparable.").

Also, it bears mention that this is the prototypical case where protection of individual class members from possible coercion is warranted.  *See*, *e.g.*, *In re Currency Conversion Fee Antitrust Litig.*, 361 F. Supp. 2d 237, 253-54 (S.D.N.Y. 2005) ("unsupervised communications" with putative credit cardholder class members to change the terms of their cardholder agreements was "potentially coercive and improper").  Here, the members of two of the proposed Subclasses (of which one, the non-Viptera and non-Duracade purchaser corn producers, is the overwhelmingly largest segment of the Class) are corn farmers, not lawyers or sophisticated commercial entities with the ability to seek advice from their own in-house legal teams.

All of that being said, Plaintiffs have not, at this time, asked the Court to enter any Order directing the talking down or modification of any firm's website.  Nor have they asked the Court to confer on Settlement Class Counsel the authority to control firms' websites, Coffman and

Toups' sweeping exaggeration to the contrary notwithstanding.  Assuming, however, that the Court grants preliminary approval, Plaintiffs reserve the right to seek this Court's intervention to halt any deceptive communications targeted at Class Members – be they mailings, emails, radio or television commercials, telephone solicitations, dedicated websites, or postings on firms' existing websites.[17]  The foregoing authorities demonstrate that the Court plainly has the power to curtail misleading communications designed to undermine the integrity of the proposed Settlement Class and global settlement.

## CONCLUSION

For the foregoing reasons and those set forth in Plaintiffs' opening memorandum (ECF No. 3507), the Court should grant (i) preliminary approval to the proposed Settlement, including approval of the method of allocation and distribution; (ii) provisional certification of the Settlement Class and Subclasses, and appointment of Settlement Class Counsel, Subclass Counsel, and Class and Subclass Representatives; (iii) approval of the Notice Plan, the Long Form Notice, Publication Notice, and Claim Forms; (iv) appointment of the Notice Administrator and Claims Administrator; (v) authorization to disseminate notice to Class Members; (vi) appointment of Special Masters Ellen K. Reisman and the Honorable Daniel Stack to oversee the settlement; and (vii) adoption of a schedule for the Rule 23(e) final approval process.

---

[17] Plaintiffs are mindful of the Supreme Court's instruction that any order that limits communications to class members "should be based on a clear record and specific findings that reflect a weighing of the need for a limitation and the potential interference with the rights of the parties." *Gulf Oil Co. v. Bernard*, 452 U.S. 89, 101 (1981); *see id.* at 102 ("[S]uch a weighing—identifying the potential abuses being addressed—should result in a carefully drawn order that limits speech as little as possible, consistent with the rights of the parties under the circumstances.").  Moreover, this Court has recognized that when "proceeding under Fed.R.Civ.P. 23(d) . . . plaintiffs must demonstrate good cause or its equivalence to limit communications." *Gottstein v. Nat'l Ass'n for the Self Employed*, 186 F.R.D. 654, 657 (D. Kan. 1999) (citing *Gulf Oil Co.*, 452 U.S. at 101-02).  For this reason, assuming that preliminary approval is granted, Plaintiffs will make appropriate application to the Court if and when they have demonstrable proof of misleading communications directed at Class Members.

Dated:  April 2, 2018

Respectfully submitted,

/s/ Patrick J Stueve
**STUEVE SIEGEL HANSON LLP**
Patrick J. Stueve — KS Bar #13847
460 Nichols Road, Ste. 200
Kansas City, MO  64112
Telephone:  816-714-7100
Facsimile:  816-714-7101
stueve@stuevesiegel.com
***Plaintiffs' Class Counsel, Liaison Counsel,***
***Co-Lead Counsel, and Proposed Plaintiffs'***
***Settlement Class Counsel***

**SEEGER WEISS LLP**
Christopher A. Seeger
55 Challenger Road
Ridgefield Park, NJ  07660
Telephone:  212-584-0700
Facsimile:  212-584-0799
cseeger@seegerweiss.com
***Proposed Plaintiffs' Settlement Class Counsel***

**GUSTAFSON GLUEK PLLC**
Daniel E. Gustafson
Canadian Pacific Plaza - Suite 2600
120 South 6th Street
Minneapolis, MN  55402
Telephone:  612-333-8844
Facsimile:  612-339-6622
dgustafson@gustafsongluek.com
***Proposed Plaintiffs' Settlement Class Counsel***

## <u>CERTIFICATE OF SERVICE</u>

The undersigned hereby certifies that on April 2, 2018, I electronically filed the foregoing with the Clerk of the Court using the CM/ECF system, which sent notification of such filing to all counsel of record.

/s/ Patrick J. Stueve
Plaintiffs' Co-Lead, Liaison, and Class Counsel