# Exhibit E

Norman E. Siegel (*pro hac vice*)
J. Austin Moore (*pro hac vice*)
**STUEVE SIEGEL HANSON LLP**
460 Nichols Road, Suite 200
Kansas City, Missouri 64112
Tel: 816-714-7100
siegel@stuevesiegel.com
moore@stuevesiegel.com

Abbas Kazerounian (Bar No. 249203)
Mona Amini (Bar No. 296829)
**KAZEROUNI LAW GROUP, APC**
245 Fischer Avenue, Unit D1
Costa Mesa, California 92626
Tel: 949-612-9999
ak@kazlg.com
mona@kazlg.com

*Attorneys for Plaintiff and the Class*

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA
SOUTHERN DIVISION

| | |
|---|---|
| WANDA SMITH, individually and on behalf of all others similarly situated,<br><br>  Plaintiff,<br><br>v.<br><br>EXPERIAN INFORMATION SOLUTIONS, INC,<br><br>  Defendant. | Case No. 17-cv-00629-CJC-AFM<br><br>Hon. Cormac J. Carney<br><br>**MEMORANDUM IN SUPPORT OF PLAINTIFF'S MOTION FOR FINAL APPROVAL OF CLASS ACTION SETTLEMENT AND ATTORNEYS' FEES, EXPENSES, AND SERVICE AWARD**<br><br>Hearing: November 9, 2020<br><br>Time: 1:30 p.m.<br><br>Courtroom: 9B |

# **TABLE OF CONTENTS**

I.    INTRODUCTION ...................................................................................................1

II.   SUMMARY OF THE LITIGATION.....................................................................2

     A.   Case filing and allegations ........................................................................2

     B.   Discovery in the *Reyes* action .................................................................4

     C.   Procedural history.....................................................................................4

     D.   The Ninth Circuit appeal in *Reyes*...........................................................5

     E.   Class certification and settlement in *Reyes* .............................................6

     F.   Settlement negotiations .............................................................................7

III.  SETTLEMENT TERMS .......................................................................................8

     A.   The Settlement Class ................................................................................8

     B.   Consideration.............................................................................................8

     C.   Releases ...................................................................................................10

     D.   Residual funds .........................................................................................10

     E.   Attorneys' fees, expenses, and service award payment .......................10

     F.   Preliminary approval and order directing class notice........................11

IV.  CLASS NOTICE, OPT-OUTS, AND OBJECTIONS .......................................11

     A.   Settlement website and class communications .....................................12

     B.   Opt-outs and objections .........................................................................12

V.   ARGUMENT........................................................................................................13

     A.   Class Certification ..................................................................................13

     B.   Fairness of the Settlement ......................................................................14

          1.   Strength of Plaintiff's Case and the Risk, Expense, Complexity, and Likely Duration of Further Litigation. ..........15

          2.   Amount Offered in Settlement.................................................18

          3.   Extent of Discovery Completed, Stage of Proceedings, and Experience and Views of Counsel. .........................................20

          4.   Reaction of Class Members. .....................................................21

VI.  ATTORNEYS' FEES AND TIMING OF PAYMENT ....................................21

VII. CONCLUSION....................................................................................................25

i

# TABLE OF AUTHORITIES

**Cases**                                                                    **Page(s)**

*Amchem Prods., Inc. v. Windsor,*
    521 U.S. 591 (1997) ......................................................................................13

*Burnthorne-Martinez v. Sephora USA, Inc.,*
    2018 WL 5310833 (N.D. Cal. May 16, 2018) ......................................19

*Cooley v. Indian River Transp. Co.,*
    2019 WL 2077029 (E.D. Cal. May 10, 2019) ......................................24

*Craft v. Cty. of San Bernardino,*
    624 F. Supp. 2d 1113 (C.D. Cal. 2008) ................................................23

*Dukes v. Air Canada,*
    2020 WL 487152 (M.D. Fla. Jan. 27, 2020) ......................................18

*Estes v. L3 Techs., Inc.,*
    2018 WL 3642085 (S.D. Cal. Aug. 1, 2018) ......................................19

*Feist v. Petco Animal Supplies, Inc.,*
    2018 WL 6040801 (S.D. Cal. Nov. 16, 2018) ......................................19

*Gonzalez v. BMC W., LLC,*
    2018 WL 6318832 (C.D. Cal. Nov. 19, 2018) ......................................19

*In re Mego Fin. Corp. Sec. Litig.,*
    213 F.3d 454 (9th Cir. 2000) ................................................................21

*In re Nat'l Collegiate Athletic Ass'n Athletic Grant-in-Aid Cap Antitrust Litig.,*
    768 F. App'x 651 (9th Cir. 2019) ........................................................23

*In re Toys "R" Us FACTA Litig.,*
    295 F.R.D. 438 (C.D. Cal. 2014) ........................................................19

*Kirchner v. Shred-It USA Inc.,*
    2015 WL 1499115 (E.D. Cal. Mar. 31, 2015) ......................................19

*Linney v. Cellular Alaska P'ship,*
    151 F.3d 1234 (9th Cir. 1998) ..............................................................14

MEMORANDUM IN SUPPORT OF PLAINTIFF'S MOTION FOR FINAL APPROVAL
OF CLASS ACTION SETTLEMENT

*Nat'l Rural Telecomms. Coop. v. DIRECTV, Inc.,*
    221 F.R.D. 523 (C.D. Cal. 2004) ........................................................... 21, 23

*Parkinson v. Hyundai Motor Am.,*
    796 F.Supp.2d 1160 (C.D. Cal. 2010) .......................................................... 23

*Patton v. Church & Dwight Co.,*
    2019 WL 6357266 (C.D. Cal. Aug. 6, 2019) ................................................. 19

*Reyes v. Experian Info. Sols., Inc.,*
    773 F. App'x 882 (9th Cir. 2019) ............................................................... 5, 6

*Reyes v. Experian Info. Sols., Inc.,*
    2019 WL 4854849 (C.D. Cal. Oct. 1, 2019) ............................................ 6, 7, 9

*Robins v. Spokeo, Inc.,*
    867 F.3d 1108 (9th Cir. 2017) .................................................................... 15

*Roe v. Frito-Lay, Inc.,*
    2017 WL 1315626 (N.D. Cal. Apr. 7, 2017) .................................................. 17

*Safeco Ins. Co. of Am. v. Burr,*
    551 U.S. 47 (2007) ............................................................................... 6, 17

*Singleton v. Domino's Pizza, LLC,*
    976 F. Supp. 2d 665 (D. Md. 2013) ............................................................. 18

*Smith v. A-Check Am. Inc.,*
    2017 WL 1550158 (C.D. Cal. Mar. 1, 2017) ................................................. 19

*Spokeo, Inc. v. Robins,*
    136 S. Ct. 1540 (2016) .............................................................................. 15

*Staton v. Boeing Co.,*
    327 F.3d 938 (9th Cir. 2003) ................................................................. 13, 14

*Syed v. M-I, LLC,*
    2016 WL 310135 (E.D. Cal. Jan. 26, 2016) .................................................. 19

*Syed v. M-I, LLC,*
    2017 WL 3190341(E.D. Cal. July 27, 2017) ................................................. 24

*Vizcaino v. Microsoft Corp.,*
    290 F.3d 1043, 1051 (9th Cir. 2002) ........................................................... 23

iii

*Vranken v. Atl. Richfield Co.*,
  901 F. Supp. 294 (N.D. Cal. 1995) ................................................................23

*Waldbuesser v. Northrop Grumman Corp.*,
  2017 WL 9614818 (C.D. Cal. Oct. 24, 2017).................................................24

