Patrick J. Stueve, Mo. Bar #37682
Todd E. Hilton, Mo. Bar #51388
STUEVE SIEGEL HANSON LLP
460 Nichols Road, Suite 200
Kansas City, Missouri 64112
Telephone: (816) 714-7100
stueve@stuevesiegel.com
hilton@stuevesiegel.com

Don M. Downing, Mo. Bar #30405
Gretchen Garrison, Mo. Bar #33963
Cort A. VanOstran, Mo. Bar #67276
GRAY, RITTER & GRAHAM, P.C.
701 Market Street, Suite 800
St. Louis, Missouri 63101
ddowning@grgpc.com
ggarrison@grgpc.com
cvanostran@grgpc.com

*Attorneys for*
*Ryan Tomlinson and Carol Richardson*

# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| IN RE: ROUNDUP PRODUCTS LIABILITY LITIGATION | MDL No. 2741<br><br>Case No. 16-md-02741-VC |
| This document relates to:<br><br>*Gilmore v. Monsanto*, Case No. 21-cv-08159 | **RYAN TOMLINSON AND CAROL RICHARDSON'S OPPOSITION TO PLAINTIFFS MOTION FOR PRELIMINARY APPROVAL OF CLASS ACTION SETTLEMENT**<br><br>Date: April 14, 2022<br>Time: 2:00 p.m.<br>Place: Via Zoom Webinar<br>Judge: Hon. Vince G. Chhabria |

## TABLE OF CONTENTS

TABLE OF AUTHORITIES ................................................................................................. iii

INTRODUCTION ............................................................................................................... 1

FACTUAL BACKGROUND ............................................................................................... 4

    A.    Monsanto's Attempts to Globally Settle in California. ........................................ 4

    B.    The *Tomlinson* Action .................................................................................. 5

    C.    The "Related Actions." .................................................................................. 6

        1.    Retailer suits failed in California and Arkansas. ....................................... 7

        2.    Retailer suits in Florida failed or languished. ............................................ 8

        3.    Ezcurra's suit against Monsanto failed in Florida. .................................. 10

    D.    Gilmore Abandoned Suit Against Monsanto in Oregon. ................................... 11

    E.    Gilmore Brought this Action in Delaware and Quickly Settled. .......................... 12

    F.    Terms of the Proposed Settlement. ................................................................... 15

APPLICABLE STANDARDS ............................................................................................ 16

ARGUMENT ................................................................................................................... 17

I.    THIS SETTLEMENT IS NOT FAIR, REASONABLE OR ADEQUATE. ........................ 17

    A.    There Are Substantial Indications of Reverse Auction........................................ 18

        1.    Monsanto faced certification, strong claims and advocacy in Missouri... 20

        2.    *Gilmore* plaintiffs and counsel were in a demonstrably weak position. ... 22

        3.    Monsanto cabined off this case and secreted settlement discussions. ...... 23

    B.    There Are Many Other Badges of Collusion and Inadequate Representation...... 24

        1.    Settlement was quick and without discovery in this case. ......................... 25

        2.    Monsanto agreed to not contest fees at unlikely ceiling amount. ............. 27

i

3.      The agreed-upon fee is disproportionate....................................................... 28

        a.      A $45 million ceiling payout is highly unlikely. .......................... 29

        b.      The proposed fee is unsupported by offered lodestar. .................. 30

4.      The settlement structure is reversionary to Monsanto. ............................ 31

5.      *Gilmore* plaintiffs obtained agreed-upon incentive awards. .................... 32

6.      There is indication of collusion in settling retailer actions. ..................... 33

7.      *Gilmore* plaintiffs and counsel are otherwise inadequate. ........................ 34

C.      The Proposed Settlement Relief Is Unsupported and Inadequate........................ 34

1.      The estimated damages figure is untested and unsupported.................... 35

2.      This settlement affords *de minimus* relief to class members. .................. 36

D.      Purported Risks Do Not Justify this *De Minimus* Settlement.............................. 39

1.      Causation risk is in plaintiffs' favor......................................................... 40

2.      Settlors fail to show applicable risk presented by prior dismissals. ......... 41

3.      Monsanto has routinely lost EPA approval and preemption arguments... 43

4.      Purported "disagreement" over damages further condemns settlement. .. 44

5.      Litigation risks are of *Gilmore* counsels' own making and cries of
        further time and expense largely illusory.................................................. 44

E.      Class Members Are Not Treated Equitably in Relation to Each Other. ............... 46

F.      The Release Is Not Confined to Identical Factual Predicate. .............................. 46

II.     CERTIFICATION OF THIS SETTLEMENT CLASS IS IMPROPER. ........................... 47

CONCLUSION............................................................................................................................. 50

# TABLE OF AUTHORITIES

**Cases**

*Acosta v. Trans Union, LLC*,
  243 F.R.D. 377 (C.D. Cal. 2007) ................................................................. 25, 28

*Akaosugi v. Benihana Nat. Corp.*,
  C 11-01272 WHA, 2013 WL 269083 (N.D. Cal. Jan. 24, 2013) ........................................... 44

*Allen v. Similasan Corp.*,
  318 F.R.D. 423 (S.D. Cal. 2016) ................................................................. 17

*Amaraut v. Sprint/United Mgmt. Co.*,
  2020 WL 1820120 (S.D. Cal. Apr. 10, 2020) ................................................................. 19

*Amchem Products, Inc. v. Windsor*,
  521 U.S. 591 (1997) ................................................................. 47, 48

*Aspinall v. Philip Morris, Inc.*,
  902 N.E.2d 421 (Mass.2009) ................................................................. 42

*Beyond Pesticides v. Monsanto Co.*,
  311 F. Supp. 3d 82 (D.D.C. 2018) ................................................................. 43

*Blitz v. Monsanto Co.*,
  317 F. Supp. 3d 1042 (W.D. Wis. 2018) ................................................................. 43

*Blue Cross Blue Shield Ass'n v. GlaxoSmithKline LLC*,
  417 F. Supp. 3d 531 (E.D. Pa. 2019) ................................................................. 39

*Blue Cross Blue Shield Ass'n v. Glaxosmithkline LLC*,
  CV 13-4663, 2016 WL 6612804 (E.D. Pa. Nov. 9, 2016) ................................................................. 38

*Borup v. CJS Sols. Grp., LLC*,
  2019 WL 2137369 (D. Minn. May 16, 2019) ................................................................. 19, 23

*Briseno v. ConAgra Foods, Inc.*,
  844 F.3d 1121 (9th Cir. 2017) ................................................................. 48, 49

*Briseño, v. Henderson*,
  998 F.3d 1014 (9th Cir. 2021) ................................................................. passim

*Carias v. Monsanto Co.*,
  2016 WL 6803780 (E.D.N.Y. Sept. 30, 2016) ................................................................. 42, 43

*Carson v. Monsanto* Co.,
   508 F. Supp. 3d 1369 (S.D. Ga. 2020) ................................................ 43

*Churchill Vill., L.L.C. v. Gen. Elec.*,
   361 F.3d 566 (9th Cir. 2004) ........................................................ 18

*City of Long Beach v. Monsanto Company*,
   2020 WL 7060140 (C.D. Cal. Nov. 25, 2020) ....................................... 46

*Cobarruviaz v. Maplebear, Inc.*,
   2016 WL 5725076  (N.D. Cal. Sept. 30, 2016) ..................................... 19

*Cotter v. Lyft, Inc.*,
   193 F. Supp. 3d 1030 (N.D. Cal. 2016) ............................................. 17

*Craft v. Philip Morris Companies, Inc.*,
   190 S.W.3d 368 (Mo. App. E.D. 2005) ............................................. 38

*Eddings v. DS Services of Am., Inc.*,
   15-CV-02576-VC, 2016 WL 3390477 (N.D. Cal. May 20, 2016) ............... 34, 39, 42

*Hadley v. Kellogg Sales Co.*, 16-CV-04955-LHK,
   2020 WL 836673 (N.D. Cal. Feb. 20, 2020) ...................................... 31, 47

*Figueroa v. Sharper Image Corp.*,
   517 F. Supp. 2d 1292 (S.D. Fla. 2007) .............................................. 19

*Fraser v. Asus Computer Int'l*, No. C,
   12-00652 WHA, 2012 WL 6680142 (N.D. Cal. Dec. 21, 2012) ................. 25, 37

*Gallucci v. Gonzales*,
   603 Fed. Appx. 533 (9th Cir. 2015) ................................................. 19

*Hanlon v. Chrysler Corp.*,
   150 F.3d 1011 (9th Cir.1998) .................................................... 48, 49

*Haralson v. U.S. Aviation Services Corp.*,
   383 F. Supp. 3d 959 (N.D. Cal. 2019) ...................................... 33, 34, 35, 39

*Hardeman v. Monsanto Co.*,
   216 F. Supp. 3d 1037 (N.D. Cal. 2016) ............................................. 43

*Hardeman v. Monsanto Co.*,
   997 F.3d 941 (9th Cir. 2021) ........................................................ 43

iv

*Harris v. Vector Mktg. Corp.*,
   C-08-5198 EMC, 2011 WL 4831157 (N.D. Cal. Oct. 12, 2011)........................................ 28, 29

*Hernandez v. Monsanto Co.*,
   CV 16-1988-DMG (EX), 2016 WL 6822311 (C.D. Cal. July 12, 2016) ................................ 43

*Hess v. Chase Manhattan Bank, USA, N.A.*,
   220 S.W.3d 758 (Mo. 2007) ................................................................................................... 5

*Hesse v. Sprint Corp.*,
   598 F.3d 581 (9th Cir. 2010) ........................................................................................... 47, 48

*HRCC, Ltd. v. Hard Rock Café Int'l (USA), Inc.*,
   302 F. Supp. 3d 1319 (M.D. Fla. 2016) ................................................................................ 37

*Hunt v. VEP Healthcare, Inc.*,
   16-CV-04790-VC, 2017 WL 3608297 (N.D. Cal. Aug. 22, 2017) ......................................... 39

*In re Apple Inc. Device Perf. Litig.*,
   Case No. 5:18-md-02827-EJD, 2021 WL 1022867 (N.D. Cal. Mar. 17, 2021)...................... 35

*In re Bluetooth Headset Prods. Liab. Litig.*,
   654 F.3d 935 (9th Cir. 2011) ....................................................................................... passim

*In re Cmty. Bank of N. Virginia*,
   418 F.3d 277 (3d Cir. 2005)................................................................................................... 49

*In re Countrywide Fin. Corp. Mortg.-Backed Sec. Litig.*,
   860 F. Supp. 2d 1062 (C.D. Cal. 2012) ................................................................................. 48

*In re Dollar Gen. Corp. Motor Oil Mktg. & Sales Pracs. Litig.*,
   No. 16-02709-MD-W-GAF, 2019 WL 1418292 (W.D. Mo. Mar. 21, 2019) ......................... 45

*In re Gen. Motors Corp. Pick-Up Truck Fuel Tank Prods. Liab. Litig.*,
   55 F.3d 768 (3d Cir. 1995)..................................................................................................... 45

*In re Johnson & Johnson Talcum Powder Prod. Mktg., Sales Pracs. & Liab. Litig.*,
   903 F.3d 278 (3d Cir. 2018)................................................................................................... 13

*In re Literary Works in Elec. Databases Copyright Litig.*,
   654 F.3d 242 (2d Cir. 2011)................................................................................................... 49

*In re Morning Song Bird Food Litig.*,
   320 F.R.D. 540 (S.D. Cal. 2017) ........................................................................................... 38

*In re Nat'l Prescription Opiate Litig.*,
  452 F. Supp. 3d 745 (N.D. Ohio 2020) .................................................................................. 42

*In re Packaged Seafood Prods. Antitrust Litig.*, 15-MD-2670 JLS (MDD),
  2020 WL 1061795 (S.D. Cal. Jan. 17, 2020) ....................................................................... 30

*In re Roundup Prods. Liab. Litig.*,
  2020 WL 3723305 (N.D. Cal. July 6, 2020) ......................................................................... 17

*In re Stec Inc. Sec. Litig.*,
  CV 09-8536-JVS MLGX, 2012 WL 6965372 (C.D. Cal. Mar. 7, 2012) ............................... 49

*In re Uber FCRA Litig.*,
  14-CV-05200-EMC, 2017 WL 2806698 (N.D. Cal. June 29, 2017) ...................................... 39

*In re Volkswagen "Clean Diesel" Mktg., Sales Pracs, & Prods. Liab. Litig.*,
  914 F.3d 623 (9th Cir. 2019) ............................................................................................... 30

*Jamison v. Summer Infant (USA), Inc.*,
  778 F. Supp. 2d 900 (N.D. Ill. 2011) ................................................................................... 42

*Johnson v. Monsanto Co.*,
  52 Cal. App. 5th 434, 266 Cal. Rptr. 3d 111, 114 ............................................................... 43

*Johnson v. Monsanto Co.*,
  CGC-16- 550128, 2018 WL 2324413 (Cal. Super. May 17, 2018) ................................. 40, 43

*Jones v. Monsanto Co.*,
  19-0102-CV-W-BP, 2021 WL 2426126 (W.D. Mo. May 13, 2021) ................................. 36, 38

*Kim v. Allison*,
  8 F.4th 1170 (9th Cir. 2021) ......................................................................................... passim

*Langdon v. Google, Inc.*,
  474 F. Supp. 2d 622 (D. Del. 2007) ..................................................................................... 13

*Lierboe v. State Farm Mut. Auto. Ins. Co.*,
  350 F.3d 1018 (9th Cir. 2003) ............................................................................................. 48

*Marshall v. Priceline.com Inc.*,
  C.A. No. 05C-02-195WCC 2006 WL 3175318 (Del. Super. Ct. Oct. 31, 2006) .................... 13

*Martin v. Cargill, Inc.,*
  295 F.R.D. 380 (D. Minn. 2013) ..................................................................................... 22, 24

*Martin v. Monsanto Co.*,
   EDCV162168JFWSPX, 2017 WL 659014 (C.D. Cal. Feb. 16, 2017)....................................43

*McKinney-Drobnis v. Oreshack*,
   16 F.4th 594 (9th Cir. 2021) ...........................................................................................17, 31

*Mendoza v. Monsanto Co.*,
   116CV00406DADSMS, 2016 WL 3648966 (E.D. Cal. July 8, 2016)....................................43

*Mirzaie v. Monsanto Co.*,
   CV 15-04361 DDP, 2016 WL 146421 (C.D. Cal. Jan. 12, 2016) .........................................43

*Moreno v. Capital Bldg. Maint. & Cleaning Servs., Inc.*,
   19-CV-07087-DMR, 2021 WL 1788447 (N.D. Cal. May 5, 2021) ........................................44

*Murphy v. Stonewall Kitchen, LLC*,
   503 S.W.3d 308 (Mo. App. E.D. 2016) ..........................................................................5, 37

*Nat'l Ass'n of Wheat Growers v. Becerra*,
   468 F. Supp. 3d 1247 (E.D. Cal. 2020)..................................................................................41

*O'Bryant v. ABC Phones of N.C., Inc.*,
   No. 19-cv- 02378-SHM-tmp, 2020 WL 7634780 (W.D. Tenn. Dec. 22, 2020) .....................19

*Ortiz v. Fibreboard Corp.*,
   527 U.S. 815 (1999).........................................................................................................49, 50

*Pilliod v. Monsanto Co.*,
   67 Cal. App. 5th 591, 282 Cal. Rptr. 3d 679 (2021)................................................................40

*Pilliod v. Monsanto Co.*,
   RG-17-862702, 2019 WL 3540107 (Cal. Super. July 26, 2019).............................................43

*Plubell v. Merck & Co., Inc.*,
   289 S.W.3d 707 (Mo. App. W.D. 2009)........................................................................5, 20, 45

*Pulaski & Middleman, LLC v. Google, Inc.*,
   802 F.3d 979 (9th Cir. 2015) .................................................................................................38

*Radcliffe v. Experian Info. Solutions Inc.*,
   715 F.3d 1157 (9th Cir. 2013) ...................................................................................16, 24, 32

*Rahman v. Gate Gourmet, Inc.,*
   3:20-CV-03047-WHO, 2021 WL 5973046 (N.D. Cal. Nov. 22, 2021) ..................................19

*Rawa v. Monsanto Co.*,
    4:17CV01252 AGF, 2018 WL 2389040 (E.D. Mo. May 25, 2018)................................ 36, 37

*Razo v. AT&T Mobility Services, LLC*,
    2021 WL 4847834 (E.D. Cal. Oct. 15, 2021) ........................................................ 18

*Reynolds v. Beneficial Nat'l Bank*,
    288 F.3d 277 (7th Cir.2002) .................................................................. 19, 22, 33

*Roes, 1-2 v. SFBSC Mgmt., LLC*,
    944 F.3d 1035 (9th Cir. 2019) ........................................................ 17, 27, 28, 32

*Ross v. Convergent Outsourcing, Inc.*,
    323 F.R.D. 656 (D. Colo. 2018) .................................................................. 19

*Schoenlein v. Routt Homes, Inc.*,
    260 S.W.3d 852 (Mo. App. E.D.2008) .......................................................... 5, 37

*Sheppard v. Monsanto Co.*,
    16-00043 JMS-RLP, 2016 WL 3629074 (D. Haw. June 29, 2016) ........................ 43