*Williams v. Brinderson Constructors, Inc.*,
  2017 WL 490901 (C.D. Cal. Feb. 6, 2017) ....................................................20

## Rules

Fed. R. Civ. P. 23 ..............................................................................13, 14, 17

## Statutes

15 U.S.C. § 1681e(b) .................................................................................2, 16

15 U.S.C. § 1681n ...................................................................................17, 19

15 U.S.C. § 1681o ..........................................................................................17

## Other Authorities

7 Newberg on Class Actions § 21:4................................................................15

## I.    INTRODUCTION

On August 10, 2020, this Court granted preliminary approval to a $5 million settlement to resolve consumer claims stemming from alleged credit reporting violations under the Fair Credit Reporting Act ("FCRA"), finding that it was likely to find the proposed settlement "fair, reasonable, and adequate" pursuant to Rule 23(e)(2) and that the prerequisites of Rules 23(a) and (b)(3) have been met. *See* Dkt. 44. Nothing has occurred in the interim to disturb that conclusion, especially in light of the overwhelmingly positive reaction of the class following the dissemination of class notice. Now, Plaintiff respectfully requests that the Court conduct a final review of the settlement and approve it as "fair, adequate and reasonable" pursuant to Rule 23(e)(2).

The settlement fund is 100% non-revisionary and will be used to compensate more than 14,500 class members who experienced the credit reporting error at issue—an error that was corrected only after litigation against Experian was commenced. The settlement fund will pay for the costs of notice and administration, a service award payment to Ms. Smith, and attorneys' fees and costs approved by the Court—with the remaining funds to be distributed equally to all class members without the need to file a claim. Accordingly, every class member will automatically receive a check for more than $253 without having to take any action under the settlement. As of this filing, no class members have objected to the settlement and only one class member has opted-out of the settlement—indicating broad support for the settlement.

Accordingly, following notice to the Class of the settlement terms, and the opportunity to opt-out and object, Plaintiff seeks this Court's final approval of the settlement, including disbursement of the settlement funds to the class members, approval of a service award to the Plaintiff, and approval of Plaintiff's attorneys' fees and costs.[1]

---

[1] In support of this motion, Plaintiff submits the Declaration of Norman E. Siegel ("Siegel Dec.") (Dkt. 46-2); the Declaration of Steven J. Giannotti on behalf of the Settlement Administrator Angeion Group ("Admin. Dec.") (Dkt. 46-3); and a Proposed Order for the Court's consideration (Dkt. 46-4).

MEMORANDUM IN SUPPORT OF PLAINTIFF'S MOTION FOR FINAL APPROVAL OF CLASS ACTION SETTLEMENT

## II.   SUMMARY OF THE LITIGATION

### A.   Case filing and allegations

On April 6, 2017, Wanda Smith filed a class action complaint alleging that Experian violated its obligations under the Fair Credit Reporting Act (FCRA), 15 U.S.C. § 1681e(b), by failing to use reasonable procedures to assure maximum possible accuracy of the information it included on consumers' reports relating to delinquent loan accounts associated with the now defunct online lender Western Sky Financial LLC. The Complaint alleges CashCall, Inc., an Experian client, entered into an agreement with Western Sky to fund high-interest loans under Western Sky's name, which purported to be affiliated with an Indian tribe. Dkt. 1; Compl., ¶¶ 21, 22. Western Sky would then sell the loans back to CashCall for loan servicing and debt collection. CashCall believed the loans would not have to comply with state licensing and usury laws because tribal entities are entitled to sovereign immunity. *Id*., ¶¶ 23, 24; Siegel Dec., ¶ 3.

As part of its collection efforts, CashCall would furnish consumers' payment history on the loans to Experian, which would then report on consumers' reports. Compl., ¶¶ 27, 28. In some cases, CashCall would sell loan debts to its affiliated company Delbert Services Corp. for servicing and collection, who would also report the loan payment history to Experian. Thus, in many instances, consumers' credit reports included two accounts associated with their Western Sky loan, one from CashCall, and a second from Delbert. The CashCall account would report as "purchased by another lender" referring to Delbert, and report the account history on the loan up until the purchase date. The Delbert account would report "purchased from CashCall Inc." and report the account history on the loan after Delbert took over collection. *Id*., ¶¶ 46, 47; Siegel Dec., ¶ 4.

Amid mounting legal pressure, Western Sky announced in September 2013 it was ceasing operations, but CashCall and Delbert continued to collect on and report outstanding loan balances to Experian. After significant internal discussion, Experian ultimately made the decision to delete all Delbert and CashCall accounts associated with

MEMORANDUM IN SUPPORT OF PLAINTIFF'S MOTION FOR FINAL APPROVAL OF CLASS ACTION SETTLEMENT

Western Sky loans from consumers' reports. Compl., ¶¶ 41-43. In December 2014, with CashCall's knowledge and assistance, Experian deleted more than 350,000 accounts relating to Western Sky loans that were being reported by CashCall (the "mass deletion"). But Experian mistakenly failed to delete more than 125,000 loans reported by Delbert, even after Delbert went out of business and instructed Experian to discontinue data reporting. *Id.*, ¶¶ 66-73; Siegel Dec., ¶ 5.

The following month in January 2015, a subset of the deleted CashCall accounts started to "re-report" on consumers' reports, but they reported differently than they had before the mass deletion. Rather than showing the account as closed and "purchased by another lender" as they would have before the mass deletion, the accounts came back to file as active, currently-delinquent accounts. Compl., ¶¶ 80-83. Experian failed to promptly delete the Delbert and CashCall accounts even after being put on notice of the reporting error and CashCall's repeated requests to Experian to confirm deletion of the accounts over the following year. *Id.*, ¶¶ 84-91; Siegel Dec., ¶ 6.

On February 16, 2016, Plaintiff's counsel in this case, Norman E. Siegel and J. Austin Moore of Stueve Siegel Hanson LLP ("Class Counsel"), filed the action *Demeta Reyes v. Experian Information Solutions, Inc.*, 8:16-cv-00563-SVW-AFM (C.D. Cal.) (the "*Reyes* action") on behalf of Ms. Reyes, seeking to represent the class of individuals who had a delinquent Delbert account remain on their credit reports after Delbert went out of business and instructed Experian to delete its accounts. Siegel Dec., ¶ 2.

Following the close of discovery in the *Reyes* action, Class Counsel filed this action on behalf of Plaintiff Smith, seeking to represent the class of individuals whose reports contained a CashCall account that "re-reported" after Experian initially deleted those accounts in December 2014. Like the Delbert accounts at issue in *Reyes*, the presence of the inaccurate CashCall accounts had a negative impact on Plaintiff's credit standing and could adversely affect credit decisions. Comp., ¶ 103; Siegel Dec., ¶ 8.

**B.    Discovery in the *Reyes* action**

As part of the *Reyes* action, Class Counsel aggressively sought discovery from Experian and relevant third parties regarding Experian's reporting and subsequent deletion of the CashCall and Delbert accounts. For example, Counsel served document requests, requests for admission, and interrogatories on Experian, and served subpoenas and Freedom of Information Act (FOIA) requests on Delbert, CashCall, and more than 30 state and federal regulatory agencies who investigated or prosecuted cases relating to Western Sky loans at issue. Counsel reviewed nearly 20,000 pages of documents, including more than 13,000 pages from third-party regulators. Siegel Dec., ¶ 9.