*Smith v. CRST Van Expedited, Inc.*,
    2012 WL 5873701 (S.D. Cal. Nov. 20, 2012) .............................................. 20

*Soto v. O.C. Communications, Inc.*,
    2019 WL 1434668 (N.D. Cal Apr. 1, 2019) .................................................. 46

*State ex rel. Wilson v. Ortho-McNeil-Janssen Pharms., Inc.*,
    777 S.E.2d 176 (S.C. 2015) .................................................................. 42

*Staton v. Boeing Co.*,
    327 F.3d 938 (9th Cir. 2003) ................................................................ 24, 32

*Stephenson v. Capano Dev., Inc.*,
    462 A.2d 1069 (Del. 1983) .................................................................. 12, 37

*Stearns v. Ticketmaster Corp.*,
    655 F.3d 1013 (9th Cir. 2011) .............................................................. 45

*Stewart v. Wachowski*,
    2004 WL 2980783 (C.D. Cal. Sept. 28, 2004) ............................................ 40

*Sunset Pools of St. Louis, Inc. v. Schaefer*,
    869 S.W.2d 883 (Mo. App. E.D. 1994) .................................................... 38

*Swinton v. SquareTrade, Inc.*,
   960 F.3d 1001 (8ᵗʰ Cir. 2020) ..................................................................... 19, 20

*Theis v. Viewsonic Corp.*,
   C.A. No. 12-1569-RGA, 2013 WL 1632677 (D. Del. Apr. 16, 2013) .................................... 13

*Trauth v. Spearmint Rhino Companies Worldwide, Inc*,
   EDCV091316VAPDTBX, 2010 WL 11468628 (C.D. Cal. July 26, 2010) ............................ 33

*Wal-Mart Stores, Inc. v. Dukes*,
   564 U.S. 338 (2011) .................................................................................... 47

*Whitley v. Baptist Health*,
   2020 WL 4575991 (E.D. Ark. Aug. 7, 2020) ......................................................... 42

*Wilson v. J.B. Hunt Logistics, Inc.*,
   218CV03487SVWAFMX, 2020 WL 11626082 (C.D. Cal. Nov. 13, 2020) ........................... 30

**Statutes**

Del. Code Ann. tit. 6 § 2525 ............................................................................ 22

Del. Code Ann. tit. 6, § 2513 ........................................................................... 42

Del. Code Ann., tit. 6, § 2512 ....................................................................... 13, 22

Fla. Stat. § 501.212 ................................................................................ 10, 42

Mo. Rev. Stat. § 407.010 ................................................................................ 1

Mo. Rev. Stat. § 407.020.2 ............................................................................. 10

Mo. Rev. Stat. §§ 407.010, 407.025.1 ................................................................... 6

**Rules**

Fed. R. Civ. P. 23 ................................................................................ passim

**Other Authorities**

4 Newberg on Class Actions § 13:60 (5th ed.) ..................................................... 23, 24

Cal. Bus. Law Deskbook § 47:12 ........................................................................ 41

Consumer Protection and the Law § 4:32 ................................................................. 42

## INTRODUCTION

Ryan Tomlinson and Carol Richardson ("*Tomlinson* plaintiffs") are named representatives in a certified Missouri state court class action against Monsanto asserting violations of Missouri's Merchandising Practices Act, Mo. Rev. Stat. § 407.010 et seq. ("MMPA"). Monsanto, *Gilmore* counsel,[1] and plaintiffs ("*Gilmore* plaintiffs"), want to use an unlitigated case originally filed in Delaware (where no plaintiff lives or purchased Roundup) to achieve a hasty settlement benefitting themselves far more than the *Gilmore* putative class, in particular at the expense of the *Tomlinson* class who prior to this settlement were set for trial. Despite settlors' efforts to keep the Delaware action out of this MDL, it has been transferred here and remains here for this Court's consideration of preliminary approval. The motion now filed, Dkt. No. 94 ("Mot."), gives short shrift to the history preceding this settlement. There is a reason: negotiators on the plaintiffs' side of this proposed settlement lost every case they had asserted, almost all against retailers, not Monsanto, and were ripe for Monsanto to achieve its goals.

This settlement displays a panoply of "red flags" that can only indicate it is not fair, reasonable, or adequate. Monsanto extracted a bargain-basement deal by any measure—one that reflects at least a 94% discount off the class's claimed damages under even settling plaintiffs' most conservative variables in exchange for a global release. That discount is inexplicable by any ordinary measure of litigation risk, particularly for the *Tomlinson* class. Why did Monsanto want

---

[1] "*Gilmore* counsel" refers to lawyers at Milstein Jackson Fairchild & Wade, LLP, counsel in this action and Related Actions in which clients now named ("*Gilmore* plaintiffs") were parties. Mr. Oster of the Law Office of Howard W. Rubinstein ("Rubinstein") appears in the signature block for this motion. He was not on the signature block for complaints, motion practice, or the preliminary approval motion in Delaware. Dkt. Nos. 1, 14, 18, 25, 33. Nor was he identified as "Class Counsel" in the original settlement agreement although he was later added by amendment. *Compare* Dkt. No. 26-1, Agrmt., § A ¶ 16 *with* Dkt. No. 102-1, Am. Agrmt., § A ¶ 16.

to settle?  Three juries hit it with massive verdicts, finding Monsanto reprehensible in manipulating science and tamping down the safety risks of its Roundup products. At the same time, Monsanto faced *Tomlinson*, a strongly litigated state-court class action limited to Missouri purchasers with potential liability exceeding even the illusory cap on this proposed nationwide settlement. There, Monsanto faced: ongoing discovery; a fully-briefed motion for class certification (ultimately granted before an enforceable settlement was signed); a looming trial date; and lawyers with a track record of large verdicts and settlements, including against Monsanto's parent company. From Monsanto's perspective, this settlement is a home run—nationwide releases from virtually all economic-loss claims by purchasers of its lawn and garden products, at a cost unlikely to exceed $23 million, and extinguishment of the L&G claims from the certified Missouri class and trial.

Less obvious is why *Gilmore* counsel and plaintiffs would agree to it.  History tells that story. At the time of the settlement, *Gilmore* and associated counsel had pursued an expensive strategy to hold primarily *retailers* liable for selling Roundup.  They spent over $7.7 million in lodestar, plus costs on their efforts. To call that investment an abject failure is an understatement. The procedural history of those cases is a graveyard of dismissals and abandonment.  Recovering that investment for *Gilmore* counsel would be impossible.  Enter Monsanto, whose effort at a nationwide settlement had only recently failed before this Court.  Mr. Gilmore suddenly files a new suit in Delaware even though he is an Oregon resident who had previously sued and dismissed his claims against Monsanto in Oregon rather than respond to Monsanto's motion to dismiss. With no connection to Delaware, he asserts clearly non-viable claims under Delaware law on behalf of a nationwide class. He inexplicably (to anyone serious about litigating those claims against Monsanto) eschewed even pleading for punitive damages even though his own complaint detailed *three* prior punitive awards rendered against Monsanto by juries assessing Monsanto's same

conduct. Once filed, Monsanto openly disregarded its duty to notify the JPML of this new lawsuit, which could have triggered (and later did trigger) transfer to this Court.  In short order, a mediator was hired, secret settlement talks began, terms were reached, and a written settlement signed—all while the Missouri class was being certified and readied for trial.

In exchange for this swap-meet settlement, *Gilmore* plaintiffs—which now include every or almost every plaintiff of *Gilmore* and associated counsel to sue a retailer and lose—were promised the Court would be asked to award them $5,000 in requested incentive awards.  But only two of those plaintiffs ever even filed suit against Monsanto, and all but Gilmore were added to the *Gilmore* case after settlement. At the same time, *Gilmore* counsel got Monsanto's full-throated support to *not only* recoup their $7.7 million failed investment in its retailer strategy but for a *premium fee* of $11.5 million.  The fee itself is premised on Monsanto's agreement to allow counsel to base the fee on the *reversionary* portion of a supposed common fund.[2]  Even taken alone, that agreement not to contest is a red flag. But the settlement goes even further: Monsanto traded its right to oppose a substantially weak fee request that would otherwise benefit Monsanto and also affirmatively agreed to "support" *Gilmore* counsel's use of work in *failed* retailer actions to justify a fee in this case—a necessary element of the fee negotiations given that *Gilmore* itself was nothing more than a settlement vehicle.  Taken together with the paltry settlement sum as compared to even Gilmore's (already discounted) estimated damages, generous incentive awards, and broad release of claims, it is apparent that this proposed class (especially as to members of the Missouri class) was undersold without any effort to actually litigate or maximize the true value of their claims.

---

[2] Tomlinson plaintiffs' discussion of clear-sailing agreements is limited to the facts of this case and the circumstances present here.

The record leads to one conclusion: faced with real liability in Missouri, Monsanto sought counsel in the weakest position to negotiate a nationwide release that included the Missouri class. Relative bargaining strength cannot be debated: while the Missouri case was being actively litigated, certified, and set for trial, *Gilmore* and associated counsel had all failed, with some $7.7 million in work hanging around their neck. Missouri counsel were excluded from the settlement while failing counsel were included and this case squirreled away. The ultimate losers are members of the class these settlors hope the Court will certify, most especially those in Missouri who had legitimate and valuable claims. They carried leverage of a certified class, viable claims under the MMPA, vigorous counsel, aggressive discovery, and a trial date. Attempted settlors here brought only liabilities to the negotiating table. Preliminary approval of this settlement should be denied.

## **FACTUAL BACKGROUND**

### A.    **Monsanto's Attempts to Globally Settle in California.**

Monsanto has twice sought global settlement in the MDL. Much as here, it targeted a case with little prior activity, stipulated to amended complaints, and contemporaneously sought preliminary approval of the settlement. Monsanto's vehicle was the *Ramirez* action, Case No. 3:19-cv-02224-VC ("*Ramirez*"). This Court on July 6, 2020 expressed significant skepticism of the first proposal (MDL Dkt. No. 11182 at 3)[3] and on February 4, 2021, settlors returned with another. *Ramirez* Dkt. No. 24-2, Sett. Agrmt. ("SA"). The new proposal covered persons who had

---

[3] Page citations to docket filings are to the ECF page number when available. *Tomlinson* plaintiffs use the same convention as *Gilmore* plaintiffs when referring to declarations by name of declarant. Mot. at 15 n. 3. They refer to the original settlement (Dkt. No 26-1, Wade Decl. Ex. 1) as "Sett. Agrmt." and the second amended agreement (Dkt. No. 102-1, Wade Decl., Ex. 1) as "Am. Agrmt." The expert report from another action on which *Gilmore* counsel rely is referred to as "Sharp Rpt." (Dkt. No 102-1, Wade Decl. ¶ 7 & Ex. 2). Reference to "Dkt. No." is to filings in this case, here and originally in Delaware, unless otherwise specified.

not "commenced an individual, non-class lawsuit or retained counsel for … individual, non-class personal injury or false advertising claims … in any way relating to or in connection with [Roundup] exposure." SA § 1.1(a); *see also* SA § 2.1 (70) (broadly defining "Roundup Claims"). Among other things, the settlement sought a covenant not to sue (SA § 17.4), a four-year stay of litigation (SA §§ 2.1(41), 17.4(b)) and waiver of punitive damages. SA §17.1(a). This Court denied preliminary approval of the second proposal on May 26, 2021. MDL Dkt. No. 13115.

      **B.**      **The *Tomlinson* Action.**

The MMPA is a consumer-friendly statute that "expressly does not" require proof of reliance, *Hess v. Chase Manhattan Bank, USA, N.A.*, 220 S.W.3d 758, 774 (Mo. 2007), or that the unlawful practice cause a purchase. *Plubell v. Merck & Co., Inc*., 289 S.W.3d 707, 714 (Mo. App. W.D. 2009). Injury and damages can be established by "compar[ing] the actual value of the item to the value of the item if it had been as represented at the time of the transaction." *Id.* at 715 (citing *Schoenlein v. Routt Homes, Inc*., 260 S.W.3d 852, 854 (Mo. App. E.D.2008)); *see also Murphy v. Stonewall Kitchen, LLC*, 503 S.W.3d 308, 313 (Mo. App. E.D. 2016) (same). *Tomlinson* plaintiffs allege such injury and damages and seek punitive damages for Monsanto's egregious behavior. Garrison Decl., Ex. 1 Pet. ¶¶ 73, 87–89. *Tomlinson* plaintiffs have been engaged in discovery since December 2019, serving five sets of written discovery requests, with multiple rounds of meet and confers and golden rule letters. Garrison Decl. ¶¶ 12, 17. To date, Monsanto has produced approximately 635,200 pages of documents. *Id*. ¶ 18.

The MMPA permits class actions and Missouri law is favorable to certification. *Id*., Ex. 4 at 4–6. On July 14, 2020, *Tomlinson* plaintiffs moved for class certification, opposed by Monsanto, concluding on November 6, 2020 with their reply. *Id*. Exs. 2, 4. On March 22, 2021, the court certified a class of "all Missouri residents who purchased Roundup for personal, family, or household use" which includes L&G, AG, and I&P purchasers. Garrison Decl. ¶¶ 3–6. On

April 1, 2021, Monsanto moved for both reconsideration of that order and interlocutory review from the Missouri Court of Appeals, also seeking a stay. Those efforts failed. *Id.* ¶¶ 7–8. On May 14, 2021, Monsanto petitioned for writ of prohibition to the Missouri Supreme Court, also denied. *Id.* ¶ 9. On June 14, 2021, the same day it moved for preliminary approval in Delaware (Dkt. No. 24), Monsanto again sought a stay, this time successfully. *Id.* ¶ 10. Until then, discovery was proceeding with a trial date scheduled. *Id.* ¶¶ 12, 18.

Monsanto faces significant liability in Missouri. While settlors take aim at AG and I&P purchasers, there is no question that L&G purchasers have a right of action.[4] Request for punitive damages is based on allegations of manipulation and avoidance of safety issues, evidence on which has resulted in three jury awards of more than $2 billion to date. Monsanto has not filed a motion to dismiss or any other dispositive motion in *Tomlinson*. *Id.* ¶ 11.

## C.   The "Related Actions."

While *Tomlinson* plaintiffs pressed viable claims against Monsanto in a favorable state forum, *Gilmore* and associated counsel pursued cases mainly against retailers. So-called "Related Actions" are federal and state cases primarily in California, Florida, and Arkansas.[5] They comprise

---

[4] Settlors offer up Monsanto's argument that "consumer" products in Missouri do not include products purchased for business use. Mot. at 19. The MMPA, however, does not use the word "consumer" but "person" in describing who has a right of action and "person" is defined to include business entities. Mo. Rev. Stat. §§ 407.010(5), 407.025.1 (Supp. 2000). Suggestion that *Tomlinson* plaintiffs would have to prove a "primary purpose element" through affidavits at trial also is wrong. *Tomlinson* plaintiffs urged that affidavits could be used to identify class members— at the claims administration stage—in response to argument that class membership is unascertainable without a purchaser list. *See* Garrison Decl., Ex. 4, Reply at 39–42. The court ruled that "self-identification affidavits" can be used without comment on "proof" requirements at trial. *Id.*, Ex. 5, Order at 7.

[5] They also include one case in the Eastern District of New York, *Thomas v. Costco Wholesale Corp.*, No. 1:19-cv-05278 (E.D.N.Y.) ("*Thomas*"), although *Gilmore* counsel has always pointed to other cases in briefing and their Appendix A. Mot. at 16, 58–62; *see also* Dkt. No. 25 at 14–15, 49–53; Dkt. No. 46 at 8 n.4. Nevertheless, *Thomas* followed the same pattern as other cases. It

the vast majority of *Gilmore* and other counsels' lodestar.  Dkt. No. 102-1 ("Wade Decl.") ¶ 40.[6]

All but one (*Ezcurra*) were against retailers, not Monsanto.  *Gilmore* plaintiffs do "not detail" the

histories of these cases, "suffic[ing]" to say that they somehow put "financial and reputational

pressure on Monsanto" and that work there somehow "contributed significantly" to this settlement.

Mot. at 16.  As further detailed below, however, all these cases *failed* on the merits and/or by

abandonment.  Few involved discovery.  Far from contributing to this settlement, these cases put

*Gilmore* counsel and plaintiffs in a weak position with every incentive to accept a *de minimus*

settlement more beneficial to themselves than putative class members.

### 1.    Retailer suits failed in California and Arkansas.[7]

Five federal cases were filed against retailers in California and two in Arkansas.  All were

filed in the home state of the named plaintiff, on behalf of purchasers in that state under the

consumer act of that state.[8]  In Arkansas, *Gilmore* counsel sought compensatory as well as punitive

---

was filed on September 16, 2019.  *Thomas* Dkt. No. 1. Costco submitted a letter regarding planned motion to dismiss, urging, among other things, Costco's lack of control or authority over Roundup packaging and failure to allege omission of information exclusively in its possession. *Id.*, Dkt. No. 24. A pre-dismissal conference resulted in a March 4, 2020 order granting leave to amend. The case was abandoned on March 25, 2020 without amendment.  *Thomas* Dkt. Nos. 33, 34.

[6]  Of 12,946 total claimed lodestar hours, 3,485 are attributed to this case.   Wade Decl. ¶ 40.

[7]  *Tomlinson* plaintiffs follow *Gilmore* plaintiffs' example and for this Court's ease of reference provide a chart, appended hereto, summarizing retailer cases and their disposition.