Counsel also deposed numerous key fact witnesses, including Experian employees Mary Cheatham, Richard Hills, and Carmen Hearn, as well two corporate representatives including Experian's membership director Peter Henke, and "in-house" expert witness Kimberly Cave, who testified she has been deposed more than 200 times in litigation involving Experian. Further, Counsel engaged Dean Binder, a 13-year veteran of the credit reporting industry and former employee of FICO, who submitted a 28-page expert report supporting Plaintiff's positions. *Id.*, ¶ 10.

Discovery efforts were significant on both sides and included numerous contested disputes that ultimately required judicial intervention. *See Reyes*, No. 8:16-cv-00563, Dkts. 53, 56, 60, 62, 63, 66, 67, 68, 72, 75, 79, 80, 86. Following the filing of *Smith*, the parties entered into a discovery sharing agreement whereby certain discovery and deposition testimony propounded in the *Reyes* action would be deemed produced in this action. Dkt. 25; Siegel Dec., ¶ 11.

**C.    Procedural history**

At the time she filed her complaint, Plaintiff Smith filed a notice of related actions, informing this Court of the *Reyes* action. Dkt. 4. After transfer of Plaintiff's case to Judge Guilford was declined (Dkt. 10), Experian filed its answer and affirmative defenses to the *Smith* complaint. Dkt. 14. On August 31, 2017, the parties filed their joint report pursuant

MEMORANDUM IN SUPPORT OF PLAINTIFF'S MOTION FOR FINAL APPROVAL
OF CLASS ACTION SETTLEMENT

to Rule 26(f) discovery plan (Dkt. 25), which set forth the parties' discovery sharing agreement and proposed scheduling deadlines, and the Court subsequently entered a scheduling order in September 2017. Dkt. 28; Siegel Dec., ¶ 12.

Shortly after this Court entered its scheduling order, the *Reyes* court granted Experian's motion for summary judgment and entered judgment against Ms. Reyes. *Reyes*, No. 8:16-cv-00563, Dkt. 97. The *Reyes* court concluded that her "credit report was neither patently inaccurate nor unduly misleading" in violation of the FCRA and that "the evidence presented in this case doesn't appear to support a claim that [Experian] 'willfully' failed to comply with the FCRA." *Id.* at 5, 7. Class Counsel and Ms. Reyes timely appealed the decision to the Ninth Circuit. Siegel Dec., ¶ 13.

Experian moved to stay this case pending the *Reyes* appeal, which Plaintiff opposed. Dkts. 34, 37. Following briefing, this Court agreed with Experian's position and stayed this case pending the *Reyes* appeal, holding that: "Because the facts of the Reyes case and the instant case are so similar, the Ninth Circuit's decision will be dispositive, or at least instructive, on the two central issues in this case: (1) whether the complained-of credit report was inaccurate under the Fair Credit Reporting Act, and (2) whether Experian's conduct was willful." Dkt. 40, at 5; Siegel Dec., ¶ 14.

### D.     The Ninth Circuit appeal in *Reyes*

On May 17, 2019, the Ninth Circuit issued an opinion reversing the grant of summary judgment in Experian's favor in the *Reyes* action and vacating the order denying Plaintiff's motions for partial summary judgment and class certification. *See Reyes v. Experian Info. Sols., Inc.*, 773 F. App'x 882 (9th Cir. 2019); Siegel Dec., ¶ 15.

*First*, the Ninth Circuit held that a jury could conclude that "Experian's continued reporting of Reyes's Delbert account, either on its own, or coupled with the deletion of portions of Reyes's positive payment history on the same loan, was materially misleading" because "Experian was reporting an account that was no longer verifiable and that Reyes could not make current, despite having been specifically informed by

MEMORANDUM IN SUPPORT OF PLAINTIFF'S MOTION FOR FINAL APPROVAL
OF CLASS ACTION SETTLEMENT

Delbert that Delbert was no longer in business." *Id*. at 884.

*Second*, the Ninth Circuit Court concluded that a jury could find "Experian's continued reporting of the Delbert account" and "extraordinarily lengthy delay in implementing its internal decision to delete the Delbert accounts (after it made the decision and after it essentially told Delbert that it had deleted the accounts)" reckless and willful in that it "entail[ed] 'an unjustifiably high risk of harm that is either known or so obvious that it should be known.'" *Id*. (quoting *Safeco Ins. Co. of Am. v. Burr*, 551 U.S. 47, 68 (2007)). The Ninth Circuit remanded the *Reyes* case for further proceedings consistent with its decision.

On June 21, 2019, the parties filed a joint status report in this case to inform the Court of the *Reyes* decision, request a lift of the stay of proceedings, and propose amended scheduling deadlines. *See* Dkt. 42. While this Court did not immediately lift the stay, the parties were able to test the strength of the cases by proceeding to class certification and trial in the *Reyes* action. Siegel Dec., ¶ 16.

### E.   Class certification and settlement in *Reyes*

On October 1, 2019, the *Reyes* court issued an order granting Plaintiff's motion for class certification and certifying a class of loan borrowers whose consumer reports contained Delbert accounts after January 21, 2015. *See Reyes v. Experian Info. Sols., Inc.*, 2019 WL 4854849 (C.D. Cal. Oct. 1, 2019). The Court rejected Experian's argument that Plaintiff lacked Article III standing to sue and concluded that the proposed class met the requirements of Rules 23(a) and 23(b)(3). *See id*. at *8-15; Siegel Dec., ¶ 17.

On October 14, 2019, Experian filed a motion for reconsideration of the class certification order. *Reyes*, No. 8:16-cv-00563, Dkt. 136. The following day, Experian filed a petition to the U.S. Court of Appeals for the Ninth Circuit for permission to appeal the class certification or pursuant to Rule 23(f). *See Reyes v. Experian Info. Sols., Inc.*, Appeal No. 19-80139 ("23(f) Appeal"), Dkt. 1-2 (9th Cir. filed Oct. 15, 2019). The parties thereafter fully briefed the reconsideration motion and 23(f) Appeal. Siegel Dec., ¶ 18.

On the evening before the *Reyes* court issued an anticipated tentative ruling on Experian's motion for reconsideration, the parties reached a $24 million settlement to resolve the *Reyes* action on behalf of more than 56,000 class members. On January 27, 2020, the Hon. Andrew J. Guilford granted preliminary approval to the *Reyes* settlement and directed notice to the class. The case was subsequently transferred to the Hon. Stephen V. Wilson, who granted final approval to the *Reyes* settlement on July 30, 2020.[2] Siegel Dec., ¶ 19.

## F. Settlement negotiations

Following preliminary approval of the *Reyes* settlement, the parties for the first time discussed resolution of this case. The parties agreed to engage the Hon. Jay C. Gandhi of JAMS ADR, a retired federal magistrate judge in this Court, to serve as the mediator in this matter. To help facilitate negotiations, Experian provided Plaintiff with information regarding the size and scope of the class and the parties exchanged correspondence setting forth their respective settlement positions. Siegel Dec., ¶ 20.