[8]  *Weeks v. Lowe's Home Ctrs., LLC*, No. 2:19-cv-06828 (C.D. Cal.) ("*Weeks I*"), Dkt. No. 1, ¶¶ 7, 62, 77-113; *Weeks v. Home Depot U.S.A., Inc*., No. 2:19-cv-06780-FMO-AS (C.D. Cal.) ("*Weeks II*"), Dkt No. 18, ¶¶ 8, 65, 79; *Hanna et al. v. WalMart Inc*., No. 5:20-cv-01075 (C.D. Cal.) ("*Hanna I*"), Dkt. No. 1, ¶¶ 11, 79, 84, 98, Dkt. No. 18, ¶¶ 14, 108, 121-33; *Williams v. Lowe's Home Ctrs*., No. 5:20-cv-01356 (C.D. Cal.) ("*Williams*"), Dkt. No. 1, ¶¶ 14, 96, 109-11; *Taylor v. Costco Wholesale Corp*., No. 2:20-cv-00655-KJM-DMC (E.D. Cal.) ("*Taylor*"), Dkt. No. 1, ¶¶ 11, 84, 98; *Jewell et al. v. WalMart, Inc*., No. 4:19-cv-04088 (W.D. Ark.) ("*Jewell*"), Dkt. No. 2 ¶¶ 7, 62, 78; *see also Boyette et al v. Lowe's Cos., Inc*., No. 4:19-cv-04119 (W.D. Ark.) ("*Boyette*"), Dkt. No. 2, ¶¶ 7–8, 68, 84 (Arkansas and California resident (Mr. Weeks) asserting violations of Arkansas and California acts on behalf of classes in those states, respectively).

damages.  *Boyette* Dkt. No. 2, ¶¶ 100, 112, 117, 119; *Jewell* Dkt. No. 2, ¶¶ 86, 91.

*Weeks I* was voluntarily dismissed with no substantive activity.  *Weeks I* Dkt. Nos. 1, 15.
The remaining federal cases in California foundered on Proposition 65's notice requirements
and/or insufficient allegations that the retailer participated in or controlled the alleged unlawful
conduct.  *Weeks II* was dismissed on September 18, 2020 based on Proposition 65, and after
pleading amendment, dismissed with prejudice on December 15, 2020.  *Weeks II* Dkt. Nos. 65, 77.
*Hanna I* and *Taylor* were dismissed shortly after filing based on insufficient allegations of
wrongdoing by the retailer and/or Proposition 65.  *See Hanna I* Dkt. No. 39, at 4, 10, 12, 15
(dismissed Nov. 4, 2020); *Taylor* Dkt. No. 22 (dismissed Oct. 8, 2020).  After pleading
amendments, both were abandoned.  *Hanna I* Dkt. Nos. 41, 47; [9] *Taylor* Dkt. Nos. 23, 24, 33.  In
*Williams*, the retailer moved to dismiss based in part on Proposition 65 and insufficient allegations
of wrongdoing.  *Williams* Dkt No. 14.  Williams amended, and after a new dismissal motion,
voluntarily dismissed three days before the hearing.  Dkt. Nos. 17, 18, 28.   The two cases in
Arkansas were abandoned.[10]

### 2.      Retailer suits in Florida failed or languished.

Retailer cases also were filed in Florida.  Those removed to federal court were shortly
abandoned.   Those remaining in state court languished.  The cases begun in state court and

---

[9] Four days later after dismissing in federal court, *Gilmore* counsel re-filed Hanna's claims as a
new class action in the Superior Court for the State of California for the County of San Bernardino.
Case No. CIV SB 2100789 (Sup. Ct. Cal. for San Bernardino).  Walmart never even appeared in
that case, and on April 14, 2021, Hanna again voluntarily dismissed. *See id*. (docket).

[10] In *Jewell*, Walmart moved to dismiss on May 8, 2020.  Two days later, Jewell voluntarily
dismissed without response. *Jewell* Dkt. Nos. 2, 37–39.  *Boyette* was voluntarily dismissed on May
20, 2020 without a pending motion to dismiss.  *Boyette* Dkt. Nos. 2, 29.

abandoned in federal court were two individual actions (*Waters*, *Fagundes*) and one action on behalf of purchasers from Home Depot (*Gregorio*).  Mot. at 60-62 (Appx.).[11]  All involved claims asserted by Florida residents under the Florida Deceptive and Unfair Trade Practices Act ("FDUTPA").[12]  In two, there was about a month's worth of remand briefing and a motion to dismiss by the retailer before voluntary dismissal (in 2019 and 2020) without responding thereto. *Waters* Dkt Nos. 10, 11, 14, 16, 19; *Fagundes* Dkt. Nos. 15–17, 20.  The other was voluntarily dismissed after removal without other substantive activity.   *Gregorio* Dkt. Nos. 1, 6.  Actions identified as still pending in state court (Mot. at 59) were individual cases remanded for lack of requisite amount in controversy.  Little more than remand briefing occurred in federal court.[13] Virtually no activity occurred after remand in 2019.[14]

---

[11]  *Waters v. Home Depot USA, Inc.*, Case No. 9:19-cv-81167-RS (S.D. Fla.) ("*Waters*") Dkt. No. 1-1; *Gregorio v. Home Depot U.S.A., Inc.*, No. 0:21-cv-60372-RS, D.I. 6 (S.D. Fla.) ("*Gregorio*"), Dkt. No. 1-1; *Fagundes v. Home Depot USA, Inc.*, Case No. 0:20-cv-61035-RS (S.D. Fla.) ("*Fagundes*"), Dkt. No. 1-2.

[12]  Waters and Fagundes sought damages "amount[ing] to the purchase price of the Product[.]" *Waters* Dkt. No. 1-1 ¶ 7; *Fagundes* Dkt. No. 1-1 ¶ 81; *see also Lamerson v. Walmart Stores, Inc*., Case No. 9:19-cv-81165-RS (S.D. Fla.) ("*Lamerson*") Dkt. No. 1 at ¶ 7 (same).

[13]  *See Lamerson* Dkt. No. 7 (Aug. 23, 2019 remand upon *sua sponte* review), Dkt. Nos. 9–10 (Oct. 27-30, 2019: retailer motion for reconsideration and response); Dkt. No. 12 (March 5, 2020 denial of reconsideration); *Shelly v. Target Corp*., No. 9:19-cv-8123-RLR (S.D. Fla.), Dkt. Nos. 5, 11–12 (Sept. 5-12, 2019: remand motion, opposition and reply), Dkt. No. 13 (Sept. 24, 2019: Remand Order); *Biddle v. Lowe's Home Ctrs. LLC*, Case No. 9:19-cv-8125-RKA (S.D. Fla.), Dkt. Nos. 12, 15, 18–19 (Oct. 3-29, 2019: motion to remand, opposition, denial of leave to file reply out of time), Dkt. No. 28 (Oct. 31, 2019 Order of Remand); *Morley v. Ace Hardware Corp*., Case No. 19-cv-62541-PCH (S.D. Fla.), Dkt. Nos. 5, 8, 9 (Oct. 15–Nov. 4, 2019: motion to remand, opposition, reply), Dkt. No. 11 (Nov. 8, 2019 Remand Order).

[14]  *See* Garrison Decl. Exs. 9-12: *Lamerson v. Walmart Stores, Inc*., 50-2019-CC-009139 (Cty. Ct. 15th Cir. Palm Beach Cty., Fl.) (most recent activity Mar. 1, 2021 dismissal for lack of activity after denying remand reconsideration); *Shelly v. Target Corp*., 50-2019-CC-010718 (Cnty. Ct. 15th Cir. Palm Beach Cty., Fl.) (most recent activity Oct. 2, 2019, remand order); *Biddle v. Lowe's Home Ctrs. LLC*, 50-2019-CC-011405 (Cnty. Ct. 15th Cir. Palm Beach Cty., Fl.) (most recent

### 3.      Ezcurra's suit against Monsanto failed in Florida.

In February 2020, the Rubinstein firm filed a case against Monsanto in Florida state court. *Ezcurra v. Bayer AG and Monsanto Company,* Case No. 9:20-cv-80524-DMM (S.D. Fla.) ("*Ezcurra*"), Dkt. No. 1-2.  It was removed in March 2020.  *Id.*, Dkt. No. 1.  *Gilmore* counsel became associated with the case around May 26, 2020.  Dkt. No. 37 ¶ 7.  Ezcurra asserted a FDUTPA claim on behalf of Florida purchasers. The class was originally defined as persons purchasing Roundup from Home Depot.  *Ezcurra* Dkt. No. 1-2, ¶ 17; *id.*, Dkt. No. 19, ¶ 17. Although that limitation was later deleted, the class was and remained limited to purchasers using credit or debit card during the proceeding four years. *Id.*, Dkt. Nos. 19 and 30 ¶ 117.  Ezcurra asserted damages in the "amount [of] the purchase price of the Product[.]" *Id.*, Dkt. No. 1 ¶¶ 5, 23; *Id.*, Dkt. No. 19 ¶ 157; *Id.*, Dkt. No. 30 ¶ 147.   When it removed, Monsanto stated that such purchasers represent about half of Roundup sales in Florida.  *Id.*, Dkt. No. 1, ¶¶ 19, 20.  It also represented that units sold in Florida from 2016-2019 at Home Depot alone accounted for "over $52 million" in sales.  *Id.* ¶ 24; *see also id.*, Dkt. No. 1-3, Guard Decl. ¶ 3 (during last four years, "Home Depot stores in Florida sold … over $52 million").

From filing through dismissal, *Ezcurra* lasted about six months. On August 7, 2020, the case was dismissed based on the FDUTPA's safe harbor provision.  *Id.*, Dkt. No. 63 at 4 (FDUTPA does not apply to "[a]n act or practice required or specifically permitted by federal or state law.") (citing Fla. Stat. § 501.212(1)).[15]  *Gilmore* counsel reference "several months of motion practice"

---

activity Nov. 7, 2019 noting remand order); *Morley v. Ace Hardware Corp.*, CONO-19-010648 (Cnty. Ct. 17th Cir. Broward Cnty., Fla.) (most recent activity Nov. 18, 2019 notice of removal).

[15] The MMPA does not have a similar safe harbor.  *See* Mo. Rev. Stat. § 407.020.2 (Supp. 2017) (safe harbor for, *e.g.*, owners of newspapers and other publications, owners of radio and television stations, and entities regulated by agencies inapplicable here).

(Mot. at 15), but much of that was amending to assert a "grossly negligent" failure-to-warn claim only to amend again to remove it. *Ezcurra,* Dkt. No. 11 at 26–27; *Id*., Dkt. No. 19 at 25–26; *Id*., Dkt. No. 30 at 25–28. *Ezcurra* involved only a brief period of discovery. *See* Mot. at 15 (discovery conducted "between May and July 2020").[16] *Gilmore* counsel say this entailed written discovery and unspecified "thousands" of pages of documents. Mot. at 15. They represent that depositions were noticed (*id.*) but ***not*** that any were taken. *Gilmore* counsel also say "expert discovery" had begun in *Ezcurra. Id.* However, Monsanto's expert disclosure was not due until August 28 (after dismissal). *Ezcurra* Dkt. No. 37 at 7; *see also id*., Dkt. No. 38 (granting request to modify scheduling order). They point to the report of their expert Dr. Sharp, dated July 31, 2020. Mot. at 15; Sharp Rpt. . If referring to discovery *to support* that report, none is indicated other than Florida sales data.[17] *Gilmore* plaintiffs heavily rely on Sharp's report to support preliminary approval here. Mot. at 15, 35. In Delaware, they heavily redacted that report. Dkt. No. 41-1 at 40; Dkt. No. 35. Even unredacted, it does not support approval. *Infra*, Sect. I.D.4.

### D.    Gilmore Abandoned Suit Against Monsanto in Oregon.

In July 2019, Mr. Gilmore filed suit against Monsanto in Oregon. *Gilmore v. Monsanto Co.,* Case. No. 3:19-cv-01123-SB (D. Ore.) ("*Oregon*") Dkt. No. 1. Gilmore, an Oregon resident,

---

[16] In May 2020, the court denied a request to extend deadlines, chastising the parties for failing to "explain how they have been diligent to date … since this case was filed in February 2020[,]"and to detail "what discovery has occurred or what obstacles … have [been] encountered[.]" Ezcurra Dkt. No. 23 at 1–2. Counsel returned, stating that Ezcurra *first served* discovery on May 18 and 29, with Monsanto's responses to "sets" of documents due June 22 and July 1. *Id*., Dkt. No. 37 ¶ 6. There is no indication as what these sets consisted of or when Monsanto actually produced documents (including sales data). The parties did not move for protective order until June 29, granted on June 30. Five weeks later, the case was dismissed. *Id*., Dkt. Nos. 41–42, 63.

[17]   Ezcurra noticed a deposition for Monsanto's global head of Packaging and Labeling. Wade Decl. ¶ 6. According to *Ezcurra* filings, this proposed deposition was to gather "information about the Roundup packaging" (*Ezcurra* Dkt. No. 37 at 4) not to address sales data provided by Monsanto.

originally sued on behalf of himself and a class of Oregon Roundup purchasers[18] under that state's consumer act. *Oregon* Dkt. No. 1 ¶¶ 7, 65, 79–103. He amended to add a nationwide class, retaining the Oregon-only class on whose behalf it was asserted. *Id.*, Dkt. No. 34 ¶¶ 84, 99. Gilmore sought full refund of the purchase price (or statutory damages of "$200, whichever is greater") and also punitive damages. *Id.,* Dkt. No. 1 ¶¶ 98, 100, 103; *Id.*, Dkt. No. 34 ¶¶ 123–26.

There is no indication that discovery took place in Oregon. On January 23, 2020, Monsanto moved to dismiss arguing, *inter alia*, that Gilmore failed to state a claim under the consumer act and that warranty claims failed for lack of privity and pre-suit notice. *Id.*, Dkt No. 39 at 10–11. Gilmore voluntarily dismissed on February 6, 2020 without responding. *Id.*, Dkt. No. 42.

### E.    Gilmore Brought this Action in Delaware and Quickly Settled.

Six months after abandonment of his case in Oregon but about a month after global settlement in the MDL was first rejected, Gilmore filed this action in Delaware on August 19, 2020. Dkt. No. 1. Even though he neither lives nor purchased Roundup in Delaware, Gilmore asserted a single claim, on behalf of himself and a *nationwide* class,[19] for violation of the Delaware Consumer Fraud Act ("DCFA"). Dkt. No. 1 ¶¶ 101-102, 111, 125. He alleged that "Roundup is worth less than the economic benefit for which they bargained due to its potential carcinogenicity." Dkt. No. 1 ¶ 108. Although available for DCFA violations,[20] Gilmore did not request punitive damages, despite having done so in Oregon and alleging reprehensible behavior and citing large

---

[18] In Oregon, Gilmore defined Roundup to mean "all formulations" of Roundup "including but not limited to" identified products. *Oregon* Dkt. No. 1 ¶ 15, Dkt. No. 34 ¶15.

[19]  In Delaware, Gilmore defined Roundup as L&G products. Dkt. Nos. 1 and 14 ¶ 16; *see also id.*, Dkt. No. 22 ¶ 23 (listing products without "including but not limited to" language in Oregon).

[20] *See Stephenson v. Capano Dev., Inc*., 462 A.2d 1069, 1076–77 (Del. 1983) ("If the fraud is gross, oppressive, or aggravated, or where it involves breach of trust or confidence, the plaintiff may recover punitive damages whether he sues in tort or under the consumer fraud statute.").

jury awards in other Roundup cases here.  *Id.*, ¶¶ 60-62, 77–91; Dkt. No. 22 ¶¶ 67-69, 85, 89–99.

*Within a month* of filing, Monsanto and *Gilmore* counsel engaged the mediator used in *Ezcurra*.  Mot. at 17 n.7; *see also* Dkt. No. 102-1, Welsh Decl. Ex. 3 ("Welsh Decl.")  at ¶ 4 (engaged Sept. 24, 2020).  After preliminary discussions, mediation was scheduled for February 2021.  Welsh Decl. ¶ 5.  Meanwhile, Monsanto moved to dismiss. The first motion, filed December 3, 2020, asserted preemption, lack of Article III injury based on *In re Johnson & Johnson Talcum Powder Prod. Mktg., Sales Pracs. & Liab. Litig.*, 903 F.3d 278 (3d Cir. 2018), and failure to plausibly allege unlawful conduct occurring in Delaware.  Dkt. No. 11.[21] *Gilmore* counsel did not oppose but amended to revise the injury allegation to express a "price premium" theory.  Dkt. No. 14 ¶ 109.  They continued to assert the DCFA claim.  *Id.* ¶¶ 8–9.  Monsanto filed another motion, opposed on February 9, 2021.  Dkt Nos. 16, 18.[22]

No discovery of any kind was conducted in this case.  Dkt. No. 25 at 33.  *Gilmore* counsel point to discovery in other cases, primarily *Weeks II* and *Ezcurra*.  Mot. at 15–16. But that was of short duration and undisclosed content.  It can be reasonably assumed that in *Weeks II*, discovery was focused on the defendant retailer, and in *Ezcurra*, on Monsanto's conduct and sales in Florida.