In advance of the mediation, the parties briefed their respective positions on the facts, claims, defenses, and assessments of the continued risks of litigation before Judge Gandhi. On May 20, 2020, the parties participated in a full-day mediation session with Judge Gandhi that included attorneys and representatives for both parties. The

---

[2] In granting preliminary approval of the *Reyes* settlement, Judge Guilford signaled that he would approve attorney's fees in the amount of 33.33% of the settlement fund, an upward departure from the 25% benchmark, in part for "undertaking this complex, risky, expensive, and time-consuming class action on a contingent fee-basis, particularly since both parties have been actively litigating this case since February 2016." *Reyes*, No. 8:16-cv-00563, Dkt. 146 at 6. The case was then transferred to Judge Wilson immediately prior to final approval, who rejected Judge Guilford's guidance and instead made a downward departure from the benchmark, awarding 16.67% of the fund. *Reyes*, No. 8:16-cv-00563, Dkt. 159 at 6-7. Class counsel have appealed that order, which has been expedited by the Ninth Circuit. *See Reyes v. Experian Info. Sols., Inc*., Appeal No. 20-55909 (9th Cir.). Plaintiffs do not believe Judge Wilson's fee analysis or any eventual modification of the order by the Ninth Circuit bears on Plaintiff's motion here, which is based on the quality of the results obtained for the *Smith* class, and tethered to the Ninth Circuit benchmark.

negotiations were hard-fought throughout and the settlement process was conducted at arm's length. Following a full day of negotiations, Judge Gandhi made a final double-blind mediator's proposal that was accepted by both sides. The parties then negotiated the substantive terms of the Settlement and executed a binding term sheet. *Id.*, ¶ 21.

After executing the term sheet, the parties negotiated the Settlement Agreement and sought bids from third-party providers to administer the Settlement and provide notice to the Class. Counsel also conducted discovery on the class size, confirming it includes approximately 14,500 individuals. Following a competitive bidding process, the parties selected Angeion Group, LLC to administer the Settlement. *Id.*, ¶ 22.

## III.  SETTLEMENT TERMS

### A.  The Settlement Class

The proposed Settlement Class is defined as the 14,587 persons who are identified on the Settlement Class List, including all persons whose Experian consumer report contained an account from CashCall, Inc. reflecting delinquency on a loan originated by Western Sky Financial, LLC on or after January 1, 2015. *See* Settlement Agreement (Dkt. 43-2) ("SA"), ¶ 27.[3] The Agreement also designates Wanda Smith as the "Class Representative" and her counsel Norman E. Siegel and J. Austin Moore of Stueve Siegel Hanson LLP as "Class Counsel." SA, ¶¶ 2, 3; Siegel Dec., ¶ 23.

### B.  Consideration

The Agreement requires Experian to establish a settlement fund of $5,000,000 to resolve classwide claims in this litigation. SA, ¶ 34. Experian paid $100,000 into the settlement fund within seven days after the Court issued its order directing class notice and owes an additional $4,900,000 to be paid into the fund within 10 days after the

---

[3] Excluded from the Settlement Class are: (1) the Judges presiding over this Action, and members of their direct families; (2) the Defendant, its subsidiaries, parent companies, successors, predecessors, and any entity in which the Defendant or its parents have a controlling interest and their current or former officers, directors, and employees; (3) Settlement Class Members who submit a valid a Request for Exclusion prior to the Opt-Out Deadline. SA, ¶ 27.

MEMORANDUM IN SUPPORT OF PLAINTIFF'S MOTION FOR FINAL APPROVAL OF CLASS ACTION SETTLEMENT

effective date of settlement. *See id*. Siegel Dec., ¶ 24.

The settlement fund is non-revisionary and will be used to make automatic cash payments to all class members who do not exclude themselves from the Settlement, without the need to file a claim. All class members will receive equal distributions of the settlement fund after payment is allocated for (1) the costs of notice and administration; (2) any service award payment approved by the Court; and (3) attorneys' fees and costs approved by the Court. Accordingly, each class member will receive a check for more than $253 no later than 21 days after the effective date of the Settlement. SA, ¶ 40. The proposed allocation of the settlement fund is set forth as follows:

| Amount | Payee |
|---|---|
| $10,000 | Class Representative Service Payment |
| $44,950 | Notice and Settlement Administration |
| $13,088.83 | Costs and Expenses |
| $1,235,490.29 | Attorneys' Fees (25% of fund after deduction of administration and attorney costs) |

Using this allocation, the remaining $3,696,470.88 will be distributed equally among 14,586 class members (14,587 class members less one exclusion), resulting in individual payouts of around $253.42 per class member. The parties have also agreed to a robust process to ensure class members receive and cash their settlement checks. For example, if a settlement check is not cashed within 60 days after the date of issue, the Settlement Administrator is authorized to send an e-mail or place a telephone call to the class member reminding the class member to cash the check before it expires. SA, ¶ 41; Siegel Dec., ¶ 25.

For any settlement check that is returned to as undeliverable, the Settlement Administrator is required to make reasonable efforts to locate a valid address and resend the settlement payment within 30 days after the check is returned. In attempting to locate a valid address, the Settlement Administrator is authorized to send an e-mail or place a telephone call to that class member to obtain updated address information. Any

9

replacement settlement checks issued to class members shall remain valid and negotiable for 60 days from the date of their issuance. SA, ¶ 42; Siegel Dec., ¶ 26.

To the extent that a settlement check is not cashed within 90 days after the date of issue, the Settlement Administrator is required to undertake the following actions: (1) attempt to contact the class member by e-mail and/or telephone to discuss how to obtain a reissued check; (2) if those efforts are unsuccessful, make reasonable efforts to locate an updated address for the class member using advanced address searches or other reasonable methods; and (3) reissuing a check or mailing the class member a postcard (either to an updated address if located or the original address) providing information regarding how to obtain a reissued check. SA, ¶ 43; Siegel Dec., ¶ 27.

## C. Releases

As part of the Settlement, participating settlement class members will release Experian from all claims that have been or could have been asserted in the action as set forth in section IX of the Settlement Agreement. SA, ¶¶ 20-22, 59-61; Siegel Dec., ¶ 28.

## D. Residual funds

The Agreement provides that there will be no reversion of any funds to Experian. In the event there are funds remaining as the result of uncashed checks after the Settlement Administrator has undertaken the robust procedures described above to locate and contact class members, any remaining funds shall be distributed as required by state law or to a non-profit organization approved by the Court following distribution of settlement payments. SA, ¶ 45; Siegel Dec., ¶ 29.

## E. Attorneys' fees, expenses, and service award payment

The settlement agreement provides that Experian will not object to an attorneys' fee request not to exceed 25% of the settlement fund, reimbursement of costs and expenses not to exceed $50,000, and a service award payment not to exceed $10,000. On September 23, 2020, Class Counsel moved for an attorneys' fee award of $1,250,000, representing 25% of the settlement fund, reimbursement of costs and expenses in the

amount of $13,088.83, and a service award payment to Ms. Smith in the amount of $10,000. Dkt. 45. Class Counsel filed this motion 21-days prior to the opt-out and objection deadlines, which was promptly posted on the settlement website. SA, ¶¶ 62, 64. As set forth further below, Counsel is reducing their fee request to $1,235,490.29, which equals 25% of the settlement fund *after* deductions for attorney and administration costs. Siegel Dec., ¶ 30.

### F.    Preliminary approval and order directing class notice

On July 20, 2020, Plaintiff filed an unopposed motion to lift the litigation stay, direct class notice, and grant preliminary approval of this class action settlement. Dkt. 43. On August 10, 2020, this Court issued an order granting Plaintiff's motion, finding that it was likely to find the proposed settlement "fair, reasonable, and adequate" pursuant to Rule 23(e)(2) and that the prerequisites of Rules 23(a) and (b)(3) have been met. *See* Dkt. 44; Siegel Dec., ¶ 31. The Court also approved the proposed notice and appointed Plaintiff Wanda Smith as the Class Representative, Norman E. Siegel and J. Austin Moore as Interim Class Counsel pursuant to Rule 23(g)(3), and Angeion Group as the Settlement Administrator. As part of its Order, the Court preliminarily approved the proposed attorneys' fee award seeking 25% of the settlement fund and the proposed service award of $10,000 to Ms. Smith. *See* Dkt. 44; Siegel Dec., ¶ 32.