---

[21] The DCFA is limited to "practices in the conduct of any trade or commerce in part or wholly *within this State*." Del. Code ann., tit. 6, § 2512); *see also Theis v. Viewsonic Corp.*, C.A. No. 12-1569-RGA, 2013 WL 1632677, at *2 (D. Del. Apr. 16, 2013) (claim by California consumer purchasing product in California failed under DCFA); *Langdon v. Google, Inc*., 474 F. Supp. 2d 622, 633–34 (D. Del. 2007) (DCFA "is limited to actions that take place within the State of Delaware;" dismissing complaint); *Marshall v. Priceline.com Inc*., C.A. No. 05C-02-195WCC 2006 WL 3175318, at *2 (Del. Super. Ct. Oct. 31, 2006) (the DCFA "is only applicable if the fraudulent conduct occurs within Delaware"). Monsanto's incorporation in Delaware is insufficient. *Theis*, 2013 WL 1632677, at *2*; Marshall*, 2006 WL 3175318, at *2.

[22] Gilmore alleged little more than a Delaware choice of law provision in Monsanto's agreement with Scotts and that "means of disclosure" originated "in part in Delaware." Dkt. No. 14 ¶¶ 17–18.  There is no allegation even that Scotts is headquartered in Delaware, and it is not. *See* Dun & Bradstreet Webpage, https://www.dnb.com/business-directory/company-profiles.the_scotts_ company_llc.f92c6ea08023fc9f490d1d814b3379b9.html (Scotts located in Ohio).

*Tomlinson* plaintiffs pointed this out in Delaware (*see* Dkt. No. 41-1 at 37-38**)** and *Gilmore* plaintiffs do not deny it here.  Insofar as sales data provided by Monsanto for settlement purposes, it was informal.  Wade Decl. ¶ 13.

Seven days after motion practice concluded and some 12 days after the second global settlement was proposed in California (MDL Dkt. No. 12509-2) the parties mediated on February 16, 2021.  Welsh Decl. ¶ 6.  According to the mediator, the goals were to settle this case and *Gilmore* and associated counsels' "pending or anticipated class actions" against Monsanto and retailers.  *Id.* at ¶ 4.  But the only pending class actions against Monsanto at the time were this one and *Ezcurra*, which was dismissed and on appeal. The only pending class actions against retailers were in California either facing dismissal (*Williams*) or already dismissed and on appeal (*Weeks II*).  *See* Dkt. No. 94-2 ("Oster Decl.") ¶ 10.  All other Gilmore plaintiff actions were dismissed or abandoned before mediation.

Settlors arrived at an "agreement in principle" in a single day. Wade Decl. ¶ 15. A settlement agreement was executed on June 9–10, 2021.  Mot. at 18; Wade Decl. ¶ 18.  Parties thereto were Monsanto, Gilmore and seven other clients of *Gilmore* counsel (Ezcurra, Weeks, Taylor, Hanna, Boyette, Jewell, and Williams), all of whom had lost or abandoned other cases and all of whom except Ezcurra had never before sued Monsanto.  Each was promised that counsel "shall" request an incentive award of $5,000.  Agrmt. § F.1. Monsanto stipulated to a new amended complaint, filed June 11, 2021, adding post-settlement parties as named plaintiffs.  Dkt. Nos. 21, 22.  Like Gilmore, none live or purchased Roundup in Delaware (or in Missouri).  Dkt. No. 22 ¶¶ 14–20, 113–133.[23]  Three days later, they moved for preliminary approval.  Dkt. Nos. 24–25.  All

---

[23] The second amended complaint also added post-settlement warranty claims.  Dkt. No. 22 ¶¶ 8– 9. The express warranty claim is not based on express statement but implication that Monsanto

propose to be representatives for a nationwide class and agreed to release extinguishing claims against Monsanto, retailers and many others.  Agrmt. § A ¶¶ 47, 51.

F.      **Terms of the Proposed Settlement.**

The proposed settlement is "claims-made," meaning that Monsanto's exposure depends on purchasers receiving notice of it, completing claim forms, and, for purchases exceeding one per year or the most expensive products, submitting "valid proof of purchase."  Mot. at 22; Am. Agrmt. § I.6. Although potential damages exceed $865 million even under a price premium theory, the amount Monsanto agrees to pay is capped at ceiling of $45 million with a $23 million floor, inclusive of attorneys' fees and expenses, incentive awards, and costs of notice and claims administration. Mot. at 20; Am. Agrmt. § D.1. *Gilmore* counsel represent that "Authorized Claimants" can receive some 20% of the average retail price for each Product claimed.  Mot. at 22.  They also say class members "stand to receive two-thirds of Plaintiffs' estimate of best-case damages."  *Id*. at 13. This appears based on 20% as a fraction of the 31% price premium *Gilmore* counsel advances.  Because settlors fail to show their work, there are many unanswered questions as to how and on what basis the damages figure was calculated. The "price premium" theory is itself steeply discounted off the full refund recovery Gilmore previously asserted.  *Infra*, Sects. I.C.2.

Regardless of how much Monsanto ends up paying class members, the agreed-upon fee for *Gilmore* counsel is 25% of the $45 million *ceiling* amount, or $11.25 million. Am. Agrmt. § F.1. A more likely payout at floor ($23 million), this represents 49% of funds otherwise available for claimants, even on a gross basis.  On a net basis, the situation is worse.  *Infra*, Sect. I.C.2.

---

warranted that Roundup's only health risk is eye irritation. There is no allegation of reliance. There is no allegation of pre-suit notice.

Monsanto not only agreed to this fee but to support *Gilmore* counsel in urging that work, against retailers, "is appropriately considered" in assessing its reasonableness.  Am. Agrmt. § F.2.

The Settlement Class includes all persons in the United States (and all its territories) who, "during the Class Period" purchased Roundup Products.  Am. Agrmt. § A ¶¶ 52, 55. The "Class Period" is defined by chart appended as Exhibit B.  *Id.* § A ¶ 20. This gives start-dates per state (going back to June 2011) *but no end dates*.  Hence, all persons who have purchased, or will at any point in the future (even for the first time) purchase a Roundup L&G Product are included in this proposed class.  "Products" are listed in Exhibit A.  Am. Agrmt. § A ¶ 45 & Ex. A.  Although there is no indication that any retailer contributed to the settlement, and none are parties to this action, they are released along with many, many others.  *Id.*, § A ¶¶ 48, 50-51.  The release also is of extraordinary breadth in terms of claims, which include everything other than personal injury/medical monitoring.  *See id.* at § L.1(a)–(c).  It covers misrepresentations and omissions regarding not only cancer-related but *any other kind* of health effect in regard to not only to glyphosate-containing Products but "*other* products."  *Id.* § L.1(a) (emphasis added).

## APPLICABLE STANDARDS

Giving notice of a proposed class "is an important event." Fed. R. Civ. P. 23, advisory committee notes to 2018 am. (subdivision (e)(1)).  It demands careful scrutiny because class action settlements involve "unique due process concerns for absent class members who are bound by the court's judgments."  *Radcliffe v. Experian Info. Solutions Inc.*, 715 F.3d 1157, 1168 (9th Cir. 2013) (quotation marks and citation omitted); *see also In re Bluetooth Headset Prods. Liab. Litig.*, 654 F.3d 935, 946 (9th Cir. 2011) ("Courts have long recognized that settlement class actions present unique due process concerns for absent class members.") (internal quotations and citation omitted).  Courts have an independent duty to both protect absent class members and ensure that neither

named plaintiffs nor counsel have bargained their interests away "in order to maximize their own recovery." *Allen v. Similasan Corp.*, 318 F.R.D. 423, 426 (S.D. Cal. 2016). In this Circuit, pre-certification settlements demand high scrutiny. *McKinney-Drobnis v. Oreshack*, 16 F.4th 594, 607 (9th Cir. 2021); *Roes, 1-2 v. SFBSC Mgmt., LLC*, 944 F.3d 1035, 1049 (9th Cir. 2019); *In re Bluetooth*, 654 F.3d at 946; *In re Roundup Prods. Liab. Litig.*, 2020 WL 3723305, at *1 (N.D. Cal. July 6, 2020). And they are subject to a "high procedural standard" in which applicable factors must be analyzed "comprehensively." *Kim v. Allison*, 8 F.4th 1170, 1178 (9th Cir. 2021) (citations omitted). A proposed settlement must be fair, reasonable, and adequate under Rule 23(e) and a proposed settlement class must meet the requirements of Rule 23(a), including adequacy of representation.

## ARGUMENT

The settlement is not fair, reasonable or adequate and the proposed class lacked adequate representatives at the bargaining table. To the contrary, this settlement carries many hallmarks recognized as indicative of a reverse auction, collusion, and inadequate representation. The Missouri class in particular is substantially prejudiced by this *de minimus* settlement. All proposed representatives also had incentive to act in their own interests. For these and other of the many reasons discussed below, preliminary approval and certification should respectfully be denied.

## I.     THIS SETTLEMENT IS NOT FAIR, REASONABLE OR ADEQUATE.

*Gilmore* counsel cite outdated case law from 2007 (Mot. at 29) but otherwise recognize that standards have changed (*id*. at 25) and before this Court, are applied "as rigorous[ly] at the preliminary approval stage as at final approval." Mot. at 29–30 (quoting *Cotter v. Lyft, Inc*., 193 F. Supp. 3d 1030, 1037 (N.D. Cal. 2016)). In 2018, Rule 23(e)(2) was amended to make clear that settlors "must provide the court with information sufficient to enable it to determine whether to give notice of the proposal to the class." Fed. R. Civ. P. 23(e)(1)(A). Factors in determining

whether a settlement is fair, reasonable, and adequate, include whether: (1) class representatives and counsel have "adequately represented the class;" (2) the proposal "was negotiated at arm's length;" (3) relief provided is adequate, taking into account costs, risks and delay, "the terms of any proposed award of attorney's fees;" and (4) the proposed settlement "treats class members equitably relative to each other." Fed. R. Civ. P. 23(e)(2)(A)–(D). These factors focus on "core concerns," Fed. R. Civ. P. 23(e) Adv. Comm. Note to 2018 amendment, but do not displace other factors set out in *Churchill Vill., L.L.C. v. Gen. Elec.*, including "the extent of discovery completed and the stage of the proceedings." 361 F.3d 566, 575 (9th Cir. 2004). Where, as here, settlement "is negotiated prior to formal class certification," assessment of such factors is "*not enough*." *In re Bluetooth,* 654 F.3d at 946 (emphasis added). Rather, the settlement must withstand "even higher level of scrutiny for evidence of collusion or other conflicts of interest than is ordinarily required under Rule 23(e)" before it can be approved. *Id.* Importantly, this demands that a court "search for 'subtle signs' that plaintiff's counsel has subordinated class relief to self-interest." *Kim*, 8 F.4th at 1179. Also at issue are this district's guidelines on preliminary approval ("Guidelines" or "Guideline"). Mot. at 50–55. *Tomlinson* plaintiffs address these in context.

## A.     There Are Substantial Indications of Reverse Auction.

First, there is substantial evidence that this settlement was a reverse auction. This occurs when "the defendant in a series of class actions picks the most ineffectual class lawyers to negotiate a settlement with the hope that the district court will approve a weak settlement that will preclude other claims against the defendant." *Razo v. AT&T Mobility Services, LLC*, 2021 WL 4847834, at *2 (E.D. Cal. Oct. 15, 2021), *report and recommendation adopted*, 2021 WL 4988866 (E.D. Cal.

Oct. 27, 2021) (quoting *Reynolds v. Beneficial Nat'l Bank*, 288 F.3d 277, 282 (7th Cir.2002)).[24]

"The ineffectual lawyers are happy to sell out a class … in exchange for generous attorneys' fees,

and the defendants are happy to pay generous attorneys' fees since all they care about is the bottom

line[.]" *Reynolds*, 288 F.3d at 282. An open "bidding war" among plaintiffs is not required to

prove a reverse auction as settlors contend. Mot. at 49. Indeed, the fact that Monsanto secreted

negotiations with plaintiffs' counsel weighed down by a string of defeats without even informing

*Tomlinson* plaintiffs is itself evidence that Monsanto knew which negotiators would favor it.

None of the cited cases support settlors' position. In *Gallucci v. Gonzales*, 603 Fed. Appx.

533 (9th Cir. 2015), the Court said there was no evidence of a bidding war (*id*. at 535), not that "a

bidding war is the primary marker of a reverse auction." Mot. at 49.[25] The Court in *Swinton v.*

*SquareTrade, Inc*., 960 F.3d 1001 (8th Cir. 2020) found insufficient evidence of reverse auction

where, among other things, the settlement provided "adequate relief," which here it does not, and

---

[24] *See also Rahman v. Gate Gourmet, Inc.,* 3:20-CV-03047-WHO, 2021 WL 5973046, at *4 (N.D. Cal. Nov. 22, 2021) (settlement in later-filed case "smack[ed] of a 'reverse auction'"); *Amaraut v. Sprint/United Mgmt. Co*., 2020 WL 1820120, at *3 (S.D. Cal. Apr. 10, 2020) (statements from plaintiffs in competing class action that reverse auction occurred properly "explain[ed] the potential harm involved when a defendant facing multiple class actions chooses to settle one of the actions in a secret process that will render the other actions moot"); *Cobarruviaz v. Maplebear, Inc*., 2016 WL 5725076, at *2 (N.D. Cal. Sept. 30, 2016) (existence of overlapping class actions "raises the risk of reverse auctions where the defendants pick the most vulnerable or compliant plaintiff with which to settle and bind all other suits"); *Ross v. Convergent Outsourcing, Inc*., 323 F.R.D. 656, 660–61 (D. Colo. 2018) (although there was no evidence that plaintiffs' counsel was "the lowest bidder in a reverse auction," more information was needed on course of conduct in reaching settlement which, among other things, released "similar claims in numerous pending class actions"); *Figueroa v. Sharper Image Corp*., 517 F. Supp. 2d 1292, 1322 (S.D. Fla. 2007) (denying preliminary approval; plaintiffs' counsel "negotiated from a position of weakness"); *Borup v. CJS Sols. Grp., LLC*, 2019 WL 2137369, at *1 (D. Minn. May 16, 2019) (reverse auction occurs where "a defendant, seeing competing class cases, cherry-picks the attorneys willing to accept the lowest class recovery, in exchange for enhanced fees") (citation omitted).

[25] *Gilmore* plaintiffs add "such as a bidding war" (Mot. at 49) to a quote attributed to *O'Bryant*, which does not contain it. *O'Bryant v. ABC Phones of N.C., Inc*., No. 19-cv- 02378-SHM-tmp, 2020 WL 7634780, at *10 (W.D. Tenn. Dec. 22, 2020).

attorneys' fees were not "extremely generous," which here they are.  *Id.* at 1006.  In *Smith v. CRST Van Expedited, Inc.*, 2012 WL 5873701 (S.D. Cal. Nov. 20, 2012), the objector was lead plaintiff in another action "recently decertified," in which "the majority of claims [had] already been dismissed." *Id.* at *2.  He made only "passing reference" to reverse auction  *Id.* at *4.  There, the objector would have been the weak negotiator.  Here, the opposite is true.

### 1.    Monsanto faced certification, strong claims and advocacy in Missouri.

*Tomlinson* was filed in 2019, discovery began and remained ongoing. As of July–April 2020, plaintiffs had already filed one motion to compel (granted) followed by a golden rule letter over 30 pages in length.  Garrison Decl. ¶ 13.  By July 14, 2020, they had moved for certification, full briefing on which was complete by November 2020.  *Id.*  ¶ 6.  Missouri law on certification and the MMPA are favorable, as Monsanto well knew.  *See id.*, Ex. 2; Ex. 5 at 7-8. As of January 5, 2021, trial was scheduled for October 2022.  *Id.* ¶ 18.   Unlike Related Actions, Monsanto has filed no dismissal motion in Missouri.  *Id.* ¶ 11.   Further, *Tomlinson* counsel have a track record of successfully prosecuting large mass and class actions resulting in large trial verdicts and settlements *including* against Monsanto's parent Bayer.  *Id.* ¶ 35 They also are well versed on the MMPA.  *See Plubell,* 289 S.W.3d at 710 (identifying counsel).

Settlors offer unconvincing reasons for bypassing *Tomlinson* plaintiffs.  Monsanto points to "confidentiality obligations" and "avoiding … suggestion … [of] reverse auction."  Dkt. No. 94-3 ("Rosenthal Decl.") ¶ 8.  The first excuse is nonsensical.  Had *Tomlinson* plaintiffs been included there would be no such concern and the settlement appears to have included everyone who had filed a case against retailers and Monsanto *except* the parties and counsel in *Tomlinson.* Only the strongest claimants were excluded.  The second is post-hock rationalization for what occurred—Monsanto chose counsel in a later-filed case in weakest position.