## IV.    CLASS NOTICE, OPT-OUTS, AND OBJECTIONS

On August 11, 2020, Counsel for Experian provided Angeion with an electronic list that included 14,587 names and addresses. Angeion reviewed the list for duplicate records and determined that there were 14,587 unique Settlement Class Members (the "Settlement Class List"). Admin. Dec., ¶ 4. On September 9, 2020, Angeion caused the Court-approved Notice to be mailed to the postal addresses on the Settlement Class List. *Id.*, ¶ 5. Prior to mailing the Notice, Angeion ran each address through the U.S. Postal Service (USPS) National Change of Address database (NCOA), which provided updated addresses for all individuals who have moved during the previous four years and filed a

MEMORANDUM IN SUPPORT OF PLAINTIFF'S MOTION FOR FINAL APPROVAL OF CLASS ACTION SETTLEMENT

change of address form with the USPS. *Id*., ¶ 6. After a thorough skip-trace process, only 264 of the mailed Notices, or approximately 1.8%, remain undeliverable. *Id*., ¶¶ 7-11.

### A. Settlement website and class communications

On September 8, 2020, Angeion established a toll-free hotline dedicated to this Settlement. The toll-free number was listed in the Notice and utilizes an interactive voice response system to provide class members with responses to frequently asked questions and inform class members of important dates and deadlines pertaining to the Settlement and allowed them to leave a message for call back by a live operator. *Id*., ¶ 10. As of October 16, 2020, the toll-free hotline has received 63 calls, totaling approximately 265 minutes, and four messages were left for call back. *Id*., ¶ 11.

On September 8, 2020, Angeion established the following website devoted to this Settlement: www.ExperianCashCallSettlement.com (the "Settlement Website"). The Settlement Website allows settlement class members to obtain information about the settlement and to access the settlement agreement and other documents related to the settlement. the settlement website also contains a "contact us" page that lists the toll-free number and allows settlement class members to contact Angeion by sending an email to a dedicated email address established for this settlement. *Id*., ¶ 12. As of October 16, 2020, the Settlement Website has had approximately 2,001 visitors, resulting in approximately 3,980-page views. In addition, Angeion has received approximately 44 emails sent to the dedicated email address. *Id*., ¶ 13.

### B. Opt-outs and objections

In response to the Notice, the Settlement Administrator received one request from a class member to be excluded from the settlement class. A list including the name of the person who requested exclusion is attached to the Settlement Administrator's Declaration as Exhibit B. *Id*., ¶¶ 14-15. As of this filing, no objections to the settlement agreement or attorneys' fee request have been received. *Id*., ¶ 16. If any objections or exclusions are

received after this filing (the post-mark deadline was October 14, 2020), Counsel will supplement the record in advance of the final approval hearing.

## V.   ARGUMENT

In assessing whether to grant final approval, the Court analyzes (1) the propriety of granting class certification for purposes of settlement, (2) the fairness of the settlement, and (3) the reasonableness of the fees, costs, and incentive award requested.

### A.   Class Certification

When a plaintiff seeks conditional class certification for purposes of settlement, the Court must ensure that the four requirements of Federal Rule of Civil Procedure 23(a) and at least one of the requirements of Rule 23(b) are met. *Amchem Prods., Inc. v. Windsor*, 521 U.S. 591, 620 (1997); *Staton v. Boeing Co.*, 327 F.3d 938, 952–53 (9th Cir. 2003). The Court analyzed each relevant factor at the preliminary approval stage and concluded that the prerequisites of Rules 23(a) and (b)(3) have been met.

Specifically, this Court found that the numerosity requirement of Rule 23(a)(1) was "easily satisfied because Defendant's records show there are approximately 14,500 individuals in the proposed settlement class." Dkt. 44 at 4. Likewise, the commonality requirement of Rule 23(a)(2) was satisfied because "every overriding issue in this litigation presents a common question that can be determined on a classwide basis, including: (1) whether class members' reports are 'inaccurate' within the meaning of § 1681e(b); (2) whether Experian followed reasonable procedures to assure maximum possible accuracy as required by § 1681e(b); and (3) whether Experian's conduct was 'willful' under § 1681n." Dkt. 44 at 4-5.

This Court found that the typicality requirement of Rule 23(a)(3) was met because "Plaintiff's injury is premised on Experian allowing a delinquent loan account to inaccurately report after it was initially deleted from her credit file. Plaintiff is seeking to represent a class of individuals who experienced the same credit reporting error." Dkt. 44 at 5. Further, the adequacy requirement of Rule 23(a)(4) was satisfied because Class

MEMORANDUM IN SUPPORT OF PLAINTIFF'S MOTION FOR FINAL APPROVAL
OF CLASS ACTION SETTLEMENT

Counsel "vigorously prosecuted" this action on behalf of the Class and there was no evidence of a conflict between Ms. Smith and the Class she represents. *Id.*

This court also found that the predominance and superiority requirements of Rule 23(b)(3) were met. Specifically, this Court concluded that "Plaintiff has shown that questions common to the class predominate over any questions affecting only individual members" and that "proceeding as a class is superior to other methods of resolving the issues in this case." Dkt. 44 at 6-8. Nothing has occurred in the interim that should disturb the Court's well-reasoned analysis finding that Plaintiff's proposed Class is appropriate for certification for settlement purposes under Rules 23(a) and 23(b)(3).

## B.      Fairness of the Settlement

The Court must next evaluate the fairness of the settlement. Although there is a "strong judicial policy that favors settlements, particularly where complex class action litigation is concerned," *Linney v. Cellular Alaska P'ship*, 151 F.3d 1234, 1238 (9th Cir. 1998), a settlement of class claims requires court approval. Fed. R. Civ. P. 23(e). This is because "[i]ncentives inhere in class-action settlement negotiations that can, unless checked through careful district court review of the resulting settlement, result in a decree in which the rights of class members, including the named plaintiffs, may not be given due regard by the negotiating parties." *Staton*, 327 F.3d at 959 (alterations and quotations omitted).

Courts must therefore "determine whether a proposed settlement is fundamentally fair, adequate, and reasonable." *Id*. (citation and quotation marks omitted). In considering whether this standard is met, courts consider various factors, including the strength of the plaintiff's case; the risk, expense, complexity, and likely duration of further litigation; the risk of maintaining class action status throughout the trial; the amount offered in settlement; the extent of discovery completed, and the stage of the proceedings; the experience and views of counsel; . . . and the reaction of the class members to the proposed settlement." *Id*. (citation and quotation marks omitted).

MEMORANDUM IN SUPPORT OF PLAINTIFF'S MOTION FOR FINAL APPROVAL
OF CLASS ACTION SETTLEMENT

**1. Strength of Plaintiff's Case and the Risk, Expense, Complexity, and Likely Duration of Further Litigation.**

The strength of Plaintiff's case, when balanced against the risks and obstacles inherent in continued litigation, weighs in favor of granting final approval of the Settlement Agreement. As described in Plaintiff's prior filings, this case was risky from the outset as it was filed on the heels of the Supreme Court's much-anticipated decision in *Spokeo v. Robins*, which set new parameters for assessing Article III standing in the context of § 1681e(b) of the FCRA, the same statutory provision at issue in this case. *See Spokeo, Inc. v. Robins*, 136 S. Ct. 1540 (2016). Siegel Dec., ¶ 33.