Settlors also claim that *Tomlinson* is not conducive to "global peace" because it involves a

Missouri-only class and Delaware is Monsanto's state of incorporation. Mot. at 49. Jurisdictionally, however, Missouri is as proper a forum as Delaware, and *factually*, that is where Monsanto's activities are centered. *See Ezcurra* Dkt. No. 1 at 4–5 (Monsanto "has its corporate headquarters, where its officers direct, control, and coordinate the corporation's activities, in the State of Missouri"); *see also* Garrison Decl. Ex. 3, Guard Decl. ¶ 9 (Monsanto has final approval over L&G advertising).   Amending in Missouri to assert a nationwide claim would indeed have benefitted settlement value given that, unlike *Gilmore* plaintiffs, *Tomlinson* plaintiffs *did* purchase Roundup in the forum state, and unlike Delaware, Monsanto's wrongful conduct *did* emanate from Missouri.   Suggestion that *Tomlinson* plaintiffs' opposition is about fees (Mot. at 49) also is meritless.  *Tomlinson* counsel represent an already certified class of Missouri that purchasers they are duty-bound to protect from this *de minimus* settlement, negotiated by plaintiffs and counsel in weak position with clear incentive to act in their own interests.  And if this *were* about *Tomlinson* counsels' fees and this settlement were fair and adequate, they would be making their own fee request from the fund in *this* settlement based on their own contribution in bringing and prosecuting the only case that actually exerted pressure on Monsanto.  *Tomlinson* was the only class case against Monsanto with motion for class certification both pending and under favorable law, it was the only case not subject to a motion to dismiss, it was in a forum unfavorable for Monsanto, and Monsanto faced experienced, proven counsel without an albatross of defeats behind them.  Monsanto had other counsel willing to accept inadequate class relief and a release that would rid Monsanto of strong claims in Missouri while also paying them rich fees.[26]

---

[26] Mr. Rosenthal also states that *Tomlinson* plaintiffs have an "unrealistic view" on claims for AG and I&P purchasers, which he proposes, were included to "expand the volume of sales at issue … and thus, to attempt to increase leverage over Monsanto." Rosenthal Decl. ¶ 9.  *Tomlinson* plaintiffs have strong arguments for including those claims in Missouri. And it is noteworthy that

## 2.   *Gilmore* plaintiffs and counsel were in a demonstrably weak position.

Gilmore, who abandoned claims against Monsanto six months earlier in Oregon, filed this action about a month after this Court rejected the first MDL settlement.[27] *Gilmore* counsel and clients were in an undeniably weak position. Most cases had been dismissed voluntarily or on the merits by 2019 or 2020.[28]  And *Gilmore* counsel had a pattern of abandonment after dismissal with leave to amend or without responding to dismissal motions at all. *See Reynolds* 288 F.3d at 284 (finding lawyer's pre-negotiation efforts "singularly feeble" as illustrated by voluntary dismissal).

Gilmore and counsel also had a single weak DCFA claim pending.[29]  The fact that Gilmore *himself* did not purchase in Delaware is highly problematic and a class of nationwide purchasers raises serious certification issues as *Gilmore* counsel admit with little justification for unattempted subclassing.   Mot., at 37–38; *see infra*, Sect. II.   Moreover, Gilmore did not seek either full purchase-price or punitive damages as he had in Oregon, despite allegations of reprehensible conduct here.  Whether this settlement should "include provision for" punitive damages misses the point.  Mot. at 36–37.   First, potential for a punitive award is hardly "speculative." Evidence

---

while containing territorial limitation, the DCFA does not contain "personal, household or family" language (Del. Code Ann. tit. 6 § 2525) and expressly protects "consumers *and legitimate business enterprises.*"  *Id.*, §2512 (emphasis added).  *Gilmore* counsel did not secure a Delaware purchaser and immediately limited the class to L&G purchasers only.  *Supra*, note 18.

[27] Such forum-shopping alone is cause for concern. *See Martin v. Cargill, Inc.,* 295 F.R.D. 380, 388 (D. Minn. 2013) ("voluntary dismissal of class claims for 'strategic purposes,' such as forum shopping or to obtain more favorable settlement terms" is practice that should make judges "wary … as they review proposed settlements") (citation omitted).

[28] *Williams*, dismissed after mediation, faced defenses under Proposition 65 and insufficient allegations of retailer wrongdoing (*Williams* Dkt. No. 14) already successful in three other cases. *See Weeks II* Dkt. Nos. 65, 77 (dismissed with prejudice Dec.15, 2020); *Hanna I* Dkt. No. 39 (dismissed Nov. 4, 2020); *Taylor* Dkt. No. 22 (dismissed Oct. 8, 2020).  The same is true of retailer cases (*Gregorio* and *Hanna II*) filed very shortly before and in obvious anticipation of mediation.

[29] Warranty claims, also problematic, were added only after settlement had been reached.

"easily support[s] a conclusion that Monsanto was more concerned with tamping down safety inquiries and manipulating public opinion than it was with ensuring its product is safe." MDL Dkt. No. 4576 at 5. Three juries have rendered ringing indictments. Second, the fact that *Gilmore* counsel relinquished *even a request* for punitive damages before purportedly mediating "greatly diminish[ed]" bargaining position on plaintiffs' behalf. MDL Dkt. No. 13115 at 4.[30]

### 3.    Monsanto cabined off this case and secreted settlement discussions.

"[F]ailure to consolidate parallel litigation where consolidation was possible" also "may indicate that the defendant sought to create the conditions enabling a reverse auction." 4 Newberg on Class Actions § 13:60 (5th ed.); *see also Borup*, 2019 WL 2137369, at *1 (low settlement value, high attorneys' fees, and steps to "cabin off" litigations were "at least indicative evidence of a reverse auction") (quotations and citation omitted). Monsanto was required to, but did not, notify the JPML of potential tag-along actions. *Gilmore* Case 3:21-cv-08159-VC, Dkt. No. 65, JPML Transfer Order at 3. Monsanto plainly did not want to risk transfer to this MDL with many plaintiffs' lawyers, a large jury verdict and a Court not only versed on issues pertinent to analysis of *this* proposed global settlement but who already had expressed significant skepticism over a prior one. MDL Dkt. No. 11182.[31]    And as noted, Monsanto also secreted settlement discussions. It did not disclose such discussions to *Tomlinson* plaintiffs—or Missouri courts—even when

---

[30] *Gilmore* plaintiffs say the Missouri court has "not ruled on [*Tomlinson*] plaintiffs' request for punitive damages" (Mot. at 36 n.27) but Monsanto has not asked for such a ruling. They also contend that the standard in Missouri "is high," but it is no higher than standards under which juries already have found reprehensible conduct. There is much to support both request and award.

[31] At some point between July 2020 and February 2021 when it proposed the second settlement, Monsanto excluded *Tomlinson* and *Gilmore* counsels' cases from its four-year stay. At the time, this was inexplicable. While *Tomlinson* counsel negotiated to exclude *Tomlinson* entirely from that settlement, *Gilmore* counsel would not return their calls. Garrison Decl. ¶¶ 28-29. Unknown at the time, *Gilmore* counsel were days away from settling with Monsanto, and circumstances strongly suggest that they were in discussions before this case was filed.

seeking to stay the *Tomlinson* action in April 2021 when it sought reconsideration and appellate review of class certification. By that point, it had an agreement in principle with Gilmore negotiators.  Keeping settlement under wraps is further evidence of reverse auction. *See Martin,* 295 F.R.D. at 388 & n.11 (stating that failure to advise of settlement left "firm impression that the lack of communication was undertaken for strategic purposes and should not be rewarded"' and rejecting excuse that settlement was only "tentative" until written agreement was signed).

### B.      There Are Many Other Badges of Collusion and Inadequate Representation.

Courts "scrutinize pre-class certification settlements because plaintiffs' counsel may collude with the defendant to strike a quick settlement without devoting substantial resources to the case." *Briseño, v. Henderson*, 998 F.3d 1014, 1024 (9th Cir. 2021); *see also* 4 Newberg on Class Actions 13:60 (red flags include quick settlement "of the least well-developed case").  They must be "particularly vigilant not only for explicit collusion, but also for more subtle signs that class counsel have allowed pursuit of their own self-interests and that of certain class members to infect the negotiations." *In re Bluetooth*, 654 F.3d at 947 (citing *Staton v. Boeing Co*., 327 F.3d 938, 960 (9th Cir. 2003)).  In addition to inadequate discovery, signs of collusion include: "(1) a handsome fee award despite little to no monetary distribution for the class, (2) a 'clear sailing' provision under which defendant agrees not to object to the attorneys' fees sought, and (3) an agreement that fees not awarded will revert to the defendant, not the class fund." *Kim,* 8 F.4th at 1180.  Courts also scrutinize incentive awards to ensure that "they do not undermine the adequacy of the class representatives." *Radcliffe,* 715 F.3d at 1163.  Settlors cannot hide behind a mediator. Mot. at 48.  Monsanto suggests that collusion would "have been apparent" to the mediator because communications during mediation occurred in her presence.  Rosenthal Decl. ¶ 7.  First, however, use of a mediator is neither substitute for independent assessment, nor dispositive of whether the "end product" is a fair, adequate, and reasonable settlement. *Kim*, 8 F.4th at 1180; *In re Bluetooth*,

654 F.3d at 948.   Second, mediators are privy only to what they are told and provided.

### 1.   Settlement was quick and without discovery in this case.

The "scope and effectiveness of the investigation plaintiffs' counsel conducted prior to reaching an agreement" demands attention. *Acosta v. Trans Union, LLC*, 243 F.R.D. 377, 396 (C.D. Cal. 2007); *see also Fraser v. Asus Computer Int'l*, No. C 12-00652 WHA, 2012 WL 6680142, *5 (N.D. Cal. Dec. 21, 2012) (denying approval where "insufficient discovery and investigation have been conducted"). *Gilmore* counsel conducted no discovery in this case. Recognizing that problem, they point to discovery in other cases, primarily *Weeks II* and *Ezcurra*. Mot. at 43.   First, however, such discovery was short lived, limited, and here undescribed. Discovery in *Ezcurra* lasted no more than 3 months without depositions.   *Gilmore* counsel recounts interrogatories, admission requests and unspecified "thousands" of (undescribed) documents in *Ezcurra* and exchange of "over 17,000 pages of [undescribed] documents and data" in *Weeks II*. Mot. at 16; Wade Decl. ¶ 6.[32]   Compared with 635,000 pages of documents produced in *Tomlinson*, that is cursory. For a nationwide class, it "is scant discovery indeed."   *Acosta*, 243 F.R.D at 397.

In addition, while representing that work in Related Actions "contributed significantly" to settlement (Mot. at 16) *Gilmore* counsel fail to show how that is so either in support of incentive awards (*infra* Sect. I.B.5) or settlement.   *Weeks II* was against Home Depot, not Monsanto. *Ezcurra* was on behalf of Florida purchasers only. It is reasonable to assume that the former was focused on the retailer and the latter on Monsanto's conduct and sales in Florida only. *Gilmore* counsel do not demonstrate that discovery there had any general value here. *See Acosta*, 243 F.R.D. at 396

---

[32] Number of written discovery requests served or responded to does not indicate what substantive information was actually provided. *See Acosta*, 243 F.R.D. at 396 (service of 172 special interrogatories and 143 requests for document production but few number of substantive answers and responses). Monsanto's responses obviously would include objections and denial of admission requests.  Plaintiffs do not provide those responses and likely resisted production for a reason.

(discovery in other cases of little value).

*Gilmore* counsel imply that "discovery" here included "preparation of an expert report" (Mot. at 43) but the only expert report identified is Dr. Sharp's report from *Ezcurra*. That is the case they hail as "particularly significant," stating that they relied on discovery there in reaching settlement here.  Mot. at 14; Wade Decl. ¶ 9.  The only possibly pertinent discovery from *Ezcurra*, however, was whatever undisclosed sales data Monsanto produced and Sharp used for the Florida damages calculation.  Ms. Wade now states that she conducted "extensive research and data analysis" in *Ezcurra*, implying that this assisted with "confirming and interpreting" nationwide sales data provided here.  Wade Decl. ¶¶ 7, 14.  *Cf.* Dkt. No. 26, Wade Decl. ¶ 13.  Sharp's analysis in *Ezcurra*, however, was limited to Florida (credit and debit card) purchasers and one set of Roundup products.[33]  *Gilmore* counsel do not say that Monsanto's sales data is self-interpreting and it is not.[34]  Garrison Decl. ¶ 16.  They do not say that Sharp himself even sat down with a Monsanto representative to interpret the Florida data.[35]  Nor do they provide basis for the idea that he was in any way equipped to "confirm" whatever sales data Monsanto provided here.  And the point remains that sales data there and here was untested.  Insofar as *Gilmore* counsels' reliance

---

[33] The class in *Ezcurra* was originally defined as persons purchasing Roundup at Home Depot in Florida.  *Ezurra*, Dkt. No. 1-2 ¶ 17. The Home Depot limitation was later removed but the class was always limited to Florida purchasers using a credit or debit card.  *Id.*, Dkt. No. 1-2 ¶ 99; Dkt No. 30 ¶ 117.  Sharp's regression analysis was limited to "Roundup Weed & Grass Killer III ('Killer III') sales in … Florida" during a four-year period.  Sharp Rpt. ¶ 3.

[34] Monsanto says it provided *Tomlinson* plaintiffs information similar to what it provided *Gilmore* counsel.  Rosenthal Decl. ¶ 12 n.2. But *Tomlinson* plaintiffs *disputed* sufficiency of such information for reasons including that it is not self-interpreting. Garrison Decl. at ¶ 16.

[35] Per the now unredacted report, at least some Florida sales data was produced. Neither counsel nor Sharp quantify time spent on analysis of sales data itself as opposed to plugging it in for the regression analysis conducted in Florida.  The report indicates review of an (unattached) email (*id.*) but other than that, interpretive efforts and bases thereof are undisclosed.

on opinion from Monsanto's expert (Mot. at 39), there is no indication of effort to test that analysis either. In sum, there is little to demonstrate scope or effectiveness of *Gilmore* counsels' investigative efforts prior to settlement. Indeed, they were thin as is relief for this proposed class.

### 2. Monsanto agreed to not contest fees at unlikely ceiling amount.

Although many circuits have declined to criticize settling parties' agreement on fees, the Ninth Circuit "has frequently stressed that clear sailing agreements … are important warning signs of collusion." *Kim,* 8 F.4th at 1180 (citation omitted). Especially with pre-certification settlements, the danger is that "plaintiff's counsel has subordinated class relief to self-interest." *Id.* at 1179; *see also Briseño,* 998 F.3d at 1027 (clear sailing carries "potential that a defendant agreed to pay class counsel excessive fees in exchange for counsel accepting a lower amount for the class members"). Courts must scrutinize clear sailing provisions "and the possibly pernicious reasons for … inclusion in the settlement." *Roes, 1-2 v. SFBSC Mgmt., LLC*, 944 F.3d 1035, 1056 (9th Cir. 2019). While defendants ordinarily do not care about distribution between class and class counsel of a common fund (*Briseño*, 998 F.3d at 1025; *Bluetooth*, 654 F.3d at 949), that is not the case here: Monsanto has a clear interest in the $22 million that is potentially reversionary based on the claims rate (the amount between $23 and $45 million). Yet Monsanto agreed to "not contest" class counsel's request for fees equal to 25% of that amount irrespective of the amount actually paid to the class. Monsanto further agreed to *support Gilmore* counsel's use of work in failed cases against retailers to buttress that request. Mot. at 24; Sett. Agmt. § F.1. Without a clear sailing provision, Monsanto would have a strong incentive to *oppose* counsel's request for a share of funds that revert to Monsanto based on work expended in failed lawsuits against other parties. Thus, this is exactly the type of self-serving, clear-sailing provision that triggers scrutiny when a defendant agrees to pay fees "separate and apart from class funds," Mot. at 47, particularly because it is highly unlikely the claims rate will cause Monsanto pay more than $23 million. *See infra*

27

I.B.2.

*Gilmore* plaintiffs stress that settlement is valid and binding regardless "whether fees are approved or reduced." Mot. at 47. But courts cannot ignore clear-sailing provisions "simply because approval of the award "[is] not dependent on the approval of fees" or fee provisions are "severable from the agreement[.]" *In re Bluetooth*, 654 F.3d at 948. "[T]he *very existence* of a clear sailing provision" signals danger that counsel will have "bargained away something of value to the class." *Id.* at 948 (citation omitted) (alteration in the original) (emphasis added). Even in *Bluetooth*, settlors could say the settlement was negotiated before fees, *id.* at 948, yet that assertion is not even present here. *Acosta,* 243 F.R.D. at 398 (a process "through which Plaintiffs' counsel negotiated its own attorneys' fees simultaneously with the negotiation of class relief is highly suspicious."). The Ninth Circuit has expressed concern over clear sailing provisions where a fund *is* inclusive of fees, describing them simply as "an arrangement where defendant will not object to a certain fee request by class counsel[.]" *Roes,* 944 F.3d at 1049 (citation and quotations omitted). That is the *Bluetooth* definition as well. 654 F.3d at 940 n.6; *see also Harris v. Vector Mktg. Corp*., C-08-5198 EMC, 2011 WL 4831157, at *7 (N.D. Cal. Oct. 12, 2011) (*Bluetooth* "made clear … that the essence of a clear sailing arrangement is that the defendant agrees not to object to a fee award up to a certain amount"). Such a provision is present here.

### 3. The agreed-upon fee is disproportionate.

Disparity between relief to the class and fees to the lawyers "raises an urgent red flag" as it creates "inherent incentives that tempt class counsel to elevate his or her own interest over those of the class members." *Briseño*, 998 F.3d at 1025, 1026. *Gilmore* counsel suggest that they may not seek the full fee amount, Mot. at 54, and advocate for a wait-and-see approach. *Id* at 46. But the Court considers what the agreement proposes. *See* Fed. R. Civ. P. 23(e)(2)(C)(iii) (court considers "the terms of any proposed award of attorney's fees"); Guideline No. 6 (requesting

information "about the fees [counsel] intend to request").  *Gilmore* counsel also say that because fees are a percentage of the fund, their interests are "aligned" with and "directly tied to" class relief (Mot. at 47) but they rely on hypothetical and unlikey $45 million ceiling. The Ninth Circuit analysis accounts for claims rate.  *Briseño*, 998 F.3d at 1026; *Kim*, 8 F.4th at 1180.  Even if, as suggested (Mot. at 46), fees are properly based on "size of the fund theoretically available … there [still] is an inherent risk of conflict … between counsel and the class[.]" *Harris*, 2011 WL 4831157 at *6.  The situation is troubling where the stated payout is "largely illusory." *Id.* at *5.