At the time this action was filed in April 2017, there were significant risks as the Ninth Circuit had not yet decided on remand whether the *Spokeo* plaintiff had Article III standing to sue. An adverse ruling from the Ninth Circuit could have significantly hindered the prospects of this case. But even after the Ninth Circuit found in favor of the *Spokeo* plaintiff in August 2017,[4] there remained a number of arguments available to challenge standing, which is reflected by the fact that scores of FCRA cases have been dismissed on standing grounds under *Spokeo* since its issuance in 2016. *See* 7 Newberg on Class Actions § 21:4, Fair Credit Reporting Act (FCRA), n. 46 (5th ed.) (collecting FCRA cases that have been dismissed on standing grounds). Siegel Dec., ¶ 34.

For example, in the aftermath of *Spokeo*, Experian challenged standing in numerous contexts in the related *Reyes* action, including asserting that individual standing determinations precluded class certification and that Plaintiff lacked a concrete injury because she could not prove her credit report was transmitted to a third party. *See, e.g.*, *Reyes*, No. 8:16-cv-00563, Dkts. 73, 81, 121, 136 (raising standing arguments). Siegel Dec., ¶ 35. In fact, this was the primary argument raised by Experian in its 23(f) Appeal pending before the Ninth Circuit at the time the *Reyes* action settled. There is little doubt the issue would be front and center in this case as well. *Id*.

---

[4] *See Robins v. Spokeo, Inc.*, 867 F.3d 1108 (9th Cir. 2017).

MEMORANDUM IN SUPPORT OF PLAINTIFF'S MOTION FOR FINAL APPROVAL OF CLASS ACTION SETTLEMENT

In addition to the standing hurdle, this case presented a unique fact pattern and novel and untested theory of liability. Through conducting discovery in the *Reyes* action, Class Counsel uncovered that Experian internally made the decision to delete certain loan accounts reported by two collection companies, Delbert Services and CashCall, for a defunct online payday lender. Although Experian made the decision to delete the accounts, through a series of internal errors it failed to delete the Delbert accounts and permitted a subset of the CashCall accounts to re-report after they were initially deleted. Siegel Dec., ¶ 36. Plaintiff filed this case pursuant to § 1681e(b) of FCRA, which mandates that credit reporting agencies like Experian "follow reasonable procedures" to assure the "maximum possible accuracy" of the information they include on consumers' reports. 15 U.S.C. § 1681e(b). Plaintiff asserted that Experian's *failure to properly delete* the Delbert and CashCall accounts resulted in misleading and inaccurate credit reports under the FCRA because the data was no longer verifiable and the accounts could not be made current—which had the potential to mislead third party creditors. This was a novel and untested basis for liability of the FCRA as Experian contended it had no obligation to delete accounts that were historically accurate. Siegel Dec., ¶ 37.

The risks associated with navigating these uncharted waters were apparent. At the time this action was filed in April 2017, cross-motions for summary judgment were pending in the *Reyes* action and an adverse opinion jeopardized the viability of this case. In fact, the *Reyes* court ultimately granted summary judgment in Experian's favor, finding that Plaintiff's report was not "inaccurate" and Experian's conduct was not willful. Following its entry of judgment, the court taxed costs against Ms. Reyes in an amount exceeding $12,000. Given the similarities in fact patterns, there was a very real risk that Ms. Smith and the Class would recover nothing and perhaps owe Experian's costs absent a successful appeal. Siegel Dec., ¶ 38.

Furthermore, as this Court previously recognized, "[e]ven though Ms. Reyes and Counsel were able to prevail on appeal and later class certification in the *Reyes* action,

there was no guarantee this case would follow the same pattern." Dkt. 44 at 9. As Class Counsel acknowledged at the outset of the case and this Court noted in granting preliminary approval, "any future rulings in the *Reyes* action are not necessarily relevant or dispositive in this case, especially to the extent they address the 'inaccuracy' at issue in *Reyes*, which is fundamentally different than the inaccuracy at issue here." Dkt. 25 at 4-5; *see also* Dkt. 44 at 9. Moreover, at the time the *Reyes* action settled, Experian had moved for reconsideration of the class certification order and the parties had fully briefed Experian's Rule 23(f) appeal, which sought appellate review of the certification order. A ruling against Plaintiff in either instance could have resulted in zero recovery in both cases. Siegel Dec., ¶ 39.

And as noted by this Court, "[e]ven if Plaintiff Smith prevailed in certifying a class in this case, she still faced the task of proving liability on a classwide basis at trial, which is a time-consuming and risky proposition." Dkt. 44 at 9. While Counsel believe in the merits of the claims, the facts forming the basis for liability in this case are novel and untested. Moreover, liability under the FCRA is not strict—it requires a finding of negligence or willful failure to comply with the statute. 15 U.S.C. §§ 1681n and 1681o. Plaintiff would likely be called upon to present significant witness and expert testimony in order to prove her case, entailing further risks to Plaintiff's and the Class's chances of recovery. Siegel Dec., ¶ 40.

Proving damages also presents a risk. Under the FCRA, a prevailing plaintiff in a class action may obtain actual damages or between $100 and $1,000 in statutory damages for each class member for willful violations. 15 U.S.C. § 1681n(a)(1)(A). Because Plaintiff did not pursue actual damages, she would have to show Experian *willfully* violated the statute or otherwise forego recovery altogether. As recognized by other courts, proving willfulness can be "challenging due to the Supreme Court's opinion in *Safeco Ins. Co. of Am. v. Burr*, 551 U.S. 47, 57–59 (2007), which left open a defense for a defendant's reasonable or even careless construction of a statute." *Roe v. Frito-Lay,*

MEMORANDUM IN SUPPORT OF PLAINTIFF'S MOTION FOR FINAL APPROVAL
OF CLASS ACTION SETTLEMENT

*Inc.*, 2017 WL 1315626, at *4 (N.D. Cal. Apr. 7, 2017). And even if the jury agreed that Experian's conduct was willful, convincing a jury to award damages on the higher end of the statutory range is not a foregone conclusion. Siegel Dec., ¶ 41. As recognized by one district court:

> Even if the Plaintiffs were to prevail on their FCRA claims at trial, it is far from certain that a jury would award the maximum of $1,000 to each Class member, especially given the statutory factors that have to be taken into account in making such an award, including frequency and persistence of noncompliance with the statute, nature of the noncompliance, and the extent to which noncompliance was willful or negligent.

*Singleton v. Domino's Pizza, LLC*, 976 F. Supp. 2d 665, 680 (D. Md. 2013) (internal citations omitted).

Of course, even if Plaintiff prevailed at trial, Experian would likely appeal the verdict which could negate or delay recovery for months or years. By contrast, the settlement provides guaranteed benefits to the Class in the form of automatic cash payments. Siegel Dec., ¶ 42. Accordingly, the Settlement Agreement presents a fair compromise in light of the risks and expense of continued litigation.

## 2. Amount Offered in Settlement.

The $5 million settlement fund provides for individual recoveries of more than $253 per class member, which is in the very high end of FCRA settlements and represents a significant recovery on a per-person basis. Indeed, recoveries of $50 per class member or less are commonplace in FCRA litigation and regularly approved by courts. *See, e.g., Dukes v. Air Canada*, 2020 WL 487152, at *8 (M.D. Fla. Jan. 27, 2020) (recovery of $41.61 per class member in FCRA settlement "represents a reasonable recovery for the class members, particularly because Plaintiff would have been required to prove Defendants' willfulness"). Siegel Dec., ¶ 43.

As this Court previously recognized, "[e]ach class member will receive approximately $250 without having to submit a claim or take any affirmative action under the settlement, which is a meaningful recovery in the context of FCRA settlements." Dkt.