### a.     A $45 million ceiling payout is highly unlikely.

Here, claims rate was considered in reaching this settlement and its structure.  Wade Decl. ¶ 16; Dkt. No. 92-2 ("Oster Decl.") ¶ 4.  And it appears obvious that Settlors believe it will be low. Their own projections show that a $45 million cap is an illusory number selected to justify an $11.25 million fee request at benchmark percentage in this Circuit.  According to the proposed claims administrator, a likely claims rate is 1%-5%. Dkt. No. 94-4 ("Schwartz Decl.") ¶ 11. Even at the *top* end, Monsanto's liability would be only $40,219,618,[36] nearly $5 million less than the negotiated cap and number on which fees are based.  Without direct notice, that estimate is lofty. *See Briseño,* 998 F.3d at 1026 (in settlement without direct notice, claims were "one-half of one percent").  Were the claims rate *double* that achieved in *Briseño* (to 1%), Monsanto's exposure will not exceed the $23 million floor,[37] an infinitesimal fraction of the class receive some $10.3

---

[36] At claims rate of 5%, the amount is $26.6 million (20% of the total retail sales figure of $2.66 billion, multiplied by 5% claims rate). When fees ($11.25 million), expenses ($207,618), administration/notice costs ($1.24 million at maximum estimate), and incentive awards ($40,000) are included, the amount is $40,219,618.

[37] At claims rate of 1%, the amount is $5.32 million (20% of the total retail sales figure of $2.66 billion, multiplied by 1% claims rate).  When fees, expenses, claims administration/notice costs, and incentive awards are included, the amount is $18,057,618, increased to the $23 million floor.

million, all class members are bound by a broad release, *Gilmore* and associated counsel obtain $11.5 million, and Monsanto is relieved of an estimated liability exceeding $825 million.

      *Gilmore* counsel suggest that the agreed-upon fee is no big deal since even if only the floor amount is reached, an $11.25 million fee "would still constitute less than half of the actual fund[.]" Mot. at 47.  But 49% of class relief *is* excessive even at gross level. *See In re Packaged Seafood Prods. Antitrust Litig.*, 15-MD-2670 JLS (MDD), 2020 WL 1061795, at *2 (S.D. Cal. Jan. 17, 2020) ("fees alone" accounted for some 46% of total settlement).  And as noted, the reality at net is worse.  *See Wilson v. J.B. Hunt Logistics, Inc*., 218CV03487SVWAFMX, 2020 WL 11626082, at *6 (C.D. Cal. Nov. 13, 2020) (troubling that fee was "higher than the net settlement amount while class members recover just a fraction of Defendant's calculated exposure").  Accounting for reductions, the result is about $10.3 million to class members versus $11.25 million to lawyers.

      **b.**     **The proposed fee is unsupported by offered lodestar.**

      Settlement must be supported with "clear explanation" on why the fee is justified "and does not betray the class's interests."  *Bluetooth,* 654 F.3d at 949.  *Gilmore* counsel offer a lodestar without description of work performed.  Mot. at 54; Wade Decl. ¶ 40.  And claimed investment of 3,485.75 hours *to this case* is dwarfed by hours from other actions, all but one against retailers which failed, were abandoned, or at best languished.  Aside from reasonableness of hours and rates themselves is pronounced question of how that work benefitted this proposed class.[38]  *Gilmore* counsel include even Florida cases involving little more than *remand* briefing, conferring no benefit whatsoever.  They contend that retailer actions were strategic to exert "financial and

---

[38] Work of counsel must "meaningfully benefit[]" the class before fees can be awarded.  Failure "to establish how, precisely, [their] activities benefitted the Class" is fatal. *In re Volkswagen "Clean Diesel" Mktg., Sales Pracs., & Prods. Liab. Litig*., 914 F.3d 623, 642, 644 (9th Cir. 2019).

reputational pressure on Monsanto" (Mot. at 16) but if that was the goal, it misfired badly.[39]
Repeated failure was a detriment, not a benefit, to this proposed class.  If anything, the lodestar
demonstrates that a bargain settlement was exchanged for Monsanto's agreement to pay not only
hours expended on *failed* efforts, but to support request for a *premium* fee of $11.5 million plus
expenses.  Monsanto's consent to help counsel fail upwards is a strong indicator of collusion.

### 4.    The settlement structure is reversionary to Monsanto.

"In light of Ninth Circuit case law disfavoring reversions," proponents of preliminary
approval should explain "why a reversion is appropriate[.]" Guideline No. 1(h). Settlors do not,
focusing instead on effort to deny that reversion exists. Contrary to suggestion (Mot. at 53), the
agreement need not contain explicit reversionary provision. Settlements often are structured in a
way that reversion occurs. *E.g., Hadley v. Kellogg Sales Co*., 16-CV-04955-LHK, 2020 WL
836673, at *5 (N.D. Cal. Feb. 20, 2020) (value of vouchers, when expired, effectively reverted to
defendant). And settlement should not be approved unless clear-sailing and reversion together
*promote* best interest of the class.  *McKinney-Drobnis,* 16 F.4th at 610.  Here they do not.

*Gilmore* counsel say there is no "automatic[]" reversion of unawarded fees to Monsanto
(Mot. at 47) but the floor/ceiling structure indeed protects fees over class members.  If a $45
million ceiling were met but fee award reduced, unawarded fees plainly revert to Monsanto.
Settlors appear to assume that claims will not exceed the floor, only underscoring the illusory
nature of the ceiling except as a clear-sailing benchmark.

---

[39] Monsanto represents only that "*Plaintiffs' counsel* indicated … that [retailer] actions *were
intended* to pressure Monsanto." Rosenthal Decl. ¶ 4 (emphasis added). That itself raises concern
over timing and context.  The fact that retailer cases failed belies any actual pressure on retailers
or Monsanto, which Mr. Rosenthal does not say was in truth exerted other than vague assertion of
indemnities he *does not* go so far as declaring were enforceable or actually asserted.  *Id*.

### 5. *Gilmore* plaintiffs obtained agreed-upon incentive awards.

Incentive awards carry risk that beneficiaries "may be more concerned with maximizing those incentives" than judging the adequacy of the settlement "to class members at large." *Staton v. Boeing Co.*, 327 F.3d 938, 977 (9th Cir. 2003). They are meant for "service to the class in bringing the lawsuit," *Radcliffe*, 715 F.3d at 1163, and their propriety is assessed by looking to "actions the plaintiff has taken to protect the interests of the class, the degree to which the class has benefitted from those actions, ... [and] the amount of time and effort … expended in pursuing the litigation." *Roes, 1-2,* 944 F.3d at 1057 (quoting *Staton*, 327 F.3d at 977) (cleaned up). *Gilmore* plaintiffs from Related Actions did not "bring[] the lawsuit" but joined it after settlement. And none, including Mr. Gilmore, invested time "pursuing" litigation here that did not, and by all indication was never intended to, occur. Suggestion that awards are justified "in light of contribution to" this settlement (Mot. at 53–54) cannot be squared with history of failure and this poor settlement relief.

Anticipating an issue, *Gilmore* plaintiffs seek to avoid the conditioned-on scenario in *Radcliffe* but that case itself recognizes that expectation of awards incentivizes representatives "tempted to accept suboptimal settlements at the expense of the class members," 715 F.3d at 1164, a danger exacerbated where awards "are seemingly untethered from service to the class." *Roes, 1-2*, 944 F.3d at 1049; *see also id*. at 1057–58. Despite acknowledgement of Guideline No. 7, the declarations are devoid of detail demonstrating actual services *in this* case and plaintiffs declare that they were not promised *receipt* of award in connection with this lawsuit or prior actions.[40] The

---

[40] Dkt. No. 94-5, Ezcurra Decl. ¶¶ 6, 7, 9; Dkt. No. 94-6, Gilmore Decl. ¶¶ 6, 8; Dkt. No. 94-7, Boyette Decl. ¶¶ 6, 8; Dkt. No. 94-8, Jewell Decl., ¶¶ 6, 8; Dkt. No. 94-9, Weeks Decl. ¶¶ 7, 8, 10; Dkt. No. 94-10, Williams Decl. ¶¶ 6, 8; Dkt. No. 94-11, Taylor Decl., ¶¶ 6, 8; Dkt. No. 94-12, Hanna Decl. ¶¶ 6, 8. Counsel attest that plaintiffs were promised nothing regarding "pursuit of claims" not pursuit of settlement. Wade Decl. ¶ 21; Oster Decl. ¶ 7.

agreement states that awards "shall" be requested. Agrmt. § F.1. Whether they would ultimately be approved is not the issue. These plaintiffs had strong incentive to accept *any* recovery, and certainly $5,000 is strong incentive in the face of prior defeats (by Ezcurra and retailer plaintiffs) and pending defeat (for Gilmore). All have incentive to act in their own interests.

### 6.     There is indication of collusion in settling retailer actions.

In addition, *Gilmore* counsel brokered settlement for their clients' own *failed* claims against retailers and all of them agreed to broad release of retailers, none of whom are defendants in this action or parties to the settlement. The propriety of doing so must be explained. *Haralson v. U.S. Aviation Services Corp.*, 383 F. Supp. 3d 959, 969 (N.D. Cal. 2019). In *Trauth v. Spearmint Rhino Companies Worldwide, Inc*, EDCV091316VAPDTBX, 2010 WL 11468628 (C.D. Cal. July 26, 2010), for example, the complaint named three defendants. As here, the settlement agreement identified representatives ("offered the attendant incentives") who were parties in other cases. *Id.* at *7. As here, there was insufficient evidence of participation in the lawsuit at hand. *Id.* As here, settlement included non-defendants. The court found "an appearance of collusion or impropriety" and denied preliminary approval. *Id.* at *4, 7.

*Gilmore* counsel state that settlement "resolve[d] 18 other matters" pursued by themselves and associated counsel in other actions. Wade Decl. ¶ 37. All but one were against retailers. There is no indication that any retailer contributed financially to settlement relief. *See Reynolds,* 288 F.3d at 281–84 (then unnamed defendant agreed to split cost of settlement but did not add amounts in contribution for its own exposure). According to Monsanto's counsel, it would not have settled this case unless the release included retailers and many others, raising the specter of potential indemnity he does not even say was *sought*, much less that Monsanto itself has paid a dime for either retailers' liability (there was none) or defense costs. Rosenthal Decl. ¶ 4. And *Gilmore* counsel do not attest to a large stock of inventory claims waiting in the wings or actual intent to

invest more time and money into retailer cases. All this is yet further indication that plaintiffs and counsel agreed to a broad release for their own interests.

### 7. *Gilmore* plaintiffs and counsel are otherwise inadequate.

*Gilmore* plaintiffs and counsel are otherwise inadequate representatives for a nationwide class, particularly members of an already-certified Missouri class, *already* represented by able counsel. Gilmore counsel certainly claim no investigation into Missouri claims, did not reach out to *Tomlinson* counsel but refused calls while secretly negotiating this settlement. There is no indication that they even considered, much less advocated, claims other than the weak one in Delaware facing dismissal and failed (mostly retailer) claims of their own clients, namely *Gilmore* plaintiffs. All have interests diverging from other class members. For these and other reasons certification itself should be denied.

### C.   The Proposed Settlement Relief Is Unsupported and Inadequate.

Inquiry into class relief further condemns this settlement. To begin, proposed fees are considered in assessing adequacy. *Briseño*, 998 F.3d at 1024. As discussed, the agreed-upon fee is exorbitant. Next, and "perhaps the most important factor[,] … is plaintiffs' expected recovery balanced against the value of the settlement offer." *Eddings v. DS Services of Am., Inc*., 15-CV-02576-VC, 2016 WL 3390477, at *1 (N.D. Cal. May 20, 2016) (Chhabria J.) (internal quotations and citation omitted). Examination is "not a hollow exercise in which the Court blindly accepts the parties' unsupported assertions[;]" rather, "Plaintiffs seeking preliminary approval should show their work by explaining the relative value of their claims in significant detail." *Haralson,* 383 F. Supp. 3d at 970 (quoting *Eddings*, 2016 WL 3390477, at *1). Not only do settlors fail to do that, but on its face, the proposed relief is miniscule compared to expected recovery. In no way is it justified by purported risks identified.

### 1. The estimated damages figure is untested and unsupported.

Whatever national sales data Monsanto provided *Gilmore* counsel for settlement purposes is not disclosed and there is no description of their review. There is no indication of efforts to test or confirm its completeness. *Gilmore* counsel did not re-engage Dr. Sharp to provide a new damages report and neither *Tomlinson* plaintiffs nor this Court can assess what their own calculations determined.[41] Notably, while representing that Sharp's analysis in *Ezcurra* is sufficient for a price-premium calculation here (Mot. at 35 n.25), and despite prior briefing on the subject (Dkt. No. 41-1 at 45–46), *Gilmore* counsel have obtained no declaration from Sharp himself that 31% is appropriately applied to *all* products covered by this settlement agreement.

What settlors provide is a "total retail sales" figure from Monsanto—$2.66 billion (Rosenthal Decl. ¶12), on which estimated price premium recovery of $825 million is based. There is no indication that this total was tested either and effort to explain it is deficient. While representing that this figure is "well informed," Monsanto leaves many unanswered questions.[42] Settlors say class members may receive 20% of "average sales price." Mot. at 13, 14, 22, 39, 53. Monsanto does not make clear even how that average was derived. Rosenthal Decl. ¶ 12. In sum, settlors fail to "show their work" in any detail, let alone significant detail. *Haralson*, 383 F. Supp.

---

[41] In *In re Apple Inc. Device Perf. Litig*. (Mot. at 39), the Court had a "well-reasoned calculation of potential damages" from plaintiffs' expert whereas this Court does not. Case No. 5:18-md-02827-EJD, 2021 WL 1022867, at *14 (N.D. Cal. Mar. 17, 2021).

[42] For example, Monsanto disavows means of obtaining data "reporting all retail sales" (Rosenthal Decl. ¶ 12), not data for some, or even most, sales. *Tomlinson* plaintiffs took Monsanto to task in Missouri for objections relating to obtaining information from third parties. Garrison Decl. ¶¶ 14-16. Research into *Ezcurra* reveals that Monsanto *does* have access to data from retailers such as Home Depot. *Ezcurra* Dkt. No. 1-3, Guard Decl. ¶ 3. Left to speculation is how much retailer data (as opposed to, *e.g.*, estimates from shipping records) Monsanto investigated let alone included in its calculation. Nor does Monsanto explain how it accounted for varying state class periods.

3d at 970.   This is reason alone to reject preliminary approval.

### 2.    This settlement affords *de minimus* relief to class members.

Based even on what is provided, this settlement is clearly inadequate. Estimated "price premium" damages are $825 million. Mot. at 41.  Even $45 million represents only about 5.45% of what *Gilmore* counsel say Monsanto owes these class members. At the more likely gross floor ($23 million), Monsanto is proposing to pay 2.8% of price premium recovery, which net of reductions, comes in at $10.3 million or 1.2% of estimated damages. *Gilmore* counsel hope to lessen this jarring disparity by pointing to a 1.5% price premium estimate from Monsanto's expert, placing damages at $40 million. Mem. at 41. Assuming it is appropriate to use *a defendant's* estimate in considering damages had plaintiffs "fully prevailed" (Guideline No. 1(e)), the opinion is both untested and fatally flawed. It derives from a "choice-based conjoint analysis" the expert "*do[es] not opine* … is an appropriate method to evaluate damages on a class-wide basis." Rosenthal Decl. Ex. A ("Shampaier Decl.") ¶ 4 (emphasis added). *Gilmore* counsel should *never* have credited, let alone ask this Court to rely on, opinion based on methodology the expert refuses to endorse.  *Gilmore* counsel also say settlement here compares favorably to two other cases (Mot. at 50), but they involved meaningful differences. Among others, neither asserted omission (cancer risk) but narrow misrepresentations regarding number of gallons concentrates would make and that glyphosate targets an enzyme found only in plants. *Rawa v. Monsanto Co.*, 4:17CV01252 AGF, 2018 WL 2389040, at *1 (E.D. Mo. May 25, 2018); *Jones v. Monsanto Co.*, 19-0102-CV-W-BP, 2021 WL 2426126, at *1 (W.D. Mo. May 13, 2021).[43]

---

[43] Additionally, relief in both cases was 50% of purchase price and Monsanto agreed to correct its misstatements. *Rawa*, 2018 WL 2389040, at *2, *6; *Jones*, 2021 WL 2426126, at *2, *4. In *Rawa*, plaintiffs had survived motions to dismiss and prevailed on class certification in another (then consolidated) case, 2018 WL 2389040, at *6, whereas here, so-called related actions were consistently dismissed or abandoned. In *Jones*, discovery in a related case included third-party

The price premium theory itself is a steep discount off damages Gilmore and others previously asserted. *See Fraser v. Asus Computer Int'l*, C 12-00652 WHA, 2012 WL 6680142, at *5 (N.D. Cal. Dec. 21, 2012) (denying preliminary approval when "expert's report only analyzes [one measure of damages but] does not consider the [other measure], which also is in the complaint [and] [c]ounsel do address this disconnect."). Reliance on Sharp's *Ezcurra* analysis (Mot. at 15) is without indication that he was asked to, or did, analyze damages under models other than price premium available for even FDUTPA violations, let alone under other states' consumer acts (including the DCFA) or to do so on nationwide basis.[44] *Gilmore* counsel attempt to justify surrender of a full-refund theory by saying it is not the applicable measure of damages. Mot. at 35. First, however, they *did* assert full refund in prior actions presumably in good faith belief that it was supportable. Second, they confuse *measure* with *amount* of damages. *Gilmore* counsel concede that *amount* can equate with full refund "if the product was worthless." *Id*. at 36. They say "it would be "extraordinarily difficult" to establish that Roundup has no value, but the question is not whether Roundup performed its intended function. *Id*. at 36 n.26. As *Gilmore* counsel themselves have asserted, injury occurs "*at the point of purchase.*" Dkt. No. 70 at 14 (emphasis original).[45] A consumer faced with two bottles of Roundup—identical except that one discloses

---

subpoenas and depositions of damages experts. Case No. 4:19-cv-00102-BP (W.D. Mo.), Dkt. No. 65 at 9–10. In *Rawa*, Monsanto could oppose fees, 2018 WL 2389040, at *2, where here it agreed to fees, which is problematic for reasons addressed and indicative of collusion.