MEMORANDUM IN SUPPORT OF PLAINTIFF'S MOTION FOR FINAL APPROVAL OF CLASS ACTION SETTLEMENT

44 at 9. Surveying other FCRA settlements within this Circuit supports this conclusion. *See, e.g., Patton v. Church & Dwight Co*., 2019 WL 6357266, at *4 (C.D. Cal. Aug. 6, 2019) (FCRA settlement providing estimated recovery of $63.94 per class member); *Estes v. L3 Techs., Inc*., 2018 WL 3642085, at *3 (S.D. Cal. Aug. 1, 2018) (FCRA settlement providing for $75 per class member); *Feist v. Petco Animal Supplies, Inc*., 2018 WL 6040801, at *2 (S.D. Cal. Nov. 16, 2018) (vast majority of FCRA class to receive $20 per member); *Smith v. A-Check Am. Inc*., 2017 WL 1550158, at *6 (C.D. Cal. Mar. 1, 2017) (FCRA settlement providing for approximately $88 per class member); *Syed v. M-I, LLC*, 2016 WL 310135, at *8 (E.D. Cal. Jan. 26, 2016) (FCRA settlement providing for approximately $16 per class member); *Kirchner v. Shred-It USA Inc*., 2015 WL 1499115, at *5 (E.D. Cal. Mar. 31, 2015) (FCRA settlement providing for average of $45.55 per class member); *In re Toys "R" Us FACTA Litig*., 295 F.R.D. 438, 453-54 (C.D. Cal. 2014) ("A $5 or $30 award, therefore, represents 5% to 30% of the recovery that might have been obtained. This is not a *de minimis* amount" in FCRA case).

Furthermore, with a range of potential statutory damages between $100 and $1,000 for willful violations, the settlement reflects a meaningful percentage of the possible recovery amount at trial. 15 U.S.C. § 1681n(a)(1)(A). Given the statutory range, a $5 million settlement fund constitutes 343% of the minimum $100 damages award and 34% of the maximum $1,000 recoverable at trial, an extremely favorable result in FCRA cases given the risks associated with establishing willfulness. Siegel Dec., ¶ 44; *see, e.g., Burnthorne-Martinez v. Sephora USA, Inc*., 2018 WL 5310833, at *3 (N.D. Cal. May 16, 2018) (finding recovery equaling "65.6% of the amount that would be awarded if the jury awarded a $100 penalty per violation" a favorable result in FCRA class action); *see also Gonzalez v. BMC W., LLC*, 2018 WL 6318832, at *7 (C.D. Cal. Nov. 19, 2018) ("A recovery of approximately 12-13% of the damages the Settlement Class could have recovered is consistent with amounts routinely found to be fair and reasonable.").

Finally, the cash payments will be distributed to members of the Class in the most

MEMORANDUM IN SUPPORT OF PLAINTIFF'S MOTION FOR FINAL APPROVAL
OF CLASS ACTION SETTLEMENT

efficient means available. All class members who did not exclude themselves will automatically receive a check for more than $253 without having to take any affirmative action under the Settlement. Siegel Dec., ¶ 45. This factor weighs in favor of final approval, especially given the favorable reaction from the class.

### 3.    Extent of Discovery Completed, Stage of Proceedings, and Experience and Views of Counsel.

The settlement was reached through arm's length negotiations and occurred at a stage of the proceedings where both parties understood the risks of continued litigation. As noted above, there were no settlement negotiations at all until after Plaintiff prevailed on appeal and class certification in the *Reyes* action, which implicated many hotly-contested legal issues under the FCRA present in this case. Settlement negotiations were conducted through an experienced and capable mediator, the Hon. Jay C. Gandhi, who can corroborate the adversarial nature of the negotiations. *See Williams v. Brinderson Constructors, Inc.*, 2017 WL 490901, at *2 (C.D. Cal. Feb. 6, 2017) (quotations omitted) ("The assistance of an experienced mediator in the settlement process confirms that the settlement is non-collusive."). Accordingly, there was no collusion or fraud in the hard-fought negotiations that led to this Settlement. Siegel Dec., ¶ 46.

Additionally, in negotiating the proposed Settlement, Counsel had the benefit of a fully developed evidentiary record from the *Reyes* action, as well as a successful class certification motion, and two fully briefed appeals before the Ninth Circuit addressing FCRA liability and class certification. Plaintiff's counsel was also able to develop the separate facts related to the unique components of this case, putting them in a position to make educated choices regarding their approach to settlement. Thus, Counsel were very familiar with the strengths and weaknesses of the case at the time the settlement was reached. As this Court previously recognized, "through related litigation dating back to 2016, the parties had a clear view of the strengths and weaknesses of their positions." Dkt. 44 at 10. Siegel Dec., ¶ 47. Likewise, the Class had the benefit the highly skilled and

MEMORANDUM IN SUPPORT OF PLAINTIFF'S MOTION FOR FINAL APPROVAL OF CLASS ACTION SETTLEMENT

experienced attorneys who have broad experience litigating and trying some of the most significant consumer class actions in the country. *See* Dkt. 43-3, Siegel Decl., ¶¶ 33-46 and Ex. 1; *see also* Dkt. 44 at 6 ("Plaintiff's counsel, Norman E. Siegel and J. Austin Moore of Stueve Siegel Hanson LLP, have extensive experience litigating consumer class actions and relied on their experience litigating the *Reyes* action, including prevailing on an appeal in the Ninth Circuit and class certification, to negotiate a well-informed settlement on behalf of the settlement class."). As previously noted, Counsel strongly recommend approval of the proposed Settlement because it provides substantial, guaranteed benefits to the Class, especially when weighed against the risks of continued litigation. Siegel Dec., ¶ 48.

### 4. Reaction of Class Members.

Following the Court's preliminary approval order, Angeion sent direct mail notice to all 14,500 plus class members. The deadline for class members to opt-out or object was October 14, 2020. Only one class member excluded herself from the settlement and no class members objected. Accordingly, class members' reaction to the settlement has been overwhelmingly positive, which favors final approval. *See, e.g., In re Mego Fin. Corp. Sec. Litig.*, 213 F.3d 454, 459 (9th Cir. 2000) (concluding that this factor supported conclusion that district court did not abuse its discretion in approving settlement where "[o]nly one of the 5,400 potential class members to whom notice of the proposed Settlement and Plan of Distribution was sent chose to opt-out of the class"); *Nat'l Rural Telecomms. Coop. v. DIRECTV, Inc.*, 221 F.R.D. 523, 529 (C.D. Cal. 2004) ("[T]he absence of a large number of objections to a proposed class action settlement raises a strong presumption that the terms of a proposed class action settlement are favorable to the class members.").

## VI. ATTORNEYS' FEES AND TIMING OF PAYMENT

Class Counsel previously filed a motion seeking attorneys' fees in the amount of $1,250,000, equaling 25% of the overall settlement fund. *See* Dkt. 45. In light of this

Court's guidance in granting final approval in *Cahilig v. Ikea*, Counsel is reducing their fee request to 25% of the settlement fund *after* deductions for Counsel's costs and Angeion's administration costs. Accordingly, Counsel seek 25% of the settlement fund less Counsel's costs of $13,088.83 and the Settlement Administrator's costs of $44,950, resulting in a fee request of $1,235,490.29. Siegel Dec., ¶ 49.