[44] Generally, the measure for a FDUTPA claim is difference in market value of the product in the condition delivered versus condition in which it should have been delivered unless the product was valueless in which case, "the purchase price is the appropriate measure of actual damages." *HRCC, Ltd. v. Hard Rock Cafe Int'l (USA), Inc*., 302 F. Supp. 3d 1319, 1323 (M.D. Fla. 2016). In Delaware, recovery is permitted under either benefit of the bargain ("difference between the actual and the represented values of the object of the transaction") or out-of-pocket rule ("difference between what he paid and the actual value of the item"). *Stephenson,* 462 A.2d at 1076.

[45] This is well established in Missouri. *Murphy v. Stonewall Kitchen, LLC*, 503 S.W.3d 308, 313 (Mo. App. E.D. 2016); *Schoenlein v. Routt Homes, Inc*., 260 S.W.3d 852, 854 (Mo. App. E.D.

cancer risk and the other does not—would not choose the former. *Gilmore* plaintiffs all attest that they *would not have purchased* Roundup had they known it can cause cancer.[46] A product that no reasonable person would purchase has no value. *See Weeks I* Dkt. No. 1 at ¶ 95 ("reasonable consumers would not pay money for a product that poses a cancer risk, absent adequate disclosures"). *Gilmore* counsels' reliance on *Jones* (Mot. at 36) is ill placed. Again, plaintiffs there were not alleging omission of cancer risk. The court expressed belief that "class members' recovery was never going to be 100% of the purchase price" but the objector (not claiming inadequacy of settlement) "provide[d] no compelling argument otherwise." 2021 WL 2426126 at *4, 6. Its view on post-purchase use is contrary to settlors' own assertion that injury occurs at purchase, with which other cases (not considered in *Jones*) agree.[47] *Gilmore* counsels' price premium theory also is not justified by Monsanto's citation to *Johnson* in a motion to dismiss they *did not oppose*. Mot. at 17; *see* Dkt. Nos. 11–14. Other decisions hold that *Johnson* does not foreclose allegations of a product worth less than what paid or a full refund theory. *Blue Cross*

---

2008); *Sunset Pools of St. Louis, Inc. v. Schaefer*, 869 S.W.2d 883, 886 (Mo. App. E.D. 1994). Hence, post-purchase use is not considered. *See Craft v. Philip Morris Companies, Inc.*, 190 S.W.3d 368, 382 (Mo. App. E.D. 2005) (injury is based on condition of product at time of purchase and "does not consider the consumer's manner of use of the product after purchase").

[46]  Gilmore Decl. ¶ 5; Ezcurra Decl. ¶ 5; Boyette Decl. ¶ 5; Jewell Decl. ¶ 5; Weeks Decl. ¶ 6; Williams Decl. ¶ 5; Taylor Decl. ¶ 5; Hanna Decl. ¶ 5.

[47] *See, e.g. Pulaski & Middleman, LLC v. Google, Inc*., 802 F.3d 979, 989 (9th Cir. 2015) (damages "need not account for benefits received after purchase because the focus is on the value of the [item] at the time of purchase"; noting that a "Full Refund" approach "may also be appropriate for calculating restitution"); *In re Morning Song Bird Food Litig*., 320 F.R.D. 540, 554, 555-56 (S.D. Cal. 2017) (certifying class alleging injury via purchase of bird food allegedly poisonous and worthless, entitling them to full refund); *Blue Cross Blue Shield Ass'n v. Glaxosmithkline LLC*, CV 13-4663, 2016 WL 6612804, at *5 (E.D. Pa. Nov. 9, 2016) ("[p]laintiffs' injury does not depend on the at-issue drugs' ineffectiveness, or factual speculation concerning future events"; rejecting argument that description of drugs as "worthless" was unfounded).

*Blue Shield Ass'n v. GlaxoSmithKline LLC*, 417 F. Supp. 3d 531, 553–54 (E.D. Pa. 2019).

As-is value of a product can indeed be zero, allowing recovery of full purchase price.  Using Missouri's proportion to total population (1.86%) (https://www.census.gov/library/stories/state-by-state/missouri-population-change-between census-decade.html) and Monsanto's national sales figure ($2.66 billion), *Tomlinson* L&G purchasers alone are looking at $49.5 million in damages. That is more than the hypothetical $45 ceiling proposed here for every purchaser in the country. Even accepting *Gilmore* counsel's price-premium theory, however, class relief is inadequate. While fractional relief may be warranted in some cases (Mot at 39-40),[48] this pitiful relief is not.

### D.   Purported Risks Do Not Justify this *De Minimus* Settlement.

If Monsanto is to receive a discount of the magnitude here, "there must be good reasons why.  And those reasons must be explained thoroughly at the preliminary approval stage."  *Hunt v. VEP Healthcare, Inc*., 16-CV-04790-VC, 2017 WL 3608297, at *1 (N.D. Cal. Aug. 22, 2017) (Chhabria J.) (denying preliminary approval of settlement affording 4.3% of possible exposure); *see also Haralson*, 383 F. Supp. 3d at 970 (plaintiff must go beyond abstractions and provide sufficient information to evaluate strengths and weaknesses of case).  It is insufficient to "list legal issues … and positions that the defendants might take"; rather, settlors should "*analyze* those issues or evaluate the strength or weakness of defendants' positions."  *Eddings* 2016 WL 3390477, at *1 (emphasis added).  They "should cite case law and apply it to explain why each claim or defense

_____

[48]  Most of settlors' cited cases involved percent-of-damages relief greater than likely here.  Mot. at 40 n.29. In *Uber* (Mot. at 42), settlement was dependent on pending appellate ruling regarding arbitration which, as of preliminary approval motion, excluded about 40% of class members. *In re Uber FCRA Litig*., 14-CV-05200-EMC, 2017 WL 2806698, at *1, 6 (N.D. Cal. June 29, 2017). Discovery had revealed that Uber actually complied with the Federal Credit Reporting Act, there was split of authority over whether it applied to independent contractors and plaintiffs conceded that "verdict value of actual damages" was zero.  *Id*. at*6–7.

in the case is more or less likely to prove meritorious.  *Id.*  Here risks identified are: (1) causation; (2) dismissals in retailer actions; (3) EPA label approval and preemption; (4) disagreement over damages; and (5) uncertainty on certification and litigation costs.  Mot. at 31–39.  Analysis is shallow at best[49] and none of these purported risks justify this painfully small settlement.

### 1.   Causation risk is in plaintiffs' favor.

As of settlement, three juries had found in favor of causation.  The two post-settlement Monsanto wins cited (Mot. at 32) do not alter the risk calculous.  Purchase-based injury does not require that Roundup caused a plaintiff's cancer.  Dkt. No. 70 at 14, 17.  The *Clark* verdict is distinguished on that basis.  In *Stephens,* the jury apparently was unconvinced that Monsanto knew or should have known that Roundup was dangerous.  But that case was plagued by Zoom presentation[50] and an outlier.[51]  *Gilmore* counsel also cite this Court's general causation ruling, which resulted in *admission* of scientific testimony and finding of sufficient evidence from which a jury "could conclude that glyphosate can cause NHL at human-relevant doses."  MDL Dkt. No. 1596 at 68.  The Court also denied summary judgment on evidence that cancer risk was known or

---

[49]   Settlors understand this Court's standards. Mot. at 42.  Here and elsewhere, they could and should have abided by them but did not.  Out of caution, *Tomlinson* plaintiffs provide more detail but settlors should not be permitted to supply additional analysis in a reply. *Stewart v. Wachowski*, 2004 WL 2980783, at *11 (C.D. Cal. Sept. 28, 2004).

[50]   *See* Carey Gillam, *Stephens trial drags on, toxicologist testifies about studies of herbicide and cancer risk* (Oct. 2021), (https://usrtk.org/monsanto-roundup-trial-tracker/stephens-trial-drags-on-toxicologist-testifies-about-studies-of-herbicide-and-cancer-risk/)  ("multiple technical problems … hindered the delivery of testimony and sharing of evidence with jury members").

[51]   MDL Dkt. No. 4565 at 3 n. 1; *Pilliod v. Monsanto Co*., Case No. RG17862702 (Cal. Super. Ct., Alameda Cnty.) Verdict No. 3 (https://www.baumhedlundlaw.com/documents/pdf/monsanto-documents/pilliod/Verdict-Form-Alva-Pilliod-Redacted.pdf); *Pilliod v. Monsanto Co*., 67 Cal. App. 5th 591, 623, 282 Cal. Rptr. 3d 679, 706 (2021) (jury could find "the potential cancer risk … was known or knowable"); *Johnson v. Monsanto Co*., No.CGC-16-550128 (Cal. Super. Ct., Los Angeles Cnty.) Verdict No. 4 (https://www.baumhedlundlaw.com/documents/pdf/monsanto-documents/johnsontrial/Johnson-vs-Monsanto-Verdict-Form.pdf).

knowable "had [Monsanto] investigated the issue responsibly and objectively."  MDL Dkt. No. 2937 at 5–6.  Moreover, *Gilmore* counsel say it is sufficient that Monsanto failed to disclose "the ongoing dispute" regarding cancer risk. Mot. at 14.  Unquestionably, Monsanto knew that.

Reliance on *Nat'l Ass'n of Wheat Growers v. Becerra* (Mot. at 32) fairs no better. There, the court enjoined a California Proposition 65 warning based largely on the view that it would be misleading "based on the finding of one organization," *i.e.*, the IARC.  468 F. Supp. 3d 1247, 1252-53 (E.D. Cal. 2020).  It expressly disclaimed comment on "whether the IARC's determination is persuasive" and distinguished its task from that of juries.  *Id.* at 1260, 1261. The decision does not bear on jury findings on causation. The odds to date are in plaintiffs' favor.[52]

### 2.    Settlors fail to show applicable risk presented by prior dismissals.

*Gilmore* counsel point to defenses successful in prior actions, which they say Monsanto could raise again.  Mot. at 32–34.  While losses in those cases vividly demonstrate weakness on the Gilmore side of negotiation, they do not inform on risk either to the claim asserted *in this* case or that might have been asserted but were not.  As to dismissals based on insufficient allegations that the retailer participated in wrongful conduct, that is not a defense available to Monsanto here or anywhere else.  California dismissals also do not justify this settlement.  Proposition 65 "is unique to California."  Cal. Bus. Law Deskbook § 47:12. *Gilmore* counsel highlight *Weeks II* as "illustrative of the challenges presented in continued litigation." Mot. at 33.  But that decision also revolved around Proposition 65, "attempts to plead around [it]," and unfair practice under the UCL.

---

[52] Representation that *Wheat Growers* would prevent *Gilmore* plaintiffs from "successfully replead[ing] their California claims" (Mot. at 34) neglects the *Weeks II* holding to the contrary. *See Weeks II* Dkt. No. 77 at 6 n.25 (as Home Depot was not an enjoined party in *Wheat Growers*, Weeks "could bring a Proposition 65 case against [it]").

*Weeks II* Dkt. No. 77 at 5, 6-8.[53]  Other states do not have a Proposition 65.  No analysis is given

to any other state law on unfair practice.  Proposition 65 has no bearing on litigation risk here

Dismissal in *Ezcurra* was based on Florida's safe harbor for acts "required or specifically

permitted by federal or state law" and that court's analysis on label approval. Fla. Stat. §

501.212(1); *Ezcu*rra Dkt. No. 63 at 6–9.  This action does not assert a FDUTPA claim and the

DCFA does not contain the same safe harbor.[54]  As to claims that might have been raised, bare

assertion that Monsanto might rely on other safe harbor provisions (Mot. at 33) is insufficient.

*Eddings*, 2016 WL 3390477, at *1.  *Gilmore* counsel neither cite nor analyze how courts interpret

other safe harbor provisions.  Mot. at 33.[55]  They come nowhere close to demonstrating that safe

harbor provisions present weighty risk justifying this miniscule settlement.   It is no risk at all in

Missouri.  *Supra*, note 14.

---

[53]  When the court said that failure to warn on carcinogenicity lacked "scientific support" (Mot. at 33), it was referring to Weeks' "two studies" that POEA enhances toxicity. *Weeks* Dkt. No. 77 at 6–7. When it said Weeks was "stretch[ing] the limit of what constitutes unfair business dealings," it was addressing California law and unethical conduct and again POEA studies.  *Id*. at 7–8.

[54]  *See* Del. Code Ann. tit. 6, § 2513(b)(1)–(3) (safe harbor for: owners/operators of publications, radio or television stations; advertisement or practice "subject to and [that] complies with" regulations and statutes administered by the Federal Trade Commission; and matters regulated by Public Service Commission or Insurance Commissioner). *Gilmore* counsel do not say that Monsanto's Roundup advertisements are subject to or compliant with FTC statutes.

[55]  The cited article is by no means thorough or addressed to activity "permitted" by FIFRA.  Mot. at 33 (citing Dee Pridgen et al., Consumer Protection and the Law § 4:32). Among other things, it cites dated cases and omits others rejecting safe harbor where the activity at issue is not itself expressly permitted.  *E.g.*, *Jamison v. Summer Infant (USA), Inc*., 778 F. Supp. 2d 900, 909 (N.D. Ill. 2011); *Aspinall v. Philip Morris, Inc*., 902 N.E.2d 421, 424 (Mass.2009); *State ex rel. Wilson v. Ortho-McNeil-Janssen Pharms., Inc*., 777 S.E.2d 176, 197 (S.C. 2015); *In re Nat'l Prescription Opiate Litig*., 452 F. Supp. 3d 745, 778–79 (N.D. Ohio 2020); *Whitley v. Baptist Health*, 2020 WL 4575991, at *1 (E.D. Ark. Aug. 7, 2020); *see also Carias v. Monsanto Co*., 2016 WL 6803780, at *8 (E.D.N.Y. Sept. 30, 2016) (rejecting Monsanto's bid for safe harbor).

3.     **Monsanto has routinely lost EPA approval and preemption arguments.**

Argument that the EPA would not approve labels containing cancer warning relies on its letter regarding Proposition 65.  Mot. at 33 & n.24.  First, however, there is no issue regarding value of injunctive relief.  Second, it is "misleading … to invoke Proposition 65 to assert that Monsanto could never get a meaningful label approved by the EPA."  MDL Dkt. No. 13115 at 3 n.2.  As to preemption, Monsanto "has lost that issue several times."  Mot. at 34.  Indeed, district courts "have reached a consensus …that FIFRA does not preempt claims for damages under state law." *Beyond Pesticides v. Monsanto Co*., 311 F. Supp. 3d 82, 92 (D.D.C. 2018) (quoting *Blitz v. Monsanto Co*., 317 F. Supp. 3d 1042, 1050 (W.D. Wis. 2018) (collecting cases)).  Monsanto has lost on preemption before this Court, the Ninth Circuit, and in many other cases, including one of *Gilmore* counsels' own.  *Weeks II* Dkt No. 65 at 4–12.[56] *Carson v. Monsanto* Co., 508 F. Supp. 3d 1369 (S.D. Ga. 2020) (cited Mot. at 34) did not even discuss, much less distinguish, the wealth of contrary decisions.  *Mirzaie v. Monsanto Co*., CV 15-04361 DDP, 2016 WL 146421 (C.D. Cal. Jan. 12, 2016) dealt with injunctive not monetary relief.  *Hardeman v. Monsanto Co*., 216 F. Supp. 3d 1037, 1039 (N.D. Cal. 2016).  Settlors point to the Supreme Court's recent request for views of the Solicitor General on whether to take up the Ninth Circuit's decision in *Hardeman*.  Mot. at 34.