As set forth in their motion, Class Counsel believe this request is appropriate given a number of factors, including the substantial risk Plaintiff and Class Counsel assumed in pursuing a novel legal theory against a highly sophisticated party with experienced counsel, as well as the time, effort, and skill Class Counsel brought to this litigation. Pursuant to the Settlement Agreement, the payment for attorneys' fees and expenses will be issued no later than 21 days after the effective date of Settlement, the same period which class members will be issued their settlement checks. SA, ¶¶ 40, 64; Siegel Dec., ¶ 50. As previously detailed, Class Counsel's fee request is also supported by awards made in similar cases as Courts across this Circuit have approved fee awards equaling or exceeding 25% of a common fund in FCRA cases, even where the recovery was materially less substantial than that recovered here. *See* Dkt. 45-1 at 18 (collecting cases). Siegel Dec., ¶ 51.

At the time Plaintiff filed her motion for attorneys' fees, Counsel's combined lodestar was $278,562.00, resulting in a multiplier of 4.49. Since that filing, Class Counsel have reduced their fee request and continued to spend time preparing for final approval, working with the Settlement Administrator on notice and administration, and communicating with class members regarding the settlement terms and timing of payments, resulting in an additional lodestar of $46,413.50. Accordingly, as of this filing, counsel have expended a total of 466.80 hours prosecuting this action, resulting in an updated lodestar of $324,975.50. This reduces the multiplier to 3.8, which will continue to decrease until the Settlement is fully administered. Siegel Dec., ¶ 52.

MEMORANDUM IN SUPPORT OF PLAINTIFF'S MOTION FOR FINAL APPROVAL
OF CLASS ACTION SETTLEMENT

Although this case arose from the same common nucleus as facts as *Reyes*, there was a significant amount of independent work that went into investigating and prosecuting Ms. Smith's potential claim—which involved a legal theory that was conceptually distinct from *Reyes*. The quality and necessity of this work is reflected in Class Counsel's work product, which is demonstrated through their thoroughly researched and well-supported complaint. *See* Dkt. 1; Siegel Dec., ¶ 53.

Additionally, Class Counsel was only able to negotiate a settlement of this size because on their work performed prior and subsequent to filing this action, including the significant efforts undertaken in the *Reyes* action, which was not billed as part of this case, but which was necessary to secure the settlement result obtained. This included extensive discovery, substantive motion practice, a successful appeal, retention of an expert and expert discovery, hotly-contested class certification, and demonstration of their willingness to take the case to trial. *See id*. Accordingly, Counsel believe that a 3.8 multiplier is reasonable for purposes of a cross-check where they took the case on a contingency at a time when the outcome was tenuous, achieved an excellent result, and there is ample authority supporting such an award. *See, e.g., Vizcaino v. Microsoft Corp.*, 290 F.3d 1043, 1051 (9th Cir. 2002) (affirming 25% fee recovery, which was supported by lodestar cross-check with a multiplier of 3.65, and explaining that that multiple "was within the range of multipliers applied in common fund cases"); *In re Nat'l Collegiate Athletic Ass'n Athletic Grant-in-Aid Cap Antitrust Litig.*, 768 F. App'x 651, 653 (9th Cir. 2019) (affirming 20% fee recovery, which was supported by lodestar cross-check with multiplier of 3.66); *see also Parkinson v. Hyundai Motor Am.*, 796 F.Supp.2d 1160, 1170 (C.D. Cal. 2010) (observing that "multipliers may range from 1.2 to 4 or even higher"); *Craft v. Cty. of San Bernardino*, 624 F. Supp. 2d 1113, 1125 (C.D. Cal. 2008) (awarding attorney fee equaling 25% of common fund, which was supported by lodestar cross-check with a multiplier of 5.2, noting that "there is ample authority for such awards resulting in multipliers in this range or higher."); *Vranken v. Atl. Richfield Co.*, 901 F. Supp. 294, 298

(N.D. Cal. 1995) ("[m]ultipliers in the 3-4 range are common in lodestar awards for lengthy and complex class action litigation.").

In addition, the lack of objections by class members to the fee request supports the fee award. Notice was sent to settlement class members via U.S. mail informing them that Class Counsel would seek up to 25% of the fund and reimbursement of costs and expenses up to $50,000. Plaintiff and Class Counsel filed their motion for attorneys' fees on September 23, 2020 (Dkt. 45) and posted it to the Settlement Website the following day. The fact that not a single class member objected to Class Counsel's fee request supports a finding that the request is reasonable and should be approved. Siegel Dec., ¶ 54; *see also Waldbuesser v. Northrop Grumman Corp.*, 2017 WL 9614818, at *5 (C.D. Cal. Oct. 24, 2017) ("the Court concludes that the lack of significant objections to the requested fees justifies an award of one-third of the settlement fund."); *Cooley v. Indian River Transp. Co.*, 2019 WL 2077029, at *8 (E.D. Cal. May 10, 2019) ("the reasonableness of the requested fee award is the lack of objections from class members to the proposed award.").

Class Counsel also moved for a service award payment of $10,000 for Ms. Smith in recognition for the time and effort she expended on behalf of the class in this litigation. This Court preliminarily approved the request, recognizing that Ms. Smith "has actively participated in these proceedings from the outset of litigation, including contacting counsel to assess the viability of her claim, gathering extensive documentation detailing her loan and credit history, regularly meeting with counsel for over three years while closely tracking the *Reyes* litigation, staying apprised of settlement negotiations, and reviewing and approving the terms of the Settlement Agreement on behalf of the class." Dkt. 44 at 10-11. This Court further recognized that "other courts have found incentive awards equaling 0.2% of the settlement fund or more reasonable in class action cases spanning multiple years." *Id.* (citing *Syed v. M-I, LLC*, 2017 WL 3190341, at *9 (E.D. Cal. July 27, 2017) (approving incentive awards of $15,000 and $20,000 which equaled

MEMORANDUM IN SUPPORT OF PLAINTIFF'S MOTION FOR FINAL APPROVAL OF CLASS ACTION SETTLEMENT

0.2% and 0.3% of the gross settlement fund respectively)). Nothing has changed to alter this conclusion as there have been no objections to the proposed service award and Ms. Smith has continued to represent the interests of the Settlement Class and will continue to do so through final approval and settlement distribution. Siegel Dec., ¶ 55.

## VII. CONCLUSION

For the foregoing reasons, Plaintiff respectfully requests that the Court grant Plaintiff's motion for final approval of the Settlements, Counsel's request for reasonable attorneys' fees in the amount of $1,235,490.29, representing 25% of the settlement fund after the deduction of attorney and administration costs, reimbursement of costs and expenses in the amount of $13,088.83, Angeion's notice and administration costs of $44,950, and approving a service award payment to Ms. Smith in the amount of $10,000.

Dated: October 19, 2020          By:    */s/ Norman E. Siegel*

Norman E. Siegel (*pro hac vice*)
J. Austin Moore (*pro hac vice*)
**STUEVE SIEGEL HANSON LLP**
460 Nichols Road, Suite 200
Kansas City, Missouri 64112
Tel: 816-714-7100
siegel@stuevesiegel.com
moore@stuevesiegel.com

Abbas Kazerounian (Bar No. 249203)
Mona Amini (Bar No. 296829)
**KAZEROUNI LAW GROUP, APC**
245 Fischer Avenue, Unit D1
Costa Mesa, California 92626
Tel: 949-612-9999
ak@kazlg.com
mona@kazlg.com

Jason S. Hartley (Bar No. 192514)
**HARTLEY LLP**
101 West Broadway, Suite 820
San Diego, California 92101
Tel: 619-400-5822
hartley@hartleyllp.com

*Attorneys for Plaintiff and the Class*

MEMORANDUM IN SUPPORT OF PLAINTIFF'S MOTION FOR FINAL APPROVAL OF CLASS ACTION SETTLEMENT