---

[56] MDL Dkt. No. 2937 at 1-5; *Hardeman v. Monsanto Co*., 997 F.3d 941, 954 (9th Cir. 2021); *Johnson v. Monsanto Co.*, 52 Cal. App. 5th 434, 462, 266 Cal. Rptr. 3d 111, 114 at note * (2020), *as modified on denial of reh'g* (Aug. 18, 2020), *review denied* (Oct. 21, 2020); *Carias,* 2016 WL 6803780, at *3; *Blitz v. Monsanto Co*., 317 F. Supp. 3d 1042, 1050 (W.D. Wis. 2018); *Martin v. Monsanto Co.*, EDCV162168JFWSPX, 2017 WL 659014, at *4 (C.D. Cal. Feb. 16, 2017); *Sheppard v. Monsanto Co.*, 16-00043 JMS-RLP, 2016 WL 3629074, at *7–9 (D. Haw. June 29, 2016); *Beyond Pesticides,* 311 F. Supp. 3d at 91–92; *Hernandez v. Monsanto Co*., CV 16-1988-DMG (EX), 2016 WL 6822311, at *6–8 (C.D. Cal. July 12, 2016); *Mendoza v. Monsanto Co*., 116CV00406DADSMS, 2016 WL 3648966, at *2–4 (E.D. Cal. July 8, 2016); *Johnson v. Monsanto Co.*, CGC-16- 550128, 2018 WL 2324413, at *23 (Cal. Super. May 17, 2018); *Pilliod v. Monsanto Co.*, RG-17-862702, 2019 WL 3540107, at *2 (Cal. Super. July 26, 2019).

But this could equally signal inclination *not to* grant review, which the Supreme Court already could have done.  There also is the very real fact that it accepts a tiny fraction of cases (*see*: https://www.supremecourt.gov/ about/ faq_general.aspx), and would have to overrule *Bates* to help Monsanto.  Commentators call this a "longshot."[57]  *Gilmore* counsel cite two cases addressing different statutes.  Mot. at 34 (citing *Akaosugi v. Benihana Nat. Corp.*, C 11-01272 WHA, 2013 WL 269083, at *3 (N.D. Cal. Jan. 24, 2013); *Moreno v. Capital Bldg. Maint. & Cleaning Servs., Inc.*, 19-CV-07087-DMR, 2021 WL 1788447, at *6 (N.D. Cal. May 5, 2021)).  But there is near unanimous agreement that FIFRA *is not* preemptive and risk that the Supreme Court will review and/or overrule *Hardeman* is small.

### 4.    Purported "disagreement" over damages further condemns settlement.

Supposed "dispute" over amount and measure of damages (Mot. at 35–37) has been largely addressed. Three points bear repeating: (1) *Gilmore* counsel did not dispute but embraced a price premium theory despite recovery previously sought; (2) there is no report from Dr. Sharp on damages for a nationwide class and Monsanto's expert relied on methodology even she rejects; and (3) there was no disagreement on punitive damages as *Gilmore* counsel failed even to seek them, greatly diminishing settlement value.  MDL Dkt. No. 13115 at 4.

### 5.    Litigation risks are of *Gilmore* counsels' own making and cries of further time and expense largely illusory.

*Gilmore* counsel should not be permitted to rely on their own inadequate pleadings and theories, when better exist, to justify incredibly discounted settlement.  Choosing to assert a DCFA claim for a plaintiff who *himself* is not a Delaware purchaser, and on nationwide basis, was just

---

[57] T. Loh and J. Feeley, *Bayer's Roundup Costs Could Top $16 Billion as Provisions Mount* (July 29, 2021) (quoting Georgia University law professor) (https://www.bloomberg.com/news/articles /2021-07-29/bayer-to-set-aside-4-5-billion-for potential-roundup-claims).

that—a choice. Filing in Delaware for jurisdictional purposes does not explain forgoing valuable claims under other state consumer acts for a patently weak one. And the choice-of-law issue is nothing new. *Gilmore* counsel are well aware of state-law impact on certification.[58] They chose to assert the claim they did rather than claims without choice-of-law risk. Indeed, any such risk disproportionately impacts the *already*-certified *Tomlinson* class. Whether it is "conditional" (Mot. at 38 n.28) matters not. *Gilmore* counsel urge that asserting claims under the "laws of each state (or sub-classes for each state)" also would defeat certification. Mot. at 38. They do not, however, deny that subclassing for *groups* of states is possible. *See In re Gen. Motors Corp. Pick-Up Truck Fuel Tank Prods. Liab. Litig.*, 55 F.3d 768, 817-18 (3d Cir. 1995) (finding inadequate consideration of state-claim groupings and "other ways to aggregate the litigation"). Furthermore, "if the class members' claims differed so much as to preclude certification even of geographic sub-classes, a settlement that treats all class members alike cannot be adequate and fair to all of them." *Id.* at 818. *Gilmore* counsel also raise, but do not analyze, issues of reliance and causation. Mot. at 38. Citation to *Stearns v. Ticketmaster Corp.* does not help them. The court there held that under California's Consumer Legal Remedies Act, causation may be established by materiality on a classwide basis, citing cases presuming reliance where omission would be material to a reasonable person. 655 F.3d 1013, 1022 (9th Cir. 2011). *Gilmore* counsel address no other consumer statute, or whether materiality is assessed by subjective or objective standard.[59]

Finally, *Gilmore* counsel say continued litigation would be time-consuming and expensive.

---

[58] In a case Ms. Wade highlights in her resume (Wade Decl. ¶ 26) she pled another nationwide class to avoid "variations in the laws" via "statewide class[s that are] governed by one state's law or set of laws." *In re Dollar Gen. Corp. Motor Oil Mktg. & Sales Pracs. Litig.*, No. 16-02709-MD-W-GAF, 2019 WL 1418292, at *25 (W.D. Mo. Mar. 21, 2019).

[59] The MMPA requires neither reliance nor transaction causation. *Plubell,* 289 S.W.3d at 714. Materiality is judged by objective "reasonable consumer" standard. 15 C.S.R. § 60-9.010 (1)(C).

Mot. at 38–39.  They ignore the pending dismissal motion.  Were this case to go forward, it might involve additional effort but there is strong indication that litigating was never the intent.  Vigorous prosecution in other cases has produced ample reward.  There has been none in this one.

### E.   Class Members Are Not Treated Equitably in Relation to Each Other.

The settlement also does not "treat[] class members equitably relative to each other."  Fed. R. Civ. P. 23(e)(2)(D).  *Gilmore* plaintiffs obtained agreement to incentive awards and receive more than other proposed class members even though there is little to no indication that, other than reading a settlement agreement, the provided services *in this case* and prior failed cases can hardly be characterized as a value to this proposed class.[60]  There also is no indication that *Gilmore* counsel even considered valuable claims that could have been asserted but were not.  This settlement most certainly does not treat Missouri purchasers equitably, given that they do not face the same defenses, already have surmounted class certification, obtained discovery, and (until stayed) had a trial date.  This settlement treats viable Missouri claims equally with the weak DCFA claim asserted.  *See, e.g., Soto v. O.C. Communications, Inc*., 2019 WL 1434668 (N.D. Cal Apr. 1, 2019) ("Without a clear explanation and careful analysis of the differences in potential recovery between the California and Washington workers, the Court cannot approve this aspect of the allocation.") (Chhabria, J.).  Trials against Monsanto have gone exceedingly well for plaintiffs.  And *Tomlinson* class members will seek damages far in excess of the "price premium" theory here advanced.

### F.   The Release Is Not Confined to Identical Factual Predicate.

Alarmingly broad releases are par for the course for Monsanto.  *See City of Long Beach v. Monsanto Company*, 2020 WL 7060140, at *3–4 (C.D. Cal. Nov. 25, 2020) (denying preliminary

---

[60] Even if Gilmore, for example, made a claim for the most expensive product a year for all four years his recovery under the settlement would be $133 ($33 per unit, Am. Agrmt. at 16), making his incentive award *over 37 times* greater than a similarly situated class member.

approval due to, among other things, overly broad release).  The release is not confined to claims "arising from the same factual predicate" as pled in the complaint.  Mot. at 51.   It now includes those words (added after transfer, *see* Agrmt. § L.1), but the release is still overbroad.  Class members release all claims of all kinds other than personal injury that they now "or may in the future have against any Released Party arising out of *or related in any way* to the same factual predicates as the Action" including, among other things:

> a. any allegedly false, misleading, incomplete, or inaccurate statement, or any alleged omission, regarding the alleged carcinogenicity, toxicity, genotoxicity, endocrine disruptive effects, *or any other alleged health effects* of the Products *or any ingredient or component thereof*, including, but not limited to, glyphosate (*whether or not such statement or alleged omission regarding an ingredient or component* thereof is made specifically with regard to the Products, with regard to the ingredient or component thereof separately, or with regard to *other products*), or any scientific claims or debate regarding the same[.]

Am. Agrmt § L.1(c) (emphasis added).  First, the phrase "related in any way" is itself over broad.  *Hadley v. Kellogg Sales Co*., 2020 WL 836673, at *2 (N.D. Cal. Feb. 20, 2020).  Second, the release encompasses health effects *of any kind* whatsoever. Third, it appears to include claims regarding not only "Products" now existing but as reformulated in the future, for example, to eliminate glyphosate and keep some ingredients and/or add others.  Class members give up claims based on misrepresentations and omissions whether made with regard to the "Products," any ingredient or component thereof, or "to other [undefined] products." Am. Agrmt. § L.1(a).

## II.      CERTIFICATION OF THIS SETTLEMENT CLASS IS IMPROPER.

While "management problems" need not be considered for a settlement class, other components of Rule 23 continue to "demand undiluted, even heightened, attention in the settlement context."  *Amchem Products, Inc. v. Windsor*, 521 U.S. 591, 620 (1997). Among other things, certification requires "representative parties [who] will fairly and adequately protect the interests of the class." Fed. R. Civ. P. 23(a)(4).  This is of constitutional significance.  *Hesse v. Sprint Corp*.,

598 F.3d 581, 588 (9th Cir. 2010); *accord Hanlon v. Chrysler Corp*., 150 F.3d 1011, 1020 (9th Cir.1998), *overruled on other grounds* by *Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338 (2011). Adequacy looks among other things to "the vigor [or lack thereof] with which the named representatives and their counsel [have pursued] the common claims."  *Hanlon* 150 F.3d at 1020. Also, inadequate representation, including for claims different than those held and asserted by individual named plaintiffs, violates Rule 23 and the due process rights of absent class members. *Hesse,* 598 F.3d at 588.  *Gilmore* plaintiffs and counsel fail adequacy on multiple levels.

*First*, neither Gilmore nor any plaintiff lives or purchased Roundup in Delaware.  Their claims are foreclosed by the DCFA's built-in territorial scope limitation. As they lack such a claim, they "cannot represent others who may have such a claim."  *Lierboe v. State Farm Mut. Auto. Ins. Co*., 350 F.3d 1018, 1022 (9th Cir. 2003); *see also e.g., In re Countrywide Fin. Corp. Mortg.-Backed Sec. Litig*., 860 F. Supp. 2d 1062, 1068–69 (C.D. Cal. 2012) ("a class may only be represented by a named plaintiff with standing").  They do not purport to be representing class members on *other* claims asserted under other state consumer protection acts. And a class representative without a claim, who stands to gain $5,000 by way of incentive award, cannot adequately advocate for Delaware purchasers who *do* have a claim.

*Second*, *Gilmore* plaintiffs and counsel did not vigorously represent putative class members. Just the reverse.  Settlement was quick, without discovery, and by all indication, without intent to ever actually litigate. The Ninth Circuit has highlighted the problem of counsel "not prepared to try a case," who are, "almost by definition, inadequate" and "confined to settlement negotiations" without "threat of litigation to press for a better offer."  *Hanlon*, 150 F,3d at 1021 (quoting *Amchem*, 521 U.S. at 621).  Such concerns "warrant special attention when the record suggests that settlement is driven by fees[.]" *Id*.; *Briseno v. ConAgra Foods, Inc*., 844 F.3d 1121,

1022 (9th Cir. 2017) (same).  All such concerns are present here.  It is all but poetic that *Gilmore* counsel present failed retailer cases as strategic "pressure" toward Monsanto, harkening to *Hanlon*'s use of those very words to describe prosecution in several state class actions prior to a federal consolidated action.  *Id.*  There, however, counsel in prior actions "met with engineering experts, conducted and defended depositions, … were proceeding through the normal course of document-intensive discovery" and in two cases had moved for class certification.  *Id* at 1018. Nothing like that happened here except in Missouri.

**Third**, there was no attempt at subclassing, or representation, for persons with claims more valuable than the one asserted, which certainly includes *Tomlinson* class members.  *See Ortiz v. Fibreboard Corp.*, 527 U.S. 815, 856-57 (1999) (rejecting proposed settlement divided along two fault lines: "holders of present and future claims" and holders of "more valuable" and less valuable claims). Gilmore and counsel eschewed home-state claims in favor of single weak DCFA claim. They are inadequate as to purchasers with claims having "different strength" and "command[ing] a different settlement value," and without incentive to maximize recovery for others.  *In re Literary Works in Elec. Databases Copyright Litig.*, 654 F.3d 242, 254–55 (2d Cir. 2011); *see also Kim*, 8 F.4th at 1174-76, 1179 (faulting district court for not considering claims of class members in another action unfettered by precarious position of settling plaintiff). "[I]t is questionable whether [*Gilmore* counsel] could have negotiated in [class members'] best interests" without "adequate exploration" of potential claims.  *In re Cmty. Bank of N. Virginia*, 418 F.3d 277, 307–08 (3d Cir. 2005); *see also In re Stec Inc. Sec. Litig.*, CV 09-8536-JVS MLGX, 2012 WL 6965372, at *6 (C.D. Cal. Mar. 7, 2012) (proposed representatives had conflict of interest with putative class members "if they … refuse to assert certain claims that may be available and advantageous" to those members).

*Gilmore* plaintiffs and counsel also had interests diverging from class members in the form of incentive awards and sunk work in failed retailer cases. Courts appoint counsel "best able to represent the interests of the class." Fed. R. Civ. P. 23(g)(2). *Tomlinson* plaintiffs and class members are already represented by capable counsel with great familiarity with law applicable to Missouri purchasers, who already have obtained certification and pursued more discovery than *Gilmore* counsel ever did. Fed. R. Civ. P. 23(g)(1)(A).

**Fourth**, the settlement covers, and extracts releases from, persons who have not yet purchased Roundup products—and apparently, even those who in the future purchase some other variant of "products" (even if reformulated to eliminate glyphosate) without named plaintiff in such position to represent them. *See Ortiz*, 527 U.S. at 856 ("it is obvious after *Amchem* that a class divided between holders of present and future claims … requires division into homogeneous subclasses … with separate representation").[61]

## CONCLUSION

It is more than apparent that Monsanto is attempting a bargain deal with named plaintiffs and counsel with every incentive to accept it at the expense of other putative class members, especially those in Missouri. For all reasons set out herein, preliminary approval should be denied.

Dated: March 3, 2022                                  Respectfully submitted,

                                                      **STUEVE SIEGEL HANSON LLP**

                                                      /s/ *Patrick J. Stueve*
                                                      Patrick J. Stueve, Mo. Bar #37682
                                                      Todd E. Hilton, Mo. Bar #51388
                                                      460 Nichols Road, Suite 200

---

[61] The short form notice plan only says that it "releases Monsanto and others from liability for related claims." Dkt No. 94-4 at 39. Thus any other notice should at minimum convey more information about who and what the release covers. Should this settlement survive preliminary approval, *Tomlinson* plaintiffs reserve further assessment of notice at final approval.

Kansas City, Missouri 64112
Telephone: (816) 714-7100
stueve@stuevesiegel.com
hilton@stuevesiegel.com

**GRAY, RITTER & GRAHAM, P.C.**

Don M. Downing, #30405 MO
Gretchen Garrison, #33963 MO
Cort A. VanOstran, #67276 MO
701 Market Street, Suite 800
St. Louis, Missouri 63101
Telephone: (314) 241-5620
Facsimile: (314) 241-4140
ddowning@grgpc.com
ggarrison@grgpc.com
cvanostran@grgpc.com

*Attorneys for*
*Ryan Tomlinson and Carol Richardson*

51

*Appendix A – Related Actions*

*Named Retailer Plaintiffs:*

| Case | State | Dismissed Based on California-only Proposition 65 | Dismissed Based on Retailer-Specific Pleading Deficiencies | Voluntarily Dismissed |
|---|---|---|---|---|
| Weeks I | California | | | ■ |
| Weeks II | California | ■ | ■ | |
| Hannah I | California | ■ | ■ | ■ |
| Taylor | California | | ■ | ■ |
| Williams | California | | | ■ |
| Jewell | Arkansas | | | ■ |
| Boyette | Arkansas | | | ■ |

*Other Plaintiffs in Retailer Cases:*

| Case | State | Class Action or Individual Suit | Voluntarily Dismissed After Federal Removal | Dismissed Based on Retailer-Specific Pleading Deficiencies | Voluntarily Dismissed |
|---|---|---|---|---|---|
| Waters | Florida | Individual | ■ | | ■ |
| Gregorio | Florida | Class (purchasers at Home Depot) | ■ | | |
| Fagundes | Florida | Individual | ■ | | ■ |
| Lamerson | Florida | Individual | Dismissed for lack of activity | | |
| Morley | Florida | Individual | No activity after removal | | |
| Shelly | Florida | Individual | No activity after removal | | |
| Biddle | Florida | Individual | No activity after removal | | |